**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., et al., | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | SIPA |

## STIPULATION REGARDING DEPOSITION DESIGNATIONS

Lehman Brothers Holdings Inc.; James W. Giddens, as Trustee for the SIPA liquidation of Lehman Brothers Inc.; the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (collectively, "Movants"); and Barclays Capital Inc. ("Barclays"), hereby stipulate to the following:

1.      As part of their case in chief, the Movants designated selected deposition testimony from 18 witnesses:  Paolo Tonucci, Alex Kirk, Michael Klein, Victor Lewkow, Edward Rosen, Michael Keegan, Stephen King, Gary Romain, David Petrie, Marty Malloy, Paul Exall, Alvin Brown, Robert Messineo, Alastair Blackwell, James Hraska, Nancy Denig, Anson Frelinghuysen, and Christopher Kiplok.  Barclays counter-designated selected deposition testimony from those same 18 witnesses.

2.      On June 14, 2010, the parties submitted to the Court full and accurate copies of the designated and counter-designated testimony from the witnesses (the "Designated Testimony"), as well as a chart cross-referencing the deposition exhibit numbers referenced in the Designated Testimony to Movants' and Barclays' trial exhibit numbers (the "Exhibit Chart").

The Designated Testimony and a revised version of the Exhibit Chart are attached hereto as

Movants' Exhibit 719.  The parties expressly reserve any and all pending objections to any such

exhibits that have not yet been admitted into evidence.

3.      The parties will meet and confer to establish an efficient procedure to determine

any objections to the Designated Testimony.  Any objections that cannot be resolved between the

parties will be brought before the Court for resolution, at the Court's convenience.  Subject to

any objections that are upheld by the Court, the Designated Testimony will be entered into

evidence.


JONES DAY                                          HUGHES HUBBARD & REED LLP


By:_____/s/ Robert W. Gaffey_____               By: _____/s/ William R. Maguire_____
       Robert W. Gaffey                                    William R. Maguire
       Jayant W. Tambe                                     Seth D. Rothman
       William J. Hine                                     Neil J. Oxford

222 East 41st Street                               One Battery Park Plaza
New York, NY 10017                                 New York, NY 10004
Telephone:  (212) 326-3939                         Telephone:  (212) 837-6000
Facsimile:  (212) 755-7306                         Facsimile:  (212) 422-4726

*Attorneys for Debtors and*                        *Attorneys for James W. Giddens, as Trustee*
*Debtors in Possession*                            *for the SIPA Liquidation of Lehman*
                                                   *Brothers Inc.*



QUINN EMANUEL URQUHART &                            BOIES, SCHILLER & FLEXNER LLP
SULLIVAN LLP


By: _____/s/ James C. Tecce_____              By: _____/s/ Jonathan D. Schiller_____
       James C. Tecce                                      Jonathan D. Schiller
       Erica Taggart                                       Hamish P.M. Hume
       Eric Kay                                            Jack G. Stern

55 Madison Avenue
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

*Attorneys for Official Committee of
Unsecured Creditors*

575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

*Attorneys for Barclays Capital Inc.*

**SO ORDERED:**

Dated: New York, New York
        June 23, 2010

_____*s/ James M. Peck*_____
Honorable James M. Peck
United States Bankruptcy Judge

*In re Lehman Brothers Holdings Inc. No. 08-13555(JMP)*
DEPOSITION DESIGNATIONS AND COUNTER-DESIGNATIONS

Yellow Highlighting = Testimony Designated by Movants
Blue Highlighting = Testimony Counter-Designated by Barclays

**Witness**

Paolo Tonucci, 8/14/2009

Alex Kirk, 8/31/2009

Michael Klein, 9/12/2009

Victor Lewkow, 2/10/2010

Edward Rosen, 2/19/2010

Michael Keegan, 8/28/2009

Stephen King, 9/10/2009

Gary Romain, 9/10/2009

David Petrie, 8/26/2009

Marty Malloy, 3/1/2010

Paul Exall, 8/27/2009

Alvin Brown, 1/8/2010

Robert Messineo, 4/1/2010

Alastair Blackwell, 8/7/2009

James Hraska, 8/14/2009

James Hraska, 1/15/2010

Nancy Denig, 8/21/2009

Anson Frelinghuysen, 3/4/2010

Christopher Kiplok, 3/4/2010

MOVANTS' TRIAL
EXHIBIT

719

```
 1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    1

 2               UNITED STATES BANKRUPTCY COURT

 3               SOUTHERN DISTRICT OF NEW YORK

 4     - - - - - - - - - - - - - - - - - - - - - -

 5     In Re:

                         Chapter 11

 6

 7     LEHMAN BROTHERS   Case No. 08-13555(JMP)

       HOLDINGS, INC. et al., (Jointly Administered)

 8

 9                         Debtors.

10     - - - - - - - - - - - - - - - - - - - - - -

11                   HIGHLY CONFIDENTIAL

12              DEPOSITION OF PAOLO TONUCCI

13                 Friday 14 August 2009

14                    At:  7:00 am

15                    Taken at:

16                    Jones Day

                   21 Tudor Street

17                      London

                   United Kingdom

18

19     Reported by: AILSA WILLIAMS

       Certified LiveNote Reporter

20

21

22

23

24

25
```

Page 6

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                6
2  Schiller & Flexner representing Barclays.
3      MR. TAMBE:  Erica, can you hear us?
4      MS TAGGART:  Yes, thank you.
5      MR. TAMBE:  Morning, Mr. Tonucci.  By
6  whom are you currently employed?
7      A.  Barclays.
8      Q.  In what capacity?
9      A.  I work in the treasury area.
10     Q.  What is your position?
11     A.  Head of group balance sheet.
12     Q.  And is that head of group balance sheet
13  for global operations?
14     A.  That is right, for global operations.
15     Q.  How long have you held that position?
16     A.  Since February of this year.
17     Q.  How long have you been employed by
18  Barclays?
19     A.  Since September, 26 September 2008.
20     Q.  What was your position at Barclays when
21  you first joined Barclays in September 2008?
22     A.  US treasurer for Barclays Capital.
23     Q.  If you could describe for us briefly
24  what your duties have been since you joined
25  Barclays, both as US treasurer and now as global

Page 7

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                7
2  treasurer?
3      A.  I am not the global treasurer.
4      Q.  Okay.
5      A.  Head of global balance sheet.  The US
6  treasurer was focused on liquidity and
7  capital management for the US Barclays Capital
8  operations and the role with group treasury, the
9  global balance sheet role is responsible for
10  funding and hedging for the group's balance sheet
11  globally.
12     Q.  Before joining Barclays
13  in September 2008 you were employed by Lehman
14  Brothers, correct?
15     A.  That is correct.
16     Q.  And what Lehman Brothers entities were
17  you employed by?
18     A.  LBHI and LBI.
19     Q.  Collectively for the Lehman entities
20  when did you first begin working for the Lehman
21  entities?
22     A.  December 1996.
23     Q.  If you can give us a brief overview of
24  your career at Lehman, the positions you held, the
25  time periods that you held them for?

Page 8

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                8
2      A.  Yes.  I joined Lehman as head of or
3  manager for the fixed income derivatives product
4  control team from 96 to 98.
5          From 98 to 2000 I was manager of fixed income
6  liquid markets product control.
7          From 2000 to 2002 I was head of asset and
8  liability management for Europe within the treasury area.
9          From 2002 until 2005 I was head of assets and
10  liability management for the group globally in New York.
11  From 2005, or in 2005 I was international treasurer and then
12  also through 2005 to 2000 onwards I was global treasurer.
13     Q.  And in your capacity as global treasurer
14  for the Lehman entities, can you briefly
15  describe what your duties were?
16     A.  Responsible for funding liquidity and
17  capital management for the group.
18     Q.  And to whom did you directly report in
19  that capacity?
20     A.  To the CFO.
21     Q.  In the time period, say, in 2008, who
22  were your direct reports at Lehman?
23     A.  Most recently in 2008, Robert Azerad,
24  Dan Fleming, Janet Birney.
25     Q.  The last name?

Page 9

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                9
2      A.  B-I-R-N-E-Y.  Julie Boyle, B-O-Y-L-E.
3  Jackie F-R-O-M-M-E-R and Kevin Thatcher.
4      Q.  Mr. Azerad, what was his position and
5  role at Lehman?
6      A.  He was responsible for liquidity
7  management.
8      Q.  And Mr. Fleming?
9      A.  For cash management.
10     Q.  And when you use the phrase "liquidity
11  management", what do you mean by that?
12     A.  I mean for the tracking, reporting, and
13  execution of liquidity oversight.
14     Q.  Does liquidity management include
15  arranging for repurchase agreements and other
16  forms of financing for the Lehman entities?
17     A.  Generally not.
18     Q.  Who within Lehman would have been
19  responsible for repurchase agreements and
20  liquidity, financing of that nature?
21     A.  Secured financing was managed within the
22  prime brokerage team and overseen by John Coghlan.
23     Q.  And John was not one of your direct
24  reports, is that correct?
25     A.  He was not, no.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    14

1
2    repos was greater than would typically have been
3    the case for a much larger set of repos.
4        Q.  And your personal involvement in those
5    particular repos was much greater than your
6    involvement had been on prior repos.  Is that
7    correct?
8        MR. HUME:  Object to the form of the
9    question and to the lack of foundation.  I think
10    if you have e-mails you should show him to
11    characterize what you are asking.
12        MR. TAMBE:  Do you have my question in
13    mind?
14        A.  I am not sure, this point about much
15    more involved, it is difficult for me to respond
16    to.  I would say that there was slightly more
17    involvement than there would have been in a normal
18    day's repo activity but I would not say that I was
19    much more involved, no.
20        Q.  Let's see what you were involved in
21    during that week broadly.  I am going to start in
22    this period beginning September 12, Friday
23    through September 22, the Monday.  Start at the
24    beginning, September 12, and just generally tell
25    me what your involvement was in the events of that

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    15

1
2    weekend, in terms of possibly doing transactions
3    with buyers, the filing of the bankruptcy, your
4    role in the sale of assets to Barclays and finally
5    the closing of the transaction on September 22,
6    and we will take it in pieces but I want to get an
7    overview of your recollection of your involvement
8    during that ten day period.  Okay?
9        A.  Okay.
10        Q.  Let's start with the weekend before the
11    filing of the bankruptcy.  What were you involved
12    in starting on Friday, September 12?
13        A.  Friday was a trading day and so the
14    range of activity included overseeing our
15    financing position that day and our financing --
16    our liquidity forecasting, which I would
17    characterize as regular daily activity, regular
18    daily oversight.
19        There was due diligence, specifically
20    with Bank of America for much of that day, and
21    there was towards the end of the day discussion
22    with Barclays directly and with the due diligence
23    teams at one other potential buyer.
24        Q.  What other potential buyer?
25        A.  Nomura, but I didn't speak to them

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    16

1
2    directly.
3        Q.  And I gather from your answer then you
4    were speaking directly with the due diligence
5    teams from Bank of America?
6        A.  Yes.
7        Q.  And you had direct discussions with
8    Barclays towards the end of the day on the 12th?
9        A.  Yes, in the capacity of due diligence,
10    not negotiations.
11        Q.  And when you mean in capacity of due
12    diligence you were providing information?
13        A.  That is right.
14        Q.  In terms of liquidity management on the
15    12th, were there any particular constraints on
16    Lehman or challenges for Lehman in terms of
17    managing its liquidity for operations on the 12th?
18        A.  Yes.
19        Q.  Can you describe what those constraints
20    were?
21        A.  There was a large cash request from
22    JP Morgan, which was for $5 billion in cash, and
23    that was a significant challenge.  There were
24    changes being made to secured funding haircuts and
25    collateral agreements and there were margin

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    17

1
2    requests from a variety of clients.  So overall
3    I would characterize it as extremely busy and
4    complicated.
5        Q.  You used a phrase, "There were changes
6    in secured funding haircuts", is that right?  I
7    want to understand what you mean by "haircuts"?
8        A.  The difference between the market value
9    and the cash received is known as the haircut in
10    a secured funding arrangement, the market value of
11    the securities I should say.
12        Q.  So is it fair to say that the haircut
13    allows you to determine how much cash you can
14    borrow against a given market value of securities?
15        A.  That is correct.
16        Q.  And what were the changes in haircuts on
17    the 12th, generally?
18        A.  Generally, they were that the haircuts
19    were widening, but I don't have any specifics.  I
20    don't recall any specifics.
21        Q.  We go into the weekend of 13 and 14
22    September.  Describe for me what you were --
23    describe for me what your duties were that weekend
24    and what you were doing that weekend?
25        A.  Due diligence continued.  Discussion

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    18

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI    18
2  with the internal team on potential outcomes and
3  the management of potential purchases.  Some
4  discussion with external lawyers acting for the
5  Board in terms of fairness opinions.
6      Q.  Generally, when you are talking about
7  interactions you had with external counsel for
8  Lehman Brothers during that time period, you can
9  identify that you had those contacts but I would
10 urge you not to disclose the substance of your
11 conversations with external counsel for Lehman.
12 Understood?
13     A.  Yes.
14     Q.  I mean when my question is requesting an
15 answer of that type, just alert me if you think
16 you are going to have to tell me about
17 conversations with external counsel.  Fair?
18     A.  Yes.
19     Q.  In terms of who the potential purchasers
20 being discussed were over the weekend
21 of September 13 and 14, you had BFA, correct?
22     A.  Correct.
23     Q.  Barclays was still a potential
24 purchaser?
25     A.  Barclays was the most likely purchaser.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    19

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI    19
2      Q.  Nomura, was that still a potential
3  purchaser?
4      A.  Not that I was aware of.
5      Q.  Other than those three were any other
6  potential purchasers discussed that weekend?
7      A.  Not that I am aware of.
8      Q.  When you say you had discussions with
9  the internal team, who was the internal team that
10 you were having discussions with?
11     A.  Largely with Ian Lowitt but with other
12 members of Lehman's senior management.
13     Q.  Do you recall any of the other members
14 of senior management that you had discussions with
15 that weekend?
16     A.  Bart McDade, Tom Russo, Stephen
17 Berkenfeld, Alex Kirk.
18     Q.  Any others?
19     A.  I can't recall.
20     Q.  When did you first learn that Lehman
21 Brothers Holdings Inc was contemplating
22 a bankruptcy filing?
23     A.  I believe first contemplated on
24 Saturday.
25     Q.  Were you asked to perform any tasks

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    20

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI    20
2  specifically in connection with contemplated
3  filing of the bankruptcy?
4      A.  Only one comes to mind, which was to
5  make a payment to Weil Gotshal.
6      Q.  We go ahead with the bankruptcy filing
7  on September 15.  Describe for me the kinds of
8  things you were doing on September 15.  What was
9  your day like?
10     A.  So the filing happened in the early
11 hours of the morning and there was great confusion
12 about the consequences of that, so much of the day
13 was spent fielding telephone calls from various
14 parts of the organization within Lehman, some from
15 external counterparties seeking clarification as
16 to the position, which entities may have filed and
17 the position of the remaining entities, and trying
18 to oversee the position and funding for LBI, the
19 US broker dealer.
20     Q.  Describe for me what actions you took
21 and conversations you had in connection with the
22 funding for LBI, the US broker dealer on the 15th?
23     A.  We had been instructed that the Fed
24 would be providing secured financing and that
25 other secured financing arrangements would be

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    21

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI    21
2  maturing, so the discussion to the extent that
3  there was any was really just about executing that
4  transaction.
5      Q.  When you say "that transaction", the Fed
6  transaction?
7      A.  With the Fed, yes.
8      Q.  Were you involved in executing the
9  transaction with the Fed?
10     A.  Not executing it, no.
11     Q.  Were you involved with negotiating the
12 transaction with the Fed?
13     A.  No.
14     Q.  What was your involvement with the Fed
15 transaction?
16     A.  Only overseeing the collateral, the
17 collateral allocation and the cash received
18 afterwards.
19     Q.  When you say "overseeing collateral
20 allocation", what was your role in overseeing?
21 What specifically did you do to oversee collateral
22 allocation on the Fed repo?
23     A.  I reviewed the collateral that had been
24 allocated and the cash that had been received
25 against that collateral.  My role was largely

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    22

2  analytical and much of the liquidity oversight is
3  an analytical function.  It is explaining the
4  changes in the liquidity position and explaining
5  the financing arrangements in the context of the
6  overall financial picture and balance sheet of the
7  entity.  So I don't know -- my group did not book
8  the transactions or the allocations, but clearly
9  it was important to understand the substance of
10  the transaction and detail of the transaction that
11  was executed to get a clear picture of the
12  financial position of the entity.
13      Q.  Who booked the transaction?
14      A.  The secured funding area.
15      Q.  Mr. Coghlan's group?
16      A.  Yes.
17      Q.  Did you have conversations with
18  Mr. Coghlan about the Fed funding on the 15th?
19      A.  I don't recall.
20      Q.  You said you reviewed the collateral.
21  What were you reviewing the collateral allocated
22  for.  Let me restate that.  You stated earlier you
23  reviewed the collateral allocated.  For what
24  purpose were you reviewing the collateral
25  allocated?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    23

2      A.  I have already explained that, to
3  understand the financial position of the entity.
4  It is obviously pertinent to the financial
5  position of the entity to understand the
6  collateral that has been transferred and the value
7  received for that.
8      Q.  So your review includes what specific
9  pieces of collateral that have been allocated, is
10  that right?
11      A.  That is right.
12      Q.  And you also did a review of what values
13  had been ascribed to that collateral?
14      A.  That is right.
15      Q.  Let's talk about the values ascribed to
16  the collateral allocated.  Who determines the
17  values of the collateral, the market value of the
18  collateral that is being allocated for financing?
19      A.  The tri-party provider in the case of
20  a tri-party repo transaction.
21      Q.  And was the Fed funding a tri-party
22  funding?
23      A.  It was.
24      Q.  Who was the third party?
25      A.  JP Morgan and Chase.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    24

2      Q.  So would it be correct to say that
3  JP Morgan and Chase would determine the values for
4  the collateral allocated by Lehman for the Fed
5  funding on September 15, is that correct?
6      A.  Yes.
7      Q.  And the applicable haircuts would then
8  be applied to the JP Morgan valuation, is that
9  correct?
10      A.  That is correct.
11      Q.  Now, Lehman would have its own values
12  for the collateral that was allocated to this
13  funding, correct?
14      A.  That is correct.
15      Q.  Was part of your review to see how the
16  JP Morgan values differed from the Lehman values
17  for the same collateral?
18      A.  It was.
19      Q.  Do you recall generally if the JP Morgan
20  values were higher, lower or the same?
21      A.  I don't recall.
22      Q.  Do you recall there being any
23  significant discrepancy at any time with the
24  JP Morgan prices for the collateral during that
25  week, September 15?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    25

2      MR. HUME:  Object to the form of the
3  question.  Any time during the week?
4      MR. TAMBE:  Yes.
5      A.  I don't recall.
6      Q.  Generally, as a matter of mechanics,
7  when the tri-party provider had done a valuation
8  of collateral and that valuation was significantly
9  lower than the Lehman valuation, that would affect
10  how much money you could borrow, correct?
11      A.  That is correct.
12      Q.  So you would probably disagree with the
13  valuation done by the third tri-party provider,
14  correct?
15      MR. HUME:  Object to the form of the
16  question.
17      A.  No.
18      Q.  You had no ability to disagree?
19      A.  We had no ability to disagree, nor do we
20  have an ability to negotiate the haircuts provided
21  by the Fed or by other lenders.
22      Q.  I am not talking about the haircut, I am
23  talking about the market value of the collateral
24  before you apply the haircuts?
25      A.  We had no ability to object.

## Page 26

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                26

1
2    I certainly did not.
3        Q.   Do you recall what the term was of the
4    Fed funding that was put in place on 15 September?
5        A.   I believe it was overnight.
6        Q.   Moving to the 16th, was that facility
7    rolled over on the 16th?
8        A.   The majority of the facility was rolled
9    over.  Barclays provided some financing as well so
10   the amount of the facility with the Fed reduced.
11       Q.   Before we get to the 16th, on the 15th,
12   other than dealing with the Fed funding, were you
13   also involved in any discussions about a possible
14   acquisition of the North American assets by
15   Barclays?
16       A.   I was not, no.
17       Q.   Were you aware that Barclays had
18   returned to Lehman to engage Lehman in discussions
19   about that?
20       A.   I was aware, yes.
21       Q.   How did you become aware of that?
22       A.   I can't remember who advised me but
23   someone, one of the senior members of the firm had
24   advised me that that was the case.
25       Q.   On the 15th through the morning of the

## Page 27

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                27

1
2    16th were you involved in any negotiations with
3    Barclays about the purchase by Barclays of
4    Lehman's North American assets?
5        A.   I was not.
6        Q.   But you were aware those negotiations
7    were taking place, correct?
8        A.   I was.
9        Q.   Did you provide any due diligence
10   information in that time period?
11       A.   I don't believe so.
12       Q.   What was your understanding of what
13   transaction was being contemplated on the 15th
14   over into the 16th between Lehman and Barclays?
15       A.   I understood that it was the purchase of
16   the business and assets, some selection of assets
17   of the North American Lehman Brothers business.
18       Q.   And either on the 15th or 16th did you
19   have any understanding of what the economics of
20   that deal were?
21           MR. HUME:  Objection, lacks foundation.
22       A.   Not really.  I mean, I was aware of the
23   balance sheet that was being agreed at a very
24   summary level and as, as I am sure you know, Martin
25   Kelly sent me a note advising me of some of the

## Page 28

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                28

1
2    details, so I had a very general sense of the
3    substance of the transaction, but to say that
4    I understood the economics would be, you know,
5    would not be accurate.
6        Q.   The Martin Kelly e-mail that you are
7    referring to, is that the one that talks about the
8    5 billion-dollar loss?
9        A.   That is right.
10       Q.   Let's take a look at that e-mail.  It is
11   136A.
12           (Exhibit 136A marked for identification)
13           MR. HUME:  Is that a new number?
14           MR. TAMBE:  Yes.
15           MR. HUME:  Has this document not been
16   made an exhibit yet?
17           MR. TAMBE:  I just do not know if it has
18   been.  Wherever possible we are trying to avoid
19   re-marking exhibits.  My guess is this one has
20   been.  We could not figure out what the number
21   was.
22           Mr. Tonucci, I have placed before you
23   a document marked Exhibit 136A.  Is that the
24   e-mail that you were referring to?
25       A.   That is correct.

## Page 29

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                29

1
2        Q.   That is an e-mail from Martin Kelly, you
3    are cc'd on that e-mail at the bottom.  Do you see
4    that?
5        A.   Yes.
6        Q.   There is a reference in there to a
7    "$5 billion all in economic loss versus our
8    marks".  Do you see that?
9        A.   I do.
10       Q.   What was your understanding of that
11   phrase?  What did that mean?
12       A.   I read that to mean that there would be
13   a discount to the marks at that time on the
14   assets.
15       Q.   And this notion of a discount on the
16   marks on the assets, was that a feature of the
17   transaction that ultimately persisted with the
18   transaction as it unfolded?
19           MR. HUME:  Objection, calls for
20   speculation and lacks foundation.
21       A.   Can you repeat?
22       Q.   Let me rephrase.  You understood the
23   5 billion dollars all in economic loss versus our
24   marks to be a reference to a discount off the
25   marks, correct?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                30

```
 2    A.  Yes.
 3         Q.  The deal that was ultimately done and
 4   closed on September 22, that too included
 5   a discount off of Lehman's marks, correct?
 6    A.  That is correct.
 7         Q.  Okay, and the amount of that discount
 8   off of Lehman's marks was about $5 billion, is
 9   that right?
10         MR. HUME:  Objection, lacks foundation.
11    A.  It is uncertain, because obviously there
12   were a lot of valuation movements and so
13   I couldn't say with certainty, but certainly what
14   I can say is versus the valuations that I recall
15   seeing from our analysis it was about that number.
16         Q.  About $5 billion?
17    A.  About $5 billion.
18         Q.  Was it your understanding that about
19   a $5 billion discount was a negotiated amount of
20   discount?
21         MR. HUME:  Objection, lacks foundation.
22    A.  Only insofar as what I can read in this
23   e-mail.
24         Q.  Here is what I am getting at.  This
25   e-mail, 136A, is sent to you on
```

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                31

```
 2   early September 16, correct?  The deal that is
 3   contemplated on the 16th changes in many ways by
 4   the 22nd, correct?
 5    A.  Yes.
 6         Q.  The amount of the discount in this
 7   e-mail, the $5 billion you are telling me was
 8   about the discount when all was said and done at
 9   the end of the day, is that correct?
10    A.  That is correct.
11         Q.  Is it your understanding that the
12   $5 billion amount was the agreed upon discount for
13   the transaction?
14         MR. HUME:  Objection, the witness has
15   said he did not participate in the negotiations
16   and so the question lacks foundation.
17    A.  Only as I said from what I read here.  I
18   didn't have any further discussions about the
19   discount that I can recall.
20         Q.  Do you have an understanding of how the
21   discount was effected, how was the discount made
22   available to Barclays?
23         MR. HUME:  Objection, vague and
24   ambiguous.
25    A.  Do you want to reword that?
```

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                32

```
 2         Q.  Do you have trouble with the question?
 3    A.  Not sure what you mean.
 4         Q.  How did Barclays get the
 5   5 billion-dollar discount?
 6    A.  Right.  I think what was contemplated in
 7   the negotiation, and what was executed in terms of
 8   the settlement probably differed slightly, you
 9   know, and involved over the week the settlement of
10   the transaction, meaning the actual transfer of
11   securities and cash was through the repo
12   agreements, and essentially the termination of
13   those repo agreements.
14         Q.  Was the discount given to Barclays by
15   defaulting on the repo?
16         MR. HUME:  Objection.  You are asking
17   the witness very general questions about
18   a complicated transaction without walking him
19   through any of the details of that transaction.  I
20   think the line of questioning lacks foundation.
21         MR. TAMBE:  You have an objection to
22   form, right, Hamish?  So noted.  Answer the
23   question, please.
24         MR. HUME:  I think the line of
25   questioning is calling for speculation and lacks
```

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                33

```
 2   foundation.
 3         MR. TAMBE:  Do you remember my question?
 4   Probably not.  Do you want it read back?
 5    A.  Yes, please.
 6         (Read back)
 7    A.  Yes, I would say that was the way in
 8   which the transaction was settled, so that is
 9   fair.
10         Q.  Would it also be fair to say, therefore,
11   that the discount was embedded in the haircut on
12   the repo transaction?
13         MR. HUME:  Objection, what discount?
14         MR. TAMBE:  The 5 billion-dollar
15   discount.
16         MR. HUME:  What 5 billion-dollar
17   discount?  You have not established or laid any
18   record of foundation.
19         MR. TAMBE:  Hamish, make objection to
20   form, move on.  Don't make speaking objections.
21         MR. HUME:  The objection is this is
22   a deliberately ambiguous and misleading line of
23   questioning.
24         MR. TAMBE:  Do you have my question in
25   mind?
```

## Page 34

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    34

2    A.  Could you repeat it please or read it
3    back.
4              (Read back)
5    A.  In a repo transaction there is haircut,
6    a difference between the market value and the cash
7    value received.  You could view that as
8    a discount.  I think in this case it is fair to
9    say that that was the settlement mechanics and
10   therefore the way that the difference between
11   market value and cash paid was accomplished.
12   There was in that sense a discount.
13   Q.  So I understand your last answer, there
14   was a 5 billion-dollar differential, roughly,
15   between the cash paid by Barclays and the market
16   value of the collateral they received, correct?
17   A.  That was when I looked at our analysis,
18   that was about the size of the number.
19   Q.  Let's go back to the week of the 16th.
20   You get the e-mail from Martin Kelly telling you
21   about at least an agreement in principle, correct?
22   A.  That is correct.
23   Q.  Let's move forward from there.  You have
24   got on the 16th a Fed funding facility in place,
25   correct.  Right?

## Page 35

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    35

2    A.  That is correct.
3    Q.  And you have got a repo from Barclays as
4    well, correct?
5    A.  Yes.
6    Q.  And there was a pre-existing master
7    repurchase agreement with Barclays, correct?
8    A.  I believe so.
9    Q.  That amended on Monday September 15?
10   A.  I believe so.
11   Q.  Were you involved in the amendment to
12   that?
13   A.  I was not.
14   Q.  Who was?
15   A.  I don't know.
16   Q.  Do you have an under standing of what
17   the terms were of the Barclays -- the amended
18   Barclays repurchase agreement?
19   A.  I don't really recall, no.
20   Q.  Am I right to believe that there are
21   haircut schedules associated with repo agreements?
22   A.  Correct.
23   Q.  There was such a haircut schedule in
24   connection with the Fed repo, correct?
25   A.  There was.

## Page 36

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    36

2    Q.  And there was a haircut schedule on the
3    Barclays repo, correct?
4    A.  I believe so, yes.
5    Q.  Do you recall there being any
6    significant difference between the haircuts on the
7    Fed repo and the haircuts on the Barclays repo?
8    MR. HUME:  Objection.
9    A.  There were certainly differences, I
10   can't recall how significant.
11   Q.  Do you remember if there were particular
12   asset classes in which there were differences?
13   A.  I don't, no.
14   Q.  The Fed repo was an overnight repo,
15   right?
16   A.  Correct.
17   Q.  So it rolled over from the 15th to the
18   16th?
19   A.  Correct.
20   Q.  And rolled over again from the 16th to
21   the 17th?
22   A.  Not the same size, no.
23   Q.  Tell me briefly what the changes were,
24   if any, in the size of the Fed repo from Monday to
25   Tuesday to later in the week?

## Page 37

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    37

2    A.  I can't recall the exact details.  I
3    recall that the Barclays repo on the -- again, I
4    am not certain about this but the Barclays repo on
5    the 16th, I believe, was for $5 billion.  On the
6    17th I believe it was for $8 billion and then on
7    the Thursday there was obviously a much bigger
8    transaction and so that changed the Fed repo,
9    which became zero.
10   Q.  Let's talk about that bigger transaction
11   on Thursday, okay.  Describe for me how the Fed
12   repo went to zero and what happened with the
13   Barclays repo on Thursday?
14   A.  It is difficult for me to talk about the
15   mechanics because I am not that close to the
16   operational mechanics of the repo being unwound,
17   but my understanding was that the repo unwound on
18   the Thursday morning, which would be typical in
19   a tri-party repo, that an overnight repo would
20   unwind, you would return the collateral and the
21   cash and the transactions would then settle with
22   that collateral that was released, and at the end
23   of the day a new financing transaction would be
24   settled.
25   In this instance there was complexity because

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    38

2    JP Morgan was the tri-party agent for Lehman and had been
3    the tri-party agent in the transaction with the Fed.  BONY
4    was the tri-party agent for Barclays and so there was a need
5    to transfer collateral from JP Morgan to Bank of New York
6    tri-party system, and I am not sure about the mechanics
7    involved in that transfer but it was clearly a more
8    complicated transaction than if the financing had just been
9    through the JP Morgan tri-party system.
10        Q.  Is it your understanding that on
11    Thursday, in this bigger transaction on Thursday,
12    Barclays effectively replaced the Fed and the Fed
13    funding transaction?
14        A.  I was not involved in the discussions
15    with Barclays or with the Fed on the removal or
16    replacement of the Fed in that transaction, so I
17    can't really talk to the specifics, but my
18    understanding was that the Fed transaction was
19    going to mature on the Thursday and they were not
20    really providing any financing subsequently.
21        Q.  Wednesday night into Thursday, do you
22    recall the size of the Fed funding being
23    approximately $45 billion?
24        A.  Yes, that sounds about right.
25        Q.  And the Fed was holding approximately

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    39

2    $50 billion in collateral against that financing?
3        A.  That sounds right.
4        Q.  And the big transaction that you
5    described on Thursday effectively had Barclays
6    coming in and putting in $45 billion to pay off
7    the Fed repo, correct?
8        A.  I understood that they were going to be
9    putting in 45, that it was going to be
10    a 45 billion-dollar transaction, yes.
11        Q.  And all the collateral that was being
12    held by the Fed was then going to be transferred
13    to Barclays, correct?
14        MR. HUME:  Objection, asked and
15    answered.  He has already explained.
16        A.  To be honest, I was not close enough to
17    the actual transaction that was being booked to
18    know exactly where all the collateral was going to
19    end up, nor was I close enough to any agreements
20    with Barclays or with the Fed as to where all of
21    the collateral was going to end up.
22        Q.  So effectively on Thursday the Fed
23    funding goes down to zero, correct?
24        A.  That is correct.
25        Q.  And they exit the financing picture at

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    40

2    that point?
3        A.  That is correct.
4        Q.  And what you have left is the Barclays
5    repo, correct?
6        A.  That is correct.
7        Q.  Describe for me what happens with the
8    Barclays repo over the next few business dates?
9    We are now into Thursday on to Friday the 19th.
10        MR. HUME:  Again, objection to the form
11    of the question and the lack of foundation.
12        A.  That transaction happened on Thursday.
13    That was essentially the last of that transaction
14    in the way that I think about it.  It was executed
15    on Thursday night and settled Thursday night into
16    Friday morning and that was the end of that
17    transaction.  After that it was just a matter of
18    that transaction terminating and the collateral
19    being rebooked as a purchase by Barclays and as
20    a sale by Lehman.
21        Q.  Do you recall if the Barclays repo was
22    terminated on Friday?
23        A.  I don't.
24        Q.  The legal documentation for the
25    Lehman/Barclays transaction, are you generally

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    41

2    familiar with that documentation?
3        A.  With parts of it.
4        Q.  What do you understand the operative
5    legal documentation to be for that transaction?
6        MR. HUME:  I am going to object again.
7    You are asking -- he said he is not a negotiator.
8    You have shown him their documents and you keep
9    asking him to speculate about the entire
10    transaction.  I will counsel the witness not to
11    speculate.
12        A.  I am not a lawyer but I believe that the
13    asset purchase agreement is the document that you
14    are referring to.
15        Q.  Is that a document that you -- when is
16    the first time you saw the asset purchase
17    agreement?
18        A.  Not until a long time after the
19    transaction closed.
20        Q.  Is it fair to say during the week of the
21    15th to the 22nd you did not see the asset
22    purchase agreement?
23        A.  I didn't, no.
24        Q.  Did you see something called
25    a clarification letter?

## Page 42

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          42

1
2      A.  Not until long after the close.
3      Q.  You know what I mean by "clarification
4   letter"?
5      A.  I know what you mean when you say the
6   clarification letter in relation to this
7   transaction, yes.
8      Q.  I am sorry, I cut you off.  What is your
9   understanding of the clarification letter?
10      MR. HUME:  Objection.  Same objection.
11   You are asking someone who was not a negotiator,
12   who is not a lawyer to speculate as to the meaning
13   of these documents that you are not even showing
14   him.
15      A.  Only that it was a clarification to the
16   purchase agreement.
17      Q.  Do you know when it was negotiated?
18      A.  I believe on the -- prior to closing on
19   the -- I don't remember.  Actually, I don't know
20   when it was negotiated.
21      Q.  Did anyone ever tell you why
22   a clarification letter was needed?
23      A.  No.
24      Q.  Did you review any drafts of
25   a clarification letter?

## Page 43

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          43

1
2      MR. HUME:  Objection, asked and
3   answered.
4      A.  No.
5      Q.  During the week of September 15, so from
6   the 15th through the 19th, were you aware of any
7   mark downs on the Lehman assets on Lehman's
8   books?
9      MR. HUME:  Objection, vague and
10   ambiguous.
11      A.  There was a great deal of volatility in
12   prices over that week so I can't really sort of
13   answer whether there were any specific mark downs.
14   I was not part of the process of re-marking those
15   books or re-marking the assets, but there was
16   a great deal of price volatility and so I would
17   certainly expect that there would be asset price
18   movements and I would expect most of them to be
19   down.
20      Q.  Were you aware of a general mark down
21   process in connection with Lehman's assets during
22   that week?
23      A.  No.
24      Q.  Going back to Thursday and the closing
25   out of the Fed facility, and then the Barclays

## Page 44

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          44

1
2   repo, you said the Bank of New York was
3   a tri-party provider for the Barclays repo, is
4   that right?
5      A.  That is right.
6      Q.  So they would have played a similar role
7   to the role played by JP Morgan on the Fed
8   facility, correct?
9      A.  That is correct.
10      Q.  And therefore Bank of New York would
11   have had prepared valuations of the collateral
12   that was being posted on the Barclays repo,
13   correct?
14      A.  Correct.
15      Q.  And they did that, correct?
16      A.  I believe so, yes.
17      Q.  Are you familiar generally with the Bank
18   of New York valuations of the collateral posted by
19   Lehman?
20      A.  Generally, yes.
21      Q.  Are you aware of any discrepancies
22   between the Bank of New York valuations for the
23   collateral and Lehman valuations of that same
24   collateral?
25      MR. HUME:  Objection to form, what

## Page 45

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          45

1
2   collateral?
3      Q.  The Barclays collateral.
4      A.  There was certainly a very comprehensive
5   reconciliation required because of the number of
6   securities that were moving, and some of those
7   securities were quite complicated in terms of not
8   just the valuation but the actual amounts.  These
9   are mortgage securities, mortgage pass throughs,
10   so there was a very big reconciliation required
11   and there were differences identified in the
12   details of the securities.  There were differences
13   in the valuations and for certain there were
14   differences in the valuations.
15      Q.  And this reconciliation process that you
16   just described, when did that take place?
17      A.  I think the reconciliation that I
18   remember sort of in detail was after the closing.
19   I think we tried to do a reconciliation on the
20   Friday.  When I say "we", it was within the
21   operations team, and certainly after the 22nd or
22   on the 22nd, and after there were more detailed
23   reconciliations produced.
24      Q.  When you got to Barclays were you
25   involved in dealing with Barclays' accountants in

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          46

2  accounting for the economics of the acquisition of
3  Lehman by Barclays?
4      A.  We were asked to contribute to the
5  initial balance sheet, the preparation of an
6  initial balance sheet, but I would say that my
7  involvement with the accountants was as an
8  information provider and was sporadic.  I was not
9  involved in -- after the initial balance sheet,
10  components of the initial balance sheet were
11  provided, our balance sheet commitment, I don't
12  think I did very much in terms of the accounting
13  for the transaction.
14      Q.  In addition to helping with the
15  preparation of the initial balance sheet, did you
16  play any role in reviewing the valuation of the
17  acquisition in connection with the year-end
18  results for Barclays?
19      A.  I saw the balance sheet, the acquisition
20  balance sheet a number of times, and as I say I
21  was peripherally involved.  The accounting for
22  this was quite complicated because of the
23  different entities that were involved, and so yes
24  I saw some details but the overall economics
25  I would say was not really clear to me.  I was not

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          47

2  sort of involved at that level.
3      Q.  You are generally aware that Barclays
4  has reported a gain on the acquisition, correct?
5      A.  Yes.  I mean, I am aware of what was
6  publicly disclosed.  I have not seen the details
7  of the calculation of that.
8      Q.  What is your general understanding of
9  the magnitude of the gain reported by Barclays for
10  the year-end 2008 from the Lehman acquisition?
11      A.  That a gain on acquisition was reported
12  of over 2 billion pounds.
13      Q.  Over 2 billion pounds?
14      A.  Yes.
15      Q.  Is it your understanding that there may
16  well be additional gains from the acquisition that
17  have not yet been reported by Barclays?
18      MR. HUME:  Objection.
19      A.  I am not aware of that.
20      Q.  You don't know one way or the other?
21      A.  I don't.
22      Q.  Did you ever talk to anyone as to why
23  Barclays was getting a 5 billion-dollar discount
24  on this transaction?
25      A.  I don't think I did, no.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          48

2      Q.  You told us that you reviewed the asset
3  purchase agreement and the clarification letter at
4  some time after the closing of the transaction?
5      A.  No, I didn't say I reviewed them.
6  I said I was shown parts of the asset purchase
7  agreement and the clarification letter.
8      Q.  Even better.  Do you recall whether the
9  asset purchase agreement or the clarification
10  letter reflect a 5 billion-dollar discount?
11      MR. HUME:  Objection to the form of the
12  question.  What do you mean "reflect"?
13      Q.  Do you have my question in mind?
14      A.  Could you repeat it, please?
15      (Read back)
16      MR. HUME:  Again I am going to object to
17  the question since you have not shown him the
18  agreements, he is not a lawyer and he was not
19  a negotiator.
20      Q.  You were shown parts of the agreements,
21  right, that is what you said?
22      A.  I just don't know.
23      Q.  Let me ask you the question.  You were
24  shown parts of these agreements, the asset
25  purchase agreement and the clarification letter,

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          49

2  right?
3      A.  Yes.
4      Q.  The parts that you were shown, did they
5  show a 5 billion-dollar discount?
6      MR. HUME:  Do you recall is the
7  question.
8      A.  I don't recall, no.
9      Q.  What parts of the agreement do you
10  recall being shown?
11      A.  I don't know.  I don't know.  I didn't
12  see the whole agreement so -- I don't think I saw
13  the whole agreement.  I saw components of it
14  related to the various schedules of assets that
15  were being transferred and to some of the other
16  assets that were included in the agreement.
17      Q.  Was there a particular task or event in
18  connection with which you were shown these pieces
19  or parts of the transaction documents?
20      A.  Yes, in the preparation I would say of
21  revisions to Schedule B to the agreement and in
22  the analysis of the 15c3 receivables.
23      Q.  And what role did you play in connection
24  with the revisions to Schedule B?
25      A.  Providing some analytical support to the

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    50

1

2 determination of available collateral.

3    Q.   Does that mean you determined what

4 collateral was available to be included in

5 Schedule B?

6    A.   No.

7    Q.   What do you mean by "analytical

8 support"?

9    A.   It means that I helped coordinate the

10 process of reviewing collateral that may be

11 available that was being extracted from various

12 systems that you would typically use, whether it

13 was the operations systems or some of the

14 databases which aggregate that information and

15 provide a different cut of analysis.  So my work,

16 my involvement, was in reviewing that to ensure

17 that it was being appropriately queried and

18 analyzed and understood, validated.

19    Q.   Who else was involved in this process?

20    A.   The operations team were really the

21 experts in the operating systems and therefore in

22 understanding the availability of collateral.

23    Q.   Who was the operations team?

24    A.   Alastair --

25    Q.   Who was the operations team doing this?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    51

1

2    A.   Alastair Blackwell manages that team.

3 I would say that Jim Hraska was the person most

4 involved.

5    Q.   And this event that you are describe,

6 the revisions to Schedule B, this is post-closing,

7 correct?

8    A.   That is correct.

9    Q.   And in the weeks immediately after the

10 closing of the transaction?

11    A.   Pre-closing there was an analysis

12 performed to determine the unencumbered

13 collateral, as I am sure you are aware, which was

14 the basis for the original Schedule B.  The

15 subsequent analysis I would say was to correct for

16 errors that may have been made in the initial

17 aggregation of information in the initial

18 analysis, and to reflect some of the breaks in the

19 different systems that were used, stock record

20 breaks for example.  That exercise continued

21 sporadically through the remaining three months of

22 2008.

23    Q.   Again, just talking about the revisions

24 to Schedule B, I want to talk about the

25 post-closing revisions to Schedule B.  The errors

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    52

1

2 you are talking about, is it errors about

3 identifying particular pieces of collateral?  Is

4 that the nature?

5    A.   That is correct.

6    Q.   When you said "stock record breaks",

7 what do you mean by "stock record breaks"?

8    A.   These are breaks between the internal

9 accounting records and the external depository

10 statements.

11    Q.   In terms of ownership of particular

12 securities, is that what you mean?

13    A.   In terms of possession.

14    Q.   Did these revisions to Schedule B that

15 took place post-close affect the value of the

16 collateral that was listed on Schedule B, the

17 total value?

18    MR. HUME:  Objection.  The revisions to

19 Schedule B are being referred to -- I believe the

20 record is unclear whether you mean revisions to

21 the schedule filed a week after the closing or any

22 subsequent work after that.  For the line of

23 questioning to be clear that needs to be made

24 clear in the questions.

25    MR. TAMBE:  I am talking about the

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    53

1

2 revisions to Schedule B that you talked about,

3 Mr. Tonucci.

4    MR. HUME:  There have been a number of

5 answers that he has provided so I still think the

6 question is unclear.

7    MR. TAMBE:  So the revisions to Schedule

8 B that you were talking about, did those revisions

9 affect the total value of the Schedule B?

10    A.   I am referring to the revisions that

11 happened in the period after the initial filing of

12 Schedule B and I am not sure when and if the --

13 you know, when and if revisions were actually

14 lodged with the court.  I am not a lawyer and I am

15 not sure what the legal process was but certainly

16 the internal calculations of unencumbered

17 collateral is what I am referring to as the

18 revisions to Schedule B that happened essentially

19 after the initial filing of Schedule B in

20 late September, and those revisions changed the

21 collateral detail significantly.  So the values

22 clearly changed along with the composition of the

23 assets.

24    Q.   Did they change up, increasing value, or

25 did they change down?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                54

2  A.  I believe they changed in both
3  directions.
4  Q.  As an aggregate?
5  A.  I don't know.
6  Q.  Do you have an understanding as to the
7  origination of Schedule B?
8  A.  I do.
9  Q.  What is your understanding about the
10 origination of Schedule B?
11 A.  The origination of Schedule B was to
12 list the unencumbered collateral that was to be
13 included within the sale and purchase agreement.
14 Q.  So this was unencumbered collateral
15 other than the collateral that had already been
16 posted to Barclays under the Barclays repo,
17 correct?
18 A.  That is correct.
19 Q.  And is it your recollection that the
20 origination of Schedule B goes back to Friday,
21 19 September?
22     MR. HUME:  Objection, lacks foundation.
23 A.  That is correct.
24 Q.  And do you recall there being an effort
25 on September 19 to find additional collateral for

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                55

2  Barclays?
3  A.  I do.
4  Q.  What can you tell us about the efforts
5  to find additional collateral for Barclays?
6  A.  That we were asked on the morning of the
7  19th to find if there was additional collateral to
8  include in the transaction.
9  Q.  Asked by whom?
10 A.  I believe I was asked by Ian Lowitt.
11 Q.  Did Ian Lowitt tell you why he was
12 asking you to find additional collateral?
13 A.  He said that it was necessary for the
14 transaction to close and he reiterated that
15 through the day.
16 Q.  In addition to Schedule B, were there
17 other collections of assets that were put together
18 to provide additional collateral for Barclays?
19 A.  There were receivables in the form of
20 the 15c3 reserve, which were reviewed, and through
21 the course of the Friday there were other
22 receivables that were also reviewed to determine
23 if they could be included as assets or collateral
24 in the sales agreement.
25 Q.  What other receivables?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                56

2  A.  We reviewed derivative receivables and
3  margin balances, FX receivables, that is foreign
4  exchange.  I should add actually we also reviewed
5  some bank receivables, because there had been cash
6  posted with some of the clearing banks, so that
7  was also reviewed.
8  Q.  Safe to say you looked in every corner
9  for assets and receivables that you could deliver
10 to Barclays?
11     MR. HUME:  Objection, vague and
12 ambiguous.
13 A.  We reviewed the balance sheet to see
14 where there might be additional assets.
15 Q.  You looked everywhere, right?
16 A.  We looked across the whole balance
17 sheet.
18 Q.  And this was a directive from Mr. Lowitt
19 to find these assets, correct?
20 A.  That is correct.
21 Q.  And you found a bunch of unencumbered
22 assets and put them in Schedule B?
23 A.  That is correct.
24 Q.  And then you found these 15c3
25 receivables, is that right?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                57

2  A.  I would say we identified the 15c3
3  receivables as an asset that could be transferred.
4  Q.  Who is the "we" who identified those
5  receivables?
6  A.  It was again overseen by Ian but it was
7  myself, Martin Kelly, Robert Azerad.
8  Q.  What was approximately the value of the
9  15c3 receivables that you identified?
10 A.  There was uncertainty, a great deal of
11 uncertainty about the excess, but there was
12 certainty about the actual deposits that had been
13 made for 15c3, which included a cash deposit with
14 Wells Fargo for a billion dollars and securities
15 which in the calculation had been valued at, I
16 believe, $769 million.
17 Q.  And so that is about what, $1.7 billion
18 total?
19 A.  That is correct.  There may have been
20 other balances.  I think that there were other
21 securities balances also that were on deposit but
22 I recall specifically those two.
23 Q.  On the Friday the 19th, is it your
24 recollection that the 15c3 receivables were
25 identified as assets or receivables that in fact

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    58

2    could be transferred to Barclays?
3         MR. HUME:  Objection to the lack of
4    foundation.
5         A.   That is correct, that is my
6    understanding.
7         Q.   From your earlier answer it seems that
8    there were receivables that you identified that
9    maybe you concluded could not be transferred to
10   Barclays, is that fair?
11        A.   That is correct.
12        Q.   The 15c3's could be transferred to
13   Barclays, right?
14        MR. HUME:  Objection to the vagueness of
15   the question.  What do you mean by "could"?
16        A.   I mean, I would try and clarify this --
17        Q.   Sure.
18        A.   The thinking was that there was
19   a surplus, in that calculation that although it
20   was uncertain as to both the amount of the surplus
21   and the requirement, these represented assets
22   which were transferable and, you know,
23   identifiable and transferable.  I would say that
24   the distinction with some of the other receivables
25   was that it was much more difficult, given our

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    59

2    information, our sort of accounting position at
3    that time, our transactional detail at that time,
4    it was much more difficult to identify specific
5    receivables that could have been transferred.  So
6    it was more a matter of that these were much more
7    easily identifiable, but yes, we did believe that
8    they were transferable, or would become
9    transferable.  It was always understood that there
10   was a regulatory approval that would be required
11   but that they would become transferable.
12        Q.   Did you have any discussions with
13   Mr. Lowitt as to whether transferring those
14   receivables was part of the deal with Barclays?
15        MR. HUME:  Objection, what receivables?
16        Q.   The 15c3 receivables?
17        A.   I do recall talking to him about that,
18   yes.
19        Q.   What did he tell you?
20        A.   We were looking for potential other
21   assets and so we were going to include this in the
22   agreement.
23        Q.   Do you know one way or the other whether
24   the 15c3 receivables were part of the asset
25   purchase agreement?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    60

2         A.   I can't recall if they were part of the
3    asset purchase agreement or some clarification
4    letter.
5         Q.   The parts of the asset purchase
6    agreement or the clarification letter that were
7    shown to you, do you recall whether they had any
8    reference to the 15c3 assets?
9         A.   I don't recall.  I don't recall which.
10   I do recall that there was in one or other of
11   those documents a reference to that, to those
12   assets.
13        Q.   The other receivables you mentioned, the
14   derivatives receivables, could you describe what
15   you mean by derivative receivables?
16        A.   Yes.  Particularly for LBI there were
17   substantial margins posted at the exchanges, which
18   were accounted for, essentially accounted for as
19   receivables, and those are what I refer to as
20   derivative receivables.
21        Q.   Would an example of derivative
22   receivables be these types of receivables that
23   were posted with the OCC?
24        MR. HUME:  Objection to the form of the
25   question.  These type?  Which type of receivables?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    61

2         Q.   Derivative receivables?
3         A.   I would say that would be consistent
4    with my understanding.
5         Q.   And the OCC is the Options Clearing
6    Corp?
7         A.   That is correct.
8         Q.   Do you recall in the bits and pieces of
9    the asset purchase agreement, the APA and the
10   clarification letter that was shown to you whether
11   those documents provided for derivatives
12   receivables to be transferred to Barclays?
13        MR. HUME:  Objection.  You are asking
14   this witness to give an opinion on a legal
15   document that you have not shown him.  He is not
16   a lawyer and he said he was not a negotiator of
17   the deal.
18        MR. TAMBE:  You have an objection to
19   foundation and form.
20        MR. HUME:  I am not just objecting to
21   foundation.  It is an inappropriate, misleading
22   question.
23        MR. TAMBE:  Don't make speaking
24   objections.  Object to form, move on, we will get
25   through this faster.

1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI    62
2         MR. HUME:  It is not just an objection
3    to form.
4         MR. TAMBE:  Are you instructing him not
5    to answer?
6         MR. HUME:  I am objecting to
7    a misleading line of questioning.
8         MR. TAMBE:  Thank you.
9         Mr. Tonucci, do you have my question in
10   mind?
11        (Read back)
12   A.  I don't recall.
13        Q.  Another type of receivable you described
14   before were FX receivables?
15   A.  Um hum.
16        Q.  Did you identify any foreign exchange
17   receivables that could be transferred to Barclays?
18   A.  There was a receivable balance for
19   forward settling foreign exchange on the LBI
20   balance sheet.
21        Q.  And the determination was that those
22   receivables could be transferred to Barclays, is
23   that right?
24        MR. HUME:  Objection to the form,
25   objection to the vagueness of the word --

1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI    63
2    A.  There was insufficient detail to be able
3    to confirm that, that that still existed at that
4    point in time.
5         Q.  At some subsequent point in time was
6    a determination made as to those FX receivables?
7    A.  I don't know.
8         Q.  Another category of receivables you
9    identified were bank receivables?
10   A.  Yes.
11        Q.  Again, the same series of questions on
12   the bank receivables; was a determination made on
13   the 19th that those were transferable to Barclays?
14   A.  On the 19th there was a determination
15   made that it was too complicated and too uncertain
16   to be able to say whether those were transferable.
17        Q.  And on some subsequent date after the
18   19th was a determination made as to whether those
19   could be transferred?
20   A.  I don't know.
21        Q.  You were in New York during this week,
22   correct?
23   A.  That is correct.
24        Q.  Do you recall accepting your offer of
25   employment at Barclays?

1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI    64
2    A.  I do.
3         Q.  When did you do that?
4    A.  I believe it was 26 September.
5         Q.  You sent an e-mail on the morning of the
6    22nd accepting your offer, right?
7         MR. HUME:  Objection, lacks foundation.
8    A.  I can't remember.
9         Q.  Do you recall about an hour after the
10   ink dried on the clarification letter you sent an
11   e-mail?
12        MR. HUME:  Objection to form.
13   A.  I don't remember.
14        Q.  Let me show it to you.
15        (Exhibit 137A marked for identification)
16        I have handed you a one page document
17   marked Exhibit 137A.  Do you have that before you?
18   A.  I do.
19        Q.  Do you recognize this as an e-mail that
20   you sent to an e-mail box called "Accept Barclays
21   offer at Lehman.com"?
22   A.  Yes.
23        Q.  And the subject simply says: "I accept".
24   Correct?
25   A.  Yes.

1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI    65
2         Q.  You were accepting an offer of
3    employment for Barclays, right?
4    A.  Yes.
5         Q.  What offer were you accepting on
6    Monday September 22 at 1:04 pm GMT?
7    A.  I can't recall the details at that point
8    but I believe that the offers went out over the
9    weekend, but I don't recall the exact details of
10   it at that point.  I recall the hard copy in more
11   detail.  I am not too sure when that was sent out.
12        Q.  If I understand your answer, at some
13   point over the weekend of the 20th/21st you
14   received a soft copy of the offer?
15   A.  Yes.
16        Q.  And at some point during the week of the
17   22nd you actually signed a hard copy?
18   A.  That is correct.
19        Q.  But you knew before the 20th that you
20   would be offered employment by Barclays, correct?
21        MR. HUME:  Objection.
22   A.  I knew on the evening of the 19th that
23   I would receive an offer from Barclays.
24        Q.  Had you had any discussions with anyone
25   prior to September 19 about receiving an offer

## Page 66

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    66

2  from Barclays?
3      A.  No.
4      Q.  What was the communication you received
5  on the evening of September 19 about an offer from
6  Barclays?
7      A.  After the Lehman and the Barclays and
8  the other teams had gone to the bankruptcy court,
9  after the day's work had been completed and I was
10  going to head home, and I had been up all night so
11  I was exhausted, and so I am not too sure, I am
12  not too sure of the exact time, before departing
13  for the day Ian Lowitt advised me that I would
14  receive an offer, and he gave me the general terms
15  that I would likely be offered.
16      Q.  When you say "the general terms", the
17  general economic terms of the offer?
18      A.  The general economic terms, but I was
19  not sure of the position at that point.
20      Q.  Prior to that September 19, had you had
21  discussions with Ian about what your future held
22  for you?
23      A.  No.
24      Q.  No discussions?
25      A.  No.

## Page 67

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    67

2      Q.  Did you try to get any assurance from
3  him or anyone else about whether there was a place
4  for you at Barclays?
5      A.  No.
6      Q.  You knew he would be heading to
7  Barclays, right?
8      A.  I didn't, no.
9      Q.  Did you know whether any of the folks
10  that you were working with at Lehman that week
11  were going to be headed to Barclays?
12      A.  I expected that there would be some that
13  were heading to Barclays but I was not sure of
14  exactly whom.
15      Q.  Barclays was buying the North American
16  operations, correct?
17      A.  Correct.
18      Q.  And they needed people to run those
19  operations?
20      A.  Correct.
21      Q.  So your expectation was that some
22  significant number of Lehman folks would in fact
23  get offers from Barclays?
24      A.  That is correct.
25      Q.  And you certainly hoped to be included

## Page 68

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    68

2  in that group?
3      A.  Yes, I think it is fair to say I hoped
4  to be included.
5      Q.  Your compensation at Lehman for the
6  calendar year 2007, the full calendar year, could
7  you briefly describe what your total Lehman
8  compensation was?
9      A.  I was on an ex-pat arrangement, so I
10  will leave that aside.  The basic components of
11  compensation, total compensation of $2 million.
12      Q.  And was that broken out into cash and
13  non-cash?
14      A.  Yes.  Salary was around -- I think it
15  was $250,000.  The cash was around, I would say
16  around a million dollars total cash, cash bonus
17  and then stock was the remainder.
18      Q.  And the stock component that you
19  received, your 2007 compensation, that was
20  immediately vested stock?
21      A.  No, that vested in the regular schedule,
22  which is 5 years for Lehman.
23      (Exhibit 138A marked for identification)
24      Q.  Sir, I have placed before you a 3-page
25  document marked exhibit 138A.  Is that a copy of

## Page 69

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    69

2  the offer of employment you received from Barclays
3  Capital over the weekend of September 20/21?
4      A.  Yes.
5      Q.  It carries a date of September 22 on the
6  first page, right?
7      A.  Correct.
8      Q.  And that is your signature on the last
9  page?
10      A.  That is correct.
11      Q.  Looking at the first page of
12  Exhibit 138A, the economic terms of your
13  employment are as set forth up there, correct?
14      A.  That is correct.
15      Q.  You have a compensation of 268,336 per
16  annum?
17      A.  That is right.
18      Q.  There is a guaranteed cash bonus for
19  2008, do you see that?
20      A.  I do.
21      Q.  That is in the amount of 1.185 million?
22      A.  Correct.
23      MR. HUME:  Sorry, I am unsure.  We are
24  going to designate obviously any portion of the
25  transcript that relates to compensation highly

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    70
2    confidential.  Is it understood we can do that
3    after the deposition?
4         MR. TAMBE:  Yes, and I think the
5    agreement that was reached at the Felder
6    deposition we assume carries for all depositions.
7         MR. HUME:  For all designations we can
8    do it later rather than during.
9         MR. TAMBE:  You can do it later.  Let's
10   just follow the Felder rule.  I think it was that
11   we were going to treat the entire transcript as
12   highly confidential.
13        MR. MAGUIRE:  Treating the entire
14   transcript as highly confidential for a week and
15   make the designations within the week.
16        MR. TAMBE:  Going back to the
17   guaranteed cash bonus of 1.185 million, did you
18   receive that in February 2009?
19        A.  I am not sure if it was February
20   or March but it was received in 2009.
21        Q.  And was that the amount of the cash
22   bonus you received in February or March 2009?
23        A.  That is correct.
24        Q.  Did you also receive the next item, the
25   2008 EPP recommendation.  Do you see that?

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    71
2         A.  I do.
3         Q.  And did you?
4         A.  I did.
5         Q.  Was it roughly that amount?
6         A.  Yes.
7         Q.  The next category, "special cash award",
8    do you see that?
9         A.  Yes.
10        Q.  That is a special cash award of 700,000,
11   do you see that?
12        A.  That is right, yes.
13        Q.  Do you have an understanding as to why
14   you were receiving a special cash award?
15        A.  I assumed that it was -- I assumed that
16   it was being awarded to a group of senior
17   employees that Barclays felt were going to be of
18   future value to the organization.
19        Q.  Have you received any portion of the
20   special cash award as of today?
21        A.  No.
22        Q.  You had a change in position you said
23   early on in February or March 09?
24        A.  That is right.
25        Q.  Has your compensation increased as

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    72
2    a result of that change in position?
3         A.  My basic salary I would say is
4    consistent and I am not sure of my bonus.
5         Q.  Do you have any guaranteed cash bonus
6    component in your new position?
7         A.  No.
8         Q.  Do you have any guaranteed EPP?
9         A.  No.
10        Q.  Any special cash awards?
11        A.  No.
12        (Exhibit 139A marked for identification.)
13        Q.  I have placed before you a 2-page
14   document marked Exhibit 139A.  Let me know when
15   you have had a chance to review it.
16        A.  I have reviewed it, yes.
17        Q.  A couple of questions about some of the
18   names that appear on this e-mail chain.  Some you
19   have mentioned this morning but a couple of others
20   I want to ask you about.  David Aronow, what
21   position did Mr. Aronow have?
22        A.  He is within the operations team.
23        Q.  At Lehman?
24        A.  At Lehman.
25        Q.  And he made the move to Barclays as

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    73
2    well?
3         A.  Yes.
4         Q.  John Palchynsky, what position did he
5    have at Lehman?
6         A.  He was in the operations team.
7         Q.  Did he make the move to Barclays?
8         A.  Yes.
9         Q.  John Feraca.  Was he in the operations
10   team at Lehman as well?
11        A.  He was in the prime services team.
12        Q.  Did he make the move to Barclays?
13        A.  Yes.
14        Q.  Monty Forrest, what was his position at
15   Lehman?
16        A.  He was in the prime services team.
17        Q.  Did he make the move to Barclays?
18        A.  He did.
19        Q.  Neil Ullman, what was his position at
20   Lehman?
21        A.  He was in the operations team.
22        Q.  Did he make the move to Barclays?
23        A.  He did.
24        Q.  Dan Fleming, you have mentioned before.
25   Did he make the move to Barclays?

Page 74

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                74

1
2   A.  He did.
3   Q.  Just a question about the e-mail address
4   for Mr. Fleming.  It has in parentheses "TSY"
5   after it.  Do you see that?
6   A.  Yes.
7   Q.  Any understanding what that means?
8   A.  Treasury.
9   Q.  And that was a designation used within
10  Lehman?
11  A.  I don't know.  I think that the TSY
12  designation is used where there may be more than
13  one person, to identify which one it is.
14  Q.  Craig Jones, what was his position
15  within Lehman?
16  A.  He was in treasury.
17  Q.  Did he make it over to Barclays?
18  A.  He did.
19  Q.  Look at the top half of Exhibit 139A.
20  There is a message there from Mr. Palchynsky to
21  several people, including you.  Do you see that?
22  A.  I do.
23  Q.  He says in there: "Anyway, see you all
24  at BarCap".  Do you see that?
25  A.  I do.

Page 75

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                75

1
2   Q.  There is an e-mail dated September 19,
3   2008.  Do you see that?
4   A.  I do.
5   Q.  Around 6:28 pm, right?
6   A.  Yes.
7   Q.  So was this the first that you had heard
8   about your employment at Barclays?
9   A.  I believe that I had heard perhaps an
10  hour before that.
11  Q.  Was this the first that you had heard
12  that all these other people were also going to be
13  going to Barclays?
14  A.  This is a relatively junior person in an
15  operations area, who could have been speculating.
16  It was not clear to me that all of these people
17  were going to be moving over.
18  Q.  This chain of e-mails has a subject line
19  that says: "Urgent, tri unwind".  Do you see that?
20  A.  I do.
21  Q.  And what was the "Urgent tri unwind"
22  about, if you recall?
23  A.  It was to do with the cash balance that
24  was placed with JP Morgan on the night by Barclays
25  on the night of the 18th, and was part of the

Page 76

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                76

1
2   tri-party arrangement, and it was being unwound.
3   Q.  And the collection of people on these
4   e-mails were involved in assisting with that
5   unwind?
6   A.  They were involved in the repo
7   operations.
8   Q.  So they would have dealt with that
9   unwind and other aspects of the repo?
10  A.  Yes.
11  MR. TAMBE :  Thank you.  We will take
12  a short break now.
13       (Break from 8:55 to 9:14 am.)
14  Q.  I am showing you a document previously
15  marked as Exhibit 19.  Have you seen this document
16  before today, sir?
17  A.  I have.
18  Q.  What do you understand it to be?
19       MR. HUME:  Objection to the form.
20  A.  It was the balance sheet that was I
21  believe, you know, part of the negotiation for the
22  sale to Barclays, so the estimated balance sheet.
23  Q.  And the estimated balance sheet for what
24  entity?
25  A.  For the part of LBI that was being sold.

Page 77

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                77

1
2   Q.  Do you recall if this is a document that
3   you saw during that week, the week
4   of September 15, 2008?
5   A.  Yes, I believe I saw it on the 16th.
6   Q.  Do you know in connection with what
7   event or action did you see this document?
8   A.  In relation to the Barclays contemplated
9   purchase.
10  Q.  Who showed it to you?
11  A.  I think it was Ian Lowitt.
12  Q.  Did you play any role in the preparation
13  of this document, Exhibit 19?
14  A.  I did not.
15  Q.  We had earlier talked about the
16  $5 billion discount.  Do you know if the
17  $5 billion discount was reflected in this
18  document, Exhibit 19?
19       MR. HUME:  Objection, lacks foundation.
20  A.  I do not know.
21  Q.  If you look under the "liabilities"
22  column, last two entries above the total are
23  titled "Cure PMT" and "Comp".  Do you see that?
24  A.  I do.
25  Q.  And there is a total of about four and

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          86

1
2     A.  No.
3     Q.  Any idea what that means?
4         MR. HUME:  Objection, calls for
5  speculation.
6     A.  No, not really.
7         MR. HUME:  He is asking you to
8  speculate.
9     Q.  Just in broad dollar terms, was it your
10 understanding that the amount of the Fed facility
11 on or about September 18, 2008, was a funding of
12 about $44 billion or $45 billion against a market
13 value of collateral of about $50 billion?
14    A.  Yes, that sounds right.
15        (Exhibit 140A marked for identification)
16    Q.  I have had placed before you a document
17 marked Exhibit 140A, a 3-page document.  Take
18 a moment to look at it, let me know when you are
19 done.  You done?
20    A.  I have read through it.
21    Q.  Do you recognize that document?
22    A.  Actually, I can't recall going through
23 this, no.
24    Q.  Do you see the cover e-mail is an e-mail
25 from Mr. Robert Azerad?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          87

1
2     A.  Yes.
3     Q.  Martin Kelly?
4     A.  Yes.
5     Q.  You are shown as a cc on that?
6     A.  Yes.
7     Q.  Do you understand the information that
8  is contained on page 2 of Exhibit 140A?
9     A.  Not entirely sure I do.
10    Q.  Do you recall there being a discussion
11 or an analysis during that week of September 15
12 about assets available to be transferred by LBI to
13 Barclays?
14    A.  I do, yes.
15    Q.  What do you recall about that analysis
16 or discussion?
17    A.  That obviously we were trying to be as
18 specific as possible about not just the assets
19 that were on the balance sheet but actually what
20 was going to be available for transfer.  The
21 difference between the balance sheet from a sort
22 of accounting or GAPP perspective from a funding
23 perspective, was really one of granularity, in
24 terms of what has settled and exactly where the
25 securities that are in the repo agreements or

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          88

1
2  reverse repo agreements.  So the effort was to try
3  and establish what was exactly available for
4  transfer.
5     Q.  Is it your understanding that the assets
6  that were listed on the LBI balance sheet, not all
7  of those ultimately were transferable to Barclays?
8     A.  Yes.
9     Q.  We had seen earlier in Exhibit 19, which
10 I think is still before you, if you can just turn
11 to that --
12    A.  Yes.
13    Q.  This is a balance sheet I think you told
14 us of LBI as of September 16, 2008, correct?
15    A.  Yes 15th, I think, I assume.
16    Q.  And that has a total adjusted assets or
17 adjusted total assets of 72.6 billion.  Do you see
18 that?
19        MR. HUME:  Objection.  Did you ask
20 whether this Exhibit 19 was a balance sheet for
21 LBI.
22        MR. TAMBE:  Yes?
23        MR. HUME:  Was that the question?
24        MR. TAMBE:  That was not the question,
25 no.  The question was whether it as had a total

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          89

1
2  adjusted assets of 72.6 billion.
3         MR. HUME:  Before you asked if it was
4  a balance sheet of LBI.
5         MR. TAMBE:  The record is what it is.
6  You have an objection to make, make it, let's move
7  on.
8         MR. HUME:  I think the record is
9  misleading now.  You asked a question that the
10 witness did not understand.
11        MR. TAMBE:  Unless you are challenging
12 the witness I am not sure what that objection is
13 all about.
14        Let's go back to the Exhibit 19, LBI
15 balance sheet adjusted total assets 72.65 billion.
16 Correct.
17    A.  I can see that, yes.
18    Q.  And is it your recollection that over
19 some -- over the course of that week, the week
20 of September 15, the assets of LBI available for
21 transfer were less than 72.65 billion?
22    A.  Yes.
23    Q.  It went down to a number of about
24 50 billion, correct?
25    A.  I am not sure it ever went as low as

## Page 90

2  that, but anyway it certainly went down.
3      Q.  How low did it go in your recollection?
4      A.  Somewhere between 50 and 60 billion.
5      Q.  And part of the reason for that change
6  from 72 to the 50 to 60 billion range is assets
7  that could not be transferred to Barclays,
8  correct?
9      MR. HUME:  Objection, lacks foundation.
10     A.  Yes, that is right.  I mean, insofar as
11 they were transactions that were being settled
12 elsewhere, and so the securities would not be
13 available for transfer to Barclays.
14     Q.  Going back to Exhibit 140A, the 3-pager,
15 on the third page of that exhibit, there is an
16 analysis set forth.  Do you see that?
17     A.  I do.
18     Q.  Do you have an understanding of what
19 that analysis is?
20     A.  General, yes.
21     Q.  Generally, could you tell us what that
22 analysis is?
23     A.  It is a summarization of the inventory
24 which has been reversed in from other entities or
25 repo'd out.  The LBI proprietary matched book is

## Page 91

2  a representation of the inventory which is both
3  reversed in and repo'd out.
4      Q.  If you can just explain what a matched
5  book is?  It is a phrase I have seen in some of
6  the e-mails.  I want to get a better understanding
7  of what that is.
8      A.  The matched book is a financing business
9  where securities on behalf of
10 customers and the matching that is on the other
11 side, they are financed to the street or with
12 other customers, so it is an activity where the
13 financing should be matched.
14     Q.  And presumably Lehman are in some spread
15 in the course of this matched activity?
16     A.  It should, yes.
17     Q.  During the course of this week
18 of September 15 was the matched book reduced down
19 effectively to zero?
20     A.  As close as possible to zero.
21     Q.  Were you involved during this time
22 period, September 18, September 19, in identifying
23 or helping to identify those assets of LBI that
24 would be available for transfer to Barclays?
25     A.  Yes, particularly in the sort of

## Page 92

2  18th/19th period.
3      Q.  And Mr. Azerad was involved in that
4  process as well?
5      A.  Yes.
6      Q.  Was Mr. Martin Kelly involved in that as
7  well?
8      A.  Yes.
9      Q.  What was Mr. Kelly's position?
10     A.  Martin was the financial controller so
11 he was the accounting -- he was essentially the
12 accountant for the group, chief accountant for the
13 group.
14     Q.  Your co-equal or your subordinate?
15     A.  We were both direct reports to the CFO.
16     Q.  Gerry Reilly, Gerard Reilly, what was
17 his position?
18     A.  He was the product controller, the head
19 of products control, which is really the business
20 CFO, business units' CFO.
21     Q.  Which business units?
22     A.  He actually oversaw all of the business
23 units.
24     Q.  Give me a description of what you would
25 consider a business unit?

## Page 93

2      A.  Just any of the fixed income for
3  example, any of the trading businesses.
4      Q.  So fixed income was a business unit that
5  he would oversee?
6      A.  Right.  I would think of Gerry as being
7  the management accountant and Martin being the
8  entity accountant, if that makes any sense.
9      Q.  Not entirely, but that is fine.  We will
10 move on.  Francis Pearn, P-E-A-R-N?
11     A.  Yes.
12     Q.  Who was Francis?
13     A.  He worked for Gerry.
14     Q.  Were Gerry and Francis involved in this
15 process we talked about, identifying the assets of
16 LBI that were in fact transferable to Barclays?
17     A.  They were, yes.
18     (Exhibit 141A marked for identification)
19     Q.  I have handed you an exhibit marked
20 Exhibit 141A, which is a cover e-mail with
21 a spreadsheet attached to it.  If you could
22 generally look at the cover e-mail and the
23 spreadsheet attached, I will ask you some general
24 questions and then maybe some specific ones about
25 the spreadsheet.  Just let me know when you are

1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI          114
2          So given that the -- you have to understand that
3     this is a transaction where the actual assets being
4     transferred over is really only being finalized on that
5     morning, and is still being reviewed, and so we were trying
6     to provide support and assistance insofar as, you know,
7     determining the securities and a potential value for those.
8     But this is not something which had already been reviewed
9     and values confirmed by Barclays, and the BONY system could
10    also have had problems with valuing some of these
11    securities.
12          Q.  The one large position you were talking
13    about, that is Pine?
14          A.  Yes.
15          Q.  What was Pine?
16          A.  Pine was a CLO, which is
17    a collateralized loan obligation.
18          Q.  I have handed you a document that was
19    previously marked as Exhibit 47.  It is about
20    3 pages of cover e-mails, 4 pages of cover
21    e-mails, and a large spreadsheet.  If you can
22    review the e-mails and take a look at the
23    spreadsheet, let me know when you are done, and I
24    will ask you some questions about them.
25          MR. HUME:  The binding of this exhibit

1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI          115
2     was obviously done for ease of presentation,
3     right?  It was not presented like this originally.
4          A.  Yes.
5          Q.  Reviewing this chain of e-mails,
6     starting with the earliest e-mail, which is an
7     e-mail from you to various people, the subject
8     line is: "Delivering other assets to Barclays".
9     Do you see that?
10          A.  Yes.
11          Q.  And is that a reference to this process
12    we talked about, the assets over and above the
13    repo assets?
14          A.  That is correct.
15          Q.  Take a look at the first page of this
16    exhibit, the e-mail, page 1, Exhibit 47.  At the
17    top of the page there is an e-mail from David
18    Murgio at Weil to two additional people, V Lewkow
19    and R Davis.  Do you see that?
20          A.  I do.
21          Q.  Was it your understanding that
22    spreadsheet information about the collateral was
23    provided by lawyers for the estate to the lawyers
24    for Barclays?
25          A.  Yes.

1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI          116
2          Q.  There is a reference to BarCap
3     collateral.xls.  Do you see that file?
4          A.  I do.
5          Q.  That was the same file that you had sent
6     over earlier, right, Exhibit 143A?
7          A.  Yes.
8          Q.  If you turn to the fifth page, Bates
9     number 5138 are the last four digits, do you see
10    that calculation up there?
11          A.  I do, yes.
12          Q.  And it is a total of 49.9 billion.  Do
13    you see that?
14          A.  I do.
15          Q.  And that is in the market value column?
16          A.  I see that.
17          Q.  And there is four components to that
18    total.  Do you see that?
19          A.  I do.
20          Q.  The first is Fed collateral?
21          A.  Yes.
22          Q.  Do you have an understanding of what
23    that item is?
24          A.  Yes.
25          Q.  What is it?

1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI          117
2          A.  It is Fed wirable collateral that was
3     transferred over, Fed wire being the market
4     settlement system for this type of collateral.
5          Q.  The next line item is DTC074.  Do you
6     see that?
7          A.  I do.
8          Q.  Is that an account or a box at DTC?
9          A.  That is I think an account at DTC.
10          Q.  A Lehman account?
11          A.  Yes.
12          Q.  The next item is DTC636.  Do you see
13    that?
14          A.  I do.
15          Q.  What is your understanding of what that
16    is?
17          A.  That is a different type of DTC account.
18          Q.  And in the last line item is "TP
19    cashed".  What does that stand for?
20          A.  That is the tri-party cash.
21          Q.  Was it your understanding on
22    Friday September 19 that there was 7 billion
23    dollars in cash to be delivered to Barclays?
24          A.  I understood that $7 billion of cash had
25    been given by -- had been deposited by Barclays

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    118

2  with JP Morgan and that it was being held by
3  JP Morgan.
4       Q.  Was it your understanding of -- I guess
5  these e-mails are all dated September 20, so was
6  it your understanding on September 20, 2008, that
7  the total value of the collateral on the cash in
8  the transaction was 49.9 billion?
9       MR. HUME:  Objection, vague and
10  ambiguous as to the value.
11       A.  This was my view of the repo transaction
12  on the Thursday night, and it was limited to that,
13  just to the repo transaction.
14       Q.  So the 15c3 cash, for example, would be
15  in addition to this?
16       A.  That is correct, yes, as well as the
17  other unencumbered collateral, as well as other
18  components to the agreement.
19       Q.  The other unencumbered collateral, that
20  would be the Schedule B collateral?
21       A.  That is what became Schedule B
22  collateral, that is right.
23       Q.  So that would be added to these items
24  here?
25       A.  That is right.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    119

2       Q.  If you go down to page 5139, do you see
3  that?
4       A.  I do.
5       Q.  There is a column titled "Market value"?
6       A.  Yes.
7       Q.  Do you know what the source of that
8  market value information was in this spreadsheet?
9       A.  I believe that this was the Lehman price
10  market value.
11       (Exhibit 144A marked for identification)
12       Q.  I have handed you a one page document
13  entitled Exhibit 144A.  Take a moment to look at
14  that and let me know when you are done.
15       A.  Yes.
16       Q.  Have you seen this document before
17  today?
18       A.  I have not, no.
19       Q.  Do you remember the information that is
20  contained in this document?
21       A.  I do.
22       Q.  If you can just go through the
23  components, the components I want to talk to you
24  about are the component that add up to the total
25  securities cash received item.  Do you see that?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    120

2       A.  Okay, yes.
3       Q.  If you start with the Fed wire
4  securities, that is similar to the Fed collateral
5  entry we were discussing earlier, correct?
6       A.  Correct.
7       Q.  And the next item is "DTC cash".  Do you
8  see that?
9       A.  I do.
10       Q.  Do you have an understanding as to what
11  that is?
12       A.  DTC securities.
13       Q.  The next item down "DTC cash .3".
14  I assume these are billions?
15       A.  Yes.
16       Q.  Do you have an understanding of what
17  that line item is?
18       A.  I assume it is more DTC securities.
19       Q.  The reference to "Repo cash, 7 billion".
20  Do you see that?
21       A.  Yes.
22       Q.  We have discussed that before?
23       A.  That is correct.
24       Q.  And then it says "Today DTC collateral".
25  Do you see that?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    121

2       A.  I do.
3       Q.  And that is 390 million.  This is an
4  e-mail dated as of September 19, 2008.  Do you
5  have an understanding as to what that means?
6       A.  I don't know the specifics.
7       Q.  And that rolled up into 52.19 billion
8  total.  Do you see that?
9       A.  Yes.
10       Q.  Again, this does not include, as far as
11  you know, the 15c3 cash, correct?
12       A.  That is correct.
13       Q.  Do you know whether this includes
14  Schedule B?
15       A.  I would presume that the "Today DTC
16  collateral" includes some of what became the
17  Schedule B collateral.
18       Q.  When you look below the total securities
19  cash received there is a repo cash amount.  Do you
20  see that?
21       A.  Yes.
22       Q.  And that is 45 billion?
23       A.  Yes.
24       Q.  So the differential between the value of
25  the securities and cash received and the repo cash

## Page 122

HIGHLY CONFIDENTIAL - PAOLO TONUCCI     122

2 amount is listed as excess collateral there,
3 right?
4    A.  That is right.
5    Q.  That is $7 billion?
6    A.  Yes.
7    Q.  So that is the excess of market value
8 over cash paid for the repo?
9    A.  That is, you know, what it looks like.
10    Q.  And this, as far as you can tell, the
11 folks who have sent this e-mail around are all
12 Barclays folks, right?
13    A.  Yes.
14    Q.  Not former Lehman people, is that right?
15    A.  No.
16    Q.  And are they also still at Barclays?
17    A.  I have no idea.
18    Q.  Do you know any of these names, Gerry
19 LaRocca?
20    A.  I do.
21    Q.  Does Gerry work with you?
22    A.  No.
23    Q.  Not in your department or group?
24    A.  No.
25    Q.  Stephen King?

## Page 123

HIGHLY CONFIDENTIAL - PAOLO TONUCCI     123

2    A.  I know Stephen, yes.
3    Q.  Is he in your group?
4    A.  No.
5    Q.  Back in the last quarter of 2008, did
6 you work with Gerry or Stephen?
7    A.  Yes, intermittently.  I mean we were not
8 in the same group but we worked together on a few
9 things, you know.
10    (Exhibit 145A marked for identification)
11    Q.  I have had placed before you a 3-page
12 document marked Exhibit 145A.
13    A.  Yes.
14    Q.  If you take a moment to look at that
15 e-mail chain and let me know when you are done.
16    A.  Yes.
17    Q.  You will see the subject line of the
18 series of e-mails is "Opening balance sheet".  Do
19 you see that?
20    A.  I do.
21    Q.  This is part of the effort that you had
22 testified about before, which was preparing the
23 initial opening balance sheet?
24    A.  That is correct.
25    Q.  It starts off with an e-mail from Martin

## Page 124

HIGHLY CONFIDENTIAL - PAOLO TONUCCI     124

2 Kelly to Robert Azerad, Blackwell and Beldner,
3 right.  Who was Brett Beldner?
4    A.  He is an accountant who worked for
5 Martin Kelly.
6    Q.  He was at Lehman, right?
7    A.  He was.
8    Q.  Is he now at Barclays?
9    A.  I don't know.
10    Q.  You are copied on that e-mail at the
11 bottom of page 2, right?
12    A.  Yes.
13    Q.  If you go over to page 1 of this
14 Exhibit 145A, it is the e-mail at the bottom of
15 the page which is an e-mail from you to a group of
16 people.  Do you see that?
17    A.  Yes.
18    Q.  And you have got sort of two items in
19 your e-mail, correct?
20    MR. HUME:  Which e-mail?
21    Q.  The bottom of page 1.  Are you with me,
22 Mr. Tonucci?
23    A.  What are the two items?
24    Q.  The first item is "I think they have
25 ..." and you correct yourself, "42.9 billion of

## Page 125

HIGHLY CONFIDENTIAL - PAOLO TONUCCI     125

2 assets and paid net 38 billion of cash." Do you
3 see that?
4    A.  Yes.
5    Q.  That is one item in your e-mail,
6 correct?
7    A.  Correct.
8    Q.  And that is your recap of the repo
9 situation?
10    A.  That is correct.
11    Q.  You have a second item: "Their opening
12 balance sheet should also include 1.9 billion of
13 box assets".  Correct?
14    A.  Correct.
15    Q.  What is that a reference to?
16    A.  The unencumbered collateral.
17    Q.  Schedule B?
18    A.  Which became Schedule B.
19    Q.  I guess there is a third item then, "and
20 one billion of cash receivable from the release of
21 lock ups."  Correct?
22    A.  That is correct.
23    Q.  And that is the 15c3?
24    A.  That is correct.
25    Q.  And at least on the morning

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    126

2  of September 20 those were the sort of three
3  components you were thinking of as comprising the
4  balance sheet.  Correct?
5      MR. HUME:  Objection, lacks foundation.
6      A.  Those were the components that I was
7  aware of, so I was not the accountant and I was
8  not on the negotiation team and I was not aware of
9  any other entries that may be being made for
10  example on the liability side or for other assets
11  over and above these.
12      Q.  Just on a net basis, the three
13  components that you identified at the bottom of
14  page 1, there is a net of 4 billion on the repo
15  piece, correct?
16      A.  If you are calculating the 42.9 minus
17  the 38.
18      Q.  Yes.
19      A.  That is the calculation you are doing?
20      Q.  That is the calculation.  It is actually
21  4.9.
22      A.  That is correct.
23      Q.  You add to that the 1.9 of boxed assets?
24      A.  Yes.
25      Q.  With no offsetting liability against

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    127

2  that 1.9?
3      MR. HUME:  Objection, lacks foundation.
4      A.  That is not clear to me. I can only
5  tell you the asset side that I was aware of.
6      Q.  So the asset side you have net assets on
7  the repo of 4.9, 1.9 on the box assets and then
8  a billion on the cash receivable?
9      MR. HUME:  Objection, vagueness, vague
10  and ambiguous.
11      MR. TAMBE:  Right?
12      A.  You can read it.
13      Q.  And that is a total of what, about
14  7.9 billion?
15      MR. HUME:  Objection, lacks foundation.
16  You are just asking him to do the maths?
17      A.  You are just asking me to add up?
18      Q.  7.8 billion --
19      A.  Yes.
20      Q.  Were you aware of any liabilities that
21  offset that 7.8 billion dollars of net assets
22  delivered to Barclays?
23      A.  I knew there were some liabilities.
24      Q.  What magnitude?
25      A.  I was not sure but I knew that there

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    128

2  were liabilities for compensation and for other
3  payments, services and so on that, you know, were
4  not part of the numbers that I was putting
5  together.
6      (Exhibit 146A marked for identification)
7      Q.  I have handed you a 3-page document
8  marked Exhibit 146A, an e-mail chain.  Let me know
9  when you are done reviewing it.
10      A.  Yes.
11      Q.  Do you recognize this as a series of
12  e-mails between folks at Lehman about a transfer
13  of collateral to BarCap?
14      A.  Yes.
15      Q.  And this is a series of e-mails
16  dated September 22, 2008.  Correct?
17      A.  Yes.
18      Q.  And it is early in the morning, right,
19  6:00 or 7:00 am?
20      A.  Yes.
21      Q.  And is that before the clarification
22  letter is signed?
23      MR. HUME:  Objection, lacks foundation.
24  The witness has testified he didn't review it that
25  week.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    129

2      A.  I can't say.
3      Q.  Do you recall there being some urgency
4  on the morning of September 22 to getting answers
5  to this question, "queuing up delivery to BarCap"?
6      MR. HUME:  Objection, vague.
7      A.  I don't really know but, you know,
8  I would say that everyone was focused on doing
9  their job.
10      Q.  And what was your job that morning?
11      A.  Well, we were trying to close the
12  transaction in an orderly way.
13      Q.  There is an e-mail at the bottom of page
14  1 over to page 2 from Monty Forrest to you and
15  Robert Azerad.  Do you see that e-mail?
16      A.  Yes.
17      Q.  And his first numbered point, which is
18  at the bottom of page 1 over on to page 2 states:
19      "What was the final agreed upon list (our
20  version or the version after Robert took out and
21  re-marked Lehman paper.)"
22      Do you see that?
23      A.  Yes.
24      Q.  Do you understand the reference to
25  re-marked Lehman paper?

Page 130

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   130

1
2     A.  Well, just I think it is more relevant
3  that he just removed the Lehman paper.  There was
4  some -- in the original unencumbered list there
5  was some securities which were Lehman issued.
6     Q.  It is not your understanding that there
7  was a mark down of Lehman paper by Robert in that
8  list?
9     A.  That is not what it refers to.
10    (Exhibit 147A marked for identification)
11    Q.  I have handed you a 2-page document
12  marked Exhibit 147A, an e-mail chain.  Please
13  review it and let me know when you are done.
14    A.  Yes.
15    Q.  And you recognize this as a series of
16  e-mails, again dated September 22, 2008?
17    A.  Yes.
18    Q.  And these are additional e-mails about
19  the financing facility?
20    A.  Additional e-mails about the securities
21  that were transferred over and confirmation of
22  those securities.
23    Q.  On page 2 of this exhibit, the body of
24  the e-mail from Jasen Yang to Robert Azerad and
25  James Hraska.  Do you see that?

Page 131

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   131

1
2     A.  Yes.
3     Q.  And you are seen as a copy on that
4  e-mail?
5     A.  Yes.
6     Q.  It appears from that e-mail that he is
7  sending over to you the BONY valuation of the
8  collateral, is that right?
9     A.  Sending over the BONY file, which
10  includes the valuation, but it obviously also
11  includes the details around nominal and
12  securities.
13    Q.  There is a reference to BONY market
14  value of approximately 45MM.  Do you see that?
15    A.  Yes.
16    Q.  He was referring to a 45 billion-dollar
17  value, correct?
18    A.  I assume so.
19    Q.  You will see on page 1 of the e-mail
20  a reference to "fast reconciliation".  Do you see
21  that?
22    A.  I do.
23    Q.  Was that sort of the beginning of the
24  reconciliation process you talked about before?
25    A.  We had tried to do an initial

Page 132

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   132

1  reconciliation on the Friday.  This was
2  a subsequent reconciliation and at a more detailed
3  level.  Jasen had identified what he saw as some
4  discrepancies, and we were trying to resolve
5  whether those discrepancies existed, principally
6  in the securities that were transferred over and
7  the nominal value of those securities.
8     (Break from 10:37 to 10:55 am.)
9     MR. TAMBE:  Mr. Tonucci, I have placed
10  before you a document marked Exhibit 126.  Can you
11  take a moment to look at the e-mail chain and let
12  me know when you are done.
13    A.  Yes.
14    Q.  Starting with the e-mail at the bottom
15  of the page, it is from Gerry Reilly to Ian Lowitt
16  and Michael Gelband.  You are copied on it.  Do
17  you see that?
18    A.  I do.
19    Q.  There are three numbered items in that
20  e-mail.  Do you see that?
21    A.  Yes.
22    Q.  The third item reads: "Not clear on the
23  amount of blocked discount or how we make it
24  happen." Do you see that?

Page 133

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   133

1
2     A.  Yes.
3     Q.  And you understand that to be
4  a reference to the 5 billion-dollar discount that
5  we talked about earlier?
6     MR. HUME:  Objection, lacks foundation.
7     A.  I understand it to be a reference to the
8  discount on purchase, so I would have linked it to
9  that $5 billion.
10    Q.  Then the next sentence reads:
11    "Defaulting on repo could be the best as
12  discounts could be taken from the haircut."
13    Do you see that?
14    A.  Yes.
15    Q.  Do you remember discussing with anyone
16  at Lehman defaulting on the repo as a way of
17  providing the discount to Barclays?
18    A.  Yes.
19    Q.  With whom did you discuss that?
20    A.  I think it was with Ian and with Gerry,
21  perhaps Martin Kelly as well.
22    Q.  And then in Gerry's e-mail at the bottom
23  of this e-mail chain on exhibit 126 he says:
24    "If not that then we need to give business an
25  allocation of block discount so they can mark down the

34 (Pages 130 to 133)

Page 134

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          134

2  books tonight."
3        Q.  Do you see that?
4        A.  Yes.
5        Q.  Do you recall if that ever happened,
6  whether there was an allocation of a block
7  discount?
8        A.  I don't know.
9        Q.  Does the phrase "block discount" have
10  any meaning to you?
11        A.  Not really.
12        Q.  Other than what we have talked about
13  here?
14        A.  Other than in this context.
15        Q.  The next e-mail up, from Ian Lowitt to
16  Gerry Reilly and Michael Gelband talks about
17  "shrinking down matched book".  Do you see that?
18        A.  I do.
19        Q.  Do you understand that to be a reference
20  to what we talked about before, about the matched
21  book being shrunk down to zero?
22        A.  Yes.
23        Q.  The first bullet point in Gerry Reilly's
24  e-mail at the bottom of the page talks about the
25  option rate book.  Do you see that?

Page 135

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          135

2        A.  Yes.
3        Q.  Was it your understanding during this
4  week of 15 September that there were assets that
5  Barclays was picking and choosing as to which
6  assets it was prepared to purchase?
7        A.  That is right.
8            MR. HUME:  Objection.
9        A.  That was my understanding.
10        Q.  And from whom did you get that
11  understanding?
12        A.  I can't recall but I understood that
13  they were not going to be buying all the assets.
14        Q.  Was it your understanding that there was
15  a change or an evolution in the transaction where
16  it went from being all assets to only some assets?
17        A.  No, I understood that it was never all
18  assets.
19        Q.  Did you have an understanding as to who
20  was making the decisions as to which assets it
21  would be?
22        A.  It was -- I think it was the negotiation
23  team, Barclays and Lehman negotiation team.
24        Q.  Was it your understanding that it was
25  Barclays making the decisions?

Page 136

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          136

2        A.  Well, they were the buyers so they would
3  by extension have the final decision on what
4  assets are bought.
5        Q.  I have placed before you a document
6  marked Exhibit 127.  It is another branch in the
7  e-mail chain that we were looking at before in
8  126.  Let me know when you are done with the
9  document.
10        A.  Yes.
11        Q.  So it starts with the same Gerry Reilly
12  e-mail at the bottom but there is a different
13  e-mail at the top. At the top of the document
14  there is an e-mail from Eric Felder to various
15  e-mail at Lehman.  Do you see that?
16        A.  Yes.
17        Q.  And Eric says:
18            "The Barclays guys chose the assets.  We did not
19  have anything to do with it."
20            Do you see that?
21        A.  Yes.
22        Q.  And that was consistent with your
23  understanding of how the assets were picked --
24            MR. HUME:  Objection to the lack of
25  foundation.  Mr. Tonucci is not on that e-mail.

Page 137

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          137

2        A.  I mean, I have only seen this e-mail in
3  the deposition process and I have not spoken to
4  Eric and I was not part of the negotiation team.
5  I am not sure what Eric was seeing.  Eric was also
6  not -- you know, he was running the credit book so
7  I don't know if he would have seen all parts of
8  this process.
9        Q.  Basically, one way or the other, you
10  don't know whether what Eric says here is right?
11        A.  That is right.
12            (Exhibit 148A marked for identification)
13        Q.  I have handed you a 2-page document
14  marked Exhibit 148A.  Let me know when you are
15  done with it.
16        A.  Okay.
17        Q.  In the top e-mail on this chain of
18  e-mails from Reilly to Martin Kelly and
19  Daniel Flores, I want you to focus on that e-mail.
20  Do you have it there?
21        A.  I do.
22        Q.  You are not shown as a copy on any of
23  these e-mails.  Can I ask you about a phrase that
24  is used in this e-mail.  The third sentence of
25  that e-mail, Gerry Reilly's e-mail states that:

## Page 138

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    138

2  "Purchase will be at a fixed discount on the
3  assets that remain to reflect the bulk size of the
4  purchase".
5      Do you see that?
6  A.  I do.
7  Q.  Did anyone ever describe for you the
8  reason for the discount being the bulk size of the
9  purchase?
10  A.  I don't recall that, no.
11  Q.  Does that phrase have any meaning to
12  you?
13  A.  I have not seen it before.
14  Q.  Then the next sentence in Gerry Reilly's
15  e-mail starts off by saying: "We can track our
16  PL..."  Is that profit and loss?
17  A.  Yes.
18  Q.  "... by assets category, which gives
19  some indication of how much we have moved the
20  marks".  Do you see that?
21  A.  Yes.
22  Q.  Do you understand the reference to
23  "moving the marks"?
24  A.  Yes.  Can I give you just a bit of
25  context, because I think that you are sort of

## Page 139

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    139

2  misunderstanding some of this.  Post Lehman, even
3  pre the Lehman filing on the weekend of
4  12/13/14th, there was a tremendous amount of price
5  volatility and tremendous amount of uncertainty in
6  sort of the traded price of a lot of securities,
7  even those which were exchange traded, and
8  therefore there was more visibility on -- we were
9  experiencing a huge amount of volatility.  The
10  process of re-marking, that was something that
11  would typically be conducted on a daily basis and
12  was conducted by thousands of traders, so it was
13  not as though there was one person with a giant
14  brain sat at the centre of this re-marking process
15  who had understanding or an ability to re-mark all
16  of these assets.  It really was a very distributed
17  process which involved many, many people, because
18  they were responsible for their trading books and
19  for the risks on those trading books, and had the
20  best understanding of the securities.
21      So on any given day there was going to
22  be a lot of price volatility and the movement in
23  the marks was often just a function of market
24  price volatility.  It may also be a function of
25  actual trading activity, but I would say that in

## Page 140

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    140

2  this week the amount of trading activity for these
3  particular securities and for these traders was
4  limited, so really it is a matter of sort of
5  interpretation of where the market is.
6      You have to add to that the fact that
7  the holding company had filed and so the coverage
8  of the desks was also impaired.  I don't think
9  that there would be every trader turning up and
10  re-marking his book.  So there was great
11  difficulty in just creating the P&L and in being
12  able to track the movements.  So that sort of
13  added to the complexity here.
14      So my interpretation here is that the
15  amount that we have moved the marks is really just
16  a reference to the traders re-marking their books
17  because of this, because of what is being observed
18  in the market, and it probably was the most
19  volatile week in the market in the last nearly
20  100 years.  So very, very difficult, very
21  difficult process, and we were not getting good
22  P&L's on a daily basis as a result.  It was much
23  more complicated than was typically the case, and
24  on a typical day the process was complicated, so
25  this was really extraordinarily difficult to

## Page 141

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    141

2  track, to track assets, the asset position and to
3  track valuations.
4  Q.  In the week of September 15 you did not
5  do any of the marking of the prices, right?
6  A.  Absolutely not.
7  Q.  That is not something you do?
8  A.  No.
9  Q.  You don't know specifically what traders
10  marked down what prices for what reason, correct?
11  A.  No.
12  Q.  You don't know if the marking down was
13  pursuant to price movements in the market or
14  because they were allocated a block discount?
15  A.  I don't know with certainty, but you did
16  ask me for my interpretation of this and my
17  interpretation is that it is going to be
18  predominantly because of the volatility in
19  valuations in the market.
20  Q.  Okay, and you don't know whether that is
21  because they were allocated a block discount to
22  mark down their books?
23  A.  I am saying that it is not because of
24  the allocation of a block discount.  My
25  interpretation of this is that it was because of

Page 142

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          142

2  the market price movements.
3      Q.  I have handed you a document marked as
4  Exhibit 71B.  It is an e-mail exchange between
5  yourself and Alastair Blackwell.  Do you see that?
6      A.  Yes.
7      Q.  It is on Friday, September 19, 2008.  Do
8  you see that?
9      A.  Yes.
10     Q.  At the top of the e-mail Alastair asks
11  you: "Putting the repo into default is my
12  conversion?" Do you see that?
13     A.  Um hum.
14     Q.  Do you have a recollection of having
15  a discussion with Alastair about putting the repo
16  into default on Friday, September 19?
17     A.  I don't, no.
18     Q.  Any understanding of the phrase "my
19  conversion", what he meant by that?
20     A.  My interpretation would be that his area
21  would have to rebook the repo, convert the repo
22  into a sale transaction.
23     Q.  And your understanding was that
24  a default on the repo really converted what was a
25  two-leg transaction; the repurchase leg would go

Page 143

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          143

2  away and there would effectively be a sale of the
3  asset?
4      MR. HUME:  Objection.
5      A.  That is correct.  It would become
6  a sale.
7      (Exhibit 149A marked for identification)
8      Q.  I have handed you a 2-page document
9  marked Exhibit 149A.  Let me know when you are
10  done reviewing that document.
11     A.  Yes.
12     Q.  Have you ever seen this document before
13  today?
14     A.  No.
15     Q.  You know who Bob Diamond is, right?
16     A.  Yes.
17     Q.  Who is he?
18     A.  He is the President of Barclays.
19     Q.  Do you know who Michael Klein is?
20     A.  Yes.
21     Q.  Who is Michael Klein?
22     A.  He is someone who was involved in the
23  transaction.
24     Q.  Is he someone that you dealt with during
25  that week of September 15?

Page 144

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          144

2      A.  Yes, I spoke to him.  I dealt with him
3  you know, just through that week.  I don't think I
4  have seen him since then.
5      Q.  Describe your interactions with
6  Mr. Klein during that week.  What were you
7  speaking with him about?
8      A.  Predominantly it was clarification of
9  the assets, so Michael was asking for various
10  points, just details of the sort of asset
11  schedules and some of the other transfers.  That
12  is all I can really recall.
13     Q.  Was he part of the conversations on
14  Friday, September 19, about locating additional
15  assets and value for Barclays?
16     A.  I didn't speak to him on that, sorry, I
17  don't know.
18     Q.  In his e-mail to Bob Diamond on
19  Saturday, September 20, 2008, Mike says: "Great
20  day.  We clawed back 3 billion more of value of
21  the transaction."  Do you see that?
22     A.  I do see that.
23     Q.  Any understanding as to what he is
24  referring to in the 3 billion more of value?
25     MR. HUME:  Objection, calls for

Page 145

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          145

2  speculation.
3      A.  I don't know what would go into that
4  specifically.
5      Q.  Was it your understanding on Friday or
6  Saturday of that week that Lehman had provided an
7  additional $3 billion of value to Barclays?
8      MR. HUME:  Objection, lacks foundation.
9  Witness has testified he was not negotiating the
10  economics of the deal.
11     A.  I can't really answer that, I don't
12  know.
13     Q.  But we have talked about a couple of
14  items of additional value on Friday, September 19,
15  right?
16     A.  We have, but we have also talked about
17  the price volatility and the lack of certainty
18  around the actual assets that were being
19  transferred, and just the difficulty in
20  establishing values.  So I mean I wouldn't sort
21  of, you know, I wouldn't sort of describe this as
22  just additive to the original transaction.  It was
23  clearly changing.
24     Q.  And among the items that were added was
25  1.9 billion in Schedule B, is that right?

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        190
2              MR. HUME:  He is not qualified to
3   articulate what is legal advice and it is
4   privileged.
5        Q.  Fine.  Let me ask you, did you obtain
6   any advice from Mr. Willoughby?
7              MR. HUME:  Objection.  Don't answer.
8        Q.  I am not asking for the substance of any
9   advice I just want to know did Mr. Willoughby
10  respond and provide you with any advice following
11  that discussion that you had?
12             MR. HUME:  Object to the
13  characterization of whether there was
14  a communication.  You can ask whether there was
15  a communication from Mr. Willoughby.
16       A.  I don't recall.
17       Q.  You don't recall receiving any
18  communication from Mr. Willoughby in response to
19  the discussion that you had in late September?
20       A.  That is right.
21       Q.  And you don't recall following up with
22  Mr. Willoughby concerning that communication?
23       A.  That is right.
24       Q.  So as far as you recall, you have never
25  touched this subject since that one discussion you

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        191
2   had with Mr. Willoughby in late September, 2008?
3        A.  Certainly not that -- I don't recall
4   speaking to Scott Willoughby and I would say that
5   my involvement in this transaction subsequent to
6   that was minimal.
7        Q.  And you don't recall discussing this,
8   this I mean in the OCC positions and Barclays'
9   entitlement since September 2008 with anyone?
10       A.  No, I don't believe I have discussed
11  with anyone.
12       Q.  You testified earlier about unencumbered
13  assets, and specifically I want to ask you about
14  Schedule B that you mentioned.  Where were the
15  assets that are listed on Schedule B physically
16  located?
17       A.  There were very many versions of
18  Schedule B so you are going to have to be more
19  specific.
20       Q.  I am just now looking only for your
21  understanding as to where they were physically
22  custodied.  If it is more than one place or
23  changed over time, let me know?
24       A.  That is what I am saying, it was more
25  than one place and it changed over time.

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        192
2        Q.  What were the different places where
3   those assets were --
4        A.  DTCC, JP Morgan, Euroclear.  I can't
5   remember the name of the Canadian depository, so
6   those are the ones that I remember.
7        Q.  At any time was Schedule B limited to
8   the unencumbered assets at DTC?
9        A.  Not that I am aware of.
10       Q.  I will show you a document we will mark
11  as 164A.
12            (Exhibit 164A marked for identification.)
13            If we start at the bottom, you will see there is
14  an e-mail that then gets sent to you on 18 September, and
15  then you forward to Mr. Azerad.  Do you see that?
16       A.  I do.
17       Q.  And the chain starts with what is called
18  a box summary.  Can you tell me what the box
19  summary is?
20       A.  Yes, it is the securities in possession,
21  in the clearance box.
22       Q.  When you say "clearance box", is that
23  the clearance box at DTC?
24       A.  No, it could mean any number of
25  custodial or depository arrangements.

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        193
2        Q.  Then you will see Mr. Azerad's e-mail
3   says: "FYI, 3.2 billion at risk."  Can you explain
4   what "3.2 billion at risk" means?
5        A.  I don't think I can.
6        Q.  Did you have an understanding at the
7   time that you received this e-mail?
8        A.  I am assuming the 3.2 billion is the
9   "stays at LBI" position.  I am not too sure what
10  the "at risk" means.
11             MR. HUME:  Don't speculate.
12       Q.  In your e-mail you say: "That seems very
13  high.  What are the assets they need to sell?"
14  Does that help you to understand what you were
15  hearing here and what you were following up with?
16       A.  Not really.  I mean, there was a lot
17  going on, and I am sure you have seen that there
18  were a lot of e-mails that I was getting, so
19  responses like that could be quite open, just
20  because I don't really know what was going on and
21  I was trying to get information from others.
22       Q.  What was the Sparrow report?
23       A.  Charlie Sparrow was the mortgage trader,
24  he was the head of the mortgage desk, so I think
25  it was his report of positions.

Page 202

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          202

2  the 800 million that had been transferred on the
3  Friday?
4      A.  I don't.  I would assume so.
5          MR. HUME:  Don't assume.  Don't
6  speculate.
7      Q.  The next is:  "We have 746 million in
8  074."  Do you recognize that as a DTC box?
9      A.  I do.
10     Q.  You will see number 4 says:  "We have
11 identified another 300 million of mortgages in
12 636."  Do you know what 636 is a reference to?
13     A.  Another DTC box or account.
14     Q.  And Mr. Forrest says:  "That is a total
15 of 2.181 billion."  Do you see that, sir?
16     A.  Yes.
17     Q.  Was there a specific target that people
18 were shooting for, a specific total people were
19 trying to get to?
20     A.  Not really.
21     Q.  So people were kind of keeping score of
22 what they found but there was not any number that
23 you had in mind as a target that you needed to get
24 to?
25         MR. HUME:  Objection to the form.

Page 203

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          203

2      A.  Not really.  I mean I think, as Ian
3  says, it is more important just to be accurate.
4      Q.  You had mentioned that you had heard I
5  believe on the Friday that there was a need for
6  additional collateral in order for the transaction
7  to close; that was something that Mr. Lowitt told
8  you?
9      A.  Um hum.
10     Q.  And he reiterated that a number of times
11 during the day?
12     A.  Yes.
13     Q.  Did he tell you how much additional
14 collateral would be needed to make the transaction
15 close?
16     A.  I thought -- no, I don't remember the
17 total.  It was more than 2 billion.
18     Q.  Was there a number that he gave you and
19 you don't remember what that is now?
20     A.  I don't remember what it was.  I don't
21 remember if he gave me a number and I don't
22 remember what it was.
23     Q.  Over the course of the next couple of
24 days, the Saturday and the Sunday, did you hear of
25 a target, a number that was needed in order to

Page 204

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          204

2  close the transaction?
3      A.  I think we had gone to the bankruptcy
4  court on Friday with the unencumbered collateral
5  at 1.9 billion, so that was our initial estimate,
6  and then a further billion or so in the 15c3
7  reserve account, so that would give nearly
8  $3 billion.  I think that that is what everyone
9  was expecting the value of the unencumbered
10 collateral plus the 15c3 to be.
11     Q.  When you say "we went to the bankruptcy
12 court", you are describing what everybody's
13 expectation was at the time everybody went down to
14 the bankruptcy court hearing?
15         MR. HUME:  Objection to the form,
16 calling for speculation about what other people's
17 expectations were.
18     Q.  That certainly was your understanding?
19     A.  It was my understanding.
20     Q.  Did you attend the hearing before the
21 bankruptcy court?
22     A.  I did not.
23     Q.  Did you hear from anybody who did
24 attend?
25     A.  Yes.

Page 205

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          205

2      Q.  Who did you hear from?
3      A.  From Chris O'Meara.
4      Q.  Who was Chris O'Meara?
5      A.  He was at Lehman Brothers.  He had been
6  head of risk.
7      Q.  What did Chris O'Meara tell you about
8  the hearing?
9      A.  That it was long and seemed to have gone
10 well, and that the court had approved the sale.
11     Q.  Did he tell you anything else?
12     A.  No.
13     Q.  Did he tell you anything about any
14 proceedings that had happened in the course of the
15 hearing?
16     A.  No, he kept it to a minimum.
17     Q.  Did you hear from anyone else other than
18 Chris O'Meara about the hearing?
19     A.  I did not.
20     Q.  I will show you a document we will mark
21 as Exhibit 169A.
22         (Exhibit 169A marked for identification.)
23         The subject of these e-mails is "PL on 9/18".  Do
24 you have an understanding what "PL" refers to?
25     A.  I am not sure here.  I am not

Page 1

1           HIGHLY CONFIDENTIAL - A. KIRK

2           UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,   (Jointly Administered)

9

                  Debtors.

10

     ----------------------x

11

12        * * * HIGHLY CONFIDENTIAL * * *

13        DEPOSITION OF ALEX KIRK

14           New York, New York

15           August 31, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24545

Page 6

HIGHLY CONFIDENTIAL - A. KIRK

1      myself down.  And I'm going to ask you please to
2      wait until there's a full question asked before
3      you answer so that we can, as best we can, get a
4      clear record.
5           A.   Uh-huh.
6           Q.   Okay?
7                Did you have discussions with anyone
8      other than your counsel, Mr. Kelley, to prepare
9      for your deposition today?
10          A.   Yes.
11          Q.   With whom?
12          A.   I don't remember.
13          Q.   Mr. Kelley or anybody from his firm?
14     Anybody outside of his firm?
15          A.   Outside his firm we met with the
16     Barclays lawyers.
17          Q.   Okay.
18          A.   I don't remember their names.
19          Q.   And by whom are you employed, sir?
20          A.   Currently I'm not employed.
21          Q.   Was there a time when you were
22     employed at Lehman Brothers?
23          A.   Yes.
24          Q.   Can you give me, sir, just a brief

Page 7

HIGHLY CONFIDENTIAL - A. KIRK

1      description of the positions you held?
2                How long were you at Lehman?
3           A.   I was at Lehman two separate stints.
4      I was at Lehman from December of 1994 until
5      January of 2008.
6           Q.   Uh-huh.
7           A.   And I returned to Lehman in July of
8      2008.  When I went to Lehman Brothers from
9      basically July of -- or, December of 1994 till
10     December 2001, I ran the distressed debt
11     business for Lehman Brothers.  From 2002 until
12     2006, I ran the high-yield and leveraged loan
13     business for Lehman Brothers.  From 2006 until
14     October of 2007, I ran the global credit
15     businesses.  From October 2007 until January of
16     '08, I was co-chief operating officer of fixed
17     income, and from -- and then I left the firm.
18     When I returned, I was global head of principal
19     businesses for that brief period of time.
20          Q.   And why did you leave the firm in
21     January of '08?
22          A.   The global head of fixed income, Roger
23     Nagioff, had resigned; my partner, Andy Morton,
24     was promoted to head of fixed income; and I

Page 8

HIGHLY CONFIDENTIAL - A. KIRK

1      reached a mutual agreement to leave the firm
2      with senior -- with the president of Lehman
3      Brothers.
4           Q.   And where did you work in between
5      January of '08 and July of '08 when you returned
6      to Lehman?
7           A.   Didn't work.
8           Q.   And what occasioned your return to
9      Lehman in July of '08?
10          A.   They had promoted Bart McDade to be
11     president of the firm, and he requested that I
12     return to the firm within a few days of his
13     elevation.
14          Q.   And I take it you worked at Lehman --
15     well, for how long after July of '08 did you
16     work at Lehman Brothers?
17          A.   Until the end.  Until most of the
18     employees were transferred to Barclays, U.S.
19     employees.
20          Q.   And at the end, did you transfer over
21     to Barclays yourself?
22          A.   Yes.
23          Q.   And when did you start work at
24     Barclays?

Page 9

HIGHLY CONFIDENTIAL - A. KIRK

1           A.   I don't remember the transfer date, to
2      be honest with you.  I worked there till the
3      first week of November.
4           Q.   First week of November '08?
5           A.   Yes.
6           Q.   What positions did you hold at
7      Barclays?
8           A.   I didn't have a position at Barclays.
9           Q.   Was there -- I know it was sort of
10     tumultuous times.  Was there any break in
11     between leaving Lehman and going to Barclays, or
12     did you just sort of start working at Barclays
13     at the end of the Lehman --
14          A.   Whenever the actual HR records
15     transferred.
16          Q.   Okay.  Did you have a written
17     employment agreement with Barclays?
18          A.   No.
19          Q.   Was any written employment agreement
20     ever offered to you by Barclays?
21          A.   No.
22          Q.   Would you describe to me your
23     compensation package at Lehman -- withdrawn.
24               What was your compensation arrangement

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2   **for Lehman when you returned in July of '08?**
3       A.   I would, when I returned, I would
4   receive salary.
5       **Q.   And what was the salary?**
6       A.   It was supposed to be $400,000, but
7   through an administrative mistake, I got paid
8   $225,000.
9       **Q.   And what was your salary at Barclays?**
10      A.   The same.
11      **Q.   Did you have any arrangements or**
12  **agreements for a bonus at Lehman?**
13      A.   No.
14      **Q.   Did you have any arrangements or**
15  **agreements for a bonus at Barclays?**
16      A.   Yes.
17      **Q.   What were those?**
18      A.   Let me clarify.
19      **Q.   Sure.**
20      A.   About two weeks after I arrived at
21  Lehman, I was granted, without a request --
22  maybe two or three weeks, I don't remember the
23  exact time -- equity under a program they had
24  started that spring.  They were granting equity
25  to a lot of the senior executives, and I was

HIGHLY CONFIDENTIAL - A. KIRK

1
2   granted I think it was 750,000 shares of Lehman
3   equity.
4       **Q.   And what were your bonus arrangements**
5   **or agreements with Barclays?**
6       A.   About the end of October, I reached
7   out to Bart McDade suggesting that perhaps
8   Barclays could pay me a bonus before I left.
9   About a week later, they informed me that they
10  would pay me $15 million in two separate
11  installments.
12      **Q.   And were those installments to be paid**
13  **on the first and second anniversary of your**
14  **Barclays tenure; was that the arrangement?**
15      A.   No, it was November 15th and
16  February -- sometime in February.
17      **Q.   Did you receive either of those**
18  **payments?**
19      A.   Yes.
20      **Q.   The first one, I take it?**
21      A.   Both.
22      **Q.   Both, okay.**
23          Why did you leave Barclays?
24      A.   I had -- because I wanted to leave the
25  sell side of the business, broadly, and move to

HIGHLY CONFIDENTIAL - A. KIRK

1
2   the buy side of the business.
3       Q.   Could you explain to me what you mean
4   by that?
5       A.   Meaning I wanted to go work as a
6   principal in a hedge fund or a money management
7   firm.
8       Q.   Did you do that?
9       A.   I'm in the process of setting up a
10  firm right now.
11      Q.   Before you went to work at Barclays,
12  before the end of Lehman, had you had any
13  discussions with anyone at Barclays about the
14  prospects of working there after the Lehman sale
15  was concluded?
16      A.   I was approached by Bob Diamond to see
17  if I was interested in a job, broadly, as
18  opposed to a specific job.  I told him I wasn't.
19      Q.   Pardon me?
20      A.   I was not.
21      Q.   And when were you approached by Bob
22  Diamond?
23      A.   At some point within the first week or
24  two that they were -- I would say probably that
25  week that they were negotiating to buy the firm.

HIGHLY CONFIDENTIAL - A. KIRK

1
2   If not that week, the week after.
3       Q.   Okay.  We're going to spend a lot of
4   time today talking about the negotiations on
5   that point, so let me take this point to frame
6   out some dates.
7           I put before you a blank calendar
8   which may help you with days of the week that
9   we'll talk about, but when you talk about the
10  week in which there were negotiations, could you
11  tell me what week or weeks you're talking about?
12      A.   The week of September -- Monday,
13  September 15th through Friday, you know, through
14  Sunday, September 21st.
15      Q.   And at what point during that week did
16  Mr. Diamond talk to you about coming to work for
17  Barclays?
18      A.   I don't remember if it was that week
19  or the following week.
20      Q.   Again, just to give us a time point,
21  the transaction we're talking about closed on
22  September 22.  Do you recall if it was before or
23  after the closing?
24      A.   I don't recall.
25      Q.   Was it just you and Mr. Diamond in the

Page 14

HIGHLY CONFIDENTIAL - A. KIRK

1
2  conversation?
3     A.  Yes.
4     Q.  And apart from this conversation with
5  Mr. Diamond, had you had discussions with anyone
6  about going to work for Barclays?
7     A.  No.
8     Q.  And when you had the discussion with
9  Mr. Diamond, did he talk to you about a
10  compensation package?
11    A.  No.
12    Q.  When did you first talk to anyone at
13  Barclays about a compensation package?
14    A.  First conversation I had with anybody
15  at Barclays was the meeting I sat down with Rich
16  Ricci where he told me what the
17  severance/compensation packet bonus would be,
18  which was in late October.
19    Q.  Had you had any conversations with any
20  of your fellow Lehman employees about the topic
21  of compensation at Barclays?
22    A.  Bart McDade.
23    Q.  Can you describe that conversation
24  with Mr. McDade?
25    A.  Yes.  Several of my colleagues were --

Page 15

HIGHLY CONFIDENTIAL - A. KIRK

1
2  who had signed employment agreements were
3  resigning from the firm and receiving large
4  payouts upon their leaving the firm, and I
5  suggested to Bart that it would be fair if I was
6  treated in a similar way, despite not having a
7  written contract.
8     Q.  And what did Mr. McDade say to you?
9     A.  He said he agreed and he would talk to
10  Barclays about that.  He was on point for those
11  sorts of issues with Barclays.
12    Q.  Do you know if he did talk to anyone
13  at Barclays about you in that regard?
14    A.  I assume he did.
15    Q.  And why do you assume that?
16    A.  Because they approached me with a
17  deal --
18    Q.  Was the conversation --
19    A.  -- a couple weeks later.
20    Q.  I beg your pardon.
21        Was the conversation with Mr. McDade
22  during the week of the negotiations between the
23  15th and the 22nd?
24    A.  No, it was sometime in late October.
25    Q.  Did you have conversations with anyone

Page 16

HIGHLY CONFIDENTIAL - A. KIRK

1
2  at Lehman during that week, the 15th through the
3  22nd?
4     A.  No.
5     Q.  Let me just put a full question so
6  that we have a clear record, okay?
7     A.  Yeah.
8     Q.  Did you have conversations with anyone
9  during the week of the 15th to the 22nd about
10  compensation that would be paid to you at
11  Barclays after the 22nd?
12    A.  No.
13    Q.  I think you referred a moment ago to
14  people receiving payouts when you left the firm.
15  What firm were you referring to?
16    A.  Barclays.
17    Q.  And who were those people you were
18  referring to?
19    A.  Mike Gelband was one.  I believe
20  Kaushik Amin was another.
21    Q.  Anyone else?
22    A.  Not that I recall directly.
23        I'm sorry.  Yeung Lee was another.
24    Q.  Anyone else?
25    A.  That's all I can recall.  There were

Page 17

HIGHLY CONFIDENTIAL - A. KIRK

1
2  many people leaving Barclays at that time.
3     Q.  Just as a general matter, when you say
4  there were many people leaving Barclays, are you
5  referring to former Lehman employees --
6     A.  Yes.
7     Q.  -- who transferred?
8     A.  Yes.
9     Q.  And then left Barclays?
10    A.  Yes.
11    Q.  And if you know, sir, why were these
12  people who were leaving Barclays, Gelband, for
13  example, receiving payouts from Barclays on
14  their departure?
15        MR. HUME:  Objection.  Calls for
16  speculation.
17    A.  I don't know.
18    Q.  Why did you get payments in the
19  amounts that you did from Barclays having worked
20  there for such a short period of time?
21        MR. KELLEY:  I'll make the same
22  objection.
23    Q.  You can answer, I think.
24    A.  I don't know.
25    Q.  Did you talk to anybody about that?

Page 18

HIGHLY CONFIDENTIAL - A. KIRK

1
2       A.    No.
3       Q.    Were you surprised to receive payments
4    in that amount from Barclays, having worked
5    there for such a short period of time?
6       A.    No.
7       Q.    I may have been a bit confused about
8    the time periods, but when you said you were to
9    be paid 15 million by -- actually, just remind
10    me, when did you leave Barclays?
11       A.    November, first week.
12       Q.    When we talked about the bonus to be
13    paid to you, the $15 million in total, I think
14    you had told me it would be paid in November and
15    then in February?
16       A.    Yes.  Uh-huh.
17       Q.    You left before the February payment
18    would have come due, correct?
19       A.    Yes.
20       Q.    Do you know why they paid you the
21    second piece?
22       A.    It was agreed that they would pay me.
23       Q.    When was it agreed?  At the time you
24    left or at some time before that?
25       A.    When I was leaving, as long as I

Page 19

HIGHLY CONFIDENTIAL - A. KIRK

1
2    didn't compete with them or solicit their
3    employees for six months, I was paid -- I would
4    be paid those amounts of money.
5       Q.    Was the non-compete/non-solicitation
6    in a written agreement?
7       A.    Yes.
8       Q.    Did you have a written agreement
9    concerning your departure from Barclays?
10       A.    Yes.
11       Q.    That went beyond the non-compete
12    and -- withdraw.  That's a terrible question.
13            When did you sign the written
14    agreement with Barclays?
15       A.    Sometime in November.
16       Q.    Do you have a copy of that agreement?
17       A.    I do.
18       Q.    Did you bring it with you?
19       A.    No.
20            Unless you brought it.
21            MR. ENRIGHT:  No.
22            MR. GAFFEY:  Just for the record, I
23    should say I think it's probably called for
24    by the subpoena.  We don't have to have a
25    colloquy about it now.  I just want to make

Page 20

HIGHLY CONFIDENTIAL - A. KIRK

1
2    my record.
3            I think it was called for by the
4    subpoena.  I also think it would be called
5    for by our document request to Barclays.
6            MR. HUME:  I think it's from November,
7    a different kind of agreement.  That's the
8    only reason.  We'll look for it.
9            MR. GAFFEY:  If you could, and if --
10            Can we go off the record for a minute?
11            (Discussion off the record.)
12    BY MR. GAFFEY:
13       Q.    Now, when you met, Mr. Kirk, with
14    Mr. Hume or people from his firm, did you talk
15    about events during a time period other than the
16    time you were employed by Barclays?
17            MR. KELLEY:  Objection.  Privileged.
18            MR. GAFFEY:  I think I can inquire to
19    find out -- a yes or no will tell me whether
20    or not I can press on the privilege point.
21       Q.    If you just answer yes or no.
22            MR. KELLEY:  No, I'll make the same
23    objection.
24       Q.    When did you meet with the lawyers for
25    Barclays?

Page 21

HIGHLY CONFIDENTIAL - A. KIRK

1
2       A.    Last Thursday.
3       Q.    Who was present?
4       A.    Mr. Hume and -- who was the other?
5            MR. KELLEY:  If you know.
6       A.    I don't remember that guy's name.
7       Q.    And I take it Mr. Kelley or people
8    from his firm were there as well?
9       A.    Yes.
10       Q.    Anyone else other than lawyers from
11    Mr. Kelley's firm or Mr. Hume's firm?
12       A.    No.
13       Q.    Did you review any documents?  Just
14    answer that yes or no, please.
15       Q.    Did any of those documents have the
16    effect of refreshing your recollection about the
17    events concerning the sale of assets from Lehman
18    to Barclays?
19       A.    Some.
20       Q.    Which ones?
21       A.    I don't remember specifically.
22       Q.    Are there any that you remember
23    specifically that refreshed your recollection
24    about matters?

Page 22

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.    Not in particular.
3    Q.    In general?
4    A.    Not in -- generally, yes.
5    Q.    Did those documents cover a time
6  period prior to -- on or prior to September 22?
7        MR. KELLEY:  I object to that.
8        MR. GAFFEY:  I'm not sure of the
9  nature of the objection, David.
10    Q.    Can you answer it?
11       MR. KELLEY:  Privileged.
12       MR. HUME:  We would assert the same
13  objection.
14       MR. GAFFEY:  Do you contend you have a
15  privilege with this witness?
16       MR. HUME:  I think the objection -- I
17  assume what you're questioning is to try to
18  attack this privilege.
19       MR. GAFFEY:  I'm not attacking the
20  privilege.  I'm just trying to find out if
21  you have a basis to assert it.
22       Do you contend you have a privilege?
23       MR. HUME:  Yes, I think that your
24  motion suggested that there were fiduciary
25  breach claims that you were considering as

Page 23

HIGHLY CONFIDENTIAL - A. KIRK

1
2  to senior Lehman officers and as part of
3  your investigation of potential claims
4  against Barclays, but the same theory would
5  give rise to claims against the officers and
6  against Barclays.  So, yes, I think we do
7  have a common interest privilege in that we
8  both deny those claims.
9        MR. GAFFEY:  I'll leave that, but I
10  don't want to have a colloquy on the record.
11  I disagree.
12  BY MR. GAFFEY:
13    Q.    Let's talk about that week, the week
14  in September that's brought us here.  Can you
15  tell me, sir, as a general matter, did you play
16  any role in the negotiations of the agreement
17  between Lehman and Barclays that led to the sale
18  of assets to Barclays.
19       (The witness confers with Mr. Kelley.)
20    A.    Is the week you're referring to the
21  15th through the 21st?
22    Q.    Yes.  Well, let me reframe it because
23  you asked that question.  At any point during
24  September of 2008, were you involved in any
25  discussions or negotiations with Barclays?

Page 24

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.    Yes.
3    Q.    When?
4    A.    I was involved in discussions that
5  went from Friday, the 12th of September, until
6  Sunday, the 14th, of the transaction that
7  ultimately failed, and I was asked to
8  participate in the discussions, facilitate the
9  discussions starting Friday morning, the 19th.
10    Q.    So if I understand your answer
11  correctly, you're not involved in any
12  discussions or negotiations with Barclays in the
13  period from the 15th through the 18th?
14    A.    That is correct.
15    Q.    Okay.  Describe for me, if you would,
16  generally the nature of what you did in
17  connection with the negotiations from the 12th
18  to the 14th, that is, from the Friday to the
19  Sunday?
20    A.    Generally, I helped organize the due
21  diligence of the assets of Lehman Brothers that
22  I was responsible for specifically and helped
23  coordinate with some of the other departments
24  meetings that would take place with Barclays.
25       In addition, I was down at the Federal

Page 25

HIGHLY CONFIDENTIAL - A. KIRK

1
2  Reserve both Saturday and Sunday, so I
3  participated in probably two different
4  discussions with Barclays on Saturday and
5  Sunday.
6    Q.    And what was the -- actually, if you
7  don't mind, just so we have some term we can use
8  and I don't have to keep saying it this way,
9  could you give me, you referred to the assets
10  you were responsible for specifically.  What
11  were those assets called?
12    A.    The global principal business.
13    Q.    What was the nature of the transaction
14  that was being discussed from the Friday and the
15  Saturday and the Sunday, the 12th through the
16  14th?
17    A.    The nature of that transaction was
18  Barclays was going to buy all of Lehman
19  Brothers.
20    Q.    Do you know what the structure of that
21  transaction was?  Was it an asset purchase?
22  Stock purchase?  Did you have any sense of that?
23    A.    It was a -- I'm not an M&A expert, but
24  I believe they were going to assume the debt and
25  other contractual obligations of Lehman

HIGHLY CONFIDENTIAL - A. KIRK

1
2  Brothers.  They were going to not assume the
3  preferred stock of Lehman Brothers and they were
4  going to pay a nominal, less than a dollar, per
5  share price for part of the equity and they were
6  going to spin off the real estate and private
7  equity positions into a new company which would
8  be capitalized with debt by a consortium of
9  lenders and have as its equity capital the
10 preferred stock of Lehman Brothers and the
11 equity.
12     Q.    And you said that that transaction
13 failed.  Why did that transaction fail, do you
14 know?
15     A.    I was told by Bart McDade that the FSA
16 had turned down the application to close that
17 transaction.
18     Q.    When were you told this by Mr. McDade?
19     A.    Sunday around noon.
20     Q.    Now, did you have any role in those
21 negotiations, again I'm on the 12th through the
22 14th, other than as you described, the sense I'm
23 getting is primarily involved with due diligence
24 for the global principal business.
25     A.    Yes, we had -- I spent most of my time

HIGHLY CONFIDENTIAL - A. KIRK

1
2  trying to coordinate due diligence with our
3  principals and the rest of the street, meaning
4  Goldman Sachs, Citigroup, First Boston, et
5  cetera, around the value of those assets which
6  they were going to make a loan to the spun-off
7  company.
8      Q.    And were Barclays personnel involved
9  in that process?
10     A.    Not in the due diligence process, no.
11     Q.    Were you in touch with Barclays
12 personnel about this due diligence process?
13     A.    There were some joint meetings that
14 were arranged between Goldman Sachs and
15 Citigroup as point for the street and Barclays
16 and Lehman Brothers together.  Barclays
17 personnel were obviously in those meetings.
18     Q.    To your knowledge, at any point in
19 that period from Friday to Sunday were people
20 from Barclays given an opportunity to review
21 Lehman's books for due diligence purposes?
22     A.    Yes, I believe they continued to do
23 due diligence over the weekend.
24     Q.    And did you have any involvement in
25 that project, that process, giving access to

HIGHLY CONFIDENTIAL - A. KIRK

1
2  Lehman's books to personnel from Barclays?
3      A.    I don't recall specifically, but
4  probably.  We were down at the Federal Reserve
5  in rooms across the hallway.
6      Q.    During the period from Friday, the
7  12th, through Sunday, the 14th, were you dealing
8  with any particular people at Barclays who you
9  could name?
10     A.    Archibald Cox.  Bob Diamond.  Rich
11 Ricci.  Michael Klein, as their agent.
12     Q.    Anyone else?
13     A.    Those are the ones I recall.
14     Q.    And was there a principal -- were
15 there a group of people you would describe as
16 the principal negotiators for Lehman?  Again,
17 I'm in the 12th through the 14th.
18     A.    Mark Shafir, who was head of M&A; Bart
19 McDade, who was president; and via telephone,
20 Dick Fuld.
21     Q.    Anyone else you would characterize,
22 that you would describe as Lehman's principal
23 negotiators?
24     A.    I was the advisor.  I believe,
25 although I don't know for sure, I don't have any

HIGHLY CONFIDENTIAL - A. KIRK

1
2  direct knowledge, but I have secondhand
3  knowledge that Skip McGee was involved.
4      Q.    Anyone else?
5      A.    That's all I know.
6      Q.    What's the basis of your secondhand
7  knowledge that McGee was involved?
8      A.    Mark Shafir would call Skip from the
9  Federal Reserve.
10     Q.    After that transaction failed, did
11 there come a time when you learned that
12 negotiations had begun again between Barclays
13 and Lehman?
14     A.    Late Sunday night sometime between 11
15 and 2 in the morning.
16     Q.    Would you describe that to me?  How
17 did you learn it?  Where were you when you
18 learned it?
19     A.    I believe I was in Bart McDade's
20 office, and he mentioned that Barclays had --
21 they had had contact with Barclays and Barclays
22 was interested -- "they" meaning Dick Fuld,
23 Skip and Barclays was interested in pursuing an
24 acquisition of the U.S. businesses of Lehman
25 Brothers.

Page 30

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.   Did he tell you anything more than
3  that?  Who called who or anything that was said
4  in the conversation?
5    A.   No, nothing more than that.
6    Q.   Who else was present when you learned
7  this from Mr. McDade on Sunday night?
8    A.   I don't recall specifically, but
9  probably Mike Gelband.
10    Q.   I should tell you, and I should have
11  said this upfront, I don't want you, please, to
12  speculate during the day.
13    A.   Okay.
14    Q.   Once or twice you've answered by
15  saying "probably," and it's common usage, but if
16  you can give me your memory of things, as you
17  have been, tell me when you'd have to speculate,
18  okay --
19    A.   Okay.
20    Q.   -- so the record will be clear.
21      So do you know if Mr. Gelband was in
22  that conversation?
23    A.   I don't recall.
24    Q.   Now, do you know if that conversation
25  took place before or after Lehman filed for

Page 31

HIGHLY CONFIDENTIAL - A. KIRK

1
2  bankruptcy protection?
3    A.   I don't remember exactly when the firm
4  filed, but that's a matter of record, so ...
5    Q.   Well, do you know, do you remember
6  when you learned, first learned the firm was
7  going to file?  Withdrawn.
8      Did you know before the firm filed
9  that it was going to do so?
10    A.   Yes.
11    Q.   When did you learn, first learn that
12  the firm was going to file?
13    A.   After the board meeting on Sunday
14  night, approximately 8 o'clock.
15    Q.   Did you attend that board meeting?
16    A.   No.
17    Q.   From whom did you learn the substance
18  of the board meeting?
19    A.   I don't recall.
20    Q.   And the conversation with Mr. McDade
21  about renewed negotiations with Barclays, did it
22  take place after the board meeting?
23    A.   Yes.
24    Q.   Did Mr. McDade ask you to do anything
25  in connection with these renewed negotiations?

Page 32

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   No.
3    Q.   Did anyone ask you to do anything in
4  connection with these new renewed negotiations?
5    A.   No.
6    Q.   Did there come a time when you learned
7  the negotiations --
8    A.   I'm sorry.
9    Q.   Beg your pardon.  Go ahead.
10    A.   No, not that evening.
11    Q.   Not that evening, okay.
12      Did come a time where you were asked
13  to perform some tasks or do something in
14  connection with the negotiations?
15    A.   Yes.
16    Q.   And when did that happen?
17    A.   Late Thursday night, the 18th of
18  September.
19    Q.   I'm coming there.
20      Did there come a time when you learned
21  there was an agreement reached between Lehman
22  and Barclays concerning the sale of Lehman
23  assets to Barclays?
24    A.   Yes.
25    Q.   When did you learn that?

Page 33

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   Sometime Tuesday.
3    Q.   From whom did you learn that?
4    A.   I don't recall.
5    Q.   Did you learn whether that agreement
6  was reduced to a writing?
7    A.   No.
8    Q.   Have you ever seen any -- the written
9  agreement, have you ever seen a written
10  agreement between Lehman and Barclays concerning
11  the asset sale?
12    A.   No.
13    Q.   So you learn on maybe the Tuesday that
14  there's a deal between Lehman and Barclays, and
15  then -- and on late Thursday night you're asked
16  to participate in some way.
17      How are you spending your time between
18  the Tuesday and Thursday?
19    A.   I'm spending, between really Sunday
20  night and Thursday, I was spending all my time
21  attempting to help coordinate the risk reduction
22  and risk management of the firm so it could
23  survive for a few days to get to closure.
24    Q.   Now, did those -- now I'm in the
25  period from, that you just described, from the

Page 34

HIGHLY CONFIDENTIAL - A. KIRK

1  
2  Sunday up until Thursday.
3      A.   Uh-huh.
4      Q.   Are you working with any people from
5  Barclays in connection with those activities?
6      A.   I don't recall specifically working
7  with Barclays employees.  Just Lehman employees.
8      Q.   Were you in communications with
9  Barclays employees?
10     A.   Not directly.  I would have
11 communicated to our finance staff and they would
12 have communicated to Barclays.
13     Q.   And who on the finance staff?
14     A.   Ian Lowitt, Paolo Tonucci.
15     Q.   Did you also deal with Martin Kelly?
16     A.   Maybe once, twice.
17     Q.   When you learned about a deal between
18 Lehman and Barclays having been concluded, what
19 was your understanding of the nature of the
20 deal?
21     A.   That I was -- that it was going to be
22 an asset purchase deal and that they were going
23 to purchase some amount of assets and assume the
24 employees of Lehman, some of the limited
25 obligations of Lehman Brothers.

Page 35

HIGHLY CONFIDENTIAL - A. KIRK

1  
2      Q.   Did you have an understanding of the
3  asset components that were going to be
4  purchased?
5      A.   No.
6      Q.   Did you ever learn what asset
7  components were going to be purchased?
8      A.   Are you specifically asking about the
9  deal that was struck on that Tuesday?
10     Q.   Yes.
11     A.   No.
12          No, let me be more specific.
13     Q.   Sure.
14     A.   I got an e-mail that said they were
15 going to purchase the building and a pool of
16 other broadly defined assets.
17     Q.   Who did you get that e-mail from?
18     A.   Ajay Nagpal.
19     Q.   Could you spell that so we have it in
20 the record, please?
21     A.   A-J-A-Y  N-A-G-P-A-L.
22     Q.   What understanding did you have of the
23 constituent parts of the pool of the defined
24 assets apart from the building?
25     A.   None.

Page 36

HIGHLY CONFIDENTIAL - A. KIRK

1  
2      Q.   Did you have an understanding who the
3  principal negotiators for Lehman of that
4  transaction were?
5      A.   I understood it to be Mark Shafir,
6  Skip McGee.
7      Q.   Did Mr. McDade have any role in those
8  negotiations, to your understanding?
9      A.   I believe he did.
10     Q.   But you wouldn't describe him as one
11 of the principal negotiators?
12     A.   He might have been.
13     Q.   Do you have a reason to think he might
14 have been?  Is it that --
15     A.   He was the president of the firm.
16     Q.   But other than his title, do you have
17 a basis for thinking he might have been one of
18 the principal negotiators?
19     A.   No.
20     Q.   Did you talk to Shafir about the
21 negotiations?
22     A.   No.
23     Q.   Did you talk to McGee about the
24 negotiations?
25     A.   No.

Page 37

HIGHLY CONFIDENTIAL - A. KIRK

1  
2      Q.   Did you have an understanding of the
3  nature of the liabilities that Barclays was
4  going to assume under the agreement?
5      A.   Not at the time.
6      Q.   Did there come a time when you did
7  gain an understanding of the liabilities
8  Barclays was going to assume under the
9  agreement?
10     A.   A very cursory understanding on
11 Friday.
12     Q.   That's on Friday, the 19th?
13     A.   Correct.
14     Q.   From whom did you get that
15 understanding?
16     A.   Paolo Tonucci.
17     Q.   What did Mr. Tonucci tell you in that
18 regard?
19     A.   That there were two categories.  One
20 was assumption of certain trade liabilities and
21 the other was the assumption of compensation
22 liabilities, and that they together totaled
23 somewhere over $4 billion.
24     Q.   Did you talk to anyone other than
25 Mr. Tonucci about these assumed liabilities that

Page 38

**HIGHLY CONFIDENTIAL - A. KIRK**

1  totaled somewhere over $4 billion?
2  A.    During Friday, the amount of those
3  liabilities were referenced several times by
4  Paolo, who was attempting to accurately estimate
5  them, and by Barclays in their description of
6  the deal later in the afternoon.
7  Q.    Let's go back to the earlier part of
8  the week.  I swear I'm getting to Thursday and
9  Friday.
10  A.    That's all right.
11  Q.    Now I'm still sort of in the early
12  part of the week.
13  Were you asked to be involved in any
14  assessment of the value of the pool of
15  securities that was to be sold?
16  A.    No.
17  Q.    Did you ever come to understand that
18  the agreement between Lehman and Barclays
19  included a loss, an overall loss against the
20  amount at which those assets were carried on
21  Lehman's books?
22  A.    No.
23  Q.    Did you ever at any time have an
24  understanding that that agreement involved a

Page 39

**HIGHLY CONFIDENTIAL - A. KIRK**

2  discount of any kind given to Barclays against
3  the amount shown on Lehman's books of those
4  assets?
5  A.    No.
6  Q.    Apart from your counsel and counsel
7  from Mr. Hume's firm, have you spoken to anybody
8  about that topic?
9  A.    No.
10  Q.    When you learned about the sale of a
11  pool of assets, and again, apart from the real
12  estate on Tuesday, did you have an understanding
13  it was to be sold at book value?
14  A.    I didn't have an understanding one way
15  or the other.
16  Q.    So on the Monday, the Tuesday, the
17  Wednesday and during the day on Thursday, if I
18  understand what we've talked about so far
19  correctly, you're essentially involved in
20  managing risk?
21  A.    Yes.
22  Q.    And the purpose, apart from the
23  inherent reason for doing it --
24  A.    Keep the firm funded.
25  Q.    Did you have an understanding, while

Page 40

**HIGHLY CONFIDENTIAL - A. KIRK**

1  you were doing that, of how long you needed to
2  do that?  What the timetable was for things?
3  A.    We knew we were -- I believe they were
4  trying to schedule a meeting with the bankruptcy
5  court on Friday evening, Friday afternoon.
6  It was really a day-to-day operation.
7  Q.    And during that day-to-day operation,
8  did any of your activities involve entering into
9  or addressing repurchase agreements, repos?
10  A.    Some of them.
11  Q.    Could you describe that for me?  What
12  was the nature of your activities in connection
13  with repos?
14  A.    The firm had a number, a large number
15  of clients whose assets had been trapped under
16  repurchase agreements in the European
17  subsidiaries, so we spent some time trying to
18  figure out how we were going to help solve those
19  issues.  That was a big piece of it.
20  And then we were also trying to shrink
21  the matched book because it used liquidity at
22  the firm as a way to raise liquidity, so where
23  you would finance client positions with other
24  client's money.

Page 41

HIGHLY CONFIDENTIAL - A. KIRK

1  Q.    Financing of client positions with
2  other client's money; is that what you're
3  talking about when you talk about the matched
4  book?
5  A.    Yes.
6  Q.    And by shrinking the matched book,
7  you're reducing that level of activity of --
8  A.    Yes.
9  Q.    -- using --
10  A.    And you're -- it would -- I was told
11  it would free up liquidity.
12  Q.    And did you have any involvement, sir,
13  in connection with the Repurchase Agreement that
14  Lehman had with the Fed?
15  A.    Only -- my only involvement there was
16  I was at the Fed when they told us Sunday
17  evening that they would lend us money to pay
18  back the tri-party repo lenders the following
19  morning.
20  Q.    And did Lehman enter into a Repurchase
21  Agreement with the Fed for that purpose, do you
22  know?
23  A.    Yes, they did.
24  Q.    Were any of your activities devoted to

Page 42

HIGHLY CONFIDENTIAL - A. KIRK

1
2  the making of that Repurchase Agreement with the
3  Fed?
4      A.  No.
5      Q.  Did there come a time when the Fed
6  made it known it wanted to come out of that
7  Repurchase Agreement, to your knowledge?
8      A.  Yes.
9      Q.  Describe to me how you came to learn
10  that.
11      A.  I don't recall specifically who told
12  me.
13      Q.  As a general matter, tell me what you
14  remember about learning that the Fed wanted to
15  get out of the Repurchase Agreement with Lehman?
16      A.  At some point on Wednesday, the Fed
17  said that they wanted to get paid back, I
18  believe it was Wednesday, and Lehman had to
19  figure out how to arrange alternative financing,
20  and there was only one party that would provide
21  that financing and that was Barclays.
22      Q.  And what did you do in connection with
23  those activities, if anything?
24      A.  I was not a repo expert.  I didn't --
25  I was not -- I'm not a repo expert.  I did not

Page 43

HIGHLY CONFIDENTIAL - A. KIRK

1
2  participate in those.
3      Q.  How did you learn about those
4  activities?  From whom?
5      A.  I don't recall specifically.
6      Q.  Do you have any general recollection?
7      A.  Probably the finance staff.
8      Q.  And that would be Tonucci?
9      A.  Ian Lowitt or Tonucci, one or the
10  other.
11      MR. GAFFEY:  Can we take a five-minute
12  break?
13      THE WITNESS:  Sure.
14      (Recess; Time Noted:  10:21 A.M.)
15      (Time Noted:  10:29 A.M.)
16  BY MR. GAFFEY:
17      Q.  In a question I asked you a little
18  while ago, Mr. Kirk, you clarified by saying,
19  "You mean the agreement made on Tuesday?"  Did
20  there come a point where you learned that the
21  deal had changed?
22      A.  Friday.
23      Q.  Okay.  Here we are.  Tell me about
24  Friday.
25      Actually, let me just back up.  I

Page 44

HIGHLY CONFIDENTIAL - A. KIRK

1
2  think you also told me there was a conversation
3  late on Thursday night that began your Friday
4  activities?
5      A.  Yes.
6      Q.  Okay.  Let's talk about that one
7  first.  Who's the conversation with, where are
8  you, and what's the content of the conversation?
9      A.  I'm at home.  I get a call from Bart
10  McDade.  He informs me that Mark Shafir has left
11  Lehman Brothers and that he needs some help
12  wrapping up the Barclays deal the following day.
13      Q.  Had Shafir left on the Thursday?
14      A.  I believe so.
15      Q.  You described Shafir as one of the
16  principal negotiators.  As of the Thursday, to
17  your knowledge, has he now gone?
18      A.  Yes.
19      Q.  Did McDade have anything to say about
20  that topic?
21      A.  He said he went -- he quit and he went
22  to work at Citigroup.
23      Q.  Other than telling you that Shafir had
24  quit and gone to work at Citigroup, did
25  Mr. McDade have anything to say about

Page 45

HIGHLY CONFIDENTIAL - A. KIRK

1
2  Mr. Shafir's departure --
3      A.  No.
4      Q.  -- on this Thursday?
5      A.  No.
6      Q.  Did Mr. McDade say anything about the
7  departure, Shafir's departure having any impact
8  on the deal?
9      A.  He said that, given his departure, he
10  would need extra help and he asked for my help.
11      Q.  What did he ask you to do?
12      A.  That evening he did not specify what
13  he wanted me to do.
14      Q.  Tell me what Mr. McDade said and what
15  you said in that conversation on Thursday night,
16  as best you remember.
17      A.  He said that Mark Shafir has quit,
18  gone to Citigroup, I need some help wrapping
19  this up tomorrow, can you help me, I said yes.
20      Q.  That's the entire conversation as you
21  remember it?
22      A.  Yes.
23      Q.  Did you ask him what he needed you to
24  do?
25      A.  I think I asked him, Do you want me to

Page 46

HIGHLY CONFIDENTIAL - A. KIRK

1      come in the office tonight?  He said no, he was
2      already home.  I said, What time do you want me
3      to come in the morning?  And he said, you'll get
4      an e-mail about an early morning meeting.
5          Q.   Did you speak to anyone else that
6      Thursday night about the deal after you spoke to
7      Mr. McDade?
8          A.   Not that I recall.
9          Q.   So let's just get through the rest of
10     Thursday night, okay?  After you have the
11     conversation with Mr. McDade, he says he needs
12     your help, there will be an early morning
13     meeting.
14          Did you do anything else with respect
15     to the transaction on the Thursday night?
16          A.   I don't recall specifically or
17     generally.
18          Q.   On the Thursday, sir -- I'll show you
19     a document about this in a second -- do you
20     recall reaching out to others in the firm,
21     including Kaushik Amin and Gerald Donini and
22     Eric Felder, to ask them to put together
23     information to -- that would be necessary to
24     portray a fire sale liquidation of the

Page 47

HIGHLY CONFIDENTIAL - A. KIRK

1      securities?
2          A.   I may have done so by e-mail.
3          Q.   Okay.  I'll show you the e-mail, but
4      first, if you don't mind, what's your
5      independent recollection of that, if you have
6      any?
7          A.   My independent recollection is that I
8      got an e-mail for a scheduled meeting the
9      following day and I got a request, I didn't
10     recall when it was specifically, to help
11     organize a valuation exercise on behalf of Barry
12     Ridings.  I didn't recall whether that was
13     Thursday night or Friday morning.
14          Q.   And who is Barry Ridings?
15          A.   A Lazard restructuring banker hired by
16     the firm to testify in bankruptcy court.
17          Q.   And who made this request of you?
18          A.   I don't recall specifically who asked
19     me to do that.
20          Q.   I'm showing you, Mr. Kirk, what has
21     been marked at a prior deposition as Exhibit 3
22     an e-mail from you to an address
23     4955214@archwireless.net.  Is that your wireless
24     account?

Page 48

HIGHLY CONFIDENTIAL - A. KIRK

1          A.   I believe we've determined that was a
2      wireless account that was used in the late '90s
3      when there were wireless pagers, if you recall
4      those devices.
5          Q.   Okay.  Uh-huh.
6          A.   But had been inoperative but still
7      alive in the system.
8          Q.   Okay.  You're about to solve one of
9      the great mysteries of this case.
10          A.   Yeah, we had --
11          Q.   Did you have that account?  Are you
12     sending it to your home e-mail?
13          A.   I don't -- no, this is auto-forwarded
14     by the computers.
15          Q.   Okay.
16          A.   So like they auto-forward to your
17     BlackBerry, these are things that auto-forward
18     from the --
19          Q.   You would love it right now if I said
20     I have nothing further, but that wasn't the key
21     question, so let me go to the exhibit that I
22     showed you.
23          A.   We had to ask ourselves the same
24     question when we saw this.

Page 49

HIGHLY CONFIDENTIAL - A. KIRK

1          Q.   Okay.  Take a minute to look through
2      what was marked as Exhibit 3, sir.  I have a
3      couple questions for you about it.
4              (Document review.)
5          A.   Okay.
6          Q.   In this, who is Daniel Flores, the man
7      from whom the underlying e-mail is sent?
8          A.   I believe Daniel worked for Mark
9      Shapiro.  It's indicated he worked in the
10     restructuring group that was run by a fellow
11     named Mark Shapiro at Lehman.
12          Q.   And in the e-mail, you see that
13     Mr. Flores recounts, "Alex Kirk suggested we
14     contact each of you to help us understand on a
15     theoretical basis what would happen in a fire
16     sale liquidation of the securities that are
17     being transferred to Barclays as part of the
18     proposed transaction."
19          Did you have a conversation or
20     communication with Mr. Flores about that topic?
21          A.   This indicates I must have.
22          Q.   Apart from seeing it written on this
23     e-mail, do you have any recollection?
24          A.   I don't recall.

Page 50

HIGHLY CONFIDENTIAL - A. KIRK

2    Q.   Does this e-mail refresh your
3  recollection in any way of a communication with
4  Mr. Flores about that topic?
5    A.   Again, I assume that I must have
6  talked to him.
7    Q.   But again, sir, apart from seeing it
8  on the page in front of you, do you have a basis
9  for that assumption?
10   A.   No.
11   Q.   You said that that was -- well, let me
12  continue down into Mr. Flores' e-mail where he
13  talks about, "We will be leaving on your desks a
14  list of the top 100 positions in each of your
15  area's expertise." Did that exercise take
16  place, to your knowledge?
17   A.   Yes, I believe it did.
18   Q.   And what was the result of the
19  exercise? Was there a fire sale liquidation
20  scenario put together?
21   A.   So these positions were delivered to
22  each of the recipients of this e-mail, Kaushik
23  Amin, Charlie Spero, Eric Felder, Gerry Donini,
24  were the various business heads in charge of
25  parts of fixed income or equities, and they

Page 51

HIGHLY CONFIDENTIAL - A. KIRK

2  would have been -- had those delivered early in
3  the morning, and then we were attempting to have
4  an 11 o'clock meeting to go over the findings of
5  their -- their assumptions and analysis about
6  the value of those positions.
7    Q.   And did that meeting take place?
8    A.   Yes, it did.
9    Q.   Were you at it?
10   A.   Yes.
11   Q.   Who was at the meeting?
12   A.   Mike Gelband, Kaushik Amin, Charlie
13  Spero and Gerry Donini, and Daniel Flores was
14  there as well as Gerry Reilly.
15   Q.   Was James Seery there?
16   A.   He might have been. I recall he was
17  there.
18   Q.   You do recall he was there?
19   A.   I recall he was there.
20   Q.   Was a determination made about
21  liquidation value?
22   A.   No. The data had been delivered in --
23  the position data had been delivered in a way
24  that, given the short period of time, a couple
25  hours, the business heads were not able to

Page 52

HIGHLY CONFIDENTIAL - A. KIRK

2  determine in any comprehensive way the values.
3  So we adjourned the meeting with the -- with a
4  plan that Barry Ridings would talk to each of
5  these individuals separately closer to the end
6  of the day when they might have a better sense.
7    Q.   Do you know if Mr. Ridings did that?
8    A.   I don't know that.
9    Q.   Did he speak to you at all?
10   A.   Not about this topic. I saw him later
11  in the day in a meeting.
12   Q.   Let me just back up a little bit. Did
13  Ridings know you were organizing this project?
14   A.   Yes.
15   Q.   Would he have known you're the contact
16  guy on it?
17   A.   Yes. I probably called him and told
18  him call these people directly.
19   Q.   Did you have any conversations that
20  you recall with Mr. Ridings about the need for a
21  liquidation scenario to be analyzed?
22   A.   I assume he clarified the reasoning as
23  a test for the court.
24   Q.   When you say you assume that, what's
25  the basis of that assumption?

Page 53

HIGHLY CONFIDENTIAL - A. KIRK

2    A.   I vaguely recall having a conversation
3  with him.
4    Q.   Let's go to the early morning of
5  Friday, the 19th. You spoke a moment ago about
6  getting a call from Mr. McDade. Shafir's quit.
7  He asked for your help, can you come to meet
8  with him in the morning. Did you do that?
9    A.   Yes.
10   Q.   And where was the meeting?
11   A.   It was a -- I believe it was in my
12  office.
13   Q.   In your office, sir?
14   A.   Yes.
15   Q.   Who was in attendance?
16   A.   Ian Lowitt, Chris O'Meara, Gerry
17  Reilly, Paolo Tonucci. I think that was it.
18   Q.   Was Mr. McDade there?
19   A.   I don't believe, no, I don't believe
20  he was there.
21   Q.   Now, in your conversation with
22  Mr. McDade the night before, he had told you
23  Shafir quit, he told you he needed your help,
24  you offered to come in, he said come in the
25  morning, if I remember your testimony right, and

Page 54

HIGHLY CONFIDENTIAL - A. KIRK

1    that's not what governs, that's basically the
2    topics you covered with McDade on Thursday
3    night.
4         So here you are in a meeting with
5    Lowitt, O'Meara, Reilly and Tonucci.  Do you
6    learn more at the meeting about the nature of
7    the help that you're going to have to give?
8         A.   They broadly outlined the first
9    transaction.  That was a quick summary.  Then we
10   discussed an issue that had come up earlier that
11   morning around JPMorgan as our clearing bank
12   shutting down Lehman's DTC account and what
13   effect that would have on the transaction as
14   planned.
15        Q.   Now, you referred to -- you said they
16   broadly outlined the first transaction.  By the
17   Friday morning, is it your understanding there's
18   a second transaction, a subsequent transaction?
19        A.   By the time we had this meeting --
20        Q.   Uh-huh.
21        A.   -- it was my view, my opinion, that
22   there would have to be a reworking of the
23   transaction because a vast majority of those
24   securities that had been planned for transfer

Page 55

HIGHLY CONFIDENTIAL - A. KIRK

1    were held at JPMorgan.  There was a -- and
2    JPMorgan had a dispute of some sort about the
3    transfer of the repo with Barclays, which was
4    described to me by Mike Keegan, and in addition
5    to that, they shut down Lehman's -- they closed
6    down Lehman's DTC account, which led me to
7    believe that JPMorgan would not cooperate and
8    transfer the aforementioned securities to
9    Barclays on that Friday.
10        Q.   When had you spoken to Mike Keegan?
11        A.   I got up and I went to the office
12   about 5 A.M. and I ran into him about 5:30 in
13   the morning.
14        Q.   Had you met Mr. Keegan before?
15        A.   I had met him the week before during
16   the due diligence process.
17        Q.   So you say "they," that's some
18   combination of Lowitt, O'Meara, Reilly and
19   Tonucci, broadly outlined the first transaction
20   to give you a quick summary?
21        A.   Yes.
22        Q.   How did they summarize -- tell me what
23   you remember about their broad outline of the
24   first transaction, the quick summary that they

Page 56

HIGHLY CONFIDENTIAL - A. KIRK

1    gave you.
2         A.   They summarized it as a purchase of
3    the building, purchase of assets, and an
4    assumption of this 4 billion, 4 and a quarter
5    billion dollars in liabilities.
6         That discussion ended very quickly
7    because of my belief that that transaction,
8    given what had just transpired -- what I had
9    learned from Keegan and the action that JPMorgan
10   had taken, that I believe that they would act as
11   a hostile party towards the closing of this
12   transaction and that whatever had taken place
13   before was irrelevant.
14        Q.   Did Mr. Tonucci tell you anything
15   other than there was an assumption of
16   liabilities in an approximate amount of 4 and a
17   quarter billion for compensation of payables?
18        A.   No.
19        Q.   Did you have any knowledge as to how
20   that number came to be determined?
21        A.   No.  I was not concerned with that
22   part of the transaction.
23        Q.   I'm sort of away from the Friday
24   meeting for a moment.

Page 57

HIGHLY CONFIDENTIAL - A. KIRK

1         A.   No.
2         Q.   At any point did you come to an
3    understanding as to how those, those components
4    of assumed liabilities came to be calculated?
5         A.   No.  No.
6         Q.   When the transaction, the first
7    transaction was outlined to you by Tonucci,
8    O'Meara, Reilly and Lowitt, or some combination,
9    did you have an understanding as to where the
10   assets would come from to fund those assumed
11   liabilities?
12        A.   I believe there was a schedule,
13   one-page schedule, which I think you have, that
14   broadly gave an asset and liability balance
15   sheet.
16        Q.   Have you ever seen that schedule?
17        A.   Yes.
18        Q.   When did you first see that schedule?
19        A.   I believe it was that morning.  It was
20   that morning.
21        Q.   Apart from the schedule, did you look
22   at any other documents that morning?
23        A.   No.
24        Q.   I'm putting before you what previously

Page 58

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2   has been marked as Deposition Exhibit 19.
3       A.   Yes, that's the schedule.
4       Q.   And the schedule that you saw that
5   morning was the one with the annotation in the
6   upper right-hand corner "9/16/08, Final SB"?
7       A.   Uh-huh.
8       Q.   Do you remember that?
9       A.   Yes.
10      Q.   Okay.  Who gave you the schedule?
11      A.   One of the gentleman.
12      Q.   Do you recall which one?
13      A.   No.
14      Q.   Did anybody tell you anything about
15   the schedule?
16      A.   They briefly described it as an asset
17   sale that was approximately this size of this
18   characteristics of the category of assets that
19   they were going to buy, category of liabilities
20   that they were going to assume, including
21   financing liabilities and the aforementioned
22   cure payment and comp.
23      Q.   When you refer to the financing
24   liabilities, are you just sort of broadly
25   describing the liabilities opposite the

Page 59

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2   particular assets in ST borrowings, government
3   and agencies?
4       A.   Yes.
5       Q.   The ones that add up to 33.9?
6       A.   Well, in addition, there's the 34.5
7   below that.
8       Q.   For collateralized short-term funding,
9   right?
10      A.   Yes.
11      Q.   Now, did you have an understanding
12   when you were shown this schedule of where the
13   values for assets -- from where the values for
14   assets were derived?
15      A.   I don't recall.  We quickly moved on
16   from this.
17      Q.   Did whoever described the schedule to
18   you, did they give you any description of the
19   role that any of that schedule played in the
20   first transaction?
21      A.   They described it as the template for
22   the first transaction.
23      Q.   And do you know who put together the
24   schedule that was the template for the first
25   transaction?  Did they tell you that?

Page 60

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2       A.   No.
3       Q.   Did you ask?
4       A.   No.
5       Q.   Now, present at the meeting was
6   Lowitt, O'Meara, Reilly and Tonucci.  Was
7   anybody participating by telephone?
8       A.   I don't recall.
9       Q.   Was there any participation in that
10  Friday morning meeting by anybody from Barclays?
11      A.   No.
12      Q.   So they broadly outlined the first
13  transaction.  They tell you the problem with
14  JPM, one of them or some combination of them.
15   What happens next in that meeting?
16      A.   We break up.  I tell them that I'm
17  going to go try to shepherd the valuation
18  process that I have been asked to follow up on
19  for this 11 o'clock meeting and that I'm going
20  to try to arrange a meeting with the senior
21  executives at Barclays to explain to them what
22  my view was, that this transaction as outlined
23  couldn't be closed on that Friday night, which
24  they agreed with.
25      Oh, I tell them I'm first going to go

Page 61

HIGHLY CONFIDENTIAL - A. KIRK

1
2   inform senior Lehman executives, Bart and Dick,
3   of this problem.
4       (Mr. Kelley confers with the witness.)
5       A.   I'm sorry, just to clarify, my
6   assumption about this being problem -- this
7   transaction being problematic was agreed to.
8   The basis for that worry was verified by or
9   agreed to by Ian Lowitt and Paolo Tonucci in
10  that meeting.
11      Q.   As I understand it, your primary
12  activities for the week until this Friday
13  morning meeting had been in risk management --
14      A.   Uh-huh.
15      Q.   -- had been in shrinking the matched
16  book, keeping the firm alive so that the Friday
17  hearing had some possibility of succeeding, is
18  that a fair summary?
19      A.   Yes.
20      Q.   And you're called into this meeting on
21  Friday morning and told that the transaction
22  that's been on the table all week can't go
23  forward because of this problem.  This may seem
24  an odd question, sir, but why are you now the
25  guy that has to call Barclays and call senior

Page 62

HIGHLY CONFIDENTIAL - A. KIRK

1
2  management?  Did you have an understanding of
3  why you're the lucky winner of that
4  responsibility?
5       A.   Because I volunteered.  Yeah, I --
6       Q.   Did you have --
7       A.   Believe me, I almost had a heart
8  attack just thinking about that.
9           (Mr. Kelley confers with the witness.)
10      A.   That's true.  In addition to Mark
11 Shafir had left the firm, so ...
12      Q.   That's sort of implicit in my
13 question.  Why are you the guy who has to step
14 up to the plate when Shafir leaves?  Why not
15 McGee?  Why not Tonucci?  Why not Lowitt?
16      A.   Because Bart trusted me.
17      Q.   So did you go and inform more senior
18 Lehman executives of the issues of the problem?
19      A.   Yes.
20      Q.   Okay.  Tell me about that.  Who did
21 you contact and what did you tell them, what did
22 they say to you?
23      A.   I contacted Bart, I don't recall who
24 else was in the meeting exactly, but I walked
25 in, and there were others, I don't remember who

Page 63

HIGHLY CONFIDENTIAL - A. KIRK

1
2  exactly, Fuld, most likely, that the assets and
3  liabilities that had been assumed to be
4  transferred in the first transaction were all
5  held in custody or had to be cleared through
6  JPMorgan, and because JPMorgan had taken this
7  hostile action, there was a dispute, which I
8  didn't understand the exact nature of, with the
9  transfer of collateral between Barclays and --
10 between the Fed through JPMorgan to Barclays.
11          I knew at a very high level there was
12 a dispute between the two firms as to what
13 collateral was accept -- what collateral was
14 transferred and what collateral was left at
15 JPMorgan, and I knew that JPMorgan had shut down
16 Lehman's DTC account and failed all the
17 settlements on that Friday, and a combination of
18 those two pieces of information led me to
19 believe that JPMorgan wouldn't transfer these
20 assets on this schedule and liabilities, both
21 sides, in any normal course.
22      Q.   And when you reported this to McDade,
23 you said -- withdrawn.  You said Fuld was there,
24 most likely.
25          Do you have a recollection of him

Page 64

HIGHLY CONFIDENTIAL - A. KIRK

1
2  being there, or are you assuming again, because
3  of his role, his title, that he might have been?
4       A.   Yes, I'm assuming because of his title
5  he might have been.
6       Q.   But you do recall talking to McDade
7  about it?
8       A.   Yes.
9       Q.   Do you recall anyone else other than
10 McDade to whom you spoke?
11      A.   No.
12      Q.   And what did Mr. McDade say?
13      A.   He said we should have a sit-down with
14 the Barclays senior team and we should explain
15 our point of view on this ASAP.
16      Q.   And what happened next?
17      A.   We had a meeting with Bart, myself,
18 and then it was Michael Klein, Rich Ricci, and
19 Mike Keegan from Barclays.
20      Q.   Where was the meeting?
21      A.   It was in an office on 31 that
22 Barclays was using as temporary space.
23      Q.   And who's there from the Lehman side
24 of the table?
25      A.   Bart and I were there.

Page 65

HIGHLY CONFIDENTIAL - A. KIRK

1
2       Q.   Anyone else?
3       A.   Ian was there as well, I'm pretty
4  sure.
5       Q.   Was Tonucci there?
6       A.   I don't remember.
7       Q.   Do you recall whether or not with
8  regard to which ones there were, do you recall a
9  bigger meeting than that, or is this the
10 assembly of people that you remember?
11      A.   It was an assembly of no more than ten
12 people total.
13          MR. GAFFEY:  Can we go off the record
14 for a minute?
15          (Discussion off the record.)
16          (Recess; Time Noted:  10:59 A.M.)
17          (Time Noted:  11:09 A.M.)
18 BY MR. GAFFEY:
19      Q.   We were, before the break, we were at
20 this Friday morning meeting, and so I want to go
21 through in as much detail as I can what happened
22 at that meeting and who said what.
23          I have a general sense that the JPM
24 problem has arisen.  Did you have a sense, was
25 there any discussion about the JPM problem being

Page 66

HIGHLY CONFIDENTIAL - A. KIRK

1
2 related in any way to the Repurchase Agreement
3 with Barclays?
4     A.   Yes.
5     Q.   Describe that for me.  What was your
6 understanding?
7     A.   So, to be clear, I'm not an expert,
8 was not an expert on repo, so I was learning
9 things for the first time that day that I didn't
10 understand how they actually worked prior to
11 that.  So I got what was a cursory as opposed to
12 a detailed explanation of the issue, but as I
13 understood it from the way that Mike Keegan
14 explained it to me was that the Fed had been
15 providing a repo for Lehman Brothers earlier in
16 the week of approximately $50 billion, that the
17 Fed had made it known that they wanted to be
18 repaid on that repo, and that Barclays had
19 agreed to assume that repo obligation from the
20 Fed.  Without that financing the firm would have
21 collapsed the next morning.
22         So the way it was explained to me was,
23 during the transfer of those -- that loan and
24 the collateral associated with that loan, there
25 were many pieces of collateral that Barclays

Page 67

HIGHLY CONFIDENTIAL - A. KIRK

1
2 could not value, so they did not accept them in
3 transfer from the Fed.  And mechanically, it was
4 explained to me the way that worked was, in a
5 tri-party repo, the Fed transferred all of the
6 positions to JPMorgan and then JPMorgan began
7 transferring those positions upon the receipt of
8 money from Barclays transferred money, and then
9 they would transfer the positions that secured
10 that repo.
11         And at some point during that process,
12 Barclays became very uncertain as to some
13 percentage of that collateral, I don't recall
14 the exact amount, but it was a large number,
15 maybe as much as, you know, 20 percent of the
16 collateral, and when Barclays didn't accept
17 those positions, they, by definition, just got
18 left at JPMorgan.
19         They -- so JPMorgan was left with
20 collateral that they were not comfortable with
21 but Barclays would not accept, so -- and
22 JPMorgan, I guess they attempted to negotiate
23 but couldn't get that negotiation done.
24     Q.   Who was the "they" who attempted to
25 negotiate?

Page 68

HIGHLY CONFIDENTIAL - A. KIRK

1
2     A.   That JPMorgan and Barclays attempted
3 to negotiate, but they couldn't complete a
4 negotiation for a transfer of that collateral.
5     Q.   And when you say Keegan's explanation,
6 I take it you're talking about the conversation
7 you had with Keegan before the meeting?
8     A.   Yes.
9     Q.   Okay.
10     A.   The 5:30 in the morning.
11     Q.   And did Keegan give you any level of
12 detail about why Barclays was uncertain about
13 some percentage of that collateral?
14     A.   It was collateral that they didn't --
15 was either they didn't have the expertise to
16 value or was not transparent, meaning that there
17 were financing vehicles that Lehman set up that
18 went into the repo that you couldn't look
19 through to what was in those financing vehicles.
20     Q.   And did Mr. Keegan give you any
21 information about what that collateral was, what
22 type of securities?
23     A.   He didn't know.
24     Q.   Well --
25     A.   In some cases he didn't know.  In

Page 69

HIGHLY CONFIDENTIAL - A. KIRK

1
2 other cases it was, yes, it was illiquid and
3 either high-yield or defaulted or consumer
4 mortgage securities that were the ones he could
5 identify that were very hard to value.
6     Q.   I'm hearing this in two categories,
7 and I want to be sure you and I are on the same
8 page.  There's a component of this collateral
9 that's hard to value and there's a component
10 that is not transparent, which may also make it
11 hard to value --
12     A.   Yes.
13     Q.   -- but some of it's transparent and
14 hard to value?
15     A.   Yes.
16     Q.   Okay.  Did he identify any particular
17 categories of hard-to-value securities?  I get
18 it, high-yield or mortgage-backed, but did he --
19     A.   Distressed.
20     Q.   Did he use the term "racers" at all?
21     A.   That was the non-transparent category.
22     Q.   Okay.  Tell me what Mr. Keegan said to
23 you about racers.
24     A.   "What are they?"
25     Q.   Anything else?

Page 70

HIGHLY CONFIDENTIAL - A. KIRK

1
2  A.  "And what's in them?"  I said, "I
3  don't know."  I then went and -- Paolo Tonucci,
4  I directed him to Paolo, who would be able to
5  tell him what was in those various financing
6  vehicles.
7      Q.  Do you know what Paolo Tonucci then
8  spoke to Mr. Keegan about?
9      A.  I don't know.
10     Q.  Did Mr. Keegan say anything else about
11  racers other than he didn't know what they were?
12     A.  He asked how would I find out.
13     Q.  Did Mr. Keegan say anything to you
14  that, in sum or substance, compared the assets
15  that Barclays had agreed to buy in the first
16  transaction, to use your term, and the assets
17  that were in the repo that were the subject of
18  this transfer problem?
19     A.  He summarized it as it was a very
20  different and riskier category of assets.
21     Q.  Was anyone else present when
22  Mr. Keegan and you had this early morning
23  conversation?
24     A.  No.
25     Q.  Did you understand from Mr. Keegan, in

Page 71

HIGHLY CONFIDENTIAL - A. KIRK

1
2  sum or substance, whether he had spoken to
3  others at Lehman about this problem by the time
4  he had spoke to you?
5      A.  I understood I was the first person he
6  had explained it to, at Lehman that he had
7  explained it to.
8      Q.  When you spoke to him and about this
9  topic, did you let him know that there was a
10  Friday meeting planned with -- that you had been
11  asked to come to an early morning meeting by
12  Mr. McDade?
13     A.  Yes.
14     Q.  And did you tell him you'd get back to
15  him after that meeting to see if there was a
16  solution to this problem?
17     A.  Yes.
18     Q.  So, in the course of that meeting, now
19  we've got the JPM issue, it's been identified,
20  you've had the first transaction outlined to you
21  broadly, the JPM problem --
22     A.  Right.
23     Q.  -- has been also described.  What
24  happens next?
25     A.  I'm sorry, so where -- what time of

Page 72

HIGHLY CONFIDENTIAL - A. KIRK

1
2  day are we now?
3      Q.  I'm sorry.  I've got you back at the
4  Friday meeting with -- we're back at the Friday
5  meeting with Bart, yourself, Klein --
6      A.  Okay.
7      Q.  -- Ricci and Keegan.
8      A.  Yeah.
9      Q.  Okay.
10     A.  So at that meeting I walk through -- I
11  summarized the issues, as I understand them, for
12  this dispute with Barclays.  I inform Barclays
13  that those executives -- that JPMorgan had shut
14  down Lehman's DTC account, and I made the
15  supposition that would make it impossible
16  to complete the transaction as contemplated.
17     Q.  And what, if anything, did Mr. McDade
18  have to say about those topics?
19     A.  He said he agreed with me.
20     Q.  Did you speak first in outlining the
21  issues?
22     A.  Yes.
23     Q.  And how did Klein, Ricci and Keegan or
24  any combination of those three men react to that
25  news?

Page 73

HIGHLY CONFIDENTIAL - A. KIRK

1
2      A.  There was some question as to, well,
3  what do we do now?  I suggested that the only
4  reasonable course of action would be to proceed
5  with the transaction substituting the repo
6  assets, the assets that Barclays had lent
7  against, for all the other securities that had
8  been contemplated in the transaction and leave
9  the rest of the transaction as was.
10     Q.  So if I understand this -- I want to
11  make sure I understand this correctly.  Your
12  suggestion was to take the assets that were the
13  subject of the first transaction roughly
14  outlined in that schedule?
15     A.  Yeah.
16     Q.  And instead of transferring that body
17  of assets, transfer the body of assets that are
18  in the repo, correct?
19     A.  Yes.
20     Q.  Maybe I'm not understanding.  Is the
21  problem here, doesn't it involve the assets that
22  are in the repo?  Hasn't Mr. Keegan told you
23  that Barclays is uncertain about some components
24  of the repo collateral?
25     A.  So, again, the issue was that it was

Page 74

HIGHLY CONFIDENTIAL - A. KIRK

1
2  my view that JPMorgan would not transfer one
3  dollar of one asset unless they got whatever
4  they wanted in a negotiation from Barclays or
5  anybody else, and even then they wouldn't -- it
6  didn't appear that they would do anything but be
7  hostile, having shut down our DTC account, which
8  is a, I mean, that's a colossal nightmare.  You
9  know, you've got tens of billions of dollars of
10  securities supposed to settle a regular way that
11  you've been transacting with your clients, and
12  every single one of them fails -- both sides,
13  buys and sells.
14       Q.   How is JPM in a position to shut down
15  Lehman's?
16       A.   They're our clearing bank.
17       So it was, again, my supposition,
18  which was confirmed by, you know, the senior
19  finance staff and Bart and then finally the
20  Barclays guys, that, you know, JPMorgan should
21  be viewed as not going to cooperate.  And
22  Barclays was attempting to reach JPMorgan and
23  never got a return call, was my understanding.
24  I was told that by probably Gerard LaRocca or
25  Keegan, one of them, and hence, you know, the

Page 75

HIGHLY CONFIDENTIAL - A. KIRK

1
2  only assets that could participate in any way in
3  this transfer were ones that Barclays had held
4  in custody at their clearing bank, Bank of New
5  York, and potentially any assets at Lehman that
6  were unencumbered and were held away from
7  JPMorgan.
8       Q.   So, again, forgive me if I'm thick
9  here, but is the problem with JPMorgan --
10  withdrawn.
11       When you talk about the assets that
12  Barclays had at Bank of New York, those were
13  assets within the repo?
14       A.   Yes.
15       Q.   Within the Barclays repo, yes?
16       A.   Yes.
17       Q.   Do you know the amount, the value of
18  the assets that were at Bank of New York within
19  the Barclays repo?
20       A.   I didn't know that.  I didn't know the
21  amount or the value of those assets.
22       Q.   Okay.  And again, so we're clear, you
23  didn't know at the time or you don't remember
24  now, or both?
25       A.   I didn't know at the time.

Page 76

HIGHLY CONFIDENTIAL - A. KIRK

1
2       Q.   Okay.  And the problem with JPM
3  refusing to transfer assets over, is that away
4  from the repo?
5       A.   Yes.
6       Q.   Okay.  So your suggestion is to focus
7  on the repo as the body of assets that can be
8  transferred to Barclays?
9       A.   Right.
10       Q.   Plus unencumbered, other unencumbered
11  assets?
12       A.   That were not held or cleared through
13  JPMorgan.
14       Q.   That are away from JPMorgan?
15       A.   Correct.
16       Q.   Now, did you have an idea then of what
17  the value of that total package could be?
18       A.   No.
19       Q.   So you've made --
20       A.   Because I wasn't clear on what
21  actually got transferred and what didn't get
22  transferred.  I knew broadly the size of the Fed
23  repo.  I didn't know what the disputed amount
24  was or the assets.
25       Q.   I just need to follow up a bit on the

Page 77

HIGHLY CONFIDENTIAL - A. KIRK

1
2  disputed amount.
3       A.   Yeah.
4       Q.   I'm trying to be as clear as I can --
5       A.   Yeah.
6       Q.   -- as to what's the JPM problem and
7  how much of that is --
8       A.   Right.
9       Q.   -- whether that's -- we've established
10  the JPM problem is away from the repo, right?
11       A.   The JPM problem vis-a-vis Lehman
12  Brothers was away from the repo, that is
13  correct.
14       Q.   But vis-a-vis Barclays, it was not
15  away from the repo?
16       A.   My understanding was there was a
17  dispute about Barclays not accepting all the
18  collateral out of the Fed, only some of it, and
19  that collateral they didn't accept got left
20  behind or, by definition, stays at the clearing
21  bank, which was JPMorgan.  JPMorgan clears for
22  the Fed.
23       Q.   And I think you had an -- a rough idea
24  of what percentage of that.  It was some
25  percentage.  It could have been as much as 20

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2  percent that Barclays would not accept, yes?
3     A.  Yes.
4     Q.  Did you have a sense of a dollar
5  amount of what was net of the amount that
6  Barclays would not accept?
7     A.  It was somewhere in the 40s.
8     Q.  And when you're talking about the
9  amount of the repo, are you talking about the
10  amount that was financed or the total collateral
11  as pledged?  Withdrawn.
12        You told me you're not an expert in
13  repos --
14     A.  Yeah.
15     Q.  -- and neither am I, but I understand
16  there's a haircut.
17     A.  Yeah, I think I was talking about the
18  amount financed, but I'm not -- I'm sketchy on
19  that.
20     Q.  So you make this proposal.  McDade
21  says he thinks you're right.  What's the
22  reaction from Klein, Ricci and Keegan?
23     A.  Ricci says -- there was some
24  discussion, I don't recall the specifics of it,
25  but Ricci then I recall specifically says, I

HIGHLY CONFIDENTIAL - A. KIRK

1
2  believe he's right.  We have to change course.
3     Q.  I know it's a long time ago, but just
4  given that phrase, is that -- are you quoting
5  him?  Are you summarizing him?
6     A.  I'm summarizing him.  He is under a
7  tremendous amount of pressure and stress, so my
8  memory is a little fuzzy from that.
9     Q.  Sure.
10     A.  At one point in this meeting, Mike
11  Klein looked at me and said, "Do you need a
12  doctor?"
13     Q.  Really?
14     A.  Yeah.
15     Q.  Well, you're kind of a last-minute
16  volunteer in this thing, you know?
17     A.  Yeah.  Story of my life.
18     Q.  What did Klein say?
19     A.  He said, okay, let's get to it.
20     Q.  And did Keegan say anything?
21     A.  He said, well, we haven't analyzed
22  this collateral so we don't know what it's
23  worth.  How are we going to figure out what it's
24  worth?  And we said we had started a process
25  with these large positions.

HIGHLY CONFIDENTIAL - A. KIRK

1
2        The problem turned out to be not only
3  was the data delivered in a not usable fashion
4  to the heads of the desk, but it was a different
5  set of securities.  So we had to -- it was
6  determined that the finance staff of Lehman
7  Brothers needed to work with the finance staff
8  at Barclays and get a list of everything that
9  was in their repo line, and then take that off
10  the systems and try to put it together in a way
11  that could be delivered to the various trading
12  desks to try to put some value on them.
13     Q.  When you referred before to, you know,
14  we had started that process, was that a -- were
15  you referring --
16     A.  From the night of the --
17     Q.  Yes.
18     A.  -- Daniel Flores' e-mail.
19     Q.  That's the one that refers to trying
20  to come up with fire-sale-type prices?
21     A.  Yes.
22     Q.  What in your mind was the connection
23  between the, what I'll call the fire sale
24  analysis and the problem you were dealing with
25  on Friday?  I'm not sure I'm clear on that.

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2     A.  Only that we had -- that I could tell
3  the Barclays guys that we were already trying to
4  value some collateral and relative to the marks.
5  The -- Lehman suffered, you know, two issues
6  that week around valuations.  One was the
7  markets were unbelievably volatile and
8  incredibly illiquid, and that we were a less
9  than desirable counterparty for our -- so that
10  we had been, when we had been liquidating
11  collateral, we had been losing a lot of money,
12  and in addition to that, a smaller problem was,
13  you know, since the firm had filed for
14  bankruptcy, not every person was showing up to
15  work.
16     Q.  Now, the fire sale liquidation
17  analysis, the top 100 positions there, did
18  you -- are you saying that some of those might
19  have been in the repo?
20     A.  Yeah, but we didn't know which ones.
21     Q.  You didn't know?
22     A.  We had no idea.
23     Q.  That's not, so we're clear, the 100
24  positions we're talking about there is not with
25  direct reference to what was in the repo?

Page 82

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   No, not at all.  We didn't know we had
3  this problem Thursday night.
4    Q.   What's the tone of the Friday meeting?
5  I know it's tense and Klein says do you need a
6  doctor, but are people angry?  Are they calm?
7  Are they -- what's the temperature in this
8  meeting?
9    A.   Anxious.  It's very, very anxious.
10  How are we going to be able to try to get
11  anything over the goal line by 4 o'clock this
12  afternoon, and if we don't, you we don't believe
13  we can survive the weekend.
14    Q.   And why 4 o'clock that afternoon?  Was
15  that the bankruptcy hearing?
16    A.   Yeah, that was the bankruptcy hearing,
17  the scheduled bankruptcy hearing.
18    Q.   Is there any discussion in this
19  meeting about what, if anything, needs to be
20  said to the bankruptcy court about this event,
21  these events?
22    A.   That it would have to be explained.
23  This transaction was very different than what
24  had been previewed two days before, and it would
25  have to be explained why it came up.

Page 83

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.   Who said it would have to be
3  explained?
4    A.   Barry -- in that meeting -- I
5  apologize, some of these meetings are blurs.
6    Q.   Sure.
7    A.   But at some point during the day,
8  Barry Ridings, I was in a meeting with him, I
9  believe it was maybe at the tail-end of this
10  meeting, he came in and, you know, he listened
11  to this explanation again and then he said,
12  okay, we're going to have to be able to explain
13  this.
14    Q.   And did the Barclays folks in the
15  meeting -- and by that, I'm including Klein
16  here, Klein, Ricci, Keegan -- did they have
17  anything to say about whether and when this
18  would have to be explained to the court?
19    A.   No, they were taking Barry's lead.
20    Q.   Now --
21    A.   We all knew that there was a court
22  hearing scheduled at 4 o'clock.
23    Q.   Why do you describe this as a very
24  different agreement?
25    A.   The list of assets is different.

Page 84

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.   Was there any discussion about the
3  consideration Barclays was to give in the
4  agreement also changing?
5    A.   Besides the amount, no.
6    Q.   Well --
7    A.   Meaning besides the fact that it
8  wasn't 72 million, you know, the attempt was to
9  get it so that the assets and liabilities would
10  balance.
11    Q.   And the 72 million, you're looking at
12  Exhibit 19, yeah?
13    A.   Yes.
14    Q.   That financial schedule.
15  Was there any discussion of the
16  compensation and cure components of the assumed
17  liabilities changing?
18    A.   Not at that meeting.
19    Q.   Did you at some point hear a
20  discussion about the compensation and cure
21  components changing?
22    A.   At some point late in the day, there
23  was a -- not on the compensation, there was no
24  discussion of compensation.  Ian -- not Ian,
25  Paolo was attempting to figure out a better

Page 85

HIGHLY CONFIDENTIAL - A. KIRK

1
2  estimate.  I think they had always continually
3  worked on it, but they were trying to figure a
4  better estimate.
5  Ian -- I remember Paolo coming into a
6  meeting I was in, I don't remember who it was
7  with, but he came in and said I'm working
8  through the cure payments to try to see if
9  there's some wiggle room there, so to speak, in
10  terms of what is that estimate.  I never got
11  a -- I was -- that was not part of the
12  transaction I was concerning myself with.  I was
13  supposed to try to shepherd along as best as
14  possible in this incredible short timeframe some
15  valuation work that we could get to on the
16  assets.
17    Q.   Wiggle room up or wiggle room down, or
18  both?
19    A.   I don't -- he didn't mention it one
20  way or another.  Some variance I guess is a
21  better way to put it.  I don't remember whether
22  it was higher or lower.
23    Q.   In the Friday meeting with McDade and
24  you and Klein and Ricci and Keegan, was there
25  any discussion about Lehman defaulting on the

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2  repo?
3      A.   No.
4      Q.   Were you ever involved in any
5  discussion concerning the topic of Lehman
6  defaulting on the repo?
7      A.   Not a discussion.  I received an
8  e-mail that referenced it, but --
9      Q.   From whom did you receive the e-mail?
10     A.   I don't have it in front of me.
11         You've got it, Gerry Reilly.  That was
12  a couple days earlier when I wasn't involved, so
13  I didn't pay attention to it.
14     Q.   Do you recall that as an e-mail where
15  Reilly proposed defaulting on the repo was the
16  best way to deliver the bulk discount to
17  Barclays?
18     A.   I would have to look at it again.
19     Q.   We'll get to that a little later.
20     A.   Fine.
21     Q.   Is there any discussion in the Friday
22  meeting of that, of using the repo as a means of
23  delivering a haircut to Barclays?
24     A.   No.
25     Q.   Was there any discussion in the Friday

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2  meeting of terminating the repo?
3      A.   I recall a discussion, I don't
4  remember who was in the meeting, but with
5  Barclays that if we couldn't get to closure that
6  day --
7      Q.   That Friday?
8      A.   That Friday.
9      Q.   Okay.
10     A.   -- it was likely they would terminate
11  the repo.
12     Q.   Do you know if at any point Barclays
13  did terminate the repo?
14     A.   I don't know the answer to that.
15     Q.   When the Barclays folks said if they
16  couldn't get to closure on Friday, they would
17  have to terminate the repo, was there any
18  reaction from the Lehman folks to that
19  statement?
20     A.   We understood they had to do what was
21  within their rights and what they felt was
22  appropriate.
23     Q.   Who said that?
24     A.   McDade.
25     Q.   I'm going to show you, Mr. Kirk,

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2  what's previously been marked as Exhibit 21.
3  Take a moment to look through the document.
4      (Document review.)
5      A.   Okay.
6      Q.   Is that the document, the e-mail you
7  referred to a moment ago?
8      A.   Yes.
9      Q.   At the very bottom of the document,
10  paragraph 3, and this is within the e-mail from
11  Reilly to Lowitt, Gelband, Tonucci and Kelly, is
12  the following, "Not clear on the amount of block
13  discount or how we make it happen.  Defaulting
14  on repo could be the best, as discount could be
15  taken from haircut."  Do you see that?
16     A.   Uh-huh.
17     Q.   You may have said something a moment
18  ago about this, but let me ask you, did you have
19  an understanding when you saw this e-mail of
20  what it was Mr. Reilly was talking about, using
21  the repo?
22     A.   No, this was before I was involved,
23  and I was CC'd on this e-mail because of my work
24  in the auction rate book and the prime brokerage
25  financing at the time.

HIGHLY CONFIDENTIAL - A. KIRK

1
2      Q.   Okay.  So the first paragraph of
3  Mr. Reilly's e-mail refers to the auction rate
4  book?
5      A.   Yeah.
6      Q.   And the question appears to be whether
7  it's staying or going in the transaction, yes?
8      A.   Right.
9      Q.   And was it your understanding that it
10  was that first question that was the reason it
11  was forwarded to you, because you're in the ARS
12  world?
13     A.   I had been in the ARS world in my
14  previous job, and I assumed it was forwarded to
15  me so they could figure out who should answer
16  these questions, who would be most expert to
17  answer them.
18     Q.   All right.  So when you got the whole
19  e-mail, including the other two questions --
20     A.   Yep.
21     Q.   -- am I fairly understanding your
22  testimony that you didn't really focus on 3
23  because it wasn't in your area of
24  responsibility, you didn't understand it to be
25  addressed to you?

**HIGHLY CONFIDENTIAL - A. KIRK**

1  **HIGHLY CONFIDENTIAL - A. KIRK**
2      A.   As a matter of fact, my answer
3  indicates what I did was I redirected them to
4  people I thought could be helpful.
5      **Q.   Okay.**
6      A.   That's what I thought my
7  responsibility would be.
8      **Q.   Okay.**
9      A.   Try to put point them in a direction.
10     **Q.   Beg your pardon.**
11         **And with respect to the third**
12  **question, you say, "The third question is**
13  **definitely for Cogs," C-O-G-S.  Is that a**
14  **reference to Mr. Coghlan?**
15     A.   John Coghlan, yes.
16     **Q.   John Coghlan, okay.  And why was it a**
17  **question for John Coghlan?**
18     A.   Because he was head of repo financing
19  at the firm.
20     **Q.   Do you know if Mr. Coghlan ever did**
21  **address the third question?**
22     A.   No idea.
23     **Q.   Now, when you were in the Friday**
24  **meeting and the topic of the repo was being**
25  **discussed -- withdrawn.**

1  **HIGHLY CONFIDENTIAL - A. KIRK**
2      **This is sent, this e-mail comes to you**
3  **on Thursday?**
4      A.   Yes.
5      **Q.   At roughly 6:40 in the morning.  Note**
6  **that that's Greenwich mean time shown there.**
7      A.   Yeah.
8      **Q.   The next morning you're in a meeting**
9  **where the repo is being discussed.  Did that**
10  **trigger any recollection in your mind about, you**
11  **know, an e-mail discussion the prior day about**
12  **using the repo as a means of making the block**
13  **discount happen?**
14     A.   No, I, you know, I get 500 e-mails a
15  day, and during this period of time we were
16  getting probably twice that.  So ...
17     **Q.   And when you saw a reference --**
18     A.   I was answering all of them, so, you
19  know, or as many of them as I could.
20     **Q.   And also to the mysterious number that**
21  **we finally identified.**
22     A.   Yes, and then there's the mysterious
23  number.
24     **Q.   Now, the --**
25     A.   I don't think the company's in

1      HIGHLY CONFIDENTIAL - A. KIRK
2  business anymore.
3      **Q.   Was there a reference to the -- any**
4  **discussion in the Friday meeting of a discount?**
5      A.   No, not that I recall.
6      **Q.   Okay.  So I'll summarize it just to**
7  **frame my next question so you're not married to**
8  **how I do this.  But as I understand it, the**
9  **meetings happened, you identified the JPM**
10  **problem, the recommendation is made to transfer**
11  **what's in the repo, and there's some issues**
12  **about how to value what's in there; is that a**
13  **fair summary?**
14     **A.   Yes.**
15     **Q.   Okay.  And the general sense of the**
16  **meeting from both sides of the table is, okay,**
17  **let's go to it and try and figure this out, we**
18  **have until about 4 o'clock to see if we can**
19  **solve this, yes?**
20     **A.   Yes.**
21     **Q.   And Barclays says if we can't reach a**
22  **resolution of that by about 4 o'clock, we may**
23  **have to terminate the repo, correct?**
24     **A.   Correct.**
25     **Q.   And McDade has said if that comes to**

1  **HIGHLY CONFIDENTIAL - A. KIRK**
2  **be, you know, you have to do what you have to**
3  **do?**
4      A.   Those are your rights.
5      **Q.   And you don't know if the repo was in**
6  **fact ever terminated by Barclays?**
7      A.   I don't know that.
8      **Q.   Okay.  So now what happens?  Does the**
9  **meeting end or is there further discussion?**
10     A.   I recall the meeting ending at that
11  time.
12     **Q.   And what did you do next?**
13     A.   I went back to my office.  I called
14  the various senior executives I was going to
15  meet with and told them that we should be
16  getting a new schedule at some point of assets
17  that we would have to -- they should ignore that
18  schedule of assets and we would be getting a new
19  schedule of assets at some point to try to put
20  some values on.
21     **Q.   When you say "ignore that schedule of**
22  **assets," again, for clarity of record, are you**
23  **talking about Exhibit 19, the original financial**
24  **schedule?**
25     A.   I'm sorry, no, I'm talking about the

Page 94

HIGHLY CONFIDENTIAL - A. KIRK

1
2 list of hundred assets that was delivered to the
3 desk early that morning.
4     Q.   Got it.  As part of the fire sale
5 liquidation?
6     A.   Correct.
7     Q.   And you told them they would be
8 getting a new list of assets.  Who is it you're
9 having these communications with?
10    A.   I certainly called Mike Gelband and I
11 would have called some subset, although I don't
12 recall who I spoke to specifically or who Mike
13 spoke to, but I would have called either
14 Kaushik, Charlie, Eric and Gerry.
15    Q.   Eric is Eric Felder?
16    A.   Yes.
17    Q.   And Gerry is Gerald Donini?
18    A.   Yes.
19    Q.   And who is Charlie?  Is that Charlie
20 Spero?
21    A.   Spero, uh-huh.
22    Q.   And did do you this on a conference
23 call?  Call them separately?  In a meeting?
24    A.   Probably called them separately.
25    Q.   And what happened after that?

Page 95

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   We waited for a deliverable schedule
3 from finance.
4     Q.   Did you get one?
5     A.   Got one at sometime within the hour.
6     Q.   And from whom within finance did you
7 receive that?
8     A.   I don't remember who it was.
9     Q.   Who within finance was in charge of
10 that piece?
11    A.   It would have been some combination --
12 well, no, most likely it would have been Paolo,
13 working with accounting.
14    Q.   And Paolo or somebody at his direction
15 delivers a schedule.  To whom is it delivered?
16    A.   I don't recall, but I'm sure it was
17 instructed to be delivered directly to the
18 people on this list that I mentioned before and
19 myself and Mike.
20    Q.   And what happened with the list?
21    A.   We asked the senior managers to try to
22 value the list given the market conditions that
23 day, and generally the response was the markets
24 are too volatile, there's too many line items,
25 it's not possible to get this done in any

Page 96

HIGHLY CONFIDENTIAL - A. KIRK

1
2 pinpoint fashion in this timeframe, but we'll
3 try.
4     Q.   And at some point was there -- did
5 they solve that problem?  Did they produce
6 valuations?
7     A.   The only valuations we got was that --
8 I don't know what they communicated to Barry
9 Ridings or the people working on that specific
10 testimony.
11    Q.   Uh-huh.
12    A.   But I got the word back generally that
13 many of these positions were so illiquid that,
14 you know, that if we were to try to sell them,
15 given our circumstances, you know, the bids
16 might be down 20 percent.
17    Q.   Was there any discussion about looking
18 at the valuations that Bank of New York had
19 given to what was in the repo?
20    A.   We didn't have access to Bank of New
21 York's valuations, I don't believe.
22    Q.   Did you talk to anyone who was
23 familiar with how repurchase -- more familiar
24 than you with how repurchase agreements worked
25 to see if the collateral agent applied

Page 97

HIGHLY CONFIDENTIAL - A. KIRK

1
2 valuations to what was held as collateral?
3     A.   I don't recall having that specific
4 conversation.
5     Q.   Do you know if anyone did have that
6 discussion, that conversation with Barclays?
7     A.   They might have.
8     Q.   Without regard to the particular
9 detail or even the number --
10    A.   Yeah.
11    Q.   -- you had a sense of whether by, you
12 know, at some point on that Friday a value was
13 put on the collateral within the repo?
14    A.   We at Lehman determined that the
15 out -- the volatility of those outcomes we
16 couldn't put a number that was specific on it.
17 It was, given how illiquid many of the assets
18 were, some of the assets you could value, but
19 the markets were tremendously volatile all week.
20    We had had, you know, been getting
21 closed out of -- just the prior day we got
22 closed out of a repo, a futures position on the
23 CME that had excess margin of, you know, $1.6
24 billion.
25    As far as we could tell, the markets

HIGHLY CONFIDENTIAL - A. KIRK

1

2  hadn't moved that much.  Many of them were in
3  Treasury and government bond futures, but the
4  CME called us to inform us they had closed us
5  out of the position and we had lost all the
6  money in excess margin.  So it was becoming very
7  hard to value even what were deemed to be liquid
8  securities.
9      Q.   Just so we're clear here, the closing
10 out of the position by the Chicago Merc doesn't
11 bear on the collateral that's within the repo;
12 that's a separate event, correct?
13     A.   That is a separate event, but it
14 was -- it was demonstrative of the volatility
15 and the issues we were wrestling with.
16     Q.   And the question that I would like to
17 put is, did Lehman come to some number, did it
18 come to a value, a valuation of the collateral
19 that was within the Barclays Repurchase
20 Agreement?
21     A.   We couldn't come up with a specific
22 value.  We didn't have time.  We knew we
23 didn't -- we tried, but we couldn't, and we knew
24 the risk was that Barclays would close out of
25 the repo and take all that collateral, so they

HIGHLY CONFIDENTIAL - A. KIRK

1

2  owned it, that we would end up with no excess
3  from that collateral, and that from the very
4  high-level work that the senior risk managers
5  did, which we were relying upon, that we could
6  be well out of the money, it was likely that we
7  could be well -- we would be well out of the
8  money in that below the haircut, which I
9  believe, understood to be somewhere between 5
10 and 10 percent.
11     Q.   When you referred to a moment ago to
12 one of the risks was that we would not end up
13 with -- we would not end up with no excess, what did
14 you mean by that?
15     A.   Meaning that if Barclays closed us out
16 of the repo, our experience had been, not just
17 in that period of time but other cases, but
18 certainly in that week, that their liquidation
19 of that collateral would eat through more than
20 the haircut they had and that they would not get
21 back a hundred cents on the dollar.  So we,
22 Lehman, would not receive any proceeds back from
23 the liquidation of that collateral.
24     Q.   What was your understanding of what
25 would happen if there was excess collateral

HIGHLY CONFIDENTIAL - A. KIRK

1

2  Who would keep that?
3      A.   If there was excess collateral, Lehman
4  would keep that value.
5      Q.   Was that discussed at the Friday
6  meeting, that if there was excess collateral, it
7  would say with Lehman?
8      A.   There was not a discussion of closing
9  out the repo and the mechanics of it.
10     Q.   So did there come a point on Friday
11 where Lehman communicated to Barclays either --
12 where it communicated a value of the repo or it
13 said it couldn't?  What happens next vis-a-vis
14 talking to Barclays.
15     A.   In terms of talking to Barclays, the
16 next meeting was at some point, call it 3
17 o'clock in the afternoon, and they were
18 indicating that the -- their view of the value
19 of the repo securities was far below the stated
20 value and below their loan value and that Lehman
21 should attempt to find other unencumbered
22 assets, should continue to attempt to find other
23 unencumbered assets or the transaction may not
24 take place.
25     Q.   Now, is this response from Barclays

HIGHLY CONFIDENTIAL - A. KIRK

1

2  after the Friday meeting has ended?  I want to
3  get a sense of the timeline within Friday of
4  when Barclays does this.
5      A.   This is like 3 o'clock in the
6  afternoon.
7      Q.   Does Barclays tell you, does Barclays
8  tell Lehman how much difference has to be made
9  up?
10     A.   No.
11     Q.   Is your answer that you don't remember
12 or that you remember that they didn't?
13     A.   I remember they didn't.
14     Q.   So what happens now?
15     A.   We said we'll continue to look.  And
16 Ian and I had a conversation with McDade
17 offline, just he and I.  I said, I don't have
18 any basis or enough information to argue with
19 them about their point of view, about the value
20 of collateral, and that the high-level work
21 we've been doing leads me to believe that they
22 have a reason to be nervous about this.
23     Q.   And what was --
24         (Mr. Kelley confers with the witness.)
25     A.   Barclays.

HIGHLY CONFIDENTIAL - A. KIRK

1
2      I'm sorry.  Who is "they," he asked
3  me.  Barclays has a reason to be nervous.
4      Q.    And did McDade give any instructions
5  or suggestions about what to do next?
6      A.    He said, well, make sure Ian is
7  working on any possible unencumbered assets.
8      Q.    So did McDade give a target of any
9  kind of how much in unencumbered assets needed
10 to be found?
11     A.    At that point, all we could do was
12 figure out what was there, and specifically I
13 don't recall, but I do -- I do recall that the
14 shortfall was described as, you know, billions
15 of dollars.
16     Q.    And by "the shortfall," you're
17 referring to what?
18     A.    The value that Barclays thought those
19 repo assets were worth versus their stated
20 value.
21     Q.    That's the shortfall between what
22 Barclays thought they were actually worth and
23 the amount of the repo?
24     A.    Yeah.
25     Q.    So your recollection is that the

HIGHLY CONFIDENTIAL - A. KIRK

1
2  shortfall was in the billions of dollars?
3      A.    Yes.
4      Q.    But do you have a recollection of
5  whether it was between 2 billion and a gazillion
6  billion?  Is there some range you were thinking
7  of at the time?
8      A.    Somewhere between 2 and 5.
9      Q.    And I'm trying to get a sense here,
10 that's why I keep pushing at the number --
11     A.    Yeah.
12     Q.    -- I'm trying to get a sense here of
13 what the project is.  Is it go find every
14 unencumbered asset we have on the one end of the
15 possibilities, or we have to make up on this
16 specific shortfall, go find that amount at the
17 other?
18     A.    I didn't have the conversation.  Bart
19 had the conversation with Ian, so I didn't have
20 that conversation specifically with him.
21     Q.    So you don't know one way or the other
22 whether Mr. McDade gave a target of some kind to
23 Mr. Lowitt?
24     A.    No, I don't know that.
25     Q.    Your understanding from your view of

HIGHLY CONFIDENTIAL - A. KIRK

1
2  things was there was a shortfall?
3      A.    Yes.
4      Q.    It wasn't Barclays was saying it
5  wouldn't be made up out of the repo bucket?
6      A.    Yeah.
7      Q.    Therefore, other assets, unencumbered
8  assets, capable of delivery had to be found?
9      A.    Right.
10     Q.    It was in the billions, but for
11 your -- for the purposes of what you were doing,
12 you didn't really need to know the number, you
13 just needed to know the problem had --
14     A.    Right, I was not the one who was going
15 to solve those specific issues, so that was
16 someone else's job.
17     Q.    Was anyone other than Lowitt involved
18 in the particulars of solving the problem?
19     A.    I don't know the answer to that.
20     Q.    Did you ever learn whether Lowitt
21 enlisted others in the task of finding
22 unencumbered assets?
23     A.    No, I didn't, I didn't find out.
24     Q.    Did there come a time when you learned
25 whether additional value, additional

HIGHLY CONFIDENTIAL - A. KIRK

1
2  unencumbered assets were located that could be
3  transferred to Barclays?
4      A.    Sometime late in the afternoon between
5  3 and 4, Ian came into a meeting where I was
6  about to start a phone call with Bart, the Weil
7  Gotshal lawyers on the phone, and I was sitting
8  in the room with Mark Shapiro and I think it was
9  Jim Seery and the Barclays, again, Diamond,
10 Ricci, Klein and Keegan, and Ian came in and he
11 said there's a -- there's a schedule of assets
12 that we have that are unencumbered.  I believe
13 the number was $1.9 billion of marked value.
14     In addition, he said there might be
15 value in our 15c3 margin, which at the time I
16 remember that specifically because I was like,
17 "Gee, what's that?  I've never heard of that."
18 So he said there might be value there, I don't
19 know yet, and there might be others.
20     So we said to Ian, well, get us a
21 schedule of what's in the 1.9 billion in the --
22 I think he referred to it as in the box
23 unencumbered of these unencumbered assets, i.e.,
24 they were being financed by Lehman's unsecured
25 debt, I believe at the time, or equity, and he

HIGHLY CONFIDENTIAL - A. KIRK

1
2  came back with that list, showed it to myself
3  and to Keegan and some others.
4        Keegan looked at it and said, you
5  know, this is the -- these assets are even
6  harder to value than what we already have.  I
7  don't even know what these are.  I specifically
8  remember there being residential mortgage
9  residual interests and things like IOs and some
10 very illiquid aged positions in high-yield and
11 distressed debt.  I don't specifically recall
12 what else it was, but I do recall the list was
13 a -- there was a reason why there was nobody
14 financing those assets and it was because they
15 were the most illiquid and hardest to value
16 securities that Lehman Brothers owned on its
17 balance sheet.
18     Q.   So when Keegan said these are even
19 harder to value than --
20     A.   Yeah.
21     Q.   -- than the other stuff, was he
22 comparing this new schedule with the
23 hard-to-value stuff in the repo?
24     A.   Yes.
25     Q.   And apart from saying it was hard to

HIGHLY CONFIDENTIAL - A. KIRK

1
2  value, did Keegan have anything to say about
3  that?
4     A.   He said I don't know how I'm going to
5  put a value on this of any positive number.
6     Q.   Describe for me as best you can the
7  conversation about that topic and who said what.
8     A.   Ian came in.  He delivered this -- he
9  said -- we started the conversation with Ian
10 delivering the list of assets, and he handed it
11 to Keegan -- he handed out probably five copies.
12 Most people were just staring at it saying
13 nothing.
14        Mike looked at it and said, you know,
15 I -- what's this asset?  What's that asset?  I
16 think Ian may have answered specifically if he
17 knew what the nature of those assets were,
18 because in like residential mortgages you have
19 names for deals that unless you knew that that
20 was a residential mortgage deal, you wouldn't
21 know what it was, you know, Sasco or things of
22 that nature.
23        And Ian had some familiarity with
24 the -- with what the assets were because he had
25 been responsible for financing those sorts of

HIGHLY CONFIDENTIAL - A. KIRK

1
2  assets or, in this case, having the equity
3  finance the assets.  And so there was some back
4  and forth around that, and Keegan made the
5  conclusion that he was not going to warrant any
6  positive value on these assets from his seat,
7  and he made that -- he sort of said that to Rich
8  Ricci and Bob Diamond:  "I can't value these.  I
9  would be very nervous about putting a positive
10 value on them."
11     Q.   So, just to kind of cut to the end of
12 the sequence here, does Barclays agree to take
13 these additional buckets of value, you know, the
14 15c3 and the assets, the unencumbered assets in
15 the box?
16     A.   Yes.
17     Q.   And when they make that agreement, are
18 you present?  Was that at this meeting?
19     A.   Yes.
20     Q.   And tell me what was said in that
21 regard.
22     A.   That, all right, we don't know what
23 they're worth.  They might be worth something,
24 so we want them.  And Bart was on the phone, he
25 agreed -- he agreed to that, and I think that

HIGHLY CONFIDENTIAL - A. KIRK

1
2  was the sum and the substance as to what was
3  said about those assets.
4     Q.   Was any number put on now the total
5  value of the deal, combining the assets that
6  were in the repo plus the 15c3 and the
7  unencumbered assets in the box?
8     A.   I don't recall a specific number being
9  put on the -- on the deal.
10    Q.   Whether you recall today what the
11 number was, I'm going to press on this a little
12 bit, do you recall if a number was put out
13 there?
14    A.   I'm sorry, I don't recall what --
15 whether -- I don't recall whether there was a
16 number specifically put out there.
17    Q.   Okay.  And did you have a sense after
18 this conversation, Mr. Lowitt reports on the
19 15c3 assets and the unencumbered assets and
20 Keegan says, I can't value those and then the
21 agreement's made, well, we'll take them because
22 there may be some value, whether after that
23 point there were additional searches for value?
24 Do you know one way or the other?
25    A.   I don't recall one way or another.  I

HIGHLY CONFIDENTIAL - A. KIRK

1
2 don't recall what the whole -- I recall 15c3. I
3 recall this 1.9 billion because I was sitting
4 there with the list and I said, "Gee, what is
5 15c3?" So I recall those two. I don't recall
6 if there were other categories discussed during
7 that meeting.
8      Q.  You said a moment ago that Lowitt,
9 when he reported on the 15c3 piece, he put that
10 at about 1.9 billion?
11     A.  That was the marked value.
12     Q.  Of marked value. And that there was
13 some value, but -- of what was in the box, but
14 he didn't know what it was?
15     A.  It was some value in 15c3, but he
16 didn't know how much there would be.
17     Q.  So when that meeting ended, did you
18 have, whether you remember the number or not
19 today, did you have a sense of what the total
20 additional value was between the 15c3 and the
21 contents of the box?
22     A.  No.
23     Q.  Was there any plan made to calculate
24 that number?
25     A.  I think Ian was putting together a

HIGHLY CONFIDENTIAL - A. KIRK

1
2 schedule that he would communicate to Bart
3 with -- there was a, first of all, in that
4 discussion there was a wrap-up of this is what
5 the deal looks like. It's got the 45 billion,
6 it's got the, on the asset side, it's got this
7 1.9, it's got 15c3, it may have had, you know,
8 other components to it.
9      Bart agreed, Ian and Bart agreed that
10 these were the components on the assets side.
11 It had the assumed liabilities. They agreed
12 that those were the assumed liabilities that
13 were going to agree, I don't remember the exact
14 numbers, and they said, okay, do we have an
15 agreement? Barclays said yes. Ian was going to
16 go codify that, I believe, and talk to Bart.
17     Bart was in a car with Weil lawyers on
18 his way to bankruptcy court. That's why he
19 wasn't in the room.
20     Q.  When you say Ian was going to go away
21 and codify that, you mean put the schedules
22 together?
23     A.  I think so, yes, that's what I mean.
24     Q.  Did Mr. Klein say anything about this
25 process adding additional value for Barclays?

HIGHLY CONFIDENTIAL - A. KIRK

1
2      A.  No, not adding additional value. He
3 didn't comment on that.
4      Q.  Did Klein make any recommendation in
5 your hearing as to whether Barclays should or
6 should not accept this deal?
7      A.  Klein recommended that they accept the
8 deal if -- when they got the additional, all the
9 additional collateral.
10     Q.  I don't mean this to be sarcastic. I
11 just can't come up with another way of phrasing
12 it.
13     We're looking around for all this
14 additional value and your memory is not clear on
15 whether there was a target or not?
16     A.  Yeah.
17     Q.  Framed that way, what was the project
18 here? Was it to go find everything else and
19 turn it over, or was it to find some, some
20 identifiable bucket of value until Barclays
21 said, yeah, that's enough? Do you see the
22 distinction I'm making?
23     A.  Yes, it's -- the project was the
24 second, not the first.
25     Q.  Okay. So the idea was there would be

HIGHLY CONFIDENTIAL - A. KIRK

1
2 some value left in Lehman; it was just a
3 question of finding enough additional value to
4 make Barclays still close?
5      A.  Yeah. And that project was Ian's
6 project, not mine. I wasn't -- I was an
7 observer to this part of the process.
8      Q.  What was Ian's manner in this meeting?
9 I mean, it's a tough week for everybody, but
10 what's his demeanor?
11     A.  He hadn't slept in a week, so he was a
12 little harried.
13     Q.  Did Ian identify other potential
14 sources of additional value that he had looked
15 at apart from the box and 15c3?
16     A.  He --
17     MR. HUME:  Objection. Asked and
18 answered.
19     Q.  You can answer.
20     A.  No, he, as I said, he may have, but I
21 didn't -- I don't remember.
22     Q.  You don't remember, then, any
23 particular other sources that he might have
24 discussed?
25     A.  No, I don't.

Page 114

HIGHLY CONFIDENTIAL - A. KIRK

1            HIGHLY CONFIDENTIAL - A. KIRK
2            (Discussion off the record.)
3    BY MR. GAFFEY:
4        Q.    While we're pulling a couple of
5    documents out, Mr. Kirk, let me see if I can get
6    the rest of, you know, the blocks of your day.
7            This meeting ends.  Lowitt is given
8    the task of codifying -- your word -- you know,
9    getting a list together?
10       A.   Yes.
11       Q.   What do you do next?
12       A.   I just go back to my office.  Sit
13   there silently, mourning.
14       Q.   Maybe try to get some sleep?
15       A.   Yeah.
16       Q.   Do you have any role or involvement in
17   this asset collection process we've been talking
18   about after this point?
19       A.   No.
20       Q.   Did you go to the hearing?
21       A.   No.
22       Q.   Did anyone render reports to you from
23   the hearing --
24       A.   Yes.
25       Q.   -- as to what was going on?

Page 115

1            HIGHLY CONFIDENTIAL - A. KIRK
2            Okay.  Who did that?
3        A.   I got a couple e-mails from Jim Seery
4    and I had a conversation with Jean-Francois
5    Astier.
6        Q.   And what were the, in sum and
7    substance, what were you hearing in the reports
8    from -- we don't have to go through this chapter
9    and verse, but what were the nature of the
10   reports you were getting back from the --
11       A.   There was, first of all, they were --
12   JF and Jim were trying to understand what the
13   new deal was, so I had a conversation with JF
14   trying to explain to him what I knew, and
15   because they were, I believe, going to
16   participate in a meeting with the creditors
17   explaining this, what the deal was.
18           And then I got -- so there was some
19   back and forth to just try to reach me on that
20   front, and then there was -- they sent me a
21   couple updates of, you know, Bart's proffers
22   being read and there's cross-examination, and
23   then ultimately the deal was done with some
24   quotes from Judge Peck later that night.
25       Q.   Did anyone --

Page 116

1            HIGHLY CONFIDENTIAL - A. KIRK
2        A.   And then somebody called me when it
3    was done.
4        Q.   Somebody called to say the judge has
5    approved the deal?
6        A.   Yeah.
7        Q.   Did you get reports from anyone that
8    told you whether or not anyone had told the
9    judge that this was a new transaction, different
10   transaction?
11       A.   I didn't get presented -- one early
12   conversation I had with JF, I didn't talk to
13   anybody directly by phone, and I just got a few
14   cursory e-mails.
15       Q.   And --
16       A.   But at one point there was, you know,
17   my understanding was there was -- and early,
18   there was discussions before they went, you
19   know, to court to wrap it up with various
20   constituents.  And certainly there were
21   constituents there, Bart, Michael Klein and
22   others, that had the details.
23       Q.   Now, did you stay in your office until
24   you heard about the --
25       A.   No.  No.  I went home and I went to

Page 117

1            HIGHLY CONFIDENTIAL - A. KIRK
2    bed sometime late that evening.
3        Q.   Sometime after you heard that the deal
4    had been approved?
5        A.   No.  No.  I went to bed before that.
6    Somebody woke me up out of bed.
7        Q.   Did you continue to do any work or did
8    you perform any tasks in connection with the
9    transaction --
10       A.   No.
11       Q.   -- over the weekend?
12       A.   Saturday I had no involvement.  On
13   Sunday, Bart asked me to come in and try to
14   participate in the closing of the transaction at
15   Weil Gotshal.
16       Q.   Did you do that?
17       A.   Yes.
18       Q.   Just so I can plan a little bit for
19   what I want to ask you after lunch break, give
20   me an outline of what you did on the Sunday.
21       A.   So we went over to Weil.  We, Bart and
22   I, were put in a room.  You know, we were there
23   as a resource as people were trying to put
24   schedules together, et cetera.
25           An issue came up early in the morning

Page 118

HIGHLY CONFIDENTIAL - A. KIRK

1
2    around the settlement of trades on Monday and
3    how they were going to be handled, Lehman
4    trades, customer trades with Lehman.  We tried
5    to help work that issue out, and then we
6    effectively became observers of this dispute
7    between JPMorgan and Barclays, as there were
8    many meetings held into the evening that
9    JPMorgan came to Weil about 6 o'clock Sunday
10   night and at the urging of the Federal Reserve
11   and they walked through, described in very large
12   group meetings the issues they had.
13           We sort of hung around and eventually
14   were told that Barclays and JPMorgan had
15   resolved their dispute and that the deal could
16   go to closure.
17       Q.   When you say "we," are you talking
18   about yourself and Mr. McDade?
19       A.   And there were others at Lehman as
20   well.
21       Q.   Who else?
22       A.   Jim Seery was there.  I called him
23   late in the afternoon.  Ian Lowitt was there.
24   Paolo was there.  A guy name Alastair Blackwell
25   was there.  Steve Berkenfeld was there.  That's

Page 119

HIGHLY CONFIDENTIAL - A. KIRK

1
2    everybody I recall.
3        Q.   Did you learn how the dispute between
4    JPM and Barclays had been resolved, what the
5    terms of that resolution were?
6        A.   They didn't tell us.
7        Q.   So did anybody ask, anybody say how
8    did this issue get resolved?
9        A.   Yeah, and they said it's between us
10   and -- Barclays representatives told us -- well,
11   I don't remember if it was the lawyer or who
12   specifically, but a representative from Barclays
13   said that's between Barclays and JPMorgan.
14       Q.   So the closing did not take place on
15   the Sunday, correct?
16       A.   It eventually I think closed Monday
17   morning, but it was one continuous -- I left at
18   2 A.M., and then they worked towards closing at
19   some point in the morning prior to the markets
20   opening.
21       Q.   Did you go back for the closing?
22       A.   No.
23       Q.   Do you know if any additional
24   documentation was done to reflect the new
25   agreement that had been reached on Friday?

Page 120

HIGHLY CONFIDENTIAL - A. KIRK

1
2        A.   Oh, I'm sure there was lots of
3    documentation, but I'm not a lawyer so I wasn't
4    reviewing it.
5        Q.   Do you know, apart from whether you
6    read it or reviewed it, my question is do you
7    know if a new -- a new contract or an amendment
8    or anything else was written up that would
9    reflect the fact that the deal had changed on
10   Friday?
11       A.   I assume so.  I don't -- I never saw
12   actual evidence of it, but ...
13       Q.   I've asked you a couple of times when
14   you said you've assumed.  What's the basis of
15   the assumption?  The fact that it --
16       A.   That you couldn't proceed with a
17   commercial transaction without it.
18       Q.   Do you have any factual basis to think
19   that it was?  Did you talk to anybody about it?
20   Did you see any documents?
21       A.   I didn't see any documents.  Certainly
22   we were advised by Weil that the documents were
23   in good order.
24           (Exhibit 316, an e-mail chain with
25   attached balance sheet, marked for

Page 121

HIGHLY CONFIDENTIAL - A. KIRK

1
2    identification, as of this date.)
3        Q.   I have put before you, Mr. Kirk, a
4    three-page document.  I'll ask you to take a
5    look through it sufficiently to tell me whether
6    you've seen it before.
7        A.   Yes, I've seen it.
8        Q.   Did you see it at or around the time
9    that it's -- of September 19 at 6:16 A.M.?
10   That's the date at the top.
11       A.   Yes.
12       Q.   And was this sent to you -- was it
13   your understanding this was sent to you to
14   prepare for that Friday meeting we've been
15   talking about?
16       A.   It was one, one of the documents that
17   I assumed we would review.
18       Q.   Okay.  And do you recall --
19           MR. HUME:  Are you marking it as an
20       exhibit?
21           MR. GAFFEY:  Yes, I did, Hamish.  It's
22       316.
23           MR. HUME:  I'm sorry.
24       Q.   Do you recall reviewing it at the
25   Friday meeting?

Page 122

HIGHLY CONFIDENTIAL - A. KIRK

2  A.  No, I actually don't recall reviewing
3  this.
4  Q.  Let me just direct your attention,
5  sir, to the third page -- well, to the second
6  page.  You'll see that that's a balance sheet
7  that's attached to the e-mail and then referred
8  to in the second e-mail.
9  A.  Yes.
10  Q.  Do you know who prepared this balance
11  sheet?
12  A.  I don't know specifically who prepared
13  it, but it should have been prepared by
14  accounting.
15  Q.  Okay.  And --
16  A.  Well, the e-mail seems to indicate
17  Martin -- somebody who worked for Martin Kelly
18  had prepared it.
19  Q.  And within the balance sheet, sir, the
20  fifth column that's entitled Transaction
21  Adjustments, do you see that?
22  A.  Yes.
23  Q.  Do you know what that column
24  represents, what the entries in that column are
25  meant to represent?

Page 123

HIGHLY CONFIDENTIAL - A. KIRK

2  A.  Only from reading it.
3  Q.  I don't want you just to guess from
4  the face of the document.
5  A.  No.
6  Q.  Do you recall any discussion of
7  transaction adjustments?
8  A.  No.
9  Q.  And in particular, if you could take a
10  look at the last page of the document, I would
11  ask you to take a look at the Transaction
12  Adjustments column where it says 2 billion and
13  1.645 billion, are you with me?
14  A.  Uh-huh.
15  Q.  And you'll see that those relate to,
16  if you read across to the left, items Bonus
17  Payable and Cure Payments?
18  A.  Uh-huh.
19  Q.  And if you read across with me on the
20  Cure Payments line, you'll see, as of 8/31/08,
21  the number 701 is there, you with me?
22  A.  Uh-huh.
23  Q.  And then as of 9/17/08, 605?
24  A.  Uh-huh.
25  Q.  And then there's a transaction

Page 124

HIGHLY CONFIDENTIAL - A. KIRK

2  adjustment of 1,645,000,000?
3  A.  Uh-huh.
4  Q.  Resulting in a balance sheet transfer
5  total of 2.25 billion, do you see that?
6  A.  Uh-huh.  Uh-huh.
7  Q.  2.25 is the amount that you recall
8  Mr. Tonucci telling you was the assumed
9  liability for cure that was Barclays'
10  consideration in the deal?
11  A.  Yes.
12  Q.  Do you have any knowledge or have you
13  been involved in any discussion where a
14  transaction adjustment of 1.645 billion was made
15  against Lehman's books?  Do you know if that
16  number was written up?
17  A.  If it was written up, meaning?
18  Q.  Do you know if the amount for cure
19  payments shown on Lehman's books was written up
20  by 1.645 billion?
21  A.  Oh, I have no idea.
22  Q.  Did you ever have a discussion with
23  Mr. Tonucci or Mr. Kelly or Mr. Lowitt about
24  that topic?
25  A.  No.

Page 125

HIGHLY CONFIDENTIAL - A. KIRK

2  Q.  And I'll ask you the same question,
3  sir, with respect to the line for bonus payable.
4  Do you see a transaction adjustment of 2
5  billion, and the 2 billion is contained in the
6  Balance Sheet Transferred column?
7  A.  Yes.
8  Q.  Any conversations with Lowitt, Kelly
9  or Tonucci about that topic?
10  A.  No, no conversations.
11  Q.  Any conversations with anyone else
12  about that topic?
13  A.  No.
14  Q.  Was that topic addressed at the Friday
15  meeting we've been talking about, to your
16  recollection?
17  A.  Only to the extent that there was a
18  liability that was 2 billion and 2 and a quarter
19  billion that's reflected in this balance sheet
20  that had been agreed to prior.
21  Q.  Do you know if those liabilities of 2
22  billion and 2 and a quarter billion were based
23  on Lehman's accruals on its books, or were they
24  agreed numbers?
25  A.  I don't know.

Page 150

HIGHLY CONFIDENTIAL - A. KIRK

1    **7:18 P.M. on that Friday, did you have a**
2    **discussion with anyone else about Barclays**
3    **taking the collateral that was in the repo at**
4    **any point?**
5        A.   No.
6        **Q.   Did you talk to anybody about that**
7    **over the weekend?**
8        A.   No.
9        **Q.   Was there any conversation about that**
10   **when you and Mr. McDade were at Weil in**
11   **connection with preparing for the closing?**
12       A.   Not that I recall.
13       **Q.   Do you know if the issue of Barclays**
14   **taking the collateral in the repo was addressed**
15   **at the closing in any way?**
16       A.   I assume not, because if the
17   transaction was that they were -- well, I don't
18   remember is the better answer.  I don't remember
19   that being discussed.
20       **Q.   And as you sit here today, you have no**
21   **recollection of you yourself engaging in a**
22   **conversation with anyone about Barclays taking**
23   **the collateral that was in the repo?**
24       A.   Except for a vague recollection that

Page 151

HIGHLY CONFIDENTIAL - A. KIRK

1    Jim would have called me about it.
2        **Q.   And just so I'm clear on that, because**
3    **you're gesturing at the document saying "Jim**
4    **would have," do you have a recollection --**
5        A.   Yeah.
6        **Q.   -- or are you just inferring that from**
7    **the document?**
8        A.   It's vague.  I don't recall the
9    specific conversation.
10       **Q.   Okay.**
11       A.   But if it had been an issue, I'm sure
12   I would remember it.
13       **Q.   Okay.**
14       A.   Since it wasn't.
15       **Q.   And from the discussions on Friday, it**
16   **was your understanding that if Barclays got --**
17   **if this value collection effort gave Barclays**
18   **enough value to support the financing in the**
19   **repo, that Lehman would get the excess back,**
20   **right?**
21           MR. HUME:  Objection.
22   Mischaracterizes the testimony.
23       A.   I don't --
24           MR. KELLEY:  Do you want the question

Page 152

HIGHLY CONFIDENTIAL - A. KIRK

1    read back?
2        THE WITNESS:  Yeah, why don't you read
3    the question back, please.  I'm not quite
4    sure exactly...
5        (Record read.)
6        MR. HUME:  Same objection.
7        A.   No, that discussion never took place.
8    There was too much uncertainty about the values.
9        **Q.   Was there, in connection with this**
10   **value of additional profit we talked about on**
11   **Friday, was there any discussion about what it**
12   **would take to get Barclays up to the value of**
13   **the financing in the repo?**
14       A.   Not that I was present at.  I don't
15   know if there were any away from me.
16       **Q.   This sort of goes to a few other**
17   **questions I have asked you about, whether there**
18   **was a goal or a cap on how much had to be**
19   **collected on Friday.**
20           **Without regard to what the number may**
21   **or may not have been, was the goal to find**
22   **enough assets to replace the loss in value**
23   **within the repo?**
24           MR. HUME:  Objection.  Vague and

Page 153

HIGHLY CONFIDENTIAL - A. KIRK

1    ambiguous and lack of foundation.
2        A.   In the end, I was the witness to an
3    agreement that was agreed to between Bart and
4    Ian and the Barclays team, but I wasn't part of
5    any discussions as to the basis for that
6    agreement.
7        **Q.   And the agreement that you were a**
8    **witness to is the one you described to me before**
9    **where they said, do we have a deal?**
10       A.   Yes.
11       **Q.   And the agreement was we have a deal.**
12           **(Exhibit 321, a document bearing Bates**
13   **Nos. AK-LB-BANKR00002 through 27, marked for**
14   **identification, as of this date.)**
15       **Q.   Mr. Kirk, I have put before you a**
16   **document bearing Bates number AK-LB-BANKR000002**
17   **through 27.  Do you recognize the document?**
18       A.   Yes.
19       **Q.   What is it?**
20       A.   It's a notebook.
21       **Q.   Is it your notebook?**
22       A.   Yes, my notebook.
23       **Q.   Is it in your handwriting?**
24       A.   Yes.

HIGHLY CONFIDENTIAL - A. KIRK

1
2      A.    Yes.
3      Q.    Anything to add?  Any knowledge as to
4  why you're listing those eight names there?
5      A.    I don't recall specifically.  Some of
6  these people I'm responsible for, some of them
7  I'm not, so I don't recall exactly what this
8  list was -- why it's there.  This would have
9  been during the week, early in the week of the
10  15th.
11      Q.    And if you would turn to starting at
12  page 24, it's the following four pages are --
13  following three pages are a typewritten balance
14  sheet of some kind.
15          Are we in the same place?
16      A.    Yes.
17      Q.    And it's entitled Funding 2008 Q3
18  Balance Sheet?
19      A.    This was a schedule which was faxed to
20  Bart Saturday morning at the Fed that he and I
21  used to prepare for a meeting with John Mack,
22  Vickram Pandit, John Thayne and their associates
23  to discuss the possible iterations of Lehman
24  Brothers going forward.  This was those -- that
25  was the first -- well, that's the first pages of

HIGHLY CONFIDENTIAL - A. KIRK

1
2  funding.
3          This second page is a -- is an
4  analysis that B of A did marking down our assets
5  earlier in the week, which we also discussed at
6  that meeting.  B of A's valuation of Lehman
7  Brothers' assets.
8      Q.    You can put that aside.  I'm done with
9  that document.
10      A.    Okay.
11          (Exhibit 322, a document bearing Bates
12  Nos. AK-LB-BANKR000028, marked for
13  identification, as of this date.)
14      Q.    Before you, Mr. Kirk, is Exhibit 322,
15  a one-page set of notes bearing Bates number
16  AK-LB-BANKR000028.  Is that your handwriting?
17      A.    Yes.
18      Q.    Do you have any recollection of making
19  these notes?
20      A.    Yeah, this was somebody trying to
21  explain to me in broad terms what 15c3-3 was.
22      Q.    Okay.  I take it you're looking at the
23  reference to customer accounts segregated in
24  margin in the box in the upper left-hand corner.
25      A.    I'm looking at the whole page, yes.

HIGHLY CONFIDENTIAL - A. KIRK

1
2      Q.    Do you know, these numbers on the
3  right-hand side, 1B and 1.7B, what do they
4  represent?
5      A.    I don't recall what they represent.
6          (Exhibit 323, a document bearing Bates
7  Nos. AK-LB-BANKR000030, marked for
8  identification, as of this date.)
9      Q.    You have before you, Mr. Kirk, what we
10  have marked as Exhibit 323, bearing Bates number
11  AK-LB-BANKR000030.  Are these notes in your
12  handwriting?
13      A.    Yes.
14      Q.    Can you, as you look at them, do you
15  remember the circumstances under which you took
16  the notes?
17      A.    I think these were notes on Sunday
18  during the closing.
19      Q.    And why is it you think they're notes
20  on Sunday during the closing?
21      A.    Because I see a reference to Alastair,
22  which would be Alastair Blackwell, who I didn't
23  deal with prior to Sunday, and Tom Hamilton, who
24  was head of mortgage trading at Barclays, who
25  was trying to deal with this issue of the

HIGHLY CONFIDENTIAL - A. KIRK

1
2  settlements.
3          The dispute that arose on Sunday was
4  who was going to guarantee the settlements of
5  the trades that were supposed to settlement on
6  Lehman Brothers' account starting Monday
7  morning.
8      Q.    And that dispute, broadly speaking,
9  involved DTC needing some comfort as to who was
10  going to guarantee those settlements?
11      A.    Yes.
12      Q.    Now, on the notes themselves there is,
13  amidst the names and above the name Tom Hamilton
14  and Harry Harnson -- I'm just giving you that
15  for placement on the document.
16      A.    Uh-huh.
17      Q.    -- is what appears to be an Assets and
18  Liabilities column; is that right?
19      A.    Yes.
20      Q.    Okay.  Can you explain to me what that
21  represents?
22      A.    To the extent that I understand it, it
23  represents some assets of 45 and a half billion,
24  goodwill would be the next line of 250 million,
25  and then it had a loan from BarCap that says 45

Page 166

HIGHLY CONFIDENTIAL - A. KIRK
1
2       MR. HUME:  Objection.
3       MR. KELLEY:  Objection.  Speculation.
4   Misstates prior answers.
5       MR. HUME:  Vague and ambiguous as to
6   valuation.
7   A.  I didn't have that understanding.
8   Q.  Did you have --
9   A.  Nowhere did anybody say they should be
10  equal.
11  Q.  Okay.  Did you have an understanding
12  that Barclays was going to get more than it had
13  funded?
14  A.  In terms of assets?
15  Q.  Yes.
16  A.  Yeah, they were going to get assets
17  that were unencumbered.
18  Q.  And when you added the unencumbered to
19  the amount in the repo, was it your
20  understanding that Barclays was going to take
21  more out than it had funded into the repo?
22  A.  Well, they were also assuming other
23  liabilities away from the repo.
24  Q.  I understand that.
25      Did you understand that they were going to

Page 167

HIGHLY CONFIDENTIAL - A. KIRK
1
2   take out more than they had funded into the
3   repo?
4       MR. KELLEY:  Objection.  That's based
5   on speculation.  Calls for speculation, I
6   should say.
7       THE WITNESS:  So I --
8   Q.  You can answer that question.
9       MR. KELLEY:  It just asks him to
10  identify the source of his knowledge.
11      MR. GAFFEY:  No, I'm going to ask him
12  to answer the question I asked.
13      Will you read it back?
14      (Record read.)
15  A.  I don't understand the nature of, when
16  you say "take out more," what does that mean?
17  Q.  Barclays funds the repo to the tune of
18  $45.5 billion, you understand that, right?
19  A.  Right.
20  Q.  In the asset transfer agreement that's
21  at issue for the bankruptcy court, Barclays is
22  going to take a certain amount of assets out of
23  Lehman, correct?
24  A.  Yes.
25  Q.  Was it your understanding that that

Page 168

HIGHLY CONFIDENTIAL - A. KIRK
1
2   latter bucket of assets was to equal or to
3   exceed the amount that Barclays had paid into
4   the repo for funding?
5       MR. HUME:  Again, objection.  Vague
6   and ambiguous as to the valuations posed in
7   your question.
8   A.  My understanding was the totality of
9   the assets should attempt to get somewhere close
10  to covering all the liabilities.
11  Q.  The liabilities, you mean the
12  liabilities in the repo plus the assumed
13  liabilities?
14  A.  Yes.
15  Q.  Is that what you mean?
16      MR. HUME:  Objection to the phrase
17  "assumed liabilities."
18  A.  Yes.
19  Q.  And the assumed liabilities you're
20  referring to are the assumed liabilities for
21  payable and comp in the amount of 4.25 billion,
22  correct?
23  A.  Correct, and then ultimately the
24  assumed liabilities in guaranteeing the trading
25  obligations which they were agreed to do come

Page 169

HIGHLY CONFIDENTIAL - A. KIRK
1
2   Sunday.
3   Q.  Okay.  And do you know what the
4   resolution was of the issue of guaranteeing --
5   the dollar resolution was of the guarantee of
6   the trading liabilities?
7   A.  I don't recall specifically, but they
8   agreed to I think fund into DTC some amount of
9   cash to make good on the liabilities.  I don't
10  remember what the number was.
11  Q.  Do you recall that the number was
12  about $250 million?
13  A.  Sounds reasonable.
14  Q.  Okay.  So Barclays is to take out of
15  the deal an amount roughly in balance to the
16  amount in the repo, the assumed liability for
17  comp, the assumed liability for payables, and
18  the guarantee to the DTC; is that your
19  understanding?
20      MR. HUME:  Object to the form of the
21  question.
22  A.  And the goodwill.
23  Q.  And the goodwill.  And the goodwill is
24  about 250 million, correct?
25  A.  Right, so that -- well, they were

Page 170

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    buying the business of Lehman Brothers and they
3    were buying a whole bunch of assets which had,
4    in my opinion, quite uncertain value so that
5    they could lose many billions of dollars or make
6    many billions of dollars on those assets given
7    the volatility of the markets, and in addition
8    to that, they would obviously get the ongoing
9    operations of Lehman Brothers.
10       Q.    Was it your understanding that --
11       A.    So that it was --
12       Q.    Sorry.
13       A.    What I would say is that, in my
14   opinion, there was, at least from my seat, no
15   way to know what the actual value of those
16   assets would end up being for Barclays, you
17   know, over -- because I had no idea what
18   strategies they were going to pursue about those
19   assets, whether they were going to hedge them,
20   you know, all the variety of things that they
21   might end up choosing to do to execute a large,
22   huge block of -- the size of a transfer of this
23   size of assets is, you know, enormous and at the
24   time maybe even unprecedented.
25       Q.    Was it your understanding that the

Page 171

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    transaction was supposed to give Barclays a gain
3    on day one?
4        A.    No.
5        Q.    I hear what you're saying about longer
6    term they may operate the business and make
7    money out of it.  The question about day one, I
8    want to be sure we're --
9        A.    Yeah.
10       Q.    -- hearing each other here.  Was it
11   your understanding that there was any immediate
12   gain embedded for Barclays in the deal that was
13   made on Friday?
14           MR. HUME:  Objection.  Lacks
15   foundation.
16       A.    No, there was no understanding on my
17   part that there was a gain.
18           (Recess; Time Noted:  2:10 P.M.)
19           (Time Noted:  3:15 P.M.)
20           (Exhibit 324, a document bearing Bates
21   Nos. AK-LB-BANKR0000987 through 119, marked
22   for identification, as of this date.)
23   BY MR. GAFFEY:
24       Q.    Mr. Kirk, you have before you what we
25   have marked as Exhibit 324, a document bearing

Page 172

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Bates number AK-LB-BANKR000097 through 119.  Do
3    you recognize the document?
4        A.    Yes.
5        Q.    What is the document?
6        A.    This is a document that describes the
7    deal that was cut early in the week between
8    Lehman and Barclays.
9        Q.    Is that your handwriting on the
10   document?
11       A.    No.
12       Q.    Do you know whose handwriting it is on
13   the document?
14       A.    No.
15       Q.    I would note that the document was
16   produced to us by you.  Do you know how you came
17   into possession of this document with somebody
18   else's handwriting on it?  Any memory?
19       A.    No, I don't know what this is.
20       Q.    Do you have any knowledge of what the
21   annotations mean on the asset side where
22   somebody has written "ACT" and "HC"?
23       A.    No.
24       Q.    Would you understand the phrase "HC"
25   to mean haircut?

Page 173

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2        A.    That could be.
3        Q.    Would you understand the phrase "ACT"
4    to mean actual?
5        A.    That's not usually a vernacular, but
6    maybe.
7        Q.    I asked you --
8        A.    It could be "account."
9        Q.    Could be.  I don't know what your --
10       A.    Yeah.  Yeah.
11       Q.    I asked you earlier this morning if
12   you had any knowledge of a discount or a haircut
13   being given to Barclays on the book value of the
14   assets being traded for in the early part of the
15   week.  Does this refresh your recollection as to
16   whether there was an agreement on the deal as it
17   originally was made on Monday and Tuesday to
18   give Barclays a discount from book value?
19       A.    No.
20       Q.    Could you put before you Exhibit 19?
21   It's within the pile.
22       A.    What does it look like?
23       Q.    It's the other copy of that financial
24   statement, the one-pager.
25       A.    Yeah.

Page 182

HIGHLY CONFIDENTIAL - A. KIRK

1          HIGHLY CONFIDENTIAL - A. KIRK
2  be assuming all kinds of risks from failed
3  trades on Friday and in addition to the trades
4  going forward on Monday, and that they wanted
5  some -- they needed a margin safety to be able
6  to do that. So they were concerned that they
7  were exposed.
8      Q.  And did you hear anything about the
9  extent of that exposure?
10     A.  No.
11     Q.  Do you know if the deposit or the
12 guarantee was meant to cover the entire
13 potential exposure?
14     A.  I don't know the answer to that.
15 Those discussions happened directly, that is, my
16 understanding those discussions happened
17 directly between DTC and Barclays.
18     Q.  Do you know if there was a written
19 agreement?
20     A.  I don't know that.
21     Q.  You never saw a written agreement
22 resolving this dispute with the DTC?
23     A.  No. No.
24     Q.  Did you hear anything about what would
25 happen to the guarantee if it turned out not to

Page 183

1          HIGHLY CONFIDENTIAL - A. KIRK
2  be used?
3      A.  No.
4      Q.  Changing the subject.  You mentioned
5  back on September 14 that Mr. McDade told you
6  that the first transaction that was being
7  discussed with Barclays wasn't going to go
8  forward.  Do you remember that?
9      A.  Yes.
10     Q.  And I think you said he told you that
11 the FSA had turned down the application to close
12 that transaction?
13     A.  Yes.
14     Q.  Did he tell you why?
15     A.  Yes, that Barclays needed a waiver to
16 guarantee the trading obligations -- I'm sorry,
17 Barclays -- for Lehman to -- for them to close
18 the transaction, they would have to get a
19 shareholder vote, which would take some period
20 of time, I forget if it was 30 or 45 days, but
21 some reasonable period of time, and that it was
22 the view of all the participants, including
23 Treasury and the Fed and everybody, that Lehman
24 would not make it for 30 days without somebody
25 else guaranteeing the trading obligations for

Page 184

1          HIGHLY CONFIDENTIAL - A. KIRK
2  that period of time.
3      The only person who would do that was
4  Barclays.  Barclays apparently needed a waiver
5  of shareholder approval to make that guarantee,
6  which the FSA deemed they would not give.
7      Q.  Okay.  Let me now switch topics again
8  and take you back to the Friday meeting that you
9  testified that I think you said started around 3
10 o'clock on Friday afternoon?
11     A.  Uh-huh.
12     Q.  This is the meeting that you had with,
13 among others, Mr. Klein, Mr. Diamond and
14 Mr. Keegan from Barclays?
15     A.  Uh-huh.
16     Q.  You have to give me an out-loud
17 answer --
18     A.  Yes.
19     Q.  -- for the court reporter.  Thanks.
20     Was Mr. McDade physically present in
21 that meeting or is he on the phone?
22     A.  He's on the phone.
23     Q.  And were there any discussions about
24 that during that meeting about having to go back
25 and explain the deal to the Barclays board?

Page 185

1          HIGHLY CONFIDENTIAL - A. KIRK
2      A.  No, not in that meeting.
3      Q.  Did you hear that at another meeting?
4      A.  No, I didn't hear it in any meeting.
5      Q.  When you say no, you don't think it
6  happened or you don't remember?
7      A.  No, I didn't have it.  Didn't
8  happen -- that was not discussed in front of me.
9      This was what day again?  This was the
10 19th?
11     Q.  On Friday, the 19th.
12     A.  Friday, yes, no.
13     Q.  You had a meeting --
14     A.  Yeah.
15     Q.  -- late in the afternoon where -- this
16 is late in the afternoon where I think you said
17 this is when Barclays came back and said they
18 thought the value of the securities didn't match
19 the value of the loan and so they were looking
20 for additional unencumbered assets?
21     A.  Uh-huh.
22     Q.  Is that right?
23     A.  Yes.
24     Q.  And Mr. Gaffey asked you a couple of
25 times about whether they gave a target or a

Page 186

```
 1          HIGHLY CONFIDENTIAL - A. KIRK
 2   number for how much more they would need?
 3        A.   Yes.
 4        Q.   Right?
 5             As best you can recall, they didn't
 6   give you such a number, correct; is that right?
 7        A.   That's correct.
 8        Q.   And nobody -- Mr. Klein didn't say
 9   anything about having to have a certain number
10   to go back to the Barclays board?
11        A.   No.
12        Q.   I'm going to mark as my only exhibit
13   as 326 an e-mail from you to Mr. McDade.
14             (Exhibit 326, an e-mail chain, marked
15             for identification, as of this date.)
16        A.   Right.
17        Q.   Do you recall sending this e-mail to
18   Mr. McDade?
19        A.   I do recall that.
20        Q.   So the bottom e-mail on the page is
21   from you to Mr. McDade.  It's sent on that
22   Friday at 3:39.
23        A.   Uh-huh.
24        Q.   Do you see that?
25        A.   Yes.
```

Page 187

```
 1          HIGHLY CONFIDENTIAL - A. KIRK
 2        Q.   You write to Mr. McDade, "Rich Ricci
 3   just told me he won't blow up this trade by
 4   being a pig."
 5             Do you recall the context for that?
 6        A.   Well, the Barclays team had left.
 7   Bart was on the road and he was having
 8   discussions with Ian about whatever additional
 9   assets there were.  You know, I implored to
10   these guys that they shouldn't blow this deal
11   up, 10,000 jobs were at stake, you know, there
12   was a tremendous amount of pressure on all of
13   us, and Rich said to me something to this
14   effect:  I won't blow the deal up by being too
15   piggish.
16             I wanted to make sure Bart knew that
17   because they were wrapping up with he and Ian
18   whatever issues there were, so that's why I sent
19   the e-mail.
20        Q.   Was there a concern on the Lehman said
21   that the Barclays people were being too piggish?
22        A.   I was concerned that we were going to
23   go into bankruptcy court, which there's always
24   uncertainty, and try to describe a deal that
25   didn't look like the deal that they had heard
```

Page 188

```
 1          HIGHLY CONFIDENTIAL - A. KIRK
 2   about two days before.
 3             So my primary concern at that point
 4   was that there be as much flexibility, so to
 5   speak, at least give the -- enough operating
 6   room that we wouldn't go into court, have the
 7   transaction denied, and have to put the padlocks
 8   on the building Saturday morning.
 9             So -- and I've been around many, many
10   bankruptcy cases over two decades.  Wildly
11   uncertain things happen in these courts in
12   circumstances.
13        Q.   Sorry.  Is that what you meant by
14   "blow up the trade"?
15        A.   Yes.
16        Q.   That the bankruptcy court wouldn't
17   approve the deal?
18        A.   That's correct.
19        Q.   And you were, just so I understand
20   your testimony, you were concerned that that
21   might happen if Barclays was too piggish?
22        A.   Yeah, I think there were a myriad of
23   risks that could have done, you know, I mean,
24   the -- the stress of that not happening that
25   evening and you only had one shot at it, you
```

Page 189

```
 1          HIGHLY CONFIDENTIAL - A. KIRK
 2   know, it was -- certainly everybody was very
 3   concerned that this was sort of a do-or-die
 4   situation, literally.
 5        Q.   Was the comment about being a pig
 6   related to the effort to find unencumbered
 7   assets?
 8        A.   Yes.
 9        Q.   And you didn't -- so you don't have,
10   since that's in Mr. Lowitt's bailiwick, you
11   don't have a specific number or value that
12   would --
13        A.   No, this comment had been made to me.
14   I just wanted to pass it along.
15        Q.   And then Mr. McDade asks you back,
16   "Are the shorts all gone?"  What was that a
17   reference to?  Did you have an understanding as
18   to what he meant?
19        A.   I don't recall specifically why he
20   asked that, but that was a problem we were
21   dealing with all week at Lehman, that we were
22   naturally getting longer every day because our
23   hedges were either derivatives that had been
24   wiped out by the terms of their contracts or
25   short positions that were being bought in on the
```

Page 190

HIGHLY CONFIDENTIAL - A. KIRK
1
2    other side.
3        So, you know, asset prices were
4    imploding and we were naturally getting longer
5    every day.  So his question was how long is the
6    firm, so to speak, at this moment in time.  I
7    believe -- I don't -- so that's what I -- I
8    guess I tracked that down.
9        Q.    And that's what your answer to
10   Mr. McDade says?
11       A.    Yeah.  Yeah.
12           MR. ROTHMAN:  That's all the questions
13   I have.  Thank you.
14           THE WITNESS:  You're welcome.
15   EXAMINATION BY
16   MR. TECCE:
17       Q.    Mr. Kirk, my name is James Tecce.  I'm
18   an attorney at Quinn Emanuel.  We are special
19   counsel to the Creditors Committee.  I just
20   wanted to ask you a couple of follow-up
21   questions.
22           Going back to Friday, September 19th,
23   I believe it is, I think that you had said that
24   it was your belief on that day that JPMorgan
25   Chase would be "hostile," I believe was the word

Page 191

HIGHLY CONFIDENTIAL - A. KIRK
1
2    that you used, with respect to the transaction.
3        What was the basis for that belief?
4        A.    The fact that they had shut our DTC
5    account down was one issue.  The other issue was
6    that Barclays had described to me they were
7    having a dispute with JPMorgan about the
8    transfer of collateral.  In addition to that,
9    JPMorgan had been, my -- my understanding, it
10   had been described to me by Ian that JPMorgan
11   over time prior to the bankruptcy had been
12   squeezing a lot of additional collateral out of
13   Lehman Brothers along the way.
14       Q.    Do you have an understanding as to
15   when JPMorgan froze the DTC account?
16       A.    You know, it was either Thursday or
17   Friday.  I don't remember.  I think it was --
18   I'm pretty sure it was Friday, but it may have
19   been Thursday.
20       Q.    And when were you told about the
21   dispute between Chase and Barclays that you
22   described?
23       A.    Friday morning.
24       Q.    Going forward --
25       A.    And that's when I learned about the

Page 192

HIGHLY CONFIDENTIAL - A. KIRK
1
2    DTC account.  So I don't remember whether they
3    had closed -- I learned about it all on Friday.
4    I just don't remember if it was for that day or
5    it was for the previous day.
6        Q.    Do you know what the basis -- do you
7    have an understanding of the basis of
8    Mr. Lowitt's statements that Chase had been
9    taking collateral?
10       A.    Well, he was dealing with them
11   directly, so they were -- my understanding was
12   that they were threatening to not clear our
13   transactions without additional collateral prior
14   to the bankruptcy.
15       Q.    Did he provide any examples of that to
16   you?
17       A.    The one example that he provided was
18   that they requested Thursday night, the 11th --
19   is that right?  Yeah, the 11th, that Lehman
20   deliver another $5 billion to them prior to the
21   opening on Friday.
22       Q.    Going forward to the 21st, I believe
23   Sunday, the day of the closing, September 21,
24   you had just spoken briefly about the dispute
25   regarding the guarantee of trades with the DTC.

Page 193

HIGHLY CONFIDENTIAL - A. KIRK
1
2        Were you aware of any other disputes
3    besides that issue between Chase and Barclays at
4    that time?
5        A.    They were still arguing about the
6    transfer of collateral, your clients were there
7    for some of those arguments, in a, what I would
8    refer to as a giant conference room with 50
9    people in it and a lot of yelling.
10       Q.    Right.  And do you remember the
11   substance of those disputes regarding the
12   collateral?
13       A.    JPMorgan felt as if Barclays should
14   pay them and take additional collateral to
15   complete the repo transfer from the Fed, and in
16   addition to that, they actually asked for
17   Barclays to buy additional collateral even
18   beyond that that they had gotten from Lehman
19   Brothers earlier.
20       Q.    And do you have an understanding as to
21   what the resolution of that dispute was?
22       A.    No, they wouldn't tell us.
23       Q.    Do you have an understanding of anyone
24   at Lehman who does know the resolution of that
25   dispute?

Page 198

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    been part of the Fed repo or would they have
3    been part of the, quote/unquote, unencumbered?
4        A.    The issues that I'm discussing with
5    him here are settlements.  So these are going
6    forward -- they're not actually positions.
7    They're going-forward settlements between Lehman
8    and other counterparties that Lehman's standing
9    in the middle buying and selling all kind of
10   securities.  So that the positions were
11   reflected.
12        This would have reflected what risk
13   there would be in settlements not settling in a
14   normal way.  So that -- but to answer your
15   question, I don't -- I don't remember what the
16   percentage of treasuries were in this.  I wasn't
17   dealing with him on any -- on that issue.
18        MR. TECCE:  Those are the only
19   questions I have.  Thank you for your time.
20        MR. HUME:  I have just a few
21   questions.
22   EXAMINATION BY
23   BY MR. HUME:
24        Q.    Mr. Kirk, my name is Hamish Hume.  We
25   met before.  I represent Barclays.

Page 199

HIGHLY CONFIDENTIAL - A. KIRK

2    Mr. Kirk, during the week of September
3    15 to September 22, 2008 that you've been
4    questioned about, did you believe there was any
5    other viable purchaser of Lehman Brothers other
6    than Barclays?
7        A.    No.
8        Q.    Did you believe there was any other
9    alternative for Lehman Brothers other than the
10   Barclays acquisition?
11        A.    Liquidation.
12        Q.    Did you believe the Barclays
13   acquisition was the best outcome for the Lehman
14   estate for all stakeholders?
15        A.    Yes.
16        Q.    During the questioning earlier in the
17   deposition, you were asked -- you testified
18   about discussions with Mike Keegan about
19   valuation of assets, do you recall that,
20   generally?
21        A.    Yes.
22        Q.    And I think at one point you were
23   explaining that Mr. Keegan complained about
24   certain asset values and that you at some point
25   huddled with Ian Lowitt and Bart McDade to

Page 200

HIGHLY CONFIDENTIAL - A. KIRK

2    discuss whether there was any good basis for
3    disagreeing with Mr. Keegan's concerns.  Do you
4    recall describing that?
5        A.    Yes.
6        Q.    I believe you testified that the three
7    of you concluded there wasn't really a strong
8    basis for disagreeing with Mr. Keegan.  Do you
9    recall that?
10        A.    Yes.
11        Q.    During those discussions, were you
12   attempting to negotiate the best deal you could
13   for Lehman Brothers?
14        A.    Yes.
15        Q.    Do you believe you participated in
16   arm's length negotiations or that you witnessed
17   arm's length negotiations?
18        A.    I'll be clear about that.  I wasn't
19   actually negotiating and I wasn't -- I had no
20   authority to negotiate.  I believe we were
21   participating in arm's length negotiations,
22   Lehman was, with Barclays.
23        Q.    You testified earlier in the
24   deposition that you did not have an
25   understanding regarding whether there would be a

Page 201

HIGHLY CONFIDENTIAL - A. KIRK

2    gain at Barclays on day one; do you recall that
3    line of questioning?
4        A.    Yes.
5        Q.    Did you have any knowledge about how
6    Barclays would account for this transaction on
7    its balance sheet?
8        A.    No.
9        Q.    Did you give any thought or analysis
10   to how Barclays would account for the
11   transaction on its balance sheet during the
12   negotiations?
13        A.    No.
14        Q.    Did you have any knowledge of whether
15   Barclays would be required to record an
16   intangible asset in excess of a billion dollars
17   on its balance sheet?
18        A.    No.
19        Q.    Did I understand your testimony
20   earlier that you believed many of the assets
21   being transferred to Barclays were of uncertain
22   value?
23        A.    Yes.
24        Q.    And were many of those assets going to
25   take some time to value?

Page 202

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   Yes.
3    Q.   Did you understand the liabilities for
4  cure payments and compensation to be estimated
5  liabilities?
6    A.   Yes.
7    Q.   Did you understand that Barclays was
8  stepping into the shoes of Lehman with respect
9  to its exchange-traded derivative accounts?
10   A.   I was not aware of any agreements
11 around the derivatives.
12   Q.   You weren't involved one way or the
13 other with derivatives?
14   A.   I wasn't involved one way or the
15 other.
16   Q.   Did you generally understand that both
17 the assets and the liabilities Barclays was
18 taking over were uncertain and difficult to
19 value as of the time of the transaction?
20   A.   Yes.
21   Q.   Therefore, as of the time of the
22 transaction, was it in your mind possible that
23 after Barclays had taken the time to value the
24 assets and the liabilities in accordance with
25 its own methodology and accounted for the

Page 203

HIGHLY CONFIDENTIAL - A. KIRK

1
2  transaction under its own accounting
3  methodologies, that it would be possible that it
4  record either a gain or a loss on the
5  transaction --
6    MR. GAFFEY:  Objection.
7    Q.   -- as of day one?
8    MR. GAFFEY:  Object to the form.
9    Q.   Do you understand the question?
10   MR. GAFFEY:  You can ignore me.
11   THE WITNESS:  Okay.
12   MR. GAFFEY:  He can't, but you can.
13   THE WITNESS:  Okay.  I never know with
14 these objections if I'm supposed to ignore
15 them or not.
16     I think it was completely a matter
17 of -- I had no idea what their accounting
18 issues were on any of those fronts, so I was
19 not aware of that, and whether they would
20 end up recording a gain or loss over time
21 would depend upon market conditions, hedging
22 strategies, you know, disposition
23 strategies, et cetera, that I had no insight
24 into how they were going to execute them.
25   Q.   I understand that.  I think you said

Page 204

HIGHLY CONFIDENTIAL - A. KIRK

1
2  that earlier.  I'm saying, wholly apart from
3  what would happen over time, after Barclays took
4  the time to actually value the assets and
5  liabilities as they were valued on day one,
6  given the uncertainties in both the assets and
7  values that Barclays took on and the limitations
8  on what you knew about derivatives and other
9  assets, was it in your mind at least possible
10 that Barclays would record either a gain or a
11 loss on day one, as of day one of the
12 transaction?
13   MR. GAFFEY:  Objection to form.
14   MR. ROTHMAN:  Objection to form.
15   A.   Yes, it was possible.
16   Q.   Mr. Kirk, you testified a little bit
17 about the transfer of collateral when Barclays
18 replaced the Federal Reserve's lending position
19 on the repo transaction, do you recall that,
20 generally?
21   A.   Yes.
22   Q.   Were you aware of that when Barclays
23 advanced its $45 billion in cash to replace the
24 Federal Reserve, Barclays did not receive the
25 same collateral that had been pledged by Lehman

Page 205

HIGHLY CONFIDENTIAL - A. KIRK

1
2  to the Federal Reserve in its repo?
3    A.   I was not aware of that.
4    Q.   Were you aware of the operational
5  difficulties that arose when the Fed collateral
6  was released into the Lehman clearing account so
7  that some of that collateral disappeared or was
8  tucked into other transactions and, therefore,
9  could not be transferred to Barclays?
10   A.   I was not aware of any specifics of
11 those issues.  I was aware there was a -- some
12 dispute.
13   Q.   I'd like to refer you very quickly to
14 Exhibit 321.
15   A.   Okay.
16   Q.   The third-to-last page with the Bates
17 number, number in the bottom corner, number 25.
18   A.   Okay.
19   Q.   Which I believe you testified
20 reflected write-downs that were being discussed
21 or considered by Bank of America in the
22 potential Bank of America transaction; is that
23 correct?
24   A.   That is correct.
25   Q.   Was this done during that weekend

Page 206

HIGHLY CONFIDENTIAL - A. KIRK

1
2  before the bankruptcy when you were at the Fed?
3      A.    This was done I believe the Friday,
4  December -- September 12th.
5      Q.    And I don't know if you testified or
6  not, but whose handwriting is this on this page?
7      A.    I don't know whose handwriting this
8  is. It's not mine.
9      Q.    Was the general idea that Bank of
10  America wanted haircuts or discounts from the
11  marked to market book values that Lehman had for
12  these assets?
13      A.    Yes.
14      Q.    And was that information shared with
15  the Federal Reserve during discussions?
16      A.    Yes.
17      Q.    And did the Federal Reserve express
18  any surprise or disagreement with that concept?
19      A.    I wasn't there when they shared it,
20  this information.
21      Q.    How do you know it was shared with the
22  Federal Reserve?
23      A.    Because we got this delivered to us at
24  the Federal Reserve.  We shared it with -- I
25  think Bart gave a copy to Shafron and we shared

Page 207

HIGHLY CONFIDENTIAL - A. KIRK

1
2  it with John Mack, Vickram Pandit and John
3  Thayne and their teams.
4      Q.    You testified earlier about the
5  unencumbered collateral in the clearance boxes
6  that Ian Lowitt identified as assets to be
7  transferred, do you recall that?
8      A.    Yes.
9      Q.    And you testified that there was an
10  agreement that those assets would be transferred
11  made on the Friday, September 19?
12      A.    Yes.
13      Q.    Is that right?
14      A.    Correct.
15      Q.    You also testified that you were aware
16  of an issue over the weekend relating to the
17  DTC's desire for some support for settlement
18  obligations on the Monday, correct?
19      A.    Correct.
20      Q.    And your general understanding was
21  Barclays agreed to deposit $250 million to
22  address those settlement obligations?
23      A.    Yes.
24      Q.    Did anyone at any time ever tell you
25  or lead you to believe -- let me withdraw that

Page 208

HIGHLY CONFIDENTIAL - A. KIRK

1
2  and say it differently.
3      Did you at any time form an
4  understanding at any time that weekend or that
5  Monday, the 22nd, did you ever form an
6  understanding that the unencumbered collateral
7  in the clearance boxes that Ian Lowitt had
8  identified to be transferred in the transaction
9  were not going to be transferred in the
10  transaction because of the way in which Barclays
11  was dealing with the DTC settlement issue?
12      MR. ROTHMAN:  Objection to the form.
13      MR. GAFFEY:  Join.
14      MR. TECCE:  Join.
15      A.    No.
16      Q.    That was never your understanding?
17      A.    No.
18      MR. HUME:  No further questions.
19  EXAMINATION BY
20  MR. GAFFEY:
21      Q.    Just one or two.  Your view that there
22  was no other viable purchaser, would that view
23  have changed if there were a $5 billion
24  immediate gain embedded in the transaction?
25  Would you have had the view there might be

Page 209

HIGHLY CONFIDENTIAL - A. KIRK

1
2  viable purchasers then?
3      MR. HUME:  Object to the form.  Calls
4  for speculation.
5      A.    I think the -- there were -- we were
6  open to a transaction with anybody, so if
7  somebody was willing to take that kind of risk,
8  I assume they would have showed up.
9      Q.    Do you think they would have shown up
10  if they were not told there was a $5 billion
11  haircut embedded in the transaction?
12      MR. KELLEY:  Objection.  Calls for
13  speculation.
14      A.    There was no certainty what that
15  number was.
16      Q.    If, in addition to whatever else was
17  said about the deal publicly, it was also said
18  that there was a $5 billion haircut embedded in
19  the transaction, do you think there would have
20  been other viable purchasers, do you know?
21      MR. KELLEY:  Objection.  Calls for
22  speculation.
23      A.    I don't know.
24      Q.    Are you able to say one way or the
25  other?

Page 210

**HIGHLY CONFIDENTIAL - A. KIRK**

1  A.  Not really.
2  Q.  Okay.  Do you know the basis of the
3  estimated liabilities?  You told Mr. Hume that
4  you knew that the liabilities for comp and cure
5  were estimated in some way.  Do you know the
6  basis for the estimation?
7  A.  I assume that the basis was -- I don't
8  know the estimation.  I knew it came from our
9  Finance Department.
10  Q.  And your understanding at the time on
11  the Friday when you were looking at this was
12  that those were estimates based upon Lehman's
13  books, correct?
14  A.  Upon the work that Lehman had done.
15  Certain, you know, liabilities only
16  come up in the nature a transaction like this,
17  right?  So you cancel contracts you have
18  liabilities.  So they would be contingent and
19  necessarily not necessarily on your books prior
20  to doing an acquisition like that.
21  So the -- it's -- it's not -- it's not
22  completely -- it wouldn't be completely just
23  what was actually recorded on the books.  There
24  would also be other liabilities that could be

Page 211

HIGHLY CONFIDENTIAL - A. KIRK

1  triggered by the transaction itself.
2  Q.  And back to this issue of a viable
3  purchaser, if it had been announced in addition
4  to the other components of the deal that --
5  withdrawn.
6  You understood the assumed liabilities
7  component of the deal to be a cost that Barclays
8  would have in the transaction, correct?
9  A.  Correct.
10  Q.  If it had been publicly announced that
11  the $2 billion cost for compensation had been
12  deliberately inflated by a billion dollars, that
13  in your view would lower the actual cost for
14  Barclays, correct?
15  MR. KELLEY:  Same objection.
16  A.  If --
17  Q.  If it --
18  A.  If the answer is if it was inflated,
19  it would lower the cost, the answer is yes,
20  that's factual, I think.
21  Q.  If it had been announced in addition
22  to other components of the deal that the assumed
23  liability for compensation was deliberately
24  inflated by a billion dollars, do you have a

Page 212

**HIGHLY CONFIDENTIAL - A. KIRK**

1  view as to whether that might have attracted
2  other viable purchasers?
3  A.  The market was so uncertain and there
4  was so much financial stress in the list of
5  potential purchasers that I'm not sure there was
6  anybody who could have executed it no matter
7  what they thought the gain was because the
8  market would have viewed it as too risky, so to
9  speak, and too strategically risky in many ways
10  and too risky from a financial standpoint to
11  approve them for any board to approve it.
12  Q.  In your view --
13  A.  No matter what the gain was.
14  Q.  Sure.  And in your view, was there at
15  any point where additional value in the deal
16  might have attracted other viable purchasers?
17  MR. HUME:  Objection.  Asked and
18  answered.
19  A.  None with the time to actually execute
20  it.
21  Q.  And what was your role in determining
22  whether or not there were other actual viable
23  purchasers?
24  A.  I didn't have a role in that.

Page 213

HIGHLY CONFIDENTIAL - A. KIRK

1  Q.  Did you have any role at all in that?
2  A.  No, that was the role of the FIG, the
3  FIG bankers, Financial Institutions Group.
4  MR. GAFFEY:  Thanks.  Nothing further.
5  THE WITNESS:  Okay.
6  MR. ROTHMAN:  One question.
7  EXAMINATION BY
8  MR. ROTHMAN:
9  Q.  Fair to say that you don't know how
10  the dispute -- the terms of the resolution of
11  the dispute with the DTC on that Sunday night?
12  MR. HUME:  Objection.  Vague and
13  ambiguous.
14  MR. KELLEY:  Asked and answered, too.
15  A.  I don't know.  Did you say is it fair
16  to say I don't know the terms?
17  Q.  You don't know, yes.
18  A.  I only know it was described that
19  there was 250 million put into the DTC account.
20  I don't know the full terms.  As I said, there
21  may have been other terms that I was not aware
22  of.
23  Q.  You don't know, beyond that 250
24  million that we discussed, you don't know one

Page 214

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2  way or the other what was supposed to happen to
3  the unencumbered assets that had been in that
4  DTC box, correct?
5      A.   No, I don't know that.
6          MR. ROTHMAN:  Thank you.
7          MR. HUME:  Let me have follow up on
8      that.
9  EXAMINATION BY
10 MR. HUME:
11     Q.   When you say you don't know the
12 unencumbered assets in the DTC box, to the
13 extent that they were identified by Mr. Lowitt
14 as transferable assets, was it your
15 understanding they were going to be transferred
16 as part of the deal?
17         (Continued on the next page to include
18     the jurat.)
19
20
21
22
23
24
25

Page 215

HIGHLY CONFIDENTIAL - A. KIRK

1
2      MR. ROTHMAN:  Objection to the form.
3      A.   Yes.
4          MR. HUME:  No further questions.
5          THE WITNESS:  I may have misunderstood
6  the earlier question.
7          MR. GAFFEY:  I'm going to have mercy.
8  I have no follow-up questions.
9          (Time Noted:  3:06 P.M.)
10             oOo
11
12
13
14
15
16
17
18         _____
          ALEX KIRK
19
20  Subscribed and sworn to
    before me this    day
21  of      2009.
22
23         _____
24
25

Page 216

HIGHLY CONFIDENTIAL - A. KIRK

1
2              CERTIFICATE
3  STATE OF NEW YORK )
              : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That ALEX KIRK, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23     In witness whereof, I have hereunto
24 set my hand this 31st day of August, 2009.
25      ------------------------------------
       KATHY S. KLEPFER, RPR, RMR, CRR, CLR

Page 217

HIGHLY CONFIDENTIAL - A. KIRK

1
2                  INDEX
3  WITNESS:        EXAMINATION BY        PAGE
4  A. KIRK      Mr. Gaffey      5, 208
5              Mr. Rothman      176, 213
6              Mr. Tecce        190
7              Mr. Hume         213, 214
8  EXHIBITS:                    PAGE
9  Exhibit 316, an e-mail chain with .......... 121
10 attached balance sheet
11 Exhibit 317, a document bearing Bates ...... 132
12 Nos. 10310050
13 Exhibit 318, a document bearing Bates ...... 137
14 Nos. 10325943 with attachment
15 Exhibit 319, an e-mail chain ............... 140
16 Exhibit 320, a document bearing Bates ...... 145
17 Nos. 10293820
18 Exhibit 321, a document bearing Bates ...... 153
19 Nos. AK-LB-BANKR00002 through 27
20 Exhibit 323, a document bearing Bates ...... 160
21 Nos. AK-LB-BANKR000030
22 Exhibit 324, a document bearing Bates ...... 171
23 Nos. AK-LB-BANKR0000987 through 119
24 Exhibit 325, a document bearing Bates ...... 174
25 Nos. AK-LB-BANKR000188

Page 1

1          HIGHLY CONFIDENTIAL - M. KLEIN

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                   Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF MICHAEL KLEIN

14              New York, New York

15              September 12, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24546

Page 6

HIGHLY CONFIDENTIAL - M. KLEIN

1   wait until I complete a question before you
2   answer it, we'll get a cleaner transcript.
3       A.   Okay.
4       Q.   Okay?
5       A.   Thank you.
6       MR. GAFFEY:  As to confidentiality, we
7   have a Confidentiality Stipulation and Order
8   which has been so ordered by Judge Peck.
9   Our agreement has been that all depositions,
10  including depositions of non-parties, as it
11  were, which includes Mr. Klein, are covered
12  by that, and you will have the same rights
13  that the party has under the confidentiality
14  agreement.  If you don't have a copy of it
15  we'll get it.
16      MR. BERNICK:  That's agreeable and we
17  appreciate that.
18      MR. GAFFEY:  I should add, too, we
19  have had a convention over and above that
20  confidentiality stip which has worked well
21  for us up till now, which is that the entire
22  deposition transcript is deemed to be --
23      Is it highly confidential?
24      MR. STERN:  Highly confidential.

Page 7

HIGHLY CONFIDENTIAL - M. KLEIN

1       MR. GAFFEY:  -- for some period of
2   time, seven or ten days or so, and we'll
3   sort that out, to give you time to sort of
4   undesignate.
5       MR. BERNICK:  Great.  Terrific.
6   BY MR. GAFFEY:
7       Q.   Mr. Klein, by whom are you employed,
8   sir?
9       A.   I'm not employed.
10      Q.   Okay.  Was there a time when you
11  worked at Citibank?
12      A.   Yes.  To be correct, I have an ongoing
13  consulting relationship with one company, so --
14  but I'm not employed.
15      Q.   Okay.  And with what company do you
16  have an ongoing consulting relationship?
17      A.   With the Dow Chemical Company.
18      Q.   And was there a time when you were
19  employed at Citibank?
20      A.   Yes.
21      Q.   Could you just give me the time
22  periods?  How long were you there?
23      A.   I was at Citi or the predecessors that
24  amalgamated into Citi from 1985 until 2008.

Page 8

HIGHLY CONFIDENTIAL - M. KLEIN

1       Q.   And what was the last position that
2   you held at Citi?
3       A.   My final position was a position that
4   had the title of Chairman of Institutional
5   Clients Group, and in that regard, I had a
6   series of responsibilities and relationships
7   with clients, amongst them governments,
8   corporations, et cetera.
9       Q.   And when did you leave Citi?  What
10  month of '08?
11      A.   I think my last official date was July
12  21st.  The third week in July.
13      Q.   Did there come a time during 2008
14  where you were asked to become involved in any
15  way in negotiations between Lehman and Barclays?
16      A.   Yes.
17      Q.   When did that occur?
18      A.   Approximately the Thursday before the
19  weekend of the Lehman bankruptcy filing.
20      Q.   We have in front of you a blank
21  calendar which you might want to refer to
22  through the day, because in this case we have
23  sort of shorthanded it to the Tuesday or the
24  Wednesday, and that will help you pick

Page 9

HIGHLY CONFIDENTIAL - M. KLEIN

1   particular dates.
2       Taking a look at that calendar, if you
3   don't mind, you were referring to the Thursday?
4       A.   Before the Lehman bankruptcy.
5       Q.   Okay.  So that would be Thursday, the
6   11th?
7       A.   I believe that's so.
8       Q.   Would you describe for me, please, how
9   you came to be involved, who asked you to be
10  involved, and what you were asked to do?
11      A.   I was called by a gentleman named
12  Hans-Jörg Rudloff at Barclays who asked me just
13  in general where I was, what I was doing.  It
14  was a non-specific conversation.  It was
15  followed by a call from Bob Diamond.  Bob
16  asked me if I could be available, given all that
17  was going on with Lehman Brothers, to be of
18  assistance to Barclays.  And that was his
19  request.
20      Q.   Now, at the time I understand you had
21  some sort of restrictive covenant or a
22  non-compete or a garden leave with regard to
23  your departure from Citi; is that correct?
24      A.   That's right.

Page 42

HIGHLY CONFIDENTIAL - M. KLEIN

1  between the discussions that Barclays had to
2  have with all of their own regulators to get
3  sign-off to do anything, walking into this
4  situation, should it be something that should be
5  done.
6      And then, third, and I'm sure there
7  were other things as well, but how do you
8  protect yourself from all of the risks that
9  could emerge. It's one thing to try to make a
10  transaction and fail. It's another thing to
11  make a transaction and fail. And obviously
12  Barclays had a very big global franchise that
13  they would be putting at risk. So that was the,
14  if you will, morning.
15      We then went over to Lehman's
16  building, the Seventh Avenue building, sometime
17  in that afternoon and began to understand what
18  potentially could be achievable. I think the --
19  because there was no understanding of what a,
20  quote, transaction was, it was fairly clear
21  that, when we walked over, we were hoping to be
22  able to effectively see if there was a way to do
23  business with the Lehman people and do business
24  as Lehman.

Page 43

HIGHLY CONFIDENTIAL - M. KLEIN

1      That was the hope behind it, beyond
2  which there was very limited knowledge. There
3  was a substantial amount of noise in the
4  marketplace because the markets had dropped
5  dramatically and there was a view that assets --
6  that Lehman was just hemorrhaging assets so that
7  no one knew what would be left, if you will,
8  when we got over there, and then we went over to
9  the meetings at Lehman.
10  Q.  And before you went over to the
11  meetings at Lehman, what, if any, parameters did
12  Barclays come up with to answer the question of
13  how it would protect itself?
14      MR. BERNICK:  Again, I know that Mr.
15  Gaffey will concur with this. He's really
16  asking these questions of you for what you
17  know. So you're not here representing
18  Barclays. You're here just being Michael
19  Klein. Subject to that, what he's
20  you about is what you know of about that
21  question.
22  Q.  Just I'll restate the question just so
23  we can be efficient today.
24      MR. BERNICK:  Okay.

Page 44

HIGHLY CONFIDENTIAL - M. KLEIN

1  Q.  At no point today do I want you to
2  give me anything other than your personal
3  knowledge, and I agree with Mr. Bernick: You're
4  not here as a representative of Barclays. I'm
5  not asking for the history, the global history
6  of the transaction. I'm asking for what you
7  know, what you saw, what you remember.
8      MR. BERNICK:  And the only reason I
9  kicked off into that is because you asked
10  him how did Barclays come up or what
11  parameters did Barclays come up with, and it
12  sounded like it was a bit broader.
13  Q.  Let's assume, sir, so I don't have to
14  say it ever time, that all my questions begin
15  with "to your knowledge."
16      So, to your knowledge, what parameters
17  did Barclays come up to address the question of
18  how it would protect itself?
19  A.  Again, it's not very easy for me to
20  reconstruct what at any moment in time even to
21  my own knowledge existed. I do know that the
22  concept of walking into the bankruptcy was one
23  that there was a lot of trepidation and there
24  was a sense that this was a -- if there was an

Page 45

HIGHLY CONFIDENTIAL - M. KLEIN

1  opportunity to have some of the right to do
2  business in the areas that the -- that Lehman,
3  old traditional Lehman, could offer, that would
4  be great, but there was no appetite to take risk
5  on things that could, if you will, come out of
6  the woodwork or things that could bite. There
7  just wasn't an ability to do that. That window,
8  if you will, of being the whole owner of a, if
9  you will, a business and a big balance sheet,
10  the whole element, that was the weekend and had
11  passed.
12  Q.  Did Mr. Diamond express to you a view
13  at that time that Barclays would not be willing
14  to pay a premium or market price -- I beg your
15  pardon. Did he express -- let me restate that
16  question.
17      Did Mr. Diamond express to you a view
18  that Barclays would not be willing to pay a
19  premium or book value as opposed to a distressed
20  price for Lehman's assets?
21  A.  I don't recall, but I don't think
22  there was an asset -- it wasn't an asset
23  discussion. We were going over to discuss how
24  to do a business transaction along with the

Page 46

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  ability to do business at Lehman. I don't know
3  of any parameters other than that there was no
4  sense as to whether there was going to be any
5  assets. I mean, it wasn't a -- that wasn't the
6  driver of certainly the -- either the roles or
7  the conversations that I was party to.
8      Q.    So you go over to Lehman. Tell me
9  what happens there. Who meets with who?
10     A.    Lehman was -- there were quite a lot
11  of people at Lehman at the time, and again, in a
12  similar vernacular, I didn't know many of them,
13  if any of them.
14          There were a series of meetings, and I
15  can't tell you who was in which meeting. The
16  Cleary lawyers were there and the Weil lawyers
17  were there. The Lehman professionals were
18  there. The Barclays team were there. And for
19  the better part of -- the early part was a
20  question as to does this make any sense because
21  the clock is running out. The message had been
22  if you can't get something done and have the
23  market believe something was going to be done,
24  your people, your counterparties, your
25  everything would be gone. So that was sort of

Page 47

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  one piece, as I recall.
3          The second piece is, with that in
4  mind, what in fact can you do that is rapid
5  enough to sustain anything of any value, because
6  the view was that if you couldn't do something
7  quickly, there was not only no value in Lehman
8  as an entity on an ongoing basis, but there was
9  going to be negative value because there's
10  always going to be liabilities, but there was
11  not going to be anything left for the business
12  itself.
13          So the early part was just discussing
14  was in fact there something that could be
15  achieved. At some point in that day, and I --
16  I'm not by any stretch a bankruptcy expert --
17  let me be clearer, I'm not a bankruptcy expert
18  all in terms of my knowledge.
19          So there were definitions and
20  description amongst the lawyers of what
21  potential paths could be taken, and there was
22  then a discussion of, if we were going to be
23  doing business as Lehman and step into the
24  operational business, if you will, of that North
25  American, how could you do that, how could you

Page 48

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  structure that, and then there was the purchase
3  discussion, the purchase price negotiation on
4  the purchase price. So that was the sort of
5  path, if you will, of what took place.
6      Q.    Was there a point on the Monday where,
7  to your knowledge, was there a point on Monday
8  where Barclays was given an opportunity to
9  review books and records and otherwise do due
10  diligence?
11     A.    In the rooms I was in --
12     Q.    Uh-huh.
13     A.    -- there was not. That wasn't
14  ongoing, and I -- there were multiple rooms, of
15  course, that were taking place, but in the rooms
16  that I and in my own role, my responsibility was
17  to attempt to determine was there some kind of a
18  transaction that could take place.
19     Q.    So due diligence is not, or the fruits
20  of it, is not within your portfolio?
21     A.    I wasn't within my portfolio.
22     Q.    You referred to purchase price
23  negotiations. Were you involved in those?
24     A.    I was involved in the discussions on
25  the elements of the building and the elements of

Page 49

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  the cash paid for the rights to operate the
3  business.
4      Q.    Can you explain to me what you mean
5  when you say "cash paid for the rights to
6  operate the business"?
7      A.    As best as I can.
8      Q.    Sure.
9      A.    The view was that the business didn't
10  have any value as an ongoing business; that if
11  you were going to step in and take on 10,000
12  employees and whatever liabilities to operate
13  that business, when you had no idea of what
14  revenues would be because there's no -- (A) you
15  just have no knowledge, (B) you have no
16  knowledge of what clients or customers think or
17  feel of you at that point in time, you don't
18  know who's going to stay and who's not going to
19  stay, whether that's clients, customers
20  counterparties, you don't know what had taken
21  place in the week prior to that, it was a
22  very -- there was a lot of reasons to believe
23  that this was not an ongoing business.
24          So the view at the outset was there's
25  no value for the ongoing business, so the

| | |
|---|---|
| Page 50 | Page 51 |

**Page 50**

HIGHLY CONFIDENTIAL - M. KLEIN

1
2 discussion as to what then cash was paid for,
3 quote, the rights to do this business, which
4 really was the transaction, is how do you end up
5 stepping into those, if you will, operations of
6 the brokerage business, as it turned out, the
7 North American brokerage business. That's what
8 I'm referring to, which became the $250 million
9 number.
10     Q.   That sort of anticipates my next
11 question.  If the deal was ultimately done,
12 that's the price paid for such things as the
13 right to use the name and license --
14     A.   Well --
15          MR. BERNICK:  Hang on.  Let's let him
16 finish the question.
17     A.   I'm sorry.
18     Q.   -- licenses, that sort of thing, not
19 the price paid for particular assets that were
20 purchased?
21     A.   No, that's right.
22     Q.   Were purchase price negotiations for
23 particular assets that were purchased within
24 your portfolio?
25     A.   No.

**Page 51**

HIGHLY CONFIDENTIAL - M. KLEIN

1
2     Q.   Were they ever within your portfolio
3 in the time period from Monday, September 15th,
4 through closing on September 22nd?
5     A.   At the end of that week -- let me
6 answer it very specifically because you said, I
7 think, "pricing of specific assets," and at no
8 point was pricing of specific assets in my
9 domain.
10          The concept of how the transaction
11 changed in the later part of the week and, in
12 addition to those changes, the then resulting
13 shifts of assets and the, what I'll call the
14 weekend of the JPMorgan-related issues I was
15 brought into.
16     Q.   I'm going to come back to each of
17 those pieces through the day today, but just so
18 I can clarify this piece for the record, when
19 you talk about the weekend of the
20 JPMorgan-related issues were on the weekend of
21 the 20th and the 21st after the approval
22 hearing, correct?
23     A.   That's right.
24          MR. GAFFEY:  Can we take a ten-minute
25 break?

| | |
|---|---|
| Page 52 | Page 53 |

**Page 52**

HIGHLY CONFIDENTIAL - M. KLEIN

1
2          MR. BERNICK:  Sure.
3          (Recess; Time Noted:  11:37 A.M.)
4          (Time Noted:  11:49 A.M.)
5 BY MR. GAFFEY:
6     Q.   Before the break, Mr. Klein, we were
7 talking briefly about negotiations concerning
8 purchase price of assets.  To your knowledge,
9 was there a team at Barclays who on the Monday
10 was negotiating with Lehman about the purchase
11 price for particular assets?
12          MR. BERNICK:  Your question assumed
13 that there was a separate purchase price.
14          MR. GAFFEY:  Yes, it does.  Apart from
15 what turned out to be the $250 million,
16 apart from the price for the right to do
17 business.
18          MR. BERNICK:  Well, that also is an
19 assumption that the 250 was just for the
20 right to do business.
21          MR. GAFFEY:  Okay.
22          MR. BERNICK:  I don't know what's
23 happened in all the other depositions, but
24 that's not a predicate that exists because
25 of what Mr. Klein has testified to this

**Page 53**

HIGHLY CONFIDENTIAL - M. KLEIN

1
2 morning.
3     Q.   You can answer the question, sir.
4     A.   I can only give you the specifics as
5 to what I'm aware to, which we've discussed, but
6 the discussion was the purchase of the rights to
7 operate the business as the business existed,
8 and there were the two principal components,
9 which were the 250 million and then the
10 buildings which Lehman specifically asked
11 Barclays to buy for which the valuation was then
12 set by Lehman on an as-occupied basis.
13          The business was defined as the rights
14 to do business and any assets and associated, if
15 you will, directly associated, liabilities tied
16 to that business that were necessary to operate
17 the business.  I'm not aware of separate
18 specific negotiations.
19     Q.   Does there come a point on Monday or
20 into the morning of Tuesday when an agreement is
21 reached between Lehman and Barclays?
22     A.   I don't know the specific timing.  An
23 agreement was reached, yes.
24     Q.   Describe for me your understanding of
25 the components of the agreement that was

Page 62

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  described already.
3      Q.   Let me show you what's previously been
4  marked, Mr. Klein, as Deposition Exhibit 19.
5          Have you ever seen that document
6  before?
7      A.   Yes, I have.
8      Q.   When did you first see that document?
9      A.   I'm not certain when I first saw it.
10 I've seen it recently, but I'm not sure when I
11 first saw it.
12     Q.   Apart from reviewing it maybe to
13 prepare for your deposition, I'm more interested
14 in at the time that we're talking about.
15         Did you see it during the week of the
16 15th, which is when Lehman filed, and the
17 closing of the deal on the 22nd?
18     A.   I know I've seen it prior to the
19 meeting I had in preparation, but I don't know
20 specifically when I saw it.
21     Q.   Do you recall if you had any
22 discussions with people from Barclays about this
23 document, Exhibit 19?
24         MR. BERNICK:  At any time?
25         MR. GAFFEY:  During the week.

Page 63

HIGHLY CONFIDENTIAL - M. KLEIN
1
2         MR. BERNICK:  During that week.
3         Q.   Between the 15th and the 22nd.
4         A.   I don't recall specific discussions
5  about the document itself.  I don't recall
6  specific discussions.
7         Q.   Did you ever attend any meetings that
8  were attended by people from Lehman and Barclays
9  at which this document was the subject of
10 discussion?
11        A.   Not that I can specifically recall;
12 the document itself, not that I can specifically
13 recall.
14        Q.   Do you have any knowledge of what
15 role, if any, this document played in the
16 reaching of an agreement on the 16th of
17 September, the Tuesday?
18        A.   I don't, with the exception of saying
19 that there's -- there was very little data that
20 was (A) forthcoming to Barclays.  The situation,
21 as you know, was exceedingly fluid.  (B) the
22 data that was coming was, if it was dated by
23 more than a few seconds, it was, given the
24 market activity, it was changing, and given the,
25 if you will, the melting iceberg that was

Page 64

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  ongoing at Lehman, it was outdated.
3         So there was a general sense that
4  there wasn't really any data except the
5  construct of what we were trying to achieve,
6  which is buy the business as it was operating.
7  But I don't know specifically -- I don't know
8  who created this nor what they specifically used
9  it for or, put differently, I don't recall who
10 specifically created it or what it was
11 specifically used for.
12     Q.   You can put that document aside.
13 Thanks.
14         To your knowledge, sir, do you know if
15 part of the agreement that was reached between
16 Lehman and Barclays included a negotiated
17 discount of $5 billion?
18         MR. BERNICK:  Off what?
19         MR. GAFFEY:  Off the value of the
20 assets transferred.
21         MR. BERNICK:  You can answer.
22     Q.   Actually, withdraw that.  Do you know,
23 sir, if the agreement reached between Lehman and
24 Barclays included a negotiated discount of $5
25 billion against the marks that Lehman had for

Page 65

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  particular securities?
3      A.   I'm sorry, can you ask that for me one
4  more time.
5          (Record read.)
6      A.   Just so I'm clear, because you've used
7  a couple of words here, there were, by the way,
8  a lot of agreements reached at various different
9  points in time, so are you referring to
10 something in specific?
11     Q.   I'm still on the agreement that was
12 first reached on Tuesday, the 16th, the day it
13 was announced.
14     A.   I was, to my knowledge, never apprized
15 of any $5 billion discount at all.
16     Q.   At any point during that week, from
17 the 15th of September, the Monday when Lehman
18 filed, through the 22nd, when the transaction
19 closed, were you ever apprized of the discount?
20         MR. BERNICK:  Again, the $5 billion
21 discount?
22         MR. GAFFEY:  Any discount.
23         MR. BERNICK:  I think that's pretty
24 unclear.  Are you talking about financial
25 assets?

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    MR. GAFFEY:  I think objection to form
3  will suffice.
4    Q.  Can I have an answer to the question?
5    MR. BERNICK:  I'm trying to be --
6    MR. GAFFEY:  I appreciate it.
7    MR. BERNICK:  -- have you be fair with
8  the witness.  I don't really have an
9  objection.  It doesn't make a difference to
10  me or my client.  What I'm trying to do is
11  to help make sure that things are clear to
12  Mr. Klein.
13    MR. GAFFEY:  Okay.
14    Q.  Can you answer the question, sir?  Do
15  you need it read back?
16    A.  Yes, please.
17    (Record read.)
18    A.  I don't really recognize the term
19  "discount" in the way you're describing it.
20    Q.  During the course of the week, from
21  the 15th of September to the 22nd of September,
22  did you have any conversations with John Varley
23  of Barclays about the pricing of the
24  transaction?
25    A.  I don't, I don't recall.  I don't

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  recall that -- I don't recall that I was
3  involved in conversations with John Varley.
4    Q.  In the course of your conversations
5  with anyone from Barclays during the week from
6  the 15th of September through the 22nd of
7  December, did anyone from Barclays ever tell you
8  in sum or substance that Barclays was going to
9  pay a discount in price for the securities it
10  was purchasing from Lehman as part of the
11  transaction?
12    MR. STERN:  Objection to the form.
13    MR. BERNICK:  I think you did
14  misspeak.  You said December.
15    MR. GAFFEY:  Did I?
16  You're absolutely right.
17    Q.  In the course of your conversations
18  with anyone from Barclays during the week from
19  the 15th of September through the 22nd of
20  September, did anyone from Barclays ever tell
21  you in sum or substance that Barclays was going
22  to pay a discount in price for the securities it
23  was purchasing from Lehman as part of the
24  transaction?
25    MR. STERN:  Objection to the form.

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    MR. BERNICK:  Answer if you can.
3    A.  Your specific comment on the discount,
4  no one -- I don't understand the concept of what
5  you're saying by "discount."
6    Q.  Part of what Barclays purchased from
7  Lehman was a body of securities; is that
8  correct?
9    A.  Barclays -- at which point in time are
10  we discussing?
11    Q.  Let's go to the closing and work
12  backwards.  Part of what Barclays ultimately
13  purchased from Lehman was a body of securities;
14  is that correct?
15    A.  The final transaction, as I understand
16  it, was the purchase of a business, and then
17  what had been the erasing, if you will, or the
18  exchanging of a loan against collateral that
19  that loan existed, and that exchange of the loan
20  against the collateral is, in a sense, a
21  purchase of long securities.
22    So, yes, at that end transaction there
23  was a purchase of a business and then the
24  exchange of a loan against assets.
25    Q.  Now, let's wind back to when a deal is

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  first reached.  We're on Tuesday, September
3  16th.  Was there a component of that deal that
4  provided for the purchase of long securities?
5    A.  As I understand the transaction, other
6  than the building, which is effectively the long
7  purchase, the remaining assets as described to
8  me was the net business attached to the
9  businesses purchased.  I hope that answers the
10  question.
11    Q.  It does.  Thank you.
12    On Monday, the 15th, and Tuesday, the
13  16th -- I'm at the day of the filing and the day
14  the deal is announced -- were you involved in
15  any way in separate price negotiations about the
16  long position of securities that would be
17  included in the transaction?
18    A.  I really don't recall that I
19  participated in -- I really don't recall that.
20    Q.  In that same period, that Monday, the
21  15th, and Tuesday, the 16th, did you have
22  discussions with anyone from Barclays about --
23  withdrawn.
24    On Monday, the 15th, and Tuesday, the
25  16th, did you have any discussions with Barclays

Page 70

HIGHLY CONFIDENTIAL - M. KLEIN

1  about the fact that one of its conditions for
2  going forward was that the deal had to be
3  capital-accretive to Barclays?
4      A.  I'm sorry, could you ask that again?
5  Can I read it or do you want to ask it again?
6      Q.  You can read it or we can have it read
7  back.
8          MR. BERNICK:  Just have it read back.
9      This is not really an official transcript.
10     I think it's accurate, but you should
11     formally just let her read it back.
12         (Record read.)
13     A.  That specific term I'm not -- I don't
14  have a recollection of that term being used.
15     Q.  You have no recollection of Mr.
16  Diamond ever using that term?
17         MR. BERNICK:  At any time?
18         MR. GAFFEY:  At any time with respect
19  to this transaction.
20     A.  That particular term, but you're
21  giving me a very specific term, but no, I don't.
22     Q.  Now, when a deal was reached on
23  Tuesday and announced, did you have an
24  understanding of what the structure of the

Page 71

HIGHLY CONFIDENTIAL - M. KLEIN

1  documented deal was?
2      Let me ask you to take look at
3  Deposition Exhibit 1, which you will see is
4  entitled "Asset Purchase Agreement."
5      A.  Yes.
6      Q.  And let me put another question
7  instead.
8      Did you have an understanding on
9  Tuesday, September 16th, that the structure of
10  the deal was described as an Asset Purchase
11  Agreement?
12         MR. BERNICK:  I think the question is,
13     did you have an understanding that the
14     transaction that had been agreed was an
15     Asset Purchase Agreement, or styled that
16     way, separate and apart from what he's
17     looking at now as Exhibit 1.
18         MR. GAFFEY:  Correct.
19         MR. BERNICK:  Do you understand that,
20     Michael?
21     A.  I think, generally speaking, I
22  understood that the estate could sell assets and
23  that that was the form of the transaction.
24     Q.  Now, your portfolio, as I'm

Page 72

HIGHLY CONFIDENTIAL - M. KLEIN

1  understanding it, was essentially to deal with
2  what the structure of the transaction was how
3  this could be achieved?
4      A.  At what point in time?
5      Q.  Well, that's what I'm about to ask.
6  Tuesday there's a deal announced.  Had that, at
7  least at that point, had that goal been reached?
8  There was a structure, there was a proposed
9  transaction that would, if successful, achieve
10  the goal?
11     A.  I'm sorry, you have asked sort of a
12  couple of questions.
13     Q.  I know.
14     A.  I just want to be clear which question
15  you want me to answer.
16     Q.  Well, your task is to determine
17  whether there's a structure that will work to
18  achieve -- to effect a transaction, correct?
19     A.  I ask you again at what time period?
20  Because --
21     Q.  Monday/Tuesday, 15th and 16th.
22     A.  Monday/Tuesday, my role was, as a
23  member of the team, to assist in determining
24  whether a transaction was achievable.  The

Page 73

HIGHLY CONFIDENTIAL - M. KLEIN

1  specific structural reference is more
2  appropriate on that weekend because on that
3  weekend is when the structural complexity of
4  creating a new structure was the most relevant.
5      On the Monday/Tuesday, there was a
6  handful of hours, so I would say all parties
7  were involved in attempting to determine what
8  could be achieved or couldn't be achieved.
9      My specific role was, as I described,
10  on that aspect of discussions on the, quote,
11  business that could be part of the transaction
12  and in the form of that, as I said, 250 and the
13  building purchase, principally.  Again, it's a
14  year ago and there were people running around
15  rooms.  The rooms were designated.  That's the
16  legal room.  That's the -- but there were many
17  people.
18     Q.  Did you have an understanding on
19  Tuesday, the 16th, when the deal was announced
20  that part of it was that Barclays would assume
21  certain liabilities?
22     A.  Yes.  Directly tied to the business,
23  yes.
24     Q.  Could you describe for me what your

Page 74

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  understanding was of the liabilities that
3  Barclays would assume?
4      A.   As I understood it -- well, as I
5  understand it now, thinking back, and again,
6  it's hard to determine what I understood
7  specifically or not, there was the specific
8  liabilities and then general liabilities.
9      The specific liabilities were defined
10  as the, quote, comp and cure discussions,
11  separately the -- if you called them
12  liabilities, the net short positions against
13  assets because it was a net book.  There was a
14  general sense, at least in my recollection, that
15  no matter how much you wanted to make this as
16  clean and clear as to what you were purchasing,
17  the concept and the fluidity of clients and
18  customers and your ability to then go forward
19  and undertake this business would be more costly
20  because you are going to have to have 10,000
21  people, or whatever the people are.  They're
22  going to do day-to-day things, they're going to
23  cost money, and there aren't going to be
24  revenues, so those liabilities in terms of an
25  expense base going forward, and then,

Page 75

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  separately, you would have clients that you
3  would hope to do business with that may have had
4  issues with Lehman that, even though they're not
5  your legal issues, they become commercial issues
6  for you.
7      So the concept of liabilities, as
8  you've asked, you were walking into a situation
9  where conceivably there could have been a lot of
10  liabilities, but clarifying what they were at
11  that point in time was a question of the -- what
12  you could and then, separately and distinctly,
13  how much risk the Barclays team was prepared to
14  take relative to that opportunity.
15      Q.   With respect to the specific
16  liabilities for comp and cure that you
17  mentioned, did you have any involvement in
18  determining what the amounts of those specific
19  liabilities would be?
20      A.   No, I don't believe I had a
21  specific -- certainly the, even the term "cure,"
22  to my knowledge, was a new term for me.  I
23  didn't set those numbers.
24      Q.   Do you know who did?
25      A.   To my knowledge, the cure payments

Page 76

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  were Lehman liabilities, so Lehman created that,
3  if you will.  With regard to the comp, I'm not
4  clear who created that.  I'm not clear on that.
5      Q.   Just to close out that area, did you
6  yourself engage in any discussions with folks at
7  Lehman about these two specific liabilities for
8  comp and cure?
9      A.   I didn't have conversations that I can
10  recall at all on comp with the Lehman
11  professionals at all.  The cure had to be
12  explained to me because, again, I didn't know
13  what it was, and it was explained to me as to
14  what it was regarding the ongoing business
15  expenses of the operation.
16      Q.   Was it someone from Lehman who
17  explained it to you?
18      A.   There was a group of people.  I sort
19  of vaguely remember being in a very big room
20  that looked like it was one of the dining rooms,
21  and there was a group of people that -- I don't
22  know how many were Lehman and how many were
23  attorneys -- who were sort of describing that,
24  because I just didn't understand it.  It wasn't
25  part of my -- so I don't know who all the

Page 77

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  specific people there that were explaining it
3      Q.   In that discussion, in that meeting
4  with all those people in there, did anyone say
5  anything to indicate to you how the quantum was
6  reached for the cure amount as opposed to the
7  purpose for the cure?
8      MR. BERNICK:  I'm sorry, the --
9      MR. GAFFEY:  The amount.
10      MR. BERNICK:  What quantum?
11      Q.   How the quantum of the liability would
12  be assumed for cure?
13      A.   They had a list of ongoing
14  obligations.
15      Q.   Did they have it there?
16      A.   I didn't -- I never was shown a list.
17      Q.   Now, did you have any discussions with
18  the Barclays folks, separate from Lehman folks,
19  about the amounts to be undertaken in these
20  specific liabilities for comp and cure?
21      A.   I don't --
22      MR. BERNICK:  Again, your question
23  assumes for this witness -- the problem I
24  have is, what do you mean by "undertaken"?
25  That sounds like a contract.  I think you

Page 78

1            HIGHLY CONFIDENTIAL - M. KLEIN
2    don't have a predicate from this witness
3    about what he understood the role of those
4    two issues to be in the transaction that he
5    personally was involved in.
6            MR. GAFFEY:  Can we read the question
7    back, please?
8        (Record read.)
9        A.   I don't remember specific
10   conversations, except for one general
11   conversation that was a conversation amongst
12   lawyers to discuss the construct of comp, what
13   "comp" meant.  Did it mean comp, bonus?  Did it
14   mean payroll?  Did it mean severance?  I
15   remember a general conversation about that.
16   That's the only conversation that I have a
17   general recollection of.
18       Q.   Did you come away from that
19   conversation with an understanding of what
20   "comp" meant?
21       A.   Well, I, you know, having come from an
22   investment banking background and having a
23   perspective on what sort of total compensation
24   is, I had a perspective just generally that I
25   went into and came away from.  I didn't come

Page 79

1            HIGHLY CONFIDENTIAL - M. KLEIN
2    away from with any great new learning from that
3    conversation.
4        Q.   Now, I want to move into the next
5    couple of days of that week after a deal was
6    announced.  Has the deal changed during the
7    week?
8            THE WITNESS:  Can I take a
9    three-minute break?
10           MR. GAFFEY:  Absolutely.
11       (Discussion off the record.)
12       (Luncheon recess; Time Noted:  12:28
13   P.M.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 80

1            HIGHLY CONFIDENTIAL - M. KLEIN
2            AFTERNOON SESSION
3        (Time Noted:  1:20 P.M.)
4    MICHAEL KLEIN, resumed and
5        testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. GAFFEY:
8        Q.   Before the break, Mr. Klein, we
9    were -- I think I asked you a question along the
10   lines of whether the deal changed during the
11   week, so let me ask you that.
12       After the Asset Purchase Agreement
13   that we looked at a moment ago was signed, did
14   the deal change during the ensuing week?
15       A.   Yes, the transaction in certain senses
16   changed.  The main transaction, which was the
17   business purchase, didn't change.  The concept
18   of buying the business, of operating the Lehman
19   Brothers old Lehman North American brokerage
20   business didn't change.
21       What did change, however, was that
22   during the week events occurred surrounding the
23   various different assets and counterparties that
24   under -- that were underlying the business that
25   caused elements of the transaction to change,

Page 81

1            HIGHLY CONFIDENTIAL - M. KLEIN
2    but the base transaction, save the adjustment on
3    the real estate value to reflect the valuation
4    that came in, the base transaction and the
5    business construct and what was driving that
6    didn't change.
7        Q.   What were the elements of the deal
8    that did change?
9        A.   The principal elements that changed
10   were a recognition that the, effectively, the
11   assets that were directly aligned and related
12   positions directly aligned to the business were
13   changing and that both volatility, valuations in
14   the market, but, more importantly, other
15   counterparties were taking possession of some of
16   those.
17       Separately, Barclays began to finance,
18   if you will, some of what was the ongoing
19   operations of Lehman, and that the change was
20   that the construct of the transaction became the
21   business purchase plus this very specific loan
22   for asset hand-off, if you will, and then some
23   elements of additional assets came into question
24   or came into the transaction as part and parcel
25   of those loan or collateral, if you will, the

Page 82

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  movement in the asset positions and the Barclays
3  loan.
4      Q.    The assets that Lehman was to deliver
5  that changed because of volatility or valuation
6  or counterparties taking possession, let's take
7  that piece first, did you have -- how did you
8  learn about those?
9      A.    I, somewhere just prior to that
10  Friday, I was apprized, one, that the Barclays
11  had been financing the business, the details of
12  which I became more aware of later as part of
13  the JPMorgan weekend; but, two, that the --
14  there had been meaningful problems in that
15  Lehman in their delivering of what was the
16  business that they intended to deliver had
17  limitations, and the net result of which was
18  what had been committed couldn't be delivered,
19  as I understood it, and the result of which was
20  there needed to be, one, both an understanding
21  of could the business operate, how could the
22  business operate, how would the business
23  operate, and what was actually being
24  transitioned.
25      Q.    Actually, did you first learn about

Page 83

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  this situation on the Friday?
3      A.    I can't recall specifically.  I know
4  that the issue became an issue post-Tuesday, at
5  least my own focus was shifted to deal with a
6  bigger set of questions that were on I think the
7  minds of senior management:  How do you deal
8  with integration risk and all of the other
9  elements that come with the transaction, and
10  then, separately, what do they do with Europe
11  and Asia?
12      So that was occurring during those
13  couple of days, but sometime before Friday
14  morning, and I don't know when specifically I
15  became aware of it, I became briefed that we had
16  a series of issues that had to be addressed that
17  were very meaningful in terms of the completion
18  of the transaction.
19      Q.    Who gave you that briefing?
20      A.    I don't know specifically.  At this
21  point I was dealing on a -- most of the basis of
22  dealing were with either Archie Cox or Jonathan
23  Hughes or Rich Ricci, but I can't say
24  specifically who gave me the briefing or whether
25  it came from attorneys involved.  I just don't

Page 84

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  know specifically.
3      Q.    And the loan for asset hand-off you
4  were talking about, the Barclays financing of
5  Lehman, did you have any more specific
6  understanding of the nature of that financing?
7      A.    I later learned, because of the
8  JPMorgan-related matters, quite a lot.  At the
9  time, I wasn't party to those dialogues.  I knew
10  that there was an offer of support and I was
11  then briefed on the quantum of the loan and the
12  size embedded in the size of capital that they
13  had put up at that stage, but I was -- but that
14  which I learned later about the JPMorgan and
15  other elements of the Fed and so forth I learned
16  subsequent to that.
17      Q.    The financing that you're referring
18  to, did you learn whether it was -- what its
19  form was?  Was it a secured loan? a Repurchase
20  Agreement? anything like that?
21      MR. BERNICK:  Whose financing?
22      MR. GAFFEY:  The Barclays financing of
23  Lehman.
24      A.    I don't, even in hindsight,
25  characterizing it specifically, I couldn't

Page 85

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  characterize it specifically.
3      Q.    So what, if anything, were you asked
4  to do in connection with this new set of
5  problems?
6      A.    I was asked specifically to -- well,
7  let me back up for a moment.
8      The problems that occurred were of a
9  magnitude that they impaired the going-forward
10  nature of the transaction.  The movements of
11  assets and, of course, data was very hard to
12  come by and very volatile, the markets had of
13  course become even more volatile and even more
14  risky.  The transaction was now public, but by
15  the same token, there was a real question as to
16  what the deliverables, not just the deliverables
17  in terms of pure assets, but could the business
18  continue to operate, operate out of the
19  building, operate with the people, operate with
20  the systems, operate in that way.
21      The question, though, that was put
22  directly on the table was, given that a
23  substantial amount of the, quote, net book that
24  was attached to the business that was the
25  business transaction had gone away and the

Page 86

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  question put forward was, what do we do?
3      The first -- one of the discussions
4  was, well, maybe we just don't have a
5  transaction that has any assets at all.  I mean,
6  this is a business purpose.  If the assets are
7  getting taken by others in different ways, just
8  do a business deal.  And I think that's how I
9  learned that there had been the loan that had
10  then been provided.
11      The second part I was then asked to do
12  was to make a specific request of the parties at
13  Lehman to find more assets to rectify what had
14  been the substantial movement and substantial
15  reduction in the transaction that had taken
16  place.
17      Q.  Did you make the request of the
18  parties at Lehman?
19      A.  I made the request.  I'm not sure that
20  it was just myself who made it, but I was part
21  of requests that were made.  And I don't know
22  who all was involved in sort of the receipt of
23  those requests, but it resulted in a series of
24  conversations on that Friday morning prior to
25  the court.

Page 87

HIGHLY CONFIDENTIAL - M. KLEIN

1
2      Q.  Did you have a particular person on
3  the Lehman side who was your point person?
4      A.  Well, originally it was the Mark
5  Shafir connectivity.  That's the beginning.
6  From that point forward, after the Tuesday
7  event, it, first of all, became far more fluid
8  in the sense that there was an agreement out
9  there; secondly, there was no particular
10  counterpart at that point in time, and frankly,
11  there was no need until that event occurred for
12  there to be a specific counterpart for me.  The
13  others may have had, because of executional
14  things that were taking place, other specific
15  counterpoints, but I don't think I had -- I
16  don't think I could define a specific
17  counterpoint at that point.
18      Q.  Did you learn that Shafir left during
19  the week?
20      A.  We did learn that Shafir had left
21  during the week, which obviously made for
22  complexity in just in that dealing.
23      Q.  So describe for me as best you can,
24  please, how, in what circumstances the request
25  was made for more assets?

Page 88

HIGHLY CONFIDENTIAL - M. KLEIN

1
2      A.  Well, I can only describe what I'm
3  aware of, and what I'm aware of is that the
4  transaction of a net book which had long and
5  shorts and could be managed over time had
6  migrated in the two ways I described:  One,
7  substantial of those assets had been removed;
8  secondly, it wasn't clear at that stage what
9  assets had been necessarily moved into which
10  pockets, but perhaps most importantly, because
11  it was now a net asset purchase, it was a -- it
12  was putting all of your capital up against just
13  assets that you're buying in the midst of this
14  market calamity, the $45 billion of capital,
15  which that was never -- that was never the
16  contemplation of the transaction, to my
17  briefing.  To my briefing, we were stepping into
18  the shoes of operating the business.
19      So the request was what do we do, and
20  the first question was, is that -- are those
21  assets sufficient for that loan, and that was
22  the first debate.  And to my knowledge, there
23  was a fairly significant disagreement as to
24  whether even the remaining assets were
25  sufficient against the collateral of that loan.

Page 89

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  And I wasn't an evaluator of those assets or a
3  participant in those evaluations, but there was
4  that, if you will, debate over can we even get
5  our loan proceeds back, so to speak, and there
6  was a disagreement on that value.  I was at one
7  point in a room where that was communicated
8  between different parties, that this -- there's
9  a disagreement on that.
10      I'm not sure if I'm answering the
11  question that you're --
12      Q.  You were.  Thank you.
13      A.  The net effect of that was, because
14  there was no fundamental agreement and there was
15  both parties taking views, that the agreement
16  was struck that the loan against the assets were
17  essentially going to be equivalent in value, to
18  my understanding.
19      The problem that that then created
20  was, because Barclays was buying an ongoing
21  business and, in buying an ongoing business, had
22  expenses that would be coming and no likely
23  revenues and significant losses during that
24  period, as well as the liabilities that they
25  were assuming that we've discussed previously,

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  they had a problem in the sense that they now
3  had $45 billion of capital as a purchase, which
4  was not the original intention, as opposed to
5  what was a purchase and then net assets that
6  came with the business.  And they were put in a
7  position where they would have to go back to
8  both their board and their regulators with what
9  was a substantial hit, if you will, not just
10  from the original transaction but to their
11  overall capital base.  They couldn't close the
12  transaction on that basis, as explained to me,
13  and as explained to me, more assets were needed
14  to fill that.  And we delivered the message
15  that, is there anything left that can fill this
16  gap that has been created as a result, and that
17  was the message we delivered.
18      Q.    Who was it who -- let me just back up.
19  Had you had any personal involvement in the
20  decision that led to Barclays financing Lehman?
21      A.    No, not that I'm aware of, no.
22      Q.    Did you have any awareness about the
23  fact that Barclays had decided to finance Lehman
24  in this way at any time before these problems
25  were outlined to you?

HIGHLY CONFIDENTIAL - M. KLEIN

1
2      A.    In a general sense, and again, this is
3  recollection of a short window in a general
4  sense, they were trying to be supportive because
5  once they announced the transaction, they were
6  trying to be supportive to preserve value of the
7  ongoing business.
8          The specifics of that, quantums and
9  the form, as I said, I believe I learned --
10  well, I know I learned a lot over that following
11  weekend, the 20th weekend, but prior to that,
12  no, I was not -- I was not briefed on that.
13      Q.    Now, you said that you were in a room
14  where the disagreement about values was
15  discussed?
16      A.    Right.
17      Q.    Who was present?  Is this one meeting
18  you're describing?
19      A.    I'm only aware of one conversation --
20      Q.    Okay.
21      A.    -- that occurred on Friday that I was
22  sort of in part of, and the only people at this
23  stage that we were seeing or that I was
24  seeing -- "we" is too broad -- from Lehman on a
25  periodic basis was McDade and Alex Kirk, because

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  obviously Shafir was gone at that point in time.
3          There was a -- as part of that
4  rectification, I think Ian Lowitt came into play
5  as well.  I can't tell you that they were all in
6  the room for that discussion, but those would be
7  the principal participants that we dealt with as
8  we tried to resolve this.
9      Q.    In trying to resolve this, did you
10  also deal with either Paolo Tonucci or Martin
11  Kelly?
12      A.    Not that I can recall.  Frankly, I
13  don't -- I don't recall even having heard the
14  name Martin Kelly before, but I don't want to
15  overstep my statement.  I just don't recall.
16      Q.    And this discussion that involved
17  McDade and Kirk, who was there for the Barclays
18  side?
19      A.    Again, I want to be clear.  As I said,
20  McDade and Kirk were the individuals we were
21  principally dealing with.  I don't know who was
22  specifically in the room when the first message
23  was delivered that this was an issue or --
24  because this was very fluid.
25      MR. BERNICK:  I have to tell you, Bob,

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  you know, maybe it's clear to everybody
3  else.  You got into this discussion of
4  meeting by talking about the discussion
5  about differences in values, and I'm not
6  sure that -- I don't know exactly what
7  meeting the witness is talking about.  He
8  talked about a meeting where a request was
9  made.
10      MR. GAFFEY:  Let me see if I can
11  clarify this.
12      Q.    You spoke, Mr. Klein, about the fact
13  that there was a fairly significant disagreement
14  as to whether the collateral was sufficient,
15  yes?
16      A.    I said that there was a disagreement
17  over the value of that collateral versus that
18  loan.
19      Q.    And you had not been involved in the
20  valuation?
21      A.    No.
22      Q.    But that you found yourself in a room
23  where there was some disagreement about whether
24  the collateral was sufficient, and that was
25  discussed?

1             HIGHLY CONFIDENTIAL - M. KLEIN
2      A.   That's right.
3      Q.   That's the meeting I'm asking about.
4  Is this the meeting on Friday morning?
5      A.   Again, I don't recall which specific.
6  I know that on Friday we had to clean up the
7  issues and or not, I mean, it was that much of a
8  make-or-break event, and the issue as it had
9  been described to me by my client was we have a
10 problem in that this is, given the significant
11 removal of positions and obviously the impact as
12 a result on the, quote, business deal, we need
13 to be very clear that (A) this is a different --
14 putting 45 billion of cash capital now to buy
15 assets and, secondly, we don't have the same
16 value.  So I was instructed to go in and express
17 that we needed more assets.  So that's the
18 meeting I'm referring to.
19     Q.   And who gave you those directions?
20     A.   At this stage, the principal people I
21 was dealing with were Rich Ricci and Archie Cox,
22 and Jonathan Hughes from a legal perspective was
23 around most of the time during this time period,
24 and the direction would have come from some
25 subset of that team.

1             HIGHLY CONFIDENTIAL - M. KLEIN
2      Q.   So did you make that request?  Did you
3  come in and say -- did you, in sum or substance,
4  did you make it known to Lehman that you needed
5  more value?
6      A.   Well, I made it known to the parties
7  that were involved that there needed to be more
8  assets, because if there weren't more assets,
9  the transaction couldn't take place.
10          Now, to say "I," it was made known and
11 I was part of discussions that were around what
12 could solve that gap.  I don't know that I was
13 the person that specifically stated it or not.
14     Q.   How big a gap had to be made up?
15     A.   The quantification of what I was told
16 was that we had an understanding that the value
17 of the assets, if you will, the loan, the $45
18 billion loan, was -- the collateral base could
19 not be assured that that would solve that; that,
20 secondly, we then needed to go and get more
21 assets.  No one gave me an instruction that said
22 you need to get X or Y, but we need to go get
23 more.
24          I wasn't, because I wasn't involved in
25 the, if you will, the -- I may not use the right

1             HIGHLY CONFIDENTIAL - M. KLEIN
2  term, but the back end of Barclays in terms of
3  how they were looking at the construct for
4  themselves, I don't know what the accounting
5  was, but I was told you need to go in and get
6  more assets, this won't work.
7          And I think there was a great degree
8  of trepidation.  It was already complicated
9  enough because the integration issues.  It was
10 already complicated enough because of the market
11 issues.  It was now public.  It was complicated
12 enough because of the Europe, Asia, everything
13 separating away.  It was now already a very
14 complicated event to have what was then this
15 meaningful change and, thus, have a hit to them
16 that additional incremental risk, and in
17 addition, owning the risk on disposing of what
18 were this 45 billion of securities, there was
19 quite a lot of fear, and at that point there was
20 a sense that this transaction just might not
21 occur.
22          Now, of course, that happened many
23 times over the couple of weeks, the sense that
24 this might not occur, but it was acute, and
25 I was told you need to -- we need to make it

1             HIGHLY CONFIDENTIAL - M. KLEIN
2  very clear if there's not other assets, we can't
3  get this done.
4      Q.   You have to make it very clear that if
5  there are not more assets, this won't get done,
6  how do you do that without being able to tell
7  Lehman this is how much more we need?  Does that
8  present an obstacle here?
9      A.   I don't want to hypothesize.
10     Q.   Let me try this another way.  Your
11 instructions are to make it clear to Lehman that
12 if there are not more assets to be added, that
13 it's possible the deal won't get done; is that
14 correct?
15     A.   My recollection of both those
16 discussions and at least the instructions that I
17 got were this transaction was going to fail
18 because of what was the diminution in the
19 original plan.  Now, that's -- those are the
20 communications that I was part of.
21     Q.   And were you part of the
22 communications to Lehman of the fact that
23 additional assets had to be added?
24     A.   I think I said that I was in a room
25 where that was discussed, and again, I don't

Page 98

1        HIGHLY CONFIDENTIAL - M. KLEIN
2    know who specifically made which statements, but
3    I was in a room in that and it was made clear
4    you need to find what else there may be because
5    this is a problem.
6        Q.    And in the room where these
7    discussions were had, was anything communicated
8    as to how much more there needed to be added in
9    order for the deal to close?
10       A.    I'm not aware that a specific number
11   was put forward.  I'm not -- I'm not clear that
12   a specific number was put forward and I'm not
13   clear that there was a sense that there was any
14   other assets and I think it was a good faith,
15   which is why I raised the point earlier that
16   this question that certainly I had put forward,
17   should we do something without assets, which, as
18   I said, caused me to learn a bit more about what
19   was this loan question.  But no, I'm not aware
20   of a specific number that was put forward.
21       Q.    You mentioned the number $45 billion.
22   Was that your understanding of the amount that
23   had been advanced by Barclays to Lehman in this
24   financing?
25       A.    My recollection of the, quote, loan

Page 99

1        HIGHLY CONFIDENTIAL - M. KLEIN
2    that Barclays had exposure was 45, although for
3    some reason I have in my mind that occasionally
4    it was 45.5, but I may not be getting that
5    exactly correct.
6        Q.    Did you have an understanding one way
7    or another as to whether the loan of 45 or 45.5
8    was collateralized by security in excess of the
9    amount lent?
10       A.    I was only briefed that it was
11   collateralized, that it was a secure -- that it
12   had securities attached to it.  I didn't get
13   into the particular details, but I will say that
14   what I was briefed on as part of this was that
15   there was real concern on the Barclays side that
16   the assets that they were going to be buying
17   could not be valued or liquidated at that price,
18   at that value.
19       Q.    Did you gain an understanding what the
20   Lehman side of the story was?  What were they
21   saying with respect to the value of the assets?
22       A.    In the rooms I was in -- and again, I
23   can only recollect this being occurring in or
24   around the frenzy, if you will, or the rush --
25   best way for me to say it is I don't remember

Page 100

1        HIGHLY CONFIDENTIAL - M. KLEIN
2    other than the sort of Friday discussions that
3    we're discussing.
4            There could have been other
5    discussions that I'm not aware of that there was
6    a disagreement as to whether it was -- and the
7    disagreement was a plus or minus the 45.  This
8    was a, you know, do you -- are you selling these
9    today?  Are you selling these tomorrow?  Are you
10   holding them for a week, and if you're holding
11   them for the week, are they worth more than the
12   45?
13           I didn't remember anybody saying this
14   is worth 90 and this is worth zero.  I think it
15   was -- and the rationale and the reason why the
16   agreement was reached that it was worth the loan
17   was it was a plus-or-minus discussion point.
18   But I wasn't part of the valuation on either
19   side, so I don't, I mean, I don't know what the
20   underlying background of those statements were.
21       Q.    I understand that you're not -- you
22   don't have the underlying data as to who's right
23   or who's wrong in the discussions, but my
24   question goes to what was the nature of the
25   discussion that you heard.

Page 101

1        HIGHLY CONFIDENTIAL - M. KLEIN
2            Was there a range of disagreement that
3    you heard between Lehman and Barclays as to the
4    value of the underlying collateral?
5        A.    I only, as I think I said, I think the
6    only thing I can recollect was that they had
7    differences as to whether you sold it today,
8    held it for a period of time, and it was a plus
9    or minus the loan amount.  It was not -- people
10   weren't -- this wasn't, to my knowledge, because
11   it certainly didn't involve me, a ten-hour
12   discussion over, you know, multiple different
13   you're here and I'm here.  This was there's a
14   difference of opinion, what do we do, and a
15   general understanding that it's not that big of
16   a difference, so let's move forward because we
17   have to move forward.  But that's just the part
18   that I was party to.
19       Q.    I need to push for a little more
20   detail on this, the scope of the difference, if
21   I could.  The request, the demand, whatever verb
22   you want to use, is made from Barclays to Lehman
23   to add more assets so that the deal can close,
24   correct?
25       A.    The -- not precisely correct.  There

Page 102

```
 1        HIGHLY CONFIDENTIAL - M. KLEIN
 2    was a clear understanding that the, quote, net
 3    book value transaction could not occur, so what
 4    you had was a loan against assets.  There was a
 5    message that that loan might not be fully
 6    satisfied by those assets and there was a
 7    difference of opinion, plus or minus.
 8            Secondarily, there was a view that
 9    because of all of the risk in liability and the
10    losses that were likely to occur, there needed
11    to be more assets from Barclays' perspective to
12    complete the transaction.  So those messages
13    were messages that were delivered and I was
14    party to at least one conversation on those
15    subjects.
16        Q.   And a while ago you told me one of the
17    issues was that it was probable that Barclays
18    was going to have expenses after the
19    transaction.  Was the request for more assets to
20    cover those expenses?
21            MR. BERNICK:  I think it's unclear
22    what the expenses were that the witness was
23    referring to with his prior answer.
24            MR. GAFFEY:  That's a good point.
25        Q.   What were the nature of the expenses
```

Page 103

```
 1    that were at issue?
 2        A.   As I understand it, the -- and I
 3    wasn't -- there was a whole team of other
 4    bankers that were working for Barclays and doing
 5    work for board and board presentations and so
 6    forth, that wasn't my agreement.  But in looking
 7    at this transaction, one had to look at the
 8    accounting day one and going forward, and
 9    clearly in a world where there's focus on
10    capital and focus from the FSA, potential both
11    day one as well as long-term losses were
12    important.
13            My understanding was that there would
14    be people that were being employed and it's not
15    clear what the revenue streams would have been
16    going forward.  So when I say expenses, there
17    were just operations of the business that --
18    because you wouldn't be up and running.
19            Now, that became more acute even later
20    on June 20th because of the JPMorgan event and
21    the shutdown, but that's what I was referring
22    to.
23        Q.   So this might be a bit simplistic for
24    me to say, but was the idea that now that
```

Page 104

```
 1        HIGHLY CONFIDENTIAL - M. KLEIN
 2    Barclays needed to have some, at closing, needed
 3    to have some equity to support its ongoing
 4    expenses once it took over the business?
 5            MR. BERNICK:  Answer that question, if
 6    you can.  You've got equity, ongoing
 7    expense, continuation of business.  I don't
 8    want to -- you just answer that if you can.
 9        A.   Maybe ask it again because I -- does
10    someone want to --
11        Q.   Was the idea now that Barclays needed
12    to have some, at closing, needed to have equity
13    to support its ongoing expenses once it took
14    over the business?
15        A.   I wouldn't -- I don't think I would
16    characterize it that way.  I wouldn't
17    characterize it that way.  The transaction from
18    Tuesday onward changed meaningfully, and what I
19    was told was that, because of that reduction in
20    the assets and in the asset value, the
21    transaction didn't work for my client and that,
22    as such, I had to work with Lehman to get more
23    assets as part of that.
24            How that all fit into what was the
25    look, if you will, that Barclays had, you'd have
```

Page 105

```
 1        HIGHLY CONFIDENTIAL - M. KLEIN
 2    to ask the Barclays folks.  The direction I got
 3    was that this change was meaningful enough that
 4    it had to be fixed.
 5        Q.   So your job is go get more?
 6        A.   That's right.
 7        Q.   And you don't have knowledge as to
 8    what Barclays' analysis was of why it needed
 9    more?  You understand --
10            MR. BERNICK:  I --
11            MR. STERN:  Objection to the form.
12        Q.   Your instructions from your client are
13    go to Lehman and get more assets, correct?
14        A.   My instructions from the client were
15    this is a very big change, the buying an ongoing
16    business with a net book has now changed,
17    because given what's taken place with
18    counterparties taking assets, given what's
19    taking place, we now don't have that
20    transaction.  It's now become a far greater
21    riskier event for them in that they're putting
22    up this $45 billion of capital and buying long
23    assets and no one wants to buy that much long
24    assets.  This wasn't intended to be an asset
25    transaction.  It was a business that they were
```

```
 1          HIGHLY CONFIDENTIAL - M. KLEIN
 2    stepping into.
 3          The concept of buying long assets in
 4    that market was great risk, and one had to look
 5    at how I value it and how I sell it.  That was
 6    sort of one comment that was given to me, and
 7    the other comment was, given the moving pieces
 8    that had taken place with this and given this
 9    risk, we need more assets as part of the
10    transaction to replace what had been taken out
11    of the transaction for us to move forward.  And
12    that's the task that I embarked upon.
13       Q.   And no one from Barclays tells you how
14    many more assets are needed to replace what had
15    been taken out of the transaction?  I'm pushing
16    for a target or a number if you have one here.
17       A.   I don't -- one, let me just say I'm
18    trying to recollect as much as I can recollect.
19       Q.   I understand.
20       A.   Two, I was a part of a team which I
21    had sort of narrow responsibility.  Third, I
22    wasn't running any kind of Barclays pro forma
23    model nor was I doing those presentations to the
24    board.  So it's not a, you know, it wasn't part
25    of what I was doing.
```

```
 1          HIGHLY CONFIDENTIAL - M. KLEIN
 2          The concept of this is a very big
 3    problem when your client says this is a very big
 4    problem and you're told to help go solve that
 5    problem, you go solve that problem.  The quantum
 6    of that problem, I think as the assets came
 7    forward, became clearer as to when I got
 8    responses that, "Here's what's available, can
 9    this get us over the finish line?" became
10    clearer, but I don't recall someone saying, "I
11    need to get" -- perhaps I'm not recollecting
12    every conversation.  I just don't remember
13    somebody saying, "I need to get ..."
14       Q.   Need to get a particular amount?
15       A.   Yeah.
16       Q.   Did anyone on the Lehman side of this
17    dialogue ask how much more does Barclays need?
18       A.   I recall the principal focus that was
19    going on at Lehman was, here's what we have,
20    does this help, and I think it was a real -- it
21    seemed to me in good faith they were trying
22    quite hard to find what was there, and basically
23    the two things they found were the two things
24    they put on the table, which were this so-called
25    bag of hammers, as it was related, and then this
```

```
 1          HIGHLY CONFIDENTIAL - M. KLEIN
 2    custodial account balance.
 3       Q.   I'm going to ask you to solve one of
 4    the great mysteries in the case.  Do you know
 5    who used the phrase "bag of hammers"?
 6       A.   It's -- I had never heard it before.
 7    It has to be a trading term, so I'm presuming it
 8    came from one of those two, either Bart or Alex.
 9    I don't -- I wouldn't want to attribute such
10    a --
11       Q.   It's not a bad phrase.  I've just been
12    wondering who was its author.
13          Were more assets added to the deal?
14       A.   Well, let me be specific.  Substantial
15    assets were reduced from the transaction, but
16    from the point of the Friday discussion, there
17    were those two asset categories brought into the
18    scope of the transaction.
19       Q.   Okay.
20       A.   So there were certainly not more
21    assets added on an additional basis, but those
22    two categories were brought in to solve the
23    problem at hand.
24       Q.   What was the value in total of those
25    two categories?
```

```
 1          HIGHLY CONFIDENTIAL - M. KLEIN
 2       A.   I don't know today nor do I know then
 3    what the real value is of those.
 4       Q.   Did you have a view at the time as to
 5    what the value was that was added on the Friday?
 6       A.   I only know what was told to me.  I
 7    don't know what was the reality of it because I
 8    never saw any of the securities or the analysis.
 9    I was told that the bag of hammers was 1.9, as I
10    recall, and I was told that there would be more
11    than a million and potentially more than a
12    million and a half in this custodial account.
13          That being said, to be quite precise,
14    there was also an e-mail given that described
15    the specific agreement and willingness, I think
16    by an S.E.C. official, to release a number that
17    was more like 750 of that custodial account.  So
18    my understanding of the value that deal
19    with as part of that conversation would be those
20    components, and those components then had to be
21    digested as:  Do they exist?  What do they mean?
22          I didn't have any involvement in the
23    work as to do they exist, what do they mean,
24    what is a bag of hammers, what is that involved
25    in, but in discussions with my client, their
```

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    determination then was that suitable in
3    order to go forward.
4         So, to your question before, it became
5    then clearer to me what the gap was because
6    those were suitable to solve that in that
7    morning.
8         Q.   The last part of your answer, though,
9    sir, is an inference.  Did your client tell you
10   that had been the gap or you inferred --
11        A.   No.
12        Q.   -- from the fact that they said they
13   would go forward that it was?
14        A.   There was an agreement to go forward.
15   That's -- there's -- I don't recall that I saw
16   the accounting before or after or subsequent for
17   it, so I don't know what their internal
18   machinations or gap was, but when I delivered
19   that as part of the discussions with the team
20   and it was discussed, and the lawyers then
21   reviewed what that meant, and I tried to
22   determine if I can figure out exactly what time
23   each of those -- I just can't figure out when
24   each of these things occurred, but certainly
25   before the bankruptcy court that -- those two

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    asset discussions came into play.  Barclays was
3    prepared to go forward with the transaction,
4    which was the relevant issue at hand.
5         Q.   Did you attend the bankruptcy hearing?
6         A.   I did attend the Friday bankruptcy
7    hearing.
8         Q.   Correct.
9         A.   That's the only one I would have
10   attended, yes.
11        Q.   And the bankruptcy hearing took place
12   in the late afternoon on Friday?  It started in
13   the late afternoon on Friday, correct?
14        A.   I don't know specific time, but yeah.
15        Q.   Was the issue resolved before you left
16   to go to bankruptcy court?
17        A.   Certainly in concept I'm aware that
18   there had been an agreement reached, otherwise
19   there was no business to go to bankruptcy court.
20   Anything that happened between my leaving and
21   going down to court I can't tell you, but there
22   was an agreement reached.
23        Q.   That's a fair comment.  I guess
24   there's two pieces to this.  One is the
25   agreement reached in concept to add more assets,

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    and then, secondly, there's the point where your
3    client says enough assets have been added, we'll
4    go forward.  My question goes to the second
5    part.
6         A.   My recollection of my own sort of
7    whereabouts was I was told that that worked and
8    that we should go down to court to get it done.
9         Q.   Now, just to clarify a little piece of
10   your testimony, you were talking before about
11   the funds that the S.E.C. had to -- the release
12   the S.E.C. had to approve, you were speaking in
13   terms of millions.  Did you mean to say you were
14   told there would be a billion to a billion and a
15   half?
16        MR. BERNICK:  Wait.  You said the
17   release that the S.E.C. had to approve.
18        MR. GAFFEY:  Let me put some
19   terminology in the here.
20        Q.   The custodial accounts you were
21   talking about, does the phrase "15c3" ring a
22   bell?
23        A.   It does, because I remember being
24   confused as to that political action committee
25   other thing, which is what -- somebody may know

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    what that is, but I --
3         Q.   You joined everybody else in the room.
4    We've all learned what 15c3 is in the last
5    couple of weeks.  But you recall the term "15c3
6    funds" to refer to --
7         A.   I do.
8         Q.   And the amount of 15c3 funds that was
9    at issue was in the billions, not millions?
10        A.   In the billions.
11        Q.   A billion to a billion and a half?
12        A.   A billion to 2 billion at one point,
13   but there was an e-mail, and I only remember it
14   because there were so few pieces of actual data
15   that had been sort of handed in any meeting that
16   I was part of, but I just remember that that
17   e-mail existed and that there was a reference to
18   somebody from the S.E.C. agreeing that a certain
19   amount could be released.
20        And I have a recollection, although I
21   don't have it specifically and I haven't
22   subsequently seen that e-mail, I don't think
23   I've seen that e-mail since that moment, was
24   that it was at least 750, but I don't -- 750
25   million, at least 750 million.

Page 118

HIGHLY CONFIDENTIAL - M. KLEIN

1 to be careful, because the term "OCC" and all of
2 the different initials came up at various points
3 in time. I just don't specifically recollect an
4 OCC discussion. I just don't specifically
5 recollect that.
6     Q.   As a general matter, the effort to
7 find additional assets, does it continue on
8 Saturday and Sunday, the 20th and 21st?
9     A.   No, not that I -- I was not --
10     Q.   As far as you know.
11     A.   As far as I know, the only directional
12 asset change, as far as I understand -- well,
13 let me back up. Leaving aside every issue
14 relating to what took place with the JPMorgan
15 and the shutting down of the business, which
16 later became very clear, leaving aside that for
17 a moment, which may be hard to do, but it was
18 not part of my understanding or vernacular
19 leading into the bankruptcy Friday event, so
20 leaving aside that as to the core transaction
21 between the business transaction between
22 Barclays and Lehman, which was the 250 plus the
23 buildings, the related assets attached to it,
24 the changes that were made were the changes that

Page 119

HIGHLY CONFIDENTIAL - M. KLEIN

1 occurred Tuesday to Friday.
2     Subsequent to that, there was a -- or,
3 somewhere on the Friday time period late, I
4 think, the appraisals were delivered, so there
5 was a change in value in the real estate as the
6 splitting of the two appraisals took place. The
7 only thing that I can think of right now, and
8 maybe I'm -- but the only thing I can think of
9 right now is the 15c3 give-back.
10     So there was no new assets being
11 searched for. In addition, there was some
12 discussion over, quote, a brokerage fee
13 additional discount on the real estate, and that
14 became a -- that became a contentious point, so
15 Barclays gave up on that, quote, discount.
16 Those are the only elements that I can recall,
17 again, except for the moving pieces relating to
18 solving the JPMorgan-related matter.
19     Q.   In your discussions with your client
20 about the need for additional value to be added
21 on the Thursday or the Friday, what we've been
22 talking about, did Barclays in sum or substance
23 tell you that they needed a buffer of some kind?
24     A.   I don't think -- I don't think the

Page 120

HIGHLY CONFIDENTIAL - M. KLEIN

1 term "buffer" -- I don't think I ever recollect
2 the term "buffer" being used.
3     Q.   Is it fair to say that your
4 understanding by Friday is that because of this
5 financing, this loan that you have talked about,
6 that the mechanism of the deal had changed?
7     A.   The basic transaction parameters to
8 buy the business hadn't changed. The purpose
9 from Monday onward was to step into the shoes of
10 operating the Lehman, if you will, North
11 American business, obviously being clear that
12 some of the activities, including customer
13 activities and all those that occurred before
14 Barclays was not going to take part in, but the
15 business, ongoing business, that transaction
16 didn't change.
17     So the sum and substance of the
18 transaction that was the meaningful transaction
19 didn't change. What happened was the related
20 assets that were going to come with those
21 businesses effectively went away, so there then
22 was this incremental additional event that took
23 place, which I have always thought of as then
24 being something different, which was you now

Page 121

HIGHLY CONFIDENTIAL - M. KLEIN

1 have a loan that you have to satisfy the loan
2 and you are going long 45 billion of securities
3 in this marketplace. So the main transaction
4 and the substance of that transaction didn't
5 change, it's just that the related assets that
6 would have come with it were no longer the same
7 or comprehensible and a, if you will, distinct
8 event in terms of the loan and the collateral
9 for that loan was undertaken.
10     That's how I understand it. Now, that
11 may just be how I understand it.
12     Q.   To your knowledge, your personal
13 knowledge, were these differences regarding the
14 related assets documented in any way? Was there
15 a written agreement reached?
16     MR. BERNICK: I'm sorry, when you say
17 "related assets," I don't understand what
18 your focus is now.
19     Q.   This addition of value on Friday, were
20 any written agreements, to your knowledge,
21 reached with respect to the addition of these
22 assets?
23     A.   Which assets are you specifically
24 referring to now?

Page 134

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    A.    I don't think I did.  I don't --
3        Do you remember where the closing was?
4 Maybe that will help me.
5    Q.    I don't know.  I know it was on Monday
6 morning, very early Monday morning.
7    A.    I don't think I was physically there
8 at the closing.  I don't recall being there.
9    Q.    And just to sort of close out a couple
10 of areas, I think I heard you say before, but I
11 want to be clear on that, you were not involved
12 in any of the presentations made to the Barclays
13 board about this transaction; is that right?
14    A.    No.  No.  There had been, early on in
15 the -- at the very beginning of the week on the
16 Thursday I believe there was a board call that I
17 sat in and listened to.  Beyond that, I wasn't
18 party to board presentations, and I don't recall
19 seeing the board materials either that were
20 presented beyond that.
21        So the Thursday -- I think it could
22 have been Thursday, it could have been Friday --
23 conversation was on that early structure that we
24 discussed, which related to the Lehman/Spinco
25 separation, the sort of pre-bankruptcy version.

Page 135

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    Q.    You yourself didn't make any
3 presentation to the Barclays board?  You weren't
4 there?
5    A.    There might have been a question put
6 to me.  I don't -- I don't believe that I was
7 called upon.  I certainly, because I was just a
8 consultant, a person, and because they had a
9 series of other bankers that were giving
10 opinions and doing work and corporate brokers
11 that were doing -- they had other people doing
12 things, I wasn't --
13    Q.    I'm putting before you, Mr. Klein,
14 what previously has been marked as Exhibit 381,
15 an e-mail chain that starts on the second page
16 with an e-mail from you to Rich Ricci dated
17 Friday, September 19, at 21:31 that says, "Rich,
18 three-ring circus.  Two overflow rooms."
19        Could you read, sir, up that plain
20 sufficiently to sort of familiarize yourself
21 with that.
22        (Document review.)
23    A.    Okay.
24    Q.    Just in terms of the where and when of
25 this, I'm assuming from the time and the date

Page 136

HIGHLY CONFIDENTIAL - M. KLEIN
1
2 that you're in the bankruptcy court when this
3 e-mail exchange is taking place; is that right?
4 This will put you on the Friday night.
5    A.    I think it would have to be.
6    Q.    And is it correct, then, that Mr.
7 Ricci was not in the bankruptcy court?
8    A.    I don't believe he was.
9    Q.    And then the next up in the chain is
10 an e-mail from Mr. Ricci to you saying, "Alex
11 tells me they're killing us on 1.9 bucket and
12 not paying anything for it.  What gives?"
13        Can you give me any greater detail of
14 what that's a reference to?
15    A.    I think, as you see my next e-mail, I
16 don't follow.  I don't -- that wasn't a
17 conversation that I had been in that he was
18 relating to.
19    Q.    You also say, "I don't follow.  We are
20 being given 1.9 billion of face."  What's the
21 1.9 billion that you're referring to?
22    A.    The only 1.9 that I'm aware is the bag
23 of hammers.  The only 1.9 that I'm aware of in
24 the transaction.
25    Q.    And then what follows in the two

Page 137

HIGHLY CONFIDENTIAL - M. KLEIN
1
2 subsequent e-mails are, Ricci to you:  "He told
3 me creditors were squawking.  Let's get it
4 then."  And then you to Ricci:  "We are meeting
5 creditors shortly on this."
6        Do you see that interchange?
7    A.    I do, yes.
8    Q.    Can you give me any more detail of
9 what's meant or what you understood to be meant
10 when Mr. Ricci wrote that the creditors were
11 squawking?
12    A.    I don't, because I don't know -- I
13 don't -- I don't know the Alex Kirk
14 conversation.  I do know that during the court
15 the Weil team pulled a bunch of folks aside,
16 including creditor folks, to explain the
17 transaction in sort of elongated, elaborate
18 sidebar.
19        So I assume that that's what my
20 comment back is referring to, but I don't -- I
21 wasn't aware of what the Alex conversation was
22 because I wasn't party to that.
23    Q.    Did you participate in the elongated
24 sidebar?
25    A.    No, I was in the -- it was a very -- I

Page 138

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  hadn't been to bankruptcy court before. I was
3  in the very, very last row.
4      Q.   I can tell that from your first note
5  here: "Three-ring circus."
6      A.   And there were people calling in as
7  well, which I was -- I had never seen in court
8  before. But I was in the very last row, and as
9  a result, I didn't have the ability physically
10 to get to the front.
11         So the sidebar conversation that took
12 place, there had been I think a discussion that
13 the lawyer from Weil would brief various parties
14 prior to the event, which they did in that
15 sidebar, but I was not -- I don't think I was
16 physically there because I think I was
17 physically separated, I believe.
18     Q.   Could you hear what was said?
19     A.   I -- no, I was -- I was literally in
20 the last row.
21     Q.   So you know there was a sidebar, but
22 you have no personal knowledge of what was said
23 in that sidebar conversation?
24     A.   I was told that there would be a full
25 debrief that was sort of part of what they had

Page 139

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  planned. I mean, I left and went down to the
3  court. I was told that they would come down to
4  the court, that they would physically debrief,
5  and then there would be a hearing.
6          So I suspect that that's what that's
7  referring to. My, best as I can recollect, is
8  that's what that's referring to, but I don't --
9  I wasn't party to that.
10     Q.   Was there a point when you arrived at
11 bankruptcy court where you gave a briefing to
12 lawyers for either Lehman or Barclays about the
13 then current status of the agreement?
14     A.   I don't -- I don't think -- I don't
15 believe that I -- I don't know. I don't know.
16 I don't know who -- I rode down by subway with
17 this chap Gerard LaRocca, who I hadn't known
18 before, who knew the subway system quite well,
19 and then I went in and was pulled to the back
20 and I sat with Archie Cox and everybody else was
21 up in the front.
22 I don't really recall who I spoke to
23 when I walked in. The only substantive thing
24 that I was briefed on that I know about was
25 the -- this agreement on the splitting the

Page 140

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  difference on the real estate value because I
3  had to step out and call -- I think I called
4  Rich to tell him and make sure he signed off on
5  that because that was a, sort of an open issue.
6      Q.   You didn't ride down to court in the
7  car with Mr. McDade?
8      A.   No. I definitely took the subway.
9      Q.   Mr. Klein, I'm putting before you what
10 we previously marked as Deposition Exhibit 382.
11 Take a look through it, please.
12         (Document review.)
13     A.   Okay.
14     Q.   Now, we've moved, just by way of date,
15 we have moved now to Saturday, the 20th, and the
16 earliest e-mail here is on Saturday evening at
17 8:44, where you write to Mr. Ricci and some
18 others: "Team, we need a brief call with Rich,
19 subject to his schedule, to review the language
20 regarding the expense accruals and to ensure
21 that BarCap has appropriate flexibility to run
22 their business as they deem appropriate."
23         What language regarding expense
24 accruals were you referring to in this e-mail?
25     A.   I don't remember specifically the

Page 141

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  e-mail, but I do recall a conversation I think
3  we talked about earlier today where the lawyers
4  were describing the definition of
5  "compensation."
6          That's the only conversation that I
7  recall that would have had lawyers and
8  otherwise. I don't remember sending this
9  specific e-mail, but that's the only
10 conversation I can recall that would have been
11 related.
12     Q.   And can you add any more detail beyond
13 the e-mail, sir, to what you would have meant
14 regarding flexibility, "appropriate flexibility
15 for Barclays to run their business"?
16     A.   I can't. Rich was, at this stage, the
17 principal client and he asked me to arrange a
18 call with people that were involved and I
19 arranged the call, so I can't -- I can't give
20 you anything more.
21     Q.   Beyond arranging the call, Rich Ricci
22 is the principal client, but beyond arranging
23 the call, did you have any involvement of that
24 issue -- involvement in that issue, that is, the
25 expense accruals and BarCap's --

Page 142

```
1          HIGHLY CONFIDENTIAL - M. KLEIN
2       A.   No. No. No. No. The only subject
3    matter that I'm aware of that was covered was
4    this, you know, definition of "compensation."
5    That's the only thing that I'm aware of at all.
6       Q.   Now, do you know how much value was
7    transferred to Barclays in the deal once the
8    issues were resolved with the addition of the
9    bag of hammers and the 15c3?
10         MR. BERNICK:  I think you --
11      A.   I don't understand the question.
12      Q.   I'm looking for a total here.  Do you
13   know how much value was agreed to be transferred
14   to Barclays?
15         MR. BERNICK:  Go ahead and answer it
16    if you can.  "Value" is a judgmental thing,
17    so if you can give it some factual context,
18    that would be helpful.
19      A.   I don't really view that there was,
20    quote, value transferred.  If you're referring
21   to the Friday events --
22      Q.   Uh-huh.
23      A.   -- where there was the clarification
24   of the issues relating to the assets going away
25   and this 45 billion loan and then the bag of
```

Page 143

```
1          HIGHLY CONFIDENTIAL - M. KLEIN
2    hammers and so forth, I don't view that as,
3    quote, value transferred.
4         I view that there was a hole in the
5    transaction and that hole was filled, and the
6    only actions that occurred that would have
7    filled that were the bag of hammers and the
8    15c3.  As I said, I think subsequently there was
9    the change in the real estate midpoint
10   valuation, and then subsequent there was the
11   give-back of the certain 15c3.
12        So the total value that was sort of in
13   those events can be quantified, but your
14   question, which said the total value transferred
15   to Barclays, I don't think there was total value
16   transferred to Barclays.
17      Q.   My question now is -- I'm away from
18   the real estate, okay.  Put the real estate
19   aside for a moment.  In terms of securities
20   transferred, filling the hole, as it were, that
21   you talked about, do you have knowledge of the
22   number, the value of the securities?
23      A.   I don't have --
24         MR. BERNICK:  Go back and look at your
25   question, Bob.  It mixes the idea of filling
```

Page 144

```
1          HIGHLY CONFIDENTIAL - M. KLEIN
2    the hole, which he's already answered, with
3    value transferred, which may -- or,
4    securities transferred, which may go way
5    beyond filling the hole.  So, which one are
6    you asking about?
7         MR. GAFFEY:  I'm asking about the
8    value of the securities, including that
9    which was added into the hole, the value of
10   the securities.
11        MR. BERNICK:  So you want total value,
12   the total value of the securities that
13   Barclays got in this transaction?
14        MR. GAFFEY:  Yes.
15        MR. BERNICK:  If you can answer that.
16   You're not being asked to answer that
17   question as an expert, Mr. Klein.  This is
18   just purely a question about what you
19   factually know in this deposition.
20      A.   I'm always very sensitive when you use
21   the term "value" because "value" has a --
22   there's a definition that assumes that it has --
23   that is the worth, that is the approximation.  I
24   don't have a view of what the approximation of
25   the, quote, value of that was.
```

Page 145

```
1          HIGHLY CONFIDENTIAL - M. KLEIN
2    I have the views that was expressed at
3    that moment as to what the values were of the
4    various different components of the transaction,
5    and I have expressed those I think in prior
6    parts of this, but I don't -- I don't have a,
7    quote, valuation of the assets that were -- I've
8    given you the componentry of what was disclosed
9    as numbers, but I don't -- neither have I done a
10   valuation nor do I have a valuation on them.
11        I don't know if I'm answering your
12   question.
13      Q.   Yeah, I see the issue with value,
14   valuation and it being somewhat judgmental.  Let
15   me ask you this:  Did you have a view, did you
16   have a view on the Friday once the bag -- you
17   know, once the additional assets had been added,
18   the 15c3 and the other assets, what the -- did
19   you have a view of what the value was?
20      A.   I have to be as clear as I can.  I had
21   never heard the term "bag of hammers."  I never
22   saw a list of securities.  So I had no knowledge
23   nor could I have, frankly, a whole lot of
24   confidence into exactly what that would have
25   resulted.
```

Page 150

HIGHLY CONFIDENTIAL - M. KLEIN

1    HIGHLY CONFIDENTIAL - M. KLEIN
2  I can say that we've had documents produced to
3  us off of servers in the UK, servers in New
4  York, and then further complicated by vendors in
5  New York, so I can never be sure if I'm looking
6  at London or New York time on some of these
7  things.
8     A.   It doesn't seem --
9        MR. BERNICK:  I think --
10    A.   Monday morning was -- Monday morning
11 is the 22nd, is the date of closing, correct?
12 So this would refer to that Sunday evening into
13 the Monday morning.
14    Q.   I suspect --
15        MR. BERNICK:  Well, no, no.  This is
16    probably 10 o'clock --
17        MR. GAFFEY:  I think it's 10 o'clock
18    London time.
19        MR. BERNICK:  -- London time.
20        MR. GAFFEY:  So you're 4 A.M. New
21    York -- or, 5 A.M. New York.
22        MR. BERNICK:  5 A.M. New York time,
23    real early in New York.
24    A.   10 A.M., that's right.  That's 5 A.M.
25 would be consistent.  That's correct.  Then

Page 151

HIGHLY CONFIDENTIAL - M. KLEIN

1    HIGHLY CONFIDENTIAL - M. KLEIN
2  that's why it says 6 and 6:30.
3     Q.   And then the subsequent one is 5:22
4  A.M. of your --
5     A.   I get it.  I understand.
6     Q.   You mentioned before the choices that
7  were given to JPM.  Does this e-mail relate to
8  that issue?
9     A.   Yes, it does.
10    Q.   And Mr. Ricci --
11        MR. BERNICK:  Actually, you say
12    choices given to JPM.  It says "we have a
13    few choices."
14        MR. GAFFEY:  I'm about to follow up on
15    that.
16    Q.   I just want to know if it relates to
17 the topic that we were referring to, the choices
18 that were given to JPM.
19    A.   The subject matter that's in this
20 e-mail relates to the JPM problem and the list
21 of securities that they gave us in the middle of
22 the night and the path to a resolution which was
23 then resolved in that phone call that we had
24 with their people and their lawyer on the phone.
25 That's what it relates to, to the best of my

Page 152

HIGHLY CONFIDENTIAL - M. KLEIN

1    HIGHLY CONFIDENTIAL - M. KLEIN
2  knowledge.
3        To be clear, though, so you don't get
4  mistaken, those three choices were not the same
5  three choices that I indicated that were given.
6     Q.   No, I didn't understand your testimony
7  that way.  That may be my fault in the question.
8  I was just sort of pointing to the topic as
9  opposed to the particulars.
10    A.   I understand.
11    Q.   I'm showing you, Mr. Klein, what was
12 previously marked as Deposition Exhibit 149A.
13 Would you take a look through that, please.
14    A.   Yes.
15    Q.   Let me know when you've had a chance
16 to review it.
17    A.   Yes.
18    Q.   Now, in the first e-mail sent here,
19 it's from you to Mr. Diamond and begins, "The
20 court has approved Barclays' acquisition of
21 Lehman Brothers.  Congratulations.  A great leap
22 forward for BarCap."
23        Do you see that?
24    A.   Yes.
25    Q.   Do you recall sending this particular

Page 153

HIGHLY CONFIDENTIAL - M. KLEIN

1    HIGHLY CONFIDENTIAL - M. KLEIN
2  e-mail to Mr. Diamond?
3     A.   Not this specific, not this specific
4  e-mail.
5     Q.   Further up in the e-mail, Mr. Diamond
6  responds to you, "Yes," exclamation, point,
7  exclamation point, exclamation point, and then
8  you reply, "Bob, great day.  We clawed back 3
9  billion more of value in the transaction and cut
10 the building prices by 160 million tonight."
11        What are you referring to there?
12    A.   This was the Friday morning pain and
13 suffering to get the transaction closed.  Bob at
14 this stage was not intimately involved in the
15 day-to-day, or I certainly wasn't communicating
16 with him, so I didn't see him in part and
17 parcel.  It was Rich who was the day-to-day
18 contact, which was a shift from the sort of Fed
19 weekend, and Rich was sort of intimately
20 involved in the moving pieces.  And the
21 summation up top was meant to sum up all the
22 events that had taken place that got us to get a
23 closing.  It was a hard -- it was a hard day.
24    Q.   Now, the reference to 160 million, is
25 that a reference to the commission issue you

Page 154

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    spoke about before?
3         A.    It was the splitting the difference on
4    the -- I believe, but I don't know this for
5    certainty, that there were two opinions,
6    valuation opinions, both put forward by Lehman.
7    It may well have been that the appraisers had to
8    be agreed to by Barclays.  I don't know the
9    specifics, but the two opinions were then split
10   down the middle.
11        Those opinions resulted in a reduction
12   in value of the two buildings of 160 million.
13   In addition, I think there was a waiving of this
14   brokerage commission, but I think this -- I
15   believe that this 160 refers to the splitting of
16   the difference.  The above was meant to be of
17   kind of a summation of -- well, just of the
18   challenges of the day to get over the finish
19   line.
20        Q.    And the 3 billion that's referred to
21   in that e-mail to is a reference to the
22   additional assets searched for and found on
23   Friday?
24        A.    I would have to -- again, I don't
25   recall the specific e-mail, but that which we

Page 155

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    found, the bag of hammers, 1.9, the 15c3, is
3    entirely consistent with that.
4         Q.    Does this refresh your recollection as
5    to the amount that was added on?
6         A.    I want to be clear.  I don't believe
7    anything was, quote, added on.  I have said --
8         Q.    Let me put a clearer question.  You
9    made that point before, and that's fair.  Let me
10   withdraw the question and rephrase it.
11        Does this refresh your recollection as
12   to the additional value that was put in the deal
13   on Friday?
14        MR. BERNICK:  Go ahead.
15        A.    You've used the term "value" a few
16   times.  I don't know what the value of, in
17   particular, the bag of hammers, I don't know
18   what the value of that was, but what I've said,
19   there was the gap.  We delivered the need to get
20   more assets.  This was a summation of what took
21   place on the Friday.
22        Q.    In your e-mail to Mr. Diamond you used
23   the word "value" and you used it -- you say "3
24   billion more of value."  Was that your view of
25   what the value was?

Page 156

HIGHLY CONFIDENTIAL - M. KLEIN
1
2         A.    I couldn't have a view specifically of
3    the value because I don't have the -- I didn't
4    have the analytics of the value and I never saw
5    the 1.9.  It was a reference made to us in terms
6    of what the value was.  The reference is when
7    someone says you're getting 1.9 billion of
8    securities, that it's 1.9 billion of securities.
9    That's just not something that today or then I
10   could independently verify.
11        (Discussion off the record.)
12        (Recess; Time Noted:  3:07 P.M.)
13        (Time Noted:  3:17 P.M.)
14   EXAMINATION BY
15   MR. TECCE:
16        Q.    Good afternoon, Mr. Klein.  My name is
17   James Tecce.  I am an attorney at Quinn Emanuel
18   and we are counsel to the Creditors Committee.
19        Going to September 19, the day of the
20   sale hearing, I believe when Mr. Gaffey was
21   asking you questions earlier, you referred to a
22   sidebar that took place during the sale hearing
23   that you did not participate in, correct?
24        A.    There was a reference -- are you
25   referring to the e-mail discussion?

Page 157

HIGHLY CONFIDENTIAL - M. KLEIN
1
2         Q.    No, no, no, I'm referring to the sale
3    hearing -- let me back up for a second.  Did you
4    participate in the sale hearing where the
5    transaction was presented to the bankruptcy
6    court for approval on the 19th of September?
7         A.    I sat in and watched, yes.
8         Q.    Okay.  And did there come a point in
9    time during the sale hearing where there was a
10   sidebar discussion among Weil attorneys and
11   creditor attorneys, as you understood?
12        A.    I believe so.
13        Q.    Okay.
14        A.    I believe there was a sidebar amongst
15   the Weil attorneys, other attorneys, and
16   interested parties broadly as a -- I don't
17   believe that it was restricted to attorneys.  It
18   was interested parties fully being briefed, as I
19   understood it to be the case, but I don't know
20   all the people that were in the room.  But it
21   was a fairly broad briefing on what had been the
22   transaction.
23        Again, I don't know, just to respond
24   to your comment about lawyers and lawyers, I
25   think it was far broader than that.

Page 158

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    Q.   Okay.  And to be clear, you did not
3    participate in that discussion, correct?
4    A.   I don't believe I did.
5    Q.   Okay.  Did there come a point in time
6    during the sale hearing that you participated in
7    any discussions with the advisors to the
8    Creditors Committee, their attorneys, their
9    financial advisors?
10   A.   Not during the sale hearing that I'm
11   aware of.
12   Q.   Okay.
13   A.   Or that I can recall.
14   Q.   Was there a point in time prior to the
15   sale hearing that you participated in
16   discussions with the committee?  And just to be
17   clear, when I say "the committee," I mean the
18   committee or their advisors or their attorneys.
19      MR. BERNICK:  I don't know that you
20      have established what the witness really
21      knows about his knowledge of who is on the
22      committee or who their lawyers are such that
23      he could answer your question.  I mean, if
24      he knows who's on the committee, who the
25      lawyers are, then he can answer the

Page 159

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    question.
3       MR. TECCE:  I'm not asking who's on
4       the committee.  I'm asking if he ever had a
5       conversation with their advisors.
6       MR. BERNICK:  But if he doesn't know
7       who their advisors are or he doesn't know
8       whose on the committee, he can't answer the
9       question.  I'm not saying -- he may well
10      know.
11      MR. STERN:  James, in other words, he
12      may have spoken to someone at Houlihan, but
13      he may not have known that the person was
14      from Houlihan.
15      MR. BERNICK:  Or that Houlihan was
16      professionals for somebody.
17   Q.   Do you have an understanding of who
18   the attorneys for the Creditors Committee were?
19   A.   I met you today.  I don't -- I don't
20   know who was representing -- I don't know that
21   there was only one creditor committee or if
22   there was more.  I don't know all the background
23   on the Creditors Committee and who was involved.
24   Q.   Okay.  Did you have an understanding
25   that Houlihan Lokey was the financial advisor to

Page 160

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    the Creditors Committee?
3    A.   I have subsequently learned that
4    official capacity.  I don't know that I knew
5    specifically that they had that role at the
6    time, but I have subsequently learned that.
7    Q.   Okay.  And did you know that Milbank
8    Tweed was counsel to the Creditors Committee?
9    A.   I don't have a recollection of
10   specifically of Milbank Tweed.  I don't.
11   Q.   So, prior to the sale hearing taking
12   place, did you engage in any conversations or
13   discussions with Houlihan Lokey or Milbank Tweed
14   concerning the sale transaction?
15   A.   I can -- to be very precise, there was
16   a series of events at the Weil Gotshal firm
17   where there were a series of meetings in meeting
18   rooms.  I don't recall the specific dates of
19   those meetings or meeting rooms, but there was
20   one evening in which there was a creditors
21   committee of some form meeting.  I don't
22   specifically know what was transpiring.
23      I did get pulled into a side room by a
24   group of people that included some of the Weil
25   lawyers, and again, I don't recall specifically

Page 161

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    which date in the chronology it was, but it was
3    described to me that could I explain some
4    elements of the transaction, and the creditors
5    were involved.  There was a guy with glasses.  I
6    don't -- I don't know what his specific name
7    was.
8       And I remember specifically that
9    meeting only because I drew on a manila folder
10   such as that with a green marker the components
11   of both this 45 and the assets that were then
12   collateralized against it, separately and
13   distinctly, the other, quote, moving pieces in
14   what I understood to be the fund flows.
15      It was not a very long conversation
16   and I can't tell you who other than I think
17   Harvey Miller was in because I got grabbed in
18   there, but I specifically went through, again,
19   only because I grabbed a manila folder and there
20   was a green pen and I just have that particular
21   recollection of drawing boxes.
22      And I did it because the Weil firm
23   asked me to, and as I understood it, there was
24   some form of ongoing creditor committee meeting
25   that I wasn't a party to.  That's my only

Page 162

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    recollection.
3        Q.    Okay.  And did this take place before
4    or after the sale hearing?
5        A.    I don't have a recollection of what --
6    I just don't have a recollection of the -- it
7    was at Weil, but I don't know -- I don't have a
8    recollection.
9        Q.    Is there any reason --
10       A.    And by the way, I know which
11   conference room it was at Weil because we had
12   moved from the corner conference room to the one
13   next to it because I was grabbed, and there was
14   the middle conference room near the entryway was
15   where the Creditors Committee was meeting.  So I
16   sort of know -- I have a picture of the
17   whereabouts, I just don't remember the day.
18       Q.    Do you have any reason to believe that
19   it took place prior to the sale hearing Friday
20   hearing?
21       A.    Again, I don't have a recollection of
22   which -- I don't have a recollection of which
23   day it happened.  I know specifically what I
24   drew and that I was asked to have this
25   discussion and that it related to the Creditors

Page 163

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    Committee and the fact that they were meeting.
3    Beyond those facts, as to which date and who the
4    people were, because I don't -- I don't think
5    they introduced themselves to me, I'm fairly
6    certain they didn't introduce themselves to me,
7    I don't have more of a recollection than that.
8        Q.    Okay.  And so let's just back up for a
9    second.  I believe that you referenced a larger
10   meeting and then you were pulled into a side
11   room; is that correct?
12       A.    That's right.
13       Q.    And so let's start with the larger
14   meeting.  Did you -- what was your understanding
15   of what the larger meeting -- of who was in
16   attendance at the larger meeting?
17       A.    Something to do with the creditors.  I
18   don't have more detail on it than that because I
19   didn't know the people.  There was just a big
20   room that supposedly there was the creditors
21   meeting and a phone call.  I was asked to be
22   pulled into this other side room --
23       Q.    Okay.
24       A.    -- and I acquiesced.
25       Q.    Okay.  The larger meeting, did you

Page 164

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    speak with anyone or --
3        A.    I wasn't in that larger meeting.
4        Q.    I believe you mentioned Mr. Miller in
5    the side meeting.  Do you remember anyone else
6    who attended that meeting, the names of anyone
7    else?
8        A.    It was -- there were people floating
9    around, you know, from Barclays and from Cleary
10   Gottlieb and people floating around from the
11   Weil firm as well.  I just don't know -- people
12   were coming in and out of some of those rooms,
13   so I just don't know.  I just remember Harvey
14   asked me to explain it, so that's the only
15   reason why I know Harvey was there.
16       Q.    Do you know why he asked you to
17   explain it?  Do you have an understanding of why
18   he asked you to explain it?
19       A.    No, he just asked me to -- no, I
20   don't.  He just asked me to.
21       Q.    Do you remember the sum and
22   substance -- well, actually, how long did this
23   sidebar, side room meeting last, do you
24   remember?
25       A.    I don't.  I don't.  I don't think it

Page 165

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    was exceptionally long, but it was long enough
3    for me to draw just a box diagram of the flow of
4    funds on a manila folder and answer one or two
5    questions.  I don't want to speculate how long
6    it was.  I don't think it was an enormously long
7    meeting.
8        Q.    Do you remember the substance of what
9    was discussed with respect to, you know, the
10   folder?
11       A.    It was the principal elements were the
12   45 loan, the assets that were roughly viewed as
13   equivalent to that, the, if you will, bag of
14   hammers and -- I'm sorry, let me be more
15   precise.
16           I recall specifically the funds flows
17   being discussed and the critical element of that
18   discussion being the 45.  Beyond that, I don't
19   know specifically which boxes or otherwise I
20   drew, so I don't want to -- I don't want to go
21   through over-detail because I would be then
22   speculating on the remaining details.
23       Q.    Do you recall whether the liabilities
24   that were being assumed by Barclays was
25   discussed during the meeting?

Page 210

HIGHLY CONFIDENTIAL - M. KLEIN

1 and I indicated that I don't have the authority
2 to do anything like that, and then I think
3 Archie Cox was the individual that was there
4 because he was the presiding, if you will,
5 officer.
6     It could well have been that the
7 agreement was other people, because there were
8 other senior people like Jonathan Hughes around.
9 But as I understood it, that was agreed to, that
10 above and beyond that, some minimum number, it
11 could in fact go back to the estate.  That was
12 very late in the process.  I don't remember
13 specifically when, but it was very late in the
14 process.
15     Q.   And do you have a recollection, Mr.
16 Klein, of where you were when this discussion
17 with Mr. Cox and Mr. Miller took place?
18     A.   You know, I want to say again, you
19 have now done this twice to me.  I have not said
20 that there was a conversation between Mr. Cox
21 and Mr. Miller.
22     Q.   I'm sorry.  I did not mean to
23 represent your prior testimony.  I think I must
24 have misunderstood your answer.

Page 211

HIGHLY CONFIDENTIAL - M. KLEIN

1     A.   I believe, but I don't know for sure,
2 that the request from Mr. Miller came somewhere
3 at the Weil offices, but I don't -- I don't have
4 a specific recollection, and I just want to be
5 clear that was a request to me that I then
6 passed on to the people at Barclays because it
7 was their decision.
8     Q.   And you say late in the process, so
9 can we at least narrow it down to a date?  Was
10 that request of Mr. Miller to you, was that on
11 the Sunday, the 21st?
12     A.   My apologies.  I don't know the date.
13 I don't -- I don't know the date.
14     Q.   Was it sometime prior to the closing
15 of the deal on Monday morning?
16     A.   Oh, it certainly was prior to the
17 closing.  I don't -- I'm not aware of -- it
18 certainly was prior to the closing.
19     Q.   And just to bookend it, can we agree
20 that that conversation took place sometime
21 between the bankruptcy court hearing on the 19th
22 and the closing on the 22nd, is that fair?
23     A.   I don't, I don't, I really don't.  As
24 I think I've said, the -- I don't think the 15c3

Page 212

HIGHLY CONFIDENTIAL - M. KLEIN

1 assets came into play until sometime when this
2 issue of the broader set of asset problems after
3 Tuesday occurred, so it's clearly after that,
4 and it's clearly before closing, but I just -- I
5 just don't know the specific date.  And I would
6 help you if I could remember, but I don't.
7     Q.   I understand, sir.  Forgive me if I'm
8 getting a little repetitive, can you be as
9 precise as possible about the terms of the
10 request from Mr. Miller to you?
11     A.   I've given you what I know.  I
12 don't -- I don't have a recollection above and
13 beyond that.
14     Q.   And just so I understand your
15 testimony, sir, Mr. Miller asked you whether
16 Barclays would agree that if there was more than
17 a certain figure, perhaps around $750 million,
18 available under c3, that would be returned
19 to the LBI estate; is that accurate?
20     A.   You are using very precise terms and I
21 want to be very careful because (A) this was a
22 year ago or more -- a year ago, and there was a
23 lot of moving pieces.  I don't specifically know
24 who was involved in the conversation other than

Page 213

HIGHLY CONFIDENTIAL - M. KLEIN

1 Harvey Miller.
2     I only know that it was a request
3 that, above and beyond what had been represented
4 as being assets that were certainly going to go,
5 which was this e-mail, if there were more, could
6 those come back to the estate, and I said it's
7 not -- that's not something that can be done.
8     Now, I don't know -- not something I
9 can do.  I don't know who else was in the room.
10 It would be -- there was virtually no situation
11 that I can recall, in fact, I can't recall any
12 situation that I was in a room alone with Harvey
13 Miller.  So it would have been as part of some
14 other grouping.  And then a response was given,
15 to my understanding, from Barclays back that
16 that would be okay.  But I don't -- I don't have
17 a recollection beyond what I've just told you.
18     Q.   Did you have an understanding, Mr.
19 Klein, that the transfer of these moneys from
20 Lehman to Barclays, the 15c3 assets, was
21 conditional upon there being an excess beyond
22 the regulatory requirement?
23     MR. BERNICK:  Object to the form.  I'm
24 not objecting.  I think the form of your

Page 214

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  question, though, is ambiguous.
3        The witness has now been over this
4  like four or five different times, and I'm
5  becoming a little concerned that there's
6  something that's turning on a nuance here
7  that's just not known by the witness.
8        A.   I've testified to what I know.
9  Someone handed an e-mail that said this would be
10 available to you.  It was an important part of
11 the decision process in that last Friday.  It's
12 not a subject I knew a lot about before and it's
13 not a subject I knew a lot about now.
14       Q.   And the e-mail was, to your
15 understanding, an e-mail from some individual at
16 the S.E.C.; is that correct?
17       A.   There was an e-mail that referenced
18 that there was an approval to release a certain
19 amount of these funds, and as part of that, the
20 Lehman team said this is an asset for you to
21 solve what was the discussion that Mr. Gaffey
22 and I had about the asset issue, and the
23 reference made, as I've said that I can recall,
24 all I can recall is that it was up to 2 billion,
25 but that this note said it was at least 750 that

Page 215

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  could be released.
3        I don't recall any more, but I'm
4  assuming that that e-mail -- that was an e-mail,
5  so you all have a lot of documents.
6        Q.   We have many e-mails, Mr. Klein, you
7  are right.
8        Do you know, Mr. Klein, whether the
9  e-mail about which you have testified -- I
10 understand that this was a year ago and your
11 recollection on this issue is one year old and
12 perhaps not any longer precise, do you recall
13 whether that was an e-mail from someone at the
14 S.E.C. or was it an e-mail that simply
15 referenced the S.E.C.'s supposed approval of
16 this element of the deal, or do you not know
17 either way?
18       MR. BERNICK:  You may want to ask him
19 if he ever saw it.  I don't know, but no one
20 has established whether he saw it.
21       MR. OXFORD:  I think he testified that
22 he hadn't seen it subsequently, from which I
23 inferred that he had seen it earlier.
24       A.   There was -- the only reason I recall
25 the e-mail was it was rare that there was

Page 216

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  specific things shown to me that said here's an
3  asset, and because of that event on Friday,
4  there was this new subject that came up --
5  whether it was Thursday or Friday, I don't know
6  when, but this new subject of this 15c3.
7        I didn't know what it was, it was
8  referred to as an available set of assets, and
9  that was then promptly handed to the lawyers
10 because it was not a subject matter that I
11 could, and then some determination had to be
12 made was, is that relevant to then consider it
13 as part of this asset pool, and the decision was
14 yes.  Who the e-mail was from and between I
15 don't -- I don't have a recollection.
16       Q.   I think last question on this, and I
17 hope last question overall:  You described
18 earlier a give-back on the 15c3.  Do you have an
19 understanding of the reasons, if any, for the
20 give-back on 15c3, sir?
21       A.   I don't.  I just recall a request
22 coming in.  I don't know why.
23       MR. OXFORD:  Okay.  Mr. Klein, thank
24 you for your time.  I don't have any further
25 questions for you at this time.

Page 217

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  MR. GAFFEY:  Just before we close the
3  record, I don't know, Mr. Klein --
4        We can go off the record.
5        (Discussion off the record.)
6        MR. BERNICK:  At the outset of the
7  deposition, there was a dialogue between Mr.
8  Gaffey and I regarding production pursuant
9  to the Subpoena that's been served on Mr.
10 Klein through me of what I will call for
11 short form the engagement letter between Mr.
12 Klein and Barclays relating to this matter,
13 and I undertook at that time to see if we
14 could even get a hold of it during the
15 course of the day, didn't have time to do so
16 because we've been working so hard and
17 intensely with these concise and insightful
18 questions that I didn't get a time to break.
19       So I will in fact get a copy of that.
20 I will in fact make it available in this
21 case pursuant to the subpoena.  However, my
22 current intent on behalf of Mr. Klein is to
23 redact the reference to a dollar amount, and
24 we can have further discussion about that,
25 but I will in fact discharge Mr. Klein's

Page 1

1       IN THE UNITED STATES BANKRUPTCY COURT

2       FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

    In re:                    )
5                             ) Chapter 11
                              )
    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
6   HOLDINGS, INC., et al, )  (Jointly Administered)
                              )
7           Debtors.   )
    -----------------------)

8

9

10

11

12          30(b)(6) DEPOSITION OF

13     CLEARY GOTTLIEB STEEN & HAMILTON LLP

14                  by

15          VICTOR I. LEWKOW

16         New York, New York

17      Wednesday, February 10, 2010

18

19

20

21

22

23   Reported by:

24   MAYLEEN CINTRON, RMR, CRR

25   JOB NO. 28226

Page 10

1                    -Lewkow-
2    seller.  There was a -- there was a provision
3    that said that on a certain pool of positions,
4    that we would be -- that Barclays would be
5    acquiring at the closing, that if, as I
6    recall -- and you know, without having the
7    Agreement in front of me to look at the words,
8    I always defer to what's in the contract.
9            But my recollection is that the --
10   there was a provision that if within some
11   period, I think it was a year, to the extent
12   that Barclays actually sold positions -- not
13   what their value was on a given date or the
14   like, not as audit, not if they held
15   positions, even if those positions increased
16   enormously in value or if they went down in
17   value.
18           But if with respect to some pool --
19   and I don't remember the details of how it
20   worked because that provision was later
21   dropped, as you know.  There was a provision
22   that if -- with respect to some of those
23   assets, if we -- if Barclays sold them during,
24   I think, the first year, there would be some
25   sharing of the -- of the profit compared to

TSG Reporting - Worldwide    877-702-9580

Page 11

1                    -Lewkow-
2    what -- I forget what the base was exactly, as
3    to what date the assumed valuation was.
4            So there was a provision for
5    additional consideration potentially to flow
6    to the seller.
7        Q.  I'll show you the Asset Purchase
8    Agreement in a minute and we'll spend some
9    time with it today.
10           But is the provision that you
11   described, is that fairly described as a
12   post-closing purchase price adjustment
13   provision?
14           MR. MORAG:  Objection.  Asked and
15   answered.
16       A.   Yeah, I have nothing more to say
17   other than what I said on that subject.
18       Q.  I'm not sure I have an answer to
19   the question as to whether it is -- the
20   provision you described is what you would
21   describe, and I'm referring to Paragraph 4 of
22   your affidavit, as a "post-closing purchase
23   price adjustment provision"?
24       A.   Well, with due respect, if you read
25   my declaration, it says, "...a pre-closing

TSG Reporting - Worldwide    877-702-9580

Page 12

1                    -Lewkow-
2    and/or post-closing purchase price adjustment
3    provision relating to the valuation of the
4    transferred assets and liabilities".  This was
5    not such a provision.
6        Q.  So to qualify as a balance sheet
7    transaction, in your view, the pre or post
8    closing purchase price adjustment provision
9    would have to relate to a valuation of the
10   assets and liabilities?  It's that last piece,
11   "valuation of the assets and liabilities" that
12   defines it as a purchase price adjustment
13   provision as you meant it in your Declaration?
14           MR. MORAG:  Object to form.
15       A.   As I said earlier, to me a balance
16   sheet transaction is when you later prepare --
17   I'm not sure that the word -- I would say do a
18   valuation from an accounting standpoint.  As a
19   balance sheet, normally you would prepare a
20   balance sheet based on generally accepted
21   accounting principles, have it audited and
22   adjust the purchase price based on that.
23       Q.  Is there a reason such a mechanism
24   was not included in the transaction at issue
25   here?

TSG Reporting - Worldwide    877-702-9580

Page 13

1                    -Lewkow-
2        A.   You know, I would -- I don't recall
3    whether at any point in time, whether Lehman
4    or its advisors requested such a provision.  I
5    just don't recall.  Certainly if they did, it
6    came and went very quickly in the discussions
7    of the concept of the Asset Purchase
8    Agreement.  But I don't recall there ever
9    being such a provision.
10           I would note that we were -- as
11   everybody knew then and knows now, it was an
12   incredibly volatile couple of days.  The Asset
13   Purchase Agreement was being negotiated on
14   that Monday and Tuesday after Lehman had filed
15   for Chapter 11 late Sunday night, early Monday
16   morning.
17           And I think the idea that anyone
18   had a wonderfully exact knowledge as to what
19   the value of portfolio assets in particular
20   were at that point in time, it would be
21   amazing because there was a very uncertain
22   value at that point in time.
23       Q.  Did Cleary Gottlieb play any role
24   in the negotiation of the transaction with
25   regard to arriving at a valuation of the

TSG Reporting - Worldwide    877-702-9580

Page 14

```
 1           -Lewkow-
 2   assets to be transferred?
 3           MR. MORAG:  Object to the form.
 4   Vague.
 5       A.  No.
 6       Q.  Were there negotiations between the
 7   parties concerning the value of the assets to
 8   be transferred?
 9       A.  As described in my declaration,
10   there were discussions, I would not -- I don't
11   believe there was a negotiation, as I heard it
12   described.  And I want to stay away from
13   privileged communications, although I'm not
14   sure I have any in particular in mind now.
15   But obviously, I assume none of -- you're not
16   asking me at any point -- if you are, I assume
17   I'll be telling you not, that I won't, or one
18   of the lawyers here will tell me not to.
19           But it was my understanding that
20   Lehman -- that Barclays -- let me step back a
21   second.
22           Even before the bankruptcy, even
23   before that Friday morning when -- the Friday
24   before the 15th, the 12th I guess when
25   Barclays had first retained us certainly, they
```

TSG Reporting - Worldwide     877-702-9580

Page 15

```
 1           -Lewkow-
 2   may have gotten involved a little bit the day
 3   before or something.  But even before Barclays
 4   had started thinking about, as far as I know,
 5   Lehman, there had been stories in the press
 6   about suggesting that Lehman had been slow to
 7   revalue assets, and that they had inflated
 8   values in their portfolio.
 9           But beyond that in the very limited
10   time, as I understood it, that Barclays had
11   been provided with some information about the
12   portfolio that we were -- that Barclays was
13   being asked to -- that it be acquiring as part
14   of its acquisition of basically the entire
15   business with certain exceptions and the
16   assumption of very substantial certain
17   specified liabilities, when their people,
18   financial people, trading people, whoever it
19   was -- and I'm not sure I knew all the people
20   involved.  It was a new client in the
21   United -- I don't know the name of all the
22   people who were going -- who were around and
23   in the different rooms that we were -- that
24   meetings were taking place on that Monday and
25   Tuesday up at Lehman Brothers on the -- on the
```

TSG Reporting - Worldwide     877-702-9580

Page 16

```
 1           -Lewkow-
 2   big conference and dining floor.
 3           But it was my understanding that
 4   Barclays people had reviewed certain
 5   information about the assets and liabilities
 6   and had thought that the -- there were
 7   large -- certain category types of assets and
 8   the like that had, as last marked by Lehman,
 9   were substantially overstated.  Whether they
10   had been overstated as of the date they
11   originally been marked or were overstated
12   because of the passage of a couple of days, I
13   believe they would not have been marked for a
14   couple of days.  It's my recollection.  I
15   could be wrong on that.
16           But one way or another, or a
17   combination of the two, that the Barclays
18   people had concluded that the Lehman marks
19   were substantially overstated.
20       Q.  When was Cleary first retained in
21   connection with this transaction?
22       A.  We were retained on Friday.  Not on
23   this transaction, we were retained on the
24   Friday before the bankruptcy on the 12th,
25   early that morning, to assist Barclays in
```

TSG Reporting - Worldwide     877-702-9580

Page 17

```
 1           -Lewkow-
 2   looking at a potential much larger transaction
 3   to buy not just a substantial part of the U.S.
 4   and Canadian broker-dealer investment banking
 5   business, but a much larger portion of Lehman
 6   Brothers.
 7           I don't know whether initially -- I
 8   can't recall whether initially it might have
 9   been all of Lehman.  I think very early it
10   became clear it was not quite everything but
11   it was a larger universe than what we ended up
12   trying to do in doing, starting with the
13   Monday filing the Chapter 11.
14       Q.  In the interest of everyone's time,
15   we've taken a lot of depositions in this case.
16   Some time over the weekend, the concept of
17   that larger transaction came to an end, those
18   negotiations?
19       A.  Correct.  Sunday around midday.
20       Q.  And around some point, negotiations
21   resumed with respect of the smaller
22   transaction that was ultimately concluded,
23   correct?
24       A.  I don't know if it matters.  But I
25   would use the word "resume."
```

TSG Reporting - Worldwide     877-702-9580

## Page 18

-Lewkow-

1
2     Q.  Okay.
3     A.  As far as I can tell, they stopped
4  on Sunday, people went home and saw their
5  families.  And I got a call Monday morning,
6  "Well, can you come up to Lehman Brothers?
7  We're going to see if we can do a deal.  If
8  they did file as they said they would" -- we
9  thought they would -- "they filed in
10  Chapter 11 and now want to see whether or not
11  there's something we can do to purchase" --
12  you know, I don't remember how it was
13  described to me in that initial call.
14        But, "Can you come up to Lehman
15  Brothers?"
16        MR. MORAG:  Mr. Lewkow, let me
17     caution you on privilege.  I think you
18     just said the gist to the conversation,
19     which is sufficient for these purposes.
20     Q.  You came back?
21     A.  I went up to Lehman Brothers.
22     Q.  Let's just talk about the period
23  when you came back.  In the negotiations that
24  began then, what steps, if any, were taken to
25  accommodate Barclays' view that the Lehman

TSG Reporting - Worldwide    877-702-9580

## Page 19

-Lewkow-

1
2  marks were substantially overstated, to use
3  your term?
4        MR. MORAG:  Objection.  Vague.
5     A.  Yeah.  I guess -- I don't know what
6  you mean by "accommodate."  And the word --
7  you also used the word "the view."  I think
8  that view -- I did mention the newspaper.
9        MR. MORAG:  I think we need a
10     break.
11        (Whereupon, a recess was taken
12     from 10:22 a.m. to 10:25 a.m.)
13  BY MR. GAFFEY:
14     Q.  In the negotiations that took place
15  in connection with the transaction that's
16  brought us here today, Mr. Lewkow, were there
17  discussions, to your knowledge, between the
18  folks at Barclays and the folks at Lehman
19  about Barclays' view that the assets of Lehman
20  were overstated on its books?
21        MR. MORAG:  Object to the form.
22     A.  Yes.  As to certain assets.
23     Q.  Can you tell me what you know with
24  regard to those discussions?
25     A.  As I stated in my declaration,

TSG Reporting - Worldwide    877-702-9580

## Page 20

-Lewkow-

1
2  Barclays, was my understanding, that Barclays'
3  trading and/or financial folks had been
4  provided certain information about the trading
5  positions; that it was contemplated that
6  Barclays would assume as part of an
7  acquisition of the business of substantially
8  all of the business.
9        And in the course of that, Barclays
10  had -- Barclays people had reached the view
11  that there were very significant -- that the
12  aggregate carrying value that they had been
13  furnished by Lehman was substantially higher
14  than Barclays believed was appropriate that
15  Monday or Tuesday.
16     Q.  And by "aggregate carrying value",
17  do you mean Lehman's book value?
18     A.  It's my -- I'm not an accountant,
19  as you know.  I'm a lawyer.  It is my
20  understanding that for an entity such as
21  Lehman, they are supposed to -- under
22  regulatory accounting principles, maybe
23  generally accepted accounting principles, I
24  don't know.  But as a general matter,
25  broker-dealers mark their portfolio to market

TSG Reporting - Worldwide    877-702-9580

## Page 21

-Lewkow-

1
2  on a daily basis.  And I believe that means
3  their book value is effectively adjusted each
4  day.  To the extent that a balance sheet is
5  prepared, the balance sheet is prepared based
6  on those marks.
7     Q.  So when you use the phrase
8  "aggregate carrying value," were you referring
9  to Lehman's books marked to market in that
10  manner?
11        MR. MORAG:  Object to the form.
12        MR. HUME:  Objection, asked and
13     answered.
14     A.  I think I've got nothing more to
15  say on that.
16     Q.  What did you mean to say when you
17  said "aggregate carrying value"?
18     A.  The value -- what I hear people
19  refer to as "the marks."  What they were being
20  marked at on the books of Lehman by Lehman.
21     Q.  And in the negotiations of the
22  transaction, were any steps taken to address
23  Barclays' concern that the aggregate carrying
24  value was substantially higher than it should
25  have been?

TSG Reporting - Worldwide    877-702-9580

Page 22

1              -Lewkow-
2              MR. HUME:  Objection.  Vague.
3              MR. MORAG:  Objection.  Asked and
4       answered.
5       A.  I have -- I've told you -- I have
6       nothing to add to my answer.
7       **Q.  Well, I'm afraid that's not going**
8       **to work, so I do need an answer to the**
9       **question.**
10      A.  Your question asked in the
11      negotiations.  I don't -- I don't -- if you
12      mean in the negotiations of the transaction, I
13      think my answer would be no, as I have said in
14      my declaration and in my statement.
15      Barclays was furnished information
16      which led it to believe that Lehman's marks
17      were not correct and overstated the value of
18      assets, and was -- Barclays was not prepared
19      to do a deal with -- where they were
20      overstated marks on the Lehman books of large
21      amounts.
22      **Q.  So if Barclays was not prepared to**
23      **do a deal where there were overstatements on**
24      **Lehman's books of large amounts, what did**
25      **Barclays do to address that concern in order**

TSG Reporting - Worldwide    877-702-9580

Page 23

1              -Lewkow-
2       **to conclude a transaction?**
3       A.  Barclays made -- made its
4       position -- made its view of the marks, that
5       they were overstated substantially, clear to
6       Lehman people and urged -- my understanding,
7       they urged Lehman to take a fresh look at the
8       values that they were carrying them on on
9       their books because it was at a crazy world,
10      and it was something that Lehman should take a
11      fresh look at to -- to both deal with the
12      passage of time and information.
13      I don't know what -- you know, in
14      my declaration, I mention an example that was
15      mentioned in a broad public -- "public" is the
16      wrong statement.  With both sides present,
17      including lawyers, including me -- of the
18      example of a particular position where
19      Barclays had a junior position of -- junior
20      tranche position from the same issuer, same
21      type of security, and was carrying it --
22      I'm sorry.  Barclays had a senior
23      position and was carrying it at a bigger
24      discount to par than Lehman was carrying the
25      junior position.  And those are -- you know,

TSG Reporting - Worldwide    877-702-9580

Page 24

1              -Lewkow-
2       I'm sure there were other examples.  That was
3       the one that was easy to explain to us lawyers
4       as evidencing why Barclays believed Lehman
5       needed to take a fresh look at what it -- how
6       it was carrying certain portions of the
7       portfolio on its books and whether or not they
8       needed to revise their marks.
9       **Q.  Did the level at which Lehman was**
10      **carrying its assets on the books affect the**
11      **price which Barclays was willing to pay on the**
12      **transaction?**
13      MR. MORAG:  Object to form.
14      A.  I think it affected their
15      willingness to do the deal.  The price was
16      what was in the Agreement where we acquired
17      certain assets, acquired certain liabilities,
18      agreed to make certain payments, assumed a
19      certain level of obligations.
20      We were buying a business as a
21      whole; the purchase price was the whole
22      transaction.  We were not -- no one from
23      Barclays went into this to buy a portfolio; it
24      was to buy substantially all the assets of a
25      business.

TSG Reporting - Worldwide    877-702-9580

Page 25

1              -Lewkow-
2       **Q.  Describe for me, if you would, the**
3       **price that Barclays paid in that purchase.**
4       A.  At what time, sir?
5       **Q.  Good point.  Describe for me the**
6       **price that Barclays agreed to pay for that**
7       **business on September 16, 2008?**
8              MR. HUME:  I'm going to just object
9       to the extent that it calls for
10      interpretation of the contract which he
11      hasn't been shown.
12      (Discussion off the record.)
13      **Q.  I think the question on the table,**
14      **Mr. Lewkow, is:  Will you describe for me the**
15      **price that Barclays agreed to pay for that**
16      **business on September 16, 2008?**
17             MR. MORAG:  Objection.  To the
18      extent it calls for a legal
19      interpretation of the contract.  If you
20      recall generally the terms.
21      A.  Look, I think the contract is the
22      contract.  Without having it in front of me, I
23      may omit certain things.  But in general
24      terms, my recollection is that under the Asset
25      Purchase Agreement as signed late on the 16th

TSG Reporting - Worldwide    877-702-9580

Page 34

-Lewkow-

1 **-Lewkow-**
2 MR. MORAG: Objection to form.
3 MR. HUME: Objection. Vague.
4 A. As I mentioned, there is a
5 provision in the compensation section that
6 refers to this piece of paper or some version
7 of it, yes.
8 **Q. Was it your understanding that the**
9 **one-page piece of paper Mr. Berkenfeld signed**
10 **also guided the transaction to the extent the**
11 **value of portfolio of assets was concerned?**
12 MR. MORAG: Mr. Gaffey, I'm going
13 to object. You keep using the word
14 "signed," he keeps using the word
15 "initialled."
16 MR. GAFFEY: We are big boys. We
17 both know it means he wrote on the
18 document. Do you want me to say
19 "initialled"?
20 MR. MORAG: If you could.
21 MR. GAFFEY: Sure. Can you read
22 the question back?
23 (Record read as follows:
24 "Question: Was it your understanding
25 that the one-page piece of paper

TSG Reporting - Worldwide    877-702-9580

Page 35

1 -Lewkow-
2 Mr. Berkenfeld signed also guided the
3 transaction to the extent the value of
4 portfolio of assets was concerned?"
5 **Q. Can you answer that question as if**
6 **I said "initialled"?**
7 A. I need to hear it again. I'm
8 sorry.
9 **Q. Let me rephrase it.**
10 **The one-page piece of paper that**
11 **Mr. Berkenfeld initialled, what role, if any,**
12 **did that play in the transaction?** Withdrawn.
13 **Did the one-page piece of paper**
14 **that Mr. Berkenfeld initialled guide the**
15 **transaction with regard to the value of the**
16 **portfolio of assets transferred?**
17 MR. MORAG: Object to the form.
18 A. I would not -- I don't know what
19 you mean by "guide."
20 **Q. Was it meant to instruct the drafts**
21 **people of the Asset Purchase Agreement as to**
22 **the value of the long position that was**
23 **transferred?**
24 A. The drafts people had already
25 drafted the Agreement. I don't remember

TSG Reporting - Worldwide    877-702-9580

Page 36

1 -Lewkow-
2 exactly what the status was at the precise
3 time. This was brought in. I don't think it
4 influenced the drafting. If by the draftsmen
5 you mean the lawyers from both sides who were
6 involved in preparation of the document, the
7 Asset Purchase Agreement, I don't believe this
8 guided the drafting of the Agreement, no.
9 **Q. Did anyone from Cleary Gottlieb**
10 **play any role in the preparation of this**
11 **document?**
12 A. No. To the best of my knowledge,
13 no.
14 **Q. Did anyone from Cleary Gottlieb**
15 **play any role in determining the values that**
16 **are shown on this document?**
17 A. No.
18 **Q. Did anyone from Barclays**
19 **participate in the preparation of this**
20 **document?**
21 A. I don't believe, not to my
22 knowledge.
23 **Q. Did anyone from Barclays play any**
24 **role in determining the values shown on this**
25 **document?**

TSG Reporting - Worldwide    877-702-9580

Page 37

1 -Lewkow-
2 A. I don't -- I don't know what that
3 means. Other than as I testified previously
4 and is set forth in my declaration, you can
5 characterize that in any way you want. But
6 other than that, I don't know of anything
7 relative to the question.
8 **Q. Would you take a look at**
9 **Paragraph 9 of your Declaration?**
10 A. Sure.
11 **Q. Take the time you need to review**
12 **the paragraph to refresh yourself of its**
13 **contents.**
14 **But my question is going to go to**
15 **the portion that begins -- seven lines down --**
16 **"While I was not present for the actual**
17 **discussions between Barclays and Lehman**
18 **Brothers traders..."**
19 A. Let me just reread it.
20 **Q. Sure.**
21 (Witness reviewing document.)
22 A. Yes?
23 **Q. Now, to your knowledge, was the**
24 **document I have before you marked as**
25 **Exhibit 19, a product of the discussions**

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1
2  between Barclays and Lehman traders that
3  you're referring to in Paragraph 9 of your
4  Declaration?
5      MR. MORAG:  Object to the form.
6      A.  No.  I -- I wouldn't -- I mean,
7  I -- this was a Lehman Brothers document.  I
8  assume that as --
9      To the extent that Lehman Brothers,
10  having listened to Barclays' views as to
11  valuation may have changed their marks, as I
12  believe they did, it may have reflected those
13  judgments by Lehman as to the proper marking
14  of assets or liabilities.  But that's all.
15      Q.  Did you come to an understanding
16  that Lehman changed its marks in response to
17  Barclays' expression of concern that they were
18  too high?
19      A.  It was my understanding that they
20  had determined that they would change their
21  marks.
22      MR. MORAG:  By that, who are you
23  referring to?
24      THE WITNESS:  Lehman.  The only one
25  that was making marks was Lehman.  It

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1
2  was their balance sheet.
3      Q.  From whom did you obtain that
4  understanding?  Can I just caution you, if it
5  is a Barclays person, just tell me their name?
6  I don't want to know the substance of the
7  conversation.
8      A.  No, I understand that.
9      Q.  Yes.
10      A.  I don't remember the name.  I have
11  a recollection of someone being involved in
12  those discussions coming into the room.  I
13  believe it was -- where lawyers and other
14  folks from the other side were in the room and
15  reported what I had characterized in my
16  testimony a minute or two ago.  But I don't
17  remember the name of the individual from
18  Barclays.
19      Q.  Do you know if Lehman did, in fact,
20  change its marks?
21      A.  I have no way of knowing that.
22      Q.  Did you or anyone else from Cleary
23  ever ask that question in the week
24  beginning -- well, from Tuesday, September
25  16th through the closing of the transaction on

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1
2  the 22nd?
3      A.  No.
4      Q.  Actually, will you turn to, in the
5  Asset Purchase Agreement, which is Exhibit 1.
6  If I can ask you, please, Mr. Lewkow, to turn
7  to page 6, which contains the definition of
8  "Purchased Assets."
9      And in particular, if you would
10  take a look at subsection (d) of that
11  definition.
12      A.  Yup.
13      Q.  Do you see there's a reference
14  there to various categories of securities.
15  Let met read it.  "Government securities,
16  commercial paper, corporate debt, corporate
17  equity, exchange-traded derivatives and
18  collateralized short-term agreements with a
19  book value as of the date hereof of
20  approximately $70 billion (collectively 'long
21  positions')."  Do you see that?
22      A.  I do.
23      Q.  Where did the $70 billion come from
24  that was put into subsection (d) of the
25  definition of "Purchased Assets"?

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1
2      A.  From Lehman.
3      Q.  Was it Barclays' understanding at
4  the time that that was an accurate estimation
5  of the book value of the described assets?
6      MR. MORAG:  Objection to form.
7      A.  To my knowledge, it was Barclays'
8  understanding that it represented what Lehman
9  Brothers -- having considered the discussions
10  I described earlier in terms of what they
11  concluded, after hearing Barclays, was the
12  proper mark to take on its balance sheet.
13  That it reflected Lehman's conclusions.
14      Q.  Was the term "book value" used for
15  a reason in subsection (d) in the definition
16  of "Purchased Assets"?
17      MR. HUME:  Objection.  Vague.
18      A.  Who's -- yeah, whose reason?
19      Q.  Well, was it supposed to say
20  "market value"?
21      A.  Not all assets on the balance sheet
22  have a market value.  There are -- it is my
23  understanding.  Again, I'm not an expert, a
24  broker-dealer expert or a market expert or a
25  valuation expert, but it is my understanding

TSG Reporting - Worldwide    877-702-9580

Page 42

-Lewkow-

1
2  that for some positions where there is no
3  active market, that other -- other things go
4  into how a broker-dealer is supposed to mark
5  their -- their valuation from an accounting
6  standpoint.
7       Q.  Was it a considered choice of the
8  people who drafted the Asset Purchase
9  Agreement to use the phrase "book value"
10 instead of some other phrase such as "market
11 value"?
12      MR. HUME:  Objection.  Vague and
13 lacks foundation.
14      A.  Can I have the question read back,
15 please?
16      (Record read.)
17      A.  I don't know how to answer that
18 question, final question.
19      Every -- we tried as a group, Weil
20 Gotshal, Simpson Thacher, Sullivan & Cromwell,
21 Cleary Gottlieb, tried to do the best we could
22 in drafting this Agreement under
23 extraordinarily unusual, difficult
24 circumstances.
25      I do recall that, that this was one

Page 43

-Lewkow-

1
2  of those final changes that was added in
3  handwriting, if I had the other version of the
4  Agreement.  And somebody, I believe on
5  Lehman's side of the table said, suggested we
6  add in words such as -- to categorize that
7  what we were talking about were, you know, a
8  disfunction of assets.  And it was for that
9  purpose that it was referenced.
10      And I believe that it was first
11 suggested -- and again, I don't know from
12 whom, it might have been a Lehman person.  It
13 might have been one of their lawyers.  Said,
14 let's say, with a -- you know, with a
15 marking -- with marks of 70 billion, or some
16 words of that sort.
17      And some lawyer -- again, I don't
18 know on which side.  Because this was all
19 being done in group session issue -- said,
20 "Well, should we use the word" -- "from a
21 legal, instead of saying 'marks', should we
22 use the word 'book value'?"
23      And that's the word that went in.
24 But I don't think people were trying to draw a
25 distinction between book value and marks, at

Page 44

-Lewkow-

1
2  least from what this lawyer believed, the
3  lawyer from Weil, understood "book value" to
4  mean in the context of financial assets held
5  by a broker-dealer.
6       Q.  Did anyone from the Barclays side
7  of the table -- by that I'm including Barclays
8  personnel or Cleary, ask for or get any
9  information to indicate whether the value of
10 $70 billion described in subsection (d) was an
11 accurate description of Lehman's book value
12 for those classes of securities?
13      MR. MORAG:  Object to the form.
14      A.  As I told you, as I believe I
15 testified, I believe we were in a group told
16 that Lehman was going to remark certain
17 portfolio assets to reduce them.  I assumed
18 that Lehman had done -- it never occurred to
19 me, when they talked about "marks", I assumed
20 that it reflected whatever Lehman had,
21 therefore, done.  And therefore, book value
22 likewise.
23      Q.  So from what we talked about so
24 far, would it be fair to say that the
25 understanding was that Lehman negotiated to

Page 45

-Lewkow-

1
2  reduce its marks?
3       MR. MORAG:  Object to the form.
4       A.  I'm not going to characterize.  I
5  have -- you're trying to characterize what I
6  testified to.  I stand by the accuracy of my
7  testimony.  But I would not -- I would not --
8  I would not call that "negotiated."  It is
9  what it is.
10      Q.  Mr. Lewkow, don't get me wrong.
11 I'm not suggesting any lack of credibility of
12 your testimony.  What I'm looking for is your
13 best memory of what people talked about at the
14 time?
15      A.  I've given you my best.
16      Q.  Do you remember anything else in
17 terms of discussions concerning the use of the
18 phrase "book value" in subsection (d)?
19      A.  No.
20      Q.  Let me show you what's previously
21 been marked as Exhibit 518.  Take a look at
22 the document.  My questions will go to the
23 notations on page 7.
24      MR. HUME:  Page which?
25      MR. MORAG:  7.  Of the document

Page 46

```
1            -Lewkow-
2       itself, not the Bates number.
3       A.  Yup?
4       Q.  And you referred a few moments ago,
5   Mr. Lewkow, to the addition of the phrase
6   "book value" in a handwritten note, in a
7   handwritten annotation.  Is this the document
8   that you were remembering?
9       A.  It appears to be, yes.
10      Q.  At least I wasn't clear as to
11  whether you have a memory as to which side of
12  the negotiations added that phrase.  Do you
13  recall whether it was Lehman or Barclays, or
14  do you not recall either side?
15      A.  As I testified, it was a suggestion
16  of someone on the Lehman side that words of
17  that nature be added, yes.
18      Q.  Do you recall who on the Lehman
19  side?
20      A.  No.  I believe it was not one of
21  their outside lawyers.  I believe it was
22  somebody from Lehman itself, but I have no
23  recollection who.
24      Q.  If you can turn back.  Actually, I
25  created kind of a document mess in front of
```

TSG Reporting - Worldwide    877-702-9580

Page 47

```
1            -Lewkow-
2   you.
3       A.  It is all right.
4       Q.  Why don't you fold those up?  And
5   let go back to your Declaration for a minute.
6       A.  Sure.
7          (Witness complying.)
8       Q.  Actually, just before we go back to
9   your Declaration?
10      MR. GAFFEY:  Bridgett, can I have
11  25, please?
12      Q.  Mr. Lewkow, I put before you a copy
13  of what previously has been marked as
14  Exhibit 25.
15          You referred a few moments ago to a
16  Clarification Letter.  Is that the
17  Clarification Letter to which you were
18  referring?
19      A.  Yes.  It appears to be.
20      Q.  What was the purpose of the
21  Clarification Letter?
22      A.  The Clarification Letter was, as
23  set forth in the opening paragraph, "To
24  clarify the intent of the parties with respect
25  to certain provisions of the Asset Purchase
```

TSG Reporting - Worldwide    877-702-9580

Page 48

```
1            -Lewkow-
2   Agreement, supplement in certain respects the
3   agreements of the parties stated therein, and
4   amend the Asset Purchase Agreement in certain
5   respects."
6       Q.  Now, are there particular portions
7   of the Agreement that were amended or are
8   there particular portions that were
9   supplemented or are there particular portions
10  that were clarified?
11      MR. MORAG:  Objection to the form.
12      MR. HUME:  Objection to the form
13  and that it calls for an intersection
14  of the agreement.  And generally
15  Barclays will object to the extent you
16  ask the witness to give legal
17  interpretations of the contract as
18  revealing privilege.
19      A.  The answer is -- the document is
20  the document.  No one ever tried to say, all
21  right, this clause is a supplement; this
22  clause is an amendment; this clause is -- they
23  are what they are.  Certain -- certain things
24  did clarify; certain things amended.  No
25  one -- there was no reason -- there was no
```

TSG Reporting - Worldwide    877-702-9580

Page 49

```
1            -Lewkow-
2   effort to allocate into buckets in this
3   document.
4       Q.  Do you recall if the use of the
5   word "amend" was a deliberate drafting choice?
6       MR. MORAG:  Objection.
7       MR. GAFFEY:  That's a bad question.
8   Let me withdraw that question.
9       Q.  Do you recall if the word "amend"
10  was added at some point during exchanging
11  drafts of the Clarification Letter?
12      A.  I would need to see all the drafts
13  to be sure.  But my recollection is yes.
14      Q.  Okay.  I'm going to show you the
15  draft, so I'm not going to ask you to
16  speculate and pinpoint.
17          Do you recall any discussions
18  between the party, that is between Lehman and
19  Barclays or their representatives, about
20  adding the word "amend" to the Clarification
21  Letter?
22      A.  I have a vague recollection that
23  with the very first draft of the Clarification
24  Letter, which was prepared very quickly by
25  someone -- and I don't know which side --
```

TSG Reporting - Worldwide    877-702-9580

Page 50

-Lewkow-

1
2  after the Asset Purchase Agreement had been
3  signed and filed with the Court on Wednesday
4  morning, that the original first draft was a
5  page or two and it clearly was truly nothing
6  other than clarification. And so that the
7  first draft did not use the word "amendment."
8        At some later point, as things got
9  more complicated and things were happening, it
10 became -- there was discussion that we should
11 add the word "amend." That is my
12 recollection.
13     Q.  Do you recall who was involved in
14 those discussions?
15     A.  People from Cleary Gottlieb and
16 people from Weil Gotshal, and probably Simpson
17 Thacher.
18     Q.  Do you have a more specific memory
19 of which people? I know it was a pretty
20 tumultuous week. But do you recall who in
21 particular was involved in those discussions?
22     A.  It was more in the direct
23 conversations between -- I think most of the
24 conversations on the Clarification Letter were
25 on Barclays side between some combination,

TSG Reporting - Worldwide    877-702-9580

Page 51

-Lewkow-

1
2  Duane McLaughlin, David Leinwand; Robert
3  Davis; some cases me, but not primarily me;
4  and various people from Weil Gotshal which I
5  believe included Robert Messineo, I may be
6  mispronouncing his name, David Murgio, maybe
7  Tom Roberts and I'm not sure who else.
8      Q.  Do you know if Harvey Miller was
9  involved in those discussions?
10     A.  Which discussions? You started --
11 I probably went too far in answering your
12 question.
13     Q.  I don't know who led who astray
14 there.
15         The question, the issue is what you
16 talked about a minute ago --
17     A.  The word "amendment"?
18     Q.  Yes. That it became more complex
19 and I decided to add the word "amendment,"
20 whether Mr. Harvey Miller was involved in
21 those discussions.
22     A.  I don't think -- I don't know what
23 Mr. Miller was doing talking internally with
24 his colleagues or with his clients. Did he
25 participate in the exact wording of that? I

TSG Reporting - Worldwide    877-702-9580

Page 52

-Lewkow-

1
2  don't know. I do have a distinct recollection
3  of him describing to the Court at the sale
4  hearing that Friday evening that there were
5  major changes in the deal.
6         So I can't imagine -- I don't want
7  to speculate. I do not recall specifically
8  whether he was involved in adding the word
9  "amend" in that clause.
10     Q.  Was the Clarification Letter meant
11 to memorialize those major changes in the
12 deal?
13         MR. MORAG:  Object to form.
14     A.  I'm picking up the Clarification
15 Letter. It was made to both supplement,
16 clarify and amend the Asset Purchase
17 Agreement. And it was intended to be
18 consistent with what the Court had been told
19 this Friday evening.
20     Q.  Were you yourself present in court
21 on the sale hearing on the 19th?
22     A.  I was.
23         MR. MORAG:  Yes.
24         MR. GAFFEY:  Yes. Okay.
25     Q.  The Clarification Letter,

TSG Reporting - Worldwide    877-702-9580

Page 53

-Lewkow-

1
2  Exhibit 25, sets forth certain changes in the
3  definition of "Purchased Assets" from the
4  original Asset Purchase Agreement; is that
5  correct?
6         MR. HUME:  Object to the form.
7      A.  Can I look at --
8      Q.  Sure.
9      A.  -- both at the Clarification Letter
10 and the Asset Purchase Agreement?
11     Q.  Look at whatever you need to look
12 at.
13     A.  Thank you.
14        (Witness reviewing document.)
15     A.  Yes.
16     Q.  While you were present in court,
17 was Judge Peck told about the changes in the
18 definition of "Purchased Assets"?
19         MR. MORAG:  Object to the form.
20     A.  You can read the transcript as well
21 as I can, and I think it speaks for itself.
22        I think that that the judge was
23 told was about the substantive changes in the
24 deal, major changes in the deal that had been
25 orally agreed to, is my understanding, by

TSG Reporting - Worldwide    877-702-9580

Page 54

1        -Lewkow-
2    representatives of Lehman and Barclays in a
3    couple of hours preceding the beginning of the
4    court hearing.
5        So it does not mean that -- as the
6    Court was well aware and as the Court noted,
7    that he did not have the document.  The
8    document did not yet exist but, you know,
9    major changes were described by Mr. Miller and
10   Ms. Fife to the Court.
11       Q.  And in Cleary Gottlieb's view at
12   the time, were the changes as described by
13   Mr. Miller and Ms. Fife to the Court at the
14   hearing, accurate and complete?
15       MR. MORAG:  Object to the form.
16       A.  Yes.
17       Q.  Were any changes to the transaction
18   discussed or agreed upon after the sale had
19   been concluded, that were incorporated in the
20   Clarification Letter?
21       MR. MORAG:  Object to the form.
22       A.  Well, one -- one thing that was
23   changed that I recall related to the
24   residential mortgages, the so-called RESIs.
25       The original Asset Purchase
     TSG Reporting - Worldwide    877-702-9580

Page 55

1        -Lewkow-
2    Agreement had -- contained a provision that
3    treated the residential mortgages differently
4    than any other category of assets and
5    provided -- can I look at the Agreement?
6        Q.  Sure.  I think you might be looking
7    for 1(e) in the definition of "Purchased
8    Assets"?
9        A.  He knows where all the clauses are
10   here.
11       Q.  Page 6.
12       (Witness reviewing document.)
13       A.  Right.  So the original Asset
14   Purchase Agreement provided that the Purchased
15   Assets that Barclays would be acquiring
16   included a 50 percent interest in the
17   positions in the residential mortgage
18   securities.
19       At some point on Thursday, late
20   Thursday or early Friday -- I have no
21   recollection of when it was precisely -- an
22   amendment No. 1 to the Asset Purchase
23   Agreement was executed by the parties that was
24   addressed -- was done to address a problem.
25       There was real uncertainty as to
     TSG Reporting - Worldwide    877-702-9580

Page 56

1        -Lewkow-
2    whether the deal could be completed because of
3    issues that DTC wanted assurances that it was
4    being -- it would be protected in certain
5    respects, the details of which I have -- was
6    not involved in, and that I don't recall great
7    detail.
8        But the amendment instead provided
9    that the 50 percent interest that Lehman was
10   going to keep, as I recall, was instead going
11   to be delivered -- and I don't remember the --
12   I have to look at amendment No. 1, but it was
13   going to be delivered instead to DTC.  And if
14   at the end of some period and the like it
15   turned out that to secure up to, I believe,
16   250 million.  But again, I would need to look
17   at amendment No. 1.
18       But that to the extent that there
19   was some excess available, it would go back to
20   Lehman.  So that Lehman still might end up
21   having some interest in the RESIs to the
22   extent that DTC did not need them to protect
23   it in connection with the Lehman positions.
24       The Court was, as I recall in the
25   court hearing, Mr. Miller and Ms. Fife made
     TSG Reporting - Worldwide    877-702-9580

Page 57

1        -Lewkow-
2    reference to this provision.
3        It turned out that the parties
4    learned at some point, Friday or Saturday, I
5    believe, that, in fact, the so-called
6    residential real estate mortgage securities or
7    RESIs, that Lehman didn't have such positions
8    available to transfer to Barclays in the first
9    place.  So there were no such -- and the
10   reasons were -- and I really don't recall.  I
11   don't know if I ever knew in detail.
12       Some of those positions had already
13   been traded; they no longer owned them; some,
14   they may have been pledged to third parties;
15   some would have involved, to the extent there
16   were separate double counting with other
17   securities that were getting outside this
18   provision.  And accordingly, there were no
19   RESIs of the sort that the Court had been told
20   about by Mr. Miller or Ms. Fife in the sale
21   hearing.  So that provision was eliminated in
22   the Clarification Letter which basically
23   amended the agreement to unwind amendment No.
24   1.
25       Q.  Just so I'm clear we don't have a
     TSG Reporting - Worldwide    877-702-9580

Page 62

```
 1            -Lewkow-
 2  the Wednesday hearing and the Friday hearing,
 3  I don't recall any changes to the deal after
 4  that, you know, at this -- at this -- at this
 5  time.
 6            Q.   Take a look, if you would,
 7  Mr. Lewkow at Paragraph 1, and tell me if
 8  there are changes to the definition of
 9  "Purchased Assets" affected by the
10  Clarification Letter, changes to the
11  definition from the Asset Purchase Agreement?
12            MR. MORAG:  You're asking him --
13       A.   Yes.
14            MR. MORAG:  -- the Clarification
15  Letter?
16       A.   Yes.
17            MR. MORAG:  The last thing --
18       A.   The answer is yes.  There was a
19  change in the definition, that's correct.
20            Q.   Do you know if the change in the
21  definition of "Purchased Assets" was brought
22  to the Court's attention?
23       A.   There was --
24            MR. MORAG:  Object to the form.
25       A.   The Court was told about the
```

TSG Reporting - Worldwide    877-702-9580

Page 63

```
 1            -Lewkow-
 2  substance of the deal.  The Court was not told
 3  about clause, actual clause Y or clause Z and
 4  the like.  So I can't answer that question
 5  other than to say, you know, you can read the
 6  transcript and I do not believe the words
 7  anyone said, and so such and such a clause or
 8  such and such a definition will be
 9  appropriately changed.  That's not the way the
10  hearing went.
11            Q.   So, for example, no one, to your
12  knowledge, told the Court that the definition
13  of "Purchased Assets" would be changed to now
14  include securities owned by LBI and
15  transferred to Purchaser or its affiliates
16  under the Barclays Repurchase Agreement?  I'm
17  referring to Paragraph 1A, subsection (ii).
18            MR. MORAG:  Objection to form.
19       A.   To the extent that -- a couple of
20  things.  First of all, that was not -- I do
21  not believe that was a change in the deal.
22  Barclays had agreed, with certain specified
23  exception, to acquire all of the assets used
24  in the business.  Who financed those assets at
25  a given point in time I don't think is
```

TSG Reporting - Worldwide    877-702-9580

Page 64

```
 1            -Lewkow-
 2  relevant to that question.
 3            At the time the Asset Purchase
 4  Agreement was signed, it's my understanding
 5  that, you know, a lot of the assets were in
 6  the form -- were being financed overnight by
 7  the Federal Reserve pursuant to a repo.
 8            At some point, Thursday or the
 9  like, Barclays had taken the fed out of the
10  repo and provided the financing.  But it was
11  the same -- or it should have been, if the
12  assets had been there as had been thought.
13  But those assets, the fact that we added a
14  reference to "repo" doesn't change whether the
15  substance of the transaction changed.
16       Q.   Was there a reason that that
17  particular phrase was added to the
18  Clarification Letter then?
19            MR. MORAG:  Objection.  What
20  particular phrase?
21       A.   I think you're going to have to be
22  more specific.
23       Q.   Well, was there discussion back and
24  forth between the parties about putting that
25  language in the Clarification Letter,
```

TSG Reporting - Worldwide    877-702-9580

Page 65

```
 1            -Lewkow-
 2  referring to the repo assets?
 3       A.   Can you point me to the exact
 4  language, please?
 5       Q.   Paragraph 1(a)(ii)(A), "The
 6  securities owned by LBI and transferred to
 7  Purchaser or its affiliates under the Barclays
 8  Repurchase Agreement, as defined below, as
 9  specified on Schedule A previously delivered
10  by Seller and accepted by Purchaser."  That
11  language.
12       A.   There were, as you know, a number
13  of drafts that were circulated of the
14  Clarification Letter.  And my recollection is
15  that at some point, as lawyers working on the
16  Clarification Letter first learned and then
17  focused on the fact that a lot, most but not
18  all of the assets had been in the -- referred
19  to in the definition of, I believe, "Long
20  positions" in the Asset Purchase Agreement,
21  were now -- had been financed by Barclays at
22  the Feds' request and were in the repo, some
23  lawyer -- and I don't remember whether it was
24  initially from Weil Gotshal or Cleary
25  Gottlieb, but there was agreement that it made
```

TSG Reporting - Worldwide    877-702-9580

Page 66

-Lewkow-

2  sense to refer to the repo in this context.
3     Q.  Do you recall when it was that the
4  lawyers first learned that assets that had
5  been originally described in the long
6  positions were, in fact, in the repo?  When
7  did that happen?
8        MR. MORAG:  Object to the form.
9     A.  Yeah, I think -- first of all, I
10  can't answer for all lawyers.  That would
11  include the Weil Gotshal lawyers and other
12  lawyers on behalf of...
13        As to Cleary Gottlieb, at some
14  point I believe, at least one of my colleagues
15  that Thursday had heard that there had been --
16  that Barclays had extend -- provided repo
17  financing to Barclays.  I'm not sure.  It is
18  my understanding none of the details, we had
19  not been involved in that at all.  But it was
20  mentioned, and we learned more about it on
21  Friday and over the weekend.
22        But even as -- even as of the Court
23  hearing we knew very little about it.
24     Q.  Did there come a time when you
25  learned that the Repurchase Agreement had been

TSG Reporting - Worldwide    877-702-9580

Page 67

-Lewkow-

2  terminated by Barclays?
3        MR. MORAG:  Object to the form.
4     A.  There came a time when I learned --
5  when I -- when I learned that -- I'm not sure
6  how I can answer, whether I can answer this
7  without talking about a privileged
8  conversation.  Can I have...
9     Q.  Absolutely.  Just before you talk
10  to your lawyers, I'm focusing on the timing
11  here.  When did you learn it?  We will tread
12  carefully so that --
13     A.  When did I learn it requires -- I
14  have to deal with your characterization.  Can
15  I hear the question again?
16     Q.  Let me put a question, and then if
17  you need to consult, you can do that.
18     A.  Sure.
19     Q.  The question is:  Did there come a
20  time when you learned that the Repurchase
21  Agreement had been terminated by Barclays?
22     A.  There came --
23        MR. MORAG:  Objection to form.
24        MR. HUME:  I will object and
25  instruct you not to answer to the

TSG Reporting - Worldwide    877-702-9580

Page 68

-Lewkow-

2  extent it would reveal a privilege from
3  Barclays.
4        MR. GAFFEY:  As to when?
5        MR. HUME:  Well, you assumed
6  when --
7        MR. GAFFEY:  It is attorney --
8        MR. HUME:  It was terminated.  What
9  does terminated mean?
10        MR. GAFFEY:  It means ended.
11     A.  It's a legal... If you want to ask
12  the question -- can I talk to counsel for
13  Barclays and my counsel?
14     Q.  Sure.  Absolutely.
15        (Whereupon, a recess was taken
16  from 11:49 a.m. to 11:52 a.m.)
17     A.  Before the break you asked me a
18  question about did there come a time of
19  learning about the termination of the repo.
20        Of course, the repo did terminate,
21  as I understand it, when we closed on Monday,
22  but I assume that's not what you're asking.
23     Q.  It is not.
24     A.  There did come a time over the
25  weekend, I don't recall whether it was

TSG Reporting - Worldwide    877-702-9580

Page 69

-Lewkow-

2  Saturday or Sunday, where we did learn -- I
3  think I was reminded in preparing for the
4  deposition, that it was -- we initially
5  learned it when we were copied, or not copied
6  and then forwarded on an e-mail from Sullivan
7  & Cromwell who was co-counsel with us for
8  Barclays, and/or to -- to Weil, that there had
9  been an inadvertent notice given to Barclays
10  by folks in the -- I don't know who, but
11  someone at Barclays had sent a notice of
12  termination of the repo at some point, I
13  believe late Friday, and that that was done in
14  error and should be undone.
15        So if that's what you're asking
16  about, you've heard what my recollection is.
17     Q.  It is.  Let me show you what's
18  previously been marked as Exhibit 27.
19        Have you seen that document before,
20  sir?
21        (Witness reviewing document.)
22     A.  No, I don't believe I have.
23     Q.  You learned about the inadvertent
24  termination of the repo over the weekend; is
25  that right?

TSG Reporting - Worldwide    877-702-9580

Page 70

-Lewkow-

1
2      A.  Yes.
3      Q.  Was it the Saturday or the Sunday?
4      A.  I don't know.
5      Q.  Were you involved in any
6   discussion, you or anyone else from Cleary or
7   Barclays, involved in any discussions from the
8   Lehman folks or Weil Gotshal about the
9   inadvertent termination of the repo?
10     A.  It is my -- I don't think I
11  personally was, but here as a
12  30(b)(6) witness --
13     Q.  You are Cleary Gottlieb, sir.
14     A.  -- internally.  I was perfectly
15  happy not knowing in my life.
16        It is my understanding that
17  following up on the e-mail from Sullivan &
18  Cromwell and the like, that the -- that there
19  may have been some discussions about, you
20  know, implementing this and getting it right
21  to -- to -- because it was, as I -- as I was
22  told at the time and we were told at the time,
23  and as I testified to, it was sent in error.
24  But I don't recall any other discussion.
25        I'm not aware of any other

TSG Reporting - Worldwide    877-702-9580

Page 71

-Lewkow-

1
2   discussion that Cleary Gottlieb was aware of
3   with the other side on, on this subject.
4      Q.  That's sort of where I'm leading.
5   Let me rephrase the question so you'll know
6   what it is I'm looking for here.
7        What knowledge does Cleary Gottlieb
8   have that Weil Gotshal or Lehman knew about
9   the termination of the repo, that it had been
10  terminated?
11     A.  I believe, as I testified a minute
12  ago, that there was an e-mail that Sullivan &
13  Cromwell on behalf of Barclays sent to Weil
14  Gotshal.  And I believe there were some
15  follow-up conversations referencing the fact
16  that there had been an inadvertent notice that
17  had been sent on this subject.  Can I look at
18  the Clarification Letter?
19     Q.  Sure.  Paragraph 13 is probably
20  where you want to go.
21     A.  Fine.
22     Q.  The language in Paragraph 13 was
23  supplied by Sullivan & Cromwell, correct?
24     A.  I would have to look at this and
25  compare it to the words in the e-mail.  I

TSG Reporting - Worldwide    877-702-9580

Page 72

-Lewkow-

1
2   don't know the answer to that.
3      Q.  There is a reference in Paragraph
4   13 to the Notice of Termination, do you see
5   that?
6      A.  Yes.
7      Q.  Is the notice of termination that
8   is referred to in Paragraph 13 of the
9   Clarification Letter, the notice that we've
10  marked as Exhibit 27?
11     A.  Well, it says it is a notice of
12  termination in Paragraph 13 dated
13  September 19.  Exhibit 27 that you've shown
14  me, that as I testified I do not believe I've
15  ever seen, it is dated September 19th.  It is
16  from Barclays, it is to Lehman, and it says it
17  is a notice of termination.  So it appears to
18  be it is, but that's all I can tell you.
19     Q.  Was there any discussion between
20  the folks on the Barclays side of the table,
21  including Cleary, and the folks on the Lehman
22  side of the table including Weil Gotshal,
23  about whether there were implications under
24  the Bankruptcy Code to the fact that the repo
25  had been terminated?

TSG Reporting - Worldwide    877-702-9580

Page 73

-Lewkow-

1
2      A.  It is my understanding that to the
3   best of Cleary Gottlieb's knowledge, no.
4      Q.  Did Cleary Gottlieb have
5   communications with any other person or entity
6   outside of your client, outside of Barclays
7   and Cleary, about Section 559 of the
8   Bankruptcy Code in connection with the
9   termination of the repo?
10        MR. HUME:  Outside of any
11  privilege.
12        MR. GAFFEY:  Outside of any
13  privilege, yes.
14     A.  To the best of my knowledge, no,
15  subject to this caveat.  You will be taking my
16  partner's Ed Rosen's deposition.  He was
17  involved in the discussions with DTC and other
18  clearance -- clearing entities.  And since he
19  was going to be the 30(b)(6) witness on those
20  discussions, I have not consulted him.  So as
21  to whether or not there was anything on that
22  point, I do not know the answer on behalf of
23  Cleary Gottlieb.  Subject to that, the answer
24  is no.
25     Q.  Were there discussions about 559

TSG Reporting - Worldwide    877-702-9580

19 (Pages 70 to 73)

```
 1          -Lewkow-
 2  with any other self-regulating organizations
 3  or governmental agency concerning Section 559
 4  of the Bankruptcy Code.
 5       A.  Not to my knowledge.
 6       Q.  Mr. Lewkow, I'm going to show
 7  you --
 8       A.  This is starting to look like my
 9  desk at the office.
10       Q.  I'm trying to make you feel at
11  home.  Let me add this to the pile there and
12  show you what previously was marked as Exhibit
13  579B, a Declaration of Alan Kaplan, deputy
14  general counsel of Barclays, that's been
15  submitted in Barclays's opposition papers on
16  Rule 60.  Have you seen this before?
17       A.  I can't remember if someone showed
18  me this in the last few days or not.
19       Q.  Take a minute if you would --
20       A.  I wouldn't swear that I haven't.
21  But if so, I didn't read it very careful.
22       Q.  There's a statement that Mr. Kaplan
23  makes that I want to see if you had any
24  knowledge about.  And it's in Paragraph 4 of
25  his declaration.  He is referring to the
```

```
 1          -Lewkow-
 2  notice going out erroneously, I'm
 3  paraphrasing.  Then he says, "The parties
 4  corrected that error in Paragraph 13 of the
 5  Clarification Letter."  Do you see that?
 6       A.  Yes, let me read all of
 7  Paragraph 4, if I may?
 8       Q.  Sure.
 9          (Witness reviewing document.)
10       A.  Remind me of the question?
11       Q.  I think the question was:  Do you
12  see that?  But --
13       A.  I do.
14       Q.  Okay.  When Mr. Kaplan says "the
15  parties", plural, "The parties corrected the
16  problem with Paragraph 13", I show you that to
17  see if it refreshes your recollection in any
18  way whether there were any discussions between
19  the parties, that is between Barclays and its
20  representatives and Lehman and its
21  representative, about the problem created by
22  the termination of the repo?
23          MR. MORAG:  Objection to the form.
24       A.  I don't know what you mean by the
25  "problem created."  But I believe it was
```

```
 1          -Lewkow-
 2  discussed between the fact that this change
 3  needed to be made, that it was sent in error.
 4  It was discussed at least briefly between the
 5  Barclays side, including Cleary and Sullivan &
 6  Cromwell, and the Lehman side including Weil,
 7  yes.
 8       Q.  Again, does it refresh your
 9  recollection, where you read Mr. Kaplan
10  talking about "correcting an error," does it
11  refresh your recollection about whether there
12  were any discussions between the Barclays side
13  of the table including Cleary, and the Lehman
14  side of the table including Weil, about
15  implications into the Bankruptcy Code from the
16  termination?
17       A.  I answered that question.  To the
18  best of my knowledge, there were no such
19  discussions.
20       Q.  If I could ask you to restrict your
21  answer, sir, to yes or no to the question I'm
22  about to ask you.
23          Were there any discussions between
24  Barclays and Cleary concerning implications
25  under the Bankruptcy Code of the termination
```

```
 1          -Lewkow-
 2  of the repo?  Yes or no?
 3          MR. HUME:  Objection to the extent
 4  it calls for privileged communications.
 5          MR. GAFFEY:  I'm not sure yes or no
 6  does.  And I think I'm entitled to that
 7  information under local Rule 26.
 8          MR. HUME:  Well, what's your basis
 9  for saying --
10          MR. GAFFEY:  Local Rule 26 provides
11  that if privilege is asserted at a
12  deposition, I'm entitled to the same
13  information that would be included on a
14  privilege log, which would be the
15  author, recipient, subject matter of
16  the communication, of the otherwise
17  privileged communication.
18          That's why I'm restricting it to a
19  yes or no.
20          MR. MORAG:  The issue here though
21  is you did not just ask about the
22  subject matter of the termination
23  notice being the subject of the
24  conversation, you asked for yes or no
25  as to the specific advice, whether it
```

## Page 78

```
 1            -Lewkow-
 2    was discussed.
 3            MR. GAFFEY:  Actually, no.  I --
 4            MR. MORAG:  You asked for the
 5    specific advice.
 6            MR. GAFFEY:  It is phrased quite
 7    carefully not to.  That's the point.
 8    That's the topic that would be on the
 9    privilege log.
10            MR. MORAG:  No, I believe it would
11    be the Notice of Termination.
12            MR. GAFFEY:  Let me get a yes or no
13    to that.  Because I want to see where
14    the instruction not to answer is
15    framed.
16    BY MR. GAFFEY:
17        Q.  Were there discussions between
18    Cleary and Barclays concerning the termination
19    of the repo?  Yes or no.
20        A.  Yes.
21        Q.  When did those discussions take
22    place?
23        A.  Some point over Saturday or Sunday.
24        Q.  Were there discussions between
25    Barclays and Cleary Gottlieb about
```

TSG Reporting - Worldwide    877-702-9580

## Page 79

```
 1            -Lewkow-
 2    implications under the Bankruptcy Code in
 3    connection with the termination of the repo?
 4    Again, yes or no, please.
 5            MR. HUME:  Again, objection.  I
 6    instruct the witness not to answer.
 7            I don't believe the privilege log
 8    subject matter would have to reveal the
 9    specific nature of the communication,
10    request for advice under Section Y, Y,
11    Z.  I mean --
12            MR. GAFFEY:  I understand you are
13    going to assert it.  I don't want to
14    take time with the colloquy.
15            MR. MORAG:  Hold on one second.
16            THE WITNESS:  Can we talk outside?
17    Is that all right?
18            (Whereupon, a recess was taken
19    from 12:07 p.m. to 12:09 p.m.)
20            MR. MORAG:  Subject to your
21    agreement that whatever Mr. Lewkow
22    responds will not constitute any waiver
23    of the attorney/client privilege, which
24    you said it wouldn't, but if you
25    confirm that, Mr. Lewkow is prepared to
```

TSG Reporting - Worldwide    877-702-9580

## Page 80

```
 1            -Lewkow-
 2    answer the question.
 3            MR. GAFFEY:  Okay.
 4            THE WITNESS:  Can I hear the
 5    question?
 6            MR. MORAG:  The one that you were
 7    prepared to answer.
 8            MR. GAFFEY:  I rephrased it.  But
 9    let's read it back.
10            THE WITNESS:  Let's hear the last
11    question.
12            (Record read as follows:
13    "Question: Were there discussions
14    between Barclays and Cleary Gottlieb
15    about implications under the Bankruptcy
16    Code in connection with the termination
17    of the repo?  Again, yes or no,
18    please.")
19        A.  To the best of my knowledge, no.
20        Q.  What needed to be corrected, then,
21    in connection with the termination of the
22    repo?  Do you know?
23        A.  That it was in error.  It wasn't
24    supposed to be terminated.  I think I was told
25    that it would create a monstrous obligation to
```

TSG Reporting - Worldwide    877-702-9580

## Page 81

```
 1            -Lewkow-
 2    give notices and so forth and so forth to
 3    everyone who was on -- to various party,
 4    etcetera.  That's all I remember.
 5        Q.  Did you or anyone else at Cleary
 6    Gottlieb have an understanding that upon
 7    termination of the repo in financing haircut
 8    over and above the amount advanced would need
 9    to be repaid into the estate of LBI?
10            MR. MORAG:  Objection.  I think you
11    are asking for a legal opinion from
12    this witness.
13            MR. GAFFEY:  You are right.  Let me
14    withdraw that.
15        Q.  Was there any discussion with
16    anyone outside of the circle of Cleary and
17    Barclays to the effect that the Bankruptcy
18    Code would require the financing haircut in
19    the repo to be paid back into the estate over
20    and above the amount that Barclays had
21    advanced in the Repurchase Agreement?
22        A.  Not to my knowledge.
23            MR. MORAG:  Objection to
24    characterization.
25        Q.  Do you know if anyone at Cleary had
```

TSG Reporting - Worldwide    877-702-9580

Page 82

```
 1              -Lewkow-
 2      communications with anyone outside of
 3      privilege, that is anyone outside of
 4      communications with your client concerning
 5      whether anyone would seek to stay the
 6      application of 559 of the Bankruptcy Code in
 7      connection with the termination of the repo?
 8          A.  Not to my knowledge.
 9          Q.  In your capacity as a 30(b)(6)
10      witness, have you inquired about that topic?
11          A.  Yes.
12          Q.  Is there a reason, Mr. Lewkow, that
13      Sullivan & Cromwell was given the
14      responsibility for drafting the language in
15      Paragraph 13 as opposed to Cleary?
16          MR. MORAG:  Objection.
17          MR. HUME:  Objection.  Calls for
18      privilege.
19          MR. MORAG:  Yes, I mean --
20          THE WITNESS:  I think I can give
21      some factual information, if you want
22      me to.
23          MR. GAFFEY:  I do.
24          THE WITNESS:  Let him ask the
25      question.
```

TSG Reporting - Worldwide    877-702-9580

Page 83

```
 1              -Lewkow-
 2          MR. MORAG:  I would ask you to
 3      first pose the foundational question of
 4      whether he knows there is a reason.
 5          Q.  Do you know whether there's a
 6      reason Sullivan & Cromwell drafted the
 7      language in Paragraph 13?
 8          MR. HUME:  I instructed the witness
 9      not to answer that.  To the extent it
10      reveals privilege, I don't know how you
11      can answer it otherwise.
12          THE WITNESS:  I actually think I
13      can.
14          MR. HUME:  If you can, go ahead.
15          A.  We had, as I testified earlier,
16      basically nothing to do with the creation, the
17      documentation, the implementation of the repo.
18      I don't know whether Sullivan & Cromwell did
19      or not, but we had not.  And so I'm not
20      surprised that we had nothing to do with
21      follow-ups with regard to that.
22          Q.  Let's clean up the pile again and
23      go back to the Lewkow declaration, which is
24      the first thing I showed you.  I forget the
25      exhibit number.
```

TSG Reporting - Worldwide    877-702-9580

Page 84

```
 1              -Lewkow-
 2          In Paragraph 4, again, Mr. Lewkow,
 3      you say, this is the last sentence, "Further,
 4      I do not recall anyone involved in the
 5      transaction ever suggesting that the deal was
 6      supposed to be a 'wash' with the value of
 7      assets acquired equal to the value of
 8      liabilities assumed."
 9          Did you or anyone else from Cleary
10      Gottlieb ever have conversations with Bart
11      McDade about his understanding of the
12      transaction?
13          A.  Bart McDade was -- about his
14      understanding of the transaction, he was in
15      the room at the time the Asset Purchase
16      Agreement -- at times when the Asset Purchase
17      Agreement was being negotiated.  So in that
18      context, I had -- we sort of had conversations
19      with him.  I don't recall any other
20      conversations with him.
21          Q.  Were any of the conversations with
22      him addressed to the topic of whether or not
23      it was a transaction in which the assets and
24      liabilities were supposed to roughly match?
25          MR. MORAG:  Object to the form.
```

TSG Reporting - Worldwide    877-702-9580

Page 85

```
 1              -Lewkow-
 2          A.  I have included in my declaration
 3      that I do not recall anyone involved in a
 4      transaction ever suggesting that.  And so that
 5      is my recollection.  And Bart McDade comes
 6      within the term of "anyone."
 7          Q.  I'm asking for a slightly different
 8      question.
 9          Was the topic ever discussed with
10      Mr. McDade?
11          A.  Not to my knowledge.
12          Q.  Was the topic ever discussed with
13      anyone --
14          MR. HUME:  Objection.  Go ahead.
15          A.  I don't know what the topic is.
16          Q.  -- whether --
17          A.  The deal was the deal, okay.  The
18      agreement is reflected in the Asset Purchase
19      Agreement as originally entered into and then
20      as supplemented, clarified and amended by the
21      Clarification Letter.
22          Q.  I'm assuming, sir -- and correct me
23      if I'm wrong -- that there must have been some
24      discussions between the parties beyond the
25      level of well, the deal is the deal and it is
```

TSG Reporting - Worldwide    877-702-9580

## Page 102

1          -Lewkow-
2      A.  So it does.
3      Q.  And the reference to Paragraph 10
4  is to a balance sheet printed at 11:18 a.m. on
5  9/16/08?
6      A.  Yes, it is.
7      Q.  Does that refresh your recollection
8  in any way?
9      A.  It seems to be.
10      Q.  Does any of this refresh your
11  recollection as to whether there were
12  discussions during the course of the week
13  after the APA had been signed about that
14  balance sheet marked as Exhibit 19?
15      A.  My recollection, and I don't recall
16  whether we knew this was going to be in the
17  draft or not, but my recollection is that this
18  showed up and we didn't think it was
19  appropriate to start dealing with that
20  document, which we had not intended to and had
21  not included as an exhibit to the Asset
22  Purchase Agreement.  And so this did not stay
23  in the Clarification Letter.
24      Q.  Were there any discussions between
25  Barclays and Cleary Gottlieb on the one hand
         TSG Reporting - Worldwide   877-702-9580

## Page 103

1          -Lewkow-
2  and Lehman and Weil Gotshal on the other about
3  whether or not to include that sheet as an
4  exhibit to the Asset Purchase Agreement?
5      A.  I believe that during the -- at
6  some point at the very end of the finalization
7  of the Asset Purchase Agreement, and it may
8  have been -- you know, it was a final meeting
9  at which people tried to finalize the Asset
10  Purchase Agreement, and that is the meeting at
11  which a Simpson Thacher associate sat between
12  me and John Findley of Simpson Thacher and
13  tried to act as scribner as the combined group
14  of people around a very large rectangular
15  table, square table reached agreement on final
16  changes.  And then she entered in handwritten
17  form, which we have looked at previously or I
18  testified about earlier today.
19      I believe, I'm not sure, but I
20  believe it was in that context that someone on
21  the Lehman side would have raised the idea,
22  would it make sense to attach this document,
23  Exhibit 19, or some variant thereof to the
24  Asset Purchase Agreement.  And a decision was
25  made collectively not to do so.
         TSG Reporting - Worldwide   877-702-9580

## Page 104

1          -Lewkow-
2      Q.  What was the basis for the decision
3  made collectively not to do so?
4      A.  The agreement --
5      Q.  I withdraw "basis."
6      What was the reason it was decided
7  not to do that?
8      A.  My recollection is that the piece
9  of paper had been prepared by Lehman and shown
10  to us and the like, and that there was one
11  reference to it that was going into the Asset
12  Purchase Agreement, but that it did not -- the
13  agreement in the deal was to be embodied in
14  the Asset Purchase Agreement, and we had not
15  spent any specific time looking at Exhibit 19
16  or any variant of it with a view towards
17  having legal significance and what it might
18  mean and how it might modify the Asset
19  Purchase Agreement.
20      The Asset Purchase Agreement was
21  intended to stand on its own two feet.
22      Q.  Let me ask you to put before you
23  Exhibit 35.  It is included in the packet of
24  documents that I gave you.
25      A.  Sure.  Yes.
         TSG Reporting - Worldwide   877-702-9580

## Page 105

1          -Lewkow-
2      Q.  And Exhibit 35, the first page, has
3  an e-mail from David Murgio at 9:15 p.m. GMT,
4  September 19, 2008 to among others me.  And
5  it attaches this, another draft of the
6  Clarification Letter?
7      A.  Correct.
8      Q.  If you would, again, sir, please
9  turn within the document to the blackline
10  section which begins at page 10279864.
11      A.  Yup.
12      Q.  And within the definition of
13  "Purchased Assets," "Excluded Assets" on the
14  first page of that blackline --
15      A.  On the first page?  First what?
16      Q.  On the first page of the blackline.
17  Okay?  Paragraph 1 of the blackline.
18      A.  Okay.  You referred -- I didn't
19  realize 64 was on all the pages.
20      Q.  It is.  It is the first page marked
21  64.
22      A.  Okay.
23      Q.  And it is Paragraph 1, "Purchased
24  Assets."
25      The underscored language in that
         TSG Reporting - Worldwide   877-702-9580

Page 114

-Lewkow-
2 they ended. I don't know if they were in
3 person or over the phone -- between not the
4 lawyers, between representatives of Barclays
5 and representatives of Lehman. And that was
6 going on until very shortly before the Court
7 hearing began.
8          So while it had been contemplated
9 the day before that we would try to have a
10 proposed form of, or maybe an actual form, I
11 don't recall which, of Clarification Letter to
12 provide to the Court, that events made that
13 impossible.
14      **Q.   Now, I take it that between the**
15 **time of this draft marked as Exhibit 35 and**
16 **the finalizing of the Clarification Letter on**
17 **Monday, the signing of the Clarification**
18 **Letter on Monday, other changes are made. We**
19 **will get to those, but I just want to**
20 **establish the fact that changes were made over**
21 **the weekend, correct?**
22          MR. HUME: Objection, vague.
23       Changes to what?
24          MR. GAFFEY: To the Clarification
25 Letter.

TSG Reporting - Worldwide    877-702-9580

Page 115

-Lewkow-
2      A.   Changes to the draft Clarification
3 Letter were made that are reflected in the
4 final Clarification Letter that was signed,
5 yes.
6      **Q.   And some of those changes were made**
7 **over the weekend, Saturday the 20th and Sunday**
8 **the 21st, correct?**
9      A.   New drafts were being prepared and
10 changes to the prior draft were therefore
11 made, correct.
12      **Q.   Now, the discussions that you**
13 **learned had taken place on Friday morning**
14 **between non-lawyers for Lehman and Barclays**
15 **that you referred to a moment ago --**
16      A.   Morning or early afternoon. I'm
17 not sure which.
18      **Q.   Was it your understanding that**
19 **those discussions were to include assets in**
20 **the deal, to make up for assets that Lehman**
21 **had not been able to deliver?**
22          MR. MORAG: Objection to form.
23      A.   Let me -- I think, I was told --
24 and now I want to carefully describe how I was
25 told it. But I was told it twice about the

TSG Reporting - Worldwide    877-702-9580

Page 116

-Lewkow-
2 conversation. I'm doing this and I'm looking
3 at my counsel and Barclays counsel, so they'll
4 caution me, I think.
5          But I was told substantially the
6 same. And to the extent there's differences,
7 I don't remember which and what was
8 the difference. I was told twice about the
9 results of the conversations that I just
10 alluded to that took place between Barclays
11 representatives and Lehman representatives
12 during the day Friday before the Court
13 hearing.
14          I arrived at the courthouse shortly
15 before the Court was supposed to convene for
16 this case. And while I was still outside the
17 courtroom, having arrived -- while I was still
18 outside -- not outside the courtroom, outside
19 the courthouse. While I was still outside the
20 Customs House, another car arrived, or taxi
21 and out came several Barclays representatives,
22 including Michael Klein.
23          Michael Klein, I may have said,
24 what's going on or what happened or something
25 like that --

TSG Reporting - Worldwide    877-702-9580

Page 117

-Lewkow-
2          MR. HUME: Why don't I interject.
3          THE WITNESS: Okay. I don't have
4 to stay with that.
5          MR. HUME: To the extent --
6          THE WITNESS: Let me jump ahead.
7 Let me just jump ahead. Go ahead.
8          MR. HUME: Just so the record is
9 clear, to the extent Barclays
10 representatives communicated to you in
11 a privileged setting facts that they
12 later communicated in a way that is not
13 privileged, you should disclose --
14          THE WITNESS: The latter.
15          MR. HUME: Be careful, but disclose
16 only what was not privileged.
17 BY MR. GAFFEY:
18      **Q.   On that point, I want you to go**
19 **back to what was next in a minute. But Klein**
20 **is there. Who else was there? Anybody non**
21 **Barclays was there?**
22      A.   Not downstairs, no.
23      **Q.   So it was Barclays people and you?**
24      A.   I had a conversation, and he
25 summarized the results of the conversation.

TSG Reporting - Worldwide    877-702-9580

Page 118

-Lewkow-

1
2       We then all went to the courtroom,
3   which was a zoo, if I can use that technical
4   term. And I was near the front of the
5   courtroom near the well.
6       I was sitting on -- I managed to
7   get a seat which not many of us did -- on the
8   side. I can't remember if there was a jury
9   box in that courtroom or not. If so, I was
10  just in the chairs just inside what would have
11  been a jury box and next to the table at which
12  Weil Gotshal as debtor's counsel was sitting.
13      And there was a conversation that
14  took place that -- of, you know, somewhere
15  between four and eight people, I can't -- I
16  think it was at least five people, six people,
17  including Michael Klein, myself, Lori Fife,
18  and a few other people. And it may -- among
19  those other people may have been -- I don't
20  think Harvey Miller was one of them. I'm not
21  100 percent certain. I believe that one of
22  them may have included, one or more of them
23  may have been Lehman Brothers business folks
24  or representatives, or Lazard representatives.
25  I'm not sure. I don't remember.

TSG Reporting - Worldwide    877-702-9580

Page 119

-Lewkow-

1
2       The only three people I am sure of
3   were present were Michael Klein, Lori Fife and
4   me. There may have been somebody else from
5   Barclays there as well, like Archie Cox. I
6   just don't remember.
7       And Michael repeated it enough --
8   as I said in the beginning, I don't recall
9   which conversation is which. And they were in
10  all, to the extent I can recall, they covered
11  the same topic and were consistent with each
12  other and I'm sure he used different words and
13  the like. But he repeated what he had told me
14  outside 30 or 40 or 50 minutes earlier, or 15
15  or 10 or whatever.
16  Q.  What did he say?
17      A.  I thought you'd ask that.
18      He reported -- and I had -- he
19  reported that it turned out that Lehman and
20  Barclays had both -- officials had both
21  learned in the prior 24 hours that a number of
22  categories of assets that Lehman had told
23  Barclays and agreed before the Asset Purchase
24  Agreement had been signed and were covered by
25  the Asset Purchase Agreement, as to categories

TSG Reporting - Worldwide    877-702-9580

Page 120

-Lewkow-

1
2   -- specifically specified categories.
3       And of course, as you know,
4   Barclays was to get under the Asset Purchase
5   Agreement, except for specified excluded
6   assets, we were supposed to get all assets
7   used in the business. But there were certain
8   assets, including financial assets that were
9   included within that universe but were also --
10  and so that Barclays had been led to believe
11  were going to be delivered. That would be
12  true whether or not they were also articulated
13  as within the including language that follows
14  in the definition of "Purchased Assets."
15      But -- so it's the same universe
16  either way. But certain of those assets,
17  which we have been told were among the assets
18  that Barclays would be getting would not --
19  were not available to be transferred to us.
20  That they either did not own or they had
21  double counted or they were subject to liens
22  in favor of third parties and they could not
23  be delivered. And so he reported that.
24      And he said that this was -- and
25  again, I believe there may have been a Lehman

TSG Reporting - Worldwide    877-702-9580

Page 121

-Lewkow-

1
2   person standing there, but I can't tell you
3   who, or a Lazard person, and that he had
4   created real issues as to whether the deal
5   could be due -- doable.
6       He went on to describe a number of
7   things that had come out as further
8   investigation as to facts as well as further
9   discussions and negotiations as to what to do,
10  as to whether this deal could be saved and
11  whether there would be no deal and there would
12  be no one to purchase the assets and to
13  purchase the business and leave the creditors
14  to a liquidation scenario.
15      But he reported on a number of
16  things. First of all, that two category of
17  assets should have been identified that could
18  have been included in assets that Lehman used
19  in the business and, therefore, should be
20  coming to Barclays pursuant to the Asset
21  Purchase Agreement, which had not been
22  specifically ever mentioned or focused on by
23  Barclays. And that those helped to some
24  extent mitigate the shortfall that I just
25  described based on what we had known.

TSG Reporting - Worldwide    877-702-9580

Page 122

-Lewkow-

1
2 So, we had learned things that
3 reduced the pool of assets that were worth --
4 substantially all the assets that we were
5 getting. But that there were two categories
6 of assets that were within what we were
7 getting that we had not focused on and that
8 Lehman had not told us about were within the
9 pool of assets that Lehman had available for
10 transfer, that they could transfer and would
11 transfer pursuant to the deal.
12 And those, those two categories
13 were the 15c3-3 reserve account or something
14 like that. I'm not sure "reserve" is the
15 right account. And where I was told -- I
16 remember often this one being told the precise
17 number, but I don't remember what number it
18 is. But it was slightly over a billion-seven
19 in -- and I believe he said in security, but
20 he may -- he may not have been that specific.
21 And the second was assets in what I
22 was told was something called the clearance
23 box about -- again, I may have given a
24 more specific number but this one is less
25 vivid in my mind, of approximately two billion

TSG Reporting - Worldwide    877-702-9580

Page 123

-Lewkow-

1
2 of assets, and that these assets were
3 available and would be transferred by Lehman
4 as part of the transfer of essentially all the
5 assets that they were going to be giving us.
6 I was also told of some discussions
7 of changes that needed to be made to the deal
8 because that didn't -- the identification of
9 those categories, of additional -- those assets
10 that would be transferred as part of the deal
11 didn't solve by any means the entirety of the
12 problem that had been learned by both sides as
13 to other assets that could not be transferred.
14 And that certain changes to the
15 deal were going to be made.
16 One was -- and that first, another
17 negative change in the deal from Barclays's
18 perspective in that there was a -- there was
19 in the Asset Purchase Agreement a concept
20 of -- I forget what the word was. "Retained
21 cash." It was a very strangely drafted
22 clause. Because retained cash was Lehman's
23 cash that Barclays would get and in a sense it
24 was retained because it would be retained for
25 use in the business that we were effectively

TSG Reporting - Worldwide    877-702-9580

Page 124

-Lewkow-

1
2 purchasing all the assets of, and certain --
3 and assuming certain specified liabilities.
4 And so I was told that the fact
5 that Lehman would receive the -- Lehman would
6 transfer the so-called retained cash was
7 dropping away and that Barclays would not get
8 that cash. I believe -- I believe I was told
9 that they just didn't have free cash sitting
10 around, but I don't remember precisely what
11 words were used. I don't remember precisely
12 what the words were on any, any of these.
13 This is my recollection and paraphrase of what
14 he told the group in the well in the courtroom
15 before the hearing started with a half a dozen
16 or so people.
17 He also talked about a favorite
18 topic, the RESIs, and that it turned out --
19 wait a second. Hold on a second. -- no. I
20 don't think -- I withdraw that. I don't think
21 there is anything about the RESIs.
22 He reported that another change
23 that needed to be made that the parties had
24 agreed to orally was to eliminate the
25 provision that I testified about earlier in

TSG Reporting - Worldwide    877-702-9580

Page 125

-Lewkow-

1
2 response to some -- some of your questions
3 that provided that if Barclays sold certain of
4 the financial positions within one year and
5 made a profit, that certain amounts of
6 additional consideration or compensation would
7 be paid to -- to Lehman, that that provision
8 had also -- would be deleted.
9 That -- let me just think if there
10 was anything else that I can recall. That's
11 my recollection.
12 MR. GAFFEY: Do you want to take a
13 lunch break?
14 MR. MORAG: Yes. I believe it's
15 available.
16
17 (Luncheon recess taken at 1:10 p.m.)
18
19 - - -
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 126

1          -Lewkow-
2       A F T E R N O O N   S E S S I O N
3          (Time noted: 1:53 p.m.)
4    V I C T O R   I.   L E W K E W,  resumed as a
5    witness and testified as follows:
6    CONTINUED EXAMINATION BY
7    MR. GAFFEY:
8          Q.  Mr. Lewkow, before the break you
9    were telling us about a conversation between
10   Michael Klein, Lori Fife, yourself and some
11   others, about discussions that had taken place
12   in the morning before the sale hearing.
13          Was there any discussion between
14   Barclays and its representatives on the one
15   hand, and Lehman and its representatives on
16   the other about what, if anything, of those
17   facts should be told to the judge in the sale
18   hearing?
19          A.  First of all, when you say -- you
20   said "morning," I was very careful.  I believe
21   it continued until shortly before the hearing
22   started at one o'clock, so I was not limited
23   to the morning.  The answer to your question
24   is, no.
25          Q.  As you sat through the sale hearing

TSG Reporting - Worldwide    877-702-9580

Page 127

1          -Lewkow-
2    and heard the presentations to the Court from
3    the various lawyers who spoke to the judge,
4    was Cleary and Barclays's comfortable that the
5    aspect of the deal that had been discussed in
6    that session prior to the sale hearing were
7    accurately disclosed to the judge?
8          MR. MORAG:  Object to the form.
9    Certainly you speak to Cleary.  As to
10   Barclays, I'm not sure if that calls
11   for a privilege conversation.
12          MR. GAFFEY:  Let me just ask as to
13   Cleary.  That's a good point.
14          A.  As was my understanding was,
15   typical the debtor's counsel on a sale would
16   normally be the ones who take the -- make the
17   presentation to the Court.
18          THE REPORTER:  Can I ask you to
19   please speak up?  Thank you.
20          THE WITNESS:  I'll try.
21          A.  As typical, Weil as counsel for the
22   debtor was making the presentation.  Maybe in
23   other context people would have seen a draft
24   of what Lori Fife was going to say or the
25   like.  But certainly, since it was such a

TSG Reporting - Worldwide    877-702-9580

Page 128

1          -Lewkow-
2    moving target we had, as I told you in your
3    last question, really hadn't had any
4    consultation as to what exactly she and
5    Mr. Miller were going to tell the Court.
6          That having been said, as I sat
7    there, I am, as a member of the Bar, I am -- I
8    do have obligations and certainly if I had
9    thought that I heard something that was
10   inconsistent with my understanding of the deal
11   or omitted information that was obvious that
12   should have been -- would make the description
13   of what the judge heard -- and by "description
14   of what the judge heard," I include everything
15   that he heard Wednesday and everything that
16   was in the Asset Purchase Agreement that he
17   had heard before.
18          If I thought he was being misled, I
19   obviously would have, as was Mr. Granfield who
20   was my partner who I was sitting next to, we
21   would have either, you know, addressed the
22   Court directly or would have talked to Weil
23   Gotshal and asked them to make appropriate
24   other statements to the Court.
25          Q.  As I understand the events and

TSG Reporting - Worldwide    877-702-9580

Page 129

1          -Lewkow-
2    discussions that Mr. Klein described to you,
3    essentially because Lehman was unable to
4    deliver certain assets within the
5    contemplation of the Asset Purchase Agreement,
6    other assets were substituted for them?
7          MR. MORAG:  Objection to form.
8          A.  No.  I totally -- that is not a
9    correct characterization.
10          Q.  What is the correct
11   characterization?
12          A.  What I testified.
13          Q.  Is it your testimony that the two
14   categories of assets you discussed, 15c3 and
15   the contents of the box, were covered by the
16   original language of the Asset Purchase
17   Agreement?
18          A.  I don't want to give you legal
19   advice.  But I will point you to the words of
20   the Asset Purchase Agreement that basically
21   says all assets used in the business, other
22   than Excluded Assets, which is a defined term.
23          Q.  At the time that you had the
24   conversation with Mr. Klein and Ms. Fife, was
25   it at that point still within the

TSG Reporting - Worldwide    877-702-9580

Page 130

```
1              -Lewkow-
2      contemplation of the parties that the
3      Clarification Letter would be submitted to the
4      Court?
5         A.  Well, we -- I don't -- the -- it
6      had been the contemplation on Wednesday and
7      Thursday, and the goal had been to, as I
8      testified earlier, to give the Court, to
9      give -- to have that ready to give the judge.
10     It was also the intention at that stage to try
11     to close Friday evening.
12            And on that sort of scenario, if,
13     in fact, you were there, it would have been
14     probably possible, one would have hoped to
15     have had a Clarification Letter that one could
16     have given to the Court.
17            It was clear to me, but I don't
18     recall that given what had changed and given
19     that there was a draft that had been served up
20     while we were in court, that -- given that it
21     showed up when it did, I was dubious even
22     before I saw it and before I talked to my
23     colleagues as to whether it did or didn't
24     reflect those discussions given the timing of
25     it.
          TSG Reporting - Worldwide    877-702-9580
```

Page 131

```
1              -Lewkow-
2            So to me, it was, it would have
3      been shocking if before the Court could have
4      approved it, whether we would have had a final
5      Clarification Letter that we could have
6      provided the Court.
7         Q.  By the end of the sale hearing, no
8      Clarification Letter had been finalized and
9      everybody let to continue their work over the
10     weekend.  Was there a point during the weekend
11     when there were conversations between Barclays
12     on the one hand and Lehman on the other
13     including their representatives, about
14     bringing the Clarification Letter to the
15     judge?
16         MR. MORAG:  Objection to the form.
17         You can answer.
18         A.  What I recall, and to me the
19     Clarification Letter was -- it was getting
20     close to being signed.  I have a vague
21     recollection, I do have a recollection of
22     sitting in the room -- I did a lot of sitting
23     in the rooms -- with a number of Weil Gotshal
24     lawyers, including Harvey Miller, including
25     one or more of his corporate colleagues in
          TSG Reporting - Worldwide    877-702-9580
```

Page 132

```
1              -Lewkow-
2      which -- and this would have been late Sunday
3      night, early hours of Monday morning.  I don't
4      know.  But it was very late, very late in the
5      game.  It might have even been Monday.
6            In fact, it might have been Monday
7      morning, you know, 5:00, 6:00, 7:00, just
8      shortly before we closed as I think about it.
9      I don't know when it was.  But it was late.
10     It wasn't Saturday.  It wasn't Sunday morning.
11     It wasn't even Sunday afternoon.  And we were
12     very close to, you know, finish.  The big
13     issues that people were dealing with were DTC
14     and J.P. Morgan and those sorts of issues were
15     really the big issues that people were facing.
16            But very late in the process,
17     Harvey Miller saying to a group of -- you
18     know, again, I don't know how many other -- it
19     was a very fluid group of people who would be
20     sitting in what room at what time that
21     weekend.  But there were a number of other
22     Weil people and Harvey Miller and me.  I don't
23     remember whether any of my colleagues were in
24     the room with me.
25            And Harvey looked at the assembled
          TSG Reporting - Worldwide    877-702-9580
```

Page 133

```
1              -Lewkow-
2      group and said something like, Does anyone
3      think that we have done anything inconsistent
4      with what we've told the Court and have to
5      bring this -- go back to court?  Or something
6      like that.  I don't remember the words.  I'm
7      totally paraphrasing.
8            My recollection is, I've read
9      Mr. Miller's deposition transcript, and he
10     does not mention who -- he mentions a
11     conversation which is, I think, more or less
12     consistent with my recollection, but he
13     doesn't mention that anyone from Cleary
14     Gottlieb, like me, was there.
15            But -- and he may have had more
16     than one, so I have no way of knowing if it's
17     the same conversation.
18            But I do recall that.  And he
19     looked around the room and nobody said
20     anything.  It was mostly people on his side.
21     So that's the one that -- you know, in
22     connection with the finalization of the
23     Clarification Letter, that conversation took
24     place.
25         Q.  Were any of your bankruptcy
          TSG Reporting - Worldwide    877-702-9580
```

Page 134

-Lewkow-

2  partners present during this conversation?
3      A.  I do not believe so.
4      Q.  Have you read any other
5  depositions?
6      A.  Yes.  I've read parts or all of
7  Mr. Miller's deposition, Mr. Hughes deposition
8  and Mr. Ridings' deposition.  I believe that's
9  all.
10     Q.  Did you read both days of
11 Mr. Hughes deposition?
12     A.  Yes.  Skimming, yes.
13     Q.  Did you review any briefs or
14 pleadings to prepare for your deposition?
15     A.  No.
16     Q.  Have you read the Rule 60 filed by
17 the debtor or the Trustee or the Creditors
18 Committee?
19     A.  No.
20     Q.  Have you had them summarized for
21 you?
22     MR. HUME:  Objection.  I think that
23     calls for privileged conversations.
24 DI    MR. MORAG:  Same objection.  I
25     instruct you not to answer.

TSG Reporting - Worldwide    877-702-9580

Page 135

-Lewkow-

2      Q.  Was there a time, was there not,
3  where it was contemplated that the
4  Clarification Letter would be styled as an
5  amendment to the APA, as a contractual
6  amendment to the APA.  Do you recall that?
7      MR. MORAG:  Objection to form.
8      A.  Contemplated by whom?
9      MR. GAFFEY:  Can I have this marked
10     as 614A?
11     (Deposition Exhibit 614A, Letter
12     from S&C, CGSH 00020701-20714, marked
13     for identification, as of this date.)
14     Q.  You have before you, Mr. Lewkow,
15 what we marked as Exhibit 614A, a document
16 bearing Bates numbers CGSH 00020701 through
17 20714.  Have you seen that document before?
18     A.  Yes.
19     Q.  I'm sorry.  I didn't hear you.
20     A.  Yes.
21     Q.  Did you see it at or around the
22 time that it's dated, September 19, 2009?
23     A.  I think that around that time, I
24 either saw the cover letter, cover e-mail, or
25 saw a cover e-mail from one of my colleagues,

TSG Reporting - Worldwide    877-702-9580

Page 136

-Lewkow-

2  basically dismissing it.
3      Q.  Why was it dismissed?
4      A.  Because it was not consistent, best
5  I can recall.  This was sent by someone at
6  Sullivan & Cromwell who had not been involved
7  directly in any of the discussions with --
8  regarding the Clarification Letter.  We didn't
9  know where this had come from.  Hold on a
10 second.  Wait a second.
11     (Witness reviewing document.)
12     A.  I think.  I think a couple of
13 things.  Shortly after this -- this came on,
14 what date is this?
15     (Witness reviewing document.)
16     A.  Friday?  May I look at amendment
17 No. 1?
18     Q.  Sure.  Absolutely.
19     A.  That you had given me earlier.
20     Q.  That's Exhibit 27, right, for the
21 record?
22     A.  24.
23     Q.  I beg your pardon.  24.  You're
24 right.
25     MR. HUME:  Can I just interject?

TSG Reporting - Worldwide    877-702-9580

Page 137

-Lewkow-

2  To the extent that the question that's
3  pending, I think --
4      THE WITNESS:  I'm not sure.
5      MR. HUME:  -- is why was it
6      dismissed, to the extent to answer that
7      question requires you to divulge any
8      privileged conversations within Cleary
9      or Cleary and Barclays, I instruct you
10     not to answer.  Otherwise you can
11     answer.
12     A.  The answer is I'm not sure -- I've
13 seen the e-mail from one of my colleagues, I
14 think it was Dave Wyman.  But it was also, and
15 I don't know the precise timing.  One of the
16 elements that I see is, and maybe the key
17 element, was this rider that Ms. Summers had
18 sent with this e-mail to deal with what was
19 called -- a new section called a holdback to
20 deal with the DTC problem.
21     In fact, later that day, Sullivan &
22 Cromwell did, in fact, prepare a First
23 Amendment to the Asset Purchase Agreement to
24 try to address based on what -- what people
25 understood at the time were the -- were the

TSG Reporting - Worldwide    877-702-9580

Page 138

```
 1              -Lewkow-
 2   facts relating to the residential real estate
 3   mortgage securities which were later learned
 4   were not the facts.
 5              And in fact, amendment No. 1 was
 6   signed.
 7        Q.  The Asset Purchase Agreement --
 8        A.  More accurately, first amendment
 9   was signed.
10        Q.  And the Asset Purchase Agreement
11   and the first amendment of the Asset Purchase
12   Agreement, both were submitted to Judge Peck
13   at the sale hearing.  Do you recall that?
14        A.  They were both described.  I
15   assume -- I know the Asset Purchase Agreement
16   had been submitted in a technical sense,
17   whether the first amendment was or not, I
18   assume it was, but I don't know for a fact.
19        Q.  I'll go back to a question I asked
20   you a few moments ago.
21              Given that the Clarification Letter
22   recites that it amends the Asset Purchase
23   Agreement, was one of the three verbs that we
24   talked about, that it "amends" the Asset
25   Purchase Agreement.
```
TSG Reporting - Worldwide    877-702-9580

Page 139

```
 1              -Lewkow-
 2              When Mr. Miller asked whoever was
 3   assembled in that room as to whether anyone
 4   thought it was different than what had been
 5   described to the Court, was there any part of
 6   that discussion that noted that this was an
 7   amendment to the agreement that had been
 8   submitted to the judge?
 9              MR. MORAG:  Objection to the form
10   and to the characterization of his
11   testimony regarding Mr. Miller's
12   statement.
13        A.  I don't recall.  I would note that
14   Mr. Miller couldn't have been more clear on
15   Friday to the Court that there were major
16   changes in the deal.  And so the fact that in
17   part this was to some extent an amendment of
18   certain aspects of the Asset Purchase
19   Agreement, I think it was entirely consistent
20   with what Weil Gotshal told the Court on
21   Friday.
22              And the Court carefully considered
23   as I recall the comments made by I think a few
24   of the creditors and/or the Committee or
25   somebody, I don't remember who, arguing that
```
TSG Reporting - Worldwide    877-702-9580

Page 140

```
 1              -Lewkow-
 2   he should wait until he had the final document
 3   before he approved the sale.  And he discussed
 4   that subject in his statements from the bench
 5   and concluded that he did not need to wait for
 6   a written document.
 7        Q.  Was it Cleary's understanding
 8   coming out of the sale hearing that there were
 9   any limitations on what could be included in
10   the clarification agreement and still be
11   within the terms of the Sale Order?
12              MR. MORAG:  Objection.  I think
13   that's work product and privilege.
14   Cleary's understanding?  He can't
15   answer it.
16              MR. GAFFEY:  What's the privilege?
17              MR. MORAG:  The mental impressions
18   of a lawyer of what they couldn't --
19              MR. GAFFEY:  I just want you to
20   identify the privilege.
21              MR. MORAG:  I said work product and
22   attorney/client privilege.
23              MR. GAFFEY:  Okay.
24              MR. MORAG:  To the extent they were
25   discussed with attorneys.
```
TSG Reporting - Worldwide    877-702-9580

Page 141

```
 1              -Lewkow-
 2        Q.  Do you recall any colloquy with the
 3   Court that you witnessed on Friday concerning
 4   any limitations placed on the Clarification
 5   Letter?
 6        A.  No.  None other than what I
 7   testified to earlier.
 8        Q.  Do you recall any restrictions in
 9   the Sale Order itself placing restrictions on
10   the Clarification Letter?
11              MR. HUME:  Same objection, I
12   believe.
13              MR. MORAG:  I think --
14              MR. HUME:  It calls for a legal
15   interpretation of the Sale Order.  That
16   is a matter in the litigation and
17   you're asking a lawyer how to interpret
18   it for you.  So I think it's asking for
19   work product.
20        Q.  Were there any discussions between
21   Barclays on the one hand including its
22   representatives, and Lehman on the other
23   including its representatives, as to whether
24   there were any limitations in the sail order
25   as to what could be included in the
```
TSG Reporting - Worldwide    877-702-9580

Page 142

```
1            -Lewkow-
2  Clarification Letter?
3        A.   Yes.  Two conversations.  One I
4  testified to already, the late Sunday night or
5  late Monday morning conversation with
6  Mr. Miller.  Earlier, I believe it was Sunday,
7  it was a crazy weekend, I believe it was
8  Sunday, there was a conversation in the
9  hallway where the subject of whether certain
10 circumstances, if we did certain things, would
11 lead to a change of -- that would require
12 going back to the Court.
13       Q.   Can you --
14       A.   I may have mischaracterized that.
15 Go ahead.  Ask your next question.
16       Q.   Okay.  My obvious question is:  How
17 did you mischaracterize it?
18            But tell me what you remember about
19 that conversation.  Who said what to who?
20       A.   So, as I testified earlier on
21 Friday, one of the things that Lehman Brothers
22 and Barclays had discovered that among the
23 Purchased Assets that Barclays was going to
24 receive in the -- pursuant to its purchase of
25 substantially all of the assets used in the
```

TSG Reporting - Worldwide    877-702-9580

Page 143

```
1            -Lewkow-
2  business, other than Excluded Assets, that
3  although there had been very substantial
4  reductions in what Lehman could deliver, they
5  also had realized and ascertained that there
6  were assets that were part of their assets
7  used in the business that had not previously
8  been sort of focused on specifically by the
9  parties, although they were assets of Lehman
10 used in the business.
11           And I mentioned two -- two
12 categories of such assets.  One was the
13 so-called 15c3-3 account.  And I think I
14 testified -- I'm not sure, it's been a long
15 day so far.  Maybe not.  I may not have
16 mentioned this.  But one of things that
17 Michael Klein had reported in describing that
18 was that he had been told by someone on behalf
19 of Lehman that there was some e-mail around in
20 which the -- pursuant to which referencing
21 that someone in the division of market
22 regulation at the SEC had confirmed that the
23 15c3-3, the assets in the 15c3-3 could, in
24 fact, be transferred by Lehman and at some
25 point, I believe Saturday morning or at some
```

TSG Reporting - Worldwide    877-702-9580

Page 144

```
1            -Lewkow-
2  point Saturday, we asked Weil to see that
3  agreement.
4            At some later point, I believe on
5  Sunday, but I couldn't swear to it at this
6  stage -- at some point, as I was walking in
7  the hallway of Weil Gotshal, we were in
8  meetings spread out over a large portion of
9  Weil Gotshal that was full of purely -- I
10 believe purely a conference space.  There were
11 lots of meetings going on by different people.
12 There were people working on the Transition
13 Services Agreement, there were people dealing
14 with DTC, there were people just getting ready
15 to do a closing.  Because all of the work had
16 to be done to be prepared to close, even while
17 other work was going on.  Discussions with
18 JPMorgan Chase.
19           Anyway, we were with Weil Gotshal
20 on that floor.  And as I was walking down the
21 floor, there were a number of the Weil
22 partners standing at this big desk which I
23 assume was the reception desk, although it
24 wasn't near the elevators where there was a
25 big reception desk.  But I don't know.  It
```

TSG Reporting - Worldwide    877-702-9580

Page 145

```
1            -Lewkow-
2  wasn't clear.  Maybe it was for if you needed
3  secretaries during the conference room.  I
4  don't remember what it since I had never
5  been there during a working day, only on
6  weekend.
7            But standing around this desk were
8  a number of Weil lawyers.  There may have well
9  been somebody from Lehman or Lazard there as
10 well, I don't recall.  I believe Harvey Miller
11 was one of the people among the group that was
12 there for Weil, and they said we have -- you
13 asked for and we now have, it gave me the
14 impression they had just received it in the,
15 you know, minutes or the last hour or two, and
16 certainly not before then was the impression.
17 I'm not sure whether they said that or not.
18 That we now have the e-mail relating to the
19 15c3-3 account.  And they showed it to me.
20 And I looked at it.
21           And they said that -- first
22 thing -- well, I noticed and commented on, I
23 believe I commented on, that it was not as I
24 had thought from the SEC but merely an
25 internal Lehman e-mail referencing a
```

TSG Reporting - Worldwide    877-702-9580

Page 146

```
 1            -Lewkow-
 2    conversation with the SEC, with someone on
 3    staff of the SEC.
 4            And somebody from Lehman, somebody,
 5    I'm sorry, from Weil said -- and it may have
 6    been Mr. Miller but I don't know.  But
 7    somebody from Weil said something like, We
 8    didn't realize that some -- that the account
 9    was not entirely securities but included a
10    bank account that -- with cash.  It was a
11    major bank.  It was one of the things on that
12    e-mail.  So it was -- and as I recall, it was
13    a million dollars in the bank account that
14    Lehman maintained with a third party bank.
15    And 700-plus, 760 odd million of securities
16    were in that account.
17            And in the course of that, one of
18    the Lehman people, again, I believe it was
19    Mr. Miller, but I'm not sure, said, the
20    question is, does anyone remember exactly what
21    Ms. Fife -- I don't think Ms. Fife was there
22    at the time -- told the Court, when she was
23    discussing the fact that you retain the cash
24    provision in the Asset Purchase Agreement was
25    being eliminated, did she say anything that
```

TSG Reporting - Worldwide     877-702-9580

Page 147

```
 1            -Lewkow-
 2    would be inconsistent with us transferring as
 3    part of all the assets of the business, the
 4    15c3-3 account which we now know includes a
 5    bank account.
 6            There then followed some further
 7    discussions on a number of -- let me just go
 8    through them.
 9            MR. MORAG:  If you like.
10        A.   Go ahead, ask another question.
11        Q.   Tell me about the further
12    discussions.
13        A.   So -- and I don't remember in
14    quite -- again, this was a weekend that was
15    very -- at the end of the week that had been a
16    very complex and difficult and weak -- not
17    just from the financial markets but from
18    everyone on both sides of this deal who were
19    trying to see if this deal could get done.  So
20    I don't remember how quickly it got done,
21    whether it was dragged out over two hours or
22    only over half an hour.
23            But there were some follow-up
24    conversations and one of the things -- it may
25    have even dragged on longer than two hours.
```

TSG Reporting - Worldwide     877-702-9580

Page 148

```
 1            -Lewkow-
 2    Because one of things we asked, or someone
 3    asked is -- I don't know who asked it.  Is it
 4    possible, can we get a transcript, can we find
 5    out exactly what Ms. Fife said to the Court to
 6    see whether or not she said something that
 7    would be or might appear to be inconsistent
 8    now that we knew that the 15c3-3 account
 9    included a bank account.
10            All of this is paraphrase.  I do
11    not remember precisely.  All of my testimony
12    where I say what people say is paraphrase.  I
13    don't recall specific words.
14            So some time clearly passed while
15    that -- but I don't remember how long, while
16    people investigated that issue.  And we were
17    told at some point -- again, I don't know by
18    whom -- that it would not be possible to get a
19    transcript, that no transcript had been
20    prepared, and that in effect the -- there had
21    not been a court reporter, shockingly, but it
22    had been -- there was a tape of the Court
23    hearing, and that tape, we learned, was locked
24    up in the courtroom.  This was Sunday.  I'm
25    sure it was Sunday.  That tape was locked up
```

TSG Reporting - Worldwide     877-702-9580

Page 149

```
 1            -Lewkow-
 2    in the courtroom, in the courthouse, there was
 3    no way to get access to it, and so there would
 4    be no way to obtain a transcript.
 5            There was some further discussion;
 6    at different points different people joined
 7    the discussion.  Still in the hallway.  All of
 8    this took place in the hallway.  It may have
 9    been a return to the hallway, but it again
10    happened in the hallway.
11            And among those who joined the
12    discussion, and there was more -- in fact, the
13    original discussion there may have been four
14    or five or six people, by then there were 10
15    or 12 people.  And included in the further
16    discussions were from the Barclays side, both
17    Michael Klein, I believe Archie Cox, I'm not
18    hundred percent sure and my partner Ed Rosen.
19            By then -- by some -- you know, was
20    it a second conversation or a third
21    conversation?  I cannot recall.  But at some
22    point we had -- "we" being the Barclays side
23    talked about --
24        Q.   You shouldn't tell me about that
25    conversation.
```

TSG Reporting - Worldwide     877-702-9580

Page 150

```
1              -Lewkow-
2      A.  I'm trying to figure out --
3          MR. MORAG:  There was a
4   communication.
5      A.   There was a communication about
6   what we had heard from Harvey Miller and/or
7   others from Weil Gotshal that I described in
8   my testimony, and that was discussed.
9          And putting aside the conversation
10  that I had with the Barclays representatives,
11  when we got back and the discussion that I'm
12  testifying to resumed to the other side, we
13  said, look, if there's no transcript, nobody
14  remembers precisely what he said.
15         And so until we can get a
16  transcript -- because she clearly had talked
17  about cash and there was, you know --  the
18  retained amount was not, was sort of cash that
19  was free and available and not tied up in
20  positions.  It was just cash that we had been
21  led to believe at the time of the Asset
22  Purchase Agreement was totally free cash that
23  they had somewhere, and that they were going
24  to transfer as part of the Purchased Assets.
25         And nobody knew precisely how
```

TSG Reporting - Worldwide    877-702-9580

Page 151

```
1              -Lewkow-
2   Ms. Fife had, in describing the changes from
3   the deal as reflected in the Asset Purchase
4   Agreement, how precisely she had put it in
5   describing those changes.  And she had clearly
6   indicated that that cash wasn't in -- wasn't
7   going to be in the deal but again, nobody knew
8   precisely what it was.
9          And so the alternative, since
10  nobody wanted to -- neither Weil Gotshal nor
11  Lehman nor Barclays nor the lawyers wanted to
12  do anything inconsistent with what the Court
13  had been told, there were two choices
14  available, which was to wait until Monday, get
15  a transcript and see what, in fact, she had
16  been told.  And then, if necessary, go back to
17  the Court.
18         There were three choices.  Just go
19  back to the Court Monday morning or find
20  another solution.  And the other solution was
21  the one that Barclays put on the table of
22  saying, okay, we will take just the securities
23  portion, 760-some-odd million in securities.
24  And in the course of that discussion, Michael
25  Klein said that if -- if for some reason you
```

TSG Reporting - Worldwide    877-702-9580

Page 152

```
1              -Lewkow-
2   can't --
3          And there was some conversation by
4   someone at Weil about do we -- do we need SEC
5   approval.  And Ed Rosen said no.  And they
6   said well -- they wanted to add language that
7   we had no problem with, something saying
8   "subject to applicable law," or something to
9   that nature that ended up in the Clarification
10  Letter.
11         And then Klein said, Look, if we --
12  you know, we're giving up this billion dollars
13  that we thought we were getting as of Friday
14  afternoon and we want to make sure we're
15  getting this 769 million in securities, and so
16  we want to add language that says -- again,
17  I'm paraphrasing, that if we can't get that,
18  you'll get us 769 million of securities of
19  some other securities.  That is my
20  recollection.
21      Q.  By the time of the conversation
22  with Mr. Miller on either Sunday night or
23  Monday morning concerning whether anyone
24  thought there were any aspects of the
25  Clarification Letter that required going back
```

TSG Reporting - Worldwide    877-702-9580

Page 153

```
1              -Lewkow-
2   to the Court, had anybody seen a transcript by
3   then?
4      A.  No.
5      Q.  Had anybody heard the tape by then?
6      A.  No.
7      Q.  Was there any discussion on Monday
8   before the closing concluded of getting the
9   transcript or the tape to make sure the
10  Clarification Letter was consistent with the
11  Court's limitations or instructions?
12         MR. MORAG:  Object to the form.
13      A.  There was no -- to my recollection,
14  there was no discussion of that.  There was a
15  belief by all of the people that's discussed
16  that it was really important to get this deal
17  closed and announced before the market opened
18  Monday morning.  There was -- the market --
19  there had been press announcements that came
20  out after midnight Friday night that had been,
21  I believe, in the Saturday papers or Sunday
22  papers or both, that the Court had approved
23  the sale.
24         And both Lehman and Barclays
25  believed it was really important both from the
```

TSG Reporting - Worldwide    877-702-9580

Page 154

```
1              -Lewkow-
2    financial markets perspective and from the
3    perspective of Barclays of keeping the Lehman
4    employees -- and I want to come back to the
5    Lehman employees in a second -- comfortable,
6    that they should hang around and that there
7    really was a deal.  That there had been a real
8    hope -- you know, there had been -- I think
9    some of the press reports might have picked up
10   the concept from this.
11             I'm not sure of this, but I believe
12   at least some of the press reports from people
13   who had been in the courtroom had indicated
14   that the deal might close over the weekend or
15   would -- was expected to close over the
16   weekend.
17             And so there was great concern that
18   if, in fact, the markets opened Monday morning
19   and we had not announced a sale, that people
20   would have thought the deal was falling apart
21   or had fallen apart, was never going to
22   happen, or what the heck is the problem out
23   there.  And in the markets that we lived in,
24   this was in the course of the days when the
25   papers were full of information talking about
```

TSG Reporting - Worldwide    877-702-9580

Page 155

```
1              -Lewkow-
2    whether Morgan Stanley will go under?  Will
3    Goldman Sachs go under?  Will we be in a Great
4    Depression?  That was the context in which
5    this conversation took place.
6              And there was a belief, as I said,
7    that the employees -- that this would be a
8    major problem if we didn't announce the deal
9    that we had closed by Monday morning before
10   the market opened.
11             I mentioned the employees.  The
12   employees were very important to this deal.
13   Barclays was not -- you know, all of this
14   discussion we've had and this testimony has
15   been -- and I understand that, has been about
16   the financial assets.  Barclays was not doing
17   this deal to buy a portfolio of financial
18   assets.  Barclays was doing this deal because
19   it wanted to buy a broker-dealer investment
20   banking business in the United States and was
21   prepared to take very substantial risks in
22   their view in doing that.
23             And I say "very substantial risks"
24   not focusing particularly on the financial
25   assets but because of the fact that when
```

TSG Reporting - Worldwide    877-702-9580

Page 156

```
1              -Lewkow-
2    people have bought investment banking firms in
3    the United States, they have often worked out
4    very badly.
5              Because it is not only what you pay
6    day one but it's can you make it work?  Can
7    you get the employees to stay?  Can you get
8    them integrated?  Can you keep them happy so
9    as to create value for your shareholders?  And
10   that's true in the best of days.
11             And I think of General Electric,
12   pretty savvy acquirers as people would think.
13   They had bought Kidder Peabody, spent a great
14   deal of money and then spent a lot more money
15   over the next X years trying to make it work
16   and had lost a zillion bucks.  A zillion is --
17   I don't know.  But they lost a lot of money.
18   And not just the money they invested but the
19   money they later put in to try to make it
20   work.
21             And that's what Barclays was
22   committing itself to do.  So the reaction of
23   the employees and keeping the employees, in
24   particular the key employees comfortable that
25   they assumed -- and I think rightfully so, and
```

TSG Reporting - Worldwide    877-702-9580

Page 157

```
1              -Lewkow-
2    they may have known it as a fact, I don't
3    know, but they assumed that really the
4    Barclays -- the best Barclays [sic] people,
5    the ones you most wanted to keep were getting
6    other inquiries from competitors during the
7    the days, during Monday, during the prior week
8    over that weekend, etcetera, and it was
9    important that we keep -- that Barclays be
10   able to keep the people together.
11             All of that went to the point that
12   the parties believed, both parties, that it
13   was really important to try to get this deal
14   announced before the beginning of the market
15   opening on Monday morning.
16        Q.  Was the concern about announcing
17   the closing of the deal before the opening of
18   the market on Monday morning, a factor in the
19   decision of the group as to whether or not to
20   bring the Clarification Letter back to the
21   judge?
22        A.  No.
23             MR. MORAG:  Object to the form.
24        A.  The question was, the Court had
25   approved the the Sale Order without the
```

TSG Reporting - Worldwide    877-702-9580

Page 158

1            -Lewkow-
2    Clarification Letter.  He knew he didn't have
3    the Clarification Letter.
4            So the only question that I
5    believed that Mr. -- the reason Mr. Miller
6    asked the question, I believe as I described,
7    was, Okay, what we're doing -- what we are
8    doing here in the Clarification Letter, is
9    it -- are we being consistent with what the
10   Court had approved?  Which turned on what the
11   Court had heard, and heard again on Wednesday,
12   on Friday in -- in the Asset Purchase
13   Agreement and the other information that the
14   Court had, and were we doing anything that was
15   inconsistent with that.
16           And this was why the question --
17   so, the question was, the Court clearly knew
18   that he didn't have to see the Clarification
19   Letter.  The question is had something
20   happened that was inconsistent with what he
21   had been told that would change that plan.  He
22   expected us to close over the weekend.  That
23   was what was talked about on Friday.
24           So the only reason we would have to
25   go back is if something had changed that made

TSG Reporting - Worldwide    877-702-9580

Page 159

1            -Lewkow-
2    it not be -- made a change that was
3    inconsistent with what he had been told.  It
4    was for that reason in the prior conversation
5    that there was uncertainty because we weren't
6    sure what he had said about that to the extent
7    it might or might not affect the ability to
8    deliver the cash in that bank account that I
9    mentioned that was part of the assets of the
10   15c3-3 account, that since we weren't sure on
11   that issue, that would have raised the problem
12   that I testified about.
13           But that was the only time that
14   there was any discussion of going back.  And
15   even there, the concept was, how do we --
16   Barclays gave up in its mind a billion dollars
17   because it was important to get the deal
18   closed on Monday morning.
19       MR. GAFFEY:  I don't have anything
20   further.
21       Thanks.  Thanks for your time,
22   Mr. Lewkow.
23       THE WITNESS:  Can we take a break?
24       (Whereupon, a recess was taken
25   from 2:41 p.m. to 2:52 p.m. )

TSG Reporting - Worldwide    877-702-9580

Page 160

1            -Lewkow-
2    EXAMINATION BY
3    MR. MAGUIRE:
4        Q.  Mr. Lewkow, as you know, my name is
5    Bill Maguire, I represent the SIPA Trustee.
6    Before we start with questions, your counsel
7    is going to put on the record the topics you
8    have been designated as representative today.
9        MR. MORAG:  As I think we confirmed
10   to you separately, Mr. Lewkow and
11   Mr. Rosen together are responding to
12   the 30(b)(6) deposition notice served
13   on Cleary Gottlieb and they have
14   separately been subpoenaed for their
15   own personal deposition, which you now
16   have agreed to complete Mr. Lewkow's
17   personal deposition along with his
18   share of the 30(b)(6).
19       With respect to 30(b)(6), the
20   easiest way for me to explain it is
21   that Mr. Rosen is addressing issues
22   relating to the DTC, OCC, and the terms
23   of the Clarification Letter relating to
24   exchange-traded derivatives.
25       To the extent there may be overlap

TSG Reporting - Worldwide    877-702-9580

Page 161

1            -Lewkow-
2    with respect to the 15c3-3 issue, then
3    they're both designated.
4        I think you know from the
5    declaration, Mr. Rosen is a market
6    regulation person and Vic is the
7    mergers and acquisition.
8        That may not be the precise answer,
9    but if you have any question, you
10   should certainly ask them of
11   Mr. Lewkow.  If it's Ed, he will tell
12   you.
13       MR. MAGUIRE:  Thank you.
14   BY MR. MAGUIRE:
15       Q.  Sir, you have seen in the course of
16   today a number of drafts of the deal document,
17   many of them with the black lining or red
18   lining convention.
19       What was the practice in terms of
20   the Cleary team dealing with the Weil team and
21   the other parties in the course of negotiating
22   first the APA and then exchanging drafts in
23   connection with the Clarification Letter?
24       MR. MORAG:  Objection to form.
25   Vague as to "practice".

TSG Reporting - Worldwide    877-702-9580

Page 198

1          -Lewkow-
2    protection that the rule is aimed at doing.
3          I don't know if I would use the
4    word you used, but I recognized that there
5    were regulatory implications about the ability
6    to take the money out that were tied to the
7    accounts of the customers who were being
8    directly or indirectly -- I'm not sure the
9    details of how it works -- to provide some
10   level of effort to the customers and clients.
11        Q.  Was there a discussion of the
12   regulatory constraints on Lehman in releasing
13   funds from its c3 account?
14        A.  As I testified this morning, I
15   believe that when the discussion took place,
16   somebody from Weil -- none of the Weil people
17   were experts at all on 15c3-3 accounts as they
18   all said at the time.  One of them made that
19   point.  And on our side, we did have someone
20   who did have real expertise, Ed Rosen, who was
21   participating at least by the latter stages in
22   discussions.  So somebody from Weil had raised
23   the question of, "Gee, as far as we at Weil
24   know, maybe we need approval from the SEC to
25   do this.  And Rosen said, "You don't need

TSG Reporting - Worldwide    877-702-9580

Page 199

1          -Lewkow-
2    approval to do it, there is no approval
3    requirement."
4          And they said, "Well, this is an
5    account that we gather -- you know, we know is
6    required as a regulatory matter.  Let's at
7    least say --" they may have proposed saying,
8    you know, "subject to SEC approval," I don't
9    remember if they used those words.
10         And Ed said, "No, that's wrong
11   because there is no need for SEC approval."
12   And they said, "Can we say something like
13   'subject to applicable law'?"  Or something
14   like that.  And since we tried to comply with
15   the SEC laws and rules, Ed did not object to
16   that, and language to that effect went into
17   the document.
18        Q.  Did anyone explain that only an
19   amount in excess of a c3 calculation is
20   permitted to be removed from such a restricted
21   account?
22        MR. MORAG:  Objection to form.
23        Answer with respect to anything you
24   were told from the Lehman side.
25        A.  I believe that 15 -- as I

TSG Reporting - Worldwide    877-702-9580

Page 200

1          -Lewkow-
2    understood 15c3-3 with total non-expertise, it
3    is a requirement that you maintain certain
4    reserves in a segregated account to protect
5    the interest of customers.  And I don't
6    recall -- I was aware certainly that basically
7    Barclays was assuming the accounts.  So I'm
8    not sure whether there was a difference
9    between an excess and a non-excess given that
10   I don't think Lehman, as a broker-dealer, was
11   going to continue to have customer accounts.
12   But that's all I can say on that subject.
13        Q.  In that hallway conversation,
14   Mr. Rosen did not say that only the excess
15   could be transferred?
16        MR. MORAG:  Is that a question?
17        MR. MAGUIRE:  Yes.
18        A.  I don't remember the word "excess."
19   You'll have to ask Mr. Rosen.
20        Q.  Did Mr. Rosen say anything about a
21   deficiency in the c3 account?
22        A.  There was no discussion of
23   deficiency of the c3 account.  Lehman Brothers
24   on Friday -- I was told that Lehman Brothers
25   on Friday had identified this account as

TSG Reporting - Worldwide    877-702-9580

Page 201

1          -Lewkow-
2    assets that consistent with the Asset Purchase
3    Agreement that required the delivery of all
4    assets used in the business other than
5    specifically excluded assets.  But they
6    identified this account for the first time on
7    Friday as assets that were Lehman, that Lehman
8    could deliver to Barclays as the purchaser.
9    And therefore, certainly no one had a
10   discussion about the deficiency.
11        Q.  Did anyone have any discussion
12   about a shortfall in customer property?
13        A.  I don't know what you mean by
14   "shortfall" as opposed to "deficiency."  To me
15   it sounds the same.  I don't -- no.
16        Q.  Did anyone discuss where Lehman
17   would get the property to pay Barclays if it
18   was unable, could not get approval, to remove
19   the funds from the c3 account?
20        A.  I think --
21        MR. MORAG:  Object to the form of
22   the question, to the word "funds."  I
23   think there has been testimony what was
24   agreed to be transferred was
25   securities.

TSG Reporting - Worldwide    877-702-9580

Page 202

1          -Lewkow-
2       A.  As I testified earlier, in the
3  course of this discussion, Mr. Klein said in
4  words or in substance that, okay, we will take
5  the billion dollars that are sitting in a bank
6  in cash, deposited with the bank but we want
7  to get the 760-odd million.  And if you can't
8  get it there, we want to get it some other
9  way.  And that's my recollection of the
10 discussion.
11      Q.  In the middle of Paragraph 20 of
12 your Declaration, page 10, after you referred
13 to Mr. Klein, you say, "This was agreed to by
14 representatives of Lehman."  Do you see that?
15      A.  Yes.
16      Q.  What do you mean by "this"?
17      A.  That if the lead -- if there were
18 legal constraints preventing transfer of the
19 rule 15c3-3 account assets, Barclays would
20 receive substitute assets.
21      Q.  And who were the Lehman
22 representatives who agreed to that?
23      A.  At a minimum, it included the Weil
24 group that was standing there.  I don't know
25 what authority they had.  As I said, this took
         TSG Reporting - Worldwide    877-702-9580

Page 203

1          -Lewkow-
2  place over a couple of conversations, I think.
3  At a minimum, it included them.
4       I actually believed that somebody
5  from Lehman may have been with them during
6  this discussion, but I don't have a distinct
7  recollection of that.  As I said, the group
8  had gotten larger during the course of these
9  two or three hallway conversations.  But I --
10 you know, certainly I leave it to Weil
11 Gotshal.
12      You know, I have enormous respect
13 for Mr. Miller and Mr. Roberts and Ms. Fife
14 and the other lawyers, and Mr. Masaneo, and
15 the other lawyers who were there doing their
16 best to represent their clients.  They know
17 what things they need to go back to and not go
18 back to.
19      So if there was no one from Lehman
20 Brothers there -- I just don't recall if
21 someone from Lehman was there at that moment
22 or not.  But Lehman -- Lehman's counsel -- and
23 there may have been somebody from Simpson
24 Thacher there as well.  May well have been.
25      Lehman's counsel agreed to it.  And
         TSG Reporting - Worldwide    877-702-9580

Page 204

1          -Lewkow-
2  then it went -- later in the day it got into a
3  draft.  So certainly I don't know what
4  kind -- if Lehman people were not present at
5  that moment, I assume Weil either had
6  authority or obtained authority to include
7  that in.  But you'll have to ask them.
8       Q.  How did Mr. Miller signify his
9  agreement to this?
10      A.  He said -- somebody from Weil said,
11 okay, or yes, or that's not a problem.  I
12 don't know what words he used.
13      Q.  Who was the person from Weil who
14 said one of those variety of comments?
15      A.  I don't -- I don't remember.
16      Q.  And did you understand that person
17 from Weil to be agreeing that Barclays would
18 get $769 million unconditionally as part of
19 the sale as opposed to simply agreeing to the
20 inclusion of the language proposed "to the
21 extent permitted by applicable law"?
22      A.  No, I think the phrase -- my
23 understanding at the time and I think what we
24 were all talking about was my understanding
25 was the reason "to the extent permitted by
         TSG Reporting - Worldwide    877-702-9580

Page 205

1          -Lewkow-
2  applicable law" or words of that nature were
3  going to get added to the language was because
4  of the technical rules governing 15c3-3 that
5  the Weil lawyers had conceded they were not
6  experts on.
7       I had absolutely no expectation,
8  and it was never suggested, to my
9  recollection, that the limitation "to the
10 extent permitted by applicable law" was a
11 limitation on the broader statement: if we
12 can't transfer that, we will transfer
13 something else.  That was not my
14 understanding.
15      Q.  Did you do anything to confirm your
16 understanding that when Weil, somebody at Weil
17 said "okay" or "yes," they were agreeing to
18 make this obligation unconditional as opposed
19 to simply agreeing to the inclusion of the
20 language proposed "to the extent permitted by
21 applicable law"?
22      A.  The language was drafted to reflect
23 the conversation that took place in the
24 hallway and was included in the Clarification
25 Letter.  I believe there is nothing else to
         TSG Reporting - Worldwide    877-702-9580

Page 206

-Lewkow-

1 say. People agreed to a principle, it got
2 reflected in the Clarification Letter.
3
4 **Q. A couple of lines down in your**
5 **Declaration, you refer to some other language,**
6 **it's the phrase you referred to "are**
7 **securities of substantially the same nature**
8 **and value." Do you see that?**
9 A. Yes.
10 **Q. Who proposed that language?**
11 A. I described the agreement, the oral
12 agreement that was reached in the hallway. It
13 was then left to the folks focusing on pushing
14 the paper forward on the Clarification Letter,
15 which included both Cleary folks and Weil
16 folks and there were others involved, or at
17 least in the room at some time during that
18 conversation.
19 And I believe that somebody did a
20 first version of it that referred to -- of the
21 same nature and didn't include "and value."
22 And then someone on the Barclays' team said,
23 "Well, that doesn't work because that
24 wouldn't -- what does that mean?" So the
25 words "and value" got put in.

TSG Reporting - Worldwide    877-702-9580

Page 207

-Lewkow-

1
2 **Q. Did anyone at Barclays go back and**
3 **ask anyone at Weil what that meant?**
4 A. What what meant, sorry?
5 **Q. The words "are securities of**
6 **substantially the same nature"; what was meant**
7 **by that language?**
8 A. With all due respect, when people
9 are trying to write a document and trying to
10 get a deal done under incredibly difficult
11 circumstances and somebody writes a language
12 that on its face does not work to solve the
13 problem that had been discussed and agreed to
14 on all matters by people to solve a problem,
15 and it was obvious that to say "the same
16 nature" could mean one dollar worth of
17 securities, that would have been an idiotic
18 remark.
19 We had no reason to believe that
20 Weil was trying to sabotage the deal that
21 their colleagues had agreed to. And so my
22 understanding, someone said, "You got to add
23 the word 'and value'," and they said "Of
24 course," and it happened.
25 **Q. From whom did you get that**

TSG Reporting - Worldwide    877-702-9580

Page 208

-Lewkow-

1
2 **understanding?**
3 A. From my colleagues, Mr. Davis,
4 Mr. McLaughlin and Mr. Leinwand and one or
5 more of that group.
6 MR. HUME: Can we take a short
7 break?
8 THE WITNESS: Yes, I can use a
9 bathroom break. Thank you.
10 (Whereupon, a recess was taken
11 from 3:58 p.m. to 4:24 p.m.)
12 BY MR. MAGUIRE:
13 **Q. Sir, over the course of the weekend**
14 **prior to closing, did you participate in any**
15 **meetings with the Creditors Committee?**
16 A. No. Let me add to that. That
17 isn't to say that one or more members of the
18 Creditors Committee may have been present when
19 meetings took place. But I certainly did not
20 have any -- to my knowledge, any particular
21 meetings with the Creditors Committee.
22 **Q. Let me show you a document that's**
23 **previously been marked as Exhibit 451.**
24 A. I got it.
25 **Q. Do you recognize that document,**

TSG Reporting - Worldwide    877-702-9580

Page 209

-Lewkow-

1
2 sir?
3 A. Yes.
4 **Q. What is it?**
5 A. This looks like, and this is the
6 document, I'm quite sure, that I was shown and
7 you asked me about before. This is the
8 letter -- the internal Lehman Brothers' e-mail
9 that I was shown that Sunday by Weil Gotshal
10 with respect to the 15c3-3 reserve account.
11 **Q. And you mentioned that a bank had a**
12 **billion dollars of cash. Are you referring to**
13 **the cash with Wells Fargo?**
14 A. Yes. On deposit with Wells Fargo.
15 **Q. So you understand this was, taking**
16 **the billion dollars in cash out of the**
17 **transaction left $769 million in qualified**
18 **securities?**
19 A. Yes.
20 **Q. And that was in the subject of the**
21 **provision that was put in the Clarification**
22 **Letter?**
23 A. Yes.
24 **Q. You'll see the reference here to**
25 Mike Macchiaroli?

TSG Reporting - Worldwide    877-702-9580

Page 226

1    -Lewkow-
2  recall anyone suggesting that.
3        MR. HUME:  Do you want to take a
4  short break?
5        MR. MAGUIRE:  Sure.
6         (Whereupon, a recess was taken
7  from 4:50 p.m. to 5:01 p.m.)
8        MR. MAGUIRE:  Sir, I have no
9  further questions, thank you.
10 EXAMINATION BY
11 MR. HUME:
12     Q.  Mr. Lewkow, I'm Hamish Hume and I'm
13 here representing Barclays, as you know.  I
14 just wanted to make sure one thing on the
15 record is clear.
16     On page 197 of the rough transcript
17 we are looking at, you were asked a question
18 by counsel for the Trustee.  This was
19 referring to the conversation you testified to
20 with Weil Gotshal about the $769 million in
21 securities.
22     The question was: "And did you
23 understand that person from Weil to be
24 agreeing that Barclays would get $769 million
25 unconditionally as part of the sale as opposed

TSG Reporting - Worldwide    877-702-9580

Page 227

1    -Lewkow-
2  to simply agreeing to the inclusion of the
3  language proposed 'to the extent permitted by
4  applicable law'?"
5        Your answer was "No," and then you
6  went on with an explanation.
7        Let me just make sure the record is
8  clear in terms of the "yes" and the "no" of
9  that question.
10       Was it your understanding from your
11 conversation with Weil Gotshal that you
12 referenced relating to the $769 million in
13 securities, that Barclays did have an
14 unconditional right to receive those assets?
15     A.  Yes.  The question, with all due
16 respect, was ambiguous, because I was offered
17 a choice, was I agreeing -- was the Lehman
18 person agreeing unconditionally to pay or
19 agreeing -- "simply agreeing," was your term,
20 to the inclusion of language "to the extent
21 permitted by applicable law."  That was a
22 choice.  And I started with "no."  My "no" was
23 addressed to the end of your question, that it
24 was not merely "to the extent permitted by
25 applicable law."

TSG Reporting - Worldwide    877-702-9580

Page 228

1    -Lewkow-
2     It was, as I explained in the rest
3  of my answer, the discussion of "the
4  applicable law," as I understood what the
5  individual was saying on behalf of Lehman, was
6  merely to 15c3-3 and not to the concept that
7  if that were not payable, there would be an
8  unconditional obligation to deliver the
9  securities some other way.
10       MR. HUME:  I have no other
11 questions.
12       MR. MAGUIRE:  Nothing further.
13       (Time noted:  5:05 p.m.)
14
15
16    _____
17    VICTOR I. LEWKOW
18
19
20
21 Subscribed and sworn to before me,
22 this ____ day _____ of 2010.
23
24 _____
25    Notary Public

TSG Reporting - Worldwide    877-702-9580

Page 229

1  ------------------I N D E X------------------
2  WITNESS        EXAMINATION BY       PAGE
3  V. LEWKOW        MR. GAFFEY          5
4          MR. MAGUIRE          160
5          MR. HUME            226
6
7  DIRECTIONS: PAGE  79, 134, 185
8  MOTIONS:   [None]
9  REQUEST:   [None]
10
11 ----------------EXHIBITS-------------------
12 EXHIBIT              FOR I.D.
13 Exhibit 613A            6
14 Declaration of Victor Lewkow
15
16 Exhibit 614A            135
17 Letter from S&C, CGSH
18 00020701-20714
19
20 Exhibit, 615A            195
21 2PP 9/18/08 e-mail from J.
22 Potenciano to distribution re:
23 Preliminary 15c3-3 reserve lock-up
24 as of 9/17/08
25

TSG Reporting - Worldwide    877-702-9580

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                  Chapter 11

7        LEHMAN BROTHERS          Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,    (Jointly Administered)

9                  Debtors.

10       ------------------------x

11

12            DEPOSITION OF EDWARD J. ROSEN

13                  New York, New York

14                  February 19, 2010

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 28461

19

20

21

22

23

24

25

Page 6

```
 1              ROSEN
 2          (Exhibit 622, declaration of Edward J.
 3      Rosen marked for identification, as of this
 4      date.)
 5  EDWARD J. ROSEN,
 6      called as a witness by the parties,
 7      having been duly sworn, testified as follows:
 8  EXAMINATION BY
 9  MR. MAGUIRE:
10      Q.   As you know, my name is Bill Maguire
11  with Hughes, Hubbard & Reed.  I am here with my
12  colleague Amina Hassan.  We represent James
13  Giddens, the SIPA trustee.
14          We are going to ask you some
15  questions.  If any questions are unclear, let me
16  know.  If you need to take a break at any time,
17  just let me know.
18          I will show you a document we have
19  marked as Exhibit 622.  If you can tell me what
20  that document is, sir.
21      A.   It looks like my declaration, pursuant
22  to Rule 30(b)(6).
23      Q.   You have mentioned in the second
24  paragraph that you specialize in derivatives.
25  Do you see that?
```

TSG Reporting - Worldwide    877-702-9580

Page 7

```
 1              ROSEN
 2      A.   Yes.
 3      Q.   Can you tell me what -- the
 4  derivatives that Barclays acquired in the
 5  transaction that's the subject of this, did that
 6  include any futures contracts?
 7          MR. MORAG:  Object to the form.
 8      A.   It did, it did include the acquisition
 9  of the futures business.
10      Q.   And did that futures business include
11  any positions?
12      A.   I don't know.  I don't know what
13  positions were actually on.  We didn't handle
14  the futures side of the arrangements.  Those
15  were handled by S&C, by and large.
16      Q.   Did you have an understanding whether
17  any futures contracts were included in the
18  acquisition by Barclays?
19          MR. MORAG:  Object to the form.
20      A.   Yes.  I believe, my understanding was
21  that there were futures positions and listed
22  options positions.
23      Q.   And what kinds of futures and options
24  contracts did you understand Barclays to be
25  acquiring in this transaction?
```

TSG Reporting - Worldwide    877-702-9580

Page 8

```
 1              ROSEN
 2      A.   I'm not sure I understand the
 3  question, what type of futures options.
 4      Q.   Were they exchange-traded or over the
 5  counter?
 6      A.   Yes, yes, listed.  Not over the
 7  counter.  My understanding was the
 8  over-the-counter business was excluded.
 9      Q.   Did you have an understanding how
10  Lehman organized its derivatives business?
11      A.   No.
12      Q.   When did you become involved in the
13  transaction?
14      A.   My recollection was sometime around
15  the 15th of September, maybe the 14th of
16  September.
17      Q.   And what was your role?
18          MR. MORAG:  Time frame?  At the start?
19      Q.   Starting on the 15th.
20      A.   On the 15th, going forward, I was both
21  dealing with certain of the deal issues relating
22  to the regulated character of the transaction,
23  and also dealing with certain regulators on
24  issues that needed to be addressed if the deal
25  was going to be closed.
```

TSG Reporting - Worldwide    877-702-9580

Page 9

```
 1              ROSEN
 2      That's primarily what I was doing, but
 3  also the clearinghouse issues that arose and the
 4  JP Morgan issues that arose, I had some
 5  involvement in, as events unfolded between then
 6  and the 22nd.
 7      Q.   When you say the clearinghouse, are
 8  you referring to DTCC?
 9      A.   And OCC.
10      Q.   What regulators did you deal with?
11      A.   I spoke with the SEC.  I did have one
12  or two conversations with staff at FINRA, and I
13  had a couple of conversations with folks at the
14  Federal Reserve.
15      Q.   With whom did you deal at the SEC?
16      A.   I had conversations with Mike
17  Macchiaroli, Randall Roy, and Dan Gallagher.
18      Q.   What were the subject of your
19  conversations with Mike Macchiaroli?
20      A.   There were a couple of issues.  The
21  principal issue related to the fact that Lehman
22  operated under a different -- was registered
23  under a different broker dealer regulatory
24  regime with different capital requirements than
25  Barclays, and there were questions about how
```

TSG Reporting - Worldwide    877-702-9580

Page 22

```
                    ROSEN
 1
 2      A.   Talking about the 30(b)(6) issues and
 3  discussing our recollection of them.
 4      Q.   Can you tell me when that happened?
 5          MR. HUME:  I am just going to object,
 6  because I think the record is unclear
 7  whether your question is about recollections
 8  reflected in the affidavit versus 30(b)(6)
 9  prep.
10      Q.   Did you distinguish between preparing,
11  getting your recollections for your declaration
12  and your recollections for your deposition, or
13  was that all part of the same process where you
14  were preparing to testify either by way of
15  declaration or by way of deposition?
16      A.   Well, obviously the discussions were
17  held earlier with respect to the declaration,
18  sometime during the week leading up to the
19  completion of the declaration.  I don't recall
20  whether Duane McLaughlin or Dana Fleischman
21  participated in those earlier discussions.
22      Q.   They did, however, participate in
23  another round of similar discussions --
24      A.   After the declaration.
25      Q.   -- after the declaration.
```
TSG Reporting - Worldwide    877-702-9580

Page 23

```
                    ROSEN
 1
 2          And when was that?  Was that just in
 3  the last week?
 4      A.   The week before, primarily.  And
 5  yesterday, but only a small subset.
 6      Q.   And how did you actually get the
 7  recollection from the partners?  How did you
 8  find out what they remembered?
 9      A.   I'm not quite sure I understand the
10  question.  We talked amongst ourselves about the
11  events and our recollections of them covered by
12  the 30(b)(6).
13      Q.   Did any of your partners remember
14  things that you did not remember?
15      A.   I would say yes, we all had different
16  recollections.
17      Q.   Now, you note in your declaration,
18  paragraph 3, you say, "Where indicated, the
19  recollection of my partners."  Do you see that?
20  It's on the second line of paragraph 3.
21      A.   Um-hm.  I do see that.
22      Q.   Is there any recollection that any of
23  your partners gave you that you did not set
24  forth in this declaration?
25          MR. MORAG:  Objection to form and
```
TSG Reporting - Worldwide    877-702-9580

Page 24

```
                    ROSEN
 1
 2  objection on the attorney/client privilege
 3  and work product.
 4          MR. MAGUIRE:  Are you objecting or
 5  directing the witness not to answer?
 6          MR. MORAG:  If I understand your
 7  question correctly, I'm directing him not to
 8  answer.
 9      Q.   In paragraph 4, sir, you refer to the
10  removal of certain language.  Do you see that?
11      A.   Yes.
12      Q.   And you note specifically the draft
13  that it was removed from.
14      A.   I am sorry.
15      Q.   You refer to language -- you refer to
16  a draft that contained that language?
17      A.   Yes.
18      Q.   And the draft language that you are
19  referring to, you set that forth in paragraph 5;
20  is that correct?
21      A.   I am sorry, in paragraph 4, I don't
22  see a reference to paragraph 5.
23      Q.   That's correct.  In paragraph 4, you
24  refer to the removal of certain language.
25      A.   Yes.  I am sorry.  You are referring
```
TSG Reporting - Worldwide    877-702-9580

Page 25

```
                    ROSEN
 1
 2  to paragraph 5 of the declaration, not
 3  paragraph -- OK, could you repeat the question.
 4      Q.   I just want to make sure we are on the
 5  same page here.  You're -- when you talk about
 6  the certain language in paragraph 4, you are
 7  referring to the language that you set forth in
 8  quotes in paragraph 5 of your declaration?
 9      A.   Yes.  This is a reference to the
10  language in 1D.
11          MR. MORAG:  Let me note for the record
12  that the quoted language in paragraph 5 does
13  have ellipses and was not intended to be a
14  full quote.
15      Q.   As a matter of reference, we are
16  talking about the same language?
17      A.   Yes.
18      Q.   At the end of paragraph 4, you say
19  that the trustee's position is incorrect, and
20  you say, "There was to my or my partners'
21  knowledge never any such agreement or
22  discussion."  Do you see that?
23      A.   Yes.
24      Q.   Sir, was there any discussion, to your
25  knowledge, or to the knowledge of your partners,
```
TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  with anyone, about the removal of the language
3  that you discuss in paragraphs 4 and 5 of your
4  declaration?
5      MR. MORAG:  Object to the form, and to
6  the extent -- you can answer to the extent
7  you're going to talk about discussion with
8  anyone on the Lehman side.
9      THE WITNESS:  Yeah, I know, it's fine.
10     A.   The only -- I -- the answer is, I
11 don't recall the specific content of the
12 discussion.  But in response to that language,
13 there was -- there was additional language that
14 we drafted that was provided and identified to
15 Lehman's attorneys explaining that this language
16 was needed in light of the changes that had been
17 made to 1D.
18     Q.   And is that, sir, your recollection or
19 the recollection of one of your partners?
20     A.   Well, we gave -- it is our collective
21 recollection that we drafted the additional
22 language, and it was our recollection that we
23 provided that in the form of a handwritten
24 markup, and I don't recall, and I'm not sure any
25 of my partners specifically recall, who actually

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  handed the markup over to the Lehman side, but
3  it was provided to the Lehman side in the form
4  of handwritten comments.
5      Q.   And the handwritten comments, are
6  those the ones that included the parenthetical
7  "property held to secure"?
8      A.   Yes, yes.
9      Q.   Have you seen those handwritten
10 comments?
11     MR. MORAG:  Time frame?
12     Q.   At any time?
13     A.   You mean including at the time that
14 they were drafted?
15     Q.   Yes.
16     A.   The recollection of the group was that
17 I drafted them.
18     Q.   Do you recall actually what you did
19 with those handwritten notes?
20     A.   I would have given them to one of my
21 partners.
22     Q.   Have you seen them since the weekend
23 when those notes were prepared?
24     A.   No, no, I have not.
25     Q.   Do you know whether they exist today?

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2      A.   I don't know.
3      Q.   Do you know whether, in fact, you did
4  give them to somebody or what you did with those
5  handwritten notes?
6      A.   My recollection is that I handed them
7  to one of my partners.
8      Q.   Do you know which partner you handed
9  them to?
10     A.   I don't recall specifically.
11     Q.   Do you have a general recollection?
12     A.   I have a general recollection, it
13 would have been Bob Davis or Duane McLaughlin or
14 David Leinwand.  It would have been one of those
15 three.
16     Q.   Have you asked your partners for that
17 draft?
18     A.   No, I haven't.
19     Q.   Do you know whether anyone has
20 attempted to locate that draft?
21     A.   I don't know.
22     Q.   Did you talk to anyone on the Lehman
23 side concerning the insertion of the
24 parenthetical that you were proposing in that
25 draft?

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2      A.   Did I personally speak to anyone on
3  the Lehman side?  Well, it depends upon -- I am
4  sorry, I personally did not speak to anyone on
5  the Lehman side.
6      Q.   Do you know whether any of your
7  partners spoke to anyone on the Lehman side
8  about including that parenthetical in the
9  clarification letter?
10     A.   Our understanding, our recollection,
11 Cleary's recollection, is that it would have
12 been -- it would have been identified as a
13 change to be made to the agreement, to the --
14 whoever the lawyer was on the -- representing
15 Lehman that was handling the document.
16     Q.   And do you know who the lawyer on the
17 Lehman side was to whom it was handed?
18     A.   I don't know.  I don't know.
19     Q.   And the draft that was handed to that
20 Lehman lawyer, did it have any other handwritten
21 changes?
22     A.   I'm trying to remember.  There were
23 two other changes that I recall, and you will
24 have to forgive me for being a little bit
25 unclear about the timing or the sequencing, but

TSG Reporting - Worldwide    877-702-9580

Page 30

ROSEN

1
2   I believe there were two other changes.
3       One, there was language -- let me back
4   up and ask you this question and get
5   clarification.  Are you asking me just about the
6   language that's described in 1D, or are you
7   asking about other changes to the clarification
8   letter?
9       Q.   Let's get our time frame and context
10  together first.  I'm talking to you specifically
11  about the draft that I understand from your
12  testimony in which you, in handwriting, inserted
13  the parenthetical that includes the words "and
14  property held to secure."
15      A.   Yes.
16      Q.   And the question is whether that draft
17  included any other proposed changes.
18      A.   I'd have to go back and look at the
19  sequence of the drafts.  There were two other
20  changes that may or may not have been
21  simultaneous.  I don't know.  They may have been
22  given sequentially but have been processed by
23  the other side as part of one turn.  I don't, I
24  don't recall.
25      But there was a change in the

TSG Reporting - Worldwide    877-702-9580

Page 31

ROSEN

1
2   clarification of language concerning 15c3-3,
3   provision to add the word "or value" at the end
4   of a sentence, and there was a sentence to
5   clarify what had been agreed as part of the
6   resolution of issues with DTC, that the
7   liabilities to DTC associated with Lehman were
8   excluded liabilities under the APA.
9       Q.   I am going to ask you again
10  specifically about the draft in which you
11  inserted that parenthetical "property held to
12  secure."
13      With respect to that draft, can you
14  tell me what, if anything, was said about anyone
15  on the Barclays side or the Cleary side to the
16  person on the Lehman side who received that
17  draft?
18      A.   No, I can't give you verbatim what
19  would have been said, but what would ordinarily
20  happen in that circumstance is that the changes
21  would be identified to the other side so they
22  could understand what was being provided to
23  them.
24      Q.   And when you say the changes would be
25  identified, the other side would be shown what

TSG Reporting - Worldwide    877-702-9580

Page 32

ROSEN

1
2   the proposed language was?
3       A.   Yes.  We did not control the
4   documents, so Cleary did not input those
5   changes.  Those changes were put into whatever
6   revised draft emerged in whatever time it
7   emerged by the Lehman's counsel.
8       Q.   Other than pointing out the changed
9   language, do you know what, if anything, was
10  said to Lehman about the addition of that
11  parenthetical?
12      A.   No.  Not at that time.
13      Q.   When you say not at that time, is
14  there some other time that there was a
15  discussion --
16      A.   Not about that specific parenthetical
17  but about the subject, there were a lot of --
18  there were exchanges of a number of
19  communications and documents that I think were
20  addressed to the same issue that were exchanged.
21      Q.   I would like to go through some of
22  them, and the first one I'd like to take is the
23  one that you refer to in paragraph 4.  And
24  that's the draft language that you have put
25  forth in quotes in paragraph 5.

TSG Reporting - Worldwide    877-702-9580

Page 33

ROSEN

1
2       And if we get our sequence right,
3   there was a draft that included this language
4   which has an express reference to margin, and
5   that's the language you have set forth in
6   paragraph 5, right?
7       A.   I am sorry, could you repeat the
8   question about this language.
9       Q.   Yes.  Let's get our context right
10  first.
11      I invite you to look at paragraph 5
12  and look at the draft language that you have,
13  starting with the quotes, "any and all
14  property."
15      A.   I am sorry, where are you in
16  paragraph 5?
17      Q.   About midway down, the second full
18  sentence:  "The draft language accomplished this
19  by making clear that the definition of excluded
20  assets did not include 'any and all property,'"
21  and it continues.
22      A.   Correct.
23      Q.   So for my next couple of questions, I
24  am going to be asking you specifically about
25  that language and the draft in which that

TSG Reporting - Worldwide    877-702-9580

```
 1              ROSEN
 2   language was deleted or crossed out.  Are you
 3   with me?
 4        A.   Yes.
 5        Q.   Did you see the draft in which that
 6   language was crossed out?
 7             MR. MORAG:  Object to the form.  I
 8   also object to the representation that all
 9   of the language was crossed out.  If you
10   want to show him the actual draft, it may be
11   more appropriate.
12        A.   I saw a draft which included a number
13   of changes in which language was moved to other
14   sections and modifications were made, and those
15   modifications included modifications to this
16   language.  Yes, I did.
17        Q.   And you refer to this as the removal
18   of certain language in paragraph 4?
19        A.   Well, I would -- without mincing
20   words, I would say that there was a draft
21   prepared that dealt with some of these issues in
22   other ways, in other provisions of the
23   agreement.
24        Q.   Did you see the draft in which the
25   language you quote in paragraph 5 was removed?
```

```
 1              ROSEN
 2        A.   Yes.  Well, subject to the caveat as
 3   to what you mean by remove.
 4        Q.   What I mean by removed is the language
 5   that you quote was deleted, it was marked as
 6   deleted?
 7             MR. MORAG:  Object to the form.
 8        Q.   Did you see such a draft?
 9        A.   I saw a draft in which this language
10   did not appear in this form.
11        Q.   Did this language appear in any other
12   form in that draft?
13        A.   Some of it did and obviously some of
14   it didn't.
15        Q.   And what part of it did not?
16        A.   I'd have to -- I would have to look at
17   the particular draft of the agreement to answer
18   that question.  I can't recall with accurate --
19   with accuracy what the other changes were that
20   were made at the same time as this change was
21   made.
22        Q.   Once you saw that draft, did you
23   personally have any discussions with anyone on
24   the Lehman side concerning the removal of any of
25   this language?
```

```
 1              ROSEN
 2        A.   As I said earlier, we prepared
 3   language, I prepared language, and that language
 4   was provided to Lehman, and they would have
 5   identified to Lehman that this language was now
 6   necessary.
 7        Q.   Yes.  And I understand that testimony.
 8   I was just asking whether there was any other
 9   conversation that you recalled.
10        A.   No, not that I was -- not that I am
11   aware of.
12        Q.   Are you aware of any discussion
13   involving any of your partners and anyone on the
14   Lehman side --
15        A.   Actually, hang on just a second.  Hang
16   on just a second.
17             I need to see the clarification
18   agreement in which this language appears,
19   because this language deals with a number of
20   issues that were in flux at the time, some of
21   which were the subject of discussions.
22             There was language that addresses
23   15c3-3, as I said earlier, that also addressed
24   the DTC situation which had changed.  And so --
25   and there were conversations obviously among the
```

```
 1              ROSEN
 2   parties about a number of issues that are
 3   addressed in this language.
 4             But as I said, with respect
 5   specifically to the language that was added in
 6   response in section 1(a)(ii)(C), the
 7   conversation would have been in connection with
 8   the transmittal of that language to the Lehman
 9   side.
10        Q.   And you don't recall any other
11   communication with the Lehman side concerning
12   the removal of this language beyond what you
13   have told us?
14             MR. HUME:  Object to the form,
15             MR. MORAG:  Same objection.
16        A.   I think the -- other than the language
17   itself, other than the changes that were
18   proffered by Cleary having received a revised
19   draft and discussions that I suspect we are
20   going to cover relating to 15c3-3, and the
21   discussions relating to DTCC, there were no
22   specific conversations that we had and none that
23   we thought were necessary, because this was part
24   of the deal.
25        Q.   Did you have any discussions with
```

ROSEN

1
2    anyone on the Lehman side concerning margin?
3         MR. MORAG:  Time frame?
4    Q.  Over the weekend prior to the closing?
5         MR. MORAG:  Objection to the form.
6    Objection to the term "margin."
7    A.   Well, there were conversations --
8    there were e-mail communications in which I was
9    copied and Lehman's people were copied about
10   what was going to happen to the margin at OCC.
11   Not just the margin but the property associated
12   with those accounts, yes, in which OCC said,
13   consistent with the order in their -- what was
14   then the draft TAA that they had prepared, was
15   going to be transferred to Barclays.
16   Q.   Any discussions about margin with
17   anyone on the Lehman side other than in
18   connection with the OCC?
19        MR. MORAG:  Objection to the form.
20   A.   There was an e-mail to me copying
21   Lehman, I believe, about the transfer of a
22   certain amount of margin -- I can't remember
23   exactly what it was -- in which Lehman was
24   copied.  I think that e-mail was from Jim
25   McDaniel.  I think the trustee's representatives

TSG Reporting - Worldwide    877-702-9580

ROSEN

1    were also copied on that.
2    Q.   And that's in connection --
3    Mr. McDaniel represented the OCC?
4    A.   The OCC.
5    Q.   Yes.
6         Other than with respect to the OCC,
7    any discussions that you had concerning margin?
8    A.   Well, verbal discussions?
9    Q.   Yes.
10   A.   I believe that there were conference
11   calls about the clearinghouses.  I think they
12   may have been scheduled for Saturday or Sunday,
13   and the arrangements that were going to be made
14   and the transfers, and I believe that
15   representatives from Lehman were on those calls.
16   I cannot recall specifically, either the
17   specific discussions or exactly when they
18   occurred.
19        And it would have -- I think it
20   probably included discussions about how things
21   were going to be done in the transfer of margin
22   and the like.
23   Q.   What clearinghouses are you referring
24   to?

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2    A.   DTC and OCC.
3    Q.   Do you recall any discussion
4    concerning margin at DTCC?
5    A.   Discussing margin at DTCC?  Well,
6    there were discussions about the DTC accounts
7    and how they were going to be handled, and those
8    accounts would have included both proprietary
9    positions, customers' positions, positions that
10   may have been margined, and so indirectly, all
11   of those discussions with DTC potentially
12   included discussions about margin, to the extent
13   that that was relevant.
14   Q.   Any express reference to margin?
15   Margin coming up in any express way in any
16   conversation with DTC that you remember?
17   A.   Well, in the sense that to the extent
18   that anything constituted margin that was in
19   there and the discussions covered those
20   accounts, yes.  But I don't remember us
21   specifically singling out margin as a topic.
22   Q.   Do you recall any discussions about
23   margin at any foreign exchanges or
24   clearinghouses?
25   A.   Again, I don't recall conversations

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2    with foreign clearinghouses, but to the extent
3    that we discussed the accounts that were going
4    over and the credit support for them, to the
5    extent that as part of the business that was
6    being transferred, there were positions in those
7    accounts, they would have been covered by the
8    conversations.
9    Q.   And do you recall any specific such
10   conversations?
11   A.   Well, there were negotiations between
12   the parties about the business, so if you're
13   saying that I'm taking the FCM business and if
14   that business includes positions that are traded
15   on foreign markets, then by definition you're
16   talking about them as part of the same thing.
17   If you are taking that business and customer and
18   other deposits associated with them and assets
19   associated with that business, then yes, you are
20   talking about the margin indirectly, although
21   you may not be specifically singling it out.
22   Q.   That's what I want to do.  I want to
23   single it out.
24        Do you recall a specific singling out,
25   a specific mention of either margin or guarantee

TSG Reporting - Worldwide    877-702-9580

Page 42

ROSEN

2  fund deposit in any conversations other than in
3  connection with the OCC?
4          MR. HUME:  Objection, asked and
5  answered.
6      A.   I think I would say that the
7  discussions about the assets that were being
8  transferred in connection with the business and
9  any deposits is a discussion about guarantee
10  fund deposits and margin at those clearing
11  organizations.
12      Q.   I understand that testimony.  The
13  question is, do you have a recollection or have
14  you heard from any of your partners their
15  hearing that somebody specifically referred,
16  specifically to margin or guarantee fund deposit
17  in any of those discussions?
18      A.   I think that the answer to your
19  question is that in the documents, that is
20  covered.  And I'm confident that there may have
21  been -- I shouldn't say that.
22          I don't recall the specific
23  conversations that we had with the clearing
24  organizations and other lawyers who may have
25  been involved.  We may have or may not have

TSG Reporting - Worldwide    877-702-9580

Page 43

ROSEN

2  specifically referred to the word "margin" on
3  those calls.
4          But we did repeatedly exchange
5  communications regarding the various forms of
6  assets that would be coming over, for example,
7  under the TAA.
8      Q.   We have been talking now about the
9  time period over the weekend prior to the
10  closing.  I would like to just ask you if I have
11  missed anything, if we go back to the work that
12  you were doing from the 15th on, anytime up to
13  that weekend.  During that period, do you recall
14  any discussions specifically in which margin or
15  guarantee fund deposit were mentioned?
16      A.   Again, I would say in the deal
17  documentation relating to the transfer of assets
18  associated with those businesses that were being
19  transferred and the agreements as to the
20  inclusion of deposits, including customer
21  deposits, yes, they were the subject of
22  communications in that form.
23      Q.   And what discussion do you remember in
24  which anyone specifically referred to margin?
25      A.   As I say, I don't recall specifically

TSG Reporting - Worldwide    877-702-9580

Page 44

ROSEN

2  the content of specific conversations that I may
3  have had at that time.
4      Q.   Is there any conversation that you're
5  aware of where anyone on the Barclays or Cleary
6  side had specifically discussed guarantee funds
7  deposit?
8          MR. MORAG:  You can answer to the
9  extent it involves someone on the Lehman or
10  OCC or DTC side as well.
11      A.   It was never raised as an issue for
12  discussion, because it was assumed by all
13  parties, I think, that it was part of the
14  business.  And certainly nobody on the Lehman
15  side ever suggested or raised the question as to
16  its needing to be singled out from the language
17  that otherwise covered it.
18      Q.   Now, when you saw that the draft
19  language referring to margin and guarantee fund
20  deposit had been removed from the draft, did
21  that suggest to you that there needed to be a
22  discussion about this or that someone on the
23  Lehman side was suggesting that they had
24  different assumptions or different
25  understandings from what you had?

TSG Reporting - Worldwide    877-702-9580

Page 45

ROSEN

2          MR. MORAG:  Objection to form.
3  Compound.
4      A.   As I mentioned, the language that came
5  out was actually not specific to OTC -- to
6  listed derivatives or listed derivatives
7  customers.  It was language that sort of
8  addressed a variety of issues.
9          And so I would not have drawn any
10  necessary inference as to what specifically the
11  concerns were that, from the Lehman side, were
12  being addressed.  There were changes to the deal
13  that needed to be addressed in that language.
14  There were changes in the agreements that
15  related to the handling of -- I'm sorry.  There
16  were changes in the language that was
17  documenting, for lack of a better reference, the
18  15c3-3 treatment, and indeed the fact that the
19  DTC arrangement had essentially changed.
20          So it was clear that the language that
21  was modified needed to be modified.  As to
22  whether or not that modification signaled a
23  specific view about the treatment of credit
24  support for exchange-traded derivatives, you
25  would never know until you clarified it with

TSG Reporting - Worldwide    877-702-9580

Page 46

ROSEN

1
2  your own language, and to my knowledge, nobody
3  on the Lehman side, when presented with that
4  language, expressed any surprise or objection.
5       So I think the clear inference is that
6  it was not a surprise to them, and therefore, we
7  inferred that there was no intent to communicate
8  to us that they didn't think it was part of the
9  deal, or anybody else who had the opportunity to
10 see those changes, which would have been all the
11 signatories.
12      Q.   So you didn't feel there was any need
13 to go up and have a specific discussion with the
14 folks on the Lehman side about the removal of
15 the language?
16      A.   I didn't think that there was anything
17 more that needed to be done than to provide to
18 them the language that we thought was
19 appropriate in order to clarify what the deal's
20 agreement was with respect to the treatment of
21 that credit support, that property.  That is the
22 way we ordinarily communicate in a transaction
23 of this type.
24      Q.   In the beginning of the, of your
25 paragraph 5, you note that the draft language at

TSG Reporting - Worldwide    877-702-9580

Page 47

ROSEN

1
2  issue was an attempt to accurately document the
3  business deal.  Do you see that?
4       A.   Yes.
5       Q.   What is the business deal that you are
6  referring to there?
7       A.   Here, that Barclays was acquiring the
8  exchange-traded businesses, exchange-traded
9  derivatives businesses of Lehman and the assets
10 and customer deposits and other deposits that
11 were part of that business.
12      Q.   Are you aware of whether there was any
13 business discussion between the Barclays and
14 Lehman folks concerning specifically the
15 acquisition of either margin or clearing fund,
16 guarantee fund deposit?
17          MR. HUME:  Objection, asked and
18 answered.
19          MR. MORAG:  Objection, form.
20      A.   I don't know whether there were or
21 weren't.  I assume as part of the negotiation of
22 the deal leading up to the description, the
23 documentation of it, that it was implicit in
24 those discussions.
25      Q.   You go on to say that the draft

TSG Reporting - Worldwide    877-702-9580

Page 48

ROSEN

1
2  language accomplished this, the beginning of the
3  next sentence.  Do you see that, sir?
4       A.   Um-hm.
5       Q.   Can you tell me, what did the draft
6  language accomplish?
7       A.   What did the -- in relation to the
8  exchange-traded derivatives, that it -- what
9  it -- what this -- I am sorry, let me see.
10         It included language that, as I said,
11 covered a wide variety of things, but also would
12 have provided -- I am sorry, included language
13 that clarified that the property of any kind
14 that was basically held by any of these or in
15 any of these forms, was not an excluded asset
16 under the terms of the deal documentation.
17      Q.   And in the quotes, you have "any and
18 all property," and then you have square
19 parenthesis, "including cash."  Do you see that?
20      A.   Um-hm.
21      Q.   Why did you include those square
22 brackets around the words "including cash"?
23      A.   Just as a clarification.  It's not
24 necessary, but just for the sake of -- for the
25 avoidance of any lack of clarity.

TSG Reporting - Worldwide    877-702-9580

Page 49

ROSEN

1
2       Q.   Why did you not include those words in
3  the handwritten parenthetical that you provided?
4       A.   The answer to that question -- I'm
5  going to try to answer this without going into
6  attorney/client privileges, but the answer to
7  that question is because we also came to believe
8  that this was not the best location for
9  clarifying this, because this got caught up in
10 provisions dealing with, you know, what the
11 parties understood to be an exception to the
12 excluded assets, and excluded assets included
13 cash.  So we wanted to make sure in this
14 provision that it was relevant.
15         But on the other hand, we realized
16 that providing this clarification in an
17 exclusion to the -- to an exclusion was not the
18 clearest way to do it and, therefore, we decided
19 in response, rather than go back into this
20 provision and start wordsmithing, which we
21 didn't have the time to do, we would just make
22 it abundantly clear, in as concise words as we
23 could, what the purchased assets included in
24 relation to that business.
25      Q.   And you made it abundantly clear by

TSG Reporting - Worldwide    877-702-9580

Page 50

ROSEN

1
2  putting the parenthetical that made clear it
3  included property held to secure?
4      A.   Yes.
5      Q.   And my question is, why did you not
6  include, beside "property," the words "including
7  cash"?
8      A.   Didn't think it was necessary.  At
9  this point in time, it was 5 or 6 o'clock in the
10 morning.  We were extremely concerned about
11 whether we were going to run out of time in
12 terms of the objective of having this deal
13 signed in time to be announced early in the
14 morning, so as to avoid any negative sort of
15 market reaction to the deal not being announced.
16     And we were trying in as concise a
17 form as possible and as clear a form as possible
18 to get it down and not to get embroiled in
19 parsing words.
20     So, I, I mean did I have -- would I
21 have preferred to have had hours to have sat
22 down and drafted it and perfected it?  I
23 certainly would.  But I thought it was
24 absolutely clear that if we said "any property,"
25 that it would include cash, noncash, securities,

TSG Reporting - Worldwide    877-702-9580

Page 51

ROSEN

2  nonsecurities, whether or not it was held by
3  Lehman, by a clearing organization, wherever it
4  was, and whoever was holding it and whatever its
5  character might be.
6      I think for the purpose of clarifying
7  what might have been a subject of dispute in
8  light of the deletion of that language, we
9  didn't think it was actually necessary to
10 include the language, but we were concerned
11 about the sort of negative inferences that could
12 arise, and so we thought because it was an
13 important point for the deal that we would make
14 it as clear as we could, as concisely as we
15 could.
16     Q.   You had had a discussion, and we will
17 get to this a little bit later, on the subject
18 of whether cash in the 15c3 account could be
19 transferred to Barclays.  You recall that?
20     A.   Yes.
21     Q.   And in connection with that, some of
22 the Lehman people at least took the position
23 that cash could not be properly transferred?
24     A.   I wouldn't describe what they said as
25 that.  I would say, this was part of the purpose

TSG Reporting - Worldwide    877-702-9580

Page 52

ROSEN

2  of the clarification letter.  There were
3  provisions about deposits, customer deposits.
4  There were provisions in the excluded assets
5  provisions of the APA regarding bank accounts.
6  And I think it was clear to us that the 15c3-3
7  assets were assets of the business that we were
8  buying.
9      I would describe what I heard at least
10 as being an expression of concern as to whether
11 in light of what had been said to the court
12 about bank deposits, whether or not if we were
13 going to include cash in bank deposits -- that
14 would be in bank deposits, whether some
15 additional steps might need to be taken, which
16 would have been inconsistent with completing the
17 deal and being able to announce it.
18     But I don't recall anybody saying that
19 it couldn't be done or that it wasn't part of
20 the deal or that it wouldn't be permitted or
21 that it wasn't part of the sale order.  There
22 was, I have said, a decision taken to
23 avoid the issue by limiting the account assets.
24     MR. HUME:  We have been going for
25 about an hour.  Can we have a break?

TSG Reporting - Worldwide    877-702-9580

Page 53

ROSEN

2      MR. MAGUIRE:  Sure.  If we can just
3  wrap up this.  It might take a couple of
4  minutes.
5      Q.   Were you at the sale hearing?
6      A.   Only during the, for lack of a better
7  word, the intermission.  It went into recess and
8  I was there.  I was not actually there at the
9  time that it was --
10     Q.   Do you know whether the court was told
11 anything about bank deposits as opposed to cash?
12     A.   No, I don't know.  I just know that
13 the issue about it was raised, and under the
14 circumstances, people were willing to eliminate
15 the issue, rather than -- because I think the
16 feeling was that if we didn't close before the
17 Monday open, there may have been greater
18 jeopardy to the deal.
19     Q.   In order to avoid the issue, Barclays
20 agreed that it would not take any of the cash in
21 the Wells Fargo account that was part of the
22 15c3 account?
23     MR. MORAG:  Objection to the form.
24     A.   I would say Barclays agreed to include
25 language in the clarification letter that only

TSG Reporting - Worldwide    877-702-9580

Page 54

```
 1              ROSEN
 2   called out the transfer of a certain amount of
 3   securities associated with the 15c3 account, or
 4   if those weren't available, other securities of
 5   similar value.
 6       Q.   And did not call out the 1 billion
 7   dollars in cash that was at Wells Fargo?
 8       A.   Not in the clarification provision,
 9   correct.
10       Q.   Now, given those discussions, and the
11   decision by everyone to avoid the cash issue,
12   did it occur to you that the words "including
13   cash" should be included in the parenthetical
14   when you described property held to secure?
15       A.   No.  No, because I thought there was a
16   clear distinction between deposits and customer
17   deposits and LBI cash in its bank accounts.
18       MR. MAGUIRE:  This is a good time for
19   a break.
20       (Recess)
21       MR. MORAG:  I should just put on the
22   record, to the extent, Mr. Maguire, you're
23   curious, Cleary did search for all
24   documents, including any handwritten notes,
25   and our production does not include them
```
TSG Reporting - Worldwide     877-702-9580

Page 55

```
 1              ROSEN
 2   because we were not able to find the markup
 3   that you asked about in your examination.
 4       MR. MAGUIRE:  I appreciate that.
 5       MR. HUME:  I should also state we have
 6   looked for it in the Weil production, have
 7   not found it.  I'm double checking.
 8       THE WITNESS:  Which would have been
 9   consistent with our handing it to Weil to
10   deal with the document.
11   BY MR. MAGUIRE:
12       Q.   Sir, before the break, we were in
13   paragraph 5 of your declaration and we were
14   talking about the -- what you referred to as the
15   business deal in the first and second lines of
16   that declaration.
17           Was it your understanding that the
18   business deal was documented in the asset
19   purchase agreement?
20       A.   It was my understanding that the deal
21   was documented in the asset purchase agreement,
22   the first amendment in the clarification letter.
23       Q.   The language that we have been talking
24   about in the quotes at the bottom of page 2 of
25   your declaration, starting with "any and all
```
TSG Reporting - Worldwide     877-702-9580

Page 56

```
 1              ROSEN
 2   property," did you draft that language?
 3       A.   I'm sorry, could you --
 4       MR. MORAG:  Starting here.
 5       Q.   Paragraph 5 on page 2 and starting
 6   with the language we have been talking about
 7   that starts with the quotation "any and all
 8   property."
 9       A.   I was involved in its drafting, but I
10   think it was, like many things, a bit of a group
11   process.
12       Q.   So who were the members of this group?
13       A.   The members of the group on the Cleary
14   side would have been me, Dana Fleischman, Bob
15   Davis, Duane McLaughlin, possibly David
16   Leinwand.  Whether -- the extent to which any of
17   one of them was specifically involved in
18   particular language, I don't recall.
19       Q.   So this was a collective, this
20   language was a collective drafting effort of a
21   number of Cleary lawyers?
22       A.   Yes, although I would say probably
23   principally me.
24       Q.   When it was proposed to the Lehman
25   side, your understanding was that this language
```
TSG Reporting - Worldwide     877-702-9580

Page 57

```
 1              ROSEN
 2   accurately reflected the business deal?
 3       A.   Yes.
 4       Q.   Did you ever ask anyone to identify
 5   who had negotiated this specific part of the
 6   business deal?
 7       MR. MORAG:  Object to the form.
 8       I will let you answer if it is -- as
 9   to the yes or no, but if it involves a
10   privileged communication, do not go into the
11   substance of the communication.
12       A.   I assume it was negotiated by the
13   principals who negotiated the deal that was
14   ultimately documented in the APA and these
15   documents.  I was not privy to those specific
16   negotiations.
17       Q.   Do you know the names of the
18   individuals who negotiated the deal specifically
19   on this point?
20       A.   I don't know who participated in each
21   discussion.  I know that Archibald Cox and
22   Michael Klein and Jonathan Hughes and Rich Ricci
23   were involved in the negotiations, but I did
24   not -- I don't have personal knowledge of those
25   exchanges.
```
TSG Reporting - Worldwide     877-702-9580

Page 58

ROSEN

1
2  Q.  Do you know who was involved on the
3  Lehman side specifically with respect to the
4  business deal that's -- that you describe in --
5  A.  Whoever was in those conversations,
6  and I wasn't present, so I couldn't identify
7  them.
8  Q.  Did the business deal ever change?
9  I'm talking now specifically about that part of
10  the business deal that's the subject of the
11  language you and your group drafted and that you
12  put forth in paragraph 5 of your declaration.
13  Did that part of the business deal change
14  anytime after the discussion of the asset
15  purchase agreement?
16  MR. MORAG:  Object to the form.
17  You can answer.
18  A.  I would say that the only respect in
19  which it changed was reflected in the 3-3
20  provisions in which Barclays agreed in essence
21  to relinquish the claims specifically in the
22  clarification letter to the -- non-769
23  million or whatever it was of securities in the
24  15c3-3 account.
25  There were aspects in which the deal

TSG Reporting - Worldwide    877-702-9580

Page 59

ROSEN

1
2  was evolving as it contemplated it would at the
3  sale hearing in relation to the DTC
4  arrangements.  That is all that comes to mind.
5  Q.  And specifically with respect to
6  assets that were related to derivatives, margin
7  or clearing funds deposit, did the deal change
8  anytime after -- the business deal change at any
9  time after the execution of the asset purchase
10  agreement?
11  A.  I'm not aware that it ever changed.
12  only that it was clarified.
13  Q.  You refer, at the bottom of page 2 and
14  top of page 3 of your declaration, to the
15  obligations of LBI or any other person.  To whom
16  are you referring with the words "any other
17  person"?
18  A.  It could be -- well, without
19  limitation on what it might include, the two
20  obvious inclusions would have been the
21  obligations of LBI or any affiliate or any
22  customer who was involved as part of these
23  transactions or part of the business that was
24  being transferred.
25  Q.  Then you say, "in an account

TSG Reporting - Worldwide    877-702-9580

Page 60

ROSEN

1
2  maintained by or on behalf of."  Can you tell me
3  what is the distinction here between an account
4  maintained by as opposed to an account
5  maintained on behalf of LBI?
6  A.  Well, Lehman, when Lehman conducts --
7  when a broker dealer conducts business with a
8  customer or on behalf of an affiliate or for its
9  own proprietary account, it will reflect, it
10  will be required to reflect on its own books and
11  records accounts which are its accounts.  Those
12  assets may be held by custodian banks, other
13  banks, clearing agencies, clearing
14  organizations.
15  So this is meant to not be limited to
16  those specific alternatives to the account as it
17  is described on the books of the carrying
18  broker, to carry anything, wherever it may be,
19  if it was to secure obligations in essence for
20  which BCI was going to become responsible.
21  Q.  And you go on to say, "for which
22  Barclays shall become responsible as of the
23  closing."  What were you referring to there?
24  A.  At this point, I believe it was
25  unclear how the DTCC accounts were going to be

TSG Reporting - Worldwide    877-702-9580

Page 61

ROSEN

1
2  handled, but it was clear that, for example, to
3  the extent that Barclays was a clearing, either
4  a clearing member of a clearing organization
5  which carried accounts, or was a clearing broker
6  carrying positions with other clearing brokers
7  who were clearing members of other exchanges on
8  which positions may have been carried in or out
9  of the United States, whatever the form, that
10  would have been covered.
11  The point was that if there was credit
12  support available and Barclays was on the hook
13  and potentially subject to liabilities
14  associated with that, that all of those assets
15  would be available.
16  Q.  And were Barclays -- in the case of a
17  foreign account, where Barclays was not
18  taking -- stepping into the shoes of Lehman and
19  taking over from Lehman, the obligations to a
20  foreign exchange or clearing corporation, it
21  would get the exchange-traded derivatives but
22  not the associated assets?
23  MR. MORAG:  Object to form.
24  A.  Not at all.  Not at all.  That's not
25  what I am saying at all.

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2       In fact, if BCI was going to be in the
3   chain of financial responsibility for those
4   positions, whether it was because they were
5   taking the account or they were carrying the
6   account or they were carrying the account with a
7   foreign clearinghouse or another broker who was
8   in the clearinghouse, that that would be
9   included.
10      Q.   And that's what I am trying to
11  understand.  Where the flip side of that
12  happens, where Barclays was not taking the
13  account, did you consider what happens when
14  Barclays does not take the account at a foreign
15  exchange?
16      A.   I think that language is dealt with
17  elsewhere.  And I need the clarification letter
18  to --
19      Q.   So you believe there is a separate
20  provision that deals with when Barclays takes
21  exchange-traded derivatives --
22      A.   I don't recall the specific language.
23  I would prefer to --
24      MR. MORAG:  You have to --
25      A.   I am sorry, I prefer to look at the

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2   clarification letter.
3       Q.   Well, we will certainly get to the
4   clarification letter, but your understanding is
5   that that's not covered by this language; is
6   that correct?
7       A.   Well, there are ellipses in here.
8   This is a very long provision, and I'm not
9   prepared to summarize all the things that it
10  does or does not cover in this abbreviated form.
11  So if you want me to tell you what it covers,
12  you are going to have to give me the provisions
13  so that I can look at them.
14      Q.   Sounds fair.  I think it is Exhibit
15  25.
16      MR. MORAG:  Mr. Maguire, if I recall
17  correctly, Exhibit 25 is the executed
18  clarification letter.  You have been asking
19  him questions about language which was not
20  included in the executed clarification
21  letter.  So I'm not sure that's going to be
22  responsive to his request.
23      Q.   That may be fair.  Maybe we should go
24  through the drafts.
25      A.   I think we should look at the draft

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2   that has this --
3       MR. MORAG:  Only if you have questions
4   about the draft.  If you have questions
5   about the final, show him the final.
6       Q.   Why don't we do that.  We will go
7   through the drafts and then we will take a look
8   at the final.
9       Before we do that, let me ask you to
10  scroll down to the end of that paragraph, the
11  bottom of paragraph 5.  You refer there to,
12  "which is consistent with the discussions of the
13  lawyers from both sides."
14      Do you see that reference to those
15  discussions?
16      A.   Um-hm.
17      Q.   Can you tell me what discussions you
18  are referring to there?
19      A.   The discussions negotiating the terms
20  of the deal, which were that Lehman sold the
21  exchange-traded derivatives business and all
22  assets associated with it and all deposits and
23  customer deposits.  But basically it is
24  consistent with the treatment in the
25  documentation and therefore the negotiation of

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2   the documentation relating to what it was that
3   Barclays was getting.
4       Q.   Is there any specific conversation
5   among any two or more lawyers that you were
6   intending to refer to in that last sentence of
7   paragraph 5?
8       A.   I was not present in the negotiations
9   of the original provisions in the APA that this
10  clarifies.
11      Q.   And you're not aware of any
12  conversations that your partners have told you
13  they remember from the negotiation of the
14  original deal?
15      What I am trying to clarify is just,
16  did you have in mind when you wrote this
17  reference to discussions something either that
18  you remembered or something that one of your
19  partners told you about?
20      A.   No.  I'm referring to what would have
21  had to have been discussed if the parties were
22  to come to the terms on which they signed the
23  APA.
24      Q.   I am going to show you a document that
25  has previously been marked as Exhibit 30.  Do

TSG Reporting - Worldwide    877-702-9580

Page 90

```
 1            ROSEN
 2  know when you're ready.
 3          And my first question is going to be,
 4  have you seen this draft before?
 5      A.  I've seen before an e-mail transmittal
 6  from Michael Mazzuchi passing on a draft of the
 7  clarification letter to DTCC and its counsel at
 8  their request, there being a draft of the
 9  clarification letter attached to it that was
10  provided to us by Weil.
11          But as to whether this is exactly the
12  same draft, I can't say.  I would have to
13  verify.
14      Q.  You will see at the bottom of page 1
15  of the draft is a reference to LBI's clearance
16  boxes.
17      A.  I see that.
18      Q.  Do you know why the word DTC was not
19  included there?
20      A.  My understanding is that it was not
21  included because there were clearance box assets
22  held at locations other than DTCC.  So DTCC was
23  not the exclusive depository of clearance boxes,
24  is my recollection.
25      Q.  And what were the other depositories?
```
TSG Reporting - Worldwide    877-702-9580

Page 91

```
 1            ROSEN
 2      A.  I don't remember knowing the details.
 3      Q.  Did anyone consider saying DTC and
 4  other clearance boxes?
 5          MR. MORAG:  Object to the form.
 6      A.  I wouldn't speculate as to whether
 7  somebody did or didn't.  They may have.
 8      Q.  In a prior draft, there had been a
 9  reference to the box 074, which I understand was
10  the DTC box.  Do you have any knowledge as to
11  why that reference was dropped?
12      A.  I am not certain, but I have a
13  recollection that it was because 074 may not
14  have included all of the clearance box assets,
15  that they may not have been confined to the
16  account 074.  But I'm not 100 percent certain.
17  I have a recollection of something along those
18  lines.
19      Q.  If you look at the bottom of page 1,
20  you will see there is a parenthetical that says,
21  "provided, however, that purchaser in its
22  discretion may elect within 60 days after the
23  closing to return any such securities to LBI."
24          Do you see that?
25      A.  Yeah.
```
TSG Reporting - Worldwide    877-702-9580

Page 92

```
 1            ROSEN
 2      Q.  And can you tell me what was the
 3  purpose of that?
 4      A.  I'm not sure that we were the source
 5  of that language.  I think that on its face, it
 6  seemed to have contemplated that there may be
 7  things that, in the clearance box, that Barclays
 8  might not have wanted.
 9      Q.  And do you have any understanding as
10  to what kinds of assets Barclays would not want
11  from the clearance box?
12          MR. HUME:  Objection, calls for
13  speculation.
14      A.  As I say, I'm not sure that this was
15  motivated by Barclays, and I'm not sure that
16  this wasn't an option that was being provided to
17  Barclays that Barclays didn't see any reason to
18  negotiate, since it gave them the ability to do
19  something but not an obligation to do it.
20      Q.  But you don't have knowledge as to
21  what prompted this?
22      A.  No, I don't.  Or I should say I don't
23  recall.
24      Q.  If you turn to page 4, and see the
25  paragraph 8, transfer of customer accounts.  And
```
TSG Reporting - Worldwide    877-702-9580

Page 93

```
 1            ROSEN
 2  towards the end of that, you will see a
 3  reference to 15c3.
 4      A.  Yes.
 5      Q.  And at the end of that sentence, it
 6  refers to the phrase, "or securities of
 7  substantially the same nature and value."
 8      A.  Yes.
 9      Q.  Can you tell me how did those words
10  get to be inserted in the clarification letter?
11          MR. MORAG:  Which words?  All of them?
12      Q.  The words "or securities of
13  substantially the same nature and value."
14      A.  My recollection of the events for
15  that, following on the discussion which led to
16  the limiting of this provision to 769 million of
17  securities, that Harvey Miller raised the
18  question whether or not it was clear that we
19  could agree to this.
20          And I told him that I was not aware of
21  a limitation, particularly to the extent as had
22  been represented, that the 769 million dollars
23  was excess to the level that Lehman was required
24  to reserve under 3-3 as of that date, and in
25  response to the question can we do it, I
```
TSG Reporting - Worldwide    877-702-9580

Page 94

ROSEN

1
2  suggested that if there was a concern along
3  those lines, which we didn't share -- and I'll
4  say only, my recollection is there was a
5  question raised about it -- that we say to the
6  extent permitted by applicable law and as soon
7  as practicable after the closing.
8          And because the provision by its terms
9  then raised a question about whether or not this
10 value was going to be conveyed, because the
11 reason this was in here and was the subject of
12 discussion was that there was a significant
13 erosion or concern about the erosion of value
14 and assets that were contemplated to be
15 delivered initially but were not available to be
16 delivered, and that Lehman identified this as a
17 source of value, and so we wanted to make sure
18 that that value was conveyed.
19         And so as a result of this language,
20 it made us think, well, fine, if you can't give
21 us these 769 million of securities, give us
22 those other securities of a similar nature and
23 value.
24         That's my recollection of the origins
25 of this provision.

TSG Reporting - Worldwide    877-702-9580

Page 95

ROSEN

1
2          Q.  I'll show you a document we have
3  previously marked as Exhibit 451.  Have you seen
4  that before, sir?
5          A.  I don't recall that I necessarily saw
6  precisely this.  I do recall that there was a
7  representation made that the SEC had approved as
8  excess a certain level of value and that there
9  was an e-mail.  We thought that we were going to
10 see an e-mail saying that.  Instead, there was
11 an e-mail, I recall, but which didn't involve --
12 didn't come from the SEC, but reported that it
13 was approved.
14         I don't think I have seen this
15 particular document, and I can't say that I
16 recall with precision the numbers for the
17 allocations between cash and securities.
18         Q.  Did you ever discuss Lehman's 15c3
19 account with Mike Macchiaroli?
20         A.  I don't recall being able -- at the
21 time that I sort of first saw this, which I
22 believe was on a -- or not this -- I was made
23 aware of the e-mail and shown something, I do
24 not believe that I spoke to Mike Macchiaroli,
25 but as I mentioned at the outset of this, I had

TSG Reporting - Worldwide    877-702-9580

Page 96

ROSEN

1
2  earlier had a conversations with Mike which,
3  while we didn't discuss specifically the 3-3
4  reserve account or the amount that was excess, I
5  came away with the impression that he was
6  optimistic that there was going to be sufficient
7  assets.
8          So I did not have a -- I did not have
9  a -- I did not have a confirmation from him.  I
10 didn't have a concern that there would be a
11 deficiency, but I did not have an opportunity to
12 actually go over this with him.
13         Q.  So in your earlier conversation with
14 Mr. Macchiaroli, he was optimistic that there
15 would be sufficient assets available to pay all
16 customer claims; is that correct?
17         A.  Yeah.  That -- well, I don't think he
18 would have -- I don't think he would have -- I
19 don't mean to put words in his mouth that he
20 would have made a representation to those
21 effects, but I came away with an impression that
22 he was optimistic that there wouldn't be a
23 shortfall.
24         Q.  And you took from that conversation
25 that there wouldn't be a shortfall in customer

TSG Reporting - Worldwide    877-702-9580

Page 97

ROSEN

1
2  property?
3          A.  Yes.
4          Q.  And you, therefore, expected --
5          A.  Well, I took away that at that point,
6  knowing what he knew, that it looked as though
7  there wouldn't be.  I wouldn't say -- I wouldn't
8  characterize it beyond that.
9          Q.  And he didn't tell you to what extent
10 there would be any excess?
11         A.  We didn't discuss any quantification.
12         Q.  Did you have any discussions with
13 anyone at the SEC concerning the reserve account
14 or any excess in the reserve account?
15         MR. MORAG:  Objection, asked and
16 answered.
17         A.  I don't recall.
18         Q.  Now, you were responding to a Weil
19 question.  Was it Harvey Miller who said can we
20 do it?
21         A.  I believe it was Harvey Miller, yes.
22         Q.  What he was referring to is the
23 transfer from the 3-3 account?
24         A.  Yes.  He was, he was raising the
25 question as to whether there might be a

TSG Reporting - Worldwide    877-702-9580

Page 102

```
 1              ROSEN
 2     Q.   And leaving aside the whole construct
 3  and whole premise, my only question is, you were
 4  not aware of any limitation, even in the
 5  event --
 6     A.   I wasn't, I wasn't thinking about all
 7  of the -- parsing all of the scenarios.  There
 8  was nothing on the face of this agreement that
 9  to my mind couldn't be accomplished, and from my
10  perspective, caveating it with the language "the
11  extent permitted by applicable law," even though
12  you could argue that that's implicit, was a
13  concession that we could readily make in order
14  to complete the deal.
15     Q.   So given that concession, you didn't
16  think through what would happen if the transfer
17  left unavailable property for customers?
18        MR. MORAG:  Object to the form.
19     A.   No, I reject that characterization.
20  It was not necessarily the case that there would
21  have been any deficit for customers as a result.
22  And as a result, because I didn't have the
23  information available to evaluate it, I did not
24  engage in a hypothetical conjecture as to
25  whether -- under what circumstances or set of
```

TSG Reporting - Worldwide    877-702-9580

Page 103

```
 1              ROSEN
 2  facts there would be a problem.
 3        But from my perspective, but for the
 4  concern, which was really a procedural concern
 5  as a matter of caution, as I understood it from
 6  Harvey Miller, I believed that these assets
 7  arguably were intended to be transferred, were
 8  intended to be transferred as part of the assets
 9  of the business.
10     Q.   In any event, you and the Barclays
11  side of the house agreed to set aside the cash
12  issue by taking the billion dollars in cash out
13  of the deal, correct?
14     A.   By taking the billion dollars out of
15  the deal?
16     Q.   Yeah.  The 1 billion dollars in the
17  bank account was not being transferred as part
18  of the reserve account?
19     A.   Let me say this.  This provision, this
20  provision doesn't call for the transfer of that.
21  I will leave it to the lawyers to argue what the
22  implications of that might be.
23     Q.   And as to the remaining issue as
24  raised by Mr. Miller about can we do it with
25  respect to the government securities, somebody
```

TSG Reporting - Worldwide    877-702-9580

Page 104

```
 1              ROSEN
 2  proposed that that issue would be resolved by
 3  inserting the words "to the extent permissible
 4  by law"?
 5     A.   My recollection is that that was me.
 6     Q.   Now, did all this happen in a hallway
 7  conversation?
 8     A.   Yes.
 9     Q.   Who was present?
10     A.   I don't have a clear recollection
11  other than Harvey Miller was there, Vic Lewkow
12  was there.  I think Dana Fleischman may have
13  been there at least for some portion of it.  And
14  there were others huddling around, but I don't
15  have a clear recollection, and to be perfectly
16  candid, because I wasn't involved in the
17  negotiation of this transaction from the very
18  beginning, I was not as -- and I was mostly
19  troubleshooting specific issues, particularly
20  those relating to the clearing arrangements, I
21  was not as familiar with the lawyers from the
22  other side, so I could not have readily, as
23  readily identified them.
24     Q.   How long did the, did this hallway
25  huddling session last?
```

TSG Reporting - Worldwide    877-702-9580

Page 105

```
 1              ROSEN
 2     A.   I honestly don't know.  More than a
 3  couple of minutes, less than a couple of hours.
 4     Q.   And can you tell me what you recall
 5  being said in the course of this hallway
 6  conversation?
 7     A.   Pretty much what I have just described
 8  to you, that there was a group already there
 9  when I arrived.  I guess some predecessor
10  language to this was being reviewed, and Harvey
11  Miller, as I said, raised the question whether
12  there might be limits under applicable law, and
13  I said that I wasn't aware of any, but to the
14  extent that they exist, and it would address
15  your concern, we can provide that the transfer
16  be to the extent permitted by applicable law.
17  But if there was such a constraint, that that
18  basically 769 million dollars in securities
19  would come from somewhere else.
20        And can I remember exactly what was
21  said, whether it was a grunt or a nod or a
22  smile, I don't remember, but I remember coming
23  away from the conversation feeling that we had
24  sort of resolved the point.
25     Q.   Who was the person who gave the --
```

TSG Reporting - Worldwide    877-702-9580

Page 106

```
 1            ROSEN
 2   manifested assent with the grunt or nod or
 3   smile?
 4       A.   I could be wrong, my recollection was
 5   that it was Harvey Miller, but I could be wrong.
 6       Q.   Did Mr. Miller agree to your proposal
 7   that "to the extent permitted by applicable law"
 8   would be inserted into the --
 9       A.   That was my understanding, yes.
10       Q.   Did he also agree to avoid the cash
11   issue by having this provision not call for the
12   transfer of a billion dollars in cash?
13       A.   I believe he did.
14       Q.   And did that also happen in this
15   hallway conversation?
16       A.   It may have been two different
17   conversations or it may have been a continuing
18   conversation.  Again, I was called out to deal
19   with other issues constantly, issues that were
20   being dealt with in different rooms and on
21   different floors, so I don't have a clear
22   recollection of precisely what the progress, the
23   progression of discussions were.
24       The cash conversation clearly preceded
25   this.  And there may have been a break before
         TSG Reporting - Worldwide    877-702-9580
```

Page 107

```
 1            ROSEN
 2   this issue, it may have been that drafts were
 3   prepared and exchanged to reflect the first
 4   issue, and then the second issue was raised.  I
 5   just don't have a clear recollection of it.
 6       Q.   We seem to have the cash issue, you
 7   say maybe came up first, and then we have a
 8   second issue, is can we do it, as in
 9   transferring the 769, and that gets resolved
10   with your proposed language "to the extent
11   permissible by applicable law," right?
12       MR. HUME:  Objection, mischaracterizes
13   his testimony.
14       A.   Do you want to repeat the question?
15       Q.   If the first issue is the cash issue,
16   the second issue is the can we do it question
17   that Mr. Miller raised?
18       A.   Transfer, there was a discussion about
19   the transfer of securities.
20       Q.   Which gets resolved with your proposed
21   language?
22       A.   Yes.  And the documentation of it gets
23   resolved.
24       Q.   Do I understand you to be saying there
25   was also a third issue in that somebody said if
         TSG Reporting - Worldwide    877-702-9580
```

Page 108

```
 1            ROSEN
 2   for any reason it is not permissible to transfer
 3   the government securities from the reserve
 4   account, Lehman has to make that up to Barclays
 5   with securities of some other value?
 6       A.   I'm not sure I would describe it as a
 7   third issue, but as an adjunct to the second
 8   issue, that if the securities, these 769 million
 9   were not available, some other 769 million
10   dollars of securities would be made available.
11       Q.   How did that, whatever you want to
12   call it, an adjunct to the second issue or a
13   third issue, how did that issue get raised?
14       A.   How did it get raised?
15       MR. HUME:  Objection, asked and
16   answered.
17       A.   Someone on our side, maybe me, maybe
18   somebody else who was there, I don't have a
19   clear recollection on the second point, but
20   said, well, if there is any contingency to the
21   769 from the 3-3, we get them from somewhere.
22       The whole purpose of this, again, was
23   to say -- we were identifying a source of value
24   that was in the deal in the light of other
25   evaporating value, and so it was important to
         TSG Reporting - Worldwide    877-702-9580
```

Page 109

```
 1            ROSEN
 2   the Lehman side -- I am sorry, it was important
 3   to the Barclays side that if this wasn't
 4   available, some other asset would be available.
 5       Q.   Was there any discussion about the
 6   implications for customer property claims --
 7       A.   No, there was no discussion about
 8   customer property claims.
 9       Q.   And there was no discussion of the
10   implications on customers of transferring 769
11   million --
12       A.   None of us, none of us on the Barclays
13   side had anything like the information that
14   would have been necessary to evaluate that, to
15   even raise questions about it.  That information
16   was not available, and there was no way for it
17   to become available and to be discussed and
18   analyzed in a time frame that would have enabled
19   the deal to close.
20       MR. MORAG:  Let him finish the
21   questions.
22       Q.   Can you tell me -- you came away from
23   this meeting with an understanding that Harvey
24   Miller or someone on the Weil side had
25   manifested assent to the proposition that if the
         TSG Reporting - Worldwide    877-702-9580
```

Page 110

ROSEN

2  government securities in the reserve account
3  weren't available, some alternative similar
4  securities would be provided.
5      Can you tell me, how are you -- how do
6  you know that Mr. Miller or his colleague was
7  agreeing to that unconditional transfer as
8  opposed to his nod, his grunt, his smile,
9  whatever you recall, meaning nothing more than
10  this conversation is at an end or that we agree
11  to your proposed language "to the extent
12  permitted by applicable law"?
13      MR. MORAG:  Object to the form.
14      A.  I don't think I have more to add, more
15  than what I have already said, except to say
16  that a draft was provided to us by Weil that
17  reflected that agreement.
18      Q.  You got a draft from Weil which
19  provided that Barclays -- that Lehman would
20  transfer to Barclays 769 million from the
21  reserve account or securities of a substantially
22  similar nature.  Are you aware of that?
23      A.  I recall that.
24      Q.  What was the reaction on the Barclays'
25  side when you got that draft?

TSG Reporting - Worldwide    877-702-9580

Page 111

ROSEN

2      A.  We didn't know what "or nature" meant
3  and whether it was clear that it meant that they
4  would be of equivalent value.  So we added the
5  words "or value."  I believe I may have made
6  that change.
7      Q.  Did you have any discussion with
8  anyone at Weil to find out what they meant by
9  adding the words "substantially similar,"
10  without the words "in value"?
11      MR. MORAG:  Objection, foundation.
12  You have not established that Weil added
13  these words as opposed to mistyped or didn't
14  type the Cleary proposal.
15      Q.  Well, let me back up.  I thought you
16  said you were provided with a draft from Weil
17  that included the words "substantially similar
18  nature"?
19      A.  I believe I was shown a draft that
20  included that language, an interim draft that
21  included that language.
22      Q.  Do you know who provided you that
23  draft?
24      A.  I don't have a clear recollection, but
25  my assumption is it was Weil.  That's my

TSG Reporting - Worldwide    877-702-9580

Page 112

ROSEN

2  assumption.
3      Q.  Did you have any discussion with Weil
4  about that draft and specifically about those
5  words in that draft?
6      A.  Yes, in the sense that we provided a
7  markup of it with the words "or value," and that
8  seems to have been accepted as an appropriate
9  clarification of the agreement that we had
10  reached earlier and reflected in the next
11  turnover of documents.
12      Q.  Any communication between the Cleary
13  and the Weil folk, other than --
14      A.  Yes.  The language "or value," which I
15  think speaks for itself.
16      Q.  I'm just saying, anything beyond that?
17      A.  I don't think there needed to be
18  anything beyond that.
19      Q.  And have you heard from your partners
20  whether they are aware of anything beyond that?
21      A.  I don't have a recollection of
22  discussing it.
23      MR. HUME:  Are you going to finish
24  before lunch or should we take a break for
25  lunch or take another break?  Either way I

TSG Reporting - Worldwide    877-702-9580

Page 113

ROSEN

2  think we can use another break.  We have
3  been going for an hour and a half.
4      MR. MAGUIRE:  Why don't we take a
5  break, and if lunch is ready, this is a fine
6  time for lunch.  I certainly will continue
7  after lunch.
8      MR. HUME:  You will.
9      MR. MAGUIRE:  Yes.  I still have quite
10  a bit to go.
11      (Recess)
12  BY MR. MAGUIRE:
13      Q.  Sir, before the break, you were
14  describing the hallway conversation at Weil
15  Gotshal's offices concerning the 3-3 account,
16  and I note that is a subject of paragraph 7 of
17  your declaration; is that correct?
18      A.  Yes.
19      Q.  In paragraph 7, and you don't refer to
20  the contingency that you described in your
21  testimony earlier today concerning what would
22  happen if Barclays did not get or Lehman could
23  not transfer government securities from the 3-3
24  account.  Do you see that?
25      A.  Um-hm.

TSG Reporting - Worldwide    877-702-9580

Page 114

ROSEN

1
2     Q.   Can you tell me why you did not refer
3  to that contingency in your declaration?
4     A.   No.
5     Q.   Earlier in your declaration, in
6  paragraph 5, you refer both to the removed
7  language that we have discussed earlier, the
8  language that starts, "any and all property" --
9  you remember that? -- and also to the
10  parenthetical that ultimately ends up being
11  inserted in the clarification letter, that's a
12  parenthetical that reads, "and any property that
13  may be held to secure obligations under such
14  derivatives."
15     A.   Correct.
16     Q.   Can you tell me why when you posed the
17  parenthetical, you didn't simply put the earlier
18  language in the parenthetical?
19     A.   The only reason is that it was -- the
20  original language had been obviously subject to
21  modification, and I didn't want to get
22  embroiled -- we didn't have time to get
23  embroiled in sending back language and having
24  extensive negotiations.
25        So the purpose of doing it this way

TSG Reporting - Worldwide    877-702-9580

Page 115

ROSEN

2  was to do it as simply and clearly as possible
3  and not resurrect language that might have
4  been -- for other reasons raised issues in
5  people's minds for reasons unrelated to the
6  point that was intended to be conveyed here,
7  clarified here.
8     Q.   By inserting the parenthetical, did
9  you mean anything different from what you say in
10  your declaration, paragraph 5 was documenting
11  the business deal?
12        MR. MORAG:  Object to the form.
13     Q.   In other words, did you mean anything
14  different in the language in the parenthetical
15  from the earlier language that had been removed?
16        MR. HUME:  Objection, I think you are
17  really calling for him to interpret the
18  contract now.
19        MR. MAGUIRE:  No, no, I am asking what
20  he meant at the time.
21     A.   What I will say is that I meant to
22  express the thought reflected in the markup, but
23  I didn't parse, because I didn't have time to
24  parse the differences in the wording.  And this
25  was intended to pick up everything in a shorter

TSG Reporting - Worldwide    877-702-9580

Page 116

ROSEN

1
2  and more concise formulation.
3     Q.   Do you know how much in value terms
4  this parenthetical picked up?
5        MR. MORAG:  Objection to the form.
6     Q.   In other words, do you know how much
7  property there actually was that was held to
8  secure obligations under such derivatives?
9        MR. HUME:  The question is whether he
10  knows today?
11     Q.   Did you know at the time what the
12  dollar amount of that was?
13        MR. MORAG:  And I object, lack of
14  foundation.
15        Go ahead.
16     A.   I did not know the precise number, no.
17     Q.   Did you have a general understanding?
18     A.   I would have assumed it was a
19  significant amount of, significant amount of
20  money.  Lehman was a very significant, one of
21  the largest investment banks.  They had a very
22  significant business, and I would have assumed
23  that with a significant business would come
24  significant customer property to margin the
25  proprietary and customer activities that were

TSG Reporting - Worldwide    877-702-9580

Page 117

ROSEN

2  going on.
3        So the bigger it was, the more
4  concerned I was about it.
5     Q.   Did you understand that the customer
6  margin was in the billions of dollars?
7     A.   I didn't have specific knowledge of
8  it, but it wouldn't surprise me to hear that.  I
9  expected it to be a large number.
10     Q.   Did you understand what the
11  proprietary margin was that was in the billions
12  of dollars?
13     A.   I would have expected it to be of that
14  kind of magnitude, but I didn't know exactly
15  what it was.
16     Q.   Do you know whether the folks at Weil
17  had an understanding as to how much property was
18  picked up by the parenthetical?
19        MR. MORAG:  Object to the form and
20  foundation.
21     A.   All I'll say about that is that they
22  had more ready access to that information
23  through their client than we had.
24     Q.   What about the trustee, do you know
25  whether the trustee had any knowledge about the

TSG Reporting - Worldwide    877-702-9580

Page 118

ROSEN

1
2 amount of the property that was the subject of
3 that parenthetical?
4     A.    I can't speak to the state of mind of
5 the trustee, but I assume that as part of this,
6 the trustee was looking at what was there.
7     Q.    Is your answer the same with respect
8 to the creditors committee?
9     A.    I've had no direct interaction with
10 them, the creditors committee, such that I can
11 recall.
12     MR. MAGUIRE:  We will mark as
13 Exhibit 623 a document dated September 19,
14 2008, Bates stamped GCGSH0002699 through
15 700.
16     (Exhibit 623, document Bates stamped
17 CGSH0002699 through 700 marked for
18 identification, as of this date.)
19     A.    Can I back up a second to your
20 previous question?  In terms of what the trustee
21 and Weil knew about the amount of the margin,
22 they would have known -- they were copied on
23 e-mails which -- from OCC just in the context of
24 OCC that suggested that just the pays and
25 collects from -- for the Monday would have been

TSG Reporting - Worldwide    877-702-9580

Page 119

ROSEN

1
2 on the order of several hundreds of millions of
3 dollars, which would have suggested an
4 extraordinarily large amount of positions and
5 therefore margin associated with them.
6     So they could have inferred that it
7 would have been an extremely significant amount of
8 margin.
9     Q.    When you refer to the pays and
10 collects, what are you referring to?
11     A.    The accounts are marked on a periodic
12 basis by the clearinghouse, and it was sort of
13 what additional flows are coming in or going out
14 between the clearinghouse and the clearing
15 member as a result of the changes in the marks
16 or the exercises of contracts or whatever other
17 activity is being conducted in the account.
18     Q.    And what's a pay?
19     A.    Well, it depends on what your
20 perspective is, but some amounts are paid by the
21 clearinghouse to the clearing member, and there
22 are amounts that are paid, so if you are
23 receiving the funds, you are the collect, and if
24 you are paying the funds, you're the pay.
25     Q.    Do you know whether the trustee or

TSG Reporting - Worldwide    877-702-9580

Page 120

ROSEN

1
2 Weil actually received any information
3 concerning pays or collects at the OCC prior to
4 the closing?
5     A.    I believe they were copied on e-mail
6 correspondence from the OCC, but that may be a
7 misrecollection, but I believe there was a lot
8 of correspondence including another e-mail that
9 referred to a billion dollars and that confirmed
10 that OCC was going to transfer all of that to
11 Barclays, as we would have all expected.
12     Q.    And did you receive any response to
13 Exhibit 623?
14     A.    I don't have a clear recollection of a
15 specific response to this except that the SEC,
16 after this interim exchange of communications
17 regarding DTCC, stepped up to support the
18 transaction, so presumably if they had had a
19 problem, they would have raised it in connection
20 with their support of the transaction.
21     Q.    We will mark as Exhibit 624 a document
22 Bates stamped DTCC 00126 through 00198.
23     (Exhibit 624, document Bates stamped
24 DTCC 00126 through 00198 marked for
25 identification, as of this date.)

TSG Reporting - Worldwide    877-702-9580

Page 121

ROSEN

1
2     Q.    Is this an e-mail you received from
3 DTCC on or about September 20, 2008?
4     A.    Appears so.
5     Q.    It is a lengthy document.  I am really
6 going to ask you only about one of the
7 attachments, the contents.
8     MR. MORAG:  Just for the record, there
9 do appear to be other e-mails starting at
10 page 180 that may or may not be part of
11 this.  Since they are dated later, I don't
12 know that they could have been part of the
13 original e-mail.
14     Q.    I'm not going to ask you about
15 anything after 178.  But if you could take a
16 look at the pages that begin 175.
17     A.    Um-hm.
18     Q.    You will see on page 176, the first
19 paragraph concerns assumption of accounts.
20     A.    Right.
21     Q.    Was there at one point in time a
22 discussion whereby Barclays was assuming the
23 DTC -- the Lehman accounts at DTCC?
24     MR. MORAG:  Object to the form.
25     MR. HUME:  Object to the form.

TSG Reporting - Worldwide    877-702-9580

Page 130

**ROSEN**

1
2    A.    He conveyed Barclays' reluctance to
3    assume the obligation to provide any form of
4    guarantee beyond the 250 million dollars
5    representing the holdback of that payment that
6    would otherwise have been made to Lehman under
7    the APA, and there would have been -- there was
8    a call -- there was a point at which he said, he
9    conveyed to DTCC that because Barclays was not
10   willing to accept more liability than that, they
11   would not be accepting the transfer of those
12   accounts.
13       **Q.    Anything else you remember Mr. Cox**
14   **saying in any of the Sunday night calls?**
15       A.    I really don't recall specifics.
16   There was undoubtedly a lot more discussed and a
17   lot more give and take, but candidly, I cannot
18   remember the specifics of the dialogues.  There
19   would have been conversations about, gee, does
20   DTCC really need all the credit support that it
21   is asking for, can't it get comfortable, it has
22   better access to the information than Barclays
23   does.  It would have been of that nature, but I
24   just, sitting here now, can't recall the
25   conversations.

TSG Reporting - Worldwide    877-702-9580

Page 131

ROSEN

1
2       **Q.    Anything you recall Jonathan Hughes**
3   **saying?**
4       A.    Not really.  I don't have a specific
5   recollection.  I think -- I'm sure that he
6   reiterated or articulated many of the same
7   themes as Archie Cox, because the Barclays view
8   was, at that point, pretty well settled that
9   they were not prepared to assume additional
10  potentially substantial liabilities.
11      **Q.    Anything you recall Mr. Hughes saying**
12  **beyond what you said?**
13      A.    Not specific words, no.
14      **Q.    Anything you recall Michael Klein**
15  **saying?**
16      A.    No.
17      **Q.    Anything you recall Mr. Larocca**
18  **saying?**
19      A.    Well, there were a lot of
20  conversations also about sort of the pipes and
21  the plumbing and sort of the operational aspects
22  of what was going to be the mechanism for DTC to
23  effect the transfers of securities that needed
24  to be effected as part of the transactions, what
25  accountant are they going to go to or through,

TSG Reporting - Worldwide    877-702-9580

Page 132

ROSEN

1
2   or how that was going to be hooked up or
3   handled, but I was not focused on those because
4   I regarded them as essentially operational
5   matters.
6       **Q.    Was that an issue that was in**
7   **Mr. Larocca's purview?**
8       A.    Yes, I think so -- yes.
9       **Q.    Did he speak to that?**
10      A.    He did, and he may have delegated some
11  of the details of it to people who reported to
12  him.
13      **Q.    Do you recall Mr. Larocca saying in**
14  **any call on Sunday night or early Monday morning**
15  **we are not taking anything?**
16      A.    I do not recall Gerard Larocca saying
17  that or anyone else saying that, because it
18  was -- the whole purpose of the DTC endeavor was
19  to resolve their concerns in a manner that would
20  enable them to effect the transfers of assets
21  that were necessary to consummate the deal.  So
22  it would have been a ludicrous thing for anyone
23  to have said, because otherwise, why did we need
24  to be dealing with DTCC?
25      **Q.    Was anyone from DTCC present for any**

TSG Reporting - Worldwide    877-702-9580

Page 133

**ROSEN**

1
2   of these discussions?
3       A.    These -- they were on the phone.
4   There was nobody from DTCC in the room at Weil's
5   offices.
6       **Q.    Who did you understand was**
7   **participating from DTCC?**
8       A.    My understanding was that it was Larry
9   Thompson, the general counsel; his deputy, Isaac
10  Montal, Shelly Hirshon, their outside counsel,
11  and Don Donahue, the chairman of DTCC, at least
12  at some -- at least in some portions of the
13  conversation.
14      **Q.    And who was the person who did most of**
15  **the talking for DTCC?**
16      A.    My recollection was that it was Larry
17  Thompson.
18      **Q.    Did you understand at some point, DTCC**
19  **was considering issuing a cease to act with**
20  **respect to Lehman?**
21          MR. MORAG:  Object to the form.
22      A.    After Barclays had conveyed to DTCC
23  that Barclays was not going to accept a transfer
24  of the accounts, I believe Larry Thompson
25  indicated -- and I don't recall exactly when

TSG Reporting - Worldwide    877-702-9580

Page 134

ROSEN

1
2  this was -- that they would issue a cease to
3  act, which meant that once the pipeline and
4  these transactions were transferred, DTCC would
5  be liquidating positions and closing out the
6  account and not accepting any other
7  transactions.
8        And I received a call from Don Donahue
9  to say, you know, if we could avoid doing that,
10 they would prefer to do that, because they
11 hadn't done it before, and which I told him I
12 would convey to the client.
13      Q.   Do you have an understanding of what
14 the consequences would be for the transaction if
15 the DTC were to issue a cease to act notice?
16      MR. MORAG:  Objection to form.
17      A.   My understanding is that it wouldn't
18 have affected the transaction.
19      Q.   Did you have any discussion with
20 anyone as to whether Barclays could or would
21 close the transaction if DTCC issued a cease to
22 act notice?
23      MR. MORAG:  Again, Mr. Rosen, if your
24 discussions are with anybody outside of
25 Barclays, you can answer.  Not -- if not,

TSG Reporting - Worldwide    877-702-9580

Page 135

ROSEN

1
2  say you are not able to answer.
3      A.   Would you mind repeating the question.
4      Q.   Yes.  The question is whether you had
5  any discussion, any conversation with anyone
6  about whether Barclays could or would close the
7  transaction if DTCC were to issue a cease to
8  act.
9        MR. MORAG:  Do you have a time frame
10 on when the issuance was supposed to be?
11     A.   It really --
12     Q.   Yes, the Sunday.
13     A.   Can I just -- let me just say this.
14 It really depends.  Your question presupposes
15 with respect to what point in time the cease to
16 act would take effect.
17        If -- I did have a conversation with
18 Shari Leventhal at the Fed, which the substance
19 of which was that I expressed my concern that we
20 were not making rapid progress in the
21 negotiations with DTCC toward a resolution in
22 which they would accept a much more limited
23 amount of credit support, and I was worried that
24 we were running out of time, and we thought that
25 it might be helpful to let the Fed know, that we

TSG Reporting - Worldwide    877-702-9580

Page 136

ROSEN

1
2  didn't want the Fed to find out at the last
3  minute that this thing was falling apart for
4  reasons unrelated to, you know, the actual
5  negotiation of the deal, that because of a
6  problem with DTCC.
7        So I spoke to Shari Leventhal and
8  said, if we can't reach a resolution with DTCC
9  and DTCC does not agree to process the
10 transactions, absent other arrangements, we are
11 not going to be able to close this, at least in
12 the manner in which we had contemplated.
13       And I did have that conversation with
14 her.
15      Q.   Can you help me out and explain,
16 because I thought you had told us that a cease
17 to act from DTCC would not have affected the
18 transaction, but I thought you also told us --
19      A.   I also told you it depends at what
20 point they are ceasing to act.  And if they
21 cease to act following the processing of the
22 transaction and the transactions that are in
23 their pipeline, we would have been able to close
24 the transaction.  If they said as of Saturday,
25 we are ceasing to act and we are not going to

TSG Reporting - Worldwide    877-702-9580

Page 137

ROSEN

1
2  accept any other instructions on Monday to
3  transfer customer or proprietary agents, that
4  would have been a very different result than the
5  one which ultimately obtained.
6      Q.   And when you told us earlier that
7  after Barclays had made clear it was not
8  accepting the transfer of accounts and Larry
9  Thompson responded that DTCC would issue a cease
10 to act, what did you understand the timing of
11 that notice that he was talking about to be?
12     A.   My understanding was that DTCC was
13 going to issue a cease to act after processing
14 trades in the pipeline, including the transfers
15 that were necessary to implement the deal, and
16 that there had been operational calls, my
17 understanding was to sort of discuss the
18 plumbing and how you accomplish that.
19     Q.   So Mr. Thompson was simply telling you
20 that they would issue a cease to act after
21 clearing all the pipelines, all the uncleared
22 trades after the closing?
23     A.   Yeah, I didn't think -- I did not
24 understand him to be saying -- well, I'm going
25 to add some clarification to this.  There was a

TSG Reporting - Worldwide    877-702-9580

Page 138

ROSEN

2  point at which we were not, we did not have a
3  meeting of the minds with DTC about what, in
4  addition to 250, Barclays might make available,
5  and DTC, DTCC was not, had not yet agreed to
6  accept only the 250 million, so you had two
7  parties who were -- who lacked a meeting of the
8  minds.
9       In that context, Larry Thompson may
10  well have said basically, you know, if we don't
11  get what we want, we are just going to cease to
12  act and you are going to have to figure things
13  out for yourself.  That was some of the need to
14  deal with that issue, so we could close
15  expeditiously and not have to create some kind
16  of a work-around, was precisely why we continued
17  the negotiations until DTCC would be willing to
18  process the transactions that were in the
19  pipeline and transactions that are associated
20  with this deal.
21     Q.  Was that comment by Mr. Thompson about
22  what they would do if they didn't get what they
23  wanted, was that in response to hearing from
24  Barclays that Barclays was not accepting
25  transfer of the accounts?

TSG Reporting - Worldwide    877-702-9580

Page 139

ROSEN

2     A.  Again, you have got to focus on the
3  time.  I think at some point it was made clear
4  that not having the credit support meant that
5  after the cease to act, when a meeting of the --
6  when DTCC agreed that on the understanding that
7  it was going to get the 250 million in credit
8  support but no more, the fact that they would
9  have to cease to act was never presented by him
10  as, you know, something that would have
11  precluded the very reason that we were having
12  the negotiations, in order to enable the
13  transaction to close by processing and making
14  the transfers.
15     Q.  Let me try --
16     A.  You couldn't accept a transfer of
17  customer accounts and get that business if the
18  accounts couldn't be -- and the assets in them
19  couldn't be transferred by DTCC.  Everybody
20  realized that they had to agree to do that and
21  not shut the pipes down.
22     Q.  Yeah, I'm not interested in what would
23  or could have happened.  I want to get the
24  sequence of your recollection down right.
25       I understand that on Sunday night at

TSG Reporting - Worldwide    877-702-9580

Page 140

ROSEN

2  some point, Archie Cox described to DTCC
3  Barclays' reluctance to assume the accounts and
4  made plain that Barclays was not accepting the
5  transfer of the accounts of DTCC?
6     A.  Yes.
7     Q.  That's correct?
8       Now, what was -- in response to that,
9  did Mr. Thompson say in words or substance if
10  DTCC can't get happy, it will issue a cease to
11  act?
12     A.  I don't recall it being specifically
13  in response to the -- you know, the articulation
14  of the final position or whether it occurred in
15  the course of earlier assertions of the
16  position.  But it was clear in their minds that
17  if they didn't have a -- if they did not have
18  adequate credit support or a viable creditworthy
19  clearing member, that they were not going to
20  take the risk of just carrying the accounts open
21  and continuing to accept positions.  They would
22  have to go through the process that they
23  described as ceasing to act.
24     Q.  And they made that clear to Barclays?
25     A.  Yes.

TSG Reporting - Worldwide    877-702-9580

Page 141

ROSEN

2     Q.  Can you tell me, what happened or what
3  was the event that triggered the decision by
4  Barclays that it would not accept a transfer of
5  accounts at DTCC?
6       MR. MORAG:  I caution you from
7  disclosing any privileged communications.
8     A.  Can I consult on the privilege
9  question?
10     Q.  Sure.
11       (Recess)
12     Q.  Would you like the question, sir?  Can
13  you tell me what happened or what was the event
14  that triggered the decision by Barclays that it
15  would not accept a transfer of accounts at DTCC?
16     A.  After the report from the operations
17  team, of the operations team to their principal,
18  their principals, Archie Cox, the decision was
19  made that they would not -- they would not
20  accept the possibility of liabilities in excess
21  of 250 million dollars, and they confirmed to
22  DTCC that they were firm on their position they
23  weren't going to accept the accounts.
24     Q.  When was the report of the operations
25  team received?

TSG Reporting - Worldwide    877-702-9580

Page 142

ROSEN

1
2    A.   Other than that it was earlier in the
3    evening on Sunday, but possibly late, I don't
4    have a specific recollection.
5    Q.   Do you have any sense of the timing as
6    to when a decision was made by Barclays that it
7    would not accept any liabilities beyond the 250
8    million?
9    A.   Well, I think internally they had
10   reached that position -- we were trying in good
11   faith to see whether they could get enough
12   information to make them comfortable, but it was
13   finally communicated that they were firm on the
14   250 and not accepting the accounts, maybe like
15   11 o'clock, something like -- it was quite late
16   on Sunday night.
17   Q.   And was that Mr. Cox who conveyed that
18   to DTCC?
19   A.   I believe so, I believe so.
20   Q.   Was Larry Thompson on the call in
21   which --
22   A.   I believe so.
23   Q.   He was?
24   A.   I believe so.
25   Q.   Did Mr. Thompson make a reference to

TSG Reporting - Worldwide    877-702-9580

Page 143

ROSEN

1
2    issuing a cease to act on that call?
3    A.   I don't recall him specifically making
4    a reference at that time in response to it.  But
5    to be clear, the understanding was that the
6    cease to act was not in respect of the
7    processing of any of the transactions that --
8    any of the -- processing any of the transfers
9    that were part of the transaction.
10   Q.   Now, when did you have the call with
11   Shari Leventhal?
12   A.   Earlier in the evening.  Whether it
13   was at 5 o'clock or 8 o'clock or 9 o'clock, I
14   don't honestly recall.
15   Q.   Did you have any follow-up call with
16   her?
17   A.   I don't recall that I had a follow-on,
18   one-on-one call with Shari.  It's possible that
19   I did, but they were on the open line which was
20   established for the purpose of reporting to all
21   people who needed to report simultaneously,
22   because we were under a very tight time frame,
23   sort of what was open and what was being agreed.
24        There was an open line with the Fed
25   and the SEC and other interested parties, and I

TSG Reporting - Worldwide    877-702-9580

Page 144

ROSEN

1
2    believe that at least at some point, she was on
3    to hear the results of the negotiations.  She
4    may have gotten information from DTCC, I just
5    don't recall specifically.
6    Q.   Can you tell me what else you recall
7    Larry Thompson saying in the various
8    conversations on Sunday night?
9    A.   For the most part, I recall him
10   justifying their need for collateral in excess
11   of the 250 million dollars.  That was the point
12   at which they were willing to go forward on that
13   basis.
14   Q.   How did he justify that?
15   A.   That they were -- his team, you know,
16   were concerned about the risks.
17   Q.   Do you recall anything specifically
18   said about the risks?
19   A.   Mostly my recollection is, you know,
20   there is uncertainty, there is a lot in there to
21   do, it would take time, we can't know exactly
22   what the results of the liquidations will be.  I
23   mean they are a clearinghouse, they are a
24   conservative organization, and they viewed the
25   risk conservatively.

TSG Reporting - Worldwide    877-702-9580

Page 145

ROSEN

1
2    Q.   Do you recall him saying anything
3    further about a cease to act other than what you
4    have told us?
5    A.   Nothing beyond what I told you.
6    Q.   Do you recall saying, addressing
7    specifically the subject of whether the -- of
8    when the cease to act would take effect and the
9    impact that it would have on the transaction or
10   on the unsettled trades that were at DTCC?
11        MR. MORAG:  Objection, asked and
12   answered.
13   A.   He never suggested that there would be
14   any impact as the transaction was resolved.  The
15   purpose of the resolution was that there would
16   be no impact.
17   Q.   Did he ever address whether the cease
18   to act would have an impact on outstanding
19   unsettled trades?
20   A.   Mostly what I recall him focusing on
21   was they don't like to cease to act because it
22   means that other participants in the marketplace
23   aren't going to receive the benefit of the
24   processing that they would otherwise do when
25   those transactions came in, and hadn't had to do

TSG Reporting - Worldwide    877-702-9580

Page 146

ROSEN

1
2  it in the past.
3       My impression was that they were more
4  concerned about the public relations
5  implications of a clearing corporation doing
6  that than they were focused on any impact on us,
7  because it was a mutual premise that the purpose
8  of this was to enable us to close and process
9  the transactions.
10      Q.  Did he ever say anything to indicate
11  that his references to cease to act related
12  exclusively to a notice that would come into
13  effect after the closing and after all of the
14  unprocessed, unsettled trades of Lehman had been
15  cleared by DTCC?
16      MR. MORAG:  Object to the form.
17      A.  I think in going over the terms of the
18  arrangements it was clear that the transactions
19  that were the subject of the acquisition, those
20  transfers were going to be made, and I don't
21  think there was any implication of any kind, it
22  would have been absurd for there to have been an
23  implication that we reached an agreement with
24  DTC and by the way, they were going to not
25  process the transactions.

TSG Reporting - Worldwide    877-702-9580

Page 147

ROSEN

1
2      Q.  Let me ask you about the time period
3  prior to reaching a meeting of the minds with
4  DTCC.  At any time before that, did he give any
5  representation or assurance to Barclays that
6  while DTCC might issue a cease to act, it would
7  not affect the transaction, and that they would
8  honor and process all unsettled trades?  Did he
9  say that in words or substance?
10      A.  I am sorry, can you repeat that.
11      Q.  Yes.  At any time prior to the meeting
12  of the minds between Barclays and DTCC, did
13  Larry Thompson in words or substance say, we may
14  have to issue a cease to act, but it will not
15  affect the transaction, and notwithstanding our
16  cease to act, we will make sure that it takes
17  effect only after all unsettled trades have been
18  cleared?
19      A.  No.  I think that if the -- if we
20  hadn't reached an agreement with DTCC, then we
21  had, we had the prospect of having to figure out
22  another way of consummating the transaction if
23  they were not going to process trades, and
24  basically what DTCC was saying was that if they
25  were going to continue to process trades and act

TSG Reporting - Worldwide    877-702-9580

Page 148

ROSEN

1
2  for these accounts, then they wanted more credit
3  support than they would have if they were left
4  to look only to the assets of LBI.
5      Q.  Is there anything further you recall
6  Larry Thompson saying on the Sunday night other
7  than what you have told us?
8      A.  I'm sure there is a lot more that
9  could be said.  I just don't have a specific
10  recollection of that.
11      Q.  And all my questions are just to your
12  recollection.
13       What about Mr. Montal?  Do you recall
14  anything that Mr. Montal said in any of the
15  conversations on Sunday night or early Monday
16  morning?
17      A.  He was not a prominent speaker, at
18  least while I was in the room.
19      Q.  Anything that you recall?
20      A.  I don't have a specific recollection
21  of what he might have said.
22      Q.  What about Shelly Hirshon?
23      A.  I don't remember Shelly Hirshon
24  speaking of it.
25      Q.  You did tell us about Don Donahue

TSG Reporting - Worldwide    877-702-9580

Page 149

ROSEN

1
2  making a call to you.  Anything else that you
3  recall hearing from Dan Donahue on the Sunday
4  night?
5      A.  No.  No more than that conversation.
6      Q.  I have been asking you now about the
7  conversations with DTC for some time limited to
8  the Sunday night, and I know that there were
9  conversations that may have spilled over into
10  the wee hours of early morning.  So if we
11  include Monday morning, are there any
12  conversations by any of the participants that
13  you recall that you haven't told us about?
14      A.  I have a vague recollection that there
15  may have been continuing discussions on the
16  operations side in anticipation of the closing
17  of the transaction, and the balance of the
18  exchanges were between the lawyers trying to
19  reflect what had been agreed in I think what's
20  become or been referred to as the DTCC letter.
21      Q.  And anything else, if you recall?
22      A.  Not that I specifically recall,
23  sitting here.
24      Q.  We will mark as Exhibit 625 a document
25  Bates stamped DTCC 00359 through 361.

TSG Reporting - Worldwide    877-702-9580

Page 150

ROSEN

1
2        **(Exhibit 625, document Bates stamped**
3        **DTCC 00359 through 361 marked for**
4        **identification, as of this date.)**
5        A.    I recall this.
6        Q.    **If you look at the e-mail at the top,**
7    **the first page, sir.  Can you tell me what you**
8    **meant when you said, "The obligations and**
9    **entitlements in relation to the funds run**
10    **between DTC and the LBI estate, not between**
11    **Barclays and DTC"?**
12        A.    Because the credit support was going
13    to be limited to the 250 million dollar cash
14    payment, we thought that since we could direct
15    that payment, I thought that since it was
16    possible to direct that payment on Lehman's
17    behalf, so that the DTC got hold of it, it
18    was -- as far as the transaction was concerned,
19    that was an asset of -- that would otherwise
20    have been an asset of the estate that was being
21    made available to provide credit support, and
22    since it would otherwise have been an asset,
23    that the arrangements relating to that were
24    between Lehman and DTC and didn't need to be
25    between Barclays.

TSG Reporting - Worldwide    877-702-9580

Page 151

ROSEN

1
2        So my feeling was that to keep things
3    simple, we didn't really need to have a separate
4    agreement.
5        Q.    **Let me show you a document that's**
6    **previously been marked as Exhibit 606.**
7        **While we are waiting for that, sir,**
8    **how did the impasse between Barclays and DTC get**
9    **resolved?  How did the parties reach a meeting**
10    **of the minds?**
11        A.    There were conversations staking out
12    positions.  The parties would go off.  There was
13    due diligence being done on both sides, because
14    both sides wanted to know what the risks were,
15    and they would get back on the telephone, and at
16    some point, DTC decided that the position that
17    had been articulated by Barclays was acceptable
18    to it.
19        Q.    **So DTC had previously refused to**
20    **accept Barclays' position of limiting the**
21    **recourse to 250 million, but it changed its mind**
22    **at some point on the Sunday or early Monday?**
23        A.    Until late on Sunday night, DTC had
24    not signaled its agreement to go forward based
25    on the 250 million dollars.

TSG Reporting - Worldwide    877-702-9580

Page 152

ROSEN

1
2        Q.    **How did DTCC signal its agreement?**
3        A.    On a conference call, it -- Larry
4    Thompson said, we are willing to go forward on
5    this basis.
6        Q.    **And what was the specific thing he**
7    **said with respect to the basis?**
8        A.    That Barclays would not be assuming
9    the accounts and that the credit support that
10    would be made available would be limited to the
11    250 million dollar holdback on the purchase, on
12    the 250 million dollars.
13        Q.    **Is that something that you recall**
14    **Larry Thompson specifically saying?**
15        A.    I could be wrong, but that's my
16    recollection.  My recollection is that Larry was
17    largely the spokesperson for DTC.
18        Q.    **And did Larry explain what prompted**
19    **DTCC to change its position?**
20        A.    No.  I don't recall -- I don't recall
21    having an explanation from him.
22        Q.    **Did you have any understanding as to**
23    **what prompted DTCC to change its position?**
24        A.    I assume that -- all I can say is that
25    I assumed with more time, they got a better

TSG Reporting - Worldwide    877-702-9580

Page 153

ROSEN

1
2    understanding of what the assets and the risks
3    were, and assumed that they decided that would
4    be acceptable for them, to take the liquidation
5    risk with the assets that they had in the
6    250 million.
7        But he didn't give us a
8    quantitative -- he didn't share his quantitative
9    analysis of their evaluation of that risk, nor
10    did we expect them to.
11        Q.    **When did this meeting of the minds**
12    **conversation happen?**
13        A.    It was very late on Sunday night.
14    Sometime before midnight, I think.
15        Q.    Do you know whether it was before
16    midnight or after midnight?
17        A.    I would have to refresh my
18    recollection.
19        Q.    How would you do that?
20        A.    I would look at the e-mail traffic.
21        Q.    Anything else?
22        A.    I think that is all that I would have
23    available to me today to help.
24        Q.    I show you a document previously
25    marked as Exhibit 606.  Sir, you received this

TSG Reporting - Worldwide    877-702-9580

Page 154

ROSEN

1    **ROSEN**
2    e-mail?
3        A.   Yes.
4        **Q.   Does it -- do you see the reference to**
5    **"earlier this evening," the first line?  Does**
6    **that refresh your recollection as to -- the**
7    **first line of the e-mail, cover e-mail, does**
8    **that refresh your recollection as to when the**
9    **agreement was reached?**
10       A.   Well, I know it was before 3:43 a.m.
11   How much before -- I remember we felt that we
12   tended to wait a long time to get drafts back
13   from the other side, but I don't recall.
14       **Q.   Who prepared this draft?**
15       A.   This was -- it appears to have been
16   prepared by DTC or its counsel, but I don't know
17   specifically.
18       **Q.   Did you have any discussions with DTCC**
19   **or its counsel anytime after receiving this**
20   **e-mail?**
21       A.   Most of the direct negotiations
22   regarding this were conducted by my partner Mike
23   Mazzuchi.  I did exchange e-mails including, I
24   guess it was slightly earlier in the evening,
25   with Sheldon Hirshon.  There may have been later

TSG Reporting - Worldwide     877-702-9580

Page 155

1    ROSEN
2    e-mails exchanges, I don't recall.
3        **Q.   Leaving aside e-mails, do you know**
4    **whether Mike Mazzuchi had discussions with**
5    **anyone at DTCC after circulating or the**
6    **circulation of this draft that has been marked**
7    **as Exhibit 606?**
8        A.   Well, with their counsel, certainly.
9    I don't recall whether or not he was, he had
10   conversations that included individuals from
11   DTCC.
12       **Q.   Do you know what conversations he had**
13   **with their counsel?**
14       A.   Other than to discuss changes to this
15   document prior to its finalization, I don't.
16       **Q.   And do you know whether there were in**
17   **fact discussions as opposed to e-mail exchanges?**
18       A.   I don't -- I think it was principally
19   exchanges of drafts.  It was very late and
20   people were very tired.
21       **Q.   If you turn to paragraph 1, sir, the**
22   **winding down of accounts.  Did you review this**
23   **at the time?**
24       A.   I don't recall specifically whether I
25   looked at this draft or a subsequent draft.

TSG Reporting - Worldwide     877-702-9580

Page 156

1    ROSEN
2        **Q.   Did you understand that, at the time**
3    **this draft was received, that there was an**
4    **agreement, a meeting of the minds between**
5    **Barclays and DTC whereby all of the assets in**
6    **the Lehman accounts at DTC were going to go to**
7    **Barclays and the accounts themselves were going**
8    **to stay at DTCC?**
9            MR. MORAG:  Object to the form.
10       A.   Could you repeat the question.
11       **Q.   Did you have an understanding at the**
12   **time you received this e-mail that there had --**
13   **there was an agreement, a meeting of the minds**
14   **between Barclays and DTCC?**
15           MR. MORAG:  That's the only question?
16           MR. MAGUIRE:  Yes.
17       A.   Yes.
18       **Q.   And did you understand that that**
19   **agreement involved the accounts, the Lehman**
20   **accounts staying at Lehman and at DTC?**
21       A.   Yes.
22       **Q.   Did you understand what was happening**
23   **to the assets in those accounts?**
24       A.   Insofar as Barclays was concerned, our
25   understanding was that the assets, whether they

TSG Reporting - Worldwide     877-702-9580

Page 157

1    ROSEN
2    were proprietary assets or customer assets that
3    under the deal terms were to be transferred,
4    would be processed.
5        **Q.   And once those transactions were all**
6    **processed, who owned the assets in the Lehman**
7    **accounts at DTCC?**
8        A.   The residual assets that were not to
9    be -- whatever we didn't -- whatever Barclays
10   didn't buy or acquire was part of the Lehman
11   estate.
12       **Q.   Did you have an understanding as to**
13   **whether Barclays was acquiring all of the assets**
14   **at the -- in the DTCC clearance boxes?**
15       A.   Yes.  Yes, my understanding is that
16   they were acquiring those assets.
17       **Q.   And so that at the closing, those**
18   **assets would then belong to Barclays?**
19       A.   Contractually, yes, at the closing
20   there would have been an agreement to transfer
21   them to Barclays, an understanding that those
22   transactions would be processed by DTCC and not
23   be subject to a cease to act.
24       **Q.   And was that explained to the DTCC,**
25   **that the assets in the Lehman accounts would**

TSG Reporting - Worldwide     877-702-9580



Page 158

ROSEN

1
2  contractually belong to Barclays at closing?
3      A.   The DTCC was provided at their request
4  a draft of the agreement that reflected the --
5  what do you call it? -- that reflected the
6  agreements to transfer the clearance box assets
7  as part of the deal.
8      Q.   A draft of the clarification letter?
9      A.   A draft of the letter, right.
10     Q.   Other than providing the DTCC with a
11 draft of the clarification letter, did anyone on
12 the Barclays side explain to DTCC that the
13 assets --
14     A.   I believe that that was the subject of
15 discussions on an operational level, because
16 they wanted to impose a cease to act at some
17 point, and they had to figure out a way to
18 effect the transfers and do whatever else that
19 they wanted to do under their rules.
20     Q.   Did you participate in any of the
21 operations conversations in which anyone from
22 the Barclays side explained to anyone on the
23 DTCC side that all of the assets at, in the
24 Lehman accounts at DTCC were being acquired by
25 Barclays?

TSG Reporting - Worldwide    877-702-9580

Page 159

ROSEN

1
2      A.   No, I don't think that I said that all
3  of the assets in those accounts were being
4  acquired.  There are some assets that were being
5  acquired, some assets that were not being
6  acquired.  There were customer accounts that
7  were being transferred and presumably other
8  customer accounts that were not part of the
9  deal.  I mean customer securities.
10          That was dealt with in the
11 clarification letter.  What Lehman was and was
12 not selling to Barclays was not the subject of
13 the DTCC letter.  The DTCC letter from the
14 beginning was about financial responsibilities
15 to DTCC for the liabilities associated with
16 those accounts.
17     Q.   And did anyone explain to DTCC that
18 Barclays understood there to be a distinction
19 between the accounts and the assets in the
20 accounts?
21     A.   It would have been an absurd
22 conversation to have with a clearing
23 corporation, because a clearing corporation is
24 basically structured fundamentally on the
25 premise that there is a difference between legal

TSG Reporting - Worldwide    877-702-9580

Page 160

ROSEN

1
2  ownership and responsibility for accounts and
3  beneficial ownership and entitlement to the
4  assets in the accounts.
5          Without that distinction, every person
6  who owns a security in the United States in
7  order to own it would have to be a clearing
8  member of a clearing corporation, which is not
9  how we would realize our financial markets.
10     Q.   You are not aware of any conversation
11 between anyone at Barclays, working for
12 Barclays, and anyone at DTCC concerning any
13 distinction between the Lehman accounts and the
14 assets in the Lehman accounts at DTCC?
15          MR. HUME:  Objection, asked and
16 answered.
17     A.   I don't have anything to add.
18     Q.   Did it come to your attention that
19 DTCC was of the understanding that the assets in
20 the Lehman account were remaining with the
21 estate?
22     A.   It is impossible for me to understand
23 how they could have formed that view or that
24 they -- and I am unaware that they did form that
25 view.

TSG Reporting - Worldwide    877-702-9580

Page 161

ROSEN

1
2      Q.   If you look, sir, at paragraph 1 of
3  the draft before you marked as Exhibit 606, you
4  will see the second part of that section 1, same
5  paragraph really of that section 1, says, "As
6  part of this closeout process, the trustee
7  hereby authorizes DTC to accept and act upon
8  instructions from NSCC to deliver securities
9  from the DTC LBI account to NSCC's account," and
10 it goes on.  Do you see that sentence?
11     A.   I do.
12     Q.   Can you explain why the parties were
13 providing for the trustee to exercise authority
14 over assets in the Lehman account if those
15 assets contractually were understood all along
16 to belong to Barclays?
17          MR. MORAG:  Objection,
18 mischaracterizes his testimony.  For the
19 third time.
20     A.   And I think you're asking me to
21 interpret what the import of this is, because I
22 don't accept your characterization of what this
23 does or -- what this provision does or says.
24     Q.   So you would --
25     A.   I think I would decline to answer on

TSG Reporting - Worldwide    877-702-9580

Page 162

ROSEN

2 the grounds that I think my interpretation of
3 this provision would be privileged.
4    Q.   At the time that this draft was
5 received, did you understand that Barclays was
6 taking -- was cherry picking or at least taking
7 certain assets from the clearance box and not
8 other assets, or at least that it had that
9 option?
10    MR. MORAG:  Objection, compound.
11    A.   Why don't you ask the first question.
12    Q.   Sure.  What I am trying to understand
13 is, at the time that this draft is circulated,
14 what is your understanding of the business deal
15 between Barclays and the estate?
16    A.   I was not -- I was not aware -- I
17 don't know it to be the case, sitting here
18 today, that there were clearance box assets that
19 Barclays had decided they didn't want.
20    Q.   Did you understand that Barclays had
21 the ability to either return or not take certain
22 clearance box assets?
23    A.   I'm not sure at that time that I had
24 focused on the language that you showed me
25 earlier today.

TSG Reporting - Worldwide    877-702-9580

Page 163

ROSEN

2    Q.   Did you raise any question with DTCC
3 or anyone else as to why there was not any
4 mechanism here for separating out the assets
5 that were being taken by Barclays and the assets
6 that Barclays did not choose to take from the
7 DTC clearance boxes?
8    A.   No, because at that point, I was under
9 the impression that Barclays was taking all of
10 the clearance box assets, which it was their
11 ability to do or not do, as they decided at any
12 time.  I think there was a lack of -- I don't
13 know how clearly it was understood what all of
14 those assets were.
15    Q.   I'll show you next a document that has
16 been marked as Exhibit 607.
17    MR. HUME:  How much more do you have?
18 And would it make sense to take a break at
19 some point afternoon then finish?
20    MR. MAGUIRE:  I can finish this in
21 five minutes and that might be a better time
22 to take a break.
23    Q.   This is an e-mail that your colleague,
24 Mr. Mazzuchi circulated?
25    A.   Um-hm.

TSG Reporting - Worldwide    877-702-9580

Page 164

ROSEN

2    Q.   I note in this draft and the prior
3 draft, there is a signature line for James B.
4 Giddens as trustee for the liquidation of Lehman
5 Brothers.  And the signature line is for James
6 B. Kobak, Jr.  Do you see that?
7    A.   Um-hm.
8    Q.   Did you have any discussions with
9 Mr. Kobak concerning this agreement?
10    A.   I did not have a verbal conversation
11 with James Kobak about this agreement, but he
12 was provided the various drafts that were
13 exchanged.
14    Q.   And made comments?
15    A.   As far as I'm aware, yes.
16    Q.   You see Mr. Mazzuchi's cover e-mail
17 says, "Further to Ed Rosen's discussion with
18 Sheldon, attached is a revised draft of the
19 recourse arrangement for the 250 million dollar
20 purchase price.  This also reflects comments
21 from Lehman."
22    Did you understand that to be a
23 reference to comments from the trustee's
24 representatives?
25    A.   I don't know.

TSG Reporting - Worldwide    877-702-9580

Page 165

ROSEN

2    Q.   Do you know whether this agreement was
3 discussed with anyone from Weil Gotshal?
4    WITNESS' ATTORNEY:  Are you referring
5 to the DTC letter in general or this draft
6 in particular?
7    Q.   The DTC letter in general.
8    A.   I do not recall.
9    Q.   Do you know whether Weil was provided
10 with any draft of the DTC letter agreement?
11    A.   Yes, it would have been on the closing
12 table and it may have been provided separately
13 by Shelly Hirshorn.
14    Q.   Other than it being on the closing
15 table and whether Mr. Hirshorn did or did not
16 provide it, do you though whether anyone
17 otherwise provided either the final agreement or
18 a draft of the DTC later agreement to anyone at
19 Weil?
20    A.   I don't have a recollection.  They may
21 well have been in the room.  The rooms weren't
22 closed off.  They may have participated in
23 reviewing the exchanges of draft.  I just don't
24 have a specific recollection.  Again, at this
25 time, I was in and out of the documentation,

TSG Reporting - Worldwide    877-702-9580

Page 166

ROSEN

1 ROSEN
2 also working on other problems.
3    Q.   In which room was the DTC letter
4 agreement put together -- speaking now to Cleary
5 and the Barclays representatives -- which room
6 at Weil were you working in?
7       WITNESS' ATTORNEY:  Objection,
8 compound.  It is two different questions.
9    A.   Yeah, I don't know how to describe,
10 there was a room on a floor and I was not
11 located in a particular room.  I jockeyed
12 between several rooms.
13    Q.   Where was the, speaking specifically
14 now to the DTCC negotiations, telephone calls
15 and the drafting, in which room did that happen?
16    A.   That happened in a room on a different
17 floor.
18    Q.   Do you know what floor?
19    A.   I believe it was the floor below the
20 floor where the other meetings were taking
21 place.
22    Q.   Were there any other Lehman-related
23 conference rooms in use on that lower floor?
24    A.   I don't, I don't recall.
25    Q.   Did anyone from Cleary instruct anyone
TSG Reporting - Worldwide    877-702-9580

Page 167

1 ROSEN
2 from Weil that they were not permitted into that
3 room?
4    A.   No, not that I am aware.
5    Q.   Have you -- at the beginning of
6 Mr. Mazzuchi's e-mail, he says, "Further to Ed
7 Rosen's discussion with Sheldon," do you know
8 what that discussion refers to?
9    A.   I think it refers to the same issue
10 that's reflected in the earlier exchange of
11 e-mail in which we were taking the view that
12 this was a limited recourse form of credit
13 support and not a guarantee of Barclays.  This
14 was an asset that would otherwise have been paid
15 to the estate as part of the transaction that
16 was being made available to secure additional
17 credit support to DTCC and its related
18 affiliates, and I thought that describing it as
19 a guarantee by Barclays was not entirely
20 accurate.
21    Q.   OK.
22       MR. MAGUIRE:  This is probably a good
23 time to take a break.
24       (Recess)
25    Q.   I will show you a document we have
TSG Reporting - Worldwide    877-702-9580

Page 168

1 ROSEN
2 previously marked as Exhibit 563C.  Have you
3 ever seen that letter before?
4    A.   Again, yes, without verifying how
5 closely it tracks the actual agreement.
6    Q.   If you turn, sir, to page 4, there is
7 a sentence beginning at the first full paragraph
8 that starts, "By Sunday night, September 21."
9 Do you see that sentence?
10    A.   Um-hm, yes.
11    Q.   I give that to you as background.  My
12 question is whether on any of the Sunday night
13 or Monday morning conversations anyone from DTCC
14 said in words, substance that they believed that
15 DTCC's exposure to Lehman from processing the
16 remaining transactions was substantially less
17 than it originally feared?
18    A.   I think implicitly by them saying they
19 had become comfortable with the internal review
20 that they were doing, they would be willing to
21 close the transaction with 250 million.
22    Q.   So the fact that there was a meeting
23 of the minds suggests that DTCC had become more
24 comfortable with its exposure?
25    A.   They may have said that we have
TSG Reporting - Worldwide    877-702-9580

Page 169

1 ROSEN
2 continued to review this and we have gotten to
3 that point based on the review.  I don't recall
4 specifically.
5    Q.   Do you have any recollection of that?
6       MR. HUME:  Objection, asked and
7 answered.
8    Q.   The reason I ask is because you say
9 specifically?
10    A.   I have an impression that that was
11 what was conveyed, that they had gotten
12 comfortable with the risk.  But I don't have a
13 specific recollection of a specific articulation
14 from the calls.
15    Q.   I'll show you a document that has
16 previously been marked as Exhibit 156B.  It is
17 actually not entirely clear, but it is a letter
18 from Cleary Gottlieb dated March 6, 2009.  Do
19 you know whether you have ever seen that letter
20 before, sir?
21    A.   I may have seen a draft of this
22 letter.  I don't have a specific recollection.
23    Q.   My only questions, sir, are with
24 respect to page 3 of this letter, the second
25 full sentence on page 3, starts, "Nothing in
TSG Reporting - Worldwide    877-702-9580

Page 170

ROSEN

1
2    this letter or in Exhibit B should be construed
3    to suggest."
4        Do you see that?
5    A.   Yes.
6    Q.   Do you have an understanding, sir, as
7    to what that sentence means, of Mr. Kobak's
8    letter?
9    A.   To be honest with you, I would have to
10   look at -- I would have to read the entire
11   letter in order to put that sentence in context.
12       WITNESS' ATTORNEY:  Maybe we could
13   discuss this off the record and I could
14   explain it to you.
15   Q.   Sure, that would be helpful.  Let me
16   just ask you then if you have an understanding
17   that the securities in the Lehman -- that
18   Barclays acquired the securities in the Lehman
19   clearance boxes at the time of closing
20   regardless of whether any customers had long
21   positions in those securities?
22       MR. HUME:  I think you're asking the
23   witness to interpret the contract when you
24   ask that question.  If you want to ask him a
25   factual question about a discussion, that's

TSG Reporting - Worldwide    877-702-9580

Page 171

ROSEN

1
2    fine, but to interpret precisely which
3    securities are covered by the clearance box
4    provision of the clarification letter just
5    seems like you're asking him a legal
6    interpretation question.
7    Q.   You can answer.
8        MR. HUME:  Well, you can't answer to
9    the extent it would reveal attorney work
10   product analysis that we have done and I
11   think beyond that --
12   A.   I think answering the question would
13   call for me to interpret the contractual
14   documents.
15   Q.   Let me leave aside the contractual
16   documents.  Just as a matter of the business
17   deal that was negotiated, did you understand the
18   business agreement between the parties was that
19   Barclays was getting the assets in the clearance
20   boxes that were not owned by customers or did
21   you understand that Barclays was getting the
22   assets in the clearance boxes notwithstanding
23   whether any customer had had a long position?
24   A.   My understanding was that they were
25   getting what was in the clearance boxes.

TSG Reporting - Worldwide    877-702-9580

Page 172

ROSEN

1
2    Q.   And that's regardless of what
3    customers had long positions in those
4    securities?
5    A.   It is based on there being lien-free
6    securities.
7    Q.   So the fact that customers had long
8    positions did not affect Barclays' rights?
9    A.   I think you're asking me to interpret
10   the implications of those provisions in the
11   clearance box, relating to the clearance box.
12   Q.   I'm just asking you to tell me what
13   you just told me?
14   A.   You're asking me to interpret whether
15   the reference to the clearance box, the extent
16   to which it covered certain kinds of assets and
17   that's asking me to interpret a term of the
18   agreement.
19   Q.   Leaving aside the agreement, just the
20   business deal, just the business deal between
21   the parties, did you understand --
22   A.   The business deal, as far as I was
23   aware, did not include a limitation on the
24   clearance box assets that Barclays was getting
25   as far as I recall.

TSG Reporting - Worldwide    877-702-9580

Page 173

ROSEN

1
2        MR. MAGUIRE:  We will mark as Exhibit
3    626 a document Bates stamped BCI-CG 0024097
4    through 99.
5        (Exhibit 626, document Bates stamped
6    BCI-CG 00024097 through 99 marked for
7    identification, as of this date.)
8    Q.   Had you received this e-mail chain
9    from Mr. McDaniel, sir?
10   A.   I did.
11   Q.   And you had learned at some point that
12   there was 1 billion dollars in cash margin at
13   the OCC?
14   A.   Could you repeat your question.
15   Q.   Yes, you learned at some point there
16   was 1 billion dollars in cash that the OCC was
17   holding for the accounts of LBI?
18   A.   That is in here, yes.
19   Q.   And that was in addition to government
20   securities that were being held at JP Morgan
21   Chase?
22   A.   It presumably is additional to any
23   other collateral that would have been noncash.
24   Q.   And you asked Jim for more information
25   about the 1 billion dollars?

TSG Reporting - Worldwide    877-702-9580

Page 210

ROSEN

1
2  both 30(b)(6) and your individual deposition.
3  My questions go to your personal knowledge. I
4  have sort of reversed the rules a little bit.
5      A.   I am sorry, could you repeat the
6  question.
7      Q.   Do you have any knowledge of whether
8  anyone on the Barclays' side of the table,
9  Barclays or its representatives, spoke to anyone
10  on the Lehman side of the table, Lehman or its
11  representatives, about provisions that needed to
12  be included in the clarification letter
13  regarding the termination of the repo?
14          MR. HUME:  Object to the form.
15      A.   I am sorry?
16          MR. HUME:  I object to the form.
17      Q.   I think you can answer.
18      A.   I believe that there may have been
19  conversations between the lawyers, maybe Alan
20  Kaplan at Barclays, but I don't have personal
21  knowledge because I was not involved in the
22  events leading up to the notice and the
23  clarification that was made in the clarification
24  letter.
25          But I assume that -- it is obvious

TSG Reporting - Worldwide    877-702-9580

Page 211

ROSEN

1
2  that since the provisions were ultimately
3  included in the clarification letter, that it
4  was conveyed in the form of the amendments to
5  the clarification letter that reflected those
6  provisions.
7      Q.   OK.  I would like to show you -- let's
8  mark this as our next exhibit.
9          (Exhibit 631, document Bates stamped
10          BCI-EX(S) 201894 through 95 marked for
11          identification, as of this date.)
12      Q.   The document I have put before you
13  Mr. Rosen marked as Exhibit 631 bears Bates
14  number BCI-EX(S) 00201894 through 895.
15          Have you seen the document before?
16      A.   Again, not parsing every word, but it
17  looks like an e-mail that I sent.
18      Q.   And you'll see it is an e-mail from
19  you to Josephine Wang?
20      A.   Yes.
21      Q.   I can't --
22      A.   This is what I was referring to --
23      Q.   It is?
24      A.   -- earlier in terms of the sort of the
25  clarification of the language included in the

TSG Reporting - Worldwide    877-702-9580

Page 212

ROSEN

1
2  order, and then we asked SIPC and, I guess it
3  was Mike Macchiaroli now that I see this, to
4  confirm that they wouldn't seek such a stay.
5      Q.   I can't tell from the e-mail address
6  with whom or what is Josephine Wang affiliated.
7      A.   You can't tell that.  I think she is
8  in the legal department at SIPC.
9      Q.   And you say in this e-mail to
10  Josephine Wang and Steven Sharbeck, Mike
11  Macchiaroli, "Below is the language we believe
12  to be necessary to ensure that the order is
13  sufficiently broad to cover the relevant
14  Barclays Capital transactions."
15          Do you see that?
16      A.   Yes.
17      Q.   And below that is some proposed
18  language and below that is a note that says,
19  "Mike, I am trying to place us in the document,
20  are you with me?"
21          Where did the particular language set
22  off in italics come from, beginning, "Exercise
23  of any rights," and ending "September 24, 2008"?
24      A.   Probably from my colleague, Sandra
25  Rocks.

TSG Reporting - Worldwide    877-702-9580

Page 213

ROSEN

1
2      Q.   And was this particular language shown
3  to or discussed with, to your knowledge, anybody
4  on the Lehman side of the table, including its
5  business people or representatives?
6      A.   I think that certainly they would have
7  seen the order in the proposed sale -- the sale
8  order.
9      Q.   Well, you are a bit ahead of me.  I
10  guess I should have asked that.  The order that
11  you refer to, is that the sale order?
12      A.   Yes.
13      Q.   Do you know if this language wound up
14  in the sale order?
15      A.   I would have to check.  I believe so,
16  but I would have to check to confirm.
17      Q.   And in the language that you proposed
18  in this e-mail, there is a reference to section
19  559 of the Bankruptcy Code.  Do you see that?
20      A.   Yes.
21      Q.   Were you familiar with the terms of
22  Section 559 of the Bankruptcy Code when you
23  proposed this language to the Section and SIPC?
24      A.   No, I was the transmitter.
25      Q.   Do you know if anyone at -- on the

TSG Reporting - Worldwide    877-702-9580

Page 214

ROSEN

1
2  Barclays side of the table, including its
3  representatives, spoke to anyone on the Lehman
4  side of the table, including its representatives
5  about Section 559 of the Bankruptcy Code?
6      A.   I don't have a specific recollection
7  of that.
8      WITNESS' ATTORNEY:  Mr. Gaffey, let me
9  state for the record, for what it's worth,
10  the language, the italicized language says,
11  "The order that the stays set forth above
12  shall not apply to," and I just am not sure
13  whether or not that really is referring to
14  the sale order as opposed to some other
15  order.
16      MR. GAFFEY:  Neither am I.  That's why
17  I asked the question.
18      Q.   Does what your counsel has to say
19  refresh your recollection?
20      MR. HUME:  I think it is the SIPC
21  order.
22      A.   Hang on a second.  You know what, I
23  think you're right.  This predated the sale
24  order.  This is Wednesday -- this is the 17th of
25  September, so there was a stay put into place

TSG Reporting - Worldwide   877-702-9580

Page 215

ROSEN

1
2  and I guess this was to seek clarification of
3  that.
4      Q.   This refers to the SIPC order, the
5  SIPA order?
6      THE WITNESS:  Is that the only order?
7      MR. GAFFEY:  Let's go off the record
8  for a minute.
9      (Recess)
10      MR. GAFFEY:  Back on the record.
11      Q.   Mr. Rosen, do you know one way or the
12  other what order is being referred to?  I mean
13  from memory, do you know one way or the other
14  what order is being referred to in the document
15  we have marked as 631, your e-mail?
16      A.   I believe it was in anticipation of
17  the sale order, but I'm not 100 percent
18  confident.
19      Q.   And how much time -- I know it was a
20  busy week -- but how much time did you devote to
21  conversations with the SEC about this assurance
22  language that's set out in Exhibit 631, this
23  issue?
24      A.   I really don't have a clear
25  recollection.  We sent it down to them and I had

TSG Reporting - Worldwide   877-702-9580

Page 216

ROSEN

1
2  a conversation and asked them to focus on it and
3  then come back.  I think there was -- they
4  understood what the import of it was.  And then
5  they came back and confirmed that they
6  wouldn't -- you know, that they agreed they
7  wouldn't exercise that right to seek a stay.
8  But it didn't take a lot of to'ing and fro'ing
9  on the telephone to get there.  Their people are
10  I think quite familiar with their rights.
11      Q.   Did there come a point that it came to
12  your attention that the repurchase agreement
13  was, in fact, terminated?
14      A.   Well, it came to my attention that the
15  clarification letter provided for a collapse
16  instead of unwinding the repurchase agreement
17  and then separately transferring to basically
18  collapse that into one step.  And it was part
19  of -- the collateral that had been under that
20  agreement was part of the securities that were
21  being sold.
22      Q.   My question is a little different.  It
23  goes to the timing point more than anything
24  else, but did there come a time when you learned
25  that the prepurchase agreement had been

TSG Reporting - Worldwide   877-702-9580

Page 217

ROSEN

1
2  terminated?  And if so, when did you find that
3  out?
4      A.   Well, with a consummation of the
5  transaction, it was terminated.
6      Q.   Do you know when the repurchase
7  agreement was terminated?
8      MR. HUME:  Objection, asked and
9  answered.
10      A.   My recollection is that the agreement
11  was terminated as part of the consummation of
12  the sale transaction.
13      Q.   That would be at the closing on the
14  22nd?
15      A.   Which would be at the closing.
16      Q.   Did it come to your attention at any
17  point prior to the closing that Barclays issued
18  a notice of termination to Lehman?
19      A.   At some point, I did see e-mail
20  traffic indicating that a notice had been sent
21  in error and then my recollection is that there
22  was an effort to document that in the
23  clarification letter.
24      Q.   When did the fact of the notice come
25  to your attention?

TSG Reporting - Worldwide   877-702-9580

Page 218

ROSEN

1
2     A.   I honestly don't recall.
3     Q.   Was it after the sale hearing?
4     A.   I honestly don't recall when I became
5   aware of it to be honest with you.  There is
6   probably an e-mail somewhere about it.  I don't
7   have a date on it.
8     MR. GAFFEY:  OK.  Let's mark this
9   document as Exhibit 632.
10    (Exhibit 632, document Bates stamped
11    CGSH 163813 through 815 marked for
12    identification, as of this date.)
13    Q.   I have put before you, Mr. Rosen, what
14  has been marked as Exhibit 632 document bearing
15  Bates number CGSH 00163813 through 815.  Take a
16  look at the document, please, sufficient to tell
17  me whether you have seen it before.
18    A.   Yes, it looks like the e-mail
19  correspondence to which I was a party.
20    Q.   Does this e-mail constitute the
21  assurance that had been requested from the SEC?
22    A.   Yeah, I believe this is.
23    Q.   And had you spoken with Alastaire
24  Bambach about the topic?
25    A.   I don't recall.  It is possible that

TSG Reporting - Worldwide    877-702-9580

Page 219

ROSEN

1
2   he -- that I did or that he was on the phone
3   when I spoke to someone regarding it.  I
4   honestly don't have a clear recollection.  There
5   was so many conversations with the SEC.
6     Q.   And you asked Alastaire in the e-mail
7   at the top of the chain, an e-mail dated
8   September 18, 2008 at the time of 4:01 p.m. -- I
9   beg your pardon, the time of 3:59 p.m.
10  Alastaire, "Is this comfort something that we
11  may share with others who may have an interest."
12  Do you see that?
13    A.   Yes.
14    Q.   Who were the others you are referring
15  to?
16    A.   I'm looking at that and I don't recall
17  specifically whether this was sort of just a
18  general, abstract question or whether I had
19  somebody in mind.  I honestly don't recall
20  sitting here today.
21    Q.   And did you share this comfort with
22  others?
23    A.   I think I probably shared it with the
24  client certainly.
25    Q.   Did you share it with anybody at Weil

TSG Reporting - Worldwide    877-702-9580

Page 220

ROSEN

1
2   Gotshal?
3     A.   I don't recall providing it directly
4   to Weil Gotshal.
5     Q.   Do you know if it was provided
6   indirectly to Weil Gotshal?
7     A.   I don't have a recollection about
8   that.  It may have been.  I do not.  It may have
9   been that I did this because the client at
10  Barclays wanted to forward it on and they asked
11  me whether they could.  But I just -- but
12  honestly, this is not a keen recollection.
13    Q.   Do you have any knowledge, direct or
14  indirect, as to whether this comfort language
15  was shared with Lehman or Weil Gotshal?
16    A.   I really don't recall.
17    Q.   You referred a few times today in
18  various contexts to -- you can put the document
19  aside.  To various circumstances where -- and
20  this is, again, not a quote, but you talked
21  about jeopardy to the deal closing by Monday the
22  22nd, that's a prospect that you have talked
23  about a few times today.  Was there a drop-dead
24  date for closing?
25    A.   No, there was just a perception that

TSG Reporting - Worldwide    877-702-9580

Page 221

ROSEN

1
2   if it didn't close by Monday, there could be
3   developments in the marketplace which might have
4   complicated or prevented the deal from getting
5   done.  I don't think it was an ultimatum.
6     I think people wanted to get the deal
7   done, but I think there was a concern that
8   letting another business cycle go by was just --
9   because we didn't know what was going to happen.
10  I think this was the weekend where we had
11  learned very late Sunday night that, you know,
12  Morgan Stanley and Goldman Sachs had quite
13  expeditiously become banks and people were
14  worried and the hurry to do that was no doubt in
15  part due to concerns.
16    So I wouldn't say that it was a drop
17  dead or an ultimatum or anything like that.  It
18  was that people realized it became more
19  complicated and there was more noise that could
20  interfere with the transaction the more time
21  that elapsed.  So we all, I think internally at
22  Cleary regarded it as, put it this way, if the
23  deal wasn't ready to close on Monday, we didn't
24  want to be the ones responsible for it not being
25  ready to close on Monday morning, so we took it

TSG Reporting - Worldwide    877-702-9580

## Page 222

ROSEN

sechously.

Q.   That issue aside, the deal could have closed on Tuesday?

A.   Theoretically, it could have closed on Tuesday if things hadn't intervened.  It was more the risks that were associated with not closing expeditiously that were the concerns.  You had to remember, the markets were very volatile and there were assets whose valuation was the source of considerable uncertainty and concern.

MR. GAFFEY:  I don't have anything further.  Thank you for your time.

MR. DAKIS:  The committee has no questions.

THE WITNESS:  Thank you.

(Time Noted:  4:35 p.m.)

_____

EDWARD J. ROSEN

Subscribed and sworn to
before me this EDWARD J. ROSEN  day
of February, 2010.

_____

TSG Reporting - Worldwide    877-702-9580

## Page 223

ROSEN
INDEX:

WITNESS        EXAM BY:            PAGE:
E. Rosen        Mr. Maguire            6
                Mr. Gaffey        202
                EXHIBITS
Exhibit No.                        Marked
Exhibit 622 declaration of Edward J. Rosen        8
Exhibit 623 document Bates stamped        120
    CGSH0002699 through 700
Exhibit 624 document Bates stamped DTCC        122
    00126 through 00198
Exhibit 625 document Bates stamped DTCC        152
    00359 through 361
Exhibit 626 document Bates stamped BCI-CG        175
    00024097 through 99
Exhibit 627 document Bates stamped CGSH        181
    0034491 through 92
Exhibit 628 document Bates stamped        183
    OCC36408 through 409
Exhibit 629 document Bates stamped OCC        186
    0036472 through 36473
Exhibit 630 document Bates stamped OCC        195
    0036482 through 483

TSG Reporting - Worldwide    877-702-9580

## Page 224

ROSEN
EXHIBITS

Exhibit No.                        Marked
Exhibit 631 document Bates stamped        213
    BCI-EX(S) 201894 through 95
Exhibit 632 document Bates stamped CGSH        220
    163813 through 815

TSG Reporting - Worldwide    877-702-9580

## Page 225

ROSEN
CERTIFICATE
STATE OF NEW YORK )
            )ss:
COUNTY OF NEW YORK)
    I, MARY F. BOWMAN, a Registered
Professional Reporter, Certified Realtime
Reporter, and Notary Public within and for
the State of New York, do hereby certify:
    That EDWARD J. ROSEN, the witness
whose deposition is hereinbefore set forth,
was duly sworn by me and that such
deposition is a true record of the testimony
given by such witness.
    I further certify that I am not
related to any of the parties to this action
by blood or marriage and that I am in no way
interested in the outcome of this matter.
    In witness whereof, I have hereunto
set my hand this 19th day of February, 2010.

_____

MARY F. BOWMAN, RPR, CRR

TSG Reporting - Worldwide    877-702-9580

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------x

     In Re:                        Chapter 11

5    LEHMAN BROTHERS                Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,       (Jointly Administered)

6    -------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9           DEPOSITION OF MIKE KEEGAN

10             New York, New York

11           Friday, August 28, 2009

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 24379

22

23

24

25

## Page 6

M. KEEGAN - HIGHLY CONFIDENTIAL

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2   Quinn, Emanuel, Urquhart, Oliver &
3   Hedges for the Official Committee of
4   Unsecured Committee.
5      MR. LAYDEN:  Good morning.  David
6   Layden from Jenner & Block for the
7   Examiner.
8   BY MR. TAMBE:
9      Q.   Mr. Keegan, by whom are you
10  employed currently?
11     A.   Barclays Bank, PLC.
12     Q.   And how long have you been
13  employed by Barclays Bank, PLC?
14     A.   I've been an employee of Barclays
15  since July of 1996.  But during that time
16  period, because of overseas assignments and
17  things like that, I've been employed by a
18  number of various entities within Barclays.
19     Q.   Starting in July of 1996 to the
20  present, if you could just give us a broad
21  overview of what your positions have been and
22  what your duties have been at Barclays.
23     A.   Sure.  In July of '96 I actually
24  joined BZW which was the investment bank
25  subsidiary of Barclays Bank located in London.

## Page 7

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  I joined in London as a chief operating
3  officer of the markets division of BZW
4  reporting to Bob Diamond.
5     I did that job for two years until
6  the formation of Barclays Capital in January
7  of 1997 -- sorry.  January of 1999.  And I was
8  the C -- sorry.  It was January of '97.  Sorry
9  about that.  So it was 18 months as COO.  Then
10  I was -- became the first CFO of Barclays
11  Capital when Barclays Capital was formed.  I
12  did that job until November of 1999 and then I
13  returned to New York at that point in time as
14  the chief administrative officer for the
15  Barclays Capital operations in the US.  I did
16  that until 2001 when I became the chief
17  operating officer for Barclays Capital's
18  credit trading and investment banking
19  businesses.  And that was the position I had
20  until I guess November '07.  And at that point
21  became head of principal credit trading which
22  is the job I currently have.
23     Q.   Just focusing on your current job
24  and your prior job, so starting in 2001
25  through the present, starting sometime in 2001

## Page 8

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  it sounds like you were head of credit
3  trading?
4     A.   No.  Chief operating officer which
5  in Barclays Capital it's different things to
6  different people.  All right?  So I worked for
7  an individual named Grant Kavalheim.
8     Q.   How do you spell that last name?
9     A.   It's K-A-V-A-H -- let me write it
10  out.
11     MR. STERN:  We can look it up.
12     Q.   Grant was the first name?
13     A.   Yeah.  Grant.
14     Q.   All right.
15     A.   K-A-V-A-L-H-E-I-M.
16     Q.   Okay.
17     A.   So Grant was head of trading and
18  investment banking.  I was his COO and as his
19  COO, yeah, I had a bunch of different duties
20  in charge of planning, budgeting, execution of
21  any strategic plans that we wanted to
22  implement.  I took on responsibility for
23  managing a number of businesses for him which
24  included our -- initially a business called
25  risk finance which was a credit arbitrage

## Page 9

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  trading business.  Then I took on
3  responsibilities for managing our loan
4  portfolio which is the portions of the loans
5  that we would make to clients that we would
6  retain on our balance sheet, managing that.
7  Took on responsibility for our distressed
8  proprietary trading business.  And, finally,
9  more recently, our real estate business.
10     Q.   And if I understand the change in
11  the nature of your duties starting in November
12  2007, you specified that date as the date at
13  which you became head of prime credit trading?
14     A.   No.  Principle credit trading.
15     Q.   Principle.
16     A.   So Grant departed the firm.  All
17  of the trading businesses rolled up to Jerry
18  del Missier.  Jerry del Missier had another
19  individual by the name of Justin Bull who was
20  his chief operating officer.  So basically my
21  chief operating officer duties for credit went
22  away and I was left with what was my trading
23  and risk management supervisory
24  responsibilities.
25     Q.   Okay.

Page 10

M. KEEGAN - HIGHLY CONFIDENTIAL

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2          A.    And I was renamed as head of
3      principle credit trading.
4          Q.    So starting with November 2007
5      through to the present if you could describe
6      who you directly reported to.
7          A.    November 2000?
8          Q.    Seven.
9          A.    Seven?
10         Q.    Yeah.
11         A.    As of November 2007 until today I
12     directly report to Jerry del Missier.
13         Q.    And who are the folks who directly
14     report to you, if any?
15         A.    Today it's Fred Orlan.  It is an
16     individual named Rene Canezen.  It's an
17     individual named Matt Barrett.  An individual
18     named Haejin Baek.  And I'm pretty sure
19     that's -- I'm trying to think.  That's it
20     right now the way we're organized.
21         Q.    Okay.  When we were earlier
22     talking about some of the work you did when
23     you were working with Grant you'd mentioned
24     managing loan portfolios, distressed
25     proprietary trading, et cetera.

Page 11

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2          Do you still do all those --
3      manage all those types of trading?
4          A.    Yes.
5          Q.    So that's included within
6      principle credit trading.
7          A.    Yeah.  What principle credit is
8      any risk that we are taking as a firm in the
9      credit space in a non-market-making capacity
10     is supposed to roll up into principle credit.
11     It doesn't but...
12         Q.    Other than the duties you have
13     with respect to the principle credit trading
14     business in the past twelve months have you
15     been involved in any strategic initiatives
16     by -- taken on behalf of Barclays?
17         A.    I was involved in the Lehman
18     acquisition, yes.
19         Q.    And other than the Lehman
20     acquisition, have you been involved in any
21     other strategic initiatives, acquisitions,
22     dispositions, things of that nature?
23         A.    Nothing major.
24         Q.    Broad terms, if you could just
25     describe your involvement in the Lehman

Page 12

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      transaction.
3          MR. STERN:  Jay, if it helps, I
4      have a September 2008 monthly calendar,
5      you know, just to keep the days of the
6      week in mind.  I just put that up here
7      in front of Mr. Keegan.
8          MR. TAMBE:  That's perfectly fine.
9          A.    So my role I guess began Friday
10     the 12th.  And was one of the people who was
11     brought in to examine portions of Lehman's
12     balance sheet and operations in preparation
13     for a bid to buy Lehman Brothers from what
14     looked like it was going to be the -- in fact,
15     the government at that point in time.
16         Q.    And over the course of that next
17     week, starting on the 12th going forward say
18     ten days until the 22nd of September, if you
19     could give us a little bit more detail in
20     terms of what tasks you were doing in
21     connection with the Lehman transaction.
22         A.    Sure.  I had responsibility
23     specifically for looking at the commercial
24     real estate portfolio, their loan portfolios,
25     their private equity investments, and their

Page 13

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      corporate credit/debt positions.
3          And, you know, that process took
4      basically, you know, the weekend through -- I
5      don't know -- 3:00 or 4:00 on Sunday when it
6      was determined that the trade wasn't going to
7      happen.
8          Q.    After that Sunday -- the Sunday
9      you're referring to is the 14th of September,
10     correct?
11         A.    I believe it was, yes.
12         Q.    After Sunday, the 14th, did you
13     have any further involvement?
14         A.    Yes, I did.
15         Q.    Okay.
16         A.    On Monday, the 15th, somewhere
17     around 10, 10:30, 11:00 I got a phone call to
18     show up to the conference room at Lehman
19     Brothers' offices on the 32nd floor and to
20     await instruction.
21         Q.    And did some instructions arrive?
22         A.    They did.  I believe it was -- I'm
23     not sure if it was actually but I believe it
24     was Richard came in and told us that we had an
25     opportunity to buy the US operations of Lehman

M. KEEGAN - HIGHLY CONFIDENTIAL

Brothers I guess prior to bankruptcy
because -- at least with respect to the
broker/dealer.  The broker/dealer was not
filed on that Monday morning.

Q.    And so after you were told about
that opportunity what involvement did you have
in those efforts to purchase Lehman's
operations?

A.    So I was asked to take a look at,
you know, the potential assets that we were
buying within the categories that I explained
to you before.  And it did not include any
commercial real estate because our board told
us we weren't eligible to take over any
commercial real estate.  It did not include
any private equity investments because during
the work we did over the weekend we determined
that the private equity investments were not
something that we wanted to take.

It did not include any of the loan
portfolios, should not have included any of
the loan portfolios, because that was another
asset category we determined we did not want
to take.

M. KEEGAN - HIGHLY CONFIDENTIAL

So it basically came down to,
within my world, what I looked at, was the
corporate debt securities that were on the
books of the broker/dealer for the most part.

Q.    And just to be clear on what you
mean by corporate debt securities, what do you
mean by that?

A.    Commercial paper, bonds, credit
link notes.  Any other, you know, security
instruments that they might have housed in
broker/dealer that, you know, involved
corporate credit risk.

Q.    And for this asset class,
corporate debt securities, would you typically
be provided with a list of CUSIP numbers,
identifiers for the securities that were held
by the broker/dealer?

MR. STERN:  I'm just going to
object to the form.  Are you asking him
if he was?  It says would you typically
have been.

Q.    That's fine.  I could restate the
question.  Are you provided with CUSIP numbers
out of the debt securities held by the

M. KEEGAN - HIGHLY CONFIDENTIAL

broker/dealer?

A.    Over the weekend we were.  And
then on Monday I'm not sure that we were given
a complete list again but we were shown -- it
was indicated what was on the books of the
broker/dealer and I guess we had a list
because I had determined whether we looked at
it or not -- or didn't look at it over the
weekend.  That was the first step.  You know,
had we seen it before.  We should have.

And then for particular areas
where we identified over the weekend as being
problematic with respect to value or other
concerns, yes, we were given a CUSIP -- we
asked for and were given a CUSIP list.

So Lehman obviously hadn't planned
on going bankrupt and they were totally
unprepared for the whole process on Monday so
it was a struggle to get any information quite
frankly.

Q.    And throughout that week, the week
of the 15th of September, was the focus of
your efforts limited to analyzing the
corporate debt securities aspect of the

M. KEEGAN - HIGHLY CONFIDENTIAL

portfolio or did you do other things as well?

A.    It was primarily that.  I also was
more or less coordinating the communication
internally between other individuals that had
responsibility for various parts of the
portfolio -- of Lehman's portfolio and
analyzing it.  And our team just -- and
that's -- no one said, Mike, you're -- you
know, you're in charge.  Just that I'm more
senior than the other guys.  So I know -- I
know Rich.  I know Archie Cox.  People like
that.

I worked on the -- securing -- we
were going to make a DIP loan to Lehman for
the week and looking at the collateral
associated with the DIP loan and how much --
what collateral might be available for the DIP
loan and how much we might be willing to
provide.  That was principally it.

Q.    And the loan that you're referring
to as the DIP loan was that, in fact, extended
by Barclays to Lehman?

A.    It was.

Q.    And in what amount?

Page 18

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2        A.   I think it was $500 million.  I'm
 3   not positive what credit finance determined.
 4   The collateral was Newburger Berman property.
 5        Q.   And just to be clear, this DIP
 6   loan is different than the tri-party repo or
 7   any other repo --
 8        A.   Absolutely, yeah.
 9        Q.   You said you were -- you played a
10   coordinating role to some extent during that
11   week.  You mentioned two names.  I believe you
12   mentioned Rich Ricci.  I think you mentioned
13   Rich but that was Rich Ricci?
14        A.   That's Rich Ricci, yes.
15        Q.   And Archie Cox, right?
16        A.   Yes.
17        Q.   Who else were you coordinating
18   with during that week?
19        A.   Jonathan Hughes, our legal
20   counsel.  A few conversations with Patrick
21   Clackson.
22        Q.   And who is Mr. Clackson?
23        A.   He's the chief financial officer
24   of Barclays.
25        Q.   Were you involved at all in
```

Page 19

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   negotiating --
 3        MR. STERN:  Excuse me.  Excuse
 4   me.  I don't know if you -- if you
 5   completed your answer.
 6        King.
 7        THE WITNESS:  Oh, the guys I was
 8   coordinating with.  Sorry.  I thought
 9   you were looking upward, not downward.
10        MR. STERN:  It's a gen -- just to
11   clarify, it's a general question about
12   all the people he was coordinating with.
13   Not just the more senior people.
14        MR. TAMBE:  That's fine.
15        Q.   Let's go through the list of
16   everyone you were coordinating with.  You got
17   to Mr. Clackson.  Mr. King.
18        A.   Right.  So Stephen King was
19   responsible for looking at all of the ABS and
20   mortgage -- residential mortgage assets with
21   Lehman Brothers.  Similar role to what I had
22   on the credit side.  John Mahon took that
23   responsibility for, I guess you would call
24   them the rates, assets, government bonds
25   principally.  Anything that they might have
```

Page 20

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   done with repo would have rolled up to him.
 3   The exposures, if any, on derivative
 4   contracts.
 5        Q.   Anyone else in this coordination
 6   circle that you --
 7        A.   That was pretty much it.  There
 8   was other people that -- like I said, I was
 9   not in the coordination but I was working with
10   our guys in credit on the DIP loan.  A guy
11   named Mark Manski and Ian Prior on that.  I
12   had conversations with James Walker.  James
13   was controller of the US.  Another lawyer
14   named Jason White.  Jason was working on the
15   DIP loan.  And Gerard LaRocco I guess as well.
16   And Gerard was working on putting a repo
17   facility in place.
18        Q.   Anyone else?
19        A.   Not that I -- not that I remember.
20   I'm not saying there wasn't.  I just don't
21   remember.
22        Q.   Were you part of the group of
23   people from Barclays that was negotiating the
24   terms of the transaction with the folks from
25   Lehman?
```

Page 21

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2        A.   I wouldn't say I was negotiating
 3   the terms of the transaction but I was
 4   involved in -- you know, I was also involved
 5   on Thursday.
 6        Q.   And you say you were also involved
 7   on Thursday.  What do you mean by that?
 8        A.   So we struck a deal on Monday in
 9   effect as to what we were going to buy.  And
10   then -- you know, so I worked from, you know,
11   at Lehman from whatever time, 10:30 in the
12   morning, 10:00 to roughly 2:30, 3:00 in the
13   morning, Tuesday morning.  Went and got some
14   sleep.  Tuesday was more worried about other
15   things in our world than I was worried about
16   anything in Lehman's world whose world was
17   melting down.  And more focused on that
18   Tuesday and Wednesday.
19        And then Thursday afternoon I got
20   called in around 4:00 to come over again to
21   Lehman by Rich to start taking a look at the
22   inventories that were coming in related to,
23   you know, an effective settlement of the asset
24   purchase to make sure we were getting, you
25   know, what we bought and everything we bought.
```

---

Page 22

M. KEEGAN - HIGHLY CONFIDENTIAL

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2         And Stephen was there as well and
3    John was back in UK at that point in time.
4         Q.    And the Stephen you're referring
5    to is Stephen King.
6         A.    Yes.
7         Q.    And the John you were referring to
8    is who?
9         A.    John Mahon.
10        Q.    Have you ever seen a copy of the
11   Asset Purchase Agreement between Lehman and
12   Barclays?
13        A.    Only in preparation for this.
14   Prior to that, no.
15        Q.    So it's fair to say the first time
16   you ever laid eyes on the Asset Purchase
17   Agreement was sometime in the past couple
18   weeks.
19        A.    Yeah.  I saw a version of the
20   agreement early on.  I was asked a specific
21   question which escapes me now why I was given
22   the agreement.  But it was very -- it was
23   specific to, you know, is this worded
24   properly, yes or no.  And I just don't
25   remember what it was.

---

Page 23

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2         Q.    And you say it was early on.
3    Would you put it during that week of the 15th?
4         A.    Yeah.  During the week prior to
5    Thursday, I believe.
6         Q.    And the provision you were shown,
7    were you shown that provision in the signed
8    APA or an APA that was being drafted?
9         A.    I think it was a draft.
10        Q.    And who showed you that provision?
11        A.    I think it was the legal
12   department.  It may have been the finance
13   department.  I don't remember.
14        Q.    You don't down remember the
15   substance of the discussion.
16        A.    The substance was --
17        MR. STERN:  If it was a discussion
18   with legal, don't talk about the
19   substance.
20        THE WITNESS:  I don't remember who
21   it was with.
22        Q.    Okay.  So what was the substance
23   of the discussion?
24        MR. TAMBE:  He doesn't know if it
25   was with a lawyer.

---

Page 24

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2         MR. STERN:  Well, since it may
3    have been with a lawyer I think I'll
4    instruct you not to answer because it
5    may have been a privileged conversation.
6         THE WITNESS:  Okay.
7         A.    I don't know then.
8         MR. STERN:  If you remember what
9    provision you discussed I think that's
10   fine.
11        A.    No, I don't.  If you put some
12   documents in front of me I might remember but
13   right now I don't remember.
14        Q.    There's a document that's been
15   referred to as the clarification letter.  Does
16   that term have any meaning to you?
17        A.    I'm not sure what that is.
18        Q.    Okay.  Did you have any
19   understanding that there were features of the
20   transaction that changed over the course of
21   that week, the week of the 15th?
22        A.    Oh, yeah.  Yes, I did.
23        Q.    And what's your understanding of
24   the features of the deal that changed over the
25   course of that week?

---

Page 25

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2         A.    All right.  So Monday night when I
3    left we had come to a conclusion as to what we
4    would buy and what we wouldn't buy.  There
5    were assets -- you know, we did have problems
6    with the valuations with a number of the
7    assets that Lehman had on the books.  And
8    overall our conclusion from the weekend was
9    that Lehman was aggressive with the rest of
10   the valuations.  And, you know, we went back
11   to them on Monday and told them that, you
12   know, we didn't agree with certain prices.  We
13   also went back to them with the knowledge that
14   the market was melting down and that that deal
15   wasn't closing until the end of the week,
16   saying that, you know, we need to put a
17   haircut on these assets because the volume of
18   the assets plus the timing -- you know, we're
19   trying to predict what the assets of are going
20   to be worth on Thursday, Friday when the deal
21   closes.  We know Lehman's employees have all
22   lost their jobs in effect as of right now and
23   they're not too focused on marketing the
24   inventory, et cetera.
25         So we had proposed some haircuts

Page 26

M. KEEGAN - HIGHLY CONFIDENTIAL

1 to them.  It was assets that we thought were
2 materially -- you know, relative to those
3 assets themselves, materially mismarked and we
4 went back to Lehman on those and told them
5 where we thought the valuation of those assets
6 were.  Some of those we agreed.  Some of those
7 weren't agreed.  And we told them to keep the
8 assets.
9         I've lost my focus on the
10 question.  Could you just repeat the question?
11         Q.   The question was about what the
12 features of the deal that changed over the
13 course of the week.
14         A.   Okay.  So that was the deal.  So
15 we basically came to a definitive list of what
16 we said we would purchase in Monday.
17         Q.   I just want to drill down a little
18 bit on a couple of things you said.
19         MR. STERN:  Just for
20 clarification, we've talked about the
21 status as of Monday and then you're
22 going to clarify that and then you'll go
23 to the changes.
24         MR. TAMBE:  Yeah.

Page 27

M. KEEGAN - HIGHLY CONFIDENTIAL

1         MR. STERN:  Okay.  That's fine.
2         Q.   You had some concerns about the
3 valuations of the assets on Monday, correct?
4 Lehman's valuations.
5         A.   Yeah.
6         Q.   And you went back to them and
7 proposed haircuts on these assets.
8         A.   Well, we proposed valuation
9 adjustments and haircuts, yes.
10         Q.   Do I gather from your answer that
11 on some of the haircuts or valuation
12 adjustments you proposed you reached agreement
13 with Lehman?
14         A.   On some of them, yeah.
15         Q.   And others you didn't?
16         A.   No.  Other's they just thought we
17 were nuts.
18         Q.   On the ones where you reached an
19 agreement with Lehman as to the haircut or the
20 valuation adjustment, were those included then
21 in the list of assets that Barclays would be
22 purchasing?
23         A.   Yes.
24         Q.   And the ones that you did not

Page 28

M. KEEGAN - HIGHLY CONFIDENTIAL

1 reach an agreement with Lehman on on valuation
2 were those excluded from the list of assets?
3         A.   That's correct.
4         MR. STERN:  Let me just pause.
5 I'm sorry.  For the reporter.  There's a
6 question "And others you didn't."  What
7 do you have as the answer?
8         (Discussion held off the record.)
9 BY MR. TAMBE:
10         Q.   In round numbers, for the
11 valuation adjustments or haircuts where you
12 did reach an agreement --
13         A.   I don't know.
14         Q.   $5 billion?
15         A.   No idea.
16         Q.   Have you ever heard about a
17 $5 billion adjustment or mark-down in the book
18 value of Lehman's assets around that period of
19 time?
20         A.   No.  Again, only in preparation
21 for this deposition.  But not otherwise.
22         Q.   When you said you proposed
23 haircuts or valuation adjustments to Lehman on
24 Monday, was there a document that had

Page 29

M. KEEGAN - HIGHLY CONFIDENTIAL

1 asset-by-asset proposed mark-downs?
2         A.   Yeah.  There was a period -- there
3 was an asset -- there was asset-by-asset where
4 we thought we had problems with valuations.
5 But then there was also a summary where we
6 just said that, you know, we're talking so
7 much -- you know, we're taking on so much
8 inventory, the market is melting down, you
9 aren't getting your hands on it till Thursday.
10 You know, what do you need to protect yourself
11 between now and Thursday or Friday.  So we can
12 manage the assets if the deal closes, right?
13         So that was the Monday night
14 process.  And I have no idea what the number
15 actually added up to.  We weren't targeting a
16 number or anything like that.  We were just
17 saying based on this type of asset, based on
18 what's going on in the market, how much
19 protection do you think you need between then.
20         Q.   Just to get a better understanding
21 of your proposal that Barclays made, was it by
22 asset category or was it even more granular,
23 particular asset by asset?
24         MR. STERN:  Objection to the form.

Page 30

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2       Q.   Do you understand my question?
 3       A.   Ask it again.  Or repeat it.
 4       Q.   The question I'm asking --
 5            MR. STERN:   I'm objecting to the
 6    proposal term.
 7            MR. TAMBE:  That's fine.
 8       Q.   You proposed some haircuts or
 9    valuation adjustments, right?
10       A.   Yeah.  By category we said we
11    think we need --
12       Q.   When I use the word proposal
13    that's what I'm talking about, okay?
14       A.   Okay.
15       Q.   That proposal.  Was it by asset
16    category or by specific asset?
17       A.   If we had a valuation adjustment
18    it was by asset.  And if we had a haircut it
19    was by category.
20       Q.   Do you recall any of the category
21    type haircuts that you proposed?
22       A.   The actual amount?
23       Q.   Yeah.
24       A.   No, I don't.  Off the top of my
25    head I don't know.  I'd have to look at the
```

Page 31

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2    documents.
 3       Q.   But you believe there's a document
 4    or documents from Monday which would contain
 5    that information.
 6       A.   There was a Monday -- there was a
 7    document that contained that information on
 8    the Monday, okay?  That deal didn't happen so
 9    I have no idea if that still exists or doesn't
10    exist.
11       Q.   All right.  We got down this
12    discussion talking about how the deal changed
13    or how features of the deal changed during
14    that week.  That deal that was being discussed
15    on Monday, did that deal get done?
16       A.   So the deal on Monday, okay, in
17    the context of the bigger deal, I guess yes,
18    it got down.  But in the context of what I was
19    looking at, which was the purchase of the
20    inventory, that aspect of the deal didn't get
21    done, okay?
22            When I showed up on Thursday night
23    there was a -- I got there around 4:00.
24    Somewhere around there.  And I expected to
25    take a look at, you know, the settlement list
```

Page 32

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2    of what inventory we got and then just do a
 3    simple comparison back to what we bought
 4    Monday and say, Yeah, it's the same list.  It
 5    wasn't the same list.  And, in fact, there was
 6    a huge delay in us getting anything back, you
 7    know.  We had wired out through JPMorgan money
 8    and they were supposed to deliver us
 9    securities and were having difficulties
10    delivering us securities for some reason.  So
11    there was a long delay.  Several hours.
12            And my recollection is around 8:00
13    at night, you know, we started getting stuff
14    in and looking at it.  We might have started
15    getting it a little bit earlier, around 7, but
16    we started looking at it.
17            But about 8:00 at night on
18    Thursday night we noticed that this wasn't the
19    inventory that we had agreed to purchase on
20    Monday.  It was different.  And it included a
21    lot of the inventory that we thought was
22    overvalued.  At least the initial deliveries
23    were a lot of what we thought was overvalued
24    in the mortgages area, mortgage agencies, that
25    we said we couldn't come to an agreement with
```

Page 33

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2    Lehman on valuation and we were leaving
 3    behind.
 4            So it was at that point I learned
 5    for the first time that the agreement had
 6    changed and apparently sometime on Tuesday the
 7    Federal Reserve came in to us and said -- you
 8    know, it's been relayed to me by third
 9    parties, I have no idea what they actually
10    said -- but, in effect, what I've been told,
11    if you guys want the deal to go through you
12    need to take us out of our repo.  And so the
13    construct of the deal changed from a purchase
14    of inventory to taking an assignment of repo.
15       Q.   And who described that change in
16    the nature of the deal to you?
17       A.   Could have been Ian Lowitt from
18    the Lehman side.  It could have been Rich.  It
19    could have been Jonathan Hughes.  It could
20    have been -- I don't know.  I mean, I was kind
21    of stunned when I heard it.  But I don't
22    remember exactly who told me that.
23            I do know what I did after that is
24    I had a conversation with Ian Lowitt, and
25    said, "Ian, we're getting stuff we didn't
```

Page 34

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  want.  You need to take it back and give us
3  the stuff we bought."
4          And he explained that he couldn't
5  do that because even though they hadn't filed
6  bankruptcy, the counterparties to the repo for
7  the securities company were grabbing
8  collateral and liquidating it on them.  And
9  they didn't have the inventory we bought
10 anymore.  They only had what was in repo at
11 the Fed.
12         Q.   Did you have any discussions with
13 Ian Lowitt or others about finding additional
14 inventory beyond the inventory that had been
15 identified on Monday?
16         A.   Yeah.  Because we had value -- we
17 were getting, for instance, these mortgage
18 securities, agency mortgage securities.  I
19 think the number, and I don't recall, Stephen
20 would know the exact number, but I think we
21 thought the adjustment should be as much as a
22 billion eight of new securities.  And Lehman
23 did not agree with us.  So those securities
24 were to be left behind.  And then all of a
25 sudden they show up in our box.  Our

Page 35

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  inventory.  And so we knew they were marked
3  wrong.  Or we believed they were marked wrong.
4          And, therefore, we were, you know,
5  short cushion or haircut, if you will, on the
6  repo.  And, you know, that was a concern to us
7  because we had -- on Monday in effect
8  negotiated, you know, what we thought was a
9  cushion to protect us, and -- similar to a
10 haircut on repo.  And on Thursday night we
11 were finding out that the actual repo haircuts
12 were in effect getting absorbed by the mismark
13 of Lehman securities.
14         So, yeah, we needed additional
15 collateral to protect us.
16         Q.   And did you have in mind a number
17 or target amount of that additional
18 collateral?
19         A.   I did not.  I just -- I didn't --
20 I didn't -- you know, we didn't -- we knew,
21 for instance, the billion eight, but we didn't
22 know what else we got.  And we were struggling
23 all night long to find out what we were
24 actually getting in terms of inventory,
25 because it came in dribs and drabs through the

Page 36

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  evening because of what we believed was
3  operational errors that JPMorgan made.
4          MR. STERN:  Let me just pause for
5  one minute.
6          (Discussion held off the record.)
7  BY MR. TAMBE:
8          Q.   Did you discuss with anyone a
9  target number for the additional collateral
10 that Barclays was looking for after the
11 Thursday night transfer?
12         A.   No.  I did not discuss a specific
13 number.
14         Q.   Did you discuss a range?
15         A.   No.  What we were asked was -- the
16 question we were asked was how much your
17 haircut -- so -- we gave a number -- you know,
18 an amount of money to the Fed, in essence,
19 which was I think gross somewhere in the $45
20 million area.  Okay?  The Fed delivered the
21 securities that went through JPMorgan.  I have
22 no idea if what we got was what came out of
23 the Fed and went to JPMorgan or how JPMorgan
24 determined what we got.  All right?  But we
25 got stuff from JPMorgan.

Page 37

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2          We were trying to find out all
3  Thursday night, all Friday morning, what
4  securities we got, were getting, were likely
5  to get, what Lehman thought the value of those
6  securities were.  Right?  So we could know, we
7  could understand what the magnitude of the
8  repo haircut that we received was.
9          And Lehman wasn't able to provide
10 us that information.  JPMorgan wasn't able to
11 provide us that information.  And, you know,
12 we had some general idea but not specific idea
13 of what the haircut cushion was.  And the
14 question we were being asked was I guess the
15 way the deal was structured initially there
16 was some liabilities we're assuming as well,
17 is there enough cushion to pay for those
18 liabilities.  And we couldn't answer that
19 question.
20         Q.   Was it a feature of the
21 transaction as you understood it that the
22 cushion you had negotiated on Monday would be
23 sufficient to pay for the liabilities you were
24 assuming?
25         A.   No.  Not on Monday night, no.  I

Page 38

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   had nothing to do -- I had no idea that there
 3   were liabilities that we were assuming.
 4        Q.   On Thursday was there a discussion
 5   about ensuring that there would be enough of a
 6   cushion to cover the liabilities that Barclays
 7   was assuming?
 8        MR. STERN:  Objection to the form.
 9        A.   Read the question.
10        (Record read.)
11        A.   No, there was not a specific
12   discussion that there was enough cushion for
13   the liabilities that we were assuming.
14        Q.   Was there a discussion of the size
15   of the cushion versus the amount of the
16   liabilities on Thursday night?
17        A.   Not versus the liability.  I had
18   no idea what the liabilities were, okay?  So I
19   did not have a view of that side of the
20   transaction.
21        MR. STERN:  When you're asking was
22   there a discussion, Jay, are you asking
23   a discussion that he participated in or
24   are you asking about if he knows about
25   other discussions?
```

Page 39

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2        MR. TAMBE:  Either way.
 3        MR. STERN:  Because it's
 4   misleading the way you're asking it.
 5        MR. TAMBE:  So you have an
 6   objection to form?
 7        MR. STERN:  I'm just trying to
 8   clarify what you mean when you asked was
 9   there a discussion.
10   BY MR. TAMBE:
11        Q.   Were you involved in any such
12   discussions, sir?
13        A.   I was told at one point in time
14   that the problem we had because of the deal
15   changing with respect to other aspects outside
16   the inventory, okay, was that Lehman had no
17   way to pay for certain liabilities that we
18   were absorbing.  I'm assuming -- and this is
19   an assumption because of the issue what
20   happened with the close-out of the repos by
21   their counterparties -- that somehow that
22   would -- those liabilities were being paid for
23   in the overall structure of the deal and now
24   there was a hole in the deal.
25        And so how you plug that hole was
```

Page 40

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   the question.  And what we were asked was how
 3   much do we think we have in haircut that could
 4   plug that hole.  And the difficulty that we
 5   had is we didn't know how much we had in
 6   haircut because we didn't have reliable
 7   valuations on what we were getting.  We did
 8   know we were getting inventory that we had
 9   valuation problems with and we had -- on those
10   items we had a relative understanding of how
11   much that was and how much shortfall you had
12   and therefore how much "haircut" would be
13   being absorbed by just valuation errors on
14   Lehman's part.
15        And then how much -- you know,
16   what do you think is kind of left over and
17   that's the question we were trying to answer
18   all day.  All right.
19        Q.   Okay.  And this effort of trying
20   to identify that question -- trying to answer
21   that question, did that effort continue into
22   the next day, the Friday?
23        A.   Yeah.  It continued into Friday.
24        Q.   And did it continue after Friday?
25        A.   I'm not aware that it continued
```

Page 41

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   after Friday.  But what did continue after
 3   Friday was the process of understanding
 4   exactly what we did get and marking it
 5   appropriately.
 6        Q.   Now, for the collateral that was
 7   transferred over on Thursday you did at some
 8   point receive a valuation report from Bank of
 9   New York for that collateral, correct?
10        MR. STERN:  Objection to the form.
11        A.   We received an indication what
12   they thought the value might be.
13        Q.   And when did you receive that
14   indication?
15        A.   My recollection is that was Friday
16   morning because we still hadn't been able to
17   get the information out of JPMorgan and we
18   still hadn't been able to get the information
19   from Lehman Brothers.  And we were pretty
20   desperate to try to understand where we were
21   at that point in time.
22        Q.   And do you recall the value that
23   Bank of New York but on the collateral?
24        A.   There was several different runs.
25   There was one that was above 50.  There was
```

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    one that was 47. There was -- there were
3    several different runs.
4          You know, the Bank of America
5    numbers --
6        Q.   You mean the Bank of York numbers.
7        A.   Bank of New York. Sorry. Bank of
8    New York, correct.
9          You can't put that much reliance
10   on them or we couldn't put that much reliance
11   on them because they're not the agent for
12   Lehman. They don't have Lehman's marks. They
13   wouldn't know securities necessarily that
14   don't trade and aren't actively quoted. They
15   wouldn't have reliable, accurate marks on
16   those.
17       Q.   If they're not the agent for
18   Lehman whose agent were they?
19       A.   They're our agent. They were
20   seeing this stuff for the first time.
21       Q.   Did you ever make it down to the
22   courthouse for any of hearings about this
23   matter?
24       A.   No.
25       Q.   Did you ever talk to anyone who

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    was down at the courthouse about the
3    courthouse hearings?
4        A.   Yeah, I did.
5        Q.   Who did you speak with?
6        A.   I spoke with Michael Klein at one
7    point asking him how it went. I think I spoke
8    with -- I'm drawing a blank on the guy's name.
9    It was our restructuring guy. Dan Shapiro.
10          MR. STERN: Mark Shapiro?
11          THE WITNESS: Mark Shapiro. I'm
12   sorry.
13       Q.   Do you recall anything that Mr.
14   Klein and Mr. Shapiro told you about the
15   courtroom proceedings?
16       A.   I was -- after the fact I was
17   interested in knowing, you know, what
18   happened. And, you know, is the judge going
19   to approve the deal or not approve the deal.
20   How did it go. And it was more along those
21   lines.
22          I guess during the -- while they
23   were in the courtroom I got asked the question
24   pretty late at night from Mark -- I think he
25   sent an e-mail out that he was trying to get a

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    question answered. I answered that question.
3        Q.   Do you recall what the question
4    was?
5        A.   The question as I read it were did
6    we take any assets from JPMorgan out of the
7    tri-party repo. And, you know, I don't know
8    if you know what the tri-party repo was or not
9    but --
10       Q.   When you refer to the tri-party
11   repo what are you referring to?
12       A.   So, again, on the Monday night one
13   of the things that was going on in addition to
14   the asset purchase is JPMorgan came back to us
15   and said, Listen, you guys are buying these
16   guys. If you're buying some of the inventory
17   can you help us out, all right, and take some
18   of the repo of the securities you're buying
19   and provide -- take some of the load off of
20   them because everybody was strapped for cash
21   after this -- strapped for cash after the
22   bankruptcy.
23          And so they wanted to know if we
24   could provide any repo for what we were
25   buying. And so we agreed to buy -- to provide

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    5 billion of repo of the inventory that we
3    agreed to buy on Monday night.
4          For some reason unknown to me
5    again that proved to be about 15 billion by
6    Thursday. And it contained securities that we
7    did not purchase or agree to purchase on
8    Monday night.
9          So the first thing I was asked
10   when I got to Lehman on Monday -- on Thursday
11   night, sorry, not Monday -- Thursday night,
12   was for -- Jerry del Missier called me up and
13   said take a look at the repo with JPMorgan and
14   tell me whether we should roll this or not.
15          And I got the list of collateral
16   that was in repo and there was a $5 billion
17   security. I have no idea what it was but I
18   know we didn't purchase any $5 billion
19   notional amount of security. So I advised
20   Jerry this is not what we agreed on Monday
21   night. It was not what we purchased. And,
22   you know, my recommendation would be not to
23   roll a repo with JPMorgan.
24          So Archie sent an e-mail out. I
25   guess he was trying to get a question

M. KEEGAN - HIGHLY CONFIDENTIAL

1  Subtracting five hours from GMT, right?
2      A.  No, no.
3          Three in the morning.  So, yeah.
4  Sorry.  Yeah.  I don't know why his e-mail is
5  in GMT.  I have no idea.  But, yeah, he's --
6  yeah, that would have added five hours.  So
7  it's 10:00 -- you're right.  It's 10:00 on
8  Sunday night.  10:30 on Sunday night.
9      Q.  In his e-mail he makes reference
10 to I guess Lehman people walking out of the
11 Lehman building.  It's being carried on the TV
12 coverage.
13         Do you see that?
14     A.  Yeah.
15     Q.  At this point, late Sunday night,
16 early Monday morning, the transaction that you
17 were contemplating and working on on the 13th
18 and 14th, that transaction was not going to go
19 forward, correct?
20     A.  That's correct.
21     Q.  Was there ever a contemplation
22 that you would hire the former Lehman
23 employees without buying any of the assets of
24 Lehman?

M. KEEGAN - HIGHLY CONFIDENTIAL

1      A.  I did suggest that actually.  So
2  on Monday -- it wasn't over the weekend that
3  we did that, right?  So over the weekend, no,
4  the answer to your question.  But on Monday,
5  right, when I was going through the assets
6  that were in Lehman's broker/dealer and what
7  other entities we might be buying or assets we
8  might be buying, one of the people I talked to
9  was Eric Felder.  I was specifically talking
10 to him about -- one of the things was that I
11 recall talking to him about was auction rate
12 securities and there was a bunch of Lehman
13 commercial paper and notes that were in his
14 inventory as well which I talked to him about
15 which obviously weren't -- you know, weren't
16 marked correctly at that point in time after
17 the bankruptcy.
18         There were some credit link notes
19 that Lehman was the payor on that they
20 obviously wouldn't be able to pay going
21 forward.  So those were the kind of topics I
22 was talking to him about.  And, you know, how
23 should we look at the value of these things,
24 right?  Because it's like Lehman is bankrupt

M. KEEGAN - HIGHLY CONFIDENTIAL

1  now and Lehman is the payor on these things
2  and, you know, they can't possibly be worth
3  what you paid for them which is what they're
4  marked at.
5          And in the context of that
6  discussion we got onto the auction rate
7  securities and the auction rate securities I
8  suggested that we didn't want to take them
9  because of all the noise around auction rate
10 securities and the whole remarketing and how
11 we would do that if we were to take them, et
12 cetera.
13         And he said to me something to the
14 effect, Well, I didn't realize that you
15 couldn't take them, that we could leave stuff
16 behind.  I said, Yeah, this is going to be an
17 asset purchase.  It's not going to be the
18 purchase of a company.  So we can leave
19 whatever we want behind.
20         And he suggested then you should
21 leave it all behind.  You shouldn't take
22 anything.  And I was kind of curious.  He
23 said, Do you realize what's going on out
24 there, and then actually that Monday morning I

M. KEEGAN - HIGHLY CONFIDENTIAL

1  didn't because we went over it -- you know,
2  Sunday night the transaction and, you know, we
3  ended it pretty depressed.  Monday I came
4  in -- what I was really focused on Monday was
5  what's our exposure to Lehman.  You know, what
6  swaps are going away.  You know, that's what I
7  was focused open.  I wasn't focused on what
8  was happening in the market.
9          So he said, "Do you realize what's
10 happening in the market?"
11         And I said, "No, I've been locked
12 up in your office all day.  I don't have
13 access to anything.  I have no idea what's
14 going on."
15         He said, "The whole world is
16 melting down out there."
17         He said, "So you guys are nuts if
18 you take anything.  If you could leave it all
19 behind you should leave it all behind."
20         And actually when you sat back and
21 thought about it that seemed like a brilliant
22 idea.
23         So our first proposal to our
24 management when they said, Okay, you know,

Page 74

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   what are you guys comfortable buying, was --
 3   we said nothing.  Just leave it all here.
 4   Just take the people.
 5            And that didn't happen though,
 6   obviously.  We were told to go back and try
 7   again.  Actually, we were instructed to take
 8   everything that we could take because the
 9   concern over whether -- you know, what you'd
10   be leaving Lehman with without people to
11   manage the inventory and leaving all of that
12   inventory on their balance sheet in markets
13   that were, you know, falling apart.
14        Q.   Was there also discussion that
15   some of Lehman's inventory was worth
16   purchasing at the right price?
17        A.   I don't recall if there was or
18   not.  I mean, that wasn't the instruction.
19   The instruction was in effect if you want the
20   deal to go through you got to try to take
21   everything you can because if you leave too
22   much behind and you leave -- and you leave --
23   and no people to manage it, that will never
24   get approved.
25        Q.   And who did you have that
```

Page 75

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   discussion with about whether all should be
 3   left behind or none should be left behind?
 4            MR. STERN:  Let me just pause here
 5   because I think we're blurring over into
 6   privileged conversations but I think you
 7   can answer.  You can answer that
 8   question and then we'll take it a
 9   question at a time.
10        A.   It was our bankruptcy counsel
11   basically.
12        Q.   Your in-house bankruptcy counsel?
13        A.   No, no.  Our outside advisors plus
14   Archie Cox.
15        Q.   Who was your external bankruptcy
16   counsel at that time?
17            MR. STERN:  You can answer that if
18   you remember.
19        A.   I think it's Cleary but I could be
20   wrong.
21        Q.   You were in discussions with
22   Cleary?
23        A.   They were in the room when I --
24   when we came in and suggested that we take
25   nothing.
```

Page 76

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2        Q.   Who else was in the room when you
 3   came in and suggested --
 4        A.   Archie Cox.
 5        Q.   And who else from Barclays?
 6        A.   That was it.
 7        Q.   So it was you, Archie Cox, and
 8   someone from Cleary?
 9        A.   Two people from Cleary, yeah.
10        Q.   Do you remember who the people
11   were from Cleary?
12        A.   Well, actually, Michael Klein
13   might have been in the room.  I can't say for
14   certain, but he might have been in the room.
15   I can't say -- no, I can't say for certain.
16   You know, I don't know.  It was a woman and a
17   guy.
18        Q.   Lindsay Grandfield?
19        A.   I don't remember the name.
20        Q.   And do you recall when that
21   meeting was?
22        A.   It was about 6:30, 7:00 on Monday
23   night.
24            (Deposition Exhibit 301A, document
25   bearing production numbers
```

Page 77

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   BCI-EX-(S)-00082251, marked for
 3   identification as of this date.)
 4   BY MR. TAMBE:
 5        Q.   Sir, I've handed you a one-page
 6   document marked 301A.  Take a moment to look
 7   at it and let me know when you're done.
 8            (Document review.)
 9        A.   Okay.
10        Q.   When you'll see this is an
11   exchange of e-mails between Rich Ricci, Robert
12   LeBlanc, and Patrick Clackson.
13            Do you see that?
14        A.   Yep.
15        Q.   Who is Robert LeBlanc?
16        A.   Rob LeBlanc is head of group risk
17   at Barclays PLC.
18        Q.   And you see there's a reference in
19   the first e-mail at the bottom of the chain to
20   the assets that would be included.
21            Do you see that?
22        A.   Yeah.  "Please could you let me
23   know who I can speak to later today to broadly
24   understand the assets that would be included.
25   Thanks."
```

Page 78

M. KEEGAN - HIGHLY CONFIDENTIAL

Q.   And then at the top of the document, Rich Ricci's e-mail states, "Looks like roughly $50 billion."

Do you see that?

A.   Yep.

Q.   Was it your understanding that the assets that would be included in the purchase as of Monday, September 15th, were roughly $50 billion?

A.   We were paying -- I don't know how he knows that necessarily, right?  We were paying 45 billion for assets that were under repo at the Fed, right?  So, you know, repo lending basically is secured lending.  And a percentage of the value of the assets is typically advanced, not a hundred cents on the dollar but a percentage.

That difference between the advance amount and the asset market value -- or mark is probably a better term -- is the haircut or cushion that the financier requires in order to protect themselves in the event they need to liquidate the inventory.

MR. STERN:  Can you reread the

Page 79

M. KEEGAN - HIGHLY CONFIDENTIAL

question, please, Francis.

(Record read.)

A.   I didn't know what they were.  So that's a better answer.  I didn't know what they were necessarily.

Q.   Did you understand the reference in Rich Ricci's e-mail of 50 billion to be the value of the assets to be included in the purchase?

A.   No.  What I was actually trying to explain to you was if we were paying 40 -- I don't know what they were exactly, but if we were paying 45 billion to take the Fed out of its repo, plus some haircut on top of that to get to 50 billion, I'm not surprised.  But I don't know for a fact one way or the other what they were.  That's the information we were trying to get from Lehman and couldn't get.

(Deposition Exhibit 302A, document bearing production number BCI-EX-00054270 with attached spreadsheet, marked for identification as of this date.)

Page 80

M. KEEGAN - HIGHLY CONFIDENTIAL

A.   I just noticed that this is actually a Monday e-mail.  So it's 4:03 Monday.

Q.   Yeah.

A.   So this was the first deal, right?  And everything I said to you was -- on the repo had to do with Thursday's deal, not Monday's deal.  So that was an error on my part giving you that answer.  I thought this was Thursday's deal.  Okay?  So --

MR. STERN:  The "this" you're referring to is Exhibit 301A?

THE WITNESS:  Yes.  301A.

Q.   So let's go back to now you're focused on the fact that it's Monday's deal.  What's the 50 billion that Rich Ricci is talking about?

A.   I don't know.  At that point in time I don't know.  Because at that point in time we were still going through -- I mean, we were still going through the assets, and I probably didn't have my conversation with Felder until about 3:00 on Monday.  And as I said earlier, Lehman -- one thing they weren't

Page 81

M. KEEGAN - HIGHLY CONFIDENTIAL

prepared for certainly was bankruptcy.  So that whole exercise on Monday getting us information, they had a very difficult time.  So I have no idea where he got his information of 50 billion from.  But he did know the process we were going to go through at that point in time which was we were going to go through and sift through the inventory and take what we wanted.  It was going to be an asset purchase and so we would take what we wanted and not take what we didn't want.

Q.   And in his e-mail, Rich Ricci's e-mail at the top of Exhibit 301, he makes a reference to you and Mahon.

Do you see that?

A.   Yes.

Q.   And he makes a reference to "all good and clean."

Do you see that?

A.   Yes.

Q.   That's a reference that you'd been separating out excluded assets from the assets that you wished to have included; is that right?

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2      A.   You got to ask Rich.
3      Q.   Well, you were looking to identify
4  the good and clean assets, right?
5      A.   We were looking to identify assets
6  that we'd be comfortable purchasing, yes.
7      Q.   And those would be the good and
8  the clean ones.
9          MR. STERN:  Objection to the form.
10     A.   You got to ask Rich.
11     Q.   Well, were you identifying assets
12 that were, you know, of questionable value?
13     A.   My assumption was we were going to
14 take all the assets initially, okay, and that
15 we were supposed to come up with a value that
16 we would take them at, that we felt
17 comfortable taking them at, right?
18         And we knew from the weekend that
19 Lehman's assets weren't -- you know, weren't
20 marked tightly, that they were marked very
21 much on the aggressive side, which isn't
22 surprising since they were struggling
23 financially and potentially going out of
24 business, that they marked things, you know,
25 less than conservatively, right?

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2          So we knew that going in that we
3  had to -- we had to get a good mark on them,
4  or a good reasonable mark on them.
5          Now, the time frame in which
6  you're doing this in everything is done kind
7  of, you know, rough numbers.  It's not -- you
8  know, we didn't have time to take every CUSIP
9  and validate a price for each security.  In
10 fact, none of that was done on Monday.  I
11 mean, we took the information that we had
12 developed over the weekend which, you know, on
13 certain inventory that's what we did, we
14 took -- we did the CUSIP pretty much and came
15 up with what we thought the value was and how
16 much we thought we were off.
17         We took that information and kind
18 of overlaid it on what we were actually being
19 asked to take on Monday.
20     Q.   Did you ever give Rich Ricci a
21 list of good and clean assets on Monday, the
22 15th of September?
23     A.   Certainly not by 4:03 p.m., no.
24     Q.   At some point on Monday?
25     A.   Not a list that we called good and

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2  clean.  We gave him a list of things we
3  thought they could buy and at a suggested
4  price.
5          MR. TAMBE:  Let's just take a
6  short break.
7          (Recess taken.)
8  BY MR. TAMBE:
9      Q.   So, sir, I've placed before you a
10 document marked Exhibit 302A which is a cover
11 e-mail with a large set of spreadsheets behind
12 it.  I'm not going to quiz you in detail about
13 the spreadsheets but if you could review the
14 cover e-mail and flip through the spreadsheets
15 and I'll ask you some questions.
16         (Document review.)
17     A.   Okay.
18     Q.   Looking at the cover e-mail and
19 the attached schedules, is this part of the
20 effort relating to the transaction we talked
21 about, the Monday transaction, as opposed to
22 the Thursday transaction?
23     A.   Looks like it, yeah.
24     Q.   And it's an e-mail -- the cover
25 e-mail is an e-mail from Stephen King to

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2  Archie Cox and you're shown as a c.c.
3          Do you see that?
4      A.   Yep.
5      Q.   And what role did Archie Cox play
6  in this transaction?
7      A.   I don't really know actually.  He
8  was a senior guy.  I mean, he was chairman of
9  the US.  So -- but did he have a line
10 responsibility in this transaction, you know,
11 I'm not so sure.  I mean, he --
12     Q.   When you think of the group of
13 Barclays business people who were leading the
14 Lehman/Barclays transaction in its various
15 forms who are the people that come to your
16 mind?
17     A.   Rich Ricci.  John Hughes in legal.
18 I guess myself with respect to the inventory.
19 Stephen King.  Jerry.  And Bob Diamond and
20 Archie.  I mean, Archie -- and also Michael
21 Klein.
22     Q.   And of this grouping of people,
23 the folks who were actually negotiating the
24 terms of the transaction, would it be a subset
25 of this group?

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2          A.   Yeah.  I would say the terms of
3    the transaction were negotiated by, you know,
4    Rich and Jonathan Hughes.  And our counsel.
5          Q.   And what role did Michael Klein
6    play in all this?
7          A.   He was an advisor to Barclays over
8    the weekend principally.
9          Q.   At any time during the September
10   12th on period, did you have any conversations
11   with Michael Klein about the assets to be
12   purchased?
13         A.   From what time period are you
14   talking about?
15         Q.   Starting on the 12th of September
16   onwards.
17         A.   Yeah.  Periodically I had
18   conversations.  You'd have to be more specific
19   with your question what you're asking me.
20         Q.   Do you recall specifically
21   conversations that you had with Mr. Klein
22   about the assets that Barclays was going to
23   purchase from Lehman?
24         A.   The only conversation -- specific
25   conversation that -- substantive conversation

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    that I know -- that I know I had with him was
3    with respect to -- it was on the Friday
4    morning with respect to -- Friday morning, the
5    19th -- with respect to the -- I don't know
6    what you want to call them.  They were called
7    unpledged assets, which was the list of assets
8    that were sitting in Lehman's -- purportedly
9    sitting in Lehman's box that were not pledged
10   against financing principally because they
11   were, you know, some sort of unique security
12   or private security that may be in some cases
13   physical securities that weren't easy to put
14   into repo.  That wasn't easy to finance.
15         Q.   And what was your discussion with
16   Mr. Klein about those unpledged securities?
17         A.   This is on Friday morning and it
18   was again we were asked -- Lehman was trying
19   to come up with additional value to close the
20   gap on the liabilities and to -- and also on
21   the -- to a certain extent on the excluded
22   inventory that we had been delivered that we
23   felt was marked incorrectly.
24         And one -- there were several items
25   that were proposed as potentially having value

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    for Barclays to close that gap and one of them
3    was this list.  And I was asked to look
4    through the list to see if we thought the
5    securities were worth what they were putting
6    on the piece of paper to be worth.  And
7    actually could do very little with respect to
8    the list because it wasn't a book quite this
9    thick (indicating) but it was thick.  Most of
10   it was a lot of zero valued securities which
11   was principally the residuals and junior
12   pieces of their -- of Lehman's asset backed
13   securitization deals they had done through the
14   years that they had held onto or didn't sell.
15         The bulk of the value -- and I
16   forget what the value of this list was -- but
17   the bulk of the value was made up by a handful
18   of municipal securities which we were able to
19   get some comfort on the pricing that was
20   reasonable based on going to Bloomberg.
21         There was another security,
22   Navigator, which was a restructured private
23   equity security that I talked to a guy named
24   Bob Mallard about.  He ran -- he was the
25   person at Lehman that ran -- I had no idea

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    what Navigator was.  I knew it was a
3    hundred -- if I remember correctly it was 144
4    million, so it was a reasonable amount of what
5    the value in this account was.  And, you know,
6    is it worth 144 million, I have no idea.  So
7    they put me in touch with Bob Mallard and I
8    talked to him about it.  And he explained to
9    me what Navigator was.  It didn't give me a
10   whole lot of comfort on the value but at least
11   I knew what it was.  It was a real operating
12   company.
13         Q.   What's your understanding of the
14   value of the unpledged assets?
15         A.   You know, off the top of my head I
16   honestly don't remember.
17         Q.   There's $1.9 million that's
18   referenced in some of the e-mails.  Does that
19   refresh your recollection?
20         A.   Could be.  I don't remember.
21         Q.   You said there were several items
22   proposed to plug the gap.  The unpledged
23   assets was one of those items.  What other
24   items were proposed?
25         A.   There was an FX clearing account

Page 90

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   which it was purportedly up to a billion
 3   dollars of good faith deposits in which turned
 4   out not to be real.  It may have been real at
 5   one point in time but C Corp was the
 6   settlement agent for Lehman for FX.  And I
 7   know Gerard LaRocco called Citicorp to find
 8   out what they thought about the value of that
 9   account.  They kind of laughed at him.  They
10   said, Of course that's gone.  They closed out
11   all their accounts and used up -- closing out
12   their contracts.
13            There was some exchange traded
14   futures that I had nothing to do with and
15   don't understand.
16            There was a couple other dead-ends
17   which I don't remember what they are off the
18   top of my head.
19        Q.   Was one of the items 15(c)(3)
20   cash?
21        A.   Might have been.  I don't
22   remember.
23        Q.   Is that a term you're familiar
24   with?
25        A.   Restricted cash?  Yeah, sure.
```

Page 91

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   Customer cash?
 3        Q.   Right.  Customer cash.
 4        A.   Yeah.
 5        Q.   And are you familiar with the
 6   notion of customer cash being one of the items
 7   that was proposed to plug the gap here?
 8        A.   Not really.  I mean, I don't know
 9   how you would plug it with customer cash
10   unless they had deposits -- that Lehman had
11   deposits within the 15 -- their own 15(c)(3)
12   deposits, right?  Which that might be their
13   money.
14        Q.   The exchange traded futures that
15   you referenced, was that -- were those OCC
16   transactions?
17        A.   I believe they were exchange
18   traded futures.
19        Q.   On what exchange?
20        A.   I wasn't involved.  I just know
21   there was a list of five or six items that
22   they proposed.  You know, can you get us some
23   additional value to cover the cost for some
24   liability that we were taking on so...
25        Q.   And you told us the FX clearing
```

Page 92

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   account, that was an item that in your opinion
 3   went nowhere.  There was no value there; is
 4   that right?
 5        A.   I was actually in Gerard's office
 6   when Gerard was on the phone with Citicorp,
 7   the clearing agent at Citicorp, and the
 8   clearing agent at Citicorp assured him that
 9   through the process of liquidating the open FX
10   contracts that Lehman Brothers' various
11   entities had open with Citicorp, that that
12   deposit was fully consumed in that process and
13   that there was no value.
14        Q.   Do you know whether there was any
15   value on the exchange traded futures?
16        A.   I don't know if there was.
17        Q.   And you don't know one way or the
18   other whether there was any additional value
19   or accessible value in the 15(c)(3) accounts?
20        A.   Nope.
21        Q.   At that time have you heard of any
22   excess margin, excess OCC margin that was
23   transferred from Lehman to Barclays?
24        A.   No.  I mean, I just wasn't
25   involved with that aspect of it, right?  I
```

Page 93

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   don't know anything about futures and exchange
 3   traded contracts and clearing and settlement.
 4   It wasn't what I was asked to do.
 5        Q.   Over the week -- the following
 6   weekend, the weekend of the 20th-21st, did you
 7   remain involved in aspects of the transaction?
 8        A.   Well, I went home Friday so I
 9   basically worked Thursday night till 4 in the
10   morning.  Went to the Four Seasons and slept
11   from 4 to 6.  Came back at 6.  And then Rich
12   been to bed at -- you know, 6 to -- he was
13   back by 9 I think.  And then I worked that
14   morning until probably again 2:30, 3:00.  Went
15   home.  Checked in on Saturday morning to try
16   to find out what happened at the court
17   hearing.  Asked if I was needed and was told I
18   wasn't needed.  So I stayed home.  And then I
19   ended up having to get on the phone and spent
20   really pretty much most of the weekend on the
21   phone talking to various Lehman employees that
22   we had hoped were coming to join us but were
23   talking to other firms about not coming and so
24   I talked them out of doing that and coming
25   with us instead.  So that's that I spent the
```

1       M. KEEGAN - HIGHLY CONFIDENTIAL
2  weekend doing mostly.
3      Q.  With respect to movement of
4  collateral or valuation of collateral did you
5  have any involvement in that?
6      A.  I didn't do anything in that.
7      Q.  How about the following week, the
8  week of the 22nd, were you involved in any
9  movement of collateral or valuation of
10  collateral that week?
11      A.  No.  Not really.  That was --
12  once -- once the -- you know, we closed on the
13  trade, got possession of what we got
14  possession of, that was -- Stephen was the
15  point person for that.  He was the point
16  person for coordinating with all the other
17  desks and putting the proper value on it and,
18  you know, distributing it out to the desks and
19  hedging it, et cetera.  That was his job.  He
20  kept me informed of what he was doing in the
21  big picture, but I wasn't involved day to day.
22      Q.  Do you have any knowledge of a
23  settlement that was entered into between
24  JPMorgan, Barclays, LBI, Lehman Brothers,
25  Inc., the broker/dealer, in December of 2008?

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      A.  I don't know what the terms of the
3  settlement were if you're asking me that.
4      Q.  I'm asking you if you were aware
5  of the fact of the settlement.
6      A.  Yeah.  I believe there was a
7  settlement.  I know that after -- so Lehman --
8  so JPMorgan and -- I believe because they had
9  operational problems were unable to deliver
10  securities to us timely on that night.  Were
11  unable to deliver everything that was in
12  the -- the we thought was in the repo to us.
13  So they delivered -- and they delivered us
14  securities late.  Our clearing agent stayed
15  open as late as they could which was well past
16  what they normally would do.  You know, say, 2
17  in the morning.  And we hadn't received -- we
18  put 45 billion of value out, but by JPMorgan's
19  measurements they hadn't given us 45 billion
20  yet.  And so they posted another 7 billion in
21  cash is what I know.  We got 7 billion in
22  cash.
23      And that -- we did have cash.  And
24  then we went to move the cash later apparently
25  and JPMorgan said you don't have cash.

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  obviously there was a dispute about that.
3      Q.  And your understanding is that the
4  settlement was to settle up that dispute.
5      A.  Yeah.
6      MR. STERN:  You marked 302A.  Are
7  we going to use that?
8      MR. TAMBE:  We used it a little
9  bit.  We'll go back and use it some
10  more.
11      MR. STERN:  Okay.  I just want to
12  note for the record that 302A may be a
13  privileged document at least in part.
14  I'm not sure.  I would have to talk to
15  some people about that.  But I just want
16  to reserve my position on that.
17  BY MR. TAMBE:
18      Q.  So I've put before you, sir, a
19  document marked Exhibit 144A.  Take a moment
20  to look at that document and let me know when
21  you're done.
22      (Document review.)
23      A.  Okay.
24      Q.  And you'll see the bottom of the
25  document there's an e-mail from Marty Malloy

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  to J. LaRocco and others.
3      Do you see that?
4      A.  Um-hum.
5      Q.  Yes?
6      A.  Yes.
7      Q.  And there's a totalling up of
8  values and cash amounts.
9      Do you see that?
10      A.  Yeah.
11      Q.  There's a line item in that e-mail
12  that says Excess Collateral, 7.19.
13      Do you see that?
14      A.  7.19.  Yeah.  I see that.  Okay.
15  I see it.
16      Q.  You don't know what that means?
17      A.  No, I don't know what it means off
18  the top of my head.
19      Q.  And further up there's a
20  line that says Repo Cash Settlement 7.00.
21      Do you see that?
22      A.  Sorry.  I may be looking at the
23  wrong line on your last question because the
24  1.7 was on the same line as the repo cash of 7
25  billion.  So is that correct?  Is that the 1.7

Page 98

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    you were referring to?
3        Q.    No.  I was asking you to look at
4    the line that says Excess Collateral.
5        A.    Oh, sorry.  Sorry, sorry, sorry,
6    sorry, sorry.  Okay.  I answered the
7    question -- I did answer the question
8    incorrectly because I was looking at the 1.7
9    trying to figure out what that is.
10       Q.    So let's go to the line that says
11   Excess Collateral, 7.19.
12       A.    Sorry.  I didn't understand your
13   question properly.
14       Q.    Do you have any understanding of
15   what that means?
16       A.    Yeah.  I do have an understanding
17   of what that means.  This BoNY -- I think I
18   testified earlier that we were trying to find
19   out how much value we received from the repo
20   from Lehman Brothers, JPMorgan, and they
21   couldn't tell us.  Okay?  BoNY, because it
22   passed through their clearance systems, has a
23   rough estimate of what they believe that
24   number is to be, okay?  And gave -- and that's
25   their -- the total securities in cash received

Page 99

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    is the sum of their rough estimates, right?
3        Plus the 7 billion in cash that's posted in
4    the repo plus another small DTC cash item to
5    come to I guess $52.19 billion of value.
6        And then I assume the 45 billion
7    is a repo cash that -- the cash we sent out to
8    JPMorgan.  And so what is referred to as
9    excess collateral is the -- probably a better
10   term.  And that is the haircut differential if
11   you believe BoNY's values.
12       Q.    Who's Marty Malloy?
13       A.    Marty was a prime brokerage
14   employee.  A security borrow lending.  I'm not
15   sure -- because it was repo I guess he was
16   involved.
17       Q.    After his name on that e-mail
18   address Marty Malloy it says CFG MGMT.  Does
19   that phrase have any management to you?
20       A.    CFG management.  Collateral
21   something -- yeah.  Collateral from the
22   finance group.  I have no idea.  I don't know
23   what it means.  I don't know definitively.
24       Q.    Okay.  If you go back to
25   Exhibit 302A there are a series of numbered

Page 100

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    items.
3        Do you see that?
4        A.    Yep.
5        Q.    And the first numbered item ends
6    with a question.  "Can securities be sold by
7    LBI without approval at a discount to current
8    mark?"
9        Do you see that?
10       A.    Um-hum.
11       Q.    Yes?
12       A.    Yeah, I see it.
13       Q.    Do you know what that means?
14       A.    Not definitively, no.
15       Q.    Was it your understanding that LBI
16   was selling securities to Barclays at a
17   discount to the current mark?
18       A.    This is Wednesday so this was the
19   Monday night transaction.  We did go through
20   and identify haircuts is the term I would use
21   as opposed to discounts.  But we applied to
22   the various security line items to account for
23   the fact that we were buying inventory in
24   bulk, to account for the fact that we were not
25   being able to close on the inventory until

Page 101

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    Friday at the earliest, to account for the
3    fact that the markets were melting down, and
4    that we didn't have certainty of the valuation
5    that Lehman -- we knew that Lehman had been
6    aggressive with their valuations and we didn't
7    have, you know, clear certainty with respect
8    to what the value of all the securities were.
9    So there were, you know, haircuts applied to
10   the inventory.
11       Q.    Sir, I'm showing you a document
12   that's previously been marked as Exhibit 19.
13   Have you seen this document before today?
14       A.    Again, only in prep for this
15   deposition.
16       Q.    Okay.  Is it fair to say that
17   you -- well, do you understand the information
18   that's contained in this document?
19       MR. STERN:  Objection to the form.
20       A.    I understand what I've been told I
21   guess.
22       Q.    By counsel?
23       A.    By counsel, yeah.
24       Q.    Okay.  And putting aside anything
25   you were told by counsel, do you have any

## Page 106

M. KEEGAN - HIGHLY CONFIDENTIAL

billion of cash out in the market because
markets were so skitterish and so concerned
about, you know, banks failing that we felt
that people might -- if they found that we had
a 7 billion hole, a potential hole in our
balance sheet, people might pull their
financial support. I believe that was the
reason.

So to get the settlement we agreed
to forgive the lawsuit. Drop the lawsuit.

Q. When did Barclays first now it had
a $7 billion hole?

A. I have no idea. It was -- I mean,
we didn't we had a hole at all because the
cash was put in the account but when they went
to remove it which was, you know, days later
JPMorgan said the cash isn't there so...

Q. In some of your prior testimony
you stated that some of the collateral that
was delivered --

A. I'm sorry. I missed the beginning
of your question.

Q. Yeah. In some of your prior
testimony you had stated that some of the

## Page 107

M. KEEGAN - HIGHLY CONFIDENTIAL

collateral that was delivered on Thursday
night included securities that Barclays did
not wish to purchase, correct?

A. Um-hum. Yes.

Q. Did Barclays return that
collateral?

A. No, we didn't return the
collateral. I testified that I went to Ian
Lowitt and said, "Ian, you got to take this
back and swap us into the collateral we
bought."

And he said, "That's impossible."
I should say the collateral we
agreed to buy on Monday night. So collateral
not on the excluded list.

And he said, "That's impossible
because our counterparties had been grabbing
-- our repo counterparties have been grabbing
collateral and liquidating it and buying us
in" is the term "on our repo and we don't have
it anymore. So this is what you got."

Q. So Barclays kept the collateral
that had been transferred over Thursday night
and you had additional collateral then

## Page 108

M. KEEGAN - HIGHLY CONFIDENTIAL

transferred to you on Friday, the items that
we were talking about to fill the gap.

MR. STERN: Objection to the form.

A. We had the repo collateral from
the Fed that JPMorgan delivered to us. We had
the deposit from JPMorgan. And, to my
knowledge, we had the additional thing that I
knew at the time that we had was the -- or
should have had was the unpledged box. That's
what I knew we were supposed to have.

The only thing I'd say is that
that may not be the only thing that we were
supposed to have. There were pieces of the
transaction that I -- you referred to them
earlier, the 15(c)(3). I have no idea whether
they were supposed to have it or didn't have
it. I don't know. And the exchange traded
derivative contracts were one of the things
that were proposed by Lehman for us to have.
But I wasn't looking at it. And I didn't
follow up with it. That was decided for us to
have it or not have it. I don't know.

(Deposition Exhibit 305A, document
bearing production number

## Page 109

M. KEEGAN - HIGHLY CONFIDENTIAL

BCI-EX-(S)-00036496, marked for
identification as of this date.)

BY MR. TAMBE:

Q. Sir, I've handed you a one-page
document marked 305A. Would you take a moment
and look at it and let me know when you're
done.

(Document review.)

A. Okay. I read it. I don't quite
understand it right now.

Q. You're anticipating my question.

A. No, I'm not anticipating your
question. I just don't -- I'm anticipating
you're going to ask me what it means and I'm
struggling to remember at the time.

Q. But you see this is an e-mail
exchange between Jasen Yang, Stephen King, and
yourself.

A. Yeah.

Q. And it has to do with valuation of
Fed collateral.

Do you see that?

A. Yeah.

Q. Having read this e-mail can you

M. KEEGAN - HIGHLY CONFIDENTIAL

explain what this -- the issue that's being
discussed in this e-mail?

A.   Well, my interpretation of it, and
I don't know whether it's an accurate
interpretation, 18.6 billion of lost Fed
collateral, right, so that's collateral that
we expected to get from the Fed that was
supposedly in the Fed box that JPMorgan was
supposed to deliver and didn't deliver, right?

He's saying it was about --
1.1 billion wasn't able to get prices for.
They're mainly structured notes, large
potential discount, Yankee bonds, unlikely to
have a large discount.  When I couldn't get
the Barclays price I used the custodian price.

So I guess reading that again I
don't know what he means by lost Fed
collateral.  Whether it's 18.6 of collateral
that we got but we didn't anticipate getting
or whether it was 18.6 that we were supposed
to get and didn't get.  I just don't recall
right now.

Q.   Going to your e-mail at the top of
the page you say if I read this right, "There

M. KEEGAN - HIGHLY CONFIDENTIAL

is a $1.9 billion difference."

A.   Yeah, that's what I'm trying to
figure --

Q.   Any idea what that means?

A.   I don't know what -- I'm trying --
I'm trying to figure that out right now.  I'm
trying to remember what that means.  What that
was referring to.  I just don't remember right
now off the top of my head.

Q.   And in the next line you have a
reference to 20 -- a swing of 28 billion gross
inventory differences.  What does that mean?

A.   (Reading document.)

Q.   What does that mean?

A.   That's the one I'm trying to --
I'm stumped on.  I know it's my own e-mail.
I'm stumped right now.

Q.   Did you play any role -- you can
put the document aside, yeah.  We're done with
the document.

A.   Sorry.

Q.   Did you play any role in the fall
of 2008 or early 2009 in helping Barclays'
auditors account for the acquisition of the

M. KEEGAN - HIGHLY CONFIDENTIAL
Lehman assets?

A.   No.

Q.   All right.  Let's just take a
short break.

A.   The auditor -- by the way, the
auditor you're referring to is PriceWaterhouse
I assume?

Q.   I assume it's PriceWaterhouse.  I
don't know who all the auditors might be for
Barclays.

MR. STERN:  I'm sure it's
PriceWaterhouse.

A.   Okay.  But you're -- the external
auditors.

Q.   The external auditors.

A.   No.  The answer to that is no.

Q.   Let me ask the follow-up question.
Have you worked with any internal auditors at
Barclays?

A.   None.  Zero.  But I was just
curious.

(Recess taken.)
BY MR. TAMBE:

Q.   Mr. Keegan, are you aware of any

M. KEEGAN - HIGHLY CONFIDENTIAL

sales of assets that were purchased by
Barclays from Lehman?

A.   You mean liquidation of the
inventory?

Q.   Liquidation of the, yeah,
collateral that was transferred over.

A.   I know we did liquidate a lot of
it, yeah.  Not all of it but...

Q.   And do you know generally the
values at which you liquidated it?

A.   No.  I don't know.

Q.   And was any of the collateral
liquidated by you or was this just something
you heard about it?

A.   No.  I didn't liquidate any of the
collateral.

Q.   And how do you know that you did
liquidate a lot of it?

A.   Because that was -- you know, that
was the goal.  The goal was that we weren't --
owning assets during this time period was not
a good thing.  So you're trying to hedge it
and get your risk down.

Q.   Are you generally familiar with

Page 122

M. KEEGAN - HIGHLY CONFIDENTIAL
1    cetera, right?  Because they had a huge -- I
2    don't know what was reported, 25 billion or
3    something like that, secured exposure to
4    Lehman.  That they would ultimately liquidate
5    that exposure and you'd see those securities
6    in the marketplace and then we might be a
7    natural buyer for something like the B note
8    for Pine since we owned the A note already.
9    But we never saw the paper come out.
10        Q.   I'm sorry.  What was the last --
11        A.    We never saw the paper come out
12   so...
13          (Deposition Exhibit 307A, document
14        bearing production numbers
15        BCI-EX-00053873 through BCI-EX-00054261,
16        marked for identification as of this
17        date.)
18   BY MR. WOOD:
19        Q.   I've handed you what's been marked
20   as Exhibit 307A.  As you'll see it's an e-mail
21   chain with a pretty hefty attachment.  Feel
22   free to look at the attachment if you'd like
23   but I'm really just going to ask you some
24   questions about the e-mails themselves.

Page 123

M. KEEGAN - HIGHLY CONFIDENTIAL
1        A.    Okay.
2              MR. STERN:  So, Mike, you may want
3    to read through the e-mails and then
4    just glance at the attachments.
5              THE WITNESS:  Yeah, no.  That's
6    fine.  I just want to see what this is
7    to see if I understand it.
8              MR. WOOD:  And just so the record
9    is, clear this, is an e-mail and the
10   first page is BCI Exhibit 00053873.
11             MR. STERN:  Well, it's Bates
12   number BCI-EX-0053873 through -- the
13   numbers appear to be cut off on this
14   copy.  So, Mike, just let us know after
15   you've had time to review this.
16             THE WITNESS:  Okay.  The problem
17   is there's two bids floating around.
18   I'm trying to figure out which one this
19   is.
20          (Document review.)
21        A.   Okay.
22        Q.   If you look on page 2 of the
23   e-mail, so the earliest e-mail
24   chronologically, it's an e-mail from Jasen

Page 124

M. KEEGAN - HIGHLY CONFIDENTIAL
1    Yang, Monday, September 22nd.  The subject is
2    Financing Facilitate Schedule.  He writes,
3    "Robert, James, I've attached the schedule
4    produced by Barclays ops of the collateral
5    currently held at BoNY under the repo
6    financing provided to Lehman (with a total
7    BoNY market value of approximately 45
8    million).  It appears to differ substantially
9    from the file received from Lehman on Friday
10   evening.  We're looking at the differences
11   now."
12             Just one first point of
13   clarification.  That 45 million, do you think
14   that's accurate or is that supposed to be 45
15   billion?
16             MR. STERN:  Objection to the form.
17        A.    Total BoNY market value 45
18   billion.  I would -- I'm speculating but I
19   think it's probably billion he's probably
20   referring to.  I said there were several
21   different versions of BoNY collateral value
22   list put in front of us.  There was a 47 list,
23   there was a 45 list, there was a 52 list.
24        Q.    And when you're referring to --

Page 125

M. KEEGAN - HIGHLY CONFIDENTIAL
1    I'm sorry.
2        A.    There was another e-mail I was
3    presented earlier which is Exhibit --
4              MR. STERN:  144A.
5        A.    144A, right?
6              So it says Total securities and
7    cash received 52.19, right?  That
8    theoretically is BoNY's valuation in effect of
9    the cumulative assets of what we got.  It's
10   one of many evaluations they had.  They had a
11   45 one.  There was a 47 one floating around.
12   So, you know, at the end of the day what I was
13   trying to get a handle on was how much value
14   did we actually receive to do the repo.  The
15   Fed repo.  And we couldn't get it from Lehman.
16   And we couldn't get it from JPMorgan.  We
17   tried to get it from BoNY but BoNY just kept
18   giving us different numbers.  So I think
19   that's what he's referring to.
20        Q.    And then if you look at the first
21   page of the e-mail string, the second e-mail
22   down from Robert Azerad dated Monday,
23   September 22nd and, again, it looks like you
24   are not on this but it was forwarded to you.

Page 130

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2      A.   Off the top of my head I don't
3   remember specifically.  I do know -- I think I
4   know what she's talking about.  But I don't
5   know what the security actually is.  But it's
6   another one of the -- it's another one of the
7   Lehman structured finance trades where they
8   basically were taking their loan books,
9   turning it into AAA securities so they could
10  post it with the Fed and get the funding.
11      Q.   And so is that what you understand
12  the $1.1 with JPM to refer to at the beginning
13  of the e-mail?
14      A.   That JPM is holding 1.1 billion of
15  SAS and we got 80 million of it delivered to
16  us.
17      Q.   Okay.  I don't have anything
18  further on that document.
19         Mr. Keegan, were you involved in
20  any way in the creation of any schedules --
21  actually, strike that.
22         Were you involved in any
23  discussions with Lehman Brothers employees
24  regarding any schedules of unencumbered
25  clearing box assets at DTC?

Page 131

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2      A.   Yeah.  I referred to it several
3   times as the unpledged asset schedule.  Yeah.
4      Q.   And what was your involvement in
5   that?
6      A.   Friday morning, the 19th, I was
7   called into Rich's office --
8      Q.   And that's Rich Ricci?
9      A.   Rich Ricci.  Who was working out
10  of the Lehman office.
11         And I was presented this schedule.
12  I think it was Paolo Tonucci may have provided
13  it to Rich and Paolo may have been in the room
14  at the time.  It was Paolo or anybody else.
15  It was definitely a Lehman employee.  And they
16  said that this was the schedule of
17  unencumbered assets that they could provide
18  us, they could get -- you know, incorporate in
19  the deal and give to us if we wanted it for
20  the values they were indicated.
21         So I was asked by Rich to take a
22  quick look at the values and try to
23  substantiate the values and determine whether
24  we thought this was something we thought had
25  value or not and whether we would be willing

Page 132

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2   to take it as part of the deal, payment as
3   part of the deal.
4      Q.   And what did you conclude?
5      A.   That it did have value and we
6   should take it.
7      Q.   And just to be clear, unencumbered
8   box -- I'm sorry.  The unencumbered assets you
9   were referring to were at DTC?
10      A.   I don't remember if they D -- I
11  don't remember if they were DTC or whose
12  assets they were.  I couldn't tell you they
13  were all DTC because I believe some of them
14  were at JPMorgan, in fact.
15         I mean, I've been led to believe
16  that the Navigator stock which to my knowledge
17  to this day we still haven't gotten is sitting
18  in safekeeping at JPMorgan.  I have no idea if
19  that's a fact or not.
20      Q.   Do you recall whether you came up
21  with a number for the valuation of these
22  unencumbered assets?
23      A.   No.  It was kind of take it for
24  what's on the piece of paper or don't take it.
25  Because most of the value was in like five or

Page 133

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2   six, maybe eight max, muni securities.  I
3   believe these were munies.  And then
4   Navigator.  And on the muni securities we were
5   able to go to Bloomberg and actually get a
6   price but that for all -- you know, for all
7   intents and purposes that was Lehman's price.
8   So I have no idea if that was a good price or
9   not.
10         But we weren't able to do much
11  more than that with that list.  And we had
12  Navigator and, you know, the bottom line I
13  guess is you weren't getting anything else.
14  There wasn't anything else to give us.  So we
15  could take it or not take it.
16      Q.   Do you recall any other assets
17  besides the munies and the Navigator?
18      A.   What was on that list, the list
19  was yea thick (indicating).  This might be the
20  list for all I know.
21         MR. STERN:  Yea thick is how
22  thick?
23         THE WITNESS:  An inch.  Inch and a
24  half.
25      A.   Most of that list was comprised of

Page 138

```
1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    in the marketplace, and they do that
3    mathematical extension, that is one of the
4    several numbers that they came up with.  Okay?
5    They came up with a 45 billion number.
6    There's another e-mail that talks about they
7    came up with a $47 billion number.  Another
8    e-mail talks about -- this is all in the
9    course of like, you know, six hours.
10         So, you know, I wouldn't say it's
11   a -- we didn't put a whole lot of stock in it,
12   right?  So...
13        Q.   And earlier you testified that if
14   you could believe Bank of New York's value.
15   Is that what you meant by if you could believe
16   their value?
17        A.   Yeah.  If you could believe their
18   value we would have 50 -- we would have 7
19   billion of haircut.
20        Q.   And aside from what you just
21   testified about the values shifting up and
22   down, did you have any other reason not to
23   believe Bank of New York's value?
24        A.   Yeah.  Absolutely.
25        MR. STERN:  Objection.  Wait,
```

Page 139

```
1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    wait, wait, wait.  Objection to the
3    form.
4         Can you repeat the question,
5    please, Francis?
6         (Record read.)
7         A.   The only reason that -- the only
8    thing that they would be -- would competently
9    value, okay, were things like exchange traded
10   equities that were very liquid.  Liquid
11   corporate debt.  Treasuries.  They'd probably
12   put a pretty good price on that stuff.
13        Any kind of structured paper,
14   asset-backed paper, all that stuff, they've
15   never seen it before.  They haven't been
16   provided prices.  They'd have no clue what
17   that really -- what that paper should really
18   be valued at.  Lehman didn't have it valued
19   right.
20        Q.   Where would you go to get values
21   for that paper?
22        MR. STERN:  Objection to the form.
23   Can I hear that again?
24        (Record read.)
25        A.   You would go to Bloomberg and
```

Page 140

```
1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    you'd find out what it was.  If you didn't
3    what the security was you'd get the
4    prospectus, you'd take a look at it.  You'd
5    see what the security was.  You'd get the cash
6    remittance reports if it's an ABS security.
7    You'd look at what -- at how the security's
8    actually performing.  You'd put a projection
9    of what you think cash flow is going to be out
10   of the securities and you'd value that from
11   those cash flows.  That's how you come up with
12   a value.
13        Q.   Did you personally value any of
14   the securities transferred in the sale
15   transaction?
16        A.   No.  I didn't value any of the
17   securities.
18        Q.   Anyone from your team do the
19   valuations?
20        A.   Stephen King.  When you talk to
21   him about that information if you talk to him
22   he would have much -- give you much better
23   information on that than I could give you on
24   that.
25        MR. DAKIS:  Nothing further.
```

Page 141

```
1          M. KEEGAN - HIGHLY CONFIDENTIAL
2         MR. STERN:  We'll just take a
3    break.  I may have some questions.
4    Let's go off the record.
5         (Recess taken.)
6    EXAMINATION BY
7    MR. STERN:
8         Q.   Let's go back on the record.
9    Mr. Keegan, from your perspective
10   what was the purpose of the haircut in the
11   reverse repo that was the basis of the Fed
12   replacement transaction?
13        MR. TAMBE:  Objection to the form.
14   Lack of foundation.
15        Q.   Go ahead.
16        A.   So the repo -- the Fed was
17   providing financing to Lehman Brothers.  It
18   was ordinary course repo.  And they provided
19   haircuts that -- a repo provider takes
20   haircuts because I'm giving you cash and I'm
21   getting back a security.  That security is
22   subject to market movements.  It's subject to
23   liquidity risk.  And if you have to liquidate
24   it will take a while to liquidate it.  And
25   that haircut is supposed to be the cushion
```

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    that's provided to the financier so that he
3    has a reasonable probability to recover the
4    amount of his loan from the security if the
5    counterparty defaults and can't pay it back.
6        Q.    And is that the way it's supposed
7    to work in a normal market?
8        A.    Well, yeah.  That's the way in the
9    normal market it works.  But the Fed couldn't
10   have anticipated Lehman's bankruptcy either.
11   I doubt they anticipated Lehman's bankruptcy,
12   you know, weeks ahead of time.  So the
13   haircuts that they were using were traditional
14   haircuts that would be in the normal market
15   and a market that is deteriorating rapidly as
16   the market did after Lehman Brothers'
17   bankruptcy, you know, those haircuts wouldn't
18   necessarily be sufficient to protect you
19   against market movements during the period of
20   time it would take you from the time you took
21   the possession of the collateral to liquidate
22   it.
23        Q.    Now, let's turn to the period you
24   testified to from late on Thursday, September
25   18th going into Friday, September 19th.

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2        Do you have that time frame in
3    mind?
4        A.    Okay.
5        Q.    In that time frame why from your
6    perspective did Barclays need an additional
7    value cushion beyond the repo haircut?
8        A.    I mean, the first reason why we
9    were being delivered securities that, based on
10   the prior work that we did over the weekend,
11   the prior weekend, based on the fact that we
12   didn't come to an agreement with Lehman on --
13   on adjusting the value of the securities and
14   we were getting those securities, that the
15   haircut that we were getting -- that those
16   securities that we were getting were
17   overvalued and therefore they were in effect
18   being used -- they were burning up the
19   haircut, they were using it up, and that
20   needed to be replaced.
21        Q.    Did anybody ask you if there was
22   any excess available through the repo?
23        A.    Yeah, we were asked --
24        MR. TAMBE:  Objection to the form
25   of the question.

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2        A.    Yeah, I was asked by I believe
3    Rich Ricci how much did we think we might have
4    in terms of "excess value" to pay for certain
5    liabilities that Barclays was absorbing in the
6    transaction.  And, you know, I thought the
7    question was -- the question was naive under
8    the circumstances.
9        And, you know, again, we couldn't
10   tell exactly what we had and didn't have at
11   that point in time.  And we knew that what we
12   did have, while it was done on haircuts that
13   were -- you know, if it were a normal market
14   and they were done at haircuts that assumed
15   the securities were valued properly.  I mean,
16   if they weren't valued properly, and some of
17   them were weren't valued properly, then they
18   were overvalued.  And, therefore, the haircut
19   wasn't adequate to protect us against the risk
20   that was inherent in Lehman Brothers were
21   taking itself, never mind to have excess to
22   pay for liabilities.
23        Q.    Turning back to Exhibit 144A and
24   looking at the figures that are listed on this
25   document, from your perspective were any of

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    the figures listed here reliable?
3        MR. TAMBE:  Objection to the form
4    of the question.
5        A.    The repo cash amount was the cash
6    that we sent out to JPMorgan so that's a good
7    number.
8        Q.    And what is that number?
9        A.    45 billion.
10       We thought the repo cash amount on
11   the deposit that was at JPMorgan, the 7
12   billion was a good number as well, but that
13   was ultimately taken back by JPMorgan.
14       Q.    What about the rest of the
15   figures?
16       A.    There'd be aspects of BoNY's
17   valuations that would be okay, but there would
18   be significant portions of it that weren't
19   which kind of takes the whole -- you know,
20   renders the whole number not reliable so...
21       Q.    Going back to the Monday,
22   September 15th, discussions between you and
23   people at Lehman concerning haircuts and
24   valuation adjustments on certain securities,
25   were there any disagreements between you and

Page 146

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   the people at Lehman?
 3        A.   This is Monday.
 4        Q.   This is on Monday the 15th.
 5        A.   Yeah.  There was -- there was a
 6   number of disagreements, right?  That's in
 7   part the context of the exclude list.  We
 8   couldn't come to an agreement on -- we
 9   disagreed with their values.  We couldn't come
10   to an agreement on their values.  So we just
11   said, Fine, you know, you own it, you know,
12   keep it.  We won't take it so...
13        MR. STERN:  I have no further
14   questions.
15        MR. TAMBE:  Just a couple of
16   follow-up questions.
17             * * *
18   EXAMINATION BY
19   MR. TAMBE:
20   DI   Q.   When you took the break before
21   your own lawyer began questioning you did you
22   discuss the content of your testimony with
23   your lawyer?
24        MR. STERN:  I'm going to object
25   and I'm going to instruct you not to
```

Page 147

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   answer.
 3   DI   Q.   Did you discuss the questions that
 4   Mr. Stern was going to ask when you came back
 5   from the break?
 6        MR. STERN:  I'm going to instruct
 7   you not to answer.
 8   DI   Q.   And did you discuss with Mr. Stern
 9   the answers that you were going to give in
10   response to those questions?
11        MR. STERN:  Again, I'll instruct
12   you not to answer.
13        Q.   On the Fed repo that you testified
14   about in response to Mr. Stern's questions, do
15   you know what the size of the Fed financing to
16   Lehman was the week prior to the week in
17   question?  So the week that began on the 8th
18   of September?
19        A.   No, I don't.
20        Q.   And do you know what the haircut
21   schedule was that was charged by the Fed
22   during that week?
23        A.   Precisely, no, I don't.  If you're
24   asking about the adjustment that week, I don't
25   know.
```

Page 148

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2        Q.   Do you know of any adjustments in
 3   the haircut schedule proposed by the Fed
 4   either on Friday, September 12th, or Monday,
 5   September 15th?
 6        A.   No.
 7        MR. TAMBE:  No further questions.
 8        MR. STERN:  I think we're done.
 9   Off the record.
10        (Time Noted:    12:39 p.m.)
11
12
13
14
15
16
17
18
19        _____
20             MIKE KEEGAN
21
22   Subscribed and sworn to before me
23   this ___ day of _____, 2009.
24
25   _____
```

Page 149

```
 1
 2        C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                       : ss.
 5   COUNTY OF NEW YORK  )
 6        I, FRANCIS X. FREDERICK, a Notary
 7   Public within and for the State of New
 8   York, do hereby certify:
 9        That MIKE KEEGAN, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I
17   am in no way interested in the outcome
18   of this matter.
19        IN WITNESS WHEREOF, I have
20   hereunto set my hand this 28th day of
21   August, 2009.
22
23        _____
24             FRANCIS X. FREDERICK
25
```

Page 1

1

2                   UNITED STATES BANKRUPTCY COURT

3                   SOUTHERN DISTRICT OF NEW YORK

4      ------------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,    (Jointly Administered)

9                   Debtors.

10     ------------------------x

11

12            * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF STEPHEN KING

14              New York, New York

15              September 10, 2009

16

17     Reported by:

18     MARY F. BOWMAN, RPR, CRR

19     JOB NO. 24299

20

21

22

23

24

25

KING - HIGHLY-CONFIDENTIAL

1          KING - HIGHLY-CONFIDENTIAL
2    STEPHEN KING,
3          called as a witness by the parties,
4          having been duly sworn, testified as
5          follows:
6    EXAMINATION BY
7    MR. HINE:
8          Q.   Good morning, Mr. King.
9          A.   Good morning.
10         Q.   We met briefly off the record.  My
11   name is Bill Hine.  I am from Jones Day, which is
12   the law firm representing, or acting as special
13   counsel for Lehman Brothers Holdings, Inc. in
14   connection with the bankruptcy proceeding that's
15   ongoing, and this deposition is related to that
16   proceeding.
17         Have you ever been deposed before?
18         A.   No.
19         MR. STERN:  Can we just introduce the
20   other people in the room.
21         MR. HINE:  Sure.  Myself from Jones
22   Day, and my associate is George Spencer, who
23   will be joining us shortly.
24         Do you want to go around the table?
25         MR. OXFORD:  Neil Oxford with the law

1          KING - HIGHLY-CONFIDENTIAL
2    firm of Hughes Hubbard & Reed.  We represent
3    the SIPA trustee, and my colleague is Fara
4    Tabatabai.
5          MR. DAKIS:  I'm Robert Dakis.  I'm
6    from the law firm of Quinn, Emanuel,
7    Urquhart, Oliver & Hedges, and we represent
8    the official committee of unsecured
9    creditors.
10         MR. LAYDEN:  David Layden from Jenner
11   & Block.
12         MR. HINE:  This is Ingrid Christian,
13   who has lost her voice, from Alvarez &
14   Marsal, so I will do the honors of
15   introducing her.
16   BY MR. HINE:
17         Q.   Mr. King, as I'm sure your counsel has
18   explained, I am going to ask you a series of
19   questions.  You are going to provide the answers
20   as best you can.
21         I did want to alert you to one
22   procedural rule we have here.  From time to time
23   during the deposition, your lawyer will
24   undoubtedly state an objection or make some kind
25   of statement on the record as to the form of my

1          KING - HIGHLY-CONFIDENTIAL
2    question.
3          MR. STERN:  Very unlikely.
4          Q.   I just want to let you know that does
5    not relieve you of the obligation to answer the
6    question.  It is just Jack being Jack.  It is Jack
7    doing his job, stating objections to the form of
8    the question.
9          In that regard, I will undoubtedly ask
10   a confusing question or a question that misuses a
11   term that you folks in your profession use all the
12   time.  I feel like I am learning a new language
13   here in some sense.  So please correct me if I
14   make a mistake with the term or abbreviation or
15   some kind of concept, because I really do want to
16   ask a clear question so you can then give me a
17   clear answer.  OK?
18         A.   Um-hm.
19         Q.   And if at any time you need a break,
20   let me know.  This is not an endurance test, so
21   just let me know if you need a break.
22         A.   Sure.
23         Q.   Can we start with your title at
24   Barclays?  What is your title?
25         A.   I am managing director and head of a

1          KING - HIGHLY-CONFIDENTIAL
2    group called PMTG.
3          Q.   And PMTG stands for what?
4          A.   Portfolio mortgage trading group.
5    Principal mortgage trading group.  I forgot what
6    the P was.  It has been so long since we named it.
7          Q.   How long have you held that title?
8          A.   MD I have had for three, four years, I
9    think, and the PMTG group was formed in late 2007.
10         Q.   Could you describe for me briefly your
11   duties in this position?
12         A.   I run the group.  It is ostensibly a
13   trading and risk management group.  It is -- once
14   upon a time its primary asset was mortgages and
15   mortgage-related securities and derivatives
16   thereon.
17         We manage a portfolio of assets which
18   the bank owned that were mortgage assets, and we
19   also have a proprietary trading activity.
20         Q.   Who do you report to directly?
21         A.   I report to Eric Bommensath.
22         Q.   And do you know his title?
23         A.   He is global head of -- global head of
24   fixed income, I think, and there are some other
25   bits to it, too.

1              KING - HIGHLY-CONFIDENTIAL
2      Q.    And who reports directly to you?
3      A.    Do I need to list all of them?
4      Q.    No.  I'm just interested in the
5  principal folks that report to you directly.
6      A.    The team is -- well, the team is
7  slightly different today than it was a few months
8  ago.  It is about 30 or so people.  They are --
9  the senior folks are -- a number of them are
10 senior traders who trade a range of securities.  I
11 can give you their names if you like, if it is
12 relevant, for those traders, and then there are
13 also operations and risk management personnel as
14 well.
15     Q.    Could you give me the heads of the --
16 let me just ask it this way:  Is your group broken
17 into separate divisions or --
18     A.    Separate not divisions but functions.
19 It is one trading operation, but within that, we
20 have different products, different risks.
21 Therefore, the group is organized along those
22 risks.  But it is really -- in the terminology of
23 a bank, it is one desk.
24     Q.    OK.  Does Mr. Yang report directly to
25 you?

1              KING - HIGHLY-CONFIDENTIAL
2      A.    Yes, yes.  Jasen reports directly to
3  me.
4      Q.    Is it fair to say that you held this
5  same position during the week of September 15,
6  2008?
7      A.    Yes.
8      Q.    And --
9            MR. STERN:  I am just going to put out
10 the blank September 2008 calendar, just in
11 case Mr. King needs to reference it.
12           MR. HINE:  That's a good idea.
13     A.    It is fair to say that this group came
14 into existence or was derived from another group
15 which I ran in 2007 in a response to the crisis in
16 credit markets and mortgage-related assets.  So
17 therefore, the group's character has changed in
18 response to those conditions over the two years,
19 or three years.  I guess it is going on towards
20 three years now.
21           One of those things that prompted
22 change was the bankruptcy or seizure of Lehman
23 itself.  So we expanded the group in response to
24 the need to manage the substantial portfolio of
25 risks and assets which the bank had taken on as a

1              KING - HIGHLY-CONFIDENTIAL
2  result of that acquisition.  So there is a slight
3  change in character immediately prior to and
4  immediately following the purchase.
5      Q.    When you say that acquisition, you are
6  meaning the acquisition of Lehman assets?
7      A.    The Lehman assets, yes.
8      Q.    As you can probably expect, most of
9  this deposition is going to center around the week
10 of September 15.
11     A.    Right.
12     Q.    Could you give me just a general
13 description of your role in connection with the
14 Lehman acquisition during that week?
15     A.    Yes.  My -- we are a -- I forgot P is
16 principal and not portfolio.  We are a principal
17 risk taking or risk managing unit, so -- and
18 essentially we were -- we manage or managed
19 illiquid risks, particularly difficult to trade
20 risks, particularly things like mortgages,
21 mortgage-backed securities.
22           So during this week and in the lead up
23 to the week, our job was -- my job was to
24 facilitate in gathering estimates as best as
25 possible in a very short period of time for the --

1              KING - HIGHLY-CONFIDENTIAL
2  for useful marks or valuations or prices for
3  various securities that were part of the various
4  different proposed purchase -- asset purchases,
5  and then the on boarding of this risk and then the
6  risk management of that risk.  That was our
7  function.
8      Q.    When you say illiquid risks or
9  illiquid assets, is there a separate unit within
10 Barclays that performs your function with respect
11 to more liquid assets?
12     A.    No.  A -- I mean I guess the answer
13 probably is yes, at some point.  It may be it
14 would be Treasury or it would be something else in
15 the bank.  For the most part, banks don't hold
16 large amounts of liquid risks, that trading
17 functions -- the reason this group was formed was
18 to deal with the fact that these are incredibly
19 difficult assets to dispose of.
20     Q.    I understand.
21     A.    And they trade, many of them trade by
22 appointment, meaning there is no exchange or
23 obvious market that you can easily trade the
24 assets.
25           So we all, we do use liquid

KING - HIGHLY-CONFIDENTIAL

1  instruments and liquid assets in the risk
2  management of these illiquid assets, so we trade
3  everything. But that's really the reason for the
4  existence of the business.
5      Q.   I understand.
6          Before we get into the week of
7  September 15, is your group separate and distinct
8  from something I see referred to as PCG?
9      A.   PCG is a control function. So
10 that's -- we are a trading group as opposed to
11 a -- so we work, I work for Eric Bommensath, who
12 works for Jerry in the business, if you like, as
13 opposed to product control, which is a control
14 function which reports up ultimately into Patrick.
15     Q.   Patrick Clackson?
16     A.   Yes.
17     Q.   So just I'm trying to picture the
18 structure of Barclays. The PCG group reports
19 under his reporting line, not yours, correct?
20     A.   PCG is a firm-wide function. It is
21 product control group, so it is a control
22 function. It deals with -- our interaction on a
23 daily basis with product control is to insure that
24 we have mandates to trade, that we are marking our

KING - HIGHLY-CONFIDENTIAL

1  books appropriately, that we are reporting
2  appropriately, and that all of the things that we
3  have to do on a normal basis are administered in
4  such a way that they can roll up into the firm's
5  books and records, et cetera, appropriately.
6      Q.   Can we talk specifically about the
7  week of September 15, and just to set some
8  parameters in case you are as bad with dates as I
9  am, September 15 is the date that Lehman Brothers
10 Holdings declared bankruptcy.
11         Can I ask you this question first.
12 You are aware there was some discussions between
13 Barclays and Lehman prior to that filing of
14 bankruptcy?
15     A.   Yes, yes.
16     Q.   Did you have any involvement in those
17 discussions?
18     A.   Yes.
19     Q.   Could you describe for me generally --
20 and again we are talking about the weekend of,
21 say, the 12th, 13th and 14th of September, right?
22     A.   Yes.
23     Q.   Could you just describe for me
24 generally your role in those sessions?

KING - HIGHLY-CONFIDENTIAL

1      A.   The same.
2      Q.   Meaning --
3      A.   That we were provided a list of
4  securities and assets that were -- at least what
5  we understood were owned or held by -- the 14th is
6  prior to the bankruptcy -- up to the bankruptcy of
7  LBM, so that then we were looking at the assets of
8  Lehman Brothers in its entirety.
9      Q.   OK.
10     A.   And then -- and there, our function
11 was to look at just the mortgage-related assets of
12 the Lehman Brothers overall group. But the
13 function was then the same, so assess estimates of
14 value or prices for categories of assets, and we
15 never really got to the risk management stage,
16 obviously because no transaction occurred.
17     Q.   When you say assess the category or --
18 categories of assets, were you provided a list of
19 all the CUSIPs that Lehman held at the time or --
20     A.   We were provided various lists of
21 CUSIPs or other such descriptions of assets that
22 Lehman held. I mean in the lead up to the 14th,
23 it was -- because it was the whole Lehman entity,
24 there were other assets, too, that weren't

KING - HIGHLY-CONFIDENTIAL

1  securities. For example, loan portfolios in
2  Europe, so they didn't have CUSIPs. But we would
3  also attempt to assess some kind of price for
4  those based on some simple analysis.
5      Q.   Your mandate during that period was
6  beyond just securities, it was any illiquid asset?
7      A.   No. Then we were really strictly
8  mortgage or asset-backed type assets. There was
9  an overall coordination of many groups. At that
10 point there were many groups or many trading desks
11 at Barclays in Europe and the U.S. that were
12 attempting to assess the entire Lehman Brothers
13 balance sheet or list of securities and assets.
14 So we were then just one, we were focused on one
15 part of that.
16     Q.   And did you come to New York to
17 participate in those discussions?
18     A.   We are based in New York.
19     Q.   So you participated in meetings with
20 Lehman folks during that weekend?
21     A.   I don't know whether we did by that
22 weekend. That was really -- I thought that was --
23 I thought in the lead up to that week, there was a
24 data room that was set up by Lehman. I never went

KING - HIGHLY-CONFIDENTIAL

2 to it actually, but one of the people that works
3 for me did.
4          I would have been at Lehman over the
5 weekend, but most of what we did was phone calls
6 to people and -- I mean in reality, there is a --
7 it is a -- there were many, many -- this was a
8 phenomenally complex situation just because of the
9 number of line items.  So in many respects, the
10 approach that we took to the analysis was high
11 level down rather than bottom up, meaning to have
12 accurately assessed the value of an individual
13 security by reference to talking to a trader when
14 there were then, say, 10,000 line items was less
15 useful than being able to initially categorize
16 things as residential mortgage-backed securities,
17 credit card securities, et cetera, et cetera,
18 subordinate, senior, and then have broad
19 valuations based on where we know similar markets
20 trade, and then each day we just refined.
21          Q.   OK, I think I understood what you
22 said.  When you said bottom up, you mean if you
23 had the luxury of time, you -- one might go CUSIP
24 by CUSIP or security by security and try to assess
25 the value of an individual security?

KING - HIGHLY-CONFIDENTIAL

2          A.   Right, right.
3          Q.   But you didn't have the luxury of
4 time.  Is that what I hear you saying?
5          A.   Luxury of time and even time -- then
6 markets are actually moving, so I would have to
7 be -- if you had infinite resources for a very
8 short period of time, then you might try to go
9 bottom up.
10          As -- once we had a definitive set --
11 it was really -- so the first exercise was -- and
12 this was repeated as we went through the 15th,
13 through the various iterations of the asset
14 population, was one, do we have a complete
15 description of the population, can we categorize
16 the population, can we estimate valuations for the
17 categories within the population, can we refine
18 and improve those estimates, increasingly becoming
19 more granular.  Have we engaged the appropriate
20 desks, trading desks within Barclays to -- or
21 existing Lehman desks, to provide us as much input
22 to where markets are or what securities -- what a
23 particular security is.
24          And then the last part was how do we
25 risk -- what is the risk associated with these

KING - HIGHLY-CONFIDENTIAL

2 categories of securities and how might we either
3 plan to dispose of the assets or in the short term
4 risk manage the assets.
5          Q.   When you say risk manage, you mean
6 hedging?
7          A.   For example, hedging, yeah.
8          Q.   So the process you have described, is
9 it correct to say it started on the weekend of the
10 13th or 14th and then continued in some form
11 throughout the week of the 15th?
12          A.   Yes.
13          Q.   And how did it change -- well, as I
14 understand it, on the 14th, it was concluded that
15 there was no deal between Barclays and Lehman,
16 correct?
17          A.   That's what I understand, yeah.
18          Q.   And how did you learn that the talks
19 were going to start again?
20          A.   I think it was at some point on the
21 15th or 16th, we were once again asked to look at
22 another population of assets that was a subset of
23 the population of assets that we had been looking
24 at the previous week.
25          Q.   That was going to be my question.  How

KING - HIGHLY-CONFIDENTIAL

2 did the population of assets change from the
3 weekend to the 15th?
4          A.   It was now the assets of LBI or what
5 we thought were the assets of LBI as opposed to
6 the assets of, say, LB.  Because there we were
7 looking at all assets regardless of whether they
8 were held by LBH or LBIE or -- so, but by that
9 point we knew we were just looking at or what we
10 thought we were looking at was the assets that
11 were included in the balance sheet for LBI.
12          Q.   OK.  Now, were you provided additional
13 information on the 15th or did you just use the
14 information you had previously acquired or --
15          A.   No, we -- I'm not sure -- we may have
16 been provided some of that information the
17 previous week.  Again, because the scope of the
18 exercise had narrowed from the entire -- you know,
19 us participating in a small part of assessing the
20 overall assets of Lehman Brothers to a larger part
21 of a much -- a subset of that overall population,
22 which was now just the LBI assets.
23          In keeping with the process of
24 improved granularity of analysis as the population
25 shrunk or the -- we were able to look at a more

Page 22

KING - HIGHLY-CONFIDENTIAL

2  refined list of assets on the 15th and spend more
3  time.  But we definitely reused the -- where there
4  was overlap with analysis that we had done the
5  previous week, we definitely reused it.
6      Q.   Let's start with this document.  I
7  think -- well, during the -- now we are in the
8  week of the 15th, starting Monday.  Ultimately
9  some kind of agreement was concluded between
10 Lehman and Barclays on the 16th, correct?
11     A.   In relation to --
12     Q.   Well, an agreement was signed on the
13 16th.  Are you aware of that?
14         MR. STERN:  Objection to the form.
15     A.   I don't --
16     Q.   Did you ever see what has been termed
17 the asset purchase agreement in connection with
18 the Lehman-Barclays transaction?
19     A.   I have seen drafts of it.
20     Q.   Were you involved in the -- I am just
21 trying to get a scope of what your involvement
22 was.  Were you involved in the back and forth
23 negotiations as to the terms of the asset purchase
24 agreement?
25     A.   No, no.

Page 23

KING - HIGHLY-CONFIDENTIAL

2      Q.   In the course of your -- well, let me
3  get back to the 15th.  On the 15th and 16th, did
4  you participate in meetings between Barclays and
5  Lehman?
6      A.   I don't think so.  I mean we may have
7  done on the 16th, but if it was, it was strictly
8  to do with identifying the -- you know, a trader
9  who may have been able to provide us clarity about
10 what a particular security was.  But I think --
11 but there wasn't an awful lot of that that we had
12 to do.
13         And it was very -- you know, we did
14 more of that in the previous week when we were
15 trying to understand what the asset population
16 was.  That was really when we needed some
17 assistance with people from Lehman.
18         But on the 16th, around the 15th and
19 16th, the only thing I could think, we probably --
20 there must have been some dialog, have we got a
21 list of securities to look at.  So I would think
22 that we were sent lists, so if you wanted to
23 include e-mails sending us lists of securities,
24 I'm sure that yes, there is communication.
25         But communication in the sense of did

Page 24

KING - HIGHLY-CONFIDENTIAL

2  we sit down and have conversations with people,
3  very, very limited.
4      Q.   Well, I understand the providing of
5  information part of the discussion, but separate
6  from that, was there a back and forth as to the
7  valuation or marking of particular Lehman assets
8  that were the subject of the discussions?
9      A.   I don't think so really.  The -- on
10 the 15th and 16th.  No.  I think for the most part
11 the 15th and 16th was trying to establish have we
12 got -- these exercises are -- they take a lot of
13 effort.
14     Q.   Sure.
15     A.   And the reason why we were involved
16 was because we had some proficiency in dealing
17 with understanding new populations of securities
18 or assets, because that's what we had been doing
19 for the last year and a half.
20         So one thing that we -- one thing that
21 is critical is to insure that you are not spending
22 a tremendous amount of time working on things that
23 were irrelevant.  So the first thing we need is to
24 be sure that we have got the correct population.
25 If we are spending time analyzing something that

Page 25

KING - HIGHLY-CONFIDENTIAL

2  isn't going to be delivered, then we have
3  definitely wasted time.  We are coming up with a
4  wrong valuation and we will never manage the
5  correct risk.
6          So I think mostly around the 15th and
7  16th would have been, well, OK, what are we
8  looking at this time?  And of course during the
9  course of that week, and that's why -- you know,
10 my -- the only reason why I am vague as to exactly
11 what happened the 15th, 16th and 17th, is that it
12 changed so much so rapidly, that most of what was
13 happening on the 15th and 16th and almost all of
14 what we were looking at became redundant by some
15 time on the 16th, 17th or 18th.
16         MR. STERN:  Let me just to clarify, I
17 take it you are focusing on what Mr. King's
18 role was and what he was involved in, and
19 when he uses the term "we," he is referring
20 to himself and his group as opposed to
21 Barclays as a whole.
22         THE WITNESS:  That's absolutely
23 correct.
24         MR. HINE:  I understand.  I
25 understand.

Page 26

KING - HIGHLY-CONFIDENTIAL

1
2    Q.   But, Mr. King, you folks didn't accept
3    the -- at face value the valuations or marks that
4    Lehman had put on various asset groups, did you?
5    A.   No.
6    Q.   Did you come to some conclusions about
7    the accuracy of Lehman's marks when you were
8    looking at all these asset groups?
9    A.   It is a peculiar way to describe it,
10   did we come up with some assessment of the
11   accuracy of Lehman's marks.  In some respects I
12   could say I didn't care about Lehman's marks.  I
13   cared about what was a reasonable assessment for
14   the value of the assets and ultimately what was
15   the risk that we were going to have to manage.
16      If you think about the way a -- as a
17   trader would think, we received phone calls from
18   somebody saying I'd like you to buy -- would you
19   be interested in buying the following at a price
20   or 72.  It is fascinating it is 72 they would like
21   to sell it to me at, but mostly I am interested in
22   where we would be interested in buying it, 55.
23      So can I therefore say ex post facto
24   that, you know, well, I have got some -- I didn't
25   think their offer of 72 was particularly accurate,

Page 27

KING - HIGHLY-CONFIDENTIAL

2    that's an inadvertent output of the fact that we
3    wanted to bid it at 50-something.
4    Q.   I think my question exhibited my
5    inexperience in this field, so I will try again.
6    Did you -- when you received the
7    information from Lehman, it had some kind of book
8    value ascribed to it by Lehman, correct?
9    A.   Yes.
10   Q.   Did you understand that by the time
11   Barclays and Lehman signed an agreement, that
12   there was going to be some kind of discount off of
13   that book value for the pool of assets that
14   Barclays was going to be acquiring?
15   A.   The signing of the agreement on the
16   Tuesday that you have told me about?
17   Q.   Yes, yes.
18   A.   -- or later --
19   Q.   Yes.
20   A.   I don't know much -- I don't really
21   know what agreement was reached on the 16th.  All
22   I know is that there was some assets that we were
23   looking at.  I would assume that it wouldn't have
24   been at all a surprise to anybody that a bid, even
25   a reasonable bid or reasonable assessment of a bid

Page 28

KING - HIGHLY-CONFIDENTIAL

1
2    for small size would be at a discount to book
3    value if that's the valuation that you are
4    referring to.  Book value being where it is held
5    in books and records.
6    Q.   Well, I guess I understand your
7    answer, but do you have any recollection of
8    discussions during that period of time -- and
9    again I'm talking the 15th and 16th -- about
10   either discounting or reducing the values that
11   Lehman had ascribed to these pools of assets in
12   order to come to an agreement as to the pool of
13   assets or the marks for the pool of assets that
14   Barclays was going to acquire?
15   MR. STERN:  This is you personally.
16   A.   This is me personally.  I have never
17   had any conversations with anybody at Lehman about
18   discounting Lehman's marks.  It is definitely the
19   case that in the crudest -- if somebody said to
20   me, Stephen, here is a security, you don't know
21   what it is, but, you know, it is -- it has a
22   price -- the last time it traded it had a price of
23   50, let's say, mentally, I would say, well, I know
24   it is not -- I certainly wouldn't be bidding 50.
25   I would be bidding half of that or 20 percent of

Page 29

KING - HIGHLY-CONFIDENTIAL

1
2    that or 80 percent of that or some number.
3      So it is definitely the case that when
4    we were trying to guess what might be a reasonable
5    value, in a very, very distressed market --
6    Q.   Sure.
7    A.   A very, very distressed market for a
8    very, very substantial number of assets that
9    Barclays would want to be selling, and Barclays
10   didn't -- bear in mind, Barclays didn't want these
11   assets.  The assets were -- you wouldn't want to
12   hold on to them.  They consume capital.  They need
13   to be funded.  Funding was expensive, capital was
14   expensive.
15      The assets were part of, you know, a
16   deal, and therefore, they would -- and, you know,
17   the -- I avoided the word "hedging" when you used
18   hedging because hedging doesn't really -- hedging
19   still means there is a left-over risk.  You never
20   really -- especially with assets like this.
21   Hedging is just, well, I have got one thing that
22   I'm short against something I am long.  It is not
23   very well hedged, there is still a risk, and
24   that's why banks and hedge funds have had quite a
25   lot of difficulty in the last few months.

Page 30

KING - HIGHLY-CONFIDENTIAL

1
2    So we knew that the objective would be
3 that we need to dispose of this risk.  That was
4 the objective.  So if I was looking at a portfolio
5 of assets, and you held the assets at 100, let's
6 say, I'd say I don't know -- and I felt
7 comfortable that I understand what the assets are,
8 my bet is I couldn't sell those for more than
9 80 cents of where you have currently ascribed a
10 value to them.
11    So yes, when we -- as a desk, the "we"
12 meaning my group, one of the first things that we
13 did was say, let's just assume that the stuff we
14 don't know is at 50 percent of book value.  The
15 stuff that is exchange traded equities is at
16 95 percent of where it is, because that was a --
17 the crudest form of guess.
18    Q.   Is that the type of analysis you were
19 doing on the 15th and 16th when you described -- I
20 think you previously talked about a top-down
21 approach as opposed to bottom up?
22    A.   Yes.  Because you do that -- really if
23 you think about it, you repeatedly do that same
24 process at an ever-more granular level.  Even if
25 you got down to an individual security, a trader

Page 31

KING - HIGHLY-CONFIDENTIAL

2 would say I've projected -- the thing about some
3 of these securities and assets is, unlike -- not
4 all of them but some of them, and certainly the
5 ones that we would have been looking at at this
6 time, they are not -- even though many of them are
7 called fixed income or debt instruments, the
8 amount of cash that they would be expected to
9 ultimately pay is actually uncertain, either
10 because there is a lot of risk associated with the
11 borrower or there is a prepayment risk or there is
12 something that makes the cash flow uncertain.
13    So the way a trader would look at it
14 is to say, I'll make a -- I'll form a view of how
15 much cash that I would want -- that I expect to
16 receive on this security, and then I would want to
17 discount the amount of cash back to some price
18 that I felt that I was earning an appropriate
19 yield on.  And then when a trader was then
20 subsequently bidding, they then may provide --
21 say, actually I'll bid 80 percent of that.
22    So whether it is at the portfolio
23 level, when we are looking at a whole balance
24 sheet, or an individual CUSIP, in many respects
25 the process is the same.  It is about how

Page 32

KING - HIGHLY-CONFIDENTIAL

2 confident you can be that you have assessed
3 everything correctly, because there is so much
4 uncertainty.
5    Q.   I think I understand that.
6    So during this early stage now, the
7 15th and 16th, is it correct to say you're looking
8 at particular asset classes or groups of assets by
9 type and performing this type of analysis on them?
10    A.   Yes, yes.
11    Q.   And so certain groups of assets, you
12 would be willing to pay a higher percent than
13 other groups, right, or --
14    A.   Yeah.  Because to reflect the idea
15 that the uncertainty about the price or the cash
16 flows was more or less clear.
17    Q.   So were there particular assets or
18 groups of assets within the Lehman portfolio that
19 was supposed to be sold to Barclays that warranted
20 much deeper discounts than others?
21    A.   Yes.
22    Q.   And which were the most discounted --
23 or which groups would require the most discount
24 from your perspective?
25    A.   The assets that are the typical assets

Page 33

KING - HIGHLY-CONFIDENTIAL

2 that my group manages, which is things like
3 mortgage-backed securities, deeply distressed
4 credit securities, things for which there is a
5 very, very limited market and poor visibility on
6 the expected cash flows.
7    Q.   And what kind of discounts would those
8 groups of assets get during this week?
9    A.   To what?
10    Q.   I don't know, did you -- again,
11 talking about the 15th and 16th, did you say --
12 again, I might be showing my ignorance here --
13 here is a pool of mortgage-backed security, a lot
14 of uncertainty here, let's mark their -- let's
15 discount their marks down by, say, 50 percent?
16    A.   Right.
17    Q.   You did.
18    A.   Yes.
19    Q.   OK.  And then other, presumably other
20 categories more secure, more visible -- again, I
21 might be displaying my ignorance, but perhaps
22 government securities might warrant a much smaller
23 discount in the mark?
24    A.   Precisely.
25    Q.   Is that right?

Page 34

KING - HIGHLY-CONFIDENTIAL

1
2    A.    Precisely.
3        (Exhibit 388-B, document Bates stamped
4    BCI-EX-S 74256 through 257 marked for
5    identification, as of this date.)
6    Q.    Mr. King, I am handing you a copy of a
7    document marked as 388-B, which is a two-page
8    document with Bates numbers BCI-EX-S 00074256
9    through 257.
10        After you have had a minute to look at
11    it, let me know, and I have a question or two
12    about it.
13    A.    OK.
14    Q.    Have you had a chance to look at the
15    document?
16    A.    Yeah.
17    Q.    Have you ever seen this document
18    before?
19    A.    Yes.
20    Q.    When?
21    A.    I remember -- this actually is, I
22    think this is my handwriting on it, and I also saw
23    it yesterday.
24    Q.    When you say "my handwriting on it,"
25    you are referring to the second page of the

Page 35

KING - HIGHLY-CONFIDENTIAL

1
2    document?
3    A.    Yes, yes.  Sorry, I thought you were
4    suggesting that I look at both pages.
5    Q.    Yes, yes, I was.
6        And is it fair to assume that this
7    document was sent to you on the 17th by Mr. Yang?
8    A.    Well, I would have seen this document
9    before the 17th.  He is sending it to James
10    Walker.  He just happens to be copying me.
11    Q.    Let me distinguish, when you say "this
12    document," the covering e-mail is on the 17th, but
13    the second page, you have seen that before the
14    17th?
15    A.    Yes.
16    Q.    Can you tell me when you first saw
17    that, the second page?
18    A.    I saw -- I think I saw a hard copy of
19    this at some point -- was this -- yeah.  This is
20    an e-mail and this is a hard copy, so I don't
21    quite know how -- whether Jasen had scanned it or
22    how the two became connected, but we had seen --
23    can I ask that?  Is that --
24    Q.    Well, this is how it was produced.  It
25    doesn't really matter about the -- where Mr. Yang

Page 36

KING - HIGHLY-CONFIDENTIAL

1
2    got it, so I'm not going to ask you about that.  I
3    just want to focus on the second page of this
4    document.
5    A.    I'd seen this in hard copy, which is
6    why I have scribbled on it at some point after
7    the -- after the 12th.  It was produced on the
8    12th.
9    Q.    This was produced by Lehman to
10    Barclays on the 12th?
11    A.    That's what it says on the top
12    left-hand corner of the second page, Lehman
13    Brothers balance sheet by GAAP asset type 9/12.
14    So I couldn't have seen it before the 12th, but I
15    must have seen it at some point thereafter, but
16    I'm not exactly sure when.
17    Q.    You believe you saw it over that
18    weekend at some point?
19    A.    I had seen it during the weekend.  I
20    might have seen it during the weekend, but that
21    was in the old -- that was in the first iteration
22    of the potential acquisition.
23        So I don't know when I saw it.  All I
24    know is I definitely saw it before he sent it to
25    James Walker.

Page 37

KING - HIGHLY-CONFIDENTIAL

1
2    Q.    I guess that was my question.  Was
3    this part of your analysis or discussion over the
4    weekend for the first iteration, or did you --
5    A.    I don't remember.
6    Q.    Or did you use it in connection with
7    the second iteration on, say, the 15th and 16th?
8    A.    I can confirm the latter part.  I
9    don't remember the former.  We might have seen it
10    in relation to the first part, but then it is only
11    a subset.  I don't really know why -- in the first
12    iteration of the transaction, where it was buying
13    Lehman, we never really had thought about Lehman
14    as being multiple entities.  So looking at LBI
15    specifically prior to Sunday would have been
16    something I wouldn't have focused on.
17        So I don't think I looked at it at the
18    weekend.  I would think I looked at it on the
19    Monday or Tuesday when we were told here is the
20    next iteration of the transaction.
21    Q.    OK, OK.  And you are referring to the
22    Lehman Brothers, Inc. at the top of this document?
23    A.    Yes.  This is Lehman Brothers, Inc.,
24    as opposed to Lehman Brothers.  But up to the
25    Sunday, we were thinking Lehman Brothers.  So the

KING - HIGHLY-CONFIDENTIAL
1
2    first thing I would have asked if somebody sent me
3    this is, to my point about population, am I
4    looking at everything, because otherwise this is
5    redundant.
6         Whereas on the Monday, if someone said
7    we are now looking at LBI, I can say is it correct
8    that this is the population of what we are
9    supposed to look at, and someone could say yes,
10    and that would make sense.  Now we have got
11    something to work on.
12         So I would think I saw this on the --
13    and also, by the way, these things, even though
14    they say 9/12, typically it would take 24 to 48
15    hours at least for somebody to produce this.
16    Q.   OK.
17    A.   So I very much doubt this -- although
18    it is of the 12th, the 12th is close of business
19    on the Friday, which means it almost certainly
20    didn't exist until something like the Sunday, and
21    I would think it was shown to us on the Monday or
22    Tuesday.
23    Q.   OK, fair enough.
24         Do you recall what you were -- I see a
25    lot of handwriting and a lot of numbers.  Do these

KING - HIGHLY-CONFIDENTIAL
1
2    refresh your recollection about what you were
3    analyzing?
4    A.   No.  These are sort of typical
5    scribble from me.  The e-mail is -- the e-mail
6    covering is quite elucidating because it
7    highlights -- the fact that it is a physical --
8    one of the problems we had at that time was this
9    is a physical.  There also was -- I remember that
10    there was -- and I don't have this, but there was
11    a paper copy again of securities that -- these
12    numbers are produced by Lehman's systems.  So
13    there would have been line items of all the
14    individual securities that fed up into these
15    numbers.
16         What Jasen is highlighting on the
17    front is that we have obviously by the 17th, this
18    definitely would have been the case as well,
19    started to receive files, which would have been
20    Excel files, I would think, and what he is
21    starting to explain is, all right, we have started
22    to try to understand what is the population that
23    leads to this.  If this is what we are buying, is
24    the assets that are currently on -- the assets
25    that are currently on LBI's balance sheet, his

KING - HIGHLY-CONFIDENTIAL
1
2    e-mail explains that we have started to get files
3    that should be all of this, but they don't tie
4    out.
5         He actually points out, you know,
6    corporate obligations, corporate stocks do not tie
7    out to the summary.  So we have been sent files
8    that purport to be the same but that don't tie
9    out.
10    Q.   So to tie out in your understanding means
11    he is trying to compare the files of individual
12    securities with the line item in the -- on this
13    balance sheet and see that they add up to that
14    total?
15    A.   Exactly right.  So he would have had
16    something that says total corporate obligations
17    and spot total, let's say.  If he would have been
18    sent a file that also purports to be corporate
19    obligations and let's say included then the line
20    items, a notional or a price, so he could
21    calculate a mark, add the marks up, he ought to
22    get back to that number, and his e-mail indicates
23    that they don't.
24    Q.   His e-mail is trying to, as you said,
25    get the proper population of the securities in

KING - HIGHLY-CONFIDENTIAL
1
2    each group?
3    A.   Yeah.  And you see, as you say -- my
4    sentence is that I have asked Jasen to send this
5    to James, because I thought I'd seen something
6    that looked similar to it that might help us to be
7    able to find out.  Because with this, there is
8    almost -- again there is almost nothing you could
9    do.  You would say -- using the percentage
10    approach, you would have to just take very heavy
11    haircuts to these large numbers and say I don't
12    really know what is behind this.
13         Then on his e-mail he is saying, we
14    have got some stuff but it doesn't tie out to
15    those numbers, and furthermore, we don't have
16    listings for derivatives category.  We are able to
17    tie out the asset listings we were given on
18    Monday.  We were given some asset listings on
19    Monday, so he is showing on Monday there were some
20    files.
21         And then the last sentence is pretty
22    interesting because it highlights the fact that
23    the problem wasn't a static problem.  It was a
24    dynamic problem.  So he has a list of securities,
25    but he says the government and agencies book is --

Page 42

KING - HIGHLY-CONFIDENTIAL

1
2  although we understand from Clement Bernard that
3  the government and agencies book is shrinking as
4  trades are unwound.
5       The problem here was the
6  counterparties to Lehman were terminating their
7  trades.  So we all have now realized that although
8  Lehman was sending us populations, minute by
9  minute, counterparties to Lehman were terminating
10 trades.  Therefore, this population is changing.
11      Q.   I understand.
12      A.   And this was only supposedly as of the
13 12th, which is the Friday.  So by the 17th, the
14 probability that these securities still were on or
15 available to LBI was low.
16      Q.   OK.  Thank you for that.
17           I would like to step back to before
18 the Wednesday, back to the Monday when you're
19 somehow using this document in connection with
20 your assessment of the Lehman assets.  Are
21 these -- if you look on the left-hand column, it
22 has "GAAP asset class."  Do you see that?
23      A.   Yes.
24      Q.   And then it has six different asset
25 classes listed.  Are these the -- are these asset

Page 43

KING - HIGHLY-CONFIDENTIAL

1
2  classes that fell within your purview in the
3  principal mortgage trading group as groups of
4  assets that you were asked to look at?
5       A.   Not on -- not at this time.
6       Q.   Not on the 15th or 16th?
7       A.   No.  We were -- the assets that we
8  were looking at were the -- it was starting to be
9  the case around the 15th and 16th that I had -- I,
10 we, my group, had two hats that we were wearing.
11 One was to look specifically to end up as the
12 ultimate risk -- actually that's not true, not to
13 end up as the ultimate risk manager, but to assess
14 the value of specific instruments.  Here the line
15 item in here that would say total mortgage or
16 mortgage-backed total, the 6 and a half billion.
17 So that is a category that my group would have
18 expected to -- or be capable of risk managing.
19      Q.   Right.
20      A.   That's one hat.
21           There is a second hat that we were
22 starting to wear, which was to facilitate in the
23 coordination and aggregation of the opinions of
24 other expert desks within Barclays on the other
25 line items.  So, for example, total government and

Page 44

KING - HIGHLY-CONFIDENTIAL

1
2  agencies securities, governments and agencies are
3  traded by a -- you know, there is a desk at
4  Barclays that trades governments and agencies.
5       Q.   Is that desk outside your principal
6  mortgage trading group?
7       A.   Yes, yes.  It is in Eric's world, but
8  it is a trading desk.
9       Q.   Eric who?
10      A.   Eric Bommensath, my boss.  It is a
11 trading desk, a customer trading desk, and we
12 would have no -- my desk would have no advantage
13 in providing a practical assessment of whether --
14 of what the valuation pricing or risk management
15 issues were associated with 39 billion dollars
16 worth of governments and agencies.
17           But with the hat of coordinating, we
18 were starting around the 15th or 16th to
19 facilitate in coordinating and aggregating that
20 information.
21      Q.   So can I just see if I understand what
22 you said.
23           Your group, the principal mortgage
24 trading group would have -- were provided the
25 assessment, if you will, as to the total mortgage

Page 45

KING - HIGHLY-CONFIDENTIAL

1
2  and total -- and mortgage-backed securities line
3  item, but as to the other five line items here you
4  would have acted as facilitator?
5       A.   Correct.
6       Q.   Assembling the assessments of other
7  groups within Barclays?
8       A.   Correct.
9       Q.   After you assembled those, presumably
10 that enters into the negotiations between Lehman
11 and Barclays in some way?
12      A.   Then I would have provided an
13 assessment to somebody as to where the current
14 estimate for the cumulative value in our view of
15 value was for this portfolio and particular
16 categories.
17      Q.   Who did you provide that to?
18      A.   I don't remember.  It might have been
19 a variety of people.  It could have been to -- it
20 would have been at various times to Patrick or to
21 Mike or to whoever was asking me for it at that
22 moment, James Walker, whoever.  Some various
23 people at various times asked for an assessment of
24 value for different purposes, and we would provide
25 it.

```
 1          KING - HIGHLY-CONFIDENTIAL
 2      Q.    Now, are you talking about people
 3  within Barclays or are you talking -- in other
 4  words, here is my -- my confusion here is this:
 5  Are you engaged in any kind of one-on-one
 6  conversations where you have Lehman as to the types of
 7  discounts we might apply to these different
 8  groups?
 9      A.    No.
10      Q.    Or are you just providing it to other
11  people within Barclays?
12      A.    Other people within Barclays.
13      Q.    Do you recall the conclusions you
14  reached on the 15th or 16th about these particular
15  asset types as far as the amount of discount that
16  would be required?
17      A.    Not particularly.  I remember that
18  the -- I remember that the mortgage securities,
19  for example, we carried around -- we had just said
20  I would -- I don't think -- I would be -- I think
21  we used something like 50 percent for the mortgage
22  securities, for example.
23      Q.    OK.  OK.  Do you recall what you used
24  for the other categories, any of the other
25  categories?
```

```
 1          KING - HIGHLY-CONFIDENTIAL
 2      A.    No.
 3      Q.    Is it fair to say, as I think we
 4  previously discussed for the less risky or more, I
 5  think you used the word visible categories, you
 6  would use a smaller discount than the 50 percent?
 7      A.    Yes.  And that's an interesting thing,
 8  because I remember actually that one of the
 9  categories here, total government and agencies, I
10  remember thinking -- I think you can sort of see
11  in some of the scribble here as well, for example,
12  the 3.2, I could see a number 3.2 here, which I
13  would guess is half of the 6.5 billion or the half
14  that we were saying that -- one of the problems
15  with that category in particular was that we
16  didn't even know what some of the securities were.
17  They were just -- you know, because if you look at
18  a CUSIP, a CUSIP doesn't tell you anything.  You
19  have to get a description to go with a CUSIP.
20      Q.    When you say "that category," talking
21  about mortgage backed?
22      A.    Mortgage backed.  Unfortunately banks
23  have a tendency of using mortgage and
24  mortgage-backed securities to mean anything that
25  isn't obviously something else.  So it isn't just
```

```
 1          KING - HIGHLY-CONFIDENTIAL
 2  mortgages.  It is CDOs, it is manufactured
 3  housing, it is franchise loans.  It is a lot of
 4  stuff.  Because you notice it doesn't obviously
 5  fit into any of those other categories, so it is
 6  stuff.
 7          Because it is stuff, some of it you
 8  would have no idea from the CUSIP or even the
 9  description whether it was a performing or
10  nonperforming security, a senior obligation or a
11  junior obligation.  You would actually have to go
12  to Bloomberg, or if in some cases it wasn't listed
13  on Bloomberg, go to a trader and say what is this.
14          Some of these, for example, were what
15  they call whole business securitizations, which
16  are secured lendings against assets of corporates.
17  And there you would have to understand something
18  about the company.
19      Q.    So in the end, because of all these
20  uncertainties, you ascribed a 50 percent discount
21  rate to that line item?
22      A.    If someone said -- yeah.  But for a --
23  if I was asked for an initial guess, a guess, I
24  would say, you know, I can't imagine that -- if
25  you turned around and asked somebody for a bid of
```

```
 1          KING - HIGHLY-CONFIDENTIAL
 2  6 and a half billion dollars -- these securities
 3  for example, mortgage and mortgage-backed
 4  securities, they trade in -- they have -- many of
 5  them have face values, notionals of millions of
 6  dollars.  Single numbers of millions of dollars.
 7  So you can see that 6 and a half billion dollars
 8  of assets is thousands of line items.
 9          Furthermore, many of them will trade
10  at a few cents on the dollar, 5, 10, 3, 20.  So
11  there is a tremendous level of uncertainty and
12  inaccuracy about it.  And the 6 and a half billion
13  dollars of assets, to sell 6 and a half billion
14  dollars of assets would take a tremendous amount
15  of time.  Actually, it did ultimately take the
16  better part of a year.
17          So therefore, to just guess, I can't
18  believe that if they are marked there, that if you
19  needed to sell them or you wanted to bid them,
20  that you would bid more than 50 cents on the
21  dollar, would have been a guess.
22          Now, remember, subsequently we did
23  some work on it and came up with similar sort of
24  numbers on it, which is why I happen to remember
25  that one.
```

KING - HIGHLY-CONFIDENTIAL

1
2    Q.   That's the one that is within your
3    group?
4    A.   That's the one within the group.
5    Interesting thing, the government and agencies
6    securities, 39 billion, I remember on -- at around
7    this time on the 15th and 16th, I had a pretty
8    rosy view of the liquidity of government
9    securities and agencies, mostly because I was
10   pretty ignorant of what they were.  Of course
11   because of the collapse of Lehman in the previous
12   two days, there was no liquidity in these either.
13          So these agency securities turned out
14   to be some of the hardest securities to sell
15   subsequently.  There was a -- there wasn't
16   39 billion dollars of them, but there was a
17   significant population of agencies securities that
18   were in the Fed repo facility.
19          They took nine months to sell at a
20   significant discount, much more than I would have
21   ever guessed on that day, because I would have
22   thought they were liquid.  There were no liquid
23   markets at this point.
24          MR. STERN:  Bill, could we take a
25   brief break?

KING - HIGHLY-CONFIDENTIAL

1
2          MR. HINE:  Sure, sure.
3          (Recess)
4    BY MR. HINE:
5    Q.   Mr. King, I would like to continue
6    with the second page of Exhibit 388-B, if you
7    will.  On the right-hand side of the balance sheet
8    it's entitled "Net Short Inventory."  Do you see
9    that?
10   A.   Um-hm.
11   Q.   Was this side of the balance sheet
12   something that you worked on in connection with
13   these transactions, or is that someone else at
14   Barclays?
15   A.   No.  There were -- it was one of the
16   things that -- they weren't really separable
17   because the longs and shorts obviously were
18   supposedly interrelated.  And you can see that --
19   it kind of highlights as well that something like
20   the mortgage or mortgage-backed pool, if you will
21   notice, is -- there are very few in the way of
22   shorts against that because it is not written --
23   it is not a -- something that is hedgeable that
24   you would expect to have two directional markets.
25   People buy stuff, therefore they are long,

KING - HIGHLY-CONFIDENTIAL

1
2    therefore all of the asset -- there is assets and
3    there is no liabilities.
4          Whereas something like government and
5    agencies is an active two-way market, people
6    borrow and sell.  You can borrow securities and
7    you can sell them, so there would be shorts.
8    Likewise, you know, corporate equities and stocks,
9    et cetera.  Again, nonmoney market instruments and
10   CDs, there is no way to short them.
11   Q.   So is it fair to say with respect to
12   the right side of this balance sheet, you
13   performed the same function you previously
14   described, assembling assessments for the first
15   five line items, and supervising your group and
16   providing assessments for the last line item?
17   A.   That's correct.  And as you see, there
18   is really nothing there.  So really it would have
19   been that we would have provided the list of longs
20   and shorts in files and sent them to the
21   respective desks.
22          And as Jasen says, of course, in
23   reality -- therefore, I can't really comment much
24   on those values because there are -- there is
25   almost nothing that's relevant to the work that my

KING - HIGHLY-CONFIDENTIAL

1
2    group was doing for itself for the last line item.
3    As Jasen's e-mail on the front says, the shorts
4    were evaporating as people closed out trades --
5    bad choice of words I suppose.  They were
6    disappearing as people actually closed out trades
7    against Lehman, and within 24 hours of this
8    Wednesday, I think they became irrelevant.  So
9    there is very little work that was done on that
10   right-hand side.
11   Q.   I understand.
12          I think you said earlier that you were
13   not engaged in one-on-one discussions with Lehman
14   about the valuations of these different groups of
15   assets?
16   A.   Correct.
17   Q.   Was there someone at Barclays who was
18   so engaged?
19   A.   I don't know.
20   Q.   You don't know.  OK.
21          Before we leave this sheet, can I ask
22   for a translation on some of your handwriting.
23   The phrase says 3.8 and there's a text.  Do you
24   see that?
25   A.   Yeah.

Page 66

KING - HIGHLY-CONFIDENTIAL

1
2   the 65.115, whether they are even based on the
3   same date, same populations.  But I do remember
4   that fact about the mortgage and mortgage-backed
5   part.
6       MR. STERN:  And that's independent of
7   Exhibit 19?
8       A.  Yes.  You can't derive that from --
9   you can't see that -- I don't remember that from
10  seeing Exhibit 19 previously, and I'm not deriving
11  it from that.
12      I am deriving it from a combination of
13  memory about discussions around that 6 and a half
14  billion dollars of mortgage and mortgage-backed
15  securities that are on the 388 page 2, and the
16  fact that I can see there is only 2.7 billion on
17  the mortgage line on Exhibit 19.
18      Q.  I understand.
19      A.  But I don't really -- I don't know
20  the -- I haven't seen this before, I haven't seen
21  Exhibit 19 before.  At least I don't remember
22  seeing it.  Therefore, I don't remember.  It
23  wouldn't surprise me that 72 and a half or 70
24  were -- because, as Jasen's e-mail says, things
25  changed by that day.

Page 67

KING - HIGHLY-CONFIDENTIAL

1
2       Q.  Let's talk about the mortgage-backed
3   securities for a second.  At some point in time it
4   was agreed that Barclays would only take half of
5   those securities, correct?
6       A.  Yeah.
7       Q.  And was it later agreed that they
8   would take more than that?
9       A.  As I say, as I pointed out earlier on,
10  one of the difficulties here is that all of what
11  we are discussing, as far as I know, as far as we
12  were concerned, became irrelevant within hours or
13  days of the 16th.  So the entire discussion about
14  this by the 17th we had put out of our minds.  Or
15  the 18th.
16      Q.  "This" meaning the valuation exercise
17  you were talking about earlier?
18      A.  Yes.  Because -- and that's very
19  challenging -- and we had to prioritize, because
20  in many respects around this time we were working
21  literally 24 hours a day.  And so the only way to
22  manage this was to say that's now redundant, I
23  don't want to discuss it, I don't care about it,
24  we need to focus on what we need to deliver,
25  because someone has asked us something within an

Page 68

KING - HIGHLY-CONFIDENTIAL

1
2   hour and a half.  So now we are going to move to
3   that.
4       So at some point -- so there are --
5   unfortunately you are asking me about things that
6   within a day or so were irrelevant to us.
7       Q.  "Us" meaning --
8       A.  "Us" meaning my group.
9       Q.  OK.  Well, tell me then why this all
10  became relevant.  I assume you are talking about
11  in the Wednesday-Thursday time frame?
12      A.  Yeah, at the point that we started to
13  be asked to focus on the securities that were
14  collateralizing the Fed repo facility.
15      Q.  And what were you told in that regard?
16      A.  That here is a population of
17  securities that is collateralizing a loan that was
18  provided to LBI by the Fed, and we were being --
19  we, Barclays being asked to step into the
20  position of the Fed.  I don't know -- I wasn't
21  part of the discussions as to why that would be
22  the case or whether it -- or how it had come about
23  or whether we would do it.
24      My group was then asked once again to
25  provide an assessment of the probable value or --

Page 69

KING - HIGHLY-CONFIDENTIAL

1
2   not just even the value actually.  What was in the
3   Fed facility.
4       Q.  And who told you -- who told you all
5   this?  Who gave you these instructions?
6       A.  The instructions to start to do that
7   work?
8       Q.  Yeah.
9       A.  I think, I think it was Mike at the
10  time asked us to look at it.
11      Q.  Mike who?
12      A.  Keegan.
13      Q.  And did you -- you understand that
14  there was a repo transaction entered into on
15  September 18 involving Barclays and Lehman,
16  correct?
17      A.  Yes.
18      Q.  That's the Thursday?
19      A.  Yes.
20      Q.  And so was this assessment you were
21  asked to do prior to that repo transaction or
22  was -- were you assessing the securities that had
23  been posted into that repo transaction?
24      A.  Both.
25      Q.  So am I correct -- I assume the

Page 70

KING - HIGHLY-CONFIDENTIAL

1
2    securities that were -- supported the Fed repo
3    earlier in the week were somehow supposed to make
4    their way into the September 18 repo involving
5    Barclays and Lehman, correct?
6        A.   Yes.
7        Q.   So you were asked to assess both the
8    Fed pool of securities and then what ultimately
9    made it into the repo?
10       A.   That's correct, yes.
11       Q.   And did you come to any conclusions
12   after that assessment?
13       A.   Yes, the same -- we did the same
14   process that we had done on each of the previous
15   iterations.  We were able to reuse some of the
16   information because there was an overlap between
17   the list of securities that were in the Fed
18   facility, ostensibly, the Fed facility and also on
19   the balance sheet of LBI.
20           We had -- I thought it was on the
21   Wednesday, we were -- I thought it was on the
22   Wednesday, not the Thursday, we were first asked
23   to look at it, which is why I say about the
24   Wednesday we started to put our pens down on what
25   we were doing previously, and I remember that we

Page 71

KING - HIGHLY-CONFIDENTIAL

1
2    had literally something like about an hour or hour
3    and a half when we were first asked to look at it
4    to -- and the population was 49 or so billion
5    dollars of assets, and the question was, Stephen,
6    what do you think these are worth?
7        Q.   That was a population in the Fed repo
8    or September 18 repo?
9        A.   In the Fed -- sorry, is there a
10   difference between --
11           MR. STERN:  I think he is asking if
12   you were looking at the Fed portfolio.
13       A.   Well, we thought -- yes, at this point
14   we were on the Wednesday or Thursday prior to the
15   funding the night of the 18th, so there was a list
16   of -- another list that was sent to us.  I can't
17   remember where the list came from, whether it was
18   a list from the Fed to operations to us.  I don't
19   remember the information flow.  But there was a
20   list of securities.  We were able to put that list
21   of securities, you know, in a spreadsheet, compare
22   it to various -- do various look-ups to see
23   whether we could find whether we had ever put a
24   price on anything that was in the Fed facility.
25           Recognizing that during the course of

Page 72

KING - HIGHLY-CONFIDENTIAL

1
2    this week, Lehman had -- Lehman Holdings had
3    become bankrupt on the 13th.  So almost anything
4    that we were saying about valuations was becoming
5    redundant each minute because markets were moving
6    so much.
7            MR. STERN:  You said the 13th.  Did
8    you mean the 15th?
9        A.   I am sorry, the 15th.  I think -- the
10   deal stopped happening on the 14th.  Right.  So
11   that week that we are talking about, markets were
12   moving tremendously because there was disarray
13   because of the bankruptcy.
14       Q.   There were other events taking place
15   at the time as well, correct?
16       A.   Yes.  Also Merrill, so other things
17   were going on that meant that, you know, literally
18   if you had a portfolio of equities or a portfolio
19   of Treasuries or portfolio of hedges or portfolio
20   of mortgages, I would say during that week, there
21   was no -- I mean the exercise to some extent was
22   academic because we are putting a price on
23   something for which there was no bid on any of it.
24   No bid.
25       Q.   Well, I think you said previously you

Page 73

KING - HIGHLY-CONFIDENTIAL

1
2    were asked -- you mentioned a close to 50 billion
3    dollar number.
4        A.   Yeah.
5        Q.   I still don't know that you answered.
6    Is that the Fed pool or is that the collateral
7    that was ultimately posted to the September 18
8    repo?
9        A.   There I am describing what we were
10   doing prior to the settlement, which was to
11   provide -- the question that had been asked to us
12   is, there is a Fed facility, I seem to remember it
13   was 45 billion dollars, and it is backed by
14   securities which have a value -- which I think
15   subsequently or around that time we found was not
16   of course -- it is neither a Barclays assessment
17   of value or Lehman assessment of value, it is a JP
18   as custodian for the securities assessment of
19   value.  Not a trader's value, so not a mark, just
20   a -- you know, a price, a matrix price or wherever
21   they got their prices from, assessment of how much
22   collateral was supposedly supporting the Fed
23   facility, and the Fed facility was sized by
24   reference to haircuts to that assumed value.
25           So we were then asked to say, well, do

KING - HIGHLY-CONFIDENTIAL

1
2  we think that if you had to liquidate this
3  portfolio, that you could recover the amount of
4  the loan that was being made.
5       Q.    And this is Wednesday night you're
6  asked this?
7       A.    This was I think Wednesday.  I
8  remember it being in the afternoon.  And I would
9  think it was --
10      MR. STERN:  And Wednesday was the
11      17th?
12      A.    I feel -- for some reason in my head I
13  am carrying it around as a Thursday, but I think I
14  have lost a day in there somewhere because I don't
15  think I had a night.  So --
16      MR. STERN:  Just to help, I mean I
17      don't think there is any dispute about this,
18      the Fed replacement transaction was executed
19      on the 18th, into the evening of the 18th,
20      which is a Thursday.  So if that helps you
21      put things in perspective.
22      A.    Yes.  In my mind, the time between
23  when we first were asked to look -- first became
24  aware of the Fed facility transaction and the
25  funding of it, was much shorter than a day and a

KING - HIGHLY-CONFIDENTIAL

1
2  half.  So that may just have been because we
3  didn't have a night.
4       Q.    I appreciate that, for all of us who
5  have missed nights as well.
6       So is this -- when you said you had
7  about an hour and a half or two --
8       A.    We had an hour and a half.  There was
9  a phone call to say we are being asked to take the
10 Fed out of this.  We didn't know the reason why or
11 reason for the transaction or whether it was even
12 necessarily related to it.
13      MR. STERN:  "We" being you?
14      A.    "We" being Barclays at that point.
15 That Barclays was being asked to take the Fed out
16 of its facility, out of this loan, and the
17 question to us as my group was, what do you think
18 about this value of securities?
19      Q.    And what did --
20      A.    And I found that an extraordinary
21 situation, because we had just had the bankruptcy
22 of Lehman and we were being asked whether or not
23 we thought a portfolio of securities, which we
24 barely knew, because we had only really
25 encountered them a handful of days before, it was

KING - HIGHLY-CONFIDENTIAL

1
2  actually worth 45 billion dollars, and therefore,
3  should we permit Barclays to lend 45 billion
4  dollars against a portfolio of securities, and in
5  any normal circumstances I would never make that
6  statement or assertion.
7       Q.    When you say 45, that's the amount of
8  the Fed facility?
9       A.    That's the amount I remember being the
10 Fed facility.
11      Q.    Secured by -- 45 was the value of the
12 pool in the Fed, to your recollection, or was that
13 the amount that the Fed --
14      A.    That was the loan amount.
15      Q.    And the value or purported value in
16 the pool was about 5 billion more than that?
17      A.    Well, you are using -- you are saying
18 "value" as if that was value.
19      Q.    OK.
20      A.    The numbers that were the JP Morgan
21 marks I think at some date, and I don't remember
22 which date it was, they may have even been from
23 the Monday or Tuesday or Wednesday, I don't
24 remember how current they were.  Markets were that
25 volatile, but that they -- those numbers added up

KING - HIGHLY-CONFIDENTIAL

1
2  to -- I remember it being anything from 48 and a
3  half to 49, to 49.7.  There was some -- if you add
4  up those numbers, it would appear that if it were
5  possible, if it were possible to sell into the
6  open market at those JP Morgan marks, then you
7  would get 49 point or 48 point whatever it is for
8  the portfolio.
9       Of course that's not a -- that's not a
10 value.
11      Q.    OK.  But -- I understand that.  I
12 didn't mean to misuse that word.
13      So what did you conclude as to the --
14 what did you respond to the people who had asked
15 you to make this assessment?
16      A.    We thought it was possible that in a
17 controlled way, we might be able to recover enough
18 to cover the loan.
19      Q.    Meaning the 45 number?
20      A.    Meaning the 45.
21      Q.    Now ultimately, that pool of
22 collateral or a pool of collateral with some
23 overlap to that gets rolled in -- gets used in
24 connection with the September 18 repo, correct?
25      A.    Yeah.

KING - HIGHLY-CONFIDENTIAL

1
2      Q.   And were you asked to do anything in
3  connection with that pool of collateral?
4      A.   Yes.  So now -- so that exercise of
5  assessing the value of, liquidatable value of the
6  securities that were supporting the facility --
7  the Fed facility was needed to be refined.  So we
8  just carried on.
9          Even though we had given that initial
10  assessment, the reason why I think it fills a very
11  compressed amount of time, we just kept refining
12  and refining and refining our views as we analyzed
13  the portfolio.
14      Q.   Right.
15      A.   As we went into the Thursday -- sorry,
16  Thursday night into the Friday, there was
17  another -- there is another very difficult piece
18  that was in the middle of that, which is
19  operationally how do you settle this transaction
20  and then how do you risk manage it once the trade
21  has come in.
22      Q.   Can you specify "this transaction"?
23      A.   The Fed transaction.
24          The peculiarity of this, and we didn't
25  really understand this at the beginning, but it

KING - HIGHLY-CONFIDENTIAL

1
2  became clear, is, of course, the normal
3  circumstances, a repo transaction shouldn't mean
4  that the lender on the loan is long the underlying
5  risk of the securities collateralizing the loan.
6  They have a secured lending to a borrower that's
7  collateralized.
8          Here, of course, we knew that we were
9  lending to a borrower that was expected to be
10  bankrupt within a short period of time, and whose
11  parent was bankrupt.  Therefore, although it was a
12  loan to a counterparty, at some point we were
13  going to be long the underlying assets.
14          And if we were long the underlying
15  assets, we therefore needed to risk manage them.
16  Because just because we had assessed that as of
17  the Thursday they were worth some amount,
18  hopefully more than 45 billion dollars, by the
19  Monday, they might have been worth 35 billion
20  dollars.
21      Q.   Right.
22      A.   So we better do something about that.
23  So the focus started to move from how do we
24  manage, how do we even see and book -- how do we
25  book securities that are not just going to be

KING - HIGHLY-CONFIDENTIAL

1
2  collateral for a repo but are effectively going to
3  need to be shadow booked into risk systems so that
4  we can generate appropriate risk metrics so that
5  we can risk manage them.  So we -- our process
6  started to change to that.
7      Q.   And this started even before you
8  booked the September 18 --
9      A.   Yes, yes.
10      Q.   -- repo?
11      A.   Yes.  Because we had to say how are we
12  going to manage this transaction?  How are we
13  going to manage this risk once Barclays has
14  lent -- once Barclays has lent -- in Barclays'
15  book, it is going to have -- the repo desk seems
16  to have lent 45 billion dollars to a counterparty
17  that is going to default, and that is
18  collateralized with a number of securities.
19          And if it followed its normal process,
20  it would be marking these securities, asking
21  desks, asking price services to -- it wouldn't
22  actually be assuming that it was going to get long
23  the collateral and have to liquidate it.
24          But here we knew that was going to be
25  the case, and it is mostly the case in other

KING - HIGHLY-CONFIDENTIAL

1
2  distressed -- it is frequently the case, and we
3  have obviously seen this because of what happened
4  with Bear and Bear's hedge funds that had
5  defaulted on repo-secured lending, that the moment
6  the repo -- the borrower defaults under the repo,
7  you seek to liquidate the collateral, and you
8  invariably don't recover enough to cover the loan.
9  You hope you are going to, but markets are
10  distressed at that moment.
11          Well, this was the mother of all
12  distress.  We are in the middle of a bank, a major
13  bank defaulting that many people had thought
14  wouldn't have been left to default, but had
15  defaulted, and we were about to undertake a
16  45 billion dollar lending in which we would be
17  long this risk with very limited ways of risk
18  managing it.
19      Q.   So what did you do to risk manage it?
20      A.   Well, so Thursday we had to assess how
21  are we going to record in our books securities,
22  when we haven't actually booked the securities, we
23  booked a repo facility.  So we had to construct
24  shadow books that were going to represent the risk
25  of the securities that were in the repo facility,

Page 82

KING - HIGHLY-CONFIDENTIAL

1
2  and then we sought to insure that -- our plan was
3  on the Thursday, each of the desks had a list of
4  the securities that they were expecting to
5  receive, and we had informed them that of course
6  repo is -- this was overnight repo.  We weren't
7  but -- a week earlier, by the way, we were not
8  experts in repo.  So some of what I am able to
9  talk about now about that repo facility, I
10 actually only learned afterwards.
11        But this was overnight repo, which
12 meant that strictly speaking the borrower could
13 switch the collateral within the repo facility
14 each night.  So we had advised the respective
15 desks, thinking about, you know, in a similar way
16 we categorized the assets that were in the repo
17 facility in a similar way to the way they are
18 categorized on 388-B, and we passed those out to
19 the relevant desks and said tomorrow, you are
20 going to be -- we need you to help us manage this
21 exposure.
22        And we sent lists to each of the
23 desks.  Of course -- but we told them they may
24 marginally change overnight, and until we are
25 certainly long the risk, we can't hedge.  We

Page 83

KING - HIGHLY-CONFIDENTIAL

1
2  couldn't hedge prior because of course if for some
3  reason the transaction hadn't settled, we would be
4  short the market, so there was no way to hedge
5  until we knew that we actually were long the risk.
6     Q.   OK then.  There was a lot there, so
7  let me ask a couple of questions.
8            When you say we were certain we were
9  long the risk, that would be when there was a
10 default?
11    A.   No.  Once the securities had settled
12 into Barclays.
13    Q.   Oh.
14    A.   Which would have been the Thursday
15 night, Friday morning.
16         MR. STERN:  You might just explain
17 what you mean when you talk about long the
18 risk and so on.
19    A.   On Thursday, there was -- we knew that
20 there was a Fed facility.  Barclays had not lent
21 any money to Lehman.  The Fed had lent money to
22 Lehman and collateralized that lending with
23 securities.
24    Q.   Right.
25    A.   That night, Barclays would effectively

Page 84

KING - HIGHLY-CONFIDENTIAL

1
2  replace the Fed, thereby knowing for certain that
3  it had a secured loan out to Lehman, LBI, where
4  LBI was expected to default.
5            So it is not until for certain that
6  Barclays has funded that loan that it could say
7  that it definitely is long the risk of the
8  underlying securities.
9     Q.   OK.  So if --
10    A.   So for example -- maybe it is easiest
11 by example.  If we took a single security on the
12 Thursday, in normal trading, in a normal trading
13 environment, I might be negotiating with a
14 counterparty to buy something and I might be
15 agreeing the price and we might be trading, but --
16 and I might know that the moment that I want to --
17 moment that I know I am going to be long the
18 security, I will need to hedge, and I have worked
19 out how I am going to hedge, but until the trader
20 tells me done, not just at some point while we are
21 discussing the price, if I decide to hedge before
22 he says done and then he says, you know what,
23 change my mind, now I have put a hedge on against
24 nothing and I have got to take the hedge off.
25            So until we know that this repo

Page 85

KING - HIGHLY-CONFIDENTIAL

1
2  transaction -- this replacement repo transaction
3  has settled, it would be -- it was a trading
4  decision whether or not we should hedge before it
5  settles or after it settles.  And we elected to
6  start hedging after it settled.
7     Q.   So when you say settles, that's on
8  Thursday, the 18th?
9     A.   Thursday night into Friday morning.
10    Q.   So that -- OK, I think I understand
11 that.
12           But aren't you -- I guess I didn't
13 understand the shadow book concept.  I thought you
14 weren't long the security until LBI defaults on
15 the Friday.
16    A.   Formally -- exactly right.  Until the
17 Friday when there is the default of LBI, then the
18 systems would record a secured lending facility.
19 As I say, some of this, you know, back filling the
20 knowledge because we learned how it really did
21 happen after the fact.
22    Q.   Sure.
23    A.   But that there would be a loan and the
24 repo desk would say, I have got a loan out to LBI
25 and it is collateralized by the following

KING - HIGHLY-CONFIDENTIAL

1
2 securities, but it isn't equipped to hedge or
3 manage those underlying securities because it is
4 not expecting to ever need to.  It thinks it has
5 got an overcollateralized loan.
6    Q.   Right.
7    A.   Where it hopes -- where a repo desk
8 risk management ought to be, I've lent you money,
9 I have got some additional margin over and above
10 the amount of money that you have lent, that I
11 have lent you, and if you default, I am going to
12 sell it all as quickly as possible.  I am not
13 going to reflect on it and think about whether I
14 would like to -- those are trading decisions for
15 someone else.  I am going to sell it.
16       And hence, when you try to sell
17 something in that way, you invariably,
18 regardless of whether the last trade observed in
19 the market was 95, if you phone up somebody and
20 say I need a bid, you might get a 85, and that's
21 why they need the margin.  But that would be their
22 normal repo risk management decision.
23       Here we were going into this lending
24 with the benefit of knowledge that within 24 hours
25 to 48 hours, it would be the case that this

KING - HIGHLY-CONFIDENTIAL

1
2 borrower would default, so that there was no value
3 to the counterparty, and furthermore, we were
4 therefore going to be long a humongous number of
5 securities that we would have no ability to sell.
6    Q.   So for that reason you start risk
7 managing those securities the minute the repo
8 settles?
9    A.   First we say -- many of these
10 securities have -- so the -- maybe again it is
11 worth just touching on this for a second.
12       When I talk about risk, what I mean is
13 that what is the expected change in value of a
14 security with respect to a change in something
15 else.  So many of the securities have interest
16 rate sensitivity.
17    Q.   Right.
18    A.   How much would the value of these
19 bonds change if the interest rates went up.
20    Q.   OK.
21    A.   We would also come up with some crude
22 estimates for, say, the equities portfolio, which
23 would be how much of the S&P 500 does this equity
24 portfolio look like.  For the RMBS securities we
25 might say how much of a particular mortgage-backed

KING - HIGHLY-CONFIDENTIAL

1
2 index does this portfolio look like.
3       Because we can't know -- we know there
4 is no way we can sell.  If we go out and start
5 selling at 8 a.m. on the Friday morning, five days
6 after the bankruptcy of Lehman, we would
7 recover -- I don't know what we would recover.
8       And we already knew that where we had
9 seen some of the bids in the market during that
10 week where other people have been selling -- bear
11 in mind, the market was flooded with collateral
12 from the bankrupt Lehman Brothers Holding and
13 LBIE, so that people were closing out other repo
14 facilities.  So the market was full of Barclays --
15 of Lehman's securities that were already being
16 sold.  So -- and we were about to get long another
17 45 billion dollars of them.
18       So there would be no way for us to
19 manage that.  The only way we could do it was
20 bring the risk on to our systems, assess how
21 volatile it was going to be and what parts of that
22 volatility we would have to hedge with instruments
23 in more liquid markets.  For example, S&P.  For
24 example, interest rate derivatives.
25       And that's what we started to do on

KING - HIGHLY-CONFIDENTIAL

1
2 the Thursday in anticipation, what systems are we
3 going to need to help manage that and what are we
4 going to do on the Friday.  Of course, that was
5 complicated, further complicated by the fact on
6 the Friday morning we woke up to discover we don't
7 own the same portfolio we thought we were going to
8 own a day earlier.
9    Q.   OK.  Let me put that issue aside for a
10 minute here.  I think I followed you.  It is an
11 area that I am not familiar with, so I apologize.
12       So on Thursday, you are risk managing
13 or hedging the volatility that you foresee in that
14 pool of securities as a result of all this market
15 activity that you have seen?  The plan was to
16 hedge the portion you needed to hedge and then
17 sell the securities later?
18    A.   Yeah.  So I think the answer to your
19 question is actually no, we were not hedging on
20 the Thursday.  We were starting to work out
21 that -- the process up to the decision of will
22 Barclays lend against this pool of assets was one
23 that would incorporate both an assessment of
24 Barclays' assessment, not JP's assessment or
25 Lehman's assessment or anybody else, but Barclays'

KING - HIGHLY-CONFIDENTIAL

1
2  traders' assessment of what was the realizable
3  value of the securities and the amount of -- it
4  would need to have some amount of cushion over and
5  above the amount that it started to sell, Barclays itself
6  moment that it started to sell, Barclays itself
7  would drive the market down.
8      Q.   Right, right.
9      A.   So we needed to do two things on
10 Wednesday and Thursday.  One, an assessment of an
11 estimate of what we thought was a reasonable
12 liquidation value for the portfolio, and then,
13 two, what was a reasonable guess at the risks that
14 we were taking by being long that portfolio.
15 That's what we were doing Thursday.
16      On Friday then --
17      MR. STERN:  "That portfolio" is the
18 Fed portfolio?
19      A.   For the portfolio we thought we were
20 going to take delivery of, or best guess of the
21 portfolio we thought we were going to take
22 delivery of on the Friday.
23      But it wasn't until -- and then we
24 made a decision not to hedge on the Thursday.  And
25 then on the Friday, once we knew the transaction

KING - HIGHLY-CONFIDENTIAL

1
2  had been consummated, so we knew that we were
3  actually long --
4      Q.   That's Thursday night, Friday morning?
5      A.   So some point Thursday night, somebody
6  would have phoned me and said, Stephen, we are
7  long.  So then we knew we had eliminated one risk,
8  which was the execution risk.
9      Q.   Right, right.
10     A.   Because we couldn't -- the reason for
11 not hedging was we could never manage -- never
12 hedge the execution risk.
13     Q.   Right.
14     A.   But on Friday we now know we are long.
15 Let's say that was at 2 o'clock in the morning or
16 something.  No markets are open, so there is no
17 way to start selling or to manage -- actually we
18 couldn't start selling because actually it is just
19 a repo facility, it is not that we are long the
20 assets, so you couldn't sell on the Friday.
21     So therefore, we would have to think
22 up things we could use to hedge the risk.  And
23 that's -- we started that process on Thursday.  By
24 Friday we started to realize there are securities
25 that we thought we were going to take delivery of

KING - HIGHLY-CONFIDENTIAL

1
2  that we haven't, and there were securities that we
3  have never seen before.
4      Q.   What happens when you -- is that early
5  in the morning Friday?
6      A.   We started to be aware of that early
7  in the morning Friday.
8      Q.   So take me through what happens.  I
9  assume you take that to someone's attention?
10     A.   Yes.
11     Q.   What happens in that regard?
12     A.   They say what -- so what do you want
13 to do, Stephen, and we start the process again,
14 which is OK, we have got a list of securities, do
15 we have a complete population -- bear in mind -- the
16 reality is, this was -- there was a tremendous
17 number of people that were involved in this,
18 because this was a -- you know, it had to be a
19 very sensibly and carefully risk managed process.
20 We couldn't eliminate the uncertainty associated
21 with prices, but we ought to be eliminating the
22 uncertainty associated with how we managed the
23 process.
24     So a lot of people involved, but the
25 Friday morning therefore we just started to do

KING - HIGHLY-CONFIDENTIAL

1
2  again what we had done the day before, how many of
3  the securities do we know?  Do we have a complete
4  population?  How do we categorize the securities
5  that we haven't seen before, what are they, and
6  actually less what do we think are they worth at
7  that point, because it doesn't matter.  More what
8  matters is what are they and how do we manage
9  them, and that's what we did on the Friday.
10     Q.   Can I ask you a question.  I think --
11 tell me if I am wrong.  I understood that there
12 was some kind of glitch in transferring the Fed
13 pool of securities to the repo to the tune of
14 about 7 billion dollars, and that Lehman, to make
15 up that shortfall, took a loan and put it into the
16 repo.  Is that your understanding?
17     MR. STERN:  Objection to the form.
18     A.   All I know is -- I reiterate the role
19 that we were playing.  The role that we were
20 playing is we are not operations people.  We are
21 traders and risk managers.  Our job was to assess
22 value and then manage the multitude of risks
23 associated with the acquisition of the assets.
24     I know by construction that there were
25 differences between what we thought we were going

Page 94

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    to be risk managing on the Thursday and what we
3    were actually risk managing on the Friday, and I
4    know that that is -- that there was 7 billion
5    dollars of supposed value, and I think they were
6    using -- I don't know what marks they were using,
7    but 7 billion dollars that had been substituted
8    for cash, which therefore cash doesn't -- nice
9    thing about cash, you don't have to risk manage
10   it, or at least we didn't think so.
11       Q.    I would assume so.
12           MR. STERN:  Turns out you did.
13       A.    Turns out we did.  Cash is supposed to
14   be cash.
15           And then in addition to that -- so
16   there was a -- there were less secure -- rather
17   than -- and I'm using these numbers just to try to
18   indicate population as opposed to the accuracy of
19   the numbers.
20           So that we had anticipated that at JP
21   marks, that there was a population that JP
22   assessed as being worth 49.7 of securities, that
23   actually that was 42.7.  Therefore -- and there
24   was 7 billion of cash.
25           In addition, though, within the

Page 95

1    KING - HIGHLY-CONFIDENTIAL
2    securities, they were not the same population.  So
3    it wasn't even that it was just a subset of the
4    original population, the Thursday population, it
5    was a subset of the original population plus about
6    10 billion dollars of stuff that we had never seen
7    before.
8        Q.    That's where I was leading with the
9    question.  In other words, the difference that you
10   saw between what you expected and what you
11   received is both in the size of the pool as well
12   as the composition of part of the pool?
13       A.    Correct.  There was approximately --
14   again I am using these numbers, using -- by
15   reference to the JP marks, not my assessment of
16   value or what we were ultimately able to sell them
17   for.  There was something like 49 -- we thought
18   that there was going to be something like 49, a
19   population that JP would mark at 49.7.  There
20   actually was only about 32 billion dollars of that
21   population was delivered.
22           Then there was 7 billion of cash or
23   cash that -- you know, cash was cash, and then
24   there was 10 billion dollars, and now -- for which
25   we didn't have any equivalent JP valuations, but

Page 96

1    KING - HIGHLY-CONFIDENTIAL
2    that once they arrived at BoNY, which was our
3    custodian, BoNY assessed as having marks in total
4    of about 10 billion dollars, and that portfolio we
5    had not seen before.
6        Q.    What did you do with respect to that
7    portfolio and the BoNY ones?
8        A.    The exact same as we had done with all
9    the preceding lists of securities.  We tried to
10   assess had we got the entire population.
11           Bear in mind, the reason we do that,
12   there is no point in risk managing something if it
13   isn't what you actually own.  So it has to start
14   with do I really own this.  We spent a tremendous
15   amount of time focusing on do I have this, is this
16   a population, categorizing the population, because
17   now all we have got is a list of CUSIPs, so you
18   have to get from CUSIPs to a description of the
19   asset by name, by asset type, then to break it out
20   into asset types, and then to assess what we think
21   its risk is and what its value ought to be.
22       Q.    And so that's a process you started
23   with respect to this 10 billion dollars --
24       A.    On that Friday morning.
25       Q.    -- on that Friday.  Did you come to a

Page 97

1    KING - HIGHLY-CONFIDENTIAL
2    conclusion on that Friday or when?
3        A.    I think one thing that's also worth
4    pointing out, the idea of a conclusion suggests
5    finality.  We had -- and I don't think we -- the
6    conclusion probably should be the date on which
7    ultimately it was sold, and stuff took a year to
8    sell.
9            On that Friday, yes, we did start to
10   think that we had a list of all the securities
11   that were delivered.  That took time.  And we
12   started to estimate our own -- you know, Barclays'
13   trading desk values for them in -- you know, in
14   the environment that we were in, and the risk.
15       Q.    And did you come to any interim
16   assessments on that Friday?
17       A.    Yes, yes.
18       Q.    What did you assess on that Friday?
19       A.    In relation to -- I don't really
20   remember too much on that Friday about the
21   valuations, because we were very focused on the
22   risk.
23       Q.    OK.  Would you have the same answer if
24   I said over the weekend?
25       A.    Yeah.  I mean over -- no, over the

Page 98

KING - HIGHLY-CONFIDENTIAL

1  weekend, then it started to change.  The -- we
2  were, you know, reassess -- we -- between then
3  and the end of the year, end of the financial
4  year, we were constantly reassessing what we
5  thought was the value of the securities.
6       So you're right, over the weekend we
7  started to revert back to what do we think the --
8  what number are we going to use as a -- when
9  management is asking me, well, Stephen, what did
10  we take delivery of, they would like an answer and
11  they would like it now, not a better answer in
12  three weeks' time.  So we had to come up with
13  something.  But that was a crude response.
14       And in some respects it didn't really
15  matter to what we were doing, "we" being my desk,
16  because what really mattered is, do we have the
17  population and what is the risk of it.
18       I know that obviously some of the
19  valuation work we were doing would then be feeding
20  back into the negotiations that other parties were
21  having about a deal with Lehman, but it actually
22  wasn't very germane to what we ourselves were
23  doing.
24       Q.   I think I understand that.

Page 99

KING - HIGHLY-CONFIDENTIAL

1       You have mentioned two different --
2  this is Friday now.  You mentioned two different
3  sets.  One is 32 billion dollars worth of
4  securities which had JP marks on them, and the
5  other is this 10 billion dollars of securities
6  that you had never seen before which had BoNY
7  marks on them.
8       A.   BoNY marks on it.
9       Q.   Is this assessment that you are doing
10  over that weekend primarily focused on the 10
11  billion dollar pool?
12       A.   No, everything.
13       Q.   Are you coming to some interim
14  conclusions during that weekend about the marks?
15       A.   Yes.
16       Q.   And what are you finding out that
17  weekend?
18       A.   I don't really -- the one thing that I
19  remember is saying that I felt that the cumulative
20  amount of securities and cash that we had received
21  in an orderly disposal, in just a fire sale,
22  we couldn't just sell -- we couldn't say let's
23  sell these over the weekend and then we are done
24  by Monday.

Page 100

KING - HIGHLY-CONFIDENTIAL

1       The -- there was -- the loan was
2  adequately collateralized.  And that I remember.
3       Q.   And you told that to your supervisors
4  or whoever was asking?
5       A.   Yes, yeah, yeah.  And then on the
6  Friday we started to hedge.
7       Q.   You started to hedge both the 32
8  billion pool and the 10 billion?
9       A.   We didn't differentiate.  We really
10  didn't start talking too much about what we had
11  received.  Much of the discussion about what we
12  had received versus hadn't received really didn't
13  go on until later on.
14       We only really cared about what
15  would -- you know, the cumulative amount of what
16  we had received.
17       Q.   Later on meaning after the weekend?
18       A.   Yeah, weeks later.
19       Q.   So did you have any discussions over
20  that weekend with Lehman or did anyone from
21  Barclays have discussions with Lehman as to, in
22  words or substance, hey, how come we got
23  10 billion dollars of securities we weren't
24  expecting?

Page 101

KING - HIGHLY-CONFIDENTIAL

1       A.   I know there were discussions, both
2  with JP and Lehman.  We weren't -- my desk weren't
3  part of those discussions.
4       Q.   All right.  Do you have any
5  understanding of what happened in those
6  discussions?
7       A.   In relation to what?
8       Q.   Well, do you have any -- someone from
9  Barclays said words to that effect to Lehman,
10  right?
11       A.   Or to JP.  I don't know -- the deck
12  securities had come from JP.  So why -- so -- all
13  we cared about, why have we not got the same
14  population that the Fed thought it had the night
15  before?
16       Q.   You are comparing what you got on
17  Thursday night and Friday to the population that
18  you had spreadsheets about what was previously
19  comprised of the Fed pool?
20       A.   Yes.
21       Q.   And there was a difference in about
22  10 billion dollars worth of those securities?
23       A.   17 or so billion, because there is
24  some missing, 7, and then the 10, and using those

Page 102

```
 1          KING - HIGHLY-CONFIDENTIAL
 2   JP or combination of JP and BoNY numbers.  But we
 3   weren't ever part of the conversations about what
 4   had happened and why it had happened.
 5       Q.   OK.  Just so I am clear, you had a
 6   pool of some close to 50 billion dollars of marked
 7   securities for the Fed.  What you get on Thursday
 8   night or Friday is about 7 billion in cash,
 9   32 billion with -- that had been in that pool, and
10   about 10 billion of new securities; is that right?
11   Am I understanding the groups now?
12          MR. STERN:  Can I hear the question,
13   the question back.
14          MR. HINE:  Let me try again.  It was a
15   long convoluted question.
16       Q.   You previously had a list or some kind
17   of data that showed about 50 billion dollars worth
18   of assets in the Fed pool, correct?
19          MR. STERN:  Objection to the form.
20       A.   Well, the -- we had a population of
21   securities which we were expecting to take
22   delivery of which we understood was supporting a
23   Fed facility.
24       Q.   And that -- I'm just trying to -- I am
25   drawing a Venn diagram in my head.  I want to see
```

Page 103

```
 1          KING - HIGHLY-CONFIDENTIAL
 2   how what you expected to be in the Fed facility
 3   compared to what you ultimately received.
 4       A.   Right.
 5       Q.   As I understand your testimony, tell
 6   me if I am wrong, it is about 32 billion dollars
 7   of what you ultimately did receive had previously
 8   been in the Fed facility, to your understanding;
 9   is that right?
10          MR. STERN:  Objection to the form.
11       A.   Unfortunately what we are having to do
12   is to use -- because we couldn't -- when we are
13   talking about the population, we can't describe --
14   between you and I, we can't discuss CUSIPs and we
15   can't discuss asset types, so we are ending up
16   using JP Morgan numbers to describe populations.
17          So I'm just being a little bit
18   cautious about the fact when you say 32 billion,
19   that 32 billion dollars is just the sum of the JP
20   Morgan marks at a particular time.
21       Q.   Right, right.
22       A.   That was probably a different time to
23   the time of the 49 billion dollars worth of
24   JP Morgan prices on securities that we thought to
25   take delivery of.  So I am just being particular
```

Page 104

```
 1          KING - HIGHLY-CONFIDENTIAL
 2   about that.
 3          Are we saying that they are of a
 4   population that JP Morgan at some point had marked
 5   at 49.7, I seem to remember, did we take delivery
 6   of a subset of that, using your Venn diagram, that
 7   JP Morgan had assessed at about the time of the
 8   settlement as 32 billion dollars, yes.
 9       Q.   And in addition, you took delivery of
10   a pool that BoNY had assessed at about 10 billion
11   dollars of new securities that were not part of
12   the Fed pool?
13       A.   Yes, yeah.
14          MR. STERN:  Objection to the form.
15   Can I hear the question again.
16          (Record read)
17          MR. STERN:  You can answer that.
18       A.   Yeah, I think that's right.  I also
19   don't know -- when I come to think about it, I
20   don't even know whether the 32 -- I think the 32
21   that you are referring to probably was -- we had a
22   list of securities that from a number of days
23   before we had JP Morgan's -- bear in mind, the
24   moment that the securities moved from JP as
25   custodian to BoNY as custodian, they are not
```

Page 105

```
 1          KING - HIGHLY-CONFIDENTIAL
 2   then -- the availability of the marks by the
 3   previous custodian at that moment are not
 4   available.
 5          So it may be even that the 32 billion
 6   dollars is actually BoNY as opposed to the
 7   original JP.  I think it was the mark -- it was
 8   the sum of the marks that JP had put on the
 9   portfolio the last time JP had provided it.
10       Q.   OK.
11       A.   Then there was a population of
12   securities which then BoNY provided, because BoNY
13   provided custodial marks.  We actually used to
14   call them custodial, although that's a desk
15   colloquial term.  The custodial marks provided by
16   BoNY on the population we hadn't seen before was
17   approximately 10 billion dollars.
18          (Exhibit 389-B, document Bates stamped
19   BCI-EX-S 75200 through 201 marked for
20   identification, as of this date.)
21       Q.   Mr. King, handing you a copy of a
22   document marked as Exhibit 389-B, which is Bates
23   stamped BCI-EX-S 00075200 through 201.  Please
24   take a minute, and I will have a few questions
25   about this.
```

Page 110

KING - HIGHLY-CONFIDENTIAL

```
 1              KING - HIGHLY-CONFIDENTIAL
 2    that means?
 3        A.   Right.  So I'm not sure where this --
 4    this may have actually -- I think -- there were
 5    two -- you mentioned that there were -- there
 6    was -- there is sort of multiple tracks that may
 7    have been going on simultaneously here.  We
 8    were -- my desk was focused on what assets do we
 9    have, what do we think we can recover from them,
10    in valuation, you know, in liquidation valuation,
11    and how do we risk manage them.
12            There also was a formal process of how
13    do we and how do Barclays and Lehman mark the
14    books and records, the securities.
15            I don't even know whether this was
16    something that was Lehman asking Lehman people to
17    mark their securities or Barclays asking Lehman
18    people to mark their securities or for what
19    purpose it was.
20            Bear in mind, traders were supposed to
21    still be sitting in their seats of a nonbankrupt
22    entity on the Friday marking their books.  They
23    still had a -- they worked for a broker dealer.
24    They have long risk positions.  They have an
25    obligation to mark every day.
```

Page 111

KING - HIGHLY-CONFIDENTIAL

```
 1              KING - HIGHLY-CONFIDENTIAL
 2        Q.   Well, Lehman, LBI declared bankruptcy
 3    on that Friday, right?
 4        A.   Maybe that was it.  Was it on the
 5    Friday?
 6            MR. STERN:  The 19th?
 7        A.   OK.  I don't know.  Maybe that was on
 8    the Thursday -- I don't know the timing of this
 9    particularly, but the -- presumably there was -- I
10    could see that they -- the traders had to mark
11    certain things.
12            I think this, David's involvement here
13    is because we would like to have a mark on what we
14    have just taken delivery of, because all we have
15    got is a list of securities, and what was clear,
16    it is not clear from this e-mail, is that some of
17    the securities at the BoNY marks were atrociously
18    mismarked.  So you need a trader.
19            Most price testing functions work
20    extremely hard.  Price testing functions meaning
21    groups.  We have a price testing group within
22    Barclays.  There is a price testing group within
23    Lehman.  BoNY and JP as custodians need to try to
24    come up with prices for thousands and thousands
25    and thousands of securities every day.  So they
```

Page 112

KING - HIGHLY-CONFIDENTIAL

```
 1              KING - HIGHLY-CONFIDENTIAL
 2    have to do it in some kind of batch way.  So they
 3    come up with heuristics by which they mark things,
 4    because otherwise how could you do it?
 5            But that's not the same as where a
 6    trader on a minute, who sat in his seat, talks to
 7    other traders and says, I would be willing to
 8    trade.  It is supposed to be a pretty good guess,
 9    but it is never perfect.
10            And in between the bankruptcy of LBH
11    and bankruptcy of LBI, it was -- you know, it
12    is -- the tracking error of that kind of exposure
13    is bound to be big.  So as soon as we have taken
14    delivery, it is great -- at least we had got
15    BoNY's assessment of where they thought they would
16    be willing to advance against -- bear in mind, the
17    other thing about the BoNY and JP marks is that
18    the Fed was using -- what the Fed does when it
19    takes those marks is -- I can't remember the
20    advance rates.  I learned them later on.
21            But when the Fed lends, if you looked,
22    went to the Fed's website and looked at the
23    advance rates of the securities, what it does is,
24    it says, we will assess a value of security at
25    some mark that the custodian has provided us, and
```

Page 113

KING - HIGHLY-CONFIDENTIAL

```
 1              KING - HIGHLY-CONFIDENTIAL
 2    then we will advance less than that as the loan.
 3            So for example, for mortgage-backed
 4    securities that might only be 50 percent of the
 5    supposed mark.  So they are not as worried, and in
 6    normal market conditions that's supposed to be
 7    fine.  They are not actually as worried that they
 8    have got the mark perfect, because they are only
 9    lending 50 cents on the dollar, or on equities,
10    for example, I think they lend 90 cents on the
11    dollar.  For agencies maybe they lend 80 cents on
12    the dollar.
13            So they are saying, I think I have got
14    this, I know statistically I must have some error
15    on it, but I am only lending 80.  Whereas the
16    trader when he trades, he is trading there, and he
17    is exposed to the first dollar of mispricing, not
18    the dollar after the haircut.  So they have very
19    different tolerances for error.
20            So this, on that Friday morning what I
21    asked David to do, let's see if we can get an
22    assessment as quickly as possible of the -- what
23    the things we haven't seen before are worth, and
24    it may have been, I don't remember, also the
25    stuff, what we long today, worth today, not
```

Page 114

KING - HIGHLY-CONFIDENTIAL

1
2  yesterday, because that also is different.
3            And what he is highlighting is that
4  there are -- in the first paragraph he highlights
5  that of course the Lehman guys hadn't actually got
6  in their inventory the list of securities that
7  were part of the repo.  Because of the
8  intercreditor relationships between the various
9  Lehman Brothers entities, it wasn't necessarily
10 the case that everything that was in the repo
11 facility was also on the Lehman balance sheet,
12 Lehman Brothers, LBI balance sheet.
13            And in the second paragraph it also
14 has -- there must have been a separate
15 conversation going on.  There is a typo in there,
16 actually, but it says, "an orderly liquidation
17 mark."  Notice the use of the term "orderly
18 liquidation mark," not liquidation today mark.
19 Because we couldn't -- that would have been
20 50 cents on -- that would have been who knows, but
21 20 billion dollars.  There just could be no bid.
22 There was no bid for any of this on this date.
23            And the second is a typo in there.  It
24 says "at a bin in comp."  That should be "a bid in
25 comp mark."  That was presumably supposed to be

Page 115

KING - HIGHLY-CONFIDENTIAL

1
2  more of an assessment of, you know, if you had
3  to -- if you were willing to buy it today, where
4  would you buy it.
5            So they are being asked to provide an
6  assessment of both.  But that wasn't for us.
7     Q.   "It wasn't for us" meaning --
8     A.   It wasn't for my group.  That might
9  have been for Lehman, it might have been for --
10    Q.   So is your group, this whole -- I
11 understand you to be saying that your group was
12 focused on getting the population that we had been
13 provided, at least an accurate assessment of what
14 we got?
15    A.   Yes, yes.
16    Q.   Was there another group focused on how
17 to mark them price-wise?  Or how to book them into
18 Lehman's system -- I mean Barclays' system?
19    A.   No.  Not -- not that part, but product
20 control -- and -- I'm trying -- I was trying to
21 explain what I do know about this e-mail and about
22 things that happened on the Friday.  So hopefully
23 I have answered that question.
24    Q.   Yeah.
25    A.   This feels like a different question,

Page 116

KING - HIGHLY-CONFIDENTIAL

1
2  which is was there another group that was also
3  marking securities.  Is that right?
4            MR. STERN:  I think what Bill wants to
5  know is, who was involved in the booking of
6  the securities and ultimately marking them
7  on the Barclays side.
8     A.   As a formal matter, it is always the
9  trader's responsibility to mark a book.  As a
10 practical matter then, there are price testing
11 groups that are within that product control group,
12 PCG function, that have a responsibility to assess
13 whether the traders have marked their books
14 correctly, and they can ask them to revisit their
15 marking and remark them.
16    Q.   OK.
17    A.   That's the logic of the trader and the
18 control function.
19    Q.   OK.
20    A.   So that would have been -- that at
21 some point -- I don't know whether it was
22 happening on the Friday.  At some point that would
23 have had to have happened.
24            In addition, Barclays would have to
25 construct the balance sheet, an acquisition

Page 117

KING - HIGHLY-CONFIDENTIAL

1
2  balance sheet that represented what it had
3  ultimately purchased by way of this transaction.
4  That again would be a finance -- it is finance's
5  responsibility, not the desk's responsibility, to
6  produce balance sheets.
7            Therefore, finance would have to make
8  a determination of what it thought was the
9  appropriately price tested valuation for the
10 securities that were acquired on the acquisition
11 date.
12    Q.   OK.
13    A.   That didn't really happen.  That
14 happened over a very long period of time.  So
15 hopefully that answers that second question.
16    Q.   It does.
17            The finance function and the
18 preparation of the balance sheet I take it is in
19 the finance department, not in the PMTG
20 department; is that right?
21    A.   That's right.  Under normal
22 circumstances, if everything worked well, traders
23 would mark their books.  Those marks would be
24 picked up by systems -- the same for Barclays as
25 any other bank.  Those marks would be picked up in

Page 126

KING - HIGHLY-CONFIDENTIAL

1    transaction, as I said, was not in isolation of
2    the fact that we were acquiring, you know, other
3    things.
4        So I never really think of them as
5    separate. I thought of it as being Barclays is
6    having to put money out of the door against what I
7    know is a portfolio of assets that have an
8    estimated value that hopefully is more than the
9    loan, but that doesn't look like a very good
10   trade. So therefore, there has to be other stuff
11   that's going on.
12       But that's not part of our
13   responsibility.
14   Q.   I guess this is what I am driving at.
15   You told me before that on that Friday, you
16   received 10 -- assets marked at 10 billion dollars
17   that you hadn't expected?
18   A.   Yes.
19   Q.   Is the additional assets that Lehman
20   provides over that weekend the result of Barclays'
21   dissatisfaction with the securities it had been
22   provided under the repo?
23   A.   I don't know. Not to -- no, I
24   think -- no, not to the best of my knowledge. It

Page 127

KING - HIGHLY-CONFIDENTIAL

1    was -- no, not to the -- I think it was another
2    list -- to us, it was another list of securities
3    that was part of -- I mean, I think by the Friday,
4    it must be the case that I had seen the draft of
5    the asset purchase agreement, so I -- you know, I
6    knew that there was a list of these securities
7    that were in this repo facility, but there were
8    lots of other things that were subject to the
9    purchase agreement as well.
10       So the fact that from time to time
11   somebody would ask us, by the way, also there are
12   these other things that look like things, Stephen,
13   that you would be able to put an estimate of value
14   on, and ultimately you will end up risk managing,
15   that would come to me. Then I would respond to
16   them, and I would assume that this was part of
17   something that was a -- the repo transaction was
18   just a subset of a liability and an asset that
19   makes up the larger transaction.
20       Obviously later on, I saw the
21   acquisition balance sheets and things, so I could
22   see that there were those pieces. So none of that
23   was a surprise to me. But I wasn't part of the
24   conversations.

Page 128

KING - HIGHLY-CONFIDENTIAL

1    Q.   OK, very good.
2        MR. STERN:  Should we take a quick
3    lunch break?
4        MR. HINE:  Sure. Let's go off the
5    record.
6        (Recess)

Page 129

KING - HIGHLY-CONFIDENTIAL
AFTERNOON SESSION
1:14 p.m.

1    BY MR. HINE:
2    Q.   Good afternoon, Mr. King. I wanted to
3    go over a few documents with you based on some of
4    the things you have already talked about, but I
5    did want to start off with two topics.
6        First is the -- you have described how
7    you received a bunch of assets through Lehman
8    transactions on Friday, and then later on you
9    received additional assets.
10       Eventually, these assets get booked
11   into Barclays' system, and is it correct that
12   Barclays intended to conduct an orderly
13   liquidation of those assets over time?
14   A.   On the -- it wasn't until later that
15   we concluded that that's what we would do or how
16   we would do it.
17   Q.   Do you know how much later? Do you
18   have a time frame in mind?
19   A.   Days and weeks and -- days and weeks.
20   Q.   Is it fair to say probably sometime
21   before the end of September of '08?
22   A.   We had been -- we had already disposed

1          KING - HIGHLY-CONFIDENTIAL
2    of some by the end of September.  Prior to the
3    19th, it had been -- my expectation and
4    understanding was that we would -- there were
5    going to be a number of teams that were coming in
6    from Lehman that would be integrated with the
7    relevant Barclays team.
8              There was work that was going on -- it
9    was a very fluid environment, very, very fluid
10   environment.  There was work that was going on in
11   the front office trading teams to interview and
12   integrate people, and it was our working
13   assumption -- this is only really coming into play
14   in the middle of that week -- that we would
15   facilitate the booking and on boarding of the
16   assets, and then we would be pushing them back
17   into the relevant trading teams.
18             And at various times, the expression,
19   you know, well, these are the guys that are going
20   to be managing the assets, was used to refer to
21   the Lehman people or the Barclays people.  They
22   would go to a desk.
23             As it transpired, as we went through
24   the following days and weeks, we started to
25   conclude that markets were much, much more broken

1          KING - HIGHLY-CONFIDENTIAL
2    at a very, very fundamental level than we had
3    really anticipated.  And "we" being I think -- I'm
4    not even talking about my group or Barclays, but
5    "we" meaning financial markets and the general
6    public at large hadn't quite realized how broken
7    it was.
8              And we, very close to what was
9    happening at Lehman, could see that some things
10   are irreparably damaged here, and the ability to
11   unwind quickly some of these assets is going to be
12   very, very difficult.
13             And at that point I suggested, and
14   this was then subsequently taken up, that rather
15   than just push the assets back into the trading
16   desks, even with segregated books in the trading
17   desks, that we ought to manage them at a more
18   coordinated -- in a more coordinated and central
19   way and liquidate them in a more orderly fashion.
20             But that really was not -- and you may
21   remember I said earlier on that my -- our group,
22   my group PMTG changed at some point around the
23   time.  We actually brought additional resources
24   into PMTG to facilitate that and took some
25   responsibility for liquidating of the assets over

1          KING - HIGHLY-CONFIDENTIAL
2    and above the assets that we were originally
3    managing.
4              So there was a bit of a change in
5    plan, you know.  There wasn't much of a plan, but
6    the understanding changed over those -- over about
7    ten days or so.
8         Q.   So the assets that you received from
9    Lehman in different tranches never were parceled
10   out to the trading desks?
11        A.   They were parceled out -- some of
12   them, they were parceled out so that the trading
13   desks could originally review them.  We further
14   refined that to say certain of the assets will be
15   parceled out and managed by the respective trading
16   desk and some of them won't be.
17             So it is a -- it is not as simple and
18   straightforward a division as all assets were
19   handed down to the respective trading desks.  Some
20   of them were.  Some of them we sold to the
21   respective trading desks so they could go out and
22   sell them as quickly as possible.
23             Otherwise, PMTG retained the risk
24   management responsibility but was facilitated by
25   the respective trading desk in the liquidation,

1          KING - HIGHLY-CONFIDENTIAL
2    and others we just kept and managed within our
3    group and brought additional resources in to
4    facilitate the management.
5              So there was three categories.
6         Q.   When you say facilitate the
7    management, meaning your group liquidated --
8         A.   Managed and liquidated it.
9         Q.   So has this orderly liquidation now
10   been completed?
11        A.   No.  I think also to suggest --
12   "orderly liquidation" to me tends to convey -- it
13   is a term that's often used when trying to
14   describe how -- what type of valuation you would
15   attribute to a particular asset.  I don't think
16   anyone ever used the term "orderly liquidation" to
17   describe particularly what we were doing.  It was
18   liquidation.
19        Q.   OK, fair enough.  I think I was using
20   it because I saw it in one of the documents here.
21             But you say sometime in September the
22   approach changed.  Is the approach still to this
23   day to liquidate all the assets that were acquired
24   by Lehman or just select types of assets or
25   categories?

Page 134

KING - HIGHLY-CONFIDENTIAL

1
2    A.    It was, it was never -- it was never
3    described to me that the intention was to retain
4    for longer than was necessary or sensible any of
5    the assets.
6    Q.    So is there a way to assess now,
7    several months later, whether Barclays made money
8    on this pool of assets it received from Lehman?
9    A.    We made -- some assets were sold at or
10   above their marks, and many of them were sold
11   below, and many of them are still there.
12   Q.    Let me ask it differently.  Has
13   Barclays undertaken some kind of after-action
14   assessment or any kind of assessment or review to
15   see if, in fact, they made money on the securities
16   and other assets that they acquired from Lehman?
17   A.    No.
18   Q.    You have never seen any reports to
19   that effect or any kind of spreadsheets to that
20   effect?
21   A.    At various times, at various times,
22   more for management reporting purposes I think
23   than financial reporting purposes, we, my group or
24   Barclays had -- product control has attempted to
25   describe how much money was made or lost over a

Page 135

KING - HIGHLY-CONFIDENTIAL

1
2    period of time on certain aspects -- certain
3    assets.
4    A -- I think it was included, I think
5    it was included in a footnote to the year-end
6    financial statement, is the acquisition balance
7    sheet for Lehman.  I don't remember whether it was
8    actually published or whether I just saw it and it
9    was somehow integrated into it.  I think it was
10   published.
11   You know, that report is a negative
12   goodwill number, is purportedly a profit of the
13   acquisition, but it includes many things that are
14   nothing to do with the assets that we have talked
15   about here because it includes items such as
16   goodwill, real estate, receivables, et cetera.
17   So there was -- there is a statement
18   there about supposedly some number that is
19   attached to the profitability.  But I think of
20   that as an accounting requirement report for
21   financial reporting purposes of the transaction.
22   But that describes the valuation of
23   the securities according to a set of rules that
24   are influenced by accounting guidelines and rules
25   on a particular day.  And I think the date that

Page 136

KING - HIGHLY-CONFIDENTIAL

1
2    was picked was the 22nd.
3    And a very sophisticated set of rules
4    were developed over the subsequent months that
5    would guide PWC and Barclays' product control and
6    finance to be able to be comfortable that it had
7    adequately come up with an asset value for these
8    assets and for other things that were -- so
9    including certain contingent claims that were
10   going to be included on the balance sheet.
11   But it doesn't say anything there
12   about how much profit or loss was made on those
13   assets after that date, and it is an incredibly
14   difficult exercise to actually aggregate all of
15   that because of the three different areas that I
16   described to you that the assets ended up.
17   Some assets were sold to traders and
18   then they subsequently sold them.  So there is a
19   P&L item, if you like, that turns up in the
20   negative goodwill that's on that acquisition
21   balance sheet.  There is a P&L that we experienced
22   between what was the price that PMTG seemed to
23   acquire the assets and where it sold them to the
24   desks, and then there is another item where the
25   desk sold it to the street and there are gains and

Page 137

KING - HIGHLY-CONFIDENTIAL

1
2    losses on the various hedges, and I'm using that
3    word in the way you were using "hedges," the
4    various instruments that were used to try to risk
5    manage while the assets were in situ in the P&L.
6    There is the gains and losses on those.
7    So I have never seen a number which
8    says how much did we make.
9    Q.    I think I understand what you are
10   saying, but the disclosure that was made in the
11   financial statement is a snapshot of the gain on
12   acquisition, right?  It doesn't even purport to
13   cover gains that might have taken place later as
14   to those securities?
15   A.    Or losses, more importantly losses,
16   right.
17   Q.    So my question is, I see the snapshot
18   of the gain on acquisition of about 4.2 billion
19   dollars.  Has Barclays undertaken any efforts
20   after that to assess what we are talking about,
21   the possibility that it gained or lost on all the
22   securities it acquired?
23   A.    Not in an isolated way.  Clearly, all
24   those gains and losses are part of the normal P&L
25   that all of the desks report, but there isn't a

KING - HIGHLY-CONFIDENTIAL

1   line item --
2   Q.   OK.
3   A.   -- that says P&L related to Lehman
4   securities.
5   Q.   I understand that.  I was just -- as a
6   layman, outside the organization, I would think
7   someone would have said, hey, did we make any
8   money on that pool of securities we bought last
9   year?
10  A.   There is certainly -- people
11  frequently asked, but it is not easy to answer
12  because -- and it is a tremendous amount of work,
13  so no one bothered to answer it.
14  Q.   Just to trace them in all the places
15  they went?
16  A.   Trace them, and there were some
17  aspects of it that had to be done so there was
18  adequate reporting in trading statements and
19  year-end statements and things, but -- and I don't
20  think it is ever, you know, that -- the
21  acquisition gain that you are referring to doesn't
22  ascribe gains or losses on the securities.  It
23  just talks about on everything that was subject
24  to -- was either -- just the difference between


KING - HIGHLY-CONFIDENTIAL

1   the assumed assets and liabilities of the
2   transaction.
3   Q.   Were you involved in helping provide
4   information that would go into the assessment of
5   that initial gain on acquisition?
6   A.   Yeah, once again we could -- the
7   estimated values for the securities was provided
8   by my desk to finance.
9   Q.   And you mentioned some stringent rules
10  that were applied in that regard?
11  A.   That's somewhat after the fact.  As I
12  described it, you know, it is not exactly a
13  normal -- as much as possible Barclays, given the
14  environment we were in, was attempting to follow
15  as many of the normal rules and procedures that it
16  would do for an acquisition, even though this one
17  was obviously extremely large.
18  So, you know, initial estimates of
19  what that balance sheet would have looked like
20  were on -- in relation to the securities, were
21  derived from my desk's estimates, where they were
22  available, of the values for the securities.
23  With time, obviously the individual
24  desks that were receiving the assets marked the

KING - HIGHLY-CONFIDENTIAL

2   assets.  I don't think we -- I don't think we ever
3   went back to remark -- we didn't really -- my desk
4   didn't really care very much about what the mark
5   was on the 19th in many respects.  We cared about
6   what it was for a certain date that we took a
7   snapshot, so that we could report day two P&L, or
8   day one P&L, day two P&L, day two P&L being
9   everything after -- all the P&L associated with
10  the assets after they have been booked.
11  So we cared about a particular
12  snapshot, and I think we took a number that was
13  closer to -- a date that was closer to the end of
14  the month for that purpose.  End of September.
15  And then we looked at P&L changes from that date
16  on individual line items.  Not aggregate but just
17  individual line items.
18  Q.   That was your best estimate at the
19  time --
20  A.   At that time, and then that continued
21  to be refined as we found out more about the
22  securities or passed them out to the respective
23  desks or sold them or what have you.
24  Q.   Sure.  But for financial reporting
25  purposes, that was your best estimate at that

KING - HIGHLY-CONFIDENTIAL

2   time?
3   A.   That was the best estimate.  We
4   provided the best estimate, and then product
5   control started to -- as things started to
6   stabilize, product control took over its normal
7   process about starting to think about how it would
8   prepare its financial statements, and then
9   therefore, obviously our information was an input
10  to that, but it was only an input, and they used
11  multiple sources, I think, to construct the
12  assumed valuations for the 19th.
13  (Exhibit 390-B, document Bates stamped
14  BCI-EX-S 52667 through 68 with attachment
15  marked for identification, as of this date.)
16  Q.   Mr. King, handing you a copy of a
17  document marked as Exhibit 390-B, which has Bates
18  ranges BCI-EX-S 00052667 through 668, and then
19  there is an attachment which is produced in native
20  form which we have attached to the exhibit.
21  It is a Monday, September 22nd e-mail
22  entitled "Long Island Draft Balance Sheet/Goodwill
23  Calc."  Do you see that?
24  A.   Um-hm.
25  Q.   After you have had a moment to review

Page 142

KING - HIGHLY-CONFIDENTIAL

1
2   it, I would like to ask you a question about it.
3        MR. STERN:  Have you read the e-mail?
4        THE WITNESS:  Yeah, I will come back
5   to that in one second.
6        A.   Yes.
7        Q.    My question is, do you see the entry
8   on the first covering e-mail -- I understand that
9   you are not a party to that e-mail, but it is
10  discussing the acquisition balance sheet, and the
11  fourth bullet down refers to the "2.83B valuation
12  adjustment is S. King's first cut only."  Do you
13  see that?
14       A.   Yes.
15       Q.    And if we refer to the last page of
16  the document, I see an entry for 2.83 billion.  Do
17  you know what -- is that the 2.83 adjustment,
18  first-cut adjustment that the e-mail is talking
19  about?
20       A.   Yes.
21       Q.   Do you know what -- can you explain to
22  me what that valuation adjustment is?
23       A.   Yes.  It is linked to your previous
24  questions.  There has to be -- and this changed
25  over time.  There has to be -- this concept, and

Page 143

KING - HIGHLY-CONFIDENTIAL

1
2   we have touched on it a few times during the --
3   through the course of the conversations, of there
4   being a value, a valuation, seems to imply that
5   there is a single price, but of course that isn't
6   actually the case.
7        When you are referring to orderly
8   liquidation -- for example, I think the e-mail
9   that we had in front of us earlier was that the
10  CMO guys told me he was told to give two months
11  orderly liquidation in the bid in comp.  So there
12  he has used -- you can see he is being given an
13  instruction.  That is actually a quite formal
14  instruction.
15       An orderly liquidation mark is
16  something that people understand to mean -- that
17  was on Exhibit 389-B.  That was something that
18  people sort of understand to mean if there is --
19  sometimes we come into work in the mornings and we
20  get a phone call saying, will you bid on the
21  following.  And if we have got enough capital and
22  we feel like doing it, then we may say yes, and
23  the guy may want to sell us the stuff for
24  30 million dollars and we may bid 10.  And if he
25  really needs a bid, then he will hit our 10.

Page 144

KING - HIGHLY-CONFIDENTIAL

1
2        I wouldn't describe that as an orderly
3   liquidation.  And in fact, we have seen a lot of
4   that during the course of the last two years, of
5   course, as so many counterparties have defaulted
6   on obligations and their assets have been seized
7   and liquidated.
8        Under normal circumstances it is not a
9   straightforward process.  In marking our books, we
10  have to try to assess whether or not we are
11  supposed to use those pricing points in marking
12  assets.
13       They are clearly actually where
14  something just traded.  Something was sold from
15  one party to another party at that price.
16  Somebody was willing to trade.  But they weren't
17  really willing to trade -- it wasn't particularly
18  by design that they traded there, they had to
19  trade, it was sold.  Maybe it was seized and sold
20  or they needed to sell it to create liquidity, but
21  it wasn't exactly orderly.
22       So on that page 389-B, where it says
23  "orderly liquidation mark and bidding comp,"
24  that's kind of -- it's trying to highlight there
25  really is a little bit of a difference between the

Page 145

KING - HIGHLY-CONFIDENTIAL

1
2   two of those.
3        We mostly mark our positions as if
4   there was an orderly disposal.  Not necessarily
5   that that's what we plan on doing with them.  We
6   might hold them, might sell them.  There is lots
7   of things we try to do, but we try to keep that
8   concept in mind.
9        At this stage, on Monday, the 22nd,
10  this balance sheet, the valuation adjustment was
11  equal to the difference between -- I think it was
12  the 45 point -- Thursday close.  The
13  45.18 billion, which is the Thursday -- this is
14  the inventory Thursday close, 45.18.  That would
15  have been, if memory serves, the BoNY marks for
16  the portfolio.
17       And -- there is a little bit of P&L in
18  here.  I think that is probably carried, and then
19  the valuation adjustment on this day, this isn't
20  necessarily on subsequent balance sheets, but on
21  this day would be equal to the difference between
22  the BoNY -- I think the BoNY marks and our current
23  best guess, based on everything that we have got
24  available to us, of the orderly liquidation mark.
25       So it is trying to get from one number

Page 146

KING - HIGHLY-CONFIDENTIAL

1
2  to another number.  With time, both of those, the
3  definitions of those were clarified, but that was
4  what this was on that date, and that's why Gary
5  refers to it as valuation adjustment, as S. King's
6  first cut only.
7          It is not an upper-case term,
8  valuation adjustment.  It was just a term that we
9  started to use to be the difference between where
10 there was some observable marks that could have
11 been the BoNY marks and where we were saying we
12 would probably book things.  Again, it was to try
13 to make the difference between the day one and day
14 two P&L.
15    Q.   This is Monday, the 22nd.  That's the
16 date on which the financial statement ultimately
17 says, let's report the acquisition as of on that
18 date, right?
19    A.   Yes.
20    Q.   If you look at 5, I don't know if that
21 helps in your answer.  I'm not sure you saw that.
22    A.   OK.
23    Q.   So that confirms that the --
24    A.   That's actually -- so we put that --
25 it is in there, initial estimate of the adjustment

Page 147

KING - HIGHLY-CONFIDENTIAL

1
2  to Barclays' marks, BoNY prices and Barclays'
3  marks.  That's precisely that.
4     Q.   The BoNY price of 45 billion is the
5  BoNY marks assessed on what pool of assets?
6     A.   What is -- I don't know if this is
7  clear on this.  It is just inventory on this day.
8     Q.   Maybe I could ask a clarifying
9  question while you look at that.
10         Is the 45 -- my question is, is the
11 45.18 the BoNY marks for the assets you received
12 from the repo, or does it also include other
13 assets that you received later?
14    A.   That's what I was just trying to
15 check.  There is a version of this where they are
16 separated.  But I don't think we were able to do
17 that as early as the 22nd.
18    Q.   That's the Monday following.
19    A.   Yeah.  Because I can only see one --
20 45.18 inventory, 15c3, financial assets.
21         Yes, I think it is 45.18.  It is just
22 whatever we -- at this point whatever we knew of.
23    Q.   If you read further down on that
24 column, you will see a reference to 15c3 assets,
25 so that's a separate asset that you received over

Page 148

KING - HIGHLY-CONFIDENTIAL

1
2  that weekend, correct?
3         MR. STERN:  Objection to the form.
4     Q.   If you can describe that, that's fine.
5     A.   On the 22nd, I wouldn't even have
6  known what 15c3 meant, and 15c3 asset wasn't -- is
7  not a security or anything that we -- it is just a
8  line item on here.  It is not an asset -- it is
9  not a tradable asset.
10    Q.   OK.  And the 7 billion in cash, is
11 that the -- in the next, next line item, 7 billion
12 in cash, is that the 7 billion that came over to
13 Barclays as a result of the repo transaction?
14         MR. STERN:  Objection to the form.
15         You can answer.
16    A.   The cash, the 7 billion was the cash
17 item on here.  Actually, I have seen -- obviously
18 I've seen this before and various subsequent
19 iterations of it.  But we didn't prepare this.
20 So --
21    Q.   "We" meaning --
22    A.   My desk.  So we didn't have any input
23 to anything that was -- you know, we would provide
24 Gary numbers, and we wouldn't have had any input
25 below inventory, because they are not securities.

Page 149

KING - HIGHLY-CONFIDENTIAL

1
2         Now, the 7 billion dollars is the
3  cash, but I know that the 7 billion dollars is the
4  cash that we thought we had in relation to the
5  nonsecurity-based collateral for the repo
6  facility.
7     Q.   If I look on here, I don't see --
8  well, could you tell me if there is any entry on
9  here that covers what we have been calling
10 unencumbered assets or the clearance box assets,
11 or have they not yet come over to Barclays?
12    A.   I -- as I say, there must be a hundred
13 of these balance sheets that were, you know, as
14 product control refined them.  I don't know how
15 many I have seen, but I've seen a few of them
16 between here and the end of the year.  This is an
17 early version of it.  And so you will have to
18 forgive me if I can't remember exactly the 45.18.
19         Inventory on the Friday morning, I
20 think from memory, is everything that we thought
21 we received at the -- by the date of -- by some
22 date on which we provided -- I don't know what
23 date -- I don't know what date Gary is producing
24 this, so it might have been this is from the
25 Friday numbers or Saturday numbers or Sunday

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    numbers.  It is probably not the Monday numbers,
3    because it is produced on Monday.  I suppose it is
4    produced late on Monday.
5         But it doesn't separate out the
6    unencumbered assets that we had already received
7    by that point.  It doesn't separate it out.  So I
8    think that everything that we had received to this
9    point was in that number.
10    Q.   Back to the 2.83 valuation adjustment.
11   How did you come up with that 2.83 number?  Is
12   that the top-down analysis we talked about
13   earlier?
14    A.   No.  We never came up, so we, my group
15   never came up with 2.83.  2.83 is a difference
16   between a set of marks and our marks.  So it is
17   not like I come up with -- it is not that I come
18   up with 2.83.  We would come up with on here 42.55
19   as a -- on the spreadsheet or the inventory, and
20   say we've marked all the individual line items,
21   and then product control will tell us at that --
22   based on all your individual marks or your best
23   estimate here -- I think by this date we were
24   still working on spreadsheets -- we estimate that
25   what we have got is worth 42 and a half billion

1    KING - HIGHLY-CONFIDENTIAL
2    dollars.
3         Then they would compare that to the
4    marks for some of the inventory at the BoNY marks,
5    and that's what that last paragraph says.  It said
6    the trades are initially booked at BoNY prices, so
7    no one is calculating the 2.83.  The 2.83 is the
8    difference between the BoNY marks and the desk
9    marks.
10    Q.   And the desk marks are -- Barclays is
11   going CUSIP by CUSIP and putting a mark in for --
12    A.   Where possible, yes.  Where possible.
13   And it is the best guess by the desk, by my desk
14   using input from as many other sources as we
15   possibly can of an orderly liquidation mark, not
16   where we would -- if we were to -- if we had
17   turned around and asked somebody to bid on this
18   day for 42 and a half billion dollars worth of
19   securities, it would have been 30-something
20   billion.
21    Q.   I understand that.  I'm just trying to
22   understand the origin of the marks that Barclays
23   put on it.  Did Barclays adopt marks that Lehman
24   had put on these assets?
25    A.   No.

1    KING - HIGHLY-CONFIDENTIAL
2    Q.   I have heard testimony in other
3    instances where Lehman valued those assets at
4    42.9.  This appears to be very close to the
5    Barclays marks.  Did you have any consideration or
6    discussion between Lehman and Barclays as to their
7    own marks?
8    A.   Well, some of the marks were -- we
9    actually used to make the unfunny joke that 42 and
10   a half versus 49, you know, or 50 versus 48 and a
11   half, it is kind of close.  It is -- that's half
12   of a billion dollars, so that's a gap.  That's
13   500 million dollars of, you know, rounding.
14        And that would have come from more of
15   a -- it just sort of highlights just how much
16   uncertainty there was.  You would be very
17   surprised if there was absolutely no relationship
18   between the BoNY marks, the JP marks, the Lehman
19   marks, the Barclays estimates.  If they weren't of
20   some similar order of magnitude, you know you have
21   a major failing of a control system somewhere.
22        But still, I don't -- we never really
23   needed to use the Lehman marks, other than -- the
24   only place where we used the Lehman marks was
25   where we had no idea what the security was other

1    KING - HIGHLY-CONFIDENTIAL
2    than a CUSIP, some generic name, and the Lehman
3    mark, then we would have said we will value it at
4    a discount to the Lehman mark because we have
5    nothing else to go on.  It could be worth nothing,
6        Many of them were worth nothing.  Not
7    because Lehman had -- bear in mind, the Lehman
8    marks were from days -- they were old, they were
9    what we call stale.  Many of them were -- I think
10   most of the stuff we were looking at earlier was
11   on the 12th, which was before the bankruptcy of
12   Lehman Brothers Holdings, and even during that
13   previous week, most of the traders were out -- at
14   Lehman were more worried about their own futures
15   than necessarily marking their books, and markets
16   were already very, very distressed.
17        So the idea that those markets were
18   good on -- those marks were good on the 22nd after
19   two bankruptcies and Merrill being acquired by --
20   or being bailed out, is -- there is a
21   tremendous -- you know, the value of them is
22   that -- so there were cases where we said -- and
23   some of them were appropriately marked by Lehman
24   but worthless to Barclays.
25        A good example would be there were

Page 154

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    warrants that were in the repo facility, I
3    remember roughly it was 300 million dollars as a
4    good example. 300 million dollars issued by
5    Lehman referencing other credits.
6        Now, those, as long as Lehman exists,
7    are worth roughly the amount of the reference
8    credit, but the moment that Lehman defaults, they
9    are worthless. So Lehman had them appropriately
10   marked where they would have traded them prior to
11   Lehman's insolvency. They are just called fixed
12   income security on a schedule that we had, and
13   they are actually worthless, and there were
14   instruments like that in the repo facility.
15       Now, we wouldn't have known that until
16   days, many days later.
17       Q.   So this 2.83 adjustment is derived
18   from comparing the BoNY marks to Barclays' own
19   marks?
20       A.   PMTG's current best guess at an
21   orderly liquidation.
22       Q.   At that particular date?
23       A.   On that particular date. It doesn't
24   say if the other bidding -- you know, that's an
25   orderly liquidation as opposed to a bidding comp

Page 155

1    KING - HIGHLY-CONFIDENTIAL
2    liquidation.
3        MR. STERN:  Should we take a short
4    break?
5        THE WITNESS:  Sure.
6        (Recess)
7    BY MR. HINE:
8        Q.   Mr. King, I am going to hand you a
9    copy of a document marked as Exhibit 86-B. After
10   you have had a minute to look at it, I would then
11   like to ask you a couple of questions, first
12   regarding whether you have ever seen this document
13   before.
14       MR. STERN:  Take your time and look at
15   it, and that's the question:  Have you ever
16   seen it before?
17       THE WITNESS:  OK.
18       Q.   Have you ever seen this document
19   before, Mr. King?
20       A.   I've never seen the document before.
21   I don't think I have seen the spreadsheet before.
22       Q.   Does it look like anything else you
23   have seen before?
24       A.   Unfortunately, it looks like a
25   tremendous number of things I have seen before,

Page 156

1    KING - HIGHLY-CONFIDENTIAL
2    but I don't think I have -- I don't know -- I
3    don't really recognize this one.
4        Q.   Do you have any understanding or can
5    you give me your best -- withdrawn.
6        Do you have any understanding of what
7    this document is modeling?
8        MR. STERN:  Objection to the form.
9    Calls for speculation.
10       Q.   Attempting to model?
11       MR. STERN:  You are asking for him to
12   guess or --
13       MR. HINE:  Yeah.
14       MR. STERN:  I object to guessing.
15       Q.   You can answer the question.
16       A.   Well, it describes PMTG and it -- and
17   the cumulative amounts are the same as the sheet
18   we looked at before. Slightly different. So it
19   looks like -- it looks like many reports that were
20   produced around this time that are of a population
21   of securities that in some way are linked back to
22   that, but I don't know this -- especially not
23   with -- without any date or anything on it, it is
24   just one of any number of spreadsheets.
25       Q.   Do you know -- can you tell by looking

Page 157

1    KING - HIGHLY-CONFIDENTIAL
2    at it, the form, who, which department within
3    Barclays might have prepared this?
4        A.   Only by the fact that it talks about
5    PCG values, as well as PMTG, and -- I would think
6    it is a -- well, it is a reconciliation of
7    something with something, and it looks -- it
8    clearly has a similar set of securities as the
9    previous -- as 39-B, I think it is, but what it
10   was trying to achieve or who prepared it -- it
11   could be either our desk or PCG. It would have to
12   be one of the two.
13       Q.   Have you ever heard of anything
14   referred to as PCG liquidity value?
15       A.   Isn't that just --
16       Q.   That's the column heading for column
17   F. Do you see that?
18       A.   Isn't that just D minus E?
19       Q.   It very well could be. I'm curious if
20   you ever heard the term used, "PCG liquidity
21   value."
22       A.   No.
23       Q.   Is that -- do you see the column
24   marked E which says "MV09/22 with bid-offer"? Do
25   you see that column?

Page 158

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    A.   Yes.
3    Q.   Did your department undertake any
4    efforts to, on or around 9/22, to solicit bids or
5    offers for these types of securities?
6    A.   No.
7    Q.   Did you have any idea of where that,
8    the entries in that column would have come from?
9         MR. STERN:  Objection to the form.
10        You can answer.
11        A.   I -- I would -- I am -- I would be
12   very surprised if column E -- column E, market
13   value 09/22 with bid offer, is a term that we in
14   PMTG -- those could be -- they could have come
15   from PMTG.  They might have come from an aggregate
16   of other places.
17        I would think they came from PMTG, and
18   as far as I can see, F is just D minus E.
19        Q.   OK.  Do you see on the left-hand
20   column there appears to be a list of various
21   categories of securities?  Do you see that?
22        A.   Yeah.
23        Q.   Below that, PMTG and then another
24   entry for PMTG2.  Are those -- other than being
25   the initials for your department, would you --

Page 159

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    could you -- do you have any idea what securities
3    are being pooled in those entries?
4         MR. STERN:  Objection to the form.
5         A.   No.  I mean over there -- you say this
6    is on the 22nd?
7         Q.   I don't have a date for it.  I see the
8    entry -- well, the title at the top appears to be
9    22 September.
10        A.   Oh.
11        MR. STERN:  The question is, do you
12        have any idea what securities are being
13        pooled in those entries.  That's the
14        question.
15        A.   1.17 billion.  I think.  I would just
16   be guessing.
17        Q.   Don't know?
18        A.   No.  I mean I would be guessing rather
19   than I know.
20        Q.   OK.  Mr. King, I would like to walk
21   through a couple of documents here just to ask you
22   some specific questions of those documents.
23        The first one, I am going to hand you
24   what was previously marked as Exhibit 302-A.  It
25   is very thick.  I don't want to ask you about the

Page 160

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    whole document, I just want to ask you about the
3    cover e-mail.  But take your time to review
4    whatever you need to review.
5         It appears.  This is dated Wednesday,
6    the 17th.  It appears that you are providing
7    comments to the asset purchase agreement; is that
8    correct?
9         MR. STERN:  Objection to the form.
10        Q.   Let me rephrase.
11        What is this covering e-mail?
12        A.   It is an e-mail from me to Patrick,
13   Mike and Jonathan.  It is called asset purchase
14   agreement comments.  And those are comments to the
15   asset purchase agreement that I would have
16   provided to them.
17        Q.   OK.  Do you recall providing comments
18   to the asset purchase agreement?
19        A.   I now do.  But I would have forgotten
20   about it otherwise.
21        Q.   OK.  I guess my first question:  The
22   agreement is signed on the 16th, so why are you
23   providing comments the day after it is signed?
24        A.   I don't know.  On that, I -- don't
25   forget, to me, I then didn't know -- until you

Page 161

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    told me earlier today that there was an agreement
3    signed on the Tuesday, I didn't know that.  Or at
4    least I certainly didn't remember it.
5         Q.   Why would you be sending these
6    agreements to Mr. -- these comments to Mr. Cox?
7    Do you recall?
8         A.   No.
9         Q.   Do you see in the first entry it talks
10   about purchase assets, and the third sentence in
11   that entry, entry number one, says, "Can
12   securities be sold to LBI without approval at a
13   discount to current mark?"  Do you see that?
14        A.   Yeah.
15        Q.   Do you recall why you were making that
16   comment?
17        A.   No, though reading it in its entirety,
18   it also says, "Are hedges put on by LBI after the
19   agreement is signed included?  Any limits or
20   restrictions?"
21        So on the 17th, you know, on the 17th
22   is before we got into the repo.  This is the --
23   these are -- these are commenting on something
24   before we actually -- not on the final form of the
25   transaction.

Page 166

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2      Q.    Now, when it says discount, do you
3  recall any discussions or having any understanding
4  at the time that Barclays was acquiring assets
5  from Lehman at a discount?
6          MR. STERN:  Objection to the form.
7      Asked and answered.
8      A.   I wasn't -- can you repeat that
9  actually.
10         (Record read)
11     A.    As I pointed out before, I wasn't
12 party to any of those discussions.
13         I would have to also question
14 discounts to what.  If it is a discount to BoNY's
15 marks or something, then I would say I was
16 assuming that my desk was viewing the assets as
17 not being worth the BoNY marks, but I don't know
18 if that's what you mean by discount.
19     Q.   I'm just trying to exhaust your
20 recollection on discussions you might have heard
21 or understandings you might have heard about the
22 discussions between Barclays and Lehman.
23         MR. STERN:  Your question?  I don't
24     think there is a question.
25     Q.   So let's reread the question.  Do you

Page 167

1  KING - HIGHLY-CONFIDENTIAL
2  recall any discussions or having any understanding
3  at the time that Barclays was acquiring assets
4  from Lehman at a discount?
5      A.   So I wasn't party to the
6  discussions -- to any discussions, but I didn't
7  think that -- if I -- I would have to define
8  discount to what, and then if I -- if you said --
9  if you had asked me the question did I think that
10 the -- we should pay less than where Lehman had
11 marked the securities on the 12th or where BoNY or
12 JP had marked them on the 17th, then I would say
13 yes.  But I don't know whether that's what you are
14 asking.
15     Q.   I understand your answer.  I was
16 asking if you have any knowledge of the
17 discussions between Lehman and Barclays --
18     A.   No.
19     Q.   -- as to that subject?
20     A.   No.
21     Q.   Can we skip ahead to the repo
22 transaction, which is the September 18 repo.
23     A.   Yeah.
24     Q.   Did Barclays provide a list of assets
25 that it wanted excluded from the repo or would not

Page 168

1  KING - HIGHLY-CONFIDENTIAL
2  accept as collateral in the repo?
3      A.   No.  We didn't have any option on
4  the -- going into the -- we weren't -- "we" being
5  PMTG, weren't aware of any flexibility as to what
6  we were going to receive.  That was part of the
7  problem, was we are going to take delivery of --
8  remember you asked me the questions earlier about
9  what were you looking at, Steve, and I was
10 provided an inventory of securities on the
11 Wednesday, Thursday, that represented what I would
12 take delivery of.
13         And then it did happen to change by
14 Friday, but that was not what we were expecting to
15 receive, that list of securities.
16     Q.   I am talking about before the Friday.
17 I'm talking about in the Wednesday, Tuesday,
18 whenever you are talking about the repo, were
19 there certain assets that Barclays would not
20 accept as collateral for that repo?
21     A.   No.  I -- on the Wednesday -- so the
22 Wednesday or Thursday we are analyzing the repo,
23 we just assumed we were taking delivery of
24 whatever was described to us as being in the repo
25 on the Thursday.

Page 169

1  KING - HIGHLY-CONFIDENTIAL
2      Q.   Described to you by who?
3      A.   In the schedule of securities
4  provided -- you asked me the question earlier as
5  to -- about a list of securities that was in the
6  repo, and I answered that I didn't know where it
7  came from, whether it was from operations or the
8  Fed or whoever, but somebody provided us a list of
9  securities on the Thursday, which is the list we
10 thought we would take delivery of.  It wasn't the
11 list that we ultimately took delivery of, but it
12 was the list that we passed out to the various
13 traders.
14         We didn't think that we had any option
15 to pick and choose.
16         MR. STERN:  Is that the list that you
17     referred to as having an hour and a half to
18     look at?
19         THE WITNESS:  The hour and a half to
20     look at, yes.
21     Q.   This might clarify the question.  I am
22 going to hand you a document that was previously
23 marked as 143-B.  It is an e-mail stream of which
24 you are not a party to until you get to page 2.
25         MR. STERN:  Take a look at the whole

Page 170

KING - HIGHLY-CONFIDENTIAL

1
2    thing.
3    Q.    You can look at the whole thing.  I am
4    just directing your attention to an entry on
5    page 2, which is an e-mail from you to David
6    Petrie, and it describes something called excluded
7    mortgage assets.
8    A.    Right.
9    Q.    So take your time to look at the
10   document, but my questions are going to be
11   primarily about that attachment.
12   A.    OK.
13   Q.    Have you ever seen this document
14   before?
15   A.    Yes.
16   Q.    Can you tell me what the attachment
17   which is titled "Excluded Mortgage Assets 9/17/08"
18   is?
19   A.    Yeah.  It is from the 6.5 billion
20   dollars of assets on the -- let me look here.
21   Q.    Is that the exhibit we first used in
22   this --
23   A.    Yeah, I think so.
24   Q.    I think it is --
25   A.    388-B.

Page 171

KING - HIGHLY-CONFIDENTIAL

1
2    Q.    The 6.6 billion in mortgage?
3    A.    Yeah.  So once upon a time in the
4    first part of the week, we had suggested that we
5    wouldn't -- remember I said that we wouldn't take
6    all of the mortgage and mortgage-backed total.  So
7    we divided it into two pools, the included and the
8    excluded.
9    So that e-mail from the 17th, unless I
10   have made a mistake, it is an e-mail about the
11   assets that we wouldn't be taking out of the
12   mortgage and mortgage-backed securities.
13   Q.    So these are mortgages you are not
14   going to take?
15   A.    These would be -- yes, that's the --
16   well, it was -- in the early part of the week it
17   was the list of securities which we were
18   suggesting that we wouldn't take, "we" being my
19   group, suggesting that we would rather not take
20   out of the total mortgage and mortgage-backed
21   total.
22   Q.    It is really nothing to do with the
23   repo.  It has to do with the agreement to only
24   take a portion of the mortgage-related securities?
25   A.    That's correct.

Page 172

KING - HIGHLY-CONFIDENTIAL

1
2    Q.    And then that agreement eventually
3    changes toward the end of the week?
4    MR. STERN:  Objection to the form.
5    A.    As I have said, I only know that what
6    we were looking at at the beginning of the week
7    didn't end up being the transaction.  I don't know
8    how the agreement changed.
9    Q.    Let's talk about mortgage, the pool of
10   mortgages-related securities itself.  What
11   happened to that?  Did Barclays end up getting
12   those securities?
13   A.    Some of them, because some of them
14   were in the repo, but not all of them were in the
15   repo.
16   Q.    And is the part that was in the repo
17   the securities that did not make it to this
18   schedule?
19   A.    I think I described --
20   MR. STERN:  Let me hear that question
21   again, please.
22   MR. HINE:  Let me try again.  That was
23   confusing.
24   Q.    You talked about this schedule, and I
25   am talking about Exhibit --

Page 173

KING - HIGHLY-CONFIDENTIAL

1
2    MR. STERN:  143-B.
3    Q.    143 -- all right, 143-B, that's the
4    schedule of mortgage-related securities that --
5    A.    Correct.
6    Q.    -- Barclays did not want included in
7    the transaction, correct?
8    A.    Right.
9    Q.    And that was -- the counterpart to
10   that is the securities that Barclays would allow
11   in the transaction, right?
12   MR. STERN:  Objection to the form.
13   A.    I'm not sure what we mean by -- if we
14   mean what we understood at the beginning of the
15   week my group was asked to assess as a portfolio
16   of assets that would end up being part of the
17   purchase agreement, then this pertains to that.
18   What ultimately happened was of course completely
19   different.
20   Q.    Well, that's what I am asking.  What
21   ultimately happened to the pool of mortgage-backed
22   securities?
23   A.    Some of them I don't know, because the
24   388-B balance sheet was -- was not completely --
25   you know, it -- what does he have, 65.1 -- it says

KING - HIGHLY-CONFIDENTIAL

1
2    65.16 billion dollars. That's on 388-B again,
3    65.16 billion.
4            So it is bigger than -- that number is
5    bigger than the repo facility which at any one of
6    the various marks that people had put on was less
7    than 50 billion dollars.
8            So not -- using your Venn diagram, not
9    all of these securities are in the repo facility.
10           MR. STERN: And you're pointing to
11   388-B.
12           THE WITNESS: I'm pointing to 388-B.
13       Q.   I'm just trying to chase what happens
14   to the pool of mortgage-backed securities that
15   were originally marked as 60 billion on 388-B,
16   what happens to them by the end of the week?
17       A.   I don't know on all of them. All I
18   know is some of them were in the list -- some of
19   them -- some of them were collateral that was
20   pledged to the Fed as far as my desk knew on the
21   Thursday, Wednesday, Thursday.
22       Q.   The Fed?
23       A.   Yeah. Some of them were in the Fed
24   facility. Every single -- a bank -- I mean every
25   single -- a balance sheet is made up of assets and

KING - HIGHLY-CONFIDENTIAL

1
2    liabilities. Some of them -- all assets have to
3    be financed, especially for a broker dealer like
4    Lehman. So, many of these assets were financed by
5    the Fed. Therefore, they would have also been in
6    the Fed facility.
7        Q.   Right.
8        A.   But there is 65 billion of assets
9    here, so they couldn't all fit in the Fed
10   facility, which was only 50 billion.
11       Q.   I understand.
12       A.   Some of them weren't even in what we
13   thought was the Fed facility on the Wednesday,
14   Thursday.
15       Q.   OK.
16       A.   So some of them were just gone.
17           MR. STERN: But he is asking you about
18   Exhibit -- the list on Exhibit 143-B.
19           THE WITNESS: Yeah.
20           MR. STERN: What happened to those.
21       Q.   No, I am asking the pool of securities
22   on 388-B --
23           MR. STERN: You didn't ask that.
24           MR. HINE: Yes, I did.
25       Q.   It was originally marked at

KING - HIGHLY-CONFIDENTIAL

1
2    6.5 billion, and you were describing to me that
3    some of that made it into the repo, as I
4    understand it.
5        A.   Some of them were in the -- some of
6    them -- if we looked at a list of securities on
7    388-B, some of those securities, many of those
8    securities were also in -- also being financed by
9    the Fed.
10       Q.   Right.
11       A.   So they were what we thought were in
12   the repo facility that we were going to assume
13   when we reviewed that list of securities on the
14   Wednesday, Thursday. Not all of them, though.
15   Some of them were just not there. And some of
16   them would have therefore been excluded assets and
17   some of them would have been included assets.
18           I seem to -- I remember that there was
19   not many of the excluded assets -- no, actually I
20   can't remember exactly how many of the included
21   or -- since the included and excluded list
22   pertained to the Lehman balance sheet, not to the
23   repo facility, there were both included and
24   excluded assets in the Thursday repo facility.
25       Q.   So in the Thursday -- September 18

KING - HIGHLY-CONFIDENTIAL

1
2    Thursday repo facility --
3        A.   Before it was the Barclays -- the Fed
4    one.
5        Q.   No. I want to know -- I want to keep
6    the story going. The September 18 repo facility,
7    some of those assets eventually make their way to
8    Barclays, and within that pool of assets, there
9    are a certain number of mortgage-related
10   securities; is that right?
11       A.   Yes. There was some -- some of the
12   mortgage-related securities were in the Fed
13   facility. Some other securities as well.
14       Q.   Do you know how many of the securities
15   within -- that came to Barclays constituted
16   mortgage-related securities?
17       A.   There is a difference. Again on the
18   Thursday when we were looking at what we thought
19   we were going to receive from the Fed, there was a
20   certain amount of the securities that were on that
21   list.
22           On the Friday, by the Friday when
23   we -- after the Fed facility has been refinanced
24   by the Barclays repo facility, then there were --
25   out of the 30 or so billion dollars of the

KING - HIGHLY-CONFIDENTIAL

2  securities that were both in the Fed facility that
3  ended up in the Barclays facility, there were some
4  of the mortgage assets, but in addition there were
5  other assets, other mortgage assets, some other of
6  the mortgage assets which we hadn't looked at on
7  Thursday, but we had looked at on Tuesday, that
8  turned up in the extra 10 billion.
9      Q.   So as you talked about earlier, on
10 Friday you realize there is two different types --
11 you assumed two different types of securities,
12 about 32 billion worth of securities that you
13 already knew about using the JPM marks?
14     A.   Correct.
15     Q.   And 10 billion using the BoNY marks of
16 securities that you didn't expect to receive?
17     A.   Correct.
18     Q.   There were mortgage securities in both
19 of those groups; is that right?
20     A.   That's correct.  Yes.
21     Q.   Do you know about how much?
22     A.   I remember it being about 3, 3 billion
23 I think.  It was about 3 billion, and we thought
24 they were worth about 1 and a half.
25     Q.   And those are the types of -- when you

KING - HIGHLY-CONFIDENTIAL

2  say 3 billion, that's within both of those two
3  groups?
4      A.   Yeah.  That's what I remember.
5      Q.   And those are the types of securities
6  that you have been focusing on because they get
7  put into your group eventually?
8      A.   That's correct, yeah.
9          MR. STERN:  Is there a question?
10         MR. HINE:  No.  He answered it.
11         MR. STERN:  Just wait for a question.
12 BY MR. HINE:
13     Q.   Did you want to elaborate on
14 something?
15     A.   No.  I was just thinking about that.
16 That's fine.
17     Q.   Mr. King, I am going to hand you
18 another document, that has been previously marked
19 as 144-A, and my question is whether you have ever
20 seen that before.
21     A.   Yes.
22     Q.   What is this document?
23     A.   I've seen it before, but I don't
24 really know.
25     Q.   Did you receive a copy of this from

KING - HIGHLY-CONFIDENTIAL

2  Mr. Malloy around -- on Friday, the 19th?
3      A.   I'm on the e-mail, so yes.
4      Q.   Do you have any understanding of why
5  Mr. Malloy prepared this analysis?
6      A.   Marty was just involved in the
7  settlement of the repo, so he -- I don't know why
8  he produced this in particular.  It is a pretty --
9  the original e-mail is a pretty vanilla e-mail
10 just saying -- I don't know who Jackie Stanley
11 Jones is, but it is just a description of Fed wire
12 securities, but I don't know what it is other than
13 that.
14     Q.   You don't know why he prepared it?
15     A.   Marty and others, Gerard and others
16 needed to know what was being received by
17 Barclays, so there would have been a lot of
18 e-mails on Friday morning saying -- starting to
19 try to get a handle on what had been received.
20 This looks like one of many of those.
21     Q.   Did you ever hear any discussions on
22 Thursday or Friday that week about the amount
23 of excess collateral that had been posted towards
24 the repo?
25     A.   I've never heard -- I don't think I

KING - HIGHLY-CONFIDENTIAL

2  have heard the term "excess collateral" per se,
3  but there was -- we were obviously extremely
4  worried on the Friday.  We were very worried on
5  Wednesday and Thursday.  We had a population of
6  securities and we were very worried that those
7  really might not be worth 45 billion dollars.
8          We were even more worried -- that was
9  with at least a list that was purportedly going to
10 be delivered to us.
11         We were even more worried over
12 Thursday night and into Friday that now we just
13 had a list of stuff that we had no idea whether it
14 was worth what we just lent against it.  So there
15 was lots of discussion of whether there was
16 adequate collateral or how -- actually, no one
17 really talked about whether there was adequate
18 collateral.  It was just how much was the
19 collateral worth.
20         So there was that discussion, but not
21 excess collateral per se.
22         (Exhibit 391-B, document Bates stamped
23 BCI-EX-S 136198 marked for identification,
24 as of this date.)
25     Q.   Mr. King, I am handing you a document

1          KING - HIGHLY-CONFIDENTIAL
2    to relevant Barclays desks or we had marked them
3    ourselves, or if we didn't know what it is, we had
4    estimated it in some variety of ways.
5          Q.    Were some of the marks, marks that you
6    had put on these assets earlier in the week, say
7    back in Monday or Tuesday?
8          A.    Yeah.  Unfortunately, the process
9    lagged, you know, because it was always -- it was
10   almost impossible to keep marks -- so for this
11   balance sheet for example, for example, this would
12   have had to have been produced based on data that
13   we had provided to Gary over the weekend that
14   would have been based on marks that we had put on
15   the portfolio or -- marks that we had put into our
16   spreadsheet on the 19th, some of which would have
17   been based on marks that we had come up with at
18   the beginning of the week.
19         Q.    So it is the accumulated marking by
20   Barclays starting in the 15th all the way through
21   that week?
22         A.    Yeah.
23         Q.    Is the set of marks you used?
24         A.    I think it is also -- rather than
25   using Barclays, it is PMTG at that point.  I'm not

1          KING - HIGHLY-CONFIDENTIAL
2    sure the firm had espoused our position, so that
3    was -- it was PMTG's latest estimate line by line,
4    and then that was refined over a period of time.
5          Q.    And then so PMTG -- I didn't mean to
6    ascribe a difference between PMTG and Barclays,
7    but PMTG has been trying to put marks on these
8    various securities dating back to the prior
9    Monday, all the way to the 15th?
10         A.    Correct.
11         Q.    This 2.83 is the product of a series
12   of marks created by that process that -- as of the
13   22nd?
14              MR. STERN:  Objection to the form.
15         Q.    Let me rephrase that.  Let me rephrase
16   it.
17              The marks that you used to come up
18   with the 2.83 number were PMTG marks, as of the
19   22nd --
20         A.    No, I don't know whether these are --
21   no.
22         Q.    OK.
23         A.    This e-mail is as of the 22nd.
24         Q.    OK, I understand.
25         A.    I notice it is at the end of the

1          KING - HIGHLY-CONFIDENTIAL
2    London day, but it is still as of the 22nd.
3              I don't remember -- we were very, very
4    heavily embroiled in the risk management of the
5    assets we had acquired by this Monday.
6          Q.    OK.
7          A.    So I don't remember whether this
8    was -- some of the marks that PMTG was using may
9    well have been updated on this Monday.  Some of
10   them may have been latest guess over the weekend.
11             I think probably over the weekend, and
12   then, in other words, they may have come -- some
13   of them would have come from various stages during
14   the course of the previous week.
15         Q.    I guess that was my question.  I
16   didn't mean to -- I am sorry.
17         A.    The 2.83 is -- what we would have done
18   was put the value that we thought was on the
19   portfolio of the 42.55, let's say, and then there
20   was the sum of the BoNY marks, which was the
21   45.18, and the 2.83 just drops out as the
22   difference between the two.
23         Q.    While we are looking at that, what
24   does the "Friday P&L approx." entry mean?
25         A.    There is always carry and yield on a

1          KING - HIGHLY-CONFIDENTIAL
2    portfolio.  That would have been that.  But I'm
3    not sure -- that would have been what that is.
4          Q.    So other than that -- I think you have
5    explained to me where you get the 2.83, but the
6    marks that you used for PMTG were accumulated by
7    PMTG from the period of the 15th through that
8    weekend, the following weekend; is that right?
9              MR. STERN:  Objection to the form.
10             You can answer.
11         A.    The -- there was a production line, if
12   you like, of Barclays' desks, my people, me, Gary,
13   that would have resulted in a steady evaluation of
14   the best estimate at the mark, of what we thought
15   would be an orderly liquidation mark or whatever
16   mark we were being asked for at a particular time,
17   to go into -- to go up to product control so that
18   they could produce this.
19         Q.    And that process is what took place
20   for the week of September 15?
21         A.    No.
22             MR. STERN:  Object to the form.
23         A.    No, that -- no.  All that happened
24   during the week of the 15th was that -- we
25   didn't -- I don't remember seeing any acquisition

Page 194

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    balance sheets during the course of the week. All
3    our desk did was try to ascertain the risk and the
4    best guess of both a liquidation valuation and an
5    orderly liquidation valuation during the course of
6    that week.
7        Once the transaction had closed on the
8    Monday, then there was a -- there was both the
9    risk management process, which was my problem, and
10   also a control process, which was product
11   control's, and obviously we had to have an input
12   to product control, which is where the 42.55 would
13   have been the latest -- Gary is using our latest
14   estimate of value -- you can see it hadn't been
15   updated because it still had the cash on it, for
16   example, of the 7 that wasn't received and so on.
17       Q.   I didn't mean to suggest you were
18   doing the acquisition balance sheet during the
19   week. I just wanted to see when the -- the marks
20   that you used were developed during that week; is
21   that right?
22       MR. STERN:  Objection to the form.
23   Objection to the form. I don't know what
24   the question is.
25       Q.   You can answer.

Page 195

1    KING - HIGHLY-CONFIDENTIAL
2        MR. STERN:  The question is, is that
3    right? What's the question?
4        Q.   You can answer.
5        MR. STERN:  Well, the question is, "I
6    wanted to see when the marks that you used
7    were developed during that week."
8        MR. HINE:  Jack, if you have an
9    objection to the form, just state it. Don't
10   coach him.
11       MR. STERN:  I am asking you what your
12   question is.
13       Q.   When the marks that you used -- let me
14   restate it.
15       I didn't mean to suggest that you were
16   working on the acquisition balance sheet, as I
17   thought I might have confused you with my last
18   question, during that week, the prior week, the
19   15th.
20       A.   Right.
21       Q.   But in developing this 2.83, the marks
22   that PMTG used were the product of its
23   accumulating knowledge about the marks from the
24   15th through the following weekend; is that right?
25       A.   We would have -- depending on the

Page 196

1    KING - HIGHLY-CONFIDENTIAL
2    product type -- some -- the 8 -- for example, of
3    that 42.55, approximately 8 billion dollars was
4    cash equities. That's incredibly easy to mark
5    from an accounting point of view. There is an
6    exchange, you type in the ticker for the equity
7    and you get a price. Therefore, that process took
8    one of my analysts approximately -- I think he had
9    Nick Leyhane in London do it for him -- 20 minutes
10   to mark 8 billion dollars in assets.
11       As a trading matter, it's useless
12   because the -- but it is necessarily where a firm
13   has to mark cash equities. Because there is an
14   exchange. It says the price is 22 dollars for --
15   you know, Barclays stock is at 3.98. Therefore,
16   you better mark all the Barclays stock at 3.98.
17       If you happen to be long a billion
18   dollars of Barclays stock and you go out and sell
19   it, you are never going to get 3.98, but the
20   process is pretty easy from the point of view of
21   providing an accounting number.
22       What we had to do over and above
23   that -- so that could have been updated and may
24   well have been updated on Saturday or Sunday. We
25   would have actually had the Bloomberg ticker in a

Page 197

1    KING - HIGHLY-CONFIDENTIAL
2    spreadsheet, so it would have kept updating it.
3        Other things are less easy. Other
4    things are, you have to run a model. You have to
5    take cash in and do all sorts of things to be able
6    to determine what the price is. So there is a
7    full range.
8        8 billion dollars worth of equities
9    doesn't trade at where those marks are. A good
10   example would be, we had cash equities where the
11   amount of the cash equity that we owned
12   represented 400 days of the historical trading
13   volume. That means if we would have traded as
14   much of that stock as trades every day for the
15   last 400 days, we still couldn't get out of our
16   position.
17       But still, the last mark, last penny
18   of stock that traded was where we had to mark that
19   position. It took us a year at that point to get
20   out of those positions, and many of them therefore
21   by construction every time we sold them took a
22   loss every time. 300 million dollars of loss or
23   whatever it was in the end, but every time we sold
24   we were selling at a discount to the published
25   mark. Easy to provide, put the published mark

Page 198

KING - HIGHLY-CONFIDENTIAL

1
2  into that spreadsheet.
3          The desk estimates were an attempt to
4  then say, we have taken that, you know, where the
5  exchange, such and such, and we assume it is going
6  to cost us an additional 300 million dollars to
7  bid side for us to be able to sell them.  So we
8  would have deducted that from that price, and that
9  would have gone into the 42.55.
10         Now, many times we were just wrong,
11 because the market was also deteriorating as we
12 went along.  So it was going to end up costing us
13 an awful lot more to actually sell the stuff.
14         Not only did we have that problem,
15 over the subsequent days we realized the 7 billion
16 dollars wasn't going to turn up 7 billion dollars.
17 We were going to get another slew of securities as
18 well, many of which were securities that were on
19 the excluded asset list that we didn't think were
20 worth anything.
21         So the problem was just getting -- but
22 that's the reason why -- some aspects of providing
23 that 42.55 could have been done on an ongoing
24 basis and others -- but would still have been
25 subject to a -- you know, an observable exchange

Page 199

KING - HIGHLY-CONFIDENTIAL

1
2  traded mark minus an estimate, and then others
3  would have been things that would have really
4  taken models or input from other desks to come up
5  with.
6     Q.   OK.  If you see further down on the
7  spreadsheet, it says, "Previously excluded 50
8  percent MBS."  Do you see that?
9     A.   Yeah.
10    Q.   That's mortgage-backed securities?
11    A.   Is that a zero?
12         MR. STERN:  The question is what MBS
13 means.
14    A.   Is that what --
15    Q.   Yes.
16    A.   MBS means mortgage-backed securities.
17    Q.   If you look at footnote 3 on that
18 line, it says, "September 20 clarification letter
19 indicates we no longer receive these assets."  Do
20 you see that?
21    A.   Yes.
22    Q.   Do you have any understanding of what
23 the September 20 clarification letter does?
24         MR. STERN:  Objection to form.
25    Q.   With respect to mortgage-backed

Page 200

KING - HIGHLY-CONFIDENTIAL

1
2  securities?
3     A.   No.
4     Q.   OK.  Did, in fact -- I know we have
5  talked about earlier some of the mortgage-backed
6  securities made their way into the 32 point -- 32
7  billion dollar pool we talked about earlier and 10
8  billion dollar pool from the repo.  Do you recall
9  that testimony?
10    A.   Can you say that again.
11    Q.   I'm just trying to get you back to the
12 testimony, but we had previously talked about some
13 of the mortgage-backed securities ended up in the
14 pool of assets that Barclays received as a result
15 of the repo, correct?
16    A.   Yes.
17    Q.   And we compared that to the original
18 number of 6.6 billion in mortgage-related
19 securities.  Do you recall that?
20    A.   Yes.
21    Q.   How many mortgage -- did Barclays
22 ultimately get the entirety of the 6.6
23 mortgage-backed securities?  And I'm not talking
24 about -- I'm not trying to confuse you with the
25 valuation, but I'm just talking about the pool we

Page 201

KING - HIGHLY-CONFIDENTIAL

1
2  originally were talking about --
3     A.   I understand.  No.
4     Q.   Did Barclays get all that?
5     A.   No.
6     Q.   Do you know how much Barclays did get?
7     A.   Eventually -- like by the end of the
8  year?  Or by --
9     Q.   Yeah.
10    A.   Because we got -- we got some -- we
11 didn't get all of it.  We weren't even supposed to
12 get all of it for this thing.  We got some of it
13 in the Fed facility that we -- the 30-odd billion
14 dollars of Fed facility assets that we thought we
15 were going to get.
16    Q.   Right.
17    A.   We got some of it in the 10 billion
18 dollars that we didn't think we were going to get,
19 and got some of it as part of the JP settlement in
20 lieu of the 7 billion dollars, and then some of it
21 we never got.
22    Q.   Have you liquidated those securities
23 yet?
24    A.   Some of them.
25    Q.   Most of them or a small portion of

Page 202

```
1              KING - HIGHLY-CONFIDENTIAL
2  them?
3       A.   Of what we are calling the
4  mortgage-backed securities?
5       Q.   Yes, the entire pool of
6  mortgage-backed securities that Barclays received,
7  no matter how you got it, from Lehman.
8            MR. STERN:  Objection to --
9       Q.   Can you give me an estimate of the
10  percentage of it that you have liquidated by now?
11           MR. STERN:  Objection to the form.
12      A.   We had about 4 point -- we only -- we
13  estimated that the 6.5 billion was only worth at
14  most about 3 point something billion, so -- and in
15  the Lehman -- in the repo that we thought we were
16  going to get, I think we thought that was about
17  1.5, even though JP had it at about 3.3.
18           And some of those are very obvious
19  mistakes as well.  Because JP doesn't know any
20  more than we do what some of the securities are.
21  Sometimes it says, if I don't know what it is,
22  mark it at par, but it may actually be worth zero,
23  and that's the reason why that number comes out so
24  wrong, because these are so complicated
25  securities.
```

Page 203

```
1              KING - HIGHLY-CONFIDENTIAL
2       Q.   OK.
3       A.   So they are worth a tremendous amount
4  less.
5            If you mean of those securities, that
6  value, I think it was about -- we thought it was
7  worth about 2 billion dollars or so.  What we
8  eventually ended up with, 2.2 I think, and we must
9  have sold about -- the last time I was involved
10  with it, it would have been about 60 percent, I
11  think, or so.
12      Q.   Do you know if Barclays made money on
13  those securities, the mortgage-backed securities?
14      A.   We lost money.
15      Q.   Do you know how much or --
16      A.   I don't remember.
17      Q.   Do you know if there has been any kind
18  of assessment of how much money Barclays made or
19  lost with respect to the mortgage-backed
20  securities that it received from Lehman?
21      A.   No, never tried.
22      Q.   For the same reasons we talked about
23  before, it would be difficult to do?
24      A.   No.  It would actually be easy to do,
25  just not useful.  We had our own portfolio of
```

Page 204

```
1              KING - HIGHLY-CONFIDENTIAL
2  mortgage-backed securities that were also losing
3  money, so we just put them in with those, and
4  therefore, I didn't track -- even though I could,
5  I didn't track what was a Lehman security versus
6  what was a Barclays security.  We just organized
7  them for appropriate liquidation or retention.
8            MR. HINE:  OK, Mr. King, that is all
9       the questions I have.  I think one of my
10      colleagues has some questions to ask you as
11      well.
12           (Recess)
13  EXAMINATION BY
14  MR. OXFORD:
15      Q.   Good afternoon, Mr. King.  I
16  introduced myself earlier on.  My name is Neil
17  Oxford.  I represent the SIPA trustee for LBI.
18           Following up on the examination by
19  Mr. Hine, initially you testified about the
20  portion of the 6.5 billion of mortgage-backed
21  securities that Barclays ended up purchasing.
22  Do you recall that?
23      A.   Yeah, yeah.
24           MR. STERN:  Wait a second.
25           OK, OK.
```

Page 205

```
1              KING - HIGHLY-CONFIDENTIAL
2       Q.   I just want to make sure I understand
3  your testimony.  So leaving aside for the moment
4  the question of value, are you able to estimate
5  what percentage of that 6.5 billion of
6  mortgage-backed securities that we have been
7  discussing that is represented on Exhibit 388-B,
8  are you able to estimate what percentage of those
9  mortgage-backed securities ended up in the hands
10  of Barclays?
11           MR. STERN:  Objection to the form.
12      Get out 388-B.  And let's hear the question
13      again.
14           MR. OXFORD:  Can you read it back.
15           (Record read)
16      A.   Not accurately, and the reason for
17  that is that we got the ultimate delivery of
18  securities that Barclays received, first the
19  subset of the ones that it expected to receive in
20  the original repo, the ones that it got in the 10
21  billion dollars of repo that it didn't expect to
22  receive and the ones that it got as part of the
23  settlement against the 7 billion dollars of cash.
24  We actually received a lot of securities that we
25  had -- that would have fallen into that category
```

Page 1

1

2      UNITED STATES BANKRUPTCY COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      -------------------------------x

       In Re:                    Chapter 11

5      LEHMAN BROTHERS            Case No. 08-13555 (JMP)

       HOLDINGS, INC., et al.,   (Jointly Administered)

6      -------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9          DEPOSITION OF GARY ROMAIN

10            New York, New York

11         Thursday, September 10, 2009

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 24298

22

23

24

25

Page 10

G. ROMAIN - HIGHLY CONFIDENTIAL

1  are broadly three areas in which you are the
2  30(b)(6) witness.  One is to do with the OCC
3  margin and values.  The other has to do with
4  what we refer to as Schedule A and Schedule B
5  on the Asset Purchase Agreement, correct?
6     A.  Yeah.
7     Q.  And a third category were certain
8  documents or spreadsheets that were prepared
9  for Barclays auditors, right?
10    A.  Sure.
11    Q.  On the Schedule A, Schedule B
12 issues who did you speak with to get ready for
13 your 30(b)(6) deposition?
14    A.  The most significant conversations
15 I had in preparation were with -- let me go
16 through it -- with Sean Teague.  With Stephen
17 Callick.  With Jerry Shi.  With Lee Bowell.
18 With Ian Cooper.
19    MR. SHAW:  Let me just ask to
20 clarify the question.  Mr. Tambe's
21 question involves specifically the
22 subject of the Schedule A and Schedule
23 B.  Were your conversations you
24 described on that subject or on other

Page 11

G. ROMAIN - HIGHLY CONFIDENTIAL

1  subjects?
2     THE WITNESS:  In terms of just the
3  Schedule A and Schedule B that would be
4  the -- discussion I've had on Schedule A
5  and Schedule B.  I have to give this
6  some thought.
7     (Pause on the record.)
8     A.  Actually, those five.  Schedule A
9  and Schedule B would be just Sean Teague.  The
10 other four would relate to the third item, the
11 OCC.
12    Q.  And on the auditor spreadsheets
13 who did you speak to if anyone to get ready to
14 testify on those topics?
15    A.  The auditor spreadsheets I didn't
16 speak to anybody in particular because the --
17 the two documents -- the two main documents,
18 one of which was put together by myself so
19 very little refreshing of memory was required.
20    The other one I worked with
21 consistently over the period.  So, again, very
22 little refreshing of my memory was required.
23    Q.  Did you read any deposition
24 testimony that's been given in this matter to

Page 12

G. ROMAIN - HIGHLY CONFIDENTIAL

1  get ready for your deposition?
2     A.  I read the deposition testimony of
3  Patrick Clackson.
4     Q.  And did you speak with Mr.
5  Clackson about his deposition testimony?
6     A.  No.
7     Q.  Did you speak with anyone else
8  about Mr. Clackson's deposition testimony
9  other than counsel?
10    A.  No.
11    Q.  You're currently employed by
12 Barclays, correct?
13    A.  That's correct.
14    Q.  And in what position?
15    A.  I'm head of technical accounting
16 and private equity finance for Barclays
17 Capital.
18    Q.  And how long have you been at
19 Barclays?
20    A.  Just over five years.
21    Q.  And before that where were you?
22    A.  I was at Deloitte for nine years
23 prior to that.
24    Q.  And do you hold any professional

Page 13

G. ROMAIN - HIGHLY CONFIDENTIAL

1  certifications from any accounting bodies
2  anywhere in the world?
3     A.  I'm an ICA so the English and
4  Welsh Institutional Chartered Accountant.
5     Q.  Last September 2008, did you have
6  the same position that you have now?
7     A.  I did, yes.
8     Q.  Describe generally for me in the
9  time period of, say, August, through December
10 of 2008, broadly, what role you played in
11 connection with the Lehman acquisition.
12    A.  Sure.
13    Q.  So starting in August.
14    A.  Yeah.  In August I was involved in
15 an exercise placed on the published financial
16 information for Lehman to try to come up with
17 a picture of what the accounts of combined
18 Barclays and Lehman might look like.  Barclays
19 and Lehman use different sets of accounting
20 rules so the primary purpose of my involvement
21 was to try to eliminate those differences.  I
22 was then involved -- well, let's give a time
23 line.  So Friday the 13th of September --
24    Q.  It's the 12th of September.

Page 14

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    A.   Friday, the 12th of September. I
3  became aware that some people were heading
4  over to New York in relation to a potential
5  deal with Lehman. I was called onto a
6  conference call in the early hours of Saturday
7  the 13th of September with Marie Stewart who
8  was my equivalent at Lehman, Lehman Brothers.
9  So the head of their technical accounting
10 department. Really to try to augment my
11 understanding. Because obviously during
12 August we only had access to published
13 financial information. So to augment my
14 understanding by talking to somebody who had a
15 greater understanding of their accounting
16 policies and how they feed into their
17 financial statements.
18       I then flew to New York on the
19 afternoon of Saturday, the 13th. When I
20 arrived it would have been early evening and I
21 was advised that the deal which was being
22 considered was no longer proceeding. A few
23 hours later I was called into the office by
24 Patrick Clackson. He had a few questions in
25 relation to a deal which may be resurrected at

Page 15

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  that time. I didn't have any details of the
3  transaction that we were looking at but he had
4  a couple of accounting questions which I
5  answered for him.
6        The next time that I had
7  involvement was -- it would have been
8  mid-morning on Monday, the 15th, when I and a
9  number of others headed across to the Lehman
10 headquarters at -- on Seventh Avenue with the
11 understanding that there was a deal which was
12 now being pursued. And I spent the next 24 to
13 30 hours I guess over there. I can't remember
14 exactly when I left but it would have been
15 probably early afternoon Tuesday. During that
16 period I was providing support to -- well, to
17 Patrick Clackson and through him to a number
18 of individuals were involved in the
19 negotiations at that time. That assistance
20 was -- some of it was administrative, just
21 pulling together documents, copying them, and
22 providing them to them. Other was liaising
23 with a number of Lehman staff to try to get a
24 number of information that they were asking --
25 Barclays executives were asking for.

Page 16

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2   Q.   Let me stop you there.
3   A.   Sure.
4   Q.   So you're on the Monday/Tuesday of
5 the week of the bankruptcy.
6   A.   That's right.
7   Q.   You've described some of the
8 support you were providing Mr. Clackson and
9 others those two days.
10      Is that fair that on that
11 Monday/Tuesday you were not involved in
12 negotiating any aspect of the transaction?
13   A.   That's correct. I wasn't involved
14 in any of the negotiations.
15   Q.   Were you doing any valuation
16 exercises of Lehman's assets on the
17 Monday/Tuesday?
18   A.   No, I was not.
19   Q.   Were you aware that there were
20 valuation discussions taking place between
21 Barclays and Lehman on that Monday/Tuesday?
22   A.   I was aware that valuation was an
23 element of the conversations which were going
24 on. But I wasn't involved in discussions
25 themselves.

Page 17

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2   Q.   What if anything do you recall
3 about the nature of the valuation discussions
4 that you understood were taking place?
5   A.   I don't really have any
6 understanding of the nature.
7   Q.   All right. So let's carry on back
8 with the time line. You were talking about
9 Monday/Tuesday. Carry on.
10   A.   Sure. So from that period onwards
11 the main task which was given to me was to
12 look towards our accounting treatment and
13 eventual disclosure of the transaction. So
14 over the next period of -- well, from then
15 right through till shortly before our
16 financial statements were published in
17 February I had and maintained the acquisition
18 balance sheets which was -- until just before
19 it was published was in the form of an Excel
20 spreadsheet which was summarizing the balance
21 sheet which needs to be disclosed in our
22 financial statements in the 6-K. That was a
23 working document through that period of the
24 time line.
25   Q.   Okay. On that Monday/Tuesday of

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    that week, the week of the 15th, were you
3    involved in reviewing or preparing any
4    materials for the board of directors of
5    Barclays?
6          A.   I was not involved in reviewing or
7    preparing any.
8          Q.   Okay.  Did you -- okay.
9          We're just going to pull an
10   exhibit and I'll discuss that with you.
11         A.   Sure.
12         (Pause on the record.)
13         Q.   Sir, I've placed before you a
14   document that's previously marked as
15   Exhibit 377A.
16         A.   Um-hum.
17         Q.   It has the Bates numbers
18   BCI-EX-115843 through -846.
19         A.   Um-hum.
20         Q.   Is that the final Excel version of
21   the acquisition balance sheet, sir?
22         A.   Yes.  That's correct.  It's --
23   sheets 844 and 845 are the final Excel --
24   well, 845, 845 and 846 are the final Excel
25   versions of the acquisition balance sheet.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    843 was and is the same information which is
3    put into a form appropriate for disclosure
4    because Barclays' balance sheet have a
5    prescribed format and the items in the
6    acquisition balance sheet needed to be
7    appropriately allocated amongst those balance
8    sheet categories for disclosure.
9          Q.   And so the acquisition balance
10   sheet, the Excel version, the -44, -45 and
11   -46, that's the document you were describing
12   before which was an evolving document which
13   finally rolled up to the disclosure document
14   which is the first page of the exhibit; is
15   that fair?
16         A.   It's fair.  To expand, when you
17   say final, it was final in that it was the
18   version which was disclosed in our 2008
19   financial statements.  Under the regulatory
20   accounting standards you have until twelve
21   months after the acquisition to finalize your
22   initial accounting for an acquisition.  That
23   anniversary hasn't quite passed yet and,
24   therefore, this is not final until we declare
25   our accounting disclosed.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Q.   And as you sit here, are you aware
3    of any adjustments or changes you expect to
4    make on the one-year anniversary?
5          A.   We don't expect to make any
6    changes.
7          Q.   And we'll come back to 377A later
8    in the examination.
9          A.   Sure.
10         (Deposition Exhibit 388A, document
11         bearing production number
12         BCI-EX-(S)-000520127 with attachment,
13         marked for identification as of this
14         date.)
15   BY MR. TAMBE:
16         Q.   Sir, I've placed before you a
17   document marked as 388A.  It's a cover e-mail
18   and what looks like a Powerpoint document
19   attached to it.  Please take a moment to
20   review it and let me know when you're done and
21   I'll ask you some questions.
22         (Document review.)
23         Q.   Sir, have you had a chance to
24   review it, sir?
25         A.   I have, yes.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Q.   Okay.  And you'll see the cover
3    e-mail is an e-mail from Marie Stewart and you
4    referred to her earlier, correct?
5          A.   That's right.
6          Q.   She was your counterpart at
7    Lehman.
8          A.   That's correct.
9          Q.   And this is a cover e-mail
10   addressed to you and looks like others at
11   Barclays; is that correct?
12         A.   Yes.  That's correct.
13         Q.   Who's Chris Weidler and Charles
14   Utley?
15         A.   Chris Weidler, he works in finance
16   based in London.  His title is head of
17   financial reporting.  European head of
18   financial reporting.  Charles Utley is the US
19   regional head of technical accounting based in
20   New York.
21         Q.   And the document that's attached
22   to this e-mail from Marie Stewart to you, was
23   that a document you had requested that she
24   provide you?
25         A.   I don't recall receiving this

G. ROMAIN - HIGHLY CONFIDENTIAL

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    document.  I do recall Marie Stewart sending a
3    number of documents to me during the process
4    from Saturday on for the next couple weeks.  I
5    don't recall requesting or subsequently using
6    this document.
7        Q.    And having skimmed through the
8    document, do you have an understanding of what
9    the document is?
10       A.    I have an understanding that it
11   is -- it is the sum -- it's the summary of
12   some exercise to fair value elements of the
13   Lehman Brothers business.  That's what it
14   seems to be.
15       Q.    The e-mail from Marie Stewart is
16   dated the 13th of September.  The Saturday,
17   correct?
18       A.    Yeah.
19       Q.    And that's the day you flew over
20   from London to New York to join your
21   colleagues here.
22       A.    Yeah.
23       Q.    The transaction that was being
24   contemplated over that weekend, was that an
25   acquisition of the entirety of Lehman's

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    business?
3        A.    The transaction that -- my
4    understanding of the transaction which I was
5    informed had not been proceeded with when I
6    left on Saturday was an acquisition of the
7    Lehman business.  That was my understanding.
8    But I wasn't involved in those discussions so
9    it's only an understanding.
10       Q.    And was it your understanding --
11   do you have an understanding what this e-mail
12   from Marie Stewart to you was in connection
13   with that contemplated transaction?
14       A.    No, I don't.
15       Q.    Do you recall using the attachment
16   to that e-mail for any purpose?
17       A.    No.
18       (Deposition Exhibit 389A, document
19   bearing production number
20   BCI-EX-(S)-00052084, marked for
21   identification as of this date.)
22   BY MR. TAMBE:
23       Q.    Sir, I've placed before you a
24   one-page document marked Exhibit 389A.  Take a
25   moment to review it and let me know when

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    you're done.
3        A.    Sure.  Yeah.
4        Q.    You'll recognize this as an e-mail
5    from Mr. Clackson to you and many other folks
6    at Barclays.
7        Do you see that?
8        A.    Yeah.
9        Q.    Is Mr. Clackson someone you report
10   to directly?
11       A.    No, I report -- well, are you
12   asking now or at that time?
13       Q.    Let's ask back then.
14       A.    Back then I was reporting to Hugh
15   Shields who reported to Patrick Clackson.
16       Q.    And now?
17       A.    And now I report to Mark Merson
18   who reports to Patrick Clackson.
19       Q.    You'll see in Mr. Clackson's
20   e-mail, the second paragraph states, "We
21   nearly got there and the value created by the
22   deal would have been an incredible
23   $25 billion."
24       Do you see that?
25       A.    I do, yeah.

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.    Did you have any discussions with
3    anyone over that weekend about the value of
4    Lehman transaction, the deal that was being
5    contemplated?
6        A.    No, I didn't.
7        Q.    And just in orders of magnitude
8    the value of $25 billion, do you have any idea
9    how that compares to the value of the Lehman
10   operations that were contemplated being
11   acquired that weekend?
12       A.    No, I don't know.
13       Q.    You told us that on Monday, the
14   15th, you learned that a potential transaction
15   with Lehman possibly was back in
16   consideration, correct?
17       A.    That's correct.
18       Q.    And who did you hear that from?
19       A.    I heard that from James Walker who
20   was the CFO of the Americas at the time.
21       Q.    At Barclays.
22       A.    At Barclays Capital.
23       Q.    And what were you told about the
24   nature of the contemplated transaction on
25   Monday, the 15th?

Page 26

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   At that time very little.  I was
3   essentially providing support to a group of
4   people that were negotiating to make a deal.
5   But I wasn't involved in the negotiation of
6   the deal directly.  So my involvement was much
7   more limited to the information I was
8   providing at that time.
9        Q.   Was it your understanding either
10  on Monday or in the subsequent days that the
11  transaction that was being contemplated was a
12  purchase of select assets from Lehman
13  Brothers?
14       A.   Yes.
15       Q.   Did you have an understanding as
16  to whether Barclays was negotiating the value
17  at which it would be purchasing those assets
18  from Lehman Brothers?
19       A.   I didn't have an understanding of
20  the negotiations as involves those terms, no.
21       Q.   At any time, has it been your
22  understanding that Barclays purchased assets
23  from Lehman at a value other than the book
24  value at which those assets were being carried
25  by Lehman?

Page 27

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   Sorry.  I'm not sure I understand
3   the question.
4        Q.   Lehman had a series of assets that
5   it carried at some value on its books,
6   correct?
7        A.   Yeah.
8        Q.   Is it your understanding -- has it
9   ever been your understanding, that Barclays
10  purchased some selection of those assets at
11  values other than the book values at which
12  Lehman carried those assets?
13       A.   I didn't have an understanding of
14  a transaction whereby we were purchasing
15  certain assets at a particular value.  I had
16  an understanding of the assets that were being
17  purchased which grew over time and I have an
18  understanding of the amount of consideration
19  which was being paid as being elements of the
20  deal.  But in terms of the relationship
21  between the two, I wasn't involved in the
22  discussions as to how those terms were arrived
23  at.
24       Q.   In connection with the Lehman
25  transaction, did anyone ever use the phrase

Page 28

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   "block discount"?
3        A.   I don't recall anybody using the
4   phrase.
5        (Deposition Exhibit 390A, document
6   bearing production numbers
7   BCI-EX-(S)-00023761 through
8   BCI-EX-(S)-00023762 with attachment,
9   marked for identification as of this
10  date.)
11  BY MR. TAMBE:
12       Q.   Sir, I've placed before you a
13  multi-page document marked Exhibit 390A.  Take
14  a moment to review the document.  It's a cover
15  e-mail, a placeholder sheet, and then a small
16  spreadsheet.  Let me know when you're done.
17       (Document review.)
18       A.   Okay, yeah.
19       Q.   All right.  The cover e-mail, at
20  least the e-mail address block states it's
21  from Tom McCosker to several people at
22  Barclays but you recognize this as an e-mail
23  that you sent, correct?
24       A.   That's right.
25       Q.   You were sending it from Tom's

Page 29

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   e-mail box.
3        A.   Absolutely.
4        Q.   The spreadsheet that's attached to
5   the cover e-mail, could you tell us what that
6   is?
7        A.   Well, that is -- that was a very
8   preliminary summary of assets and liabilities
9   which was put together into a balance sheet
10  format and I was asked to send to the people
11  in the "to" box there.
12       At the time I sent the e-mail I
13  was at the -- I was on the 31st floor of 745
14  providing support to Patrick and the
15  negotiators.  I was provided with these
16  numbers as being numbers to put into that
17  format and sent.
18       Q.   In your cover e-mail you'll see a
19  reference to the PC used was installed with an
20  updated version of Excel.
21       Do you see that?
22       A.   Yeah.
23       Q.   Was that a Lehman PC that you were
24  using to create this?
25       A.   No.  It was a Barclays laptop that

Page 30

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2 we'd taken across.
3      Q.    On your acquisition summary, the
4 third page of the exhibit, the calculation
5 there begins with the line item that states
6 Inventory Carrying Amount.
7          Do you see that?  64 billion?
8      A.   I do, yes.
9      Q.    Where did that number and the
10 other numbers on the sheet come from?
11      A.   I don't recall who provided them
12 to me.  At that stage I wouldn't have been
13 involved in any of the underlying work so I
14 was provided with those numbers to send and at
15 that time, the 16th of September, would have
16 obviously been very preliminary numbers.
17      Q.    And the next line item on that
18 page, the third page of 390A, is Inventory
19 Valuation Adjustment.
20          Do you see that?
21          And that's a negative $3.5 billion
22 number.
23      A.   Yeah.
24      Q.    Right.  Do you know what that's a
25 reference to?

Page 31

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2      A.   I don't, no.
3      Q.    If you look on your cover e-mail
4 that you sent you refer to that $3.5 billion
5 adjustment as a writedown.
6          Do you see that?
7      A.   I do, yeah.
8      Q.    Was it your understanding that the
9 carrying value of these assets was being
10 written down by Barclays in calculating this
11 acquisition summary?
12      A.   At that time I didn't have enough
13 information to have a real sense.
14      Q.    You had on the liability section a
15 bonus accrual item of 1.3 billion.
16          Do you see that?
17      A.   Yeah.
18      Q.    And, again, do you know the source
19 of that number?
20      A.   I don't, no.
21      Q.    I'm sorry if I've already asked
22 you this.  Who was providing you with these
23 numbers?
24      A.   I don't recall who provided me
25 with those numbers precisely.  It would have

Page 32

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2 been somebody that was involved in the process
3 but I couldn't pinpoint to it an individual.
4      Q.    And, again, I'm just trying to
5 understand the exercise that was going on when
6 this sheet was prepared.
7      A.   Sure.
8      Q.    You had an Excel spreadsheet
9 opened and someone was giving you assets and
10 liabilities to put into a balance sheet, a
11 rudimentary balance sheet; is that right?
12      A.   That's correct.
13      Q.    Sir, I've handed you a document
14 that was previously marked as Exhibit 378.
15 It's a covering e-mail, a placeholder sheet,
16 and then a Powerpoint presentation.  Take a
17 moment to review the document and please let
18 me know when you're done.
19          (Document review.)
20      A.   Okay.
21      Q.    The attachment to the cover
22 e-mail, the Powerpoint document, have you seen
23 that document before today, sir?
24      A.   I've seen it in preparation for
25 the deposition.  If it's -- or if not this

Page 33

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2 one, something which looks very similar to it.
3      Q.    Just keep that document in front
4 of you.  I'm marking another exhibit.
5      A.   Um-hum.
6          (Deposition Exhibit 391A, document
7       bearing production numbers
8       BCI-EX-001766522 through
9       BCI-EX-001766536, marked for
10       identification as of this date.)
11 BY MR. TAMBE:
12      Q.    Sir, I've had placed before you a
13 document marked 391A.  Please take a look at
14 it.  It's also a Powerpoint presentation with
15 a similar title to Exhibit 378.
16          Is that the document you reviewed
17 in preparation for the deposition?
18          MR. SHAW:  I note that there
19 appear to be multiple documents here.
20      A.   Are these identical?
21          Oh, no.  This one has some
22 scribbles on it.
23          They look very, very similar so
24 I'm not sure.
25      Q.    And just as a housekeeping matter,

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2   the last three pages of the exhibit, I think
3   we can just extract.  It's a different form of
4   document.  It look like a memo.
5          A.   Oh, okay.
6          Q.   You can just pull those right off.
7          A.   Sure.
8          Q.   So the exhibit will just be the
9   Powerpoint presentation.
10         A.   Okay.
11         Q.   So looking at the Powerpoint
12   presentation it appears to be on a quick
13   summary similar to the document that's
14   attached to Exhibit 378 except for some
15   handwritten scribbles; is that right?
16         A.   It appears to be, yes.
17         Q.   Are those your handwritten
18   scribbles there?
19         A.   No.  That's not my handwriting.
20         MR. TAMBE:  I could ask counsel.
21   We received this collection of documents
22   I believe yesterday.  Is that right,
23   Terry?
24         MR. McMAHON:  Right.
25         MR. TAMBE:  Whose files did these

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2   documents come from?
3          MR. SHAW:  If it's what I think it
4   is, then this was from a collection of
5   hard copy documents that Mr. Romain had.
6          MR. TAMBE:  Okay.
7   BY MR. TAMBE:
8          Q.   Is that fair, Mr. Romain?  Was
9   that a collection of hard copy documents that
10   you turned over to your counsel?
11         A.   Yes, that's true.
12         Q.   And it's possible that in that
13   collection of hard copy documents were
14   documents with other people's handwriting on
15   them?
16         A.   Yes.
17         Q.   And you wouldn't know whose
18   handwriting this is on Exhibit 391A; is that
19   fair?
20         A.   No, no.
21         Q.   Do you understand the nature of
22   the handwriting?  I believe you're looking at
23   page 5 of the Powerpoint.
24         A.   I'm looking at page 5.  No, I'm
25   not aware of what the amendments were there

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2   for.
3          Q.   If you look at that column that
4   states New Transaction Included Gross, do you
5   see that column?
6          A.   I do, yes.
7          Q.   That column totaled up to
8   75.3 billion?
9          Do you see that?
10         A.   I do, yeah.
11         Q.   And the heading on this Powerpoint
12   page states total assets and new transaction
13   are 75 billion.
14         Do you see that?
15         A.   I do.
16         Q.   Any understanding as to where that
17   number comes from, the $75 billion number?
18         A.   No, I don't.  There were multiple
19   spreadsheets circulating around that time as
20   the nature of the deal and information changed
21   around that time and subsequently.  So I
22   wouldn't know -- I wouldn't know what set of
23   numbers these were drawn from.  But given the
24   date they would certainly have been very
25   preliminary numbers.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Q.   And looking at this exhibit,
3   Exhibit 391A, if you turn to the second page
4   of the exhibit -- yeah, that's the one.
5          It states Project Long Island
6   Board Discussion Materials.
7          Do you see that?
8          A.   I do.
9          Q.   And do you understand these were
10   materials prepared for discussion at a board
11   of directors meeting at Barclays?
12         A.   I don't know that.
13         Q.   Well, if you turn to the next
14   page, page 2 of the presentation, the very
15   last point on that page states, "We are
16   seeking board approval for the transaction and
17   to issue 612 million Barclay shares."
18         Do you see that?
19         A.   I do.
20         Q.   Does that help your understanding
21   that this was prepared for the board of
22   directors meeting for Barclays?
23         A.   I don't know that.
24         Q.   Did the $75 billion number we were
25   talking about a few minutes ago, are you aware

Page 38

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   of any other description of the assets to be
 3   purchased being provided to the board of
 4   directors on or around the 16th of September?
 5        A.   I wasn't involved in the provision
 6   of materials to the board.
 7            (Deposition Exhibit 392A, document
 8        bearing production numbers
 9        BCI-EX-(S)-00023813 through
10        BCI-EX-(S)-0023814, marked for
11        identification as of this date.)
12   BY MR. TAMBE:
13        Q.   Sir, I've handed you a two-page
14   document marked 392A. It's an e-mail chain.
15   Take a moment to review it and let me know
16   when you're done.
17            (Document review.)
18        A.   Okay.
19        Q.   You'll see the cover e-mail, the
20   first e-mail at the top of the page, the first
21   page of Exhibit 392A, is someone from called
22   Vivek Syal?
23        A.   Um-hum.
24        Q.   To you and then c.c.'d to others.
25        Do you see that?
```

Page 39

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2        A.   Yes.
 3        Q.   Who is Vivek Syal?
 4        A.   He works for Barclays Capital but
 5   are you asking for what role he would have
 6   been performing at that time?
 7        Q.   If you know, yeah.
 8        A.   I can't recall the exact title.
 9   He was -- he was a member -- a function which
10   I would describe as similar to investor
11   relations, but Barclays Capital rather than
12   Barclays Group.
13        Q.   And you'll see that Vivek is
14   forwarding you an e-mail which has a
15   calculation in it.
16            Do you see that?
17        A.   Yes.
18        Q.   And the e-mail that's being
19   forwarded to you, and you were a c.c. on that
20   original e-mail as well, begins with the
21   following phrase:  "Following the numerous
22   e-mails on people trying to reconcile the
23   75.3 billion pound in the board dec and in
24   particular wanting to understand the
25   19.9 billion in the board dec..." and then it
```

Page 40

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   goes on.
 3            Do you recall on or about the 16th
 4   being involved in any discussions about
 5   reconciling numbers in the board dec?
 6        A.   I recall this e-mail, certainly.
 7        Q.   Okay.  So what do you recall about
 8   this e-mail?
 9        A.   I recall that Bill was trying to
10   reconcile a set of numbers he had and we had a
11   conversation.  I don't recall the entire
12   content of that conversation.  But essentially
13   during that period the numbers -- people's
14   understanding of the numbers on the 16th and
15   subsequent to that, was changing over time.
16   And I was trying to help Bill to track down
17   where the number that he was referring to may
18   have come from.
19            In terms of the source of the
20   information which is included here, I don't
21   know where -- I don't know where those numbers
22   would have come from.
23        Q.   And what you're referring to are
24   the numbers in Bill Castell's e-mail, the
25   asset and liability numbers, the other
```

Page 41

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   calculations, correct?
 3        A.   Precisely.
 4        Q.   Were you ever able to answer his
 5   question as to reconciling the 75.3 billion
 6   number?
 7        A.   I don't recall.
 8        Q.   Did you ever conclude that that
 9   was an incorrect number?
10        A.   The numbers which were circulated
11   for a variety of purposes between a number of
12   people during that period were based on
13   preliminary estimates and people's best
14   understanding of numbers.  So I wouldn't use
15   the word incorrect.  I would say that the
16   numbers -- the appropriate numbers for the
17   deal changed over time for a variety of
18   reasons until we ended up with the numbers
19   that were disclosed in our annual report.
20        Q.   Were you involved at all in
21   calculating any of the numbers that were
22   disclosed to the Street in the analyst call
23   that was held on the 17th of September?
24        A.   I don't recall any direct
25   involvement.  I may have answered questions
```

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   from people who were involved in that.  But it
3   would be difficult to say more than that.
4        Q.   And certainly when Barclays was
5   speaking to the Street on the 17th, Barclays
6   would have made an effort to be accurate in
7   its description of the transaction, correct?
8        A.   Because I wasn't involved in the
9   conversation, I think I probably -- I don't
10  have a great understanding of what the form
11  and requirements are for those type of
12  announcements.  So I wouldn't want to comment
13  inaccurately.
14       Q.   Okay.  Well, I would expect
15  accuracy to be one of the requirements,
16  correct?
17       A.   I would expect that -- I would
18  expect faithful representation.  Accuracy is a
19  term which is difficult to find when -- based
20  on provisional information.
21       Q.   Do you have any understanding of
22  the headings Gross and Net as they're used in
23  that calculation that's provided by Mr.
24  Castell to you and others?
25       A.   No.  I -- no, I don't know what

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   those columns specifically represented, no.
3        Q.   But if you just follow the math,
4   it appears that on a line-by-line basis there
5   is a gross number, there's a parenthetical
6   which appears to be a deduction, and then a
7   net number.
8        Do you see that?
9        A.   I do.
10       Q.   Okay.  And this is all in the
11  section titled FV Inventory.
12       A.   Yes.
13       Q.   And you recognize that as fair
14  value inventory?
15       A.   Yes.
16       Q.   Do you have any understanding as
17  to why, on or about the 16th of September,
18  these adjustments were being made to the gross
19  valuation numbers?
20       A.   No, because I don't have a sense
21  of what the gross column represents.  I don't
22  have a sense of what might be deducted or why.
23       Q.   If you flip over to the next page,
24  at the top of the page there's two lines.  One
25  line simply means minus and there's a negative

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   1.5 number.
3        Do you see that?
4        A.   I do.
5        Q.   And then there's a little asterisk
6   that states Unallocated Deduction.  Not
7   assigned to a specific asset class.
8        Do you see that?
9        A.   Yeah.
10       Q.   And, again, were you aware on or
11  around the 16th of a roving unallocated
12  deduction for fair value?
13       A.   No.
14       Q.   This calculation rolls up to a
15  negative goodwill number of 3 -- I presume
16  billion -- pretax.
17       Do you see that?
18       A.   Yeah.
19       Q.   What is negative goodwill?
20       A.   Goodwill, positive or negative, is
21  an accounting concept which is calculated as
22  the difference between net assets acquired and
23  consideration paid in an acquisition.
24       Q.   So if you were going to calculate
25  a gain on acquisition you would need to

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   calculate the negative goodwill; is that
3   correct?
4        A.   If you were to put together the
5   accounting for an acquisition you would
6   calculate -- you would calculate goodwill, and
7   depending on whether the goodwill is positive
8   or negative, the treatment would differ.  If
9   goodwill is negative it would be included in
10  the income statements as a profit.
11       (Deposition Exhibit 393A, document
12  bearing production numbers
13  BCI-EX-(S)-00052197 through
14  BCI-EX-(S)-00052198, marked for
15  identification as of this date.)
16  BY MR. TAMBE:
17       Q.   Sir, just before we go on to the
18  exhibit that's been placed before you I just
19  want to make sure I understood your last
20  answer.
21       A.   Sure.
22       Q.   I believe you said if goodwill is
23  negative it would be included in the income
24  statement as a profit; is that right?
25       A.   For accounting purposes; that is

Page 46

1           G. ROMAIN - HIGHLY CONFIDENTIAL
2    correct, yes.
3        Q.   All right.
4            Sir, I've placed before you a
5    two-page document marked 393A.  It's a cover
6    e-mail and a spreadsheet.  Have you had a
7    chance to review the document?
8        A.   I have, yes.
9        Q.   The attachment, do you have an
10   understanding of what that attachment is?
11       A.   It's a schedule which I did see at
12   the time which was produced by Lehman, I
13   believe.  Yeah.
14       Q.   If you'd have Exhibit 392A in
15   front of you.  If you turn to page 2 of
16   Exhibit 392A, that's the calculation from Bill
17   Castell that we were looking at a few minutes
18   ago.  That has a total asset number of 72.05.
19           Do you see that?
20       A.   Yeah.
21       Q.   And the spreadsheet in
22   Exhibit 393A has an Adj. total assets of
23   72.65.
24           Do you see that?
25       A.   I do.

Page 47

1           G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   Do you have any understanding in
3    Exhibit 393A what the nature of the adjustment
4    is that's referred to in Adj. total assets?
5        A.   No, I don't.
6        Q.   And in Exhibit 393A which is the
7    Lehman-prepared document you testified about,
8    the Pure Payment and Comp Payment under
9    Liabilities, did you have an understanding on
10   the 16th what the source of those numbers was?
11       A.   No, I didn't.
12       Q.   As you sit here, do you know where
13   those numbers came from on the 16th?
14       A.   No, I don't.
15       Q.   Was it your understanding that
16   those numbers were inserted there to balance
17   out this balance sheet?
18       A.   No.  I don't have any
19   understanding of the source of any of the
20   numbers on the spreadsheet.
21           (Deposition Exhibit 394A, document
22   bearing production numbers
23   BCI-EX-(S)-00052200 through
24   BCI-EX-(S)-00052201, marked for
25   identification as of this date.)

Page 48

1           G. ROMAIN - HIGHLY CONFIDENTIAL
2    BY MR. TAMBE:
3        Q.   Sir, I've placed before you a
4    two-page document marked Exhibit 394A.  Take a
5    moment to review it and let me know when
6    you're done.
7            (Document review.)
8        A.   Okay.
9        Q.   And you'll recognize at the top of
10   this exhibit, there's an e-mail exchange at
11   the top, the first page, and the top e-mail is
12   from James Walker to you and others.
13           Do you see that?
14       A.   Yes.
15       Q.   And the attachment is a marked-up
16   portion of what appears to be a balance sheet.
17           Do you see that?
18       A.   Yes.
19       Q.   Do you have an understanding as to
20   what this document is and what the handwritten
21   notations are?
22       A.   My understanding is that this was
23   another version of a representation of assets
24   and liabilities based on information at the
25   time.  It's clear that we were trying to tie

Page 49

1           G. ROMAIN - HIGHLY CONFIDENTIAL
2    this out to some other document.  During that
3    week there were many exercises of this nature
4    as understanding of the transaction and its
5    component parts changed.
6            So that was part of that ongoing
7    process.
8        Q.   Any idea as to what you're trying
9    to tie this spreadsheet out to?
10       A.   No.
11       Q.   And is this your handwriting on
12   the second page of the exhibit?
13       A.   No.
14       Q.   394A?
15       A.   No.
16       Q.   Do you know whose handwriting it
17   is?
18       A.   I don't know.
19           (Deposition Exhibit 395A, document
20   bearing production numbers
21   BCI-EX-(S)-00052268 through
22   BCI-EX-(S)-00052270, marked for
23   identification as of this date.)
24   BY MR. TAMBE:
25       Q.   Sir, I've placed before you a

Page 50

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    three-page document marked Exhibit 395A.  Take
3    a moment to review it and let me know when
4    you're done.
5        (Document review.)
6        A.   Okay.
7        Q.   Now, this is an e-mail you'll see
8    from Bill Castell to several folks at Barclays
9    and other places.
10        Do you know what the purpose of
11    that this e-mail was?  I see addresses here
12    for db.com.  I assume that's deutschebank.com?
13        A.   I don't know the people but db.com
14    is the standard e-mail ending for Deutsche
15    Bank, yes.
16        I don't have an understanding as
17    to the purpose for this.
18        Q.   Okay.
19        A.   It implies that there was a call
20    so...
21        Q.   And there's a reference to an 0745
22    DD call.  Does that have any meaning to you?
23        A.   No.  DD could mean a number of
24    things.  I'm not sure.
25        Q.   Okay.  And this e-mail from Bill

Page 51

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    Castell has another calculation of total
3    assets, total liabilities.
4        A.   Um-hum.
5        Q.   Do you know where these numbers
6    come from?
7        A.   No.  No, I don't know where he got
8    them from.
9        Q.   Were you ever a participant in
10    discussions with analysts about this
11    transaction?  External analysts about the
12    Lehman Barclays transaction?
13        A.   No.
14        Q.   In the week of the 15th, do you
15    recall discussions about how and where the
16    assets that were being acquired were going to
17    be booked?  And by where I mean what entity.
18    What legal entity.
19        A.   During that week I don't recall
20    any discussions along those lines, no.
21        Q.   Okay.  Subsequent to that week, do
22    you recall any discussions about how and where
23    the assets were going to be booked?
24        A.   Yes.  Yes, there were numerous
25    discussions around entity allocations within

Page 52

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    Barclays group, over the next period of time.
3    I'm not sure exactly how long.
4        Q.   And what you refer to as entity
5    allocations, what drove the decision as to
6    what entity was selected for allocating
7    particular assets?
8        A.   I don't think there was a single
9    determining factor.  As with any decision of
10    that nature you'd be considering a number of
11    things like infrastructure that was present in
12    the various entities.  Capital.  The normal
13    activities of the entities.  These are issues
14    of a type which I would expect to feed into
15    it.  But at a time which I recall being raised
16    at one time or another.
17        Q.   How about tax considerations?
18        A.   Tax considerations as well, yes.
19        Q.   So that would be a fourth.  It
20    wasn't included in one of the three you
21    mentioned.
22        A.   They were examples.
23        Q.   So let's make sure we covered all
24    the possible reasons why you might choose to
25    allocate in one entity versus another.  You

Page 53

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    mentioned infrastructure.  You mentioned
3    capital, by which I assume you mean regulatory
4    capital requirements?
5        A.   Primarily.  Yeah, it would seem to
6    be encapsuled in regulatory capital.
7        Q.   Then you talked about normal
8    activities.  So I guess you were allocating
9    the assets to entities that's consistent with
10    their normal activities.  Is that what you
11    mean?
12        A.   Yes.
13        Q.   And then another consideration
14    would be tax.
15        A.   Yes.
16        Q.   You want to minimize the tax
17    burden on the enterprise as a whole; is that
18    right?
19        A.   Well, I don't work in the tax
20    department so I wouldn't be able to say the
21    tax minimization is always the primary reason.
22    But tax considerations I would expect to be
23    considered -- I wouldn't be able to represent
24    that list of four generic categories as an
25    exhaustive list clearly.

Page 54

G. ROMAIN - HIGHLY CONFIDENTIAL

1  
2    Q.   In connection with the
3  Lehman/Barclays transaction and the
4  allocations of assets to particular Barclays
5  entities, can you identify any other reason
6  for the allocation other than these four that
7  we've discussed?
8    A.   Not off the top of my head, no.
9        MR. TAMBE:  Let's just take a
10  short break and we'll continue.
11        THE WITNESS:  Sure.
12        (Recess taken.)
13  BY MR. TAMBE:
14    Q.   Sir, I've placed before you a
15  document that was previously marked as
16  Exhibit 283A.  It's a somewhat long e-mail
17  chain.  So if you want to start from the back
18  and read your way up to the front, let me know
19  when you're done and I'll ask you some
20  questions.
21        (Document review.)
22    A.   Okay.
23    Q.   This e-mail chain, Exhibit 283A,
24  starts off with an e-mail from you at the top
25  to Caroline Owen and others.

Page 55

G. ROMAIN - HIGHLY CONFIDENTIAL

1  
2    Q.   Do you see that?
3    A.   Yeah.
4    Q.   And you're asking for a
5  coordinated approach on how assets are brought
6  onto the Barclays balance sheet, correct?
7    A.   Yeah.
8    Q.   In your second paragraph of your
9  e-mail you state, the second sentence, "I've
10  heard nothing about an SPV plan and generation
11  of gain in PLC..."
12        And then the sentence goes on.
13    A.   Yeah.
14    Q.   One, what did you mean by SPV
15  plan?
16    A.   There's a reference in Mark
17  Rudduck's e-mail two down about potential sale
18  to an SPV which is responding to a reference
19  in Beatrice Montaudy's preceding e-mail of a
20  plan to acquire assets through an SPV of
21  Barclays.
22    Q.   Do you recall --
23    A.   At all times -- what I was saying
24  there was that I hadn't heard about it and
25  that if there were discussions on it that the

Page 56

G. ROMAIN - HIGHLY CONFIDENTIAL

1  
2  broader finance needs to be involved.
3    Q.   Do you recall having had
4  discussions with any of these people who are
5  on this e-mail chain about an SPV plan?
6    A.   No, I'm not sure what plan
7  Beatrice would have been talking about at that
8  time.
9    Q.   And the other phrase you use in
10  your e-mail was generation of gain in PLC.
11        Do you see that?  It's in your
12  e-mail, the first e-mail.
13    A.   Yeah.
14    Q.   And when you refer to PLC you're
15  talking about Barclays Bank PLC, correct?
16    A.   Yeah.  I'm referring back to
17  Beatrice's e-mail where she identifies the
18  plan as being to acquire through SPV of BBPLC
19  and sell to BCSl to recognize a gain in BBPLC.
20  So I was -- I was saying I didn't know
21  anything about such a plan.
22    Q.   Just so I get through the
23  abbreviations, BBPLC is just Barclays Bank
24  PLC, right?
25    A.   That's correct.

Page 57

G. ROMAIN - HIGHLY CONFIDENTIAL

1  
2    Q.   And BCSL is?
3    A.   It's Barclays Capital Securities,
4  Ltd.  I'm 99 percent sure that's the name of
5  it.
6    Q.   Okay.  And both the PLC and the
7  limited company are non-US companies, correct?
8    A.   They are both UK companies.
9    Q.   Okay.  And your reference or the
10  reference to recognition of gain --
11    A.   They're both UK companies.  That's
12  not to say that US operations and assets are
13  not owned by those.  So, for example, BBPLC
14  does have a New York branch.
15    Q.   And apart from those two entities,
16  you also have a US broker/dealer entity,
17  correct?
18    A.   That's correct.
19    Q.   And what's the name of that
20  entity?
21    A.   Barclays Capital, Inc. I think
22  is -- BCI is its normal reference.
23    Q.   And if you go to the third page of
24  Exhibit 283A, that's an e-mail from Beatrice
25  Montaudy, Mark Rudduck, and Jasen Yang.

Page 58

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2        Do you see that?
 3        A.    Yes.
 4        Q.    And she makes a reference in there
 5   to the 46 percent marginal tax rate applicable
 6   to BCI.
 7        Do you see that?
 8        A.    Yes.
 9        Q.    And so that's the US tax rate
10   applicable to the US broker/dealer, correct?
11        A.    That's how I'd read the sentence.
12   I don't have a particular detailed knowledge
13   of the tax regimen.
14        Q.    In that same sentence, earlier in
15   that sentence she makes a reference to the
16   following:  "It was essential to the valuation
17   calculation that the 'discount' between the
18   value of the assets acquired and the purchase
19   price not be subject to the 46 percent
20   marginal US tax rate applicable to BCI."
21        Do you see that?
22        A.    I do.
23        Q.    Do you have any understanding as
24   to what she meant by that?
25        A.    No, I don't know.
```

Page 59

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2        Q.    And the use of the word "discount"
 3   in her sentence, was it your understanding
 4   that the differential in the value of the
 5   assets acquired versus the purchase price paid
 6   was a discount?
 7        MR. SHAW:  Objection to form.
 8        A.    I don't recall reading the e-mail
 9   chain down that far.  My response as I read
10   and recollect it was a response to the e-mail
11   from Caroline suggesting that I get involved.
12   So this is certainly the first time I recall
13   seeing the sentence and I don't have any sense
14   as to what Beatrice meant by it.
15        Q.    And other than this e-mail chain,
16   did you hear anyone else at Barclays refer to
17   that differential to mean the value of the
18   assets acquired and the purchase price as a
19   discount?
20        A.    No.
21        Q.    What is Beatrice Montaudy's
22   position?
23        A.    She works in the tax department in
24   New York.
25        Q.    And what's her position within the
```

Page 60

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   tax department?
 3        A.    I'm not sure.  At the time she
 4   reported to Susan Grbic.  She was the US head
 5   of tax.
 6        Q.    And do you know what her position
 7   is now, Beatrice Montaudy's, if she's still
 8   with the bank?
 9        A.    She's still in the US tax
10   department, yes.
11        Q.    And her position?
12        A.    I don't know.
13        Q.    As the week goes on, Tuesday,
14   Wednesday, Thursday, that week of the 15th of
15   September, was it your understanding that the
16   nature of the transaction was changing?
17        A.    I don't recall precisely what day
18   I became aware of that but certainly by the
19   Monday when a deal had been executed I was
20   aware that the form of the deal was different
21   than that envisaged previously.
22        Q.    So you're comparing Monday, the
23   15th, to the weekend.
24        A.    Yes.
25        Q.    Now moving further in the week,
```

Page 61

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   was it your understanding that the deal that
 3   was discussed and the deal that was the
 4   subject of the acquisition sheets we were
 5   looking at before, the Monday/Tuesday
 6   transaction, did that change during the course
 7   of the week?
 8        A.    So from when to when?
 9        Q.    So starting Monday, the 15th, the
10   day that Lehman declares bankruptcy, you go
11   back, you reengage in discussions with Lehman
12   on the 15th.
13        A.    Yeah.
14        Q.    That deal that evolves from those
15   discussions, does that change during the
16   course of the week as far as you know?
17        A.    Sorry.  That was the question I
18   was responding to previously.  I must have
19   misunderstood the question.
20        Yes.  It was -- so over the week
21   from the 15th to Monday, the 22nd when the
22   deal was executed, I understood the form
23   of the deal changed.
24        Q.    As you sit her, what's your
25   understanding of the how the form of the deal
```

Page 62

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  changed from the 15th to the 22nd?
3         So not what you knew at the time
4  but what you know now with the benefit of
5  everything that's happened.
6       A.   The main thing I know is that the
7  deal that was executed finally there may have
8  been changes in the form which I was not
9  specifically aware of.  The change in the form
10 I was aware of was that we were entering into
11 a repo type transaction involving the Fed but
12 that was the principal difference that I was
13 aware of.
14      Q.   Now, going back to the week of the
15 15th, did you become aware of this change to a
16 repo type transaction during that week?
17      A.   I can't recall precisely when I
18 became aware of that because I know I was
19 definitely aware of it by the 22nd.  It's
20 possible I was aware of that sometime before
21 then, but I can't recall accurately whether
22 that was the case or not.
23      Q.   Do you recall what role you played
24 on Thursday, the 18th, Friday the 19th, over
25 the weekend, onto the 22nd?  What were you

Page 63

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  doing during that time frame?
3       A.   I don't accurately recall.  I was
4  involved in discussions around the balance
5  sheet I was maintaining so including lofty
6  placeholder numbers at that stage obviously
7  and speaking to people to try to improve
8  those.  But beyond that general level I don't
9  recall specific involvements during those
10 days.
11      Q.   Do you have any understanding of
12 any efforts made by Lehman and Barclays to
13 identify additional assets to be delivered by
14 Lehman to Barclays on Friday, the 19th, and
15 then the weekend that followed?
16      A.   No.
17      Q.   Was it your -- is it your
18 understanding that all of the assets acquired
19 by Barclays from Lehman, the deal that was
20 finally executed, are also assets that came
21 over as a result of the repo?
22      A.   My understanding was that the repo
23 transaction was involved but to my
24 understanding the assets that were acquired or
25 the liabilities that were incurred were

Page 64

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  from -- I was less involved and interested in
3  how things developed during the week because I
4  wasn't particularly involved in that.
5         What I was interested in was the
6  deal which ended up getting done.  So it was
7  based on the deal documents and conversations
8  with those who understood elements of any one
9  asset class.  Rather than -- rather than any
10 sort of development or other sets of
11 discussions.
12      Q.   In terms of working with the
13 balance sheet which was a document that you
14 said was an iterative document that you were
15 working with, how did you obtain information
16 that you put into your work-in-progress
17 balance sheet?
18      A.   It was principally a process of
19 liaison and discussion across finance and with
20 others.  So I was speaking with many people
21 over the course of months to at first get an
22 understanding of the nature of the transaction
23 and the assets and liabilities that had been
24 acquired.  And then later at a more granular
25 level to get an accurate representation for

Page 65

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  our books and records and annual report.
3         So it was a project size involving
4  a huge number of people in the back.
5       Q.   And did you actually sit down with
6  the Asset Purchase Agreement and use that as a
7  guide to helping you create the balance sheet?
8       A.   The Asset Purchase Agreement was
9  one of the documents which I looked at, yes.
10      Q.   And did you actually annotate the
11 Asset Purchase Agreement against the changes
12 that were made in the clarification letter?
13      A.   I made no annotations that I can
14 recall, no.
15      Q.   Okay.
16      A.   I -- no.
17      Q.   Were you aware of changes to the
18 Asset Purchase Agreement that were made via
19 the clarification letter?
20      A.   I wasn't aware of changes.  I
21 was -- the best way of putting it would be
22 that I looked at the Asset Purchase Agreement,
23 the amendment to the Asset Purchase Agreement,
24 and the clarification letter as a
25 representation of the transaction.  I wasn't



G. ROMAIN - HIGHLY CONFIDENTIAL

1

2  differentiating between the two.  I had to
3  look at all of them to get a sense of the
4  transaction that was done.
5      Q.    When's the first time you recall
6  seeing the Asset Purchase Agreement?
7      A.    I definitely saw -- I'd definitely
8  seen it by the 18th.  It's possible I may have
9  seen a draft a day or two before that.  I say
10 a draft.  A version or a copy.  I definitely
11 have an e-mail which indicates that I had it
12 on the 18th because I looked for that in
13 preparing for this deposition.
14     Q.    Do you recall what the event or
15 circumstance was that makes you so sure that
16 you had it by the 18th?  You saw an e-mail?
17     A.    I saw an e-mail.
18     Q.    Sorry.  Do you know why you were
19 provided with a copy on the 18th?
20     A.    Because I was responsible for
21 putting together the acquisition balance
22 sheets and it was important I had a sense of
23 the transaction so I was seeking to get copies
24 of relevant deal documentation.
25     Q.    When's the first that you saw the

G. ROMAIN - HIGHLY CONFIDENTIAL

1

2  clarification letter?
3      A.    Again, in preparing for the
4  deposition I had looked at my e-mails and I
5  definitely have an e-mail on the 22nd which
6  had the clarification letter attached to it.
7      Q.    Did you find any indication in
8  preparing for your deposition that you
9  received a copy of the clarification letter
10 prior to the 22nd?
11     A.    No.
12     Q.    And in terms of the process you
13 followed in putting together the balance sheet
14 you actually sat down with the operative legal
15 documents to help you prepare the balance
16 sheet?
17     A.    I referred to them, yes.  Yes.
18         (Deposition Exhibit 396A,
19         three-page document bearing production
20         numbers 464242, marked for
21         identification as of this date.)
22 BY MR. TAMBE:
23     Q.    Sir, I've placed before you a
24 three-page document marked Exhibit 396A.  Take
25 a moment to review it and tell me when you're

G. ROMAIN - HIGHLY CONFIDENTIAL

1

2  done.
3         MR. SHAW:  I'll note that there
4  appears to be an erroneous or additional
5  unknown date on this at the very top.
6  I'm not sure if it's just an artifact of
7  the document production.
8         MR. TAMBE:  Yeah.  The first two
9  lines on page 1 are an artifact of the
10 document production.  As is the date
11 that appears in the bottom left-hand
12 corner.
13        (Document review.)
14     A.    Okay.
15     Q.    And you'll see your cover e-mail
16 is an e-mail from you to Martin Kelly at
17 Lehman.
18         Do you see that?
19     A.    Yes.
20     Q.    And others.
21     A.    Yes.
22     Q.    And who is Martin Kelly?
23     A.    At that time?
24     Q.    Yeah, at that time.
25     A.    Martin was -- I'm not sure

G. ROMAIN - HIGHLY CONFIDENTIAL

1

2  precisely what his position was but he was a
3  senior member of finance for Lehman.
4      Q.    Okay.  And what role does he have
5  now?
6      A.    He's now the CFO of the Americas
7  for Barclays Capital.
8      Q.    And if you follow this e-mail
9  chain it starts with a request from Patrick
10 Clackson to James Walker trying to acquire --
11 trying to obtain a balance sheet.
12         Do you see that?
13     A.    Yeah.
14     Q.    And then James sends that request
15 on to Martin Kelly.
16         Do you see that?
17     A.    Yeah.
18     Q.    And there's an e-mail then from
19 Martin to James Walker and to you with some of
20 the numbers on the balance sheet.
21         Do you see that?
22     A.    I see the e-mail, yes.
23     Q.    Just in terms of process, let me
24 ask you why was Barclays reaching out to
25 Lehman for an opening balance sheet?

1             G. ROMAIN - HIGHLY CONFIDENTIAL
2             MR. SHAW:  Objection, foundation.
3         Q.   If you know.
4         A.   I don't know why James
5    specifically sent it to Martin.  During the
6    period we were speaking with Lehman employees
7    who had familiarity with some of the acquired
8    assets for some information.  But I
9    wouldn't -- I wouldn't know precisely why
10   James at that time thought that Martin was the
11   best source of information for the numbers at
12   that stage.
13        Q.   And as you developed your balance
14   sheet, the one that you worked on --
15        A.   Yeah.
16        Q.   -- did you work off of the Lehman
17   prepared balance sheet or did you create a new
18   balance sheet from scratch?
19        A.   I created a new balance sheet from
20   scratch.
21        Q.   Did you compare your balance sheet
22   to the Lehman balance sheet?
23        A.   There wasn't any Lehman balance
24   sheet as such that I was aware of.
25        Q.   And what I mean by the Lehman

1             G. ROMAIN - HIGHLY CONFIDENTIAL
2    balance sheet, the Lehman-prepared balance
3    sheet.
4         A.   Apart from this list here I'm not
5    aware of a parallel Lehman balance sheet
6    existing.
7             (Deposition Exhibit 397A, document
8             bearing production numbers
9             BCI-EX-(S)-00013605 through
10            BCI-EX-(S)-00013606 with attachment,
11            marked for identification as of this
12            date.)
13   BY MR. TAMBE:
14        Q.   Sir, I've handed you a document
15   marked Exhibit 397A.  It's a cover e-mail, a
16   placeholder sheet, and a spreadsheet.  Take a
17   moment to review it and let me know when
18   you're done.
19            (Document review.)
20        A.   Sure.
21        Q.   Have you had a chance to review
22   it?
23        A.   Yeah.
24        Q.   If you look at the cover e-mail,
25   the second e-mail on the first page is an

1             G. ROMAIN - HIGHLY CONFIDENTIAL
2    e-mail from Robert Azerad to you, James
3    Walker, and others.
4             Do you see that?
5         A.   Yeah.
6         Q.   And it attaches a document that's
7    titled Copy of Opening Balance Sheet.  There's
8    some more notations after that.
9         A.   Sure.
10        Q.   And the attachment appears to be a
11   spreadsheet.
12            Do you see that?
13        A.   Yeah.
14        Q.   And you'll see that several of the
15   items on that spreadsheet tie into the numbers
16   on the other exhibit we were looking at,
17   Exhibit 396A.
18            Do you see that?
19        A.   Yes.
20        Q.   Does this refresh your
21   recollection at all that you received a
22   spreadsheet from Lehman setting out the
23   opening balance sheet?
24        A.   Well, I clearly received this
25   spreadsheet, yes.

1             G. ROMAIN - HIGHLY CONFIDENTIAL
2         Q.   Did you have any discussions with
3    Lehman about the valuation of the total assets
4    that's reflected on Exhibit 397A?
5         A.   No.  No.
6         Q.   And did you have an understanding
7    as to the source of that information?
8         A.   No, I don't have any understanding
9    as to the source.
10            (Deposition Exhibit 398A, two-page
11            document bearing production number
12            44230, marked for identification as of
13            this date.)
14   BY MR. TAMBE:
15        Q.   Sir, I've handed you a two-page
16   document marked Exhibit 397A.  Take a moment
17   to review that and let me know when you're
18   done.
19            (Document review.)
20        Q.   Oh, I'm sorry.  398A.
21        A.   Okay.
22        Q.   And in Exhibit 398A in the
23   middle -- towards the bottom of the first page
24   there's an e-mail from you to Martin Kelly.
25            Do you see that?

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          A.    Yes.
3          Q.    And you're in particular asking
4    him about his $44.88 billion number.
5          Do you see that?
6          A.    Yes.
7          Q.    And you ask him whether the
8    additional 1.9 billion of assets separate to
9    the 15(c)(3) is part of that 44.88 number.
10         Do you see that?
11         A.    I see that, yeah.
12         Q.    What's your understanding of what
13   the 1.9 billion of additional assets is a
14   reference to?
15         A.    The 1.9 is a reference there to
16   securities which were due to Barclays clearing
17   process.  And the purpose of my mail was
18   essentially to ensure that we weren't double
19   counting when trying to identify the assets
20   that needed to be valued.
21         Q.    And you see the response from
22   Martin Kelly to you where he says, "Includes
23   the 1.9B."
24         Do you see that?
25         A.    Yes.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Q.    Do you recall further discussions
3    on this topic as to whether the 44.88 included
4    the 1.9?
5          A.    Yes.
6          Q.    And do you recall that ultimately
7    you resolved the 1.9 was not included as part
8    of the 44.88?
9          A.    Well, if we're using shorthand for
10   the 1.9 and the 44.88 to refer to assets from
11   the clearance box and assets which came across
12   the repo, then the conclusion of those
13   discussions was that not all of the assets
14   from the clearance boxes had come across.  And
15   there was some which were still to be
16   received.  The 1.9, 2.9, and 44.88 were not --
17   did not end up being represented as Barclays'
18   view of the fair value of the assets which is
19   the numbers that are represented in that
20   financial statement.
21         I'm not sure what the source of
22   those two numbers themselves and the values
23   was.
24         Q.    And it's your understanding that
25   the assets in the clearance boxes is what

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    ultimately became Schedule B; is that right?
3          A.    I don't have enough of an
4    understanding about the precise composition of
5    Schedule B as it relates to understanding
6    there.  My understanding was that Barclays was
7    o due to receive the assets from the clearing
8    box and we received some but not others at
9    that time.
10         Q.    Putting on your 30(b)(6) hat now
11   for a moment.
12         A.    Yeah.
13         Q.    What is your understanding of
14   Schedule A to the Asset Purchase Agreement?
15         A.    My understanding of Schedule A was
16   that it was the representation of the assets
17   which were coming across to Barclays against
18   the reverse repo.
19         Q.    So your understanding is that all
20   of the assets that are listed on Schedule A
21   were assets that had been pledged to the Fed
22   and were transferred to Barclays.
23         MR. SHAW:  Objection.
24         Mischaracterizes the prior testimony.
25         Foundation.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Q.    You can answer if you understand
3    the question.
4          A.    I was aware that there was a
5    reconciliation process which was required of
6    Schedule A at the detailed CUSIP level but
7    it's my understanding that was what Schedule A
8    was intended to represent, yes.
9          Q.    Just so we're clear, every CUSIP
10   that appears on Schedule A it is your
11   understanding as the 30(b)(6) witness for
12   Barclays that every one of those CUSIPs was a
13   CUSIP that had been pledged to the Fed?
14         A.    No.  That's not my understanding.
15         MR. SHAW:  And I'm going to object
16   this witness has been offered only with
17   respect to the Schedule A and Schedule B
18   issues to talk about the Barclays effort
19   to value the securities that appear on
20   Schedule A and Schedule B.
21         MR. TAMBE:  Okay.  So let's just
22   mark the 30(b)(6) and maybe it's already
23   been marked.  Has it already been
24   marked?
25         MR. McMAHON:  This one I think has

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     not been.
3          MR. TAMBE:  Okay.  So then let's
4     mark it.  We'll just mark the 30(b)(6)
5     notice so we have some precision as to
6     what he's being offered for and what
7     he's not being offered for.
8          MR. SHAW:  Okay.
9          (Pause on the record.)
10    BY MR. TAMBE:
11        Q.   Sir, I've placed before you a
12    document that's been marked 81B.
13             MR. TAMBE:  My first question is
14    really a point of clarification for your
15    counsel.  On items 1 and 2 of Schedule A
16    of this 30(b)(6) notice for what -- for
17    what subjects or topics is Mr. Romain
18    the 30(b)(6) witness for Barclays?
19             MR. SHAW:  Mr. Romain is a
20    30(b)(6) witness on the issue of
21    Barclays' efforts to value the
22    securities that were on Schedule A and
23    Schedule B.
24    BY MR. TAMBE:
25        Q.   Taking off your 30(b)(6) hat, do

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     you have any understanding as to how the
3     assets that came to be listed on Schedule A
4     and Schedule B were selected?
5          A.   No, I don't.  No.
6          Q.   And taking off your 30(b)(6) hat,
7     do you have any understanding as to how the
8     assets on Schedule A and Schedule B were
9     transferred to Barclays?
10         A.   No, I don't.  No.
11         Q.   Do you have an understanding as to
12    whether the assets on Schedule A and Schedule
13    B have, in fact, been transferred to Barclays?
14         A.   In terms of -- at the CUSIP level
15    I was aware there was a reconciliation process
16    so my understanding is that is not a -- that's
17    not a perfectly accurate statement was my
18    understanding.  My involvement with the
19    Schedule A and Schedule B assets was in
20    relation to ensuring that the assets that were
21    received by Barclays were the properly
22    recorded value.  The process by which they
23    came to be transferred to Barclays an area
24    which I don't have particular insight into.
25             (Pause on the record.)

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Q.   Sir, I've placed before you a
3     document marked previously as Exhibit 86B.
4     Would you take a moment to look at this
5     spreadsheet and let me know when you're done.
6             (Document review.)
7          A.   Okay.
8          Q.   When you talked about the
9     valuation of the Schedule A and Schedule B
10    assets, does this document, Exhibit B, relate
11    to that process in any way?
12         A.   It does, yes.
13         Q.   Is 86B the summary level valuation
14    of the Schedule A assets?
15         A.   Yeah.  It's the summary level
16    valuation for -- yeah, for those assets.
17         Q.   So now with your 30(b)(6) hat
18    firmly on I'm going to ask you to explain to
19    me at the summary level from Exhibit 86B what
20    is the information that's in 86B.  And you can
21    start with the spreadsheet and go by rows or
22    columns.  Describe this collection of
23    information.
24             MR. SHAW:  Before we do, can we
25    just confirm that the witness believes

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     this was the final version of that?
3             MR. TAMBE:  Sure.
4          Q.   Is it the final version?
5          A.   It looks like the final version.
6     To be definitive I would need to compare -- to
7     be definitive sitting here right now I would
8     need to compare the numbers with those on the
9     acquisition balance sheet.
10         Q.   And we had earlier this morning
11    looked at what you believed to be the final
12    version of the acquisition balance sheet.
13         A.   Yeah.
14         Q.   Let me see if I can locate that.
15    Which is Exhibit 377A.
16         A.   Yeah.
17         Q.   Are you doing that comparison now,
18    sir?
19         A.   I am, yes.
20             Yes.  This is the final version.
21    There were some immaterial off-line
22    adjustments made just to tidy up right before
23    the financial statements were published but
24    the differences were very minor.
25         Q.   So keep before you the final

Page 82

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  acquisition balance sheet which is 377.  Also
3  keep in front of you 86B.  I'm going to add
4  one more document to your pile for now and
5  that's a document previously marked as
6  Exhibit 87B if you could confirm that that
7  is the valuation of the Schedule B assets.
8      A.    Sorry.  I think there's been --
9  there's confusion there.
10      Q.    Okay.
11      A.    Exhibit 86B is the valuation of
12  the assets which were received by Barclays,
13  whether Schedule A or Schedule B.
14      Q.    All right.
15      A.    The Exhibit 87B is the valuation
16  of the -- of securities which were received on
17  or around the 22nd of September from JPMorgan
18  Chase.
19      Q.    Okay.  No, you're absolutely
20  right.  Okay.  So going back to 86B, 86B
21  includes both Schedule A and Schedule B.
22      A.    Yeah.  It includes all of the
23  Schedule A and Schedule B assets that were
24  received around -- well, around the time of
25  the deal.  So yes.

Page 83

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2      A.    All right.  So looking at -- and
3  87B, is that a final schedule as well, if you
4  can confirm that?
5      A.    It is, yes.
6      Q.    Let's start with 87B which is the
7  JPM -- it has the title JPM assets.
8          Do you see that?
9      A.    Yes.
10      Q.    And putting on your 30(b)(6) hat
11  which should remain firmly on this whole
12  series of questions.
13      A.    Sure.
14      Q.    Describe for me what this
15  spreadsheet is.
16      A.    This spreadsheet is a summary of a
17  valuation of those assets designed for
18  inclusion in our books and records and in our
19  financial statement disclosures.
20      Q.    And going across the columns,
21  column A of this spreadsheet lists -- these
22  are the top third asset categories.
23          Do you see that?
24      A.    Yes.
25      Q.    There's a phrase there, Portfolio

Page 84

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  3.  Does that have any meeting to you, sir?
3      A.    Portfolio 3 was the term used to
4  refer to the JPMorgan assets.
5      Q.    And then you have several asset
6  categories.  Lines 13 and 14 have the initials
7  PMTG and PMTG unknown.
8          Do you see that?
9      A.    Yes.
10      Q.    What is PMTG?
11      A.    PMTG is a group within the firm.
12  It's a business line.  It relates -- let me
13  get this correct.  Principal mortgage trading
14  group I think is the full name.
15      Q.    There's a separate line item, line
16  6, which states Agency Mortgage.
17      A.    Yeah.
18      Q.    Okay.  Do you know if any agency
19  mortgages are included within PMTG?
20      A.    Well, the line for PMTG is not
21  supposed to indicate that these were all
22  assets of a PMTG type.  That group wouldn't
23  typically trade in some of these items.  The
24  significance here is that PMTG were the group
25  that were taking responsibility for

Page 85

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  coordinating the valuation of the acquired
3  assets from a business perspective.
4          So what happened was that
5  initially assets were taken into a central
6  pot, if you like, such that they could be
7  considered, you know, as part of the
8  acquisition.
9          Subsequent to that assets were
10  transferred to the appropriate group that
11  would trade in those asset classes as a data
12  matter also in the Street or whatever decision
13  was made with those assets subsequent to
14  acquisition.  But PMTG were responsible until
15  that happened from a business perspective.
16      Q.    So assets that would have come
17  over from JPMorgan obviously would not have
18  had a PMTG tag on them.  They would have been
19  agency mortgages, corporates, munies, et
20  cetera, right?
21      A.    All asset classes.
22      Q.    If you look behind the line 13
23  PMTG does it break out into separate asset
24  classes?
25      A.    The breakout of the asset classes

Page 86

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  is rows 6 to 10.
3       Oh, in terms of the PMTG item.
4       Q.   Yes.
5       A.   Right.  I may have misunderstood
6  the question then.
7          The PMTG -- the non-PMTG items are
8  principally the ones in 6 to 10.  The items in
9  row 13 would have been the ones which, by
10  nature, were more relevant to PMTG as a group.
11  But PMTG were responsible for all of them
12  until they were transferred out of this sort
13  in effect pool which the assets were initially
14  transferred into.  As a matter of practice
15  they were our single point liaison for the
16  Lehman acquisition.
17       Q.   All right.  Column B is titled
18  Notional.  And what's your understanding of
19  what that means?
20       A.   The contractual notional of the
21  underlying assets.
22       Q.   Column C is -- well, before we go
23  to C, when you say contractual notional that
24  is the principal amount owing on those
25  securities?

Page 87

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2       A.   Yes.  The principal value, yes.
3       Q.   Column C is FO value.  Does that
4  mean front office value?
5       A.   It does, yes.
6       Q.   And whose front office?
7       A.   Our front office.
8       Q.   What --
9       A.   Barclays, sorry.
10       Q.   What is the significance of a
11  front office value?
12       MR. SHAW:  Objection.
13       Q.   What does it mean?
14       A.   The process by which assets are
15  valued within Barclays is that first off the
16  front office would value.  The second line of
17  consideration is that price testing will occur
18  within the product control group within
19  finance.  So the initial marking of any book
20  including this book would be done by the front
21  office.
22       Q.   And does the front office include
23  the traders who trade these products?
24       A.   Yes.  The front office would be
25  the traders.

Page 88

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2       Q.   Column D is JP value.
3       A.   Yes.
4       Q.   And that's the value -- well, what
5  is that?
6       A.   That's the value that JPMorgan
7  were contributing to the securities on the
8  30th of September.
9       Q.   So both column C and column D are
10  30th of September values.
11       A.   That's correct.
12       Q.   Do you know when this particular
13  sheet, 87B, was prepared?
14       A.   There were -- again, there were
15  multiple versions of this as our understanding
16  of the assets developed.  The -- until a final
17  version was produced which was shortly before
18  the annual report was produced.
19       Q.   When was the earliest version of
20  this document prepared, 87B?
21       A.   The earliest version in that form
22  would have been shortly after the 22nd of
23  December.  Because we weren't able to -- the
24  appropriate value for us to include in our
25  books and records was the value of the

Page 89

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  inventory on the day we received the items,
3  being the 22nd of December.
4          Prior to that there were -- there
5  were understandings of what assets we were
6  expecting to receive and therefore preliminary
7  versions.  But nothing which had data which
8  was struck to a date which would have been
9  appropriate for inclusion could have existed
10  before the 22nd of December.
11       Q.   The column C and column D are
12  values as of the 30th of September, right?
13       A.   Yeah.
14       Q.   Why was that date picked?
15       A.   It was picked largely for
16  practical reasons.  It was a month-end.  It
17  didn't have any significance for books and
18  records.  Which was the primary purpose of
19  this spreadsheet.
20       Q.   Was there any discussion within
21  Barclays at valuing both doing a front office
22  value and a JP value of these JPM assets as of
23  the 22nd of September 2008?
24       A.   Sorry.  I don't understand the --
25       Q.   Was there any discussion of doing

Page 90

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  the valuation as of the 22nd of September as
3  opposed to the 30th of September?
4       A.  There was discussion with auditors
5  as to what the appropriate date to include in
6  our books and records was for these.  The two
7  dates -- the two relevant dates were the 22nd
8  of December and the 22nd of September.
9  Because you've got the transaction date and
10 you've got the date you receive the assets and
11 there's two different ways of viewing the
12 transaction from an accounting perspective
13 purely the decision which was reached was to
14 use the 22nd of December.
15      Q.  How did Barclays calculate its
16 front office values as of the 30th of
17 September for these assets which it did not
18 receive until the 22nd of December?
19      A.  I can talk to the general process
20 of valuation as at the date.  In terms of how
21 the front office went about its -- how it went
22 about it in a historical sense, the processes
23 would have been the same and were the same.
24 But struck at a different date.  We had the
25 items -- we had the identity of the items.  So

Page 91

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  it's a case of valuing as at based off market
3  data which is relevant as of that date.  So
4  I'm not sure if I'm understanding the
5  question.
6       Q.  I think towards the end of your
7  answer you answered it.  So let me see if I
8  understand it.
9       A.  Yeah.
10      Q.  For the items that you received
11 from JPMorgan Chase on December 22nd, on or
12 about December 22nd, your traders went back to
13 market data to try to value those assets as of
14 the 30th of September; is that right?
15      A.  There had been previously drafts
16 of expected values which predated the 22nd of
17 December.  And the 30th of September was a
18 date which was looked at on a consistent basis
19 as the understanding as to the identity of the
20 assets that we would receive changed.  And
21 then when we reached the 22nd of December, the
22 22nd of -- the valuation as of the date the
23 items were received were updated and were
24 focused upon.  There was not a great deal of
25 focus on the 30th of September values at that

Page 92

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  time because their significance at that time
3  was marginal.
4       Q.  Again, just so I understand what
5  you're telling me, are you saying that you
6  knew as early as the 30th of September the
7  list of assets that you eventually received on
8  December 22nd?
9       A.  No.
10      Q.  No.  When did you first know what
11 specific assets you would be receiving from
12 JPMorgan Chase?
13      A.  I'm not sure what date that that
14 was absolutely finalized.
15      Q.  So, again, I'm going back to this
16 process that was followed in coming up the
17 with the column C values which is the front
18 office values.  Was it a process where your
19 traders in December, sometime in December got
20 a list of the JPMorgan Chase assets by CUSIP
21 number and went back to historical pricing
22 data to try and price those as of the 30th of
23 September.
24      A.  That's correct.
25      Q.  Okay.  And just focusing on that

Page 93

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  exercise, why didn't they price them as of the
3  22nd of September?  For that column, column C.
4       A.  That exercise wasn't done for the
5  first time until the 22nd of December.  The
6  understanding as to the items would have
7  changed as understanding as to what items
8  would be received changed in the days and
9  weeks preceding the 22nd of December.  So it
10 wasn't a new process, let's value them on the
11 30th of September, on the 22nd of December.
12 That wasn't the first time where people were
13 looking at that.  Over the period -- over the
14 period from the acquisition date up until the
15 22nd of December there was an ongoing process
16 to try and get a handle on what value -- what
17 assets and what value of assets we would end
18 up receiving.  And that was again an iterative
19 process.  This just represents a part of that
20 being two month-end values and the actual
21 value that we received.
22      Q.  Let me try it another way.
23           Was September 30th the month end
24 picked because there was better or more
25 complete pricing data available as of the 30th

1         G. ROMAIN - HIGHLY CONFIDENTIAL
2    of September as opposed to the 22nd of
3    September?
4         A.   I'm not sure.
5         Q.   And do you have any sense
6    generally whether this collection of assets
7    you received from JPMorgan Chase increased in
8    value or decreased in value from the 22nd of
9    September to the 30th of September?
10        A.   I don't have a great sense of the
11   sense which is created by the summary.  The
12   values for the 30th of September were not
13   items that I particularly focused on because
14   from the point of the view of the process of
15   valuing being -- the point of view of valuing
16   the portfolio, the important number was the
17   most up to date number.
18        If you're looking at previous
19   month ends, say the 31st of October or the
20   30th of November, as time was progressing,
21   then at that time it was -- the interesting
22   thing would be based on our assessment of what
23   assets we expect to receive, what they'd be
24   worth at that time, at the point in time we're
25   setting because we didn't know when we

1         G. ROMAIN - HIGHLY CONFIDENTIAL
2    received them so the 22nd of December wasn't a
3    date which had any significance for us earlier
4    than that.  So we were constantly updating our
5    best estimate of the value we expected to
6    receive.
7         So there were values done of this
8    portfolio or our best estimate of this
9    portfolio on a number of dates preceding that
10   as time progressed.  And this was the last one
11   because this was the one that corresponded
12   with the date that we received them.
13        Q.   Just help me trace your -- trace
14   the connection between 87B and 377A.  You
15   could use line items or page numbers.
16        A.   Sure.
17        Q.   I just want to see where the
18   numbers, if they do, from 87B track onto the
19   spreadsheet that's 377A.
20        A.   The tracking is the cell E-18 from
21   37B.
22        Q.   So that's 3.9 billion and change.
23        A.   Yeah.
24        Q.   All right.
25        A.   That feeds through to -- the

1         G. ROMAIN - HIGHLY CONFIDENTIAL
2    easiest one to look at is actually the one
3    which is numbered 844.  That feeds through to
4    cell C-8.  And then cell G-18 is a component
5    of cell C-12.
6         MR. SHAW:  Just so we're clear,
7         when you said G-18 you were talking
8         about on 87B and when you were talking
9         about C-12 you were talking on the
10        second page of 377A?
11        THE WITNESS:  That's correct.
12        Q.   Okay.  So the -- looking at 87B,
13   the cell you pointed me to was E-18.
14        A.   Yes.
15        Q.   That's the column dated 22
16   December 2008 BCG value, correct?
17        A.   Yes.
18        Q.   And the total number is 3.916
19   billion and change, right?
20        A.   (Witness nods.)
21        Q.   And when you go over to the
22   acquisition balance sheet which is
23   Exhibit 377A on the second page in column --
24   in cell C-8, the number of 3.92 is just  a
25   rounded up 3.916, correct?

1         G. ROMAIN - HIGHLY CONFIDENTIAL
2         A.   That is correct.
3         Q.   There is in the acquisition
4    balance sheet a line item for valuation
5    adjustment which is a negative $2.09 billion
6    number, correct?
7         A.   Yes.
8         Q.   And what you have also told me is
9    for the JPMorgan Chase assets there is an item
10   number which is G-18 which is $176 million.
11        A.   Yeah.
12        Q.   That is also part of the 2.09
13   valuation adjustment.
14        A.   That's correct.
15        Q.   All right.  Okay.  So on your
16   acquisition balance sheet, the JPM inventory
17   which is line 8, that is being valued as of
18   December 12th, 2008, correct?
19        A.   December 22nd.
20        Q.   Sorry.  December 22nd, 2008.
21        A.   That's correct.
22        Q.   You're right, yeah.
23        Q.   The line item which is 7 on your
24   acquisition balance sheet which states Initial
25   Inventory, that is being valued as of the 22nd

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  of September, 2008, correct?
3      A.   Yes.
4      Q.   And those valuations and the other
5  items on your acquisition balance sheet roll
6  up to the negative goodwill item of
7  4.7 billion, correct?
8      A.   Those items are part of the net
9  assets which contribute towards the negative
10  goodwill calculation, yes.
11     Q.   And if I go to the first page of
12  Exhibit 337A, which is a form of the
13  acquisition balance sheet, that was used for
14  disclosure purposes, correct?
15     A.   Yeah.
16     Q.   On that first page of
17  Exhibit 377A, the values for the assets are as
18  of those different dates that we've talked
19  about.  Some of those assets are valued as of
20  the 22nd of December and some of them are
21  being valued as of the 22nd of September.
22     A.   That's correct.
23     Q.   All right.  Other than those two
24  dates, are there any other dates as of which
25  assets were valued for purposes of your

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  acquisition balance sheet?
3      A.   No.
4      Q.   Let's take a look at 86B which --
5  I'm sorry.  Let's stay with 87B for a minute.
6  A few other items here.
7          Column E on 87B which is BCG
8  value, what's that?  The product control
9  group?
10     A.   Yes.  That's correct.
11     Q.   And what is that?  An internal
12  independent price valuation group of some
13  type?
14     A.   Yes.  That's the mid price value
15  that resulted from the process of product
16  control price testing front office values.  So
17  that was the end agreed Barclays value.  The
18  mid price.
19     Q.   And just to be clear, what that
20  process was, the obtaining of the BCG value,
21  could you describe how just mechanically the
22  process that's followed within Barclays to
23  come up with those BCG values.  Go from the FO
24  values, the front office values, to the BCG
25  values.

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2      A.   Yeah.  So the front office will
3  mark their assets -- the traders who trade the
4  assets and are closest to it for that purpose,
5  that's the same process that we followed on a
6  business as usual basis for all assets, all
7  trading assets which are held by Barclays
8  Capital.
9          Those valuations would then be
10  considered by price testing group which
11  resides within product control.  They would
12  test those prices by reference to observe for
13  market data and indices and close proxies and
14  broker quotes and other sources of independent
15  information which will differ according to
16  asset class and security type.
17         The difference between those two
18  values would be assessed and discussed and a
19  consensus value will be included on the
20  balance sheet.
21     Q.   The next column over, F, is MV
22  with liquidity which is market value with
23  liquidity; is that right?
24     A.   Yes.  That's the market value
25  stated at bid price.  So under accounting

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  standards we're required to measure assets at
3  bid so our best estimate of exit price.  And
4  that's what column F is.  And that's the net
5  number which feeds into the acquisition
6  balance sheet and therefore the negative
7  goodwill calculation and financial statement
8  disclosures.
9      Q.   At the bottom section of this
10  spreadsheet, 87B, is titled Entity Level
11  Breakdown.
12         Do you see that?
13     A.   Yeah.
14     Q.   Could you describe briefly what
15  information is being shown in that section of
16  the spreadsheet.
17     A.   Yeah.  That's the allocation of
18  the items between two legal entities.
19     Q.   Okay.  What are those two legal
20  entities?
21     A.   LMBR is BBPLC is part of a branch
22  of that.  And LIICT is a separate entity whose
23  full name -- I can't recall its full name off
24  the top of my head.  It was another
25  wholly-owned subsidiary of the Barclays group.

Page 102

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    I can't recall the full name.
3        Q.    Okay.  If you look at 337A which
4    is the acquisition balance sheet --
5        A.    Yeah.
6        Q.    -- and if you look at the second
7    page, line 8 which is the JPM inventory, we
8    earlier looked at cell C-8 which is the BCG
9    value number, the 3.92, correct?
10       A.    Yes.
11       Q.    And if you read across that line,
12   that 3.92 number is allocated between BCI,
13   right?  .69 is allocated to BCI.
14       A.    I have misspoke.  The LMBR relates
15   to BCI not to BBPLC.
16       Q.    All right.  And the remainder,
17   3.23 billion, is allocated to column N as in
18   Nancy, 3.23.
19            Do you see that?
20       A.    Yes.
21       Q.    And that's a Cayman -- that's
22   Cayco is what it's called?
23       A.    Yeah.  That was a shorthand.  That
24   wasn't its full name.  That's the main reason
25   why I can't recall the full name of it because

Page 103

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    I was used to referring to it in shorthand as
3    Cayco.
4        Q.    What can you tell us about what
5    Cayco is?
6        A.    It's a subsidiary of Barclays
7    Group.
8        Q.    Is it a Cayman Islands company?
9        A.    It was certainly going to be set
10   up in the Caymans which is why it was referred
11   to as Cayco.  My recollection is that's --
12   yeah, my recollection is that is what happened
13   here.
14       Q.    And just to be clear, the BCI
15   where .69 of the 3.9 billion is allocated,
16   that's the US broker/dealer, correct?
17       A.    That's correct, yes.
18       Q.    Let's turn to 86B.
19            86B is Schedule A and Schedule B,
20   correct?
21       A.    86B is -- yeah, it's the inventory
22   which was received -- it's the inventory which
23   was received the weekend of the 21st and the
24   days preceding that.
25       Q.    Does 86B include any inventory

Page 104

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    that you expected to receive but have yet not
3    received?
4        A.    No.  This spreadsheet is the
5    valuation of the inventory we did receive.
6        Q.    And I apologize if I've asked you
7    this before.  Other than 86B and 87B, are you
8    aware of any other inventory that you're
9    expecting to receive that you haven't yet
10   received?
11       A.    In addition to 86B and 87B?
12       Q.    Yes.
13       A.    Yes, I am.
14       Q.    Okay.  And what is that other
15   inventory?
16       A.    Items from the LBI clearance boxes
17   which has not yet been transferred to
18   Barclays.
19       Q.    And so those items have not been
20   included in your calculations in 86B and 87B;
21   is that correct?
22       A.    That's correct.
23       Q.    And, therefore, they haven't --
24   well, maybe not therefore.  And they have not
25   been included in your acquisition balance

Page 105

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    sheet, Exhibit 377A?
3        A.    That's not correct.
4        Q.    Okay.  So where on 87 -- on 377A
5    have you provided for items that you expect to
6    receive but, in fact, have not yet received?
7        A.    To the extent that they have been
8    recognized they are included in cell C-11.
9        Q.    And that's an item of about 700
10   million, correct?
11       A.    Yes.
12       Q.    And it's titled Additional
13   Unencumbered Assets?
14       A.    Yes.
15       Q.    And now setting those aside, what
16   else is there in terms of collateral that you
17   expect to receive, have not yet received, and
18   haven't accounted for in your acquisition
19   balance sheet?
20       A.    And haven't accounted for.
21       Q.    Have not accounted for.
22       A.    There are further unencumbered
23   assets which we commonly refer to as list B-2
24   and C which were not included in cell C-11 of
25   the second page of 377A in terms of other

## Page 106

G. ROMAIN - HIGHLY CONFIDENTIAL

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2   assets that have not been recognized.
3         There is also collateral raised
4   futures positions held in Lehman affiliates
5   which has not been recognized.  There is --
6   actually, would it be possible to refer to
7   those notes?  I'm sure there are two smaller
8   items -- there are four items which I -- I'm
9   aware there are four items.  That's two of
10  them.  There are two other items which I can't
11  immediately recall.
12      Q.  And the notes that you're
13  referring to are the notes that were handed
14  over to us this morning.
15      A.  Yes.
16      Q.  Is it your handwritten notes?
17      A.  Yes.
18        (Deposition Exhibit 399A,
19   handwritten notes, marked for
20   identification as of this date.)
21      A.  Oh, yes.  So the principal and
22  interest on --
23      Q.  Hold on one second.  Let's just
24  get --
25      A.  Sure.

## Page 107

G. ROMAIN - HIGHLY CONFIDENTIAL

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.  I've handed you an exhibit which
3  has been marked as 399A.  Are those the notes
4  that you were referring to?
5      A.  They are.
6      Q.  Okay.  And if you could state for
7  the record what the other items are.  The
8  other two items are.
9      A.  The other two items are principal
10  and interest on the unencumbered assets which
11  are summarized in cell C-11 of Exhibit 377A.
12  And also -- and also collateral against
13  customer positions which held in the form of
14  letters of credit were not recognized for
15  accounting purposes.
16      Q.  Just on your notes, where in your
17  notes are you?  This is page 1 of your notes,
18  right?
19      A.  Yes.  It's the second -- it's the
20  second bullet.  So I've just been through the
21  four subbullets of the second bullet.
22      Q.  And the second bullet just to be
23  clear is titled Assets Not Received Not on
24  Balance Sheet, Not on BS.
25      A.  Yes.

## Page 108

G. ROMAIN - HIGHLY CONFIDENTIAL

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.  That's it.
3      A.  Yes.
4      Q.  And your estimate of the value of
5  those four items is 765 million and then you
6  have a provision, correct?
7      A.  The provision is against those
8  items.  They're two separate items.
9      Q.  Okay.  So the valuation then -- or
10  your estimate of the valuation of those four
11  items is 765 million?
12      A.  Yes.
13      Q.  And, again, just to be clear,
14  those do not appear -- that item, 765 million,
15  is not included on your acquisition balance
16  sheet, Exhibit 377A, correct?
17      A.  Correct.
18      Q.  And it's not part of 86B and 87B.
19      A.  That's correct.
20      Q.  Okay.
21       All right.  86B.  There are two
22  parts of the first page of Exhibit 86B that I
23  want to draw your attention to.  There appears
24  to be a valuation and calculation as of the
25  22nd of September which goes from line 1

## Page 109

G. ROMAIN - HIGHLY CONFIDENTIAL

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2   through line 30; is that right?
3       (Document review.)
4      A.  Yes.
5      Q.  And then starting on line 32 down
6  to line 45, if I'm reading this correctly,
7  this appears to be a valuation or a
8  calculation as of 9 January, '09; is that
9  correct?
10      A.  No.  It's a valuation as at 22nd
11  of September but they're two slightly
12  differing versions.  One is between rows 3 and
13  14 and the other is between 32 and 44.  There
14  were a couple of individual adjustments which
15  needed to be made which are summarized in
16  those 27 to 30.
17      But the valuations are -- for
18  financial reporting purposes that net
19  difference which is 57 million from cell E-30
20  is not particularly material.
21      Q.  And in connecting 86B and 377A,
22  which cells on 86B roll up into the second
23  page of 377A?
24      A.  So the ones in row 14.
25      Q.  And so those would be D-14 and

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   F-14?
 3        A.   That's correct.  As I said, there
 4   were some immaterial adjustments but if you
 5   were to -- there were some immaterial
 6   adjustments which were made at the last minute
 7   but at a material level the cells D-14 and
 8   F-14 are the ones which roll up in the
 9   acquisition accounting in our financial
10   statements.
11        Q.   The differential between the
12   values in the -- in column D, BCG value, and
13   the column E, Market Value 9/22, that's again
14   pricing at the bid.  Is that the reason for
15   the differential?
16        A.   Yes.  It's the bid/offer
17   differential, yes.
18        Q.   The differential between column C
19   and column D, do you know why there's a
20   differential there?
21        A.   The column C values don't feed
22   into our financial reporting.  They were
23   values which were ascribed to the securities
24   by the custodian whereas we are required to
25   value them by asset class according to
```

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   relevant accounting standards and in line with
 3   valuation methodology used for other similar
 4   assets already owned by the bank.  So the
 5   important numbers from our financial reporting
 6   perspective are those between D and F rather
 7   than what the custodian may have attributed to
 8   them.
 9        Q.   You told us earlier that this
10   document, 86B, you confirmed that this was the
11   final version that rolled up into your
12   disclosure document, correct?
13        A.   Yes.
14        Q.   When was the first version of 86B
15   created?
16        A.   The form of it changed and evolved
17   over time.  So this is the final
18   representation of valuation process which was
19   ongoing from the time of the acquisition.  The
20   spreadsheet in which that process was embodied
21   may have been simpler or different at various
22   stages through that time.  But it was an
23   evolution.
24        Q.   And if I understand the way this
25   spreadsheet works, 86B, there is in fact CUSIP
```

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   level valuation data that rolls up into each
 3   of these categories, line 3, line 4, line 5,
 4   et cetera; is that correct?
 5        A.   That's correct.
 6        Q.   Now, some of the collateral that
 7   was transferred over to Barclays on the 18th,
 8   19th and that time period of September 2008,
 9   some of that's been sold, correct, by
10   Barclays?
11        A.   Some of it, yes.
12        Q.   Okay.  How, if at all, has the
13   value at which assets were sold been reflected
14   in this spreadsheet?
15        Let me just rephrase that.
16        Is the price obtained by Barclays
17   on the sale of assets that were acquired from
18   Lehman, is that reflected on this spreadsheet?
19        A.   Not directly.  What I would say is
20   that there are various levels of liquidity
21   embodied in the various underlying assets.  So
22   you've got very liquid and frequently traded
23   positions whereby they could be valued in a
24   straightforward manner by reference to
25   observed for market data for the 22nd of
```

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   September.
 3        And then there are less liquid
 4   assets which trade very infrequently and for
 5   which is there not much market data for those
 6   assets.
 7        In order to arrive at a 22nd of
 8   September valuation you'll be looking at a
 9   number of things, transactions in similar
10   assets, recent transactions in assets, et
11   cetera.  And for those -- assets of those
12   types, the price at which assets were sold
13   shortly after may be a factor which would be
14   taken into account because it may be
15   additional evidence as to what the appropriate
16   mark was for the 22nd of September.
17        But if those prices are used, then
18   they are used only as evidence to try to
19   improve the estimate of value on the 22nd of
20   September.  And, therefore, would be adjusted
21   for any changes in circumstances or market
22   conditions between the 22nd of September and
23   the dates of sale.
24        So the simplest answer is, no,
25   they're not reflected at all directly.  But
```

Page 114

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  the more -- the more accurate answer is that
3  for illiquid assets sales may factor into the
4  valuations as one part of the consideration of
5  the right price.
6      Q.   Okay.  They may factor in and, in
7  fact, were factored in for certain CUSIPs.
8      A.   I don't have a sense of to what
9  extent those sales did feed in because that's
10 getting down to a more CUSIP-by-CUSIP
11 level consideration.
12     In terms of the general process,
13 for the more liquid securities to the extent
14 they were sold, yes, they would have been
15 taken into account.  But to get an accurate
16 sense of whether that occurred in any material
17 sense it would be necessary to talk to the
18 relevant asset class experts.
19     Q.   The liquidity value column, column
20 F, BCG Liquidity Value, in effect the numbers
21 that appear there are basically column D minus
22 column E, correct?
23     A.   Yes.  That's the bid/offer
24 adjustment.
25     Q.   But if I understand your last --

Page 115

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  your prior answers, that's not just the
3  bid/offer adjustment, correct?
4      A.   No.  That is just the bid/offer
5  adjustment.
6      Q.   Okay.  So any adjustments that are
7  made on account of sales and price discovery
8  through sales of assets, are they not
9  reflected in column F?
10     A.   They would be reflected.  Any
11 adjustments to mid price that are required to
12 get to bid are included in that column for
13 whatever reason based on whatever evidence.
14     Q.   So you would reflect the bid/offer
15 adjustment where you didn't transact but where
16 you had a bid and offer you would price it at
17 the bid, correct?
18     A.   All of the securities included
19 there are priced at the bid.
20     Q.   And in those instances where you
21 actually had a transaction in the weeks
22 subsequent to acquiring the assets, and you
23 sold the asset, you actually executed at a
24 particular price, you would use that as the
25 price or at least that would factor into your

Page 116

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  analysis of the appropriate price?
3      A.   It may do.  Depending on other
4  evidence which is available in order to get to
5  the right bid price.
6      Q.   Do you have any understanding as
7  to why the PCG values in column D were
8  different from the BoNY values in column C?
9      A.   No.
10     MR. TAMBE:  We could break for
11 lunch.
12     MR. SHAW:  Forty-five minutes?
13     MR. TAMBE:  Forty-five minutes.
14     (Luncheon recess taken at 12:28
15 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 117

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  A F T E R N O O N   S E S S I O N
3      (Time noted:      1:22 p.m.)
4  G A R Y   R O M A I N,   resumed and
5      testified as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. TAMBE:
8      Q.   I understand, Mr. Romain, you
9  wanted to clarify or add to one of your
10 answers before the lunch break?
11     A.   Oh, yes.  That's correct.  When we
12 were talking about the securities which come
13 across, I was asked about whether any which
14 have not been received by Barclays were
15 included on the acquisition balance sheet and
16 I directed you towards the additional
17 unencumbered assets on to which is cell C-11
18 in the second page of Exhibit 377A.
19     I want to clarify, that is not the
20 only asset on the acquisition balance sheet
21 which had not been received by Barclays.
22 There's four types of which that is one.  But
23 the four -- they're actually -- they're
24 summarized in the four bullets on the top of
25 the first page of Exhibit 399A.  So there's

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    futures collateral held from brokers.  There's
3    the OCC collateral largely in the form of
4    government securities.  There's the
5    unencumbered assets item.  And there's also
6    the amount of $769 million receivable from
7    15(c)(3) or equivalent tax.  So to be
8    complete, that's the sum of the assets
9    included on the acquisition balance sheet
10   which are not in physical possession of
11   Barclays.
12        Q.   Okay.  And other than C-11, where
13   else would you find on this acquisition
14   balance sheet, which is the second page of
15   377A, those items?
16        A.   So the first item, the futures
17   collateral is included in item C-17.
18        Q.   Futures customer balances.
19        A.   That's right.
20             The second item, OCC collateral,
21   is included in item C-18.  The unencumbered
22   assets we talked about as being item C-11.
23   And the 15(c)(3) or equivalent is item C-15.
24        Q.   In your handwritten notes,
25   Exhibit 399A, you have a bracket and the words

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    app 3 billion.
3             Do you see that?
4        A.   Yes.
5        Q.   So approximately $3 billion of
6    asset value on the acquisition balance sheet
7    is attributable to these four categories of
8    assets not received.
9        A.   That's correct.
10       Q.   All right.  And if you look at the
11   line items on 377A, C-11 is -- is the entirety
12   of that cell comprised of assets not yet
13   received?
14       A.   Yes.
15       Q.   How about the 15(c)(3) assets?
16       A.   Yes.
17       Q.   So none of that has been received
18   by Barclays as yet.
19       A.   That's correct.
20       Q.   The futures customer balances?
21       A.   That's a mixture.  Some of that
22   has been received and some of that has not.
23       Q.   Okay.  And then the OCC customers
24   on clearing margin?
25       A.   That item's actually easier to see

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    on the following page where it's shown gross
3    because that item is the net of the collateral
4    balances and the fair value of the derivative
5    positions.
6             The collateral balance is item
7    F-16 and item F-26.  There's no distinction
8    between those two lines items other than
9    historically I had one number and then I added
10   another number until I realized quite shortly
11   into the process that I was actually looking
12   at a single number.
13             So the total of 2.29 is partly
14   received and partly not received.
15       Q.   Okay.  Just so I follow through
16   then on that, on the acquisition balance sheet
17   on page 2 of Exhibit 377 for OCC customer and
18   clearing margin you have an amount of .98.
19       A.   Yes.  .98 directly feeds through
20   from cell F-26.
21       Q.   On the next page.
22       A.   Yes.
23       Q.   Page 845?
24       A.   Whereas the item, 0.21 is the net
25   of item F-16 and item F -- E-42.  Sorry.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   And where does that show up on the
3    acquisition balance sheet?  Is that C-14?
4        A.   The net of F-16 and E-42 on the
5    third page shows up in item C-14.
6        Q.   Exchange traded options.
7        A.   Yes.
8        Q.   And C-14, that's an amount
9    actually received by Barclays.
10       A.   The -- C-14 is the net of two
11   items from the point of view of the gross
12   balance sheet.  It's split up principally into
13   a valuation because qualitatively it's a
14   different process to value the open exchange
15   derivative positions as opposed to valuing the
16   cash and securities which represent the margin
17   against those positions.
18             So the item really to look at --
19   or the items to look at are F-16 and F-26.
20   The total of that is the total of the customer
21   margin against OCC positions and some of that
22   total, 2.29, has been received and some has
23   not.
24       Q.   And how much has not been
25   received?

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2       A.    It's approximately a billion
3    dollars.
4            (Deposition Exhibit 400A, document
5        bearing production numbers
6        BCI-EX-(S)-00024451 through
7        BCI-EX-(S)-00024455, marked for
8        identification as of this date.)
9    BY MR. TAMBE:
10      Q.    Mr. Romain, we're back to a
11   non-30(b)(6) topic.  I've placed before you
12   Exhibit 400A.  Take a moment to review and it
13   let me know when you're done.
14           (Document review.)
15      A.    Okay.
16      Q.    And you'll see there's a cover
17   e-mail from Patrick Clackson to you.
18      A.    Um-hum.
19      Q.    Which is forwarding the attachment
20   to this document, Exhibit 400A.
21           Do you see that?
22      A.    Yes.
23      Q.    And is the attachment a document
24   you're familiar with?
25      A.    It's a document I remember seeing,

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    yes.
3       Q.    And the last page of this exhibit
4    which is titled Appendix B, Preliminary
5    Balance Sheet, is that a document that you
6    prepared?
7       A.    I can't tell if there's been any
8    amendment to it but it is essentially a
9    document I prepared, yes.
10      Q.    And this is an e-mail dated
11   September 22nd, 2008.  Both the e-mails on the
12   first page are as of that date.
13           Do you see that?
14      A.    Yes.
15      Q.    The 22nd was the Monday following
16   the Lehman bankruptcy filing.  On that day
17   what was your source of information for the
18   items that appear on this last page of
19   Exhibit 400A?
20      A.    I don't recall the source at that
21   time.  This was another version of the
22   iterative balance sheet that was developing
23   over the period.  The iteration at any given
24   date was based on the best information I had
25   available at the time.

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2       Q.    Does the valuation adjustment line
3    if you see up in the asset allocation -- do
4    you see it?
5       A.    Yes.
6       Q.    That's a negative $2.83 billion
7    number?
8       A.    Yes.
9       Q.    On the 22nd of September your BCG
10   group had not gone through and done any kind
11   of valuation adjustment, correct?
12      A.    I can't recall if it's accurate to
13   say they had done nothing.  It's fair to say
14   that the detailed valuation work that was
15   required to get to the end valuations had not
16   yet occurred.
17      Q.    Do you have any understanding as
18   to how that adjustment number of 2.83 billion
19   was arrived at on Monday the 22nd of
20   September?
21      A.    No.
22      Q.    I understand from other e-mails
23   that Stephen King may have been the source of
24   that number.  Is that your understanding?
25      A.    I don't recall if that number was

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2    sourced from Stephen or otherwise.
3       Q.    You know Stephen, correct?
4       A.    I do, yes.
5       Q.    And what role did he play at
6    Barclays at this point in September of '08?
7       A.    So he was a senior trader within
8    the PMCG group and was one of the people in
9    the front office that was most involved with
10   the -- with the acquisition from a business
11   perspective and he was one of my main contacts
12   from a business perspective during the entire
13   process.
14      Q.    And did you have any discussions
15   with Stephen as early as the 22nd about
16   valuation adjustments to the inventory that
17   had come over?
18      A.    I don't recall precise dates of
19   conversations I had with him.  I was certainly
20   having conversations with him throughout the
21   process to work on ensuring that the
22   acquisition balance sheet I would be treating
23   it at any time was as accurate as I could make
24   it.
25      Q.    We could probably move to the side



Page 126

G. ROMAIN - HIGHLY CONFIDENTIAL

1

2  for now 87B, your handwritten notes, and the
3  other stuff.  But keep 400A, the document we
4  were just looking at handy.  And especially
5  the last page of 400A.
6      (Pause on the record.)
7      (Deposition Exhibit 401A, document
8  bearing production numbers
9  BCI-EX-(S)-00052667 through
10  BCI-EX-(S)-00052668 with attachment,
11  marked for identification as of this
12  date.)
13  BY MR. TAMBE:
14      Q.  I've handed you a three-page
15  document marked Exhibit 401A.  Take a moment
16  to look at it and let me know when you are
17  done.
18      (Document review.)
19      A.  Okay.
20      Q.  And this is an e-mail from you to
21  Rich Ricci and others.  Do you see that?
22      A.  Yes.
23      Q.  And you're attaching another
24  iteration of the acquisition balance sheet,
25  correct?

Page 127

G. ROMAIN - HIGHLY CONFIDENTIAL

1

2      A.  Yes.
3      Q.  And you state in your e-mail "The
4  $2.83 valuation adjustment is S. King's first
5  cut only."
6      Do you see that?
7      A.  Yes.
8      Q.  If you could turn to the balance
9  sheet which is the last page of Exhibit 401A.
10      A.  (Witness complies.)
11      Q.  And if we compare it to the
12  balance sheet we were looking at which is
13  400A, both of these are -- the cover e-mails
14  are 22nd September 2008.  It looks like
15  Exhibit 401 is a little bit later in the day
16  than Exhibit 400.  You could confirm that for
17  yourself.
18      A.  Yeah.  They're both on the same
19  date and, yes, they're the e-mails from
20  slightly different times during the day, yes.
21      Q.  Right.  And 401 is after 400,
22  correct?
23      A.  Yes.
24      Q.  There's a couple of changes that I
25  want to bring to your attention.  One is on

Page 128

G. ROMAIN - HIGHLY CONFIDENTIAL

1

2  Exhibit 401A, you have a line item now for
3  Friday P&L approximately.
4      Do you see that?
5      A.  Yes.
6      Q.  And so that's reflecting a Friday
7  profit and loss number?
8      A.  That's what Friday P&L stands for,
9  yes.
10      Q.  And that's a number of about
11  $200 million.
12      A.  Yes.
13      Q.  What is your understanding of what
14  that entry referred to?
15      A.  I don't recall putting together
16  this precise version.  The item is included as
17  part of the calculation of fair value based on
18  best information at the time.  But in terms of
19  how precisely it fit into that calculation I
20  don't have a clear recollection.
21      Q.  The valuation adjustment number
22  is the same as before, the 2.83 billion
23  negative.
24      Do you see that?
25      A.  Yes.

Page 129

G. ROMAIN - HIGHLY CONFIDENTIAL

1

2      Q.  And there's a note associated with
3  that adjustment, note 5.
4      A.  Yes.
5      Q.  And in Exhibit 401A note 5 states
6  Trades are initially booked at BoNY prices.
7  2.83 billion is initial estimate of the
8  adjustment Barclays' marks.
9      Do you see that?
10      A.  Yes.
11      Q.  And, again, do you know what
12  process was followed in coming up with this
13  $2.83 billion number on the 22nd?
14      A.  That would have been -- or was an
15  early estimate of the adjustment that would be
16  required to get the inventory to the 42.55
17  number which would have been the best
18  estimates of the prior bid price at that time.
19  As talked about, these numbers were moving
20  frequently during this period as additional
21  information was acquired.
22      But that's what the 2.83 -- that's
23  the purpose of the 2.83 was fulfilling in that
24  calculation there at that time.
25      Q.  Okay.  And I could see

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    mathematically how the 2.83 sort of gets
3    subtracted from the 45.18 but what's the
4    process that yields the 2.83?  Is it CUSIP by
5    CUSIP?  Is it by asset category?  Is it an
6    estimate of the entire portfolio?  How is that
7    done?  Back at that point in time.
8        A.    Back at that point in time I don't
9    have clear understanding of the process that
10   Stephen went through to get that initial cut.
11   It was understood at that time that we were
12   working on provisional numbers and a
13   provisional understanding of the assets.  And
14   that a great deal of work involving Stephen
15   King and front office but also finance price
16   testing and discussion with PwC, our auditors,
17   would be required before we got to a number
18   which was sufficiently verified to be included
19   in our financial statements.
20       Q.    I understand, Mr. Romain, that you
21   probably went through a lot of additional
22   steps before you put anything in your reported
23   financial statement.  I really am focusing on
24   that date, the 22nd of September, the
25   transaction has closed that morning.  I just

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    want to know if you know what process was
3    followed in arriving at that estimate that
4    morning.
5        A.    I don't know, no.
6        Q.    If you'd look down in
7    Exhibit 4012A, below the net asset calculation
8    there are line items -- I'm sorry -- below the
9    total asset calculation, there are line items
10   for repo liability, cure, retention, bonus.
11       Do you see that?
12       A.    Yes.
13       Q.    And if you compare the entries for
14   cure and bonus accrual on Exhibit 401A to
15   those same items on 400A you'll see different
16   entries, right?
17       A.    Yes, yes.
18       Q.    So the cure payment which was
19   reflected at 2.25 in Exhibit 400A in
20   Exhibit 401A is .8 billion.
21       Do you see that?
22       A.    Yes.
23       Q.    And do you know a reason for why
24   that number changed on the 22nd of September?
25       A.    Well, at that time when I was

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    putting together the acquisition balance
3    sheets, I didn't have an understanding as to
4    what cure payment was or what the nature of
5    our obligation was.  So there were initial
6    placeholder numbers included for that as well
7    as a number of other items.  The source of
8    those numbers I don't recall precisely now but
9    I do recall that they were moving quickly as I
10   had discussions with people who had an
11   understanding of the terms of the
12   acquisition -- the terms of the acquisition in
13   that regard and better understood the
14   appropriate item -- the appropriate quantum to
15   be included.
16       The cure in particular had two
17   sources of uncertainty which persisted for
18   some time.  The first was uncertainty as to
19   amount which was an exercise by which we
20   needed to identify which contracts we'd be
21   accepting and therefore which cure payments
22   would be paid.
23       And the second was a question of
24   accounting treatment under appropriate
25   accounting standards because in acquisition

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    accounting you're required to include only
3    obligations that you take on.  And there is a
4    way of viewing the cure payments which
5    would -- and which would imply that we should
6    not recognize any cure payments as an accrual
7    in the acquisition balance sheet because we
8    had no obligation to accept any contracts.
9        That was an issue which was
10   discussed for some time with PwC.  That
11   discussion was running parallel with the
12   separate consideration of how much cure we
13   thought we'd end up paying.  The end
14   resolution of that was that we felt that the
15   appropriate interpretation of accounting
16   standards would require us to include our best
17   estimate for cure payments in the acquisition
18   balance sheet and that's what we ended up
19   doing.
20       Q.    And by the time you end up
21   disclosing your financial statements for the
22   acquisition, did you ultimately use the
23   financial number that was actually paid out by
24   Barclays for cure?
25       A.    By the time we -- by the time we



Page 134

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  published our financial statements the process
3  was not quite complete but very substantially
4  complete.  So the amount we included as an
5  accrual was $224 million.  My recollection is
6  that by the time we reached financial
7  statements we paid very close to that amount
8  and there was a small amount which we were
9  intending still to pay.  And when I revisited
10  it in the middle of this year the difference
11  between what we paid and what we recognized in
12  our financial statements was very small.  A
13  quantum of less than a million dollars as I
14  recall.
15      Q.  Okay.  And as you compared 400A
16  and 401A, the net asset number in 401A is
17  $4.52 billion, correct?
18      A.  Yes.
19      Q.  And that's up from 3.67 billion in
20  Exhibit 400A.
21      A.  Yes.
22      Q.  I've handed you, sir, a document
23  previously marked as Exhibit 361A.  Take a
24  moment to review it and let me know when
25  you're done.

Page 135

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2      (Document review.)
3      MR. WOOD:  Can I just note on the
4  record that I think this same document
5  has also been marked as Exhibit 384 in
6  another deposition.
7      (Document review continuing.)
8      A.  Okay.
9      Q.  And sir, do you recognize this as
10  a forward of your e-mail that we were just
11  looking at, Exhibit 401A, by Mr. Clackson to
12  Rich Ricci and so on?
13      Do you see that?
14      A.  Yes.
15      Q.  And you can confirm this for me
16  but it appears to me that the attachment to
17  Exhibit 361A, the acquisition summary,
18  although the printout is a little different I
19  believe it's the same spreadsheet as 401A but
20  correct me if I'm wrong.
21      A.  Yes.  Yes, it is.
22      Q.  Now, if you focus on Mr.
23  Clackson's e-mail to Rich Ricci forwarding
24  this draft balance sheet, he states, "So some
25  things we have to keep working on to squeeze

Page 136

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  out what we can, but looks more like 3 to 3.5
3  rather than 4 plus."
4      Do you see that?
5      A.  Yes.
6      Q.  What's he referring to with the 3
7  to 3.5 rather than the 4 plus?
8      MR. SHAW:  Objection, foundation.
9      A.  I don't know.
10      Q.  Was it your understanding that
11  there was a target negative goodwill number
12  that you were looking to achieve?
13      A.  No.
14      Q.  That wasn't your understanding.
15      A.  No, that wasn't my understanding.
16      Q.  Did you have an understanding as
17  to any target goodwill number?
18      A.  No.
19      Q.  Rich Ricci responds to Patrick
20  Clackson by saying, "What have we told Group?"
21      Do you see that?
22      A.  Yes.
23      Q.  Do you understand what the
24  reference to "group" there is?
25      A.  I don't -- I don't know what he

Page 137

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  means.  Typically when we refer to group we
3  mean Barclays Group.
4      Q.  Putting this exhibit aside, at
5  this time period, early the week of the 22nd,
6  were you party to any discussions about trying
7  to achieve a negative goodwill number that
8  coincided with the negative goodwill number
9  that had been set out in the Barclays board
10  presentations the prior week?
11      A.  No.
12      Q.  Was there any concern about not
13  achieving the negative goodwill number that
14  had been disclosed to the board?
15      MR. SHAW:  Objection, foundation.
16      A.  Not that I was aware of.
17      Q.  Sir, I've handed you what's been
18  previously marked as Exhibit 385.  If you
19  could take a moment to review that e-mail
20  chain and let me know when you're done.
21      (Document review.)
22      A.  Okay.
23      Q.  You'll see this e-mail chain
24  begins again on page 2 with the cover e-mail
25  to Exhibit 401A which is your e-mail to the



G. ROMAIN - HIGHLY CONFIDENTIAL

1    group.
2        Do you see that?
3    A.   Yes.
4    Q.   And I want to draw your attention
5    to the first page of Exhibit 385 which is the
6    third e-mail down which is from Rich Ricci to
7    Patrick Clackson.
8        Do you see that?
9    A.   Yes.
10   Q.   It says, "Need to get to 4 or no
11   write-down capacity."
12       Write-down is misspelled but it
13   says write-down capacity.
14       Do you see that?
15   A.   Yes.
16   Q.   Do you know what that was a
17   reference to?
18   A.   No, I don't.
19       (Deposition Exhibit 402A, document
20       bearing production number
21       BCI-EX-(S)-00052678, marked for
22       identification as of this date.)
23   BY MR. TAMBE:
24   Q.   Sir, I've handed you a one-page

G. ROMAIN - HIGHLY CONFIDENTIAL

1    document marked Exhibit 402A.  Take a moment
2    to review it and let me know when you're done.
3        (Document review.)
4    A.   Okay.
5    Q.   And you'll see the bottom e-mail
6    on this page, Exhibit 402A, is an e-mail from
7    you to Jasen Yang copied to others.
8        Do you see that?
9    A.   Yes.
10   Q.   Okay.  Who is Jasen?
11   A.   Jasen is another trader in the
12   PMGT group.  I believe he reports to Stephen
13   King.
14   Q.   You state in your second
15   paragraph, "What we're ultimately trying to
16   get to is a valuation for the total portfolio
17   (including the 1.9 billion from the box) for
18   inclusion in the acquisition balance sheet -
19   Friday close so not including any
20   Monday/Tuesday gain/losses which should remain
21   in trading P&L."
22       Do you see that?
23   A.   Yeah.
24   Q.   Were you stating in that sentence

G. ROMAIN - HIGHLY CONFIDENTIAL

1    that you were trying to value the total
2    portfolio as of Friday close of business
3    prices?
4    A.   Yeah.  That point in time --
5    that's the direction I'm giving to Jasen at
6    that point in time, yes.
7    Q.   I understand from your testimony
8    this morning that for the collateral that was
9    transferred over, the Thursday, Friday, the
10   weekend, the valuation date that was picked
11   was September 22nd, the Monday, right?
12   A.   That's true.
13   Q.   Why the change?  Why was that the
14   ultimate decision?
15   A.   At that point in time the deal had
16   only just been done and my understanding of
17   what happened when and other terms and what
18   had been received when was incomplete and
19   evolving.  And over time discussions of
20   various aspects occurred and one of which was
21   the appropriate valuation date and the
22   appropriate valuation date was determined to
23   be the 22nd of September.
24   Q.   In Exhibit 401A you have a line

G. ROMAIN - HIGHLY CONFIDENTIAL

1    item there for Friday P&L.
2        Do you see that?
3    A.   Yes.
4    Q.   Can you tell from that version of
5    the acquisition summary balance sheet as of
6    what date you were valuing the inventory?
7    A.   I can't, no.  And to be clear I
8    wasn't valuing the inventory.
9    Q.   Or Barclays was valuing the
10   inventory.
11   A.   Yeah.
12   Q.   Because the line right above the
13   Friday P&L line in Exhibit 401A reads
14   Inventory Thursday Close.
15       Do you see that?
16   A.   Yes.
17   Q.   And Thursday is when the Fed repo
18   assets were transferred over to Barclays,
19   correct?
20   A.   I don't have full information of
21   exactly what was transferred precisely when.
22   Q.   Do you know who would have
23   provided you with the Friday P&L number that
24   appears in Exhibit 401A?

Page 142

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2     A.   No.
3     Q.   When the valuation was done as of
4  Monday the 22nd of September were the prices
5  used close of business prices on Monday the
6  22nd?
7     A.   I'm not sure.  I'm not the
8  valuation expert.  I'm not sure what the
9  CUSIP-by-CUSIP approach that was taken was.
10  And, you know, what market convention is for
11  valuing the various security types which were
12  involved.
13     Q.   Okay.  Who would know the answer
14  to that?
15     A.   It would the price testing group
16  within product control.
17     Q.   And just so I understand, just
18  using 401A as the example, if the decision was
19  made -- and the decision was made -- to price
20  the inventory as of Monday, September 22nd,
21  having done that, would you take into account
22  in valuing the assets any P&L on Friday?
23     A.   I'm not sure I quite understand
24  the question.  Sorry.  Take into account in
25  what way?

Page 143

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2     A.   As you do in Exhibit 401A.
3        In Exhibit 401A, if I understand
4  what's going on there, there's a valuation --
5  at least it appears to be, inventory Thursday
6  close.  And then the gain that is earned by
7  Barclays during the day on Friday is reflected
8  as additive to the asset value.
9        Do you see that?
10     A.   Yes.
11     Q.   If the decision was made that you
12  weren't going to value the inventory as of
13  Thursday, you were going to value the
14  inventory as of Monday, would that eliminate
15  the need to record a P&L gain for Friday?
16     A.   You'd be valuing it by reference
17  to the Monday price.  So that would be the sum
18  of what you'd need to do.
19     Q.   But this P&L gain that's reflected
20  on Exhibit 401A, that would be categorized as
21  the trading P&L, correct?
22     A.   I don't know what that item
23  particularly was.
24        (Deposition Exhibit 403A, document
25        bearing production numbers

Page 144

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2        BCI-EX-(S)-00024689 through
3        BCI-EX-(S)-00024690 with attachment,
4        marked for identification as of this
5        date.)
6  BY MR. TAMBE:
7     Q.   Sir, I've handed you a three-page
8  document marked Exhibit 403A.  A cover e-mail,
9  a placeholder page, and then a spreadsheet.
10  Let me know when you're done reviewing it.
11        (Document review.)
12     A.   Okay.
13     Q.   And the last page of Exhibit 403A,
14  if you can confirm that that's another version
15  of the acquisition balance sheet, correct?
16     A.   It is, yes.
17     Q.   And it's a cover e-mail from you
18  to Patrick Clackson and that's dated September
19  24th, correct?
20     A.   Yes.
21     Q.   Now, if you compare Exhibit 403A,
22  the acquisition balance sheet in Exhibit 403A,
23  with Exhibit 401A, you'll see that the net
24  asset number has $6.01 billion.
25        Do you see that?

Page 145

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2     A.   Yes.
3     Q.   And at least one of the drivers of
4  that change is the valuation adjustment
5  number.  And you'll see it's down from 2.83 to
6  1.38.
7     A.   Sorry.  You changed my reference
8  to which version?
9     Q.   Sure.  The two documents you
10  should be looking at are Exhibit 401A and
11  403A.
12     A.   Yes.  One of the differences is
13  that.
14     Q.   Okay.  Now, that's roughly a
15  $1.5 billion difference, correct?  In the
16  valuation adjustment.
17     A.   Well, it's -- in terms of the
18  adjustment that's made to the 45.18 to get to
19  a net number the difference is slightly less.
20     Q.   Right.
21     A.   Because there's no 0.2.
22     Q.   The P&L, the Friday P&L number is
23  no longer --
24     A.   Yes.
25     Q.   But looking at just the valuation

Page 146

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2  adjustment line you've gone from a 2.83
3  negative to a 1.38 negative adjustment,
4  correct?
5          A.   My concern there is whether we're
6  comparing like with like.  I don't know enough
7  about the 0.2 to know whether that was rolled
8  into the 1.38 or not.
9          Q.   And do you have any understanding
10 as to the reason for the change from 2.83 to
11 the 1.38 putting aside the 0.2?
12         A.   No.
13         Q.   Both in 401A and 403A on -- for
14 the inventory pricing there's a note that
15 reads, "Trades are initially booked at BoNY
16 prices."
17         Do you see that?
18         A.   Yes.
19         Q.   Do you know what the convention is
20 in pricing securities that are used for repo
21 trading?
22         A.   I don't know.
23         Q.   And do you know whether the Bank
24 of New York was Barclays' agent for that repo
25 transaction?

Page 147

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          A.   I'm not sure of the precise
3  relationships in that regard, no.
4          MR. TAMBE:  Let's take a short
5  break.
6          (Recess taken.)
7  BY MR. TAMBE:
8          Q.   Mr. Romain, we talked this morning
9  about some of the assets acquired by Barclays
10 having been sold.
11         Do you remember that?
12         A.   Once the assets were acquired a
13 number of things happened to them.  Some would
14 have been sold relatively shortly.  Some were
15 transferred into ongoing trading books to be
16 managed by the relevant traders.  Once that
17 happens they're commingled with assets which
18 were acquired in other ways so there would
19 have been some which had been elected and
20 there would have been some which were held for
21 a long period.
22         We had a brief discussion about
23 whether prices at which the assets were sold
24 factored into the valuation analysis in some
25 way.

Page 148

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Do you recall that discussion?
3          A.   Yeah.
4          Q.   Okay.  Would transfers of assets
5  within the Barclays Group be treated as sales
6  and factored into that calculation?
7          A.   In terms of the measurement
8  objective being an export fair value, those
9  prices would not factor -- those prices in and
10 of themselves would not factor into the
11 valuations.
12         However, the price at which
13 something is transferred into may well be a
14 representation of what our best estimate of
15 the market price is at that time in which case
16 they may well be the same number.
17         But in terms of the considerations
18 which feed into the price that assets were
19 transferred internally within Barclays I don't
20 have a great deal of insight into how that
21 works in practice.
22         Q.   And just so I understand your
23 answer, at least for some of the assets
24 acquired from Lehman there were transfers of
25 those assets within Barclays, correct?

Page 149

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          A.   Yes.
3          Q.   And there were values ascribed to
4  those assets when those assets were
5  transferred internally, correct?
6          A.   Yes.
7          Q.   And on some occasions you have
8  taken into account the values at which those
9  internal transfers were done for purposes of
10 valuing those assets for the acquisition
11 balance sheet; is that correct?
12         A.   No.
13         Q.   Okay.  Is it the case that
14 internal transfers and internal transfer
15 values were disregarded in doing your
16 acquisition balance sheet valuation?
17         A.   I was not directly involved in the
18 valuation.  I did not factor into the
19 acquisition balance sheet transfers.  What I
20 factored into the acquisition balance sheets
21 was Barclays' best estimate of the bid price
22 for those securities which was determined in
23 accordance with Barclays' ongoing valuation
24 policies and applicable accounting standards.
25         Q.   Okay.  And when you took into

Page 150

G. ROMAIN - HIGHLY CONFIDENTIAL

2 account Barclays' best estimate would
3 Barclays' best estimate include bids provided
4 by Barclays' own internal traders?
5     A.    The process for valuation is
6 dependent on the asset type.  And for less
7 liquid assets it's more judgmental than it is
8 for more liquid assets.  However, the maximum
9 possible use is always made of external data.
10 So the views of traders as to the appropriate
11 valuation of an asset being their best
12 estimate of an external bid price for that
13 asset is a part of the valuation process which
14 is supplemented by external market data and
15 price testing -- and price testing procedures.
16 The precise balance between those depends on
17 the asset but external market data to the
18 extent it is available is typically the best
19 evidence of the appropriate fair value.  So
20 that's the concept.  When you get down to
21 individual security level, that's where my
22 sort of level of knowledge ends.
23     Q.    The spreadsheets that roll up into
24 the summary sheets -- we looked at 87B and 86B
25 which were the summary level sheets that then

Page 151

G. ROMAIN - HIGHLY CONFIDENTIAL

2 rolled up into the acquisition balance sheet.
3 Do you remember that?
4     A.    Yes.
5     Q.    Okay.  The CUSIP level
6 spreadsheets, do those indicate what
7 particular methodology or process was used on
8 a CUSIP-by-CUSIP basis for determining the
9 value?
10     A.    Not to my recollection.  That's
11 the result of the process.  But for the less
12 liquid and more complex instruments, the
13 methodology is not something which were
14 typically captured in the Excel spreadsheets.
15 There are extensive valuation procedures and
16 policies within the bank which are used as a
17 reference point for how to value these assets.
18 And the approach, the value of these assets
19 was in mind in those policies both internally
20 and in the opinion of the our outside
21 auditors.
22     Q.    In terms of orders of magnitude
23 can you ascribe any percentage to the
24 percentage of this portfolio, the percentage
25 of the inventory that you believe is the fault

Page 152

G. ROMAIN - HIGHLY CONFIDENTIAL

2 of this less liquid more complex difficult to
3 value type of security.
4     A.    There's no dividing line really.
5 It's a spectrum.
6     Q.    I just want to make sure I have
7 one point covered.  It's my understanding that
8 at least some of the assets acquired from
9 Lehman were subject to internal sales within
10 Barclays from one desk to another desk.  Is
11 that your understanding as well?
12     A.    Yes.
13     Q.    Okay.  Were the prices at which
14 those assets sold within Barclays ever counted
15 by you as a sale price that was used in the
16 valuation?
17     A.    No.  I was -- I had no awareness
18 of the price at which securities were sold.
19 What I asked for and received was the fair
20 values of the assets.
21     Q.    So a trader reporting a fair value
22 of an asset to you may have factored in an
23 internal sale price but you wouldn't know
24 that.
25     A.    The trader wasn't reporting

Page 153

G. ROMAIN - HIGHLY CONFIDENTIAL

2 valuations to me.
3     Q.    Who was?
4     A.    The numbers that fed into those
5 were the numbers which had been through the
6 process which we discussed earlier which
7 involved input from traders, price testing
8 within finance, and auditor review.
9         So those are the numbers which I
10 took, the numbers which had passed through
11 those processes and were then viewed as the
12 agreed appropriate fair value for the
13 instruments.
14     Q.    Okay.  And so the processes that
15 yield the numbers that you then used, those
16 processes could have included prices at which
17 assets sold within Barclays; is that correct?
18         MR. SHAW:  Objection.  That calls
19 for spec --
20     A.    I wouldn't want to speculate on
21 that.  All I can say which is not a response
22 to your question, but it's pertinent to it, is
23 that the values which came out of that process
24 were Barclays' view of the appropriate fair
25 value for those instruments, irrespective of

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    whether transfers had occurred in those
3    instruments or not subsequent to the
4    transaction date.  That was the measurement
5    objective and that's what -- and that is the
6    basis on which those numbers were considered.
7        Q.   I'm not quarrelling with you, sir,
8    as to whether Barclays Capital believed those
9    to be the fair values.  All I'm trying to
10   understand is the mechanical point which is --
11   and maybe you don't know the answer to this.
12       In arriving at Barclays' best
13   estimate of the fair values of those assets
14   did the processes which you referred to take
15   into account the prices at which assets were
16   transferred within Barclays?
17       A.   They took into account the
18   traders' view of the value of the securities
19   based on their experience and available market
20   data.
21       Q.   And do you know whether the
22   traders' views about valuation included prices
23   at which securities were transferred within
24   Barclays?
25       A.   No, I don't know that.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   Okay.  Thank you.
3            MR. TAMBE:  I pass the witness.
4            * * *
5    EXAMINATION BY
6    MR. WOOD:
7        Q.   Good afternoon, Mr. Romain.
8    Again, I'm John Wood.  I'm from Hughes,
9    Hubbard & Reed.  I represent the SIPA trustee.
10           And just to start off I'm going to
11   ask you some questions in your capacity as a
12   30(b)(6) witness regarding margin held secure
13   exchange rate derivatives and just to speed
14   things along why don't you go ahead and take a
15   look at your handwritten notes, Exhibit 399A.
16       A.   (Witness complies.)
17       Q.   On the second page, sort of the
18   middle of the page there, you've got an entry
19   that's margin posted by LBI at OCC (23/9).
20           Do you see that?
21       A.   Yes.
22       Q.   Is that margin posted by LBI at
23   the OCC on September 23rd?
24       A.   It's from the 23rd of September
25   statement.  My understanding is that there's a

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    day lag in the statement.  So it's intended to
3    represent the 22nd of September.
4        Q.   And it looks like you have three
5    entries, cash, governments, and LOC; is
6    that correct?
7        A.   Yes.
8        Q.   And LOC is letters of credit?
9        A.   That's correct.
10       Q.   What are letters of credit?
11       A.   Well, they're essentially
12   facilities which are drawn down, the account
13   party being third-party banks but they take
14   various forms.
15       Q.   So in writing this are you
16   counting that as an asset?
17       A.   We have not included that in our
18   acquisition balance sheets at the current
19   time.  But we're not distinguishing between
20   those three items in terms of the nature of
21   our claim and entitlement.  These are viewed
22   as -- all the three are viewed as margin which
23   is related to the positions that were taken
24   on.  But it's margin which is held in one of
25   three forms.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   Now, when you say your claim and
3    entitlement, does that mean a claim and
4    entitlement from the estate?
5        A.   I'm not sure in terms of the -- in
6    what way we make a claim at all or against
7    who.  It's my understanding that these items
8    we are entitled to receive under the service
9    of the acquisition.
10       Q.   And so why were they not included
11   in the acquisition balance sheet?
12       A.   The letters of credit?
13       Q.   Yes.
14       A.   I'm not directly involved in the
15   proceedings but I understand there are
16   discussions with the counterparties to those
17   letters of credit which we don't believe has a
18   bearing on our entitlement from a legal
19   perspective.  But when preparing financial
20   statements we tend to be conservative and
21   prudent in the way we do so.  So if there are
22   ongoing conversations or just more potentially
23   disputes we would bear that in mind whether or
24   not to include them in that balance sheet.
25       Q.   Are the disputes you're referring

Page 1

1              HIGHLY CONFIDENTIAL - D. PETRIE

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4       ----------------------x

5       In Re:

6                                Chapter 11

7       LEHMAN BROTHERS          Case No. 08-13555(JMP)

8       HOLDINGS, INC., et al.,  (Jointly Administered)

9

10               Debtors.

        ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF DAVID PETRIE

14             New York, New York

15             August 26, 2009

16

17

18

19

20

21

22

23      Reported by:

24      KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25      JOB NO. 24293

Page 6

1          HIGHLY CONFIDENTIAL - D. PETRIE
2          MR. O'BRIEN:  On the phone is Tom
3     O'Brien from Quinn Emanuel representing the
4     Creditors Committee.
5     BY MR. TAMBE:
6          Q.   Mr. Petrie, have you ever given a
7     deposition before?
8          A.   No, I have not.
9          Q.   Okay.  Basic rules:  I'm going to ask
10    you a series of questions about the
11    Lehman/Barclays transaction and what role, if
12    any, you may have played in that transaction.
13          If you have any trouble understanding
14    my question, let me know.  I'll rephrase it.
15    You have to give your answers vocally, no nods
16    of the head, et cetera.  She's writing down
17    everything you say, so yeses, nos.  I'm happy to
18    clarify any question.
19          By whom are you currently employed?
20          A.   Barclays Capital.
21          Q.   And how long have you been with
22    BarCap?
23          A.   Been with Barclays Capital since
24    January 1998.
25          Q.   Before that by whom were you employed?

TSG Reporting - Worldwide (877) 702-9580

Page 7

1          HIGHLY CONFIDENTIAL - D. PETRIE
2          A.   I was employed by AIG Trading Group,
3     Fischer, Frances, Trees & Watts, and Progressive
4     Insurance Company.
5          Q.   At Barclays Capital, if you could just
6     describe, starting in '98 to the present,
7     broadly what your positions have been, what your
8     duties have been?
9          A.   Sure.  I began working at Barclays
10    Capital in a junior role in the repo desk.  That
11    role over several years grew into a repo trading
12    position as well as a risk management position
13    for the repo desk.
14          From the repo desk, as you said,
15    broadly, the end of 2005, 2006, I joined the
16    Barclays Bank, PLC Portfolio Group, and my
17    responsibilities were to run the dollar
18    portfolio; and in the beginning of 2008, I
19    returned to the repo desk to run the repo desk
20    for Barclays Capital in the U.S.
21          Q.   So, starting in January 2008, what was
22    your title or position at Barclays Capital?
23          A.   Specifically in January, I was still
24    working for the Barclays Bank portfolio.  I did
25    not take my responsibilities as the head of the

TSG Reporting - Worldwide (877) 702-9580

Page 8

1          HIGHLY CONFIDENTIAL - D. PETRIE
2     desk until roughly April.
3          Q.   And in April when you took your
4     responsibilities for the repo desk at Barclays
5     Capital, what was your position or title?
6          A.   My title was director.
7          Q.   And was that the title you held
8     throughout 2008?
9          A.   Yes.
10          Q.   Focusing on that position, starting in
11    April 2008 as a director --
12          And you were the head of the repo desk
13    for Barclays Capital in the U.S.; is that right?
14          A.   That's correct, for certain products.
15          Q.   Okay.
16          A.   Those products included Treasuries,
17    agencies, and mortgages.
18          MR. SHAW:  Do you mind if I ask a
19    question to make the record clear?
20          MR. TAMBE:  Sure.  Go ahead.
21          MR. SHAW:  Are you currently the head
22    of the Barclays repo desk?
23          THE WITNESS:  No, I am not.
24          Q.   What's your current position?
25          A.   I currently run the short-term

TSG Reporting - Worldwide (877) 702-9580

Page 9

1          HIGHLY CONFIDENTIAL - D. PETRIE
2     interest rate desk for Barclays Capital.
3          Q.   And how long have you had that
4     position?
5          A.   Since approximately October of last
6     year.
7          Q.   So it's fair to say shortly after the
8     Lehman/Barclays transaction you took on this new
9     position running the short-term interest rate
10    desk?
11          A.   Yes.
12          Q.   And maybe we can cut through some of
13    the questions.  Starting last October, October
14    2008, did you continue to have any involvement
15    in the Lehman/Barclays transaction, the
16    aftermath of that transaction?
17          A.   Yes.
18          Q.   If you could just briefly describe,
19    after October 2008 what has been the nature of
20    your involvement in the Lehman/Barclays
21    transaction?
22          A.   Assisting in the integration of the
23    two companies, specifically to the desk.
24          Q.   When you say "specifically to the
25    desk," what desk are you referring to in the

TSG Reporting - Worldwide (877) 702-9580

Page 10

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   post October 2008 time period?
 3       A.   The repo desk.
 4       Q.   And is that something that you're
 5   still involved in helping with the
 6   integration of the two companies?
 7       A.   No.
 8       Q.   Was there a period of time when you
 9   were involved in that and then that process
10   ceased when you were no longer involved in that
11   integration process?
12       A.   Yes.
13       Q.   Describe that time period for me.
14   From when to when?
15       A.   I would say by approximately
16   November/December that process ended.
17       Q.   Are you aware of a settlement
18   agreement that was entered into in or about
19   December 2008 concerning the Lehman/Barclays
20   transaction?
21       A.   What settlement agreement are you
22   speaking of?
23       Q.   Are you aware of any kind of
24   settlement agreement between Barclays, JPMorgan,
25   Lehman Brothers, Inc., the trustee for Lehman
```
TSG Reporting - Worldwide (877) 702-9580

Page 11

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   Brothers, Inc., in or about December 2008 having
 3   to do with the transfer of collateral from
 4   Lehman through JPMorgan to Barclays?
 5       A.   As you describe it, no.
 6       Q.   Okay.  We'll come back to that.  I'm
 7   just trying to get a sense of where you fit into
 8   the various pieces of the Lehman/Barclays
 9   transaction as a whole.
10          So let's go back to the front end.  So
11   let's go back to April 2008.  You are on the
12   repo desk at Barclays Capital, correct?
13       A.   That is correct.
14       Q.   Just describe that desk for me in
15   terms of who you report to, who reports to you.
16   I'm just trying to get a sense of who the
17   individuals are who are involved with that desk.
18       A.   Sure.
19          MR. SHAW:  As of April 2008?
20       Q.   As of April 2008.
21       A.   I ran the U.S. dollar repo desk.  I
22   reported to Mark Dearlove, and --
23          Do you want me to go further as to who
24   Mark reported to?
25       A.   Sure.
```
TSG Reporting - Worldwide (877) 702-9580

Page 12

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2       A.   Mark Dearlove at the time reported to
 3   Alastair Hodge, if I remember correctly.
 4       Q.   And just in terms of titles or
 5   positions, what was Mr. Dearlove's position?
 6       A.   Managing director.
 7       Q.   At Barclays Capital?
 8       A.   Yes.
 9       Q.   And he was based here in New York?
10       A.   No.
11       Q.   He was based overseas?
12       A.   Mark Dearlove was based in London.
13       Q.   How about Mr. Alastair Hodges, what
14   was his position or title?
15       A.   Alastair Hodge at the time was a
16   managing director in charge of Prime Services, I
17   believe.
18       Q.   And where was he based?
19       A.   London.
20       Q.   Other than being managing director,
21   did Mr. Dearlove and Mr. Hodge have any other
22   functionary titles, chief operating officer,
23   chief financial officer, things like that, those
24   types of titles?
25       A.   No.
```
TSG Reporting - Worldwide (877) 702-9580

Page 13

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2       Q.   And was there any particular
 3   department or group or unit that Mr. Dearlove
 4   and Mr. Hodge were in?
 5       A.   Prime Services.
 6       Q.   And were you a member of that group as
 7   well, the Prime Services Group?
 8       A.   During that period, yes.
 9       Q.   Yeah, I'm talking about the April 2008
10   period.  Is that still the case in September of
11   2008, that you're in the Prime Services Unit?
12       A.   Yes.
13       Q.   And are you still reporting in
14   September 2008 to Mr. Dearlove?
15       A.   Yes.
16       Q.   During this time period, April 2008
17   through September 2008, who is reporting to you?
18       A.   That would be my team at the time.
19          May I ask again for you to clarify,
20   clarify the dates again?
21       Q.   Yes.  This is April 2008 through
22   September 2008, so the months leading up to the
23   transaction.
24       A.   Multiple repo traders.
25       Q.   How many?
```
TSG Reporting - Worldwide (877) 702-9580

4



Page 38

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    responsibilities were he was based in London and
3    was responsible for the financing of corporate
4    bond positions.  His team was responsible for
5    the corporate bond positions.
6        Q.   On the weekend of the 13th and 14th,
7    were you engaged in an exercise to identify
8    assets that Barclays would not wish to purchase
9    from Lehman if there were -- if there was a
10   transaction?
11       A.   No.
12       Q.   At any time during that ten-day
13   period, starting on the 13th through the 23rd,
14   were you involved in such an exercise?
15       A.   No.
16       Q.   We'll come to an e-mail, an e-mail
17   which makes reference to a spreadsheet of
18   excluded assets.  Does that have any meaning to
19   you?
20       A.   Yes.
21       Q.   Okay.  What is your understanding of
22   the phrase "excluded assets" in this context?
23       A.   In the context of the timeframe, which
24   I believe you said from the 10th to the --
25       Q.   From the 13th to the 23rd.
TSG Reporting - Worldwide (877) 702-9580

Page 39

HIGHLY CONFIDENTIAL - D. PETRIE
1
2        A.   -- 13th to the 23rd, as we move into a
3    few days that week, my sole responsibility
4    was to facilitate removing the Fed's funding of
5    Lehman Brothers and replace it with Barclays
6    funding Lehman Brothers.  To accomplish that
7    would mean simply we would just take the assets
8    that the Fed was funding.
9        Q.   And the phrase "excluded assets," what
10   meaning does that phrase have in the context of
11   your answer?
12       MR. SHAW:  Had you finished your
13   answer?
14       A.   No, I wasn't finished.
15       Q.   Go ahead and finish.
16       A.   To accomplish the task of only
17   receiving the collateral that the Fed had been
18   financing for Lehman would, by nature, include
19   assets that weren't being financed by the Fed,
20   which would be excluded assets.
21       Q.   You completely lost me with the last
22   part of your answer, so let me try again.
23       Later on in the week, you're involved
24   in the process of replacing the Fed financing
25   with the Barclays financing, is that fair to
TSG Reporting - Worldwide (877) 702-9580

Page 40

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    say?
3        A.   Yes.
4        Q.   There are assets that are securing the
5    Fed financing, correct?
6        A.   Yes.
7        Q.   Are those same assets then used to
8    secure the Barclays financing?
9        A.   The intent was for Barclays to finance
10   the assets that the Fed had been financing on
11   Thursday of that week.
12       Q.   And in connection with Barclays
13   financing the assets that the Fed had been
14   financing, what role, if any, did excluded
15   assets play in that financing?
16       A.   Since Lehman Brothers was financing
17   assets outside of the Fed facility, and my only
18   purpose that week was to remove the Fed from
19   financing of the assets from that Thursday would
20   imply that there were -- not just imply, there
21   were other assets that would be excluded from
22   the Fed replacement trade, as I would call it.
23       Q.   So your understanding is the excluded
24   assets were those assets that in fact were not
25   securing the Fed financing?
TSG Reporting - Worldwide (877) 702-9580

Page 41

HIGHLY CONFIDENTIAL - D. PETRIE
1
2        A.   Yes.
3        (Exhibit 268, a document bearing Bates
4    Nos. BCI-EX-(S)-37199 through 200, marked
5    for identification, as of this date.)
6        (Discussion off the record.)
7        (Recess; Time Noted:  10:35 A.M.)
8        (Time Noted:  10:47 A.M.)
9    BY MR. TAMBE:
10       Q.   I think before we took the break, sir,
11   we placed in front of you a document Exhibit
12   268.  Have you looked at that?
13       A.   No, I have not.
14       Q.   Why don't you take a look at that and
15   let me know when you're done.
16       (Document review.)
17       A.   Okay.  I've read it.
18       Q.   On the first page of Exhibit 268,
19   that's an e-mail from Mr. Rozen to you
20   forwarding a set of e-mails.  Do you see that?
21       A.   Yes.
22       Q.   And is it fair to say that this
23   collection of e-mails on pages 1 and 2 of
24   Exhibit 268 have to do with Barclays' existing
25   exposure to Lehman on the 14th, the Sunday, 14th
TSG Reporting - Worldwide (877) 702-9580

Page 62

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2   mortgages, do you see that?
 3      A.   Yes.
 4      Q.   And the numbers that appear after each
 5   of those, what are those numbers?
 6      A.   Do you want me to give my best guess?
 7      Q.   Your best guess, yes.
 8          MR. SHAW:  Objection.  Calls for
 9   speculation.
10      A.   Those numbers, 25 cents, 2.75 and
11   2.90, were probably reflective of current market
12   rates for repo transactions.
13      Q.   And are those references to haircuts
14   for those types of assets; is that what you're
15   referring to?
16      A.   No.
17      Q.   Okay.  When you say they're current
18   market rates, how are those market rates being
19   expressed?
20      A.   A repo transaction has two parties,
21   normally, one party that's lending collateral
22   and another party that's lending cash.  The
23   party lending cash will receive an interest rate
24   on that cash for the term of that loan.  These
25   appear to be rates that would be attached to
```

TSG Reporting - Worldwide (877) 702-9580

Page 63

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2   those types of loans.
 3      Q.   Further down on that first page 847,
 4   there's a reference that appears to be the
 5   number 100 followed by some words.  You see
 6   that?
 7      A.   Yes.
 8      Q.   Can you decipher that for me, please?
 9      A.   "100 billion to Barclays" is what it
10   appears to be.
11      Q.   And do you have an understanding as to
12   what that entry means, "100 billion to
13   Barclays"?
14      A.   No.
15      Q.   At any time during that week, the week
16   of the 15th through the 22nd of September, did
17   you ever discuss with anyone the overall
18   economics of the transaction between Lehman and
19   Barclays?
20      A.   No.
21          MR. SHAW:  Objection.
22      Q.   Do you know whether the transaction,
23   the acquisition of these assets by Barclays from
24   Lehman, resulted in a gain to Barclays?
25      A.   No.
```

TSG Reporting - Worldwide (877) 702-9580

Page 64

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2      Q.   Did anyone tell you about a discount
 3   in the sale of assets from Lehman to Barclays?
 4      A.   No.
 5      Q.   Were you ever part of any
 6   conversations or discussions about marking down
 7   the Lehman assets that were being purchased by
 8   Barclays?
 9      A.   No.
10      Q.   Have you ever reviewed to this day the
11   Asset Purchase Agreement between Lehman and
12   Barclays?
13      A.   No.
14      Q.   Ever seen it?
15      A.   I've seen parts of it on the Internet.
16      Q.   When did you see parts of it on the
17   Internet?
18      A.   Approximately a month, couple months
19   ago maybe.
20      Q.   And for what purpose were you on the
21   Internet looking at parts of the APA?
22      A.   Curiosity.
23      Q.   Was it in connection with your
24   potential deposition in this case?
25      A.   No.
```

TSG Reporting - Worldwide (877) 702-9580

Page 65

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2      Q.   Other than looking at parts of the
 3   APA -- let me withdraw that.  What were you
 4   curious about?
 5      A.   I was curious about the enormity of
 6   the times, so it wasn't just me looking at the
 7   Lehman Brothers information.  It would also be
 8   looking at overall economically where we had
 9   come from September 2000 -- September 2008 to
10   where we are now.
11      Q.   Were there other documents that you
12   were looking up on the Internet when you
13   happened across the APA?
14      A.   No.
15      Q.   Let me ask you the other way.  Did you
16   go looking for the APA to see what the deal was?
17      A.   No.
18      Q.   And what is it that you remember about
19   the parts of the APA that you saw during your
20   Internet search?
21      A.   Simply that it was available on the
22   Internet.
23      Q.   Okay.  Have you talked to anyone about
24   any of the terms of the APA?
25      A.   No.
```

TSG Reporting - Worldwide (877) 702-9580

Page 74

```
1            HIGHLY CONFIDENTIAL - D. PETRIE
2       A.   I don't know.  "Legal Opinion on
3   repo," right, thinking out loud.
4       Q.   Right below the "Legal Opinion on
5   Repo" you have an entry that says, I believe,
6   "SIPIC waiver," do you see that?  S-I-P-I-C
7   waiver, do you see that?
8       A.   Yes.
9       Q.   And there's a name next to that, Ray
10  Dorato?
11      A.   Yes.
12      Q.   At BONY, correct?
13      A.   The page says "BONY" after Ray Dorato.
14      Q.   Do you know Mr. Dorato as the general
15  counsel of BONY?
16      A.   I don't recognize the name.
17      Q.   It states, below "SIPIC waiver," "Is
18  Asset Purchase Agreement effective after
19  bankruptcy?"  Do you see that?  Or effect --
20           Did I read that correctly?
21      A.   You read it correctly.
22      Q.   What's that a reference to?
23      A.   I don't know.
24      Q.   Did you have a concern that there
25  would be a default on the repo if LBI went into
```

TSG Reporting - Worldwide (877) 702-9580

Page 75

```
1            HIGHLY CONFIDENTIAL - D. PETRIE
2   bankruptcy?
3       A.   In any repo transaction, whether it be
4   small or large, my job in running the repo desk
5   would be to continually be concerned about
6   events of default.
7       Q.   So your best guess is you in fact were
8   concerned about a potential default on the repo
9   that was being contemplated with Lehman,
10  correct?
11      A.   That is correct.  However, I would
12  like for the record to show that I was concerned
13  about that for an event of default with any
14  transaction that we did, and in fact, during the
15  year 2008 and the end of 2007, there was
16  heightened concern across Wall Street in regards
17  to events of default.  And repo desks across the
18  street were plagued with events of default that
19  did cause considerable losses across Wall
20  Street, and my job was -- part of my job was to
21  be wary of those events.
22      Q.   Had you experienced any defaults on
23  your repo desk?
24      A.   Yes, the Barclays repo desk
25  experienced defaults, most of them, if not all,
```

TSG Reporting - Worldwide (877) 702-9580

Page 76

```
1            HIGHLY CONFIDENTIAL - D. PETRIE
2   prior to me joining the desk, meaning me running
3   the desk in 2008.
4       Q.   I mean, if Barclays had lent money and
5   received collateral to secure that lending,
6   Barclays would be protected, right?
7       A.   The question you're asking is actually
8   the answer is no.  You do your best, one does
9   their best, in running a repo desk to protect
10  itself in the event of default of their
11  counterparties, and to the extent that there is
12  a default, lessons were learned quite quickly
13  that the depth of markets for certain types of
14  assets were quite shallow and oftentimes
15  resulted in losses.
16      Q.   And would you try and protect yourself
17  from a risk of default by asking for a greater
18  haircut on the collateral that was being
19  pledged?
20      A.   As Wall Street progressed through
21  2006, 2007, 2008, haircut issues were addressed
22  almost daily across all of Wall Street,
23  including Barclays.
24      Q.   And you increased the haircuts to try
25  and give yourself more protection, correct?
```

TSG Reporting - Worldwide (877) 702-9580

Page 77

```
1            HIGHLY CONFIDENTIAL - D. PETRIE
2       A.   Sometimes haircuts were increased.
3   Sometimes haircuts were decreased.
4       Q.   And if you had concerns about the
5   liquidity of a particular piece of collateral
6   that was being pledged to you, you would ask for
7   a greater haircut, correct?
8       A.   If a repo desk endeavors to borrow a
9   particular asset, it will make a determination
10  at the time of borrowing that asset as to what
11  is the correct haircut, period.
12      Q.   And just cutting to the chase on the
13  Fed repo that ultimately got replaced by the
14  Barclays financing, Barclays provided, what, $45
15  billion of financing to Lehman; is that right?
16      A.   In connection with the Barclays taking
17  the Fed out of the funding of Lehman, and at the
18  request of the Fed, we provided funding for $45
19  billion for the Fed collateral for Thursday.
20      Q.   And that Fed collateral had a value
21  greater than $45 billion, correct?
22      A.   Yes.
23      Q.   A value of approximately $50 billion,
24  correct?
25      A.   I would put it below that, but yes.
```

TSG Reporting - Worldwide (877) 702-9580

Page 78

```
 1            HIGHLY CONFIDENTIAL - D. PETRIE
 2     Q.   That was the haircut, correct?
 3     A.   The haircut would reflect the
 4   difference between the cash that's loaned and
 5   the value of the collateral at the time of the
 6   trade being executed.
 7     Q.   And was it your understanding that if
 8   there had been a default on the repo, that
 9   Barclays would simply keep the collateral?
10     A.   In the event of a default, if an event
11   of default has occurred, it is normal practice
12   for the collateral that had been collateralizing
13   the loan to then revert to the lender of cash.
14     Q.   Just so I understand what you mean by
15   that, if Barclays is the lender and Barclays
16   has, say, 50 billion of collateral, and Lehman
17   defaults, Barclays gets to keep the collateral;
18   is that what you're saying?
19     A.   Yes.
20     Q.   Were you concerned at all that if
21   Lehman's default was the result of a bankruptcy,
22   Barclays may not be able to keep all of the
23   collateral?
24     A.   No.
25     Q.   Do you remember discussing that with
```

TSG Reporting - Worldwide (877) 702-9580

Page 79

```
 1            HIGHLY CONFIDENTIAL - D. PETRIE
 2   anyone during that week?
 3     MR. SHAW:  Again, I'll --
 4     Q.   Other than lawyers?
 5     A.   No.
 6     Q.   Next page, 851, towards the bottom
 7   third of the page you have a line that begins
 8   "excluded asset," do you see that?
 9     A.   Yes.
10     Q.   And the calculation that appears
11   there, do you see that?
12     A.   Yes.
13     Q.   Can you, one, decipher that language
14   and, two, explain what you mean by that?
15     A.   May I take a moment to read the whole
16   page, please?
17     Q.   Sure.  Absolutely.  Let me know when
18   you're done.
19     A.   Okay.  Your question again, please?
20     (Record read.)
21     A.   Excluded asset says 71 billion; 10
22   something funded, meaning I can't read that,
23   that word; 61 billion balance, and I don't know
24   what that math is pertaining to.
25     Q.   Flip down a couple more pages to page
```

TSG Reporting - Worldwide (877) 702-9580

Page 80

```
 1            HIGHLY CONFIDENTIAL - D. PETRIE
 2   853.  There are details of notes on page 853,
 3   854 over onto 855.  I'm not sure if they all go
 4   together, but if you could look at those three
 5   pages and just read those notes to yourself.
 6   Let me know when you're done and I'll ask you
 7   some questions.
 8     (Document review.)
 9     A.   I've looked them over.
10     Q.   One, do these three pages, should they
11   be read together as a set of notes about a
12   particular meeting or event?
13     A.   Yes.  The date's incorrect, it
14   appears.
15     Q.   And the date that appears on page 853
16   is 9/17/08, which was the Wednesday?
17     A.   Right.  This meeting occurred on
18   Tuesday.
19     Q.   And this meeting that you're referring
20   to is a meeting with the Fed; is that right?
21     A.   Yes.  It's physically at the Fed.
22     Q.   And you attended that meeting?
23     A.   Yes.
24     Q.   How long did the meeting last?
25     A.   Approximately two hours.
```

TSG Reporting - Worldwide (877) 702-9580

Page 81

```
 1            HIGHLY CONFIDENTIAL - D. PETRIE
 2     Q.   And just -- let's step away from the
 3   notes for a second.  Just describe generally
 4   what was discussed in the meeting.
 5     A.   The Fed had asked Barclays to step
 6   into the funding of Lehman and to take the Fed
 7   out of the funding of Lehman.  That was the sole
 8   purpose of the meeting.
 9     Q.   And if I could just run down your
10   notes in terms of who attended that meeting.  I
11   think you have a list of names at the top of
12   page 853.  I can't read any of those names.
13     A.   Ian, Gerard, Elena.
14     Q.   Let me stop there for a second.  Ian
15   and Gerard, that would be Ian Lowitt and Gerard
16   Reilly from Lehman?
17     A.   Gerard LaRocca.
18     Q.   Oh, Gerard LaRocca.  And Ian?
19     A.   Ian Lowitt.
20     Q.   Elena, who is Elena?
21     A.   Matrullo.
22     Q.   From?
23     A.   Our Credit Department.
24     Do you want me to continue?
25     Q.   Yes, please.
```

TSG Reporting - Worldwide (877) 702-9580

21

Page 82

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2     A.   Ian, Alan, Art Citassamo.
 3     Q.   Who are those three individuals?
 4     A.   Ian Pryor, also from Credit; Alan
 5   Kaplan from Barclays Legal; Art Citassamo, a
 6   senior representative from Bank of New York.
 7     Q.   And then the names that appear down
 8   the -- I don't know, I'm not sure if they're
 9   columns or descriptions.  If you move over from
10   those names, there's another set of entries.
11   What are those?
12     A.   Lucinda.
13     Q.   Lucinda who?
14     A.   Brickler I believe is how you
15   pronounce her last name.
16     Q.   From Barclays?
17     A.   No, Lucinda -- these are now
18   individuals representatives attending the
19   meeting from the Fed.
20          So Lucinda.  Next to her name is
21   "payments."  Andrew, I can't decipher his last
22   name, but it says next to it "CCR."
23     Q.   And what does "CCR" stand for?
24     A.   I don't know.
25     Q.   Okay.
```
TSG Reporting - Worldwide (877) 702-9580

Page 83

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2     A.   Then I read Donna from the Markets
 3   Group.  And it appears to be Jan Byce, as best I
 4   can read my writing, and then Aaron Klein, but
 5   next to both of their names I have counsel.
 6          Rick -- I can't pronounce his last
 7   name.  I can't read his last name.
 8     Q.   Okay.
 9     A.   Next to his name I have "credit," and
10   then below that is the name Chris Burke, in
11   parentheses, "coming."
12     Q.   And who is Chris Burke?
13     A.   Chris Burke is a senior person that
14   works at the Fed.
15     Q.   You have a series of items below.  If
16   you could just decipher those.
17     A.   Number 1, "Explain our undertaking of
18   Fed's" -- I can't read that next word -- "on
19   replacing LBI with BCI to assume 47 billion."
20          I'm sorry, I do know what that word
21   says.
22     Q.   Okay.
23     A.   Number 1, "Explain our undertaking of
24   Fed's focus on replacing LBI with BCI to assume
25   47 billion."
```
TSG Reporting - Worldwide (877) 702-9580

Page 84

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2          Number 2, "Half collateral DTC
 3   eligible/half Fed wire" -- I can't make out that
 4   word.
 5     Q.   Next item?
 6     A.   Number 3, "Intention tomorrow to
 7   reverse all collateral."
 8     Q.   Let me just ask you about that entry
 9   and your statement about the date when this
10   meeting took place.  The meeting took place on
11   Tuesday.  Was there an intention to reverse all
12   the collateral on the Wednesday?
13     A.   No.
14     Q.   The reversal of the collateral took
15   place on Thursday, right?
16     A.   That's correct.
17     Q.   Okay.
18     A.   Number 4, "Offering of day loan."
19   Number 5, "We take all collateral to PDCF."
20   Number 6, "Over two-week period put to street."
21     Q.   So those last two items, 5, "We take
22   all collateral to PDCF," what did you mean by
23   that?
24     A.   In the undertaking/at the behest of
25   the Fed, Barclays' funding Lehman Brothers for
```
TSG Reporting - Worldwide (877) 702-9580

Page 85

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   the collateral that the Fed was funding on
 3   Thursday.  Barclays received assurances from the
 4   Fed that we would be able to take that
 5   collateral and fund it through the PDCF, the
 6   Primary Dealer Credit Facility, which is what
 7   addresses point number 5.
 8     Q.   And just to drill down that further,
 9   whether or not that collateral otherwise
10   satisfied PDCF eligibility, Barclays was seeking
11   from the Fed an understanding that all of this
12   collateral would in fact be PDCF-eligible, is
13   that fair?
14     A.   Yes.
15     Q.   Okay.  The next point?
16     A.   Number 6, "Over two-week period put to
17   street."
18     Q.   What do you mean by that?
19     A.   That Barclays, upon completion of what
20   I call the Fed trade, would make every effort to
21   self-finance the received collateral without the
22   assistance of the Fed facilities.
23     Q.   Just so I understand how 5 and 6 may
24   relate to each other, for a period of two weeks,
25   for up to a period of two weeks, you could use
```
TSG Reporting - Worldwide (877) 702-9580

Page 86

1        HIGHLY CONFIDENTIAL - D. PETRIE
2    the PDCF as a financing facility with this
3    collateral. After that two-week period, you
4    would start getting financing for that
5    collateral from the street or otherwise dispose
6    of that collateral, is that fair?
7        A.   No.
8        Q.   Okay. How do 5 and 6 work together,
9    if at all?
10       A.   To be precise, on day one, upon
11   receiving the collateral, we had assurances from
12   the Fed that, should we need to fund the
13   collateral, we could do so through the PDCF, all
14   the while working towards self-financing.
15       Q.   What's the two-week period? Is that a
16   limitation or a requirement that you become
17   self-financing with respect to that collateral
18   in two weeks?
19       A.   The discussion at the Fed was a
20   two-way discussion, and I felt comfortable that
21   I told the Fed that within a couple of weeks we
22   could finance this collateral. It was not a
23   directive of the Fed. It was my estimation that
24   I explained to the Fed.
25       Q.   Did Barclays in fact finance that
TSG Reporting - Worldwide (877) 702-9580

Page 87

1        HIGHLY CONFIDENTIAL - D. PETRIE
2    collateral to the street after the transaction,
3    so on and after the 22nd of September?
4        A.   Is your question the entire amount of
5    collateral or portions of the collateral?
6        Q.   Portions of it.
7        A.   On day one of receiving the
8    collateral, we started financing parts of that
9    collateral with the street.
10       Q.   Do you know of any efforts to sell the
11   collateral?
12       A.   No.
13       Q.   Do you know if there have been any
14   sales of the collateral?
15       A.   No.
16       Q.   If you look at the -- I'm sorry, let's
17   go on, items 7, 8 and 9 that appear on page 853.
18   So let's carry on. If you could carry on
19   deciphering what your words are --
20       A.   Oh, just read it?
21       Q.   -- and then we can talk about what you
22   meant by some of these entries.
23       A.   Sure. Number 7, "Discussing reserve
24   impact of" something -- I can't decipher the
25   word at this point -- "TSLF adding 20 billion
TSG Reporting - Worldwide (877) 702-9580

Page 88

1        HIGHLY CONFIDENTIAL - D. PETRIE
2    total."
3        Number 8, "Debit cap is 54 billion
4    according to Lucinda." Below that in
5    parentheses, "13 billion," question mark,
6    question mark, "with Gerard." 9, "JPM"
7    something "pledge."
8        Q.   Okay. If you can roll over to page
9    856, and looking at 856 and 857 together, if you
10   could first confirm for me whether those two
11   sets of notes all relate to the same event or
12   meeting?
13       A.   Yes, they appear to be.
14       Q.   And they reference a DTC meeting; is
15   that right?
16       A.   That's correct.
17       Q.   And when did the DTC meeting take
18   place?
19       A.   Upon leaving the Federal Reserve on
20   Tuesday evening, several of us walked directly
21   to the DTC to meet with them.
22       Q.   And what was the purpose of that
23   meeting?
24       A.   Given that the Fed had requested
25   Barclays to step into the funding of Lehman
TSG Reporting - Worldwide (877) 702-9580

Page 89

1        HIGHLY CONFIDENTIAL - D. PETRIE
2    Brothers, and it being a sizable trade, assets
3    move over or assets -- assets move over the DTC
4    wire. So we were engaging DTC to let them know
5    what we were planning at the behest of the Fed
6    and to come up with a plan as to how to best
7    accomplish that.
8        Q.   How long did that meeting last?
9        A.   Approximately one hour.
10       Q.   And you identified on page 856 at the
11   top, you've got the I guess the two DTC people
12   you met with, Donald Donahue and Grace Montal?
13       A.   Isaac, I believe.
14       Q.   Isaac Montal.
15       Next section down, there appear to
16   be -- well, why don't you decipher what the next
17   three lines are. It begins at "250MM" on the
18   left-hand side?
19       A.   Would you like me to read them to you?
20       Q.   If you could just first read them and
21   then tell me what you mean by those entries.
22       A.   It says, "250 million, 10,000
23   employees, licenses, 75 billion in assets. 1.
24   Corporate Headquarters; 2. Data centers and
25   more real estate. 60 billion in assets. 47
TSG Reporting - Worldwide (877) 702-9580

Page 110

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      Q.   Do you have an understanding as to how
3  these excluded mortgage assets were identified?
4      A.   No.
5          (Exhibit 274, a document bearing Bates
6  Nos. BCI-EX-(S)-38010 through 38013, marked
7  for identification, as of this date.)
8      Q.   I've handed you a four-page document
9  marked Exhibit 274.  Please take a moment to go
10 through the document and I'll ask you about it,
11 starting with the last e-mail, which is on page
12 2 over to 3 over to 4.
13          (Document review.)
14     A.   I've read the last e-mail in the
15 string.
16     Q.   It's an e-mail from Teri Scott to
17 Jonathan Stone and several other people.  You're
18 CC'd on that e-mail, do you see that?
19     A.   Yes.
20     Q.   Do you recognize this as a summary of
21 the transactions that were done on the 18th of
22 September?
23     A.   I recognize it as Teri Scott's
24 summary, yes.
25     Q.   And you read his summary, correct, or
TSG Reporting - Worldwide (877) 702-9580

Page 111

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  her summary?
3      A.   I've just now read it.
4      Q.   And is it consistent with your
5  recollection of those transactions?
6      A.   It is consistent with my recollection,
7  although parts of it I wasn't privy to previous
8  to receiving this e-mail.
9      Q.   What parts of it were you not privy to
10 prior to receiving this e-mail?
11     A.   On paragraph 1, in regards to the
12 tri-party and rehypothecation issues.
13     Q.   Anything else?
14     A.   In bold, the, "A list of Cusips to be
15 excluded has been provided to ensure collateral
16 we are not purchasing is excluded in this
17 matter" is something I'd be ignorant of.
18     Q.   And just so I understand your answer,
19 you were not aware until you saw this e-mail
20 that a list of Cusips to be excluded had been
21 provided to ensure the collateral that Barclays
22 was not purchasing was excluded from the
23 transfer, correct?
24     A.   Well, as noted before, we only wanted
25 to take the Fed collateral, and the way that she
TSG Reporting - Worldwide (877) 702-9580

Page 112

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  writes this is worded a bit differently than my
3  understanding, but I can't speak for Teri Scott
4  and how -- what she meant by that statement.
5      Q.   Go to the next substantive e-mail in
6  this chain.  It's the e-mail that begins at the
7  bottom of page 1 over to page 2 from John Haley
8  to Teri Scott and others.  Have you had a chance
9  to look at that e-mail?
10     A.   I'll read it right now.
11     Q.   Okay.
12          (Document review.)
13     A.   Okay.
14     Q.   You'll see in John Haley's e-mail, the
15 description that begins on page 1, carries over
16 on to page 2.  Do you see that, the various
17 items that are listed there?
18     A.   Yes, I do.
19     Q.   Is it your understanding that,
20 following the repo on the 18th, on the morning
21 of the 19th, that was in fact the position of
22 the collateral and cash held by Barclays on the
23 Barclays repo?
24     A.   I can see that John Haley has produced
25 an e-mail to attempt to break down the types of
TSG Reporting - Worldwide (877) 702-9580

Page 113

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  collateral that we received.
3      Q.   Is that consistent with your
4  recollection of what happened that evening into
5  the Friday?
6      A.   My recollection is in dollar terms.
7  We received 42.7-ish billion dollars worth of
8  collateral and got $7 billion in cash to
9  complete the Fed repo trade.  This breakdown
10 from John Haley is something I wouldn't be able
11 to comment on.  I don't know if it's correct or
12 not.
13     Q.   The very first e-mail at the top of
14 page 1, the short e-mail, I don't know if you've
15 read it.  Have you?
16     A.   Not yet.
17     Q.   Just read it and let me know when
18 you're done.
19          (Document review.)
20     A.   I've read it.
21     Q.   That's another e-mail from Teri Scott,
22 do you see that?
23     A.   Yes.
24     Q.   In the middle of her e-mail, she
25 writes, "Ops. had to pull all the collateral
TSG Reporting - Worldwide (877) 702-9580

29

Page 114

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    allocated to London, and we're therefore over
3    our unsecured limit by $1.9 billion."  Do you
4    see that?
5        A.  I see that.
6        Q.  Do you have an understanding as to
7    what that means?
8        A.  No.
9        Q.  Do you have any understanding as to
10   what the phrase "collateral allocated to London"
11   means?
12       A.  No.
13       Q.  The next sentence reads, "Part of this
14   overage can also be attributed to EFG, as they
15   were unsecured by 1 billion."  Do you see that?
16       A.  Yes.
17       Q.  What does EFG mean?
18       A.  Equity Finance Group.
19       Q.  And do you have an understanding as to
20   what this sentence means?
21       A.  Yes.  During the normal course of
22   business, there can be, especially during this
23   volatile time period in September, there can be
24   large valuations intraday in regards to the
25   value of collateral, and I take this sentence as

TSG Reporting - Worldwide (877) 702-9580

Page 115

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    to meaning that, due to there being a valuation
3    change in collateral normally held by EFG, that
4    they needed additional billion-dollar loan from
5    PLC, which would be unusual.
6        Q.  When we were talking earlier about
7    John Haley's e-mail at the bottom of page 1 over
8    to page 2, you said that you thought about the
9    repo in some dollar terms, and you said $42
10   billion and change in collateral, do you
11   remember that?
12       A.  Yes.
13       Q.  Okay.  That $42 billion in change in
14   collateral value, what is your --
15       A.  You said 42 billion change?
16       Q.  $42 billion and change.  It's 42 point
17   something, right?
18       A.  Oh, okay.  Yes.
19       Q.  Where did that value come from, the
20   value that you have in your mind?
21       A.  The value of 42.7, approximately,
22   $42.7 billion would have come from, as assets
23   moved from JPMorgan to the Bank of New York
24   during the Fed trade, the valuations would come
25   from the Bank of New York.

TSG Reporting - Worldwide (877) 702-9580

Page 116

HIGHLY CONFIDENTIAL - D. PETRIE
1
2        Q.  So when you think of this $42.7
3    billion number, you're thinking of a Bank of New
4    York valuation number?
5        A.  Yes, and also thinking of it in terms
6    of, like I just mentioned, that there's a
7    volatile -- we were in volatile markets, so the
8    approximate value of 42.7 is a snapshot in time
9    that could go up or down, you know, minute by
10   minute as markets changed.
11       Q.  I assume when this repo was done on
12   the 18th, at some point on the 19th Barclays
13   received a report from BONY as to the value of
14   the collateral; is that correct?
15       MR. SHAW:  Objection.  Foundation.
16       A.  You're asking me, once again, am I
17   assuming that there was a report?
18       Q.  No, I'm asking you do you know whether
19   there was a report?
20       A.  There were attempts of reports to be
21   sent by Bank of New York to Barclays for
22   valuations of securities, but as mentioned,
23   those values would be during very volatile
24   markets and pricings could have been going up or
25   down during minutes and hours post-transaction.

TSG Reporting - Worldwide (877) 702-9580

Page 117

HIGHLY CONFIDENTIAL - D. PETRIE
1
2        Q.  I handed you a document that was
3    previously marked as Exhibit 157A, a two-page
4    document.  Let me know when you're done
5    reviewing it.
6        (Document review.)
7        A.  I've read it.
8        Q.  You're not shown as a recipient or a
9    sender of any of these e-mails.  I want to ask
10   you about the e-mail on the first page from
11   David Aronow to Paolo Tonucci, 19th of
12   September, 12:47.  Do you see that?
13       A.  Yes, I see it.
14       Q.  David Aronow states in that e-mail,
15   "Barclays' Operations Team has recalculated the
16   value of the collateral that they received from
17   us last night and they are more than fully
18   collateralized, including the haircuts applied."
19       Do you see that?
20       A.  I read that.
21       Q.  Did you have any discussions with
22   David Aronow about recalculating the value
23   of the collateral Barclays received from BONY?
24       A.  No.
25       Q.  Had you expressed any views to David

TSG Reporting - Worldwide (877) 702-9580

Page 118

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  Aronow or to anyone else at Lehman about whether
3  you believed that Barclays was fully
4  collateralized as of Friday, the 19th of
5  September?
6      A.   No.
7      Q.   Was that your understanding, that you
8  were fully collateralized on the 19th of
9  September?
10     A.   I believed that we were, including the
11 $7 billion.
12     Q.   And did you have any discussions with
13 anyone at Lehman about standing down with the
14 transfer of any further movements of collateral
15 on that Friday, the 19th of September?
16     A.   I do not understand what he means by
17 "stand down."
18     Q.   Putting aside the collateral that
19 moved over on the 18th in connection with the
20 Barclays repo, were you aware of any movements
21 of collateral that were taking place on Friday,
22 the 19th?
23     A.   I was aware there were movements of
24 collateral, but for what purposes I'm not aware.
25     Q.   Did anyone say to you on the 19th of
TSG Reporting - Worldwide (877) 702-9580

Page 119

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  September or over the weekend of the 20th or
3  21st that, other than the Fed repo collateral,
4  other collateral had to be identified and moved
5  into Barclays by Lehman?
6      A.   No.
7      Q.   And did you ever have a view on the
8  19th and thereafter that the collateral that
9  Barclays received from the Fed repo was not the
10 collateral that Barclays intended to purchase
11 from Lehman?
12         MR. SHAW:  Objection.  Vague as to
13 time.
14         You say "intended to purchase from
15 Lehman."
16     A.   Can you repeat the question, please?
17     (Record read.)
18     A.   I wasn't part of that -- party to the
19 Asset Purchase Agreement.  I was only tasked
20 with one purpose, which was to receive the Fed
21 collateral to take the Fed out of the repo
22 trade, and it was clear that we did not receive
23 in its entirety the repo that had been at the
24 Fed from Lehman Brothers and given the
25 difficulties we have discussed already.  So it
TSG Reporting - Worldwide (877) 702-9580

Page 120

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  was clear to me that we had received collateral
3  to collateralize our loan that would have
4  included assets that were not part of the
5  original Fed trade on Thursday.
6      Q.   Are you aware of any effort to try and
7  transfer to Barclays that collateral which was
8  part of the Fed repo but which wasn't
9  transferred to Barclays?
10     A.   I know I went into the office on
11 Friday morning expecting to try to complete the
12 Fed repo transfer and that there was collateral
13 that had moved, but for what that collateral was
14 satisfying, I don't know.
15     Q.   Let's go back to the notes, 272.  Page
16 862, which is the next page after the one we had
17 last discussed, if you could help us decipher
18 what the words that appear on that page.  If you
19 could just read them out and we can talk about
20 what you're writing about.
21     A.   It says, number 1, "PBN customer
22 finance."  Below that says, "Racers are RV with
23 LCPI," and the name James Walker on the same
24 line.  Below that says, "Trust structures.  LCPI
25 repo'd LBI.  LBI repo'd to street.  PDCF 20
TSG Reporting - Worldwide (877) 702-9580

Page 121

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  percent on racers.  Loans are still on LCPI.
3  Trust is funded by ABCP."  Then the name Martin
4  Kelly.
5      Q.   Okay.  So let's start unpackaging the
6  that.  The "PBN customer finance" that appears
7  in the first line, "PB" is prime brokerage or
8  prime brokering?
9      A.   That would seem reasonable.
10     Q.   Okay.  And racers, the reference to
11 racers, what are racers?
12     A.   I believe racers are a
13 securitized-type product that had been issued
14 off of another entity, not LBI, so Lehman
15 Brothers entity.
16     Q.   Is not the LCPI Lehman Commercial
17 Paper, Inc.?
18     A.   To be honest with you, LCPI, you've
19 just told me what it is.  I wouldn't have been
20 able to explain that to you.
21     Q.   Okay.  And so these are some kind of
22 structured security, and you say the "racers are
23 RV with LCPI."  What did you mean by that?
24     A.   Racers RV stands for reverse repo.
25     Q.   Okay.
TSG Reporting - Worldwide (877) 702-9580

Page 146

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2      Q.   Were you aware of a BONY valuation for
 3  that collateral as of Thursday night, the values
 4  as of Thursday night, of $45 billion?
 5      A.   No.
 6      Q.   Are you aware of any valuations by
 7  BONY, any specific valuations by BONY for that
 8  Fed repo collateral?
 9      A.   Am I aware of any specific
10  valuations --
11      Q.   By BONY.
12      A.   -- by BONY?
13           BONY, as our custodian, is the one
14  that values the collateral.
15      Q.   Are you aware of any specific values
16  put by BONY on the Fed repo collateral that was
17  transferred over on the 18th?
18      A.   No.
19      Q.   Would that information not have
20  crossed your desk on the 19th, the 20th, the
21  21st?
22      A.   Your question said "specific
23  valuations."  My desk, as mentioned in the very
24  beginning of the testimony, like any other repo
25  desk on Wall Street, is to finance the firm.
```
TSG Reporting - Worldwide (877) 702-9580

Page 147

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2  So, as collateral enters Barclays, my group and
 3  myself's number one job is to finance it.
 4           So, to the extent that the value of
 5  the collateral held by Barclays Capital went up,
 6  I would then raise, or my group would raise,
 7  cash to meet that obligation in financing it.
 8      Q.   I've handed you a multi-page document
 9  previously marked as Exhibit 83B.  Take a moment
10  to look at the document and the spreadsheet
11  attached in the document.  Let me know when
12  you're done.
13           (Document read.)
14      A.   I've read it.
15      Q.   Have you seen this document before
16  today?
17      A.   No.
18      Q.   Do you have any understanding of the
19  information that's contained in the spreadsheet
20  attached to this Exhibit 83B?
21      A.   Yes, I have some understanding.
22      Q.   What's your understanding of what that
23  spreadsheet is?
24      A.   Given that Barclays Capital had
25  received many different asset classes of
```
TSG Reporting - Worldwide (877) 702-9580

Page 148

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2  securities from Lehman Brothers in taking the
 3  Fed out of its trade, there was an attempt by
 4  Stephen Sell to have those securities under the
 5  watchful eye of the relevant trading desks to
 6  manage the risk associated with those different
 7  asset classes would be -- you asked my opinion.
 8           I can't speak for Stephen Sell, but --
 9  I haven't seen the document, but that's my
10  opinion.
11      Q.   Do you see the two bullet points on
12  the first page of the exhibit, Exhibit 83B, the
13  first bullet point reads, "We should book all
14  positions from the Lehman financing facility to
15  BCI (45 billion securities - see attached
16  file)."
17           Do you see that?
18           MR. SHAW:  Objection.
19  Mischaracterizes the document.
20      Q.   Do you see that bullet point?
21           MR. SHAW:  Objection.
22  Mischaracterizes the document.
23           MR. TAMBE:  Whether he sees the
24  document?
25           MR. SHAW:  The document you described
```
TSG Reporting - Worldwide (877) 702-9580

Page 149

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2  does not exist because you left out a
 3  critical piece of information.
 4      Q.   The first bullet point on page 1 of
 5  Exhibit 83B, do you see that first bullet point?
 6      A.   I see the first bullet point.
 7      Q.   This parentheses it "45 billion
 8  securities - see attached file," do you see
 9  that?
10           MR. SHAW:  Objection.
11  Mischaracterizes the document.
12           MR. TAMBE:  How does that
13  mischaracterize the document?
14           MR. SHAW:  You have left out the
15  little mark that generally indicates --
16  well, I know what it generally indicates to
17  me and what I understand it is
18  approximately.
19      Q.   Okay.  "Approximately $45 billion in
20  securities," do you see that?
21      A.   Yes, I see that --
22      Q.   The squiggly line?
23      A.   I would read it, "We should book all
24  positions from the Lehman financing facility to
25  BCI (approximately 45 billion securities - see
```
TSG Reporting - Worldwide (877) 702-9580

38

Page 150

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   attached file)."
 3        Q.   That's the file we were talking about
 4   before, the spreadsheet that's attached to the
 5   cover sheet?
 6        A.   The file that you said -- yes, the
 7   spreadsheet that I haven't seen before until
 8   now, and if it adds up to 45, approximately 45
 9   billion, then, okay, then that's the file we
10   were talking about.
11        Q.   And the next bullet point states, "We
12   should book based on the price within the BONY
13   file, at least for Day 1."  Do you see that?
14        A.   I see that statement.
15        Q.   And taking those two bullet points
16   together, do you understand that as Mr. Sell
17   saying that the BONY prices were used for
18   booking these trades into the Barclays system,
19   at least for Day 1?
20        MR. SHAW:  Objection.
21        Mischaracterizes the document.
22        A.   I don't know what Stephen Sell was
23   trying -- what he was saying here.
24        Q.   What do you understand those two
25   bullet points to mean there?
     TSG Reporting - Worldwide (877) 702-9580
```

Page 151

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2        A.   In Barclays' books and records, you
 3   have to characterize these assets being held in
 4   a price that is a starting price from whence you
 5   held them.
 6        Q.   Okay.  And you understand this e-mail
 7   as saying that those prices should be the BONY
 8   prices, correct?
 9        A.   I can't speak for Stephen Sell.
10        Q.   That's what the e-mail said.  Do you
11   read that?  Do you understand the e-mail as
12   saying that?
13        A.   It appears that's what he's saying.
14        Q.   And do you know, based on how these
15   trades were booked to the Barclays system,
16   whether they in fact were booked to the BONY
17   prices on day one?
18        A.   I don't know.
19        Q.   Who would know that?
20        A.   I would suggest speaking to Stephen
21   Sell.
22        Q.   You said many, many times today that
23   there was a lot of volatility that week.  If it
24   was up to you, what -- what day's prices should
25   have been used to book these assets when they
     TSG Reporting - Worldwide (877) 702-9580
```

Page 152

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   were booked in Barclays' books?
 3        MR. SHAW:  Objection to form.
 4        A.   If it was up to me, at what prices
 5   should the assets that came over from the Fed
 6   repo trade been booked at; am I characterizing
 7   your question correctly?
 8        Q.   Not quite.  What day's prices would
 9   you have used?
10        MR. SHAW:  Objection to form.
11        Q.   Thursday's prices?  Friday's prices?
12   Monday's price?
13        MR. SHAW:  Objection to form.
14        A.   I'm not an accountant, so I wouldn't
15   know what day to use.
16        Q.   But you run the repo desk, right?
17        A.   Right, for financing --
18        Q.   You need to know what you have on your
19   assets so you know what you financed, right?
20   You need to have some sense of what prices
21   you're going to use?
22        A.   For financing the positions, it would
23   be current market value.
24        Q.   So you'd use the prices of the day you
25   got the assets into your books?
     TSG Reporting - Worldwide (877) 702-9580
```

Page 153

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2        MR. SHAW:  Objection to form.
 3        A.   Buying a security and financing a
 4   security, the price that you paid for the
 5   security versus where you finance that security
 6   can differ to the extent of market volatility.
 7        Q.   A lot of things can differ, okay?  Do
 8   you have any procedures or rules that you follow
 9   when you get securities and you lend money?  Are
10   you required to follow any particular pricing
11   convention or methodology?
12        MR. SHAW:  Objection to form,
13        foundation, and vague as to who the "you" is
14   in that question.
15        Q.   You, Mr. Petrie.  Is there a problem
16   with "you"?  Is it unclear to you as to who the
17   "you" is in my question?
18        A.   I'm glad you clarified it, meaning my
19   attorney.
20        In running a repo desk, every day you
21   come into a new day where the market has moved
22   up or down, and you use, you can only use,
23   whatever market value of the securities that are
24   within Barclays Capital to raise cash.
25        Q.   And where Barclays is using a
     TSG Reporting - Worldwide (877) 702-9580
```

Page 154

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2    tri-party arrangement and there's a custodian
3    and the custodian has assigned prices to those
4    securities, are you required to use those
5    prices?
6         MR. SHAW:  Objection to form.
7    Foundation.
8         A.   Bank of New York, being our custodian,
9    prices our securities, and when we lend those
10   securities, the value that we lend those
11   securities at is the money that we're able to
12   borrow to finance the firm.
13        Q.   And whose values do you use, Bank of
14   New York's values or your values?
15        A.   Bank of New York's.
16        Q.   Thank you.  I have placed before you a
17   two-page document previously marked Exhibit
18   147A.  Take a moment to review the document.
19   Let me know when you're done.
20        (Document review.)
21        A.   Okay.  I've finished it.
22        Q.   Have you seen this document before
23   today?
24        A.   No.
25        Q.   There's a reference in the first
         TSG Reporting - Worldwide (877) 702-9580
```

Page 155

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2    e-mail at the top of page 1 to $1.9 billion of
3    additional collateral.  Do you see that?
4        A.   Yes, I see it.
5        Q.   Do you recall having any discussions
6    with anyone on or after the 19th of September
7    about $1.9 billion of additional collateral?
8        A.   No.
9        Q.   I have handed you a document marked
10   144A.  Take a moment to look at that document.
11   Let me know when you're done.
12        A.   I'm finished.
13        Q.   There's a forward of an e-mail on this
14   exhibit, and the e-mail is from Marty Malloy to
15   Gerard LaRocca and others.  Do you see that?
16        A.   Yes.
17        Q.   Okay.  Who's Marty Malloy?
18        A.   Marty Malloy is a managing director in
19   the Collateralized Finance Group.
20        Q.   And in terms of seniority, how does he
21   fit in with Mr. Dearlove and others we have
22   discussed?
23        A.   He's a senior member of the Barclays
24   team, so relatively on par.
25        Q.   There's a CC shown on his e-mail,
         TSG Reporting - Worldwide (877) 702-9580
```

Page 156

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2    Jacqui Stanley-Johns.  Do you see that?
3        A.   I see that.
4        Q.   Is that a name you're familiar with?
5        A.   No.
6        Q.   And you see the subject line of this
7    e-mail, "Totals For the Fed Facility
8    Collateral," do you see that?
9        A.   I see that.
10        Q.   And are you familiar with this
11   calculation that appears below in his e-mail?
12        A.   No.
13        Q.   You haven't seen that before today?
14        A.   No, I have not.
15        MR. TAMBE:  Let me take a short break.
16        (Recess; Time Noted:  3:22 P.M.)
17        (Time Noted:  3:31 P.M.)
18   BY MR. TAMBE:
19        Q.   Mr. Petrie, were you involved at all
20   in helping Barclays' auditors account for the
21   value of the securities that were purchased in
22   the Lehman/Barclays transaction?
23        A.   No.
24        Q.   I'm showing you what's previously been
25   marked as Exhibit 86B.  Just take a look at it
         TSG Reporting - Worldwide (877) 702-9580
```

Page 157

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2    and tell me if you've ever seen that document
3    before.
4        (Document review.)
5        A.   No, I have not.
6        Q.   There's a column on page 1 of Exhibit
7    86B, column F, titled "PCG Liquidity Value."  Do
8    you see that?
9        A.   Yes, I see it.
10        Q.   And do those words have any meaning to
11   you?
12        A.   Yes.
13        Q.   What is your understanding of what
14   those words mean?
15        A.   Product Control Group liquidity value.
16        Q.   And do you have an understanding as to
17   the calculations that are being done in that
18   column on page 1 of 86B?
19        A.   No, I do not.
20        Q.   I've handed you a one-page document
21   previously marked as 87B.  Have you seen this
22   document before today?
23        A.   No.
24        Q.   There's a column F on this document
25   87B entitled "MV w Liquidity," do you see that?
         TSG Reporting - Worldwide (877) 702-9580
```

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4        ----------------------x

5        In Re:

6                                  Chapter 11

7        LEHMAN BROTHERS           Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

         ----------------------x

11

12

13

14            DEPOSITION OF MARTY MALLOY

15              New York, New York

16              March 1, 2010

17

18

19

20

21

22

23       Reported by:

24       KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25       JOB NO. 28684

Page 6

M. Malloy

1
2  prefer, if there's a question pending, that we
3  get an answer to the question before we take the
4  break.  But beyond that, just speak right up if
5  you want to take break.
6          I have a habit of speaking quickly,
7  and if I start to speed up too much, and that
8  refers to rule number 1, if you don't understand
9  a question, if our friend, the court reporter,
10 doesn't tell me, you should.
11     A.  Okay.
12     Q.  Okay?
13         You are employed as a managing
14 director at Barclays Capital, Inc.; is that
15 correct?
16     A.  That is correct.
17     Q.  Can you give me a more specific
18 explanation of your duties and responsibilities?
19     A.  I'm the Global Head of the Prime
20 Brokerage Group at Barclays, which cuts across
21 Equities, Fixed Income and FX.
22     Q.  And briefly, sir, could you describe
23 for me what your -- what are your duties and
24 responsibilities in that job?
25     A.  I'm responsible for the delivery of

Page 7

M. Malloy

1
2  the overall platform and the products that we
3  use within Prime Services, and I'm responsible
4  for the client servicing aspects of the
5  business.  So everything essentially after the
6  trade.
7     Q.  And does anything within the scope of
8  your duties and responsibilities as Global Head
9  of Prime Brokerage require you to analyze or
10 apply values to securities?
11        MR. GREEN:  Object to the form.
12        You may answer.
13     A.  Not directly.  Not directly in this
14 role.
15     Q.  Indirectly?
16     A.  Indirectly.
17     Q.  Okay.  And how does that come across
18 your screen indirectly?
19     A.  If, within the Client Service Group,
20 if there is a dispute with a margin call, we
21 could get involved in working with the different
22 departments on a valuation.
23     Q.  And when you say "working with the
24 different departments," do I understand
25 correctly you would essentially -- you might be

Page 8

M. Malloy

1
2  the customer interface, but you would go to
3  another department within Barclays to get the
4  valuations done?
5        MR. GREEN:  Objection to the form.
6     A.  That's correct.  The trading desk.
7     Q.  Okay.  And how long have you held the
8  post of Global Head of Prime Brokerage at
9  Barclays?
10     A.  Since spring of 2008.
11     Q.  How long have you worked at Barclays?
12     A.  Eleven years.
13     Q.  Now, I've premarked as Exhibit 658C a
14 copy of a declaration that has been submitted in
15 this action by Barclays.  Do you recognize the
16 document, sir?
17     A.  I do.
18     Q.  I take it that's your signature at the
19 end of the declaration?
20     A.  It is.
21     Q.  And you have reviewed the declaration
22 before you signed it?
23     A.  Yes.
24     Q.  And to your knowledge, the contents of
25 the declaration are true and correct?

Page 9

M. Malloy

1
2     A.  Yes.
3     Q.  Did you participate in the drafting of
4  it, the writing of it?
5     A.  The formation of it, yes.
6     Q.  The actual words in the declaration?
7     A.  I reviewed the words in the sentences,
8  yes.
9     Q.  But a draft was prepared for you, you
10 reviewed it for accuracy, and you'll stand
11 behind the accuracy of your declaration?
12     A.  Yes.
13     Q.  Now, the declaration recites that you
14 had read paragraph 92 of a certain motion, the
15 Debtors' Motion For An Order, et cetera, et
16 cetera, correct?
17     A.  (Witness nods.)  Yes.
18     Q.  That was the other instruction I
19 should have given you.  You have to give your
20 answers out loud, please.
21        Did you review anything in the motion
22 papers other than paragraph 92?
23        MR. GREEN:  Object to the form.
24     A.  No.
25     Q.  And paragraph 92 of your declaration

Page 10

M. Malloy

1
2  recites, refers to a particular document
3  previously marked as Exhibit 144A.  Do you see
4  that?
5        MR. GREEN:  Do you understand the
6  question?
7     Q.   Take a look at paragraph 2 of your
8  declaration.
9        MR. GREEN:  You might want him to
10  restate the question so you understand.
11     A.   Can I just see the Exhibit 144A?
12     Q.   Sure.  I'm about to hand it to you.
13  Let's do it that way.
14        I'm giving you a copy of what's
15  previously been marked as Deposition Exhibit
16  144A.
17        MR. GREEN:  Thank you, Bob.
18     Q.   My question, Mr. Malloy, is that
19  document 144A the same document that's referred
20  to in paragraph 2 of your declaration?
21     A.   Yes, it is.
22     Q.   Okay.  And Deposition Exhibit 144A
23  contains an e-mail from you to, among others,
24  Gerard LaRocca.  Do you see that?
25     A.   Yes, I do.

Page 11

M. Malloy

1
2     Q.   Can you explain for me, Mr. Malloy,
3  the circumstances under which you came to draft
4  the e-mail that is marked as Exhibit 144A?
5        MR. GREEN:  Object to the form.
6     A.   Sure.  I was involved in the
7  collateral transfer of the Fed repo the previous
8  day on that Thursday, and on Friday morning,
9  essentially all the collateral did not move that
10  Thursday night, so we were trying to ascertain
11  essentially midday what additional potential
12  collateral actually moved over because we were
13  short $7 billion that particular night.
14        So this e-mail was an estimate based
15  on the only information that we had available at
16  the time, which was the Bank of New York
17  statements, but the collateral itself was not
18  reconciled until several days later and the
19  valuations of the collateral weren't verified
20  until several days later as well.
21     Q.   Well, who asked you to put the e-mail
22  together?
23     A.   I recollect Gerard.
24     Q.   And was it Gerard LaRocca who had put
25  you in charge of that task that you just

Page 12

M. Malloy

1
2  described?
3        MR. GREEN:  Object to the form.
4     A.   Not necessarily in charge.  I got
5  my -- I understand how some of these things work
6  and I got involved in trying to help because of
7  the, quite frankly, unique nature of this
8  particular transfer.  So I got involved as far
9  as helping to get some of this collateral moved.
10     Q.   Who asked you to get involved?
11     A.   No one specifically.  No one
12  specifically asked me to get involved.  Just my
13  background in these matters, I was a useful
14  resource to the group.
15     Q.   And you referred to some Bank of New
16  York statements that you had when you prepared
17  Exhibit 144A?
18     A.   Yes.  I did not have those statements.
19  I got that information from our Securities
20  Operations Group.
21     Q.   Who in the Securities Operations Group
22  sent you that information?
23        MR. GREEN:  Object to the form.
24     A.   I believe it was Keith.  His surname
25  alludes me.  Keith in Collateral Management.

Page 13

M. Malloy

1
2  INFORMATION TO BE PROVIDED:  _____
3     Q.   If at some point Keith's last name
4  comes to you during the deposition, let me know.
5  And we'll leave a blank in the transcript to be
6  filled in, if that's okay.
7     A.   Understood.
8     Q.   Did Keith send you Bank of New York
9  statements?
10     A.   During the course of that week, yes,
11  at different times as we tried to reconcile
12  things.
13     Q.   Okay.  Can you describe those
14  statements to me?  What did they look like?
15     A.   The statements normally come out in
16  kind of a bulk form.  It has the name of the
17  security, the Cusip, the nominal amount and the
18  price are the normal key pieces of information.
19     Q.   Do you know if the Bank of New York
20  statements that you had access to when you
21  prepared 144A are still in existence?
22        MR. GREEN:  Object to the form of the
23  question.
24     A.   I don't know offhand.
25     Q.   When was the last time you saw them?

Page 18

M. Malloy

1          M. Malloy
2    Group.
3       Q.   And was that Keith who gave you the
4    verbal notionals?
5       A.   As I recall, yes.
6       Q.   And was he present with you when he
7    gave you the verbal notionals, or was it by
8    phone?
9       A.   It was by phone.
10      Q.   Do you recall if he sent you any
11   e-mails or any other written communication
12   concerning the notionals?
13      A.   To produce this statement?
14      Q.   Yes.
15      A.   No, as I recall, it was all by phone
16   because it was -- it was a very tight timeframe.
17   I think the e-mail went out in the midmorning or
18   early afternoon.
19      Q.   Now, in paragraph 3 of your
20   declaration, would you take a look -- why don't
21   you take a minute and read through that
22   paragraph to yourself.
23          (Document review.)
24      Q.   Have you had a chance to do that?
25      A.   Yes.

Page 19

M. Malloy

1          M. Malloy
2       Q.   You say in paragraph 3, "Rather, I was
3    simply reporting to Mr. LaRocca the nominal
4    value BONY had assigned to the collateral it had
5    received in connection with the September 18,
6    2008 repo transaction."
7          Do you see that sentence?
8       A.   I do.
9       Q.   I know everybody was busy that week,
10   but was that the purpose of your task in
11   preparing 144A, to give that information to Mr.
12   LaRocca?
13          MR. GREEN:  Object to the form.
14      A.   Yes, it was.  The purpose of this was
15   to see how much additional collateral we got in
16   that Friday morning because of the shortfall the
17   Thursday night.  That was the purpose of the
18   e-mail.
19      Q.   And in the next sentence of paragraph
20   3, you say you were "referring to a BONY
21   document" that you had received "shortly
22   before."  Do you see that?
23      A.   Yes.
24      Q.   What was the BONY document you were
25   referring to in your declaration?

Page 20

M. Malloy

1          M. Malloy
2       A.   We had received BONY documents during
3    that previous day in order to look at the
4    valuations, and then I called the collateral
5    operations managers those Fridays to get the
6    latest information.
7       Q.   So when you prepared 144A, you
8    extracted figures from the BONY document, as you
9    say in your declaration, but also you extracted
10   relevant figures from your verbal communications
11   with others?
12          MR. GREEN:  Object.
13      Q.   Correct?
14      A.   Correct.
15          MR. GREEN:  Object to the form.
16      Q.   And the verbal communication that you
17   had with others, did they give you information
18   that was different from that available to you in
19   the BONY document you referring to in your
20   declaration?
21          MR. GREEN:  Object to the form.
22          Do you remember?
23          THE WITNESS:  Well, yes, because the
24   collateral had changed.  We got additional
25   collateral in on that Friday.

Page 21

M. Malloy

1          M. Malloy
2       Q.   So in paragraph 3 of your declaration
3    where you say, "Referring to a BONY document I
4    had received shortly before, I extracted the
5    relevant figures and performed some mathematical
6    calculations adding up the numbers provided by
7    BONY and subtracting the $45 million that
8    Barclays had advanced," in addition to what you
9    described there, the calculations you did were
10   also dependent on other information; is that
11   right?
12          MR. GREEN:  Object to the form.
13      A.   Specifically, I started with the
14   valuations from the Thursday night.
15      Q.   Yes.
16      A.   And then updated it with the Friday's
17   figures, the BONY statements from the Thursday
18   night which we had received, which was a day
19   old, and then the Friday valuations.
20      Q.   And the Friday valuations you
21   understood also to be derived from BONY
22   valuations, correct?
23      A.   Yes.
24      Q.   They were not the result of any
25   internal valuation done by Barclays personnel?

Page 22

M. Malloy

1
2      A.   No.
3      Q.   So the calculations that you prepared
4  in Exhibit 144A derive entirely from BONY's
5  marks, correct?
6      A.   That is correct.
7      Q.   And you took the information you had
8  about the BONY marks and you put together a
9  calculation of what you describe in your e-mail
10 as excess collateral; is that right?
11         MR. GREEN:  Object to the form.
12     A.   In the e-mail, yes.
13     Q.   And the excess collateral, the number
14 on paragraph 144A is 7.19; that's billions,
15 correct?
16     A.   That number is in billions.
17     Q.   And so the calculations that you
18 performed or the calculations you put together
19 based on the BONY marks indicated there was
20 excess collateral of 7.19 billion in the repo,
21 correct?
22         MR. GREEN:  Object to the form.
23     A.   Based on the BONY marks, but the other
24 issue that we had is none of this collateral was
25 reconciled, so this was the best estimate that

Page 23

M. Malloy

1
2  we had at that point in time.
3      Q.   I would be grateful if I could just
4  have an answer to the question I actually asked,
5  which is the calculations that you put in
6  Exhibit 144A were based solely on BONY marks,
7  correct?
8      A.   Correct.
9      Q.   And the calculations you did in 144A
10 based solely on BONY markets indicated excess
11 collateral of 7.19 billion, correct?
12         MR. GREEN:  Object to the form.
13     A.   Yes.
14     Q.   And you transmitted that information
15 about excess collateral of 7.19 billion,
16 according to the BONY marks, to Messieurs
17 LaRocca and King, correct?
18     A.   Yes.
19     Q.   And you refer in your e-mail to a
20 spreadsheet, "I will send Jackie a spreadsheet
21 as well for Gerard," do you see that?
22     A.   I do.
23     Q.   Did you prepare such a spreadsheet?
24     A.   As I recall, yes.
25     Q.   Do you know if it still exists?

Page 24

M. Malloy

1
2      A.   I don't know.
3      Q.   Okay.  When was the last time you saw
4  that spreadsheet?
5      A.   That Friday.
6      Q.   Did you transmit that spreadsheet by
7  e-mail or by some other mechanism?
8      A.   I believe by e-mail.
9      Q.   And who was the Jackie you refer to in
10 that sentence?
11     A.   It was the -- Jackie Stanley.
12     Q.   And what was Jackie Stanley's job?
13     A.   She's an administrative assistant.
14     Q.   And do you know if Jackie has a copy
15 of the spreadsheet that you refer to here?
16         MR. GREEN:  Object to the form.
17     A.   I don't know.
18         MR. GAFFEY:  Again, Chris, I don't
19 think that spreadsheet has been produced, so
20 I would make the same request for its
21 production.
22     Q.   Now, do you know if the -- well, you
23 performed no independent valuation of the
24 collateral in the repo at this point, correct?
25     A.   That's correct.

Page 25

M. Malloy

1
2      Q.   Were you involved thereafter in any
3  independent valuation of the collateral in the
4  repo?
5      A.   No.
6      Q.   Do you know if at some point after you
7  prepared your e-mail there was an independent
8  valuation of the collateral in the repo
9  performed?
10     A.   I don't know firsthand, but as a -- as
11 a business issue, you get independent marks for
12 your collateral.
13     Q.   So when you take collateral in, after
14 you've got it, after you own it, you figure out
15 what it's worth, right?
16     A.   Yes.
17     Q.   When you take the collateral in out of
18 a repo, do you take it in at those marks and
19 then figure out an independent valuation later?
20         MR. GREEN:  Object to the form.
21     A.   No, because when you -- when you book
22 the collateral, you have your own pricing
23 mechanism.  You don't use the Bank of New York
24 marks.
25     Q.   Do you know when Barclays booked the

Page 30

M. Malloy

1           M. Malloy
2   valuation of the collateral is it comes in
3   marked by the collateral agent, correct?
4           MR. GREEN:  Object to the form.
5       A.   No.
6       Q.   Why does BONY put marks on it at all?
7       A.   Because you need some reference to say
8   what they show is the value of the overall
9   collateral, you need some piece, but when we
10  book it in our systems, you have a separate
11  process that goes through what that valuation
12  is.
13      Q.   Describe that process to me, please.
14      A.   It would change depending upon the
15  different trading desks.  So, once you book the
16  collateral, there's different hierarchy
17  processes that you use to validate a position.
18  You can get different pricing fees versus
19  different traders that would be marking it.
20      Q.   And again, forgive me if I'm going
21  over some old ground, but I want some clarity.
22  When you say "once you book the collateral," I
23  want to go back to something I asked you a
24  moment ago.  When the collateral arrives, is it
25  booked?

Page 31

M. Malloy

1           M. Malloy
2       A.   No.
3           MR. GREEN:  Object to the form.
4       Q.   So does the valuation take place
5   before or after you book the collateral?
6       A.   The valuation --
7           MR. GREEN:  Object to the form.
8       A.   -- takes place after you book the
9   collateral.
10      Q.   And this independent valuation, tell
11  me what happens.  Do they look at the BONY marks
12  and determine whether they're right or wrong, or
13  is it a from-the-ground-up valuation?
14          MR. GREEN:  Object to the form.
15      A.   It's normally done as a ground-up
16  within your individual systems because the marks
17  that you use for your collateral is similar to
18  all the positions that you have at the firm.
19      Q.   And when Barclays is engaged in
20  Repurchase Agreements and BONY is the custodial
21  agent, one of BONY's tasks, one its jobs is to
22  apply a value to the assets in the repo,
23  correct?
24          MR. GREEN:  Object to the form.
25      A.   On the BONY systems, yes.

Page 32

M. Malloy

1           M. Malloy
2       Q.   Okay.  That's a service that BONY
3   provides to Barclays as its collateral agent,
4   correct?
5       A.   As I understand the process, we don't
6   use the BONY pricings in our collateral
7   valuation processes.  We use independent.
8       Q.   Who within Barclays is the person with
9   direct knowledge of that topic?
10          MR. GREEN:  Object to the form.
11      Q.   I just take note you qualified by
12  saying "as I understand it."  So I'll give you a
13  chance to shorten your deposition.  Who would
14  you ask that question of?
15          MR. GREEN:  What is the question?  I'm
16  sorry.
17      Q.   Who would you ask?
18          MR. GREEN:  Ask what?
19      A.   The valuations?
20      Q.   Yes.
21      A.   It depends on each one of the trading
22  desks because each product is a little bit
23  different.  So, for example, if you're working
24  with equities, it's a lot simpler because you
25  can look at a closing price on an exchange.  If

Page 33

M. Malloy

1           M. Malloy
2   you're looking at more esoteric bonds and credit
3   bonds, each process is different because
4   different people use different pricing sources
5   and then ultimately trader marks, if need be,
6   because their price is one thing, but the
7   liquidity is another, meaning if it's a larger
8   bond or a smaller bond.  So I'm not trying to
9   avoid the question.
10      Q.   No, I know.
11      A.   It's different people depending on the
12  asset class.
13      Q.   In that sort of latter category where
14  it's a little more complicated to figure out,
15  that takes some period of time, right?
16          MR. GREEN:  Object to form.
17      A.   Depending upon the collateral.
18      Q.   And during the time it takes to
19  perform that collateral valuation, how is the
20  collateral shown on Barclays' books?
21          MR. GREEN:  Object to the form.
22      A.   It will come -- it'll have a hierarchy
23  within Barclays.  It will assign a price in
24  there associated with the systematic process,
25  but it doesn't take into consideration, you

Page 34

M. Malloy

1
2  know, like I said, size or potential sale
3  prices.
4      Q.    And again, my question -- I think we
5  might be missing each other here.  It takes a
6  period of time, be it two days, three days, a
7  week, it takes a period of time for some
8  securities to be valued according to Barclays,
9  under Barclays' systems and procedures, correct?
10      A.    Yes.
11      Q.    That could take, for example, three
12  days, just -- yes?
13      A.    For a security, it's possible it could
14  take three days.
15      Q.    With that kind of security, when it
16  comes in the house, when it comes to Barclays
17  and it takes three days to value it, at what
18  value is it held on Barclays' books in that
19  three days?
20          MR. GREEN:  Object to the form.
21      A.    There will be a price in the system in
22  which to value that.  That price will be based
23  on Barclays' protocol of how the pricing regime
24  would work.
25      Q.    And does that pricing regime take into

Page 35

M. Malloy

1
2  account the marks applied by the collateral
3  agent?
4      A.    Typically, no.
5      Q.    Where is the initial price derived at?
6      A.    You get a number of different pricing
7  feeds, so you have some feeds that are more
8  focused on that particular asset class so some
9  feeds are better than others.  You know, some
10  securities it's not difficult because --
11  exchange-traded, for example.  So you'd using
12  the closing exchange price.
13      Q.    You get a hundred shares of Verizon,
14  you can check the price, right?
15      A.    Right.  The only thing you'd have to
16  look at that is if the position was large, you
17  might have to look at the particular price
18  because you couldn't liquidate such a larger
19  position, as an example.
20      Q.    Let me move from the general to the
21  specific.
22          With respect to the collateral that
23  was in this repo that we're talking about, that
24  is, the September 18 repo, do you know one way
25  or the other what the source was of the values

Page 36

M. Malloy

1
2  at which the collateral was initially posted to
3  Barclays' books?
4          MR. GREEN:  Object to the form.
5      A.    I don't.  I didn't book the
6  collateral.
7      Q.    Now, are you comfortable, sir, again,
8  with reference to Exhibit 144A -- not your
9  declaration, the other exhibit.
10      A.    Yes.
11      Q.    Are you comfortable that your e-mail
12  accurately depicts the values that were drawn
13  from the BONY information that you had?
14          MR. GREEN:  Object to the form.
15      Q.    You know what, that question is just
16  way too complicated.
17          Were you comfortable that your e-mail
18  was accurate when you sent it?
19          MR. GREEN:  Object to the form.
20      A.    As accurate as this e-mail could be at
21  12 o'clock on that Friday with collateral
22  moving, yes.
23      Q.    Now, if you go back to your
24  declaration, if you don't mind, and turn the
25  page to paragraph 4, you say in paragraph 4, "In

Page 37

M. Malloy

1
2  preparing that e-mail, I conducted no
3  independent valuation and made no effort to
4  validate BONY's numbers, which in any event I
5  believed to be a preliminary list."  Do you see
6  that sentence?
7      A.    I do.
8      Q.    Did anyone else at the time that you
9  prepared the e-mail, or in connection with
10  preparing the e-mail, had anyone else done an
11  independent valuation?
12      A.    I don't see how we could because all
13  of the collateral wasn't booked.
14      Q.    And in the next sentence of that
15  paragraph, you say that "many of the securities
16  to which BONY assigned nominal values were
17  highly illiquid and would have required
18  substantial analytical work to value
19  accurately."  Do you see that portion of the
20  sentence?
21      A.    I do.
22      Q.    Did you have any discussions with Mr.
23  LaRocca or Mr. King about that topic at the time
24  that you sent this e-mail?
25      A.    I remember discussing with Mr. LaRocca

M. Malloy

1
2  as the securities came through that there was
3  corporate bond inventory in there, and corporate
4  bond valuations were very subject at that point,
5  they were very liquid.
6       Q.   Did you have any discussions with Mr.
7  LaRocca about any of the buckets of securities
8  that come over being large positions that would
9  have required some sort of liquidity discount?
10       MR. GREEN:  Object to the form.
11       A.   In the Fed transfer, not specifically,
12  no, not that I can recall.
13       Q.   Were there any particular corporate
14  bonds that you discussed with Mr. LaRocca that
15  would require closer analysis to arrive at a
16  valuation?
17       MR. GREEN:  Object to the form.
18       A.   No, it was more that asset class at
19  that point in time was under tremendous stress.
20       Q.   In any of --
21       A.   Unlike equities, which are more
22  liquid.
23       Q.   In any of your conversations with Mr.
24  LaRocca, did you talk about any particular, by
25  name, any particular of the securities in the

M. Malloy

1
2  repo as opposed to talking about them by asset
3  class?
4       MR. GREEN:  Object to the form.
5       A.   In the Fed repo, not that I recall,
6  no.
7       Q.   Now, further into that sentence in
8  paragraph 4, that is, the second -- I'm sorry,
9  the third sentence in paragraph 4, you refer to
10  substantial analytical work and you say that was
11  "work that BONY had simply not had time to do."
12       What's the basis of that statement?
13  How do you know BONY didn't have time to do it?
14       A.   That was really more referring to the
15  getting us the accurate statements of everything
16  that was in there.  The only reason I know it
17  wasn't able to do was we didn't shut the whole
18  process till I think it was like 2 o'clock in
19  the morning, so all of the reporting didn't come
20  out -- until I think it was a couple hours out
21  of the normal end-of-day business.  It was two
22  hours delayed.
23       Q.   So when you refer in your declaration
24  to "work that BONY simply had not had time to
25  do," we should understand you to be referring to

M. Malloy

1
2  the work of getting you the documents, getting
3  you the information?
4       MR. GREEN:  Object to the form.
5       Q.   As opposed to time to perform
6  valuations that were contained in that
7  information?
8       A.   Well, they're related.  If you don't
9  have all of the collateral in there, your
10  valuation is off.
11       Q.   Well, in that sentence you, again, in
12  the whole sentence, and I don't mean to break it
13  up, but -- let me read the whole thing into the
14  record:  "To the contrary, given that many of
15  the securities to which BONY assigned nominal
16  values were highly illiquid and have
17  required substantial analytical work to value
18  accurately -- work that BONY had simply not had
19  time to do -- I did not believe that the BONY
20  numbers represented an accurate assessment of
21  what the collateral was worth."
22       Do you see that?
23       A.   Yes.
24       Q.   When you put this in your declaration,
25  was that meant to be a statement about the

M. Malloy

1
2  values that BONY assigned or, as I think you
3  have just described, BONY hadn't had time to get
4  you full collateral lists?
5       MR. GREEN:  Object to the form.  You
6  mischaracterized his testimony.
7       A.   This piece, when I was assigning the
8  nominal values -- it's twofold.  So number one
9  is all the collateral so that these high-level
10  numbers which is what I was looking at, right --
11       Q.   Yes.
12       A.   -- is what's representative.  And
13  that's in two forms:  One, the overall
14  collateral that you're going to be getting in,
15  and yes, the valuation that they were applying.
16       So it's twofold, number one, it's all
17  the collateral that actually came in and then
18  updating all those prices on the Bank of New
19  York component, because we were running two
20  hours late, I had no knowledge of even those
21  valuation numbers, which we don't use in our
22  systems, were -- were refreshed due to the late
23  nature of the process.  I couldn't tell if they
24  had updated all their prices or other collateral
25  came in.

M. Malloy

1
2    Q.    To go back to the sentence that's in
3    your declaration, are you describing in that
4    sentence the process of updating the prices, or
5    are you saying that BONY didn't have time to get
6    you an accurate -- a complete collateral list?
7        MR. GREEN:  Object to the form.
8    A.    In this statement, in this particular
9    sentence, the price.
10    Q.    How do you know that BONY had not had
11    time to do the pricing?
12    A.    As I stated earlier, based on the fact
13    that everything was backed up, I could not rely
14    upon the fact that everything was accurate.
15    Q.    Did you have any conversations with
16    anyone at BONY about whether they had time to do
17    the pricing at the time that you prepared
18    Exhibit 144A?
19    A.    Not that I recall.
20    Q.    Did you talk to anyone who had talked
21    to BONY about whether they had time to do the
22    pricing?
23        MR. GREEN:  Object to the form of the
24    question.
25    A.    Not specifically, not pricing that I

M. Malloy

1
2    recall.
3        Q.    So could you tell me what is the basis
4    for your statement in your declaration that BONY
5    did not have time to do the pricing?  What's the
6    information source that gave you the ability to
7    swear to the truth of that?
8    A.    The fact that we could not have
9    verified all that information.
10    Q.    That's a different question, sir.  The
11    question is how did you know, how were you able
12    to say in your declaration that BONY did not
13    have time to do valuations?
14        MR. GREEN:  I think he's answered.
15        MR. GREEN:  What's the source of that information?
16        MR. GREEN:  I think he's answered your
17    question, Bob.
18        MR. GAFFEY:  I don't think he has.
19        MR. GREEN:  I think he has.
20    Q.    You can answer the question.
21        MR. GREEN:  Object to the form.
22    A.    In relating to this specific e-mail,
23    right, what I was referring to in this statement
24    is the fact that analytical work could not have
25    been done based on the late nature that we

M. Malloy

1
2    actually put in place that following morning.
3    That's what I was referring to in that
4    statement.
5    Q.    You've explained to me how it would
6    take Barclays some time to do its analytical
7    work to arrive at pricing that it wanted.  I'm
8    asking a different question.  I'm asking you,
9    what's the basis of your statement that BONY
10    simply had not had time to do that?  How do you
11    know that that's true?
12        MR. GREEN:  Object to the form.  Asked
13    and answered.
14    Q.    The answers are about Barclays.  I'm
15    asking about BONY.  How do you know BONY didn't
16    have time to do it?
17        MR. GREEN:  The statement is they did
18    not have the time to do the work accurately.
19        MR. GAFFEY:  The statement says what
20    it says.  You don't have to explain it to
21    him.  What I want is the basis of this
22    information in this statement, under penalty
23    of perjury, that BONY did not have time.
24        MR. GREEN:  You don't need to hammer
25    on about "under penalty of perjury."  He

M. Malloy

1
2    understands he signed the declaration under
3    penalty of perjury.
4    Q.    So what's the basis of your knowledge,
5    sir, that BONY did not have time to do
6    valuations?
7        MR. GREEN:  He has given that to you,
8    Bob.
9    A.    At the time I wrote this e-mail, we
10    did not have all of the relevant information
11    from Bank of New York.  I was simply referring
12    to the timing delay in which to get all of the
13    information from Bank of New York.  It was not
14    to complete, as I understood it, talking to
15    the -- talking to the collateral people coming
16    back for when I put this in place.
17    Q.    And when you got the information from
18    BONY, it had BONY's pricing on it, correct?
19        MR. GREEN:  Object to the form.
20    A.    That Friday?
21    Q.    Whenever it came in on the Thursday or
22    Friday, it came in with pricing, yes?
23    A.    Yes.
24    Q.    And the pricing was pricing assigned
25    to it by BONY, correct?

Page 46

1           M. Malloy
2      A.   Yes.
3      Q.   So it's fair to say that, at least by
4  the time BONY got you the information, BONY had
5  time to arrive at its own version of the pricing
6  of the collateral, correct?
7           MR. GREEN:  Object to the form of the
8      question.
9      A.   They produced statements.  I don't
10 know how accurate -- I was suspect of the
11 accuracy at that time given, again, the delay
12 that we had in the processing.
13     Q.   Did you get any information from BONY
14 that did not contain pricing, that only had
15 nominals?
16     A.   I don't know because I did not receive
17 those statements on that Friday.
18     Q.   Did you ask anybody if that was so?
19 Do you know one way or the other?
20          MR. GREEN:  Object to the form of the
21     question.
22     A.   No.
23     Q.   When you referred in paragraph 4 to
24 securities that were "highly illiquid," did you
25 have any particular securities in mind?

Page 47

1           M. Malloy
2      A.   No, just more of the corporate bonds
3  that were under stress at the time.
4      Q.   Again, that's more by asset class than
5  by any particular issue, any particular bond,
6  yes?
7      A.   For the Fed repo, that's correct.
8      Q.   To your knowledge, sir, was -- I may
9  have touched on this before.  I just want to ask
10 this to set the topic for the next few
11 questions.
12          After Barclays got the collateral, did
13 it conduct a valuation of its own?
14          MR. GREEN:  Object to the form.  Asked
15     and answered.
16     A.   As the normal course of business,
17 Barclays does make a valuation of the
18 collateral.
19     Q.   Do you know if with respect to the
20 particular collateral in the repo we've been
21 talking about it followed that normal course of
22 business, it did that?
23          MR. GREEN:  Object to the form.  Asked
24     and answered.
25     A.   I do not know because I did not book

Page 48

1           M. Malloy
2  the collateral.
3      Q.   So if I were to ask you how long it
4  took to prepare valuations for the repo
5  collateral, would you know?
6          MR. GREEN:  Object to the form.
7      A.   No.
8      Q.   Were you involved in that process at
9  all?
10     A.   No, other than just getting, you know,
11 the data, you know, to the appropriate folks.
12     Q.   So you sent the data out.  I'm at the
13 other end.  Are you at any point where you get
14 the valuations back?
15     A.   No.
16     Q.   Have you ever spoken to anyone at
17 Barclays about that topic outside the presence
18 of your lawyers?
19     A.   No.
20     Q.   Do you have any knowledge as to how,
21 if at all, the Barclays valuations differed from
22 the BONY valuations?
23     A.   I don't know.
24     Q.   Do you know if they did?
25     A.   I knew we had a lot of reconciliation

Page 49

1           M. Malloy
2  differences between what we expected to get and
3  what we got in.  That piece of the valuation,
4  not pricing.
5      Q.   And let me just go back.  Again, for
6  clarity, because I had those questions about
7  reconciliation before, are you talking about
8  reconciling the values or reconciling the actual
9  identity of the collateral?
10          MR. GREEN:  Object to the form.
11     A.   The latter.  The identity of the
12 collateral.
13          (Continued on the next page to include
14     the jurat.)

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     -------------------------------x

      In Re:                    Chapter 11

5     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,    (Jointly Administered)

6     -------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9            DEPOSITION OF PAUL EXALL

10              New York, New York

11           Thursday, August 27, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 24380

22

23

24

25

Page 6

P. EXALL - HIGHLY CONFIDENTIAL

1       P. EXALL - HIGHLY CONFIDENTIAL
2  you what's going to happen here but basically
3  I'm going to ask you a series of questions.
4  You're under oath.  You're going to answer the
5  questions as best you can.
6      At some point during the
7  deposition you might hear your attorney voice
8  an objection to either preserve an objection
9  or challenge a question that I might ask.
10  That doesn't relieve you of the obligation to
11  answer the question.  You still have to answer
12  the question.  I might change the question in
13  response to his deposition -- to his objection
14  but unless he instructs you not to answer you
15  still have to answer the question.  Okay?
16    A.   I understand.
17    Q.   In that regard if I ask a question
18  that's a little bit confusing or I misuse a
19  term that you folks use or an abbreviation
20  that you folks use, please correct me and ask
21  me to clarify the question.  I want to have a
22  clear question so I can get a clear answer,
23  okay?
24    A.   Okay.
25    Q.   Did you prepare at all for today's

Page 7

P. EXALL - HIGHLY CONFIDENTIAL

1       P. EXALL - HIGHLY CONFIDENTIAL
2  deposition?
3    A.   Yes, I did.
4    Q.   How did you do that?
5    A.   I obviously met with counsel and
6  prepared over the course of the past week.
7  And I reviewed insofar as I could the
8  documentation and events around the time of
9  the acquisition insofar as I could recall them
10  and reference them.
11    Q.   Okay.  Did any of those documents
12  refresh your recollection about anything in
13  connection with this litigation?
14    A.   Yes, they did.  Yes.
15    Q.   Which documents are those?
16    A.   I don't recall.  I mean, I read
17  through a lot of old e-mail correspondence and
18  things like that that I have in relation to
19  the matter.  And I had discussions with people
20  that assisted me in the preparation of the
21  spreadsheet.
22    Q.   And you don't have any specific
23  document that refreshed your recollection
24  about that?
25    A.   Nothing specific.

Page 8

P. EXALL - HIGHLY CONFIDENTIAL

1       P. EXALL - HIGHLY CONFIDENTIAL
2    Q.   Okay.  You're aware that you've
3  been asked to appear by Barclays as a 30(b)(6)
4  witness on specific topics, correct?
5    A.   Yes.
6    Q.   Okay.  Well, let's start off with
7  the 30(b)(6) notice.  I'm going to hand you a
8  copy of a document marked as Exhibit 279B
9  which is entitled Debtor's First Rule 30(b)(6)
10  Deposition Notice to Barclays on Issues
11  Pertaining to Accrued '08 FY Liability Under
12  the Asset Purchase Agreement.
13     And my question is have you ever
14  seen this deposition notice?
15    A.   I have.
16    Q.   Fair to say you reviewed this in
17  preparation for today's deposition?
18    A.   I have reviewed this, yes.
19    Q.   And if you look on Schedule A
20  which is the third page you'll see you've been
21  designated as a 30(b)(6) witness in connection
22  with bonus and severance payments made to
23  former Lehman employees, right?
24    MR. GREEN:  Object to the form of
25  the question.  That's not all the

Page 9

P. EXALL - HIGHLY CONFIDENTIAL

1       P. EXALL - HIGHLY CONFIDENTIAL
2  schedule says.
3    MR. HINE:  Okay.
4    Q.   But in general you're here to
5  testify about bonus and severance payments
6  made to former Lehman employees, right?
7    A.   I'm here to represent that --
8  what's represented on the schedule prepared in
9  respect to this deposition.
10    Q.   Okay.  Now, that schedule is the
11  schedule -- the spreadsheet referenced in this
12  Schedule A?
13    A.   I believe it to be, yes.
14    Q.   And then a couple days ago we
15  received a replacement or an updated
16  spreadsheet so you understand that that's the
17  subject of today's deposition as well.
18    A.   I do.
19    Q.   Okay.  We'll get to that later.
20  I'm done with that exhibit.
21    Well, before I finish on that did
22  you undertake any investigation in connection
23  with being a 30(b)(6) witness?
24    A.   What do you mean by that?
25    Q.   Well, did you look into any of the

P. EXALL - HIGHLY CONFIDENTIAL

1  
2  issues that are embodied in that spreadsheet
3  in preparation for today's deposition?
4      A.   I prepared the spreadsheet,
5  itself.
6      Q.   Okay.
7      A.   So I understand the items on it
8  and can testify to those.
9      Q.   Okay.  Could you just give me a
10  little background about yourself?  You're a
11  Barclays employee; is that correct?
12      A.   Barclays Capital employee, that's
13  correct.
14      Q.   And how long have you been with
15  Barclays?
16      A.   As a permanent employee I've been
17  with Barclays since April 2000.  Prior to that
18  I consulted with Barclays Capital from around
19  June 2008.
20      MR. GREEN:  You mean 1998?  Excuse
21  me.
22      Q.   I think you just lost me.
23      A.   1998, sorry.
24      Q.   All right.  Just so I have it, you
25  consulted with Barclays from June 1998 to

P. EXALL - HIGHLY CONFIDENTIAL

1  
2  April 2000?
3      A.   That's correct.
4      Q.   And from April 2000 you've been a
5  permanent employee of Barclays; is that right?
6      A.   That's right.
7      Q.   And in what capacity are you
8  employed by Barclays?
9      A.   Currently my job title would be
10  head of compensation analytics across
11  investment banking and investment management.
12      Q.   How long have you held that
13  position?
14      A.   I would estimate four -- three,
15  four, five years.
16      Q.   Okay.  And what were you before
17  that?
18      A.   I've been a director in HR for
19  several years.  The job role, itself, has
20  existed since -- it sort of -- it's become a
21  formal role so to speak.  I've been doing this
22  particular function for Barclays Capital, for
23  BGI, and for Barclays Wealth, over a period of
24  time since I joined the HR department.
25      Q.   Okay.  And is it fair to say that

P. EXALL - HIGHLY CONFIDENTIAL

1  
2  you've been in the HR department since you
3  came to Barclays?
4      A.   No, that's not correct.  Initially
5  in 2008 I joined the investment banking
6  finance department which then amalgamated into
7  the finance global department.  And I worked
8  there until approximately July 2001 when I
9  transferred down to HR.
10      Q.   Did any of your work prior to July
11  21 involve compensation issues?
12      A.   Insofar as it related to finance
13  matters and books and records of Barclays
14  Capital, yes.
15      Q.   Well, let me -- let's take a step
16  back.  If you were to describe your current
17  duties, could you just explain to me what your
18  duties and responsibilities are in your
19  current position?
20      A.   The primary responsibilities that
21  I assume are -- I work for Michael Evans as
22  the global head of HR across investment bank,
23  management.  My primary duties involve -- and
24  this is the best way I can describe it -- the
25  liaison between Barclays Capital HR and -- or

P. EXALL - HIGHLY CONFIDENTIAL

1  
2  IBRAM HR because we span Barclays Global
3  Investors and Barclays Wealth, with the group
4  HR function and the board HR and remuneration
5  committee of Barclays PLC.  So any
6  compensation matters that require approval by
7  the remuneration committee under its terms of
8  reference as a committee of the board of
9  Barclays, those matters come through me
10  subject to approval by management.
11      Q.   Okay.  So --
12      A.   That's one of the primary roles.
13  The other functions I perform are some
14  analytical modeling around internal
15  compensation related matters for Barclays
16  Capital BGI and Wealth.
17      Q.   You keep saying different entities
18  here.  BGI is what?
19      A.   Yes.  Just to explain the
20  structure of what is known as investment
21  banking and investment management -- if you
22  look in the books -- in the published report
23  of the accounts of Barclays PLC there's
24  investment banking and investment management
25  and what's called GICB and then there's the

1    P. EXALL - HIGHLY CONFIDENTIAL
2    group center.  Investment Banking and
3    Investment Management comprise the three
4    businesses run by Mr. Diamond.  Barclays
5    Capital, Barclays Global Investors, now
6    subject to the sale to Blackrock, and Barclays
7    Wealth.
8        Q.    And your primary role is with that
9    group?
10       A.    That's correct.
11       Q.    And other groups you have a role
12   or not?
13       A.    No.
14       Q.    Okay.  So did I understand you
15   correctly that you interface between that
16   group, the one run by Mr. Diamond, with
17   respect to compensation matters to the
18   committee of the board who approves
19   compensation; is that right?
20       A.    Yes.  I do not liaise directly
21   with them.  We go through obviously our own
22   management who represent us on that committee.
23   And I liaise with the group HR function who
24   again represent them and others on that
25   committee.

1    P. EXALL - HIGHLY CONFIDENTIAL
2        Q.    Okay.  So Mr. Evans is -- and what
3    is his title?
4        A.    Mr. Evans is -- amongst other
5    things he's responsible for several
6    departments.  I'll probably to get this wrong
7    but in my capacity he's global head of human
8    resources across global investment global
9    management.
10       Q.    So you report to him?
11       A.    I do.
12       Q.    Do you report to anyone else
13   directly?
14       A.    Not directly.
15       Q.    Okay.
16           MR. GREEN:  Bill, I just want to
17       without giving a long speech say that
18       when you're getting background from Paul
19       of his understanding of the
20       organization, I mean this is just
21       background from him.  He's not speaking
22       as a 30(b)(6) deponent in terms of
23       taking a position for the company on
24       what the organizational structure is.
25           MR. HINE:  Fair enough.

1    P. EXALL - HIGHLY CONFIDENTIAL
2        MR. GREEN:  All right.
3    BY MR. HINE:
4        Q.    So, Mr. Exall, could you explain
5    to me -- you're aware that this whole
6    proceeding and these depositions have to do
7    with the sale -- a transaction between Lehman
8    and Barclays that closed on or around
9    September 22nd, 2008, correct?
10       A.    I understand that, yes.
11       Q.    Okay.  Could you just describe for
12   me generally any role you played in connection
13   with that transaction through -- what I'm
14   asking about is any role you played in the
15   negotiations of the transaction or the closing
16   or anything else related to it.
17           MR. GREEN:  Object to the form.
18       You may answer.
19       A.    I played no role whatsoever in any
20   negotiations whatsoever.
21       Q.    Okay.  So -- and, again, I just
22   want to get a sense of your general background
23   here.  You were not involved in discussions
24   concerning the compensation provisions that
25   later made their way into the Asset Purchase

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Agreement; is that right?
3            MR. GREEN:  Objection to the form
4        of the question.  You may answer.
5        A.    Could you repeat the question,
6    please?
7        Q.    You were not involved, am I right,
8    in the negotiations or discussions concerning
9    the compensation provisions that later made
10   their way into the Asset Purchase Agreement in
11   this case; is that right?
12       A.    That is right.  I was not
13   involved.
14       Q.    Okay.  And how did you learn about
15   the compensation provisions that are embodied
16   in the Asset Purchase Agreement?
17           MR. GREEN:  Object to the form.
18       A.    I was passed a copy of the
19   purchase agreement by some colleagues in the
20   finance department.
21       Q.    Okay.
22       A.    And reading that and -- I came to
23   understand that there were some provisions in
24   there in relation to compensation.
25       Q.    Okay.  And were you passed -- when

## Page 18

P. EXALL - HIGHLY CONFIDENTIAL
1
2  were you passed that agreement?
3      A.   I can't recall the exact date but
4  it would have been on or around the 22nd of
5  September or shortly thereafter.
6      Q.   Okay.  And did you need to consult
7  that agreement to do your job from then on?
8      A.   It was a point of reference, yes.
9      Q.   Okay.  Were you passed any other
10 documents related to compensation in
11 connection with this transaction?
12     A.   Yes.
13     Q.   Like what?
14     A.   I requested to see a copy of the
15 schedule referred to in the APA.
16     Q.   Okay.
17     A.   The sale agreement.
18     Q.   Okay.
19     A.   And I was passed what was
20 represented to me as being that schedule.
21     Q.   Okay.  Anything else?
22     A.   I don't recall getting any other
23 specific sale-related documentation in that
24 regard, no.
25     Q.   Okay.  Have you ever seen a copy

## Page 19

P. EXALL - HIGHLY CONFIDENTIAL
1
2  of the first amendment to the Asset Purchase
3  Agreement?
4      A.   I don't believe so, no.
5      Q.   Okay.  Fair to say you don't have
6  any use for that document in connection with
7  the work you've performed with respect to
8  compensating former Lehman employees?
9          MR. GREEN:  Object to the form of
10 the question.
11         MR. HINE:  It was a bad question.
12 Let me try again.
13     Q.   Is it fair to say you haven't had
14 need to consult with the first amendment of
15 the APA in connection with the work you
16 performed with respect to compensation for
17 former Lehman employees?
18     A.   I did not consult it.
19     Q.   Okay.
20     A.   Consequently, I do not know if I
21 needed to.
22     Q.   Okay.  Fair enough.
23         Have you ever seen a document
24 called a clarification letter that was agreed
25 to between Barclays and Lehman in connection

## Page 20

P. EXALL - HIGHLY CONFIDENTIAL
1
2  with the Asset Purchase Agreement?
3      A.   I don't recall specifically seeing
4  that document.  I know of its existence but I
5  don't recall actually either seeing it or
6  having read it in any great detail.
7      Q.   Okay.
8      A.   If I did see it.
9      Q.   Do you have any understanding of
10 its purpose?
11     A.   No.  Not particularly.
12     Q.   Do you have any understanding of
13 how it relates in any way, if at all, to
14 compensation issues?
15     A.   No.
16     Q.   Okay.  Is it fair to say that
17 you've been able to do your job with respect
18 to compensation of former Lehman employees
19 without consulting the clarification letter?
20     A.   I believe so.
21     Q.   Okay.  And I believe you said
22 earlier that you prepared the spreadsheet that
23 we're going to be discussing here today?
24     A.   I did.
25     Q.   Okay.  And is that something that

## Page 21

P. EXALL - HIGHLY CONFIDENTIAL
1
2  you prepared in the normal course of your
3  employment?
4      A.   It was prepared in the normal
5  course of business in support of various
6  requirements from PriceWaterhouseCoopers as
7  part of their annual audit as well as the
8  ancillary or related regulatory filings that
9  they may or may not have had to prepare.
10     Q.   So when was it prepared?
11         MR. GREEN:  Object to the form.
12 You mean the spreadsheet?  When was the
13 original spreadsheet prepared?
14         MR. HINE:  Well, we'll just wait
15 till I get to the spreadsheet.  I just
16 want to get some background here.
17     Q.   We'll put that question aside.
18         So when did you learn of the
19 Lehman/Barclays sale transaction?
20     A.   I learned -- I don't recall
21 actually specifically learning when it
22 occurred.  I was aware that the initial
23 discussions were being held in New York
24 amongst various parties in relation to the
25 original form of the transaction whereby, I

P. EXALL - HIGHLY CONFIDENTIAL

1  you speculate you would have talked about.
2  **But do you recall any discussions between any**
3  **of your senior Barclays management about what**
4  **was being discussed or contemplated in**
5  **connection with compensation-related issues**
6  **concerning the Lehman Barclays proposed**
7  **transaction?**
8
9      MR. GREEN:  These are discussions
10     between Paul and senior management
11     you're asking about.
12         MR. HINE:  Yes.
13     A.   Sorry.  So let me just be clear.
14  You're asking do I know of any discussions
15  that my senior management may have had with
16  Lehman Brothers?
17     Q.   No, no, no.  **I'm asking did you**
18  **have any conversations with senior management**
19  **during that week, September 15th through**
20  **September 22nd, about the compensation issues**
21  **that were being discussed or considered in**
22  **connection with the Lehman Barclays**
23  **transaction?**
24     A.   I don't recall anything specific.
25  I do know that the initial sale agreement had

P. EXALL - HIGHLY CONFIDENTIAL

1
2  been concluded by the time I had come to New
3  York and was beginning to assist Mr. Evans in
4  whatever he needed me to do.  And it was my
5  understanding that the transaction was closed
6  at that point.
7      Q.   And at that point do you recall
8  the date you were --
9      A.   I look back -- I think it was on
10  or around the 20th or 21st of September that I
11  came across.  I forget the exact date but I
12  believe it was on or around there.
13     Q.   Okay.  So you thought the
14  transaction had closed by then?
15     A.   It was my general understanding
16  that the transaction for all intents and
17  purposes had been completed the prior week.  I
18  have subsequently come to understand that
19  there was a clarification agreement and
20  officially the judge may have sanctioned at a
21  later date.  You know, the legalities for me
22  are neither here nor there.  My understanding
23  is that the transaction had been concluded in
24  all material respects at that point.
25     Q.   Okay.  Did you have any

P. EXALL - HIGHLY CONFIDENTIAL

1
2  **understanding during that period about the $2**
3  **billion compensation figure that appeared on**
4  **the schedule that you had referenced earlier?**
5      MR. GREEN:  Could you show him
6      that figure?
7      MR. HINE:  Okay.  Let's get to
8      the -- let's get to that.
9      MR. GREEN:  Just so it's clear
10     what we're talking about.
11     MR. HINE:  Let's get to the
12     schedule.
13  BY MR. HINE:
14     Q.   **Mr. Exall, I'm going to hand you a**
15  **copy of a document that's previously been**
16  **marked as Exhibit 1 which is a copy of the**
17  **Asset Purchase Agreement which I think you've**
18  **been discussing.  Just so you have it in front**
19  **of you.  And I'm also going to give you a copy**
20  **of a document that's been marked as Exhibit 19**
21  **which I understand is the schedule that is**
22  **referenced in the APA.  If you want just take**
23  **a couple minutes to refresh -- review these**
24  **documents and I'll ask you some questions.**
25          **(Document review.)**

P. EXALL - HIGHLY CONFIDENTIAL

1
2      **MR. GREEN:  Are you ready, Paul?**
3      **THE WITNESS:  Yeah.**
4      **Q.   Now, my previous question had to**
5  **do with the schedule.  We'll call this the**
6  **9/16 schedule if you will.  Do you see the $2**
7  **billion compensation number in that schedule?**
8      **A.   I do.**
9      **Q.   Okay.  Did you, during the week of**
10  **September 15th to the 22nd say, did you have**
11  **any conversations with any of Barclays senior**
12  **management about that $2 billion comp figure?**
13     A.   I was made aware of this schedule
14  during that week.
15     Q.   Um-hum.
16     A.   And I'm certain I would have asked
17  someone questions with respect of the schedule
18  and what I understood it -- you know, what I
19  needed to interpret from it.  But, yes, in
20  general I would have had conversations with
21  people on this.
22     Q.   Okay.  And who gave you the
23  schedule?
24     A.   Mr. Clackson passed me the
25  schedule.

Page 38

P. EXALL - HIGHLY CONFIDENTIAL

1     P. EXALL - HIGHLY CONFIDENTIAL
2        Q.   And what did he tell you about it?
3        A.   He represented this as being the
4    schedule referred to in the APA.
5        Q.   Okay.  And you were looking down.
6    I think -- are you looking at Section 9.1(c)
7    of the APA?
8        A.   That is correct.
9        Q.   Okay.  So this Exhibit 19 is the
10   schedule -- or you understood that the
11   Exhibit 19 is the schedule referred to in
12   paragraph 9.1(c) of the APA, correct?
13       MR. GREEN:  Object to the form.
14       A.   This is a copy of the schedule
15   that was represented to me as being the
16   schedule referred to, correct.
17       Q.   Okay.  What did Mr. Clackson tell
18   you about that schedule?
19       MR. GREEN:  Object to the form.
20   Asked and answered.  You may answer.
21       A.   I don't recall what he told me
22   about it.  I asked him for a copy of it as
23   part of my own reading of the relevant
24   sections of the APA.
25       Q.   Okay.  And you had been previously

Page 39

P. EXALL - HIGHLY CONFIDENTIAL

1        P. EXALL - HIGHLY CONFIDENTIAL
2    provided a copy of the APA?
3        A.   Yes.
4        Q.   And who gave you that?
5        A.   I believe Mr. Gary Romaine gave me
6    a copy of the APA.
7        Q.   Okay.  And why did he give it to
8    you?
9        MR. GREEN:  Object to the form.
10       A.   He understood there to be
11   compensation related matters that I would
12   probably be -- need to be aware of.
13       Q.   Okay.  And I take it you reviewed
14   the APA after receiving a copy of it.
15       A.   In general, yes.  I can't testify
16   to having read it in any great depth.  I read
17   I think the sections in relation to me and
18   probably, to put a word on it, skimmed the
19   rest.
20       Q.   Okay.  I'm not trying to be tricky
21   here but is it fair to say you focused on
22   Section 9.1 of the APA and probably skimmed
23   the rest of it?
24       MR. GREEN:  Object to the form.
25   You may answer.

Page 40

1        P. EXALL - HIGHLY CONFIDENTIAL
2        A.   Yes.  I think that would be
3    reasonably accurate.
4        Q.   Okay.  Well, let's just take a
5    look at 9.1 for a minute.  If you wouldn't
6    mind turning to 9.1(a).  9.1(a), as I
7    understand it, has to do with Barclays
8    offering employment to certain individuals who
9    are defined as transferred employees.
10       Do you see that definition in
11   there?
12       A.   I see the term transferred
13   employee referred to.
14       Q.   Okay.  Is that a term you're
15   familiar with?
16       A.   No.
17       Q.   Well, I guess the reason I'm
18   asking is you're charged with supervising
19   compensation issues with respect to
20   transferred employees, right?
21       MR. GREEN:  Object to the form of
22   the question.  I think that
23   mischaracterizes his prior testimony.
24       A.   I would say that part of my
25   responsibility is in relation to compensation

Page 41

1        P. EXALL - HIGHLY CONFIDENTIAL
2    of the former Lehman Brothers employees that
3    Barclays Capital or Barclays acquired under
4    the transaction.  The meaning of transferred
5    employee in the sense of this agreement or any
6    other document I can't testify to not being a
7    lawyer and I just have no legal understanding
8    of that.
9        Q.   Okay.  So the term -- the defined
10   term transferred employees is not something
11   you use in the normal course of your business?
12       A.   Not in the normal course of my
13   business, no.
14       Q.   Okay.
15       Do you know how many employees --
16   well, let's just explore this for a minute.
17   You work on compensation issues related to
18   former Lehman employees who transferred to
19   Barclays, correct?
20       A.   Compensation of former Lehman
21   employees that came to work for Barclays.
22       Q.   Okay.  Now, do you know how many
23   of those folks there are?
24       A.   I recall, and I'm approximating
25   here, that there were in excess of 10,000

1          P. EXALL - HIGHLY CONFIDENTIAL
2    has been complied with by Barclays with
3    respect to former Lehman employees?
4            MR. GREEN:  Object to the form of
5        the question.  Calls for a legal
6        conclusion.
7        A.   I don't know whether this or any
8    other clause has been complied with.
9        Q.   Okay.
10       A.   I don't know what Barclays'
11   obligations are under these.  What I do know
12   is that when individuals across the firm have
13   been affected by a reduction in force exercise
14   they are subject to -- for consideration to
15   severance payments in the normal course of
16   business.
17       Q.   Okay.  And I believe you said that
18   you believe that's been done in accordance
19   with the former Lehman's policies?
20       A.   I believe that for former Lehman
21   Brothers employees the former Lehman Brothers
22   policy has been applied.
23       Q.   Okay.
24       A.   That's my understanding.
25       Q.   Okay.  Now, this provision, 9.1(b)

1          P. EXALL - HIGHLY CONFIDENTIAL
2    doesn't refer to the schedule that we talked
3    about earlier, right, that September 16th
4    schedule?
5            MR. GREEN:  Object to the form.
6        A.   I don't see any specific reference
7    to it.
8        Q.   Okay.  Now, if we turn to 9.1(c)
9    that has to do with bonus payments, correct?
10   In general?
11           MR. GREEN:  Object to the form of
12       the question.
13       A.   Again, I can't interpret the
14   clause.  I see the word bonus, annual bonuses
15   reflected in the clause.  But as to what it
16   may or may not refer to I really can't testify
17   in any legal capacity.
18       Q.   I understand.  I'm not asking for
19   your legal interpretation.  I'm asking as a
20   general matter as a person charged with
21   compensation issues and working with this
22   stuff.  Do you have a general understanding of
23   what this provision (c) entails in connection
24   with bonuses that were to be paid to former
25   Lehman employees?

1          P. EXALL - HIGHLY CONFIDENTIAL
2            MR. GREEN:  Object to form.
3        Do you have the question in mind?
4            THE WITNESS:  I'm just re-reading
5        the clause.
6        A.   Could you perhaps rephrase the
7    question?
8        Q.   Yeah.  Let's try again.
9            What is your understanding -- and
10   I understand you're not a lawyer and I'm not
11   asking for a legal conclusion as to this
12   paragraph.  But what is your understanding
13   about the amount of bonuses that are supposed
14   to be paid, were supposed to have been paid to
15   former Lehman employees who now are with
16   Barclays?
17       A.   I don't understand anything in
18   respect of this clause that refers to any
19   amount, quantum of bonus whatsoever.
20       Q.   Well, but it does refer to the
21   schedule, right?
22       A.   It refers to a schedule, yes.
23       Q.   Okay.  And what did you understand
24   that to mean when it refers to that schedule?
25           MR. GREEN:  Object to the form of

1          P. EXALL - HIGHLY CONFIDENTIAL
2        the question.  Calls for a legal
3        conclusion.
4        A.   It refers to a schedule.  And the
5    schedule, itself, does not have the word bonus
6    anywhere on it.
7        Q.   Okay.
8        A.   So I can't reach a conclusion as
9    to any -- in any capacity, personal, private,
10   on behalf of the company, as to what quantum
11   of bonus may or may not be referred to in this
12   clause.
13       Q.   Okay.  I understand.  I'm not
14   asking for a legal interpretation.  But in the
15   course of preparing the spreadsheet that we're
16   going to talk about and your work in
17   connection with compensation related to these
18   former Lehman employees, what did you
19   understand the $2 billion was supposed to
20   cover?
21           MR. GREEN:  Object to the form of
22       the question.
23       Q.   And when I say $2 billion I'm
24   referring to the 2 billion in the schedule,
25   the September 16th schedule.

P. EXALL - HIGHLY CONFIDENTIAL

1
2    MR. GREEN:  Object to the form of
3  the question.
4    A.    Again -- and to reiterate, I
5  cannot pass a legal opinion as to what the
6  obligations of Barclays may or may not be.  It
7  is my personal view, and that may be different
8  to the views of Barclays or anyone else in
9  Barclays that $2 billion is referred to as
10  comp.  And my understanding in a personal
11  capacity is that refers to compensation in all
12  its forms.
13    Q.    In all its forms.  Meaning what?
14    A.    In respect of pre-acquisition
15  service of the former Lehman Brothers
16  employees.
17    Q.    What do you mean by compensation
18  in all its forms?
19    A.    Again, I'm speaking in my personal
20  capacity as opposed to on behalf of Barclays.
21  Their definition of compensation may be
22  different than mine.
23      I understand personally
24  compensation to mean any manner of awards and
25  payments and reward to employees in general

P. EXALL - HIGHLY CONFIDENTIAL

1
2  that would encompass things like salary,
3  annual bonus, deferred stock, deferred cash.
4  Benefits.  Pensions.  Recruit -- you know, I
5  would say that there's no standard definition
6  of what is termed as compensation in either
7  the accounting environment or in the human
8  resources environment.  But my personal
9  understanding is that compensation is any form
10  of a award delivered to or on behalf of a
11  employee.  Or to their benefit.
12    Q.    Okay.  I really didn't ask the
13  definition of compensation.  I'm trying to
14  find out what in preparing the spreadsheet
15  that we're going to talk about today and in
16  your work in connection with providing
17  compensation to the former Lehman employees,
18  is that $2 billion supposed to cover more than
19  bonuses?
20    MR. GREEN:  Object to the form of
21  the question.  I think you did ask about
22  his understanding of the term
23  compensation to begin with so I think
24  the lead-in to your question was
25  inappropriate.  But, nevertheless, you

P. EXALL - HIGHLY CONFIDENTIAL

1
2  can answer the question.
3    A.    I can testify to the schedule,
4  itself, that's the subject of this deposition
5  which reflects the compensation delivered, the
6  wide discharge of compensation delivered to
7  former Lehman Brothers employees in respect of
8  their pre-acquisition service to Lehman
9  Brothers.
10    Q.    But, Mr. Exall, you have no
11  understanding of what that $2 billion was
12  supposed to encompass in connection with
13  compensation to former Lehman employees?
14    A.    I don't see it defined in the
15  agreement and I can't interpret it.
16    Q.    Okay.  When you were asked to
17  prepare the schedule, were you told that it
18  should total up to $2 billion?
19    A.    No.
20    Q.    Were you told what the amount is
21  that in aggregate were supposed to have been
22  paid in any form of compensation to former
23  Lehman employees?
24    A.    No.
25    Q.    Do you have any understanding of

P. EXALL - HIGHLY CONFIDENTIAL

1
2  the amount of compensation that's supposed to
3  be paid to former Lehman employees?
4    A.    No.
5    Q.    Further into this paragraph you
6  see -- and I'm reading starting on the seventh
7  line down onto the eighth line it talks about
8  forms and proportions as are consistent with
9  purchaser's customary practices.
10      And it's referring to the annual
11  bonuses.  Do you see that sentence?
12    A.    I do.
13    Q.    What is -- just based on your
14  experience at Barclays, what is form and
15  proportions -- or what is Barclay's customary
16  practice with respect to annual bonuses?
17    MR. GREEN:  Object to the form of
18  the question as to the extent it calls
19  for a legal conclusion.
20    A.    Our customary practice prior to
21  2008 in terms of annual bonus awards at
22  Barclays Capital --
23    Q.    Right.
24    A.    -- in general their annual bonuses
25  were delivered in the form of either cash or

Page 58

1     P. EXALL - HIGHLY CONFIDENTIAL
2   cash and stock.
3     **Q.   Right.**
4     A.   Whereby above a certain threshold
5   an amount of the annual bonus was deferred or
6   delivered through a stock vehicle which would,
7   based at the time, through a tax table kind of
8   approach so above a certain threshold a
9   proportion was deferred or delivered in stock
10  and beyond a certain -- another step more
11  stock was delivered.
12    **Q.   Okay.  And was this -- when you**
13  **said tax table you threw me there.  What did**
14  **you mean there?**
15    A.   Sorry.  It's a term I use.  I
16  shouldn't use it.  We colloquially refer to it
17  as a tax table.  It's in effect if your bonus
18  is X, then there is no deferral into stock.
19  If it's above a certain threshold, a certain
20  proportion of the entire bonus is delivered in
21  stock.  If it's above another threshold,
22  further proportion of that bonus is delivered
23  in stock.
24    **Q.   Okay.  And as a general matter**
25  **what percentage of bonus is provided in stock?**

Page 59

1     **P. EXALL - HIGHLY CONFIDENTIAL**
2     A.   In general, our customary practice
3   prior to 2008 was that any bonus -- and there
4   were regional fluctuations here based on the
5   exchange rate -- so I will quote this in
6   pounds.  Any bonus below 150,000 pounds
7   sterling there was no deferral or no delivery
8   in stock.  Any amounts above 150,000 pounds
9   but below 250,000 pounds of annual bonus,
10  10 percent of the entire amount was delivered
11  in stock.  Any amounts over and above 250,000
12  pounds, the first 250,000 pounds were
13  delivered -- 10 percent of that was delivered
14  in stock.  Any amount above 250,000 25 percent
15  was delivered in stock.
16    **Q.   And this stock vested over time?**
17    A.   That's correct.  Subject to the
18  rules of the stock -- of the plan itself, the
19  standard practice was to cliff vest at the end
20  of a three-year period.
21    **Q.   Okay.  I saw that term cliff vest.**
22  **What does many mean?**
23    A.   In general that means that it
24  vests in equal tranches, so to speak, so some
25  of our competitors in a stock award would --

Page 60

1     P. EXALL - HIGHLY CONFIDENTIAL
2   let's say, as an example, if you had a hundred
3   pounds of an amount deferred into stock,
4   vesting over four years, if -- you can either
5   have pro rata vesting which is you could take
6   a quarter, a quarter, a quarter, and 25 would
7   accrue at the end of one, 25 after -- et
8   cetera.
9     Cliff vesting means that it only
10  vests at the end of the period concerned.  So
11  you'd only get the full hundred in this
12  example at the end of the fourth year.
13    **Q.   And it was a custom to have a**
14  **three-year cliff vest period for stock**
15  **bonuses?**
16    A.   It was our custom, yes.
17    **Q.   All right.  And has this changed**
18  **since 2008?  You said prior to 2008.**
19    A.   2008 was a unique year for
20  compensation and we delivered at Barclays
21  Capital -- at Barclays in a different way
22  subject to a different type of arrangement.
23    **Q.   Are you talking about the former**
24  **Lehman employees when you say that or --**
25    A.   No.  They were subject to our

Page 61

1     P. EXALL - HIGHLY CONFIDENTIAL
2   standard practice that was employed prior to
3   this.
4     **Q.   Okay.  So as a general matter, and**
5   **I know there's individuals, but as a general**
6   **rule this practice -- the prior practice that**
7   **you just described was applied to the former**
8   **Lehman employees that came to work at**
9   **Barclays?**
10    A.   I believe that to be the case yes,
11  in most cases, yeah.
12      (Deposition Exhibit 280B, document
13      bearing production number
14      BCI-EX-00077287, marked for
15      identification as of this date.)
16      (Deposition Exhibit 281B, document
17      bearing production number
18      BCI-EX-00115843, marked for
19      identification as of this date.)
20  BY MR. HINE:
21    **Q.   Mr. Exall, I'm handing you two**
22  **exhibits.  One is marked as Exhibit 280B which**
23  **is Bates stamped BCI-EX-00077287 which I**
24  **understand to be the original version of the**
25  **schedule that was provided to us.  And the**

Page 62

P. EXALL - HIGHLY CONFIDENTIAL

1
2  second document is marked as Exhibit 281B
3  which is Bates stamped BCI-EX-00115843 which,
4  Chris, I think you'll agree is the updated
5  schedule that was recently provided to us.
6       My first question, Mr. Exall, have
7  you ever seen these documents before?
8       A.   Yes.
9       Q.   You prepared these documents?
10      A.   I did.
11      Q.   Okay.  I want to -- and am I
12  correct that 281B is an updated replacement
13  version of 280B?
14      A.   Yes.
15      Q.   Okay.  Before we put away 280B
16  could you explain to me the differences and
17  why you had to update it?
18      A.   Sure.  280B as you referred to
19  here was the original schedule provided around
20  the middle of July I understand.  It reflected
21  what we believed to be an accurate picture of
22  the discharge of compensation to previous --
23  former Lehman Brothers employees in respect of
24  their prior pre-acquisition service.
25       It was thought to be accurate at

Page 63

P. EXALL - HIGHLY CONFIDENTIAL

1
2  that time, although we were still
3  investigating certain items reflected on the
4  schedule.  Subsequent to those investigations
5  and the correction of a couple of
6  typographical errors as well as some of the
7  text was cut off from the narrative on the
8  right-hand side of the original schedule, the
9  updated schedule reflects a more accurate --
10  an accurate picture of the discharge of those
11  compensation items as of the date it was
12  produced.
13      Q.   Okay.  Now, other than typos is it
14  fair to say the main differences have to do
15  with severance entries?
16      A.   Yes.
17      Q.   Okay.  Just take a step back a
18  minute.  Why was this schedule -- and I'll
19  refer to them generically now, why was this
20  schedule prepared?
21      A.   The schedule was prepared in the
22  normal course of business to support the -- or
23  for production to -- primarily for production
24  to PriceWaterhouseCoopers as part of their
25  annual audit as well as any ancillary filings

Page 64

P. EXALL - HIGHLY CONFIDENTIAL

1
2  they may or may not have had to provide as
3  part of their normal course of business as
4  auditors of Barclays.
5       Q.   Okay.  So this is someone from PwC
6  requested a schedule of compensation related
7  to the Lehman acquisition?
8       A.   I was instructed that this would
9  be needed in support of the annual audit and
10  other related filings by my finance
11  colleagues.
12      Q.   Who told you that?
13      A.   Mr. Romaine.
14      Q.   Romaine?
15      A.   Gary Romaine.
16      Q.   Okay.  And he is -- what was his
17  position?
18      A.   I believe -- I don't know -- I
19  can't recall his exact title but he's a
20  technical accountant in the finance
21  department.
22      Q.   Okay.  He's not in the HR
23  department, correct?
24      A.   No, no.
25      Q.   So is it correct to say that the

Page 65

P. EXALL - HIGHLY CONFIDENTIAL

1
2  finance department requested this type of
3  schedule from your department?
4       A.   Mr. Romaine requested it of me,
5  yes.
6       Q.   Okay.  Any other purpose behind
7  this other than to assist PwC?
8       A.   No.  The primary purpose of this
9  was to assist PwC.
10      Q.   Any other purposes?
11      A.   I think we in general in support
12  of our own internal accounting records would
13  have prepared the schedule.  But the primary
14  purpose would be to support the annual audit
15  and regulatory filings that were required.
16      MR. GREEN:  Bill, I'm sorry.
17  Could we go off the record for one
18  second?
19      MR. HINE:  Sure.
20      (Discussion held off the record.)
21  BY MR. HINE:
22      Q.   Mr. Exall, I think you had
23  something you wanted to clarify?
24      A.   If you could repeat that question
25  in respect of why the schedule was prepared

Page 70

P. EXALL - HIGHLY CONFIDENTIAL
1
2     A.   There was no regular requirement
3  to update it.  There were certain points of
4  time that an update was required and as part
5  of the -- whether it be the annual report from
6  PriceWaterhouse or anything else in respect of
7  what they were looking at or passing an
8  opinion on.  So there are points in time at
9  which a schedule would have been updated and
10  presented formally to them.  I know they've
11  had a copy I believe of this schedule.  I'm
12  not sure whether they have a copy of 281B.
13     Q.   So when you said this schedule you
14  meant 280B?
15     A.   I meant 280B, yes.
16     Q.   Okay.  Now, did you start
17  preparing a schedule in this form or like this
18  starting in September of 2008?
19     A.   I don't recall the exact time when
20  we first produced the -- a first iteration of
21  the schedule or its predecessor without
22  guessing or consulting prior records, but what
23  I can say is that this schedule was -- or its
24  predecessor would have been prepared in Q4
25  2008.

Page 71

P. EXALL - HIGHLY CONFIDENTIAL
1
2     Q.   Okay.
3     A.   During that period, yes.
4     Q.   Okay.  And it's gone on through a
5  couple iterations between Q4 '08 and mid July
6  of '09; is that right?
7     A.   Of course.
8     Q.   Okay.  And the iteration following
9  the mid July version which is Exhibit 280B,
10  what I have in front of me as 280B -- 281B?
11     A.   281B, yes.
12     Q.   Okay.  Were there no iterations
13  between these two?
14     A.   That was the iteration.
15     Q.   Okay.
16     A.   We updated this Schedule 280B.
17  It's now become 281B.
18 RQ     MR. HINE:  Okay.  Chris, we're
19  going to request copies of all these
20  iterations going back to the fourth
21  quarter of '08 just as part of our
22  document requests.
23     MR. GREEN:  We'll take that
24  request under advisement.
25     MR. HINE:  Okay.

Page 72

P. EXALL - HIGHLY CONFIDENTIAL
1
2     Q.   All right.  Was either 280B or
3  281B prepared in any way in connection with
4  the discovery we're undertaking here in this
5  litigation?
6     MR. GREEN:  Object to the form of
7  the question to the extent it calls for
8  a legal conclusion.
9     A.   That is not my understanding.
10     Q.   Okay.  Were you ever asked to
11  prepare a schedule in response to discovery
12  requests in this case?
13     A.   No.
14     Q.   Okay.  So this is something you
15  had -- were you ever asked to alter these
16  schedules or modify them in any way with
17  respect to providing discovery in this case?
18     MR. GREEN:  Object to the question
19  to the extent it invades communications
20  between counsel and client.
21     Q.   I'm not asking you any discussions
22  you may have had with attorneys in connection
23  with this schedule.  But were you ever asked
24  to modify this schedule that you've been -- I
25  take it you've been maintaining this schedule

Page 73

P. EXALL - HIGHLY CONFIDENTIAL
1
2  for several months now, correct?
3     A.   That would be correct.
4     Q.   Since fourth quarter of '08,
5  right?
6     A.   Yes.
7     Q.   Were you ever asked to modify the
8  schedule in response to anything that was
9  taking place in this litigation here in the
10  US?
11     A.   Not to my recollection.
12     Q.   Okay.  Were you ever told in any
13  way that the amount of comp at the bottom,
14  you'll see at the bottom of 280B it totals to
15  1.999 billion.  Could you see that?
16     A.   Yes.
17     Q.   Were you ever told that that
18  number should be 2 billion when all was said
19  and done you should get down to 2 billion at
20  the end?
21     A.   No.
22     Q.   I'm not talking in connection with
23  this litigation.  I'm just asking in general.
24  Did anyone ever tell you that the total amount
25  of compensation should total about $2 billion?

**P. EXALL - HIGHLY CONFIDENTIAL**

1
2    A.   I was asked to prepare the
3    schedule in respect of detailing the discharge
4    of our obligations to former Lehman Brothers
5    employees in respect of their prior service
6    and compensation for their prior service for
7    Lehman Brothers.  And this is what the
8    schedule represents.  It's items relating to
9    pre-acquisition services.
10   Q.   Okay.  But were you ever told that
11   it should be a total of $2 billion?
12   A.   No.
13   Q.   Do you have any understanding of
14   how this schedule and the compensation listed
15   in this schedule relates to the 9/16 balance
16   sheet or the schedule we looked at previously?
17   MR. GREEN:  The Exhibit 19?
18   Q.   Exhibit 19.
19   A.   The only reference point between
20   schedules 280B and 281B and the schedule you
21   have as Exhibit 19 is the OBS compensation
22   accrual line which is reflected on both 280B
23   and 281B.  The source referenced here is the
24   APA which references the $2 billion described
25   as comp on Exhibit 19.

P. EXALL - HIGHLY CONFIDENTIAL

1
2    Q.   Okay.  So let's look at
3    Exhibit 281B.  I don't want to confuse the
4    record here.
5    A.   Okay.
6    Q.   281B is the most recent version of
7    this schedule, right?
8    A.   That's correct.
9    Q.   Just so I understand what you just
10   said, when you see on the -- OBS Compensation
11   Accrual, OBS stands for opening balance sheet;
12   is that right?
13   A.   Yes.  That's my understanding.
14   Q.   Okay.  And the source for the $2
15   billion number is the APA, correct?
16   A.   Yes.
17   Q.   And by that you mean the source
18   for the $2 billion is Exhibit 19 that we just
19   pointed to?
20   A.   That's correct.
21   Q.   Okay.  So now how do you -- I just
22   want to walk through preparing this schedule.
23   How do you get from the $2 billion number --
24   how do you break it into 17 -- into
25   1.7 billion in cash versus 300 million in

**P. EXALL - HIGHLY CONFIDENTIAL**

1
2    equity?
3    A.   I was requested by Mr. Romaine
4    to -- for accounting purposes to estimate the
5    stock component of any such compensation that
6    may total 2 billion with the assumption that
7    we applied -- oh, sorry.  Let me say it again.
8    I was asked to estimate the stock
9    potential of any compensation that may be
10   represented by this 2 billion.
11   Q.   Okay.
12   A.   And the 300 million is an estimate
13   based on historic norms and experience under
14   the Barclays Capital stock deferral scheme.
15   Q.   Is that the scheme we talked about
16   earlier, the normal practice of Barclays?
17   A.   That is correct, yes.
18   Q.   Okay.  And when did he ask you to
19   do this?
20   A.   I believe it's a technical
21   accounting matter.  And it's really a question
22   for Mr. Romaine.
23   MR. GREEN:  I'm sorry.  Did you
24   say when or why?
25   MR. HINE:  Why.

P. EXALL - HIGHLY CONFIDENTIAL

1
2    MR. GREEN:  Oh, I'm sorry.
3    A.   It's a technical accounting matter
4    in respect of how the -- my understanding is
5    how the acquisition is accounted for in the
6    books and records of Barclays PLC.  I don't
7    know the technical aspects behind it.
8    Q.   Okay.  Just a general question.
9    Has this allocation between cash and equity
10   changed at all since the fourth quarter of '08
11   when you first started preparing the schedule
12   to the present?
13   A.   Not to my recollection.  Again,
14   that would have to be something for Mr.
15   Romaine.
16   Q.   Okay.  And again I'm happy if you
17   tell me it's someone else's department.  I'm
18   not trying to get you to testify about things
19   you have no knowledge about.
20   A.   No, I understand.
21   Q.   In the next -- could you just tell
22   in the general structure here.  You have
23   payments -- I see payments in future and other
24   items.  Payments are cash outflows or expenses
25   that have already taken place?

Page 78

P. EXALL - HIGHLY CONFIDENTIAL

1
2     MR. GREEN:  Object to the form.
3     Q.   That's a bad question but --
4     A.   My understanding is that these
5  were amounts that had been either paid in cash
6  or awarded in equity or paid as severance at
7  the time that this spreadsheet had been
8  prepared.
9          Payable in the future I understand
10 to be things that in most cases have not yet
11 been paid and were due and payable at a future
12 time through some sort of timing issue, et
13 cetera; whereas, other items were things that
14 were economic costs to Barclay PLC that were
15 related to awards that had already been made.
16          I guess you could actually
17 categorize the other items -- actually, the
18 way they're represented here the ISP awards
19 you could actually have recategorized that as
20 payments.  And payroll taxes, you could
21 categorize that as payable in the future.
22     Q.   I see.  When I -- again, just to
23 compare 280B and 281B I see in the first entry
24 under Payment it says Pre -- on 281B it says
25 Pre 22/9 Payroll Items and in 280B is says

Page 79

P. EXALL - HIGHLY CONFIDENTIAL

1
2  22/2.  Is that just a typo?
3     A.   Yes, it is.
4     Q.   Okay.  So back to 281B.  What does
5  this entry encompass?
6     A.   There are two general components
7  to the $12 million I believe you're referring
8  to.
9     Q.   Um-hum.
10    A.   In general, the first is a series
11 of payments made by Barclays on behalf of
12 former Lehman Brothers employees that were
13 expatriates.  So these are payments made to
14 tax authorities in other jurisdictions -- or
15 it may have been the US jurisdiction but in
16 the UK and other international jurisdictions
17 in respect of their pre-acquisition service.
18          These were liabilities that
19 effectively would have been for Lehman
20 Brothers but Barclays took on those
21 liabilities and funded them and made good on
22 those payments.
23    Q.   These are payments to the
24 individuals or to regulatory authorities?
25    A.   To regulatory authorities on

Page 80

P. EXALL - HIGHLY CONFIDENTIAL

1
2  behalf of individuals.
3     Q.   Okay.  Just so I understand it,
4  these are Lehman employees who were ex-pats at
5  the time of the acquisition who had some
6  regulatory obligation to foreign authorities
7  or other authorities and Barclays paid that;
8  is that right?
9          MR. GREEN:  Objection to form.
10 You can answer.
11    A.   That is my understanding.
12    Q.   Okay.  And how much of this 12
13 million is that?
14    A.   I estimate it to be approximately
15 $7 million.
16    Q.   And that money didn't go to the
17 individuals; it went to some regulatory
18 authority, correct?
19    A.   That's my understanding.
20    Q.   Okay.  And then what's the
21 balance, the 7 from the 12?
22    A.   The balance of 5 -- as I said,
23 there were two items.  The balance of the 5
24 relates to payrolls that -- for former Lehman
25 Brothers employees that were due and payable

Page 81

P. EXALL - HIGHLY CONFIDENTIAL

1
2  on and around the date of the bankruptcy.
3  Those payables are not going to be made.  They
4  were liabilities for the former Lehman
5  Brothers.  They were payables that were not
6  going to be paid.  My understanding was there
7  was no cash to make them.  As part of the
8  ordinary course of business to take on those
9  employees Barclays agreed to fund those
10 payrolls in respect of those pre-acquisition
11 services.
12    Q.   Okay.  Just so I understand the
13 pool of people we're talking about, you're
14 talking about payroll -- payroll amounts that
15 were due to the Lehman employees who came to
16 Barclays?
17    A.   Yes.
18    Q.   You're not talking about -- this
19 does not include payroll that was owed to
20 Lehman employees who stayed with Lehman,
21 correct?
22    A.   That's not my understanding.
23    Q.   We have a double negative there.
24    A.   Yeah.  There's a double negative.
25 It's my understanding those

Page 82

P. EXALL - HIGHLY CONFIDENTIAL

1    P. EXALL - HIGHLY CONFIDENTIAL
2    amounts relate to payroll in respect to former
3    Lehman Brothers employees in respect of their
4    pre-acquisition services but these employees
5    were employees that transferred or became
6    employees of Barclays Capital.
7    Q.   Okay.  So it's only folks who
8    transferred to Barclays, correct?
9    A.   That is my understanding in most
10   cases.
11   Q.   Okay.  When you say
12   pre-acquisition services, what do you mean?
13   Can I just use my colloquial term and you tell
14   me whether I'm right or wrong.  Is this base
15   salary that was owed to these folks as of
16   September 22nd?
17   MR. GREEN:  Object to the form of
18   the question.  Do you mean --
19   Q.   Well, let me back up.
20   MR. GREEN:  This specific
21   component of the first entry is what
22   you're talking about?
23   MR. HINE:  I'm talking about the
24   $5 million out of the 12 million that
25   we've been talking about.

Page 83

1    P. EXALL - HIGHLY CONFIDENTIAL
2    MR. GREEN:  Right.
3    Q.   Is that what I've seen referred to
4   as base salary?
5    A.   Not only.  I would suggest without
6   reviewing the records in detail or
7   investigating in general, if you're talking
8   payroll, you're talking any base salary paid
9   to the individual amongst other things that
10   are payroll related.
11   Q.   Like what?
12   A.   Benefits, pensions.  Anything that
13   may or may not -- or that may be part of an
14   individual's monthly salary or related items.
15   Q.   I understand.  But it's not bonus.
16   It's not annual bonuses, right?
17   A.   That's not my understanding, yes.
18   Q.   We've got a double negative.
19   A.   My understanding is that that was
20   a payroll item and I do not believe that there
21   were any - as you term them - annual bonus
22   payments incorporated in that.
23   Q.   When you say a payroll item you're
24   talking about the weekly or biweekly or
25   monthly checks that these folks were getting

Page 84

1    P. EXALL - HIGHLY CONFIDENTIAL
2   throughout the year.
3    A.   That's my understanding.
4    Q.   Okay.  And so is this 5 million
5   payments to those folks up to September 22nd
6   or does it go beyond September 22nd?
7    A.   I don't recall the exact dates.  I
8   don't know the exact dates to which the
9   payroll related.  I do know that they were the
10  payrolls that were due and payable at the time
11  that the acquisition was happening.  The risk
12  was -- and this was the commercial risk --
13  that these employees that were going to come
14  to work for Barclays were not going to get
15  paid for that month from Lehman Brothers.  They
16  would have had no monthly salary not being
17  employed by Barclays at that time.  So this
18  was a make-good, I guess goodwill gesture by
19  Barclays to fund the payroll to ensure the
20  smooth transition into the new structure.
21   Q.   Okay.  So presumably most of these
22  employees have been paid August 31st and this
23  is for the period of September for which they
24  worked?
25  MR. GREEN:  Objection to the form

Page 85

1    P. EXALL - HIGHLY CONFIDENTIAL
2   of the question.
3    A.   I don't know that for certain but
4   I believe that to be the case.
5    Q.   Okay.  But when I see the title it
6   says Pre-September 22nd payroll items, my
7   question is does that 5 million continue these
8   payroll items all the way to the end of the
9   year or is it just for the period in
10  September?  Do you understand my question?
11   A.   They do not relate to any payments
12  for the rest of the year.
13   Q.   Okay.  So the 5 million is just to
14  bring these employees up to September 22nd; is
15  that right?
16   A.   I can't testify to whether the
17  22nd of September is the exact date but what I
18  can tell you is that is for their salary and
19  related items as per a payroll that was due
20  and payable at the time in and around the
21  acquisition.  So whether that was the 23rd or
22  the 25th of September I can't testify.  I
23  don't know the exact dates.
24   Q.   Okay.  But assuming the date of
25  around September 22nd, this item, the $5

P. EXALL - HIGHLY CONFIDENTIAL

1
2  million, does not include payments for
3  October, November and December for those
4  employees; is that right?
5      A.   That is right.
6      Q.   Okay.  The next item we see is
7  replacement RSUs.  Could you tell us what that
8  is?
9      A.   RSU is an acronym to stand for
10 restricted stock units.
11     Q.   Okay.  And what are they?
12     A.   They are effectively in general
13 stock awards made to individuals that are
14 restricted in the sense that they either do
15 not vest immediately or can't be sold
16 immediately.
17     Q.   Okay.  Now, these are a form of
18 compensation that Lehman had previously used?
19     A.   Yes.
20     Q.   Okay.  Did Barclays previously use
21 these?
22     A.   Yes, we have.
23     Q.   Okay.  Now, I see that you cite
24 here $11 million and I just want to read your
25 source.  It says new RSUs granted as

P. EXALL - HIGHLY CONFIDENTIAL

1
2  replacements for ex-Lehman employees granted
3  to them in 2008 prior to the acquisition.
4          So just explain to me what's going
5  on here.  This is Barclays replacing some RSUs
6  that Lehman had previously granted to its
7  employees?
8          MR. GREEN:  Object to form.  You
9  may answer.
10     A.   There was a population of people
11 that were given stock awards by Lehman
12 Brothers earlier in 2008.  At the time of the
13 acquisition the value of those awards had
14 declined to zero.
15     Q.   Right.
16     A.   For these specific employees it
17 was decided that as a goodwill gesture,
18 Barclays would give restricted stock awards in
19 respect of that zero -- that original award
20 now valued at zero in effect to split the loss
21 50/50.
22          So as a hypothetical example if
23 the individual had been -- received an award
24 of stock to the value of $100 from Lehman
25 Brothers that had gone to zero at the time of

P. EXALL - HIGHLY CONFIDENTIAL

1
2  the bankruptcy, Barclays' goodwill gesture in
3  respect of that employee would have been to
4  give them a stock award to the value of 50 in
5  Barclays stock.
6      Q.   So it's in Barclays stock now.
7      A.   It's in Barclays stock but relates
8  to the value of stock awarded prior to the
9  acquisition by Lehman Brothers.
10     Q.   And that's based on the value of
11 Barclays stock as of around September '08,
12 correct?
13     A.   That's normal practice, yes.
14     Q.   And does this vest over a period
15 of time?
16     A.   It would have, yes.  I don't know
17 the specific vesting for this particular award
18 but that would be the normal course of events,
19 yes.
20     Q.   Would it be the three-year cliff
21 vest that you mentioned earlier?
22     A.   It may or may not have been.
23 Often -- in many cases we will mirror the
24 original vesting of an award at a previous
25 employer with a replacement award.  I can't

P. EXALL - HIGHLY CONFIDENTIAL

1
2  testify to what the vesting period because I
3  don't know it for this particular award.
4      Q.   Okay.  Well, if it vested over
5  time, would it be entered on the balance sheet
6  for this year?
7      A.   Sorry.  Excuse me?
8      Q.   If it had vested over time would
9  it be entered on the acquisition balance sheet
10 for this year?
11         MR. GREEN:  Object to the form of
12 the question.  You may answer if you
13 know.
14     A.   I believe that's a technical
15 accounting question.  I believe the answer to
16 be yes but I can't pass an exact accounting
17 opinion.  You should refer that to Mr.
18 Romaine.
19     Q.   Okay.  And when you say this is a
20 goodwill gesture are you saying that Barclays
21 wasn't obligated to do this under the APA?
22         MR. GREEN:  Objection to the form
23 of the question.  It calls for a legal
24 conclusion.
25     A.   I don't know what the APA

P. EXALL - HIGHLY CONFIDENTIAL

1
2  specifically obligated Barclays or anyone else
3  to do. I do know that this is a goodwill
4  gesture for those employees. That's my
5  understanding of that award.
6      Q.   Okay. And are these very senior
7  employees?
8      A.   I believe they are -- there are --
9  I -- hum. I would categorize them as
10 employees -- I would suggest -- my
11 recollection is actually that they're a range
12 of employees. There were some senior
13 employees and some junior employees in that.
14 I don't think that they were specifically
15 targeted as the senior group. They were a
16 group of people that had received awards at
17 Lehman Brothers.
18     Q.   Whoever happened to be in the pool
19 of people who received an award.
20     A.   In the specific grouping, yes.
21     Q.   The next entry -- well, another
22 question on that. Why is that not in the
23 equity column, that 11 million?
24     A.   I don't know.
25     Q.   Do you think it should be or is it

P. EXALL - HIGHLY CONFIDENTIAL

1
2  just a -- it's not paid in cash, right?
3      A.   My understanding it was stock
4  awards.
5      Q.   Okay. You don't know why it's
6  in --
7      A.   No.
8      Q.   Okay. You have to answer either
9  yes or no. If you shake your head --
10     A.   Oh, sorry. I don't know why.
11     Q.   The next entry is Bonus Concluding
12 Social Tax. Could you tell me what you mean
13 by social tax? What is that?
14     A.   My interpretation of social tax
15 would be -- my understanding would be these
16 are any ancillary taxes that would be due and
17 payable to various regulatory authorities in
18 respect of any annual bonus payment at any
19 point in time in whatever jurisdiction they
20 have to be made in.
21     Q.   So is this like withholding tax?
22 Income tax?
23     A.   Not personal income tax, no.
24     Q.   Oh. Just any --
25     A.   Let me characterize it again.

P. EXALL - HIGHLY CONFIDENTIAL

1
2  Where withholdings are required, yes, they
3  would be included in that number. It would
4  also include whatever benefits may or may not
5  be derived from any annual incentive payment
6  that is made. So I believe one of those to be
7  FICA in the US.
8      Q.   Okay. So this would -- this
9  figure of 1.529 billion includes all of that
10 type of regulatory requirements, correct?
11     A.   That's my understanding, yes.
12     Q.   Okay. And when you say bonus
13 here, these are annual bonuses?
14     MR. GREEN: Object to the form.
15     Q.   Well, let me show you another
16 document. Maybe that helps me ask the
17 question better.
18     (Pause on the record.)
19     Q.   While we're trying to find the
20 document, do you see in the source it says TCR
21 27 Feb 2009?
22     MR. GREEN: 23rd Feb?
23     Q.   23 Feb.
24     A.   TCR is an acronym for our internal
25 on-line compensation review system. It stands

P. EXALL - HIGHLY CONFIDENTIAL

1
2  for total compensation review. The date 23
3  February 2009 relates to the date the data
4  were extracted from that system from which
5  this -- that element of the schedule was
6  prepared.
7      Q.   Okay. So this is just a database
8  where you track compensation payments to
9  employees?
10     A.   In effect, yes.
11     Q.   Oh, okay. And would that data
12 have changed since February of '09 up until
13 the date you prepared this?
14     MR. GREEN: Object to the form.
15     A.   I don't believe so. The
16 compensation round had closed at that point.
17     Q.   Okay.
18     A.   Whilst there may be movements of
19 items subsequent to that, I think that data
20 extract is accurate.
21     Q.   When you say the compensation
22 round had been concluded, is there like an
23 annual schedule for the award of bonuses at
24 Barclays?
25     MR. GREEN: Object to the form.

P. EXALL - HIGHLY CONFIDENTIAL

1
2  A.   Yes.  There's a normal cycle that
3  is followed.
4  Q.   Okay.  So are you saying that
5  they've been awarded by February 23rd and they
6  probably didn't change between then and now?
7  A.   At the 23rd of Feb the cash
8  amounts would have been distributed through
9  the payroll.  The equity awards, the value
10  thereof would have been fixed.
11  Q.   Okay.
12  A.   The equity awards I don't believe
13  had been formally made in terms of the amount
14  of stock units at that point.  But the value
15  of those awards had been fixed.
16  Q.   But you're relatively confident
17  that there's been no substantial changes from
18  February 23rd to the present.
19  A.   Yes, I am.
20  Q.   Okay.  Let me hand you a copy of
21  an exhibit that's been previously marked as
22  216 which is a copy of a contract between
23  Barclays and Mr. Lowitt.  I'm just going to
24  use this as an example so I don't expect that
25  you're familiar with the terms but if you want

P. EXALL - HIGHLY CONFIDENTIAL

1
2  to just take a minute to take a look at it.
3       (Document review.)
4       MR. GREEN:  Bill, while he's
5  looking at I should say that as I'm sure
6  you know this entire deposition is
7  designated highly confidential.
8       MR. HINE:  Highly confidential.
9       MR. GREEN:  And don't expect any
10  redesignation because it's all about
11  comp.
12       MR. HINE:  I understand.  I
13  understand.
14       MR. GREEN:  So it will remain that
15  way.
16       MR. HINE:  Well, I think our
17  agreement is we'll treat it as all
18  highly confidential and you guys let me
19  know if have you any re-designations.
20       MR. GREEN:  Right.
21       MR. HINE:  So that's fine.
22       MR. GREEN:  Right.
23  BY MR. HINE:
24  Q.   Mr. Exall, have you had a chance
25  to look at this document?

P. EXALL - HIGHLY CONFIDENTIAL

1
2  A.   Yes.
3  Q.   And my question is Mr. Lowitt is
4  apparently awarded something entitled 2008
5  guaranteed cash bonus.
6       Do you see that?
7  A.   I do.
8  Q.   Do you understand that that bonus
9  is part of the bonus including social tax
10  entry that we just talked about on this
11  spreadsheet?
12  A.   Yes.
13  Q.   Okay.  Is there anything else on
14  Mr. Lowitt's contract that would be part of
15  that $1.5 billion figure?
16  A.   If I take Mr. Lowitt as the
17  example, the 4.56 million referred to in the
18  contract being 2008 guaranteed cash bonus
19  would be part of the 1,271 number reflected as
20  cash in that line.
21  Q.   Okay.
22  A.   The EPP -- 2008 EPP recommendation
23  to the value of $1.44 million as reflected in
24  the contract, would be included in the $258
25  million number.

P. EXALL - HIGHLY CONFIDENTIAL

1
2  Q.   I see.  Okay.
3  A.   Any ancillary social taxes and
4  whatever that were due and payable to whatever
5  authorities or any withholding tax in regard
6  with are included in those numbers as well.
7  Those obviously are not specified in the
8  contract as well.
9  Q.   I understand that.  But any
10  regulatory requirements related to those two
11  entries on its contract would be included in
12  the numbers that you put in the spreadsheet,
13  correct?
14  A.   That's correct.
15  Q.   Okay.  And how about where you see
16  he has a special cash award, is that in that
17  entry on the spreadsheet?
18  A.   No, it is not.
19  Q.   Okay.  Where would I find that
20  entry on the spreadsheet?
21  A.   It is not on the spreadsheet.
22  Q.   Okay.  So what is the special cash
23  award that I see several senior executives
24  from -- former Lehman executives getting?
25       MR. GREEN:  Object to the form of

P. EXALL - HIGHLY CONFIDENTIAL

1    P. EXALL - HIGHLY CONFIDENTIAL
2         the question.
3         A.   My understanding of these special
4    cash awards is that they are retention awards
5    subject to future service of the employee.
6    They do not relate to pre-acquisition services
7    performed for Lehman Brothers in relation to
8    these individuals.  Consequently, they're not
9    on the schedule.
10        Q.   Okay.  So just so -- I was
11   confused about that.
12             So where I see special cash award
13   and various contracts that is to encourage the
14   individual to stay at Barclays for a period of
15   time, correct?
16             MR. GREEN:  Object to the form.
17   You may answer.
18        A.   That is my understanding of their
19   retention award.
20        Q.   When you say retention award
21   that's an inducement for them to stay a period
22   of time; is that right?
23        A.   Yes.  That's my understanding.
24        Q.   Okay.  And then -- and because
25   that was not meant to compensate them for work

1    P. EXALL - HIGHLY CONFIDENTIAL
2    they had done at Lehman it's not part of your
3    spreadsheet; is that right?
4         A.   Totally not related to the
5    pre-acquisition service supplied by Lehman
6    Brothers and consequently are not on the
7    schedule.
8         Q.   Okay.  So this schedule is only
9    relating to pre-acquisition services that
10   former Lehman employees performed for Lehman;
11   is that right?
12        A.   Yes.  That's correct.
13        Q.   All right.  Thank you for
14   clarifying that.
15             While we're on Mr. Lowitt's
16   contract, again we'll use it an example but do
17   you see the provision that says termination
18   other than for cause?
19        A.   I see the provision.
20        Q.   And that lays out certain benefits
21   that he's entitled to if he gets terminated
22   without cause.  Is that what I would call a --
23   is that a severance payment?
24             MR. GREEN:  Take your time to read
25   the provision before you answer just to

1    P. EXALL - HIGHLY CONFIDENTIAL
2    make sure your answer is addressed to
3    the question.
4         (Document review.)
5         A.   Can you repeat the question?
6         Q.   Well, why don't we do this.  We're
7    going to get to some entries called severance
8    on your spreadsheet so we'll come back to that
9    question.
10        A.   Yes.
11        Q.   It has to do with severance so
12   let's just postpone that question.
13             Let's go back to your spreadsheet.
14             The next entry I see is IBD Grad
15   Programs.  Could you tell me what that is?
16        A.   These -- the IBD grad program is
17   the graduate program implemented by the
18   former -- well, we had one at Barclays Capital
19   but the majority of the -- well, all the
20   people reflected on here are the former Lehman
21   Brothers graduates that were working in the
22   investment banking division of Lehman Brothers
23   that came on as part of the acquisition.  The
24   payments related to them are reflected here in
25   respect of their pre-acquisition service.

1    P. EXALL - HIGHLY CONFIDENTIAL
2             These were made in June of 2009.
3    That is a quirk -- I term it a quirk.  It's
4    market practice for Lehman Brothers graduate
5    program to pay their annual bonuses to the
6    graduates at midyear.  It's different to the
7    policy that we had at Barclays Capital.  We
8    stuck to this -- their policy in respect of
9    the US graduates.
10        Q.   These are investment banking
11   division employees who went to grad school and
12   is this a payment to the grad school for the
13   school?
14        A.   No, no, no.  These are payments to
15   the individuals.  The graduate program as --
16   these are people as you pointed out are
17   graduates that we recruited off campus to come
18   and work for us.  They're on the former
19   graduate program within investment banking.
20   And their compensation is -- I would term it
21   as being quite rigorously standardized in the
22   sense that there's a lot of competition in the
23   market for these individuals and there's quite
24   a standardized form of compensation paid to
25   them.  And they're on the specific program

Page 102

P. EXALL - HIGHLY CONFIDENTIAL

1
2  that is different to let's say non-graduate
3  employees.
4      Q.   So this isn't a bonus.  This is a
5  compensation -- this is an extra form of
6  compensation to them because they went to
7  graduate school?
8      A.   No.  It's an extra form of
9  compensation because they're on the graduate
10  program and as part of that program they're
11  entitled to certain awards at certain points
12  in time.  June 2009 being the point in time at
13  which they were entitled to them.
14      Q.   Okay.  I guess I'm just not
15  understanding that.  You've recruited them out
16  of -- Lehman has recruited them out of a grad
17  school and this is a payment they get as an
18  extra incentive to come work for Lehman?
19          MR. GREEN:  Objection to form.
20      You may answer.
21      A.   This is for all intents and
22  purposes in general their annual bonus, okay?
23  Their timing is different than the general
24  population for whatever reason.  That's
25  standard practice at -- it was standard

Page 103

P. EXALL - HIGHLY CONFIDENTIAL

1
2  practice at Lehman -- the cycle of their bonus
3  awards or payments were midyear.  Whereas
4  everyone else it's year end.
5      Q.   Okay.  But they are still in grad
6  school still?
7      A.   No, no.  They have left grad
8  school.  They're all graduates.  But they're
9  part of our formal graduate program having
10  been recruited from grad school.
11      Q.   Okay.  And how are they eventually
12  transitioned from this program into becoming a
13  regular -- like, how do they transition to the
14  normal bonus cycle?
15      A.   I can't speak for the exact Lehman
16  policy but in general my understanding of the
17  graduate program that we have is that they
18  rotate for a certain period of time within the
19  business in which they work.  They learn their
20  business.  They, you know, work, they learn,
21  et cetera.  And as and when they -- the
22  graduate program is generally a finite amount
23  of time.  In Barclays Capital traditionally it
24  was 18 months.  The graduates did a bunch of
25  rotations in various business areas and they

Page 104

P. EXALL - HIGHLY CONFIDENTIAL

1
2  were either employed or not employed at the
3  end of that cycle by Barclays Capital.
4      Q.   Okay.  So --
5      A.   But I -- if the Lehman Brothers
6  scheme is the same in general as the Barclays
7  Capital scheme, that's how think I would
8  transition into what I would term as the
9  general population.
10      Q.   Okay.  I think I understand it.
11  So this is -- these are folks who had been in
12  this graduate program as of September 22nd and
13  now are able to continue in that same program
14  at Barclays?
15      A.   Yes.  That's my understanding of
16  it.
17      Q.   Okay.  So the $11 million here is
18  in lieu of an annual bonus for them?
19      A.   It's exactly the same for all
20  intents and purposes as any other compensation
21  delivered to any other ex-Lehman employee.
22  It's just that the timing is different.
23      Q.   Well, do they also receive a base
24  salary?
25      A.   Yes, they do.

Page 105

P. EXALL - HIGHLY CONFIDENTIAL

1
2      Q.   Okay.  So they have a base salary
3  and then an additional amount paid in or
4  around June of every year; is that correct?
5      A.   That's correct.
6      Q.   And is this only the additional
7  amount or does this also include the base
8  salary?
9      A.   This is the additional amount.
10      Q.   And where does their base salary
11  fall?
12      A.   In the normal books and records of
13  Barclays Capital.
14      Q.   So that would be up in the first
15  item, the $5 million we talked about earlier?
16          MR. GREEN:  Object to the form.
17      A.   I would say that insofar as the
18  IBD graduates may or may not have -- may have
19  been in the payrolls that Barclay made good
20  the answer would be yes.
21          In general, I don't believe -- I
22  believe that most of those investment banking
23  graduates were not part of that payroll cycle
24  and consequently any salary paid to them
25  pre-acquisition would have been borne -- the

1          P. EXALL - HIGHLY CONFIDENTIAL
2    costs would have been borne by Lehman Brothers
3    and post acquisition would have been borne by
4    Barclays Capital in the normal course of
5    business.  And those payments would not be
6    reflected in the schedule.
7          Q.    Okay.  So this $11 million for IBD
8    graduates is only -- does not include the base
9    salary component of their compensation.
10          A.    That's correct.
11          Q.    Okay.  It only includes the
12    portion of their compensation that they
13    receive every June.  Or thereabouts.
14          A.    It reflects what was paid to them
15    in June 2009.
16          Q.    Okay.  And --
17          A.    In respect of their
18    pre-acquisition service for Lehman Brothers.
19          Q.    So it's paid to them in June of
20    2009 but it relates to their work up until
21    September of 2008?
22          A.    Yes.
23          Q.    And how about their work from
24    September onward?
25          A.    This again comes back to the

1          P. EXALL - HIGHLY CONFIDENTIAL
2    difference in treatment between a graduate and
3    a non-graduate.  As I mentioned before,
4    graduate compensation is quite highly specific
5    and regulated within specified bands and it's
6    run in a different way to compensation for
7    non-graduates.  Consequently, these amounts
8    would have been June payable almost
9    irrespective of the performance of the
10    graduate.
11          So by the fact that we employed
12    them as part of the acquisition those would
13    have been paid in any event.  It's simply a
14    timing issue.
15          Q.    Well, does it mean that some of
16    that 11 million relates to work that they did
17    after September?
18          A.    I don't believe so to be the case.
19          Q.    You don't think so?
20          A.    No.
21          Q.    Why not?
22          A.    Because I believe as I mentioned
23    before that those amounts would have been June
24    payable to these graduates in any event.
25    Irrespective of their service.  These are --

1          P. EXALL - HIGHLY CONFIDENTIAL
2    as I said, their compensation is treated
3    somewhat differently to compensation among
4    non-graduates.
5          Q.    Okay.  And are they informed that
6    this is their annual bonus?
7          MR. GREEN:  Object to the form of
8    the question.
9          A.    I haven't seen what was given to
10    them as part of their graduate program.
11          Q.    Okay.  If we go back to the bonus
12    in the previous entry, the $1.529 billion,
13    does any of that encompass work that were
14    performed by former Lehman employees since
15    they've come to Barclays?  In other words,
16    after September 22nd?
17          MR. GREEN:  Object to the form.
18    Asked and answered.
19          A.    This schedule represents
20    compensation paid to former Lehman Brothers
21    employees in respect to their pre-acquisition
22    services for Lehman Brothers.
23          Q.    So am I correct to say that $1.529
24    billion does not relate in any way to work
25    these individuals performed for Barclays after

1          P. EXALL - HIGHLY CONFIDENTIAL
2    September 22nd?
3          A.    That is my understanding, yes.
4          Q.    And so in certain employment
5    contracts if I see anything relating to a 2009
6    bonus recommendation you're saying that would
7    not be in this $1.259 billion number?
8          A.    No, it wouldn't.  It would not be
9    in that number.
10          Q.    Okay.
11          A.    Well, could you show me an example
12    if you want to be specific?
13          Q.    I'm not sure I have one but I --
14          A.    I mean, if I refer back to Mr.
15    Lowitt's contract it talks about a 2008
16    guaranteed cash bonus and a 2008 EPP
17    recommendation.
18          Q.    Right.
19          A.    Those amounts are included on the
20    spreadsheet.  Had there been two additional
21    clauses referring to 2009 cash and stock,
22    those would not have been on the schedule.
23          Q.    Okay.  That was my question.
24          Now, when you see on his contract
25    he has a -- if you see on there it says

Page 110

P. EXALL - HIGHLY CONFIDENTIAL

1
2    compensation he has a base salary of 200,000.
3           Do you see that?
4      A.   Yep.  I do.
5      Q.   Is that on your spreadsheet at all
6    within any entries?
7      A.   No.
8      Q.   And why is that?
9      A.   Because that salary would have
10   been paid to him post-acquisition.  The
11   schedule does not reflect any post-acquisition
12   obligations.
13      Q.   I understand.  So that is
14   compensation he's receiving for work he's
15   performing for Barclay post-acquisition.
16      A.   That would be correct.  The only
17   way that that -- some of that 200,000 would
18   have been part of this schedule is if it was
19   part of the pre-2009 payroll we discussed
20   previously.
21      Q.   I understand.  Okay.
22           The next entry you'll see is
23   entitled Severance.  Could you tell me what
24   that is meant to cover?
25      A.   That relates to payments and

Page 111

P. EXALL - HIGHLY CONFIDENTIAL

1
2    ancillary -- payments to individuals.
3    Withholding taxes and ancillary liabilities in
4    respect of the reduction in force exercise
5    implemented in Q4 2008 and Q1 2009 in respect
6    of former Lehman Brothers employees.
7      Q.   Okay.  When I see RIF in the
8    source that's reduction in force?
9      A.   That acronym stands for reduction
10   in force, yes.
11      Q.   And what does that VIG stand for?
12      A.   I don't know what VIG actually
13   stands for.  It is meant to refer to the Q1
14   2009 reduction in force exercise.
15      Q.   So RIF refers to the fourth
16   quarter '08 reduction in force?
17      A.   That's my understanding.
18      Q.   And the second acronym refers to
19   the first quarter of '09 reduction?
20      A.   That's my understanding.
21      Q.   Okay.  And you got lists of --
22   what do your lists show from HR?  I see a
23   reference from HR.
24      A.   We maintained -- we, HR,
25   maintained databases of payments made to

Page 112

P. EXALL - HIGHLY CONFIDENTIAL

1
2    individuals and related items on a
3    name-by-name-basis reflecting these items
4    totalling these amounts on the schedule.
5      Q.   Okay.  Now, these individuals came
6    to work for Barclays at or around September
7    22nd and had left since then?
8      A.   These are former Lehman Brothers
9    employees that came and worked for Barclays
10   and then were part of the reduction in force
11   exercises, yes.
12      Q.   Okay.  So they're not -- that list
13   does not include people who ever came to
14   Barclays at all?
15      A.   That's not my -- I believe that to
16   be the case, yes.
17      Q.   Okay.  So if they received
18   severance it was from Lehman, not Barclays,
19   correct?
20      MR. GREEN:  Object to the form of
21   the question.  You can answer if you
22   know.
23      A.   I don't know.
24      Q.   Okay.  Fair enough.
25      A.   I don't know.

Page 113

P. EXALL - HIGHLY CONFIDENTIAL

1
2      Q.   And how was their severance
3    calculated?
4      A.   The standard severance policy of
5    Lehman Brothers was applied in respect to --
6    in most cases in respect of former Lehman
7    Brothers employees and the application of that
8    policy resulted in severance payments being
9    calculated and awarded to individuals
10   concerned.
11      Q.   Okay.  Now, this is -- these
12   severance payments are separate from the bonus
13   payments we talked about earlier.
14      A.   Yes, they are.
15      Q.   Okay.  So these are -- is it
16   correct all of these payments have been made
17   to people who no longer work for Barclays,
18   correct?
19      A.   Yes.
20      Q.   Now, why in the entry do we have
21   some severance and it looks like it's payable
22   in the future?  Do you see the entry I'm
23   talking about?  The $27 million?
24      A.   I do.
25      Q.   What is that meant to cover?

Page 114

P. EXALL - HIGHLY CONFIDENTIAL

1
2  A.  These are meant to cover exactly
3  the same thing in that they are severance
4  related to former Lehman Brothers employees
5  that are part of the reduction in force
6  exercise.  But these are amounts that had not
7  at the time of the production of the schedule
8  either been paid or had been reconciled fully
9  to the extent that they had -- we can trace
10  the item to a payroll.
11  Q.  Can you explain that last part to
12  me.
13  A.  For the most part these amounts
14  have been paid.  Have actually been discharged
15  and the cash has left the account.  The 27
16  million reflect payments that have not as yet
17  been made.  All are still in the process of
18  being reconciled.
19  Q.  Meaning negotiating with the
20  individuals leaving?
21  A.  No.  Reconciling between what
22  people originally estimated their -- an
23  individual severance to be and what they were
24  eventually paid on the payroll.  There may be
25  differences between those two points.

Page 115

P. EXALL - HIGHLY CONFIDENTIAL

1
2  Q.  So am I correct to say that that
3  27 million entails either a reconciliation
4  issue that you just mentioned or something
5  that's been promised to someone after they
6  left but that's payable in the future.
7  A.  That's my understanding, yes.
8  Q.  Okay.  So if I wanted to know the
9  total amount of severance paid to former
10  Lehman employees or to be paid to former
11  Lehman employees I would add up the 238 and
12  the 27 million, correct?
13  A.  Yes.  And that would cover not
14  only the payment made to individuals and the
15  withholding associated with those but also an
16  estimate for ancillary benefits and amounts
17  that may be payable on those amounts to
18  various regulatory bodies.
19  Q.  So do you have any understanding
20  whether these severance entries related in any
21  way to the clause 9.1(c) of the APA that we
22  discussed earlier which talked about bonuses?
23  MR. GREEN:  Object to the form to
24  the extent it calls for a legal
25  conclusion.

Page 116

P. EXALL - HIGHLY CONFIDENTIAL

1
2  A.  I don't have a specific -- I don't
3  have specific knowledge as to how the two are
4  tied together or not as the case may be.  I'm
5  not qualified to interpret that.  What I can
6  say is that again these are severance related
7  to former Lehman Brothers employees related to
8  their service with Lehman pre-acquisition.
9  Q.  Okay.  In the Future Severance
10  entry in your note you talk about the RIF and
11  VIG list from HR and then you write, "And
12  includes 25 percent for benefits for RIF."
13  What does that refer to?
14  A.  We have made an estimate in these
15  amounts in this 27 million in respect of, as I
16  mentioned earlier, payments that may be due
17  and payable to regulatory bodies in respect of
18  benefits or people that are on salary
19  continuation.  So these are people that don't
20  get their severance upfront, they take it over
21  a period of time, and they're still covered by
22  benefits.  So those are payments, estimates in
23  respect of the benefit amounts that they're
24  still covered for during the period of their
25  severance.

Page 117

P. EXALL - HIGHLY CONFIDENTIAL

1
2  Q.  So is it correct to say 25 percent
3  of the 27 million is that type of benefit?
4  A.  I don't know if that's the exact
5  calculation.  I haven't got an answer for
6  that.
7  Q.  Okay.  If you refer back to
8  Exhibit 19 are these severance payments part
9  of the $2 billion in comp that you see listed
10  there or do you have any understanding about
11  that?
12  MR. GREEN:  Object.  Calls for a
13  legal conclusion.
14  A.  I don't know what that represents.
15  So I can't say whether those services are
16  included or not.
17  Q.  When you said that you were
18  pointing to the $2 billion on figure 19?
19  A.  Described as comp, yes.
20  Q.  Oh, okay.  When I looked at the
21  prior version, 280B, it says Severance 2 as
22  the title.  Or is that just a typo?
23  A.  Typo.
24  Q.  Okay.  And now you might have
25  covered this already but how did the severance

P. EXALL - HIGHLY CONFIDENTIAL

1
2  figures change from the time you prepared the
3  first version of this -- or version marked as
4  280B versus the most recent version?
5           I mean, I see they've gone down in
6  terms of the payment severance version but
7  they've gone up -- oh, no.  I guess they've
8  gone down in both instances.
9           MR. GREEN:  Object to the form.
10      A.  Could you just restate that
11 question?
12      Q.  If I compare the two severance
13 entries on Exhibit 280B with 281B it's fair to
14 say the severance numbers have reduced,
15 correct?
16      A.  That is correct.
17      Q.  And my question is why.
18      A.  If you aggregate them I believe
19 the Schedule 280B, the amounts of severance
20 total $314 million.  On Schedule 281B they
21 total $265 million.  That's approximately a
22 $40 million difference.
23           Is that right?
24           $50 million difference.  Excuse
25 me.

P. EXALL - HIGHLY CONFIDENTIAL

1
2           MR. GREEN:  Forty-nine.
3      A.  $49 million.  Okay.
4           The reason for the movement --
5  there are two reasons in general.  One was a
6  pure error on the spreadsheet.  There were
7  amounts paid -- there were amounts of
8  severance that were paid to individuals that
9  were included both in the bonus including
10 social tax line and in the severance line.
11 That related to approximately $28 million that
12 if I refer back to 280B that $28 million was
13 reflected in the 261 and was reflected in the
14 1,529.
15      Q.  So you're just removing the double
16 counting.
17      A.  We removed the double count and
18 moved it to the second schedule which we
19 discovered for the reconciliation award.
20      Q.  Okay.
21      A.  The other reduction of the
22 additional, what? -- $21 million relates to a
23 full -- a more full reconciliation of the
24 severances yet to be paid.  As I mentioned
25 earlier, we were in the process of reconciling

P. EXALL - HIGHLY CONFIDENTIAL

1
2  what original severances were estimated to be
3  for individuals versus what was actually
4  processed and paid ultimately to those
5  individuals.
6           And in the cross-comparisons of
7  the original database to the payroll we
8  discovered that people had been estimated to
9  receive severances substantially in excess to
10 what they actually received.  So the
11 difference between A and B is a reduction as
12 you see reflected on the schedule.
13      Q.  Okay.  Is any of the difference
14 between these two schedules -- the severance
15 entries on these two schedules the result of
16 any kind of change in policy at Barclays as to
17 severance payments?
18      A.  Not at all.
19      Q.  Okay.  And who would I ask if I
20 really wanted specifics on that question?
21 That would be --
22           MR. GREEN:  On which question?
23      Q.  On just severance payments.
24      A.  On policy or specific severance
25 payments?

P. EXALL - HIGHLY CONFIDENTIAL

1
2      Q.  Both.
3      A.  On policy I think you could direct
4  both sets of questions through to Mr. Kerman.
5      Q.  Okay.
6      A.  Although he's not responsible for
7  payroll.  You know, he may or may not pass
8  that question on.
9      Q.  But when you get the lists from
10 HR, is he the person preparing those lists?
11      A.  No.  It would be -- it's prepared
12 by, you know, people within HR function.
13      Q.  Okay.
14      A.  He doesn't prepare them, no.
15      Q.  Well, does he supervise those who
16 prepare them?
17      A.  He's the head of employee
18 relations.  I don't know whether he
19 particularly supervised the preparation of
20 these databases.  He knows of their existence.
21      Q.  But am I correct -- I mean, as
22 you've described it, it seems to be -- the
23 difference in the two schedules appears to me
24 to be just reconciling accounting errors or
25 reconciliation type errors; is that right?

Page 122

P. EXALL - HIGHLY CONFIDENTIAL

1
2    MR. GREEN:  Object to form.
3        A.    The errors -- well, the two items
4    represent a double count of particular
5    individuals.
6        Q.    Right.
7        A.    Which were clear errors in the
8    production of the original spreadsheet.  As
9    well as a further reconciliation as to
10   estimated severance amounts versus actual
11   payments to former Lehman Brothers employees.
12   The reconciliation effort is a -- you know,
13   was -- is a joint effort between HR and
14   finance professionals.
15       Q.    Okay.  Now, if we looked at your
16   spreadsheets over time which you said you
17   started preparing them in the fourth quarter
18   of '08, is it fair to assume that the
19   severance numbers would have increased over
20   time?
21       MR. GREEN:  Object to the form.
22       A.    I don't recall.
23       Q.    I mean, the more people leave, the
24   more gets paid out in severance and these
25   numbers increase, correct?

Page 123

P. EXALL - HIGHLY CONFIDENTIAL

1
2        A.    I would be speculating.  It sounds
3    plausible but I can't answer directly.  I
4    don't have the previous schedules in front of
5    me.
6        Q.    Okay.  Well, my question is how do
7    you know that these severance payments are
8    made in respect of work they did at Lehman
9    when they've been working for Barclays for six
10   or eight months now?  Where's the cutoff?
11       MR. GREEN:  Object to the form.
12       A.    In general, severance payments are
13   based on previous service at an employer.  The
14   vast majority of any individual receiving a
15   severance, the vast majority of their previous
16   service would have been in respect of Lehman
17   Brothers, services rendered to Lehman
18   Brothers.
19       Q.    So in preparing this schedule
20   which is only supposed to reflect service or
21   costs associated with their service at Lehman,
22   you're assuming that the entire amount of
23   severance paid to these individuals is in
24   respect of their service at Lehman; is that
25   right?

Page 124

P. EXALL - HIGHLY CONFIDENTIAL

1
2        A.    That is what I am assuming on the
3    schedule, correct.
4        Q.    And theoretically at some point
5    any severance payment they received should
6    also include a component that relates to their
7    work at Barclays, right?
8        MR. GREEN:  Object to the form, please.
9        A.    Just repeat that question, please.
10       Q.    Well, theoretically over time if
11   these folks worked for Barclays for a period
12   of time, a portion of their severance has to
13   be allocated to the work they did at Barclays
14   as opposed to Lehman, right?
15       A.    That would be correct.
16       Q.    Okay.  But you haven't made that
17   allocation in preparing this spreadsheet?
18       A.    I don't believe so.  I can't
19   answer for my -- I believe that these
20   represent amounts paid to individuals for
21   their pre-acquisition service.
22       Q.    Okay.  The next entry talks about
23   the payroll tax on equity compensation.
24       A.    Yes.
25       Q.    Could you explain to me what that

Page 125

P. EXALL - HIGHLY CONFIDENTIAL

1
2    is?
3        A.    Those would be amounts due and
4    payable to relevant tax authorities once the
5    equity awards reflected on the schedule are
6    vested and become vested by the employees.
7        Q.    So is this the three-year cliff
8    vest you talked about?
9        A.    Yes.
10       Q.    So three years from now there will
11   be some kind of obligation to regulatory
12   authorities based on individuals' receipt of
13   their stock bonus?
14       A.    That's my understanding.
15       Q.    And the 1.79 percent what is that
16   based on?
17       A.    That's an estimate made by finance
18   based -- you'd have to ask them.  My
19   understanding is it's based on a blended rate
20   of tax which is standard practice across
21   Barclays Capital.
22       Q.    Okay.  And then what is that --
23   1.9 percent of what?
24       MR. GREEN:  1.79 percent you mean?
25       Q.    I'm sorry.  1.79 percent of what?

1    P. EXALL - HIGHLY CONFIDENTIAL
2        A.    It relates to the $258 million
3    of -- in the equity column of bonuses
4    including social taxes.  I should point out
5    here if you do a calculation of 1.79 on the
6    258 you don't get 9.
7        Q.    Right.  That's my question.
8        A.    The difference is the growth in
9    the Barclays stock price subsequent to the
10   award being made.  The tax will be payable,
11   due and payable, based on the ultimate value
12   of those awards when the vest.  So that 9
13   could increase over time.
14       Q.    Well, so this 1.79 assumes a
15   growth in the value of the stock that's
16   vesting over that three-year period, right?
17       A.    The 1.79 is the blended -- my
18   understanding is that the 1.79 is the blended
19   rate applied to the equity award respect of
20   tax.
21       Q.    Right.
22       A.    You will notice that's being
23   increased by a multiple of 2 on the
24   spreadsheet.
25       Q.    Right.

1    P. EXALL - HIGHLY CONFIDENTIAL
2        A.    The reflects the fact that between
3    the date of award of these stock -- these
4    amounts of stock and the date at which these
5    schedules were prepared, the stock price of
6    Barclays underpinning the value of these
7    awards had roughly doubled.
8        Q.    From when to when?  From
9    September --
10       A.    These stock awards were made in
11   May 2009.  And the schedule is done as you see
12   it with all these -- it is an estimate of a
13   liability that is due and payable at some
14   future time.  That liability may or may not be
15   $9 million.  It could be different.
16       Q.    Okay.  But at present you're
17   estimating it at 9 million.
18       A.    That's correct.
19       Q.    And that's assuming or it's based
20   on an increase in the value of the Barclays
21   stock which is the item that you multiple by
22   1.79.
23       A.    My calculation would be the $258
24   million multiplied by 1.79 percent times 2,
25   the 2 factor representing the growth of the

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Barclay stock price.
3        Q.    Okay.  And now this $9 million
4    doesn't get paid to former Lehman employees,
5    right?  It gets paid to regulatory authorities
6    around the globe?
7        A.    Yes.
8        Q.    The next entry talks about
9    acquisition buyout vesting over two years.
10          Do you see that?
11       A.    I do.
12       Q.    $53 million.  What is that meant
13   to encompass?
14       A.    As described here, it's a bonus
15   relating to pre-acquisition performance by an
16   individual or individuals that worked for
17   Lehman Brothers and now work for Barclays.
18   These are commitments that we assumed and
19   embodied in contracts in respect of this
20   individual or individuals to deliver this
21   $53 million over the next two years.
22       Q.    Okay.  Now, let's turn back to Mr.
23   Lowitt's contract.
24       A.    Yeah.
25       Q.    Do you see the special cash award

1    P. EXALL - HIGHLY CONFIDENTIAL
2    to be awarded over two years?
3        A.    I do.
4        Q.    Is that this 50 -- part of this
5    $53 million you're talking about?
6        A.    No.
7        Q.    Okay.  So I don't see any other
8    entries here that could be that.  You're
9    saying that he's not one of the recipients of
10   the $53 million that you're talking about
11   here?
12       A.    No, he is not.
13       Q.    Okay.  And who is getting that
14   money?
15          MR. GREEN:  You can go ahead and
16   answer.
17       A.    A gentleman by the name of Mr.
18   Jonathan Hoffman.
19       Q.    And who is he?
20       A.    He is a principal trader in the
21   global markets business at Barclays Capital.
22       Q.    And why is he getting this money?
23       A.    The amount was owed -- was due and
24   payable to him by Lehman Brothers under his
25   contract with Lehman Brothers pre-acquisition.

P. EXALL - HIGHLY CONFIDENTIAL

1        P. EXALL - HIGHLY CONFIDENTIAL
2   Barclays assumed that liability as part of the
3   acquisition process and embodied these amounts
4   of that compensation amongst others in that
5   contract and those amounts are due and payable
6   to him over time as specified in that
7   contract.
8      Q.   Okay.  Now, this is all -- the
9   entire 53 million goes to this one individual?
10     A.   That is correct.
11     Q.   Over a three-year period?
12     A.   He receives two tranches of $20
13   million in February '10 and February '11.  And
14   the additional 13 will effectively be
15   delivered in February of 2010.
16     Q.   Okay.  When I -- just for
17   clarification when it says February '10 that
18   means February 2010?
19     A.   That's correct.
20     Q.   And February '11 means February
21   2011?
22     A.   That is correct.
23     Q.   And maybe you explained this but
24   is this -- what is this to reflect as far as
25   his performance at Lehman?

1        P. EXALL - HIGHLY CONFIDENTIAL
2     A.   He was owed -- under his contract
3   with Lehman Brothers, that was the amount due
4   and payable to him -- well, that is not the
5   entire amount.  But that is the amount
6   included on this spreadsheet.  Well, the
7   entire amount is included on this spreadsheet.
8   There's another element sitting in bonus
9   including social taxes.  The 53 million
10   represents the amount outside of the bonus
11   including social taxes amount and is in
12   respect -- the entire amount is in respect of
13   the contract that he had at Lehman Brothers
14   which guaranteed him a payout on his trading
15   performance.  And the amount relates to the
16   trading performance he did, for want of a
17   better word, pre-acquisition.
18     Q.   Okay.  So this is a con -- he had
19   a contract with Lehman that provided him X
20   amount of compensation based on his trading
21   performance and this number is the amount due
22   and payable to him up to September 22nd, 2008
23   under that contract?
24      MR. GREEN:  Object to the form of
25   the question.

1        P. EXALL - HIGHLY CONFIDENTIAL
2     A.   That's correct.
3      MR. GREEN:  Well, could we go off
4   the record for one second?  Because I
5   think the record is unclear.  Or I can
6   add a clarification.
7      MR. HINE:  You want to add a
8   clarification?
9      MR. GREEN:  But I don't want to
10   testify.
11      MR. HINE:  No, no.  You can take a
12   break.
13      MR. GREEN:  Take a short break.
14      (Recess taken.)
15      MR. HINE:  Let's go back on the
16   record.
17     A.   A clarification of the previous
18   question perhaps is relevant.  The amounts --
19   the amounts payable to Mr. Hoffman were
20   amounts that were due and payable to him under
21   the contract with Lehman Brothers.  And the
22   clarification is they had not as yet at that
23   time been paid to him at all.  They were just
24   due and payable to him.  He hadn't received
25   any of that compensation.

1        P. EXALL - HIGHLY CONFIDENTIAL
2     Q.   So Barclays undertook that
3   obligation to pay him what he was owed by
4   Lehman.
5     A.   That is correct.
6     Q.   Okay.  But in your note here it
7   says bonus relating to performance for one
8   January to 22 September '08.
9      Do you see that?
10     A.   I do.
11     Q.   Then it says but with future time
12   served criteria and a portion linked to future
13   production.
14      What does that mean?
15     A.   I can't -- I'll give you my
16   general interpretation of the terms.  The
17   specific legal interpretation of the
18   forfeiture clauses I can't really speak to all
19   that.
20     Q.   Sure.
21     A.   The intention was to deliver two
22   payments or two tranches of $20 million in
23   each of February 2010 and February 2011.
24   Those payments could be reduced -- each
25   payment could be reduced by up to 10 million

Page 134

P. EXALL - HIGHLY CONFIDENTIAL

1
2    should Mr. Hoffman had made losses in his
3    trading for Barclays Capital post-acquisition.
4          So for all intents and purposes we
5    promised Mr. Hoffman to pay him $20 million.
6    10 million of that 20 -- of each of the 20
7    could be re -- that 20 million could be
8    reduced by up to 10 million should he have
9    made losses for Barclays Capital in the
10   performance period subsequent to the
11   acquisition.
12        Q.   So part of the 53 is based on his
13   performance at Barclays, right?
14            MR. GREEN:  Object to the form.
15        A.   No.  The entire fee is based on
16   his pre-acquisition performance.  The delivery
17   of the residual 53 is to an extent relative to
18   his trading performance at Barclays.
19        Q.   All right.  So am I correct to
20   say -- and how much is at issue with respect
21   to his performance at Barclays?  I thought you
22   said 10 million --
23        A.   10 million of each of the 20 --
24   again, you would need a lawyer to interpret
25   the contract.

Page 135

P. EXALL - HIGHLY CONFIDENTIAL

1
2        Q.   Sure.  Sure.
3        A.   I'm giving you a general
4    intention, and my interpretation personal and
5    it may or may not -- somebody may or may not
6    agree with that or not.  Ten of the 20 -- of
7    each 20 was subject to forfeiture depending on
8    the extent of Mr. Hoffman's loss -- trading
9    loss for Barclay in each of those years.  And
10   the $13 million is also subject to him having
11   made money for Barclays subsequent to his --
12        Q.   So am I correct to say that the 53
13   million is based on his pre-acquisition
14   performance at Lehman but Barclays'
15   willingness to assume that liability is in
16   part based on how well he performs at
17   Barclays?
18            MR. GREEN:  Object to the extent
19       it calls for a legal conclusion.
20        A.   Barclays assumed the entire
21   liability and has structured some terms and
22   conditions around the delivery of that
23   liability.
24        Q.   Well, but that's a modification to
25   the agreement he had at Lehman, right?

Page 136

P. EXALL - HIGHLY CONFIDENTIAL

1
2        A.   The two agreements are distinct
3    and separate.  They're two individual
4    contracts that stand alone.
5        Q.   Okay.  But Barclays assumes a
6    $53 million obligation based on his work prior
7    to the acquisition, right?
8        A.   That's correct.
9        Q.   But Barclays' willingness to pay
10   that is contingent on at least in substantial
11   part on how well he performs for Barclays
12   thereafter, correct?
13        A.   That is correct.  As well as Mr.
14   Hoffman being in employment with Barclays at
15   the time.
16        Q.   Okay.  So he has to stay an
17   employee at Barclays at least through the
18   third payment.
19        A.   I don't know that for certain.
20   Again, I can't interpret the specific leaving
21   clauses or termination clauses under his
22   agreement.  But in general that's -- you know,
23   I would say it's based on future time served
24   criteria as well trading performance.
25        Q.   Okay.  And so is there an

Page 137

P. EXALL - HIGHLY CONFIDENTIAL

1
2    individual agreement with this Mr. Hoffman?
3        A.   Yes, there is.
4        Q.   Okay.  And -- okay.  Is there
5    anything else in this entry of 53 million
6    other than the Mr. Hoffman deal?
7        A.   Nope.
8        Q.   Okay.  I had a follow-up question
9    on the -- you had previously talked about the
10   social tax and the payroll tax in certain of
11   these entries.  Do you remember that?
12        A.   Yes.
13        Q.   And I didn't understand whether
14   you're talking about -- when you have an entry
15   for one of those taxes, are you talking about
16   the withholding obligation of Barclays or
17   Barclays' own obligation to pay those
18   authorities?
19            I don't know if that's a clear
20   question but --
21        A.   No, it's not.
22            MR. GREEN:  Object to the form.
23        Q.   Barclays has an obligation to
24   withhold personal income tax as to certain
25   individuals, right?

Page 138

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    Yes.
3       Q.    So when you have an entry in here
4  on payroll tax, for example, is that -- where
5  it says payroll tax on equity compensation, do
6  you remember that discussion?
7    A.    Yes.
8       Q.    Is that just a withholding tax or
9  is it an obligation of Barclays to pay the tax
10  authorities?
11       MR. GREEN:  Object to the form.
12    A.    I actually don't know the answer
13  to that.  It is a tax that's due and payable
14  to the regulatory authorities.  As to whom
15  that liability relates, I don't know.
16       Q.    Okay.  And would that be the same
17  answer with respect to the social tax up in
18  the bonus entry?
19    A.    Yes.
20       Q.    Okay.
21    A.    What I can say is that the
22  withholding taxes that you referred to that
23  are -- these are the gross amounts payable to
24  those individuals in terms of -- so if I refer
25  again back to Mr. Lowitt's contract, we've got

Page 139

P. EXALL - HIGHLY CONFIDENTIAL

1
2  to pay him a cash advance of $4.56 million.
3  That's a gross amount payable to him.  He in
4  his individual capacity has to pay income tax
5  which we will withhold in entirety.  The
6  entire 4.56 is embodied in the 1,271 cash
7  component effectively.
8       Q.    Okay.  And I don't think I asked
9  you this but if we go to that bonus entry with
10  social tax, do you see that?
11    A.    Yes.
12       Q.    The 1.529 billion.  Could you give
13  me a percentage -- how much of that is the
14  social tax portion and how much is the actual
15  bonus paid to that individual?
16       MR. GREEN:  Object to form.
17       Q.    Gross bonus paid to that
18  individual.
19    A.    I don't have the exact amount but
20  I would categorize it as not significant.
21       Q.    Can you ball park percentages?
22    A.    Crickey.
23       If I had to guess I'd say maybe
24  $50 million.
25       Q.    $50 million?  Okay.  And --

Page 140

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    And the reason I say that -- and,
3  again, not being a payroll professional I
4  can't speak for every social tax that may or
5  may not be payable as part of a payroll.
6       Q.    Sure.
7    A.    But one of the --the only one is
8  the FICA taxes that are payable to the US tax
9  authorities in whichever form that may be.
10  That's -- I know is 1 point something percent.
11  It's a very small percentage.  So I'm basing
12  my estimate on that primarily.
13       I do not believe that that -- if I
14  was to look at that line and if you -- I would
15  categorize that line item as being not
16  significantly material.
17       Q.    Okay.  And there are documents
18  somewhere at Barclays that would specify how
19  much that social tax is with respect to those
20  bonuses?
21    A.    Yes.
22       Q.    Okay.  How about the payroll tax
23  on equity compensation?
24    A.    What's your question?
25       Q.    That's a separate entry so I don't

Page 141

P. EXALL - HIGHLY CONFIDENTIAL

1
2  need to ask that question.  I apologize.  I
3  misunderstood that.
4    A.    Okay.
5       Q.    Okay.  The payroll tax on
6  acquisition buyout, what is that?
7    A.    The $3 million reflected on the
8  schedule, I believe or I understand the
9  calculation to be similar to the one
10  referenced in the payroll tax and equity tax
11  line in compensation of $53 million shown
12  directly above it on the schedule.
13       Q.    So that relates only to Mr.
14  Hoffman's deal with Barclays?
15    A.    That's my understanding.
16       Q.    And that money doesn't get paid to
17  him; it he gets paid to a regulatory
18  authority?
19    A.    That's my understanding.
20       Q.    Can we skip down to ISP awards.
21  Could you explain to me what that is?
22    A.    The acronym?
23       Q.    Yes.
24    A.    The ISP stands for incentive share
25  plan.  It is a stock award program -- it's the

Page 142

1    P. EXALL - HIGHLY CONFIDENTIAL
2    name of the stock award program we have in
3    place at Barclays and which we will utilize to
4    make these relevant awards.
5         Q.    Is this a plan that was in place
6    at Lehman prior to the acquisition?
7         A.    This plan was not in place at
8    Lehman, no. They had similar stock award
9    programs under their own compensation schemes.
10        Q.    Okay. And so what is this
11   $56 million being paid for?
12        A.    Okay. So these -- the $56 million
13   directly relates to the $258,000,000 further
14   up in the Equity column under Bonus Including
15   Social Taxes.
16             The sequence of events was as
17   follows. Under normal Barclays policy stock
18   awards are made in March of every year. So
19   under the normal practice Barclays would have
20   made stock awards to individuals in March of
21   2009 in respect of their 2008 annual bonuses.
22        Q.    Okay.
23        A.    The stock awards for various
24   reasons were made in May 2009. The value of
25   the awards -- well, because of the unforeseen

Page 143

1    P. EXALL - HIGHLY CONFIDENTIAL
2    and unanticipated delay in making the awards
3    to individuals, during that period the stock
4    price at Barclays appreciated substantially
5    and in effect individuals received an amount
6    of stock units of less than what they would
7    have received had the awards been made under
8    the normal process in March 2009 because of
9    the increase in the stock price.
10             The $56 million reflects
11   additional shares awarded to those -- to
12   former Lehman Brothers employees and the
13   awards were not exclusive to former Lehman
14   Brothers employees. This just reflects the
15   component related to former Lehman Brothers
16   employees to compensate them for that loss of
17   value that they had suffered as a result of
18   the normal process not having been followed in
19   that particular year.
20        Q.    So just so I understand why --
21   what caused the delay in the award of the
22   bonus -- of the stock bonuses?
23        A.    I can't speak for the specific
24   reason why. I know there was a delay.
25        Q.    Was it related to the

Page 144

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Barclays/Lehman acquisition?
3         A.    No. Not to my knowledge.
4         Q.    Okay. So this -- if I understand
5    you correctly, this $56 million only relates
6    to stock awards granted to former Lehman
7    employees, right?
8         A.    This $56 million dollars, yes.
9         Q.    All right. And it's to compensate
10   them for the delay in awarding that award from
11   March until May.
12        A.    That's correct.
13        Q.    But aren't the Lehman Brothers
14   employees granted their award back in
15   September?
16        A.    They were given a value, a dollar
17   value of award. When it comes to granting an
18   amount of stock units they get an amount of
19   stock units based on the prevailing share
20   price at the time of the award grant.
21             So they would have received --
22   I'll give you a hypothetical example. An
23   individual would have had $100 worth of stock
24   of value that was to be delivered to him in
25   March of 2009. Assume the stock price in

Page 145

1    P. EXALL - HIGHLY CONFIDENTIAL
2    March 2009 was a dollar. He would have got a
3    hundred shares. Those awards were never made
4    in March. What happened was they were made in
5    May. In May let's assume for argument's sake
6    the stock was $2. He would only have got 50
7    shares. He got -- and he's lost the stock
8    price appreciation he would have got on the
9    hundred shares had he been awarded them three
10   months prior.
11             The $56 million is to compensate
12   him for that loss of value in the respect of
13   the fewer amounts of shares that he ultimately
14   received.
15        Q.    Okay. So it's actually the --
16   it's the value of the appreciation of the
17   stock he would have received from March to
18   May.
19        A.    It's not the entire value. It's
20   to compensate him for that loss of value. I
21   don't believe that the entire value is
22   reflected in this number. It was to
23   compensate him for an extent of that, yes.
24        Q.    Well, here's my question. If he's
25   granted in September $100 worth of stock bonus

Page 146

P. EXALL - HIGHLY CONFIDENTIAL

1
2  he would have gotten a hundred shares in
3  March -- or he would have gotten a hundred
4  shares in March if the price was a dollar
5  using your hypothetical, right?  He would also
6  have gotten his hundred shares in May if he
7  gets 50 shares at $2.  Why --
8          MR. GREEN:  Object to the form.
9      Q.    Well, I'm trying to use your
10  hypothetical.
11      A.    My hypothetical is that he would
12  not have got the hundred shares in May.  He
13  would have only got 50 shares in May.
14      Q.    But it would be worth $2 at that
15  time.
16      A.    That's correct.  The value would
17  have been the same.  But he has lost that.
18  Rewind to March.  If he had been awarded the
19  shares in March he would have a hundred shares
20  worth a dollar.  Those shares by May would
21  have been worth 200 at the stock price of 2.
22      Q.    Okay.
23      A.    You're giving him only a hundred
24  of value in May.
25      Q.    Okay.

Page 147

P. EXALL - HIGHLY CONFIDENTIAL

1
2      A.    That's the difference.
3      Q.    I see.  So this is done not only
4  for the former Lehman employees.  It's also
5  done for all the other Barclays employees who
6  suffered this same type of loss, right?
7      A.    They were granted for the
8  majority -- for other Barclays Capital
9  employees that received stock awards at the
10  time for the most part, yes.
11      Q.    So this is not --
12      A.    This is a subset of a wider
13  population.
14      Q.    This program, this ISP award was
15  not granted to former Lehman employees.  It
16  was granted Barclays wide to those who
17  qualified, right?
18      A.    To my knowledge, it was not
19  granted Barclays wide.  It was Barclays
20  Capital wide.
21      Q.    Okay.
22      A.    I don't -- I can't testify as to
23  if it was that specific, but there were more
24  individuals concerned than this.  I cannot say
25  it was a Barclays wide policy.  I don't know

Page 148

P. EXALL - HIGHLY CONFIDENTIAL

1
2  that to be true.
3      Q.    But it's not a former Lehman
4  employees policy only.
5      A.    Not only, no.
6      Q.    Okay.  So then why is this
7  award -- how is this award related to the work
8  they performed at Lehman?  Because, I mean,
9  basically it's compensating them for a delay
10  in a stock payment while at Barclays.
11          MR. GREEN:  Object to the form.
12      A.    The amount of the award is derived
13  directly from the equity awards that would
14  have been made under the normal course of
15  business.  And insofar as they are related to
16  pre-acquisition service on behalf of Lehman
17  Brothers, these -- the value of these awards,
18  the economic cost of these awards relate to
19  that pre-acquisition service.  It relates to
20  the delivery of the stock component of
21  compensation in many cases embodied in
22  contracts such as Mr. Lowitt's here.  Had they
23  been awarded in the normal course of business
24  in March of 2009.
25      Q.    Okay.  But --

Page 149

P. EXALL - HIGHLY CONFIDENTIAL

1
2      A.    They all relate to the awards
3  embodied -- well, if I take Mr. Lowitt as an
4  example, any additional shares he would have
5  been awarded under that program relate to the
6  2008 EPP recommendations that embodied in his
7  contract and the value thereof.
8      Q.    I understand how they relate to
9  it.  But the award -- isn't it true that the
10  award itself of the ISP is to compensate them
11  for mistakes or whatever problems occurred at
12  Barclays that caused this delay from March to
13  May, right?
14          MR. GREEN:  Object to the form.
15      A.    I can say that the $56 million has
16  nothing to do with post-acquisition service of
17  Barclays PLC.  It has everything to do with
18  the services that they provided
19  pre-acquisition to Lehman Brothers.
20      Q.    I'm not sure you've answered my
21  question.  I understand that the 258 million
22  comes from their pre-acquisition services.
23  But this additional 56 million, isn't it the
24  case, is paid to them because of some mistakes
25  or whatever happened at Barclays that caused

Page 150

P. EXALL - HIGHLY CONFIDENTIAL

1
2  this delay in awarding the bonus, right?
3       MR. GREEN:  Object to the form.
4       A.   It directly relates to the $258
5  million insofar as the $56 million is derived
6  specifically from the $258 million reflected
7  on the schedule.
8       Q.   All right.  I understand how it's
9  derived from the 258 million and I understand
10 how the 258 million is derived from their
11 pre-acquisition work.  But the 56 million is
12 not compensation for pre-acquisition work.
13      MR. GREEN:  Asked and answered.
14 Bill, I think you've asked this question
15 three times and he's given you his
16 answer.
17      MR. HINE:  Well, I'm getting what
18 seems to be an evasive answer.
19      MR. GREEN:  No.  He's given you an
20 answer and it's an entirely appropriate
21 answer and there's no reason to ask it
22 until you get the answer you want.
23      MR. HINE:  All right.  I just want
24 an answer to the last one I asked.
25      MR. GREEN:  Could you repeat the

Page 151

P. EXALL - HIGHLY CONFIDENTIAL

1
2  question?
3       (Record read.)
4       Q.   Is that right?
5       A.   No.  In my personal opinion it is
6  not.  The $56 million would have been
7  valued -- would have accrued to these
8  individuals had they received their stock
9  awards under the normal course of business.
10 It was directly compensation related to
11 pre-acquisition services in relation to Lehman
12 Brothers as derived from the shares that they
13 would have got had the normal course of
14 business been followed.
15      Q.   Okay.  Now, the payroll tax on
16 those awards, what is that?
17      A.   The calculation of those again is
18 an accounting -- is an estimate similar to the
19 one reflected previously on the schedule
20 entitled Payroll Tax on Equity Compensation.
21      Q.   So same method of estimating only
22 now you're estimating it based on 56 million?
23      A.   That's correct.
24      Q.   Okay.  Back to the 56 million for
25 a second.  It says here Additional shares

Page 152

P. EXALL - HIGHLY CONFIDENTIAL

1
2  awarded at 25P.  What does that P mean?
3       A.   Pence.  English pence.  English
4  pounds.
5       Q.   So is that the equivalent of
6  25 percent?
7       A.   Yes.  25 cents on the dollar.
8       Q.   Okay.  So 25 cents on the dollar
9  as measured against the value of a Barclays
10 share from March to May?
11      A.   No.  That's not correct.  So if
12 you related back to the 258 it's roughly a
13 quarter.
14      Q.   Oh, I gottcha.  25 cents on the
15 dollar as compared to the 258 million.
16      A.   That would be correct.
17      Q.   Okay.  And 25 cents is not total
18 compensation for the value increase in
19 Barclays' share but it's a portion of the --
20 it's based on the -- as a portion of the
21 increase in Barclays' share price from March
22 to May?
23      MR. GREEN:  Object to form.
24      A.   I don't recall the loss of value
25 or the notional loss of value.  I don't recall

Page 153

P. EXALL - HIGHLY CONFIDENTIAL

1
2  the exact amounts.  I don't believe it's an
3  exact lack-for-lack replacement.  I can't
4  speak to whether it was more or less but I
5  believe it was less.
6       Q.   Okay.  Substantially less or
7  just --
8       A.   I don't recall.
9       Q.   Okay.  But if I wanted to find
10 that out I would take the share price from
11 Barclays in March and compare it to May?
12      A.   You would think so.  That's not
13 practically how things work.  The stock awards
14 at any point in time are generally based on an
15 average stock price calculated over a number
16 of days in which stock would have been
17 purchased in the market to hedge the awards.
18 So there is a process underpinning
19 it.  There is some math -- there is
20 mathematical calculations behind all this that
21 had been produced.  But you can't simply just
22 take a spot price at a point in time.
23      Q.   I gottcha.
24      Now, if I look at the bottom line
25 it says Total Spend.  Do you see that?

Page 154

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.   I do.
3    Q.   That is -- that's not what
4  Barclays has spent to date, correct?  Because
5  that includes future payment.
6        MR. GREEN:  Object to the form.
7    A.   Not all those cash payments have
8  been made, no.
9    Q.   Okay.  In other words, if I wanted
10  to know the total amount that has been paid to
11  date, I would look up to the $1.543 billion
12  number?
13    A.   On this schedule that would be
14  correct.  I would suspect that on further
15  reconciliation some of the 27 million
16  reflected as severance under the payable in
17  the future may well flip up into the previous
18  category.
19    Q.   Okay.
20    A.   And obviously as time moves on
21  other amounts will.
22    Q.   Well, in the course of working on
23  the compensation for these former Lehman
24  employees are you aware that there's a
25  provision in the APA that required them to be

Page 155

P. EXALL - HIGHLY CONFIDENTIAL

1
2  paid by March 15th of 2009?
3        MR. GREEN:  Object to the form.
4    A.   I've seen the date March 15th,
5  2009.  I'm unsure as to what that obligates
6  Barclays to do or what it doesn't obligate
7  Barclays to do.
8    Q.   Okay.  So, in other words, the
9  March 15th, 2009 date is not something you've
10  been shooting to comply with in the course of
11  compensating these employees?
12        MR. GREEN:  Object to the form of
13  the question.  Are you speaking to him
14  personally?
15        MR. HINE:  Well, he's not paying
16  them.  Barclays is paying them.
17        MR. GREEN:  Okay.  So --
18    Q.   Is the March 15th, 2009 date
19  something that Barclays has taken into
20  consideration when it's paid these employees
21  these various forms of compensation?
22        MR. GREEN:  Object to the form.
23  You may answer if you know.
24    A.   I don't know specifically whether
25  we've taken -- it's a date that we know of.

Page 156

P. EXALL - HIGHLY CONFIDENTIAL

1
2  But I can't answer for the specific wording of
3  your question when you refer to paid.  Can you
4  rephrase that perhaps in some different way?
5    Q.   Yeah, let's try this.  You see the
6  entry for bonuses, bonus including social tax?
7    A.   Excuse me.  Oh, sorry.  On the
8  schedule?
9    Q.   On the spreadsheet.
10    A.   Yes.
11    Q.   Was that all paid or committed by
12  March 19th, 2009?
13    A.   The cash amounts -- certainly I
14  would say the vast majority if not all, but
15  there's always an exception.  People sometimes
16  don't want to be paid at a particular point in
17  time.  Those cash amounts would in the
18  majority have been paid and discharged by that
19  time.
20    Q.   Okay.
21    A.   The equity awards, again, I've
22  explained to you the delay in the award of
23  value -- the award of the amount of shares.
24  But I believe that at the time of bonus there
25  were compensation communications for employees

Page 157

P. EXALL - HIGHLY CONFIDENTIAL

1
2  they would have been aware of the value of
3  that stock.
4    Q.   Okay.
5    A.   As opposed to the amount of units
6  they would receive.  But, again, I'm not
7  specific on the date.
8    Q.   And the delay you talked about was
9  the one you previously mentioned from March to
10  May?
11    A.   That's correct.  In terms of the
12  equity awards, yes.
13    Q.   Any other entries on this
14  spreadsheet that were made before March 15th
15  2008 -- 2009?
16    A.   March 15th?  Sorry?  Could you
17  say that again?  Sorry.  I missed the
18  question.
19    Q.   Were any other entries on this
20  spreadsheet paid before March 15th, 2009?
21        MR. GREEN:  Objection to form.
22  You may answer if you know.
23    A.   Yes.  There entries on the
24  spreadsheet prior to March 15th, 2009.
25    Q.   Like what?

Page 158

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    An example would have been
3    severance payments made to individuals
4    terminated under the RIF, reduction in force
5    program in Q4 2008 and Q1 2009 as one example.
6    Q.    Okay.  Any others?
7    A.    There are likely to be some bonus
8    advances that were made to particular
9    individuals that are included in the 1,271
10   number which is bonus to clean social taxes.
11   They may well have been paid prior to the 15th
12   of March 2009.
13   Q.    Okay.  Any others?
14   A.    Off the -- obviously, the pre-22/9
15   payroll items would have been discharged and
16   paid prior to the 15th of March 2009.
17   Q.    Why?  When were they paid?
18   A.    Well, as I've said to you 5
19   million of the $12 million relate to payrolls
20   that had to be made in September of 2008.
21   Q.    So they were paid in September
22   2008.
23   A.    That's my understanding.
24   Q.    Okay.  And the ex-pat regulatory
25   sum of $7 million, that was --

Page 159

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    I don't know exactly when that was
3    paid.
4    Q.    Okay.  Could you turn to the APA
5    again.  Section 9.1(c).
6    A.    (Witness complies.)
7    Q.    And I know you're not a lawyer and
8    I'm not trying to trip you up here but if you
9    refer to the section where it says -- do you
10   see the sentence about a third of the way down
11   the paragraph that starts, "Any amounts that
12   would have been allocated in respect of any
13   transferred employee who voluntarily
14   terminates employment before such award is
15   made shall instead be allocated among the
16   remaining transferred employees."
17   Do you see that?
18   A.    I do.
19   Q.    Did that ever happen?
20   MR. GREEN:  Objection to form.
21   You can answer if you know.
22   A.    I don't know.  Did what ever
23   happen?
24   Q.    Well, did someone who was supposed
25   to get a bonus, for example, and voluntarily

Page 160

P. EXALL - HIGHLY CONFIDENTIAL

1
2    terminated did the bonus that he was supposed
3    to get thrown back in and get distributed
4    among the remaining transferred employees?
5    A.    I don't know.  I mean, there were
6    people that resigned.
7    Q.    Yeah.
8    A.    And they got nothing as they left.
9    Q.    Okay.  Let me give you a specific
10   question then.
11   MR. HINE:  Let's mark this.
12   (Deposition Exhibit 282B, document
13   bearing production numbers
14   BCI-EX-00113161 through BCI-EX-00113163,
15   marked for identification as of this
16   date.)
17   BY MR. HINE:
18   Q.    Mr. Exall, I'm handing you a copy
19   of an exhibit marked 282B which appears to be
20   a form of employment contract offered to Mr.
21   McDade dated December 18th, 2008.  It has
22   Bates stamps BCI-EX 00113161 through -63.
23   My first question is have you ever
24   seen this document before?
25   A.    I may have seen it.  I don't

Page 161

P. EXALL - HIGHLY CONFIDENTIAL

1
2    recall.
3    Q.    Do you know if Mr. McDade signed
4    this employment contract with Barclays?
5    A.    No, I don't.
6    Q.    You don't know?
7    A.    I don't know.
8    Q.    Okay.  Just as an aside, do you
9    see the date is September 18th, 2008?
10   A.    I do.
11   Q.    Which is prior to the September
12   22nd closing.
13   Do you know how many Barclays
14   employees were offered employment contracts
15   before the closing?
16   A.    Before the 22nd of September?
17   Q.    Yeah.
18   A.    No.  I don't know.
19   Q.    Do you know how I could find that
20   out?  Would Mr. Evans know that?
21   A.    He wouldn't know off the top of
22   his head.  I guess it's a request you could
23   make.  And it could be found out.  It's
24   possible.
25   Q.    Okay.

Page 162

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    We could count contracts.
3    Q.    Do you know if there was any
4  effort to offer employment terms to the --
5  what I've seen called as the Elite 8 or the
6  top eight people at Barclays prior to the
7  closing?
8        MR. GREEN:  Object to the form of
9  the question.  When you say closing what
10  date are you referring to?
11        MR. HINE:  I'm talking about
12  September 22nd, 2008.
13    A.    Sorry.  Could you repeat the
14  question?
15    Q.    Are you aware of any efforts to
16  offer employment or to discuss the terms of
17  employment with former Lehman executives prior
18  to September 22nd?
19    A.    I have no direct knowledge.  I
20  wasn't involved in any negotiations with any
21  of these employees.
22    Q.    Okay.  Have you heard anything
23  about that?
24    A.    I don't recall.
25    Q.    Do you have any understanding

Page 163

P. EXALL - HIGHLY CONFIDENTIAL

1
2  about former Lehman executives who signed
3  employment contracts with Barclays prior to
4  September 22nd, 2008?
5    A.    Do I have any?  Sorry.
6    Q.    Understanding.
7    A.    What does that mean?
8    Q.    Well, do you have any knowledge
9  that, for example, Mr. Lowitt signed his
10  contract before the closing?
11    A.    I've never examined the contracts
12  in that respect, no.
13    Q.    Well, I didn't ask you if you
14  examined the contracts.  Do you have any
15  understanding about whether any of the senior
16  executives at Lehman were signed up by
17  Barclays before the closing?
18    A.    I don't know.
19    Q.    Okay.  Back to Mr. McDade's --
20    A.    Okay.
21    Q.    Whether he signed it or not I'm
22  not really sure, but my question is you'll see
23  in this document it refers to a cash bonus of
24  2008, right?  A 2008 EPP recommendation.
25        Do you see that?

Page 164

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    I see that.
3    Q.    Do you see the special cash award?
4    A.    I do.
5    Q.    Now, did Mr. McDade -- Mr. McDade
6  resigned, correct?
7    A.    I don't know how -- I don't know
8  the circumstances around Mr. McDade's joining
9  or not or leaving or not from Barclays.
10    Q.    You don't know whether he was
11  terminated for cause or without cause.
12    A.    I have no knowledge of his
13  arrangements, no.
14    Q.    Okay.  Do you have any knowledge
15  of any individual that was supposed to be
16  offered awards like this who then left and my
17  question is what happened to that award money?
18        MR. GREEN:  Object to the form.
19    A.    I don't understand the question.
20    Q.    Well, if you look back at 9.1(c)
21  it purports to say -- it appears to say that
22  their award money should go back into the pool
23  and be shared among the all the transferred
24  employees and my question is did that in fact
25  ever happen?

Page 165

P. EXALL - HIGHLY CONFIDENTIAL

1
2        MR. GREEN:  Objection to form.
3  Calls for a legal conclusion.
4    A.    I don't know what Section 9.1(c)
5  obligates Barclays to do so I can't answer
6  that question.
7    Q.    Okay.  You don't know one way or
8  the other?
9    A.    I don't have an opinion on that.
10    Q.    Okay.  If you skip down further in
11  that paragraph, 9.1(c), you'll see it starts
12  with the word "however" and then from there to
13  the end of the paragraph it talks about a
14  circumstance where perhaps more than
15  10 percent of the transferred employees
16  voluntarily terminate.
17        Do you see that?
18    A.    I do.
19    Q.    Am I safe to assume that that did
20  not happen in connection with the
21  Barclays/Lehman transaction?
22        MR. GREEN:  I just want to caution
23  the witness to read the exact language
24  you're referring to.
25    Q.    It says, "However, the accrued '08

Page 166

P. EXALL - HIGHLY CONFIDENTIAL

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   FY liability shall be reduced if..."
 3            MR. GREEN:  All the way to the end
 4   of the paragraph?
 5            MR. HINE:  Yes.
 6            MR. GREEN:  Okay.  Take your time
 7   to read that.
 8        Q.   Take your time to read that but my
 9   question is did that ever happen or are you
10   aware of that clause ever being invoked or
11   that many people ever left.  So just take your
12   time to read it.
13            MR. GREEN:  Object to the form
14   before he answers the question.
15            (Document review.)
16        A.   I can't speak for the obligations
17   that this places upon Barclays.  I don't know
18   what those are.  I can't interpret it.
19            Perhaps I can answer in a
20   different way.  I don't know what it means by
21   voluntarily terminated.  That would be my
22   question.  I don't know what exactly you're
23   asking me to answer.
24        Q.   Well, I understand you're not a
25   lawyer and I'm not trying to ask for any legal
```

Page 167

P. EXALL - HIGHLY CONFIDENTIAL

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   interpretation.  Is it correct to say that in
 3   the course of your employment in your present
 4   position you haven't heard anyone say, Oh,
 5   more than 10 percent of the people left, we
 6   should reduce the bonus pool?
 7            MR. GREEN:  Object to form.
 8        Q.   Or words to that effect?
 9        A.   No one has said that to me, no.
10        Q.   Okay.  Did you understand that
11   anyone was ever considering that?
12        A.   My understanding is that this is a
13   clause in the APA and people are aware of it
14   and relevant people know what that means.  It
15   is a consideration.  It has been considered.
16   I do know that.
17        Q.   But did more than 10 percent of
18   the employees voluntarily terminate?
19            MR. GREEN:  Object to form.
20        A.   I can't answer -- I can't give you
21   a factual answer because I don't know the
22   extent to which -- I don't know what you're
23   defining as voluntary termination.  Perhaps
24   that means resignation.  I don't know what
25   this actually refers to.  I've never heard
```

Page 168

P. EXALL - HIGHLY CONFIDENTIAL

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   someone -- I've never personally heard someone
 3   say that the section of the clause would
 4   apply.
 5        Q.   Okay.  And you don't have -- in
 6   your experience working in the compensation
 7   field you don't have an understanding of what
 8   voluntarily terminate means?
 9        A.   If you're asking for what I
10   understand by voluntarily termination I can
11   give you my view, my personal view, and that
12   may be different than the interpretation of
13   the APA or the position taken by Barclays.
14            My view is that that refers to
15   voluntary resignations by former Lehman
16   Brothers employees that decided
17   post-acquisition that they no longer wanted to
18   be employed by Barclays Capital and hence
19   resigned.
20        Q.   Okay.  And in your view did more
21   than 10 percent of the transferred employees
22   do that?
23        A.   I would like to -- well, I don't
24   know the exact number or the exact proportion.
25   I would -- I'd leave it at that.  I don't know
```

Page 169

P. EXALL - HIGHLY CONFIDENTIAL

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   the exact number or exact proportion but --
 3   leave it at that.
 4        Q.   Is it your sense that more than
 5   10 percent have resigned?
 6            MR. GREEN:  Object.  Calls for
 7   speculation.
 8        A.   If you want me to speculate I
 9   will.  I will speculate that not more than
10   10 percent had voluntarily resigned under
11   these -- post-acquisition.
12        Q.   Okay.  Fair enough.  Thank you.
13        A.   I mean there would be other points
14   in time.  That's not to say that in the future
15   that if you aggregated it all up --
16        Q.   Sure.
17        A.   Right?
18        Q.   But you're speaking as of today.
19        A.   I'm speaking as of today.  To the
20   best of my knowledge, yes.
21            MR. GREEN:  Speculating as of
22   today, I might add.
23        A.   Speculating as of today, that's
24   correct.
25            MR. GREEN:  To the best of your --
```

Page 170

P. EXALL - HIGHLY CONFIDENTIAL

1
2       A.   To the best of my speculation.
3       Q.   Is it fair to say you don't have
4   any personal knowledge or understanding about
5   the circumstances of Mr. McDade leaving?
6       A.   No direct knowledge, no.
7       Q.   Do you have any indirect
8   knowledge?
9       A.   I don't know how or under what
10  circumstances he left, no.
11      Q.   Do you know how or under what
12  circumstances he received any compensation
13  from Barclays?
14      A.   I don't believe he received any
15  compensation from Barclays.  I don't know that
16  for fact.  But that is my general
17  understanding.
18      Q.   Okay.  Well let me introduce this
19  as an exhibit and maybe it will prompt a
20  further question.
21          (Deposition Exhibit 283B, document
22      bearing production number
23      BCI-EX-00113194, marked for
24      identification as of this date.)
25

Page 171

P. EXALL - HIGHLY CONFIDENTIAL

1
2   BY MR. HINE:
3       Q.   Mr. Exall, I'm handing you a copy
4   of a document marked as Exhibit 283B which
5   appears to be a W-2 statement in connection
6   with -- issued by Barclays to Mr. McDade and
7   my only question is whether this provides any
8   assistance to you in trying to figure out
9   whether Barclays paid Mr. McDade anything.
10          MR. GREEN:  Object to the form of
11      the question.  The document speaks for
12      itself.
13          MR. HINE:  Okay.
14          MR. GREEN:  Are you asking does it
15      refresh his recollection?
16          MR. HINE:  Yes.
17      A.   I've never seen this document.
18      Q.   Do you know why Mr. McDade was
19  paid anything if at all by Barclays?
20      A.   I have no idea.  As I've said
21  before, I have no knowledge of his
22  arrangements.
23      Q.   Fair enough.
24          (Deposition Exhibit 284B, document
25      bearing production numbers

Page 172

P. EXALL - HIGHLY CONFIDENTIAL

1
2       BCI-EX-(S)00027190 through
3       BCI-EX-(S)00027197, marked for
4       identification as of this date.)
5   BY MR. HINE:
6       Q.   Mr. Exall, I've handed you a copy
7   of a document marked as Exhibit 284B which is
8   an e-mail dated September 23rd and the
9   attachment thereto is Bates stamped
10  BCI-EX-00027719 through -197.  And my first
11  question after you've had a chance to review
12  it is have you ever seen this document before.
13      A.   Yes, I have this.
14      Q.   Could you explain to me what this
15  is?
16      A.   As explained on the front page, an
17  e-mail from Mr. Evans.  It represents an
18  update of our present bonus and related spend
19  in respect of the commitments we have made to
20  former Lehman employees as part of the
21  acquisition.
22      Q.   All right.  So I see several
23  iterations of this.  Is this a periodically
24  prepared analysis?
25      A.   Yes.  This was a set of

Page 173

P. EXALL - HIGHLY CONFIDENTIAL

1
2   analysis -- or this was an analysis prepared
3   daily for the purposes of the Executive
4   Committee of Barclays Capital for a certain
5   period following the acquisition.
6       Q.   Is it still prepared daily?
7       A.   No.
8       Q.   So this is -- immediately
9   following the acquisition this is a daily
10  summary?
11      A.   That's correct.
12      Q.   And how long did those summaries
13  go?  Do you know?
14      A.   I don't --
15          MR. GREEN:  Object to the form.
16      A.   I don't recall when we ceased
17  producing them.  I can't recall.
18      Q.   Who prepared these?
19      A.   I prepared the original one
20  personally drawing on work done by several HR
21  colleagues.  Thereafter individuals in my team
22  prepared the document and distributed it to
23  Mr. Evans for distribution.
24      Q.   Okay.  So do you have any way of
25  knowing whether you prepared this particular

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x

     In Re:                    Chapter 11

5    LEHMAN BROTHERS            Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,    (Jointly Administered)

6    ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9      VIDEOTAPED DEPOSITION OF ALVIN H. BROWN

10            New York, New York

11          Friday, January 8, 2010

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 27031

22

23

24

25

Page 6

1        A. BROWN - HIGHLY CONFIDENTIAL
2    Creditors Committee.
3        MS. LEE:  Shinzong Lee from
4    Simpson Thacher.
5        MR. ROTHMAN:  Seth Rothman from
6    Hughes Hubbard on behalf of the SIPA
7    Trustee.
8        MR. THOMAS:  And let me just note
9    that this is part two of a 30(b)(6)
10   deposition of Simpson Thacher as opposed
11   to an individual deposition of the
12   witnesses.
13            *  *  *
14   A L V I N   B R O W N,  called as a witness,
15   having been duly sworn by a Notary
16   Public, was examined and testified as
17   follows:
18   EXAMINATION BY
19   MR. THOMAS:
20       Q.   Mr. Brown, good afternoon.
21       A.   Good afternoon.
22       Q.   Would you please state your full
23   name?
24       A.   Alvin Howard Brown.
25       Q.   And have you been deposed before?

TSG Reporting - Worldwide    877-702-9580

Page 7

1        A. BROWN - HIGHLY CONFIDENTIAL
2        A.   I have.
3        Q.   So you understand how this process
4    works.  If at any point you're not sure what
5    question I'm asking, please ask me to
6    rephrase.  I'll be happy to try.
7        A.   Yes.
8        Q.   Do you understand you've been
9    designated by Simpson to be the 30(b)(6)
10   witness on a couple of topics here today?
11       A.   Yes.
12       Q.   And those topics include generally
13   the compensation and cure liabilities assumed
14   by Barclays and the employment offered to
15   Lehman executives by Barclays.
16       A.   I just didn't understand -- after
17   "compensation" what was the next word that
18   you --
19       Q.   Cure payments, liabilities.
20       A.   Okay.
21       Q.   We'll work through it and see how
22   we do.
23       A.   Fine.
24       Q.   How long have you been with
25   Simpson?

TSG Reporting - Worldwide    877-702-9580

Page 8

1        A. BROWN - HIGHLY CONFIDENTIAL
2        A.   Since May of 1983.  So about 26
3    years.
4        Q.   And what is your area of practice?
5        A.   I'm the head of the Executive
6    Compensation and Employee Benefits Group at
7    the firm.
8        Q.   And when was the first time you
9    became involved in the Lehman/Barclays
10   transaction?
11       A.   September of 2008.  It was after
12   Labor Day.  I don't -- I don't remember the
13   exact date.
14       Q.   And had you worked previously for
15   or with Lehman Brothers?
16       A.   During the course of my time at
17   Simpson?
18       Q.   Yes.
19       A.   Yes.
20       Q.   Had they been a regular client of
21   the firm for many years?
22       A.   Yes.
23       Q.   And can you describe what work you
24   have done for Simpson over the years?  You
25   personally?

TSG Reporting - Worldwide    877-702-9580

Page 9

1        A. BROWN - HIGHLY CONFIDENTIAL
2        A.   For Simpson?
3        Q.   Or excuse me.  For Lehman.  What
4    work have you done for -- on behalf of Lehman
5    while at Simpson?
6        MR. AMER:  Do you mean in very
7    general terms?
8        MR. THOMAS:  Yes.
9        A.   Actually, my involvement was in my
10   early years at Simpson generally and I
11   addressed some questions related to ERISA or
12   compensation.  But hadn't worked with them for
13   years until this.
14       Q.   And when this came up, the
15   transaction with Barclays, why were you
16   brought into the matter?
17       A.   Because my partner in the group
18   had a personal issue conflict that he couldn't
19   be available for the weekend that was going to
20   be relevant and I was asked to step in.
21       Q.   Do you recall the week that Lehman
22   Brothers Holding filed bankruptcy being
23   roughly September 15th?  Is that consistent
24   with your recollection?
25       A.   Yeah.  That's consistent.

TSG Reporting - Worldwide    877-702-9580

## Page 10

A. BROWN - HIGHLY CONFIDENTIAL
1
2  Q.   And do you recall whether you were
3  over -- physically went over to Lehman
4  Brothers' building on that Monday after the
5  filing?
6  A.   Yes.
7  Q.   And you spent a good part of the
8  day there?
9  A.   Yes.
10  Q.   And what were you doing there?
11  A.   Negotiating the benefit provisions
12  of an acquisition agreement.
13  Q.   And can you elaborate a little
14  more on the benefit provisions, what precisely
15  you mean?
16  A.   There were provisions in the
17  agreement that related to the treatment or
18  handling of the employees of the Lehman
19  entities.  And I was addressing those issues
20  along with two partners from Weil Gotshal.
21  Q.   And who were they?
22  A.   Andy Gaines and Amy Rubin.
23  Q.   And did you continue to work on
24  those issues through the week or just for a
25  couple of days, or do you recall?

TSG Reporting - Worldwide   877-702-9580

## Page 11

A. BROWN - HIGHLY CONFIDENTIAL
1
2  A.   My recollection, yes, but
3  intermittently.
4  Q.   So through the time of closing?
5  A.   Really, after the agreement was
6  signed my involvement was pretty attenuated.
7  Q.   And by agreement, are you
8  referring to the original executed APA?
9  A.   Correct.
10  Q.   Let me go ahead and show you this.
11  I might refer to it later.  It was previously
12  marked as Exhibit 1.  Take a moment and review
13  and just confirm whether that's the agreement
14  that you were involved in negotiating and
15  drafting.
16  A.   I mean the title of it is the same
17  title as the agreement.  You know, without --
18  I'm assuming that if it is, it is the one that
19  I worked on.
20  Q.   If you would --
21  A.   It's certainly the same title.
22  Q.   Sure.  And if you'd flip to
23  Section 9.
24  A.   (Witness complies.)
25  Q.   Are those sections or issues some

TSG Reporting - Worldwide   877-702-9580

## Page 12

A. BROWN - HIGHLY CONFIDENTIAL
1
2  of the sections and issues that you worked on?
3  A.   Yes.
4  Q.   Let's put that aside for a second.
5  And let me show you a document -- we'll refer
6  back to that in a minute.  But let me show you
7  a document marked Exhibit 489 which is the
8  LBHI board minutes.
9  (Document review.)
10  Q.   Let me start by asking if you
11  recognize the document itself.
12  A.   Only because it's identified.  But
13  I'm not sure.
14  Q.   Have you had occasion to read this
15  document before?
16  A.   I have read it in connection with
17  preparing for this deposition.
18  Q.   Okay.
19  A.   I'm not sure I saw it before that.
20  But I...
21  Q.   Do you recall attending this board
22  meeting described here?
23  A.   Yes.
24  Q.   And you're listed as a present on
25  the first page.

TSG Reporting - Worldwide   877-702-9580

## Page 13

A. BROWN - HIGHLY CONFIDENTIAL
1
2  Do you see that?
3  A.   Yes.
4  Q.   If you would turn, please to page
5  number 3 of this document.
6  A.   (Witness complies.)
7  Q.   The second paragraph reads, "Mr.
8  Roberts -- " do you understand that to be a
9  Weil Gotshal lawyer?
10  A.   I don't remember who he was with.
11  Q.   Okay.
12  It reads, "Mr. Roberts resumed by
13  describing that it is a condition to the
14  transaction that eight specific firm employees
15  enter into employment agreements with
16  Barclays.  He stated that Mr. McGee was one of
17  those employees, so interested firm employees
18  were involved in the transaction negotiations
19  on behalf of the team."
20  Do you see that?
21  A.   Yes.
22  Q.   And so Simpson was aware at the
23  time the deal was being negotiated that
24  members of Lehman negotiating the deal were at
25  the same time negotiating employment

TSG Reporting - Worldwide   877-702-9580

Page 14

A. BROWN - HIGHLY CONFIDENTIAL
1
2  agreements with Barclays, correct?
3      MR. HINE:  Object to the form.
4      A.    Well, I'm not sure -- from your
5  question I'm just not -- you said Simpson was
6  aware?
7      Q.    Yes.  Simpson Thacher.
8      A.   I was aware.
9      Q.    Good enough.
10     A.   Okay.
11     Q.    And you're the firm designee on
12  this issue.
13     A.   Okay.
14     Q.    Do you recall that being raised in
15  the -- in a board minute, a discussion of the
16  fact that certain employees, Lehman employees
17  who were negotiating a transaction were at the
18  same time negotiating for future employment
19  and bonus agreements with Barclays?
20     MR. HINE:  Object to the form.
21  A.   No.  No.  Not --
22     Q.    You don't recall that?
23     A.   I don't recall that being a point
24  of discussion in the form you just asked me.
25     Q.    Okay.  Do you recall that it was

TSG Reporting - Worldwide    877-702-9580

Page 15

A. BROWN - HIGHLY CONFIDENTIAL
1
2  described to the board that interested firm
3  employees were involved in transaction
4  negotiations on behalf of LBHI?
5      A.   Yes.
6      Q.    And at the last paragraph on this
7  page do you see where it says "Mr. Brown of
8  Simpson Thacher & Bartlett reported on the
9  employee benefits aspect of the proposed sale
10  agreement.  He..." being yourself "...reported
11  that the firm proposed post-closing covenants
12  to protect employee benefits but that the only
13  commitment Barclays would make is to keep
14  severance levels in place for the balance of
15  the calendar year."
16      Do you see that?
17     A.   Yes.
18     Q.    The reference to employee benefits
19  and the keeping of severance levels in place
20  for the balance of the calendar year, is that
21  issue described in Section 9 of the original
22  APA, Exhibit 1?
23     A.   Yes.
24     Q.    It goes on.  Further down in the
25  paragraph, it says, "Mr. Brown described the

TSG Reporting - Worldwide    877-702-9580

Page 16

A. BROWN - HIGHLY CONFIDENTIAL
1
2  draft employment letters for eight specific
3  former employees which are a condition to the
4  deal.  He described that draft employment
5  letters provide for at-will employment for a
6  period of time with salary and guaranteed cash
7  bonus and a retention award."
8      Is that an accurate summation of
9  your description to the board?
10     A.   Based on my recollection, yes.
11     Q.    And did you actually review the
12  employment agreements of those individuals?
13     A.   No.
14     Q.    How did you know about the terms
15  of the agreements?
16     A.   I saw a draft of the form of
17  letter.  But not the actual completed letters
18  for the individuals.
19     Q.    And the form of the letter made
20  clear that salary and guaranteed cash bonus
21  and retention award were being provided?
22     A.   You know, at this point I don't
23  recall.  But...
24     Q.    You have no reason to believe this
25  description's inaccurate.

TSG Reporting - Worldwide    877-702-9580

Page 17

A. BROWN - HIGHLY CONFIDENTIAL
1
2  A.   I do not.
3      Q.    So in any event you and presumably
4  others at Simpson were aware of the fact that
5  people -- at least some of the people
6  negotiating the deal on behalf of LBHI were at
7  the same time being offered employment with
8  Barclays including salary, guaranteed cash
9  bonus and retention awards?
10     MR. HINE:  Object to the form.
11     MR. AMER:  Objection to the form
12  of the question.  You can answer.
13     A.   Yes.
14     Q.    If you would turn to page 4,
15  please.
16     A.   (Witness complies.)
17     Q.    The last paragraph reads, "The
18  directors asked questions about the sale and
19  license-back of the Lehman Brothers name and
20  the ability to solicit firm employees if the
21  deal does not go forward, and the fact that
22  Barclays will have already signed up
23  approximately 200 of the firm's employees."
24      Do you recall that the -- Barclays
25  was concerned about being able to retain the

TSG Reporting - Worldwide    877-702-9580

## Page 18

A. BROWN - HIGHLY CONFIDENTIAL

1       A. BROWN - HIGHLY CONFIDENTIAL

2 firm's employees which they were going to be

3 buying?

4    A.   Yes.

5    Q.   And did that make sense to you in

6 this environment that Barclays was concerned

7 that they were essentially buying the

8 business, that they be able to retain the

9 Lehman employees that made up the business?

10      MR. HINE:  Object to the form.

11    A.   Yes.

12    Q.   Let me show you a document that

13 we'll mark as Exhibit 531.

14      (Deposition Exhibit 531, document

15      bearing production number STB 09661,

16      marked for identification as of this

17      date.)

18 BY MR. THOMAS:

19    Q.   And let me know when you've had a

20 chance to review it.

21      (Document review.)

22    A.   Okay.

23    Q.   Do you recognize this as an e-mail

24 from yourself to a couple people at Lehman and

25 other Simpson attorneys dated September 17th,

TSG Reporting - Worldwide      877-702-9580

## Page 19

A. BROWN - HIGHLY CONFIDENTIAL

1       A. BROWN - HIGHLY CONFIDENTIAL

2 2008?

3    A.   Yes.

4    Q.   And in here you write in part in

5 the second paragraph, "I wanted to be sure

6 that you knew that I would be happy to speak

7 to you or any of the Big 8 or other senior

8 executives as they worked through the

9 employment letters or other arrangements with

10 Barclays."

11      Do you see that?

12    A.   I do.

13    Q.   Do you recall if you ever ended up

14 doing further work in terms of the substance

15 of the employment letters?

16    A.   I -- yes.

17    Q.   And did you?

18    A.   No.

19    Q.   Turning back to the original APA

20 and that Section 9.  Section 9.1.  Is it fair

21 to say that Section 9.1 addresses two types of

22 employment -- employee benefits; one involving

23 severance payments and one involving bonus

24 payments?

25    A.   Could you repeat the question?

TSG Reporting - Worldwide      877-702-9580

## Page 20

A. BROWN - HIGHLY CONFIDENTIAL

1       A. BROWN - HIGHLY CONFIDENTIAL

2    Q.   Sure.  Within Section 9.1 which is

3 Employment Benefits there's both an assumed

4 liability by the purchaser in terms of

5 severance and bonus payments, correct?

6      MR. HINE:  Object to the form.

7      MR. AMER:  You can answer.

8    A.   Yes.

9    Q.   Do you know if there was ever any

10 effort to calculate that liability?

11    A.   I don't recall.

12    Q.   Do you have any recollection of a

13 $2 billion number?

14    A.   Yes.

15    Q.   Is it your recollection that $2

16 billion number was someone's estimate of

17 potential liability under Section 9.1?

18      MR. HINE:  Object to the form.

19    A.   Yes.  But not with respect to the

20 section that you just were referencing.  The

21 $2 billion number really related to subsection

22 C.

23    Q.   Do you recall ever seeing it on

24 a -- where do you recall seeing the $2 billion

25 number?

TSG Reporting - Worldwide      877-702-9580

## Page 21

A. BROWN - HIGHLY CONFIDENTIAL

1       A. BROWN - HIGHLY CONFIDENTIAL

2    A.   It was on a schedule.

3    Q.   And did the schedule have a

4 separate line item for severance?

5    A.   I don't recall.

6    Q.   And do you know who calculated the

7 $2 billion figure?

8    A.   I do not.

9    Q.   Were you involved in that process

10 in any way?

11    A.   In calculating the number?

12    Q.   Yes.

13    A.   No.

14    Q.   Do you have any understanding what

15 it entailed specifically?

16    A.   Yes.

17    Q.   And -- let me go ahead and show

18 you a document we'll mark as 532.

19      (Deposition Exhibit 532, document

20      bearing production number LBHI 013444

21      with attached spreadsheet, marked for

22      identification as of this date.)

23    A.   Okay.

24    Q.   Have you ever seen this document

25 before?

TSG Reporting - Worldwide      877-702-9580

1    A. BROWN - HIGHLY CONFIDENTIAL
2    A.    No.
3    Q.    Let me ask you to take a moment to
review the attachment to the e-mail.
5    A.    The attachment to --
6    Q.    The cover is an e-mail --
7    A.    Oh, I see.  Okay.  Sorry.
8    Q.    The cover is an e-mail from Kelly
9    Martin to Richard Krasnow, an attorney at Weil
10    Gotshal, dated September 18th, 2008.
11    A.    Right.
12    Q.    The spreadsheet attachment, do you
13    recall whether as part of your work with
14    respect to the Barclays sales transaction, you
15    ever reviewed sheets like this?
16    A.    Yes.
17    Q.    And did you?
18    A.    Yes.  But not this one.
19    Q.    How do you -- how are you certain
20    a year later that it's not this one?
21    A.    I've just never seen it before.
22    Q.    Did you see a lot of spreadsheets?
23    A.    No.  Well, in this transaction?
24    No.
25    Q.    Have you seen more than one?

1    A. BROWN - HIGHLY CONFIDENTIAL
2    A.    Not that I recall.
3    Q.    When you say spreadsheet, are you
4    referring to just a one-page schedule?
5    A.    Correct.
6    Q.    You never saw any of the backup as
7    to how that schedule was built up?
8    A.    (Witness shakes head.)
9    MR. AMER:  You have to answer.
10    THE WITNESS:  Oh.
11    A.    No.
12    Q.    If you would look at the last page
13    of this document under the Liabilities column,
14    do you see the fourth section there, Payables?
15    A.    Yes.
16    Q.    And do you see Compensation
17    Payable?
18    A.    Yes.
19    Q.    And do you see that there was a
20    transaction adjustment to that payable?
21    A.    Yes.
22    Q.    Were you aware at the time that
23    there was a transaction adjustment to the
24    estimate for compensation payables?
25    A.    Not that I recall.

1    A. BROWN - HIGHLY CONFIDENTIAL
2    Q.    You don't recall having
3    discussions with Weil Gotshal lawyers about
that issue?
5    A.    No.
6    Q.    Do you have an understanding of
7    why there would be a transaction adjustment?
8    MR. GATTO:  Object to the form of
9    the question.
10    Q.    To the compensation payable.
11    MR. AMER:  Same objection.  Since
12    he doesn't recall there being an
13    adjustment.
14    A.    No.  I mean...
15    Q.    Do you have any knowledge as to
16    whether this line item, Compensation Payable,
17    includes severance?
18    A.    No.
19    Q.    Do you know whether Lehman pays a
20    larger or smaller percentage of its yearly
21    bonuses as cash than Barclays does?
22    MR. AMER:  Object to the form of
23    the question.
24    A.    I don't recall.
25    Q.    Do you know whether the $2 billion

1    A. BROWN - HIGHLY CONFIDENTIAL
2    figure you're referring to was adjusted in
3    order to allow for the fact that Barclays pays
4    a higher percentage of cash compensation?
5    MR. HINE:  Object to the form.
6    A.    No.
7    Q.    Do you understand whether there
8    was any adjustment to the figure in order to
9    cover the entire Lehman fiscal year for the
10    compensation amounts due?
11    MR. HINE:  Object to the form.
12    A.    No.
13    Q.    Do you have any understanding of
14    where that $2 billion figure came from or how
15    it was calculated?
16    A.    Yes.
17    Q.    Can you tell me.
18    A.    My understanding was that that was
19    the number for the accrued bonuses for the
20    Lehman employees for that year.  It had been
21    agreed to and was put on the schedule.
22    Q.    And where did that understanding
23    come from?
24    A.    I don't -- it was from one of the
25    participants or part of the team that was

Page 26

A. BROWN - HIGHLY CONFIDENTIAL

1
2   involved in negotiating but I don't recall
3   specifically who it was.
4       Q.   Do you recall which party it was
5   from?
6       A.   No.
7       Q.   Is this something that you
8   actually recall from a year and a half ago or
9   is it something that you've learned in
10  preparation for this deposition?
11      MR. HINE:  Well, hold on.  Before
12  you answer that --
13      MR. THOMAS:  That's a timing
14  question.  That can't be privileged.
15      MR. HINE:  I'm cautioning him not
16  to reveal privileged information he
17  might have learned after September 30th.
18  We have a waiver here.  So if your
19  answer entails something that you
20  learned after September 30th you're not
21  allowed to waive the privilege.
22      A.   I'm not -- could you repeat the
23  question because I'm not sure --
24      Q.   Your understanding about this $2
25  billion figure, is this an actual recollection

TSG Reporting - Worldwide    877-702-9580

Page 27

A. BROWN - HIGHLY CONFIDENTIAL

1
2   of yours from a year and a half ago or is it
3   something you've come to understand more
4   recently in connection with this deposition?
5       MR. HINE:  Same warning.
6       A.   When you say my understanding of
7   this, I mean, what I told you was my
8   understanding and I really hadn't had
9   discussions that changed that since then.
10      Q.   So this is based on your
11  recollection from a year ago.
12      A.   My recollection.
13      Q.   Now, what did you do to prepare
14  for today's deposition?
15      A.   I met with my counsel.
16      Q.   Anything else?
17      A.   Actually, no.
18      Q.   If -- so turning back to the --
19  Section 9.1 of the original APA did you draft
20  this language in any part of the 9.1?
21      A.   Yes.
22      Q.   Which portions did you draft?
23      A.   That I can't recall.
24      Q.   Were you the original drafter?
25      A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 28

A. BROWN - HIGHLY CONFIDENTIAL

1
2       Q.   Do you know who was?
3       A.   Somebody at Cleary.  I dealt with
4   Arthur Cohen who's a partner at Cleary but I
5   don't -- the draft came originally to me and
6   my understanding was it had been drafted by
7   Cleary and then I marked it up.
8       Q.   Do you recall any changes you made
9   to (b) or (c)?  Section (b) or (c) of 9.1.
10      A.   I don't recall the specifics.
11      Q.   Okay.  Is it your under -- let's
12  say that after Barclays -- the Barclay
13  transaction was consummated 90 percent of the
14  employees were severed.  Barclays would have
15  to pay severance for those employees, correct,
16  pursuant to 9.1(b)?
17      MR. AMER:  Objection to the form
18  of the question.
19      Q.   9(c).  Strike that.
20      If Barclays -- under 9.1 Barclays
21  would have to pay severance payments to
22  employees severed prior to the end of the
23  year; is that correct?
24      A.   Correct.
25      Q.   And if there were a lot of

TSG Reporting - Worldwide    877-702-9580

Page 29

A. BROWN - HIGHLY CONFIDENTIAL

1
2   severances -- strike that.
3       And you know if that would involve
4   paying those employees all of their accrued
5   2008 bonus money.
6       A.   Yes.
7       Q.   So there's potentially a lot of
8   assumed liability by taking on that severance
9   obligation; is that correct?
10      MR. HINE:  Objection.
11      A.   Correct.  Yes.
12      Q.   Is it your belief that if Barclays
13  had terminated 90 percent of the employees,
14  that the remaining 10 percent of the employees
15  would have to get paid $2 billion?
16      MR. ROTHMAN:  Objection to the
17  form.
18      MR. HINE:  Same objection.
19      MR. AMER:  You can answer.
20      A.   No.  That's not my understanding.
21  Or my belief.
22      Q.   In that event if that -- in that
23  scenario, would some of the $2 billion be sent
24  to pay bonuses to the retained employees and
25  severance to the severed employees?

TSG Reporting - Worldwide    877-702-9580

1      A. BROWN - HIGHLY CONFIDENTIAL
2          MR. HINE:  Object to the form.
3      A.   Well -- no.  I mean, I --
4          MR. AMER:  If you don't understand
5      the question tell him.
6      A.   Yeah.  Can you repeat the
7      question?
8      Q.   Sure.  There's $2 billion we've
9      referred to.
10     A.   Right.
11     Q.   And I think you've said that if
12     90 percent of the employees are severed you
13     wouldn't have to pay the whole $2 billion to
14     the remaining 10 percent for bonuses.  My
15     question is wouldn't some of the $2 billion
16     under your -- under the section here be going
17     to pay the accrued bonuses of those severed?
18     A.   Yes.
19         MR. HINE:  Object to the form.
20     A.   As well as severance.
21     Q.   Okay.  So the $2 billion includes
22     both bonus and severance?
23         MR. HINE:  Object to form.
24         MR. KAY:  Objection.
25     A.   No.
       TSG Reporting - Worldwide      877-702-9580

1      A. BROWN - HIGHLY CONFIDENTIAL
2      Q.   Can you explain?
3      A.   Yes.  The bonus -- in order to
4      prevent people from being terminated and
5      deprived of their bonus, the arrangement was
6      that if they were terminated they would
7      receive their accrued bonus and they would be
8      paid severance under the severance
9      arrangements so that the $2 billion -- if
10     90 percent of the people were terminated and
11     they represented 90 percent of the bonus pool,
12     they would be paid the 90 percent of the bonus
13     pool and to the extent they were covered under
14     severance arrangements they would also be paid
15     the severance arrangements that they were
16     entitled to.  If they were severed before
17     12/31/2008.
18     Q.   But those that were severed,
19     although they would be getting paid in effect
20     their accrued bonus for 2008, that payment
21     would actually be in the form of a severance
22     payment, correct?
23         MR. HINE:  Object to the form.
24     A.   I mean, you know, to me it's a
25     bonus payment that's being paid because
       TSG Reporting - Worldwide      877-702-9580

1      A. BROWN - HIGHLY CONFIDENTIAL
2      somebody's being severed.  To you that may be
3      a severance payment.  I distinguish the
4      severance payment that somebody gets purely on
5      account of being severed from things that get
6      accelerated by virtue of a termination.
7          So, for instance, if somebody was
8      entitled to a retirement payment under a
9      non-qualified retirement arrangement and the
10     got severed and that accelerated the payment,
11     I wouldn't call that a severance payment.  I
12     would call that an accelerated retirement
13     payment that's triggered by severance.
14         So I would say they would get
15     severance and they would get a bonus.  The $2
16     billion or their portion of the $2 billion
17     would be the bonus and the severance would be
18     whatever the severance was.
19     Q.   Well, however it's characterized,
20     if there was a 90 percent -- or 90 percent of
21     the compensation, of the $2 billion 90 percent
22     would go to the 90 percent terminated and the
23     10 percent would go to the 10 percent
24     retained, correct?
25     A.   Correct.
       TSG Reporting - Worldwide      877-702-9580

1      A. BROWN - HIGHLY CONFIDENTIAL
2      Q.   Turning back to Exhibit 532 which
3      is the e-mail attaching the two-page
4      spreadsheet.
5      A.   Okay.
6      Q.   What do you understand the term
7      transaction adjustment to refer to?
8          MR. HINE:  Object to the form.
9      A.   Generally?
10     Q.   Yes.
11     A.   It's some kind of either purchase
12     price or other calculation change.
13     Q.   And are you -- do you know how the
14     estimates for potential exposure on cure
15     liabilities was calculated?
16     A.   No.
17     Q.   Do you have any knowledge of what
18     those amounts were?
19     A.   No.
20         Yeah, go ahead.
21     Q.   I mean --
22     A.   I'm not sure I know what a cure
23     liability is so --
24     Q.   Okay.  Or -- well, let's take a
25     look at Section 2.5 of the APA.  Would you
       TSG Reporting - Worldwide      877-702-9580

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                    )
                               ) Chapter 11
6    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
                               ) (Jointly Administered)
7    HOLDINGS, INC., et al.,   )
                               )
8            Debtors.          )
     --------------------------)

9

10

11

12

13

14   HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF

15                ROBERT MESSINEO

16             New York, New York

17           Thursday, April 1, 2010

18

19

20

21

22   Reported by:

23   KRISTIN KOCH, RPR, RMR, CRR, CLR

24   JOB NO. 29427

25

Page 6

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED
 3   by and between the attorneys for the
 4   respective parties herein, that filing and
 5   sealing be and the same are hereby waived.
 6          IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn
15   to before the Court.
16
17
18
19
20            - oOo -
21
22
23
24
25
```

Page 7

```
 1
 2          (Deposition Exhibit 682, Declaration
 3   of Robert L. Messineo, marked for
 4   identification.)
 5            *    *    *
 6          THE VIDEOGRAPHER:  This is the start
 7   of tape number 1 of the videotaped
 8   deposition of Robert Messineo in the matter
 9   in re Lehman.
10          Today's date is April 1st, 2010 at
11   approximately 2:10 p.m.
12          Will the court reporter please swear
13   in the witness.
14   R O B E R T   M E S S I N E O,
15   called as a witness, having been duly sworn
16   by a Notary Public, was examined and
17   testified as follows:
18   EXAMINATION BY
19   MS. NEUHARDT:
20      Q.   Good afternoon, Mr. Messineo.  My
21   name is Amy Neuhardt.  I am with Boies,
22   Schiller & Flexner and I am representing
23   Barclays in this matter.
24      A.   Good afternoon.
25      Q.   Could you tell me where you are
```

Page 8

```
 1          Messineo - Highly Confidential
 2   employed?
 3      A.   The law firm of Weil, Gotshal &
 4   Manges.
 5      Q.   And you are a partner there?
 6      A.   Yes, I am.
 7      Q.   And is that the same place you were
 8   employed in September of 2008?
 9      A.   Yes.
10      Q.   Okay.  And you were a partner at
11   that time as well?
12      A.   That's correct.
13      Q.   Have you ever been deposed before?
14      A.   Yes, I have.
15      Q.   Okay.  So you know then that if you
16   don't understand one of my questions, you can
17   ask me to clarify, or if you need a break, you
18   can let me know.
19      A.   I understand.
20      Q.   Okay.  In connection with your work
21   as a Weil partner in September of 2008, were
22   you involved in a transaction between Barclays
23   and Lehman Brothers?
24      A.   Yes, I was.
25      Q.   Okay.  And what was your role in
```

Page 9

```
 1          Messineo - Highly Confidential
 2   that transaction?
 3      A.   I was involved in the negotiation
 4   and the preparation of the documents that
 5   were the Asset Purchase Agreement with regard
 6   to the sale of the Lehman capital markets and
 7   investment banking business.
 8      Q.   Okay.  Which party were you
 9   representing?
10      A.   I was representing Lehman.
11      Q.   Okay.  I am going to hand you or the
12   court reporter will hand you what's been marked
13   as Deposition Exhibit 682.  After you have had
14   a chance to look at it my question will be do
15   you recognize it?
16      A.   Yes, I do.
17      Q.   And on the last -- what is this
18   document?
19      A.   This is my declaration from a few
20   months ago.
21      Q.   Okay.  And on the last page is that
22   your signature?
23      A.   Yes, it is.
24      Q.   Okay.  You can take a moment to look
25   it over if you would like, but my question --
```

Page 10

```
 1        Messineo - Highly Confidential
 2   my first question will be is there anything in
 3   this declaration that you now consider
 4   inaccurate?
 5       A.  No.
 6       Q.  Okay.  All right.  Paragraph 3 of
 7   your declaration refers to an Exhibit A.  It's
 8   a Clarification Letter.  I can tell you that
 9   the version of this that was served to us did
10   not have an Exhibit A, so I am going to give
11   you what was previously marked as Deposition
12   Exhibit 25 (handing) and ask you whether or not
13   this document is the same as what you had
14   intended to attach to your declaration.
15       A.   This appears to be the final
16   Clarification Letter, yes.
17       Q.  Okay.  So let's look at paragraph 2
18   of your declaration.  The third sentence
19   begins:  "I was one of the Weil attorneys
20   responsible for drafting the letter agreement
21   dated September 20, 2008, which was executed on
22   September 22, 2008 by Barclays, LBHI, James W.
23   Giddens as the trustee for the SIPA liquidation
24   of LBI, and LB 745 LLC (the Clarification
25   Letter)."  Is that correct?
        TSG Reporting - Worldwide    877-702-9580
```

Page 11

```
 1        Messineo - Highly Confidential
 2       A.   That's correct.
 3       Q.   Okay.  Did you have responsibilities
 4   in connection with the Clarification Letter
 5   other than participating in the drafting?
 6       A.   I don't -- I am not sure I
 7   understand what you are asking.
 8       Q.   Sure.  Were you one of the Weil
 9   attorneys who would have been directly
10   interacting in negotiations with
11   representatives of Barclays?
12       A.   Yes.
13       Q.   Okay.  So you would have been
14   speaking to people from Barclays or Barclays'
15   attorneys in connection with the Clarification
16   Letter?
17       A.   Correct.
18       Q.   When I refer to representative of
19   Barclays throughout the deposition, actually I
20   will be intending to mean Barclays as well as
21   its agents, which would be Cleary Gottlieb,
22   Michael Klein, who is an independent financial
23   advisor.  So will you understand that to be the
24   meaning as I refer to representatives of
25   Barclays?
        TSG Reporting - Worldwide    877-702-9580
```

Page 12

```
 1        Messineo - Highly Confidential
 2       A.   Yes.
 3       Q.   Okay, great.
 4            Now, paragraph 4 of your
 5   declaration, page 2, reads:  "I understood at
 6   all times while the Clarification Letter was
 7   being drafted that both securities and cash
 8   were being held in accounts maintained by LBI
 9   for the purpose of complying with Rule 15c3-3
10   for the benefit of and in order to protect the
11   interests of customers of LBI.  The accounts so
12   holding securities or cash pursuant to Rule
13   15c3-3 are herein after referred to as the
14   customer reserve accounts."
15            Is that an accurate statement?
16       A.   Yes, it is.
17       Q.   Okay.  Do you consider yourself an
18   expert in SEC Rule 15c3-3?
19       A.   No.
20       Q.   Okay.  Had you had any prior
21   dealings with that rule prior to the
22   Lehman/Barclays transaction?
23       A.   Only a very small degree.
24       Q.   Okay.  And do you consider yourself
25   to be an expert in the Securities Investment
        TSG Reporting - Worldwide    877-702-9580
```

Page 13

```
 1        Messineo - Highly Confidential
 2   Protection Act known as SIPA?
 3       A.   I do not.
 4       Q.   Okay.  And had you had any prior
 5   matters that involved interpretation of SIPA
 6   prior to the Lehman/Barclays matter?
 7       A.   Again, only in a small degree.
 8       MS. NEUHARDT:  I am going to hand
 9   you what will be marked as Deposition
10   Exhibit 683.
11       (Deposition Exhibit 683, Declaration
12   of Victor I. Lewkow, marked for
13   identification.)
14       Q.   Have you ever seen this document
15   before?
16       A.   Yes.
17       Q.   In what context have you seen it
18   before?
19       A.   I saw it recently in connection with
20   preparation for this deposition.
21       Q.   Okay.  Did you review any other
22   documents in connection with this deposition?
23       A.   I also looked at one of the
24   memoranda that had been submitted.
25       Q.   Oh, that was publicly filed in
        TSG Reporting - Worldwide    877-702-9580
```

Page 14

1          **Messineo - Highly Confidential**
2   this --
3          A.   Yes.
4          Q.   Okay.  Okay.  Do you know
5   Mr. Lewkow?
6          A.   Yes, I do.
7          Q.   Okay.  Who is he?
8          A.   He is a partner at Cleary Gottlieb
9   and he was the lead partner in the negotiation
10  of the acquisition of the Barclays agreement.
11         Q.   Okay.  Do you have any reason to
12  doubt Mr. Lewkow's honesty or integrity?
13         A.   No.
14         Q.   Okay.  Would you take a moment and
15  read paragraphs 18 to 20 of his declaration.
16         (Document review.)
17         A.   18 and 20, yes.
18         Q.   18 through 20.  Sorry.
19         (Document review.)
20         A.   Okay.
21         Q.   So those paragraphs recount
22  Mr. Lewkow's recollection of a conversation
23  that occurred in the hallway of Weil Gotshal on
24  either the late night of September 21st, 2008
25  or early morning of September 22nd, 2008;

TSG Reporting - Worldwide     877-702-9580

Page 15

1          **Messineo - Highly Confidential**
2   correct?
3          A.   That's what they describe.
4          Q.   Okay.  Do you recall participating
5   in a conversation in the hallway such as
6   described by Mr. Lewkow?
7          A.   I don't recollect this specific
8   conversation that he is describing.
9          Q.   Okay.  Do you have any reason to
10  believe that that conversation did not occur as
11  described by Mr. Lewkow?
12         MR. WOOD:  Objection to form.
13         A.   Well, I can only say that in
14  conversations that I had with people and in the
15  course of the drafting that I was involved
16  with, there was never any question raised to
17  this effect that if securities could not come
18  out of the custodial accounts, that they would
19  be made available otherwise by Lehman.
20         Q.   But do you have any reason to doubt
21  that Mr. Lewkow is telling the truth about his
22  version of that hallway conversation in his
23  declaration?
24         MR. WOOD:  Objection to the form.
25         A.   It's not something that I can

TSG Reporting - Worldwide     877-702-9580

Page 16

1          Messineo - Highly Confidential
2   correspond with.
3          Q.   So you have no personal knowledge of
4   it one way or the other?
5          A.   I did not have this conversation
6   with Mr. Lewkow.
7          Q.   Okay.  All right.  Let's look back
8   at your declaration, paragraph 8.
9          Paragraph 8:  "I understood the
10  phrase "or securities of substantially the same
11  nature and value" was included at the end of
12  the second sentence of paragraph 8 of the
13  Clarification Letter to take account of the
14  potential for there to be a change in the
15  specific securities held in the customer
16  reserve accounts between September 22nd and the
17  date when it became permissible to withdraw
18  securities from the customer reserve accounts."
19  Is that correct?
20         A.   Correct.
21         Q.   Okay.  Did you personally draft that
22  clause, "or securities of substantially the
23  same nature and value"?
24         A.   I can't recollect whether I
25  specifically drafted it.  It's possible that I

TSG Reporting - Worldwide     877-702-9580

Page 17

1          Messineo - Highly Confidential
2   did.
3          Q.   Okay.
4          A.   I think the clause was originally
5   somewhat different, but I just can't say for
6   sure whether I drafted it.  I might have.
7          Q.   Okay.  Did you get your
8   understanding of the meaning of that phrase as
9   set forth in paragraph 8 of your declaration
10  from any representative of Barclays?
11         A.   I can't recollect specific
12  conversation with specific persons, but my
13  understanding of that phrase grew out of my
14  participation in the discussions and in the
15  negotiations that were going on that night.
16         Q.   So you can't recall discussing this
17  with anybody from Barclays?
18         A.   I don't have specific recollection
19  of discussing this phrase.
20         Q.   Okay.  After you drafted the phrase
21  did you communicate your understanding of that
22  phrase to any representative of Barclays?
23         A.   I don't recollect a specific
24  conversation.
25         Q.   Do you recollect generally having

TSG Reporting - Worldwide     877-702-9580

Page 18

1          **Messineo - Highly Confidential**
2    had a conversation to that effect?
3          A.   I recollect generally this phrase
4    coming into the agreement and this being in the
5    context of the fact that there were securities
6    in this account and that the way the phrase --
7    the way the related phrase had been drafted is
8    it referred to the specific securities on that
9    date and so it was necessary to have this
10   phrase in order to properly present the thing.
11          THE COURT REPORTER:  I'm sorry?
12          A.   Properly present the matter.
13          Q.   Can you look at the Clarification
14   Letter, Exhibit 25, and show me where you are
15   referring to securities as of a specific date?
16          A.   Did you say it was paragraph 25?
17          Q.   Sorry, it's Deposition Exhibit 25.
18   It is paragraph 8, which is on page 4.
19          A.   Okay.  Yes, because it says
20   securities -- 769 million of securities is held
21   by or on behalf of LBI on the date hereof
22   pursuant to Rule 15c3-3.
23          Q.   Okay.  And was it your understanding
24   that there was only 769 million of securities
25   in that account?

TSG Reporting - Worldwide     877-702-9580

Page 19

1          **Messineo - Highly Confidential**
2          A.   That was the current amount or value
3    that we were told was in the account.
4          Q.   Who told you that?
5          A.   Again, I can't recollect who
6    specifically.  The information would have come
7    from someone at Lehman.
8          Q.   And it was your understanding that
9    that was the total amount of securities in the
10   account or the total amount that was in excess
11   in the account or that was believed to be in
12   excess in the account?
13          MR. WOOD:  Objection to form.
14          A.   I'm sorry, was in excess of what?
15          Q.   Let me back up.
16          What did you understand the 769
17   million to represent?
18          A.   To be securities, I believe mostly
19   government securities or primarily government
20   securities, that were held in this account, or
21   may have been more than one actual account, for
22   customer protection purposes.
23          Q.   Did you understand there to be an
24   excess in that account that could be
25   transferred?

TSG Reporting - Worldwide     877-702-9580

Page 20

1          **Messineo - Highly Confidential**
2          A.   I understood there to be cash as
3    well as securities in the account, and so the
4    total value of the account -- and, again, this
5    may have been more than one account.  The total
6    value of them I understood to be substantially
7    more than 769 million, but the portion of it
8    that was represented by securities I understood
9    to be 769 million, or at least that's what had
10   been reported by the Lazard people for purposes
11   of negotiation of this issue which had come up
12   that evening.
13          Q.   And you did not understand that to
14   only be 769 million in the excess as opposed to
15   the entirety of the account?
16          A.   No, I don't -- I'm not sure what you
17   mean, excess of what.
18          Q.   Excess of the amount required by SEC
19   Rule 15c3-3.
20          A.   Oh, oh, oh.  Okay.  I see what you
21   are saying.  I'm not sure that people knew at
22   this point how much in this account was what
23   was required to be in the account.  My
24   understanding is that this is something that
25   requires approval of the SEC and the

TSG Reporting - Worldwide     877-702-9580

Page 21

1          Messineo - Highly Confidential
2    calculations are fairly complicated and there
3    might be excess funds as of that date or there
4    might not be excess funds as of that date and
5    as of some future date it would be different
6    depending on what happened with customers and
7    customer positions, and so there might be funds
8    that were excess, but whether all or part of
9    these were excess on that day I don't know.
10          Q.   Okay.  Well, do you understand now,
11   though, what I am asking whether or not it was
12   believed that the 769 was in the excess or if
13   it was 769 in the entirety of the account?
14          A.   I believe the general understanding
15   is that this was the entire account, the cash
16   and the securities, and that some part of it
17   would ultimately turn out to be excess or might
18   ultimately turn out to be excess.
19          Q.   Okay.  All right.
20          Let's go back to -- we were talking
21   about paragraph 8 of your declaration and your
22   understanding of the meaning of the clause "or
23   securities of substantially the same nature and
24   value," and I believe you had testified that
25   you did not have a specific recollection of

TSG Reporting - Worldwide     877-702-9580

Page 22

Messineo - Highly Confidential

1
2  communicating your understanding of that phrase
3  to any representative of Barclays; is that
4  correct?
5       A.    Correct.
6       Q.    And then I asked if you had any
7  general recollection and I do not believe your
8  answer was quite answering the question.
9            So I will ask you again, do you
10 recall generally meeting -- representing your
11 understanding of that phrase to anybody who was
12 a representative of Barclays?
13           MR. WOOD:  Objection to form.
14           MR. HINE:  Objection to form.
15           MR. POLKES:  You can answer.
16      A.    I don't recollect a specific
17 conversation regarding this phrase with anyone
18 at Barclays.
19      Q.    Okay.  Who is Harvey Miller?
20      A.    Harvey Miller is a senior partner
21 here.
22      Q.    Okay.  And did you communicate your
23 understanding of that phrase to Mr. Miller?
24      A.    At the time that this was written or
25 ever?

TSG Reporting - Worldwide    877-702-9580

Page 23

Messineo - Highly Confidential

1
2       Q.    Well, prior to the closing of the
3  transaction.
4       A.    I don't know that I had a specific
5  conversation with Mr. Miller about this phrase.
6       Q.    To your knowledge, was a provision
7  regarding maturing securities required in any
8  way by a statute or regulation?
9       A.    Was a provision regarding maturing
10 securities required?
11      Q.    That's how I am characterizing what
12 you described the meaning of the phrase to be,
13 but was -- is there any statute or regulation
14 that requires provision to be made for maturing
15 securities such as in this situation?
16      A.    I don't know of a regulation that
17 requires a provision to be made.  My
18 understanding is that the securities in the
19 account would mature and would need to be
20 reinvested.
21      Q.    Okay.  Was there any list by CUSIP
22 or otherwise of the 769 million that were to be
23 transferred over to Barclays?
24      A.    There was not one that I was aware
25 existed at that time.

TSG Reporting - Worldwide    877-702-9580

Page 24

Messineo - Highly Confidential

1
2       Q.    So do I understand your testimony to
3  believe that -- to be that you believed that
4  the provision was necessary because there may
5  have only been $769 million in securities in
6  that customer reserve account on the date of
7  the agreement?
8            MR. WOOD:  Objection to the form.
9       A.    I wouldn't say it that way.
10 There -- what was described was that Barclays
11 was to get 769 million of particular securities
12 that existed in particular accounts on a
13 particular day and then it went on, as it
14 needed to in order to make sense, to say that
15 it could get substantially the same securities
16 since those particular securities that were
17 there on that day may not be there on the day
18 when it talked about the account being
19 accessed, which is going to be at some time in
20 the future when regulatory conditions were
21 satisfied.
22      Q.    If there were more than 769 million
23 of securities in that account, would there have
24 been any particular 769 that had to be used to
25 pay this out in the absence of the provision

TSG Reporting - Worldwide    877-702-9580

Page 25

Messineo - Highly Confidential

1
2  that you added?
3            MR. HINE:  Objection to form.
4       A.    I think the understanding was that
5  the 769 million was all the securities that
6  were in the account.
7       Q.    Okay.  So if that were not correct,
8  then it would not have been necessary to have
9  this phrase?
10           MR. WOOD:  Objection to form.
11      A.    No, it would still have been
12 necessary to have the phrase.
13      Q.    Okay.  That's what I am trying to
14 understand.
15           Why would it have been necessary to
16 have that phrase if Barclays was not being
17 given a claim to a particular 769 million, but
18 just 769 million in securities in that account
19 of which there may have been significantly more
20 than 769 million?
21           MR. HINE:  Object to form.
22           MR. WOOD:  Object to the form.
23      A.    I'm not quite sure I am capturing
24 the point that you are trying to make here.
25 There were particular securities in the

TSG Reporting - Worldwide    877-702-9580

## Page 26

Messineo - Highly Confidential

1
2  account.  There were believed to be particular
3  securities in the account.  There wasn't a list
4  of them, but whatever they were they were, and
5  they were in the account -- they were believed
6  to be worth 769 million.  I guess if there was
7  a lot more, then they would only receive 769
8  million.
9      Q.   Right, well, that's my point.  If it
10  was not correct that there was only 769 million
11  in the account, if that was actually only in
12  excess but there was actually substantially
13  more in the account as a whole, would it have
14  been necessary to have this clause?
15          MR. HINE:  Objection to form.
16          MR. WOOD:  Objection to form.
17      A.   It would have still been necessary
18  to have the clause because the securities could
19  change.  Whether there were 769 or 770, the
20  securities could still have changed over the
21  time that was going to go by before it was
22  possible for them to be withdrawn.
23      Q.   Do you know if anybody from Lehman
24  discussed that interpretation of the clause
25  with anybody from Barclays?

TSG Reporting - Worldwide    877-702-9580

## Page 27

Messineo - Highly Confidential

1
2          MR. WOOD:  Objection to form.
3          MR. POLKES:  I'm sorry, what
4  interpretation?
5          MS. NEUHARDT:  Excuse me?
6          MR. POLKES:  What interpretation?
7          MS. NEUHARDT:  The interpretation
8  that is set forth in paragraph 8 of your
9  declaration.
10      A.   I do not know if anyone discussed
11  it.
12      Q.   I am going to hand you what has been
13  marked as Deposition Exhibit 1 in prior
14  depositions.  My first question will be do you
15  recognize this document?
16      A.   Yes.  This appears to be the Asset
17  Purchase Agreement.
18      Q.   Okay.  And did you participate in
19  the drafting or negotiation of this document?
20      A.   I did.
21      Q.   Okay.  If you could turn to page 6,
22  please, and look at the definition of purchased
23  assets.  I am not going to force you to read
24  all the subdivisions, but the intro to that
25  definition says:  "Purchased assets means all

TSG Reporting - Worldwide    877-702-9580

## Page 28

Messineo - Highly Confidential

1
2  of the assets of seller and its subsidiaries
3  used in connection with the business (excluding
4  the excluded assets) including," and then it
5  lists out A through S of specified assets.  Is
6  that correct?
7      A.   That's correct.
8      Q.   Okay.  Did you understand the list
9  of A through S to be an exclusive list?
10      A.   No, I wouldn't say exclusive.
11  Primary, but not exclusive.
12      Q.   Okay.  And what did you, in general,
13  understand the meaning of the phrase "all of
14  the assets of seller and its subsidiaries used
15  in connection with the business" to mean?
16      A.   Well, there was -- what was being
17  sold was an operating business and it was being
18  done through the form of an asset transfer.
19      Q.   Okay.
20      A.   So basically it was the assets that
21  were used in the business other than things
22  that were being excluded.
23      Q.   Okay.  And if you look at page 2 at
24  the definition of business, it says:  "The
25  business means the U.S. and Canadian investment

TSG Reporting - Worldwide    877-702-9580

## Page 29

Messineo - Highly Confidential

1
2  banking and capital markets businesses of
3  seller, including the fixed income and equities
4  cash trading, brokerage, dealing, trading and
5  advisory businesses, investment banking
6  operations and LBI's business as a futures
7  commission merchant."
8          In your role in negotiating and
9  drafting that -- this agreement, what was your
10  understanding of this definition to mean?
11          MR. HINE:  Objection to form.
12      A.   Again, without simply repeating the
13  words, the business as a whole was being sold.
14  Basically the capital markets and investment
15  banking business of Lehman as an operating unit
16  were being sold as a whole.
17      Q.   Okay.  Now, when -- now, the
18  Clarification Letter was drafted after this
19  document; correct?
20      A.   That's correct.
21      Q.   Okay.  When you were drafting the
22  Clarification Letter and based on your
23  understanding of the definitions of purchased
24  assets and business and the APA as a whole, did
25  you understand the securities to be contained

TSG Reporting - Worldwide    877-702-9580

Page 30

Messineo - Highly Confidential

1
2  in LBI's customer reserve account to be part of
3  the assets primarily used in the business?
4      MR. WOOD:  Objection to the form.
5      MR. POLKES:  I'm sorry, if you could
6  just clarify whether you are asking him to
7  sort of give an opinion about that now or
8  if he had thought about it back when he was
9  drafting the Clarification Letter, I would
10  appreciate that.
11      MS. NEUHARDT:  It's the time of the
12  Clarification Letter that matters, so...
13      MR. POLKES:  Had you thought about
14  it then one way or the other?
15      A.  Well, at the time of the
16  Clarification Letter as opposed to the time of
17  the Asset Purchase Agreement are different
18  things.  Yes, at the time of the Clarification
19  Letter, yes.
20      Q.  Okay.  So you considered it at that
21  time to be part of the purchased assets, "at
22  that time" being the time of the Clarification
23  Letter?
24      A.  Well, the Clarification Letter, I
25  think, makes it clear that they are part of the

TSG Reporting - Worldwide    877-702-9580

Page 31

Messineo - Highly Confidential

1
2  purchased assets.
3      Q.  Okay.  And that's because it was --
4  they were part of the assets used in the
5  business that was being acquired by Barclays?
6      MR. HINE:  Objection to form.
7      MR. KAY:  Objection to form.
8      A.  Well, it's because it's specifically
9  referred to.  I am not quite sure what you are
10  asking.  We just read the -- we just looked at
11  the sentence that specifically says that those
12  assets come along.
13      Q.  I understand, but I am asking
14  whether or not you believed that regardless of
15  whether they was specified in the clarification
16  letter, they nonetheless were assets that were
17  used in the business?
18      A.  Oh, I don't think it would have been
19  clear one way or another without the
20  specification in the clarification letter how
21  you would have treated those assets.
22      Q.  So you don't -- you wouldn't have
23  had an opinion one way or the other whether
24  they would have been an asset under the Asset
25  Purchase Agreement that was being transferred?

TSG Reporting - Worldwide    877-702-9580

Page 32

Messineo - Highly Confidential

1
2      A.  Oh --
3      MR. WOOD:  Objection to the form.
4      A.  Opinion one way or another, I would
5  say probably the better reading of things
6  absent the Clarification Letter would be that
7  they would not have been included, because my
8  understanding is that they were basically cash
9  and government securities and those weren't
10  within the category of things that was intended
11  generally to transfer.
12      Q.  It's your understanding that an
13  account that was used particularly for the
14  business of maintaining a reserve for customers
15  would not have been used in the business, would
16  not have been an asset in the business?
17      MR. HINE:  Objection to form.
18      MR. WOOD:  Objection to form.
19      A.  It's not a question being used in
20  the business or not being used in the business.
21  The question is was it intended to go as part
22  of what was being transferred or not, and in
23  general the terms of the agreement as, you
24  know, I think was understandable for this type
25  of situation, did not involve transfer of cash

TSG Reporting - Worldwide    877-702-9580

Page 33

Messineo - Highly Confidential

1
2  or highly liquid securities.  That was just --
3  the buyer would have to pay for something that
4  would just be round-tripped.  It wouldn't make
5  any sense particularly.  So those assets would
6  generally be excused even though they would
7  otherwise might be considered part of the
8  assets used in the business.  Obviously there
9  is always some cash used in the conduct of any
10  business.
11      Q.  Okay.  And is your view of that any
12  different today?
13      A.  No.
14      MS. NEUHARDT:  If we can take a
15  short break, I am probably through, but I
16  just want to --
17      MR. POLKES:  Okay.  That's fine.
18      THE VIDEOGRAPHER:  The time is 2:37.
19  We are going off the record.
20      (Recess was taken from 2:37 to
21  2:45.)
22      THE VIDEOGRAPHER:  The time is 2:45.
23  We are back on the record.
24  BY MS. NEUHARDT:
25      Q.  Mr. Messineo, I just want to go back

TSG Reporting - Worldwide    877-702-9580

## Page 34

1       **Messineo - Highly Confidential**
2   to the last discussion we were having.
3       In the APA do I correctly understand
4   you to say that you believe the APA was
5   essentially ambiguous on whether or not the
6   customer reserve account would have been a
7   purchased asset?
8      MR. WOOD:  Objection to the form.
9     A.  Yes, before the Clarification Letter
10  the APA, I think it was an issue that people
11  could have debated.
12     (Continued on next page to include
13  jurat.)
14
15
16
17
18
19
20
21
22
23
24
25

    TSG Reporting - Worldwide    877-702-9580

## Page 35

1     Messineo - Highly Confidential
2    Q.  Okay.  And the Clarification Letter
3  then would have been resolving any ambiguity?
4    A.  It did.
5     MS. NEUHARDT:  Okay.  I have no
6  further questions.
7     MR. WOOD:  I have nothing.
8     MR. HINE:  No questions.
9     MR. KAY:  No questions.
10    THE VIDEOGRAPHER:  The time is 2:46.
11  We are going off the record.
12     (Time noted:  2:46 p.m.)
13
14
15     ---------------------
16      ROBERT MESSINEO
17
18  Subscribed and sworn to before me
19  this    day of     2010.
20
21  -------------------------------------
22
23
24
25

    TSG Reporting - Worldwide    877-702-9580

## Page 36

1
2      C E R T I F I C A T E
3
4  STATE OF NEW YORK  )
5         ) ss.:
6  COUNTY OF NASSAU   )
7
8     I, KRISTIN KOCH, a Notary Public
9  within and for the State of New York, do
10  hereby certify:
11     That ROBERT MESSINEO, the witness
12  whose deposition is hereinbefore set
13  forth, was duly sworn by me and that such
14  deposition is a true record of the
15  testimony given by such witness.
16     I further certify that I am not
17  related to any of the parties to this
18  action by blood or marriage; and that I am
19  in no way interested in the outcome of
20  this matter.
21     IN WITNESS WHEREOF, I have hereunto
22  set my hand this 1st day of April, 2010.
23     ------------------------
24     KRISTIN KOCH, RPR, RMR, CRR, CLR
25

    TSG Reporting - Worldwide    877-702-9580

## Page 37

1
2  -------------------I N D E X-----------------
3
4  WITNESS      EXAMINATION BY    PAGE
5  ROBERT MESSINEO   MS. NEUHARDT    7
6
7  -------------------EXHIBITS-----------------
8  DEPOSITION        PAGE LINE
9
10  Exhibit 682
    Declaration of Robert L. Messineo.... 7  2
11  Exhibit 683
    Declaration of Victor I. Lewkow...... 13  11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

    TSG Reporting - Worldwide    877-702-9580

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                    )
                               ) Chapter 11
6    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
                               )
7    HOLDINGS, INC., et al.,   )
                               )
8              Debtors.        )
     --------------------------)

9

10

11

12

13

14       HIGHLY CONFIDENTIAL DEPOSITION OF

15            ALASTAIR BLACKWELL

16           New York, New York

17         Friday, August 7, 2009

18

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR, CLR

25   JOB NO. 24037

Page 6

```
 1
 2     A L A S T A I R   B L A C K W E L L,
 3         called as a witness, having been duly sworn
 4         by a Notary Public, was examined and
 5         testified as follows:
 6     EXAMINATION BY
 7     MR. HINE:
 8         Q.    Good morning, Mr. Blackwell.
 9         A.    Good morning.
10         Q.    How are you?
11         A.    Very good, thanks.
12         Q.    I am sure your counsel has told you
13     what's going on here today, but we are here
14     taking a deposition involving the Lehman
15     bankruptcy proceedings.
16         My name is Bill Hine and I am from
17     Jones Day, which is the firm that's special
18     counsel to LBHI.  Several of the other counsel
19     along the table will introduce themselves
20     later, but they represent various entities that
21     are involved in this proceeding.
22         So the way this is going to work is
23     I am going to ask you a bunch of questions
24     first and they will all take turns with you
25     later as we progress.
```

Page 7

```
 1     Blackwell - Highly Confidential
 2         A.    Understood.
 3         Q.    As we go, I am going to be asking
 4     you a series of questions.  You are under oath,
 5     so you will answer the questions.  At some
 6     points in time you will hear your counsel state
 7     an objection.  That doesn't mean you don't have
 8     to answer the question.  That just means he is
 9     either preserving the record or he wants to ask
10     me to clarify the question.  If he instructs
11     you not to answer, that's up to you as well,
12     but the mere fact that he makes an objection
13     doesn't mean you don't have to answer the
14     question.
15         In that vein, I'd like to ask you
16     just please ask me to clarify any question
17     where I might misuse an acronym or a word.  I
18     feel like I am learning a new language here
19     reading all you folks' e-mail, so I know there
20     is technical financial words that you guys use
21     and you understand readily, but if you need me
22     to clarify one, I want to have a clear question
23     so you can answer it.
24         I think your counsel has probably
25     told you, but you have been designated as a
```

Page 8

```
 1         Blackwell - Highly Confidential
 2     30(b)(6) witness for a select set of issues in
 3     this case and those issues relate to Schedules
 4     A and B of the Clarification Letter.  We will
 5     get to that later, but I just want to let you
 6     know that, and that I will alert you to that
 7     fact when we get to that portion of the
 8     deposition, so in that portion you will be
 9     speaking on behalf of Barclays.
10         So I am ready to proceed if you are.
11     Are we ready to do this?
12         A.    Absolutely, yes.  Thank you.
13         Q.    Can we start off with a little
14     background information about you.
15         You are currently employed by
16     Barclays Capital; correct?
17         A.    I am, yes.
18         Q.    And what is your present position?
19         A.    I am responsible for the Americas
20     operations department for capital markets.
21         Q.    Okay.  And do you have a title?
22         A.    I am a managing director.
23         Q.    When did you start your employment
24     at Barclays?
25         A.    I received a contract after
```

Page 9

```
 1         Blackwell - Highly Confidential
 2     bankruptcy, I don't know exactly when I signed
 3     that, but it would have been, I think, two
 4     weeks after bankruptcy that I signed a contract
 5     to join Barclays.  I wasn't one of those people
 6     that received an e-mail and clicked off on it,
 7     for instance.
 8         Q.    Okay.  When did you -- that's the
 9     contract, we will get to that in a second, but
10     when did you consider yourself a Barclays
11     employee?
12         A.    Post bankruptcy.
13         Q.    Was it upon the closing of the sale
14     transaction?
15         A.    I would think so, yes.
16         Q.    And just as we go forward, if I
17     refer to the sale transaction, can we agree
18     that that will be the transaction that closed
19     on the 22nd of September 2008 whereby certain
20     assets were transferred to Barclays?  Can we
21     agree on that?
22         A.    What time is that?
23         Q.    I don't know the time.
24         A.    Midnight from that day.
25         Q.    Okay.  So is it fair to say after
```

1          Blackwell - Highly Confidential
2     which is led by James Black and informally
3     managed by Alex Crepeau until about a week ago.
4          Q.   When you talk about operations
5     function, is there a component of that of your
6     work that covers valuing or marking assets?
7          A.   I want to be very precise about the
8     way I would describe that.  There is a function
9     in operations that values positions, but that's
10    using data, pricing data, that is either
11    purchased from a third party or is consumed
12    from a front office trading source, so we are
13    not determining a valuation on a security.  We
14    do not determine valuation.
15         Q.   But you mark the security with this
16    information that you receive from a third
17    source?
18         A.   It's a mechanical process.
19    Inventory, mark, it gives you a result.  It's
20    not -- you are not applying any thought to it
21    other than is that actually the security that
22    our mark ties out to.
23         Q.   Could we go back now to your last
24    position you held at Lehman.
25              First of all, how long did you work

1          Blackwell - Highly Confidential
2     for Lehman?
3          A.   I worked for Lehman from November
4     27th, 2000 until the 22nd of September, 2008.
5          Q.   And what was the last position you
6     held at Lehman?
7          A.   I was global head of operations for
8     both capital markets and IMD.  I was in the
9     process of taking responsibility for Aurora
10    loan services, but I hadn't been formally
11    announced, so that was matter of a few weeks'
12    worth of effort, but I didn't have any formal
13    management responsibility at that point, so you
14    will see information in my e-mails associated
15    with Aurora.
16         Q.   And who did you report directly to
17    in that position?
18         A.   I reported to Ian Lowitt.
19         Q.   Anyone else?
20         A.   No.
21         Q.   And who were your direct reports?
22         A.   In the United States, Neal Ullman,
23    who is global head of our clearance and custody
24    function.  Monty Forrest, who is global head of
25    prime services operations.  Kirk Butryn who was

1          Blackwell - Highly Confidential
2     co-head of equity operations.  Alex Crepeau,
3     who was responsible for regulatory operations,
4     tax, operations control, client valuations and
5     margin.  I believe that's all of them from
6     memory.  In the U.K. there is a gentleman
7     called Garth Barker Goldie, who is responsible
8     for European operations, and in Asia,
9     Christopher Flanagan, who was responsible for
10    our Asian operations.  And there was also --
11    actually, there is another gentleman called
12    Stewart Nineham who was my CAO in -- global
13    CAO.
14         Q.   Can you explain to me in your Lehman
15    role whether your group was responsible for
16    valuing or marking securities?  Same question
17    only I am trying to see if the Lehman role was
18    the same.
19         A.   It was identical.  In terms of
20    consumption of data, any model-driven pricing
21    would be front-end trading, trading
22    responsibility to provide a mark, and finance
23    function at Lehman Brothers, product control,
24    for want of a better term, was responsible for
25    price testing, so they would test the models to

1          Blackwell - Highly Confidential
2     ensure that those were accurate and produce the
3     result that they were intended to do.
4          Q.   And who were in charge of those
5     functions at Lehman; do you recall?
6          A.   The front office was various
7     different business heads, so, I mean,
8     ultimately it would have been Bart as president
9     and head of risk effectively, but Gelband was
10    responsible for the fixed income division and
11    Jerry Donini was responsible for equities, and
12    the IMD business theoretically didn't take any
13    risk.
14         Q.   I don't mean to be intrusive, but I
15    have to ask you some questions about your
16    compensation.
17              MR. SHAW:  This is all highly
18    confidential.
19              MR. HINE:  Yes.
20         Q.   When you transitioned from Lehman,
21    your position at Lehman to your position at
22    Barclays, did your compensation increase?
23         A.   No, actually, it declined.
24         Q.   Declined.  In what way?
25         A.   I had a two-year guarantee from

Page 42

Blackwell - Highly Confidential
1
2    Q.    Did you have an understanding of the
3  terms of the Asset Purchase Agreement?
4    A.   I didn't know an Asset Purchase
5  Agreement existed at that point.
6    Q.    Have you ever seen an Asset Purchase
7  Agreement?
8    A.   I have, but not -- I have, yes, I
9  have, but much, much, much post bankruptcy.
10  Maybe weeks afterwards.
11    Q.    Okay.  That was a badly phrased
12  question.
13      Have you -- when I meant "Asset
14  Purchase Agreement," I meant the Asset Purchase
15  Agreement that's at issue in this case, which
16  is the one between Barclays and Lehman.
17      So am I correct to understand you to
18  say you didn't see that agreement until after
19  the closing of the sale transaction?
20    A.   I believe so.  It may have hit my
21  e-mail.  I don't ever remember reading it.  I
22  think it's highly unlikely that I saw it until
23  after bankruptcy, and it's certainly the case
24  that I was asking Jonathan Hughes post
25  bankruptcy --

TSG Reporting - Worldwide  (877) 702-9580

Page 43

Blackwell - Highly Confidential
1
2      MR. SHAW:  Let's not get into any
3  discussions you had with Jonathan.
4      MR. HINE:  Is Jonathan a lawyer?
5      MR. SHAW:  He is the general
6  counsel.
7      MR. HINE:  So you are asserting a
8  privilege over that conversation?
9      MR. SHAW:  Yes.
10    Q.    I just want to be clear.  When we
11  talk here, when you said "bankruptcy," you were
12  talking LBI's bankruptcy?
13    A.   I am talking about LBI's bankruptcy,
14  yes.  I had no knowledge of an APA pre
15  bankruptcy and the content of it.
16    Q.    Did you have any understanding of
17  what the sale transaction was supposed to
18  accomplish?
19    A.   I had a set of actions to perform,
20  which was providing data to my supervisor, to
21  Ian Lowitt, and those components were
22  clearly -- at certain points it became clear
23  they were part of the transaction, but I didn't
24  know what part, and I had very limited
25  understanding.  It was perform this task, get

TSG Reporting - Worldwide  (877) 702-9580

Page 44

Blackwell - Highly Confidential
1
2  the task done, and that's what I tried to
3  execute as effectively as I could.
4    Q.    And so did you ever -- again, I
5  understand that and we will go through those
6  tasks as we go, but did you ever have any
7  inkling about a $70 billion figure with respect
8  to the assets that were going to be transferred
9  to Barclays?
10    A.   70 billion?
11    Q.    Yes.
12    A.   That's not a number that sticks out
13  in my memory, no.
14    Q.    Did you ever hear anyone talk about
15  a discount that was being awarded to Barclays
16  with respect to Lehman assets?
17    A.   No.  And I think when I was asked
18  what the deal content was by one of my
19  colleagues, I pointed them in someone else's
20  direction to the deal lawyers.  I didn't have
21  details of that.
22    Q.    Did you have any -- I'm not asking
23  about whether you were involved in discussions,
24  but did you hear any rumors or, you know, water
25  cooler talk about a discount being awarded to

TSG Reporting - Worldwide  (877) 702-9580

Page 45

Blackwell - Highly Confidential
1
2  Barclays as to Lehman assets?
3    A.   I don't think so, no.
4    Q.    Did you ever hear the phrase "block
5  discount" used in connection with the sale
6  transaction?
7    A.   Block discount, no.
8    Q.    Did you ever hear that phrase or a
9  similar phrase used when it came to valuing
10  assets that were supposed to be transferred to
11  Barclays?
12    A.   No.  I wasn't focused on anything
13  related to valuation, so that wasn't really --
14  making lists of securities was different than
15  determining what they should be worth in
16  aggregate.
17    Q.    We will get into that more.  I
18  understand.
19      Did you ever hear anyone refer to
20  the transaction as a wash transaction or words
21  to that effect?
22    A.   No.
23    Q.    Is it fair to say that you really
24  were fairly unfamiliar with the specific
25  contractual terms of that transaction during

TSG Reporting - Worldwide  (877) 702-9580

1          Blackwell - Highly Confidential
2          (Exhibit 74 B, e-mail dated
3      9-20-2008, marked for identification.)
4          Q.    Mr. Blackwell, I am handing you a
5   copy of a document marked as Exhibit 74 B,
6   which is an e-mail stream dated September 20th,
7   2008 involving yourself and several others
8   including Ian Lowitt and some of your people in
9   your group.  I think I am mixing two concepts
10  here, so I just want to get some clarification
11  on what we have just been talking about after
12  you have had a chance to look at the e-mail.
13          (Document review.)
14      A.    Okay.
15      Q.    Have you had a chance to look at it?
16      A.    I have.
17      Q.    Could you tell me what you recall
18  about this discussion that's embodied in this
19  e-mail?
20      A.    It's just a -- it's a list of things
21  that we were working on.  It's two things that
22  we were working on.  Looking for the
23  unencumbered -- trying to define a list of
24  unencumbered assets, and what it's saying here
25  is that 15C3, if there is excess, and that

1          Blackwell - Highly Confidential
2   potentially there is money that can be released
3   as an unencumbered asset of the firm.
4       Q.    I think I understand what you said.
5   I just want to make sure.
6           This is during a period of time when
7   your group is trying to locate unencumbered
8   assets which would then presumably be
9   transferred to Barclays for whatever purpose?
10      A.    Right.
11          MR. SHAW:  Objection.  Foundation.
12      Q.    And I see here mentioned the goal is
13  1.9 billion.  Do you see that?
14      A.    Yes.
15      Q.    Who set that goal or where did that
16  goal come from?
17      A.    Ian is saying guys, we need 1.95
18  billion.
19      Q.    Okay.  Ian is after the below
20  e-mail; right?  The e-mails are from the bottom
21  up in sequence?
22      A.    Yes.  It would have come from Ian or
23  Paolo.
24      Q.    Do you recall any discussions about
25  why we need 1.9 billion in unencumbered assets?

1          Blackwell - Highly Confidential
2       A.    Again, people closer to the deal
3   were negotiating whatever they were
4   negotiating.  I was being asked to carry out an
5   action.  I have a goal.  Find 1.9 billion of
6   unencumbered assets.
7       Q.    I just want to make sure, you were
8   not involved in the setting of that goal or --
9   am I correct to say you don't have any
10  knowledge of why that number was passed down to
11  you?
12      A.    I haven't -- no, I don't have
13  knowledge.
14      Q.    And now as I read this e-mail, the
15  bottom e-mail is Monty Forrest reporting on
16  some of the efforts to find unencumbered
17  assets; correct?
18      A.    Yes.
19      Q.    Okay.  And as we get to the upper
20  e-mail, Ian says he really needs 1.95 billion;
21  is that right?
22      A.    Yes.
23      Q.    But I don't understand what he means
24  by a shortfall in the 15C3 lock-up release.
25  Can you explain that?

1          Blackwell - Highly Confidential
2       A.    I don't know exactly -- the way I
3   would interpret this would be if he is looking
4   for -- if the target is to find 1.95 billion of
5   unencumbered securities, then -- if there is no
6   excess in the 15C3 or there is an excess, we
7   don't know at this point, because we haven't
8   rerun the calculation, then potentially finding
9   more unencumbered assets because you wouldn't
10  take -- if it is not an excess, you can't take
11  it, so it's a sum.
12      Q.    Is it correct to say he is asking
13  for a little more in the assets in case there
14  was no excess in 15C3, but actually there was a
15  shortfall --
16          MR. SHAW:  Objection.  Foundation.
17      Q.    -- in 15C3?  Is that right?
18      A.    No, I wouldn't interpret it like
19  that.  I think he is saying find -- review --
20  we are not looking for assets that aren't
21  there.  We are going through a process in a
22  very methodical way based on a set of -- an
23  understood approach which are under the rules
24  that we would apply to our depos, to the boxes
25  of Lehman Brothers, to find unencumbered

Blackwell - Highly Confidential

1
2    securities based on those rules to come up with
3    a list.  The data that we had, because Chase
4    had failed to send files for a period of time,
5    was incredibly difficult to work with.
6    Broker/dealer assets aren't run -- aren't used
7    to running over a weekend, they work on a
8    five-day week normally, so trying to create
9    this data was difficult.  So we are combing
10   through the data to create a list of
11   unencumbered assets.  We are recalculating the
12   15C3 to see what the segregation -- what the
13   lock-up requirement would be, on a hypothesis
14   that as customer assets had left Lehman
15   Brothers, then the requirement for a lock-up
16   would be reduced, so that would create an
17   unencumbered asset.  So we weren't looking for
18   things that weren't there.  We were looking for
19   things that were there based on the
20   challenge -- very challenged and uncertain data
21   that we had.
22        Q.   I think I understood what you just
23   said, but did you mean that over the previous
24   week presumably customers had left Lehman and
25   that would reduce the requirement for the 15C3

Blackwell - Highly Confidential

1
2    lock-up or reserve?
3        A.   That was a hypothesis.
4        Q.   And you were doing the calculation
5    to test that hypothesis?
6        A.   Yes.
7        Q.   Did it prove to be correct?
8        A.   I don't know what conclusion we
9    ultimately reached, because the data was so
10   challenging we didn't reach a conclusion that
11   weekend.
12        Q.   So do you know if there was an
13   excess in the end?
14        A.   I don't.  I don't recall whether
15   there was an excess or not.
16        Q.   When you say the data was so -- what
17   data are you talking about?
18        A.   Stock record data.  Books and
19   records of the firm are dependent on several
20   data feeds; trade data -- new trade data that
21   comes from the front office, external trade
22   data, so repo, for instance, coming from Chase,
23   these are all of the trades -- securities we
24   have pledged, I need that data, that needs to
25   be fed in, and then you carry out third

Blackwell - Highly Confidential

1
2    world -- a third-party check of your depos
3    versus the outside world, so your custody
4    information.  We had partial information around
5    repo coming back in and we had no visibility
6    over our depo at Chase, because they had
7    removed access to their systems, so we couldn't
8    operate in the normal course of business.
9        Q.   Depo means deposit?
10       A.   Depo means like a clearing box.  I
11   would use that term interchangeably.
12       Q.   And why had Chase cut off this data
13   stream?
14       A.   As a result of the funding activity
15   that is taking place.  I believe -- and this
16   is -- I didn't have a conversation with Chase,
17   but they rescinded access.  I passed that
18   information on to Paolo and asked him to speak
19   to Chase, because -- he in the end called Chase
20   and they still would not give us access to the
21   systems.
22       Q.   Did they ever restore access to the
23   system?
24       A.   Not that I'm aware of.
25       Q.   Were you party to any of those

Blackwell - Highly Confidential

1
2    conversations between Lehman and Chase about
3    this issue?
4        A.   No, I was not.
5        Q.   Do you have any understanding of why
6    they were restricting access to the system?
7        A.   I believe it's a dispute that they
8    had with Barclays around the financing trades
9    that were put on at that point.
10       Q.   Do you have any more detail in your
11   understanding than that?
12       A.   Just around -- just that.
13           (Exhibit 75 B, e-mail dated
14   9-20-2008, marked for identification.)
15       Q.   Mr. Blackwell, I am handing you a
16   document marked as Exhibit 75 B, which is a
17   similar e-mail stream to the one you previously
18   just looked at marked as sent on September
19   20th, 2008.  It appears to me to be the same
20   e-mail stream, only the last entry is a little
21   different than previously.  So my question has
22   to do with the first entry on page 1 after you
23   have had a chance to look at it.
24           (Document review.)
25       A.   Okay.

Page 194

Blackwell - Highly Confidential

1  unencumbered.
2
3    Q.  Did you have a number of
4  conversations with Mr. Lowitt over the weekend
5  about the subject of the unencumbered assets?
6    A.  I would imagine so, yes.
7    Q.  But is it fair to say they kind of
8  blur a little bit into one?
9    A.  It was -- it was.  It was -- they did.
10  It's hard to know exactly when and where these
11  conversations took place, but clearly we were
12  using e-mail a lot as well to just ask people
13  to create it.
14    Q.  Were any of your conversations with
15  Mr. Lowitt face to face?
16    A.  Some of them would be, yes.  Ian was
17  not -- some of them might have been.  Fairly
18  infrequently.
19    Q.  Did Mr. Lowitt prefer to communicate
20  by e-mail?
21    A.  I just had a very narrow set of
22  actions I was focused on, right, so I think it
23  wasn't a question whether he preferred to
24  communicate or not.  I was doing the task that
25  had been sent me and he wanted updates.  He

Page 195

Blackwell - Highly Confidential

1
2  would send "any update."  I think there are
3  lots of e-mails like that, and there were lots
4  of e-mails from me to the various teams that
5  were working on these things saying "any
6  updates."
7    Q.  Understood.  Do you remember when
8  your first conversation with Mr. Lowitt was
9  about this task that he had sent you?
10    A.  No, and it's possible it was Paolo
11  that initiated the work even.  Paolo Tonucci
12  may have even initiated the work.
13    Q.  So you may have gotten your marching
14  orders indirectly from Mr. Lowitt?
15    A.  That's quite possible.
16    Q.  You said that your task changed over
17  time and that your first task was to determine
18  whether there was, in fact, any unencumbered
19  assets; is that correct?
20    A.  Correct.
21    Q.  Did you have any understanding of
22  why it was you had been sent this task?
23      MR. SHAW:  Objection.  Asked and
24  answered.
25    A.  As I stated earlier, I had a goal

Page 196

Blackwell - Highly Confidential

1
2  that was sent me.  It wasn't a period of time
3  when we were asking lots of questions about why
4  we were doing it.
5    Q.  Did you come to learn at any time
6  that the purpose of you and your team
7  identifying unencumbered assets was that they
8  be transferred to Barclays?
9      MR. SHAW:  Objection.  Asked and
10  answered.
11    A.  There was a -- my understanding was
12  at some point later on over the course of the
13  weekend, I actually think it may even have been
14  the Monday that we were talking about
15  transferring these assets, talking with I think
16  the trustee of LBI even at that point.
17    Q.  That was a conversation you had with
18  the trustee of LBI?
19    A.  I didn't, no, but people within my
20  organization or people within the former Lehman
21  organization were having those conversations.
22    Q.  Okay.  What do you remember about
23  that conversation?
24    A.  I don't -- I didn't have it, so I
25  don't recall it.

Page 197

Blackwell - Highly Confidential

1
2    Q.  You just remember that there was a
3  conversation with the trustee?
4    A.  Yes.
5      MR. SHAW:  Objection.
6    Q.  About the subject of transferring
7  assets?
8    A.  I recall that there were -- there
9  was a dialogue with the trustee.
10    Q.  When you say "the trustee," do you
11  mean the trustee directly or the trustee's
12  office and his staff?
13    A.  I think it's probably something like
14  Anson Frelinghuysen.
15    Q.  We will put that under staff.
16      The second part of your marching
17  orders appears to be to ascertain the existence
18  or otherwise of any excess in Lehman's 15C3
19  account; is that correct?
20    A.  It was to recalculate the 15C3.  The
21  moneys and securities that were locked up in
22  association with that were managed by the
23  treasury function, I contributed data into the
24  calculation which finance ran and we ran that
25  calculation.

Page 198

```
1            Blackwell - Highly Confidential
2       Q.   And as I understand it, it is
3   Mr. Tonucci's team I think you said owns that
4   calculation?
5       A.   No, it's not.  It's Tony Stucchio
6   who reported to Martin Kelly.
7       Q.   And Mr. Kelly's position at the time
8   was?
9       A.   Financial controller.
10      Q.   And that's a separate reporting
11  stream from yourself and separate --
12      A.   Reported to Ian.
13      Q.   And separate from Mr. Tonucci?
14      A.   Paolo reported to Ian.
15      Q.   Did anybody tell you at any point,
16  Mr. Blackwell, that a certain amount of the
17  excess, if any, in the 15C3 fund was to be
18  transferred to Barclays?
19      MR. SHAW:  Objection to form.  Asked
20  and answered.
21      A.   There was a discussion about a
22  mechanism potentially, and I think I had that
23  conversation with Gerard LaRocco, to transfer
24  cash if the SEC, Mike Macchiaroli, signed off
25  that there was, indeed, an excess at a point in
```

TSG Reporting - Worldwide  (877) 702-9580

Page 199

```
1            Blackwell - Highly Confidential
2   time.  Now, that changed.  That was a mechanism
3   we looked at and discarded.  So that's the only
4   conversation that I had around moving cash.
5       Q.   When did you have that conversation
6   with Mr. LaRocco?
7       A.   I don't recall, again, exactly the
8   exact time.  It was probably on -- late on
9   Saturday, maybe Sunday, but certainly over that
10  weekend.
11      Q.   Mr. LaRocco was employed by Barclays
12  at that time; correct?
13      A.   Correct, but that was more about how
14  do you technically move money over a weekend.
15      Q.   What was the mechanism you discussed
16  with Mr. LaRocco?
17      A.   This is an operational process.  You
18  can't move money on a weekend, so discussing
19  opening up a bank account at -- I think it was
20  at Wells Fargo.  We didn't pursue that any
21  further.
22      Q.   It sounded like you also discussed
23  with Mr. LaRocco the need for the SEC to sign
24  off on any transfer of 15C3 funds; is that
25  accurate?
```

TSG Reporting - Worldwide  (877) 702-9580

Page 200

```
1            Blackwell - Highly Confidential
2       A.   Well, the SEC would have to give --
3   it is a bankrupt entity -- or the SEC would
4   need to approve any cash movement out of the C3
5   lock-up.
6       Q.   What's the basis of your knowledge
7   about that subject?
8       A.   Just -- what do you mean by the
9   "basis"?
10      Q.   How is it you are able to testify
11  about that fact?
12      A.   What fact?
13      Q.   That the SEC would have to approve
14  any transfer from a bankrupt entity.
15      A.   Because of the experience that I
16  have had.
17      Q.   That's all I was asking.
18           Did you have any conversations with
19  the SEC that weekend about the subject of the
20  15C3 in particular?
21      A.   Not over that weekend, no.  I think
22  I had conversations with -- I had many
23  conversations with the SEC post, but not over
24  that weekend.
25      Q.   The conversations that you have had
```

TSG Reporting - Worldwide  (877) 702-9580

Page 201

```
1            Blackwell - Highly Confidential
2   with the SEC subsequent to that weekend, are
3   they related to the transfer of funds from
4   Lehman's 15C3 account to Barclays?
5       MR. SHAW:  Objection.  Form.
6       A.   I wouldn't characterize them that
7   way.  The -- no, I wouldn't characterize them
8   that way.
9       Q.   How would you characterize them?
10      A.   The conversations I had with the SEC
11  have been around asset transfers, not
12  necessarily related to moneys due from the
13  15C3, although I think I have had one
14  conversation post the LBI bankruptcy with Mike
15  Macchiaroli and some other members of his
16  office where we discussed this and provided --
17  I think we may have -- we had a discussion
18  around the 15C3.  That was probably the only
19  direct conversation we have had specifically
20  around the 15C3.  Then in relation to other
21  asset transfers, the PIM asset transfer, we
22  have had a plethora of conversations of which
23  the 15C3 is a source of customer protection
24  and, therefore, moneys that you would expect
25  would be released as it relates to the PIM
```

TSG Reporting - Worldwide  (877) 702-9580

Page 202

Blackwell - Highly Confidential

1
2    transfer, so it's slightly tangential.
3        Q.    When did you have this conversation
4    with Mr. Macchiaroli?
5        A.    I don't know the exact date.  It was
6    probably on the Tuesday -- sometime in the
7    first week.
8        Q.    And when you say "the first week,"
9    just so we have a clear record --
10        A.    My first week at Barclays.
11        Q.    Who else was present for that
12    conversation with Mr. Macchiaroli?
13        A.    Kendall McLaughlin and Alex Crepeau,
14    I think.  I may not be correct.
15        Q.    Who is Kendall McLaughlin?
16        A.    He was responsible for regulatory
17    operations at Lehman Brothers.
18        Q.    Does he work for Barclays now?
19        A.    He does not at present.  He did
20    transfer.  He subsequently left.
21        Q.    Do you know where he is employed
22    now?
23        A.    Citibank.
24        Q.    And Mr. Crepeau you mentioned
25    earlier.  Was he --

Page 203

Blackwell - Highly Confidential

1
2        A.    Kendall's boss.
3        Q.    Did he transfer to Barclays?
4        A.    He did.
5        Q.    And is he still employed by
6    Barclays?
7        A.    He is.
8        Q.    Do you know what his position is?
9        A.    He is responsible for regulatory
10    operations.  He replaced Kendall.  He had
11    previously post bankruptcy been responsible for
12    the LBI TSA, the services provided by Barclays
13    to LBI for operations only.
14        Q.    Do you recall why it is you met with
15    Mr. Macchiaroli?
16        A.    Yes.  We discussed the potential
17    transfer of -- we wanted to transfer the
18    initial funding of the PIM accounts so -- this
19    is actually -- this meeting is later.  This is
20    a week later, actually.  Sorry.  My
21    recollection is wrong.  This is later on, this
22    meeting.
23        Q.    So if we are talking about the
24    closing of the deal on Monday, the 22nd, of
25    September, you think it's sometime the week

Page 204

Blackwell - Highly Confidential

1
2    of --
3        A.    I think it's later.
4        Q.    The week of Monday 29th?
5        A.    Or even possibly later.
6        Q.    Possibly afterwards?
7        A.    Yes.  So we were talking about the
8    transfer of the loan, the cash in the 15C3 that
9    was related to the margin loans, and that was,
10    I think, the first element of the conversation,
11    and I think the second component of the
12    conversation was as it related to the
13    $769 million worth of securities, Ginnie Maes
14    held at Chase that potentially were going to be
15    delivered as part of the -- that was one way to
16    satisfy the component of the APA, it would
17    either be securities or some alternative value.
18        Q.    Can you explain to me a little more
19    about your conversation that related to the
20    first alternative, the first part.  You said it
21    was cash in the 15C3 account or fund that
22    related to the margin.  What do you mean by
23    that?
24        A.    That's related to PIM.  PIM
25    customers take, borrow money against their

Page 205

Blackwell - Highly Confidential

1
2    positions.  They can borrow up to 440 percent
3    of value.
4        Q.    And you said the second subject, I
5    think probably the subject that I am more
6    interested in, is the $769 million of Ginnie
7    Mae securities that you said were potentially
8    to be transferred pursuant to the agreement
9    with Barclays; correct?
10        A.    769 value, so that was either going
11    to be satisfied through Ginnie Maes or other
12    alternative value, if there is an excess in the
13    C3, the 769 value.
14        Q.    It sounds like you have an
15    understanding now of the deal between Barclays
16    and Lehman, is that correct, at least in this
17    respect?
18        A.    Yes.
19        Q.    Can you tell me without waiving any
20    privilege, of course, and any of my questions
21    are not designed to discover information that
22    you discussed with your attorneys, but can you
23    tell me how it is you came to have that
24    understanding of the APA.  I ask because your
25    answers to Mr. Hine's questions suggested you

Page 206

Blackwell - Highly Confidential

1
2    weren't really involved and have no knowledge
3    of the deal and now you are telling me you have
4    some knowledge of the deal.
5        A.    This was after the event, after the
6    deal had closed, I believe, and that was where
7    these conversations began, in terms of
8    actioning the content of the deal.
9        Q.    Right.  Okay.
10       A.    It doesn't mean I had an
11   understanding of the whole deal.
12       Q.    I understand.  I don't think you
13   quite answered my question, though, which is
14   how is it that you came to have an
15   understanding that this was a term of the deal?
16       MR. SHAW:  If you can answer the
17   question without revealing discussions with
18   counsel.
19       A.    That is probably the most likely
20   source.
21       Q.    Okay.  Let's try it this way.  What
22   did you and Mr. Macchiaroli discuss in this
23   meeting that you testified about that took
24   place sometime in the week of September 29th or
25   perhaps later?

Page 207

Blackwell - Highly Confidential

1
2        A.    Asking the SEC to review the
3    calculation and release and authorize --
4    provide their sign-off that the C3 had an
5    excess or otherwise, but have an opinion on the
6    C3 and authorize a sign-off to the trustee of
7    LBI to release the cash related to the margin
8    balances, as I mentioned before, another
9    element of the PIM transfer, and securities
10   from -- securities from JPMorgan Chase.
11       Q.    Was this a meeting that you had
12   requested, Mr. Blackwell?
13       A.    I don't recall whether I requested
14   it.  It's quite possible I did.  The SEC set up
15   an office at 745, so were available.
16       Q.    Where did the meeting take place, at
17   the SEC's office at 745?
18       A.    Correct.
19       Q.    And this was Mr. Macchiaroli's
20   office?
21       A.    Yes.
22       Q.    Do you have any notes of the
23   conversation you had there?
24       A.    I don't believe I do.  I could go
25   back to my -- I could go back and try and

Page 208

Blackwell - Highly Confidential

1
2    review my papers.
3        Q.    Where would they be if you had them?
4        A.    Where would they be?  They are most
5    likely going to be in my e-mail and files are
6    also potentially in my boxes of files which I
7    have already reviewed and looked through, so I
8    can do that based on these questions.
9        Q.    Your counsel and I can talk off the
10   record about our document requests.
11              What was Mr. Macchiaroli's response
12   to your request that the SEC review and sign
13   off the 15C3 calculation?
14       A.    I don't think he was comfortable
15   doing it, doing that at that point.  He wanted
16   to get a better understanding of the books and
17   records at that point.  So I think we continued
18   to work with members of the SEC and to try and
19   provide them with a better understanding and
20   the finance team probably led that effort in
21   terms of the overall 15C3.
22       Q.    At the time you asked
23   Mr. Macchiaroli to sign off on this
24   calculation -- withdrawn.  I am going to set
25   that up a little better.

Page 209

Blackwell - Highly Confidential

1
2             You testified in response to
3    Mr. Hine's questions that you were
4    uncomfortable about the accuracy of the C3
5    calculation over the weekend of September 20th
6    and 21st; correct?
7        A.    To be precise, what I said, I was
8    uncomfortable about some of the inputs into the
9    calculation, not the calculation itself.
10       Q.    I didn't mean to mischaracterize
11   your testimony.  I didn't mean to suggest that
12   somehow the formula wasn't properly applied,
13   but it seemed to me that as of Sunday night,
14   the 21st, you were not comfortable that the
15   calculation, because of the reasons you have
16   testified to, you are not comfortable that the
17   calculation or the result of the calculation
18   was a hundred percent accurate; is that
19   correct?
20       A.    That's correct.
21       Q.    And what happened between Sunday the
22   21st of September and this meeting with the SEC
23   a week or so hence that allowed you to become
24   comfortable that the calculation was correct?
25       A.    I wasn't talking about the accuracy

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                Chapter 11

7        LEHMAN BROTHERS          Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,   (Jointly Administered)

9                Debtors.

10       ------------------------x

11

12            DEPOSITION OF ELIZABETH JAMES

13               New York, New York

14               January 14, 2010

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 27055

19

20

21

22

23

24

25

JAMES

1
2    Q.   Beginning of 2009?
3    A.   Yes.
4    Q.   Do you know where he is employed
5  today?
6    A.   I believe he is at Credit Suisse.  But
7  I'm not 100 percent sure.
8    Q.   Approximately how long did the
9  conversation with Ms. Taylor last on Sunday
10  evening?
11    A.   It was literally a five-minute
12  conversation.  She -- it was an, "Are you
13  prepared to talk to Jeff Jennings," and the
14  response was, "Yes, we are," and she then put
15  Jeff on the phone, so -- I suppose like a
16  go-between.
17        And then she put Jeff on the phone and
18  we made arrangements to actually go into the
19  Lehman offices on Monday morning.
20    Q.   Did Ms. Taylor remain on the phone
21  while Mr. Jennings was on the phone with you and
22  Mr. Stack?
23    A.   I'm actually not sure, to be honest.
24    Q.   And approximately how long did the
25  whole conversation take?

TSG Reporting - Worldwide    877-702-9580

JAMES

1
2    A.   It was literally -- she introduced, we
3  said yes, and we arranged then with Jeff to go
4  into the offices on Monday morning.  That was
5  it.  That was the whole of the conversation.
6    Q.   That affirmative yes was a decision by
7  Mr. Stack or you?
8    A.   Mr. Stack.
9    Q.   Did you then proceed to have that
10  meeting at Lehman on Monday morning?
11    A.   Yes, we did.
12    Q.   What time did that take place?
13    A.   I think it was 9 a.m.
14    Q.   And that's Lehman's offices at 745 7th
15  Avenue?
16    A.   Right, correct.
17    Q.   Who was present for that meeting?
18    A.   There was Tim Stack, myself, Sean
19  Byrne, B-Y-R-N-E, Alexandra Guest, who are all
20  Barclays employees.  There was Ken Raisler, who
21  is our counsel.
22    Q.   Sullivan & Cromwell; is that right?
23    A.   Yeah.
24        And then from the Lehman side, there
25  was Jeff Jennings, Donna Moran, Adam Cohen,

TSG Reporting - Worldwide    877-702-9580

JAMES

1
2  Michael Macchiavernia, and Ron Filler.  And Mike
3  Nielsen was on the phone.
4    Q.   Just starting with the Barclays
5  employees, Tim Stack's position at the time was?
6    A.   Global head of futures for Barclays.
7    Q.   Is that his position today?
8    A.   Yes.
9    Q.   And you're currently employed as
10  director in the futures sales department for
11  Barclays?
12    A.   Correct, yeah.
13    Q.   Was that your title at the time?
14    A.   Yes.
15    Q.   And Sean Byrne, what was his title?
16    A.   Sean was the U.S. futures head at that
17  time.
18    Q.   Is he currently employed by Barclays?
19    A.   He is.
20    Q.   What's his role today?
21    A.   He runs sales and trading for futures.
22    Q.   Alexandra Guest, what was her --
23    A.   Is our compliance officer.
24    Q.   And was she your compliance officer at
25  the time of the meeting?

TSG Reporting - Worldwide    877-702-9580

JAMES

1
2    A.   Yeah.
3    Q.   So we have four Barclays employees
4  there?
5    A.   Yes.
6    Q.   If you indicate affirmatively, it is
7  easier for Mary to take down.
8    A.   Sorry.
9    Q.   So on the Lehman side, we have
10  discussed Jeff Jennings already.  The second
11  person you identified was Donna?
12    A.   Donna Moran, and she was sales.
13    Q.   Is she employed by Barclays today?
14    A.   No.
15    Q.   Did she ever take a position at
16  Barclays?
17    A.   Yes, she did.
18    Q.   Do you know when she left?
19    A.   It was the end of the summer.
20    Q.   Do you know where she is employed
21  today?
22    A.   I don't believe she is.
23    Q.   You don't believe she is employed by
24  anyone?
25    A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 74

```
 1                JAMES
 2     A.  I reached out to George Paragham.
 3     Q.  How do you spell Paragham?
 4     A.  P-A-R-A-G-H-A-M.
 5     Q.  And do those underlying account
 6  statements that you used to create Exhibit 1,
 7  are those all once the exchange has closed out
 8  all of Lehman's proprietary future positions?
 9     A.  Let me just clarify something.  Not
10  all of the positions were closed by the
11  exchange.  Our Barclays traders had to close
12  some of those positions.
13     Q.  Understood.
14     A.  Yeah.
15     Q.  With that clarification in mind, do
16  the account statements that underlie this
17  exhibit all reflect the positions that Lehman
18  held at these brokers or custodians once the
19  accounts had been closed out?
20     MS. BLOOMER:  Objection to the vague
21  use of the words "positions" and "accounts."
22     A.  Yes.
23     Q.  Did those reports include any
24  information about what of this collateral was
25  held as margin?
```

TSG Reporting - Worldwide    877-702-9580

Page 75

```
 1                JAMES
 2     MS. BLOOMER:  Objection to the form.
 3     A.  I'm not sure what you --
 4     Q.  I'll ask a better question.  I'll try
 5  to at least.
 6     You described this as undelivered
 7  margin, correct?
 8     A.  Yes.
 9     Q.  This 457 million dollars that you have
10  in Exhibit 1 you described as undelivered
11  margin.
12     A.  It's -- it's--
13     Q.  Why do you describe it as margin?
14     A.  It is the money that's sitting in the
15  account at the brokers that has not come back.
16     Q.  And do you know how much of it was
17  used at margin -- as margin at the time of
18  closing?
19     A.  It would all be margin.  That's what
20  it is in the account.
21     Q.  Do you know how much of the margin was
22  excess to the minimum required by each exchange?
23     MS. BLOOMER:  Objection to the form.
24     A.  You need to clarify what you mean by
25  "excess."
```

TSG Reporting - Worldwide    877-702-9580

Page 76

```
 1                JAMES
 2     Q.  I am sorry, I thought I did.
 3     Each exchange requires a certain
 4  minimum number, amount of margin for each
 5  position, correct?
 6     A.  Yes.
 7     Q.  And from time to time, Lehman would
 8  have margin that exceeds those requirements,
 9  correct?
10     A.  Yes.
11     Q.  Do the reports that you base this
12  report on explain what the exchange minimum
13  margin was and whether there was any excess
14  margin beyond that?
15     A.  No.  But it -- we need to clarify --
16  no.  And the -- when you -- margin and -- when
17  you have money in an account, that is your
18  margin account.  OK?  That can be more than the
19  requirement for the initial margin for your
20  current position, because a lot of these
21  exchanges, you have to prefund your trading.  So
22  unless you have money in the account, you can't
23  trade.
24     So margin is -- it is -- it is one of
25  those clarifications between margin and excess.
```

TSG Reporting - Worldwide    877-702-9580

Page 77

```
 1                JAMES
 2  I'm just trying to -- I want to make sure that
 3  we are not --
 4     Q.  Are you able to tell me whether at the
 5  time of closing, these accounts contained margin
 6  that was in excess of the minimum required by
 7  each exchange?  And I'm referring to the account
 8  and the broker custodian accounts referenced on
 9  Exhibit 1 to your declaration.
10     MS. BLOOMER:  Objection to the form.
11  You are asking whether she can tell you that
12  now or whether she knew that then?
13     MR. OXFORD:  I am asking whether she
14  can tell me now.
15     A.  I would have to go and look.
16     Q.  Do you know whether or not Barclays
17  knew at the time of closing what -- sorry,
18  whether these accounts included excess margin?
19     A.  We had no idea.
20     Q.  Why did you have no idea?
21     A.  Because Lehman didn't either.  Sorry.
22     Q.  Can you explain that a little further?
23     A.  When Barclays took over on
24  September 22, we actually asked the Lehman
25  operations people for a list of their positions
```

TSG Reporting - Worldwide    877-702-9580

Page 78

JAMES

1
2  and their brokers and their accounts, and they
3  were not capable of giving it to us.  And in
4  fact, it took a fair number of days for us to
5  get all the information that was required,
6  because their books and records were in such a
7  mess.
8          And in fact, the proprietary trades
9  that were in these accounts we didn't even know
10  were there for a couple of days, because they
11  couldn't actually tell us that they were there.
12      Q.   Do you know whether or not Barclays
13  asked Lehman prior to the closing for
14  information about its proprietary future trades?
15      A.   I don't know.
16      Q.   When did Barclays first learn about
17  the margin that is reflected in Exhibit 1, the
18  457 million dollars?
19      A.   When we first knew it was actually
20  in -- the amount of money that was in the
21  accounts or the amount of money that was in the
22  accounts after the positions had been closed?
23      Q.   Sorry.  That's a good distinction.
24          When did -- I am sorry, withdrawn.
25          When did Barclays first learn that

TSG Reporting - Worldwide    877-702-9580

Page 79

JAMES

1
2  Lehman had proprietary future accounts?
3      A.   In the week following the 22nd.
4      Q.   Do you know whether or not Barclays
5  asked Lehman whether there were proprietary
6  future accounts prior to closing?
7      A.   I don't believe so.  I don't know.
8      Q.   And can you be more specific in terms
9  of when Barclays first learned about these
10  proprietary future accounts?
11      A.   On September 22, once we had taken
12  over, we requested information on all of the
13  accounts.  So the customers' accounts, the
14  broker relationships, and what the positions
15  were.
16          And between the 22nd and the -- which
17  was the Monday, and the Thursday or the Friday,
18  the operations guys actually kept coming up with
19  new house positions that they didn't actually
20  tell us on day one.
21          So on the 22nd, we were informed of --
22  and even though -- the VIX positions, which are
23  not on this exhibit because they were for the
24  affiliates.  It slowly came to light that they
25  had positions sitting in house accounts, over

TSG Reporting - Worldwide    877-702-9580

Page 80

JAMES

1
2  the course of that week.
3      Q.   Who were the operations guys that you
4  were getting this information from?
5      A.   Mike Nielsen, who ran global
6  operations for Lehman.
7      Q.   Is he employed --
8      A.   And people that work for him.  And no,
9  he is not still with...
10      Q.   He is the same Mike Nielsen who was at
11  the meeting on the 15th?
12      A.   Correct.
13      Q.   Do you know where he works today?
14      A.   As I said earlier, I think he works
15  for a charity.
16      Q.   Sorry.
17      A.   That's OK.
18      Q.   Do you know which of these accounts
19  were closed out by Barclays and which were
20  closed out by the exchanges?
21      A.   Not off the top of my head, no,
22  because it was not something I personally did.
23      Q.   Have you seen account statements from
24  the brokers or custodians that reflect the
25  margin requirements as of closing?

TSG Reporting - Worldwide    877-702-9580

Page 81

JAMES

1
2      A.   I have seen them, yes.
3      Q.   How is it you came to see them?
4      A.   In E -- the E-1 document -- the other,
5  the one that was referred to in -- those
6  statements were as of the time of the open
7  positions.  So would they have the numbers on?
8  Yes.  Did I look at them?  No.
9      Q.   Do you know whether or not those
10  account statements were available to Lehman at
11  the time of the closing?
12      A.   I would hope so.
13      Q.   Do those account statements, to your
14  knowledge, break down the margin between the
15  various forms in which margin might be held,
16  such as cash or securities?
17      A.   They should do, yes.
18          MR. OXFORD:  And Trish, do you know if
19  these have been produced to us?
20          MS. BLOOMER:  Broker statements?  I'll
21  have to confirm that.  I assume that they
22  were produced, but I can't be sure, so I'll
23  confirm and let you know.
24          MR. OXFORD:  Thank you.
25          MS. BLOOMER:  And you're talking about

TSG Reporting - Worldwide    877-702-9580

JAMES

1
2    the broker, would you be able to
3    answer that question about the total value or
4    net equity of the open positions in that
5    account?
6         MS. BLOOMER:  Objection to the form.
7    A.    Yes.  I could point out the open trade
8    equity number on those statements, yes.
9    Q.    And I think you testified before, but
10   I just want to be clear, you could also identify
11   from those statements how much collateral or
12   margin was posted against those open trades?
13   Correct?
14        MS. BLOOMER:  Objection to the form.
15   Mischaracterizes.
16   A.    Can we just clarify, you'd want to
17   know what the actual requirement from the broker
18   was for those positions?
19   Q.    That's my next question.
20   A.    Oh.  Then I don't understand the first
21   one, sorry.
22   Q.    You have told me that in order to
23   calculate the total open trade equity of a set
24   of positions in a particular account, and we are
25   discussing this in the context of the

JAMES

1
2    proprietary futures accounts that are reflected
3    on Exhibit 1 to your declaration, you would look
4    at the broker's statement and that would tell
5    you the answer to that question, correct?
6    A.    Correct.
7    Q.    Would that same broker's statement
8    also tell you how much margin was required by
9    the broker or the exchange to be posted as
10   against those positions?
11   A.    It should do.  And I -- that's why I
12   am saying it should.
13   Q.    And would those broker statements that
14   you have just testified about typically reflect
15   whether or not there was excess margin or
16   collateral posted over and above the minimum
17   requirements by that exchange or clearing house?
18   A.    Can we just clarify what you mean by
19   excess here?  Because I have a problem with the
20   word "excess," I'll be very honest.  Because
21   "excess" kind of gives the impression that it
22   is, you know, free money, and it is really not.
23   Let's be honest about this.
24        So that's why I want to clarify when
25   you use "excess," "excess" in the futures world

JAMES

1
2    is a very different word to what's used in the
3    rest of the world.  So I want to clarify, what
4    do you mean by "excess"?
5    Q.    I mean more than -- well, withdrawn.
6         Would the broker reports that you
7    would look to, to calculate or to show you what
8    the total open equity positions were, would
9    those same broker reports show you the margin
10   required by that exchange?
11   A.    They should do, and the reason I am
12   saying they should is because certain of the
13   brokers that they used, it does not, which is
14   why I am...
15   Q.    And would those same statements
16   typically show the amount of collateral that was
17   posted in addition to the amount of collateral
18   that was required by that exchange?
19        MS. BLOOMER:  Objection to the form.
20        At the time -- at the snapshot of the
21   broker's statement or -- I mean, I don't
22   think the question is clear about what time
23   you're talking about a requirement.
24   Q.    I'm talking about at any given date,
25   but particularly September 19, 2008.

JAMES

1
2    A.    But I can't talk to September 19.
3    That's -- that's my problem.
4    Q.    I understand.  I'm not asking you --
5    Ms. James, I'm not asking you what you did.  I
6    understand your testimony that you were not
7    involved in any such due diligence.
8    A.    Right.
9    Q.    I am asking you if you had to answer
10   this question, how would you go about doing it?
11   Does that help you answer the question?
12   A.    OK.  And this is why I want to clarify
13   "excess," because the problem is, people have
14   the habit of using the word "excess" as though
15   it is something that shouldn't be there.  OK.
16   Which is not the case in the futures world.
17        What you need to understand with the
18   way the futures account works, the money that's
19   held on your futures account is there to secure
20   your trading in that environment.  Yup.  So you
21   will have your open trade equity value that
22   moves every single day.  You will have cash on
23   the account that you have put up to cover that
24   open trade equity, OK.  You will have an initial
25   margin requirement that has been calculated

JAMES

1
2  based on the position you have open at that
3  time.
4          And then there may or may not be --
5  and then you'll get what we call your excess
6  deficit.  OK?  Which is known in the futures
7  world as period, this is the money that is above
8  and beyond what is required for this particular
9  day's trading.  OK?
10         That money can also be used or is also
11 used to fund your intraday margin calls, which
12 of course you don't know what they are at the
13 time, and also on certain exchanges your
14 prefunding.  So in most of the Asian exchanges,
15 you have to prefund.  So if you want to trade,
16 unless you have got money or collateral
17 securities in the account, you cannot trade.
18         Which is why the word "excess" is a
19 bit -- that's why I have a problem with it,
20 sorry, because people assume "excess" is
21 something that somebody could have taken away,
22 and that's actually not the case.
23     Q.  I appreciate that answer.  That clears
24 up a lot for me.  Thank you.
25     A.  So yes, if somebody said to me -- yes,

TSG Reporting - Worldwide    877-702-9580

JAMES

1
2  I would look at the broker's statements and
3  hopefully get all the information that's
4  required.
5      Q.  And if in this example, Lehman were to
6  have closed out at the end of the day on the
7  19th of September their proprietary futures
8  positions, would you be -- by looking at those
9  statements, be able to tell how much equity or
10 value would be returned to Lehman?
11         MS. BLOOMER:  Objection to form.  And
12 foundation.
13     A.  I just want to double check.  If I
14 looked at a broker statement that Lehman had,
15 they have closed the positions, what the value
16 was?  No.
17     Q.  Why is that?
18     A.  Because all I can tell you is the
19 balance in the account.
20     Q.  And why are you not able to tell me
21 the value that would return to Lehman if those
22 positions were closed out?
23     A.  Well, can we just clarify what you
24 mean by "value"?  Because perhaps -- to me, with
25 all the conversations we have had earlier,

TSG Reporting - Worldwide    877-702-9580

JAMES

1
2  value, we have been talking about the open trade
3  equity to the value of the open positions.
4  There is no open positions, there is no value.
5      Q.  Right.  Maybe I can --
6      A.  Sorry.
7      Q.  Let's go back.  Let's go back to
8  Exhibit 1, because I think we are getting close
9  here.
10         In the accounts reflected in
11 Exhibit 1, there were open positions that Lehman
12 held as of the 19th of September, 2008, correct?
13     A.  Yes.
14     Q.  And there was also margin?
15     A.  Yup.
16     Q.  And you have told me that you think
17 you would be able to tell me by looking at the
18 broker statements, with some exceptions, what
19 the value of those open positions was at the
20 close of a particular date.
21         MS. BLOOMER:  Objection to form.
22     Q.  How then would you calculate --
23 withdrawn.
24         You have also told me those broker
25 statements would include how much margin or

TSG Reporting - Worldwide    877-702-9580

JAMES

1
2  collateral was posted against those positions,
3  right?
4      A.  It should do, yes.
5      Q.  And also how much margin was required
6  against those positions on -- by the exchange.
7          MS. BLOOMER:  Objection to the form.
8  Mischaracterizes the testimony.
9      Q.  Correct?
10     A.  It should do.  Yes.
11     Q.  And then if Lehman were on Monday
12 morning, when the exchange is opened, to
13 liquidate those trades, does the broker
14 statement that you have been talking about tell
15 you how much value would return to Lehman?
16         MS. BLOOMER:  After the liquidation?
17         MR. OXFORD:  Yes.
18     A.  It would give you the total amount in
19 the account that they could remove.  Exactly the
20 same as my Exhibit 1.
21     Q.  I see.
22         MR. OXFORD:  Now might be a good time
23 for a lunch break.
24         MS. BLOOMER:  OK.
25         (Luncheon recess; 12:25 p.m.)

TSG Reporting - Worldwide    877-702-9580

Page 102

```
 1              JAMES
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 103

```
 1              JAMES
 2         AFTERNOON SESSION
 3            1:21 p.m.
 4        THE WITNESS:  I wanted to go back and
 5   clarify something.  When we were talking
 6   before the break about the closeouts and
 7   looking at the statement and the value, and
 8   I had to go back and read the question,
 9   sorry, I've muddled the two together, yeah,
10   because the question was, can you tell from
11   the statement the value of the positions,
12   which is correct, you can.
13        But can you tell the value of those
14   positions prior to them being liquidated?
15   No, you can't, which is what I just want to
16   clarify.
17        So can you look at a statement and
18   tell what its value is going to be?  No.
19   BY MR. OXFORD:
20   Q.   What would you have to look at to
21   determine the -- what the value of those
22   positions are going to be?
23   A.   Well, you can't.  I don't have a
24   crystal ball.  Because the problem is, you don't
25   know what price you are going to close out at.
```

TSG Reporting - Worldwide    877-702-9580

Page 104

```
 1              JAMES
 2   And that's why I wanted to go back and double
 3   check what was said again, because you said can
 4   you tell from the broker's statement, and then
 5   they close them, and I thought it was the other
 6   way around.
 7        So I thought we said can you tell from
 8   a broker's statement after you have closed them,
 9   yes.  Can you tell before they have closed them,
10   no.  All you can tell is the value as of last
11   night.  But you can't tell what the value of
12   that closeout is until you physically close it
13   in the market.
14   Q.   Because the market will move?
15   A.   The positions are going to move.  It
16   is a volatile -- which it was at that time.  It
17   is moving around all over the place.  So you
18   can't -- and I thought we meant -- yes, you can
19   look at the statement after they have been
20   closed.  You can't look at the statement before
21   they have been closed.  Does that --
22   Q.   I think I --
23   A.   Sorry.
24   Q.   I think I understand your
25   clarification.
```

TSG Reporting - Worldwide    877-702-9580

Page 105

```
 1              JAMES
 2   If you were to look at the broker's
 3   statements that you testified to just before
 4   lunch --
 5   A.   Yeah.
 6        MS. BLOOMER:  These are the statements
 7   on the 19th.
 8   Q.   The statements on the 19th.  You would
 9   be able to tell the total open equity positions
10   in that account, correct?
11   A.   Yes.  As of close of business of the
12   19th.
13   Q.   And you would also know the exchange
14   minimum margin that the exchange requires as
15   against those positions, correct?
16   A.   As of close of business on the 19th,
17   correct.
18   Q.   And you would also know the total
19   collateral posted against those exchange minimum
20   margin requirements, correct?
21   A.   Yes.
22   Q.   So you would know whether there was
23   more or less collateral than the exchange
24   minimum margin with, in fact, the close of
25   business on the 19th?
```

TSG Reporting - Worldwide    877-702-9580

Page 110

JAMES

1  for the 19th trading.  It would be the same
2  reports on the Saturday and the Sunday.
3      Q.   I see.  So if you on Sunday looked at
4  a report that has Friday's close prices, that
5  would be delivered sometime in the wee hours
6  Friday night, Saturday morning, you would be
7  able to tell what the, in this case the OCC's
8  margin requirements were, correct?
9          MS. BLOOMER:  Objection to form.
10      A.   You can tell what the OCC states the
11  number to be.
12      Q.   Right.  I understand an individual
13  participant may have a different view and may be
14  able to negotiate that with the OCC.
15      A.   Well --
16      Q.   May have a different view than the OCC
17  on that margin requirement.
18          MS. BLOOMER:  Objection.  Is that a
19  question, what you understand?
20      Q.   Is that correct?
21      A.   Hang on, wait a minute.
22      Q.   Withdrawn.  It is not -- it is not
23  material.
24          Just to round out this set of
25

TSG Reporting - Worldwide    877-702-9580

Page 111

JAMES

1  questions, Ms. James, you told me a few minutes
2  ago that the purpose of the margin was to make
3  sure that the exchange has enough money to pay
4  the opposite side of the trade.
5          MS. BLOOMER:  Objection.
6  Mischaracterizes the testimony.
7      Q.   Is that what you said?
8      A.   At --
9      Q.   Is that a -- is that a fair
10  characterization of what you said, if not word
11  for word?
12      A.   Can we go back and check, that's
13  exactly what I said?
14          MS. BLOOMER:  Do you want her to
15  confirm that it is word for word what she
16  said?
17          MR. OXFORD:  I'm just trying to lay
18  the foundation.
19          MS. BLOOMER:  Fair enough.
20          You can answer the question to the
21  best that you can.
22      A.   I think that's -- I would have to go
23  back and check exactly what I said.  I don't
24  remember word for word, I'll be honest.
25

TSG Reporting - Worldwide    877-702-9580

Page 112

JAMES

1      Q.   So in our example, on Monday morning,
2  before the markets open, the OCC would have set
3  the margin so that they would have enough money
4  to pay the opposite side of the trade in what
5  eventuality?
6          MS. BLOOMER:  Objection to form.
7      A.   In -- what do you mean, in --
8      Q.   Why does the exchange need to have
9  margin so that they know they have enough money
10  to pay the other side of the trade?
11          MS. BLOOMER:  Objection to form.
12      Q.   Is it in case of default by the
13  member?
14      A.   It is default by the member, but it's
15  also the volatility of the trading that's going
16  to occur that day.  So the initial margin is
17  there.  OK.  And the initial margin is normally
18  based on a certain amount of movement in the
19  market during the trading day.  OK.  So -- and
20  this may be more detail than you need.
21      They have what they call limit up and
22  limit down, and based on how much the market
23  moves up or the market moves down, it is never
24  more than the range of that initial margin.  If
25

TSG Reporting - Worldwide    877-702-9580

Page 113

JAMES

1  it is, they end up halting trading and calling
2  more initial margin.
3      Now, because of the volatility at that
4  time in the markets in the two, three weeks
5  before and the three, four weeks after, let's be
6  honest about this, it was a constant move on
7  that initial margin requirement and what was
8  being called.
9      So yes, on the morning, there would
10  have been initial margin requirement, and I'm
11  pretty sure there was another call at intraday,
12  another call in the afternoon.  There was a
13  constant moving target.
14      Q.   Do you know whether or not when
15  Barclays started trading Lehman's positions,
16  customer and firm, for options and futures on
17  September 22 of 2008, do you know whether there
18  in fact was an additional margin call made by
19  any exchange?
20      A.   You said traded customers' positions.
21  You don't trade -- that's what you --
22      Q.   Sorry.
23      A.   Sorry.  I just -- customers trade for
24  themselves.
25

TSG Reporting - Worldwide    877-702-9580

Page 114

1             JAMES
2     Q.   Right.
3     A.   I don't know.  I would have to go back
4  and check.
5     Q.   Looking at the OCC statements, for
6  example, to continue that example, that reflect
7  Friday night's close, the 19th.
8        MS. BLOOMER:  Which statement in your
9  question reflects Friday night's close?
10  What statement are you talking about in your
11  question?
12        MR. OXFORD:  We can look at a specific
13  statement this afternoon, but I'm trying to
14  understand the subject generally.
15        MS. BLOOMER:  OK.  I just want to be
16  sure that she understands the question.
17     Q.   It is your testimony, if I am
18  understanding you properly, you would be able to
19  tell on Monday morning what the open equity
20  positions were in any particular account,
21  correct?
22     A.   As of close of business of the 19th,
23  yes.
24     Q.   Correct.
25        So when the markets open at 8 a.m. or
   TSG Reporting - Worldwide    877-702-9580

Page 115

1             JAMES
2  at least, say, one minute before the markets
3  open, 7:59 a.m., would you know what the open
4  equity positions were, correct?
5     A.   Yes.
6     Q.   And you would know this just by
7  looking at the OCC statement?
8     A.   You know the net, yes.
9     Q.   Right.  You --
10     A.   You don't know an individual
11  customer's position.
12     Q.   It is not a spreadsheet of thousands
13  and thousands of pages, correct?
14     A.   No.  It is the net number the OCC is
15  calling that member.
16     Q.   And again, just so we are clear,
17  looking at that report, you would know the
18  exchange minimum margin that the OCC has
19  requested or requires?
20     A.   Yes.
21        MS. BLOOMER:  Objection to form.
22     Q.   Correct?
23     A.   Yes.
24     Q.   And you would know whether or not
25  there was collateral posted that was greater
   TSG Reporting - Worldwide    877-702-9580

Page 116

1             JAMES
2  than that minimum requirement, correct?
3     A.   Yes.
4     Q.   Would you use that report, Ms. James,
5  to assess the risk inherent in holding those
6  positions?
7     A.   No.
8        MS. BLOOMER:  Objection to form.
9  Would she or did she?
10     Q.   I think it is would.
11     A.   No.
12     Q.   Why not?
13     A.   Because it doesn't give you the
14  details of the trade.  Without the details of
15  the trades, you have got no idea.
16     Q.   Looking at the OCC's statement before
17  the markets open on September 22, would you be
18  able to assess the risk in assuming those
19  positions -- withdrawn.
20        Looking at the OCC statement on the
21  morning of September 22, before the markets
22  opened, that reflects the Friday night prices
23  and the Friday night margin based on those
24  prices, would you be able to assess the risk
25  inherent in taking on those positions if the
   TSG Reporting - Worldwide    877-702-9580

Page 117

1             JAMES
2  intention was to liquidate those positions
3  immediately?
4     A.   No.
5     Q.   Why not?
6     A.   Because the OCC reports don't give you
7  the detail of the transactions.
8     Q.   If you liquidated all the positions
9  held at the OCC on Monday morning, as soon as
10  the markets opened, what would happen?  Would
11  the margin be applied to those positions?
12     A.   Yes.  But we need to -- the issue is,
13  if you were going to close those positions on
14  the Monday morning, OK, you have to know what
15  those positions are.  You have to know
16  exactly -- and I'm assuming we are talking more
17  about the OCC options here, rather than the
18  futures.
19        You have got to know those positions,
20  you have got to know the history and the
21  volatility of that product, and you have got to
22  look at where it stands and what's the
23  volatility behind it and whether you're looking
24  at a balanced portfolio or a nonbalanced
25  portfolio.
   TSG Reporting - Worldwide    877-702-9580

Page 118

JAMES

1

2    So to just say I'm going to close out
3    all these positions on a Monday morning would
4    not be the smartest move to do, let's be honest
5    about this. And plus, you don't know what price
6    you're going to get if you went into the market
7    and closed them out.
8        The OCC position that Lehman had was a
9    fairly large substantial position, as I've now
10   seen it, OK. If you had gone into the market on
11   Monday morning and closed all of those positions
12   out, there would have been absolute havoc in the
13   market.
14       Q.    Why would there have been havoc in the
15   market?
16       A.    Because of the size of the positions
17   that you're attempting to close out. Yeah. So
18   the volume of the positions, the risk
19   associated. You would have moved the market
20   price substantially if you had attempted to
21   close all of those positions in one go. The
22   risk associated with that is just -- I wouldn't
23   even want to go there.
24       Would there have been enough margin to
25   cover? Yeah, I'm not convinced there would have

TSG Reporting - Worldwide    877-702-9580

Page 119

JAMES

1

2    been.
3        Q.    Why not?
4        A.    Due to the size of their positions
5    they had on. And, you know, actually in the
6    deposition of, I think it was Craig Jones --
7        MS. BLOOMER: Declaration?
8        A.    Declaration, I'm sorry. I muddle the
9    two together.
10       The Craig Jones who is the Treasury
11   guy for the OCC, it actually states, the OCC
12   actually would not allow Lehman to take back
13   money on the Friday. They gave them -- they
14   gave them an extra call, margin call on Friday
15   due to the positions they had on and the
16   volatility in the market.
17       Q.    When did Barclays first learn that?
18       A.    When did we learn --
19       Q.    About the additional margin call that
20   you were just talking about.
21       A.    I don't know when Barclays learned
22   about it. I only learned about it from actually
23   Craig's declaration. Because that would have
24   been proprietary information to Lehman.
25       Q.    In your experience, Ms. James, is that

TSG Reporting - Worldwide    877-702-9580

Page 120

JAMES

1

2    a typical way for -- withdrawn.
3        How typically are margin calls made in
4    or at the OCC?
5        MS. BLOOMER: Objection, foundation.
6        A.    Daily.
7        Q.    How are they communicated to the
8    member?
9        A.    It depends on how the member wishes to
10   have them. The OCC has an online system that
11   you can actually go on and look the number up.
12   They will sometimes call you and sometimes they
13   will do it by e-mail.
14       I don't know Lehman's process.
15       Q.    In terms of the OCC, if the OCC makes
16   an additional margin call intraday, do you have
17   any understanding as to whether or not that is
18   reflected in the OCC's books and records?
19       A.    I'm actually not sure, I'll be honest.
20   I don't know.
21       Q.    So you don't know -- if you got a
22   margin call during the day, you don't know
23   whether or not by the end of the day Lehman -- I
24   am sorry, the OCC's books and records will be
25   updated to reflect that?

TSG Reporting - Worldwide    877-702-9580

Page 121

JAMES

1

2        A.    They will be updated to reflect the
3    money if you had to wire more money in or if you
4    had to put in more securities. But if it was
5    money that was already there that they are not
6    allowing you to take out, then it hasn't
7    changed. So it depends on --
8        Q.    Well, I'm not sure I quite understand
9    that. I thought you said there was an
10   additional margin call made to Lehman on Friday,
11   the 19th of September?
12       A.    Right. And if you read Craig's
13   declaration, what he says is, they went to
14   withdraw money on Friday from the OCC, which was
15   a requirement above and beyond the initial
16   requirement they had there, so they chose to
17   pull it back into their normal, regular bank
18   account, I'm assuming to satisfy other
19   requirements.
20       When they called that money back, the
21   OCC said no, and the OCC said no, we are keeping
22   that money as an additional requirement.
23       Q.    And would you expect the OCC to update
24   their books and records to reflect that?
25       MS. BLOOMER: Objection, foundation.

TSG Reporting - Worldwide    877-702-9580

Page 122

JAMES

1
2    A.    No.  No, because they haven't changed
3    anything.  There is nothing for the OCC to
4    reflect.
5        Q.    I understand that you are not an OCC
6    expert.  It is -- futures is your area of
7    expertise, not the OCC.
8            Have you ever heard of a margin call
9    being made in the manner that you have just
10   described?
11       A.    Yes.
12       Q.    Under what circumstances?
13       A.    Normally very extreme, volatile
14   markets.
15       Q.    That's happened to you in your tenure
16   at Barclays?
17       A.    No.  Previous company.
18       Q.    Where did it happen?
19       A.    ABN AMRO.
20       Q.    And that's prior to your employment
21   with Barclays that began in 2001?
22       A.    Yup.
23       Q.    Can you give me a year of when this
24   call happened?
25       A.    Year 2000.

TSG Reporting - Worldwide    877-702-9580

Page 123

JAMES

1
2        Q.    Could we return to your declaration,
3    which is 535-A.
4        A.    Yup.
5        Q.    Could you turn to page or paragraph 9.
6            MS. BLOOMER:  Can we just pause for
7    one minute so I can run back and get my
8    copies of this exhibit.
9            MR. OXFORD:  Yeah, sure.
10           MS. BLOOMER:  Thanks.
11           (Recess)
12       Q.    Ms. James, you have your declaration
13   in front of you?
14       A.    I do, yeah.
15       Q.    Looking at paragraph 9, you see that
16   it says as of closing, LBI held in open -- LBI
17   held open LBI futures in account number 084F at
18   the OCC.  Do you see that?
19       A.    No.
20       Q.    And do you know, sitting here today,
21   what the total open equity was in that account?
22       A.    No.
23       Q.    Have you ever known that answer?
24       A.    No, I don't think I have.
25       Q.    If you were to calculate the total

TSG Reporting - Worldwide    877-702-9580

Page 124

JAMES

1
2    open equity in that account, can you tell me how
3    you would go about that?
4            MS. BLOOMER:  Objection, vague as to
5    time frame.
6        A.    Are we talking as of the day we took
7    over?  So September 22?
8        Q.    My question is not particularly
9    bounded by time, but you can pick that day if
10   you like if that's helpful.
11       A.    So we would have taken the positions
12   in the account, identified what the positions
13   were, the prices that they were originally
14   traded at and marked them versus the closing
15   price on the day that we are looking to mark
16   them to and that would give you the current
17   value for that day.
18       Q.    And if you wanted to figure out the
19   total open equity as of Monday morning before
20   the markets close on the 22nd of September, how
21   would you do that?  Would that change your
22   answer?
23           MS. BLOOMER:  Objection.
24       A.    Yeah.
25       Q.    OK, can you tell me under that

TSG Reporting - Worldwide    877-702-9580

Page 125

JAMES

1
2    scenario you would go about determining that?
3        A.    Well, what you would have to do is
4    take the trades that you have on.  You are then
5    going to have to go look at a screen, a trading
6    screen to see where is the current value which
7    of course is constantly moving and try and
8    price.
9        Q.    I don't mean to interrupt.  My
10   question was before the markets open on Monday
11   morning.
12       A.    Sorry, then it would be -- you can
13   only value it based on the closing price of the
14   previous night.
15       Q.    That closing price, if I understand
16   your previous testimony correctly, would be
17   available in a summary OCC report?
18       A.    Yes.
19           MS. BLOOMER:  Objection to form.
20       Q.    Is that correct?
21       A.    Yes.
22       Q.    If you could have in front of you just
23   briefly Mr. Romain's notes again.
24       A.    These?
25       Q.    These are marked as Exhibit 534A.  We

TSG Reporting - Worldwide    877-702-9580

Page 182

JAMES

1  of lots.  There was a number on it, but there
2  was no designation if that was actually a value
3  or not.  And there was no separation between it
4  being client, house, or affiliate.
5      So was something sent to Barclays,
6  yes.  Could Barclays actually take from that
7  what they were getting?  No.
8      (Exhibit 554, e-mail dated 9/19/2008
9  with attachment marked for identification,
10  as of this date.)
11  Q.   Ms. James, I have handed you what I
12  have marked as Exhibit 554 which I will identify
13  for the record as an unBates-stamped e-mail from
14  Christopher Mincak, M-I-N-C-A-K, to Stephen King
15  and others at Barclays on Friday, 19th of
16  September, 2008 at 4:445 p.m.?
17      MS. BLOOMER:  Note for the record that
18  I believe we did provide you the Bates
19  numbers for this even though it doesn't
20  appear on this, in an e-mail last night.
21  Q.   OK.  Can you take a moment to look at
22  Exhibit 554 and can you tell me if that is the
23  report to which you refer in your notes that you
24  just testified about.?
25

TSG Reporting - Worldwide    877-702-9580

Page 183

JAMES

1      MS. BLOOMER:  Objection, vague.  I
2  believe she refers to more than one report.
3  A.   Yes, but I certainly didn't see all of
4  this.
5  Q.   When you say you never saw all of it,
6  can you explain?
7  A.   I think, I think the report I was
8  originally shown, there was like 25 pages.
9  Not -- not a brick.
10  Q.   And who showed you the report, the 25
11  page version of the report, Ms. James?  Was that
12  Mr. King?
13  A.   Yeah.
14  Q.   So is it your testimony that you have
15  seen 25 pages of this --
16  A.   Yes.
17  Q.   -- e-mail and the attachment?
18  A.   Yes.
19  Q.   But you haven't seen the whole thing?
20  A.   Correct.
21  Q.   It is your testimony that Mr. King did
22  not show you that at the time?
23  A.   Correct.
24  Q.   Without taking the requisite hours to
25

TSG Reporting - Worldwide    877-702-9580

Page 184

JAMES

1  go through line by line, could you tell me
2  whether the full report that I have placed in
3  front of you and marked as Exhibit 554 contains
4  more information and specifically more useful
5  information in determining the value of LBI's
6  open positions at the OCC than the report that
7  Mr. King showed you on Sunday the 21st of
8  September.
9  A.   No, it doesn't.
10  Q.   Why is that?
11  A.   There is no lots.  There is no
12  designation of house and customer.  Or firm or
13  affiliate.  There is no designation.  It doesn't
14  tell you who these positions belong to.  It
15  doesn't give you the number of lots.
16  Q.   OK, do you know whether Barclays asked
17  for the information about lots, clear value,
18  client and house positions that you say is
19  missing from this report?
20  A.   I don't know.
21  Q.   And you don't know because you weren't
22  part of the deal team?
23  A.   Correct.
24  Q.   And you have never learned that fact

TSG Reporting - Worldwide    877-702-9580

Page 185

JAMES

1  subsequently?
2  A.   No.
3  Q.   Did Barclays have any in-house options
4  experts at the time of the closing?
5  A.   I don't know to be honest.
6      (Exhibit 555, document Bates stamped
7  BCI-EX-(S) 188225 through 270 marked for
8  identification, as of this date.)
9  Q.   Thank you, Ms. James.  I have handed
10  you a document that is marked as Exhibit 555.  I
11  believe it has actually been marked as 394B.
12  But I'm not 100 percent, so I marked it again.
13  I will identify this for the record as -- sorry,
14  this has not been previously marked as 394B.
15      I will identify it for the record as
16  an e-mail bearing the Bates range BCI-EX-(S)
17  00188225 and it is from Frank Pearn to Tim Stack
18  and others.  September 21, 2008.  Have you seen
19  this document before?
20  A.   Yes.
21  Q.   Tell me the circumstances in which you
22  have seen it, please.?
23      MS. BLOOMER:  Objection to the extent
24  you can answer without revealing privileged

TSG Reporting - Worldwide    877-702-9580

Page 186

JAMES

1    information.
2    A.    I saw it on Sunday, September 21st.
3    Q.    Tell me the circumstances under which
4    you first saw this e-mail sent September 21.
5    A.    This was given to me and asked if I
6    could explain how to read the report.
7    Q.    Given to you by Mr. King?
8    A.    By Mr. Stack.
9    Q.    What did you tell Mr. Stack when he
10   asked you if you could read the report?
11   A.    I said yes.  And I told him how to
12   read it.
13   Q.    And how is it that you were able to
14   read this report?  Have you seen reports like
15   this before?
16   A.    Yes.
17   Q.    Under what circumstances had you seen
18   reports like this before?
19   A.    This is a report from the OCC.  It is
20   the same report they use for their futures as
21   well as for their equity options.  It is a
22   standard format.  You read it in the same way.
23   Q.    If you could direct your attention to
24   your notes, page 1 for a moment.  You reference

Page 187

JAMES

1    in 9/21, 4:07 p.m. e-mail saying e-mail to Tim
2    with OCC reports reflecting 9/19 and 9/22
3    reports?
4    A.    That's this.
5    Q.    In case there is any confusion in the
6    record, the time stamp on the document marked as
7    555 is in Greenwich mean time.  It says 8:07
8    p.m. as opposed to the 4:07 p.m. in your notes?
9    A.    Yeah, that's probably right.
10   Q.    And is it fair to say, Ms. James, that
11   the information that appears in bullet point
12   form below the line we have just read, first of
13   all, report reflecting 9/19 date showed a total
14   of 2,148 -- I am sorry, 2,148,180,547.47.  That
15   figure is drawn from your analysis of this
16   report, correct?
17   A.    Correct.
18   Q.    And it is a total of what, Ms. James?
19   A.    If you actually --
20   MS. BLOOMER:  You're asking about the
21   9/19 entry on her notes?
22   MR. OXFORD:  Yes, the one that I just
23   read.
24   BY MS. BLOOMER:

Page 188

JAMES

1    Q.    Can you tell me where on the report
2    that 2.1 billion dollars comes from?
3    A.    OK, so if you go past the second blue
4    divider and the very first page --
5    Q.    Do you have a Bates number, that's the
6    number that appears at the --
7    A.    Yes, so BCI-EX-(S) 00188255.
8    Q.    And what you have done to get that 2.1
9    billion dollars is total the three entries that
10   appear under the column "face value"?
11   A.    That's correct.
12   Q.    What does that 2.1 billion dollars
13   represent, Ms. James?
14   A.    As per the breakdown, it is a letter
15   of credit, it's cash, and it's government
16   securities that Lehman had with the OCC for
17   their trading.
18   Q.    Posted as margin by the -- by Lehman
19   with the OCC?
20   MS. BLOOMER:  Objection to form.
21   A.    Yes.
22   Q.    Is part of that also clearing fund to
23   your knowledge?
24   A.    I actually don't know.  It doesn't

Page 189

JAMES

1    say.  So I wouldn't actually know.
2    Q.    And for whose options, has Lehman, in
3    this report, posted this collateral?
4    A.    It doesn't tell you.
5    Q.    Is that information available anywhere
6    in this report?
7    A.    No.
8    Q.    Is it -- does this report break down
9    the collateral that's posted in categories,
10   whether they are posted for customer positions,
11   firm positions, et cetera?
12   A.    For the report, this report dated
13   9/19, no, it does not.
14   Q.    So I take from your answer, you have
15   seen another report that does break it down like
16   that?  Is that correct?
17   A.    (Indicating).  The next day.
18   Q.    Can you indicate by Bates range?
19   A.    So it is BCI-EX-(S) 00188233 through
20   to BCI-EX-(S) 00188254.
21   Q.    Which exhibit number are you looking
22   at?
23   A.    555.
24   Q.    I see, it is attached to the same

Page 190

JAMES

1
2  e-mail?
3      A.  Yes.
4          MS. BLOOMER:  Whenever you reach a
5  good time for a break, we would like to take
6  a break.
7          MR. OXFORD:  We can take a break just
8  now.
9          (Recess)
10     Q.   Directing your attention to Bates
11  number 18233 of Exhibit 255.  It is the page I
12  think we were looking at just before the break.
13  And it appears to reflect that in the OCC
14  account 074C, collateral of a total of 507
15  million and change was posted by Lehman, is that
16  correct?
17     A.  Correct.
18     Q.   You read the report the same way as I
19  do?
20     A.  Yes.
21     Q.   In fact, that number is reflected at
22  the bottom of your chart at the bottom of page 1
23  of your notes, isn't it?
24     A.  Correct.  Yes.
25     Q.   And I think I have this, but I just

Page 191

JAMES

1
2  want to make sure that I understand it, Lehman
3  posted that collateral with the OCC to secure
4  options placed on behalf of customers, correct?
5      A.  Correct.
6      Q.   And do you know whether or not
7  Lehman's customers also -- to secure Lehman's
8  obligation to the exchange or the posting of
9  this collateral -- also provided Lehman with
10  collateral?
11         MS. BLOOMER:  Objection beyond the
12  scope of the 30(b)(6).
13         (Record read)
14     A.  I don't, but I'm actually going to do
15  a but, and say in Craig Jones' declaration, he
16  actually states that the money posted at the OCC
17  for all of the business was Lehman's money.
18     Q.   Right, I understand that.  I
19  appreciate that clarification.  Your testimony
20  is the same as Mr. Jones' testimony, right?
21     A.  Yes.
22     Q.   You don't disagree that the 2.1
23  billion dollars that you have identified as
24  being reflected as posted by Lehman at the OCC
25  in this report Exhibit 555 -- you don't dispute

Page 192

JAMES

1
2  that that's Lehman's money?
3      A.  No.
4      Q.   That Lehman, at least insofar as this
5  account 074C, posted to secure the obligations
6  that relate to Lehman's customers options,
7  correct?
8      A.  Correct.
9      Q.   My question is a little different.  To
10  secure or in return for the posting of this
11  margin, this 507 million dollars in account
12  074C, do you know whether Lehman obtained
13  collateral from customers?
14         MS. BLOOMER:  I object to the form of
15  the question.  I would also object that this
16  is beyond the scope of this witness'
17  testimony today.
18     A.  And I am going to have to say I don't
19  know, because I honestly don't.
20     Q.   Who would you ask if you wanted to
21  know the answer to that question?
22     A.  This is equity options.  I would ask
23  somebody in the Lehman -- probably be their PB
24  world, prime brokerage world.
25     Q.   Do you believe Mr. Jones would know

Page 193

JAMES

1
2  the answer?
3      A.  He may do.  I don't know.
4      Q.   What about Mr. Dziemian?
5      A.  I'm not sure.
6      Q.   If I could direct your attention to
7  the second page of your notes, Ms. James.  There
8  is a reference again 9/21, 4:07 p.m.  Do you see
9  that, a little more than halfway down?
10     A.  Yes.
11     Q.   Tim receives an OCC group board
12  activity date 9/22/08?  Do you see that?
13     A.  Yes.
14     Q.   And that reports excess across all
15  accounts of 689 million dollars, correct?
16     A.  Yes.
17     Q.   When was the first time that you saw
18  the report that you are referencing?
19     A.  Sunday, Sunday the 21st of September.
20     Q.   Did Mr. Stack give you that?
21     A.  Yes, he did.
22     Q.   Go off for one second.
23         (Pause)
24     Q.   Is that activity the report, the OCC
25  report?

Page 194

JAMES

1
2        MS. BLOOMER: Objection, foundation.
3        Q.   Is the OCC report that you have
4    referred to Mr. Stack receiving at 4:07 p.m. on
5    the 21st, is that Exhibit 555?
6        A.   Yes.
7        Q.   It is?
8        A.   Yes.
9        Q.   And you note below that this exhibit
10   shows EXC across all accounts of 689 million
11   dollars, correct?
12       A.   Yes.
13       Q.   Can you explain to me what that means?
14       A.   From the exchange reports, there is
15   actually a line here that gives you a number
16   with EXC.
17       Q.   And EXC refers to excess?
18       A.   Yes.
19       MS. BLOOMER: Objection, foundation.
20       Q.   And what do you understand excess to
21   mean in this context?
22       A.   In this particular context?
23       Q.   Yes, the context of this report?
24       A.   Right. And in this particular side of
25   the report, because you have to be very

TSG Reporting - Worldwide    877-702-9580

Page 195

JAMES

1
2    specific, yeah, that means that is money that
3    was placed -- actually money, collateral or LCs
4    that were at the OCC to cover the initial margin
5    requirement. And that's above and beyond the
6    requirement required by the exchange.
7        Q.   OK. What do you explain to --
8    withdrawn.
9        Did Mr. Stack ask you to interpret
10   this report?
11       A.   Yes.
12       Q.   And what did you tell him in response
13   to that request?
14       A.   I explained what the numbers were.
15       Q.   And those are the numbers that you
16   have in your 30(b)(6) notes breakdown by type
17   Exhibit 552?
18       A.   Yes.
19       MS. BLOOMER: Objection to the form of
20   the question. Are you asking whether she
21   can recall now that these are the precise
22   numbers that she explained to him then? Or
23   are you asking her whether these numbers are
24   the same numbers on the page?
25       MR. OXFORD: I think my question was

TSG Reporting - Worldwide    877-702-9580

Page 196

JAMES

1
2    clear. I'm asking her what she told
3    Mr. Stack.
4        A.   This is what I told Mr. Stack.
5        Q.   The numbers that are on the page?
6        A.   Yes.
7        Q.   Thank you.
8        MS. BLOOMER: The numbers that are on
9    which page? I just want to be clear. I'm
10   not clear.
11       Q.   The numbers on the page --
12       MS. BLOOMER: The numbers on the page,
13   this page of this report, page Bates
14   numbered 233?
15       THE WITNESS: Yes.
16       MS. BLOOMER: So these particular
17   numbers you told him?
18       THE WITNESS: Yes.
19       MS. BLOOMER: OK. Sorry.
20       Q.   That section of the report that starts
21   at 233, do you see that?
22       A.   Yes.
23       Q.   Do you see that that report goes on
24   for a number of pages through Bates range 254?
25       A.   Yup.

TSG Reporting - Worldwide    877-702-9580

Page 197

JAMES

1
2        Q.   And did you discuss with Mr. Stack all
3    of the numbers on this page?
4        A.   Yes.
5        Q.   These pages between the two Bates
6    ranges?
7        MS. BLOOMER: Please specify which
8    page you are talking about when you asking
9    the questions.
10       Q.   Between Bates range 188233 and 188254.
11       A.   Yes.
12       Q.   And those numbers are which are excess
13   margin and various accounts at the OCC are also
14   reflected under breakdown by type on page 2 of
15   your notes, Exhibit 552, correct?
16       A.   That's correct.
17       Q.   Do you remember anything else about
18   the discussion with Mr. Stack on the 21st?
19       A.   No.
20       Q.   What did he say when you gave him this
21   information?
22       A.   He said OK. Knowing Tim.
23       Q.   Do you know -- you will see, directing
24   your attention to 188233, do you see the report
25   has an activity date at the top? Do you see

TSG Reporting - Worldwide    877-702-9580

Page 198

JAMES

1  that?
2  A.   Yes.
3  Q.   That's 9/22/2008.
4  A.   Yes.
5  Q.   Do you have any understanding of why
6  the activity date on this report was 9/22?
7  A.   It was because it was an option
8  weekend, expiry weekend.
9  Q.   Can you explain that a little further?
10  A.   The third Friday of every month, and
11  especially on the quarter months, is a main
12  option expiry weekend.  So the options go off
13  over that weekend.  They actually are either
14  exercised or assigned.  The weekend of 19th, 21,
15  20 was an option expiry weekend.
16          So the OCC puts out reports on the
17  morning of the Saturday morning which are the
18  regular calls, and then they would do the option
19  exercises and reassignments and issue you a new
20  set of numbers.
21  Q.   Does this report fall into the latter
22  category, the new set of numbers that you are
23  talking about?
24          MS. BLOOMER:  Objection, no

TSG Reporting - Worldwide    877-702-9580

Page 199

JAMES

1  foundation.
2  A.   Yes, it does.
3  Q.   And the system date that you see just
4  below the activity date, do you see that?
5  A.   Um-hm.
6  Q.   That system date is 9/20/2008?
7  A.   Yes.
8  Q.   Do you have an understanding of why
9  the system date is different from the activity
10  date?
11          MS. BLOOMER:  Objection, no
12  foundation.
13  A.   I believe, it's how the OCC dates
14  their reports.
15  Q.   OK.  I think this is clear from your
16  prior testimony, but just to be sure, is it your
17  understanding, Ms. James, that this report
18  reflects the Friday mark-to-market close prices
19  in the OCC system?
20          MS. BLOOMER:  Objection,
21  mischaracterizes her testimony.
22  A.   No.
23  Q.   Why not?
24  A.   What I don't know is once they have

TSG Reporting - Worldwide    877-702-9580

Page 200

JAMES

1  done the option exercises and assignments, is
2  whether they revalue.  That, I don't know.
3  Q.   Can you explain a little further what
4  do you mean about the option exercises and
5  assignments?
6  A.   When you book off an option exercise
7  or assignment, you are taking it out of being a
8  position.  So it is no longer an open position.
9  You are actually taking it off the books and
10  there is a value that goes with that.
11          What I don't know is if they use the
12  closing prices of Friday night or if they use
13  the closing prices that have been determined for
14  the exercise and assignment process.
15  Q.   Do you have an understanding of how
16  they -- they being the OCC -- determine the
17  closing prices for the exercise and assignment
18  process?
19          MS. BLOOMER:  Objection, no
20  foundation.
21  A.   No, I don't.
22  Q.   So you told Mr. Stack, when he asked
23  you to interpret this report, that this showed
24  that Lehman, as of the date of this report, had

TSG Reporting - Worldwide    877-702-9580

Page 201

JAMES

1  an excess of collateral at the OCC of close to
2  700 million dollars, correct?
3          MS. BLOOMER:  Objection to the form of
4  the question.  I don't think she has ever
5  said that she told Mr. Stack that number in
6  particular.
7  A.   Yeah.  I told him these are the
8  numbers on the report and how to read them.
9  Q.   Did you add it up for Mr. Stack?
10  A.   I don't remember, to be honest.
11  Q.   You don't remember giving him a total?
12  A.   I may have done.
13  Q.   I think we covered this earlier.
14  Below the list of numbers, you write,
15  "subsequent knowledge, 9/19/OCC late margin
16  call"?
17  A.   Yes.
18  Q.   As a 30(b)(6) witness for Barclays,
19  are you able to tell me when Barclays first
20  learned about the late margin call that you have
21  testified about earlier?
22  A.   I think within the first two to three
23  weeks after September 22.
24  Q.   But that Barclays did not know to your

TSG Reporting - Worldwide    877-702-9580

Page 202

JAMES

1
2  knowledge, and as the 30(b)(6) witness, about
3  that late margin call until after closing,
4  correct?
5      A.   Correct.
6      Q.   Again, as the 30(b)(6) witness for
7  Barclays, what was Barclays' knowledge of the
8  excess in margin posted at the OCC by Lehman as
9  of the closing of the deal?
10         MS. BLOOMER:  Objection to the use of
11  the term "excess."
12     A.   Can we just clarify what do you mean?
13     Q.   Right.  Sure.  And I do want to be
14  very clear on this.  Your notes reflect, and I
15  think your testimony reflects, that Exhibit 555
16  which you reviewed with Mr. Stack --
17     A.   Yup.
18     Q.   -- the Sunday before the deal
19  closed --
20     A.   Yes.
21     Q.   -- shows an excess across all Lehman
22  accounts at OCC --
23     A.   Yes.
24     Q.   -- of over 689 million dollars?
25     A.   Yup, that's the -- yes.

TSG Reporting - Worldwide    877-702-9580

Page 203

JAMES

1
2      Q.   As Barclays 30(b)(6) witness, what was
3  Barclays' knowledge of the excess --
4      A.   The knowledge was --
5      Q.   Let me finish that.
6      A.   Sorry.
7      Q.   -- of the excess collateral that
8  Lehman had posted at the OCC over and above the
9  margin requirements of the OCC as at the closing
10  of the deal before the markets opened on
11  September 22, 2008?
12     A.   So I -- on the Sunday 21st, when we
13  received this report.
14     Q.   Or 7:59 a.m. before the markets
15  opened?
16     A.   The only information we had is these
17  were the numbers at the OCC that had been
18  provided.  We did not know at that time whether
19  the customers had paid the funds, who the
20  collateral and the excess belonged to.
21  Subsequent to that, based on Craig Jones'
22  testimony, we had found out it was all LBI
23  money.  But at that time on Sunday 21st, we did
24  not know.
25         We did not know what the positions

TSG Reporting - Worldwide    877-702-9580

Page 204

JAMES

1
2  were.  We didn't know the breakdown, we didn't
3  know the volatility of any of those positions
4  that were on on the Sunday.
5      Q.   You didn't know the breakdown of what?
6      A.   The positions.
7      Q.   The underlying option positions that
8  might be long and short Barclays had no
9  information?
10     A.   Correct.
11     Q.   Did Barclays ask for information about
12  that prior to closing?
13     A.   I don't know.
14         MS. BLOOMER:  Objection, beyond the
15  scope of the 30(b)(6).
16     Q.   We may have covered this earlier.  If
17  so, I apologize.  Do you know whether or not
18  Barclays posted additional margin in the OCC
19  accounts that it assumed from Lehman in the week
20  following the closing?
21         MS. BLOOMER:  Objection, beyond the
22  scope of the 30(b)(6).
23     A.   I would certainly assume yes due to
24  the volatility.  I think the weeks following, we
25  lost roughly 700 million dollars based on the

TSG Reporting - Worldwide    877-702-9580

Page 205

JAMES

1
2  positions that were there.  So yes, they
3  definitely would have posted.
4      Q.   You lost 700 million dollars based on
5  which positions?
6      A.   The positions that were in the OCC
7  account.
8      Q.   Which OCC account?  The proprietary
9  ones or all of the them?
10     A.   All of them.  I mean, the volatility
11  that week was horrendous.
12     Q.   Well, I'm confused because I thought
13  you told me earlier that the customers accept
14  the gains and losses for any -- when an option
15  is closed out and there is a gain or loss, that
16  is not something that Barclays assumes
17  responsibilities for; it is the customer's
18  option, correct?
19     A.   Correct.  These weren't just customer
20  though, these were house as well.
21     Q.   I understand that.  Maybe we are just
22  talking past each other again.  I thought you
23  said Barclays lost 730 million dollars post
24  closing on all of the OCC accounts.?
25         MS. BLOOMER:  You can look at the

TSG Reporting - Worldwide    877-702-9580

Page 1

1          HIGHLY CONFIDENTIAL - J. HRASKA

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                  Debtors.

10

     -----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF JAMES HRASKA

14              New York, New York

15              August 14, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24039

Page 6

1     **HIGHLY CONFIDENTIAL - J. HRASKA**
2     **answer the questions.**
3            **On occasion, your counsel will state**
4     **an objection or, you know, make some kind of**
5     **objection for the record.  That doesn't relieve**
6     **you of the obligation to answer the question.**
7     **It's just him trying to either correct a portion**
8     **of my question or preserve an objection.**
9            **In that regard, throughout the day, I**
10    **am undoubtedly going to a misuse a word or some**
11    **kind of acronym or some technical term that you**
12    **folks use every day in your line of business**
13    **which I'm not as familiar with as you are,**
14    **obviously, so please correct me if I misuse a**
15    **word or I ask a question that's misleading in**
16    **any way or you just don't understand the**
17    **question because I would like to ask a clear**
18    **question so you can answer it.**
19           **Is that okay?**
20    A.    That's fine.  Thank you.
21          MR. SHAW:  Just before we begin,
22    again, I want to put on the record our
23    understanding that we will designate the
24    entire transcript highly confidential and
25    then we'll go back and redesignate.

Page 7

1     HIGHLY CONFIDENTIAL - J. HRASKA
2           MR. HINE:  Yes.  That's true.  That's
3     fine.
4     Q.    One other thing before we get started,
5     Mr. Hraska.  I imagine you're aware that you've
6     been designated as what's called a 30(b)(6)
7     witness by your employer, by Barclays, as to
8     particular topics, and they relate to Schedules
9     A and B which we'll discuss later.  So when we
10    get to that portion of the deposition, I'll let
11    you know and we'll treat that portion as a
12    30(b)(6) deposition, but I'll let you know as we
13    get there.
14          MR. SHAW:  Just so we're, again,
15    clear, Bill, as I think you know, he is one
16    of several witnesses who's been designated
17    as partially responsive to those particular
18    topics.
19          MR. HINE:  I understand.
20    Q.    So, unless you have any questions, we
21    can get started.
22    A.    No, I'm fine.
23    Q.    Okay.  Can we just review briefly your
24    employment history with Lehman?  What was the
25    last position you held at Lehman?  I'm talking

Page 8

1     **HIGHLY CONFIDENTIAL - J. HRASKA**
2     **about in the period of September 2008.**
3           A.    I was senior vice president from a
4     corporate title perspective and I managed the
5     Secured Financing Operations Group.
6     Q.    And can you just describe for me what
7     that means?  What were your responsibilities and
8     duties in that position?
9     A.    The Financing Operations, also known
10    as a financing middle office, is a group that
11    sits between a bunch of groups, but primarily
12    trading and sales individuals and clearance and
13    settlements folks, and we do tasks such as, you
14    know, monitoring positions, reconciling
15    differences, dealing with, you know, customer,
16    you know, concerns, bringing the attention of
17    customers' concerns to either sales staff or
18    trading staff.
19          We also deal with legal and compliance
20    and regulatory on certain matters.  If there
21    are, you know, questions or queries as to the
22    nature of the transactions, if somebody needs
23    some technical expertise on, we usually provide
24    that expertise as to the structure of the
25    transactions and things like that.

Page 9

1     HIGHLY CONFIDENTIAL - J. HRASKA
2     Q.    And who did you report to in that
3     position?
4     A.    At Lehman Brothers at the time, I was
5     reporting to Monty Forrest.
6     Q.    Did you report directly to anyone
7     else?
8     A.    No, under that structure I was a
9     direct report of Monty Forrest.
10    Q.    And who were your direct reports?
11    A.    My direct reports now or at the time?
12    Q.    At the time in September of 2008.
13    A.    Okay, my direct reports in the U.S.
14    were Nancy Denig, D-E-N-I-G, and Paul Lindner.
15    Q.    Prior to this position -- or, let me
16    ask you another question.  How long were you in
17    this senior vice president position?
18    A.    Approximately five to six years.  I
19    don't remember the exact date, actually.  I
20    don't remember the exact date when I got my
21    senior vice presidentship.
22    Q.    Okay.  How long had you been in the
23    position of managing the secured financing?
24    A.    It began in 2001, but it began in a
25    much smaller scale.  I only managed a portion of

Page 10

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  it and over time it grew into a larger and
3  larger responsibility.  At the point of
4  September, I was managing both equity and fixed
5  income.  I was managing that globally as well.
6      Q.  Okay.  When did you join Lehman?
7      A.  August of '93.
8      Q.  So you held this management position
9  since 2001, you said?
10     A.  That particular one related to
11  Financing Operations since 2001, yes.
12     Q.  What did you do before that at Lehman?
13     A.  I did a host of different roles, all
14  in derivatives-based.  I worked in Derivative
15  Settlements, I worked in Derivatives Middle
16  Office, and I also worked in a Structured
17  Products and Reinsurance Middle Office as well.
18     Q.  Okay:
19     A.  And over the period of time I also
20  held management positions in those roles as
21  well.
22     Q.  When you say middle office, could you
23  just tell me what that means?
24     A.  Middle office is similar to the way I
25  described it before for financing, only it was

Page 11

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  for derivative-related products.  So same types
3  of trader inquiries, sales inquiries, customer
4  resolutions to problems, things like that.
5      Q.  Did there come a point when you left
6  Lehman and moved to Barclays?
7      A.  Yeah, I mean after the -- after the
8  declaration of bankruptcy, Barclays extended an
9  offer of employment to me, which I accepted.
10     Q.  Okay.  And when did you start working
11  for Barclays, do you recall the date?
12     A.  I don't know, I can't for certain be
13  given the official date.  When I started, I was
14  extended an employment contract, which I signed,
15  and I believe I signed that sometime in October,
16  but I don't know what the specific date that
17  Barclays considers me an official employee
18  versus when I stopped my Lehman employment.
19     Like I was never out of work for a
20  period of time.  I mean, I continued to show up
21  every day.  I'm just not sure what point in time
22  they considered me officially a Barclays
23  employee.
24     Q.  I understand.  When did you consider
25  yourself to be working for Barclays?

Page 12

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.  I mean, I guess I considered myself to
3  be working for Barclays in the week after the
4  declaration of bankruptcy.
5      Q.  Okay.  We're going to be talking about
6  these weeks for the whole deposition, so the
7  week of September 15 is the week you're
8  referring to as the week where they declared
9  bankruptcy; is that right?
10     A.  The week is when -- September 15 is
11  when Lehman declared bankruptcy.  I wasn't
12  completely confident that I was a Barclays
13  employee until I guess the week of the 22nd,
14  because I was still working, you know, with LBI
15  in the U.S. broker-dealer, so I wasn't actually
16  sure of my status at that point, to be
17  completely honest.
18     Q.  I understand.  Okay.  So that
19  September 22 was a Monday, correct?
20     A.  I believe so, yeah.
21     Q.  Had you had any discussions with folks
22  at Barclays prior to September 22 about the
23  possibility of you going to work for Barclays?
24     A.  No.
25     Q.  When do you recall first speaking to

Page 13

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  anyone at Barclays about you becoming a Barclays
3  employee?
4      A.  I would say it was in that week of the
5  22nd.
6      Q.  Okay.  Had you spoken to any folks at
7  Lehman prior to September 22 about the
8  possibility of you moving over and becoming a
9  Barclays employee?
10     A.  Well, wait.  Could I just go back to
11  that previous question?
12     Q.  Sure.
13     A.  When I spoke on that week of September
14  22, like I had never had any employment
15  conversations with a legacy Barclays employee.
16  All my conversations were with legacy Lehman
17  employees, so either my manager, which was Monty
18  Forrest, or Alastair Blackwell.
19     So like nobody from like Barclays HR
20  had approached me or had offered me any
21  conversations prior to my conversations with my
22  legacy Lehman managers.  I don't know if that's
23  important or not.
24     Q.  No, I just want to make sure we're all
25  on the same page here.

Page 14

HIGHLY CONFIDENTIAL - J. HRASKA

1

2    So when you say legacy Lehman
3  managers, you're talking about people who were
4  previously employed with Lehman who may now be
5  employed with Barclays?
6    A.   Yes.
7    Q.   Okay.  So am I correct to say that,
8  prior to September 22, you had had no
9  conversations with anyone who was -- who had
10  always been a Barclays employee as to your
11  possibility of you going over working for
12  Barclays; is that right?
13    A.   That's correct.
14    Q.   So had you had conversations with
15  legacy Lehman employees or people who were
16  employed with Lehman at the time prior to
17  September 22 about the possibility of you going
18  to work for Barclays?
19    A.   No.
20    Q.   Okay.  Do you recall any conversations
21  with Mr. Forrest or anyone in your chain of
22  command about the possibility of you going to
23  work for Barclays?
24    MR. SHAW:  Asked and answered.
25    A.   No.

Page 15

HIGHLY CONFIDENTIAL - J. HRASKA

1

2    Q.   Okay.  Before I forget, what is your
3  current position at Barclays?
4    A.   I am in a very similar role.
5  Corporate title-wise I'm a director, which is
6  equivalent to SVP.  I manage, again, Secured
7  Financing Operations for both equities globally
8  and fixed income in North America.
9    Q.   Is it fair to say your role is -- your
10  duties and responsibilities are relatively the
11  same as you had when you were at Lehman?
12    A.   Responsibilities are reasonably the
13  same, not quite as extensive as they were at
14  Lehman from a global perspective.
15    Q.   Who do you report directly to now?
16    A.   I have a dual reporting line.  From a
17  product perspective, I still report to Monty
18  Forrest.  And Barclays is structured a little
19  bit different, so from a regional perspective, I
20  report to Alastair Blackwell.
21    Q.   And who are your direct reports?
22    A.   My direct reports now are still Nancy
23  Denig, Paul Lindner, and a gentleman by the name
24  of Henry Duarte, D-U-A-R-T-E.
25    Q.   Okay.  Anyone else?

Page 16

HIGHLY CONFIDENTIAL - J. HRASKA

1

2    A.   No.  Not direct reports, no.
3    (Exhibit 136B, a document bearing
4  Bates Nos. BCI-EX-00077317 through 77319,
5  marked for identification, as of this date.)
6    Q.   Mr. Hraska, I apologize, I'm not
7  trying to be intrusive here, but I need to ask
8  you some questions about your compensation.
9    A.   That's fine.
10    Q.   So I'm handing you a copy of Exhibit
11  136B, which appears to be an agreement between
12  yourself and Barclays dated September 22, 2008,
13  and my question to you is, have you ever seen
14  this document before?
15    MR. SHAW:  Take a minute to look at as
16  much of it as you need to.
17    A.   Yes, I've seen this before.
18    Q.   What is this document?
19    A.   This was the document offering me
20  employment at Barclays.
21    Q.   Okay.  And is this your current
22  employment contract with Barclays?
23    A.   It is, yes.
24    Q.   Okay.  Did you sign it on September
25  22?

Page 17

HIGHLY CONFIDENTIAL - J. HRASKA

1

2    A.   I don't believe so.
3    No, on October 2, when it's dated.
4    Q.   Okay.  Any understanding of why it's
5  dated September 22, but you didn't sign it until
6  October 2?
7    MR. SHAW:  Foundation.
8    A.   I have no idea.  I mean, I'm -- I
9  signed it September 22nd because that's when I
10  decided to agree to the terms.
11    Q.   Okay.  Was there any negotiations
12  between you and Barclays as to the compensation
13  part of your employment?
14    A.   No.
15    Q.   Okay.  How did it take place?  Did
16  they just give you a copy of this letter and ask
17  you to sign it?
18    A.   The letter was sent to me via
19  interoffice mail.
20    Q.   Uh-huh.
21    A.   It was preceded by a phone call which
22  said, you know, you're a key employee that we
23  would like to retain, we're going to be sending
24  you a letter for, you know, an offer to join
25  Barclays.  We would like you to review it and,

Page 26

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    MR. SHAW:  If you know.
3    A.    It was used -- it was to be used for
4  anybody who would provide us secured financing.
5  In the end, it ended up being the Fed, but --
6    Q.    Did you have any understanding during
7  that weekend that there were discussions between
8  Lehman and the Fed about providing financing?
9    A.    No, not specifically.
10    Q.    Okay.  Let's just continue through the
11  week briefly and then we'll come back to
12  different topics.
13        On the Monday of the 15th, were you
14  involved in any negotiations between Barclays
15  concerning the sale transaction that ultimately
16  took place between Barclays and Lehman?
17    A.    No.
18    Q.    Were you asked to provide any
19  information to those who were involved in those
20  negotiations?
21    A.    No.
22    Q.    Were you involved in negotiations with
23  the Fed about the Fed financing that was
24  provided during that week?
25    A.    No.

Page 27

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    Q.    Were you asked to provide information
3  in support of that financing?
4    A.    No.
5    Q.    Okay.  What did you do ultimately on
6  that Monday, if you recall?
7    A.    A year ago?
8    Q.    Well, it's a big day.  It's an
9  eventful day in Lehman's history, correct?
10    A.    It is.
11    Q.    What do you recall doing the Monday
12  when Lehman Holdings filed for bankruptcy?
13    A.    Well, I mean, I guess the first thing
14  to do was, you know, talk to my manager and ask
15  him, you know, kind of what our next steps were.
16  Do we carry on as normal, do we do something
17  different, or do we wait for further
18  instructions or, you know, basically what do we
19  do.
20    Q.    Okay.
21    A.    He advised me that we were going to
22  carry on as normal.  We were, at the time, we
23  were still trying to preserve the liquidity and
24  functioning of the broker-dealer, and as far as
25  financing transactions, just to clarify, you

Page 28

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  know, our involvement was to find collateral and
3  those -- that financing by the Fed that you
4  referred to was -- those programs are open to
5  every broker-dealer, and every broker-dealer at
6  the time -- the market was in a very, you know,
7  as you know, very turbulent situation -- every
8  broker-dealer was taking advantage of those
9  programs so it was normal course for us to
10  figure out what assets we could finance with the
11  Fed that potentially wouldn't be financeable
12  with other counterparties.
13        And that was our focus that week, was
14  to try to locate all the collateral that we had
15  available to finance that the Fed would deem
16  acceptable in their programs.
17    Q.    Okay.  And so were you involved in the
18  selection of the securities that were ultimately
19  pledged to the Fed?
20    A.    I wasn't involved in the selection of
21  what was pledged to the Fed.  I was involved in
22  identifying assets which were not encumbered and
23  could be used as collateral to be pledged to the
24  Fed.
25    Q.    Okay.  And who actually selects which

Page 29

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  collateral was pledged to the Fed?
3    A.    The Fed programs are, at least the
4  ones we used for financing, were tri-party
5  transactions.
6    Q.    Right.
7    A.    And the actual selection criteria
8  itself was done by the tri-party agent.
9    Q.    Who was that?
10    A.    JPChase.  JPMorgan.
11    Q.    And can you describe for me your role,
12  if any, in supporting the financing that was
13  provided by the Fed?
14    A.    My role was to communicate between
15  the -- between the trading desks and the
16  tri-party operations groups and just coordinate,
17  you know, the availability of collateral and the
18  booking of the transactions which would
19  ultimately represent that financing.
20    Q.    Okay.
21    A.    So the trading desk basically books
22  the transaction onto a system.  My group's role
23  is to ensure that that booking makes it all the
24  way through the front-end booking system all the
25  way through to the system that is the books and

1           HIGHLY CONFIDENTIAL - J. HRASKA
2    records and what transmits that transaction to
3    our tri-party agent and that there's no
4    discrepancies, everything matches with what the
5    traders know to have raised from a financing
6    perspective.
7           And then we coordinate with the
8    tri-party operations folks to make sure that
9    there were no mechanical difficulties in the
10   allocation that's performed by the tri-party
11   agent, that there wasn't any shortfalls of
12   collateral and things of that nature, and then
13   report back to the trading desk.
14       Q.   Do you have any involvement in how
15   that collateral is valued?
16       A.   No.
17       Q.   Who does that?
18       A.   The tri-party agent.
19       Q.   And that would be Chase?
20       A.   JPChase, yes.
21       Q.   Does Lehman --
22       A.   Going forward, should we just refer to
23   it as Chase?  Because I'm not sure JPMorgan
24   Chase, JPChase.
25       Q.   That's fine.  We'll use Chase as a

1           HIGHLY CONFIDENTIAL - J. HRASKA
2    shorthand.
3        A.   That's fine.
4        Q.   So, to your knowledge, with respect to
5    that Fed financing of the week of September 15,
6    Chase placed a value on the collateral that was
7    used?
8        A.   That's correct.
9        Q.   Did Lehman place its own value on that
10   collateral?
11          MR. SHAW:  Objection.  Vague.
12       A.   I don't know that -- Lehman, as a
13   normal broker-dealer would have their own marks
14   for collateral on their books and records.
15       Q.   Right.
16       A.   The final determinant of that
17   collateral with respect to the financing
18   transaction would be the responsibility of the
19   tri-party agent.
20       Q.   Okay.  And do you know if there's
21   any -- were there any differences in the
22   valuations that Lehman would -- placed on that
23   collateral versus what Chase placed on that
24   collateral during that week?
25       A.   I don't know.

1           HIGHLY CONFIDENTIAL - J. HRASKA
2        Q.   Okay.  Would you be involved in that
3    normally?
4        A.   No.
5        Q.   Okay.  Before we go further on in that
6    week, do you have any understanding of the
7    actual sale transaction, the terms of the sale
8    transaction between Lehman and Barclays?
9        A.   No, I don't.
10       Q.   Did you ever have a chance to look at
11   what's known as the Asset Purchase Agreement?
12       A.   No, I didn't.
13       Q.   Did you ever have any understanding
14   about the terms of the transaction whereby
15   Lehman assets were going to be transferred to
16   Chase -- I mean to Barclays?
17          MR. SHAW:  Objection to form.
18       A.   At what point in time are you
19   referring to?
20       Q.   Okay.  Let's break it down.  Early in
21   the week, Monday, Tuesday?
22       A.   Of the week of the 15th?
23       Q.   Of the week of the 15th.
24          Did you have any understanding of the
25   terms of the deal between Lehman and Barclays?

1           HIGHLY CONFIDENTIAL - J. HRASKA
2        A.   I did not.
3        Q.   Did you have any understanding that the
4    Asset Purchase Agreement called for the sale
5    of $70 billion in long positions to Barclays?
6        A.   I did not.
7        Q.   Had you ever heard that phrase used?
8        A.   No.  That number is a completely new
9    number to anything I've had heard.
10       Q.   You never heard that number during
11   that week?
12       A.   During -- to this day.
13       Q.   Okay.  I'm just trying to get a sense
14   of what you were involved in.
15       A.   That's fine.
16       Q.   Had you ever heard during that week
17   that the transaction involved the transfer of
18   $69 billion in short positions to Barclays?
19       A.   No.
20       Q.   Okay.  Going further on in the week,
21   did there come a time when you learned some of
22   the terms of the transaction between Lehman and
23   Barclays?
24       A.   During that week, no.
25       Q.   After moving to Barclays, have you

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   learned some of the terms of the transaction
3   between Lehman and Barclays?
4       A.   At a much later time, yes.
5       Q.   What have you learned about it?
6       A.   I learned that Barclays has purchased
7   the unencumbered assets -- the way I understand
8   it is they purchased the unencumbered assets of
9   Lehman Brothers' clearance boxes.
10      Q.   Anything else that Barclays purchased?
11      A.   The building at 745.
12      Q.   Anything else?
13      A.   No.
14      Q.   When you say "unencumbered assets,"
15  what do you mean by that?
16      A.   An unencumbered asset, from my
17  perspective, as an operations professional, is
18  an asset which does not have a lien on it by any
19  other party, primarily customers.
20      Q.   And when you say "in the clearance
21  boxes," what are you referring to?
22      A.   Clearance boxes are -- it's a loose
23  term that can be defined in two ways:  A
24  clearance box can be a location at a depository
25  institution, such as DTC, or it can be a

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   clearance or -- a location at a clearing bank,
3   such as a JPChase or Bank of New York, or it can
4   refer to the record of your having those
5   accounts on your stock records.  So basically
6   your stock record represents your position of
7   those locations at those outside agents.  So
8   it's used intermittently, depending upon the use
9   or the person using it.
10      Q.   And what is your understanding of the
11  amount or the value of the assets that were
12  transferred from Lehman to Barclays?
13      MR. SHAW:  Objection.  Just for
14  clarification, do you mean as unencumbered
15  assets or overall?
16      MR. HINE:  Whatever assets he thinks.
17      Q.   Let me clarify that.  Let's take out
18  the real estate.
19      A.   Okay.
20      Q.   What is your understanding of the
21  value of the assets other than the real estate
22  that were transferred from Lehman to Barclays?
23      A.   At what point in time?
24      Q.   Now.
25      A.   As of today?

HIGHLY CONFIDENTIAL - J. HRASKA

1
2       Q.   Yes.
3       A.   As of today, my understanding is that
4   the value of unencumbered collateral that was
5   transferred was approximately 1.4 billion.
6       Q.   Have you heard the term "Schedule B"?
7       A.   I have, yes.
8       Q.   And what is your understanding of what
9   that is?
10      A.   Schedule B, to my understanding, is
11  the schedule of assets which were part of the
12  transaction between Barclays and Lehman
13  Brothers.
14      Q.   And is the 1.4 billion that you just
15  mentioned, is that the approximate amount of the
16  assets on Schedule B?
17      A.   The 1.4 -- the short answer is I don't
18  know.
19      Q.   Okay.
20      A.   You had asked me what had been
21  transferred to date.  So what had been
22  transferred is approximately 1.4.
23      Q.   Okay.  Are you drawing a distinction
24  between transferred and some other -- other --
25      A.   Originally, yes, because you

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   originally asked what had been transferred.
3       Q.   Right.
4       A.   And based on, you know, transactions,
5   1.4 or so billion had been transferred.
6       Q.   Right.
7       A.   There may have been a different total
8   value on Schedule B.  I can't be certain what
9   that value is.  There's been people who have
10  talked about a number.
11      Q.   Okay.
12      A.   So I have a general sense, but I
13  wouldn't testify that I knew a hundred percent
14  what that value of Schedule B was.
15      Q.   Do you have any knowledge of what has
16  been called Schedule A with respect to that
17  transaction?
18      A.   Schedule A, as I understood it, was
19  related to a transaction prior to that
20  transaction which was the financing between
21  Lehman Brothers and Barclays.
22      Q.   Okay.  And do you have any --
23      A.   I'm not sure, is it all part of the
24  same transaction?  I don't know that it's part.
25  I view those as distinctly different

Page 38

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  transactions, Schedule A and what became
3  Schedule B, but...
4      Q.    Okay.  Well, I just want to understand
5  what your understanding is.
6      A.    Okay.
7      Q.    So let me just try to understand.  You
8  mentioned a separate transaction between
9  Barclays and Lehman that eventually led to a
10  collection of securities that has been known as
11  Schedule A; is that right?
12      A.    That's correct.
13      Q.    Okay.  And what was the transaction
14  that you understood took place that led to
15  Schedule A?
16      A.    There was a secured financing
17  transaction, a repo transaction -- from Lehman's
18  perspective, it was a repo transaction with
19  Barclays which took place on the 18th of
20  September, and the assets related to that
21  transaction became Schedule A.
22      Q.    Okay.  And is it all right -- was that
23  a tri-party repo?
24      A.    That transaction was a -- was a repo.
25  There were -- it was sort of a unique

Page 39

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  transaction.  It was one that took on elements
3  of tri-party as well as a bilateral contract,
4  but it was governed under the documents of a
5  tri-party repo, yes.
6      Q.    And who is the agent with respect to
7  that transaction?
8      A.    There was -- well, that's what made it
9  unique.  There were two tri-party agents
10  involved.  There was Chase, who was a tri-party
11  agent, who held our collateral with the Fed that
12  we had pledged to the Federal Reserve, and then,
13  in effecting the transaction, according to the
14  tri-party terms, there was Bank of New York, who
15  was the agent for Barclays.
16      Q.    I see reference in some of the
17  documents to the BONY tri-party?
18      A.    Uh-huh.
19      Q.    Is that the tri-party we're -- is that
20  the transaction we're talking about?
21      A.    Yes, that's correct.  We moved the
22  assets from JPChase, who was our tri-party
23  agent, to Bank of New York, who was, as I
24  mentioned, Barclays' agent.
25      Q.    Just so I understand the sequence,

Page 40

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  tell me if I'm wrong here.  There was a
3  financing with the Fed in which there was a
4  certain amount of collateral posted by Lehman,
5  correct?
6      A.    That's correct.
7      Q.    At some point in time, that collateral
8  gets transferred to Chase?  Withdrawn.  Let me
9  start again.
10          At some point in time that collateral
11  gets transferred to Bank of New York in
12  connection with this transaction you have just
13  described?
14      A.    That's correct.
15      Q.    Okay.  And were you involved in that
16  transfer of collateral from the Fed program to
17  Bank of New York?
18      A.    I was, yes.
19      Q.    You were, okay.  And did all the
20  collateral make it from the Fed program to the
21  Bank of New York?
22      A.    It did not.
23      Q.    And do you know -- do you recall how
24  much made it and how much didn't?
25      A.    I can't give you the figure of exactly

Page 41

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  how much that was in the Fed program made it to
3  Barclays of the original collateral because
4  there were difficulties in the collateral all
5  moving over to Barclays.
6          I can tell you how much collateral,
7  approximately, made it to Barclays, but it
8  wouldn't necessarily be all of the same
9  collateral that was with the Fed.
10      Q.    Okay.  Did you mean to say Bank of New
11  York or Barclays?
12      A.    Well, it was to Barclays -- I'm sorry,
13  to the Bank of New York for the benefit of
14  Barclays.
15      Q.    Okay.  So how much made it to the Bank
16  of New York in connection with that transfer
17  from the Fed program?
18      A.    On the night of the 18th,
19  approximately $42 billion worth of collateral.
20      Q.    And that figure is based on a
21  valuation of the collateral provided by who?
22      A.    By Bank of New York.
23      Q.    So $42 billion is how Bank of New York
24  valued the amount of money -- the amount of
25  collateral that was transferred from the Fed

Page 46

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    Q.   So when you add up all these assets
3    that were eventually made their way to Barclays,
4    do you have a number that would reflect the
5    value of those assets?
6        A.   I don't know what the value of those
7    assets are today.  I know that there was a value
8    assigned to the assets on the night of the 18th
9    for what made it, which were -- what was $42
10   billion.  My approximate evaluation of what was
11   subsequently transferred was about 1.4 billion
12   of physically moving from Lehman to Barclays.
13       So those are the two figures that I'm
14   reasonably comfortable with.  And the market
15   valuation of those things has been changing over
16   time, being that it's a year later and things
17   like that.
18       Q.   I just want to get a -- just so I
19   understand your perspective on this, from your
20   perspective, there was $42 billion moved to Bank
21   of New York which eventually makes its way to
22   Barclays, correct?
23       A.   That's correct.
24       Q.   And there's a separate amount of 1.4
25   billion which is gathered sometime late in the

Page 47

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    week and that eventually makes it to Barclays as
3    well, correct?
4        A.   That's correct.
5        Q.   And is the 1.4 billion what's called
6    Schedule B?
7        A.   The 1.4 --
8            MR. SHAW:  Objection.  Asked and
9    answered.  Mischaracterizes prior testimony.
10           MR. HINE:  I didn't say anything about
11   his prior testimony.
12       Q.   I'm just trying to figure out, do you
13   consider the 1.4 billion the assets that are on
14   Schedule B?
15       A.   I have subsequently learned that the
16   1.4 billion are assets that are on Schedule B,
17   yes.
18       Q.   And were you involved in preparing
19   Schedule B?
20       A.   I was not involved in preparing the
21   official Schedule B.  I provided assets which
22   were used as the securities that would be later
23   selected and placed on Schedule B, but I didn't
24   prepare the official Schedule B.
25       Q.   Who selected the assets ultimately

Page 48

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    that would become part of Schedule B?
3        A.   I provided that information through my
4    manager at the time.  I don't recall whether I
5    had sent it to Monty or to Alastair, but
6    nonetheless, they forwarded it to Paolo Tonucci
7    and I believe Paolo sort of crystallized the
8    official Schedule B.
9        Q.   Is it fair to say over that weekend
10   your role was to just find unencumbered assets
11   that they could possibly decide what to do with?
12       A.   That's correct.
13       Q.   Okay.  Did you have an understanding
14   of why you were doing that?
15       A.   No.
16       Q.   Did anyone tell you that there was any
17   kind of shortfalls in what Barclays was
18   expecting to receive at the end of that week?
19       A.   My understanding at the time was that
20   I was still trying to complete the repo
21   transaction, and part of that repo transaction
22   was we had placed cash as well as an asset to
23   Barclays, and, you know, my understanding at the
24   time was that I was looking to, in addition
25   to -- I was looking for assets that would be

Page 49

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    able to be sent to Barclays for the purposes of
3    also substituting that cash.
4        Q.   When you say the repo transaction, are
5    you talking about the September 18 transaction
6    that we previously discussed?
7        A.   Involving the Federal Reserve, yes.
8        Q.   I think I just misunderstood you.  The
9    September 18 transaction was between Barclays,
10   Lehman and BONY, right?
11       A.   It was Barclays, Lehman and BONY, but
12   it was -- well, yes, it was Lehman.  It was
13   basically like I guess a transaction where I
14   guess the collateral that Lehman had on finance
15   with the Fed was being -- instead now being
16   financed with Barclays and Barclays was then I
17   guess going to finance that transaction with the
18   Fed.  So that's why I referenced the Fed.
19       Q.   Okay.  When you said you were
20   concerned with the repo at that time, what were
21   you doing with respect to the repo?  Again, I'm
22   talking Friday of that week.
23       A.   Friday of that week, I -- it was my
24   understanding that we were looking to substitute
25   the cash that we had placed on deposit for the

1              HIGHLY CONFIDENTIAL - J. HRASKA
2    benefit of Barclays with assets as opposed to
3    leaving cash, because it's not efficient from a
4    lending transaction to collateralize a cash loan
5    with cash.  So we were looking to find available
6    assets which were suitable under the repo
7    agreement to substitute.
8        Q.   How much cash are we talking about?
9        A.   On the night of the 18th, Lehman
10   Brothers placed $7 billion on deposit for the
11   benefit of Barclays.
12       Q.   Just so I understand it, in layman's
13   terms -- well, before I ask that, let me -- was
14   that cash part of the $42 billion that you
15   mentioned?
16       A.   It was not.  42 billion was the value
17   of the assets, physical securities, that had
18   made it to Bank of New York for the benefit of
19   Barclays.
20       Q.   And so there was $7 billion in cash on
21   top of that?
22       A.   Yes.
23       Q.   And so am I correct to say you were
24   trying to locate other assets that could be
25   transferred to Barclays so Lehman could keep the

1              HIGHLY CONFIDENTIAL - J. HRASKA
2    cash portion?
3        A.   So, yes, Lehman could get a return of
4    the cash in lieu of assets.  So a substitution
5    of one asset for another.
6        Q.   And were you able to come up with any
7    assets to do that?
8        A.   Yes, I was.  On Friday.
9        Q.   How much?
10       A.   Approximately a billion, just a little
11   over a billion.  Something like a billion-34,
12   -35, something along those lines.
13       Q.   Okay.  And did those assets in fact
14   get substituted in and make their way to
15   Barclays?
16       A.   Well, they made their way into
17   Barclays.  My expectation of a return of the
18   cash never occurred.
19       Q.   Why is that?
20       A.   Well, with the mechanics and
21   everything that happened with the relationship
22   with Chase that day, Chase didn't return any of
23   the cash at that point.
24       Q.   Can you explain to me the problems you
25   had with the relationship with Chase that day?

1              HIGHLY CONFIDENTIAL - J. HRASKA
2        A.   The morning of the 19th, Chase had
3    effectively shut down our clearing accounts and
4    stopped having communication with anything other
5    than I think some very senior folks in Lehman
6    Brothers.
7        Q.   And why did they do that?
8            MR. SHAW:  Objection.  Foundation.
9        A.   I don't know particularly why they do
10   that.  I mean, there was, you know, there was
11   some speculation as to why they did that because
12   of the status of our situation from a credit
13   perspective and things like that, but I don't
14   know if there was a particular trigger that
15   caused them to do that.
16       Q.   Did you have any conversation with
17   folks at Chase about this?
18       A.   On the morning of the 19th, no.
19       Q.   At any time?
20       A.   I mean, I had conversations with folks
21   at Chase all through the night on the 18th,
22   actually, technically, I guess into the morning
23   of the 19th while we were trying to finalize the
24   transaction.  And after the morning of the 19th,
25   I guess the very early morning, like in the 1, 2

1              HIGHLY CONFIDENTIAL - J. HRASKA
2    o'clock range, that was the last conversation I
3    had with anybody at Chase.
4        Q.   What was that about?
5        A.   That was primarily about --
6            The last conversation or the last
7    series of conversations?
8        Q.   Last series of conversations?
9        A.   The last series of conversations were
10   in relation to securing a loan to create the $7
11   billion which we placed on deposit with
12   Barclays.
13       Q.   I see something referred to in the
14   documents as a box loan.  Is that the loan
15   you're talking about?
16       A.   The 7 billion was a box loan, yeah.
17   Lehman took a box loan from Chase and let -- as
18   a result, Chase puts a lien on the assets for
19   that $7 billion in cash, yes.
20       Q.   What assets was that lien on?
21       A.   There were assets which were
22   unencumbered assets sitting in Lehman's
23   clearance boxes at Chase.
24       Q.   Is that an identifiable set of assets
25   that now has a lien on them from Chase?

Page 58

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    Q.   Right.
3    A.   The price, the prices, are the prices
4  of the individual collateral that make up that
5  loan, and in order for a loan to be effective,
6  the value of the price times the par amount of
7  the collateral should exceed the principal
8  extended.
9    Q.   Okay.  Is that what's known as the
10 haircut, the amount by which it exceeds?
11   A.   The amount by which it would exceed
12 the loan is known as the haircut, that's
13 correct.
14   Q.   And so what was the haircut associated
15 with the September 18 repo?
16   A.   There wasn't a -- there wasn't a
17 specific stated haircut.  There was a total loan
18 amount, which was this $45 billion, and the
19 total collateral value that we were trying to
20 transfer over to Barclays or what we were
21 directed to transfer over to Barclays was
22 approximately $50 billion.
23   Q.   And that $50 billion was comprised of
24 the approximately $42 billion in securities that
25 you mentioned earlier plus the cash?

Page 59

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    A.   It turned out that that was the case.
3  It was initially intended to be all collateral,
4  but the market value of what we were to transfer
5  initially was $50 billion.
6    Q.   Okay.  And Barclays was, after the --
7  after they received the proceeds of the loan and
8  the collateral, was Barclays satisfied that it
9  had received the entire amount of collateral
10 that it was expecting with respect to that repo?
11        MR. SHAW:  Objection.  Foundation.
12   A.   Yeah, I don't know whether they were
13 satisfied or not.  I mean, we completed the
14 securities transfers until the point that we
15 couldn't make any transfers because the system
16 had been shut down, and we were requested at
17 that point to deliver an additional 7 billion in
18 cash, which we did.
19   Q.   Okay.  When was that transferred,
20 approximately?
21   A.   The 7 billion in cash?
22   Q.   Yes.
23   A.   Somewhere between 2 and 3 o'clock in
24 the morning on the 19th.
25   Q.   Friday?

Page 60

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    A.   Well, it was -- it was -- we worked
3  through the night of the 18th.  So I guess it
4  was very, very early in the 19th.  So it was the
5  morning of the 19th at like maybe 2 o'clock in
6  the morning or something like that.
7    Q.   So, back to the notion of a haircut,
8  the haircut for that transaction is the
9  difference between the approximate $50 billion
10 in collateral and cash that was transferred to
11 Bank of New York and the 45 billion that
12 Barclays transferred to Lehman, correct?
13   A.   Could you repeat that one more time?
14 I'm sorry.
15   Q.   I'm just trying to figure out what the
16 haircut is for that transaction.  I thought you
17 said that approximately 50 billion was
18 transferred to Bank of New York or Barclays?
19   A.   That's correct.
20   Q.   In the form of either collateral or
21 cash?
22   A.   Uh-huh.
23   Q.   And that Barclays gave Lehman 45
24 billion in cash?
25   A.   Right, that's correct.

Page 61

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    Q.   So that makes the haircut
3  approximately $5 billion?
4    A.   That would be correct.
5    Q.   Do you know what the haircut was for
6  the Fed program earlier in that week?
7    A.   I don't.  Again, the haircut, each
8  security class had its own individual haircut,
9  so there would have been a, I guess what's
10 called a synthetic haircut, which, you know,
11 would equate to something similar to what you
12 did there, you know, so -- and I believe it was
13 similar because the transaction was described to
14 me as we were going to take the extension of
15 financing that the Fed had offered to Lehman and
16 we were going to help effect the transfer of
17 that to Barclays so that Barclays could then
18 step back into that transaction.  So I believe
19 it was similar.  I don't know exactly what the
20 haircut was.
21   Q.   Okay.  And who described the
22 transaction to you like that?
23   A.   John Rodefeld, who was held of North
24 American Operations at the time, had contacted
25 Alastair and myself to talk about the

Page 62

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  transaction.
3      Q.   And what did he say about it?
4      A.   He basically told us that Barclays had
5  been contacted by the Fed and Barclays was asked
6  to provide a credit, a counterparty credit
7  upgrade to the Fed, in essence.  They were fine
8  with financing the collateral basket that they
9  were financing, but they would prefer not to
10 have Lehman as a counterparty on the other side
11 of that.
12         They asked Barclays to basically
13 intermediate a transaction where Barclays
14 offered Lehman the same financing that they had
15 been -- that the Fed had been financing with
16 them throughout that week, and then that
17 Barclays would take that collateral and place it
18 back on deposit with the Fed to make them whole
19 on the cash transaction.
20     Q.   I think I understand what you just
21 said.
22         What else did Mr. Rodefeld say on that
23 call?
24     A.   Well, that call was on the 17th, and
25 they initially were looking to actually effect

Page 63

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  that transaction the same day on the 17th.  And
3  then, you know, with some subsequent
4  conversations, it just became -- it basically
5  became an impossibility not just for Lehman
6  Brothers, but for Bank of New York, JPChase,
7  Barclays to do a transaction of that magnitude
8  in the course of a day.
9          So from the 17th through the --
10 basically the whole 17th into the night of the
11 17th and even morning of the early 18th, we
12 discussed the mechanics on how we would effect
13 that transfer in the most efficient manner.
14     Q.   So do you recall anything else about
15 what Mr. Rodefeld told you on that call?
16     A.   Not other than what I just described
17 to you.
18     Q.   So am I correct to say that the
19 initial intent was to have this transaction take
20 place on the Wednesday of that week?
21     A.   From the first phone call, yes, it was
22 intended to take place on Wednesday, but...
23     Q.   And just why mechanically was that not
24 possible?
25     A.   There were numerous reasons from each

Page 64

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  of the parties.  Purely from the size of the
3  transaction, it was an extremely large
4  transaction, and the number of securities
5  involved were in the multiple thousand range,
6  you know, I would say in the double-digit
7  thousand range.  So that was one of the issues.
8          So not just from a transactional
9  perspective, but also from a static perspective
10 on the Bank of New York's side, they didn't have
11 a lot of these securities set up on their
12 systems.  It was going to take them time to set
13 the securities up to be able to set up receipts
14 for these securities and things along that
15 nature.
16     Q.   So how was it possible to do it on
17 Thursday as opposed to Wednesday?
18     A.   People were working 24 hours a day to
19 get it done and bunches of people were brought
20 in to help set things up and there were
21 technologists brought in on all different sides
22 to help do away from ordinary type transactions
23 and things like that to get the securities
24 transferred.
25     Q.   So am I correct to say that you

Page 65

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  learned of the possibility of this transaction
3  sometime on Wednesday, late Wednesday, and then
4  people worked through Wednesday night and then
5  all the way through Thursday night to get it
6  done?
7      A.   That's correct.
8      Q.   Okay.  Did the nature of that transfer
9  change at all?  In other words -- let me
10 rephrase that.
11         You just described what Mr. Rodefeld
12 told you about the transaction.  Did that
13 transaction change at all over the course of
14 that Wednesday into Thursday?
15         MR. SHAW:  Objection.  Foundation.
16     A.   The nature of the transaction itself,
17 the spirit of the transaction, nothing changed,
18 no.
19     Q.   Okay.  That makes sense.
20     A.   Could I -- I apologize.
21         (Discussion off the record.)
22         (Recess; Time Noted:  10:31 A.M.)
23         (Time Noted:  10:38 A.M.
24 BY MR. HINE:
25     Q.   Mr. Hraska, I just want to take a

HIGHLY CONFIDENTIAL - J. HRASKA
1
2  second to just talk again about your
3  understanding of the transaction between
4  Barclays and Lehman.
5      Did you ever have any understanding
6  that there was supposed to be a discount
7  associated with that transaction?
8      A.  Which transaction?  The repo
9  transaction?
10     Q.  No.  The sale transaction between
11 Barclays and Lehman.
12     A.  I didn't have any knowledge as to what
13 the terms of that transaction were.
14     Q.  Did you ever hear the phrase "block
15 discount" used in connection with either that
16 transaction or the repo that we have been
17 talking about?
18     A.  No.
19     Q.  Did you ever have any understanding
20 that Barclays was going to be paying less than
21 full value for the assets that it was buying
22 from Lehman?
23     A.  No.
24     Q.  Did you ever hear any discussion about
25 the possibility of defaulting on the repo that

HIGHLY CONFIDENTIAL - J. HRASKA
1
2  we have been discussing?
3      A.  There was discussions related to that
4  topic on the week of the 22nd.
5      Q.  Tell me what you recall about that,
6  those discussions.
7      A.  Well, there was -- it was news that
8  obviously LBI had filed for I guess SIPC
9  protection.  So the margin folks had contacted
10 me on the morning of -- I don't know which
11 morning, I believe it was on the 22nd, but if
12 not, on the 23rd, to ask me if that transaction
13 was being considered a default by Barclays.  And
14 at the time, I didn't know, but there was -- I
15 then had conversations about whether that was
16 going to be treated as default with my manager,
17 and at the time, you know, we didn't actually
18 know when it was or if it was going to be
19 treated in as default.
20     Q.  When we talk about "it," we're talking
21 about the September 18 repo?
22     A.  Repo itself, yes.
23     Q.  And LBI filed for bankruptcy on
24 Friday, the 19th?
25     A.  That's my understanding.

HIGHLY CONFIDENTIAL - J. HRASKA
1
2      Q.  And so you had conversations the
3  following Monday about this?
4      A.  Yes.
5      Q.  And who were the conversations with?
6      A.  I don't recall specifically.  Somebody
7  from the Margin Group.  I don't recall
8  specifically who it was from the Margin Group
9  that I had a conversation with.  And I also had
10 a conversation with Monty Forrest, which is my
11 manager.
12     Q.  The Margin Group at Barclays?
13     A.  The Margin Group at legacy Lehman
14 Brothers.
15     Q.  Do you recall the names of the
16 individuals that you spoke to?
17     A.  No, I just said I didn't recall it.
18     Q.  To your understanding, was the
19 September 18 repo unwound in some way?
20     A.  To my understanding, it was defaulted
21 and the collateral that was put up to securitize
22 that loan was seized by Bank of New York for the
23 benefit of Barclays.
24     Q.  Okay.  And did Bank of New York also
25 seize the cash that had been posted?

HIGHLY CONFIDENTIAL - J. HRASKA
1
2      MR. SHAW:  Objection.  Foundation.
3      A.  The cash itself was not in an account
4  that or in a position for Bank of New York to
5  seize.  The cash itself was being held for the
6  benefit of Barclays at JPChase.
7      Q.  Okay.  And what happened to that cash?
8      MR. SHAW:  Foundation.
9      A.  Barclays, because the cash was put
10 into the account of their benefit, they -- later
11 I understood, and it would make sense, that they
12 claimed ownership of that cash.  What happened
13 to the cash after that, I sort of was removed
14 from the transaction after they laid ownership
15 claim to that cash.
16     Q.  Okay.  I guess do you understand that
17 there was an ensuing dispute between Chase and
18 Barclays as to the ownership of that cash, among
19 other things?
20     A.  I did, yes.
21     Q.  And were you involved in that
22 resolution of that dispute?
23     A.  My only -- not in the resolution, no.
24     Q.  What was your involvement in
25 connection with that dispute?

Page 138

HIGHLY CONFIDENTIAL - J. HRASKA

1    
2    Q.   I know you're not -- you didn't
3    recognize some of the other numbers we just
4    talked about.  So, in your mind, approximately
5    42.9 billion is the value of the securities on
6    Schedule A, correct?
7         MR. SHAW:  Objection.
8    Mischaracterizes.  You can --
9         A.   It was the value that I knew at the
10   time of transfer, and whether or not that value
11   changed or was subsequently discussed, I don't
12   know, but it was the value that I knew at the
13   time of transfer.
14        Q.   Okay.  And you weren't involved in any
15   discussions about other values with respect to
16   that schedule, correct?
17        A.   No.
18        Q.   And do you think that's the value in
19   your mind of the final version of Schedule A?
20        MR. SHAW:  Objection to form.
21        A.   Again, I don't know if it was the
22   final version.  I know it was the value when I
23   transferred it.
24        Q.   Maybe that was a bad question.  Did
25   Schedule A change in composition, to your

Page 139

HIGHLY CONFIDENTIAL - J. HRASKA

1    
2    knowledge, from the original chart that we
3    looked at?
4         A.   In composition of securities?  The
5    number of securities and things like that?  The
6    schedule did not change.  The pricing may have
7    changed.
8         Q.   Okay.  But you don't have any
9    knowledge of whether the pricing changed?
10        A.   Other than the knowledge of looking at
11   these documents here, there's obviously a
12   discrepancy, but no upfront knowledge that it
13   changed.
14        Q.   And you don't have any knowledge of
15   the value of any securities on Schedule A being
16   written down in connection with this
17   reconciliation process?
18        A.   No.  You asked that earlier, right?
19   No.
20        Q.   Do you recall what the par value was
21   for the security listed on Schedule A?
22        A.   I don't, no.
23        Q.   Okay.  That's all I have with that
24   document.
25        Mr. Hraska, you were involved in

Page 140

HIGHLY CONFIDENTIAL - J. HRASKA

1    
2    preparing Schedule B, correct?
3         A.   I was involved in giving a list of
4    unencumbered collateral, which I understand some
5    of which became Schedule B.
6         Q.   But you're not familiar with the terms
7    Part 1 and Part 2 of Schedule B; is that right?
8         A.   No.
9         Q.   Are you familiar with any kind of
10   discussions about the valuation of the
11   securities that are on Schedule B?
12        A.   Well, there was the valuation that I
13   knew to have transferred, which is 1.4 billion.
14   I don't know what the ultimate valuation of that
15   or the -- I don't know what the final version of
16   that list was or the market value associated
17   with that, so ...
18        Q.   Do you recall any discussions about
19   any discrepancies in the valuation of the
20   securities that comprised Schedule B?
21        A.   I remember there being discussions in
22   valuation of those securities, discrepancies in
23   general.  I don't know whether they were
24   specifically Schedule B or if they were just
25   purely related to the repo we were discussing

Page 141

HIGHLY CONFIDENTIAL - J. HRASKA

1    
2    earlier, so ...
3         Q.   Well, I guess I'm just trying to --
4    was there a reconciliation process that went on
5    with respect to the securities in Schedule B?
6         A.   There was a -- there was a
7    reconciliation process from the standpoint of we
8    were asked what securities were delivered, which
9    we provided to the Finance folks, and the
10   Finance folks did a spreadsheet compared to what
11   they knew to be Schedule B and at one point told
12   us something along the lines of -- I don't
13   remember whether it was 800 Cusips or 800
14   million in value, but there was a number of 800,
15   which whatever was the discrepancy on that.  I
16   believe it was Cusips.
17        Q.   800 Cusips?
18        A.   800 Cusips or security identifiers
19   which weren't delivered.
20        Q.   And was that reconciled in some way?
21        MR. SHAW:  Objection to form.
22        A.   The Cusips in question were looked at
23   by the Clearance folks and my teams as to
24   whether they were delivered or whether they
25   could be delivered, and we verified that in fact

Page 142

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    they were not delivered.
3        Q.    And was there any effort to then
4    deliver them later?
5        A.    There was an effort to see if they
6    were available for delivery, and in most
7    instances, they were actually not available for
8    delivery.
9        Q.    So was any further action taken on
10   that?
11       A.    For that -- for the particular
12   securities on that list, no.
13       Q.    Were substitute securities delivered
14   instead?
15       A.    Substitute securities were not
16   delivered.
17       Let me just think about that.  Yeah,
18   no, there was no substitute securities delivered
19   after that, no.
20       Q.    Was that possibility considered?
21       MR. SHAW:  Objection to form,
22   foundation.
23       A.    That possibility was considered.
24   There was conversations that I had with the
25   Treasury folks, who were prior legacy Lehman,

Page 143

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    but now, as a result of the timing, were now
3    employed by Barclays, so Robert Azerad and those
4    folks, as to whether or not there were other
5    securities which were unencumbered that could be
6    substituted for the securities that could not be
7    delivered on the original Schedule B.
8        Q.    And what was the result of that
9    discussion?
10       A.    The result of that discussion was is
11   that we went through yet again another
12   identification process to try to locate
13   unencumbered securities that were available or
14   that could be made available to transfer.  At
15   that point in time, by then, we no longer had
16   capability to just go ahead and make a transfer.
17   It would have been subject to approval by
18   Deloitte and a few other folks before anything
19   could be done.
20       Q.    So where does that effort now stand?
21       A.    The effort basically concluded with a
22   subsequent set of lists that, you know, we feel
23   are securities that are eligible to be
24   transferred to Barclays.
25       Q.    And why have they not been

Page 144

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    transferred?
3        MR. SHAW:  Objection to form and
4    foundation.
5        A.    The clearance boxes in which they
6    reside are presently under administration.  So,
7    as Barclays employees, we wouldn't have the
8    ability to go and make those transfers without
9    the administration's approval.
10       Q.    So does Barclays thinks it's entitled
11   to these securities?
12       A.    I'm not a hundred percent sure what
13   Barclays thinks.  I was asked to go find
14   something that was unencumbered in the Lehman
15   boxes, which I did.  I would speculate that
16   Barclays would think they're entitled if they
17   asked me to do that exercise.
18       Q.    Who would know at Barclays whether
19   they think they're entitled to those securities?
20       MR. SHAW:  Objection to form,
21   foundation.
22       A.    I would start with the Treasury team
23   and possibly the Legal team.
24       Q.    And who is the Treasury team to which
25   you are referring?

Page 145

HIGHLY CONFIDENTIAL - J. HRASKA

1
2        A.    Robert Azerad would be the point
3    person that I would use, or Alan Kaplan in
4    Legal.
5        Q.    Can you tell me an approximate value
6    for those securities that are -- that you
7    identified that were not able to be transferred?
8        A.    I would say 6 to 7 hundred million.
9        Q.    And that's based on Lehman valuations?
10       A.    Based on Lehman valuations at a
11   particular point in time, which was November 17
12   of 2008.
13       Q.    Just so I have a little clarity, this
14   effort to identify these additional securities
15   took place after you transferred over to
16   Barclays?
17       A.    That's correct.
18       Q.    Did it start during the weekend of
19   September 20th at all?
20       A.    This particular exercise, no.  It
21   started I would say early October.
22       Q.    Okay.  We had -- in discussing
23   Schedule A, I think you said there was a
24   reconciliation effort, but to the extent there
25   was an effort to reconcile the values, that's

Page 242

HIGHLY CONFIDENTIAL - J. HRASKA

1        HIGHLY CONFIDENTIAL - J. HRASKA
2    from my records.
3      Q.    Does the 1.4 billion figure you have
4   testified about include assets that were
5   transferred on the 19th of September?
6      A.    Yes, it does.
7      Q.    And what's the approximate value, to
8   your knowledge, of the assets that were
9   transferred on the 19th?
10     A.    A little bit over a billion. I
11   believe it's like 1.034 or 35 billion.
12     Q.    You said that you looked across stock
13   records the weekend of the 20th and 21st for
14   assets over which there was no lien; is that
15   correct?
16     A.    That's correct.
17     Q.    Is it fair to conclude that the
18   results of your search for unencumbered assets
19   or assets with no lien was the results were
20   imperfect?
21     A.    That's fair to say, yes.
22     Q.    And it's fair to say because of the
23   800 or so Cusips that you testified earlier were
24   identified to you as actually encumbered or
25   other than unencumbered, correct?

Page 243

1        HIGHLY CONFIDENTIAL - J. HRASKA
2     A.    That's correct, yes.
3     Q.    Can you tell me how you went about
4   identifying --
5     A.    Can I just clarify something?
6     Q.    Of course.
7     A.    They were identified as -- on the
8   system as not movable or encumbered, but we
9   needed to do some more investigation because we
10   didn't know whether they truly needed to remain
11   encumbered or whether they were erroneously
12   encumbered.
13     Q.    And did you do that investigation?
14     A.    I didn't personally do that
15   investigation. There was -- there was a
16   reconciliation effort that took place that
17   reconciles stock record breaks which then later
18   helped unencumber some of that collateral.
19     Q.    So, as I understand this, you were
20   given a list that you called an exception list;
21   is that correct?
22     A.    That's correct, yes.
23     Q.    Who gave you that exception list?
24     A.    I don't recall the person. I remember
25   it came from Finance.

Page 244

1        HIGHLY CONFIDENTIAL - J. HRASKA
2     Q.    And Finance is?
3     A.    Finance is like product control.
4   Finance -- those are the names of the
5   organization, Product Control Finance. I
6   believe it's managed now by Martin Kelly and his
7   team here at Barclays.
8     Q.    And can you tell me what an exception
9   list is, please?
10     A.    The exception list as defined by what
11   we're discussing was the Schedule B list
12   versus -- the official Schedule B list versus
13   the actual collateral delivered to Barclays
14   subsequent to the 18th.
15     Q.    And at some point did you get a list
16   of 800 Cusips that had not been delivered? Are
17   we talking about the same list?
18     A.    That's the same list, yes.
19     Q.    And a reconciliation effort was then
20   undertaken; is that correct?
21     A.    There was a reconciliation effort --
22   well, there was two things that were done.
23   There was a verification to see whether or not
24   those, in fact, those 800 were or were not
25   delivered. We verified that those 800 were not

Page 245

1        HIGHLY CONFIDENTIAL - J. HRASKA
2   delivered, and then there was a reconciliation
3   just in general to resolve stock breaks at the
4   firm that was done.
5     Q.    Of the 800 Cusips that you have
6   verified or your team had verified were not
7   delivered, did you determine whether or not any
8   of those securities were in fact unencumbered?
9     A.    I didn't determine that, no.
10     Q.    Do you know if such a determination
11   was made?
12     A.    I don't, no.
13     Q.    When were you given this exception
14   list?
15     A.    I don't recall, honestly.
16     Q.    Can you give me any idea as the
17   whether it was 2008 or 2009?
18     A.    Honestly, no.
19     Q.    Was it around the same time, Mr.
20   Hraska, that you were asked to go and find
21   additional unencumbered assets in Lehman's
22   clearance boxes?
23     A.    Yes, but I was asked that multiple
24   times at multiple stages. We talked about it
25   over the weekend and then there was times where

Page 250

**HIGHLY CONFIDENTIAL - J. HRASKA**

1
2    A.    No, which is what led to the
3    inconsistencies you referenced on my set of
4    files that I first produced.
5        Q.    Those are those 800 Cusips that were
6    not delivered, many of which were in fact
7    determined ultimately to be encumbered, not
8    unencumbered securities, correct?
9        A.    Yes.
10       Q.    Why were Lehman's stock records not
11   fully reconciled over that weekend?
12       A.    Well, as I'm sure you're aware, the
13   financial markets were going through down --
14   quite a meltdown in that period and, more
15   specifically, Lehman Brothers.  There was an
16   inordinate amount of activity going through our
17   clearance boxes, through our front ends and back
18   ends processing systems.
19       In addition to that, there were
20   relationship troubles with JPMorgan Chase, and
21   as a result of that, there was information that
22   was typically received, like file transfers that
23   represent statement balances and things like
24   that, that we would normally expect to receive
25   from our custodians which were not sent to

Page 251

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    Lehman Brothers on either the night of the 19th
3    or during bat cycles on the 20th.  So it was
4    very difficult to do a reconciliation without a
5    complete set of data.
6        Q.    Did you ever get to have a complete
7    set of data such that you could make that
8    reconciliation?
9        A.    The firm received additional data.  I
10   personally wasn't in charge of those
11   reconciliations.  So, as to the nature of its
12   completeness, I couldn't testify to that.
13       Q.    Who was in charge of any subsequent
14   reconciliations of the firm's stock records?
15   And my question is with respect to Schedule B or
16   subsequent iterations of Schedule B, as far as
17   you're aware, sir.
18       A.    Well, that's two questions.  So
19   there's a group that's responsible for the stock
20   record reconciliations, which is the firm
21   Balancing Department, which I don't remember who
22   was in charge of it at the time, but it would
23   have been the firm Balancing Department that's
24   responsible for that in conjunction with the
25   Clearance folks.

Page 252

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    They focused on putting the stock
3    record back in balance, but I don't know whether
4    there was any reconciliation once the stock
5    record was back in balance to the original
6    Schedule B.
7        Q.    The securities that were transferred
8    from Lehman to Barclays on the 19th?
9        A.    Yes.
10       Q.    Was it your idea to transfer those or
11   was that the idea of someone that you reported to?
12       A.    It wasn't that it was a unique idea of
13   my own.  What it was, it was a normal course
14   transaction, which we had previously deposited
15   cash as a result of the problems we had the
16   night before.
17       And in a repo transaction, I think I
18   mentioned earlier, you typically wouldn't
19   deposit cash to get cash.  So it's, you know,
20   it's a normal course transaction and it was a
21   situation where you're not using your collateral
22   efficiently to try to find substitute
23   collateral.  Especially in a tri-party
24   arrangement, you have full rights to go ahead
25   and do that, and that type of transaction is

Page 253

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    typically affected by Operations personnel, not
3    Trading personnel.
4        So, you know, I discussed with the
5    folks at Barclays the previous night and, you
6    know, and at Lehman that we were going to, you
7    know, the next morning we were going to look to
8    do exactly that and replace the cash with, you
9    know, substitute collateral.
10       Q.    Can you be more specific about the
11   names of the people you discussed this with?
12       A.    At Barclays I spoke to John Rodefeld
13   about it, and at Lehman I would have spoke to
14   Monty Forrest and Alastair Blackwell about it.
15       Q.    And did Mr. Forrest and Mr. Blackwell
16   approve of this transaction?
17       A.    Yes, they understood it to be a normal
18   course function that I would have done at any
19   other point in time.
20       Q.    So I'm clear, it was something that --
21   this transfer of approximately $1.1 billion was
22   done on your initiative, correct?
23       A.    That's correct, yes.
24       Q.    But what you say is this is something
25   that was --

Page 254

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2         A.   Commonplace.
3         Q.   -- commonplace in this commercial
4    situation?
5         A.   Yes.
6         Q.   And the underlying commercial contract
7    that governed this transaction was the tri-party
8    repo that you've testified about today?
9         A.   Yes.
10        Q.   And just so the record is clear, no
11   cash was ever returned to Lehman in return for
12   this transfer of $1.1 billion in additional
13   unencumbered collateral to Bank of New York on
14   the 19th of September, correct?
15        A.   To my knowledge, that's correct.
16        Q.   I have a few documents to show you.
17             (Exhibit 147B, an e-mail sent from Mr.
18        Hraska to Paolo Tonucci, copying others, on
19        Friday, the 19th of September, 2008, marked
20        for identification, as of this date.)
21        Q.   Showing you, Mr. Hraska, what I've
22   marked as Tab 147B.  Let me know when you've had
23   a chance to look at that document.
24             (Document review.)
25        A.   Okay.

Page 255

1    HIGHLY CONFIDENTIAL - J. HRASKA
2         Q.   I'll identify this for the record as
3    an e-mail sent from Mr. Hraska to Paolo Tonucci,
4    copying others, on Friday, 19th of September,
5    and at this time written here 2:28 P.M. is in
6    GMT.  So in Eastern Standard Time, that's about
7    10:30 in the morning.
8         A.   Uh-huh.
9         Q.   Do you recognize this document, sir?
10        A.   I do.
11        Q.   The subject is pledges.  It says,
12   "Paolo," and you write to Mr. Tonucci, "We
13   managed to pledge over about 800 MM in MV to
14   BarCap."  What does that mean?
15        A.   "MM" is a term that means millions,
16   and "MV" is market value.  So the assets that we
17   had pledged over up to that point were, in our
18   estimation, from the, you know, our systems, the
19   way we had them marked, was worth about 800
20   million in value.
21        Q.   So the 800 in MV is Lehman's marks?
22        A.   Those are Lehman's marks, yes.
23        Q.   And was this a transfer that you had
24   instructed on Friday morning, the 19th?
25        A.   That was part of it.  Being that it's

Page 256

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    only 800 million, I don't believe it was all of
3    it that ultimately ended up getting transferred
4    over.
5         Q.   Is this 800 million part of the 1.1
6    million we have just been discussing that was
7    transferred that same day, the 19th?
8         A.   It would have been, yes.
9         Q.   You go on to say, "We may have
10   identified another 500 million, but I wanted to
11   check with you first before pledging it to
12   them."
13        A.   Yes.
14        Q.   Do you recall whether Mr. Tonucci
15   replied to you?
16        A.   I don't recall.
17        Q.   That's all I have for that document.
18             (Exhibit 148B, an e-mail chain, the
19        first in time dated September 19, 2008, at
20        3:43 P.M., marked for identification, as of
21        this date.)
22        Q.   I've handed you a document I have
23   marked as Exhibit 148B.  Tell me when you've had
24   a chance to look through it.
25             (Document review.)

Page 257

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2         Q.   Of course, you are welcome to look at
3    the whole document.  It's really the original
4    e-mail at 3:43 P.M. that I'm going to focus my
5    questioning on.  It's a two-page document.  It's
6    double-sided.
7         A.   I didn't realize it was double-sided.
8    I'm sorry.
9             (Document review.)
10        A.   Okay.
11        Q.   At 3:43 P.M. on Friday, 19th, you
12   write to Mr. Feraca, Mr. Aronow, and others, on
13   the subject of an urgent tri unwind.  You say,
14   "We pledged only 800 million of new collats to
15   BarCap.  All is frozen."
16        A.   Are we talking about the same
17   document?
18             (Indicating.)
19        A.   Oh, on the very last sentence.  I'm
20   sorry.  Okay.  I'm sorry.  Go ahead.
21        Q.   Do you see where it says, "We pledge
22   only 800 million of new collat to BarCap.  All
23   is frozen"?
24        A.   I do, yes.
25        Q.   Does that refresh your recollection

Page 270

HIGHLY CONFIDENTIAL - J. HRASKA

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    the collateral, and those market values came
3    from the work that me and my team did.  So I
4    don't know why he's referencing finance systems
5    here.  These were collateral pieces that were
6    based in the mainframe which was picked up by
7    GFS.  I'm just not sure what he's referring to
8    by "financing systems."
9        Q.    So you see there's a total there, Mr.
10   Hraska, of close to $2.3 billion?
11       A.   Yes.
12       Q.    Does that represent the unencumbered
13   assets that, at least as of the date of this
14   e-mail, you and your team had been able to
15   identify?
16           MR. SHAW:  Objection to form.
17       A.   I can't be certain.  I can't be a
18   hundred percent certain.  I don't know.
19       Q.    Did you look for unencumbered assets
20   in any location other than those listed in the
21   e-mail from Mr. Forrest here?
22       A.   We looked for all unencumbered assets
23   in the stock records.  These were the ones that
24   we thought that had the highest probability of
25   having unencumbered assets in them.  They were

Page 271

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    our primary clearance boxes.
3        Q.    Were you looking for physical
4    securities as well, Mr. Hraska, that weekend?
5        A.   We had, yes, we had looked through
6    some of the clearance locations for physical
7    securities, but based on the analysis, we, over
8    the course of that weekend, weren't confident
9    enough that we could determine whether those
10   assets were unencumbered or not so we left them
11   off of this analysis.
12       Q.    Did you leave physical securities off
13   not just this analysis, but any analysis of
14   unencumbered assets you provided to Mr. Forrest?
15           MR. SHAW:  Objection.  Vague as to
16   time.
17       Q.    My question is specifically with
18   respect to this weekend of the 20th and 21st of
19   September.
20       A.   We did an analysis of this weekend.
21   Based on that analysis, we didn't forward any
22   value of unencumbered securities which were
23   physical.
24       Q.    You see the paragraph immediately
25   following the 2.3 billion number?

Page 272

1    HIGHLY CONFIDENTIAL - J. HRASKA
2        A.   Uh-huh.
3        Q.    Relates to BONY Tri Pledge line item?
4        A.   Yes.
5        Q.    Does that refresh your recollection
6    about any of your prior testimony about the
7    reason the file was restored?
8        A.   Well, it was restored because we
9    wanted to maintain records, but according to
10   this, it appears that complete restore maybe
11   wasn't possible.  But I wouldn't change my
12   reason to have requested the restore on the
13   file.
14       Q.    After reading this e-mail, is it still
15   your testimony that the transfer of
16   approximately $1.1 billion from Lehman to BONY
17   pledged to Barclays on the 19th of September
18   settled?
19       A.   Yes.
20       Q.    That's all I have with that exhibit.
21           I'm handing you, Mr. Hraska, a
22   one-page document that's previously been marked
23   Exhibit 93B.  If you can take a look at that and
24   let me know when you've reviewed it, please.
25           I'm sorry, it's a two-page document.

Page 273

1    HIGHLY CONFIDENTIAL - J. HRASKA
2            (Document review.)
3        Q.    I'll direct your attention to item 1
4    in the box, and if you would just identify for
5    the record.  This document is entitled
6    "Management of Unencumbered Asset Gap."
7            Actually, let me first direct your
8    attention to the first line that says,
9    "Objective:  Delivery to BCI of 1.95 billion of
10   unencumbered collateral by COB Friday, September
11   19."  Do you see that?
12       A.   I do, yes.
13       Q.    Were you aware of any objective to
14   deliver 1.95 billion of unencumbered collateral
15   to Barclays by the close of business on Friday,
16   the 19th?
17       A.   No.
18       Q.    Item 1 in the box that's headed
19   "Current Status Summary" is "Actual Delivery EOD
20   Friday."  Do you see that?
21       A.   I do.
22       Q.    Do you believe that refers to the
23   approximately $1.1 billion of collateral that
24   we've been discussing that was transferred from
25   Lehman to Bank of New York on Friday, 19th?

Page 306

HIGHLY CONFIDENTIAL - J. HRASKA

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    this delta figure of 362 million here?
3        A.   Yes, that's correct.
4        Q.   Do you have any understanding of the
5    reason for the difference?
6        A.   Well, this is purely a delta of the
7    two figures that Mr. Forrest provided.  The 600
8    to 700 million that I was referring to were
9    based of an analysis of unencumbered securities
10   in the Lehman boxes at a later date and time.
11   So I think that's where there's a discrepancy
12   because of the timing.
13       Q.   Are you able to estimate a total of
14   the unencumbered securities in the various
15   Lehman clearance boxes that you reviewed, either
16   over the weekend of the 20th and 21st of
17   September or subsequently, are you able to give
18   me a total of the unencumbered securities that
19   you believe you identified?
20       A.   On that weekend?  Or, when you say
21   "subsequently"?
22       Q.   At any time subsequently.  Obviously
23   you identified a figure that fluctuated, as we
24   saw in the documents that we looked at and you
25   looked at with Mr. Hine of approximately 1.9 to

Page 307

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    2 billion dollars?
3        A.   Yes.
4        Q.   And you've subsequently identified
5    additional collateral you say of at least a few
6    hundred million?
7        A.   That's correct.
8        Q.   Correct.  Are you able to give me,
9    just in broad terms, an estimate of the total
10   amount of unencumbered collateral that you
11   believe you have identified?
12       A.   That would be available let's say as
13   of today if nothing had happened in the
14   clearance box?
15       Q.   Yes.  That's a much better question
16   than I would have been able to articulate.
17   Thank you.
18       A.   Yes, that's the 6 to 7 hundred million
19   dollar figure.
20       Q.   And the total would be the 6 to 7
21   hundred million dollar figure plus this $1.587
22   billion figure that has already been transferred
23   subject, of course, to your caveat that you
24   believe the BONY Tri Pledge number may be off by
25   a factor of 10 percent or so, is that correct?

Page 308

1    HIGHLY CONFIDENTIAL - J. HRASKA
2        A.   That's correct, yes.
3        Q.   Last document.
4            (Exhibit 156B, a letter from Cleary
5        Gottlieb Stein & Hamilton is James Kobak at
6        Hughes Hubbard dated October 6, 2009, marked
7        for identification, as of this date.)
8            (Discussion off the record.)
9            (Recess; Time Noted:  5:24 P.M.)
10           (Time Noted:  5:30 P.M.)
11   BY MR. OXFORD:
12       Q.   You testified in response to a
13   question from Mr. Hine that you had been
14   involved, Mr. Hraska, in efforts to refine
15   Schedule B, do you remember saying that?
16       A.   Yes.
17       Q.   Can you tell me briefly about those
18   efforts to refine Schedule B?
19       A.   I don't know that I testified that I
20   was involved in an effort to refine Schedule B
21   but, rather, to identify additional assets that
22   perhaps were not on the original Schedule B that
23   were unencumbered.
24       Q.   And you were also involved, I think
25   you testified, in ascertaining that certain

Page 309

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    assets that were on the exception list were in
3    fact encumbered and unavailable for delivery; is
4    that correct?
5        A.   I'm sorry, could you repeat that
6    question or just read it back to me?
7            (Record read.)
8        A.   That they were unavailable for
9    delivery.  I can't be certain that they were
10   unencumbered; just they were unavailable for
11   delivery.
12       Q.   Why would they be unavailable for
13   delivery other than the fact that they are
14   encumbered?
15       A.   It's possible that at a point in time
16   a particular asset wouldn't have been in the
17   actual box itself.  So, in other words, there
18   might have been an inventory position versus a
19   break account instead of versus the actual
20   repository.
21       Q.   Can you take a look at what I've
22   marked as 156B?
23       A.   Sure.
24       Q.   Which is a letter from Cleary Gottlieb
25   Stein & Hamilton is James Kobak at Hughes

Page 1

1

2          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF NEW YORK
3

    IN RE:                        )
4                                 )
    LEHMAN BROTHERS HOLDINGS, INC.,)
5   et al.,                       ) Chapter 11
                                  ) 08-13555(JMP)
6          Debtors.              ) (Jointly
                                  ) Administered)
7                                 )
    ------------------------------)
8

9

10

11          DEPOSITION OF JIM HRASKA
12             New York, New York
13          Friday, January 15, 2010
14

15

16

17

18

19

20

21

22

23

    Reported by:
24  Philip Rizzuti
    JOB NO. 27206
25

Hraska

1
2 sufficient review of Exhibit 25, sir?
3     A.   Yes, I have.
4 DI   Q.   Can you tell me, sir, as Barclays'
5 30(b)(6) witness whether there is any --
6 anywhere reflected in the clarification letter
7 any agreement between the parties that
8 Barclays retained any right to amend or
9 supplement Schedule B?
10     MR. SHAW:  Objection.  Beyond the
11 scope of the 30(b)(6) testimony.  He is
12 not here to testify about the content or
13 meaning of the clarification letter.  As
14 I already indicated to you the agreement
15 in question was contained in a joint
16 motion filed with the court and not the
17 clarification letter.
18     Q.   Do you have the question in front
19 of you, sir?
20     A.   Could you read it back.
21     (Record read.)
22     MR. SHAW:  I continue to object.
23 Beyond the scope of the 30(b)(6)
24 designation and I am going to instruct
25 him not to answer this question as

Hraska

1
2 Barclays witness.  If you want to ask him
3 that question in his personal capacity
4 you are welcome to do so.
5     Q.   Well, we can disagree or agree on
6 the scope of the notice, but I will ask it in
7 the witness' personal capacity.
8     Do you have the question in front
9 of you, sir?
10     A.   Read it back.
11     (Record read.)
12     A.   From the review of this document
13 it does not appear there to be any agreement
14 in that section.
15     Q.   Or any other section that you can
16 see today, sir?
17     A.   Well I only reviewed that section.
18     Q.   Moving further down your notes,
19 sir, again under topic 32-A, you say that
20 Schedule B was compiled by many people
21 including -- and then you List A number of
22 names here?
23     A.   Yes.
24     Q.   Can you tell me, please, for each
25 of them in turn who they were employed by

Hraska

1
2 prior to the closing of the deal on September
3 22nd and what their role was in compiling
4 Schedule B?
5     A.   Sure.  Anthony Crispino employed
6 by Lehman Brothers was a clearance
7 representative.  William -- let me go back to
8 Anthony Crispino.  He provided data as to the
9 depot accounts along with -- depot accounts is
10 enough.
11     William Parrinello was a
12 technologist whose specialty was in the GFS
13 system.  Myself also employed by Lehman
14 Brothers who worked interpreting the data once
15 retrieved.  Nancy Denig who also worked at
16 Lehman Brothers who works in my organization
17 also to do interpretation work and spreadsheet
18 work.
19     Paolo Tonucci also at Lehman
20 Brothers was the recipient of the data from
21 the treasury group.  Robert Azerad at Lehman
22 Brothers, worked for Robert Azerad at
23 treasury, also a recipient of data, as well as
24 reviewing the data and providing the
25 spreadsheets.  And the legal, the gentleman

Hraska

1
2 from Weil, Gotshal, I am not sure what their
3 role was.
4     Q.   You write that Schedule B was
5 compiled by many people including the list of
6 people that you named here.  Do you know
7 whether there were any other people involved
8 in the compilation of Schedule B?
9     A.   How broad are you defining
10 involved; the primary people for its genesis
11 are listed.  There may have been other people
12 who worked in the organizations for these
13 people who either reviewed a portion or made
14 suggestions or something like that.  But
15 beyond the scope of the list of people listed
16 here I wouldn't know who these people might
17 have instructed somebody else to look at.
18     Q.   That is understood.
19     A.   Yes.
20     Q.   Can you give me more information
21 on the interpretation work that Nancy Denig
22 did in the compilation of Schedule B?
23     A.   She was primarily my spreadsheet
24 mechanic.  She is -- I am an average
25 spreadsheet user, she is a much better

Page 66

Hraska

1
2  spreadsheet user with results around pivoting
3  and macro'ing, and sorting and filtering.
4      Q.   That doesn't sound like
5  interpretation work to me.  I asked you about
6  the interpretation work that Nancy Denig did?
7      A.   So then I would say that that
8  is -- that was an incorrect description then.
9  She would have taken the spreadsheet, I would
10 have asked her for specifics -- series of data
11 and she would have filtered it out and
12 provided that.
13     Q.   Yes.
14     A.   She was also familiar with -- she
15 was very familiar with the GFS system and we
16 were using that as a primary search tool.  So
17 William Parrinello, Nancy and myself were
18 working to create the rules to pull data using
19 the GFS system.
20     Q.   I think you testified that
21 Mr. Tonucci and Mr. Azerad were recipients of
22 did data, do you remember that testimony?
23     A.   Yes, I do.
24     Q.   In your notes you list both of
25 those individuals as people who were involved

TSG Reporting - Worldwide    877-702-9580

Page 67

Hraska

1
2  in compiling Schedule B.  Can you tell me what
3  the role was of Mr. Tonucci in compiling
4  Schedule B?
5      A.   He had primarily instruction to
6  look for clearance box assets came from Mr.
7  Tonucci.  So it was at his direction that we
8  were doing it.  So I interpreted that to be
9  that he was involved in compilation work.
10     Q.   Is it accurate to say that Mr.
11 Tonucci wasn't involved in the gathering or
12 analysis of data to your knowledge?
13     A.   I would say he was not involved in
14 the gathering of data.  I believe he was
15 heavily involved in the analysis of data.
16     Q.   Tell me what you recall or rather
17 tell me what you know about Mr. Tonucci's
18 instruction to look for clearance box assets?
19     A.   He had requested us to look for
20 assets which were not segregated or fully paid
21 for which could be -- which could be delivered
22 to Barclays if requested as part of the
23 purchase agreement.
24     Q.   When did Mr. Tonucci issue that
25 request to you?

TSG Reporting - Worldwide    877-702-9580

Page 68

Hraska

1
2      A.   He didn't issue it directly to me.
3  He would have issued it to Alister Blackwell.
4  I would have been on call subsequent to that
5  where he would have been describing what his
6  request was.  But that would have been -- I am
7  not certain the time it would have been I
8  believe on that Saturday.  I believe that is
9  the 20th of September.
10     Q.   Did Mr. Tonucci issue a -- or
11 request Mr. Blackwell gather a specific amount
12 of non-segregated or non-fully paid for assets
13 that could be delivered to Barclays?
14     A.   I believe we were looking for a
15 target of approximately 1.9 billion.
16     Q.   Who was that target set by, sir?
17     A.   From my perspective Mr. Tonucci.
18 I don't know who agreed or who set it.
19     Q.   It is from your perspective Mr.
20 Tonucci, how do you know that?
21     A.   Because we were asked to find the
22 clearance box assets and we were asked to find
23 at least 1.9 billion of them.
24     Q.   Was it Mr. Blackwell who asked you
25 to find at least 1.9 billion of assets that

TSG Reporting - Worldwide    877-702-9580

Page 69

Hraska

1
2  could be delivered to Barclays?
3      A.   I mean Mr. Blackwell would have
4  sent a communication down to me.  I don't know
5  whether it would have been to join a meeting
6  to discuss it or he directly told either
7  myself or Mr. Forest who I worked for to send
8  that message down to us.  At the end of the
9  day I mean the instruction came from Mr.
10 Tonucci.  So specifically who gave it to me I
11 don't recall.
12     Q.   You don't list any Barclays
13 personnel as involved in the compilation of
14 Schedule B; is that correct?
15     A.   That is correct.
16     MR. SHAW:  A point of
17 clarification, you mean --
18     MR. OXFORD:  Is it correct --
19     MR. SHAW:  You mean preclosing
20 Barclays employees or --
21     MR. OXFORD:  We are going to get
22 there.
23     A.   Could you repeat the question
24 again.
25     Q.   Focusing on the timeframe prior to

TSG Reporting - Worldwide    877-702-9580

1          Hraska
2    the details.
3        Q.   Turning to topic 32-B, sir?
4        A.   Yes.
5        Q.   Was it your intention in compiling
6    Schedule B to exclude any fully paid customer
7    or affiliate securities?
8        A.   Yes.
9        Q.   Do you believe that was the
10   intention of all of the individuals who you
11   have testified were involved in compiling
12   Schedule B?
13       A.   Yes.
14       Q.   Did someone issue to you a
15   direction to exclude any fully paid customer
16   or affiliate securities from Schedule B?
17       A.   Yes, that would have been Paolo.
18       Q.   Do you agree with me, sir, that if
19   any fully paid customer or affiliates were
20   accidentally included on Schedule B, they
21   should be removed from that list?
22       MR. SHAW:  Objection.  Calls for a
23   legal conclusion.  Beyond the scope of
24   the 30(b)(6).
25       Q.   Was it the intention, sir, in

TSG Reporting - Worldwide    877-702-9580

1          Hraska
2    compiling Schedule B that only unencumbered
3    assets in Lehman's clearing box be included?
4        A.   Yes.
5        Q.   Can you tell me please what you
6    mean by the term or understand by the term
7    unencumbered assets?
8        A.   Assets which would have been fully
9    paid for by a -- I am sorry, assets which were
10   not fully paid for by a customer.
11       Q.   If assets had been pledged by
12   Lehman for example as part of a bank loan,
13   would those assets be eligible to your
14   understanding for the inclusion in Schedule B?
15       A.   It would have depended on whether
16   the pledge itself was carried out in a manner
17   which would have reflected on the stock record
18   that it was a segregated account versus a
19   non-segregated account.  Had it been placed in
20   a segregated account they would have been
21   excluded from Schedule B.
22       Q.   If it was pledged but not placed
23   in a segregated account it would have been
24   included in Schedule B?
25       A.   If the securities would have been

TSG Reporting - Worldwide    877-702-9580

1          Hraska
2    in an account which would have appeared on the
3    stock record as unsegregated, then it would
4    have appeared on Schedule B.
5        Q.   Did you understand the direction
6    from Mr. Tonucci to identify approximately 1.9
7    billion of assets in the Lehman clearing boxes
8    to include a direction to search for assets
9    that Lehman had pledged but not segregated?
10       A.   Could you be more specific on
11   pledged?
12       Q.   I am not sure I can.  Can you be
13   more -- can you answer my question like that?
14       A.   Well Schedule B as referenced here
15   was the composition of two components.  One
16   which were securities which were pledged to
17   the Bank of New York for the benefit of
18   Barclays.  Those assets were skill in Lehman's
19   clearance boxes, but were pledged for the
20   benefit of Bank of New York.  And then the
21   second component of that would have been the
22   work that was done around the review of the
23   stock record using GFS which would have
24   yielded securities in accounts which were in
25   non-segregated locations.

TSG Reporting - Worldwide    877-702-9580

1          Hraska
2        Q.   Was it your intention, sir, to
3    include both of those categories of assets in
4    Schedule B, or only one?
5        MR. SHAW:  Asked and answered.
6        Q.   Was it your intention, sir, to
7    include on Schedule B the assets that Lehman
8    pledged on Friday the 19th of September?
9        A.   The original exercise was to look
10   for assets which were purely on the Lehman
11   stock record as unencumbered.  We were later
12   instructed by Mr. Tonucci to also include
13   these assets which were pledged on the 19th as
14   well as part of Schedule B.
15       Q.   When did that instruction to
16   include the pledged assets from September 19th
17   come from Mr. Tonucci?
18       A.   I don't have a specific time, but
19   it would have been in the latter part of that
20   weekend.
21       Q.   So before the closing of the
22   transaction?
23       A.   Yes, correct.
24       Q.   If a security was pledged by
25   Lehman as part of a bank loan but not placed

TSG Reporting - Worldwide    877-702-9580

Page 138

Hraska

1              **Hraska**
2  pledged, Lehman --
3       A.   Took loans to replace the cash?
4       **Q.   That was used to purchase the**
5  **CUSIP's that was partly paid for by the prime**
6  **broker customer, you understand that Lehman**
7  **has an obligation to pay that too?**
8       A.   I didn't realize that that is what
9  you were referring to.  So based on that could
10  you please repeat the question to me.
11        (Record read.)
12        MR. SHAW:  I object.  Beyond the
13  scope of the 30(b)(6) testimony.  It
14  lacks foundation.  Calls for legal
15  conclusion.
16        THE WITNESS:  Can I answer?
17        MR. SHAW:  If you know the answer
18  you can answer.
19       A.   Based on the previous testimony
20  these positions should have been in a stock
21  record location that we would have shown the
22  assets still being held in one of our
23  clearance boxes.  If they were being financed
24  and the securities were no longer in our
25  possession we wouldn't have made any attempt

TSG Reporting - Worldwide    877-702-9580

Page 139

Hraska

1  to try to repay the loan in a scenario like
2  that, because under those scenarios as we
3  discussed earlier the person that we gave the
4  securities to would have kept them under the
5  default of the financing.
6
7       **Q.   Just back to the original creation**
8  **of Schedule B for a second.  The instruction**
9  **came --**
10       A.   Schedule B, back to 32 then?
11       **Q.   Yes.  Did the instruction from Mr.**
12  **Tonucci to identify unencumbered assets, was**
13  **that instruction limited to any particular**
14  **depository locations?**
15       A.   The initial request was not.  So
16  we were to look at all clearance locations
17  available on the stock record which were not
18  fully paid for customers.
19       **Q.   Did you do so?**
20       A.   We did, yes.
21       **Q.   And the fruits of that initial**
22  **instruction and your labor consequent to that**
23  **instruction are reflected on Exhibit B; is**
24  **that correct?**
25       A.   That is correct.  That was what we

TSG Reporting - Worldwide    877-702-9580

Page 140

Hraska

1              Hraska
2  produced on that weekend which subsequently
3  became Schedule B.  The one place we had some
4  difficulty on that weekend was we knew we had
5  a lot of physical securities in physical
6  locations and we were unable to confidently
7  determine what were firm physical securities
8  and what were not until later on.  So that
9  further analysis that was done after the 22nd
10  yielded some physical securities that we felt
11  then confident later that we would be entitled
12  to.
13        So I think I would like to
14  clarify, I think I testified earlier that
15  there were no changes to the security list
16  initially put forth versus what was filed on
17  the 30th.  I would like to amend that by
18  saying that the physical securities were added
19  to the list that was finally submitted on the
20  30th.
21       **Q.   To your knowledge were there any**
22  **other changes to the version of Schedule B**
23  **that was available at the closing of the**
24  **transaction on the 22nd and the finally**
25  **submitted Schedule B that was filed with the**

TSG Reporting - Worldwide    877-702-9580

Page 141

Hraska

1              **Hraska**
2  **Bankruptcy Court on the 30th of September**
3  **other than this addition of physical**
4  **securities that you just testified to?**
5       A.   I believe there may have been some
6  discrepancies on some of the CUSIP's, but I
7  don't know what the materiality of those
8  discrepancies are.  I think primarily they are
9  essentially the same.
10       **Q.   Did you personally add the**
11  **physical securities to the list, Schedule B?**
12       A.   I don't believe I personally added
13  the physical securities, no, I created the
14  initial list.  I think Robert Azerad's team
15  did.
16       **Q.   Mr. Hraska, included on Schedule B**
17  **are a number of securities that are in**
18  **accounts other than the DTC; right?**
19       A.   Yes.
20       **Q.   That reflects your initial**
21  **instruction coming down from Mr. Tonucci that**
22  **you and the rest of the team involved in**
23  **gathering and identifying the securities**
24  **should look everywhere for available**
25  **inventory; is that accurate?**

TSG Reporting - Worldwide    877-702-9580

Page 142

Hraska

1
2    A.    Yes, that is accurate.
3    Q.    That search for additional
4    inventory, sir, that you and your team
5    conducted subsequent to September 30th that
6    led to the creation of Exhibits B and C that
7    you testified to today also included search
8    for inventory outside of the DTC boxes; is
9    that correct?
10    A.    Yes, that is correct.
11    Q.    Do you know, Mr. Hraska, whether
12    there were any residential mortgage securities
13    that were identified as a separate category of
14    assets that were to be purchased by Barclays
15    under the original asset purchase agreement?
16    MR. SHAW:    Objection.    Beyond the
17    scope of the 30(b)(6).    You already had
18    your shot with him as an individual
19    witness.
20    Q.    Do you know, sir?
21    A.    Just repeat the question.
22    MR. OXFORD:    If you want to go off
23    for a second I can explain why I am
24    asking the question.    Off the record.
25    (Recess taken.)

TSG Reporting - Worldwide    877-702-9580

Page 143

Hraska

1
2    Q.    Mr. Hraska, I am asking this
3    question in your individual capacity, not as a
4    30(b)(6) witness of Barclays.    Do you know
5    whether or not there were any residential
6    mortgage backed securities that were
7    identified as a separate category of assets
8    that were to be transferred to Barclays under
9    the original asset purchase agreement?
10    MR. SHAW:    Objection.    Foundation.
11    A.    Read it back, please.
12    (Record read.)
13    A.    I believe that there was, but they
14    would have been included in the assets that
15    were available to be transferred in the
16    overall list.    So there was a discussion about
17    residential mortgages, but those resided in
18    the same clearance boxes and locations as the
19    other securities that were in question.
20    Q.    Do you know whether those
21    residential mortgage securities ended up on
22    Schedule B?
23    MR. SHAW:    Objection.
24    Q.    Do you know whether any of those
25    residential mortgage securities that were

TSG Reporting - Worldwide    877-702-9580

Page 144

Hraska

1
2    identified as a separate category in the
3    original APA ended up being included on
4    Schedule B to the clarification letter?
5    MR. SHAW:    Objection.    Foundation.
6    A.    I am sorry, can you read that back
7    again.
8    (Record read.)
9    A.    I don't know for a fact, but it is
10    plausible that some of them might have ended
11    up on Schedule B based off the criteria
12    that was used to create Schedule B.
13    Q.    If I asked you the same question
14    with respect to Exhibits A and B would you
15    have the same answer?
16    A.    Exhibits A and B?
17    Q.    Yes.
18    A.    Its possible that Exhibits A and B
19    would have contained that asset class, but it
20    is less likely.
21    Q.    Why is it less likely, sir?
22    A.    Because those asset classes were
23    held in a different system.
24    Q.    Which two systems are you talking
25    about in your testimony here?

TSG Reporting - Worldwide    877-702-9580

Page 145

Hraska

1
2    A.    The residential mortgages would
3    have been held in the system called MTS, and
4    would have been held in a clearance box DTC
5    participant ID 636.
6    Q.    I take it that these two locations
7    for the residential mortgage securities were
8    not sources that you were looking at for the
9    compilation of the data that led to Exhibits A
10    and B; is that correct?
11    A.    That is correct, yes.
12    Q.    You mentioned that there were some
13    conversations about residential mortgage
14    securities.    What were you referencing?
15    A.    Trying to recall, it was a long
16    time ago.    I honestly don't recall the
17    specifics.    I remember us talking about
18    residential mortgages.    I remember us talking
19    about where were they located.    Would they be
20    physically able to be moved as part of the
21    asset purchase agreement to Barclays.    What
22    type of assets were they, were they DTC or
23    physical, that type of stuff.    Beyond that I
24    don't remember much more.
25    Q.    Who is the "us" that you are

TSG Reporting - Worldwide    877-702-9580

## Page 154

Hraska

1
2    So therefore he wanted to look at
3  those securities and their locations and
4  determine whether they were physically able to
5  be moved to Barclays as a result of the
6  transaction.
7    **Q.  I think I understand.**
8    **So during that effort to locate**
9  **these additional assets to be transferred to**
10 **Barclays was there some consequence associated**
11 **with not meeting this $1.9 billion target?**
12    MR. SHAW:  Objection.  Beyond the
13  scope of the 30(b)(6).  Foundation.
14    A.  Can you define consequence?
15    **Q.  Was Barclays not going to close if**
16  **you didn't meet the $1.9 billion?**
17    MR. SHAW:  This is so far beyond
18  the scope of the 30(b)(6).
19    MR. HINE:  This is the origin of
20  Schedule B.  This is the --
21    MR. SHAW:  No.  The origin of
22  Schedule B is a far more discreet topic.
23  I mean under your theory the fact that
24  Lehman went bankrupt would be something
25  that you would be entitled to because

TSG Reporting - Worldwide    877-702-9580

## Page 155

Hraska

1
2  absent the bankruptcy we wouldn't have
3  had a deal and so forth.  At some point
4  we have to draw a line between the origin
5  of Schedule B and everything that led up
6  to the transaction.
7    MR. HINE:  That entire weekend is
8  assembling the assets that eventually
9  become Schedule B.  I am just asking --
10    MR. SHAW:  I continue to object.
11  Way beyond the scope of the 30(b)(6).  I
12  will let him answer if he knows anything
13  about this.  But it is not something that
14  he has been put forth as a 30(b)(6)
15  witness on and he is not prepared on
16  this.
17    A.  Repeat the question, please.
18    (Record read.)
19    MR. SHAW:  Same objections.
20    **Q.  If you know?**
21    A.  As a 30(b)(6) witness I can't
22  answer that question.
23    **Q.  In your individual capacity do you**
24  **know; I am asking you --**
25    A.  I guess my question is, we have

TSG Reporting - Worldwide    877-702-9580

## Page 156

Hraska

1
2  done it a couple of times, but if this
3  30(b)(6) subpoena, I am going to keep flipping
4  back and forth, I am happy to answer --
5    MR. SHAW:  Off the record for a
6  second.
7    (Recess taken.)
8    **Q.  Back on the record.**
9    A.  So I apologize, could you repeat
10  the question to me.
11    (Record read.)
12    MR. SHAW:  Objection.  Foundation.
13  This is an individual question, not
14  30(b)(6).
15    MR. HINE:  I asked it in a
16  30(b)(6), I note your objection, and he
17  is not answering the 30(b)(6), so I would
18  like his answer as an individual.
19    A.  As an individual, as a Lehman
20  employee at that time I had no knowledge as to
21  whether Barclays would close or not.
22    **Q.  Did your team assembling these**
23  **assets that would eventually become Schedule B**
24  **in fact meet that target?**
25    A.  The target of raising assets which

TSG Reporting - Worldwide    877-702-9580

## Page 157

Hraska

1
2  had a value of --
3    **Q.  The $1.9 billion target that Mr.**
4  **Tonucci communicated to you?**
5    A.  Yes, we did.
6    **Q.  Did you exceed that target?**
7    A.  Yes, we did.
8    **Q.  By how much?**
9    A.  Without having my spreadsheets, to
10  approximate I would say 300ish million.
11    **Q.  Why didn't you stop when you met**
12  **the target?**
13    A.  We didn't stop because I was asked
14  from my perspective from an operational
15  perspective did we feel that -- what was the
16  probability of us being able -- what were the
17  mechanical probabilities of us being able to
18  actually deliver assets to Barclays that were
19  located in the various locations that we
20  found.
21    Some of the locations were
22  locations which were held by custodial banks
23  outside the U.S., and as a result of the
24  holding situation some of those accounts, our
25  access had been frozen.  So even though the

TSG Reporting - Worldwide    877-702-9580

Hraska

1
2  securities showed as unencumbered, the
3  probability of us being able to action or move
4  any of those securities was very likely not
5  going to happen.
6          So based on that we tried to
7  assemble as much unencumbered collateral as we
8  could in locations where we still felt we had
9  the capability to action that collateral and
10 deliver it to Barclays.
11     Q.   So when you assembled this
12 additional 300 million in assets that you
13 testified about --
14     A.   Can I stop you there?
15     Q.   Yes.
16     A.   There was never an assemblage of
17 an additional 300, there was an assemblage of
18 approximately 2 point something billion of
19 which we felt that 300 of it was not going to
20 be very easy to transfer.
21     Q.   So once you assembled that 2 point
22 something billion you stopped in your search
23 for additional assets; is that correct?
24     A.   At that time that is what the
25 entire exercise yielded.  It is not that he

TSG Reporting - Worldwide    877-702-9580

Hraska

1
2  stopped, it was what the total result was.
3      Q.   When did you get to this 2 point
4  something billion figure?
5      A.   Specific time?
6      Q.   Like over the weekend?
7      A.   Very late Sunday, I don't
8  remember -- potentially into the hours of
9  Monday morning.  We pretty much -- I didn't
10 sleep that whole weekend, so I don't know what
11 point.
12     Q.   Can you turn for a minute to your
13 Exhibit 562-D which is your notes we talked
14 about today?
15     A.   Yes.
16     Q.   In the first sentence of the
17 section under topic 32-A I would like to refer
18 you to that sentence which reads:  Schedule B
19 was referenced in the clarification letter
20 representing the parties best effort based on
21 the information available at the time to list
22 the clearance box securities that Barclays was
23 entitled to receive.
24         Do you see that?
25     A.   I do.

TSG Reporting - Worldwide    877-702-9580

Hraska

1
2      Q.   What do you mean by the phrase
3  entitled to receive in that context?
4      A.   Entitled to receive as a result of
5  the purchase agreement.
6      Q.   And how does that relate, the
7  concept of what they are entitled to receive
8  relate to the $1.9 billion target that we were
9  talking about?
10        MR. SHAW:  Objection to the form.
11     A.   They were entitled to receive
12 clearance box securities as per the selection
13 criteria.  What was returned were clearance
14 box securities for which customers had not
15 fully paid for them.
16     Q.   I guess my question is were they
17 entitled to receive all clearance box
18 securities for which customers had not paid,
19 or did you think they were entitled to receive
20 $1.9 billion of such securities?
21        MR. SHAW:  Objection.  Foundation.
22 Beyond the scope.  Calls for a legal
23 conclusion.  Speaks for itself.
24     A.   I think they were entitled to
25 receive all clearance box securities that were

TSG Reporting - Worldwide    877-702-9580

Hraska

1
2  not fully paid for.
3      Q.   Then I guess I don't understand
4  why you had a $1.9 billion target?
5      A.   I didn't -- I was given that
6  target.  So I testified as to where I think
7  that target came from.  As to why I had that
8  target I honestly don't know.
9      Q.   I understand.  I guess my question
10 is was the $1.9 billion target a
11 quantification of what the parties thought
12 Barclays was entitled to receive, or did it
13 come from some other basis?
14        MR. SHAW:  Objection.  Calls for
15 legal conclusion.  Beyond the scope of
16 the 30(b)(6).  Lack of foundation.
17        If you know you can try to answer
18 this in your individual capacity.
19     Q.   If you know?
20     A.   Can you repeat the question again.
21 (Record read.)
22        MR. SHAW:  I would add the further
23 objection that it is vague as to time.
24     Q.   During that weekend?
25        MR. SHAW:  It is still vague as to

TSG Reporting - Worldwide    877-702-9580

Page 1

1

2             UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4      ------------------------x

5      In Re:

6                          Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,   (Jointly Administered)

9             Debtors.

10     ------------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF NANCY DENIG

14            New York, New York

15            August 21, 2009

16

17     Reported by:

18     MARY F. BOWMAN, RPR, CRR

19     JOB NO. 24044

20

21

22

23

24

25

DENIG - CONFIDENTIAL

1  DENIG - CONFIDENTIAL
2  NANCY DENIG,
3      called as a witness by the parties,
4      having been duly sworn, testified as
5      follows:
6  EXAMINATION BY
7  MR. HINE:
8      Q.   Good morning, Ms. Denig.  How are you?
9      A.   Good.
10     Q.   I introduced myself before, but my
11 name is Bill Hine.  I am from the firm of Jones
12 Day, which is special counsel to Lehman Brothers
13 Holdings, Inc. in connection with all the
14 bankruptcy proceedings that are going on.
15         So your deposition today is in
16 connection with those proceedings and some
17 discovery that we are taking in those proceedings.
18 Have you ever been deposed before?
19     A.   I have not.
20     Q.   Very simple.  I am going to ask you a
21 bunch of questions.  You are under oath, you are
22 going to give me truthful answers.
23         On occasion your counsel will raise an
24 objection or interpose an objection.  He is either
25 doing that for any number of reasons, but I just

1  DENIG - CONFIDENTIAL
2  wanted to let you know that it doesn't relieve you
3  of the obligation to answer the question.  You
4  still have to answer the question, unless of
5  course your counsel instructs you not to answer
6  the question, which he may do on occasion as well.
7          I think all the other counsel around
8  the table will introduce themselves as they get up
9  to ask you questions, if they have any, but if you
10 have any questions -- unless you have any
11 questions, we can get started.
12         One point of clarification before we
13 get started.  I see e-mails addressed to N. Bayne.
14 Is that you?
15     A.   That is my maiden name.
16     Q.   So if I see --
17     A.   Unfortunately when you were at Lehman,
18 when I got married -- my user profile before I got
19 married was N. Bayne, which was my maiden name.
20 When I got married, in order for them to change
21 the user name, they would have had to delete me
22 from the system altogether and I would have to
23 reapply for all my applications, which I didn't
24 want to do because I was already four years into
25 the company, so I left my user name as N. Bayne.

1  DENIG - CONFIDENTIAL
2      Q.   If I see an e-mail addressed to
3  N. Bayne at Lehman --
4      A.   That's me.
5      Q.   Could you tell me how long you worked
6  for Lehman?
7      A.   15 years.
8      Q.   So that's starting in --
9      A.   1994, January 20.
10     Q.   OK.  And could you kind of briefly
11 walk me through the progressions of positions you
12 held up until the end?
13     A.   I started as an analyst in customer
14 service, which dealt with like trade discrepancies
15 for fixed income products.
16         Moved to P&L in the finance division,
17 where I supported the repo desk for central
18 funding for all types of fixed income assets.
19         I then took on various different
20 groups throughout the life, sales support, trade
21 support, P&L, structured repo, EMG, trade and
22 sales support, and probably that was pretty much
23 it.  So I pretty much stayed on the fixed income
24 side pretty much all my career.
25     Q.   What was the last position you held?

1  DENIG - CONFIDENTIAL
2      A.   Last position, regional head for fixed
3  income repo, middle office, so that was trade
4  support, so we supported the traders in the daily
5  transactions that they executed.
6          We did sales support, which also
7  supported any trade confirmations, sales
8  confirmations, trade discrepancies with regards to
9  the salespeople.
10         We did -- we reported the P&L to the
11 business lines, and, you know, some various little
12 odds and ends, but nothing that needs to be
13 clarified.
14     Q.   Who did you report to in that
15 position?
16     A.   Jim Hraska.
17     Q.   Any other people that you reported to
18 directly?
19     A.   No.
20     Q.   How long have you held this position?
21     A.   Three years of all that.  I just kept
22 getting more stuff added to me as my career
23 progressed.  So I started with one group and got
24 another one, another, another, another.  But
25 basically all in the same business line.

Page 54

DENIG - CONFIDENTIAL

1
2  shortfall?
3       A.   We weren't.
4       Q.   And so what did you do then?
5       A.   Because we basically ran out of time,
6  the Fed and the DTC depositories ended up shutting
7  down at a particular time and we didn't get
8  everything that we wanted to over, because it
9  wasn't enough time to do all the research.
10      Q.   And you're talking about Thursday
11 evening?
12      A.   Thursday evening around 11 o'clock.
13      Q.   So what was the shortfall by the time
14 of -- by the time you ended on Thursday night?
15      A.   I am not 100 percent sure of what the
16 final figure was, but I want to say it was
17 42 billion is what they received.
18      Q.   OK.  So 42 is not the shortfall, 42 is
19 what ultimately did make it?
20      A.   Yeah.
21      Q.   Was there a 7 or 8 billion dollar
22 shortfall, do you recall?
23      A.   Yes.
24      Q.   Is that the genesis of what I have
25 seen referred to as box loan?

Page 55

DENIG - CONFIDENTIAL

1
2       A.   Yes.
3       Q.   And can you tell me what that is?
4       A.   Well, because we didn't -- we couldn't
5  make the rest of the collateral, because of the
6  timing, they didn't receive the value of
7  7 million -- 7 billion worth of collateral.  So
8  Chase lent Lehman 7 billion dollars to give back
9  to -- to give to Barclays to make up that.
10           Typically you wouldn't collateralize
11 cash with cash, but at that late hour, that was
12 really the only way to facilitate that so that
13 Barclays was made whole.
14      Q.   And what secured that loan?
15      A.   Chase.  The assets that we still had
16 in the box, that Lehman still had in the box.
17      Q.   And the box meaning what?
18      A.   Our free collateral box, meaning any
19 assets that didn't get delivered over to BoNY and
20 was still in the possession of Lehman Brothers,
21 Inc.
22      Q.   And is that the 074 box?
23      A.   No, it was a Chase box.
24      Q.   OK.  074 box is separate?
25      A.   That's a DTC box.

Page 56

DENIG - CONFIDENTIAL

1
2       Q.   I understand.  OK.
3           So now you have gotten us through
4  Thursday night.  What did you do Friday morning or
5  Friday during the day?
6       A.   Well, we -- there was a lot of --
7       Q.   I just mean Friday, the 19th of
8  September.
9       A.   19th.  So first thing in the morning,
10 what we thought was pulled, that they were short
11 collateral that we didn't finish, to try to get as
12 much collateral that we knew was available in the
13 DTC, because at this point the Fed collateral was
14 all exhausted.  We didn't have Treasuries,
15 agencies.  They went.  They were delivered and
16 they were reconciled with Barclays, that they
17 received them.
18           The assets that we ran out of time to
19 send were the DTC, what you referenced as 074
20 collateral, 636 collateral, which are the two DTC
21 boxes that Lehman Brothers, Inc. owned.
22           The traders were basically using their
23 front-end capture system to determine what the
24 positions were that they had available and what
25 they knew as unencumbered, and they delivered

Page 57

DENIG - CONFIDENTIAL

1
2  those via pledge mechanism to DTC, a DTC box for
3  BoNY, which was owned technically by Barclays.
4       Q.   And how much collateral was
5  transferred to the BoNY box in connection with
6  that effort?
7       A.   A billion dollars, a billion and
8  change.
9       Q.   And now what was the purpose of
10 transferring that to that BoNY box?
11           MR. SHAW:  Objection, foundation.
12      A.   We were under the impression we were
13 still short market value.
14      Q.   So that was short market value in
15 connection with the September 18 repo?
16      A.   Yes.
17      Q.   So was that billion and change to
18 substitute in for the cash that had been placed in
19 the repo through the box loan?
20           MR. SHAW:  Objection, foundation.
21      A.   It wasn't my -- it wasn't my
22 understanding, no.
23      Q.   What did you understand it to be for?
24      A.   It was just that BoNY said they
25 didn't have enough market value, you need to give

Page 190

```
 1          DENIG - CONFIDENTIAL
 2   in a search for additional unencumbered
 3   collateral; is that correct?
 4       A.   That's correct.
 5       Q.   Did you have an understanding of why
 6   you were looking for this additional unencumbered
 7   collateral?
 8          MR. SHAW:  Objection, asked and
 9   answered.
10       A.   My impression was that we were -- we
11   had a shortfall in the delivery of the original
12   repo, and we were just trying to find the rest of
13   the -- the collateral to make up the shortfall in
14   market value.
15       Q.   Again, I am a little confused.  Is the
16   shortfall in the market value of assets that were
17   delivered -- withdrawn.  I'll try that question a
18   better way.
19          Can you be more specific about the
20   shortfall in the market value of securities that
21   were delivered that you just told me about?
22       A.   Sure.  When pens went down on the end
23   of September 18, they came back to us, and who,
24   I'm not really sure who, but saying -- and it was
25   communicated down to us that we were short in the
```

Page 191

```
 1          DENIG - CONFIDENTIAL
 2   value, in I believe the 1.9 billion dollar range.
 3          A billion of it was transferred Friday
 4   morning, which we didn't know what the total
 5   market value of that was until Monday, the 22nd,
 6   but on Saturday, those assets were not reflected
 7   in any of the documentation that anybody had at
 8   that point, because we didn't receive the file
 9   from BoNY until Monday morning.
10          So Saturday basically we were told to
11   look for -- we were told, tasked to look for
12   1.9 billion.  We kept referring to a billion of it
13   was delivered already, so we were really on the
14   search for 900 million odd.
15       Q.   And your understanding about what you
16   were looking for and why came from conversations
17   with Mr. Hraska; is that correct?
18       A.   Mr. Hraska and Mr. Forrest.
19       Q.   Did anyone ever tell you, Ms. Denig,
20   that one of the reasons that additional collateral
21   was transferred to BoNY on Friday, the 19th, was
22   because Lehman had had to transfer cash as part of
23   the repo?
24       A.   I knew Lehman transferred cash as part
25   of the repo, so I wasn't sure how that was going
```

Page 192

```
 1          DENIG - CONFIDENTIAL
 2   to be reconciled.  I thought that potentially
 3   Chase and BoNY were kind of discussing that and
 4   working that out.  I wasn't sure that they -- they
 5   segregated that collateral and were going to just
 6   deliver it the very next day, if Barclays would
 7   have given us the cash -- given Chase the cash
 8   back, and then they were given collateral worth
 9   that value.
10          I wasn't sure how they were going to
11   make that whole or whether they were just going to
12   leave it as cash.
13       Q.   When Mr. Hraska testified last week,
14   he told me that the reason additional collateral
15   was transferred on the 19th from Lehman to BoNY
16   for the benefit of Barclays, it was with the
17   intention of releasing some of the cash that had
18   been pledged as part of the September 18 repo.
19   Did Mr. Hraska ever tell that information to you?
20          MR. SHAW:  Objection, form,
21   mischaracterizes Mr. Hraska's testimony.
22          But you can answer the question.
23       A.   As far as my recollection was, it was
24   to satisfy the shortfall of collateral.  How that
25   was -- the 7 billion really didn't come more clear
```

Page 193

```
 1          DENIG - CONFIDENTIAL
 2   to me or people told me about it until later on,
 3   but not at that particular time, no.
 4       Q.   Have you ever heard at any time that
 5   the reason additional unencumbered collateral was
 6   moved to BoNY on the Friday, the 19th, was to
 7   release the cash that had been transferred as part
 8   of the repo on the 18th?
 9       A.   I did not.
10       Q.   Do you have in front of you what has
11   previously been marked as Exhibit 237?
12       A.   Yes.
13       Q.   I am also handing you what has
14   previously been marked as Exhibit 150B.  I don't
15   think Mr. Hine marked that this morning.
16          You will see, Ms. Denig, that both
17   Exhibit 237 and Exhibit 150B have attachments; is
18   that right?
19       A.   Yes.
20       Q.   And both the attachments appeared out
21   of the file name TRI09192008.xls?
22       A.   Yes.
23       Q.   But Exhibit 237 appears to be
24   version 3 of a spreadsheet with that same file
25   name; is that correct?
```

DENIG - CONFIDENTIAL

1
2      A.   OK, OK.
3      Q.   Do you have any understanding of the
4  difference between those two spreadsheets?  I am
5  obviously not expecting you to go through them
6  line by line, CUSIP by CUSIP, but just if you
7  could take a moment to look at them and tell me
8  whether you have any understanding of the
9  difference between the two, if any.
10     A.   I don't see a difference.
11     Q.   Just looking for the moment at
12 Exhibit 237.  Is that the spreadsheet that you
13 created?
14     A.   No.
15     Q.   It appears to be sent from you to
16 Kendall McLaughlin, William Bach and Bob Azerad?
17     A.   Correct, but I did receive it from the
18 Magics technology team.  It is either Magics or
19 BoNY, to be honest with you.  No, it was
20 definitely Magics.
21     Q.   Can you explain what you mean by
22 Magics?
23     A.   Magics is a front-end system that
24 would have been the mechanism that we did the
25 pledges.  So a trader inputs the information in,

DENIG - CONFIDENTIAL

1
2  feeds into a trader system, feeds down to a
3  settlement system, and then a delivery is made.
4      So according to the front-end system,
5  this is what the individual CUSIPs were that were
6  sent to BoNY on the 19th, the morning of the 19th.
7  And the market value -- where I wanted to see if
8  it is different is that the values on the last
9  page of both equal the same amount of money, one
10 billion eighty.
11     One of them is a warrant which they
12 didn't want, so I think they ended up delivering
13 that back.  So in Exhibit 237, you see how the
14 last page, you have a total market value of
15 1,035,000,000, and then there is this one line
16 that says 54 million?
17     Q.   Um-hm.
18     A.   And if you look at the file on the
19 last page of Exhibit 150, the total value was
20 1,090,059,000.  If you add up the two, it is the
21 same value.  So I'm assuming that the information
22 is consistent, that it reflects the same
23 information.
24     Q.   OK.
25     A.   The different version could just be

DENIG - CONFIDENTIAL

1
2  the fact that something, you know, was shuffled
3  around a little bit.
4      Q.   And the market values that you see
5  reflected on these two spreadsheets, Ms. Denig, is
6  a market value that's assigned by Lehman, correct?
7      A.   Yes.
8      Q.   And if I understand your testimony
9  correctly, these were CUSIPs that were transferred
10 out from Lehman's box of DTC to BoNY for the
11 benefit of Barclays on the 19th?
12     A.   That's correct.
13     Q.   And do you know whether or not the
14 CUSIPs reflected in Exhibits 150B and 237 were
15 ever returned to DTC's clearance boxes?
16     A.   I think this one asset was.  I think
17 that's why it is highlighted.  I'm pretty sure my
18 recollection is this was on the excluded list so
19 they kicked it back.  So in --
20     Q.   Just so we have a clear record --
21     A.   In Exhibit 237, you see there was this
22 one security, the last page that's highlighted,
23 and it is called the warrant, that's the type of
24 product it is.  Usually that was not something
25 that you can go raise cash for.  And it had a

DENIG - CONFIDENTIAL

1
2  market value of 54 million.  I think that was on
3  the excluded list and they did kick it back.
4      Q.   With the exception of that one warrant
5  worth 54 million dollars, is it correct that the
6  assets reflected in Exhibit 237 were not held in
7  LBI's clearance boxes as of the close of business
8  on the 19th of September?
9      A.   That's correct.
10     Q.   And is it also correct that, again
11 with that one exception of that one line item, the
12 54 million dollars, the assets reflected on
13 Exhibit 237 were not at any time after close of
14 business on September 19 ever included in LBI's
15 clearance boxes?
16     MR. SHAW:  Objection to form,
17 foundation.
18     A.   And I'm not 100 percent sure that
19 there weren't other discrepancies, but as of this
20 particular moment, when this particular file was
21 done, this is the only one that we knew of that
22 got kicked back.  In subsequent reconciliations
23 there could have been others.
24     Q.   Let me try it this way.  As of close
25 of business on Friday, with that one exception we

Page 198

DENIG - CONFIDENTIAL

1
2  have talked about, the CUSIPs that are reflected
3  on 237 were not in Lehman's clearance box,
4  correct?
5       A.   That's correct.
6       Q.   As of Monday morning, again with this
7  one exception, the CUSIPs reflected on 237 were
8  not contained in Lehman's clearance boxes,
9  correct?
10      A.   That's correct.
11      Q.   Thank you.  That is all I have for
12  those documents at the moment, I think.
13          (Exhibit 253, document Bates stamped
14          BCI-EX-S-00018190 through 191 marked for
15          identification, as of this date.)
16      Q.   Ms. Denig, you have in front of you
17  what has been marked as Exhibit 253, which is a
18  two-page document I'll identify for the record as
19  bearing the Bates range BCI-EX-S-00018190 through
20  91.
21          If you'd just take a moment to
22  familiarize yourself with that and let me know
23  when you have finished doing so.
24      OK.  Do you see below the --
25  Mr. Hraska's emoticon?

Page 199

DENIG - CONFIDENTIAL

1
2       A.   Is that what it is called?
3       Q.   I believe so.  It is the first time I
4  have had a chance to say "emoticon" on the record
5  anywhere.
6          It is an e-mail from you, Ms. Denig,
7  to John Rodefeld at Barclays, Wednesday, September
8  24th.
9       A.   Yes.
10      Q.   With a re: line "Just to summarize."
11          Can you explain to me the context in
12  which you sent this e-mail to Mr. Rodefeld,
13  please?
14      A.   Yes.  Jim asked me to follow up with
15  the clearance folks to find out if, in fact, we
16  did pledge this particular CUSIP to Barclays.
17  They didn't have it on their books anywhere, and I
18  didn't have it as a discrepancy on my
19  reconciliation with John.
20          So we went to the clearance folks, who
21  was this guy Ed Steffens.  He went -- which is the
22  original one.  He said this to Jim, which is
23  basically a reflection of what was in each box for
24  these three CUSIPs, so he was saying 074, there
25  was nothing in the box.  In 636 we had 20 billion,

Page 200

DENIG - CONFIDENTIAL

1
2  210 in the box and nothing in the other two.
3          I was telling him in this e-mail that
4  we already did pledge to him, which isn't
5  reflected anywhere else in the e-mail, that at 70
6  million, 210, and that we had additional 200 -- 20
7  million, 210 in the box.
8       Q.   Do you know at which point these
9  CUSIPs were pledged to Barclays?
10      A.   For the 70 million, 210, it was done
11  on -- it could have been done on a combination of
12  the 18th and the 19th, because ultimately my list
13  ended up being combined and I only knew of one
14  list, so I combined those as could have been
15  delivered on either date.  Though we could -- it
16  could be looked to see where.
17      Q.   And that answered my question with
18  respect to the 70 million.  The 20 million figure?
19      A.   Yes.
20      Q.   Is that the same answer?  Was it
21  pledged on either the 18th or the 19th?
22      A.   No, it was not.  It was still as of
23  September 24 sitting in the DTC box, 22 -- 636,
24  which is LBI's DTC box location.
25      Q.   At any point did that CUSIP get

Page 201

DENIG - CONFIDENTIAL

1
2  transferred or pledged to Barclays?
3          MR. SHAW:  Objection, foundation.
4       A.   I can't be sure.
5       Q.   To the best of your knowledge, was it
6  ever pledged or transferred to Barclays?
7       A.   I think so.
8       Q.   And when do you believe it was pledged
9  or transferred to Barclays?
10      A.   On the 29th or the 30th.
11      Q.   Thank you.  That is all I have about
12  that document.
13          (Exhibit 254, document Bates stamped
14          BCI-EX-S-18206 with attachment marked for
15          identification, as of this date.)
16      Q.   Ms. Denig, I have handed you what has
17  been marked as Exhibit 254, which is a one-page
18  e-mail having the Bates range BCI-EX-S-00018206,
19  and it has an attachment that was produced to us
20  in native form, and the place holder is
21  BCI-EX-S-00018207.
22          My question to you is a simple one,
23  Ms. Denig:  Do you know what this document is?
24      A.   It looks like a dump of information
25  that was in our DTC boxes as of 9/24 based on what

Page 1

1

2             UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4    --------------------------X

5    IN RE:

6                           Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,

9

10              Debtors.

11    --------------------------X

12

13

14

15       HIGHLY CONFIDENTIAL DEPOSITION OF

16              ANSON FRELINGHUYSEN

17           New York, New York

18         Thursday, March 4, 2010

19

20

21

22

23

24    Reported by:
      JOMANNA DeROSA, CSR
25    JOB NO. 27494

Page 2

```
 1
 2
 3
 4          March 4, 2010
 5          9:40 a.m.
 6
 7
 8          HIGHLY CONFIDENTIAL Deposition of
 9  ANSON FRELINGHUYSEN, held at the offices of
10  Boies Schiller & Flexner, LLP, 575 Lexington
11  Avenue, New York, New York, pursuant to
12  Notice, before Jomanna DeRosa, a Certified
13  Shorthand Reporter and Notary Public of the
14  States of New York, New Jersey, California
15  and Arizona.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S:
 3
 4
 5      JONES DAY, LLP
 6      Attorneys for Lehman Brothers, Inc.
 7        222 East 41st Street
 8        New York, New York 10017-6702
 9      BY:  JENNIFER L. DEL MEDICO, ESQ.
10
11
12      BOIES SCHILLER & FLEXNER, LLP
13      Attorneys for Barclays
14        5301 Wisconsin Avenue, N.W.
15        Washington, D.C. 20015
16      BY:  JONATHAN SHAW, ESQ.
17
18
19      HUGHES HUBBARD & REED, LLP
20      Attorneys for SIPA Trustee
21        One Battery Park Plaza
22        New York, New York 10004
23      BY:  SETH D. ROTHMAN, ESQ.
24
25
```

Page 4

```
 1
 2  A P P E A R A N C E S (Continued):
 3
 4
 5      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 6      Attorneys for the Creditors Committee
 7        51 Madison Avenue, 22nd Floor
 8        New York, New York 10010
 9      BY:  ERIC M. KAY, ESQ.
10
11
12  ALSO PRESENT:
13      JOSH LIPSON, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1      FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2          THE VIDEOGRAPHER:  This is the
 3  start of tape No. 1 of the videotaped
 4  deposition of Anson Frelinghuysen in the
 5  matter In re Lehman.
 6          Today's date is March 4th, 2010, at
 7  approximately 9:40 a.m.
 8          Will the court reporter please
 9  swear in the witness.
10  A N S O N   F R E L I N G H U Y S E N, called as
11      a witness, having been duly affirmed by a
12      Notary Public, was examined and testified
13      as follows:
14  EXAMINATION BY
15  MR. SHAW:
16      Q.  Mr. Frelinghuysen, my name is
17  Jonathan Shaw.  We met off the record a moment
18  ago.  I'm with Boies, Schiller & Flexner, and I
19  represent Barclays Capital, Inc.
20          You're an associate of Hughes
21  Hubbard & Reed.  Is that correct?
22      A.  That's correct.
23      Q.  And you were an associate of Hughes
24  Hubbard & Reed in September of 2008.  Is that
25  right?
```

Page 6

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1  FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    A.   I was.
3    Q.   How long at law school were you?
4    A.   I graduated from Brooklyn Law
5  School in June of 2007.
6    Q.   And you've been at Hughes Hubbard
7  your entire career?
8    A.   I have been.
9    Q.   Since September 2008 you've been
10 working on the SIPA liquidation of Lehman
11 Brothers, Inc.  Is that correct?
12   A.   Yes.
13   Q.   When were you first assigned to
14 that matter?
15   A.   I was first assigned to the Lehman
16 Brothers, Inc. matter on September 13th.
17   Q.   And how did you learn on
18 September 13th that you would be working on that
19 matter?
20   A.   I received a call from Mr. Margolin
21 that he would like for me to come into the office
22 the next morning.
23   Q.   "The next morning" being Saturday
24 the 14th?
25   A.   Sunday the 14th.

Page 7

1  FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    Q.   Sunday the 14th.  Okay.
3    And did you get any further
4  instruction in the course of that phone call?
5    A.   No.
6    Q.   Can you give me an overview of what
7  you did in connection with that matter between
8  starting work on September the 14th and the
9  closing of the transaction on the morning of
10 September 22nd.
11   MR. ROTHMAN:  You can give him a
12 general overview without revealing any
13 privileged information.
14   A.   As a first-year associate, I
15 prepared some of the documents associated with the
16 filing of the SIPA liquidation.  I attended the
17 district court hearing in which Lehman Brothers,
18 Inc. was placed in liquidation.  I also attended
19 the closing of the transaction between Lehman
20 Brothers, Inc. and Barclays.
21   Q.   I take it, then, that you did not
22 attend the September 19th sale hearing?
23   A.   I was -- I was at the
24 September 19th sale hearing before it began.
25   Q.   And you left to go where?

Page 8

1  FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    A.   There were other documents that
3  needed to be prepared in connection with the
4  Trustee's appointment.
5    Q.   And I take it you also did not
6  attend the September 17th hearing?
7    A.   I did not attend that hearing.
8    Q.   Over the weekend following the sale
9  hearing, did you participate in any discussions
10 concerning the documentation of the sale
11 transaction?
12   A.   I did, yes.
13   Q.   Setting aside any purely internal
14 discussions between you and the Trustee or the
15 Trustee's lawyers at Hughes Hubbard, tell me what
16 discussions concerning the documentation with the
17 transaction you were involved in.
18   A.   Primarily I was there to discuss
19 the signing of a multitude of signature pages for
20 the related documents for the closing of the
21 transaction.
22   Q.   So that would be early on the
23 morning of the 22nd?
24   A.   No.  Most of the signature pages
25 were signed on Saturday, September 20th.  Still

Page 9

1  FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  others were signed on Sunday, September 21st.
3    Q.   Were any signed on the morning of
4  the 22nd?
5    A.   If they were signed on the morning
6  of the 22nd it would have been, you know, between
7  midnight and 2:00 a.m.  And actually, there were
8  further documents signed later in the morning.
9    Q.   Later in the morning of the 22nd?
10   A.   Yes.
11   Q.   What documents were signed later in
12 the morning of the 22nd?
13   A.   The services and settlement
14 agreement was signed in the morning, as well as
15 the DTCC letter.
16   Q.   Were you physically present at the
17 offices of Weil Gotshal at any time during that
18 weekend?
19   A.   I was -- yes, I was.
20   Q.   How much of the weekend were you
21 present at Weil Gotshal?
22   A.   I was present for large portions of
23 both Saturday, Sunday, and I was there from
24 midnight Monday morning until about 8:00 a.m.
25   Q.   Tell me what you were doing there.

3 (Pages 6 to 9)

Page 10

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      A.    I was monitoring the closing
3  proceedings for the Trustee and reporting back
4  information as necessary.
5           Q.    When you say you were "monitoring
6  the closing proceedings," what do you mean?
7           A.    There were a number of people there
8  discussing issues related to the closing, and I
9  would listen to them and let other attorneys at
10  HHR and the Trustee know what was going on.
11          Q.    And when you say "issues related to
12  the closing," do you mean substantive issues or
13  just logistical issues about how the documents
14  were going to be signed, or both?
15          A.    There would be both document
16  signing and logistical issues that really were not
17  relevant.  That was just, what does my signature
18  block look like, you know, that kind of thing,
19  which is not relevant.
20               Primarily, the discussion was
21  between Barclays and JPMorgan Chase over an issue
22  that they were having that was holding up the
23  closing.
24          Q.    And when were those discussions
25  taking place?

Page 11

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      A.    Those discussions took place all
3  day Saturday, all day Sunday and into Monday
4  morning.
5           Q.    Were you involved -- were there any
6  other representatives of the Trustee at Weil
7  Gotshal?
8           A.    Yes.  Mr. Kiplok arrived around
9  4:00 or 5:00 on Sunday the 21st.
10          Q.    5:00 a.m. or p.m.?
11          A.    Oh, p.m.
12          Q.    And how long did he stay?
13          A.    Mr. Kiplok and I left together
14  around 8:00 a.m. on Monday morning.
15          Q.    Why did you sign the documents
16  rather than Mr. Kiplok or someone else more
17  senior?
18          A.    Most of the documents were signed
19  before Mr. Kiplok got there.
20          Q.    Apart from the -- strike that.
21               You talked about discussions
22  between Barclays and JPMorgan that stretched from
23  Saturday through some point on Monday.
24               Were you present for any portion of
25  those discussions?

Page 12

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      A.    Those discussions were behind
3  closed doors when they were between the parties
4  themselves, and they then made various
5  presentations to the larger group, which I would
6  have been present for.
7           Q.    How many such presentations do you
8  recall?
9           A.    There were two or three or -- two
10  or three of them.
11          Q.    And who did the presenting?
12          A.    Mr. Cox did some of the presenting,
13  people who -- you know, I didn't know who they
14  were at the time.
15          Q.    Representatives of JPMorgan?
16          A.    Representatives of JPMorgan,
17  representatives of Barclays, both lawyers and
18  business individuals.
19          Q.    What was your understanding of the
20  substance of the issue that was being discussed
21  between JPMorgan and Barclays?
22          A.    I understood from their discussions
23  to have been a holdup in collateral transfers,
24  with assets stuck at JPMorgan that were
25  purportedly due to Barclays.

Page 13

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      Q.    Would that be the $7 billion?
3      A.    Yes, that's -- I recall that being
4  one of the issues that was discussed.
5           Q.    What other issues do you recall
6  being discussed?
7           A.    That was the primary kind of
8  blockage that they were unable to resolve for
9  quite some time.
10          Q.    Can you tell me anything about what
11  was discussed during these presentations, as much
12  detail as you can recall?
13          A.    You know, at the presentations,
14  some of them were at the beginning where they
15  presented the issue, and then some of them were
16  later when they had reached a -- what they
17  believed to be a resolution to the issue.
18               Yes.  Since they didn't necessarily
19  affect what we were doing there, I don't remember
20  the details of them.
21          Q.    When Mr. Kiplok was present on
22  Sunday going through to Monday morning, what were
23  his responsibilities as compared with your
24  responsibilities?
25          A.    Mr. Kiplok had other -- I mean, I

4 (Pages 10 to 13)

1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    or late afternoon/early evening when I was told
3    that they would not be closing that night because
4    they were working on a few other matters,
5    primarily what had been discussed was the
6    JPMorgan/Barclays issue, but also he said there
7    was this clarification letter.
8             And I said that we should probably
9    have a copy of that.
10        Q.    And what did he tell you?
11        A.    He didn't give me a copy.
12        Q.    Do you know if there was a copy to
13    give you at that point?
14        A.    I didn't know that.
15        Q.    Did you later learn that there was
16    a copy to give you?
17        A.    I've seen documents that have, you
18    know, earlier dates.
19        Q.    You ultimately did receive various
20    drafts of the clarification letter.  Is that
21    correct?
22        A.    I did receive various drafts of it,
23    yes.
24        Q.    Over the course of the weekend?
25        A.    Beginning on Sunday evening, yes.

1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        Q.    You mentioned PIK notes.
3             What do you mean by the "PIK
4    notes"?
5        A.    PIK notes are the payment-in-kind
6    notes; that I understood the holding company moved
7    all the subsidiaries out from underneath LBI in
8    return for a PIK note to be valued at a later
9    date, and that PIK note was to be delivered to the
10    Trustee.
11        Q.    Aside from the discussion you've
12    already testified about that involved both
13    Mr. Messineo and Ms. Fife concerning the 15c3-3
14    account, what other discussions did you have on
15    Saturday with Ms. Fife?
16        A.    With Ms. Fife?
17        Q.    Yes.
18        A.    None.
19        Q.    What discussions did you have with
20    Mr. Gruszecki or Grabowski, the gentleman from
21    Cleary Gottlieb?
22        A.    That -- those conversations would
23    have been three-way with Ms. Clausen as we
24    discussed the signature pages.  Those two
25    associates were primarily working on getting the

1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    signature pages to all the ancillary documents to
3    the APA in order and signed in triplicate or
4    quadruplicate as necessary.
5        Q.    Anything else of significance that
6    you did on Saturday?
7        A.    No.  When I left in the evening I
8    gave my contact details to Ms. Clausen and
9    Mr. Gruszecki in case they needed to contact me in
10    the event that the deal would actually be able to
11    close that night, and I could sign any of the
12    final documents.
13        Q.    What time did you leave?
14        A.    I think I left at 6:30 or 7:00.
15        Q.    Any additional activity that
16    evening or that night?
17        A.    Yes.
18        Q.    What happened that night?
19        A.    I communicated with attorneys from
20    Hughes Hubbard.
21        Q.    Did you return to Weil Gotshal on
22    Sunday?
23        A.    I did, yes.
24        Q.    At what time?
25        A.    I arrived later that day, probably

1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    between 11:00 and 12:00.
3        Q.    Okay.  And what did you do on
4    Sunday?
5        A.    Sunday was similar to Saturday.  We
6    re-signed some of the documents with the proper
7    date because it was -- now another day had passed.
8    I monitored proceedings again on behalf of the
9    Trustee and reported back any developments.
10        Q.    And when you say you "monitored"
11    the proceedings, what proceedings are you talking
12    about?
13        A.    There were people in and out of
14    various rooms, and I was in the hallway.  I was
15    listening.
16        Q.    And what did you hear when you
17    listened?
18        A.    Primarily discussions regarding the
19    Barclays transaction with -- and the issue with
20    JPMorgan.
21        Q.    Anything about the terms of the
22    transaction?
23        A.    The terms of the Barclays
24    transaction?
25             MR. ROTHMAN: Which transaction?

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  Q.  The sale transaction.
3  A.  No, that was -- that was not really
4  being discussed.
5  Q.  Anything concerning the terms of
6  the clarification letter that you were involved in
7  discussing on Sunday?
8  A.  Yes.  We would have discussed the
9  clarification letter beginning much later on
10 Sunday night.
11 Q.  And who would you have had those
12 discussions with?
13 A.  Mr. Kiplok and I went into a room
14 with Mr. Messineo, Mr. Murgio.  Both of those
15 individuals are from Weil.  Mr. McLaughlin, an
16 attorney from Cleary Gottlieb.  And there were a
17 few other associates in both of those firms
18 sitting in the perimeter of the office.  And, you
19 know, we reviewed the clarification letter.
20 Q.  About what time did that -- did
21 that occur?
22 A.  We were in that room probably
23 beginning around 1:00 a.m. on Monday morning
24 through until about 6:00 or 7:00 in the morning.
25 Q.  Tell me in as much detail as you

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  can what you remember about that session between
3  1:00 a.m. and 6:00.
4  A.  Primarily, Mr. Messineo or
5  Mr. Murgio, both of whom had laptops, would make
6  changes to the clarification letter as they were
7  discussed between Mr. Murgio and Mr. Messineo and
8  Mr. McLaughlin.  Mr. McLaughlin would suggest
9  various changes.  Mr. Murgio would discuss it with
10 him.  They would then make or not make the change.
11 Q.  Did you or Mr. Kiplok offer any
12 input into this process?
13 A.  No.  We were reading along while
14 they made suggestions to the document.  We were
15 not familiar with the document that they had been
16 drafting together, so we, you know, let them
17 finish it.
18 Q.  Do you recall any of the
19 substantive issues that were discussed during that
20 meeting?
21 A.  We discussed certain changes to the
22 customer account section, which is what we
23 primarily were focused on.  The transfer of
24 customer accounts.  There was a section about some
25 sort of insurance liability that remained after

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  the fact and where that cash would go.
3  You know, those were the two areas
4  I remember discussing.
5  Q.  Do you remember that there was
6  discussion about other issues; you just don't
7  remember what it was -- or what they were?
8  A.  They may have discussed other, you
9  know, parts.  Those were the ones I remember.  It
10 was five hours.
11 Q.  Did you or Mr. Kiplok ask any
12 questions during the course of that session?
13 A.  I don't recall any specific
14 questions.
15 Q.  Were you excluded from any portion
16 of the discussions?
17 A.  There were a lot of different rooms
18 in which people were having a lot of different
19 conversations.  We were not present at all
20 conversations regarding the clarification letter.
21 Q.  Did anyone ever tell you that you
22 were not welcome at any particular discussion?
23 A.  Certainly we were not welcome at
24 the discussions between JPMorgan and Barclays.
25 Q.  Any other discussions you were not

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  welcome at?
3  A.  Those people went into separate
4  rooms to have private conferences with their
5  attorneys with themselves, and we were not welcome
6  at those.
7  Q.  Any multilateral discussions in
8  which you were not welcome?
9  A.  Not that I know of.  But people
10 went into different rooms all the time.
11 Q.  Did you attend or participate in
12 any discussion of the terms of the DTCC letter?
13 A.  I did.
14 Q.  When did those discussions take
15 place?
16 A.  I believe those discussions were
17 parallel to the clarification letter discussions,
18 and then probably I started looking at it around
19 6:00 in the morning.
20 Q.  When you say those discussions
21 "were parallel to the clarification letter
22 discussions," what do you mean?
23 A.  The first letter that I received
24 was at 6:00 a.m., and it had already been written,
25 so it had to have been written while I was working

Page 30

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  the sale transaction over that weekend?
3      A.   I did.
4      Q.   Okay.  When was that?
5      A.   There was a presentation to the
6  larger group that had gathered at Weil Gotshal on
7  Sunday night with various individuals from the Fed
8  and the SEC on the phone.
9      Q.   What time Sunday night was that?
10     A.   That call remained open from about
11  4:00 p.m. until 1:00 a.m.
12     Q.   And were you on that call
13  constantly from 4:00 p.m. until 1:00 a.m.?
14     A.   When I was in the room in which the
15  line was open.  There was a lot of down time on
16  that call.
17     Q.   Okay.  Do you know who else was on
18  that call for the Trustee?
19     A.   Mr. Kobak, Mr. Kiplok, the Trustee.
20     Q.   Kobak, Kiplok and the Trustee?
21     A.   You know, it's impossible to say
22  when people were on and off the call.  It lasted
23  for a long time.
24         MR. ROTHMAN:  He was just asking
25     you to clarify your prior answer.

Page 31

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2         MR. SHAW:  Yeah.  I just wasn't --
3         MR. ROTHMAN:  It wasn't clear when
4  you said Kobak, Kiplok, whether they were --
5         MR. SHAW:  For the Trustee or also
6  with the Trustee.
7         MR. ROTHMAN:  -- for the Trustee or
8  also with.
9      A.   Oh.  Also with.
10     Q.   Tell me in as much detail as you
11  can recall anything of substance discussed on that
12  call.
13     A.   Again, the focus of that call was
14  the Barclays/JPMorgan issue and resolution of
15  that.  The SEC and the Fed were adamant that the
16  deal be closed before business opened on Monday
17  and that those two parties reach a resolution so
18  the deal as discussed on Friday night, the sale
19  hearing, would close.
20         And primarily they went through
21  their resolution of the issue.  And one part of
22  that resolution that I recall was that the
23  $250 million of collateral that originally was
24  going to be paid to LBI was going to be paid to --
25  not collateral; sorry -- consideration was going

Page 32

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  to be paid to DTCC.
3      Q.   What did paying the collateral to
4  DTCC have to do with the JPMorgan/Barclays issue?
5      A.   It was consideration, not
6  collateral.
7      Q.   Okay.  What did payment of the
8  $250 million of consideration to DTCC have to do
9  with the JPMorgan/Barclays issue?
10     A.   I don't know.
11     Q.   But your understanding was it was
12  somehow related to that?
13     A.   I understand if the
14  JPMorgan/Barclays issue was holding up the
15  transaction, that there would be some relation.
16     Q.   You said a moment ago that the SEC
17  and the Fed were adamant that the deal be closed
18  before business opened on Monday.
19         What's your basis for saying that?
20     A.   I recall voices on the telephone
21  saying, Please resolve this issue before the
22  markets open on Monday.
23     Q.   Anything else?
24     A.   Not that I recall specifically.
25     Q.   Do you recall anything else about

Page 33

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  what was discussed on that call that was open from
3  about 4:00 p.m. until about 1:00 a.m.?
4      A.   No, not in detail.
5      Q.   Approximately how much of that call
6  were you present for between 4:00 p.m. and
7  1:00 a.m.?
8      A.   Between 4:00 p.m. and 1:00 a.m. the
9  call was probably active for two and a half to
10  three hours, and I was probably present for all of
11  the active moments of it.
12     Q.   And what were you doing when it was
13  inactive?
14     A.   We had various side conversations
15  with Hughes Hubbard attorneys, and we had -- that
16  was pretty much it.
17     Q.   Did you or any other representative
18  of the Trustee request any changes to any of the
19  deal documents over the course of that weekend?
20     A.   Yeah.  We had a lot of changes to
21  the signature blocks of the documents.  The DTCC
22  letter we did have some substantive changes to.
23     Q.   You did or you did not have?
24     A.   Did, positive.
25     Q.   Okay.  What substantive changes did

9 (Pages 30 to 33)

Page 34

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1    the Trustee request in the DTCC letter?
2    A.   I don't recall what they were.  I
3    just remember that there were other discussions
4    going on.
5    Q.   And you requested changes.
6         Were those changes made?
7    A.   I don't know.
8    Q.   Who requested the changes on behalf
9    of the Trustee?
10    A.   Mr. Kobak and Mr. Kiplok.
11    Q.   And you don't recall what any of
12    those requested changes were?
13    A.   Not at this time.
14    Q.   And you don't know whether the
15    changes that were requested, whatever they were,
16    were actually incorporated in the final letter; do
17    you?
18    A.   If we signed the letter, they must
19    have been acceptable to us.
20         MR. ROTHMAN:  Well, don't guess.
21    A.   No, I don't know what the changes
22    were and whether they were incorporated.
23    Q.   Do you know whether any requests
24    for changes were made orally or in writing?

Page 35

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1    A.   Do you mean via e-mail?
2    Q.   E-mail, somebody marking up an
3    agreement; anything like that?
4    A.   You know, we were not physically
5    present with DTC attorneys or themselves, so I
6    would -- my recollection is that they would be
7    oral requests.
8    Q.   And you were not personally
9    involved in any discussions concerning the
10    contents of the DTCC letter.  Is that right?
11    A.   Not with DTCC, no.
12    Q.   With anyone other than internally
13    at Hughes, Hubbard & Reed?
14    A.   My discussions about the DTCC
15    letter were with Mr. Kiplok.
16    Q.   Did the Trustee -- aside from
17    changes you've mentioned to the signature block,
18    perhaps, did the Trustee or any of its
19    representatives request changes to the
20    clarification letter at any time?
21    A.   I don't know what they did.
22    Q.   You're not aware of it if they did?
23    A.   I'm not aware of anything else than
24    what I was there for on Monday morning.

Page 36

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1    Q.   While you were there over the
2    weekend, did anyone ever state or suggest the deal
3    as documented in the final version of the
4    clarification letter had not been approved by the
5    Court?
6    A.   My understanding of the deal
7    documents was that they reflected what had been
8    presented to the Court on Friday night, and that
9    the reason that I was signing was because no
10    substantive changes were being made.
11         MR. SHAW:  I'll show you what's
12    been previously marked as Exhibit 25 in this
13    case.
14    Q.   I'm just going to ask if you
15    recognize that as the clarification letter that
16    you signed on the Trustee's behalf?
17         MR. ROTHMAN:  Objection to the
18    form.
19    Q.   Do you recognize that document?
20    A.   I do recognize this document.
21    Q.   Did you -- and what is the document
22    you recognize?
23    A.   The document appears to be the
24    clarification letter.

Page 37

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1    Q.   And did you sign the clarification
2    letter?
3    A.   I signed the signature page that's
4    attached to this letter, yes.
5    Q.   Okay.  And you did so on behalf of
6    the -- of James Giddens, Trustee for the SIPA
7    liquidation of Lehman Brothers, Inc.?
8    A.   That's correct.
9    Q.   When did you sign that signature
10    page?
11    A.   I signed the signature page on the
12    late evening of Sunday, September 21st or in the
13    early morning of September 22nd, probably before
14    1:00 or 2:00 a.m.
15    Q.   And where were you physically when
16    you signed that page?
17    A.   I believe at this point for the
18    signing of this one, I went to some internal
19    office at Weil Gotshal where Mr. Gruszecki and
20    Ms. Clausen had been set up once the larger office
21    they had been using had been taken for other
22    purposes.  That was the room where all the
23    signature pages were being kept in those accordion
24    files.

10 (Pages 34 to 37)

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2         Q.    And when they gave it to you to
3    sign, was there just a signature page or was there
4    an agreement attached to the signature page when
5    you were signing it?
6         A.    It was just the signature page; no
7    agreement.
8         Q.    Was there at some point any further
9    authorization you were required to give before
10   they could use the signature page that you signed?
11        A.    The deal was closed around
12   8:00 a.m. on Monday morning when the signature
13   pages were released by the various parties.
14        Q.    And how was -- how was the -- how
15   were the signature pages that you signed released
16   by the Trustee?
17        A.    We were in another conference room
18   at Weil Gotshal, and all the documents had been
19   signed and reached and the funds transferred.
20        Q.    Let me unpack that for a moment.
21              You were in a conference room at
22   Weil Gotshal at around 8:00 a.m. Monday morning.
23   Is that correct?
24        A.    That's correct.
25        Q.    And who else was in this conference

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    room?
3         A.    More people than I could remember
4    or describe.  It was not the larger conference
5    room.  It was kind of small, and it was full.
6         Q.    Representatives of Barclays?
7         A.    There were representatives of
8    Barclays, of JPMorgan, of -- you know, there were
9    Cleary lawyers, Weil lawyers, Shearman lawyers; a
10   lot of people.
11        Q.    Anyone for the creditors committee?
12        A.    I recall that there were members of
13   the creditors committee there during the course
14   of -- earlier in the evening.  I assumed they
15   didn't go home.
16        Q.    And so you're in this room with
17   representatives of various parties.
18              And did they have final versions of
19   all the contract documents?
20        A.    No, not at all.
21        Q.    So how was it that the documents
22   were -- or that the signature pages were released?
23              I mean, did a representative, for
24   example, of the Trustee say, "Okay, our signature
25   pages are now released," or what happened?

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2         A.    I don't actually recall that
3    moment, but --
4         Q.    But in some way, was it you or some
5    other representative of the Trustee indicated that
6    it was okay to release the signature pages?
7         A.    I didn't.
8         Q.    Do you know who did?
9         A.    No, I can't recall.
10        Q.    Had you read a final version of the
11   clarification letter at that point?
12        A.    I had seen drafts of the
13   clarification letter and had read what I thought
14   was the final version, yes.
15        Q.    And when you say "what I thought
16   was the final version," do you still believe that
17   was the final version that you read?
18        A.    I assumed there were no changes
19   made after we wrapped up.
20        Q.    If you'd take a look at the first
21   page of Exhibit 25, and particularly the paragraph
22   that is at the bottom of that page, No. 1(a)(ii).
23              Do you see that?
24        A.    Yes, I see that paragraph, yes.
25        Q.    And you'll see that that paragraph

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    references a Schedule A and a Schedule B.
3              Do you see that?
4         A.    I do see the references to
5    Schedule A and Schedule B.
6         Q.    Had you seen those references prior
7    to signing this?
8         A.    Had I seen those references?
9         Q.    Yes.
10        A.    Yes, I had.
11        Q.    Did you make any effort to examine
12   Schedule A or Schedule B?
13        A.    These schedules were never
14   delivered to us for review.
15        Q.    When you say they were not
16   "delivered to us for review," do you mean they
17   were never delivered to the Trustee for review?
18        A.    That's -- I never received a copy
19   of them.
20        Q.    And when you say "never," I take it
21   you mean that weekend?
22        A.    That's correct.
23        Q.    Do you know whether anyone else, a
24   representative of the Trustee, ever received a
25   copy of those this weekend -- that weekend?

Page 42

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2          A.   I don't know what other people
3      received.
4          Q.   Do you know if anyone representing
5      the Trustee ever asked for copies of either
6      Schedule A or Schedule B?
7          A.   I did not.
8          Q.   And you don't know whether anyone
9      else did?
10         A.   I don't know.
11         Q.   Are you aware that final versions
12     of Schedule A and Schedule B were filed with the
13     Court on September 30th, 2008?
14         A.   I'm -- am I aware of that?
15         Q.   Yes.
16         A.   No.
17         Q.   Did you ever have occasion to
18     review the final filed versions of Schedule A or
19     Schedule B?
20         A.   I have seen them.
21         Q.   In what context?
22         A.   As .pdf documents.
23         Q.   When approximately did you see
24     them?
25         A.   At some point in the months

Page 43

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2      following.
3          Q.   And for what purpose were you
4      looking at them?
5          A.   To transmit them.  They -- I was
6      just passing through.  They weren't really
7      something that I could read.
8          Q.   To whom did you transmit them?
9          A.   To Deloitte.
10         Q.   And when you transmitted them to
11     Deloitte, did you transmit them with any
12     instruction?
13             MR. ROTHMAN:  That's a yes-or-no
14     question.
15         A.   No.
16         Q.   Were you involved in the process of
17     preparing those final versions of Schedule A and
18     Schedule B?
19         A.   No.
20         Q.   Do you know if any representative
21     of the Trustee was involved in preparing the final
22     versions of Schedule A or Schedule B?
23         A.   I do not know.
24         Q.   Do you know if anyone representing
25     the Trustee ever requested to be involved in the

Page 44

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2      preparation of those final versions of Schedule A
3      and Schedule B?
4          A.   I do not know.
5          Q.   Other than the Trustee and his
6      counsel, have you ever discussed the preparation
7      or contents of Schedule A or Schedule B with
8      anyone?
9          A.   No.
10         Q.   Are the terms "636 box" and
11     "074 box" familiar to you?
12         A.   I don't normally refer to them that
13     way.
14         Q.   Okay.
15             MR. ROTHMAN:  That wasn't what he
16     asked you, but go ahead.
17         Q.   If I were to say the 636 box, what
18     would your understanding of that be?
19         A.   The DTCC participant account of
20     LBI's.
21         Q.   Okay.  And the 074 box, what would
22     your understanding of that be?
23         A.   It's another participant account
24     member of LBI's.
25         Q.   At the DTCC?

Page 45

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2          A.   At DTCC.
3          Q.   When did you learn that?
4          A.   I learned that on Monday,
5      September 22nd or Tuesday, September 23rd.
6          Q.   And how did you come to learn that?
7          A.   I began the process of the customer
8      account transfers which involved the transfer of
9      assets to the benefit of those customers, and the
10     assets had to transfer through DTC.
11         Q.   And did someone explain to you what
12     the 636 and 074 boxes were?
13         A.   Yes.
14         Q.   Who would that be?
15         A.   Mr. Ullman at Lehman Brothers,
16     Inc., who became a Barclays Capital employee.
17         Q.   Do you know when Mr. Ullman became
18     a Barclays Capital employee?
19         A.   I assume he became a Barclays
20     Capital employee the moment that the transaction
21     changed.
22             MR. SHAW:  Can we take a short
23     break.  This is a logical stopping point.
24             THE VIDEOGRAPHER:  The time is
25     10:29.  We are going off the record.

12  (Pages 42 to 45)

Page 46

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      (Recess taken.)
3          THE VIDEOGRAPHER:  The time is
4      10:40.  We are back on the record.
5          Q.    Mr. Frelinghuysen, could you please
6      give me an overview of what you did in connection
7      with this matter between the closing and the end
8      of September 2008.
9          A.    Between the closing on
10     September 22nd through the end of September 2008,
11     I was -- I worked primarily on the transfer of
12     customer assets to Neuberger Berman, Barclays and
13     Prime Brokerage.
14         Q.    Anything else?
15         A.    I worked on various other kind of
16     administrative matters within, you know, the
17     liquidation.
18         Q.    And what was entailed by the
19     transfer of customer assets to Neuberger Berman,
20     Barclays and the Prime Brokerage?
21         A.    Primarily it involved authorization
22     to DTC to transfer customer assets from LBI's
23     accounts at DTC to accounts -- other participant
24     accounts at DTC, Barclays, Ridge, or whomever the
25     Prime Brokerage people designated.

Page 47

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2          Q.    And you had other responsibilities
3      as well over the course of that week or so.  Is
4      that correct?
5          A.    I worked on some other matters,
6      yes.
7          Q.    Were you involved with approving
8      payments from the LBI estate?
9          A.    "Approving payments"?  I'm not
10     sure --
11             MR. ROTHMAN:  Objection to the
12         form.
13         A.    I don't know what that means.
14         Q.    Were the request -- strike that.
15             What did you understand the limits
16     on your authority to act for the Trustee were?
17         A.    I was --
18             MR. ROTHMAN:  Objection to the
19         form.
20         Q.    You can answer.
21         A.    I was there to transfer customer
22     assets and to facilitate those movements through
23     the holders of those securities.
24         Q.    In your understanding, did the
25     scope of your authority differ depending on which

Page 48

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      entity you were interacting with?
3              MR. ROTHMAN:  Objection to the
4          form.
5          A.    The purpose remained to have
6      custodial banks, such as DTC or any of the others
7      around the world, transfer customer assets as
8      needed.
9          Q.    And in order to accomplish these
10     asset transfers, did you understand that you had
11     been invested with some measure of authority to
12     act on the Trustee's behalf in his dealings -- or
13     in your dealings with these custodial entities?
14         A.    Yes.
15         Q.    And what did you understand the
16     scope of the authority you had been given to be?
17         A.    That I should encourage or instruct
18     the banks to transfer LBI's assets that were
19     related to customers as necessary.
20         Q.    Do you understand yourself to have
21     more or less -- strike that.
22             Did you understand yourself to have
23     more, less or the same authority in dealing with,
24     say, JPMorgan as you did in dealing with the DTC
25     or the OCC?

Page 49

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2              MR. ROTHMAN:  Objection to the
3          form.
4          A.    My authority with the DTC and JPMC
5      with respect to LBI's accounts at those banks
6      where customer assets were stored was identical.
7          Q.    You were on site in Jersey -- at
8      Lehman Brothers' Jersey City facility for much of
9      that period.  Is that right?
10         A.    It's been -- yes.  I was at
11     70 Hudson Street.
12         Q.    Okay.  Was Mr. Kiplok there as
13     well?
14         A.    No, he was not.
15         Q.    Were there any other
16     representatives of the Trustee on site in
17     Jersey City?
18         A.    In what time period?
19         Q.    Between closing and the end of
20     September.
21         A.    No.
22         Q.    Were there any other
23     representatives of the Trustee who were involved
24     in authorizing the transfers of assets from the
25     DTC and OCC and JPMorgan custodial accounts during

13  (Pages 46 to 49)

Page 50

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  that time period?
3        A.   There were.
4        Q.   Who were they?
5        A.   Mr. Kiplok.
6        Q.   How were responsibilities allocated
7  between you and Mr. Kiplok during that period?
8        A.   I worked most entirely with DTCC
9  and with JPMC after Mr. Kiplok had established
10 those channels of dealings.
11       Q.   And he had responsibility for what,
12 as you understood it?
13       A.   He did the JPMC transfers
14 initially, and I took over for those since I was
15 located at the operations center.  And that's it.
16       Q.   How much supervision did you
17 receive from more senior lawyers or other
18 representatives of the Trustee during that week?
19       MR. ROTHMAN:  Objection to the
20 form.
21       Q.   You can answer.
22       A.   I received general instruction to
23 transfer customer assets as they were presented to
24 me.
25       Q.   One of the responsibilities you had

Page 51

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  that week was to determine if proposed transfers
3  of assets should be authorized by the Trustee or
4  denied.  Correct?
5        A.   My role was to assure that the
6  assets that Barclays' personnel were asking be
7  transferred got transferred to the extent they
8  were customer assets.
9        Q.   When you say to the extent that
10 they were customer assets, who -- strike that.
11       Who gave you your instructions
12 about what your role was?
13       A.   About what my role was?
14       Q.   Yes.
15       A.   Hughes Hubbard attorneys.
16       Q.   Which Hughes Hubbard attorneys
17 particularly?
18       A.   Mr. Kobak, Mr. Kiplok and the
19 Trustee.
20       Q.   As exactly as possible, what were
21 you told was your role?
22       MR. ROTHMAN:  I instruct you not to
23 answer that question.
24       Q.   In deciding which transfers to
25 approve and which to deny approval to, how did

Page 52

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  you -- how did you do that?
3        MR. ROTHMAN:  Again, you can give a
4  general idea, but please don't reveal any
5  privileged communications you may have had
6  with other lawyers at Hughes Hubbard or with
7  the Trustee.
8        A.   Okay.  I instructed Mr. Ullman that
9  when he had a request for me to transfer assets,
10 that he had to state where they were going and for
11 what purpose, and that that purpose needed to be a
12 customer transfer.
13       Q.   When did you have this discussion
14 with Mr. Ullman?
15       A.   That discussion would have taken
16 place on September 23rd, which is a Tuesday.
17       Q.   What time on September 23rd?
18       A.   I believe I arrived at his offices
19 at the 70 Hudson location around 11:00 a.m.  We
20 had numerous conferences throughout the day going
21 over, you know, what needed to be done, how it
22 would be done.  And in the course of those
23 conversations, that discussion happened.
24       Q.   When in the course of those
25 discussions did that conversation happen?

Page 53

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        A.   It would have happened multiple
3  times in the course of that conversation.
4        Q.   And tell me as exactly as you can
5  precisely what you instructed Mr. Ullman with
6  respect to -- with respect to requesting transfers
7  of assets.
8        A.   That I needed appropriate
9  instructions as to where the assets would be going
10 and where they would be coming from.  I needed
11 appropriate contact information.  I needed
12 confirmation from him that those assets were
13 related to customers.
14       Q.   What were your exact words to
15 Mr. Ullman?
16       A.   I don't recall.
17       Q.   Did you put any of these
18 instructions in writing?
19       A.   Not to Mr. Ullman.
20       Q.   To anyone?
21       A.   On certain occasions where I
22 received instructions that did not match what I
23 needed to have them, I would refuse the
24 instructions and address the short-falling.
25       Q.   Do you recall any specific examples

14 (Pages 50 to 53)

Page 54

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2   of situations like that?
3        A.   I do not.  I just recall that it
4   happened more than once.
5        Q.   With Mr. Ullman or with others?
6        A.   With Mr. Ullman or any of his
7   personnel working for him.
8        Q.   And who were the personnel working
9   for him that you're thinking of?
10        A.   My primary people with whom I
11   worked on those customer account transfers and the
12   transfer of customer assets would have been
13   Mr. Fondacaro, Mr. Gallagher and Mr. Borzi.
14   Mr. Crispino was -- worked for them and was also
15   involved.
16        Q.   What about Laura Vecchio; did you
17   have any contact with her during that period of
18   time?
19        A.   I did.
20        Q.   And what was your contact with her?
21        A.   Ms. Vecchio was assisting to
22   coordinate some of the operations.
23        Q.   And did you understand her to be a
24   Barclays employee?
25        A.   Yes.

Page 55

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2        Q.   A former Lehman person who became a
3   Barclays employee effective with the closing.
4        Is that your understanding?
5        A.   That was -- my understanding is
6   that she was -- that that was her position, yes.
7        (Exhibit 669-B marked for
8   identification.)
9        MR. SHAW:  I'm showing you what's
10   been marked as Exhibit 669-B.
11        Q.   Take a moment to look at it and
12   then tell me if you recognize this as a
13   September 26th, 2008, e-mail chain, parts of which
14   you wrote and parts of which were addressed to
15   you.
16        A.   What was your question?
17        Q.   Sure.  Do you recognize this as a
18   September 26th, 2008, e-mail -- or e-mail chain,
19   rather, parts of which you wrote and parts of
20   which -- of which were addressed to you?
21        A.   Yes, I do recognize it as that.
22        Q.   Okay.  If you take a look at the
23   earliest e-mail in the chain, that is, the first
24   chronologically, do you recognize that as an
25   e-mail to you from Mr. Borzi, requesting that the

Page 56

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2   Trustee authorize the transfer of PIM Plant
3   Securities from LBI's 074 box to Barclays 229 box?
4        A.   I do not see the word "box," but I
5   understand it to be a request to move PIM customer
6   assets from LBI's participant account 074 to
7   Barclays' participant account.
8        Q.   Take a look at the next e-mail in
9   the chain.
10        Does that indicate to you that at
11   about 13 minutes after receiving that request that
12   you forwarded that e-mail, along with the
13   Trustee's authorization, to the DTCC?
14        A.   Yes.  This shows that I forwarded
15   it to various attorneys and operations personnel
16   at DTCC with the Trustee's authorization.
17        Q.   How did you decide it was
18   appropriate to authorize that transfer?
19        A.   This transfer in particular had
20   been discussed offline and in very close detail
21   with Mr. Borzi and Mr. Ullman, so I was expecting
22   it.
23        And also, it had the appropriate
24   language from Mr. Borzi to me, stating that it was
25   customer assets going to Barclays, and that the

Page 57

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2   PIM business was the business of -- that I had
3   known Barclays to have acquired.
4        Q.   When we talk about customer assets,
5   there were PIM customer assets, there were PAM
6   customer assets, P-A-M, and there were Prime
7   Brokerage assets.  Is that correct?
8        A.   Those are some of the classes of
9   assets.
10        Q.   Okay.  What other customer assets
11   were you involved -- what other classes of
12   customer assets were you involved in transferring
13   during that period of time?
14        A.   We only would have done PIM and
15   PAM, and PB didn't actually start until October.
16        Q.   Okay.  So when you talk about
17   customer assets, at least in that time period,
18   you're talking about the PIM and the PAM assets?
19        A.   That's correct.
20        Q.   Take a look at the most recent
21   e-mail in the string on Exhibit 669-B.  You
22   thanked Mr. Borzi for the clarity and precision of
23   his instructing e-mail.
24        What specifically were you
25   commenting on?

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      A.    Mr. Borzi had included references
3  that I had specifically asked him to include, such
4  as which participant account number it was going
5  to, that it was related to PIM clients and
6  customers.  That's it.
7      Q.    And so it was important to you that
8  Mr. Borzi specify that the assets to be
9  transferred were PIM customer assets.  Is that
10  right?
11      A.    Yes, and that they were being
12  transferred in connection with Barclays' purchase
13  of the PIM customers under --
14      Q.    Okay.  And if I understand you
15  correctly, when transfers of customer assets were
16  requested, you required that the assets be
17  identified as customer assets.  Is that right?
18      A.    Well, my understanding was that
19  only customer assets were being transferred.
20      Q.    Where did you get that
21  understanding from, sir?
22      A.    That's what I understood the
23  transaction to include.  And certainly that's all
24  I understood to be going on in those first couple
25  of weeks.

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      Q.    Did you consult on the transfers of
3  any assets with more senior attorneys at Hughes
4  Hubbard & Reed or other representatives of the
5  Trustee?
6      A.    Yes.
7      Q.    With whom did you consult during
8  that period of time?
9      A.    Mr. Kobak, Mr. Kiplok.
10      Q.    Anyone else?
11      A.    At Hughes Hubbard?
12      Q.    At Hughes Hubbard or anyone else
13  representing the Trustee.
14      A.    No.
15      Q.    To the best of your recollection,
16  did requests that you authorize the transfer of
17  customer assets always specify that the assets in
18  question were customer assets?
19      A.    Requests to me?
20      Q.    Yes.
21      A.    No, they very often did not, and I
22  wouldn't approve them.
23      Q.    Okay.  How did -- when you received
24  such a request, how did you verify that the assets
25  requested were actually customer assets?

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      A.    Based on the information and the
3  representation from the Lehman/Barclays employee.
4      Q.    In connection with any request for
5  the transfer of assets, was anyone from Barclays
6  ever dishonest with you?
7          MR. ROTHMAN:  Objection to the
8      form.
9      A.    Was anyone ever dishonest with me?
10      Q.    Do you believe that anyone from
11  Barclays ever lied to you or attempted to mislead
12  you about the transfer of any assets?
13          MR. ROTHMAN:  Same objection.
14      A.    I would have always understood them
15  to be asking that I transfer customer assets.
16      Q.    That's not responsive to my
17  question, sir.
18      My question was:  In connection
19  with any requests for transfers of assets, do you
20  believe that anyone from Barclays was ever
21  dishonest with you?
22          MR. ROTHMAN:  Same objection.
23      A.    No.
24      Q.    Did you communicate with Alastair
25  Blackwell concerning any asset transfers during

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  September 2008?
3      A.    I did.
4      Q.    Who was Mr. Blackwell, sir?
5      Or who -- rather, who did you
6  understand Mr. Blackwell to be?
7      A.    I understood Mr. Blackwell to be
8  the head of global operations of Barclays.
9      Q.    A former Lehmanite?
10      A.    I actually wasn't clear on that.
11      Q.    How many times did you discuss the
12  transfer of assets with Mr. Blackwell in September
13  2008?
14      A.    It's hard to say when in
15  September -- you know, a number of times.
16      Q.    Tell me about any specific
17  discussions you recall having with Mr. Blackwell
18  about the transfer of assets.
19      A.    I recall a specific discussion the
20  first week after the closing with Mr. Blackwell.
21      Q.    One discussion or more than one
22  discussion?
23      A.    One discussion with him in his
24  office, or an office he was using, followed up by
25  some phone calls.

Page 62

```
 1         FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2         Q.   So was this in Jersey City?
 3         A.   This was in Jersey City.
 4         Q.   Do you recall when during the week
 5   your discussion with Mr. Blackwell took place?
 6         A.   I think that it must have been a
 7   Thursday.
 8         Q.   Thursday the --
 9         A.   It should have been the 25th.
10         Q.   The 25th.
11              Tell me everything you remember
12   about that discussion.
13         A.   Mr. Blackwell and I discussed the
14   customer transfers that were ongoing and that we
15   were in the process of completing for PIM and PAM.
16   We discussed some other customer transactions and
17   that there was an additional transfer of assets
18   that needed to occur that valued around
19   $1 billion.
20         Q.   And what did you understand that
21   $1 billion in assets to be?
22         A.   I don't recall what he said it was.
23         Q.   Well, do you recall what you
24   thought it was?
25         A.   No.
```

Page 63

```
 1         FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2         Q.   How long did that discussion in an
 3   office in Jersey City last?
 4         A.   Around half an hour probably.
 5         Q.   Can you recall anything else about
 6   the discussion?
 7         A.   No.
 8         Q.   Can you recall anything else about
 9   the approximately $1 billion in other assets that
10   you discussed with Mr. Blackwell?
11         A.   He never asked me to transfer it.
12         Q.   What did he ask you?
13         A.   He asked me what steps would be
14   necessary to transfer it.
15              And I said I would get back to him.
16         Q.   And did you get back to him?
17         A.   I did.
18         Q.   And what did you tell him?
19         A.   I drafted him a representation from
20   him that the assets were appropriate to transfer,
21   and he never responded.
22         Q.   Did you record your time on this
23   case?
24         A.   As a matter of course, I record my
25   time.
```

Page 64

```
 1         FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2         Q.   Do you do it daily?
 3         A.   I keep daily track of my time.  I
 4   sometimes catch up at the end of the week.
 5         Q.   Was that true in September of 2008
 6   that you were keeping daily track of your time?
 7         A.   Yes.
 8         Q.   Is it fair to say that you
 9   attempted to record your time accurately?
10         A.   Yes.
11         Q.   And that's at least in part because
12   you understood that your time entries would
13   ultimately be submitted to the Court in connection
14   with Hughes Hubbard's fee submission.  Is that
15   correct?
16         A.   That is correct.
17              (Exhibit 670-B marked for
18   identification.)
19              MR. SHAW:  I'm showing you what has
20   been marked as Exhibit 670-B.  I will
21   represent to you that this is an excerpt from
22   a much larger document submitted by Hughes
23   Hubbard & Reed in connection with its request
24   for fees for the period from September 13,
25   2008, through January 31st, 2009.
```

Page 65

```
 1         FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2         Q.   Are you aware that such a
 3   submission was made?
 4         A.   I am aware of that submission, yes.
 5              MR. ROTHMAN:  Just for the record,
 6   it's a three-page document.  The first page
 7   appears to be a cover page, and then it has
 8   pages 46 and 47.
 9         Q.   If you'll take a look at the entry
10   that appears at the bottom of page 46 and carries
11   onto the top of page 47 of this document.
12              Do you recognize that as a
13   description of your time for September 24th, 2008?
14         A.   Yes, I do recognize it as that.
15         Q.   And do you believe that that time
16   is -- that is recorded there -- or that the entry
17   that's recorded there is as you wrote it?
18         A.   I have no reason to believe it's
19   not.
20         Q.   Do you have any reason to believe
21   that that entry is inaccurate?
22         A.   No, I do not.
23         Q.   The first part of that entry
24   discusses the PAM customer accounts.  Is that
25   correct?
```

17  (Pages 62 to 65)

Page 66

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      And when I say "part," I'm
3  referring to the segments that end with a number
4  in parentheses and a semicolon.
5      A.   Yeah.  The first part of the entry
6  that ends with a number on page 47 is with respect
7  to PAM transfers.
8      Q.   And what were the PAM customer
9  accounts?
10     A.   The PAM customer accounts were the
11 private asset management customer accounts that
12 were transferred to Ridge as the new broker-dealer
13 for Neuberger Berman.
14     Q.   And if you look at the second and
15 third portions of the entry for that date, you'll
16 see that they talk about PIM transfers.  Is that
17 correct?
18     A.   That is correct.  They do talk
19 about PIM transfers.
20     Q.   Okay.  And what did you mean by
21 "PIM transfers"?
22     A.   PIM transfers was the private
23 investment management business of Lehman Brothers,
24 Inc. that was purchased by Barclays.
25     Q.   And then the fourth section talks

Page 67

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  about what appears to be a three-hour discussion
3  with David Aronow concerning PB accounts.
4      Q.   What did you mean by "PB accounts"?
5      A.   Those were the prime brokerage
6  accounts.
7      Q.   And what did you talk about with
8  Mr. Aronow about the transfer of prime brokerage
9  accounts?
10     A.   We had been discussing in the -- in
11 the course of the day how to gather assets related
12 to customers to effectuate their transfer to a new
13 broker-dealer.
14     Most of the PIM customers were
15 relatively simple accounts.  PB accounts hold a
16 lot of other financial products and have more
17 complicated trading arrangements.  We were trying
18 to figure out a way operationally to move those
19 accounts and their assets.
20     Q.   And then the final section of your
21 time entry talks about a discussion with
22 A. Blackwell Re: Transfer of other LBI assets in
23 relation to asset purchase agreement.  Is that
24 correct?
25     A.   That is correct.

Page 68

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      Q.   And when you wrote about other
3  assets, you're referring to the $1 billion of
4  other assets that Mr. Blackwell had discussed with
5  you?
6      A.   Yes.  It appears that conversation
7  was on the 24th.
8      Q.   And when you write "other" assets,
9  that's to distinguish it from the PAM, PIM and
10 prime brokerage assets that are discussed in
11 earlier sections of your time entry.  Is that
12 correct?
13     A.   Yes.
14     Q.   Does this refresh your recollection
15 that what you discussed with Mr. Blackwell is the
16 transfer of the remaining clearance box assets
17 pursuant to the clarification letter?
18     MR. ROTHMAN:  Objection to the
19 form.
20     A.   This is -- reflects my recollection
21 that Mr. Blackwell was requesting assets --
22 requesting transfer of non-customer assets.
23     Q.   And the assets he was requesting
24 were assets in the 636 and 074 box.  Is that
25 correct?

Page 69

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      A.   He did not disclose to me which
3  assets they were; only their value.
4      Q.   Now having read your time entry for
5  the 24th, do you have any further recollection of
6  your conversation with Mr. Blackwell on this
7  topic?
8      A.   Nothing further to what was just
9  discussed.
10     Q.   And after your discussion with
11 Mr. Blackwell, what did you do with respect to his
12 request concerning the transfer of those assets?
13     MR. ROTHMAN:  Object -- go ahead.
14 Objection.  Asked and answered.
15     You can answer again.
16     A.   I contacted other -- I contacted
17 other attorneys at Hughes Hubbard.
18     Q.   And who specifically did you
19 contact?
20     A.   Mr. Kobak, Mr. Kiplok.
21     (Exhibit 671-B marked for
22 identification.)
23     Q.   If you would look at what has been
24 marked as Exhibit 671-B.
25     Have you had a chance to look at

18  (Pages 66 to 69)

Page 70

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2    it?
 3        A.   I have reviewed this document, yes.
 4        Q.   Do you recognize that as an e-mail
 5    that you wrote to Mr. Blackwell on the 25th of
 6    September, 2008?
 7        A.   Yes, I do.
 8        Q.   And you copied Mr. Giddens,
 9    Mr. Kobak and Mr. Kiplok on that e-mail.  Is that
10    correct?
11        A.   That's correct.
12        Q.   And why did you copy them
13    particularly?
14        A.   I copied my supervisors on a
15    regular basis.
16        Q.   Okay.  And you had discussed this
17    issue between your conversation with
18    Mr. Blackwell -- strike that.
19        Between your conversation with
20    Mr. Blackwell on the 24th and the time you sent
21    this e-mail on the 25th, you had discussed this
22    with at least Mr. Kobak and Mr. Kiplok.  Is that
23    right?
24        A.   That's correct.
25        Q.   Had you run a draft of this past
```

Page 71

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2    them?
 3             MR. ROTHMAN:  I'm going to instruct
 4        him not to answer that question.  I think
 5        you're getting into the privilege.
 6        Q.   Attached to this e-mail is a letter
 7    that you sent to Mr. Blackwell which he would need
 8    to submit before the Trustee would:
 9             "... authorize the movement of the
10    positions discussed earlier that are due as part
11    of the LBI/Barclays transaction."
12             Is that right?
13        A.   It says:
14             "... which were sold to Barclays
15    Capital pursuant to the asset purchase."
16        Q.   I was actually quoting from your
17    e-mail.  Sorry.  I asked a confusing question.
18    Let me start again.
19        You sent Mr. Blackwell a letter
20    that he needed to submit before the Trustee would:
21             "... authorize the movement of the
22    positions discussed earlier that are due as part
23    of the LBI/Barclays transaction."
24             Is that correct?
25        A.   That's correct.
```

Page 72

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        Q.   And when you say "discussed
 3    earlier," you're referring to the discussions
 4    shown on your time records for the 24th.  Right?
 5        A.   Yes, that's correct.
 6        Q.   And why did you need that letter?
 7        A.   Because he had stated that they
 8    were due as part of the asset purchase agreement,
 9    and we were going to be basing that movement on
10    his representation.
11        Q.   And you didn't request a similar
12    letter when Mr. Borzi asked you to authorize
13    transfer of pending client securities; did you?
14        A.   No.
15        Q.   Why did you request a letter from
16    Mr. Blackwell in connection with the transfer you
17    discussed with him, but didn't request a similar
18    letter from Mr. Borzi in connection with the
19    earlier transfer we looked at?
20             MR. ROTHMAN:  Objection to the
21        form.
22        A.   The nature of the transfer was
23    different.
24        Q.   In what -- I'm sorry.  Go ahead.
25        A.   The customer transfers had been
```

Page 73

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2    discussed between me and Mr. Borzi, Mr. Ullman and
 3    Mr. Gallagher.  The file had been discussed.
 4             Mr. Blackwell had brought me into a
 5    separate room to discuss this, closed the door,
 6    and represented these were certain accounts that
 7    they needed to have transferred -- certain assets.
 8    Pardon me.
 9        Q.   You say he took you into a separate
10    room and closed the door.
11             You mean the two of you went and
12    sat at a desk in an office?
13        A.   Yeah.  We went into his office.
14        Q.   Okay.  And did you attach any
15    significance to his closing the door?
16        A.   Most of the discussions I had had
17    regarding transfer of customer assets had been on
18    the operations floor with, you know, ten or 15
19    people who were on the team working on it.
20        Q.   Take a look at the draft letter
21    attached to 671-B, the attachment.
22             In that letter you ask
23    Mr. Blackwell to confirm that the requested assets
24    were:
25             "... assets of Lehman Brothers,
```

19 (Pages 70 to 73)

Page 74

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2    Inc. which were sold to Barclays Capital, Inc.
 3    pursuant to the asset purchase agreement dated as
 4    of September 16, 2008, as amended."
 5        Right?
 6        A.   That's a correct reading of the
 7    letter -- draft of the letter.
 8        Q.   And beyond just a correct reading
 9    of the letter, that was, in fact, what you were
10    asking him to do.  Right?
11        A.   I was, in fact, asking him to
12    represent that these were assets under the APA.
13        Q.   And you understood that they were
14    proprietary assets of LBI, not customer assets.
15    Right?
16        MR. ROTHMAN:  Objection to the
17    form.
18        A.   I understood them to not be
19    customer assets.
20        (Exhibit 672-B marked for
21    identification.)
22        Q.   Have you had a chance to read
23    through Exhibit 672-B?
24        A.   I have.  Thank you.
25        Q.   And do you recognize that as an
```

Page 75

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2    e-mail string that was sent to you by Neal Ullman
 3    at 4:19 p.m. on Friday, September 26, 2008?
 4        A.   I do recognize it to be that, yes.
 5        Q.   And that string was about the
 6    transfer of approximately $269 million in
 7    collateral from the 636 box at DTC to Barclays.
 8    Is that correct?
 9        A.   Yes, it appears to discuss that
10    transfer.
11        Q.   And in the most recent e-mail in
12    that string, Mr. Ullman says to you:
13        "Be over in a minute."
14        Right?
15        A.   That's correct.
16        Q.   Okay.  Did he, in fact, come over
17    to your office to discuss that transfer?
18        A.   I can't recall.
19        Q.   Were you physically located near
20    Mr. Ullman during this period of time?
21        A.   We were on the same floor of the
22    building.  He was 100 yards away and around the
23    corner.
24        Q.   Do you remember ever discussing
25    this request with Mr. Ullman?
```

Page 76

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        A.   No, I do not.
 3        Q.   Do you remember ever discussing
 4    this request with Ms. Vecchio?
 5        A.   No, I do not.
 6        Q.   Do you remember ever discussing
 7    this request with anyone?
 8        A.   Then, no -- well, this wouldn't
 9    have been sufficient for me.
10        MR. ROTHMAN:  That wasn't the
11    question he asked you.
12        Q.   Why would this not have been
13    sufficient for you?
14        A.   It didn't contain an instruction.
15        Q.   What do you mean by "didn't contain
16    an instruction"?
17        A.   It says:
18        "Be over in a minute."
19        There's no instruction of what to
20    do with it.
21        Q.   Are you aware that you had six
22    minutes earlier actually already sent the
23    instruction and authorization to the DTC on this
24    transaction -- for this transfer, rather?
25        A.   No.
```

Page 77

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        Q.   Would it surprise you to learn
 3    that?
 4        MR. ROTHMAN:  Objection to the
 5    form.
 6        A.   Would it surprise me now?
 7        Q.   Yes.
 8        A.   Yes.
 9        Q.   Did you understand the
10    approximately $269 million in securities
11    referenced in this e-mail string to be a portion
12    of the assets that Mr. Blackwell had discussed
13    with you a couple of days earlier?
14        MR. ROTHMAN:  Objection to the
15    form.
16        A.   No, I did not know what these
17    assets were, and I did not know them to be related
18    to the conversation I'd had with Mr. Blackwell.
19        Q.   Do you see anywhere on here any
20    indication that these are customer assets?
21        MR. ROTHMAN:  Objection to the
22    form.
23        A.   No.
24        Q.   Take a look at the earliest e-mail
25    in this string.  That's an e-mail from Monty
```

Page 78

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    Forrest to Mister -- to Mr. Blackwell.
3            Do you see that?
4        A.   I do see that, yes.
5        Q.   Okay.  And if you look at the last
6    sentence of the first paragraph of that e-mail,
7    you see that Mr. Forrest writes that:
8            "The list has changed a bit since
9    this morning as Paolo asked to take out the very
10   small pieces (under $10)."
11           Do you see that?
12       A.   I do see that sentence, yes.
13       Q.   Would it have been acceptable to
14   leave behind even small pieces if these were, in
15   fact, customer assets?
16           MR. ROTHMAN:  Objection to the
17   form.
18       A.   In the course of transferring
19   customer assets we did many transfers, some of
20   which were to catch up on transfers that had been
21   left out in the initial files.
22       Q.   Can you think of any reason why, if
23   you were transferring customer assets, you would
24   exclude small portions of the customer assets --
25           MR. ROTHMAN:  Objection to --

Page 79

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        Q.   -- from a particular customer
3    account?
4            MR. ROTHMAN:  Objection to the
5    form.
6        A.   DTCC is a complicated place.  They
7    were doing the operations for us.  We were trying
8    to get a bulk of the assets across.  We wouldn't
9    have wanted to gum up their systems with small
10   transfers.
11       Q.   Is that just your speculation now,
12   or do you have any recollection of thinking that
13   at the time?
14       A.   That's my understanding of how the
15   transfers were effected.
16       Q.   Can you think of any other
17   transfers where small pieces of the -- of the
18   accounts to be transferred were excluded from the
19   transfer of DTC?
20           MR. ROTHMAN:  Objection to the
21   form.  It assumes facts not in evidence.
22       Q.   You can answer.
23       A.   As a matter of fact, I know that,
24   you know, over the course of doing these transfers
25   the smaller bits of securities had to be cut up

Page 80

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    later, so they were not always included in the
3    initial files.
4        Q.   Not quite what I was asking, or at
5    least may not what I intended to ask.  Let me try
6    it again.
7            Can you think of any other
8    transaction where small amounts of securities were
9    deliberately excluded from a planned transfer of
10   customer assets?
11           MR. ROTHMAN:  Objection to the
12   form.
13       A.   No.
14           THE VIDEOGRAPHER:  The time is
15   11:27.  We are going off the record.
16           (Recess taken.)
17           THE VIDEOGRAPHER:  The time is
18   11:36.  We are back on the record.
19           (Exhibit 673-B marked for
20   identification.)
21       Q.   Have you had a chance to look at
22   Exhibit 673-B?
23       A.   I have, thank you.
24       Q.   And do you see this is an e-mail
25   from you to various people at the DTCC, copying

Page 81

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    Mr. Ullman, Ms. Vecchio, Mr. Kobak, Mr. Kiplok,
3    among others?
4        A.   Yes, that's correct.
5        Q.   And this was an e-mail that you
6    sent at 4:13 p.m. on Friday the 26th of September,
7    2008?
8        A.   That's correct.
9        Q.   And you were authorizing on
10   behalf of the -- strike that.
11           And you were transmitting to the
12   DTCC the Trustee's authorization of the transfer
13   of approximately $269 million in securities.  Is
14   that correct?
15       A.   There's no dollar figure.
16       Q.   If you'd take a look at the bottom
17   of the first attachment.
18       A.   269 units, yes.
19       Q.   And you think it's units, not
20   dollars?
21       A.   It doesn't say dollars.  A lot of
22   times they transferred numbers of shares.
23       Q.   Do you know whether that's the
24   same -- strike that.
25           Do you know whether this is the

21  (Pages 78 to 81)

Page 86

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    "Lehman Market Value" it has a sum of
3    $269,921,368.
4           Do you see that?
5       A.  Yes, I see that.
6       Q.  Does this refresh your recollection
7    that the amount of the transfer you authorized --
8    or strike that.
9           Does this refresh your recollection
10   that the amount of the transfer authorized in
11   Exhibit 673-B was, in fact, $269 million?
12          MR. ROTHMAN:  Objection to the
13   form.
14      A.  The authorization from Mr. Kiplok
15   doesn't state a value.
16      Q.  Well, if you look at the chart that
17   immediately precedes the authorization by
18   Mr. Kiplok, you'll see it contains almost the same
19   number.  It's off by, it looks like, about $20 as
20   the one attached to Exhibit 674-B that we looked
21   at a moment ago.
22      A.  Yes, I see that the numbers are
23   approximate and that the attachment on 674-B
24   contains two additional lines.
25      Q.  Those being the lines:

Page 87

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2           "Schultz Securities and securities
3    delivered.
4           Is that what you're referring to?
5       A.  Yes.
6       Q.  Looking at the -- at
7    Exhibit 674-B --
8       A.  Yes.
9       Q.  -- does that refresh your
10   recollection that you were informed by Mr. Fleming
11   on the 29th that a transfer of $269 million in
12   securities had taken place?
13          MR. ROTHMAN:  Objection to the
14   form.
15          MR. SHAW:  You can answer.
16      A.  By Mr. Fleming?
17      Q.  Yes.
18      A.  I don't recall that.
19      Q.  Well, you note that Mister -- it
20   says "Dan" -- this is an e-mail from Mr. Tonucci
21   to Mr. Fleming, copying Mr. Marsal.
22          Do you see where it says "Dan" --
23   this is an e-mail from Mr. Tonucci to Mr. Fleming.
24          "Dan, can you advise the SIPC team
25   with this transfer of assets that's been

Page 88

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    completed."
3       A.  That is what's written.
4       Q.  Okay.  And do you remember
5    Mr. Fleming ever advising any members of the SIPC
6    team that it had been completed?
7       A.  I have no recollection of that.
8          MR. SHAW:  You can put 674-B aside.
9          (Exhibit 675-B marked for
10   identification.)
11         MR. SHAW:  Take a moment to read
12   what's now been marked as Exhibit 675-B,
13   please.
14      Q.  Have you had a chance to read
15   through that?
16      A.  I have.
17      Q.  Do you recognize that as an e-mail
18   string between you and Mr. Ullman, dated
19   September 29th, 2008?
20      A.  I do, yes.
21      Q.  If you'd look at the most -- at
22   the -- sorry -- at the oldest e-mail in the string
23   at the bottom of the first page.  It says:
24          "Anson, I am seeking authorization
25   to transfer the securities in the attached

Page 89

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    spreadsheets as part of the transfer of assets to
3    Barclays Capital."
4          Do you see that?
5       A.  I do see that.
6       Q.  And then it attaches two worksheets
7    which are not attached to this exhibit.
8          Do you see that?
9       A.  I do see that.
10      Q.  Do you recall this transfer?
11      A.  No.
12      Q.  Do you know why this is headed
13   forward resending?
14      A.  No.
15      Q.  Take a look at the second e-mail in
16   the string.  You see that your response to
17   Mr. Ullman was that you asked him to confirm that:
18          "... the attachments to the e-mail
19   below represent assets of Lehman Brothers, Inc.
20   that were sold to Barclays Capital, Inc. pursuant
21   to the Asset Purchase Agreement dated as of
22   September 16, 2008."
23          Do you see that?
24      A.  I see that, yes.
25      Q.  Okay.  That is substantially the

23 (Pages 86 to 89)

Page 90

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2     same as the representation that you asked
 3     Mr. Blackwell to make in the draft letter that you
 4     e-mailed to him a few days earlier.  Is that
 5     right?
 6              MR. ROTHMAN:  Objection to the
 7     form.
 8          A.   I communicated with Mr. Ullman and
 9     Mister -- and Mr. Blackwell on different subjects.
10          Q.   That's not my question, sir.
11              My question is:  The confirmation
12     you were seeking from Mr. Ullman with respect to
13     these transfers was substantially the same as the
14     confirmation you sought from Mr. Blackwell in the
15     letter that you -- in the draft letter that you
16     sent him on the 25th?
17              MR. ROTHMAN:  Same objection.
18          Q.   Is that correct?
19          A.   It does seem similar, yes.
20          Q.   Okay.  And now -- because you
21     understood that what Mr. Ullman was asking you to
22     transfer were non-customer assets, just as the
23     ones Mr. Blackwell had discussed with you earlier.
24     Right?
25          A.   No.  I only understood Mr. Ullman
```

Page 91

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2     to be requesting transfer of customer securities.
 3          Q.   Then why are you asking for this
 4     confirmation?
 5          A.   I asked for confirmation that the
 6     assets being transferred were appropriate for
 7     transfer every time I made a transfer.
 8          Q.   Okay.  You didn't ask him to
 9     confirm that these were customer assets.  Right?
10          A.   My understanding with Mr. Ullman is
11     that we were transferring customer assets.
12          Q.   That's not my question, sir.
13              My question is:  You did not ask --
14     you did not ask him to confirm that these were
15     customer assets being transferred.  Right?
16              MR. ROTHMAN:  Objection.  Asked and
17     answered.
18          Q.   You can answer.
19          A.   I asked him to -- no.
20          Q.   And you previously stated that --
21     strike that.
22              And Mr. Ullman confirmed at about
23     3:50 p.m. on the 29th that what you had asked him
24     to confirm was correct.  Is that right?
25          A.   Yes.
```

Page 92

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2              MR. SHAW:  Showing you what's been
 3     previously marked as Exhibit 449 in this case.
 4          Q.   Do you recognize that as an e-mail
 5     that you sent to various personnel at the DTCC and
 6     copied to Mr. Kobak, Mr. Ullman, Ms. Vecchio and
 7     Mr. Gallagher on the 29th of September, 2008, at
 8     approximately 3:52 p.m.?
 9          A.   Yes.
10          Q.   And do you understand that to be
11     you're transmitting the authorization that
12     Mr. Ullman was requesting you to transmit in
13     Exhibit 675-B?
14          A.   Yes, I do.
15          Q.   And you did that without any
16     confirmation that these were customer assets.  Is
17     that correct?
18          A.   I transferred them as -- in
19     connection with the Asset Purchase Agreement,
20     which I understood to effect the transfer of
21     customer assets.
22          Q.   You'd also had a discussion with
23     Mr. Blackwell a few days earlier where you had
24     discussed with him a billion dollars of other
25     assets that were -- that were to be transferred
```

Page 93

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2     pursuant to the Asset Purchase Agreement.  Isn't
 3     that correct?
 4          A.   I had asked Mr. Blackwell at that
 5     time to transmit to me a firm and a signed letter
 6     from him that those assets were being transferred,
 7     not Mr. Ullman.
 8              MR. SHAW:  Move to strike as
 9     nonresponsive.
10          Q.   My question, sir, was:  And you'd
11     had a conversation with Mr. Blackwell a few days
12     earlier about a billion dollars of other assets.
13     Correct?
14              MR. ROTHMAN:  Objection to the
15     form.
16              You can answer.
17          A.   I had had a conversation with
18     Mr. Blackwell about the transfer of other assets.
19          Q.   Yes.  And those other assets were
20     assets that you understood were conveyed under the
21     Asset Purchase Agreement.  Correct?
22          A.   I was asking him to represent that
23     they were conveyed under the Asset Purchase
24     Agreement.
25          Q.   Yes.  But you understood that the
```

24   (Pages 90 to 93)

Page 94

```
 1          FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2   Asset Purchase Agreement dealt with things other
 3   than customer assets.  Correct?
 4              MR. ROTHMAN:  Objection to the
 5   form.
 6       A.   I was asking him to make that
 7   representation.
 8       Q.   And you were asking Mr. Ullman --
 9   going back to Exhibit 675-B, you were asking
10   Mr. Ullman to make that same representation in
11   connection with these two transfers.  Correct?
12              MR. ROTHMAN:  Objection to the
13   form.
14       A.   I asked Mr. Ullman to confirm that
15   we were transferring customer assets in connection
16   with the APA.
17       Q.   Where does -- where do you see the
18   words "confirm that these were customer assets"?
19       A.   My normal course of dealing with
20   Mr. Ullman was with customer assets.
21       Q.   Okay.  But you did not ask
22   Mr. Ullman to confirm that these were, in fact,
23   customer assets; did you?
24              MR. ROTHMAN:  Objection to the
25   form.  He just said that he did.
```

Page 95

```
 1          FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2       Q.   Can you show me where on this -- on
 3   Exhibit 675-B you asked Mr. Ullman to confirm that
 4   these were customer assets.
 5       A.   I asked that they were being
 6   transferred pursuant to the Asset Purchase
 7   Agreement, which I understood to transfer customer
 8   assets.
 9       Q.   And which you also understood to
10   transfer non-customer assets.  Right?
11       A.   I had asked other personnel to
12   inform me or to represent to me that it
13   transferred other assets.
14       Q.   So you were asking Mr. Blackwell to
15   give you legal advice on what the Asset Purchase
16   Agreement transferred?
17              MR. ROTHMAN:  Objection to the
18   form.
19       A.   Representation is not legal advice.
20              MR. SHAW:  Let's take a five-minute
21   break.  I may be done.  I just want to look at
22   a couple of things.
23              THE VIDEOGRAPHER:  The time is
24   11:58.  We are going off the record.
25              (Recess taken.)
```

Page 96

```
 1          FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2              THE VIDEOGRAPHER:  The time is
 3   12:03.  We are back on the record.
 4              MR. SHAW:  Mr. Frelinghuysen, I
 5   have no further questions for you at this
 6   time.  Thank you very much.
 7              THE WITNESS:  Thank you.
 8   EXAMINATION BY
 9   MR. ROTHMAN:
10       Q.   I'd like to just clarify one thing
11   with you, if I may, Mr. Frelinghuysen.
12              Do you recall telling Mr. Shaw that
13   you saw a draft of the clarification letter on
14   Monday morning, the 23rd or 22nd?
15       A.   22nd.
16       Q.   And you assumed that that was the
17   final version?
18       A.   Yes.
19       Q.   When did you see that draft?
20       A.   I saw that draft around 6:00 a.m.
21       Q.   And why did you assume it was the
22   final version?
23       A.   We stopped talking about the
24   clarification letter at that point.
25       Q.   Did you get any further drafts of
```

Page 97

```
 1          FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2   the clarification after 6:00 that morning?
 3       A.   I don't recall receiving or seeing
 4   any further drafts of the clarification letter
 5   that morning.
 6       Q.   Do you know if the draft that you
 7   got at 6:00 a.m. that morning is the same as the
 8   exhibit that you've been shown here today?
 9       A.   I do not know that.
10              MR. ROTHMAN:  That's all I have.
11              MR. SHAW:  Just one question
12   following up on that.
13   EXAMINATION BY
14   MR. SHAW:
15       Q.   Mr. Rothman asked you if you got
16   any further drafts of the clarification letter
17   after 6:00 that morning, and you said no.
18              Were you speaking only for
19   yourself, or were you purporting to speak for
20   the -- for any representative of the Trustee --
21   let me -- let me take that question out and shoot
22   it and start again.
23              When Mr. Rothman asked you if you
24   recalled receiving any further drafts of the
25   clarification letter after 6:00 that morning, and
```

25  (Pages 94 to 97)

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ---------------------------X

5     IN RE:

6                          Chapter 11

7     LEHMAN BROTHERS        Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,

9

10              Debtors.

11    ---------------------------X

12

13

14

15         HIGHLY CONFIDENTIAL DEPOSITION OF

16              CHRISTOPHER KIPLOK

17             New York, New York

18           Thursday, March 4, 2010

19

20

21

22

23

24    Reported by:
      JOMANNA DeROSA, CSR
25    JOB NO. 27494

Page 2

```
 1
 2
 3
 4                March 4, 2010
 5                1:08 p.m.
 6
 7
 8         HIGHLY CONFIDENTIAL Deposition of
 9    CHRISTOPHER KIPLOK, held at the offices of
10    Boies Schiller & Flexner, LLP, 575 Lexington
11    Avenue, New York, New York, pursuant to
12    Notice, before Johanna DeRosa, a Certified
13    Shorthand Reporter and Notary Public of the
14    States of New York, New Jersey, California
15    and Arizona.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    A P P E A R A N C E S :
 3         JONES DAY, LLP
 4         Attorneys for Lehman Brothers, Inc.
 5             222 East 41st Street
 6             New York, New York 10017-6702
 7         BY:   JENNIFER L. DEL MEDICO, ESQ.
 8
 9         BOIES SCHILLER & FLEXNER, LLP
10         Attorneys for Barclays
11             5301 Wisconsin Avenue, N.W.
12             Washington, D.C. 20015
13         BY:  JONATHAN SHAW, ESQ.
14
15         HUGHES HUBBARD & REED, LLP
16         Attorneys for SIPA Trustee
17             One Battery Park Plaza
18             New York, New York 10004
19         BY:  SETH D. ROTHMAN, ESQ.
20
21
22
23
24
25
```

Page 4

```
 1
 2    A P P E A R A N C E S (Continued):
 3         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 4         Attorneys for the Creditors Committee
 5             51 Madison Avenue, 22nd Floor
 6             New York, New York 10010
 7         BY:  ERIC M. KAY, ESQ.
 8
 9    ALSO PRESENT:
10
11    JOSH LIPSON, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1         KIPLOK - HIGHLY CONFIDENTIAL
 2            THE VIDEOGRAPHER:  This is the
 3    start of Tape No. 1 of the videotaped
 4    deposition of Christopher Kiplok in the matter
 5    In re Lehman.  Today's date is March 4th,
 6    2010, at approximately 1:08 p.m.
 7            Will the court reporter please
 8    swear in the witness.
 9    C H R I S T O P H E R   K I P L O K, called as a
10    witness, having been duly affirmed by a
11    Notary Public, was examined and testified
12    as follows:
13    EXAMINATION BY
14    MR. SHAW:
15         Q.   Good afternoon, Mr. Kiplok.
16         A.   Good afternoon.
17         Q.   As I said off the record, my name
18    is Jonathan Shaw.  I'm with Boies, Schiller &
19    Flexner.  I represent Barclays Capital in this
20    case.
21            You are a partner at the law firm
22    of Hughes Hubbard & Reed.  Is that correct?
23         A.   Yes.
24         Q.   I take it that's a recent
25    promotion.  Is that right?
```

2 (Pages 2 to 5)

KIPLOK - HIGHLY CONFIDENTIAL

1
2      A.    Yes.
3      Q.    Before that, you were an associate
4  with Hughes Hubbard & Reed.  Is that correct?
5      A.    Yes.
6      Q.    And you were an associate of Hughes
7  Hubbard & Reed as of -- in September of 2008.
8           Is that right?
9      A.    Yes.
10      Q.    Okay.  You're here today both in
11  your individual capacity and as a 30(b)(6)
12  witness.  Is that your understanding?
13      A.    Yes, it is, as to two topics on the
14  30(b)(6).
15           (Exhibit 676-B marked for
16  identification.)
17           MR. SHAW:  I'm showing you what's
18  been marked as Exhibit 676-B.
19      Q.    Do you recognize this as a 30(b)(6)
20  notice to which you've been designated or for
21  which you've been designated the Trustee's witness
22  on two topics?
23      A.    Yes.
24      Q.    And those would be Topics Nos. 4
25  and 5.  Is that correct?

KIPLOK - HIGHLY CONFIDENTIAL

1
2      A.    Yes.
3      Q.    What did you do to prepare to
4  testify as a 30(b)(6) witness on those two topics?
5      A.    I spoke with other -- others of the
6  Trustee's professionals, including professionals
7  at Hughes Hubbard and Deloitte & Touche.
8      Q.    Which professionals did you speak
9  with at Hughes Hubbard?
10      A.    There were several that include
11  Mr. Kobak, a couple of associates, and -- and some
12  others.
13      Q.    Who are the associates?
14      A.    Mr. Mills.  And that's all I
15  recall.
16      Q.    Who were the couple of others?
17      A.    I believe -- I have chatted with
18  Mr. Giddens, and I believe Mr. Frelinghuysen as
19  well, actually.
20      Q.    And who at Deloitte have you spoken
21  with in preparation for your 30(b)(6) deposition?
22      A.    Ms. Karp and Mr. Harris.
23      Q.    What is Mr. Harris' first name?
24      A.    Christopher.
25      Q.    What did you speak to Mr. Kobak

KIPLOK - HIGHLY CONFIDENTIAL

1
2  about, for purposes of preparing for your 30(b)(6)
3  deposition?
4      A.    General background in connection
5  with Topics 4 and 5.
6      Q.    Okay.  And what do you recall
7  Mr. Kobak telling you?
8      A.    I recall my conversations with
9  Mr. Kobak, and confirming my own understanding
10  of -- of those two topics.
11      Q.    And when did your conversation with
12  Mr. Kobak take place?
13      A.    Over the last several days.  Either
14  earlier this week or late last week.
15      Q.    Okay.  And you talked to Mr. Mills.
16  What did you and Mr. Mills discuss in preparation
17  for your 30(b)(6) testimony?
18      A.    The Topics 4 and 5 that you alluded
19  to.
20      Q.    And what specifically did you
21  discuss?
22      A.    The -- I think they're enunciated
23  in those topics.  Specifically it was confirming
24  my understanding of those topics.
25      Q.    Did Mr. Kobak provide you with any

KIPLOK - HIGHLY CONFIDENTIAL

1
2  facts as to which you will testify today
3  concerning those topics?
4      A.    I don't think so.  I think I've --
5  he confirmed my understanding, which -- which was
6  the goal of our conversation.  If there's any
7  disagreement, he may -- he may have done so, but
8  there was not.
9      Q.    What about Mr. Mills?  Did he
10  provide you with any factual information
11  concerning those two topics?
12      A.    I -- I recall Mr. Mills providing
13  me with some documents, which included -- the one
14  document that I recall is a letter from Jonathan
15  Hughes, addressed to the Trustee, and there were
16  some others, but I don't specifically recall.
17      Q.    When did you talk with Mr. Mills?
18      A.    This week.
19      Q.    And the letter from Mr. Hughes to
20  the Trustee, what was the topic of that letter?
21      A.    Claims Barclays has made that I
22  understand are now the subject of this litigation.
23      Q.    Did Mr. Mills explain to you why he
24  was providing you with a copy of that letter?
25           MR. ROTHMAN:  Let me just

3 (Pages 6 to 9)

KIPLOK - HIGHLY CONFIDENTIAL

1
2 interject. Mr. Mills doesn't -- isn't a
3 person who has personal knowledge of these
4 topics or who were -- was involved in these
5 topics. He was preparing Mr. Kobak for the
6 deposition and showing him documents in
7 connection with the preparation.
8         MR. SHAW: All right.
9         Q. What did you discuss with
10 Mr. Giddens about these two topics?
11        A. It was similar to my conversation
12 with Mr. Kobak, confirming my understanding of --
13 frankly, to be sure I had a fulsome understanding
14 of both topics, and he confirmed that I had such
15 an understanding.
16        Q. And when did you talk with
17 Mr. Giddens?
18        A. Yesterday. Yesterday. I don't
19 remember whether it was morning or afternoon.
20        Q. For about how long?
21        A. I don't recall. Less than an hour.
22        Q. And when did you speak with
23 Mr. Frelinghuysen about those two topics?
24        A. I think it was earlier this week.
25        Q. And what did you discuss with

KIPLOK - HIGHLY CONFIDENTIAL

1
2 Mr. Frelinghuysen about those topics?
3         A. I recall my discussion with
4 Mr. Frelinghuysen was limited to, I think, Topic
5 4, the clearance box asset topic.
6         Q. And what did Mr. Frelinghuysen tell
7 you about that topic?
8         A. Again, I presented him with my
9 understanding, and I don't think he added anything
10 to the understanding I had.
11        Q. And when did you speak to Ms. Karp?
12        A. This morning.
13        Q. And how long did you speak to her?
14        A. I don't recall specifically. I'd
15 estimate maybe 30 minutes or so.
16        Q. Was that by telephone?
17        A. In person.
18        Q. In person. And did Ms. Karp convey
19 any facts to you about either Topic 4 or Topic 5?
20        A. She conveyed to me what I'll call a
21 high level understanding of the work Deloitte had
22 done around Schedule B, to the extent that would
23 impact Topic No. 4.
24        Q. And what work did she tell you that
25 Deloitte had done around Schedule B?

KIPLOK - HIGHLY CONFIDENTIAL

1
2         A. That Deloitte had tried to
3 comprehend the schedule, had requested, on several
4 occasions, to meet with Barclays to further
5 understand the schedule, that such requests were
6 repeatedly denied, and that from Deloitte's
7 perspective, the schedule was not helpful.
8         Q. Did she say when Deloitte tried to
9 comprehend the schedule?
10        A. I don't recall specifically, but --
11 or if she mentioned it. I -- I do recall that --
12 and she refreshed my recollection -- that a
13 request to meet with Barclays as to the schedule
14 was raised at a meeting that I and others and she
15 participated in with some of your partners and
16 your client in June, when the request for
17 assistance in -- in understanding the schedule was
18 refused.
19        Q. That would be June of 2009?
20        A. Yes.
21        Q. And what did you discuss with
22 Mr. Harris about Topics 4 or 5?
23        A. Mr. Harris was with Ms. Karp when
24 we had this discussion. And so, I think my prior
25 answers would cover that.

KIPLOK - HIGHLY CONFIDENTIAL

1
2         Q. Aside from Mr. Mills, did anyone
3 provide you with any documents to review in
4 preparation for your 30(b)(6) testimony?
5         A. Mr. Mills was assisted with others
6 in preparation for my deposition, you know, a
7 paralegal and another associate. And whether that
8 was in connection with 30(b)(6) or generally, I --
9 I don't recall.
10        Q. Let's start with Topic No. 5. Has
11 the Trustee or any of his representatives had any
12 communication with the Securities and Exchange
13 Commission concerning any proposed transfer of
14 securities to Barclays under Paragraph 8, sub 2,
15 of the clarification letter?
16        A. The Trustee has not proposed
17 transferring securities. I understand 8 sub 2 to
18 refer to the 15c3 account.
19        Q. That's correct.
20        A. Such proposal has not been made.
21        Q. Has the Trustee sought permission
22 from the SEC or any other regulatory agency to
23 transfer securities to Barclays pursuant to that
24 provision?
25        A. The claim that Barclays has made to

Page 14

```
 1            KIPLOK - HIGHLY CONFIDENTIAL
 2   those assets has been the subject of certain
 3   discussions with the SEC, and the SEC has
 4   confirmed -- in those discussions, I'd say that
 5   the SEC staff that those discussions occurred with
 6   agreed with the Trustee's position that, at best,
 7   it would be premature for even a proposal of such
 8   transfer to be made.
 9        Q.   Who at the SEC has had those
10   discussions with the Trustee or the Trustee's
11   staff?
12        A.   Individuals in the Department of
13   Market Regulation.
14        Q.   What were their names?
15        A.   They included Mr. Machiaroli and
16   Mr. McGowan.
17        Q.   Who representing the Trustee was
18   involved in those communications?
19        A.   I was, as well as Mr. Kobak.
20        Q.   When did those discussions take
21   place?
22        A.   We meet or have met on what I'll
23   call a semi-regular basis with the staff,
24   including the two individuals I referenced, the
25   SEC staff, you know, throughout the proceeding,
```

Page 15

```
 1            KIPLOK - HIGHLY CONFIDENTIAL
 2   and I don't recall specifically when these issues
 3   were raised.
 4        Q.   2010, 2009, 2008; when?
 5        A.   Well, again, I don't recall
 6   specifically when they were made.  I know it
 7   wasn't apparent to the estate that Barclays was
 8   making these claims until several months into the
 9   proceeding.  I would say generally 2009, but,
10   again, I don't recall specifically, and I believe
11   these discussions occurred on more than one
12   occasion.
13        Q.   Were there any written
14   communications concerning these discussions or the
15   topic of these discussions?
16        A.   No.  You mean with the SEC?
17        Q.   SEC.
18        A.   There have been written
19   communications with Barclays, but not with the
20   SEC.
21        Q.   Are these discussions recorded in
22   any way?
23        A.   No.
24        Q.   What about any regulatory agency
25   other than the SEC?  Are there any such
```

Page 16

```
 1            KIPLOK - HIGHLY CONFIDENTIAL
 2   discussions with such an entity?
 3        A.   I recall a brief discussion with
 4   FINRA that included Barclays, I'll call it claim
 5   or demand to the 3-3 assets.  The SEC staff was
 6   present, and that FINRA's, at least the
 7   individuals we met with, confirmed or had the same
 8   understanding that the estate and the SEC did.
 9             That, again, at best, until
10   customer claims have been satisfied, it would be
11   premature to even have a proposed release of those
12   3-3 assets.
13        Q.   Who representing FINRA attended
14   that meeting?
15        A.   I recall Ms. Vogel and Mr. Wollman.
16        Q.   And you have summarized what you
17   understood to be the position of the SEC and
18   FINRA.
19             Can you recall anything that they
20   actually said, the actual words?
21        A.   I don't recall specifically who
22   said it, but at one point I think I do recall the
23   phrase "that claim is crazy" being used, but I
24   don't recall specifically who said it or when.
25        Q.   Let's look at Topic 4 now.
```

Page 17

```
 1            KIPLOK - HIGHLY CONFIDENTIAL
 2        What have you done to ascertain
 3   what the disposition of securities or other assets
 4   in LBI's clearance boxes at the time of the
 5   closing was, to the extent the Trustee no longer
 6   retains them?
 7        A.   Would you repeat the question?  I
 8   mean, are you reading me the topic?
 9        Q.   What I'm really doing is misreading
10   the topic.
11        A.   Okay.
12        Q.   To the extent that the LBI Trustee
13   or the LBI estate no longer holds any security or
14   other asset that was held in LBI's clearance boxes
15   as of the time of the closing, how are such
16   securities or other assets disposed of?
17        A.   Well, first I think Barclays is
18   probably very familiar with the disposition of
19   clearing box assets used to satisfy certain
20   customer claims, including, you know, over $42
21   billion that transferred as part of the PIM
22   conversion to Barclays, and a slightly larger
23   amount that transferred to the PAM conversion.
24             So, you know, I'm assuming your
25   question is aside from those -- what I'll call
```

5 (Pages 14 to 17)

Page 26

1    KIPLOK - HIGHLY CONFIDENTIAL
2  Others were on the phone. I didn't quite know who
3  was there.
4         But what I principally remember
5  when I walked in was a negotiation or a dispute, I
6  frankly couldn't tell when I walked into the room,
7  between Mr. Cox of Barclays, and Mr. Cutler of
8  Chase, and my understanding going to Weil Gotshal
9  was that there was an issue that could prevent the
10  closing, and it became apparent, when I arrived at
11  Weil Gotshal, that that issue appeared to be an
12  issue between Chase and Barclays because there was
13  a substantial and sustained discussion between
14  Mr. Cutler. And I believe some of the Wachtell
15  lawyers were with him, but I just don't recall,
16  and Mr. Cox. And that ensued -- if I arrived at
17  5:00 or so, that had to ensue for a couple of
18  hours.
19       Q.   Did you participate in any other
20  discussions between then and -- and the closing on
21  Monday morning?
22       A.   Well, first of all, I clearly did
23  not participate in any of those discussions. I
24  walked in, in the middle of them, and at best was
25  trying to make heads or tails of what could

Page 27

1    KIPLOK - HIGHLY CONFIDENTIAL
2  possibly prevent the closing.
3         You know, to be clear, that entire
4  weekend we were focused on transferring accounts
5  and what, in our view, was fulfill the public
6  interest of the deal, which was moving as many
7  accounts as possible, and then, secondly,
8  preparing for the days and weeks of the SIPA case
9  that would follow.
10        It was never my intention to
11  participate, nor frankly seeing what I walked
12  into, did I have the resources to participate in
13  the discussions that were occurring either in that
14  conference room or on the phone. So, I first say
15  that.
16        There was initially that discussion
17  with Chase. Later in the evening there were
18  discussions, I recall, involving issues that DTCC
19  had. And, again, I was trying to monitor those
20  discussions, and as the night wore on, there were
21  some multiple documents. But we were, frankly,
22  doing all we could to be sure the closing occurred
23  so that the transfer of accounts happened. We
24  were looking to the days and weeks to come. We
25  thought the deal had been done Friday evening

Page 28

1    KIPLOK - HIGHLY CONFIDENTIAL
2  before Judge Peck.
3       Q.   Tell me what you recall about this
4  issue involving the DTCC.
5       A.   I recall the DTCC had some concerns
6  regarding its exposure, and -- and the collateral
7  available to cover that exposure. I -- I don't
8  recall much of the specifics. I -- I do recall
9  that DTCC issues were, in part, discussed at some
10  point late in the evening around midnight or
11  12:30. The whole -- there were many occasions, by
12  the way, when I refer to this group, where the
13  group would disburse.
14        And I recall Barclays had two or
15  three conference rooms, and Weil was obviously in
16  their firm, so Lehman had two or three conference
17  rooms. The Creditors Committee had a conference
18  room, all filled with their professionals. And
19  there would be these gaps in the evening where,
20  frankly, it would be Mr. Frelinghuysen and me
21  perhaps alone in the large conference room because
22  the other parties had broken out, what I'll call
23  the parties who -- at least Barclays and Lehman --
24  who were participating in the transaction.
25        But I -- I recall at one point,

Page 29

1    KIPLOK - HIGHLY CONFIDENTIAL
2  midnight or 12:30, and this is in connection with
3  DTCC, the group reconvened in a large room, and a
4  pronouncement was made, I believe, by Mr. Harvey
5  Miller, that the $250 million consideration that
6  Barclays was going to pay would first be deposited
7  with the DTCC, and only at such time that DTCC had
8  covered its exposure -- I'm speaking in broad
9  terms -- would such $250 million be released to
10  the estate.
11        I remember thinking that that
12  basically meant Barclays was getting 72,000
13  accounts for nothing from the estate. But, again,
14  we were focused on the customer account transfer
15  process and -- and the transaction proceeded.
16       Q.   Were you privy to any other
17  discussions about the DTCC issue? And I exclude
18  internal discussions at Hughes Hubbard or with the
19  Trustee.
20       A.   You know, I do recall early morning
21  hours speaking to Shelly Hirshon at Proskauer, but
22  I -- I just recall that happening. I don't recall
23  any of the specifics. And I know Larry Thompson
24  and some others from DTCC were on and off the
25  phone at various points. So, I guess what I'm

8  (Pages 26 to 29)

Page 30

KIPLOK - HIGHLY CONFIDENTIAL

1
2  saying it I remember there were other discussions,
3  but I just don't remember specifics. The specific
4  is the point I mentioned about the 250 million.
5      Q.   Were you involved at all in the
6  negotiation of the terms of the clarification
7  letter?
8      A.   No, not at all.
9      Q.   Were you involved in any
10  discussions concerning the terms of the
11  clarification letter over the course of that
12  weekend?
13      A.   First of all, I don't think I was
14  aware that a clarification letter existed until
15  sometime into the evening on Sunday, which I guess
16  is the 21st. I was aware that after the parties
17  had left the courtroom, that certain statements
18  had been made on the record that needed to be --
19  I'll use your word -- "clarified," but that -- the
20  understanding I had was that such would have been
21  accomplished shortly after the sale hearing or
22  first thing Saturday morning.
23      So, again, I was focused on account
24  transfers and the like. But Sunday evening I do
25  recall the term "clarification letter" quite

Page 31

KIPLOK - HIGHLY CONFIDENTIAL

1
2  clearly. I think there were drafts on conference
3  room tables. I never had an opportunity to what
4  I'd say read or review the document. The one
5  thing I do remember is at some point being in a
6  conference room. You know, I was in and out of
7  many as different documents and issues were
8  percolating through the wee hours of the morning,
9  where I believe Mr. Messineo from Weil Gotshal was
10  at a laptop computer, and there was an issue as to
11  the 15c3 account, the clarification letter. And
12  at some point I recall saying to him we need that
13  asset or something along those lines, and his
14  response being, you know, don't worry -- don't
15  worry, we've made -- you know, we've got that
16  covered, and he raised his hand off of the laptop.
17  I recall that.
18      But beyond that session where I was
19  in that conference room, which was -- I think
20  there were three or four Weil Gotshal lawyers and
21  at least a half dozen Cleary lawyers, and a couple
22  of Simpson Thatcher lawyers in the room, I don't
23  recall any -- anything else regarding drafting of
24  the clarification letter.
25      Q.   Were you present for any

Page 32

KIPLOK - HIGHLY CONFIDENTIAL

1
2  discussions concerning the economic terms of the
3  sale transaction?
4      A.   No.
5      Q.   Did anyone, over the course of that
6  weekend, state or suggest, in any way, to your
7  knowledge, that the -- that the terms of the sale
8  transaction, as captured in the APA and the
9  clarification letter, differed from what had been
10  approved by the Court?
11      A.   I don't recall. I don't recall
12  that.
13      Q.   Was anyone representing the Trustee
14  tasked with monitoring the negotiation of the
15  clarification letter?
16      A.   No. We were -- I think
17  Mr. Frelinghuysen and myself -- Mr. Frelinghuysen
18  had been at Weil Gotshal from the early morning of
19  Saturday, actually. We asked him to go up to
20  execute whatever needed to be done to finalize the
21  deal that had been presented to Judge Peck. And
22  he remained at Weil Gotshal for countless hours
23  and even into Sunday for that to occur, and that
24  did not happen.
25      When I arrived at Weil Gotshal, I

Page 33

KIPLOK - HIGHLY CONFIDENTIAL

1
2  was there to monitor, frankly, any -- as I've said
3  before, issues attendant to anything that could
4  prevent account transfers from occurring. I was
5  not -- it was not my understanding, in arriving at
6  Weil Gotshal, or while I was there, that I would
7  be, you know, participating in a negotiation. I
8  tried to keep my eye on as much as possible, but
9  there were a number of documents and a number of
10  issues that evening. And all the while still
11  focused on our team back at Hughes Hubbard that
12  was working on, you know, motions for the first
13  days of the case, and -- and what was going on
14  with the transfers of accounts.
15      Q.   I just want to be clear. You may
16  have said this already. You did not have an
17  opportunity, between the time you got there or
18  whenever it was on Sunday, and the closing on
19  Monday morning, to ever read the clarification
20  letter. Is that correct?
21      A.   No, I don't recall being able to
22  sit down and read through the letter, no.
23      Q.   Do you know whether the Trustee or
24  any of his representatives requested any changes
25  to the terms of the clarification letter at any

9 (Pages 30 to 33)

Page 34

KIPLOK - HIGHLY CONFIDENTIAL
1
2 point over the weekend?
3     A.    The only thing I recall was what I
4 mentioned earlier in connection with the 3-3
5 account.  And -- and I don't recall much more than
6 what I've already said, that I know it was an
7 issue, and I don't want to travel on any privilege
8 grounds, but that was of a concern to Mr. Kobak
9 and to me, based on our understanding of what a
10 3-3 account was, and the role it would play for
11 customer accounts, because we were very concerned.
12 We did have an understanding that the customer
13 accounts would be left in the estate.  We had an
14 understanding that substantial assets would be
15 left to satisfy them.  But that the 3-3 account
16 would be one of the primary assets to do that.
17         So, I do recall what I said
18 earlier, saying -- you know, speaking to
19 Mr. Messineo and having -- and I don't recall
20 specifically if that was language being added or
21 the like.  I just don't recall more than that.  It
22 was, you know, 3:00 in the morning on Monday.
23     Q.    Were you aware that weekend that
24 the clarification letter referenced a Schedule A
25 and a Schedule B?

Page 35

KIPLOK - HIGHLY CONFIDENTIAL
1
2     A.    No, I recall that.
3     Q.    Did you learn that post-closing?
4     A.    I believe at -- I mean, the terms
5 are not unfamiliar to me now, so at some point,
6 but I don't -- I really can't recall when.
7     Q.    Do you think it might have been
8 within the month of September 2008?
9     A.    Frankly, no, largely because I -- I
10 know what happened when I left Weil Gotshal that
11 morning, and it was full speed ahead, largely
12 transferring assets to accounts that now reside
13 with Barclays.
14         From the night -- from 1:30 in the
15 morning on that Saturday forward, you know, we
16 were moving forward with the mission of customer
17 protection.  I don't recall focusing on APA
18 transactions or anything else, but I do recall
19 spending countless hours and weekends on transfers
20 of accounts for customers.
21     Q.    Did you stay at Weil Gotshal until
22 the closing on -- on Monday morning?
23     A.    Yes.  I left Weil Gotshal roughly
24 8:30 in the morning.  I believe the wires hit a
25 few minutes before 8:00 is my best memory.

Page 36

KIPLOK - HIGHLY CONFIDENTIAL
1
2     Q.    Why was the Trustee concerned that
3 the deal close?
4     A.    You know, as I said earlier, the
5 primary concern -- again, I'm saying my
6 understanding --
7     Q.    Sure.
8     A.    -- is -- was with the transfer of
9 accounts to Barclays and Neuberger Berman.  So,
10 that trading could resume on as seamless a basis
11 as possible.
12     Q.    So, after you left Weil Gotshal at
13 about 8:30 in the morning on Monday, where did you
14 then go?
15     A.    I went home and took a shower and I
16 was at Hughes Hubbard by about 9:30.
17     Q.    Okay.  And if you can give me an
18 overview of what you did between then -- in
19 connection with this deal, obviously -- between
20 then and the end of September 2008?
21     A.    I was focused primarily on the
22 transfer of accounts and the various pleadings,
23 motions, and I forget when the first controversies
24 arose, but disputes of the SIPA proceeding.
25     Q.    In terms of the transfer of

Page 37

KIPLOK - HIGHLY CONFIDENTIAL
1
2 accounts and assets, what was the allocation
3 responsibilities between yourself and
4 Mr. Frelinghuysen?
5     A.    I'm not sure there was a direct
6 allocation of responsibilities.  I recalled that
7 Tuesday morning, which I think is the 23rd, early
8 that morning the Trustee asked Mr. Frelinghuysen
9 to head to Lehman's operation center in Jersey
10 City, New Jersey, I believe it's 70 Hudson Street,
11 now premises occupied by Barclays, and asked me to
12 head to 745 Seventh Avenue to go to Mr. Russo's
13 office so the Trustee had his personnel on site to
14 facilitate the transfers.
15         As I was heading up there, I was
16 directed to 1271 -- I think it's Sixth Avenue --
17 it's the Barclays office now -- which is where I
18 headed.  And so, to the extent there was a
19 division at all, it was I would be up at the New
20 York office and Anson would be in Jersey City.
21     Q.    Did you deal -- strike that.
22         In connection with the -- with
23 requests for transfers -- strike that.
24         In connection with the request that
25 assets be transferred, did you deal with former

TSG Reporting 877-702-9580

Page 38

KIPLOK - HIGHLY CONFIDENTIAL
2  Lehman employees who are now employed by Barclays?
3      A.   Yes.
4      Q.   Who particularly did you deal with?
5      A.   The -- I guess beginning that
6  Tuesday, my primary contact was a managing
7  director named Laura Vecchio, and the idea was --
8  the premise was that we wanted -- and "we" being
9  the estate -- wanted to transfer customer assets
10  as promptly as possible, knowing that ultimately
11  there would be, as there has now been, a
12  reconciliation of all those transfers.
13          Ms. Vecchio's role was to be a
14  central point so that I wouldn't be getting
15  requests from multiple -- what I'll call
16  Lehman/Barclays people.  That did still happen.  I
17  recall in particular Ms. Black sending me many
18  varied and confusing and different instructions
19  that had to be then vetted through Ms. Vecchio.  I
20  recall a Mr. Jennings doing the same thing.
21          I don't think anything was being
22  done in bad faith, but I think having the central
23  point of contact was helpful because otherwise the
24  demands being made by different Barclays personnel
25  were often inaccurate and appeared to be confused

Page 39

KIPLOK - HIGHLY CONFIDENTIAL
2  on their side.
3      Q.   In determining whether to approve
4  or reject any particular request for a transfer,
5  what criteria did you apply?
6      A.   The entire premise was that we were
7  transferring customer assets, and that was the
8  understanding that we portrayed at the beginning.
9  Literally when I went up to Lehman, I said this
10  is -- my role is to provide whatever
11  authorization, you know, the depositories -- in
12  connection with me, it ended up primarily being
13  Chase -- would need to release customer assets to
14  get into customer accounts.
15          And it was with that understanding
16  that all -- that I was -- that I had been made
17  available, and in general that I would be
18  authorizing any of the request.  So, a request
19  would be made, and I would be sure it was verified
20  through Ms. Vecchio that it was related to
21  customer accounts, again, on the entire
22  understanding that should there be any missed
23  delivers, over-deliveries, under-deliveries, that
24  would be reconciled in due course, which, I think
25  as Barclays knows, was accomplished over a year

Page 40

KIPLOK - HIGHLY CONFIDENTIAL
2  and a half with this past December's motion and
3  order.
4      Q.   You said when you went up to Lehman
5  you stated that your role was to provide whatever
6  authorization, depository is needed in connection
7  with the release of customer assets.
8          To whom did you convey that?
9      A.   I -- I said that to Ms. Vecchio.  I
10  remember having a conversation at some point, I
11  believe, during the week of the 22nd, or the
12  following week with Mr. Raisler at Sullivan &
13  Cromwell when there were certain issues by Chase
14  Bank, and I remember saying to him our role is to
15  facilitate customer account transfers.
16          And he actually said he had always
17  worried that if there ever was a large
18  broker-dealer failure, it would be the Trustee
19  that would be the block to customers getting their
20  assets, not the depository, and that he was
21  very -- and how grateful he was that the Trustee
22  was trying to move customer assets on an expedited
23  basis.
24          So, those are the two conversations
25  I, in particular, remember having.  There very

Page 41

KIPLOK - HIGHLY CONFIDENTIAL
2  well may have been others.
3          I recall conversations with
4  Mr. Novikoff (phonetic), I believe Mr. Minland at
5  Wachtell, that it was my role to provide them with
6  the authorizations they required to accomplish,
7  again, the transfer of customer assets.
8      Q.   You say you recall a conversation
9  with Ms. Vecchio.  When did that conversation take
10  place?
11      A.   I don't recall specifically, but
12  likely it would have been the 23rd when I arrived.
13  Sort of this is just -- this is who I am, this is
14  why I'm here, how can I be helpful to the transfer
15  of customer accounts.
16      Q.   Do you remember any of the specific
17  words used in that discussion?
18      A.   No.
19      Q.   In determining whether to approve
20  any given request for a transfer of assets, what
21  steps did you take to ensure or to verify that the
22  assets in question were customer assets?
23      A.   I was relying primarily on
24  Ms. Vecchio as a gatekeeper, and the fact that
25  should there be a reconciliation, it could be done

11 (Pages 38 to 41)

Page 42

KIPLOK - HIGHLY CONFIDENTIAL

1

2  so later.  Largely I was relying on the fact that
3  I was acting in good faith, and that the parties
4  would be too, to be sure customer assets were
5  transferred.  And there were -- there were
6  over-deliveries that were -- that did come back to
7  the estate later.
8          But there was, I think,
9  intentionally not, you know, a large diligence
10  process at the time, for the very reason that we
11  wanted customers to get their assets as quickly as
12  possible.  We weren't about to have 1,000 Deloitte
13  accountants descend on Lehman.  We intended to
14  step back, allow the transfers to occur, and deal
15  with the remaining customers that were left, and
16  in a reconciliation, and as much was presented to
17  the Court.  I believe Mr. Caputo made that clear,
18  that that was the intent at the beginning of the
19  proceeding.
20          Q.   Did you require any representations
21  from Barclays explicitly that assets being
22  requested were customer assets?
23          A.   I believe that the process I had
24  with Ms. Vecchio was to get her okay that these
25  were assets for the transfer of customer accounts.

Page 43

KIPLOK - HIGHLY CONFIDENTIAL

1

2          And I generally recall that the
3  language used in the authorizations, as a general
4  matter, included authorizing the transfer of
5  customer accounts.
6          Q.   Did you take steps to ensure that
7  that language that you just referred to would
8  appear in authorizations of customer account
9  transfers?
10          A.   I'd say I used my best efforts at a
11  time when there was a lot going on.  So, it
12  wouldn't shock me if it didn't happen each and
13  every time.  But more to the point, it was clearly
14  my intent, with any authorization I made, that it
15  was for a customer asset used to support a
16  customer account.
17          Q.   Did you come to learn, during that
18  week, that Mr. Frelinghuysen had had a discussion
19  with Alastair Blackwell concerning the transfer of
20  non-customer assets to Barclays pursuant to the
21  APA?
22          A.   I don't recall that, no.
23          Q.   Did you have any communications
24  with Neal Ullman during that week?
25          A.   If I did, I don't recall them.  I

Page 44

KIPLOK - HIGHLY CONFIDENTIAL

1

2  mean, I have spoken to Neal.  I know who he is.
3  But I don't recall -- you know, I don't recall
4  anything specific with Mr. Ullman that week.  He
5  was not where I was.  Neal worked in Jersey City.
6          Q.   Ms. Vecchio was in Manhattan?
7          A.   That's right.
8          Q.   I'm showing you what has previously
9  been marked as Exhibit 671-B.
10          Do you recognize that document as
11  an e-mail from Mr. Frelinghuysen to Mr. Blackwell,
12  on which you were copied on Thursday, September
13  25th, 2008?
14          A.   I can read it, sitting here today.
15  That is what it appears to be, yes.
16          Q.   Do you have any recollection of
17  receiving this document at the time?
18          A.   No.
19          Q.   Do you have any understanding of
20  what the issue that this document related to was?
21          A.   No.
22          Q.   I'm showing you what has previously
23  been marked as Exhibit 447 in this case.
24          A.   Okay.
25          Q.   Do you recognize that as an e-mail

Page 45

KIPLOK - HIGHLY CONFIDENTIAL

1

2  to you from Laura Vecchio, dated Friday, the 26th
3  of September, 2008?
4          A.   I can read it today, and that is
5  what it appears to be, yes.
6          Q.   Do you recall receiving this e-mail
7  at the time?
8          A.   No, I do not.
9          Q.   Do you recall anything about the --
10  the request for a transfer of $269 million in
11  securities from the DTC to the 636 box?
12          A.   No, I do not.
13          Q.   Do you recall how you responded to
14  this request?
15          A.   No, I don't.
16          Q.   Do you recall any discussion with
17  Ms. Vecchio or anyone else about this request?
18          A.   Not this request specifically.  I
19  spoke to Ms. Vecchio at that time, probably
20  multiple times a day.
21          (Exhibit 677-B marked for
22  identification.)
23          THE WITNESS:  Okay.
24          Q.   You've had a chance to review
25  Exhibit 677-B?

12 (Pages 42 to 45)

KIPLOK - HIGHLY CONFIDENTIAL
1
2       A.   I've looked at it, yes.
3       Q.   And do you recognize that as an
4  e-mail string that you were sent -- or that you
5  were copied on various parts of -- and as you
6  wrote various parts of on the 24th of September,
7  2008?
8       A.   Reading it today, that's -- that's
9  what it appears, yes.
10      Q.   Do you have any recollection of
11  the -- the transfers that are being discussed in
12  this e-mail string?
13      A.   Not specifically.
14           Generally, this is reflective of
15  what I believe I had mentioned earlier, and it was
16  Ms. James.  I don't know if I used her proper
17  name, and Mr. Jennings as a couple of the -- what
18  I'll call Lehman/Barclays people who are reaching
19  out to me directly for requests.
20           And in this instance I can see,
21  reading the document, that it was an instance
22  where I went back to Ms. Vecchio on the e-mail to
23  see if she indeed concurred with the transfers of
24  the customer foreign futures and foreign options
25  security account, which I -- I did do.

KIPLOK - HIGHLY CONFIDENTIAL
1
2           But beyond that, I don't recall
3  this or any other transfers in -- in particular.
4       Q.   So I'm clear, you now believe that
5  when you earlier said Ms. Black, you were thinking
6  of Ms. James?
7       A.   If that's what I said, I think I
8  may have -- I -- I recall Ms. James on the future
9  side.  And the reason I, in part, recall her is
10  her e-mail signature had this kind of funky thing
11  where her name slid in.  But I remember Ms. James.
12  Ms. Black I may have -- I think I meant Ms. James,
13  if that's what I said.
14           But I do recall Ms. James making
15  some requests, which at first she had asked for,
16  just to use a round number, 300 million from the
17  XYZ account, and then it would come back as less
18  than that, and she'd ask for less.  And I just
19  remember having the sense that there was confusion
20  on the Barclays side.  And that was one of the
21  reasons that we took some comfort in funneling
22  things through Ms. Vecchio.
23           (Exhibit 678-B marked for
24  identification.)
25       Q.   Do you recognize this document as

KIPLOK - HIGHLY CONFIDENTIAL
1
2  an e-mail sent by you to Ms. Vecchio and
3  Mr. Frelinghuysen on Wednesday, the 1st of
4  October, 2008?
5       A.   Reading it, I don't recall it, but
6  that is -- that is what it appears to be, at least
7  the top message.
8       Q.   And the top message says:
9           "Anson, please do not take action
10  in this yet.  Laura is clarifying this
11  instruction."
12           What did you mean by "Laura is
13  clarifying this instruction"?
14      A.   I don't recall specifically.
15  Generally, I would believe this would refer to --
16  there were several instances where -- again, I
17  mentioned were people would try to reach out to
18  me.
19           There were instances where
20  Ms. Vecchio, I recall, would get several requests
21  and she would try to filter them through herself.
22  So, this may have been an instance where
23  Ms. Vecchio said to me, perhaps in person or by
24  the telephone, wait a minute, we need to have
25  further clarity.

KIPLOK - HIGHLY CONFIDENTIAL
1
2           But, again, I don't recall
3  specifically.  I mean, reading it, it seems to me
4  that I was telling Anson not to act on this.  And
5  I would assume he did not act on it, based on my
6  saying so.
7       Q.   But you have no specific
8  recollection of this particular incident?
9       A.   I don't recall this specific
10  message, no, not -- not specifically.
11      Q.   And you don't recall any discussion
12  with Ms. Vecchio about this particular issue; do
13  you?
14      A.   Not specifically, no.
15           THE VIDEOGRAPHER:  The time is
16  2:13.  We are going off the record.
17           (Recess taken.)
18           THE VIDEOGRAPHER:  The time is
19  2:21.  We are back on the record.
20           (Exhibit 679-B marked for
21  identification.)
22           THE WITNESS:  Okay.
23      Q.   Do you recognize this, sir, as an
24  e-mail chain involving you, I believe, at every
25  stage, although at one point your e-mail address

Page 50

KIPLOK - HIGHLY CONFIDENTIAL

1
2  was misspelled and it was later forwarded to you?
3      A.   Reading it, this is -- that's --
4  that is what it appears to be, yes.
5      Q.   Okay.  Looking at the most recent
6  e-mail on the chain, so, the very first one, you
7  say:
8          "I think we are okay with the
9  below.  We should revisit the LOC issue later
10 after transfers of collateral are affected."
11         Do you see that?
12     A.   I do.
13     Q.   When you say "I think we are okay
14 with the below," were you referring to the first
15 paragraph of the e-mail from Mr. McDaniel to you
16 that's dated October 2nd at 1:28 p.m.?
17     A.   I -- I don't recall specifically.
18 I can read the document as well as you can.  I
19 recall generally that this was an issue that
20 became a topic of great discussion and
21 consideration, without breaching any privilege
22 within my firm, and I believe it went on much
23 later than the first few days of October.
24         So, I can read what I said, and you
25 may well be right, that it refers to that, that,

Page 51

KIPLOK - HIGHLY CONFIDENTIAL

1
2  you know, my reading today would seem to -- that
3  that may make sense, but I also -- what I do
4  recall was that this was not the end of this
5  discussion.
6      Q.   As you read it today, do you have
7  any recollection of whether you -- when you said
8  "I think we're okay with the below," the below
9  you're referring to is the first paragraph of the
10 first e-mail in this chain?
11     A.   I actually do not have that
12 recollection.  I may well be referring to Jim
13 McDaniel's second note to me, which it appears he
14 had a discussion with my partner, Carolyn Levine,
15 but I don't -- I just don't recall either way.
16 I'm reading it, you're reading it, but I don't
17 recall.
18         (Continued on next page for jurat.)

Page 52

KIPLOK - HIGHLY CONFIDENTIAL

1
2      MR. SHAW:  I have no further
3  questions for you, sir.
4      MR. ROTHMAN:  I have no questions
5  for the witness.
6      MR. STERN:  No questions.
7      MR. DAKIS:  No questions.
8      MR. SHAW:  Thank you very much.
9      THE VIDEOGRAPHER:  The time is
10 2:25.  We are going off the record.
11         (Time Ended:  2:25 p.m.)
12
13 _____
14 CHRISTOPHER KIPLOK
15
16 Subscribed and sworn to
17 before me this      day
18 of March, 2010.
19
20 _____
21
22
23
24
25

Page 53

1
2          INDEX:
3  WITNESS        EXAM BY:          PAGE:
4  C. Kiplok      Mr. Shaw           5
5
6
7
8          EXHIBITS
9  EXHIBIT NO.                    PAGE:
10 Exhibit 676-B  30(b)(6) Notice of Deposition  6
       (No Bates)
11
   Exhibit 677-B  Series of E-mails        45
12      (HHR_00009013 - 17)
13 Exhibit 678-B  Series of E-mails        47
       (HHR_00017164 - 166)
14
   Exhibit 679-B  Series of e-mails        49
15      (BCI-EX(S)-00140141 - 42)
16
17
18
19
20
21
22
23
24
25

14  (Pages 50 to 53)

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
William J. Hine
Jayant W. Tambe

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re:                                                         :      Chapter 11
                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                       :      Case No. 08-13555 (JMP)
                                                               :
                              Debtors.                         :      (Jointly Administered)
                                                               :
                                                               :
---------------------------------------------------------------x
                                                               :
In re:                                                         :      SIPA Proceeding
                                                               :
LEHMAN BROTHERS INC.,                                          :      Case No. 08-01420 (JMP)
                                                               :
                              Debtor.                          :
                                                               :
---------------------------------------------------------------x

**EXHIBIT CROSS-REFERENCE LIST FOR DEPOSITION READ-IN**

| Deposition Exhibit Number | Trial Exhibit Number | Deponent / Witness |
|---|---|---|
| 1 | M. 1 | Brown, Exall, Lewkow, Messineo |
| 19 | M. 2 | Exall, Kirk, Klein, Lewkow, Tonucci |
| 25 | M. 3 | Frelinghuysen, Lewkow, Messineo, Rosen |
| 27 | M. 38 | Lewkow |
| 47 | M. 59 | Tonucci |
| 50 | M. 160 | Rosen |
| 71B | M. 173 | Tonucci |
| 74B | M. 61 | Blackwell |
| 83B | M. 73 | Petrie |
| 86B | M. 102 | King, Romain |
| 87B | M. 103 | Romain |
| 126 | M. 188 | Tonucci |
| 136A | M. 8 | Tonucci |
| 137A | BCI Ex. 576 | Tonucci |
| 138A | M. 111 | Tonucci |
| 140A | M. 595 | Tonucci |
| 143A | | Tonucci |
| 143B | M. 192 | King |
| 144A | M. 47 | Keegan, Malloy |
| 145A | M. 55 | Tonucci |
| 148A | M. 21 | Tonucci |

| Deposition Exhibit Number | Trial Exhibit Number | Deponent / Witness |
|---|---|---|
| 149A | M. 52 | Klein |
| 150B | M. 571 | Denig |
| 157A | M. 618 | Petrie |
| 216 | M. 108 | Exall |
| 237 | M. 591 | Denig |
| 272 | M. 214 | Petrie |
| 274 | M. 40 | Petrie |
| 279B | | Exall |
| 280B | M. 218 | Exall |
| 281B | M. 107 | Exall |
| 282B | M. 26 | Exall |
| 283A | M. 31 | Romain |
| 301A | | Keegan |
| 302A | | Keegan |
| 307A | | Keegan |
| 316 | M. 221 | Kirk |
| 321 | | Kirk |
| 326 | M. 51 | Kirk |
| 361A | M. 228 | Romain |
| 377A | M. 105 | Romain |
| 378 | M. 604 | Romain |
| 381 | M. 408 | Klein |
| 385 | M. 580 | Romain |

| Deposition Exhibit Number | Trial Exhibit Number | Deponent / Witness |
|---|---|---|
| 388A | M. 231 | Romain |
| 388B | BCI Ex. 191 | King |
| 389A | M. 572 | Romain |
| 389B | M. 658 | King |
| 390A | M. 227 | Romain |
| 390B | M. 659 | King |
| 391A | M. 232 | Romain |
| 392A | M. 10 | Romain |
| 394A | BCI Ex. 672 | Romain |
| 395A | M. 575 | Romain |
| 396A | M. 576 | Romain |
| 397A | M. 577 | Romain |
| 398A | M. 578 | Romain |
| 399A | M. 443 | Romain |
| 400A | M. 497 | Romain |
| 401A | M. 579 | Romain |
| 402A | M. 233 | Romain |
| 403A | M. 581 | Romain |
| 449 | BCI Ex. 422 | Frelinghuysen |
| 489 | M. 9 | Brown |
| 532 | | Brown |
| 562D | M. 507 | Hraska II |
| 563C | M. 248 | Rosen |

| Deposition Exhibit Number | Trial Exhibit Number | Deponent / Witness |
|---|---|---|
| 579B | | Lewkow |
| 606 | BCI Ex. 476 | Rosen |
| 613A | BCI Ex. 364 | Lewkow |
| 622 | BCI Ex. 368 | Rosen |
| 631 | M. 136 | Rosen |
| 658C | | Malloy |
| 669B | M. 430 | Frelinghuysen |
| 670B | | Frelinghuysen |
| 671B | BCI Ex. 514 | Frelinghuysen |
| 672B | BCI Ex. 515 | Frelinghuysen |
| 675B | BCI Ex. 517 | Frelinghuysen |
| 676B | | Kiplok |
| 677B | BCI Ex. 518 | Kiplok |
| 679B | BCI Ex. 520 | Kiplok |
| 682 | BCI Ex. 645 | Messineo |