**Hearing Date and Time: July 14, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  July 7, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,      :    08-13555 (JMP)
                                              :
                         Debtors.             :    (Jointly Administered)
                                              :
------------------------------------------------------------------x

### NOTICE OF DEBTORS' MOTION
### PURSUANT SECTIONS 105 AND 363
### OF THE BANKRUPTCY CODE AND RULE 9019 OF
### THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR
### APPROVAL OF SETTLEMENT AGREEMENT BETWEEN LEHMAN
### BROTHERS HOLDINGS INC., LEHMAN COMMERCIAL PAPER INC., SILVER
### LAKE CREDIT FUND, L.P. AND SILVER LAKE FINANCIAL ASSOCIATES, L.P.

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman
Brothers Holdings Inc. ("LBHI"), Lehman Commercial Paper Inc., ("LCPI," and together with
LBHI and its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors") pursuant
sections 105 and 363 of title 11 of the United States Code and rule 9019 of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules") for approval of a settlement agreement between
LBHI, LCPI, Silver Lake Credit Fund, L.P. and Silver Lake Financial Associates, L.P., all as
more fully described in the Motion, will be held before the Honorable James M. Peck, United
States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs
House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy
Court"), on **July 14, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall
be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy
Court for the Southern District of New York, shall set forth the name of the objecting party, the
basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court
electronically in accordance with General Order M-242 (which can be found at
www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Lori R. Fife, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; (v) Willkie Farr & Gallagher LLP, 787 Seventh Ave., New York, New York 10019-6099, Attn: Matthew A. Feldman, Esq., attorneys for Silver Lake Credit Fund L.P. and Silver Lake Financial Associates, L.P.; and (vi) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **July 7, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: June 23, 2010
      New York, New York

                                /s/ Lori R. Fife
                                Lori R. Fife

                                WEIL, GOTSHAL & MANGES LLP
                                767 Fifth Avenue
                                New York, New York 10153
                                Telephone: (212) 310-8000
                                Facsimile: (212) 310-8007

                                Attorneys for Debtors
                                and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                      :
**In re**                                             :    **Chapter 11 Case No.**
                                                      :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.***,**    :    **08-13555 (JMP)**
                                                      :
                                **Debtors.**          :    **(Jointly Administered)**
                                                      :
----------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT**
**SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND**
**RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**FOR APPROVAL OF SETTLEMENT AGREEMENT BETWEEN LEHMAN**
**BROTHERS HOLDINGS INC., LEHMAN COMMERCIAL PAPER INC., SILVER**
<u>**LAKE CREDIT FUND, L.P. AND SILVER LAKE FINANCIAL ASSOCIATES, L.P.**</u>

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("<u>LBHI</u>"), and Lehman Commercial Paper Inc.

("<u>LCPI</u>," and together with LBHI, the "<u>Debtors</u>," and collectively with their debtor and non-

debtor affiliates, "<u>Lehman</u>") file this Motion pursuant to sections 105 and 363 of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>") and rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>"), and respectfully represent:

<u>**Preliminary Statement**</u>

1.        By this Motion, the Debtors seek authorization to redeem or sell a limited

partnership interest in Silver Lake Credit Fund, L.P. ("<u>SLCF</u>"), a credit -focused hedge fund that

invests in liquid and illiquid securities.  Pursuant to a Settlement Agreement, dated June 23, 2010

(the "Settlement Agreement"), negotiated among the Debtors, SLCF, and SLCF's general

partner, Silver Lake Financial Associates, L.P. ("SLF," and together with SLCF, "Silver Lake

Financial"), Silver Lake Financial or, at the discretion of Silver Lake Financial, a third party

purchaser will pay LBHI in tranches (as further described herein) 92.5% of its Book Capital

Account (as defined below) as of the date of such payment (the "Lehman Proceeds"), which

Book Capital Account has not been audited and is valued at $127,529,417 as of April 30, 2010.

Silver Lake Financial will withdraw Claim No. 15157 (as defined below), and waive any right it

may have to recoup amounts that may be owed by LBHI on account of the Silver Lake Financial

Claims (as defined below) against amounts owed to LBHI on account of its Book Capital

Account.  A copy of the Settlement Agreement is attached hereto as Exhibit A.  As set forth

below, the Debtors have determined, in their business judgment, that a redemption or sale of the

limited partnership interest in SLCF pursuant to the Settlement Agreement presents the best

opportunity to realize value from the investment in SLCF.  The Settlement Agreement also

allows the Debtors to avoid the considerable time and expense attendant to litigating both the

terms of their withdrawal from SLCF and the amount and validity of SLCF's claims against

LBHI.

## **Background**

2.       Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including LCPI,

commenced with this Court voluntary cases under the Bankruptcy Code.  The Debtors' chapter

11 cases have been consolidated for procedural purposes only and are being jointly administered

pursuant to Rule 1015(b) of the Bankruptcy Rules.  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

       3.     On September 17, 2008, the United States Trustee for the Southern

District of New York appointed the statutory committee of unsecured creditors pursuant to

section 1102 of the Bankruptcy Code (the "Creditors' Committee").

       4.     Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

## Jurisdiction

       5.     This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

       6.     The Debtors seek an order pursuant to sections 105 and 363 of the

Bankruptcy Code and Bankruptcy Rule 9019 approving the Settlement Agreement and

authorizing the transactions contemplated therein.  The Debtors have determined, in the exercise

of their sound business judgment, that the Settlement Agreement and the related transactions are

in the best interests of their respective estates and should be approved.

## Lehman's Interest in SLCF

       7.     Prior to the Commencement Date, LBHI's businesses included numerous

investments in hedge funds located in the United States and internationally.  In January 2008,

LBHI acquired a limited partnership interest in SLCF (the "SLCF Interest").  Under the terms of

its subscription agreement with SLCF, LBHI made Capital Contributions (as defined below)

totaling $100,000,000 in the following installments:

| Date | Amount |
|---|---|
| January, 2008 | $50,000,000 |
| May, 2008 | $25,000,000 |
| June, 2008 | $2,777,778 |
| July, 2008 | $16,666,667 |
| October, 2008 | $5,555,555 |

       8.      In the ordinary course of its business during the prepetition period, LBHI

entered into various repurchase transactions with, among others, LCPI in an effort to obtain

financing using its assets as collateral.  The SLCF Interest may have been pledged by LBHI as

collateral to LCPI in connection with such a prepetition transaction.  Each of LBHI and LCPI

have reserved its rights against each other with respect to the prepetition transaction and any

claims arising therefrom.  In addition, all of Silver Lake Financial's rights are reserved in the

event that the Settlement Agreement and transactions contemplated therein are not

consummated.  Notwithstanding the foregoing, both LBHI and LCPI have determined, for the

reasons set forth below, that the transactions set forth in the Settlement Agreement are an

exercise of their sound business judgment and in the best interests of their respective estates.

### Silver Lake Financial and the LP Agreement

       9.      Pursuant to SLCF's Fourth Amended and Restated Agreement of Limited

Partnership (together with any side letters thereto, the "LP Agreement"), each Limited Partner[1]

entered into a subscription agreement with Silver Lake Financial that governs, *inter alia*, the

amount and timing of the capital contributions each Limited Partner is required to make to SLCF

(the "Capital Contribution").  SLF, as general partner, among other things, establishes and

---

[1] Capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the LP
Agreement.

maintains capital accounts (the "<u>Book Capital Accounts</u>") for, and in the amount of, each

Limited Partner's Capital Contribution, which Capital Contribution after adjustments based on

operating expenses and SLCF's performance, among other things, represents each Limited

Partner's limited partnership interest in SLCF.

        10.     On September 17, 2009, SLCF filed two proofs of claim in LBHI's

chapter 11 case (the "<u>Silver Lake Financial Claims</u>").  Proof of claim number 15156, in the

amount of $721,628, alleges that LBHI had certain guarantee obligations with respect to an

ISDA Master Agreement entered into between SLCF and Lehman Brothers Special Financing

Inc., a subsidiary of LBHI.  Proof of claim number 15157 ("<u>Claim No. 15157</u>"), in the amount of

$25,451,655.31, alleges that LBHI had certain guarantee obligations to SLCF as a result of the

obligations of Lehman Brothers International (Europe), one of LBHI's foreign affiliates, to

SLCF.  To date, LBHI has not objected to the Silver Lake Financial Claims.

        11.     In the months following the Commencement Date, the Debtors engaged in

internal discussions regarding their alternatives with respect to the SLCF Interest.  Those

discussions included consideration of certain provisions of the LP Agreement, including those

provisions that penalize a Limited Partner for withdrawing any portion its Book Capital Account

that is attributable to a Capital Contribution for a period of 24 months following the tender of

such Capital Contribution (a "<u>Lock-Up Period</u>").  The expiration of the Lock-Up Period with

respect to LBHI's initial Capital Contribution was January of 2010.  Notwithstanding the fact

that SLCF's performance has been very strong over the past eighteen months, the Debtors have

determined to redeem the investment in SLCF.

        12.     The decision to withdraw the investment in SLCF was consistent with the

Debtors' general investment strategy and based on a number of specific grounds including (i) the

Debtors' general desire to limit exposure to market fluctuations; (ii) the Debtors' belief that within the timeframe of these chapter 11 cases, monetizing the interest in SLCF in the near term is the prudent course of action; and (iii) given the fact that LBHI is one of the significant investors in SLCF, the withdrawal of one of the other significant investors could divert much of SLCF's available cash and limit LBHI's withdrawal options in the future.

13.    In furtherance of this decision, LBHI delivered a redemption notice to Silver Lake Financial on March 31, 2010 (the "<u>Redemption Notice</u>").  The Redemption Notice informed Silver Lake Financial of LBHI's intent to withdraw 100% of the balance of the Debtors' Book Capital Account in installments keyed to the expiration of the relevant Lock-Up Periods for each of LBHI's Capital Contributions.

14.    Following receipt of the Redemption Notice, Silver Lake Financial advised LBHI that it intended to recoup amounts that were purportedly due under the Silver Lake Claims against the Debtors' Book Capital Account.  Silver Lake Financial further informed LBHI that it may attempt to enforce provisions in the LP Agreement that seek to restrict or penalize a limited partner's withdrawal of funds from its Book Capital Account.  These provisions include:

§    a provision that gives SLF discretion to limit the aggregate withdrawals made by all Limited Partners in a particular Semi-Annual Period to 15% of the aggregate Book Capital Accounts of the Partners as of the opening of business on the first business day of such Semi-Annual Period;

§    a provision that authorizes SLF to suspend or limit withdrawals and defer payments of distributions or withdrawals where, *inter alia*, SLF deems such action to be in the interests of SLCF;

§    provisions that provide, with certain limitations, that distributions of Book Capital Accounts may be made in cash, securities, or other property; and

§    a provision that provides, as a condition to SLF granting a consent with respect to any of the limitations on withdrawal, SLF may require the Limited Partner who wishes to make

such withdrawal forfeit a portion of such Limited Partner's Book Capital Account specified by SLF.

15.     While the Debtors dispute the amount and validity of the Silver Lake Financial Claims and the enforceability of certain of the restrictions, limitations, and penalties contained in the LP Agreement, it is clear that pursuing a judicial resolution to the withdrawal of the Debtors' Book Capital Account from SLCF would result in significant delay, uncertainty and expense. Accordingly, the Debtors determined to explore the possibility of a consensual resolution of their dispute with Silver Lake Financial. Following good faith, arms length negotiations, and after consultation with the Creditors' Committee's professionals, the Debtors and Silver Lake Financial agreed on the terms set forth in the Settlement Agreement.

**The Settlement Agreement**

16.     The Settlement Agreement includes, *inter alia*, the following material terms:[2]

| Withdrawal of the Debtors' *Book Capital Account* | Unless SLCF elects to enter into an Alternative Transaction (as defined below), the Debtors' Book Capital Account shall be withdrawn, and LBHI shall cease to be a partner of SLCF in accordance with the following terms (cumulatively, the "Withdrawal"):<br><br>i.   Not less than 33% of the balance of the Debtors' Book Capital Account (such amount, the "Initial Payment") shall be withdrawn and paid to LBHI in cash no later than the later of (A) August 1, 2010, or (B) the first day of the month following the Effective Date[3] (the "Initial Withdrawal Date").<br><br>ii.   An amount at least equal to the lesser of (A) 50% of the balance of the Debtors' remaining Book Capital Account and (B) the difference between (x) 66% of the sum of the Initial Payment and the balance of the Debtors' Book Capital Account and (y) the |

---

[2] The terms listed below are provided as a summary of the terms of the Settlement Agreement and the Assignment and Assumption Agreement (as defined below). In the case of an inconsistency between the terms set forth in the summary and the terms of the Settlement Agreement or the Assignment and Assumption Agreement, the terms of the Settlement Agreement or the Assignment and Assumption Agreement, respectively, shall control.

[3] As such term is defined in the Settlement Agreement.

| | |
|---|---|
| | Initial Payment, shall be withdrawn and paid to LBHI in cash no later than the later of (X) February 1, 2011, and (Y) six-month anniversary of the Initial Withdrawal Date (the "Second Withdrawal Date"). |
| | iii.  The remaining balance of the Debtors' Book Capital Account shall be withdrawn and paid to LBHI in cash no later than the later of (A) August 1, 2011, or (B) the six-month anniversary of the Second Withdrawal Date (the "Final Withdrawal Date" and any of the Initial Withdrawal Date, the Second Withdrawal Date or the Final Withdrawal Date, a "Withdrawal Date"). |
| ***Waiver of Withdrawal Restrictions*** | SLCF will make the withdrawal payments above regardless of any other restrictions or limitations it may have the right to impose on withdrawals under the LP Agreement. |
| ***The Discount*** | The proceeds payable to LBHI in connection with a withdrawal of a portion of the Debtors' Book Capital Account pursuant to Section 3(a) of the Settlement Agreement shall be reduced to an amount equal to 92.5% of the amount that would otherwise be payable to LBHI in connection with the withdrawal of such portion of the Debtors' Book Capital Account (the "Discount"). |
| ***Alternative Sale of LP Agreement*** | In lieu of the withdrawal of all or any portion of the Debtors' Book Capital Account as of a given Withdrawal Date, SLCF may, in its discretion, cause LBHI to sell all or a designated portion of its interest in SLCF to any person(s) (an "Alternative Transaction"), pursuant to an assignment and assumption agreement in the form attached as Exhibit A (the "Assignment and Assumption Agreement") to the Settlement Agreement.  The purchase price for any Alternative Transaction shall not be less than 92.5% of the balance of the portion of the Debtors' Book Capital Account to be transferred (determined as of the date of transfer). |
| ***Indemnity Associated With Alternative Sale of LP Agreement*** | LBHI retains, and agrees to indemnify the purchaser(s) under the Assignment and Assumption Agreement (each, a "Purchaser") with respect to, any and all obligations arising out of or as the result of a their breach of certain representations, warranties, covenants, agreements, and obligations contained in the Assignment and Assumption Agreement.<br><br>LBHI also agrees, subject to certain limitations, to indemnify SLCF and SLF from and against certain damages due to or arising out of a breach of any representation, warranty or agreement of LBHI contained in the Assignment and Assumption Agreement (the indemnities described in this section, the "Indemnity"). |

| The Silver Lake Claims | SLCF agrees to waive and release any and all rights to recoup amounts owed by LBHI on account of the Silver Lake Financial Claims against amounts owed to LBHI on account of the Debtors' Book Capital Account.<br><br>Upon the Effective Date, Claim No. 15157 shall be deemed withdrawn with prejudice and SLCF shall have no rights or claims to any distributions from the Debtors' estates related thereto. |
|---|---|

### The Settlement Agreement Meets The Legal Standard
### Established Under Rule 9019 and is in the Best Interests of the Debtors' Estates

17.     Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed R. Bankr. P. 9019(a). This rule empowers bankruptcy courts to approve compromises "if they are in the best interest of the estate." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). Indeed, courts have long considered compromises to be "a normal part of the process of reorganization." *TMT Trailer Ferry*, 390 U.S. at 424 (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

18.     The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). The settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness. *Drexel Burnham Lambert Group*, 134 B.R. at 505; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown &*

*Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). However, the analysis must focus on the

question of whether a particular compromise is "fair and equitable, and in the best interest of the

estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations

omitted).

19.    While a court must "evaluate . . . all . . . factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699

F.2d at 608, or conduct a full independent investigation. *Drexel Burnham Lambert Group*, 134

B.R. at 496. "[T]he bankruptcy judge does not have to decide the numerous questions of law and

fact. . . . The court need only canvass the settlement to determine whether it is within the

accepted range of reasonableness." *Nellis*, 165 B.R. at 123 (internal citations omitted).

20.    The court may give weight to the "informed judgments of the . . . debtor-

in-possession and their counsel that a compromise is fair and equitable, and consider the

competency and experience of counsel who support the compromise." *Drexel Burnham Lambert

Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*,

150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr.

S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for

the Trustee's, but only that I test his choice for reasonableness. . . . If the Trustee chooses one of

two reasonable choices, I must approve that choice, even if, all things being equal, I would have

selected the other.").

21.    Significantly, there is no requirement that "the value of the compromise

. . . be dollar-for-dollar the equivalent of the claim." *Ionosphere Clubs, Inc.*, 156 B.R. at 427.

Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to

a hundredth or even a thousandth part of a single percent of the potential recovery." *Id*. at 427-

28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

22.    The Settlement Agreement achieves a near full recovery of the Debtors'

Book Capital Account while avoiding the inevitable costs and delay that could otherwise be

associated with challenging the enforceability of the restrictions, limitations, and penalties

contained in the LP Agreement and described above in paragraph 14 through a judicial

proceeding or otherwise.

