1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Adv. Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01480

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.,

                  Debtors.

- - - - - - - - - - - - - - - - - - - -x

SECURITIES INVESTOR PROTECTION CORPORATION,

                  Plaintiff-Appellant,

        -against-

LEHMAN BROTHERS INC.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - -x

PT BANK NEGARA IndONESIA (PERSERO) TBK,

                  Plaintiff,

        -against-

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - -x

(continued on next page)

VERITEXT REPORTING COMPANY

2

1

2                    U.S. Bankruptcy Court

3                    One Bowling Green

4                    New York, New York

5

6                    December 16, 2009

7                    10:02 AM

8

9

10   B E F O R E:

11   HON. JAMES M. PECK

12   U.S. BANKRUPTCY JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2     HEARING re Fee Committee Final Recommendations for Second

3     Interim Applications

4

5     HEARING re LBHI's Motion for Authorization to Make a Capital

6     Contribution to Aurora Bank

7

8     HEARING re Debtors' Motion for Approval of a Settlement

9     Agreement Among Lehman Brothers Special Financing Inc.,

10    American Family Life Assurance Company of Columbus, and Others,

11    Relating to Certain Swap Transactions with Beryl Finance

12    Limited

13

14    HEARING re Motion of The TAARP Group, LLP Authorizing and

15    Directing Immediate Payment of an Administrative Expense Claim

16

17    HEARING re Motion of Deutsche Bank AG to Permit Late Claim

18    Filing Pursuant to Federal Rule of Bankruptcy Procedure

19    9006(b)(1)

20

21    HEARING re Debtors' Motion Pursuant to Rule 1015(b) of the

22    Federal Rules of Bankruptcy Procedure Requesting Joint

23    Administration of Merit, LLC's Chapter 11 Case

24

25

4

1

2    HEARING re Debtors' Motion for a Determination that Certain

3    Orders and Other Pleadings Entered or Filed in the Chapter 11

4    Cases of Affiliated Debtors be Made Applicable to the Chapter

5    11 Case of Merit, LLC

6

7    HEARING re Debtors' Motion Pursuant to Bankruptcy Rule 1007(c)

8    to Extend the Time to File Merit LLC's Schedules, Statements of

9    Financial Affairs, and Related Documents

10

11    HEARING re Motion of California Public Employees Retirement

12    System for Relief from the Automatic Stay

13

14    HEARING re Motion of Banesco Banco Universal Requiring Lehman

15    Brothers Holdings Inc. to Provide Requested Information and to

16    Deem Claim to be Timely Filed by the Securities Programs Bar

17    Date

18

19    HEARING re Motion of Pacific Life Insurance Company to File

20    Proof of Claim After Claims Bar Date

21

22    HEARING re Motion of PB Capital to Include Certain European

23    Medium Term Notes in the Lehman Program Securities List or,

24    Alternatively, to Deem Such Claims to be Timely Filed by the

25    Securities Programs Bar Date

5

1

2     HEARING re Debtors' Motion for Authorization to Implement the

3     Derivatives Employee Incentive Program

4

5     HEARING re Debtors' Motion for an Order Approving Settlements

6     with Bamburgh Investments (UK) Ltd. and Corfe Investments (UK)

7     Ltd.

8

9     HEARING re Debtors' Motion for an Order Modifying the Automatic

10    Stay to Allow Settlement Payment Under Directors and Officers

11    Insurance Policies

12

13    HEARING re Motion of Merrill Lynch International for Relief

14    from the Automatic Stay

15

16    HEARING re Motion of Malayan Banking Berhad for Examination of

17    Debtors Under FRBP 2004

18

19    SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

20    HEARING re Motion for Order Approving Trustee's Allocation of

21    Property of the Estate

22

23

24

25

6

1

2    HEARING re California Public Employees Retirement Systems'

3    Motion for Relief from the Automatic Stay to Effect Setoff

4    against LBI Funds Currently Held by Securities Finance Trust

5    Company

6

7    PRE-TRIAL CONFERENCE re PT Bank Negara Indonesia (Persero) Tbk

8    v. Lehman Brothers Special Financing,

9    Inc.

10

11    HEARING re Motion to Compel Production of Documents from the

12    Trustee and the Committee Based on Privilege Waiver filed by

13    Hamish Hume on behalf of Barclays Capital, Inc.

14

15    HEARING re Motion of Official Committee of Unsecured Creditors

16    of Lehman Brothers Holdings Inc., et al. for Letters of Request

17    for International Judicial Assistance

18

19

20

21

22

23

24    Transcribed by:  Clara Rubin

25

7

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES, LLP

4           Attorneys for Lehman Brothers Holdings, Inc. and

5            Affiliated Debtors

6           767 Fifth Avenue

7           New York, NY 10153

8

9    BY:   GARRETT FAIL, ESQ.

10          PETER GRUENBERGER, ESQ.

11          DAVID R. FERTIG, ESQ.

12          SHAI Y. WAISMAN, ESQ.

13          RICHARD P. KRASNOW, ESQ.

14          MICHAEL J. FIRESTONE, ESQ.

15          EVERT J. CHRISTENSEN JR., ESQ.

16          SUNNY SINGH, ESQ.

17

18   WEIL, GOTSHAL & MANGES, LLP

19          Attorneys for Lehman Brothers and Lehman Brothers Bank

20          700 Louisiana

21          Suite 1600

22          Houston, TX 77002

23

24   BY:   ALFREDO R. PEREZ, ESQ.

25          ELEANOR H. GILBANE, ESQ. (TELEPHONICALLY)

8

1

2    JONES DAY

3         Special Counsel to Lehman Brothers Special Financing Inc.

4         222 East 41st Street

5         New York, NY 10017

6

7    BY:   ROBERT W. GAFFEY, ESQ.

8

9

10    BINGHAM MCCUTCHEN LLP

11         Attorneys for Deutsche Bank AG

12         399 Park Avenue

13         New York, NY 10022

14

15    BY:   JOSHUA DORCHAK, ESQ.

16

17

18    BOIES, SCHILLER & FLEXNER LLP

19         Attorneys for Barclays PLC

20         575 Lexington Avenue

21         7th Floor

22         New York, NY 10022

23

24    BY:   JONATHAN D. SCHILLER, ESQ.

25

9

1

2    BOIES, SCHILLER & FLEXNER LLP

3        Attorneys for Barclays PLC

4        401 East Las Olas Boulevard

5        Suite 1200

6        Fort Lauderdale, FL 33301

7

8    BY:   TODD THOMAS, ESQ.

9

10   CHADBOURNE & PARKE LLP

11       Attorneys for Banesco

12       30 Rockefeller Plaza

13       New York, NY 10112

14

15   BY:   DAVID M. LEMAY, ESQ.

16       HOWARD SEIFE, ESQ.

17

18   EPSTEIN BECKER & GREEN, P.C.

19       Attorneys for Creditors, InfoSpace, Inc. and Intersil

20       Corporation

21       250 Park Avenue

22       New York, NY 10177

23

24   BY:   DAVID J. CLARK, ESQ.

25

10

1

2   EPSTEIN BECKER & GREEN, P.C.

3        Attorneys for Creditors, InfoSpace, Inc., Intersil

4         Investment Company, Intersil Holding GmbH, Intersil

5         Europe Sarl, and Xicor LLC

6        1227 25th Street, NW

7        Suite 700

8        Washington, DC 20057

9

10   BY:   DAVID B. TATGE, ESQ.

11

12

13   HUGHES HUBBARD & REED LLP

14        Attorneys for the James W. Giddens, SIPA Trustee

15        One Battery Park Plaza

16        New York, NY 10004

17

18   BY:   JAMES B. KOBAK JR., ESQ.

19        SARAH LOOMIS CAVE, ESQ.

20        WILLIAM R. MAGUIRE, ESQ.

21

22

23

24

25

```
 1    KRAMER LEVIN NAFTALIS & FRANKEL LLP

 2         Attorneys for Rutger Schimmelpennick and Frederic

 3           Verhoeven, as Co-Trustees of Lehman Brothers Treasury

 4           Co. B.V.

 5         1177 Avenue of the Americas

 6         New York, NY 10036

 7

 8    BY:   THOMAS MOERS MAYER, ESQ.

 9

10    LINKLATERS LLP

11         Attorneys for the Joint Administrators

12         1345 Avenue of the Americas

13         New York, NY 10105

14

15    BY:   MARY K. WARREN, ESQ.

16

17    MILBANK, TWEED, HADLEY & MCCLOY, LLP

18         Attorneys for the Official Committee of

19          Unsecured Creditors

20         One Chase Manhattan Plaza

21         New York, NY 10005

22

23    BY:   EVAN R. FLECK, ESQ.

24         DENNIS C. O'DONNELL, ESQ.

25         DENNIS F. DUNNE, ESQ.
```

12

1

2  QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

3      Special Counsel to the Official Committee of Unsecured

4       Creditors

5      51 Madison Avenue, 22nd Floor

6      New York, NY 10010

7

8  BY:   JAMES C. TECCE, ESQ.

9

10  QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

11      Special Counsel to the Official Committee of Unsecured

12       Creditors

13      16 Old Bailey

14      London EC4M 7EG

15      United Kingdom

16

17  BY:   JAMES SHAERF, ESQ. (TELEPHONICALLY)

18

19  ROTTENBERG LIPMAN RICH, P.C.

20      Attorneys for Malayan Banking Berhad

21      369 Lexington Avenue

22      16th Floor

23      New York, NY 10017

24

25  BY:   THOMAS E. CHASE, ESQ.

13

1

2    SALANS LLP

3         Attorneys for Svenska Handelsbanken AB

4         Rockefeller Center

5         620 Fifth Avenue

6         New York, NY 10020

7

8    BY:   DAN J. SCHULMAN, ESQ.

9

10

11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

12        Attorneys for Merrill Lynch International and Certain of

13         Its Affiliates

14        Four Times Square

15        New York, NY 10036

16

17   BY:   JAY M. GOFFMAN, ESQ.

18        GEORGE A. ZIMMERMAN, ESQ.

19        SALLY MCDONALD HENRY, ESQ.

20

21

22

23

24

25

14

1

2    TROUTMAN SANDERS LLP

3         Attorneys for PT Bank Negara

4         The Chrysler Building

5         405 Lexington Avenue

6         New York, NY 10174

7

8    BY:   LEE W. STREMBA, ESQ.

9         HOLLACE TOPOL COHEN, ESQ.

10

11   WHITE & CASE LLP

12        Attorneys for the Ad Hoc Group of Lehman Brothers

13         Creditors

14        1155 Avenue of the Americas

15        New York, NY s10036

16

17   BY:   GERARD UZZI, ESQ.

18

19   SECURITIES INVESTOR PROTECTION CORPORATION

20        805 15th Street, N.W.

21        Suite 800

22        Washington, DC 20005

23

24   BY:   KENNTH J. CAPUTO, ESQ.

25

15

U.S. DEPARTMENT OF JUSTICE

    Office of the United States Trustee

    33 Whitehall Street, Suite 2100

    New York, NY 10004


BY:  LINDA A. RIFFKIN, AUST

    ANDREW D. VELEZ-RIVERA, ESQ.


CHAPMAN & CUTLER

    Attorneys for Creditor, US Bank

    111 West Monroe Street

    Chicago, IL 60603


BY:  JAMES HEISER, ESQ. (TELEPHONICALLY)

    FRANKLIN H. TOP III, ESQ. (TELEPHONICALLY)


FELDERSTEIN FITZGERALD WILLOUGHBY & PASCUZZI LLP

    Attorneys for Creditor, CalPERS

    The Wells Fargo Center

    400 Capitol Mall, Suite 1450

    Sacramento, CA 95814


BY:  STEVEN H. FELDERSTEIN, ESQ. (TELEPHONICALLY)

    HOLLY A. ESTIOKO, ESQ. (TELEPHONICALLY)

```
                                                              16

 1

 2     FLASTER GREENBERG

 3            Attorneys for Creditor, TAARP Group LLP

 4            4 Penn Center

 5            1600 JFK Boulevard, 2nd Floor

 6            Philadelphia, PA 19103

 7

 8     BY:   GREG T. KUPNIEWSKI, ESQ. (TELEPHONICALLY)

 9

10     MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO PC

11            Attorneys for Creditors, Teva Pharmaceuticals and SL

12             Green Realty

13            One Financial Center

14            Boston, MA 02111

15

16     BY:   LAURENCE A. SCHOEN, ESQ. (TELEPHONICALLY)

17            ADRIENNE K. WALKER, ESQ. (TELEPHONICALLY)

18

19     STUTMAN TREISTER & GLATT

20            Attorneys for Creditor, Baupost Group

21            1901 Avenue of the Stars

22            12th Floor

23            Los Angeles, CA 90067

24

25     BY:   GABRIEL GLAZER, ESQ. (TELEPHONICALLY)
```

17

1

2    STUTMAN TREISTER & GLATT

3         Attorneys for Interested Party, Elliott Company

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

9

10   STUTMAN TREISTER & GLATT

11        Attorneys for Creditor, Perry Capital

12        1901 Avenue of the Stars

13        12th Floor

14        Los Angeles, CA 90067

15

16   BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

17

18   TARCZA & ASSOCIATES, LLC

19        Attorneys for Claimant, Louisiana Sheriff Pension &

20         Relief Funds

21        1310 Whitney Building

22        228 St. Charles Avenue

23        New Orleans, LA 70130

24

25   BY:   ROBERT E. TARCZA, ESQ. (TELEPHONICALLY)

18

1

2    TOBIN & TOBIN

3         Attorneys for Creditor, John S. Rosekrans

4         500 Sansome Street

5         San Francisco, CA 94111

6

7    BY:   JOHN P. CHRISTIAN, ESQ. (TELEPHONICALLY)

8

9

10   AURELIUS CAPITAL MANAGEMENT

11        Interested Party

12

13   BY:   DAVID TIOMKIN (TELEPHONICALLY)

14

15

16   THE BAUPOST GROUP

17        Interested Party

18

19   BY:   MEGHAN S. SHERWOOD (TELEPHONICALLY)

20

21

22   CITIGROUP

23        Interested Party

24

25   BY:   ARIEL BARZIDEH (TELEPHONICALLY)

19

1

2    CREDIT SUISSE FIRST BOSTON

3         Creditor

4

5    BY:   ANDREW REBAK (TELEPHONICALLY)

6

7    FARALLON CAPITAL MANAGEMENT

8         Creditor

9

10   BY:   ANATOLY BUSHLER (TELEPHONICALLY)

11

12   KING STREET CAPITAL MANAGEMENT, LLC

13        Creditor

14

15   BY:   MITCHELL SOCKETT (TELEPHONICALLY)

16

17   MERRILL LYNCH

18        Interested Party

19

20   BY:   MICHAIL ZEKYRGIAS (TELEPHONICALLY)

21

22   SILVERPOINT CAPITAL LP

23        Interested Party

24

25   BY:   AUSTIN SAYPOL (TELEPHONICALLY)

20

1

2   TRICADIA CAPITAL

3        Interested Party

4

5   BY:   STEPHEN GRISANTI (TELEPHONICALLY)

6

7   MATT HIGBEE, IN PROPRIA PERSONA (TELEPHONICALLY)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

21

P R O C E E D I N G S

1

2       THE COURT:  Be seated, please.

3       MR. FAIL:  Good morning, Your Honor.  Garrett Fail,

4   Weil, Gotshal & Manges, for Lehman Brothers Holdings, Inc., and

5   its affiliated debtors.  There are a number of items on the

6   agenda this morning.  Unless the Court prefers otherwise, we'll

7   take them in the order that they appeared on the agenda.

8       THE COURT:  Let's do that.

9       MR. FAIL:  Thank you, Your Honor.  And with respect to

10   motions on stipulations of the debtors that would be presented,

11   I proposed that we just submit them, to the extent granted, at

12   the end of this morning's calendar.

13       THE COURT:  Fine.

14       MR. FAIL:  Thank you.  Your Honor, the first item on

15   the agenda is a case conference with respect to the final --

16   the fee committee final recommendations with respect to second

17   interim fee applications.

18       THE COURT:  Now a contested matter.

19       MR. FAIL:  Somewhat, Your Honor.  I'll turn the podium

20   over to Mr. Velez-Rivera, or anyone else for the fee committee.

21       MR. VELEZ-RIVERA:  Your Honor, just a very brief

22   series of remarks.  The fee committee has gone through the

23   second wave of fee applications twice.  It has filed its report

24   with additional guidelines with which the Weil Gotshal firm

25   seems to have disagreed.

22

1        The fee committee hasn't had the opportunity to

2    deliberate on the document because it was filed only late last

3    night, but the U.S. Trustee's comments with respect thereto are

4    simply that the fee committee's recommendations are nothing --

5    are no more than that.  There are recommendations as to a

6    series of deductions from fee applications, which the Court

7    revisits at the end of the case, and recommendations by the

8    very nature aren't punitive.  The document also assumes a level

9    of arbitrariness that just isn't there.

10       The fee committee is a very deliberative body.  It

11   makes recommendations, and in this particular instance, where

12   it proposes to make deductions, it makes them only -- it will

13   make them only to the extent it believes that documents and

14   materials should have been submitted with a fee application the

15   first time around.

16       The guideline to which Weil Gotshal is complaining

17   simply addresses a recurring difficulty that the fee committee

18   is having in reviewing applications.  The same omissions and

19   the same shortcomings keep on arising in fee applications over

20   and over again.  And this was the best method that the fee

21   committee could come up with to grapple with the problem.

22       That's all I have.

23       THE COURT:  Well, I have a couple of comments, and I

24   don't have to deliberate with anybody about the objection filed

25   by Weil Gotshal; I read it and I reacted to it.  And one of my

23

1   reactions is that I don't know enough about this process.  The

2   last time the fee committee made a report, and I think I was

3   quite complimentary in my remarks from the bench about the work

4   about the committee, and I still am, I had requested that I

5   receive the same information that the fee committee receives in

6   terms of the oversight of professionals and the adjustments in

7   their fee applications.  That hasn't happened.  None of those

8   materials had been provided to chambers.

9          As a result, I find myself in the uncomfortable

10  position, and we're going to have to do something to fix it,

11  that I read your report literally within days of a hearing such

12  as this, and in the even more uncomfortable position of

13  receiving on the morning of the hearing an objection from Weil

14  Gotshal regarding their recommendations.  I had no advance

15  notice that there would be recommendations, nor did I have any

16  advance notice that these would be controversial.

17         It seems to me, without getting into the substance of

18  the recommendations or the objections thereto, that I need more

19  visibility into this process than I have been given.  And I'm

20  going to schedule a chambers conference.  Mr. Feinberg will be

21  there, as will all members of the committee.  I'm looking for

22  informal insights not available from the written report as to

23  how the committee is functioning, whether or not there are

24  material issues of concern with regard to the fee application

25  review process, whether or not this is efficient or inefficient

24

1    in the way it's being managed, and I want an opportunity for

2    Weil Gotshal and perhaps the creditors' committee lawyers, as

3    representatives of those professionals who submit fee

4    applications, to be in attendance at this meeting as well.  I'd

5    like this to be a candid off-the-record review as to whether or

6    not this is working, and if it isn't, what we can do to make it

7    better.

8              MR. VELEZ-RIVERA:  That's good, Your Honor.

9              THE COURT:  We'll do that in January.

10             MR. VELEZ-RIVERA:  Okay.

11             THE COURT:  What I'm going to suggest is that you meet

12   and confer on the phone with members of the committee to

13   determine some dates that are workable.  This will be an in-

14   person meeting.

15             MR. VELEZ-RIVERA:  We will do that.

16             THE COURT:  Okay.

17             MR. VELEZ-RIVERA:  Thanks, Judge.

18             THE COURT:  Thank you.  Oh, and by the way, I accept

19   the report and appreciate the fact that there were significant

20   consensual reductions in the fees applicable to this interim

21   period based upon the work of the committee.

22             MR. VELEZ-RIVERA:  Thank you.

23             MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez.

24   I'm here on the next matter, which is LBHI's motion for

25   authority to make a capital contribution to Aurora Bank.  It's

25

1    docket number 5956.

2        Your Honor, we did not have any objections to the

3    motion but, nevertheless, we though it important to come down

4    and kind of tell the Court what's going on with this, because I

5    continue to come down here.

6        THE COURT:  This is funding by a thousand cuts.

7        MR. PEREZ:  Well, Your Honor, it may be, and I hope

8    the Court doesn't perceive it that way, but I think we're very

9    close to a --

10        THE COURT:  Well, I guess I do perceive it that way,

11    because I just said it.

12        MR. PEREZ:  Understood, Your Honor.  And I think we

13    are in advanced discussions -- the bank is advanced discussions

14    with the regulators; they've submitted a business plan.  And I

15    think that -- I would hope, well, that the next time I'm

16    here -- and we intend to file a motion as soon as we have a

17    deal on the table, which would resolve the issue, at least for

18    the foreseeable future.  This has been a very difficult

19    process.  There's no great solutions here.  Because the banks

20    have mark-to-market accounting or fair value accounting, we're

21    subject to the vagaries of the market.

22        The particular issue today was occasioned by a mistake

23    in the calculation of the RFC master servicing rights and a

24    result of some changes in the fair value of the assets.  So we

25    wanted to make sure that there wasn't any issue that on 12/31

26

1    we're well-capitalized.

