WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU-2297)
J. Christopher Shore (JS-6031)

ATTORNEYS FOR THE AD HOC GROUP
OF LEHMAN BROTHERS CREDITORS

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>, | ) Case No. 08-13555 (JMP) |
| Debtors. | ) (Jointly Administered) |

**PRELIMINARY OBJECTION OF THE AD HOC GROUP OF
LEHMAN BROTHERS CREDITORS TO THE JOINT CHAPTER 11 PLAN
OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND
TO THE DEBTORS' DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN
OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED
DEBTORS PURSUANT TO SECTION 1125 OF THE BANKRUPTCY
<u>CODE AND REQUEST FOR STATUS CONFERENCE</u>**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Lehman Group"),[1] by and through its undersigned counsel, hereby files this (i) preliminary objection (the "Preliminary Objection") to the Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. ("LBHI") and Its Affiliated Debtors (together with LBHI, the "Debtors" or "Lehman Brothers"), dated April 14, 2010 [Docket No. 8330] (the "Plan") and to the Debtors' Disclosure Statement for Joint Chapter

---

[1] The Ad Hoc Lehman Group is currently comprised of California Public Employees' Retirement System, Canyon Capital Advisors LLC, Fiduciary Counselors Inc., Fir Tree, Inc., Fortress Credit Opportunities Advisors LLC, Gruss Asset Management, L.P., King Street Capital Management, L.P., Owl Creek Asset Management, LP, Paulson & Co. Inc., San Mateo County, Taconic Capital Advisors L.P. and Western Asset Management Company.

11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code, dated April 14, 2010 [Docket No. 8332] (the "Disclosure Statement") and (ii) written request for status conference pursuant to Local Rule 9076-1. In support of this pleading, the Ad Hoc Lehman Group respectfully states as follows:

## PRELIMINARY OBJECTIONS

1. The Ad Hoc Lehman Group consists of entities which, together with their affiliates, collectively hold claims against certain Debtors, including claims against LBHI totaling approximately $15.5 billion. The Ad Hoc Lehman Group has been actively involved in these cases, largely in connection with contested matters affecting issues of particular import to the LBHI estate, in which their holdings are concentrated.[2] On numerous occasions, the Ad Hoc Lehman Group has been able to work cooperatively with the Debtors and the Official Committee of Unsecured Creditors (the "Official Committee") on significant issues affecting the Debtors' reorganization and has repeatedly expressed its desire to see these cases resolve themselves quickly with minimal administrative overhead. The Ad Hoc Lehman Group intends to continue this open, cooperative process, while at the same time recognizing that instances can and will arise in which the best interests of creditors of various estates may not align themselves and indeed may become adverse to each other.

---

[2] (See, e.g., June 2, 2009 Statement in support of Debtors' motion to terminate unfunded commitments [Docket No. 3744]; June 13, 2009 Statement in support of Debtors' motion for approval of cross-border insolvency protocol [Docket No. 3914]; June 22, 2009 Statement in support of Debtors' motion for discovery from Barclays [Docket No. 4079]; July 31, 2009 Statement in support of Debtors' motion for ADR procedures [Docket No. 4625]; October 6, 2009 Statement in support of LCPI's motion for authorization to purchase Fairpoint Participation [Docket No. 5357]; November 17, 2009 Statement in support of Debtors' motion for establishment of procedures [Docket No. 5864]; December 15, 2009 Statement in support of Debtors' motion for authorization to implement derivatives employee incentive program [Docket No. 6208]; January 12, 2010 Statement in support of Debtors' motion for approval of settlement agreement with insolvency administration of Lehman Brothers Bankhaus AG [Docket No. 6612]; March 11, 2010 Statement in support of Debtors' motion to compel performance by Norton Gold Fields Limited [Docket No. 7527])

