Hearing Date and Time: July 14, 2010 at 10:00 a.m.
Objection Deadline: July 8, 2010 at 5:00 p.m.

BUCHANAN INGERSOLL & ROONEY PC
620 Eighth Ave., 23rd Floor
New York, NY 10018
(212) 440-4400 - Telephone
(212) 440-4401 - Facsimile
William H. Schorling (WS-6322)
Donald E. Malecki
Zakarij O. Thomas

Attorneys for Greenbrier Minerals Holdings, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 08-13555 (JMP) |
| | : | |
| LEHMAN BROTHERS HOLDINGS, | : | |
| INC., *et al* | : | Chapter 11 |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

### OBJECTION TO MOTION PURSUANT TO SECTIONS 105(A) AND 362 OF THE BANKRUPTCY CODE FOR AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST GREENBRIER MINERALS HOLDINGS, LLC

AND NOW comes Greenbrier Minerals Holdings, LLC ("Greenbrier"), by and through its undersigned counsel, Buchanan Ingersoll & Rooney PC, and files the within Objection (the "Objection") to the Motion of Lehman Commercial Paper Inc. (the "Debtor") Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Enforcing the Automatic Stay against Greenbrier (the "Motion")[1] and in support thereof avers as follows:

### Preliminary Statement

1.      The Debtor inappropriately seeks to involve this Court in a contractual dispute that falls squarely within the agreement to arbitrate such disputes as set forth in Greenbrier's

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms by the Motion.

Operating Agreement. Even if this Court were to entertain the Debtor's Motion, the relief sought therein is declaratory and injunctive in nature, which must be initiated by Adversary Complaint pursuant to the Federal Rules of Bankruptcy Procedure.

2.       In substance, the Debtor's Motion seeks to litigate multiple issues related to the Debtor's ownership interest in Greenbrier in a piecemeal manner. The Debtor seeks a determination that it retains a right to vote as a Member of Greenbrier in spite of Section 18-304 of the Delaware LLC Act which terminates an LLC member's right to vote upon the member's filing of a voluntary bankruptcy petition. Such a determination is interrelated with Greenbrier's claims against the Debtor as a secured lender and equity owner.

3.       As set forth more fully below, Delaware Courts have held that Section 18-304 of the Delaware LLC Act operates to restrict a bankrupt member's right to vote or otherwise participate in the corporate governance of a Delaware Limited Liability Company. Further, Greenbrier has not contracted away the protections of Section 18-304 and Section 18-304 is enforceable in the Debtor's chapter 11 case.

4.       Section 18-304 of the Delaware LLC Act is not the only obstacle to the Debtor's attempt to participate in the governance of Greenbrier. The Debtor's equity interest in Greenbrier was increased from 15% to 49% in exchange for its commitment to fund the development of Greenbrier through completion and sale of the company. The Debtor breached this commitment by failing to fund a valid advance request in the amount of $10,000,000 prior to filing its voluntary petition and communicating to Greenbrier that it would not fund the $39,000,000 in otherwise available advances under its loan commitment to Greenbrier. Accordingly, the Debtor's right to five (5) votes, as well as its economic interest of 49%, in Greenbrier is also in dispute.

5.      There is no urgency to the Debtor's request.   Although, upon the request of Greenbrier's Independent Manager, William G. Karis, Greenbrier recently determined that the Debtor's bankruptcy prevents Greenbrier from having a quorum, Greenbrier's Operating Agreement provides for the non-Debtor members to amend the Operating Agreement to cure the lack of a quorum without the intervention of this or any other Court.   Moreover, the lack of quorum does not prevent Greenbrier's management from making appropriate operational decisions and the mine is continuing to operate with impeccable safety.

**The Debtor's Defaults and Disputed Membership Interest Percentage**

6.      Greenbrier is a Delaware Limited Liability Company primarily in the business of mining, processing and selling coal that it produces.   The rights of the holders of ownership interests in Greenbrier are governed by the Amended and Restated Operating Agreement ("Operating Agreement"), dated March 12, 2008.   Greenbrier's owners have intended, from the beginning of the project, to develop the mine and sell it.

