Hearing Date and Time: July 14, 2010 at 10:00 a.m.
Objection Deadline: July 8, 2010 at 5:00 p.m.

BUCHANAN INGERSOLL & ROONEY PC
620 Eighth Ave., 23rd Floor
New York, NY 10018
(212) 440-4400 - Telephone
(212) 440-4401 - Facsimile
William H. Schorling (WS-6322)
Donald E. Malecki
Zakarij O. Thomas

Attorneys for Greenbrier Minerals Holdings, LLC

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | CASE NO. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS, INC., *et al* | Chapter 11 |
| Debtors. | (Jointly Administered) |

### DECLARATION OF WILLIAM G. KARIS IN SUPPORT OF OBJECTION TO MOTION PURSUANT TO SECTIONS 105(A) AND 362 OF THE BANKRUPTCY CODE FOR AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST GREENBRIER MINERALS HOLDINGS, LLC

Under penalty of perjury, William G. Karis hereby declares pursuant to section 1746 of title 28 of the United States Code:

<u>1.</u>    I am over 18 years of age and I can testify to the following facts based on my personal knowledge and my review of Greenbrier Minerals Holdings, LLC ("Greenbrier")'s business records. I submit this Declaration in support of Greenbrier's Objection to the Motion of Lehman Commercial Paper Inc. (the "Debtor") Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Enforcing the Automatic Stay against Greenbrier (the "Motion").[1]

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms by the Objection.

2. I am the Independent Manager of Greenbrier. I own 1,000 Class C Units of Greenbrier, which represent a 1% ownership interest in Greenbrier. Greenbrier is a Delaware Limited Liability Company primarily in the business of mining, processing and selling coal that it produces. Greenbrier's owners have intended to develop the mine and sell it from the beginning of the project.

3. I informed the Debtor no later than December 17, 2009 that the Debtor had lost its ability to vote as a result of the Debtor's bankruptcy filing. Thereafter, Greenbrier routinely informed the Debtor that it was allowing Mr. McCarthy, the Debtor's appointed Manager, to participate in Board discussions, but that such participation was not a waiver of any rights or applicable statutory provisions.

4. Greenbrier allowed the Debtor's appointed Manager and other representatives to attend Board meetings and provide input along with other individuals and Members that were not Managers.

5. I asked the Debtor's representative, Mr. Jack McCarthy, to lead Greenbrier's efforts to renegotiate Mr. Turley's employment contract because I thought Mr. McCarthy would be impartial and because of his experience as a former CFO of a major corporation. I did not ask Mr. McCarthy to participate in this process because I considered him a member of the Board of Managers. Other attendees at Board of Manager meetings have been asked to assist the Board in important decisions even though they were not members of the Board of Managers.

6. Because the decisions made by the Board were unanimous, Greenbrier's counsel was not requested to determine whether the actions taken were authorized under the Operating Agreement.

7. For some time, the Debtor, Greenbrier and the other Managers have been engaged in a sometimes contentious negotiation process. The negotiations included discussions of how to address the Debtor's disputed secured claim and ownership interest in the distribution of proceeds of a sale of Greenbrier. In that regard, the parties discussed whether a joint sale should be pursued with Midland to provide a potential buyer with access to low sulfur coal necessary to blend Greenbrier's coal down to the required level.[2] The Debtor's failure to satisfy the Funding Request and fulfill the Commitment prevented Greenbrier from opening the Buck Lilly Project. Any potential purchaser of Greenbrier would need reliable access to low sulfur coal.

8. Mr. Turley originally offered to sell Midland along with Greenbrier to address that need. Certain of the non-Debtor Managers expressed concern that a buyer could end up overpaying for Midland to the detriment of Greenbrier. As negotiations continued, Midland sent a letter withdrawing from a potential joint sale arrangement. After receipt of the letter, the Debtor refused to participate in any further negotiations regarding the sale of Greenbrier.

9. The first non-unanimous vote by the Board after the Petition Date was caused by the Debtor. On May 25, 2010, the next Meeting of the Board of Managers, at the Debtor's urging, the Board attempted to hold a vote on whether to terminate Greenbrier's CEO and President, Mr. Turley.

10. Prior to the Debtor's attempt to remove Mr. Turley, Mr. Turley was never informed by the Debtor of non-performance and, months earlier, Mr. Turley was rewarded with his highest-ever bonus from Greenbrier with the support of the Debtor and members of the Board of Managers.

---

[2] The Declaration of Joseph C. Turley, III, filed contemporaneously with this declaration, contains a background discussion of the Debtor's funding obligations to Greenbrier and the importance of the Buck Lilly Project.

11. Prior to the Debtor's attempt to remove Mr. Turley, the Debtor strongly supported Mr. Turley as CEO and stated to me on several occasions that the Debtor would consider entering into an agreement with Mr. Turley to run Greenbrier after forcing Greenbrier into bankruptcy and "throwing out" the other shareholders in Greenbrier. This threat was repeated in a conference call in the presence of two other members of the Board of Managers.

12. The Debtor has repeatedly used its position as lender in an attempt to leverage its share of proceeds from the sale of Greenbrier by threatening to accelerate the loan to Greenbrier if we did not accept their sharing arrangement.

13. Midland has supplied, and continues to supply, low sulfur coal to Greenbrier without any allegations of impropriety.

14. To my knowledge, Mr. Turley has not taken the position that the inclusion or exclusion of Midland from the Greenbrier sale is a condition for his approving the sale of Greenbrier.

15. During the discussion following the Debtor's proposal to remove Mr. Turley as CEO, I objected to the attempt to terminate Mr. Turley as CEO and formally challenged the Debtor's membership on the Board of Managers and the Debtor's ability to vote to remove Mr. Turley as CEO. I then stated that because two members of the Board of Managers wished to remove Mr. Turley as CEO, I would support that decision as long as Mr. Turley was retained so that he could continue to fulfill responsibilities that he was uniquely qualified to manage. The two members of the Board of Managers agreed with me and the decision was made that Mr. Turley should continue as President of the Company and that he would be removed as CEO. I then cast my vote in favor of changing Mr. Turley's role with Greenbrier even though I was

personally opposed to the decision and continued to contest the Debtor's right to vote on the matter.

16. Because the vote to remove Mr. Turley was the first non-unanimous vote by the Board since the Petition Date, I requested that Greenbrier's counsel analyze the Operating Agreement to determine whether the vote of the non-Debtor Managers was effective. Mr. Turley was not a part of this request.

17. In response to my request, Greenbrier's counsel circulated a memorandum dated May 29, 2010. The memorandum expressed the opinion that the Debtor's loss of voting rights rendered Greenbrier without a quorum and that the remaining Members with voting rights would need to amend the Operating Agreement to reestablish a quorum.

I have reviewed the Objection and I believe it accurately reflects the facts set forth therein. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of July, 2010.

_____
William G. Karis