Hearing Date and Time: July 14, 2010 at 10:00 a.m.
Objection Deadline: July 8, 2010 at 5:00 p.m.

BUCHANAN INGERSOLL & ROONEY PC
620 Eighth Ave., 23rd Floor
New York, NY 10018
(212) 440-4400 - Telephone
(212) 440-4401 - Facsimile
William H. Schorling (WS-6322)
Donald E. Malecki
Zakarij O. Thomas

Attorneys for Greenbrier Minerals Holdings, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 08-13555 (JMP) |
| | : | |
| LEHMAN BROTHERS HOLDINGS, | : | |
| INC., *et al* | : | Chapter 11 |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

## DECLARATION OF JOSEPH C. TURLEY, III IN SUPPORT OF OBJECTION TO MOTION PURSUANT TO SECTIONS 105(A) AND 362 OF THE BANKRUPTCY CODE FOR AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST GREENBRIER MINERALS HOLDINGS, LLC

Under penalty of perjury, Joseph C. Turley, III hereby declares pursuant to section 1746 of title 28 of the United States Code:

1. I am over 18 years of age and I can testify to the following facts based on my personal knowledge and my review of Greenbrier Minerals Holdings, LLC ("Greenbrier")'s business records. I submit this Declaration in support of Greenbrier's Objection (the "Objection") to the Motion of Lehman Commercial Paper Inc. (the "Debtor") Pursuant to



Sections 105(a) and 362 of the Bankruptcy Code for an Order Enforcing the Automatic Stay against Greenbrier (the "Motion").[1]

2. I am the President and CEO of Greenbrier. Greenbrier is a Delaware Limited Liability Company primarily in the business of mining, processing and selling coal that it produces. Greenbrier's owners have intended to develop the mine and sell it from the beginning of the project.

3. Greenbrier's management is presently making operational decisions and the mine is continuing to operate with impeccable safety. The mine has employees serving in management positions in operations, human resources, purchasing, sales, finance and administration.

### Greenbrier's Ownership and Governance Structure

4. Greenbrier's ownership structure primarily consists of four groups, designated by members ("Member") holding ownership units ("Units") in one of four classes. The rights of the Members are governed by the Amended and Restated Operating Agreement ("Operating Agreement"), dated March 12, 2008. Greenbrier's Operating Agreement treats economic interests and ownership interests separately, such that the proportionate amount of a Member's ownership interest may be greater or less than the proportionate strength of its voting rights or representation on the Board of Managers.

5. I own 15,000 Class A units of Greenbrier, which represents a 15% ownership interest in Greenbrier and a unit-voting ratio of 20.89%. The other Class A Member, Raymond McCormick, owns 13,000 Class A units of Greenbrier, which represents a 13% ownership interest in Greenbrier and a unit-voting ratio of 18.11%. The Class A Members have the right to appoint 2 Managers to the Board, with each Manager holding 1 vote each on Board matters.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms by the Motion.

2

6.  Greenbrier Equity Opportunity, LP (the "McConnell Group") owns Class B Units representing a 12% economic interest in Greenbrier and a 12% unit-voting interest. The Class B Members have the right to appoint one Manager to the Board, with that Manager holding 2 votes.

7.  Class C Units are held by a number of investors and represent an 11% economic interest in Greenbrier and no unit-voting interest. The Class C Members do not have the right to appoint any Manager to the Board.

8.  The Debtor asserts a right to Class D Units representing a 49% economic interest in Greenbrier a 49% unit-voting interest and right to appoint one Manager to the Board, with that Manager previously holding 5 votes. The Debtor's interest in Greenbrier is subject to dispute.

9.  The Class A, B and D Members have the right to jointly appoint an Independent Manager to the Board, with that Manager holding two votes (or, in the event that two Independent Managers are appointed, each would hold one vote each) (the "Independent Manager"). William G. Karis is presently the Independent Manager.

10. Thus, without taking into account the Debtor's bankruptcy filing or the Debtor's defaults, Greenbrier's Board of Managers would consist of 5 Managers with 11 total votes.

11. Section 5.5(a) of Greenbrier's Operating Agreement provides that "the Managers in office, who collectively have the right to vote more than six (6) votes, shall constitute a quorum for the transaction of business by the Board of Managers."

12. Section 5.1(d) of the Operating Agreement further provides that, subject to certain objections, "any matter subject to the approval of, or requiring action or a determination by, the Board of Managers shall require the affirmative vote of Managers holding at least six (6) votes out of the eleven (11) total votes held by the Board of Managers."



**The Debtor's Defaults and Disputed Membership Interest Percentage**

13. The Debtor originally loaned $10,000,000 to Greenbrier in December, 2005 as bridge financing until Greenbrier could secure permanent financing. On July 25, 2006, Greenbrier entered into a Credit Agreement with WestLB Bank, as agent, and WestLB Bank and Metropolitan Life Insurance Company (the "WestLB Credit Agreement"). The Debtor extended a second-lien term loan to Greenbrier with a commitment of $29,000,000 pursuant to a Term Loan Agreement, dated August 29, 2006 (the "Second-Lien Credit Agreement").

14. The Debtor acquired the WestLB Credit Agreement via an assignment on January 19, 2007.

15. On May 1, 2007, the Debtor and Greenbrier entered into an Amended and Restated Credit Agreement (the "Credit Agreement") in order to increase the facility amount to $94,000,000 and amend and restate the WestLB Credit Agreement (now held by the Debtor) and the Second-Lien Credit Agreement.

