# Exhibit B

Term Sheet

BINDING TERM SHEET AMONG
LCPI AS ADMINISTRATIVE AGENT FOR THE 1ST LIEN LENDERS,
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
AND THE CHAPTER 11 TRUSTEE

       This Term Sheet dated as of September [23], 2009 (this "Term Sheet") is by and among ALFRED H. SIEGEL, solely in his capacity as the chapter 11 trustee (the "Trustee") of the administratively-consolidated estates of LBREP/L-SunCal Master I LLC ("Parent Debtor"), LBREP/L-SunCal McAllister Ranch LLC ("McAllister Ranch"), LBREP/L-SunCal McSweeny Farms LLC ("McSweeny Farms"), and LBREP/L-SunCal Summerwind Ranch LLC ("Summerwind Ranch"; with McAllister Ranch, McSweeny Farms and Summerwind Ranch being referred to collectively as the "Subsidiary Debtors," and together with the Parent Debtor, as the "Debtors") in their respective bankruptcy cases (the "SunCal Bankruptcy Cases") now pending in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court"); THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS of the Debtors (the "Creditors' Committee"); and LEHMAN COMMERCIAL PAPER INC. solely in its capacity as administrative agent ("LCPI") for the first-position secured lenders of the Debtors (the "1st Lien Lenders"); and is acknowledged and agreed as to certain provisions by one or more 1st Lien Lenders, in order to reach interim agreement with respect to the distribution of certain funds, to establish certain parameters for a chapter 11 plan of reorganization for the Debtors and otherwise to establish the terms for globally resolving all disputes between the parties. Notwithstanding any references to the contrary contained herein, each and every reference in this Term Sheet to "Trustee" shall mean and refer to ALFRED H. SIEGEL, solely and exclusively in his capacity as the chapter 11 trustee of the administratively-consolidated estates of the Debtors, and in no other capacity.

## DEAL TERMS

### The Compromise Motion

A.    1. The Trustee will seek approval of this compromise by filing a motion (the "Compromise Motion") under Federal Bankruptcy Rule 9019 within ten calendar days of the Trustee's actual receipt of a copy of this Term Sheet fully executed by all non-Trustee parties hereto. The Trustee shall file the Compromise Motion in all of the SunCal Bankruptcy Cases and LCPI shall file the Compromise Motion in the LCPI bankruptcy case (the "LCPI Bankruptcy Case", and together with the SunCal Bankruptcy Cases, the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court", and together with the California Bankruptcy Court, the "California Bankruptcy Court" and together with the New York Bankruptcy Court, the "Bankruptcy Courts") to obtain approval of this Term Sheet. The orders approving the Compromise Motions (the "Compromise Orders") must be obtained, and become final orders, by no later than [November 12], 2009 (or, provided the Trustee has filed the Compromise Motion by no later than [October 2], 2009, such date that is the soonest available Court hearing date thereafter), unless this date is extended by mutual agreement of the

1

Trustee, LCPI and the Creditors' Committee. If the Compromise Orders have not become final orders on or before [November 12], 2009, this Term Sheet and any Settlement Agreement, and the terms and provisions hereof and thereof shall become null and void and of no further force and effect. Immediately upon the last of the Compromise Orders becoming final orders, this Term Sheet shall be binding on LCPI, the Trustee, the Creditors' Committee and each other party hereto (the date of such entry, the "Settlement Effective Date"). All parties hereto acknowledge that all other parties hereto intend to and will rely on the binding nature of this Term Sheet as of the Settlement Effective Date in moving forward with the Bankruptcy Cases. The Trustee, the Creditors' Committee, LCPI and each other party hereto, will diligently work together in good faith to incorporate the substance of this Term Sheet into a mutually-agreeable settlement agreement (the "Settlement Agreement") which shall be attached to the Compromise Orders. If the parties hereto are unable to agree to the final language of the Settlement Agreement, this Term Sheet shall constitute the Settlement Agreement and the California Bankruptcy Court shall be given the exclusive authority to clarify the meaning of the Settlement Agreement if there are ever any issues arising regarding the meaning thereof. The terms of the Settlement Agreement will then be incorporated into one or more plans of reorganization to be filed by the Trustee (the "Plan") in consultation with, or jointly with, the Creditors' Committee in the California Bankruptcy Court with respect to the SunCal Bankruptcy Cases. The Trustee and the Creditors' Committee shall work together in good faith with LCPI to ensure that the Plan is consistent with this Term Sheet and the Settlement Agreement. If LCPI believes that the Plan filed does not conform to this Term Sheet or the Settlement Agreement, then LCPI shall have the right to object to the Plan solely with respect to the alleged nonconformity with the Term Sheet or Settlement Agreement. The Plan shall be subject to LCPI's consent prior to filing, and such consent shall not be unreasonably withheld if the Plan is in a form and substance consistent with the Term Sheet or Settlement Agreement. Notwithstanding the prior language in this paragraph, if LCPI determines that entry into this Term Sheet and performance of its terms does not require the New York Bankruptcy Court's approval, LCPI may file a written statement to that effect concurrently with the filing by the Trustee of the Compromise Motion with the California Bankruptcy Court, in which case the Term Sheet and any Settlement Agreement shall be deemed binding on all parties hereto immediately upon the Settlement Effective Date which shall be deemed to occur on the date the Compromise Order is entered. If this Term Sheet becomes null and void for any reason (subject to any provision of this Term Sheet which is expressly stated to survive termination of this Term Sheet), and to the extent that 11 U.S.C. § 362(d)(3) applies to the Subsidiary Debtors, the time period within which to file a chapter 11 plan under 11 U.S.C. § 362(d)(3)(A) shall be extended for 30 days after the date on which this Term Sheet becomes null and void.

