## Exhibit D

May 12, 2010 Transcript

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.

　　　　　Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.

　　　　　Debtor.

- - - - - - - - - - - - - - - - - - - -x

　　　　　United States Bankruptcy Court

　　　　　One Bowling Green

　　　　　New York, New York


　　　　　May 12, 2010

　　　　　10:07 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

 1

 2    HEARING re Conference re: Alternative Dispute Resolution

 3    Procedures for Affirmative Claims of Debtors Under Derivatives

 4    Contracts

 5

 6    HEARING re Debtors' Motion for Authority to Compromise

 7    Controversy in Connection with a Repurchase Transaction with

 8    Fenway Capital, LLC and a Commercial Paper Program with Fenway

 9    Funding, LLC

10

11    HEARING re Motion of the SunCal Debtors for Order Determining

12    that Automatic Stay Does Not Apply; or, in the Alternative,

13    Relief from the Automatic Stay

14

15    HEARING re Motion of Debtors and Debtors in Possession for

16    Entry of an Order to Consolidate Certain Proceedings and

17    Establish Related Procedures

18

19    HEARING re Debtors' Motion to Compel Performance by Norton Gold

20    Fields Limited of its Obligations Under an Executory Contract

21    and to Enforce the Automatic Stay

22

23

24

25

3

1

2  HEARING re LBSF v. BNY Corporate Trustee Services Ltd. [Adv.

3  Case No. 09-01242] - Status Conference re Motion and Memorandum

4  of Law of Defendant BNY Corporate Trustee Services Limited in

5  Support of its Motion for Entry of an Order, or, Alternatively,

6  to Reopen and Reargue the Parties' Cross-Motions for Summary

7  Judgment

8

9  HEARING re Neuberger Berman v. PNC Bank, NA, et al. [Case No.

10  09-01258] - Status Conference re COMPLAINT FOR INTERPLEADER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

4

1

2   A P P E A R A N C E S :

3

4   WEIL, GOTSHAL & MANGES LLP

5       Attorneys for Debtor and Debtors-in-Possession

6       767 Fifth Avenue

7       New York, NY 10153

8

9   BY:   PETER GRUENBERGER, ESQ.

10       RICHARD W. SLACK, ESQ.

11

12   WEIL, GOTSHAL & MANGES LLP

13       Attorneys for Debtor and Debtors-in-Possession

14       700 Louisiana

15       Suite 1600

16       Houston, TX 77002

17

18   BY:   ALFREDO R. PEREZ, ESQ.

19

20

21

22

23

24

25

5

1

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for Debtor and Debtors-in-Possession

4         1300 Eye Street, N.W.

5         Suite 900

6         Washington, DC 20005

7

8    BY:   RALPH I. MILLER, ESQ.

9

10   JONES DAY

11        Special Counsel for the Debtors

12        222 East 41st Street

13        New York, NY 10017

14

15   BY:   JAYANT W. TAMBE, ESQ.

16        AVIVA W. SISITSKY, ESQ.

17

18   MILBANK, TWEED, HADLEY & MCCLOY LLP

19        Attorneys for Official Committee of Unsecured Creditors

20        One Chase Manhattan Plaza

21        New York, NY 10005

22

23   BY:   EVAN R. FLECK, ESQ.

24        DENNIS C. O'DONNELL, ESQ.

25

6

1

2   MILBANK, TWEED, HADLEY & MCCLOY LLP

3        Attorneys for Official Committee of Unsecured Creditors

4        International Square Building

5        1850 K Street, NW

6        Washington, DC 20006

7

8   BY:   DAVID S. COHEN, ESQ.

9        WILBUR FOSTER, ESQ.

10

11  HUGHES HUBBARD & REED LLP

12        Attorneys for SIPA Trustee

13        One Battery Park Place

14        New York, NY 10004

15

16  BY:   JEFFREY S. MARGOLIN, ESQ.

17

18  U.S. DEPARTMENT OF JUSTICE

19        Office of the United States Trustee

20        33 Whitehall Street

21        21st Floor

22        New York, NY 10004

23

24  BY:   ANDREW D. VELEZ-RIVERO, ESQ.

25

7

1

2    BUCHANAN INGERSOLL & ROONEY PC

3           Attorneys for PNC Bank, National Association

4           One Oxford Centre

5           20th Floor

6           301 Grant Street

7           Pittsburgh, PA 15219

8

9    BY:   KATHLEEN J. GOLDMAN, ESQ.

10

11   DEWEY & LEBOEUF LLP

12          Attorneys for Fenway Capital and Fenway Funds

13          1301 Avenue of the Americas

14          New York, NY 10019

15

16   BY:   RICHARD W. REINTHALER, ESQ.

17          IRENA M. GOLDSTEIN, ESQ.

18

19   GIBSON DUNN & CRUTCHER LLP

20          Attorneys for BNY Corporate Trustee Services Limited

21          200 Park Avenue

22          4th Floor

23          New York, NY 10166

24

25   BY:   RANDY M. MASTRO, ESQ.

8

1

2    MILLER BARONDESS, LLP

3         Special Litigation Counsel for SunCal Debtors

4         1999 Avenue of the Stars

5         Suite 1000

6         Los Angeles, CA 90067

7

8    BY:   LOUIS R. MILLER, ESQ.

9          MARTIN H. PRITIKIN, ESQ.

10

11   REED SMITH LLP

12        Attorneys for BNY Corporate Trustee Services Limited

13        599 Lexington Avenue

14        New York, NY 10022

15

16   BY:   ERIC A. SCHAFFER, ESQ.

17

18

19

20

21

22

23

24

25

9

```
 1
 2    SHEARMAN & STERLING LLP
 3         Attorneys for Nomura International plc and Nomura
 4          Securities Co., Ltd.
 5         599 Lexington Avenue
 6         New York, NY 10022
 7
 8    BY:   DOUGLAS P. BARTNER, ESQ.
 9          SOLOMON J. NOH, ESQ.
10          DANIEL LEWIS, ESQ.
11
12    SHEPPARD MULLIN RICHTER & HAMPTON, LLP
13         Attorneys for Norton Gold Fields Limited
14         30 Rockefeller Plaza
15         24th Floor
16         New York, NY 10112
17
18    BY:   EDWARD H. TILLINGHAST, III, ESQ.
19          BLANKA K. WOLFE, ESQ.
20
21
22
23
24
25
```

```
                                                              10
 1

 2     STROOCK & STROOCK & LAVAL LLP

 3          Attorneys for Neuberger Berman Management, LLC

 4          180 Maiden Lane

 5          New York, NY 10038

 6

 7     BY:   BENJAMIN I. RUBINSTEIN, ESQ.

 8

 9     WHITE & CASE LLP

10          Attorneys for the Ad Hoc Group of Lehman Brothers

11           Creditors

12          1155 Avenue of the Americas

13          New York, NY 10036

14

15     BY:   GERARD UZZI, ESQ.

16

17     WINTHROP COUCHOT PROFESSIONAL CORPORATION

18          Attorneys for the SunCal Voluntary Debtors

19          660 Newport Center Drive

20          Fourth Floor

21          Newport Beach, CA 92660

22

23     BY:   SEAN A. O'KEEFE, ESQ.

24          PAUL J. COUCHOT, ESQ. (TELEPHONICALLY)

25
```

11

```
 1

 2     BROWN RUDNICK LLP

 3          Attorneys for Ad Hoc Group of Lehman Brothers Creditors

 4          One Financial Center

 5          Boston, MA 02111

 6

 7     BY:   ANGELO THALASSINOS, ESQ.

 8          (TELEPHONICALLY)

 9

10     CHAPMAN & CUTLER LLP

11          Attorneys for U.S. Bank

12          111 West Monroe Street

13          Chicago, IL 60603

14

15     BY:   JAMES HEISER, ESQ.

16          FRANKLIN H. TOP III, ESQ.

17          (TELEPHONICALLY)

18

19

20

21

22

23

24

25
```

12

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for Goldman Sachs Bank, USA and Goldman Sachs

4          International

5         2000 Pennsylvania Avenue, NW

6         Washington, DC 20006

7

8    BY:   BENJAMIN MEEKS, ESQ.

9         (TELEPHONICALLY)

10

11   IRELL & MANELLA LLP

12         Attorneys for Official Committee of Unsecured Creditors

13         840 Newport Center Drive

14         Suite 400

15         Newport Beach, CA 92660

16

17   BY:   ALAN J. FRIEDMAN, ESQ.

18         (TELEPHONICALLY)

19

20

21

22

23

24

25

13

```
 1

 2    LEO & WEBER, P.C.

 3          Attorneys for Liberty Mutual

 4          One N. LaSalle Street

 5          Suite 3600

 6          Chicago, IL 60602

 7

 8    BY:   T. SCOTT LEO, ESQ.

 9          (TELEPHONICALLY)

10

11    MILLER STARR & REGALIA PLC

12          Attorneys for Miller Starr & Regalia

13          1331 North California Boulevard

14          Walnut Creek, CA 94596

15

16    BY:   TARA C. NARAYANAN, ESQ.

17          (TELEPHONICALLY)

18

19

20

21

22

23

24

25
```

14

1

2       PACHULSKI STANG ZIEHL & JONES LLP

3              Special Counsel to the Debtors and Debtors-in-Possession

4              10100 Santa Monica Boulevard

5              11th Floor

6              Los Angeles, CA 90067

7

8       BY:    DEAN A. ZIEHL, ESQ.

9              (TELEPHONICALLY)

10

11      STUTMAN TREISTER & GLATT LLP

12              Attorneys for Perry Capital

13              1901 Avenue of the Stars

14              12th Floor

15              Los Angeles, CA 90067

16

17      BY:    MARINA FINEMAN, ESQ.

18              JEFFREY H. DAVIDSON, ESQ.

19              WHITMAN L. HOLT, ESQ.

20              (TELEPHONICALLY)

21

22

23

24

25

15

P R O C E E D I N G S

1

2      THE COURT:  Be seated, please.  Well, you're in the

3  position to give a report.

4      MR. GRUENBERGER:  Yes, Your Honor.  Good morning.

5      THE COURT:  Good morning.

6      MR. GRUENBERGER:  Peter Gruenberger, Weil Gotshal &

7  Manges for the debtors.  May it please the Court.  I'll be very

8  brief.  We are here today regarding Your Honor's ADR procedures

9  order that governs debtors' affirmative claims under

10  derivatives contracts with counterparties.  And particularly,

11  paragraph 10 of that order which requires that a monthly report

12  be submitted to Your Honor giving a scorecard of how we're

13  doing.

14      Your Honor issued that order on September 17, 2009.

15  It took a few weeks to get going but we've been in full swing

16  now for about six months.  We and the creditors' committee

17  concurred that with this six-monthly report that I submitted

18  yesterday, we would put it on the docket so all interested

19  parties could see the progress that we were making in this

20  effort.

21      As the report to you demonstrates, the process is very

22  much alive and healthy as we both predicted back in September

23  when you signed the order.  As of yesterday, forty-five ADR

24  notices were served on seventy-one different counterparties.

25  We had achieved as of yesterday ten settlements, four after-

16

1    mediations and six pre-mediations in the ADR process.  Had I

2    waited two more hours, we could have added another success to

3    that scorecard because the fifth mediation came through with a

4    settlement.  So now we're batting one thousand, five of five in

5    mediations and have eleven settlements involving fifteen

6    counterparties.

