JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball
Richard Engman
Robert Micheletto
Scott Griffin


Attorneys for Debtor and Debtor in Possession
Lehman Commercial Paper Inc.


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                              :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------x


**REPLY OF DEBTOR LEHMAN COMMERCIAL PAPER INC. TO OBJECTION**
**TO MOTION PURSUANT TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY**
**CODE FOR AN ORDER ENFORCING THE AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

            Lehman Commercial Paper Inc. ("LCPI"), as debtor and debtor in possession

(together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, the

"Debtors"), files this reply (the "Reply") to the Objection (the "Objection") of Greenbrier

Minerals Holdings, LLC ("Greenbrier") to the Motion Pursuant to Sections 105(a) and 362 of the

Bankruptcy Code for an Order Enforcing the Automatic Stay Against Greenbrier (the "<u>Motion</u>").[1]

## <u>INTRODUCTION</u>

Tellingly, Greenbrier waits until page 17 of its Objection before attempting to challenge the merits of the Debtor's Motion.  As its current argument is contrary to both the express language of the Operating Agreement and its own conduct for more than a year after LCPI's chapter 11 filing, Greenbrier engages in a hodge podge tactical strategy of diversionary arguments that have no bearing on the issue before this Court.  The issue is whether Greenbrier violated the automatic stay when it declared, on May 29, 2010, that LCPI forfeited its Membership Interests in Greenbrier and that LCPI's appointee, Jack McCarthy, was not (and apparently never has been) a Manager on Greenbrier's Board of Managers.  Greenbrier's desire to ignore the merits is particularly disconcerting given that its actions on May 29th resulted in, at best, a paralyzed Board of Managers and, at worst, an entity that is operating completely *ultra vires.*

Greenbrier's transparent focus-shifting strategy is unavailing.  In each argument urging the Court to refrain from deciding the merits, Greenbrier either misconstrues or simply ignores the plain language of both the Operating Agreement and the Delaware Limited Liability Company Act (the "<u>Delaware LLC Act</u>").  For example, in arguing that the Court should defer consideration of whether it has violated the automatic stay to an arbitration process allegedly mandated by Article 12 of the Operating Agreement, Greenbrier conveniently ignores the final

---

[1]    Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Motion.

section of Article 12, which provides that "[n]othing in this <u>Article 12</u> or in any other provision of this Agreement shall prevent or limit any Member's ability to commence litigation at any time in order to request equitable relief, including, without limitation, an injunction to prevent irreparable harm."  Operating Agreement at § 12.14.  Here, there is no debate that the Motion seeks equitable relief – Greenbrier admits to such in its Objection.  <u>See</u> Objection at 16 – 17.  As a consequence, there is no *valid* debate that the issue before the Court is in any way subject to mandatory arbitration.

Greenbrier next argues, with apparent ignorance of Section 12.14 quoted above, that the equitable relief sought in the Motion can only be granted in the context of an adversary proceeding.  Like its argument for arbitration, this attempt to convince the Court to forestall a determination on the merits is also misguided.  Greenbrier's actions on and after May 29, 2010 have robbed LCPI of its Membership Interests.  Greenbrier thus has taken control over property of the estate in violation of section 362 of the Bankruptcy Code.  As further described below, the case law is clear that there is no requirement to file an adversary complaint in order to seek a remedy for violations of the automatic stay.

When Greenbrier finally does address the merits of the Motion, it again ignores the plain language of the Operating Agreement and the consequences of its own conduct.  LCPI participated and voted as a member of Greenbrier ("<u>Member</u>") for over a year following its bankruptcy filing.  During the same time period, Jack McCarthy, LCPI's appointed Manager, participated in and voted at each meeting of Greenbrier's Board of Managers and was acknowledged as a Manager by Greenbrier's Corporate Secretary in all of the Minutes of those meetings.  It is simply too late for Greenbrier to now argue that LCPI lost all of its rights as a

Member and its ability to appoint a Manager when it filed its chapter 11 petition on October 5, 2008, more than 20 months ago.

Even if Greenbrier is not estopped by waiver and laches from asserting that LCPI's Membership Interests were terminated, it is barred from doing so by the black letter terms of the Operating Agreement. Although Greenbrier acknowledges for the first time in the Objection that LCPI could not have lost all of its Membership Interests in Greenbrier, it does so in a misguided attempt to argue that Section 18-304 of the Delaware LLC Act is applicable notwithstanding Section 9.7 of the Operating Agreement, which gives Greenbrier a three month call-right on the Membership Interests of a Member that files for bankruptcy. According to its latest theory, Section 9.7 only applies to a Member's economic interest such that Section 18-304 remains applicable to cause the termination of a Member's non-economic voting interests.

Here again, the express language is exactly contrary to Greenbrier's contention. The Operating Agreement defines Membership Interests to include not just a Member's economic rights, but "all of the interest of such Member in [Greenbrier], including such Member's . . . (iv) rights with respect to the management and business and affairs of the Company, if any, including any voting rights as may be provided in this Agreement." Operating Agreement at § 1.1. Accordingly, Section 9.7 of the Operating Agreement provides for the purchase of the entirety of a debtor-Member's interests in Greenbrier (both economic and managerial) and, because the Operating Agreement expressly addresses the totality of a debtor-Member's interests in Greenbrier, the default provisions of Section 18-304 of the Delaware LLC Act are not applicable in determining whether LCPI had a continuing right to its Membership Interests.

For these reasons, as detailed more fully below, the Debtor's Motion should be granted.

- 4 -

## ARGUMENT

### This Dispute Is Not Arbitrable Under the Plain Language of the Operating Agreement

1.      Recognizing the significant hurdle it faces in light of the plain language of the Operating Agreement, Greenbrier attempts to divert the Court's attention by alleging that the Court must cede its exclusive jurisdiction to address the governance dispute between the parties and related automatic stay issues because such matters are subject to arbitration.[2] Greenbrier's argument lacks merit for a number of reasons.

2.      To start, section 12.14 of the Operating Agreement provides that "[n]othing in this Article 12 or in any other provision of this Agreement shall prevent or limit any Member's ability to commence litigation at any time in order to request equitable relief . . . ." See Operating Agreement at § 12.14.  Thus, by its terms, the Operating Agreement expressly exempts litigation seeking equitable relief from any alternative dispute resolution process.  It is beyond dispute that a motion to enforce the stay is a form of equitable relief.  See Jeffries v. Browning (In re Reserves Dev. Corp.), 78 B.R. 951, 956 (W.D. Mo. 1986) (finding a motion to enforce the automatic stay as equitable relief).  Greenbrier, in fact, admits the same in its Objection.  See Objection at 16 – 17.  Accordingly, the Court may properly rule on the relief requested in the Motion.

---

[2]      It is beyond dispute that this Court has exclusive jurisdiction over property of LCPI's estate and the safeguard of such property.  See 28 U.S.C. § 1334(e) ("The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction . . . of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.").  Moreover, jurisdiction of any dispute regarding whether property is property of the estate for purposes of section 541 of the Bankruptcy Code lies solely with bankruptcy courts.  See In re First Assured Warranty Corp., 383 B.R. 502, 541 (Bankr. D. Colo. 2007) (finding "[g]enerally a dispute over whether an asset is property of a debtor's estate should and must be resolved in favor of the [bankruptcy court's] jurisdiction"); see also Manges v. Atlas (In re Duval County Ranch Co.), 167 B.R. 848, 849 (Bankr. S.D. Tex. 1994) (finding that "[w]henever there is a dispute regarding whether property is property of the bankruptcy estate, exclusive jurisdiction is in the bankruptcy court").

