EXECUTION VERSION

## PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS

Escrow No. 629422-VR

Date of Opening
of Escrow: July __, 2010

Fidelity National Title Company/Major Accounts
("Escrow Holder")
1300 Dove Street, #310
Newport Beach, CA 92260
Ph: 949-477-3646
Fax: 949-477-3600
E-mail: Valerie.Rapp@fnf.com

THIS PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS (this "Agreement") is made this 13th day of July, 2010 (the "Execution Date"), by and between Alfred H. Siegel, solely in his capacity as the Chapter 11 trustee ("Trustee") of the administratively consolidated estates of LBREP/L-SunCal McAllister Ranch, LLC ("McAllister Ranch"), LBREP/L-SunCal McSweeny Farms, LLC ("McSweeny Farms"), and LBREP/L-SunCal Summerwind Ranch, LLC ("Summerwind Ranch"; with McAllister Ranch, McSweeny Farms and Summerwind Ranch being referred to herein from time-to-time individually as a "Debtor", and collectively as the "Debtors"), and Land Co. Coldwater Endeavor, LLC, a California limited liability company ("Buyer"). Trustee, acting on behalf of the applicable Debtors in the foregoing capacity only, shall be referred to herein from time-to-time as "Seller".

R E C I T A L S:

A.    McAllister Ranch is the fee owner of certain real property situated in the County of Kern, State of California, as more particularly described on Exhibit "A-1" attached hereto and incorporated herein by this reference (the "McAllister Real Property").

B.    McSweeny Farms is the fee owner of certain real property situated in the County of Riverside, State of California, as more particularly described on Exhibit "A-2" attached hereto and incorporated herein by this reference (the "McSweeny Real Property").

C.    Summerwind Ranch is the fee owner of certain real property situated in the County of Riverside, State of California, as more particularly described on Exhibit "A-3"

1

EXECUTION VERSION

attached hereto and incorporated herein by this reference (the "Summerwind Real Property"). The McAllister Real Property, the McSweeny Real Property and the Summerwind Real Property are referred to herein from time-to-time individually as a "Real Property", and collectively as the "Real Properties".

D.    Trustee, as the duly appointed Chapter 11 trustee in the Case (defined below), is authorized to sell the Real Properties and certain other assets defined below subject to approval of the Court (defined below), and subject to compliance with Court approved Sale Procedures (defined below).

E.    Trustee desires to sell to Buyer, and Buyer desires to acquire from Trustee, the Property, upon the terms set forth in this Agreement.

NOW, THEREFORE, incorporating the foregoing recitals and in consideration thereof, in consideration of the mutual covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## TERMS AND CONDITIONS

### ARTICLE I

### DEFINITIONS; PURCHASE AND SALE OF PROPERTY

1.1    Defined Terms.    The following terms shall have the definitions and meanings provided herein:

(a)    "Benefits" means all of Seller's right, title and interest, if any, in all deposits, fee credits and other credits, pre-paid fees, reimbursements, rights to reimbursements, benefits of any cost sharing agreements, insurance benefits and proceeds, California Department of Real Estate rights, deposits and reserves (including any homeowner's association reserves), and rights in and to any community facilities districts and other assessment and benefit districts to the extent related to the Real Properties, and each of them. Benefits excludes the Reserved Matters (as defined below).

(b)    "Case" shall mean that certain Chapter 11 proceeding for the administratively consolidated estates of LBREP/L-Lehman SunCal Master I, LLC, LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC, pending in the United States Bankruptcy Court, Central District of California, Santa Ana Division, as Case No. 8:08-bk-15588-ES.

(c)    "Claim" or "Claims" shall mean and refer to any and all suits, claims, causes of action, lawsuits, liens, losses, damages, fines, penalties, governmental actions, demands, liabilities, losses, expenses or costs of any kind, character or nature, to any person, entity, governmental body, or property, including, but not limited to reasonable

EXECUTION VERSION

attorneys' fees and costs, which arise out of the subject matter of each particular
provision of this Agreement in which this term is used.

(d)    "Court" shall mean the United States Bankruptcy Court, Central District of
California, Santa Ana Division.

(e)    "Environmental Law" means any federal, state or local statute, ordinance,
rule, regulation, order, consent decree, judgment or common-law doctrine, and provisions
and conditions of permits, licenses and other operating authorizations relating to
(i) pollution or protection of the environment, including natural resources, (ii) exposure
of persons, including employees, to Hazardous Materials or other products, raw
materials, chemicals or other substances, (iii) protection of the public health or welfare
from the effects of by-products, wastes, emissions, discharges or releases of chemical
substances from industrial or commercial activities, or (iv) regulation of the manufacture,
use or introduction into commerce of chemical substances, including without limitation,
their manufacture, formulation, labeling, distribution, transportation, handling, storage
and disposal.

(f)    "Final Order" means an order or judgment that has not been stayed,
reversed, modified or amended, and as to which the time to appeal, petition for certiorari,
or move for reargument or rehearing has expired and as to which no appeal, petition for
certiorari, or other proceedings for reargument or rehearing shall then be pending or in
the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been
sought, such order shall have been affirmed by the highest court to which such order was
appealed, or certiorari, reargument or rehearing shall have been denied and the time to
take any further appeal, petition for certiorari, or move for reargument or rehearing shall
have expired; provided, however, that the possibility that a motion, under Rule 59 or Rule
60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy
Code (with any such motion being referred to herein as a "Motion for Reconsideration"),
may be filed with respect to such order shall not prevent such order from being deemed a
Final Order.

(g)    "Hazardous Material" is defined to include any chemical or hazardous or
toxic substance, material or waste which is or becomes regulated by any local
governmental authority, the State of California, or the United States Government. The
term "Hazardous Material" includes, without limitation, any material or substance which
is:  (i) petroleum or oil or gas or any direct or derivative product or byproduct thereof;
(ii) defined as a "hazardous waste," "extremely hazardous waste" or "restricted hazardous
waste" under Section 25115, 25117 or 25122.7, or listed pursuant to Section 25140, of
the California Health and Safety Code, Division 20, Chapter 6.5 (Hazardous Waste
Control Law); (iii) defined as a "hazardous substance" under Section 25316 of the
California Health and Safety Code, Division 20, Chapter 6.8 (Carpenter-Presley-Tanner
Hazardous Substance Account Act); (iv) defined as a "hazardous material," "hazardous
substance," or "hazardous waste" under Sections 25501(j) and (k) and 25501.1 of the
California Health and Safety Code, Division 20, Chapter 6.95 (Hazardous Materials
Release Response Plans and Inventory); (v) defined as a "hazardous substance" under
Section 25281 of the California Health and Safety Code, Division 20, Chapter 6.7

EXECUTION VERSION

(Underground Storage of Hazardous Substances); (vi) "used oil" as defined under Section 25250.1 of the California Health and Safety Code; (vii) asbestos; (viii) listed under Chapter 11 of Division 4.5 of Title 22 of the California Code of Regulations or defined as hazardous or extremely hazardous pursuant to Chapter 10 of Division 4.5 of Title 22 of the California Code of Regulations; (ix) defined as waste or a hazardous substance pursuant to the Porter-Cologne Act, Section 13050 of the California Water Code; (x) designated as a "toxic pollutant" pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1317; (xi) defined as a "hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. (42 U.S.C. § 6903); (xii) defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. (42 U.S.C. § 9601); (xiii) defined as "Hazardous Material" pursuant to the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; (xiv) defined as such or regulated by any "Superfund" or "Superlien" law, or any other federal, state or local law, statute, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning Hazardous Materials and/or oil wells and/or underground storage tanks and/or pipelines, as now, or at any time hereafter, in effect; and/or (xv) substances known by the State of California to cause cancer and/or reproductive toxicity.

(h)    "Intangible Property" means all of Seller's right, title and interest, if any, and to the extent assignable, in all development rights, entitlement rights, fee credit agreements or other such agreements entered into by Debtors for the benefit of the Real Properties including that certain Development Agreement between the City of Calimesa and Summerwind Ranch dated 7/16/07 (provided Seller makes no representation regarding the existence, scope, effectiveness or terms of any such agreement), air space rights, other rights and benefits, approvals and privileges and all such other governmental approvals and entitlements, permits, maps, development plans, development agreements, homeowner's association rights and benefits, engineering data, architectural plans and drawings, CAD files, contracts, warranties, guarantees, assurances to the extent primarily related to the Real Properties, or any individual Real property. Notwithstanding anything to the contrary contained elsewhere in this Agreement, Intangible Property shall not include, and Buyer shall not acquire any rights to any of the following pursuant to this Agreement (collectively, the "Reserved Matters"): (i) the Yucaipa Proceeds, (ii) the MRID Deposit, (iii) any cash or funds in accounts in the possession or under the control of the Trustee as of the Closing Date on behalf of the bankruptcy estate of any of the Debtors or of LBREP/L-Lehman SunCal Master I, LLC, including, without limitation, any debtor funds and accounts (which includes the approximately $13,800,000 held by the Trustee on behalf of the bankruptcy estate of any of the Debtors or of LBREP/L-Lehman SunCal Master I, LLC, as of the Execution Date), provided, however, any cash or funds in accounts in the possession or under the control of the Trustee as of the Closing Date that has been received between the Execution Date and the Closing Date on account of Benefits or Intangible Property to the extent primarily related to the Real Properties shall not be included in the Reserved Matters and shall be part of the assets acquired by Buyer, and (iv) any litigation claims held by Seller or any of the Debtors, including, without limitation, any preference, fraudulent conveyance or equitable subordination claims. If for any reason Buyer or any of its affiliates receive any

4

EXECUTION VERSION

payments, development credits or offsets or other savings or economic benefits following the Closing from or as a direct result of any of the Reserved Matters, Buyer shall, within ten (10) days following such time as Buyer actually receives the sums or benefit, deliver to Seller an accounting thereof along with a payment to Seller equal to the economic benefit received as of the time of the accounting. Buyer's obligations hereunder shall survive the Closing.

(i) "McAllister Property" means, collectively, the McAllister Real Property and all of Seller's right, title and interest, if any, in the Tangible Property, the Intangible Property and the Benefits appurtenant or pertaining to the McAllister Real Property.

(j) "McSweeny Property" means, collectively, the McSweeny Real Property and all of Seller's right, title and interest, if any, in the Tangible Property, the Intangible Property and the Benefits appurtenant or pertaining to the McSweeny Real Property.

(k) "MRID Deposit" means any and all deposits, cash or funds at, with or which are held by, the McAllister Ranch Irrigation District which are subject to a dispute by or between the parties in the adversary proceeding currently pending before the Court which was filed by Superior Pipelines, Inc., and which is referenced as Adv. Proc. No. 8:09-01318-ES.

(l) "NY RFS Order" means an order entered by the United States Bankruptcy Court for the Southern District of New York in the case of Lehman Brothers Holdings, Inc., et al (Case No. 08-13555 (LMP)) (the "NY Court") approving the Motion of the Chapter 11 Trustee of the SunCal Master Debtors for an Order Granting Relief from the Automatic Stay, dated June 17, 2010 [Docket No. 9642] sufficient to permit the consummation of the transactions contemplated hereby.

(m) "Property" means, collectively, the McAllister Property, the McSweeny Property and the Summerwind Property.

(n) "Sale Order" means an order to be entered by the Court pursuant to Sections 363 of the United States Bankruptcy Code authorizing the sale of the Property to Buyer free and clear of all monetary liens (including any mechanics' or materialmen's liens), writs of attachment, delinquent taxes, claims, or causes of action, and subject only to those encumbrances that are Approved Title Matters, and granting to Buyer all protections afforded a good faith purchaser under Section 363(m) of the United States Bankruptcy Code. The form of the Sale Order shall be reasonably acceptable to the Buyer, however, Buyer's consent to the form of the Sale Order shall not be unreasonably withheld provided that the Sale Order is consistent with this Agreement in all material respects.

(o) "Sale Procedures" means the competitive bidding procedures, including: (i) approval of the Buyer as the "stalking horse" purchaser entitled to a break-up fee of one million dollars ($1,000,000) and (ii) a prohibition against allowing any creditor (secured or otherwise) a right to credit bid any part of its claim, consistent with the terms set forth in Exhibit ""B"" attached hereto in all material respects.

(p)   "Sale Procedures Motion" means a motion filed with the Court seeking approval of the Sale Procedures , this Agreement and entry of the Sale Order.

(q)   "Sale Procedures Order" means an order entered by the Court approving the Sale Procedures Motion. The form of the Sale Procedures Order shall be reasonably acceptable to the Buyer, however, Buyer's consent to the form of the Sale Procedures Order shall not be unreasonably withheld provided that the Sale Procedures Order is consistent with this Agreement in all material respects.

(r)   "Summerwind Property" means, collectively, the Summerwind Real Property and all of Seller's right, title and interest, if any, in the Tangible Property, the Intangible Property and the Benefits appurtenant or pertaining to the Summerwind Real Property.

(s)   "Tangible Property" means all of Seller's right, title and interest, if any, and to the extent assignable, in the equipment and other tangible personal property situated on the Real Properties and intended to be used or utilized in connection with the ownership, development or physical maintenance of the Real Properties (but expressly excluding any Tangible Property which his leased by Debtors, or any of them).

(t)   "Yucaipa Proceeds" means those funds which the Estate may receive as part of a settlement related to the Summerwind Property which are currently held by the Yucaipa Water District in the approximate amount of $434,000.00.

1.2   Agreement to Purchase and Sell.   Subject to all of the terms, conditions and provisions of this Agreement, and for the consideration herein set forth, Seller hereby agrees to sell the Property to Buyer, and Buyer hereby agrees to purchase the Property from Seller.

ARTICLE II

OPENING OF ESCROW; CLOSING DATE

2.1   Opening of Escrow.   Within two (2) business days after the execution of this Agreement by Buyer and Seller, the parties shall open an escrow ("Escrow") with the Escrow Holder by causing an executed copy of this Agreement to be deposited with Escrow Holder. Escrow shall be deemed open on the date that a fully executed copy of this Agreement is delivered to Escrow Holder ("Opening of Escrow"). Escrow Holder shall provide each of the parties in Section 13.13 with written confirmation of the date of Opening of Escrow, provided that notwithstanding such confirmation from Escrow Holder, each party shall be bound hereto as of the Execution Date.

2.2   Closing Date. Subject to the timeframes and termination rights set forth in Section 4.1 below, the "Closing Date" shall mean and refer to the date that is twenty (20) days following the later of (i) the date upon which the Sale Order becomes a Final Order, and (ii) the date upon which either (a) the NY RFS Order becomes a Final Order, or (b) the NY RFS Order has been entered by the NY Court regardless of whether an appeal  or Motion for Reconsideration thereof has been filed so long as there is no stay of the NY RFS Order pending resolution of such appeal or Motion for Reconsideration; provided that if the Closing Date has not occurred on or before

EXECUTION VERSION

January 31, 2011, then subject to Section 7.3(c) below, at Buyer's option, the Closing Date will be extended to be the date that is forty-five (45) days following the later to occur of the events in clause (i) or (ii) above. Notwithstanding the foregoing, if the Closing Date is scheduled to occur on a day other than a business day, the Closing Date shall be automatically extended to the first business day immediately following the non-business day upon which the Closing Date is otherwise scheduled to occur. The terms the "Close of Escrow", and/or the "Closing" are used herein to mean the recording of the Quitclaim Deeds in the Recorder's Office of the counties in which the Real Properties are situated (each, a "County" and collectively, the "Counties").

2.3     Possession. Possession of the Property shall be delivered to Buyer as of Close of Escrow pursuant to the terms of this Agreement.

ARTICLE III

PAYMENT OF PURCHASE PRICE

3.1     Amount of Purchase Price. The purchase price for the Property shall be FORTY-ONE MILLION DOLLARS ($41,000,000.00) (the "Purchase Price").

3.2     Payment of Purchase Price. The Purchase Price shall be paid as follows:

(a)     Within two (2) business days following the later of (i) the Opening of Escrow, and (ii) the filing by Seller with the Court of a stipulation addressing the procedures for the return of the Deposit upon a termination in accordance with the terms of this Agreement in the form attached as Exhibit "F" (the "Escrow Stipulation"), Buyer shall deposit in Escrow in good funds the sum of ONE MILLION DOLLARS ($1,000,000.00) (the "Deposit"). The Deposit shall be non-refundable subject only to the following: (i) the Sale Order becoming a Final Order, (ii) either (a) the NY RFS Order becoming a Final Order or (b) the NY RFS Order is entered by the NY Court regardless of whether an appeal or Motion for Reconsideration thereof has been filed so long as there is no stay of the NY RFS Order pending resolution of such appeal or Motion for Reconsideration as of the Closing Date, (iii) Seller has performed all of its obligations hereunder, (iv) all of the conditions precedent to the Closing set forth in Section 7.1 below for the benefit of Buyer have been satisfied, and (iv) no other events described in this Agreement that expressly provide for a return of the Deposit to Buyer have occurred. For the avoidance of doubt, Buyer shall have the right to terminate this Agreement and obtain the immediate return of its Deposit in the express circumstances set forth in Section 7.3 below. If Buyer fails to deliver the Deposit to Escrow Holder within two (2) business days following the later of (i) the Opening of Escrow, and (ii) the filing by Seller with the Court of the Escrow Stipulation, then this Agreement shall terminate and shall be of no force or effect and neither party shall have any further rights or obligations hereunder, except for those obligations of Buyer hereunder which expressly survive termination of this Agreement. The Deposit shall be applicable to the Purchase Price upon the Closing, and shall be held by Escrow Holder pending the Closing or termination of this Agreement, as applicable; provided that a portion of the Deposit shall be immediately released to Trustee on a non-refundable basis in the amount and for the purposes set forth in Section 4.3 below. If Escrow does not close due to Buyer's default

under this Agreement, Seller shall be entitled to receive and retain the Deposit as liquidated damages in accordance with Section 12.1 below.

