- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14             Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16             United States Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             June 21, 2010

21             9:31 AM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

- 2 -

1

2   CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3   the September 20, 2008 Sale Order and Granting Other Relief;

4   (ii) Motion of the Trustee for Relief Pursuant to the Sale

5   Orders or, Alternatively, for Certain Limited Relief Under Rule

6   60(b); (iii) the Motion of Official Committee of Unsecured

7   Creditors of Lehman Brothers Holdings Inc., Authorizing and

8   Approving (A) Sale of Purchased Assets Free and Clear of Liens

9   and Other Interests and (B) Assumption and Assignment of

10  Executory Contracts and Unexpired Leases, Dated September 20,

11  2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12  SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13  Sale Order; (iv) All Joinders Thereto and Related Adversary

14  Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15  the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

- 3 -

```
 1
 2     A P P E A R A N C E S :

 3     JONES DAY

 4          Special Counsel for the Debtors

 5          222 East 41st Street

 6          New York, NY 10017

 7

 8     BY:   ROBERT W. GAFFEY, ESQ.

 9

10     HUGHES HUBBARD & REED LLP

11          Attorneys for James W. Giddens, SIPC Trustee

12          One Battery Park Plaza

13          New York, NY 10004

14

15     BY:   WILLIAM R. MAGUIRE, ESQ.

16

17     BOIES, SCHILLER & FLEXNER LLP

18          Attorneys for Barclays Capital, Inc.

19          333 Main Street

20          Armonk, NY 10504

21

22     BY:   DAVID BOIES, ESQ.

23

24

25
```

- 4 -

1

2    STUTMAN TREISTER & GLATT LLP

3         Attorneys for Elliott Management

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   MARINA FINEMAN, ESQ.

9         WHITMAN L. HOLT, ESQ.

10        REBECCA S. REVICH, ESQ.

11        (TELEPHONICALLY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 5 of 273

- 5 -

1                    P R O C E E D I N G S

2              THE COURT:  Be seated, please.  Good morning.

3              MR. GAFFEY:  Good morning, Your Honor.  Robert Gaffey

4     for the debtor, Your Honor.  We propose to proceed this morning

5     with movants calling Bryan Marsal to the stand unless Your

6     Honor has housekeeping matters to deal with before.

7              THE COURT:  No.  You should proceed.

8              MR. GAFFEY:  Then the movants call Bryan Marsal, Your

9     Honor.  Your Honor, we have a witness book for Mr. Marsal which

10    I've distributed to everyone except Your Honor.  May I

11    approach?

12             THE COURT:  Yes.  Thank you.  Mr. Marsal, you sit

13    here.  Good morning.  Please raise your right hand.

14        (Witness duly sworn)

15             THE COURT:  Be seated, please.

16    DIRECT EXAMINATION

17    BY MR. GAFFEY:

18    Q.   Mr. Marsal, I'd ask you to keep your voice up and keep the

19    microphone close to you so that everyone in the courtroom can

20    hear.  Thank you.

21         How are you employed, sir?

22    A.   I'm sorry?

23    Q.   How are you employed?

24    A.   I am the chief executive officer of Lehman Brothers and

25    the co-chief executive officer of Alvarez & Marsal.

08-13555-mg    Doc 10178    Filed 06/23/10    Entered 07/14/10 10:26:48    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 6 of 273

- 6 -

1    Q.    And what is the business of Alvarez & Marsal, sir?

2    A.    The primary business of Alvarez & Marsal is in the

3    distressed arena.  We provide problem-solving solutions to

4    troubled companies.

5    Q.    And how long have you held the position of chief executive

6    officer of Lehman Brothers Holdings?

7    A.    I was made chief executive officer on January 1, 2009.

8    Q.    And would you tell the Court how long Alvarez & Marsal has

9    been involved in this bankruptcy -- in the affairs of Lehman

10   Brothers Holdings Inc. in this bankruptcy proceeding?

11   A.    I was called by the board the night of September 14th,

12   2008.  Showed up on premises September 15th, 2008 and was

13   actually officially hired by the company four days later.

14   Q.    And who was it who placed that first call to you, Mr.

15   Marsal?

16   A.    Mark Shapiro, who was in charge of restructuring at Lehman

17   Brothers, made the first phone call at the request of the board

18   of Lehman.

19   Q.    And at some point shortly after that, did you take a title

20   with respect to Lehman Brothers Holdings?

21   A.    Four days later, I took the title of chief restructuring

22   officer.

23   Q.    Okay.  And what were your duties as chief restructuring

24   officer, Mr. Marsal?

25   A.    Everyone in the company reported to the chief

- 7 -

1    restructuring officer and I reported to the board of directors

2    of Holdings and, of course, the Court.

3    Q.    And what is it you're supposed to as chief restructuring

4    officer?  What are your job responsibilities?

5    A.    The chief restructuring officer in a bankruptcy or a

6    troubled situation is sort of a interim marshal where all

7    officers of the company and all managers would be reporting,

8    effectively, to that chief restructuring officer for the

9    interim period of the crisis.  Once the crisis goes away, the

10   CRO, the chief restructuring officer will go away and it would

11   return to a more normalized structure.

12   Q.    And as chief restructuring officer and with respect to the

13   work of Alvarez & Marsal, generally regarding Lehman, what are

14   the first priorities when you first take your post as CRO?

15   A.    It depends on each situation.

16   Q.    What were they here?

17   A.    The situation of Lehman, priority number one had to do

18   with trying to preserve the data, the information.  With the

19   data, with the information, we could always come back -- circle

20   back and figure out what happened with various transactions.

21   Priority number two was because of the loss in the employee

22   base, four days later, four days after the bankruptcy, in

23   essence, ten thousand employees moved over to Barclays.  We

24   were left with 651 billion dollars of assets, eventually a

25   trillion dollars of claims and no employees and no accounting

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 8 of 273

- 8 -

1    systems in place.  So what we tried to do, the second order of

2    business, after trying to preserve e-mail traffic and

3    transaction traffic, was to recruit a team and so on.  And it

4    was really stabilizing this patient to figure out what we had

5    here.

6    Q.    Now, when you first were retained, did it come to your

7    attention that there was a transaction being negotiated with

8    Barclays?

9    A.    The day I was -- the first day on the job, I was told by

10   the chief administrative officer, Steven Berkenfeld, that my

11   responsibility would be as the CRO immediately after two

12   transactions had taken place.  One was the Barclays -- proposed

13   Barclays transaction.  And second was the proposed Neuberger

14   Berman transaction.  I was specifically told that these

15   transactions were underway.  They were being addressed by the

16   two management teams at Lehman and that it was not an area from

17   my focus.  And at that point, I did not focus on it, at least

18   not for four days.  After four days, it became clear to me that

19   without accounting systems and without the technology needed,

20   it was going to be very difficult for us to manage the ongoing

21   bankruptcy.  And it was imperative that we have a transition

22   services agreement in place with a sale to Barclays.  With all

23   the systems that were being transferred to Barclays, pricing

24   systems, accounting systems, it was essential that we have some

25   assurance that we would have that ongoing support.  We call it

- 9 -

1    the TSA but it's the transition services agreement.

2    Q.    And what role, if any, did you or others from Alvarez &

3    Marsal play with regard to seeing to it that a TSA was put in

4    place?

5    A.    The first time the TSA became a concern was on Thursday of

6    that week.  It would be 15, 16, 17, 18 -- the 18th I met with

7    Steven Berkenfeld.  And I expressed to him my concern about the

8    TSA, about access to information.  And clearly, that was not

9    the emphasis of management or Barclays during this transaction.

10   I insisted -- in fact, I told him that I was going to object to

11   the transaction if we did not have a TSA crafted.  And

12   Berkenfeld agreed with me and he -- I proceeded to assign Jim

13   Fogarty and he assigned Bill Gordon of Alvarez & Marsal with

14   responsibility for trying to develop some kind of a TSA

15   transition services agreement as part of this transaction.

16   Q.    And did you or anyone else from Alvarez & Marsal play any

17   role in negotiating the actual terms of the Lehman/Barclays

18   transaction?

19   A.    No.

20   Q.    Were you or anyone else from Alvarez & Marsal asked to

21   participate in valuing property that would be transferred to

22   Barclays?

23   A.    No.

24   Q.    Were you or anyone else from Alvarez & Marsal asked to

25   review or comment on the documentation of the transaction?

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
Pg 10 of 273
LEHMAN BROTHERS HOLDINGS INC., et al.

- 10 -

1    A.    No.

2    Q.    Did you talk to anyone during that first week who was

3    involved in the negotiation of the transaction about its

4    economic terms?

5    A.    Yes.

6    Q.    Who did you speak to?

7    A.    Steve Berkenfeld.

8    Q.    And would you describe your conversation with Mr.

9    Berkenfeld to the Court?

10   A.    The conversation I had was probably Wednesday or Thursday.

11   I'd say -- it was probably Wednesday of the week of the

12   bankruptcy which would make that the 17th of September.  In

13   that discussion, I said what's the transaction.  And he said

14   well, you're going to be losing -- I think you're going to be

15   losing 10,000 employees which was pretty troublesome.  And I

16   believe that we will have to set aside an amount of securities

17   equal to the liabilities that were being assumed, those -- I

18   said what are those liabilities.  He said well, liabilities

19   would include severance, would include bonuses to be paid to

20   employees, 'cause I got into a sort of a debate on the level of

21   those bonuses that they were -- had to be paid to the employees

22   and the accrued liabilities.  We call that cure liabilities.

23   And it was clear, he said, Barclays will not be taking this

24   transaction if they're going to lose money in the transaction

25   so the liabilities being assumed will have to be equal to the

- 11 -

1    value of the securities being exchanged.

2    Q.   Did he use any particular term to describe that

3    relationship between assets and liabilities?

4         MR. BOIES:  Objection, Your Honor, unless it's offered

5    solely for the purpose of this witness' understanding.

6    Otherwise it is hearsay and also irrelevant on the grounds of

7    unexpressed subjective understanding.  If it's offered only for

8    this witness' understanding, we have no objection to the Court

9    taking it subject, of course, to our arguments on the relevance

10   factor.

11        THE COURT:  Well, that's a multi-part objection.  Do

12   you want to respond to it before I rule?

13        MR. GAFFEY:  It's offered only for Mr. Marsal's state

14   of mind, his understanding.  It's not offered for the truth of

15   the statements that Mr. Berkenfeld makes.

16        THE COURT:  Given that qualification, I don't believe

17   there's any objection any longer.

18        MR. BOIES:  That is correct, Your Honor.

19        THE COURT:  That's fine, Mr. Marsal, you can answer

20   the question.

21   A.   I do not know whether he used the term push or wash.  I do

22   not know which term he used.  It was one of those terms, the

23   meaning being liabilities would equal assets, asset value would

24   equal liabilities being assumed.

25   Q.   Did you talk to -- during that first week, that is, the

- 12 -

1   week of September 15th, Mr. Marsal, did you make an attempt to

2   talk to any members of the financial team who were negotiating

3   the transaction?

4   A.   Yes.  Steve Berkenfeld attempted to arrange a series of

5   meetings with the senior management team.  Unfortunately, that

6   week, the only one that was available for any meetings, and

7   that was quite limited, was Steve Berkenfeld and Alex Kirk very

8   briefly later in the week.  The team was not available.  They

9   were busy working on the transaction.

10   Q.   And did you talk to any of the lawyers who were

11   representing Lehman in connection with the negotiation of the

12   transaction?

13   A.   The only discussions I had were with the Weil Gotshal

14   people.  This would have been Thursday of that week when I,

15   again, expressed to them that it would be impossible to manage

16   this case without the accounting systems and the pricing

17   systems.  And I expressed to them the importance of the TSA.

18   Q.   At any point, either during that week or after the

19   transaction closed, did you have any discussions with anyone on

20   the Weil Gotshal team about the economic terms of the deal?

21   A.   No.

22   Q.   Now when you had the discussion with Mr. Berkenfeld, did

23   he show you any documents?  Did he show you any analysis of the

24   transaction?

25   A.   I do not recall.

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 13 of 273

- 13 -

1   Q.   Did there come a point where you had a conversation with

2   Tom Roberts about the transaction?

3   A.   Yes.

4   Q.   How did Mr. Roberts describe the transaction to you?

5   A.   He described the transaction, I believe, as a wash.

6   Q.   Okay.  And what is your understanding to mean when he

7   described it as a wash?

8   A.   A wash or a push would have meant the assets being

9   assumed -- I mean, the assets that were being transferred

10  equaled the liabilities that were being assumed.

11  Q.   And did there come a time when you had conversations with

12  members of the Lehman Brothers Holdings board about the

13  economic terms of the transaction?

14  A.   Yes.

15  Q.   And do you recall when that conversation or conversations

16  took place?

17  A.   Well after.  Well after.

18  Q.   And did you gain an understanding from them as to what

19  their view was of the economic terms of the transaction?

20       MR. BOIES:  Your Honor, may we have an understanding

21  that all of this is offered for his state of mind?

22       MR. GAFFEY:  It is, Your Honor.

23       MR. BOIES:  Thank you.

24       THE COURT:  Okay.

25  A.   Yes.  Their recollection of the transaction was it was

- 14 -

1   going to be a wash.  It was not going to be a loss to -- nor

2   gain to Barclays.  All liabilities would be covered by the

3   market value of the assets being exchanged.

4   Q.   Now, how, if at all, were these descriptions of the

5   economic terms of the transaction relevant to your early work

6   as chief restructuring officer?

7   A.   It was not, not at the outset.

8   Q.   And why is that?

9   A.   What was relevant at the outset was the transition

10  services agreement.  I mean, I had any number of other fires to

11  be focusing my attention on.  My assumption was you had a

12  management team which was working on the transaction.  They

13  were being advised by professionals who were overseeing the

14  transaction.  And the details of that transaction were being

15  brought to the bankruptcy court.  I had too many other things

16  to focus on as opposed to worrying about a transaction after

17  the fact.  I did worry about the transition services agreement.

18  That was one of our major points of emphasis.

19  Q.   Did you attend the sale hearing?

20  A.   I attended -- it was a long sale hearing.  I attended a

21  little bit of it.  But probably the first couple of hours.

22  Q.   Did others from Alvarez & Marsal attend the sale hearing?

23  A.   I don't think anyone was ready for that, no.

24  Q.   And --

25  A.   It was a warmer courtroom then.  I don't know what you've

1    done but it's much better now.

2    Q.   It was a bit more crowded.  Hard to believe but true.  At

3    least, that's what I'm told.  Who were your team with regard to

4    seeing to it that you got what you needed on transition

5    services?

6    A.   The transition services -- again, the assignment was

7    broken into -- normally Alvarez & Marsal would have one team.

8    It would consist of five to seven people.  This case required

9    twenty-four teams.  Twenty-four individual teams working on --

10   one of those teams was headed up by Bill Gordon who reported to

11   Jim Fogarty.  So Jim Fogarty and Bill Gordon had responsibility

12   for the operations side, namely the TSA.

13   Q.   Now could you give the Court a description, sir, of the

14   state of play in the beginning of the first week after the

15   transaction -- after the closing?  What are we faced with in

16   terms of the tasks that you had to accomplish and the things

17   that you have to do?

18   A.   Well, let's start with chaos.  You know, start with chaos.

19   People were walking out the door with boxes.  Not only did we

20   not have information, we didn't have people, people that were

21   transferred -- within four or five days, you had 10,000

22   employees transferred.  We were left with a small cadre of tax

23   and compliance people which were of no use to us in terms of

24   the task at hand or minimal use.  I shouldn't say no use.

25   Minimal use.  So there was melting assets where, if we didn't

- 16 -

1    have an emergency court hearing on the asset for its

2    disposition, we would have lost more value.  There was a

3    clamoring on the part of various creditors, where's my

4    transaction, where's my money.  2004 motions were the order of

5    the day.  We were trying to satisfy that chaos or that

6    confusion and trying to do it, like I said, without any

7    employees.  So we were -- we were very busy.

8        And at the same time, then you have the needs of the

9    creditor committee who also wanted to be brought up to speed as

10   to how we were addressing it.  And I think we did -- we

11   attempted that in October in the first meeting, October 8th, to

12   try and bring them up to speed on what our game plan was.

13   Q.   And in those early weeks, that is, in the few weeks after

14   the closing, were there any discussions with the creditors'

15   committee about the sale transaction?

16   A.    No.  This wasn't a focus of any -- well, there might have

17   been a discussion but not that I'm aware of.

18   Q.    Okay.  Now, you mentioned before the need for systems.

19   Could you describe to the Court what the state of computer and

20   other data management systems was when you took over?

21   A.    Well, the -- I mean, the -- worldwide Lehman was one

22   worldwide accounting and information system with hubs in India,

23   in London and in the U.S.  When the bankruptcy occurred, walls

24   went up in each of those jurisdictions preventing the ongoing

25   flow.  So the accounting systems completely broke down.

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 17 of 273

- 17 -

1        I do not believe there were any accounting entries that

2    were done by Lehman or by Barclays after the 12th of September

3    until mid-November.

4        And then supporting the accounting systems, you've got

5    pricing systems and tracking systems.  When a client would

6    pay -- a customer would pay interest, how would the interest

7    get applied?  This was simplistic.  Operational systems were

8    completely broken down.

9    Q.   And in the time after the closing, after the closing on

10   September 22nd, did you have access or communications with the

11   members of the Lehman deal team, the people who had negotiated

12   the sale transaction?

13   A.   Very limited.  I mean, if you -- yeah, very limited.

14   Q.   What do you mean by very limited?  Could you give us an

15   idea of --

16   A.   Well, I mean, Bart McDade -- Bart missed four meetings

17   with me the week of the 15th.  The first time Bart could meet,

18   I think, was the 22nd or 23rd.  And that meeting was short and

19   really not of much help.

20   Q.   And to what degree after the closing did you need to

21   depend on Barclays to obtain information that you needed to do

22   your job as chief restructuring officer?

23   A.   Oh, Barclays was critical.

24   Q.   Why was Barclays critical?

25   A.   Because they -- the information systems and the

- 18 -

1   operational systems were transferred to Barclays as part of the

2   transaction.  So we were -- it was essential that we gain their

3   cooperation.

4   Q.   Did you have people on staff who had not gone over to

5   Barclays who were knowledgeable about those systems?

6   A.   No, we did not.

7   Q.   So what mechanism did you set up or did you try to set up

8   to get information from Barclays that you needed?

9   A.   Well, the TSA.

10  Q.   And how did that work?

11  A.   The transition services agreement -- what happened there

12  was that the senior management at Barclays, I think, were

13  probably reasonable when negotiating it.  They realized the

14  problems that we would have without information systems,

15  without the accounting systems, the financial systems, the

16  pricing systems.  Being businesspeople, they recognized the

17  dilemma we would have.  So they were quite supportive of it at

18  a senior level.  Unfortunately, once the transaction occurred,

19  the compliance people, or the policemen, for Barclays took over

20  and they wanted to make sure that -- most important to them was

21  securing their system and making sure that they could integrate

22  Lehman into Barclays.  And really, we were a secondary

23  consideration for about sixty days while they were attempting

24  to integrate it in -- into Barclays overall.

25  Q.   So were you getting the information that you needed in

LEHMAN BROTHERS HOLDINGS INC., et al.

- 19 -

1    those first sixty days?

2    A.    No, we were not.

3    Q.    And did you take any steps to try to get the information

4    that you needed?

5    A.    Well, people were very courteous and -- but we -- they

6    were courteous and I think they were attempting to be

7    responsive.  But the compliance unit was just -- it was clear,

8    the compliance unit was not going to permit -- at Barclays was

9    going to permit any potential contamination of their systems by

10   letting us have access at the outset.  And they wanted to do

11   the integration and we were -- my problems were -- we were

12   secondary to them.

13   Q.    Did there come a point when you gave instructions to Weil

14   Gotshal to do anything about loosening up the information that

15   you needed?

16   A.    Well, the situation improved in November as the first

17   accounting started to flow.  But then the situation got very

18   erratic between mid-November and mid-December.  During that

19   time period, it was stop and go, stop and go.  We continued to

20   have problems with the compliance department.  And I think on

21   the 24th of December, right before Christmas, we let them know

22   that we were going to be suing them on a violation of the TSA

23   because they were not enabling us to manage the estate.

24   Q.    And did you wind up bringing that lawsuit?

25   A.    No, we did not.

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 20 of 273

- 20 -

1    Q.   Why not?

2    A.   Because we met with the senior management of Barclays.

3    They understood our problem.  And I think the senior

4    management -- my assessment would be the senior management

5    instructed compliance to stand down and to cooperate with us.

6    And from that point on, there was never a problem with

7    Barclays.  Barclays was very responsive.

8    Q.   And when you say from that point on, can you give us an

9    idea of what point you're talking about in time?

10   A.   Well, the notice was delivered in December 24th.  We had a

11   meeting, I believe, early January.  So from about mid-January

12   onward.

13   Q.   In front of you, Mr. Marsal, is a binder, a witness book.

14   And it's got some tabbed entries in there.  Would you turn to

15   tab M397, please?  Are you there?

16   A.   Yes.

17   Q.   Do you recognize the document that's behind tab M397?

18   A.   Yes, I do.

19   Q.   And what is the document?

20   A.   The document is a letter to Jonathan Hughes who is general

21   counsel to Barclays indicating that we were going to be suing

22   him -- suing Barclays for a breach of the TSA.

23   Q.   And the letter, I note, is on the letterhead of Weil

24   Gotshal and signed by Tom Roberts.  Do you see that?

25   A.   Yes.  Tom Roberts -- Tom Roberts is a partner with Weil

- 21 -

1    Gotshal.  Weil Gotshal did business with Barclays.  Tom Roberts

2    was on the corporate side not on the bankruptcy side.  So Tom

3    did business with -- Tom Roberts did business with Barclays and

4    with Lehman.  So he, for much of this time, was a liaison

5    trying to prevent a fight from developing here.

6    Q.   Okay.  And you referred a few moments ago to the notice of

7    the estate's intent to sue.  Is that the document that you were

8    referring to?

9    A.   Yes.

10        MR. GAFFEY:  Your Honor, I move Exhibit M397 into

11   evidence?

12        THE COURT:  Any objection?

13        MR. BOIES:  Your Honor, may we have an understanding

14   of what the purpose of the offer is?

15        MR. GAFFEY:  It's evidence concerning the state of the

16   estate's knowledge and intent and its access to information

17   about the sale transaction and other aspects of Lehman as of

18   the 24th of December, Your Honor.

19        MR. BOIES:  Your Honor, I would object to it on that

20   grounds.  It is hearsay.  If it were offered simply for the

21   purpose of showing when notice was given to Barclays of these

22   complaints, I would have no objection.  But if he's offering it

23   for a purpose beyond that, I would object on the grounds of

24   hearsay.

25        MR. GAFFEY:  I think, Your Honor, it follows from the

- 22 -

1    testimony we've just had from Mr. Marsal concerning the

2    estate's difficulties in getting information the nature of the

3    bumps in the road, as it were, under the TSA.  And we needed

4    the estate to threaten legal action to remedy that.  That's the

5    purpose for which I'm offering it.

6            THE COURT:  Well, I think that Mr. Boies is

7    technically correct.  This is a document that was prepared by

8    Mr. Roberts presumably in consultation with his client that

9    went to Barclays that set forth concerns regarding performance

10   with the TSA at the time.  I don't know that we can get the

11   document in for all purposes through this witness.  Probably

12   could with a stipulation or from Mr. Roberts.  But I'm going to

13   grant Mr. Boies' objection as to scope for admission.  If you

14   need to get the document in, you may need another witness at

15   some point.

16           MR. GAFFEY:  Fine, Your Honor.  We'll do that.  I will

17   say I don't think I've heard an authenticity objection.  So,

18   for clarity, I don't think there's any dispute that it's

19   written by Mr. Roberts.

20           MR. BOIES:  There is no authenticity objection, Your

21   Honor.

22           THE COURT:  I think it's just about --

23           MR. BOIES:  It's a hearsay objection.

24           THE COURT:  -- it's just about the use of the

25   contents.

- 23 -

1          MR. BOIES:  Exactly.

2          MR. GAFFEY:  Then I'll offer it at this point, Your

3    Honor, for the limited purpose of its indication of the

4    estate's intent to bring a lawsuit and not for the truth of the

5    contents of the letter.

6          MR. BOIES:  No objection, Your Honor.

7          THE COURT:  It's admitted then with that

8    qualification.

9          MR. GAFFEY:  Okay.  And we'll reserve the right --

10   we'll consider whether we need to bring another witness to move

11   it in for other purposes, Your Honor.

12         THE COURT:  Fine.

13         MR. GAFFEY:  Thank you.

14   (Exhibit M397, notice of the Lehman estate's intent to sue

15   Barclays for violation of TSA, for the limited purpose of its

16   indication of the estate's intent to bring a lawsuit and not

17   for the truth of the contents, was hereby received into

18   evidence as of this date.)

19   BY MR. GAFFEY:

20   Q.   Now, as of the time of this letter -- let's just go to --

21   at the end of the year, sir -- at the end of the year 2008,

22   what is the state of play with regard to your knowledge of the

23   terms of the sale transaction?

24   A.   I'm still pretty ignorant of the transaction.  I mean, we

25   have not been able to get the balance sheet yet.  And without

- 24 -

1    the balance sheet, we still were in the dark.  That's the

2    balance sheet as of the 14th -- excuse me -- as of the 12th of

3    December -- of September.

4    Q.    And in that fourth quarter of 2008, did you consider it to

5    be part of your duties to go back and investigate the sale

6    transaction to determine whether it was accurately described to

7    the Court?

8    A.    I had too many other fires to go put out.

9    Q.    And had you had -- did there come a point where you did

10   develop some concerns about whether the transaction which had

11   been described to you as a wash had been -- whether you were

12   right about that?

13   A.    Yes.  As the accounting started to come in, the CFO said

14   he did not understand how the estimates were put together by

15   his predecessor, his Lehman predecessor.  And that he raised

16   the concern to me in -- well, I would say, toward late January

17   which started -- we started to ask questions.  The estimates

18   I'm speaking of is what was the level of accrued liabilities

19   that were on the books at the time of the transaction.  And we

20   really hadn't gotten into the severance or the bonuses at that

21   point in time.

22        Shortly thereafter, in early February -- I believe it was

23   early February -- the quarterly results came out from Barclays.

24   And it indicated that there had been a substantial built-in

25   gain from the transaction not from operations post the

- 25 -

1    transaction but from the transaction itself which would suggest

2    that the net assets received were greater than the assets -- I

3    mean, than the liabilities assumed.  And at that point, we

4    registered a -- we sent a letter out to -- again to Jonathan

5    and asked him could he explain this 'cause we thought -- I

6    mean, our initial reaction was there must have been a mistake

7    made here.  Again, in the chaos of the situation, there was a

8    mistake made by the parties.  And we asked him, can you explain

9    how this came about.

10   Q.   When you say Jonathan, to whom are you --

11   A.   I'm sorry.  Jonathan Hughes, the general counsel of

12   Barclays.

13   Q.   Mr. Marsal, would you turn in your witness book to what's

14   been marked as tab 124A?

15              MR. GAFFEY:  Your Honor, for the record -- and I'm

16   going to ask for Mr. Boies' agreement on this.  We have, for

17   clarity, there are two letters that are within Exhibit 124,

18   which is the Rule 2004 motion, which I'm going to show to Mr.

19   Marsal.  We've marked them as 124A and 124B.  And I will

20   represent to the Court that they are within Exhibit B of the

21   greater motion.  And I'm asking for their consent if we can go

22   ahead on that basis --

23              MR. BOIES:  Yes, Your Honor.

24              MR. GAFFEY:  -- if that's all right with Your Honor.

25              THE COURT:  Okay.  Thanks for the clarification.

- 26 -

1          MR. GAFFEY:  And 124 is in evidence, I should say,

2     Your Honor.  So I would ask that 124A and 124B be deemed to be

3     in evidence as part of that greater exhibit.

4     BY MR. GAFFEY:

5     Q.    Turning to 124A, Mr. Marsal -- are you there in your book?

6     A.    Yes.

7     Q.    Is that the letter to which you just referred?

8     A.    Yes.

9     Q.    And just -- you see it's addressed to Jonathan Hughes and

10    to Rich Ricci?

11    A.    Wait, wait.  But -- 124A?

12    Q.    Yes, sir.

13    A.    I've got M124A -- okay.  Excuse me.  Yes.  This is the

14    letter I was referencing.

15    Q.    And had you spoken to Mr. Ricci prior to this time?

16    A.    Only about the TSA matters.

17    Q.    Okay.  And did you get a response from either Mr. Ricci or

18    Mr. Hughes to your letter?

19    A.    Shortly after I received a response from Mr. Hughes.

20    Q.    Okay.  And would you turn to tab 124B in your book,

21    please?  And what is 124B?

22    A.    Was Mr. -- well, on 124B is Mr. Jonathan Hughes' of

23    Barclays response.

24    Q.    And was the response -- to your view, sir, was the

25    response that you received from Barclays about your inquiries

- 27 -

1    concerning the accrued liabilities satisfactory?

2    A.    No, it was not.

3    Q.    Okay.  And why was it not satisfactory in your view?

4    A.    It didn't explain the -- it did not explain the

5    differences between what was the -- was reported as the deal

6    and what was actually going down in the case.

7    Q.    Okay.  So what, if anything, did you do next about the

8    matter?

9    A.    Well, at this point, it became clear that there was a

10   significant disagreement between the Lehman estate -- was going

11   to be a significant disagreement between the Lehman estate and

12   Barclays without an answer.  And again, this was only on the

13   subject of the accrued liabilities, severance and the bonus.

14   There was going to be a significant difference of opinion --

15   we -- probably leading to an adversarial proceeding.  At that

16   point in time, Weil Gotshal had indicated that they could not

17   proceed as our counsel.  So then we began aggressively -- we

18   were quite disappointed but we -- not disappointed hiring you,

19   obviously.  But we were disappointed --

20   Q.    Disappointed?

21   A.    -- and began to try and find a law firm, did our

22   interviews.  There were significant number of law firms that

23   could not represent us against Barclays.  And ultimately, I

24   guess, we hired you in early or mid-March of 2009.  Jones Day

25   we hired in mid-2009.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 28 -

1    Q.    And during this time period -- again, we're in the last

2    quarter of 2008 and the first quarter of 2009.  Could you

3    describe to the Court what, if any, communications there were

4    with the creditors' committee about whether the sale

5    transaction had been accurately disclosed to the Court?

6    A.    Well, what happened after the first quarter results came

7    out, if I received one phone call, I received twenty from

8    various creditors asking what had happened here, how could this

9    be.  How could the estate have this kind of a built-in -- have

10   agreed to -- initially, people were registering their concern

11   that the estate did not realize anything for an ongoing

12   enterprise value.  I dismissed that.  But in this case, the

13   creditors were clamoring for the fact that we had actually paid

14   three billion pounds.  At least that's what it seemed like from

15   the quarterly results.  And we were asking for an explanation

16   to give those creditors.  So the unsecured creditors' committee

17   was all over us in mid to late January.  And then from that

18   point onward -- or from -- from the time of the -- I guess it

19   would be early February when the time of the public release by

20   Barclays came.

21   Q.    Two other matters within fourth quarter of 2008 that I

22   want to ask you about, Mr. Marsal.  And one is, do you recall a

23   time when it came to your attention that there was a dispute

24   between Barclays and JPMorgan Chase that was to be resolved?

25   A.    Yes.

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 29 of 273

- 29 -

1   Q.   When was that?

2   A.   December --

3   Q.   Okay.  And --

4   A.   -- 2008.

5   Q.   Did Lehman Brothers Holdings join in that settlement?

6   A.   No.

7   Q.   Did the process surrounding that settlement bring to you

8   any greater clarity or knowledge about the terms of the sale

9   transaction?

10  A.   No.

11  Q.   And did you give instructions to your counsel in

12  connection with the December settlement with regard to whether

13  it would be binding on the estate going forward?

14  A.   I asked counsel to reserve our rights till we had a fact

15  base.

16  Q.   Okay.  And to your knowledge, did he do that?

17  A.   I believe so.

18  Q.   Who's the counsel you're referring to there?

19  A.   Weil Gotshal.

20  Q.   And who at Weil Gotshal?

21  A.   Harvey Miller.

22  Q.   Now, in the -- from time to time in your work as chief

23  restructuring officer -- A&M's work generally, A&M makes

24  presentations to the creditors' committee, is that correct?

25  A.   That's correct, monthly.

- 30 -

1    Q.    Is that -- did you say monthly, sir?

2    A.    Monthly.

3    Q.    And were such meetings held in the early days after the

4    closing of the sale transaction?

5    A.    They were held monthly beginning, I believe, October --

6    about October 8th.

7    Q.    Okay.  Now, if you would turn, Mr. Marsal, in your book to

8    Exhibit 712.  Are you with me there, sir?

9    A.    Yes.

10   Q.    All right.  Could you describe generally to the Court what

11   Exhibit 712 is?

12   A.    712, I believe, was the -- it's a little bit -- I think

13   it's the October 8th, 2008 presentation -- first presentation

14   that was made to the unsecured creditors' committee.

15   Q.    Okay.  And if you would, please, Mr. Marsal, turn to page

16   28 within that exhibit.  Are you with me on page 28, sir?

17   A.    Yes.

18   Q.    All right.  You see, sir, there's a reference in that

19   slide to significant transactions.  And it refers to the sale

20   of Lehman Brothers to Barclays?

21   A.    Yes.

22   Q.    And a little further down, there's a reference to a 43. --

23   to 43.1 billion repo assets.  And it says "Book value per

24   Lehman stale marks negotiated a five billion dollar reduction."

25   Do you see that, sir?

- 31 -

1   A.   Yes.

2   Q.   What was your understanding at or around October of 2008

3   with regard to the role of a repurchase agreement in the

4   transaction and whether or not there had been a five billion

5   dollar reduction?

6   A.   I -- first of all, I mean, I didn't prepare this schedule

7   but one of my managing directors did.  What I read into this

8   was that there was a loss of value.  Market price had dropped

9   on this -- forty-three billion dollars or fifty billion dollars

10   of securities had dropped by five billion, which given the

11   market conditions post-Lehman seemed to be reasonable to me.

12   Q.   Did you or anyone else at Alvarez & Marsal in or around

13   October of 2008 have any knowledge of a negotiated buffer or

14   discount built into the transaction?

15   A.   I had none and I was told of none.

16   Q.   Okay.

17         MR. GAFFEY:  I have nothing further for Mr. Marsal,

18   Your Honor.

19   CROSS-EXAMINATION

20   BY MR. BOIES:

21   Q.   Good morning, Mr. Marsal.

22   A.   Good morning.

23   Q.   I don't believe we've met but my name is David Boies.  And

24   you understand that I represent Barclays, do you not?

25   A.   Yes.

- 32 -

1    Q.   Let me try to put up on the screen page 28 that you were

2    just being examined about.  And this is page 28 of Movants'

3    Exhibit 712.  First, you said this was prepared by one of your

4    managing directors.  Who prepared this?

5    A.   I do not know who prepared it but the area of

6    responsibility for this would have been Jim Fogarty and Bill

7    Gordon.

8    Q.   Who presented this portion of the presentation?

9    A.   Jim Fogarty would have presented this.

10   Q.   To the creditors' committee?

11   A.   Yes.

12   Q.   And who else was present when this was presented?

13   A.   The full creditors' committee, their professionals, most

14   of my management team and myself.

15   Q.   What about Weil Gotshal?  Were they present?

16   A.   They were present.

17   Q.   Now, let me ask you to first look at the line that you

18   were being examined about that talks about a five billion

19   dollar reduction being negotiated.  Do you see that?

20   A.   Yes.

21   Q.   Who, as you understood it, at the time of this

22   presentation had negotiated that five billion dollar reduction?

23   A.   It wasn't me or my team.  So my assumption was it was

24   Lehman personnel that negotiated that.

25   Q.   Negotiated that with Barclays?  Is that correct?

LEHMAN BROTHERS HOLDINGS INC., et al.

- 33 -

1   A.   I wouldn't say -- I mean, at the time -- again, what I was

2   told by the Lehman team was that the assets equaled the

3   liabilities.  And with that as the assumption from Steven

4   Berkenfeld, when I looked at that, my assumption was during the

5   chaos of the week following Lehman to say that the stale marks

6   had gone down five billion in value would make sense to me.

7   Q.   Well --

8   A.   That's what I interpreted off of that.

9   Q.   What it says here is that there was a negotiated five

10  billion dollar reduction.  Do you see that?

11  A.   That's what it says.

12  Q.   Now you didn't think that Lehman was negotiating with

13  itself, did you, sir?

14  A.   No.  Lehman would be negotiating -- if you and I were

15  trying to value a security, we would be in a negotiation,

16  particularly if it was an illiquid security.  That's what I

17  would interpret it.

18  Q.   And this would have been a negotiated -- negotiation

19  between Lehman and Barclays' representatives, correct?

20  A.   Over value, yes.

21  Q.   Okay.  Now, the next line item there says "1.9 billion

22  dollars unencumbered box" as one of the assets that Barclays

23  purchased.  Do you see that?

24  A.   Yes.

25  Q.   And what did you understand in October that that referred

- 34 -

1    to?

2    A.   I didn't have a clue at that point.

3    Q.   You didn't have a clue?

4    A.   No, sir.

5    Q.   Did you ever ask anybody at that time?

6    A.   I did not know what an unencumbered box was.

7    Q.   Did you try to find out?

8    A.   Well, eventually I found out what an unencumbered box was.

9    Q.   When did you first try to find out what an unencumbered

10   box was?

11   A.   When we started to question what actually happened with

12   the transaction which would have been in the first quarter of

13   2009.

14   Q.   First quarter of 2009?

15   A.   Yes.

16   Q.   Let me go down to the next line.  It says "1.5 billion

17   building and data centers".  In October of 2008, did you

18   understand what that referred to?

19   A.   Yes.

20   Q.   And what did that refer to?

21   A.   It referred to the building, the headquarters building and

22   the two data centers that were owned by Holdings.

23   Q.   The next item on "Assets Purchased" is 800 million dollars

24   of 15c3-3 securities.  Do you see that?

25   A.   Yes.

- 35 -

1  Q.   And did you have an understanding in October of what that

2  referred to?

3  A.   I did not.

4  Q.   Did you ask anybody?

5  A.   I did not.  These are -- again, these are assets of LBI in

6  both categories of which I was not responsible for.

7  Q.   When you say these were assets of LBI that you were not

8  responsible for, you're talking about the assets purchased by

9  Barclays?

10  A.   I'm talking about the assets that would be in the box and

11  the 15c3-3 would have been with LBI.  Both of those categories

12  of assets.

13  Q.   What about the 43.1 billion of repo assets?  Would that

14  have been with LBI?

15  A.   That was with LBI as well.

16  Q.   Okay.  So all of the assets that are being purchased here

17  by Barclays are LBI assets not LBHI assets?  Is that what

18  you're saying?

19  A.   I believe the 1.5 billion was LBHI assets.

20  Q.   Okay.

21  A.   The headquarters building.

22  Q.   All right.  So there are four items here as to what

23  Barclays is purchasing.  Three of them were LBI assets and the

24  building and data centers were LBHI assets, is that right?

25  A.   That's correct.

- 36 -

1    Q.    Okay.  And are you telling me that the reason that you

2    know what the 1.5 billion dollar building and data center line

3    item was was because that was an LBHI asset and the reason that

4    you don't know about the others was because those were LBI

5    assets, is that what you're saying?

6    A.    The reason I know about the LBHI asset was because, again,

7    Lehman did not have any -- it was out of cash.  So the way to

8    provide funding to Lehman Holdings was through the sale of the

9    building.  That was the cash that primed the pump for the

10   estate post-bankruptcy.

11   Q.    Okay.  I'm now focusing -- and I appreciate that answer.

12   I'm now focusing on the three line items that you say you did

13   not understand.  And what I'm asking is the reason that you

14   didn't feel you needed to find this out was because they were

15   LBI assets as opposed to LBHI assets?

16   A.    No.  I mean, what I didn't have was I did not have anybody

17   responsible for those assets.  I didn't have anybody -- that

18   was not within -- that was not -- well, the other assets of the

19   estate were under my supervision.  These assets were not under

20   my supervision.

21   Q.    That's really what I'm asking you.

22   A.    Yeah.

23   Q.    I mean, you did have people that you could have asked what

24   an unencumbered box was, correct?

25   A.    No.  We did not have people.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 37 -

1   Q.   Well, you could have asked Weil Gotshal, correct?

2   A.   No.  I could have asked LBI.  I could have asked the SIPA

3   trustee, yeah.

4   Q.   Right.  And you didn't have any problems asking Weil

5   Gotshal to pursue something for you on the TSA, correct?

6   A.   That's correct.

7   Q.   So you could have asked Weil Gotshal what the unencumbered

8   box was, correct?

9   A.   I could have asked what the unencumbered box was, yes.

10  Q.   But you didn't?

11  A.   I did not, no.

12  Q.   And you could've asked Weil Gotshal what the 15c3-3

13  securities were, correct?

14  A.   That's correct.

15  Q.   And I'm just trying to understand why you didn't do that.

16  Was that because these were not assets that you thought you

17  were responsible for?

18  A.   No.  The assets -- my assumption was was that these

19  assets, the 43.1, the 1.9 and the .8 billion, was the market

20  value of those assets at the time of the transaction.  Offset

21  by that was an equal amount of liabilities.  I had no reason to

22  believe that the assets did not equal the liabilities being

23  assumed at this point in time.

24  Q.   You say you had no reason to believe that the assets

25  didn't equal the liabilities.  You knew by October that

- 38 -

1   Barclays had already announced publicly that it was going to

2   have a gain on the transaction, correct, sir?

3   A.   I did not know that.

4   Q.   You did not know that?

5   A.   No, sir.

6   Q.   Is it your testimony to the Court that as of October of

7   2008, you had no knowledge at all that Barclays had made press

8   announcements and it had been reported in the press that

9   Barclays was expecting to make a gain on this transaction?

10  A.   That's correct.

11  Q.   Now you would have expected that Barclays would have made

12  a press release concerning a transaction of this size, correct,

13  sir?

14  A.   I would assume so, yes.

15  Q.   Now you say that you were told by somebody that this

16  transaction was going to be a wash.  You were never told that

17  by anybody from Barclays, correct?

18  A.   That's correct.

19  Q.   Did you ever ask anybody to check and see what Barclays

20  was saying about this transaction?

21  A.   No.  I mean, I don't know if you understand, counselor.

22  Barclays --

23  Q.   I'm just asking a question whether --

24  A.   No, no.  I don't remember.  No, no, no.  I mean, ask your

25  question again, please.

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 273

- 39 -

1    Q.    Sure.  Did you ever ask anybody to check and see what

2    Barclays was saying about this transaction whether there would

3    be a gain or not, for example?

4    A.    No.

5    Q.    In October of 2008, was it important to you, in your

6    position, whether or not the transaction was, as you say

7    somebody told you it was going to be, a wash?

8    A.    Can I explain something to you?

9    Q.    Well, is it --

10   A.    If you're asking --

11   Q.    I'd like a yes or no --

12   A.    No.  But it's not a yes or no answer, counselor.

13   Q.    Well, if you need to --

14   A.    It's a --

15   Q.    Could I just finish --

16   A.    It's a nonanswerable answer.

17   Q.    Well, if you can't answer that question --

18   A.    But, counselor, you're asking about the gain.  The gain

19   consisted of a gain on securities.  It also consisted of

20   accounting gains.  And those accounting gains would relate to

21   purchase accounting rules.  The purchase accounting rules would

22   be between Barclays -- I would never know about that.  But the

23   gains consisted of two components.  It consisted of gains from

24   this transaction and it consisted of -- which were purchase

25   accounting gains, accounting gains.  And it consisted of real

- 40 -

1    cash gains.

2    Q.    When you talk about the gain --

3    A.    Right.

4    Q.    -- consisted of these two different aspects or components,

5    what gain are you referring to?

6    A.    Well, the purchase accounting gain, I would have no basis.

7    I don't know anything about Barclays.

8    Q.    What gain?  You say Barclays' gain consisted of these two

9    parts.  What gain are you talking about?

10    A.    Well, that's what I'm asking you.  That was my question to

11    you.  What gain are you talking about?  Because there's two

12    gains.  There's purchase accounting gains which were in the --

13    as you say, in the quarterly report, as purchase accounting

14    gains which I'd have no basis to know about.  And the other

15    gain would relate to the specific security gains which would be

16    assets exceeding liabilities being assumed.

17    Q.    Okay.

18    A.    I assume you're talking about the second component, the

19    assets being greater than the liabilities being assumed.

20    Q.    Sir, when did you first become aware that Barclays had

21    announced that it was going to have a gain on the transaction,

22    a gain of any source?

23    A.    In February.

24    Q.    In February, okay.  Now, was it important to you in

25    October of 2008 whether or not Barclays was going to announce a

- 41 -

1   gain on the transaction, a built-in gain as you described it?

2   A.   You're starting again.  Built-in gain or gain from this

3   transaction?  In any event --

4   Q.   You used the word "built-in gain".  Do you remember that,

5   sir?

6   A.   Yeah.

7   Q.   Do you remember using the term "built-in gain"?

8   A.   Yeah.

9   Q.   Okay.  Now, focusing on what you mean by "built-in gain",

10   was it important to you in October of 2008 --

11   A.   Not in October.

12   Q.   -- whether or not Barclays had a built-in gain?

13   A.   Not in October.

14   Q.   Okay.  Let me continue down the list here.  Your

15   presentation to the creditors' committee in October of 2008

16   also lists the liabilities that Barclays is assuming, correct?

17   A.   Yes.

18   Q.   And the first one is it says that Barclays had

19   extinguished a thirty-eight billion dollar LBI liability to the

20   Fed, correct?

21   A.   Yes.

22   Q.   And the second assumed liability is what is referred to as

23   an assumed cure liability, correct?

24   A.   Yes.

25   Q.   And in October of 2008, did you understand what that

- 42 -

1   referred to?

2   A.   Well, my understanding was that this was equal to the

3   lia -- this was the liabilities, the accrued liabilities that

4   were being assumed by Barclays in the transaction.

5   Q.   My question is did you understand what was being referred

6   to when it talked about an assumed cure liability.

7   A.   That was what I assumed.  Just what I just told you.  My

8   assumption was is that the liabilities that were being assumed

9   were the liabilities that were on the balance sheet as of --

10   and the liabilities that existed that Barclays was assuming as

11   of the date of the transaction.

12   Q.   And did you ever ask anybody whether that assumption on

13   your part was correct?

14   A.   No.

15   Q.   Did you know what the amount of the assumed cure liability

16   was?

17   A.   I was told it was one and a half to two billion dollars by

18   various people.

19   Q.   Were you told that prior to October of 2008?

20   A.   I was told that by -- I think I was -- I was in attendance

21   in court for a statement that was made by Weil Gotshal.  I

22   believe Harvey Miller made the statement that 1.5 billion was

23   the liabilities.  And someone else along the way, I don't

24   recall the time, told me that it was actually two billion

25   dollars of accrued liabilities.

- 43 -

1    Q.    And you don't remember who told you that?

2    A.    Along the way -- I mean, someone from my management team

3    told me that.

4    Q.    But it was somebody from Alvarez & Marsal?

5    A.    I would say yes.

6    Q.    Did they tell you where they had gotten that information?

7    A.    No.

8    Q.    Okay.  When did they tell you that?

9    A.    Well, I mean, Steve Berkenfeld was another source of that.

10   I mean, Berkenfeld indicated that the liabilities -- I asked

11   him what the dimensions of the liabilities and the bonuses that

12   were going to be paid --

13   Q.    Do you understand I'm talking about the cure liability

14   here?

15   A.    Yeah.  Yeah.

16   Q.    Okay.  Let me try to stick with the cure liability.  Now

17   with respect to the cure liability, you told me that you heard

18   Mr. Miller describe the cure liability to the Court, correct?

19   A.    In court, yeah.

20   Q.    You also told me that somebody from your management team

21   had told you that the cure liability was approximately two

22   billion dollars.  Do you recall that?

23   A.    The assumption being used, yes.

24   Q.    And you said you didn't remember who that was.  My next

25   question was when did they tell you that?

- 44 -

1    A.    I do not know.

2    Q.    Was it before or after the transaction closed?

3    A.    Oh.  It's well after the transaction.  Well after the

4    transaction.

5    Q.    Was it before or after October of 2008?

6    A.    I do not recall.

7    Q.    Now you also said Mr. Berkenfeld had some conversations

8    with you.

9    A.    Yes.

10   Q.    Did Mr. Berkenfeld tell you what the amount of the assumed

11   cure liability was?

12   A.    I don't recall whether he gave a specific number.

13   Q.    Did he give an approximate number?

14   A.    Again, I think -- I thought the total was 4.2 billion for

15   everything.  I don't know what the geography was among the

16   individual pieces.

17   Q.    Let me be sure I understand what you're saying.  You

18   believe that the total liabilities being assumed were about 4.2

19   billion but you don't remember how much of that was related to

20   the assumed cure liability, is that correct?

21   A.    Yes.

22   Q.    Okay.  Now the next liability that is assumed here in

23   Alvarez & Marsal's October presentation is the assumed

24   severance liability.  Do you see that?

25   A.    Yes.

- 45 -

1    Q.    Now in October of 2008, did you have an understanding of

2    what the amount of that assumed severance liability was?

3    A.    I did not.

4    Q.    Approximately?

5    A.    I did not.  I mean, I had the 4.2 million (sic) dollar

6    number.  I didn't know the geography, like I said, that you're

7    asking, 'cause I didn't know who was going to be severed and

8    who was not going to be severed.

9    Q.    Was it your understanding in October of 2008 that the

10   assumed cure liability that is listed here and the assumed

11   severance liability that was listed here together added up to

12   4.2 billion dollars?

13   A.    That was my assumption based on the conversation with

14   Steven Berkenfeld, yes.

15   Q.    And the conversation that you had with Steven Berkenfeld,

16   did that precede October of 2008?

17   A.    Yes.

18   Q.    Did it precede the closing of the transaction?

19   A.    I think it was Thursday of the bankruptcy week.  And the

20   transaction had closed on Monday, the following Monday, yes.

21   Q.    Okay.  Now, you said that in late January of 2009, your

22   CFO did not understand certain things about the accrued

23   liabilities?  Do you recall that?

24   A.    Yes.

25   Q.    Who was the CFO at that time?

- 46 -

1    A.   It was a combination of two individuals, David Coles and

2    Bill Fox.  Bill Fox is now the -- he's now the CFO.  But David

3    Coles was in a state of transition at the time.

4    Q.   David Coles was in a state of transition of being

5    transitioned out of the CFO position?

6    A.   Well, responsibilities were moving around.  And there was

7    just -- the financial task was just too great.  So we needed

8    someone to focus more on the accounting which was Bill Fox.

9    And initially, Coles was responsible for both finance and

10   accounting and so Bill Fox was his underling.  And Bill Fox was

11   playing a greater and greater role.

12   Q.   And at some point, the responsibilities between finance

13   and accounting got split between Fox --

14   A.   Yes.

15   Q.   -- and Coles?

16   A.   Yes.

17   Q.   Okay.  Now, did Mr. Coles tell you in January of 2009, or

18   at any other time, what information he had previously received

19   concerning these accrued liabilities?

20   A.   No.

21   Q.   Do you know whether Mr. Coles received information

22   concerning these accrued liabilities before your October

23   presentation to creditors' committee?

24   A.   I do not know.

25   Q.   When Mr. Coles told you there was something he didn't

- 47 -

1    understand, did you ask him what information he'd previously

2    been given?

3    A.   Well, again, in early January --

4    Q.   This is a yes, no or I don't remember.  And if you need to

5    make an explanation --

6    A.   Okay.

7    Q.   -- you can do that.  But I'd like to start with a

8    responsive answer.

9    A.   Okay.  Let's get both the question again.  Excuse me.

10   Q.   Sure.  When Mr. Coles told you that there was something he

11   didn't understand about the accrued liabilities, did you ask

12   him what information he previously had been given about that?

13   A.   Again, counselor, correction.  It's Mr. Fox.  Mr. Fox is

14   the one who's doing the accounting.  He had the responsibility

15   for the accounting and the transition.  Fox versus Coles.

16   Q.   Excuse me.  Just a minute.  When you testified that the

17   CFO did not understand certain things about the accrued

18   liabilities, who were you referring to as the CFO in that

19   statement?

20   A.   This would have been the CFO in charge of accounting in

21   which case this would have been Bill Fox.  So your question

22   relates to Bill Fox.  Bill Fox at that time -- Bill Fox at that

23   time did not give me a written -- did not give me a heads-up on

24   it until the financials came out in February.

25   Q.   And when Mr. Fox gave you what you describe as a heads-up,

                                                              - 48 -

1     did you ask him what information he had previously been given

2     about these assumed liabilities?

3     A.    Well, Bill Fox was able to --

4     Q.    I am -- did you ask him?  Yes, no, I don't remember.

5     A.    Did I ask him about the information?  Yes.

6     Q.    And what did he tell you about the information that he'd

7     previously been given?

8     A.    The information that he was previously given was when the

9     accounting records were available which was in early January.

10    And in early January, the accounting records became available

11    through the reopening of the accounting process from Barclays.

12    Q.    Do you mean to imply in that answer that prior to January

13    of 2009, Mr. Fox and Mr. Coles did not have available to them

14    information concerning the assumed liabilities?

15    A.    Yes, sir.

16    Q.    That's what you're meaning to imply?

17    A.    That's what I've been telling you, yes, sir.

18          MR. BOIES:  Can you hand out the witness binder?

19    Q.    Let me hand you a volume of documents like what Mr. Gaffey

20    gave you which are documents I'm going to be referring to.

21          (Pause)

22    Q.    And let me ask you to look at tab 12 which is Barclays'

23    Exhibit 212.  And you will see that in the middle of the first

24    page, there is an e-mail from Martin Kelly to David Coles and

25    some other people.  Do you see that?

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 49 of 273

- 49 -

1    A.    Yes.

2    Q.    As well as Mr. Fogarty?  You see that?

3    A.    Yes.

4    Q.    And it says -- the subject is "Consolidating Balance

5    Sheet".  Do you see that?

6    A.    Yes.

7    Q.    And the date of this is Friday, September 19th, 2008,

8    correct, sir?

9    A.    Correct.

10   Q.    And it says, "David", referring to David Coles, "please

11   see latest draft attached."  Do you see that?

12        (Pause)

13   A.    Yes.

14   Q.    And do you see that there is a attached balance sheet as

15   of September 17th, 2008 that is attached?

16   A.    Yes.

17   Q.    Were you aware that Alvarez & Marsal was being furnished

18   with these balance sheets in September of 2008?

19   A.    No.

20   Q.    If you turn to the second page of the balance sheet, the

21   one that would have the "Liabilities" heading on.  Do you see

22   that?

23   A.    Yes.

24   Q.    Do you see under the heading "Payables" a line for "Bonus

25   Payable" and "Cure Payments Payable"?

08-13555-mg    Doc 10178    Filed 06/23/10    Entered 07/14/10 10:26:48    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 50 of 273

- 50 -

1        (Pause)

2    Q.    Do you see that?

3    A.    No, I don't know.  Sorry.

4    Q.    You see the "Liability" heading, correct, in the left-hand

5    side?

6    A.    Yeah.

7    Q.    And the first thing under that is "Short Term Borrowings".

8    Do you see that?

9    A.    Yes.

10   Q.    And then it says "Financial Instruments".  Do you see

11   that?

12   A.    Yes.

13   Q.    And then it says "Total Securities" or something, "Total

14   SEC and Other Financial Instruments".  Do you see that?

15   A.    Yes.

16   Q.    Next it says "Collateralized Short Term Financing".  Do

17   you see that line?

18   A.    Yes.

19   Q.    And the next one it says "Payables".  Do you see that?

20   A.    Okay.

21   Q.    And then beneath that, do you see "Bonus Payable and Cure

22   Payments Payable"?

23   A.    Yes.

24   Q.    Okay.  And do you see that there are numbers for each of

25   those line items both as of October 31, '08, as of September

- 51 -

1   17th, '08 and then "Transaction Adjustments" and then "Balance

2   Sheet Entries".  Do you see that as you go across the page?

3   A.   Um-hmm, yes.

4   Q.   Were you aware that Alvarez & Marsal had been furnished

5   this information in September of 2008?

6   A.   I did not see this information, no.

7   Q.   Whether or not you actually saw this piece of paper, were

8   you aware that this information was -- made available for

9   Alvarez & Marsal?

10   A.   You got to answer -- you got -- again, the question you

11   asked was did I -- I have never seen before this event.  Did

12   David Coles?  My assumption is yes, he did see this on the

13   17th.  I have no reason to believe that wasn't the case.

14   Q.   Did you personally know prior to my showing you this that

15   Alvarez & Marsal had been furnished with this information in

16   September of 2008?

17   A.   I did not know in September 2008 or October 2008 or up

18   until just now.

19   Q.   Okay.

20   A.   And, by the way, counselor, I don't exactly understand the

21   17th of -- there was no accounting -- I don't know how the

22   17th -- the 17th would have just been an estimate 'cause we did

23   not have a -- an accounting cutoff period until January of

24   2009.  So I think this was an estimate.

25   Q.   You think this was a what?

- 52 -

1    A.    I think this would have been an estimate in any event.

2    There was no accounting cutoff -- the accounting stopped at the

3    12th of September.

4    Q.    Yes.  You've said that a couple of times.  And why did the

5    accounting stop as of the 12th of December -- September?

6    A.    'Cause we stopped posting entries.

7    Q.    And why was that?

8    A.    'Cause the system just came to a collapse.  The

9    interconnectivity of the worldwide system -- you had a -- you

10   had three hubs.  It stopped and went to bankruptcy.

11   Q.    Did that mean that subsequent to September 12th that the

12   marks on various assets were not being updated?

13   A.    Yes, sir.

14   Q.    You mentioned that there came a time when you began to

15   have some concerns as to whether or not the transaction was in

16   fact a wash.  Do you recall that?

17   A.    Yes.

18   Q.    When did you first have any concern about whether or not

19   the transaction with Barclays was a wash?

20   A.    The first concern would have been when the financial

21   information from the accounting system started to perk up.  I

22   recall in mid to late January there were questions about, as we

23   were able to close the books on September -- as of September

24   12th, the questions were coming up, I don't understand -- I

25   don't understand how the assets equaled the liabilities in this

- 53 -

1    context.  And then a week or two later, the quarterly results

2    came out and that caused even greater questioning on our part.

3    Q.    When you refer to September 12th, that's September 12th of

4    what year?

5    A.    2008, the date before the filing.

6    Q.    Are you saying that your first time you tried to close the

7    books for September 12th of 2008 was sometime in the first

8    quarter of 2009?

9    A.    Yes.  Yes.

10   Q.    And are you saying that the first time you had any concern

11   at all as to whether or not the Barclays transaction was a wash

12   was in the first quarter of 2009?

13   A.    It would be early 2009, yes.

14   Q.    Well, when you say early 2009, does that mean the first

15   quarter of 2009?

16   A.    January of 2009.

17   Q.    January of 2009.  When was the first time that you asked

18   anyone to investigate whether or not the Barclays transaction

19   had, in fact, been a wash?

20   A.    It was right around the time of the press release, shortly

21   before, shortly after the press release.

22   Q.    What press release?

23   A.    The quarterly press release, the February 8th Barclays'

24   press release.

25   Q.    In 2008, did you have any understanding one way or another

- 54 -

1    whether the valuation placed on Lehman's trading assets

2    represented the book value of those assets for purposes of the

3    Barclays transaction?

4    A.   No.  I had no knowledge of the book value.  My assumption

5    was it was the market value that was being exchanged.

6    Q.   And was it your assumption that the market value that was

7    being exchanged was less than the book value of the Lehman

8    assets because the book value stopped being updated on

9    September 12th?

10   A.   I didn't know that.  I mean, I didn't know whether it was

11   higher or lower.  I knew that the market -- what I thought was

12   the market value equal to liabilities being assumed, the market

13   value of the assets.

14   Q.   Is it your testimony that you don't know whether the

15   market value of Lehman's assets declined after September 12th,

16   2008?

17   A.   The assets being exchanged?

18   Q.   Yes.

19   A.   Yes.

20   Q.   You don't know that?

21   A.   I don't know that, no.

22   Q.   All right.  Did you ever make any effort to investigate

23   that?

24   A.   I did not.

25   Q.   Did you ever have any concern that Barclays might have

08-13555-mg    Doc 10178    Filed 06/23/10    Entered 07/14/10 10:26:48    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 55 of 273

- 55 -

1    negotiated a discount from the market value of the Lehman

2    assets that it was acquiring?

3    A.    No.

4    Q.    Were you ever told that Barclays had obtained a discount

5    on the valuation of the Lehman assets for purpose of the

6    transaction?

7    A.    No.

8    Q.    Well, you actually saw a presentation in which was talked

9    about a negotiated five billion dollar discount in October

10   2008, correct, sir?

11   A.    That was pricing negotiation.

12   Q.    I'm sorry.  What?

13   A.    That was pricing negotiation was my interpretation,

14   counselor.

15   Q.    By pricing negotiation, you mean they were negotiating the

16   price at which Barclays would acquire the assets?

17   A.    Well, if you were at Barclays and you set a price on a

18   security and Lehman sets a price on a security, you might not

19   agree.  You have a negotiation as to figure out what the fair

20   market value price of that is.  That's I assume what happened.

21   I assume the five billion dollars was a deterioration in the

22   price during that chaotic week, yeah.

23   Q.    And if the five billion dollars was a deterioration during

24   that chaotic week, that would have meant that the market value

25   of Lehman's assets was declining during that week, correct?

- 56 -

1    A.    Correct.

2    Q.    Did you ever come to understand what the value of the

3    severance assumed liabilities were for Barclays?

4    A.    No.

5    Q.    When you refer to assumed severance liability here --

6    A.    Yes.

7    Q.    -- am I correct that that includes liability for certain

8    accrued bonuses?

9    A.    No, sir.  It could be -- that line I just assumed was

10   severance liability.  The assumed cure liability would have

11   been --

12   Q.    No, not cure.  I'm sorry.  I may have misspoke or you may

13   have misspoke.  I didn't say cure.  I didn't mean to say cure

14   if I did.  And I don't think I did.  What I was talking

15   about --

16   A.    You did.

17   Q.    -- the -- it was bonus liability.

18   A.    Well, there's nowhere on that schedule -- I don't know

19   whether the bonus accrual is in that line or the line above.  I

20   don't know.  Again, the geography I don't know about.  It's  --

21   the 4.2 million dollar num -- billion dollar number had those

22   three components.

23   Q.    Okay.  So the 4.2 billion dollar item had assumed cure,

24   assumed bonus and assumed severance, is that correct?

25   A.    That's my understanding.

1   Q.    And that 4.2 billion dollar number, have you ever seen

2   that in writing any place?

3   A.    Yes.  I saw it on a schedule that Steve Berkenfeld showed

4   me.  That was a schedule -- it was -- again, I don't recall

5   that schedule now but I saw it on a schedule somewhere.

6   Q.    When did he show you that schedule?

7   A.    Maybe he showed me that schedule right about the time he

8   was describing the transaction.

9   Q.    When was that?

10  A.    The week of the 15th.

11  Q.    Did he tell you who prepared that schedule?

12  A.    No, he did not.

13  Q.    Did you understand that the estimates for severance and

14  bonuses and cure changed between the preparation of that

15  schedule and the closing of the transaction?

16  A.    I did not know that.

17  Q.    Did you ever come to know that?

18  A.    I came to know that after the fact, yes.

19  Q.    Okay.  And when did you come to know that?

20  A.    I came to know that after I got the response back from

21  Jonathan Hughes --

22  Q.    And --

23  A.    -- in the first quarter of 2009.

24  Q.    And do you now know how the total of comp and severance

25  and cure and bonus liabilities were described to the Court,

LEHMAN BROTHERS HOLDINGS INC., et al.

- 58 -

1   what the total amount described to the Court was?

2   A.   No, sir.  I'm still confused.

3   Q.   Okay.  When did you first become aware that the amount of

4   money that Barclays might pay to satisfy the assumed cure

5   liability might be less than whatever had been assumed at the

6   time of the transaction?

7   A.   When the quarterly results came out -- the first quarterly

8   results came out -- or, excuse me -- the February 8th press

9   release came out from Barclays.

10  Q.   Was that the first time?

11  A.   I attempted to reconcile that against this other --

12  against the Berkenfeld conversation.  We were struggling.

13  Q.   My question is when did you first become aware that the

14  amount of money that Barclays might pay to satisfy the cure

15  liabilities that it had assumed was less than the potential

16  amount that was described at the time of the transaction?

17  A.   It would have been when the 8/14 or 8/12 accounting --

18  excuse me -- 9/14 or 9/12 accounting would have been completed

19  which would have been mid-January, 2009.

20  Q.   Did anyone tell you in 2008 that the cure payments that

21  Barclays was going to make were, to a large extent, within

22  Barclays' discretion?

23  A.   I don't recall.  I don't recall getting to having that

24  conversation.

25  Q.   You know what negative goodwill is, do you not, sir?

- 59 -

1    A.    Yes.

2    Q.    When were you first aware that Barclays might account for

3    the transaction in a way that resulted in negative goodwill?

4    A.    Well, purchase accounting is a fairly typical -- it's

5    fairly typical in M&A transactions where you would recognize --

6    you would be able to recognize a gain from the transaction.

7    But the first time I became aware of the built-in gain that

8    existed here was in -- was when the press release of early

9    February came out, 2009.

10   Q.    Let me ask another term.  You're familiar with what Tier 1

11   capital is, correct?

12   A.    Yes.

13   Q.    And would you just explain for the record what Tier 1

14   capital is?

15   A.    No.  I'm just -- I'm not familiar with Tier 1 capital

16   except from a -- in a very general sense.

17   Q.    Are you sufficiently familiar with the term Tier 1 capital

18   to know that it would include only hard assets?  It would not

19   include intangibles.

20   A.    If you say so, yes.

21   Q.    Well, I'm really asking whether you --

22   A.    It's not relevant in my business.  I mean, we were not --

23   we were no longer with the bankruptcy.  We no longer had to --

24   had to track Tier 1 capital.  So it was not really relevant to

25   us.

- 60 -

1    Q.   I'm not really asking whether it was relevant to LBHI.

2    I'm really asking for your personal knowledge as somebody who

3    is in this business?

4    A.   I'm not an expert in this business, sir.

5    Q.   Okay.  You were aware that there was a clarification

6    letter that was signed by LBHI and LBI, correct?

7    A.   Came to be aware of it, yes.

8    Q.   When did you first become aware that there was a

9    clarification letter?

10   A.   Let's say the -- I do not recall the exact date but it

11   would have probably been in the end of December, early January

12   time frame.

13   Q.   So, prior to the end of December of 2008 or January of

14   2009, you were not aware that LBHI had signed a clarification

15   letter in connection with the Barclays transaction, is that

16   your testimony?

17   A.   That's correct.

18   Q.   When you were at the hearing before you left the hearing

19   before the Court on this transaction, was there a discussion of

20   the clarification letter that was being -- that occurred?

21   A.   I don't recall any discussion on it.

22   Q.   And it's your testimony that no one ever told you that

23   there was a clarification letter or one was being discussed

24   either before or after the fact?

25   A.   It wasn't relevant to me at that time.

- 61 -

1    Q.    My question, sir, is --

2    A.    No.  No one did.

3    Q.    -- whether anyone ever told you.

4    A.    No, not to my knowledge.

5    Q.    Okay.  Now when you say that somebody told you that the

6    transaction was supposed to be a wash, is there anything to

7    that effect in the documentation of the transaction?

8    A.    I haven't studied the documentation of the transaction.  I

9    haven't studied the agreement.  So my assumption is no.

10   Q.    Your assumption is that there's not anything --

11   A.    Well, we wouldn't be here if there was.  So --

12   Q.    Right.

13   A.    -- and my assumption is it's not in there.

14   Q.    I think that's a fair point.  Did there come a time when

15   you asked somebody to read the documentation for this

16   transaction and explain to you what the terms were?

17   A.    Yes.

18   Q.    When was that for the first time?

19   A.    Early mid-January.

20   Q.    Of 2009?

21   A.    Yes.

22   Q.    And at that time, did whoever you asked for this

23   information tell you whether or not there was any reference, in

24   words or in substance, to a wash concept in the written deal

25   documents?

- 62 -

1    A.    There was a significant amount of confusion, yes.

2    Q.    Was a considerable amount of confusion as to whether there

3    was such a reference?  Is that what you're saying?

4    A.    The -- yes.  Tom Roberts, who was also responsible for

5    drafting this addendum had indicated to me that there was a

6    wash, this was a wash transaction.  And yet, the addendum had

7    no mention of the word "wash" in it or "wash" of --

8    effectively, having "wash" in it.

9    Q.    Now, by the addendum, is that the clarification letter?

10   A.    Yes, the clarification letter.

11   Q.    Okay.

12   A.    Yeah.

13   Q.    So even though you weren't aware of it in 2008, at some

14   point, you became aware that the documentation of the

15   transaction did not include this wash concept, correct?

16   A.    In 2009, I believe, yes.

17   Q.    Okay.

18   A.    Early 2009.

19   Q.    Okay.  At that point, did you ask anybody why this

20   supposed wash concept had not been included in the written deal

21   documents?

22   A.    Yes and it wasn't clear.  There was no clear explanation.

23   Q.    Okay.  Now, given the uncertainty that existed with

24   respect to the valuation of these assets, the fact that the

25   valuations were changing, am I correct that it really would not

- 63 -

1    have been possible to have a transaction that was actually a

2    wash unless you have some kind of true-up provision?

3    A.    Correct.

4    Q.    And were you aware that there was originally some form of

5    true-up provision in a draft but that had been taken out?

6    A.    Steve Berkenfeld, in the meeting I had with him, also

7    indicated there was a true-up provision.

8    Q.    That there was a true-up provision?

9    A.    Yes.

10   Q.    And when did Mr. Berkenfeld tell you that there was a

11   true-up provision in the deal documents?

12   A.    The exact date, I don't know.  I think it was Wednesday or

13   Thursday of that week, of the -- week of the 15th.

14   Q.    Did anybody ever tell you prior to closing that that true-

15   up provision had been taken out?

16   A.    No.

17   Q.    When was the first time you realized what the true-up

18   provision Mr. Berkenfeld had told you was in the deal documents

19   had been taken out?

20   A.    When I was going to ask for a refund which would have been

21   in early January.

22   Q.    Of 2009?

23   A.    Yes.

24   Q.    And at that point, did you ask anybody why that true-up

25   provision had been taken out?

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 64 of 273

- 64 -

1   A.   Yes.

2   Q.   And what did they say?

3   A.   Lots of confusion with the explanation.  It wasn't clear.

4   Berkenfeld had no explanation and Weil did not have a clear

5   explanation.

6   Q.   What did Weil tell you about why this true-up provision

7   had been taken out?

8   A.   There was no explanation provided.  I mean, it was just --

9   it was negotiated among the parties.  They were the lawyers.

10  And Berkenfeld indicated that he hadn't been in that

11  negotiation.  So you would have to ask whoever gave that

12  provision up, I guess.

13  Q.   Well, Weil Gotshal was involved in those negotiations,

14  correct?

15  A.   Weil Gotshal -- yes.

16  Q.   And they were representing Lehman in those negotiations,

17  correct?

18  A.   Yes.

19  Q.   And you asked Weil Gotshal why this true-up provision that

20  you had been told was included had been taken out, correct?

21  A.   Yes.

22  Q.   And what did Weil Gotshal tell you?

23  A.   The businesspeople negotiated it away.

24  Q.   Did they tell you why the businesspeople negotiated it

25  away?

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 65 of 273

- 65 -

1    A.   No.

2    Q.   Did you ask them?

3    A.   You had to be there is what the answer was from Weil

4    Gotshal.  You had to be there.  I wasn't there.  And the

5    implication was it was very chaotic.

6    Q.   Now, I want to probe a little bit your understanding of

7    what it means to say the transaction was going to be a wash.

8    You were aware that there were certain assets that were being

9    transferred to Barclays for which no valuation was set or

10   negotiated, correct?

11   A.   No, I was not.

12   Q.   You were not?

13   A.   No.

14   Q.   Are you aware of that now?

15   A.   Well, I'm aware of it now, yes.

16   Q.   Okay.  And what are some of the assets that you are now

17   aware of for which no value was set or negotiated in the

18   transaction?

19   A.   I assume what's in the box.  Again, what's in the box, so

20   what's in that category, I don't know if that's been valued or

21   not.  I don't know what's in the box because we have no

22   visibility at Holdings to what's in the box.

23   Q.   And by the "box", what are you referring to?

24   A.   Back to page 28 of the --

25   Q.   The unencumbered box?

- 66 -

1    A.   Yes.

2    Q.   Okay.  Is the unencumbered box the same as the clearance

3    box?

4    A.   I don't know.

5    Q.   You've heard the term "unencumbered box" and you've heard

6    the term "clearance box", correct?

7    A.   Yes.

8    Q.   And have you made any effort to determine whether those

9    are the same or different things?

10   A.   I have not.

11   Q.   Were you aware that Barclays, in the course of this

12   transaction, was acquiring software and other intangibles?

13   A.   Yes.

14   Q.   And were those assets given any valuation in connection

15   with the Barclays transaction?

16   A.   I do not -- I don't believe so.

17   Q.   And were you aware of that at the time of the transaction?

18   A.   I was aware of it because of the TSA agreement was to what

19   software and what technology would be available and that we had

20   to set up a two-year -- a two-year contract with Barclays in

21   order to continue to have that technology.

22   Q.   So you're aware, because of the TSA agreement, that

23   Barclays was getting certain software and technology and

24   systems as part of the transaction, correct?

25   A.   Yeah.  No.  They were taking everything over.  They were

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 67 of 273

- 67 -

1    taking it all over.

2    Q.   They were taking all of the assets.

3    A.   Every business.  All of the software, all of the

4    technology, everything -- and we were becoming a tenant of

5    theirs, if you would.

6    Q.   Now, when you say that it was going to be a wash --

7    A.   That's what Tom Roberts said, a wash.

8    Q.   Well --

9    A.   I said a push.  But it means the same as a wash.

10   Q.   Okay.  You thought the transaction -- at some point in

11   time, you thought the transaction was going to be a push or a

12   wash, correct?

13   A.   Yes.

14   Q.   And those two things mean the same to you, correct?

15   A.   In my jargon, yes.

16   Q.   And is it fair to say that what you're referring to there

17   is the fact that there would be some rough balance between the

18   valuation of the assets and valuation of liabilities?

19   A.   No.  It'd be more specific.  The market value of the

20   assets would equal the liabilities being assumed.

21   Q.   Exactly equal?

22   A.   Yes, sir.

23   Q.   Exactly equal?

24   A.   Well, within a -- normally, on an M&A transaction, you

25   would have, as you know, as you pointed out, a true-up concept.

- 68 -

1    Q.    Yes.  But you didn't have a true-up concept here, did you?

2    A.    No.  But you would have to have a -- I guess a materiality

3    test.  It would have to be within a certain -- I mean, to be

4    precise, if this was about a few hundred million dollars, we

5    wouldn't be arguing, I would say.

6    Q.    All right.  And what would be the materiality threshold in

7    percentage terms?

8    A.    Well, I don't know but I would say, in percentage terms

9    for this transaction, I would say within a couple hundred

10    million dollars.

11    Q.    Okay.  So if the assets and the liabilities were in

12    balance within a couple hundred million dollars, you would

13    consider that a wash or a push?

14    A.    Yes.

15    Q.    Now, when you valued the assets as part of this analysis

16    to determine whether their transaction was a wash or a push,

17    did you value all of the assets including the intangibles?

18    A.    I didn't value any of the assets, not even the

19    intangibles.

20    Q.    Well, in terms of what your understanding was, was your

21    understanding that the liabilities that Barclays was going to

22    assume was going to -- roughly, within a couple hundred million

23    dollars, be equal to the value of all of the assets that

24    Barclays was getting including the intangibles or only equal to

25    the value of certain assets?

- 69 -

1   A.    It would have been more certain assets.

2   Q.    Okay.  Now what I want to try to do is I want to

3   distinguish between the assets that you include in the wash,

4   according to your understanding, and the assets you do not,

5   okay?  And am I correct that the assets that you would include

6   would be the so-called trading assets, the securities?

7   A.    Well, assets with a market value.  Some of the assets did

8   not necessarily have a trading value.  I don't know -- they

9   might have been illiquid, for example.  But they were

10  securities, illiquid or liquid securities.

11  Q.    Let me see if I understand what you're saying.  The assets

12  that would be valued for determining how much liabilities

13  Barclays should assume would be assets that had a market value.

14  Is that what you're saying?

15  A.    Yes.

16  Q.    Okay.  And you would recognize that certain assets of

17  Lehman that might have more value to Barclays would not have a

18  market value for Lehman's because it was going out of business,

19  correct?

20  A.    Correct.

21  Q.    And did you make any effort at any time -- have you made

22  any effort to determine what the value of those assets are?

23  That is, the value of the assets that Barclays acquired that

24  had value to Barclays but didn't have a market value and hence

25  were not included in the wash calculation?

08-13555-mg    Doc 10178    Filed 06/23/10    Entered 07/14/10 10:26:48    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 70 of 273

- 70 -

1    A.    No.

2              MR. GAFFEY:  Your Honor, given the time period that

3    Mr. Boies' question addresses, the "at any time" provision of

4    it, I believe the question may call, at least in part, for

5    privileged information.  As Your Honor knows, we have a

6    privilege waiver that covers the period up to the 30th of

7    September, 2008 and the settlement discussions in December of

8    2008.  But I think beyond that, the question calls for

9    privileged information, at least in part.

10             THE COURT:  Do you want to narrow the scope of the

11   question or do you believe that the question doesn't go to that

12   area?

13             MR. BOIES:  Well, I asked him whether he made any

14   effort and he said no.  So I don't know what the objection can

15   relate to given the witness' answer.

16             MR. GAFFEY:  I'm just a little slow on my feet, Your

17   Honor.  I had hoped to be up before the answer.  But the point

18   is -- well, let me ask -- let me wait then for another

19   question, Your Honor.

20             MR. BOIES:  Yeah.

21             MR. GAFFEY:  But to the extent that --

22             MR. BOIES:  I am going to ask some questions that may

23   raise this issue.  But if there was no effort then there was no

24   privileged effort, no non-privileged effort.  There was no

25   effort of any kind.

- 71 -

1        MR. GAFFEY:  I'll reserve the right to argue the

2   inference doesn't follow from the answer.  That's why I rise to

3   make the objection, Your Honor.

4        THE COURT:  All right.  We're going to settle an area

5   that, to me, suggests it's time for a morning break.

6        MR. BOIES:  Yes, Your Honor.  Thank you.

7        THE COURT:  So let's take a break for ten minutes and

8   we'll resume at 11:15.

9       (Recess from 11:07 a.m. until 11:21 a.m.)

10       THE COURT:  Be seated, please.  Mr. Boies?

11       MR. BOIES:  Thank you, Your Honor.

12   RESUME CROSS-EXAMINATION

13   BY MR. BOIES:

14   Q.   Mr. Marsal, let me ask you to turn to tab 37 in your book

15   which is Barclays' Exhibit 854.  Do you have that?

16   A.   No.  tab 37 is a note from Harvey Miller.

17   Q.   Yes.  I don't know why that was put up on the screen.

18   That was a technological issue.

19   A.   Okay.

20   Q.   It's -- but tab 37 has Barclays' Exhibit 854 there.  Do

21   you see that?

22   A.   Yes.

23   Q.   And at the top, there is an e-mail from Harvey Miller to

24   you, is that correct?

25   A.   Yes.

- 72 -

1    Q.   And that is in response to an e-mail you sent the morning

2    of September 27th, 2008, correct?

3    A.   I have to read it.

4        (Pause)

5    Q.   You see where -- there's an e-mail from you to Mr.

6    Fogarty, copied to Harvey Miller?

7    A.   Yes.  Yes.  Okay.

8    Q.   And you say, "Jim" -- and that refers to Jim Fogarty,

9    correct, sir?

10   A.   Correct.

11   Q.   "I think your team needs to be the failsafe on both the

12   Barclays and Bain transaction to outline what was sold and what

13   was kept per the agreement and confirm that that is actually

14   what happened."  Do you see that?

15   A.   Yes.

16   Q.   And then Mr. Miller writes you back that same morning

17   saying that "Mr. Fogarty should coordinate with Rod Miller who

18   is intimately familiar with what was sold."  Correct?

19   A.   Yes.

20   Q.   And then if you turn to tab 10, this is Barclays' Exhibit

21   325, and at the bottom, there's an e-mail from Mr. Fogarty.  Do

22   you see that?

23   A.   Yes.

24   Q.   And it says, "Here is all we have at the moment that makes

25   an effort to describe what Barclays got and didn't get."  Do

- 73 -

1    you see that?

2    A.   Yes.

3    Q.   And that's an e-mail from him the afternoon of September

4    27th, 2008, correct?

5    A.   Yes.

6    Q.   And then attached -

7    A.   I think it's 29th, isn't it?  Monday, the 29th?

8    Q.   Saturday, the 27th, it says.

9    A.   You're talking about Gordon's response or Fogarty's?  I'm

10   sorry.

11   Q.   Mr. Fogarty.  Mr. Fogarty.  You wrote Mr. Fogarty the

12   morning --

13   A.   Right.

14   Q.   -- of September 27th, correct?

15   A.   Yes.  And now -- okay.

16   Q.   And then the afternoon of September 27th, Mr. Fogarty

17   writes somebody at Weil Gotshal saying "Here is all we have at

18   the moment that makes an effort to describe what Barclays got

19   and didn't get."  Correct?

20       (Pause)

21   A.   Yes.

22   Q.   Okay.  And then attached is a document that purports to

23   describe what Barclays got and didn't get, correct?

24       (Pause)

25   A.   Yes.

- 74 -

1    Q.    And if you turn to the page that has the Bates number 2293

2    in the bottom right-hand corner of this exhibit --

3    A.    Okay.

4    Q.    -- it's headed "Lehman Brothers/Barclays Transaction

5    Division of Assets and Liabilities".  Do you see that?

6    A.    Yes.

7    Q.    And at the beginning, it says, "The business being sold

8    includes the United States and Canadian investment banking and

9    capital markets business of seller."  Do you see that?

10   A.    Yes.

11   Q.    And was that your understanding of what business was being

12   sold as of the end of September of 2008?

13   A.    Yes.

14   Q.    And then further down, it talks about "Purchased Assets".

15   And the first item is "Securities and Trading Operations".  And

16   the first item under that is "the securities set forth on

17   Schedule A to the clarification letter" that we've talked

18   about.  And then, the second item is "the securities and other

19   assets held in LBI's clearance boxes as of the time of the

20   closing."  Do you see that?

21   A.    Yes.

22   Q.    And was that consistent with your understanding of the

23   Barclays transaction as of the end of September 2008?

24   A.    I don't know if I ever received this summary.  Am I in

25   circulation here?  I didn't see that.  I don't think I am.  I'm

- 75 -

1    not in circulation.  So I don't believe I received this.

2    Q.    Let me go back to the first page of Exhibit 325.  At the

3    top, there is a list of people at Alvarez & Marsal to whom this

4    is distributed, correct?

5    A.    Yes.

6    Q.    And obviously, Mr. Fogarty had it because he sent it to

7    Weil Gotshal, correct?

8         (Pause)

9    A.    Yes.

10   Q.    And Mr. Gordon had it because he then distributes it to

11   other people on September 29, 2008, correct?

12   A.    Correct.

13   Q.    And who is Mr. William Gordon?

14   A.    He's in charge of the TSA.

15   Q.    And then there's a list of the people who are the

16   addressees.  And could you identify those people?

17   A.    Mary Korycki.

18   Q.    She is with Alvarez & Marsal, correct?

19   A.    Alvarez & Marsal analyst who works for Bill Gordon.  Jeff

20   Donaldson is the head of Alvarez & Marsal -- he is the IT,

21   information technology officer.  Al Lakhani is a managing

22   director of Alvarez & Marsal.  His responsibility is data

23   preservation.  This was the data team, information team.

24   Q.    Now, we saw that you had, in Barclays' Exhibit 854, asked

25   Mr. Fogarty's team to be the failsafe to outline what was sold

- 76 -

1   to Barclays and to confirm that that was actually what

2   happened.  Did Mr. Fogarty report back to you in response to

3   this direction you gave him?

4   A.   Just -- can I just -- maybe it was for both.  Probably

5   these instructions were the failsafe for both the Barclays

6   transaction and the Bain transaction which was Neuberger

7   Berman.  Both of those transactions we wanted to get a handle

8   on.  Yes.  He reported back to me.

9   Q.   And what did he tell you in terms of what was sold to

10  Barclays?

11  A.   Well, the big confusion wasn't about Barclays.  It was

12  more about Bain.

13  Q.   Can I focus on Barclays?

14  A.   Well, yeah.  But that wasn't --

15  Q.   I know you want to talk about Bain and I don't have any

16  objection to your talking about Bain at some point on somebody

17  else's time.  But what I want to do is focus on the Barclays

18  transaction.  Now maybe he never got back to you on Barclays.

19  That would be an answer.  But all I'm trying to find out is did

20  he ever get back to you on the Barclays transaction.

21  A.   There were no assets of controversy in Barclays, yes.  The

22  assets were not in controversy as to what was going to Barclays

23  or not.

24  Q.   What was going to Barclays or not was not in controversy.

25  A.   Not in controversy.

- 77 -

1  Q.   Okay.  And so, is it your answer that he did not get back

2  to you because it was not in controversy or that he got back

3  and told you it was not in controversy.

4  A.   He told me there was no open issues on Barclays.

5  Q.   Okay.  So after your e-mail the morning of September 27th,

6  2008 to Mr. Fogarty, he got back and told you that there were

7  no open issues on what was sold to Barclays, is that correct?

8  A.   As it relates to the Holdings assets, yes, that's correct.

9  Q.   When you say as it relates to the Holdings assets, this

10  document that we were looking at a moment ago that Mr. Fogarty

11  distributed didn't just relate to Holdings assets, did it?

12  A.   It related to the assets that he had supervision of.

13  Q.   These related to LBI assets, correct?

14  A.   He wouldn't have had access to the LBI answers.  He would

15  only have had access to the LBH answers.

16  Q.   Well, sir, let's go back to Barclays' Exhibit 325.  This

17  is what Mr. Fogarty distributes and what Mr. Gordon distributes

18  to a number of Alvarez & Marsal people the next day -- or two

19  days later.  Back on page 2293, we're talking about the

20  purchased assets.  The first item at the bottom of the page

21  were "the securities set forth on Schedule A to the

22  clarification letter".  Do you see that?

23  A.   Yes.

24  Q.   Now those were LBI assets, correct, sir?

25  A.   That's correct.

- 78 -

1    Q.   And the next one is "the securities and other assets held

2    in LBI's clearance boxes as of the time of the closing".  Do

3    you see that?

4    A.   Yes.

5    Q.   And those were LBI assets, correct?

6    A.   Correct.

7    Q.   Not LBHI assets, LBI assets, correct?

8    A.   Correct.

9    Q.   And going over to the next page, the next item is "all

10   exchanged traded derivatives and any property that may be held

11   to secure obligations under such derivatives".  Do you see

12   that?

13   A.   Yes.

14   Q.   And those again were LBI assets not LBHI assets, correct?

15   A.   Correct.

16   Q.   And the next item is "all prime brokerage business and

17   accounts and repurchase agreement operations and securities

18   lending operations of the business".  And that again is LBI

19   assets not LBHI assets, correct?

20   A.   Correct.

21   Q.   And skipping down, the next major heading is "Intellectual

22   Property".  Do you see that?

23   A.   Yes.

24   Q.   And that is LBI assets, correct, sir?

25   A.   Yes.

- 79 -

1    Q.    And if you skip over to page 2296, at the top of the page,

2    where it refers to "To the extent permitted by applicable law

3    and as soon as practical after the closing, 769 million dollars

4    of securities, as held by or on behalf of LBI on the date

5    hereof, pursuant to Rule 15c3-3 of the SEC Act of 1934, all

6    securities of substantially the same nature and value" -- do

7    you see that?

8    A.    Yes.

9    Q.    And again, that would be LBI assets, not LBHI assets,

10   correct?

11   A.    Correct.

12   Q.    Now did Mr. Fogarty ever get back to you in response to

13   your September 27th e-mail or otherwise and tell you whether

14   there was any open issue with respect to the LBI assets

15   transferred to Barclays pursuant to the sales transaction?

16   A.    He did not.

17   Q.    Did he ever get back to you and tell you anything at all

18   about what was transferred to Barclays and whether that was

19   supposed to be transferred had actually happened?

20   A.    No.

21   Q.    Okay.  Did you ever follow up with him and ask him why he

22   hadn't gotten back to you?

23   A.    Well, again, he was asked the question about the intent

24   which he understood related to LBHI assets.  The failsafe that

25   we're talking about is to make sure that assets that were under

- 80 -

1   my receivership or our control, LBHI's control, those that I

2   was responsible for, were all being accounted for in both of

3   those transactions.  What he indicated to me was -- again, you

4   don't want to hear about the Bain but it was more relevant to

5   the Bain than it was to the Barclays transaction 'cause these

6   assets were not under our control.

7   Q.   Well, sir, you say that this only had to do with the

8   assets that were under your control.  Let me go back to Exhibit

9   854, okay?  tab 37.  Your e-mail is -- the subject of your e-

10   mail is "APA schedules do exist".  Do you see that?

11       (Pause)

12   Q.   You have to answer audibly.

13   A.   I don't know what that subject means.  What's APA stand

14   for?  I'm not sure -- is this just an earlier e-mail?

15   Q.   This is your e-mail, sir, right?

16   A.   Well, I don't know.  Is this just an e-mail trail?  That

17   subject's been carried forward?

18   Q.   Yes.  I think it is.

19   A.   Okay.  APA would stand for --

20   Q.   Asset purchase agreement?

21   A.   Yes, sir.  There it is.

22   Q.   And if you look just south of your e-mail, you will see

23   the e-mail that began the chain on the subject "APA schedules

24   do exist".  Do you see that?

25   A.   Yes.

- 81 -

1   Q.   And this was an e-mail from Fogarty to you, correct?

2   A.   Yes.

3   Q.   And Mr. Fogarty's e-mail to you here is dated September

4   26th, correct, sir?

5   A.   Yes.

6   Q.   And when he's talking about the APA schedules, he explains

7   what those schedules are, correct, sir?

8   A.   Deal clarification agreement?

9   Q.   Yes.

10  A.   This line below?

11  Q.   And the deal clarification agreement is what we referred

12  to as the clarification letter, correct?

13  A.   Right.

14  Q.   And these are Schedules A and B to the clarification

15  letter, correct?

16  A.   You have to scroll down.  I don't know.  I assume it is.

17  Q.   Look on the next page.

18  A.   I'm trying to get that.

19       (Pause)

20  A.   Yes.

21  Q.   Now, Schedule A is a list of the securities transferred

22  under the Barclays repo agreement, correct?

23  A.   Yes.

24  Q.   And those were all LBI securities, correct?

25  A.   To my knowledge, yes.

- 82 -

1    Q.   And the Schedule B is what was in the so-called

2    "unencumbered box", correct?

3    A.   Yes.

4    Q.   And that was also LBI not LBHI assets, correct?

5    A.   The unencumbered box had LBHI assets in it?  Is that what

6    you said?  I'm sorry.

7    Q.   Yes.  They were LBI assets not LBHI assets --

8    A.   Correct.  Correct.

9    Q.   -- correct?

10   A.   Yes, correct.

11   Q.   So what Mr. Fogarty is writing you about is not LBHI

12   assets.  It's LBI assets, correct?

13   A.   Yes.

14   Q.   And you then respond to him by saying that his team needs

15   to be the failsafe on the Barclays transaction to outline what

16   was sold and what was kept per the agreement and to confirm

17   that that was actually what happened, correct, sir?

18   A.   That's correct.

19   Q.   And you don't mention anything there at all about LBHI, do

20   you, sir?

21   A.   No, I do not.

22   Q.   And what he has been talking about has been entirely LBI,

23   correct?

24   A.   That's correct.

25   Q.   Now, let me go back to tab 10, which is Barclays' Exhibit

- 83 -

1    325.  And I'd asked you a question about a provision on page

2    2296, at the top of the page, which had included as a purchased

3    asset, "To the extent permitted by applicable law 760 million

4    dollars of securities held by or on behalf of LBI pursuant to

5    Rule 15c3-3 of the SEC Act or securities of substantial or the

6    same nature and value."  Do you see that?

7    A.    Yes.

8    Q.    And was that consistent with your understanding of the

9    Barclays transaction, that is, that this would be one of the

10   purchased assets as of the end of September of 2008?

11   A.    This would be -- this would be included in the

12   transaction, yes.

13   Q.    Now, on -- let me ask you to look next at tab 6 which is

14   Barclays' Exhibit 1 which is the asset purchase agreement.  And

15   I asked you this question about the clarification letter.  But

16   I don't think I asked you this question about the asset

17   purchase agreement.  Did you ever review this document

18   yourself, sir?

19   A.    No.

20   Q.    Am I correct that there came a time when you asked someone

21   to review it on your behalf and summarize its contents for you?

22   A.    Yes.

23   Q.    And when is the first such time that you did that?

24   A.    I believe it would have been in the mid-January time

25   frame.

- 84 -

1    Q.    And that would be --

2    A.    Mid-2000 -- mid-January 2009.

3    Q.    Okay.

4          (Pause)

5    Q.    Let me ask you to turn next to tab 14 which is Barclays'

6    Exhibit 435.  And this is a continuation of the e-mail chain

7    that we saw earlier, that is, includes Mr. Fogarty's September

8    26th e-mail that included you, your back to him saying his team

9    needed to be the failsafe.  And Harvey Miller's e-mail back to

10   you on the 27th saying that Fogarty should coordinate with Rod

11   Miller.  And then at the top, there is another e-mail from Mr.

12   Fogarty to Mr. Miller.  Do you see that?

13   A.    Yes.

14   Q.    And this relates to your request for Mr. Fogarty's team to

15   be the failsafe on the Barclays and Bain transaction to outline

16   what was sold and kept and to be sure that what was supposed to

17   happen happened, correct?

18   A.    Correct.

19   Q.    And Mr. Fogarty writes Mr. Miller at 11:56 a.m. on the

20   27th:  "I spent some time on this with David Murgio of your

21   shop last night.  We planned to get a group together for a

22   walk-through of the final deal and detail schedules early next

23   week including" -- and then he lists various people including

24   the Alvarez & Marsal team.  Do you see that?

25   A.    Yes.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 85 -

1   Q.   Did that walk-through of the final deal together with the

2   detailed schedules occur?

3   A.   I do not know.  The deal closed on the 22nd.  I don't know

4   why -- the closure was the 22nd of September.  So I'm not quite

5   sure what this speaks to.

6   Q.   Did you ever make any effort to determine -- you got a

7   copy of this e-mail from Mr. Fogarty to Mr. Miller, correct?

8   A.   Correct.  I just don't know whether this -- are you sure

9   this doesn't also relate to Bain?  This would be after the

10   closing of the transaction.  This memo would be after the

11   closing of the Barclays transaction.

12   Q.   And, indeed, your e-mail was after the closing of the

13   Barclays transaction, correct, sir?

14   A.   Correct.

15   Q.   I mean, your e-mail that started this was the morning of

16   the 27th, and this is late morning of the 27th, correct?

17   A.   That's correct.

18   Q.   And --

19   A.   I'm just saying I'm not sure -- I'm not sure what this

20   relates to.  It could be Barclays and Bain; it could be

21   Barclays only; it could be Bain only.  I'm not quite sure what

22   we're emphasizing here with Harvey's response.

23   Q.   Well, the ABA sched -- APA schedules, you know those just

24   relate to Barclays, correct?

25   A.   Yes.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 86 -

1    Q.   Okay.  And all of these e-mails on the subject of the APA

2    schedules do exist, correct?

3    A.   I thought it began with both Barclays and Bain.

4    Q.   Well, if you want to go back, actually, you can --

5    A.   I don't want to torture you.  So if you say that's the

6    case, it's okay.  I don't know.

7    Q.   Okay.  I think you can confirm that when Mr. Fogarty

8    writes the September 26th e-mail to you, it is, subject:  "APA

9    schedules do exist."  And anything that I can see in that

10   e-mail relates to the Barclays transaction, not to the Bain

11   transaction.  If you see something in there that relates to the

12   Bain transaction --

13   A.   No, I believe you're correct.

14   Q.   Okay.  Now, let me ask you to look next at tab 15, which

15   is Barclays' Exhibit 857.

16   A.   Counselor, can I just go back and correct my --

17   Q.   Sure.

18   A.   See, what I don't understand is -- you're on Exhibit 435,

19   812

20   Q.   435.

21   A.   -- 812 that you just referenced.  If you turn the page to

22   the next page, you have the same "APA schedules do exist"

23   reference on the top of that e-mail.  And if you look in the

24   body of the letter, we're talking about both Barclays and Bain.

25   Q.   Yes, that's your e-mail --

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 87 of 273

- 87 -

1    A.    Yeah.

2    Q.    -- right, sir?

3    A.    That's my e-mail to them about -- that's why I'm

4    requesting as it relates to the APA.  But, I mean, the subject

5    matter is the same, APA, but I'm asking for both Barclays and

6    Bain on this -- in this e-mail.  So I think that's maybe the

7    source of the confusion.  The use of the word "APA" doesn't

8    apply to Bain.

9    Q.    APA does not apply to Bain; we can agree on that?

10   A.    Yeah.

11   Q.    And we can agree on the fact that Mr. Fogarty's e-mail to

12   you of September 26th that started this all had to do only with

13   the Barclays transaction, correct?

14   A.    It started with the Barclays transaction, that's right.

15   Q.    And other than your e-mail that says that you want Mr.

16   Fogarty to be the failsafe on both the Barclays transaction and

17   the Bain transaction --

18   A.    Right.

19   Q.    -- there is no further reference to the Bain transaction

20   itself, correct?

21   A.    That's correct.

22   Q.    Now, let me ask you to go to tab 15, Barclays' Exhibit

23   857.  And this is a series of e-mails dated October 7th and 8th

24   of 2008.  Have you ever seen any of these e-mails before?

25   A.    I have to review them.

- 88 -

1        No.  I had to read each mail I could review, but the top

2   e-mail, no, I haven't seen this.

3   Q.   Well, take a moment to familiarize yourself with it.

4   A.   (Pause).  No, I don't recall seeing this.

5   Q.   Okay.  Now, just for context purposes, on the late morning

6   of September 27th Jim Fogarty writes, "Harvey," saying he had

7   spent some time with David Murgio last night.  "Set up a group

8   together for a walkthrough of the final deal and detailed

9   schedules early next week."  You recall that?

10  A.   Yes.

11  Q.   Now I want you to look at tab 20, which is Barclays'

12  Exhibit 328.  And this is a -- an e-mail dated September 29th,

13  2008, correct?

14  A.   Yes.

15  Q.   And the subject is "Files for tomorrow's APA schedules

16  meeting", do you see that?

17  A.   Yes.

18  Q.   And it says "Attached are the files for the APA schedules

19  meeting tomorrow," which would have been September 30, correct?

20  A.   Yes.

21  Q.   And then attached to it are summaries of Schedules A and

22  Schedules B to the clarification letter, correct?

23  A.   Yes.

24  Q.   And it is clear that this relates to the Barclays

25  transaction, correct?

- 89 -

1  A.   Yes.

2  Q.   And were you aware -- there are a number of Alvarez &

3  Marsal people that are mentioned here as either the author or

4  addressees of this.  I don't see your name personally.  But you

5  were aware that this meeting to review the APA schedules for

6  the Barclays transaction was taking place at the end of

7  September?

8  A.   No.  I mean, I'm the chief executive officer/CRO of the

9  company, and, like I explained to you before, there's over

10  twenty teams reporting to me.  This particular meeting, no.

11  Q.   Whether you remember this particular meeting or not, were

12  you aware that at the end of September -- at or about the end

13  of September of 2008, that Weil Gotshal had done a detailed

14  walkthrough of the APA schedules, what was included in them,

15  for, among others, Alvarez & Marsal personnel?

16  A.   I was not aware of it, but it would not surprise me, yes.

17  Q.   Okay.  Let me ask you to go next to tab 36, which is

18  Movants' Trial Exhibit 634.  And this is an e-mail from Jamie

19  Schwartz dated September 22, 2008 to a number of people at

20  Alvarez & Marsal, including yourself.  Do you see that?

21  A.   Yes.

22  Q.   And this purports to be a Cliff Notes summary of the

23  Barclays deal.  Do you see that?

24  A.   Yes.

25  Q.   Did you receive this?

- 90 -

1    A.    I assume I did.

2    Q.    Next let me ask you to look at tab 38, Barclays' Exhibit

3    429.  And this is also dated September 22, 2008, correct?

4    A.    Yes -- I'm sorry, 429 is dated --

5    Q.    At the top.

6    A.    -- September 22nd?

7    Q.    Yes.

8    A.    Yes.

9    Q.    At 2:08 a.m. Greenwich Mean Time --

10   A.    Yes.

11   Q.    -- correct?

12   A.    Yes.

13   Q.    And it's from James Fogarty to John K. Suckow.  Do you see

14   that?

15   A.    Yes.  [sue-co].

16   Q.    [sue-co].

17   A.    Yeah.

18   Q.    And is -- and Mr. Suckow is with Alvarez & Marsal,

19   correct?

20   A.    Correct.

21   Q.    And this is a response to an earlier e-mail chain, the

22   first one of which is an e-mail from Mr. Fogarty to you,

23   correct, sir, at 18:06 on September 21, 2008, correct?

24   A.    Correct.

25   Q.    And the subject is "Huge problems encountered in Barclays

- 91 -

1    deal!"  Do you see that?

2    A.    Yes.

3    Q.    And did you receive a copy of this?

4    A.    I'm not sure about the first one.  The second one I assume

5    I did.  First in the chain; I assume I did.

6    Q.    That is, you assume you received the one addressed to you?

7    A.    Correct.

8    Q.    And do you have any recollection of it at all?

9    A.    I don't recall the e-mail.  I recall the phone call.

10   Q.    The phone call from whom?

11   A.    It had been Jim Fogarty.

12   Q.    And he made a phone call to you on or about the same time

13   that he sent you the e-mail --

14   A.    Yes.

15   Q.    -- is that correct?

16   A.    Yes.

17   Q.    And what did he tell you in that phone call?

18   A.    Oh, he told me that the transaction was -- the transaction

19   with Barclays was in jeopardy because of a problem of the

20   settlement with JPMorgan, and that JPMorgan, the Federal

21   Reserve and Barclays were trying to work it out but it could

22   result in the transaction being blown.

23   Q.    Let me ask you to look next at tab 40, Movants' Trial

24   Exhibit 627.  And this is a -- at the top, it is an e-mail from

25   Weil Gotshal to a number of people at Alvarez & Marsal, do you

- 92 -

1    see that?

2    A.   Yes.

3    Q.   And the subject is "Copies to be executed and sales

4    documents for the Barclays deal and the as-yet unsigned draft

5    clarification letter", do you see that?

6    A.   Yes.

7    Q.   Now, you are not listed here as an addressee or copyee of

8    this document, but were you aware that your people were being

9    furnished with these drafts and copies of the schedules to the

10   clarification letter and the APA on or about September 21,

11   2008?

12   A.   I don't know about September 21st, but it would not

13   surprise me that they would be advised of this, no.

14   Q.   And let me go back to the day just preceding September

15   21st -- this is September 20th -- and ask you to look at tab

16   43, which is Barclays' Exhibit 448.  Do you have that?

17   A.   Yes.

18   Q.   Now, this is an e-mail from Mr. Fogarty to -- one, two,

19   three, four, five, six, seven, eight, nine, ten, eleven --

20   twelve Alvarez & Marsal personnel, including yourself?

21   A.   Yes.

22   Q.   And the subject is "Deal status.  Please read," correct?

23   A.   Correct.

24   Q.   And did you in fact get this e-mail?

25   A.   Yes.

- 93 -

1    Q.   And did you in fact read it?

2    A.   Yes.

3    Q.   Now, let me ask you to look in the middle of the page

4    where there's a line that says "Interesting details from this

5    and other reports".  Do you see that?

6    A.   Okay.  Yes.

7    Q.   And there is a diamond next to a heading that says "Price

8    reduction rationale".  Do you see that?

9    A.   Yes.

10   Q.   And it says "now conveying to Barclays 47.4 billion of

11   securities and 45.5 billion dollars of liabilities, or a net

12   value of 1.9 billion dollars". Do you see that?

13   A.   Yes.

14   Q.   And do you recall being told that as of September 20th the

15   transaction encompassed a net value to Barclays of

16   approximately 1.9 billion dollars?

17   A.   Yes, this -- that's what this says.

18   Q.   And it then goes on to say that this was a change from the

19   earlier seventy-two billion dollars in securities and sixty-

20   eight billion dollars of liabilities, or a net value of four

21   billion dollars.  Do you see that?

22   A.   Yes.

23   Q.   And were you aware as of September 20, 2008 that the

24   earlier deal had involved a net value to Barclays of four

25   billion dollars, or approximately four billion dollars?

- 94 -

1   A.   No.

2   Q.   You were aware of that when you got this e-mail, correct?

3   A.   Well, I really can't tell you.  I mean, that's what this

4   e-mail says, but I -- the numbers at this point in time are

5   moving all over the place.  I don't really know what all this

6   means, to tell you the truth.  I wasn't involved in the

7   negotiations, so I don't -- I can't relate to the old deal any

8   more than I can relate to the new deal.  The only thing I had

9   was the comment that assets would be equaling -- market value

10   assets would be equaling liabilities.

11   Q.   And, of course, if there's a net value to Barclays in the

12   billions of dollars, the net value of the market value assets

13   and liabilities would not be a wash of course, correct, sir?

14   A.   Correct.

15   Q.   Now, when you saw this, as you say you did, did this cause

16   you to ask anybody how can there be this net value in the

17   billions of dollars to Barclays if the deal is supposed to be a

18   wash or a push?

19   A.   I mean, my concern --

20   Q.   No, I'm just --

21   A.   I mean, I --

22   Q.   Did you or didn't you?

23   A.   My concern was on points 1 and 2.  His points are 3, 4 and

24   5.  I mean, 3, 4 and 5 in this memorandum I gave a lot less

25   credibility to than the first and the second.  That was my

- 95 -

1    focus.  The TSA agreement is 1 and 2.

2    Q.    The -- when you're referring to 1 and 2, you're referring

3    to diamond points in this --

4    A.    Diamond point 1 and diamond point 2.

5    Q.    You're referring to the TSA?

6    A.    Yes.

7    Q.    Okay.  I'm focusing on --

8    A.    I know, but you're asking me what interesting details from

9    this scuttlebutt.

10   Q.    It doesn't say "scuttlebutt", does it, sir?

11   A.    Oh, no, it says "Rumor has it".  Danny Golden -- I caught

12   him in the hall and he was talking -- point number 5 is

13   reference to Danny Golden.  I mean, I look at that --

14   Q.    Yeah, but --

15   A.    I can't understand this transaction; maybe you can.

16   Q.    Sir --

17   A.    I don't know how it went from 4 billion to 1.9 billion.  I

18   never knew about the 4 billion, so it was irrelevant to me.

19   Q.    Sir, in point 5 when you're talking about Daniel Golden --

20   A.    Yeah.

21   Q.    -- that -- where do you see the word "rumor"?

22   A.    No, it's a comment Danny Golden says this is a flawed sale

23   process.  I mean, that's interesting, but that wasn't really

24   relevant to me.

25   Q.    Well, I will come to that.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 96 -

1    A.    Yeah.

2    Q.    But before I get to that -- which is point 5, as you

3    note -- I'm talking about point 3, the price reduction

4    rationale.  And there it talks about the current deal having a

5    net value to Barclays of 1.9 billion dollars, an earlier deal

6    having a net value to Barclays of 4 billion dollars.  You've

7    recognized, obviously, that that's not consistent with your

8    idea that this is going to be a wash.  And all I'm asking now

9    is, when you read this, as you say you did, at the time, did

10   that cause you to ask anybody why there would be these net

11   values to Barclays in the billions of dollars if you were being

12   told by somebody that the deal's supposed to be a wash?

13   A.    It was very simply --

14   Q.    Did it -- first, let me ask you to begin with "yes", "no"

15   or "I don't remember."  And then if you need to explain it, you

16   can explain it.

17   A.    Okay.  Ask your question again, please.

18   Q.    Sure.  You have recognized, obviously, that the net value

19   to Barclays in the billions of dollars is not consistent with

20   your idea that this was going to be a wash.  And what I'm

21   asking you now is, when you read this, as you say you did, in

22   September of 2008, did that cause you to ask anybody why there

23   would be these net values to Barclays in the billions of

24   dollars if the deal was supposed to be a wash?

25   A.    Yes.

- 97 -

1    Q.    Okay.  And who did you ask that of?

2    A.    Fogarty.

3    Q.    And when did you ask that of Fogarty?

4    A.    I asked that of Fogarty probably after this e-mail.

5    Q.    Shortly after this e-mail?

6    A.    Yeah.

7    Q.    And what did Mr. Fogarty tell you?

8    A.    I just -- he told me he was confused as well.  The numbers

9    are moving all over the place.

10   Q.    And that's the only explanation he gave you?

11   A.    That was all -- keep in mind, and I --

12   Q.    No, I'm just asking you, was that the only explanation he

13   gave you?

14   A.    Best of my recollection.  He was confused.

15   Q.    He was confused.  You said --

16   A.    As confused as me.

17   Q.    As confused as you.  And after he told you that he was

18   confused like you were confused, did you ask him to do anything

19   to try to clear up that confusion?

20   A.    I don't recall.

21   Q.    Okay.  Now let me come to your point number 5 about Danny

22   Golden.  And this quotes Daniel Golden of Akin Gump, who

23   represents clients holding about nine billion dollars in bonds,

24   as saying, quote, "We believe this was a flawed sales process.

25   It benefits Barclays and the federal government, but not the

- 98 -

1    creditors of this estate," close quote.  Do you see that?

2    A.   Yes.

3    Q.   Now, first of all, you know Mr. Golden, correct?

4    A.   Yes.

5    Q.   And when you read that this was his view on September

6    20th, 2008, did that cause you to take any action?

7    A.   No.

8    Q.   Okay.  Now, Mr. Fogarty makes a comment about Mr. Golden's

9    assertion, correct?  He says "Well said," correct?

10   A.   Yes.

11   Q.   And you understood that to be Mr. Fogarty endorsing what

12   Mr. Golden was saying, correct?

13   A.   That would be my inference, yes.

14   Q.   And did you ask Mr. Fogarty why he was agreeing with Mr.

15   Golden's assertion that this was a flawed sales process that

16   benefited Barclays and the federal government but not the

17   creditors of this estate?

18   A.   No.  It was irrelevant.

19        (Pause)

20   Q.   Let me ask you to look at tab 46, and this is Barclays'

21   Exhibit 430.  And I apologize for taking this a little bit out

22   of order.  But this relates to the e-mail chain that we looked

23   at before that began on September 26th with Mr. Fogarty's

24   e-mail that said the APA schedules do exist, and you asked him

25   to have his team be the failsafe for both the Barclays and the

- 99 -

1    Bain transaction, and then they set up a walkthrough.  You

2    recall those e-mails generally?

3    A.   Yes.

4    Q.   Now, this is an e-mail on Monday, September 29, 2008 at

5    4:16 p.m. Greenwich Mean Time, correct?

6    A.   Correct.

7    Q.   And this is an e-mail from Mr. Fogarty to a number of

8    people at Alvarez & Marsal, with a copy to you and others,

9    correct?

10   A.   Correct.

11   Q.   And the e-mail says it's attaching the final Schedule B.

12   Do you see that?

13   A.   Yes.

14   Q.   And the body of the e-mail says, from Mr. Fogarty, "I

15   believe this is the final securities collateral file we

16   discussed.  Securities to move on Monday.  Looks like another

17   300 million dollars.  This is on top of the 2.3 billion in

18   prior files, for a total of 2.6 billion, in addition to the

19   unwind of a 44 billion repo with Barclays.  Note, for security

20   control, there's another 14 million yet to move."  And then Mr.

21   Fogarty says, "This information should now allow us to roll

22   forward securities inventory and ensure we have what we're

23   supposed to have.  We will still have walkthrough tomorrow on

24   this deal and details."  Do you see that?

25   A.   Yes.

- 100 -

1    Q.    And did you receive this e-mail and its attachment on or

2    about September 29, 2008?

3    A.    Don't recall, but I believe so.

4          MR. BOIES:  I'm now going to ask some questions that I

5    alert counsel may or may not involve a claim of privilege.

6    Q.    And so I would ask you to listen to the question, but give

7    counsel an opportunity to inject himself if he wishes to.

8          Did there come a time -- and this is just a yes-or-no

9    question -- did there come a time when you reached a conclusion

10   as to approximately what the value was of the market-value

11   assets that were transferred to Barclays in connection with the

12   sales transaction?

13   A.    Yes.

14   Q.    When was the first such time?

15   A.    Mid-summer, late summer, 2009.

16   Q.    And what was the amount of that estimate?

17         MR. GAFFEY:  Objection, Your Honor, to the -- I have

18   no objection to the question, unless it calls for

19   communications from counsel or for the revelation of privileged

20   work product.  That's outside the time period for which we

21   point to.

22         THE COURT:  If you can answer the question with those

23   limits, you can answer the question.

24   A.    I do not recall -- I don't recall the numbers right now

25   but, I mean, by the -- we had the forensic team reconstruct the

- 101 -

1   market value by the middle of the summer 2009, and the

2   valuation estimates they had were different than the valuation

3   estimates Barclays had.

4   Q.   Now, it is important to you as the chief executive officer

5   of LBHI, you thought, to know what the value was that was

6   transferred to Barclays, correct?

7   A.   Yes.

8   Q.   And the first time that you received such an estimate was

9   in the summer of 2009, correct?

10  A.   Valuation of the securities?  Is that what you asked?

11  Q.   Well, let me just be sure where the question and the

12  answer are meeting.  You have said that, in determining whether

13  or not the Barclays sales transaction was a wash or a push, you

14  would add up the estimated values of the market-valued assets

15  and the market-valued liabilities and compare them, correct?

16  A.   With the actual liabilities, yes.

17  Q.   Yes.  And you would do that as of the time the transaction

18  closed, correct?

19  A.   Yes.

20  Q.   And there would be some assets that Barclays was acquiring

21  that would be excluded from this because there was not a market

22  value attached to them, correct?

23  A.   No.  You would expect to value all the assets, but the

24  illiquid assets would be much more difficult to value than the

25  market -- than the liquid assets, yes.

- 102 -

1    Q.   Well, let me go back.  You recall a number of times

2    talking about how the transaction was supposed to be a wash

3    with respect to the assets that had a market value?

4    A.   Correct.

5    Q.   Are you now saying that it should be a wash with respect

6    to assets -- all the assets, including those that did not have

7    a market value?

8    A.   Well, let me clarify.  I wasn't speaking to the software,

9    the value of soft assets.  What I was talking about is you have

10   a market value of the securities, which were clearly

11   government -- were clearly easy to value, but then you had

12   structured notes and you had certain illiquid securities, which

13   Barclays had, which made it difficult to value but which had to

14   be valued as part of the package of securities that they

15   received.  I wasn't speaking to the -- I wasn't speaking to the

16   software, the value of the label, et cetera.  I wasn't speaking

17   to those assets.

18   Q.   Okay.  To the extent that Barclays booked a gain as a

19   result of purchase accounting, you don't have any problem with

20   that, correct?

21   A.   No.  No.

22   Q.   And to the extent that Barclays booked a gain because it

23   got intangible assets, like software, the going-concern value,

24   anything like that, you don't have a problem with that either,

25   correct?

LEHMAN BROTHERS HOLDINGS INC., et al.

- 103 -

1    A.   Correct.

2    Q.   Okay.  Now let me go back to the tab 46, Exhibit 430.  Was

3    it your understanding as of September 29th, 2008 that you had

4    available to you the information necessary to do what is said

5    by Mr. Fogarty is going to be done here in this e-mail?

6    A.   If Jim believes it can be done, I believe in Jim.  That's

7    what he says in the second paragraph.

8    Q.   Okay.  Now, in fact, the valuation or an estimated value

9    of the assets, the hard assets, if I can call them that, or

10   trading assets, that were transferred to Barclays, you didn't

11   get an estimated value of those until the summer of 2009,

12   correct?

13   A.   I don't know if it was those assets, but the whole asset

14   picture, the whole liquid and illiquid trading assets, or

15   securities if you will --

16   Q.   Okay.

17   A.   -- not until that time, that's right.

18   Q.   Okay.  I'll use whatever word you want:  hard assets,

19   trading assets, securities --

20   A.   With government assets, for example, you could -- you

21   would be able to value the governments (sic) very early on in

22   the process.  It would be more the illiquid assets that would

23   take significant amount of time.

24   Q.   Okay.  But trading assets including both the securities

25   that are easy to value and the ones that are harder to value,

- 104 -

1   correct?

2   A.   If you want to define it that way.  A trading asset would

3   not have -- you wouldn't have illiquid assets in a trading

4   book.  They were given as part of the transaction in order to

5   make the purchase occur but, you know, there were transactions

6   in their New York giant derivatives that were thrown in.

7   There's no trading value -- there was no -- that's not a

8   trading asset, traditionally.

9        Governments would have been a trading asset.  Common

10   stocks would have been trading assets.  This portfolio

11   consisted of a combination of trading assets and illiquid

12   assets that had value but illiquid assets.

13   Q.   As you understood it at the end of September or early

14   October 2008, what assets of Barclays, other than intangibles,

15   had not been valued for purposes of determining whether or not

16   there was a wash?

17   A.   Well, no, Barclays had valued all of the assets.  The

18   question wasn't whether Barclays valued it.  The question was

19   whether we value it and do we concur with their valuations.

20   That was completed in the summer of 2009.

21   Q.   But did you understand that, at the time that the sales

22   transaction was done in September of 2008, that not just

23   Barclays did a valuation of the assets but Lehman did a

24   valuation of the assets?

25   A.   Exactly, and that's why it was accepted.  We did not -- we

- 105 -

1    did not believe there was a problem with the Lehman valuation,

2    until we got into the due diligence and to the discovery of

3    April and May of 2009.  Exactly.  That was why we had no reason

4    to believe there was a problem with this transaction.

5    Q.   Well, when you say "no reason to believe", Mr. Fogarty had

6    written to you, saying that there was going to be a net value

7    to Barclays of 1.9 billion dollars up to 4 billion dollars,

8    correct, that you said you were confused about?

9    A.   Maybe you can decipher that; I can't.  I don't -- I'm

10   still confused as to what we actually paid for this

11   transaction.

12   Q.   And you were confused back then, correct, sir?

13   A.   Very confused.

14   Q.   And you told Mr. Fogarty that --

15   A.   Yes.

16   Q.   -- right?  And he told you he was confused too?

17   A.   Yes.

18   Q.   But neither one of you cleared up the confusion then, did

19   you?

20   A.   We didn't have the financial information because it was

21   not available, sir.

22   Q.   Well, did either of you go to Weil Gotshal and say, We're

23   confused, you're telling us there's a 1.9 billion dollar to 4

24   billion dollar net value to Barclays and that somebody's

25   telling us it's a wash?  Did you do that in September 2008?

- 106 -

1   A.   I don't think Weil Gotshal would have been the right party

2   to go --

3   Q.   Did you do it, sir?

4   A.   I don't believe we did it, no.

5   Q.   Okay.

6   A.   Well, Weil Gotshal wouldn't be where you would go, sir.

7   Q.   Well, Weil Gotshal was --

8   A.   You would go to Lehman, and the Lehman people were now

9   employed by Barclays.  That's who you would go to.  You

10  wouldn't -- Weil Gotshal didn't value the collateral.

11  Q.   Weil Gotshal --

12  A.   Lehman --

13  Q.   -- was negotiating on behalf of Lehman, for sale.

14  A.   No, sir, they were constructing the agreement.

15  Q.   Constructing the agreement?

16  A.   Yes, sir.

17  Q.   They were the lawyers, right?

18  A.   Yes, sir.

19  Q.   And was it your understanding that they were involved in

20  negotiating the terms of the agreement at all?

21  A.   I would hope so, yeah.

22  Q.   Yes.  Yes.  Now, in the summer of 2009, what was the best

23  estimate that you, as the chief executive officer of Lehman

24  Brothers Holdings Inc., had as to the value of the assets that

25  were transferred to Barclays as part of this transaction?

- 107 -

1    A.   I'd be --

2         MR. GAFFEY:  Objection, Your Honor, again, to the

3    extent it calls for a conclusion reached as part of privileged

4    work product or communications with counsel.

5         THE COURT:  I think it's asking for his estimate in

6    his capacity as the chief executive officer of Lehman Brothers.

7    And to the extent that he can estimate without regard to work

8    product, that's a permissible question.  To the extent he

9    can't, he'll have to confess his inability to do that.

10   A.   The -- I'll give you a -- I can give you a range of value.

11   Q.   Okay.

12   A.   I don't recall, but by the middle of 2009, we had

13   determined that the accrued liabilities, the severance and the

14   bonuses actually paid, were far, far less than what -- than the

15   4.2 billion dollars that had been estimated.  We also concluded

16   that the market value of the securities were significantly --

17   by an excess of five billion dollars, was -- that had been

18   provided to Barclays, as part of the transaction, they had been

19   improperly valued.  That combination of activity would cause

20   you to believe this transaction was anywhere from eight to

21   eleven billion dollars.  Eight to eleven billion dollars in

22   value was lost by the Lehman estate, in excess of the original

23   understanding.

24   Q.   And when you say the value of the assets that Barclays got

25   was in excess of five billion dollars more than they were

- 108 -

1    supposed to get -- did I understand you right?

2    A.    Yes, sir.

3    Q.    -- when you included in that asset calculation, how much

4    did you include for the 15c3 assets?

5    A.    I don't recall the exact numbers.

6    Q.    Approximately.

7    A.    I don't recall the exact numbers.

8    Q.    Within a hundred million dollars.

9    A.    I wouldn't -- you would assume that it was a hundred

10    million-- it's a big number --

11    Q.    Right.

12    A.    -- except for Lehman.  It's not for Lehman.

13    Q.    Okay, let's say within a half a billion dollars.

14    A.    I -- you know, I would have to -- the -- I don't have the

15    specifics, but we -- I can certainly get them for you.

16    Q.    Well, how about the unencumbered box -- that you've now

17    had explained to you what it means, correct?

18    A.    Yes.

19    Q.    And in this estimate of the value that Barclays got that

20    you say was five billion dollars or more above what it was

21    supposed to get, how much did you attribute there to the value

22    of the unencumbered box assets?

23    A.    Same answer.  I mean, there's a schedule which we have

24    prepared which takes the value that Barclays put on all the

25    various assets, versus what we think the value should have been

- 109 -

1  on those same assets.  I mean, the breakdown of it is -- I

2  mean, I don't have the breakdown of it, but we have the

3  breakdown.  I don't have it in my head what the numbers would

4  relate to.

5  Q.   And is this something that you saw in the summer of 2009?

6  A.   Yes.  Yes.

7  Q.   In your capacity as chief executive officer of --

8  A.   Yes.

9  Q.   LBHI?

10 A.   Yes.

11 Q.   And is this something that has, to your knowledge, been

12 withheld from us on privilege grounds?

13 A.   Not to my knowledge.  I don't know if it was requested.

14 But this is an analysis that has been prepared for this

15 litigation.

16 Q.   Well, I'll take that up with your counsel maybe at the

17 break.  But let me just ask you while I've got you right now,

18 can you tell me within a billion dollars how much was

19 attributed to the unencumbered box?

20 A.   I do not know how much was attributed to the -- it could

21 be -- it would be a guess, stab.

22      MR. BOIES:  Your Honor, I have no more questions at

23 this time.  I would request that schedule, because I don't

24 think we've gotten that schedule.  And I would either like to

25 have them produce the schedule, or at least just give us the

- 110 -

 1      Bates number of what schedule he's referring to.

 2              THE COURT:  Rather than my responding to that request,

 3      I'm going to give you and counsel for the movants an

 4      opportunity to confer so we at least understand what we're

 5      talking about.  I have no idea whether or not this is a

 6      document that's included in the mass of production that you

 7      already have, or precisely what the witness is adverting in his

 8      testimony.  So I'm not going to direct anything without knowing

 9      a little bit more about this.

10              And with the exception of any issues that relate to

11      this document, you've concluded your cross-examination, is that

12      correct?

13              MR. BOIES:  I have, Your Honor.

14              THE COURT:  All right.  Let me just -- it's our

15      traditional time to take a lunch break.  Let me just ask if

16      there's going to be redirect.

17              MR. GAFFEY:  No, Your Honor, not from the debtor.

18              UNIDENTIFIED SPEAKER:  No, Your Honor.

19              THE COURT:  Mr. Marsal, the good news is you don't

20      have to come back after lunch.  I suppose the bad news is there

21      may be a follow-up if there's some issue with respect to the

22      document.  But, even then, I think it's more about document

23      production questioning.  So you're excused.

24              THE WITNESS:  Thank you.

25              THE COURT:  And thank you for your time.

- 111 -

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  We're all adjourned until 2 o'clock.

 3         (Recess from 12:29 p.m. until 2:03 p.m.)

 4              THE COURT:  Be seated, please.

 5              MR. GAFFEY:  Your Honor, the movants call Robert

 6    Diamond.  And I've taken the liberty of handing out the witness

 7    books ahead of time.

 8              THE COURT:  Thank you.  I have mine.

 9              Good afternoon, Mr. Diamond.  Please raise your right

10    hand.

11         (Witness duly sworn)

12              THE COURT:  Be seated, please.

13    DIRECT EXAMINATION

14    BY MR. GAFFEY:

15    Q.   Good afternoon, Mr. Diamond.

16    A.   Good afternoon.

17    Q.   As you know, sir, I'm Bob Gaffey.  I'm from Jones Day.  I

18    represent the debtor.  I'm going to ask you please, sir, to

19    keep your voice up.  And if you can, pull the microphone closer

20    to you so that everyone in the courtroom can hear.

21         How are you employed, Mr. Diamond?

22    A.   President of Barclays Group.

23    Q.   And how long have you been the president of Barclays

24    Group?

25    A.   I joined Barclays in 1996.  I've been president for --
```

- 112 -

1    ooh, I think that was in '04.  I was promoted to president.

2    Q.   And have you held that title continuously since that time?

3    A.   Yes.

4    Q.   You were president of Barclays Group at the time of the

5    transaction that's brought us here, in September of 2008?

6    A.   Yes.

7    Q.   And are you also a member of Barclays' executive

8    committee?

9    A.   I am.

10   Q.   And were you a member of the executive committee in

11   September of 2008?

12   A.   Yes, I was.

13   Q.   Okay, do you hold a seat on any Barclays boards?

14   A.   The main board.

15   Q.   The main board.  And did you hold a seat on Barclays'

16   board in September of 2008?

17   A.   Yes.

18   Q.   Now, as you know, sir, what's brought us here is the

19   transaction between Lehman and Barclays that was presented to

20   this Court in September of 2008. I'd ask you first to focus on

21   a time period somewhat before that; that's the summer of 2008.

22   And during the summer of 2008, there were some discussions

23   within Barclays, were there not, concerning the possibility,

24   the potential, for some sort of transaction involving Lehman,

25   is that correct?

- 113 -

1    A.    Yes.  More broadly, there had been discussions, I would

2    say since August or September of 2007, that the situation in

3    the financial markets could create an opportunity for us to

4    grow our business.

5    Q.    It was generally the view -- not generally the view, but

6    the topic of conversation was that the credit crunch could in

7    one form or another present an opportunity for Barclays to make

8    some sort of strategic investment?

9    A.    Yeah, but I would give the caveat that Barclays, like many

10   others, were impacted, and we also needed to manage very, very

11   carefully our exposures to the market, our capital position to

12   the market.  But I think it was a credit to our board that we

13   were also willing to kind of step back from that and say, as we

14   manage through this crisis -- and clearly we didn't know how

15   big the crisis would be at the time, but we knew it was going

16   to be quite a tough time in the financial markets -- that there

17   also could be some good strategic opportunities as well.

18   Q.    And one of the potential strategic opportunities that

19   Barclays was looking at was, potentially, some sort of

20   acquisition or transaction involving Lehman Brothers, correct?

21   A.    Yeah, but let me give you a little bit of context.

22   Q.    That's okay, sir.  "Yes" or "no" is fine.  Is the answer

23   "correct"?

24   A.    Not exactly, so that's why I thought it best if I explain.

25   Q.    Well, generally the rule we follow, sir, is that you can

- 114 -

1  answer "yes", "no", and if you need to give me an explanation,

2  I'll let you explain.  So is the answer yes that one of the

3  potential topics of conversation for a strategic opportunity

4  was Lehman?

5  A.   Yes, and I would like to explain.

6  Q.   By all means.

7  A.   Thank you.  We had had discussions with one other

8  financial institution that were going on at the time.  I had a

9  call from the U.S. Treasury, Bob Steel, post-Bear Stearns,

10  asking, if there was a -- you know, if there was a situation

11  where Lehman were available at a distressed price, is that

12  something that we would want to be considered for -- or not --

13  "considered for" is a strange turn of phrase, I apologize --

14  would we want to be called in that situation.

15  Q.   It was a -- it was more or less a "what if" conversation

16  at that point with Mr. Steel, correct?

17  A.   That's a good way to say it.

18  Q.   All right, and Mr. Steel was the deputy undersecretary of

19  the Treasury at the time?

20  A.   He's undersecretary.  One of the two undersecretaries,

21  yes.

22  Q.   And in the conversation that you had with Mr. Steel, you

23  didn't talk about dollars and cents, but you did say to him you

24  don't want to be interested in such a transaction if it were at

25  a distressed price, correct?

- 115 -

1  A.   At that point when he first called, I didn't give him any

2  inclination until I had discussions with the executive team and

3  the board.

4  Q.   And one member of the executive team that you spoke to was

5  Mr. Varley, correct?

6  A.   I was referring to the BarCap executive team, actually.

7  Q.   Did you have a conversation with Mr. Varley about your

8  conversation with Mr. Steel?

9  A.   Yes.

10  Q.   And in that conversation with Mr. Varley, when you

11  discussed it you both agreed you'd consider a potential

12  transaction with Lehman if it happened at a distressed price as

13  opposed to a premium or a book-value price, is that right?

14  A.   No, not exactly.  This is a hard question to answer, so

15  can I take a second, because I don't want to mislead at all.

16  The way you asked it is confusing, so --

17  Q.   Well, let me rephrase the question so that we're not

18  confusing each other, sir.  Did you -- in your discussion with

19  Mr. Varley, did you say you would -- that Barclays should

20  consider it if in fact it happened at a distressed price as

21  opposed to a premium or a book-value price?  Answer --

22  A.   No.

23  Q.   -- "yes", "no", and I'll let you explain.

24  A.   Thank you very much.  No.  What we did discuss is a market

25  concept, and this is very, very important for, I think, the

LEHMAN BROTHERS HOLDINGS INC., et al.

- 116 -

1    Court to understand.  If -- it's not a question of book value,

2    because Lehman Brothers could be worth a book value of a

3    hundred or a book value of ten depending on the state of the

4    financial markets, how people are looking at banks.  And so

5    that had -- whether it was book value or not book value wasn't

6    the discussion.  The discussion was very much about the state

7    of the financial markets.  And as you recall, Bear Stearns had

8    been rescued, by a combination of the U.S. government and

9    JPMorgan, at a price that was very low relative to the kinds of

10   prices institutions like that traded in in the market.

11       And so what we were explaining -- what we discussed at our

12   executive team and at the board is distressed in a market

13   sense, because what's funny is -- not -- "funny" is the wrong

14   word.  What needs to be factored is that the book value will go

15   up and down to some extent with the distress of the markets,

16   and to some extent it would not.  So the distress was very much

17   in the context of the absolute value of the organization, in

18   terms of what the market would pay.

19   Q.   And you distinguish in these conversations a distressed

20   price as opposed to a book or premium price, is that correct,

21   sir?

22   A.   No, I think I said no.

23   Q.   Okay.  Take a look in the book before you; there's a copy

24   of your deposition transcript.  It should be toward the back of

25   the book.  Let me know when you've found the transcript itself.

- 117 -

1    And I'll ask you to turn to page 13.

2    A.    (Pause).  Okay.

3    Q.    And if you'd take a look, sir, at the question and answer

4    that actually start on page 12 -- it's quite a long answer, but

5    the question starts at 12, line 16 -- and read through to the

6    bottom of page 13.  But the portion that I want to ask you

7    about is at the bottom of page 13 where you say, quote, "I

8    think the new information that was coming in the wake of Bear

9    Stearns -- or actually through Bear Stearns and in the wake of

10   Bear Stearns is, if in fact it happens at a distressed price as

11   opposed to a premium or a book-value price, does that change

12   the opportunity?"

13   A.    Again, it comes right back to what I was saying.  The

14   markets were in distress, and the Bear Stearns price -- I'm

15   trying to use an example of this -- of whether it was at three

16   dollars or ten dollars or sixty dollars or fifty dollars, it

17   could have been at book value all that time.  So book value at

18   sixty dollars would be different than book value at three

19   dollars, if you're following me, because it was a lower price.

20   What was important to us was the price in the context of the

21   turmoil in the financial markets.

22   Q.    And in the context of the turmoil in the financial

23   markets, it was always a given, at least amongst you and Mr.

24   Varley, that if Barclays was going to do a deal with anybody,

25   it would be at a distressed price as opposed to a book-value or

- 118 -

1   premium price, is that right?  Was it -- it was always a given,

2   wasn't it?

3   A.   We always felt -- well, actually, I should back up a

4   little bit.  We --

5   Q.   Could I have a "yes" or "no", sir?

6   A.   We never felt there would be --

7   Q.   Could I have a "yes" or "no", please, sir?  Was it always

8   a given --

9   A.   It's not the same.

10  Q.   -- it was at a distressed price as opposed to a book or

11  premium price?

12  A.   If what you're saying -- it's just hard to answer it the

13  way you're asking it.  So can I take a crack at it?

14  Q.   Well, let me -- let's take a crack from your deposition,

15  sir.

16  A.   Okay.

17  Q.   Go to page 17.

18  A.   Yeah.

19  Q.   Go to line 16 where I ask you, quote, "How big a focus was

20  it for your and Mr. Varley that if you were going to do a deal

21  with anybody it would be at a distressed price as opposed to a

22  book-value or a premium price?"  And your answer begins, "I

23  think it was always a given," and then you go on to explain.

24      So my question is, was it always a given when you were

25  talking to Mr. Varley that if you were going to do a deal, it

- 119 -

1    would be at a distressed as opposed to a book or premium value

2    price, as you said at your deposition?

3    A.    There's a couple of aspects that come into this, and you

4    need to take -- you know, to walk through them.

5    Q.    Could you walk through by beginning with a "yes" or "no"

6    to the question that I asked you?  Is it always a given, as you

7    said at your deposition, that it would be at a distressed price

8    as opposed to a book-value or a premium price?  Yes or no?

9    A.    The question is what you mean by "premium" in this case.

10   What was important as we did this transaction, the single most

11   important thing, was to do the right value of the deal that

12   would be capital-accretive.

13   Q.    And in your discussions with Mr. Varley about even the

14   potentiality for a deal, that you were having in the summer of

15   2008, you had rejected the notion of a deal at book value?  For

16   whatever reason, you had rejected the notion of a deal at book

17   value, is that right?

18   A.    Well, not necessarily, because the book value was one

19   dollar because of the state of the financial markets.  The

20   notion of a discount or a buffer was primarily driven by a

21   couple of factors; one was, which would be implied in book

22   value -- one of those would be are the value -- are the assets

23   valued correctly.  And we were in a period of incredible

24   turmoil in the financial markets.  So one of the issues we had

25   is, is it possible to determine book value in any time, which

LEHMAN BROTHERS HOLDINGS INC., et al.

- 120 -

1   is why we went through the due diligence that we went through.

2       The second thing that was important is to ensure that, in

3   a market with that kind of turmoil, we're putting the right

4   value on the assets.

5       And the third thing that was important, and it was very

6   important in this environment -- if you recall, we had said to

7   our regulators and we had said to our board that we would

8   recommend a deal, or we would plan to recommend a deal -- one

9   of the things we had to feel very competent about is that the

10  deal would be capital-accretive.  And the reason for that, if

11  you recall, is, within a couple of weeks of the transaction

12  that we did with Lehman Brothers, the Royal Bank of Scotland

13  and Lloyds Bank in the U.K. both were insolvent and both were

14  acquired by the government.

15  Q.   I -- we're going to talk about capital-accretive, sir, and

16  I know that's a topic you want to get to.  My question, though

17  is, in your discussions in the summer of 2008 with Mr. Varley,

18  you were making a distinction between a distressed price and

19  book value?  Book value would not be automatic for you, is that

20  right?

21  A.   I'm trying to recall, sir -- and I'm not trying to be

22  obstinate -- if anyone even established a book value for the

23  portion of Lehman we acquired at the time.  But our condition

24  had nothing to do -- we were trying to value the business as

25  best we could value the business.

- 121 -

1    Q.   Do you know if the deal that you did was described to the

2    Court as a book value?

3    A.   I don't.  You mean -- I'm not sure what you mean.

4    Q.   Do you know if --

5    A.   Well, the part of the presentation to the Court?

6    Q.   Yes.

7    A.   The presentation to the Court was made by the Lehman

8    advisors.  And as far as I know, you know, all of the -- you

9    know, all of the appropriate presentations were made.  I don't

10   have any recollection one way or the other of that

11   specifically, no.

12   Q.   You -- do you -- you have no recollection one way or the

13   other if the term "book value" was used in any means of

14   description of the transaction to the Court?

15   A.   Well, we didn't make the presentation, and I wasn't --

16   Q.   But you signed the asset purchase agreement --

17   A.   -- I wasn't --

18   Q.   -- did you not, sir?

19   A.   -- I wasn't present at the -- but my understanding is that

20   everything was disclosed as is appropriate.

21   Q.   Do you know if the deal was described to the Court in part

22   as measured by book value with the securities that Barclays

23   purchased?

24   A.   No.  I think what we --

25   Q.   "Yes" or "no" will do it, sir.  No, you don't know?

- 122 -

1    A.    Well, can I tell you what I do know?  It was described --

2    Q.    If you can tell me whether you did know or not, I'll move

3    on to another question.  Did you or did you not know?

4    A.    I don't have a memory of whether that phrase was used.

5    Q.    Okay, did you review the asset purchase agreement at the

6    time it was submitted to the Court?

7    A.    I was not the one that had that review, no.

8    Q.    Now, after your conversation with Mr. Steel and your

9    discussions with Mr. Varley, some time passed.  And come

10   September of 2008, an opportunity arises to have discussions

11   with Lehman about a potential transaction, is that correct?

12   A.    I'm sorry, did you --

13   Q.    Let me ask a simpler question.  You actually started

14   having conversations with Lehman representatives in September

15   of 2008 about an acquisition, correct?

16   A.    I'm pretty sure it was September, yeah.  It was very close

17   to when the deal happened.

18   Q.    It was shortly before what we refer to as Bankruptcy

19   Weekend, is that right?

20   A.    Yeah, it may have been that weekend.

21   Q.    It was on our about September 12th --

22   A.    Yeah.

23   Q.    -- the Thursday before that weekend?

24   A.    My recollection is it was the Friday of that weekend.

25   Q.    And on the Thursday or Friday of that weekend, you spoke

- 123 -

1    to Mr. Fuld, is that right?

2    A.    I think it was Friday, yeah.

3    Q.    And when you spoke to Mr. Fuld, you told him you had an

4    interest if this is a rescue situation, meaning it's a very,

5    very distressed price, is that correct?

6    A.    That's correct.

7    Q.    And you also had conversations in or around that time with

8    then-president of the New York Fed, Mr. Geithner, correct?

9    A.    I'm sure I did.

10    Q.    And in your conversations with Mr. Geithner, you said to

11    him the only way this would work for Barclays is if it -- if it

12    works at all, is at a distressed price, is that correct?

13    A.    That's correct.

14    Q.    Now, when you were talking to Mr. Fuld at the time in

15    those first conversations on the Thursday or the Friday, you

16    told him there's no deal at a market price, correct?

17    A.    I can't imagine I would have said that, because we were

18    looking to do, in essence, in the conte -- a price in the

19    context of the market.  And there's a complete difference

20    between saying a distressed price and saying it's not going to

21    be at the market.  The market was in distress.

22    Q.    But, sir --

23    A.    What we were saying, and I think this is really important,

24    when I had the conversations with Secretary Paulson, and --

25    Q.    I was actually asking about conversations with Mr. Fuld,

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 124 of 273

- 124 -

1    so --

2    A.    -- and with New York (sic) president Geithner, which you

3    just asked about, the context -- it could be above book value,

4    below book value.  It wasn't a context --

5    Q.    Sir, my question goes to your conversation with Mr. Fuld.

6    A.    I thought you just asked me about New York president

7    Geithner.

8    Q.    No.  I then asked you, when you spoke to Mr. Fuld in these

9    early negotiations on the Thursday or the Friday, did you tell

10   him, albeit in the most polite way possible, that there's no

11   deal at a market price, the current market price, because of

12   the risk and because of the overlap?  Did you say that to Mr.

13   Fuld?

14   A.    What was the current market price that day?

15   Q.    Did you say to Mr. Fuld that there would not be a deal at

16   a market price, the current market price, because of the risk

17   and because of the overlap?  Yes or no?

18   A.    The -- I can tell you the conversation I had with him that

19   day.  I can't pick out words, so it's going to take a second.

20   But we were very, very clear:  distressed.

21        The market was in freefall.  Lehman was in distress on

22   that day.  I think what he was referring to was -- he asked me

23   why we weren't prepared to do a deal much earlier in the year,

24   and that's where the context of overlap came in, sir.  It had

25   nothing to do with the conversation that day -- or the

LEHMAN BROTHERS HOLDINGS INC., et al.

- 125 -

1    transaction that day.

2    Q.   Would you take a look at your deposition at page 26, sir?

3    Actually, go to the line at the bottom of page 25.  And again

4    I'll give you a chance, if you want it, to read the whole

5    question and answer.  But it's a very long answer, sir, so what

6    I want to ask you about is this statement from your deposition,

7    quote:  "What I explained to him is that Lehman was an

8    incredibly great firm, that we were really proud of what he had

9    built, but that it was impossible for me to imagine how we

10   would overcome the overlap and the risk associated with doing a

11   deal at a market price.  And, in essence, the overlap and the

12   risk was too great to even contemplate.  And knowing, I guess,

13   from the market that Lehman was at least considering something,

14   it was very important to me to be very clear with him and not

15   lead him on.  And, in essence, it was a way for me to say in

16   the most polite way possible that there's no deal at a market

17   price, the current market price, because of the risk and

18   because of the overlap."

19        Did you say that to Mr. Fuld as you told me at your

20   deposition you said it to Mr. Fuld?

21   A.   The --

22   Q.   Yes or no, sir?

23   A.   I don't want to be obstinate, so I'm going to say yes if

24   you mean that I was referring to the conversations that he was

25   asking why didn't we have a conversation.  He had called me two

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 126 of 273

- 126 -

1   or three times much earlier in the year to ask if we had an

2   interest in doing a deal.

3   Q.   And whatever caused you to say it, sir --

4   A.   And we only had an interest in doing a deal at a very

5   distressed price.  But by the time I was talking to Mr. Fuld on

6   Friday, it was at a very distressed price.  We were there to do

7   a deal.

8   Q.   And whatever caused you to say it, sir, you said to Mr.

9   Fuld, in essence, "It was a way for me to say in the most

10  polite way possible that there's no deal at a market price, the

11  current market price, because of the risk and because of the

12  overlap"?

13  A.   Yeah, I'm pretty sure what I was referring to there were

14  the earlier discussions.  But certainly if I had said that that

15  day --

16  Q.   The day of your deposition?

17  A.   -- then the market price was a distressed price.  I

18  apologize, sir, if I'm confusing you, but it's very, very

19  difficult what you're trying to do.

20  Q.   I'm not at all confused, sir.  What I'm trying to get is

21  an answer to my question of whether you said that to Mr. Fuld

22  when you spoke to him on the Thursday or Friday before the

23  Lehman Bankruptcy Weekend.  It's a simple question, sir.  Did

24  you say it --

25  A.   The answer is yes --

- 127 -

1    Q.    -- or did you not?

2    A.    If what you're asking is did I say that in the context to

3    the earlier period in the year, yes.  It was at a distressed

4    price that Friday.  Mr. Fuld had called me three times during

5    the year to see if we wanted to do a deal.

6         I think the part that's -- that shouldn't be confusing

7    is --

8    Q.    There's actually no question from me, sir.

9    A.    -- on that day, on Friday, it was at a distressed --

10   Q.    Sir, I don't have a question pending.

11   A.    Okay.  Sorry.

12   Q.    Just for the context that you want, sir, take a look back

13   at page 24 of your deposition where you're describing your

14   conversations with Mr. Fuld and you say it was after the

15   meeting with Secretary -- after the discussion with Secretary

16   Paulson.  And you say at the bottom of page 24, at line 23,

17   "And so with a number of my colleagues on Thursday, I flew to

18   the United States, and we had another board meeting scheduled

19   for Friday morning, U.K. time."

20        Just as a matter of timing context, sir, does that reflect

21   your recollection as to whether, when you had the conversation,

22   that we're talking about, with Mr. Fuld about no deal being

23   possible at a market price, it wasn't in the summer of 2008; it

24   was just before Bankruptcy Weekend?

25             MR. BOIES:  Your Honor, this is a long answer.  And I

- 128 -

1    would ask that the witness have an opportunity to read page 26,

2    lines 14, 24 that comes in between the two portions of his

3    answer that the examiner has directed his attention to.

4              THE COURT:  What's your reaction to that?

5              MR. GAFFEY:  Your Honor, it's a very long answer.  Let

6    me withdraw the question and try this another way.

7              THE COURT:  Even better.

8              MR. GAFFEY:  Thank you.

9    Q.   Mr. Diamond, what I want you to focus on, please, without

10   regard to your deposition, sir, which I see you're reading --

11   let me put a new question to you.  What I want you to focus on

12   are the conversations or conversation you had with Mr. Fuld

13   just before Bankruptcy Weekend, be it the Thursday or the

14   Friday.  Are we in the same place in time here?

15   A.   It was Bankruptcy Weekend.  It was Friday.

16   Q.   Okay.  And on the Friday before Bankruptcy Weekend, when

17   you spoke to Mr. Fuld, did you tell him in sum or essence

18   Barclays was not willing to do a deal at market price because

19   of the risk?

20   A.   I think I've answered it, but I'm going to try again.

21   Q.   Thank you.

22   A.   The market price was distressed and we were prepared to do

23   a deal at a distressed price.  If somehow those words are out

24   of context, I apologize.  My recollection is he had wanted to

25   know why we wouldn't do a deal at a higher price, and he wanted

- 129 -

1    to know why we hadn't done a deal earlier in the year, and I

2    may have been referring to that.

3    Q.   Okay.

4    A.   And sincere apologies if these words sound confusing,

5    because you keep coming back to the same question.  But I was

6    very, very clear with Mr. Fuld, which is that the firm was in

7    distress, which is why I was there, and that my conversations

8    were with the Fed and the Treasury.

9    Q.   So when at your deposition you told me that you told Mr.

10   Fuld in the most polite way possible there's no deal at a

11   market price, is it your testimony that what you meant to say

12   was unless the market price is a distressed price?

13   A.   Well, yeah, or -- as I said to you, I think I was

14   referring to the earlier conversations in the year.  If I used

15   that phrase in terms of the current price, it was a poor turn

16   of phrase.  But the market price was distressed.  I mean, the

17   facts are the facts.

18   Q.   So it's your testimony that when you told Mr. Fuld in the

19   most polite way possible that there's no deal at a market

20   price, you were referring to historical discussions, not the

21   one you were having at the time?  Is that your testimony, sir?

22   A.   So I'll --

23   Q.   Yes or no, sir.

24   A.   I think this is really important for the Court.

25   Q.   What's important, sir, first is a "yes" or "no" answer.

- 130 -

1   A.   What I said is if I had -- I don't recall all the words I

2   used with Mr. Fuld.  What I can give you is the sense of the

3   meeting.  Is that what you want?

4   Q.   Does the testimony we've been talking about, where in the

5   most polite way possible you said there's no deal at a market

6   price, help refresh your recollection as to the conversation

7   that took place on the Friday before Bankruptcy Weekend?

8   A.   All right, I'm going to have to go back to what you say,

9   because --

10  Q.   Sure.  Take a look at page --

11  A.   -- I thought we were moving off the question.

12  Q.   -- 27, lines 12 to 16.  Question now is, does it refresh

13  your recollection about the content of your --

14  A.   Where are we?

15  Q.   -- conversations with Mr. Fuld?

16  A.   26?

17  Q.   Page 27, lines 12 to 16.

18  A.   (Pause).  Sorry, and the question?

19  Q.   Does it refresh your recollection as to whether part --

20  whether what you were discussing with Mr. Fuld was the deal

21  you'd come to New York to talk about, not reasons the deal

22  hadn't been done in the past?

23  A.   Well, we talked about both those things.

24  Q.   Okay, and when --

25  A.   I think --

- 131 -

1    Q.    -- when you said to Mr. Fuld, in essence, that there would

2    be no deal at a market price, were you referring to the deal

3    you'd come to New York to talk about?

4    A.    I'm sure what I was referring to was the previous price,

5    because the price that day was distressed.

6    Q.    So at your deposition when you described your conversation

7    that you'd flown to New York to have with Mr. Fuld and you said

8    "It was a way for me to say in the most polite way possible

9    that there's no deal at a market price," what -- your testimony

10   is, what you meant by that is there had not in the past been an

11   opportunity to do a deal at a market price, is that right?

12            MR. BOIES:  Objection, Your Honor.

13            THE COURT:  What's the objection?

14            MR. BOIES:  It misstates the testimony of the witness

15   at his deposition.

16            THE COURT:  No, I think it's a permissible question,

17   because there's a disconnect between what the witness is saying

18   now from the stand and what I have read he said in his

19   deposition.  And this is a pointed question seeking to get a

20   clear answer from the witness as to what he really meant.

21   Objection overruled.

22            THE WITNESS:  Judge, if I could say what I meant, I

23   would be pleased to.

24            THE COURT:  Just answer his questions, please.

25            THE WITNESS:  I'm trying very hard to, and I think --

- 132 -

1          THE COURT:  When he asks for a yes or a no, give him a

2     yes or a no.  You're coming across as evasive.

3          THE WITNESS:  I apologize for that.

4     Q.   So the question, sir, is, when you gave this testimony at

5     your deposition, at lines 12 to 16 of page 27 up there on the

6     screen, about there being no deal at a market price, were you

7     talking about the deal you'd come to discuss, or were you

8     talking about deals that had not happened in the past?

9     A.   (Pause).  Well, that's clearly referring to the previous

10    discussions that we had.  I was not -- this is difficult.  I

11    was not prepared to discuss price with Mr. Fuld, or any parts

12    of the deal.  I had discussed with Secretary Geithner and --

13    sorry, Secretary Paulson and New York Fed president Geithner

14    that any discussions on the deal were going to be had with

15    them, and we agreed not to have any discussions.

16         What I was clearly trying to do here is to have a meeting,

17    straight up, with Mr. Fuld.  And I'm pretty sure what I was

18    referring to is why I hadn't been responsive when he had called

19    looking to a deal earlier in the year.  And that's all I can

20    say.  But I was instructed that the negotiations should not be

21    happening with Mr. Fuld.

22    Q.   So you fly to New York on the Thursday the 12th.  Your

23    arrangements to meet with Mr. Fuld were quite complicated,

24    weren't they?  They involved getting in the back of a car and

25    going in the service door and meeting in his office so that you

- 133 -

1    wouldn't be seen by the press, yes?

2    A.    Not really.  That's what he asked me to do.  He asked me

3    to come in his car.  I hoped to meet him at our offices, but he

4    preferred to stay.  Apparently they had quite a few cameras

5    outside.

6    Q.    All right.  And there's no doubt that the reason you had

7    come to New York was to talk to representatives of Lehman about

8    the potential for a transaction now, the time of your trip,

9    yes?

10   A.    I'm really glad you asked that question.

11   Q.    I'd be really glad if the answer --

12   A.    No.

13   Q.    Yes or no:  Did you come to New York to talk about a

14   transaction, with Mr. -- with Lehman then?

15   A.    So I don't think this is material.  No, it wasn't to speak

16   with Mr. Fuld.  My arrangements were with the Treasury --

17   Q.    The question is Lehman representatives, sir.

18   A.    -- of the United States of America, and the New York Fed.

19   And they had asked me to visit with him, but not to negotiate

20   with him.

21   Q.    Okay.  But you didn't come just to reminisce with Mr. Fuld

22   or anyone else about deals of the past; you came to talk about

23   making a deal now if possible, yes?

24   A.    But with the New York Fed and the Treasury.  Those are

25   board discussions, are executive committee discussions.  And my

- 134 -

1   discussions on this transaction were all leading up into the

2   presentation of a deal here at this court, were with the New

3   York Fed and with the U.S. Treasury.

4   Q.   And in addition to the New York Fed and the U.S. Treasury,

5   you met with Mr. Fuld on the thirty-first floor over at Lehman,

6   yes?

7   A.   Yes.

8   Q.   And it was more than a social call, yes?

9   A.   But I would not have referred to it as a social call.  It

10  was very much --

11  Q.   It was a business meeting, yes?

12  A.   -- something that the New York Fed had asked me to do.

13  Q.   It was a business meeting, yes?

14  A.   Yeah.

15  Q.   And in that meeting with Mr. Fuld, again in sum and

16  essence, after the normal platitudes, your message was "We have

17  an interest in this if this is a rescue situation," meaning if

18  this is a very, very distressed price, is that correct?

19  A.   We were only interested in a distressed price.

20  Q.   Now, shortly after this conversation with Mr. Fuld where

21  you told him you're only interested in it at a distressed

22  price, did any form of due diligence begin?

23  A.   The due diligence had begun slowly on Thursday, but very,

24  very slowly, I should say.  So it picked up in earnest on

25  Friday during the day and later into the evening, and Saturday.

- 135 -

1    Q.    Okay.  So, stopping at that point, between the

2    consideration, the discussions internally at Barclays that had

3    taken place over the summer, and some due diligence, you had a

4    good idea of Lehman and its portfolio, correct?

5    A.    From earlier than this?

6    Q.    Yeah.  I mean, when you were talking about it back in the

7    summer, you and the executive committee had spent some time

8    looking at a potential Lehman transaction, correct?

9    A.    Well, only public information.

10    Q.    You had done --

11    A.    So not in a due diligence sense.  It was more structure

12    and --

13    Q.    And you got a chance to do some due diligence on the 12th

14    and the 13th and the 14th of September, correct?

15    A.    12th was the --

16    Q.    Thursday.

17    A.    -- Friday?  Very -- virtually none.  We --

18    Q.    I beg your pardon.  The 12th is the Friday.

19    A.    Okay.  Yeah, 12th is when it really began in earnest, and

20    toward the end of the day.

21    Q.    And this due diligence exercise takes place on the Friday

22    and into the Saturday, correct?

23    A.    Correct.

24    Q.    And the transaction that is under consideration at the

25    time is a potential purchase by Barclays of all of Lehman

- 136 -

1    globally, correct?

2    A.    Not quite, but close.

3    Q.    Okay.  It's more or less everything?  There may be a thing

4    here or a thing there, but --

5    A.    Yeah, I mean, one of the stumbling blocks was we were

6    excluding a lot of the assets that were very difficult to value

7    and that had not been valued appropriately.  We weren't sure

8    which all of those would be.  Commercial real estate, for

9    example, was a part of that.  Illiquid private equity was a

10   part of that.  We had not completed that process with the

11   secretary of the Treasury or the New York Fed, but there was a

12   large portion that would be excluded because of the, kind of,

13   chaotic nature and the inappropriate valuations.

14   Q.    Okay, and in fact one of the reasons that that initial --

15   that deal in its initial contemplation did not happen was an

16   inability to ring-fence assets that Barclays did not want,

17   correct?

18   A.    Well, I'm sure my version of that events and other

19   people's would be different.  But I thought we had made some

20   progress in that area, but we didn't make a lot of progress in

21   terms of getting a guarantee for clearing and funding on Monday

22   morning.

23   Q.    And a guarantee for clearing and funding was a guarantee

24   of some kind from the government?

25   A.    It's a little bit complicated.  It could have been from

- 137 -

1    the government; it didn't have to be.  Our feeling was that the

2    New York Fed would have been the appropriate place for that to

3    come.  But at the same time, we knew that Secretary Paulson had

4    said from the beginning that he did not want government money

5    in this deal.  And so it's a tough question of is a guarantee

6    government money or not government money.  So that was the --

7    Q.   I really just more or less want to establish that the

8    first deal didn't get done.  Is that correct?

9    A.   Yes.

10   Q.   And talks ended at some point on the Saturday or the

11   Sunday of Lehman Bankruptcy Weekend, correct?

12   A.   Sunday.

13   Q.   On Sunday.  And you and your team left the premises,

14   correct?

15   A.   No, we were -- we stayed, and then the Fed wanted me to

16   come down to be a part of what was going to happen as a result

17   of that.

18   Q.   And what was going to happen as a result of that was -- by

19   that you don't mean the Fed called you down to talk about a

20   Lehman transaction anymore; it was other rescue-type --

21   A.   It was how to wind down derivatives --

22   Q.   Okay.

23   A.   -- stuff like that.

24   Q.   But the fact is, at some point over that weekend, the

25   discussions with Lehman about a Barclays-Lehman transaction

- 138 -

1   stop, correct?

2   A.   The discussion with the New York Fed and the Treasury, who

3   is -- who were negotiating, was stopped, yes.  We had not had

4   discussions with Lehman about the deal.  I think this is a

5   very, very important point.  At this point, our discussions

6   were a little bit --

7   Q.   Actually, it's really not, sir.  Let me move on to the

8   next thing.

9        The point is, on the 15th of September, discussions do

10  commence again, and this time it's between you and Bart McDade,

11  correct?

12  A.   What day is that -- day of the week?  I apologize.

13  Q.   It's the 15th, sir.  It's after --

14  A.   Is that a Monday?

15  Q.   Yes.

16  A.   We began discussions on Monday, yes.

17  Q.   Okay, and by this point, Lehman's filed for bankruptcy,

18  yes?

19  A.   That's my understanding.

20  Q.   And you got a telephone call from Bart McDade, correct?

21  A.   I had the call Sunday night, but that was prior to any

22  official bankruptcy.  And we agreed to meet if there was

23  bankruptcy.

24  Q.   Okay, and then there was a bankruptcy, yes?

25  A.   Yeah.

- 139 -

1    Q.   And the discussions with Mr. McDade resumed on early the

2    morning of the 16th, correct?

3    A.   Is that Monday?  I'm sorry.

4    Q.   That's the Monday, yes.

5    A.   Yes.

6         MR. GAFFEY:  Steve, have you got the calendar?

7    Q.   We're going to put a calendar up on the screen, sir, so

8    you and I can stop confusing each other about what day of the

9    week --

10        So on the 15th you have a discussion with Mr. McDade about

11   resuming discussions -- about having discussions; and then on

12   the morning of the 16th, discussions begin about a potential

13   and different deal between Barclays and Lehman, yes?

14   A.   I don't think we waited until Tuesday.  I think it began

15   Monday and went through Tuesday --

16   Q.   Okay.

17   A.   -- the discussions.

18   Q.   You yourself did not take a direct role in the

19   negotiations, correct?

20   A.   Discussions I would have called them, but, no.  The team

21   was led by Rich Richie.

22   Q.   Okay.  You, Bob Diamond, were not involved in the specific

23   negotiations?

24   A.   I was not involved in the specific discussions, yes.

25   Q.   Okay.  And Rich Richie is and was -- well, what was his

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 140 of 273

- 140 -

1   title at the time?

2   A.   He's the chief operating officer of the investment bank,

3   Barclays Capital.

4   Q.   Okay.  And you delegated responsibility for these

5   negotiations to run the deal to Mr. Richie, yes?

6   A.   Yeah, that was his job as chief operating officer, right.

7   Q.   Okay, and Richie ran the deal; you did not run it?

8   A.   I was not doing the moment-to-moment management, correct.

9   Q.   Okay.  He had full responsibility for negotiating the

10  agreement, yes?

11  A.   Rich was responsible, yes.

12  Q.   Okay.  And the responsibility that you gave to him was

13  within the authority that you had been -- that the board had

14  given to John Varley, and John Varley in turn had given to you,

15  concerning parameters for a transaction, yes?

16  A.   Yeah, but keep in mind -- I think we're bringing the same

17  thing -- keep in mind, Rich would be having these discussions.

18  They would have to come back from -- for approval, obviously,

19  by the board if they were not -- right.  I think you said it

20  fairly.

21  Q.   Okay, we're -- and we're coming back to it.  We're almost

22  back to a topic that I know you want to discuss, and that's,

23  one of the conditions that the board placed on you in terms of

24  a deal with Lehman is that the deal had to be capital-

25  accretive, correct?

- 141 -

1    A.    It wasn't a condition.  It was certainly a priority.  And

2    it was important, but there was just simply no way that one

3    could guarantee capital accretion in a deal.

4    Q.    And it was a -- you needed to be able to make a commitment

5    to your board that, notwithstanding the risk associated with

6    the deal and the difficult valuations in that setting, that any

7    deal that was agreed with Lehman would be capital-accretive, is

8    that right?

9    A.    It was not a condition.  There are no guarantees on

10   something like this.

11   Q.    My question was commitment to your board, sir.  I didn't

12   use the word "condition".

13   A.    Sorry.  Well, I take commitment and condition as

14   relatively the same, so I apologize.  What --

15   Q.    All right, well --

16   A.    What we had agreed with the board is that we would do the

17   best we could to provide a deal that was capital-accretive.

18   But I was also very clear with the board that one can't

19   guarantee that and that, you know, if you just put yourself in

20   the context of the time, Fannie Mae and Freddie Mac had just

21   been nationalized.  B of A had just left negotiations and

22   feeling they couldn't pay anything for Lehman Brothers and yet

23   could pay fifty billion for Merrill Lynch on the same day; I

24   think it was Tuesday.

25        So we were in incredibly difficult times.  And I was very

LEHMAN BROTHERS HOLDINGS INC., et al.

- 142 -

1    clear with the board that I couldn't guarantee something like

2    that.  But I also knew how important it was to our regulator,

3    the FSA, and it was understood by Secretary of the Treasury

4    Geithner, and it was certainly important to our board, that we

5    did everything we could to ensure capital accretion.

6    Q.   A few moments, ago, sir, I think you told me that you

7    considered the phrase "commitment and condition" to be

8    interchangeable?

9    A.   Um --

10   Q.   I asked you if it was a condition --

11   A.   Apologies.  When you said "condition", I took it as that.

12   Apologies if I misinterpreted--

13   Q.   Well, I don't need apologies here; what I need is a

14   clarification.  I asked you if it was a condition of the deal;

15   you said it wasn't a condition.  I asked you if it was a

16   commitment to the board, and you said you viewed commitment and

17   condition as the same thing.

18   A.   Apologies.

19   Q.   Did I understand your correctly?

20   A.   (Pause).

21   Q.   It's a yes-or-no question, sir.  Did you view commitment

22   and condition to be the same thing?

23   A.   I viewed my commitment to the board as something that I

24   was endeavoring to do and working to do, but not a guarantee,

25   if I'm explaining that well.

                                                                    - 143 -

1   Q.   And you did have an import -- you made an important

2   commitment to your board that there would be capital accretion

3   on the deal that you or your delegees made with Lehman, yes?

4   A.   We committed to take best efforts and to work the

5   hardest -- we couldn't guarantee it, and there were too many

6   risks in the market and too many risks to the deal --

7   Q.   Well, there was a condition --

8   A.   -- and too many risks to the asset prices.

9   Q.   It was a condition -- capital accretion was a condition

10  that was very important to agreeing to a deal for your board,

11  and your board giving you authority, isn't that right?

12  A.   Yes, to the -- listen, I'm not trying to beat around the

13  bush.  Capital accretion was incredibly important.  You have to

14  understand the environment we're working in.

15  Q.   I -- sir, we may be --

16  A.   Most those things, very honestly --

17  Q.   -- we may be at different points over terms again.  You're

18  saying "important", and I'm asking you if it was a condition

19  that your board laid down that it had to be capital-accretive

20  for it to give you authority to make the deal.

21  A.   I feel like I've answered this, so I apologize very much

22  if you feel that I'm avoiding anything, because I'm really not

23  trying to.  I couldn't guarantee something like that.  So if

24  that phraseology was used, it was inappropriate.

25       It was absolutely a condition in a sense.  If you mean by

- 144 -

1    "condition" I was using every wit of my analysis, working with

2    the team, working with the other side, that we had a deal that

3    was capital-accretive, you're absolutely right.  That was

4    absolutely a condition that I had to use every best effort.  I

5    couldn't have guaranteed it.

6    Q.   And let me --

7    A.   It would have been an uncertainty --

8    Q.   And in between that guarantee, sir -- let me press a

9    little bit -- it was what the board required of you, yes?

10   A.   They couldn't require it, I don't think, because you

11   can't -- it's not something that could be guaranteed.  But,

12   again, I'm not trying to beat around the bush.  It was

13   definitely something we talked about a lot.  It was very

14   important to the board.  It was very important to the executive

15   committee.  It was very important to me.

16        And if I'm misusing phraseology, I sincerely apologize,

17   because it was of paramount importance in the environment we're

18   in that our regulators were comfortable that this was a

19   capital-accretive deal.

20        But I need to be perfectly frank; it's not something that

21   one could guarantee, because of the nuances of accounting, the

22   changing valuation of the assets and, frankly, the risks in the

23   market.

24   Q.   Well, it's a fact, sir -- I mean, capital-accretive meant

25   that in the transaction there had to be an asset/liability

- 145 -

1   mismatch, and that mismatch had to be in Barclays' -- had to be

2   in favor of positive capital accretion or you weren't

3   authorized to do the deal, is that correct?

4   A.   There's a couple of questions there.

5   Q.   Can I have a yes or no to that one?

6   A.   There's -- you've got two completely different questions.

7   You have -- one is --

8   Q.   Does capital -- I'll put another one.  Does capital-

9   accretive mean that the asset/liability mismatch had to have a

10  mismatch in favor of a positive capital accretion or you

11  weren't authorized to do the deal?  Yes or no?

12  Q.   On the first part of the question, I could answer it

13  either yes or no, so I have to explain.  If you said -- it's

14  yes in terms of that's how you get capital accretion if you're

15  talking about trading assets and trading liabilities.  But

16  there are many other liabilities that formed a part of this

17  transaction, liabilities such as the value of customer lists,

18  liabilities such as the incredible -- the technology, which

19  wouldn't have anything to do with Tier 1 capital.  So if you're

20  dealing with strictly trading assets and trading liabilities,

21  that has a correlation with Tier 1 capital, which was important

22  from our regulator.

23  Q.   And with respect to trading assets --

24  A.   But if you were --

25  Q.   -- and trading liabilities, sir --

- 146 -

```
 1   A.   I would like to finish.  If you were talking about all
 2   assets and liabilities, then the answer would have been no.
 3   Q.   I'll just ask about Tier 1.  With respect to Tier 1, with
 4   respect to capital ratios, Tier 1 capital ratios, when you say
 5   "capital-accretive", you mean that there's an asset/liability
 6   mismatch; you had to have a mismatch in favor of a positive
 7   capital accretion, is that correct?
 8   A.   If trading assets -- did you say "trading assets"?  I
 9   apologize.
10   Q.   With respect to Tier 1 capital.
11   A.   In order to get Tier 1 capital accretion, it's -- there's
12   many pieces that go into it, and I'm not a professional
13   regulator here.  But there are many parts of the asset and
14   liabilities that were presented in this transaction that would
15   have nothing to do with Tier 1 capital.
16   Q.   Let me ask you --
17   A.   I've given some examples.
18   Q.   -- to take a look at page 86 of your deposition, sir.
19   A.   The best way to think about this, and I think this is a
20   really important --
21   Q.   Sir, I didn't ask how to think about it.  I asked you to
22   take a look at page 86 of your deposition.
23   A.   (Pause).
24   Q.   And when you get to page 86 of your deposition, if you'd
25   read the statement that you made at your deposition, starting
```

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 147 of 273

- 147 -

1    at 86, line 25, and concluding on 87, line 5.  And, again, sir,

2    it was a very long answer, so I'm picking out just that piece.

3    But let me read it.  Quote:  "So when I say 'capital-

4    accretive', accretive to the capital ratios, which means that

5    the asset/liability mismatch had to have a mismatch in favor of

6    a positive capital accretion or we weren't authorized to do a

7    deal," end quote.  Do you see that?

8    A.    I do.

9    Q.    Was that true when you said it at your deposition?  Yes or

10   no?

11   A.    It was clearly something --

12   Q.    Yes or no, sir?  Was it true when you said it at your

13   deposition?

14   A.    I think I probably misused the phrase "authorized",

15   because I was only authorized to bring back a deal that, in the

16   best of my ability, would be capital-accretive.  That I would

17   agree with.  I couldn't guarantee it.  And if that's throwing

18   this off, I apologize.  I absolutely could only go back to the

19   board with the deal that I believe had a very high likelihood

20   of being capital-accretive.  But I couldn't guarantee it, sir,

21   so I apologize if I used the wrong phrase.

22   Q.    And if -- it's your phrase, sir, when you said "or we

23   weren't authorized to do a deal".

24        Was that a true statement when you made it at your

25   deposition that if there wasn't an asset/liability mismatch in

- 148 -

1    favor of positive capital accretion, you weren't authorized to

2    do a deal?  Is that right?

3    A.    Couple caveats.

4    Q.    Just a yes or no first, sir.

5    A.    If what you're saying -- and you have to be very careful

6    here.  Asset/liability mismatch, to have capital accretion,

7    would have been trading assets and trading liabilities, not all

8    assets and not all liabilities.  And I was absolutely only

9    authorized to bring a deal that in -- to the best we could, but

10   I could not guarantee that.

11   Q.    Okay.  You were only authorized to do a deal as best you

12   could to achieve an asset/liability mismatch --

13   A.    And that was --

14   Q.    -- trading assets, sir, is that your testimony?

15   A.    No.  My testimony is exactly as it says there.  That's all

16   I wanted.

17   Q.    Positive capital accretion.  Or you weren't authorized to

18   do a deal.  Exactly as you said there, yes?

19   A.    I was only authorized to bring them a deal that I believed

20   would create capital accretion.

21   Q.    Is that a yes?  That was true testimony when you gave it

22   at your deposition?

23   A.    As long as you are comfortable with the fact that I can't

24   guarantee it, it was absolutely my objective to bring in a deal

25   that was capital accretive.

- 149 -

1   Q.   When you did finally structure a transaction, you were

2   highly confident you could hold up your head and -- to the

3   board and say yes, it is capital accretive, yes?

4   A.   It was very volatile.  It was --

5   Q.   Were you highly confident you could hold up your head to

6   the board and say yes, it is capital accretive?

7   A.   I think we did everything we could in the situation, so I

8   would say that as much as one could in that environment,

9   because that was the week that AIG was rescued, it was the week

10  that Morgan Stanley and Goldman Sachs became bank holding

11  companies, there was such volatility in asset prices that it

12  was very, very difficult.  But I certainly felt that we had

13  done everything that we could do.  So it depends on what you

14  mean by hold my head high.

15  Q.   Well, let me ask you what you meant when you said the

16  following at page 91 in your deposition, starting at line 9 and

17  reading through 15:

18  "Q.  Did you have a sense, when the deal was agreed, that

19  Barclays was going to have a gain as opposed to a loss on the

20  deal?

21  "A.  I was highly confident, notwithstanding the environment we

22  were in, that I could hold my head up to the board and say,

23  yes, it is capital accretive."

24      Was it a true answer when you gave it to me at your

25  deposition, sir?

- 150 -

1         MR. BOIES:  Your Honor, for completeness, he must

2    finish that paragraph at least, or at least the next sentence.

3    I respectfully ask the Court that under the rule of

4    completeness, that these answers not be taken out of context.

5         MR. GAFFEY:  Your Honor, I'd suggest we've been here

6    before.  When the witness wants to go to long-winded answers,

7    as opposed to simply saying yes or no, whether that sentence

8    was true, I ought to be entitled to cross-examine.  Mr. Boies

9    has all the time in the world to take this witness back through

10   this.

11        THE COURT:  I'm agreeing with Mr. Gaffey on this one.

12   I can see what it says in the next sentence that begins with

13   the word "but", but this witness, as I have already noted, is

14   not prone to answering yes and no questions with yeses and nos.

15   So I'm going to overrule the objection and I'm going to go with

16   the rule of examination that David Boies has made classic in

17   this case, which is that witnesses are to answer "yes," "no,"

18   "I don't know," "I don't recall," and then explain.

19        MR. BOIES:  May I respond, Your Honor?

20        THE COURT:  Sure.

21        MR. BOIES:  I do not believe that I have ever taken an

22   answer out of context.  And if somebody has asked for me to

23   read the next sentence, I don't believe I have ever declined to

24   do so.  I never objected to his asking for yes, no, or I don't

25   know.  I've been entirely silent when that's happened.  The

- 151 -

1    only time I have risen is when he takes an answer very much out

2    of context.  I don't believe I have done that in examination,

3    and if somebody has suggested to me that they want me to read

4    another sentence, I have always done it.

5              THE COURT:  I understand.  But I think at this

6    point -- I appreciate your comment -- at this point in this

7    examination, I think that this is a witness that needs to have

8    the leash held tightly.  And you can ask whatever you want to

9    ask on redirect, including going back to this very provision of

10   the testimony if you can see it appropriate.  We're dealing

11   with a very sophisticated witness who's been examined at length

12   in deposition, and he seems not to be giving precisely the same

13   answers now.

14             You can ask the question again, if you wish.

15   BY MR. GAFFEY:

16   Q.   Mr. Diamond, when the deal was made, when it was agreed,

17   were you highly confident, notwithstanding the environment that

18   you were in, that you could hold your head up to the board and

19   say, yes, it is capital accretive.  Yes or no?

20   A.   Yes, but I think you can see that I knew there was risk

21   involved.

22   Q.   And when you recommended approval to the board of the deal

23   as capital accretive, you took into consideration every aspect

24   of the deal, is that correct?

25   A.   All of those that -- well, sorry, did you ask in terms of

- 152 -

1   capital accretion?

2   Q.   No, I mean every -- yes, yes.

3   A.   In terms of my commitment on capital accretion, I only

4   took those things in that were involved with capital accretion.

5   There were other aspects of the deal that were important.

6   Q.   Well, when you were making the determination as to whether

7   you could recommend to the board as capital accretive, did you

8   take into account the assumed liabilities for compensation and

9   for contract cure?

10  A.   I think I've been quite clear about the trading assets and

11  the trading liabilities of being the things that are most

12  important to capital accretion.  I'm not an accountant, and I'm

13  not a trained accountant or a trained regulatory capital

14  person, so there may be other things that came in.  But I know

15  that they're primarily driven.  And there's a number of things

16  on the balance sheet that would have nothing to do with Tier 1

17  capital.

18  Q.   When you were recommending to the board the deal as

19  capital accretive, were you taking into account the assumed

20  liabilities for compensation and contract cure?

21  A.   I'm not an expert on what other liabilities.  I would have

22  asked the team and the experts to show me, but I have no

23  specific recollection of what other assets and liabilities,

24  other than trading assets and trading liabilities.

25  Q.   Okay, take a look at page 162 in your deposition.  Go to

- 153 -

1    line 17.  And we'll go through to page 163, line 6, the

2    complete question and answer.  And I'll read you:

3    "Q.  When you were making the determination as to whether you

4    could recommend it to the board as capital accretive, did you

5    take into account the assumed liabilities for compensation and

6    for contract cure?

7    "A.  When I recommended this deal to the board as capital

8    accretive, I took into consideration every aspect of the deal.

9    "Q.  Those aspects include the assumption of liabilities for

10   compensation and contract cure?"

11       Mr. Hume allows as how it's asked and answered.

12   "A.  I answered all aspects of the deal.  So if those were

13   aspects of the deal, yes."

14       Was that true testimony when you gave it at your

15   deposition?  Yes or no.

16   A.   Sorry.  The question is?

17   Q.   Was it true testimony when you gave it at your deposition?

18   A.   Oh, I'm sure it was true testimony, yes.

19   Q.   So you took into account, in making a recommendation to

20   your board that this was a capital accretive deal, the assumed

21   liabilities for contract cure and compensation, correct?

22   A.   Again, I took the recommendation of the team on all of

23   those things, and the deal changed substantially from the

24   beginning of the week to the end of the week.

25   Q.   It was capital accretive from the very beginning, though,

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 154 of 273

- 154 -

1    right?

2    A.   The deal that we talked about earlier in the week which

3    changed because of the Fed repo, we never got to a point where

4    we had a, you know, that complete deal.  But my objective would

5    have been the same with that deal, yes.

6    Q.   And your commitment to your board to deliver a capital

7    accretive deal was met both in the deal as originally agreed

8    and in the deal as ultimately closed, right?

9    A.   The capital accretion was a part of the deal from the

10   beginning, yes.

11   Q.   And at each point when the deal changed over the course of

12   the week, including as a result of the repo, one of the

13   instructions that your negotiating team had was to make sure

14   that that capital accretion aspect stayed in the deal, yes?

15   A.   We never changed, so I --

16   Q.   So yes?

17   A.   The view of the deal needing to be capital accretive, I

18   don't recall it changing.

19   Q.   That was always part of your negotiating team's marching

20   orders, to get capital accretion?

21   A.   I think from the beginning of this deal, as I have said,

22   one of the things that I knew was important for our board and

23   for the regulators, and I committed to do the best I could to

24   make sure we could deliver, knowing the risks and knowing the

25   markets and all those things -- I don't mean to be verbose --

- 155 -

1    was that we had capital accretion.

2    Q.   And as a matter of fact, the deal as structured provided

3    for a gain to Barclays on acquisition; is that correct?

4    A.   There was a gain on acquisition.

5    Q.   And so you had assured your board it was capital

6    accretive, and you also had assured your regulators it was

7    capital accretive, correct?

8    A.   Well, I didn't personally speak to the regulators.

9    Q.   So you or those working for you made representations to

10   your regulators that the deal was capital accretive.  I know

11   you weren't every place at every time, sir.

12   A.   It probably would have been John that had those

13   conversations.

14   Q.   And to your knowledge, that representation was made by

15   Barclays to its regulators that the deal was capital accretive,

16   yes?

17   A.   Not that it was capital accretive, but that -- that that

18   was one of our objectives, and a key objective is we wouldn't

19   recommend a deal unless we felt confident, knowing all the

20   risks associated, that we couldn't guarantee it, but certainly,

21   if what you're asking is was that important to our regulators

22   and was that communicated, yes.

23   Q.   It was communicated, yes?

24   A.   Sorry, I apologize.  I didn't have that conversation.  As

25   far as I know.

- 156 -

1   Q.   Okay, and when the deal closed on September 22nd, you were

2   satisfied that the deal was capital accretive, is that right?

3   A.   Again, I don't want to -- the same answer I've given all

4   along.  We had done the best we could for that, but we couldn't

5   be positive.  As you know, there were things changing,

6   literally, during that evening.

7   Q.   Would you take a look at page 128 of your deposition,

8   starting at line 23?

9        Tell me when you get to page 128, Mr. Diamond.

10  A.   Yep, I'm there.

11  Q.   All right, at line 23, starts the following question and

12  answer:

13  "Q.  When the deal closed -- on the day the deal closed, the

14  22nd of September, were you able to report to your board that

15  you satisfied the demand that it be capital accretive.

16  "A.  That's my understanding.  I don't recall a report going

17  in, but that would be my understanding."

18       Did, by that answer, sir, did you mean to say that you

19  were satisfied that the deal, as closed, was capital accretive?

20  A.   That was the -- again, knowing that there were still risks

21  that market prices could change, we felt we did the best we

22  could to deliver a deal that was capital accretive.

23  Q.   You did the best you could to build a structure that would

24  deliver capital accretion?

25  A.   There were no guaranties.

- 157 -

1   Q.   Okay, there's no guaranties of anything, sir.  You and

2   your negotiating team built a deal whose structure you were

3   confident would deliver capital accretion, an asset/liability

4   mismatch, yes?

5   A.   It wasn't an asset/liability mismatch.  It was a trading

6   asset and trading liability mismatch.  And I think we have to

7   be very careful because asset/liability mismatch could be very,

8   very different.  There are a lot of things that go into

9   acquisition accounting and go into Tier 1 capital.  And Judge,

10  you should know this.  We had to balance the Tier 1 capital,

11  which was incredibly important to the FSA, and I can't

12  overstate how important this was and how much pressure we were

13  under, given the market, that we couldn't reduce our capital,

14  given the problems that RBS and Lloyd's were having.

15      Acquisition accounting takes other things into account.

16  It can take the value of client lists.  Client lists have no

17  value to the estate or to the creditors, but could have a value

18  to us, and from an accounting point of view, there were

19  differences in how compensation was an expense or an asset.  So

20  there were a lot of changes to these things and we had to

21  balance all these things.  It was a real priority for the

22  regulators, and therefore, for me, that we did the best we

23  could to deliver a deal that was accretive in Tier 1 equity,

24  and it was very, very important in this market at the time.

25  But I feel it keeps coming back to assets and liabilities,

- 158 -

1    which are not the same thing.  And to be quite frank, I've been

2    very clear that it's trading assets and trading liabilities.

3    It's not all assets and all liabilities.

4    Q.    Well then, Mr. Diamond, was this condition so important

5    that you made sure to know whether anybody ever mentioned it to

6    the Lehman negotiating team?

7    A.    Again, Judge, we held a conference with analysts and

8    media --

9          MR. GAFFEY:  Your Honor --

10   A.    -- on Tuesday or Wednesday --

11         MR. GAFFEY:  -- regardless of who it's directed to --

12   A.    -- we talked about --

13         MR. GAFFEY:  -- can I ask for a yes or no answer?

14   A.    -- how actually it would be capital accretive.  This was

15   the most public thing that can be out there.  So it's very

16   public.

17   Q.    Sir, did anyone on the Barclays negotiating team say

18   anything to anyone on the Lehman negotiating team about this

19   incredibly important aspect that the deal needed to be capital

20   accretive?  Yes or no?

21   A.    I don't know.  I wasn't part of those deals.  But what I

22   would say is --

23   Q.    Well, was it -- Mr. Ricci would report it to you, sir.

24   Did Mr. --

25   A.    Can I answer, please?

- 159 -

1   Q.   -- did you have a discussion with Mr. Ricci to make sure

2   that he let Lehman know how important this capital accretion

3   aspect was?

4   A.   The capital accretion was only important to Barclays.  It

5   was an in --

6   Q.   Well, to Barclays, to its regulator.

7   A.   Right.

8   Q.   Did you think it would be important to the Court in

9   considering the transaction, sir?

10  A.   As I said, I did not have those discussions.

11  Q.   And the fact is, you didn't know one way or the other at

12  the time whether anyone on your team told this Court it was a

13  condition to the deal that it be capital accretive, correct?

14  A.   Well, as I said, it wasn't a condition.  We were

15  working --

16  Q.   Correct?

17  A.   It wasn't a conditional of the deal.  It was something

18  that was important to Barclays and it was something that we

19  talked about publicly with the media and with the analysts on a

20  call that was fairly public on either Tuesday or Wednesday.

21  Q.   And when you talked about this --

22  A.   And we put documents up.

23  Q.   -- to the media and the analysts, sir, was it your hope

24  that that would seep into this courtroom as a form of

25  disclosure?  That when you talked to the media and when you

                                                                    - 160 -

1    talked to the analysts, did you consider that to be a form of

2    disclosure to this Court when you put an application before it

3    asking it to approve the transaction?

4    A.   The application we put before --

5    Q.   Yes or no, sir.

6    A.   -- had all the assets and all the liabilities, other than

7    those that were specifically excluded --

8    Q.   Let me know when you get to a yes or no, sir.  The

9    question is, did you consider press releases and analysts' call

10   to be a form of disclosure to this Court when it was asked to

11   approve the transaction.  Yes or no.

12   A.   It wasn't a condition of the transaction.

13   Q.   So I take it, then, the answer is no?  Because it wasn't a

14   condition of the transaction, you didn't think that was a means

15   of disclosure to the Court?

16        Let me withdraw that question.

17        Do you agree with me, sir, that a press release is not a

18   form of disclosure to a United States Bankruptcy Court?

19   A.   I didn't say it was.

20   Q.   So, yes, you agree with me, it's not a form of disclosure

21   to the Court, a press release?

22   A.   I don't know how a court works.  I would suspect -- it may

23   or may not be.  I don't know how much of the deal information

24   went through.  I had great confidence --

25   Q.   Well, at the time --

- 161 -

1   A.    -- that all the important aspects of the deal --

2   Q.    -- this was a very important deal to Barclays, wasn't it?

3   A.    -- all the important aspects of this deal were presented.

4   Q.    Sir, this was a critically important deal to Barclays,

5   wasn't it?

6   A.    Yes.

7   Q.    And it was about the biggest deal Barclays had ever done,

8   yes?

9   A.    In terms of value, I mean, in terms of the environment at

10   the time, it was probably the riskiest deal, yes.

11   Q.    All right, and you knew that to get the deal done,

12   Barclays needed to get the Court's approval of the deal, yes?

13   A.    I think it was Lehman that needed to get the approval.

14   Q.    Well, at the very least, sir, you knew you had to be

15   respectful of the Court's processes, yes?

16   A.    And we were very much.

17   Q.    All right, and you knew that you had a bunch of lawyers in

18   the courtroom when the deal was being discussed, yes?

19   A.    I wasn't in at the courtroom.

20   Q.    That's not the question.  I didn't ask if you saw them.  I

21   asked if you knew you had a bunch of lawyers in the courtroom.

22   Get a legal bill that made you choke, sir?  I mean, you had a

23   bunch of lawyers in the courtroom, yes or no?

24   A.    I assume so.  But I don't know.  I wasn't a part of that.

25   Q.    And you knew that an application had been put before the

- 162 -

1    Court to consider the terms of the transaction, yes?

2    A.    I knew that there was a -- yes, I knew there was a -- I

3    knew there was a bankruptcy hearing Friday night, if that's

4    what you're asking, yes.

5    Q.    And to you knowledge -- and you were keeping track of the

6    deal, even though you weren't on the front line doing the

7    negotiations?  Yes?

8    A.    Sorry?

9    Q.    You were keeping track of the progress of the deal during

10   that week, yes?

11   A.    Yep.

12   Q.    And you were in touch with Mr. Ricci about it, yes?

13   A.    Yep.

14   Q.    All right, and others involved in your negotiating team,

15   Mr. LaRocca, for example?

16   A.    I mean, I'm sure I talked to him a few times that week,

17   but most of my interactions were with Mr. Ricci, though.

18   Q.    And in the course of most of your interactions with Mr.

19   Ricci, the fact is, you did not even know whether the Court was

20   told about this commitment to capital accretion that had been

21   made to your board?

22   A.    Again --

23   Q.    That's --

24   A.    -- that's a subtlety that impacted Barclays --

25   Q.    Actually, it's a yes or no question, sir.

- 163 -

1   A.   -- that --

2   Q.   There's no subtlety about it.

3   A.   I don't know.  I said, I don't know.

4   Q.   And --

5   A.   I did answer your question.  I don't know.

6   Q.   And you're not aware of any steps taken to put before the

7   Court such things as press releases and transcripts of

8   analysts' calls, correct?

9   A.   Don't know.

10  Q.   And you never had reports from anyone out of the coalface,

11  on the front line, here, that anyone had told this Court that

12  capital accretion was an aspect of the deal, correct?

13  A.   I think I answered that.

14  Q.   Indulge me, sir, yes or no.  Correct?

15  A.   What's the question, then?

16  Q.   You didn't know if anyone told Judge Peck?

17  A.   I wasn't at the hearing, and I think what is clear is that

18  the Tier 1 capital accretion was an issue that was important to

19  Barclays that didn't necessarily have an impact on anyone else.

20  Q.   Okay, and you mentioned before, and I'll come back to

21  this, but you thought it was just Lehman's presentation to the

22  Court?  Do you think Barclays had any obligations or

23  responsibility to make sure that there was full disclosure to

24  the Court of the terms of the transaction?

25  A.   We did, and we absolutely felt an obligation for a

- 164 -

1    presentation that was substantive, complete, absolutely.

2    Q.   And you don't know -- well, tell me, sir, what steps, if

3    any, were taken to inform the Court that Barclays would have a

4    gain on acquisition when the deal was closed?

5    A.   I don't think acquisition accounting necessarily forms

6    part of a deal like this.  It may, but I wasn't a part of the

7    presentation.

8    Q.   So is the answer you don't know?  You have "yes," "no," or

9    "I don't know."  Do you --

10   A.   Is acquisition accounting --

11   Q.   No, first my question, sir, not yours.

12   A.   Well --

13   Q.   My question was --

14   A.   -- acquisition accounting before the --

15   Q.   Let me put a question, sir.

16   A.   Okay.

17   Q.   My question was, do you know if any steps were taken to

18   inform the Court that Barclays would have a gain on

19   acquisition?

20   A.   Again, I was --

21   Q.   Yes, no, or I don't know.

22   A.   I don't know.

23   Q.   Those are your three choices.

24   A.   Don't know.

25   Q.   And you, yourself, did not give any instructions to Mr.

- 165 -

1   Ricci or others on your team or the lawyers to make sure that

2   there was full and proper disclosure to the Court, correct?

3   A.    If your question is did I give instructions to Mr. Ricci

4   before he went down on the presentation, no.  And --

5   Q.    It's -- I think what you said was --

6   A.    -- if your question is was I aware of the importance for

7   everyone of the quality of the presentation and the openness of

8   the presentation, of course, we all felt that.

9   Q.    Given your understanding of the importance of the

10  presentation and the openness of the presentation, the fact is,

11  you didn't preview the presentation before it was made, right?

12  A.    The presentation almost didn't get made.  We --

13  Q.    That's a different question, sir.  The question I actually

14  asked was, did you preview the presentation before it was made,

15  yes or no?

16  A.    No.

17  Q.    And you had no discussion with anyone at Lehman about what

18  was contained in or intended for the presentation that was to

19  be made to the Court, yes, sir?

20  A.    Well, I had a lot of input, but when you say the

21  presentation, pieces were changing up until -- right up until

22  the end.

23  Q.    And when you had a lot of input, sir, did you input the

24  idea that someone should tell the Court about capital

25  accretion?

- 166 -

1    A.    I -- I have no recollection of doing that, no.

2    Q.    Did you input the idea that someone should tell the Court

3    about a gain on acquisition?

4    A.    I don't have any recollection of that.

5    Q.    Did you input the idea that someone should tell the Court

6    about an asset/liability mismatch as to the trading assets?

7    A.    Again, I don't know.

8    Q.    Now, you did have some concerns about how the transaction

9    was described to the Court.  For example, you mentioned before

10   a press release.  Were you -- was there some -- did you have

11   some level of concern about what the Court might read in the

12   newspapers about the deal?

13   A.    Not sure I understand.

14   Q.    Well, take a look, within your book, sir, is tab M-133.

15   It's Movants' Exhibit 133 in evidence.

16   A.    Sorry, page 133?

17   Q.    No, there's a bunch of tabs, sir.  It should say M-133 or

18   just 133.  I think we might have run out of M's.

19   A.    Yeah.

20   Q.    With me?

21   A.    Yep.

22   Q.    Okay.  And you recognize this document, do you not, as a

23   press release that was issued -- as containing a press release

24   that was issued by Barclays dated 17 September 2008 describing

25   the transaction?

- 167 -

1    A.    Yes.

2    Q.    Yes?  And there was a time, sir, where internal -- and

3    actually within Exhibit M-133, in the second paragraph, it

4    says, "Barclays will acquire trading assets with a current

5    estimated value of forty billion pounds -- seventy-two billion

6    dollars -- and trading liabilities with a current estimated

7    value of thirty-eight billion pounds -- sixty-eight billion

8    dollars -- for a cash consideration of fourteen million (sic),

9    250 million dollars, Barclays will also acquire the New York

10   headquarters of Lehman Brothers, as well as its two data

11   centers at close to their current market value."  Do you see

12   that piece?

13   A.    Yes.

14   Q.    Do you recall, sir, expressing concern that this portion

15   of the press release only talked about 250 million dollars as

16   the price?

17   A.    Yeah, I recall either a conversation or an e-mail with

18   Chris Lucas about that.

19   Q.    Okay, take a look in your book at Exhibit M-19, sir.  And

20   at the bottom of the first page of M-19, sir, is that the e-

21   mail that you just referred to from you to Chris Lucas --

22   A.    Yes.

23   Q.    -- copies to Varley, Ricci?

24   A.    Yes, it is.

25   Q.    All right, and Chris Lucas is -- what's Chris Lucas'

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 168 of 273

- 168 -

1    title?

2    A.   Chief financial officer.

3    Q.   All right, and Mr. Varley is the group chief executive?

4    A.   That's right.

5    Q.   And Mr. Ricci is your chief negotiator, yes?

6    A.   Chief operating officer.

7    Q.   Chief operating officer.  And this is the e-mail -- in

8    this e-mail, you are commenting on a draft of the press release

9    that you have seen, is that correct?

10   A.   Yes, it certainly appears to be, yup.

11   Q.   And you say there, "Just heard we are planning the small

12   number for price.  Please do not.  The circa two billion dollar

13   number is out.  It is very important to the Bankruptcy Court to

14   see the larger number."  It is very important to the Bankruptcy

15   Court to see the larger number.  You wrote that in your e-mail,

16   sir?

17   A.   Yes.

18   Q.   You were concerned, were you not, that in case the Court

19   read a newspaper that picked up the press release, whatever was

20   put in the press release, it would see, yes?

21   A.   I think I said it in the next sentence.  It's not

22   credible.

23   Q.   The press release -- that's actually how the press release

24   went out, though, sir, isn't it?

25   A.   Yes.

- 169 -

1    Q.   And did you do anything to recapture a not credible press

2    release that had been issued by your company?

3    A.   I think you see I was trying to do that, yes.

4    Q.   The horse was out of the barn, though, by this time, yes?

5    A.   No, I think there was a -- I think there was a decision to

6    show both numbers, or at least mention the purchase of the

7    building, and, you know, there's different opinions, and in

8    situations like this, you know, I'm sure Chris and John wanted

9    Barclays to appear to, in such a volatile environment, to be

10   paying as little as possible, and I just felt it was not

11   credible to not mention the purchase for the building which was

12   a substantive number.

13   Q.   And you wanted to be sure in this e-mail -- you were

14   concerned about what the Bankruptcy Court might see, yes?

15   A.   I thought it was not credible for them to see the smaller

16   number.  Right?  The smaller number wasn't the credible

17   disclosure.

18   Q.   So does this suggest to you, sir, that you did take at

19   least some time to be concerned about what the Court might see

20   with regard to the transaction?

21   A.   This was an incredibly important transaction --

22   Q.   Sir, it's a yes or no question.

23   A.   -- and I think that was very --

24   Q.   It's a yes or no question, sir.  Does this indicate that

25   you were -- you took some time to be concerned about what the

08-13555-mg    Doc 10178    Filed 06/23/10    Entered 07/14/10 10:26:48    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 170 of 273

- 170 -

1   Court might see in the newspapers about the transaction, yes or

2   no?

3   A.   I don't know if it was in the newspapers, but I think you

4   can -- you can see there that I did have that concern, yes.

5   Q.   Okay, and you took the time to comment on the substance of

6   a press release to make sure that the Bankruptcy Court saw the

7   larger number, but you didn't take the time to preview the

8   presentation that was actually made in the court where the deal

9   was described?

10  A.   The --

11  Q.   Is that right?

12  A.   The purchase agreement and the discussions of the

13  clarification letter and all those things, what I said is I

14  didn't see the presentation that Lehman Brothers' attorneys

15  made.

16  Q.   When you were commenting on the press release, did you

17  think it was equally important that the Court see about an

18  asset/liability mismatch in the press release?

19  A.   Again, I thought that the trading assets and trading

20  liabilities and the capital accretion was an issue that was

21  primarily internal, and -- I think this is key --

22  Q.   Internal to what?  Barclays?

23  A.   Can I finish?

24  Q.   Just, if you could explain that.

25  A.   It was something important to Barclays, but it was also

LEHMAN BROTHERS HOLDINGS INC., et al.

- 171 -

1    something similar to the press release that was public.

2    Q.   Did you think -- while you were thinking it was important

3    for the Bankruptcy Court to see the larger price, did you take

4    any time to think whether the press release should make some

5    reference to a gain on acquisition?

6    A.   I think in both cases, we're dealing with press releases.

7    Q.   I understand that, sir.

8    A.   And both things are public.

9    Q.   My question is, in the press release, where you thought it

10   was important the Bankruptcy Court see the larger price, did

11   you say to anybody it was important that the Bankruptcy Court

12   see something about a gain on acquisition for Barclays.

13   A.   I don't think we would know if we would have a gain on

14   acquisition for a very long time.

15   Q.   Did you think it was --

16   A.   There was no way that we knew at this point whether there

17   was a gain or a loss on acquisition.

18   Q.   Did you think it was important for the press release to

19   contain some reference to capital accretion?

20   A.   We weren't sure we had capital accretion at this point.

21   That was the plan, and I think we're saying in the press

22   release, but the same press release that you're criticizing me

23   for for having a larger number is the same press release

24   with -- and analysts, and all these things were public

25   information.  And we were being -- we were being totally open

- 172 -

1   publicly about what we were doing.

2   Q.   I'm actually -- I may be a little confusing at the moment

3   myself, sir.  I'm actually asking about your e-mail.  In your

4   e-mail, you take some time in the middle of an incredibly

5   hectic deal in chaotic circumstances to allow as how you think

6   it's important for the Bankruptcy Court to see the bigger

7   price.  My question is, you didn't take the time to allow as

8   how the Bankruptcy Court should see anything about capital

9   accretions, isn't that right?

10  A.   But I think the same --

11  Q.   Is that a yes?  Yes, no, or I don't know?

12  A.   It is -- all right, say it one more time and I'm going to

13  get this right.

14  Q.   Did you think it was important that the Bankruptcy Court

15  also see in the press release some reference to capital

16  accretion?

17  A.   I know the intent for capital accretion was in the

18  disclosure we did with analysts.  I don't recall right now,

19  unless I read this, of whether it was in the press release.

20  But I know it had been in the public record.

21  Q.   And you don't know if it was in anything filed in the

22  proceedings in this court seeking approval of the transaction,

23  do you?

24  A.   Again, it had nothing to do with the deal from -- from

25  either the trustee's point of view or the creditor's point of

LEHMAN BROTHERS HOLDINGS INC., et al.

- 173 -

1    view.  It was an internal capital rulings.  But it was

2    something that we had on the public record, sir, so I -- it's

3    nothing that we're -- we talked about very openly.  Whether it

4    was a part of that presentation or not may have to do with how

5    those presentations are made.  But if there's any insinuation

6    that it's something that we were uncomfortable with, we

7    wouldn't have made it so public.

8    Q.   I'm actually just asking about how you made use of your

9    time at the time of the transaction, Mr. Diamond.  You took a

10   minute to tell your subordinates that the Bankruptcy Court

11   should see a bigger price in the press release.

12   A.   Those weren't my subordinates; those were my bosses.

13   Q.   Okay, even better.  You stood up to your bosses and you

14   said the press release -- it's important to the Bankruptcy

15   Court to see the larger number, but you didn't have the same

16   thinking about capital accretion, gain on acquisition, or for

17   that matter, sir, anything about the assumed comp and cure

18   liabilities.

19   A.   I'm very comfortable that we're open and transparent and

20   in the public record, and I'm pleased that I wrote that e-mail.

21   I think it -- it was appropriate.  I thought it wasn't a

22   credible number.

23   Q.   But you did nothing to bring that press release back after

24   you'd learned it had gone out without the change that you

25   wanted, yes?

- 174 -

1    A.    I think you see I tried to do that.  I think -- I don't

2    recollect -- we can look at it, but I think that there is some

3    comments up above that the chief executive and CFO discussed it

4    and made some change to style but probably not as much change

5    as I wanted.

6    Q.    Actually, I'll just zoom on in on this because I don't

7    want to leave that one hanging, sir.  We'll just put the whole

8    document up there.

9            MR. GAFFEY:  Steve, can you put in the pullout,

10    please?

11    Q.    I think what you'll find -- and take a look through it,

12    sir, and tell me whether you agree with me -- is that the e-

13    mail conversation that takes place, the next one up is from Mr.

14    Lucas to you where he says he takes your point.  "Total

15    considerations in the detail para" -- that's, I will tell you

16    further in -- "it's a bit of a compromise."  And then above

17    that, in an e-mail between Mr. Lucas and Mr. Varley where they

18    don't copy you, they say -- Mr. Lucas says, "So do I, but I

19    accept it from a very tired group president that other

20    audiences may have other needs.  Not sure RED will see it that

21    way."  You are -- the code for you is RED, that's Robert E.

22    Diamond?

23    A.    That's an initial.  It's not a code.

24    Q.    Okay, all right.  I didn't mean to suggest it was anything

25    secret, sir.  It's a -- nor am I going to ask you about a "code

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 175 of 273

- 175 -

1    RED".

2         But you see that they are discussing up there, sir, that

3    the press release has gone out -- basically, they're ignoring

4    you.  It's gone out, and they like it the way it is.  Is that a

5    fair description of what they've done there?

6    A.    Yeah, this was the day that AIG was bailed out by the U.S.

7    government.  It's the day that Merrill Lynch was rescued by

8    Bank of America after Bank of America walked away from Lehman

9    Brothers.  It was within days of bank holding company status

10   for Goldman and Lehman (sic).  My bosses, my chief executive --

11   and I should say Chris is more a peer, but he's the guy that

12   has the final pen on something like this as the group chief

13   financial officer -- were very concerned from the Barclays

14   point of view of what would be the investor reaction.  And they

15   were looking for every edge they could get in that regard.  It

16   was very difficult market conditions.  Our equity price --

17   it -- the -- or, market capital of Barclays --

18   Q.    I'll let you finish if you want, but just can you remind

19   me was there a yes or no at the beginning of that?  It was just

20   a yes or no question.

21   A.    You'll let me finish first, or you'll --

22   Q.    Let me just check.  Sure, I have a yes.  Go ahead.  Did

23   you want to finish?

24   A.    I think you have to give some consideration when you see

25   this to the difficult environment.  And it seems quite clear

- 176 -

1    that everyone was being aboveboard.  It's a figure that could

2    have been reported two ways, and I thought it was more credible

3    to report the larger number.

4    Q.   Now, you referred --

5            MR. GAFFEY:  You can take that off the screen, Steve.

6    Q.   You referred, a little earlier in your testimony, sir, you

7    used the word buffer.  Do you recall that?

8    A.   I don't recall it specifically, but I don't dispute it.

9    Q.   Essentially, there was a buffer in the deal to protect

10   Barclays from downside risk on market movement?

11   A.   Depends on how you mean buffer.  There was a mismatch

12   between trading assets and trading liabilities around capital

13   accretion, and there was an enormous difficulty in valuing

14   assets because there were no good prices on the records at

15   Lehman Brothers, so we had to take all of these and find the

16   appropriate prices.  So I don't know what phrase you'd use; you

17   could use any number.  But we were struggling to try and find

18   the appropriate value for many of the assets.

19   Q.   Did you ever hear Mr. Varley use the term buffer?

20   A.   I don't recall, but I'm sure he may have.

21   Q.   Okay, and one way or the other, you would understand --

22   whether you heard him or not, you would understand the term

23   buffer to mean some discount off of the value of the assets

24   which would provide a degree of protection for Barclays from

25   downside market movement, yes?

- 177 -

1    A.   It could mean that, or it could mean that if they're not

2    valued correctly, as the commercial real estate wasn't, that

3    there would have to be a difference between the price that the

4    market would bear and, you know, the price that was -- that was

5    there as of September 12th, and many of those were off.  So I

6    mean, I think at the end of the day, we're all trying to get to

7    the same thing, is, what's the right value of the inventory.

8    Q.   Okay, and one place you were trying to get by the time the

9    deal was announced to the market was to be able to tell the

10   market that the deal had been de-risked, correct?  Well --

11   A.   I've heard that phrase referenced, absolutely.  But I will

12   tell you, I don't think you need me to go back through the time

13   to think that anything could have been de-risked with --

14   Q.   Okay, well, you've mentioned --

15   A.   -- the amount of assets and liabilities that were taken

16   from the Fed repo would be a real stretch.

17   Q.   You've mentioned a couple of times now, sir, this

18   analysts' call.  Let me ask you to take a look at Exhibit M-16

19   in your book.  It's Movants' Exhibit 16 in evidence.

20   A.   Yep.

21   Q.   And that is the transcript of the analysts' call that you

22   have referred to, correct?

23   A.   It appears to be, yes.

24   Q.   And you attended that analysts' call along with Mr. Varley

25   and Mr. Lucas, yes?

- 178 -

1   A.   I think I was on the phone but not with them, is my

2   recollection.

3   Q.   All right, in person or by phone you were --

4   A.   I think so, yeah, because I think I was here in the

5   States.

6   Q.   You do -- I will tell you, sir, that -- at least in the

7   transcript, it reflects that you spoke up occasionally --

8   A.   Yep.

9   Q.   -- suggesting -- you were there by phone from start to

10   finish, yes?

11   A.   That would be my recollection, but I'm not positive.

12   Q.   Okay, and when you were participating by phone, you could

13   hear the statements that Mr. Varley made to the analysts?

14   A.   I would have been able to, yes.

15   Q.   And it's important in such a call that statements made to

16   the analysts be true and accurate, correct?

17   A.   Yes, sir.

18   Q.   Okay, now, well, first let me ask you to turn to page 2 of

19   the document, sir.  And I'll direct your attention down to the

20   seventh paragraph.  They're not numbered, but it's the seventh

21   paragraph down.  Do you see that?  It begins, "Before moving on

22   this opportunity".

23   A.   Um-hmm.

24   Q.   And further in there, Mr. Varley, who's doing the speaking

25   here, says, "The transaction meets our financial test with

- 179 -

1   significant margin for error."  Is that the buffer we've been

2   talking about?

3   A.   Not sure.

4   Q.   Okay.  And Mr. Varley continues, "We expect it to be

5   immediately economic profit positive."  Do you see that?

6   A.   I do.

7   Q.   You heard Mr. Varley say that to the analysts?

8   A.   Yes.

9   Q.   And did you understand that statement to be true of the

10  deal as you understood it at the time, that it would be

11  immediately economic profit positive to Barclays?

12  A.   Right, as long as -- yes, but that's his expectation.

13  There's no guarantee.  There's a lot of risk.

14  Q.   But hence he says, "We expect it to be" -- "We expect it

15  to be immediately economic profit positive."  Right?  You

16  agreed with Mr. Varley when he said it.

17  A.   I agree, he said that, yes.

18  Q.   Okay, and did you agree with him when he said it?

19  A.   I don't recall him saying it at the time.  I see it

20  written here.  So --

21  Q.   At the time of the deal, you expected it to be -- did you

22  expect it to be immediately economic profit positive?

23  A.   We certainly had that -- we certainly didn't want it to be

24  a loss, that's for sure, so we did everything we could to

25  create a deal that we could manage in the context of a

- 180 -

1    ferocious market environment.  So yes, I would agree with that.

2    Q.   And at page -- take a look at page 3 of the analysts'

3    call.  And there's an answer at the bottom of the page by

4    Chris.  Do you see that?  It begins, "I should say that out of

5    a total," do you see that?

6    A.   Yes.

7    Q.   And Mr. -- that's Chris Lucas?

8    A.   That's Chris Lucas, yes.

9    Q.   Okay, and Mr. Lucas says, "I should say that out of a

10   total of 72.7, which is a net number, the vast majority of

11   those assets are quoted equity government and agency paper,

12   commercial paper, money market instruments, and derivatives and

13   of relatively sizeable cash and matched book.  There's a small

14   amount of mortgage paper which has been heavily written down

15   and included in those numbers.  So we've been through a process

16   where we took the original marks, reviewed them, and then took

17   some further write-downs.  But that is against a very small

18   portion, less than five percent of that book."  Do you see

19   that?

20   A.   I do.

21   Q.   Did you understand that that was Mr. Lucas telling the

22   analysts that this was one aspect of the transaction that

23   reduced risk for Barclays, the vast majority being quoted

24   equity government and agency paper, et cetera?

25   A.   Certainly, that was meant to encourage the analysts that

- 181 -

1    it wasn't the commercial real estate and some of the toxic

2    assets, yes.

3    Q.   Okay, and if you would turn to -- the fact is, sir, in the

4    due diligence that we talked about a bit before, Barclays was

5    able to establish the marks, yes?

6    A.   Oh, it's not quite that easy.  There were things - there

7    were valuations -- we would have liked to, but it was chaos.

8    There was a lot of information that wasn't there, securities we

9    didn't know.  This is not the deal -- the deal you're referring

10   to here is not the deal that was done Friday night.  That was

11   the deal where the Fed came in and replaced everything here

12   with --

13   Q.   And before we get to that part of the week, sir, let's so

14   we know what we're both talking about, this is the deal that

15   was originally described to the Court, yes?

16   A.   But you do realize, that we --

17   Q.   I realize, sir.  The question is, did you realize that

18   this is the deal that was originally described to the Court,

19   yes or no?

20   A.   It was the -- I don't know what you would have called the

21   hearing, but the preliminary meeting on the Tuesday or

22   Wednesday, this looks like this was referring to that deal.

23   But as it turned out, many of these assets and liabilities

24   weren't there.

25   Q.   At the end of the week?

                                                                    - 182 -

1    A.    Which is a good way to say --

2    Q.    At the end of the week?

3    A.    -- how could we have valued them.  No, this day, even.

4    And during the end of the week.  And that's why the Fed had to

5    step in and ask us to assume their position in the repo.  It

6    was chaotic.  The people had taken collateral.  People had

7    taken positions.  So the books and records of positions that

8    were given by Lehman had huge gaps and huge misinformation.  So

9    the deal that we recommended to the judge -- and I apologize, I

10   think it was Wednesday; it may have been Tuesday -- was not the

11   deal that was approved Friday, and that's why, you know, that's

12   why, I mean, the fundamental reason was the Federal Reserve

13   Bank said we want you to take the whole business.  It's all

14   being financed by the Fed.  We want you to step into that repo.

15   And I think you know this, but there was over -- there was over

16   seven billion dollars worth of collateral that wasn't there and

17   didn't show up, and there was a tremend -- there were billions

18   and billions of dollars worth of collateral that was different

19   than what the Fed said it would be.  This is all documented.

20   We were in a period of an incredible chaos.

21   Q.    So you've mentioned, sir.  But on the 17th of September,

22   this was your accurate understanding of the deal you had made,

23   yes?

24   A.    I think --

25   Q.    You're telling the analysts --

- 183 -

1  A.   -- it could be described as the deal that we were hoping

2  to make, but it turned out that those securities and those

3  assets weren't there.

4  Q.   And you're not talking to the analysts on the 17th of

5  September about how it turns out several days later.  My

6  question, sir, is when these statements were made to the

7  analysts, did you believe them to be true?

8  A.   When --

9  Q.   Yes or no.

10  A.   Do I believe that John and Chris were speaking the truth?

11  Q.   Yes.

12  A.   I'm sure to the best of their ability they were.

13  Q.   Okay, and on page 4 of the analysts' call transcript, in

14  what's described as a further answer from Bob, the last

15  sentence says, so when it came time to make the decision on

16  what came, we personally had been doing due diligence and were

17  able to establish the marks.  Do you see that?

18  A.   Yes, sir.

19  Q.   Was that true?

20  A.   That was true on the securities that turned out not to be

21  there.

22  Q.   Was it true to the best of your knowledge on the 17th of

23  September?

24  A.   For the deal that didn't happen, yes.

25  Q.   And --

- 184 -

1    A.    See, we were dealing with lists of securities --

2    Q.    Sir, there's no question pending.

3    A.    -- that we were --

4    Q.    Sir, I'll ask you a question.

5    A.    Oh.  I was --

6    Q.    Mr. Boies gets his shot, too.  So if there's other stuff

7    you want to add, I'm sure he'll ask about it.

8    A.    Apologies.

9    Q.    Now, on page 5 of the analysts' call, you see an answer by

10   Mr. Varley to a question from Tom Rayner of Citigroup.  And Mr.

11   Rayner asks -- and I'm just at the last couple of sentences

12   where he actually forms his question.  "Because I guess it

13   could come down from four all the way to one, and still be

14   accretive for capital at the end of the day.  Or is it that

15   very much this mark-to-market, as of last night, all the toxic

16   stuff is outside of this portfolio.  We are expecting, if

17   anything, maybe to run profits from these positions."  And then

18   Mr. Varley answers, "The 'or is it' piece of your analysis,

19   tom, is the right way of looking at it.  So we absolutely

20   expect to preserve the buffer, to preserve that buffer and in

21   the way that Chris has described, we have marked, and the

22   capital derived from the negative good will that arises from

23   the transaction is actually more than is needed to support the

24   fifteen billion dollars of risk-weighted assets.  It is just

25   the combination of that part of the transaction gives them an

- 185 -

1    enhancement to the Tier 1 capital and equity Tier 1."  Do you

2    see that answer?

3    A.    I do.

4    Q.    Okay, and when Mr. Varley referred to the buffer, he was

5    referring, was he not, to a discount against the net value of

6    the assets, correct?

7            MR. BOIES:  Your Honor, I'm going to object again on

8    context.

9    Q.    Was it your understanding --

10           MR. BOIES:  On context.

11           MR. GAFFEY:  I'll rephrase, Your Honor.

12   Q.    Was it your understanding that that's what Mr. Varley was

13   referring to?

14   A.    I expect he was referring to the trading asset and

15   liability mismatch and the capital accretion.  And I thought he

16   actually described it pretty well.

17   Q.    And on the next page, on page --

18   A.    If -- which -- capital accretion couldn't be more than the

19   risk-weighted assets that we took on, it wouldn't be capital

20   accretive.  And what he's explaining is that the negative good

21   will, which is an industry phrase -- I apologize -- but it's an

22   industry phrase for the capital accretion has to be more than

23   the risk-weighted assets we took on.

24   Q.    And negative good will is what, is a nonscientific way of

25   referring to what, to a discount, right?

- 186 -

1   A.   Capital accretion.  It's kind of the same thing as the

2   capital accretion.

3   Q.   Okay.

4   A.   Apologies, but it's shorthand for saying kind of what I've

5   been trying to go through in terms of the capital accretion.

6   Q.   And you refer on page 6 of the analysts' call -- again, we

7   have an answer from Bob where you say, "Spot on, Tom, an

8   example of an opportunity would be this:  within the U.S.

9   broker/dealer, one of the most exciting businesses which you'll

10  appreciate is the cash equities business.  It is an absolute

11  machine; it is extremely profitable."  Do you see that?

12  A.   Yes, sir.

13  Q.   And you believed that to be true when you said it to the

14  analysts?

15  A.   Yes, sir.

16  Q.   And at page 7 of the analysts' call, reading from the top

17  of the page, go down to where it says, "Answer:  John".

18  A.   Yep.

19  Q.   And he says, "And that is because we have not taken the

20  entire balance sheet that creates that income.  What we have

21  taken is a portfolio of trading assets and liabilities that

22  are, first of all, de-risked, and secondly, those that need to

23  support the ongoing parts of the business that we have

24  acquired.  And therefore, they are predominantly market-making

25  assets and liabilities and very tradable."  Do you see that?

LEHMAN BROTHERS HOLDINGS INC., et al.

- 187 -

1    A.    I do.

2    Q.    When Mr. Varley made that statement to the analysts, did

3    you have any reason to disagree with it?

4    A.    Well, it turned out that the -- this was not the deal that

5    was done.

6    Q.    When Mr. Varley made the statement, on the 17th of

7    September, as you participated on the call, without regard,

8    sir, to how the future may have unfolded, did you have any

9    reason to disagree with what Mr. Varley told the analysts, yes

10   or no?

11   A.    I'm sure John was saying everything he believed and this

12   was about the deal.  I'm sorry.

13   Q.    I know, it's the deal -- you've told us, now, several

14   times, sir.  It's not the deal as it happened.

15   A.    I'm sorry, I won't answer you more --

16   Q.    My question is on the 17th of September --

17   A.    I want to give you a short answer, and I apologize.  Just

18   ask one more time.  I apologize.

19   Q.    Did you feel any need to correct Mr. Varley when, on the

20   17th September, he made that statement?

21   A.    I think it could take some explanation, but it's in spirit

22   correct.  De-risking, for example, was referring to the fact

23   that we didn't take the toxic assets.

24   Q.    Okay.

25   A.    It doesn't imply that it wasn't risky; it was hugely

- 188 -

1    risky.  But a lot of the conversations that had been -- as our

2    analysts knew that we were in discussions to take the whole

3    businesses, there was a lot of worry about the toxic assets, in

4    particular the commercial real estate and some of the mortgage

5    assets.

6    Q.   And I'm going to ask you to turn to another statement of

7    Mr. Varley.  This one's on page 13.  It's an answer to a

8    question from Sandy Chen of Panmure Gordon.  Mr. Chen asks,

9    "Afternoon, and a very well-priced deal, I say.  Those are two

10   questions.  One, I missed the beginning of the call, but did

11   you give a probability of approval with the U.S. Bankruptcy

12   Court for the deal?"  "Answer, John:  It would be, and if I

13   could put it this way, impertinent of us to do that.  We have

14   to be respectful of the process of the court.  We have put a

15   proposal, which we hope the Court will think of as attractive

16   to the protection of interest of creditors.  I mean, it is a

17   big proposal within the overall bankruptcy, and we will go in

18   front of the Court as soon as we can and get a decision."  Do

19   you see that?  When Mr. Varley made that statement, did you

20   have any reason to disagree with it?

21   A.   Well, only that it wasn't John that would be going or us

22   that would be going in front.  It would be Lehman Brothers.

23   Q.   But you understood by -- when he said "we", you understood

24   him to be talking about Lehman Brothers, sir?

25   A.   I'm not sure what I thought at the time, but --

- 189 -

1    Q.   Well, let me ask what you think now.  When Mr. Varley said

2    to the analysts, "We have to be respectful of the process of

3    the court," "We have put a proposal, which we hope the Court

4    will think of as attractive," and "as soon as we can and get a

5    decision," it's not your testimony that he was referring to

6    Lehman Brothers there, is it, sir?

7    A.   We didn't make the proposal, is what I'm saying.  But we

8    absolutely wanted a --

9    Q.   Different question, sir.  It's what you understood Mr.

10   Varley to mean.

11   A.   -- absolutely wanted a proposal that was positive, that

12   was good for the creditors, that was good -- and I think we got

13   one.  This was a tremendous deal.  This deal saved 10,000 jobs

14   in New York.  It was supported --

15   Q.   Again, sir, I think that's probably -- you don't want to

16   steal Mr. Boies' thunder.  He's going to want you to talk about

17   saving 10,000 jobs.  I want you to tell you whether, when Mr.

18   Varley used the phrase "we" in that answer to the analysts'

19   call, you thought he was talking about Lehman Brothers.

20   A.   I didn't pay that much attention to John making that

21   comment at the time.  He's using the royal we.  We're all

22   trying to get a deal done.  I think, you know, I think, of

23   course, we were all working on this together.

24   Q.   Now, did you or anyone on your team take any steps to

25   ensure that the Court was told that the deal had been de-risked

- 190 -

1    from Barclays' perspective?

2    A.    I think as I've said to you, the de-risking was a

3    reference to not taking the toxic assets from the deal of the

4    previous week.  Not even this, but when it was the entire

5    thing.

6    Q.    Is that a no?

7    A.    Sorry, I didn't answer it yes or no.  So --

8    Q.    No, you didn't.

9    A.    -- try me again.

10   Q.    You have the question in mind?

11   A.    No.

12   Q.    Did you take any steps -- did you or anyone on your team

13   take any steps to inform the Court that the deal had been de-

14   risked?

15   A.    I didn't think the deal had been de-risked, as I said, for

16   all the reasons.  So of course, we wouldn't do anything like

17   that.

18   Q.    Okay.  And I take it, then, sir, your answer would be the

19   same -- well, let me ask it.  Did you or anyone on your team

20   take any steps to ensure the Court was told that the deal would

21   be immediately economic profit positive for Barclays?  It's a

22   yes or no question, sir.

23   A.    I don't -- actually don't know if that was -- if our

24   intents or plans were specifically stated that way, but I can't

25   imagine we would have presented a deal to the Court that would

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 191 of 273

- 191 -

1    have been immediately economically negative.

2           THE COURT:  Mr. Gaffey, in light of the pause, let me

3    just ask you a question.  Approximately how much longer do you

4    think you're going to be?

5           MR. GAFFEY:  Well, it's going a little longer than I

6    had hoped, Your Honor.  I think I might have another hour or

7    so.  I had hoped to stop by about 4:15, but I'm not sure that

8    I've gotten as far as I would've liked by now.

9           THE COURT:  I'm going to suggest that since we've been

10   going for about an hour and three-quarters, that we take an

11   afternoon break at this point.

12          MR. GAFFEY:  Okay, that would be good.  I can see what

13   I can cut back on, too, Your Honor, during the break.

14          THE COURT:  Okay, we'll take a ten-minute break.

15        (Recess from 3:43 p.m. to 3:51 p.m.)

16          THE COURT:  Be seated, please.  I just want to

17   interject something on scheduling.  And you don't have to react

18   one way or the other right now.  I checked with my courtroom

19   deputy during the break in part because it appeared that we

20   were not going to be doing such a good job of keeping the

21   schedule that we had set for ourselves this week.  And this

22   Thursday, I will have some available time starting around 11

23   a.m. for the balance of the day.  I'm informed that that day,

24   which had been reserved for matters in the SIPA case only

25   involves a couple of matters that should not be terribly time-

LEHMAN BROTHERS HOLDINGS INC., et al.

- 192 -

1   consuming.  So if Thursday works to pick up the slack of an

2   existing witness or a new witness, we can talk about that at

3   the end of the day today.

4        It also appears to me that we are not likely to finish

5   with this witness during ordinary business hours, today, and we

6   need to consider whether or not we're going to stay late to do

7   that or whether to bring him back tomorrow.  And that's

8   something that we can consider at 5:30.

9        MR. GAFFEY:  Thank you, Your Honor.

10       May I proceed, Your Honor?

11       THE COURT:  Please.

12  RESUME DIRECT EXAMINATION

13  BY MR. GAFFEY:

14  Q.   Mr. Diamond, there came a point late in the week when it

15  was so that the deal was in danger of not closing because of

16  some dissatisfaction with the assets Lehman was able to

17  deliver.  Is that right?

18  A.   Yes.

19  Q.   And Barclays was concerned that there were not enough

20  assets in the transaction at that point, correct?

21  A.   Well, we had -- not exactly.  But it might be that.

22  Apologies if this is too long, but within the agreed Fed repo,

23  if I can use that phraseology, a lot of what was expected to be

24  delivered was not delivered because things were missing.  So

25  there was a scramble, a chaotic scramble, to find replacements

- 193 -

1   for that.  If that's what you're referring to, yes.

2   Q.   Okay, and with regard to -- and we'll come to a piece of

3   this in a moment or two, but with regard to the assets in the

4   repo not coming over in full or as expected, there was, among

5   other things, a seven billion dollar shortfall, correct?

6   A.   Among other things, yes.

7   Q.   Okay, and with regard to that seven billion dollar

8   shortfall, an agreement was made that JPMorgan Chase would lend

9   Lehman the money, the difference to make up the shortfall,

10  correct?

11  A.   No, it was -- it was to -- not to lend the money but to

12  put the money in the account for the shortfall of --

13  Q.   Okay, let's -- but the verb's irrelevant to my point.

14  JPMorgan would put seven billion in cash in Barclays' account,

15  yes?

16  A.   Yes.  Not lent, permanently.

17  Q.   I understand.

18  A.   Or until it could be replaced, yes.

19  Q.   Okay.  And a dispute arose after the sale hearing, in

20  fact, after the closing concerning that seven billion dollars,

21  correct?

22  A.   It wasn't really a dispute but, yes, there was

23  controversy.

24  Q.   Okay, and the controversy arose as between Barclays and

25  JPMorgan about where that seven billion dollars was, right?

- 194 -

1    A.    JPMorgan removed it from our custody account.

2    Q.    Okay, and you demanded it back?

3    A.    Yes.

4    Q.    Yes.

5    A.    To the extent that we had any ability to demand --

6    Q.    Okay.

7    A.    Yes.

8    Q.    All right.

9    A.    Since it was our custody account.

10   Q.    I'll come back to that in a minute but I --

11   A.    Yep.

12   Q.    -- because you had mentioned it, I wanted to kind of put a

13   pin in that.  With regard to the total number of assets coming

14   over, there was a scramble for additional assets, correct, on

15   Friday?

16   A.    Yes, I'm trying to recollect if it was after the

17   deliveries.  And with the seven billion, there was still a

18   scramble for whether the securities were actually there or not

19   there, yes.

20   Q.    That's why I sort of went off on that little side road

21   about the controversy with JPMorgan arising after the closing.

22   I'm on the Friday of the sale hearing, the 19th of September,

23   before the closing.  And at that point, there's scrambling

24   going on to find more assets to put in the deal, yes?

25   A.    Yeah, I would have said -- I might be using the wrong

- 195 -

1  phraseology here, I would have said more value, but yes, I

2  think we're saying the same thing.

3  Q.   Okay, and there was a target for more value of roughly

4  three billion dollars, to your knowledge, correct?

5  A.   It changed a lot during the day.  So I'd hate to put a pin

6  in it because it was up and down all day.  But this was -- this

7  was in the balance of the forty-five billion dollars that we

8  had sent.

9  Q.   Okay, and it's at least -- in your view, it's at least

10  possible three billion was the number.  That's in the range of

11  the possible, yes?

12  A.   Yes.

13  Q.   Okay.  And the purpose of that target was to have enough

14  buffer in the transaction for Barclays, yes?

15  A.   Buffer would not be a phrase I'd use.  It was to have the

16  value that we had agreed in terms of doing the deal.  It was

17  just to live up to the agreement that we were striving for.

18  Q.   Well, I just want to drill down a little bit on what you

19  just said about buffer's not a term you would use.  Would you

20  turn to page 94 of your deposition?  And for a full context,

21  let me ask you this.  Well, I'm going to start at page 94, line

22  9, and read through the end of the page.  Are you there, sir?

23  A.   Not yet.

24  Q.   Okay.

25  A.   Any second.  Sorry, you're starting on 94?

- 196 -

1    Q.   Yes, sir, page 94, line 9.

2    A.   Okay.

3    Q.   Okay, and it's a question:  "That's really my question.

4    Was there a target?  Was it a dollar?  Was it three billion

5    dollars?"

6    "A.   It's very possible there was.  I certainly don't recall.

7    "Q.   Let me just, for clarity, my clarity, you don't recall

8    what it was or you don't recall even whether there was one.

9    "A.   I would be surprised if we didn't start with a target, and

10   I would think that target would include recognition that the

11   target would have to have enough buffer in it because of the

12   lack of information, the incorrect information, the volatility

13   in the prices minute to minute and day to day, and the

14   uncertainty and misinformation regarding the prices that were

15   listed on the books, but I don't recall what it was."

16       You had a chance to look that through as I read it out

17   loud?

18   A.   Yeah, I'm trying to read --

19   Q.   And you used the term "buffer" in there.  I just want to

20   clarify as between you and me that you do use -- you used the

21   term "buffer" in there and what you mean is a buffer meant to

22   protect Barclays from downside risk on market refund.

23   A.   I've just got to read a little bit of this, if you could

24   give me a second.  I'm having -- I'm struggling getting the

25   context.

08-13555-mg    Doc 10178    Filed 06/23/10    Entered 07/14/10 10:26:48    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 197 of 273

- 197 -

1        I think "buffer" was -- many phrases were used, in some

2    cases talking about the trading assets and trading liabilities

3    and the capital accretion, in other cases, you know, the seven

4    billion from JPMorgan wouldn't be described as a buffer.  It

5    was in replace of securities.

6    Q.    Right.  No, I put that off to the side.

7    A.    So it was a chaotic struggle.  I'm not positive right

8    now --

9    Q.    Okay.

10   A.    -- specifically which of those -- it could refer to a lot

11   of things.  It could be assets that we couldn't value so we had

12   to take other assets, as well.

13   Q.    Within -- let's just assume, for the moment, it's trading

14   assets.  By "buffer", what you mean is the difference between

15   assets and liabilities.

16   A.    I'm not sure, here, what I mean.  I can't get the context,

17   to be honest.

18   Q.    Okay.

19   A.    I -- what I said is it could mean any number of things.

20   It certainly was -- could be used, as we go back to the trading

21   assets and trading liabilities and capital accretion.

22   Q.    And just to go back for a moment, sir, to what you

23   described as the scramble for more value.  One of Barclays'

24   negotiating team is Michael Klein, an outside advisor, correct?

25   A.    He was an advisor, yes.

- 198 -

1    Q.   Okay.

2    A.   Our advisor.

3    Q.   And there was a point on Friday where Mr. Klein reported

4    to you with some degree of glee that the deal had been approved

5    by the Court, correct?

6    A.   Was he the one that did that?  I can't recall.

7    Q.   Well, glee's your term, but he did report it to you.  Do

8    you recall that?

9    A.   I don't recall that it was him.

10   Q.   Okay.

11   A.   I think I would have -- but it makes sense.

12   Q.   Okay, do you think you would have remembered an e-mail

13   where he told you that they had successfully clawed back three

14   billion more in value in the transaction?

15   A.   I've seen it during prep, yes.

16   Q.   Okay, would you take a look at Exhibit 52 in your book, M-

17   52 in evidence?  And at the bottom of the e-mail, Mr. Klein

18   writes to you and to some others that the Court has approved

19   the Barclays' acquisition of Lehman Brothers.  Congratulations,

20   et cetera, et cetera.  You see that?

21   A.   Yes, sir.

22   Q.   All right, and you respond, in e-mail world, fairly

23   excitely given the number of exclamation points there, "yes".

24   Yes?

25   A.   Yes.

- 199 -

1   Q.   Okay, so just "yes", you say.  And then further above

2   that, he writes back, "Bob, great day.  We clawed back three

3   billion more of value in the transaction and cut the building

4   prices by 160 million tonight, but all that pales in comparison

5   to Barclays' share price today."  Do you see that?

6   A.   I do.

7   Q.   Did you understand Mr. Klein's report that three billion

8   more had been clawed back -- three billion more of value had

9   been clawed back to be a reference to what you called the

10  scramble before for more value?

11  A.   It was a scramble to replace value that had disappeared,

12  yes.  So I think we're saying the same thing.  But he was part

13  of the team working all day, knowing that some of the

14  securities and assets that we were getting didn't have value or

15  were being excluded.  We couldn't do the deal until we got up

16  to the original agreed number.  And it was, you know, it was a

17  crazy day, as I said, and I do recall this e-mail.  But what

18  he's referring to is the fact that we got over the line.

19  Q.   Right, and over the line --

20  A.   We were able to get to bankruptcy court.

21  Q.   And the over the line included a sufficient buffer?

22  A.   Again, what we agreed is we agreed to take all the assets

23  and all the liabilities of the broker/dealer, U.S.

24  broker/dealer of Lehman as stipulated by the New York Fed,

25  unless they were specifically excluded.  So this is a business

- 200 -

1    acquisition.  This was different than earlier in the week.  And

2    I think you're thinking of earlier in the week when you had the

3    seventy-two billion numbers.  This wasn't the deal that was

4    presented to the bankruptcy judge and to Judge Peck.  The deal

5    was basically -- it changed unbelievably on Thursday when the

6    Fed had us change the deal at their request -- request is

7    probably too light a word -- to assume all the obligations of

8    the business -- from -- all the obligations of the Fed repo to

9    step into their position.  And what we agreed with the judge at

10   bankruptcy court was to assume all the assets and liabilities,

11   unless they were specifically excluded.  And we had -- the

12   chaos was locating them all.

13   Q.   Do you know what steps your team took to inform the Court

14   on Friday the 19th that the deal had changed unbelievably?

15   A.   I think it was right on the front page of the APA that

16   went through -- referenced the clarification letter, which my

17   understanding is that the lawyers -- none of the lawyers from

18   any side -- all were supportive of the deal, but none of the

19   lawyers, whether from the trustee, whether from the creditors,

20   whether from the estate, or whether from Barclays, no one had

21   completed all the paperwork necessary.  But it was stated in

22   the first or second page of the purchase agreement that there

23   was a clarification letter coming.

24   Q.   I can't let that hang, sir, because I think you just

25   misspoke about the documents.  You don't --

- 201 -

1    A.   Apologies if I did.

2    Q.   You don't mean the purchase agreement, do you?

3    A.   I think I mean the APA.   Right.

4    Q.   Okay.   Now, we talked a few moments ago about the

5    controversy with JPMorgan about the seven billion.   Do you

6    recall that?

7    A.   Yes, sir.

8    Q.   And there came a point where, as you put it, you found out

9    that JPMorgan had removed seven billion that, in your view, was

10   supposed to have gone to Barclays, yes?

11   A.   They removed seven billion from a Barclays custodian

12   account.

13   Q.   Okay, and you learned about that removal of the seven

14   billion dollars from a Barclays custodian account after the

15   closing, correct?

16   A.   My recollection is we learned that after the Monday

17   morning -- or the during-the-night closing, if that's what

18   you're referring to.

19   Q.   Just for clarity, sir, did you learn about it before or

20   after the deal had actually closed?   I'm just a little confused

21   by your reference --

22   A.   Yeah.

23   Q.   -- to a night closing.

24   A.   Apologies.   I'm thinking of the closing pushed back, if

25   I'm -- is just before we opened for business Monday morning.

- 202 -

1    Q.   Okay.

2    A.   And it was after that.

3    Q.   Okay, so it's after Monday morning when the closing has

4    ended.  Closing concludes on Monday morning, yes?

5    A.   Yes.  It's --

6    Q.   And you learn about the seven billion after that point?

7    A.   Yes.

8    Q.   Okay.  And the dispute was between JPMorgan on the one

9    hand and Barclays on the other, yes?

10   A.   I think, well, clearly they were primary, yes.

11   Q.   Okay.

12   A.   Were there others involved, certainly the New York Fed was

13   involved and others.  But it was primarily JPMorgan-Barclays.

14   Q.   All right, well, by involved, the New York Fed may have

15   been involved in the conversation about the dispute, but the

16   dispute was between Barclays on the one hand and JPMorgan on

17   the other, yes?

18   A.   I think that would be right, yes.

19   Q.   Okay, it wasn't between -- over the seven billion, it

20   wasn't between the Fed and Barclays or the trustee and -- I beg

21   your pardon, the Fed and JPMorgan or the trustee and JPMorgan

22   or Holdings and JPMorgan.  It was between Barclays and

23   JPMorgan, yes?

24   A.   That's my understanding, yes.

25   Q.   Okay, and ultimately, that dispute was ended with a

- 203 -

1    settlement that was reached several months later, correct?

2    A.    That's correct.

3    Q.    And in your view, as part of that settlement, Barclays

4    ended up settling for significantly less than it thought it was

5    entitled to have, yes?

6    A.    We never got the full seven billion back into our custody

7    account.

8    Q.    Okay, and again, sir, we can take the time with your

9    deposition, but in essence, you ended up, in your view,

10   settling for significantly less, yes?

11   A.    I think it was, give or take, a billion.

12   Q.    Okay, and to your knowledge at the time, that settlement

13   between Barclays and JPMorgan had to be approved by the Court,

14   yes?

15   A.    I don't specifically recall.

16   Q.    Do you recall learning that there were proceedings

17   regarding the settlement of the dispute between JPMorgan Chase

18   and Barclays?  Whether they were acquired or not, do you recall

19   that?

20   A.    I don't recall.  My conversations during that were mostly

21   with the New York Fed and with JPMorgan.

22   Q.    And -- well, let me ask you to -- when the dispute first

23   arose, when the fight first broke out, you had a conversation

24   or conversations with Jamie Dimon of JPMorgan Chase, correct?

25   A.    There was a conversation I had with him --

- 204 -

1    Q.    Okay.

2    A.    -- when we found out, yes.  I'm not sure exactly when.  I

3    think it was a couple days after we had --

4    Q.    All right.

5    A.    -- we had recognized this.

6    Q.    I will tell you, Mr. Diamond, I'm going to refer to Jamie

7    Dimon by both his first and last name only to make for some

8    clarity in the record, okay?

9         And when you spoke to Jamie Dimon, it was about the seven

10   billion that had been taken from the custodial account, yes?

11   A.    Yes, sir.

12   Q.    And you demanded that it be returned, yes?

13   A.    I asked for it to be returned, yes.

14   Q.    Okay, and I take it while it may have been polite and

15   civilized, this was not a happy call.

16   A.    That would be fair.

17   Q.    And shortly -- within a few weeks after the closing, Jamie

18   Dimon wrote a letter to Mr. Varley, a copy of which you

19   received, about that dispute.  Is that correct?

20   A.    Yes.

21   Q.    Okay, would you turn to --

22   A.    I don't recall exactly when, but it was after the call.

23   Yeah.

24   Q.    Okay, let's -- I want to pinpoint the date.  Would you

25   turn to Exhibit M-360 in your book, please?  Now, sir, I'm

- 205 -

1  going to ask you to take a look through document M-360, but at

2  the outset, focus, if you would, on the fact that the first

3  page of the exhibit contains an e-mail from Robert McAllister

4  Chase to John Varley, cc Bob Diamond, Jamie Dimon, Bill Winters

5  at JPMorgan, and Jonathon Hughes, who I understand at the time

6  was the general counsel of Barclays.  And I'll ask you, sir,

7  does that -- you don't have any dispute or doubt that you

8  received this e-mail and the attachment to it, is that right?

9  A.   I don't see the e-mail you're referring to, but I --

10  Q.   It's the very first page of the exhibit.  You'll see at

11  the bottom, sir, below -- there's some redacted --

12  A.   Oh, I got it.  Sorry.

13  Q.   So there's a big white space, but at the bottom, you'll

14  see that there's an e-mail.

15  A.   Yep.

16  Q.   Does the e-mail on that include you as an addressee?

17  A.   Sorry, yeah, I see that.

18  Q.   Okay, and you received this e-mail and its attached letter

19  at or around the time that it's dated, and the date on the next

20  page is Saturday, October 11th.  Do you see that?

21  A.   Yep.

22  Q.   All right, and do you recall receiving this e-mail and the

23  letter attached to it?

24  A.   I can't recall if I got the e-mail or the letter itself,

25  but I got one.  So I had -- I had a copy, yes, sir.

- 206 -

1    Q.   Okay, you've had a -- you've looked through Exhibit 360

2    and -- 360, and you recall receiving this letter from Jamie

3    Dimon, yes?

4    A.   Yes.

5    Q.   Okay, and the letter concerns the dispute between JPMorgan

6    Chase and Barclays, correct?

7    A.   Yes.

8    Q.   And it concerns the dispute about the seven billion

9    dollars between JPMorgan Chase and Barclays, correct?

10   A.   Well, I would have to refer to this letter, sir.  I

11   haven't seen this in two years.  I suspect it referred to a lot

12   more than just the seven billion.  If I can --

13   Q.   Have you --

14   A.   -- tell you why I think that for one second.

15   Q.   Well, that's okay.  We'll go back to that in a minute.  I

16   just want to go to something you just said.  You have not seen

17   this letter at any time?

18   A.   No, I said I haven't seen it in two years.

19   Q.   Okay.

20   A.   Sorry.

21   Q.   You see it --

22   A.   I didn't mean to say that, if I did.

23   Q.   No, no, no.  I meant -- you didn't let me finish.  Is it

24   your testimony, sir, this is the first time you've seen this

25   letter since two years ago?

                                                                    - 207 -

1    A.    It wasn't quite two years ago, so I apologize for that,

2    but since the period of having resolved this, which was after

3    that, I don't think I've seen it since then, no.

4    Q.    Okay, okay.  Take a look through the letter.  If you have

5    to read every line, I guess, by all means, but just please read

6    it sufficiently to remind yourself of its -- of, generally, its

7    contents.  But my question, sir, is it's about the dispute

8    between JPMorgan Chase and Barclays.

9    A.    I suspect other things were brought into it.

10   Q.    Let me know when you can answer about whether it's about

11   the dispute between JPMorgan Chase and Barclays.

12        (Pause)

13   A.    I tried to do a quick skim, if you want to start, and then

14   I would just ask your indulgence that I may have to go back

15   because that was a really fast skim of a pretty long letter.

16   Q.    Have you screened it enough to be able to say whether it

17   addresses -- I'm not asking you to commit to completely every

18   line, every jot, every comma, but it addresses the dispute

19   between JPMorgan Chase and Barclays over the seven billion

20   dollars?

21   A.    No, most of it is a dispute that had been resolved that

22   was still being brought back on the table by JPMorgan on

23   another repo, a tri-party repo that had been done earlier in

24   the week.  My recollection is that one was done after the

25   initial meeting with Judge Peck, but before the Friday night

- 208 -

1   meeting.  We had terminated a tri-party repo that JPMorgan was

2   disputing in here

3   Q.   Okay.

4   A.   And I think they brought a lot of other things in.  You

5   have to understand --

6   Q.   I can get to the details, sir, for my purposes at the

7   moment --

8   A.   It's much --

9   Q.   -- whatever the topic is --

10  A.   It's much more than what you say it refers to.

11  Q.   I haven't -- my question is to you, for my current

12  purposes, sir, this letter, whatever the topic, concerns a

13  dispute between JPMorgan Chase on the one hand and Barclays on

14  the other?

15  A.   And other things, yes.

16       MR. GAFFEY:  Your Honor, I move the admission of

17  Exhibit M-360.

18       MR. BOIES:  Objection, Your Honor.  It's hearsay.

19  It's also, I believe, it's a -- subject to 408 privilege.  But

20  as a threshold matter, it's simply hearsay.  It's what Chase is

21  saying about this deal.

22       MR. GAFFEY:  Your Honor, I offer the document not for

23  the truth of the matters asserted by Jamie Dimon in the letter,

24  but purely for the purposes that he made those statements to

25  Barclays, and to the degree that constitutes some kind of

- 209 -

1    notice that that's JPMorgan Chase's view.  It is not for the

2    truth.  With respect to the 408 objection, I would suggest

3    that, in essence, already has been resolved by the Court's

4    decision on May 7th regarding Exhibit 701 and 705.  We

5    established that the letter concerns a dispute between JPMorgan

6    Chase and Barclays, not a dispute between Barclays and any

7    other movant, and therefore, it is not barred under a binding

8    precedent in the Second Circuit by Rule 408 because it's not

9    being offered to prove liability of the dispute that the letter

10   itself addresses.

11           THE COURT:  The letter is admitted for the limited

12   purpose outlined by Mr. Gaffey in his clarifying remarks.

13   (Movants' Exhibit 360, letter concerning dispute between

14   JPMorgan Chase and Barclays, was hereby received into evidence

15   as of this date.)

16   BY MR. GAFFEY:

17   Q.   Now, Mr. Diamond, Mr. Diamond, when you received this

18   letter from Jamie Dimon, did you have any conversations with

19   Mr. Varley about it?

20   A.   Yes.  I'm sure we did.

21   Q.   And in his letter, Mr. Dimon, James Dimon, makes some

22   fairly significant assertions with regard to what the Court was

23   told and what the Court was not told in his view regarding the

24   sales transaction.  That's the subject of this proceeding, is

25   that correct?

- 210 -

1    A.    I'd have to go back and read it.

2    Q.    Okay.

3    A.    there was a lot of things addressed in here that had

4    nothing to do with the -- key issue is that JPMorgan had

5    removed seven billion dollars from a custody account, which is

6    not a legal action.

7    Q.    I can -- I think I can agree with you, Mr. Diamond, that

8    the one thing we're not going to resolve today is the dispute

9    between Barclays and JPMorgan Chase.  My questions don't go to

10    who was right or wrong about it.  My questions go to my

11    statements that Mr. Jamie Dimon made in the letter and how you

12    reacted to them.

13    A.    Our focus -- okay.

14    Q.    So, at -- in his letter, Jamie Dimon says, as he

15    introduces the topic, in the hope that we can have an honest

16    and forthright discussion about what we might do to resolve our

17    differences -- and I'm in the first paragraph of the letter --

18    what I think we must do -- his italics -- what I think we must

19    do in light of the potential impact of these matters on the

20    Lehman Brothers Inc. estate and LBI's creditors.  I know you

21    are focused on the movement of seven billion of cash out of the

22    cash collateral account into an LBI clearance account on

23    Friday, September 19th.  What I do not know is whether you are

24    aware of, one, the context, at least from our perspective in

25    which that occurred, and two, the interest that LBI, its

LEHMAN BROTHERS HOLDINGS INC., et al.

- 211 -

1    creditors, the SIPA trustee, and the bankruptcy court may have

2    in these events."  After reading that introduction, well, let

3    me ask you first, did you ever talk to Mr. Jamie Dimon about

4    the contents of his letter after you read it?

5    A.    I did not, personally.  The letter was addressed to John

6    Varley.

7    Q.    Okay.  Well, and it was transmitted to you directly by

8    e-mail, yes?

9    A.    But it wasn't addressed to me, it was addressed to John.

10   Q.    I understand that.  And did you have any conversations

11   with Mr. Varley as to whether, based on statements made in

12   Jamie Dimon's letter, it would be necessary to investigate what

13   disclosures were made to the Court about the sale transaction?

14   A.    The focus of the dispute was the seven billion dollars

15   which was removed from our custodian account.  And I'm not sure

16   it states in here even that.  And our view was, until that

17   money was returned, that it didn't make much sense to talk.

18   Q.    Ultimately, this dispute was resolved with a settlement,

19   yes?

20   A.    Yes.

21   Q.    Now, in his letter, Jamie Dimon refers on page 3 to -- he

22   says that you spoke to Heidi Miller and other senior executives

23   of JPMorgan Chase and asked that Chase release a lien on

24   additional securities so Barclays Capital would receive an

25   aggregate of 49.7 billion in securities in exchange for

LEHMAN BROTHERS HOLDINGS INC., et al.

- 212 -

1   aggregate payments of 45 billion in cash.  Do you see that?

2   It's the second paragraph on page 3.

3   A.   Yes.

4   Q.   Did you have that conversation with Heidi Miller?

5   A.   We -- I had a conversation with Heidi Miller.  It's not

6   represented accurately here.  She was one of the people on the

7   phone, and the prime person whom my conversation was with was

8   Bill Winters.

9   Q.   Was Bill?

10  A.   Bill Winters.

11  Q.   Okay.  And --

12  A.   I did not believe -- I'm sorry.  I'll leave it at that.

13  Bill Winters was the person I had the conversation with.

14  Q.   And when you had the conversation or conversations with

15  people at JPMorgan Chase, were you in sum or essence asking

16  that Chase release a lien on securities so Barclays would

17  receive an aggregate of 49.7 billion in securities?

18  A.   I think this is the whole part that's in dispute.  And

19  this was a one-sided letter where it would take some time for

20  us to, you know, go through this.  But our whole position was

21  that this was not an accurate reflection.

22  Q.   Was it an accurate reflection on the particular point that

23  what Barclays Capital expected to receive was an aggregate of

24  approximately 49.7 billion in securities in exchange for

25  aggregate payments of 45 billion in cash?

LEHMAN BROTHERS HOLDINGS INC., et al.

- 213 -

1    A.    We --

2    Q.    That exchange, 49.7 for 45?

3    A.    -- the specifics of the transaction -- it's two years ago,

4    and it would be disingenuous or -- not disingenuous -- it would

5    be inappropriate for me -- the transaction was -- we were doing

6    the Fed repo -- those numbers are very similar.  The 45 billion

7    dollars was the amount that we wired to JPMorgan in return for

8    the Fed repo assets.

9    Q.    Okay.

10   A.    The exact number, I think is right, but I'm not positive.

11   Q.    Okay.  I don't want to hold you right to 49.7.  But you do

12   agree, sir, that the exchange was essentially for 45 billion in

13   cash, something in the range of 49.7 or a little more or a

14   little less for -- in securities, yes?

15   A.    That had originally been valued at that when the repo was

16   done by the Fed, yes.  They were no longer valued at that.

17   Q.    All right.  And owing to operational issues at DTC, by the

18   time DTC closed down, that entire amount, the 49.7 or

19   thereabouts, had not make its way over to Barclays, correct?

20   A.    Yes, as we discussed earlier.  Correct.

21   Q.    And that's what the seven billion was supposed to --

22   A.    That's part of it.

23   Q.    -- take care of?  Okay.  And -- well let me -- Mr. Jamie

24   Dimon goes on at some length about repos during the week, and

25   which -- what repos replaced what, and what rolled, and what

- 214 -

1    didn't, and what got sent over.  But I really want to direct

2    your attention to a statement that he makes on page 5 of his

3    letter.

4        And it's the first paragraph at the top of page 5.  And

5    Jamie Dimon writes the following:  "On Friday night, for the

6    first time, as far as we know, the bankruptcy court was

7    apprised of a different deal between Barclays Capital and

8    Lehman Brothers, and that Barclays Capital was no longer

9    purchasing seventy billion in assets and assuming sixty-nine

10   billion in related debt.  But the Court was not apprised of the

11   purchase that Barclays Capital now says it agreed to make.

12   Instead of the Court being told that Barclays Capital was

13   purchasing approximately 49.7 billion in securities for 45

14   billion in cash, the Court was told that Barclays Capital was

15   purchasing 47.4 billion in securities for 45.5 billion in cash.

16   In addition, the Court was told that the reason for the change

17   was a deterioration in market prices, an explanation that we

18   now know to be incorrect."

19       Now, I'm not going to ask you to agree or disagree with

20   it, sir, but I am going to ask you if, at the time you received

21   this letter from Jamie Dimon, you understood this to be an

22   extremely serious accusation?

23   A.   The whole situation was very serious.  The removal of

24   seven billion dollars from a custody account, at a time when we

25   were going out in the market to raise equity, was a very

- 215 -

1    difficult position.  So the markets were in turmoil, and we had

2    seven billion dollars removed from a custodian account.

3    Q.    Sir --

4    A.    So, the situation was very serious.

5    Q.    In sum, sir, Mr. Dimon says in that paragraph of his

6    letter that the Court was misled about the terms of the deal.

7    Do you agree with me there?  Whether he's right or he's wrong,

8    that's the accusation Jamie Dimon is making in his letter to

9    you?  Yes?

10   A.    What he's saying is misleading, but accusatory, yes.

11   Q.    Okay.  And it's accusatory about an extremely serious

12   matter.  It's accusatory about whether the Court was told the

13   truth on Friday the 19th about the deal that Barclays made with

14   Lehman, yes?

15   A.    Again, the focus of our dispute with JPMorgan was over the

16   seven billion dollars.

17   Q.    I got that.  But in this part of Jamie Dimon's letter,

18   he's saying to you that the United States Bankruptcy Court for

19   the Southern District of New York was misled about the terms of

20   the deal it approved.  Did you understand him to be saying that

21   when you read this letter?  I'm not asking you to agree or

22   disagree with him, just that that's what you were being accused

23   of -- you Barclays.

24   A.    We saw a lot of things in this letter that were misleading

25   and inaccurate, including this paragraph, yes.

- 216 -

1    Q.    Okay.  Now, you told us before, sir -- but actually, I'm

2    not sure I got an answer to that question.  Did you understand

3    this to be an extremely serious accusation against Barclays?

4    A.    Yes, but also misleading and inaccurate.

5    Q.    Okay.  And you told us before that you did not attend the

6    court hearing, correct?

7    A.    Correct.

8    Q.    And by the court hearing I mean the sale hearing.  You did

9    not attend that, yes?

10   A.    I'm sorry?

11         MR. GAFFEY:  Withdrawn.

12   Q.    It's correct that you did not attend the sale hearing,

13   yes?

14   A.    That's the Friday night bankruptcy?

15   Q.    Correct, sir.

16   A.    Correct.

17   Q.    And Mr. Varley, the other addressee of this letter, also

18   did not attend the sale hearing, yes?

19   A.    Correct.

20   Q.    And you had not, by the time you received Jamie Dimon's

21   October 11th letter, read the transcript of proceedings before

22   the Court on September 19th -- that is the sale hearing -- is

23   that right?

24   A.    I don't recall.

25   Q.    Well, do you recall asking for the transcript of the very

08-13555-mg    Doc 10178    Filed 06/23/10    Entered 07/14/10 10:26:48    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 217 of 273

- 217 -

1    long sale hearing after you learned the deal had been approved?

2    A.    We clearly had all the people involved in the transaction

3    look at this letter.  So, Rich Ricci, for

4    example -- in other words, this didn't -- yes.

5    Q.    Well, at the end of the day you're -- I know you're not

6    directly involved in the negotiations.  Rich Ricci is your

7    delegee.  But it's fair to say, sir, you're the guy in charge

8    of this deal, yes?  This is your deal within Barclays?

9    A.    Well, I -- I was a big part of it yes.  But it was a

10   Barclays transaction.

11   Q.    Okay.  And you see an accusation in the letter that says

12   the Court was misled by 2.3 billion dollars as to the value of

13   securities that were being transferred from the debtor to

14   Barclays.  Did you order anyone on your team to go back and

15   review the disclosures that had been made to the judge to make

16   sure that that wasn't right?

17   A.    We took appropriate action with the letter in terms of

18   looking into the things that were said, yes.

19   Q.    That's a bit more general than I think the answer calls

20   for, sir.  The question is, did you tell anyone on your team go

21   make sure that this Court was not misled about the amount of

22   assets that we took out of the debtor?

23   A.    Yes.  If what you mean is did we take this letter and make

24   sure that the things that we felt were inappropriate were in

25   fact inappropriate, yes, we took those actions.

- 218 -

1   Q.   And what steps, if any, did Barclays take to bring to the

2   Court's attention the fact that Jamie Dimon -- I'm sorry --

3   that JPMorgan Chase and Barclays had this dispute where

4   JPMorgan Chase was of the view that the Court had been misled

5   to the tune of 2.3 billion dollars?

6   A.   I'm not sure, sir.

7   Q.   Well, again, as somebody who was pretty involved in this

8   deal and fairly senior at Barclays, did you take any steps to

9   make sure that happened?

10  A.   As I said, we took steps to make sure that the team was

11  able to review this.  And as I said, this was -- this was a

12  one-sided view that we clearly didn't agree with.  Whether

13  there were discussions beyond that, I don't know.

14  Q.   Okay.  Do you know, sir -- to your own knowledge, do you

15  know whether when the settlement of this dispute between

16  JPMorgan Chase and Barclays was brought to the Court for

17  approval, the Court was told that there had been this exchange

18  between Barclays and JPMorgan Chase, where JPMorgan says the

19  Court was not told the truth about the transaction?

20  A.   Well, we clearly believe that the Court was given all of

21  the information, the relevant information, to make a judgment

22  on a deal.  And so clearly, we disagree with this.  I've said

23  that a couple of times.  So there were many people that could

24  say many things that are inaccurate.  That doesn't mean that

25  they all get dealt with in the same way.

- 219 -

1    Q.   Well --

2    A.   The genesis of this dispute was as serious as it could be.

3    It's a bank taking seven billion dollars out of a custody

4    account -- a custodian account.  That was the genesis of this.

5    Q.   And under the degree of seriousness, sir, you would agree

6    with me that if Mr. -- what Jamie Dimon had to say in his

7    letter were true, that would be an issue of at least equal

8    significance, whether the Court was told the truth about the

9    transaction that led to your bank's acquisition of the Lehman

10   brokerage?

11   A.   I think -- I don't want to try and put value judgments,

12   but clearly, we have tremendous respect for the judge and for

13   the process in the bankruptcy court.

14   Q.   And -- well, let me ask you to take a look at page 6 of

15   the letter, sir; and in particular to numbered paragraph 3 in

16   Jamie Dimon's letter.  And again, this relates to other parts

17   of the letter that he has written, and it's in evidence for

18   people to read.

19        But he says about halfway down the paragraph, beginning

20   with the word "Moreover", "Moreover, the bankruptcy court was

21   told that Barclays was to receive 47.4 billion, not 49.7

22   billion in securities and to pay 45.5 billion, not 45 or 45.2

23   billion, in cash.  We are both duty-bound to ensure that LBI

24   received the value it was supposed to receive in exchange for

25   your 45 billion.  We have offered several times to do this

- 220 -

```
 1    accounting, and you, and as appropriate the Fed, and it is

 2    entirely possible that the SIPA trustee and the bankruptcy

 3    court, would want such an accounting.  But your personnel have

 4    declined, citing the amount of time and effort it would take.

 5    We should do this accounting.  We should do it now.  We would

 6    be willing to discuss the concept of an escrow while such

 7    reconciliation was taking place."

 8        When you got this letter from Mr. Dimon, did you find out

 9    if your personnel had in fact engaged in an accounting, as he

10    urged you were duty-bound to do?

11    A.   Again, you have to --

12    Q.   He says we asked, you said no --

13    A.   -- start with a position that the fair discussion was an

14    escrow or was first returning the money to our account.  And

15    that was never offered or never done.  And we had seven billion

16    dollars taken out of our account.  I don't know how much more I

17    can do to discredit this letter.

18    Q.   Well, again, sir, I'm not asking you to give a view from

19    the stand here as to who was right or wrong in the dispute.

20    What I'm more interested in is, when this accusation is made by

21    Jamie Dimon -- Jamie Dimon is the CEO of JPMorgan Chase, yes?

22    A.   Yes.

23    Q.   He's a pretty serious character in the banking world, yes?

24    A.   He -- the dispute here was over removal of seven billion

25    dollars from a custodian account.
```

- 221 -

1    Q.   Okay.  And Mr. Dimon writes and says -- and again, I'm

2    overstating it a bit to make the point -- you guys lied to the

3    bankruptcy court, and we asked you to do an accounting, and

4    your people refused.  Whether he's right or wrong about the

5    dispute, did your people engage in an accounting to figure out

6    whether Mr. Dimon was right or wrong when he made that

7    accusation?

8    A.   You know, I'm sure -- again, we're in a situation where

9    the clearing bank, JPMorgan, removed money from a Barclays

10   account, not from anyone else's account, but from our

11   account -- cash from a custodian account.  They then were using

12   other ways to try and not deal with this.  It was important to

13   put the money back in the account.  And there were things said

14   that we -- in the case of this -- that we were completely

15   confident with our position and our case.  And we were

16   completely confident that the deal that Judge Peck approved is

17   the deal that we executed on Monday morning.

18   Q.   And you understood that the deal Judge Peck approved that

19   you closed on Monday morning was the deal as described to the

20   Court, yes?

21   A.   I think, importantly, the deal that was executed on Monday

22   morning was supported by the trustees, by the creditors, by

23   everyone, through thick and thin, through very difficult times.

24   There were periods in January where, you know, the building

25   that we acquired in the deal, could have been worthless.  There

- 222 -

1    were periods in January where the market cap of most major

2    banks, including Barclays, had reduced dramatically.  There

3    were cases when employees, you know, may have left.  The

4    business environment was terrible in the fourth quarter.  But

5    we didn't come back to the bankruptcy court and say change the

6    deal.

7    Q.    And going back to the question I was actually asking, when

8    you got this letter from Jamie Dimon accusing Barclays of

9    misleading the bankruptcy court, did your people do the

10   accounting that Mr. Dimon suggested you were duty-bound to do?

11   A.    I don't know specifically if they did, but I'm happy to

12   look into that.

13   Q.    You don't know, as you sit here today, fully prepared to

14   testify at this case, whether they did that accounting?

15   A.    There are so many different nuances to different things

16   that go on.  I don't know that specifically, sir.  I wasn't

17   prepared to answer the detail of this letter.  But I'm

18   absolutely delighted to look into it.

19   Q.    Can I suggest to you, sir, that there's not a lot of

20   nuance when someone accuses you of misleading a bankruptcy

21   court to the tune of --

22   A.    Keep in mind --

23   Q.    -- 2.3 billion dollars?

24   A.    -- this is -- this is the bank that took money out of our

25   custody account.  So there were many accusations in here that

- 223 -

1  we knew to be untrue.  And we knew our values.  We knew our --

2  the deal that we did.  We knew all those things.  So you're

3  asking me --

4  Q.   And --

5  A.   -- specifically was there a test.  I'm not sure.  I'm

6  happy to look into it.  But we do know whether the accusations

7  were accurate or not.

8  Q.   -- and although you're confident the accusations were

9  completely inaccurate, the fact of the matter is, Barclays

10  settles for significantly less several months later, yes?

11  A.   That was a tough decision to make.

12  Q.   That's the decision you made, yes?

13  A.   You know, in a -- in this situation where money has been

14  taken out of a custody account, you have to put all that in

15  context.  And it was -- it was a difficult decision to try and

16  draw a line under it and move on.

17  Q.   And drawing a line under it involved taking significantly

18  less than you thought Barclays was entitled to?

19  A.   Well, less than what was in our custody account, yes.

20  Q.   Okay, and isn't it --

21  A.   And --

22  Q.   -- a fact, sir, one of the reasons you drew a line under

23  it and made that decision, is to avoid that accusation from

24  seeing the light of day --

25  A.   Um --

LEHMAN BROTHERS HOLDINGS INC., et al.

- 224 -

1    Q.   -- by that, I mean the accusation that the Court had been

2    misled about the assets taken out of the estate --

3    A.   -- we're completely --

4    Q.   -- were paid?

5    A.   -- we are completely confident in how we behaved and how

6    we did the deal, and I think that's an accusation without

7    merit.

8          MR. GAFFEY:  I have nothing further for Mr. Diamond,

9    Your Honor.

10         THE COURT:  Mr. Boies, I think there's some more

11   coming from the direction of the other table.

12         MR. MAGUIRE:  If it please the Court, Bill Maguire for

13   the SIPA trustee.  Your Honor, if I might approach with a

14   binder of documents?

15         THE COURT:  You may.

16     (Pause)

17   CROSS-EXAMINATION

18   BY MR. MAGUIRE:

19   Q.   Sir, you've testified a number of times about how

20   incredibly important this deal was.  It was incredibly

21   important, was it not?

22   A.   Yes.

23   Q.   This was, in your words, and opportunity of a lifetime for

24   Barclays?

25   A.   The deal was transformational to our business.

- 225 -

1   Q.   You described it, in fact, to the world, as the

2   opportunity of a lifetime, did you not?

3   A.   Yes.  I think I was referring -- yes.  And referring

4   specifically to the opportunity for an institution like

5   Barclays to acquire the business of a U.S. broker-dealer.

6   Q.   This transaction occurred amid considerable media

7   attention, did it not?

8   A.   There was media attention, yes.

9   Q.   In the period since this transaction, the transaction

10  itself, your role in it, and statements you have made about the

11  transaction, have been the subject of considerable media

12  attention, have they not?

13  A.   I don't know if it's significant, but there's been media

14  attention.

15  Q.   Sir, you recall the -- an article in the New York Times,

16  "Deal Book", by Andrew Ross Sorkin, in which reported that the

17  editors and writers of Investment Dealers' Digest had chosen

18  you as best banker of the year for 2008 for your shrewd

19  takeover of the Lehman Brothers franchise in the United States?

20  A.   I recall that, yes.

21  Q.   And you recall telling Mr. Sorkin, "I never contemplated

22  that it would be possible to acquire so cheaply, effectively

23  for the price of the building, a U.S. bulge bracket franchise"?

24  A.   It's taken a little bit out of context.  But if it's a

25  quote, I'm sure it's a quote.

- 226 -

1    Q.   And do you recall going on to say, "Never mind a U.S.

2    bulge bracket franchise as special as Lehman Brothers"?

3    A.   Lehman Brothers was a bulge bracket firm, yes.

4    Q.   Sir, do you recall Esquire magazine's article by Tom Junod

5    on this transaction, the article with a large photograph of you

6    and with the headline "The Deal of the Century"?

7    A.   I do recall.

8    Q.   Do you recall, sir, giving an interview to Martin Vander-

9    Weyer of The Mail, in early February 2009 which is in your

10   binder at tab 11?  It's Movants' Exhibit 721.

11   A.   Yes, I see it.

12   Q.   Do you recall giving a rare interview by a transatlantic

13   phone call to Mr. Vander-Weyer concerning this transaction?

14   A.   Vaguely, but yes.

15   Q.   If you'd turn to the second page of the exhibit, sir,

16   you'll see in the third paragraph down a statement attributed

17   to you, where you say, "What's interesting and ironic is that

18   we probably made our most important strategic move in the

19   history of BarCap with the acquisition of the U.S. broker-

20   dealer business of Lehman Brothers."  Do you see that?

21   A.   I do.  But you should look at the very next sentence --

22   Q.   Only question is if you see that, sir?

23   A.   Okay, I see it.

24   Q.   This transaction was the most important strategic moment

25   in the history of BarCap, was it not?

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 227 of 273

- 227 -

1    A.    Yes.  And with great risk.

2    Q.    And the decision that took place in this courtroom at the

3    sale hearing on September 19, 2008, the decision whether this

4    transaction should proceed or should not be approved, that was

5    the most important strategic decision in the history of

6    Barclays Capital, was it not?

7    A.    The bankruptcy decision or the decision to go forward with

8    the deal?

9    Q.    The decision whether this transaction would proceed?

10   A.    Well, Barclays Capital was formed in 1997, and it's been

11   through an awful lot.  But I would agree this was the single

12   biggest strategic risk and strategic opportunity, yes, sir.

13   Q.    This is what your colleague Michael Klein referred to as a

14   great leap forward in the e-mail that you saw earlier today?

15   A.    It was a -- it was -- you know, it's interesting, because

16   we were the only ones to bid on this property because of how

17   much risk there was at the time.  But I do agree that I think

18   in times of -- it was tough, because no other board was willing

19   to put in a bid.  But it's in times of great turmoil and great

20   stress like that that sometimes good opportunities come up.

21   Q.    My only question, sir, is, that was a subject Michael

22   Klein described here as being a great leap forward for

23   Barclays?

24   A.    I suspect it was.  I don't know what he had in mind.  But

25   I suspect it was that.

- 228 -

1    Q.    I did not ask you about any bid or non-bid that anybody

2    else put in.  We will come to that later if you wish, but that

3    was not the subject of my question, okay?

4    A.    Yes, sir.

5    Q.    Now, sir, if you move down three lines, you will see the

6    reporter here notes that "BarCap was fundamentally a fixed-

7    income business focused on the UK, Europe and Asia."  Do you

8    see that?

9    A.    I see that.

10   Q.    And that was a true statement prior to this deal, was it

11   not?

12   A.    It comes right after I pointed out the risk, yes.

13   Q.    It goes on to report that "BarCap could never be a player

14   in equities until it could acquire a top-tier U.S. operation."

15   And that was your view, was it not, sir?

16   A.    It was my view that having a U.S. presence in equities was

17   critical to having a presence outside the U.S.

18   Q.    And when the opportunity came along to buy Lehman, in your

19   words, "it was almost too good to be true.  Its client

20   franchise in the U.S. is second to none."  Correct, sir?

21   A.    It's a fantastic client franchise, yes.

22   Q.    So you bought these core businesses at a price that was

23   barely more than the value of the real estate that came with

24   them, correct?

25   A.    With all the risks associated with that, the risks of

LEHMAN BROTHERS HOLDINGS INC., et al.

- 229 -

1    running the business, the risks of deteriorating market

2    conditions, the risk that our investors would support the deal,

3    the risk that we could continue to raise equity.  So with all

4    those risks, during a two-week period which was of the greatest

5    risk ever in the market, according to Chairman Bernanke, we did

6    take advantage -- we did pursue an opportunity.  But through

7    great execution, there's very, very few times -- is there -- I

8    can't think of an example of a merger in the investment banking

9    business that was executed as well as this was so that we're

10   able to keep the business intact, particularly when handicapped

11   with the incredible turmoil.  Many of our clients wouldn't do

12   business with us for quite a long time.

13   Q.   I understand, sir, there's a great deal that you have to

14   say about all of this transaction.  My question now is with

15   respect to the next line and the statement that is attributed

16   to you, whether or not that fairly reflects your views.  And

17   that is, "Most pleasing to us is that it's already a positive

18   operating business.  You might expect a few months or a year or

19   so of negative operating earnings, but this is already

20   positive"?

21   A.   Yeah, we were very surprised and very pleased with that.

22   Q.   And when you said it was already a positive operating

23   business, you meant the Lehman business was already generating

24   positive earnings and operating earnings and cash flow for

25   BarCap.  Isn't that right?

                                                            - 230 -

1    A.    Positive revenues.  And it was increasingly difficult, as

2    the days went on, to differentiate what was the Lehman business

3    and what was the BarCap business.  But we did.  We were very,

4    very pleased that the ability to get the business up and

5    running, having been in bankruptcy for a week, we were earning

6    positive revenues that quickly.

7    Q.    What you meant here is you might expect ordinarily in a

8    transaction that you would have negative operating earnings at

9    the beginning for a few months or for a couple of years, that

10   would eventually realize the benefits, but in this case, you

11   realized the benefits right away.  Isn't that correct?

12   A.    Not really.  I think in most cases, in an acquisition, you

13   would absolutely expect positive operating earnings day one.  I

14   think the concern we had is, because of the environment and the

15   turmoil, and because it had been in bankruptcy for a week --

16   and as Judge Peck knows, one of the reasons it was -- the

17   normal bankruptcy process wouldn't be as short as Tuesday

18   through Friday, opening on Monday.  But we were very concerned

19   that the business would atrophy.

20        Employees weren't coming in.  The phones weren't working.

21   The bills weren't being paid.  Clients weren't picking up the

22   phone.  So the fact that we could get it up and running that

23   quickly by Monday gave us a chance.  And we found it really

24   pleasing -- pleasantly surprised that we could get positive

25   operating earnings, given the environment.  Most deals, you're

- 231 -

1    absolutely right, would expect positive operating earnings day

2    one.

3    Q.    And you got --

4    A.    We were concerned because of the full week of this --

5    well, the turmoil in the market --

6    Q.    Whatever your concern, sir, you got positive operating

7    earnings from day one, correct?

8    A.    Yes, and by that --

9    Q.    That's fine.

10   A.    -- by that we don't mean in a full P&L sense.  But we did

11   have higher revenues than direct costs.

12   Q.    You were adamant in this interview that despite some

13   skepticism, there were no skeletons in the closet?

14   A.    Um --

15   Q.    You'll see that two lines down, you say -- there's a

16   quote, "The issues which damaged Lehman were around commercial

17   mortgages and illiquid private equity assets."  You explained

18   that.  Do you see that?

19   A.    I see that, yes.

20   Q.    And then you went on to say, "But the core business of

21   credit trading, the investment banking, M&A and equities, was

22   like the Lehman that I had competed with for decades with

23   admiration.  They ran a really tight ship."  And that was your

24   understanding when you competed with Lehman over the decades.

25   Isn't that right?

LEHMAN BROTHERS HOLDINGS INC., et al.

- 232 -

1   A.   That was our understanding from the outside, yes.

2   Q.   And that was your understanding when you gave this

3   interview in February of 2009.  Correct, sir?

4   A.   We were very pleased with the speed of integration, yes.

5   Q.   Now, in fact, sir, this was an extraordinarily lucrative

6   transaction for Barclays from day one, was it not?

7   A.   Sadly, no.  I think the turmoil of the environment meant

8   that the impact on our share price, because of the risks

9   associated with doing this deal, the week that we did this

10  deal, the market cap of Barclays was twenty-five billion

11  pounds, roughly.

12  Q.   Let me be more precise in my question.

13  A.   Sorry, I wanted to answer the question.

14  Q.   Barclays --

15  A.   You said Barclays --

16  Q.   I think you're misunderstanding my question.  Barclays

17  Capital made billions of dollars on this transaction on day

18  one.  Isn't that correct?

19  A.   I think you're confusing -- no, it's not.  I think you're

20  confusing day-one accounting, which is a phrase, with day one.

21  Q.   Well, let me just take the accounting, then, sir.

22  A.   Could I please answer the question?

23  Q.   Let me try to make it easier for you.

24  A.   You asked a question, I --

25  Q.   I'll give you a new question.

- 233 -

1   A.   -- I don't want you to make it easier.

2   Q.   Well, I don't want -- I want a clear record, sir.  So if

3   you're having difficulty with a question, let me give you a

4   different one.  Barclays announced an accounting gain of

5   billions of dollars in connection with this transaction, did it

6   not?

7   A.   I'm going to take my time to answer the question.  I think

8   that's only fair.  I didn't have trouble with the question.

9   Months and months later -- months and months later there was an

10  accounting --

11  Q.   Sir, you're not going to give either a yes or a no before

12  you give this explanation, are you?

13  A.   Yes, if you mean eventually.  Was there a gain on

14  acquis --

15  Q.   That's fine.

16  A.   -- I would like to explain if I could.  Yes, but.  Yes,

17  there was a gain on acquisition. But acquisition accounting

18  included the value of the client lists, the value of the

19  technology, things that would have had no value to the Lehman

20  estate, things that for accounting convention we are required

21  to write up.  So I think to say there's a day-one accounting --

22  and I think you'll also see e-mail traffic showing that our

23  financial people had no idea if there would be a gain on

24  acquisition immediately following this transaction.  There was

25  tremendous risk.

- 234 -

1       And listen, I do know where you're going with this.  And

2   it's not fair to say that this was a windfall in any sense.  We

3   worked very, very hard at the integration.  And you know

4   there's a difference between GAAP accounting or regulatory

5   accounting and gain on acquisition.  It's driven by accounting

6   standards that are very, very different.  And I think the best

7   example I can give you is that we took a gain based on the

8   client lists and the value of a client list, which wouldn't

9   have had value to an estate in bankruptcy.  And actually there

10  was no day-to-day P&L coming from that.  It's an accounting

11  convention.

12      So yes, eventually.  But it took months and months and

13  months to determine that.  And during that period, the Barclays

14  Group suffered significant deterioration in its equity price

15  because of the risk associated.

16  Q.   And when you say months and months and months, you're

17  referring to the announcement in February, of Barclays'

18  accounting gain, right?

19  A.   I think it was February, yes.

20  Q.   And then the annual report which came out, I believe, in

21  March, right?

22  A.   I think those were the appropriate -- around that time,

23  yeah.

24  Q.   Let me ask you specifically with respect to the profit

25  that Barclays reported in its results announcement.  In that

- 235 -

1   announcement, the profit -- the day-one profit that Barclays

2   made on this acquisition made BarCap's entire year.  It changed

3   it from a loss to a profit.  Isn't that right?

4   A.   Yes, but I don't think -- I think one investment bank in

5   the world other than BarCap had a gain that year.  So it was a

6   year of incredible risk and a deterioration.  And it wasn't a

7   profit.  I want to point this out.  It wasn't a profit on

8   acquisition, it was acquisition accounting.  So it's reported

9   as a gain -- an acquisition gain, as opposed to a profit made

10  by trading the markets.

11  Q.   If you'd turn, sir, to Movants' Exhibit 100, which is in

12  tab 3 of your binder, you will see the results announcement

13  with the figures for 2008.  There's an excerpt there which is

14  page 8.  Do you see that, sir?

15  A.   I do.

16  Q.   If you'd go to "Business performance, investment banking

17  and investment management," you'll see that Barclays Capital

18  profit before tax was 1,302,000,000 Sterling, in a very

19  challenging market, down 44 percent, and included a gain on the

20  acquisition of Lehman Brothers' North American businesses of

21  2,262,000,000 Sterling.  Do you see that?

22  A.   I do.

23  Q.   Without that gain on Lehman of 2.3 billion, Barclays would

24  have gone -- for 2008, it would have reported a profit before

25  tax, not of 1.3 billion Sterling, but a loss of around a

- 236 -

1   billion pounds Sterling.  Isn't that right, sir?

2   A.    You mean Barclays Capital not Barclays?

3   Q.    Barclays Capital.  Yes, sir.

4   A.    Yes.  And as you can see, it says "gain" -- I want to get

5   the -- "gain on the acquisition not profit."  So I think what's

6   really important is the operating of our business lost money

7   that year.  There was a gain on acquisition, which is

8   acquisition accounting.  And that reinforces my point of the

9   incredible risk we were taking in an incredibly risky time in

10  the market, where other than ourselves and I think one other

11  investment bank, all lost money.  And we lost money without the

12  accounting gain on acquisition.  So it reinforces how

13  important -- how important it is to understand the environment

14  that this deal was done in and the difference between gain and

15  acquisition and acquisition accounting versus operating

16  earnings.  It's very, very different.

17  Q.    And sir, the --

18  A.    There was a -- it was a difficult market environment in

19  the fourth quarter of that year, and it was the most negative

20  operating period we had ever had.

21  Q.    The profit that Barclays made on this enjoyed special tax

22  advantages, did it not?

23  A.    Um --

24  Q.    To be more precise, Barclays' businesses in the United

25  States had been operating at losses and had accumulated tax

- 237 -

1   losses.  So you were able to shelter the gain here and achieve

2   a very low tax rate.  Isn't that correct?

3   A.    I'm not familiar with the tax accounting.

4   Q.    Well, let me ask you --

5   A.    But if --

6   Q.    -- to turn to Movants' Exhibit 554 in tab 6 of your

7   binder.  You'll see there an excerpt, at page 3.  And if you

8   look just past the bullets on the income statement, sir -- are

9   you with me?

10  A.    Um-hmm.

11  Q.    You'll see it notes, "The profit after tax increased four

12  percent."  It notes then that, "this reflected an effective tax

13  rate of thirteen percent; 2007, twenty-eight percent; primarily

14  due to the gain in the acquisition of Lehman Brothers' North

15  American businesses of 2,262,000,000 pounds Sterling, in part

16  being offset by carried-forward U.S. tax losses attributed to

17  Barclays' businesses."  Do you see that, sir?

18  A.    Yes, sir.

19  Q.    So when you look at the special tax advantages that

20  Barclays got from this transaction, you look at the profit that

21  Barclays reported eventually, months after this transaction,

22  this was an extraordinarily advantageous transaction for

23  Barclays, was it not, sir?

24  A.    I don't think we had anything special in taxes.  I think

25  that's part of the tax code -- the tax laws carry forward.

- 238 -

1    Q.    And that's because you had losses --

2    A.    Yes.

3    Q.    -- that you need to have profits in order to use.  Isn't

4    that right?

5    A.    I don't think we had -- I think we had losses pre -- how

6    did you phrase it?

7    Q.    You were able to use the tax losses because you --

8    A.    But the losses -- the losses were real.

9    Q.    -- you've had real losses and real tax losses in the

10    United States.  So when you had a big gain, you were able to

11    use those tax losses, against the profit?

12    A.    We had real P&L losses in building our business in the

13    U.S., yes.  But they were real losses.  There was nothing

14    special that I'm aware of.  I think this is just tax code.

15    Q.    In terms of realizing these advantages, it was critical to

16    Barclays that the Court approve the transaction.  Isn't that

17    right?

18    A.    The require -- the transaction would not have gone forward

19    without court approval.

20    Q.    You mentioned a lot about risks, sir.  And you mentioned

21    the Fed repo.  You were referring there to assets that Barclays

22    took over after stepping into the shoes of the New York Fed.

23    Is that correct?

24    A.    Well, there were a number of different transactions.  So I

25    think -- depending on where you're going with that, we did step

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 239 of 273

- 239 -

1    into the shoes of the Fed.

2    Q.   Now, you had until -- let me ask you, prior to that

3    point -- you had the ability at any stage to walk away from

4    this deal.  Isn't that right?

5    A.   Any stage prior to closing.

6    Q.   Prior to, let's say, Thursday of the week of the

7    bankruptcy?

8    A.   I would think we did.  Yes, sir.

9    Q.   So all the market risks and the valuation risks and the

10   information risks -- all these terrible risks that so

11   preoccupied you, at any time up to that, you could have simply

12   said we're not doing this, and you wouldn't have had to deal

13   with any of those risks.  Isn't that right?

14   A.   If we didn't do the transaction, there wouldn't have been

15   market risk.

16   Q.   And you wouldn't have had to worry about whether all the

17   assets that Lehman had were worth exactly what people thought

18   they were worth or what the market would value them as.  Isn't

19   that right?

20   A.   If we didn't do the transaction, that would be right.

21   Q.   Now, all that changed on Thursday.  Isn't that right, sir?

22   A.   Well, the deal was approved Friday.

23   Q.   Well, you mentioned earlier in your testimony that

24   everything changed on Thursday, changed --

25   A.   I'm sorry, the deal changed --

- 240 -

1    Q.   -- unbelievably?

2    A.   -- it didn't change the risk, it changed -- it may have

3    changed the risk, but the deal changed from what had originally

4    been proposed to Judge Peck, which was --

5    Q.   No, sorry, sir.  Let me be more --

6    A.   -- am I on the wrong thing?

7    Q.   Yeah.  I'm not asking you about the deal now.  I'm asking

8    you about what Barclays did on Thursday night.  On Thursday

9    night, you stepped into the shoes of the New York Fed in

10   financing Lehman.  Isn't that right?

11   A.   Yes, sir.

12   Q.   You wired forty-five billion dollars of Barclays cash to

13   New York, correct?

14   A.   To the New York Fed.

15   Q.   And what you got in return was collateral, right?

16   A.   Yes.

17   Q.   From that moment on, you could not walk away from any of

18   those risks.  Isn't that correct, sir?

19   A.   Well, it would have been a -- I'm just trying to think

20   this through.  We stepped into the role of the Fed on a

21   financing transaction.  I think, just trying to think it

22   through, that if we didn't do the deal, we could have unwound

23   the financing.

24   Q.   You were stuck with the financing.  And if the deal hadn't

25   gone through, your only way of recouping your forty-five

- 241 -

1    billion dollars of Barclays cash, would have been to unwind, as

2    you say, or liquidate the collateral, correct?

3    A.    We were at risk, yes.

4    Q.    Indeed, you were at great risk, were you not?  You had all

5    of the market risk for all of that collateral.  If the market

6    tanked, the collateral tanked, and with it, you were exposed,

7    correct?

8    A.    We took risk, yes.

9    Q.    Your P&L was exposed, correct?

10   A.    Yes.

11   Q.    Your Tier 1 capital was exposed, correct?

12   A.    Well, we had a transaction that was on the market, so of

13   course everything -- you know, it had all those attributes,

14   yes.  We took risk.

15   Q.    So on Friday the 19th, if the Court had declined to

16   approve this transaction, you were stuck with all of the

17   downside risks that you have told us about, in connection with

18   the collateral, the assets of Lehman.  Isn't that correct, sir?

19   A.    Well the financing transaction could have been reversed.

20   Q.    By liquidating the assets?

21   A.    Or reversing it.

22   Q.    Well, you'd need to get the cash back, wouldn't you, sir?

23   A.    Yes.

24   Q.    And you'd need to get that back from a bankruptcy estate,

25   right?

- 242 -

1    A.    Well, I think it was -- I may be wrong, but I think it was

2    with the clearing bank.

3    Q.    The exposure that you had here was that if you were unable

4    to unwind the transaction, then Barclays was at risk.  And that

5    was the exposure you faced if the Court did not approve the

6    transaction, correct?

7    A.    There were risks associated with that --

8    Q.    There were --

9    A.    -- but we could --

10   Q.    -- specific risks?

11   A.    -- manage.

12   Q.    Now, sir, if the Court did not approve the transaction,

13   then you had all of those risks which you felt you could

14   manage, but you had none of the upside.  In other words, if you

15   managed the risk perfectly, and you unwound the Lehman assets,

16   and you got back more than the forty-five billion dollars in

17   cash that you had given to Lehman -- to the New York Fed -- if

18   you got all of your money back and five or ten billion dollars

19   on top of that, because it was a financing transaction, you

20   would have had to give all of the surplus cash back to the

21   Lehman estate.  Isn't that right?

22   A.    It depends on the structure of the transaction.  If it was

23   still considered a financing, yes.

24   Q.    In a financing, you don't get the upside, right?

25   A.    Correct.  As I understand the transaction that the Fed

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 243 of 273

- 243 -

1   had -- as I understand the transaction that we stepped in at

2   the Fed's request, yes.

3   Q.   That was the nature of the repo.  If this transaction was

4   not approved on Friday, September 19, then you were stuck with

5   the downside of the financing, but you got none of the upside

6   of acquiring the Lehman franchise, correct?

7   A.   Well, keep in mind, we did this transaction hand-in-hand

8   with the Federal Reserve Bank of New York.  They were working

9   with us.  And as I had said to you, we had conversations with

10  the Federal Reserve Bank of New York and the U.S. Treasury

11  about how this worked.  And we stepped into the role of the Fed

12  at their request.

13  Q.   Did you hear my question, sir?

14  A.   Your -- your question was, we had -- go ahead, sorry.

15  Q.   If the Court did not approve this transaction on Friday,

16  September 19, then Barclays was stuck with all of the downside

17  of the financing -- the repo financing -- and none of the

18  upside of acquiring the Lehman franchise, correct?

19  A.   We were at risk, but I think we would have had, certainly

20  the partnership of the New York Feds.  I think you're

21  overstating the risk to the downside.

22  Q.   Let's not overstate or understate the risk of the

23  downside.  Whatever that risk was, we are agreed, that this was

24  the most critical strategic decision that was made here in this

25  courtroom on September the 19th, correct?

- 244 -

1   A.   It was a critical strategic decision for Barclays, yes.

2   Q.   Now, before Barclays' representatives came down here to

3   this courtroom, Barclays had to evaluate whether this

4   transaction was in its best interests, correct?

5   A.   Of course.

6   Q.   And in conducting that evaluation, you had to have an

7   understanding of the essential elements of this deal, right?

8   A.   Yes.

9   Q.   You understood, there was a group of assets and

10  liabilities being conveyed, correct?

11  A.   We were taking the entire business.

12  Q.   And you understood the bottom-line impact on Barclays of

13  this transaction, correct?

14  A.   I'm not sure I follow you.  We --

15  Q.   You understood --

16  A.   -- evaluated it to be --

17  Q.   -- that it needed to be capital accretive?

18  A.   -- we couldn't be sure of anything.  We could absolutely

19  not be sure of anything.

20  Q.   It was, however, as you have said, important for you --

21  critically important that it be capital accretive, correct?

22  A.   It was very important to construct a deal that was capital

23  accretive or not to do the deal.

24  Q.   In fact, you could not have evaluated whether this

25  transaction was in the best interests of Barclays without

- 245 -

```
 1    having an understanding whether there was, in fact, a mismatch

 2    of assets and liabilities that was in favor of Barclays?

 3    A.    I know you were here -- it's trading assets and trading

 4    liabilities, if it's capital accretion that you're looking for.

 5    Q.    And you had that understanding, did you not, sir?

 6    A.    We felt, with the best of our ability, we had an

 7    appropriate mismatch between trading assets and trading

 8    liabilities, to give us a very good chance of this being

 9    capital accretive from a Tier 1 equity point of view, with the

10    FSA.

11    Q.    And notwithstanding the importance of this sale hearing,

12    you chose not to attend.  Is that correct?

13    A.    I was not here, correct.

14    Q.    And Mr. Ricci, in fact, was not here either?

15    A.    Who was here in --

16    Q.    You were comfortable with the decision that Mr. Ricci

17    would not attend this sale hearing?

18    A.    I don't recall the specifics, but I know it was very, very

19    hard, as this transaction ran down to the wire, to get the

20    right people in the right place, because we were scrambling in

21    a pretty chaotic period.  And it was so much so that on Friday

22    evening it was unclear who was going to get -- who and how

23    people were going to get to the courthouse.

24    Q.    You're aware that Michael Klein and Mr. Archie Cox

25    attended this sale hearing?
```

- 246 -

1    A.   My recollection is that they were here, yes.

2    Q.   But you were comfortable that you had the right people

3    here at the sale hearing?

4    A.   It was a chaotic day.  But, you know, we -- so, yes.

5    Q.   You had your principal negotiators here, did you not?

6    A.   The hearing wasn't for negotiation.

7    Q.   No, my question simply is, you had the right people here?

8    A.   Well, we weren't a part of the hearing.

9    Q.   Sir, you weren't here, so you don't know what happened at

10   this hearing, right?

11   A.   Only by report.

12   Q.   My only question is, you were comfortable that you had the

13   right people here?

14   A.   It was a pretty chaotic day, and I think we did the best

15   we could do with who was going to be in what place at the time,

16   yes.

17   Q.   Do you have some reservations about whether Archie Cox and

18   Michael Klein were the right people to attend this critical

19   sale hearing on behalf of Barclays Capital?

20   A.   I'm not sure why you would suggest that.

21   Q.   My only question --

22   A.   Archie Cox was the chairman of our business in the

23   Americas.  But Michael wasn't an employee of Barclays, he was

24   an advisor.

25   Q.   Who was brought in specifically for this transaction,

- 247 -

1    correct?

2    A.   Yes.

3    Q.   In fact, by you personally, correct?

4    A.   I think there were a number of us involved, but I

5    certainly had a hand in it.

6    Q.   And Michael Klein was the person who reported to you that

7    the Court had approved this transaction, right?

8    A.   Well, I got the message from a few people.  But I did get

9    an e-mail from Michael.

10   Q.   Did he report to you that a representation had been made

11   to the Court in the course of the hearing that no Lehman cash

12   was being transferred to Barclays?

13   A.   I'm aware of a discussion about no retained cash being a

14   part of the agreed assets and liabilities that were included as

15   kind of the whole business.  And I'm aware that when there was

16   a decision made that all of the assets and liabilities other

17   than those specifically stipulated, and one of the ones

18   stipulated was separate retained cash.

19   Q.   Did Michael Klein report to you that a representation had

20   been made to the Court at the sale hearing that no Lehman cash

21   was being transferred to Barclays?

22   A.   I think I answered the question very accurately.  I didn't

23   have any communication with Michael.  But I was aware -- and

24   the word "retained" is important here -- that it wasn't no

25   Lehman cash, it was retained cash.  It was an asset class that

- 248 -

1   wouldn't be included.

2   Q.   You're quite sure you understood my question?

3   A.   So I apologize if I didn't.  If you feel I didn't please

4   ask again.

5   Q.   The question is very specifically whether Michael Klein

6   told you that a representation was made to the Court at the

7   sale hearing that no Lehman cash was being transferred to

8   Barclays?  Did Michael Klein report that to you?

9   A.   I don't have a specific recollection.  There were various

10  e-mails and conversations that I've had.  I don't have a

11  specific recollection.  But I do recollect the decision on

12  retained cash, so I understand the situation you're referring

13  to.  If there was a conversation with Michael, I don't recall

14  it.

15  Q.   Did Archie Cox report to you that at the sale hearing a

16  representation was made to the Court that no Lehman cash was

17  being transferred to Barclays?

18  A.   I think I would have the same answer there, sir.  I don't

19  have any specific recollection of -- and obviously I know a lot

20  about this, because I know about the retained cash being

21  excluded as an asset class.  But I don't recall who that

22  conversation was with at the time.

23  Q.   Did anyone of your management team tell you -- report to

24  you, that a representation had been made to the Court that no

25  Lehman cash was being transferred to Barclays?

- 249 -

1    A.    Again, it's pretty much the same answer.  I have no

2    specific recollection.  But I think -- I think your question is

3    around the decision that retained cash, as a separate asset

4    class, would be an asset class excluded.

5    Q.    No, sir.  My question is not around anything.  My question

6    is whether anyone reported to you about a representation being

7    made to the Court that no cash -- no cash, no Lehman cash was

8    being transferred to Barclays?

9    A.    The recollection I have is around retained cash, so I have

10   no specific recollection.

11   Q.    Let me ask you, sir, about the period following the sale

12   hearing and up to the closing.  Over that weekend -- over that

13   weekend, did anyone tell you about any cash issue that came up?

14   A.    As I said, I'm very familiar with the issues.  I don't

15   recall what might have come up over that weekend.

16   Q.    Did Michael Klein tell you that the creditors' committee

17   and Lehman's counsel, Harvey Miller, had objected to Barclays

18   getting a billion dollars of Lehman cash that was sitting in a

19   bank account at the Wells Fargo bank?  Did Michael Klein tell

20   you about that?

21   A.    What I do recall, and I don't have any recollection of a

22   conversation with Michael, but it could have been -- he didn't

23   normally communicate through me.  But what I am aware of is

24   that there was a decision at one point to split the retained

25   cash -- and it was retained cash, not all cash -- it was

- 250 -

1    separate, retained cash, not cash that forms part of

2    collateral.  And --

3    Q.   Sir, I'm not asking --

4    A.   -- at one point --

5    Q.   -- you about retained cash.  This is entirely different

6    altogether.

7    A.   This is the only conversation I know.

8    Q.   Okay.  So if that's all you know, then you can just tell

9    me.

10   A.   And if I could just finish.  What I was generally aware of

11   is at some point during the discussions of how to do the deal,

12   it was kind of a fifty-fifty split.  But we decided in the end,

13   as part of the deal, that the retained cash would be an asset

14   class that didn't move.

15   Q.   And so there would be no cash going from Lehman to

16   Barclays?

17   A.   Well, as I understand it, retained cash.

18   Q.   Now, sir, did Michael Klein tell you that there was a

19   negotiation over the weekend, following the sale hearing, in

20   which the creditors' committee and Lehman's counsel, Harvey

21   Miller, told Michael Klein that Barclays could not have a

22   billion dollars of cash that was in the Wells Fargo account,

23   because the Court had been told that no Lehman cash was going

24   to Barclays?  Did Michael Klein tell you about that?

25   A.   Judge, I'm trying as hard as I can to make it known that

08-13555-mg    Doc 10178    Filed 06/23/10    Entered 07/14/10 10:26:48    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 251 of 273

- 251 -

1    the only conversations I had were on retained cash.  And I feel

2    I'm being pushed into all cash.  There is a difference between

3    various forms of cash that were clear in the agreement, that

4    formed part of collateral around exchange-traded derivatives.

5    It's very different than the agreement on retained cash.

6         THE COURT:  Just answer the question that's been put

7    to you.

8    A.   I don't recall a specific conversation, but it was -- but

9    if there was a conversation, it would have been round retained

10   cash.

11   Q.   Michael Klein never told you anything about the billion

12   dollars --

13        MR. MAGUIRE:  Let me strike that.

14   Q.   Did Michael Klein tell you that he had agreed that

15   Barclays would not take any of the billion dollars in cash that

16   was sitting in the Wells Fargo bank account?

17   A.   Again, the specifics of was it Michael, was it Wells

18   Fargo, I have no recollection.  I do have a recollection that

19   after a period of having agreed that the retained cash as an

20   asset class would be split, there was a decision that we would

21   not include it, and that could lead to the conversation you're

22   referring to.  But I don't have specific recollections.  But

23   again, that was on retained cash and it was a decision we all

24   made mutually.

25   Q.   But you don't recall Michael Klein telling you anything

- 252 -

1   about the cash at the Wells Fargo Bank?

2   A.   It was a -- you know, a -- I don't recall a specific

3   conversation with Michael about that.  Clearly --

4   Q.   You did --

5   A.   -- was aware of the situation.

6   Q.   -- you do recall there was an asset that's referred to as

7   a 15c3 asset?

8   A.   15c3-3.

9   Q.   And you knew that Michael Klein had negotiated a deal with

10  Lehman concerning the 15c3-3 asset?

11  A.   Well, my understand is that was Rich Ricci and his team.

12  Whether Michael was a part of that, I'm not sure.

13  Q.   Did Rich Ricci or Michael Klein tell you that either of

14  them had been warned by Lehman's counsel, Harvey Miller, that

15  the chances of Barclays ever getting any of those assets was

16  slim to none?

17  A.   Well, what I am aware of is that -- I'm not aware of that

18  conversation.  But I'm aware of, in the agreement to include

19  the 15c3-3 assets, what we agreed was the excess collateral,

20  not the customer collateral.  And we agreed that if there were

21  any regulatory issues with it, that other value could be

22  replaced.  But this was part -- keep in mind, this is part of a

23  the Friday afternoon, when we're scrambling to get the assets

24  to do the deal.  We came very close to not doing this deal.

25  And that day, we were very clear that if there were any

- 253 -

1    regulatory issues around 15c3-3 because we know that that can

2    be -- you know, that can be controversial -- that, one, it's

3    only the excess collateral, and two, it was something like 700

4    and something million dollars, that we would take other value

5    in place of it, if it created regulatory issues.

6    Q.   In connection with this transaction, did you indicate to

7    your executives that you did not want to hear bad news?

8    A.   I'm sorry?

9    Q.   Did you indicate to your executives engaged in this

10   transaction that you did not want to hear bad news and that it

11   was their job to take care of bad news?

12   A.   I don't recall that specifically, no.

13   Q.   Do you recall that issue coming up in connection with the

14   interview you did for Esquire magazine?

15   A.   Something vaguely about do I like bad news.  And I said no

16   one likes bad news.  I don't think it was in relation to this

17   deal.  I think he was talking about my management style, sadly.

18   Q.   At any time over the course of the weekend, did anyone

19   tell you that Barclays had found billions of dollars of Lehman

20   cash in its margin accounts?

21   A.   I don't recall anything in that regard.

22   Q.   At any time over of the weekend, did anyone report to you

23   that there were any problems in Barclays getting any of that

24   cash?

25   A.   I don't recall any conversations in that regard.

- 254 -

1    Q.   So you mentioned a lot earlier about risks, and you

2    mentioned about how yours was the only bid.  Do you recall

3    that?

4    A.   I do.  Yes, sir.

5    Q.   Now, you talked also about how there was a buffer or a

6    gain between the trading assets and the trading liabilities of

7    some four billion dollars, right?

8    A.   I don't think I gave a number.

9    Q.   There was, was there not, a difference between -- in the

10   original deal, between seventy-two billion dollars that was

11   reported in the Barclays announcement of assets -- trading

12   assets -- and trading liabilities of sixty-eight billion

13   dollars.  Do you recall that?

14   A.   Excuse me.  Excuse me.  In the earlier deal, those numbers

15   sound broadly familiar from some of the documents that I've

16   seen.  But frankly, that deal was an earlier deal and is never

17   the one that transpired.

18   Q.   Right and under that earlier deal, there was a

19   difference -- a net difference between the gross amount of

20   trading assets and trading liabilities of four billion dollars?

21   A.   In a document there was.  Whether the deal was ever there,

22   I don't recall.

23   Q.   Yes, that's the document Movants' Exhibit 703.  It's in

24   tab 9 of your binder on the second page.  And that's Barclays'

25   announcement -- you saw it earlier in --

- 255 -

1    A.    I'm sorry, 9?

2    Q.    Yes.  You'll find it at tab 9.  It's Movants' Exhibit 703.

3    And you'll see in the second page --

4    A.    Sorry, I'm -- the Barclays press release --

5    Q.    Yes.

6    A.    -- 17th of September?

7    Q.    Yes.  You'll see the second full paragraph, "Barclays will

8    acquire trading assets with a current estimated value" -- I'll

9    just do the U.S. dollars -- "seventy-two billion" --

10   A.    Yep.

11   Q.    -- "and trading liabilities with a current estimated value

12   of sixty-eight billion."  Do you see that?

13   A.    Yes, sir.

14   Q.    So just looking at the trading assets and the trading

15   liabilities, there was a difference of four billion dollars,

16   right?

17   A.    Yes, sir.

18   Q.    So just looking at that, at that stage of the deal, one

19   would expect that Barclays would have a gain, a difference of

20   four billion dollars on the trading assets, right?

21   A.    Not necessarily.  It's not quite that simple.  It

22   certainly would be a big part of ensuring that we had capital

23   accretion.  But you'd have to add in all the other assets and

24   liabilities --

25   Q.    Of course, that's --

- 256 -

1    A.    -- in order to know that.

2    Q.    -- that's my next point.  That's without including all the

3    other additional liabilities, for example, for cash that you

4    have to pay to cure contracts or cash that you have to pay to

5    employees for compensation, right?

6    A.    Well, there's also a lot -- you know, it could be for any

7    number of reasons -- the illiquidity of securities, the bid-

8    offer spreads -- there can be any number of reasons of why you

9    would want that.  The primary reason for the gap between

10   trading assets and trading liabilities was to give us the

11   highest chance of success in capital accretion.

12   Q.    And even if you succeeded --

13   A.    The overall value of the deal, which is what was

14   important, and this was the only deal.

15   Q.    -- and if you succeeded in maintaining that four billion

16   dollars between the trading assets and the trading liabilities,

17   despite all the market problems and risks that you mentioned,

18   even if you succeeded with that, that four billion dollar

19   difference could be whittled away if you had additional

20   liabilities that cost additional amounts, right?

21   A.    There's many ways it could be whittled away.

22   Q.    And in fact, Barclays did take on additional liabilities,

23   including, for example, for compensation and for contract cure.

24   Isn't that right?

25   A.    In fact it could be the market that did it.  You could

- 257 -

1    have one set of assets decline and another one rise, and it can

2    go against our positions.  The volatility prices can -- keep in

3    mind, as you --

4    Q.    And even if with that, even if the market didn't change,

5    if you took on four billion dollars of additional liabilities,

6    then that would equal the four billion dollar trading gain,

7    correct?

8    A.    Well, there was a series of assets and liabilities that

9    were not included.  It wasn't that simple.  But it was the

10   value of the overall deal.

11   Q.    Right.  But four billion dollars --

12   A.    Of this is -- this is a hypothetical deal.  We never got

13   there on this deal.

14   Q.    -- absolutely.  But four -- I'm not talking now about

15   software and the client list.  Just taking the trading gain of

16   four billion dollars.  If you take on additional liabilities to

17   pay cash to people in the amount of four billion dollars, then

18   you entirely offset, you wipe out that trading gain, right?

19   A.    I'm not going to do accounting math sitting here.  I'm not

20   sure where you're going.

21   Q.    All I'm saying is four billion dollars is four billion

22   dollars.  If you're up four billion dollars on the trading

23   assets and you're down four billion dollars on employees and

24   contracts --

25   A.    -- there's a lot of risk --

- 258 -

1    Q.    -- then you end up at zero.

2    A.    -- seventy-two billion dollars.

3    Q.    Do you remember my question, sir?

4    A.    Trading assets are hugely volatile.

5    Q.    Do you remember my question, sir?

6    A.    Yes, was there a four billion gain.  And I'm saying you

7    can't be sure.

8    Q.    No.  No.  The question, sir, was, if you succeeded in

9    making a four billion dollar gain on the trading assets and

10   then paid out four billion dollars in other liabilities, you

11   would be left with zero, correct?

12   A.    Is that from an acquisition gaining point of view?

13   Q.    No.  Just a real world dollars and cents.  If you make

14   four billion in the roundabouts and you lose it on the

15   swings --

16   A.    It's in the balance sheet.  Sir --

17   Q.    -- you end up at zero.

18   A.    -- you can't go there.  It's a balance sheet.  It's not a

19   P&L.  This is an illogical question.  I have to just say that

20   there's no answer to that.  It depends on so many things that

21   happen.  There's so many ins and outs.  You can't jump to those

22   conclusions.

23   Q.    Well, notwithstanding all of those considerations and

24   factors that were out there, you were highly confident that

25   despite all the additional liabilities that Barclays was taking

- 259 -

1    on, this transaction would remain capital accretive.  Isn't

2    that correct?

3    A.   I was highly confident, as much as I could be, given the

4    risks associated.  And I did use those words.  Yes, sir.

5    Q.   And you used the words that you had a very, very high

6    degree of confidence in that.  Isn't that correct, sir?

7    A.   I did use those words with the analysts, yes.

8    Q.   And of course, you were right.  Barclays did, indeed,

9    report that it had made a very substantial gain, two point

10   whatever billion pounds Sterling, over four billion dollars

11   U.S., right?

12   A.   I think you know what you're doing, but you just went from

13   capital accretion to gain on acquisition.  The accounting rules

14   are very, very different.  The assets and liabilities are very

15   different.  I think you know exactly what you're doing.  But

16   you just tried to compare apples and oranges, and it's not

17   okay.

18   Q.   Well, then let's put aside the apples and the oranges,

19   sir, and see if we can agree about cash.  Are you aware that

20   Barclays is claiming more than four billion dollars of Lehman

21   cash is included in this deal?

22   A.   I don't know the numbers.  But I want to be as direct,

23   Judge, as I can be.  I suspect what he's referring to are the

24   exchange-traded derivative positions, which have had wild

25   swings in valuations.  And when we did this deal it was both

- 260 -

1    implicit and explicit in writing, that we would take over all

2    obligations.  In fact the OCC required it.  We would take over

3    all of these obligations of the exchange-traded derivatives,

4    including the collateral.  And when we did this deal, we had no

5    idea what the collateral was, how much it was, whether it was

6    cash or non-cash.  But anyone taking on a series of obligations

7    would, of course, take the collateral with those obligations.

8    And I think to tie this back now to the decision on retained

9    cash which was very, very specific, if there's standalone,

10   separate cash, sitting in the balance sheet, we agreed that

11   that would not be one of the assets that came over after

12   debate; that's very, very different than coming back and saying

13   we took all the risk of all these derivative positions, with

14   the regulators involved, where it was both implicit and

15   explicit in the documentation.

16   Q.   Let's do a couple of facts -- let's establish your

17   knowledge on a couple of --

18   A.   I think we had some facts.

19   Q.   Okay.  Were you aware at the time of the sale hearing on

20   Friday, September 19, that Barclays intended to acquire four --

21   more than four billion dollars of Lehman cash and cash

22   equivalents?

23   A.   What we were aware of is that we were assuming the

24   obligation for all of the exchange -- well, not all of -- for

25   this set of exchange --

- 261 -

1   Q.   Were you personally, Bob Diamond, aware that Barclays

2   believed there was four billion dollars of Lehman cash in this

3   deal?  Did anyone tell you that on or before Friday, September

4   19?

5   A.   I have no recollection of that, no.

6   Q.   Did anyone report to you, at the sale hearing or any time

7   over the weekend, that there was billions of dollars of Lehman

8   cash and cash equivalents that Barclays was going to get?  Did

9   anyone report that to you?

10  A.   What there was was exchange-traded derivatives then

11  collateral.  It wasn't --

12  Q.   Did anyone tell you that there was billions of dollars of

13  Lehman cash --

14  A.   No.  All I --

15  Q.   -- down in the --

16  A.   -- knew is that we had agreed, both implicitly and

17  explicitly, to take ownership of, if you will, or take all of

18  the exchange-traded derivative positions and all of the

19  collateral that went with them.  Because if you were -- anyone

20  in the market would understand, if you take a derivative

21  position that was established prior -- and all of them were

22  established prior -- that every day the value goes up and down

23  on the market, and the counterparty has to provide collateral,

24  so if you're going to take derivative positions, you take the

25  collateral that goes with them.  The extent of what I knew is

- 262 -

1    that we were taking the obligations of the exchange-traded

2    derivatives and the collateral.

3    Q.    When did you first learn that Barclays was claiming over

4    four billion dollars of Lehman cash in this transaction?

5    A.    Well, I was aware from the beginning that we had assumed

6    all the obligations of the exchange-traded derivatives.  And

7    with all due respect, I was abreast day-by-day of some of the

8    assets we took on had gone down in value, some had gone up in

9    value.  But by January 22nd, when our market cap had reduced

10   significantly, the value of the building that we paid close to

11   one and a half billion pounds for had deteriorated.  And so

12   what happened to those positions, the exchange-traded

13   derivatives and the collateral, sometimes they were going down

14   in value, sometimes they were going up in value.  Other assets

15   were going up and down in value.  And I think to look back now

16   and say these assets went up and these -- but so that's not

17   okay, these went down so that is okay -- I was kept abreast

18   generally of the value of the overall portfolio as opposed to

19   anything in particular.

20   Q.    I'm not going to ask you about any assets that went up and

21   down in value, and I'm certainly not going to ask you about any

22   intangible assets like client lists and software and --

23   A.    Those are the intangible.

24   Q.    -- intangible, right.  I'm only going to ask you about

25   cash.  You understand that cash doesn't go up and down in

- 263 -

1   value.  It's just cash, right?  Right?

2   A.   Yes.

3   Q.   The value of a dollar didn't change between September 15

4   and September 22?

5   A.   Well, if you're a UK-based institution, it certainly did.

6   Q.   It didn't change in U.S. dollars.

7   A.   It didn't change in constant currency.  There were risks

8   all over this deal, of currencies, of assets --

9   Q.   But no --

10  A.   -- I think you're onto a very good point.

11  Q.   -- no one reported to you.  This is the point I want to

12  get onto, sir.  No one reported to you that Barclays was

13  getting over four billion dollars -- U.S. dollars, cash from

14  Lehman in this transaction.  No one reported that to you any

15  time before the closing.  Isn't that correct?

16  A.   I think the only thing that was reported to me before the

17  closing, and I'm pretty sure the only thing we knew, was that

18  we were acquiring the exchange-traded derivatives and the

19  collateral.  And so that's what I knew.  And I think that was

20  the knowledge that was available.

21  Q.   You understood this deal had a headline price?

22  A.   I did.

23  Q.   And that price was 250 million dollars?

24  A.   Or one and three-quarters, depending on what angle you're

25  pushing.

- 264 -

1    Q.   Over you objection, Mr. Varley decided that the headline

2    price here would be 250 million dollars of cash?

3    A.   Well, he at least --

4    Q.   Leaving aside the building.

5    A.   -- he at least put in the value of the building as well,

6    to give Mr. Varley credit.

7    Q.   He threw you a bone.  But without the buildings, the

8    headline price here was 250 million dollars?  And that was

9    cash?

10   A.   That's my recollection, yes.

11   Q.   That was, Barclays was paying that as part of -- that was

12   the purchase price, right?

13   A.   There or thereabouts, yes.

14   Q.   And you understood that this was a purchase.  There was an

15   asset purchase agreement.  It was a purchase, and that's why

16   you had a purchase price, right?

17   A.   I think I follow that, yes.

18   Q.   And you did not understand at the time --

19   A.   We were buying a business.  We were buying more than

20   assets.

21   Q.   -- you were buying a business for cash?

22   A.   Yes.

23   Q.   For 250 million in cash?

24   A.   But it was a building with assets and liabilities, yes.

25   Q.   My point, sir, is that the cash was going from -- on the

- 265 -

1    headline price, the cash was going from Barclays to Lehman.  It

2    was not your understanding that the cash was going from Lehman

3    to Barclays?

4    A.    Again, I think you're mixing things.  That cash was

5    going -- the collateral associated with the exchange-traded

6    derivatives, was clearly coming to us.  It was part of what we

7    had agreed in terms of the value of the business.  Listen, it

8    was not only implicit in the deal, it was explicit.  It was

9    written that all of the collateral for the exchange-traded

10   derivatives.  It was part of a deal; a deal we signed; a deal

11   that the Lehman estate signed and supported; a deal that the

12   creditors signed and supported.  So this is not new.

13   Q.    No one reported to you any time before the sale hearing on

14   September 19, that Barclays was being paid more than four

15   billion dollars in Lehman cash to take the Lehman business?

16   A.    Um --

17   Q.    No one reported that to you?

18   A.    I think we've answered this question.  They didn't report

19   that to me, nor is that an accurate reflection.

20   Q.    You would agree, however, sir, all other things being

21   equal, getting paid four billion dollars in cash is a much

22   superior deal to having to pay 250 million in cash?

23   A.    I think that the deal that was approved by Judge Peck was

24   very, very good for the Lehman creditors, the Lehman estate,

25   for the trustees.  It turned out to be very good for Barclays

08-13555-mg   Doc 10178   Filed 06/23/10   Entered 07/14/10 10:26:48   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 266 of 273

- 266 -

 1   and for Barclays Capital.  I will tell you, it was a heck of a

 2   ride there for a number of months as the financial industry was

 3   in turmoil.  And today, a lot of people look back and -- you

 4   know, beginning maybe last year and say this is a terrific

 5   deal, and you know, what did you know that we didn't know.  I

 6   think it was a bold deal at a time -- and it was very good for

 7   the creditors, it was very good for the employees, it was very

 8   good for the trustees, and it was good for Barclays.  It was a

 9   good -- this was a very good deal.  And it's recognized as

10   having been market stabilizing.  It's recognized as having been

11   very good for our clients.  It's recognized as being good for

12   the government of the United States, who are the number one

13   provider of liquidity to them.  This was a good deal, not just

14   for Barclays.  And I think picking out pieces of the assets

15   that happened to work maybe a little bit better than you

16   expected from pieces of the assets that worked maybe not as

17   well as you expect, is all hindsight now.

18       It was a very good deal for New York, for the financial

19   markets, for Barclays, for the estate, for the creditors, and

20   for a lot of employees who were able to stay employed, and for

21   our clients.

22   Q.   You understand that it was not for Barclays to decide who

23   good a deal this was for other people, it was for those other

24   constituencies to make up their own minds and then ultimately

25   for the Court to make the decision as to whether to approve

                                                                    - 267 -

1    this deal or not.  You understood that?

2    A.   It was up to the Court to approve, yes.

3    Q.   And when you said that no one else made a bid for this

4    business, you were not suggesting that those people, the

5    banking world at large, was aware that if they took this deal,

6    it would include -- according to Barclays -- more than four

7    billion dollars of Lehman cash.  You're not suggesting that the

8    banking world at large or the world at large had any idea that

9    this deal -- at least according to Barclays -- included more

10   than four billion dollars of Lehman cash.  You're not

11   suggesting that when you say no one else bid on this

12   transaction, are you sir?

13   A.   I'm suggesting that we're all dealing with the same public

14   information.

15   Q.   The public information was the headline price --

16   A.   I haven't finished.  I haven't finished.  I haven't

17   finished.  That other organizations such as Bank of America had

18   done the same due diligence, and there was a lot of information

19   in terms of assets and liabilities, where we had to take some

20   risk.  That's why we couldn't be sure on the valuations.

21   Q.   Are you suggesting that Bank --

22   A.   And by the way, I don't think -- it's my impression, but

23   just to put you at ease, I don't think many people understood

24   completely the makeup of the collateral when the decision was

25   taken to accept all of the positions and all of the collateral.

- 268 -

1   And the value of the positions and the value of the collateral

2   changes, depending on the market.

3   Q.   Are you suggesting that Bank of America had an

4   understanding that if it stepped forward and paid 250 million

5   to buy this business, it would be repaid more than sixteen

6   times that cash in Lehman cash, more than four billion dollars?

7   Are you suggesting that Bank of America had that understanding?

8   A.   Bank of America walked away from the deal, because in the

9   aggregate, they felt that the -- they would take a loss if they

10  didn't have a government subsidy.

11  Q.   Are you su --

12  A.   That's my understanding from what's been said publicly.

13  Q.   -- are you suggesting that Bank of America or anyone else

14  had an understanding that they would get more than four billion

15  dollars of Lehman cash if they did this deal?

16  A.   We did a whole business.  We didn't do a piece of a

17  business.

18  Q.   You're not suggesting that anyone -- anyone outside --

19  you're not suggesting that anyone understood, as of September

20  19, that if they came and did this deal, they would be repaid

21  the 250 million dollar purchase price sixteen times over, with

22  more than four billion dollars of Lehman cash.  You're not

23  suggesting that, sir?

24  A.   I think what you're saying is, you know, you're

25  referring --

- 269 -

1   Q.   My question is are you suggesting that anyone reported to

2   Bank of America or to anyone else that they would get paid more

3   than four billion dollars of cash if they did this deal?

4   A.   And --

5   Q.   Are you aware of any such report?

6   A.   -- nor would anyone be able to acquire just -- you know,

7   cherry-pick the business.  As you said, we took the whole

8   business with the exception of some assets and liabilities that

9   were excluded.  And some things went up in value, some things

10  went down in value.  That was the transaction that we did.  And

11  I think the same -- the same knowledge as we had, which was not

12  the knowledge that exists today, was held by the creditors and

13  the estate and Lehman Brothers.  So I think we all went into

14  this the same way.

15  Q.   Now, let's be really, really precise and wrap this up.

16  Are you saying that you were aware of any disclosure to anyone

17  as of Friday September 19, that they would get over four

18  billion dollars of Lehman cash if they did this deal?

19  A.   Am I aware of any --

20  Q.   Any report, any disclosure to anyone?

21  A.   I have no recollection of that, no.

22  Q.   Thank you, sir.

23        MR. MAGUIRE:  I have no further questions.

24        THE COURT:  Is there anything from the committee?

25        MR. TEECE:  No, Your Honor.

- 270 -

1           THE COURT:  Mr. Boies, do you have any examination for

2    the witness?

3           MR. BOIES:  I do, Your Honor.

4           THE COURT:  Can you give me an estimate as to the

5    length of it?

6           MR. BOIES:  I would think it's probably in the range

7    of sixty to ninety minutes.

8           THE COURT:  I think it would probably make the most

9    sense for Mr. Diamond to return tomorrow.  It's now ten to six.

10   And I think we'll all be fresher tomorrow at 9:30.

11          MR. BOIES:  Could I just take a moment just to find

12   out from the witness whether -- he was not planning to be here

13   tomorrow.  Can I just find out what his schedule is, Your

14   Honor?

15          THE COURT:  We can all find out.  Mr. Diamond, we

16   expect you here tomorrow at 9:30.

17          THE WITNESS:  I'll be here, Judge.

18          THE COURT:  That takes care of that, right?  Fine.

19   We'll see you tomorrow morning at 9:30.  Is there something

20   more, Mr. Gaffey?

21          MR. GAFFEY:  Just very briefly, Your Honor.  And I

22   know it's been mentioned before, but given the gap, I would ask

23   the Court to reiterate its instructions about witnesses on

24   cross.  And Mr. Diamond may not be aware of the Court's

25   prohibition on --

- 271 -

1          THE COURT:  I'm confident that Mr. Boies would be able

2    to advise his witness about the rule with regard to cross

3    examination, and I have every confidence that it will be

4    respected.

5          MR. GAFFEY:  I have nothing else, Your Honor.

6          THE COURT:  We're adjourned.

7       (Whereupon these proceedings were concluded at 6:12 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- 272 -

1

2                        I N D E X

3

4                    T E S T I M O N Y

5    WITNESS              EXAM BY                PAGE    LINE

6    Bryan Marsal         Mr. Gaffey               5      15

7    Bryan Marsal         Mr. Boies               31      20

8    Robert Diamond       Mr. Gaffey             111      15

9    Robert Diamond       Mr. Maguire            224      18

10

11

12

13                    E X H I B I T S

14   NO.          DESCRIPTION                      ID.    EVID.

15   M-397        Notice of Lehman estate's intent        23

16                to sue Barclays for violation of

17                TSA offered for the limited purpose

18                of its indication of the estate's

19                intent to bring a lawsuit and not

20                for the truth of the contents

21   M-360        Letter concerning dispute between       209

22                JPMorgan Chase and Barclays

23

24

25

- 273 -

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Also transcribed by:     Clara Rubin (CET**D-491)

12                            Dena Page

13                            Penina Wolicki

14

15   Veritext

16   200 Old Country Road

17   Suite 580

18   Mineola, NY 11501

19

20   Date:  June 23, 2010

21

22

23

24

25