- 1 -

1

2      UNITED STATES BANKRUPTCY COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5      - - - - - - - - - - - - - - - - - - - -x

6      In the Matter of:

7

8      LEHMAN BROTHERS HOLDINGS INC., et al.

9                 Debtors.

10     - - - - - - - - - - - - - - - - - - - -x

11     In the Matter of:

12

13     LEHMAN BROTHERS INC.

14                 Debtor.

15     - - - - - - - - - - - - - - - - - - - -x

16                 United States Bankruptcy Court

17                 One Bowling Green

18                 New York, New York

19

20                 June 25, 2010

21                 9:32 AM

22

23     B E F O R E:

24     HON. JAMES M. PECK

25     U.S. BANKRUPTCY JUDGE

- 2 -

1

2    CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3    the September 20, 2008 Sale Order and Granting Other Relief;

4    (ii) Motion of the Trustee for Relief Pursuant to the Sale

5    Orders or, Alternatively, for Certain Limited Relief Under Rule

6    60(b); (iii) the Motion of Official Committee of Unsecured

7    Creditors of Lehman Brothers Holdings Inc., Authorizing and

8    Approving (A) Sale of Purchased Assets Free and Clear of Liens

9    and Other Interests and (B) Assumption and Assignment of

10   Executory Contracts and Unexpired Leases, Dated September 20,

11   2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12   SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13   Sale Order; (iv) All Joinders Thereto and Related Adversary

14   Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15   the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

- 3 -

```
 1

 2      A P P E A R A N C E S :

 3      JONES DAY

 4            Attorneys for the Movant, LBHI

 5            222 East 41st Street

 6            New York, NY 10017

 7

 8      BY:   ROBERT W. GAFFEY, ESQ.

 9

10      HUGHES HUBBARD & REED LLP

11            Attorneys for Movant, James W. Giddens, SIPC Trustee

12            One Battery Park Plaza

13            New York, NY 10004

14

15      BY:   NEIL J. OXFORD, ESQ.

16

17      QUINN EMANUEL URQUHART & SULLIVAN, LLP

18            Attorneys for the Movant, Official Committee of Unsecured

19             Creditors

20            51 Madison Avenue

21            22nd Floor

22            New York, NY 10010

23

24      BY:   JAMES C. TECCE, ESQ.

25            SUSHEEL KIRPALANI, ESQ.
```

- 4 -

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         333 Main Street

5         Armonk, NY 10504

6

7    BY:   DAVID BOIES, ESQ.

8

9    STUTMAN TREISTER & GLATT LLP

10        Attorneys for Elliott Management

11        1901 Avenue of the Stars

12        12th Floor

13        Los Angeles, CA 90067

14

15   BY:   WHITMAN L. HOLT, ESQ.

16        REBECCA S. REVICH, ESQ.

17        (TELEPHONICALLY)

18

19

20

21

22

23

24

25

08-13555-mg   Doc 10203   Filed 06/28/10   Entered 07/15/10 10:49:32   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 5 of 127

- 5 -

1                    P R O C E E D I N G S

2              THE COURT:  Be seated, please.  Good morning.

3              MR. KIRPALANI:  Good morning, Your Honor.  Susheel

4    Kirpalani from Quinn Emanuel on behalf of the creditors'

5    committee.  I believe Mr. Gaffey has one housekeeping matter.

6    And then we're going to call our witness.  Thank you.

7              THE COURT:  Okay.

8              MR. GAFFEY:  Your Honor, we're able to eliminate the

9    need for one witness today, Mr. Guarnuccio, because we've

10   reached a stipulation with Barclays as to a fact.  If I could

11   read it into the record --

12             THE COURT:  Go right ahead.

13             MR. GAFFEY:  -- because our witness -- we've agreed

14   that:  "Barclays Capital Inc. (Barclays) and Movants stipulate

15   that if called to testify at trial, Michael Guarnuccio of

16   PricewaterhouseCoopers would testify as follows:

17             "Michael Guarnuccio recalls that at some time in

18   September 2008, after the Barclays/Lehman transaction closed,

19   he spoke with a Paul Exall.  And Mr. Exall stated that he

20   believed the two billion dollar estimate was for bonus payments

21   only not for severance pay."

22             And if Mr. Boies can confirm that's our agreement --

23             MR. BOIES:  Yes, Your Honor.

24             MR. GAFFEY:  -- we can excuse Mr. Guarnuccio as a

25   witness.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 6 -

1           THE COURT:  Does that stipulation cover in any respect

2     the apparent hearsay within that offer of proof?

3           MR. GAFFEY:  Mr. Guarnuccio would testify to an

4     admission by Mr. Exall who is a employee of Barclays.  So that

5     resolves the hearsay issue.

6           THE COURT:  Fine.  I didn't know who the man was.  And

7     what was his position at Barclays?

8           MR. BOIES:  I believe he was an HR, human resources,

9     person.

10          THE COURT:  Okay.

11          MR. GAFFEY:  There is testimony from Mr. Exall

12    designated as part of the deposition transcript that frames his

13    employment, Your Honor.

14          THE COURT:  I will look at it next.

15          MR. KIRPALANI:  Thank you, Your Honor.  With that, the

16    creditors' committee would call Luc Despins.

17          THE COURT:  Good morning, Mr. Despins.

18          THE WITNESS:  Good morning.

19          THE COURT:  Please raise your right hand.

20       (Witness duly sworn)

21          THE COURT:  Be seated, please.

22    DIRECT EXAMINATION

23    BY MR. KIRPALANI:

24    Q.   Good morning.

25    A.   Good morning.

08-13555-mg    Doc 10203    Filed 06/28/10    Entered 07/15/10 10:49:32    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 7 of 127

- 7 -

1    Q.    Can you please state your full name for the record?

2    A.    Luc Despins.

3    Q.    And, Mr. Despins, by whom are you currently employed?

4    A.    The law firm of Paul Hastings.

5    Q.    And what is your title and general area of expertise?

6    A.    I'm the chair of the restructuring practice.

7    Q.    When did you join Paul Hastings?

8    A.    The Monday before Thanksgiving 2008.  So I don't know

9    precisely the date.  But it was the Monday before Thanksgiving.

10   Q.    And prior to joining Paul Hastings, what firm were you

11   affiliated with?

12   A.    I was a partner with Milbank Tweed.

13   Q.    And how long were you with Milbank and in what capacity?

14   A.    I was there for approximately ten years plus or minus one

15   week or so.  And I was chair of the financial restructuring

16   practice.

17   Q.    While you were chair of the financial restructuring

18   practice at Milbank, did you become involved in the Lehman

19   bankruptcy case?

20   A.    Yes, I did.

21   Q.    Can you please describe for the Court how Milbank became

22   involved in the Lehman case and in what capacity?

23   A.    Yes.  In -- that was in September -- I think it was

24   September 17th -- it was a Wednesday.  We were -- we pitched

25   for the committee.  And we were retained in the early afternoon

- 8 -

1    of that day, Wednesday, the 17th of September, 2008.

2    Q.    Okay.  And can you tell the Court what specifically your

3    role, individual role was when you were at Milbank in

4    connection with the Lehman assignment?

5    A.    Well, I led the engagement with respect to the transaction

6    at issue here.

7    Q.    So as the lead bankruptcy partner on the transaction at

8    issue here, can you briefly describe your responsibilities on

9    behalf of the committee?

10   A.    Well, generally, we're there to ensure that the provisions

11   of the contract are acceptable or to benefit of the estate.  We

12   obviously represent the committee in court before Your Honor.

13   And we generally monitor the transaction to try to maximize

14   value for the estate.

15   Q.    I believe you previously stated that you joined Paul

16   Hastings in November 2008.  Can you please advise the Court

17   when your involvement in the Lehman case on behalf of the

18   committee ended?

19   A.    It ended on October 20th, 2008.

20   Q.    Okay.  And why did it end prior to your departure?

21   A.    'Cause Milbank -- once I announced to Milbank that I was

22   leaving, they directed me not to have any further involvement

23   with this matter.

24   Q.    Okay.  And since leaving Milbank, have you had any

25   involvement in the Lehman case on behalf of the committee?

- 9 -

1    A.    No.

2    Q.    Have you had any involvement in the Lehman case at all

3    other than in connection with these proceedings?

4    A.    No.  Well, my firm has and I have been involved

5    tangentially on some matters that have nothing to do with this,

6    that deal with Bankhaus and --

7    Q.    Okay.

8    A.    -- issues like that.

9    Q.    Mr. Despins, you're here in response to a trial subpoena

10   that we served on you, is that correct?

11   A.    That's correct.

12   Q.    Okay.  Did you meet with anyone besides your counsel in

13   preparing for your testimony today?

14   A.    No.

15   Q.    Okay.  I'd like to turn your attention to the period

16   between September 17th, the day that you were retained for the

17   committee, and September 22nd, the day that the sale

18   transaction that's in dispute here closed.  Turning to the days

19   between the retention of Milbank and the closing, can you tell

20   us what your initial involvement was in connection with the

21   Lehman sale proposed to Barclays?

22   A.    My initial involvement was that we were retained, again,

23   on the afternoon of the 17th.  I recall there was a hearing

24   before Your Honor -- I'm not sure if it was 3 or 4:00 that day.

25   And so we came right down to court.  That's the first point of

LEHMAN BROTHERS HOLDINGS INC., et al.

- 10 -

```
 1    contact that --

 2    Q.   Do you recall what hearing that was?

 3    A.   That was a hearing to approve bid procedures and maybe --

 4    and a breakup fee as well with respect to this transaction.

 5    Q.   And how much time had elapsed between your being retained

 6    and that court hearing taking place?

 7    A.   I'd say less than hour.

 8    Q.   At the hearing on September 17th, if you recall, you spoke

 9    on behalf of the committee with respect to the bid procedures.

10    And the record of the hearing, obviously, reflects what was

11    said.  Can you please advise what else, if anything, you did on

12    behalf of the committee in connection with the sale on that

13    day, on September 17th?

14    A.   I remember calling Mr. Miller, counsel for the debtor,

15    prior to the hearing.  I think he was on his way down here --

16    to ask him to consent to an adjournment of the hearing.  But

17    other than that, I don't recall doing -- and attending the

18    hearing -- and participating in the hearing, I don't recall

19    anything else.

20    Q.   Okay.  So turning then to the next day, Thursday,

21    September 18th, that's the day before the sale hearing actually

22    took place, just to put it in your mind.  Can you please advise

23    the Court what you did on that Thursday in connection with the

24    sale?

25    A.   Well, generally, there was a meeting that had been
```

- 11 -

1   offered, if you will -- at the Wednesday hearing, Mr. Miller

2   had offered to parties in attendance or the main parties in

3   attendance to have a meeting on the 18th to get more

4   information of the transaction and all that.  So I prepared for

5   that meeting and I went to that meeting which was at Weil

6   Gotshal.  And there were follow-up discussions with advisors to

7   the committee among ourselves that day regarding that meeting

8   and regarding the next day hearing, the final hearing and

9   approval of the sale.

10  Q.   And who attended that meeting on behalf of the committee?

11  A.   The Thursday, the 18th, meeting -- there was a group from

12  Houlihan.  That would be Saul Burian, Geer, Fazio and others

13  from Houlihan that I -- in fact, I'm not sure who they were.

14  But there were a bunch people from Houlihan.  Then there were

15  people from FTI.  So that would be Mike Eisenband and others.

16  But I don't recall others than Mike Eisenband.  And, of course,

17  people from Milbank attended the meeting on behalf of the

18  committee.

19  Q.   You attended personally?

20  A.   Yes, I did.

21  Q.   And do you remember who else from Milbank went with you?

22  A.   Crayton Bell was there.

23  Q.   And who's Crayton Bell?

24  A.   Yes, sir.  He's a partner, corporate -- M&A partner from

25  Milbank.  I'm not a hundred percent sure who else attended from

- 12 -

1   Milbank so I -- but I'm sure there were others from Milbank but

2   precisely, other than Crayton Bell, I don't recall.

3   Q.   Okay.  What was the purpose of that meeting?  You

4   mentioned Mr. Miller had offered it.  When you got there, what

5   was your understanding as to the purpose of the meeting?

6   A.   Well, obviously, things were moving very quickly.  And

7   parties were all "complaining" about the pace at which things

8   were moving and the lack of information so that, I think, it

9   was Mr. Miller's attempt to address parties' concerns regarding

10  the lack of information.  So, basically, describing what the

11  transaction was about and a bunch of other issues as well.  For

12  example, are there other potential suitors here?  What

13  shopping -- what marketing of this asset was done?  I mean,

14  just general questions about how the asset purchase agreement

15  worked.

16  Q.   Do you recall any other specifics about the meeting?  I

17  understand it was a long time ago.  But if you do, you could

18  tell the Court?

19  A.   Again, how the asset purchase agreement works.  So that

20  subsumes a lot of categories.  But other than that general -- I

21  know there was time spent on who else is out there, what other

22  bids are available, et cetera, et cetera.  But more than that.

23  Q.   And when you refer to the asset purchase agreement, just

24  for purposes of the record, are you referring to the asset

25  purchase agreement that had been filed with the court at that

- 13 -

1   time?

2   A.   Yes.  I'm sorry.  Yes.  That's what I meant, yes.

3   Q.   Okay.  And was there another asset purchase agreement or

4   you believe that was the one?

5   A.   Well, I think it was amended at one point.  But the one we

6   were talking about was the one in existence at that time.

7   Q.   Okay.  At the meeting at Weil, did the debtors address

8   questions that the committee had with respect to the sale

9   transaction?

10  A.   Yes, they did.

11  Q.   Did you feel that every question that the committee had

12  was sufficiently addressed?

13  A.   No, obviously not.  And I'm not saying this in any

14  critical way of Weil Gotshal or the debtors' professionals.

15  But, you know, this was a very large complex transaction.  So

16  did they address our issues fully with respect, for example, to

17  the marketing process?  Yes, as far as we know.  But in terms

18  of how -- what assets were being transferred precisely, the

19  securities that were transferred, et cetera, it was not a

20  complete -- there were no complete answers.  And I think that

21  it was contemplated that there would be further meetings with

22  smaller groups because this was a room with at least thirty,

23  forty people.  So I think that it was contemplated that it

24  would be smaller meetings with a subset of the professionals

25  there to try to get more information.

- 14 -

1    Q.   And was there anything else that you yourself did on the

2    18th that you recall regarding the sale transaction?

3    A.   Not specifically that I recall, no.

4    Q.   Okay.  And as between you and Milbank and Houlihan Lokey,

5    the committee's financial advisor, can you tell the Court what

6    your respective responsibilities were with respect to the

7    Barclays sale?

8    A.   Yeah.  I think the easiest way to describe it is to start

9    with Houlihan.  Houlihan is really the financial advisor to the

10   committee, which means lead responsibility on the M&A process,

11   valuation issues that can come up in the case and the like.  So

12   they are really spearheading the committee's efforts in terms

13   of analyzing the transaction, seeing what other transactions

14   are available and understanding the mechanics of the

15   transaction and what is being sold, generally.

16        FTI -- and there's somewhat -- there's some overlap there.

17   More in the financial analysis -- in a financial analysis

18   capacity.  So they still have a role in the transaction but

19   their role, for example, would not be to value assets or

20   determine what marketing process should have been followed to

21   sell the assets.

22        And then Milbank, obviously, is there to review the

23   contracts, make sure the contracts work -- or I try to address

24   concerns we have with respect to the contracts.  And also,

25   obviously, appearing in court and representing the committee

- 15 -

1    before the Court.

2    Q.    Okay.  This brings us then to Friday, September 19th.

3    That's the day of the sale hearing which didn't occur until

4    very late in the day.  Can you please advise the Court what you

5    did on Friday to prepare for the sale hearing?

6    A.    Well, obviously, I'm sure that at one point I reviewed the

7    agreements and, to the extent I had not already done so, the

8    motions -- the motion that had been filed.  And I know that --

9    I'm sure -- we had calls with Houlihan.  I'm sure that I had

10   call -- one or many calls with Houlihan.  And I think that, as

11   well, we had a conference call with the committee on that day

12   just before the hearing.

13   Q.    Do you know if the committee professionals reviewed any

14   publicly available documents in advance of the sale in order to

15   educate themselves on what the street was saying about the

16   sale?

17   A.    I don't know whether they did or not.

18   Q.    In the ordinary course of representing creditors'

19   committees in connection with asset sales, is that something

20   you would expect the committee professionals to be doing?

21   A.    In a normal transaction, absolutely.  Absolutely.

22   Q.    Why don't you recall specifically whether it was done on

23   this transaction?  Is this abnormal?

24   A.    Well, the issue here was timing in the sense that we were

25   retained on Wednesday afternoon.  The final sale hearing was

- 16 -

1    Wed -- sorry -- was Friday afternoon.  So in the normal case,

2    you would go, without a doubt, look at 10Ks, 10Qs, and other

3    documents like this.  But here, there's an issue of allocation

4    of resources which is -- okay, we can do this, we can get

5    smarter doing that, that's a good thing to do.  But compared to

6    other matters such as understanding how the contract works,

7    what the assets are, et cetera, that may not be the top

8    priority.  So that's why I'm reluctant to say that this was

9    done in this case.  In a normal case, absolutely.  The question

10   is, with the press of time, I'm not sure that it was done or

11   not.

12   Q.   On Friday morning prior to the sale hearing, did you

13   participate in any conference calls with Mr. Seery of Lehman

14   regarding the Barclays sale?

15   A.   Did I participate?

16   Q.   You personally.

17   A.   No.  Well, not that I recall at all.

18   Q.   Okay.  You should have a witness book -- oh, you know

19   what?  We have to hand them out.

20         MR. KIRPALANI:  So, if Your Honor -- if I can find --

21   if we can just pass out the witness books?

22         THE COURT:  Thank you.

23         (Pause)

24   Q.   Okay.  I'd like to ask you to turn to the tab in the book

25   in front of you that's marked Movants' Exhibit 261 which is a

- 17 -

1    transcript of the sale hearing on September 19th.  If you could

2    turn to page 67 of that transcript.  There where it --

3    A.    I'm there.

4    Q.    There where it says, Mr. Despins -- you make a statement

5    on behalf of the committee.  This is at lines 10 through 25:

6         "We're not affirmatively supporting the transaction, Your

7    Honor, because there has been insufficient time for us to

8    really do all the due diligence that we would feel should be

9    done to take that next step of saying yes, this is the best

10   deal and we're supportive actively.  We've met with the debtor.

