

Troy A. Uhlman
2310 Battery Hill Circle
Woodbridge, VA 22191
(540) 907-3021

June 24, 2010

The Office of the United States Trustee
33 Whitehall Street, Suite 2100
21st Floor
New York, NY 10004
Attn: Andrew D. Velez-Rivera, Esq.

Re: Lehman Brothers Holdings Inc., 08-13555, U.S. Bankruptcy Court, Southern District of New York (Manhattan)

United States Trustee Diana G. Adams,

On 28 April 2010 the United States Trustee declined appointment of an official Equity Committee in the bankruptcy case of Lehman Brothers Holdings Inc., ("LBHI")[1]. The letter indicated that the United States Trustee (UST) had considered the matter in the customary manner and deferred the issue to the Honorable James M. Peck for further contemplation. A series of letters[2] have been addressed to the Honorable James M. Peck for consideration of our request. Thus far there has been no development.

I humbly request subsequent consideration by the United States Trustee on the matter of appointment of an exclusive Equity Committee as the only means to adequately represent equity security holders. As it stands now, security holders' representation is nonexistent and requests for information are being wholly ignored by the Debtor, Debtors' Restructuring Team, Debtor's Counsel, and Committee of Unsecured Creditors. Support of the United States Trustee is our only viable option at this point.

There are several key points (not inclusive) that I believe warrant subsequent consideration by the United States Trustee. All of these topics are interdependent but can generally be separated into the following three topics:

1)  Legal Representation and Costs
2)  Previous Equity Motion Request and Basis of Denial
3)  Stockholders Right for Annual Stockholder Meetings and the Election of addition Board Members

1) The principal reason I am requesting a subsequent decision by the United States Trustee is matter of legal representation. It is simple fact that a small group of stockholders cannot muster sufficient legal firepower to match that of the officially approved committees. The most recent Monthly Operating Report for May 2010[3] indicates that Debtors' Counsel and Counsel for Committee of Unsecured Creditors have been paid $190.7M and $52.8M, respectively, since September 2008 (Debtor's Chief Restructuring Officers have been paid $296.0M). There are approximately two dozen other legal teams on the Debtors payroll adding an additional $200M+ in legal fees. In the 622 days since Lehman Brothers Holdings Inc., filed for bankruptcy (through end of May) professional fees have totaled a mind blowing $830.6M. At this rate the total bill for professional fees is likely to exceed one billion dollars by September 2010. These numbers are quite shocking considering this is the largest bankruptcy ever and yet shareholders still have no voice. It seems a bit disheartening to know that everyone has representation but the owners of this once venerable 158-year old institution.

I have contacted numerous law firms to gage their interest in filing a Motion for appointment of an Equity Committee. Nearly all declined due to a conflict of interest or the complexity of the case. To date only a **SINGLE** firm has agreed to potentially take the case on behalf of stockholders. However, the required retainer and costs are prohibitive for individual stockholders.

---

[1] Docket No. 8679 @ http://lehman-docket.com
[2] Docket No. 8874, 8872, 8871, 8523, 8363, 8364, 8357, 8356, 8040 @ http://lehman-docket.com
[3] Docket No. 9791 @ http://lehman-docket.com



2) On 16 October 2008 a hearing was held regarding the first Motion for appointment of an Equity Committee filed by L. Matt Wilson on behalf of Greg Georgas, et al[4]. At that time, the United States Trustee[5], Debtor[6], and Official Committee of Unsecured Creditors[7] all objected to the Motion.

**The first tenant of the objection by the UST was "The Proponent Has Not Shown Inadequate Representation."**

> "The Proponent, an individual, is the only person who has requested the appointment of an equity committee. The United States Trustee has not received any calls or correspondence from other equity holders requesting the appointment of an equity committee as of the date hereof; nor does the docket reflect any filings made in support of the Motion. The Proponent and other shareholders in the Lehman Bros. bankruptcy case are not statutorily disenfranchised from the chapter 11 process. The law provides that equity holders have standing to be heard on any issue in the bankruptcy case. 11 U.S.C. § 1109(b)(2)."

In the intervening time since this objection was made in there have been numerous letters to the Court requesting appointment of an Equity Committee[8]. Specifically, Docket No. 8523 was forwarded to the UST for consideration by the Court. This package contained letters from 112 stockholders of Lehman Brothers Holdings Inc., common and preferred shares. In addition there have been other individual letters addressed to the court. Exhibit A attached list the names of individuals who have requested appointment of an Equity Committee. Although the law states that we have the right to be heard on any issue in the bankruptcy case it is not reasonably feasible for individual holders to prepare sophisticated legal arguments for presentation to the court. We're outgunned.

