**HUGHES HUBBARD & REED LLP**
William R. Maguire
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

*Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.*

**JONES DAY**
Robert W. Gaffey
222 East 41st Street
New York, New York 10017
(212) 326-3939 (telephone)
(212) 755-7306 (facsimile)
rwgaffey@jonesday.com

*Attorneys for Debtors
and Debtors in Possession*

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
James C. Tecce
51 Madison Ave
22nd Floor
New York, New York 10010
(212) 849-7000 (telephone)
(212) 849-7100 (facsimile)
jamestecce@quinnemanuel.com

*Attorneys for Official Committee of Unsecured
Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: <br><br> LEHMAN BROTHERS HOLDINGS INC., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Case No. 08-13555 <br><br> (Jointly Administered) |
| In re: <br><br> LEHMAN BROTHERS INC., <br><br> Debtor. | Case No. 08-01420 (JMP) SIPA |

**MEMORANDUM OF MOVANTS IN OPPOSITION TO THE MOTION IN LIMINE OF
BARCLAYS CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT
TESTIMONY OF DANIEL MCISAAC RELATING TO EXCHANGE TRADED
DERIVATIVES ("ETDS") AND ETD MARGIN**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers, Inc. ("LBI"), Lehman Brothers Holdings Inc. ("LBHI"), and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. and its affiliated debtors and debtors-in-possession (the "Committee," and collectively, the "Movants"), respectfully submit this memorandum in opposition to the motion in limine of Barclays Capital Inc. ("Barclays") (LBHI Docket No. 8481, LBI Docket No. 3155) to exclude the expert testimony of Daniel McIsaac relating to exchange traded derivatives and associated margin assets.

## INTRODUCTION

1.  Mr. McIsaac's testimony concerns the approximately $4 billion in LBI's proprietary cash and cash equivalents that LBI had posted at various exchanges, clearing houses and foreign brokers as of September 2008. These margin assets were posted to support the trading of exchange traded derivatives – options and futures contracts – that LBI held on its own behalf and, as part of its clearing business, on behalf of its customers.

2.  The Trustee maintains that these margin asserts were not part of the business deal reached between Lehman and Barclays during the week of September 15, 2008. None of the key negotiators from Lehman or Barclays recalls any discussions or negotiations surrounding the margin assets,[1] and Lehman's primary negotiator and President, Bart McDade,

---

1. *See*, *e.g.*, 4/30/2010 Hr'g Tr. [Jonathan Hughes] at 224:11-225:24; 4/27/2010 Hr'g Tr. [Steven Berkenfeld] at 202:22-25; 4/28/2010 Hr'g Tr. [Harvey Miller] at 91:25-92:12.

2

testified that he did not put the margin assets into the deal.  (4/26/2010 Hr'g Tr. [Bart McDade] at 234:20-25; 4/27/2010 Hr'g Tr. [Bart McDade] at 47:3-17.)

3.     The Asset Purchase Agreement executed on September 16, 2008 ("APA") is consistent with this testimony.  The APA does not list the approximately $4 billion in margin assets as "Purchased Assets," and makes clear, in two separate provisions, that the margin assets are in fact, "Excluded Assets."  The APA excludes "assets primarily related to the IMD Business and derivatives contracts," i.e., the margin assets.  It also excludes cash and cash equivalents, other than the "Retained Cash."  (Oxford Decl. Ex. A (APA) § 1.1, subsections (b) & (n) of the definition of "Excluded Assets" at 2, 4.)[2]

4.     At the Sale Hearing on September 19, 2008, the Court was informed that there had been changes to the deal since the signing of the APA.  There was no mention of the margin assets; certainly, no one told the Court or the Trustee that approximately $4 billion in margin assets, consisting primarily of cash and cash equivalents, were now being added to the deal.  Indeed, the Court was assured that there was no cash going to Barclays.

5.     In support of its claim to the margin assets, Barclays offers the expert testimony of Mr. Anthony Leitner, who states that, in the circumstances of the Lehman-Barclays deal, "no rational purchaser would have agreed to acquire the ETDs, or to assume the financial responsibility of a clearing broker with respect to such ETDs, without also receiving LBI's rights with respect to the entirety of the posted collateral." (Expert Report of Anthony Leitner, dated Jan. 8, 2010 ("Leitner Report") ¶¶ 19, 94.)  In response to Mr. Leitner, the Trustee offers Mr.