23.    For example, SLCF could argue that certain sections of the LP Agreement

permit distributions of the Debtors' Book Capital Account to be made in kind – including in

illiquid securities.  The Settlement Agreement, on the other hand, expressly provides that

distributions of the Debtors' Book Capital Account must be in cash.  Similarly, the LP

Agreement purportedly provides SLF with discretion to impose a 15% gate on withdrawals from

Book Capital Accounts.  While the Debtors could contest the applicability of this provision, the

Settlement Agreement allows for the withdrawal of LBHI's entire Book Capital Account, less

the Discount, in 13 months.

24.    The Settlement Agreement also provides for a withdrawal with prejudice

of Claim No. 15157, relieving LBHI's estate of over $25 million in potential liability, and

restricts Silver Lake Financial's ability to recoup amounts related to the Silver Lake Financial

Claims – relieving LBHI's estate of the need for burdensome, protracted, or expensive litigation.

25.    For the reasons stated above, and in the informed judgment of the Debtors

and their professionals, the Settlement Agreement is a "fair and equitable" resolution of the

issues described herein, is well within the "range of reasonableness," and is in the best interests

of the Debtors' respective estates and creditors.  As set forth above, each of LBHI and LCPI has

reserved its rights against each other with respect to prepetition transactions and to the proceeds

of the SLCF Interest resulting from the Settlement Agreement and nothing in the proposed order

shall alter or affect those rights.  Accordingly, the Debtors requests that the Settlement

Agreement be approved pursuant to Bankruptcy Rule 9019.

26.    The Debtors have been informed that the Creditors' Committee has no

objection to LBHI's entry into both the Settlement Agreement and, if necessary, the Assignment

and Assumption Agreement.

### The Transactions Set Forth in the Settlement Agreement
### Are An Appropriate Exercise of the Debtors' Business Judgment

27.    As described in greater detail above, the Settlement Agreement provides

that in lieu of the return of the Debtors' Book Capital Account, SLCF may instruct LBHI to sell

its interest, or a portion thereof, in SLCF to a third party or parties pursuant to an Alternative

Transaction.  Accordingly, the Debtors also seek authority to consummate a sale of all or a

portion of their interest in SLCF, under sections 105 and 363 of the Bankruptcy Code, pursuant

to an Alternative Transaction.

28.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  While section 363 of the Bankruptcy

Code does not set forth a standard for determining when it is appropriate for a court to authorize

the sale, disposition, or other use of a debtor's assets, courts in the Second Circuit, in applying

this section, have required that it be based upon the sound business judgment of the debtor.  *See*

*In re Chateaugay Corp.*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge reviewing a

section 363(b) application must find from the evidence presented a good business reason to grant

such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

1063, 1071 (2d Cir. 1983) (same).  Section 105 of the Bankruptcy Code provides, in pertinent

part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).

29.    It is generally understood that "[when] the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'" *In*

*re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

30.    Silver Lake Financial has informed the Debtors that the option to elect an

Alternative Transaction is an integral aspect of the Settlement Agreement.  As the minimum

purchase price required for the sale of the SLCF Interest pursuant to an Alternative Transaction

must equal or exceed the amount the Debtors would have been entitled to pursuant to the

Withdrawal, such a sale is in the best interests of the Debtors' estates.

31.    While an Alternative Transaction would require LBHI to indemnify the

Purchaser, LBHI does not believe that its liability with respect to the Indemnity is material

because the representations and warranties that are covered by the Indemnity are limited, are

under LBHI's direct control, and can be mitigated by strict compliance with the Assignment and

Assumption Agreement.  Accordingly, for the reasons set forth above, approval of the

Alternative Transaction aspect of the Settlement Agreement is in the best interests of the

Debtors' respective estates and creditors.  The Settlement Agreement is necessary, in the

Debtors' judgment, to maximize the prospect of a recovery on their investment in SLCF.  In light

of the direct and indirect benefits inuring to the Debtors' estate and creditors pursuant to the

Settlement Agreement, entry into the Settlement Agreement is a proper exercise of the Debtors'

business judgment and should be approved.

**The Transfer of the SLCF Interest Pursuant to An
Alternative Transaction Should Be Free and Clear of Liens, Claims and Interests
<u>Regardless of Whether Or Not LCPI Is Later Determined to Have An Interest Therein</u>**

32.    The transfer of the SLCF Interest pursuant to an Alternative Transaction

should be free and clear of any and all liens, claims, encumbrances and other interests in

accordance with section 363(f) of the Bankruptcy Code.   A debtor may sell property of its estate

free and clear of any interest in such property if one of the conditions in section 363(f)(1) – (5) is

satisfied.  *See* 11 U.S.C. § 365(f); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d

Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and

clear of third-party interests, the third party is adequately protected if his interest is assertable

against the proceeds of the disposition.); *Circus Time, Inc. v. Oxford Bank & Trust (In re Circus

Time, Inc.)*, 5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the court's power to sell property free and

clear of liens has long been recognized); *see also In re Riverside Inv. P'ship*, 674 F.2d 634, 640

(7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of

the sale and discharged at the time of sale.").

33.    As discussed above, LCPI has consented to the proposed transaction.  All

rights of LCPI with respect to a claim against LBHI for the proceeds of the proposed transaction

are reserved.

## <u>Notice</u>

34.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the second

amended order entered on June 17, 2010, governing case management and administrative

procedures for these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the

Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties

who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further

notice need be provided.

35.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.


WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: June 23, 2010
        New York, New York


/s/ Lori R. Fife
Lori R. Fife
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **Exhibit A**

**(Settlement Agreement)**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is made and entered into as of the 23rd day of June, 2010, by and among Silver Lake Credit Fund, L.P. ("<u>SLCF</u>" or the "<u>Partnership</u>"), Silver Lake Financial Associates, L.P. (the "<u>SLF</u>" and collectively with SLCF, "<u>Silver Lake</u>"), and Lehman Brothers Holdings Inc. ("<u>LBHI</u>") (each of the foregoing, a "<u>Party</u>" and collectively, the "<u>Parties</u>").

RECITALS:

WHEREAS, LBHI is a limited partner of the Partnership pursuant to that certain Fourth Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of March 1, 2010 (as may be amended from time to time, the "<u>Partnership Agreement</u>").

WHEREAS, commencing on September 15, 2008 and thereafter, LBHI and certain of its affiliates (collectively, the "<u>Debtors</u>"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").

WHEREAS, on September 17, 2009, SLCF timely filed two proofs of claim against LBHI, which were assigned claim number 15156 ("<u>Claim No. 15156</u>") and claim number 15157 ("<u>Claim No. 15167</u>") by the Debtors' Bankruptcy Court-approved claims and noticing agent, and one claim against one of LBHI's Debtor affiliates, Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), which was assigned claim number 15158 ("<u>Claim No. 15158</u>," and together with Claim No. 15156 and Claim No. 15157, the "<u>Claims</u>").

WHEREAS, by letter dated March 31, 2010, LBHI notified the Partnership of its request to withdraw 100% of the balance of its entire Book Capital Account[1] attributable to the Capital Contributions[2] made by LBHI in January 2008, May 2008, June 2008 and October 2008 (the "<u>Withdrawal Notice</u>").

NOW, THEREFORE, in consideration of the recitals set forth above and promises made herein, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

Section 1.      <u>Effectiveness</u>.  Except as set forth in Section 2 hereof or unless otherwise agreed in writing by LBHI, this Agreement shall not be binding on or enforceable against LBHI prior to the entry of a final order ("<u>Order</u>") by the Bankruptcy Court approving the terms of the

---

[1]      "<u>Book Capital Account</u>" means in the case of any partner of the Partnership (each, a "<u>Partner</u>") the account or accounts established and maintained with respect to such Partner pursuant Article V of Partnership Agreement.  For the avoidance of doubt, each Partner's Book Capital Account includes any portion of such Partner's interest in the Partnership that is attributable to any "Side Pocket Investment" (as such term is defined in the Partnership Agreement).

[2]      "<u>Capital Contribution</u>" means in the case of any Partner the amount contributed from time to time to the capital of the Partnership by such Partner.

Agreement under section 363 of the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").  The Order shall not become final until (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order(s) or judgment(s) of the court shall have been affirmed by the highest court to which such order(s) was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order(s), and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired (the "Effective Date"); provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule may be filed relating to such order(s) shall not cause such order(s) to not be the Order.  In the event that the Effective Date does not occur on or before September 15, 2010, (a) nothing contained in this Agreement shall be deemed to be a waiver of any claims or an admission of liability by any Party hereto, and (b) this Agreement shall be null and void and all rights of the Parties prior to this Agreement shall be preserved.

Section 2.    Withdrawal of Withdrawal Notice.  LBHI hereby rescinds its Withdrawal Notice.  In the event the Effective Date has not occurred on or before September 15, 2010, on or after September 16, 2010, LBHI shall be entitled to issue a new withdrawal request in accordance with the Partnership Agreement.  Following the Effective Date, LBHI shall have no right to make a withdrawal request or to withdraw capital from the Partnership except as set forth in this Agreement; provided that, if the Partnership is dissolved and its affairs wound up prior to the date that LBHI is fully withdrawn from the Partnership, LBHI shall be entitled to payment of its liquidating distribution, if any, as contemplated by Section 14.1(b) of the Partnership Agreement.

Section 3.    Withdrawal of Book Capital Account.  Subject to and, if applicable, in accordance with Section 4 below, the entire interest of LBHI in the Partnership as reflected by its Book Capital Account shall be withdrawn, and LBHI shall on completion thereof cease to be a partner of the Partnership and have no further interest in, or funding obligation to, the Partnership, in accordance with the following terms:

(a)(i)    Subject to Sections 3(b) and (c) of this Agreement, but otherwise in accordance with the terms of the Partnership Agreement, not less than 1/3 of the balance of LBHI's Book Capital Account (for the avoidance of doubt, such amount, after giving effect to the Discount (defined below), the "Initial Payment") shall be withdrawn (or paid in full or part pursuant to the terms of Section 4 below) and paid to LBHI in cash no later than the later of (A) August 1, 2010, or (B) the first day of the month following the Effective Date (the "Initial Withdrawal Date").

(ii)    Subject to Sections 3(b) and (c) of this Agreement, but otherwise in accordance with the terms of the Partnership Agreement, an amount at least equal to the lesser of (A) 1/2 of the balance of LBHI's Book Capital Account as of the Second Withdrawal Date (defined below) and (B) the difference between (x) 2/3 of the sum of the Initial Payment and the balance of LBHI's Book Capital Account as of Second Withdrawal Date and (y) the Initial Payment, shall be withdrawn and paid

- 2 -

to LBHI in cash no later than the later of (X) February 1, 2011, and (Y) six-month anniversary of the Initial Withdrawal Date (the "Second Withdrawal Date"); provided, however, that if (B) is less than or equal to 0, then a withdrawal shall not be required to be made from LBHI's Book Capital Account on the Second Withdrawal Date.

(iii)    Subject to Sections 3(b) and (c) of this Agreement, but otherwise in accordance with the terms of the Partnership Agreement, the remaining balance of LBHI's Book Capital Account shall be withdrawn and paid to LBHI in cash no later than the later of (A) August 1, 2011, or (B) the six-month anniversary of the Second Withdrawal Date (the "Final Withdrawal Date" and any of the Initial Withdrawal Date, the Second Withdrawal Date or the Final Withdrawal Date, a "Withdrawal Date").

(b)    Notwithstanding any provision to the contrary contained in the Partnership Agreement, (i) the proceeds payable to LBHI in connection with a withdrawal of a portion of its Book Capital Account pursuant to Section 3(a) above shall be reduced to an amount equal to 92.5% of the amount that would otherwise be payable to LBHI in connection with the withdrawal of such portion of LBHI's Book Capital Account pursuant to the Partnership Agreement as modified by this Agreement (the remaining 7.5% of such proceeds, the "Discount" and the withdrawal proceeds payable to LBHI pursuant to this Agreement (as reduced by the Discount), the "LBHI Withdrawal Proceeds") and (ii) LBHI hereby forfeits the right to receive all or any portion of the Discount, and the Partnership shall retain the Discount for the benefit of the partners of the Partnership other than LBHI.   In accordance with Section 8.3.6 of the Partnership Agreement, ninety percent (90%) of the proceeds payable to LBHI at each Withdrawal Date in accordance with Section 3(a) above shall be paid to LBHI within 30 days after such Withdrawal Date, with the balance, if any, to be paid not later than 30 days after the date that audited financial statements of SLCF for the fiscal year in which such Withdrawal Date has occurred are completed.

(c)    In connection with each withdrawal pursuant to Section 3(a) and 3(b) hereof, the Partnership shall pay in cash to LBHI the applicable portion of the LBHI Withdrawal Proceeds in accordance with the terms hereof notwithstanding the potential applicability of (i) the limitations on withdrawals set forth in Section 8.4(a) of the Partnership Agreement (the right to limit withdrawals as of a given Withdrawal Date to not more than 15% of the aggregate Book Capital Accounts of the Partners as of such date), (ii) Section 8.4(b) (the right to suspend or limit withdrawals and to defer the payment of withdrawal proceeds) of the Partnership Agreement, (iii) Sections 8.1 and 8.8 (the right to pay withdrawal proceeds in kind) of the Partnership Agreement, (iv) Section 8.12 (the right to require that the limited partners who wishes to make a withdrawal agree to forfeit a portion of its Book Capital Account) of the Partnership Agreement, (v) the five percent penalty contained in Section 8.3.2 of the Partnership Agreement and (vi) any other limitations on withdrawals set forth in Article VIII or any other provision of the Partnership Agreement; provided, however, that the Partnership shall not be

obligated to waive provisions of the Partnership Agreement which may not be waived pursuant to applicable law or regulatory authority or would subject SLCF to a materially adverse regulatory regime; provided, that Silver Lake shall use its commercially reasonable efforts to refrain from taking any action after the Effective Date that would cause the withdrawal of LBHI's Book Capital Account pursuant to Section 3(a) hereof to subject the Partnership to a materially adverse regulatory regime.

Section 4.    Sale of Partnership Interests.    Subject to the occurrence of the Effective Date, in lieu of the withdrawal of all or any portion of LBHI's interest in the Partnership as of a given Withdrawal Date, the Partnership may, in its sole and absolute discretion, cause LBHI to sell all or a designated portion of its interest in the Partnership to any person, pursuant to an Assignment and Assumption Agreement substantially in the form annexed hereto as Exhibit A (provided that if at the time of execution LBHI is unable to make the representations and warranties contained in the form of Assignment and Assumption Agreement, LBHI shall be required to execute a modified form of Assignment and Assumption Agreement), as of, or prior to, such Withdrawal Date; provided, that the purchase price for such interest shall not be less than 92.5% of the portion of the Book Capital Account to be transferred (determined as of the date of transfer).  Notwithstanding the foregoing, (a) Silver Lake shall not cause LBHI to enter into an Assignment and Assumption Agreement on more than three occasions and (b) to the extent that the Partnership causes LBHI to enter into an agreement in connection with the sale of an interest in the Partnership pursuant to this Section 4, the closing of such sale shall occur on the same date that such agreement is executed.  Additionally, LBHI also retains the right to sell its interest (subject to the terms of the Partnership Agreement) in the Partnership (for so long as LBHI continues to hold such interest); provided, however, that Silver Lake shall retain its right to consent to any such transfer and the admission of any prospective limited partner to the Partnership, which consent shall not be unreasonably withheld.  For the avoidance of doubt, nothing in this Section 4 shall relieve LBHI of its obligations under the Partnership Agreement to keep certain information confidential; provided, however, that LBHI may disclose any information that it reasonably believes is necessary to disclose in connection with its chapter 11 case currently pending in the Bankruptcy Court.

Section 5.    Side Letter.    Silver Lake agrees that Sections 1 and 2 of the letter agreement, dated January 7, 2008, among SLCF, SLF, Silver Lake Financial Management Company, L.L.C. and LBHI shall remain effective with respect to LBHI (i.e., management fee and incentive fee calculation), notwithstanding that LBHI no longer meets the terms of the Lehman Requirement (as defined in such letter agreement).  For the avoidance of doubt, in no event shall any purchaser of, or any assignee or transferee with respect to, any portion of LBHI's interest in the Partnership acquire or be assigned or transferred any right under such letter agreement.  Any purported assignment or transfer of any such right shall be null and void.

Section 6.    Recoupment.    Subject to the occurrence of the Effective Date, SLCF hereby agrees to waive and release any and all rights to recoup amounts owed by LBHI on account of the Claims and on account of amounts that may be owed to SLCF by Lehman Brothers Inc. ("LBI") against amounts owed to LBHI on account of its Book Capital Account.

Section 7.    <u>Other Claims</u>.  Upon the Effective Date, Claim No. 15157 shall be deemed satisfied and SLCF shall have no rights or claims to any further distributions from LBHI's or the Debtors' estates related thereto.  Within five (5) business days of the Effective Date, SLCF shall execute and deliver to the Bankruptcy Court a notice of withdrawal of claim substantially in the form attached hereto as Exhibit B with respect to Claim No. 15157.  For the avoidance of doubt, this Agreement shall have no effect whatsoever on the rights or remedies of SLCF, SLF, their respective affiliates, successors, transferees and assigns, with respect to any and all direct or indirect claim(s) asserted, whether now existing or hereafter asserted, against LBIE, LBSF, LBI, or any other direct or indirect claims against any of the Debtors, other than Claims No. 15157, and all rights and defenses with respect to such claim(s) and any other rights that may exist against such entities are hereby preserved.  Except as expressly set forth herein, this Agreement shall not in any way affect the rights and obligations of the Parties under any other agreements, stipulations or orders of the Bankruptcy Court.