2         But that doesn't solve the long-term problem of both

3    Aurora and Woodlands Bank.  This is something that -- Mr.

4    Lambert is here from Alvarez & Marsal; he spends full time

5    working on this, and a whole group of people additionally.  The

6    creditors' committee has a whole subcommittee devoted to

7    working on these problems.  Mr. Rosenberg is here representing

8    Aurora Bank.  I mean, this is something that is at the highest

9    level in all of these institutions and trying to find a

10    solution.

11         As the Court is aware, I mean, we have been through

12    significant financial tumult, and the banks have not fared well

13    during this time period.  Finding a solution is not going to be

14    an easy thing.

15         Just so the Court's aware, there are about six proofs

16    of claim filed both by the OTS and Aurora against LBHI,

17    totaling about three billion dollars.  Some of those proofs of

18    claim have been filed as priority claims under 365(o).  There

19    are approximately twenty-five proofs of claim filed by

20    Woodlands Bank against not only LBHI but LBSF and several of

21    the other entities.

22         The goal would be to have a resolution of all of the

23    claims and to be able to set ourselves up on a way where the

24    estate could realize the value out of these assets.

25         At this point, Your Honor, I wish I could go further,

27

1   but, I mean, there have been significant discussions, they're

2   at an advanced stage, and when they're done we'll file a motion

3   immediately to try to resolve the issue.

4        THE COURT:  Okay.  I've given what I assume is the

5   delicacy of those conversations, and the fact that we have a

6   very full courtroom, there's no need to go into this in further

7   detail.  But can you give me any assurance as to whether this

8   is the end of the line in terms of emergency funding for these

9   institutions?

10       MR. PEREZ:  Your Honor, based on what I know as of

11  this morning, and literally there have been proposals exchanged

12  as late as Friday, I believe that the next pleading that we

13  file, hopefully before the end of the year, will be a

14  comprehensive resolution.  But, Your Honor, I can't in good

15  faith say absolutely; I just can't -- I can't in good faith.

16  Based on everything I know, that's the case, but I just

17  couldn't -- I just don't know enough, and certainly I have no

18  control over, you know, two of the three, or three of the four

19  parties.  I mean, I have control over LBHI.  I don't have

20  control over either bank; I don't have control over the OTS or

21  the FDIC or any other governmental agency that might be

22  involved.

23       So it's -- I can make a good-faith representation that

24  based on everything I know as of Friday that hopefully the next

25  piece of paper is the last one.

1          THE COURT:  Okay.  I mean, this is an uncontested

2     motion.  I would be encouraged to hear that the creditors'

3     committee has reviewed it and is satisfied that this funding is

4     in the best interests of the estate.

5          MR. O'DONNELL:  Your Honor, Dennis O'Donnell of

6     Milbank, Tweed, Hadley & McCloy, on behalf the creditors'

7     committee.  In answer to your question, Your Honor, is yes, the

8     committee has been, and continues to be, intimately involved in

9     the ongoing negotiations with the regulators over a global

10    resolution.  This is stop-gap measure.  I mean, it's -- I agree

11    where the perception is to easily perceive this death by a

12    thousand cuts.  But this should be the last cut before a global

13    resolution, if we can get to a global resolution, which we

14    agree with Mr. Perez's representations that we think before the

15    end of the year is a possibility.  We can't guarantee that; we

16    don't control the regulators.  But all indications are that

17    we're moving with a momentum and direction that we have had --

18    not had previously, hopefully towards a global resolution.

19         THE COURT:  Okay, and just so I'm clear -- this is

20    really a question for Mr. Perez, if he has the data.  From the

21    beginning of this process through today, what's the total in

22    advances made to Aurora?

23         MR. PEREZ:  I do have that data, Your Honor.  Your

24    Honor, we have foregone ninety-nine million in disputed serving

25    fees.  So in other words, these were servicing fees that they

1    had that they claimed they owed, that we claimed we owed, and

2    we gave them up.  We had a capital contribution of 9,838,000

3    dollars on February 27th; a capital contribution of 15,000,000

4    dollars on March 31st; a capital contribution of 50,000,000

5    dollars on June 30th.  We had the MSR rights, which at the time

6    were valued at 171-; they're 50 million dollars lower; hence,

7    the reason for the motion today.  And in addition, Your Honor,

8    we were able to reduce loan commitments which were held as

9    reserves against them at a 100 percent of a 1,357,000,000, at

10   really minimal cost; there might have been some cost to

11   reducing the loan commitments.

12        So that's what -- and then in addition to that, Your

13   Honor, we have provided two financings, which are advanced and

14   repaid:  one of 450-, one of 500 million.  Those are kind of

15   temporary liquidity facilities.  That's what we've done with

16   respect to Aurora.

17        With respect to Woodlands, as the Court will recall,

18   there was a disputed asset on the books, some municipal bonds,

19   and against that we advanced 200 million dollars.

20        THE COURT:  And today's measure will do what?

21        MR. PEREZ:  Today's measure, Your Honor, will increase

22   the capital of Aurora so that it will be over the ten percent

23   well-capitalized.  We're -- there's a concern that it's going

24   to be under that at 12/31.

25        THE COURT:  And how much money is -- are we talking

30

1    about that will be going into Aurora?

2            MR. PEREZ:  Today, a hundred million, Your Honor.

3            THE COURT:  Hundred million today?

4            MR. PEREZ:  Yes, Your Honor.

5            THE COURT:  Okay.

6            MR. PEREZ:  Thank you, Your Honor.

7            THE COURT:  Motion's approved.

8            MR. PEREZ:  May I be excused?

9            THE COURT:  You may be excused.

10           MR. PEREZ:  Thank you.

11           MR. GRUENBERGER:  Good morning, Your Honor.  Peter

12   Gruenberger, Weil, Gotshal & Manges, for the debtors, on docket

13   number 5955.

14           We are pleased to inform the Court that no objections

15   have been filed to debtors' motion under Bankruptcy Rule 9019

16   for approval of the settlement between LBSF, AFLAC and others

17   regarding to the Beryl notes program that Your Honor's familiar

18   with.

19           Ordinarily, we'd have just filed a certificate of no

20   objections and handed up the order.  That order will be handed

21   up at the end of the hearing by my colleague Mr. Singh, but

22   we -- the reason we didn't just file the certificate is that

23   all parties to the settlement wanted Your Honor to be aware of

24   the fact that there is a timing issue that exists relating to

25   when Your Honor signs the order.  Because of applicable

31

1   accounting rules, AFLAC is required, as I understand it, to

2   close this -- or book this deal anyway as a filed settlement

3   before the end of the calendar year 2009.

4        And so we all wanted to make it explicit to Your Honor

5   that we hope Your Honor can find the time to sign it, today

6   being December 16th, before the end of the year so AFLAC can

7   accomplish that end.  And so that order will be handed up at

8   the conclusion of this morning's hearing.

9        THE COURT:  That conveys the impression that I'm tardy

10  in the entry of my orders.

11       MR. GRUENBERGER:  No, Your Honor, I just want to give

12  a holiday present, that's all.

13       THE COURT:  Okay.  Thanks very much.  There'll be no

14  trouble, at least on my side, in being able to promptly enter

15  the order.  I'm familiar with the circumstances of the

16  settlement as a result not only of the motion but certain

17  chambers conferences that we've had concerning the process and

18  procedure of reaching a settlement.  And I'm pleased with the

19  outcome and I'm happy to approve it.

20       MR. GRUENBERGER:  Thank you, Your Honor.

21       MR. FAIL:  Good morning again, Your Honor.  Garrett

22  Fail, Weil Gotshal, for the debtors.

23       Returning briefly to the first item on the agenda and

24  the fee committee and the case conference on the fee

25  committee's final recommendation, just a point of

32

1   clarification.  Whether or not the Court was going to address

2   the recommendations with respect to the second interim

3   applications, I'm aware that there are parties who came today

4   prepared to address those recommendations.  Weil Gotshal, as

5   noted in our report, agreed, but there are other professionals

6   who are here that didn't.  So the question is whether or not

7   the Court preferred to adjourn till after the status conference

8   or address those today.

9        THE COURT:  Well, maybe I don't understand what you've

10  just said.  I thought that the case conference on the final

11  recommendations was just that, a conference, and that we've

12  moved on.  Are there people who wish to circle back to that now

13  to be heard in connection with the fee committee

14  recommendation?

15       I hope the answer's no.

16       MR. FAIL:  Your Honor, I think there were some that --

17  some professionals who thought that the Court may rule on the

18  second interim applications, but it's clear that today -- it

19  seems clear now that today was just a status conference and

20  that the Court will address final recommendations on the second

21  interim applications after the status conference in January.

22  There was a ten percent holdback, Your Honor.

23       THE COURT:  There's a ten percent holdback; there's a

24  recommendation in the committee report that that holdback be

25  finalized by virtue of the final recommendations.  If you're

33

1    looking for a so-ordered that that can be done, I can do that,

2    but it's not part of the agenda.

3              MR. FAIL:  Thank you, Your Honor.

4              THE COURT:  Do you want that done?

5              Do the professionals want that done as a Christmas

6    present?

7              MR. FAIL:  Unfortunately, Your Honor, that's why I

8    mentioned that there were professionals here today who did not

9    agree with the final recommendations.  While some professionals

10   may enjoy the Christmas present, others wouldn't -- would like

11   to return it probably after they opened it.

12             MR. DUNNE:  Your Honor, may I be heard?  It's Dennis

13   Dunne from Milbank Tweed, on behalf of the committee.  The

14   committee agrees with what Your Honor proposed.  If we could

15   actually take you up on the so-ordered with respect to the

16   holdback portion, have the case conference in January.  We view

17   a lot of what's in that -- the fee committee's report as being

18   prospective and applicable to the third fee application as

19   well --

20             THE COURT:  So do I.

21             MR. DUNNE:  -- particularly with respect to what Weil

22   Gotshal filed last night.  And we have some of the same issues

23   that we think we can resolve in a case conference like that.  I

24   think the only matter for consideration now is the ten percent

25   holdback.  And we would enjoy the holiday gift, Your Honor.

34

1         THE COURT:  The ten percent holdback may be treated as

2    paid to those professionals, subject to deductions for the

3    adjustments that have been reflected in the committee final

4    recommendations.  And to the extent that there's a need for a

5    more formal order than what I just did, which I so order that,

6    you can submit a piece of paper which I will enter as promptly

7    as I enter the AFLAC settlement approval.  If that's not

8    necessary, then you can simply rely upon this transcript.

9         MR. FAIL:  Thank you, Your Honor.  Weil Gotshal will

10   discuss with the members of the fee committee and circulate to

11   the relevant professionals before it submits an order to the

12   Court.

13        THE COURT:  Okay.

14        MR. FAIL:  Your Honor, moving to item 4 on the agenda

15   is a motion filed by the TAARP Group authorizing and directing

16   payment of an administrative expense claim.  Your Honor, TAARP

17   sought allowance of an administrative expense in excess of 1.4

18   million dollars.  The parties have reached a stipulation and

19   would present it at the end of today's calendar, which would

20   provide TAARP with immediate payment of 50,000 dollars as an

21   administrative expense claim and allow the balance of the

22   amount as a general unsecured claim, the 50,000 dollars

23   representing the amount of work performed post-petition.

24        If the motion is unopposed, then we'd request the

25   Court approve the stipulation.

35

1          THE COURT:  It's approved.

2          MR. FAIL:  Thank you, Your Honor.  The next motion is

3    the motion of Deutsche Bank AG to permit a late claim filing

4    pursuant to Bankruptcy Rule 9006(b)(1).  After reviewing and

5    consulting with the creditors' committee, the debtors agreed

6    not to object to the proof of claim on the basis of

7    untimeliness but reserved rights to object to the claim on all

8    other grounds.  And we would present a stipulation to reflect

9    that agreement as well.

10          THE COURT:  Okay, that's approved.

11          MR. FAIL:  Thank you, Your Honor.  The next items on

12   the agenda are first-day motions with respect to Merit, LLC.

13   Merit, LLC filed a petition in this court on Monday the 14th of

14   December.  Merit, LLC is a derivates-related single-purpose

15   entity wholly owned by Lehman Commercial Paper Inc., a debtor

16   in these Chapter 11 cases.  The filing was done after notice

17   and consultation with the majority of material creditors from

18   Merit, LLC.  The majority of those are current and former

19   affiliates of these debtors and of Merit, LLC.

20          The three motions on the calendar today are standard

21   orders:  the first requests joint administration along with the

22   other jointly administered cases.

23          THE COURT:  I just have a question.

24          MR. FAIL:  Yes, sir.

25          THE COURT:  What prompted the filing at this juncture?

1        MR. FAIL:  Your Honor, Merit, LLC filed, after

2    consultation with its independent manager, to preserve the

3    value of certain of its assets and to protect and hopefully

4    enhance its ability to liquidate certain of its assets.

5        THE COURT:  Okay, that was sufficiently opaque that I

6    don't understand it.

7        MR. FAIL:  Should I clarify or move on, Your Honor?

8        THE COURT:  I'd just like to know why they filed now.

9        MR. FAIL:  You'd like to know?  Merit, LLC has amongst

10   its assets certain shares of third-party stock and certain

11   contractual rights that it believes it has the right to

12   exercise in connection with a put option.  And all parties --

13   or -- and Merit, LLC believes that negotiations with the

14   counterparty --

15       (Pause)

16       MR. FAIL:  And, Your Honor, there are ongoing

17   discussions and negotiations, and there may be disputes with

18   certain parties around those.  And to enhance the benefit and

19   protect its assets, Merit, LLC commenced the Chapter 11 case

20   last Monday.

21       THE COURT:  Okay.

22       MR. FAIL:  Your Honor, the first -- the next motion,

23   as I mentioned, was for joint administration with these cases.

24   The second motion is an all-orders motion applying for

25   administrative use and efficiencies, orders that apply to all

37

1    debtors in these cases to Merit, LLC's Chapter 11 case.  It

2    excluded the bar date motion and a motion to extend the time

3    for the current debtors to file schedules.

4        The third motion, then, is a motion to extend the

5    debtors' -- Merit, LLC's time to file schedules in additional

6    thirty days, through January 27th.  Merit, LLC believes that

7    it's able to meet that deadline, and we'll be filing by that

8    point.

9        THE COURT:  Okay.  I mean, these are entirely standard

10   first-day motions, there are no objections, and they're all

11   approved.

12       MR. FAIL:  Thank you, Your Honor.  Your Honor, my

13   colleague David Fertig will address the next matter on the

14   calendar.

15       MR. FERTIG:  Good morning, Your Honor.  David Fertig

16   from Weil Gotshal, on behalf of debtors LBHI and LBSF.  Your

17   Honor, we're here this morning on CalPERS's motion for stay

18   relief filed against LBHI and LBSF, the hearing of which is

19   tentatively scheduled to take place on the next omnibus hearing

20   in January of the new year.

21       Before we get started, we can be brief; this is just a

22   status conference, but before we get started I wanted to alert

23   Your Honor to the fact that on the agenda as well, item number

24   19, is a similar motion filed by CalPERS for setoff -- for a

25   stay relief to exercise a setoff in the case of LBI.  So we've

38

1    invited Mr. Brundige up from Hughes Hubbard so that if Your

2    Honor wishes to hear anything from him following this, you can

3    consider the issues together.

4           THE COURT:  So this is a twofer?

5           MR. FERTIG:  It's a twofer.  I think also, just for

6    the record, I believe we have counsel for CalPERS appearing

7    telephonically this morning, Mr. Felderstein from the

8    Felderstein Fitzgerald firm.  Is he on?

9           THE COURT:  Are you on the line, sir?

10          MR. FELDERSTEIN:  Yes, I am.  Thank you.

11          THE COURT:  Okay.

12          MR. FERTIG:  Your Honor, the parties thought it would

13   be useful to appear for a status conference here this morning,

14   really just for two limited purposes:  the first, to update the

15   Court as to the status of CalPERS's motion and the briefing and

16   hearing schedule that has been agreed to by the parties; and

17   second, to make the Court aware of the parties' shared view

18   that, for purposes of the Court's planning in setting a hearing

19   date on the motion, that the CalPERS motion essentially raises

20   a threshold issue of law as to which no discovery is required

21   and no evidentiary hearing is necessary, so that the Court

22   would have advanced notice of the parties' belief that it would

23   be appropriate to move to oral argument on this issue of law at

24   the next time we're before Your Honor.

25          As Your Honor may recall, CalPERS's motion seeks an

39

1    order granting CalPERS relief from stay, for the sole purpose

2    of exercising a purported right of setoff by which CalPERS

3    seeks to offset an approximately 17 million dollar to LBSF,

4    representing a termination payment that's owed to LBSF in

5    respect of CalPERS's early termination of various derivative

6    transactions between LBSF and CalPERS against an approximately

7    430 million dollar claim that CalPERS has asserted not against

8    LBSF but against LBHI in respect of amounts that CalPERS

9    contends it's owed under certain pre-petition bonds that were

10    issued by LBHI.

11           As set forth in the debtors' objection which --- to

12    the motion, which we filed on November 24th, the debtors are

13    reserving their rights to challenge both the -- or to confirm

14    the proper amount of the termination payment owed by CalPERS to

15    LBSF, as well as to challenge the amount and validity of the

16    CalPERS claim in respect of the LBHI bonds, which -- and

17    likewise, it's my understanding from conversations with CalPERS

18    counsel last evening that CalPERS wishes to reserve its rights

19    with respect to the proper amount of the termination payment,

20    and more specifically any interest component that may be owing

21    on that.

22           But the parties are in agreement that there is a --

23    the motion raises a threshold and potentially dispositive legal

24    issue, and that is whether, under the circumstances, CalPERS's

25    debt to LBSF may be, as a matter of law, set off against

40

1    CalPERS's claims against LBHI under the bonds.  And more

2    specifically the question is whether those debts can be

3    considered mutual as required for purposes of setoff under

4    Section 553 of the Bankruptcy Code and New York law.

5         It's debtors' position that those debts are not

6    mutual, because the CalPERS debt is owed to LBSF, whereas the

7    CalPERS alleged claim exists solely against LBHI.  And CalPERS,

8    on the other hand, asserts that the requirement of mutuality is

9    either excused in its entirety or, alternatively, that

10   mutuality exists by virtue of the fact that LBHI guaranteed

11   certain of LBSF's obligations under the derivative transactions

12   that were terminated.

13        THE COURT:  Is there any issue here of a master

14   netting agreement?

15        MR. FERTIG:  I'm sorry?  I didn't hear.

16        THE COURT:  Is there any issue here of a master

17   netting agreement?

18        MR. FERTIG:  No, Your Honor.  There is a master -- and

19   is the master agreement in 1992, standard is the master

20   agreement that is in place.  And that's one of the issues that

21   is raised and is briefed in the motion.  It's the estate's

22   position that the -- that master agreement does not provide for

23   or permit nonmutual setoff or any setoff other than among the

24   parties to the swap agreement, LBH -- I'm sorry, LBSF and

25   CalPERS, but that's the only agreement that's in place.

41

1        THE COURT:  Okay.

2        MR. FERTIG:  So, Your Honor, that's essentially the

3   threshold legal issue on which the CalPERS motion turns and on

4   which the parties would wish to be heard at oral argument the

5   next time they're before this Court.

6        And so that brings me back to the other reason we

7   thought it would be useful to be here today, which is timing

8   and scheduling.  As Your Honor may recall, the CalPERS motion

9   was originally filed in late August of this year.  By consent

10  of the parties, however, the briefing and hearing schedule was

11  modified on two occasions, as reflected in notices of

12  adjournment that were filed on September 3rd and October 28th.

13       By consent of the parties, the debtors filed their

14  objection to the motion on November 24th, and CalPERS's reply

15  papers are due to be served on December 23rd, such that the

16  motion and this threshold legal issue I've been speaking about

17  will be fully briefed as of next week.

18       And so the parties just wish to advise the Court of

19  their desire to have argument on the motion in January, either

20  at the next omnibus hearing, which is the date for which we've

21  tentatively scheduled it, or, if more convenient for Your Honor

22  given the docket, what it looks like on the 13th, some other

23  date in January.

24       THE COURT:  Let me ask this question of all counsel.

25  I accept the rendition of the facts and the law that you've

42

1    just presented, recognizing there may be some areas of

2    disagreement; it sounds like it's mostly a factual recitation.

3    I'm interested in knowing about how long counsel expect

4    argument to take on this.  Is there any estimate as to how long

5    oral argument will last?  If it's going to last more than, say,

6    forty-five minutes, it seems to me that this is a matter that

7    might be best heard on an adversary day when I tend to hear

8    matters at greater length than on the omnibus day.  But if it's

9    going to be relatively brief, it can be heard on the next

10   omnibus day, which is January 13th.

11       MR. FERTIG:  Your Honor, I certainly don't want to

12   speak for counsel for CalPERS.

13       THE COURT:  That's why I'm asking everybody.

14       MR. FERTIG:  You could hear from him in a moment.  I

15   guess my reaction would be that I don't think that the issues

16   raised, which, again, we believe are issues of law, and I don't

17   believe there are disputed facts that are germane to that

18   issue, I think it's not a fairly complex one, I think the law

19   is fairly straightforward from the estate's perspective, and I

20   don't believe that we would need more than forty-five minutes

21   for argument, although I suppose I'm thinking more along the

22   lines of per party.  It may be that if we're going to hear the

23   motions of LBI on the same date, then it might make sense to

24   have it on another day.