2

2. One such instance has now arisen, necessitating this Preliminary Objection. On April 14, 2010, the Debtors filed the Plan and Disclosure Statement. As described below, the Plan establishes a "pot" of assets for distribution and pits creditors of the various estates against each other in the distribution of the assets of the enterprise as a whole. Over the past two months, the Ad Hoc Lehman Group has engaged in discussions with the Debtors, the Official Committee and various other constituents in these cases to better understand the intent and circumstances of the Plan and its distribution scheme and to explore options for a more consensual resolution of these cases. As an outgrowth of those discussions, the Ad Hoc Lehman Group is filing this Preliminary Objection to the Plan and Disclosure Statement to apprise the Court in a timely fashion of the Ad Hoc Lehman Group's primary objection with respect to the current proposed Plan. Specifically, the Plan's proposed allocation of value within the individual Debtor estates is seriously flawed, particularly with respect to its proposed treatment of inter-estate conflicts. By this Preliminary Objection, the Ad Hoc Lehman Group also respectfully requests that the Court hold a status conference at the July 14, 2010 omnibus hearing (or as soon thereafter as the Court can accommodate the request). That conference should address the implementation of procedures for the interposition of objections such as the present one and for creditor participation in the prosecution of the Plan and Disclosure Statement so that all constituencies may properly assimilate, digest and present evidence relevant to confirmation of a plan in these cases.

3. At its core, the Plan highlights what the Ad Hoc Lehman Group believes will be a key issue at confirmation — the allocation of tens of billions of dollars of distributable value between the twenty-three Debtor estates for further distribution to creditors of those estates. Currently, the Plan reflects a series of "settlements" proposed by the Debtors in an attempt to

3

NEWYORK 7614996 (2K)

harmonize two potential opposing structures for allocating that value: a plan premised on global or partial substantive consolidation of Debtor estates and a series of individual Debtor plans that purport to recognize strictly the corporate identity of each Debtor and the allowance of all intercompany claims and guarantee claims of affiliated Debtors and their respective creditors. (Disclosure Statement at 134-35, 85)

4. The Debtors readily acknowledge that both structures are legitimate approaches to the treatment of creditors and claims across the various Debtor estates. With respect to substantive consolidation, for example, the Debtors disclose that "[t]here are facts relating to the manner in which the Debtors operated their businesses that strongly support a finding that certain of the Debtors are susceptible to being substantively consolidated." (Disclosure Statement at 2-3) The Debtors further disclose that the plan structures reflecting different treatment of issues concerning substantive consolidation and intercompany claims (collectively, the "Inter-Debtor Issues") can lead to materially different creditor recoveries at various estates. For example, substantive consolidation would "eliminate[] intercompany Claims, guarantee Claims against any consolidated entity that guaranteed the obligations of another consolidated entity, and any issues concerning the ownership of assets among the consolidated entities." (Disclosure Statement at 2) A strict entity-by-entity approach, on the other hand, would require examination of tens, if not hundreds, of thousands of intercompany claims and causes of action.

5. The Examiner, while not tasked to investigate the appropriateness of substantive consolidation, also lays out certain facts that strongly favor substantively consolidating the Debtors' estates. For instance, with respect to the manner in which the Lehman enterprise conducted its business pre-petition, the Examiner finds that:

> Lehman functioned as an integrated company, and in general structured and managed its businesses along different product lines within the three

4

> divisions. Lehman and its subsidiaries typically presented themselves to the public as "Lehman" or "Lehman Brothers." Customers typically had a relationship with LBI, but Lehman employees would book certain trades to the legal entity within Lehman that corresponded to the product being traded, or that satisfied tax, financing or regulatory considerations. Multiple Lehman entities often were used to structure particular types of transactions. As a result, customers whose relationships were with LBI would, in fact, often have their business transacted through other Lehman entities. Those customers generally did not rely on the credit rating of those Lehman entities; indeed, those customers sometimes were not even aware that Lehman entities other than LBI were involved in their transactions.