7.      The Debtor originally loaned $10,000,000 to Greenbrier in December, 2005 as bridge financing until Greenbrier could secure permanent financing.   On July 25, 2006, Greenbrier entered into a Credit Agreement with WestLB Bank, as agent, and WestLB Bank and Metropolitan Life Insurance Company (the "WestLB Credit Agreement").   The Debtor extended a second-lien term loan to Greenbrier with a commitment of $29,000,000 pursuant to a Term Loan Agreement, dated August 29, 2006 (the "Second-Lien Credit Agreement").

8.      The Debtor acquired the WestLB Credit Agreement via an assignment on January 19, 2007.

9.      On May 1, 2007, the Debtor and Greenbrier entered into an Amended and Restated Credit Agreement (the "Credit Agreement") in order to increase the facility amount to

$94,000,000 and amend and restate the WestLB Credit Agreement (now held by the Debtor) and the Second-Lien Credit Agreement.

10.     Ultimately, Greenbrier needed significant funds beyond the $94,000,000 to fund its development to the point that it could be sold.  The Debtor agreed to finance Greenbrier through the completion and sale in exchange for an increase in its ownership interest in Greenbrier from 15% to 49%.

11.     After lengthy negotiations, Greenbrier's Operating Agreement was amended and restated on March 12, 2008 to reflect the Debtor's 49% interest.

12.     Rather than expressly setting forth the full amount necessary to fund the project through completion, the Credit Agreement was structured so that increases in the amount of the facility were provided through amendments.

13.     The Credit Agreement was amended seven times through June 3, 2008, primarily to increase the amount of availability to Greenbrier.  A true and correct copy of Amendment No. 7, (the "Seventh Amendment") is attached hereto as Exhibit A.  At the time of the Seventh Amendment, the parties estimated that the total amount of funding necessary to fund Greenbrier through its eventual sale would be $206,000,000, an increase in the commitment by $50,000,000 from the Sixth Amendment.  Thus, the Debtor and Greenbrier entered into the Seventh Amendment, resulting in a maximum principal loan commitment of $206,000,000 (the "Commitment").

14.     One of the primary purposes of the increase in the loan commitments under the Seventh Amendment was to allow Greenbrier to develop a surface mine project (the "Buck Lilly Project") that would provide a supply of low sulfur coal to blend with the higher sulfur coal that Greenbrier already was mining.  Greenbrier's contracts require it to deliver coal with a lower

sulfur content than Greenbrier can presently mine. Greenbrier presently obtains lower sulfur coal from sources such as Midland Trail Resources, LLC ("Midland") so that Greenbrier can blend its higher sulfur coal down to the sulfur content required by Greenbrier's contracts. The Buck Lilly Project is and always has been vital to Greenbrier's ability to conduct its business as a stand-alone operation.

15.     On or about September 18, 2008, with the Debtor's support and encouragement, Greenbrier requested that the Debtor fund $10,000,000 of the Commitment pursuant to the terms of the Credit Agreement (the "Funding Request").

16.     On September 18, 2008, prior to the Debtor's filing of its voluntary chapter 11 petition on October 5, 2008 (the "Petition Date"), the Debtor approved, but failed to fund, the Funding Request. To this date, the Debtor has not satisfied its obligation to fund the Funding Request.

17.     Pursuant to the Seventh Amendment, there is currently $39,000,000 in availability under the Commitment. The Debtor has informed Greenbrier that it will not fund additional advances under the Commitment.

18.     The Debtor's failure to fund the full Commitment constitutes a breach of the Credit Agreement, and has caused and will cause significant damages to Greenbrier in an amount yet to be determined. Greenbrier timely filed a proof of claim to assert such damages, among other claims, on September 21, 2009.

19.     The Operating Agreement provides that "[e]ach Member shall contribute, or cause to be contributed, cash and/or other property to the Company in exchange for the acquisition of its Units, unless such Units were awarded as compensation." Operating Agreement, ¶ 3.1.

20.     The Debtor's contribution required to earn its Units was the full funding of the Seventh Amendment.  Accordingly, the Debtor's failure to fund prevents the Debtor from fully exercising its purported rights under the Operating Agreement because the Debtor has not satisfied the obligations necessary to obtain its right to five (5) votes or the 49% economic interest in Greenbrier.

### Greenbrier's Ownership and Governance Structure

21.     Greenbrier's Operating Agreement treats economic interests and ownership interests separately, such that the proportionate amount of a Member's ownership interest may be greater or less than the proportionate strength of its voting rights or representation on the Board of Managers.