16. Ultimately, Greenbrier needed significant funds beyond the $94,000,000 to fund its development to the point that it could be sold. The Debtor agreed to finance Greenbrier through the completion and sale in exchange for an increase in its ownership interest in Greenbrier from 15% to 49%.

17. After lengthy negotiations, Greenbrier's Operating Agreement was amended and restated on March 12, 2008 to reflect the Debtor's 49% interest.

18. Rather than expressly setting forth the full amount necessary to fund the project through completion, the Credit Agreement was structured so that increases in the amount of the facility were provided through amendments.

4



19. The Credit Agreement was amended seven times through June 3, 2008, primarily to increase the amount of availability to Greenbrier. At the time of Amendment No. 7 (the "Seventh Amendment"), the parties estimated that the total amount of funding necessary to fund Greenbrier through its eventual sale would be $206,000,000, an increase in the commitment by $50,000,000 from the Sixth Amendment. Thus, the Debtor and Greenbrier entered into the Seventh Amendment, resulting in a maximum principal loan commitment of $206,000,000 (the "Commitment").

20. One of the primary purposes of the increase in the loan commitments under the Seventh Amendment was to allow Greenbrier to develop a surface mine project (the "Buck Lilly Project") that would provide a supply of low sulfur coal to blend with the higher sulfur coal that Greenbrier already was mining. Greenbrier's contracts require it to deliver coal with a lower sulfur content than Greenbrier can presently mine. Greenbrier presently obtains lower sulfur coal from sources such as Midland Trail Resources, LLC ("Midland") so that Greenbrier can blend its higher sulfur coal down to the sulfur content required by Greenbrier's contracts. The Buck Lilly Project is and always has been vital to Greenbrier's ability to conduct its business as a stand-alone operation.

21. On or about September 18, 2008, with the Debtor's support and encouragement, Greenbrier requested that the Debtor fund $10,000,000 of the Commitment pursuant to the terms of the Credit Agreement (the "Funding Request").

22. On September 18, 2008, prior to the Debtor's filing of its voluntary chapter 11 petition on October 5, 2008 (the "Petition Date"), the Debtor approved, but failed to fund, the Funding Request. To this date, the Debtor has not satisfied the Funding Request.



23. Pursuant to the Seventh Amendment, there is currently $39,000,000 in availability under the Commitment. The Debtor has informed Greenbrier that it will not fund additional advances under the Commitment.

24. The Debtor's failure to fund the full Commitment has caused and will cause significant damages to Greenbrier in an amount yet to be determined. Greenbrier filed a proof of claim to assert such damages, among other claims, on September 21, 2009.

25. Section 3.1 of the Operating Agreement provides that "[e]ach Member shall contribute, or cause to be contributed, cash and/or other property to the Company in exchange for the acquisition of its Units, unless such Units were awarded as compensation."

26. The Debtor's contribution required to earn its Units was the full funding of the Seventh Amendment. Accordingly, Greenbrier disputes the Debtor's rights under the Operating Agreement.

### The Current State of Greenbrier's Board of Managers

27. The Debtor was informed no later than December 17, 2009 by the Independent Manager that the Debtor had lost its ability to vote as a result of the Debtor's bankruptcy filing. Thereafter, Greenbrier routinely informed the Debtor that it was allowing Mr. McCarthy, the Debtor's appointed Manager, to participate in Board discussions, but that such participation was not a waiver of any rights or applicable statutory provisions.

28. Greenbrier allowed the Debtor's appointed Manager and other representatives to attend Board meetings and provide input along with other individuals and Members that were not Managers.



29.  Because the decisions made by the Board were unanimous, Greenbrier's counsel was not requested to determine whether the actions taken were authorized under the Operating Agreement.

30.  For some time, the Debtor, Greenbrier and the other Managers have been engaged in a sometimes contentious negotiation process. The negotiations have included discussions of how to address the Debtor's disputed secured claim and ownership interest in the distribution of proceeds of a sale of Greenbrier. In that regard, the parties discussed whether a joint sale should be pursued with Midland to provide a potential buyer with access to low sulfur coal necessary to blend Greenbrier's coal down to the required level. The Debtor's failure to satisfy the Funding Request and fulfill the Commitment prevented Greenbrier from opening the Buck Lilly Project. Any potential purchaser of Greenbrier would need reliable access to low sulfur coal.

31.  As a majority owner of Midland, I originally offered to sell Midland along with Greenbrier to address that need. Due to objections from certain of the non-Debtor Managers arising from a concern that a buyer could end up overpaying for Midland to the detriment of Greenbrier and the Debtor's request for constraints on Midland as part of a standstill agreement between Greenbrier and the Debtor, Midland withdrew from a potential joint sale arrangement. After Midland withdrew, the Debtor refused to participate in any further negotiations regarding the sale of Greenbrier.

32.  I was not present at Greenbrier's May 25, 2010 Board of Managers Meeting due to personal reasons. I was represented at the meeting by a proxy.

33.  Prior to May 25, 2010, I was never informed of non-performance and, only months earlier, I was rewarded with my highest-ever bonus from Greenbrier with the support of the Debtor and the other members of the Board of Managers.

7



I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8 day of July, 2010.

Joseph C. Turley, III