2. As of the date hereof, the Trustee and the Creditors' Committee shall stipulate to LCPI being granted immediate relief from the automatic stay to record a new notice of default with respect to the Parent Debtor and Subsidiary Debtors so as to allow LCPI to re-commence the period within which a foreclosure sale may be conducted, which expired on August 21, 2009.

### Allowance of Claim of LCPI; Claims Filed by Second and Third Lien Lenders

B.    Upon the Settlement Effective Date: (i) the claims of the 1st Lien Lenders in the aggregate amount of $230,006,233.98 plus accrued and unpaid interest calculated through September 10, 2008 (the "Petition Date") and accrued and unpaid legal fees shall be allowed; provided, however, the 1st Lien Lenders' allowed secured claims against the Subsidiary Debtors shall be in the amount of the 1st Lien Lenders' final credit bid under 11 U.S.C. Section 1123(a)(5)(d) pursuant to the Plan, as set forth in paragraphs E and F below (or, in the case of one or more successful bids by any third party purchasers at the related sales pursuant to the Plan, the aggregate amount of such successful third party bids), plus any amounts received by the 1st Lien Lenders as described in paragraph D below, and minus any amounts paid by the 1st Lien Lenders as described in paragraph H below. Any amount not deemed a portion of the 1st Lien Lenders' allowed secured claim shall be deemed an allowed unsecured claim against all of the Debtors as further described in paragraph F below. Proofs of claim have been filed in the Bankruptcy Cases by second position lenders (the "2nd Lien Lenders") and third position lenders (the "3rd Lien Lenders", with the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders being referred to collectively as the "Lenders"). The Lenders alleged that their loans to the Parent Debtor are guaranteed by each of the Subsidiary Debtors. This Term Sheet is not intended to affect the rights of the 2nd Lien Lenders and the 3rd Lien Lenders, if any, against the Debtors (including without limitation the Subsidiary Debtors) or any other Person (as defined in the First Lien Credit Agreement (hereinafter defined)).

### Distributions Upon Settlement Effective Date

C.    On the Settlement Effective Date, the Trustee will retain $4.5 million from those certain Debtor funds previously held by First Bank & Trust and subsequently transferred to the Trustee for the benefit of the Debtors' estates, which funds are currently subject to the liens and rights of the 1st Lien Lenders (the "Development Account Funds"), of which (1) $3.0 million shall be available for use by the Trustee in administration of the SunCal Bankruptcy Cases (the "Administrative Funds"); and (2) $1.5 million shall be placed in a segregated account subject to the 1st Lien Lenders' security interest (the "Senior Lien Reserve Funds"). The Administrative Funds shall be available (i) immediately to pay administrative claims owing in the SunCal Bankruptcy Cases and (ii) upon the effective date of the Plan to make distributions to non-Lender creditors in respect of unsecured claims. In addition to the $3.0 million in Administrative Funds and $1.5 million in Senior Lien Reserve Funds, the Trustee shall also retain $2.0 million of the Development Account Funds (the "Remaining Development Funds"), which Remaining Development Funds may be used by the Trustee solely to fund the ongoing current expenses of maintaining the real property owned by McAllister Ranch, McSweeny Farms, and Summerwind Ranch (together, the "Properties") pursuant to cash collateral orders of the California Bankruptcy Court in a manner consistent with the budget attached as Exhibit "A" hereto (the "Approved Budget") or otherwise for uses for which the Trustee obtains the 1st Lien Lenders' consent or which are approved by the California Bankruptcy Court after notice to the 1st Lien Lenders. Any unused Remaining Development

3

Funds will be transferred to the 1st Lien Lenders within five business days of the date that the Debtors no longer hold title to the Properties.

D.      Upon the Settlement Effective Date, the Trustee shall immediately transfer to the 1st Lien Lenders, free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, all Development Account Funds less the aggregate $6.5 million in Administrative Funds, Senior Lien Reserve Funds, and Remaining Development Funds to be retained by the Trustee pursuant to paragraph C above (the funds to be transferred to the 1st Lien Lenders hereafter referred to as the "1st Lien Lenders Retained Settlement Funds").

## Sale Of Properties Under The Plan

E.      The Properties shall be sold free and clear of Liens (hereinafter defined) under the Plan pursuant to 11 U.S.C. Section 1123(a)(5)(d).  The 1st Lien Lenders together shall be the initial bidder with respect to each of the Properties and shall credit-bid their allowed secured claims with respect to each Property in accordance with the bidding procedures set forth in paragraphs F and P below, and Exhibit "B" hereto (together, the "Bidding Procedures").  With respect to those Properties for which the 1st Lien Lenders are determined to be the Winning Bidders (as defined in the Bidding Procedures) and purchase by way of credit bid, such Properties shall be transferred to the 1st Lien Lenders free and clear of Liens.  As used in this Term Sheet, "Liens" shall mean liens, claims, encumbrances and interests, including without limitation Senior Liens (hereinafter defined), other than (1) the lien of 1st Lien Lenders and (2) liens, claims, encumbrances or interests that satisfy clause (b), (c) and/or (d) of the definition of "Permitted Exceptions" set forth in the First Lien Credit Agreement dated January 19, 2006 (as amended) among LCPI, Parent Debtor, the 1st Lien Lenders, and certain other parties (the "First Lien Credit Agreement").