7         So we have added to date thirty-nine million new

8    dollars to the treasury of the debtors' estates for the benefit

9    of all creditors.  And we are going strong.  We have eight more

10   mediations scheduled over the next six weeks.  And we will

11   report monthly.  And I would hope that we could, every six

12   months perhaps, post the status report on the docket and make a

13   report to Your Honor, if that's okay.

14        THE COURT:  I appreciate that.  Let me just ask you

15   this question.

16        MR. GRUENBERGER:  Certainly.

17        THE COURT:  Obviously, the successful outcomes speak

18   for themselves.  But in terms of procedure, is the ADR

19   procedure working well in terms of efficiency and are there any

20   areas needing improvement?

21        MR. GRUENBERGER:  I would say, overall, it's very

22   efficient.  There are some bumpy spots where parties,

23   especially parties in different parts of the world cannot

24   communicate as quickly as one would like in a perfect world,

25   but it's not a perfect world.  And so we ride with those bumps.

17

1    and we overcome the hurdles.  The mediators are working hard.

2    The creditors committee and we are getting along well.  And I

3    see no gross inefficiencies whatever.  I think that maybe over

4    the next six months I can report more fully but there's no

5    complaints out of any court from anyone.

6              THE COURT:  Good.  I appreciate that.  Is there anyone

7    else who wishes to be heard on this subject?  Fine.

8              MR. GRUENBERGER:  Thank you.

9              THE COURT:  Let's move on to the next part.  And, Mr.

10   Gruenberger, if you wish to be excused, you may be; if you wish

11   to stay, you're welcome to stay.

12             MR. GRUENBERGER:  Thank you, Your Honor.

13             MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

14   on behalf of the debtors.  And I'm here on the debtors' motion

15   for authority to compromise with Fenway, docket number 7831.

16   May I proceed?

17             THE COURT:  Sure.

18             MR. PEREZ:  Your Honor, this is a 9019 motion in which

19   LCPI and LBHI seek -- on the one hand, seek to compromise and,

20   basically, do away with the Fenway structure.  And it involves

21   a settlement with Fenway, Fenway Funding -- Fenway Capital and

22   Fenway Funding, Hudson Castle and the trustee or the

23   administrator which is Deutsche Bank.

24             Your Honor, we have received one objection to it from

25   the SunCal debtors.  Both the unsecured creditors' committee

18

1    has filed statements in support as has Fenway.

2           Your Honor, last night, we received and was filed on

3    the record a withdrawal of the objection on behalf of the

4    SunCal involuntary debtors.  I don't know if the Court's aware

5    of that.

6           THE COURT:  I'm aware of it but I'm not sure if it was

7    a withdrawal on behalf of the SunCal voluntary debtors or the

8    trustee.

9           MR. PEREZ:  The trustee, Your Honor.  It's the -

10          THE COURT:  It was from Lobel.

11          MR. PEREZ:  From Mr. Lobel.  It's on behalf of the

12   trustee.

13          THE COURT:  I didn't understand it because it was a

14   withdrawal without prejudice.  I don't know what that means.

15          MR. PEREZ:  Well, Your Honor, I think what that means

16   is that the debtors and the trustee are in the process of

17   documenting a settlement that would resolve all the disputes

18   between the Lehman debtors and the trustee.  And the key fact

19   about that, Your Honor, is that the property which the trustee

20   controls is about seventy-five percent of the value of the

21   SunCal debtors.  So we're talking about we're on the verge of

22   finalizing and documenting a settlement with the party that has

23   the vast majority of the SunCal assets.

24          THE COURT:  All right.

25          MR. PEREZ:  So -- and not --

19

1          THE COURT:  Let me just ask if the trustee is

2    represented in court today or on the telephone.

3       (Pause)

4          THE COURT:  Apparently, yes.

5          MR. O'KEEFE:  Actually, Your Honor, I represent the

6    voluntary SunCal debtors.

7          THE COURT:  You represent --

8          MR. O'KEEFE:  The voluntary SunCal debtors not the

9    involuntary debtors, although I could speak to the issue from a

10   knowledge perspective but not on behalf of the trustee.

11         THE COURT:  All right.  So there's no one here acting

12   as local counsel for Mr. Lobel and Mr. Lobel is not on the

13   phone?

14         MR. O'KEEFE:  Not to my knowledge, Your Honor.

15         THE COURT:  Okay.  Why don't you proceed?

16         MR. PEREZ:  Thank you, Your Honor.  So, Your Honor, I

17   think this is a key development not only as it relates to this

18   motion but, absolutely, as it relates to the motion of lift

19   stay because they've also withdrawn their request on the motion

20   to lift stay.

21         So, Your Honor, what we have is a situation where --

22   and Fenway has obviously been the subject of a lot of scrutiny

23   recently.  But it's a structure whereby LCPI repo'd certain

24   assets to Fenway.  Fenway then, in turn, issued a commercial

25   paper note that was purchased by LBHI.  I have a chart.  It's

20

1    similar to the chart that was attached to one of the pleadings,

2    Your Honor.  If I may approach?

3            THE COURT:  Sure.  Thank you.

4            MR. PEREZ:  But, in essence, Your Honor, it's a very

5    simple chart.  LCPI repo'd the assets to Fenway Capital.

6    Fenway Capital issued a variable funding note to Fenway

7    Funding.  Fenway Funding then issued commercial paper.  That

8    commercial paper was purchased by LBHI.  Approximately three

9    billion dollars.  Those -- that commercial paper was pledged to

10   JPMorgan.  And, Your Honor, the reason we can undo the

11   structure currently is because as a result of the JPM

12   agreement, the CDA, we now have -- LBHI now has that commercial

13   paper.

14           So the goal, Your Honor, is to reduce the cost

15   associated with the Fenway structure, be able to deal with the

16   assets directly.  SunCal is about half of the three billion in

17   Fenway assets.  In connection with that, there are other

18   assets, some of them not even real estate related, that sit in

19   the Fenway structure that LCPI and LBHI need to deal with.

20           THE COURT:  What's the Hudson Castle involvement with

21   this?

22           MR. PEREZ:  Your Honor, Hudson Castle -- and Ms.

23   Goldstein is here and could address this.  But Hudson Castle is

24   basically the manager of the Fenway structure, Your Honor.

25           So, to some extent, what we've done here is just a

21

1   plain vanilla motion which seeks to not only undo the structure

2   but, very critically, maintain the status quo among the

3   debtors.  That's a critical importance.  As the Court is aware,

4   we filed twenty-three separate plans.  I mean, one document but

5   twenty-three separate plans.  The recovery percentages for the

6   LBHI creditors are different than the recovery percentages for

7   the LCPI creditors.  So we do not want to, in any way, shape or

8   form, affect what the recovery balances would be.  And in

9   connection with that, in the motion as filed, we indicated that

10  LBHI would be tendering the commercial paper notes as the

11  guarantor, 'cause LBHI was on both sides, not only did it buy

12  the commercial paper but it also guarantied LCPI's obligations

13  under the Master Repurchase Agreement.  So they tendered as the

14  guarantor.  They tendered the notes as the guarantor.  And

15  there was a full reservation of rights as between the debtors

16  to make sure that we could allocate the value as was indicated.

17  Subsequent to that, there were -- this was filed on March --

18  mid-March.  The JPMorgan agreement was approved, I think,

19  either shortly thereafter or right around the time we filed it

20  at the March hearing.  Since that time, a bunch of time has

21  passed.  We have further refined the reservation of rights to

22  make sure that we maintain the rights as between the parties.

23  So we filed the supplemental order, the revised order, which

24  made sure that everybody maintained their rights.  And then we

25  also filed a supplement to the motion.  And basically, what the

22

1    supplement did was, at the time that we originally structured

2    the transaction, Fenway and Hudson Castle were getting limited

3    releases.  Deutsche Bank was getting a full release.  Through

4    the supplement to the motion, those releases were further

5    scaled back -- the releases that Fenway and Hudson Castle were

6    getting were further scaled back.  So that's the purpose of

7    those two motions.

8         Now, Your Honor, as I read -- and there's been a lot

9    of paper filed.  But as I read the papers, there's really no

10   objection to the debtors' business judgment in doing this

11   transaction.  I mean, we're going to be saving costs, we're

12   getting rid of structure.  We're going to be able to deal with

13   the assets directly.  I think the objections go to other

14   things, not really related to the business judgment.

15        I have Mr. Fitts here who could talk to the business

16   judgment.  I don't think that's really necessary to put him on

17   because we just really -- there's no allegation that there is

18   any -- that we're not exercising our business judgment.

19        The focus is whether this is being done somehow in bad

20   faith.  And, Your Honor, I submit there's absolutely no

21   evidence that this is being done in bad faith.  I --

22        THE COURT:  Well, consistent with the fact that we

23   have a contested hearing still on this, you might want to

24   proffer the testimony that you have available, both as it

25   relates to the purpose of the transaction and the good faith of

23

1      the transaction and why it's being done now.

2              MR. PEREZ:  Yes, Your Honor.  I could certainly do

3      that.  Your Honor, Mr. Fitts is in the courtroom.  I believe

4      he's testified before.  As the Court is aware, Mr. Fitts is a

5      managing director with Alvarez & Marsal.  He is the co-head of

6      the real estate group at Lehman and he's familiar with this

7      transaction.  He was managing director at GE and was formerly

8      in Citibank's workout group where he had extensive experience

9      since approximately 1988.

10             He's been assigned to the representation of Lehman

11     since September of 2008.  In connection with the Fenway repo

12     and the Fenway commercial paper program, he has reviewed the

13     motion and informed himself of the relevant transaction as

14     embodied in the various documents.

15             He would testify that the assets were repo'd to Fenway

16     and that the goal of this motion is to be able to save the

17     money that's associated with maintaining the structure; that in

18     September of 2008, Fenway Funding issued commercial paper notes

19     to LBHI and that LBHI is the current holder of those notes;

20     that the proposed actions are intended to eliminate the expense

21     and time delay associating with maintaining the programs;

22     eliminating the administrative fees to Deutsche Bank, Hudson

23     Castle and other third parties in connection with maintaining

24     the repo and the commercial program; and enabling LBHI to

25     access certain funds that are currently held at the Fenway

24

1    structure in approximately a little over a million dollars.

2         He would testify that the transaction is done on the

3    basis of arm's length negotiation with Fenway and that the goal

4    would be to put LCPI in the position that it was prior to the

5    time of the funding of the repo maintaining LBHI's interest in

6    the notes.

7         Additionally, Your Honor, Mr. Fitts would testify that

8    as a result of the transaction with JPMorgan Chase that we're

9    able to undo the structure and that there are several other

10   structures that hold real estate assets that now, as a result

11   of the JPMorgan transaction are in the process of being

12   unwound.

13        Mr. Fitts would further testify that this is a

14   reasonable exercise of the debtors' business judgment to

15   alleviate the expense and time delay associated with

16   maintaining both the repo and the commercial paper program;

17   that it was done -- that the transaction is fair and reasonable

18   to the debtors under the circumstances; and that it was the

19   product of protracted arm's length negotiation.

20        LBHI would indemnify Fenway and Hudson Castle with

21   respect to certain activities related to the assets as modified

22   by the supplement to the carve-out of the indemnity and the

23   guaranty.  In addition, they would pay approximately a million

24   six in attorneys' fees to Fenway in connection with the amounts

25   of money that they have expended.