3.    Even assuming *arguendo* that the Motion does not fall within the scope of litigation exempted from the alternative dispute resolution procedures under Section 12.14 of the Operating Agreement, those procedures would not be applicable to the governance dispute currently before this Court.  As Greenbrier admits in the Objection, for the dispute resolution procedures to apply, there must first be a dispute between Members.  Objection at 10.  Indeed, Section 12.1 of the Operating Agreement provides that Members "agree if any dispute arises between [Members] relating to this Agreement . . . they will first utilize the mediation procedures specified in this Article prior to any additional proceedings."  Operating Agreement at § 12.1.  Here, neither the stay enforcement issue (the only relevant issue currently before this Court) nor any of the ancillary issues raised by Greenbrier in the Objection[3] constitute disputes between Members.  Rather, these issues are disputes between a non-Member, Greenbrier, and a Member, LCPI.[4]  Because there is no dispute between Members, the dispute resolution procedures set forth in Article 12 of the Operating Agreement are simply not applicable.

---

[3]    For example, in the Objection, Greenbrier asserts that "the Debtor's failure to fund [the full amount of the commitment under the Credit Agreement] prevents the Debtor from fully exercising its purported rights under the Operating Agreement because the Debtor has not satisfied the obligations necessary to obtain its right to five (5) votes or the 49% economic interest in Greenbrier."  Objection at 6.  While LCPI's alleged failure to fund under the Credit Agreement is not at issue in this Motion, and will be adjudicated by the Court at a later date in connection with the Proof of Claim filed by Greenbrier Minerals, even a cursory review of the Operating Agreement establishes that LCPI has retained its 49% economic interest in Greenbrier.  Indeed, the Operating Agreement expressly provides that "[n]otwithstanding anything in this Agreement to the contrary, in no event shall the Class D Sharing Ratio be reduced below 49%."  Operating Agreement at § 3.4(b)(iv).  Further, the Operating Agreement contains an integration clause providing that "[t]his Agreement represents the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, express or implied, oral or written, with respect thereto.  The express terms of this Agreement control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof."  Operating Agreement at § 11.4.  In light of the integration clause, the clear and unambiguous terms of the Operating Agreement, including Section 3.4(b)(iv), must be enforced notwithstanding any argument raised by Greenbrier arising from LCPI's funding under the separate Credit Agreement.  See, e.g., Chrin v. Ibrix Inc., No. Civ. A. 20587, 2005 WL 2810599, at *5 (Del. Ch. Oct. 19, 2005) (finding under Delaware law that after entering into an agreement containing an unambiguous integration clause, a party could not seek to rely on external documents).

[4]    Moreover, if one were to accept Greenbrier's position, as articulated in the Karis Email and the Buchanan Ingersoll Memorandum, that LCPI ceased to be a Member upon its bankruptcy filing, the aforementioned

4.       Assuming again that the dispute resolution procedures are applicable, the Member seeking to initiate those procedures against LCPI is required to obtain relief from the automatic stay from this Court before doing so.  <u>Cohen v. Nat. Union Fire Ins. Co of Pittsburgh, Pa. (In re County Seat Stores, Inc.)</u>, No. 01 Civ. 2966 (JGK), 2002 U.S. Dist. LEXIS 1555, at *6 (S.D.N.Y. 2002) (noting violation of automatic stay where party did not seek relief from the stay before commencing arbitration action); <u>Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc. (In re Ionosphere Clubs)</u>, 105 B.R. 765, 769 (Bankr. S.D.N.Y. 1989) (finding that "[t]he stay precludes the 'commencement or continuation' of all proceedings against the debtor, including arbitration proceedings."); <u>Commercial Union Fire Ins. Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 31 B.R. 965, 974 (S.D.N.Y. 1983) (citations omitted) (same).  To date, no Member has sought relief from the automatic stay to commence the dispute resolution procedures.

5.       Significantly, if the parties are required to proceed according to the dispute resolution procedures, there are additional delays before arbitration of the dispute would commence.[5]  During such time, the Board would remain without authority to act, seriously

---

(continued…)

issues would not constitute disputes between Members.  <u>See</u> Karis Email and Buchanan Ingersoll Memorandum at 2.

[5]    To initiate the procedures, the party raising the dispute must first give written notice of the nature of the dispute to the Board and the other Members and identify an individual with settlement authority to negotiate on behalf of that Member.  <u>See</u> Operating Agreement at § 12.2.  The member receiving the notice then must identify its own individual with settlement authority, and the parties then engage in direct negotiations to resolve the dispute.  <u>See</u> Operating Agreement at §§ 12.2 and 12.3.  Assuming no negotiated resolution is reached, the parties must then proceed to mediation.  <u>See</u> Operating Agreement at §§ 12.4 - 12.9.  If mediation is ultimately unsuccessful, the parties, as a last step, resort to arbitration.  <u>See</u> Operating Agreement at § 12.11.

jeopardizing the safety of Greenbrier's employees and the proper operation of its coal mines.

Such delay is simply untenable.[6]

### The Bankruptcy Court Is the Appropriate Forum to Adjudicate Whether Greenbrier's Denial of LCPI's Rights to Its Membership Interests Violates the Automatic Stay

6.      In the event this Court finds that the dispute resolution procedures are applicable to the narrow governance issue currently before it, contrary to Greenbrier's assertions, the Court is not required under Second Circuit law to refrain from hearing the parties' dispute on this issue in conjunction with the stay enforcement relief requested by LCPI.  Indeed, bankruptcy courts have discretion to hear an arbitrable matter where the dispute involves core matters and such matters may cause an inherent conflict between the Bankruptcy Code and the Federal Arbitration Act or seriously jeopardize the objectives of the Bankruptcy Code if heard in arbitration.  MBNA Am. Bank, N.A. v. Hill, 436 F.3d 104, 108 (2d Cir. 2006); U.S. Lines, Inc. v. Am. Steamship Owners Mutual Protection and Indem' Ass'n. (In re U.S. Lines, Inc.), 197 F.3d 631, 640 (2d Cir. 1999).

7.      LCPI's request that this Court determine that Greenbrier violated the automatic stay by denying LCPI's rights of its Membership Interests, as estate property under section 541 of the Bankruptcy Code, is a core matter even where such determination would resolve the quorum lock currently being faced by Greenbrier.  See MBNA, 436 F.3d at 108 (finding a section 362 action to be a core matter); Mt. McKinley Ins. Co.v. Corning Inc., 399

---

[6]      If the Court decides that the Operating Agreement's dispute resolution procedures are applicable to the governance dispute raised in the Motion, an order preserving LCPI's Membership Interests pending arbitration is appropriate.  See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1053 (2d Cir. 1990) ("The issuance of an injunction to preserve the status quo pending arbitration fulfills the court's obligation under the FAA to enforce a valid agreement to arbitrate.").

F.3d 436, 448 (2d Cir. 2005) (core matters include those related to the automatic stay); In re

Delta Air Lines, Inc. v. City of Los Angeles (In re Delta Airlines), No. 07 Civ. 2649 (DC), 2007

U.S. Dist. LEXIS 81216, at *11 (S.D.N.Y. 2007) (motion to enforce the automatic stay was

core); see also St. Paul Fire and Marine Ins. Co. v. Pepsico Inc., 884 F.2d 688, 701 (2d Cir.

1989) (finding proceedings related to property of the estate as core).  Additionally, the denial of

the Court's right to adjudicate the related property of the estate and stay issues in favor of

arbitration presents an inherent conflict between the Bankruptcy Code and the Federal

Arbitration Act, as the automatic stay is central to the objectives of the Bankruptcy Code and this

Court's exclusive jurisdiction over estate property.  Merrill v. MBNA Am. Bank, N.A. (In re

Merrill), 343 B.R. 1, 7, 9 (Bankr. D. Me. 2006) (finding that a violation of the automatic stay as

a central feature of the Bankruptcy Code and arbitration of a stay violation claim would conflict

with the court's duty to safeguard the automatic stay's fundamental protection for debtors).[7]

Accordingly, this Court should decide the Debtor's Motion.