(b)      At least one (1) business day prior to the Closing Date Buyer shall deposit with Escrow Holder in good funds an amount equal to the Purchase Price plus all other costs and expenses chargeable to Buyer hereunder, less the amount of the Deposit.

"Good funds" shall mean a wire transfer of funds or cash.  Buyer and Seller each agree to execute and deliver to Escrow Holder such documents as required by Escrow Holder for the reporting of interest credited to each party.

3.3      <u>Allocation of Purchase Price Amongst Properties</u>.  At the Closing, the Purchase Price shall be allocated to and amongst the McAllister Property, the McSweeny Property and the Summerwind Property by the parties as follows, and the parties shall account for this transaction with all applicable governmental and taxing authorities accordingly:

| | | |
|---|---|---|
| (a) | McAllister Property: | $12 million |
| (b) | McSweeny Property: | $3 million |
| (c) | Summerwind Property: | $26 million |

For purposes of clarification, Seller will have no right to sell to Buyer, and Buyer will have no obligation to purchase from Seller, fewer than all of the Real Properties at the Closing.

3.4      <u>Interest Bearing Account</u>.  Escrow Holder shall place the Deposit (less the Loan Amount which is to be immediately released to Seller pursuant to Section 4.3 below) in an interest bearing account with interest accruing for the benefit of Buyer.

ARTICLE IV

ADDITIONAL BUSINESS TERMS

4.1      <u>Sale Procedures and Court Approval</u>.  The parties acknowledge and agree that subject to the terms of this Agreement (including, without limitation, the terms of Section 7.3 below), consummation of the transactions contemplated by this Agreement, and Seller's obligation to pursue this transaction, requires: (i) approval of the Court, which approval shall be evidenced by the Sale Order becoming a Final Order, (ii) either (a)  the NY RFS Order becoming a Final Order, or (b) the NY RFS Order being entered by the NY Court regardless of whether an appeal or Motion for Reconsideration thereof has been filed so long as there is no stay of the NY RFS Order pending resolution of such appeal or Motion for Reconsideration as of the Closing Date, and (iii) Seller having the right to accept a higher or otherwise better bid received by Seller (as determined by Seller in its discretion) in accordance with the Sale Procedures.  Provided that Escrow has been opened and Buyer has timely delivered the Deposit to Escrow Holder, Seller agrees that Seller shall file the Sale Procedures Motion within five (5) business days following the earlier of (a) the date the NY RFS Order becoming a Final Order, or (b) expiration of the applicable period within which an appeal or Motion for Reconsideration of the NY RFS Order can be filed with the NY Court so long as there is no stay of the NY RFS Order pending resolution of such appeal or

EXECUTION VERSION

Motion for Reconsideration then in effect. Seller agrees to use its reasonable efforts to seek entry, as soon as practicable, of the NY RFS Order, the Sale Procedures Order and the Sale Order, and Buyer shall reasonably cooperate with Seller in such efforts, including without limitation signing and delivering documents and declarations reasonably requested by Seller, furnishing reasonable information to Seller or to the Court or the NY Court; provided, however, that except for costs associated with Buyer's delivery of such documents, declarations and information, Buyer shall not be obligated to take any action that would cause it to incur other out of pocket fees or costs or to incur liability. Further, if Buyer's requested reasonable cooperation will result in out-of-pocket costs which Buyer is not obligated to incur under this Section 4.1, and which Buyer is not willing to incur, Buyer shall nevertheless be obligated to undertake such cooperation if Seller, with Court approval, advances such out-of-pocket costs on Buyer's behalf (provided Seller shall have no obligation to do so) from available cash. Buyer acknowledges that Seller, through its Court-appointed agent, shall conduct an auction sale of the Property (the "Auction") on terms and conditions generally consistent with the Sales Procedures.

4.2    Overbid Procedures; Break-Up Fee. With respect to higher and better bids made by any third party at the Auction or otherwise (each, an "Overbid"), Seller will accept an Overbid only if, in Seller's discretion, the Overbid is a higher and/or better bid than the transaction contemplated by this Agreement which meets the criteria for overbids generally set forth in the Sale Procedures as approved by the Court. Seller shall have the right during the term of this Agreement to solicit, consider, negotiate for, and accept one or more Overbids subject to the criteria established herein. In all events, however, Buyer shall have the right to be an overbidder and submit an Overbid consistent with Court approved Sale Procedures. If (and only if) Seller accepts an Overbid from a third-party and the transaction with such third party is consummated, Buyer shall be entitled to receive from cash proceeds received by Seller at such closing a one million dollar ($1,000,000) break-up fee (the "Break-up Fee") on the terms set forth in the Sale Procedures, as approved by the Court. Seller shall be entitled to entertain and to accept either a single Overbid from a single party to acquire the entirety of the Property, or separate Overbids from multiple third parties for portions of the Property as Seller determines to be appropriate; provided that if Seller accepts an Overbid or Overbids, such Overbid or Overbids must collectively provide for the sale of the entirety of the Property.

4.3    Loan For Payment of Trustee Expenses; Partial Release of Deposit. Buyer agrees to loan to Seller the sum of FIFTY THOUSAND DOLLARS ($50,000.00) (the "Loan Amount"), without interest thereon, on the terms set forth herein, which Loan Amount shall be utilized by Trustee to reimburse Trustee and/or to pay for certain out-of-pocket costs incurred by Trustee or anticipated to be incurred by Trustee in connection with the sale of the Property and the gathering of due diligence and other information in connection therewith. Buyer agrees that immediately upon Seller's filing of the Sale Procedures Motion, the Loan Amount shall be funded and delivered to Trustee by having Escrow Holder release the Loan Amount to Trustee from the Deposit, and Escrow Holder is hereby instructed by Buyer to do so (and Buyer and Seller shall further instruct Escrow Holder at such time to release the Loan Amount to Seller if required by Escrow Holder). Buyer understands and agrees that notwithstanding anything to the contrary set forth elsewhere in this Agreement, (i) if Buyer acquires the Property pursuant to this Agreement or an Overbid, the Loan Amount shall be deemed to have been repaid by Seller upon the application of the Deposit to the Purchase Price at the Closing and Seller shall have no further obligation to Buyer to repay such sum, (ii) if Buyer is entitled to a return of the Deposit, then

9

EXECUTION VERSION

subject to Court approval if required Seller shall repay the Loan Amount from available assets of the Debtors' estates as soon as reasonably practical (Buyer understands that there may not be sufficient available assets to repay the Loan Amount and as such repayment is contingent and uncertain), and (iii) if, based in a Buyer default of under this Agreement, Buyer is not entitled to a return of the Deposit, the Loan Amount shall be deemed to have been repaid Seller shall have no further obligation to Buyer to repay such sum. Seller's contingent obligation to repay the Loan Amount in the circumstances specified above shall survive termination of this Agreement. All references in this Agreement to the return of the Deposit to Buyer in certain circumstances shall mean and refer to the return to Buyer of the Deposit, less the Loan Amount which shall be repaid, if at all, on the terms set forth herein.

4.4    Trustee Liability.    Buyer understands and agrees that (i) Trustee is executing this Agreement solely in his capacity as the Chapter 11 Trustee in the Case, (ii) Trustee is not in the business of developing real property, (iii) Trustee has not developed and was not involved with any development of the Property, or any portion thereof, or the construction of any improvements thereon, (iv) Trustee has limited information regarding the Property, the condition thereof and matters pertaining thereto, (v) Trustee does not have access to all information of the Debtors pertaining to the Property, and (vi) the knowledge of Debtors shall not be imputed to Trustee, and Trustee shall not be charged with any knowledge of the Debtors, or any of them, or their respective employees, principals and agents. Trustee's duties as to the Property shall be limited to the selling of the Property pursuant to terms approved by the Court. Buyer acknowledges and agrees that Trustee is not and shall not be personally liable or responsible for any Claims that Buyer may suffer or incur as the result of this transaction or any acts, omissions, breaches or defaults of or by Trustee in connection therewith or in connection with the Property, whether occurring prior to, upon or following the Execution Date (without limiting the foregoing, in no event shall Trustee have any personal liability to repay the Loan Amount to Buyer). Buyer further acknowledges that Trustee acts at the direction of the Court, that the Court shall have jurisdiction over any dispute relating to the Property or to this Agreement, and that Trustee shall have no liability whatsoever if the Court does not approve of this transaction or the Sale Procedures, or the NY Court fails to enter the NY RFS Order, for any reason whatsoever. Without limiting any other provisions of this Agreement, Buyer hereby releases and holds harmless Trustee and its agents, attorneys, affiliates, successors and assigns, from and against any Claims arising out of or in any way relating to the Property, the development or construction of any improvements thereon, the condition thereof, or any acts, omission or other matters or circumstances occurring or arising on, under, about or with respect to the Property prior to or following the Execution Date. Such release applies to all claims, whether such claims, damages, or losses are known or unknown, foreseen or unforeseen, or patent or latent, that Buyer may have against Trustee. Buyer waives application of California Civil Code Section 1542, which states:

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

As a consequence of the foregoing waiver, Buyer understands that even if Buyer incurs damages as a result of a breach of this Agreement by Seller, or otherwise arising from the

EXECUTION VERSION

purchase of the Property, Buyer will not be able to make any claim for those damages against Trustee personally, and that Buyer's sole recourse, if any, shall be to and against the assets of the applicable Debtors. Further, Buyer acknowledges that Buyer understands these consequences even as to claims for damages that may exist as of the date of this release but which Buyer does not know exist, and which, if known, would materially affect Buyer's decision to execute this release, regardless of whether Buyer's lack of knowledge is the result of ignorance, oversight, error, negligence, or any other cause.

The provisions of this Section 4.5 shall survive the Close of Escrow or termination of this Agreement, as applicable.

Buyer's Initials: _____

ARTICLE V

TITLE MATTERS

5.1    Approval of Title.  Buyer has, prior to the Execution Date, received and reviewed a preliminary title report for each of the Real Properties prepared by Escrow Holder (also referred to herein as "Title Company") together with copies of all recorded instruments specified therein and such easement plots, surveys and other documents and information with respect to the condition of title to the Real Properties (collectively the "Title Reports") as Buyer deems necessary or desirable in order for Buyer to approve of the condition of title to the Property.  By its execution of this Agreement, Buyer hereby approves of the Title Reports and all recorded agreements, easements, and matters referenced therein that are of public record as of the Execution Date (Approved Title Matters"), and agrees to accept the Property at the Closing subject to all such Approved Title Matters; provided that all of the following are hereby disapproved and will not be considered to be an Approved Title Matter: (i) delinquent property taxes and assessments; (ii) monetary liens, including any deeds of trust or mortgages or documents executed in connection therewith; (iii) mechanics' or materialmen's liens, and (iv) *lis pendens*.

5.2    Buyer's Title Policy.  Escrow Holder shall cause Title Company to issue as of the Close of Escrow, and to deliver to Buyer following the Close of Escrow, a standard CLTA owner's policy of title insurance ("Owner's Title Policy") along with such endorsements as may be reasonably requested by Buyer, or, upon Buyer's request, an ALTA extended coverage owner's policy of title insurance (provided Buyer shall be responsible for any survey costs associated therewith), issued by Title Company, with liability in the amount of the Purchase Price, covering the Real Properties and showing title vested in Buyer free of exceptions and encumbrances, except:

(a)    All non-delinquent general and special real property taxes and assessments for the current fiscal year;

(b)    The Approved Title Matters;

(c)    Any matters disclosed by an ALTA survey obtained in connection with Buyer's procurement of ALTA extended title coverage;

11

EXECUTION VERSION

(d)     Those other matters, if any, expressly permitted (in writing), created or caused by Buyer; and

(e)     Those certain standard pre-printed exceptions and exclusions contained in a standard CLTA owner's title policy.

Notwithstanding the foregoing, Buyer understands and agrees that neither procurement of ALTA extended title coverage nor the Title Company's issuance of any particular title endorsements shall be a requirement of the Owner's Title Policy or a condition precedent to Buyer's obligation to close this Escrow, and Buyer hereby advises Seller that it has confirmed with Title Company prior to the Execution Date the availability of such additional coverages as Buyer deems appropriate. Further, Title Company's agreement or willingness to agree to any particular allocation of title insurance coverage between the Real Properties is not a condition precedent to Buyer's obligation to close this Escrow. All that is required in order to satisfy the condition precedent set forth in Section 7.1(c) is that Title Company issue a standard CLTA owner's policy of title insurance subject only to the matters referenced in sub-paragraphs (a) through (e), inclusive, as specified above in this Section 5.2, without any endorsements or other coverages. For purposes of clarification, if Seller is unable to cause the Property to be sold free and clear of monetary liens pursuant to the terms of the Sale Order, then Seller will have no obligation to use its or the Debtor's funds to remove, cure or satisfy such disapproved title matters.

ARTICLE VI

DUE DILIGENCE

6.1     Due Diligence Approval.     By its execution of this Agreement, Buyer acknowledges, confirms and agrees that Buyer has had adequate and ample opportunity and ability to undertake such investigations, inquiries, studies other due diligence efforts as Buyer has determined to be appropriate, desirable and necessary in order for Buyer to enter into this Agreement and to deliver the Deposit on a non-refundable basis as provided herein, and that Buyer does not desire or require any further or additional time or opportunity to review or inspect the Property or any matters relevant thereto in order to proceed with this transaction. Buyer's execution and delivery of this Agreement shall for all purposes constitute Buyer's conclusive and absolute approval of the Property, the condition thereof (including the condition of title thereto), and all matters associated therewith, and Buyer shall have no further or additional review or approval rights regarding same, and no ability to terminate this Agreement and/or to obtain a return of the Deposit based upon any objection or disapproval of the Property or any matter related thereto, except as expressly provided for in this Agreement.

6.2     Entry Rights.

(a)     Although Buyer has approved of the Property and its condition as of the execution of this Agreement, should Buyer desire during the term of this Escrow to enter upon the Real Properties, or any of them, in order to undertake such efforts as Buyer

EXECUTION VERSION

deems reasonably prudent with respect to its contemplated ownership of same, then, and subject to the provisions of this Section 6.2, Buyer shall have the right, at its sole cost and expense, to enter upon the Real Properties; provided that in no event shall Buyer perform any soil sampling, borings or other so-called "phase II" or invasive environmental assessments without Seller's prior written consent, which may be granted or withheld in Seller's sole and absolute discretion. This right of entry is being granted merely as an accommodation to Buyer in order to facilitate Buyer's forward planning efforts with respect to the Property. Nothing contained in this Section 6.2 shall grant to Buyer or be construed as granting to Buyer the right object to any matters related to the Property (whether or not discovered during the term of this Escrow), or to obtain a return of the Deposit as a result thereof, and Buyer shall not be entitled to the return of the Deposit should it discover certain objectionable matters pertaining to the Property during the term of this Escrow.

(b)    Subject to the terms above and the conditions hereafter stated, Seller grants to Buyer and its agents, consultants, contractors, designees and employees (collectively, the "Buyer Parties") a limited and non-exclusive license to enter upon the Real Properties during the term of this Escrow for the sole purpose of conducting surveys, studies and other non-invasive and non-destructive investigations as Buyer may reasonably desire, all at Buyer's sole cost and expense. The license herein granted shall be terminated at the Closing or upon any termination of this Agreement.

(c)    Buyer shall (i) conduct all activities in a safe manner and not allow any dangerous or hazardous conditions created by Buyer or any of the Buyer Parties to occur on the Real Properties during such investigation (and Buyer shall immediately cure any such conditions should they occur); (ii) promptly restore the applicable Real Property(ies) to the condition existing immediately prior to such entry; (iii) comply with all applicable laws and governmental regulations; (iv) not interfere with the use or occupancy of any adjacent real property, including any homeowners or any homeowner's association facilities, (v) keep the Real Properties, and each of them, free and clear of all materialmen's liens, lis pendens and other liens arising out of the entry and work performed under this paragraph; and (vi) cause the removal of any such liens and provide Seller with proof of same within ten (10) days following the imposition thereof without the requirement of notice from Seller.

(d)    Buyer's right to enter onto the Real Properties, or any of them, as provided above shall be subject to the following additional terms and conditions:

(i)    Buyer shall provide Seller with at least one (1) business day prior written notice of such entry.

(ii)    The persons or entities performing the inspections, investigations or tests referred to above by or on behalf of Buyer shall be properly licensed and qualified and shall have obtained all appropriate permits for performing relevant tests on the Real Properties and shall have delivered such permits to Seller, prior to performing any tests on the Real Properties. Prior to entry onto the Real Properties (or any of them), Buyer shall deliver to Seller a certificate of insurance evidencing that Buyer has obtained

13

EXECUTION VERSION

a policy or policies of commercial general liability insurance providing for a combined single limit of not less than Three Million Dollars ($3,000,000.00) per occurrence covering liability to property or persons for Buyer's and its agents' and employees', contractors' and consultants' activities on or about the Real Properties, and naming Trustee and each of the Debtors as additional insureds.

(iii)    Seller shall have right to have one (1) or more representatives of Seller accompany Buyer and Buyer's representatives, agents, consultants or contractors while they are on the Real Properties.