11   They've been very cooperative.  I don't want to imply that they

12   have not been but we have not had time to test the assumptions

13   and do all the due diligence we would normally do.  So that is,

14   Your Honor, the distinction."

15        Could you please advise what information the committee was

16   lacking in order to take a position one way or the other

17   regarding the sale?

18   A.    Well --

19        (Pause)

20   A.    I'm hesitating because I think we have to go by

21   categories.  Let's take from the simplest, real estate, that

22   there wasn't real estate being sold.  What was the true value

23   of that real estate?  What marketing process was done with the

24   real estate?  We didn't really know that to our satisfaction.

25   But that's -- but frankly, that's just an example.  But there

- 18 -

1    are other examples.  And I think that the greatest or the

2    biggest issue was the book of securities that was being

3    transferred.  One is, what was in that book precisely?  I don't

4    think we had at that time the final list of what was in the

5    book, the exact securities that were in the book.  And how the

6    transaction worked generally in a sense of -- there was a

7    description in court, if I recall, of -- there's value of x,

8    there are liabilities of y.  That's what's being transferred.

9    And we just didn't have the full understanding of exactly what

10   that was.  So I can't give you the minutiae for each.  But I

11   can give you examples, liability sides -- there were some

12   liabilities being assumed.  They were stated to be in the

13   amount of x or y.  We had no ability to really test that, to

14   really understand is that a potential liability, is that a

15   guarantied liability that that liability will actually

16   materialize.  We just didn't know.

17   Q.   Okay.  Do you believe that in the time period prior to the

18   sale hearing, the advisors to the committee, including

19   yourself, Houlihan, were working diligently to try to learn as

20   much as they could about the transaction?

21   A.   Yes.

22   Q.   Notwithstanding those efforts, the committee still had

23   questions at the time of the sale hearing.  What else do you

24   feel that you could have done?

25   A.   Well, short of delaying the hearing or the process, I'm

- 19 -

1    not sure what we could have done.  I mean, in the time frame we

2    had, I don't think it was humanly possible -- and that's why I

3    say, I'm not faulting the debtor here for not cooperating.

4    They said this is what's going on and all that.  But I think

5    themselves, one -- and we could see from the hearing that the

6    deal changed during the middle of the hearing -- themselves

7    were sort of overwhelmed with what was going on.  So if they

8    were overwhelmed -- again, I'm not saying this in any way to be

9    critical at all.  We were more than overwhelmed because we're

10   two weeks behind them or a week behind them.

11   Q.   Right.  At the hearing on September 19th, do you recall at

12   some point Mr. Miller requested a recess in order to explain to

13   various parties the changes that had been made to the

14   transaction since the bid procedures hearing?

15   A.   Yes.  Yes.

16   Q.   Did you participate in that conference during the recess?

17   A.   Yes, I did.

18   Q.   Do you recall anything that was discussed during this

19   off-the-record conference?

20   A.   I recall some of it.  There was a discussion of the real

21   estate.  There were appraisals -- and now I'm unclear whether

22   it was on the Manhattan building or New Jersey building.  But

23   there were appraisals that were coming in but came in lower

24   than expected.  And so there was an adjustment being proposed

25   with respect to the real estate.  Certainly, that was part of

- 20 -

1    it.  The rest I don't remember specifically.  There were many

2    balls in the air at that point.  So -- but I remember the real

3    estate being discussed extensively.

4    Q.    And then when His Honor came back to the bench, do you

5    recall Mr. Miller relaying those same changes that he had

6    relayed to the parties in conference to the Court?

7    A.    Yes.

8    Q.    Do you have a recollection of Ms. Fife -- that's Lori Fife

9    from Weil Gotshal -- describing certain what she deemed

10   material changes to the Court during that hearing?

11   A.    Yes.  Now I'm wondering -- I remember specifically her

12   saying, well, we were selling seventy, now we're selling

13   something else.  But I don't know if that was before or after

14   the recess, to be honest.  I don't recall.  But I know that she

15   described the changes to the transaction, yes.

16   Q.    To the best of your recollection, what she described to

17   the Court was consistent with what she described to you

18   privately, is that fair?

19   A.    Yes.  Yes.

20   Q.    And you mentioned the value seventy something billion.

21   You mentioned the real estate.  Do you recall any other values

22   on the liability side or on the asset side that were

23   specifically disclosed during the hearing?

24   A.    Not that I can recall, no.

25   Q.    Is there anything else that you did in connection with the

- 21 -

1    sale on the day of the sale hearing other than you mentioned

2    talking to Houlihan, having a committee call, coming to court.

3    Anything else you can think of?

4    A.    No.

5    Q.    Do you recall whether during the hearing, you requested

6    any changes being made to the sale order?

7    A.    Yes.

8    Q.    And what were those changes?

9    A.    I don't remember all of them but I remember one in

10   particular which was the committee consent provision.

11   Q.    Okay.  And what was that request?

12   A.    Essentially, that no changes could be made to the

13   agreement -- I'm not paraphrasing.  The provision speaks for

14   itself.  But no changes could be made without our consent.

15   Q.    Was it contemplated that changes would need to be made?

16   Why did you feel you needed that?

17   A.    Well, based on what happened at the hearing, meaning, that

18   a deal was changing during the hearing, I knew that it was

19   certainly a possibility.

20   Q.    Okay.  We'll come back to the consent issue --

21   A.    Okay.

22   Q.    -- in a little while.  Anything else that you did on the

23   19th or in the early morning of the 20th when the Court entered

24   the order?

25   A.    Not that I can recall, no.

- 22 -

1   Q.   Okay.  All right.  Let me ask you a question about the

2   week leading up to the sale hearing.  So that some of this is

3   even prior to Milbank being retained and then Milbank's

4   retention.  Was the committee receiving updates directly from

5   Barclays or Barclays' representatives regarding the transaction

6   and any changes that were being made to the transaction?

7   A.   Not to my knowledge.

8   Q.   Okay.  So your testimony is whatever updates you got or

9   Houlihan got, to your knowledge, came from Lehman or Weil or

10  their representatives, is that fair?

11  A.   Yes.  I mean, look, we have to be careful here.  I'm sure,

12  for example, the update that was given in court, I'm sure that

13  counsel for Barclays was there during that time.  But as far as

14  us receiving direct updates from Barclays, I don't know

15  anything about that.

16  Q.   Well, the reason I ask you is that Mr. Diamond, Barclays'

17  president, testified earlier this week that there was support

18  from the creditors' committee for the sale transaction and that

19  the committee was kept informed and -- so do you agree with

20  those statements -- came from -- by Barclays?

21          MR. BOIES:  Objection, Your Honor.  I'm not sure that

22  that was Mr. Diamond's testimony.

23          MR. KIRPALANI:  Withdrawn, Your Honor.  Withdrawn.

24          THE COURT:  I'm actually not sure it was either.  So

25  the objection is sustained.

- 23 -

1            MR. KIRPALANI:  Okay.

2            THE COURT:  If you have transcript references, you

3     could certainly do that.

4            MR. KIRPALANI:  It's immaterial to the question, Your

5     Honor, whether it was Mr. Varley or Mr. Diamond.  So I'll just

6     ask it a different way, if that's okay.

7            THE COURT:  Okay.

8     Q.   Is it your understanding that Barclays' representatives

9     had directly kept the committee apprised of changes during the

10    week leading up to the sale hearing?

11    A.   Not that -- to my knowledge.  If that happened, it didn't

12    happen in front of me or -- nowhere -- I have never heard any

13    committee member mention that.

14    Q.   Okay.  And do you agree with Barclays' statements during

15    this trial that there was support from the creditors' committee

16    for the sale transaction during that week?

17    A.   The only thing I know of in terms of the committee's

18    position is what I told the Court.  So I -- is he pointing to

19    something else?  I'm not aware of it.

20    Q.   Okay.  Let's turn our attention to the weekend, September

21    20th, Saturday; September 21st, which was a Sunday.  Can you

22    please advise what, if anything, you recall doing in connection

23    with the sale on Saturday, September 20th?

24    A.   Exchanges of e-mails or phone calls with my colleagues.

25    But I did not -- the best of my recollection is I did not go to

- 24 -

1    Weil Gotshal for meetings on that day, on Saturday.

2    Q.    Okay.  But to your understanding, there were such meetings

3    on Saturday?

4    A.    Yes.

5    Q.    Okay.  Did anyone from your firm go?

6    A.    I believe that Crayton Bell was there among others.

7    Q.    Okay.  So turning to Sunday, September 21st, did you do

8    anything on that day in connection with the sale, attend

9    meetings or whatever?

10   A.    Yes.  On Sunday, the 21st, at around noon, 1:00 or so, I

11   went to the office of Weil Gotshal to monitor what was going on

12   there.

13   Q.    Do you recall who else was there on behalf of the

14   committee?

15   A.    Yes, generally.  Again, Houlihan.  That means, Burian,

16   Fazio, Geer and others whose names I forget.  FTI - I'm pretty

17   sure Eisenband was there.  But there certainly were

18   representatives from FTI.  And then Milbank -- clearly, Crayton

19   Bell was there.  I think there was a bankruptcy associate,

20   David Eastlake, but I'm not sure if he was but I think he was

21   there.  But -- and also David -- sorry.  Crayton Bell had some

22   of his associates there and I forget the name of those folks.

23   Q.    And did you personally attend any meetings on that Sunday?

24   A.    Yes, but I want to qualify "meetings".  This is not like

25   we -- the committee would go to -- or the committee

- 25 -

1    representatives would go to a conference room and meet -- have

2    a meeting with Barclays or a meeting with Lehman.  There were

3    six or seven conference rooms at Weil Gotshal on the twenty-

4    fifth floor reserved for different parties including us, one

5    for Barclays, one for the debtors, one for the SIPC trustee and

6    his firm.  And did I mention Barclays?  One for Barclays as

7    well.  And there a number of meetings.  But most of what I

8    observed during that day were -- what I participated in were,

9    really most of the time, hallway discussions with Lehman

10   representatives rather than having a formal meeting where we go

11   to a conference room and go through ten points that are to be

12   discussed.  There was one such meeting that I would call a more

13   formal meeting.  That took place later on in the day.  But the

14   rest were really one-off discussions.  Yes, sometimes the one-

15   off discussions ended up in conference rooms.  But I think that

16   most of the discussions we had were in the hallway or sort of

17   informal discussions rather than meetings.  That's why I wanted

18   to put some quotes around the word "meetings".  But, yeah, I

19   was there and I participated in that process.

20   Q.   Okay.  And were committee representatives invited to

21   attend all meetings that were going on in all of the rooms?

22   A.   No.

23   Q.   Are you familiar with the clarification letter that was

24   executed between the parties with respect to the sale

25   transaction?

- 26 -

1   A.   Generally, yes.

2   Q.   Do you recall receiving and reviewing a copy of the

3   clarification letter over the course of the weekend?

4   A.   I remember that we received a draft of it, that's correct.

5   Q.   Do you recall reviewing a final executed version of the

6   clarification letter after the closing?

7   A.   After the closing?  I remember -- I'm sure I did.  But do

8   I remember the day I did that?  No.  I just -- I'm sure I did.

9   Q.   What about meetings on Sunday regarding the clarification

10  letter?  Do you recall there being any meetings or even hallway

11  discussions regarding what that clarification letter is doing

12  or should be doing?

13  A.   Yeah.  There were -- I want to be precise.  There were a

14  lot of issues that were subsumed in the clarification letter.

15  So the answer is yes.  There were a number of discussions.

16  Whether it said over time are we talking about the

17  clarification letter now rather than are we talking about what

18  was referred to as regulatory capital, 15c3 accounts, or the

19  issue of the marks, the securities that are being transferred

20  and what are the marks for those securities.  And it's all part

21  of the same -- in my mind, it's all part and parcel of the same

22  thing.  So in that sense, yes, there were -- there were a bunch

23  of discussions.

24  Q.   Turning to process, do you recall asking Harvey Miller

25  that he make sure that his corporate team keeps your corporate

- 27 -

1    team, including Crayton Bell, involved in all discussions and

2    meetings with respect to documenting the sale?

3    A.    I remember sending him an e-mail to that -- generally, to

4    that effect.

5    Q.    Okay.  Can I ask you to turn in your book to Exhibit 367?

6    A.    Yes.  I'm there.

7    Q.    And is this the e-mail that you were referring that you

8    sent to Mr. Miller?

9    A.    Yes.

10   Q.    Why did you ask that Mr. Bell have that type of a role?

11   A.    Because it's our job to be involved and because debtors

12   sometimes have a tendency to just run on their own and forget

13   that there's a committee out there.

14   Q.    Do you recall at any time on Sunday discussing with Mr.

15   Miller a need to go back to court for approval of the

16   clarification letter?

17   A.    No.  I remember two discussions with him that would be

18   fairly within that scope.  But I want to be precise.  The first

19   discussion with him was to correct a statement that he had made

20   that -- and he said these changes are not material, therefore I

21   don't need your consent.  And I -- in hindsight, I understand

22   why he said that, because usually the formulation of an order

23   is that you can make nonmaterial changes without anybody's

24   consent.  I said, no, no.  You have to look at the order.  The

25   order specifically says that you need our consent for

- 28 -

1   nonmaterial changes.  So I guess that touches on your question.

2   That's the first exchange on that topic -- well, the general

3   topic, if you will.

4        Then there's another exchange, this one much later in -- I

5   would say the day.  Actually, it was the morning of the

6   closing, so Monday the 22nd, I guess, where -- with his

7   partner, Tom Roberts.  They were going through a list -- and

8   Tom Roberts is a corporate partner.  His job is to close deals.

9   I'm not saying this in a negative way.  That's positive.

10  That's what he does for a living.  But -- and so he had this

11  legal pad with issues, an issues list, trying to check off

12  these issues.  And we were in disagreement with a number of

13  these issues.  And I said something to the effect of, look, you

14  can do whatever you want but we're not consenting to this

15  transaction.

16       So these are the two discussions that would touch on the

17  topic that you just raised.

18  Q.   And what was Mr. Roberts' reaction when you said you can

19  do whatever you want but we're not consenting to this.

20  A.   He was annoyed.  He was annoyed in a sense -- I think he

21  said something along the lines of why am I talking to you then.

22  And I understand his reaction.  But he was annoyed and it was

23  very late, early morning.

24  Q.   I'd ask you to turn to Movants' Exhibit 381 in your book

25  there.  These are schedules dated as of September 21st, 2008.

- 29 -

1   A.   Okay.  I'm sorry.  It's 381, correct?

2   Q.   381, yes.

3   A.   That's an e-mail from Brian Kelly?

4   Q.   Yes.  With an attachment.

5   A.   Okay.

6   Q.   I want you to just turn to the second page of that

7   document which is a summary schedule.

8   A.   Yes.

9   Q.   Do you recall having seen this document when you were at

10  Weil on Sunday, the 21st of September?

11  A.   I'm really not sure I saw it.  I mean, I -- possibly I did

12  but I don't have any clear recollection of seeing that.

13  Q.   Do you recall you yourself having any discussions about

14  this schedule with anybody or was that something more that

15  Houlihan was involved in?

16  A.   Yeah.  This would absolutely be a Houlihan topic.

17  Q.   On that page, the summary page, it shows assets totaling

18  49.9 billion dollars.  Do you recall any discussions regarding

19  that figure?

20       (Pause)

21  A.   I remember discussions of numbers in that vicinity,

22  meaning, forty-five, forty-seven, forty-nine.  But do I

23  remember that number specifically?  I'm sorry, no.

24  Q.   And what about with Houlihan?  Did Houlihan update you on

25  discussions they were having regarding the number whether it's

- 30 -

1    forty-nine or forty-seven?

2    A.   Well, they were updating us on the issues that were open,

3    yes.

4    Q.   And what did they think -- was there any open issues with

5    respect to that number?

6    A.   Well, if this number refers to the book -- the securities

7    in the book, yes.  There was -- there was this ongoing debate

8    or discussion between Houlihan and Lehman representatives over

9    how this -- what's in the book, the lack of certainty as to

10   what's in the book; and second is how are the securities in the

11   book marked, meaning, how they're valued.  Yeah.  That was --

12   that was a topic that was ongoing the whole evening.

13   Q.   And did you have any understanding as of that Sunday as to

14   how the book or the assets/securities were being marked or

15   valued?

16   A.   Other than the fact that Houlihan was extremely agitated

17   over how that was done or -- and unhappy about the lack of

18   clarity over the issue of how the marks were determined or --

19   et cetera, I don't remember precisely what the nature of the --

20   the precise nature of the issue.

21   Q.   Do you recall attending any meetings on that issue with

22   Jim Seery and Alex Kirk?

23   A.   Yes.

24   Q.   And was --

25   A.   That would be sort of the closest thing to a formal

- 31 -

1    meeting we had during that day.  There was one big meeting

2    where a number of people attended, people from JPMorgan Chase,

3    Barclays, Fed -- the Federal Reserve representatives, or maybe

4    they were in by phone, which did not, as far as I can recall,

5    deal with the issue of the marks, but really dealt with the

6    issue of certain transactions having not cleared or being in

7    the process of clearing and who was going to be on the hook for

8    these transactions because there's a passing of the baton there

9    between two institutions.  So there was a whole -- and DTC,

10   actually, was involved in that as well, I think.  So there was

11   a -- that was one meeting that probably lasted an hour.  So we

12   were in that meeting.  But it didn't seem to affect us

13   directly.

14       Right after that meeting, in that same conference room,

15   Houlihan sort of cornered -- in a loose way, cornered the

16   Lehman representatives saying look, we need to understand how

17   the book of securities, how does it work, what's in it, et

18   cetera.  And they did sit down.  And I was not sitting.  I was

19   just sort of over their shoulders.  But I remember, for sure,

20   Seery being there.  I think Alex Kirk was there as well.  And

21   on the Houlihan side, without a doubt, Fazio, Geer and Burian

22   were there.  And I think -- pretty sure that Crayton Bell was

23   there as well -- my partner, Crayton Bell.

24   Q.   Okay.  Let's go back to the topic of regulated capital.

25   Do you recall the sum and substance of any discussions that you

LEHMAN BROTHERS HOLDINGS INC., et al.

- 32 -

1   were having with either Mr. Roberts or any other

2   discussions/meetings on the issue of regulated capital?

3   A.    Generally there but apparently -- but that this was

4   recounted to us by Mr. Roberts.  But Barclays was taking the

5   position that they should get regulated capital, meaning, cash

6   and securities that are -- I'm not sure they're formally

7   deposited but there's a mechanism to ensure the solvency of the

8   going concern of a broker/dealer and some securities were

9   posted or were put in escrow -- I don't know the exact details

10  -- in cash.  And I think that the -- that he told us that

11  Barclays' position was that they were getting all of that as

12  part of this deal.  So that I remember fairly well.