> "The "statutory focus of section 1102(a)(2) is not whether the shareholders are 'exclusively' represented, but whether they are 'adequately' represented." Williams Common's, 281 B.R. at 223. In this analysis, the bankruptcy courts consider a number of non-exclusive factors in determining whether there is adequate representation, including the debtor's insolvency, the number of shareholders, the complexity of the case, and whether the cost of the committee would significantly outweigh the concern for adequate representation. Johns-Manville Corp., 68 B.R. at 159-60."

An essential argument in opposition to the appointment of an exclusive Equity Committee has been the adequacy of stockholder representation. In the past 21 months I cannot find a single example where the Debtor or any of their representatives have made any effort to represent stockholder interests. Their only effort to date has been to file motions in objection of Equity interests. Not only are we inadequately represented, we lack access to dedicated legal and financial experts, we have no way to question/investigate any of the unaudited financial reports, we've been denied an Annual Stockholders Meeting, and have been told that the Board of Directors isn't currently functioning. We've been shut out at every turn. Try emailing the Debtor, Debtors' Counsel, or Committee of Unsecured Creditors as a shareholder. If you are lucky enough to garner a response it's likely going to be "contact an attorney." Hardly adequate by any interpretation.

Finally, the cost of an exclusive Equity Committee surely can no longer be a valid obstacle to its appointment given the obscene spending by the Debtors et al.

> It is true that Lehman Bros. has a large number of shareholders, and it is conceded that this relatively-new bankruptcy case has raised complex issues, and will continue raising them during most of its pendency in this Court. But generally, "not every case with public shareholders warrants an equity committee." In re National R.V. Holdings, Inc., 390 B.R. 690, 698 (Bankr. C.D. Cal. 2008) (denying appointment of equity committee because insolvency not proven). Specifically, "while there is a large number of shareholders, not every case with such a large number will require an official equity committee." Williams Common's, 281 B.R. at 223.

> When a corporate debtor remains in possession, as is the case here, its directors bear the same fiduciary responsibilities to creditors and shareholders as would a bankruptcy trustee, if one was appointed. "Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.' " Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343, 355 (1985) (citing Wolf v. Weinstein, 372 U.S. 633, 649-652 (1963)). In this sense, the Proponent has neither alleged nor proven that the Debtor and its representatives have faltered in the exercise of their fiduciary duties to equity security holders.

I assert that the Debtor and its representatives have indeed faltered in the exercise of their fiduciary duties to equity security holders. There are numerous issues that only an exclusive Equity Committee can explore to satisfactory conclusion. Currently the Debtor refuses to tell shareholders who makes up the Board of Directors, how often they

---

[4] Docket No. 293, 841 @ http://lehman-docket.com
[5] Docket No. 804 @ http://lehman-docket.com
[6] Docket No. 905 @ http://lehman-docket.com
[7] Docket No. 865 @ http://lehman-docket.com
[8] Docket No. 8874, 8872, 8871, 8363, 8364, 8357, 8356, 8040 @ http://lehman-docket.com

meet, and what they are discussing[9]. Debtor's Counsel has told me "If the Chapter 11 Plan is confirmed, subject to the satisfaction of certain requirements set forth therein and other legal requirements, the Chapter 11 Plan will become effective, at which time, as provided by the Chapter 11 Plan, the board of directors of LBHI will be reconstituted." [see Exhibit B attached]  Are they not meeting now or for the past 18 months?  The Board of Directors has abrogated their responsibility and fiduciary duty to Stockholders to the restructuring team of Alvarez and Marsal (A&M) and we are paying the price.

Delaware General Corporation Law requires annual meetings be held so stockholders may exercise their right of corporate governance[10].  The Honorable Judge Mary F. Walrath in the case of Washington Mutual[11] stated "the automatic halt to litigation that applies to companies in bankruptcy cannot bar shareholders from exercising their corporate governance rights."  Furthermore, rejecting the company's arguments, Walrath said it is "well-settled law" that shareholders can hold meetings to elect new directors despite a company being in bankruptcy[12].

When asked why no Annual Stockholders Meeting would be held, Debtor's Counsel said that holding an Annual Meeting "would be a diversion from the pressing needs of the Debtors' chapter 11 cases and require an expenditure of the resources and funds of the Debtors' estates that would have no benefit to the Debtors' estates and the Chapter 11 Plan process." [Exhibit B].  It has become apparent that the Debtors and Creditors have taken an adversarial posture towards stockholders.  Stockholders are no longer being considered part of the estate.  My response to Debtor's Counsel is attached as Exhibit C.

Furthermore, in an effort to potentially speed up the bankruptcy process the Debtor may be improperly distributing stockholders equity by paying third-party guarantees.  The legality of this strategy needs to be fully investigated and equity needs exclusive representation before the Chapter 11 Plan and Disclosure Statement are brought to a hearing.

There are significant and serious questions regarding the Debtors' determination of payout priority for LBHI.