---

2.  "Oxford Decl." refers to the Declaration of Neil J. Oxford in Support of the Memorandum of Movants in Opposition to the Motion in Limine of Barclays Capital Inc. for an Order Excluding the Expert Testimony of Daniel McIsaac Relating to Exchange Traded Derivatives ("ETDs") and ETD Margin, dated July 16, 2010.

3

McIsaac, who has 20 years of experience working for broker-dealers and has substantial first-hand deal-experience in the purchase and sale of exchange traded derivatives businesses.

6. Mr. Leitner claims that Barclays needed all of LBI's margin to off-set the risk associated with its acquisition of the exchange traded derivatives, but does not analyse this risk in any detail. In contrast, Mr. McIsaac undertakes a systematic risk analysis to determine the exact nature and extent of this alleged risk, and concludes that Barclays assumed very little risk. Moreover, Mr. McIsaac points out that to the extent Barclays was assuming any risk, Barclays could have negotiated for downside protection. (*See generally* Expert Report of Daniel McIsaac, dated Mar. 14, 2010, on exchange traded derivatives and associated margin assets ("McIsaac Report") ¶ 10 (summarizing opinions), ¶¶ 40-68 (discussing opinions in detail).)

7. Barclays is unable to challenge Mr. McIsaac's risk analysis and assessment, so resorts to attacking a few isolated statements from Mr. McIsaac's expert report and deposition testimony (together, the "testimony"). These attacks are legally insufficient to justify the exclusion of Mr. McIsaac's opinions because they do not challenge Mr. McIsaac's "principles and methodology," and only express Barclays' disagreement with Mr. McIsaac's conclusions. That Barclays is unhappy with what Mr. McIsaac says is not, of course, a basis to exclude Mr. McIsaac's testimony. His opinions are well-grounded in fact, and, contrary to Barclays' assertions, Mr. McIsaac neither overlooks nor misinterprets "indisputable facts." Accordingly, the Movants respectfully request that the Court deny Barclays' motion to exclude Mr. McIsaac's testimony.

# ARGUMENT

## I. Mr. McIsaac's Testimony is Permissible Because It Relies on Sound Principles and Methodology

8. In his expert report, Mr. McIsaac conducts a systematic and granular analysis of the risk that Barclays assumed in acquiring LBI's exchange traded derivatives and derivatives clearing business. Mr. McIsaac begins by treating options contracts and futures contracts separately, since each poses different potential risks. Within each of these categories, he then distinguishes between, and separately assesses the risks associated with, (i) derivatives positions LBI held for PIM customers whose accounts transferred to Barclays, (ii) derivatives positions LBI held for its affiliates and non-PIM customers whose accounts did not transfer to Barclays, and (iii) LBI's proprietary derivatives positions. (McIsaac Report ¶¶ 47-68.) Mr. McIsaac's systematic methodology allows him to take account of differences in the risk profiles of these various types of exchange traded derivatives and reach the conclusion that Barclays assumed very little risk. Barclays does not challenge Mr. McIsaac's risk assessment and fails to offer a sufficient basis for excluding Mr. McIsaac's testimony on this issue.

9. In considering whether expert testimony is admissible, the proper focus is on the "principles and methodology" employed by the expert. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95 (1993). Expert testimony may be excluded if it is "speculative or conjectural-or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 493 (S.D.N.Y. 2009) (citation omitted). Attacks on an expert's alleged failure to review all facts and circumstances, and on the conclusions derived from the facts, go to the weight of the expert's opinion and not to its admissibility. *See*, *e.g.*, *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009)

5

(allegations that the expert may not have inspected all circumstances went to the probative value of the opinion and did not mandate exclusion); *Daubert*, 509 U.S. at 595 ("The focus [of a Rule 702 inquiry], must be solely on principles and methodology, not on the conclusions that they generate."); *Feldman v. Van Gorp.*, No. 03 Civ. 8135(WHP), 2008 WL 5429871, at *3 (S.D.N.Y. Dec. 19, 2008) (allegations that the expert "failed to review all the [relevant data and] gave improper weight to some evidence," went to the weight of the expert's opinion and not its admissibility) (citing *Daubert*, 509 U.S. at 596). Such attacks are properly the subject of cross-examination, not exclusion. *See Daubert*, 509 U.S. at 596; *Feldman*, 2008 WL 5429871, at *2.