Section 8.    <u>Representations</u>.  Subject to Section 1 hereto, each Party represents and warrants to each other Party that (i) the execution, delivery, and performance by such Party of this Agreement are within the powers of such Party and have been duly authorized by all necessary action on the part of such Party, (ii) this Agreement has been duly executed and delivered by such Party and constitutes a valid and binding obligation of such Party, enforceable against such Party in accordance with the terms hereof, (iii) it has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, which it enters voluntarily and of its own choice and not under coercion or duress, (iv) it has made its own investigation of the facts and is relying upon its own knowledge and the advice of its counsel, and (v) it knowingly waives any and all claims that this Agreement was induced by any misrepresentation or non-disclosure and knowingly waives any and all rights to rescind or avoid this Agreement based upon presently existing facts, known or unknown.  The Parties agree and stipulate that each Party is relying upon the representations and warranties set forth in this Agreement and that these representations and warranties are a material inducement for entering into this Agreement.  These representations and warranties shall survive the execution of this Agreement.

Section 9.    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

Section 10.    <u>Jurisdiction; Governing Law</u>.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that if the Bankruptcy Court does not have or abstains from exercising such jurisdiction, the Parties hereto agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States

District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court having jurisdiction over an appeal from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  This Agreement (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any Party to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law principles that might lead to the application of the laws of any other jurisdiction, except to the extent that the laws of the State of New York are superseded by the Bankruptcy Code.

Section 11.    Successors and Assigns.  The provisions of this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  This Agreement shall be binding upon any chapter 7 or chapter 11 trustee or examiner appointed in the above-captioned cases, and shall be further binding upon any person or entity acting through, or on behalf of, or claiming to act through, or on behalf of LBHI, including, but not limited to, any statutory committee appointed in the above-captioned cases.

Section 12.    Amendment.  This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

Section 13.    Entire Agreement.  This Agreement supersedes all other prior letters, term sheets and understandings, both written and verbal, among the Parties or any of them with respect to the subject matter hereof.

Section 14.    Construction.  This Agreement has been negotiated by the Parties and their respective legal counsel, and legal or equitable principles that might require the construction of this Agreement or any of its provisions against the Party responsible for drafting this Agreement will not apply in any construction or interpretation of this Agreement.

Section 15.    Termination.  If on or before the later of the Effective Date or September 15, 2010, LBHI:  (i) issues a withdrawal request or notice, other than the Withdrawal Notice; (ii) grants or creates an Encumbrance (as defined in the Assignment and Assumption Agreement) on LBHI's interest in the Partnership; or (iii) except pursuant to a written agreement with Silver Lake, takes any action to disallow, reduce or otherwise diminish the Claims, which action is not withdrawn within three (3) business days following notification of such action by Silver Lake to LBHI, Silver Lake shall have the immediate right, upon written notice to LBHI, to terminate this Agreement.

*[Signature pages follow]*

- 6 -

IN WITNESS WHEREOF, the undersigned have executed, or caused to be executed, this Agreement on the date first written above.

SILVER LAKE CREDIT FUND, L.P.

By: Silver Lake Financial Associates, L.P., its general partner

By: _____
Name:
Title:

SILVER LAKE FINANCIAL ASSOCIATES, L.P.

By: _____
Name:
Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:    William Fox
Title:    Executive Vice President

[SIGNATURE PAGE TO SETTLEMENT AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or caused to be executed, this Agreement on the date first written above.

SILVER LAKE CREDIT FUND, L.P.

By: Silver Lake Financial Associates, L.P., its general partner

By: *Karen M. King*

Name:
Title:  **Karen M. King**
        **Managing Director and**
        **General Counsel**

SILVER LAKE FINANCIAL ASSOCIATES, L.P.

By: *Karen M. King*

Name:
Title:  **Karen M. King**
        **Managing Director and**
        **General Counsel**

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

**EXHIBIT A**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is made and entered into as of the [__] day of [_____], 2010 (the "Reference Date"), among Lehman Brothers Holdings Inc. (the "Seller"), [_____] (the "Purchaser") and Silver Lake Financial Associates, L.P. (the "General Partner" and together with the Seller and the Purchaser, the "Parties" and each, a "Party").

WHEREAS the Seller is a Limited Partner of Silver Lake Credit Fund, L.P., a Delaware limited partnership (the "Partnership"), pursuant to the Fourth Amended and Restated Limited Partnership Agreement, dated as of March 1, 2010, among the General Partner and the additional parties, including the Seller, admitted to the Partnership as Limited Partners (the "Partnership Agreement");

WHEREAS, commencing on September 15, 2008 and thereafter, the Seller and certain of its affiliates (collectively, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS the Seller desires to sell, transfer and assign [__]% of its Interest with respect to its Class A Book Capital Account (such [__]% portion representing a fully funded original Capital Commitment equal to $[___]) in the Partnership (the "Transferred Interest") to the Purchaser; and

WHEREAS the Purchaser desires to purchase and acquire the Transferred Interest and to become a party to and be bound by the terms of the Partnership Agreement and to be admitted to the Partnership as a substitute Limited Partner with respect to the Transferred Interest as provided in the Partnership Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein made and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the parties hereto hereby agree as follows:

1.     Definitions.  Capitalized terms used herein which are not herein defined shall have the respective meanings set forth in the Partnership Agreement.

2.     Purchase and Sale.

(a)     Upon the terms and subject to the conditions set forth in this Agreement, the Seller hereby sells, assigns, transfers and delivers to the Purchaser and the Purchaser hereby purchases, assumes, accepts and acquires from the Seller, all right, title and interest in and to the Transferred Interest free and clear of all liens, pledges, claims, security interests, encumbrances, charges, restrictions or limitations of any kind, whether arising by agreement, operation of law or otherwise (each, a "Lien"), and other than with respect to the Excluded Obligations (as defined below).  The Purchaser hereby assumes the Seller's rights and obligations with respect to the Transferred Interest (other than with respect to any Excluded Obligations).  The purchase and sale effected hereby shall be effective as of the Reference Date.

1

(b)     All Excluded Obligations shall be specifically retained by the Seller and the Seller shall indemnify the Purchaser with respect to any and all such obligations.

(c)     "Excluded Obligations" means, with respect to the Transferred Interest, any and all (i) obligations arising out of or as the result of a breach by the Seller of: (A) any representation and warranty made by the Seller in this Agreement, the Partnership Agreement or the subscription agreement pursuant to which the Transferred Interest was initially issued to the Purchaser (the "Subscription Agreement"), (B) any of Seller's covenants and agreements in this Agreement, the Partnership Agreement or the Subscription Agreement, (ii) deductions pursuant to Section 5.3 of the Partnership Agreement, as well as any and all obligations of the Seller, arising under applicable law or under Sections 4.4 or Article XVIII of the Partnership Agreement, to return or repay to the Partnership any distributions with respect to the Transferred Interest pursuant to Sections 4.4 or Article XVIII of the Partnership Agreement ("Distributions") received by the Seller prior to the Reference Date (for the avoidance of doubt, the Parties acknowledge that the Partnership has not made any Distributions to the Seller on or prior to the date hereof), and (iii) tax obligations of the Seller related to its ownership of the Transferred Interest.

3.     Purchase Price.

(a)     The purchase price for the Transferred Interest (the "Purchase Price") shall be an amount equal to [92.5]% of the Transferred Interest Value (as defined below). "Transferred Interest Value" means the value of the aggregate balance of the Book Capital Accounts attributable to the Transferred Interest as of the Reference Date.

(b)     The Transferred Interest Value initially shall be determined on the basis of the applicable Book Capital Account values as of the Reference Date, as calculated by the Partnership and reported to the parties hereto within 30 days of the Reference Date (such report, the "Preliminary Book Capital Account Report").   Upon or following the completion of the Partnership's annual audit for the fiscal year in which the Reference Date occurs, the Partnership shall determine pursuant to the Partnership Agreement the final aggregate balances of the applicable Book Capital Accounts attributable to the Transferred Interest as of the Reference Date (such value, the "Final Transferred Interest Value" and such report, the "Final Book Capital Account Report").   The General Partner shall use its reasonable best efforts to cause a copy of the Final Book Capital Account Report to be completed and delivered to the Purchaser and the Seller within 90 days of the end of fiscal year in which the Reference Date occurs.  To the extent that the Final Transferred Interest Value set forth in the Final Book Capital Account Report exceeds the initial Transferred Interest Value set forth in the Preliminary Book Capital Account Report, then the Purchase Price shall be increased by the amount of such excess multiplied by [92.5%].   To the extent that the Final Transferred Interest Value set forth in the Final Book Capital Account Report is less than the initial Transferred Interest Value set forth in the Preliminary Book Capital Account Report, then the Purchase Price shall be decreased by the amount of such shortfall multiplied by [92.5%].

(c)     Ninety percent (90%) of the Purchase Price, calculated on the basis of the Transferred Interest Value set forth in the Preliminary Book Capital Account Report, shall be due and payable by the Purchaser to the Seller on the Reference Date.  To the extent that

pursuant to the Final Book Capital Account Report, (x) any balance of the Purchase Price, as adjusted pursuant to Section 3(b), remains unpaid (such balance, a "Purchase Price Balance"), or (y) the amount of the Purchase Price, as adjusted pursuant to Section 3(b), is less than the amounts initially paid by the Purchaser pursuant to this Section 3 (such shortfall, a "Purchase Price Overpayment"), then an amount equal to such Purchase Price Balance or Purchase Price Overpayment, as applicable, shall be due and payable by the Purchaser to the Seller or by the Seller to the Purchaser, respectively, within 30 days after the Partnership completes the Final Book Capital Account Report.

(d)    Any amounts payable pursuant to this Section 3 shall be payable by wire transfer of U.S. federal funds or other immediately available funds denominated in U.S. dollars to the bank account(s) designated by the Seller (except that in the case of amounts with respect to any Purchase Price Overpayment, the Purchaser shall designate the bank account).

4.    Reserved.

5.    Creation of Purchaser's Book Capital Account.  In connection with the transfer and assignment contemplated herein, the General Partner shall create a new [**Class A // Class B**] Book Capital Account in the name of the Purchaser, which shall be credited with an amount equal to the portion of the Seller's Class A Book Capital Account corresponding to the Transferred Interest, with a corresponding debit to the Seller's Class A Book Capital Account. The parties acknowledge and agree that the Transferred Interest transferred hereby includes [__]% of the Seller's Proportionate Share of any Side Pocket Investment(s) existing as of the Reference Date in respect of the Class A Book Capital Account transferred hereby.

6.    No Transfer of any Seller Side Letters.  The parties hereto expressly agree that no rights, terms or other provisions contained in the letter agreement, dated January 7, 2008, among the Seller, the Partnership, the General Partner and Silver Lake Financial Management Company, L.L.C. relating to the Seller's investment in the Partnership (the "Seller Side Letter") shall be transferred or assigned to the Purchaser pursuant to the assignment of the Transferred Interest contemplated herein.

7.    Purchaser Withdrawals.  The parties hereto expressly agree that with respect to any future withdrawal by the Purchaser from the new [**Class A // Class B**] Book Capital Account created as a result of the transfer of the Transferred Interest contemplated herein, the initial [**twelve (12) month and twenty-four (24) month // thirty-six (36) month**][1] period[**s**] applicable to withdrawals of amounts attributable to the Transferred Interest from the Purchaser's [**Class A // Class B**] Book Capital Account in accordance with Section 8.3 of the Partnership Agreement shall commence with effect from the Reference Date.

8.    Admission of Seller as Limited Partner; Consent to Assignment.  The General Partner and the Purchaser agree that by virtue of the execution and delivery of this Agreement by the parties hereto the Purchaser hereby becomes a party to the Partnership Agreement in respect of the Transferred Interest (and is hereby deemed to be admitted to the Partnership as a substitute Limited Partner with respect thereto and to have executed and

---

[1]    **Use 12/24 month for Class A and 36 month for Class B.**

delivered a counterpart to the Partnership Agreement) and the Purchaser hereby accepts and agrees to be bound by all of the terms and provisions of the Partnership Agreement, including, without limitation, appointment of the General Partner as attorney-in-fact of the Purchaser under Article 16 thereof.  The General Partner hereby waives the opinion provided for by Section 13.1 of the Partnership Agreement and consents to (i) the assignment of the Transferred Interest to the Purchaser, and (ii) the substitution of the Purchaser as a Limited Partner in the Partnership in stead of the Seller with respect to the Transferred Interest.  The General Partner acknowledges that all other requirements and conditions for such transfer and the admission of the Purchaser as a substituted Limited Partner with respect to the Transferred Interest have been satisfied or otherwise waived.

      9.    <u>Seller Representations and Warranties</u>.  The Seller hereby represents and warrants, as to itself and the Transferred Interest, to the Purchaser, the Partnership and the General Partner as of the date hereof and as of the Reference Date as follows:

      (a)    The Seller is a corporation and is duly formed under the laws of the State of Delaware.

      (b)    The Seller has all necessary power and authority to enter into, execute and deliver this Agreement and to perform all of the obligations to be performed by it hereunder.  This Agreement has been duly authorized, executed and delivered by the Seller and constitutes its valid and binding obligation, enforceable against it in accordance with its terms, in accordance with its terms.

      (c)    The execution and delivery by the Seller of this Agreement, as well as any other instruments executed in connection with the transactions contemplated by this Agreement, and the consummation by the Seller of the transactions contemplated by this Agreement and such instruments, have been duly authorized by all necessary corporate action on the part of the Seller.

      (d)    Except for the proceedings currently before the Bankruptcy Court regarding the reorganization of certain affiliates of Seller under chapter 11 of the Bankruptcy Code (In re: Lehman Brothers Holdings Inc., *et. al*, Case No. 08-13555, S.D.N.Y., September 15, 2008) (the "<u>Chapter 11 Proceeding</u>"), there is no arbitration, lawsuit, proceeding or investigation pending or, to the knowledge of Seller, threatened against Seller or its affiliates that could prevent or delay the consummation of the transactions contemplated hereby.

      (e)    Neither the execution and delivery of this Agreement nor the performance or consummation of the transactions contemplated hereby will conflict with, result in a breach or violation of, constitute a default under, or accelerate the performance provided by the terms of:  (i) any law, any rule or regulation of any government or any agency of any government, or any judgment, order, writ, decree, permit or license of any court or other agency of any government to which the Seller may be subject; (ii) any contract, agreement, instrument, arrangement or understanding to which the Seller is a party (other than the Partnership Agreement, the Subscription Agreement and the Seller Side Letter) or by which it or any of its assets are bound or committed; or (iii) the Seller's constituent charter documents or other instruments governing the Seller or its operations.  Neither the execution and delivery of this

4

Agreement nor the performance or consummation of the transactions contemplated hereby will constitute an event which, with the lapse of time or action by a third party, could result in the default under any of the foregoing or result in the creation of any Lien upon the Transferred Interest.  With respect to the Transferred Interest (other than the consent of the General Partner to the transfer of the Transferred Interest and the admission of the Purchaser as a Limited Partner of the Partnership), the execution and delivery of this Agreement and the performance and consummation of the transactions contemplated hereby will not require any Approval (as defined below) that the Seller has not obtained on or prior to the Reference Date, or any notice (including with respect to rights of first offer, rights of first refusal and co-sale rights), registration or filing under any law, rule, regulation, judgment, order, writ, decree, permit or license.  "Approval" means any amendment, assignment, waiver or modification of, or any authorization, consent or approval under, any document or instrument, or any authorization, consent or approval by any court, or by any regulatory or tax agency or body, or by any self-regulatory agency, or any notice to or approval by the Bankruptcy Court required pursuant to the Chapter 11 Proceeding, as may be required so that the transactions contemplated by this Agreement may be consummated as provided hereunder without any delay, and shall not result in any default or breach of any contract, agreement, instrument, arrangement or understanding (including, without limitation, with respect to any options, rights of first offer, rights of first refusal and co-sale rights relating to the Transferred Interest) to which the Seller is a party or by which the Seller or any of the Seller's assets are bound or committed.

(f)     The Seller owns all right, title and interest (legal and beneficial) in and to the Transferred Interest, free and clear of all Liens.  All of the Encumbrances (as defined below) potentially applicable to the transaction contemplated by this Agreement have been duly waived or satisfied, or, in the case of any rights of first offer, rights of first refusal or co-sale rights, have been duly waived or all applicable notice periods have expired without such rights having been exercised on or before the Reference Date, by all interested parties.  Other than any Encumbrances arising under the Partnership Agreement, there are no Encumbrances applicable to the Transferred Interest.  Upon the payment for the Transferred Interest in accordance with this Agreement, the Purchaser will acquire good and marketable title to the Transferred Interest, free and clear of all Liens (other than any restrictions on subsequent transfer arising under the Partnership Agreement).  "Encumbrance" means any Lien pertaining to the sale, assignment, disposition, transfer or the voting rights of, on or pertaining to the Transferred Interest (including, without limitation, any Approvals and any other options, rights of first offer, rights of first refusal and co-sale rights) arising out of any contract, agreement, instrument, arrangement or understanding to which the Transferred Interest is subject.

(g)     The Seller has not, except with the prior acknowledgment and written approval by the Purchaser, (i) sold, assigned, transferred, delivered or otherwise disposed of any portion of the Transferred Interest or any direct or indirect interest therein, (ii) forgiven, released, compromised or demanded payment of any indebtedness owed to it with respect to the Transferred Interest other than upon full payment thereof, (iii) amended, canceled or terminated (or consented to the amendment, cancellation or termination of) any of the Seller's rights with respect to the Transferred Interest under the Partnership Agreement or the subscription agreement pursuant to which the Transferred Interest was initially issued to the Purchaser (the "Subscription Agreement"), (iv) created or permitted to exist any Lien on the Transferred Interest other than the Encumbrances, or (v) agreed to do any of the foregoing.