25       THE COURT:  I think we should specially list it, based

43

 1    upon that.  And I don't know what my calendar looks like in

 2    January for the Lehman case, other than the 13th, and I would

 3    suggest that it be listed as if it were an adversary proceeding

 4    and as if this were, in effect, a motion for summary judgment

 5    with respect to an adversary proceeding.  That way, we can

 6    allocate sufficient time to it and we will not be delaying the

 7    hearing of other matters on an omnibus day when so many other

 8    lawyers are present.

 9            MR. FERTIG:  That's okay with me, Your Honor.

10            UNIDENTIFIED SPEAKER:  I think that makes a lot of

11    sense, Your Honor.

12            THE COURT:  Fine.

13            Is that all right with CalPERS?

14            MR. FELDERSTEIN:  This is Steven Felderstein.  I

15    agree.

16            THE COURT:  Okay.

17            Well, everybody agrees with that, at least.  I'll see

18    you in January on a day to be determined.

19            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20            MR. FERTIG:  Thank you, Your Honor.

21            MR. FELDERSTEIN:  Thank you, Your Honor.

22            MR. WAISMAN:  Good morning, Your Honor.  Shai Waisman,

23    Weil, Gotshal & Manges, on behalf of the Lehman debtors.  Your

24    Honor, the next three matters that appear on the calendar, as

25    Your Honor may recall, were the subject of disputes at the last

44

1    omnibus hearing.  They were carried over to this calendar at

2    Your Honor's request for a status conference.  So I'm not sure

3    anyone is prepared or is making a presentation other than to

4    have a status conference.

5         There have been two pleadings filed since the last

6    hearing; I can address those very briefly, or --

7              THE COURT:  Why don't you address those very briefly.

8              MR. WAISMAN:  Your Honor, the debtors filed a

9    supplement.  Your Honor gave us the opportunity, because some

10   of the later-filed pleadings at the last hearing, to address

11   any of the points raised.  We took the opportunity to file a

12   short pleading addressing some of what we felt were

13   misstatements that needed to be corrected but also to address

14   some of the statements that we had made -- that the debtors had

15   made representations regarding the number of claims and late

16   claims that have been filed, for which there was no evidence in

17   the record.

18        Yesterday we received from counsel to PB Capital a

19   motion requesting an opportunity to file a surreply.  I think

20   the motion itself was the surreply.

21             THE COURT:  Yes, it was.  I read it.

22             MR. WAISMAN:  And it attached and relied on an

23   affidavit.  The affidavit made two points, as I recall, the

24   first point being that there is a proof of claim filed by a

25   party similarly situated to PB Capital.  As to that proof of

45

1    claim, I would make two points.  First, for a party similarly

2    situated to PB Capital, the counterparty, and I believe it was

3    DWS, or something similar to that, in fact understood that its

4    claim, having not been on the program securities list, was due

5    September 22nd and filed its claim on September 15th.  So the

6    party similarly situated to PB Capital did in fact understand

7    the program, its responsibilities and the bar date.

8         Out of curiosity, because I looked at the proof of

9    claim that was attached and that was supposedly the proof of

10   claim filed by DWS, I went on to the docket and pulled the

11   claim -- or had a look at the claim, because the claim annexed

12   did not have the claims agent's notation that it was a filed

13   claim.  The claim attached to the affidavit is in fact not the

14   proof of claim filed by DWS, claim 13735, and I have that claim

15   here with the claims agent's stamp; actually, September 16th

16   was the date it was filed, well in advance of the September

17   22nd bar date.

18        And the other point made was that a law clerk at

19   Cleary spoke to the client who spoke to some other party who

20   told them that they are in fact the third holder of the

21   security.  I don't think I have to say much more; that doesn't

22   exactly comport with the evidentiary requirements in the

23   Federal Rules of Evidence.

24        Other than that, we have continued to receive requests

25   for late-filed claims.  We consider each of them.  As Your

46

1    Honor saw, Deutsche Bank, we felt, did merit leave to file a

2    late claim; circumstances were out of their control.  We are

3    speaking to certain other parties who have similar

4    circumstances, and I expect that additional stipulations will

5    be filed.  And we have since received additional motions for

6    leave to file late claims, at least one of which we will likely

7    oppose for the same reasons we oppose the PB Capital request.

8         THE COURT:  Okay.  Thanks for that update.

9         Here's what I'm going to do.  I've decided this as to

10   Banesco Banco Universal and PB Capital.  I have not decided it

11   as to Pacific Life Insurance Company.  Given the fact that the

12   courtroom is quite crowded still and there are people standing

13   at this moment, I think it's unnecessary for me to spend the

14   time at this moment to read into the record my bench, but I'm

15   going to adjourn my bench ruling to this afternoon's calendar,

16   and those who might be interesting in hearing it can sit and

17   listen as I read it into the record as the last item today.

18        However, to the extent that people want to know

19   generally what I will be saying, I'm concluding that the two

20   that I have identified, Banesco Banco Universal and PB Capital

21   Corporation, have satisfied, at least in my judgment, the

22   standards of the Pioneer Investment Services v. Brunswick case

23   of the Supreme Court, and the Midland Cogeneration Venture

24   Limited Partnership v. Enron case of the Second Circuit, in

25   respect of a late-filed claim, and that they have convinced me

47

1    that, to the extent there is excusable neglect it's sufficient

2    to permit a late-filed claim here.

3            I'm still troubled by the Pacific Life Insurance

4    Company situation.  I have analogized it in my mind to a fly

5    ball going into the outfield and two outfielders are calling

6    for it and it drops between them.  It's clearly an error, and

7    it counts and runs score.

8            So is that excusable neglect?  I'm really not sure.

9    And I think Pacific Life should do everything that it can to

10   cure procedures that are clearly deficient within its

11   organization.  There is a level of inadvertence or incompetence

12   here that is embarrassing, and probably inexcusable.  Whether

13   or not there is excusable neglect, however, under the

14   applicable standards is something I'm still considering.  And

15   so I will defer my ruling with respect to that to another day.

16           I will read into the record a fairly well-developed

17   analysis as to Banesco and PB Capital this afternoon when only

18   those who are really interested in what I have to say will be

19   here to listen, if they wish, or they can simply order the

20   transcript.

21           MR. WAISMAN:  Thank you, Your Honor.  I will be here

22   this afternoon, as I am interested, but until then I have

23   nothing further on the calendar; I would just ask to be

24   excused.

25           THE COURT:  You may be excused until this afternoon.

48

1          MR. WAISMAN:  Thank you, Your Honor.

2          UNIDENTIFIED SPEAKER:  Your Honor, may I be excused

3     till this afternoon too, please?

4          THE COURT:  You certainly may.

5          UNIDENTIFIED SPEAKER:  Thank you.  Thank you, Your

6     Honor.

7          MR. KRASNOW:  Good morning, Your Honor.  Richard

8     Krasnow, Weil Gotshal, on behalf of the Chapter 11 debtors.

9     Your Honor, the next matter on the calendar is the motion filed

10    at docket number 5952, which seeks authorization and approval

11    of a derivatives incentive plan that is designed to maximize

12    the value of the debtors' derivative assets by aligning the

13    interest of the derivative workforce, which consists of

14    approximately 230 full-time employees devoted to maximizing

15    recoveries with respect to the debtors' derivative business,

16    with the interests of the creditors.

17         Your Honor, in addition to the motion itself, the

18    debtors, on December 8th, 2009, filed a declaration of Mr.

19    Robert Hershan, who is here in court this morning, in support

20    of the motion, as well as a reply in support of the motion,

21    which is at docket number 6214.  The Herhsan declaration is

22    docket number 6078.

23         Your Honor, there were three pleadings that were filed

24    with respect to this particular motion.  There was the

25    statement in support filed by the creditors' committee; soon

49

1    after, the motion itself was filed, as well as a statement in

2    support filed by the ad hoc group of Lehman Brothers'

3    creditors.  There was as well a response filed by the U.S.

4    Trustee's Office, which I generally would not characterize as

5    an objection to the program.  They do raise one issue, which I

6    will address in a moment, but really requesting that we augment

7    the record, which we think we have, but I will address that

8    also in a moment.

9         Your Honor, the motion goes into great detail about

10   the derivatives incentive plan regarding the benchmarks that

11   must be achieved to trigger contributions to the aggregate

12   incentive pool, which pool is capped at fifty million dollars.

13   As the motion also reflects, there are further individual caps

14   and, as well, certain rights of the creditors' committee with

15   respect to aspects of the plan, which are addressed in the

16   motion but I will also point them out, Your Honor, during the

17   course of the hearing.

18        Your Honor, generally the contributions to the

19   incentive pool, under the incentive plan, will be made based

20   upon cash collections, preservations of value of live trades,

21   and counterparty settlement offers, as well as mitigation of

22   claims.  A minimum of ten billion dollars, ten billion dollars,

23   Your Honor, of total recovery must be achieved to trigger these

24   contributions to the incentive pool.  Your Honor, as explained

25   in paragraph 25 of the motion, for total recovery values

50

1    between ten and eleven billion dollars, fifty basis points of

2    recovery in excess of the ten billion dollar floor will be

3    contributed to the incentive pool.  For recoveries in excess of

4    eleven billion dollars, one hundred basis points will be

5    contributed.

6         There are special thresholds however, Your Honor, in

7    place for special-purpose vehicles, also known as SPVs, and so-

8    called big-bank claims that are mitigated.  Moreover, Your

9    Honor, to ensure an objective assessment of contributions to

10   the incentive pool, as I noted, Your Honor, there are --

11   there's a specific role for the creditors' committee with

12   consent rights.  Those consent rights apply to an analysis of:

13   the maximum incentive to be paid to each employee; the actual

14   incentive to be paid to each employee; the realizable asset

15   value on the open portfolios where it has been determined that

16   it would be more valuable to preserve the assets rather than

17   sell them, if you will, under current market conditions;

18   settlement offer values; and initial claim values for

19   mitigation.  At each of these steps, this is not simply

20   consulting with the creditors' committee but they are in fact

21   imbedded in the process.

22        And I should also add, Your Honor, that the committee

23   was very much involved in the formulation of this plan itself

24   and worked very closely with members of Lehman and Alvarez &

25   Marsal in the development of this plan.

51

1          Your Honor, with regards to the reply that had been

2     filed by the U.S. Trustee, as I noted, most of the statements

3     which are made there was really a request for an augmentation

4     of the record.  They did raise one issue, which we in fact

5     addressed in the motion itself, perhaps in anticipation that

6     this might be something which would be raised by the U.S.

7     Trustee or others, and that's the so-called officer issue, and

8     specifically the application of Section 503(c).

9          Your Honor, the U.S. Trustee, and we in our motion,

10     addressed the question in the first instance as to whether

11     503(c) should be applicable, which we believe would only be the

12     case if this were a retention plan.

13          Your Honor, this is not like the retention plan which

14     was specifically approved by the Court in December of last

15     year.  This is a plan, which, as I've described it, Your Honor,

16     and as the motion makes clear, we submit, in excruciating

17     detail, it is a plan which is not -- which does not result in

18     payments because you are there, because you are employed.  It

19     is a plan which is premised upon goals being achieved.  It is

20     incentive-based.

21          Your Honor, any kind of compensation arrangement,

22     arguably, has retention elements to it.  Salaries are, if you

23     will, retention-based; you're seeking to retain individuals by

24     paying them a wage.  But as the Courts -- as Dana, a case that

25     the U.S. Trustee cites, makes abundantly clear, merely because

52

1    a plan, a compensation arrangement, has some elements to it

2    that could be characterized as a retention doesn't make a plan

3    a retention-based plan.  This, Your Honor, this plan, we

4    submit, is clearly, on its face, incentive-based.

5         Moreover, Your Honor, we would submit that the

6    "officers", and I'll put that in quotes, Your Honor, who are

7    participating in this program, they are limited in number, one

8    less than we originally had at the time we filed this plan, as

9    the Hershan declaration indicates, are nominal officers in the

10   sense that their only authority as officers is signatory.  They

11   do not have any authority as officers with respect to the

12   management of the operations of the business.  It is as if they

13   were simply assistant vice presidents and, as I said, Your

14   Honor, they were simply made officers to allow them to be able

15   to sign certain documents.  None of the authority which any of

16   these individuals have as members of the derivative team are in

17   any way related to their officer status.  If they were not to

18   be officers, signatory officers, they'd still have the

19   authority they otherwise have in the derivative program.  And

20   Mr. Hershan has made that abundantly clear in his declaration.

21        Your Honor, I would then turn, if I may, to the record

22   which the U.S. Trustee has asked that we establish.  I am

23   prepared to make a proffer, a proffer of Mr. Hershan.  I would

24   note, Your Honor, it is a crowded courtroom, and were I to make

25   that proffer, it would simply reflect that which was in the

53

1    motion, in the declaration and in the reply in which we think

2    we've addressed the issues that have been raised by the U.S.

3    Trustee.  I'm more than happy to go through the proffer, but if

4    it's acceptable to the Court, I would say that Mr. Hershan

5    would testify in a manner consistent with all of those

6    pleadings --

7            THE COURT:  This --

8            MR. KRASNOW:  -- and we could short-circuit it.

9            THE COURT:  This is breaking new ground; this is a

10    virtual proffer.  Let me find out if this virtual proffer that

11    has been suggested is acceptable to the U.S. Trustee.

12            MR. VELEZ-RIVERA:  Your Honor, we've reviewed Mr.

13    Hershan's declaration as well as the reply filed by the

14    debtors.  To the extent it's called a virtual proffer, it's

15    acceptable to my office.

16            THE COURT:  Fine.  I just made that up.  I'm not even

17    sure it's a good idea to use that term.  From an evidentiary

18    perspective, there's no such thing really; there's either -- if

19    a proffer is designed to expedite a proceeding by dispensing

20    with live testimony, a virtual proffer, it seems to me, is

21    borderline nonexistent.

22            So I will accept the declaration of Mr. Hershan as the

23    functional equivalent of the evidence that he would preset if

24    he were called as a live witness.  I treat the consent of the

25    U.S. Trustee as acceptance of that declaration and as a waiver

54

1    of any need to cross-examine him in connection with what he

2    said.  I also treat the debtors' reply, which obviously is

3    satisfactory to the U.S. Trustee, not as evidence but as

4    representations of counsel concerning the nature of the

5    program.  Furthermore, given the support for the program both

6    by the creditors' committee and the ad hoc committee of

7    creditors, this is a program which obviously is necessary to

8    provide reasonable employment incentives to those employees who

9    have specialized knowledge to extract maximum value out of the

10   Lehman derivatives book.  I recognize that Wall Street

11   compensation is generally a hot topic and a topic that people

12   like to take shots at.  Nonetheless, in this instance,

13   providing reasonable incentives for these very qualified and

14   absolutely critical employees is an essential ingredient to the

15   success of the Lehman liquidation, at least as it relates to

16   the derivatives book.  And so I approve it.

17            MR. KRASNOW:  Thank you, Your Honor.  There may be

18   some here who are here simply with regards to this motion.  May

19   they be excused, Your Honor?

20            THE COURT:  Everyone who wishes to be excused in

21   connection with this motion or anything else may leave now.

22            IN UNISON:  Thank you.

23            MR. FAIL:  Good morning again, Your Honor.  Garrett

24   Fail, Weil Gotshal, for the debtors.  The next item on the

25   agenda is the debtors' motion for an order approving

55

1    settlements with Bamburgh Investments (UK) Limited and Corfe

2    Investments (UK) Limited.

3         As set forth in the motion, Your Honor, Alnwick (ph.)

4    Investments (UK) Limited, along with Bamburgh and Corfe, are

5    companies incorporated in England and Wales.  They were -- they

6    are wholly indirect subsidiaries of LBHI, and they were formed

7    to carry out certain structured bond transactions.

8         LBHI and its affiliates have agreed in principle to

9    certain transactions that would prevent these companies from

10   being struck off and dissolved, and would substantially reduce

11   the claims against LBHI, maximizing returns to LBHI's

12   creditors.

13        So LBHI seeks authority now to enter into these

14   compromises and settlements, which would allow them to forgive

15   pre-petition amounts owed by Bamburgh and Corfe in exchange for

16   amounts that LBHI currently owes to Alnwick.

17        Only one limited objection was filed, Your Honor; it

18   doesn't object to the relief sought insofar -- at least it's

19   LBHI's understanding that it doesn't object to the settlement,

20   between LBHI and certain of its subsidiaries, of the claims

21   amongst those entities.

22        I believe, Your Honor, that Lehman Brothers

23   International is investigating its books and records in

24   connection with claims it may have against Alnwick, Bamburgh

25   and/or Corfe, or certain other nondebtors.  Those claims, if

56

1    there are any, wouldn't be before Your Honor.  To the extent

2    that there is leakage in the transactions such that claims

3    wouldn't be set off dollar for dollar, we've provided for that

4    in the motion and used approximate values.

5          LBHI believes that going forward with these

6    transactions in the orderly liquidation of Alnwick, Bamburgh

7    and Corfe will yield a tremendous value to the estate.

8          I believe someone is here for the liquidators of

9    Lehman Brothers International, Inc.

10         THE COURT:  Okay.  Do you want to press your limited

11   objection?

12         MS. WARREN:  Thank you, Your Honor.  Mary Warren of

13   Linklaters, for the joint administrators.  When this motion

14   appeared on the docket, LBIE was not aware of it beforehand.

15   LBIE's been investigating its books and records.  The books and

16   records that LBIE has access to do show some balances as

17   between these parties A, B and C, as they're called in the

18   motion, and LBIE.  We're not sure they're accurate.  We've been

19   in -- PricewaterhouseCoopers has been in touch with Alvarez &

20   Marsal, and I understand there have been a number of conference

21   calls trying to work out whether these balances are accurate or

22   not.

23         I understand from an e-mail I received this morning

24   that Alvarez & Marsal is -- has reconstructed the books and

25   records of these entities and is going to share that with

1    Pricewaterhouse but can't do it right now.  And I understand

2    there were some other proposals made, such as holding back ten

3    percent of the assets in one of the entities to account for the

4    possibility that LBIE might be a creditor.

5          I know that Mr. Fail hasn't had a chance to verify

6    that with his own client, because this just came up before

7    court today.  So what we ask, Your Honor, is that just a

8    reservation of rights on behalf of LBIE pending the parties

9    resolving these issues.  And with that stated, we don't object

10   to the settlement.

11         THE COURT:  All right.  Fine.

12         MS. WARREN:  Thank you.

13         THE COURT:  There are no objections to this other than

14   the LBIE reservation of rights, which, as clarified, is not an

15   objection to approval of this arrangement.  I will acknowledge,

16   based upon my review of these documents, that this appears to

17   be an unusually complex set of arrangements schematically

18   depicted in the pleadings and related to something that sounds

19   like the next Bjorn (ph.) movie, "The Helsinki

20   Recapitalization", which I don't fully understand.  It is a

21   good title, and maybe you can extract asset value from that.  I

22   don't know what it means.  What is the Helsinki

23   Recapitalization?

24         MR. FAIL:  Your Honor, there may be --

25         THE COURT:  Is that another tough question?

58

1          MR. FAIL:  It is.  And I would say it's transactions

2      involving nondebtor subsidiaries that we need not burden the

3      Court with this morning.

4          THE COURT:  Fine, we won't go into that at all, then.

5      It's approved.

6          MR. FAIL:  Thank you very much, Your Honor.  Thank

7      you.  With respect to the conversations that -- I do

8      acknowledge on behalf of LBHI that there are conversations

9      ongoing with LBIE, reserve all rights to challenge the nature

10     of the conversation and the context of the conversations that

11     the representative for LBIE has just articulated, however.

12     Another reservation of rights, Your Honor.

13         THE COURT:  Okay.

14         MR. FAIL:  The next motion --

15         THE COURT:  All rights are reserved.

16         MR. FAIL:  Thank you.  The debtors' motion -- the next

17     item on the agenda is the debtors' motion for an order

18     modifying the automatic stay, to the extent applicable, to

19     allow settlement payments under a directors' and officers'

20     insurance policy.

21         Your Honor, as set forth in the motion, it's the

22     debtors' position that the policy proceeds at issue here are

23     not property of the debtors' estate.  Nonetheless, as an

24     alternative argument, the debtors moved to get this comfort

25     order and, to the extent that the proceeds are property of the

59

1    estate, have demonstrated that cause exists to lift the

2    automatic stay to allow for the payment.  In particular, as

3    noted in our reply which was filed yesterday, Your Honor, prior

4    orders of this Court, which are final and nonappealable orders,

5    previously authorized two things that are relevant; the first

6    is the use of these insurance proceeds to pay officers' and

7    directors' defense costs.  Another order, Your Honor, entered

8    by this Court approved the use of the -- the establishment of a

9    three million dollar fund to fund officer and director

10   liability defense costs that would not be covered by the

11   insurance proceeds.

12        The debtors have been informed, and it's their

13   business judgment, that payment of the approximately 1.6

14   million dollar settlement at issue here from the policy

15   proceeds would expend less cost, it would be a lower cost than

16   continued litigation of the underlying action, which is the

17   Openwave action, as it's been captioned in these papers.

18        Additionally, Your Honor, the settlement of the

19   Openwave action does eliminate or reduce the potential

20   indemnification claims that Ds and Os may others may otherwise

21   seek to assert against the debtors.  So any policy proceeds

22   that would be depleted by use of what would be Side A policy,

23   as has been discussed in these papers, would be

24   greater -- there would be a greater reduction in Side B claims,

25   to the extent that LBHI had to reimburse the debtors (sic) and

60

1    officers for any payments.