(Examiner's Report vol. 5 [Docket No. 8307] at 1967-68 (footnotes omitted)) Moreover, the Examiner states that "Lehman personnel asserted that customers did not rely on the credit ratings of [LBHI affiliate operating companies that regularly traded], with the exception of LBDP and LBFP [the separately rated entities]." (Id. at 1970 (footnotes omitted))

6. Despite the recognition that the Inter-Debtor Issues are the subject of legitimate debate, the Debtors seek to justify their decision to propose settlements of all Inter-Debtor Issues, ostensibly on the basis that litigation could take years to resolve and based on generically described analyses that the Debtors claim to have performed. (See, e.g., Disclosure Statement at 135 ("A plan (i) based on substantive consolidation or (ii) that . . . strictly recognizes the corporate integrity of each Debtor, would both invite protracted litigation with respect to such determination and the Claims which would take years to resolve."); id. at 84 ("The terms of the Plan are the result of substantial analysis and discussions by the Debtors and their advisors concerning various issues including, without limitation, the enforceability of Guarantee Claims, Intercompany Claims and substantive consolidation."); see also id. at 3, 59, 85, 86)

7. Given their perception of cost and delay, the Debtors have proposed a Plan that purports to resolve all claims and "expedite the administration of the Debtors' Chapter 11 Cases, accelerate recoveries to creditors and avoid the potential enormous costs and extended time that

5

would otherwise be incurred in connection with litigation of multifaceted and complex issues associated with these extraordinary cases." (Disclosure Statement at 2) The Debtors nonetheless make clear that they reserve the right to amend the plan to propose an alternate settlement or litigate the Inter-Debtor Issues should they fail to obtain the requisite creditor support. (Disclosure Statement at 3 ("[I]f it appears that the Plan may not be accepted, the Debtors may elect to amend the Plan to provide for the substantive consolidation of all or certain of the Debtors and their Affiliates."))

8. Based on current disclosures, the Ad Hoc Lehman Group does not believe that the Plan reflects a fair assessment of the risks and rewards attendant to an active litigation of Inter-Debtor Issues. In fact, with respect to various foreign and domestic affiliates of LBHI, the Plan does not appear to reflect any risk in respect of litigation over certain Inter-Debtor Issues. (Disclosure Statement Ex. 6 at Annex B-2) Based on Disclosure Statement analysis of the claims pool, claims of creditors of most, if not all, Debtors and other affiliates of LBHI will be permitted to participate to the full extent of their allowed amount in distributions under the Plan from both their primary obligor, and against LBHI, their purported guarantor. (Disclosure Statement Ex. 11) If there were a substantive consolidation, that dual recovery could not occur; rather, such creditors would be left with a single claim against a consolidated Debtor and, on account thereof, a single vote on any proposed plan of reorganization. In short, with respect to those creditors that will receive a full double recovery under the Plan, the "settlement" of the Inter-Debtor Issues in the Plan reflects no risk of a substantive consolidation result that the Debtors admit is meaningfully probable. The Plan also fails to adequately address purported intercompany claims that arise under previously undisclosed board resolutions and intercompany agreements that have been filed in an amount in excess of $200 billion. While the Debtors seek

6

to "cap" the allowed amount of these claims at $21.2 billion, the Ad Hoc Lehman Group believes that these claims are subject to readily available defenses. Based on readily accessible information, the Ad Hoc Lehman Group believes that, even if eventually determined to be enforceable, the allowed amount of these claims would not exceed materially the capped amounts, making the Debtors' purported "settlement" illusory. Moreover, based on an analysis of the distributable assets in the Disclosure Statement, the vast majority of the billions of dollars of distributable assets to affiliate creditors is composed of cash and equivalents, while the majority of assets distributable to LBHI creditors are of a fixed income or equity nature. Due to the difference in future cash flows and liquidity between the distributable assets at LBHI affiliates and LBHI itself, there is enormous value to subsidiary creditors, but very little value to LBHI creditors, in rushing to a settlement and attendant confirmation. This lack of symmetry is nowhere reflected in the proposed settlement.