22.      Greenbrier's ownership structure primarily consists of four groups.  Raymond McCormick and Joseph C. Turley, III own Class A Units representing a 28% economic interest in Greenbrier and a 39% unit-voting interest.  The Class A Members have the right to appoint 2 Managers to the Board, with each Manager holding 1 vote each.

23.     Greenbrier Equity Opportunity, LP (the "McConnell Group") owns Class B Units representing a 12% economic interest in Greenbrier and a 12% unit-voting interest. The Class B Members have the right to appoint one Manager to the Board, with that Manager holding 2 votes.

24.      Class C Units are held by a number of investors and represent an 11% economic interest in Greenbrier and no unit-voting interest.  The Class C Members do not have the right to appoint any Manager to the Board.

25.     The Debtor asserts a right to Class D Units representing a 49% economic interest in Greenbrier and a 49% unit-voting interest and asserts a right to appoint one Manager to the

Board, with that Manager holding 5 votes.  The Debtor's interest in Greenbrier is subject to dispute, as set forth more fully in this Objection.

26.    The Class A, B and D Members have the right to jointly appoint an Independent Manager to the Board, with that Manager holding two votes (or, in the event that two Independent Managers are appointed, each would hold one vote each) (the "Independent Manager").  William G. Karis is presently the Independent Manager.

27.    Thus, without taking into account the Debtor's bankruptcy filing or default, Greenbrier's Board of Managers would consist of 5 Managers with 11 total votes.

28.    Greenbrier's Operating Agreement provides that "the Managers in office, who collectively have the right to vote more than six (6) votes, shall constitute a quorum for the transaction of business by the Board of Managers."  *See* Operating Agreement Section 5.5(a).

29.    The Operating Agreement further provides that, subject to certain objections, "any matter subject to the approval of, or requiring action or a determination by, the Board of Managers shall require the affirmative vote of Managers holding at least six (6) votes out of the eleven (11) total votes held by the Board of Managers."  *See* Operating Agreement, Section 5.1(d).

**The Current State of Greenbrier's Board of Managers**

30.    Section 18-304 of the Delaware LLC Act provides that "[a] person ceases to be a member of a limited liability company upon the happening of any of the following events …(1) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, a member … b. Files a voluntary petition in bankruptcy."  6 Del. C. §18-304. As set forth more fully below, the Delaware Courts have held that in bankruptcy the effect of Section 18-304 is that a bankrupt member retains its economic interest, but no longer has the

right to vote or otherwise participate in the governance of a Delaware Limited Liability Company.

31.     The Debtor admits in Paragraph 20 of the Motion that it was informed no later than December 17, 2009 by the Independent Manager that the Debtor had lost its ability to vote as a result of the Debtor's bankruptcy filing.   Thereafter, Greenbrier routinely informed the Debtor that it was allowing Mr. McCarthy, the Debtor's appointed Manager, to participate in Board discussions, but that such participation was not a waiver of any rights or applicable statutory provisions.

32.     Despite the fact that the Debtor and its appointed Manager did not have the right to vote, Greenbrier allowed the Debtor's appointed Manager and other representatives to attend Board meetings and provide input along with other individuals and Members that were not Managers.

33.     Because the decisions made by the Board were unanimous, none of the Managers requested Greenbrier's counsel to determine whether the actions taken were authorized under the Operating Agreement.

34.     For some time, the Debtor, Greenbrier and the other Managers have been engaged in a sometimes contentious negotiation process.   The negotiations have included discussions of how to address the Debtor's disputed secured claim and ownership interest in the distribution of proceeds of a sale of Greenbrier.   In that regard, the parties discussed whether a joint sale should be pursued with Midland to provide a potential buyer with access to low sulfur coal necessary to blend Greenbrier's coal down to the required level.   The Debtor's failure to satisfy the Funding Request and fulfill the Commitment prevented Greenbrier from opening the Buck Lilly Project. Any potential purchaser of Greenbrier would need reliable access to low sulfur coal.