F.      The initial credit bids by the 1st Lien Lenders shall be in the aggregate amount of $62 million allocated among the three Properties based on the appraisals obtained by the 1st Lien Lenders in November 2008 in the following amounts: McAllister Ranch $28.2 million; Summerwind Ranch $25.8 million; and McSweeny Farms $8 million (each, a "Credit Bid Price").  The 1st Lien Lenders shall be entitled to increase their respective credit bid for each Property to a maximum amount equal to $250,000 in excess of the highest competing bid for such Property, if any, up to the entire amount of their allowed claims (in the aggregate for all of the Lenders' credit bids with respect to the Properties, with no set-offs, reductions or other defenses) in their discretion in accordance with the Overbid Procedures (as defined in the Bidding Procedures) (the "Maximum Credit Bid").  If one or more of the Properties are successfully bid upon by a Qualified Bidder (as defined in the Bidding Procedures) under the Overbid Procedures, the Trustee may, subject to the right of the 1st Lien Lenders to submit a greater bid, sell such Property(ies) to such third party free and clear of all Liens (including the lien of the 1st Lien Lenders).  Except for the "Trustee's Participation" under Paragraph R, the lien of the 1st Lien Lenders shall attach to any monies received from the sale to a third party and such monies, net of any ordinary course sales costs, shall be paid to the 1st Lien Lenders simultaneous

4

with payment of the Trustee's Participation to the Trustee. The 1st Lien Lenders shall have an allowed unsecured claim as set forth in paragraph B above (for the avoidance of doubt, in accordance with paragraph B above, the calculation of the 1st Lien Lenders' allowed unsecured claim shall take into account (1) the 1st Lien Lenders' aggregate credit bids for those Properties that were included in their Winning Bids (as defined in the Bidding Procedures) minus any liabilities assumed by the 1st Lien Lenders in connection with the transfer of title to such Properties to the 1st Lien Lenders pursuant to such Winning Bids and (2) any proceeds received by the 1st Lien Lenders from the sale pursuant to the Plan of any of the Properties that were not included in the 1st Lien Lenders' Winning Bids to one or more third parties).

### Use of Remaining Development Funds; Trustee Loss Collateral

G.     During the period from the Settlement Effective Date until the transfer of title of the Properties to the 1st Lien Lenders or any third party, either pursuant to the Plan or by way of a foreclosure by the 1st Lien Lenders (the "Trustee Maintenance Period"), the Trustee shall be authorized to pay all expenses incidental to the ownership, operation and maintenance of the Properties from the Remaining Development Funds in amounts not to exceed those on the Approved Budget (plus a variance of 10% on a line-item basis of the amounts set forth therein), without the further consent of the 1st Lien Lenders.  Upon the Settlement Effective Date, LCPI on behalf of the 1st Lien Lenders shall deliver to the Trustee cash or one or more irrevocable letters of credit acceptable to the Trustee in his reasonable discretion (together, the "Trustee Loss Collateral") in the aggregate amount of $500,000.  During the Trustee Maintenance Period, in the event the Trustee incurs proven losses (not otherwise covered by insurance) based upon claims of simple negligence or strict liability in connection with his ownership, operation, maintenance and management of the Properties, but not in the event of any gross negligence or gross malfeasance on the part of the Trustee, the Trustee shall have the right to draw and recover from the Trustee Loss Collateral an amount not to exceed in the aggregate the lesser of (i) the amount of such losses multiplied by a fraction, the numerator of which is the amount of the 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders (including any unused Remaining Development Funds actually paid over to the 1st Lien Lenders pursuant to paragraph C above) and the denominator of which is the aforementioned amount plus $6.5 million[1], and (ii) the full amount of the Trustee Loss Collateral, and in the event such recovery from the Trustee Loss Collateral is insufficient to cover such losses, the Trustee shall have the right to apply Administrative Funds to cover such losses.  Upon the earlier to occur of (i) a Termination Event or (ii) the effective date of the Plan, the Trustee shall deliver any remaining Trustee Loss Collateral to LCPI for the benefit of the 1st Lien Lenders.  Further, LCPI on behalf of the 1st Lien Lenders hereby fully and forever releases and discharges the Trustee both in his capacity as trustee and in his individual capacity

---

[1] As an example only, in the case of an $800,000 loss, if the amount of 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders is $8.5 million, then the numerator will be $8.5 million, the denominator will be $15 million (i.e. $8.5 million plus $6.5 million), and therefore the resulting fraction will be 8.5/15 (= 0.57).  The Trustee's recovery will be the lesser of (i) $456,000 (i.e., $800,000 multiplied by 0.57) and (ii) $500,000 (i.e., the full amount of the Trustee's Loss Collateral).  Thus, the Trustee's recovery will be $456,000.

with respect to any acts or omissions occurring or claims arising in any way related to the subject matter hereof or the Trustee's actions or duties with respect to the Debtors or the Properties prior to the conclusion of the Trustee Maintenance Period, except to the extent of any gross negligence or gross malfeasance on the part of the Trustee.