25

1          Mr. Fitts would further testify that the concessions

2     that have been made by LBHI and LCPI are far outweighed by the

3     benefits that LBHI and LCPI would receive as a result of

4     undoing the structure.

5          Your Honor, I don't think -- that would be the

6     conclusion of his testimony.

7          THE COURT:  Is there any objection to my receiving the

8     proffer in evidence in support of the motion?

9          MR. O'KEEFE:  Good morning, Your Honor.  Sean O'Keefe

10    appearing on behalf of the voluntary SunCal debtors.  My only

11    objection is to the extent that the testimony, counsel's

12    characterization of testimony is inconsistent with what is

13    reflected in the motion then I would seek the right to cross-

14    examine Mr. Fitts because the characterization by counsel of

15    certain elements of that transaction is directly contrary to

16    what is reflected in the motion.  And if that's the testimony

17    then I would respectfully ask the Court to have Mr. Fitts take

18    the stand on those limited issues.

19         THE COURT:  If you wish to cross-examine, that's your

20    right.

21         MR. O'KEEFE:  Then I would ask the Court to call him

22    to the stand.

23         MR. PEREZ:  Your Honor, I'm not sure that anything in

24    his testimony contradicted what's in the motion or what's in

25    the transaction.  And, frankly, Your Honor, this is a common

26

1    theme in their objection which I, frankly, don't understand.

2    It's our motion with Fenway.  We can basically file a motion

3    requesting for the Court to do various things.  I'm not sure I

4    understand what the objection is.  I think we've clearly

5    reflected what we want the motion to do, that we want it to

6    preserve the integrity as between LCPI and LBHI.  So I'm not

7    sure what the nature of the objection is.

8           MR. O'KEEFE:  Your Honor --

9           THE COURT:  Well, at the moment, we're dealing with a

10   very limited question which is whether the proffer of Mr.

11   Fitts' testimony is to be accepted as is or whether or not you

12   want the right to cross-examine.  You have the right to cross-

13   examine as an objector regardless of your rationale.  And if

14   you want to have Mr. Fitts on the stand, ask him some

15   questions, he's here.  So we can have him come to the stand.

16   We don't have to have an argument about whether or not you have

17   some basic right to object.  You do.  It doesn't matter what

18   your objection is.  You're a party in interest; you're

19   objecting.  I think I know what your objection's about.  It's

20   about having these loans come into the estate and be subject to

21   the automatic stay and the SunCal litigation in California.

22   Isn't that right?

23          MR. O'KEEFE:  Your Honor, certainly that is our

24   primary concern.  And just to respond to counsel's comment, I,

25   in no way, want to interfere with this transaction except in

27

1    the following limited respect.  I understand --

2         THE COURT:  Well, that means you do want to interfere

3    the transaction.

4         MR. O'KEEFE:  Well, Your Honor, not as stated in the

5    motion.  Not as stated in the motion.  The motion states, "The

6    parties will terminate the MRA".  So the MRA is terminated.  So

7    this contention that a terminated contract can somehow give

8    rise to liens which are provided for therein, that would be my

9    issue.  So if they're saying it's not terminated, that's not

10   what' s in their motion.  They say the guaranty will be

11   terminated.  So we would simply ask them to acknowledge the

12   guaranty is terminated.  And that's the basis for their claims

13   against LCPI.  They also state the CP notes are terminated.

14   That's right here in front of me on page 10.  "The CP notes are

15   terminated."  This exchange, they state, is in full payment of

16   the purchase price under the MRA.  So that transaction is done;

17   it's over.  I think we can all agree you can't have a lien if

18   there's no claim.  You can't have a lien if there's no

19   underlying lien documents.

20        THE COURT:  Well, we're not arguing your objection

21   right now.  We're dealing with, as I said, a very narrow

22   question.  Do you want to examine Mr. Fitts?  If so, we'll call

23   him to the stand now.  If you want to accept the proffer, we

24   can accept the proffer with your rights reserved in terms of

25   what you're arguing about and we can reserve that to argument.

28

1    But that's what's currently in front of me.

2           MR. O'KEEFE:  Well --

3           THE COURT:  It's binary.  We either have Mr. Fitts or

4    we don't have Mr. Fitts as a witness.

5           MR. O'KEEFE:  Your Honor, then we would -- we would

6    reserve our rights.  The only issue is I have a material

7    concern about Your Honor making findings based upon that

8    characterization of the testimony as opposed to what is before

9    us in terms of their motion.

10          THE COURT:  Well, you can certainly argue whatever you

11   want to argue about the reasonable conclusions to be drawn from

12   the record.  And you're also free, if you wish, to call Mr.

13   Fitts to the stand and ask him as many direct questions as you

14   wish.

15          MR. O'KEEFE:  Your Honor --

16          THE COURT:  If you want to simply reserve this to

17   argument, that's fine, too.  It's up to you.

18          MR. O'KEEFE:  We will reserve it, Your Honor.  We

19   understand the standard.  I agree they have a lot of

20   discretion.  And we're certainly not here to interfere with

21   this transaction.  We're not a claimant in this case.  So we

22   haven't asserted standing to get into the issue of the merits.

23          THE COURT:  Oh.  Then why don't you just sit down?

24          MR. O'KEEFE:  I will, Your Honor.

25          THE COURT:  If you acknowledge you don't have

29

1    standing --

2         MR. O'KEEFE:  Only in terms of the issue of their

3    discretion and that transaction.  But to the extent that

4    those -- the assertion of those findings relative to the

5    characterization of the transaction could affect my client then

6    I did have concerns.  And Your Honor is saying that you're

7    inclined to approve the transaction, as I understand it,

8    without making those findings.

9         THE COURT:  No.  I didn't say that.  What I said was

10   that if you have a concern about the proffer and wish to

11   examine the witness in order to make a record that you view to

12   be either more consistent with your understanding of the facts

13   or more helpful to you in the argument you wish to make when we

14   get into the legal argument phase of this, you're free to call

15   the witness.  That's the only thing we're talking about now.

16        MR. O'KEEFE:  Very well, Your Honor.  We will reserve

17   the right for the following motion.

18        THE COURT:  All right.  So I take that as you're not

19   calling Mr. Fitts.  I don't have any questions of Mr. Fitts.  I

20   accept the proffer with such conclusions to be drawn from the

21   proffer as will be determined following argument.

22        MR. O'KEEFE:  Thank you, Your Honor.

23        THE COURT:  Okay.

24        MR. PEREZ:  Your Honor, I'm glad Mr. O'Keefe brought

25   up the question of standing.  And the only reason I raise it is

30

1   because I did -- I'm kind of a newcomer to this whole

2   situation.  So I did look up to see if there had been any

3   proofs of claim filed.  I couldn't find any proofs of claim

4   that had been filed by any of the SunCal debtors one way or

5   another.  So obviously, they filed a motion to lift stay.  But

6   I haven't been able to determine, in fact, what their standing

7   is.  And they certainly haven't filed a proof of claim in this

8   proceeding.

9        (Pause)

10       MR. PEREZ:  Just to continue, Your Honor, as it

11  relates to the indication of bad faith, the committee has

12  reviewed this transaction, has reviewed this transaction

13  extensively.  They have filed two documents in support of the

14  transaction.  There's no indication that there's bad faith.

15  The testimony is that this has been subject of a long

16  negotiation, arm's length negotiation with Fenway.

17       So, Your Honor, the main issue that has been raised by

18  SunCal and what I think they simply ignore at every turn and

19  for some reason it's a little bit of "gotcha" lawyering is that

20  LCPI has always had the right to repurchase the loans.  LBHI

21  has always been the guarantor of the loans.  LBHI has always

22  held the commercial paper which is the economic -- which is

23  part of the economic interest in the loan.  Now that it's not

24  subject to the JPMorgan pledge, they can deal with it.  There

25  has -- Fenway has consistently taken the position -- and I

31

1    think there are five instances that were cited in the papers

2    where they've said we're just the middleman in this.  We really

3    don't have an economic interest because you have LCPI and LBHI

4    on one side and LBHI on the other side.

5          So, Your Honor, when you boil this down to its

6    essence, two things are happening.  We're doing away with a

7    costly structure, that is Fenway.  We're doing away with that

8    and it's not the only one that we're going to be doing away

9    with because there were several of these.  Second, we are doing

10   everything possible, as is our fiduciary obligation in

11   connection with the representation of twenty-three separate

12   estates to maintain the economics of each -- the integrity of

13   the economics of each debtor.  And in this case, LBHI paid for

14   the commercial paper.  They're the holder of the commercial

15   paper.  And they clearly will have an interest in those assets

16   because those assets form part of the recovery in their estate.

17         So, Your Honor, I would request that the Court approve

18   the motion.  There's really been no -- no challenge to the

19   debtors' business judgment.  And I don't think there can be any

20   real challenge to any bad faith associated with undoing this

21   transaction.  This has been going on for a long time.  We have

22   e-mails from Ms. Goldstein going back to January saying they've

23   been wanting to get out -- and earlier, saying they've been

24   wanting to get out of this.  I mean, much longer, saying that

25   they've been wanting to get out of the transaction.  This is a

32

1    cost saving measure and it effectively allows the debtors to

2    deal with the assets.  And half of the loans in Fenway have

3    nothing to do with SunCal, Your Honor.

4              THE COURT:  Mr. Perez, you said a little earlier in

5    your presentation that you're new to this.

6              MR. PEREZ:  Correct.

7              THE COURT:  Now, you're not new to the bankruptcy case

8    itself, obviously.  You've been involved from the very

9    beginning.

10             MR. PEREZ:  I have, Your Honor.

11             THE COURT:  When you say you're new to this, do you

12   mean you're new to the ongoing hostilities between the SunCal

13   debtors and the Lehman estates?

14             MR. PEREZ:  Correct, Your Honor.

15             THE COURT:  All right.  To the extent that there is an

16   allegation of bad faith in this transaction, it seems to me

17   that it relates to the following.  There is the suggestion by

18   the SunCal debtors that one of the motivations for this

19   transactions is to bring assets into the debtors' estates that

20   are not now within the estate directly by virtue of the Fenway

21   structure, and as a result, to have those assets subject to the

22   automatic stay which would, in their view -- and I'm

23   characterizing their view -- materially interfere with the

24   prosecution of equitable subordination litigation pending in

25   the bankruptcy court in Santa Ana, California.  That's my

33

1    understanding of their view as to why this transaction may be

2    suspect.  What's your response to that?

3         MR. PEREZ:  Your Honor, I have several responses to

4    that.  First of all, that is based on what I believe to be a

5    false premise.  LCPI has always had rights to those assets

6    through the repurchase agreement.  They've always had that

7    right.  If the Court looks at the Palmdale decision while the

8    BAP panel never reached that issue because, remember, Your

9    Honor, there are loans that LCPI has that are not in Fenway,

10   that are SunCal loans.  So we'll get to the issue of the

11   automatic stay at the next hearing.  But there are loans in

12   SunCal -- SunCal loans that are not in Fenway.  So while the

13   BAP never reached that decision, it did say that LCPI might

14   likely have an interest through the repurchase agreement.

15   That's number one.

16        Number two, I think that the examiner's report is

17   fully replete with references to the fact that these repo

18   agreements were financings, that they were not sales.  I mean,

19   that Lehman used the repo transaction in order to provide

20   financings.