### The Motion Is Proper for the Relief Requested by LCPI

8.      Contrary to Greenbrier's misguided assertions, LCPI is not required to

commence an adversary proceeding or other proceeding seeking declaratory relief in order for

this Court to hear matters pertaining to the automatic stay, including relief seeking to enforce the

---

[7]      Greenbrier cites to In re XO Communications, Inc., 2004 WL 360437 (S.D.N.Y. 2004) and MBNA for the
proposition that arbitration does not conflict with the Objectives of the Bankruptcy Code.  See Objection at
12 – 14.  These cases either do not stand for the propositions for which they are being cited by Greenbrier,
or are easily distinguishable.  For example, in XO Communications, the court addressed only whether a
Bankruptcy Court order directing arbitration was final or interlocutory and, upon finding it interlocutory,
declined to grant leave to appeal from the order.  XO Communications, 2004 WL 360437, at *4-6.  MBNA,
the Second Circuit expressly noted that arbitration of the debtor's adversary proceeding asserting a stay
violation claim would not seriously jeopardize the objectives of the Bankruptcy Code where the
estate was fully administered, the debtor received a discharge, and it no longer required the protection of
the automatic stay.  MBNA, 436 F.3d at 109.  Here, of course, LCPI is in the midst of its bankruptcy case
and requires the full protection of the automatic stay to protect property of its estate.

stay. Indeed, it is well established that it is unnecessary for a movant seeking injunctive relief to proceed by adversary proceeding where such relief is automatically available under the Bankruptcy Code. In re LTV Steel Co., Inc., 264 B.R. 455, 462-63 (Bankr. N.D. Ohio 2001) (finding stay violation action was properly before the court on motion rather than adversary proceeding, where debtor also sought declaratory and injunctive relief) (citation omitted); In re Thongta, No. 07-21837 (SVK), 2009 Bankr. LEXIS 1428, at *2 (Bankr. E.D. Wisc. 2009) (finding an adversary proceeding was unnecessary where relief sought a declaratory judgment related to the protections of the automatic stay); In re Tubman, 364 B.R. 574, n. 11 (Bankr. D. Md. 2009) (where declaration regarding the automatic stay is sought, an adversary proceeding was unnecessary); see also 10 Collier on Bankruptcy ¶ 7001.08 (Lawrence P. King ed. 15th ed. 2010) (noting that a Rule 7001(7) "proceeding is one instituted to obtain the necessary relief; such . . . proceeding is not necessary when the relief is automatically available. Thus, a distinction should be made between those situations covered by section 362(a) of the Code, and those in which a proceeding must be commenced to obtain an injunction.").

### LCPI's Rights to the Membership Interests, Including Economic and Managerial Interests, Are Governed by Section 9.07 of the Operating Agreement, Not the Default Provisions of Section 18-304 of the Delaware LLC Act

9.      As previously demonstrated in the Motion, there is no real dispute that Section 9.7 of the Operating Agreement explicitly addresses the rights of a Member to its Membership Interests in Greenbrier upon such Member's bankruptcy filing. Instead, the Operating Agreement provides the Company with a right to purchase and liquidate the debtor-Member's Membership Interests (including both economic and managerial interests) within three months of becoming aware of such Member's bankruptcy. Again, Section 9.7(a) of the Operating Agreement provides, in relevant part, that

> [a]t the election of the Company within three months after the Company becomes aware of an Affected Company Interest [defined as, *inter alia*, the Membership Interest of a Member that has sought bankruptcy relief], the Affected Company Interest may be purchased and liquidated by the Company, and the Member owning the Affected Company Interest shall surrender the Affected Company Interest in exchange for the Liquidation Value of the Affected Company Interest.

Operating Agreement at § 9.7(a). "Affected Company Interests" is defined in the Operating Agreement to include the "*Membership Interests* of a Member upon . . . the Bankruptcy of such Member . . . ." (Operating Agreement at § 9.7(b) (emphasis added)); while "Membership Interests" is defined to include

> "*all of the interest* of such Member in the Company, including such Member's . . . (i) right to an allocable share of the income, gain, losses, and deductions of the Company . . ., (ii) right to a distributive share of the Company's assets, . . . and (iv) rights with respect to the management of the business and affairs of the Company, if any, including any voting rights . . . ."

Operating Agreement at § 1.1 (emphasis added).

10.     Despite the plain language of the Operating Agreement, Greenbrier asserts (for the first time in the Objection) that Section 9.7 was only intended to address a Member's economic interests relating to its Membership Interests and that managerial interests, such as voting rights, are governed by the default provisions of Section 18-304 of Delaware LLC Act. See Objection at 17 – 21.    Unsurprisingly, Greenbrier cites no authority for its novel interpretation of Section 9.7 of the Operating Agreement.

11.     Greenbrier's argument flies in the face of the unequivocal terms of the Operating Agreement.   The Operating Agreement does *not* bifurcate economic and voting interests in the definition of Membership Interests.   Section 9.7 provides for the purchase of the entirety of a debtor-Member's Membership Interests (not only its economic interests) as an Affected Company Interest.   Accordingly, Greenbrier is simply wrong when it contends that

Section 9.7 was intended to address only a Member's economic interests, and that Section 18-304

of the Delaware LLC Act applies to the remaining managerial interests (such as voting interests).

12.     The only way LCPI's bankruptcy could have affected its rights to the

Membership Interests is if Greenbrier had exercised its right to purchase those interests within

three months of learning of LCPI's bankruptcy.  Greenbrier did not exercise such right, and as a

result, LCPI's Membership Interests remain property of its bankruptcy estate.  Greenbrier's

attempt to now deny LCPI its rights to its Membership Interests is a clear violation of the

automatic stay.

13.     Additionally, Greenbrier simply cannot overcome that for almost 20

months following LCPI's bankruptcy filing, neither Greenbrier nor Company counsel indicated

that the Board lacked authority to act on behalf of the Company due to a failure to achieve a

voting quorum as a result of LCPI's purported loss of its Membership Interests.  Greenbrier's

assertion that, following the Karis Email on December 17, 2009, Greenbrier routinely informed

LCPI that it was allowing Mr. McCarthy to participate in Board discussions without waiver to

Greenbrier's rights or applicable statutory provisions misses the point.  See Objection at 8.  As

set forth in the Motion, not only was the Karis Email itself 14 months after LCPI's filing, but by

continuing to engage in Company business with third parties, the Board purported to have

authority to conduct Company affairs.  See In re Desmond, 2005 WL 1244842, at *3 (Bankr. D.

N.H. 2005) (rejecting a Delaware limited liability company member's argument that a company

had dissolved under the Delaware LLC Act as a result of the member's bankruptcy filing, where

such member continued to hold the company out for purposes of conducting business well after

the filing).[8]

14.     Notably, in a stay enforcement action procedurally similar to this matter

and involving one of LCPI's affiliate debtors, this Court, in <u>Metavante</u>,[9] found that a non-debtor's

refusal to make payments under an executory contract based on the debtor's bankruptcy filing

was a violation of the stay.   <u>Metavante</u>, Hr'g Tr. at 112-113.   In that case, the Debtor sought an

order enforcing the automatic stay in order to require Metavante Corporation to stop withholding

payments under its swap agreement with the Debtor.   Metavante argued that the Debtor's

bankruptcy filing constituted a default under the swap agreement such that, pursuant to the

Bankruptcy Code's safe harbor provisions, Metavante could terminate the agreement (which it

had not sought to do, even more than a year after the debtor's bankruptcy filing) and/or withhold

payment. <u>Metavante</u>, Hr'g Tr. at 103-104.