(iv)    Promptly upon request from Seller, Buyer shall promptly furnish to Seller, on an "AS IS" basis, copies of all third party reports, studies and assessments of the Property or improvements thereon. Buyer's obligations under this clause (iv) shall survive the termination of this Agreement.

(e)    Buyer hereby agrees to indemnify, defend (with counsel selected by Seller) and hold Seller and Debtors free and harmless from and against any and all Claims arising from or relating to, otherwise incurred as a consequence of Buyer's entry upon the Real Properties, or any of them, prior to the Closing.  Buyer's obligation to indemnify, defend and hold harmless Seller and Debtors shall survive the Close of Escrow or the termination of this Agreement.

## ARTICLE VII

## CONDITIONS PRECEDENT TO CLOSE OF ESCROW

7.1    Conditions to Buyer's Obligations.    The obligations of Buyer to purchase the Property shall be subject to the satisfaction or written waiver, in whole or in part, by Buyer of each of the following conditions precedent:

(a)    The Court has entered the Sale Order and such Sale Order has become a Final Order.

(b)    Either (a) the NY RFS Order shall have been entered and become a Final Order., or (b) the NY RFS Order has been entered by the NY Court regardless of whether an appeal or Motion for Reconsideration thereof has been filed so long as there is no stay of the NY RFS Order pending resolution of such appeal or Motion for Reconsideration as of the Closing Date.

(c)    Title Company shall be unconditionally committed to issue the Owner's Title Policy in the form prescribed in Section 5.2 (provided Buyer shall deliver to Title Company such entity information and other information as Title Company may reasonably require in order to issue the Owner's Title Policy).

(d)    The representations and warranties of Seller set forth in Section 10.1 are true and accurate in all material respects as of the Closing.

14

EXECUTION VERSION

(e)     Escrow Holder holds on or before the Closing Date and will deliver to Buyer the instruments accruing to Buyer pursuant to this Agreement.

(f)     Seller shall have complied with and satisfied its pre-Closing obligations and performances as specified herein, Seller shall not be in material default of any term or condition of this Agreement, and Seller shall have made all deliveries required by this Agreement.

If any of the foregoing conditions are not satisfied by the specified dates, unless Buyer expressly waives any such condition in writing, Buyer shall have the right to terminate this Agreement in accordance with Section 7.3.  If Buyer proceeds with the Closing, then the foregoing conditions shall be conclusively deemed satisfied.

7.2     <u>Conditions to Seller's Obligations</u>.  The obligations of Seller under this Agreement shall be subject to the satisfaction or written waiver, in whole or in part, by Seller of each of the following conditions precedent:

(a)     The Court has entered the Sale Order and such Sale Order has become a Final Order.

(b)     Either (a) the NY RFS Order shall have been entered and become a Final Order., or (b) the NY RFS Order has been entered by the NY Court regardless of whether an appeal or Motion for Reconsideration thereof has been filed so long as there is no stay of the NY RFS Order pending resolution of such appeal or Motion for Reconsideration as of the Closing Date.

(c)     Escrow Holder holds on or before the Closing Date and will deliver to Seller the instruments and funds accruing to Seller pursuant to this Agreement.

(d)     The representations and warranties of Buyer set forth in Section 10.2 are true and accurate in all material respects as of the Closing.

(e)     Buyer shall have complied with and satisfied its pre-Closing obligations and performances as specified herein, Buyer shall not be in material default of any term or condition of this Agreement, and Buyer shall have made all deliveries required by this Agreement.

In the event any of the foregoing conditions are not either satisfied on or before the date specified for satisfaction of each respective condition, or expressly waived by Seller in writing, Seller shall have the right to terminate this Agreement in accordance with Section 7.3.

7.3     <u>Termination of Agreement</u>.

(a)     In the event any condition to the obligation of Buyer or Seller to purchase/sell the Property, as applicable, has not been satisfied or waived in writing by Buyer (if such condition is for the benefit of Buyer) or Seller (if such condition is for the benefit of Seller) on or before the dates specified therein or, if no date has been specified, on or before the Closing Date, then either party who is not then in default shall have the

EXECUTION VERSION

right to terminate this Agreement and the Escrow by delivery of written notice to the other party and to Escrow Holder. In the event of such termination, the Deposit shall be returned to Buyer along with all interest earned thereon while held in Escrow.

(b)    If (i) the NY RFS Order has not been entered by August 18, 2010, (ii) the Sale Procedures Motion has not been filed by August 23, 2010, (iii) the Sale Procedures Order has not been entered and become a Final Order by October 22, 2010, or (iv) subject to Section 7.3(c) below, the Closing shall not have occurred by January 31, 2011, both Buyer and Seller shall each have the right, exercised in their respective sole and absolute discretion, to terminate the Agreement by written notice to the other, and in the event of such termination by either party, Buyer shall promptly receive a return of the Deposit along with all interest earned thereon while held in Escrow as its sole recourse and remedy; provided, however, that any attorneys fees and costs incurred by Buyer in connection with Buyer's efforts to obtain the return of the Deposit following a termination under this Section 7.3(b), to which Buyer is otherwise entitled pursuant to Section 13.5 below, shall be recoverable without limitation. For the avoidance of doubt, no delay by Buyer or Seller of its right to exercise any applicable termination right shall be construed as a waiver of such termination right.

(c)    Notwithstanding the foregoing (or anything else inconsistent in this Agreement), if the Court enters the Sale Order prior to January 31, 2011 and, after the entry of the Sale Order, there is an appeal and/or Motion for Reconsideration of the Sale Order, then (and only then) all relevant deadlines provided elsewhere in this Agreement shall be extended to the extent necessary to cause the Sale Order to become a Final Order prior to the Closing. The parties agree to cooperate in good faith to attempt to cause the Sale Order to become a Final Order as promptly as possible, and during the pendency of the appeal and/or Motion for Reconsideration, the parties will remain bound to Close the transaction contemplated in this Agreement (notwithstanding the otherwise applicable timing requirements in this Agreement and any associated termination rights) with the only conditions to such Closing being the entry of a Final Order and satisfaction of the other conditions to Buyer's and Seller's obligations as expressly set forth herein. The Deposit shall remain in Escrow and shall not be returned to Buyer pending such appeal and/or Motion for Reconsideration and the Closing. Notwithstanding the potential extension of the timeframes for performance under this Agreement pursuant to the above provisions, Buyer and Seller shall each have the unilateral right (to be exercised in each of their respective sole and absolute discretion) to terminate this Agreement if either (i) an appeal and/or Motion for Reconsideration of the Sale Order has been brought and the Closing shall not have occurred within two (2) years from the Execution Date, (ii) any ruling or order precluding the Sale Order from becoming a Final Order becomes a Final Order, or (iii) the appeal and/or Motion for Reconsideration of the Sale Order is otherwise adjudicated and resolved in such a manner so as to preclude the consummation of the transaction contemplated in this Agreement. If this Agreement is terminated pursuant to this Section 7.3(c), Buyer shall receive a return of the Deposit and all interest earned thereon (except for contingent repayment of the Loan Amount as provided in Section 4.3 above) as its sole recourse and remedy, and neither party shall have any further liability to the other except for those obligations of Buyer contained herein which expressly survive such termination.

EXECUTION VERSION

(d)    In the event of a termination of this Agreement pursuant to Section 7.3(a), (b), or (c); Section 11.1; or Section 12.2, neither party shall thereafter have any obligations to, or rights against, the other under this Agreement, except such rights and obligations as the parties may have pursuant to Section 4.2; Section 4.3; Section 6.2; this Section 7.3; Section 11.1; or Section 12.2 or any other provisions herein which expressly survive termination.  Notwithstanding anything to the contrary in the foregoing, this Section 7.3 shall not apply in the event the transactions contemplated hereunder fail to close because of (i) a material breach of this Agreement by Buyer, in which event the provisions of Section 12.1 shall instead apply and Seller shall be entitled to retain the Deposit as liquidated damages as provided therein or (ii) a material breach of this Agreement by Seller, in which event the provisions of Section 12.2 shall instead apply and Buyer shall be entitled to a return of the Deposit as provided therein.

ARTICLE VIII

CLOSING FUNDS AND DOCUMENTS REQUIRED FROM BUYER AND SELLER

8.1    Buyer.  Buyer agrees that at least one (1) business day before the Closing Date, or such earlier time as Escrow Holder may require in order to close the Escrow on the Closing Date, Buyer will deposit with Escrow Holder all additional funds and/or documents (executed and acknowledged, if appropriate) which are necessary to comply with the terms of this Agreement, including without limitation, the following:

(a)    The Purchase Price plus all other costs and expenses chargeable to Buyer hereunder, less the Deposit;

(b)    At Buyer's option, a Preliminary Change of Ownership Statement completed in the manner required in the Counties (or in lieu thereof Buyer may pay the charge for omission of such statement); and

(c)    Such funds and other items and instruments as may be necessary in order for Escrow Holder to comply with this Agreement.

8.2    Seller.  Seller agrees that at least one (1) business day before the Closing Date, or such earlier time as Escrow Holder may require in order to close the Escrow on the Closing Date, Seller will deposit with Escrow Holder such funds and other items and instruments (executed and acknowledged, if appropriate) as may be necessary in order for the Escrow Holder to comply with this Agreement, including without limitation:

(a)    An executed and acknowledged original quitclaim deed for each of the Real Properties in the form attached hereto as Exhibit "D" (each, a "Quitclaim Deed", and collectively, the "Quitclaim Deeds") conveying fee title thereto to Buyer;

(b)    Two (2) originals of the Non-Foreign Affidavit in the form attached hereto as Exhibit "E" ("Non-Foreign Affidavit") on behalf of each of the Debtors owning fee title to the Real Properties to the extent required and appropriate;

EXECUTION VERSION

(c)      An original General Assignment and Bill of Sale in the form attached hereto as Exhibit "F" (the "General Assignment");

(d)      Two (2) originals of the California Form 597-W Real Estate Withholding Exemption Certificate ("California Residency Affidavit") on behalf of each of the Debtors owning fee title to the Real Properties to the extent required and appropriate; and

(e)      Such funds and other items and instruments as may be necessary in order for Escrow Holder to comply with this Agreement.

8.3      Recordation, Completion and Distribution of Documents and Funds. Escrow Holder shall confirm that any documents signed in counterpart are the matching documents and shall combine the signature pages thereof so as to create fully executed documents. Escrow Holder will cause the Quitclaim Deeds to be recorded in the Official Records of the Counties in which the Real Properties are situated when it holds for the account of Buyer and Seller, respectively, the funds and items described above to be delivered to Buyer and Seller, respectively, through Escrow, less costs, expenses and disbursements chargeable to Seller pursuant to the terms hereof. Promptly following Close of Escrow, Escrow Holder shall date all undated documents as of Close of Escrow and shall distribute Escrow Holder's closing statement and the documents deposited and funds in Escrow as follows:

(a)      To Buyer: (i) one certified conformed copy of each Quitclaim Deed, the originals to be mailed following recordation thereof in accordance with the information provided thereon; (ii) one original and two copies of the Owner's Title Policy; (iii) one original each of the General Assignment, the Non-Foreign Affidavit (if applicable), the and the California Residency Affidavit (if applicable); and (iv) one certified copy, conformed if recorded, of any other document delivered to Escrow Holder by Buyer or Seller pursuant to the terms hereof.

(b)      To Seller: (i) one certified conformed copy of each Quitclaim Deed, the originals to be mailed following recordation thereof in accordance with the information provided thereon; (ii) one (1) original each of the Non-foreign Affidavit (if applicable), the California Residency Affidavit (if applicable); (iii) one (1) certified copy, conformed if recorded, of any other document delivered to Escrow Holder by Buyer or Seller pursuant to the terms hereof; and (iv) the Purchase Price, less any costs or charges allocable to Seller hereunder.

(c)      To Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP, 650 Town Center Drive, Suite 950, Costa Mesa, California 92626, Attn: Evan D. Smiley, Esq., one certified copy, conformed if recorded, of any other document delivered to Escrow Holder by Buyer or Seller pursuant to the terms hereof.

ARTICLE IX

ESCROW PROVISIONS

9.1      Escrow Instructions. This Agreement, when signed by Buyer and Seller, shall also constitute escrow instructions to Escrow Holder. If required by Escrow Holder, Buyer and Seller

EXECUTION VERSION

agree to execute Escrow Holder's standard escrow instructions, provided that the same are consistent with and do not conflict with the provisions of this Agreement. In the event of any such conflict, the provisions of this Agreement shall prevail.

9.2    <u>Disclosure of Documentary Transfer Taxes</u>. Escrow Holder is hereby specifically instructed not to show the amount of documentary transfer taxes on the Quitclaim Deeds and to file a separate unrecorded supplementary affidavit of transfer taxes.

9.3    <u>Prorations</u>.    All non-delinquent general and special real property taxes and assessments for each of the Real Properties shall be prorated to the Close of Escrow on the basis of a thirty (30) day month and a three hundred sixty day (360) year. Any supplemental tax bills received after Close of Escrow shall be paid by Seller to the extent they relate to a period prior to Close of Escrow, and by Buyer, to the extent they relate to a period after Close of Escrow. If a supplemental tax bill covers a period commencing before and continuing after Close of Escrow, the party named in the bill will pay the tax and the other party shall reimburse the first party its pro rata share within thirty (30) days after receipt of a copy of the tax bill and evidence of the second party's payment of same. The provisions of this Section 9.3 shall survive Close of Escrow.

9.4    <u>Payment of Costs</u>.    Seller shall pay one-half (1/2) of the Escrow fee, all documentary transfer taxes and all title insurance premiums for that portion of the Owner's Title Policy premium which would be incurred for a standard CLTA form owner's policy. Buyer shall pay one-half (1/2) of the Escrow fee, any title insurance coverage required by any lender providing financing to Buyer at the Closing, that portion of the Owner's Title Policy premium which is attributable to the additional cost of ALTA extended coverage, if applicable, the cost of any title endorsements requested by Buyer and the cost of recording the Quitclaim Deeds and any other instruments or agreements to be recorded at the Closing in accordance with this Agreement. Seller and Buyer shall each be responsible for their respective attorneys' fees and costs in preparing and negotiating this Agreement. All other costs of Escrow not otherwise specifically allocated by this Agreement shall be apportioned between the parties in a manner consistent with the custom and usage of Escrow Holder.

9.5    <u>Termination and Cancellation of Escrow</u>.    If Escrow fails to close as provided above, Escrow shall terminate automatically without further action by Escrow Holder or any party, and Escrow Holder is instructed to return all funds and documents then in Escrow to the respective depositor of the same with Escrow Holder; provided that any document which has been signed by a party who is not to receive the return of such document, shall be marked "void and of no force or effect" by Escrow Holder before it is delivered and the Deposit shall be delivered to Seller in the case of Buyer's default pursuant to Section 12.1 (if same has not previously been released to Seller). Cancellation of Escrow, as provided herein, shall be without prejudice to whatever legal rights Buyer or Seller may have against each other arising from the Escrow or this Agreement, including Seller's right to receive and to retain the Deposit in accordance with Section 12.1 hereof.

9.6    <u>Brokerage Commissions</u>.    If, and only if, this transaction closes on the terms set forth herein, and subject to Court approval, Seller shall pay from proceeds of sale a commission to Madison Partners ("<u>Broker</u>") of 2.5% of the Purchase Price. Buyer and Seller each represent to

EXECUTION VERSION

the other that, except for Broker, neither party has retained or otherwise dealt with any brokers or finders for which a commission or fee is payable in connection with this transaction. Buyer and Seller each agrees to indemnify, defend and hold the other harmless from and against all Claims resulting from such party's breach of its representation contained in the preceding sentence. The obligations of the parties hereunder shall survive the Closing.

ARTICLE X

REPRESENTATIONS AND WARRANTIES

10.1   Seller's Representations and Warranties.  As of the date of this Agreement and again as of the Closing, Seller hereby makes the following covenants, representations and warranties, which representations and warranties shall survive the Closing:

(a)   Subject to the Sale Order and the NY RFS Order becoming Final Orders, the execution and deliver of this Agreement has been authorized and approved by all requisite actions of Seller, and the consummation of the transactions contemplated hereby will be duly authorized and approved by all requisite actions of Seller.

(b)   Subject to the Sale Order and the NY RFS Order becoming Final Orders, this Agreement and all other documents to be executed by Seller hereunder will, upon execution and delivery thereof, have been duly executed by Seller and will constitute legal, valid and binding obligations of Seller.

10.2   Buyer's Representations and Warranties.  As of the date of this Agreement and again as of the Closing, Buyer hereby makes the following covenants, representations and warranties, which representations, warranties and covenants shall survive the Closing:

(a)   The execution and deliver of this Agreement has been authorized and approved by all requisite actions of Buyer, and the consummation of the transactions contemplated hereby will be duly authorized and approved by all requisite actions of Buyer.

(b)   This Agreement and all other documents to be executed by Buyer hereunder will, upon execution and delivery thereof, have been duly executed by Buyer and will constitute legal, valid and binding obligations of Buyer, and to Buyer's knowledge, neither the execution of this Agreement nor the performance of Buyer's obligations hereunder will result in a default by Buyer under any agreement or contract to which Buyer is a party, which default would adversely impact or impair Buyer's ability to perform its obligations under this Agreement.

(c)   Buyer is a limited liability company duly organized, existing and in good standing under the laws of the State of California and qualified to transact interstate business in California. No internal or third party consents, approvals or authorizations are required to be obtained in order to duly authorize Buyer's execution of this Agreement or Buyer's performance of the obligations specified herein.