13  Q.    And do you recall what the committee's position was on --

14  A.    No.  It was hell no.  I remember Burian being very

15  agitated over that, especially over the cash portion.  Not that

16  he was acquiescing in the rest but certainly over the cash, he

17  said there's no way they're buying cash.  That was never part

18  of the deal, et cetera, et cetera.  So I remember that.

19       And then, I remember that, again, Mr. Roberts, not to be

20  critical of him, but his job is to close deals so -- coming up

21  and saying why don't we split the baby in half.  And again,

22  Burian got very agitated saying you're out of your mind.

23  There's nothing -- there's no baby to split in half.  I mean,

24  they're not supposed to get the cash.  So that I remember

25  fairly well.

- 33 -

1    Q.    Okay.  Let me ask you , Mr. Despins, did you ever indicate

2    to Mr. Miller or anyone else over the weekend at Weil that the

3    committee was consenting to the sale transaction?

4    A.    No.

5    Q.    On late Sunday, early Monday morning, did you attend any

6    meetings with Michael Klein as a representative of Barclays?

7    A.    That question was asked in depositions.  And I've been

8    jogging my memory for that.  It's very possible that I did but,

9    sitting here today, I cannot say with a hundred percent

10    certainty that I did.

11    Q.    Okay.  You'll recall a short while ago, I read to you a

12    portion of the transcript from the sale hearing in which you

13    informed His Honor that there had been insufficient time for

14    the committee to perform the necessary due diligence.  Do you

15    remember that?

16    A.    Yes, I do.

17    Q.    Did anything happen over the closing weekend that would

18    have prevented the committee to make an informed decision as to

19    whether they support or object to the transaction?

20    A.    No.  And I would say, if anything, it was going in the

21    other direction.

22    Q.    Was the committee able to do the due diligence that its

23    professionals felt was necessary over that weekend to have

24    permitted the professionals to make a recommendation to the

25    committee?

- 34 -

1    A.   You said "permitted".  I think our due diligence was

2    limited by the events to statements made by Lehman

3    professionals or Lehman employees to us saying this is what's

4    going on, this is what the transaction is.  But checking beyond

5    that, no.

6    Q.   Okay.  Now the transaction itself closed sometime in the

7    early morning of Monday, correct?

8    A.   That's what I understand.

9    Q.   Okay.  Were you and the other committee professionals

10   present when the deal officially closed?

11   A.   No.

12   Q.   Was there a reason why you weren't?

13   A.   Yes.

14   Q.   What's that?

15   A.   Well, we didn't want to be deemed to have acquiesced or

16   consented to this in any way by being there at the closing.

17   Q.   Did you ever indicate to anyone after the closing that the

18   committee had consented to the transaction?

19   A.   No.

20   Q.   In the months following the closing, did anyone from

21   Lehman, Weil or Barclays ever say, to your knowledge, that the

22   committee did, in fact, consent to the transaction?

23   A.   To me?

24   Q.   Um-hmm.

25   A.   Never, until -- the first time I heard that was when the

- 35 -

1   examiner started to question folks about this.

2   Q.   Okay.  I'd like to ask you to turn your attention to some

3   post-closing activities.  If you could turn in your book to tab

4   Exhibit 713.

5   A.   Yes, I'm here.

6   Q.   Okay.  And this is an e-mail chain with the topping,

7   though, that it's September 22nd.  That's the Monday of the

8   closing.  Do you see that?

9   A.   Yeah.  I see it.

10  Q.   Okay.  Can you turn to page 2, please, Mr. Despins?  The

11  first line reads, "Per Luc's instructions, please forward this

12  e-mail to the committee.  When forwarding, please keep in mind

13  that it has an attachment."  You see that, right?

14  A.   Um-hmm.

15  Q.   The last paragraph of this agenda states that "The

16  committee did not consent and expected to see computer runs of

17  all of the transfers at some point."  Do you recall what the

18  requested computer runs were supposed to show?

19  A.   Well, what securities were -- among other things, what

20  securities were transferred and the marks associated with such

21  securities.

22  Q.   So your understanding was you expected to see a line by

23  line, item by item set of marks that when you added it all up,

24  it dovetails with the number?

25  A.   That -- I think so, yes.

- 36 -

1    Q.   In this period of time, September, October of 2008, did

2    you do anything following the closing regarding the Barclays

3    sale?

4    A.   Following the closing?

5    Q.   Um-hmm.  And I referred to you as opposed to --

6    A.   Yeah.  It -- yes, I did.

7    Q.   Okay.  What did you do?

8    A.   I remember sending an e-mail to Weil Gotshal.  I believe

9    it was Lori Fife -- asking her to provide us with a copy of the

10   schedules to the asset purchase agreement or to the

11   clarification letter.  But the schedules that had the list of

12   securities.

13   Q.   If you can turn your book to Exhibit 369 -- and this is an

14   e-mail sent September 25th by you to Harvey Miller and Lori

15   Fife.  Is this the e-mail that you're remembering?

16   A.   Let me just read it quickly.

17        (Pause)

18   A.   Yes.

19   Q.   You can see in the reply e-mail to you, Mr. Miller states,

20   "Luc, I am sure it will be furnished ASAP.  I don't believe it

21   is helpful to suggest that the schedules may have been

22   manipulated post-closing.  You were invited to stay Monday a.m.

23   as the schedules were reviewed and finalized."  Were you

24   suggesting that the schedules may have been manipulated?

25   A.   No.  I -- it was just a comment from committee counsel

- 37 -

1   which is typical in the sense that we're always a bit paranoid

2   in this business.  So I was troubled by the fact that -- it's

3   now -- I think it's Thursday or maybe Friday that week that

4   we're asking for schedules and -- you know, clearly, if they

5   closed on Monday, I assume there were schedules and therefore,

6   it should be just a click of the button to send us the

7   schedules.  And so I was sort of tweaking him little bit,

8   meaning, did they change or you're just not providing them to

9   me.  Essentially, that's the subtext of this.

10  Q.   Can you turn in your book to the tab marked Movants'

11  Exhibit 707?

12  A.   Yes.

13  Q.   If you look -- the first e-mail at the bottom is from you

14  to Michael Fazio and Brad Geer at Houlihan.  And you wrote,

15  "Brad and Mike, we finally received the schedules to the APA on

16  Friday.  Did you guys get them?  They should be "audited" now

17  because if there is an issue with them, we need to speak up now

18  before the trail gets cold."

19  A.   Um-hmm.

20  Q.   See that?  Why was it important to speak up now before the

21  trail gets cold?  And what did you mean by the trail gets cold?

22  A.   In these deals, it's typically a deal involving a complete

23  or almost complete switch of a management team from one company

24  to the other or people just leaving the company.  You don't

25  want to let a lot of time pass because people forget about

08-13555-mg    Doc 10203    Filed 06/28/10    Entered 07/15/10 10:49:32    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 38 of 127

- 38 -

1     exactly who did what to whom as I described in my deposition.

2     And that's why I thought that we should focus on that right

3     away.

4     Q.    And did you, in fact, focus on it?  Did Houlihan audit it?

5     A.    Well, I think that they took them and they started looking

6     at them right away.  Yes.  But, remember, my involvement

7     stopped on October 20th.  So until that date, as far as I was

8     concerned, they were actively reviewing them and working on

9     that stuff.

10    Q.    Okay.  Do you recall yourself reviewing the attachments or

11    the schedules that were delivered on the 25th and comparing

12    them to schedules you had been given during the closing weekend

13    or that's not something you were doing?

14    A.    No.  I was not doing that.

15    Q.    To your knowledge --

16    A.    I mean, I don't recall doing that and, frankly, that would

17    probably be a Houlihan exercise.

18    Q.    Okay.  I'd like to turn your attention to October 8th.

19    There was a meeting between Alvarez & Marsal, the debtors'

20    advisors, and the official creditors' committee's advisors on

21    October 8th at Weil's offices.  Do you recall that meeting?

22    A.    Vaguely.

23    Q.    Do you recall whether that meeting was to discuss the

24    Barclays sale or was it something more expansive than that?

25    A.    Well, this was a -- what I call a debtor committee update

08-13555-mg    Doc 10203    Filed 06/28/10    Entered 07/15/10 10:49:32    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 127

- 39 -

1    meeting, meaning, that I think Mr. Marsal was having a meeting

2    with a number of his folks to update the committee on

3    everything that's going on in the case.

4    Q.    Okay.

5    A.    Or -- everything.  That's a big word -- with most of

6    what's going on in the case.

7    Q.    Okay.  Can you turn your -- turn to your book, Movants'

8    Exhibit 712?  These are portions of the dec or presentation

9    that Alvarez & Marsal provided to the committee on October 8th.

10   It's an excerpt of a longer presentation.  Do you recall

11   receiving this presentation?

12   A.    Generally.  But I don't recall the content.  But,

13   generally, I remember that meeting.  And I'm sure I received

14   something, a document like this.  But would I have received

15   this particular document?  Precisely, I can't recall.

16   Q.    Can you turn to the page that's page 28 of that

17   presentation?

18   A.    Yes.  I'm there.

19   Q.    Okay.  And it says -- this is the page that's been

20   discussed a bit during this trial.  It says under "Assets

21   Purchased", "43.1 billion repo assets, book value per Lehman's

22   stale marks negotiated a five billion dollar reduction".  Do

23   you recall seeing this slide during that meeting?

24   A.    No.  No more than I remember any of the other pages on

25   that.  I have no doubt that it's part of the books that I

- 40 -

1    received.  But whether I -- I don't recall receiving it, no.

2    Q.    Do you have any specific recollection of a discussion

3    about stale marks and the negotiated five billion dollar

4    reduction during that meeting?

5    A.    No.

6    Q.    Do you recall any discussions at all regarding the marks

7    of the purchased securities by Barclays during that meeting?

8    A.    No.  No.

9    Q.    I'm sorry.  You said --

10   A.    I said no.

11   Q.    Oh, I'm sorry.  I didn't hear.  Do you recall sending any

12   e-mails to Weil Gotshal requesting another meeting to discuss

13   the sale transaction and Houlihan's views regarding the sale?

14   A.    Yes, generally.  Yes.

15   Q.    Okay.  Can you turn to the tab in your book marked

16   Movants' Exhibit 148?  This is an e-mail string.  To put it

17   into context --

18   A.    Just getting there.

19   Q.    Yeah.  To put it into context, you probably should start

20   looking from the second page and go backwards.

21   A.    Okay.

22   Q.    So this is October 13th, five days after that Alvarez &

23   Marsal meeting.  If you can just refresh your memory and take a

24   look at this and I'll ask you a couple of questions.

25   A.    Yeah.  Just two seconds.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 41 -

1        (Pause)

2    A.    Yes.

3    Q.    Okay.  And can you just -- for the Court, can you read

4    your e-mail, the October 13th, 11:23 e-mail, the one that

5    starts "Lori"?

6    A.    "Lori, we would like to set up a meeting or conference

7    call with someone at Weil, Lehman, A&M and Lazard to discuss

8    issues related to the asset schedules to the Barclays

9    agreement.  Could you identify the appropriate persons to

10   participate in such a meeting/call.  We would propose a low key

11   preliminary meeting/call during which we'd explain our concern

12   about the schedules.  It is important for that preliminary

13   meeting/call to take place before the hearing on Thursday."

14   Q.    Okay.  What were the concerns on the schedules that you're

15   referring to there?

16   A.    I think it's the general issue of -- that I've mentioned

17   before, the marks, meaning that the book of securities -- you

18   know, Houlihan, I think, by that time, had said that there

19   were -- I'm not sure discrepancy is the right word.  But there

20   were gaps in there in terms of their understanding of the

21   transaction.  And that's what they wanted to explore.

22   Q.    And why would you tell Ms. Fife that you wanted a low key

23   preliminary meeting?

24   A.    Because we -- this was in the nature of exploratory due

25   diligence.  It was not in the nature of taking that position

- 42 -

1    with these folks. We just wanted to understand whether it's

2    possible there's an explanation for what Houlihan sees as an

3    issue.

4    Q.    If you had had some concerns at that time, why didn't you

5    involve me and my firm to get involved and start doing some

6    discovery here?

7    A.    Because I think we didn't know enough.  I think that

8    this -- again, I would describe this in the nature of due

9    diligence to confirm that there's no issue here.

10   Q.    Okay.  Going back to the October 13th e-mail exchange,

11   after Ms. Fife responded to your e-mail requesting more

12   specifics on the proposed meeting, you write back and state,

13   "The concern is with respect to the securities which were

14   transferred, Houlihan has reviewed them and cannot even come

15   close to the amount which was announced in court.  I think it

16   was 47.4 billion dollars.  And there's also a discrepancy on

17   the liability side although it could be much smaller than the

18   issue on the asset side.  Houlihan's review would indicate that

19   the securities transferred could be worth billions more than

20   the 47.4 billion dollars.  There may very well be a logical

21   explanation for all of this which is why the first meeting was

22   just to explore the issues."

23         In Ms. Fife's response to the e-mail saying that she's at

24   a loss -- I'm paraphrasing but she's at a loss --

25   A.    Can I slow you down?

- 43 -

1    Q.    Yeah.

2    A.    I'm just trying to keep track.  Okay.  Go ahead.  I'm

3    sorry.

4    Q.    Okay.  Ms. Fife responds -- I might as well just tell you.

5    "I am really at a loss why you and the other committee

6    professionals are spending so much time on the Barclays sale.

7    What could you or anyone, for that matter, do even if it turned

8    out that the assets turned out to be greater?  As you know, the

9    sale has been consummated which effectively moots out any

10   relief you might be seeking.  I would really appreciate it if

11   you would enlighten me as to the potential actions vis-a-vis

12   Barclays other than in connection with the TSA."  And then she

13   goes on to talk about setting up the meeting.  And you

14   responded "No.  Let's just schedule the meeting/call.  There is

15   no point at this stage in going through an exchange of e-mails

16   over why we disagree with your mootness contention."

17        Did you ever participate, Mr. Despins, in any follow-up

18   meetings that you tried to set up through this e-mail?

19   A.    No.

20   Q.    Okay.  Do you know whether such a meeting ever occurred?

21   A.    I don't know.

22   Q.    Okay.  Why do you not know?

23   A.    Well, because I stopped being involved in any Barclays

24   matter on October 20th.  So if a meeting would have -- took

25   place after that, I wouldn't know.

- 44 -

1    Q.    Okay.  Do you know if Milbank ever followed up on your

2    request?

3    A.    I assume they did but I don't have any independent

4    knowledge.

5    Q.    Let's talk about communications with Barclays or its

6    representatives.  Mr. Despins, we've talked about your efforts

7    with Weil Gotshal after the closing and during the closing

8    weekend.  But did you ever have any communications directly

9    with Barclays' counsel regarding the transaction?

10   A.    I want to be precise.  I mean, clearly, when we had a

11   recess in court, Barclays' counsel was there.  I'm sure that I

12   interacted with them at that time.  That's one category of

13   discussions.  You're asking me pre-closing?  Post-closing?

14   Q.    I'm actually asking you post-closing --

15   A.    Oh, I'm sorry.  I'm sorry.  Post-closing?  Not in a

16   substantive way but I remember mentioning to counsel for

17   Barclays that this issue was coming up, sort of giving her a

18   heads up that this issue was coming up.

19   Q.    And who was that that you had a conversation with?

20   A.    Lindsee Granfield.

21   Q.    And what was the context of that meeting?

22   A.    It was actually just near where you're standing.  There

23   was a hearing in Barclays obviously after the transaction

24   closed.  I don't know precisely when but it would be certainly

25   before October 20th because I was gone by that time, gone from

- 45 -

1   the Barclays case.  And I said something to the effect that the

2   committee is looking into these issues.  Yeah.  Sort of a heads

3   up, the committee is looking into these issues.

4   Q.   And did she have any reaction to that?

5   A.   No.  Unhappy.  You know, basically, I seem to recall

6   something like this is the final thing.  I don't know what you

7   think you're doing but something along those lines.

8   Q.   Okay.  Mr. Despins, during your tenure as committee

9   counsel, was a pre-negotiated five billion dollar gain for

10  Barclays ever presented to the committee for consideration?

11  A.   No.

12  Q.   During your tenure as committee counsel, did you

13  understand that Barclays was applying a liquidation value to

14  set the marks for the securities?

15  A.   No.  I didn't understand that.

16  Q.   Okay.

17        MR. KIRPALANI:  I think, Your Honor, unless you permit

18  me to ask Mr. Despins some questions about when I used to work

19  for him while he's still under oath, that concludes my direct.

20        THE COURT:  All right.  It would be tempting to

21  listening to that questioning.  Would this be a good time for

22  us to take our morning break?  I think that makes sense.  Let's

23  break for ten minutes.  We'll see you back at ten to 11.

24        (Recess from 10:37 a.m. until 10:54 a.m.)

25        THE COURT:  Be seated.  Mr. Boies, please proceed.

- 46 -

```
 1          MR. BOIES:  Thank you, Your Honor.

 2     CROSS-EXAMINATION

 3     BY MR. BOIES:

 4     Q.    Good morning, Mr. Despins.

 5     A.    Good morning.

 6     Q.    I don't believe we've met.  My name is David Boies and you

 7     understand I represent Barclays.

 8     A.    Yes.  We have met before.

 9     Q.    Okay.  Now you testified that in preparation for this

10     testimony, you had not met with anyone other than your counsel.

11     Do you recall that?

12     A.    That's correct.

13     Q.    Now, to your knowledge, did your counsel meet with

14     representatives of the committee in connection with preparing

15     you for your deposition (sic)?

16     A.    I don't know if they met or talked to somebody from the

17     committee.

18     Q.    But they did talk to members of the committee?

19     A.    They probably did.

20     Q.    And did your counsel convey to you some of the questions

21     that the committee was going to ask you?

22     A.    Not -- topically, yes, but not in detail.

23     Q.    Topically.  That goes to the topics?

24     A.    Yes.

25     Q.    You testified that the APA had been amended at some point.
```

- 47 -

1    Do you recall that?

2    A.   Yes.

3    Q.   Were you referring to the clarification letter?

4    A.   I'm not a hundred percent sure.  Well, I know that it was

5    amended through the clarification letter but I think there may

6    have been another version of the APA as well before -- before

7    the final hearing.  In between the bid procedure hearing and

8    the following hearing.

9    Q.   And did the committee participate in any way in the

10   preparation of the revised version of the APA that you say you

11   believe was developed prior to the final confirmation hearing?