**The second tenant of the objection by the UST was "The Proponent Has Not Established that There is an Economic Interest to Protect."**

> Equity committees "should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule." Williams Commen's, 281 B.R. at 223. In this regard, section 101(32) requires a "balance sheet test." In re Nirvana Restaurant, Inc., 337 B.R. 495, 506 (Bankr. S.D.N.Y. 2006.) If the debtor is a going concern, fair valuation means "the fair market value of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." Id., quoting Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 35 (2d Cir.1996). The analysis starts with a review of the balance sheet, with the recognition that book value does not always provide a fair estimate of market value. Nirvana, 337 B.R. at 506. However, book values "may still support a court's inference of an entity's insolvency in some circumstances." In re Flutie New York Co., 310 B.R. 31, 52 (Bankr. S.D.N.Y. 2004) (quoting Roblin Indus., 78 F.3d at 36. Other evidence of insolvency can be found in SEC filings and accompanying financial statements, including (1) reports of negative net worth, (2) statements or figures that show sustained losses; (3) facts that show that the debtor is operating in a depressed market, and (4) reports of failure to pay bank debt. Roblin Indus., 78 F.3d at 37. However, "whenever possible, a determination of insolvency should be based on reasonable appraisals or expert testimony." Id., at 38.

The proposed plan as presented by the Debtor indicates that no distribution is expected to be made under the Chapter 11 Plan to holders of equity in LBHI, including LBHI's common and preferred stockholders.  With regard to a "balance sheet test" the current unaudited balance sheet is nearly seven months old and lacks the type of details necessary to lend credibility to the process.  The pre-bankruptcy audited financial statements of LBHI indicate a relatively straightforward capital structure.  Disclosure Statement Exhibit 2A indicated that LBHI had $209B in assets, $147 of which was from affiliates; $189B in debt, $88 of which was due to affiliates, leaving $20B in total stockholders' equity.

The unaudited June 30, 2009 Balance Sheet (Disclosure Statement Exhibit 2c) indicates a significant loss of assets, the most important of which is a $37B swing from a positive $10.275B to a negative $26.510B in "Investments in Affiliates, Debtor-Controlled Entities", which I think is a key inquiry point for an Equity Committee.  Without this $37B swing, there could still be post bankruptcy equity value.  Even if this "Investments in Affiliates went to zero

---

[9] Email requests beginning 30 April 2010 to Lehman Brothers Media Contact Kimberly Macleod have gone unanswered
[10] http://delcode.delaware.gov/title8/c001
[11] In Re Washington Mutual Inc., 08-12229, U.S. Bankruptcy Court for the District of Delaware (Wilmington)
[12] http://finance.yahoo.com/news/WaMu-shareholders-can-pursue-apf-2025952229.html?x=0&.v=3

3

(i.e. the negative $26.5B was reduced to zero) there would still be $3.5-$4.0 B in equity, which should accrue at least to the preferred.

Similarly, the (unaudited) December 31, 2009 Balance Sheet indicates further degradation in "Investments in Affiliates, Debtor-Controlled Entities" from negative $26.510B to negative $30.123B. Stockholder equity in LBHI stood at negative $29.321B based almost solely on the loss of assets in "Investments in Affiliates, Debtor-Controlled Entities".

The May 2010 Monthly Operating Report indicates that cash and investments have increased $983M to $18.4B, an increase of 5.7% month-over-month. However, the report indicates "This MOR is not prepared in accordance with U.S. generally accepted accounting principles (GAAP). This MOR should be read in conjunction with the financial statements and accompanying notes in the Company's annual and quarterly reports that were filed with the United States Securities and Exchange Commission." Lehman Brothers Holdings Inc., is currently not filing either annual or quarterly reports.  What are we to read these reports in conjunction with?

Mr. Marsal said that "he will spend five years selling assets to pay unsecured creditors as little as 14.7 cents on the dollar. Any proceeds from litigation would add to the payout."[13]  The most recent balance sheet indicates that LBHI had total assets of $153,219M and liabilities of $182,540M. This would seem to indicate that LBHI could pay 83.9% of its liabilities.  What is missing?

An article entitled "Lehman Examiner Punted on Valuation[14]" by Frank Partnoy[15] says in regards to the Examiners report Volume 2 that "The Valuation section is 500 pages of utterly terrifying reading. It shows that, even eighteen months after Lehman's collapse, no one – not the bankruptcy examiner, not Lehman's internal valuation experts, not Ernst and Young, and certainly not the regulators – could figure out what many of Lehman's assets and liabilities were worth."  What has changed?  How are we to believe that Alvarez & Marsal can project cash-flow for the next five years for Affiliated Debtors and Debtor-Controlled Entities when we cannot even get a detailed Balance Sheet in a timely manner?

As a holding company, LBHI would have expended great effort to avoid assuming or guaranteeing any of the debts of its subsidiaries.  Therefore, while there could be huge losses in the subsidiaries, such as those investing in sub-prime and alt-a mortgages, and other "cooking of the books" in subsidiaries, those losses should have been contained within those corporate shells and not passed up to the parent, other than to wipe out whatever positive value those subsidiaries represented.  In this manner, any positive value represented by the many good investments would flow up to the parent while the losses would be contained within the corporate shells of the subsidiaries.