10. Ignoring these standards, the bulk of Barclays' motion attacks the factual adequacy of Mr. McIsaac's opinions and his conclusions, rather than the principles and methodology he employs. Barclays contends that Mr. McIsaac failed to consider all the facts and circumstances of the Sale Transaction (*see* Barclays' Br. Section A, pp. 3-8), and improperly interpreted other facts (*see id*. Section B, pp. 9-10). Neither of these contentions can support the exclusion of Mr. McIsaac's opinions. (*See supra* ¶¶ 8-9.)[3]

## II.    Mr. McIsaac's Opinions are Properly Based on and Consistent with the Record Evidence

### A.    Mr. McIsaac Considered the Facts and Circumstances of the Sale Transaction in Rendering His Opinions

11. As noted above, Barclays' attacks on the alleged factual inadequacy of Mr. McIsaac's testimony go to the weight of Mr. McIsaac's opinions, not their admissibility.

---

3. Barclays cites only a single case, *Li. v. Aponte*, No. 05 Civ. 6237(NRB), 2009 WL 1285928 (S.D.N.Y. May 5, 2009), in support of its argument that ignorance of the facts may be disqualifying. However, this case involved an egregious situation, which has no relevance here. In contrast to the chiropracter in *Aponte*, who did not review any of plaintiff's past medical records and had not seen plaintiff in seventeen months, Mr. McIsaac conducted a thorough and extensive review of the facts relevant to his opinion, including numerous documents

(Footnote continued on next page)

Nevertheless, a review of Mr. McIsaac's report and deposition testimony demonstrates that he fully considered the facts and circumstances of the Sale Transaction in rendering his opinions.

12. Contrary to Barclays' assertions (Barclays' Br. ¶ 6), Mr. McIsaac fully considered the timing of the Sale Transaction and the market conditions in September 2008, frankly acknowledging at his deposition that both factors were special circumstances in which the transaction occurred. (Oxford Decl. Ex. B (McIsaac Tr.) at 92:4-22.) That Mr. McIsaac considered additional facts, which Barclays finds inconvenient and ignores, and so reaches a different conclusion than the one Barclays advocates, does not imply that Mr. McIsaac ignored these circumstances. For example, in concluding that despite the time and market constraints, Barclays could have, and in many cases did, conduct adequate due diligence to assess the risk it was undertaking in assuming LBI's exchange traded derivatives and clearing business (McIsaac Report ¶¶ 27-39), Mr. McIsaac considered, among other things, the following evidence:

- a Barclays' memorandum dated September 15, 2008 concluding that the credit risk of assuming LBI's futures clearing business would not be significant, whereas the benefit would be the generation of approximately $250 million in additional annual revenue for Barclays (*id.* ¶ 59 (citing Dep. Ex. 556));[4]

- the testimony of Barclays' counsel that as early as September 16, 2008 Barclays was in direct contact with futures exchanges and clearing organizations, and obtained information including reports on LBI positions (*id.* ¶ 34 (citing BCI-EX-(S)-00231517-2046; Raisler Tr. at 18:5-19, 20:8-21:8, 24:4-26:12, 30:6-13, 42:13-23, 44:2-12));[5] and

---

(Footnote continued from previous page)

and extensive deposition testimony. (*See infra* Section II.A-B.)

4. Oxford Decl. Ex. C (Dep. Ex. 556).

5. Oxford Decl. Ex. D (BCI-EX-(S)-00231517-2046), Ex. E (Raisler Tr.).

7

- the representation of Barclays' attorneys to the CFTC on September 19, 2008 that, "'LBI has sufficient segregated and secured amount funds, as well as sufficient regulatory capital, pursuant to the provisions of the Commodity Exchange Act and the Commission's Regulations thereunder'" (*id*. ¶ 39 (citing Dep. Ex. 659A)).[6]

13. Barclays' remaining criticisms (Barclays' Br. ¶ 7) also mischaracterize Mr. McIsaac's positions and take isolated statements out of context.