K&E 16787099.14

(h)    The Seller has not directly or indirectly dealt with anyone acting in the capacity of a finder or broker or incurred any obligation for any finder's or broker's fee or commission in connection with the transactions contemplated by this Agreement.

(i)    The Seller is not a "benefit plan investor" within the meaning of the U.S. Department of Labor Regulations.  Neither the execution and delivery of this Agreement nor the performance or consummation of the transactions contemplated hereby by the Seller will result in a nonexempt prohibited transaction under Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and/or Section 4975 of the U.S. Internal Revenue Code, as amended (the "Code").

(j)    Reserved.

(k)    The Seller is a sophisticated, experienced investor, capable of evaluating the value of the Transferred Interest, has made its own due diligence analysis in its decision to sell the Transferred Interest to the Purchaser pursuant to and in accordance with the terms of this Agreement, and has not relied in connection with the sale of the Transferred Interest upon any representations, warranties or agreements of the Purchaser other than those set forth in this Agreement.  The Purchaser has no obligation to provide information to the Seller relating to the value of the Transferred Interest or otherwise, except as specified in this Agreement.

(l)    The Seller is not in material breach of any provision of the Partnership Agreement, the Subscription Agreement, the Seller Side Letter or any other contract, agreement, instrument, arrangement or understanding applicable to the Transferred Interest to which it is a party (other than any document (other than the Partnership Agreement) executed on Seller's behalf pursuant to a power of attorney of which the Seller currently has no knowledge).

(m)    The Transferred Interest was issued in registered, book-entry form and is uncertificated.

10.    Purchaser Representations and Warranties.    The Purchaser hereby represents and warrants to the Seller, the Partnership and the General Partner as of the date hereof and as of the Reference Date as follows:

(a)    The Purchaser is a [_____] and is duly formed, validly existing and in good standing under the laws of the State of **[Delaware]**.

(b)    The Purchaser has all necessary power and authority to enter into, execute and deliver this Agreement and to perform all of the obligations to be performed by it hereunder.  This Agreement has been duly authorized, executed and delivered by the Purchaser and constitutes its valid and binding obligation, enforceable against the Purchaser in accordance with its terms.

(c)    Neither the execution and delivery of this Agreement nor the performance or consummation of the transactions contemplated hereby will conflict with, result in a breach or violation of, constitute a default under, or accelerate the performance provided by the terms of:  (i) any law, any rule or regulation of any government or any agency of any government, or any judgment, order, writ, decree, permit or license of any court or other agency

6

of any government to which the Purchaser may be subject; (ii) any contract, agreement, instrument, arrangement or understanding to which the Purchaser is a party or by which the Purchaser or any of its assets is bound or committed; or (iii) the Purchaser's charter documents or other governing instruments.

(d)    The Purchaser has not directly or indirectly dealt with anyone acting in the capacity of a finder or broker and has not incurred any obligations for any finder's or broker's fee or commission in connection with the transactions contemplated by this Agreement.

11.    <u>Purchaser Representations and Warranties to, and Covenants with, the Partnership and the General Partner</u>.  The Purchaser hereby represents and warrants to, and covenants with, the Partnership and the General Partner as follows:

(a)    The Purchaser has received a copy of the Partnership Agreement and of the Subscription Agreement.  The Purchaser has been furnished and has carefully read the Private Placement Memorandum of the Partnership dated as of June 2009 (as amended or supplemented from time to time, the "<u>Memorandum</u>").  The Purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Transferred Interest, is able to bear the risks of an investment in the Transferred Interest and has a understanding of all of terms, conditions and risks thereof, and other considerations relating to, a purchase of an Interest, including the matters set forth under the caption "Risk Factors" in the Memorandum, and is capable of assuming and willing to assume such risks.

(b)    The Purchaser is aware that, among other risks, (i) the Partnership has a limited financial or operating history, (ii) the General Partner (or another person, firm or entity that is an affiliate of the General Partner) may receive substantial compensation in connection with the management of the Partnership and (iii) no U.S. federal, state, local or non-U.S. agency has passed upon the Interests or made any finding or determination as to the fairness of this investment.  The Purchaser understands the method of computation of the Incentive Allocation and the risks associated with this method of compensation.

(c)    The Transferred Interest is being acquired by the Purchaser for the Purchaser's own account for investment purposes only and not with a view to resale or distribution.  If the Purchaser is acting as trustee, agent, representative nominee or intermediary for another person or entity, the Purchaser understands and acknowledges that the representations and warranties made in this Agreement are made by the Purchaser (i) with respect to the Purchaser and (ii) with respect to such other person or entity on whose behalf the Purchaser is acting.

(d)    The Purchaser understands that the Transferred Interest has not been registered under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>"), the securities laws of any state thereof or the securities laws of any other jurisdiction, nor is such registration contemplated.  The Purchaser understands and agrees further that the Transferred Interest must be held indefinitely unless they are subsequently registered under the Securities Act and these laws or an exemption from registration under the Securities Act and these laws

K&E 16787099.14

covering the sale of Transferred Interest is available. Even if such an exemption is available, the assignability and transferability of the Transferred Interest will be governed by the Partnership Agreement, which imposes substantial restrictions on transfer. The Purchaser understands that legends stating that the Transferred Interest have not been registered under the Securities Act and these laws, and setting out or referring to the restrictions on the transferability and resale of the Transferred Interest will be placed on all documents evidencing the Transferred Interest. The Purchaser's overall commitment to the Partnership and other investments that are not readily marketable is not disproportionate to the Purchaser's net worth, and the Purchaser has no need for immediate liquidity in the Purchaser's investment in the Transferred Interest.

(e)     The Purchaser is, with respect to the Partnership, one person within the meaning of Rule 12g5-1 under the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Purchaser's form of holding its interest in the Partnership is not, and will not be, used primarily to circumvent the provisions of Section 12(g) or Section 15(d) of the Exchange Act.

(f)     To the full satisfaction of the Purchaser, the Purchaser has been furnished any materials the Purchaser has requested relating to the Partnership, the offering of the Transferred Interest or any statement made in the Memorandum, and the Purchaser has been afforded the opportunity to ask questions of representatives of the Partnership concerning the terms and conditions applicable to the Transferred Interest, and to obtain any additional information necessary to verify the accuracy of any representations or information set forth in the Memorandum. The Purchaser acknowledges that no such answer or additional information was inconsistent in any material respect with the Memorandum.

(g)     Other than as set forth herein or in the Memorandum or the Partnership Agreement, the Purchaser is not relying upon any other information (including, without limitation, any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, and any seminars or meetings whose attendees have been invited by any general solicitation or advertising), representation or warranty by the Partnership, the General Partner, their Affiliates or any agent or representative of them, written or otherwise in determining to acquire the Transferred Interest.

(h)     The Purchaser (i) acknowledges that in view of developments in the law and applicable regulations, or other circumstances, the General Partner may require additional information from the Purchaser to remain exempt from or to comply with the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Code, or to comply with or qualify for an exemption from any applicable similar law, and (ii) agrees to provide additional information reasonably requested by the General Partner from time to time to determine whether the Partnership is treated as holding plan assets subject to ERISA, the Code, or any applicable similar law. If the Purchaser has checked "yes" to Question 5.a. in Section C of the Purchaser Questionnaire (as defined below), or is subject to any state or local law similar to ERISA or Section 4975 of the Code, the Purchaser represents that its investment in the Transferred Interest contemplated hereby are in accordance with all requirements applicable to the Purchaser under its governing instruments, ERISA, the Code, and any similar laws. The Purchaser hereby acknowledges and agrees that, for so long as the Partnership is not deemed to hold "plan assets" (within the meaning of the Department of

8

Labor's plan asset regulations, 29 C.F.R. § 2510.3-101, (the "Plan Asset Regulations"), as modified by Section 3(42) of ERISA, the General Partner is not a "fiduciary" (within the meaning of Section 3(21) of ERISA or any applicable similar law) under ERISA or such similar law with respect to any assets of the Purchaser by reason of the Purchaser's investment in the Partnership and that the Purchaser has not and is not relying on the General Partner to provide, and that the General Partner has not provided, any kind of investment advice with respect to the Purchaser's purchase or commitment to purchase the Transferred Interest.

(i)    The Purchaser acknowledges and agrees that the General Partner may, in its sole discretion, require the withdrawal of the Purchaser (in whole or in part) at any time and for any reason, including to assure that the Fund will not be deemed to hold "plan assets" within the meaning of the Plan Asset Regulations, as modified by Section 3(42) of ERISA.

(j)    The Purchaser agrees to provide such information and materials as may from time to time be requested by the General Partner, including the information requested on Exhibit D.  The Purchaser acknowledges that the General Partner is required to verify the source of funds paid to the Partnership by the Purchaser and/or the identity of the Purchaser and persons associated with the Purchaser.

(k)    The Purchaser specifically intends and agrees that the Partnership shall, for U.S. federal income tax purposes, elect to be classified as a partnership, that for U.S. federal, state and local income tax purposes the partners of the Partnership shall constitute partners of the Partnership and that their rights and obligations as partners of the Partnership for U.S. federal, state and income tax purposes are such as are set forth in the Partnership Agreement.  The Purchaser agrees that it will not make any election or take any other action that would cause the relationship of the partners of the Partnership under the Partnership Agreement to be excluded from the application of all or any part of Subchapter K of Chapter 1 of Subtitle A of the Code ("Subchapter K"), from any successor provisions of Subchapter K of the Code or from similar provisions of state law or the law of any foreign jurisdiction.

(l)    The Purchaser understands and acknowledges that the Partnership is not being registered as an "investment company" (as such term is defined in Section 3(a) of the Investment Company Act of 1940, as amended (the "Investment Company Act")) by reason of the provision of Section 3(c)(7) thereof, which excludes from the definition of an investment company any issuer which has not made and does not presently propose to make a public offering of its securities and whose outstanding securities are beneficially owned only by "qualified purchasers" within the meaning of Section 2(a)(51) of the Investment Company Act or "knowledgeable employees" or companies owned exclusively by "knowledgeable employees" pursuant to the rules promulgated thereunder.  The Purchaser understands and acknowledges that the Partnership does not have any intention of registering the Partnership as an "investment company" under the Investment Company Act.  The Purchaser hereby consents to the treatment of the Partnership as a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act with respect to any and all possible future investments, whether or not known or contemplated at this time.  The Purchaser, if it is a corporation, partnership, trust, limited liability company or other form of entity, has received all consents required by subparagraph (C) of

9

Section 2(a) (51) of the Investment Company Act and rules and regulations thereunder in order for the Partnership to be treated as a "qualified purchaser" with respect to any such investment.

(m)    The Purchaser will not transfer or deliver any interest in the Transferred Interest except in accordance with the restrictions set forth in the Partnership Agreement.

(n)    Each of the representations, warranties and statements made by the Purchaser in the Purchaser Questionnaire, an executed copy of which is attached hereto as Exhibit B (the "Purchaser Questionnaire"), is true and correct and incorporated herein by reference.

(o)    The Purchaser understands that the information provided herein will be relied upon by the Partnership for the purpose of determining the eligibility of the Purchaser to purchase Interests in the Partnership. The Purchaser agrees to notify the General Partner immediately if any representation, warranty or information contained in this Agreement, including the Purchaser Questionnaire, becomes untrue at any time. The Purchaser agrees to provide such information and execute and deliver such documents regarding itself and all of its beneficial owners as the Partnership may reasonably request from time to time to verify the accuracy of the Purchaser's representations and warranties herein or to comply with any law, rule or regulation to which the Partnership may be subject, including compliance with anti-money laundering laws and regulations or for any other reasonable purpose.

12.    Covenants.

(a)    The Seller and the Purchaser shall cooperate fully with each other in furnishing any information or performing any action reasonably requested by each to the other party, which information or action is reasonably necessary to the prompt and successful consummation of the transactions contemplated by this Agreement.

(b)    The Seller and the Purchaser shall each bear responsibility for its own expenses associated with the sale, purchase and transfer of the Transferred Interest.

(c)    The Seller and Purchaser agree to cooperate with the General Partner in connection with the Partnership's compliance with any U.S. federal tax requirements related to the transfer of the Interest. Without limitation of the foregoing, (i) the Purchaser agrees to provide to the Partnership such information, and at such time, as is set forth in U.S. Department of Treasury Reg. § 1.743-1(k)(2) (determined as if an election under Code § 754 were in effect for the Partnership) and (ii) if the Seller receives notice that the Partnership is an electing investment partnership under Code § 743(e), the Seller agrees to provide to the Partnership and to the Purchaser such information, and at such time, as is set forth in Section 5A of Internal Revenue Service Notice 2005-32 (or any successor guidance issued by the Internal Revenue Service related thereto).

(d)    The Seller, the Purchaser and the General Partner agree to allocate between the Seller and the Purchaser using the "interim closing of the books" method in accordance with Code § 706 and the Treasury Regulations promulgated thereunder, all items of

income, gain, loss, deduction or credit attributable to the Transferred Interest for the tax year of the Partnership in which the Reference Date occurs.

(e)    The Seller shall not withhold under Code § 1445.

13.    <u>Anti-Money Laundering</u>.

(a)    Reserved.

(b)    The Purchaser represents and warrants to the General Partner and the Partnership that the Purchaser has implemented, complies with and will comply with anti-money laundering policies and procedures that satisfy and will continue to satisfy the requirements of applicable anti-money laundering laws and regulations, including, if the Purchaser is subject to the laws of the United States, the United States Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "<u>USA PATRIOT ACT</u>").

(c)    The Purchaser represents and warrants to the General Partner and the Partnership that in the event that it is, receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "<u>Non-U.S. Bank</u>") in connection with the Purchaser's investment in the Transferred Interest, such Non-U.S. Bank:  (i) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities; (ii) employs one or more individuals on a full-time basis; (iii) maintains operating records related to its banking activities; (iv) is subject to inspection by the banking authority that licensed it to conduct banking activities; and (v) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered Affiliate.  The Purchaser further agrees and acknowledges that, among other remedial measures, (i) the Partnership may be obligated to "freeze the account" of such Purchaser, either by prohibiting additional investments by the Purchaser and/or segregating assets of the Purchaser in compliance with governmental regulations and/or if the General Partner determines in its sole discretion that such action is in the best interests of the Partnership and (ii) the Partnership may be required to report such action or confidential information relating to the Purchaser (including, without limitation, disclosing the Purchaser's identity) to the regulatory authorities.  The Purchaser further agrees:  (i) that the Purchaser shall promptly notify the General Partner if any of these representations cease to be true and accurate with respect to the Purchaser; (ii) to provide to the General Partner any additional information regarding the Purchaser that the General Partner deems necessary or appropriate to ensure compliance with all applicable laws concerning money laundering and similar activities; and (iii) that if at any time it is discovered that any of the foregoing representations are incorrect, or if otherwise required by applicable law or regulation related to money laundering and similar activities, the General Partner may, in its sole discretion, undertake appropriate actions to ensure compliance with applicable law or regulation, including but not limited to freezing, segregating or requiring a Purchaser to withdraw the Transferred Interest.  The Purchaser further understands that the Partnership or the General Partner may release confidential information about the Purchaser and, if applicable, any underlying beneficial

11

ownership, to proper authorities if the General Partner, in its sole discretion, determines that it is in the best interests of the Partnership in light of relevant rules and regulations concerning money laundering and similar activities.    The Purchaser further understands the Partnership's administrator, SEI Investments Developments, Inc. ("SEI"), in accordance with its anti-money laundering procedures ("SEI AML Procedures"), reserves the right to prohibit the movement of any monies if all due diligence requirements have not been met, or, if for any reason, SEI Investments feels that the origin of the funds or the parties involved is suspicious. In the event that the movement of monies is withheld in accordance with SEI AML Procedures, SEI personnel intend to strictly adhere to all applicable laws, and will notify the Partnership as soon as professional discretion allows or as otherwise permitted by law.

(d)    The Purchaser represents and warrants to, and agrees with, the General Partner and the Partnership that, notwithstanding anything to the contrary contained in the Partnership Agreement or any other agreement, to the extent required by any anti-money laundering law or regulation, the Partnership or the General Partner, as applicable, may prohibit additional capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Transferred Interest, and the Purchaser shall have no claim, and shall not pursue any claim, against the Partnership, the General Partner, the Investment Manager or any other person or entity in connection therewith.

(e)    The Purchaser hereby agrees to promptly provide such additional information and representations as the General Partner may request to ensure compliance with all applicable anti-money laundering laws and regulations.

14.    Electronic Communications.

(a)    On behalf of the Partnership, the General Partner expects to provide Limited Partners (including the Purchaser) electronically information relating to the Partnership or the Purchaser's investment and personal information.  Although this may be of benefit, it is important to note that:

(i)    electronic communications will not be encrypted and may not be secure, may contain computer viruses or other defects, may not be accurately replicated on other systems or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. Such communications may be sent to other authorized parties and service providers to the Partnership, including but not limited to the General Partner, the custodian, the prime broker, the auditor, the trustee or any relevant authority where appropriate; and

(ii)    the information may be located outside of the United States and may need to be disclosed to third parties; e.g. those involved with the maintenance of the website, and could be accessed by unauthorized persons.

(b)    By execution of this Agreement the Purchaser agrees to receive electronic communications containing information relating to the Partnership, including but not limited to the Purchaser's investment and personal information, and any notices provided for under the Partnership Agreement.  By doing so, subject to the General Partner's standard of care

12

under the Partnership Agreement, the Purchaser agrees to release the Partnership, the General Partner and any authorized persons:

        (i)     from their duty, in connection with the transmission of any such electronic communications, to protect the confidentiality of information relating to the Fund, including but not limited to the Purchaser's personal and investment information; and

        (ii)    from and against all costs, claims, demands, liabilities, expenses, damages or losses (including, without limitation, consequential losses and loss of profit and all interest, penalties and legal and other professional costs and expenses) arising out of or in connection with the communication or publication of information relating to the Partnership through the transmission of any such electronic communications, including but not limited to the Investor's investment and personal information.