2        Additionally, settlement of the action would avoid

3    collateral estoppel.  We also believe that there's no immediate

4    risk that policy proceeds would be depleted.  The debtors, as

5    noted in the motion and in the reply, have a total of 250

6    million dollars of coverage.  To date, only approximately

7    twenty million of that has been depleted and we're fifteen

8    months into these Chapter 11 cases, Your Honor.

9        The insurers are willing to fund this settlement

10   payment that will resolve the litigation, but there's always

11   the risk that they would be unwilling to provide coverage for

12   certain judgments going forward.

13       In addition, Your Honor, the settlement that was

14   reached is contingent upon court approval of this motion, so we

15   would submit that the Ds and Os are in immediate need of the

16   insurance proceeds.

17       One other point, which we highlighted in the reply to

18   the objections that were filed, Your Honor, is simply to

19   reiterate the point that there is no direct coverage for LBHI

20   in this policy; that was what would be referred to as Side C

21   coverage, which the objectors highlighted for the Court was

22   terminated pre-petition.  So the only coverage that's available

23   is direct coverage for directors and officers, or coverage for

24   LBHI to the extent that it is seeking reimbursement of costs

25   paid to the directors and officers.  And we would submit that

61

1   in this case that would be limited to the 3 million dollars, to

2   the extent that money was paid out of the fund, and then that

3   those reimbursements were allowed under the insurance policies;

4   so a de minimis amount in light of the 230 million dollars of

5   insurance proceeds that are available.

6        I'm confident that someone's here for the objectors.

7   Unless Your Honor has any questions, I turn the podium over.

8   Thank you.

9        THE COURT:  I'll hear from the objectors.  Thank you,

10  Mr. Fail.

11       MR. CLARK:  Good morning, Your Honor.  David Clark of

12  Epstein Becker & Green, for the InfoSpace and Intersil

13  creditors.  I respectfully request that the Court permit my

14  colleague David Tatge from our Washington, DC office to speak

15  on this matter.

16       THE COURT:  So does he need to be pro hac'd in to do

17  that?

18       MR. CLARK:  We have filed a proc hac vice motion with

19  the Court.

20       THE COURT:  I don't know if it's been approved, but

21  he's certainly free to argue.

22       MR. CLARK:  Thank you, Your Honor.

23       MR. TATGE:  Thank you, Your Honor, very much.  Your

24  Honor, David Tatge from Epstein Becker.  I'm here on behalf of

25  InfoSpace, Inc., Intersil Investment Company, Intersil Holding

62

1    GmbH, Intersil Europe Sarl, and Xicor LLC.

2         Your Honor, as we set forth in our papers, and I think

3    as you just heard from the debtor, this policy and all the

4    policies have two types of coverage:  the Side A coverage for

5    the D&Os, and there's also Side B coverage for indemnification

6    claims.  Where, Your Honor, that duality exists, the policy

7    proceeds, under applicable law, are property of the estate.

8    This is not a situation, Your Honor, where there's just Side A

9    coverage covering the D&Os.  And I would cite the Court again

10   to the --

11        THE COURT:  So let's just say for the sake of

12   discussion that it is property of the estate, and I recognize

13   that the debtor doesn't concede that.  What on earth is wrong

14   with using property of the estate to settle burdensome

15   litigation for what seems to be a fairly reasonable amount, and

16   how on earth are your clients adversely affected by that, and

17   what claims do they have against the coverage?

18        MR. TATGE:  Okay.  Your Honor --

19        THE COURT:  Answer those in order, please.

20        MR. TATGE:  Okay.  Those are all good questions, and

21   they're the same questions I'd ask, because I think that the

22   Court is exactly right.  I think the debtor has pretty much

23   conceded that these policy proceeds are property of the estate;

24   they don't concede it, but I think that is the applicable law.

25        THE COURT:  No, they haven't conceded it.  I'm just

63

1    saying for purposes of this question, let's assume it.

2           MR. TATGE:  Right.  Okay, well, the first thing, Your

3    Honor, I would say is what we need to do to be able to answer

4    your questions is I would like thirty days to take discovery

5    from the debtors, because we asked a bunch of questions that I

6    think are relevant to this issue, and the debtor didn't answer.

7           THE COURT:  What kind of claims do your client have?

8           MR. TATGE:  Okay, what we have, Your Honor, we have

9    claims against Lehman and against Lehman Brothers -- that's

10   Lehman Brothers Inc. in the SIPA proceeding -- and against

11   Lehman Brothers Holding for auction rate securities that my

12   clients were sold by Lehman Brothers Inc. pre-petition.  We've

13   asserted, Your Honor, a claim on behalf of the Intersil

14   Company, as I say Intersil collectively; I believe it's about a

15   hundred million dollars, and I believe it's about almost forty

16   million dollars on behalf of InfoSpace.  And we attached to

17   those claims to the legal papers that were filed in connection

18   with this.

19          The bottom line, Your Honor, is that my people feel

20   that they were misled by the debtors, and there's a number of

21   other -- you know, we have about ten claims, Your Honor, in

22   each of those proceedings.  These are --

23          THE COURT:  I understand.  This a situation where --

24          MR. TATGE:  Right, right.

25          THE COURT:  -- auction rate securities were viewed as

64

1    being as the functional equivalent of a money market fund in

2    terms of liquidity and have turned out not to be.

3            MR. TATGE:  Right, they violated our investment

4    policies --

5            THE COURT:  But so what?

6            MR. TATGE:  Okay --

7            THE COURT:  So you were one of tens of thousands of

8    claimants in this case.  What gives you any special right to

9    stand up here now and make a claim about how proceeds of D&O

10   insurance should be used in the best business judgment of the

11   debtor.

12           MR. TATGE:  I think, Your Honor, a couple things.  One

13   of the questions that we asked, and this goes to what I've said

14   earlier, one of the questions that we asked, and we really

15   would like to take discovery, to be honest, how many other

16   claims are there against these policies, not only for auction

17   rate securities but for anything that might be covered by the

18   policies that the debtors know.  Okay?  And one of the

19   questions that would -- comes to mind is are these policy

20   proceeds going to be exhausted or not?  The debtors are here

21   telling the Court there's 250 million dollars of coverage.  We

22   spent 20 million dollars so far, so now we're digging into the

23   excess cover (sic), which is what brought this motion before

24   the Court.  But what we don't know, Your Honor -- okay, we know

25   from what I've just told the Court that my clients alone -- we

65

1    have 140 million dollars of claims.  If we would get judgments

2    against Lehman Brothers D&Os or employees who are responsible

3    for the actions that harmed my clients and some of the client's

4    indemnity, that's a claim against Side B under the policy.

5            THE COURT:  Can I ask you a question?

6            MR. TATGE:  Yes, Your Honor.

7            THE COURT:  Do your clients currently have any pending

8    litigation claims in any court against the officers and

9    directors of Lehman Brothers?

10           MR. TATGE:  Your Honor, we do not.  I will tell you

11   that we have attached to our claims a draft FINRA action naming

12   directors and employees of Lehman Brothers, but we have not

13   made as yet claims against individual D&Os.  We intend to do so

14   and we will be doing so.

15           THE COURT:  Well, I mean, that's your privilege.

16   Whether or not it's a good claim, I don't know, but what

17   standing do you have now to be getting up and complaining about

18   what on its face appears to be a rational use of insurance

19   proceeds?

20           MR. TATGE:  The standing that we have, Your Honor, is

21   that by paying the Side A claims now, the estate's going to be

22   harmed because there's less Side B coverage later, particularly

23   where these policies are going to be -- there may not be enough

24   coverage, and we don't believe -- we think once discovery comes

25   out and we know the size of all the claims that are against

66

1    these policies and what sort of indemnifications are or might

2    be requested of the debtor, the answer is that the D&Os will

3    have benefited at the expense of the estate because they're

4    going to have gotten paid first and everybody else will have

5    gotten paid -- you know, the money from the estate that my

6    people will get a dividend from as an unsecured creditor of the

7    Lehman Brothers estate and of the SIPA estate is going to be

8    less than it would otherwise be.  So we will have been harmed.

9    Whereas, Your Honor, if -- you know, that might not be an issue

10   if we take discovery and we find out, Your Honor, that

11   there's -- that all the total claims are less than 250 million

12   dollars so that in a -- you know, that there's a chance -- you

13   know, there's less of chance that that's going to happen.  But

14   we think, Your Honor, that there is a chance that my clients

15   will be harmed in that fashion, and we think, Your Honor, that

16   that's what gives us the right to come here, because we say,

17   and as some of the cases have said, when there is Side A and

18   Side B coverage, particularly here where there is no priority

19   of payments, it was never triggered by Lehman Brothers, we said

20   where's the notice from the CFO.  The reply papers of Lehman

21   don't say anything about that.  So I infer that that means that

22   the priority of payments was never triggered.

23         So therefore I'd say, Your Honor, that the estate has

24   a much greater interest here.  And we also asked, as you see in

25   the papers, the estate had the right to terminate D&O coverage

67

1    for former directors under Delaware law.  Lehman Brothers

2    Holding had that; we cited the case to the Court.  And one of

3    the questions that we had is certainly when the debtor has

4    current officers and directors before the sale of substantially

5    all its assets to Barclays, there would be coverage.  But this

6    particular action for Openwave was filed several months -- it

7    was filed in November 2008, several months after that sale.

8         So there's a number of things, Your Honor, that we

9    think that what we would like to do is have thirty days, or

10   maybe sixty days, to take discovery, come back before the

11   Court, and then we'll be -- I'll be in a better position to

12   answer your question, and the Court will better be able to

13   weigh should it lift the stay or not.

14        I think, Your Honor, right now there's an incomplete

15   record that for the Court to really be able to balance the

16   risks and the harms -- because none of us know what other

17   claims are out there, what indemnification claims have been

18   made, what are the total damages claimed, what type of claims

19   are out there, none of us know, the debtors didn't say anything

20   about it; it just says, well, it's only 1.6 million out of 250

21   million, so it's okay.  There could be a billion dollars' of

22   claims.  There could be two billion dollars of claims.  We

23   don't know.  But we think that the estate is not being

24   protected, Your Honor, and that my clients, as unsecured

25   creditors, are going to be harmed because of that.  And I think

68

1        that's what gives us standing, Your Honor.

2                THE COURT:  Okay.

3                Is there anyone else who has any position to assert

4        with respect to this motion?

5                UNIDENTIFIED SPEAKER:  I did not file papers, Your

6        Honor, but may I be heard briefly?

7                THE COURT:  No.

8                UNIDENTIFIED SPEAKER:  All right, thank you.

9                THE COURT:  Although I'm always happy to see you in

10       court, this is not a time when I allow for what amounts to open

11       discussion.  Parties who have filed objections or who have

12       fiduciary roles to play in the case are welcome to be heard.

13               Does the committee have any position on this?

14               MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

15       Tweed, Hadley & McCloy, on behalf of the committee.  Your

16       Honor, the debtor (sic) supports the debtors' position on this

17       particular motion.  We won't delve into the particular

18       arguments raised by the movants here but believe that in fact

19       the -- at this point in time, the debtors have a better

20       argument.

21               We have reserved our rights previously, with respect

22       to the other motions made to lift the stay here, to take a

23       different position down the road to the extent the debtors wind

24       up with indemnification claims that they could recover on.  We

25       don't think that time has come yet, and we don't think it's

69

1    appropriate to make those arguments at this point.

2         THE COURT:  Has the committee independently evaluated

3    the fairness of the proposed settlement which would be

4    implemented by virtue of the use of these insurance proceeds?

5         MR. O'DONNELL:  Yes, Your Honor, we have and we've

6    presented it to the committee, and the committee believes that

7    the cost benefit analysis here in terms of the potential

8    defense costs to be incurred versus the payments to be made

9    here weigh heavily in favor of doing the settlement as

10   proposed.

11        THE COURT:  Okay.

12        Does the debtor have any thing more?

13        MR. FAIL:  No, Your Honor.  In light of all the

14   pleadings and the oral argument, we would request that the

15   Court approve the debtors' motion.

16        THE COURT:  I'm going to approve the debtors' motion

17   and overrule the objections that have been put forth by counsel

18   for Intersil, InfoSpace and Xicor.  The objections, as I've

19   heard them articulated and as I've read them, are predicated on

20   a great deal of speculation and relate to not so much claims to

21   protect the debtors' estate as much as it is claims potentially

22   to protect parties who may someday bring claims that may one

23   day be subject to the same insurance coverage.  That's a pretty

24   remote objection at this point, particularly when measured

25   against the business judgment in settling litigation, within

70

1    policy limits, in a manner that will result a potential

2    significant saving of defense cost that would also eat into the

3    policy proceeds.

4         I note that during the course of the Lehman bankruptcy

5    case a number of motions have been presented relating to

6    comfort orders for the Ds and Os.  This is the first motion

7    that has produced any objection.  I consider the objection to

8    be, at a minimum, premature, particularly since those claimants

9    who are making the objection have no presently cognizable

10   claims as to any of the proceeds of the D&O coverage.  But in

11   making this ruling, I'm mindful of the committee's observations

12   that they have reserved their rights, and just because I have

13   approved this motion does not necessarily mean that other

14   similar motions will be approved, provided that good objections

15   are lodged as to the use of those proceeds at some future date.

16        So the objections are overruled without prejudice to

17   the promulgation of other appropriate objections in the future.

18        MR. FAIL:  Thank you very much, Your Honor.  The next

19   item on the agenda --

20        MR. KRASNOW:  Your Honor, Richard Krasnow.  Actually,

21   I'm standing just to advise the Court the next motion is the

22   motion of Merrill Lynch for modification of the stay.  And

23   therefore I will turn over the agenda for counsel for Merrill

24   Lynch.

25        THE COURT:  Good morning.

71

1          MR. GOFFMAN:  Good morning, Your Honor.  Jay Goffman

2     of Skadden Arps, on behalf of Merrill Lynch International and

3     certain of its affiliates.  With me, my partner, Mr. Zimmerman.

4          Your Honor, after being in front of -- in this court

5     for the last nine months on Charter Communications, it's a

6     pleasure to be here on something else.  But, frankly, I'm

7     surprised that we're here today arguing over this motion.  I

8     think there's some confusion about what it is we're seeking and

9     what we're not seeking, and I'd like to spend a few minutes

10    describing it, if I may.

11         THE COURT:  Sure.

12         MR. GOFFMAN:  Prior to the Lehman bankruptcy, Lehman

13    had a longstanding euro medium-term note program.  Notes would

14    be issued by LBT, the Lehman Dutch entity, and they were

15    guaranteed by LBHI, U.S. entity.  Merrill Lynch has bought some

16    of these notes.

17         When LBHI filed for Chapter 11, as a matter of law the

18    notes against LBHI accelerated.  We think that's black-letter

19    law.  But under Dutch bankruptcy law, we actually have to send

20    a notice of acceleration.  We're permitted to send the notice

21    to LBT, there's no dispute about that, but in order for the

22    notice of acceleration against LBT to be effective, we were

23    also required to send a simultaneous notice to LBHI.

24         The notice we send to LBHI, again, is designed merely

25    to make the notice as to LBT effective.  As to LBHI, it's a

72

1    ministerial act with no substantive impact on the LBHI estate.

2    Again, the notes accelerated as a matter of law upon filing; we

3    think that's clear black-letter law.

4         So it has no impact against LBHI.  On the other hand,

5    sending them the notice allows their claims to be accelerated

6    against LBT, which allows the claims to be appropriately valued

7    and calculated in the Dutch proceeding and will allow that

8    Court to move forward with its liquidation process.  That's why

9    the LBT trustee filed papers in support of our motion and is

10   here today so support that motion.

11        Now, I point out to the Court that no one else in this

12   case has filed a motion to lift the stay, to do just what we're

13   seeking to do.  We know many parties have sent in these notices

14   both to LBHI and LBT providing for the acceleration, and the

15   question is why, why hasn't anyone filed these motions?  We

16   know from talking to other parties that all the rest of the

17   parties said it has no substantive impact against LBHI, it's

18   merely a ministerial act.  So they took the view that it wasn't

19   a violation of the automatic stay.  We said maybe, but it's a

20   close question, and we should come to the Court and we should

21   ask permission rather than coming back later and asking

22   forgiveness.  And that's what we're doing here today.

23        Now, for some reason LBHI decided to object to our

24   request.  They didn't object to any of the acceleration notices

25   they've previously gotten from any of the parties.  They didn't

73

1    come running to this Court and say violation of the automatic

2    stay, Judge, hold them in contempt, they're harming the estate.

3    They've got lots of these notices, we think, for billions of

4    dollars.

5         We're not quite sure why they decided to object to

6    ours, but we do know a few things.  First, we are not seeking

7    to create any claims against LBHI today.  We're not seeking to

8    have our claims allowed against LBHI today.  They want to go

9    through an objection process, good, they can go through it;

10   they're free to do so.  They can raise any defenses they want.

11   All that's happening today is, if the relief is granted, is we

12   send in the notice, the ministerial notice to LBHI, and as a

13   result our notice to the Dutch trustee is effective and that

14   case can proceed and our claims can be properly valued.

15        Frankly, the only way this could have an impact, in

16   our view, on the LBHI estate is to help LBHI.  To the extent

17   our claims are properly valued in the Dutch estate and get paid

18   an appropriate amount with all the other claims, it ends up

19   reducing the amount that we have to seek against LBHI as a

20   guarantee.  To the extent we're not permitted to move forward

21   and have our claims valued there, it can only increase the

22   amount of our guaranteed claim.

23        Moreover, Judge, even if you were to accept the

24   debtors' position that somehow something we're doing here is

25   impacting the LBHI estate, that somehow, on a basis we don't

74

1   understand, that it's increasing the claims against the LBHI

2   estate by a dollar, it's not harm.  As Your Honor's recognized

3   on many cases, this occasion -- this is a liquidation.  All the

4   claims need to come in; at some point they all need to be

5   valued, they all need to be calculated, and then there'll  be

6   some sort of pro rata distribution.  The mere fact that another

7   claim is valued at a dollar more or a dollar less is not harm

8   to the estate; on the other hand, clearly harm to Merrill Lynch

9   and anyone else that's done this if they're not able to

10   appropriately pursue their claims in the Dutch court and

11   therefore it can't get paid on those claims.

12       I also don't understand the debtors' request that our

13   claim only applies to the notes we have -- we hold today.

14   Doesn't make sense to me, Judge.  Are we supposed to every day

15   that we buy another note come back and file another lift-stay

16   motion and ask Your Honor to rule again on the same facts, the

17   same legal issues?  Your Honor's going to make a determination

18   as to whether or not the stay applies, and if it does whether

19   it should be lifted.  It's the same whether for the claims I

20   hold today or the claims I might buy tomorrow; there's no

21   difference.

22       Finally, Your Honor, I would make it clear to the

23   Court that there's no issue in our providing documentation to

24   the debtor.  I saw something in their papers that we had

25   somehow withheld information.  I talked to Mr. Krasnow; Mr.

75

1    Krasnow and I have known each other for twenty-five years.  All

2    the relevant information is in the proof of claim.  Moreover,

3    to the extent that they wanted any more information, they

4    wanted the documents, I offered to provide it to them under an

5    appropriate confidentiality agreement.  He told me the only

6    appropriate confidentiality agreement was one in which he's the

7    final decision-maker as to whether or not to disclose anything.

8    I said that's not an appropriate confidentiality agreement.  He

9    said he would serve discovery.  I said if you do, we'll respond

10   to it.  There hasn't been any.

11       But it doesn't matter, Judge.  This is really a very

12   simple situation.  If we're allowed to move forward, we serve a

13   ministerial notice to the debtor; it has no impact on the

14   debtor.  It could theoretically help the debtor by reducing the

15   amount that we have to seek against them as a guarantee, and

16   our claims can move forward in the Dutch estate and allow that

17   case to move forward.

18       At some point, even in this case, we're going to have

19   to get to -- around to valuing, calculating all the claims.

20   Something that allows that to happen isn't a negative for this

21   debtor; it certainly isn't cause to prevent us from getting the

22   relief as we balance the so-called harms in this case.

23       So I'm happy to answer any questions Your Honor has,

24   but other than that, we would ask that Your Honor enter the

25   relief we requested.

76

1          THE COURT:  I don't have any questions, other than to

2     find out whether it makes better sense in terms of procedure to

3     hear from Mr. Mayer concerning his support for the motion, or

4     whether I should hear from him after I hear the opposition.  I

5     think it makes sense to hear from Mr. Mayer now; that way I

6     have everybody lined up on the same side.

7          MR. MAYER:  Thank you, Your Honor.  For the record,

8     Thomas Moers Mayer of Kramer Levin Naftalis & Frankel, on

9     behalf of, I apologize for the long name, Rutger

10    Schimmelpennick -- I believe the reporter has a spelling -- and

11    Frederic Verhoeven, as co-trustees of Lehman Brothers Treasury

12    Co. B.V.

13         Your Honor, we are in support of the motion, although

14    for somewhat different reasons.  Our interests are in the ease

15    of administering our own estate.  So I don't have to agree with

16    everything that was just said by Merrill Lynch, and in

17    particular the closing comments on facilitating the allowance

18    of claims.  That's kind of the whole point.  Nothing that's

19    going on today, in our view, should relate to the allowance of

20    claims at all in this proceeding.