9. This Preliminary Objection, however, does not seek to have the Court address in any respect the merits of substantive consolidation or allowance of the guarantee or board resolution claims filed by affiliates or third-party creditors. The Ad Hoc Lehman Group certainly recognizes that, in the context of a normal Chapter 11 process, plan objections are better presented and prosecuted after approval of a disclosure statement. Rather, the purpose of this Preliminary Objection is to provide a mechanism for starting now what portends to be a lengthy pre-confirmation process of education and preparation. An unqualified "wait and see" approach is neither warranted nor practical here.

10. First, the Disclosure Statement provides no pro forma economic data regarding the relative importance of substantive consolidation or disallowance of affiliate guarantee claims on an estate-by-estate basis. For example, LBHI creditors, who are being asked to support the

7

settlement, are not informed of the range of economic recoveries available to them if there were a substantive consolidation versus a strict "books and records" waterfall. Clearly whether there is a de minimis swing versus a material one is relevant to voting (as is the spot on the spectrum of total win versus total loss that the proposed settlement sits), and the Debtors need to perform that analysis and disclose it on an estate-by-estate basis. Based upon its own analysis of publicly available information, the Ad Hoc Lehman Group believes that resolution of the Inter-Debtor Issues could impact creditor recoveries in the tens of billions of dollars. A substantive consolidation of the Debtors' U.S. subsidiaries alone would increase recoveries for LBHI creditors by billions, and litigation with respect to other intercompany claims could involve additional billions.[3] Given these anticipated swings, resolution of Inter-Debtor Issues is better addressed openly and early starting with full disclosure by the Debtors.[4]

11.    <u>Second</u>, it is not a foregone conclusion that, at any confirmation, the purported settlements of the Inter-Debtor Issues will receive the requisite creditor support at each of the Debtors' estates or the approval of this Court. A real possibility exists that parties in interest will have no choice but to litigate. Indeed, the Debtors themselves reserve the right to litigate the Inter-Debtor Issues rather than pursue settlement. As noted above, issues relating to substantive consolidation and intercompany claims are exceedingly fact intensive and will take significant time to litigate from discovery through trial. (Disclosure Statement at 2-3, 59) Beyond the

---

[3] By way of example, according to the Disclosure Statement, as of June 30, 2009, LBHI itself had a total pre-petition intercompany receivable from other Debtors of $147.575 billion and a total pre-petition payable to other Debtors of $79.736 billion. (Disclosure Statement Ex. 9-2 at 3) As a result, assets available for distribution to LBHI creditors can shift by tens of billions of dollars depending on the resolution of issues such as netting, recharacterization and subordination.

[4] Additionally, the propriety of ownership of significant estate assets continues to plague these cases as evidenced, for example, by two of the Debtors' most recent motions, which relate or otherwise indicate that the Debtors may never know the true economic ownership of the underlying assets. (<u>See, e.g.</u>, May 25, 2010 Lehman Brothers Holdings Inc.'s and Lehman Commercial Paper Inc.'s Motion Pursuant to Section 363 of the Bankruptcy Code for Authority to Transfer Funds to Rosslyn LB Syndication Partner LLC [Docket No. 9238]; June 7, 2010 Motion of Lehman Brothers Holdings Inc. Pursuant to Section 363 of the Bankruptcy Code for Authority to Make New Debt Investment in 237 Park Avenue Property [Docket No. 9441])

necessary disclosure, then, procedures must be established now for developing evidence related to the Inter-Debtor Issues if only to avoid conflicting and wasteful ad hoc discovery demands on the Debtors. Waiting only increases the possibility that one or more sides will be inappropriately prejudiced by delay.