35.     Mr. Turley originally offered to sell Midland along with Greenbrier to address that need.  Due to objections from certain of the non-Debtor Managers arising from a concern that a buyer could end up overpaying for Midland to the detriment of Greenbrier and the Debtor's request for constraints on Midland as part of a standstill agreement between Greenbrier and the Debtor,  Midland withdrew from a potential joint sale arrangement.  After Midland's withdrawal from the sale process, the Debtor refused to participate in any further negotiations regarding the sale of Greenbrier.

36.     The first non-unanimous vote by the Board after the Petition Date was caused by the Debtor.  On May 25, 2010, the next Meeting of the Board of Managers, at the Debtor's urging, the Board attempted to hold a vote on whether to terminate Greenbrier's CEO, Mr. Turley.

37.     Prior to the Debtor's attempt to remove Mr. Turley, Mr. Turley was never informed of non-performance and, only months earlier, Mr. Turley was rewarded with his highest-ever bonus from Greenbrier with the support of the Debtor and the other members of the Board of Managers.  It appears that Mr. Turley has become a pawn in the sale negotiations between Managers who want Midland included in the sale and those who do not.

38.     Midland has supplied, and continues to supply, low sulfur coal to Greenbrier, without any allegations of impropriety.

39.     Mr. Turley has not taken the position that the inclusion or exclusion of Midland from a Greenbrier sale is a condition for his approving the sale of Greenbrier.

40.     During the discussion following the Debtor's proposal to remove Mr. Turley as CEO, the Independent Manager objected to the attempt to terminate Mr. Turley as CEO and formally challenged the Debtor's membership on the Board of Managers and the Debtor's ability

to vote to remove Mr. Turley as CEO.  The Independent Manager stated that because two members of the Board of Managers wished to remove Mr. Turley as CEO, he would support that decision as long as Mr. Turley was retained so that Mr. Turley could continue to fulfill responsibilities that he was uniquely qualified to manage.  Two members of the Board of Managers agreed with the Independent Manager and the decision was made that Mr. Turley should continue as President of the Company and that he would be removed as CEO.  The Independent Manager then cast his vote in favor of changing Mr. Turley's role with Greenbrier even though he remained personally opposed to the decision and continued to contest the Debtor's right to vote on the matter.

41.     Because the vote to remove Mr. Turley was the first non-unanimous vote by the Board since the Petition Date, the Independent Manager requested that Greenbrier's counsel analyze the Operating Agreement to determine whether the vote of the non-Debtor Managers was effective.  Mr. Turley was not a part of this request.  In fact, Mr. Turley was the last Manager informed of the request and Greenbrier's counsel's conclusion.

42.     In response to Independent Manager's request, Greenbrier's counsel circulated a memorandum dated May 29, 2010.  The memorandum expressed the opinion that the Debtor's loss of voting rights rendered Greenbrier without a quorum and that the remaining Members with voting rights would need to amend the Operating Agreement to reestablish a quorum.

## ANALYSIS

### I.     ALL ISSUES SET FORTH IN THE MOTION ARE SUBJECT TO ARBITRATION

43.     Section 12.1 of the Operating Agreement provides that the Members "agree if any dispute arises between them relating to this Agreement (the "Dispute"), they will first utilize the [mediation] procedures specified in this Article (the "Procedure") prior to any additional

proceedings." *See* Operating Agreement, Section 12.1.    Section 12.11 of the Operating Agreement provides that, if the good faith participation in the mediation procedure does not resolve the dispute, "the Disputing Members shall settle the dispute by binding arbitration pursuant to the rules of the American Arbitration Association." *See* Operating Agreement, Section 12.11.

44.    The Second Circuit has stated that "[t]he Arbitration Act as interpreted by the Supreme Court dictates that an arbitration clause should be enforced 'unless [doing so] would seriously jeopardize the objectives of the [Bankruptcy] Code.'" *In re U.S, Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999) (citation omitted).    Further, "[t]he party opposing arbitration has the burden of proving that Congress evinced an intent 'to limit or prohibit waiver of a judicial forum for [the] particular claim at issue.'" *In re Winimo Realty Corp.*, 270 B.R. 108 (S.D.N.Y. 2001), *recons. denied*, 276 B.R. 334 (S.D.N.Y. 2001) (quoting *Shearson/Am. Express v. McMahon*, 482 U.S. 220, 227 (1987)).

45.    Bankruptcy Courts generally do not have discretion to refuse to compel arbitration of non-core bankruptcy matters, or matters that are simply "related to" bankruptcy cases.    *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 166 (2d Cir. 2000).