H.    To the extent that the Remaining Development Funds are inadequate to fund the Trustee's reasonable and necessary expenses with respect to the preservation and maintenance (but not development) of the Properties through and including [January 15], 2010, the 1st Lien Lenders agree to pay for such reasonable and necessary expenses to the extent they are (i) consistent in nature and amount with expenses provided for in prior cash collateral budgets approved by the California Bankruptcy Court and (ii) in an aggregate amount not to exceed fifty percent (50%) of the amount of the 1st Lien Lenders Retained Settlement Funds actually received by the 1st Lien Lenders. These expenses shall be paid upon written request by the Trustee to LCPI; however, if there is a dispute as to the reasonableness or necessity of any of the expenses incurred by the Trustee, the California Bankruptcy Court shall retain jurisdiction to hear and determine the Trustee's motion to compel payment of such expenses. Pending payment of such expenses by the 1st Lien Lenders, the Trustee shall be authorized to use the Administrative Funds for the purposes set forth in this paragraph.

## Information Regarding Title Insurance Policy

I.    LCPI has heretofore provided the Trustee with a complete copy of that certain Title Insurance Policy number 27-44-94-120334 (the "Title Insurance Policy") issued by Fidelity National Title Insurance Company ("Fidelity") for the benefit of LCPI as administrative agent for the 1st Lien Lenders for the Properties. Promptly upon execution of this Term Sheet LCPI will provide the Trustee with all documents and information reasonably related to the Title Insurance Policy and any and all claims made thereunder so as to allow the Trustee to comply with the requirements of paragraphs J and K below and otherwise to proceed with matters to conclusion.

## Resolution of Senior Liens; Availability of Title Insurance

J.    Promptly following the Settlement Effective Date and after due and proper notice to Fidelity, the parties hereto shall cooperate to file estimation motions with the California Bankruptcy Court (the "Estimation Process") to determine whether any Liens are superior to the 1st Lien Lenders' lien in the applicable Properties and to estimate the amount of any such superior Liens ("Senior Liens"). The Trustee shall afford Fidelity reasonable opportunity to participate in the Estimation Process (including without limitation participation in any process to determine whether a Lien is a Senior Lien), promptly furnish to Fidelity all notices and information reasonably related to the Estimation Process, and otherwise cooperate in all reasonable respects with Fidelity in connection with the Estimation Process and the Title Insurance Policy so as not to adversely affect the rights of LCPI and the 1st Lien Lenders under the Title Insurance Policy. In the event that any Senior Lien is identified pursuant to the Estimation Process and Fidelity shall not have accepted without reservation the

6

defense and payment (as applicable) of such Senior Lien promptly following the conclusion of the Estimation Process:

i. the Trustee shall negotiate with the lienor of such Senior Lien (each, an "Unaccepted Senior Lien") in order to obtain the release of such Senior Lien, and if necessary to obtain such release, the Trustee may elect to make a payment out of the Senior Lien Reserve Funds and/or the Administrative Funds to such lienor in an amount as may be agreed between the Trustee and such lienor, subject in the case of payments out of the Senior Lien Reserve Funds to the approval of the 1st Lien Lenders in their sole discretion (for the avoidance of doubt, the 1st Lien Lenders may elect to withhold approval of such payments in the event that such payments are not proposed to be made in connection with a comprehensive settlement of all Senior Liens); and/or

ii. the Trustee shall confirm one or more Plans that provide that any party holding a Senior Lien not otherwise released pursuant to clause (i) above shall have recourse solely against the proceeds of the Title Insurance Policy and not to the Properties.

In the event that all Senior Liens have been released pursuant to clause (i) above, and/or have had recourse thereunder transferred to the Title Insurance Policy pursuant to clause (ii) above, the Trustee shall be entitled to retain all unused Senior Lien Reserve Funds solely for the benefit of non-Lender administrative and general unsecured claims. In the event that all Senior Liens have not been so released and/or recourse thereunder has not been so transferred, the Trustee shall immediately turn over to the 1st Lien Lenders the balance remaining of the Senior Lien Reserve Funds after deduction for accrued and unpaid legal fees and related expenses related to removal of Senior Liens (see paragraph K(ii) below), and all other aspects of the Term Sheet shall be fully enforceable.

K.   i. In furtherance of the foregoing, in the event that one or more Senior Liens shall have been identified pursuant to the Estimation Process, for so long as this Term Sheet and the Settlement Agreement are in full force and effect and after due and proper notice to Fidelity (the sufficiency of which notice shall be an express finding by the California Bankruptcy Court (and if necessary, the New York Bankruptcy Court) in the Compromise Orders), (a) the Trustee (and any successor in interest) shall have all of the rights, standing and privileges of an "insured claimant" as that term is used under the Title Insurance Policy so that the Trustee (and any successor in interest) can take such actions (on his own behalf in his capacity as Trustee or successor thereto and/or on behalf of LCPI), including but not limited to (1) filing a declaratory relief action in the California Bankruptcy Court to establish whether such Senior Liens are covered by the Title Insurance Policy and (2) commencing litigation and filing claims that will constitute insured claims against the Title Insurance Policy for the purpose of recovering under the Title Insurance Policy in respect of such Senior Liens; and (b) LCPI and the 1st Lien Lenders shall assign to the Trustee their respective rights under the Title Insurance Policy to receive proceeds thereof relating to such Senior Liens, and in

7

connection therewith, take such actions as are reasonably necessary to accomplish such assignment. Notwithstanding anything to the contrary contained herein, nothing in this Term Sheet or the Settlement Agreement shall constitute a representation or warranty by LCPI or the 1st Lien Lenders that Fidelity will accept, acknowledge or agree to the matters contemplated by this subparagraph K(i).