21        Third, Your Honor, LBHI has always had an interest.

22   They're the ones that paid three billion dollars.  They've

23   always had an interest in these assets.  They've never not had

24   that interest.

25        THE COURT:  I understand all that and I accept that

34

1    argument.  But they're saying that this is, in part, an effort

2    to expand the scope of the automatic stay and the SunCal

3    litigation to these assets.  And they say that various

4    statements were made on the record that ignore the Fenway

5    structure.  It was, if I'm understanding it correctly,

6    representations made that there was property of the estate in

7    the SunCal bankruptcy cases when, in fact, some of loans were

8    within the Fenway structure.  And to the extent that that's

9    true, and I'm not saying that it is true because I don't know

10   those facts, but undoing the structure is a way to cure that

11   defect.

12        MR. PEREZ:  Well, Your Honor, I'm not sure that I

13   agree with that premise.  I believe that -- and I haven't gone

14   back and read every single transcript.  I've certainly read

15   most of the stuff that's been filed.  But, Your Honor, to the

16   extent that Lehman held these assets as loans on their books,

17   even though they were repo'd to Fenway then I think that they

18   would have every right to do that.  And every indication based

19   on the examiner's report, that's, in fact, what they did.  So

20   I'm not sure that there is any real deception that went on

21   there.

22        Furthermore, Your Honor, let me make two other points.

23   The principal objector with seventy-five percent of the value

24   has now stopped objecting.  So we're really talking only about

25   the smaller part of the claims.  And, Your Honor, to the extent

35

1   that the Court somehow believes that there's some merit to that

2   argument, which I don't believe there is --

3           THE COURT:  I'm not suggesting --

4           MR. PEREZ:  Okay.

5           THE COURT:  -- that there is or there isn't.  All I'm

6   saying is that you're trying to get over the hurdle of this is

7   in good faith.  And one of the issues that you haven't really

8   dealt with directly is what I've been talking about which is my

9   characterization -- and I may have it wrong, by the way -- my

10  characterization of what I believe to be embedded in the SunCal

11  papers, namely, this is a device to improve Lehman's litigation

12  position in California and that that may be one of the

13  principal motivations for doing this deal.

14          MR. PEREZ:  Your Honor, if as a result -- let me put

15  it this way.  If as a result of undoing the structure, the

16  ownership of the assets is cleared up, then I think that's a

17  salutary effect.  I can't believe that would be in bad faith.

18          THE COURT:  Okay.

19          MR. PEREZ:  I mean, if as a result of doing the

20  structure it's cleaned up, I can't understand why that would be

21  in bad faith.  What is it that it's in bad faith about?  That's

22  what I don't seem to understand.

23          THE COURT:  All right.  I think it's time to hear from

24  the SunCal debtors and understand exactly from them what the

25  problem is, if any.

36

1    And you speak softly and we have a fairly crowded

2    courtroom.  If you could -- you're close to me and I can hear

3    you but please speak up so that everybody can hear you.

4    MR. O'KEEFE:  Yes, Your Honor.  Let me deal briefly

5    with a few of counsel's comments.  As far as Article III

6    standing, you don't have to file a claim to have Article III

7    standing.  The reality is to the extent that what they're doing

8    has an adverse effect on our case then we have standing to make

9    an objection.  Now, we have limited our issue to that part that

10   affects our case.

11   And let me just tell you the sequence of events here

12   that led us to the conclusion.  And each sequential filing in

13   this case has confirmed that fact.  The transaction before the

14   Court specifically states that the MRA, the master repurchase

15   agreement, is being terminated.  And just to step back from

16   that, every repo from an economic perspective is, in effect, a

17   secured transaction.  It's a buy and sell that generates a

18   yield between the buyer and seller.  But the simple fact is

19   that is an incredibly important market.  That's how we move M1

20   and M2 on the money supply.  So decisions were made twenty

21   years ago that when they say it's a true sale, no matter what

22   it looks like, it's a true sale.  And this particular contract

23   says it is a true sale.  And there's twenty years of case law

24   that says no matter what it looks like it's a true sale because

25   that market says it's a true sale --

37

1        THE COURT:  We are not arguing in the context of this

2    motion to unwind the Fenway structure whether or not repos that

3    function as financings are true sales.  And the question that

4    you are asserting has not been decided in this case and is not

5    being decided now.

6        MR. O'KEEFE:  Well, let me just deal with the issue of

7    this transaction.  The transaction in the motion says that the

8    master repurchase agreement is being terminated.  That's where

9    the backup lien rights were vested in Fenway.  And basically,

10   the contract says this is a true sale but if for any reason

11   it's broken, we continue to have a lien right to protect

12   ourselves in the same way as you have a lessor saying that in a

13   lease.

14       But the contract before Your Honor -- the motion

15   before Your Honor says that contract is being extinguished.  It

16   says the guaranty that Lehman Brothers issued in favor of LCPI

17   to back up their repurchase obligation is being extinguished.

18   It says that the CP notes are being extinguished.  It says that

19   the VFN, or the variable funding note, is being extinguished.

20   Every element of that transaction is being extinguished.  And

21   it says this is in full performance.

22       Now, we then see in the pleading and in subsequent

23   pleadings, the development of the following argument.

24   Notwithstanding the fact that the guaranty goes away, there's a

25   subrogation based upon an extinguished guaranty.

38

1    Notwithstanding the fact that the MRA is gone, we say there's a

2    lien that they're taking based on the MRA against the sold

3    loans that are being acquired by LCPI. Transactionally, it

4    doesn't make any sense. We then point out in our papers, wait

5    a minute here. There is no reference to a financing -- a 364

6    financing in this motion. But you're referencing debt that

7    LCPI is purporting incurring and liens that it's purporting

8    giving to secure a debt which is not referenced in the motion.

9    So when you see the sequence of events, they then file a

10   supplement and said, oh well, notwithstanding the fact what we

11   said in the motion, we're reserving rights and somehow or

12   another there are these follow on liens which weren't discussed

13   or could survive under the transaction that we've enunciated

14   before the Court.

15        So at that point, it confirmed what was initially a

16   suspicion. And now they've admitted that they will assert that

17   Lehman Brothers stay a party that has -- doesn't own the loans,

18   has never owned the loans, has never had a lien on the loans,

19   will now acquire a lien based upon an extinguished contract,

20   based upon a guaranty that's extinguished, based upon a

21   transaction that is fully performed and paid.

22        So when we look at that sequence of events, we see

23   that there appears to be an underlying objective to insert LBHI

24   into a transaction and to create lien rights that really can

25   have no existence under the transaction that they presented

39

1    before the Court.

2         So SunCal's objective is simply to do its own

3    reorganization.  And I'll address this in the next motion.  We

4    don't, in any way, want to get involved in Lehman's case.  We

5    haven't filed a claim.  We haven't appeared here except as

6    necessary.  But when someone files a motion that presents what

7    appears to be a clear --

8         THE COURT:  By the way, one of the issues here is that

9    you haven't appeared here enough, that you chose to absent

10   yourself in Santa Ana taking actions that were, as confirmed by

11   the BAP panel, in violation of the stay.  So maybe one of the

12   problems is you haven't been here enough.

13        MR. O'KEEFE:  Well, Your Honor, I'm more than willing

14   to address that, Your Honor.

15        THE COURT:  No.  You don't need to.  It's an aside.

16   But I'm not going to let an aside like that go without comment.

17   Just finish your argument.

18        MR. O'KEEFE:  My point, Your Honor, is the motion

19   describes a transaction for the extinguishment of the MRA, for

20   the extinguishment of the underlying transaction so that there

21   would be no basis for a follow on lien by LBHI.  So our concern

22   was they were designing this to get back into the SunCal cases

23   in California.  And on that basis, we objected.

24        Insofar as the issue of counsel's characterization of

25   a tentative settlement that's reached with the trustee debtors,

40

1      seventy-five percent of the value, obviously, there's no

2      evidence before the Court with respect to that.  What I would

3      say --

4            THE COURT:  The evidence is the withdrawal of their

5      objection.  They've withdrawn their objection and did so last

6      evening.  And I accept the representation of counsel that

7      discussions are underway.  Those are not before the Court.  The

8      only thing that's happened is that you're now the lone

9      objector.

10           MR. O'KEEFE:  Well, Your Honor, it's -- I think

11     it's -- the voluntary debtors are the loan objectors.  And as

12     we'll deal with in the next motion, the reason why that

13     settlement was possible is because of the pursuit of litigation

14     in California, but for that --

15           THE COURT:  That's not before me right now.  The

16     question before me -- and I understand some of what you're

17     arguing.  But I will tell you that some of what you've said I

18     find confusing.  I don't believe that there is anything in the

19     motion before me that requires me to make any findings as to

20     the consequences in the SunCal bankruptcy of my unwinding the

21     structure.  So part of what I don't understand is why you're

22     spending all this time arguing about those consequences.

23           MR. O'KEEFE:  Your Honor, with that characterization,

24     I'm more than willing to sit down.  I just wanted to make sure,

25     Your Honor, that in connection with the next motion, I didn't

41

1   prejudice any rights in this motion.  Otherwise, I wouldn't

2   have said anything.  But I appreciate Your Honor's

3   clarification in that regard.

4          THE COURT:  Okay.  I might -- let me ask Mr. Perez,

5   have I said it correctly?  Is it correct that there's nothing

6   about my unwinding the Fenway structure in accordance with the

7   amended order that you have proposed that necessarily impacts

8   the characterization of anything in the SunCal bankruptcy case?

9          MR. PEREZ:  Your Honor, I think that's correct, Your

10  Honor.  I believe the -- once the transaction is unwound, we'll

11  be in a position -- we'll be in the position that we find

12  ourselves.  But I don't think you're making any finding with

13  respect to the SunCal and what our position is in the SunCal

14  case.

15         THE COURT:  All right.  With that clarification, maybe

16  the objection for the time being fades away.  And I think it's

17  time to hear from the creditors' committee particularly as it

18  relates to their review of the transaction and their

19  reservation of rights with respect to certain parties, notably,

20  Hudson Castle and the Fenway parties.

21         MR. O'DONNELL:  Yes, Your Honor.  Dennis O'Donnell,

22  Milbank Tweed Hadley & McCloy on behalf of the official

23  creditors' committee.  Your Honor, as Mr. Perez said, we have

24  spent a lot of time with this motion on several different

25  levels.  Just as a preliminary matter, in terms of business

42

1    judgment, we think that -- we're totally convinced that the

2    business judgment of the debtors here makes sense.

3        There are, I think, two business purposes.  One is to

4    simply making the management of the loans easier.  I mean, we

5    can speak to that from the context of transactions we've been

6    involved in with respect to Fenway loans where the extra level

7    of having Fenway involved made things much more complicated and

8    time consuming.  So there is that business purpose.

9        The second business purpose is simply to confirm the

10   ownership of these loans in LCPI which is significant for lots

11   of purposes, one of which might have some consequence in the

12   SunCal proceeding, but it has other purposes as well.  So to

13   the extent we're looking for a business purpose here, there are

14   several fairly compelling business purposes separate and apart

15   from whatever the SunCal debtors have to say.

16       We did look at the motion on other levels as well.

17   And our particular focus from the get-go was on the actual

18   nature and structure of the transaction and the parties

19   involved.  And specifically, the involvement of Hudson Castle.