15.     Significantly, the Court ruled that notwithstanding the safe harbor

provisions of the Bankruptcy Code that permitted such termination at the time of the debtor's

bankruptcy filing, by failing to promptly exercise its default remedies for more than a year after

the debtor's filing, Metavante Corporation had effectively waived such rights.   <u>Metavante</u>, Hr'g

Tr. at 111 -112.   Specifically, this Court found that Metavante Corporation's "conduct of riding

---

[8]     In the Motion, LCPI inadvertently cited a prior decision from the <u>In re Desmond</u> bankruptcy proceeding. <u>See</u> Motion at 13.

[9]     <u>Metavante</u> refers to the proceedings concerning the Debtor's Motion pursuant to sections 105(a), 362 and 365 of the Bankruptcy Code to Compel Performance of Metavante Corporation's Obligations under an Executory Contract and to Enforce the Automatic Stay.   <u>In re Lehman Bros. Holdings, Inc.</u>, 2009 WL 1569988 (Bankr. S.D.N.Y. May 29, 2009) (Docket No. 3691).   A copy of the transcript with the Court's September 15, 2009 bench ruling is attached hereto as <u>Exhibit A</u>.   The Court's Order to Enforce the Automatic Stay, pursuant to its bench ruling, can be found at <u>In re Lehman Bros. Holdings, Inc.</u>, 2009 WL 6057286 (Bankr. S.D.N.Y. Sept. 17, 2009).   All references to "<u>Metavante</u>" herein are references to the bench ruling.

the market for the period of one year, while taking no action whatsoever, [was] simply unacceptable and contrary to the spirit of these provisions of the Bankruptcy Code."  Metavante, Hr'g Tr. at 110.  The Court went further to find "that Metavante's window to act promptly under the safe harbor provisions [had] passed, and while it may not have had the obligation to terminate immediately upon the [debtors'] filing . . . its failure to do so, at this juncture, [constituted] a waiver of that right . . . ."  Metavante, Hr'g Tr. at 111-112.  Accordingly, the Court found that Metavante Corporation's attempt to control property of the estate, *i.e.* payments owed to the debtor pursuant to the contract, was a violation of the automatic stay.  Metavante, Hr'g Tr. at 112-113.

16.    Similarly, Greenbrier has waited at least 14 months to challenge LCPI's rights and has engaged in a course of conduct for at least 19 months inconsistent with the position it now takes.  Only now, in an attempt to block LCPI's vote, does Greenbrier attempt to exercise these rights.  Like Metavante, Greenbrier has long since waived its rights, assuming such rights even existed, to challenge LCPI's rights in its Membership Interests as a result of its bankruptcy filing.  Greenbrier's attempt to control property of the estate by extinguishing LCPI's Membership Interests therefore constitutes a violation of the automatic stay.

## NOTICE

17.    No trustee has been appointed in these chapter 11 cases.  LCPI has served notice of this Objection, in accordance with the procedures set forth in the amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [Docket No. 9635], on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the United States Attorney for the Southern

District of New York; (v) counsel for Greenbrier; and (vi) all parties who have requested notice

in these chapter 11 cases (collectively, the "Notice Parties").  LCPI submits that no other or

further notice need be provided.

Dated:  July 12, 2010
      New York, New York

JONES DAY


 /s/ Corinne Ball
Corinne Ball
Richard Engman
Robert Micheletto
Scott Griffin

222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for Debtor and Debtor in Possession*
*Lehman Commercial Paper Inc.*

# EXHIBIT A

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01258

Adv. Case No. 08-01743

Adv. Case No. 09-01242

Case No. 09-14884-jmp

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

      Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

      Debtor.

- - - - - - - - - - - - - - - - - - - -x

NEUBERGER BERMAN, LLC,

      Plaintiff,

   -against-

PNC BANK, NATIONAL ASSOCIATION,

LEHMAN BROTHERS INC., AND LEHMAN

BROTHERS COMMERICAL CORPORATION,

      Defendants.

- - - - - - - - - - - - - - - - - - - -x

2

1   - - - - - - - - - - - - - - - - - - - -x

2   STATE STREET BANK AND TRUST COMPANY,

3                       Plaintiff,

4   LEHMAN COMMERCIAL PAPER INC.,

5           -against-

6                       Defendant.

7   - - - - - - - - - - - - - - - - - - - -x

8   LEHMAN BROTHERS SPECIAL FINANCING INC.,

9                       Plaintiff,

10  BNY CORPORATE TRUSTEE SERVICES, LTD.,

11          -against-

12                      Defendant.

13  - - - - - - - - - - - - - - - - - - - -x

14  In the Matter of:

15  LEHMAN RE LTD.,

16                      Debtor.

17  - - - - - - - - - - - - - - - - - - - -x

18                  U.S. Bankruptcy Court

19                  One Bowling Green

20                  New York, New York

21                  September 15, 2009

22                  10:03 a.m.

23  B E F O R E :

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

3

1

2   RE: CASE NOS. 08-13555(JMP) and 08-01420(JMP)(SIPA)

3   HEARING re Interim Applications for Allowance of Compensation

4   for Professional Services Rendered and for Reimbursement of

5   Actual and Necessary Expenses [Docket No. 4839]

6

7   HEARING re Motion of Wells Fargo, NA for Relief from the

8   Automatic Stay [Docket No. 4640]

9

10  HEARING re Motion of Wells Fargo, NA for Relief from the

11  Automatic Stay [Docket No. 4671]

12

13  HEARING re Motion of Washington Mutual Bank f/k/a Washington

14  Mutual Bank, FA. For Relief from the Automatic Stay [Docket No.

15  4759]

16

17  HEARING re Motion of A/P Hotel, LLC for Relief from the

18  Automatic Stay [Docket No. 4950]

19

20  HEARING re Motion for Authorization to Assume an Interest Rate

21  Swap with MEG Energy Corp. [Docket No. 5012]

22

23

24

25

4

1

2  HEARING re Debtors' Motion for Establishment of Procedures for

3  the Debtors to Transfer Their Interests in Respect of

4  Residential and Commercial Loans Subject to Foreclosure to

5  Wholly-Owned Non-Debtor Subsidiaries [Docket No. 4966]

6

7  HEARING re Debtors' Motion for Establishment of Procedures for

8  the Debtors to Compromise Claims of the Debtors in Respect of

9  Real Estate Loans [Docket No. 4942]

10

11 HEARING re Motion of Landwirtschaftliche Rentenbank for 2004

12 Examination [Docket No. 4800]

13

14 HEARING re Debtors' Motion for Authorization to Implement

15 Alternative Dispute Resolution Procedures for Affirmative

16 Claims of Debtors Under Derivative Contracts [Docket No. 4453]

17

18 HEARING re Debtors' Motion to Compel Performance of Metavante

19 Corporation's Obligations Under an Executory Contract and to

20 Enforce the Automatic Stay [Docket No. 3691]

21

22 HEARING re Motion of DnB Nor Bank ASA for Allowance and Payment

23 of Administrative Expense Claim and Allowing Setoff of Such

24 Claim [Docket No. 4054]

25

5

1

2    HEARING re Motion of William Kuntz, III for Review of Dismissal

3    of Appeal [Docket No. 1261]

4

5    RE: ADV. CASE NO. 09-01258:

6    PRE-TRIAL CONFERENCE

7

8    RE: ADV. CASE NO. 08-01743:

9    PRE-TRIAL CONFERENCE

10

11    RE: ADV. CASE NO. 09-01242:

12    Motion of BNY Corporate Trustee Services Limited to Stay

13    Further Proceedings Pending Disposition of its Motion for Leave

14    to Appeal the August 12, 2009 Order Denying BNY's Motion to

15    Dismiss and any Disposition of the Merits of that Appeal

16

17    RE: CASE NO. 09-14884-jmp

18    HEARING re Joint provisional liquidators' request that the

19    Court grant recognition of the company's Chapter 15 case as a

20    foreign main proceeding or, alternatively, as a foreign non-

21    main proceeding, and award the JPLs the requested associated

22    relief

23

24    Transcribed by:  Clara Rubin

25                     Pnina Eilberg

6

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES, LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   HARVEY R. MILLER, ESQ.