EXECUTION VERSION

(d)    Buyer is not a party to any bankruptcy, insolvency or receivership proceeding of any kind, whether voluntary or involuntary, nor is any such proceeding contemplated.

(e)    Buyer undertakes and assumes the risks associated with all matters pertaining to whether the Real Properties are located in any area designated as a special flood hazard area, dam failure inundation area, earthquake fault zone, seismic hazard zone, high fire severity area or wildland fire area, by any federal, state or local agency. Without limiting the generality of the foregoing, Buyer acknowledges that it has had the opportunity, prior to the Execution Date, to obtain and review its own Natural Hazards Disclosure Report respecting each of the Real Properties with respect to such matters, and Buyer accepts all risk, and releases Seller from all Claims, resulting from Buyer's failure to obtain its own Natural Hazards Disclosure Report.

(f)    Buyer is a sophisticated buyer of real estate with extensive experience in land acquisition and residential development. Buyer has made and/or prior to the Closing will have made its own independent investigation respecting the Property and all other aspects of the transactions contemplated hereby, and, except for the express representations and warranties of Seller set forth in Section 10.1 above, Buyer is relying and/or will rely entirely thereon and on the advice of Buyer's consultants in entering into this Agreement and purchasing the Property. BUYER EXPRESSLY AGREES AND ACKNOWLEDGES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY OR ANY MATTER RELATED    THERETO,    INCLUDING,    WITHOUT    LIMITATION,    THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY (AS USED IN THIS SENTENCE, THE TERM "SELLER" SHALL INCLUDE THE DEBTORS). The preceding sentence includes, without limitation, plans, renderings, schematics, elevations, compaction, grade, improvements, landscaped areas, topography, acreage, air, water rights, hydrocarbon rights, geothermal rights, toxic materials, mineral rights, availability, cost, or quality of utilities, water, soil, subsoil, the purpose to which the Property is suited, drainage, access to public roads, proposed routes of roads or extensions thereof, and all governmental laws and regulations, including, but not limited to, zoning, flood, earthquake, environmental and land use laws and regulations, to which the Property may be subject.

Based on the foregoing, Buyer is deemed to have approved and waived any and all objections to Property, including the physical, environmental and economic characteristics and conditions thereof, whether or not disclosed by this Agreement, and/or Buyer's inspection; and that Buyer's is relying solely upon its own inspection, investigation and analysis of the Property and is acquiring the same "AS IS", WITH ALL FAULTS, DEFECTS AND DEFICIENCIES, WHETHER KNOWN OR UNKNOWN. Buyer acknowledges and agrees that Seller and Debtors shall have no obligation to alter

21

EXECUTION VERSION

or to improve any portion of the Property, to construct or install any on-site or off-site improvements of any kind or to obtain any agreements or understandings of any kind with any other parties (including, without limitation, governmental agencies or entities, homeowner's associations or adjacent or nearby property owners), or to expend any sums or other efforts or to incur or assume any liabilities or obligations either during the term of this Escrow or following a Closing unless and except as expressly set forth in this Agreement.. As of the Closing Buyer assumes all obligations, costs, liabilities, expenses and responsibilities associated with the post-Closing, ownership, use, occupancy, maintenance, enjoyment, entitlement, development, construction, marketing and sale of the Property.

Except for the express representations and warranties of Seller set forth in Section 10.1 above, Buyer on behalf of itself and its successors-in-interest in the Property agrees to, and hereby does, waive, release and discharge Seller and the Debtors from any and all Claims, in law or in equity, known or unknown, which Buyer or its successors-in-interest in the Property had, now have, or hereafter may have or acquire or possess arising out or in any way connected with the use, maintenance, ownership, development, sale, operation and occupancy of the Property, the condition, status, quality, nature, contamination or environmental state of the Property (including, without limitation the existence of any Hazardous Material on, under or about the Property and any violation of Environmental Laws) and/or any of the improvements constructed or existing thereon as of the Closing.  Without limiting the generality of the preceding sentence, Buyer hereby waives any Claim Buyer may have for contribution from Seller and/or Debtors under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. or any other federal or state statute or regulation for the cost of clean up of any hazardous and/or toxic materials and substances on, in or under the Real Properties.

It is the intention of this paragraph that any and all responsibilities and obligations of Seller and Debtors and any and all rights or Claims of Buyer, its heirs, successors and assigns, arising by virtue of the physical or environmental condition of the Property and the development of the Property are by this release provision declared null and void and of no present and future effect as to such persons or entities.  Buyer expressly waives any right of rescission and all Claims by reason of any statement, representation, warranty, promise or covenant, if any, not contained in this Agreement.

As to the express releases contained herein, Buyer hereby waives the provision of California Civil Code Section 1542 which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

Buyer Initials: _____

ARTICLE XI

DAMAGE AND DESTRUCTION

11.1    Risk of Physical Loss. In the event the Real Properties (or any of them) shall be materially damaged by fire, flood, earthquake or other casualty prior to the Close of Escrow, Buyer shall have the option to terminate this Agreement in its entirety, provided such notice of termination is delivered to Seller within three (3) business days following the date that Buyer receives Seller's written notice of such casualty (and Buyer shall be entitled to a return of the Deposit, less the Loan Amount). If Buyer fails to terminate this Agreement pursuant to the foregoing sentence by written notice to Seller within said three (3) business day period, or if such casualty is not material, Buyer shall complete the acquisition of the Property and Seller shall assign to Buyer the interest of Seller in all insurance proceeds, if any, which may be due to Seller related to such casualty. If received prior to the Close of Escrow, such proceeds shall be held by Escrow Holder until the Close of Escrow and such proceeds shall be released to Buyer at Closing as an additional condition of the Closing. As used herein, a casualty event shall be deemed to be "material" if the cost to restore the applicable Real Property to substantially the condition existing immediately prior to such casualty event exceeds $2,000,000.00, as reasonably determined by Seller.

ARTICLE XII

DEFAULT

12.1    **DEFAULT OF BUYER; LIQUIDATED DAMAGES. BUYER SHALL BE DEEMED TO BE IN MATERIAL DEFAULT OF THIS AGREEMENT IF IT FAILS TO CLOSE THIS TRANSACTION FOLLOWING THE SALE ORDER AND THE NY RFS ORDER BECOMING FINAL ORDERS, ON THE TERMS SET FORTH HEREIN. IF THE CLOSE OF ESCROW DOES NOT TIMELY OCCUR DUE TO BUYER'S FAILURE OF PERFORMANCE OR DEFAULT UNDER THIS AGREEMENT, THEN AND IN SUCH EVENT, AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, BUYER AND SELLER AGREE THAT SELLER WILL INCUR DAMAGES BY REASON OF SUCH DEFAULT BY BUYER, WHICH DAMAGES SHALL BE IMPRACTICAL AND EXTREMELY DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN. BUYER AND SELLER, IN A REASONABLE EFFORT TO ASCERTAIN WHAT SELLER'S DAMAGES WOULD BE IN THE EVENT OF SUCH DEFAULT BY BUYER, HAVE AGREED BY PLACING THEIR INITIALS BELOW THAT THE DEPOSIT (i.e., $1,000,000.00) WHICH HAS AS OF THE DATE OF DEFAULT BEEN DELIVERED BY BUYER TO ESCROW HOLDER (WHETHER OR NOT RELEASED TO SELLER) SHALL BE DEEMED TO CONSTITUTE A REASONABLE ESTIMATE OF SELLER'S DAMAGES UNDER THE PROVISIONS OF SECTION 1671 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. IN THE EVENT OF AND FOR SUCH DEFAULT BY BUYER, SELLER SHALL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT AND TO RECEIVE AND TO RETAIN THE DEPOSIT WHICH HAS PREVIOUSLY BEEN DELIVERED BY BUYER TO ESCROW HOLDER AS**

LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AND AS SELLER'S SOLE AND
EXCLUSIVE REMEDY AGAINST BUYER, EXCEPT THAT BUYER'S
INDEMNIFICATION OBLIGATIONS UNDER SECTION 6.2 OF THIS AGREEMENT
SHALL SURVIVE SELLER'S RECEIPT AND RETENTION OF THE DEPOSIT AS
LIQUIDATED DAMAGES AND SELLER'S RIGHTS OF RECOVERY PURSUANT TO
SUCH INDEMNITY OBLIGATIONS SHALL NOT BE LIMITED OR IMPAIRED AS A
RESULT OF THIS PARAGRAPH. FURTHER, ANY ATTORNEYS FEES AND COSTS
INCURRED BY SELLER IN CONNECTION WITH BUYER'S INDEMNIFICATION
OBLIGATONS IN SECTION 6.2 AND/OR IN CONNECTION WITH SELLER'S
EFFORTS TO OBTAIN THE DEPOSIT AS LIQUIDATED DAMAGES PURSUANT TO
THIS PARAGRAPH FOLLOWING BUYER'S DEFAULT, AND TO WHICH SELLER IS
OTHERWISE ENTITLED PURSUANT TO SECTION 13.5, SHALL BE RECOVERABLE
FROM BUYER IN ADDITION TO THE DEPOSIT. SELLER SHALL HAVE NO RIGHT
TO COMPEL BUYER'S PURCHASE OF THE PROPERTY PURSUANT TO AN
ACTION FOR SPECIFIC PERFORMANCE. IN CONSIDERATION OF THE PAYMENT
OF LIQUIDATED DAMAGES SELLER WILL BE DEEMED TO HAVE WAIVED ALL
OTHER CLAIMS FOR DAMAGES OR RELIEF AT LAW OR IN EQUITY INCLUDING
ANY RIGHTS SELLER MAY HAVE PURSUANT TO SECTION 1680 OR SECTION 3389
OF THE CALIFORNIA CIVIL CODE RELATING TO BUYER'S DEFAULT
RESULTING IN ESCROW NOT CLOSING AS PROVIDED UNDER THIS
AGREEMENT, EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION 12.1. BY
INITIALING THIS PROVISION IN THE SPACES BELOW, SELLER AND BUYER
EACH SPECIFICALLY AFFIRM THEIR RESPECTIVE AGREEMENTS CONTAINED
IN THIS SECTION AND AGREE THAT SUCH SUM IS A REASONABLE SUM
CONSIDERING THE CIRCUMSTANCES AS THEY EXIST ON THE DATE OF THIS
AGREEMENT.

_____               _____
**SELLER'S INITIALS**                 **BUYER'S INITIALS**

12.2   Default of Seller.   If Seller materially defaults in its obligations under this
Agreement following receipt of written notice of default from Buyer and failure to cure same
within five (5) business days from receipt of such notice, then so long as Buyer is not in default
with respect to any of its obligations hereunder, Buyer's sole and exclusive remedies for any such
default by Seller shall be limited to termination of this Agreement and the return of the Deposit to
Buyer plus an amount recovery from the Debtors' estates of an equal to Buyer's out-of-pocket
expenses to third parties incurred in connection with the Property (including its actual attorneys'
fees) not to exceed $100,000.00, provided, however, that any attorneys fees and costs incurred by
Buyer in connection with Buyer's efforts to obtain the return of the Deposit following Seller's
default, and to which Buyer is otherwise entitled pursuant to Section 13.5 below, shall be
recoverable and not subject to such $100,000 limitation. In no event shall Buyer have the right to
seek or to pursue specific performance of Seller's obligations under the Agreement, nor shall
Buyer have the right to record a lis pendens or similar or other lien or notice against any of the
Real Properties. Seller shall not be in default under this Agreement if this transaction is not
consummated due to either (i) the Court's failure to approve the Sale Procedures Motion within
the timeframe prescribed in Section 7.3 above and the subsequent termination of this Agreement
by either party as expressly provided for therein, (ii) the failure to procure a Sale Order and a NY

24

EXECUTION VERSION

RFS Order that have become Final Orders within the timeframe prescribed in Section 7.3 above and the subsequent termination of this Agreement by either party as expressly provided for therein, or (iii) a successful Overbid by another party, and in any such event Buyer's sole recourse and remedy shall be to obtain a return of its Deposit (less the Loan Amount, subject to contingent repayment thereof as provided in Section 4.3 above) and payment of the Break-up Fee in the case of a successful Overbid by another party, and whereupon this Agreement shall automatically terminate and neither party shall have any further liability to the other except for those obligations of Buyer contained herein which expressly survive termination.

## ARTICLE XIII

## MISCELLANEOUS

13.1   <u>Successors and Assigns; Assignment</u>.  This Agreement shall be binding upon the parties hereto and their respective heirs, representatives, transferees, successors and assigns.  This Agreement and the rights and obligations hereunder may not be assigned by Buyer without the prior written consent of Seller, which consent shall not be unreasonably withheld, and provided that as a condition to any such assignment which is otherwise reasonably acceptable to Seller, Buyer's assignee shall assume in writing in a form reasonably acceptable to Seller all obligations of Buyer in this Agreement, and otherwise confirm and acknowledge that it is acquiring the Property on an "AS-IS" basis, subject to the releases in favor of Seller and Debtors as set forth in this Agreement.  It shall be reasonable for Seller to withhold its consent to a proposed assignment if such assignment would violate, invalidate or otherwise impair the Court's approval of this transaction.  Notwithstanding the foregoing, or any other provision in this Agreement, Buyer may assign and transfer its interest under this Agreement and the right to acquire one or more of the Real Properties to one or more entities controlled by Buyer or its principals, or designated by Buyer to take title to such Real Property, by providing notice to Seller of such assignment and transfer so long as (i) Buyer's assignee assumes in writing in a form reasonably acceptable to Seller all obligations of Buyer in this Agreement, and otherwise confirms and acknowledges that it is acquiring the Property on an "AS-IS" basis, subject to the releases in favor of Seller and Debtors as set forth in this Agreement, and (ii) such assignment does not violate, invalidate or otherwise impair the Court's approval of this transaction.  An assignment that is permitted under this Section 13.1 may also include an assignment to a qualified intermediary for purposes of effectuating an exchange under Section 1031 of the Internal Revenue Code so long as such tax-deferred exchange meets the other requirements of this Section 13.1 and does not delay the Closing or impose any cost, liability or obligation on Seller or any of the Debtors.  Any transfer under this Section 13.1 will not relieve Buyer of its obligations under this Agreement.

13.2   <u>Time of Essence</u>.  Time is of the essence in this Agreement and with respect to each covenant and condition hereof.  Buyer and Seller each specifically agrees to strictly comply and perform its obligations herein in the time and manner specified and waives any and all rights to claim such compliance by mere substantial compliance with the terms of this Agreement.

13.3   <u>Time Period Computations</u>.  All periods of time referred to in this Agreement shall include all Saturdays, Sundays and California state or national holidays unless the reference is to business days, in which event such weekends and holidays shall be excluded in the computation of time and provide that if the last date to perform any act or give any notice with respect to this

EXECUTION VERSION

Agreement shall fall on a Saturday, Sunday or California state or national holiday, such act or notice shall be deemed to have been timely performed or given on the next succeeding day which is not a Saturday, Sunday or California state or national holiday.

13.4    Qualification; Authority. Each individual executing this Agreement on behalf of a partnership, corporation, limited liability company or as trustee of a trust represents and warrants that such entity is duly formed and authorized to do business in the State of California and that he or she is duly authorized to execute and deliver this Agreement on behalf of such entity (and that no additional signatures on behalf of such entity are required in order for this Agreement to be binding) in accordance with authority granted under the formation documents of such entity, and, if a corporation, by a duly passed resolution of its Board of Directors, that all conditions to the exercise of such authority have been satisfied, and that this Agreement is binding upon such entity in accordance with their respective terms. Upon request of either party, Escrow Holder or Title Company, Buyer and Seller agree to deliver such documents reasonably necessary to evidence the foregoing.

13.5    Attorneys' Fees. In the event of any dispute between the parties hereto arising out of the subject matter of this Agreement or the Escrow, or in connection with the Property, the prevailing party in such action shall be entitled to have and to recover from the other party the prevailing party's reasonable attorneys' fees and other reasonable expenses (including expert witness fees) in connection with such action or proceeding in addition to its recoverable court costs.

13.6    Interpretation; Governing Law; Jurisdiction and Venue. This Agreement shall be construed according to its fair meaning and as if prepared by both parties hereto. This Agreement shall be construed in accordance with the laws of the State of California in effect at the time of the execution of this Agreement except to the extent superseded by the laws of the United States. Buyer and Seller each agree that the Court shall have jurisdiction to hear and to determine all matters, disputes and controversies related to this Agreement and the subject matter hereof, and each party hereby submits to the jurisdiction and venue of the Court with respect thereto. Notwithstanding the foregoing, if the Court will not accept jurisdiction or otherwise hear any such matter, then such matter shall be heard by the Orange County Superior Court for the State of California, and each party hereby submits to the jurisdiction and venue of such court with respect thereto. Titles and captions are for convenience only and shall not constitute a portion of this Agreement. As used in this Agreement, masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others wherever and whenever the context so dictates.

13.7    No Waiver. No delay or omission by either party hereto in exercising any right or power accruing upon the compliance or failure of performance by the other party hereto under the provisions of this Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by either party hereto of a breach of any of the covenants, conditions or agreements hereof to be performed by the other party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof.

Suncal/LandCo PSA (execution version)
11162104.1

EXECUTION VERSION

13.8    Modifications. Any alteration, change or modification of or to this Agreement, in order to become effective, shall be made by written instrument or endorsement thereon and in each such instance executed on behalf of each party hereto.