12   A.   Did we participate in the preparation?

13   Q.   Yes.

14   A.   No.  We don't prepare documents for --

15   Q.   Ahh.  Let me try to be maybe a little more clear.  Did the

16   committee participate in the negotiations that led to this

17   revised APA that you say was prepared in between the original

18   APA and the clarification letter?

19   A.   No doubt that we were informed about the changes.  Whether

20   we participated in the negotiation, I am not sure.

21   Q.   Okay.  You said that you had told Mr. Harvey Miller that

22   the debtor needed the committee's consent for any changes to

23   the transaction after the final confirmation hearing.  Do you

24   recall that?

25   A.   I told him at the closing on Sunday that he needed our

- 48 -

1    consent, that's correct.

2    Q.   He needed your consent for any changes.

3    A.   Correct.

4    Q.   Now were there any changes, in your view?

5    A.   That's a bit of the issue that's before the Court today.

6    But I -- so I think ultimately the judge will have to decide

7    that.  But I think that the reading of the clarification letter

8    that was finally executed at the closing, it's hard to concede

9    that there were no changes.  I mean, the paragraphs say we're

10   changing this, we're changing that.

11   Q.   And I'm only asking for your view.  I'm not asking for,

12   obviously, the final issue before the Court.  But back in

13   September of 2008, you believed that the clarification letter

14   had made some changes to the transaction, correct?

15   A.   I -- would I have reached that conclusion finally or not,

16   I don't know.  But I know that I was looking at it yesterday

17   and I could see that there were a bunch of changes to the asset

18   purchase agreement in the clarification letter.

19   Q.   And you said you'd read the clarification letter back in

20   September of 2008, correct?

21   A.   I'm sure I did.  I don't have a specific recollection of

22   reading it, but I'm sure I did.

23   Q.   And so is it fair to say that in September of 2008 you

24   were aware that the clarification letter made certain changes

25   to the transaction?

- 49 -

```
 1    A.    That's a logical inference, yeah.

 2    Q.    And you testified that you had asked the Court that no

 3    changes be made without your consent, correct?

 4    A.    Correct.

 5    Q.    And you had told Mr. Miller that he needed your consent,

 6    correct?

 7    A.    Um-hmm.

 8    Q.    You have to answer audibly.

 9    A.    Yes.  I'm sorry.  Yes.

10    Q.    And you didn't give your consent, did you?

11    A.    No, we did not.

12    Q.    Now did you ever consider going back to the Court and

13    saying, in substance, Your Honor, you told him not to make any

14    changes without our consent.  They went ahead and did it

15    anyway.  We objected.  Did you ever consider doing that?

16    A.    Not without having the full understanding of what the

17    changes were and the impact that the changes might have had for

18    the estate.

19    Q.    Well, you knew that the changes had been made.

20    A.    I knew that --

21    Q.    You knew changes had been made, correct?

22    A.    That some changes had been made, yes.

23    Q.    And you knew what the changes were 'cause they were

24    written right there in the clarification letter, right?

25    A.    Well, I knew that I could read the document and say we're
```

LEHMAN BROTHERS HOLDINGS INC., et al.

- 50 -

```
 1    changing that and we're changing that section, et cetera.  But
 2    what we don't know is the impact of those changes on the value
 3    received by the estate.  So I don't want to run to court on a
 4    half-baked theory that there are some changes but, frankly,
 5    Judge, I don't understand what the impact of those changes are.
 6    So I -- what I'm telling you is that we wanted to have the
 7    schedules.  We wanted to understand what happened to those
 8    schedules and the marks.  And obviously, the game plan was --
 9    after I gained a full understanding of that and briefing the
10    committee, if warranted, that we would be eventually going back
11    to the Court.
12    Q.   Well, the committee professionals believed that the
13    securities that had been transferred were worth billions of
14    dollars more than the 47.4 billion dollar figure they had been
15    used with the Court, correct, sir, back in September 2008?
16    That's what the committee professionals believed?
17    A.   Well, which committee professionals?
18    Q.   Did you hear my question, sir?
19    A.   Yeah, I heard your question.  And I'm a committee
20    professional and I did not believe that.  So --
21    Q.   You did not believe that.
22    A.   I have no -- I had not reached a conclusion on that issue
23    at that time, no.
24    Q.   Were you aware the other committee professionals believed
25    that?
```

- 51 -

1   A.   I was aware that they were raising issues about that, yes.

2   Q.   Well, raising issues about that?  Did you be -- did you

3   understand that other committee professionals believed that the

4   securities transferred could be worth billions more than the

5   47.4 billion dollar number used with the Court?

6   A.   Could be, I think is the operative word.  I think --

7   there's no doubt that they were raising issues about it.

8   Whether a final conclusion had been reached that, in fact, this

9   is what happened and that this was inconsistent with the

10   agreement, no.  On my watch, that conclusion was not reached.

11   Q.   Well, let me see what did happen on your watch.  On your

12   watch, the transaction is changed without your consent,

13   according to you, correct?

14   A.   Well, the modification (sic) letter speaks for itself.  It

15   either changed or not.  I think it changes but that's beside

16   the point.

17   Q.   I'm asking your view, sir.

18   A.   Yes.

19   Q.   Okay?  Your view was that the deal had been changed

20   without your consent in the clarification letter, correct?

21   A.   That's my view today after reading the clarification

22   letter yesterday, yes.

23   Q.   Well, wasn't that your view back in September when you

24   read it?

25   A.   I don't recall what precisely was my view at the time.

- 52 -

1    What I know -- I recall vividly at the time is that we were

2    doing due diligence on all the aspects of the closing of this

3    transaction.

4    Q.    Let me just try to see if I understand what you're saying.

5    Reading the clarification letter now, it's obvious to you,

6    according to your testimony, that the clarification letter made

7    changes to the transaction, correct?

8    A.    To the asset purchase agreement, yes.

9    Q.    Okay.  And that would have been equally obvious to you

10    back in September of 2008, would it not?

11    A.    It probably was.

12    Q.    Okay.  And that you knew back in 2008 that the committee

13    was supposed to have its consent for any changes, correct?

14    A.    That's correct.

15    Q.    Now you knew these changes could, to use your word, have

16    cost the estate billions of dollars, correct?

17    A.    I knew that Houlihan was of that view, that's correct.

18    Q.    Okay.  And Houlihan was of the view that the changes had

19    cost billions of dollars to the estate.  And Houlihan was

20    actually the professionals that were responsible for valuation,

21    correct?

22    A.    No.  Now you changed it.  It said could.  Whether they had

23    to reach a final conclusion on that, as I said, on my watch, I

24    don't think they did because we never had the meeting with the

25    debtor to get their side of the story.

- 53 -

1    Q.   Did you think that if the committee professionals

2    responsible for valuation had reached the conclusion that

3    changes had been made without your consent that could have cost

4    the estate billions of dollars it was important to come back to

5    the Court and tell the Court that?

6    A.   Not until I hear from the debtor as to what they think

7    happened.

8    Q.   How long were you going to wait to hear from the debtor

9    before going back to court?

10   A.   A matter of weeks or a month or so.  And that's -- you

11   know, I think that's what we were doing.  Meaning, on my watch,

12   I was asking -- pestering them to have a meeting.  And that

13   meeting didn't take place on my watch.  But -- and I don't know

14   what happened after that.

15   Q.   Well, would you agree that it would have been

16   irresponsible on the part of the committee to conclude that

17   changes were made without their consent despite the fact that

18   they had asked the Court to provide that no such changes

19   without their consent be made, that those changes had possibly

20   cost the estate billions of dollars and to do nothing for

21   months in terms of coming back to the Court and raising the

22   issue?

23   A.   I think the committee needs to pursue this issue

24   diligently.  What happened after I was no longer involved, I

25   have no idea.

- 54 -

1    Q.   You mentioned that you had raised a issue with Lindsee

2    Granfield representing Barclays.  Do you recall that?

3    A.   Post-closing --

4    Q.   Post-closing.

5    A.   -- yes.  Well, I raised the issue but I -- I gave her a

6    heads-up.  That's the nature of the description.

7    Q.   You gave her a heads-up that the committee was looking at

8    certain things, correct.

9    A.   That's correct.

10   Q.   Did you tell her that you believed or that the committee

11   believed or that the committee professionals believed that

12   billions of dollars of assets might have been inappropriately

13   transferred to Barclays?

14   A.   In those terms?  No.  I didn't tell her that, no.

15   Q.   Did you tell her anything at all about what you thought

16   the problems were or might be?

17   A.   Generally, I think I did.

18   Q.   What did you say to her, sir?

19   A.   That the committee was looking into the issue of the marks

20   with respect to the book of securities that had been

21   transferred, something along those lines.

22   Q.   Did you tell her anything else, sir?

23   A.   I'm sure I said other words but I don't recall anything

24   else of substance, no.

25   Q.   Okay.  And you don't recall any other words that you used,

- 55 -

1    do you?

2    A.    Do I recall any other words?

3    Q.    Words that you used.

4    A.    Not precisely, no, but the gist of the conversation was as

5    I just described it.

6    Q.    And the only gist of the conversation was as you've

7    described it, is that correct?

8    A.    Yeah.  It was I want you to know that the committee is

9    investigating this issue, something along those lines.

10   Q.    And this issue was the marks, is that correct?

11   A.    Something -- yeah.  Something -- yes.  That's fair.

12   That's a fair --

13   Q.    And she told you that the transaction had closed a month

14   ago and it was final, correct?

15   A.    She never said a month ago.  That would have been

16   impossible 'cause I was involved only until October 20th.  I

17   said that I had this conversation before I ceased being

18   involved.  So --

19   Q.    When did you have the conversation?

20   A.    It was at a hearing.  We can look at calendars.  But it

21   was a Lehman hearing after, obviously, the closing of the

22   transaction before October 20th.  So there can't be too many of

23   those, one or two.

24   Q.    All right.  Regardless of how long it had been, she told

25   you the transaction is final in her --

- 56 -

1    A.    Yes.

2    Q.    -- view, right?

3    A.    Yes.

4    Q.    And did you consider going to court and saying, we think

5    the transaction's not final.  Barclays thinks it is final.  We

6    ought to get this resolved.

7    A.    That's not the way the process works, sir.

8    Q.    Well, sir, did you consider doing that?

9    A.    Not without knowing the full story, no.

10   Q.    Not without knowing the full story.  And how long were you

11   prepared to wait to know the full story as you describe it

12   before going back to court?

13   A.    I had not made that determination of how long I was

14   prepared to wait.

15   Q.    Had you made any determination at all about that?

16   A.    Given that I was -- it was right after the transaction

17   that I was pestering the debtor to have a meeting, no, I

18   didn't -- it didn't enter in my thinking that -- how long will

19   I wait?  No.  I didn't think about that, no.

20   Q.    Now you knew that this Court's order was being appealed to

21   the federal district court, did you not?

22   A.    I'm sure I did at the time.

23   Q.    In fact, you were responsible for preparing some papers to

24   be filed in that connection, were you not, sir?

25   A.    I'm not sure about that, meaning, it's very possible that

- 57 -

1     my name was on some pleading because I'm the partner in charge.

2     But I don't recall specifically that.

3     Q.    Let me ask you --

4           MR. BOIES:  Did we hand up a volume of --

5           THE WITNESS:  Yes.  I have a volume.

6     Q.    Let me ask you to look at the document that is marked as

7     Barclays' Exhibit 398.  It's behind your tab 76.  And I don't

8     know if your -- I don't think your name is on this or not but

9     it is something that was filed on October 20th, 2008 and,

10    obviously, prepared before then.  And I would ask you whether

11    you were aware that the committee was preparing this document

12    to file.

13    A.    I don't think so.  I mean I -- if I'm involved, my name is

14    generally on the pleading.  The way I would say it is that if

15    my name is not on the pleading, somebody made a conscious

16    decision to take it off.  So the fact that my name is on the

17    pleading would mean that I may be involved, I may not be

18    involved.  But if my name's not on it, somebody made a

19    conscious decision to take it off, meaning, I'm not sure I was

20    involved in this at all.  And I have no specific recollection

21    of that.

22    Q.    Now, on October 20th was when you told Milbank Tweed you

23    were leaving, correct?

24    A.    No.  I told them earlier than that.

25    Q.    You told them earlier than that?

- 58 -

1    A.    Yes.

2    Q.    And when did they tell you to stop having involvement in

3    this case?

4    A.    October 20th.

5    Q.    October 20th.  So prior to October 20th, you continued to

6    be involved in this case, correct?

7    A.    To the best of my abilities, yes.

8    Q.    Okay.  Now, even though they may have taken your name off

9    of these pleadings on October 20th, is it your testimony that

10   you didn't know they were preparing this document?

11   A.    My -- I have no specific recollection that they were.  I

12   can't be more precise than that.

13   Q.    Well, do you have a general recollection that they were?

14   A.    No.

15   Q.    All right.  You did know that there was an appeal,

16   correct?

17   A.    I think I knew that, yes.

18   Q.    And did you know that the committee was going to file

19   papers in connection with that appeal?

20   A.    I don't think I knew that.

21   Q.    Well, in your experience in this area, if there was an

22   appeal of an order such as this, would the official creditors'

23   committee typically file some papers in connection with that?

24   A.    It's possible they would or they would not.  There's no

25   automatic -- I would say, it's very possible but sometimes we

LEHMAN BROTHERS HOLDINGS INC., et al.

- 59 -

1   don't.

2   Q.   And you were the lead person on this engagement until

3   October 20, correct?

4   A.   What I said is that on October 20th I was told to cease

5   working on this matter.

6   Q.   My question to you --

7   A.   Obviously, something else was going on that I had no

8   involvement in.  But --

9   Q.   All right.  Now, the names on this paper are Dennis Duane

10  (sic), Wilbur Foster, Paul Aronzon and Gregory Bray.  Do you

11  see that?

12  A.   Yes.

13  Q.   Did you work with any of those people on this client --

14  this transaction?

15  A.   Sure.  They were my partners, yes.

16  Q.   They were your partners?

17  A.   Yes.

18  Q.   And not only were they your partners at Milbank Tweed, but

19  they were people that you worked with in connection with the

20  Barclays transaction, correct?

21  A.   No.  Some of them have nothing to do with this

22  transaction.

23  Q.   Did any of them have anything to do with transaction, sir,

24  with you?

25  A.   I'm looking at the names now.  Bray, Aronzon, no.  Foster,

- 60 -

1    no.  Dunne, tangentially, but -- meaning that, for example,

2    they were not at the closing or anything like that.  Or they

3    were -- they were in court.  Dennis was here in court with me

4    on the -- on both hearings, the 17th and the 19th.

5    Q.    Post-closing --

6    A.    Yes.

7    Q.    -- is it your testimony that you have never worked with

8    Mr. Dunne, Mr. Foster, Mr. Aronzon and Mr. Bray in connection

9    with the Barclays transaction?

10   A.    Aronzon and Bray for sure.  Foster, sure.  Dennis, I'm

11   sure I talked to him about the transaction or what was

12   happening post-closing from time to time, yes.

13   Q.    All right.  And is it your testimony that in your

14   conversations with Mr. Dunne post-closing, you've never had any

15   conversations with him about what position, if any, the

16   committee would take in connection with the appeal?

17   A.    My testimony is I don't recall that -- filing papers in

18   the appeal at all.  It doesn't mean the conversation did not

19   take place.  I'm just saying I have no recollection of that.

20   Q.    And I take it you have no recollection of what position

21   the committee took on this appeal?

22   A.    No.

23   Q.    Now you testified that the committee did not affirmatively

24   support the Barclays transaction.  Do you recall that?

25   A.    That's correct.

- 61 -

1   Q.   It's also the case that the committee did not oppose the

2   transaction, correct?

3   A.   That's correct.

4   Q.   Why didn't the committee oppose the transaction?

5   A.   I think the lead point would be no other viable

6   alternative -- well, no apparent viable alternative at the time

7   probably would be the principal reason.

8   Q.   Now, there is -- you didn't object because you believed

9   there was a lack of a viable alternative, is that correct?

10  A.   That's what I just said, I thought, but --

11  Q.   And did you believe that the Barclays transaction was

12  better than no transaction?

13       (Pause)

14  A.   I think the belief was that the Barclays transaction was

15  better than a liquidation.  I mean, that the assumption was

16  that this was a going concern bid and therefore, it was better

17  than liquidation --

18  Q.   Okay.  And --

19  A.   -- which would be the only other alternative absent

20  somebody else stepping up and saying I want to buy this.

21  Q.   Okay.

22       (Pause)

23  Q.   I know that you said that you don't recall any discussions

24  about the appeal, but I just want to probe it one more time and

25  see if I can refresh your recollection.  Do you recall any

- 62 -

1    discussions, either within Milbank Tweed or with other

2    committee professionals, concerning the fact that it was in the

3    committee's interest that the appeal be denied because this

4    transaction was the only viable alternative and it was better

5    than having no transaction at all?  Do you recall that?

6    A.    No.

7    Q.    Did you have any discussions with anyone prior to the time

8    that you left Milbank Tweed concerning what the results were of

9    the audit that you had said you planned to do and, in fact, was

10   being done?

11   A.    Conversations before -- I'm repeating your question in my

12   mind.  Conversations before leaving regarding the results of

13   Houlihan's review or audit of the book?

14   A.    Yes.

15   Q.    Well, I'm sure I would have told people at the firm about

16   it.  And actually, I remember sending an e-mail the date I was

17   told not to work on this anymore.  And I'm pretty sure I sent

18   it to Crayton Bell saying just be careful you follow up on this

19   because Houlihan has raised these issues.  But other than that,

20   I have no specific recollection because I'm not sure that the

21   audit was completed, if you will.  I mean, I'm not sure we had

22   the final picture from Houlihan.

23   Q.    Well, let me try to set the stage.  On September 25th, you

24   write Lori Fife--

25   A.    Yes.

- 63 -

1   Q.   -- trying to get the schedules because you want to do an

2   audit, correct?

3   A.   Yes.

4   Q.   And on September 28th, you get the schedules, correct?

5   A.   I think that I said that we got them by then but I may

6   have gotten them one day earlier.  But, yeah, essentially, yes.

7   Q.   In any event, by September 28th, you had the schedules --

8   A.   Correct.

9   Q.   -- and the audit was underway, correct?

10   A.   Audit review -- yes.

11   Q.   Well, I'm using the word "audit" because that's the word

12   you used.

13   A.   Yes.

14   Q.   Now, what were the results of that audit three weeks later

15   while you were still working on this matter?