Unfortunately, none of that information is public.  But an exclusive official Equity Committee could very easily engage accountants to examine these issues, starting with the balance sheets.

Furthermore, there are significant questions regarding the claims process and the efforts to date to dramatically reduce them.  Without insight into the claims process, specifically third party guarantees, equity holders have no way of determining if equity value is being sacrificed (which we believe it is).

There is also an issue of the Net Operating Loss that was incurred by equity owners of LBHI prior to 2008. Stockholders are the rightful owners of the approximately $10B (minus allowable priority tax claims) in allowable net operating losses.  The Chapter 11 Plan and Disclosure statement indicate that common and preferred equity will be wiped out.  Shouldn't those who incurred the past-years losses be the recipient of those future gains?  Even if no other value were to be distributed to Stockholders the net operating loss would represent significant recovery.

The Proponent has fallen short of meeting his burden of establishing "a substantial likelihood" that there will be a "meaningful distribution" to equity. Williams Common's, 281 B.R. at 223. According to Exhibit "A" to the Voluntary Petition of Lehman Bros., the latest available information as of the Petition Date was that Lehman Bros.' total assets were $639 billion and its total liabilities were $613 billion as of May 31, 2008. Voluntary Petition, Exh. A, Docket No. 1. However, these figures were based on calculations

[13] http://www.businessweek.com/news/2010-06-22/jpmorgan-said-barclays-misled-judge-in-lehman-deal-update1-.html
[14] http://www.nakedcapitalism.com/2010/03/frank-partnoy-lehman-examiner-punted-on-valuation.html
[15] Professor Frank Partnoy is the George E. Barrett Professor of Law and Finance and is the director of the Center on Corporate and Securities Law at the University of San Diego.  He is one of the world's leading experts on the complexities of modern finance and financial market regulation.  http://www.frankpartnoy.com

made more than three months prior to the Commencement Date. Thus, they reflect a financial performance that has likely changed with the volatility of the global financial markets during the intervening time frame. Moreover, updated public information with respect to the Debtors' solvency, such as their bankruptcy schedules and regulatory filings for the third and fourth fiscal quarters of 2008, is not yet available.

Thus, as the Proponent has not established, and perhaps at this time cannot establish, that there is an economic interest to protect from the perspective of equity, the appointment of an equity committee is not warranted at this time.

This is an interesting burden of proof. Without access to current information how can one determine if the Debtors are correctly distributing any potential recovery. Stockholders need an Equity Committee to prove we need an Equity Committee. Seems like a difficult if not impossible burden to meet. It took an examiner a year and $50M just to scratch the surface on the inner workings of Lehman Brothers Holdings Inc., before the collapse. How are we to believe the dated, unaudited information being released given LBHIs past behavior? We have no insight into how they are determining valuation on their illiquid assets or reducing claims against them.

**The Debtor and Official Committee of Unsecured Creditors used a variety of interesting, albeit skewed arguments in their objection to an exclusive Equity Committee. Only selected objections will be discussed as they are mostly duplicative of those points made by the UST.**

Well-settled interpretative principles guide the Court's discretion in this area. First, that "[t]he appointment of official equity committees should be the rare exception," and second, that "[s]uch committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee." Williams, 281 B.R. at 223 (emphasis added); see also In re Emons Indus., Inc., 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985).

The Debtors themselves have decided to break the strict application of the absolutely priority rule by devising a scheme to pay all of their largest creditors and third party guarantee claims a prorated amount. This point should not be held against Stockholders seeking to establish an Equity Committee. Furthermore, we are completely unable to represent ourselves and our interests in the largest and most complex bankruptcy case in United States history. We therefore meet the "well-settled interpretative principles" set forth above.

Lehman's stock is currently trading for approximately 11 cents per share, a nearly 100 percent drop in value from its price only months ago. Even more tellingly, Lehman's unsecured debt largely is trading at less than 10 cents on the dollar, suggesting that market participants believe the prospects for substantial repayment to creditors are slim.

If unsecured debt is a metric of potential payout than we are 70% more likely to receive a distribution now than in October 2008. The Debtor listed twelve bonds and their corresponding prices (three have matured) as proof that the company had no value. The average price as of 8 October 2008 was $6.35. As of 18 June 2010, the average price was $10.78 or 70% higher. Furthermore, any argument based on the trading value of LBHI common or preferred stock should be completely discounted since the shares are under a trading restriction.

**16 October 2008 Court Hearing**

Mr. Miller, Lead Debtors' Counsel, on 16 October 2008[16] assuring Judge Peck stockholders would be adequately represented:

"I would submit to Your Honor that the number of stockholders in this particular case is not a significant factor. The question is one of adequate representation. And as I pointed out before, Your Honor, **we have a board of directors with nine independent directors [emphasis mine]**. At least for this time being, Your Honor, the adequate representation of stockholders is vested in the board of directors. The board of directors is aware of their fiduciary responsibilities. They are acting, they are active, they are meeting with Mr. Marsal. And until something in that respect changes, I would submit to Your Honor that there is adequate representation."