- In arguing that Mr. McIsaac assumed that LBI could have decided to sell to another entity (*id*. at 4), Barclays seeks to prove too much. At his deposition, Barclays' counsel asked Mr. McIsaac a broad hypothetical question, i.e.,: "[c]ould they [LBI] have decided to sell to a different entity," to which Mr. McIsaac responded: "I'm sure they could have." (Oxford Decl. Ex. B (McIsaac Tr.) at 99:2-4.) He then elaborated that had LBI been marketing the firm, it "might have been able to find other buyers." (*Id*. at 101:10-13.) That Barclays disagrees with Mr. McIsaac's answers is of no consequence. Among other things, these are responses to a hypothetical line of questioning by Barclays' counsel, and not the basis of any of Mr. McIsaac's opinions.

- In similar fashion, Barclays also takes issue with Mr. McIsaac's comment that the Fed "could have continued to provide liquidity while [LBI looked] for another purchaser." (Barclays' Br. at 5.) Again, however, Mr. McIsaac does not base any of his opinions on that statement. As in the example above, he was simply responding to the hypothetical questions from Barclays' counsel at his deposition. (*See* Oxford Decl. Ex. B (McIsaac Tr.) at 99:2-102:8.)

- In alleging that Mr. McIsaac did not have any idea of the timing of the Sale Transaction (Barclays' Br. at 5), Barclays is simply wrong. At his deposition, Mr. McIsaac testified that he was aware that the Lehman-Barclays transaction was done "fairly quickly," and he candidly acknowledged the "quickness of the negotiations." (Oxford Decl. Ex. B (McIsaac Tr.) at 92:4-13, 93:6-22.)

- Ironically, Barclays criticizes Mr. McIsaac for assuming that the parties could have postponed the closing (Barclays' Br. at 6), even though its own expert testified that the sale could have closed as late as September 24, 2008. (*See* Oxford Decl. Ex. G (Saunders Tr.) at 19:21-20:10.) This is clearly not a basis for excluding Mr. McIsaac's testimony.

---

6. Oxford Decl. Ex. F (Dep. Ex. 659A).

8

- Barclays is again wrong when it alleges that Mr. McIsaac ignored the OCC's threat to liquidate LBI's accounts and the loss LBI allegedly incurred when the CME closed out LBI's positions. (Barclays' Br. at 6-7.) Mr. McIsaac did not ignore these facts (*see, e.g.*, Oxford Decl. Ex. B (McIsaac Tr.) at 74:8-12, 76:4-9, 76:22-77:5), but instead explained that because there was a chance that some margin may be left over after a liquidation by the OCC, it would be more rational for LBI to have the OCC liquidate its positions rather than transfer the margin to Barclays for free. (*Id.* at 74:8-82:11.) Mr. McIsaac's position is supported by Barclays' own expert, who conceded that LBI margin may have been left over after the OCC closed all positions. (*See* Oxford Decl. Ex. H (Leitner Tr.) at 238:12-239:2.)[7]

- Finally, in stating that, "I don't believe there was a recession on September 19, but I don't know," Mr. McIsaac did not purport to offer an expert opinion on whether or not the country was in an economic recession. (Oxford Decl. Ex. B (McIsaac Tr.) at 136:25-137:2; *see* Barclays' Br. at 7-8.) More importantly, Mr. McIsaac explained that whether or not there was a recession did not change his opinion about the creditworthiness of LBI's derivatives customers. He explained that a recession did not necessarily imply that these customers posed greater credit risk because credit risk is determined by the nature of the customers and the way they have bet in the market. (Oxford Decl. Ex. B (McIsaac Tr.) at 136:12-137:12.)

### B. Barclays' Disagreement with Mr. McIsaac On Disputed Matters is Not Grounds to Exclude Mr. McIsaac's Testimony

14. Barclays next argues that Mr. McIsaac's opinions contradict "indisputable facts." (Barclays' Br. at 9-10.) The "indisputable facts" that Barclays cites, however, are a combination of facts which Mr. McIsaac actually agrees with and does not contradict, facts that are in dispute, or not facts at all, but merely matters of Barclays' opinion or speculation. Each of these "indisputable facts" is addressed in turn below.