      15.   <u>General Partner's Legal Counsel</u>.  The Purchaser and the Seller each represents and warrants to the General Partner as of the date hereof and as of the Reference Date that each it has been advised that the General Partner has retained Kirkland & Ellis LLP in connection with the management and operation of the Partnership and related matters, including the transactions contemplated by this Agreement, and, including making, holding and disposing of investments.  Kirkland & Ellis LLP is not representing and will not represent the Seller, the Purchaser in connection with this Agreement, the management and operation of the Partnership, or any dispute that may arise between any limited partner on one hand and the General Partner and/or the Partnership on the other hand (the "<u>Fund Legal Matters</u>").  Furthermore, the Purchaser acknowledges and agrees that (i) Kirkland & Ellis LLP's representation of the General Partner is limited to specific matters with respect to which it has been specifically retained and consulted by the General Partner and its affiliates, (ii) there may exist other matters that could have a bearing on the Partnership, the Partnership's investments and portfolio companies, the General Partner and/or their affiliates as to which Kirkland & Ellis LLP has been neither retained nor consulted, (iii) Kirkland & Ellis LLP does not undertake to monitor the compliance of the General Partner and its affiliates with the investment program and other investment guidelines and procedures set forth in the Partnership's Private Placement Memorandum and the Partnership Agreement, nor does Kirkland & Ellis LLP monitor compliance by the Partnership, the General Partner and/or their affiliates with applicable laws, unless in each case Kirkland & Ellis LLP has been specifically retained to do so, (iv) Kirkland & Ellis LLP does not investigate or verify the accuracy and completeness of information set forth in the Partnership's Private Placement Memorandum concerning the Partnership, the General Partner or any of their respective affiliates and personnel or investments or portfolio companies and (v) Kirkland & Ellis LLP is not providing any advice, opinion, warranty or other assurance of any kind as to any matter to the Seller or the Purchaser in connection with the transactions contemplated by this Agreement.  The Purchaser will, if it wishes counsel on a Fund Legal Matter, retain its own independent counsel with respect thereto and will pay all fees and expenses of such independent counsel.

      16.   <u>Certain Information</u>.  The Seller and Purchaser acknowledge and agree that each of the Partnership, the Investment Manager, the General Partner, their affiliates and

their respective directors, officers, employees, partners, members, shareholders and agents (collectively, "Silver Lake") expressly disclaims any and all liability, and shall have no liability whatsoever, for representations or warranties, express or implied, contained in, or for omissions from, any written or oral information made available by or on behalf of Silver Lake or any other party to Seller or Purchaser (or made available by Seller and Purchaser to each other) in connection with the transactions contemplated by this Agreement.  Each of the Seller and the Purchaser expressly acknowledges that it is not relying upon any information (other than the Book Capital Account balance relating to the Transferred Interest), representation or warranty by Silver Lake in determining to sell or purchase, as applicable, the Transferred Interest and that Silver Lake has not made any representations or warranties to the Seller or the Purchaser, as applicable, in connection therewith.  Each of the Seller and the Purchaser acknowledges that it has, independently and without reliance upon Silver Lake, and based on such documents and information as the Seller or the Purchaser, as applicable, has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition, investment merits and consequences of its sale or purchase, as applicable, of the Transferred Interest and made its own decision with respect to its sale or purchase, as applicable, of the Transferred Interest.  Each of the Seller and the Purchaser represents and warrants to Silver Lake that the Seller or the Purchaser, respectively, has consulted to the extent deemed appropriate by it with its own advisers as to the financial, tax, accounting, legal and related matters concerning a sale or purchase, as applicable, of the Transferred Interest (including, without limitation, all of the terms and conditions relating to such transaction, such as price and any discount or premium to face value, any closing conditions, any indemnification obligations and any other provisions relating thereto) and on that basis understands the consequences of a sale or purchase, as applicable, of the Transferred Interest, and believes that a sale or purchase, as applicable, of the Transferred Interest is suitable and appropriate for it.  Each of the Seller and the Purchaser acknowledges that Silver Lake has confidential information relating to the Partnership and its investments that has not been disclosed to the Seller or the Purchaser, as applicable, and that notwithstanding such non-disclosure the Seller or the Purchaser, as applicable, has received information deemed by it to be sufficient to allow it to make an independent and informed decision with respect to its sale or purchase, as applicable, of the Transferred Interest.

17.    Indemnification by Seller.

(a)    The Seller hereby agrees to defend, indemnify and hold harmless the Purchaser from and against any damage, liability, loss, cost or expense (including reasonable attorneys' fees) occasioned or caused by, resulting from or arising out of:

(i)    any breach or other failure by the Seller to perform any of its covenants or obligations as set forth in this Agreement;

(ii)    any inaccuracy in or breach of any of the representations or warranties of the Seller set forth in this Agreement;

(iii)    any Excluded Obligation; and/or

K&E 16787099.14

(iv)    any and all actions, suits, litigations, arbitrations, proceedings, investigations or claims arising out of any of the foregoing.

(b)    The Seller agrees to indemnify the Partnership and the General Partner, including their respective affiliates and their respective directors, officers, employees, partners, members, shareholders, agents and representatives, from and against any Damages due to or arising out of a breach of any representation, warranty or agreement of the Seller contained in this Agreement; provided, that the Seller's indemnification obligations hereunder shall not apply to any Damages due solely to or arising solely out of any acts or omissions of the Purchaser; and provided, further, that the obligation to indemnify hereunder shall be limited by the provisions of applicable law.

18.    Indemnification by Purchaser.

(a)    The Purchaser shall defend, indemnify and hold harmless the Seller from and against any damage, liability, loss, cost or expense (including reasonable attorneys' fees) occasioned or caused by, resulting from or arising out of:

(i)    any breach by the Purchaser of, or other failure by the Purchaser to perform, any of its covenants or obligations as set forth in this Agreement or in any certificate or instrument delivered pursuant to this Agreement;

(ii)    any inaccuracy in or breach of any of the representations or warranties of such Purchaser set forth in this Agreement; and/or

(iii)    any and all litigation, actions, suits, arbitrations, proceedings, investigations or claims arising out of any of such Purchaser's foregoing representations or warranties.

(b)    The Purchaser agrees to indemnify the Partnership, the General Partner, the Investment Manager and each Limited Partner, including their respective affiliates and their respective directors, officers, employees, partners, members, shareholders, agents and representatives, from and against any loss, damage or liability ("Damages") due to or arising out of this Agreement and assignment, including, without limitation, a breach of any representation, warranty or agreement of the Purchaser contained in this Agreement (including the Purchaser Questionnaire), in any other document provided by the Purchaser to the Partnership or in any agreement (other than the Partnership Agreement) executed by the Purchaser with the Partnership or the General Partner in connection with the Purchaser's investment in Interests or the transactions contemplated hereby; provided, that the Purchaser's indemnification obligations hereunder shall not apply to any Damages due solely to or arising solely out of any acts or omissions of the Seller; and provided, further, that the obligation to indemnify hereunder shall be limited by the provisions of applicable law.

19.    Power of Attorney.

(a)    The Purchaser by executing this Agreement hereby appoints the General Partner, with full power of substitution, as the Purchaser's true and lawful representative and attorney-in-fact, and agent of the Purchaser, to execute, acknowledge, verify, swear to,

K&E 16787099.14

deliver, record and file, in the Purchaser's name, place and stead, the Partnership Agreement, any amendments to the Partnership Agreement (approved in accordance therewith) or any other document, deed, agreement or instrument that the General Partner deems appropriate solely to give effect to the purchase, sale and transfer of the Transferred Interest and the other transactions contemplated hereby and to admit the Purchaser as a Limited Partner of the Partnership. The Purchaser hereby empowers each attorney in fact acting pursuant hereto to determine in its sole discretion the time when, purpose for and manner in which any power herein conferred upon it shall be exercised, and the conditions, provisions and covenants of any instruments or documents that may be executed by it pursuant hereto. The powers of attorney granted herein shall be deemed to be coupled with an interest, shall be irrevocable and shall survive the death, incompetency, disability or dissolution of the Purchaser.

(b)    The appointment of attorney-in-fact provided in this Section 19 shall not revoke, in whole or in part, any powers of attorney previously or contemporaneously executed by the undersigned (including the power of attorney contained in the Partnership Agreement or any other power of attorney executed in connection with investing in the Partnership). This appointment shall not be revoked by any subsequent or contemporaneous power of attorney (including the power of attorney contained in the Partnership Agreement or any other power of attorney executed in connection with investing in the Partnership) that the undersigned may execute, unless the General Partner agrees and (i) such subsequent power of attorney specifically provides that it revokes the power of attorney provided by this Section 19 by referring to the power of attorney provided by this Section 19 and the name of the agent appointed hereby as attorney-in-fact and (ii) a copy of such subsequent power of attorney is provided to the agent appointed hereby.

(c)    The Purchaser agrees to execute such other documents as the General Partner may reasonably request in order to effect the intention and purposes of the power of attorney contemplated by this Section 19. Without limiting the foregoing, the Purchaser shall complete the form of power of attorney contained in Exhibit A and, if applicable, Exhibit C.

20.    <u>Confidentiality</u>. All information furnished by the Purchaser to the Seller or by the Seller to the Purchaser (or their respective agents), or by any other person or entity to the Purchaser or the Seller, in connection with this Agreement and the transactions contemplated hereby, as well as the terms, conditions and provisions of this Agreement and the transactions contemplated hereby, including the Purchase Price, shall be kept confidential by the Seller and the Purchaser and shall only be used by the Seller and the Purchasers in connection with this Agreement and the transactions contemplated hereby, except to the extent that such information (i) is already known on a non-confidential basis by the party to whom the information is disclosed or in the public domain at the time the information is disclosed, (ii) thereafter becomes lawfully obtainable from other sources, (iii) is required to be disclosed to any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign or (iv) is required under securities laws or regulations applicable to the Seller or a Purchaser (including notice of the transactions contemplated hereby given pursuant to rules and regulations of the Securities and Exchange Commission); <u>provided</u>, <u>however</u>, that (x) in the case of any disclosure pursuant to clause (iii) or (iv) hereof, the disclosing party must advise the other parties hereto of any such disclosure as far in advance of

such disclosure as reasonably practicable, (y) the Seller and the Purchaser may disclose such information to their partners, directors, officers, investors, advisors, trustees and representatives, but only to the extent that such persons have been informed of the confidential nature of such information and (z) any disclosures pursuant to this Section 20 are further subject to the provisions of the Partnership Agreement (including, without limitation, Section 22.14 thereof).

        21.   <u>Miscellaneous</u>.

        (a)   This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. A facsimile signature page hereto shall be treated by the parties for all purposes as equivalent to a manually signed signature page.

        (b)   Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court; provided, however, that if the Bankruptcy Court does not have or abstains from exercising such jurisdiction, the parties hereto agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court having jurisdiction over an appeal from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. This Agreement (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law principles that might lead to the application of the laws of any other jurisdiction, except to the extent that the laws of the State of New York are superseded by the Bankruptcy Code.

        (c)   No amendment or waiver of this Agreement shall be effective without the prior written consent of the General Partner and the Party against whom such amendment or waiver is sought to be enforced.

        (d)   Neither the Seller nor the Purchaser may assign or delegate, respectively, any of its rights or obligations hereunder without the prior written consent to such assignment or delegation by the General Partner and each of the other parties hereto; <u>provided</u>, <u>however</u>, that following prior written notice to the General Partner, the Seller may assign and delegate, respectively, all of its rights and obligations hereunder to an affiliate or a liquidating

trust or similar vehicle in connection with the consummation of Seller's Chapter 11 Plan of Reorganization without the prior consent of any other Party.

(e)    The Seller and the Purchaser each acknowledges that it participated in, or had the meaningful opportunity to participate in, the negotiation and drafting of this Agreement.  In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed to be the product of meaningful negotiations among the General Partner, the Seller and the Purchaser and no presumption or burden of proof shall arise favoring or disfavoring any of them by virtue of the authorship of any of the provisions of this Agreement.

(f)    All of the Seller's and the Purchaser's respective representations and warranties shall survive in perpetuity following the execution and delivery of this Agreement and the sale and purchase of the Transferred Interest.

(g)    If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of this Agreement.

(h)    The parties hereto acknowledge and agree that the General Partner and the Partnership are intended beneficiaries of each and every provision of this Agreement.  This Agreement and each provision hereof will inure to the benefit of and be enforceable by the General Partner, the Partnership and their respective successors and assigns.

(i)    Each of the Seller and the Purchaser shall execute and deliver such additional documents, certificates and instruments, and to perform such additional acts, as may be reasonably requested and necessary or appropriate to carry out all of the provisions of this Agreement and to consummate all of the transactions contemplated by this Agreement.

(j)    Each of the Seller and the Purchaser acknowledges that the other such party will have no adequate remedy at law if the Seller or the Purchaser, respectively, fails to perform any of its obligations under this Agreement.  In such event, each of such parties agrees that the other such party shall have the right, in addition to any other rights it may have (whether at law or in equity), to specific performance of this Agreement.

(k)    This Agreement, together with all exhibits hereto (which are incorporated herein by reference), supersedes any other agreement (including any confidentiality agreement entered into by any affiliate of the Purchaser with respect to the Transferred Interest), whether written or oral, that may have been made or entered into by the parties hereto relating to the matters contemplated hereby, and constitutes the entire agreement of the parties hereto with respect to the subject matter hereof.

(l)    THE SELLER, THE PURCHASER AND THE GENERAL PARTNER, ON BEHALF OF ITSELF AND THE PARTNERSHIP, IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, THE PARTNERSHIP AGREEMENT OR THE PARTNERSHIP'S PRIVATE PLACEMENT MEMORANDUM.

K&E 16787099.14

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

SELLER:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name:
    Title:

PURCHASER:

[_____]

By: _____
    Name:
    Title:

GENERAL PARTNER:

SILVER LAKE FINANCIAL ASSOCIATES, L.P.

By: SLFA (GP), L.L.C., its general partner

By: _____
    Name:
    Title:

## SELLER ACKNOWLEDGMENT

State of              )
                             ):ss:
County of           )

        The undersigned hereby acknowledges that as of the ___ day of _____, 2010 there did appear before him/her _____, who, being duly sworn, did depose and acknowledge, that he/she is the Seller, and, as such, did execute the foregoing Assignment and Assumption Agreement for the uses and purposes therein stated, being thereunto duly authorized.


_____
              Notary Public

**PURCHASER ACKNOWLEDGMENT**

State of                          )
                                 ):ss:
County of                        )


      The undersigned hereby acknowledges that as of the ___ day of _____, 2010 there did appear before him/her _____, who, being duly sworn, did depose and acknowledge, that he/she is the Purchaser, and, as such, did execute the foregoing Assignment and Assumption Agreement for the uses and purposes therein stated, being thereunto duly authorized.


                                    _____
                                         Notary Public

## **EXHIBIT A**

## **Power of Attorney**

(To be executed by Purchaser and notarized)

K&E 16787099.14

_____
Name of Investor
(Please Print or Type)

## SILVER LAKE CREDIT FUND, L.P.
## POWER OF ATTORNEY

The undersigned hereby constitutes, appoints and grants Silver Lake Financial Associates, L.P., a Delaware limited partnership, and each other person or entity that is or becomes a general partner of Silver Lake Credit Fund, L.P. a Delaware limited partnership (the "Partnership") after the Partnership's initial closing date (collectively, the "General Partner"), and each member of the General Partner, as the undersigned's true and lawful representative and attorney-in-fact, in the undersigned's name, place and stead to:

1.      make, execute, sign and file a Certificate of Limited Partnership of the Partnership, any amendment thereof required by law or deemed advisable by the General Partner and all such other instruments, documents and certificates as may from time to time be required by the laws of the United States of America, the State of Delaware, New York or California, and any other state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement or continue the valid subsisting existence of the Partnership;

2.      make, execute and sign all consents, approvals, waivers, certificates and other instruments, including without limitation amendments to this Agreement, that the General Partner deems appropriate or necessary to make, evidence, give, confirm or ratify any vote, consent, approval, waiver, agreement, or other action made or given by the Partners under the Partnership's Agreement of Limited Partnership, as the same may be amended from time to time (the "**Agreement**"), or consistent with the terms of the Agreement or to effectuate the terms or intent of the Agreement; provided, however, that when required by any provision of the Agreement which establishes that consent or approval of the Partnership's limited partners ("**Limited Partners**") is required to take any action, the General Partner may exercise the power of attorney made in this Section only after the necessary consent or approval by the Limited Partners is obtained;

3.      effectuate the forfeiture of fifty percent (50%) of the undersigned's interest in the Partnership pursuant to Article XX(d) of the Agreement;

4.      sell such Partner's interest in the Partnership pursuant to Article XX(e) of the Agreement;

5.      take any action that the General Partner shall consider advisable in connection with the exercise of authority granted in the Agreement; and

6.      take any other actions incidental, convenient or necessary to carry out the foregoing.

A-2

The undersigned hereby empowers each attorney-in-fact acting pursuant hereto to determine in its sole discretion the time when, purpose for and manner in which any power herein conferred upon it shall be exercised, and the conditions, provisions and covenants of any instruments or documents which may be executed by it pursuant hereto; provided, however, that the powers of attorney granted herein shall only be exercised in accordance with the Agreement and clauses 1 through 6 above.   The powers of attorney granted herein are coupled with an interest in favor of the General Partner and as such (a) shall be irrevocable and continue in full force and effect notwithstanding the subsequent death, incompetency, incapacity, disability, insolvency or dissolution of the undersigned regardless of whether the Partnership or the General Partner has notice thereof and (b) shall survive the delivery of an assignment by the undersigned of the whole or any portion of its interest in the Partnership, except that if the assignee thereof has been approved for admission to the Partnership as a substitute limited partner, this Power of Attorney given by the assignor shall survive the delivery of the assignment for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect the substitution.  The powers of attorney granted herein shall not be deemed to constitute a written consent of the undersigned for purposes of Article XII of the Agreement.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Agreement.