21         But we have a separate proceeding to administer, and

22    we have to interpret our own documents and our own law, and it

23    does facilitate that proceeding if, for purposes entirely

24    solely limited to the allowance of claims in our proceeding,

25    under Dutch law, this ministerial act can be countenanced.  I

77

1   don't have witnesses here today, but I can indicate, as counsel

2   to the trustee, we also have received calls indicating that

3   people have filed notices of acceleration.  And in fact just

4   last night somebody called me and said what's going on in

5   court, what's this bit about relief from the stay for notice of

6   acceleration, we sent one in and never occurred to us to do

7   anything else.

8          If this Court determines that the stay does apply and

9   decides that it should not be lifted, my client will be faced

10  with the unenviable task of figuring out whether under Dutch

11  law, in a Dutch proceeding, folks who sent notices that may be

12  deemed to be void under American law nonetheless have effect

13  under Dutch law.  And I guess if we have to make that

14  determination we will, but it seems to me not the best process

15  to have the stay in the United States affect proceedings that

16  are happening solely in the Netherlands.  And I believe the

17  Court could enter an order which very carefully provides that

18  nothing that happens with respect to this notice shall cause

19  any claim against LBHI or any American debtor to increase,

20  decrease or otherwise be affected, pending further orders of

21  this Court, and that relief is granted solely to allow the

22  allowance-of-claims process to proceed unaffected in the

23  Netherlands.  And that is really all that we seek.

24         I want to state for the record, the trustees don't

25  advocate that anyone accelerate or not accelerate; that's not

78

1    our job.  But our job is to figure out what it means when

2    people have accelerated and what happened, and if in fact they

3    have accelerated.  And permitting or countenancing these

4    notices to be filed with no effect on the American proceeding

5    will help us in the Netherlands.

6           And I'm happy to answer any questions the Court has.

7           THE COURT:  I have a question that's very naive.  If

8    there were no permitted acceleration, let's just say for the

9    sake of argument that all of the earlier notices are void as

10   stay violations, and let's just say for the sake of discussion

11   that I agree with the debtors and I don't grant the Merrill

12   Lynch motion, under applicable insolvency law of the

13   Netherlands, is it possible for the Netherlands Court to deem

14   all of the claims relating to the euro medium-term note program

15   to be accelerated, notwithstanding the lack of formal notice,

16   for purposes of claim allowance and case administration?

17          MR. MAYER:  I will hazard an answer to that on the

18   understanding that I am not a Dutch lawyer, and there are rules

19   for providing expert testimony on foreign law, which we can

20   meet if necessary.  But this is my understanding.

21          THE COURT:  No, I'm just asking you a very simple

22   question.

23          MR. MAYER:  This is my understanding.  I'll do my

24   best, Judge.

25          THE COURT:  Okay, qualification noted.

79

1        MR. MAYER:  First of all, as a matter of what does the

2   law of the Netherlands -- positive statutory civil law of the

3   Netherlands provide?  There's no automatic acceleration, and

4   without venturing into what a Dutch court might extend to in

5   terms of expanding existing law -- they don't have a common law

6   system over there -- I don't think, as I understand Dutch law,

7   there is something in operative Dutch law that allows a Court

8   to do that.  Court might find additional authority, but my

9   understanding from my client is that you're supposed to apply

10  the terms of the documents, which leads to the next answer,

11  which is one I'm not eager to get to.  Yes, there is one way

12  that a Dutch Court could deem those notices to -- could deem

13  claims accelerated, and that is to determine that Your Honor's

14  order in this court has no affect and will be deemed

15  disregarded for purposes of allowing claims in the Netherlands.

16  I don't want to go there.  I think that would be a necessary --

17        THE COURT:  That would be repugnant to me.

18        MR. MAYER:  Yes, well, that's why I'm -- that's why

19  I'm urging the Court to allow the ministerial notice to be

20  accepted, because I don't want my client to be in a position --

21  I'm not saying he's there or they would ever get there.  But if

22  we were -- we'd have to figure out what it means because some

23  people have filed these notices.  And they'll be making

24  arguments that say, well, Judge Peck says they're invalid in

25  New York, but that doesn't mean they're invalid in Amsterdam.

80

1          THE COURT:  Let me ask you --

2          MR. MAYER:  I don't want to be in that position.

3          THE COURT:  Let me ask you a follow up question

4    which -- and don't draw any negative inference from the fact

5    that I'm asking it -- is this motion being brought on for the

6    benefit of Merrill Lynch or is it being brought on for the

7    benefit of the administrators in the Dutch proceeding?

8          MR. MAYER:  No, it's a good question, Your Honor.  The

9    answer is we found out about this motion the same time

10   everybody else did.  Nobody told us in advance -- at least I

11   don't believe so; Mr. Goffman -- from time to time, we have

12   talked to Merrill Lynch, but this motion came out of the blue

13   for us.  It's being brought for Merrill Lynch's benefit.  The

14   administrators that I represent, the trustees that I represent

15   believe, in their own interests, it makes sense to see this

16   happen because they have administrative issues, here.  But this

17   motion is brought for Merrill Lynch's benefit.  We just believe

18   that it helps us in the administration.

19         THE COURT:  And one other question, just to give me a

20   sense of the magnitude of the issue.  Is there an estimate of

21   the claims, in dollars, represented by notes issued in this

22   program as they might ultimately be allowed against LBT?

23         MR. MAYER:  I can give you a rough estimate, Your

24   Honor.  I believe it's around 34 billion dollars of claims

25   under the notes, and they're held by, our best estimate is,

81

1     100,000 individual holders, many of -- I think almost all of

2     them outside the -- well, I can't say almost all of them

3     outside the United States any more, but certainly, originally,

4     they were sold mostly outside the United States, some of them

5     in lots as small as 5,000 euros.  So you may have notices of

6     acceleration sent in -- doctors and dentists may be magnifying.

7     We may be talking about, frankly, fairly poor people who bought

8     very low denominated notes, here.  And that's part of our

9     problem in allowing these claims in our jurisdiction.  But,

10    yeah, these were notes sold in all denominations.  There are

11    3700 different notes that were sold under this program --

12    different kinds of notes.

13              THE COURT:  Okay, thank you.

14              MR. MAYER:  Um-hum.

15              MR. KRASNOW:  Your Honor, Richard Krasnow, Weil,

16    Gotshal on behalf of the Chapter 11 debtors.  I just note at

17    the outset that we will accept Mr. Goffman's observation that

18    the amount of Merrill Lynch's guarantee claim will be reduced

19    by whatever recoveries they may receive in the LBT case.

20              Your Honor, this is not a ministerial act.  Let me

21    take a step back and describe, if I may, certain aspects of

22    these notes which I would advise the Court, whatever the

23    Court's ruling may be, as we understand these notes, they are

24    extraordinarily complex instruments.  Whatever methodology may

25    be used to calculate the amount of the claims, these are not

82

1    claims which are simply, you owe a principal amount of X, the

2    interest rate is Y.  Some of these claims may have portions of

3    them which are, I'll call them principal-protected in the sense

4    that one can easily calculate the amount.  A good portion of

5    these notes are, I would say, derivative based.  Calculations

6    require an analysis of the baskets which were used for purposes

7    of determining what may or may not be due and payable at the

8    end of the day, whenever it is.  So whichever way Your Honor

9    rules, the administration of this process, certainly on the

10   part of LBHI, with respect to the guarantee, and based on the

11   extensive discussions we have been having and will continue to

12   have with the Dutch trustees with respect to these notes, they

13   will still be extraordinarily complicated.

14          Your Honor, under the terms of the underlying

15   documents, here, there is not an automatic acceleration with

16   respect to the notes as a consequence of the bankruptcy filing

17   by either the issues as to these notes, LBT, or the guarantor.

18   Nor, as we understand it, under Dutch law, is there an

19   automatic acceleration under their insolvency laws as otherwise

20   exists here.  Rather, Your Honor, in order for there to be an

21   acceleration of the notes, if there's an event of default,

22   which event of default was the filing of LBHI which proceeded

23   the filing of LBT, in other words, an ipso facto default, there

24   must, nonetheless, be a vote of a certain percentage of the

25   holders of the notes in order for there to be an acceleration.

83

1    Not only must those noteholders vote to accelerate, but they

2    must, under the underlying agreements, give notice of the

3    acceleration to both the issuer and the guarantor.  It's not to

4    one or the other; it is to both.  One might argue that,

5    ordinarily, that is, as has been suggested by counsel, a simple

6    ministerial act.  But in determination, we submit, as to

7    whether some action is ministerial or not depends upon the

8    impact of that notice as it relates to LBHI, to LBHI in the

9    estate.  In this instance, Your Honor, based upon what the

10   Dutch trustees have promulgated as their proposed methodology

11   for analyzing these claims as it relates to Merrill Lynch, as

12   they've acknowledged in their motion, without an acceleration,

13   their claims might be lower than the claim would be with an

14   acceleration.

15        Merrill Lynch has attached to its motion as, I

16   believe, it's Exhibit C a notice that was -- it is Exhibit C --

17   a report that was issued by the trustees in November of this

18   year.  In that report, the trustee has indicated the

19   methodology that -- the trustees, I should say, have indicated

20   the methodologies that they propose to use for the purpose of

21   determining the amounts of various types of claims.  Types

22   distinguished not by the nature of the baskets of derivatives

23   that are used to calculate each of the separate 3000 or so

24   issues here, but rather types based upon did the notes mature

25   pre-petition -- that's one methodology -- did they mature

84

1    during the first year of their case, was there an acceleration

2    during that first year, would the notes otherwise have matured

3    beyond the first year, and what the calculation will be if

4    there's a notice of acceleration.  The point of that, Your

5    Honor, is that the trustees have proposed a methodology of

6    crystallizing Merrill Lynch's claims and fixing the amounts,

7    even if there is not an acceleration.  Merrill concedes that in

8    their papers.  So this is not a situation where, in the absence

9    of being able to give a notice, they may not have a claim.

10   They have a claim no matter what Your Honor does.  What they're

11   seeking, here, is to take advantage of one of the methodologies

12   proposed by the trustees, which we understand from discussions

13   we've had with one of the trustees, that the trustees believe

14   that methodologies they've proposed are consistent with Dutch

15   law.

16        They, Merrill Lynch, has said we don't like the

17   methodology that the trustee proposes to use with regards to

18   notes that we hold, and we don't know what those notes are,

19   Your Honor.  That's among the information we've asked of them

20   that they won't tell us.  And it isn't clear from their proof

21   of claim.  I don't know why they won't tell us what notes they

22   hold, I don't know why they insisted that we keep that

23   information confidential, but so be it.  We'll accept their

24   representations as to what the impact of all of this would be

25   as to the notes that they hold.  They don't like the

85

1     methodology that would be used in the absence of an

2     acceleration.  They want to be able to assert a higher claim

3     against LBT as to which we are indifferent, but also a claim

4     against the guarantor, LBHI.

5          THE COURT:  I'm not understanding this.  If

6     acceleration means what I think it means, it doesn't change the

7     quantum.  It, rather, accelerates the due date.

8          MR. KRASNOW:  No, Your Honor.  Not under the

9     methodology set forth in the trustee's report.  There's a

10     different calculation that would be used.  There's a

11     discounting of the claim.

12          THE COURT:  What, like, original issue discount?  What

13     are we talking about?

14          MR. KRASNOW:  Your Honor, I can't -- it's a little

15     more complicated than that, but I would suggest, Your Honor,

16     that for purposes of this hearing, we can't make the comparison

17     as to what the results would be, but Merrill has taken the

18     position -- Merrill has taken the position that the amount of

19     the claim that they would be able to assert, if they're able to

20     accelerate the notes, would be higher both as against LBT and

21     the guarantor, if they can accelerate than it would otherwise

22     be if the trustee uses the nonacceleration methodology set

23     forth in the report and, we understand from the Dutch trustee,

24     which is consistent with Dutch law.

25          THE COURT:  Yeah, but what I'm hearing, and I'll give

1    Mr. Mayer a chance to comment in a minute, what I'm hearing

2    said by both counsel for Merrill Lynch and the Dutch trustees

3    is that this is desired by the Dutch trustees because it will

4    avoid a somewhat thorny procedural problem under applicable

5    Dutch law relating to claim allowance.  And I'm also hearing

6    that this is at least viewed by Merrill for purposes of what it

7    represents through counsel as a purely procedural matter that

8    is not designed to augment claim dollars, nor is it designed to

9    have an impact on claim dollars.

10          MR. KRASNOW:  But Your Honor --

11          THE COURT:  That's different from what you're saying.

12          MR. KRASNOW:  Absolutely, Your Honor, because it's

13   simply not factually correct.  Under the underlying documents

14   which govern these notes, if notice of acceleration is given to

15   both LBT, LBHI, there is an acceleration.  There is an early

16   redemption amount calculated in the manner provided in those

17   documents -- very complicated calculations -- which is

18   different from a final maturity amount, which has a different

19   methodology, and as to which, the Dutch trustee has said if the

20   final maturity amount -- as we understand it, from the report,

21   will be calculated in a certain fashion.  So the Dutch trustee

22   has a methodology to be used if there's a final maturity amount

23   which is the year beyond the commencement of the Dutch case.

24          That's why I said, Your Honor, this is not a question

25   of do they have a claim, is the claim crystallized.  The issue,

87

 1    I think, as been framed by Merrill, is they would prefer to

 2    have their claim calculated through an early redemption amount

 3    process, which they can only do if they send notices of

 4    acceleration to both parties as against a final maturity

 5    amount.  And if they send those notices, then that limits or

 6    may limit our ability to challenge the amount of the guarantee

 7    because the agreements say what they say.  This is -- I would

 8    love for it to be the case, Your Honor, that if Your Honor

 9    would lift the stay, there's no question that we can ignore the

10    acceleration notices that would result from that, and we could

11    still challenge the amount of the guarantee claim saying it

12    should be calculated as if the acceleration notice hadn't been

13    given, and therefore, it's a lower amount.  But once the stay

14    is lifted, it's lifted, and it has the consequences that will

15    flow from that.

16         If they could simply -- if the Dutch trustee were to

17    tell us, we will accept a notice of acceleration that is simply

18    sent to LBT, and that accelerates the note, and therefore, we

19    will calculate the note as if it had been accelerated in the

20    Dutch proceeding, then we would not be here.  The stay doesn't

21    apply; we would have all of the rights that we otherwise would

22    have to challenge the amount of the claim.  We wouldn't be

23    bound by what happens.  But that's something which Mr. Mayer

24    has suggested, if you will, might be problematical for them as

25    to whether or not they could do that.  All right, we'll accept

88

1    that.  Therefore, we're left with a situation where the

2    consequence of the lifting of the stay would be a modification

3    of the amount of the claim they could otherwise -- they being

4    Merrill Lynch -- assert against us to a higher amount.  To a

5    higher amount than would otherwise be the case.

6         THE COURT:  Okay, well, I'm hearing conflicting

7    presentations as to what's really at issue, here, and I want to

8    hone in on a couple of things.

9         First, Mr. Goffman mentioned during his opening

10   presentation that what makes this Merrill Lynch motion

11   exceptional is that it's one of -- it is perhaps the only

12   motion for relief from stay relating to an acceleration under

13   this program, and that up to this point, the debtor has

14   received some unnumbered number of historical accelerations

15   associated with no programs of this type.  Does the debtor take

16   the position that those acceleration notices are of no force

17   and effect because they took place with that stay relief?  Or

18   does the debtor take the position that they are what they are,

19   or they are what they purport to be?

20        MR. KRASNOW:  Your Honor, there are numerous notices

21   of acceleration that we received prior to the Merrill motion

22   being filed.  Until the Dutch trustee filed the report that the

23   filed this past November, and until Merrill, soon thereafter,

24   filed it's motion, bearing in mind there are 3000 separate

25   issues of notes, it was not clear to us that the notices of

89

1    acceleration could have the adverse impact on our estate -- at

2    least some of the notices, we can't say all of them because it

3    may well be as to some notices of acceleration, the early

4    redemption amounts could be lower than the final maturity

5    amount.  But that issue aside for the moment, Your Honor, it

6    was not until the Dutch trustee took the position he did in the

7    report, and, as I said, Merrill filed its motion, that the

8    possibility that the accelerations could give rise to higher

9    claims really came to the fore.  And indeed, Your Honor, as a

10   result of the Merrill's motion being filed, subject to how Your

11   Honor addresses this, we have advised, very recently, the Dutch

12   trustees that in connection with the next global protocol

13   meeting which is, in fact, taking place in New York in January,

14   we want to have a more focused discussion about these

15   structured notes in the context of these notices of

16   acceleration that we've had in the past.  We've been having

17   discussions with the trustee for months about how you calculate

18   the amounts due under these notes with regards to the

19   derivative aspect of it, and have not necessarily been focusing

20   on, as much, on the early redemption amounts and the final

21   maturity and the affect of the acceleration, other than to

22   observe, one, that there seems not to be the same provisions in

23   Dutch law as in U.S. law with respect to automatic

24   acceleration, and, indeed, we had been requesting of Dutch

25   trustee to know what his legal position was as to how he was

90

1    going to deal with the nonacceleration of the notes.  And

2    frankly, Your Honor, it was not until this report was filed

3    that we were given a more tangible sense as to what his

4    position was.

5         So the fact that we did not take any position or have

6    not taken any position with respect to the notices that have

7    been given is not reflective of what the estate's views are as

8    to the modification of the stay.  If it were a pure ministerial

9    act, we might -- we probably would say, for purposes of

10   administration and process, no harm, no foul.  What is becoming

11   apparent is there may be a harm, and that's something which,

12   again, with respect to all the other notices, the coordination,

13   if possible, between ourselves and the Dutch trustee is going

14   to be the subject of discussions, come January.

15        But today, we're not dealing with all those other

16   notices, although Your Honor's ruling may have an impact on

17   that.  I would also urge that today we should not be dealing

18   with whatever claims Merrill Lynch may or may not purchase in

19   the future.  I don't think Your Honor should engage in

20   resolving a nonjudiciable (sic) controversy to facilitate

21   Merrill Lynch's trading.  We should be dealing with the issues,

22   concrete issues before the Court which relate to the notes,

23   whatever the may be, that they had purchased.  And again, Your

24   Honor, it is based upon Merrill's stated position that if the

25   stay is lifted, they will have a claim in a higher amount.  And

91

1    we're not challenging that proposition.  We submit, Your Honor,

2    that under the case law, under Texaco, the cause -- that's not

3    cause to lift the automatic stay.

4          THE COURT:  Well, let's just say for the sake of

5    discussion -- and this is really my next question to you -- if

6    we were to craft along the lines suggested by Mr. Mayer, a

7    narrowly tailored, carefully lawyered order that made it

8    absolutely clear that all that was happening here was

9    ministerial, in other words, that narrow will be permitted to

10   issue notices of acceleration with respect to the Dutch

11   insolvency proceeding in the Netherlands, and as required by

12   the documents, will be permitted to issue a similar notice to

13   LBHI as guarantor with the understanding that it has no impact

14   whatsoever on claim allowance.  Now, I presume that that's too

15   simplistic, and once lawyers become involved, there'll be some

16   reservation of rights saying provided, however, that the

17   parties reserve the right to assert the position that the

18   claims should be valued either as of the final maturity amount

19   date or the early redemption amount date.  I don't know what it

20   would say, but let's just say, for the sake of this colloquy,

21   that good lawyers put their pens to paper and sought to achieve

22   a result that is frequently achieved in this case, which is a

23   negotiated resolution of what is a relatively narrow question.

24         MR. KRASNOW:  Your Honor, we've thought about that.

25   And you would almost have to have an order which says, the stay

92

1  is lifted to allow them to give the notice to both LBT and LBHI

2  for the purpose of acceleration with respect to the LBT

3  proceeding, but that it is deemed that the notice has not been

4  given as it relates to LBHI for the purposes of any claim they

5  may have, here.  And it's kind of you have it and you don't

6  have it.  So they have the notice and they don't have the

7  notice.  Whether something like that would satisfy the LBT, I

8  have no idea because either the notice is given or its not

9  given.

10      The problem is I'm dealing with underlying agreements

11  which we can't modify.  As I said, Your Honor, if all that had

12  to be done, here, was a notice to LBT, and it didn't have to be

13  a notice to the guarantor, we wouldn't be in court.  I don't

14  think I, as I stand here today, Your Honor, and I have to give

15  it more thought, would have a problem if one had an order

16  crafted that said the notice is effective there, but it's as if

17  no notice was given as against LBHI with respect to the

18  guarantor.  That might work for us.  But something short of

19  that, Your Honor, is probably very problematic.

20      THE COURT:  Well, there may be multiple approaches

21  that will work.  I don't know, as I sit here, that that's the

22  only one that will work.

23      Let me ask Mr. Mayer, who was, at various times during

24  the last fifteen minutes or so, trying to get my attention, if

25  he has anything he'd like to add.

1          MR. MAYER:  Well, to start at the end, Your Honor, the

2    approach that you outlined, I'm pretty sure we could make work.

3    I need to check with my client as to exact form of wording, but

4    that's almost exactly the kind of thing that we're looking for.

5          We -- I apologize for my rising and falling from my

6    seat, but two things.  First, with respect to the effect of

7    acceleration, Mr. Krasnow is right in that it does affect the

8    size of the claim.  Our only point is we're trying to make sure

9    it affects the size of the claim only in the LBT estate, and

10   not in the LBHI estate.  So there are going to be some notes

11   where early acceleration amount is less than the final

12   redemption amount.  There are going to be some where it's more.