12. Accordingly, the Court should, at this point, seek to establish a comprehensive plan for conducting discovery with respect to Inter-Debtor Issues in the event that the settlements proposed in the Plan are rejected and the creditors themselves are forced to pursue litigation.[5] To be clear, the Ad Hoc Lehman Group does not desire to litigate these issues, but the stakes are too high for parties in interest simply to hope for global peace and later learn that they have no real ability to develop a case in a contested setting.

13. In that regard, the Ad Hoc Lehman Group respectfully requests that, pursuant to Local Rule 9076-1, this Court set a status conference to establish procedures with respect to the Inter-Debtor Issues and enter an order substantially in the form of that appended hereto as Exhibit A, versions of which have previously been presented to the Debtors and the Official Committee. The procedures set forth in Exhibit A are based in large part on Judge Gerber's scheduling order of inter-debtor disputes and related confirmation issues in Adelphia Communications that provided the necessary framework for resolution of a case that was "among the most challenging — and contentious — in bankruptcy history" and was made significantly more complicated by similar inter-debtor disputes and allocation issues. See In re Adelphia Commc'ns Corp., 368 B.R. 140, 147 (Bankr. S.D.N.Y. 2007). Critically, the proposed order provides a mechanism for (i) the Debtors to establish a data room to provide all

---

[5] It is unlikely that either the Debtors or their counsel can properly appear in Court to litigate issues in which one Debtor estate is adverse to the others. Moreover, the Plan fails to address how the Debtors addressed, if at all, the inherent conflicts of interest that must have arisen in developing a Plan that splits assets amongst Debtors and pits individual Debtors against each other. The Debtors' proposed asset management entity cannot resolve these conflicts, and it remains to be seen what corporate governance the Debtors propose to solve these intractable issues.

9

information relevant to the Inter-Debtor Issues, (ii) all parties in interest to declare their intent to participate in discovery, (iii) participating parties to access information and seek additional disclosures, (iv) the Debtors to produce witnesses for deposition in limited seatings over a controlled period and (v) all participating parties to exchange any expert disclosures and reports in advance of a confirmation hearing to be scheduled at a future date. The Ad Hoc Lehman Group believes that establishment of procedures now not only preserves creditors' due process rights and provides a sound foundation for resolution of a contested confirmation but also may have the salutary benefit of bringing consensus where none exists now.

## **NOTICE**

14. Pursuant to Local Rule 9076-1(c), this Preliminary Objection is being served upon the Debtors, the Office of the United States Trustee, and the Official Committee. Additionally, this Preliminary Objection is being served on all persons and entities that have formally appeared and requested service in these cases.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## **CONCLUSION**

For the foregoing reasons, the Ad Hoc Lehman Group respectfully requests that the Court schedule a status conference and grant such other and further relief as the Court deems just and proper.

Dated: June 29, 2010
      New York, New York

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU-2297)
J. Christopher Shore (JS-6031)

By: */s/ Gerard Uzzi*
    Gerard Uzzi

ATTORNEYS FOR THE AD HOC GROUP
OF LEHMAN BROTHERS CREDITORS

# EXHIBIT A

1.  A schedule for discovery ("Inter-Debtor Issue Discovery") with respect to Inter-Debtor Issues (as defined in the Preliminary Objection of the Ad Hoc Group of Lehman Brothers Creditors to the Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and to the Debtors' Disclosure Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code and Request for Status Conference, dated June 29, 2010) is established as set forth in paragraphs 2 through 11 below.