46.    A Bankruptcy Court only has discretion to decline to compel arbitration when the matter is a core proceeding and a conflict exists "'between the Bankruptcy Code, which favors centralization of disputes concerning a debtor's estate, and the Arbitration Act, which advocates a decentralized approach to dispute resolution.'" *In re Winimo*, 270 B.R. at 118 (*citing In re Singer Co. N.V.,* 2001 WL 984678, *5 (S.D. N.Y. Aug. 27, 2001) *(quoting U.S. Lines*, 197 F.3d at 640-41).

47.    To determine whether the Bankruptcy Court can exercise its discretion, it must determine the nature of the underlying dispute:

> [W]hen the underlying dispute is premised on rights created by the Bankruptcy Code, the Bankruptcy Court has discretion to assess whether arbitration would actually conflict with the purposes of the Bankruptcy Code. Where the underlying dispute concerns non-Bankruptcy Code issues derivative of the debtor's pre-petition business activities, no such discretion exists.

*In re Winimo,* 270 B.R. at 124 (*citing Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum),* 118 F.3d 1056, 1067-1070 (5th Cir. 1997) and *In re Singer,* 2001 WL 984678 at *4).

48.    When a Bankruptcy Court does have discretion to decline to enforce an arbitration clause, it may only do so if it finds that the proceedings are based on provisions of the Bankruptcy Code that "inherently conflict" with the Arbitration Act or that arbitration of the claim would "necessarily jeopardize" the objectives of the Bankruptcy Code.  *U.S. Lines*, 197 F.3d at 640.

A.    The Debtor's Contention That The Parties Intended To Contract Around Section 18-304 Of The Delaware LLC Act In The Operating Agreement Is Subject To Arbitration

49.    A question of state contract law which can be resolved by interpreting a pre-bankruptcy LLC agreement does not jeopardize the objectives of the Bankruptcy Code and is appropriate for referral to arbitration.  *In re XO Communications, Inc.*, 2004 WL 360437, *5 (S.D.N.Y. 2004).

50.    The Debtor's contention that the parties to the Operating Agreement intended to contract away the protections provided by Section 18-304 of the Delaware LLC Act is solely a question of contractual interpretation and does not touch any bankruptcy issues.

51.     Accordingly, to the extent that there is a question as to whether the Section 9.7(a) of the Operating Agreement nullifies Section 18-304 of the Delaware LLC Act, the issue is one that must be decided in accordance with the Operating Agreement's arbitration clause rather than by the Debtor's Motion.

                **B.**      **Greenbrier's Contention That The Debtor Does Not Have a Right To Vote Is Subject To Arbitration**

52.     The Debtor's Motion is premised on the assumption that both its economic interest and voting rights are property of the estate, thus requiring a determination of the impact of Section 18-304 of the Delaware LLC Act and the Debtor's defaults upon the Debtor's property interest in Greenbrier under Section 541 of the Bankruptcy Code.

53.     Arbitration of the interplay between Bankruptcy Law and the Delaware LLC Act would not seriously jeopardize the objectives of the Bankruptcy Code, as "[a]rbitration is presumptively an appropriate and competent forum for federal statutory claims" including those that arise under title 11 of the United States Code.  *See MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 110 (2d Cir. 2006).

54.     Similarly, Greenbrier's contention that the Debtor's defaults have impaired its interest in Greenbrier does not require any special expertise of a Bankruptcy Court and the Debtor has not asserted that its rights in Greenbrier are central to its reorganization or that arbitration of the issues set forth in the Motion would impair the Debtor's reorganization.

55.     Accordingly, the arbitration of Greenbrier's contention that both Section 18-304 and the Debtor's defaults deprive the Debtor of its right to vote would not jeopardize the objectives of the Bankruptcy Code.

      C.      The Debtor's Contention That Greenbrier Violated The Automatic Stay Is Subject To Arbitration

56.     The automatic stay does not come into play until two arbitrable issues are first determined - (i) that Section 18-304 does not operate to prohibit the Debtor from voting its interest in Greenbrier and (ii) that the Debtor retains its economic and voting interests in Greenbrier in spite of its defaults.