    ii. The Trustee anticipates that significant professional fees and expenses will be incurred in connection with the Trustee's efforts to recover under the Title Insurance Policy and/or negotiate with the lienors of Unaccepted Senior Liens, as the case may be. To the extent that the Trustee is successful in resolving the Senior Liens through such efforts, such resolution will inure to the primary benefit of the 1st Lien Lenders. Consequently, the Trustee shall have the right to utilize a portion of the Senior Lien Reserve Funds not to exceed $250,000 as necessary to pay reasonable legal fees and reasonable related expenses in connection with such efforts with such fees and expenses subject to approval of the California Bankruptcy Court.

    iii. Upon the sale of the Properties free and clear of all Liens pursuant to the Plan as provided in paragraph E above, the Trustee shall be entitled to retain the remaining balance of the Senior Lien Reserve Funds for the benefit of all non-Lender creditors and any and all proceeds from the Title Insurance Policy. Alternatively, if the Properties are sold subject to any Senior Liens, the balance of the Senior Lien Reserve Funds shall be transferred to the 1st Lien Lenders and any and all proceeds from the Title Insurance Policy shall be paid to LCPI for the benefit of the 1st Lien Lenders.

**Support of the Plan**

L.    LCPI hereby agrees that, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan, which Disclosure Statement and other solicitation materials (A) implement this Term Sheet and the terms of the Settlement Agreement and (B) are not otherwise materially inconsistent with such terms, it being recognized that the Settlement Agreement shall not constitute an agreement by LCPI to take any step or action that would violate any provision of applicable bankruptcy law or any other applicable laws, and to the extent any provision hereof shall be construed as constituting such a violation, such provision shall be deemed stricken herefrom and of no force and effect without liability to any of the parties, LCPI will, as promptly as practicable following the California Bankruptcy Court's approval of the Disclosure Statement and solicitation materials, present the Plan and related materials to the 1st Lien Lenders and recommend that the 1st Lien Lenders vote to accept the Plan, provided that to the extent the Plan contains additional terms and provisions unrelated to the substantive provisions of the Term Sheet and the Settlement Agreement, such additional terms and provisions are acceptable to LCPI and the 1st Lien Lenders. Also, subject to the occurrence of the Settlement Effective Date, LCPI and those other 1st Lien Lenders who have signed this Term Sheet agree, prior to the occurrence of a Termination Event, not to vote in favor of any other plan

that fails to incorporate the substantive provisions of this Term Sheet and the Settlement Agreement until such time (if any) as the provisions set forth in paragraph R below are in effect.

M.    All 1st Lien Lenders who are on the "steering committee" shall be parties to the Settlement Agreement. All parties to the Settlement Agreement agree, prior to the occurrence of a Termination Event, to support confirmation of the Plan provided the same is consistent in all material respects with the terms of the Term Sheet and the Settlement Agreement and does not contain material terms and provisions which have not been approved by LCPI and the "steering committee" of 1st Lien Lenders. Notwithstanding anything to the contrary contained herein, nothing in this Term Sheet or the Settlement Agreement shall constitute a representation or warranty by LCPI that the 1st Lien Lenders will vote in favor of the Plan by the requisite majorities under the Bankruptcy Code to obtain acceptance of the Plan by the class of 1st Lien Lenders nor shall LCPI have any liability in respect of such voting by the 1st Lien Lenders.

N.    Nothing contained in this Term Sheet or Settlement Agreement shall limit or interfere, in any way, with the ability of any 1st Lien Lender or member of the "steering committee" to transfer or assign its interests under the First Lien Credit Agreement. However, if such transferor or assignor has signed this Term Sheet, its transferees or assignees shall be bound by the provisions of this Agreement to the same extent such transferor or assignor was bound thereby. The transfer or assignment of all or part of such transferor's or assignor's interests under the First Lien Credit Agreement shall constitute a novation, whereby, such transferor or assignor shall automatically receive a release of its obligations under this Term Sheet and any Settlement Agreement by and to the same extent that its transferee or assignee is bound by the provisions of this Term Sheet and any Settlement Agreement.

<u>Key Plan Provisions</u>.

O.    The 1st Lien Lenders will be classified as a separate class under the Plan.

P.    The Plan will provide that the Trustee will sell the Properties (including without limitation any related personal property) pursuant to 11 U.S.C. Section 1123(a)(5)(d) to the 1st Lien Lenders and/or one or more successful third party Qualified Bidders under the Overbid Procedures, as the case may be, free and clear of Liens for the aggregate amount of $62 million by way of credit bid (or such other amount by way of cash bid as may be assented to by the 1st Lien Lenders in the case of a successful third party Qualified Bidder) as set forth in the Bidding Procedures.