20   Even before the audit call that appeared in the Times a few

21   weeks ago appeared, we had been asking questions about the

22   nature of the transaction, the intents of the transaction, how

23   it was put together, how it unfolded.  That article provoked us

24   to look even harder at that relationship.  And subsequent to

25   that, we spent a two-week period talking to the debtors and

43

1   talking directly to Hudson Castle and its counsel trying to get

2   a better understanding of the relationship between Hudson

3   Castle and Lehman and precisely how the Fenway structure was

4   put together and modified over the summer of '08.

5        That investigation is ongoing.  We haven't had all our

6   questions answered yet.  But the ones we have answered have

7   convinced us that we have no reason to oppose the current

8   motion.  And that's the case because the releases provided to

9   Fenway and Hudson Castle in this motion are very limited.  We

10  had already started the process of limiting those releases.

11  But subsequent to further investigation, we narrowed them

12  further.  And all that's getting released at this point is any

13  claims arising out of -- and Ms. Goldstein can correct me if

14  I'm incorrect on this -- but, basically speaking, not the

15  specific language, any claims arising out of the administration

16  or management or origination of the underlying loan

17  collateral -- which we believe Hudson Castle likely had nothing

18  to do with.  All claims relating to the actual structure of the

19  Fenway transaction and Hudson Castle's involvement in it are

20  being preserved for future investigation.  And with that

21  understanding and our understanding and acceptance of the

22  business judgment here, we believe the motion should be granted

23  by the Court.

24        THE COURT:  All right.  Thank you.  Is there anyone

25  else who wishes to be heard in connection with this?

44

1        MR. MILLER:  Good morning, Your Honor.  I'll be very

2   brief.  My name is Skip Miller.  I'm the litigation attorney

3   for the SunCal debtors.  I, obviously -- and I'm not a

4   bankruptcy lawyer.  I obviously don't want my lawsuit, my

5   equitable subordination lawsuit encumbered or made any more

6   difficult than it already is by virtue of this compromise

7   motion.  That's my only concern.  The exact questions that Your

8   Honor asked at the beginning of the hearing are my concerns as

9   well.  Other than that, we don't have any objection or

10  reservation.

11       This tentative settlement from the trustee's side, Mr.

12  Lobel's side, is great news to us.  If it sticks, if it's

13  good -- I don't know the details of it.  But this is obviously

14  something that has grown out of my lawsuit, my equitable

15  subordination lawsuit.  And I want to just be able to continue

16  with it in Santa Ana before Judge Smith not in any way, shape

17  or form intruding on the stay or the jurisdiction of this

18  Court.  And that's our position.

19       THE COURT:  Let me just ask you one question.

20       MR. MILLER:  Sure.

21       THE COURT:  Who do you represent in that litigation?

22       MR. MILLER:  I represent all of the debtors, the

23  voluntary and involuntary debtors -- the trustee debtors and

24  the voluntary debtors as special litigation counsel.

25       THE COURT:  And as special litigation counsel, you

45

1    heard for the first time this morning that the trustee has

2    worked out something that may result in a settlement of at

3    least that party a lawsuit, is that correct?

4            MR. MILLER:  No.  I spoke to Mr. Lobel about it last

5    Friday.  And we've been discussing it.  But I have not seen the

6    term sheet yet and I don't know the nitty gritty of the details

7    of it.  So -- but he called me on Friday and we had a

8    conversation about it.

9            THE COURT:  I don't want to get into the specifics of

10   it.  It will either, as you say, stick or it won't.

11   Presumably, it will stick.  And at least that part of the

12   litigation goes away.

13           MR. MILLER:  I mean, what I heard sounded okay.  I

14   just need to see -- you know, the devil is in the details.

15   And, you know, it's about half the case.  It's the involuntary

16   debtors, the trustee debtors.  We still have to deal with the

17   other half of the case.  And we're working hard on it.  And my

18   lawsuit, quite frankly, is the driver of all of it.

19           THE COURT:  Well, I know that's your perspective.  I

20   don't know if it's true or not.  And I'm not approving your fee

21   so it doesn't matter.

22           MR. MILLER:  Thank you, Your Honor.

23           THE COURT:  All right.

24           MR. MILLER:  Appreciate it.

25           MR. PEREZ:  If the opposition is withdrawn, I'll sit

46

 1   down, Your Honor.  Otherwise, I've got a couple of comments to

 2   make.

 3           THE COURT:  I think there's no one -- well, let me

 4   find out.  Is there anyone else who has a comment about this

 5   pending motion?  Apparently not.  Mr. Perez?

 6           MR. PEREZ:  Yeah.  Just a couple, three comments, Your

 7   Honor.  Number one, one of our exhibits is a letter going back

 8   to January of this year where we informed the SunCal debtors

 9   that LBHI had an interest in these assets through the CP notes.

10   I mean, there's no question about it.  The record is clear.

11   This is not anything new or different.

12           And furthermore, Your Honor, our motion clearly

13   contained a full reservation of rights of the debtor so that we

14   wouldn't affect the distribution among the various debtors'

15   estates.  And that's precisely what we're trying to do.  Thank

16   you, Your Honor.

17           THE COURT:  Okay.  Having heard the argument presented

18   by the debtors, the support of the creditors' committee and the

19   opposition by the SunCal voluntary debtors, which appears to

20   the Court to have been more in the nature of a reservation of

21   right as to the potential consequences in the SunCal bankruptcy

22   case in California to approval of the unwinding of the

23   structure, I am satisfied that sufficient business

24   justification has been presented to approve the motion and that

25   the undoing of the structure results in a number of claimed

47

1   benefits to the estate including the elimination of certain

2   costs and the preservation of the rights of separate debtors so

3   that the distribution rights of those creditors looking to

4   particular members of the Lehman corporate family will

5   unaffected by the approval of a settlement.

6          I'll entertain an appropriate order.

7          MR. PEREZ:  Thank you, Your Honor.  Should I tender

8   the order now or --

9          THE COURT:  At the end of the hearing.

10         MR. PEREZ:  Okay.  Thank you, Your Honor.  Your Honor,

11  the next matter on the docket is the motion to lift stay.

12      (Pause)

13         MR. O'KEEFE:  Good morning again, Your Honor.  Sean

14  O'Keefe appearing on behalf of the SunCal debtors, the

15  voluntary debtors.  Your Honor, I'm a Chapter 11 reorganization

16  lawyer and my objective is simply to reorganize the cases that

17  I have been assigned to.  In the current context in California,

18  it's an inherently difficult process because this is a large

19  land case and we are facing the largest property value of the

20  clients since 1930.  We also have a substantial secured

21  creditor.  The overlaying variable on that is that there is a

22  litigation ongoing with that secured creditor.  But our

23  objective is not in any way to do anything other than to

24  reorganize under Chapter 11 in our case.  And I can't emphasize

25  that enough.

VERITEXT REPORTING COMPANY

48

1              Insofar as the characteriz --

2              THE COURT:  Can I break in and ask a question?

3              MR. O'KEEFE:  Yes, Your Honor.

4              THE COURT:  Are you personally involved in the appeal

5     of the BAP decision to the Ninth Circuit?

6              MR. O'KEEFE:  Yes, I am.  I'm the principal lawyer,

7     Your Honor.

8              THE COURT:  Are you the lawyer of record?

9              MR. O'KEEFE:  Yes.

10             THE COURT:  And what's the time horizon of briefing

11    and adjudication in the Ninth Circuit?

12             MR. O'KEEFE:  Your Honor, my recollection now is

13    briefing is complete.  But they don't tell you when they will

14    set oral argument or if they're going to have oral argument.

15    It's entirely possible that could take months or as much as

16    nine months.  So I just finished two appeals.  And as a general

17    rule, it takes a significant period of time.  So I don't

18    exactly know when they're going to set oral argument or whether

19    they're going to rule simply on the papers.  But they haven't

20    provided us that.

21             THE COURT:  Now, I take it that it's your position on

22    behalf of the voluntary SunCal debtors that the BAP panel got

23    it wrong when the BAP concluded that the SunCal debtors needed

24    to come to this court to obtain stay relief in order to

25    prosecute the equitable subordination litigation in the

49

1    bankruptcy court in California.  Is that right?

2        MR. O'KEEFE:  No, Your Honor.  That -- there is no

3    question in my mind that the home bankruptcy court determines

4    the scope and application of the stay, as the BAP said, in the

5    final resolution.  So, for example, there was just a case, it's

6    a published decision, where the Supreme Court in New York made

7    a decision regarding whether or not the stay applied in that

8    particular case.  Every Court that confronts the stay has to

9    make a determination does the stay apply on these facts.

10       THE COURT:  Yeah.  But I'm trying to understand

11   whether or not in appealing the BAP decision, you're arguing

12   that the BAP got it wrong when the BAP concluded that Judge

13   Smith got it wrong when she concluded that you could properly

14   prosecute equitable subordination litigation against the Lehman

15   debtors without first obtaining stay relief here.

16       MR. O'KEEFE:  Not the procedural issue but the

17   substantive issue.  Basically, our position is -- is consistent

18   with what we read to be the law in this circuit.  And in the

19   Ninth Circuit, but for that one case, that the pursuit of an

20   equitable subordination action whether through a contested

21   matter or through an adversary proceeding is deemed defensive

22   and consequently that does not violate the stay.

23       The second issue as to who gets the final say on

24   whether the stay applies, we absolutely agree that the home

25   bankruptcy court makes that decision.  So now we have a

50

1    circumstance, we believe -- and we have absolute confidence

2    that the BAP will be reversed.  We think Judge Markell's

3    decision states the law.

4            THE COURT:  Are you saying you have absolute

5    confidence that the BAP will be reversed?

6            MR. O'KEEFE:  Yes, Your Honor.  Yes, Your Honor.  I

7    just think that --

8            THE COURT:  That's an unbelievable statement to make

9    on the public record.

10           MR. O'KEEFE:  Your Honor, the -- it is a decision

11   which we think is directly contrary to the authorities of that

12   circuit and we don't think that it will stand both

13   jurisdictionally and substantively.

14           But we agree -- we agree, Your Honor, that if the

15   determination of whether the stay applies in the final

16   determination -- and that's what the BAP said.  And the final

17   determination is Your Honor.  So we absolutely agree.  So, for

18   example, Lehman had the right to come back here and say there's

19   this determination and we think it's in error.  And had Your

20   Honor said I think so, too, then that's it.  We're stumped.

21   There's no question there.  We operated from that point going

22   forward because Lehman raised the issue -- Lehman raised the

23   issue with Judge Smith.  Lehman filed the motion for relief

24   from stay and said, Judge, we're making a motion under (d)(2)

25   and (d)(3) that says this reorganization automatically fails

51

1   because our stay prevents them from subordinating our claims.

2   Faced with that argument, Judge Smith said, well, that's not

3   the law in this circuit.  And also we have the Meddium (ph.)

4   decision and Your Honor's decision in Shinsei.  And maybe we

5   are misreading that.  But --

6          THE COURT:  I think you are reading the Shinsei

7   decision.

8          MR. O'KEEFE:  And that's entirely possible, Your

9   Honor.  But I do believe that Judge Smith's decision based on

10  their argument, and it was in response to their argument, she

11  said I see, under (d)(2), an ability to reorganize pursuant to

12  which they can seek to subordinate your claims.  And on that

13  basis, we proceeded.  So they raised the issue and she ruled on

14  it.