9          ROBERT J. LEMONS, ESQ.

10         MARK I. BERNSTEIN, ESQ.

11         RICHARD P. KRASNOW, ESQ.

12         PETER GRUENBERGER, ESQ.

13         DENISE ALVAREZ, ESQ.

14         HOWARD B. COMET, ESQ.

15         RICHARD W. SLACK, ESQ.

16

17   WEIL, GOTSHAL & MANGES, LLP

18         Attorneys for Plaintiffs/Movants Lehman Brothers

19          Holdings, Inc. ("LBHI") and Lehman Brothers

20          Special Financing, Inc. ("LBSF")

21         1300 I Street, N.W.

22         Suite 900

23         Washington, DC 20005

24

25   BY:   RALPH I. MILLER, ESQ.

7

1

2    WEIL, GOTSHAL & MANGES, LLP

3          Attorneys for Plaintiffs/Movants Lehman Brothers

4           Holdings, Inc. ("LBHI") and Lehman Brothers

5           Special Financing, Inc. ("LBSF")

6          8911 Capital of Texas Highway

7          Building One, Suite 1350

8          Austin, TX 78759

9

10   BY:   MEREDITH B. PARENTI, ESQ.

11

12   ANDREWS KURTH LLP

13          Attorneys for EPCO Holdings, Inc.

14          450 Lexington Avenue

15          New York, NY 10017

16

17   BY:   PETER S. GOODMAN, ESQ.

18

19   BINGHAM MCCUTCHEN LLP

20          Attorneys for State Street Bank and Trust

21          One Federal Street

22          Boston, MA 02110

23

24   BY:   ANDREW C. PHELAN, ESQ.

25

8

1

2    BUCHANAN INGERSOLL & ROONEY PC

3         Attorneys for PNC

4         One Oxford Centre

5         301 Grant Street, 20th Floor

6         Pittsburgh, PA 15219

7

8    BY:   STANLEY YORSZ, ESQ.

9

10

11   CADWALADER, WICKERSHAM & TAFT LLP

12        Attorneys for Lehman Re Ltd.

13        One World Financial Center

14        New York, NY 10281

15

16   BY:   INGRID BAGBY, ESQ.

17        ELIZABETH BUTLER, ESQ.

18        JONATHAN M. HOFF, ESQ.

19        GREGORY M. PETRICK, ESQ.

20

21

22

23

24

25

9

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for D.E. Shaw Composite Portfolios LLC, D.E.

4          Shaw Oculus Portfolios LLC, and Affiliates, and Wachovia

5         One Liberty Plaza

6         New York, NY 10006

7

8    BY:   JEFFREY A. ROSENTHAL, ESQ.

9          DAVID Y. LIVSHIZ, ESQ. (admitted pro hac vice)

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for Barclays Capital, Inc.

13        One Liberty Plaza

14        New York, NY 10006

15

16   BY:   LUKE A. BAREFOOT, ESQ.

17

18   DEWEY & LEBOEUF, LLP

19        Attorneys for Royal Bank of Scotland PLC and Its

20         Affiliates

21        1301 Avenue of the Americas

22        New York, NY 10019

23

24   BY:   MARTIN J. BIENENSTOCK, ESQ.

25        IRENA M. GOLDSTEIN, ESQ.

```
                                                        10
 1

 2    HOGAN & HARTSON LLP

 3          Attorneys for Landwirtschaftliche Rentenbank

 4          875 Third Avenue

 5          New York, NY 10022

 6

 7    BY:   LYNDON M. TRETTER, ESQ.

 8

 9

10    HUGHES HUBBARD & REED LLP

11          Attorneys for the James W. Giddens, SIPA Trustee

12          One Battery Park Plaza

13          New York, NY 10004

14

15    BY:   JEFFREY S. MARGOLIN, ESQ.

16          JEFFREY M. GREILSHEIMER, ESQ.

17

18

19    JENNER & BLOCK LLP

20          Attorneys for Anton R. Valukas, Examiner

21          919 Third Avenue

22          37th Floor

23          New York, NY 10022

24

25    BY:   PATRICK J. TROSTLE, ESQ.
```

11

1

2      KIRKLAND & ELLIS LLP

3            Attorneys for Lehman Re

4            300 North LaSalle Street

5            Chicago, IL 60654

6

7      BY:   ANDREW R. MCGAAN, ESQ.

8

9      MAYER BROWN LLP

10           Attorneys for Societe Generale and Certain of its

11            Affiliates, and CIBC and Certain of its Affiliates

12           1675 Broadway

13           New York, NY 10019

14

15     BY:   AMIT K. TREHAN, ESQ.

16

17     MILBANK, TWEED, HADLEY & MCCLOY, LLP

18           Attorneys for the Official Committee of

19            Unsecured Creditors

20           One Chase Manhattan Plaza

21           New York, NY 10005

22

23     BY:   DENNIS C. O'DONNELL, ESQ.

24           DENNIS F. DUNNE, ESQ.

25           EVAN R. FLECK, ESQ.

12

```
 1
 2    MILBANK, TWEED, HADLEY & MCCLOY, LLP
 3         Attorneys for the Official Committee of
 4          Unsecured Creditors
 5         International Square Building
 6         1850 K Street, NW
 7         Washington, DC 20006
 8
 9    BY:   DAVID S. COHEN, ESQ.
10
11    MILLER & MARTIN PLLC
12         1200 One Nashville Place
13         150 Fourth Avenue North
14         Nashville, TN 37219
15
16    BY:   W. NEAL MCBRAYER, ESQ.
17
18    O'MELVENY & MYERS LLP
19         Attorneys for Oceania Cruises, Inc.
20         Times Square Tower
21         7 Times Square
22         New York, NY 10036
23
24    BY:   SHANNON LOWRY NAGLE, ESQ.
25
```