13.9    Severability. If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstances shall, to any extent, be held invalid or unenforceable, the remainder of this instrument, or the application of such term, provision, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.10    Merger of Prior Agreements and Understandings. This Agreement, and other documents incorporated herein by reference contain the entire understanding between the parties relating to the transaction contemplated hereby and all prior or contemporaneous agreements, letters of intent, understandings, representations and statements, oral or written are merged herein and shall be of no further force or effect.

13.11    Covenants to Survive Escrow. The covenants and agreements contained herein which are to be performed following the Closing or which expressly survive the Close of Escrow shall be binding upon and inure to the benefit of the parties hereto and their representatives, heirs, successors and assigns.

13.12    Execution in Counterpart; Facsimile and Electronic Delivery. This Agreement and any modifications, amendments or supplements thereto may be executed in several counterparts, and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all parties are not signatories to the original or the same counterpart. The parties may also deliver executed copies of this Agreement to each other by facsimile or by electronic copy (e.g. pdf), which facsimile or electronic signatures shall be binding as if they were originals.

13.13    Notices. Any notice which either party may desire to give to the other party or to the Escrow Holder must be in writing and shall be effective (i) when personally delivered by the other party or by messenger or courier; (ii) upon actual receipt or refusal of delivery if sent via the United States mail, registered or certified; (iii) one (1) business day after deposit before the daily deadline time with a reputable overnight courier or service where next day service has been fully paid for by the sending party; or (iv) upon receipt of a telecopy or fax transmission (as evidenced by a computer generated receipt confirming a successful transmission), provided a hard copy of such transmission shall be thereafter delivered in one of the methods described in the foregoing (i) through (iii) and provided further that if such telecopy or fax transmission is actually received after 5:00 p.m. on or a day that is not a business day, such telecopy or fax transmission shall be deemed to have been received at 9:00 a.m. on the next business day; in each case postage fully prepaid and addressed to the respective parties as set forth below or to such other address and to such other persons as the parties may hereafter designate by written notice to the other parties hereto:

Suncal/LandCo PSA (execution version)
11162104.1

EXECUTION VERSION

|  |  |
|--|--|
| To Seller: | Alfred H. Siegel, CPA, Chapter 11 Trustee |
| | Crowe Horwath LLP |
| | 15233 Ventura Boulevard, Ninth Floor |
| | Sherman Oaks, California 91403-2250 |
| | Fax:    (818) 501-7040 |
| | Phone: (818) 501-5200 |
| | |
| Copy to: | Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP |
| | 650 Town Center Drive, Suite 950 |
| | Costa Mesa, CA 92626 |
| | Attn: Evan D. Smiley, Esq. |
| | Fax:    (714) 966-1002 |
| | Phone: (714) 966-1000 |
| | |
| To Buyer: | Land Co. Coldwater Endeavor, LLC |
| | c/o Land Co. Development Resources, Inc. |
| | 2211 Michelson Drive, Suite 850 |
| | Irvine, CA 92612 |
| | Attn: Jeffrey Fullerton |
| | Fax:    (949) 207-7229 |
| | Phone: (949) 858-1886 |
| | |
| Copy to: | Munger, Tolles & Olson LLP |
| | 355 South Grand Ave., Suite 3500 |
| | Los Angeles, CA 90071 |
| | Attn: Todd J. Rosen, Esq. |
| | Fax:    (213) 683-4022 |
| | Phone: (213) 683-9222 |

13.14  <u>Exhibits</u>.    The exhibits attached to this Agreement are incorporated into this Agreement by reference as if fully set forth herein.

Suncal/LandCo PSA (execution version)
11162104.1

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have executed this Purchase Agreement and Escrow Instructions as of the date set forth above.

_____

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee of the administratively consolidated estates of LBREP/L-SunCal McAllister Ranch, LLC, and LBREP/L-SunCal McSweeny Farms, and LBREP/L-SunCal Summerwind Ranch

"Seller"

Land Co. Coldwater Endeavor, LLC, a California corporation

By:_____
   Its:_____

By:_____
   Its:_____

"Buyer"

AGREED AND ACCEPTED AS OF THIS
_____ DAY OF _____, 2010.

FIDELITY NATIONAL TITLE COMPANY

By:_____

   Its:_____

"Escrow Holder"

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have executed this Purchase Agreement and Escrow Instructions as of the date set forth above.

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee of the administratively consolidated estates of LBREP/L-SunCal McAllister Ranch, LLC, and LBREP/L-SunCal McSweeny Farms, and LBREP/L-SunCal Summerwind Ranch

"Seller"

Land Co. Coldwater Endeavor, LLC, a California corporation

By: _____
Its: MANAGING MEMBER _____

By: _____
Its: _____

"Buyer"

AGREED AND ACCEPTED AS OF THIS
_____ DAY OF _____, 2010.

FIDELITY NATIONAL TITLE COMPANY

By: _____

Its: _____

"Escrow Holder"

## SCHEDULE OF EXHIBITS

EXHIBIT "A-1"   LEGAL DESCRIPTION OF McALLISTER REAL PROPERTY

EXHIBIT "A-2"   LEGAL DESCRIPTION OF McSWEENY REAL PROPERTY

EXHIBIT "A-3"   LEGAL DESCRIPTION OF SUMMERWIND REAL PROPERTY

EXHIBIT "B"     SALE PROCEDURES

EXHIBIT "C"     FORM OF QUITCLAIM DEED

EXHIBIT "D"     NON-FOREIGN AFFIDAVIT

EXHIBIT "E"     GENERAL ASSIGNMENT AND BILL OF SALE

EXHIBIT "F"     ESCROW STIPULATION

EXHIBIT "A"

LEGAL DESCRIPTION OF REAL PROPERTIES

EXHIBIT "A-1"

LEGAL DESCRIPTION OF McALLISTER REAL PROPERTY

THAT CERTAIN REAL PROPERTY SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF KERN, DESCRIBED AS FOLLOWS:

Title No. 10-**259923122**-A-SB
Locate No. CAFNT0925-0925-0199-0259923122

## LEGAL DESCRIPTION

## EXHIBIT "A"

PARCEL 1:

That portion of Section 16, Township 30 South, Range 26 East, M.D.M., in the City of Bakersfield, County of Kern, State of California, including Lots 20, 30 and 31 thereof, as shown upon the Sales Map of Lands of Kern County Land Company dated May 23, 1892 and recorded May 28, 1892 in the Office of the Kern County Recorder, lying Westerly and Southwesterly of the lands conveyed to Southern Pacific Railroad Company, a corporation, in deeds recorded October 21, 1893 and July 2, 1894 in Book 47, Page 356 of Deeds and in Book 54, Page 262 of Deeds, respectively.

EXCEPTING THEREFROM that portion thereof conveyed to the City of Bakersfield, in deed recorded December 30, 1976 in Book 4999, Pages 431 and 436 of Official Records.

ALSO EXCEPTING THEREFROM all oil, gas and other liquid and gaseous hydrocarbons and in addition thereto carbon dioxide, hydrogen, helium, nitrogen, methane, sulfur (in each case in either liquid or gaseous form) and any other liquid or gaseous substances, inert or otherwise, or any of them, and any minerals or other substances produced in association therewith ("hydrocarbons") in, on or under the premises, together with all rights, privileges, duties and responsibilities in any way related thereto, as conveyed to Tenneco Oil Company, a Delaware corporation, in assignment and conveyance recorded November 18, 1988 in Book 6183, Page 1167 of Official Records.

ALSO EXCEPTING THEREFROM all other minerals of whatever kind or character (all herein collectively called "minerals"), not conveyed to Tenneco Oil Company whether now known to exist or hereafter discovered (it being intended that the word "minerals" as used herein shall be defined in the broadest sense of the word and shall include, but not be limited to, oil, gas, other hydrocarbons and all other mineral substances and products, both metallic and nonmetallic, solid, liquid or gaseous), which are upon, in, under or may be produced from said real property; all salt water which is in, under or may be produced from said real property; the exclusive right, by whatever methods now or hereafter known, as Grantor or its successors or assigns, may deem advisable, to prospect for, investigate for, explore for, drill for, produce, mine, extract, remove and reduce to possession and ownership, all such minerals and salt water which are upon, in, under or may be produced from said real property; the exclusive right to drill into and through said real property to explore for and thereafter produce and extract minerals which may be produced from adjacent real property; the right to lay, construct, erect and place upon and in said real property, and use, maintain and operate thereon and thereafter remove, all buildings, tanks, pressure plants and other machinery, fixtures and equipment, pipelines, telephone lines, electric power lines, roads, power houses and other structures and facilities as Grantor or its successors or assigns, may deem advisable, for the exercise and enjoyment of the rights herein excepted and reserved; the exclusive right to treat, process, (but not refine), store upon and remove from said real property such minerals and salt water; the exclusive right to produce and extract such minerals by repressuring the subsurface sands and strata with fluids or gases or by such other method or methods as Grantor or is successors or assigns, may deem advisable, and to inject in and store and thereafter remove such fluids and gases, whether or not indigenous to said real property; the right at all times, without charge, to investigate for, explore for, drill for, produce, remove and reduce to possession and ownership, those quantities of fresh water from aquifers underlying said real property deemed necessary by Grantor or its successors or assigns, to use in prospecting, exploring, drilling, mining, producing, extracting and removing (including, but not limited to, use in unit operations, waterflood, thermal, or other secondary recovery methods now or hereafter known), or other operations in connection with the full enjoyment and exercise of the rights herein excepted and reserved; the right to exercise all rights herein excepted and reserved and any and all other rights upon said real property as Grantor or its successors or assigns, deems necessary, incidental to or convenient, whether alone or co-jointly with neighboring lands, in exploring for, producing and extracting the minerals and salt water herein excepted and reserved; and the unlimited and unrestricted rights of access to said minerals and salt water and of ingress and egress to and from, over and across said real property for all purposes deemed advisable by Grantor or its successors or assigns in the exercise of the rights excepted and reserved herein; provided, however, that Grantor, or its successors and assigns, upon being provided proof thereof, shall compensate Grantee or its successors and assigns for any and all actual damage to improvements and growing crops upon said real property which is caused by the exercise of the rights excepted and reserved herein, and the reasonable value of the lands used for actual development and extraction of such mineral rights as excepted and reserved in Deed from TENNECO WEST INC., a Delaware corporation, recorded January 2, 1991

2

EXHIBIT "A" (continued)                                    Title No. 10-259923122-A-SB
                                            Locate No. CAFNT0925-0925-0199-0259923122

in Book 6473, Page 375 of Official Records.

PARCEL 2:

All of Section 21, Township 30 South, Range 26 East, M.D.M., in the City of Bakersfield, County of Kern, State
of California, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof conveyed to the Southern California Gas Company, a California
corporation, in Grant Deed recorded July 28, 1980 in Book 5301, Page 1695 of Official Records, described as
follows:

A three-dimensional parcel of land commencing at a point 1000 feet below the surface of the hereinafter
described tracts and extending to a depth of 8,500 feet below the surface of the ground in and under the
following described tracts of land, to wit:

The SW 1/4 of the SW 1/4; the W 1/2 of the SE 1/4 of the SW 1/4; the SE 1/4 of the SE 1/4 of the SW 1/4

Also excepting therefrom that portion of said land lying within the boundaries of Tract 6229, Phase 1, as
recorded August 22, 2006 in Book 56, Page 1 through 18 of Maps.

ALSO EXCEPTING THEREFROM all oil, gas and other liquid and gaseous hydrocarbons and in addition thereto
carbon dioxide, hydrogen, helium, nitrogen, methane, sulfur (in each case in either liquid or gaseous form) and
any other liquid or gaseous substances, inert or otherwise, or any of them, and any minerals or other
substances produced in association therewith ("hydrocarbons") in, on or under the premises, together with all
rights, privileges, duties and responsibilities in any way related thereto, as conveyed to Tenneco Oil Company,
a Delaware corporation, in assignment and conveyance recorded November 18, 1988 in Book 6183, Page 1167
of Official Records.

ALSO EXCEPTING THEREFROM all other minerals of whatever kind or character (all herein collectively called
"minerals"), not conveyed to Tenneco Oil Company whether now known to exist or hereafter discovered (it
being intended that the word "minerals" as used herein shall be defined in the broadest sense of the word and
shall include, but not be limited to, oil, gas, other hydrocarbons and all other mineral substances and products,
both metallic and nonmetallic, solid, liquid or gaseous), which are upon, in, under or may be produced from
said real property; all salt water which is in, under or may be produced from said real property; the exclusive
right, by whatever methods now or hereafter known, as Grantor or its successors or assigns, may deem
advisable, to prospect for, investigate for, explore for, drill for, produce, mine, extract, remove and reduce to
possession and ownership, all such minerals and salt water which are upon, in, under or may be produced
from said real property; the exclusive right to drill into and through said real property to explore for and
thereafter produce and extract minerals which may be produced from adjacent real property; the right to lay,
construct, erect and place upon and in said real property, and use, maintain and operate thereon and
thereafter remove, all buildings, tanks, pressure plants and other machinery, fixtures and equipment, pipelines,
telephone lines, electric power lines, roads, power houses and other structures and facilities as Grantor or its
successors or assigns, may deem advisable, for the exercise and enjoyment of the rights herein excepted and
reserved; the exclusive right to treat, process, (but not refine), store upon and remove from said real property
such minerals and salt water; the exclusive right to produce and extract such minerals by repressuring the
subsurface sands and strata with fluids or gases or by such other method or methods as Grantor or is
successors or assigns, may deem advisable, and to inject in and store and thereafter remove such fluids and
gases, whether or not indigenous to said real property; the right at all times, without charge, to investigate
for, explore for, drill for, produce, remove and reduce to possession and ownership, those quantities of fresh
water from aquifers underlying said real property deemed necessary by Grantor or its successors or assigns, to
use in prospecting, exploring, drilling, mining, producing, extracting and removing (including, but not limited
to, use in unit operations, waterflood, thermal, or other secondary recovery methods now or hereafter known),
or other operations in connection with the full enjoyment and exercise of the rights herein excepted and
reserved; the right to exercise all rights herein excepted and reserved and any and all other rights upon said
real property as Grantor or its successors or assigns, deems necessary, incidental to or convenient, whether
alone or co-jointly with neighboring lands, in exploring for, producing and extracting the minerals and salt
water herein excepted and reserved; and the unlimited and unrestricted rights of access to said minerals and
salt water and of ingress and egress to and from, over and across said real property for all purposes deemed
advisable by Grantor or its successors or assigns in the exercise of the rights excepted and reserved herein;
provided, however, that Grantor, or its successors and assigns, upon being provided proof thereof, shall
compensate Grantee or its successors and assigns for any and all actual damage to improvements and growing
crops upon said real property which is caused by the exercise of the rights excepted and reserved herein, and
the reasonable value of the lands used for actual development and extraction of such mineral rights as

3

EXHIBIT "A" (continued)                                    Title No. 10-**259923122**-A-SB
                                                           Locate No. CAFNT0925-0925-0199-0259923122

excepted and reserved in Deed from TENNECO WEST INC., a Delaware corporation, recorded January 2, 1991 in Book 6473, Page 375 of Official Records.

PARCEL 3:

All of Section 22, Township 30 South, Range 26 East, M.D.M., in the City of Bakersfield, County of Kern, State of California, according to the Official Plat thereof.

Also excepting therefrom that portion of said land lying within the boundaries of Tract 6229, Phase 1, as recorded August 22, 2006 in Book 56, Page 1 through 18 of Maps.

ALSO EXCEPTING THEREFROM all oil, gas and other liquid and gaseous hydrocarbons and in addition thereto carbon dioxide,
hydrogen, helium, nitrogen, methane, sulfur (in each case in either liquid or gaseous form) and any other liquid or gaseous substances, inert or otherwise, or any of them, and any minerals or other substances produced in association therewith ("hydrocarbons") in, on or under the premises, together with all rights, privileges, duties and responsibilities in any way related thereto, as conveyed to Tenneco Oil Company, a Delaware corporation, in assignment and conveyance recorded November 18, 1988 in Book 6183, Page 1167 of Official Records.

ALSO EXCEPTING THEREFROM all other minerals of whatever kind or character (all herein collectively called "minerals"), not conveyed to Tenneco Oil Company whether now known to exist or hereafter discovered (it being intended that the word "minerals" as used herein shall be defined in the broadest sense of the word and shall include, but not be limited to, oil, gas, other hydrocarbons and all other mineral substances and products, both metallic and nonmetallic, solid, liquid or gaseous), which are upon, in, under or may be produced from said real property; all salt water which is in, under or may be produced from said real property; the exclusive right, by whatever methods now or hereafter known, as Grantor or its successors or assigns, may deem advisable, to prospect for, investigate for, explore for, drill for, produce, mine, extract, remove and reduce to possession and ownership, all such minerals and salt water which are upon, in, under or may be produced from said real property; the exclusive right to drill into and through said real property to explore for and thereafter produce and extract minerals which may be produced from adjacent real property; the right to lay, construct, erect and place upon and in said real property, and use, maintain and operate thereon and thereafter remove, all buildings, tanks, pressure plants and other machinery, fixtures and equipment, pipelines, telephone lines, electric power lines, roads, power houses and other structures and facilities as Grantor or its successors or assigns, may deem advisable, for the exercise and enjoyment of the rights herein excepted and reserved; the exclusive right to treat, process, (but not refine), store upon and remove from said real property such minerals and salt water; the exclusive right to produce and extract such minerals by repressuring the subsurface sands and strata with fluids or gases or by
such other method or methods as Grantor or is successors or assigns, may deem advisable, and to inject in and store and thereafter remove such fluids and gases, whether or not indigenous to said real property; the right at all times, without charge, to investigate for, explore for, drill for, produce, remove and reduce to possession and ownership, those quantities of fresh water from aquifers underlying said real property deemed necessary by Grantor or its successors or assigns, to use in prospecting, exploring, drilling, mining, producing, extracting and removing (including, but not limited to, use in unit operations, waterflood, thermal, or other secondary recovery methods now or hereafter known), or other operations in connection with the full enjoyment and exercise of the rights herein excepted and reserved; the right to exercise all rights herein excepted and reserved and
any and all other rights upon said real property as Grantor or its successors or assigns, deems necessary, incidental to or convenient, whether alone or co-jointly with neighboring lands, in exploring for, producing and extracting the minerals and salt water herein excepted and reserved; and the unlimited and unrestricted rights of access to said minerals and salt water and of ingress and egress to and from, over and across said real property for all purposes deemed advisable by Grantor or its successors or assigns in the exercise of the rights excepted and reserved herein; provided, however, that Grantor, or its successors and assigns, upon being provided proof thereof, shall compensate Grantee or its successors and assigns for any and all actual damage to improvements and growing crops upon said real property which is caused by the exercise of the rights excepted and reserved herein, and the reasonable value of the lands used for actual development and extraction of such mineral rights as excepted and reserved in Deed from TENNECO WEST INC., a Delaware corporation, recorded January 2, 1991 in Book 6473, Page 375 of Official Records.