16   A.   I don't think we had results other than Houlihan repeating

17   the same thing which is that they had concerns about the marks

18   and that there seemed to be a gap of billions of dollars.  But

19   I -- but more than that, I don't recall.

20   Q.   Now, Houlihan's view was that there seemed to be several

21   billions of dollars' discrepancy before they even began their

22   audit, correct, sir?

23   A.   I don't recall whether it's -- it's possible that it was

24   before they actually -- no -- the answer is I don't know.  I

25   don't know whether that was their view.  We can look at the

- 64 -

1    e-mails if you want but --

2    Q.    Let's look at Movants' Trial Exhibit 707 in the book that

3    counsel for the committee gave you.

4         (Pause)

5    A.    Okay.  One second.  I'm here.

6    Q.    Now this --

7              MR. GAFFEY:  Your Honor, sorry.  Can I have the tab

8    number, please?

9              MR. BOIES:  Oh, I'm sorry.  Well, it doesn't have a

10   tab number.  It's -- they number it by exhibit numbers.

11   Q.    Now, this is an e-mail from Brad Geer to you and a variety

12   of other people, correct, dated September 28th, 2008 early in

13   the morning?

14   A.    Yes, yes.

15   Q.    6:15 a.m.?  And this does suggest that your clarification

16   was correct, that you had actually gotten the schedules before

17   September 28th because the e-mail at 6:15 a.m. says that you

18   have the schedules and you're looking at them.  And it says,

19   "Schedule A appears consistent with that which we had last

20   Sunday night at Weil."  You see that?

21   A.    Yeah, I see that.

22   Q.    And was that accurate, sir?

23   A.    I don't know.  Other than the fact that he's making the

24   statement, I don't know if it's accurate or not.

25   Q.    You don't have any reason to dispute that statement, do

- 65 -

1    you?

2    A.    The statement here?  No.

3    Q.    And when you talk about the schedule that appears

4    consistent with that which you had last Sunday night at Weil,

5    you're talking about the schedule that lists the securities in

6    the Fed repo, so-called, that were transferred to Barclays,

7    correct?

8    A.    But this is not me.  This is from Brad Geer.  You said

9    "when you talk about".  I didn't author that e-mail.

10   Q.    But you understood it when you got it, didn't you, sir?

11   A.    Yes, yes.  I understood it.  But --

12   Q.    And you understood that it related to the schedule of

13   securities that were the Fed repo, correct?

14   A.    I don't know about Fed repo but their book of securities

15   that were transferred as part of the transaction.  I was just

16   merely correcting your statement that said "you said".

17   Q.    Yeah, but what do you think was being transferred back in

18   September when you were the lead partner for Milbank Tweed?

19   What did you think that book of securities was?

20   A.    What do you mean, what did I think it was?  Did I know the

21   exact nature of each security or what's your question?

22   Q.    My question, sir, is that you knew perfectly well at the

23   end of September of 2008 that what had been transferred to

24   Barclays was the Fed repo securities that were listed on a

25   schedule that had been given to the committee representatives

- 66 -

1    prior to closing at Weil Gotshal, correct, sir?

2    A.   I don't know that for a fact.

3    Q.   You don't?

4    A.   No.  You're asking me would I recall of two years ago?  I

5    don't know if that was my understanding or not.  I see the e-

6    mail.  I have no reason to dispute it.  So I'm not trying to

7    evade the question.  But personally, I don't recall -- I

8    remember distinctly a book of securities being transferred.

9    Whether they were repo securities or not, sitting here today, I

10   don't have a recollection of that.

11   Q.   Do you recall a Fed repo that, during the week prior to

12   closing, that Barclays had stepped into the shoes of the Fed?

13   A.   I remember discussions about that, yes, generally.

14   Q.   I'm not talking about remembering discussions about that

15   generally.  I'm talking about whether, sitting here right now,

16   you remember that that week Barclays stepped into the shoes of

17   the Fed with respect to a repo financing?

18   A.   I think that's correct.  I'm not a hundred percent sure

19   but I think that's correct.

20   Q.   What?

21   A.   I'm not a hundred percent sure but I think that's correct.

22   Q.   And sitting here right now, do you recall that the

23   clarification letter provided that those repo securities were

24   going to be transferred to Barclays?

25   A.   I don't know that.  I would have to look at the repo --

- 67 -

1    the clarification letter.

2    Q.    You just don't remember that one way or another sitting

3    here?

4    A.    That's correct.

5    Q.    Sitting here right now, do you remember one way or another

6    what Schedule A refers to?

7    A.    I think it's the schedule of securities being transferred.

8    Q.    The schedule of securities being transferred from Lehman

9    to Barclays as part of the transaction?

10   A.    Yes.

11   Q.    And that list of securities was furnished to committee

12   representatives prior to closing at Weil Gotshal, correct?

13   A.    There was a list of securities provided to committee

14   counsel or to committee advisors prior to closing.  Whether

15   it's identical to the one that's attached to the final executed

16   clarification letter, I don't know.

17   Q.    Did you ever try to find out?

18   A.    No.  That was Houlihan's job to look into this.

19   Q.    Well, if it was Houlihan's job, Houlihan then reports to

20   you that the Schedule A that was given to -- attached to the

21   clarification letter was consistent with what you'd been given

22   at Weil, correct?

23   A.    It says "appears to be consistent", correct.

24   Q.    And you don't have any reason to doubt that?

25   A.    No.  I said that a few minutes ago.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 68 -

1   Q.   All right.  And the e-mail goes on to say, "So the issue

2   is if they were really only worth the amount that was agreed to

3   between Lehman and Barclays or if they were worth more."  Do

4   you see that?

5   A.   I see that.

6   Q.   And as of September 28th, 2008, did you believe that

7   that's what the issue was?

8   A.   I understand that that's -- I understood that that's the

9   issue that Houlihan had, yes.

10  Q.   My question to you is whether you, as the lead partner

11  representing the committee, whether you believed that that was

12  the issue.

13  A.   As I said before, I -- on issues of securities, valuation

14  of securities, I rely a hundred percent on Houlihan and so I

15  have no independent view of what the value of these securities

16  are or should be or -- et cetera.  So if they're telling me

17  that's the issue then I understand that that's the issue that's

18  outstanding.

19  Q.   Okay.  Now they talk about the valuation of these

20  securities that are being transferred to Barclays as having

21  been agreed to between Lehman and Barclays.  Do you see that?

22  A.   Just one second.  I see the sentence that says "worth the

23  amount that was agreed to between Lehman and Barclays or if

24  they were worth more".  Yeah, I see that.

25  Q.   And in September of 2008, was it your understanding that

- 69 -

1    the securities transferred to Barclays had been valued based on

2    an agreement between Lehman's and Barclays?

3    A.    Other than my knowledge from this e-mail?  No.  You

4    mean -- I see that that's what they told me but I have no

5    independent knowledge of that point.

6    Q.    And were they the people who you would rely on for making

7    this determination?

8    A.    Yes.

9    Q.    Okay.  Then, sir, I take it you would not have any

10   disagreement with their statement.  Is that fair?

11   A.    I'm not in a position to disagree with them on that issue,

12   no.

13   Q.    Okay.  Now, did you see anything wrong or inappropriate

14   about Lehman and Barclays agreeing as to what the securities

15   being transferred to Barclays were worth?

16   A.    You're asking me what my frame of mind was then?

17   Q.    Yes, sir.

18   A.    I don't recall whether I had a reaction to that or not.

19   Q.    Other than looking at this e-mail, do you recall anything

20   at all about how the values of the securities transferred to

21   Barclays were arrived at?

22        (Pause)

23   A.    Yes.  Well, there were discussions between us and Houlihan

24   about this all along.  Maybe I'm not answering your question

25   precisely.  But he said -- other than this e-mail?  Yes.  There

- 70 -

1    were numerous conversations with Houlihan about this issue.

2    Q.   And in those conversations that Houlihan conveyed to

3    you -- how the valuations of the securities transferred to

4    Barclays had been arrived at?

5         (Pause)

6    A.   I'm trying to recall.  I know they were upset about the

7    valuation.  But how it had been arrived at, I am not -- I don't

8    recall.

9    Q.   You knew the weekend of the closing that there were

10   certain securities being transferred to Barclays, correct?

11   A.   Yes.

12   Q.   And you knew that those securities had been valued,

13   correct?

14   A.   We knew that there was a mark associated with these

15   securities, yes.

16   Q.   A mark as to their valuation, correct?

17   A.   Correct, yes.

18   Q.   And you knew that Houlihan was very agitated and unhappy

19   about that mark or valuation, correct?

20   A.   I don't know if it's only about the mark but it's about

21   the lack of information about the securities themselves and --

22   et cetera.  But I'll subsume in what you're raising here, yes.

23   Q.   Let me just follow up on that.  As you understood it the

24   weekend of the closing, did Houlihan have any concern that the

25   marks or valuation on the securities being transferred to

- 71 -

1    Barclays were too low?

2    A.    I think they had concerns about the fact that these marks

3    didn't add up to a number that had been given in court

4    regarding the value of the assets being transferred.

5    Q.    When you say they didn't add up --

6    A.    Didn't add up to the value that had been described to the

7    Court regarding what was being transferred.

8    Q.    I'm just trying to clarify.  There was an amount described

9    to the Court as to the total value of the assets being

10   transferred, correct?

11   A.    That's my understanding, yes.

12   Q.    Now my question is, when you say that Houlihan believed

13   that the marks on those assets didn't add up to that number, do

14   you mean that it added up to a smaller number or a larger

15   number?

16   A.    Well, I think that the securities were worth more than the

17   amount that was reflected -- or how shall I -- let me rephrase

18   that.  They reviewed the schedules.  They did some spot

19   checking of the securities.  There were marks associated with

20   these securities.  And they said, wait a minute.  That does not

21   correspond -- these are -- I remember Fazio saying vividly

22   something like these -- some of them are government securities,

23   should be a hundred cents on the dollar.  They're being pegged

24   at a lower amount.  What's going on?

25   Q.    Well, when did Mr. Fazio say that?

LEHMAN BROTHERS HOLDINGS INC., et al.

- 72 -

1    A.    I think shortly after the closing.

2    Q.    After the closing?

3    A.    Yes, when we got the schedule.

4    Q.    Well, you've actually gotten schedules prior to the

5    closing, correct, at Weil Gotshal?

6    A.    Well, when we got the final schedules, I should say.

7    Q.    I want to separate in time.

8    A.    Okay.

9    Q.    Before the closing and after closing.  Prior to closing,

10   were you aware of any concerns that Houlihan had concerning the

11   marks, the valuations placed on the securities to be

12   transferred to Barclays?

13   A.    Yes.  They had questions about the marks.  They had

14   questions about the securities that were being transferred in

15   general.

16   Q.    Prior to the closing, had anyone from Houlihan conveyed to

17   you that they believed that the marks or valuations placed on

18   securities to be transferred to Barclays, or any of them, were

19   lower than the actual market value of those securities?

20   A.    I don't think they did.  I don't recall them saying that

21   before the closing.

22   Q.    When was the first time they said that after the closing?

23   A.    I can't pinpoint precisely but it would be in --

24   certainly, it wouldn't be before the Friday when we got the

25   schedules because we only got the schedules on Friday.  So it

LEHMAN BROTHERS HOLDINGS INC., et al.

- 73 -

1    would be sometime between that Friday and that e-mail of

2    September 28th.

3    Q.    So you got the schedules on the Friday following the

4    closing, is that correct?

5    A.    That's what my e-mail seems to reflect, yes.

6    Q.    Okay.  And that would have been September 26th, correct?

7    A.    I take your word.  I'm not sure, yeah.

8    Q.    And shortly thereafter, Houlihan informed you that the

9    difference between what they thought the value, actual value of

10   those securities were and the value that had been placed on

11   them in the transaction could be several billions of dollars,

12   correct?

13   A.    They told us that, yeah, that there was an issue of

14   several billions of dollars, yes.

15   Q.    And neither at that time nor at any other time prior to

16   the time that you left, did any representative of the

17   committee, insofar as you were aware, ever tell either the

18   Court or Barclays about that several billion dollar difference,

19   correct?

20   A.    Certainly not the Court.  As to Barclays, I think my

21   conversation with counsel for Barclays speaks for itself.  But

22   I didn't use the word billions of dollars but we -- I remember

23   giving her heads up that Houlihan was looking at this issue and

24   that they just didn't add up or something along those lines.

25   But I --

- 74 -

1    Q.   Now you remember saying it didn't add up?

2    A.   No.  I said something along those lines.  And that's how I

3    would describe my prior conversation.  I don't remember exactly

4    what sentence I used.  I remember that I gave her a heads-up

5    that this issue was percolating.  And I didn't use the word

6    "percolating" last time either.  I'm just giving you the sense

7    of the conversation.

8    Q.   Yes.  And last time what you said was that you had given

9    her a heads-up that the committee was looking at the marks.

10   A.   Yes.

11   Q.   And I asked you whether you remembered anything else in

12   words or in substance and you told me you didn't.

13   A.   Not precisely, that's correct.

14   Q.   And I asked -- you did say that.  And then I said

15   generally do you?  And you said you didn't generally either.

16   Do you recall that?

17   A.   Okay.

18   Q.   Okay.  So are you now saying that you remember telling her

19   that the numbers, the marks didn't add up?

20   A.   I didn't use the words "add up".  I said the committee is

21   looking into the issue of valuation of the marks.

22   Q.   Okay.

23   A.   I didn't use the word "billions".  I don't recall using

24   the word "billions".  But something along the lines of the

25   committee is investigating this issue.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 75 -

1    Q.   And the -- and when you say investigating this issue, is

2    the issue of the marks?

3    A.   Correct.

4    Q.   So at any point, did you or, insofar as you were aware,

5    any representative of the committee, at any time prior to the

6    time you left ever tell or communicate to anyone at Barclays

7    that the committee believed that the difference between what

8    was transferred and the marks placed on those transferred had a

9    difference between x and y several billion dollars?

10   A.   I can only speak to what I said -- what indicated and

11   other than the general conversation I had with counsel for

12   Barclays, I did not communicate what you're talking about.

13   Q.   Insofar as you are aware -- I understand I can only ask

14   you about your knowledge.

15   A.   Correct.

16   Q.   But insofar as you are aware, did anyone else ever --

17   A.   Not to my knowledge.

18   Q.   Okay.

19        (Pause)

20   Q.   Let me turn next to Movants' Exhibit 381 which is in your

21   book.  You have that?  When you have it, let me know.

22   A.   Yeah.  One second.  Almost there.  Yeah, I'm here.

23   Q.   And this is an e-mail with an attachment that purports to

24   provide on Sunday, September 21st, at 11:34 a.m. the Schedule A

25   information, correct?

08-13555-mg    Doc 10203    Filed 06/28/10    Entered 07/15/10 10:49:32    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 76 of 127

- 76 -

1    A.    Correct.

2    Q.    And this is sent by Brian Kelly of Milbank, correct?

3    A.    That appears to be the case, yes.

4    Q.    And who is Mr. Kelly?

5    A.    I think he was an associate in the corporate group at the

6    time.

7    Q.    Do you know how Mr. Kelly got this?

8    A.    I have no idea.

9    Q.    Now, it is sent to Ann Kaminski, the -- right?

10    A.    That's what the e-mail indicates, yes.

11    Q.    Do you know who she is?

12    A.    I think she's an associate at Houlihan Lokey but I'm not a

13    hundred percent sure.  I think so.

14    Q.    And it's copied to Michael Fazio?

15    A.    Yes.

16    Q.    And he's also at Houlihan, correct?

17    A.    He's a partner at Houlihan, yes.

18    Q.    And do you know why Mr. Kelly is sending them to these two

19    people at Houlihan?

20    A.    No.  I don't know why he was sending them.

21    Q.    Well, you know he was sending it so that they would check

22    it, correct, sir?

23    A.    I don't know what was his intent but I -- it makes sense

24    that they would be looking at that, yes.

25    Q.    And did Houlihan, in fact, make any attempt to check this

- 77 -

1   prior to closing, the Schedule A?

2   A.    The schedule that he received at 11:30 on the morning of

3   the closing?

4   Q.    Yes.

5   A.    I remember them -- I don't recognize the names of the

6   securities or anything like that.  But I remember them looking

7   at a list like this in our conference room at Weil.

8   Q.    Prior to the closing?

9   A.    Yes.

10  Q.    And did they do any spot checks?

11  A.    I'm sure they did but I don't know that precisely.  And

12  spot checks -- what does spot check mean?

13  Q.    What does spot check mean?

14  A.    Well, I understand what -- what do you mean by spot check?

15  I'm sure they looked at some of these securities.  More than

16  that, I can't --

17  Q.    You remember using the term "spot check" earlier in your

18  testimony?

19  A.    Maybe I have, yeah.

20  Q.    What did you mean by "spot check", sir?

21  A.    I don't know.  They were looking at the security -- I saw

22  them in a conference room going through this book and looking

23  at some of these securities -- that I can't tell you more than

24  that.

25  Q.    What do you think they were doing when they were going

- 78 -

1    through this book?

2    A.    They were trying to see if they can find data points on

3    these securities to see, for example, if you had any security

4    which is a U.S. Treasury due in 2020, how much is that worth.

5    I mean, I'm making this up.  I don't know if they're in there

6    or not but that's what they were doing, I assume.

7    Q.    Sure.  What they're doing is they're taking this and

8    they're trying to test, as best they can in a short period of

9    time, whether valuations are really reasonable valuations,

10   correct, sir?

11   A.    That must be part of what they're doing.  I --

12   Q.    All right.  Now did they ever give you any report as to

13   what the results of that attempt were?

14   A.    They didn't give us a report but I remember them saying

15   that they were government securities that were off, meaning

16   that the marks seemed to be off compared to what that

17   government security would fetch in the open market.

18   Q.    And they told you this in this conference room at Weil?

19   A.    Yes.  I am not clear about that.  I think so.

20   Q.    And this was prior to closing, correct?

21   A.    I think so.  Not a hundred percent sure but I think so.

22   Q.    Okay.  Now when Houlihan told you that they had discovered

23   prior to closing that some of the marks that were used to value

24   the securities transferred to Barclays looked to be off, did

25   you raise that with Weil Gotshal?

LEHMAN BROTHERS HOLDINGS INC., et al.

- 79 -

1    A.    That's an issue that was raised not only with Weil Gotshal

2    but with Lehman generally.  That's what led to these sidebar

3    discussions.

4    Q.    And when -- well, let me just ask.  Did you personally

5    raise it?