Recall, communication from Debtors' Counsel (28 May 2010) stated:

If the Chapter 11 Plan is confirmed, subject to the satisfaction of certain requirements set forth therein and other legal requirements, the Chapter 11 Plan will become effective, at which time, as provided by the Chapter 11 Plan, the board of directors of LBHI will be reconstituted. For the reasons explained in the Disclosure Statement, no distribution is expected to be made under the Chapter 11 Plan to holders of equity in LBHI, including LBHI's common and preferred stockholders.

---

[16] Transcript available @ http://lehmanlotto.blogspot.com/2010/05/previous-equity-committee-motion.html

5

Debtors' Counsel confirms that the Board of Directors is NOT active. In fact, email requests to the Debtor regarding the Board of Directors members, meeting dates, transcripts, etc. have all gone unanswered.

Judge Peck's comments when denying the Appointment of an Equity Committee:

> "But I'm doing so without prejudice to such a motion being presented at some time in the future should the facts warrant the appointment of such a committee. Such a motion, in order to be successful, in my view, would need to demonstrate some credible reason to believe that there is an opportunity for equity security holders to recover something of value in this case and a showing that the debtor and other parties who are involved in the case are not providing adequate representation for that constituency."

Judge Peck was clear in his expectation of what would constitute a successful motion for appointment of an Equity Committee. However, in order to bring a motion to this court, Stockholders need legal representation due to the tremendous expense and complexity of preparing a cogent legal argument. There is a recovery potential based on how LBHI decides to pay its creditors and third party guarantee claims, uses the Net Operating Loss provision, and the success of ongoing litigation.

3) Lehman Brothers Holdings Inc., is incorporated under the laws of the State of Delaware. On 11 November 2007, LBHI filed an 8-K with the Securities and Exchange Commission that included an Amended and Restated By-laws Effective November 8 2007[17].

Delaware General Corporation Law Chapter 1 Title 8, Chapter 1, Subchapter VII. Meetings, Elections, Voting and Notice states:

> "If there be a failure to hold the annual meeting or to take action by written consent to elect directors in lieu of an annual meeting for a period of 30 days after the date designated for the annual meeting, or if no date has been designated, for a period of 13 months after the latest to occur of the organization of the corporation, its last annual meeting or the last action by written consent to elect directors in lieu of an annual meeting, the Court of Chancery may summarily order a meeting to be held upon the application of any stockholder or director. The shares of stock represented at such meeting, either in person or by proxy, and entitled to vote thereat, shall constitute a quorum for the purpose of such meeting, notwithstanding any provision of the certificate of incorporation or bylaws to the contrary. The Court of Chancery may issue such orders as may be appropriate, including, without limitation, orders designating the time and place of such meeting, the record date or dates for determination of stockholders entitled to notice of the meeting and to vote thereat, and the form of notice of such meeting."

In addition to being delinquent in holding the required Annual meeting, preferred stockholders are authorized additional appointments to the Board of Directors based on a missed dividend provision.

> Whenever dividends payable on the shares of Preferred Stock have not been paid for six or more dividend periods, whether or not consecutive, the authorized number of our directors will automatically be increased by two. The holders of the Preferred Stock will have the right, with holders of any other equally ranked series of preferred stock that have similar voting rights and on which dividends likewise have not been paid, voting together as a class, to elect two directors to fill such newly created directorships at our next annual meeting of stockholders and at each of our subsequent annual meetings until full dividends have been paid on the Preferred Stock for at least four consecutive dividend periods. At that point the right to elect directors terminates, and the terms of office of the two directors so elected will terminate immediately.

The two preferred classes which contain this provision are 7.25% Non-Cumulative Perpetual Convertible Preferred Stock Series P[18] and 8.75% Non-Cumulative Mandatory Convertible Preferred Stock Series Q[19]. Stockholders are being prevented from exercising their right to corporate governance and appointment of two additional directorships.

### 4) Affiliate and Affiliate guarantee claims

From Risk Magazine 25 March 2010

> An apparent guarantee from Lehman Brothers Holding (LBH) to its subsidiaries pledging to undertake their liabilities and obligations might be subject to a challenge from the parent company, say lawyers. If successful, LBH could render billions of dollars worth of claims against the bankrupt estate invalid.