- Mr. McIsaac's testimony does not contradict the alleged fact that "there were no alternative buyers for the Business." (Barclays' Br. ¶ 10(a).) As described

---

7. Mr. Leitner also failed to cite a single instance of an exchange exhausting a member's margin in closing out that member's account. (*See* Oxford Decl. Ex. H (Leitner Tr.) at 232:13-233:4.) Indeed, Mr. Leitner agrees with Mr. McIsaac that the OCC's margining rules are designed to protect against such losses. (*See* McIsaac Report ¶ 33; Leitner Report ¶ 46.)

9

above, Mr. McIsaac's testimony was only that, had Lehman marketed the firm, it might have been able to find other buyers. He did not claim that there were, in fact, other buyers at the time of the sale. (*See supra* ¶ 13.)

- Similarly, Mr. McIsaac does not deny that the sale was done "fairly quickly." (*See* Barclays' Br. ¶ 10(b).) He candidly acknowledges that this was indeed the case. (*See supra* ¶ 13.)

- Barclays also claims that "the Sale had to close immediately," (Barclays' Br. ¶ 10(c)), even though, as discussed above, Barclays' own expert disputes this supposedly "indisputable fact." (*See supra* ¶ 13 (citing Professor Saunders' testimony that the sale could have closed after September 22, 2008).)

- Barclays next claims that it had no reliable information relating to the exchange traded derivatives and associated margin prior to the Closing. (Barclays' Br. ¶ 10(d).) This is plainly incorrect. Barclays had substantial information about LBI's derivatives prior to the closing (*see*, *e.g.*, McIsaac Report ¶¶ 28, 31-32),[8] and must have determined that it was reliable because on September 19, 2008, Barclays' counsel represented to the CFTC that, "LBI has sufficient segregated and secured amount funds," with respect to futures trading. (Oxford Decl. Ex. F (Dep. Ex. 659A).)

- Barclays further asserts that "the LBI estate faced virtually certain losses on its ETD positions and margin if they were not immediately transferred to Barclays," (Barclays' Br. ¶ 10(e)), but its own expert concedes that margin may have been left over for the estate had the OCC closed LBI's derivatives positions instead of LBI transferring them to Barclays. (*See supra* ¶ 13.)

- Finally, in ordering this evidentiary hearing to go forward, the Court has already rejected the idea that Barclays' reading of the APA is an "indisputable fact." The Movants certainly do dispute Barclays' assertion that the APA authorizes the transfer of the margin assets to Barclays (*see* Barclays' Br. ¶

---

8. The McIsaac Report cites to, among others, the following documents that contradict Barclays' assertion that it had no reliable information about exchange traded derivatives and associated margin prior to the Closing of the Sale Transaction: Dep. Ex. 556 (email from Alasdair Hodge to Carole Machell et al., Sept. 16, 2008 attaching memo that concludes that the purchase of Lehman's futures clearing business would be beneficial for Barclays); Dep. Ex. 554 (email from Christopher Mincak to Stephen King, Sept. 19, 2008 attaching LBI options position report); Dep. Ex. 657 (email from Christopher Mincak to Jasen Yang, Sept. 19, 2008 attaching an additional LBI options position report); Dep. Ex. 627 (email from the OCC to Barclays' counsel, Sept. 21, 2008 showing that LBI was to receive over $350 million in net collects from the OCC as of Sept. 19, 2008); and Dep. Ex. 555 (email from Francis Pearn to Tim Stack, Sept. 21, 2008 showing that LBI had $689 million in excess margin at the OCC). (Oxford Decl. Ex. C (Dep. Ex. 556), Exs. I-L (Dep. Exs. 554, 657, 627, 555).)

10

11), especially since, as explained above, the APA specifically excludes these assets from the deal. (*See supra* ¶ 3.)