This Power of Attorney shall be governed and construed in accordance with the laws of the State of Delaware.

* * * * *

A-3

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney on the date set forth below.

Dated _____ ____, _____

INDIVIDUAL INVESTOR:

_____
(Print Name)

_____
(Signature)

PARTNERSHIP, CORPORATION, LIMITED
LIABILITY COMPANY, TRUST, CUSTODIAL
ACCOUNT, OTHER INVESTOR:

_____
(Print Name of Entity)

By: _____
(Signature)

_____
(Print Name and Title)

EXECUTED AND SWORN to
before me this _____ day
of _____, _____.

_____
Notary Public

My Commission Expires:

_____

# EXHIBIT B

## Purchaser Questionnaire

(To be executed by Purchaser)

K&E 16787099.14

## PURCHASER QUESTIONNAIRE*

**A.    General Information**

1.    Print Full Name of Investor:        Individual:

_____

First            Middle            Last

_____

Date of Birth

Partnership, Corporation, Trust, Limited Liability
Company, Custodial Account, Other:

_____

Name of Entity

2.    Address for Notices:        _____

_____

_____

3.    Telephone Number:        _____

4.    Facsimile Number:        _____

5.    Permanent Address:        _____
(if different from address
for Notices above)        _____

_____

6.    U.S. Taxpayer Identification or
Social Security Number:        _____

7.    E-mail address:        _____

---

*    **If additional space is required, please provide the information in a separate attachment to this
questionnaire or copy this page to add additional contacts.**

Pursuant to Section 22.5(c) of the Partnership Agreement, the Investor may elect **not** to receive notices, reports, requests, demands, consents and other communication via the Partnership's intranet website by checking the box below.

☐ Intranet website opt-out. If checking this box, please indicate preferred method of delivery (fax, e-mail, or mail): _____.

8.    Primary Contact Person for this Account:

Name: _____

Address: _____

_____

Telephone: _____

Fax: _____

E-mail: _____

9.    Please indicate authorized signers and their preferred method of distribution (fax, e-mail, or mail). NOTE: At least three authorized signers are required for non-individual investors.

Name: _____    Distribution Method:_____

Name: _____    Distribution Method:_____

Name: _____    Distribution Method:_____

Name: _____    Distribution Method:_____

Name: _____    Distribution Method:_____

10.    Please provide your wiring escrow account information for your Capital Commitment:

Bank Name: _____

Bank Location: _____

Telephone Number of Bank: _____

Facsimile Number of Bank: _____

B-3

Name of Banking Officer: _____

Account Number: _____

Account Name: _____

For further credit to (if any): _____

____ _____

Reference: _____

11.    For distributions of cash, please wire funds to the following bank account:

Bank Name: _____

Bank Location: _____

Telephone Number of Bank: _____

Facsimile Number of Bank: _____

Name of Banking Officer: _____

Account Number: _____

Account Name: _____

For further credit to (if any): _____

____ _____

Reference: _____

*Please be advised that any disbursements will automatically be sent as indicated above unless the Partnership is notified otherwise in writing.*

12.    For distributions in-kind, please:

Credit securities to my brokerage account at the following firm:

Firm Name: _____

Address: _____

Telephone Number: _____

Account Name: _____

Account Number: _____

B-4

Name of Contact Person at Firm: _____

*Please be advised that if the above information is not provided or electronic share delivery is not reasonably practicable, distributions in-kind will be sent to the Investor at the Investor's address provided above unless the Partnership is notified otherwise in writing.*

13.     If the Investor would like to opt for **automatic annual income distributions**, please indicate below along with the applicable percentage.  This automatic annual withdrawal would be from the Investor's Book Capital Account as of the end of each Fiscal Year equal to the percentage you indicate below multiplied by the amount, if positive, of any realized Net Profit allocated to the Investor for such Fiscal Year.  In making such election, the Investor acknowledges, accepts and agrees that the Partnership Agreement will govern all terms and conditions of such a withdrawal, including, without limitation, the amount, timing and nature of the payment of amounts so withdrawn, and the circumstances under which the General Partner may elect to limit or suspend such withdrawals.

YES                    % desired:

☐                    _____ %

## B.      Accredited Investor Status

The Purchaser represents and warrants that the Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and has checked the box or boxes below which are next to the category or categories under which the Purchaser qualifies as an accredited investor:

FOR INDIVIDUALS:

☐      (A)      A natural person with individual net worth (or joint net worth with spouse) in excess of $1 million.  For purposes of this item, "net worth" means the excess of total assets at fair market value, including home, home furnishings and automobiles (and including property owned by a spouse), over total liabilities.

☐      (B)      A natural person with individual income (not including any income of the Investor's spouse) in excess of $200,000, or joint income with spouse in excess of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.

B-5

FOR ENTITIES:

☐    (C)    An entity, including a grantor trust, in which all of the equity owners are accredited investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust is an equity owner).

☐    (D)    A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity.

☐    (E)    An insurance company as defined in Section 2(a)(13) of the Securities Act.

☐    (F)    A broker or dealer registered pursuant to Section 15 of the Exchange Act.

☐    (G)    An investment company registered under the Investment Company Act.

☐    (H)    A business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐    (I)    A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, as amended.

☐    (J)    A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

☐    (K)    (A) an organization described in Section 501(c)(3) of the Code, (B) a corporation, limited liability company or partnership or (C) a Massachusetts or similar business trust , in each  case (i) not formed for the specific purpose of acquiring Interests and (ii)  with total assets in excess of $5 million.

☐    (L)    A trust with total assets in excess of $5 million, not formed for the specific purpose of acquiring Interests, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Interests., as defined in Rule 506(b)(2)(ii) of Regulation D under the Securities Act.

☐    (M)    An employee benefit plan within the meaning of ERISA where (i) the decision to invest in the Interests is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, (ii) the

B-6

employee benefit plan has total assets in excess of $5 million ,or (iii) the employee benefit plan is a self-directed plan, with investment decisions made solely by persons that are accredited investors.

☐        (N)        A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5 million.

**C.        Supplemental Data for Entities**

1.        If the Purchaser is not a natural person, furnish the following supplemental data (natural persons may skip this Section of the Purchaser Questionnaire, and proceed to Section D):

Legal form of entity (trust, corporation, partnership, limited liability company, benefit plan, etc.):

_____
_____.

Jurisdiction of organization: _____

2.        Was the Purchaser organized or reorganized for the specific purpose of acquiring Interests?

☐    Yes        ☐    No

If the answer to the above question is "Yes," please contact Kirkland & Ellis LLP for additional information that will be required.

3.a.        Is the Purchaser a grantor trust, a partnership or an S-Corporation for U.S. federal income tax purposes?

☐    Yes        ☐    No

3.b.        If the question above was answered "Yes," please indicate whether or not:

(i)        more than 50 percent of the value of the ownership interest of any beneficial owner in the Investor is (or may at any time during the term of the Partnership be) attributable to the Purchaser 's (direct or indirect) interest in the Partnership; or

☐    Yes        ☐    No

B-7

K&E 16787099.14

(ii)    it is a principal purpose of the Purchaser 's participation in the Partnership to permit the Partnership to satisfy the 100 partner limitation contained in U.S. Treasury Regulation Section 1.7704-1(h)(3).

☐   Yes      ☐   No

If either question above was answered "Yes," please contact Kirkland & Ellis LLP for additional information that will be required.

4.     Are shareholders, partners or other holders of equity or beneficial interests in the Investor able to decide individually whether to participate, or the extent of their participation, in the Purchaser's investment in the Partnership (i.e., can shareholders, partners or other holders of equity or beneficial interests in the Purchaser determine whether their capital will form part of the capital invested by the Purchaser in the Partnership)?

☐   Yes      ☐   No

If the answer to the above question is "Yes," please contact Kirkland & Ellis LLP for additional information that will be required.

5.a.    Do any of the assets of the Investor constitute "plan assets" within the meaning of the Plan Asset Regulations as in effect immediately *after* the effective date of Section 3(42) of ERISA as added by the Pension Protection Act of 2006?

☐   Yes      ☐   No

5.b.    If the Purchaser checked "yes" to 5.a., it must also check <u>all of the</u> boxes below that describe the Purchaser.  The Purchaser is:

☐  (a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA that is subject to Part 4 of Subtitle B of Title I of ERISA or to Section 4975 of the Code.

☐  (b) an insurance company separate account that includes assets of an "employee benefit plan" within the meaning of Section 3(3) of ERISA or of a "plan" described in Section 4975(e) of the Code, and the "employee benefit plan" or "plan" is subject to Part 4 of Subtitle B of Title I of ERISA or to Section 4975 of the Code.

☐  (c) an insurance company general account the assets of which are treated as including "plan assets" subject to Part 4 of Subtitle B of Title I of ERISA or to Section 4975 of the Code to the extent of ____% of the Purchaser's assets (as determined under Prohibited Transaction Class Exemption 95-60).

☐  (d) a trust, partnership, fund or other entity, other than an insurance company separate or general account, whose underlying assets would be treated, in whole or in part, as including "plan assets" under the Plan Asset Regulations <u>*as modified by Section 3(42) of ERISA*</u>.  If the Purchaser checked this box, the percentage of "plan assets" (under the Plan

K&E 16787099.14

Asset Regulations) in the trust, partnership or other entity is and will continue to be
____%.

6.  Please indicate by checking the appropriate box below whether the Purchaser is a person who has discretionary authority or control with respect to the assets of the Partnership or any person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of such person:

☐ Yes    ☐ No

7.a.  Is the Purchaser a private investment company which is not registered under the Investment Company Act in reliance on:

Section 3(c)(1) thereof?    ☐ Yes    ☐ No

Section 3(c)(7) thereof?    ☐ Yes    ☐ No

7.b.  If question 7.a. was answered "Yes," please indicate whether or not the Purchaser was formed on or before April 30, 1996.

☐ Yes    ☐ No

7.c.  If question 7.b. was answered "Yes," please indicate whether or not the Purchaser has obtained the consent of its direct and indirect beneficial owners to be treated as a "qualified purchaser" as provided in Section 2(a)(51)(C) of the Investment Company Act and the rules and regulations thereunder.

☐ Yes    ☐ No

If question 7.c. was answered "No," please contact Kirkland & Ellis LLP for additional information that will be required.

8.  Is the Purchaser an "investment company" registered or required to be registered under the Investment Company Act?

☐ Yes    ☐ No

9.  Does the amount of the Purchaser's subscription for Interests in the Partnership exceed 40% of the total assets (on a consolidated basis with its subsidiaries) of the Purchaser?

☐ Yes    ☐ No

If the answer to the above question is "Yes," please contact Kirkland & Ellis LLP for additional information that will be required.

B-9

10.    Is the Purchaser generally exempt from taxation under the Code?

☐    Yes    ☐    No

11.    Is the Purchaser a "BHC Partner" as such term is defined in Article One of the Partnership Agreement?

☐    Yes    ☐    No

12.    If the Purchaser's tax year ends on a date other than December 31, please indicate such date below:

_____

13.    Is the Purchaser subject to the Freedom of Information Act, 5 U.S.C. § 552, ("FOIA"), any state public records access laws, any state or other jurisdiction's laws similar in intent or effect to FOIA, or any other similar statutory or legal right that might result in the disclosure of confidential information relating to the Partnership?

☐    Yes    ☐    No

If the question above was answered "Yes," please indicate the relevant laws to which the Investor is subject and provide any additional explanatory information in the space below:

_____
_____
_____
_____

14.    What percentage of the Purchaser is owned by non-United States persons or entities?

_____%

15.    Is the Purchaser (a) a trust any portion of which is treated (under subpart E of part I of subchapter J of chapter 1 of subtitle A of the Code) as owned by a natural person (*e.g.*, a grantor trust), (b) an entity disregarded for U.S. federal income tax purposes and owned (or treated as owned) by a natural person or a trust described in clause (a) of this sentence (*e.g.*, a limited liability company with a single member), (c) an organization described in Section 401(a), Section 501(c)(17) or Section 509(a) of the Code, or (d) a trust permanently set aside or to be used for a charitable purpose?

☐    Yes    ☐    No

If the above question was answered "Yes," please contact Kirkland & Ellis LLP for additional information that will be required.

B-10

**D.      Related Parties**

1.      To the best of the Purchaser's knowledge, does the Purchaser control, or is the Purchaser controlled by or under common control with, any other investor in the Partnership?

☐    Yes    ☐    No

If question 1 was answered "Yes," please identify such related investor(s) below.

Names of related investor(s):  _____

2.      Will any other person or entity have a beneficial interest in the Interests to be acquired hereunder (other than as a shareholder, partner, policy owner or other beneficial owner of equity interests in the Purchaser)?  (By way of example, and not limitation, "nominee" Investors would be required to check "Yes" below.)

☐    Yes    ☐    No

If either question above was answered "Yes," please contact Kirkland & Ellis LLP for additional information that will be required.

**E.      Supplemental Data for Individuals**

1.      Are you investing the assets of any retirement plan account, employee benefit plan or other similar arrangement, such as an IRA or a "Keogh" plan?

☐    Yes    ☐    No

If the question above was answered "Yes," please contact Kirkland & Ellis LLP for additional information that will be required.

2.      The Purchaser is executing the Subscription Agreement and the other documents related thereto while in the State of New York.

_____ True        _____ False

If the box above was checked "True," please refer to Exhibit 1 of this Subscription Agreement for important information and materials that must be read and completed in conjunction with this Purchaser Questionnaire.

**F.      Qualified Purchaser Status**

The Purchaser represents and warrants that the Purchaser is a "qualified purchaser" within the meaning of Section 2(a)(51) of the Investment Company Act and has checked the box or boxes below which are next to the category or categories under which the Purchaser qualifies as a qualified purchaser.  In order to complete the following information, the Purchaser must read

K&E 16787099.14

Annexes 1 and 2 to this Purchaser Questionnaire for the definition of "investments" and for information regarding the "valuation of investments," respectively. The Purchaser agrees to provide such further information and execute and deliver such documents as the Partnership may reasonably request to verify that the Purchaser qualifies as a "qualified purchaser."

FOR INDIVIDUALS:

☐      (i)      A natural person (including any person who holds a joint, community property or other similar shared ownership interest in the Partnership with that person's qualified purchaser spouse) who owns not less than $5,000,000 in "investments."

FOR ENTITIES:

☐      (ii)     A company* that owns not less than $5,000,000 in "investments" and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons (a "Family Company").

☐      (iii)    A trust that is not covered by (i) above, and that was not formed for the specific purpose of acquiring Interests, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settler or other person who has contributed assets to the trust, is a person described in clause (i), (iii) or (vi) of this Section F.

☐      (iv)     A person or entity, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis not less than $25,000,000 in "investments."

☐      (v)      A qualified institutional buyer as defined in paragraph (a) of Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser; *provided*, that (i) a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25 million in securities of issuers that are not affiliated persons of the dealer; and (ii) a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

B-12

☐        (vi)        A company* each beneficial owner of the securities of which is a qualified purchaser.

*Company, as defined in the Investment Company Act, means a corporation, a partnership, an association, a joint-stock company, a trust, a fund, or any organized group of persons whether incorporated or not; or any receiver, trustee in a case under title 11 of the United States Code (11 USCS §§ 101 et seq.) or similar official or any liquidating agent for any of the foregoing, in his capacity as such.

## G.    New Issue Questionnaire

In order for the General Partner to confirm the eligibility of the Purchaser to receive allocations with respect to "New Issues" (as defined in Rule 5130 of the Financial Industry Regulatory Authority ("FINRA"), formerly NASD Rule 2790) the Purchaser has checked all those statements below which apply to it or, if the Purchaser is a corporation, partnership, trust or other entity, all those statements below which apply to *any person having a Beneficial Interest* in such corporation, partnership, trust or other entity.    In order to complete the following information, Investors must read Annex 5 to this Purchaser Questionnaire for the definition of certain applicable terms.

RESTRICTED PERSONS

☐    (A) ***Members or other Broker/Dealers.***    The Purchaser, or any person having a Beneficial Interest in the Purchaser, is a member of FINRA or other broker/dealer.

☐    (B) ***Broker/Dealer Personnel.***  The Purchaser, or any person having a Beneficial Interest in the Purchaser, is:

☐ (i) an officer, director, general partner, Associated Person, or employee of a FINRA member or any other broker/dealer (other than a Limited Business Broker/Dealer);

☐ (ii) an agent of a FINRA member or any other broker/dealer (other than a Limited Business Broker/Dealer) that is engaged in the investment banking or securities business; or

☐ (iii)an Immediate Family Member of a person described in subparagraph (B)(i) or (B)(ii) if the person specified in subparagraph (B)(i) or (B)(ii):

B-13

PLEASE CHECK ALL THAT APPLY

☐ (a) Materially Supports, or receives Material Support from, the Immediate Family Member;

☐ (b) is employed by or is a Person Associated With a FINRA Member or Affiliate of a FINRA member; or

☐ (c) has an ability to control the allocation of New Issues.