13   And the way that works, Your Honor -- and this is an anecdotal

14   example, but it puts a human face on it -- Lehman sold some of

15   these notes in small quantities where the principal amount was,

16   at any one point in time, fixed to the price of bread in

17   Germany.  Now, you have people who had remembered the

18   starvation of post-World War II period and wanted to hedge the

19   price of bread in very small amounts.  So if you have an early

20   redemption amount, you're going to pick the price of bread at a

21   particular point.  It might be higher than the final amount or

22   it might be less.

23         But for purposes of this estate and the approach that

24   you have outlined is the correct one.  We urge the Court to

25   enter an order where this doesn't affect this estate at all.

1    And we can wordsmith as to whether the notice is deemed not to

2    have been given or whether it's given, it is deemed not to have

3    any affect.  But just for purposes of allowing the claims in

4    the Netherlands, it will help us to simply apply the

5    contractual language, rather than to try to force through a

6    civil law process a legal advance on how we deal, not so much

7    with can we focus on acceleration or nonacceleration, but how

8    do we deal with people who sent the notices already and people

9    who have sent the notices without getting relief from stay or

10   where stay has been denied.  I think the approach you outlined

11   is an excellent one, and I think we can make it work.

12        THE COURT:  Let me find out, before I hear from Mr.

13   Krasnow, if it's something that Merrill Lynch thinks has

14   potential.

15        MR. GOFFMAN:  Thank you, Your Honor.  Yes, Your

16   Honor's approach would be acceptable to us.  I believe what

17   Your Honor has outlined is exactly what we are trying to

18   achieve.  Consistent with what Mr. Mayer presented, sometimes

19   when we accelerate the claims may be higher, and sometimes they

20   may be lower.  They're not always going to be higher.  But we

21   do want to be on the same footing as everybody else in the

22   world, those parties that are outside the jurisdiction of this

23   Court, those parties that have already sent notices, and they

24   take the position that the automatic stay didn't apply.  So we

25   think the narrowly-crafted order that Your Honor just outlined

95

 1    should satisfy all parties.  And frankly, that's where we were

 2    going when I stood up originally.

 3              THE COURT:  Okay, I'm seeing discomfort in the face of

 4    counsel for the creditors' committee.

 5              MR. KRASNOW:  Before, may I just make --

 6              MR. DUNNE:  May not be unusual but --

 7              THE COURT:  No, I actually watch for discomfort.

 8              MR. KRASNOW:  You can go first.

 9              MR. DUNNE:  I just want to be clear that I'm clear on

10    this, and I'll start off by saying, Your Honor, that I think we

11    can all stipulate that this is a very quirky security.  I

12    didn't fully understand it the first few times, reading it.

13    What I've analogized it to is it's as if you had a note that

14    said if the obligor files for bankruptcy and I haven't

15    accelerated before it went in, obligor, you owe me a hundred

16    dollars.  But if I've accelerated, you owe me 200.  So it's not

17    what we typically view as acceleration of a finite principal

18    amount.  The acceleration actually adds to the amount that

19    would be due and owing.  And I heard Mr. Goffman say,

20    repeatedly, that this is solely to look to the Netherlands

21    estate for that additional quantum of whatever that methodology

22    entails.  And we don't represent the creditors over BV, and we

23    understand Mr. Mayer's concern that he'd like some certainty

24    over there.  Fine with that, but that's why I think Your Honor

25    was going right down the right path, which is, well, vis-a-vis

1    this courtroom and these estates, can we do something that

2    allows the claim to be asserted in the Netherlands, allow the

3    ministerial act to be given, but vis-a-vis the estate here, Mr.

4    Goffman has said it wouldn't increase the claims.  If that's

5    so, then we should be calculating the claim here as if that act

6    hadn't been given and we weren't using the acceleration

7    formula.  That was my confusion.  Because I think Mr. Goffman

8    wants to say, I already filed a guarantee claim -- in my

9    analogy for the hundred, you know, the pre-acceleration

10    formula.  Now, we're just switching methodologies by giving the

11    ministerial act, so I'm going to go back to my pre-existing

12    claim, and lo and behold, it's not 100; it's 200 now.  If

13    that's what he thinks we're accomplishing today, then that's

14    more than a ministerial act, and that's not what I hear is the

15    stipulation that would be acceptable to the creditors'

16    committee or the debtor.

17         THE COURT:  We spent a lot on this subject, more than

18    I expected.  I'm going to give Mr. Krasnow an opportunity to

19    speak.  But I think we're --

20         MR. KRASNOW:  Yeah, Your Honor, I just wanted to note

21    one thing.  I would hazard a guess that, you know, Merrill

22    probably wants its cake and eat it too, which is to say, with

23    respect to the notes it has purchased, and notes it may

24    purchase in the future, it's going to pick and choose which

25    ones it's going to accelerate and which ones it isn't.  It's

1   going to make a calculation as to how it's better off, and I

2   think Your Honor ought to factor that in terms of Your Honor's

3   analysis here.

4        THE COURT:  Here's what I'm going to do.  I'm not

5   ruling today.  I'm adjourning this to the next hearing date in

6   January, but I'm also directing the parties, consistent with

7   their other obligations and the upcoming holidays, to exercise

8   their reasonable best efforts in crafting an agreed order to

9   resolve this motion in a manner that would accomplish the

10  following objectives.  First, that Merrill, as to the notes it

11  currently holds, would be able to issue a notice of

12  acceleration in the Netherlands in respect of the LBT

13  insolvency proceeding, that it would be able to issue a mirror

14  image notice of acceleration in the United States as to LBHI so

15  as to comply with the requirements of the underlying documents

16  that I have not read and I've only heard about, but I assume

17  that there is such a requirement, as represented; and that

18  there would be -- and this is the hard part -- some

19  appropriate, consensual, without prejudice language that would

20  make clear that to the extent of augmentation of claim dollars

21  otherwise allowable in the Netherlands proceeding, by virtue of

22  acceleration, such augmentation would not have any deleterious

23  impact in the U.S. proceeding and would be either disregarded,

24  or there would be some appropriate reservation of rights with

25  respect to it.  Those are my thoughts on it.  And actually, if

98

1     you read the transcript, you might even have the basis for an

2     order.

3          MR. MAYER:  I'm sorry, Your Honor.  Our next hearing

4     is when?

5          THE COURT:  January 13th.

6          MR. KRASNOW:  January 13th.

7          THE COURT:  So that gives you a little less than a

8     month, particularly if you subtract the days when nobody will

9     be working, with any good luck.

10         MR. KRASNOW:  Thank you, Your Honor.

11         MR. GOFFMAN:  Thank you, Your Honor.

12         MR. MAYER:  Thank you, Your Honor.

13         THE COURT:  Malayan Banking.

14         MR. FIRESTONE:  Your Honor, Michael Firestone of Weil,

15    Gotshal & Manges for the debtors.  As Your Honor noted, it's

16    the Malayan Bank Berhad's motion under Rule 2004, and I will

17    turn the podium over to Maybank's counsel.

18         THE COURT:  Okay.

19         MR. CHASE:  Thank you, counsel.  For the record, Tom

20    Chase of Rottenberg Lipman Rich appearing on behalf of Malayan

21    Banking Berhad, otherwise known as Maybank, a large Malaysian

22    bank.  Yeah, we have filed a Rule 2004 motion seeking

23    production of, essentially, plain vanilla account documents,

24    account records reflecting the circumstances under which an

25    interest rate swap was entered in 1999.  The basis for our

1    request for this relief concerns the very unique nature and

2    documentation that was entered at that time, memorializing the

3    swap agreement.  In 1999, Maybank entered the plain vanilla

4    ISDA master agreement, schedule, credit support annex with

5    Lehman Brothers Special Finance, LBSF, as counterparty.  Days

6    later, they entered a confirmation with LBIE memorializing the

7    swap transaction.  The interesting part of the LBIE

8    confirmation is that it refers to and incorporates, by

9    reference, all of the terms of the documentation entered

10   between Maybank and LBSF.  Everybody who I've spoken to,

11   including Lehman's counsel, Mr. Maurice Horwitz, during my

12   previous request to voluntarily obtain this information

13   expressed surprise and uncertainty as to why this type of

14   transaction would have been entered, whereby LBIE, the European

15   entity and administration, would be the counterparty under the

16   confirmation.  But all of the seeming rights and obligations

17   under the ISD documentation, including the CSA which governs

18   the terms under which collateral -- in this case, there was an

19   8 million dollar note posted as collateral -- would be

20   governed.  So the CSA documentation provides that LBSF,

21   essentially depending on how you resolve this ambiguity among

22   the counterparties, might be holding this collateral.

23   Certainly, there is no ISDA or other more formal documentation

24   than the confirmation giving LBIE the collateral.

25        So after walking through this information with Mr.

100

1    Horwitz, back in June -- the swap matured in June, the

2    collateral would be due paid back to Maybank after the ten-year

3    expiration of the term -- he said well, he'd check on it, and

4    he explored some records that seemed to be readily available,

5    and he told me that the collateral was held by LBIE, and we had

6    to go there for further information relating to the

7    transaction, which we did.

8         We hired counsel there to more formally pursue our

9    claims, to investigate, to engage Linklaters in conversation,

10   et cetera.  We have been unable to obtain any information

11   relating to this issue from them.  We thereby filed the motion

12   that's before Your Honor seeking, what we believe, is really

13   generic information.  I was sort of surprised we didn't get it

14   consensually during the initial informal discussions.  I was

15   really surprised I didn't get anything in response to the

16   motion, but we didn't.  So I don't think that we are requesting

17   anything more that would or should be available via a couple

18   keystrokes on a computer, perhaps opening a file cabinet

19   somewhere.  The similar 2004 application which Your Honor

20   denied for which the transcript is attached as an exhibit to

21   Lehman's opposition or objection to our application seemed to

22   involve a much more convoluted series of transactions, or

23   multiple series of transactions whereby the money, among other

24   things, was at Barclays and moved around, and Your Honor denied

25   that application.  Reason --

1          THE COURT:  I'll very likely do the same with yours.

2          MR. CHASE:  Okay, understood.  But we feel --

3          THE COURT:  That's not a ruling.  That's just a

4     prediction.

5          MR. CHASE:  Okay, I'll step up my game, Your Honor.

6     We feel that this information, under any sort of weighing up

7     the equities, is so readily available, concerns a sufficiently

8     sui generis unique situation that it's not likely to open the

9     floodgates to all of the other people with similar

10    documentation.  It concerns eight and a half million dollars in

11    collateral, has required us to pursue our claims here, pursue

12    our claims in England, file proofs of claims here that are

13    entirely difficult to value because of the ambiguity in this

14    unusual documentation, that we feel the production of this

15    minimal information is, hopefully, warranted.

16         THE COURT:  Okay, I understand what you want.

17         MR. FIRESTONE:  Your Honor, Michael Firestone of Weil,

18    Gotshal & Manges.  Be very brief.  Simply to say that after the

19    motion was filed, we spoke with Mr. Chase again, we said

20    nothing had changed, we don't have the collateral.  So as we

21    read the motion, that is essentially what this is searching

22    for:  the collateral.  LBIE has the collateral.  Mr. Chase has

23    a market statement which was -- Maybank received from LBIE

24    indicating that it was most likely in a LBIE brokerage account.

25    So, you know, the requests that have been attached to the

102

1    motion are extremely broad, which I don't think was touched on

2    in Mr. Chase's remarks.  They seek all documents relating to

3    the collateral, they seek all documents on any transaction, as

4    well.

5         THE COURT:  Can you confirm in a reliable way to Mr.

6    Chase or Maybank what you just said, which is we don't have

7    this collateral, we think it must be at LBIE, spend your time

8    and money in England?

9         MR. FIRESTONE:  Well, short of what we've already

10   done, I'm not sure what more we can do.  I can -- certainly

11   willing to talk with Mr. Chase, again, about if --

12        THE COURT:  I guess what I'm really getting at is

13   this.  I mean, as a matter of -- my decision in Hillson (ph.)

14   has been cited here.

15        MR. FIRESTONE:  Um-hum.

16        THE COURT:  A very unrelated case except that it

17   involves 2004, but it also dealt with the question of whether

18   2004 is properly used in situations where there is no property

19   to investigate because it's long gone.

20        MR. FIRESTONE:  Um-hum.

21        THE COURT:  In that case, it was a sculpture; in this

22   case, it's a security.  I was assured in the Hillson case that

23   the sculpture was long gone --

24        MR. FIRESTONE:  Um-hum.

25        THE COURT:  -- and I was satisfied by the facts of

1    that case that Rule 2004 didn't apply.  I believe you're

2    probably right, because I accept the representations that the

3    underlying collateral here isn't in the United States and isn't

4    subject to your control.  But it's not unreasonable for Maybank

5    to want to know where to spend its time and effort.  Can you

6    give them some reliable indication that it's a waste of time to

7    pursuing this motion unless you go elsewhere?

8         MR. FIRESTONE:  Your Honor, you know, I can certainly

9    speak with my client and I can speak with Mr. Maybank (sic)

10   about what they would consider more reliable than what we've

11   already told them.  We're willing to do that.  But we've said

12   that it's not there, and I don't know what else would be more

13   reliable, other than, if there's documentation that we have, we

14   can look at it.  And obviously, if there is documentation, we'd

15   consider sharing it, but the representations that we've made

16   and that were made earlier in June are the representations that

17   will be made.

18        THE COURT:  Okay, I'm denying the motion for

19   examination under 2004 for reasons substantially similar to the

20   ones that were attached to the debtors' papers in opposition

21   from a hearing transcript dealing with the Carret (ph.) motion

22   for 2004 discovery and also based upon my ruling in the Hillson

23   case.  Nonetheless, I'm encouraging the parties to work

24   cooperatively to try to provide informal information that will

25   give Maybank some reason to believe that it doesn't have an

104

1    asset here to pursue and can concentrate its efforts in the UK

2    in the LBIE case.

3            Additionally, for policy reasons, I consider

4    miscellaneous Rule 2004 requests such as this to be incredibly

5    wasteful.  And that was really embedded in my Carret comments.

6    To the extent that parties who have reasonable questions can

7    get those questions answered, that should happen in a reliable

8    way.  And motion practice relating to this kind of

9    particularized discovery should be kept to a minimum.  I'll

10   entertain orders in respect of denial of this motion, but

11   without prejudice to other procedures that may be adopted by

12   Maybank if they're unable to get information from the debtor in

13   a cooperative form.

14           MR. FIRESTONE:  Thank you, Your Honor.

15           THE COURT:  Okay, let's -- I think we go to the SIPC

16   agenda?

17           MR. FIRESTONE:  Yes, Your Honor.

18           MR. KOBAK:  Good afternoon, Your Honor.  James Kobak,

19   Hughes, Hubbard & Reed on behalf of the SIPC trustee.  We had

20   two items on your calendar:  number 18 which concerns the

21   allocation motion and number 19 which concerns the CalPERS

22   matter.  I think the discussion before Your Honor in the LBHI

23   case took care of number 19, so the only thing that's left is

24   the allocation motion.  I'll try to be as brief as possible

25   because I know it's been a long morning for all of us.

105

1      We were here in November.  I think since that time,

2   several things have happened which represent progress on this

3   issue and should allow us to move forward in what I hope will

4   be a somewhat simplified hearing.  I may be optimistic in that

5   regard.  As you know, this is a very important motion to us

6   because it's the motion that will help to determine how much

7   customer property is available in the estate, and therefore,

8   help us to determine when and in what quantity we can make

9   distributions to customers.

10      Since we were here, before, a number of parties had

11   objected on the original objection date.  We've talked to those

12   parties.  A couple of them have withdrawn their objections.

13   We're talking to some others.  I'm not sure all of them will

14   withdraw their objections, but I think at least some additional

15   parties will.  In addition to that, we had been working with

16   the holding company, which, I think, as we reported to Your

17   Honor last time is working in conjunction with their creditors'

18   committee in the Chapter 11.  So we've been talking to them.

19      We've also been talking to LBIE.  They do not have a

20   date to object, yet.  We have been sharing information with

21   them and with their expert, Grant Thornton, in the case of the

22   holding company and the creditors' committee.  So for going

23   forward, we would like to use the date of February 25th --

24   which I think is one of the dates we'd reserved for hearings on

25   SIPC matters going forward, next year -- as a date to bring

1    this forward, hopefully, to determine it.  And I don't know if,

2    at this point, that will be a question of law or a question of

3    fact or a mixture of both.

4         One thing that's happened in the interim period is we

5    did receive a substantial brief in support of our position that

6    was filed by the Securities Exchange Commission.  That brief,

7    basically, says that our reading of the law and how the

8    15(c)(3) and the securities regulations correspond with the

9    SIPC statute is essentially what our position is, and they say

10   that's entitled to chevron deference.  Of course, we agree with

11   that proposition.  So I think that what the effect of that -- I

12   don't want to speak for the other parties, they still might

13   want to contest that legal position -- but it seems to me, to a

14   large extent, it narrows the issues to specific items of --

15   where we contend property was not properly segregated or the

16   appropriate calculations weren't made under Rule 15(c)(3).

17        So our proposal is to try to go ahead on the 25th.  We

18   would ask that the date for objections from those parties who

19   haven't objected be set as January 22nd, which we think gives

20   everyone ample time to consider exploring the facts, and will

21   give us ample time and Your Honor ample time to know what

22   issues really are likely to go forward on the 25th.  We would

23   hope that those objections would have a fair degree of

24   specificity so that we would know particularly what items they

25   think they might want to dispute and -- with some degree of

1    specificity, at least in a few sentences, what the nature of

2    their disagreement with our position is.  We think that's the

3    most practical way for going forward.

4         THE COURT:  It sounds practical to me, as well.  I

5    think just for purposes of appropriate notice to parties who

6    may not be here and just in order to discipline the process

7    beyond your remarks from the podium, that it would be a good

8    idea to have these dates set forth in a pre-trial order of some

9    sort.

10        MR. KOBAK:  I think -- if Your Honor believes this is

11   a reasonable schedule, I think we'll try to do an order and

12   circulate it among the interested parties and file it.

13        THE COURT:  It sounds like a reasonable schedule to

14   me.  I don't know if the objection deadline is early, relative

15   to a hearing date in late February, and I leave that to the

16   parties to adjust.  But I think that it's reasonable that there

17   be some outside date by which those parties who are continuing

18   to press their objections have to commit to writing what it is

19   that they're complaining about.  And also, it should provide

20   sufficient time, to the extent any discovery is required, that

21   discovery can take place on a consensual basis.

22        MR. KOBAK:  Yes.  That's our objective, Your Honor.

23   Thank you.

24        THE COURT:  Okay.  There's someone standing.

25        MR. SCHULMAN:  Your Honor, Dan Schulman of Salans,

1    counsel for Svenska Handelsbanken which has noticed a

2    substantial objection.

3         THE COURT:  You're too far away --

4         MR. SCHULMAN:  Sorry.

5         THE COURT:  -- to be heard and appropriately

6    recognized.

7         MR. SCHULMAN:  Your Honor, one very small point.  Dan

8    Schulman of Salans, counsel for Svenska Handelsbanken which has

9    filed a substantial objection.  I note that there have been

10   some responses filed in the SEC's amicus brief.  We would ask

11   that objectants (sic) be permitted to respond to the SEC's

12   brief if they so wish.

13        THE COURT:  I don't know how you object to somebody's

14   brief if --

15        MR. SCHULMAN:  Well, if we -- they filed, basically, a

16   legal brief.  We'd like to file a reply brief to that.

17        THE COURT:  I think that you should simply participate

18   in the discussions that we've just outlined with counsel for

19   the trustee about a consensual form of order.  There's no need

20   for special treatment for your client on this.  Everybody will

21   get the same treatment.

22        MR. SCHULMAN:  We already have filed an objection,

23   Your Honor.

24        THE COURT:  Then there's nothing more you need to do.

25        MR. SCHULMAN:  All right, thank you, Your Honor.

109

1          THE COURT:  Okay, we're adjourned until 2:30.  Thank

2     you.

3          (Recess from 12:23 p.m. until 2:40 p.m.)

4          THE COURT:  Be seated.  Good afternoon.

5          MR. CHRISTENSEN:  Good afternoon, Your Honor.  Evert

6     Christensen from Weil, Gotshal & Manges.  First matter on the

7     agenda this afternoon, Your Honor, is a pre-trial conference in

8     the PT Bank Negara adversary proceeding which should be

9     relatively short.  Plaintiff's counsel is making his way

10    forward.

11         Your Honor, just to update you, both defendants, LBI

12    and LBSF have filed answers to the complaint, and I believe

13    that the plaintiffs intend to seek permission to amend the

14    pleadings at this point.  So with that, I'll turn it over to

15    Mr. Stremba to address the Court.

16         THE COURT:  Okay, let me hear about the reason for the

17    amendments.

18         MR. STREMBA:  Good afternoon, Your Honor.  Lee Stremba

19    of Troutman Sanders LLP, counsel to plaintiff PT Bank Negara

20    Indonesia.  I have with me, today, my partner, Hollis Cohen.

21         Your Honor, this action arises from a very standard

22    foreign exchange transaction of a type that my client and

23    Lehman Brothers Special Financing conducted hundreds of times

24    before these bankruptcies occurred.  My client was to provide,

25    in this transaction, one million dollars of British pounds, and

1    simultaneously, was to receive the equivalent in U.S. dollars

2    from LBSF at the rate agreed upon, which was 1.765 dollars per

3    pound.  The agreement was entered into on September 12, 2008,

4    shortly before the bankruptcies.  It was to be concluded on

5    September 16.  On the 15th, my client made the arrangements to

6    deliver the British pounds to the agent for LBSF.  In this

7    transaction, as in hundreds before it, LBSF designated Lehman

8    Brothers, Inc. as the receiving agent for my client's British

9    pounds.  And so that is why LBI is a party to the lawsuit.  The

10   British pounds were delivered to an account of LBI at Citibank

11   London.  The bankruptcy of Lehman's -- LBI's parent occurred

12   roughly at the same time, and when our client found out about

13   that bankruptcy, demanded the return of its British pounds.