2.  **Participation**:

    a.  No later than ten (10) calendar days after service of notice of entry of this order in accordance with paragraph 8 below, any party in interest seeking to participate in Inter-Debtor Issue Discovery shall file with the Court and serve on counsel to the Debtors a notice (a "Participation Request") setting forth the name and address of such party and the nature of the interest asserted by such party in the outcome of the Inter-Debtor Issues. In the absence of an objection or upon a favorable determination of the Court, such party shall be deemed to be a "Participant."

    b.  Any Participant shall have the following rights with regard to Inter-Debtor Issue Discovery:

        (i)   to monitor all aspects of Inter-Debtor Issue Discovery and to be served with copies of all briefs or other pleadings served by Participants in connection with Inter-Debtor Issues;

        (ii)  to promulgate document discovery and access the information contained in the Data Room (defined below);

        (iii) to notice and attend depositions; and

        (iv)  to attend and be heard at all status conferences, pretrial conferences and hearings scheduled in connection with Inter-Debtor Issues.

c.  The Debtors and the Official Committee of Unsecured Creditors ("Official Committee") shall be deemed to be Participants with respect to Inter-Debtor Issues.

d.  Subject to the remaining provisions of this Order, Participants shall be deemed to have standing to appear and be heard on all matters relating to the Inter-Debtor Issues.

e.  The failure to file timely a Participation Request shall bar a party in interest from participating in Inter-Debtor Issue Discovery. The failure to file timely a Participation Request shall not otherwise affect the right of any party in interest to participate and be heard in the litigation of Inter-Debtor Issues, but the Court may consider the status of such party as a non-Participant in determining the extent of such party's participation in the evidentiary portion of any hearing on Inter-Debtor Issues, including the extent to which such party may present evidence, object to evidence and question witnesses.

3.  **Discovery:**

    a.  Data Room:

        (i)  Within twenty (20) calendar days of entry of this order, the Debtors will: (a) create a virtual data room ("Data Room") containing information relevant to any of the Inter-Debtor Issues and (b) provide written certification to all Participants regarding whether any relevant documents have been omitted from the Data Room and, if so, produce a privilege log stating the basis for any such omission. Notwithstanding the foregoing, the Debtors shall use their reasonable best efforts to load documents and/or data into the Data Room as soon as possible. Nothing herein shall require a Participant to access any or all such information directly or through its counsel or other advisors.

        (ii)  To the extent that documents not already contained in the Data Room by virtue of the preceding paragraph 3.a.(i) are relevant to any Inter-Debtor Issue, the Debtors shall, as soon as is practicable, but no later than thirty (30) calendar days after the filing by a Participant of the applicable objection or the service by a Participant of a written request for the addition of documents to the Data Room, add any additional relevant documents to the Data Room. Thereafter, the Debtors shall promptly provide written certification to all Participants that all such additional documents have been added to the Data Room (together with an identification of the bates or other Data Room control number of such additional documents) and/or produce a privilege log stating the basis for omitting any relevant documents from the Data Room.

NEWYORK 7614996 (2K)

(iii) The Debtors shall have the right to supplement, from time to time, the information contained in the Data Room and shall notify all Participants any time that documents are added to the Data Room (together with an identification of the bates or other Data Room control number of such additional documents).

(iv) The Examiner appointed in these cases, or whichever party is in possession of the Examiner's materials, shall work in good faith with the Debtors and the Participants to determine which Examiner's materials relating to Inter-Debtor Issues shall be made available in the Data Room. The Court shall, if necessary, resolve any issues with respect to the disclosure of such Examiner's materials.

(v) Nothing herein shall prohibit any Participant from seeking discovery from other Participants and/or third parties in accordance with the Bankruptcy Rules ("Third Party Discovery"), provided any such requests for document discovery are served within the deadline set forth herein. To the extent non-privileged, non-confidential documents relevant to any of the Inter-Debtor Issues are obtained, either by the Debtors or by any Participant, through Third Party Discovery, the party who obtained such documents shall provide notice to all Participants of its receipt of such documents and shall forward copies of such documents to the Debtors so that they can be added to the Data Room.

(vi) To the extent any document is protected by the attorney-client privilege, the work product doctrine or another evidentiary privilege, the Debtors' inclusion of such document in the Data Room shall not constitute a waiver of the attorney-client privilege, the work product doctrine or the other applicable evidentiary privilege, as the case may be. Nothing contained herein shall prohibit any Participant from arguing that a document was protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege before it was included in the Data Room.