57.     Even if this Court were to determine that the Debtor has a valid right to vote, the Debtor's contention that Greenbrier has violated the automatic stay with respect to that right is arbitrable. *MBNA,* 436 F.3d at 110 ("Arbitration of Hill's automatic stay claim would not necessarily jeopardize or inherently conflict with the Bankruptcy Code.").

## II.    THE AUTOMATIC STAY IS NOT IMPLICATED IN THIS CASE

58.     The Debtor's Motion is expressly based upon Section 362(a)(3) which precludes a party from taking "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Motion at ¶36; 11 U.S.C. § 362(a)(3). No other sub-section of Section 362 appears to be even remotely applicable. However, there has been no violation of Section 362(a)(3) in this case.

59.     Parsing Section 362(a)(3) shows that the Debtor's argument must be based upon the "exercise control over property of the estate" prong because it is clear that Greenbrier has not taken "possession" of the Membership Interest. *See* Motion at ¶36.

A.    The Automatic Stay Is Not Implicated Because Greenbrier
Performed No "Act"

60.    On a fundamental level, the Court must first address whether there was "any act"
to exercise control over property of the estate.  In this case, there is no "act" because the Debtor's
bankruptcy filing triggered Section 18-304 of the Delaware LLC Act as a matter of law.
Greenbrier did not perform any "act" that resulted in the termination of the Debtor's right to
vote.  The termination of the Debtor's right to vote occurred automatically pursuant to Delaware
law.

61.    As a result, there was no "act" committed by Greenbrier that constitutes a
violation of the automatic stay.

B.    The Automatic Stay Is Not Implicated Because Greenbrier Has
Not Exercised Control Over The Membership Interests

62.    Likewise, the automatic stay is not implicated because Greenbrier has not
exercised control over the Debtor's Membership Interests.

63.    There is no indicia of any control exercised by Greenbrier over the Membership
Interests.  Greenbrier is not voting the Membership Interests and is not seeking to transfer or
assign the Membership Interest.  All that is in dispute in this case is the legal significance of the
automatic termination of the Debtor's right to vote and participate in the governance of
Greenbrier pursuant to Section 18-304 of the Delaware LLC Act and the impact of the Debtor's
defaults on its management and economic interests.  This dispute does not invoke the automatic
stay because Greenbrier has not done anything to exercise control over the Membership Interests.

64.    As a result, there is no "exercise of control" over the Membership Interests by
Greenbrier that constitutes a violation of the automatic stay.

### III.    THE MOTION IMPROPERLY SEEKS INJUNCTIVE AND DECLARATORY RELIEF WHICH MUST BE INITIATED BY ADVERSARY COMPLAINT

65.    The Debtor is trying to fit a square peg into a round hole by bringing this matter before the Court as an alleged violation of the automatic stay as opposed to an adversary proceeding or other proceeding seeking declaratory relief.

66.    The Debtor's Motion is a request for equitable or declarative relief dressed up as an automatic stay case.  The Debtor is asking the Court to make a determination of whether the Membership Interests were terminated pursuant to Section 18-304 of the Delaware LLC Act or whether the Operating Agreement should be construed as containing a contractual provision that saves the Membership Interests from automatic termination.

67.    If this Court has jurisdiction over this matter, the Debtor's Motion is a request for injunctive or declaratory relief which must be brought as a non-core adversary proceeding pursuant to Rule 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure.  The Debtor is using the automatic stay posture as a way to avoid characterizing this matter as an adversary proceeding because the Debtor does not want to afford Greenbrier the procedural protections available if the matter is treated as an adversary proceeding and wants to litigate piecemeal the issues concerning the Debtor's interest in Greenbrier.  However, if the Debtor wishes to seek equitable or declaratory relief from this Court, the procedure should be by adversary proceeding, which is the vehicle that Lehman Brothers Special Financing, Inc. has already used in seeking a similar declaration that a contractual provision constituted an unenforceable *ipso facto* provision and that any action by its counter-party to enforce such provisions would constitute a violation of the automatic stay.  *In re Lehman Brothers Holdings, Inc.*, 422 B.R. 407, 411 (Bankr. S.D.N.Y. 2010).