Q.    The Plan will provide that until such time as the earliest to occur of (a) all holders of allowed claims, other than the Lenders, have been paid in full the allowed amounts of their respective claims according to their respective legal priorities, (b) the Lenders have been paid the full amount of their allowed claims, or (c) the Settlement Agreement or this Term Sheet terminates in accordance with their respective terms,

any recovery of proceeds from any avoidance action, litigation (including, without limitation, litigation in respect of any claims of fraudulent conveyance), asset disposition (excluding the sale of the Properties), or other recovery by the Trustee prior to or after Plan confirmation (the "Other Recoveries"), after payment in full of all allowed administrative and other priority unsecured claims in all four of the SunCal Bankruptcy Cases (collectively, the "Unsecured Priority Claims"), shall be split 50/50 between the 1st Lien Lenders (based on the understanding of the parties hereto that, and only if, all such proceeds would be distributed to the 1st Lien Lenders under the Intercreditor Agreement, defined below in this paragraph) and the holders of allowed claims other than the Lenders (the "Trade Creditors", which term excludes any and all claims by the Lenders). The portion of the Other Recoveries that is allocated to the Trade Creditors (the "Trade Creditor Allocation") shall be distributed to Trade Creditors pursuant to a confirmed administratively-consolidated chapter 11 plan on a pro rata basis among those Trade Creditors based on the allowed amount of their respective claims. Distributions to Trade Creditors shall be made out of a single fund consisting of Other Recoveries that shall be administered by an appropriate fiduciary. This division of Other Recoveries shall be enforceable in the Bankruptcy Courts and any court of competent jurisdiction notwithstanding (1) the effect or terms of any agreement among the Lenders; (2) that assets, claims or causes of action may be held or pursued on behalf of one or only some of the Debtors; and (3) that Parent Debtor has few if any creditors other than the Lenders. After all Trade Creditors of the Debtors' estates are paid in full, the balance of the funds in the Debtors' estates, if any, shall be distributed to the Lenders in accordance with their respective priorities but subject to that certain Amended and Restated Intercreditor Agreement among the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders, dated as of February 6, 2007 (the "Intercreditor Agreement"). If the foregoing allocations are either altered without the consent of the parties hereto or not approved by one or both of the Bankruptcy Courts, then any allowed unsecured claim of the 1st Lien Lenders shall be deemed assigned to the Debtors' bankruptcy estates (the "Assigned 1st Lien Lenders' Claim") for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the Lenders, but without representation or warranty and only for the purpose of effectuating the distributions provided for in this paragraph Q. The proceeds from the Assigned 1st Lien Lenders' Claim shall be distributed first, to all unpaid Unsecured Priority Claims and second, to all Trade Creditors on a pro rata basis. After all of the Unsecured Priority Claims and Trade Creditors are paid in full, the remaining proceeds from the Assigned 1st Lien Lenders' Claim shall be paid to the 1st Lien Lenders.

R.    The Trustee shall be entitled to, and shall recover and receive from each Gross Recovery (hereinafter defined) that the 1st Lien Lenders receive from subsequent dispositions of the Properties by the 1st Lien Lenders the lesser of (1) the amount sufficient to pay in full the allowed amount of the claims of the holders of allowed claims other than the Lenders to the extent not previously paid, and (2) 3.5% of such Gross Recovery (the "Trustee's Participation"); provided that at the time of any such subsequent disposition the holders of allowed claims other than the Lenders shall not have otherwise been paid the full allowed amount of their claims. The Trustee's Participation in each portion of any Gross Recovery that consists of cash shall be

immediately due and payable to the Trustee from the 1st Lien Lenders in cash upon the 1st Lien Lenders' receipt of such portion of the applicable Gross Recovery. The Trustee's Participation shall be transferred to the Trustee free and clear of Lender liens for the sole benefit of all allowed non-Lender unsecured claims. As used herein, "Gross Recovery" shall mean all cash and other property actually received by the 1st Lien Lenders, or any of their affiliates or principals, either directly or indirectly, from the disposition of each Property, including the proceeds from the sale of any of the Properties under Paragraph E to a party other than the 1st Lien Lenders, whether such proceeds are received in a single lump sum or on a piecemeal basis over time, excluding cash and other property used to satisfy any Senior Liens not otherwise satisfied under the Title Insurance Policy or the Plan. For the avoidance of doubt, in the case of such property actually received that consists of promissory notes and/or equity interests (direct or indirect) in any entities taking title to the Properties, the Trustee shall be entitled to receive, at the time such promissory notes and/or equity interests are received by the 1st Lien Lenders or their applicable affiliates or principals, a profits participation or similar right to receive the applicable amount representing the Trustee's Participation from all cash actually received by such entities taking title to each Property from the disposition of such Property and by the Lenders and their applicable affiliates and principals in respect of such promissory notes, which profits participation or similar right shall be provided for in the operating, partnership, or similar governing documents of such entities and in such promissory notes (as the case may be), such provisions to be enforceable by the Trustee. The California Bankruptcy Court shall retain jurisdiction with respect to the determination of the value of any component of each Gross Recovery. Without limiting the foregoing, if the 1st Lien Lenders form a joint venture with, or borrow funds from, any party, including themselves or affiliates to obtain funding necessary to develop one or more of the Properties or to maintain and/or operate the Properties prior to any disposition, the funds required to repay such unaffiliated equity or debt, as the case may be, shall reduce dollar-for-dollar the Gross Recovery for the applicable Properties. The 1st Lien Lenders agree to act in good faith to carry out the terms of this paragraph R and to effectuate this participation interest of the Trustee. The 1st Lien Lenders will, at their sole expense, provide a report and accounting to the Trustee or the Trustee's successor in interest as soon as possible following receipt of Proceeds and shall provide semi-annual financial reports relating to the Properties. In addition, the 1st Lien Lenders will provide such documents and other information reasonably requested by the Trustee or the Trustee's successor in interest to monitor the 1st Lien Lenders' compliance with this paragraph R. Finally, the Plan may contain such other reasonable provisions as may be required to effectuate the performance of the terms of this paragraph R.