15         Now the BAP took that issue up -- and they didn't seek

16  to set aside the order denying motion for relief from stay.

17  They appealed just that narrow ruling, that issue of law, as to

18  whether or not the stay was affected by an equitable

19  subordination action, whether that was offensive or defensive.

20  Prior to that point in time, we believe the law was clear that

21  it was defensive.  They view it, the BAP did, as offensive.

22         But --

23         THE COURT:  That's consistent with Judge Gonzalez'

24  decision in the Enron case as well.

25         MR. O'KEEFE:  Your Honor, I think the correct

52

1    statement of the law is what was stated in the Meddium decision

2    because I think what the Court is saying is, look, if you come

3    to a case, we have to be able to determine the priority of your

4    claim.  And that's really what's going on here.  Integral to

5    our reorganization effort, we have to deal with the claims that

6    they filed in our case.  Conceptually, I think we can all agree

7    that we could have objected to their claim, raised an unclean

8    hands defense and a recoupment defense and, on the basis of

9    those equitable affirmative defenses, sought subordination.

10          THE COURT:  I understand --

11          MR. O'KEEFE:  It's just that --

12          THE COURT:  I understand your position on that.  But

13   one of the issues here is that through other counsel, in

14   November of 2008, the SunCal debtors brought a motion for stay

15   relief here which I denied without prejudice.  It was very

16   obvious, I think, to anybody who was present in court,

17   including your partner, that one of the problems with the

18   original motion was that overly broad, it didn't seek

19   particularized relief.  And from the very beginning of the

20   SunCal bankruptcy, it was apparent that SunCal needed to deal

21   with Lehman Brothers.  I made it very clear that I would

22   entertain other motions for stay relief or stipulations that

23   the parties might enter into relating to stay relief.

24          But nothing happened.  Except in January of 2009, I

25   was involved in an emergency hearing, I believe it was on a

53

1    Friday afternoon, New York time, seeking to enforce the stay

2    because, in effect, your debtors were treating this Court as if

3    it had no say in the matter.  Ultimately, I made some

4    threatening noises on the record, and the record speaks for

5    itself, that there might well be sanctions for a willful

6    violation of the automatic stay.  And until now, the SunCal

7    debtors have absented themselves from this court.  That's one

8    of the reasons why I interjected earlier in your argument on

9    the Fenway motion about your not having been here except when

10   you needed to be here.  I think you needed to be here a lot

11   sooner.  And I'd like an explanation as to why you haven't been

12   here sooner.

13        MR. O'KEEFE:  The first thing is, Your Honor, to the

14   extent that we have engaged in any course of conduct that was

15   offensive to this Court or that affected the stay, we sincerely

16   apologize.  That was not our point.  To the contrary, I've been

17   practicing bankruptcy law in twenty-five years -- for twenty-

18   five years and nobody has ever accused me of violating the

19   stay.

20        What happened in this circumstance was, Your Honor, we

21   moved for -- the circumstance you're referencing -- and I'll

22   just go back.  Twenty years ago, I had a case, and it was only

23   one in my whole career, where we had two cases, two debtors,

24   who were looking at each other saying well, my stay applies and

25   your stay applies.  And we went to Mr. Klee (ph.) and Mr.

54

1   Tweester (ph.) because there were no cases anywhere on the

2   issue that confronted that circumstance and said well, what

3   happens, who has primacy.  And their response was the Code

4   doesn't work very well under those circumstances.

5          Well, since then, we've had more input from the case

6   law.  But the truth of the matter is, Your Honor, we've never

7   run into this circumstance before.  And insofar as that hearing

8   you're referring to, we moved the use of cash collateral in

9   that case and that was the issue that Your Honor is speaking

10  to.  And Your Honor told us I think that violates the stay and

11  we withdrew that motion.  The reason why we filed that motion

12  is because there was another pending Lehman case, LB Rep,

13  something or other, and it was represented by the same counsel.

14  And the trustee in that case moved for the use of cash

15  collateral and there was no stay assertion.

16         Now, going all the way back to the first motion for

17  relief from stay, Your Honor is absolutely correct.  And I

18  wasn't involved in that.  That motion was early in this case.

19  And it basically was this blanket prayer for relief.  I don't

20  really understand why that motion was filed in that structure

21  particularly given the fact that this was early in this case.

22  It was going to be denied.  It should have been more focused

23  and Your Honor made that clear.

24         But insofar as that particular issue, the motion for

25  use of cash collateral, Your Honor made your thoughts clear on

55

1   that and we withdrew the motion.  And that was very difficult

2   in a Chapter 11 to operate without the use of cash collateral

3   particularly since the party who controlled the cash collateral

4   or alleged that they controlled it was trying to crush our

5   case.  The next thing that happened in time, Your Honor, is

6   they raised the issue before Judge Smith.  They filed the

7   motion for relief from stay saying our stay thwarts their case.

8   You cannot succeed.  You might as well give us relief from stay

9   to foreclose on everything because they can't reorganize,

10  period, because of our stay.  That was the argument.  It was a

11  (d)(2) and a (d)(3) argument.

12          In response to that, we presented -- and in response

13  to that, we presented our arguments and our case law saying

14  that the stay didn't apply, that this was a defensive act and

15  we could subordinate their claims.  And the claims objection in

16  priority determinations are traditionally to the extent they

17  just affect the claim deemed defensive.  And Judge Smith

18  specifically ruled on that.  It was only within the protection

19  of that ruling that we proceeded.  Now, Your Honor, they had

20  the option to come to you and say, look, we think this is

21  wrong.  And whatever Your Honor said, that's the law.  That's

22  it.  We agree.  There's no dispute.  But they didn't do that.

23  In fact, thereafter, they affirmatively represented to Judge

24  Smith over and over again the stay doesn't apply.  In fact, I

25  will tell you that I went to court once to complain that the

1    motion -- the agreement we entered into -- because when Your

2    Honor said we couldn't move for the use of cash collateral, we

3    had to enter into a very onerous financing agreement.  And what

4    was discovered after the fact is that they didn't hold the lien

5    or even the claim.  And so, when we went in again, I said you

6    know, there's something unfair about this.  They invoked the

7    stay with respect to a loan and a lien they don't hold and now

8    I'm stuck with this onerous financing agreement which they

9    should never have had in the first place because that's not

10   their lien.

11         At that point, Mr. Pachulski, an exceptional lawyer,

12   jumps up and scolds me in front of Judge Smith and says that

13   stay has not been an issue in this case for months.  And that's

14   in their disclosure statement.

15         So maybe it was incorrect for us to rely on Judge

16   Smith's ruling.  But they invoked that issue.  And she

17   responded and ruled.  And we, in reliance on that, went

18   forward.  And they could have come to Your Honor and said Your

19   Honor has the final say and we agree.  There's no dispute.  But

20   they didn't do that.  They said the stay does not apply over

21   and over again.  And it's in their own pleadings.

22         So to the extent that we have proceeded in a manner

23   that's procedurally inappropriate, we apologize.  That was not

24   our intent.  We thought we were doing the right thing.  And I

25   have to tell you, Your Honor, I'm a debtor moving for relief

57

1    from stay.  That just seems -- I mean, it's just a new thing

2    for me and for everybody out there.  There just isn't a lot of

3    case law on this.

4           THE COURT:  Mr. O'Keefe, I understand your position.

5    But here's the concern that I have and it's actually the

6    flipside of the argument that you were making in the context of

7    the unwinding of the Fenway Capital commercial paper program.

8    And that's the question of good faith.  I couldn't have been

9    clearer in January of 2009 that this was the Court that you

10   needed to come to for purposes of getting stay relief, in that

11   instance, relating to the use of cash collateral.

12          But it's now May of 2010.  It's quite a long while

13   after that.  And one of the concerns I have is that Judge Smith

14   and I are players in a cross-country game of gaming the system,

15   of using courts to your particular purpose in order to gain

16   strategic advantage.  And speaking for myself, I don't like

17   that.  I suspect that Judge Smith would say the same thing if

18   she were here.

19          MR. O'KEEFE:  Your Honor, all I can do is apologize.

20   The reality is there was a ruling; we did rely on that.  They

21   did have their procedural remedies.  Maybe in retrospect that

22   was not the right thing to do but rather to take that and

23   immediately come back here.  And in retrospect, given Your

24   Honor's insight, that's what I would do.

25          THE COURT:  Let me ask you a question.  Assuming that

58

1    you are successful in the Ninth Circuit whenever that happens,

2    what's the consequence of that successful prosecution of the

3    appeal of the BAP decision to the Ninth Circuit?  What happens

4    then?  Does it moot my need to decide the pending motion?

5         MR. O'KEEFE:  Your Honor, I don't think it does.  And

6    this is just my analysis of the law.  Essentially, the BAP was

7    correct in one respect, that, procedurally, to the extent that

8    there is a final determination who trumps everybody insofar as

9    the determination relative to the scope and application of the

10   stay, it is the home bankruptcy court.  So if you make a

11   determination with respect to that issue, then our only

12   recourse is to appeal.  That's it.  That's the only option we

13   have.

14        The mechanical -- the effect of the BAP being

15   overruled is there is a case in the Ninth Circuit which

16   determines that a particular course of action in isolation --

17   and again, they didn't appeal the merits of the order denying

18   the motion for relief from stay.  And subsequently, we brought

19   to them they didn't even own these loans so the motion

20   shouldn't have been brought in the first place.  So that's our

21   jurisdictional issue.  But if -- and we believe the Ninth

22   Circuit will reverse this, even if just on jurisdictional

23   grounds to say why are you here.  The motion shouldn't have

24   been brought, the appeal wasn't valid.  It's all vacated.

25        But what we think will happen is we'll clarify the law

59

1    in our circuit.  And that's really, at this point, what we're

2    trying to do.  Insofar as your determination, the reality

3    issue, Your Honor, we have no dispute that to the extent the

4    stay applies, the home bankruptcy court gets to say it applies.

5    And you trump everybody else.  And at that point it's solely --

6         THE COURT:  I'm asking you a slightly different

7    question.  And you may have answered it and I just didn't fully

8    understand the answer.  If you are successful in the Ninth

9    Circuit, would you be able to prosecute the litigation against

10   the Lehman debtors for equitable subordination in the

11   bankruptcy court in Santa Ana without obtaining stay relief

12   here?  That's a yes or no question.

13        MR. O'KEEFE:  Under Baldwin-United, yes, Your Honor --

14        THE COURT:  In that case --

15        MR. O'KEEFE:  -- unless --

16        THE COURT:  -- then the Ninth Circuit adjudication

17   could moot the pending motion here, correct?

18        MR. O'KEEFE:  If Your Honor --

19        THE COURT:  That's a yes or no question.

20        MR. O'KEEFE:  It would depend upon the ruling, Your

21   Honor.

22        THE COURT:  That's a yes, no or I don't know.

23        MR. O'KEEFE:  I would say yes, if it's before the

24   ruling.  Yes, because if they decide that the BAP is overruled,

25   then at this point, Judge Smith's ruling with concurrent

60

1    jurisdiction, but not final -- Your Honor gets the trumper, we

2    agree with that -- every Court has the right to determine

3    whether the stay applies.  So if she determines the stay

4    doesn't apply and nobody comes back here then that's the law of

5    our case and we proceed on that basis.