13

1

2   PACHULSKI STANG ZIEHL & JONES

3       780 Third Avenue

4       36th Floor

5       New York, NY 10017

6

7   BY:   ROBERT J. FEINSTEIN, ESQ.

8

9

10   PILLSBURY WINTHROP SHAW PITTMAN LLP

11       Attorneys for Embarcadero Aircraft Securitization Trust

12       1540 Broadway

13       New York, NY 10036

14

15   BY:   RICK B. ANTONOFF, ESQ.

16

17

18   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP

19       Special Counsel to the Official Creditors' Committee

20       51 Madison Avenue

21       22nd Floor

22       New York, NY 10010

23

24   BY:   JAMES G. TECCE, ESQ.

25

14

1

2    REED SMITH, LLP

3         Attorneys for BNY Corporate Trustee Services, Bank of

4          New York Mellon

5         599 Lexington Avenue

6         New York, New York 10022

7

8    BY:   ERIC A. SCHAFFER, ESQ.

9

10

11   RICHARDS KIBBE & ORBE LLP

12        One World Financial Center

13        New York, NY 10281

14

15   BY:   MICHAEL FRIEDMAN, ESQ.

16

17

18   SALANS LLP

19        Attorneys for Swedbank AB

20        Rockefeller Center

21        620 Fifth Avenue

22        New York, NY 10020

23

24   BY:   CLAUDE D. MONTGOMERY, ESQ.

25

15

1

2    SHEARMAN & STERLING LLP

3        Attorneys for Bank of America and Merrill Lynch and Their

4        Affiliates

5        599 Lexington Avenue

6        New York, NY 10022

7

8    BY:   DANIEL H.R. LAGUARDIA, ESQ.

9        NED S. SCHODEK, ESQ.

10

11

12   SHEARMAN & STERLING LLP

13       Attorneys for Nomura International plc

14       599 Lexington Avenue

15       New York, NY 10022

16

17   BY:   SOLOMON J. NOH, ESQ.

18

19   STROOCK & STROOCK & LAVAN LLP

20       Attorneys for Omnibus Derivative Counterparties

21       180 Maiden Lane

22       New York, NY 10038

23

24   BY:   CLAUDE G. SZYFER, ESQ.

25

16

1

2    STROOCK & STROOCK & LAVAN LLP

3         Attorneys for Neuberger Berman

4         180 Maiden Lane

5         New York, NY 10038

6

7    BY:   DEREK I. A. SILVERMAN, ESQ.

8

9

10   SULLIVAN & CROMWELL LLP

11        Attorneys for Defendant Barclays Bank PLC and Long Island

12         International

13        125 Broad Street

14        New York, NY 10004

15

16   BY:   ROBINSON B. LACY, ESQ.

17

18

19   WHITE & CASE, LLP

20        Attorneys for Ad Hoc Group of Creditors

21        1155 Avenue of the Americas

22        New York, NY 10036

23

24   BY:   LISA THOMPSON, ESQ.

25

17

1

2   WHYTE HIRSCHBOECK DUDEK S.C.

3         Attorneys for Creditor Metavante Corporation

4         555 East Wells Street

5         Suite 1900

6         Milwaukee, WI 53202

7

8   BY:   BRUCE G. ARNOLD, ESQ.

9

10

11  WINTHROP COUCHOT PC

12        660 Newport Center Drive

13        Fourth Floor

14        Newport Beach, CA 92660

15

16  BY:   SEAN A. O'KEEFE, ESQ.

17

18

19  U.S. DEPARTMENT OF JUSTICE

20        Office of the United States Trustee

21        33 Whitehall Street, 21st Floor

22        New York, NY 10004

23

24  BY:   LINDA A. RIFFKIN, ESQ.

25

18

1

2   U.S. DEPARTMENT OF JUSTICE

3        U.S. Attorney's Office, Southern District of New York

4        86 Chambers Street

5        3rd Floor

6        New York, NY 10007

7

8   BY:   JOSEPH N. CORDARO, ESQ.

9

10   SELTZER CAPLAN MCMAHON VITEK

11        Attorneys for Lusardi Construction Co.

12        2100 Symphony Towers

13        750 B Street

14        San Diego, CA 92101

15

16   BY:   DENNIS J. WICKHAM, ESQ. (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

99

1    that it has been presented and will make some judgments as to

2    the identity of the mediators in consultation with counsel for

3    the debtors and for the creditors' committee who have been so

4    active in developing these procedures.

5         I recognize that a lot of people who are in court at

6    this moment are here for the ADR procedures, and I'm going to

7    give people who want to leave an opportunity to leave.  I'm

8    also going to give everybody an opportunity for a break.  But

9    because of the congestion of this docket, I think I'm going to

10   go until 1 o'clock.  So let's take a break for ten minutes, and

11   then resume, and then go until 1 o'clock and then break for

12   lunch.  We're adjourned until then.

13        MR. GRUENBERGER:  Thank you, Your Honor.

14     (Recess from 12:12 p.m. to 12:28 p.m.)

15        THE COURT:  Be seated please.  Number 11, Metavante.

16        MR. SLACK:  Your Honor, Richard Slack from Weil,

17   Gotshal for the debtors.  We're here on the debtors' motion to

18   compel performance of Metavante Corporation.  As Your Honor

19   knows, two months ago we had argument, after fully briefing the

20   issue.  Your Honor is in receipt of letters from both

21   Metavante's counsel and from the debtors, which I think

22   provides the status of where we are in terms of discussions,

23   which is, essentially, that the parties have not had

24   substantial discussions, as the letters which are docketed

25   state.

100

1          The debtors were requested to make a proposal to

2    resolve it, which we did.  We have not received a proposal from

3    Metavante in the two months since the hearing, and Metavante

4    has not responded to our proposal that we've made.

5          Your Honor has mentioned Metavante a couple of times

6    today, and so Your Honor may have a plan for the conference,

7    but it is the debtors' position that this matter should be

8    considered and decided, at the Court's discretion, obviously.

9          THE COURT:  Understood.  I'm ready to rule today.

10         MR. ARNOLD:  May it please the Court, mindful of that

11   comment, I want you to know why we wrote the letter, so that

12   you have in mind that parties do take into account the risks of

13   not settling, and you were quite clear at the hearing on July

14   14th that there was an opportunity for the parties to consider

15   resolving this matter.

16         For the Court's information, neither Lehman nor its

17   counsel have been obdurate, ornery, or in any fashion

18   unprofessional.  Our dealings have been quite, to the contrary,

19   exceptional throughout the history of our relationships.  I

20   reached out to counsel for the debtors to explain how it is

21   that an impending transaction which will close on October 1st

22   would, in my judgment, have a favorable impact on the

23   likelihood of this matter resolving consensually.  That was the

24   singular purpose for us writing the letter to the Court.  We

25   are not here today to reargue the motion.  The Court heard

101

1    extensive oral argument.  It has been well briefed.  The issues

2    have come up again in, frankly, in other instances and motions

3    and adversary proceedings.  I wanted the Court to know that it

4    was not by design, neglect or deliberately ignoring your

5    comments on July 14th that the settlement has not proceeded

6    further than it has.  About a week ago we received a settlement

7    proposal.  I am authorized to state by both Fidelity and

8    Metavante that post-closing of the merged entity we expect to,

9    and intend to, and will make a settlement proposal, but we're

10   also mindful that it hasn't been settled, and if it is the

11   Court's desire to rule on the matter today, we govern ourselves

12   accordingly.  I just wanted the Court to know what I've done

13   since July 14th to try to move this matter on.

14            THE COURT:  Okay.  Thank you for that update.

15            MR. ARNOLD:  Thank you, Your Honor.

16            THE COURT:  The Metavante matter consumed the better

17   part of an afternoon's oral argument.  My best recollection is

18   that we specially listed it on the afternoon before the July

19   omnibus hearing.  Candidly, I don't recall why it was specially

20   listed all by itself, but it's just as well that it happened,

21   because it took a lot of time.

22            It's correct that I encouraged the parties to attempt

23   to resolve this consensually, and I appreciate the fact that

24   large enterprises, particularly those that are involved in

25   major transactions in which acquisitions are literally weeks

102

1   away from being consummated, may be distracted or may have

2   other priorities.  But I also believe that when I suggested

3   that this be listed for the September 15th omnibus hearing it

4   was with the notion that, in effect, time would be up.

5        I'm also mindful of the fact that on today's calendar

6   a matter very similar to this, item 6, has been consensually

7   resolved, involving the payment of fifty percent more dollars

8   to the debtors than are at issue in this current dispute.

9        I am prepared to rule and will do so now.  Recognize

10  that what I'm about to do will take some time and will probably

11  take us to the lunch hour.  If there is anyone here who doesn't

12  want to hear the ruling in this case I'd like you to be free to

13  both leave, because I won't be offended, or, if at some point

14  during my rendition of this ruling you say to yourself this is

15  something I don't need to hear, you're also free to leave at

16  that point.