PARCEL 4:

All of Section 23, Township 30 South, Range 26 East, M.D.M. in the City of Bakersfield, County of Kern, State of California, according to the Official Plat thereof.

CLTA Preliminary Report Form - Modified (11/17/06)

EXHIBIT "A" (continued)

EXCEPTING THEREFROM all of Tract No. 5840, Unit A, in the unincorporated area of the County of Kern, State of California, as per Map recorded June 23, 1998, in Book 44, Pages 38 to 42, inclusive, of Maps in the Office of the County Recorder of said County.

Also excepting therefrom that portion of said land lying within the boundaries of Tract 6229, Phase 1, as recorded August 22, 2006 in Book 56, Page 1 through 18 of Maps.

ALSO EXCEPTING THEREFROM all oil, gas and other liquid and gaseous hydrocarbons and in addition thereto carbon dioxide, hydrogen, helium, nitrogen, methane, sulfur (in each case in either liquid or gaseous form) and any other liquid or gaseous substances, inert or otherwise, or any of them, and any minerals or other substances produced in association therewith ("hydrocarbons") in, on or under the premises, together with all rights, privileges, duties and responsibilities in any way related thereto, as conveyed to Tenneco Oil Company, a Delaware corporation, in assignment and conveyance recorded November 18, 1988 in Book 6183, Page 1167 of Official Records.

ALSO EXCEPTING THEREFROM all other minerals of whatever kind or character (all herein collectively called "minerals"), not conveyed to Tenneco Oil Company whether now known to exist or hereafter discovered (it being intended that the word "minerals" as used herein shall be defined in the broadest sense of the word and shall include, but not be limited to, oil, gas, other hydrocarbons and all other mineral substances and products, both metallic and nonmetallic, solid, liquid or gaseous), which are upon, in, under or may be produced from said real property; all salt water which is in, under or may be produced from said real property; the exclusive right, by whatever methods now or hereafter known, as Grantor or its successors or assigns, may deem advisable, to prospect for, investigate for, explore for, drill for, produce, mine, extract, remove and reduce to possession and ownership, all such minerals and salt water which are upon, in, under or may be produced from said real property; the exclusive right to drill into and through said real property to explore for and thereafter produce and extract minerals which may be produced from adjacent real property; the right to lay, construct, erect and place upon and in said real property, and use, maintain and operate thereon and thereafter remove, all buildings, tanks, pressure plants and other machinery, fixtures and equipment, pipelines, telephone lines, electric power lines, roads, power houses and other structures and facilities as Grantor or its successors or assigns, may deem advisable, for the exercise and enjoyment of the rights herein excepted and reserved; the exclusive right to treat, process, (but not refine), store upon and remove from said real property such minerals and salt water; the exclusive right to produce and extract such minerals by repressuring the subsurface sands and strata with fluids or gases or by such other method or methods as Grantor or is successors or assigns, may deem advisable, and to inject in and store and thereafter remove such fluids and gases, whether or not indigenous to said real property; the right at all times, without charge, to investigate for, explore for, drill for, produce, remove and reduce to possession and ownership, those quantities of fresh water from aquifers underlying said real property deemed necessary by Grantor or its successors or assigns, to use in prospecting, exploring, drilling, mining, producing, extracting and removing (including, but not limited to, use in unit operations, waterflood, thermal, or other secondary recovery methods now or hereafter known), or other operations in connection with the full enjoyment and exercise of the rights herein excepted and reserved; the right to exercise all rights herein excepted and reserved and any and all other rights upon said real property as Grantor or its successors or assigns, deems necessary, incidental to or convenient, whether alone or co-jointly with neighboring lands, in exploring for, producing and extracting the minerals and salt water herein excepted and reserved; and the unlimited and unrestricted rights of access to said minerals and salt water and of ingress and egress to and from, over and across said real property for all purposes deemed advisable by Grantor or its successors or assigns in the exercise of the rights excepted and reserved herein; provided, however, that Grantor, or its successors and assigns, upon being provided proof thereof, shall compensate Grantee or its successors and assigns for any and all actual damage to improvements and growing crops upon said real property which is caused by the exercise of the rights excepted and reserved herein, and the reasonable value of the lands used for actual development and extraction of such mineral rights as excepted and reserved in Deed from TENNECO WEST INC., a Delaware corporation, recorded January 2, 1991 in Book 6473, Page 375 of Official Records.

PARCEL 5:

Lots 1 through 8; 10 through 18; 20, 21; 23 through 32, inclusive, of Tract No. 5840, Unit A, in the City of Bakersfield, County of Kern, State of California, as per Map recorded June 23, 1998 in Book 44, Page 38 of Maps, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas and other liquid and gaseous hydrocarbons and in addition thereto carbon dioxide, hydrogen, helium, nitrogen, methane, sulfur (in each case in either liquid or gaseous form) and any other liquid or gaseous substances, inert or otherwise, or any of them, and any minerals or other substances

produced in association therewith ("hydrocarbons") in, on or under the premises, together with all rights, privileges, duties and responsibilities in any way related thereto, as conveyed to Tenneco Oil Company, a Delaware corporation, in assignment and conveyance recorded November 18, 1988 in Book 6183, Page 1167 of Official Records.

ALSO EXCEPTING THEREFROM all other minerals of whatever kind or character (all herein collectively called "minerals"), not conveyed to Tenneco Oil Company whether now known to exist or hereafter discovered (it being intended that the word "minerals" as used herein shall be defined in the broadest sense of the word and shall include, but not be limited to, oil, gas, other hydrocarbons and all other mineral substances and products, both metallic and nonmetallic, solid, liquid or gaseous), which are upon, in, under or may be produced from said real property; all salt water which is in, under or may be produced from said real property; the exclusive right, by whatever methods now or hereafter known, as Grantor or its successors or assigns, may deem advisable, to prospect for, investigate for, explore for, drill for, produce, mine, extract, remove and reduce to possession and ownership, all such minerals and salt water which are upon, in, under or may be produced from said real property; the exclusive right to drill into and through said real property to explore for and thereafter produce and extract minerals which may be produced from adjacent real property; the right to lay, construct, erect and place upon and in said real property, and use, maintain and operate thereon and thereafter remove, all buildings, tanks, pressure plants and other machinery, fixtures and equipment, pipelines, telephone lines, electric power lines, roads, power houses and other structures and facilities as Grantor or its successors or assigns, may deem advisable, for the exercise and enjoyment of the rights herein excepted and reserved; the exclusive right to treat, process, (but not refine), store upon and remove from said real property such minerals and salt water; the exclusive right to produce and extract such minerals by repressuring the subsurface sands and strata with fluids or gases or by such other method or methods as Grantor or is successors or assigns, may deem advisable, and to inject in and store and thereafter remove such fluids and gases, whether or not indigenous to said real property; the right at all times, without charge, to investigate for, explore for, drill for, produce, remove and reduce to possession and ownership, those quantities of fresh water from aquifers underlying said real property deemed necessary by Grantor or its successors or assigns, to use in prospecting, exploring, drilling, mining, producing, extracting and removing (including, but not limited to, use in unit operations, waterflood, thermal, or other secondary recovery methods now or hereafter known), or other operations in connection with the full enjoyment and exercise of the rights herein excepted and reserved; the right to exercise all rights herein excepted and reserved and any and all other rights upon said real property as Grantor or its successors or assigns, deems necessary, incidental to or convenient, whether alone or co-jointly with neighboring lands, in exploring for, producing and extracting the minerals and salt water herein excepted and reserved; and the unlimited and unrestricted rights of access to said minerals and salt water and of ingress and egress to and from, over and across said real property for all purposes deemed advisable by Grantor or its successors or assigns in the exercise of the rights excepted and reserved herein; provided, however, that Grantor, or its successors and assigns, upon being provided proof thereof, shall compensate Grantee or its successors and assigns for any and all actual damage to improvements and growing crops upon said real property which is caused by the exercise of the rights excepted and reserved herein, and the reasonable value of the lands used for actual development and extraction of such mineral rights as excepted and reserved in Deed from TENNECO WEST INC., a Delaware corporation, recorded January 2, 1991 in Book 6473, Page 375 of Official Records.

PARCEL 6:

Lots 1 through 26, inclusive, of Tract 6229, Phase 1, in the City of Bakersfield, County of Kern, State of California, as per Map recorded August 22, 2006 in Book 56, Pages 1 through 18 of Maps, in the office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas and other liquid and gaseous hydrocarbons and in addition thereto carbon dioxide, hydrogen, helium, nitrogen, methane, sulfur (in each case in either liquid or gaseous form) and any other liquid or gaseous substances, inert or otherwise, or any of them, and any minerals or other substances produced in association therewith ("hydrocarbons") in, on or under the premises, together with all rights, privileges, duties and responsibilities in any way related thereto, as conveyed to Tenneco Oil Company, a Delaware corporation, in assignment and conveyance recorded November 18, 1988 in Book 6183, Page 1167 of Official Records.

ALSO EXCEPTING THEREFROM all other minerals of whatever kind or character (all herein collectively called "minerals"), not conveyed to Tenneco Oil Company whether now known to exist or hereafter discovered (it being intended that the word "minerals" as used herein shall be defined in the broadest sense of the word and shall include, but not be limited to, oil, gas, other hydrocarbons and all other mineral substances and products, both metallic and nonmetallic, solid, liquid or gaseous), which are upon, in, under or may be produced from said real property; all salt water which is in, under or may be produced from said real property; the exclusive

EXHIBIT "A" (continued)

Title No. 10-**259923122**-A-SB
Locate No. CAFNT0925-0925-0199-0259923122

right, by whatever methods now or hereafter known, as Grantor or its successors or assigns, may deem advisable, to prospect for, investigate for, explore for, drill for, produce, mine, extract, remove and reduce to possession and ownership, all such minerals and salt water which are upon, in, under or may be produced from said real property; the exclusive right to drill into and through said real property to explore for and thereafter produce and extract minerals which may be produced from adjacent real property; the right to lay, construct, erect and place upon and in said real property, and use, maintain and operate thereon and thereafter remove, all buildings, tanks, pressure plants and other machinery, fixtures and equipment, pipelines, telephone lines, electric power lines, roads, power houses and other structures and facilities as Grantor or its successors or assigns, may deem advisable, for the exercise and enjoyment of the rights herein excepted and reserved; the exclusive right to treat, process, (but not refine), store upon and remove from said real property such minerals and salt water; the exclusive right to produce and extract such minerals by repressuring the subsurface sands and strata with fluids or gases or by such other method or methods as Grantor or is successors or assigns, may deem advisable, and to inject in and store and thereafter remove such fluids and gases, whether or not indigenous to said real property; the right at all times, without charge, to investigate for, explore for, drill for, produce, remove and reduce to possession and ownership, those quantities of fresh water from aquifers underlying said real property deemed necessary by Grantor or its successors or assigns, to use in prospecting, exploring, drilling, mining, producing, extracting and removing (including, but not limited to, use in unit operations, waterflood, thermal, or other secondary recovery methods now or hereafter known), or other operations in connection with the full enjoyment and exercise of the rights herein excepted and reserved; the right to exercise all rights herein excepted and reserved and any and all other rights upon said real property as Grantor or its successors or assigns, deems necessary, incidental to or convenient, whether alone or co-jointly with neighboring lands, in exploring for, producing and extracting the minerals and salt water herein excepted and reserved; and the unlimited and unrestricted rights of access to said minerals and salt water and of ingress and egress to and from, over and across said real property for all purposes deemed advisable by Grantor or its successors or assigns in the exercise of the rights excepted and reserved herein; provided, however, that Grantor, or its successors and assigns, upon being provided proof thereof, shall compensate Grantee or its successors and assigns for any and all actual damage to improvements and growing crops upon said real property which is caused by the exercise of the rights excepted and reserved herein, and the reasonable value of the lands used for actual development and extraction of such mineral rights as excepted and reserved in Deed from TENNECO WEST INC., a Delaware corporation, recorded January 2, 1991 in Book 6473, Page 375 of Official Records.

APN: 537-010-40 and others

CLTA Preliminary Report Form - Modified (11/17/06)

EXHIBIT "A-2"

LEGAL DESCRIPTION OF McSWEENY REAL PROPERTY

THAT CERTAIN REAL PROPERTY SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF RIVERSIDE, DESCRIBED AS FOLLOWS:

2

Title No. 10-**259923123**-A-SB
Locate No. CAFNT0925-0925-0199-0259923123

## LEGAL DESCRIPTION

## EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF HEMET, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1: (LOTS 1 - 5 / APN 454-400-012, 013, 014, 015, 016) (REMAINDER PARCEL / APN 454-100-012, 018; 454-170-011, 013; 454-180-005, 012)

LOTS 1 THROUGH 5, INCLUSIVE, AND THE REMAINDER PARCEL, OF TRACT NO. 33961, IN THE CITY OF HEMET, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 425, PAGES 39 THROUGH 42, INCLUSIVE, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LAND LYING WITHIN CERTIFICATE OF COMPLIANCE NO. 08-001 RECORDED FEBRUARY 4, 2009 AS INSTRUMENT NO. 2009-0054108 OF OFFICIAL RECORDS.

PARCEL 2: (APN 454-400-009, 010, 011):

LOTS 8, 10 AND 11, OF TRACT NO. 32529, IN THE CITY OF HEMET, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 395, PAGES 73 THROUGH 76, INCLUSIVE, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

CLTA Preliminary Report Form - Modified (11/17/06)

## EXHIBIT "A-3"

### LEGAL DESCRIPTION OF SUMMERWIND REAL PROPERTY

THAT CERTAIN REAL PROPERTY SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF RIVERSIDE, DESCRIBED AS FOLLOWS:

Title No. 10-259923124-SB
Locate No. CAFNT0925-0925-0199-0259923124

## LEGAL DESCRIPTION

## EXHIBIT "A"

PARCEL 1 (APN 413-170-043, 045, 050; 413-180-028; 413-160-012, 015; 413-200-046, 051; 413-190-018, 022, 023, 026):

PARCEL 1A:

PARCEL A OF CERTIFICATE OF COMPLIANCE FOR LOT LINE ADJUSTMENT NO. "LLA 05-002" DATED APRIL 22, 2005 AND RECORDED APRIL 26, 2005 AS INSTRUMENT NO. 2005-0324926 IN THE CITY OF CALIMESA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA.

EXCEPT THEREFROM ANY AND ALL NATURAL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN AND ALL RIGHTS THEREIN, GEOTHERMAL STEAM, AND ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING, THAT MAY BE WITHIN OR UNDER THE LAND, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND STORING IN AND REMOVING THE SAME FROM THE LAND OR ANY OTHER PROPERTY, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM PROPERTY OTHER THAN THE LAND, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS, TUNNELS OR SHAFTS, WITHOUT THE RIGHT TO DRILL, MINE, STORE OR EXCAVATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE LAND, AS RESERVED BY OAK VALLEY PARTNERS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED JUNE 5, 2006, AS INSTRUMENT NO. 2006-0406030, OF OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM ANY AND ALL WATER, WATER RIGHTS OR INTERESTS THEREIN APPURTENANT OR RELATING TO THE LAND OR OWNED OR USED BY OAK VALLEY PARTNERS, L.P., IN CONNECTION WITH OR WITH RESPECT TO THE LAND (NO MATTER HOW ACQUIRED BY OAK VALLEY PARTNERS, L.P.), WHETHER SUCH WATER RIGHTS SHALL BE RIPARIAN, OVERLYING, APPROPRIATIVE, LITTORAL, PERCOLATING, PRESCRIPTIVE, ADJUDICATED, STATUTORY OR CONTRACTUAL, TOGETHER WITH THE RIGHT AND POWER TO EXPLORE, DRILL, REMOVE AND STORE THE SAME FROM OR IN THE LAND OR TO DIVERT OR OTHERWISE UTILIZE SUCH WATER, RIGHTS OR INTERESTS ON ANOTHER PROPERTY OWNED OR LEASED BY OAK VALLEY PARTNERS, L.P., WITHOUT THE RIGHT TO ENTER UPON THE SURFACE OF THE LAND IN THE EXERCISE OF SUCH RIGHTS; PROVIDED, HOWEVER, ONLY IF AND TO THE EXTENT THAT SUCH RIGHTS ARE NOT USED BY LBREP/L-SUNCAL SUMMERWIND RANCH LLC, IN ITS USE AND ENJOYMENT OF THE LAND, AS RESERVED BY OAK VALLEY PARTNERS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED JUNE 5, 2006, AS INSTRUMENT NO. 2006-0406030, OF OFFICIAL RECORDS.