6    A.    No.  I -- Houlihan raised it with Lehman folks.  And Weil

7    Gotshal was there and I was there as well.

8    Q.    But you were personally present when Houlihan raised,

9    prior to closing, with the Lehman people and the Weil Gotshal

10   people that Houlihan believed that some of the marks were, as

11   you described it, off?

12   A.    Yeah.  Again, I -- I'm not sure they had reached a

13   conclusion about that but I think they did raise that issue

14   with the Lehman folks, yes.

15   Q.    And with the Weil Gotshal folks?

16   A.    Weil Gotshal was present.  I believe they were present in

17   some of these discussions.

18   Q.    And what did the Lehman folks and the Weil Gotshal folks

19   say in response to Houlihan's objections?

20   A.    I'm trying to recall precisely.  I think that, but I'm not

21   a hundred percent sure, I think they said something along the

22   lines that the marks that Lehman was using were stale and

23   that's why the new marks were used.

24   Q.    I thought that you said that Houlihan had gone through and

25   looked at some government securities that should have marked at

- 80 -

1   par, saw they were marked lower than that and raised that

2   concern.  Am I correct about that?

3   A.   I think that that -- that did take place, yes.

4   Q.   Okay.  Now that wouldn't have anything to do with whether

5   marks were stale or not, correct?

6   A.   I don't know it.  I didn't tell you that.  I think the

7   focus of the discussion was on Lehman explaining that the marks

8   they had in their book were stale and that's why they were

9   using other marks.

10  Q.   Was anyone in this discussion that you say took place --

11  was anybody from Barclays there?

12  A.   Not that I recall.

13  Q.   Did anyone from Lehman or Weil Gotshal give you any

14  explanation as to why, as you say was the case, government

15  securities being transferred to Barclays were marked for

16  valuation purposes below what Houlihan thought they should be

17  marked at?

18  A.   I don't remember a response to that.

19  Q.   Did you consider that to be a significant enough issue

20  that you would want to raise that with the Court?

21  A.   Not until I have the full story.

22  Q.   The full story?

23  A.   Yes.

24  Q.   So you didn't think it was enough to raise with the Court

25  the fact that you had discovered that government securities

- 81 -

 1    were being transferred to Barclays at a price that was below

 2    their value and that neither Lehman nor Weil Gotshal had any

 3    explanation for that, is that correct?

 4    A.   No.  I think I would say that they gave an explanation to

 5    Houlihan.  And I believe that Houlihan, without doing due

 6    diligence or, rather, having the ability to actually test

 7    everything, left the -- was left with the impression that

 8    everything was okay.  And -- but they needed to be audited and

 9    that's what they did after the closing.

10    Q.   How long does it take to audit the market price of a

11    government security?

12                MR. KIRPALANI:  Objection, Your Honor.  No foundation.

13    A.   I don't know.  You would have to ask Houlihan.

14                THE COURT:  Sorry.  One second.  There's an objection.

15    What's the objection?

16                MR. KIRPALANI:  Your Honor, there's no foundation this

17    witness has that understanding of how long it takes to value

18    securities in the marketplace.

19                THE COURT:  That's a fair objection.  Do you want to

20    rephrase it or do you want to establish your foundation for it?

21                MR. BOIES:  I will, Your Honor.

22    BY MR. BOIES:

23    Q.   Mr. Despins, do you have any understanding as to how long

24    it takes to get a reliable value for government securities --

25    U.S. government securities, in the marketplace?

08-13555-mg    Doc 10203    Filed 06/28/10    Entered 07/15/10 10:49:32    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 82 of 127

- 82 -

 1   A.   On a Sunday afternoon?  I don't know.

 2   Q.   Does it take more than an hour or two during business

 3   hours?

 4   A.   I have no -- I have no idea.  I've never done that, so I

 5   don't know.

 6   Q.   What?

 7   A.   I have never done that, so I don't know.

 8   Q.   And you don't have an understanding.  That's your

 9   testimony?

10   A.   That's correct.

11   Q.   As the lead partner from Milbank Tweed at the end of

12   September, did you investigate how long it should take to

13   determine whether what Houlihan was telling you was their

14   concern was right or wrong about these U.S. government

15   securities?

16   A.   Can you -- I'm sorry, can you restate that question?

17   Q.   Sure.  Houlihan had told you that there were U.S.

18   government securities that they believed were marked for

19   valuation purposes as part of the Barclays transaction at below

20   their fair market price, correct?

21   A.   That's -- I think that that was said, yes.

22   Q.   And you were told this prior to closing, correct?

23   A.   To the best of my recollection, yes.

24   Q.   You raise it in -- or the committee raised it with Lehman

25   and Weil Gotshal and got no explanation for that, correct?

- 83 -

1    A.    No, I didn't say that.  I said that I don't recall what

2    was their response to this issue.

3    Q.    Okay.  You don't recall, though, they gave you a response,

4    correct?

5    A.    For what it was, if --

6    Q.    For what it was?

7    A.    Yes.

8    Q.    Now, you've also said that you don't know how long it

9    takes to check what the market price is for U.S. government

10   securities, correct?

11   A.    That's true.  And I certainly don't know how long it takes

12   to do that on a Sunday afternoon.

13   Q.    I'm not really asking about Sunday, sir, I'm asking about

14   business hours.  I'm talking about a regular business day.

15   A.    And I said I don't know.

16   Q.    Okay.  And my next question is, did you ever try to find

17   that out in September?

18   A.    No.

19   Q.    Did you ever try to find out how long it should take or

20   how difficult it was to determine whether, in fact, U.S.

21   government securities were being transferred at a mark that was

22   below their current market value?

23   A.    I'm sorry, can you --

24   Q.    Sure --

25   A.    -- repeat that?

- 84 -

1   Q.   Did you ever try to find out after the closing, how long

2   it should take or how difficult it was to determine whether, in

3   fact, U.S. government securities being transferred to Barclays

4   were marked at a level below their current market value?

5   A.   No.  No, I did not.

6   Q.   You were aware that under the asset purchase agreement,

7   there were a number of categories of assets that were being

8   transferred to Barclays that did not have a stated value,

9   correct?

10  A.   I don't recall that precisely.  Meaning, when you -- I'm

11  confused by your question, because you say "did not have a

12  stated value".  Do you mean anywhere or do you mean in the

13  purchase agreement or as opposed to court representations?  You

14  know.

15  Q.   Either in the APA or the qualification letter or in the

16  representation to Court, there were many assets that were being

17  acquired by Barclays for which there was no valuation?

18  A.   Well, I think that there was a description to the Court at

19  the April -- sorry -- September 19th hearing that the assets

20  being transferred no longer had a value of seventy, but they

21  had a value of X, and I forget what the X is; but that's in the

22  transcript.

23  Q.   And those were securities, correct, sir?

24  A.   I think that describes securities generally, yes.

25  Q.   And the seventy billion dollars was the so-called long

- 85 -

1    value of securities, correct, sir?

2    A.    I don't recall.

3    Q.    You don't recall?

4    A.    No.

5    Q.    Did the seventy billion dollars, as you recall, include

6    intangibles?

7    A.    I'm not sure.  I don't think so, but I'm not sure.

8    Q.    Did it include software?

9    A.    I don't know.

10   Q.    Furniture and furnishings?

11   A.    I don't know.

12   Q.    Technology?

13   A.    I just don't recall.

14   Q.    Customer lists?

15   A.    I don't know.

16   Q.    Customer contracts?

17   A.    We can go on like this, but the answer will be I don't

18   know.  I don't recall.

19   Q.    Okay.

20   A.    I would have to re-read the agreements, et cetera, et

21   cetera, which I haven't done for two years, so.

22   Q.    Let me try to see if I can refresh your recollection.  Let

23   me put up on the screen Mr. Harvey Miller's testimony from the

24   trial, official transcript April 28, 2010, page 107, line 22,

25   through 108, line 11.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 86 -

1    A.    Is it in the binder as well, or no?

2    Q.    It's on right on the screen right there.

3    A.    Okay.

4    Q.    And down at the bottom of page 107, line 22:

5    "Q.    The APA doesn't provide valuations for many of the

6    nineteen categories of purchased assets that you see identified

7    there under the definition and through pages 6 and 8, they're

8    referencing the documentation."

9         And the answer is "Yes, sir."  Do you see that?

10   A.    I see that.

11   Q.    And continuing down to the next page:

12   "Q.    It does provide a valuation of approximately seventy

13   billion for long positions and approximately a valuation of

14   1.34 retained cash, but it has no estimated valuations at all

15   for any of the other seventeen categories of purchased assets.

16   Do you see that and agree with that?

17   "A.    I do.

18   "Q.    Was Barclays entitled to each of those assets listed there

19   as clarified in the clarification letter, specifically

20   identified, irrespective of whether there was a valuation

21   provided for it?

22   "A.    Pursuant to the approved APA, yes."

23         Do you see that?

24   A.    I see that.

25   Q.    And do you have any reason to disagree with Mr. Miller's

08-13555-mg   Doc 10203   Filed 06/28/10   Entered 07/15/10 10:49:32   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 87 of 127

- 87 -

1    testimony?

2    A.    No.  I think the agreements speak for themselves.  It's

3    sort of irrelevant what I think or what he thinks.  It's the

4    agreement that governs.

5    Q.    I'm asking you, sir.

6    A.    I said no, I don't have any reason to disagree.  But my

7    point is, what he thinks or I think is sort of beside the

8    point.  The documents presumably cover that.

9    Q.    And if you wanted to find out what was being transferred

10   and what the rights and obligations of the parties are, you

11   would look to the documents, not to anybody's interpretation of

12   those documents.  Is that what you're saying?

13   A.    I would certainly look at the documents.  And if there's

14   ambiguity, then we can look at other sources.  But initially, I

15   would look at the documents.

16   Q.    Are you aware of any ambiguity in the documents?

17   A.    Sitting here, I have no recollection of whether there are

18   ambiguities or not.

19   Q.    Did you ever look into that?  As the lead lawyer from

20   Milbank Tweed representing the committee, did you ever look at

21   these documents and try to determine whether there was any

22   ambiguity?

23   A.    I'm sure I looked at the documents.  Would I have looked

24   at them to determine if there were ambiguities, I don't recall

25   that.

- 88 -

1    Q.   Okay.  Did you understand that Barclays was going to make

2    an economic gain on this transaction?

3    A.   I did not -- I did not have a view either way; meaning I'm

4    sure they were not -- you know, they're called Barclays

5    Capital, not Barclays.org.  So clearly they're in there to make

6    some money.  But how much they were going to make and all that,

7    I have no idea.

8    Q.   But you do know that not only were they in it to make a

9    gain, but that both they and the committee expected that they

10   would make a gain, correct, sir?

11   A.   That the committee expected they would make a gain?

12   Q.   Yes.

13   A.   I don't know that the committee formed a view that we

14   expected them to make a gain.  Would we be surprised it if it

15   made a gain?  No.  That's what they're in the bus -- you know,

16   they're in business, so obviously they want to make a gain.

17   Q.   You know who Mr. Burian is, correct?

18   A.   Yes.

19   Q.   And let me ask you to look at Mr. Burian's testimony on

20   May 7th in this case, at the official transcript, pages 27 to

21   28, particularly page 28.  For context, the preceding question

22   is:  "When did you tell the committee your opinion as to

23   whether or not Barclays was going to get an economic gain from

24   this transaction?"

25        And then his answer is he's trying to remember whether it

- 89 -

```
 1    was Thursday, Friday or Sunday.  And the context is, that's the

 2    Thursday, Friday or Sunday prior to the closing.  And he goes

 3    on to tell me, "I could tell you that it was a given that the

 4    broker-dealer business, the 250 million dollars for the broker-

 5    dealer, was viewed by all of us as being incredibly and

 6    inexpensively huge gain for that going-concern engine.  So that

 7    was the premise of the deal from the start."

 8         And then I'm happy to read the rest for context, if

 9    counsel wants me to.  But the next question is the one I want

10    to focus on on page 28:

11    "Q.  So that, at all times, during the conversations with the

12    committee, to the extent that you would be talking about

13    whether or not Barclays was going to have an economic gain, you

14    would have been telling the committee that in their opinion

15    Barclays was going to have an economic gain, correct?

16    "A.  Yes."

17         Now, were you present when Mr. Burian said that?

18    A.   I don't recall him specifically saying that, but I have no

19    doubt that something along those lines was said; or that even

20    if it wasn't said that people would expect that Barclays was

21    buying this to make money.

22    Q.   And did you understand that part of the reason for this

23    economic gain was the fact that Barclays was getting a number

24    of assets that would have value to Barclays but that had little

25    or no value to Lehman, and hence were not valued as part of the
```

08-13555-mg    Doc 10203    Filed 06/28/10    Entered 07/15/10 10:49:32    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 90 of 127

- 90 -

1    transaction?  Did you understand that?

2    A.    There are a lot of elements in your question.

3    Q.    If it's confusing, I'll break it down.

4    A.    Could you, please?

5    Q.    Sure.  First, you understood that Barclays was getting a

6    number of assets that would have value to Barclays but that had

7    little or no value to Lehman, and hence were not valued as part

8    of the transaction, correct?

9    A.    There's no doubt they were getting assets that had value

10   to them but little or no value Lehman.  But the last part about

11   "and therefore were not valued", that I'm not sure I recall

12   that or have an understanding to that effect.

13   Q.    You think that those assets like the intangibles or

14   software, the kinds of things that have value to Barclays but

15   not value to Lehman, you think those were valued as part of the

16   transaction?

17   A.    I don't know if they were valued or not.  I just -- I have

18   no recollection one way or another that these separate items

19   were valued or not.

20   Q.    As the lead lawyer representing the committee, did you

21   ever try to find that out?

22   A.    You're asking me my recollection today.  What I knew about

23   this transaction two years ago is a different story.  So I am

24   sure that I knew this agreement inside out at the time.  But

25   right now, I haven't looked at it for two years, so I don't

LEHMAN BROTHERS HOLDINGS INC., et al.

- 91 -

1    have a recollection of these various items.

2    Q.    Whether you have a recollection of particular items, do

3    you at least have a recollection that there were items with

4    value to Barclays that were not valued as part of the

5    transaction?  Do you at least have that recollection?

6    A.    I know that some assets were not allocated any particular

7    value in the transaction.  I have that general understanding.

8    But more than that, I don't know -- no.  I know that some

9    assets were not allocated any particular value, but more

10   precisely than that, no.

11   Q.    Let me put the question a little differently.  Without

12   knowing which assets they were or what their value was, are you

13   aware that there were certain assets that Barclays was getting

14   that had value to Barclays that were not included in any

15   valuations given to the Court?  Were you aware of that at the

16   time?

17   A.    That makes a lot of sense to me, but I don't recall that

18   specifically here -- sitting here today.

19   Q.    Okay.  In September of 2008, were you aware of a four

20   billion dollar buffer that Barclays had between trading assets

21   and trading liabilities?

22   A.    No.  That doesn't ring a bell.  No.

23   Q.    You were aware that Barclays was getting seventy-two

24   billion dollars, according to the valuation marks placed on the

25   assets of trading assets, and assuming trading liabilities of

- 92 -

1   sixty-eight billion dollars, correct?  You're aware of that?

2   A.   These numbers seem familiar, but I don't recall precisely

3   whether that was the case or not.

4   Q.   Let me try to refresh your recollection.  Let me ask you

5   to look at tab 2, which is Barclays' Exhibit 110.

6   A.   This is in your book?

7   Q.   This is in my book.

8   A.   Okay.  I'm here.

9   Q.   I'm sorry, it's tab 4 -- tab 4.

10  A.   Yes.

11  Q.   Barclays' Exhibit 110 at tab 4.

12  A.   Yes.

13  Q.   And this is an analyst call that took place on September

14  17, 2008, correct?

15  A.   That -- I see that that's what it says, yes.

16  Q.   Have you ever seen this document prior to the time I'm

17  showing it to you right now?

18  A.   Yes.

19  Q.   When?

20  A.   When your partner deposed me.

21  Q.   Other than seeing it at your deposition, have you ever

22  seen this document before?

23  A.   Well, I know from the deposition that I was copied on an

24  e-mail -- well, let me make sure it's the right document.

25  Q.   Sure.

- 93 -

1    A.    I think it's the right document.  But I was copied on an

2    e-mail at the time, where this document was attached to it.  So

3    that's the best I can do for you.  I don't recall -- before

4    your partner showed it to me, I didn't recall seeing, but I

5    did -- I do see or he did show me an e-mail where I was copied,

6    where this document was attached.

7    Q.    Let me see if I can identify that e-mail.  Let me ask you

8    to --

9    A.    Can I tell you what e-mail it is?

10   Q.    Yes.  Why don't you tell me, and then I'll try to find it?

11   A.    Just save some time?

12   Q.    Yeah.

13   A.    It's an e-mail from the guy at Shinsei Bank.  I'm having

14   a senior moment.  I'm trying to remember his name.  But there's

15   a representative on the committee who was with Shinsei Bank.

16   Q.    Mr. Gilbert?

17   A.    Gilbert.  That's the e-mail.

18   Q.    That is, I think, Exhibit 864 --

19   A.    Are we going back to the other book?

20   Q.    No, no, we're staying with mine.

21   A.    Okay.

22   Q.    If you'd look at -- well, look at tab 19 and tell me what

23   document it is?

24   A.    It's an e-mail from Ed Gilbert to numerous people

25   including myself.

- 94 -

1     Q.    Is that Barclays' Exhibit 261 down at the bottom?

2     A.    In your book it says 864.

3     Q.    Okay 864.  There are two versions of that same e-mail.

4     Okay, 864.  And this is the document dated September 21, 2008,

5     that you are one of a large number of copyees, in which Mr.

6     Gilbert sent this around, correct?

7     A.    That's correct.

8     Q.    And while we're here let me just ask you to look at the

9     next tab, which is Barclays' Exhibit 386.

10    A.    Tab 20?

11    Q.    Tab 20.

12    A.    Yes.

13    Q.    This is an e-mail from Michael Fazio to Brad Geer on

14    September 19, 2008, with an instruction, "Listen to Barclays'

15    investor call."  Do you see that?

16    A.    I see it.

17    Q.    Were you ever told that committee representatives or

18    professionals had listened to the Barclays investor call?

19    A.    That doesn't ring a bell.

20    Q.    Let me go back to tab 19, Exhibit 864, and to the second

21    page of the analysts' call.

22    A.    Yes.

23    Q.    And the third paragraph -- and this is a statement by

24    Barclays' chief executive officer, Mr. Varley.  He says, "We

25    are acquiring trading assets with a current estimated value of

- 95 -

1   72 billion dollars, and trading liabilities with a current

2   estimated value of 68 billion dollars, for a cash consideration

3   of 250 million dollars.  Do you see that?