> The pledge, known as the board-resolution guarantee, was drafted on June 9, 2005 and signed by then chief executive Richard Fuld

---

[17] http://www.scribd.com/doc/32906388
[18] http://www.sec.gov/Archives/edgar/data/806085/000104746908004053/a2184062z424b2.htm
[19] http://www.sec.gov/Archives/edgar/data/806085/000104746908007310/a2186178z424b2.htm

and former board director John Macomber. It appears to guarantee the liabilities of 18 affiliates, including Lehman Brothers International Europe, Lehman Brothers Finance and Lehman Brothers Special Financing. As a result, more than $100 billion worth of claims has been filed by both creditors and subsidiaries citing the resolution in an attempt to get their claims honored by LBH.

However, some bankruptcy lawyers who spoke to Risk believe the resolution is peculiar, and add it is unusual for a board resolution to function as a guarantee by itself.

"The resolution is not like other guarantees and LBH is right to view the document with suspicion. Indeed, it is odd the guarantee exists. Typically, board resolutions authorize or give permission for guarantees to be issued as opposed to actually operating as a guarantee. This is the profound difference between this resolution and others. It might be ingenuous, but in my experience this is the only time I've seen a guarantee embedded in a corporate resolution," says a bankruptcy lawyer in New York, who represents firms that have cited the resolution in their claims.

According to a high-level source who worked for LBH and is acquainted with the resolution, the document is not a guarantee but gives the power to offer a guarantee. "The existence of this document doesn't necessarily make it a guarantee, but it does give the authority to give guarantees. This might point to the existence of actual guarantee documents, but we don't have the full deck of cards here so we don't know if actual paper guarantees exist. The situation is akin to me having the authority to writing cheques out of my banking account. I have the authority, but that doesn't mean I write cheques," he says.

However, some lawyers believe the intent of the resolution is obvious. "The intent of the document is clear and the entities are clearly specified. What would be the point of drafting this if not to act as a guarantee? If it is not a guarantee, then what is it? The four corners of this document are clear in the intent and I'm sure many counterparties bought it. We are taking the position this operates as a guarantee," says the counsel to a major creditor of LBH, which cited the resolution in its guarantee claim.

According to a 2,200-page report into the causes of the Lehman bankruptcy, released on March 11, the US court-appointed examiner, Anton Valukas, was unable to locate any decision concerning the enforceability of a guarantee contained only in a corporate resolution.

However, the report goes on to suggest creditors might have a strong argument for the validity of the board resolution as a guarantee. "The guarantee resolution appears to satisfy the basic general guarantee requirements of knowledge, acceptance (which can be implied) and consideration, and therefore might be held to create an enforceable general guarantee obligation," the report suggests.

If the guarantee is in fact deemed valid, LBH might instead attempt to litigate individual claims that cite the resolution, say lawyers. The estate could try to claim creditors did not rely on the resolution when transacting with a subsidiary. If LBH can prove a creditor had no knowledge of, and did not rely on, the guarantee when dealing with the subsidiary, the claim can be disallowed.

"The biggest problem for a lot of people is they didn't know about this board resolution and when one interprets the binding nature of the guarantee, you have to follow normal contract law. There will be people who were not aware of this resolution and who will have a tough time trying to prove they accepted the offer of and relied on the guarantee. This is the biggest area of vulnerability at the moment for a lot of creditors," says the bankruptcy lawyer in New York.

It is logical to request that the Chapter 11 Plan and Disclosure Statement should not be approved until affiliate guarantees can be determined as claims are the key to determining recovery for all classes.

I appreciate your time and request that an exclusive Equity Committee be appointed prior to the approval of the Debtors' Chapter 11 Plan and Disclosure Statement. Appointment of an Equity Committee is an absolute necessity if stockholders are to have any representation in this case. The creation of LAMCO, reduction of allowable claims, and on-going litigation seem to offer a reasonable change of recovery for LBHI Stockholders. An Equity Committee could at least inform stockholders that this is an honest attempt to fairly compensate all parties of the LBHI estate. The truth is as of this date stockholders simply don't know. We deserve to know and an exclusive Equity Committee could go a long way in ensuring transparency for everyone involved. If you have any questions I can be reached via email at thirtysomethinginvesting@gmail.com

Troy Uhlman

Electronic submission to Andrew D. Velez-Rivera, Esq. for the United States Trustee Diana G. Adams, Debtors' Counsel Weil Gotshal & Manges LLP, Debtors' Chief Restructuring Officers Alvarez & Marsal North America, LLC., and Counsel for Committee of Unsecured Creditors Milbank, Tweed, Hadley & McCloy LLP. Mailed copy has been sent to the Chambers of the Honorable James M. Peck.