15. Barclays relies on cases (Barclays' Br. ¶ 9) excluding experts whose opinions relied heavily on false assumptions that were directly contradicted by the factual record. *See Davidov v. Louisville Ladder Group, LLC*, No. 02 Civ. 6652(LLS), 2005 WL 486734 (S.D.N.Y. Mar. 1, 2005) (plaintiff's expert's assumption of how the accident occurred was directly contradicted by plaintiff's own description of the accident); *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001 (NRB), 2004 U.S. Dist. LEXIS 2676 (S.D.N.Y. Feb. 20, 2004) (expert's assumption that plaintiff was a full market participant was directly contradicted by undisputed facts showing that plaintiff had lost a key reproduction license and had failed to participate in a significant trade show during the disputed period). That is not even close to the case here. When Mr. McIsaac's opinions are considered in the context of the entire record, it is clear that they are well grounded in fact.[9]

### C. Mr. McIsaac's Testimony is Consistent with His Expert Report

16. Mr. McIsaac opines that because the risks in assuming LBI's exchange traded derivatives and clearing business were minimal, he would not expect a rational seller to give away billions of dollars in margin to a buyer without any negotiation and for *no* additional consideration. (*See* McIsaac Report ¶¶ 10, 17-18, 40-68.) Ignoring Mr. McIsaac's central opinion, Barclays' motion focuses instead on a single phrase – "dollar for dollar compensation"

---

9. The remaining case that Barclays cites, *GE v. Joiner*, 522 U.S. 136 (1997), does not apply to the issue here. *Joiner* deals with the insufficiency of the scientific studies underlying an expert's opinion, and not with a contradiction between the expert's opinion and the fact record before the court.

11

− from Mr. McIsaac's report, insisting incorrectly that Mr. McIsaac contradicted it at his deposition. (Barclays' Br. ¶¶ 12-13.) He did not.

17. In his report, Mr. McIsaac opined that *any* rational buyer and *any* rational seller would each try to obtain maximum benefit in a deal, therefore, "[w]hile a purchaser might like to obtain the margin that LBI posted at the OCC … a rational seller would not include that margin in the deal, unless it was being compensated dollar for dollar." (McIsaac Report ¶ 50; *see also id*. ¶ 55.) Consistent with this, he testified at his deposition that the starting expectation of a rational seller would be dollar for dollar compensation for any margin included in a deal, and that this compensation may be negotiated up or down based on the specific circumstances. (Oxford Decl. Ex. B (McIsaac Tr.) at 197:9-198:9.) Mr. McIsaac did not claim − either in his report or at his deposition − to know what precise compensation the Trustee and Barclays might have ultimately negotiated had the margin assets been included in the deal.

### III. Mr. McIsaac is Qualified to Opine on Exchange Traded Derivatives and Margin

18. Mr. McIsaac is qualified to render an expert opinion on exchange traded derivatives and associated margin. Rule 702 of the Federal Rules of Evidence requires that a witness be qualified as an expert by the witness' "knowledge, skill, experience, training, or education," (Fed. R. Evid. 702), and it is well-settled that practical experience is sufficient to qualify a witness as an expert. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (citing Fed. R. Evid. 702); *Point Prods. A.G.*, 2004 U.S. Dist. LEXIS 2672, at *13-20.

#### A. Mr. McIsaac Has Relevant Deal-Experience

19. During his tenure at UBS, Mr. McIsaac was directly involved in at least three acquisitions of exchange traded derivatives businesses.

12

(a) Around 2005/2006, Mr. McIsaac was involved in the UBS acquisition of ABN-AMRO's futures and options business. (Oxford Decl. Ex. B (McIsaac Tr.) at 12:4-5.)

(b) Around 2004/2005, Mr. McIsaac participated in the UBS acquisition of Charles Schwab's market-making business, which included options. (*Id*. at 13:20-14:3, 15:17-19.)

(c) Around 2003/2004, Mr. McIsaac was involved in the UBS acquisition of ABN AMRO's prime broker business that included customer options. (*Id*. at 13:9-16; 15:20-23.)

20. Contrary to Barclays' claim that Mr. McIsaac's deal-experience is irrelevant to this case (Barclays' Br. ¶ 15), Mr. McIsaac's experience relates to both key aspects of his expert report – due-diligence and risk assessment of derivatives businesses. This is particularly exemplified by the UBS acquisition of ABN-AMRO's futures and options business (*see supra* ¶ 19(a)), in which Mr. McIsaac "worked on the due diligence [and] on the preparation of [the] bid [for UBS]," which necessarily includes risk assessment. (Oxford Decl. Ex. B (McIsaac Tr.) at 12:17-25.)