If the Purchaser, on behalf of itself or any person having a Beneficial Interest in the Purchaser, answered affirmatively to statements (b) or (c) above, please provide the name of the FINRA member or other broker/dealer:

_____.

☐ (C) ***Finders and Fiduciaries.*** The Purchaser, or any person having a Beneficial Interest in the Purchaser, is:

☐ (i) a finder or a person who is in the business of acting in a fiduciary capacity to a managing underwriter, including, but not limited to, attorneys, accountants and financial consultants; or

☐ (ii) an Immediate Family Member of a person specified in subparagraph (C)(i) if the person specified in (C)(i) Materially Supports, or receives Material Support from, the Immediate Family Member.

If the Purchaser, on behalf of itself or any person having a Beneficial Interest in the Purchaser, answered affirmatively to statements (C)(i) or (C)(ii) please provide the name of the person who may be a finder or fiduciary:

_____.

B-14

☐    (D) ***Portfolio Managers.***  The Purchaser, or any person having a Beneficial Interest in the Investor,:

    ☐ (i) has authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment adviser or Collective Investment Account; <u>or</u>

    ☐ (ii) is an Immediate Family Member of a person specified in subparagraph (D)(i) that Materially Supports, or receives Material Support from such person.

☐    (E) ***Persons Owning a Broker/Dealer.***  The Purchaser, or any person having a Beneficial Interest in the Purchaser,:

PLEASE CHECK ALL THAT APPLY

    ☐    (i)    is listed, or required to be listed, in Schedule A of a Form BD (other than with respect to a Limited Business Broker/Dealer), <u>except</u> persons identified by an ownership code of less than 10%;

    ☐    (ii)    is listed, or required to be listed, in Schedule B of a Form BD (other than with respect to a Limited Business Broker/Dealer), <u>except</u> persons whose listing on Schedule B relates to an ownership interest in a person listed on Schedule A identified by an ownership code of less than 10%;

    ☐    (iii)    is listed, or required to be listed, in Schedule C of a Form BD that meets the criteria of subparagraphs (E)(i) and (E)(ii) above;

    ☐    (iv)    directly or indirectly owns 10% or more of a public reporting company listed, or required to be listed, in Schedule A of a Form BD (other than a reporting company that is listed on a national securities exchange or is traded on the NASDAQ Global Market, or other than with respect to a Limited Business Broker/Dealer);

    ☐    (v)    directly or indirectly owns 25% or more of a public reporting company listed, or required to be listed, in Schedule B of a Form BD (other than a reporting company that is listed on a national securities exchange or is traded on the NASDAQ Global Market, or other than with respect to a Limited Business Broker/Dealer);

    ☐    (vi)    is an Immediate Family Member of a person specified in subparagraphs (E)(i)-(v) <u>unless</u> the person owning the broker/dealer:

B-15

(a)    does not Materially Support, or receive Material Support from, the Immediate Family Member;

(b)    is not an owner of a FINRA member, or an Affiliate of a FINRA member; <u>and</u>

(c)    has no ability to control the allocation of New Issues.

If the Purchaser, on behalf of itself or a person having a Beneficial Interest in the Investor, answered affirmatively to statement (vi), please provide the name of the FINRA member:

_____.

☐    (F)   ***<u>None of the above statements apply</u>***.

<u>GENERAL EXEMPTIONS</u> (unless you have checked "F" above, please **check all** of the below that apply).

Please indicate whether the Purchaser, or any person having a Beneficial Interest in the Purchaser, is one or more of the following:

☐    (1)    An investment company registered under the Investment Company Act;

☐    (2)    A common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act which:

(A)    has investments from 1,000 or more accounts; <u>and</u>

(B)    does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐    (3)    An insurance company general, separate or investment account which satisfies each of the following conditions:

(A)    the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders; and

(B)    the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons;

☐    (4)    A bank, foreign bank, broker/dealer, investment adviser or other conduit or collective investment vehicle;

B-16

*If you answer affirmatively to this Section (4), you should complete the Section entitled "Collective Investment Accounts and Other Conduits")  below and understand that your answers to those questions will determine whether you are eligible for this exemption*.

☐    (5)    A publicly traded entity (other than a broker/dealer or an Affiliate of a broker/dealer where such broker/dealer is authorized to engage in the public offering of New Issues either as a selling group member or underwriter) that:

          (A)    is listed on a national securities exchange;

          (B)    is traded in the NASDAQ Global Market; <u>or</u>

          (C)    is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange or trading on the NASDAQ Global Market;

☐    (6)    An investment company organized under the laws of a foreign jurisdiction which satisfies each of the following conditions:

          (A)    the investment company is listed on a foreign exchange for sale to the public or authorized for sale to the public by a foreign regulatory authority; <u>and</u>

          (B)    no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐    (7)    An Employee Retirement Income Security Act benefits plan that is qualified under Section 401(a) of the Internal Revenue Code and is not sponsored solely by a broker/dealer;

☐    (8)    A state or municipal government benefits plan that is subject to state and/or municipal regulation;

☐    (9)    A tax exempt charitable organization under Section 501(c)(3) of the Internal Revenue Code;

☐    (10)    A church plan under Section 414(e) of the Internal Revenue Code.

## COLLECTIVE INVESTMENT ACCOUNTS AND OTHER CONDUITS

(A)    If the Purchaser, on behalf of itself, answered affirmatively to Statement (4) under "GENERAL EXEMPTIONS" above, does the Purchaser allocate all profit and loss from New Issues attributable to the Purchaser's interest in the Partnership away from Restricted Persons who are Beneficial Owners of the Purchaser?

*If "No," please answer  question (B).*

☐ YES          ☐ NO

(B)    What percentage of the Purchaser is beneficially owned, in the aggregate, by Restricted Persons? _____%

*[remainder of page intentionally left blank]*

K&E 16787099.14

## PURCHASER QUESTIONNAIRE SIGNATURE PAGE

The Purchaser understands that the foregoing information will be relied upon by the Partnership for the purpose of determining the eligibility of the Purchaser to purchase and own Interests in the Partnership. The Purchaser agrees to notify the General Partner immediately if any representation, warranty or information contained in the Purchaser's Subscription Agreement or the Purchaser Questionnaire becomes untrue at any time. The Purchaser agrees to provide such information and execute and deliver such documents regarding itself and all of its beneficial owners as the Partnership may reasonably request from time to time to substantiate the Purchaser's status as an accredited investor or qualified purchaser or to otherwise determine the eligibility of the Purchaser to purchase Interests in the Partnership, to verify the accuracy of the Purchaser's representations and warranties herein or to comply with any law, rule or regulation to which the Partnership may be subject, including compliance with anti-money laundering laws and regulations or for any other reasonable purpose. To the fullest extent not prohibited by law, the Purchaser agrees to indemnify and hold harmless the Partnership and each Partner thereof from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Purchaser contained in the Purchaser's Subscription Agreement or the Purchaser Questionnaire or in any other document provided by the Purchaser to the Partnership or in any agreement (other than the Partnership Agreement) executed by the Purchaser with the Partnership or the General Partner in connection with the Purchaser's investment in Interests.

Signatures:

INDIVIDUAL:

_____

(Signature)

_____

(Print Name)

PARTNERSHIP, CORPORATION, LIMITED
LIABILITY COMPANY, TRUST, CUSTODIAL
ACCOUNT, OTHER INVESTOR:

_____

(Print Name of Entity)

By: _____

(Signature)

_____

(Print Name and Title)

## EXHIBIT C

## INSTRUCTIONS FOR POWER OF ATTORNEY FOR NEW YORK INDIVIDUALS

If the Purchaser is an individual (i.e. a natural person (subscribing directly or through an individual retirement account or a self-directed retirement plan) a revocable grantor trust, or is comprised of multiple individuals subscribing as joint tenants) and is executing the Subscription Agreement Purchaser Questionnaire or any of the related documents within New York State, the Purchaser must complete and submit all pages of this Exhibit C and have his or her signature notarized by a notary public. If such Purchaser consists of a multiple natural persons subscribing as joint tenants, each such individual must separately complete this Exhibit C. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Subscription Agreement.

The statutory disclosures entitled "CAUTION TO THE PRINCIPAL" and "IMPORTANT INFORMATION FOR THE AGENT" are included below solely for the purpose of ensuring compliance with Section 5-1501B of the New York General Obligations Law governing the execution for a power of attorney by an individual and, except for ensuring the validity of this Power of Attorney under the New York General Obligations law, shall not form part of, or in any way affect the interpretation of this Exhibit C, the Subscription Agreement, Purchaser Questionnaire, the Partnership Agreement or the Power of Attorney contained earlier in this Transfer Booklet and shall not be deemed to impose any additional obligations on the General Partner or any other agent acting as attorney-in-fact to pursuant to any power of attorney, granted in connection with the Subscription Agreement except to the extent required by applicable law.

By executing the Power of Attorney contained in this Exhibit C, the Investor agrees that such Power of Attorney shall be incorporated by reference into the Subscription Agreement and that the statutory disclosures contained in this Exhibit C shall be deemed incorporated by reference into the Subscription Agreement, the Partnership Agreement and the governing documents of any Alternative Investment Vehicle.

* * * * *

C-1

K&E 16787099.14

## POWER OF ATTORNEY FOR NEW YORK INDIVIDUALS

The undersigned hereby constitutes, appoints and grants Silver Lake Financial Associates, L.P., a Delaware limited partnership, and each other person or entity that is or becomes a general partner of Silver Lake Credit Fund, L.P., a Delaware limited partnership (the "Partnership") after the Partnership's initial closing date (collectively, the "General Partner"), and each member of the General Partner, as the undersigned's true and lawful representative and attorney-in-fact, in the undersigned's name, place and stead to:

1.    make, execute, sign and file a Certificate of Limited Partnership of the Partnership, any amendment thereof required by law or deemed advisable by the General Partner and all such other instruments, documents and certificates as may from time to time be required by the laws of the United States of America, the State of Delaware, New York or California, and any other state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement or continue the valid subsisting existence of the Partnership;

2.    make, execute and sign all consents, approvals, waivers, certificates and other instruments, including without limitation amendments to this Agreement, that the General Partner deems appropriate or necessary to make, evidence, give, confirm or ratify any vote, consent, approval, waiver, agreement, or other action made or given by the Partners under the Partnership's Agreement of Limited Partnership, as the same may be amended from time to time (the "**Agreement**"), or consistent with the terms of the Agreement or to effectuate the terms or intent of the Agreement; provided, however, that when required by any provision of the Agreement which establishes that consent or approval of the Partnership's limited partners ("**Limited Partners**") is required to take any action, the General Partner may exercise the power of attorney made in this Section only after the necessary consent or approval by the Limited Partners is obtained;

3.    effectuate the forfeiture of fifty percent (50%) of the undersigned's interest in the Partnership pursuant to Article XX(d) of the Agreement;

4.    sell such Partner's interest in the Partnership pursuant to Article XX(e) of the Agreement;

5.    take any action that the General Partner shall consider advisable in connection with the exercise of authority granted in the Agreement; and

6.    take any other actions incidental, convenient or necessary to carry out the foregoing.

This Power of Attorney shall not revoke, in whole or in part, any powers of attorney previously executed by the undersigned.  This Power of Attorney shall not be revoked by any subsequent power of attorney that the undersigned may execute, unless (i) such subsequent power of attorney specifically provides that it revokes this Power of Attorney by referring to this Power of Attorney and the name of the agent appointed hereby as attorney-in-fact and (ii) a copy of such subsequent power of attorney is provided to the agent appointed hereby.

C-2

The undersigned hereby empowers each attorney-in-fact acting pursuant hereto to determine in its sole discretion the time when, purpose for and manner in which any power herein conferred upon it shall be exercised, and the conditions, provisions and covenants of any instruments or documents which may be executed by it pursuant hereto; provided that the powers of attorney granted herein shall be only be exercised in accordance with the Agreement and clauses 1 through 8 above. The powers of attorney granted herein are coupled with an interest in favor of the General Partner and as such (a) shall be irrevocable and continue in full force and effect notwithstanding the subsequent death, incompetency, incapacity, disability, insolvency or dissolution of the undersigned regardless of whether the Partnership or the General Partner has notice thereof and (b) shall survive the delivery of an assignment by the undersigned of the whole or any portion of its interests in the Partnership, except that if the assignee thereof has been approved for admission to the Partnership as a substitute limited partner, this Power of Attorney given by the assignor shall survive the delivery of the assignment for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect the substitution. The powers of attorney granted herein shall not be deemed to constitute a written consent of the undersigned for purposes of Article XVI of the Agreement. Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Agreement.

This Power of Attorney shall not revoke, in whole or in part, any powers of attorney previously executed by the undersigned. This Power of Attorney shall not be revoked by any subsequent power of attorney that the undersigned may execute, unless (i) such subsequent power of attorney specifically provides that it revokes this Power of Attorney by referring to this Power of Attorney and the name of the agent appointed hereby as attorney-in-fact and (ii) a copy of such subsequent power of attorney is provided to the agent appointed hereby.

K&E 16787099.14

**CAUTION TO THE PRINCIPAL**:  Your power of Attorney is an important document. As the "principal." you give the person whom you choose (your "agent") authority to spend your money and sell or dispose of your property during your lifetime without telling you.  You do not lose your authority to act even though you have given your agent similar authority.

When your agent exercises this authority he or she must act according to any instructions you have provided or, where there are no specific instructions in your best interest.  "Important Information for the Agent" at the end of this document describes your agent's responsibilities.

Your agent can act on your behalf only after signing the Power of Attorney before a notary public.

You can request information from your agent at any time. If you are revoking a prior Power of Attorney by executing this Power of Attorney, you should provide written notice of the revocation to your prior agent(s) and to the financial institutions where your accounts are located.

You can revoke or terminate your Power of Attorney at any time for any reason as long as you are of sound mind.  If you are no longer of sound mind, a court can remove an agent for acting improperly.

Your agent cannot make health care decisions for you.  You may execute a "Health Care Proxy" to do this.

The law governing Powers of Attorney is contained in the New York General Obligations Law Article 5, Title 15.  This law is available at a law library or online through the New York State Senate or Assembly websites, www.senate.state.ny.us or www. assembly.state.ny.us.

If there is anything about this document that you do not understand, you should ask a lawyer of your own choosing to explain it to you.

## IMPORTANT INFORMATION FOR THE AGENT:

When you accept the authority granted under this Power of Attorney, a special legal relationship is created between you and the principal.  This relationship imposes on you legal responsibilities that continue until you resign or the Power of Attorney is terminated or revoked. You must:

(1)    act according to any instructions from the principal, or, where there are no instructions, in the principal's best interest;

(2)    avoid conflicts that would impair your ability to act in the principal's best interest;

(3)    keep the principal's property separate and distinct from any assets you own or control unless otherwise permitted by law;

(4)    keep a record or all receipts, payments, and transactions conducted for the principal; and

(5)    disclose your identity as an agent whenever you act for the principal by writing or printing the principal's name and signing your own name as "agent" in either of

C-4

the following manner: (Principal's Name) by (Your Signature) as Agent, or (your signature) as Agent for (Principal's Name).

You may not use the principal's assets to benefit yourself or give major gifts to yourself or anyone else unless the principal has specifically granted you that authority in this Power of Attorney or in a Statutory Major Gifts Rider attached to this Power of Attorney.  If you have that authority, you must act according to any instructions of the principal or, where there are no such instructions, in the principal's best interest.  You may resign by giving written notice to the principal and to any co-agent, successor agent, monitor if one has been named in this document, or the principal's guardian has been appointed.  If here is anything about this document or your responsibilities that you do not understand, you should seek legal advice.

Liability of agent:

The meaning of the authority given to you is defined in New York's General Obligations Law, Article 5, Title 15.  If it is found that you have violated the law or acted outside the authority granted to you in the Power of Attorney, you may be liable under the law for your violation.

C-5

K&E 16787099.14

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney on the date set forth below.

FOR COMPLETION BY INVESTORS WHO ARE NATURAL PERSONS: (i.e. individuals)

Investor's Name: _____
(print or type)

Investor's Signature: _____
(signature

Spouse's Signature: _____
(only required if                      (signature)
investment is being
made by a husband
and wife as joint tenants

FOR COMPLETION BY INVESTORS WHO ARE NOT NATURAL PERSONS: (e.g. trusts)

Investor's Name: _____
(print or type)

By: _____
(signature of authorized representative)

Name: _____
(print or type name of authorized representative)

Title: _____
(print or type title of authorized representative)

EXECUTED AND SWORN to
before me this ___ day
of _____, ____

_____
   Notary Public
My Commission Expires

_____

The undersigned entity does hereby accept its appointment as said attorney-in-fact on the date set forth below.

GENERAL PARTNER:

Silver Lake Financial Associates, L.P.

By:      SLFA (GP), L.L.C., its      General Partners

By:      Silver Lake Group, L.L.C., its Managing Member

By: _____
Name:
Title:

EXECUTED AND SWORN to
before me this ___ day
of _____, ____

_____
    Notary Public
My Commission Expires

_____

## __EXHIBIT D__

See attached Internal Revenue Service Form W-9

*(If any Form W-8 is required, please contact the General Partner and one will be provided)*

The completed forms should be returned to the General Partner with this Agreement.

***Do not send them to the Internal Revenue Service****.*

D-1

# DEFINITION OF "INVESTMENTS"

The term "investments" means:

(1)     Securities, other than securities of an issuer that controls, is controlled by, or is under common control with, the Investor that owns such securities, unless the issuer of such securities is:

(i)      An investment company or a company that would be an investment company but for the exclusions or exemptions provided by the Investment Company Act, or a commodity pool; or

(ii)     A Public Company (as defined below); or

(iii)    A company with shareholders' equity of not less than $50 million (determined in accordance with generally accepted accounting principles) as reflected on the company's most recent financial statements; *provided*, that such financial statements present the information as of a date within 16 months preceding the date on which the Investor acquires Interests;

(2)     Real estate held for investment purposes;

(3)     Commodity Interests (as defined below) held for investment purposes;

(4)     Physical Commodities (as defined below) held for investment purposes;

(5)     To the extent not securities, Financial Contracts (as defined below) entered into for investment purposes;

(6)     In the case of an Investor that is a company that would be an investment company but for the exclusions provided by Section 3(c)(1) or 3(c)(7) of the Investment Company Act, or a commodity pool, any amounts payable to such Investor pursuant to a firm agreement or similar binding commitment pursuant to which a person has agreed to acquire an interest in, or make capital contributions to, the Investor upon the demand of the Investor; and

(7)     Cash and cash equivalents (including foreign currencies) held for investment purposes.