14   Ultimately, several days later, Lehman Brothers Special

15   Financing went into bankruptcy.  As of that time, my client's

16   funds remained at Lehman Brothers, Inc.  It never was

17   transferred out of that account.  So what we have is a claim

18   against LBI --

19           THE COURT:  Let me just check on something you said.

20           MR. STREMBA:  Yes.

21           THE COURT:  You said the pounds remained at Lehman

22   Brothers, Inc.

23           MR. STREMBA:  Yes.

24           THE COURT:  I thought that they were deposited to an

25   LBSF account at Citibank.

111

1          MR. STREMBA:  No, Your Honor, it was an LBI account at

2    Citibank.  LBI was the receiving agent.  In all of these

3    British pound transactions, LBI received the money on behalf of

4    LBSF.  So it was an LBI account at Citibank in London into

5    which --

6          THE COURT:  As agent for LBSF?

7          MR. STREMBA:  As agent, yes.

8          THE COURT:  Okay.

9          MR. STREMBA:  They call it a receiving agent in the

10   documentation.

11         So the funds were at LBI when the LBI bankruptcy

12   occurred, and when the -- or, the SIPC filing, and when the

13   LBSF bankruptcy filing occurred, they were still in the LBI

14   account at Citibank.  Our client had demanded the return of

15   those funds, both from LBSF, it's counterparty, and from LBI,

16   the agent, but they were not returned.

17         We commenced this action, in part, to assert that

18   those funds delivered by my client never became property of

19   either the LBI estate or the LBSF estate.  And that,

20   essentially, is the first count of our complaint for a

21   declaration that the funds that were delivered did not become

22   property of the estates.  And we also assert that under the

23   theories of constructive trust and unjust enrichment, those

24   funds rightfully need to be returned.

25         Interestingly, Your Honor, a little bit of a quirk in

112

1    this case, or at least an interesting aspect, under the Uniform

2    Commercial Code, foreign exchange transactions involve the

3    purchase and sale of goods.  The funds that are transferred by

4    each party are considered goods, rather than payments for --

5    mediums of payment.  And therefore, when my client delivered a

6    million British pounds, it was delivering goods or a commodity,

7    and, therefore, had rights of reclamation and rights pursuant

8    to Section 503(b)(9) of the Bankruptcy Code.  And we have

9    asserted those rights -- they were asserted first by way of

10   demand, but they have been asserted as additional claims in the

11   complaint.  Now, that's by way of background to explain why we

12   have an issue to deal with by way of amendment.

13           In the answer of LBI, there is an affirmative defense

14   that the action must be dismissed because of a missing

15   necessary party.  And based upon those pleadings, the answers,

16   and discussions with counsel for LBI, we understand that my

17   client's funds have been frozen in the LBI account in London

18   since the beginning of the SIPC proceeding because Citibank has

19   asserted setoff rights against all of the LBI accounts.  And

20   you probably know a lot more about that than I do, but that's

21   our understanding.  As a result, I guess the good news is that

22   my client's funds remain where they were, and we know where

23   they are.  The bad news is that because Citibank is asserting

24   rights to those accounts, it does appear to us that we cannot

25   fully adjudicate my client's rights to those funds without

113

1    having Citibank present in the lawsuit.  And for that reason --

2    and we've discussed this with counsel to the other

3    defendants -- what we propose to do is very quickly amend the

4    complaint to add Citibank as a party serve that so that we have

5    all three parties in the lawsuit, and then come back to Your

6    Honor with a schedule for discovery after Citibank has been

7    introduced to the action.

8            Given the requirement, first to amend, then to have

9    time for Citibank to answer, plus a little holiday slippage, I

10   think I would propose that we come back to Your Honor in

11   approximately sixty days, at which point I would hope that all

12   the parties would then be before Your Honor and we could move

13   the action forward.

14           THE COURT:  Sounds reasonable to me.  Is there any

15   comment from either LBI or LBSF?

16           MR. CHRISTENSEN:  No, Your Honor.  Obviously, we've

17   answered and we rest on our answer with respect to Mr.

18   Stremba's analysis of the legal claims.  But we have no

19   objection to their amending their answer to add Citibank at

20   this point -- or, amending their complaint, rather, to add

21   Citibank.

22           THE COURT:  Okay.  Sounds fine.  LBI?

23           MS. CAVE:  Your Honor, Sarah Cave from Hughes Hubbard

24   on behalf of the trustee, and we have no objection to the

25   answer, either -- or, to amending the complaint, either.

114

1          THE COURT:  Okay, does this mean that the complaint

2     can be amended by stipulation without the need for motion

3     practice?

4          MR. STREMBA:  Yes, Your Honor.

5          THE COURT:  Fine.

6          MR. STREMBA:  Your Honor's permission is required, but

7     I believe --

8          THE COURT:  I hereby --

9          MR. STREMBA:  -- everybody's consenting --

10          THE COURT:  I hereby grant you permission.

11          MR. STREMBA:  Thank you, Your Honor.

12          THE COURT:  Okay.

13          MR. CHRISTENSEN:  I believe the next matter on the

14     agenda, Your Honor, are the Rule 60(b) motions.  With the

15     completion of the pre-trial, that concludes my business before

16     the Court, and I ask to be excused.

17          THE COURT:  So you may be excused.

18          MR. CHRISTENSEN:  Thank you, and I'll turn it over to

19     those who are here for the 60(b) motions.

20          THE COURT:  All right, I'm going to provide a bench

21     ruling with respect to the motion that was argued last week in

22     which Barclays Capital asserted that the filing of 60(b)

23     motions by each of the creditors' committee and the trustee and

24     the LBI SIPC case constituted an at issue waiver of the

25     attorney-client privilege.  Here's my ruling.

1   At the outset, the Court examines the relevant law

2   governing the attorney-client privilege.  This privilege exists

3   to encourage full and frank communication between attorneys and

4   their clients, and thereby promote broader public interest in

5   the observance of law and the administration of justice.  See

6   Morande Auto Group v. Metropolitan Inc., 2009 WL 650444 at *2

7   (D. Conn., Mar. 12, 2009).  Accordingly, courts in the Second

8   Circuit have exercised great caution when construing rules

9   resulting in the waiver of the privilege.  Per re: the County

10   of Erie, 546 F.3d 222 at 228 (2nd Cir. 2008).  An excerpt from

11   that case, "Rules which result in the waiver of this privilege

12   and thus possess the potential to weaken attorney-client trust

13   should be formulated with caution."

14   Generally, courts have found that parties implicitly

15   waive the attorney-client privilege in three factual scenarios.

16   When a client testifies concerning portions of the attorney-

17   client communication, when a client places the attorney-client

18   relationship directly at issue, and when a client asserts

19   reliance on an attorney's advice as an element of a claim or

20   defense.  County of Erie, 546 F.3d at 228.  It is this third

21   instance of at issue privilege waiver on which Barclays relies.

22   County of Erie sets forth the applicable legal standard in the

23   Second Circuit for determining implied at issue waiver of

24   attorney-client privilege.  That case defined the test as

25   whether the moving party can prove that the opposing party

1    "relied on the privileged communication as a claim or defense,

2    was an element of a claim or defense."  546 F.3d at 228.

3    County of Erie examined whether e-mails exchanged between a

4    county attorney's office and sheriff's office concerning strip

5    searches were admissible in a lawsuit challenging their

6    constitutionality.  The defendants in that case invoked an

7    objective, qualified immunity defense in that they believed

8    their conduct had been legal.  County of Erie, 546 F.3d at 229.

9    The Second Circuit held that the defendant's reliance on an

10   objective, rather than subjective legal defense did not

11   constitute at issue waiver.  As stated in that case,

12   "Petitioners do not claim a good faith or state of mind

13   defense.  They maintain only that their actions were lawful or

14   that any rights violated were not clearly established.  In view

15   of the litigation circumstances, any legal advice rendered is

16   irrelevant to any defense so far raised."

17        Moreover, the Second Circuit emphasized that a finding

18   of waiver requires actual reliance on privileged advice,

19   whereas the "mere indication" of privileged advice is

20   "insufficient to place legal advice at issue."  Under the test

21   as enunciated in Erie, then, the 60(b) motions filed by the

22   trustee and the committee did not implicitly waive the

23   attorney-client privilege with respect to their advisor's

24   knowledge and understanding of the sale transaction.  Despite

25   Barclays' arguments to the contrary, the claims asserted by the

1   trustee and the committee in the 60(b) motions do not rely on

2   any legal advice provided by their respective advisors, with

3   regard to the sale transaction.  Instead, these claims rely on

4   allegedly misleading and incomplete public representations made

5   to the Court at the sale hearing and on the alleged failure of

6   Barclays and certain Lehman executives to say anything to

7   contradict those representations.  In other words, the claims

8   asserted by the trustee and the committee in the 60(b) motions

9   constitute what I'll call objective claims, asking the Court to

10  compare in-court disclosures concerning the sale transaction

11  with the provisions of the sale transaction as actually

12  consummated.  Neither the trustee nor the committee asserts

13  claims based on their subjective state of mind at the time of

14  the sale hearing.

15          The Court is also not persuaded by Barclays insistence

16  that the context of the claims of the trustee and the committee

17  and the 60(b) motions means that they necessarily waive the

18  attorney-client privilege.  At bottom, Barclays seems to argue

19  that reliance that purported mistakes and newly discovered

20  evidence means that the claims for relief under Rule 60(b)

21  necessarily implicate the contemporaneous advice provided by

22  professionals for the trustee and the committee at the time of

23  the sale hearing.  Based on the Court's review of these

24  motions, the Court disagrees.  The committee argued at the

25  hearing and in its 60(b) motion that the newly discovered

118

1    evidence underlying its 60(b) motion consists of discovery

2    unearthed during the Rule 2004 investigation, purportedly

3    demonstrating misrepresentations and nondisclosures related to

4    the sale transaction.  The trustee's 60(b) motion makes clear

5    that his arguments, with respect to mistakes, are, in fact,

6    premised on insufficient disclosure to the Court.  Thus the

7    60(b) motions simply do not implicate and rely on the advice

8    given by attorneys.

9         This holding on at issue waiver comports with widely-

10   recognized principles of public policy.  The attorney-client

11   privilege is critically important to ensuring open and frank

12   communications between attorneys and their clients.  For this

13   reason, policy considerations weigh in favor of strictly

14   construing any implied waivers of the privilege such as urged

15   by Barclays.

16        Barclays is not unfairly prejudiced by this holding

17   because other means exist for it to obtain relevant information

18   in support of its defense to the 60(b) motions.  The agreement

19   by LBHI to share otherwise privileged information is certainly

20   one important source.

21        Additionally, Barclays remains free to pursue

22   discovery from third parties that provided information to the

23   committee and the trustee's advisors concerning the sale

24   transaction.  Accordingly, Barclays is not worse off in that it

25   has not been denied access to information vital to its claims.

119

1    See County of Erie 546 F.3d at 229.

2            Moreover, should it become apparent at a later date

3    that the claims of the trustee or the committee as actually

4    presented, do, in fact, rely on legal advice provided by their

5    respective professionals, then Barclays remains free to assert

6    an at issue waiver at that time and seek additional related

7    discovery.

8            Finally, the fact that LBHI has agreed to produce

9    otherwise privileged documents to Barclays is not relevant to

10   any purported privilege waiver by either the trustee or the

11   committee.  The trustee and the committee are not similarly

12   situated to LBHI with respect to the current dispute.

13           As mentioned by counsel for LBHI on the record at the

14   hearing, LBHI viewed itself as distinct from the trustee and

15   the committee because LBHI made representations to the Court

16   with respect to the sale transaction at the sale hearing and

17   LBHI initiated the Rule 2004 discovery from Barclays.  LBHI

18   also based its 60(b) motion in part on the contention that its

19   attorneys were kept in the dark with respect to changes in the

20   sale transaction.

21           The motion by Barclays is denied without prejudice to

22   bringing a later motion should it become clear at some future

23   date that the committee or trustee is relying on privileged

24   communications to support 60(b) relief.  That's the ruling of

25   the Court.

1          The next item is a motion by the committee.  If people

2     wish to leave at this point or change their seat that's fine.

3          MR. TECCE:  Good afternoon, Your Honor.  James Tecce

4     of Quinn Emanuel on behalf of the creditors' committee.  First,

5     let me state at the outset, Your Honor, I appreciate sincerely

6     your entertaining the motion at this hearing.  I know that it

7     was not originally scheduled for this time.  I understand the

8     Court is extremely busy and I am going to be brief in my

9     presentation this afternoon.

10          THE COURT:  Before we get started, what happened here

11     just in terms of the schedule because I had been advised that

12     this was off calendar --

13          MR. TECCE:  Correct.

14          THE COURT:   -- and then I was advised this morning it

15     was back on?

16          MR. TECCE:  Your Honor, we had two motions on calendar

17     for today on the 10 o'clock agenda; this motion and a Rule 2004

18     motion.  We adjourned the Rule 2004 motion but we inadvertently

19     adjourned this one as well.  We had no intention of doing that,

20     it was fully briefed and the parties were ready to go forward,

21     it was just a mistake.

22          THE COURT:  Okay, well, happily I reviewed this before

23     it was adjourned so I'm as ready for it as I'm going to be.

24          MR. TECCE:  Thank you very much, Your Honor.

25          Your Honor, the committee motion asks the Court to

1    issue two letters of request for international judicial

2    assistance pursuant to the Hague Convention.  The committee

3    submits that the motion does not seek extraordinary relief.

4    Indeed, the committee styles the motion as a procedural motion

5    because of the discreet nature of the relief it is requesting.

6         I note also that the motion is joined by LBHI with

7    respect to the Financial Services Authority or the FSA request

8    and the PricewaterhouseCoopers U.K. request.  And LBI joins the

9    motion with respect to the FSA.

10        If the Court grants the committees' motion, it will

11   transmit two letters of request to the High Court in the United

12   Kingdom which will then issue document requests to the two

13   proposed respondents, the FSA and PwC.  Both respondents will

14   be given every opportunity to defend against the subpoena in

15   the English courts.  Today, we are simply asking the Court to

16   take the necessary first step in that process that enables us

17   to pursue relief from the United Kingdom.

18        With respect to the two respondents, the FSA and PwC,

19   the committee notes that the committee transmitted copies of

20   the motion papers on November 25th to both of those

21   respondents.  The committee has since met and conferred with

22   the FSA through a telephone call dated December 3, 2009 and

23   indeed we attach our correspondence with the FSA in connection

24   with our reply papers.

25        The committee also has received indications from

122

1    senior justice -- from Senior Master Whitaker from the Queen's

2    Bench Division that he will leave a calendar date for Monday,

3    December 21 should the Court grant the motion today.  That day

4    will be available for the committee to present their letters of

5    request at this hearing.  The Court -- it's anticipated that

6    the Court will schedule a fixture, which I understand is an

7    English term for a future date, for argument and final

8    disposition of the application, again, should the Court grant

9    the motion today.

10        We submit that ample justification exists to grant the

11   motion when the documents that we're requesting are not only

12   relevant but are important to the Rule 60(b) litigation.  The

13   movants allege in that litigation that Barclays realized

14   billions in profits from the sale transaction that were not

15   disclosed to the Court.  To that end, the narrow document

16   request to seek disclosure that go to approval of the sale

17   transaction by Barclays' regulators.  The regulators evaluation

18   of Barclays' results announcement in 2009 and Barclays'

19   independent auditor's evaluations of the assets acquired in the

20   sale transaction and the results announced in the results

21   announcement.  Certainly, these documents are relevant and they

22   have probative work.

23        What's more, there is no alternative means to secure

24   the discovery while Barclays has indicated that it may agree to

25   produce its correspondence with the FSA and while that offer is

123

1     appreciated and would help, it would not result in the

2     production of FSA's internal documents including its

3     contemporaneous notes from meetings with Barclays' executives.

4          Barclays has also indicated that it would consider

5     providing documents, it's -- strike that.

6          Barclays has also indicated that it will provide

7     documents it supplied to PricewaterhouseCoopers.  But, again,

8     that would not result in the production of internal work papers

9     from its independent auditor.  And while Barclays has indicated

10    that it will consider instructing PwC to do so, we have no

11    assurance that PwC will, in fact, produce those work papers.

12         Barclays is the only objector to this motion, Your

13    Honor.  They are not a respondent with respect to the subpoena.

14    The thrust of their objection is that the factual predicate

15    upon which the motion rests is inaccurate and Barclays

16    challenges relevance on that basis.  But we will not dispute

17    today Barclays' assertions and we note the Court's analysis

18    should focus on whether the documents are relevant to the Rule

19    60(b) motions instead of deciding whether the Rule 60(b)

20    movants have conclusively proven their claim.

21         The committee submits that it has satisfied the

22    relatively low legal hurdle of demonstrating the documents are

23    relative.  The committee alleges a flat transaction was

24    approved but one resulting in billions in profits was

25    consummated, and to that end documents concerning the approval

124

1    of that transaction by Barclays United Kingdom regulator and

2    its independent auditors is highly relevant.

3         Lastly, Your Honor, Barclays maintains that issuing

4    the letters of request would undermine interest in the United

5    Kingdom.

6         First, we're not asking the Court to direct the

7    production of these documents in violation of U.K. law.

8    Instead, we are simply asking the Court to take the first step

9    in letting us pursue the production of the documents in the

10   United Kingdom.  The FSA, PwC and even Barclays can contest the

11   discovery before the English court.  But we cannot initiate

12   that process in the first instance without issuance of the

13   letters of request.

14        Secondly, Your Honor, we are not seeking pretrial

15   documents as that term was understood in the United Kingdom.

16   If this were a Rule 2004 application or a similar, quote,

17   unquote, "fishing expedition" Barclays might have a point.  The

18   movants are not seeking to depart on a train of inquiry that

19   might produce trial evidence.  Instead, they are seeking

20   disclosure in connecting with -- in connection with an existing

21   litigation that is scheduled for argument and possibly trial.

22        Third, to the extent that there are confidentiality

23   issues and concerns, they can be handled by the United Kingdom

24   court.

25        Today's motion and the enter of this order is not a

1   finding on confidentiality issues.  It can be addressed another

2   day in the United Kingdom.  Because the documents are located

3   beyond the Court's subpoena power, however, there is a

4   precondition to starting that process that the Court issue the

5   letters of request, of course, subject to everyone's rights to

6   debate confidentiality and other issues in the appropriate

7   forum in the United Kingdom.  Unless Your Honor has any

8   questions, that concludes my presentation on the motion.

9           THE COURT:  I have no questions.

10          MR. TECCE:  Thank you very much.

11          MR. THOMAS:  Your Honor, Todd Thomas from Boies,

12  Schiller & Flexner on behalf of Barclays and I'm here with

13  Jonathan Schiller who I believe Your Honor knows.

14          We oppose this motion simply because we don't believe

15  the legal standard has been met.  Movant has emphasized the

16  relatively low Rule 401 standard of evidence, but, in fact,

17  under the comity analysis that this Court must do the factor

18  that must be considered is the, quote, "importance" of that

19  information, not just its relevance.  Here, we don't believe

20  the information is relevant and certainly don't believe it is

21  important.  With respect to the PwC papers, we have offered --

22  Barclays has offered to provide and will provide two movants

23  the information that Barclays provided to PwC in order to allow

24  PwC to do their audit.

25          Barclays has also offered and produced two movants

126

1    information that Barclays prepared for its valuation of the

2    assets.  If movant would like to challenge those valuations,

3    they are able to do so without seeing PwC's internal audit

4    papers.  They understand what the assets are and they have the

5    ability to go and do their own valuation of those assets if

6    they want.

7         With respect to the FSA internal work papers, again,

8    Barclays has agreed to look for any official correspondence it

9    had with the FSA and to produce those documents.  So what we're

10   talking about is just the internal regulatory papers of the

11   FSA.  We don't believe those are relevant to this proceeding.

12   Some of those, in fact, don't even relate to this deal but

13   relate to the prior pre-bankruptcy deal which did not occur.

14        Additionally, we attach to a supplemental filing a

15   letter from the English FSA which they asked us to present to

16   the Court and we agree with FSA's conclusion as noted in our

17   brief that this request is also procedurally in conflict with

18   English law which is another consideration for the Court under

19   its comity analysis.

20        We believe that the requests are not to the degree of

21   specificity required under the law.  That's a point that the

22   FSA made in their letter.  And I would note that the standard

23   in one of the cases cited by movants in the reply brief in

24   terms of how specific the requests must be, it's the

25   Westinghouse case which is 3 W.L.R. 430 at 24 and 25 reads,

127

1    "The description should be sufficiently specific to enable the

2    person to put his hand on the document or the file without

3    himself having to make a random search.  In short, specifically

4    to know what to look for."  And, Your Honor, we believe -- we

5    agree with the FSA these requests are much broader than that.

6    And, in particular, the FS -- the request with respect to PwC

7    are even broader than the FSA request.

8            Additionally, we also agree with the FSA's point that

9    this is improper procedurally under English law because it is

10   seeking confidential information.

11           THE COURT:  Let me ask you something that occurs to me

12   as I'm hearing your argument.  PwC and FSA are not here making

13   these arguments; Barclays is.  Are you doing this with the

14   direction and authority of PwC -- PwC and FSA or are you just

15   doing this on your own?  Because the appearance is that you're

16   trying to stonewall discovery.

17           MR. THOMAS:  Your Honor, we are simply here objecting

18   to it because we don't think the legal standard has been met.

19           THE COURT:  Yes, but let me -- just answer the

20   question which is a simple one.  Did PwC and/or FSA ask

21   Barclays to carry its argument here so that they didn't have to

22   appear in court and do it, or are you simply doing it on behalf

23   of your client?

24           MR. THOMAS:  Your Honor, the FSA asked us to present

25   the letter to the Court.  I do not believe any of the

128

1   communications could be construed as formally authorizing us to

2   appear on their behalf.  So we are preparing just on Barclays

3   behalf but we did -- we were asked by the FSA to present this

4   letter to the Court.

5        THE COURT:  Okay.  And this is a question that I guess

6   I'll raise both with you and committee counsel and counsel for

7   others who are joining in the committees' motion, which is

8   whether any of these issues that you have raised can be raised

9   on December 21st in front of the High Court at a time when

10  English law can be interpreted by an English judge as opposed

11  to my purporting to interpret English law across the Atlantic.

12  I assume that the answer to that is yes.

13       MR. THOMAS:  Yes, Your Honor.  If I might add, it is

14  also part of the analysis that the U.S. court, we believe, is

15  intended to engage in before even sending it across the seas

16  because of the comity factors.

17       THE COURT:  Well, in what respect is comity implicated

18  in your objection?  It seems to me that courts in the United

19  Kingdom and courts in the United States have a shared interest

20  in getting at the truth.  And since the 60(b) motions being

21  prosecuted here by LBHI, LBI and the committee all raise fairly

22  significant questions about the truth being withheld.  It

23  strikes me as a curious posture for you to be in to be

24  preemptively saying we don't want you to know the truth; we

25  only want you to know what we want to tell you from our

129

1    records.

2         MR. THOMAS:  Your Honor, we certainly don't want to be

3    in that posture.

4         THE COURT:  I'm sure you don't.

5         MR. THOMAS:  No.  And we have provided extensive

6    discovery including all our work papers and we certainly

7    welcome alternative valuations of those assets and we are

8    simply pointing out the courts have emphasized that U.S. courts

9    need to carefully scrutinize applications of this type.  But

10   beyond our just pointing out that we don't believe the legal

11   standards have been met here and that we provided most of the

12   information.

13        THE COURT:  Could you explain to me why the legal

14   standard is not met?

15        MR. THOMAS:  We believe because movants have not

16   demonstrated that the internal work papers of FSA, the

17   regulatory body, with respect to a pre-bankruptcy deal, Your

18   Honor, for example, that was not consummated would be important

19   to this litigation.

20        THE COURT:  Let me tell you why I think it might be.

21   One of the things about this transaction that's highly unusual

22   and I think everybody who has observed this case recognizes it,

23   is that the transaction happened very quickly.  It could not

24   have happened that quickly had the parties not been engaged in

25   extraordinarily intense pre-bankruptcy negotiations the week

130

1    before.  So the fact that there was a bankruptcy filing and a

2    changed transaction is certainly very significant.  But if

3    Barclays had come in fresh that week, there hardly could have

4    been a transaction consummated within four or five days.

5    That's just not humanly possible. So I think that there is a

6    connection to what, at least in my mind, to what happened pre-

7    bankruptcy and what happened post-petition and I'm certainly

8    interested in knowing about it.

9        MR. THOMAS:  Very well, Your Honor.

10       THE COURT:  Okay.  After that comment from the bench,

11   I'm not sure if anybody wants to say anything more.

12       I'm prepared to grant this motion for the reasons that

13   I've articulated.  In doing so, however, I recognize that this

14   is a matter which is delicate because it goes to the heart of

15   institutions in the United Kingdom and confidential --

16   potentially confidential work papers of PwC and potentially

17   confidential internal records of the FSA.  I leave it to the

18   High Court to determine issues of relevance, the

19   appropriateness of the discovery and will be guided entirely by

20   what the U.K. court decides.  In authorizing this opportunity

21   to obtain discovery in the U.K., I by no means mean to suggest

22   anything about how a U.K. court should decide the issue once

23   it's presented there.  So all issues that have been raised here

24   by Barclays can be raised there by PwC, FSA and Barclays and a

25   U.K. judge can decide whether or not the discovery is

131

1    appropriate.  Anything more?

2         MR. TECCE:  Your Honor, I do have just one point and I

3    apologize for this.  In one of their requested documents we had

4    misstated a date, Number 5, of the FSA's request.  The date

5    should be 19 September instead of 22 September.  So if we --

6    when we submit a form of order to the Court electronically, we

7    were going to make that change.

8         THE COURT:  If it's simply changing a typographical

9    error I assume there's no controversy.

10        MR. THOMAS:  No, Your Honor.

11        THE COURT:  Fine.

12        MR. TECCE:  Thank you very much, Your Honor.

13        THE COURT:  There are three matters from this

14   morning's calendar that I adjourned to the afternoon, so

15   anybody who wants to come up to hear the bench ruling Banesco

16   Banco Universal and PB Capital, this is a time to do that.

17        (Pause)

18        THE COURT:  It's lonely up here.

19        UNIDENTIFIED SPEAKER:  I represent Pacific Life; it's

20   very lonely up there.

21        THE COURT:  The Court will read into the record a

22   ruling with respect to the late filed claims of Banesco Banco

23   Universal and PB Capital.  As I indicated during this morning's

24   calendar, I've given active consideration to the Pacific Life

25   Insurance Company matter which is of a somewhat similar nature

132

1    but with some distinguishing facts and I'm simply not ready to

2    rule with respect to Pacific Life.

3         Like many aspects of the Lehman bankruptcy,

4    establishing a bar date in these cases was an unusually complex

5    exercise.  The debtors' bar date motion at Docket Number 3654

6    was contested by a multitude of parties including the holders

7    of certain debt securities issued by or guaranteed by the

8    debtors.  These objectors questioned the requirement that they

9    file both proofs of claim and guarantee questionnaires.

10   Ultimately, the parties reached an agreement and the Court

11   entered the bar date order at Docket Number 4271 establishing

12   two separate deadlines.  The general bar date for claims, which

13   is September 22, 2009, and a later date known as the securities

14   bar date on November 2, 2009 for claims identified on the final

15   version of the Lehman Programs Securities List as of July 17,

16   2009 at 5 p.m.

17        The bar date order specified that only those

18   securities in the final version of the Lehman Programs

19   Securities List would be entitled to the later bar date.  The

20   Lehman Programs Securities List was the result of a

21   collaborative process that ultimately produced a final version

22   of that list setting forth 6,744 securities that were subject

23   to the later securities bar date.  But importantly for the

24   current dispute, this list did not include Banesco's or PB

25   Capital's securities.  The Lehman Programs Securities List

1    never included the claim of Pacific Life.

2         Bankruptcy Rule 3003(c) allows the bankruptcy court to

3    set a bar date after which proofs of claim may not be filed.

4    Bankruptcy Rule 9006(b)(1) gives a bankruptcy court discretion

5    to enlarge the time to file claims where the failure to act was

6    the result of excusable neglect.

7         Excusable neglect is an equitable determination that

8    requires consideration of all relevant circumstances

9    surrounding a claimant's omission.  Pioneer Investor (sic)

10   Services v. Brunswick Associates, LP 507 U.S. 380 at 395 (1993)

11   is the leading case in this area.  The Pioneer Court noted four

12   factors that should be considered in analyzing excusable

13   neglect.  These factors are:  The danger of prejudice to the

14   debtor, the length of the delay and its potential impact on

15   judicial proceedings, the reason for the delay including

16   whether it was in the reasonable control of the movant and

17   whether the movant acted in good faith.

18        The Second Circuit has adopted what has been

19   characterized as a hard line in applying this Pioneer test.  I

20   cite to the case of Midland Cogeneration Venture Limited

21   Partnership v. Enron Corp. 419 F.3d 115 at 122 (2d Cir. 2005).

22   This hard line focuses heavily on the reason for the delay and

23   specifically whether the delay was in the reasonable control of

24   the movant.  The other factors which generally favor the party

25   seeking the extension become more relevant in close cases.  The

1    Court will apply these factors in considering each of the

2    movant's circumstances.  I'll start with Banesco.

3         On October 31, 2009, Banesco filed its motion seeking

4    that this Court deem its claim timely filed under a theory of

5    excusable neglect or add the Banesco note to the Lehman Program

6    Securities list.

7         The Banesco claim is for a note in the amount of 15.5

8    million dollars.  The Banesco note is a structured security and

9    is similar to many of the securities on the Lehman Program

10   Securities list. Banesco believed that because of the nature of

11   the Banesco note and its similarity to many of the securities

12   listed on the Lehman Program Securities list, including three

13   other securities Banesco owned that were included on the final

14   list, it too was subject to the November 2, 2009 securities bar

15   date.  However, this particular security was not on the list

16   and any claim for that note had to be filed by September 22,

17   2009.  Banesco filed a proof of claim for the Banesco note

18   prior to the securities bar date.

19        The debtors, joined by the official creditors'

20   committee, object to Banesco's motion.  The debtors challenge

21   Banesco's assertion of excusable neglect and argue that Banesco

22   and its counsel were aware of the Lehman Program Securities

23   list and that the bar date order clearly provided that only

24   securities on the final version of that list were subject to

25   the securities bar date.  The failure to timely file was simply

1    a failure to follow the directions relevant to the bar date

2    order.

3        The debtors concede that the length of delay in

4    Banesco's late file claim is minimal and that there was no bad

5    faith when it filed its motion.  Accordingly, the Court will

6    focus on prejudice and the reason for the delay.

7        The prejudice factor calls for consideration of the

8    size of the claim in relation to the estate whether a

9    disclosure statement or plan has been filed and the disruptive

10   effect permitting the late claim would have on plan

11   formulation.  In re Keene Corp 188 B.R. 903 at 910 (S.D.N.Y

12   1995).

13       I this case, each of the prejudice factors favor

14   Banesco.  The claim of 15.5 million dollars is objectively

15   large, but in reality is an insignificant percentage of the

16   total claims filed against the debtors.  The debtors are not

17   ready to file a plan or disclosure statement and allowing this

18   claim will not disrupt the plan formulation process.  Moreover,

19   the claim in question was filed before the November 2nd

20   deadline for listed securities claims.

21       The debtors also assert that allowing claims such as

22   Banesco's will result in the proverbial flood of similar late

23   claims.  This is not a foreseeable risk.  Banesco believed,

24   incorrectly as it turns out, that its claim was subject to the

25   securities bar date.  It filed a proof of claim before that

136

1   date.  This fact alone distinguishes it from other late filed

2   claims and the class of other claimants that could make a

3   similar credible plea for the exercise of discretion by the

4   Court must be an extremely limited group of potential

5   creditors.  The Court therefore finds that the prejudice factor

6   weights in favor of Banesco.

7        The reason for the delay is the most important factor

8   in this circuit.  In re Enron 419 F.3d at 122.  A creditor

9   seeking to file a late claim must explain the circumstances

10  surrounding the delay in order to supply the Court with

11  sufficient context to fully and adequately address the reason

12  for delay factor and the ultimate determination of whether

13  equities support the conclusion of excusable neglect.  In re

14  Enron Creditors Recovery Corp. 370 B.R. 90 at 103 (S.D.N.Y.

15  2007) citing to Pioneer.

16       Here, Banesco claims that it wrongly believed that the

17  Banesco note was subject to the securities bar date.  Banesco

18  attached to its motion a declaration by its counsel, the

19  attorney who was responsible for filing its proof of claim who

20  indicated his reasons for the mistake.  The Banesco note was a

21  structured security that is similar to many of the securities

22  on the Lehman Program Securities list.  Additionally, the

23  Banesco note did not have a CUSIP or ISIN number that would

24  assist in identifying whether it was one of the many thousands

25  of securities subject to the later bar date.

137

1     The bar date order established two different bar dates

2     for different types of claims.  The reason for Banesco's delay

3     is not merely a failure to comply with a clear bar date or a

4     simple missed deadline situation, Banesco neglected to

5     determine the proper bar date for the Banesco note but acted

6     properly based on its own erroneous beliefs.  The reason for

7     the delay does fall on Banesco to some extent.  But the

8     complexity of the claims, the dual nature of the bar dates

9     here, the international aspects of these cases all mitigate

10    responsibility for the error.

11    The decision to permit a late file claim is ultimately

12    based on equity.  Guided by the Pioneer court and the Second

13    Circuit's ruling in In re Enron, the equities here favor

14    deeming Banesco's claim timely filed.  There is minimal, if

15    any, prejudice to the debtors and no appreciable risk of a

16    multitude of similarly situated claims.  There is no issue

17    regarding the length of the delay or Banesco's good faith.  And

18    while the reason for the delay may be chargeable more to

19    Banesco than to any other party, the relief afforded by Rule

20    9006(b)(1) exists for this very type of circumstance.

21    Accordingly, a balancing of the equities favors Banesco and the

22    Banesco proof of claim will be deemed timely.  I'll next turn

23    to PB Capital.

24    On October 22, 2009, PB capital filed its motion

25    seeking to have this Court deem four if its claims timely filed

138

1    under a theory of excusable neglect or to add the PB securities

2    to the final version of the Lehman Program Securities list.

3            The PB Capital claims are for four securities totaling

4    270 million dollars.  The PB securities are a series of

5    financial guarantee linked notes due in 2/20/27 that were

6    issued under the Euro Medium Term Note Program.  Like the

7    Banesco note, the PB securities are similar to many of the

8    securities in the Lehman Program Securities list.  In fact, the

9    PB securities were included on the initial version of that list

10   on July 6, 2009 but were removed from the final version of that

11   list published on July 17, 2009.  Accordingly, because the

12   securities were not on the list as of July 17, 2009, the PB

13   securities were not eligible for the later bar date.

14           PB Capital asserts that it believed the PB securities

15   were on the final version of the Lehman Program Securities list

16   and would be subject to the later securities bar date.  PB

17   Capital did not file a timely proof of claim prior to the

18   general bar date, but did file a proof of claim on or before

19   the securities bar date.

20           The debtors objected to PB Capital's motion on

21   substantially the same grounds as they did for the Banesco

22   motion.  The debtors challenge PB Capital's assertion of

23   excusable neglect mirroring their objection to Banesco.  They

24   argue that PB Capital and its counsel were aware of the initial

25   and final versions of the Lehman Program Securities list and

139

1    that the bar date order clearly provided that only securities

2    on the Lehman Program Securities list were subject to the

3    securities bar date.  The failure to timely file was simply a

4    failure to check the final list and follow the plain directions

5    of the bar date order.  The debtors again concede that the

6    length of delay and PB Capital's late filed claim is minimal

7    and that there was no bad faith when it filed its motion.

8         For substantially the same reasons applicable to

9    Banesco, the equities favored deeming PB Capital's claim timely

10   filed.  There is minimal prejudice because PB Capital timely

11   filed its claim prior to what it believed was the correct bar

12   date.

13        Turning to the reason for the delay, PB Capital's

14   claim is, perhaps, even more compelling than Banesco's.  The PB

15   securities were on the initial version of the Lehman Program

16   Securities list.  And while it is not disputed that they were

17   removed from the final version two weeks later, PB Capital's

18   mistake is understandable.

19        Permitting these claims will result in no prejudice to

20   the debtors and no foreseeable risk of multiple similar late

21   filed claims.  The length of delay was minimal and there was no

22   bad faith.  As in Banesco's case, PB Capital is responsible for

23   the error but it is not the result of mere inattention or

24   inadvertence.  PB Capital failed to pay enough close attention

25   to changes made in the list of the securities.  On balance, the

140

1    equities favor PB Capital and accordingly the PB security --

2    the PB Capital proof of claim will be deemed timely filed.

3    That's the ruling of the Court.

4         On the Pacific Life motion which was heard at the same

5    time, I guess the troublesome news is that I haven't been able

6    to reach the same result and I'm not sure what result I'm going

7    to reach or when I'm going to reach it.  Suffice it to say,

8    that in exercising judgment here and attempting to apply the

9    strict Pioneer factors as recently interpreted in the Second

10   Circuit, the so-called hard line approach, it becomes more

11   difficult but not yet impossible for me to find that the delay

12   is properly excusable.  As to that matter, it will continue to

13   be under advisement and at an appropriate I'll advise counsel

14   when I'll be prepared to make a ruling.

15        I believe that concludes today's calendar unless

16   there's anything more?

17        UNIDENTIFIED SPEAKER:  Your Honor, would it be

18   allowable or okay if I spoke just for a moment on Pacific Life

19   or is this not the time and place?  Less than two minutes but

20   if this is not the time and place then I'll hold off.

21        THE COURT:  I think it's not the time and place.

22        UNIDENTIFIED SPEAKER:  Fine.

23        MR. LEMAY:  Your honor, David LeMay from Chadbourne &

24   Parke for Banesco.  Of course, thank you.  I rise only to say

25   we have an order, if the Court desires it or we can submit it

141

1   electronically, I just didn't want to walk out of here without

2   taking care of that.  The form of order we did have to revise

3   slightly to take out some surplus language that was in the form

4   that we filed with the motion.  If Your Honor would like me to

5   hand it up I can do that, I can send it along; whatever the

6   Court would likely be guided by.

7          THE COURT:  Well, the bench ruling sort of stands for

8   itself but I will entertain orders both from counsel for

9   Banesco and counsel for PB Capital and suggest that those be

10   submitted to chambers.

11          MR. LEMAY:  We'll do that, Your Honor.

12          THE COURT:  Okay.  Thank you.  We're adjourned.

13          (Proceedings concluded at 3:39 PM)

14

15

16

17

18

19

20

21

22

23

24

25

142

1

2                           I N D E X

3

4                      T E S T I M O N Y

5    WITNESS                  EXAM BY            PAGE      LINE

6    Robert Hershan           (Via declaration)   53        22

7

8                        R U L I N G S

9    DESCRIPTION                                 PAGE      LINE

10   Fee Committee Final Recommendations for      24        18

11   Second Interim Applications, Accepted.

12

13   LBHI's Motion for Authorization to Make      30         7

14   a Capital Contribution to Aurora Bank

15

16   Debtors' Motion for Approval of a            31        19

17   Settlement Agreement Among Lehman

18   Brothers Special Financing Inc.,

19   American Family Life Assurance Company

20   of Columbus, and Others, Relating to

21   Certain Swap Transactions with Beryl

22   Finance Limited

23

24

25

143

1

2                          R U L I N G S (cont'd.)

3    DESCRIPTION                                   PAGE      LINE

4    Motion of The TAARP Group, LLP                 35          1

5    Authorizing and Directing Immediate

6    Payment of an Administrative Expense

7    Claim

8

9    Motion of Deutsche Bank AG to Permit           35         10

10   Late Claim Filing Pursuant to Federal

11   Rule of Bankruptcy Procedure 9006(b)(1)

12

13   Debtors' Motion Pursuant to Rule 1015(b)       37         11

14   of the Federal Rules of Bankruptcy

15   Procedure Requesting Joint Administration

16   of Merit, LLC's Chapter 11 Case

17

18   Debtors' Motion for a Determination that       37         11

19   Certain Orders and Other Pleadings Entered

20   or Filed in the Chapter 11 Cases of

21   Affiliated Debtors be Made Applicable to

22   the Chapter 11 Case of Merit, LLC

23

24

25

144

1                    R U L I N G S (cont'd.)

2     DESCRIPTION                                    PAGE        LINE

3     Debtors' Motion Pursuant to Bankruptcy          37          11

4     Rule 1007(c) to Extend the Time to File

5     Merit LLC's Schedules, Statements of

6     Financial Affairs, and Related Documents,

7     Granted.

8

9     Debtors' Motion for Authorization to            54          16

10    Implement the Derivatives Employee

11    Incentive Program

12

13    Debtors' Motion for an Order Approving          58           5

14    Settlements with Bamburgh Investments

15    (UK) Ltd. and Corfe Investments (UK) Ltd.

16

17    Debtors' Motion for an Order Modifying          69          16

18    the Automatic Stay to Allow Settlement

19    Payment Under Directors and Officers

20    Insurance Policies

21

22    Motion of Malayan Banking Berhad for           114          10

23    Examination of Debtors Under FRBP 2004

24

25

145

R U L I N G S (cont'd.)

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion to Compel Production of Documents from the Trustee and the Committee Based on Privilege Waiver filed by Hamish Hume on behalf of Barclays Capital, Inc. | 119 | 21 |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. for Letters of Request for International Judicial Assistance | 130 | 12 |
| Motion of Banesco Banco Universal Requiring Lehman Brothers Holdings Inc. to Provide Requested Information and to Deem Claim to be Timely Filed by the Securities Programs Bar Date, Granted. | 137 | 22 |
| Motion of PB Capital to Include Certain European Medium Term Notes in the Lehman Program Securities List or, Alternatively, to Deem Such Claims to be Timely Filed by the Securities Programs Bar Date, Granted. | 140 | 22 |

146

C E R T I F I C A T I O N

I, Clara Rubin, certify that the foregoing transcript is a true

and accurate record of the proceedings.

_____

Clara Rubin

AAERT Certified Electronic Transcriber (CET**D-491)


Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501


Date: December 18, 2009