(vii) Consistent with their obligations under Bankruptcy Rule 7034, the Debtors shall, at a minimum, reproduce their documents in the Data Room as they were kept in the ordinary course of the Debtors' businesses. To the extent feasible, hard-copy documents shall be loaded into the Data Room in a format that is full-text searchable and electronic documents shall be loaded into the Data Room in their native electronic format. The Debtors shall confer in good faith with the Participants with respect to other details regarding the organization, coding and/or functionality of the Data Room. In the event the Participants and the Debtors are unable to

3

agree on such details, any Participant may seek the intervention of the Court.

b. <u>Documentary Discovery Cutoff</u>:  No later than one hundred and thirty (130) calendar days prior to the Confirmation Hearing Date (defined below), all requests for documentary discovery, including Third Party Discovery, must be served, although the Data Room will remain open and available to all Participants throughout the entire Resolution Process.

c. <u>Depositions</u>:

   (i) No later than one hundred and thirty (130) calendar days prior to the Confirmation Hearing Date, the Debtors shall, after reasonable investigation, provide each Participant with a list of persons employed by or on behalf of the Debtors likely to have material personal knowledge of any of the issues related to the Inter-Debtor Issues.

   (ii) No later than one hundred and twenty (120) calendar days prior to the Confirmation Hearing Date, Participants shall exchange lists of all persons (whether affiliated with the Debtors, a Participant or third parties) whom each Participant intends to depose (collectively, the "Deponents").  Following the exchange of the lists of Deponents, Participants shall meet and confer to establish a schedule for the taking of depositions.  Absent direction from or an order of the Court, for good cause shown, no depositions shall occur prior to the exchange of lists of Deponents nor shall any Deponent be required to appear for more than one seven-hour deposition.  Notwithstanding the foregoing, any deposition taken of a Deponent pursuant to this Order is without prejudice to the rights of the parties to any adversary proceeding related to these cases.

d. <u>Non-Expert Discovery Cutoff</u>:  All non-expert depositions shall be completed no later than seventy (70) calendar days prior to the Confirmation Hearing Date.  Thereafter, Participants shall meet and confer to establish a schedule for the taking of expert depositions taking into account, among other things, the order in which Inter-Debtor Issues are to be addressed at any hearing related to confirmation.

e. <u>Expert Disclosures</u>: No later than sixty-five (65) calendar days prior to the Confirmation Hearing Date, all disclosures required by Federal Rule of Civil Procedure 26(a)(2), as incorporated by Bankruptcy Rule 7026, including the exchange of expert reports, shall be made.

4

f. Rebuttal Experts: No later than forty (40) calendar days prior to the Confirmation Hearing Date, all disclosures regarding rebuttal expert witnesses, including rebuttal expert reports, shall be exchanged.

g. Expert Discovery Cutoff: Absent (i) consent of the Debtors and those Participants involved in a particular Inter-Debtor Issue or (ii) direction from or an order of the Court, on good cause shown, all expert depositions shall be completed no later than twenty-one (21) calendar days prior to the Confirmation Hearing Date.

h. Witness Lists: No later than twenty-one (21) calendar days prior to the Confirmation Hearing Date, Participants shall serve upon all other Participants a list of witnesses, including expert witnesses, they expect to call at any hearing related to confirmation.

i. Discovery Disputes: On notice to the Debtors and all Participants, the Court promptly will hold a telephonic or in-Court hearing to resolve any discovery disputes between the Debtors and a Participant or any discovery disputes between or among Participants.

4. **Briefing:**

a. The Court reserves decision with respect to briefing and will establish briefing deadlines in connection with the scheduling of disclosure statement and confirmation hearings.

5. **Hearing Dates:**

a. The Court will set dates for hearings related to the disclosure statement and dates for hearings related to confirmation (the first such confirmation hearing date being the "Confirmation Hearing Date").

6. **Status Conferences:**

a. Subject to this Court's calendar, following the entry of this Order and until the Confirmation Hearing Date, the Court shall schedule monthly status conferences to monitor the progress of Inter-Debtor Issue Discovery. The Debtors shall provide prompt notice of each status conference to:

(i) all Participants;

(ii) all other parties in interest who file objections to the proposed Disclosure Statement or the proposed Plan; and

(iii) to the extent feasible, all parties who have served a notice of appearance in accordance with Bankruptcy Rule 2002 prior to the date of service thereof.

5

7. **Amendments to this Order:**

   a. The Court may vary the terms of this Order as necessary <u>sua sponte</u> or on motion of a Participant for good cause shown.

8. **Service and Process:**

   a. Inter-Debtor Issue Discovery shall constitute a contested matter and, to the extent not modified herein, Participants shall have all of the rights afforded to a party in a contested matter including, without limitation, all of the rights set forth in Bankruptcy Rule 9014.

   b. All notices, motions or other documents required to be served by this Order shall be served by facsimile, e-mail or same-day hand delivery. All such notices, motions or other documents shall be served on all Participants.

   c. Within five (5) calendar days of the entry of this Order, the Debtors will serve a copy of this Order on all known creditors and, to the extent feasible, all parties who have filed and served a notice of appearance in accordance with Bankruptcy Rule 2002 prior to the date of service hereof. In addition, as soon as reasonably practicable following the entry of this Order and consistent with applicable publication submission deadlines, the Debtors will publish a copy of this Order in the national editions of The Wall Street Journal and The New York Times.

9. **Reservation of Rights:**

   a. Nothing contained herein shall preclude the Debtors or the Official Committee from seeking to compromise one or more of the Inter-Debtor Issues (either by separate motion or in connection with a proposed plan of reorganization) on notice to the appropriate parties, and nothing herein shall prejudice the rights of any Participant to object to any such compromise and/or to assert that the Debtors or the Official Committee have no authority to compromise such disputes.

   b. Nothing contained herein shall preclude the Debtors or the Official Committee from taking a position with respect to any Inter-Debtor Issue, including, without limitation, in a plan of reorganization or otherwise.

   c. Nothing contained herein shall preclude the Debtors or the Official Committee from advocating a position with regard to the treatment or resolution of any Inter-Debtor Issue that differs from that currently proposed by the Debtors in the Plan.

   d. Except as provided herein with respect to a ruling with respect to an Inter-Debtor Issue, nothing contained herein shall prejudice the rights of any

NEWYORK 7614996 (2K)

party to oppose and object to approval of the proposed Disclosure Statement or confirmation of the Plan on any grounds.

  e. Nothing contained herein shall be deemed to be an adoption or consent to the Debtors' characterization in the Disclosure Statement or Plan of any Inter-Debtor Issue.

  f. By participating in Inter-Debtor Issue Discovery, no Participant, or counsel or other professional therefor, assumes any duty to any Debtor, person or entity other than its own client or, subject to the terms of this Order, waives any right to seek alternative relief from the Court, including, without limitation, the right to object to any plan of reorganization or disclosure statement in respect thereof as not satisfying the appropriate standards.

  g. The Participants reserve the right to seek compensation and reimbursement pursuant to section 503 of the Bankruptcy Code and the Debtors, the Official Committee and other parties in interest shall have the right to oppose any such application.

10. All dates and deadlines specified in this Order that are keyed to the Confirmation Hearing Date shall be operative from the first scheduled Confirmation Hearing Date and shall not be extended or modified in the event the Confirmation Hearing Date is adjourned.

11. This Order shall bind any successors or assigns of any party in interest in these Chapter 11 cases, including, without limitation, any Chapter 11 trustees.

12. The Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.