68.    As a result, the Motion is not the appropriate procedural vehicle to obtain injunctive or declaratory relief.

IV.    GREENBRIER DID NOT VIOLATE THE AUTOMATIC STAY BECAUSE SECTION 18-304 OF THE DELAWARE LLC ACT TERMINATES THE DEBTOR'S RIGHT TO VOTE

69.    The substantive issues in the Motion are subject to mandatory arbitration. Without waiving the argument that the Motion is not properly before this Court, Section IV of this Objection establishes that the Debtor is not entitled to the substantive relief it seeks in any forum.

A.    The Parties Did Not Contract Around Section 18-304 Of The Delaware LLC Act In The Operating Agreement

70.    Section 18-304 of the Delaware LLC Act provides, in relevant part, as follows: "A person ceases to be a member of a limited liability company upon the happening of any of the following events: (1) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, a member ... b. Files a voluntary petition in bankruptcy." 6 Del. C. §18-304.

71.    As set forth below, Delaware Courts recognize a distinction between a member's economic rights (to share in profits and losses) and voting and management rights and hold that Section 18-304 operates to terminate a bankrupt member's voting and management rights, but the member's economic rights are preserved. *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 760-61 (Del. Ch. Dec. 17, 2004).

72.    In accordance with Section 18-304 of the Delaware LLC Act, there are only two ways that an LLC member can retain its voting and management rights after a voluntary bankruptcy. *Id.* First, a member can retain voting and management rights after filing a bankruptcy petition if the LLC's operating agreement provides that they may retain such rights.

*See* 6 Del. C. §18-304(1).  Second, a member may retain such rights with the written consent of all the members.  *See* 6 Del. C. §18-304(2).

73.    Here, the Operating Agreement does not provide that a Member may remain a Member after the filing of a voluntary bankruptcy and the remaining Members of Greenbrier have not consented to the Debtor remaining a Member.

74.    The only provision in the Operating Agreement that addresses a Member's bankruptcy is Section 9.7(a), which addresses the Affected Member's economic interest and provides that Greenbrier may purchase and liquidate a bankrupt Affected Member's Membership Interest within three months of learning of the bankruptcy.  Section 9.7(a) does not provide that a Member may retain its right to participate in the governance of Greenbrier upon the Member's filing of a bankruptcy petition.

75.    The Debtor argues that Section 9.7(a) of the Operating Agreement is intended to exclude Section 18-304 by contending the Section 9.7(a) would be meaningless if Section 18-304 would terminate a bankrupt Member's interest, as no party would pay for such an interest that automatically terminated by statute.  The Debtor's argument fails to recognize that the Delaware Chancery Court has held that Section 18-304 does not terminate the Debtor's economic interest in Greenbrier.  Thus, Section 9.7(a) retains meaning because it is intended to address a bankrupt Member's economic interest.

76.    Because there is no specific language in the Operating Agreement addressing a bankrupt Member's voting and management rights, the parties did not contract away the protections of Section 18-304 with respect to a bankrupt Member's voting and management rights.

                    B.        Section 18-304 Of The Delaware LLC Act Terminates The
                                            Debtor's Right To Vote

77.      The Debtor's Membership Interest in Greenbrier is a creature of Delaware law and Debtor's bankruptcy filing cannot elevate Debtor's rights beyond those defined by Delaware law. *Butner v. U.S,*. 440 U.S. 48, 55 (1979). Voting and governance rights associated with a Membership Interest are subject to the Delaware LLC Act pursuant to which they were created.

78.      As discussed above, Section 18-304 of the Delaware LLC Act provides that Debtor's Membership Interest terminated upon filing of the bankruptcy petition as follows:

> A person ceases to be a member of a limited liability company upon the happening of any of the following events: (1) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, a member… b. Files a voluntary petition in bankruptcy."

6 Del.C. §18-304.

79.      In the bankruptcy context, § 18-304 has been construed as terminating a debtor's managerial and voting rights upon the filing of a bankruptcy petition unless the operating agreement provides to the contrary. However, the debtor retains the economic rights associated with its investment. *See Milford Power*, 866 A.2d at 760 (Chancery Court held §365(e)(1), which was applicable in state court litigation notwithstanding the prior dismissal of debtor's bankruptcy case, did not invalidate debtor's loss of managerial interests under provisions of the operating agreement and §18-304 of the Delaware LLC Act).

80.      This termination of the managerial and voting rights occurred automatically pursuant to Delaware law and without any act of Greenbrier. As a result of this automatic termination of the Membership Interest, the Debtor has no right to participate in the management of Greenbrier.

81.    The Debtor broadly asserts that its Membership Interest in Greenbrier, including the right to vote, is "property of the estate" under Section 541 of the Bankruptcy Code and that the protections set forth in Section 18-304 of the Delaware LLC Act are not available to Greenbrier because the Operating Agreement provides to the contrary.  The Debtor's position is incorrect and is not supported by law.

82.    In support of its assertion, the Debtor primarily relies upon *In re Desmond*, 316 B.R. 593 (Bankr. D. N.H. 2004), a case factually inapposite from the issue before this Court.

83.    The *In re Desmond* case is applicable solely for the boilerplate proposition that membership interests in a limited liability company are property of a debtor's estate.  However, the case does not involve the termination or modification of the membership interests and associated rights pursuant to a state statute such as § 18-304.

84.    Debtor points to no authority for the proposition that § 18-304 is not effective to deny the Debtor the right to vote or participate in management arguing instead that § 18-304 is not applicable because the parties have contracted to the contrary.[2]  In this regard, Debtor's argument is asking the Court to interpret the terms of the Operating Agreement.  However, such

---

[2]    The only provision of the Bankruptcy Code that could possibly render § 18-304 ineffective is §365(e)(1).  However, §365(e)(1) is not applicable because that section only applies to invalidate terminations of executory contracts "solely because of a provision in such contract or lease."  Thus, by its express terms, Section 365(e)(1) is not applicable to terminations of executory contracts that result from the application of a state statute as opposed to a contractual provision.  *But see, Summit Investment and Development Corp. v Leroux*, 69 F.3d 608 (1st Cir. 1995).  Even if this Court construes Section 365(e)(1) as invalidating modifications resulting from the application of state statute as opposed to terminations resulting solely from a contractual provision, the provisions of Section 365(e)(2) would apply to save the termination because applicable law excuses Greenbrier and its members from accepting performance from the Debtor.  *See Milford Power*, 866 A.2d at 751-752, citing *In re IT Group, Inc.* 302 B.R. 483 (D. Del. 2003).  As a result of the foregoing, it is clear that Section 18-304 applies in this case and is not invalidated by Section 365(e)(1) of the Bankruptcy Code.

interpretation is subject to the arbitration clause and should be addressed in an arbitration proceeding and not before this Court.

85.     In short, *Milford Power*, establishes that applicable law excuses Greenbrier and its members from having to permit the Debtor to participate in management under section 365(e)(2).

86.     In the present case, the factual and legal issues mirror *Milford Power*. Greenbrier is a Delaware Limited Liability Company and the Debtor's rights derive from the Operating Agreement. The Operating Agreement does not express an intent by the parties to contract away the protections of Section 18-304 of the Delaware LLC Act. Delaware Law is clear that unless the LLC agreement states otherwise, the filing of a bankruptcy petition deprives the debtor-member of its right to vote and managerial interests.

87.     As a result of the foregoing, it is clear that Section 18-304 applies in this case and the Debtor does not have any right to vote or participate in the management of Greenbrier.

## **CONCLUSION**

88.     For the reasons set forth above, the issues raised in the Motion must be brought in arbitration rather than before this Court. Even if this Court were to entertain the Debtor's Motion, the relief sought herein is declaratory and injunctive in nature, which must be initiated by Adversary Complaint pursuant to the Federal Rules of Bankruptcy Procedure.

89.     In substance, the Debtor is not entitled to the relief it seeks because Section 18-304 of the Delaware LLC Act terminated the Debtor's voting and management rights and Greenbrier has not taken any act to exercise control over the Debtor's interest in Greenbrier.

WHEREFORE, Greenbrier respectfully requests that this Honorable Court deny the Motion and grant it such other and further relief as this Court deems just and proper.

Dated:  July 8, 2010   **BUCHANAN INGERSOLL & ROONEY PC**

       /s/  William H. Schorling (WS-6322)
       William H. Schorling, Esquire (WS-6322)
       Donald E. Malecki, Esquire
       Zakarij O. Thomas, Esquire
       620 Eighth Ave., 23rd Floor
       New York, NY 10018
       (212) 440-4400 - Telephone
       (212) 440-4401 - Facsimile

       Counsel for Greenbrier Minerals Holdings, LLC