S.    The Plan shall provide that as of the effective date of the Plan (i) the Trustee in his capacity as such and the Debtors' estates through the Trustee will be deemed to have released the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders) and, subject to the last sentence of this paragraph S, their respective affiliated parties, officers, directors, employees, agents and attorneys, and (ii) LCPI (in its individual capacity as a 1st Lien Lender and in its capacity as administrative agent for the 1st Lien Lenders but not in any other

11

capacity) and the 1st Lien Lenders will be deemed to have released the Debtors' estates and the Trustee, for and from all claims (as defined in section 101(5) of the Bankruptcy Code and including any claims that could be brought by or against the Trustee pursuant to the Bankruptcy Code) and causes of action other than distribution and other rights as set forth above. Notwithstanding the foregoing and for the avoidance of doubt, the releases to be exchanged shall not include claims and causes of action against any third parties other than the 1st Lien Lenders and LCPI and their respective affiliated parties, officers, directors, employees, agents and attorneys acting in their capacities as lenders, agents, loan administrators or advisors thereto, and such releases specifically shall *not* include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"); SCC Acquisitions, Inc. ("SCC Inc."); SCC Acquisitions, LLC ("SCC LLC"); or SCC Ranch Ventures LLC (collectively with SCC Inc. and SCC LLC, "SCC") or any claims related to the acts of the owners of any of the Debtors including any transfers of funds by any of the owners of any of the Debtors.

**Certain Rights and Releases Upon Termination Event**

T.    If a final order confirming the Plan shall not have been obtained by [January 15], 2010 (or such later date as may be mutually agreed upon by the Trustee, LCPI and the Creditors' Committee, such later date in no event to be later than [January 29], 2010) or this Term Sheet or the Settlement Agreement shall otherwise terminate in accordance with their respective terms (any of the foregoing events, a "Termination Event"), then:

   i.    The 1st Lien Lenders immediately will be granted relief from stay to foreclose on the Properties. The Bankruptcy Court will grant this relief upon the presentation of an order by LCPI, accompanied by a declaration signed by an authorized representative of LCPI, confirming that a Termination Event has occurred. No party in interest, including without limitation the Trustee and the Creditors' Committee, shall be entitled to or permitted (A) to challenge the presentation of or entry of the order granting LCPI relief from stay with respect to the Properties, except to the extent no Termination Event has in fact occurred or (B) to challenge or otherwise interfere with the foreclosure of the Properties. Upon the entry of such order, the Trustee shall cooperate with the 1st Lien Lenders' foreclosure actions.

   ii.   The Trustee shall retain the Administrative Funds free from the secured claims of the Lenders.

   iii.  The 1st Lien Lenders shall retain the 1st Lien Lenders Retained Settlement Funds and the Trustee shall immediately pay over to the 1st Lien Lenders (A) the unused portion of the Senior Lien Reserve Funds, (B) the unused portion of the Remaining Development Funds, and (C) the unused portion of the Trustee Loss Collateral, in each case free and clear of any claims or interests (including without limitation any right to recovery) of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors.

iv. Without any further order of or action by the Bankruptcy Court, (A) the Debtors' estates through the Trustee shall be deemed to have released the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders), and their respective affiliated parties, officers, directors, employees, agents and attorneys, and (B) LCPI (in its individual capacity as a 1st Lien Lender and in its capacity as administrative agent for the 1st Lien Lenders but not in any other capacity) and the 1st Lien Lenders will be deemed to have released the Debtors' estates and the Trustee, in each case for and from all claims (as defined in Section 101(5) of the Bankruptcy Code and including any claims that could be brought by or against the Trustee pursuant to the Bankruptcy Code) other than the allowance of the Lenders' claims as set forth in paragraph B above and the rights to receive distributions based on those allowed claims, and for the rights set forth in this paragraph T. Notwithstanding the foregoing and for the avoidance of doubt, the releases to be exchanged shall be broad but also shall preserve any of the Trustee or the Debtors' estates' claims against any third parties other than the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders) and their respective affiliated parties, officers, directors, employees, agents and attorneys, and shall *not* include a release of LBREP Lakeside or SCC.

v. LCPI and the 1st Lien Lenders shall in no event be deemed to have waived any right to object to the substantive consolidation of the Debtors' cases.

vi. The Trustee shall execute and deliver to LCPI any and all instruments and documents necessary to terminate and/or assign back to LCPI, as applicable, all rights, standing and privileges of the Trustee as an "insured claimant" under the Title Insurance Policy and all rights to receive proceeds thereof assigned to the Trustee pursuant to subparagraph K(i) above.

vii. Except as provided in this paragraph T, this Term Sheet and the Settlement Agreement shall be of no further force or effect, including any obligation contained in paragraphs L and M.

## No Substantive Consolidation

U.    The parties hereto acknowledge and agree that neither any provision of this Term Sheet nor any of the transactions contemplated herein, including without limitation the contemplated terms and provisions of the Settlement Agreement and the Plan, do nor shall (i) effect substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors, (ii) suggest that any such substantive consolidation is or might be possible, or (iii) affect the right of the 1st Lien Lenders to object to the substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors. However, nothing here shall constitute a waiver of the rights of the parties to seek substantive consolidation of one or more of the Debtors if such is necessary or appropriate in the interests of creditors.

[Signatures appear on the following page]

13

Dated: _9/24/2009_

_____

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee
of the administratively consolidated estates
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

[Signatures continue on the following page]

34

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

By: _____

Lennar Homes of California, Inc., solely in its capacity as chairperson

By: _____                    Dated: _10/7/09_

VICE PRESIDENT

[Signatures continue on the following page]

LEHMAN COMMERCIAL PAPER INC., as
administrative agent of the 1st Lien Lenders
to LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

By: _____          Dated: _8/27/09_
Name:
Title: Its Authorized Signatory

[Signatures continue on the following page]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

LEHMAN COMMERCIAL PAPER INC., as
1st Lien Lender

By:

Name:

Title:

Dated: _8/27/09_

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:

Grayson CLO, Ltd.
By: Highland Capital Management, L.P.,
As Collateral Manager
By: Strand Advisors, Inc.,
Its General Partner

Dated: 8/10/2009

By: _____
Name:     JASON POST
Title:     OPERATIONS DIRECTOR

[Signature page to SunCal Pool I – Chapter 11 Settlement Term Sheet]

38

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:

Highland Credit Opportunities CDO Ltd
By:  Highland Capital Management, L.P.,
As Collateral Manager
By:  Strand Advisors, Inc.,
Its General Partner

[ _____ ]

By: _____

Name:         JASON POST

Title:         OPERATIONS DIRECTOR

Dated: 8/10/2009

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:                     Highland Offshore Partners, L.P.
                                     By: Highland Capital Management, L.P., As Collateral Manager
                                     By: Strand Advisors, Inc., Its General Partner

[                    ]

By: _____              Dated: 8/10/2009
  Name:        JASON POST
  Title:    OPERATIONS DIRECTOR

[Signature page to SunCal Pool I – Chapter 11 Settlement Term Sheet]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:                    Loan Star State Trust
                                    By: Highland Capital Management, L.P., As Collateral Manager
                                    By: Strand Advisors, Inc., Its Investment Advisor

[_____]

By: _____                    Dated: _8/10/2009_
Name:        JASON POST
Title:       OPERATIONS DIRECTOR

[Signature page to SunCal Pool I – Chapter 11 Settlement Term Sheet]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:     Longhorn Credit Funding, LLC
                     By: Highland Capital Management, L.P., As Collateral Manager
                     By: Strand Advisors, Inc.
[_____       Its General Partner

By: _____                    Dated: 8/10/2009
    Name:       JASON POST
    Title:    OPERATIONS DIRECTOR

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

                                                  Red River CLO Ltd.
                                                  By: Highland Capital Management, L.P.
1ST LIEN LENDER:           As Collateral Manager
                                                  By: Strand Advisors, Inc., Its General Partner

[_____]

By: _____                 Dated: _8/10/2009_
  Name:      JASON POST
  Title:    OPERATIONS DIRECTOR

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:

Rockwall CDO LTD.
By:  Highland Capital Management, L.P.
As Collateral Manager
By: Strand Advisors, Inc., It's General Partner

[_____]

By: _____          Dated: _8/10/2009_
Name:        JASON POST
Title:     OPERATIONS DIRECTOR

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:

Rockwall CDO II Ltd,
By:  Highland Capital Management, LP.,
As Collateral Manager
By:  Strand Advisors, Inc.,
Its General Partner

[                                    ]

By: _____          Dated: 8/10/2009
Name:          JASON POST
Title:         OPERATIONS DIRECTOR

[Signature page to SunCal Pool I – Chapter 11 Settlement Term Sheet]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:    Westchester CLO, Ltd
By: Highland Capital Management, L.P., As Collateral Servicer
By: Strand Advisors, Inc., Its General Partner

[                                          ]

By: _____        Dated: _8/10/2009_
Name:    JASON POST
Title:    OPERATIONS DIRECTOR

[Signature page to SunCal Pool I – Chapter 11 Settlement Term Sheet]

46

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

[ FIRST TRUST/HIGHLAND CAPITAL FLOATING RATE INCOME FUND ]


By: _____          Dated: ____08/12/2009____
      Name:  M. JASON BLACKBURN
      Title:   AUTHORIZED SIGNATORY

[ Signature page to SunCal Pool I – Chapter 11 Settlement Term Sheet ]

47

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

[ HIGHLAND CREDIT STRATEGIES FUND ]


By: _____          Dated: ___08/12/2009___

   Name:  M. JASON BLACKBURN
   Title:   SECRETARY & TREASURER

[ Signature page to SunCal Pool I – Chapter 11 Settlement Term Sheet ]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

[ HIGHLAND FLOATING RATE ADVANTAGE FUND ]

By: _____     Dated: ___08/12/2009___
   Name:  M. JASON BLACKBURN
   Title:  SECRETARY & TREASURER

[ Signature page to SunCal Pool I – Chapter 11 Settlement Term Sheet ]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

[ HIGHLAND FLOATING RATE FUND ]


By: _____          Dated: ___08/12/2009___
    Name:  M. JASON BLACKBURN
    Title:  SECRETARY & TREASURER

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:

[ PACIFIC SELECT FUND – FLOATING RATE LOAN PORTFOLIO ]

By: _____          Dated: ___08/12/2009___
  Name:  M. JASON BLACKBURN
  Title:   AUTHORIZED SIGNATORY

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

[ istar Financial ]

By: _____          Dated: _____
Name:
Title:
　　　Steve Magee
　　　Senior Vice President

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

BANK MIDWEST, N.A.


By: _____          Dated: 7-22-09
Name:  John Price
Title:   Executive Vice President

EXHIBIT A

BUDGET

[See Attached]

EXH. A