6          The -- so it would be a timing issue.  Now, on the

7    other hand, if Your Honor were to determine the stay doesn't

8    apply, okay, then the Ninth Circuit would potentially --

9    someone could argue it's an Amwell (ph.), maybe that moots that

10   issue because the home bankruptcy court has ruled it doesn't

11   apply.  We were not -- we want that decision vacated for a lot

12   of reasons.

13         But I think that would be the result.  So I think it's

14   a timing issue.  And I don't mean to be evasive, Your Honor,

15   but -- I mean, the bottom line is we do need a resolution and

16   we're looking to Your Honor to give us that.

17         I would note that subordination -- basically, dealing

18   with these claims, a lien priority dispute, is integral to the

19   plan of reorganization.  It's going to be very difficult for us

20   to reorganize without resolving the claims against the estate.

21   At this point, Your Honor, all the folks, the defendants, are

22   all nondebtors, all nondebtors.  This motion -- this

23   transaction is bringing them, they believe, back into that

24   case.  Now, what Judge Smith did was say, okay.  I agree.  The

25   BAP controls; LCPI has to leave.  So she dismissed them;

61

1    they're gone.  There are no debtors in the litigation.  The

2    issue is do they get, through this transaction, to just come

3    right around and buy a claim, in effect, go right back to Judge

4    Smith and say I'm sorry, we're here again.  We still get to

5    thwart the litigation which has a material adverse effect on my

6    ability to confirm a Chapter 11 plan.  And that's really in our

7    mind what's going on here because they're all nondebtors.

8         Now, the whole argument, Your Honor, that we're the

9    aggressor in this -- Your Honor, there's only ten lawyers at

10   Winthrop Couchot.  And only two and a half, on a good day, can

11   work on this case.  These folks have hundreds of them.  These

12   are the two largest bankruptcy firms in the United States.  I'm

13   working seven days a week, get up at 6:00 on a Saturday morning

14   and they have unlimited resources.  So if the concept is that

15   I'm kicking them around like a can, that's not happening.  It

16   is absolutely to the vice versa.

17        THE COURT:  You can put this on your website, it's

18   good for marketing.

19        MR. O'KEEFE:  Your Honor, the merits of the claim that

20   LBHI stay will apply premised upon the contention that they're

21   going to attach a lien to the loans.  And I've already gone

22   through that.  They stated in their motion, the MRA is gone,

23   and that's the basis for the lien.  They state that the

24   guarantee is terminated.  They state that the CP notes are

25   terminated.  So this is some sort of leap-springing lien that I

62

1    don't understand.  And it's a lender of a lender.  That is too

2    indirect for the stay to apply.

3          And, also, to the extent that that's their design.

4    You shouldn't be able to buy into a piece of litigation that's

5    going on in a bankruptcy court and ten stand up and say you

6    know what, I knew it was happening, but I'm here and you're

7    stayed.  That's just something wrong with that.

8          Your Honor, we've had a back and forth relative to

9    whether or not a subordination action is subject to the

10   automatic stay.  We can all agree that a claim objection is not

11   subject to automatic stay.  And a claim objection can

12   effectuate the complete disallowance of a claim.  If the claim

13   is disallowed the lien goes away.

14         What we're trying to do is to subordinate to the

15   extent necessary to deal with the creditors who they've created

16   by authorizing work.  We don't think that is subject to the

17   stay.  Your Honor may have a different opinion.  But if that's

18   the case, I would simply say to Your Honor that it's very

19   difficult to do a reorganization if you can't deal with claims

20   and liens against your estate.

21         So conceptually both cases should be able to proceed.

22   And Your Honor should be able to fashion, and I note that the

23   creditors' committee, although they object to this, say as a

24   secondary position that Your Honor could have a reporting

25   system or other controls that would assure that your case was

1    not affected.  But it can be that a grader or a framer in

2    California doesn't get paid and the creditors in this case gets

3    paid.  There has to be a medium where they both can proceed.

4         The problem that we have from a balance of the harms

5    perspective, and basically our orientation under Sonnax was,

6    these huge properties are sitting there.  Every weekend I drive

7    passed one.  And it is this giant expanse of land with dust

8    blowing around in the midst of a city.  And there are fire

9    issues, there are flood issues, there are dust issues.  We

10   can't solve that problem until we deal with this claim.  So

11   delay has a material affect on our asset and theirs.  Nobody

12   gains by delay.  This is not a solution, it is simply a -- in

13   our estimation an issue of litigation leverage.  The pricing of

14   a future settlement, and that's not a basis -- that is not a

15   harm for them.  But it is a severe harm for us.  I don't know

16   that we don't have relief from stay.

17        THE COURT:  All right.  Let me just see if we can

18   accelerate through the rest of your argument.  Because we've

19   been going at this for a long time, and we have a very full

20   courtroom still.

21        MR. O'KEEFE:  I apologize, Your Honor.

22        THE COURT:  No, you have nothing to apologize for.

23   But as you point out you're not exactly a party-in-interest

24   here.

25        MR. O'KEEFE:  Well --

64

1       THE COURT:  You're a party-in-interest, representing

2   the interest of the SunCal debtors and I appreciate that.  But

3   I think we need to move it along.

4       MR. O'KEEFE:  Then I would simply submit to the Court

5   as we've gone through in our briefs, that to the extent the

6   stay applies, to the extent that Your Honor determines that it

7   does apply, Your Honor should lift the stay to the extent

8   necessary to allow the action to proceed.

9       One of the points that Mr. Miller made was there is a

10  settlement.  Your Honor, this case will settle.  I can't

11  guarantee that for sure.  But the reality is there is a dynamic

12  here, the parties where they initially weren't talking, now

13  they are talking.  The truth of the matter is, the stay will

14  just cause delay, it will shift litigation leverage and it

15  isn't a solution.

16      So we have addressed the Sonnax factors, we are asking

17  for limited relief from stay.  To the extent that we've

18  offended the Court I sincerely apologize, that was certainly

19  not our intent.  We thought we were doing the right thing.

20      THE COURT:  Okay.

21      MR. O'KEEFE:  Thank you, Your Honor.

22      THE COURT:  Apparently Mr. Miller is going to be

23  brief.

24      MR. MILLER:  Be very brief.  Learning more about

25  bankruptcy law and bankruptcy stays than I ever knew before.

65

1          Your Honor, I just want to very briefly, because I

2     think it's been well addressed.  I just want to answer Your

3     Honor's question about, you know, why didn't you come back

4     sooner?  And this is from my perspective as a trial lawyer, a

5     litigation lawyer, not a bankruptcy lawyer.

6          In March of '09, Judge Smith -- I was there, they

7     moved for relief from stay so they could foreclose.  And Judge

8     Smith in her order, I'm quoting, says "that her court has

9     concurrent jurisdiction to determine the scope or applicability

10    of the automatic stay under 11 U.S.C. 362(a)."  And she said

11    "the automatic stay arising from the bankruptcy case of Lehman

12    Commercial Paper does not apply to any proceeding to

13    subordinate the claim of Lehman Commercial Paper and/or to the

14    transfer of the lien," so forth and so on.

15         So, you know, we won, we thought we were golden, and

16    to the extent we should have come back here -- this is my take

17    on it, we should have come back here with this order since I

18    gather from my lesson this morning this Court has the final say

19    on the debtor before this Court's stay.  We probably should

20    have come back here with this order.  And to the extent we

21    didn't, we're sorry.

22         The BAP then reversed at the end of the year.  And

23    when the BAP reversed we had this ruling from Judge Smith that

24    LCPI had sold the loans to Fenway, all of them.  So it didn't

25    seem like LCPI was part of the case anymore, or that the stay

1  was implicated.

2       Then we get this compromise motion, and we say whoa,

3  this compromise motion brings LCPI and Lehman entities back

4  into the picture, we better fire up our motion for relief from

5  stay. So here we are, okay. Here we are. And to the extent

6  we should have done it sooner, we should have done it sooner.

7  But there was no intent, at least from my perspective, to ever

8  avoid or evade the jurisdiction of Your Honor, and, Your Honor,

9  the stay in this court. Okay, so that's number one.

10       Number two, very briefly. My ultimate -- I'm

11  representing the debtors, but my ultimate clients are, like Mr.

12  O'Keefe said; the grading contractor, the drywall, the guy that

13  does the sidewalks, the retaining walls, they're all in

14  California, all the documents are in California. We filed our

15  lawsuit in January of '09. We've virtually completed document

16  discovery. Mr. Lobel's been working real hard, and I'm hoping

17  this settlement sticks for part of the estates, frankly. I'm

18  hoping it seeps over to the other estates, if we can work that

19  through. I'm working with him and with his office, and it's

20  going to take a lot more work, but I don't want to change the

21  playing field. And that's why we're here, Your Honor. We want

22  to be able to maintain the playing field as it is right now.

23  I've got my lawsuit, we're litigating equitable subordination.

24  I'm beginning to think they think we have a pretty good case

25  based on what I'm hearing on this settlement that Mr. Lobel's

67

1    been negotiating, but, you know, I'll put that on my website or

2    something.

3           THE COURT:  No, I suggest you don't do that.

4           MR. MILLER:  I just want to be able to keep it going

5    and not have to go back to California and say well, we're going

6    to try the case there against the nondebtors, because there's

7    no stay implicated.  But then we've got to take some of the

8    same creditors and come back to Your Honor, and basically retry

9    the same case and do it twice.  And that's exactly -- I was

10   reading the papers on the plane, in a footnote that's exactly

11   what they say they -- that's exactly what they suggest.  They

12   suggest that they could have requested that the entire

13   equitable subordination be tried before this Court, but they're

14   not.  They just want the LCPI piece here and I guess the

15   nondebtor piece in California.  That doesn't make any sense.

16   That is -- I think that's gaming the system.  That's just a

17   litigation tactic, it's clever, very smart lawyers.  But it's

18   just repetitious, duplicative.

19           I'm sure this Court is, you know, very, very busy.  I

20   know Judge Smith is very busy, because I've spent half of my

21   life there over the last year.  And I would just request Your

22   Honor to enter relief to the extent it's necessary so that we

23   can do it all in California.

24           THE COURT:  All right.

25           MR. MILLER:  Thank you, Your Honor.

68

1          MR. PEREZ:  Your Honor, Alfredo Perez.  A couple of

2     comments.

3          I hear counsel saying that they believe that the home

4     court has the last say on the automatic stay.  Unfortunately, I

5     believe that their actions really don't support that.

6          And, in fact, Your Honor, if the Court looks at the

7     equitable subordination claim, one of the predicate acts, if

8     you will, to the liability for equitable subordination is --

9     are improper attempt to enforce the automatic stay before this

10    Court.  So it's completely -- this pleading completely belies

11    the mea culpas that we've heard this morning.

12          Second, Your Honor, as it relates to whether the stay

13    apply, I don't believe that there's any question but that the

14    stay does apply.  The BAP found that the stay applies, in

15    connection with their equitable subordination claim.  I mean,

16    what they really want to do, is they really want to strip our

17    lien.  It's not the situation that you had before Judge Drain,

18    where you're reordering priorities.  And I read Shinsei three

19    times and the Court basically says under these circumstances

20    involving Japanese law, it's limited to these facts.  I don't

21    think that's a broad ruling that equitable subordination is

22    defensive in every ruling.  Judge Gonzalez's ruling in Enron

23    says it's affirmative.  So I don't believe that there's any

24    question about the fact that the stay does apply.

25          Now, let me address what I believe is the key Sonnax

69

1     factors, and that is balancing of the harm.  Your Honor, at

2     this point -- and we could have, by the way, I'll take up Mr.

3     Miller's point.  I mean, we could have requested that the whole

4     thing be moved here.  And as a practical matter, we didn't

5     think that was appropriate because, first of all, in view of

6     this Court's docket and the fact that it's basically their

7     claim.  So we didn't think that was appropriate.

8            But we also don't think it's appropriate for the stay

9     to be lifted at this time.  There may be an appropriate time

10    for the stay to be lifted.   But there are probably three or

11    four -- what I think are very compelling reasons why the stay

12    shouldn't be lifted.

13           The first one is, Your Honor, we need to see the

14    settlement through.  We need to see what ends up at the end of

15    the day.  Now, there are -- there has been LCPI loans that

16    weren't in Fenway, that have always been the subject of the

17    stay regardless of the Fenway deal.  So we really need to see

18    that settlement through.

19           We also need to see what the BAP does.  I mean -- and

20    I think the Court's --

21           THE COURT:  I think you mean what the Ninth Circuit

22    does.

23           MR. PEREZ:  What the Ninth Circuit does, I think

24    you're -- and I think Your Honor's play was absolutely upright.

25    And, frankly, if I was in Mr. O'Keefe's shoes I probably would

70

1   have done the same top dance in response to your question.

2   Because I think the answer based on their papers is yes.  It

3   would moot it.  I mean, that's basically what they were telling

4   you.  Yes, if you read their papers, that's what they said.

5   That's number one.

6           Number three, Your Honor, I mean we are regardless of

7   whatever anybody says, at a critical time in this case.  I

8   mean, filed a plan, we filed a disclosure statement, going to

9   file the motion to approve the disclosure statement hopefully

10  this Friday.  That's one of the things I'm going to do when I

11  get back.  And we're going to prosecute the plan.  And it's

12  going to take a while, but we're affirmatively going to

13  prosecute the plan.

14          And to the extent that we are able to resolve the

15  thing with seventy-five percent of the value, I think that's --

16  that's going to instruct a lot better as to how the balance

17  gets resolved.  And continuing to litigate in my mind

18  doesn't -- I mean, it's great for Mr. Miller to come up here

19  and take credit, you know, for something that he learned about

20  on Friday, that's terrific.  But the fact of the matter is is

21  that despite those efforts, I mean we are trying to reach

22  resolution.  We're trying to reach a resolution with all our

23  constituencies, that's not something that we take lightly.

24          I mean, if our goal was to litigate, Your Honor, as

25  the Court well knows, you know we could be here 24/7, you know,

71

1   until we're both very old.  And that's not our goal.  I mean,

2   our goal is to try to resolve these matters as expeditiously as

3   possible.  And I think we are making progress.

4          So, Your Honor, at a very minimum I would request that

5   the Court defer the stay.  I think the Court should deny at

6   this time, without prejudice, and let them resurge their

7   motion.

8          And, by the way, Your Honor, the thought that they

9   can't craft a plan that they do come back here and say this is

10  our plan, we'll set up a litigation trust, we'll do whatever.

11  I mean, that's what people -- that's what people normally do.

12  And come to Your Honor and say you know, we'll -- we want the

13  stay lifted so we can prosecute this plan, this sets up the

14  litigation trust.  I don't see any reason why something -- and

15  basically the Court had invited them to do that.  And they

16  haven't done it.

17         So for all those reasons, Your Honor, we think the

18  motion should be denied.

19         THE COURT:  Is there anything more?

20         MR. O'KEEFE:  Your Honor, just one minute.  Counsel's

21  comparative with a balance of harms is that they need

22  apparently an allocation of resources relative to filing their

23  plan.  Certainly, they have more than sufficient resources

24  between the firms that they have working on this, and they also

25  have a professional firm managing the debtors' liquidation.

72

1      In contrast, the balance of the harms, the delay on

2  our part, is the properties, Your Honor.  These are huge pieces

3  of property that probably stretch from here to the Hudson.

4  So -- I mean, some of these are ten thousand acres.  They're in

5  the midst of cities, there are material issues that we have

6  addressed.  So there is a fundamental difference, the balance

7  of the harms tip sharply in our favor.

8      Insofar as the concept of settlement should delay the

9  litigation, certainly Your Honor has participated in this

10  process on both sides of this to see that litigation, if there

11  is a stay, the settlement might go away, or alternatively it

12  will change.  Certainly, the litigation is a driver for

13  settlement and it will expedite that process to our mutual

14  benefit.  Thank you, Your Honor.

15      THE COURT:  All right.  This took quite a bit longer

16  than I anticipated.  And it's a complicated question.  One of

17  the things that I believe complicates it is the fact that there

18  is an appeal currently pending before the Ninth Circuit court

19  of appeals from the decision of the Ninth Circuit Bankruptcy

20  Appellate Panel.  And I believe, but don't know, that it is

21  more likely than not that successful prosecution of the appeal

22  in the Ninth Circuit by the SunCal debtors in fact will moot

23  the motion which is before me.

24      There's a corollary, however, which is my granting the

25  pending motion may to some extent moot the appeal.  This is

73

1    another example of what we've been colloquially calling gaming

2    the system, in effect, using litigation to gain tactical

3    advantages.  In this instance, litigation which has gone all

4    the way to the Court of Appeals level in the Ninth Circuit and

5    litigation which was not brought here for stay relief that

6    could have been brought earlier.

7         Ultimately, the question of whether or not I should

8    grant relief from the automatic stay is driven by my

9    application of the Sonnax factors.  And both parties appear to

10   be focused most heavily on the balance of harms factor.  That's

11   convenient because I prefer to focus on that one myself.

12        One of the reasons I have a difficult time finding

13   that there is any material harm to the SunCal debtors in not

14   granting their motion for stay relief is that they did not

15   bring it until now.  The SunCal debtors have scrupulously

16   avoided coming into this court from November of 2008 until

17   today.  And have managed to deal with their litigation requests

18   in the bankruptcy court and beyond apparently without material

19   impairment in those efforts.  In effect, they've elected their

20   remedy.  They have chosen to proceed with litigation in their

21   home court.  And when they suffered a reversal at the BAP level

22   at the end of last year then had to review their strategy

23   again.

24        Having gone to the Ninth Circuit, I believe the Ninth

25   circuit is the place for this question to be decided.  And I'm

74

1    going to defer my decision with respect to stay relief until

2    after the Ninth Circuit has acted.

3           Moreover, and I think this is a very significant

4    point, the existence of the stay is not inconsistent with the

5    pursuit of negotiations that could lead to a resolution of this

6    ongoing dispute.  The fact that the involuntary debtors,

7    through their trustee, appeared to have reached an agreement in

8    principle resolving many, if not all, of the same issues that

9    are set forth in the equitable subordination complaint,

10   demonstrates that it's possible for the parties to engage in

11   potentially productive discussions, notwithstanding the fact

12   that they stay remains in effect.

13          To the extent that the existence of the stay is viewed

14   as an impediment of any sort to meaningful dialogue, I want to

15   be absolutely clear in saying that I do not believe the stay

16   impacts in any adverse way the ability of the parties to meet

17   and confer -- to mediate or to otherwise seek a constructive

18   resolution of the matters that are currently before the

19   bankruptcy court in the Central District of California.

20          As to active litigation, the motion is denied without

21   prejudice to being reconsidered at some later time in the case,

22   either before or after the Ninth Circuit has acted.

23          And I will consider an appropriate order consistent

24   with what I've just said.

25          MR. PEREZ:  Your Honor, we'll prepare one and submit

75

1    it to counsel.

2         THE COURT:  Fine.

3         MR. O'KEEFE:  Your Honor, can I ask a few clarifying

4    questions?

5         THE COURT:  You can ask.

6         MR. O'KEEFE:  Is the Court --

7         THE COURT:  The motion's denied.  I want to be really

8    clear on that.  Your motion is denied.

9         MR. O'KEEFE:  And I'm not rearguing the motion, Your

10   Honor.

11        THE COURT:  Fine.

12        MR. O'KEEFE:  So the Court -- is the Court finding the

13   stay applies and the motion is denied?

14        THE COURT:  The stay applies and the motion is denied.

15        MR. O'KEEFE:  Is the Court finding that insofar as

16   LBHI -- what is the Court's finding with respect to the

17   application of their stay?

18        THE COURT:  I'm not making any particularized

19   findings.  And let me be really clear, the law in the Southern

20   District of New York as stated by Judge Gonzalez in the Enron

21   case, and I choose to follow his reasoning, is that litigation

22   brought by a party against a debtor seeking to equitably

23   subordinate claims of that debtor constitutes a violation of

24   the automatic stay.  To the extent that there are debtors or

25   debtor property implicated by your litigation I am saying the

76

1    stay applies.  And I'm not going to say more than that.  And I

2    think it's a good time for you to sit down.

3            MR. O'KEEFE:  Very well, Your Honor.  We appreciate

4    the Court's time and consideration.

5            THE COURT:  Sure.

6            MR. MILLER:  I just wanted to thank the Court for the

7    pro hac vice admission, and for hearing me this morning.  Thank

8    you.

9            THE COURT:  No problem at all.  And then just so it's

10   clear what my view is of the Shinsei case because that has been

11   liberally misquoted in papers, my ruling with respect to the

12   Shinsei case speaks for itself.  But I view actions taken

13   pursuant to principles of Japanese bankruptcy law which would

14   have the effect of subordinating claims, not to be covered by

15   the principal announced by Judge Gonzalez in the Enron case

16   because under Japanese law active litigation comparable to an

17   adversary proceeding is not involved.  And in that case the

18   action taken by Shinsei Bank was not self executing and

19   involved actions to be taken by a quasi judicial figure, a

20   supervisor, who would be determining whether and when a

21   competing plan would be circulated to creditors.  It was

22   incredibly fact specific, and is not subject to broad

23   application in the U.S.

24           MR. PEREZ:  Thank you, Your Honor.  May I be excused,

25   Your Honor?

77

1          THE COURT:  Yes.

2          MR. PEREZ:  I believe, Your Honor, the balance of the

3    matters on the docket are not being handled by our firm, Your

4    Honor.

5       (Pause)

6          MR. TAMBE:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. TAMBE:  Jay Tambe from Jones Day, counsel for the

9    debtors.

10         I'm addressing items 4 and 5 on this morning's agenda.

11         Number 4 is the motion of the debtors for an entry of

12   order to consolidate certain proceedings.  And the proceedings

13   we are seeking to consolidate are basically three.  There are

14   two adversary complaints, one each against Nomura International

15   and Nomura Securities.  And also we are seeking to consolidate

16   an objection with respect to Nomura GFP.

17         We've had some developments, I think we've resolved

18   part of the motion, and we're seeking to adjourn part of the

19   motion.  I can address those issues if the Court would like.

20         THE COURT:  I'd be delighted to hear about the

21   resolution.

22         MR. TAMBE:  With respect to International and

23   Securities, those two entities did put in a response to the

24   motion to consolidate.  And those two entities have expressed

25   concerns about consolidation off an evidentiary hearing or