17       LBSF requests that the Court compel Metavante to

18  perform its obligations under that certain 1992 ISDA Master

19  Agreement dated as of November 20, 2007, defined as the "Master

20  Agreement".  And that certain trade confirmation dated December

21  4, 2007, defined as the "Confirmation", and together with the

22  Master Agreement, the "Agreement".

23       The Master Agreement provides the basic terms of the

24  parties' contractual relationship and contemplates being

25  supplemented by trade confirmations that provide the economic

103

1    terms of the specific transactions agreed to by the parties.

2    Under the Master Agreement, Metavante and LBSF entered into an

3    interest rate swap transaction, the terms of which were

4    documented pursuant to the Confirmation.

5         LBHI is a credit support provider for LBSF's payment

6    obligations under the Agreement.

7         Due to declining interest rates the value of LBSF's

8    position under the Agreement has increased.  As of May 2009,

9    under the payment terms of the Agreement, Metavante owed LBSF

10   in excess of 6 million dollars, representing quarterly payments

11   due November, 2008, February, 2009 and May, 2009, plus default

12   interest in excess of 300,000 dollars.

13        It is possible that due to current market conditions

14   and to the quarterly payment schedule prescribed by the

15   Agreement the amounts that Metavante owes to LBSF as of today

16   are even higher than those stated in the motion.  Metavante has

17   refused to make any payments to LBSF.  In fact, it has refused

18   to perform its obligations under the Agreement, as of November

19   3, 2008.  Instead, Metavante claims that LBSF and LBHI, via the

20   filing of their respective Chapter 11 cases, each caused an

21   event of default under the Agreement.

22        Metavante argues that due to such events of default it

23   has the right, but not the obligation, under the safe harbor

24   provisions of the Bankruptcy Code, to terminate all outstanding

25   derivative transactions under the Agreement.  Metavante also

104

1    maintains that it is not otherwise required to perform under

2    the Agreement.

3         The parties presented their arguments to the Court at

4    a hearing held on July 14, 2009.  Notably at the hearing

5    counsel to Metavante stated that, quote, "the opportunity to

6    settle the matter", is a possibility.  The reference in the

7    transcript is page 58, lines 18 to 19.  The Court took the

8    matter under advisement and suggested that it be calendared for

9    the September 15, 2009 omnibus hearing for purposes of either a

10   bench ruling or a status conference on any progress the parties

11   may have made towards a resolution.

12        I want to make clear that I am proceeding with this

13   ruling because I view the letter described by counsel for

14   Metavante, which talked about a possible settlement

15   counterproposal occurring sometime after the closing of a

16   merger on October 1, as being an insufficient commitment to a

17   timely settlement.

18        On September 14, 2009 the Court received letters from

19   counsel to each of the parties.  Counsel to Metavante requests

20   an adjournment to October 14.  Counsel states that an

21   adjournment will facilitate the parties' settlement

22   negotiations but explains that Metavante may not make a

23   counterproposal to LBSF's September 5, 2009 settlement proposal

24   until after the proposed October 1, 2009 closing of a merger.

25   Counsel also suggests that an adjournment will allow the Court

105

1    to put the motion on the same track as two other motions

2    currently pending before the Court.  Which motions, counsel

3    claims, raise similar issues to the motion?  Counsel to LBSF

4    and LBHI maintain that inasmuch as Metavante has done nothing

5    since July 14, 2009 to settle this matter other than asking

6    LBSF and LBHI to make a settlement proposal, the parties are no

7    closer to settlement than they were at the hearing, and,

8    therefore, the status conference should go forward as planned.

9         While each of the matters reference by counsel to

10   Metavante may have overlapping issues with those presented in

11   the current dispute, each matter involves its own distinct set

12   of fats.  Moreover, each of the two referenced matters is in

13   its infancy.  No response has been filed in either one, which

14   may further delay resolution here.

15        This is a dispute that has been fully briefed and

16   argued and is ripe for determination.  Moreover, I note that

17   the settlement that was achieved with MEG Energy that was

18   referenced this morning indicates that parties who are willing

19   to settle can, and do.

20        Under the Agreement LBSF is obligated to pay the

21   floating three month USD LIBOR BBA interest rate on a notional

22   amount of 600 million dollars, which notional amount declines

23   over time, beginning in May, 2010.  Metavante, in turn, is

24   obligated to pay a fixed interest rate, 3.865 percent, on the

25   notional amount.  The Agreement is set to expire on February 1,

106

1    2012.  The Agreement defines event of default to include the

2    bankruptcy of any party or credit support provider.  Under the

3    terms of the Agreement, upon an event of default the non-

4    defaulting party may designate an early termination date.  Upon

5    termination a final payment is calculated and paid in order to

6    put the parties into the same economic position as if the

7    termination had not occurred.

8         In the instant case Metavante has refused to perform

9    under the Agreement on account of the event of default that has

10   occurred, and is continuing, on account of the bankruptcies of

11   LBSF and LBHI.  Metavante has not, however, attempted to

12   terminate the Agreement.  Instead, Metavante entered into a

13   replacement hedge covering the period from November 3, 2008

14   through February 1, 2010.

15        LBSF and LBHI argue that the Agreement is an executory

16   contract because material performance, specifically payment

17   obligations, remain due by both LBSF and Metavante.  Under

18   Bankruptcy Code Section 365(a) a debtor in possession may,

19   "subject to the court's approval, assume or reject any

20   executory contract".  The case law makes clear, however, that

21   while a debtor determines whether to assume or reject an

22   executory contract the counterparty to such contract must

23   continue to perform.

24        LBSF and LBHI further argue that the safe harbor

25   provisions do not excuse Metavante's failure to perform.

107

1    Indeed, the safe harbor provisions permit qualifying non-debtor

2    counterparties to derivative contracts to exercise certain

3    limited contractual rights triggered by, among other things, a

4    Chapter 11 filing.  They're available, however, only to the

5    extent that a counterparty seeks to one, liquidate, terminate

6    or accelerate its contracts or two, net out its positions.  All

7    other uses of ipso facto provisions remain unenforceable under

8    the Bankruptcy Code.

9         Notably, Metavante does not dispute that it has failed

10   to perform under the Agreement.  Instead, Metavante argues that

11   the occurrence of an event of default under the Agreement gives

12   rise to its right, as the non-defaulting party, to terminate

13   under the safe harbor provisions.  According to Metavante the

14   occurrence of an event of default does not, however, create the

15   obligation for it to terminate under the safe harbor

16   provisions.  Metavante emphasizes the term, quote, "condition

17   precedent" set forth in Sections 2(a), 1 and 3 of the

18   Agreement, which subject payment obligations to the condition

19   precedent that no event of default with respect to the party

20   has occurred and is continuing.

21        Metavante argues that under New York State contract

22   law a failure of a condition precedent excuses a party's

23   obligation to perform.  Metavante states that its unequivocal

24   right to suspend payments until the termination of the

25   Agreement is fundamental to the manner in which swap parties

108

1    government themselves.  Metavante takes issue with LBSF and

2    LBHI in asking the Court to treat the Agreement like a garden

3    variety executory contract, arguing that it cannot be compelled

4    to pay because LBSF and LBHI cannot provide the essential item

5    of value Metavante bargained for, namely an effective

6    counterparty.

7            Metavante further argues on information and belief

8    that LBSF and LBHI also are in default under certain

9    unspecified indebtedness that allegedly may have created a

10   cross default under the Agreement, asserting, as a result, an

11   alleged need to engage in the discovery process.

12           It is clear that the filing of bankruptcy petitions by

13   LBHI and LBSF constitute events of default under the Agreement.

14   Specifically, Section 5(a)(vii) of the Agreement provides that

15   it shall constitute an event of default should a party to the

16   Agreement or any credit support provider of such party

17   institute a proceeding seeking a judgment of insolvency or

18   bankruptcy, or any other relief under any bankruptcy insolvency

19   law or similar law affecting creditors' rights.

20           Section 2(a)(i) and 3 of the Agreement, in turn,

21   subject payment obligations to the condition precedent that no

22   event of default with respect to the other party has occurred

23   and is continuing.  It is also clear, however, that the safe

24   harbor provisions, primarily Bankruptcy Code Sections 560 and

25   561, protect a non-defaulting swap counterparty's contractual

109

1    rights solely to liquidate, terminate or accelerate one or more

2    swap agreements because of a condition of the kind specified in

3    Section 365(e)(1), or to "offset or net out any termination

4    values or payment amounts arising under or in connection with

5    the termination, liquidation or acceleration of one or more

6    swap agreements".  That language comes from Section 560.

7           In the instant matter Metavante has attempted neither

8    to liquidate, terminate or accelerate the Agreement, nor to

9    offset or net out its position as a result of the events of

10   default caused by the filing of bankruptcy petitions by LBHI

11   and LBSF.  Metavante simply is withholding performance, relying

12   on the conditions precedent language in Sections 2(a)(i) and

13   (iii) under the Agreement.

14          The question presented in this matter and the issue

15   that was argued by the parties at the hearing is whether

16   Metavante's withholding of performance is permitted, either

17   under the safe harbor provisions or under terms of the

18   Agreement itself.  It is not.

19          Although complicated at its core the Agreement is, in

20   fact, a garden variety executory contract, one for which there

21   remains something still to be done on both sides.  Each party

22   to the Agreement still is obligated to make quarterly payments

23   based on a floating or fixed interest rate of a notional

24   amount, it being understood that the net obligor actually makes

25   a payment after the parties respective positions are calculated

110

1   on a quarterly basis, in February, May, August and November of

2   each calendar year.

3       Under relevant case law it is clear that while an un-

4   assumed executory contract is not enforceable against a debtor,

5   see NLRB v. Bildisco & Bildisco, 465 US 513 at 531, such a

6   contract is enforceable by a debtor against the counterparty.

7   See McLean Industries, Inc. v. Medical Laboratory Automation,

8   Inc., 96 B.R. 440 at 449 (Bankr. S.D.N.Y. 1989).  Metavante

9   relies on In re Lucre, Inc., 339 BR 648 (WD Mich.) for the

10  proposition that a debtor's uncured pre-petition breach of its

11  executory contract, here the event of default caused by the

12  bankruptcy filings of LBHI and LBSF, will, in and of itself,

13  justify continued nonperformance by the non-debtor

14  counterparty, and mere commencement of bankruptcy proceedings

15  and the imposition of the automatic stay does not empower the

16  debtor to compel performance from a non-debtor party.

17      The Court rejects the Lucre decision as nonbinding and

18  non-persuasive.  While Metavante's argument for the events of

19  default caused by the bankruptcy filings of LBHI and LBSF do

20  create an obligation for it to terminate the Agreement under

21  the safe harbor provisions, that's a tenable argument.  Its

22  conduct of riding the market for the period of one year, while

23  taking no action whatsoever, is simply unacceptable and

24  contrary to the spirit of these provisions of the Bankruptcy

25  Code.

111

1          First, inasmuch as the Bankruptcy Code trumps any

2     state law excuse of nonperformance, Metavante's reliance on New

3     York contract law is misplaced.  Moreover, legislative history

4     evidences Congress's intent to allow for the prompt closing out

5     or liquidation of open accounts upon the commencement of a

6     bankruptcy case.  Citation is to the Congressional history of

7     this, H.R. Rep. 97-420 at 1 (1982), as well as its stated

8     rationale that the immediate termination for default and the

9     netting provisions are critical aspects of swap transactions

10    and are necessary for the protection of all parties in light of

11    the potential for rapid changes in the financial markets.

12    Citation to the Senate Report number 101-285 at 1 (1990).

13         The safe harbor provisions specifically permit

14    termination solely, quote, "because of a condition of the kind

15    specified in Section 365(e)(1) that is the insolvency or

16    financial condition of the debtor and the commencement of a

17    bankruptcy case.  See also In re Enron Corp., 2005. WL 3874285,

18    at *4, Judge Gonzalez's case, 2005.  Noting that a

19    counterparty's action under the safe harbor provisions must be

20    made fairly contemporaneously with the bankruptcy filing, less

21    the contract be rendered just another ordinary executory

22    contract.

23         The Court finds that Metavante's window to act

24    promptly under the safe harbor provisions has passed, and while

25    it may not have had the obligation to terminate immediately

112

1    upon the filing of LBHI or LBSF, its failure to do so, at this

2    juncture, constitutes a waiver of that right at this point.

3           Metavante's references to defaults under certain

4    unspecified indebtedness that allegedly may have created a

5    cross default under the Agreement are of no moment.  First,

6    Metavante failed to set forth the basis, either in its papers

7    or at the hearing, for its information and belief that such a

8    default may have occurred.  Its assertion that such a default

9    may have occurred indicates that Metavante is not aware of any

10   such default, and, therefore, did not rely on that default in

11   its refusal to perform under the Agreement or lacks knowledge

12   of what that default may be.

13          Additionally, the argument that LBSF or LBHI may have

14   defaulted under other specified indebtedness, as that term is

15   defined in the Agreement, relies upon the financial condition

16   of bankruptcy debtors to withhold performance.  That is also

17   unenforceable as an ipso facto clause that may not be enforced

18   under the Bankruptcy Code Section 365(e)(1)(A).

19          LBSF and LBHI are entitled to continued receipt of

20   payments under the Agreement.  Metavante's attempts to control

21   LBSF's right to receive payment under the Agreement constitute,

22   in effect, an attempt to control property of the estate.  See

23   In re Enron Corp., 300 B.R. 201 at 212 (S.D.N.Y. 2003),

24   recognizing that contract rights are property of the estate and

25   that therefore those rights are protected by the automated

113

1    stay.

2         This is a violation of the automatic stay imposed by

3    Code Section 362.  Accordingly, for the reasons set forth in

4    LBSF's and LBHI's papers, for the reasons stated on the record

5    at the hearing and for the reasons stated on the record today,

6    pursuant to Bankruptcy Code Sections 105(a), 362 and 365,

7    Metavante is directed to perform under the Agreement until such

8    time as LBSF and LBHI determine whether to assume or reject.

9    That's the ruling of the Court.

10        MR. KRASNOW:  Good afternoon, Your Honor.  Richard

11   Krasnow, Weil, Gotshal & Manges, for the Chapter 11 debtors.

12   We are close to the end of this morning's agenda, but not quite

13   there as yet.  The next item, Your Honor, is number 12.  It is

14   the motion of DnB Nor Bank described in the agenda.  Your

15   Honor, that matter has been fully submitted to the Court, fully

16   briefed, arguments held on November 5th, and today is the

17   scheduled status conference.

18        THE COURT:  Okay.  I'm ready to rule on that, but

19   given the hour I'm not going to take the time to do that now.

20   But we'll issue a short memorandum in due course.  So as to not

21   create any undue suspense for those parties who are here in

22   connection with the DnB Nor matter, I am deciding that in favor

23   of the debtors and against DnB Nor, denying DnB Nor's motion

24   for allowance of an administrative expense claim, substantially

25   for the reasons set forth in the committee's papers.