PARCEL 1B:

NON-EXCLUSIVE EASEMENTS FOR GRADING, SLOPE STABILIZATION, IMPROVEMENTS APPURTENANT TO THE DEVELOPMENT OF THE PROPERTY, GRADING, CONSTRUCTION AND INSTALLATION OF A SOFT-BOTTOM EARTHEN DRAINAGE CHANNEL, DRAINAGE ACROSS, OVER AND IN THE CHANNEL, ACCESS, SLOPE MAINTENANCE, FUEL MODIFICATION AND GENERAL REPAIR AND MAINTENANCE (COLLECTIVELY, THE "RESERVED CONSERVANCY EASEMENTS") AS RESERVED IN THAT GRANT DEED RECORDED SEPTEMBER 19, 2003 AS INSTRUMENT NO. 2003-732045 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF RIVERSIDE, AND AS ASSIGNED BY THAT PARTIAL ASSIGNMENT OF RIVERSIDE LAND CONSERVANCY EASEMENTS RECORDED MAY 3, 2005 AS INSTRUMENT NO. 05-350552 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF RIVERSIDE COUNTY, AND AS ASSIGNED BY THAT PARTIAL ASSIGNMENT RECORDED JUNE 5, 2006 AS INSTRUMENT NO. 2006-0406031, OFFICIAL RECORDS.

PARCEL 1C:

NON-EXCLUSIVE EASEMENTS FOR THE CONSTRUCTION, INSTALLATION (INCLUDING THE RIGHT TO CONNECT EXISTING FACILITIES), MAINTENANCE, OPERATION, REPAIR, SERVICE, RECONSTRUCTION, RELOCATION AND REPLACEMENT OF ELECTRIC, GAS, TELEPHONE, CABLE, WATER, SEWER, DRAINAGE AND OTHER UTILITY FACILITIES, AND NON-EXCLUSIVE EASEMENTS FOR VEHICULAR AND PEDESTRIAN INGRESS AND EGRESS AS RESERVED IN THAT GRANT DEED RECORDED JUNE 17, 2004 AS INSTRUMENT NO. 2004-0467494 OF OFFICIAL RECORDS, IN THE OFFICE OF THE RECORDER OF RIVERSIDE COUNTY, AND AS

2

EXHIBIT "A" (continued)

Title No. 10-**259923124**-SB
Locate No. CAFNT0925-0925-0199-0259923124

ASSIGNED BY THAT PARTIAL ASSIGNMENT OF OAK MESA EASEMENTS RECORDED MAY 3, 2005 AS INSTRUMENT NO. 05-350553 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF RIVERSIDE COUNTY.

PARCEL 1D:

NON-EXCLUSIVE EASEMENTS FOR STREET CONSTRUCTION, OFF-SITE CONSTRUCTION, GRADING, FUEL MODIFICATION, ACCESS, INGRESS AND EGRESS, STORM DRAINS AND SEWER AND WATER LINES AS SET FORTH IN THAT EASEMENT AGREEMENT RECORDED MAY 3, 2005 AS INSTRUMENT NO. 05-350551 OF OFFICIAL RECORDS, IN THE OFFICE OF THE RECORDER OF RIVERSIDE COUNTY.

PARCEL 1E:

NON-EXCLUSIVE AGREEMENT FOR STREET CONSTRUCTION, OFF-SITE CONSTRUCTION, GRADING, FUEL MODIFICATION, ACCESS, INGRESS AND EGRESS, STORM DRAINS AND SEWER AND WATER LINES, AS SET FORTH IN THAT EASEMENT AGREEMENT RECORDED JUNE 5, 2006 AS INSTRUMENT NO. 2006-0406032, OF OFFICIAL RECORDS, IN THE OFFICE OF THE RECORDER OF RIVERSIDE COUNTY.

PARCEL 2 (APN 413-180-034 through 037; 413-200-047, 052; 413-190-019, 024, 026; 413-290-010, 035, 036 and 037; 413-460-038, 040, 043):

PARCEL 2A:

PARCEL B OF CERTIFICATE OF COMPLIANCE FOR LOT LINE ADJUSTMENT NO. "LLA 05-001" DATED APRIL 22, 2005 AND RECORDED APRIL 26, 2005 AS INSTRUMENT NO. 2005-0324927, IN THE CITY OF CALIMESA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA.

EXCEPT THEREFROM ANY AND ALL NATURAL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN AND ALL RIGHTS THEREIN, GEOTHERMAL STEAM, AND ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING, THAT MAY BE WITHIN OR UNDER THE LAND, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND STORING IN AND REMOVING THE SAME FROM THE LAND OR ANY OTHER PROPERTY, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM PROPERTY OTHER THAN THE LAND, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS, TUNNELS OR SHAFTS, WITHOUT THE RIGHT TO DRILL, MINE, STORE OR EXCAVATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE LAND, AS RESERVED BY OAK VALLEY PARTNERS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED MAY 3, 2005, AS INSTRUMENT NO. 2005-0350550, OF OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM ANY AND ALL WATER, WATER RIGHTS OR INTERESTS THEREIN APPURTENANT OR RELATING TO THE LAND OR OWNED OR USED BY OAK VALLEY PARTNERS, L.P., IN CONNECTION WITH OR WITH RESPECT TO THE LAND (NO MATTER HOW ACQUIRED BY OAK VALLEY PARTNERS, L.P.), WHETHER SUCH WATER RIGHTS SHALL BE RIPARIAN, OVERLYING, APPROPRIATIVE, LITTORAL, PERCOLATING, PRESCRIPTIVE, ADJUDICATED, STATUTORY OR CONTRACTUAL, TOGETHER WITH THE RIGHT AND POWER TO EXPLORE, DRILL, REMOVE AND STORE THE SAME FROM OR IN THE LAND OR TO DIVERT OR OTHERWISE UTILIZE SUCH WATER, RIGHTS OR INTERESTS ON ANOTHER PROPERTY OWNED OR LEASED BY OAK VALLEY PARTNERS, L.P., WITHOUT THE RIGHT TO ENTER UPON THE SURFACE OF THE LAND IN THE EXERCISE OF SUCH RIGHTS; PROVIDED, HOWEVER, ONLY IF AND TO THE EXTENT THAT SUCH RIGHTS ARE NOT USED BY LBREP/L-SUNCAL SUMMERWIND RANCH LLC, IN ITS USE AND ENJOYMENT OF THE LAND, AS RESERVED BY OAK VALLEY PARTNERS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED MAY 3, 2005, AS INSTRUMENT NO. 2005-035055, OF OFFICIAL RECORDS.

PARCEL 2B:

NON-EXCLUSIVE EASEMENTS FOR GRADING, SLOPE STABILIZATION, IMPROVEMENTS, CONSTRUCTION AND INSTALLATION OF A SOFT-BOTTOM EARTHEN DRAINAGE CHANNEL, DRAINAGE ACROSS, OVER AND IN THE CHANNEL, ACCESS, SLOPE MAINTENANCE, FUEL MODIFICATION, AND GENERAL REPAIR AND MAINTENANCE (COLLECTIVELY, THE "RESERVED CONSERVANCY EASEMENTS"), AS RESERVED IN THAT GRANT DEED RECORDED SEPTEMBER 19, 2003, AS INSTRUMENT NO. 2003-732045, OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF RIVERSIDE, AND AS ASSIGNED IN THAT PARTIAL ASSIGNMENT OF

CLTA Preliminary Report Form - Modified (11/17/06)

EXHIBIT "A" (continued)

Title No. 10-259923124-SB
Locate No. CAFNT0925-0925-0199-0259923124

RIVERSIDE LAND CONSERVANCY EASEMENTS, RECORDED MAY 3, 2005, AS INSTRUMENT NO. 05-350552, OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF RIVERSIDE COUNTY.

PARCEL 2C:

NON-EXCLUSIVE EASEMENTS FOR THE CONSTRUCTION, INSTALLATION (INCLUDING THE RIGHT TO CONNECT EXISTING FACILITIES), MAINTENANCE OPERATION, REPAIR, SERVICE, RECONSTRUCTION, RELOCATION AND REPLACEMENT OF ELECTRIC, GAS, TELEPHONE, CABLE, WATER, SEWER, DRAINAGE, AND OTHER UTILITY FACILITIES, AND NON-EXCLUSIVE EASEMENTS FOR VEHICULAR AND PEDESTRIAN INGRESS AND EGRESS, AS RESERVED IN THAT GRANT DEED RECORDED JUNE 17, 2004, AS INSTRUMENT NO. 2004-0467494, OF OFFICIAL RECORDS, IN THE OFFICE OF THE RECORDER OF RIVERSIDE COUNTY, AND AS ASSIGNED BY THAT PARTIAL ASSIGNMENT OF OAK MESA EASEMENTS RECORDED MAY 3, 2005, AS INSTRUMENT NO. 05-350553, OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF RIVERSIDE COUNTY.

PARCEL 2D:

NON-EXCLUSIVE EASEMENTS FOR STREET CONSTRUCTION, OFF-SITE CONSTRUCTION, GRADING, FUEL MODIFICATION, ACCESS, INGRESS AND EGRESS, STORM DRAINS, AND SEWER AND WATER LINES AS SET FORTH IN THAT EASEMENT AGREEMENT RECORDED MAY 3, 2005, AS INSTRUMENT NO. 05-350551, OF OFFICIAL RECORDS, IN THE OFFICE OF THE RECORDER OF RIVERSIDE COUNTY.

PARCEL 2E:

NON-EXCLUSIVE AGREEMENT FOR STREET CONSTRUCTION, OFF-SITE CONSTRUCTION, GRADING, FUEL MODIFICATION, ACCESS, INGRESS AND EGRESS, STORM DRAINS AND SEWER AND WATER LINES, AS SET FORTH IN THAT EASEMENT AGREEMENT RECORDED JUNE 5, 2006 AS INSTRUMENT NO. 2006-0406032, AND AMENDMENTS RECORDED AUGUST 23, 2007, AS INSTRUMENT NOS. 2007-0542758, 2007-0542759, 2007-0542760, AND 2007-0542761, ALL OF OFFICIAL RECORDS, IN THE OFFICE OF THE RECORDER OF RIVERSIDE COUNTY.

APN: 413-160-012 and others

4

EXHIBIT "B"

SALE PROCEDURES

Set forth below are the Sale Procedures (the "Sale Procedures") to be employed with respect to the Purchase and Sale Agreement, dated as of _____ (the "Agreement"), by and among Alfred H. Siegel, solely in his capacity as the Chapter 11 trustee ("Trustee") of the administratively consolidated estates of LBREP/L-SunCal Mc Allister Ranch, LLC ("Mc Allister Ranch"), LBREP/L-SunCal McSweeny Farms, LLC ("McSweeny Farms"), and LBREP/L-SunCal Summerwind Ranch, LLC ("Summerwind Ranch"; with Mc Allister Ranch, McSweeny Farms and Summerwind Ranch being referred to herein from time-to-time individually as a "Debtor", and collectively as the "Debtors"; Trustee, acting on behalf of the applicable Debtors in the foregoing capacity only, shall be referred to herein from time-to-time as "Seller""), and Land Co. Coldwater Endeavor, LLC, a California limited liability company ("Buyer") concerning, among other things, the sale, conveyance, assignment and transfer of the Property (the "Sale"); *provided*, that Buyer reserves the right to further comment on the form of the the order of the Bankruptcy Court approving the Sale Procedures. The Sale is subject to competitive bidding as set forth herein (the "Bidding Process") and approval by the Bankruptcy Court at a hearing under sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Hearing"). The following Sale Procedures and related bid protections are designed to reimburse Buyer for its efforts and agreements to date and to facilitate a full and fair process designed to maximize the value of the Property for the benefit of Seller's estate and creditors. Any capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

"Stalking Horse"

Buyer has been designated by Seller to be the "stalking horse" bidder for the proposed transactions contemplated by the Agreement.

Participation Requirements

In order to participate in the Bidding Process, each person or entity (each, a "Potential Bidder") other than Buyer, which is and shall be deemed to be a Qualified Bidder for all purposes, must deliver (unless previously delivered) to Seller the following items 28 days in advance of the Auction Date (as defined below):

(i)      An executed confidentiality agreement provided by Seller, which shall be no more favorable in the aggregate to the Potential Bidder than any confidentiality agreement delivered by Buyer;

(ii)      Current financial statements of (A) the Potential Bidder, or (B) if the Potential Bidder is an entity formed for the purpose of acquiring the Property of Seller, current financial statements of the equity holder(s) of the Potential Bidder who shall either guarantee the

obligations of the Potential Bidder or provide such other form of financial disclosure and credit-quality support information or enhancement reasonably acceptable to Seller and its advisors; and

(iii)    A preliminary (non-binding) proposal regarding (a) the purchase price range, (b) any assets expected to be excluded, (c) the structure and financing of the transaction (including the amount of equity to be committed and sources of financing), (d) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals, (e) any conditions to closing that it may wish to impose in addition to those set forth in the Agreement, and (f) the nature and extent of additional due diligence it may wish to conduct.

As promptly as practicable after a Potential Bidder delivers all of the materials required by subparagraphs (i), (ii), and (iii) above, Seller shall (i) deliver to Buyer a copy of such materials, and (ii) determine whether the Potential Bidder is a Qualified Bidder.  Seller shall promptly notify the Potential Bidder and Buyer of such determination.

After Seller notifies the Potential Bidder that it is a Qualified Bidder, Seller shall provide to the Qualified Bidder (i) access to the same confidential evaluation materials provided by Seller to Buyer containing financial information and other data relative to the Property and/or such other information as the Qualified Bidder may reasonably request (provided, that all such additional information shall also be provided to Buyer); (ii) the results of Buyer's investigations, studies, tests, memoranda, analyses and other work product to the extent that Buyer in Buyer's sole discretion has elected to give Seller such results; and (iii) a copy of the Agreement, marked to delete references to the Break-up Fee (as defined below) and such other provisions applicable only to Buyer.

## Due Diligence

Only Qualified Bidders may conduct due diligence.  Due Diligence access may include management presentations as may be scheduled by Seller, access to physical and online data rooms, on-site inspections and such other matters which a Qualified Bidder may reasonably request and as to which Seller, in its reasonable exercise of discretion, may agree.  Seller will designate employee(s) or other representative(s) to coordinate all reasonable requests for additional information and due diligence access from a Qualified Bidder.  If any Qualified Bidder receives any information related to the Property from Seller not theretofore given to Buyer, Seller shall provide Buyer with such information.  Seller may, in its discretion, coordinate due diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or on-site inspections.  Neither Seller nor any of its affiliates (or any of their respective representatives) are obligated to furnish any information relating to the Property to any person other than to Qualified Bidders who make an acceptable preliminary proposal.  Qualified Bidders are advised to exercise their own discretion before relying on any information regarding the Property provided by anyone other than Seller or its representatives.  It is expressly understood and agreed to between the parties that the results of Buyer's investigations, studies, tests, memorandums, analysis and other work product are strictly confidential; provided, however, that if Buyer, in Buyer's sole discretion, elects to give such results to Seller, Seller shall have the right to disclose any

information regarding the results of Buyer's investigations, studies, tests, memorandums, analysis and any other work product to any Potential Bidder.

### Bid Deadline

All Bids (as defined below) must be submitted to Seller c/o [_____], so as to be received no later than 7 days before the Auction Date (as defined below) at 5:00 p.m. (Pacific Time) (the "Bid Deadline") Copies of all Bids shall simultaneously be provided by facsimile transmission, electronic mail, personal delivery or reliable overnight courier service to counsel to the Committee. For purposes of the Agreement, "Bid" shall mean one or more letters from a Qualified Bidder stating that (i) such Qualified Bidder offers to purchase all or substantially all of the Property upon the terms and conditions set forth in a copy of the Agreement, together with all Exhibits and Schedules thereto (the "Definitive Sale Documentation"), marked to show those amendments and modifications to the Definitive Sale Documentation, including, but not limited to, price and the time of closing, that such Qualified Bidder proposes, (ii) such Qualified Bidder is prepared to enter into and consummate the transaction within not more than fifteen (15) days after entry by the Bankruptcy Court of the Sale Order, provided such order shall have become a Final Order, and (iii) each such Qualified Bidder's offer is irrevocable until the closing of a purchase of all or substantially all of the Property.

### Qualified Bids

Only Qualified Bids will qualify for consideration at the Auction (as defined below). A Bid received from a Qualified Bidder will constitute a "Qualified Bid" only if such Bid includes the documents and meets the requirements set forth below. In particular, a "Qualified Bid" is a Bid that:

(i)      is received by the Bid Deadline (as may be extended, as described below);

(ii)      identifies the proponent of the Bid and an officer who is authorized to appear and act on behalf of the Qualified Bidder and provides evidence of authorization and approval from the Qualified Bidder's board of directors or comparable governing body with respect to the submission, execution, delivery and closing of the Qualified Bid;

(iii)      provides for the purchase by the Qualified Bidder of all of the Property for cash, and under no circumstances provides for any portion of the Purchase Price to be satisfied by credit bid;

(iv)      is a proposal which Seller determines is at least as favorable to the estate as the terms of the Agreement and has a value greater than or equal to the sum of (a) the Purchase Price *plus* (b) the Break-up Fee (as defined below) *plus* (z) $1,000,000;

(v)      includes a copy of a definitive purchase agreement in form and substance similar to the Agreement signed by an authorized representative of such Qualified Bidder in addition to a marked copy of such agreement to reflect the Qualified Bidders modifications to the Agreement;

(vi)    is generally on the same or more favorable terms in the aggregate to Seller as set forth in the Agreement;

(vii)    is not subject to termination except on the same terms as the Agreement;

(viii)    includes written evidence of a commitment for financing (by a credit worthy bank or financial institution) that shall provide such financing without alteration of conditions or delays or other evidence of ability, as determined in the reasonable business judgment of the Seller, to consummate the transaction;

(ix)    is accompanied by a deposit (by means of a certified bank check from a U.S. bank or by wire transfer) equal to $1,000,000.00 (the "Deposit");

(x)    is not conditioned on the outcome of any unperformed due diligence by the bidder, the receipt of equity or debt financing, or the approval of any board of directors, shareholder, or other corporate approval;

(xi)    is not conditioned upon approval by the Bankruptcy Court of any bid protections, such as a termination fee, expense reimbursement or similar type of payment;

(xii)    is irrevocable until the closing of the Sale if such Qualified Bidder is selected as Successful Bidder or Back-up Bidder; and

(xiii)    contains a Purchase Price allocation.

Whether the Bid of a Qualified Bidder meets the foregoing requirements to become a Qualified Bid shall be determined by the Seller, in its reasonable business judgment, within 48 hours after receipt of such Bid.  The Seller shall immediately notify Buyer if Seller determines that any Bid is a Qualified Bid.

The Seller, in his reasonable business judgment, may reject any proposal.

If Seller does not receive any Qualified Bids by the Bid Deadline, Seller shall report the same to the Bankruptcy Court and shall proceed with a sale of the Property to Buyer pursuant to the terms of the Agreement.  The Agreement executed by Buyer, as it may be amended, modified, or supplemented, shall constitute a Qualified Bid for all purposes.

<u>Auction, Bidding Increments, and Bids Remaining Open</u>

If Seller receives one or more Qualified Bids, Seller will conduct an auction (the "Auction") at the offices of Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP, 650 Town Center Drive, Suite 950, Costa Mesa, California 92626, beginning not later than 10:00 a.m. (Pacific Time) on ░░░░░░░░░░ (the "Auction Date"), which Auction Date shall in no event be later than 60 days following the date on which the Sale Procedures Order has become a Final Order.  The Seller shall evaluate all Qualified Bids received and shall determine which Qualified

Bid reflects the highest or best offer for the Purchased Assets. At least three (3) days prior to the
Auction, Seller shall give Buyer and all other Qualified Bidders who have timely submitted
Qualified Bids a copy of the highest and best Qualified Bid received and copies of all other
Qualified Bids. Only Buyer, Seller, the representative(s) of the Committee, and any Qualified
Bidders (including such parties' respective advisors) who have timely submitted Qualified Bids
shall be entitled to attend the Auction. Only Buyer and such Qualified Bidders will be entitled to
make any subsequent Qualified Bids at the Auction.

At the Auction, Qualified Bidders will be permitted to increase their Bids.

Bidding at the Auction shall be in increments of $1,000,000 and shall continue until such
time as the highest and best Qualified Bid is determined by Seller in its discretion, in
consultation with the Committee. In each bidding round, Buyer shall be entitled to bid its Break-
up Fee (as defined below). At the conclusion of the bidding, Seller, after consultation with the
Committee, shall announce its determination as to the Qualified Bidder submitting the successful
Bid (the "Successful Bidder" and "Successful Bid"), which shall be submitted to the Bankruptcy
Court for approval at the Sale Hearing, and the second highest and best Qualified Bid (the
"Back-up Bid"). Seller will be deemed to have accepted any Qualified Bid only when such
Qualified Bid is determined to be the Successful Bid and has been approved by the Bankruptcy
Court. Buyer shall be deemed a party-in-interest with standing to appear and be heard in
connection with any motion, hearing, or other proceeding relating to the Agreement, any
subsequent Bids, and the Auction.

### Break-up Fee

If Seller accepts a Qualified Bid, other than a bid of Buyer, as the highest or best offer,
Seller shall pay Buyer at the closing of such competing transaction as reasonable compensation
for Buyer's efforts in connection with the negotiation and execution of the Agreement and the
transactions contemplated thereby an amount equal to $1,000,000.00 (the "Break-up Fee").

The Break-up Fee obligation of Seller shall be payable at closing solely from the funds to
be used to satisfy the purchase price for the competing transaction or other sale of the Property or
any portion thereof, as applicable.

### The Sale Hearing

The Sale Hearing is presently scheduled to take place on _____, at _____
(Pacific Time) before the Honorable Erithe Smith, United States Bankruptcy Judge for the
Central District of California (Orange County Division). At the Sale Hearing, Seller will seek
entry of the Sale Order, among other things, authorizing and approving the Sale (i) to Buyer, if
no other Qualified Bid is received and accepted as the Successful Bid, pursuant to the terms and
conditions set forth in the Agreement or (ii) to the Successful Bidder, if a Qualified Bid is
received and accepted by Seller as the Successful Bid, as determined by Seller in accordance
with the Sale Procedures, pursuant to the terms and conditions set forth in the Agreement or
marked agreement submitted by the Successful Bidder.

If, following the entry of the Sale Order by the Bankruptcy Court, the Successful Bidder fails to consummate a transaction with Seller in respect of such Successful Bid because of a breach or failure to perform on the part of such Qualified Bidder, then the Back-up Bid shall be deemed to be the Successful Bid, and Seller shall consummate a transaction in respect of the Back-up Bid without further order of the Bankruptcy Court.

The Sale Hearing may be adjourned or rescheduled without notice, including by an announcement of the adjourned date at the Sale Hearing.

### Failure to Consummate Purchase

If the Successful Bidder (other than Buyer) fails to consummate the Sale, and such failure is the result of a breach by the Successful Bidder, the Successful Bidder's Deposit shall be forfeited to Seller and, except to the extent provided in the Agreement or marked agreement, Seller specifically reserves the right to seek all available damages from such person.

### Return of Good Faith Deposit

The Deposits of all Qualified Bidders (other than Buyer) shall be retained by Seller and held in escrow in an interest bearing account and all Qualified Bids will remain open, notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of a Successful Bid by a Qualified Bidder, until forty-eight (48) hours after the closing of the sale of the Property (the "Return Date"). On the Return Date, Seller shall return the Deposits of all Qualified Bidders, except the Successful Bidder, with the accrued interest.

### Modifications

The Seller may (a) determine, in his business judgment, which Qualified Bid, if any, is the highest or otherwise best offer, (b) reject, at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid, other than the Stalking Horse Bid, that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, these Sale Procedures or the terms and conditions of the Agreement, or (iii) contrary to the best interests of Seller, its estate and creditors and other parties-in-interest, and (c) with the prior consent of Buyer, extend the Bid Deadline; provided, however, that if Buyer submits the only Qualified Bid, the provisions of clauses (a) and (b) above shall be inoperative.

EXHIBIT "C"

WHEN RECORDED MAIL TO:

_____
_____
_____
_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# QUITCLAIM DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, _____,
do(es)    hereby    REMISE,    RELEASE    AND    QUITCLAIM    to    _____
that certain real property in the County of _____, State of California, as more particularly described on
attached Exhibit "A" attached hereto and incorporated herein by this reference.

Dated _____, 20___                          _____
                                                      _____

ACKNOWLEDGMENT

STATE OF CALIFORNIA                 )
                                    ) SS
COUNTY OF _____           )

On _____, before me, _____, Notary Public, personally appeared
_____, who proved to me on the basis of satisfactory evidence to be the
person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his
authorized capacity, and that by his signature on the instrument, the person, or the entity upon behalf of which the
person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

_____
Notary Public

Suncal/LandCo PSA (execution version)                    10

<u>EXHIBIT "D"</u>

<u>NON-FOREIGN AFFIDAVIT</u>

Section 1445 of the Internal Revenue Code provides that the transferee of an interest in real property located in the United States must withhold tax if the transferor is a foreign person. To inform _____ ("<u>Transferee</u>"), that withholding of tax is not required upon the sale by _____ (hereinafter "<u>Transferor</u>"), of the fee simple interest in that certain real property sold pursuant to the Purchase Agreement and Escrow Instructions dated _____, 2010, which real property is described in <u>Exhibit "A"</u> attached hereto and made a part hereof, the undersigned hereby certifies the following:

1.    The Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and the income tax regulations promulgated thereunder);

2.    The Transferor's United States Taxpayer Identification Number is _____;

3.    The Transferor's office address is _____; and

4.    The Internal Revenue Service has not issued any notice with respect to Transferor or listed Transferor as a person whose affidavit may not be relied upon for purposes of Section 1445 of the Internal Revenue Code.

The Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalty of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Transferor.

Dated: _____, 2010          _____

Address of property for sale:  See legal description attached as Exhibit "A".

EXHIBIT "A"

LEGAL DESCRIPTION OF REAL PROPERTY

EXHIBIT "E"

GENERAL ASSIGNMENT AND BILL OF SALE

THIS GENERAL ASSIGNMENT and BILL OF SALE ("Assignment") is entered into as of _____, 2010, in connection with that certain Purchase Agreement and Escrow Instructions dated as of _____, 2010 (the "Purchase Agreement"), between _____ a _____ ("Buyer"), and Alfred H. Siegel, solely in his capacity as the Chapter 11 trustee of the Debtors ("Seller"), with respect to that certain real property described in more detail on Exhibit "A" attached hereto and made a part hereof (the "Property"). The terms of the Purchase Agreement are incorporated herein by this reference, and this Assignment is made expressly subject to the terms and conditions set forth therein. Capitalized terms which are not defined herein shall have the meaning given to them in the Purchase Agreement.

For good and valuable consideration, receipt of which is hereby acknowledged, Seller does hereby sell, transfer, assign, convey and deliver to Buyer all of Seller's right, title and interest, if any, in the Tangible Property and the Intangible Property and the Benefits appurtenant or pertaining to the Real Properties (collectively, the "Assigned Property").

The foregoing assignments are made on an "AS-IS" basis, "WITH ALL FAULTS", and without any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to the Assigned Property or any matter related thereto, including, without limitation, the existence, scope and/or extent thereof, or the habitability, merchantability, marketability, profitability or fitness for a particular purpose, all as more particularly provided in Section 10.2 of the Purchase Agreement. In the event of any inconsistency between the terms of this Assignment and the terms of the Purchase Agreement, the Purchase Agreement shall control.

_____

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee of the administratively consolidated estates of LBREP/L-SunCal McAllister Ranch, LLC, and LBREP/L-SunCal McSweeny Farms, and LBREP/L-SunCal Summerwind Ranch

EXHIBIT "F"

ESCROW STIPULATION

1  **WEILAND, GOLDEN,**
   **SMILEY, WANG EKVALL & STROK, LLP**
2  Evan D. Smiley, State Bar No. 161812
   esmiley@wgllp.com
3  Robert S. Marticello, State Bar No. 244256
   rmarticello@wgllp.com
4  650 Town Center Drive, Suite 950
   Costa Mesa, CA 92626
5  Telephone:   (714) 966-1000
   Facsimile:   (714) 966-1002
6
   Attorneys for Alfred H. Siegel
7  Chapter 11 Trustee

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  SANTA ANA DIVISION

11  In re                                    Case No. 8:08-bk-15588-ES

12  LBREP/L-Sun Cal Master I, LLC, et al.,   Chapter 11

13              Debtor.                      (Jointly Administered with Case Nos.
                                             8:08-bk-15637-ES; 8:08-bk-15639-ES; and
14                                           8:08-bk-15640-ES)
    _____ Affects LBREP/L-SunCal Master I,
15  LLC Only                                 **STIPULATION REGARDING RETURN OF**
                                             **ESCROWED FUNDS**
16  _____ Affects LBREP/L-SunCal McAllister
    Ranch, LLC Only                          **[No Hearing Requested]**
17
    _____ Affects LBREP/L-SunCal
18  McSweeny Farms Only

19  _____ Affects LBREP/L-SunCal
    Summerwind Ranch Only
20
    __X__ Affects All Debtors.
21

22      Alfred H. Siegel, solely in his capacity as the Chapter 11 trustee ("Trustee") of the

23  administratively consolidated estates of LBREP/L-Lehman SunCal Master I, LLC ("Parent

24  Debtor"), LBREP/L-SunCal McAllister Ranch, LLC ("McAllister Ranch"), LBREP/L-SunCal

25  McSweeny Farms, LLC ("McSweeny Farms"), and  LBREP/L-SunCal Summerwind

26  Ranch, LLC ("Summerwind Ranch"; with Parent Debtor, McAllister Ranch, McSweeny

27  Farms and Summerwind Ranch being referred to herein from time-to-time individually as a

28  "Debtor", and collectively as the "Debtors"), and Land Co. Coldwater Endeavor, LLC

435334.1

                                                              STIPULATION

1  ("Buyer"), enter into this Stipulation Regarding Return of Escrowed Funds (the

2  "Stipulation").

3  <u>**RECITALS**</u>

4       1.    On July 12, 2010, Trustee and Buyer entered in that certain Purchase

5  Agreement And Escrow Instructions attached thereto as <u>Exhibit A</u> (the "<u>Purchase

6  Agreement</u>").[1]

7       2.    The Purchase Agreement calls for the Buyer to make a one-million dollar

8  ($1,000,000) deposit (the "<u>Deposit</u>") into escrow in connection with the proposed

9  acquisition as set forth in the Purchase Agreement.

10      3.    The Buyer has the right to terminate the Purchase Agreement and receive a

11 refund of the Deposit under certain circumstances, including, without limitation, the failure

12 of the Seller to achieve certain milestone dates as set forth in Section 7.3 of the Purchase

13 Agreement.

14      4.    The Seller intends to seek approval of this Court for entry into the Agreement

15 and, in the interim, Buyer and Seller wish to agree to the conditions upon which the Buyer

16 is entitled to a return of the Deposit.

17 ///

18 ///

19 ///

20

21

22

23

24

25

26

27  [1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Purchase
    Agreement.

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1

### STIPULATION

2      THEREFORE, the undersigned, by and through their counsel, have conferred, and,

3 have agreed and stipulated that in the event that the Buyer exercises its right to terminate

4 the Purchase Agreement under Section 7.3 of the Purchase Agreement, Buyer shall be

5 entitled to promptly receive a return of the Deposit along with all interest earned thereon

6 while held in Escrow, and Seller shall take all necessary actions to facilitate such return of

7 the Deposit.

8 Dated: July 12, 2010          WEILAND, GOLDEN,
                                       SMILEY, WANG EKVALL & STROK, LLP

9

10                             By: _____

11                                  EVAN D. SMILEY

12                                  Attorneys for Alfred H. Siegel,
                                 Chapter 11 Trustee

13 Dated: July 12, 2010          MUNGER, TOLLES & OLSON LLP

14

15                             By: _____

16                                  TODD J. ROSEN
                                 Attorneys for Land Co. Coldwater
                                 Endeavor, LLC

17

18

19

20

21

22

23

24

25

26

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002



1  **WEILAND, GOLDEN,**
   **SMILEY, WANG EKVALL & STROK, LLP**
2  Evan D. Smiley, State Bar No. 161812
   esmiley@wgllp.com
3  Robert S. Marticello, State Bar No. 244256
   rmarticello@wgllp.com
4  650 Town Center Drive, Suite 950
   Costa Mesa, CA 92626
5  Telephone:    (714) 966-1000
   Facsimile:     (714) 966-1002
6
   Attorneys for Alfred H. Siegel
7  Chapter 11 Trustee

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    SANTA ANA DIVISION

11  In re                                  Case No. 8:08-bk-15588-ES

12  LBREP/L-Sun Cal Master I, LLC, et al.,  Chapter 11

13              Debtor.                     (Jointly Administered with Case Nos.
                                            8:08-bk-15637-ES; 8:08-bk-15639-ES; and
14                                          8:08-bk-15640-ES)

15  _____ Affects LBREP/L-SunCal Master I,
    LLC Only                               **ORDER APPROVING STIPULATION**
                                           **REGARDING RETURN OF ESCROWED**
16  _____ Affects LBREP/L-SunCal McAllister **FUNDS**
    Ranch, LLC Only
17
    _____ Affects LBREP/L-SunCal
18  McSweeny Farms Only

19  _____ Affects LBREP/L-SunCal
    Summerwind Ranch Only
20
    __X__ Affects All Debtors.
21

22       The Court having duly considered the Stipulation Regarding Return of Escrowed

23  Funds (the "Stipulation") [Docket No. ___ ] entered into by Alfred H. Siegel, chapter 11

24  trustee in the above-captioned bankruptcy cases (the "Trustee"), and Land Co. Coldwater

25  Endeavor, LLC ("Buyer"), and for good cause shown,

26  ///

27  ///

28  ///

435335.1

                                                                        ORDER

1    **IT IS ORDERED** that:

2        1.    The Stipulation, the terms of which are incorporated herein by this reference,

3    is approved.[1]

4        2.    In the event that the Buyer exercises its right to terminate the Purchase

5    Agreement under Section 7.3 of the Purchase Agreement, Buyer shall be entitled to

6    promptly receive a return of the Deposit along with all interest earned thereon while held

7    in Escrow, and Seller shall take all necessary actions to facilitate such return of the

8    Deposit.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the

27    Stipulation.

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000    Fax 714-966-1002

435335.1                          2                          ORDER