4   A.   I see that.

5   Q.   And does that refresh your recollection that you were

6   aware in September of 2008 prior to closing, that Barclays was

7   acquiring -- was planning to acquire 72 billion dollars in

8   trading assets in exchange for 68 billion dollars of trading

9   liabilities?

10  A.   Well, that statement was made on September 17th.  That

11  deal fell by the wayside -- well it fell -- was changed at the

12  hearing.  So I remember seventy-two, sixty-eight, okay, I

13  remember numbers like that.  But that deal that he's describing

14  is not the deal that the Court approved.

15  Q.   All right.  Very good point.  And I just want to

16  underscore that.  That description related to a set of

17  securities that were never transferred.  What was transferred

18  was actually quite different, correct?

19  A.   I don't know how they differed but this is not the --

20  there was no sixty-two, seventy -- seventy-two, sixty-eight

21  deal approved by the Court.  I think Lori Fife described in

22  court, it's no longer seventy.  So that's why I'm -- and she

23  said another number who I can't recall, but it's in the

24  transcript, so.

25  Q.   And you understood at the time -- forget what Ms. Fife

- 96 -

1    said -- you, the chief lawyer for the committee, understood at

2    the time, that the deal had changed very substantially in terms

3    of what securities were going to be delivered, correct?

4    A.   I'm not sure I understood that.  I understood that the

5    deal had changed.  And I think her description was that the

6    value of these securities had changed drastically.  And by the

7    time -- between the time of signing and the time of the

8    hearing.  So whether the type of securities changed themselves,

9    I didn't have an understanding of that.

10   Q.   Let me try to focus on your understanding, not what Ms.

11   Fife said, okay?  I'm asking for your understanding.

12   A.   Okay.

13   Q.   As you understood it, at the time of the closing, had the

14   securities themselves changed very substantially between

15   Tuesday and the time of the closing?

16   A.   I did not have that understanding.

17   Q.   You did not have that understanding?

18   A.   No.

19   Q.   Did you have an understanding that they had changed -- the

20   securities themselves, not just the valuation of them, but the

21   securities themselves, had changed to some extent?

22   A.   I have no recollection of that.  It's very -- look,

23   everything was moving, so I can't tell you that I believed on

24   the day of the closing that exactly the same securities that

25   people contemplated selling on September 17th were being sold.

- 97 -

```
 1     No, I can't say that.  But I have no recollection of thinking

 2     that the securities were different in any material way.  I'm

 3     using material, I probably shouldn't.  But just in any -- that

 4     was not on the table as far as I was concerned.

 5     Q.    Okay.  You were present during the Friday hearing.  Is

 6     that correct?

 7     A.    Yes.

 8     Q.    Now, you were aware that the original APA had a true-up

 9     provision, correct, sir?

10     A.    I seem to recall that, yes.

11     Q.    And did you understand what the purpose of that true-up

12     provision was?

13     A.    I'm sure I understood it then.  Sitting here, I don't

14     recall the terms of the true-up, so I can't tell you.

15     Q.    Let me try to refresh your recollection.  Were you aware

16     in September prior to closing that the valuations of these

17     assets were recognized by everybody as being in flux and

18     difficult to pin down, and so there was a provision that

19     enabled, after I believe it was twelve months, people to take a

20     look back and have a true-up in case the valuation to Barclays

21     was above a certain level?

22     A.    I hear what you're telling me, but I don't have that

23     recollection.

24     Q.    Okay.  Do you have at least a recollection that the final

25     deal did not have a true-up provision?
```

- 98 -

1   A.   I recall that I don't think there was a purchase price

2   adjustment.   I -- that's my recollection, yes.

3   Q.   And do you recall that the Court was told by Ms. Fife that

4   the true-up provision had been removed?

5   A.   Well, the transcript will speak for itself, but I -- she

6   probably did.   But I don't recall specifically.

7   Q.   Did you or any representative of the committee ever

8   complain or object to anyone about the removal of the true-up

9   provision?

10  A.   I did not.   Whether my corporate partners did or not, I

11  don't know.

12  Q.   If they did, you were not aware of it.   Is that fair?

13  A.   That's fair.

14  Q.   You were aware that Barclays was assuming certain

15  liabilities, correct?

16  A.   Correct.

17  Q.   And you were aware that among the liabilities that

18  Barclays was assuming were certain liabilities for what was

19  referred to sometimes as cure and comp?

20  A.   Yes.

21  Q.   Okay.   And did you have an understanding as of the Friday

22  before the closing, what the estimated values of those cure and

23  comp liabilities were?

24  A.   At the time I did, yes.   I'm sure I did.

25  Q.   Do you recall what they were now?

- 99 -

1    A.    No.  I remember numbers, I think, 2.5 billion dollars, but

2    I -- again I -- the transcript will reflect what it was.

3    Sitting here today, I don't recall precisely what the estimated

4    liabilities were.

5    Q.    And by the transcript, you're talking about the transcript

6    of the hearing, correct?

7    A.    That's correct.

8    Q.    Now, regardless of what was said at the hearing, I'm just

9    trying to get your knowledge, did you have an understanding

10   from what you had been told by Houlihan or Weil Gotshal or

11   Lehman Brothers, as to what the valuation of the cure and comp

12   liabilities were?

13   A.    I'm sure I did at the time.  Right now, I don't recall

14   what those were.

15   Q.    Do you recall that there was uncertainty about what the

16   actual cure and comp payments by Barclays would be?  And by

17   uncertainty, I mean uncertainty at the time of the closing?

18   A.    If by uncertainty you mean the precise amount that they

19   would be liable for had not been set, other than the cap, I

20   think that I would agree with that statement.

21   Q.    And did you have an understanding as to what factors would

22   influence how much Barclays would actually pay for cure and

23   comp liabilities, up to the cap?

24   A.    No.

25   Q.    Did you understand generally that, for example, with

- 100 -

1   respect to the cure liabilities, Barclays had discretion as to

2   what contracts to assume and what contracts not to assume?

3   A.   Yes, I recall that.

4   Q.   And did you recall that what Barclays' actually cure

5   payments were going to be would be a function of what contracts

6   they assumed and what contracts they didn't assume?

7   A.   That's fair.

8   Q.   Okay.  Now, were you aware that there was a web site that

9   listed what contracts Barclays was assuming and what contracts

10  Barclays was not assuming?

11  A.   No.

12  Q.   During the time before you left, did you ever make any

13  efforts to try to find out what contracts Barclays was assuming

14  and what contracts Barclays was not assuming?

15  A.   I'm sure somebody did, but not me.

16  Q.   Did they ever report what they'd found?

17  A.   I can't -- not that I recall, no.

18  Q.   Let me go back to the committee counsel's book just for a

19  minute and ask you to look at Movants' Exhibit 381.  And you

20  previously identified this as something that was received by

21  the committee on September 21 and that it purported to be

22  Schedule A to the clarification letter or a listing of the

23  securities that were going to be transferred to Barclays as

24  part of this transaction.  Do you recall that?

25  A.   I'm not sure I identified it.  But I think that it's an

- 101 -

1    e-mail from Milbank.  So there's no issue with what you're

2    saying, but I just -- I didn't formally identify this as

3    something received by the committee.  But in fact, it was

4    received by committee advisors, yes.

5    Q.   This was received by the committee advisors on September

6    21, 2008, correct?

7    A.   Correct.

8    Q.   And what it does is it purports to list the securities

9    that were transferred to Barclays as part of the sales

10   transaction which were supposed to be listed as Schedule A to

11   the clarification letter, correct?

12   A.   No.

13   Q.   No?

14   A.   You said the securities "that were transferred".  This was

15   before the closing.  I think you said "were transferred".

16   Q.   Let me just try to be clear.  Exhibit 381 was furnished on

17   Sunday, September 21, sometime before 11:30 a.m. to the

18   committee, correct?

19   A.   Correct.

20   Q.   And this was furnished to the committee as a list of the

21   securities that were planned to be transferred to Barclays as

22   part of the transaction, correct?

23   A.   Planned to be transferred?  Yes.

24   Q.   And you understood that the securities transferred to

25   Barclays were to be listed in Schedule A of the clarification

- 102 -

1    letter, correct?

2    A.    That's correct.

3    Q.    Now, if you turn to the second page of Movants' Exhibit

4    381, there's a summary of the market value of these securities.

5    Do you see that?

6    A.    I see that.

7    Q.    And that shows the total to be 49.9 billion dollars,

8    correct?

9    A.    I see what the numbers say, yeah, forty-nine and change,

10   yes.

11   Q.    The change is 902 million dollars, correct, sir?

12   A.    The document speaks for itself, yes.

13   Q.    The document speaks for itself.  What I'm asking you is

14   about your knowledge.  Did you know prior to --

15   A.    You didn't ask --

16   Q.    -- closing -- did you know prior to closing that the

17   market value of the securities being transferred to Barclays

18   that were going to be listed on Schedule A were valued at 49.9

19   billion dollars?

20   A.    I have no recollection of knowing that.

21   Q.    Did you understand that the 49.9 billion dollar number was

22   greater than the number that had been described to the Court as

23   the valuation of the securities?

24   A.    I see that forty-nine is bigger than forty-seven, but I'm

25   not even sure I looked at this document.  I see it.  I see that

- 103 -

1   it was sent to a Milbank person at sometime the day of the

2   closing.  But I -- so -- I have no recollection of looking at

3   this, comparing this to any other number.

4   Q.   Do you have a recollection of somebody telling you prior

5   to closing that the committee had been furnished with a listing

6   of the securities to be transferred to Barclays that put a

7   value on those securities of 49.9 billion dollars?

8   A.   No.  Meaning, yes.  I remember that there was a list of

9   securities, but I don't recall anybody saying this is worth 49

10  million -- 49,902,000,000 or anything along those lines.

11  Q.   Do you recall, at any time prior to closing, anyone coming

12  to you and telling you that the securities transferred to

13  Barclays had a valuation by somebody of two billion dollars

14  more than the value that had been described to the Court?

15  A.   Not before the closing.  I don't recall that.

16  Q.   Now, I want to distinguish between some things we've

17  already covered, which talk generally about several billion

18  dollars difference --

19  A.   Yes.

20  Q.   -- and this particular issue of the 49.9 billion dollars.

21  A.   Okay.

22  Q.   When was the first time that anyone told you that the

23  securities transferred to Barclays and listed on Schedule A had

24  a value that someone had given them of two billion dollars

25  greater than the number the Court was told?

- 104 -

1    A.    I don't think I was ever told that.

2    Q.    You don't think you were ever told that?

3    A.    No.  You said there was a discrepancy of two billion

4    dollars.

5    Q.    Approximately two billion dollars.

6    A.    I was told that it was a discrepancy of several billion

7    dollars.  And for some reason, the number that sticks in my

8    mind was -- I think it's post-closing, but really like more

9    like five billion, not two.  I could be wrong on that, but my

10   recollection was that a number that was mentioned, and I think

11   it was post-closing, was a five billion dollar discrepancy.

12   Q.    And what I'm -- who told you there was a five billion

13   dollar discrepancy?

14   A.    I think I saw that in some e-mails from Houlihan or -- for

15   some reason the five billion dollar figure sticks in my mind.

16   But I can't pinpoint exactly where.

17   Q.    When were you first told that there was a five billion

18   dollar discrepancy between the assets transferred to Barclays

19   and the valuation given to the Court?

20   A.    I think it was post-closing.

21   Q.    How much post-closing?  Obviously it was before October

22   20th, correct?

23   A.    Yes.  By the way, that people had concerns that there was

24   a discrepancy of five billion dollars that needed to be

25   investigated, not that they had reached a final conclusion.

- 105 -

1    But a five bi -- the five billion number, I think is some -- we

2    have a lot of exhibits here, but I thought it was in some Fazio

3    or Geer e-mail, or maybe I just remember it.  But it would have

4    come from one of these gentlemen -- or Saul Burian.  But it

5    would be post-closing, certainly post September 28, okay,

6    because the schedules are received, you know, after that time

7    or at that time.

8    Q.   Let me try to --

9    A.   Yes.

10   Q.   -- sharpen this, because I'm trying to finish up.

11   A.   Okay.

12   Q.   You see in Exhibit 381 --

13   A.   Yes.

14   Q.   -- Movants' Exhibit 381 a valuation of the assets

15   transferred to Barclays and listed on Schedule A of the

16   clarification letter, that is approximately two and a half

17   billion dollars higher than what the Court was told, correct?

18   A.   I see that there's a number of 49.902.  I see that it's

19   higher than the 47 and change that was given to the Court.  But

20   I don't know if that's an apples to apples comparison.

21   Meaning, whether these are the same securities or whether there

22   are other assets.  And that's where I'm -- because I seem to

23   recall Lori saying something along the lines of we were

24   transferring value of seventy, and we're now transferring value

25   of forty-seven, or something along those lines.  And the

- 106 -

1    question is, is it value for only those securities or for other

2    things as well.  And I --

3    Q.   Let me try to --

4    A.   -- am not sure.

5    Q.   -- let me try to put the question this way.

6    A.   Okay.

7    Q.   Would you agree that Movants' Exhibit 381 demonstrates

8    that the committee was advised that the assets transferred to

9    Barclays as part of the transaction and listed on Schedule A

10   were at least worth two and a half billion dollars more than

11   what the Court was told?

12       MR. GAFFEY:  Objection, Your Honor.  I think it goes

13   to personal knowledge.  I think if the question is, are the

14   numbers different, that's one thing.  But what the document

15   purports to prove is an ultimate issue that the witness is not

16   competent to testify about.

17       THE COURT:  I'm going to overrule that objection.

18   It's asking for what this witness understood at the time based

19   upon his having seen the document and having done the math, the

20   math being the subtraction between 47.4 and 49.9.

21   A.   I'm sorry, could you restate the question?

22   Q.   Sure, sure.  And let me break it down.  You would agree

23   and you would have understood at the time, if you'd seen this,

24   that Movants' Exhibit 381 is saying that the assets transferred

25   to Barclays as part of a transaction and listed on Schedule A

- 107 -

1    to the clarification letter, had a market value of at least two

2    and a half billion dollars more than what the Court was told

3    was being transferred to Barclays, yes?

4    A.    No.

5    Q.    All right, sir.

6    A.    Can I ex -- do you want an explanation, if I may?  The

7    first part is we have to make sure it's apples to apples, that

8    this 49.902 reflects the same apples that Lori described as

9    47.2.  Assuming that's the case -- I don't know if that's the

10   case.  I would have to reread the transcript and all that --

11   Q.    You won't actually have to do that, sir.  That's why I

12   said at least.  You said you didn't think it was this, you

13   thought it was five billion dollars.  That's why I put in the

14   words at least, meaning it's two and a half or more.  You

15   understand that that's what I mean?

16   A.    Okay.

17   Q.    Okay?

18   A.    The point is, I would need to read a transcript to see

19   what that forty-seven and change referred to.  But putting that

20   aside for a second, the second point is, I don't know where

21   this is coming from.  I see that there's an e-mail from Milbank

22   sending this to Houlihan, and I don't know who's putting this

23   market value on these securities.  Is it Lehman, is it

24   Barclays, is it somebody else?  I have no -- I have no idea.

25   So I'm not sure I can conclude --

- 108 -

1    Q.    Okay.

2    A.    -- anything other than doing the math that 49.902 is

3    higher than 47 and change.

4    Q.    So what you're saying -- and I think it's a fair point --

5    is you don't know who came up with this market value of 49.9

6    billion dollars, correct?

7    A.    And also, what is the --

8    Q.    No, no.  Please just focus on that question.

9    A.    Yes, sorry.

10   Q.    You don't know who came up with that number, correct?

11   A.    That's correct.

12   Q.    And you don't know whether that's a reliable number or

13   not, correct?

14   A.    And the context in which it was prepared, at what time it

15   was prepared, etcetera, etcetera, yes.

16   Q.    It might have been an unreliable number to start with or

17   it might have been a reliable number to start with that became

18   unreliable because of the passage of time, correct?

19   A.    That's -- these are certainly possibilities, yes.

20   Q.    Okay.  And you don't know one way or the other which that

21   is?

22   A.    That's correct.

23   Q.    Now, accepting that, you do see that somebody is saying

24   that the assets transferred to Barclays were worth more than

25   the valuation that the Court was given.  Would you agree with

- 109 -

1    that?

2    A.    I'm not trying to be difficult, but --

3    Q.    Just yes or no.  Let me -- answer that.

4    A.    No, no.

5    Q.    You would not agree with that?

6    A.    No.

7    Q.    Okay.

8    A.    Can I explain or no?

9    Q.    If it's short, sir.

10   A.    That's tough.  Because I don't know where it's coming

11   from.  The assets -- I'm not sure this document tells you that

12   the assets being transferred are worth more.  I can't conclude

13   that from this document.  That's short.

14   Q.    Do you understand that I'm not asking you where it comes

15   from or even whether it's reliable.

16   A.    Um-hmm.

17   Q.    Okay.  I am prepared to stipulate, although I'm not sure

18   my brethren on the other side would, that this is an unreliable

19   document, okay?

20   A.    Um-hmm.

21   Q.    So I'm not asking you whether this is reliable or not.

22   What I'm asking you is whether this market value valuation, you

23   recognize is a number that is larger than what the Court was

24   given?

25   A.    Subject to the issue of apples to apples, which I would

- 110 -

1   like to check in the transcript, my math is not too good, but I

2   can see that 49.902 is larger than 47.

3   Q.   Okay.  Now, did you ever think that you needed to find out

4   quickly whether this number was reliable or not --

5   A.   I just told you I have no recollection of seeing this

6   document.

7   Q.   Did you ever -- were you ever told that there was a market

8   valuation by somebody --

9   A.   No.

10   Q.   -- of the Schedule A assets of forty-nine billion dollars

11   or more?  Were you ever told that?

12   A.   No.

13   Q.   By anybody?

14   A.   I have no recollection of that.  No.

15   Q.   At any time?

16   A.   That's correct.  At any time.

17   Q.   Okay.

18        MR. BOIES:  Your Honor, we're past our normal breaking

19   time.  I have about another five minutes.  I don't know what

20   the Court would like to do.

21        THE COURT:  If you have another five minutes, we

22   should stay.

23        MR. BOIES:  Okay.

24   Q.   Let me go to Movants' Exhibit 712.

25   A.   So we're in your book?

- 111 -

1    Q.   It's in their book.

2    A.   I'm sorry, in their book.

3    Q.   It's in their book.  It's page 28, a page they examined

4    you about.  And --

5    A.   Two seconds.  I'm just --

6    Q.   Sure.

7    A.   -- almost there.  Okay, go ahead.  I'm sorry.

8    Q.   First, with respect to the assets purchased that's listed

9    here --

10   A.   Yes.

11   Q.   -- you see there it refers to the repo assets?

12   A.   I see those words.

13   Q.   Do you know what that is referring to?

14   A.   I think that they refer to what you were trying to tell me

15   earlier that this was part of a repo.

16   Q.   All right.  And do you now accept that that is true?

17   A.   I'm not trying to be difficult, but I have no reason to

18   believe that that's not true, but I have no independent

19   recollection that those securities were part of a repo or not.

20   Q.   Okay.  And it refers to a negotiated five billion dollar

21   reduction.  Do you see that?

22   A.   I see that.

23   Q.   And that's a negotiated five billion dollar reduction in

24   the stated value or marked value of whatever these asset were,

25   whether repo or not, correct?

- 112 -

1    A.    I'm sorry.  Can you repeat the question?

2    Q.    Sure.  You got this presentation --

3    A.    Yep.

4    Q.    -- October 8, 2008, correct?

5    A.    I was at that meeting, yes.

6    Q.    And you understood that when they talked about a

7    negotiated five billion dollar reduction, they were talking

8    about a five billion dollar reduction in the marks of the

9    assets acquired by Barclays, correct?

10   A.    Sorry, but I don't have a recollection of what I thought.

11   Frankly, I'm not sure I ever saw this page.  I got the

12   presentation.  I have no doubts about that.  But whether

13   actually I focused on that or not, I can't actually -- I think

14   looking at this, I would have been -- I would remember seeing

15   this.  So I can't tell you that I have -- what my state of mind

16   was.  But I don't recall seeing this precisely.  I mean this is

17   a -- I think a very long presentation that lasted four hours,

18   minimum.  So I -- so I can't tell you what my state of mind --

19   Q.    Let me just try to follow up.

20   A.    Okay.

21   Q.    You said, I thought, and correct me if I'm wrong, that if

22   you had seen this reference to a negotiated five billion dollar

23   reduction, you would have remembered it, correct?

24   A.    I think it -- now we're really testing memories.  But I --

25   Q.    I'm actually asking if what you  -- your memory of thirty

LEHMAN BROTHERS HOLDINGS INC., et al.

- 113 -

1    seconds ago.

2    A.    -- I would think I would remember that, yes.

3    Q.    And you don't remember it, correct?

4    A.    That's correct.  Not sitting here today.

5    Q.    And do you remember that one of the assets being purchased

6    was the unencumbered box that had a valuation of 1.9 billion

7    dollars, which is the next item?

8    A.    No.  I don't recall that.  I do recall the real estate.

9    Q.    You do recall the real estate?

10   A.    Yes, the New Jer -- there was New Jersey.  There's a main

11   building in New York, but it was --

12   Q.    I'm not actually asking you about the real estate.  I'm

13   trying to ask you about the things that are at issue in this

14   case.

15   A.    I understand.

16   Q.    The fourth item is the 800 million dollars of 15c3-3

17   securities.  Did you understand that that was one of the assets

18   purchased by Barclays?

19   A.    Yes.  I did remember that.

20   Q.    Okay.  And then with respect to the -- before I go on with

21   the liabilities, one more question about the five billion

22   dollar reduction, which you say, if anybody had told you, you

23   would have remembered.  When, if ever, were you told by anybody

24   that there had been a negotiated five billion dollar reduction?

25   A.    I don't think anybody -- that I knew this until this

08-13555-mg   Doc 10203   Filed 06/28/10   Entered 07/15/10 10:49:32   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 114 of 127

- 114 -

1    litigation started.

2    Q.   No one had made that assertion to you at any time prior to

3    this litigation?

4    A.   No.  There was a lot of noise by Houlihan saying these

5    numbers don't add up, there's an issue, blah, blah, blah.  But

6    somebody telling me, oh, they cut a deal where they're going to

7    give a five billion dollar discount.  I didn't know anything

8    about that until this litiga -- or the examiner's report,

9    maybe.  But way -- you know, many, many months after.

10   Q.   I want to be sure that we're not missing each other with

11   the use of words.

12   A.   Okay.

13   Q.   This doesn't say discount.  It may mean the same thing.

14   A.   Oh, okay.

15   Q.   It just talks about a reduction.  So I just want to stick

16   with the language of this document.  Were you ever told prior

17   to the time that you left Milbank that there had been a

18   negotiated five billion dollar reduction in the marks of Lehman

19   assets?

20   A.   No.

21   Q.   Okay.  Now let me go to the liabilities assumed.  You

22   understood that one of the liabilities that was being assumed

23   was the cure liability.  Is that correct?

24   A.   Yes.

25   Q.   And you understood that one of the liabilities being

- 115 -

1    assumed was the severance liability, correct?

2    A.    That's correct.

3    Q.    Did you understand that Barclays was assuming any

4    liabilities other than those liabilities?

5    A.    I'm not a hundred percent sure, but I don't think so.   I

6    think that -- well, maybe liabilities associated with the book,

7    I mean, of the securities themselves.   But other than that, I

8    think that this probably lists the types of liabilities that

9    were being assumed by Barclays.

10   Q.    Okay.

11         MR. BOIES:   Your Honor, I have no more questions.

12         THE COURT:   Redirect?   I guess the question becomes if

13   it's going to be lengthy, we should take a lunch break.   If

14   it's going to be relatively brief, it's probably a convenience

15   to the witness who's here under subpoena to complete him and

16   allow him to go about his business.

17         MR. KIRPALANI:   I think I can keep it very brief, Your

18   Honor.

19         THE COURT:   Fine.

20         MR. KIRPALANI:   Okay.

21   REDIRECT EXAMINATION

22   BY MR. KIRPALANI:

23   Q.    Mr. Despins, you attended the sale hearing, right, on

24   September 19th?

25   A.    Yes, I did.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 116 -

1    Q.    And you listened carefully to Ms. Fife's statements to His

2    Honor?

3    A.    I think I did.

4    Q.    Okay.  Do you recall any statements being made about a

5    five billion dollar reduction?

6    A.    No.

7    Q.    Mr. Boies asked you some questions about the clarification

8    letter effectively amending or changing the APA.  Do you recall

9    that?

10   A.    Generally, yes.

11   Q.    Okay.  Then he also asked you some questions about the

12   clarification letter amending or changing the transaction.  Do

13   you recall that?

14   A.    Yes.

15   Q.    Okay.  What was your understanding with respect to the

16   clarification letter?  Was it anticipated to change the

17   transaction as reported to the Court or was it anticipated to

18   change the APA as had just been filed with the Court?

19   A.    My understanding was the clarification letter was supposed

20   to document the issues that had been resolved before the Court,

21   such as -- I always come back to the real estate, because I

22   remember that -- the real estate.  Also there was an issue of

23   one entity not getting consideration for the real estate --

24   another Lehman entity.  So that was being fixed through the

25   clarification letter.  But nothing more than -- I don't want to

- 117 -

1    say plumbing, because that's pejorative, but those types of

2    issues.

3    Q.    Okay.  And if the clarification letter had in fact changed

4    the APA to faithfully and accurately modify the APA to reflect

5    the transaction that was represented to the Court, was the

6    committee's consent required?

7    A.    No.

8    Q.    You were asked some questions about a Schedule A that was

9    dated September 21st.  Do you recall that?

10    A.    Yes, the -- yes.

11    Q.    On Sunday, did Houlihan ever advise you that they were

12    informed by Lehman senior executives that that Schedule A is

13    not final?

14    A.    Yes.  Yes.  I remember that schedule was not final.

15    That's why I always said, which schedule are we referring to,

16    because it was clear that it was not final on that day.

17    Q.    You testified earlier on direct that -- or it might have

18    been through Mr. Boies -- that Lehman was selling its broker-

19    dealer business as a going concern.  Do you recall that?

20    A.    Yes.

21    Q.    Okay.  Would it be consistent, in your experience, with

22    that type of a sale, for the seller to value its own securities

23    using a hypothetical liquidation value?

24    A.    Let me think about that.  For the seller to use a

25    liquidation value for -- well, no, that would be a liquidation

LEHMAN BROTHERS HOLDINGS INC., et al.

- 118 -

1    sale.  Or maybe I'm missing the point.

2    Q.   Okay.  You testified on cross examination about the

3    economic gain issue that Barclays, not being a nonprofit, would

4    be expected to make.  Do you recall that?

5    A.   Correct.

6    Q.   Okay.  If you had learned, following the closing, that

7    Barclays had made a tremendous economic gain, because it

8    acquired the broker-dealer of Lehman Brothers for 250 million

9    dollars, and as it turns out, that valuable engine of a

10   business was worth much more than 250 million dollars, would

11   you have come to court and cried foul?

12   A.   No.  That's the deal we signed up for.

13   Q.   If you had been told post-closing in the weeks you were

14   still working on the Lehman case that the reason that Barclays

15   had made an enormous economic gain was that senior executives

16   at Lehman and executives at Barclays agreed to use a

17   hypothetical liquidation value to value the book of securities

18   and thereby give Barclays a five billion dollar embedded gain,

19   would you have gone to court and cried foul?

20            MR. BOIES:  Objection, Your Honor.  Hypothetical

21   unless he establishes a foundation.

22            THE COURT:  Objection sustained.

23            MR. KIRPALANI:  I have no further questions, Your

24   Honor.

25            MR. BOIES:  Just one question, Your Honor.

- 119 -

1    RECROSS-EXAMINATION

2    BY MR. BOIES:

3    Q.    You were asked whether you believed that if the

4    clarification letter did not change the basic transaction

5    presented to the Court, whether your consent was needed, and

6    you said your consent was not needed under those circumstances.

7    Do you recall that?

8    A.    That's correct.

9    Q.    Now, in fact, you believe that the clarification letter

10   did change the transaction presented to the Court, correct?

11   A.    I think that a fair reading of that letter is that it did

12   modify the transaction, yes.

13   Q.    And under those circumstances, you believed your consent

14   was required, correct?

15   A.    That's correct.

16   Q.    And it was never given?

17   A.    That's correct.

18          MR. BOIES:  I have no questions, Your Honor.

19          MR. KIRPALANI:  Nothing further, Your Honor.

20          THE COURT:  Fine.  Mr. Despins, you're excused.  Thank

21   you.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  Is there anything more for today?

24          MR. TEECE:  Your Honor, very briefly.  I had alluded

25   to this a few times.  There are some exhibits which we'd like

- 120 -

1   to move into evidence, eleven in number.  Barclays has

2   withdrawn their objections to those exhibits.  So just as a

3   technical matter, I'd like to move them into evidence.  That

4   was one issue that I wanted to resolve today.

5          THE COURT:  We should probably do that before lunch so

6   people don't have to come back.

7          MR. TEECE:  Fair enough.  If I could have one second,

8   Your Honor.

9          THE COURT:  Assuming that this is very brief.

10          MR. TEECE:  Your Honor, I can proceed how ever you

11   like.  I have a copy of the exhibits which I can present to the

12   Court, or if Your Honor would like to see them before I can

13   move it into evidence, or I can just have them projected on the

14   screen, how ever the Court would like to proceed.

15          THE COURT:  Can this just be done by stipulation?

16          MR. BOIES:  I think so, Your Honor.  These are 432,

17   4 --

18          MR. TEECE:  No, they're not.  I'll read the numbers:

19   370, 373, 647, 649, 650, 651, 652, 653, 654, 655, and 706.

20          MR. BOIES:  Your Honor, may I have just a moment?

21          MR. TEECE:  Actually, if it can help you, sir, I have

22   a copy of the e-mail from your partner where you've agreed to

23   withdraw your objections.

24          MR. BOIES:  And it's these specific ones.  That's what

25   I'm not finding, these specific ones.

LEHMAN BROTHERS HOLDINGS INC., et al.

- 121 -

1           MR. TEECE:  Sure.

2           MR. BOIES:  I'll tell you what, Your Honor.  I don't

3    object, subject to just checking --

4           THE COURT:  I understand.

5           MR. BOIES:  -- the e-mail.

6           THE COURT:  Assuming that the documents that have just

7    been identified by number are, in fact, the same documents that

8    the parties have previously agreed are admissible, they're

9    admitted.

10   (Movants' Exhibits 370, 373, 647, 649, 650, 651, 652, 653, 654,

11   655, and 706, various documents, were hereby received into

12   evidence as of this date.)

13          MR. TEECE:  Thank you very much, Your Honor.

14          THE COURT:  To the extent that there is a mistake that

15   has been made, we'll revisit that.

16          MR. TEECE:  Thank you very much, Your Honor.

17          MR. BOIES:  Thank you, Your Honor.

18          THE COURT:  I think I next see you all in connection

19   with this 60(b) matters on Monday, August 23rd.

20          MR. BOIES:  Yes, Your Honor.

21          THE COURT:  And if there's any need to deal with the

22   Court between now and then, you can always contact my chambers

23   and we can have a conference.

24          MR. BOIES:  Do I understand that the next order of

25   business is Barclays' case?  That is, the movants are now

- 122 -

1    completed with their case?

2         MR. GAFFEY:  We are complete, Your Honor, with the

3    factual segment.  We have the --

4         MR. BOIES:  Experts.

5         MR. GAFFEY:  -- the expert segment.  It's our facts,

6    your facts --

7         MR. BOIES:  Yes.

8         MR. GAFFEY:  David, I'm sorry.  It's our facts, it's

9    Barclays' facts, and then it is each side's experts.

10        MR. BOIES:  Yes.

11        MR. GAFFEY:  So we're not resting --

12        MR. BOIES:  No, no, I understand.  You're completed

13   with your factual case, and we -- our first order of business

14   is for us to put witnesses on?

15        MR. GAFFEY:  Yes.

16        MR. BOIES:  Thank you.

17        MR. GAFFEY:  Yes.

18        THE COURT:  All right.  So the factual record for the

19   movants is closed as of this moment, with the only exception

20   being the week that we're going to have experts testifying, in

21   which case you'll have witnesses that you'll be calling.  And

22   the next order of business on August 23 at 9:30 a.m. will be

23   the first Barclays witness called by Barclays.  Do we know who

24   that is?

25        MR. BOIES:  Your Honor, let me check with Mr.

- 123 -

1    Schiller.  And what I'll do, with the Court's permission, is

2    advise counsel and the Court by letter of who that witness will

3    be.

4              THE COURT:  That's fine.

5              MR. BOIES:  Thank you.

6              THE COURT:  And I'll see you in August.  And have a

7    good summer between now and then.

8              MR. GAFFEY:  Thank you very much, Your Honor.  I beg

9    your pardon.  I have thirty seconds.

10             THE COURT:  Oh, I thought we were done.

11             MR. GAFFEY:  Just briefly.  I hope -- understand Mr.

12   Boies to be saying that we're going to get notice of more than

13   who the next one is.  We -- at least who is involved in the two

14   weeks and the anticipated order?

15             MR. BOIES:  Yes.  We'll follow exactly the procedure.

16             MR. GAFFEY:  That's fine.  And, Your Honor, one

17   question that goes to the end of the proceedings.  I have not

18   appeared before Your Honor before.  Would you anticipate after

19   the conclusion of all this, the submission of post-findings of

20   fact or briefs or --

21             THE COURT:  Absolutely.

22             MR. GAFFEY:  Absolutely both?  Absolutely --

23             THE COURT:  Absolutely, yes.  But the substance and

24   the general size of such submissions will be the subject of a

25   conference that we'll have just to talk about what's useful in

- 124 -

1   that for the parties.  Whether or not it's desirable to have

2   such a conference before we get to the conclusion of all of

3   this, I leave to the parties.  I think it may be desirable to

4   do that.  I would suggest that we have a conference at some

5   point during the period of August.  We have hearings August

6   23rd, 24th, 25th and 27th, August 30th and August 31.

7          My suggestion is that we, at some point during that

8   period of time, agree to meet and confer about the nature of

9   the submissions that the parties consider appropriate and that

10  the Court will find useful.

11         Additionally, I think it makes some sense, once we

12  have a better understanding as to how much time is being spent

13  during the next phase of these proceedings, that we will

14  identify a time for summing up.  And I'm assuming that we will

15  have what amounts to closing arguments of the movants and of

16  Barclays, that will make specific reference to the evidentiary

17  record.  And we can at least attempt to predict a reasonable

18  time for that, hopefully using one of the dates that I already

19  have set aside in the month of October to the extent those

20  dates are not necessary for evidence.

21         MR. GAFFEY:  Thank you, Your Honor.

22         MR. BOIES:  Thank you, Your Honor.

23         MR. OXFORD:  Your Honor, Neil Oxford from Hughes

24  Hubbard & Reed on behalf of the trustee.  There's just one

25  small housekeeping matter.  There's about a half a dozen

- 125 -

1   documents which the trustee would like to move into evidence.

2   Barclays, at this present time, objects to those, but we think

3   through negotiation we can resolve those objections.  But I

4   would just like that the record does not close formally on the

5   trustee's case before it goes into evidence.

6          THE COURT:  You'll be able to move in those documents

7   hopefully on a consent basis in August.

8          MR. OXFORD:  Thank you.

9          THE COURT:  Or after lunch, if people want to come

10  back.  But I think August may make some sense.  Is there

11  anything more, or --

12         MR. KIRPALANI:  Oh, no, no.  I was anticipating the

13  "All rise".

14         THE COURT:  All right, fine.  I mean, we've a lot of

15  false signals to depart.  Okay, we're excused, all of us.

16      (Whereupon these proceedings were concluded at 12:56 p.m.)

17

18

19

20

21

22

23

24

25

- 126 -

```
 1

 2                              I N D E X

 3

 4                         T E S T I M O N Y

 5

 6    WITNESS                 EXAM BY                  PAGE     LINE

 7    Luc Despins             Mr. Kirpalani              6       22

 8    Luc Despins             Mr. Boies                 46        2

 9    Luc Despins             Mr. Kirpalani            115       21

10    Luc Despins             Mr. Boies                119        1

11

12

13                         E X H I B I T S

14

15    NO.        DESCRIPTION                    ID.      EVID.

16    Movants    Exhibit nos. 370, 373, 647, 649,        121

17               650, 651, 652, 653, 654, 655

18               and 706

19

20

21

22

23

24

25
```

- 127 -

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Also transcribed by:    Penina Wolicki

12

13   Veritext

14   200 Old Country Road

15   Suite 580

16   Mineola, NY 11501

17

18   Date:  June 28, 2010

19

20

21

22

23

24

25