EXHIBIT A

| | | | |
|---|---|---|---|
| Allen A. Moff | Fernando M. Weiga | Lawrence Reddock | Richard Miller |
| Alli Joseph | Fran DeLaura | Linh Khanh T Vo | Robert F. Hausmann |
| Andrea Lerner | George E. Di Russo | Marc Uribe | Robert L. Biscardi |
| Andrew Hopkins | Gerald Galiger | Margaret L. Smith | Robert Pettit |
| Arun K. Kakarla | Glenn A. Blaze | Reva Kirk | Rodger Stelter |
| Brian Ellis | Grover Younger | Margaret Mitchell-King | Rogelio Beltran |
| Brian T. Kelleher | Ida May S. Barnes | Mark A. Crigler | Ronald J. Mandrachhia |
| Bryan Borum | Ivan Aldea Alvarez | Mark Neander | Rudolph Weiszmann |
| Carly Galiger | James E. Pyle | Marko Verbic | Ruthann McFarland |
| Carolyn J. Bessler | James Eason | Martin J. Redilla | Scott Kitchens |
| Chris C. Bobell | James Moscola | Mary E. Uhlman | Shane Visto |
| Curtis Ware | Jason C. Chapin | Matteo Etemad | Shannon Allen |
| Dale Suder | Jeff McMurrey | Michael Duceatt | Smitha Aiyar |
| Daniel A. Clute | Jennifer Squires | Michael R. Zodda | Sridhar B. Duddukuri |
| Daniel R. Hager | Joel J. Farrer | Michael Sroka | Srihari Javvaji |
| Danny Kirk | John Chadwick | Monika Wenzl | Stanley Czajka |
| David Lerner | Jose Ruiz | N.J. Joseph | Sudhakar Aremanda |
| David Younger | Joseph P. Brunetti | Ngoc Huong Huynh | Thomas M. Cockrell |
| Davin J. Noto | Kavitha Duddukuri | Nicholas S. Mateko | Thomas Reynolds |
| Dhyan Appachu | Kelly McGehee | Nick Santino | Thomson Tat |
| Donald Tang | Kelsey Galiger | Paul Edwards | Tracey Morman |
| Donna Galiger | Kevin Mun | Pavel Kinel | Troy A. Uhlman |
| Edvard-Ragnar Fackner | Kevin R. Kristick | Quoc Truong Huynh | Van Trai Huynh |
| Edwin D. Thomas | Khin Tun | Rajesh Pentapati | Vincent Jackson |
| Ercan Eren | Kristi Brim | Rak Koestler | William C. Meyer Jr. |
| Eric C. Giles | Kyle Hamatake | Reva Kirk | Wim J.M. Alen |
| Eric Giles | Kylie Galiger | Richard A. Lough | Xianhuz Xu |
| Fatima Butt | Lance Edwards | Richard B. Johnson | Yun You |

EXHIBIT B

Gmail - Lehman Hotline Inquiry    https://mail.google.com/mail/?ui=2&ik=bc2b2c0543&view=pt&search=i...



**Troy Uhlman <thirtysomethinginvesting@gmail.com>**

## Lehman Hotline Inquiry

**Bekeny, Erika <Erika.Bekeny@weil.com>**                          Fri, May 28, 2010 at 9:38 AM
To: "thirtysomethinginvesting@gmail.com" <thirtysomethinginvesting@gmail.com>
Cc: Lehman Team <lehmanteam@weil.com>

Dear Mr. Uhlman,

We are the attorneys for Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (the "Debtors"). Thank you for your recent inquiry regarding an annual meeting of stockholders of LBHI. As you may know, commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with the United States Bankruptcy Court for the Southern District of New York voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The cases have been assigned Case No. 09-13555 (JMP).

On March 15, 2010, the Debtors filed their joint chapter 11 plan pursuant to section 1121 of the Bankruptcy Code [Docket No. 7572]. On April 14, 2010, the Debtors filed an amended chapter 11 plan (the "Chapter 11 Plan") [Docket No. 8330] and their proposed disclosure statement pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement") [Docket No. 8332]. The Debtors will be soliciting votes for and subsequently seeking confirmation of the Chapter 11 Plan in accordance with the requirements set forth by the Bankruptcy Code. If the Chapter 11 Plan is confirmed, subject to the satisfaction of certain requirements set forth therein and other legal requirements, the Chapter 11 Plan will become effective, at which time, as provided by the Chapter 11 Plan, the board of directors of LBHI will be reconstituted. For the reasons explained in the Disclosure Statement, no distribution is expected to be made under the Chapter 11 Plan to holders of equity in LBHI, including LBHI's common and preferred stockholders.

The Debtors' efforts are concentrated on the prosecution of their chapter 11 cases, the negotiations on the Chapter 11 Plan, and the solicitation and confirmation of the Chapter 11 Plan. Under the circumstances, holding an annual meeting of stockholders would be a diversion from the pressing needs of the Debtors' chapter 11 cases and require an expenditure of the resources and funds of the Debtors' estates that would have no benefit to the Debtors' estates and the Chapter 11 Plan process. Accordingly, LBHI has not called an annual meeting of stockholders.

Regards,

Erika

**Erika Bekeny**

Weil, Gotshal & Manges LLP

767 Fifth Avenue

New York, NY 10153-0119

212.310.8323

erika.bekeny@weil.com

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

---

EXHIBIT C

Shareholders maintain our responsibility of corporate governance and we feel that the current BOD has abrogated their responsibility to the Debtors' Restructuring, lead Counsel, and Creditor Committee.

You indicated that "If the Chapter 11 Plan is confirmed, subject to the satisfaction of certain requirements set forth therein and other legal requirements, the Chapter 11 Plan will become effective, at which time, as provided by the Chapter 11 Plan, the board of directors of LBHI will be reconstituted"

Are you implying that the current BOD is not active?

If so, that is contradictory to a statement made by Mr. Miller on 16 Oct 2008 to the court assuring Judge Peck that shareholders would be represented.

"I would submit to Your Honor that the number of stockholders in this particular case is not a significant factor. The question is one of adequate representation. And as I pointed out before, Your Honor, we have a board of directors with nine independent directors. At least for this time being, Your Honor, the adequate representation of stockholders is vested in the board of directors. The board of directors is aware of their fiduciary responsibilities. They are acting, they are active, they are meeting with Mr. Marsal. And until something in that respect changes, I would submit to Your Honor that there is adequate representation."

Furthermore, Judge Peck when denying the Appointment of an Equity Committee stated:

"But I'm doing so without prejudice to such a motion being presented at some time in the future should the facts warrant the appointment of such a committee. Such a motion, in order to be successful, in my view, would need to demonstrate some credible reason to believe that there is an opportunity for equity security holders to recover something of value in this case and a showing that the debtor and other parties who are involved in the case are not providing adequate representation for that constituency."

I would have to stay that the issue of representation is far from being adequate.

Thank you very much
Troy Uhlman
SHAREHOLDER

[Quoted text hidden]



Troy Uhlman <thirtysomethinginvesting@gmail.com>

---

# Lehman Hotline Inquiry

---

**thirtysomethinginvesting@gmail.com <thirtysomethinginvesting@gmail.com>**                    Fri, May 28, 2010 at
1:10 PM

To: "Bekeny, Erika" <Erika.Bekeny@weil.com>
Cc: Lehman Team <lehmanteam@weil.com>, "Velez-Rivera, Andy (USTP)" <Andy.Velez-Rivera@usdoj.gov>

Erika, thank you for your reply.

I will have to respectfully and vigorously disagree with your assertion that calling a shareholder meeting "would have no benefit to the Debtors' estates and the Chapter 11 Plan process." To the contrary, a shareholder meeting should be considered integral to the process. Regardless of the fact that the current (unapproved) Chapter 11 Plan and Disclosure Statement indicate no recovery for Equity Interests, we are still part of the estate and accordingly should be afforded the same access to information and protection as the largest creditors. Your statement seems to indicate a play-for-pay system for distribution of information skewed towards the biggest creditors. Furthermore, the term 'estate' has become synonymous with 'big creditor' and has never involved the interest of the Equity Holders as Mr. Miller indicated to the court on 16 October 2008.

Shareholders of LBHI are still part of the estate and stand to lose the most out of this bankruptcy. It is really brazen of you to insinuate that a shareholder meeting would be a waste of estate resources and funds. In the 592 days since Lehman Brothers Holdings Inc., filed for bankruptcy (through end of April) professional fees have totaled a mind blowing $794,084,000. At this rate the total bill for professional fees is likely to exceed one billion dollars by September 2010. These numbers are quite shocking considering this is the largest bankruptcy ever and yet shareholders still have no voice. It seems a bit disheartening to know that everyone has representation but the owners of this once venerable 158-year old institution.

In addition to being the right thing to do, calling a shareholder meeting is required. At least two of the Equity Interests in LBHI have clauses that allow for additional appointments to the Board of Directors upon missing the required dividend.

"Whenever dividends payable on the shares of Preferred Stock have not been paid for six or more dividend periods, whether or not consecutive, the authorized number of our directors will automatically be increased by two. The holders of the Preferred Stock will have the right, with holders of any other equally ranked series of preferred stock that have similar voting rights and on which dividends likewise have not been paid, voting together as a class, to elect two directors to fill such newly created directorships at our next annual meeting of stockholders and at each of our subsequent annual meetings until full dividends have been paid on the Preferred Stock for at least four consecutive dividend periods. At that point the right to elect directors terminates, and the terms of office of the two directors so elected will terminate immediately. "

7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series P
http://www.sec.gov/Archives/edgar/data/806085/000104746908004053/a2184062z424b2.htm

8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series Q
http://www.sec.gov/Archives/edgar/data/806085/000104746908007310/a2186178z424b2.htm

How are shareholders to exercise their rights without an active board of directors or shareholder meeting?

Recently Judge Walrath of the WAMU bankruptcy stated that "the automatic halt to litigation that applies to companies in bankruptcy cannot bar shareholders from exercising their corporate governance rights."

Furthermore, rejecting the company's arguments, Walrath said it is "well-settled law" that shareholders can hold meetings to elect new directors despite a company being in bankruptcy.