### B. Mr. McIsaac's Job Responsibilities Gave Him First-Hand Understanding of Margin Requirements and Risk Management

21. With more than twenty years of experience working for UBS Securities LLC, Dean Witter Reynolds, and Drexel Burnham Lambert, Mr. McIsaac has first-hand knowledge of the operations of a regulated broker-dealer. (McIsaac Report ¶ 6; *see also id*. Ex. B (Curriculum Vitae of Daniel McIsaac).) As a result of his job responsibilities, Mr. McIsaac obtained first-hand knowledge of margin requirements, the operation of clearing agencies, and broker-dealers' risk management systems – all key and relevant issues here:

- Mr. McIsaac is intimately familiar with margining requirements and handling of customer funds. He was responsible for the preparation of CFTC-mandated segregated and secured calculations for approximately twenty years. (Oxford Decl. Ex. B (McIsaac Tr.) at 8:20-9:6.)

13

- Mr. McIsaac testified that as part of his financial responsibilities in running the regulatory group at UBS for fifteen years, he had to understand "the rules and regulations of the OCC," "what the margin requirements were [and] how they impacted the firm in general," and that he "worked closely with [UBS] people in the areas regarding margin requirements at the OCC." (*Id*. at 9:7-18, 20:21-21:5, 26:9-24.)

- As part of his duties in supervising regulatory reporting at UBS, Mr. McIsaac also had to understand proprietary options and futures trading strategies. (*Id*. at 20:21-22:19 ("We need[ed] to know what the desk was doing so that we could allocate it properly for capital purposes and for haircut purposes as well as to make sure we were producing it properly on our financial statements.").)

- Similarly, as a result of his regulatory functions, Mr. McIsaac was familiar with the risk assessment systems of a broker-dealer. Therefore, he could testify that LBI would have had to have a risk assessment system to assess risk after hedges were placed because "they [Lehman] were a CSE firm so they certainly had value at risk [systems] and they did -- they did analysis of what their gains and losses were." (*Id*. at 160:18-161:24.)

These experiences demonstrate that Mr. McIsaac is qualified to opine on what due diligence Barclays needed to, did, or could have conducted to assess its risks with respect to LBI's exchange traded derivatives and clearing business, and to assess the alleged risks Barclays was undertaking in assuming this business.[10]

---

10. Barclays takes Mr. McIsaac's statement that, "I'm not an expert on risk trading, on risk management," out of context to allege that Mr. McIsaac "disclaim[ed] expertise or proficiency in evaluating risk management or the risk associated with particular types of ETDs." (Barclays' Br. ¶ 15.) Barclays completely ignores Mr. McIsaac's immediately subsequent testimony that explained that he was not a risk-assessment "quant" *because*, "in our firms we would have separate people that were responsible for risk management processes and procedures." (Oxford Decl. Ex. B (McIsaac Tr.) at 24:4-12; *see also id*. 96:22-97:10.)

**CONCLUSION**

For the foregoing reasons, Movants respectfully request that the Court enter an Order denying Barclays' motion to exclude the expert report and deposition testimony of Mr. McIsaac with respect to LBI's exchange traded derivatives and associated margin.

Dated: New York, New York
July 16, 2010

| /s/ Neil J. Oxford | /s/ Robert W. Gaffey |
|---|---|
| HUGHES HUBBARD & REED LLP | JONES DAY |
| William R. Maguire | Robert W. Gaffey |
| Seth D. Rothman | Jayant W. Tambe |
| Neil J. Oxford | William J. Hine |
| One Battery Park Plaza | Todd R. Geremia |
| New York, New York 10004 | 222 East 41st Street |
| (212) 837-6000 (telephone) | New York, New York 10017 |
| (212) 422-4726 (facsimile) | (212) 326-3939 (telephone) |
| maguire@hugheshubbard.com | (212) 755-7306 (facsimile) |
| | rwgaffey@jonesday.com |

John F. Wood (*pro hac vice*)
1775 I Street, N.W., Suite 600
Washington, D.C. 20006

*Attorneys for James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

*Attorneys for Debtors and Debtors in Possession*

/s/ James C. Tecce
QUINN EMANUEL URQUHART & SULLIVAN, LLP
Susheel Kirpalani
James C. Tecce
51 Madison Ave 22nd Floor
New York, New York 10010
212 849-7000 (telephone)
212 849-7100 (facsimile)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

*Attorneys for Official Committee of Unsecured Creditors*