Real estate that is used by the owner or a Related Person (as defined below) of the owner for personal purposes, or as a place of business, or in connection with the conduct of the trade or business of such owner or a Related Person of the owner, will NOT be considered real estate held for investment purposes; *provided*, that real estate owned by an Investor who is engaged primarily in the business of investing, trading or developing real estate in connection with such business may be deemed to be held for investment purposes.  However, residential real estate will not be deemed to be used for personal purposes if deductions with respect to such real estate are not disallowed by Section 280A of the Code.

A Commodity Interest or Physical Commodity owned, or a Financial Contract entered into, by the Investor who is engaged primarily in the business of investing, reinvesting, or trading

i

in Commodity Interests, Physical Commodities or Financial Contracts in connection with such business may be deemed to be held for investment purposes.

"Commodity Interests" means commodity futures contracts, options on commodity futures contracts, and options on physical commodities traded on or subject to the rules of:

(i)     Any contract market designated for trading such transactions under the Commodity Exchange Act, as amended (the "Commodity Exchange Act") and the rules thereunder; or

(ii)    Any board of trade or exchange outside the United States, as contemplated in Part 30 of the rules under the Commodity Exchange Act.

"Public Company" means a company that:

(i)     files reports pursuant to Section 13 or 15(d) of the Exchange Act; or

(ii)    has a class of securities that are listed on a Designated Offshore Securities Market, as defined by Regulation S of the Securities Act.

"Financial Contract" means any arrangement that:

(i)     takes the form of an individually negotiated contract, agreement, or option to buy, sell, lend, swap, or repurchase, or other similar individually negotiated transaction commonly entered into by participants in the financial markets;

(ii)    is in respect of securities, commodities, currencies, interest or other rates, other measures of value, or any other financial or economic interest similar in purpose or function to any of the foregoing; and

(iii)   is entered into in response to a request from a counter- party for a quotation, or is otherwise entered into and structured to accommodate the objectives of the counterparty to such arrangement.

"Physical Commodities" means any physical commodity with respect to which a Commodity Interest is traded on a market specified in the definition of Commodity Interests above.

"Related Person" means a person who is related to the Investor as a sibling, spouse or former spouse, or is a direct lineal descendant or ancestor by birth or adoption of the Investor, or is a spouse of such descendant or ancestor, provided that, in the case of a Family Company, a Related Person includes any owner of the Family Company and any person who is a Related Person of such an owner. "Family Company" means a company, partnership or trust that owns not less than $5,000,000 in investments and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons.

ii

ANNEX 1

For purposes of determining the amount of investments owned by a company, there may be included investments owned by majority-owned subsidiaries of the company and investments owned by a company ("Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company.

In determining whether a natural person is a qualified purchaser, there may be included in the amount of such person's investments any investment held jointly with such person's spouse, or investments in which such person shares with such person's spouse a community property or similar shared ownership interest.  In determining whether spouses who are making a joint investment in the Partnership are qualified purchasers, there may be included in the amount of each spouse's investments any investments owned by the other spouse (whether or not such investments are held jointly).  There shall be deducted from the amount of any such investments any amounts specified by paragraph 2(a) of Annex 2 incurred by such spouse.

In determining whether a natural person is a qualified purchaser, there may be included in the amount of such person's investments any investments held in an individual retirement account or similar account the investments of which are directed by and held for the benefit of such person.

K&E 16787099.14

**ANNEX 2**

## VALUATION OF INVESTMENTS

The general rule for determining the value of investments in order to ascertain whether a person is a qualified purchaser is that the value of the aggregate amount of investments owned and invested on a discretionary basis by such person shall be their fair market value on the most recent practicable date or their cost.  This general rule is subject to the following provisos:

(1)     In the case of Commodity Interests, the amount of investments shall be the value of the initial margin or option premium deposited in connection with such Commodity Interests; and

(2)     In each case, there shall be deducted from the amount of investments owned by such person the following amounts:

    (a)     The amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring the investments owned by such person.

    (b)     A Family Company, in addition to the amounts specified in paragraph (a) above, shall have deducted from the value of such Family Company's investments any outstanding indebtedness incurred by an owner of the Family Company to acquire such investments.

i

ANNEX 3

# PRIVACY NOTICE

We are sensitive to the privacy concerns of our individual Limited Partners.  We have a policy of protecting the confidentiality and security of information we collect about you.  We are providing you this notice to help you better understand why and how we collect certain personal information, the care with which we treat that information, and how we use that information.

In connection with the formation and ongoing activities of our private investment funds, we collect and maintain nonpublic personal information about our individual investors from the following sources:

a)    Information we receive from you on subscription agreements, investor questionnaires or other forms that you submit to us or contracts that you enter into with us;

b)    Information related to your transactions with us, our affiliates or others; and

c)    Information obtained from meetings and telephone conversations with you.

We may disclose any of the information we collect, as described above, in connection with the activities of our investment funds to third parties and to our affiliates, including:

a)    Financial service providers, such as broker-dealers, custodians, banks and others used to finance or facilitate transactions by or operations of our private funds;

b)    Other service providers to the General Partner, the Investment Manager, their affiliates and/or our private funds, such as legal, accounting or tax preparation services; and

c)    Actual and potential portfolio companies of our private equity funds, purchasers thereof and potential co-investors, and each of their respective advisors if requested in connection with an investment or disposition.

We may also disclose nonpublic personal information about you to nonaffiliated third parties as permitted by law and in accordance with the agreements governing your investment in our private funds, including:

a)    Other service providers to our investment funds, such as those who provide accounting, legal, or tax preparation services;

b)    Other partners and potential investors in our investment funds; and

c)    Transfer agents, portfolio companies, brokerage firms and the like, in connection with distributions to our limited partners.

i

**ANNEX 3**

We maintain physical, electronic and procedural safeguards to guard the nonpublic personal information that we have obtained from you.

We reserve the right to change our privacy policies and this Privacy Notice at any time. The examples contained within this notice are illustrations only and are not intended to be exclusive.  This notice complies with the privacy provisions of the Gramm-Leach-Bliley Act. You may have additional rights under other foreign or domestic laws that may apply to you.

## Disclosure Opt Out

If you prefer that we not disclose nonpublic personal information about you to nonaffiliated third parties, you may opt out of those disclosures (other than disclosures permitted by law or the agreements governing your investment in our private funds); that is, you may direct us not to make those disclosures (other than disclosures permitted by law or the agreements governing your investment in our private funds).  To opt out of disclosures to nonaffiliated third parties, you may return the Opt Out Form included in the next page to us.

ii

**ANNEX 4**

## OPT OUT FORM

Pursuant to the last paragraph of the attached Privacy Notice, the undersigned hereby instructs you not to disclose nonpublic personal information about the undersigned (other than disclosures permitted by law or the agreements governing the undersigned's investment in your funds) to nonaffiliated third parties.

_____

Name of Investor/Name on Account

_____

Signature

_____

Date

**Note**:  If electing to opt out, please return the completed form by both (i) <u>facsimile transmission</u> or email and (ii) <u>postal mail</u> to:

Silver Lake Financial Management Company, L.L.C.
One Market Plaza
Steuart Tower, 10th Floor, Suite 1000
San Francisco, CA 94105
Attn:   Gabby Borlongan Elma, Administration Manager
          Tel: (415) 293-4360
          Fax: (415) 293-4365
          Email: gabby.elma@silverlake.com

i

08-13555-mg    Doc 9808    Filed 06/23/10    Entered 06/23/10 22:20:11    Main Document
Pg 87 of 95

### DEFINITIONS FOR THE NEW ISSUE QUESTIONNAIRE

"Affiliate" means a company which controls, is controlled by or is under common control with a member of FINRA. The term Affiliate is presumed to include, but is not limited to, the following:

i.    a company will be presumed to control a member if the company beneficially owns 10 percent or more of the outstanding voting securities of a member which is a corporation, or beneficially owns a partnership interest in 10 percent or more of the distributable profits or losses of a member which is a partnership;

ii.    a member will be presumed to control a company if the member and Persons Associated With the Member beneficially own 10 percent or more of the outstanding voting securities of a company which is a corporation, or beneficially own a partnership interest in 10 percent or more of the distributable profits or losses of a company which is a partnership;

iii.    a company will be presumed to be under common control with a member if: (1) the same natural person or company controls both the member and company by beneficially owning 10 percent or more of the outstanding voting securities of a member or company which is a corporation, or by beneficially owning a partnership interest in 10 percent or more of the distributable profits or losses of a member or company which is a partnership; or (2) a person having the power to direct or cause the direction of the management or policies of the member or the company also has the power to direct or cause the direction of the management or policies of the other entity in question.

Notwithstanding the foregoing, none of the following shall be presumed to be an Affiliate of a member:

i.    an investment company registered with the Commission pursuant to the Investment Company Act;

ii.    a "separate account" as defined in Section 2(a)(37) of the Investment Company Act;

iii.    a "real estate investment trust" as defined in Section 856 of the Code;

iv.    a "direct participation program" as defined in Rule 2810 of the National Association of Securities Dealers, Inc. ("NASD") as administered by FINRA; and

v.    a corporation, trust, partnership or other entity issuing financing instrument-backed securities which are rated by a nationally recognized statistical rating organization in one of its four highest generic rating categories.

"Beneficial Interest" means any economic interest, such as the right to share in gains or losses. The receipt of a management or performance based fee for operating a Collective Investment Account, or other fees for acting in a fiduciary capacity, shall not be considered a Beneficial Interest in an account.

i

K&E 16787099.14

"Collective Investment Account" means any hedge fund, investment partnership, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities. A Collective Investment Account does not include a Family Investment Vehicle or an Investment Club.

"Family Investment Vehicle" means a legal entity that is beneficially owned solely by Immediate Family Members.

"Immediate Family Members" includes a person's parents, mother-in-law or father-in-law, spouse, brother or sister, brother-in-law or sister-in-law, son-in-law or daughter-in-law, and children, and any other individual to whom the person provides Material Support.

"Investment Club" means a group of friends, neighbors, business associates, or others that pool their money to invest in stock or other securities and are collectively responsible for making investment decisions.

"Limited Business Broker/Dealer" means any broker/dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

"Material Support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Immediate Family Members living in the same household are deemed to be providing each other with Material Support.

"New Issue" means any initial public offering of an equity security as defined in Section 3(a)(11) of the Act, made pursuant to a registration statement or offering circular. "New issues" do not include:

<ol type="i">
<li>offerings made pursuant to an exemption under Section 4(1), 4(2) or 4(6) of the Securities Act, or SEC Rule 504 if the securities are "restricted securities" under SEC Rule 144(a)(3), or Rule 144A or Rule 505 or Rule 506 adopted thereunder;</li>
<li>offerings of exempted securities as defined in Section 3(a)(12) of the Exchange Act, and rules promulgated thereunder;</li>
<li>offerings of securities of a commodity pool operated by a commodity pool operator as defined under Section 1a(5) of the Commodity Exchange Act;</li>
<li>rights offerings, exchange offers, or offerings made pursuant to a merger or acquisition;</li>
<li>offerings of investment grade asset-backed securities;</li>
<li>offerings of convertible securities;</li>
<li>offerings of preferred securities;</li>
<li>offerings of an investment company registered under the Investment Company Act;</li>
<li>offerings of securities (in ordinary share form or ADRs registered on Form F-6) that have a pre-existing market outside of the United States; and</li>
</ol>

ii

**ANNEX 5**

> (x)    offerings of a business development company as defined in Section 2(a)(48) of the Investment Company Act, a direct participation program as defined in NASD Rule 2810(a)(4), or a real estate investment trust as defined in Section 856 of the Code.

"Person Associated With a FINRA Member" or "Associated Person of a FINRA member" means:

> (i)    a natural person who is registered or has applied for registration under the Rules of the Association, and

> (ii)    a sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA.

"Restricted Person" means a person described in any of the paragraphs (A), (B), (C), (D) or (E) of Section I of this New Issue Questionnaire.

iii

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------------x

## WITHDRAWAL OF CLAIM

| | |
|---|---|
| Debtor Name and Case Number: | Lehman Brothers Holdings Inc. (Case. No. 08-13555) |
| Creditor Name and Address: | Silver Lake Credit Fund, L.P.<br><br>One Market Plaza<br><br>Steuart Tower, 10th Floor, Suite 1000<br><br>San Francisco, CA 94105<br><br>Attn: Ross Weiner, Esq. |
| Claim Number (if known): | 15157 |
| Date Claim Filed: | September 17, 2009 |
| Total Amount of Claim Filed: | Not less than $25,451,655.31 |

I, the undersigned, am the above-referenced creditor, or an authorized signatory for the above-referenced creditor. I hereby withdraw the above-referenced claim and authorize the Debtors' claims and noticing agent to file and reflect this withdrawal on the official claims register for the above-referenced Debtor.

| | |
|---|---|
| Signature: | Title: |
| Printed Name: | Dated: |

## DEFINITIONS

*Debtor*

The person, corporation or other entity that has filed a bankruptcy case is called the debtor.

*Creditor*

A creditor is any person, corporation, or other entity to which the debtor owed a debt.

*Proof of Claim*

A form filed with the clerk of the bankruptcy court where the bankruptcy case was filed, to tell the bankruptcy court how much the debtor owed a creditor (the amount of the creditor's claim).

## ITEMS TO BE COMPLETED ON THIS WITHDRAWAL OF CLAIM

*Name of Debtor and Case Number:*

Fill in the name of the debtor in the bankruptcy case, and the bankruptcy case number.    A list of the Debtors and their cases numbers is provided below.

| | | | | | |
|---|---|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC | 08-13904 | Lehman Scottish Finance L.P. |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC | 08-13664 | PAMI Statler Arms LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC | 08-13902 | Lehman Brothers Financial Products Inc. |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. | 09-17331 | Merit, LLC |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC | 09-17503 | LB Somerset LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation | 09-17505 | LB Preferred Somerset LLC |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC | | |

*Information about Creditor:*

Complete the section giving the name and address of the creditor that was listed on the previously filed Proof of Claim form.

*Information identifying the Claim that is to be withdrawn:*

Complete the section giving the court claim number, date claim was filed and total amount of claim filed to help identify the claim that is to be withdrawn.

**Sign and print the name and title, if any, of the creditor or other person authorized to file this withdrawal of claim (attach copy of power of attorney, if any).**

**THIS FORM MUST BE SENT TO EPIQ BANKRUPTCY SOLUTIONS LLC, THE DEBTORS' AUTHORIZED CLAIMS AND NOTICING AGENT AT:**

**Epiq Bankruptcy Solutions, LLC**
**Attn: Lehman Brothers Holdings**
**757 Third Avenue, 3rd Floor**
**New York, New York 10017**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                          :
In re                                     :     Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :     08-13555 (JMP)
                                          :
                    Debtors.              :     (Jointly Administered)
                                          :
---------------------------------------------------------------x

ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY
CODE AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE APPROVING SETTLEMENT AGREEMENT BETWEEN LEHMAN
BROTHERS HOLDINGS, INC., LEHMAN COMMERCIAL PAPER INC., SILVER
LAKE CREDIT FUND, L.P. AND SILVER LAKE FINANCIAL ASSOCIATES, L.P.

Upon the motion, dated June 23, 2010 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI"), Lehman Commercial Paper Inc., ("LCPI," and together with LBHI, the

"Debtors") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and

debtors-in-possession, pursuant to sections 105 and 363 of title 11 of the United States Code (the

"Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for authorization to enter into a settlement agreement (the "Settlement

Agreement") with Silver Lake Credit Fund, L.P. ("SLCF") and Silver Lake Financial Associates,

L.P. ("SLF," and together with SLCF, "Silver Lake Financial"), all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the second

amended order entered June 17, 2010 governing case management and administrative procedures

[Docket No. 9635] to (i) the United States Trustee for the Southern District of New York; (ii) the

attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; and (vi) all parties who have requested notice in these chapter 11 cases,

and it appearing that no other or further notice need be provided; and a hearing (the "Hearing")

having been held to consider the relief requested in the Motion and the Objection; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their respective estates and creditors, and all parties in interest and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is

      ORDERED that the Motion is granted; and it is further

      ORDERED that, pursuant to Bankruptcy Rule 9019, LBHI's entry into the

Settlement Agreement is approved; and it is further

      ORDERED that, pursuant to sections 105 and 363 of the Bankruptcy Code, and to

the extent required by the Settlement Agreement, LBHI is authorized to execute one or more

Assignment and Assumption Agreements;[1] and it is further

      ORDERED that, pursuant to section 363(f) of the Bankruptcy Code, the

Purchaser under an Alternative Transaction shall take title to the asset(s) transferred therein free

---

[1] Capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Motion.

and clear of all liens, claims, encumbrances and other interests of any kind or nature whatsoever; and it is further

ORDERED that nothing in this Order shall affect the rights of LBHI and LCPI with respect to any claims and defenses each may have against the other; and it is further

ORDERED that LBHI is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the Settlement Agreement and / or an Assignment and Assumption Agreements and perform any and all obligations contemplated therein; and it is further

ORDERED that Claim No. 15157 shall be waived and expunged from the claims register with prejudice upon the Effective Date; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2010
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE