**EXHIBITS A-E OF DECLARATION OF NEIL J. OXFORD
IN SUPPORT OF THE MEMORANDUM OF
MOVANTS IN OPPOSITION TO THE MOTION IN LIMINE OF BARCLAYS
CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF
DANIEL MCISAAC RELATING TO EXCHANGE TRADED
DERIVATIVES ("ETDs") AND ETD MARGIN**

# EXHIBIT A

**EXECUTION COPY**

ASSET PURCHASE AGREEMENT

AMONG

LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS INC.

LB 745 LLC

AND

BARCLAYS CAPITAL INC.

———————————

Dated as of September 16, 2008



EXHIBIT

7 31 09 MS

MOVANTS' TRIAL
EXHIBIT

1

# TABLE OF CONTENTS

**Page**

Article I        DEFINITIONS ................................................................. 1
    1.1      Certain Definitions ............................................................ 1
    1.2      Other Definitional and Interpretive Matters ........................... 10
Article II       PURCHASE AND SALE OF ASSETS; ASSUMPTION OF
         LIABILITIES ................................................................ 11
    2.1      Purchase and Sale of Assets ............................................... 11
    2.2      Excluded Assets ............................................................... 11
    2.3      Assumption of Liabilities ................................................... 11
    2.4      Excluded Liabilities ......................................................... 12
    2.5      Cure Amounts ................................................................. 13
    2.6      Further Conveyances and Assumptions .................................. 13
    2.7      Bulk Sales Laws .............................................................. 14
Article III       CONSIDERATION .......................................................... 14
    3.1      Consideration .................................................................. 14
    3.2      Payment of Cash Amount ................................................... 14
    3.3      Adjustment to Cash Amount ............................................... 14
Article IV       CLOSING AND TERMINATION ......................................... 15
    4.1      Closing Date ................................................................... 15
    4.2      Deliveries by Seller .......................................................... 15
    4.3      Deliveries by Purchaser ..................................................... 15
    4.4      Termination of Agreement .................................................. 16
    4.5      Procedure Upon Termination .............................................. 16
    4.6      Effect of Termination ........................................................ 16
Article V        REPRESENTATIONS AND WARRANTIES OF SELLER ......... 17
    5.1      Organization and Good Standing .......................................... 17
    5.2      Authorization of Agreement ................................................ 18
    5.3      Conflicts; Consents of Third Parties ...................................... 18
    5.4      Title to Purchased Assets ................................................... 19
    5.5      Compliance with Laws; Permits ........................................... 19
    5.6      No Other Representations or Warranties; Schedules ................... 20

i

# TABLE OF CONTENTS
## (continued)

Page

Article VI      REPRESENTATIONS AND WARRANTIES OF PURCHASER .........20

6.1      Organization and Good Standing ............................................................20

6.2      Authorization of Agreement .................................................................20

6.3      Conflicts; Consents of Third Parties ....................................................21

6.4      Financial Capability ...............................................................................21

6.5      Condition of the Business ......................................................................21

Article VII      BANKRUPTCY COURT MATTERS .......................................................22

7.1      [Reserved] ...............................................................................................22

7.2      Bankruptcy Court Filings ......................................................................22

Article VIII      COVENANTS .........................................................................................22

8.1      Access to Information .............................................................................23

8.2      Conduct of the Business Pending the Closing .......................................23

8.3      Consents .................................................................................................25

8.4      Regulatory Approvals. ...........................................................................26

8.5      Further Assurances.................................................................................27

8.6      Confidentiality .......................................................................................27

8.7      Preservation of Records ........................................................................28

8.8      Publicity .................................................................................................28

8.9      Trademark License .................................................................................28

8.10      Use of Purchased Intellectual Property..................................................29

8.11      Deferred Transfers .................................................................................30

8.12      Release of Guarantees............................................................................32

8.13      Transition Services .................................................................................32

8.14      Subleases................................................................................................32

8.15      Landlord Notice .....................................................................................33

8.16      Artwork..................................................................................................33

Article IX      EMPLOYEES AND EMPLOYEE BENEFITS ........................................33

9.1      Employee Benefits .................................................................................33

Article X      CONDITIONS TO CLOSING ................................................................35

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | |
|---|---|---|---|
| | 10.1 | Conditions Precedent to Obligations of Purchaser | 35 |
| | 10.2 | Conditions Precedent to Obligations of Seller | 36 |
| | 10.3 | Conditions Precedent to Obligations of Purchaser and Seller | 36 |
| | 10.4 | Frustration of Closing Conditions | 37 |
| Article XI | | [RESERVED] | 37 |
| Article XII | | TAXES | 37 |
| | 12.1 | Transfer Taxes | 37 |
| | 12.2 | Prorations | 37 |
| | 12.3 | Purchase Price Allocation | 37 |
| | 12.4 | Adjustment to Purchase Price | 37 |
| Article XIII | | MISCELLANEOUS | 38 |
| | 13.1 | Expenses | 38 |
| | 13.2 | Injunctive Relief | 38 |
| | 13.3 | Submission to Jurisdiction; Consent to Service of Process | 38 |
| | 13.4 | Waiver of Right to Trial by Jury | 39 |
| | 13.5 | Entire Agreement; Amendments and Waivers | 39 |
| | 13.6 | Governing Law | 39 |
| | 13.7 | Notices | 39 |
| | 13.8 | Severability | 41 |
| | 13.9 | Binding Effect; Assignment | 41 |
| | 13.10 | Non-Recourse. | 41 |
| | 13.11 | Counterparts. | 41 |
| | 13.12 | Scope of Purchased Assets | 41 |

ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of September 16, 2008 (this "Agreement"), among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("LBHI"), **LEHMAN BROTHERS INC.**, a Delaware corporation ("LBI" and, together with LBHI, the "Seller"), **LB 745 LLC**, a Delaware limited liability company ("745"), and **BARCLAYS CAPITAL INC.**, a Connecticut corporation ("Purchaser").

W I T N E S S E T H:

WHEREAS, LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. [08-13555]) (the "Bankruptcy Case");

WHEREAS, the Seller and its Subsidiaries presently conduct the Business;

WHEREAS, Seller and 745 desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller and 745, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein; and

WHEREAS, an Affiliate of Purchaser has agreed to provide to LBHI a debtor-in-possession facility (the "DIP Facility") and has agreed to provide to LBI certain other financing;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1    Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms

1

i

"controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Breakup Fee and Competing Bid Order" means an order of the Bankruptcy Court in the form attached as Exhibit A hereto.

"Business" means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease or other agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to or necessary for the conduct of the Business and the Purchased Assets in each case whether or not in electronic form.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall mean the following assets, properties, interests and rights of Seller and its Subsidiaries:

(a)    the shares of capital stock, limited liability company membership, general and limited partnership, and other equity interests, of Seller and its Subsidiaries (other than (i) the capital stock of Townsend Analytics and (ii) the capital stock or other equity interests of any other Subsidiary that Seller and Purchaser may agree prior to the entry of the Sale Order shall be a Purchased Asset);

(b)    all cash, cash equivalents, bank deposits or similar cash items of LBI and its Subsidiaries (the "Retained Cash") other than $1.3 billion in cash, cash equivalents, bank deposits or similar cash items;

2

i

(c)    all intercompany receivables;

(d)    the Excluded Contracts, including any accounts receivable to the extent arising out of any Excluded Contract;

(e)    any Intellectual Property Rights that do not constitute Purchased Intellectual Property;

(f)    any (i) confidential personnel and medical records pertaining to any Excluded Employee; (ii) other books and records that LBI is required by Law to retain, including, but not limited to, books and records required to be retained by Rules 17a-3 and 17a-4 of the Exchange Act with respect to the Purchased Assets or that LBHI reasonably determines are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (iv) minute books, stock ledgers and stock certificates of Subsidiaries..

(g)    any claim, right or interest of LBHI or any of its Subsidiaries in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(h)    all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Seller or any of its Subsidiaries other than customer account insurance supplemental to SIPC coverage included in the Business;

(i)    any rights, claims or causes of action of Seller or any of its Subsidiaries against third parties relating to assets, properties, business or operations of Seller or any of its Subsidiaries (other than those primarily related to Purchased Assets) arising out of events occurring on or prior to the Closing Date;

(j)    commercial real estate investments (including commercial loans, equity investments in such commercial real estate and other commercial real estate assets and all Archstone debt and equity positions), private equity investments and hedge fund investments;

(k)    50% of each position in residential real estate mortgage securities;

(l)    assets related to the soliciting, placing, clearing and executing of buy and sell orders for derivatives contracts by Lehman Brothers Derivative Products Inc. and all activities related or ancillary thereto;

(m)    all artwork owned by Seller and its Subsidiaries;

3

i

(n)     all assets primarily related to the IMD Business and derivatives contracts;

(o)     any assets set aside, segregated, or otherwise specifically identified as being held for the purpose of satisfying Excluded Liabilities referred to in Section 2.4(e);

(p)     all real property leases of Seller and its Subsidiaries, and all rights and obligations appurtenant thereto, as set forth on Schedule 1.1(a), other than the Transferred Real Property Leases; and

(q)     Lehman Commercial Paper, Inc. and any assets thereof.

"Excluded Contracts" means all of the Contracts of Seller and its Subsidiaries, other than the Purchased Contracts.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by Seller and its Subsidiaries in the conduct of the Business, including all desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory, judicial or administrative, body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organization, including, but not limited to, the Financial Industry Regulatory Authority.

"Hardware" means any and all computer and computer-related hardware, networks and peripherals, including, but not limited to, information and communication systems, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"IMD Business" means the investment management business of Seller and its Subsidiaries.

"Intellectual Property Rights" means, collectively, all intellectual property and other similar proprietary rights in any jurisdiction, whether owned or held for use

4

i

under license, whether registered or unregistered, including without limitation such rights in and to: (i) patents and applications therefor, including continuations, divisionals, continuations-in-part, reissues, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom and patents issuing thereon (collectively, "Patents") and inventions, invention disclosures, discoveries and improvements, whether or not patentable, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, slogans, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof and all common law rights thereto (collectively, "Marks"), (iii) copyrights and registrations and applications therefor and renewals and extensions thereof, and works of authorship, databases and mask work rights, and all moral rights (collectively, "Copyrights"), (iv) all Software, Technology, trade secrets and market and other data, and rights to limit the use or disclosure of any of the foregoing by any Person, and (v) all claims, causes of action and defenses relating to the enforcement of any of the foregoing.

"Intellectual Property Licenses" means (i) any grant to a third Person of any license, immunity, a covenant not to sue or otherwise any right to use or exploit, any of the Purchased Intellectual Property owned by Seller or any of its Subsidiaries, and (ii) any grant to Seller or its Subsidiaries of a license, immunity, a covenant not to sue or otherwise any right to use or exploit any Purchased Intellectual Property which is not owned by Seller or any of the Subsidiaries.

"Knowledge of Seller" means the knowledge after due inquiry, as of the date of this Agreement, of the senior officers and directors of Seller and its Subsidiaries.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation (including rules of any self-regulatory organization).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings or investigations by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

5

i

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through September 14, 2008 consistent with past practice.

"Permits" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of a Governmental Body.

"Permitted Exceptions" means all (i) defects, exceptions, restrictions, easements, rights of way and encumbrances of record, (ii) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; (vi) Liens arising under the DIP Facility; and (vii) the terms and provisions of the ground lease and related documents affecting the property located at 745 Seventh Avenue, New York, NY (the "745 Seventh Ground Lease").

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchased Assets" means all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets), including:

(a)     the Retained Cash;

(b)     all deposits (including customer deposits, security deposits for rent, electricity, telephone or otherwise and required capital deposits) and prepaid charges and expenses of Seller and its Subsidiaries associated with the Business, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(c)     the Transferred Real Property Leases, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(d)     government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, "Long Positions");

(e)     50% of each position in the residential real estate mortgage securities;

(f)     the Furniture and Equipment;

6

i

(g)    the Purchased Intellectual Property and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Purchased Intellectual Property (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover damages for past or future infringements or misappropriations thereof and the right to fully and entirely stand in the place of Seller in all matters related thereto;

(h)    the Purchased Contracts;

(i)    all Documents that are used in, held for use in or intended to be used in, or that arise in connection with, or are necessary to carry on or are related to the operation of the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), account agreements, books and records required to be maintained in connection with the Business under applicable Law, compliance manuals, supervisory policies and procedures, customer lists, supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, but excluding (i) personnel files for Excluded Employees of Seller or its Subsidiaries who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any Documents primarily related to any Excluded Assets;

(j)    all Permits used by Seller in the Business to the extent assignable under applicable Law;

(k)    all supplies owned by Seller and used in connection with the Business;

(l)    all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees, contractors and agents of Seller or its Subsidiaries or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(m)    rights to "Lehman" indices and analytics that support the indices and all other indices and analytics used in the Business;

(n)    general trading tools supporting the Business;

(o)    the stock of  Townsend Analytics and the stock, equity interests or assets of any other Subsidiary of LBI that the Seller and Purchaser may mutually agree on prior of the entry of the Sale Order and of which a notice has been provided to any statutory committee;

i

      (p)     the equity interests or assets (at the election of Purchaser in its sole discretion prior to the entry of the Sale Order) of Eagle Energy Management LLC;

      (q)     all past and present goodwill and other intangible assets associated with or symbolized by the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

      (r)     Mercantile Exchange license agreements with respect to 335 South LaSalle Street, Chicago, IL and 400 South LaSalle Street, Chicago, IL; and

      (s)     any insurance proceeds from the occurrence after the date hereof and prior to Closing, of any casualty or event loss with respect to any Transferred Real Property Leases or any properties subject thereto.

"Purchased Contracts" means all Contracts designated as Purchased Contracts pursuant to Section 2.5.

"Purchased Intellectual Property" means the Purchased Marks and all other Intellectual Property Rights, Software and Technology throughout the world that are used in, related to, or otherwise necessary for the Business, including all Intellectual Property Rights embodied in or arising from the Purchased Assets.

"Purchased Marks" means the Mark "LEHMAN" and "LEHMAN BROTHERS" throughout the world, all other Marks throughout the world containing or incorporating the name "LEHMAN," the Internet domain name www.lehman.com, all other Internet domain names containing or incorporating any Purchased Marks, and any other Mark throughout the world that is used in, related to, or otherwise necessary for the Business; in each case, together with all of the goodwill associated therewith and all registrations and applications for the foregoing and all common law rights thereto.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Breakup Fee and Competing Bid Order and Sale Order.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall

i

retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in <u>Section 13.3</u> hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller.

"<u>Software</u>" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing.

"<u>Subsidiary</u>" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by Seller.

"<u>Tax Authority</u>" means any state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"<u>Taxes</u>" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"<u>Tax Return</u>" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"<u>Technology</u>" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or confidential information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

9

i

"Transferred Real Property Leases" means the leases listed on Schedule 1.1(b) attached hereto and any rights and obligations appurtenant thereto.

1.2    Other Definitional and Interpretive Matters

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

10

i

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1      Purchase and Sale of Assets.  On the terms and subject to the conditions
set forth in this Agreement, at the Closing (as defined below), Purchaser shall purchase,
acquire and accept from the Seller and 745, and Seller and 745 shall sell, transfer, assign,
convey and deliver (or cause to be sold, transferred, assigned, conveyed and delivered) to
Purchaser, all of Seller's and its applicable Subsidiaries' right, title and interest in, to and
under the Purchased Assets free and clear of all Liens pursuant to Section 363(f) of the
Bankruptcy Code.

2.2      Excluded Assets.  Nothing herein contained shall be deemed to sell,
transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and
indirectly) shall retain all right, title and interest to, in and under the Excluded Assets.

2.3      Assumption of Liabilities.  On the terms and subject to the conditions set
forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the
Closing, and shall timely perform and discharge in accordance with their respective
terms, the following  Liabilities of Seller and its Subsidiaries (collectively, the "Assumed
Liabilities"):

(a)      all Liabilities of Seller incurred, after the Closing, in connection
with the Business;

(b)      all Liabilities of Seller under the Purchased Contracts arising after,
with respect to each entity comprising Seller, the date on which such entity commenced a
voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the
Bankruptcy Code;

(c)      all Liabilities assumed under Article IX;

(d)      accounts payable incurred in the Ordinary Course of Business of
Seller after, with respect to each entity comprising Seller, the date on which such entity
commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be,
of the Bankruptcy Code, associated with the Business other than any accounts payable
arising out of one in connection with any Excluded Contract (including, for the avoidance
of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts
payable);

(e)      all Transfer Taxes applicable to the transfer of the Purchased
Assets pursuant to this Agreement;

(f)      all other Liabilities to the extent related to the Business, the
Purchased Assets or the Transferred Employees arising after the Closing;

11

i

       (g)     all Liabilities under Transferred Real Property Leases from the date of Closing forward;

       (h)     all Liabilities relating to amounts required to be paid by Purchaser hereunder; and

       (i)     all short positions and "repos" relating to any securities or interests of the types included in the definition of "Long Positions" with a book value as of the date hereof of approximately $69 billion (collectively, "Short Positions" and, together with the Long Positions, "Positions").

       2.4     Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser will not assume or be liable for any Excluded Liabilities. "Excluded Liabilities" shall mean all Liabilities of Seller and its Subsidiaries to the extent they do not arise out of the Business and the following Liabilities:

       (a)     all Liabilities arising out of Excluded Assets, including Contracts that are not Purchased Contracts;

       (b)     except as otherwise provided in Article XII, all Liabilities for Taxes of Seller for any Tax periods (or portions thereof) ending on or before the Closing Date;

       (c)     except as otherwise provided in this Agreement and other than any cure amounts that Purchaser is required to pay pursuant to Section 2.5, Liabilities incurred in the Ordinary Course of Business existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Case (the "Compromised Liabilities");

       (d)     except as expressly assumed pursuant to Article IX hereof, any Liabilities relating to the employment, potential employment or termination of employment of any Person relating to or arising out of any period prior to the Closing, including without limitation any Liability under or relating to any employee benefit plan, program, agreement or arrangement, including in respect of equity compensation plans and tax-qualified or not tax-qualified pension or saving plans as to which the parties agree there shall be no transfer to or assumption of Liabilities by the Purchaser;

       (e)     all Liabilities relating to amounts required to be paid by Seller, hereunder, including upon any breach;

       (f)     all Liabilities under Excluded Real Property Leases and Transferred Real Property Leases other than Liabilities under Transferred Real Property Leases from the date of Closing forward; and

       (g)     all intercompany payables.

i

2.5     Cure Amounts. For a period of 60 days after the Closing, the Purchaser shall have the right upon notice to Seller to designate any contract related to the assets purchased from the Seller by Purchaser or its Affiliates (the "Related Contracts") as either (1) a Purchased Contract or (2) a Contract not designated as a Purchase Contract (a "Rejected Contract"). Until a Related Contract is so designated, Buyer shall be obligated to pay or cause to be paid ordinary course amounts due under such contracts in accordance with the terms thereof. If a Related Contract is designated as a Purchased Contract, such Purchased Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract. If a Related Contract is designated as a Rejected Contract, Purchaser shall have no further obligations in respect thereof. In the event of any dispute relating to such cure amount, Purchaser shall escrow such funds in a manner satisfactory to the court. This Section will not apply to real property leases.

2.6     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, Seller shall, or shall cause its Affiliates to, make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)     From time to time following the Closing, without further consideration, Seller and Purchaser shall, and shall cause their respective Affiliates to, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further conveyances, deeds, assignments, notices, assumptions, releases, acquaintances, powers of attorney and assurances (including any notarization, authentication, legalization and consularization of the signatures of Seller's and its Subsidiaries' representatives), and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents, and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(c)     If any third-party consent is required for the assignment of any Intellectual Property Licenses to Purchaser and such consent cannot be obtained, then, to the extent permitted by Applicable Law, Seller shall sublicense whatever rights they are permitted to sublicense under the respective Intellectual Property Licenses, provided such sublicense is at no cost to Seller. If, however, Seller is permitted to sublicense only at a one time, fixed payment or an ongoing fee, Seller shall notify Purchaser thereof and, only if Purchaser agreed in writing to be responsible to such payment or fee, as applicable, Seller shall sublicense whatever rights it is permitted to sublicense under the respective Intellectual Property Licenses, subject to the payment or fee being paid by Purchaser.

13

i

2.7    Bulk Sales Laws. Purchaser hereby waives compliance by Seller and its
Subsidiaries with the requirements and provisions of any "bulk-transfer" Laws of any
jurisdiction that may otherwise be applicable with respect to the sale and transfer of any
or all of the Purchased Assets to Purchaser.

ARTICLE III

CONSIDERATION

3.1    Consideration. The aggregate consideration for the Purchased Assets shall
be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser.
The "Cash Amount" shall equal an amount in cash equal to the sum of (i) $250 million,
(ii) the appraised value (as reasonably determined by an independent, recognized
appraiser) of the Lehman headquarters at 745 Seventh Avenue in New York City less a
reasonable market commission that would be paid assuming a sale of such property as of
the Closing, (iii) the appraised value (as reasonably determined by an independent,
recognized appraiser) of the Cranford New Jersey Data Center less a reasonable market
commission that would be paid assuming a sale of such property as of the Closing, and
(iv) the appraised value (as reasonably determined by an independent, recognized
appraiser) of the Piscataway New Jersey Data Center less a reasonable market
commission that would be paid assuming a sale of such property as of the Closing. For
illustrative purposes only, the parties note that as of the date hereof they expect that the
Cash Amount will be approximately $1.7 billion (less the aforementioned assumed
commissions).

3.2    Payment of Cash Amount. On the Closing Date, Purchaser shall pay the
Cash Amount to Seller, which shall be paid by wire transfer of immediately available
funds into an account designated by Seller.

3.3    Adjustment to Cash Amount. Promptly following the first anniversary of
the Closing Date, Purchaser shall determine with respect to each Position (long or short,
including repos), that was part of the Purchased Assets and was sold on or prior to such
first anniversary, the profit or loss realized from such sale (such profit or loss determined
by reference to LBI's mark (book value) for such Position as of the date hereof).
Purchaser shall provide reasonable supporting information to Seller with respect to such
calculation of profit or loss. If the aggregate amount of all such profits exceeds the
aggregate amount of all such losses (a) by up to $500 million, Purchaser shall promptly
pay Seller such net amount, or (b) by more than $500 million, Purchaser shall promptly
pay Seller the sum of $500 million plus one-half of the excess of such net amount over
$500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant
to this Section 3.3). For purposes of this Section 3.3, the time value of money shall be
disregarded and no interest shall be deemed earned.

14

i

## ARTICLE IV

## CLOSING AND TERMINATION

4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10 a.m (New York time) on the day of, or at Purchaser's election the Business Day following, the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date.

4.2    Deliveries by Seller.  At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed, reasonably customary bill of sale in the form of Exhibit A hereto;

(b)    duly executed, reasonably customary assignment and assumption agreements (including, with respect to the 745 Seventh ground lease, all assignments that were entered into in connection with Seller's acquisition of such lease) and duly executed assignments of the U.S. and Canadian trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. and Canadian trademark office, and general assignments of all other Purchased Intellectual Property;

(c)    a certificate, duly executed by Seller, that Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(d)    duly executed Seller Sublease and Purchaser Subleases; and

(e)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser or as Purchaser may reasonably request, including such instruments of conveyance and transfer in form and substance comparable to the instruments of conveyance and transfer exchanged in connection with Seller's acquisition of the 745 Seventh Ground Lease.

15

i

4.3 Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Seller:

(a) the Purchase Price, in immediately available funds, as set forth in Section 3.2 hereof;

(b) a duly executed, reasonably customary assignment and assumption agreement; and

(c) duly executed Purchaser Subleases and Seller Sublease.

4.4 Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a) by Purchaser or Seller, if the Closing shall not have occurred by the close of business on September 24, 2008 (the "Termination Date");

(b) by mutual written consent of Seller and Purchaser;

(c) by Seller or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d) by Purchaser upon the entry of an order by the Bankruptcy Court authorizing a Competing Transaction; or

(e) by Purchaser if the Breakup Fee and Competing Bid Order is not approved by the Bankruptcy Court in the form attached hereto as Exhibit A.

4.5 Procedure Upon Termination. In the event of termination and abandonment by Purchaser or Seller, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller. If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6 Effect of Termination.

(a) In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that the obligations of the parties set

16

i

forth in Sections 4.6 and 8.6 and Article XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)     Nothing in this Section 4.6 shall relieve Purchaser or Seller of any liability for a material breach of this Agreement prior to the date of termination. The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the transactions contemplated hereby.

(c)     The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Seller of their obligations under the Confidentiality Agreement; provided, that upon the termination of this Agreement, the non-solicitation obligations of Purchaser and its Affiliates under the Confidentiality Agreement shall be of no further force and effect; provided further that upon the Closing, the non-solicitation obligation of Purchaser and its Affiliates under the Confidentiality Agreement with respect to non-U.S. employees of the broker-dealer and investment banking business shall be of no further force and effect.

(d)     In the event that Purchaser terminates this Agreement pursuant to Section 4.4(d), Sellers shall pay to Purchaser (i) the Break-Up Fee promptly upon such termination and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order.

(e)     In the event that Purchaser or Seller terminates this Agreement pursuant to Section 4.4(a) and at any time after the date of this Agreement and prior to such termination a bona fide proposal for a Competing Transaction shall have been publicly disclosed or otherwise communicated to the Sellers and shall not have been irrevocably withdrawn, then if a Qualified Bid shall be consummated within twelve months after such termination Sellers shall pay to Purchaser (i) the Break-Up Fee and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order on the date of such consummation.

(f)     The parties hereto acknowledge that the agreements contained in this Section 4.6 are an integral part of the transactions contemplated by this Agreement. The Sellers shall be jointly and severally liable for any amount due to Purchaser pursuant to this Section 4.6. In the event that the Sellers shall fail to pay any amounts due pursuant to this Section 4.6, the Sellers shall reimburse Purchaser for all reasonable costs and expenses actually incurred or accrued by Purchaser (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of this Section 4.6.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

17

i

Seller hereby represents and warrants to Purchaser that:

5.1    Organization and Good Standing. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Seller is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a material adverse effect.

5.2    Authorization of Agreement. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller which is a party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Seller's obligations under Section 4.4, the entry of the Breakup Fee and Competing Bid Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller or, as the case may be, its Subsidiary in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    Conflicts; Consents of Third Parties.

(a)    None of the execution and delivery by Seller of this Agreement or by Seller and its Subsidiaries of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller and its Subsidiaries with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller or any Subsidiary; (ii) subject

18

i

to entry of the Sale Order, any Order of any Governmental Body applicable to Seller or
any of the properties or assets of Seller as of the date hereof; other than, in the case of
clause (ii), such conflicts, violations, defaults, terminations or cancellations that would
not have a material adverse effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or
declaration or filing with, or notification to, any Person or Governmental Body is
required on the part of Seller or any Subsidiary in connection with the execution and
delivery of this Agreement or the Seller Documents, the compliance by Seller or any
Subsidiary with any of the provisions hereof or thereof, the consummation of the
transactions contemplated hereby or thereby or the taking by Seller or any Subsidiary of
any other action contemplated hereby or thereby, except for (i) compliance with the
applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of
the Breakup Fee and Competing Bid Order with respect to Seller's obligations under
Section 4.6, (iv) filings of applications and notices with, and receipt of consents,
authorizations, approvals, exemptions or non-objections from, the Securities and
Exchange Commission (the "SEC"), foreign and state securities authorities, the Financial
Industry Regulatory Authority ("FINRA"), the Commodity Futures Trading Commission
("CFTC"), National Futures Association ("NFA") applicable securities, commodities and
futures exchanges, the Financial Services Authority ("FSA") and other industry self-
regulatory organizations ("SRO"), (v) the filing of any other required applications, filings
or notices with the Board of Governors of the Federal Reserve System (the "Federal
Reserve"), any foreign, federal or state banking, other regulatory, self-regulatory or
enforcement authorities or any courts, administrative agencies or commissions or other
governmental authorities or instrumentalities, and (vi) such other consents, waivers,
approvals, Orders, Permits, authorizations, declarations, filings and notifications, the
failure of which to obtain or make would not have a material adverse effect.

5.4    Title to Purchased Assets.  Other than the real property subject to the
Transferred Real Property Leases, intellectual property licensed to Seller and the personal
property subject to personal property leases, Seller owns (directly or indirectly) each of
the Purchased Assets, and Purchaser will be vested with good and exclusive title to such
Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the
fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased
Assets, together with all of Seller's agreements hereunder and under the Seller
Documents, constitute all of the necessary assets and services used by Seller and its
Affiliates to operate the Business as it is currently operated.

5.5    Compliance with Laws; Permits.

(a)    Seller and its Subsidiaries, and their respective personnel, are in
compliance with all Laws applicable to their respective operations or assets or the
Business, except where the failure to be in compliance would not have a material adverse
effect.  Neither Seller nor any of its Subsidiaries has received any written notice of or
been charged with the violation of any Laws applicable to their respective operations or

19

i

assets or the Business, except where such violation would not have a material adverse effect.

(b)    Seller and its Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not have a material adverse effect. Neither Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party required for the operation of the Business as presently conducted, except where such default or violation would not be material.

5.6    No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, its Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in Article V (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a material adverse effect.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1    Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

20

i

6.2    <u>Authorization of Agreement</u>.  Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to conduct the Business, except for compliance with the regulatory regimes referred to in <u>Section 5.3(b)</u> or as would not have a material adverse effect.

6.4    <u>Financial Capability</u>.  Purchaser (i) has, and at the Closing will have, sufficient internal funds available to pay the Cash Amount and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to

21

i

perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

6.5    Condition of the Business.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis.  Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in Article V hereof (as modified by the Schedules hereto as supplemented or amended).  Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller or any of its Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the transactions contemplated hereby.  Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

ARTICLE VII

BANKRUPTCY COURT MATTERS

7.1    [Reserved]

7.2    Bankruptcy Court Filings.  As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court the Sale Motion seeking entry of the Sale Order and the Breakup Fee and Competing Bid Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Breakup Fee and Competing Bid Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Purchaser shall

22

i

not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder. In the event the entry of the Sale Order or the Breakup Fee and Competing Bid Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII

## COVENANTS

8.1    Access to Information.  Seller agrees that, until the earlier of the Closing and termination of this Agreement, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller and its Subsidiaries to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller or any of its Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller or any of its Subsidiaries is bound.

8.2    Conduct of the Business Pending the Closing.  In order to attempt to preserve the going concern value of the Business, Purchaser shall have the right to be on-site and shall coordinate and consult with representatives of Seller regarding the business, operations and management of the Business   In addition, until the earlier of the Closing and termination of this Agreement, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser:

(a)    Seller shall, and shall use its best efforts to cause its Subsidiaries whose equity or assets constitute Purchased Assets to:

(i)    conduct the Business only in the Ordinary Course of Business (recognizing its current distressed state); and

(ii)    use its commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B)

23

i

preserve the present relationships with customers and suppliers of the Business and Seller's Subsidiaries (recognizing that Seller reserves the right to cause any of its Subsidiaries, other than a Subsidiary the equity or assets of which constitutes a Purchased Asset, to commence a proceeding under the Bankruptcy Code or other applicable state or foreign law); and

(b)     Seller shall not, and shall not permit its Subsidiaries whose equity or assets constitute Purchased Assets to, solely as it relates to the Business:

(i)     other than in the Ordinary Course of Business, (A) materially increase the annual level of compensation of any director or executive officer of Seller, (B) increase the annual level of compensation payable or to become payable by Seller or any of its Subsidiaries to any such director or executive officer, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any such director or executive officer, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller or any of its Subsidiaries is a party or involving any such director or executive officer, except, in each case, as required by applicable Law from time to time in effect or by any existing employee benefit plans;

(ii)     make or rescind any material election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent tax returns;

(iii)     subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

(iv)     cancel or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)     [Reserved];

(vi)     enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(vii)     other than (A) in the Ordinary Course of Business or (B) secured borrowings from the Federal Reserve Bank under the Primary Dealer Facility, incur any indebtedness for borrowed money, issue any debt securities,

24

i

assume, guarantee, endorse or otherwise become responsible for the obligations of any other individual, corporation or other entity, or make any loan or advance or capital contribution to, or investment in, any person, in any case that would be related to the Business or constitute an Assumed Liability;

(viii)   set any record date or payment date for the payment of any dividends on its capital stock or make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any shares of its capital stock or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock;

(ix)   sell, transfer, pledge, lease, license, mortgage, encumber or otherwise dispose of any of Purchased Assets (including pursuant to securitizations) to any individual, corporation or other entity or cancel, release or assign any material amount of indebtedness related to the Business to any such person or any claims held by any such person, other than any such transactions as are in the Ordinary Course of Business;

(x)   transfer ownership, or grant any license or other rights, to any person or entity of or in respect of any Purchased Intellectual Property, other than grants of non-exclusive licenses pursuant to license agreements entered into in the Ordinary Course of Business;

(xi)   in connection with the Business, make any investment in, or any acquisition of, any business entity or division, by merger, consolidation, asset purchase or other business combination, or by contributions to capital; or make any property transfers or purchases of any property or assets, in or from any other individual, corporation, joint venture or other entity;

(xii)   in connection with the Business, conduct its operations or take actions related to trading or credit extension in any manner other than in the Ordinary Course of Business;

(xiii)   change in any material respect the policies, practices and procedures governing operations of the Business;

(xiv)   amend or otherwise modify, except in the Ordinary Course of Business, or knowingly violate in any material respect the terms of, any Purchased Contract, or (ii) except as may be required by applicable Law, create or renew any agreement or contract or other binding obligation related to the Business containing (A) any material restriction on the ability of Purchaser to conduct the Business as it is presently being conducted or (B) any material

25

i

restriction on the ability of Purchaser to engage in any type of activity or business after the Closing;

       (xv)    abandon, cancel, let lapse, fail to renew, fail to continue to prosecute, protect, or defend, or dispose of, any Purchased Intellectual Property;

       (xvi)    commence or settle any claim, action or proceeding related to the Business, other than settlements resulting solely in the payment of monetary damages in amounts not in excess of $500,000 in the aggregate; or

       (xvii)    agree to do anything prohibited by this Section 8.2.

    8.3    Consents. Seller shall use (and shall cause each of its Subsidiaries to use) its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

    8.4    Regulatory Approvals.

       (a)    If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or subsidiaries, as applicable, or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 1 Business Day after the date of this Agreement, (b) comply at the earliest practicable date with any request under such Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or subsidiaries, as applicable, from any other Governmental Body in respect of such filings or such transactions, and (c) cooperate with each other in connection with any such filing and in connection with resolving any investigation or other inquiry of any Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body (other than Purchaser solely with respect to a Governmental Body in the United Kingdom) in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable law, the parties hereto will consult and cooperate with

i

one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(b)       Each of Purchaser and Seller shall use its best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any Antitrust Law, each of Purchaser and Seller shall cooperate and use its best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective best interests.

8.5    Further Assurances.

(a)       Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

27

i

(b)    In the event that, for any reason including a determination by a court of competent jurisdiction that any sale, transfer, assignment, conveyance or delivery contemplated by this Agreement is ineffective or invalid to vest or confirm such title, any conveyance, assignment, assumption, allocation or other action is necessary or appropriate to vest in or confirm to Purchaser full title to any of the Purchased Assets vested in Purchaser pursuant to Section 2.1, or to cause Purchaser to assume any Liabilities allocated to Purchaser pursuant to Section 2.3, then Seller shall, and shall cause its Subsidiaries to, execute and deliver all such instruments and take all such actions necessary in order to convey, assign or allocate such Purchased Assets or Liabilities to Purchaser.

8.6    Confidentiality.

(a)    Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms of the confidentiality agreement between Purchaser and Seller dated September 11, 2008 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchaser acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller and its Subsidiaries shall, other than Purchased Assets, remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. For purposes of this Section 8.6, "Confidential Information" shall mean any confidential information with respect to, including, methods of operation, customers, customer lists, products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

(b)    From and after the Closing, Seller shall, and shall cause its Subsidiaries to, use the same efforts to maintain the confidentiality of any proprietary or confidential information regarding the Purchased Intellectual Property as Seller and/or its Subsidiaries used to maintain the confidentiality of such information prior to the Closing.

8.7    Preservation of Records. Seller and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Seller or Purchaser wishes to destroy such records before or after that time (and such

28

i

proposed destruction is not in violation of applicable Law), such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.8    Publicity. Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller lists securities, provided that the party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.9    Trademark License.

(a)    From and after the closing Purchaser hereby grants Seller a perpetual, worldwide, nonexclusive, full paid, royalty-free license under the trademarks "LEHMAN" and "LEHMAN BROTHERS," including any logos containing such names (collectively, the "Licensed Marks") for any of its existing uses or in connection with the IMD Business and the unwinding of any of its other operations including use in corporate or other entity names. The foregoing license as it relates to the IMD Business shall be assignable by Seller without the need for further consent to a purchaser of all or substantially all of the equity interests in or assets of the IMD Business. Seller shall have the right to sublicense the foregoing license to any of its Subsidiaries and an assignee in connection with a sale of all or substantially all of the IMD Business shall have a right to sublicense such right to any of its Affiliates in connection with the conduct of that business, provided that any such sublicense shall terminate on the date when Seller's or its assignee's license terminates. In the remainder of this provision, the licensee or sublicensee (Seller or Seller's assignee or their sublicensees) shall be referred to as "Licensee." Each Licensee acknowledges Purchaser's ownership of the Licensed Marks and the validity of the Licensed Marks and shall not register any confusingly similar mark in any jurisdiction. All goodwill arising from use of the Licensed Marks shall inure to Purchaser's benefit. Each Licensee shall use each Licensed Mark in connection with any markings or other notices as required by law. Purchaser shall have the right to supervise and control the use of the Licensed Marks by each Licensee, including by reviewing specimens of use of the Licensed Marks, with respect to the nature and quality of the products and services designed, performed, distributed, sold or otherwise commercialized by such Licensee and the materials used to promote such products and services for the purpose of protecting and maintaining the validity of the Licensed Marks and the goodwill associated with the Licensed Marks. Each Licensee shall at all times use the Licensed Marks only in connection with goods and services of quality at least as

29

i

high as that offered by Seller and its Affiliates under such marks immediately prior to the Closing. Any use of the Licensed Marks in connection with the IMD Business shall include a disclaimer in a form reasonably acceptable to Purchaser indicating that the IMD Business is not affiliated with Seller. Seller or its assignee shall be responsible for each Licensee's compliance with the terms of this Section 8.9 and shall be liable to Purchaser for any non-compliance by any such Licensee with any such terms.

(b)    Purchaser hereby grants to Seller a perpetual, irrevocable, worldwide, nonexclusive, fully-paid, royalty-free license under all non-Mark Purchased Intellectual Property used in or covering any business of the Seller and/or its Affiliates other than the Business in the fields of investment management, investment research, portfolio management and other fields of the IMD Business as well as the unwinding of any of Seller's other operations, solely for use in connection with such business outside of the Business. The foregoing license as it relates to the IMD Business shall be assignable without the requirement of further consent by Seller in connection with a sale of all or substantially all of the assets of the IMD Business and may be sublicensed to any entity conducting the IMD Business and any successor of the IMD Business and any contractor providing services to such business or successor. The foregoing license shall be under Purchased Intellectual Property acquired by Purchaser hereunder that was previously owned by Seller or its Affiliates as well as Purchased Intellectual Property owned by third parties as to which Purchaser shall have after Closing has the right to grant a sublicense without requirement of additional consent or payment of additional consideration.

8.10    Use of Purchased Intellectual Property.  Except as permitted under subsection 8.9 above, after the Closing Date, neither the Seller nor any of its Subsidiaries will, directly or indirectly, in any jurisdiction: (i) exploit or make use of, or authorize any third party to exploit or make use of, any of the Purchased Intellectual Property, or any Marks confusingly similar to the Purchased Marks; (ii) attempt to register the Purchased Marks or any mark confusingly similar thereto; or (iii) challenge or otherwise contest the Purchaser's efforts to register, or enforce its trademark registrations for and trademark rights in, the Purchased Marks or its rights in other Purchased Intellectual Property.

8.11    Deferred Transfers.

30

i

(a)    If and to the extent that the allocation to and vesting in Purchaser of any Purchased Assets pursuant to Section 2.1 or otherwise would be a violation of applicable Law or require any Consent or the approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by the Purchaser prior to the Closing then, unless the Parties shall otherwise agree, the allocation to and vesting in Purchaser of such Purchased Asset shall, without any further action by any Party, be automatically deferred and any allocation or vesting of such Purchased Asset pursuant to Section 2.1 or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled. Any such Purchased Asset shall be deemed a "Deferred Transfer Purchased Asset."

(b)    If and to the extent that the allocation to Purchaser of, and Purchaser's becoming responsible for, any Assumed Liabilities pursuant to Section 2.3 or otherwise would be a violation of applicable Law or require any Consent or approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by Seller prior to the Closing, then, unless the Parties shall otherwise agree, the allocation to Purchaser of, and Purchaser's becoming responsible for, such Assumed Liability shall, without any further action by any Party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to Section 2.3 or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled. Any such Assumed Liability shall be deemed a "Deferred Transfer Assumed Liability."

(c)    With respect to any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible, (i) Seller shall, and shall cause any applicable Subsidiary to, following the Closing, hold such Deferred Transfer Purchased Asset for the use and benefit of Purchaser and its Subsidiaries (at the expense of Purchaser) and (ii) Purchaser shall, or shall cause its applicable Subsidiary to, pay or reimburse Seller for all amounts paid or incurred in connection with the retention of such Deferred Transfer Assumed Liability. In addition, Seller shall, and shall cause any applicable Subsidiary to, insofar as reasonably possible and to the extent permitted by applicable Law, hold and treat such Deferred Transfer Purchased Asset in the Ordinary Course of Business in accordance with past practice and take such other actions as may be reasonably requested by Purchaser in order to place Purchaser, insofar as permissible under applicable Law and reasonably possible, in the same position as if such Deferred Transfer Purchased Asset had been transferred to and vested in Purchaser or an applicable Subsidiary at the Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transfer Purchased Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transfer Purchased Asset, are to inure from and after the Closing to Purchaser or its applicable Subsidiary entitled to the receipt of such Deferred Transfer Purchased Asset.

31

i

       (d)    If and when the Consents, approvals of Governmental Bodies and/or conditions, the absence or non-satisfaction of which caused the deferral or transfer of any Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability pursuant to Section 8.12(a), are obtained or satisfied, the transfer, allocation or novation of the applicable Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability shall be effected in accordance with and subject to the terms of this Agreement.

       (e)    Seller shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced, assumed or agreed in advance to be reimbursed by Purchaser, other than reasonable attorney's fees and recording or similar fees, all of which shall be promptly reimbursed by Purchaser.

       (f)    For a period of nine months after the Closing Date, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, to the extent Excluded Employees occupied real property subject to a Transferred Real Property Lease prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Excluded Employees prior to the Closing, without charge or consideration.

       (g)    For a period of nine months after the Closing Date, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, after the Closing, to the extent Transferred Employees occupied real property is not subject to a Transferred Real Property Lease prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Transferred Employees prior to the Closing, without charge or consideration.

    8.12   Release of Guarantees. Purchaser shall deliver to the respective beneficiaries of any and all guarantees relating to or arising under any Purchased Contracts, Transferred Real Property Leases or Assumed Liabilities ("Seller Guarantees") such replacement guarantees from Purchaser and its Affiliates, letters of credit, collateral, or other credit support, as shall be required pursuant and in accordance with any Purchased Contract, Transferred Real Property Leases or Assumed Liability. In the event that the respective beneficiaries under any of the Seller Guarantees do not agree to release (the "Guarantee Release") Seller and its Subsidiaries from any and all liability arising thereunder after theClosing, prior to the Closing, then Purchaser shall cause to be delivered to Seller, as beneficiary, at the Closing an indemnification agreement and guarantee, dated and effective as of the Closing Date and in form and substance reasonably satisfactory to Seller and from a creditworthy obligor as shall be satisfactory to Seller (collectively, "Backstop Documents"), pursuant to which Seller and its Affiliates shall, from and after the Closing, be indemnified, reimbursed and held harmless from any and all liabilities, losses, claims, costs and expenses under or arising out of the

i

relevant Seller Guarantee. From and after the Closing, Purchaser shall not permit any Contract to which a Seller Guarantee relates to be renewed, extended, amended or modified unless the Purchaser obtains and delivers to Seller the related Guarantee Release duly executed by the beneficiaries of the related Seller Guarantee.

8.13    Transition Services. The Purchaser and Seller shall use commercially reasonable efforts to enter into a Transition Services Agreement in a form reasonably acceptable to Seller and Purchaser in order for each of Seller and Purchaser to continue to receive the services provided between LBI and LBHI on the Closing Date.

8.14    Subleases.

(a)    For the leased premises located in 555 California Street, San Francisco, CA, Seller shall sublet to Purchaser pursuant to a sublease agreement (the "Seller Sublease"), reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, a portion of the demised premises in such location subject to the terms of the applicable lease and obtaining the landlord's consent to the Sublease or Bankruptcy Court approval. Purchaser shall bear its portion of the occupancy cost for such location based on the relative square footage sublet. Seller and Purchaser shall enter into the Seller Sublease at Closing to memorialize the provisions of this Section.

(b)    For the leased premises located in 125 High Street, Boston, MA, 190 S. LaSalle Street, Chicago, IL and 10250 Constellation Boulevard, Los Angeles, CA Seller shall assume such leases in connection with Seller's bankruptcy proceedings and assign such leases to Purchaser. Purchaser shall then sublet to Seller or a designee of Seller, in either event with credit reasonably acceptable to Purchaser, pursuant to three separate subleases (each, a "Purchaser Sublease", collectively the "Purchaser Sublease"), reasonably acceptable to both Purchaser and Seller and subject in all cases to the terms of the underlying lease, a portion of the demised premises in such locations shall be subject to obtaining the landlord's consent to each Sublease or Bankruptcy Court approval. Seller shall bear its portion of the occupancy cost for each such location based on the relative square footage sublet. Seller and Purchaser shall enter into each Sublease at Closing to memorialize the provisions of this Section.

8.15    Landlord Notice. Seller shall give notice, on the date hereof , to Rock-Forty-Ninth LLC in accordance with the terms of the 745 Seventh Ground Lease, regarding the transactions contemplated hereunder and shall provide Rock-Forty-Ninth LLC with the appropriate bankruptcy filings in order to provide adequate notice thereof under applicable Law.

8.16    Artwork. Purchaser shall have the right to possess, for a period of one-year after the closing, all of the artwork at the Seller's headquarters located at 745 Seventh Avenue, New York, New York. At any time during such period, Purchaser shall have the option to purchase any or all of the artwork for a price equal to its appraised value (as

33

i

determined by an independent, recognized appraiser). To the extent Purchaser does not exercise such option on any or all of the artwork by the first anniversary of the Closing, the Purchaser shall return such artwork to the Seller.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Employee Benefits.

(a)    Effective as of the Closing Date, Purchaser shall, or shall cause one of Purchaser's Subsidiaries to, continue to employ (where employment continues or is transferred to Purchaser or a Subsidiary of Purchaser automatically by operation of Law), or offer employment to (where employment does not continue or transfer automatically by operation of Law), each Offeree. For purposes of this Agreement, the term "Offeree" means each active employee employed primarily in connection with the Business at the Closing, other than such employees who are identified by Purchaser to Seller prior to Closing, such identified persons shall not include any person who is in the targeted population referred to in Section 10.1(b). Each Offeree who accepts Purchaser's or one of its subsidiaries' offer of employment, together with each person whose employment transfers to Purchaser or a subsidiary of Purchaser automatically by operation of law, shall be referred to herein as a "Transferred Employee." Each Person who is not a Transferred Employee shall be referred to herein as an "Excluded Employee". An Offeree who performs work at his then applicable place of employment on the first Business Day immediately following the Closing shall be deemed for all purposes of this Agreement to have accepted Purchaser's or one of its subsidiaries' offer of employment and shall be deemed to be a Transferred Employee for all purposes of this Agreement.

(b)    Without limiting any additional rights that each Transferred Employee may have, Purchaser shall, or shall cause its Subsidiaries, for a period commencing at the Closing and ending on December 31, 2008, to provide to each Transferred Employee whose employment is terminated during such period by the Purchaser by reason of a "reduction in force" or a "job elimination" (as those terms are customarily applied in good faith, consistent with past practice) severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to the provisions of the Seller's severance plans or agreements covering such Transferred Employee as in effect immediately prior to the Closing. Nothing contained in this Section 9.1 or elsewhere in the Agreement shall be construed to prevent, from and after the Closing, the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any Transferred Employee.

34

i

(c)    On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability"). Such 08 Annual Bonuses shall be awarded on or before March 15, 2009 in such forms and proportions as are consistent with Purchaser's customary practices, so that the aggregate amount awarded shall equal the Accrued 08 FY Liability. Any amounts that would have been allocated in respect of any Transferred Employee who voluntarily terminates employment before such award is made shall instead be allocated among the remaining Transferred Employees (who include, for this purpose, those Transferred Employees who are terminated without cause by Purchaser or its affiliates prior to the time the awards are made) (collectively, the "Remaining Transferred Employees"). However, the Accrued 08 FY Liability shall be reduced if, prior to the time such awards are made, both (x) 10% of the Transferred Employees have voluntarily terminated their employment with the Purchaser and (y) such terminated Transferred Employees would have been expected to receive at least 10% of the 08 Annual Bonuses had no such Transferred Employee's employment in fact terminated. In that case, Purchaser may adjust the Accrued 08 FY Liability proportionately from its initial level, in the same proportion as the reduction in Transferred Employees below 90% of the initial number of Transferred Employees compared to 90% of the initial number of Transferred Employees, in a good faith and reasonably equitable manner to account for the Transferred Employees to whom 08 Annual Bonuses will not be payable, and thereby to reduce the aggregate 08 Annual Bonuses. Any such reduction shall take into account the length of service, seniority within the Business and contribution of the Remaining Transferred Employees, relative to the allocation of the Accrued 08 FY Liability, in accordance with the principles enumerated herein.

## ARTICLE X

## CONDITIONS TO CLOSING

10.1    Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

i

(b)    at least 70% of the U.S. and Canadian Persons identified by Seller and reasonably accepted by Purchaser, acting in good faith, not later than two Business Days after the date hereof as the targeted population are actively employed in the Business immediately prior to the Closing and as to whom management of Seller has made a good faith assessment that they will continue in employment with the Business as of the Closing Date;

(c)    the Bankruptcy Court shall have entered a final order permitting Seller to sell the premises at 745 Seventh Avenue, New York, New York to Purchaser;

(d)    the mortgage in favor of the Seller's Affiliate with respect to the premises at 745 Seventh Avenue, New York, New York shall have been fully repaid and extinguished;

(e)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(f)    Purchaser shall have obtained confirmation from the SEC and CFTC that Purchaser will be eligible, following the Closing, to compute its net capital under Appendix E to SEC Rule 15c3-1 and adjusted net capital in accordance with the provisions of CFTC Rule 1.17(c)(6);

(g)    Purchaser shall have obtained from the SEC confirmation reasonably satisfactory to Purchaser regarding (i) the transition period during which Purchaser will be permitted to come into compliance with the consolidated holding company supervisory framework applicable to ultimate holding companies that have a principal regulator under SEC Rule 15c3-1e and g, and (ii) the scope of the deference to be extended by the SEC to the Federal Reserve and/or the home country consolidated supervisor of Purchaser's ultimate parent company in connection with the SEC's administration of the framework described in clause (i) of this subsection 10.1(g); and

(h)    the Sellers headquarters building at 745 Seventh Avenue, New York, New York shall be substantially habitable.

10.2    Conditions Precedent to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

36

i

(b)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3.

10.3    Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)    the Bankruptcy Court shall have entered the Breakup Fee and Competing Bid Order, in form and substance reasonably acceptable to Seller and Purchaser;

(c)    the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court;

(d)    LBI shall have commenced a case under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court; and

(e)    Purchaser shall have obtained regulatory approval under the HSR Act and all other material regulatory, self-regulatory, exchange, clearing organization and governmental approvals, authorizations, waivers and/or licenses required to conduct the transferred Business following the Closing substantially in the manner as it was conducted immediately prior to the Closing and, after giving effect to the Closing (subject to such exceptions as shall not, in the aggregate, be material).

10.4    Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## [RESERVED]

## ARTICLE XII

## TAXES

12.1    Transfer Taxes.  Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents,

37

i

successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("Transfer Taxes"). Seller shall, however, seek to include in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(c). Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

12.2    Prorations. Seller and Purchaser shall enter into customary prorations for the Purchased Assets as of the Closing.

12.3    Purchase Price Allocation. Seller and Purchaser shall allocate the purchase price (including the Assumed Liabilities) among the Purchased Assets as specified in Schedule 12.3 and, in accordance with such allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation. The purchase price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Seller, and all income Tax Returns and reports filed by Purchaser and Seller shall be prepared consistently with such allocation.

12.4    Adjustment to Purchase Price. The parties agree that any payment made under this Article XII shall be treated by such parties as an adjustment to the Purchase Price.

ARTICLE XIII

MISCELLANEOUS

13.1    Expenses. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in

38

i

this Agreement. The rights set forth in this Section 13.2 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.3    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

13.4    Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.5    Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), the transition services agreements, the Dip Facility, the Interim Support and Cooperation Agreement, Master Repurchase Agreement and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this

i

Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.7    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Facsimile: (646) 758-4226
Attention: Steven Berkenfeld, Esq.

i

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile: (212) 310-8007
Attention:      Thomas Roberts
                Michael Lubowitz

and a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Facsimile: (212) 455-2502
Attention:      John Finley
                Andrew Keller

If to Purchaser, to:

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Facsimile: (212) 412-7519
Attention:      Jonathan Hughes, Esq.

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Facsimile: (212) 225-3999
Attention:      Victor I. Lewkow
                David Leinwand
                Duane McLaughlin

and

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Facsimile: (212) 558-3580
Attention:      Mitchell S. Eitel
                Jay Clayton

41

i

13.8    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, provided that Purchaser shall be entitled to assign its rights and obligations in whole or in part to its Affiliates or to designate its rights to acquire any assets hereunder to its Affiliates. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.10    Non-Recourse. No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Seller shall have any liability for any obligations or liabilities of Seller under this Agreement or the Seller Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

13.11    Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.12    Scope of Purchased Assets. This Agreement is not intended to convey and does not convey assets and liabilities from the non-U.S. and non-Canadian operations of Seller.

*[signature page follows]*

42

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.

By: _____
Name: Steven Berkenfeld
Title: Managing Director

LB 745 LLC

By: _____
Name:
Title:

BARCLAYS CAPITAL INC.

By: _____
Name: Gerard LaRocca
Title: Chief Executive Officer

Asset Purchase Agreement

# EXHIBIT B

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    ---------------------x

5    In Re:

6                            Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

     ----------------------x

11

12            PARTIALLY HIGHLY CONFIDENTIAL

13      VIDEOTAPED DEPOSITION OF DANIEL McISAAC

14               New York, New York

15               April 6, 2010

16    * * *(Pages 12-23 have been designated highly

17    confidential.)* * *

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 29428

Page 2

1
2          April 6, 2010
3
4          VIDEOTAPED deposition of DANIEL
5    McISAAC, held at offices of Boies
6    Schiller & Flexner, LLP, 575 Lexington
7    Avenue, New York, New York, before Kathy S.
8    Klepfer, a Registered Professional
9    Reporter, Registered Merit Reporter,
10   Certified Realtime Reporter, Certified
11   Livenote Reporter, and Notary Public
12   of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2          A P P E A R A N C E S :
3
4
5    JONES DAY, LLP
6    Attorneys for Lehman Brothers, Inc.
7       222 East 41st Street
8       New York, New York  10017
9    BY:  BART GREEN, ESQ.
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays
13      10 North Pearl Street
14      Albany, New YOrk  12207
15   BY:  TRICIA J. BLOOMER, ESQ.
16      AMY L. NEUHARDT, ESQ.
17      LOUIS SMITH, ESQ.
18      HEATHER KING, ESQ.
19      - AND -
20   CLEARY GOTTLIEB STEEN & HAMILTON LLP
21   Attorneys for Barclays
22      One Liberty Plaza
23      New York, New York  10006
24   BY:  DAVID AMAN, ESQ.
25

Page 4

1
2          A P P E A R A N C E S :  (Cont'd.)
3
4    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5    Attorneys for the Creditors Committee
6       51 Madison Avenue
7       22nd Floor
8       New York, New York  10010
9    BY:  ERIC M. KAY, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12   Attorneys for the SIPA Trustee
13      One Battery Park Plaza
14      New York, New York  10004
15   BY:  NEIL J. OXFORD, ESQ.
16      AMINA HASSAN, ESQ.
17      FARA TABATABAI, ESQ.
18
19
20
21
22
23
24
25

Page 5

1          D. McIsaac
2          THE VIDEOGRAPHER:  This is the start
3    of the tape labeled number 1 of the
4    videotaped deposition of Daniel McIsaac in
5    the matter In re:  Lehman.  Today is April
6    6, 2010.  The time is approximately 9:37.
7          My name is Michael Pineiro from TSG
8    Reporting, Inc. and I'm the legal video
9    specialist.  The court reporter is Kathy
10   Klepfer, in association with TSG Reporting.
11          Will the court reporter please swear
12   in the witness.
13          * * *
14   DANIEL McISAAC, called as a
15      witness, having been duly sworn by a Notary
16      Public, was examined and testified as
17      follows:
18   EXAMINATION BY
19   MS. BLOOMER:
20      Q.   Good morning, Mr. McIsaac.
21      A.   Good morning.
22      Q.   My name is Tricia Bloomer.  I'm with
23   Boies, Schiller & Flexner and we represent
24   Barclays Capital in this matter.
25      A.   Uh-huh.

Page 6

D. McIsaac

1
2    Q.    Have you ever been deposed before?
3    A.    No, I have not.
4    Q.    Okay.  Just to go over a few kind of
5    ground rules that will help the day go a little
6    bit more smoothly.  I'll try to ask my questions
7    clearly, and if you could allow me to finish a
8    question before you begin your answer, and I'll
9    try to do the same for you so that Kathy can
10   take down everything that we say more easily.
11   A.    Okay.
12   Q.    If you can answer with verbal
13   responses as opposed to, you know, nods or
14   anything like that, that will help things.
15   A.    As opposed to (nods)--
16   Q.    And if you need a break at any point,
17   please let me know and I'll try to accommodate
18   you as soon as we can wrap up whatever topic
19   we're on.  Okay?
20         If you don't understand any of my
21   questions, please let me know and I'm happy to
22   try to rephrase it for you.
23         Okay.  I'm going to show you the first
24   exhibit, 684.
25         (Exhibit 684, Expert Report of Daniel

Page 7

D. McIsaac

1
2    McIsaac, marked for identification, as of
3    this date.)
4    Q.    Exhibit 684 is a copy of the expert
5    report that you submitted on exchange-traded
6    derivatives issues; is that right?
7    A.    Yes, it is.
8    Q.    Okay.  Do you have any opinions that
9    you didn't express in this report that relate to
10   the issues --
11   A.    No, I don't believe so.
12   Q.    -- on exchange-traded derivatives?
13   Okay.
14         And what did you do today to prepare
15   for your deposition?
16   A.    I reread my reports, I spoke to the
17   trustees, and did have a slight conversation
18   with the financial advisors for the Trustee.
19   Q.    Okay.  And what financial advisors?
20   A.    Deloitte.
21   Q.    Okay.  Anyone else that you spoke with
22   in preparation?
23   A.    No.
24   Q.    Okay.  Did you review any documents in
25   preparation other than your report?

Page 8

D. McIsaac

1
2    A.    The reports and some of the
3    information that I would have relied on for my
4    reports.
5    Q.    Do you remember any of the specific
6    documents that you reviewed?
7    A.    I just glanced at everything that was
8    there or looked at whatever was in my reliance
9    material, would have been affidavits and the
10   like in his report.
11   Q.    Okay.  When were you retained by the
12   Trustee's counsel to provide expert testimony
13   concerning exchange-traded derivatives issues?
14   A.    Sometime in February, I believe.
15   Q.    In February.  Do you remember whether
16   it was -- so February would have been after Mr.
17   Leitner submitted his expert report; is that
18   correct, to your knowledge?
19   A.    I think it was, yes.
20   Q.    Okay.  Can you describe generally for
21   me what your background is that qualifies you to
22   give expert testimony on exchange-traded
23   derivatives issues?
24   A.    I was responsible for the preparation
25   of seg and secured reports for the

Page 9

D. McIsaac

1
2    exchange-traded futures for approximately 20
3    years.  I worked closely with the regulators,
4    the FTC, CME, on the issues regarding that, as
5    well as the SEC on issues regarding the futures
6    business.
7         I did some reviews of acquisitions
8    that one of my firms worked for -- that I worked
9    for did as far as futures-related.  As far as
10   options, I was responsible for the preparation
11   of the reserve formula for 15c3 for
12   approximately 20 years, worked closely with our
13   people in the areas regarding margin
14   requirements at the OCC as they relate to the
15   firm and the impact on the firm's calculations,
16   and was the liaison for my firms with the
17   regulators, both the OCC, CME, SEC, on all
18   financial matters.
19   Q.    Okay.  The first thing that you
20   mentioned was segregated and secured reports.
21   Can you describe those reports?
22   A.    Yes, that's the customer protection
23   portion of the futures rules, CFTC, and it
24   basically requires you or requires the firm to
25   maintain all the customers' assets in a secure

D. McIsaac

1    place with no liens on them.
2        Calculation is done every day.  You
3    start out by reviewing what the -- you owe the
4    customers, your liabilities to the customers,
5    and then determine where the assets are.  And
6    you do a report every day and make sure you're
7    in compliance with the rules.
8        Q.   Okay.  Is that similar to the reports
9    that are required under the SEC's rules?
10       MR. OXFORD:  Object to the form.
11       A.   Similar in some respects because
12   they're both required to protect customers.
13   Different from the fact that, futures world, all
14   of the assets that the customers give you should
15   be locked up from day one.  They're supposed to
16   be sent into a seg. account and kept in
17   segregation at all times.
18       The reserve requirement requires you
19   to do a calculation Mondays as of Friday based
20   on information that as of the close of business
21   Friday.  So there is a difference in the way
22   it's done, but it has the same basic qualities
23   attached.
24       Q.   Okay.  You mentioned that you worked

D. McIsaac

1    on reviews of acquisitions?
2        A.   Uh-huh.
3        Q.   Can you -- and you said that was
4    futures-related acquisitions, I believe?
5        A.   Yes.
6        (Pages 12 through 22 have been
7        designated highly confidential and will
8        continue on the next page.)

1    HIGHLY CONFIDENTIAL - D. McISAAC
2        Q.   Can you describe how many acquisitions
3    did you review?
4        A.   When I was at UBS, we acquired the
5    futures and options business of ABN Amro.
6        MR. OXFORD:  And Trish, if I can just
7        note for the record that, given some
8        confidentiality concerns about this
9        information, we would like for the moment to
10       designate this section of the testimony as
11       highly confidential.
12       MS. BLOOMER:  Absolutely.
13       A.   Just not sure what -- what's public
14   knowledge, what's not public knowledge.
15       Q.   Fair enough.  Sure.
16       So, I'm sorry, I --
17       A.   We acquired the -- UBS acquired the
18   futures business from ABN Amro worldwide futures
19   business.  I worked on the due diligence.  I
20   worked on the preparation of our bid, although I
21   didn't work on the financial information, more
22   of a review, quick review of the aspects of it,
23   how it would have impacted our firm.  Worked on
24   the due diligence, supervised the due diligence
25   in some respects of our financial professionals.

1    HIGHLY CONFIDENTIAL - D. McISAAC
2        Q.   Uh-huh.
3        A.   And was responsible for the worldwide
4    implementation from the finance standpoint of
5    bringing them onto our books and records.
6        Q.   When did this transaction take place?
7        A.   Dates are fuzzy.  2006, I believe.
8    Maybe 2005.
9        Q.   Okay.  Were there any other
10   transactions that you -- or, acquisitions that
11   you reviewed?
12       A.   We also at one point in time bought
13   the prime broker business of ABN Amro also,
14   which included, you know, the options business
15   that they did for their customers, but it was
16   primarily a purchase of the customer business.
17       Q.   Did it include proprietary options?
18       A.   No.  No sense in buying proprietary
19   options.  You book your own.
20       Q.   Any other transactions that you were
21   involved in reviewing?
22       A.   We also bought -- this goes a little
23   bit further back, a little bit more fuzzy on
24   it -- the capital markets business of Charles
25   Schwab, which included their market-making

Page 14

1      HIGHLY CONFIDENTIAL - D. McISAAC
2  business in -- in equities and, in some
3  respects, options.
4      Q.   And that would have been an
5  acquisition of the proprietary portfolio as
6  opposed to a customer?
7      A.   It would have been an actual entity as
8  well as certain businesses that were bought into
9  a different entity.  We bought a whole entity
10  that did some business as a clearer for some
11  prime brokers as well as trading for them,
12  market-making for them, and we bought in some
13  market-making information into the firm
14  separately.
15      Q.   Okay.  Why is it that in that context
16  it made sense to buy proprietary positions
17  whereas it wouldn't make sense to buy them in
18  the case of the prime brokerage acquisitions?
19      A.   We bought a whole entity.
20          MR. OXFORD:  Objection to the form.
21          If you could just slow down a little a
22      little bit to make sure that Trish gets her
23      question finished before you answer and so
24      that I have an opportunity to object.
25          THE WITNESS:  Sorry about that.

Page 15

1      HIGHLY CONFIDENTIAL - D. McISAAC
2      We bought a whole entity at the time.
3      Q.   Which time?
4      A.   With the Charles Schwab.  So the
5  entity had proprietary -- might have had options
6  positions in it when we bought it.
7      Q.   Okay.  Do you know whether it had
8  options positions?
9      A.   I don't remember if it did or not at
10  this point in time.  It wouldn't have been a
11  significant portion of it.
12      Q.   Do you remember the terms of the
13  acquisition of the proprietary book?
14      A.   We bought the entity at a price, at a
15  bid price, and whatever the net asset value of
16  the entity would have been.
17      Q.   What year was the Charles Schwab
18  transaction?
19      A.   Maybe 2004, 2005.
20      Q.   And the acquisition of the prime
21  brokerage business of ABN Amro?
22      A.   I want to say around 2003, 2004,
23  somewhere around there.
24      Q.   With respect to the UBS acquisition of
25  ABN Amro in 2006, the first one that you

Page 16

1      HIGHLY CONFIDENTIAL - D. McISAAC
2  testified about?
3      A.   Uh-huh.
4      Q.   How long did it take to negotiate that
5  deal from the day it was first conceived to the
6  day it closed?
7          MR. OXFORD:  Object to the form.
8      A.   It probably took a couple of months.
9  I don't remember exactly.
10      Q.   And you said that you were involved in
11  the due diligence on that transaction?
12      A.   Yes.
13      Q.   Okay.  Can you describe for me what
14  the due diligence consisted of?
15      A.   We reviewed the financial information
16  of their business, reviewed their models.  I
17  didn't review the models per se to determine the
18  revenue streams.  That was done by other groups.
19          I reviewed from a financial standpoint
20  and from a regulatory standpoint for both the
21  assets we were buying from one entity as well as
22  multiple other entities we were buying, I think
23  I want to say 13 or 14 different assets and/or
24  entities at -- purchased assets from different
25  companies and/or entities and reviewed that and

Page 17

1      HIGHLY CONFIDENTIAL - D. McISAAC
2  directed our professionals that did a little bit
3  deeper dive on due diligence.
4      Q.   Can you give me a sense of the
5  relative size of the business that was acquired
6  relative to the LBI transaction that you're
7  testifying about in this case?
8      A.   Well, at the time of the acquisition,
9  I believe ABN, with what UBS had at the time,
10  made us probably the largest FCM in the country.
11      Q.   Okay.  And in 2008 where did Lehman
12  Brothers' business rank?
13          MR. OXFORD:  Object to the form.
14      A.   I don't know exactly where it was.  I
15  don't, looking at the numbers, I don't think it
16  was very high.
17      Q.   You don't think it was very high.
18  Okay.
19      A.   As far as, you know, seg and secured
20  accounts.  Seg and secured balances, that's how
21  you usually rate it.
22      Q.   Other than reviewing models, what else
23  did your due diligence consist of?
24          MR. OXFORD:  Object to the form.
25      Misstates his testimony.

Page 18

HIGHLY CONFIDENTIAL - D. McISAAC

1          You can answer.
2     A.    I didn't review the models.  Somebody
3   else reviewed the models.  I reviewed the
4   financial information, the regulatory aspects,
5   the impact that it would have on the firm, the
6   controls, the system they were using, they were
7   using a different system, to make sure we were
8   familiar with it.
9     Q.    Did you review the accounts, the
10  customer accounts of the companies you were
11  acquired?
12    A.    No, the businesspeople along with some
13  of their professionals reviewed the actual
14  customer accounts to determine which customers
15  they may not -- they wanted to take and which
16  customers they didn't want to take.
17    Q.    Do you know how long they spent
18  conducting that exercise?
19    A.    I think a lot of it was done prior to
20  the final bid as far as, you know, first blush,
21  on the larger clients.  They probably spent a
22  little extra time on the smaller clients.
23    Q.    Okay.  And when you say a little extra
24  time, you said that the entire process took a

Page 19

HIGHLY CONFIDENTIAL - D. McISAAC

1   couple of months --
2     A.    Some of the customers -- I'm sorry.
3     Q.    That's okay.
4          You said that the entire process took
5   a couple of months.  How long would you say was
6   spent on analyzing the customer base?
7     A.    I don't know how much time in
8   particular.  The main review for the customer
9   base was that they cleared for some market
10  makers and it wasn't a business, I think, that
11  we wanted to be in, so it was carving out which
12  ones you wanted to take and which ones you
13  didn't want to take.
14    Q.    Okay.  Did you do a -- were you
15  involved in any type of credit check of the
16  customers that you were -- that were in the --
17    A.    No.
18    Q.    -- accounts?  Okay.
19         And did you say that the UBS -- this
20  first acquisition from 2006 that we discussed
21  was an acquisition of just a customer business,
22  or did it also include proprietary portfolio?
23    A.    It was just the customer business.  We
24  took over ABN's proprietary business to clear it

Page 20

HIGHLY CONFIDENTIAL - D. McISAAC

1   for them, so we didn't buy the positions.  They
2   maintained the positions and we were the
3   clearing agent for them.
4     Q.    Okay.  Were there any other
5   transactions other than the three that we
6   discussed so far that you were involved in
7   reviewing?
8     A.    Just along the way we did some mergers
9   and I was involved in the PaineWebber
10  acquisition.  I was involved in the merger we
11  did with SBC, but more for maintaining the
12  regulatory atmosphere, making sure we were
13  complying with that.
14    Q.    Did you have any role in negotiating
15  the terms of any of those transactions?
16    A.    I -- we had a separate group that did
17  the negotiation that determined how much to pay
18  for them.  I was consulted by them for various
19  issues but didn't negotiate the price.
20    Q.    Do you have any experience with
21  proprietary options or futures trading
22  strategies?
23    A.    I ran the regulatory group at UBS for
24  15 years, so in doing the regulatory reports,

Page 21

HIGHLY CONFIDENTIAL - D. McISAAC

1   you had to understand what we were doing.  As we
2   went into a new business or a new process or new
3   product, I had sign-off authority over it to
4   make sure we were doing it accurately.
5     Q.    And what type of information would you
6   require in that role about the trading strategy?
7          MR. OXFORD:  Object to the form.
8          You can answer.
9     A.    We need to know what the desk was
10  doing so that we could allocate it properly for
11  capital purposes and for haircut purposes as
12  well as to make sure we were producing it
13  properly on our financial statements.
14         At one point in time we started doing
15  volatility trading and wanted to make sure that
16  we had all the right information and that it was
17  recorded properly, at the end of the day we had
18  all the correct information.
19    Q.    Was there a particular name of the
20  volatility trading positions that were acquired,
21  do you know?
22    A.    No, we didn't acquire them.  They were
23  a new business that we instituted within the
24  firm.

Page 22

1    HIGHLY CONFIDENTIAL - D. McISAAC
2        (The non-highly confidential portion
3    will continue on the next page.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 23

1                    D. McIsaac
2        Q.    Are you familiar with the term "VIX"?
3        A.    VIX is a -- it's an index that's
4    traded over the -- I'm not sure if it's
5    over-the-counter or exchange-traded.  I think
6    it's exchange-traded, but it's, if I remember
7    correctly, it's the volatility index of the
8    market.  You're trading the volatility index.
9        Q.    What's your understanding of the risk
10    profile of a VIX position in a volatile market?
11        MR. OXFORD:  Object to the form.
12    Vague.
13        You can answer if you're able.
14        A.    I'm not a risk man so I don't know.  I
15    wouldn't venture to guess what the risk profile
16    is.  We would normally use quants and people
17    like that to determine that information.
18        Q.    Do you have an understanding of the
19    risk profile of any other types of
20    exchange-traded derivatives?
21        MR. OXFORD:  Object to the form.
22    Vague.
23        A.    Just from the standpoint of dealing
24    with them and understanding how the market
25    moves, not from a risk standpoint or a value at

Page 24

1                    D. McIsaac
2    risk standpoint.  We would have other people
3    that were responsible for that.
4        Q.    Is it fair to say that you're not an
5    expert on risk management in terms of
6    proprietary trading?
7        MR. OXFORD:  Object to the form.
8        You can answer.
9        A.    I'm not an expert on risk trading, on
10    risk management.  Again, in our firms we would
11    have separate people that were responsible for
12    risk management processes and procedures.
13        Q.    What types of risks would you be
14    knowledgeable about when analyzing an
15    exchange-traded derivatives acquisition?
16        A.    Reputational risk, and, you know, if
17    we were taking on something, the impact it would
18    have on the firm's reputation; capital risk,
19    from a standpoint of how much capital would be
20    used and how it would impact the firm's capital
21    position; financial statement disclosure and
22    understanding that, and in general, the terms --
23    general understanding of the business.  So, in
24    such when we took over our futures and clearance
25    business, again, it's a customer-related

Page 25

1                    D. McIsaac
2    business, really not much risk involved.
3        Q.    If there's not much risk involved,
4    what is -- why is it generally the case that a
5    transaction of this type would take two months
6    to negotiate?
7        MR. OXFORD:  Object to the form.
8        A.    It would take two months to finalize,
9    to set up the systems because you're going to
10    convert their information onto your systems, and
11    to, you know, finalize all the information you
12    need to finalize on it to do your due diligence
13    and to, you know, to finalize everything around
14    the purchase.
15        Q.    And would that give you enough time to
16    analyze any problems with the books and records
17    of the selling entity?
18        MR. OXFORD:  Object to the form.
19        You can answer.
20        A.    It would, although, you know, your
21    first review would come up with anything
22    significant usually.
23        Q.    Okay.  And how long would the first
24    review take?
25        MR. OXFORD:  Same objection.

Page 26

D. McIsaac

1
2     A.    Sometimes it could take a weekend.
3     Q.    And what's the longest that it could
4     take?
5     A.    It may be a couple weeks, possibly.
6     It's according to what you're doing and how --
7     what other things you have to do at that point
8     in time.
9     Q.    One of the things that you mentioned
10    when you were describing your general areas of
11    expertise was margin requirements at the OCC.
12    Can you describe for me what your background and
13    familiarity is in that regard?
14    A.    Well, from the firm's financial
15    standpoint, you know, we needed to know what the
16    margin requirements were, how they impacted the
17    customer reserve formula, how they impacted the
18    firm in general to know what margin was being
19    called; the rules and regulations of the OCC,
20    how it impacts additional margin requirements at
21    points in time for firms, an understanding of
22    that.  I worked for a firm that was -- I don't
23    think it's a secret -- was having some financial
24    difficulties, so we did have a lot of
25    conversations with the regulators over the

Page 27

D. McIsaac

1
2     margin requirements.
3     Q.    Okay.  Can you describe generally what
4     the problems were with the firm that you just
5     described?
6     A.    We lost a lot of money.  UBS lost a
7     lot of money.
8     Q.    Lost a lot of money on what?
9     A.    On various trading strategies.
10    Q.    Would that include their trading
11    strategies at the OCC?
12    A.    I do not believe so.
13    Q.    Okay.  What was the context of your
14    involvement with the OCC?
15    A.    As a regulator, a regulated entity, as
16    our clearing org., they had a concern on our
17    capital position and our ability to fulfill our
18    obligations to it.  I interfaced with them to
19    keep abreast of what the firm was doing, how we
20    were doing, and what we were -- what we were
21    taking to maintain our capital base and keep
22    them comfortable from a financial perspective.
23    Q.    Were you able to keep them
24    comfortable?
25    A.    I believe so.

Page 28

D. McIsaac

1
2     Q.    Did they ever threaten to liquidate
3     the account?
4     A.    Not to my knowledge.
5     Q.    Did they ever increase the margin
6     requirements because of the financial situation
7     of the company?
8         MR. OXFORD:  Object to the form.
9     A.    As long as this is confidential, yes.
10    Q.    Do you know the extent to which they
11    did that?
12    A.    30 percent requirement, additional
13    requirement.  I think it was called Phase 3 or
14    Level 3.
15    Q.    Did they ever refuse to allow the
16    company to withdraw excess that happened to be
17    in an account on any given day?
18        MR. OXFORD:  Object to the form.
19    A.    Not that I'm aware of.
20    Q.    Did you deal with the OCC in this
21    regard with respect to customer accounts, firm
22    or market maker accounts, or both?
23    A.    It was the overall relationship we had
24    with the OCC.
25    Q.    So they were both?

Page 29

D. McIsaac

1
2     A.    So it was firm and customer.
3     Q.    Do you have an understanding of what
4     the OCC's rights are vis-a-vis clearing members
5     when they have insecurities about
6     creditworthiness?
7         MR. OXFORD:  Object to the form.
8     A.    I understand I think they have four
9     levels for firms.  Level 1 being no concerns; I
10    believe Level 2 is an alert status, where
11    they pay a little bit more attention to how the
12    firm is doing; Level 3 is where they raise the
13    margin requirements by 30 percent; and I believe
14    Level 4 is even more severe, where they raise it
15    to 50 percent.
16    Q.    At what level do they start
17    threatening to liquidate accounts?
18        MR. OXFORD:  Object to the form.
19    A.    I don't know.
20    Q.    You've never experienced that?
21    A.    I've never experienced that.
22    Q.    Do you know what level LBI was at in
23    September of 2008?
24    A.    No, I do not.
25    Q.    Did you ask anyone that?

Page 30

1          D. McIsaac
2      A.   I may have asked, and I don't know if
3  I ever got -- I don't believe I ever got an
4  answer.
5      Q.   Do you have a sense of which level
6  they would be at given what you have learned
7  under the course of your studies in this case?
8          MR. OXFORD:  I'll object to the form
9  of the question.
10         MR. GREEN:  Objection also.
11         MR. KAY:  Objection.
12     A.   I don't know.
13     Q.   What are the OCC's -- withdrawn.  Do
14  you have an understanding of how the OCC
15  computes margin requirements as it relates to
16  volatility?
17         MR. OXFORD:  Object to the form.
18     A.   Again, I'm not an expert in that area.
19  I have somewhat of a knowledge that they are
20  looking at the potential movement in the assets
21  and look for margin to satisfy a market movement
22  of a one- or two-day market swing based on some
23  kind of theoretical pricing models.
24     Q.   Okay.  You just said that you're not
25  an expert in the area.  What area were you

Page 31

1          D. McIsaac
2  referring to?
3      A.   In how they calculate the margin
4  requirements.
5      Q.   Are the -- is the OCC's formula
6  guaranteed to ensure that in the event of a
7  liquidation there would not be a deficit in the
8  margin account?
9          MR. OXFORD:  Object to the form.
10     A.   I don't think any calculation can
11  ensure anything.  I think their calculation is
12  there for whatever they feel they need to
13  address as far as the volatility of the firm
14  and/or the marketplace.
15     Q.   Is it possible that a firm, a
16  broker-dealer could have an excess in an account
17  and nevertheless, upon a liquidation the
18  following day, incur a cost that exceeds the
19  amount that they had posted?
20         MR. OXFORD:  Objection to the form.
21     A.   I don't have a relevance to look at to
22  determine that.  I don't know.  I've never seen
23  it happen.  I don't know.
24     Q.   You don't know if it's possible for
25  the liquidation to cost more than the

Page 32

1          D. McIsaac
2  margin posted?
3      A.   I would assume anything is possible.
4  I don't know if it's ever happened or there's
5  any, you know, history of it happening.
6      Q.   Would it be more or less likely to
7  happen in a particularly volatile market based
8  on what you know about how the OCC generally
9  formulates their margin requirements?
10         MR. OXFORD:  Objection to the form.
11     A.   I guess in a volatile market anything
12  is more possible to happen.  It would be based
13  on what their positions were at the time, were
14  they long or short, were they short calls, short
15  puts.  It's, I guess, it's according to what the
16  relevance is of their -- of their book.
17     Q.   You have your report there with you?
18     A.   Yes.
19     Q.   Could you turn to page 14, please, and
20  could you review footnote 9?
21     A.   Yes.
22     Q.   Footnote 9 references an OCC Rule
23  601(c), do you see that?
24     A.   Uh-huh.  Yes, I do.
25     Q.   How long have you been familiar with

Page 33

1          D. McIsaac
2  this particular rule?
3      A.   In general terms, probably, you know,
4  understanding how the OCC works, probably, in
5  general terms, forever.
6      Q.   Okay.
7      A.   You know, but not specifically.  I've
8  never had to deal with it in specifics.
9      Q.   The rule states that the margin
10  requirement shall be the amount of margin assets
11  that must be held in the account such that the
12  minimum expected liquidation value of the
13  account after excluding positions covered by
14  deposits in lieu of margin, measured at
15  confidence levels as may be selected by the
16  corporation from time to time, will not be less
17  than zero.
18         Do you have an understanding of what
19  the phrase "minimum expected liquidating value"
20  means?
21         MR. OXFORD:  Objection to the form.
22  Misstates the document.
23     A.   "Minimum expected liquidating value" I
24  believe is the minimum value of the account
25  after it liquidates.

Page 34

D. McIsaac

1
2    Q.   Is it the minimum value or the minimum
3    expected value?
4    A.   Minimum expected value upon
5    liquidation.
6    Q.   Okay.  And expected by whom?
7    A.   I'm assuming this is an OCC rule, so
8    it's expected by them.
9    Q.   Okay.
10    A.   Based on the confidence level they
11    select.
12    Q.   Do you have any understanding of what
13    their confidence level would be based on?
14    A.   No, I do not.
15    Q.   In a market in which there's more than
16    average volatility, would you agree that it's
17    more likely that their margin requirement will
18    be insufficient to cover the liquidating cost of
19    an account?
20        MR. OXFORD:  Object to the form.
21    A.   Based on the fact that I have never
22    heard of them liquidating anybody and making a
23    call to the rest of the members, I don't know if
24    it's ever been proven that that's the case.
25    Q.   Do you agree that there's more of a

Page 35

D. McIsaac

1
2    risk of that being the case in a particularly
3    volatile market?
4        MR. OXFORD:  Object to the form.
5    A.   Could you repeat your question?because
6    it was sort of one question, then another?
7    Could you --
8    Q.   Sure.  In a market in which there's
9    more than average volatility, would you agree
10    that it's more likely that their margin
11    requirement will be insufficient to cover the
12    liquidating cost of an account?
13        MR. OXFORD:  Same objection.
14    A.   More likely than what?
15    Q.   Than in an average -- than in a market
16    with average volatility.
17    A.   Okay, so if you're saying in a market
18    that has extreme volatility, could their
19    calculations be more likely to -- to not be
20    correct than in a market that has average
21    volatility?  I guess the answer would be yes.
22    Q.   Okay.  Are you aware that on Friday,
23    September 19, 2008, the OCC refused to allow LBI
24    to withdraw margin from its account that was in
25    excess of the requirements it had published that

Page 36

D. McIsaac

1
2    morning?
3    A.   I have heard inferences to that.  I
4    might have seen an e-mail to that.
5    Q.   Have you -- in your experience, has
6    the OCC ever, to your knowledge, refused a
7    clearing member the ability to withdraw excess
8    from its account?
9    A.   To my knowledge, I don't think so that
10    I'm aware of, but I'm sure if they were
11    concerned with other firms, they might have done
12    the same with other firms.  It was a time and
13    place in the marketplace.
14    Q.   Is it possible that the OCC made that
15    decision because it was concerned that the
16    market may move away from the positions to the
17    extent that the margin requirements were not
18    going to be sufficient to cover the cost of a
19    liquidation?
20    A.   I can't determine what OCC's thought
21    process was.  Maybe they knew there was an
22    impending sale.  I don't know what the rationale
23    was on their part.
24    Q.   What is the OCC's overall goal in
25    setting a margin requirement?

Page 37

D. McIsaac

1
2        MR. OXFORD:  Object to the form.
3    A.   Again, I'm not there, but I believe
4    their overall goal is to make sure that there's
5    adequate margin so that the entities that
6    they're clearing for can be or could be
7    liquidated at no cost to the rest of the
8    members.
9    Q.   Can you turn to page 29 of your
10    report.  In paragraph 70, you say here that
11    "Barclays' acquisition balance sheet recognizes
12    a day one gain of $1.19 billion relating to
13    options."  Do you see that?
14    A.   Yes.
15    Q.   And in the next sentence, you say that
16    "this appears to be comprised of approximately
17    $2.29 billion of margin at the OCC less $1.1
18    billion of liabilities at the OCC."  Do you see
19    that?
20    A.   Yes.
21    Q.   Would you agree that if Barclays had
22    not received the $2.29 billion of margin at the
23    OCC, Barclays would have recorded a loss of $1.1
24    billion on these options on its acquisition
25    balance sheet?

Page 38

D. McIsaac

1
2    A.   I'm not sure. From my understanding
3  the proprietary assets, proprietary options at
4  OCC were positive by about 300 million. I
5  believe the short side was an affiliate that
6  cleared through the OCC through -- that was a
7  subordinated affiliate. So I believe the assets
8  they were buying were positive or net asset
9  value of about 300 million as well as they were
10  part of a larger portfolio of assets that they
11  were buying.
12       So they might have -- I don't see
13  where the loss came from because I believe it
14  was affiliates positions, but even if there was,
15  it would be offset by possibly gains in other
16  areas.
17    Q.   Can you describe the larger portfolio
18  of assets that Barclays was buying?
19    A.   I believe there was a repo that had
20  significant value of assets for which they
21  forgave a liability of Lehman's in lieu of the
22  assets.
23    Q.   Okay. Were they long positions or
24  short positions?
25    A.   Long positions.

Page 39

D. McIsaac

1
2    Q.   Were there any short positions
3  undertaken on the fixed equity side?
4    A.   I don't believe so.
5    Q.   Were there short equity positions at
6  Lehman outside of that repo?
7       MR. OXFORD: Object to the form.
8    A.   I don't know. I would assume there
9  might have been, but I don't know.
10    Q.   Do you recall reviewing the Asset
11  Purchase Agreement that the parties signed on
12  September 16?
13    A.   Yes.
14    Q.   Do you recall what the amount of long
15  and short positions was that was described in
16  that document?
17    A.   I believe it was 70 billion long, 69
18  billion short.
19    Q.   Do you have any reason to believe that
20  the 69 billion short didn't still exist by
21  Monday, the 22nd of September, 2008?
22    A.   I have no reason to know what the
23  number was at that point in time.
24    Q.   Is it fair to say that those ceased
25  being part of the transaction?

Page 40

D. McIsaac

1
2    A.   Those short positions, yes.
3    Q.   Okay. And the long positions still
4  were coming over?
5       MR. OXFORD: Object to the form.
6    Q.   Is that correct?
7    A.   My understanding of the Clarification
8  Letter and the APA, yes.
9    Q.   And do you understand, generally, the
10  nature of the agreement with respect to the
11  assets that were pledged under the Fed repo?
12    A.   Could you be a little more specific?
13  I'm not sure what your question is.
14    Q.   Sure. Was there a give and take with
15  respect to the long positions that were pledged
16  at the Fed repo?
17       MR. OXFORD: Object to the form.
18       MR. KAY: Same objections.
19    A.   What's give and take? I just don't
20  know what you mean by that. If you could --
21    Q.   Sure. What is your understanding of
22  the -- of the transaction as it related to the
23  assets in the Fed repo?
24       MR. OXFORD: Object to the form.
25    A.   My understanding is that the Fed was

Page 41

D. McIsaac

1
2  providing Lehman with liquidity, somewhere 45,
3  50 billion dollars, I don't remember exactly,
4  and that was secured by assets of I think I read
5  somewhere about 4 to 5 billion dollars extra in
6  assets.
7       I believe Barclays assumed that repo.
8  I believe they took over most of the assets,
9  possibly, not all of them, and those were long
10  assets that they -- that was part of the
11  purchase agreement at the end.
12    Q.   Do you have any -- did you study the
13  pleadings in this case that related to the Fed
14  repo transaction?
15       MR. OXFORD: Object to the form.
16    A.   I don't believe so. I don't think I
17  did.
18    Q.   Okay. Are you aware that Barclays had
19  expressed concern over the value of the assets
20  in the Fed repo relative to the amount of cash
21  it was advancing?
22    A.   No. If I didn't read the pleadings, I
23  probably don't know that.
24    Q.   You mentioned that there were
25  affiliate positions that you believe were part

Page 42

D. McIsaac

1
2 of the account that you referenced liabilities
3 for in paragraph 70 of your report?
4      A.    Uh-huh.
5      Q.    Can you describe generally what your
6 understanding was with respect to the transfer
7 of those positions to Barclays?
8           MR. OXFORD:  Object to the form.
9 Misstates his testimony.
10     A.    There was an affiliate that signed a
11 subordination agreement between them and LBI,
12 and I believe the OCC is a party to that,
13 whereby they would allow their securities to be
14 commingled with the firm's securities.  It's an
15 advantage usually for the firm because it gets
16 them better margin rates, possibly.  And it was
17 my understanding it was short positions of the
18 affiliate.
19          From my understanding of reading most
20 of the stuff I've read, I didn't -- I do not
21 believe that Barclays was taking over any
22 affiliates accounts.
23     Q.    Okay.  I'm showing you an exhibit
24 that's been marked as Exhibit 51.  Do you
25 recognize this document?

Page 43

D. McIsaac

1
2      A.    Yes, it's the Transfer and Assumption
3 Agreement.
4      Q.    And did you review this in connection
5 with preparing your report?
6      A.    Yes.
7      Q.    Do you see in the first "whereas"
8 clause on the first page where it says, "Lehman
9 is a clearing member of OCC and carries one or
10 more accounts (nos. 74, 84 and 273)"?
11     A.    Yes, I do.
12     Q.    And it defines that as "Account," with
13 a capital A?
14     A.    Yes.
15     Q.    Okay.  Is it your understanding that
16 the term "account" there encompasses the
17 accounts that you referenced in relation to
18 paragraph 70 of your report?
19     A.    I believe they use the same accounts,
20 yes.
21     Q.    If you go down to paragraph 1(b) on
22 that same page, do you see where it says,
23 "Barclays hereby accepts such sale, assignment,
24 and transfer of the Account, agrees to be bound
25 by and receive the benefits of maintaining such

Page 44

D. McIsaac

1
2 Account, and assumes and agrees to perform each
3 obligation arising out of or to be performed
4 with respect to the activity in the Account"?
5      A.    Yes.
6      Q.    Do you understand that to mean that
7 Barclays assumed settlement responsibility for
8 all of the positions in all of the Lehman's
9 accounts at the OCC?
10     A.    Yes.  I think Barclays assumed
11 clearance and settlement of all the accounts
12 there.
13     Q.    Okay.  And what is the basis for your
14 understanding that Barclays -- withdrawn.
15          Is it fair to say that Barclays was
16 responsible for settling and clearing the
17 positions in the 074F and 074M accounts
18 regardless of whether they were held on the firm
19 account on behalf of an affiliate?
20     A.    Yes, they would have been responsible
21 for settling and clearing and liquidating if
22 need be.
23     Q.    Does that mean that on short positions
24 that were held on behalf of affiliates Barclays
25 would have to advance any securities that were

Page 45

D. McIsaac

1
2 owed or advance any cash that was owed on an
3 exercise or an assignment of one of those
4 positions?
5           MR. OXFORD:  Object to the form.
6      A.    It means they would have either
7 settled the transactions if they were called or
8 closed them out.
9      Q.    You say in your report that Barclays
10 charged back the LBI estate for the cost of
11 closing out affiliate positions.  Let me give
12 you the page reference.
13          If you turn to pages 26 and 27 of your
14 report, paragraph 66 on page 26, you say,
15 "Barclays did not assume any risk with respect
16 to LBI affiliate customers' futures positions."
17          Oh, wait.  I'm sorry.  Let me get to
18 the options positions because that's what we're
19 talking about now.
20          MR. OXFORD:  I think it's probably
21 page 21, Trish, you're looking for.
22          MS. BLOOMER:  Thank you.
23     Q.    You say in paragraph 51 that Barclays
24 has charged back the LBI estate for the cost of
25 maintaining and closing out those positions.

Page 46

D. McIsaac

1
2  You see that?
3      A.   Yes.
4      Q.   What is -- is the Dziemian declaration
5  that you cite here the only factual basis for
6  that statement?
7      A.   I believe there's a schedule that I
8  saw that had those amounts in it.  I'm not sure
9  if it came from Dziemian's declaration or where
10  else it might have come from, but his
11  declaration did say they were charging them
12  back.
13          MS. BLOOMER:  I think maybe this is a
14      good time to take a first break and that way
15      I can pull an extra document that I missed.
16          MR. OXFORD:  Okay.  That would be
17      great.  Thanks.
18          THE VIDEOGRAPHER:  The time is 10:25.
19      We're going off the record.
20          (Recess.)
21          THE VIDEOGRAPHER:  This is the start
22      of tape number 2.  The time is 10:43.  We
23      are back on the record.
24  BY MS. BLOOMER:
25      Q.   Welcome back, Mr. McIsaac.

Page 47

D. McIsaac

1
2      A.   Thank you.
3      Q.   I want to show you a document -- I
4  think we're going to have to mark this.  It's
5  already been marked, but I don't have the marked
6  copy.  So, Exhibit 685.
7          (Exhibit 685, Declaration of Daniel
8      Dziemian, marked for identification, as of
9      this date.)
10      Q.   I'm showing you a document that's
11  marked as Exhibit 685, Mr. McIsaac.  We were
12  looking before the break at paragraph 51 of your
13  expert report in which you state that Barclays
14  has charged back the LBI estate for the cost of
15  maintaining and closing out those positions.
16          You see that?
17      A.   Yes.
18      Q.   Okay.  And which positions precisely
19  were you referring to in this statement?
20      A.   Let me just see.  I guess it would be
21  non-PIM customer transactions.
22      Q.   Okay.  Would that include affiliates?
23      A.   Yes.
24      Q.   And you cite the Dziemian declaration
25  at paragraphs 12 and 14 through 16 as the

Page 48

D. McIsaac

1
2  support for that statement.
3          Can you review those paragraphs and
4  tell me where in this declaration it suggests
5  that Barclays charged back the LBI estate for
6  the cost of maintaining and closing out the
7  affiliate positions?
8      A.   I presume it's in paragraph 14.
9      Q.   And what portion of the paragraph?
10      A.   The fourth or fifth line down, "The
11  net effect of the close-out and liquidation of
12  all positions and equities relating to the 074C
13  LBI Affiliate Options on the LBI Bridge Account
14  is a net receivable from LBI to Barclays in the
15  amount of $80 million."
16      Q.   And are you assuming in that statement
17  that a net receivable on the LBI Bridge Account
18  is the equivalent of charging back the estate
19  for the cost of closing out those options?
20          MR. OXFORD:  Objection to the form.
21      A.   If you record a receivable, I assume
22  you think somebody's going to pay you for that,
23  yes.
24      Q.   Do you understand what the purpose of
25  the LBI Bridge Account was?

Page 49

D. McIsaac

1
2      A.   I'm -- by the words there, I assume
3  it's a bridge account between two entities or
4  between two systems.  On one side you book --
5  you may book the receivables.  On the other side
6  you book the payables.
7      Q.   Okay.  If you look at paragraph 13, it
8  says, "The bridge accounts were necessary to
9  account for the fact that the settlement bank
10  and the settlement depository as of
11  approximately September 23, 2008, were switched
12  to Barclays while the accounts of these
13  customers and affiliates remained with LBI."
14  You see that?
15      A.   Yes.
16      Q.   Is it possible that the bridge account
17  was necessitated by accounting concerns and the
18  need to process trades on both sides on a system
19  as opposed to because Barclays was charging back
20  the estate for any of those costs?
21      A.   Could you repeat --
22          MR. OXFORD:  Object to the form.
23      A.   Sorry.
24          Could you repeat the last part?
25  Because I don't understand the part where you

Page 50

D. McIsaac

1 talked about charge back, the way you said it.
2    Q.    Okay.  Is it possible that the bridge
3 account was necessitated by accounting concerns
4 and the need to process trades on both sides on
5 a system as opposed to because Barclays was
6 charging back the estate for any of those costs?
7        MR. OXFORD:  Same objection.
8        MR. GREEN:  Objection.
9    A.    If they were booking them on both
10 sides, then wouldn't they be charging them back?
11 If they were taking responsibility for them,
12 then they would have written them off to an
13 expense, not a receivable.
14    Q.    Okay.  Did you review Gary Romain's
15 deposition testimony in preparing your report?
16    A.    I believe I read it, yes.
17    Q.    Okay.  I'm going to mark this exhibit
18 as Exhibit 686.
19        (Exhibit 686, Deposition of Gary
20 Romain, marked for identification, as of
21 this date.)
22    Q.    You have in front of you Gary Romain's
23 deposition testimony.  Can you turn to page 141,
24 please?
25

Page 51

D. McIsaac

1    A.    Do you want your copy back?
2    Q.    Pardon?  I realize it's yellow.
3    A.    That's fine.
4    Q.    I wanted to direct you to that portion
5 of it, so it's fine.  Thank you.
6        Do you see the portion that's boxed in
7 that deposition transcript?
8    A.    Yes.
9    Q.    And do you see where Gary Romain says
10 that "we had written off 100 percent of it and
11 in the acquisition accounting, but it's been
12 recorded as an expense, an expense being a
13 deduction from the negative goodwill on the
14 acquisition"?
15    A.    Let me read it, please.
16        MR. OXFORD:  And Mr. McIsaac, to the
17 extent you feel necessary to answer the
18 question, you should read as much as you
19 need of Mr. Romain's testimony.
20    Q.    In fact, perhaps it would be better
21 for you to start on page 139 at the bottom of
22 the page, line 22, when Mr. Romain starts
23 describing --
24    A.    Uh-huh.
25

Page 52

D. McIsaac

1    Q.    -- the accounting treatment on the
2 affiliate options that we've been discussing.
3        MR. OXFORD:  Thank you, Trish.
4    A.    Okay.  I've read it.  Can you repeat
5 your question?  I'm sorry.
6    Q.    Sure.  Do you see in on page 140 in
7 the answer provided on line 7 through 15 Gary
8 Romain says, "So if you look at the payments
9 made to close out positions and for some OCC
10 related-costs, the total payment made by
11 Barclays was $104 million and the receivable,
12 which might otherwise have been recognized, has
13 been written off"?
14    A.    Yes.
15    Q.    Did you read that in preparing your
16 report?
17    A.    I probably read this, this deposition,
18 so yes, I probably read this, right.
19    Q.    Is this inconsistent with your
20 understanding that Barclays charged back the LBI
21 estate for the cost of closing out affiliate
22 positions?
23    A.    My understanding, and even from
24 reading here, it looks like they recorded a
25

Page 53

D. McIsaac

1 receivable which was charging them back, they
2 didn't take them to P&L directly, and eventually
3 wrote them off.  Maybe they deemed them
4 uncollectable, I'm not sure why, but I don't
5 know why you would set them up as a receivable
6 if you were going to write them off if you
7 didn't -- if you were taking responsibility from
8 the start.  So Mr. Dziemian basically said that
9 they were being set up as receivables.
10    Q.    Would you agree that Barclays incurred
11 a cost of $104 million according to the record
12 facts that you've seen in this case on the
13 affiliate options positions in the 074C account?
14        MR. OXFORD:  Object to the form.
15    A.    I agree that's what Mr. Romain
16 says in his deposition.  I have not seen
17 anything to show me what the numbers are or had
18 anybody provide information, but that's what he
19 says here.
20    Q.    Do you have any reason to dispute or
21 doubt the fact that Barclays incurred costs in
22 closing out these positions?
23    A.    No, I do not.
24    Q.    Do you have any reason to believe that
25

Page 54

D. McIsaac

1
2   Barclays collected the amounts that it incurred
3   in closing out affiliate positions from the LBI
4   estate?
5       A.   No, I do not.
6       Q.   Do you believe that Barclays did
7   collect the costs from the LBI estate that it
8   incurred in closing out --
9       A.   I don't know if they did or didn't.
10      Q.   -- the LBI affiliate positions?
11          Please allow me to finish the
12  question.
13          -- in closing out the LBI affiliate
14  positions?
15      A.   I don't know if they collected or not
16  or presented a bill or not.
17      Q.   Is it your general understanding that
18  entities write off amounts that they were able
19  to collect?
20          MR. OXFORD:  Object to the form.
21      A.   No.  You usually write them off when
22  you think there might be a -- you may not be
23  able to collect them.
24      Q.   Do you have a general understanding of
25  the priorities in a SIPC liquidation with

Page 55

D. McIsaac

1
2   respect to creditor claims?
3       A.   I'm not a SIPC expert.  I have a
4   general understanding of the SIPC claims.
5       Q.   Are you an expert in Customer
6   Protection Rules?
7       A.   Yes.
8       Q.   What's your understanding of where
9   customers fall in terms of priority when they
10  have claims against a SIPC Trustee or an estate
11  and bank in SIPC proceedings relative to general
12  Creditors?
13          MR. OXFORD:  Object to the form.
14      A.   I believe SIPC customers have first
15  priority to the assets in the customer estate
16  and then share rateably with the general
17  Creditors if there's not enough -- not enough
18  moneys in the general estate to satisfy them.
19      Q.   Is it your understanding that the LBI
20  estate has sufficient assets currently to cover
21  all customer claims?
22          MR. OXFORD:  Object to the form.
23      A.   I don't know if they have or don't
24  have.  I think that's still being assessed.
25      Q.   Is it possible that the reason

Page 56

D. McIsaac

1
2   Barclays wrote these expenses off is because
3   Barclays didn't expect it would ever be able to
4   recover these costs from the Lehman estate?
5       A.   I can't determine why Barclays wrote
6   them off.
7       Q.   Do you generally consider a
8   broker-dealer who is in SIPC proceedings to be a
9   good credit risk?
10      A.   No, I would not consider them a good
11  credit risk.
12      Q.   Would you extend credit to a
13  broker-dealer in SIPC liquidation?
14      A.   Would I extend credit to them after
15  they were in liquidation?
16          MR. OXFORD:  Object to the form.
17      A.   Sorry.
18          Probably if it was court-approved, I
19  think there's some way where the court can
20  approve you providing credit to a liquidated
21  estate, but no, in general terms, I wouldn't.
22      Q.   Why not?
23      A.   Because you have a bankrupt estate
24  that you don't know the creditworthiness of
25  whether or not you'll be paid.

Page 57

D. McIsaac

1
2       Q.   Do you think -- do you have any reason
3   to believe that Barclays thought it would be
4   paid by the LBI estate for losses it incurred on
5   affiliate positions that it took clearance
6   responsibility for?
7          MR. OXFORD:  Object to the form.
8          MR. GREEN:  Objection.
9       A.   Again, I don't know what was in
10  Barclays' mind and what they thought when they
11  wrote off the receivables.  I'm not sure what
12  the basis was.
13      Q.   Would you agree that your report
14  characterizes the level of risk associated with
15  affiliate positions to be minimal, if it existed
16  at all?
17          MR. OXFORD:  Object to the form.
18      A.   Yes, I think it says it's less risky
19  because the credit is borne by the affiliates,
20  the market risk is borne by the affiliates, and
21  that I believe Barclays was not taking
22  responsibility for any affiliates' positions.
23      Q.   But you agree that Barclays was taking
24  settlement responsibility for those positions?
25      A.   It appears that in the TAA that they

Page 58

```
 1          D. McIsaac
 2  took settlement responsibility for them.
 3     Q.   And are you aware of the financial
 4  state of the LBI affiliates themselves during
 5  the month of September 2008?
 6        MR. OXFORD: Object to the form.
 7     A.   I believe some of them were in
 8  liquidation and some of them may not have been.
 9     Q.   Would you consider them a credit risk
10  at that time?
11        MR. OXFORD:  Object to the form.  You
12  mean any time in September?
13     Q.   Sure.  We'll start with any time in
14  September.
15     A.   I don't know what the credit risk
16  would have been in September prior to anybody
17  going into liquidation, what the analysis would
18  have been, and people will take risk based on
19  what the rewards they think they will receive.
20     Q.   What reward was Barclays receiving by
21  agreeing to take over settlement responsibility
22  for the affiliate positions?
23     A.   Maybe the business that was there and
24  maybe they were willing to take on an additional
25  risk to -- to get the customer business and
```

Page 59

```
 1          D. McIsaac
 2  whatever other business was there.
 3     Q.   Were they going to see any profit from
 4  taking over the affiliate positions themselves?
 5     A.   When you take over a business, not
 6  every piece of it may be profitable.  So you may
 7  accept some risk to get the profitable pieces of
 8  it.  I don't know why they assumed the
 9  responsibility for the affiliates if they didn't
10  want them.
11     Q.   Earlier you were describing
12  transactions in which you conducted due
13  diligence in one of your prior companies, and
14  you explained that the acquirer spent a week to
15  several weeks reviewing the customer base to
16  determine which customers it wanted and which
17  customers it didn't?
18     A.   Uh-huh.
19     Q.   Do you believe that Barclays had
20  adequate time during the week of September 15,
21  2008 to review all of the customers that it was
22  acquiring or not acquiring from LBI?
23        MR. OXFORD:  Object to the form.
24     A.   It possibly didn't have time to review
25  all the customers, but it certainly had time to
```

Page 60

```
 1          D. McIsaac
 2  review the affiliates and could have determined
 3  that they didn't want to take the affiliate
 4  accounts if that was the case.
 5     Q.   What is your understanding of what
 6  would have happened in the event that Barclays
 7  had refused to take responsibility for the
 8  affiliate positions?
 9     A.   I don't know what would have happened
10  if they refused to take responsibility for it.
11     Q.   Is it your understanding that the
12  affiliate positions were commingled at the OCC
13  with firm positions and also with customer
14  positions?
15     A.   Yes.
16     Q.   Is it your understanding that there
17  were both affiliate and firm positions in the
18  074F account at the OCC?
19     A.   Yes.
20     Q.   And is it your understanding that
21  there were affiliate positions commingled with
22  customer positions in the 074C account at the
23  OCC?
24     A.   Yes.
25     Q.   What is your understanding of the
```

Page 61

```
 1          D. McIsaac
 2  position that the OCC took during the week of
 3  September 15 with respect to Lehman Brothers as
 4  a clearing member?
 5        MR. OXFORD:  Object to the form.
 6  Vague.
 7     A.   I'm not sure what position the OCC
 8  took with regard to them.  You know, I thought
 9  they were going on as business as usual.  They
10  looked like they were clearing their trades and
11  assigning their trades, so I don't see any -- I
12  haven't seen anything that says what the OCC did
13  or didn't do.
14     Q.   Do you have any basis to say what
15  would have happened to LBI's accounts with the
16  OCC if Barclays had refused to take over
17  settlement responsibility for those accounts?
18     A.   I don't have a basis, but I assume the
19  OCC would have liquidated the accounts.
20     Q.   Why do you assume that?
21     A.   Because Lehman was bankrupt at the
22  time or was entering into SIPC liquidation, so I
23  think the OCC as a first move would liquidate
24  the accounts.  It doesn't mean that various
25  positions in those accounts couldn't be
```

Contains Highly Confidential Portions

Page 62

D. McIsaac

1
2 transferred to another broker-dealer.
3    Q.   Do you know how much time Barclays and
4 Lehman had to negotiate the terms of this
5 transaction before they entered into the APA?
6    A.   No, I do not.
7    Q.   Would it surprise you to hear that it
8 was less than 24 hours?
9        MR. OXFORD:  Object to the form.  You
10 can answer.
11    A.   It would -- wouldn't surprise me or
12 not surprise me.  Lehman was in financial
13 difficulty at that time and there were reports
14 in the papers that a lot of people were looking
15 at Lehman from time to time.  So I have no idea
16 when Barclays started to look at it and
17 determined what they wanted to do.
18    Q.   You didn't review that in connection
19 with this report?
20    A.   Review?  What would I have reviewed to
21 say that?  I'm asking what -- what would I have
22 reviewed?
23    Q.   I understand that you're asking that,
24 but I'm asking you what did you review in order
25 to understand the circumstances in which this

Page 63

D. McIsaac

1
2 deal was negotiated?
3    A.   I read the Asset Purchase Agreement.
4 I read the Clarification Letter.  I read the
5 TAA.  You know, I read some e-mails that went
6 around.  As a general knowledge of what was
7 happening in 2008, you know, I lived it.
8    Q.   Okay.  So is it fair to say that you
9 prepared your report without knowing the amount
10 of time that it took Lehman -- that Barclays and
11 Lehman had to negotiate the APA?
12    A.   I didn't specifically find out how
13 much time they took to negotiate it and I don't
14 know what that has to do with what we're talking
15 about.  I'm not sure what the timing, you know,
16 has to do with what they decided or what they
17 didn't decide to do.  They certainly didn't have
18 to do it, I don't think, at any point in time.
19 There was not a gun held to their head, I don't
20 believe.  I mean, unless I didn't -- there's
21 more information than I know.
22    Q.   Uh-huh.  So when you prepared your
23 opinions in your report, did you believe it was
24 possible that the parties had spent more than a
25 week negotiating the terms of the APA?

Page 64

D. McIsaac

1
2        MR. OXFORD:  Object to the form.
3    A.   I don't think I gave much thought to
4 how much time they spent negotiating it.  I
5 understand the timing of what was happening
6 around then.  I don't know how long they were
7 talking about the APA, what conversations they
8 may have had during the time period.  I don't
9 believe that's public information.
10    Q.   Were you allowed to ask questions of
11 fact witnesses during your investigation?
12    A.   I --
13        MR. OXFORD:  I'll object to the form
14 of the question.
15    Q.   Okay.  Go ahead.  You can answer.
16        MR. OXFORD:  I'm not sure in terms
17 of --
18    Q.   Did you talk to anybody -- let me
19 rephrase the question.
20        MS. BLOOMER:  Thanks, Neil.
21    Q.   Did you talk to anybody who was
22 involved in the negotiation of the transaction?
23    A.   No, I did not.
24    Q.   Did you speak with the advisors who
25 were present at the time?

Page 65

D. McIsaac

1
2    A.   No, I did not.
3        MR. OXFORD:  Sorry.  If you can slow
4 down, Mr. McIsaac, to let me get my
5 objection.
6        I'll object to the form of the
7 question and particularly to the vagueness
8 of the term "advisors."
9    Q.   Okay.  When did you speak with
10 Deloitte?
11        MR. OXFORD:  Object to the form.
12    A.   Regarding?  Excuse me, regarding what?
13    Q.   You said earlier today that in
14 preparing for your deposition today you spoke
15 with Deloitte.  Was that the first time that you
16 spoke with them?
17    A.   Deloitte is the financial advisors for
18 the Trustee.  In working on the original work I
19 did with the motion, I spoke to Deloitte, if
20 that's what you mean, but not in relation to
21 this.
22    Q.   Okay.  Was Deloitte present, to your
23 understanding, during the negotiations of this
24 deal?
25    A.   I don't believe they were, but I don't

Page 66

D. McIsaac

1 know.
2
3      Q.   Did you ask them?
4      A.   No, I did not.
5      Q.   Did you ask them any of the
6 circumstances under which the deal was
7 negotiated?
8      A.   No, I did not.
9      Q.   Did you ask anyone what the
10 circumstances were of the deal at the time it
11 was negotiated?
12     A.   I think I understand what was going on
13 in the environment at that time.  I don't think
14 I had to ask specifically what was happening in
15 the environment at that time.  It was a rough,
16 you know, a difficult time and I don't know if
17 Barclays had one day or five days or how long
18 they were reviewing the transaction.
19     Q.   You don't know if it was ten days?
20     A.   I don't know if it was ten days.
21     Q.   And you don't know if it was a month
22 that Barclays had to review the transaction?
23     A.   That's right.
24     Q.   Okay.
25     A.   But that doesn't change my thoughts on

Page 67

D. McIsaac

1 it because whether or not you had one day or
2 ten, you could still decide to buy something or
3 not buy something.  You can decide what you want
4 to buy and what you don't want to buy.
5
6      Q.   Can you remind me, if you haven't
7 testified to this already -- strike that.
8           What is the shortest amount of time
9 that you've ever seen an acquisition of a
10 broker-dealer business consummated in?
11          MR. OXFORD:  Object to the form.
12     A.   I believe Bank of America bought
13 Lehman Brothers over a weekend.
14     Q.   Do you know how long -- did they spend
15 any time negotiating that transaction prior to
16 that weekend?
17     A.   All I know is what I read in the
18 papers, and I thought Bank of America was
19 thinking of buying Lehman and instead bought
20 Merrill at that point in time.  I thought the
21 negotiations happened over a weekend.
22     Q.   Do you know whether they had done due
23 diligence prior to that weekend?
24     A.   I don't know.
25     Q.   Do you have any knowledge at all of

Page 68

D. McIsaac

1 the negotiations that took place during the
2 structuring of that deal?
3      A.   No, I do not.
4      Q.   With respect to the deals that you
5 have personal knowledge of, what's the shortest
6 amount of time that you know of in which an
7 acquisition of a broker-dealer business took
8 place?
9          MR. OXFORD:  Object to the form.
10 Vague.
11     A.   I -- I've been involved in some
12 acquisitions and mergers that I don't know how
13 much time was spent in doing the negotiation.
14 When UBS and Swiss Bank merged, I have no idea
15 how long it took for them to do the due
16 diligence and decide on the merger.
17     Q.   What's the shortest amount of time
18 with respect to a transaction that you do have
19 an idea of how long it took?
20     A.   Probably a month or so.
21     Q.   You say in your report that the
22 circumstances of this transaction don't affect
23 your opinion.  Do you recall saying that in your
24 report?

Page 69

D. McIsaac

1
2      A.   I believe so.
3      Q.   Okay.  The fact that this transaction
4 closed in 24 -- was negotiated in 24 hours
5 doesn't have any impact on your opinion as to
6 what was rational under those circumstances in
7 terms of structuring the terms of the deal?
8          MR. OXFORD:  Objection.
9      Q.   Is that your opinion?
10          MR. OXFORD:  Object to the form.
11 Assumes facts not in evidence.
12     A.   I believe it was negotiated.  It
13 didn't have to close, and until such time as it
14 closed, there was still negotiations and I
15 assume due diligence going on.
16     Q.   Is it your understanding that an
17 agreement can be negotiated after it's executed?
18     A.   An agreement can be -- I don't -- I'm
19 sorry, I'm not sure where you're going on that.
20 "After it's executed," I'm not sure.
21     Q.   Sure.  Do you agree that the parties
22 would have negotiated the terms of the deal
23 before they signed a binding agreement that
24 expressed and set forth the terms of that deal?
25          MR. OXFORD:  Object to the form.

Contains Highly Confidential Portions

Page 70

D. McIsaac

1    You can answer.
2    A.    I'm sorry. I believe firms negotiate
3  a shell of a deal and then usually negotiate the
4  specifics. Until a final contract is signed and
5  it's consummated, that is not, you know, it's
6  not a closed deal.
7    Q.    Showing you a document that's been
8  premarked as Exhibit 630.
9         Can you take the time to review this
10 e-mail and let me know when you're ready?
11         (Document review.)
12    A.    Yes.
13    Q.    Did you review this document in
14 preparing for your deposition today?
15    A.    I believe I might have seen this. I
16 don't remember exactly, but I might have seen
17 this e-mail trail.
18    Q.    And had you reviewed this document at
19 the time you prepared your expert report on
20 exchange-traded derivatives?
21    A.    I thought I just answered that. I
22 think I might have reviewed this when I -- when
23 I prepared it.
24    Q.    Oh, I was asking you whether you

Page 71

D. McIsaac

1  reviewed it when you prepared for the deposition
2  today --
3    A.    Oh, no.
4    Q.    -- was my first question.
5    A.    No, no, I did not review it before
6  today, for preparation today. I might have
7  reviewed it in preparing my report.
8    Q.    You're not sure? You might --
9    A.    I believe I've seen this. I know I've
10 seen the top of it. I don't know if I've seen
11 the whole other trail.
12    Q.    Okay. If you turn to the second page,
13 will you look at the paragraph that's
14 denominated paragraph 3?
15    A.    Uh-huh.
16    Q.    It says, "If the transaction does not
17 close tonight, OCC would need to immediately
18 liquidate and close out the LBI accounts and is
19 preparing to do so." Do you see that?
20    A.    Yes.
21    Q.    You see that this is an e-mail from
22 James McDaniel of Sidley?
23    A.    Uh-huh.
24    Q.    And it's to Ed Rosen of Cleary

Page 72

D. McIsaac

1  Gottlieb. Do you know who Ed Rosen is?
2    A.    Yes. He's a lawyer for Cleary
3  Gottlieb.
4    Q.    And do you know who Cleary Gottlieb
5  was representing in this transaction?
6    A.    I believe they were representing
7  Barclays.
8    Q.    And you see Hughes Hubbard is also
9  copied on these e-mails, Giddens and Kobak?
10    A.    Uh-huh.
11    Q.    Do you know who they are?
12    A.    Mr. Giddens is the Trustee and Mr.
13 Kobak is his legal counsel, I believe.
14    Q.    Okay. And you see that the SPIC
15 organization, Steve Harbeck, was also copied?
16    A.    Yes.
17    Q.    You said earlier in your testimony
18 that you don't think the parties had to do the
19 deal in any particular amount of time, and I
20 believe you said they didn't have a gun to their
21 head. Do you recall that testimony?
22    A.    Yes.
23    Q.    Do you agree that this e-mail suggests
24 that there was some urgency to the parties in

Page 73

D. McIsaac

1  closing the deal in the timeframe that they did?
2    MR. OXFORD: Object to the form.
3    A.    I believe the e-mail from the -- Mr.
4  McDaniel at Sidley Austin was relaying that to
5  Mr. Rosen. Barclays still did not have to go
6  through with the deal if they didn't want to go
7  through with the deal. I mean, again, nobody
8  was holding a gun to their head saying if you
9  don't do this, I'm going to shoot you. They
10 could have walked away from it, I assume, at
11 that point in time or they could have postponed
12 the closing. I don't know if they could have
13 done that, but --
14    Q.    Do you think they could have postponed
15 the closing and avoided liquidation of the OCC
16 account?
17    A.    I think you could have negotiated
18 anything with the OCC if they wanted to talk to
19 them about it. I don't know what negotiations
20 were going on. I don't know why this was being
21 pushed at this point in time.
22         I mean, Barclays, when I said they
23 didn't have a gun to their head, they could have
24 walked away from the deal at any point in time.

Page 74

D. McIsaac

1 If they didn't think they had enough time to do
2 the due diligence and to understand what they
3 were buying, they didn't have to buy it I guess.
4    Q.    And they didn't have to buy it if they
5 didn't like the terms of the deal either, right?
6    A.    Right.
7    Q.    You agree that the parties were aware
8 that the OCC was at least threatening to
9 liquidate the accounts on the 22nd if the deal
10 didn't close that morning?
11    A.    Yes.
12    Q.    Do you have any experience that would
13 allow you to surmise on what an OCC
14 liquidation -- how an OCC liquidation would have
15 proceeded?
16        MR. OXFORD:  Object to the form.
17    A.    I would assume they would either
18 auction the positions off or, you know, closed
19 them out.  I'm not sure how they would have
20 proceeded.  I'm not -- I have not seen one in my
21 past experience.
22    Q.    Any liquidation or any auction have
23 you seen?
24    A.    I have not seen a liquidation at the

Page 75

D. McIsaac

1 OCC.  I have not been involved in a liquidation
2 at the OCC.
3    Q.    Have you been involved in a
4 liquidation at any other clearing organization?
5    A.    I have not personally been involved,
6 no.
7    Q.    What is your understanding of what the
8 OCC's rights are in the event of a liquidation?
9        MR. OXFORD:  Object to the form.
10    A.    I believe they have the right to
11 liquidate the positions and charge back to the
12 clearing firm any losses they incur that's not
13 covered by the margin that they have available,
14 and if they don't, I assume -- I believe they
15 have the right to charge back to other members
16 of the clearing org.
17    Q.    Okay.  So you would agree then that
18 any margin that was posted at the OCC was
19 accessible to the OCC in order to cover the
20 costs of a liquidation?
21    A.    Yes.
22    Q.    And would you agree that all of the
23 margin posted at the OCC was accessible to the
24 OCC in the event that they wanted to auction off

Page 76

D. McIsaac

1 the positions instead of liquidating them?
2    A.    Yes.
3    Q.    Do you have any knowledge of any other
4 clearing organizations liquidating or auctioning
5 off positions?
6    A.    I believe that during the week I've
7 been informed that the CME auctioned off LBI's
8 positions.
9    Q.    Do you have any understanding of the
10 approach that the CME took to auctioning off the
11 positions?
12    A.    I haven't reviewed anything firsthand,
13 but I believe they took the various positions
14 and would have gone to other firms and asked
15 them to assume them.
16    Q.    And do you know what the CME was
17 offering in exchange for other members assuming
18 those obligations?
19    A.    No, I'm not, I'm not sure of the
20 negotiations that occurred with them.
21    Q.    Do you have an understanding of the
22 amount of money that was consumed in the auction
23 of the CME -- in the CME's auction of LBI's
24 proprietary positions?

Page 77

D. McIsaac

1        MR. OXFORD:  Object to the form.
2    A.    I have heard a number maybe a billion
3 dollars, but I don't know if I've seen the
4 actual documents.
5    Q.    I'm showing you a document that's
6 marked as Exhibit 442.  I certainly don't expect
7 you to read the whole document.
8    A.    Okay, good.  I was going to say can I
9 please get a brief recess if that's the case.
10    Q.    This is a copy of the hearing that
11 took place before Judge Peck in the bankruptcy
12 proceeding on September 19, 2008.  Have you had
13 occasion to review any portion of the sale
14 hearing transcript?
15    A.    I have reviewed this maybe six months
16 ago.
17    Q.    Can you turn to page 61, the full
18 paragraph on page 61 starting "Since the hearing
19 last Wednesday," and it continues, "and in the
20 space of roughly 24 hours, your Honor, there
21 have been a number of significant events.
22 Yesterday the Chicago Mercantile Exchange
23 unilaterally decided to close out all of
24 Lehman's positions on that exchange.  That

Page 78

D. McIsaac

1
2  closeout resulted in a loss to Lehman of
3  approximately $1.6 billion." Do you see that?
4      A.  Yes, I do.
5      Q.  Do you recall, does this refresh your
6  recollection --
7      A.  Yes, I think this is probably where I
8  saw it.
9      Q.  Do you have any reason to doubt the
10  accuracy of the statement that's made on this
11  page?
12      A.  No, I do not.
13      Q.  So you'd agree that the Chicago
14  Mercantile Exchange closed out Lehman's
15  positions at a cost of $1.6 billion?
16         MR. OXFORD:  Object to the form.
17      A.  That's what it says here.
18      Q.  And that's what you believe happened?
19      A.  That's what I believe happened.
20         MR. OXFORD:  Object to the form.
21      Q.  What's your understanding of what a
22  SIPC trustee's objectives are when analyzing the
23  terms of a proposed bankruptcy sale?
24         MR. OXFORD:  I'll object to the form.
25      A.  I assume that they -- any sale is

Page 79

D. McIsaac

1
2  going to occur of any assets, they would have to
3  make sure that they are protecting the customers
4  and receive, you know, value for the assets
5  they're selling.
6      Q.  And is the customer -- is the
7  preservation of value for customers the sole
8  objective of a trustee, do you know?
9         MR. OXFORD:  I'll object to the form
10  of the question.
11      A.  No, I don't think so.  I think they're
12  supposed to preserve the whole estate.
13      Q.  Are trustees also interested in
14  maximizing the number of customer accounts that
15  can be preserved and transferred to a solvent
16  broker-dealer?
17         MR. OXFORD:  Objection to the form.
18      A.  I believe both transfers are a
19  priority of SIPC.
20      Q.  Have you ever advised the SIPC trustee
21  in analyzing the terms of a proposed bankruptcy
22  sale?
23      A.  No, I have not.
24      Q.  Do you have any expertise in advising
25  on what the proper objectives are of a trustee

Page 80

D. McIsaac

1
2  in that circumstance?
3         MR. OXFORD:  Objection to the form.
4      A.  No, I do not.
5      Q.  Is it your understanding that the
6  proprietary positions in Lehman's OCC account as
7  of the week of September 15 carried exposure?
8         MR. OXFORD:  Object to the form.
9      A.  All positions carry exposure.  I'm not
10  sure if I'm answering the question, your
11  question, but all positions, as far as I'm
12  concerned, carry exposure.
13      Q.  By transferring positions do you agree
14  that you're eliminating that exposure?
15         MR. OXFORD:  I object to the form.
16      A.  By the person transferring them?
17      Q.  Uh-huh.
18      A.  Yes, they would limit their exposure.
19      Q.  So you would agree that LBI and the
20  Trustee, by agreeing to transfer the proprietary
21  positions to Barclays, was eliminating any
22  exposure that it had on those positions?
23      A.  They would no longer have exposure on
24  those positions, I assume, after they have
25  transferred them.

Page 81

D. McIsaac

1
2      Q.  And would that be to the benefit of
3  customers, to eliminate exposure to the -- to a
4  SIPC trustee's estate?
5         MR. OXFORD:  Objection to the form.
6      A.  It would benefit customers if you were
7  paid properly for them, yes.  So if you took
8  exposure off and received consideration, then it
9  would be good.  If you just took exposure off
10  and received no consideration, I don't know if
11  it would be good.  You'd have to analyze each
12  one separately.
13      Q.  That would depend on the value of the
14  positions at any given point in time, is that
15  fair to say?
16         MR. OXFORD:  Objection to the form.
17      A.  It would depend on the value of the
18  positions, the marketplace, you know, what --
19  what the impact of disposing of those positions
20  would have or the downside it could have.
21      Q.  If there's net exposure on a set of
22  positions that you transfer, would it be
23  irrational to do that for no consideration?
24         MR. OXFORD:  Objection to the form.
25      A.  When you say "net exposure," there's

Page 82

D. McIsaac

1
2  exposure, so would it be rational to transfer
3  them for no consideration?  I don't know at the
4  point in time.  I don't know -- the worst case
5  you could be is zero if you're long.  So not
6  getting anything for them, if you liquidate
7  them, gave them away for nothing or had them
8  liquidated, you would be at the same place, and
9  if the margin would cover any potential losses,
10  you might be better off having the OCC liquidate
11  them than give them away for free.
12      Q.   You testified earlier that you could
13  never guarantee that the margin would be
14  sufficient to cover exposures in a liquidation;
15  is that right?
16          MR. OXFORD:  Objection.  Misstates
17      testimony.
18      A.   Yes, I believe I said something to
19  that effect.
20      Q.   So would you agree that if you have
21  short positions, there's exposure that can't be
22  eliminated entirely unless you transfer the
23  positions?
24          MR. OXFORD:  Object to the form.
25      Misstates his testimony.

Page 83

D. McIsaac

1
2      A.   They could be liquidated the next day
3  and you would relieve your exposure.
4      Q.   I'm showing you an exhibit that's been
5  marked 676A.  Do you recognize this document?
6      A.   Yes, I believe I've seen this before.
7      Q.   Did you review it in preparing for
8  today's deposition?
9      A.   No, I don't believe so.
10      Q.   Did you review it at the time that you
11  prepared your report?
12      A.   Yes.
13      Q.   If you could turn to Exhibit 1 of this
14  document.  You see that Exhibit 1 shows the
15  margin requirements on dates from 9/15/2008
16  through 9/19/2008?
17      A.   Yes.
18      Q.   Okay.  And just so that I don't force
19  you to take this out of context, you should read
20  the paragraph where he describes what the
21  margin -- which margin requirements he's
22  referring to.  So if you look at --
23          MR. OXFORD:  Paragraph 6, I think.
24      Q.   -- paragraph 6 of Mr. Jones'
25  declaration, he says, "Exhibit 1 hereto shows

Page 84

D. McIsaac

1
2  for each day from September 15 through September
3  19, 2008, the total requirement at the open of
4  business for each day across all of LBI's OCC
5  accounts, the total value of collateral of the
6  open business of each day across all of LBI's
7  OCC accounts, and the excess or deficit at the
8  open of business on each day across all of LBI's
9  OCC accounts."  Do you see that?
10      A.   Yes.
11      Q.   Do you see that on between September
12  15 and September 16 the margin requirement for
13  the OCC accounts went from $789,583,205 to
14  $1,359,001,075?
15      A.   Yes, I see that.
16      Q.   Would you agree with me that's an
17  increase of over $500 million in a single day?
18      A.   Yes.
19      Q.   If you look two lines down from
20  September 17, 2008 to September 18, 2008, do you
21  see that the margin requirement went from
22  $1,400,000,000 and change to $2 billion, over $2
23  billion, do you see that?
24      A.   Yes, I see that.
25      Q.   Would you agree that that's over a

Page 85

D. McIsaac

1
2  $600 million increase in a single day?
3      A.   Yes.
4      Q.   You said a moment ago that the -- that
5  LBI could have liquidated the following day and
6  eliminated their exposure on their OCC accounts.
7  Do you recall that testimony?
8      A.   Yes.
9      Q.   Would LBI have been able to know for
10  certain that it would not -- strike that.  Would
11  LBI know for certain what the cost of
12  liquidating the account on the following day
13  would have been by looking at that day's margin
14  requirements?
15          MR. OXFORD:  Object to the form.
16      A.   Let me make sure I have your question
17  clear.  You're asking me as of the close of
18  business the 19th, would LBI have known what the
19  cost would be to close out their positions on
20  top day the 22nd?
21      Q.   Yes.
22      A.   They would know what the closing price
23  was on the 19th and use that as I guess a proxy
24  for what, you know, for what they could possibly
25  close it out and do some kind of an

Page 86

D. McIsaac

1  extrapolation on how they might impact the
2  market.
3
4      Q.   Okay.  And if the margin requirement
5  is a proxy for exposure and increased by $500
6  million, as it had on two other days this week,
7  would you agree that using Friday's close of
8  business number may not be an accurate way to
9  determine what the cost would be on Monday of
10 closing out the positions?
11     MR. OXFORD:  Objection.  Form.
12     A.   It's very difficult to determine that
13 because I believe the 19th was a triple-witching
14 day, so a lot of the exposures that were sitting
15 there would have been closed out close of
16 business.  I don't know if this margin
17 requirement is at the end of the day or the -- I
18 believe this is the beginning of the day on the
19 19th.
20     Q.   Uh-huh.
21     A.   So when all the options that they --
22 that were in their account were called, anything
23 that was expiring on the 19th would have had an
24 impact on this amount.  I don't know the balance
25 or the size of the positions they had that were

Page 87

D. McIsaac

1
2  expiring on the 19th, but again, I believe if I
3  remember Mr. Leitner's testimony, he looked at
4  the margin as being a proxy for the most they
5  could lose or the most that would cover
6  Barclays' exposure.
7      So, by looking at that, my guess this
8  would be the worst place LBI would be in if they
9  exposed.  So if they were looking to transfer
10 their assets, this might be a starting point for
11 negotiations but not necessarily the ending
12 point.
13     Q.   Okay.  Whose responsibility do you
14 understand it was to settle the trades that
15 occurred over the expiration weekend, Barclays
16 or Lehman's?
17     A.   I believe it was Lehman's.
18     Q.   You believe it was Lehman's?
19     A.   Barclays didn't sign the agreement
20 until the 22nd.  I believe they all settle over
21 the weekend.
22     Q.   And when would the pays and collects
23 from a weekend expiration be due?
24     A.   Monday morning, I believe, because you
25 can't pay anything on the weekend.

Page 88

D. McIsaac

1
2      Q.   And it's your understanding that
3  Lehman is the party that settled those weekend
4  expirations?
5      A.   I believe any settlements would have
6  had to occur because Barclays didn't own them at
7  that point in time.  So all of the settlement
8  transactions would have had to go through
9  Lehman, and I believe Lehman settled them all.
10 To my knowledge, I think that's what happened.
11     Q.   If that's inaccurate, would that
12 affect your opinion in any way?
13     MR. OXFORD:  Object to the form.
14     A.   Not necessarily, because I don't know
15 the size of it, although I thought I -- I
16 believe I saw some information that showed the
17 pay/collects being a significant pay-back to
18 Lehman on the 22nd or pay-back to the -- to the
19 holder of the account on the 22nd.
20     Q.   Would it be rational for Barclays to
21 accept the obligations on options expiring over
22 the weekend of September 20th and 21st for short
23 positions and yet not acquire the rights for any
24 profit and loss on long positions?
25     MR. OXFORD:  Object to the form.

Page 89

D. McIsaac

1
2      A.   I'm not sure -- please rephrase it.
3  I'm not sure where -- what the question is
4  asking.
5      Q.   Sure.  There were long positions and
6  short positions both in LBI's --
7      A.   Right.
8      Q.   -- OCC accounts; is that right?
9      A.   Right.  Okay.  Yes.
10     Q.   And any short positions that were
11 exercised over the weekend of September 22 --
12 20th and 21st would have resulted in a loss to
13 the clearing member; is that right?
14     MR. OXFORD:  Objection to form.
15     A.   Not necessarily.  If they had the
16 assets to deliver against the ex -- the
17 exercise, there would be no loss.
18     Q.   And if they didn't have the assets to
19 deliver and they had to acquire them at the then
20 market rates?
21     A.   If they had marked them --
22     MR. OXFORD:  Wait.  I'm sorry.  Can
23 you just let me get my objection in?
24     THE WITNESS:  I'm sorry.
25     MR. OXFORD:  I'll object to the form.

Contains Highly Confidential Portions

Page 90

D. McIsaac

1
2  You can answer.  Thank you.
3      A.   If they would have been marking their
4  positions to market, they would have, I assume
5  already, recorded those losses.
6      Q.   When do you think that Lehman recorded
7  the losses that occurred over the weekend of
8  September 20th and 21st?
9      A.   I believe you would record those
10 effective the 19th because that's the option
11 expiration date.  At that point in time, you
12 know what your locked-in is on your gains and
13 losses.  You would do that on a daily basis --
14     Q.   And when --
15     A.   -- of the market movement.
16     Q.   I apologize for interrupting you.
17         And when would Lehman make the payment
18 on those trades?
19     A.   I would assume the next business day.
20     Q.   And so you're assuming that Lehman
21 paid any amounts due to settle short options
22 that were in its account over the weekend of
23 September 20th and -- 20th and 21st?
24     MR. OXFORD:  I'll object to the form.
25     A.   I assumed that not everything is cash

Page 91

D. McIsaac

1
2  settled so they might have delivered securities
3  against those exercised calls or puts, and on
4  the cash settle piece, that the pay/collect
5  would occur on Monday morning.  And if they
6  didn't have securities to deliver, they would
7  have to go out and buy the securities and make a
8  delivery.
9      MR. OXFORD:  Trish, we've been going
10 about another hour.  I don't know if this is
11 a good time to take a five-minute break.
12     MS. BLOOMER:  This is actually a good
13 time.  That would be fine.  Off the record.
14     THE VIDEOGRAPHER:  The time is 11:36.
15 This is the end of the tape labeled number
16 2.  We're going off the record.
17     (Recess.)
18     THE VIDEOGRAPHER:  This is the start
19 of the tape labeled number 3.  The time is
20 11:57.  We are back on the record.
21 BY MS. BLOOMER:
22     Q.   Mr. McIsaac, could you turn in your
23 report to page 7, please.  The first full
24 sentence at the top of the page --
25     A.   Give me one second.  One second.

Page 92

D. McIsaac

1
2      Q.   Sure.
3      A.   Okay.
4      Q.   The first full sentence at the top of
5  the page, you say, "The circumstances of the
6  transaction between Lehman and Barclays do not
7  change my opinions in this matter."
8         What circumstances were you referring
9  to in that sentence?
10     A.   The timing of everything happening,
11 the -- I think Mr. Leitner was talking about how
12 much time, you know, it took the quickness of
13 the negotiations.
14     Q.   Any other circumstances that you
15 were --
16     A.   No.  I mean, the marketplace, you
17 know, everything that was happening at the time.
18     Q.   Anything other than the timing and the
19 marketplace that you were -- that you had in
20 mind when you said the circumstances of --
21     A.   No, I think just the market, what was
22 happening in the market at the time --
23     I'm sorry.
24     Q.   Are there any circumstances other than
25 the timing and the marketplace that you had in

Page 93

D. McIsaac

1
2  mind when you said "the circumstances of the
3  transaction between Lehman and Barclays do not
4  change my opinions in this matter"?
5      A.   No.  Basically that was it.
6      Q.   With respect to the timing, what was
7  your understanding of the circumstances?
8      A.   I believe that it was negotiated in
9  a -- it didn't have, you know, three or four
10 months of negotiations, as far as I know.  It
11 was done fairly quickly, although I don't know
12 how much time and how much due diligence was
13 done along the way.
14     Lehman had been in trouble for a
15 while, so I'm assuming a lot of firms were doing
16 some things, reviewing it to determine, you
17 know, if there was a, you know, a good place to
18 go in and buy and, you know, there possibly was
19 the Lehman executives might have been shopping
20 the firms.  I don't know what happened, but I do
21 know that a lot of things happened fairly
22 quickly.
23     Q.   Were you assuming that Barclays had
24 plenty of time to do due diligence before
25 settling on the terms of the transaction it was

Contains Highly Confidential Portions

Page 94

D. McIsaac

1  willing to enter into?
2       MR. OXFORD:  Objection to the form.
3       A.   I don't know how much time Barclays
4  had to do due diligence. I don't know how long
5  they were talking to Lehman and what information
6  they had.
7       And they were buying pretty much the
8  whole entity, so, you know, it's not like they
9  had to do due diligence on certain things.  It
10  was a viable entity.  It wasn't capital -- it
11  had adequate capital.  You know, it didn't
12  appear that they were buying the broker-dealer,
13  that there was that much of a concern around it.
14  The customers were the customers.  I don't know
15  if there was any major concern on the customers
16  they had.
17       Q.   Do you have an understanding of what
18  the value of the entity was that Barclays was
19  acquiring?
20       MR. OXFORD:  Objection to the form.
21       A.   I believe if I looked at the August
22  Focus that was not filed, it showed a net -- a
23  net equity of I want to say 3 to 5 billion, if I
24  remember properly, correctly.

Page 95

D. McIsaac

1       Q.   What was that number?
2       A.   3 to 5 billion.
3       Q.   What, in your opinion, would be a
4  typical amount of time for an entity to take
5  doing due diligence on an acquisition the size
6  of this one?
7       MR. OXFORD:  Objection to the form.
8       A.   I don't know how much time it would
9  take.  They ended up buying certain businesses,
10  the customers' businesses, they bought assets
11  like the buildings, things of that nature, and
12  they bought some positions.  How much time, I
13  don't know.  I don't know how much time they
14  spent knowing what was going on.
15       In the Lehman case, you know, Lehman
16  was not in, from what I understand, capital,
17  severe capital -- it was a liquidity crunch, and
18  Lehman was having problems getting the
19  information, getting the money they needed to
20  support their assets.  It didn't mean they
21  didn't have good assets, it didn't mean the
22  business was crumbling, it just meant they were
23  having a liquidity crunch.
24       I worked at Drexel.  I saw what

Page 96

D. McIsaac

1  happened to Drexel.  It didn't necessarily mean
2  the broker-dealer had a problem.  There was
3  illiquidity at the parent company, and that
4  trickles down.
5       Q.   Do you mean to suggest that there was
6  not a significant amount of risk that Barclays
7  was encountering in acquiring this business?
8       MR. OXFORD:  Object to the form.
9       A.   I didn't say there wasn't a
10  significant amount of risk.  I think there was a
11  discernible amount of risk.  I think that buying
12  customer positions, customer business, not that
13  risky a business.  Looks like they didn't buy
14  the prime broker, which would have been the more
15  risky of the customer businesses.
16       Futures clearing is not what I would
17  consider a very risky business.  They bought
18  certain assets, again, not everything that was
19  what I consider ultimately, you know, extremely
20  risky.
21       Q.   You're not an expert in risk
22  management or risk assessment; is that right?
23       MR. OXFORD:  Objection to the form.
24       A.   General knowledge of risk I have.  I'm

Page 97

D. McIsaac

1  not a quant.  I don't, you know, determine the
2  value what risk for a firm.  I understand what
3  assets are risky, what assets are not risky at a
4  firm, what businesses are risky, what businesses
5  are not risky, and I think, you know, in a firm
6  of this size, it was a top, you know, three or
7  four broker-dealer in the country for a long
8  period of time.  So, yes, there were risks
9  there, but I think they were quantifiable.
10       Q.   Do you know how long it would take to
11  assess the risk profile in a set of equities
12  positions and options positions that was $70
13  billion on the long side and $69 billion on the
14  short side?
15       MR. OXFORD:  Object to the form.
16       A.   I don't think equities were the total
17  70 and 69.  I think there were a portion of
18  that.  I think a large portion of that inventory
19  was government securities.
20       Q.   Do you know how much government
21  securities were in that versus equities versus
22  exchange-traded derivatives?
23       A.   I believe at one point in time I saw
24  something that sort of broke it down, but I

Page 98

D. McIsaac

1
2  don't remember exactly, but I believe equities
3  were probably maybe 10 billion range.
4      Q.    Would you have experience that would
5  qualify you to assess the risk profile
6  associated with a set of positions of that size?
7          MR. OXFORD:  Object to the form.
8      A.    On a daily basis they are required to
9  maintain capital.  They have to assess their
10  capital every day.  Part of their capital is
11  assessing the risk.  They were on a daily basis
12  assessing the risk of their capital.  You could
13  have easily used that information to determine
14  where the risk was and, you know, from that
15  standpoint, yes, determine the risk.  When I
16  file reports, I'm looking at the risk of the
17  firm.
18      Q.    When you described the circumstances
19  of the transaction between Lehman and Barclays
20  on page 7 of your report, did you consider among
21  those circumstances the options that Lehman had
22  to the deal with Barclays?
23          MR. OXFORD:  Object to the form.
24      A.    The options that Lehman had?  I guess
25  Lehman could have decided to sell or not sell.

Page 99

D. McIsaac

1
2      Q.    Could they have decided to sell to a
3  different entity?
4      A.    I'm sure they could have.
5      Q.    Could you pull Exhibit 442 out.
6  That's the sale hearing transcript.
7      A.    Uh-huh.
8      Q.    And turn to page 101.
9      A.    Yes.
10      Q.    If you read the first three paragraphs
11  or, you know, if you need to read a little bit
12  more to get context.
13          (Document review.)
14      A.    Okay.
15      Q.    In the second paragraph, it says,
16  "And, yet, he would say nobody has expressed an
17  interest to step into the shoes of -- excuse me,
18  step into the shoes of Barclays, your Honor."
19  The next paragraph says, "Lehman has not
20  received any other interest since the
21  commencement of the Chapter 11 cases."  And it
22  goes on to say, "If Lehman was approached by
23  another potential buyer that he would consider
24  the offer, provided that the company had
25  sufficient liquidity to operate the business

Page 100

D. McIsaac

1
2  without jeopardizing customer accounts.  That
3  has not happened, your Honor.  So it is almost
4  academic."  Do you see that?
5      A.    Yes, I do.
6      Q.    Had you read this testimony in
7  preparing for your -- or, in preparing your
8  expert report?
9      A.    I read this report in the -- when I
10  first started working with the Trustee regarding
11  the motion, the motion on the 3-3.
12      Q.    You testified a moment ago that you
13  were sure Lehman could have sold the assets to a
14  different buyer.  Does this refresh your
15  recollection at all on the circumstances that
16  Lehman was facing at the time?
17      A.    This says they have no buyers.  It's
18  Chapter 11.  The Fed was providing them with
19  liquidity earlier in the week before Barclays
20  stepped into the shoes.  The Fed could have
21  continued to provide liquidity while they were
22  looking for another purchaser.
23          That has happened before.  If they
24  stepped in the shoes once before, I assume
25  things could have been done, still been done in

Page 101

D. McIsaac

1
2  that fashion.
3      Q.    Do you agree that the court is being
4  told at the September 19th sale hearing that it
5  is almost academic for Lehman to find another
6  potential buyer at that point?
7      A.    That's what it looks like here, yes,
8  but I --
9      Q.    And if you --
10      A.    Excuse me.  But it also says they
11  weren't marketing the firm in the first
12  paragraph on that page.  So maybe if they did,
13  they might have been able to find other buyers.
14      Q.    Okay.  Can you read the second
15  paragraph for me?  "That notwithstanding the
16  lack of a specific program for marketing, the
17  sale of Lehman's broker-dealer business has been
18  known worldwide.  And, yet, he would say nobody
19  has expressed an interest to step into the shoes
20  of -- excuse me, step into the shoes of
21  Barclays, your Honor."
22      A.    Uh-huh.
23      Q.    Do you see that?
24      A.    Yes.
25      Q.    Do you agree that the speaker in this

Contains Highly Confidential Portions

Page 102

D. McIsaac

1 testimony is suggesting that they were not able
2 to find another buyer for the business?
3     A.    No, I believe he's saying that it was
4 known that the business might be for sale and
5 nobody else has stepped up, but I believe the
6 first paragraph says that they were not going
7 out and marketing the sale of the business.
8     Q.    Do you have any understanding of why
9 they weren't going out and marketing the
10 business?
11     A.    No, I do not.
12     Q.    Could it be because they didn't have
13 time to market the business because the
14 transaction needed to close by the following
15 Monday?
16     A.    This says the business has been known
17 worldwide, so I don't know why it had to
18 close -- I don't know what happened that made it
19 have to close within a week's period.
20     Q.    Okay.
21     A.    If I looked at the financial
22 statements that were not filed but prepared, it
23 looked like they had adequate capital for the
24 broker-dealer.

Page 103

D. McIsaac

1     Q.    Okay. Can you turn to page 73.  If
2 you review where the court asks a question in
3 the middle of the page, "In order for this
4 transaction to be optimally closed from the
5 perspective of SIPC, when should it close?  Does
6 it need to close this weekend before the markets
7 open on Monday?"
8     A.    I'm sorry, I lost where you're
9 reading.
10     Q.    Page 73.
11     A.    Yes, I'm on 73.  I see, "The Court:
12 Let me ask a question."
13     Q.    Oh, the next statement.
14     A.    I'm sorry.
15         (Document review.)
16     A.    Uh-huh.  Okay.
17     Q.    So you see where Mr. Caputo says to
18 the court, in response to the court's question,
19 "As soon as possible it needs to close.  The
20 sooner the better." Do you see that?
21     A.    Yes.
22     Q.    On the following page, the court asks,
23 "Would it be your position on behalf of your
24 client that, assuming the transaction, the sale

Page 104

D. McIsaac

1 transaction that has been proposed to me today
2 is approved, that the approval should happen
3 before the close of today's hearing?  In other
4 words, we should stay here as late as we need to
5 in order to get this done?" And Mr. Caputo
6 says, "Yes, your Honor.  That would be our
7 recommendation." Do you see that?
8     A.    Yes.
9     Q.    Does this suggest to you that the
10 transaction under contemplation did not need to
11 close by Monday, September 22, 2008?
12     A.    I believe in the prior response by Mr.
13 Caputo he said as soon as possible, and nothing
14 was forcing Barclays to close this agreement.
15 They did not have to do it if they didn't think
16 they had done sufficient due diligence to -- to
17 mandate a purchase of an asset like this.
18     Q.    Would you agree that at this sale
19 hearing, which you read the transcript of, the
20 parties were telling the court that it was
21 critical to get this deal done within a matter
22 of days?
23         MR. OXFORD:  Object to the form.
24     A.    I believe that's what was said here.

Page 105

D. McIsaac

1 I don't -- I haven't read anything here, or I'd
2 have to go back and read the whole thing, of
3 what Barclays was saying why it would be
4 critical for Barclays to get it done.
5     Q.    Do you believe that you are in a
6 better position than the parties who were
7 negotiating this deal and representing it to the
8 court to determine the urgency of the closing of
9 this transaction?
10         MR. OXFORD:  Object to the form.
11     A.    No, I think the urgency was on
12 Lehman's side, not necessarily on Barclays'
13 side.  Barclays, if they didn't feel they had
14 done enough due diligence and didn't feel they
15 had adequate time to review it, didn't have to
16 go through with it at that point in time.
17     Q.    Would you agree that in a transaction
18 where one party has an urgency to complete a
19 deal and another party doesn't, that there is a
20 disparity in bargaining power as between those
21 two entities?
22         MR. OXFORD:  Objection.
23     A.    Yes, but I'm not sure which way.  If I
24 don't sell it, what happens?  I'm out of

Contains Highly Confidential Portions

Page 106

D. McIsaac

1 business. If I sell it, I'm still out of
2 business.
3     So if the parent company is selling
4 the business or if the broker-dealer, they're
5 selling the business, they have a decision to
6 whether or not they sell it or not sell it. You
7 know, this isn't a sale where I'm trying to sell
8 something and, you know, just get rid of some
9 bad assets and go on.
10     Q.    And we saw earlier that the OCC had
11 threatened to liquidate LBI's accounts if it
12 didn't close this transaction by the 22nd of
13 September; is that right?  Do you recall that?
14     A.    Yes, but the one thing the OCC said
15 they would liquidate was that the customer and
16 proprietary or just the customer -- just
17 proprietary accounts?
18     Q.    Sure, we can look at the exhibit
19 together.  It was Exhibit 630.
20     A.    Uh-huh.
21     Q.    And it was on the second page under
22 paragraph 3, and it says, "OCC would need to
23 immediately liquidate and close out the LBI
24 accounts, and is preparing to do so."

Page 107

D. McIsaac

1     A.    Right, but I, after -- I don't
2 remember which -- I think you showed me this and
3 then you showed me something from the CME, and
4 the CME just liquidated the proprietary
5 accounts.  It didn't liquidate the customers.
6     Q.    The OCC wasn't drawing a distinction
7 in that, do you see that?
8     A.    Well, I don't know if they were -- it
9 says "the accounts," so I'm assuming they meant
10 all, but it looks like, you know, they could
11 have drawn the same distinction that the CME did
12 and just liquidate the proprietary business if
13 they were concerned.
14     Q.    They could have?
15     A.    Yes.
16     Q.    But that's not what they're indicating
17 in this paragraph, would you agree?
18     A.    That's not what it looks like the
19 counsel was stating.
20     Q.    If the Lehman Trustee believed that a
21 liquidation of the OCC accounts would result in
22 a depletion of all of the posted margin, would
23 it have been rational for the LBI Trustee to
24 agree to transfer those accounts to Barclays in

Page 108

D. McIsaac

1 exchange for the posted margin?
2     MR. OXFORD:  Objection to the form.
3     Assumes facts not in evidence.
4     A.    If they looked at it and I guess
5 assumed that they would lose whatever the number
6 was, let's say $2 billion, or transferred
7 something like $2 billion, yes, it would make, I
8 guess, sense to do it or, you know, if there was
9 a better good to be had by it, but I don't know
10 if that analysis was done.  You said it was a
11 very short time, so I'm not sure if they had
12 time to analyze that.
13     Q.    If you turn in your report to page 6,
14 you say in paragraph 18 that, "In addition to
15 the net asset value, I would expect a purchaser
16 to pay a premium based on the anticipated
17 earnings of the clearing business." Do you see
18 that?
19     A.    Uh-huh.
20     Q.    Would you continue to have that
21 expectation in a circumstance in which there was
22 only one purchaser willing to acquire a
23 business?
24     A.    I would guess their negotiating powers

Page 109

D. McIsaac

1 would not be the same, but I would still expect
2 some payment for an ongoing business that was
3 going to reap benefits for the purchaser.
4 Certainly the purchaser would want to get it for
5 nothing.  I think the seller would want to get
6 some value for the assets they were selling.
7     Q.    But as you said, if the seller
8 believed that it wasn't going to get value in
9 the alternative, then it would have been
10 rational to sell it for nothing in order to
11 preserve the customer positions; is that right?
12     MR. OXFORD:  Object to the form.
13     A.    I don't think I said that.
14     I'm sorry, could you read back my -- I
15 don't think I said that.
16     Q.    Earlier I asked you the question:  "If
17 the Lehman Trustee believed that a liquidation
18 of the OCC accounts would result in a depletion
19 of all of the posted margin, would it have been
20 rational for the LBI Trustee to agree to
21 transfer those accounts to Barclays in exchange
22 for the posted margin?"  And you said, "If they
23 looked at it and I guess assumed that they would
24 lose whatever the number was, let's say $2

Contains Highly Confidential Portions

Page 110

D. McIsaac

1 billion, or transferred something like $2
2 billion, yes, it would make, I guess, sense to
3 do it or, you know, if there was a better good
4 to be had by it, but I don't know if that
5 analysis was done."
6 A.  Yes.
7 Q.  You also said, just for the sake of
8 completeness, you said it was a very short time
9 so I'm not sure if they had time to analyze
10 that.
11 A.  The Trustee in that case.
12 Q.  Yes.
13 A.  Yes.
14 Q.  So the question and answer that I just
15 asked you was, earlier I asked you the question,
16 if the Lehman Trustee believed that a
17 liquidation of the OCC accounts would result in
18 a depletion of all of the posted margin, would
19 it have been rational for the LBI Trustee to
20 agree to transfer those accounts to Barclays in
21 exchange for the posted margin, and you said
22 that if they looked at it and, I guess, assumed
23 that they would loose whatever the number was
24 and so on.

Page 111

D. McIsaac

1 A.  Right.
2 MR. OXFORD:  Hold on.  Hold on.  Is
3 there a question?  You just have been
4 reading from the record, Trish, which you're
5 free to do, but if you could ask Mr. McIsaac
6 a question, then he could answer it.  I
7 think that's the traditional way to go.
8 Q.  If the Lehman Trustee believed that a
9 liquidation of the OCC account would result in a
10 depletion of all of the posted margin, would it
11 have been rational for the LBI Trustee to agree
12 to transfer those accounts to Barclays in
13 exchange for that margin?
14 MR. OXFORD:  Objection.  Asked and
15 answered.
16 You can answer it again.
17 A.  I think I answered that question.  You
18 posed another question when you went back to
19 read that.
20 Q.  Unfortunately, I'm not able to find it
21 online.
22 A.  Okay.  That's the question you asked
23 that I didn't think was the same as that
24 question.

Page 112

D. McIsaac

1 Q.  Are acquirers, in your experience,
2 generally willing to pay a premium if they are
3 the only potential acquirer for a business and
4 they know that going into a negotiation?
5 MR. OXFORD:  Objection to the form.
6 A.  I haven't been in negotiations where
7 that would be the case, but you still would
8 expect to pay some value for getting value.  I
9 would think the seller would want some value.
10 Q.  But a premium is valued -- what do you
11 define a premium to mean?
12 MR. OXFORD:  Object to the form.
13 A.  In my experience, you bought
14 businesses and paid a premium based on how much
15 you believe that that business will earn for you
16 over the next few years, and then that's the
17 base price plus you pay the net asset value of
18 the business you're buying if you're just buying
19 bits and pieces of the business.
20 So you pay a premium based on, you
21 know, potential benefits to your firm.  I
22 believe in some of the pages I was reading
23 through here in the futures world, I think
24 people doing the due diligence believed that

Page 113

D. McIsaac

1 they would make $250 million in revenues over
2 the next year.  So there's a lot of value there,
3 so maybe they saw value where other people
4 didn't.
5 Q.  And would a reasonable -- would a
6 rational acquirer be willing to pay premium if
7 it believed paying a premium wasn't necessary to
8 close the deal?
9 MR. OXFORD:  Object to the form.
10 A.  I would assume they would try to get
11 value for nothing if they could.  So if you're
12 saying would they pay a premium if they didn't
13 have to, that would be negotiated and whether or
14 not the seller would be willing to sell it for
15 that price.
16 Q.  Can you turn to page 23 of your
17 report, please?  Actually, if you could start at
18 page 22.  I'd like to ask you some questions
19 about paragraphs 44 -- 54 and 55.
20 (Document review.)
21 A.  Okay.
22 Q.  In these two paragraphs you're talking
23 about the proprietary options positions that LBI
24 held in accounts at the OCC; is that right?

Page 114

1           D. McIsaac
2     A.    Yes.
3     Q.    At the end of paragraph 55, you say,
4  "Certainly a rational seller would not include
5  margin in a deal unless it was being compensated
6  dollar for dollar." Do you see that?
7     A.    Uh-huh.
8     Q.    Can you explain what you mean by
9  "compensated dollar for dollar"?
10    A.    They were giving other assets and I
11 would assume they would be compensated for the
12 assets. So if the value of the assets they were
13 giving was $100, I would expect them to be
14 compensated $100.
15          The deal was to buy the portfolio of
16 assets, not the margin that's posted to make
17 sure that the firm complies with its obligations
18 to the OCC.
19    Q.    So if there was, for example, a
20 billion dollars in the proprietary options
21 account posted as margin with the OCC, you
22 believe that it would have been irrational for
23 the Trustee to agree to transfer that account to
24 Barclays for anything less than that same
25 amount?

Page 115

1           D. McIsaac
2     MR. OXFORD: Object to the form of the
3  question.
4     A.    I would expect the seller to look at
5  the portfolio of assets that they were selling
6  and to get the value for the portfolio of
7  assets. So if they were selling long positions
8  and short positions, I would expect them to get
9  the net asset value for that, and if the buyer
10 wanted the margin that was posted in addition, I
11 would expect them to get the net asset value for
12 the margin.
13    Q.    Just so that I understand your
14 opinion, so if the positions in an account are
15 worth negative a billion dollars on net, and the
16 margin posted in an account were a billion
17 dollars, are you suggesting that it would have
18 been rational for the Trustee to transfer the
19 account with the margin because they were
20 offsetting positives and negatives?
21    MR. OXFORD: Object to the form.
22 Misstates the witness's testimony.
23          You can answer again.
24    A.    I think what I said is there was a
25 portfolio of assets, and you would look at the

Page 116

1           D. McIsaac
2  net asset value of the portfolio of assets,
3  which was the long positions and the short
4  positions. And I don't look at it just as the
5  options positions, I'd look at it as the whole
6  inventory positions that they were purchasing,
7  and they would pay value for what they were
8  buying. If you were to include the posted
9  margin, I would expect to pay extra value for
10 that.
11    Q.    Dollar-for-dollar extra value?
12    A.    That's where I would start at least,
13 yes.
14    Q.    Would it be irrational to accept
15 anything less than dollar-for-dollar
16 compensation for the posted margin?
17    MR. OXFORD: Object to the form.
18    A.    That would be at the point in time you
19 would negotiate what you want to sell it for. I
20 would think it would be a negotiating point and
21 it would be expressed in the contracts what you
22 were buying and what you were receiving and how
23 much you were paying for it.
24    Q.    Would it be rational for LBI to
25 negotiate for compensation less than

Page 117

1           D. McIsaac
2  dollar-for-dollar compensation for the posted
3  margin?
4     MR. OXFORD: Objection to the form.
5     A.    I don't think so, because if they were
6  getting net asset value, then you'd be almost
7  providing the downside protection for the
8  acquirer.
9     Q.    And the net asset value in the terms
10 of this transaction was what?
11    MR. OXFORD: Object to the form.
12    A.    I believe there was 40 something
13 billion dollars of assets, less than that in a
14 repo liability that was assumed by Barclays, I
15 guess, and the long option value that I thought
16 was about $300 million.
17    Q.    So you are excluding from your
18 equation the negative value of the LBI affiliate
19 positions that were in the firm account at the
20 OCC?
21    A.    I believe they weren't buying the
22 affiliates business. That's what I've seen. So
23 I thought they were negotiating to buy LBI's
24 business and not the affiliates positions.
25    Q.    They were taking settlement

Page 118

D. McIsaac

1 responsibility for the affiliate positions as
2 well, you agree with that?
3 A. From the TAA, yes.
4 Q. Where do you think Barclays was going
5 to turn to recover the losses on the short
6 affiliate positions in that account?
7 MR. OXFORD: Object to the form.
8 A. I don't know where they would turn.
9 I'm not sure why they would have assumed them.
10 Q. You saw that they assumed settlement
11 responsibility for all of the positions at the
12 OCC, correct?
13 A. I see that they assumed it, yes.
14 Q. Okay. Would it have been rational for
15 Barclays to assume settlement responsibility for
16 those positions knowing that LBI was in SIPC
17 proceedings and would not be able to reimburse
18 it for the costs of liquidating those positions?
19 MR. OXFORD: Object to the form.
20 A. I think it would have been rational to
21 negotiate what you were doing with those
22 positions and, if you had to take over clearance
23 and settlement of them, negotiate how you were
24 going to be remunerated for that.

Page 119

D. McIsaac

1 Q. Would it be rational for the Trustee
2 to agree to transfer the posted margin that
3 secured those positions in exchange for Barclays
4 taking on the exposure for those positions?
5 MR. OXFORD: Objection to the form.
6 Asked and answered.
7 You can answer again.
8 A. I don't think it would have been to
9 transfer $2 billion of margin to cover a
10 billion-dollar loss. I don't think you would
11 transfer that much, no.
12 Q. How about 1 billion, would that have
13 been rational for the Trustee to transfer?
14 A. It might have been.
15 MR. OXFORD: Object to the form.
16 THE WITNESS: Sorry.
17 Q. It might have been?
18 A. It might have been. At that point in
19 time, if they negotiated it and -- and, you
20 know, that's what the parties decided.
21 Q. So it's not your opinion that it would
22 have been irrational under any circumstances for
23 Lehman or the LBI Trustee to transfer posted
24 margin to Barclays in exchange for taking

Page 120

D. McIsaac

1 settlement responsibility for the affiliate
2 positions; is that right?
3 MR. OXFORD: Object to the form.
4 A. I believe in my report I talked about
5 the proprietary positions. If they're assuming
6 affiliate clearance and settlement of affiliates
7 positions, that would be something they should
8 negotiate. You know, the parties there would
9 negotiate it and whatever they thought was valid
10 would be valid.
11 Would it be out of the realm to say,
12 yes, give me the market value of that? No.
13 Q. Would that be a rational resolution,
14 to give them the market value of that?
15 MR. OXFORD: Object to the form.
16 A. It would be rational to say this is
17 the cost of it, sure, or, you know, we'll
18 liquidate it, leave it in -- don't take those
19 positions, don't take that account.
20 I'm sure it could have been negotiated
21 with the OCC to transfer the customer accounts
22 separate from the proprietary accounts if that
23 was -- if that was everybody's desire.
24 Q. If you could turn -- I'm showing you

Page 121

D. McIsaac

1 what has been marked as Exhibit 687.
2 (Exhibit 687, Trustee's Memorandum in
3 Further Support of His Motion for Relief
4 Pursuant to the Sale Orders or,
5 Alternatively, For Certain Limited Relief
6 under Rule 60(B) and in Opposition to the
7 Motion of Barclays Capital Inc. to Enforce
8 the Sale Orders and Secure Delivery of all
9 Undelivered Assets, marked for
10 identification, as of this date.)
11 Q. If you could turn to page 60. In
12 paragraph 136, the last two sentences, the
13 Trustee says in his brief, "For example, LBI
14 could have agreed to transfer to Barclays the
15 minimum margin assets that the OCC required to
16 secure LBI's liabilities to the OCC for LBI's
17 proprietary positions. Such a transfer arguably
18 would have cost LBI little because, in any
19 event, LBI could not have withdrawn the minimum
20 margin assets required by the OCC to secure
21 LBI's open positions." Do you see that?
22 A. Yes, I do.
23 Q. Do you agree with that statement?
24 A. Can I read the whole two paragraphs?

Page 122

D. McIsaac

1
2  Q.  Uh-huh.
3      (Document review.)
4      MR. OXFORD:  Okay.  And Mr. McIsaac,
5  you should feel free, of course, not to just
6  read those paragraphs, but the whole of the
7  section to which Ms. Bloomer directs you.
8      (Document review continues.)
9  A.  Okay.  Now, I'm sorry, I've read it
10  now, so ...
11  Q.  Okay.  Directing you again to the last
12  two sentences of paragraph 136, do you agree
13  with the statement that, "LBI could have agreed
14  to transfer the minimum margin assets that OCC
15  required to secure all of the liabilities to the
16  OCC for LBI's proprietary positions"?
17  A.  In context, it says, for example, they
18  could have done it.  They have also said that it
19  could have been negotiated, so this was just one
20  example of things that could have occurred.
21  Q.  And in the next sentence, it says,
22  "Such a transfer arguably would have cost LBI
23  little because, in any event, LBI could not have
24  withdrawn the minimum margin assets required by
25  the OCC to secure LBI's open positions."  Do you

Page 123

D. McIsaac

1
2  see that?
3  A.  Yes.
4  Q.  Do you agree with that?
5  A.  In the context here, yes.
6  Q.  What do you mean in the context here?
7  A.  There's four paragraphs here
8  explaining things they could have been done if
9  it was negotiated.  All I've said all along is
10  this was something that should have been
11  negotiated and decided upon by the parties prior
12  to consummating the trade of the sale.
13  Q.  You said that the Trustee would have
14  been irrational to agree to transfer the posted
15  margin for anything less than dollar for dollar,
16  isn't that right?
17  A.  For the proprietary --
18      MR. OXFORD:  Object to the form.
19  Misstates the witness's testimony.
20      You can answer.
21  A.  I was talking about proprietary
22  assets.  I don't know if this was talking about
23  all the proprietary assets.  The proprietary
24  assets at the OCC, my understanding, were net
25  long positions.

Page 124

D. McIsaac

1
2  Q.  This says that the transfer would have
3  cost -- would arguably have cost LBI little
4  because LBI could not have withdrawn the minimum
5  margin assets required by the OCC to secure
6  LBI's open positions.
7      Could the Trustee have withdrawn the
8  minimum margin requirements required by the OCC
9  to secure the affiliate positions in the firm
10  account?
11  A.  No, I do not believe so.  Because
12  they're in the account, they could not withdraw
13  any of the minimum margin requirements.
14  Q.  Could LBI have withdrawn the minimum
15  margin assets required by the OCC to secure
16  LBI's customer accounts?
17      MR. OXFORD:  Object to the form.  Do
18  you have a specific timeframe in mind,
19  Trish?
20      MS. BLOOMER:  No, I don't.
21  A.  I don't think they could have
22  withdrawn any of the minimum margin requirements
23  at that point in time.
24  Q.  For the customer accounts either?
25  A.  For the customer accounts or the

Page 125

D. McIsaac

1
2  proprietary accounts.
3  Q.  Outside of the OCC, could LBI have
4  withdrawn the minimum margin assets required by
5  other clearing organizations or clearing brokers
6  to secure LBI's open positions?
7  A.  When you say "outside the OCC," what
8  are you referring to?  A little bit -- it's a
9  very broad statement outside --
10  Q.  Sure.  I'll give an example.  Your
11  understanding -- do you understand that LBI had
12  a customer account open at the CME at the time
13  the transaction closed?
14  A.  Yes.
15  Q.  Okay.  Could LBI have withdrawn the
16  minimum margin assets required by the CME to
17  secure LBI's customer accounts?
18  A.  No.
19      I'm sorry.
20      MR. OXFORD:  Sorry.  Withdrawn.
21  A.  No.
22  Q.  And at any other place where there
23  were open customer or proprietary accounts could
24  LBI have withdrawn the minimum margin assets
25  required to secure those open positions?

Page 126

D. McIsaac

1
2      A.  I don't believe they could have.
3  You're making it broad, so I don't want to make
4  a general statement, but my understanding, no,
5  they could not have.  But it didn't mean they
6  had to give them away either.
7      Q.  Okay.  The sentence says that "a
8  transfer arguably would have cost little because
9  LBI could not have withdrawn the minimum margin
10  assets required to secure the positions."
11         Would you agree that that same
12  sentence applies not just to proprietary, but to
13  any accounts for which LBI could not withdraw
14  the minimum margin assets required?
15         MR. OXFORD:  Object to the form.
16         You can answer.
17      A.  I would say the minimum margin
18  requirements as it relates to the exposure of
19  the positions would be transferred as long as
20  they were not -- did not get adequate protection
21  elsewhere.  So in the second part where they
22  talk about the customers' margin positions,
23  the -- Barclays in the transfer of the
24  customers' accounts I believe had adequate
25  protection against the customers fulfilling

Page 127

D. McIsaac

1
2  their obligations.  So, transferring those, they
3  already got the margin that was provided by the
4  customers to support that.
5      Q.  I'm showing you what has been marked
6  as Exhibit 659A.  If you could review the e-mail
7  and the first attachment to the e-mail.
8  Specifically, I would direct your attention to
9  the first full paragraph on page 2 of the
10  letter.
11         (Document review.)
12      A.  You said the first two paragraphs,
13  right?
14      Q.  I said the first full paragraph.
15      A.  I'm sorry, I read the first two, okay.
16      Q.  On page 2.
17      A.  Oh, on page 2.  Okay.  Sorry.
18         (Document review.)
19      A.  Yes, okay, I've read those paragraphs
20  that start "pursuant to."
21      Q.  Okay.  Now, in this paragraph
22  Barclays' counsel is writing to the CFTC about
23  the customer accounts that LBI is going to be
24  transferring.  Do you understand that reference
25  in the context of this letter to be referring to

Page 128

D. McIsaac

1
2  the futures customer accounts?
3      A.  Yes.
4      Q.  The second sentence of that paragraph
5  says, "Some of these accounts are accounts that
6  contain no open commodity positions and accounts
7  that are in deficit, within the meaning of
8  Regulations 190.06(e)(1)(iv) and (v)," and then
9  "17 C.F.R. Section 190.06(e)(1)(iv) and (v),
10  respectively."  Do you see that?
11      A.  Yes.
12      Q.  What do you understand this to mean
13  when it says that "some of these accounts are
14  accounts that are in deficit"?
15      A.  That would be accounts that had -- you
16  had a receivable from the customer that exceeded
17  any assets he had on deposit with you as the
18  firm.
19      Q.  Okay.  And you said in the answer to
20  the last question that Barclays had adequate
21  protection against the customers fulfilling
22  their obligations.  Were you assuming that the
23  customer margin accounts were not in deficit?
24      A.  Are we talking about in the futures
25  sense?

Page 129

D. McIsaac

1
2      Q.  Uh-huh.
3      A.  In the futures sense, even if you're
4  in deficit, the firm -- the FCM is required to
5  make up that deficit to protect all the
6  customers that are not in deficit.  So they
7  would have to lock up additional collateral.
8  They're responsible for all the customers that
9  they owe -- they have an obligation to where
10  they owe them money or owe them net equity to
11  cover them in their lockup.  The deficits -- the
12  customers or deficits, they would be required to
13  top them off in the second secured calculation.
14      Q.  The customers would be required to --
15      A.  No, the firm would be required to top
16  them off.
17      Q.  And if the firm was required to top
18  off any deficits, is it your understanding that
19  that would constitute customer property to which
20  Barclays was entitled under the terms of this
21  transaction even though it wasn't property
22  deposited by any customer?
23         MR. OXFORD:  Object to the form.
24      A.  The way the seg and secured
25  calculation works, you have a requirement on the

Contains Highly Confidential Portions

Page 130

D. McIsaac

1   D. McIsaac
2   top and you have where the assets are on the
3   bottom. The requirement would add back to your
4   requirement that deficit. So you'd be required
5   to lock up all moneys owed to all customers.
6       Q.   Including money that the customers had
7   not deposited?
8       A.   They would add it back.
9       MR. OXFORD:  Object to the form.
10      Q.   And when Barclays took over
11  responsibility for these accounts, did it
12  inherit those requirements?
13      MR. OXFORD:  I object to the form.
14      A.   Yes.
15      Q.   And if there were margin deficits in
16  the customer accounts, what protection did
17  Barclays receive in this transaction if it
18  didn't receive any of the LBI assets that were
19  held in those accounts, that were held in the
20  customer's segregated and secured accounts?
21      MR. OXFORD:  Object to the form.
22  Misstates his testimony. Assumes facts not
23  in evidence.
24      THE WITNESS:  I'm sorry, can I answer
25  or --

Page 131

D. McIsaac

1   D. McIsaac
2       MR. OXFORD:  Yes.
3       THE WITNESS:  I'm sorry.
4       Two things could have happened: They
5   could have decided not to take the customers
6   that were in deficit and had them
7   liquidated, liquidated them on the spot, and
8   they would have been topped up for that
9   potential loss by the firm making sure that
10  they covered the requirement which would
11  have been all the obligations to customers.
12      Q.   I'm sorry, can you -- what was the
13  second option? You said two things could have
14  happened. I don't understand your answer. Can
15  you --
16      A.   They could have decided not to take
17  those customers.
18      Q.   Okay.
19      A.   Or, if they did take them, could have
20  liquidated their positions and closed them out.
21      Q.   If there was a margin deficit, were
22  they protected in the event of a liquidation to
23  the full extent of the exposure on the
24  positions?
25      A.   They would have --

Page 132

D. McIsaac

1   D. McIsaac
2       MR. OXFORD:  Object. Object to the
3   form.
4       A.   Sorry. They would have had some
5   minimal exposure from the time that the market
6   closed on one day to the market opened on the
7   next to liquidate the positions.
8       Q.   How do you know that the exposure is
9   minimal if you don't know the size of the margin
10  deficit?
11      A.   The positions are marked to market
12  every day. You have protected all of the
13  clients who have -- that you owe money to. You
14  have locked up -- all of that money has been
15  locked up. Then you go and you would liquidate
16  those accounts.
17      Whatever the cost is, because it's
18  marked to market every day, you only have that
19  fraction of from the time the market closed to
20  the time the market opened and you were able to
21  liquidate to lose any money on the liquidation.
22  And you could make money on the liquidation.
23      Q.   But as the acquiring broker-dealer,
24  isn't it true that you're only, in your opinion,
25  under the structure of this transaction,

Page 133

D. McIsaac

1   D. McIsaac
2   entitled to the customer property that was held
3   by LBI to secure those customer positions?
4       A.   And that customer property is what it
5   would be locked up as assets pertaining to the
6   customer. That's for the obligations of the
7   customer. So you start out with your net
8   customer balances, you add back any deficits
9   that aren't fully secured, and that's your
10  obligations to your customers. And that's what
11  they would get in a transfer.
12      Q.   Okay. So they would get property in a
13  customer's seg and secured account that wasn't
14  necessarily a customer's property; is that
15  right?
16      A.   No, it would be the customer's
17  property. The customers gave you $100. You'll
18  return -- they -- you have to set aside that
19  $100 for the customers.
20      Q.   If the customer account is in a margin
21  deficit, does that mean you have a receivable as
22  opposed to actual cash in that account?
23      A.   Yes. And but for the customers that
24  you owe moneys to, you have to lock up all of
25  that money. So if a customer gives you $100 and

Contains Highly Confidential Portions

Page 134

D. McIsaac

1 another customer is in deficit for $50, you have
2 to lock up $100.  So you would be transferring
3 all the assets that belong to the customers.
4         You would then liquidate -- you would
5 also transfer whatever assets the customer's in
6 deficit because he may have securities -- he may
7 have a receivable of $20 and secured for $10.
8 You would have some security against it, but
9 your exposure is only between the time of
10 liquidation, from the close of the market to the
11 open of the market to liquidate that account.
12     Q.    And that size of that exposure would
13 depend on the quantity and size of the customer
14 positions as well as the market volatility; is
15 that right?
16     A.    It would depend on a lot of things.
17 It also may be a very good receivable because
18 maybe the customer went in deficit for a market
19 move and he'll make -- he'll meet his call
20 tomorrow morning.
21     Q.    If the customer positions were to, on
22 net, drop in value between the day of the
23 closing and the following day, is it fair to say
24 that Barclays was exposed to the full risk of

Page 135

D. McIsaac

1 the amount of drop in value and did not receive
2 protection against that risk from the customer
3 property that it received?
4         MR. OXFORD:  Object to the form.
5     Assumes facts not in evidence.
6     A.    Are we talking about just the customer
7 who's in deficit or are we talking about the
8 whole customer?
9     Q.    Any customer.
10     A.    No, there would be no difference for
11 the other customers because you have market
12 movement and you make market calls.  Customers
13 are required to meet their margin calls every
14 day.  Usually, a firm will have excess margin
15 there to cover themselves.  If they lose money,
16 they bring in money and you -- you use that
17 money to pay the exchanges.
18     Q.    And that assumes that the customers
19 are creditworthy and pay their margin calls; is
20 that right?
21     A.    That assumes that the customers meet
22 their margins calls.  If they don't meet their
23 margin call, you liquidate them.
24     Q.    Would you agree that credit risk is

Page 136

D. McIsaac

1 more substantial in a volatile market?
2         MR. OXFORD:  Object to the form.
3     A.    I think credit risk is dependent on
4 who your counterparties are.  I believe, from
5 what I saw in the due diligence done by the
6 Barclays people, that it was mainly
7 institutional customers that were in their
8 futures business.  Based on that, I would tend
9 to think that they would be viable
10 counterparties to meet their obligations.
11     Q.    Is credit risk greater in a recession
12 than it is in a -- under stable market
13 conditions?
14         MR. OXFORD:  Object to the form.
15     A.    The credit risk is dependent on the
16 customer and the positions they have.  They
17 could be betting that the market goes down and
18 making a ton of money.
19         So I don't know what the positions
20 that the customers had, in what markets they
21 were trading, and what effect that was happening
22 at September 19 that would have affected
23 individual customers' positions, you know, so
24 there was I don't believe a recession on

Page 137

D. McIsaac

1 September 19, but I don't know.
2     Q.    Do you -- did you base your opinion on
3 the understanding that there was not a recession
4 as of September 19, 2008?
5     A.    It doesn't matter to me if there was
6 or wasn't or if we were or were not in a
7 recession.  People pay their bills when they're
8 in a recession and when there's not a recession.
9 These are not individual customers, primarily.
10 These are institutions, from what I've
11 understood.
12     Q.    So it has no bearing on your opinion
13 that the country was in a recession -- if the
14 country were in fact in a recession at the time
15 this transaction was negotiated?
16     A.    It would matter what the customers had
17 and the positions they had and who the customers
18 were.
19     Q.    Would it matter at all to your
20 opinion, at all to your opinion, whether or not
21 there was a recession at the time that this deal
22 was negotiated in terms of assessing the risks
23 associated with the transaction?
24     A.    You assess the risk of the customers

Contains Highly Confidential Portions

Page 138

D. McIsaac

1    and the market environment at that point in time
2    and the customer's position. I don't know if a
3    recession has anything to do with the viability
4    of a futures customer paying their margin
5    requirements.
6       Q.   You just said you assess the risk of
7    the customers and the market environment at that
8    point in time. Are you agreeing that the market
9    environment at that point in time is relevant to
10   an assessment of the risks associated with a
11   transaction of the type that Barclays
12   consummated with Lehman Brothers in September of
13   2008?
14       MR. OXFORD: Object to the form.
15       A.   The market environment in relation to
16   the positions that the customers had on. If the
17   market's going down and the customers were
18   betting that the market is going to go down,
19   they're not a credit risk. So you have to
20   analyze the customers, the types of positions
21   they are, their familiarity with the market, and
22   your belief on where the market goes and whether
23   or not you have adequate collateral.
24       Q.   Okay. I'm going to try to ask the

Page 139

D. McIsaac

1    question one more time, and if you could just
2    answer the question that I'm asking.
3       Would it matter at all to your opinion
4    whether or not there was a recession at the time
5    that this deal was negotiated in terms of
6    assessing the risks associated with the
7    transaction? Would that matter to your opinion?
8       MR. OXFORD: Object to the form. It's
9    been asked and answered a number of times.
10      You can answer it again.
11      A.   I would not care if there was a
12   recession in analyzing individual customer's
13   ability to meet their obligations.
14      Q.   Thank you.
15      MR. OXFORD: Trish, if you can let me
16   know when you think it's a good time to
17   break for lunch? It's 1.
18      MS. BLOOMER: Just like five more
19   minutes, if that's okay with everyone.
20      MR. OXFORD: If it's okay with Mr.
21   McIsaac, it's okay with me.
22      MS. BLOOMER: Okay. Thanks.
23      Q.   Could you turn back in your expert
24   report to page -- oh, I'm sorry. Could you turn

Page 140

D. McIsaac

1    in the Trustee's brief, which was Exhibit --
2       MR. OXFORD: 687.
3       Q.   687.
4       MS. BLOOMER: Thanks, Neil.
5       Q.   To page 60.
6       A.   Page 60.
7       Q.   We were talking earlier about the
8    sentence in the Trustee's brief in which they
9    say that a transfer to Barclays of the minimum
10   margin assets required by the OCC to secure
11   LBI's open positions would arguably have cost
12   LBI little. Do you recall earlier discussing
13   that?
14      A.   Yes.
15      Q.   Are you aware that the margin
16   requirements at the OCC were shifting by $500
17   million a day during the week of September 15 on
18   multiple days?
19      MR. OXFORD: Objection to form.
20   Misstates --
21      A.   I believe --
22      MR. OXFORD: -- the record.
23      A.   Sorry.
24      I believe you showed me a document

Page 141

D. McIsaac

1    that showed it going up and then drastically
2    down on the 19th.
3       Q.   Perhaps we can look at that document.
4    I believe it was the declaration of Craig Jones.
5       A.   Right, Exhibit 1.
6       Q.   In Exhibit 1.
7       Do you recall that between the 15th
8    and the 16th the margin requirement went up by
9    over $500 million, do you see that?
10      A.   Yes, I do.
11      Q.   And then between the 17th and 18th --
12   well, between the 16th and the 17th it went up
13   another 45 million or so dollars, do you see
14   that?
15      A.   Uh-huh. Yes.
16      Q.   And then it goes up over $600 million
17   between the 17th and the 18th?
18      A.   Yes.
19      Q.   So between the 15th and the 18th, you
20   see that the margin requirement increased by
21   over $1.2 billion?
22      A.   Yes, I see that.
23      Q.   Okay. And then it dropped by
24   approximately $400 million on that last day of

Contains Highly Confidential Portions

Page 142

D. McIsaac

1  the week, do you see that?
2      A.   Yes.
3      Q.   Would it have been rational for the
4  Trustee, assuming he was aware of the swings in
5  the margin requirements, to believe that it
6  would have arguably cost LBI little to transfer
7  even more than the minimum margin assets given
8  the risk that those margin requirements could
9  increase dramatically over the following day
10  after the transaction?
11      MR. OXFORD:  Object to the form.
12  Assumes facts not in evidence.
13      A.   I believe you would have to assess
14  what your exposure was there, assess whether or
15  not the margin requirements might have been
16  inflated by the OCC for whatever reason, and
17  determine what your potential risk or what you
18  think the risk is and negotiate from there.
19      Q.   Regardless of whether the OCC's margin
20  requirements were inflated or what the reason
21  for them was, you agree that LBI couldn't
22  withdraw anything beyond -- anything that would
23  bring the posted margin below the minimum margin
24  assets required, right?

Page 143

D. McIsaac

1      A.   Correct.
2      Q.   And you see that the margin
3  requirements increased by $1.2 billion in a
4  matter of four days during the week of September
5  15, correct?
6      A.   I see that they increased and then
7  decreased.
8      Q.   Would it be rational for a seller, in
9  light of these margin requirement movements,
10  during the week of September 15, 2008, to
11  believe that there was a risk that the margin
12  requirements would increase again substantially
13  on September 22 and September 23?
14      MR. OXFORD:  Object to the form.
15  Assumes facts not in evidence.
16      A.   In light of triple-witching day, I
17  don't know if -- if LBI was putting on
18  additional positions during the week or the
19  positions that would close out on Friday would
20  have -- what impact they would have on the
21  margin requirement.
22      I can't answer a question of where I
23  think the margin requirement is going to go
24  without having any idea what the positions were

Page 144

D. McIsaac

1  and how they had them already covered.  Maybe
2  the margin requirement was on shorts that we had
3  long positions already sitting in the account
4  and they would have been covered.
5      Q.   Do you know how many positions were in
6  the proprietary accounts at the OCC?
7      MR. OXFORD:  Object to the form.  Do
8  you have a particular day?
9      MS. BLOOMER:  On the 19th of
10  September.
11      A.   I believe there were tens of thousands
12  of positions in there that date that included
13  the affiliates, subordinated affiliates
14  accounts.
15      Q.   So if a Trustee were to want to
16  assess -- or, if LBI, I apologize, were to want
17  to assess the impact that the expiration weekend
18  would have on the margin requirements, how long
19  would it take the LBI -- LBI to conduct that
20  analysis?
21      MR. OXFORD:  Object to the form.
22      A.   I would assume LBI, if their systems
23  were like any other systems on the street, would
24  have been able to analyze that fairly quickly.

Page 145

D. McIsaac

1  They -- they have risk systems that would
2  quantify this and they would know what their
3  exposure was as of close of business.
4      MS. BLOOMER:  I think this is probably
5  a good time to take our break for lunch.
6      MR. OXFORD:  Okay.  Thanks.
7      THE VIDEOGRAPHER:  The time is 1:05.
8  This is the tape labeled number 3.  We're
9  going off the record.
10      (Luncheon recess.)

Page 146

D. McIsaac

1    D. McIsaac
2         AFTERNOON SESSION
3    DANIEL McISAAC, resumed and
4        testified further as follows:
5         THE VIDEOGRAPHER:  This is the start
6    of tape labeled number 4.  The time is 2:05.
7    We're back on the record.
8    EXAMINATION BY (Cont'd.)
9    MS. BLOOMER:
10    Q.    Good afternoon.
11    A.    Good afternoon.
12    Q.    I'm showing you a document that's been
13    marked as Exhibit 648.  This is a declaration
14    that was submitted by Eric Clark.  Are you
15    familiar with this declaration?
16    A.    I believe I've seen it, yes.
17    Q.    And did you see it preparing for your
18    deposition today?
19    A.    I think I might have seen it, but I
20    don't recall if it was in preparing or not.  But
21    I know I've seen the declaration.
22    Q.    Do you believe you saw it -- do you
23    believe you saw it prior to when you submitted
24    your expert report?
25    A.    Yes.

Page 147

D. McIsaac

1    D. McIsaac
2    Q.    On exchange-traded derivatives issues?
3    A.    Yes.
4    Q.    Yes?
5    A.    Yes.
6    Q.    If you could turn to the second page,
7    paragraph 6, and review that and let me know
8    when you've had a chance to look at it.
9         (Document review.)
10    A.    Yes.
11    Q.    Okay.  In this paragraph, Mr. Clark
12    says that the OCC options were not immediately
13    brought onto Barclays' systems, as the systems
14    were not capable of incorporating the LBI OCC
15    options.  Do you see that?
16    A.    Yes.
17    Q.    Do you have any reason to doubt the
18    accuracy of that statement?
19    A.    No, I do not.
20    Q.    In the next sentence he says, "The
21    delay in moving the options on the Barclays'
22    systems created difficulties for Barclays' Risk
23    Management Team in terms of their ability to
24    manage the risk associated with these positions
25    effectively during the interim period."

Page 148

D. McIsaac

1    D. McIsaac
2    Do you see that?
3    A.    Yes.
4    Q.    Do you have any reason to doubt the
5    accuracy of that statement?
6    A.    No, I do not.
7    Q.    Have you seen anything in the record
8    that suggests that Barclays did have the ability
9    to manage the risk associated with these
10    positions prior to the time it was able to
11    incorporate them onto its system?
12         MR. OXFORD:  Object to the form.
13    A.    I believe I did see something where
14    they were trying to risk-manage the positions
15    for a period of time and then turned them back
16    to the Lehman traders to manage the risk.
17    Q.    Okay.  And do you believe that what
18    you saw led you to conclude that that risk
19    management during that period of time was
20    effective?
21         MR. OXFORD:  Object to the form.
22    A.    I don't know if I saw enough within
23    that to determine if it was totally effective.
24    Q.    What would you consider to be an
25    effective hedge program in terms of the

Page 149

D. McIsaac

1    D. McIsaac
2    relationship between losses on underlying
3    positions, for example, and gains onto hedge
4    positions?
5         MR. OXFORD:  Object to the form.
6    A.    I would assume, having them roll up
7    into a system, that you would be able to monitor
8    both sides of the positions, be able to monitor
9    the options as well as the equity into one
10    straight -- one flow-through system, for lack of
11    better words.
12    Q.    If Barclays were attempting to hedge a
13    set of options positions, and those options
14    positions lost $500 million in value over a
15    discrete period of time, would you consider an
16    effective hedge if the hedge positions that
17    Barclays placed only gained $150 million during
18    that same time?
19    A.    I don't know if their objective was to
20    fully hedge the position.  Most trading books do
21    not fully hedge because then there would be no
22    gain or loss unless you were just trying to play
23    the -- the gain or loss when you put on the
24    contract.  So most traders don't fully hedge
25    their positions.

Contains Highly Confidential Portions

Page 150

D. McIsaac

1
2 But I don't know if that was
3 effective. Their goal might have been to only
4 hedge a portion of it.
5    Q.    Assuming their goal was to fully hedge
6 the position, would you agree that a hedge that
7 only gained $150 million against underlying that
8 lost $500 million was an ineffective hedge?
9       MR. OXFORD:  Object to the form.
10    Assumes facts not in evidence.
11    A.    If you were trying to hedge the entire
12 portfolio and you put on hedges that didn't
13 replicate it, that would have been an
14 ineffective hedge.
15    Q.    If you would turn in your report to
16 page 3 -- I'm sorry, page 4, sub-bullet 3 at the
17 top of the page.  It says there that, "Any
18 ongoing market risk associated with the
19 proprietary exchange-traded derivatives that
20 Barclays acquired could be and was mitigated by
21 Barclays by hedging these positions."  Do you
22 see that?
23    A.    Yes.
24    Q.    And then if you turn to page 7,
25 paragraph 22, you say, "I would assume that the

Page 151

D. McIsaac

1
2 purchaser would have anticipated that the short
3 exchange-traded derivatives positions would be
4 hedged by certain long equity positions in LBI's
5 total portfolio."  Do you see that?
6    A.    Yes.
7    Q.    Are you familiar with the various
8 trading strategies that a broker-dealer could
9 undertake for a proprietary portfolio?
10       MR. OXFORD:  Object to the form.
11    A.    Somewhat, yes, sure.
12    Q.    Are long equity positions the only
13 positions that would interact with
14 exchange-traded derivatives positions in terms
15 of the full portfolio?
16       MR. OXFORD:  I'll object to the form
17    of the question.
18    A.    Yes, I'm not sure really what the
19 question is.  I'm not sure what you're --
20    Q.    Is it possible that short
21 exchange-traded derivatives positions would be
22 hedged by anything other than long equity
23 positions in a broker-dealer's portfolio?
24    A.    Yes.
25    Q.    Can you give me an example?

Page 152

D. McIsaac

1
2    A.    A short put might be hedged by a short
3 position in a portfolio.  A short option could
4 be hedged by a long option.  An index could
5 hedge a portfolio of a basket of other options.
6    Q.    And could over-the-counter positions
7 also be used to hedge exchange-traded
8 derivatives positions?
9    A.    I would tend to think normal course
10 would be to use exchange-traded derivatives to
11 hedge over-the-counter derivatives.
12    Q.    Okay.  And if you were to have
13 purchased an exchange-traded derivatives
14 position in order to hedge an over-the-counter
15 position, would the acquirer of the
16 exchange-traded derivatives position be
17 considered to have a naked position in the event
18 it didn't also acquire the corresponding
19 over-the-counter derivative?
20       MR. OXFORD:  Object to the form.
21    A.    I think if the question you're asking
22 is if there was an over-the -- exchange-traded
23 option hedging an over-the-counter position,
24 that if you didn't assume the over-the-counter
25 position, would that single exchange-traded

Page 153

D. McIsaac

1
2 option be naked?  Unless you had something else
3 in your portfolio that was hedging it or could
4 be considered a hedge to it, yes.
5    Q.    Is it your understanding that Barclays
6 was acquiring the over-the-counter derivatives
7 of LBI in the September 2008 transaction?
8    A.    I do not believe they were.
9    Q.    Is it fair to say, then, that Barclays
10 would have been reasonable in assuming that
11 there may be unhedged exchange-traded
12 derivatives positions in the portfolio it was
13 acquiring?
14       MR. OXFORD:  Object to the form of the
15    question.  Assumes facts not in evidence.
16    A.    I don't know if there were
17 over-the-counter derivatives in the -- in LBI's
18 portfolio, nor do I know if they hedged them
19 with exchange-traded derivatives.  The --
20    Q.    Is it possible that they did?
21       MR. OXFORD:  Object to the form.
22    A.    Yes, it's possible that could have
23 happened.
24    Q.    And if that was the case, would that
25 position then not be fully hedged if you were

Page 154

D. McIsaac

1 taking the exchange-traded portfolio and not the
2 over-the-counter portfolio?
3        MR. OXFORD:  Object to the form.
4     Asked and answered.
5        You can answer again.
6     A.    Unless there was another security or
7 another transaction out there that that was
8 hedging.
9     Q.    Okay.  My question assumes that the
10 position is hedging the over-the-counter
11 position.  Do you understand?
12    A.    Yes, but there could be another
13 position that that would also act as a hedge
14 for.
15    Q.    Do you -- does a broker-dealer
16 typically put duplicative hedges on its
17 portfolio?
18    A.    No.  What I meant is they could be
19 hedging this transaction.  You take that
20 transaction off, it may be now a hedge for a
21 different security out there.  All I'm saying
22 is, in the realm things, it could be hedging
23 another exposure.
24    Q.    Is it fair to say that you wouldn't

Page 155

D. McIsaac

1 assume as an acquirer that you were getting a
2 fully hedged portfolio if you were taking
3 exchange-traded derivatives and not
4 over-the-counter derivatives?
5        MR. OXFORD:  Object to the form.  That
6     assumes facts not in evidence.
7     A.    I wouldn't assume anything.  I would
8 inquire as to what I was purchasing and what the
9 various books were, and if I had exchange-traded
10 derivatives hedging an, you know, an
11 over-the-counter derivative book, I would assume
12 I'd find that out before I decided to buy the
13 unhedged exchange-traded derivatives.
14    Q.    Okay.  When you're -- if you were
15 considering an acquisition of tens of thousands
16 of exchange-traded derivatives positions, how
17 would you go about determining whether or not
18 those positions were hedged in full or in part
19 by over-the-counter derivatives or vice-versa?
20    A.    I guess I'd ask the people who were
21 managing the over-the-counter derivative book if
22 they had exchange-traded derivatives in their
23 portfolio.
24    Q.    And if the answer was yes, what would

Page 156

D. McIsaac

1 you do in order to determine the extent of the
2 naked exposure on those exchange-traded
3 derivatives in the event you weren't acquiring
4 the over-the-counter derivatives?
5        MR. OXFORD:  Object to the form.
6     Assumes facts not in evidence.
7        You can answer.
8     A.    I would ask them what their portfolio
9 of exchange-traded derivatives was that was
10 hedging it, specific portfolio.
11    Q.    And would that require you to obtain
12 information not only about the positions that
13 were open in an exchange-traded derivatives
14 account, but also the relationship between those
15 positions and any over-the-counter positions?
16    A.    No, I would just ask for a list of the
17 exchange-traded derivatives in his trading
18 portfolio book.
19    Q.    And what would you do with that list?
20    A.    I would, I guess, determine if I want
21 to buy those assets without the
22 over-the-counters positions that they may or may
23 not be hedging.
24    Q.    Would you also try to determine at the

Page 157

D. McIsaac

1 same time whether there were equities positions
2 that were hedging those positions?
3        MR. OXFORD:  Object to the form.
4     Which positions are you talking about?
5     Q.    The exchange-traded derivatives
6 positions that you were -- would be acquiring?
7        MR. OXFORD:  Okay.  Same objection.
8        You can answer.
9     A.    I thought we started this by saying if
10 we had exchange-traded derivatives hedging an
11 over-the-counter book, well, how would I
12 determine that?  And I think I said I would talk
13 to the people managing that book.  I would
14 assume, and maybe that's a bad thing, I would
15 probably ask them also what other positions do
16 they have that's exchange-traded that is in the
17 portfolio that I might be acquiring.
18    Q.    Okay.  And you would want to analyze
19 the relationships between the exchange-traded
20 derivatives, the over-the-counter derivatives,
21 and the other long and short positions in the
22 portfolio that you were acquiring in order to
23 understand the relationships between the various
24 trades, is that fair?

Contains Highly Confidential Portions

Page 158

D. McIsaac

1   
2   MR. OXFORD: Object to the form.
3   A.   If I was not obtaining the
4   over-the-counter derivatives and had no reason
5   to know about them, I would try to assess the
6   exchange-traded derivatives and the equity
7   positions on the risk that it was -- that it
8   would give me perhaps to take over those
9   positions.  I don't care what they did with the
10  over-the-counter if I'm not assuming that.
11  Q.   Do you care what they did with the
12  over-the-counter if the over-the-counter
13  derivatives were related to the exchange-traded
14  derivatives or the fixed equity positions that
15  you were acquiring in terms of a hedge
16  relationship?
17  MR. OXFORD: Object to the form.
18  A.   Again, if I'm not acquiring the
19  over-the-counter, why would I care their
20  relationship to the exchange-traded that I was
21  acquiring?  I wouldn't care if it was a good
22  hedge or not because I wasn't acquiring the
23  over-the-counter.
24  Unless you're saying that I, in the
25  realm of possibility, I may decide to take over

Page 159

D. McIsaac

1   
2   the over-the-counter positions.
3   Q.   Would you care if it was naked hedge
4   that you were acquiring, a naked position -- I'm
5   sorry.
6   Would you care if it was a naked
7   position that you were acquiring because you
8   weren't getting the over-the-counter position?
9   MR. OXFORD: Object to the form.
10  A.   I would analyze that just as any other
11  position I was acquiring I would analyze.
12  Q.   You say on the top of page 8 in your
13  expert report that, "Mr. Leitner appears to
14  assume that Barclays was, at least at the start
15  of the week, purchasing a book of business that
16  was at least partly hedged."
17  Is it your understanding that Barclays
18  was acquiring a book of business that was partly
19  hedged or that was fully hedged as of the
20  beginning of the week?
21  A.   I don't know if I have an
22  understanding one way or the other.  I don't
23  think anybody's business would be fully hedged,
24  because if you're fully hedged, then you don't
25  make money.  So you would determine what hedges

Page 160

D. McIsaac

1   
2   you wanted based on the risk that you wanted in
3   that book and where you thought your rewards
4   were.  You wouldn't, for every long position,
5   have a corresponding short because then you
6   wouldn't make any money.
7   Q.   Would you be qualified to do that
8   assessment yourself if you were advising on a
9   transaction of the type that Lehman and Barclays
10  entered into in September of 2008?
11  MR. OXFORD: Object to the form.  I'm
12  not sure it's clear what assessment you're
13  asking about.
14  MS. BLOOMER: He can ask me to clarify
15  if he needs me to clarify, Neil.
16  A.   I don't know, when you say "assess,"
17  what you mean by it.
18  Q.   You said you wouldn't for every long
19  position have a corresponding short because you
20  wouldn't make any money.  You said you would
21  determine what hedges you wanted based on the
22  risk that you wanted in that book and where you
23  thought your rewards were.
24  Were you qualified -- are you
25  qualified, do you consider yourself qualified to

Page 161

D. McIsaac

1   
2   make those types of assessments in the
3   connection with a transaction of this type?
4   MR. OXFORD: Objection to the form.
5   A.   What I was referring there is the
6   trader who's trading that book would make that
7   assessment.  Firms have various people that
8   monitor what the traders are doing and there are
9   different risk managers that look at different
10  risk.
11  If you're asking me if I was long IBM
12  and short a call on AT&T, could I assess the
13  total risk on that, I would know that I have
14  exposure on two sides and I'm not hedged.  Could
15  I tell you how much I could lose on each?  No,
16  but firms will have systems that do that.
17  Lehman certainly had a system that did
18  that because they were on -- they were a CSE
19  firm so they certainly had value at risk and
20  they did -- they did analysis of what their
21  gains and losses were, and I'm -- what their
22  gains and losses could be based on the value at
23  risk, and I'm assuming that they had the
24  wherewithal to determine that.
25  Q.   Do you have knowledge of how the

Page 162

D. McIsaac

1
2  process of assessing this risk and determining
3  what positions you are taking over would consist
4  of?
5        MR. OXFORD:  Object to the form.
6     A.    Again, you normally have a
7  businessperson determine what risk appetite he
8  had for his business and determine if the book
9  of business that they were selling he wished to
10  buy and it fit into his risk model.
11     Q.    Do you know how long it would take
12  that person to do an analysis of the risk
13  profile of a portfolio of exchange-traded
14  derivatives and equities positions the size that
15  Barclays was acquiring in September of 2008?
16     A.    I do not know how long it would take,
17  but I would assume that the systems already in
18  place at LBI would have spit that information
19  out.
20     Q.    You think that you could hit a button
21  and print that information out; is that your
22  testimony?
23        MR. OXFORD:  Object to the form.
24     Mischaracterizes the witness's testimony.
25        You can answer.

Page 163

D. McIsaac

1
2     A.    I believe Lehman had systems that
3  provided them with value at risk on a daily
4  basis.
5     Q.    And do those systems that provide
6  value at risk on a daily basis tell you which
7  positions are hedging which positions so that if
8  you're not taking all of the positions, you know
9  what's at risk?
10        MR. OXFORD:  Objection to the form.
11     A.    I don't believe it will earmark every
12  naked position that's in the portfolio.  It will
13  tell you the portfolio and what the anticipated
14  market movement could be in that portfolio.
15     Q.    And if there are multiple portfolios,
16  and you're not taking all of them, would you
17  agree that it's not as simple as pressing a
18  button in order to determine the risk profile of
19  the portfolio that you're taking over?
20        MR. OXFORD:  Object to the form.
21     Mischaracterizes the witness's testimony.
22        MS. BLOOMER:  I'm asking him a
23     question.  I'm not characterizing anything.
24     A.    I would believe that the systems would
25  enable the management of Lehman to assess the

Page 164

D. McIsaac

1
2  risk at various levels, possibly down to the
3  individual trader, but at a minimum probably
4  down to the individual desk.
5     Q.    Was it -- maybe I misunderstood your
6  testimony.  Was it your testimony that the
7  systems wouldn't have information other than the
8  aggregate risk of a particular portfolio?  So,
9  in other words, wasn't it your testimony that
10  the system wouldn't generate information that
11  would tell you which positions are hedged by
12  which other positions?
13     A.    I believe what I said, and if I said
14  that, it's not what I meant to say, the system
15  would analyze your risk on a portfolio basis.
16  It may not at a top level spit out this position
17  is not hedged.  In the makeup of the risk
18  matrix, it would give you information that you
19  need to see.
20     Q.    What do you mean when you say "on a
21  portfolio basis"?
22     A.    Well, on a trader level, on a desk
23  level, whatever the firm prescribes to be a
24  portfolio.
25     Q.    And could any one portfolio include

Page 165

D. McIsaac

1
2  both exchange-traded positions and
3  over-the-counter positions?
4     A.    Sure.
5     Q.    And if the system were to spit out a
6  report that showed the risk profile of a
7  portfolio that contained both exchange-traded
8  and over-the-counter derivatives, would that
9  report tell you which of those positions were
10  going to be naked in the event that the
11  over-the-counter derivatives were not to be
12  transferred with the exchange-traded positions?
13     A.    There would probably be reports in the
14  system that would indicate all the individual
15  securities that are in that system.  It may not
16  assess them separately as to the risk of that
17  one position that's hedged because it may be
18  looking to hedge on the total desk position, but
19  you would have the analysis of what was owned
20  and what the exposure was on that security.
21     Q.    Do you know that or you -- you said
22  "probably."  I would like to confirm.  Do you
23  know that or not?
24     A.    I would assume most risk systems would
25  have that information.  I did not look at

Page 166

D. McIsaac

1  Lehman's system and I can't determine whether or
2  not they did, but I'm assuming that during the
3  due diligence somebody would have looked at
4  that.
5  Q.   During what due diligence?
6  A.   Barclays' due diligence.
7  Q.   And how long did Barclays have to do
8  that due diligence?
9      MR. OXFORD:  Object to the form.
10  Asked and answered.
11      You can answer again.
12  A.   I don't know how long Barclays had to
13  do the due diligence.  I assume they had enough
14  time to do it or else they would not have
15  entered into the transaction.
16      Somebody, I'm assuming, made an
17  assessment of the risk of what they were buying
18  and determining whether or not it fit into what
19  they were looking for and they could afford to
20  take on that risk.
21  Q.   Could it be that they agreed to take
22  on the risk because they believed they were
23  getting protection of the posted margin at the
24  clearing corporations, is that possible?
25

Page 167

D. McIsaac

1      MR. OXFORD:  Object to the form.
2  A.   I can't go into what they thought they
3  were getting and weren't getting.  I cannot tell
4  you what is in their mind and what they were
5  getting and what they weren't getting.
6  Q.   Is it possible that the reason they
7  agreed to take on these positions was not
8  necessarily because they had the time to do all
9  of the due diligence, but because they believed
10  they were getting posted margin as protection
11  against some portion of those risks?
12      MR. OXFORD:  Objection to the form.
13  Q.   Is that possible?
14  A.   Which positions?  We've talked about
15  the portfolio.  We've talked about cash
16  positions and exchange-traded derivatives.
17      What positions are we looking for
18  margin to protect?
19  Q.   Is it possible that Barclays agreed to
20  take over Lehman's exchange-traded derivatives
21  portfolio because it believed that it was
22  getting the margin that was posted to secure
23  those positions as protection against any risk
24  that may exist due to the fact that those
25

Page 168

D. McIsaac

1  positions may or may not be naked exposures?
2      MR. OXFORD:  Objection.  Asked and
3  answered.
4  A.   I don't know if I could assess what
5  was in their mind on negotiating the deal and
6  what they thought they were getting and weren't
7  getting.
8  Q.   I'm asking you if it's possible that
9  that's the reason that they agreed to go forward
10  with the transaction --
11  A.   It is possible --
12  Q.   -- despite having not done the due
13  diligence that they requested.
14  A.   It is possible that that was in their
15  mind and they thought of that, yes.
16  Q.   Okay.  In your review of the evidence
17  in this case, did you see any indication that
18  Barclays was arranging to post margin to the OCC
19  or the various other clearing brokers and
20  clearing organizations such that the margin
21  requirements come Monday, September 22, would be
22  satisfied in order to avoid a liquidation?
23  A.   I didn't see anything to the effect
24  that they were preparing to do that, but I
25

Page 169

D. McIsaac

1  haven't reviewed all the documents that Barclays
2  has in their possession as to the transaction.
3  Q.   If you were advising a company who was
4  acquiring an exchange-traded derivatives
5  portfolio, and you knew the closing was going to
6  take place in a matter of days, would you be
7  advising that company to start making
8  arrangements to post the collateral if you
9  didn't believe you were getting the collateral
10  that had already been posted by the selling
11  entity?
12  A.   Where would I advise them to post the
13  collateral if they didn't buy anything as yet?
14  I'm not sure what the question is.  How would I
15  advise them to post collateral?  Post collateral
16  where?
17  Q.   To arrange.  Would you advise them to
18  start arranging to post that collateral if you
19  believed you weren't going to be getting the
20  collateral that was already posted by the
21  selling entity?
22  A.   How much time would I -- I don't think
23  they would need a lot of time to arrange for
24  collateral to post if they were a broker-dealer.
25

Page 170

D. McIsaac

1
2  They had plenty of collateral that could have
3  been posted if they needed to.
4      Q.   Are you aware of how many different
5  clearing organizations and clearing brokers LBI
6  traded in exchange-traded derivatives through?
7      A.   I believe they traded through the OCC,
8  the CME in the U.S.  I believe they cleared
9  through other brokers for some of the other
10  foreign businesses.  I don't know what
11  arrangements Barclays had with those entities
12  already.
13      Q.   What is the typical practice of a
14  clearing organization at the open of business on
15  a given day if collateral is not posted
16  sufficient to satisfy the margin requirements?
17          MR. OXFORD:  Objection.  Form.
18      A.   I'm not sure what the question --
19  could you sort of rephrase it so I understand
20  what the question is?
21      Q.   Sure.  If the OCC woke up on Monday
22  morning and realized that there was no
23  collateral posted in the OCC accounts that were
24  held on behalf of LBI, what would the OCC have
25  done?

Page 171

D. McIsaac

1
2      A.   Well, I don't know how that could
3  happen because I don't know how the collateral
4  could come out.  So I assume when they were
5  taking over the positions, however they decided
6  to move those positions into their
7  infrastructure into their position, that they
8  would make arrangements with the OCC to have the
9  adequate collateral there.
10          Sometimes you may transfer the
11  collateral that's in the accounts already and
12  then pay it back to the -- to the seller just as
13  a means to do it efficiently.
14      Q.   And if you were advising an entity, a
15  seller, to enter into that type of an
16  arrangement, would you have something written
17  into an agreement somewhere to provide for a
18  true-up of that money?
19      A.   I would have something that explained
20  what I was purchasing, and if I wasn't
21  purchasing those assets, I might have something
22  in there saying I'll return them or else.  If
23  I'm not paying for them, I'd be obliged to
24  return them.  I've done a deal before, we have
25  moved those assets over and then paid them back

Page 172

D. McIsaac

1
2  the next day.  It was just the ease of moving it
3  into the -- into the process of moving the
4  exchange-traded derivatives over.
5      Q.   Would it be prudent as an advisor to a
6  seller in that circumstance to have a
7  documentation of the agreement that you would be
8  getting back billions of dollars in collateral?
9          MR. OXFORD:  Objection to the form.
10  Assumes facts not in evidence.
11          You can answer.
12      A.   I would assume that as well as what
13  you were purchasing would be in the agreement.
14      Q.   I'm showing you what has been marked
15  as Exhibit 51.  Oh, you already have a document
16  that's Exhibit 51.
17          If you look at paragraph 1(a), it says
18  here, "For good and valuable consideration, the
19  receipt and sufficiency of which are hereby
20  acknowledged, Lehman hereby sells, assigns,
21  transfers and sets over to Barclays, without
22  recourse or without representation or warranty,
23  all of Lehman's rights, title, interests,
24  powers, privileges, remedies, obligations, and
25  duties in, to, under, and in respect of the

Page 173

D. McIsaac

1
2  Account, as of the Effective Date including with
3  respect to (i) the Clearing Fund deposit; (ii)
4  all margin deposits held by OCC with respect to
5  the account; (iii) all settlement obligations
6  with regard to transactions in cleared accounts;
7  and (iv) all rights and obligations in respect
8  of exercises of options contracts and
9  assignments of such exercises."
10          Do you see that?
11      A.   Yes.
12      Q.   Do you agree that under this agreement
13  the Trustee agreed -- authorized Lehman's sale
14  of Lehman's rights in the margin deposits that
15  were held at the OCC without recourse or
16  representation of warranty?
17          MR. OXFORD:  I'll object to the form
18  of the question.  Calls for a legal
19  conclusion.
20      A.   I don't think -- I'm not a lawyer, so
21  I don't want to talk about it, but I don't think
22  this is selling -- this is the sale agreement.
23  This is an agreement just to transfer at the
24  OCC, and I assume when they say hereby
25  acknowledge for, you know, sufficiency, without

Page 174

D. McIsaac

1        D. McIsaac
2  recourse, representation, whatever has happened,
3  is in another agreement. This is not the
4  binding sale agreement, I don't think.
5     Q.  This is a binding agreement, you
6  realize that, right?
7       MR. OXFORD: Objection to form. Calls
8  for a legal conclusion.
9     A.  I think what I said is this is not a
10  sale agreement.
11     Q.  Do you think that it's -- do you think
12  that the language of this provision that we just
13  looked at together suggests that Lehman was
14  going to transfer the margin deposits held by
15  the OCC to Barclays? Is that what you
16  understand this language to mean?
17     A.  Yes.
18       MR. OXFORD: Objection to form.
19     Q.  Do you think that -- do you think that
20  that language is clear or do you think it's
21  ambiguous in some way?
22       MR. OXFORD: Objection to form.
23     A.  I think the language is clear as far
24  as the OCC goes as to what is happening with the
25  assets at the OCC.

Page 175

1        D. McIsaac
2     Q.  Okay.
3     A.  It is not determining what
4  compensation was paid or how the arrangements
5  were made. All this is between two
6  counterparties who are at the clearing org.
7  transferring their obligations from one to
8  another.
9     Q.  So you assume that the sale agreement,
10  for example, that was approved by the court
11  suggests that the posted margin would be
12  transferred and then this agreement would make
13  sense to you; is that what you're saying?
14       MR. OXFORD: Objection to form.
15  Misstates the witness's testimony.
16     You can answer.
17     A.  I think the sale agreement would
18  denote what was being paid for the assets, not
19  how they were being transferred.
20     Q.  And this would denote how it's being
21  transferred?
22       MR. OXFORD: Objection. Form.
23     A.  This would denote the authority for
24  OCC to transfer it. You have a sale agreement
25  and you may have another agreement on how you're

Page 176

1        D. McIsaac
2  going to effectually move moneys back and forth.
3  Usually you convert, do a conversion, and you'll
4  have some documents that talk about how you're
5  going to do that.
6     Q.  But the fact that it was going to be
7  transferred, that is denoted in the TAA; is that
8  right?
9       MR. OXFORD: Objection. Form.
10     A.  This is a vehicle to move the Lehman
11  option boxes at OCC into Barclays' name.
12     Q.  And that would include the margin
13  deposits?
14     A.  I believe it includes everything
15  that's denoted here, which is the margin
16  deposits is part of it.
17     Q.  Okay. What do you understand "without
18  recourse" to mean?
19       MR. OXFORD: Objection. Form. Calls
20  for a legal conclusion.
21     You can answer.
22     A.  I'm not sure what it means in this
23  case.
24     Q.  What do you generally understand the
25  term "without recourse" to mean?

Page 177

1        D. McIsaac
2     A.  I would guess there's no recourse to
3  the OCC if something went wrong.
4     Q.  You don't think it may mean without
5  recourse to Barclays for any of the money that
6  Lehman is transferring to Barclays?
7       MR. OXFORD: Objection. Form. Asked
8  and answered. Calls for a legal conclusion.
9     You can answer again.
10     A.  As I said, I think this means recourse
11  to the OCC.
12     Q.  Is it possible that it means without
13  recourse to anyone?
14       MR. OXFORD: Objection. Calls for a
15  legal conclusion.
16     A.  It's a legal document. I'll let the
17  lawyers decide.
18     Q.  Okay. I'd like to go back in your
19  report to page 23 again where you say that "a
20  rational seller would not include margin in the
21  deal unless it was being compensated dollar for
22  dollar," do you see that?
23     A.  Could you point out what paragraph?
24  I'm sorry.
25     Q.  Page 23 at the last --

Page 178

D. McIsaac

1
2    A.   Got it.  Sorry.
3    Q.   You see that language?
4    A.   Uh-huh.
5    Q.   I'm handing you -- I'm going to mark
6  it as an exhibit -- Exhibit 688.
7         (Exhibit 688, Deposition of Bart
8   McDade, marked for identification, as of
9   this date.)
10   Q.   If you could turn with me to page 275.
11  This is testimony of Bart McDade.  Are you
12  familiar with that name?  Do you know who he is?
13   A.   I believe he might have been the
14  president at Lehman Brothers, Inc.
15   Q.   Is it your understanding that he was
16  involved in the negotiations of the transaction
17  in September of 2008 between Lehman and
18  Barclays?
19   A.   I believe he was, but I don't know if
20  I've ever seen anything that said what his role
21  was in it.
22   Q.   Okay.  On page 275, starting at line
23  3, Mr. McDade was asked:  "Did you understand
24  that, in addition to the long positions that
25  short positions that Lehman had at OCC, it also

Page 179

D. McIsaac

1
2  had additional cash and assets that were
3  deposited as margin and also clearing funds
4  deposited at the OCC?"  Do you see that
5  question?
6    A.   Yes.
7    Q.   Mr. McDade responds, "Yes, I did, but
8  keep in mind the context that we had had assets
9  like that, for example, at the CME and they lost
10  those assets over the course of the week.  So we
11  had no confidence that those were potentially
12  our assets given what had been transpiring."
13        Do you see that?
14    A.   Yes.
15    Q.   What do you understand Mr. McDade to
16  be suggesting in this testimony?
17        MR. OXFORD:  Objection.  Form.  Calls
18  for speculation.
19    A.   I wouldn't want to try to guess what
20  he's thinking.
21    Q.   Do you have any idea what he means
22  when he's referring to the CME losing assets
23  over the course of the week?
24    A.   I'm assuming based on what we said
25  before that maybe he liquidated some of their

Page 180

D. McIsaac

1
2  assets.  But this is a paragraph taken out of
3  this page 275, so I don't know where it is in
4  relation to what this question is referring to
5  or where the background for it is.
6    Q.   You said the CME could have liquidated
7  positions.  Aren't you aware that the CME in
8  fact did liquidate or auction off positions in
9  LBI's account during the week of September 15?
10    A.   I said this could have been referring
11  to that.  I don't know if this is referring to
12  that.  I don't know what it's referring to.
13    Q.   Do you know of any other actions by
14  the CME during that week that involved
15  liquidation of positions?
16    A.   He doesn't say anything here about
17  liquidation of positions.  He just is referring
18  to they lost assets.
19    Q.   Do you know of any instance other than
20  the auction in which LBI lost assets in relation
21  to the CME account?
22    A.   I don't know of any other reference
23  anyplace else of them losing assets at the CME.
24    Q.   Mr. McDade says, "We had no confidence
25  that those were potentially our assets given

Page 181

D. McIsaac

1
2  what had been transpiring," and he was saying in
3  response to a question about assets, cash and
4  assets, that were deposited as margin in its
5  clearing funds deposited at the OCC.
6        Do you understand Mr. McDade to be
7  suggesting that the assets posted at the OCC
8  were at risk?
9        MR. OXFORD:  Objection.  Asked and
10  answered.
11    A.   Again, I don't know if I can determine
12  what Mr. McDade meant.  There were a lot of
13  assets mentioned above that.  I'm not sure what
14  he's referring to there.  He might have been
15  referring to long positions.  I don't know.
16    Q.   Do you agree that Mr. McDade seemed to
17  think that there were some assets at the OCC
18  that were potentially not going to be available
19  to Lehman and that he thought the CME example
20  was evidence of that?
21    A.   I don't want to speculate what he
22  meant by these words.  I don't know really what
23  he meant by these words.
24    Q.   Assuming Mr. McDade was referring to
25  the loss of $1.6 billion in assets at the CME on

Contains Highly Confidential Portions

Page 182

D. McIsaac

1  September 18, and assuming for purposes of this
2  question that Mr. McDade was talking about the
3  margin and clearing funds deposited at the OCC
4  when he says they had no confidence that those
5  were potentially our assets, would you consider
6  it irrational for Mr. McDade to lack that
7  confidence?
8      MR. OXFORD: Objection to form.
9      MR. GREEN: Objection.
10     A.  Again, I'm not sure what his lacking
11  of confidence is. The question is did you
12  understand that, in addition to the long
13  positions and short positions that Lehman had at
14  the OCC, it also had additional cash assets that
15  were deposited as margin, so the answer is --
16     Q.  And my question assumed that the
17  assets in the answer that he gave was the assets
18  that were deposited as margin and clearing funds
19  at the OCC. So assuming that that's what the
20  assets were referring to, was it irrational for
21  Mr. McDade to lack confidence that those were
22  going to be available to Lehman?
23     MR. OXFORD: Objection. Form.
24  Assumes facts not in evidence.

Page 183

D. McIsaac

1      A.  I mean, I -- I'm having a problem
2  answering the question only because I don't know
3  what he said in reference to and what the time
4  period was that this was talking -- even talking
5  about. I don't know if this is talking about
6  the sale or anything else. I'm reading one
7  paragraph.
8          It seems somehow that he's concerned
9  about that there was confidence in that
10  potential assets -- what is he saying? "So we
11  had no confidence that those were potentially
12  our assets given to what was transpiring." I
13  don't know what he means by that. Maybe he
14  thought he sold them already. I don't know.
15     Q.  Okay. If you were involved in the
16  negotiations of this transaction on behalf of
17  Lehman and you had just seen the CME auction off
18  all of your proprietary positions and transfer
19  the margin that was posted at the CME to the
20  bidders who were willing to take those positions
21  over, and then the OCC started threatening to
22  liquidate your account, would you be concerned
23  that the same thing might happen?
24     MR. OXFORD: Objection. Form.

Page 184

D. McIsaac

1      A.  I would take action if I thought they
2  were going to liquidate them for me and probably
3  direct my people to liquidate them before the
4  OCC had a chance to liquidate them. So I would
5  be at my best possible advantage.
6      Q.  Let's assume you had tens of thousands
7  of positions, and if you tried to liquidate them
8  all in a matter of a day, you would lose a
9  substantial amount of money on that liquidation.
10     A.  Again --
11     MR. OXFORD: Hold on. Is there a
12  question?
13     MS. BLOOMER: Yes, there is, if I
14  could finish.
15     MR. OXFORD: Sure.
16     Q.  Would it be rational for you to fear
17  that the OCC might liquidate those positions
18  before you would get a chance to?
19     MR. OXFORD: Okay. Can we just make
20  sure we have that question in mind before --
21     THE WITNESS: Sorry.
22     MR. OXFORD: -- Mr. McIsaac answers?
23     A.  Could you just read back the whole --
24     Q.  Let's assume you had tens of thousands

Page 185

D. McIsaac

1  of positions, and if you tried to liquid them
2  all in a matter of day, you would lose a
3  substantial amount of money on that liquidation.
4          Would it be rational for you to fear
5  that the OCC would liquidate those positions
6  before you would get a chance to?
7      MR. OXFORD: Objection. Form.
8      MR. KAY: Objection.
9      A.  I don't know why you would fear that
10  they would be able to liquidate them before you
11  could liquidate them. I don't know why you
12  would have that fear. If you were afraid that
13  they were going to liquidate them, I would think
14  you would start liquidating your portfolio.
15     Q.  If you thought the liquidation would
16  happen all in one day, would you be concerned
17  that that liquidation may cost you a substantial
18  amount of the margin you had posted in those
19  accounts?
20     MR. OXFORD: Objection. Form.
21     A.  If I liquidated, it would cost me none
22  of the margin. It may cost me -- I may have
23  gains and losses in the liquidation, but at the
24  end of the day, if I liquidated everything, I

Contains Highly Confidential Portions

Page 186

D. McIsaac

1  would have no margin requirement.
2
3      Q.   And the margin that was posted to
4  secure those positions in the event of a
5  liquidation would be accessible to the OCC,
6  correct, to cover any losses on that
7  liquidation?
8          MR. OXFORD:  Objection.  Form.
9      A.   I thought you asked me if I was
10 liquidating them.  If I was liquidating them,
11 no, they would give me back my margin.
12     Q.   They would give you back your margin
13 after you had liquidated the positions and
14 settled any costs associated with that
15 liquidation, right?
16     A.   Correct, any costs associated with the
17 OCC on the liquidation.
18     Q.   Would they give you back your margin
19 before the positions were closed out and before
20 they had gotten protected themselves?
21     A.   No, that's why I would be liquidating
22 them so that I could close out my account with
23 the OCC.
24     Q.   Okay.  And is there a risk that you
25 liquidated those positions and the cost of

Page 187

D. McIsaac

1  liquidating the positions exceeds the margin
2  that you had posted to secure those positions?
3          MR. OXFORD:  Objection.  Asked and
4  answered.
5      A.   I believe somebody would assess that
6  risk and determine what to do, and if they
7  thought the cost was going to exceed it, then if
8  it was liquidated, wouldn't they come back and
9  charge me for it anyway?
10     Q.   How long would it take you to
11 liquidate tens of thousands of positions, do you
12 think?  A day?
13         MR. OXFORD:  Objection to form.
14     A.   I have no idea.
15     Q.   You have no idea?
16     A.   I have no idea.
17     Q.   Do you think it's likely that you
18 could liquidate tens of thousands of positions,
19 equities options positions in a day, without
20 substantially moving the market?
21         MR. OXFORD:  Objection.  Form.  Asked
22 and answered.  Assumes facts not evidence.
23         You can answer.
24     A.   I don't know what the difference is if
25

Page 188

D. McIsaac

1  you move the market whether or not you could
2  liquidate them.
3      Q.   Do you understand that there could be
4  a difference in the cost of liquidating them if
5  the market price changes throughout the course
6  of the day that you're conducting your
7  liquidation?
8      A.   Yes.  But what does that have to do
9  with me, my ability to liquidate them?  You
10 asked me could I liquidate them?  I said yes.
11     Q.   And the cost of liquidating them would
12 be dependent upon the impact that the sales
13 would have on the market price of what you're
14 liquidating, isn't that right?
15     A.   Yes.
16     Q.   CME liquidated the positions when it
17 liquidated the proprietary account on September
18 18th in a single day.
19         Do you have any reason to think that
20 the OCC would not have taken the same approach?
21         MR. OXFORD:  Objection.  Form.
22     A.   I'm not -- I don't understand what the
23 question is.  We started out my saying that the
24 firm should liquidate.  Now you're asking me

Page 189

D. McIsaac

1  would the OCC liquidate.
2      Q.   That's right.  I'm asking you a
3  different question now.
4      A.   Okay.
5      Q.   Which is:  If the OCC were to
6  liquidate, do you have any reason to think that
7  they wouldn't have conducted that liquidation in
8  the same manner in which the CME did?
9          MR. OXFORD:  Same objection.
10     A.   I don't know their procedures for
11 liquidating accounts.  I would assume it could
12 be similar to the CME, but in light of the CME
13 doing that, if I was Lehman, I would take -- I
14 would be proactive and do my own liquidation
15 before they liquidated me and I could lose $1.6
16 billion.
17     Q.   If you thought you couldn't avoid the
18 loss of $1.6 billion either way, might you just
19 decide to transfer the accounts to an acquirer
20 instead of liquidating them yourself?
21         MR. OXFORD:  Objection.  Asked and
22 answered.  Assumes facts not in evidence.
23     A.   Again, I think I've said I would
24 assess the risk of doing the business, but if I

Page 190

D. McIsaac

1            D. McIsaac
1 was negotiating transferring the margin, that
2 would be a part to start my negotiating.  If
3 they were liquidated, that would be the amount;
4 I would negotiate from there.
5    Q.   And if you assume that the liquidation
6 would cost you all of the margin, would it be
7 rational to agree to transfer the accounts and
8 transfer the margin with the accounts?
10    A.   For what reason?  Why would I have to
11 do that?  What benefit do I get by doing that?
12    Q.   Do you preserve customer positions by
13 doing that?
14    A.   Are we talking about customer
15 positions or proprietary?  I'm not sure what
16 we're talking about here.  I thought we were
17 talking proprietary positions.  That's what the
18 CME --
19    Q.   Would it preserve customer positions
20 by doing that?  Let's talk about the customer
21 account.  If you moved -- if you knew that you
22 were going to lose the posted margin in a
23 liquidation either way, would it be rational to
24 transfer that margin to an acquirer in order to
25 preserve the customer positions for the benefit

Page 191

D. McIsaac

1 of those customers?
2    MR. OXFORD:  Objection.  Asked and
3 answered.  Assumes facts not in evidence.
4    You can answer.
5    A.   I would assume you would take all that
6 into account.  The main thing I would look at is
7 that the CME liquidated the proprietary
8 positions and not the customer positions.
9    There is some, I guess some goal in
10 preserving the customer positions even from the
11 clearing orgs., so I would assume Lehman would
12 talk to the OCC and said if we liquidated all of
13 our proprietary positions, maybe they would not
14 liquidate the customer positions.  That would be
15 something you would negotiate when that is
16 happening.  You would discuss it when that is
17 happening.
18    Q.   Assuming the parties didn't agree to
19 just transfer all of the accounts with all of
20 the margin to Barclays?
21    A.   I would think you would look at all
22 your options before you decided on doing
23 something.
24    Q.   Okay.  And how long does it take to

Page 192

D. McIsaac

1 analyze all of your options in the circumstances
2 that we're talking about here?
3    MR. OXFORD:  Objection.  Form.
4    MR. GREEN:  Same objection.
5    A.   I don't know how long they had to
6 prepare for these options and how long -- how
7 long it would take to call the OCC and ask them
8 the question.  I'm sure you could ask them the
9 question and go from there and see what they
10 said.
11    Q.   And what question would you propose
12 asking the OCC?
13    A.   Well, you're -- you seem to be
14 concerned about them liquidating the account.  I
15 would talk to the OCC and say, "The CME just
16 liquidated my accounts.  What are your plans?"
17    Q.   And --
18    A.   Or I'm sure maybe they were having
19 discussions with the OCC at the time.
20    Q.   Didn't we look at an e-mail earlier
21 that showed that -- that had the discussion with
22 the OCC and the OCC told Lehman and the Trustee
23 that it was going to liquidate their accounts?
24    A.   That was after the 19th.

Page 193

D. McIsaac

1    Q.   Okay.
2    A.   The sale agreement was the 16th.
3    Q.   Let's assume the threats to liquidate
4 started on the 15th.  Does that change your
5 opinion?
6    MR. OXFORD:  Object to the form.  It
7 assumes facts not in evidence.
8    You can answer if you're able.
9    A.   I don't know what happened at the time
10 and I don't know -- we're assuming if the OCC
11 came in on the 15th and said unless you
12 liquidated, if that was the case, then why on
13 the 20th were they threatening to liquidate it
14 if they already threatened to liquidate it and
15 didn't do it?  I'm not sure --
16    Q.   I understand, but I want you to
17 understand that I'm trying to ask you questions
18 because you are providing an expert opinion
19 about what would have been rational under these
20 circumstances, and I'm probing that by
21 describing to you circumstances that may or
22 may not affect your opinion.
23    So I would like you to answer my
24 questions as opposed to posing questions each

Contains Highly Confidential Portions

Page 194

D. McIsaac

1    time.
2        A.    Sorry about that.
3        Q.    That's okay.
4        A.    I -- would it be rational?  It would
5    be rational to do many things.  It might be
6    rational to transfer the margin.  It might be
7    rational to liquidate your accounts.  It may be
8    rational to find another buyer.  There's a lot
9    of rational things that could be done at that
10   point in time.
11       Q.    And is it fair to say that you can't
12   really say what would be truly rational if you
13   didn't understand the circumstances?
14           MR. OXFORD: Objection.  Form.
15       A.    I can say that based -- and I was not
16   there, I don't know what was negotiated and what
17   was discussed.  I think what I laid out was
18   rational things you could do.
19       Q.    How can you say that it wouldn't have
20   been rational for the Trustee to make a decision
21   under the specific circumstances that it was
22   facing at the time if you don't know the
23   specific circumstances that the Trustee was
24   facing at the time?

Page 195

D. McIsaac

1           MR. OXFORD: Objection.  Form.
2        A.    We talked about the 15th is what I
3    asked the question -- answered a question on,
4    and the Trustee wasn't involved then.  So I'm
5    not sure, this question now, what's the basis of
6    it.  I'm sorry.
7        Q.    Right.  Each question I ask is a new
8    question, so I would appreciate it if you would
9    not assume for every question I ask that I'm
10   building on a prior question.
11       A.    No.  No.  That's why I'm asking what's
12   the basis for this question, because I don't
13   know.
14       Q.    I'm asking you how you can give an
15   expert opinion about what it would have been
16   rational for the Trustee to do under a specific
17   set of facts when you don't know the
18   circumstances that the Trustee was facing at the
19   time?
20           MR. OXFORD: Objection.  Form.
21   Misstates -- misstates the witness's
22   testimony.
23           But you can answer.
24       A.    I don't know what went through the

Page 196

D. McIsaac

1    Trustee's mind and what his determination was
2    and what he believed to be at that time.  What I've given an opinion on is
3    what I think a rational seller would do in my
4    opinion at that point in time, how they would
5    react to what was going on.
6        Q.    Doesn't that opinion require you to
7    know what was going on at that time?
8           MR. OXFORD: Objection.  Form.
9        A.    I believe I've stated that a rational
10   seller would negotiate the sale of the margin
11   assets.  No matter what was going on at the time
12   you would do that negotiation.
13       Q.    Is it fair to say that it is not your
14   opinion that a rational seller would have
15   required dollar-for-dollar compensation for
16   every dollar's worth of margin that it agreed to
17   transfer in this situation facing this Trustee
18   in September of 2008, or --
19           MR. OXFORD: Objection.
20       Q.    -- is it not your opinion?
21           MR. OXFORD: Objection.  Form.  Asked
22   and answered.
23           You can answer it again.

Page 197

D. McIsaac

1        A.    My opinion is a rational seller would
2    look for dollar for dollar, they would negotiate
3    from there, and at this point in time if there
4    were things that needed to be adjusted, people
5    negotiating the sale and the purchase would come
6    to an agreement on what was being sold and what
7    was being purchased.
8        Q.    Okay.  So when you say in your report
9    a rational seller would not include margin in
10   the deal unless it was being compensated dollar
11   for dollar, do you mean what you say in that
12   sentence or are you modifying it here today?
13           MR. OXFORD: Objection.  Form.  Asked
14   and answered.
15           You can answer it again.
16       A.    You are giving me facts that were not
17   part of my opinion.  What I said in my opinion
18   was a rational purchaser would want to quantify
19   the risk to determine what additional assets it
20   needed, and a rational seller would include
21   margin on dollar-for-dollar basis.
22           As you negotiate that, you may change
23   your mind.  You may decide I'll take 50 cents on
24   the dollar, I may take 25 cents on the dollar, I

Contains Highly Confidential Portions

Page 198

D. McIsaac

1  may want a dollar and a half on a dollar because
2  I think the assets are worth more.  That's a
3  negotiation that would occur at that time.
4      Q.    You might want zero --
5      A.    But the starting fact would be I would
6  want dollar for dollar and I would negotiate
7  from there.  I would assume I would not give
8  away assets for nothing.
9      Q.    Would you agree that there could be
10 circumstances in which it was rational to agree
11 to transfer the accounts in exchange for the
12 margin that was posted to secure those accounts?
13         MR. OXFORD:  Objection.  Form.
14     A.    I would agree that the seller could
15 make a rational decision to transfer the
16 accounts with no compensation, if that's what
17 they wanted, based on facts and circumstances at
18 that point in time if that's what they
19 negotiated, but I would anticipate that that
20 would be somehow brought into -- into the
21 contract that that was being done and probably
22 brought in front of the judge if he was selling
23 assets above and beyond what was in the
24 Clarification Letter.

Page 199

D. McIsaac

1
2      Q.    Okay.
3         MR. OXFORD:  Trish, that's about
4  another hour.  I don't know if this is a
5  good time to take five minutes.
6         MS. BLOOMER:  Yes, it's fine.
7         THE VIDEOGRAPHER:  The time is 3:03.
8  This is the end of the tape labeled number
9  4.  We're going off the record.
10        (Recess.)
11        THE VIDEOGRAPHER:  This is the start
12 of the tape labeled number 5.  The time is
13 3:19.  We're back on the record.
14 BY MS. BLOOMER:
15     Q.    Good afternoon again.
16     A.    Good afternoon.
17     Q.    Would you consider assets that were
18 posted as margin at a clearing organization with
19 respect to an exchange-traded derivatives
20 account to be an asset that's used in the
21 business of the exchange-traded derivatives?
22        MR. OXFORD:  Objection.  Form.
23     A.    It would be an asset that at that
24 point in time was being used to secure the
25 obligations.  Assets used in the business may

Page 200

D. McIsaac

1
2  have a lot of different terms.
3      Q.    Do you agree that posted margin is
4  associated with the exchange-traded derivatives
5  business that it secures?
6      A.    It's associated with the
7  exchange-traded derivatives that it's securing.
8  I don't know what business it would be part of.
9      Q.    Can you operate an exchange-traded
10 derivatives business without posting margin to
11 satisfy the requirements of a clearing
12 organization?
13     A.    I don't believe so.
14     Q.    I'm showing you Exhibit 1, which is
15 the Asset Purchase Agreement.  If you could turn
16 to page 2 at the bottom, meaning the number on
17 the bottom.  The term "business" is defined, do
18 you see that?  It's the second full definition
19 on page 2.
20     A.    You're saying -- oh, I'm sorry.
21 Business, yes, I'm sorry.  I was looking at the
22 bottom, actually.
23         Yes.
24     Q.    Would exchange-traded derivatives in
25 your experience fall under any of the categories

Page 201

D. McIsaac

1
2  of LBI's businesses that are described in this
3  definition?
4         MR. OXFORD:  Objection.  Form.
5      A.    The concept of exchange-traded
6  derivatives -- there are different parts of the
7  business.  You have futures that are clearing
8  and execution business.  You have equity options
9  that are just -- that are transpiring for
10 customers that are just part of the customer
11 business as well as selling bonds, you know,
12 stocks and bonds, and then you have trading of
13 exchange-traded derivatives that could be part
14 of a portfolio of assets or you could possibly
15 just be trading them by themselves.
16     Q.    Okay.  And one of the businesses
17 that's listed here of the seller that are
18 encompassed within the term "business" is the
19 trading and advisory businesses.  Do you see
20 that?
21     A.    Uh-huh.  I see fixed income and
22 equities cash trading.
23     Q.    And then in the next line do you see
24 trading and advisory businesses?
25     A.    Yes.

Page 202

D. McIsaac

1
2     Q.    Would exchange-traded derivatives that
3 were proprietary to LBI be considered part of
4 the trading business of LBI?
5     A.    I'm a little confused why trading
6 would be used in two places. I'm not sure
7 what -- what the differentiation is between the
8 two of them. Fixed income and equities cash
9 trading and trading and advisory business, I
10 just don't know why it would be referenced
11 twice.
12     Q.    Is it your understanding that the
13 exchange-traded derivatives were a portion of
14 the trading business that Barclays acquired?
15         MR. OXFORD: Objection. Form.
16     A.    The proprietary part of it would have
17 been part of the exchange -- the trading
18 businesses that they acquired.
19     Q.    And would you agree that the customer
20 futures business that Barclays acquired from
21 Lehman was -- I'm sorry. Would you agree that
22 the customer futures business that LBI conducted
23 prior to September 22, 2008 would fall within
24 the definition of LBI's business as a futures
25 commission merchant?

Page 203

D. McIsaac

1
2     A.    Yes.
3     Q.    Okay. If you turn to page 4 -- I'm
4 sorry, page 10. I'm sorry, 6.
5         If you turn to page 6 of the Asset
6 Purchase Agreement, do you see the definition of
7 "purchased assets" that begins around the middle
8 of that page?
9     A.    Uh-huh.
10     Q.    It says, "Purchased Assets means all
11 of the assets of seller and its subsidiaries
12 used in connection with the business, excluding
13 the excluded assets," and then the word
14 "including," do you see that?
15     A.    Yes.
16     Q.    And the term "business" that's
17 capitalized there, do you understand that to be
18 referring to the business definition that we
19 just looked at on the prior page?
20     A.    I believe so.
21     Q.    Okay. If you look at page 10, there's
22 a word "including" that's defined. Do you see
23 that?
24     A.    Yes.
25     Q.    And do you see that it says, "The word

Page 204

D. McIsaac

1
2 'including' or any variation thereof means
3 including, without limitation, and shall not be
4 construed to limit any general statement that it
5 follows to the specific or similar terms or
6 matters immediately following it."
7     A.    Yes.
8     Q.    Turning back to page 6, the definition
9 of "purchased assets," given the definition we
10 just looked at of the term "including," is it
11 fair to say that the "purchased assets"
12 definition is not limited by the subparagraphs
13 that follow the word "including"?
14         MR. OXFORD: Objection. Form. Calls
15     for a legal conclusion.
16     A.    Yeah, I'm not a lawyer, so this is --
17 I'm not sure what it means and if you had before
18 businesses, why you needed additional, but I
19 don't know. I'm not -- I don't want to -- I
20 don't want to give an opinion on a legal
21 document.
22     Q.    Okay. You understand what the term
23 "including without limitation" means?
24     A.    I believe so.
25     Q.    What does that mean?

Page 205

D. McIsaac

1
2     A.    It means including without limitation.
3     Q.    And you understand what that means,
4 the common usage of that term means?
5     A.    I -- "including without limitation"
6 means including, we're not limiting it to what
7 it means, what follows it.
8     Q.    Okay. Thank you. Is it your opinion
9 that the margin that was posted in LBI's
10 accounts at the OCC were not assets of LBI used
11 in connection with the business, as that term is
12 defined in this agreement?
13         MR. OXFORD: Objection. Form.
14     Misstates the document. Calls for a legal
15     conclusion.
16         You can answer.
17     A.    Could you re-read that question?
18     Q.    Is it your opinion that the margin
19 that was posted in LBI's accounts at the OCC
20 were not assets of LBI used in connection with
21 the business as that term is defined in this
22 agreement?
23         MR. OXFORD: Objection. Form. Again,
24     misstates the document. Calls for a legal
25     conclusion.

Page 206

D. McIsaac

1
2     A.    There was a negative in there and I'm
3  not sure -- I mean, I don't know what that term
4  means in a legal document.
5     Q.    Are the assets posted as margin at the
6  OCC assets of LBI?
7     A.    They may or may not be assets of LBI.
8     Q.    Do you know in the context of the
9  assets at the OCC as of September 19, 2008
10 whether they were assets of LBI or assets of
11 someone else?
12    A.    The assets posted there could have
13 been derived from many factions.  If they put
14 Treasury bills up, it could have been Treasury
15 bills owned by LBI.  It could have been Treasury
16 bills that were accepted as collateral against a
17 receivable for a reverse repo or a stock borrow.
18 It could be customers or non-customers assets.
19    Q.    Do you understand the Trustee's
20 position in this case to be the assets at the
21 OCC were not LBI proprietary assets?
22    A.    I don't know if I have seen that -- I
23 don't recall seeing that specific phrase, that
24 they were not proprietary assets.
25    Q.    You reviewed this agreement when you

Page 207

D. McIsaac

1
2  provided your opinion; is that right?
3     A.    Yes.  Uh-huh.
4     Q.    And is it your opinion that this
5  agreement does not encompass the margin assets
6  that were posted at the OCC?
7     A.    I don't believe I've seen anything in
8  here that references margin assets, and it
9  appeared to be a very substantial asset class.
10 I would have thought they would have been broken
11 out in the agreement as to what was happening
12 with the assets that were posted at various
13 exchanges.
14    Q.    You said earlier when we looked at the
15 Transfer and Assumption Agreement that you would
16 have assumed that the purchase agreement would
17 document the agreement to transfer margin to
18 Barclays if that were the parties' agreement,
19 correct?
20    A.    Right.
21    Q.    Do you think this purchase agreement
22 accomplishes that when it says "all assets of
23 seller used in connection with the business,
24 excluding the excluded assets, are purchased
25 assets"?

Page 208

D. McIsaac

1
2     MR. OXFORD:  Objection.  Form.  Asked
3  and answered.  You can answer.
4     A.    At points in time you may use assets
5  to secure your obligations.  I don't know if
6  they would be considered assets of the business.
7  If they were $700 million today and $200 million
8  tomorrow, what would they be?  So I would think
9  if you were trying to transfer or somehow
10 include those margin assets, you would define
11 them and what the value was because that value
12 could have changed drastically from day one to
13 whenever you're consummating the deal.  As you
14 saw, the margin requirements go significantly up
15 and then down.
16    Q.    Is it your understanding that the
17 parties agreed that they would include specific
18 references to every asset that Barclays was to
19 acquire in this transaction?
20    MR. OXFORD:  Objection.  Form.
21    A.    I don't know if they did or not.  I
22 would think significant assets such as margin
23 would be noted and what was happening with it.
24    Q.    The agreement says that all of the
25 assets used in connection with the business are

Page 209

D. McIsaac

1
2  purchased assets, excluding the excluded assets.
3     Would you expect that since margin was
4  such a significant asset, as you say, that it
5  would have, therefore, had to have been -- that
6  it would, therefore, have been logical to
7  reference it in the excluded assets section if
8  indeed the parties intended to exclude it?
9     MR. OXFORD:  Objection.  Form.
10    A.    I don't know if you -- I would always
11 include what you're buying, not necessarily
12 exclude what you're not buying.  I think to make
13 something really understandable, you would say
14 include this, include that.
15    Like I said, the margin at the point
16 in time when this was done might have been a
17 billion dollars.  On the 19th, it might have
18 been $100 million.  I think you would define
19 that at the time you were agreeing to the
20 contract so that you made sure both parties came
21 to what their -- with what they agreed to.
22    So if it was on the 15th or something,
23 it was one item, one balance, later on it's a
24 different balance.  I don't think an asset like
25 that would be included without some kind of

Contains Highly Confidential Portions

Page 210

D. McIsaac

1    reference.
2        Q.   So you would assume the parties to a
3    transaction would specifically identify the
4    included assets as opposed to saying we're
5    getting everything except the excluded assets;
6    is that your testimony?
7        A.   I would expect if it's an asset like
8    margin, that would go up and down in value on a
9    daily basis.  If you were negotiating to buy
10   that asset, you would want to put into the
11   contract what the value of that asset is, what
12   that asset is that you're receiving.
13           Open-ended margin could be, again, it
14   could have been a dollar.  Would they have
15   accepted it if it was only a dollar?  I don't
16   know.  So I think for any ambiguity, you would
17   include the assets and you would either state at
18   the time of the transaction or put a dollar
19   amount at that point in time so that if they
20   were used at one point in time, they weren't
21   sold out, you know, five days later.
22       Q.   If you were advising LBI on this deal,
23   and you saw that the agreement was structured so
24   that all of the assets were purchased assets

Page 211

D. McIsaac

1    except what was excluded, would you advise them
2    that to avoid ambiguity they should reference
3    margin in the excluded assets section?
4        MR. OXFORD:  Objection to form.
5        A.   I would probably advise the seller --
6    the buyer to make sure that they put in all the
7    assets that they wanted to make sure they got in
8    the agreement, not --
9        Q.   I'm not asking you what you would do
10   for the buyer.  I'm asking you if you were
11   advising the seller and their agreement stated
12   "purchased assets means all of the assets of
13   seller used in connection with the business,
14   excluding the excluded assets, would you advise
15   him that it was prudent to reference margin as
16   an excluded asset given how substantial the
17   value was.
18       A.   I would advise them to reference it
19   either as excluded or included.
20       Q.   Included if it was included and
21   excluded if it was excluded?
22       A.   Right.
23       Q.   Okay.  Is it your understanding that
24   Barclays knew on September 16, 2008 what the

Page 212

D. McIsaac

1    margin was worth at the OCC and at the other
2    clearing organizations to which LBI traded in
3    exchange-traded derivatives?
4        A.   I believe I've seen some e-mail
5    traffic that noted that the legal counsel for
6    Barclays had been discussing margin requirements
7    of various exchanges.  I think Mr. Leitner
8    pointed out that Barclays was monitoring their
9    exposure by knowing what the margin values were.
10   So I assume they knew something that was going
11   on at the exchanges.
12       Q.   Is it your opinion that you would have
13   advised the acquirer to reference margin
14   specifically because it was so substantial in
15   value assumes that Barclays knew on September 16
16   what the value of the margin was; is that
17   correct?
18       A.   I would think they would know what
19   assets they were buying.
20       Q.   And does your opinion assume that they
21   knew what assets, what the value of the margin
22   was that they were buying on April -- on
23   September 16, 2008 when they entered into this
24   Asset Purchase Agreement?

Page 213

D. McIsaac

1        MR. OXFORD:  Objection.  Form.
2        A.   I would have to assume somebody
3    purchasing assets would know the value of the
4    assets they were purchasing, if not what they
5    thought the value was, at least what the value
6    was on the seller's records.
7        Q.   I'm not trying to be argumentative.
8    You've given an opinion in your report, and we
9    can look at the opinion if you don't recall it.
10           You've given an opinion in your report
11   that, given how much this margin was worth, you
12   would have expected the acquirer to reference it
13   specifically as a purchased asset --
14       A.   Yes.
15       Q.   -- if indeed they thought it was being
16   purchased.
17           I'm asking you whether that opinion
18   assumes that Barclays knew on September 16, 2008
19   what the value of the margin was that LBI held
20   or that LBI had posted to secure the
21   exchange-traded derivatives?
22       A.   Again, I would assume they knew the
23   value of what they were purchasing.  So I --
24       Q.   Does your opinion --

Contains Highly Confidential Portions

Page 214

D. McIsaac

1
2    A.   My opinion assumes that they would
3    know the value they were purchasing.  I would
4    assume most people wouldn't buy something that
5    they didn't know what they were buying.
6    Q.   Would you assume that most people
7    wouldn't buy an entire broker-dealer business
8    based on 48 hours of negotiations as well?
9         MR. OXFORD: Objection.  Form.
10   Assumes facts not in evidence.
11   A.   From what I understand, Bank of
12   America bought Lehman, more than just the
13   brokerage business, over a weekend.  So I think
14   you can buy anything you want in any time period
15   you want.  I don't know how much due diligence
16   was done in July, in August, June.
17        People have an understanding of the
18   various competitors and what they do and how
19   they manage it.  There are reports out there.
20   There's information out there.  So I don't know
21   what Barclays knew when they negotiated the
22   deal.
23        I don't know how much time they took
24   to write this versus how much time it took to
25   determine what they were buying.

Page 215

D. McIsaac

1
2    Q.   And again, you think it's possible
3    that they executed this agreement before they
4    knew what they were buying?
5         MR. OXFORD: Objection.  Form.
6    Misstates the witness' testimony.
7         You can answer.
8    A.   I believe I said I assume when they
9    execute an agreement they knew what they were
10   buying.
11   Q.   Is that assumption based on any
12   preliminary assumptions about how much time
13   Barclays had to do the due diligence prior to
14   the time it entered into this transaction?
15   A.   I can't fathom why anybody would buy
16   anything without knowing what they were buying.
17   So if they took 48 hours and thought that was
18   enough to assess what they were buying and put a
19   value on it, then that's what they did.
20        I don't know -- I can't be in Barclays
21   shoes to figure out what was in their mind when
22   they bought this.  Evidently, they thought they
23   were getting valuable assets.  How much they
24   were getting and what they were willing to pay
25   for it they had to make an assessment, and I

Page 216

D. McIsaac

1
2    assume they took whatever time it needed to take
3    to do that assessment.
4         And I'm assuming that this transaction
5    had to be approved by the board of directors.
6    They had to provide some information to their
7    board of directors on a purchase of this size.
8         I don't think they went to
9    the board -- would have gone to the board of
10   directors and said we're going to buy this, but
11   we don't know what we're buying.  So I would
12   think they would have had a clear understanding
13   of what they were buying.
14   Q.   Might they have had a clear
15   understanding of what they were buying but not
16   necessarily a clear understanding of what all of
17   those assets were worth?
18   A.   Then what were they buying if they
19   didn't know what they were buying, what the
20   worth -- how could you put a price on something
21   unless you assessed it?
22   Q.   I would appreciate it if you would
23   answer my question.
24   A.   I'm sorry.  I'm asking you, I don't
25   believe a purchaser would enter into an

Page 217

D. McIsaac

1
2    agreement to purchase something without
3    assessing what the value is that they were
4    purchasing.
5    Q.   Okay.  If you could take the Sale
6    Order transcript that we had looked at earlier,
7    it's Exhibit 442, and if you could turn to
8    page -- if you could turn to page 60.
9         At the bottom of page 60, the hearing
10   transcript reads: "We cannot take the risk of
11   rejecting this transaction because of
12   ambiguities, the lack of a piece of paper to
13   support every element of the assets to be
14   transferred, the lack of a definition as to
15   particular items."
16        Do you see that?
17   A.   Yes.
18   Q.   Is it possible that in this
19   circumstance the parties agreed, due to the
20   extraordinary circumstances at the time, to
21   structure a deal in a way that they wouldn't
22   structure under normal circumstances?
23        MR. OXFORD: Objection.  Form.
24   A.   I believe that they might structure a
25   deal differently than they would under different

Page 218

D. McIsaac

1  circumstances, yes.
2  Q.   And is it your understanding that the
3  circumstances that existed in 2000 -- in
4  September of 2008 made it such that the parties
5  in fact conducted their negotiations and
6  structured this transaction in a manner
7  differently than they would have under normal
8  market situations, circumstances?
9  MR. OXFORD:  Objection.  Asked and
10  answered.
11  A.   I believe I answered that saying yes,
12  I believe this was a different time and they
13  negotiated this differently than they would have
14  at other times.
15  Q.   Is it possible that Lehman was willing
16  to offer terms to Barclays that a typical seller
17  wouldn't necessarily offer because of the
18  exigencies that made this transaction important
19  to Lehman?
20  MR. OXFORD:  Objection.  Form.
21  A.   I'm not sure how -- why a firm would
22  do certain things at times.  It couldn't make
23  agreements that it normally wouldn't make.  I'm
24  not sure what was in Lehman's mind or Barclays'

Page 219

D. McIsaac

1  mind at the time of selling this and what
2  decisions they thought they were doing and for
3  what reasons.
4  Q.   I'm showing you a document marked as
5  Exhibit 689.
6  (Exhibit 689, Deposition of James
7  Kobak, marked for identification, as of this
8  date.)
9  Q.   This is deposition testimony that was
10  provided on behalf of the Trustee by Mr. Kobak.
11  Are you familiar with this deposition
12  testimony?
13  A.   I don't know if I've read it and
14  relied upon it.  I know Mr. Kobak made
15  declarations and depositions.  I don't know if
16  this was something that was in my reliance
17  materials, but I know he made the depositions.
18  Q.   Okay.  So you haven't necessarily --
19  do you remember reading this deposition
20  transcript?
21  A.   I don't remember, but I might have
22  read it.  I don't remember.  I read a few of
23  them and -- I don't know if I read this one.  I
24  think I might have.  I'm not sure if it was this

Page 220

D. McIsaac

1  or the declaration.
2  Q.   Fast forwarding to the time that the
3  SIPC Trustee was introduced into this matter on
4  Friday, September 19, you said that you don't
5  know what was in the minds of the parties at the
6  time that they were considering this
7  transaction; is that right?
8  A.   Uh-huh.
9  Q.   If you could turn to page 282 of Mr.
10  Kobak's deposition testimony, starting on line
11  14, the question says, and this is, for context,
12  talking about a Collateral Agreement that the
13  Trustee signed on Friday, September 19, either
14  at or shortly after the sale hearing:
15  It says, "LBI has assigned to Barclays
16  all rights and securities, cash, and other
17  property defined as collateral pledged by LBI to
18  the Options Clearing Corporation and held for
19  OCC's benefit at JPMorgan Chase.  Did you see
20  that?"  The answer is, "Yes."
21  The next question:  "And was it your
22  understanding that that's what the Trustee was
23  authorizing when you signed this?"  And the
24  answer is, "Yes, consistent with the overall

Page 221

D. McIsaac

1  deal that there be no cash excess that would go
2  to Barclays, because that would be inconsistent
3  with the no cash and that this wouldn't make the
4  deal so rich that it would be way beyond the
5  parameters that we discussed earlier."
6  Do you see that testimony?
7  A.   Yes.
8  Q.   Okay.  The next question says:  "Did
9  you tell anyone this?  When you say you signed
10  this consistent with the idea that there would
11  be no cash, this says cash.  This says cash will
12  be transferred to Barclays."  And the answer,
13  "Yeah, but cash would be transferred against the
14  liabilities.  What I'm saying is nobody told us
15  there might be in excess of a billion dollars of
16  cash or something like that that would end up at
17  Barclays when the deal was no cash and when
18  there was an economic parameter to the deal."
19  Question:  "So to the extent the cash
20  was simply needed to cover the liabilities, you
21  thought it was possible to be included in the
22  deal; is that correct?"
23  Answer:  "Yes."
24  Do you recall having ever seen this

Page 222

D. McIsaac

1    testimony before?
2        A.   I don't recall, but I might have seen
3    it, yes. I don't recall right now, but it seems
4    something I might have heard or seen.
5        Q.   Would you agree that this testimony is
6    speaking to the understanding that the Trustee
7    and Mr. Kobak had at the time on September 19,
8    2008?
9        MR. OXFORD: Objection. Form.
10       A.   I mean, it's taken out of context.
11   I'm reading two pages of a 300-and-some-page
12   document. It looks like Mr. Kobak is stating
13   that he was transferring or willing to transfer
14   assets that he thought was part of the deal.
15       Q.   And those assets included collateral
16   pledged by LBI to the Options Clearing
17   Corporation and held for OCC's benefit at
18   JPMorgan Chase, right?
19       A.   That's what it says, yes.
20       Q.   That --
21       A.   That's what the question says.
22       Q.   You understand that to be different
23   from property, customer property held by LBI to
24   secure customer positions?

Page 223

D. McIsaac

1        MR. OXFORD: Objection. Form.
2        A.   I'm not sure of what assets were being
3    held at JPMorgan Chase. It looks like he's
4    saying cash in this reference and it looks like
5    he's assuming it was part of the liabilities.
6    So it might have been the cash that was payable
7    to the customers who put up margin for the OCC
8    trades, and he thought he was just transferring
9    the cash against those liabilities.
10       Q.   Would that be cash held by LBI or cash
11   held by JPMorgan under your interpretation of
12   what this may be referring to?
13       A.   It would be cash held by LBI at
14   JPMorgan.
15       Q.   For whose benefit?
16       A.   LBI's.
17       Q.   Okay. This seems to be talking about
18   cash that was held for the OCC's benefit at
19   JPMorgan Chase, do you see that?
20       A.   It looks like it's being pledged to
21   the OCC for the benefit of LBI and it's held at
22   Chase.
23       Q.   And you agree that this is property
24   held at Chase, not at LBI?

Page 224

D. McIsaac

1        MR. OXFORD: Objection. Form.
2        A.   It's property held at LBI on deposit
3    at Chase.
4        Q.   I'm showing you what has been marked
5    as Exhibit 25. Do you recognize this document?
6        A.   I believe this is what's considered
7    the Clarification Letter.
8        Q.   Did you rely on this in forming your
9    opinions in this case?
10       A.   I reviewed this, yes.
11       Q.   And is it your opinion that this
12   agreement does not encompass property held in
13   respect of OCC accounts to secure proprietary
14   positions of LBI as of September 19, 2008?
15       MR. OXFORD: Objection. Form.
16       A.   I believe this does not indicate the
17   transfer or sale of LBI assets put up as margin
18   at the OCC.
19       Q.   If you look at the top of page 2,
20   capital letter C in that first paragraph. And
21   this is a definition of the purchased assets.
22   It says, "Exchange-traded derivatives and any
23   property that may be held to secure obligations
24   under such derivatives." Do you see that?

Page 225

D. McIsaac

1        A.   Yes, I do.
2        Q.   Do you agree with me that this
3    language is not limited to customer property?
4        MR. OXFORD: Objection. Form.
5        A.   I don't know what the parenthetical
6    really means. I think in my report, if that's
7    what you're asking me, I think the
8    parenthetical, to be clear, if this was margin
9    posted, it would say -- it would say assets
10   posted to secure LBI's obligations. It doesn't
11   say that, so it's kind of ambiguous on what I'm
12   holding and what this clause means.
13       To me it means I'm holding it, which
14   means probably customers have given it to me to
15   secure their assets -- their transactions.
16       Q.   It doesn't strike you as ambiguous
17   that it doesn't say customer property and you're
18   willing to assume that any property is
19   customer -- strike that. Do you agree with me
20   that the language here nowhere references
21   customer property?
22       A.   Yes.
23       Q.   Do you see the reference to any
24   property?

Page 226

D. McIsaac

1
2      A.    No.  I see a reference to any
3   property.
4      Q.    No reference to customer property
5   appears on the face of this document; is that
6   right?
7          MR. OXFORD: Objection.  Form.
8      A.    I believe that's correct.  I haven't
9   read the rest of it, but in that clause there's
10  nothing there.  I don't know if in -- if
11  anything in paragraph C says anything to -- you
12  said the whole page.  I don't know if anything
13  in paragraph C says anything.  I'm just looking
14  at this clause you're talking about.
15     Q.    Uh-huh.
16         MR. OXFORD: Just so we're clear,
17  Trish's question was about the whole
18  document.
19         MS. BLOOMER:  No, my question is about
20  this parenthetical.
21         MR. OXFORD: Okay.  Then you might
22  want to clear up the record.
23     Q.    Does this parenthetical reference the
24  term "customer property" or does it say "any
25  property"?

Page 227

D. McIsaac

1
2          MR. OXFORD: Objection.  Form.
3      A.    It says "any property."
4      Q.    You said that you thought it would be
5   ambiguous to say "property that may be held" if
6   what you really meant was "property posted,"
7   correct?
8      A.    Yes, that's correct.
9      Q.    Is it also ambiguous to say "any
10  property" if what you mean is "customer
11  property"?
12     A.    I'm looking at the whole phrase and it
13  says "any property that may be held to secure."
14  I'm looking at the whole phrase, not just the
15  two little words.  I'm looking at the whole
16  phrase and the way it's written.
17     Q.    And does the whole phrase reference
18  customer property?
19         MR. OXFORD: Objection.  Form.  Asked
20  and answered.
21     A.    I believe to me, my opinion, this
22  would refer to assets held by LBI, and the only
23  assets they would have to secure obligations on
24  the derivatives would be with customers or for
25  counterparties.

Page 228

D. McIsaac

1
2      Q.    Does the language say "any property
3   that may be held by LBI"?
4      A.    No, but to me, my opinion held to
5   secure, if I'm writing this, if I'm part of this
6   agreement, I would have to be holding it, not
7   anybody else; and holding it, I mean and I have
8   the obligation to return it to somebody.
9      Q.    Do you think the parties could have
10  written "it may be held by or on behalf of LBI"
11  if that's what they intended?
12         MR. OXFORD: Objection.  Form.
13     A.    I believe they could have written "and
14  any property posted by LBI to secure their
15  obligations."
16     Q.    Okay.  If you look with me at
17  paragraph 8 on page 4, the third line down
18  reads, "Any and all property of any customer,
19  including any held by or on behalf of LBI, to
20  secure the obligations of any customer whose
21  accounts are being transferred to purchaser as
22  part of the business."  Do you see that?
23     A.    Yes.
24     Q.    And it says "purchaser shall receive
25  for the account of the customer any and all

Page 229

D. McIsaac

1
2   property of any customer, including any held by
3   or on behalf of LBI to secure the obligations of
4   any customer."  Do you see that?
5      A.    Just let me read it again, please.
6   "Shall receive ..."
7          Yes.
8      Q.    So would you agree that in this
9   paragraph when the parties intended to limit a
10  phrase to "customer property held by or on
11  behalf of LBI," they said "property of any
12  customer held by or on behalf of LBI"?
13         MR. OXFORD: Objection to form.
14     Q.    Would you agree with that?
15     A.    What -- excuse me.  What was the
16  question?
17     Q.    Would you agree that in this paragraph
18  when the parties intended to limit a phrase to
19  "customer property held by or on behalf of LBI,"
20  they said "property of any customer held by or
21  on behalf of LBI"?
22     A.    It says here "held by or on behalf of
23  LBI."  So I'm assuming that's what they wanted
24  it to mean, but yes, I can't read into their
25  mind what they said because I think you were

Page 230

D. McIsaac

1 referring is this what they meant to say, and I
2 don't know if this is what they meant to say.
3 This is what they said.
4     Q.    And back to page 2, they didn't say
5 "any property of any customer," did they?
6     A.    No, they did not.
7     Q.    And they didn't say "by or on behalf
8 of LBI," did they?
9     A.    No, they did not.
10     Q.    Okay.
11     A.    But they --
12     Q.    But you would read this language --
13         MR. OXFORD:  Excuse me, Trish.  Mr.
14 McIsaac wasn't finished with his last
15 sentence.
16     A.    But as clearly as they defined it
17 here, why wouldn't they have clearly defined it
18 over here?
19     Q.    Perhaps because -- could it be because
20 they were referring to two different categories
21 of assets?
22     A.    I don't know, but they clearly --
23     Q.    Is that possible?
24     A.    I guess anything is possible.  I don't

Page 231

D. McIsaac

1 know why they would have been so clear in a
2 definition here and not so clear in the
3 definition over here.
4     Q.    Did you consider that they were being
5 perfectly clear and that they were referring to
6 two different sets of assets and that's why they
7 described them differently?
8         MR. OXFORD:  Objection.  Form.  Asked
9 and answered.
10     A.    To me, it wasn't clear.  So, no, it
11 wouldn't have been clear to me because to me if
12 I was transferring the margin that I had posted
13 at exchanges, that would be the clear
14 definition.
15         I think over here, where they talk
16 about -- they're talking about held by and on
17 the behalf of LBI, that means LBI is holding it,
18 but it may be at JPMorgan or someplace else.  So
19 I think this is fairly clear.  I don't think the
20 first clause is that clear as to what they meant
21 by it.
22     Q.    Do you agree that exchanges and
23 clearing corporations hold property to secure
24 obligations of derivatives that their clearing

Page 232

D. McIsaac

1 members hold?
2     A.    Clearing organizations require margin
3 to be held for the obligations of the clearing
4 member.  I believe that was your question.
5     Q.    So the OCC holds property just as LBI
6 holds property; is that right?
7     A.    That's correct, and the OCC's
8 responsibility would be to return to me the
9 property because I posted it with them and my
10 responsibility no matter where it is to return
11 that property to whoever gave it to me no matter
12 where I posted it.
13     Q.    In your opinion does paragraph 8
14 encompass anything that is not encompassed by
15 the parenthetical on page 2?
16         MR. OXFORD:  Objection.  Form.  You
17 mean the whole of paragraph 8 or to specific
18 subsections you referred him to earlier?
19         MS. BLOOMER:  I mean the sentence that
20 we've been focusing on, which starts "in
21 connection therewith" and reads through
22 "whose accounts are being transferred to
23 purchaser as part of the business."
24     Q.    Do you see the language that I refer

Page 233

D. McIsaac

1 you to?  Does this encompass anything, in your
2 opinion, that's not already encompassed by
3 paragraph C on page 2 and the parenthetical?
4         MR. OXFORD:  Objection.  Form.  Calls
5 for a legal conclusion, but you can answer.
6     A.    Yeah, I mean, it's a legal document.
7 My assumption is that on this is this is not
8 just referring to exchange-traded derivatives,
9 this is referring to the entire account of a
10 customer that would be transferred to Barclays.
11 So if they were holding equity securities at DTC
12 for the customer, we would transfer them to
13 Barclays.
14     Q.    And in your opinion, the parenthetical
15 on page 2 -- do you believe that the
16 parenthetical on page 2 is unambiguous in terms
17 of the property that it's referring to?
18         MR. OXFORD:  Objection.  Asked and
19 answered.
20     A.    It doesn't define the property.  It
21 just defines any property that may be held to
22 secure obligations under such derivatives.
23 Again, I believe that's any property held by
24 LBI, not posted by LBI, because if it was

## Page 234

D. McIsaac

1     posted, I think the words would have been used
2 "posted" or "held by" or someplace else further
3 clarification I think would be included.
4     Q.  Are assets posted at the OCC by LBI as
5 of September 19, 2008 property held by the OCC
6 to secure obligations under the derivatives held
7 in the OCC accounts?
8     A.  I just want to make sure I have your
9 question clear.  I believe the question was, is
10 the property held at OCC there to secure the
11 obligations in the accounts at OCC?
12     Q.  No, that wasn't my question.
13     A.  Okay.
14     Q.  Are assets posted at the OCC by LBI
15 property that is held by the OCC to secure
16 obligations under the derivatives in the OCC
17 accounts?
18     MR. OXFORD:  Objection.  Form.
19     A.  It's property held by OCC.  It may be
20 excess, but it's in the accounts to secure it.
21 Some of it may be used to secure obligations.
22 Some of it may be excess collateral.
23     Q.  Okay.  I'm showing you a document
24 that's marked as Exhibit 690.

## Page 235

D. McIsaac

1     (Exhibit 690, a document bearing Bates
2 Nos. CGSH33921 through 922, marked for
3 identification, as of this date.)
4     Q.  Could you take a moment to review this
5 e-mail.
6     (Document review.)
7     Q.  Have you had a chance to review the
8 document?
9     A.  Yes.  Yes.
10     Q.  The first sentence of the e-mail from
11 James McDaniel at Sidley --
12     Do you know who James McDaniel at
13 Sidley is?
14     A.  I believe he's one of their counsels.
15     Q.  One of whose counsel?
16     A.  Sidley's counsels for the OCC.
17     Q.  For the OCC.  Okay.
18     And on September 20, this e-mail is
19 sent.  You see that it's copied to several
20 individuals from Weil?  Do you understand that
21 to be Weil Gotshal?
22     A.  Yes.
23     Q.  And you understand that that is the
24 law firm that represented LBHI in this

## Page 236

D. McIsaac

1 transaction?
2     A.  Uh-huh.
3     Q.  Okay.  And then you see that Mr. Kobak
4 and Mr. Giddens are also copied on this e-mail?
5     A.  Yes.
6     Q.  And that's the Trustee and his
7 counsel, correct?
8     A.  That's correct.
9     Q.  The first sentence of the e-mail says,
10 "To the group:  OCC is seeking to confirm its
11 understanding that the LBI accounts and all
12 positions, cash and securities collateral that
13 are held by OCC in respect of those accounts are
14 intended to be transferred to Barclays and that
15 Barclays is assuming all obligations with
16 respect to those accounts."  Do you see that?
17     A.  Yes.
18     Q.  Do you believe -- are you aware of any
19 recipient of this e-mail responding to this and
20 telling the OCC that Barclays was not to receive
21 the cash and securities collateral held by the
22 OCC in respect of the OCC accounts?
23     A.  I am not aware of anybody sending an
24 e-mail back saying that.

## Page 237

D. McIsaac

1     Q.  You said earlier that the margin at
2 the OCC was of significant value, did you not?
3     A.  Yes.
4     Q.  Would you have expected any recipient
5 of this e-mail to raise an objection to the
6 OCC's stated intent if they were not of the same
7 understanding as to who would be entitled to the
8 cash and securities collateral held by OCC in
9 respect of the OCC accounts?
10     MR. OXFORD:  Objection.  Form.
11     A.  I believe this is advising the
12 individuals that the OCC is assuming that the
13 assets are being transferred, and in the second
14 paragraph it is saying, "It is our understanding
15 that certain parts of the APA are still being
16 negotiated."
17     So I'm assuming in the interim while
18 they're negotiating the final documents that the
19 OCC wants the -- I'm guessing this is the Asset
20 and Assumption Agreement -- Transfer and
21 Assumption Agreement to be signed.
22     Q.  You see at the very beginning of the
23 e-mail it says, "OCC is seeking to confirm its
24 understanding that all cash and securities

Contains Highly Confidential Portions

Page 238

1          D. McIsaac
2    collateral are intended to be transferred to
3    Barclays"; Do you see that?
4        A.   Yes.
5        Q.   If it's true, as you suggest it may
6    be, that the Purchase Agreement is still being
7    negotiated --
8        A.   I didn't say that. I'm sorry. Mr.
9    McDaniel is saying that.
10       Q.   Would you expect when the terms of
11   this transaction were confirmed, that if indeed
12   it was the case that Barclays was not to receive
13   the cash and securities collateral held at the
14   OCC, the Trustee and LBI would have been prudent
15   to inform the OCC of that fact?
16       A.   Yes.
17           MR. OXFORD:  Objection.  Asked and
18   answered.
19       Q.   Have you seen any evidence in the
20   record that either the Trustee or LBI's
21   attorneys informed the OCC that Barclays was not
22   intended to receive the cash and securities
23   collateral at the OCC?
24       A.   No.  I think, as I've discussed
25   before, the Transfer and Assumption Agreement is

Page 239

1          D. McIsaac
2    a means to allow Barclays to start trading the
3    next day and protecting the OCC.  Whatever the
4    agreement was regarding those assets that are
5    being transferred and what payment had to be
6    made for them or not be made for them would I
7    expect to be part of an agreement.
8        Q.   Do you agree that if the parties
9    hadn't intended for these assets at the OCC to
10   be transferred to Barclays, it would have been
11   prudent for them to inform the OCC of that?
12           MR. OXFORD:  Objection.  Form.
13       A.   Yes.  As I said, it would have been
14   prudent, if they didn't think that all the
15   assets should have been transferred, it would
16   have been prudent to tell the OCC that they were
17   not agreeing to that.
18       Q.   And have you seen any evidence in the
19   record in which any party told the OCC that they
20   did not intend that?
21       A.   No, I have not seen anything in the
22   record that states that.
23           MS. BLOOMER:  I think if you'll give
24   me a few minutes, I might be wrapped up and
25   we can have Amy come in and start the second

Page 240

1          D. McIsaac
2    part of the deposition.
3           MR. OXFORD:  Okay.  Let's go off the
4    record.
5           THE VIDEOGRAPHER:  The time is 4:13.
6    This is the end of the tape labeled number
7    4.  We're going off the record.
8        (Recess.)
9        (Exhibit 691, Affidavit of Daniel
10   McIsaac, marked for identification, as of
11   this date.)
12       (Exhibit 692, Supplemental Affidavit
13   of Daniel McIsaac, marked for
14   identification, as of this date.)
15       (Exhibit 693, Rebuttal Report of
16   Daniel McIsaac, marked for identification,
17   as of this date.)
18           THE VIDEOGRAPHER:  This is the start
19   of tape labeled number 6.  The time is 4:45.
20   We're back on the record.
21   EXAMINATION BY
22   MS. NEUHARDT:
23       Q.   Good afternoon, Mr. McIsaac.  My name
24   is Amy Neuhardt and I'm representing Barclays
25   and I'm here to discuss with you the reports

Page 241

1          D. McIsaac
2    that I have put in front of you as Exhibits 691,
3    692 and 693.  And could you identify those for
4    the record for me?
5        A.   691 is my affidavit that was filed
6    with the original motion.  69 --
7        Q.   Do you mean the original allocation
8    motion?
9        A.   Allocation motion.  I'm sorry.
10       692 is the Supplemental Affidavit
11   filed with the court on or about February 27,
12   and 693 is the Rebuttal Report.
13       Q.   Okay.  Very good.  Now, in 691 if you
14   could turn to paragraph 5, and in that you say,
15   "Based on my experience in the public and
16   private sectors, I am fully familiar with the
17   SEC rules governing financial responsibility of
18   SEC registered broker-dealers and the protection
19   of customer property and with industry practices
20   regarding the handling of customer property and
21   compliance with SEC Customer Protection Rules."
22       And unless I'm mistaken, which you may
23   take a look, paragraph 2 of your Rebuttal Report
24   contains a very similar statement.  Can you just
25   confirm that?  It's the last sentence.

Page 242

D. McIsaac

1  A.  Uh-huh.
2  
3  Q.  So are you offering opinions as an
4  expert in any substantive area other than what
5  you're describing in this sentence that appears
6  in 691 and 693?
7  A.  When you say -- I'm -- if you can
8  clarify what that means.  I'm not sure what you
9  mean by that.
10  Q.  Sure.  Absolutely.  In particular, are
11  you putting yourself forth as an expert in SIPA
12  statutory or regulatory requirements?
13  A.  No.
14  Q.  Okay.  Are you putting yourself
15  forward as an expert on the practices of SIPC
16  trustees?
17  A.  No.
18  Q.  Okay.  Are you putting yourself
19  forward as an expert on the Bankruptcy Code?
20  A.  No.
21  Q.  All right.  Now, when you say you were
22  familiar with the SEC rules governing financial
23  responsibility of SEC registered broker-dealers
24  and the protection of customer property, are you
25  purporting to be an expert in the legal

Page 243

D. McIsaac

1  
2  interpretation of those rules?
3  A.  I have spent a good part of 30 years
4  in the industry working on the last 20 years of
5  the preparation of the -- my two firms weekly.
6  I have monthly 3-3 calculations.  I'm a licensed
7  Fin. Op., Series 27, so I interpret -- I would
8  have to review and interpret the rules and the
9  interpretations of those rules.
10  Q.  Okay.  Are you a lawyer?
11  A.  No, I am not.
12  Q.  So your testimony is based on your
13  practice in interpreting 15c3-3, but not based
14  on experience as a lawyer doing legal analysis;
15  is that correct?
16  A.  I am -- sorry.
17  MR. OXFORD:  Objection.  Form.  You
18  can answer.
19  A.  I'm not a lawyer and most people who
20  work on the reserve formula I believe are not
21  lawyers.
22  Q.  Okay.  Now, when you say you are
23  familiar with industry practices regarding the
24  handling of customer property and compliance
25  with SEC Customer Protection Rules, are you

Page 244

D. McIsaac

1  
2  purporting to be an expert in the operations and
3  processing systems used by Lehman that were fed
4  into the reserve calculation?
5  MR. OXFORD:  Hold on.  Objection to
6  form.  Sorry.
7  Q.  By reserve calculation, I am referring
8  to the calculation required under SEC Rule
9  15c3-3.  Will you understand that that's what I
10  mean when I say "reserve calculation" throughout
11  the deposition?
12  A.  The allocation formula?
13  Q.  Yes.
14  A.  Yes.
15  MR. OXFORD:  Same objection.  Do you
16  have the question in mind?
17  A.  No, maybe --
18  Q.  So when you say you were familiar with
19  industry practices regarding the handling of
20  customer property and compliance with SEC
21  customer rules, are you purporting to be an
22  expert in the operations and processing systems
23  used by Lehman that were fed into the reserve
24  calculation?
25  A.  When you say an expert in the systems,

Page 245

D. McIsaac

1  
2  I am not a systems analyst.  I am not a systems
3  programmer.  I --
4  Q.  Okay.  So you are not familiar with --
5  MR. OXFORD:  Let him --
6  Q.  I apologize.
7  A.  That's all right.
8  Q.  I realize you weren't through.
9  A.  I am very familiar with the allocation
10  process and what people preparing the report
11  will look to see out of the allocation process.
12  Q.  Okay.  So are you familiar with the
13  ADP system?
14  A.  Yes, I am.
15  Q.  Okay.  The ITS system?
16  A.  No, not necessarily.
17  Q.  Okay.  NTS?
18  A.  I am familiar with fixed income
19  systems.
20  Q.  Okay.  And the RISC, R-I-S-C, system?
21  A.  I am not intimately familiar with it.
22  Q.  Okay.  Have you ever had any prior
23  experience in forensic accounting?
24  A.  No.
25  Q.  Okay.  Now, are you aware that the

Contains Highly Confidential Portions

Page 246

D. McIsaac

1  Trustee and Barclays are currently in a dispute
2  regarding the interpretation of a contract under
3  which Barclays purchased assets from the former
4  Lehman Brothers estate?
5     A.   Yes, I am.  I sat here through four
6  hours of a deposition on that.
7     Q.   Yes.  I just don't want a foundation
8  objection from Neil over there.
9        Okay.  Are you purporting to offer any
10  opinion on the interpretation of the language in
11  that contract?
12       MR. OXFORD:  Objection.  Form.
13    A.   I don't know if you're going to ask me
14  a question on it, but I don't -- I don't think
15  this allocation motion was part of -- looked
16  at -- I might have reviewed that, but it wasn't
17  part of reliance.
18    Q.   Have you been asked by anybody to
19  analyze the contract?
20       MR. OXFORD:  Is your question, because
21  as Mr. McIsaac says, we have sat through
22  almost five hours of questioning --
23       MS. NEUHARDT:  A lot.
24       MR. OXFORD:  -- from your colleague in

Page 247

D. McIsaac

1  connection with the Asset Purchase Agreement
2  and various other documents.  It would be
3  clearer for me and perhaps also for the
4  witness it will make things a little quicker
5  if you could clarify if your questions are
6  relating solely to the three affidavits and
7  reports that you have premarked.
8        MS. NEUHARDT:  Yes, they are.
9     Q.   I am purely asking whether you have
10  been asked to interpret the contract as it
11  relates to assets in the reserve accounts or
12  substitute assets for what would be in the
13  reserve account?  That doesn't help --
14       MR. OXFORD:  I still have an objection
15  to form, but you can answer if you're able.
16    A.   I'm not sure where you're going.  I
17  thought there was only one thing in the
18  allocation motion that talked to the contract
19  with Barclays, and that's the OCC deposit.
20    Q.   Okay.  Have you examined any other
21  part of the contracts other than the portion
22  that relates to the OCC margin other than in
23  this morning's portion of the deposition?
24    A.   In relation to?

Page 248

D. McIsaac

1     Q.   To your opinion as set forth in the
2  three exhibits sitting in front of you?
3     A.   I don't think I placed reliance on the
4  APA to review whether or not the 3-3 was in
5  compliance with the rules.
6     Q.   Okay.  Did you place any reliance on
7  the Clarification Letter?
8     A.   Again, I don't know, in relation to
9  this, if I placed any reliance on it.
10    Q.   You don't know if you placed reliance
11  on it?
12    A.   I don't think I placed any reliance on
13  that.  I was asked to review the 3-3 allocation
14  and what could be or compliance issues thereto.
15    Q.   Okay.  If you could turn to the first
16  exhibit in -- the first exhibit in the first
17  exhibit, which is your resumé, and it should be
18  tagged with a purple tag.
19    A.   Yes.
20    Q.   This is your resumé, correct?
21    A.   Yes, it is.
22    Q.   It says you have a bachelor of science
23  in accounting from Lehman College; is that
24  correct?

Page 249

D. McIsaac

1     A.   Yes.
2     Q.   Okay.  Do you have any other formal
3  education?
4     A.   No postgraduate.  No postgraduate
5  education.
6     Q.   So you did no work toward a degree
7  that you then did not receive?
8     A.   No.
9     Q.   So you've taken the courses in law?
10    A.   I've taken the courses that were
11  required for my CPA certification.
12    Q.   Did that include any courses in law?
13    A.   Yes.  Business law I think was a
14  requirement.
15    Q.   Business law, okay.  All right, that's
16  all I have about your education.
17        Now, this shows the most recent
18  position as you being at UBS Securities.  You do
19  not still work at UBS, do you?
20    A.   No, I left UBS in June.
21    Q.   In June of 2009?
22    A.   9.
23    Q.   Okay.  And why did you leave?
24    A.   There was downsizing at UBS.

Contains Highly Confidential Portions

Page 250

D. McIsaac

1
2   Q.   And where do you currently work?
3   A.   Currently today I work for KPMG.
4   Q.   And how long have you been at KPMG?
5   A.   Three weeks.
6   Q.   Three weeks? Okay. What's your
7   position there?
8   A.   Director of Regulatory Advisory.
9   Q.   Okay. And did you hold any position
10   between UBS and KPMG?
11   A.   Between then I was acting as an
12   independent consultant.
13   Q.   And was that as independent consultant
14   to the Trustee on this matter?
15   A.   That, and I had other clients I was
16   doing work for.
17   Q.   Can you tell me the other clients?
18   A.   It's confidential, I would think.
19   Q.   It's confidential. All right.
20   When did you first begin doing
21   consulting work for the Trustee?
22   A.   On or about the middle of July.
23   Q.   Did you perform any work for Lehman
24   Brothers Holdings, Inc. as an independent
25   consultant?

Page 251

D. McIsaac

1
2   A.   No.
3   Q.   Okay. Did you serve any function for
4   the Trustee other than as an expert witness for
5   this matter in your independent consulting?
6   A.   I provided an expert report on the
7   derivatives, and I provided two other -- I think
8   they're called affidavits for other issues
9   regarding customer property.
10   Q.   Do you know if those affidavits were
11   filed in the public record?
12   A.   I believe they were, but I don't know.
13   I can't say for sure.
14   Q.   Okay. And did you perform any other
15   services for the Trustee?
16   A.   From time to time.
17   MR. OXFORD: I'll let you answer that
18   question yes or no, Mr. McIsaac.
19   A.   Yes.
20   Q.   Okay. I think I know what's coming.
21   Can you describe for me the nature of
22   the services you performed for the Trustee?
23   MR. OXFORD: I'm going to object to
24   the form of that question and instruct you
25   not to answer.

Page 252

D. McIsaac

1
2   MS. NEUHARDT: And what's the basis of
3   your instruction?
4   MR. OXFORD: It's privileged.
5   MS. NEUHARDT: Can you describe for me
6   the basis of the privilege?
7   MR. OXFORD: Yes. Mr. McIsaac has
8   been retained as a consultant by the Trustee
9   to provide professional advice.
10   MS. NEUHARDT: Are you representing
11   that none of the other services that he
12   performed for the Trustee relate in any way
13   to his opinions that have been proffered in
14   these three exhibits?
15   MR. OXFORD: That is my understanding.
16   MS. NEUHARDT: That's your
17   representation on the record?
18   MR. OXFORD: That's my best
19   understanding.
20   Q.   Okay. Now, other than the positions
21   with KPMG and your independent consulting that
22   we have discussed, are there any other
23   professional positions that you have held in the
24   last 20 years that are not reflected on this
25   resumé?

Page 253

D. McIsaac

1
2   A.   I've been a chair -- well, it's in the
3   resumé. So, no, everything's in the resumé.
4   Q.   Now, in your work as an independent
5   consultant, and I'm referring specifically to
6   your work on the expert reports that are in
7   front of you, did you have any staff assisting
8   you?
9   A.   No, I did not.
10   Q.   Okay. All right. I'm going to start
11   with at UBS, could you explain to me how your
12   position at UBS gave you experience with
13   industry practices regarding the handling of
14   customer property and compliance with SEC
15   customer rules?
16   A.   Yes. I was the Fin. Op. for UBS
17   Securities Financial Operational Principal. I
18   signed the Focus Reports. I took all
19   responsibility on the financial information
20   filed with the regulators. I supervised the
21   reserve formula calculation, the net capital
22   calculations, the seg and secured calculations,
23   as well as the filing of the Focus Reports.
24   Q.   Okay. And did you ever personally do
25   the reserve calculation?

Contains Highly Confidential Portions

Page 254

D. McIsaac

1    A.   I worked on it as a more junior
2 person.
3    Q.   When you were at UBS?
4    A.   No. No.
5    Q.   Was that in one of your prior
6 positions?
7    A.   At Dean Witter I managed a group. I
8 also did some work on it from time to time when
9 somebody was out.
10    Q.   At Dean Witter that was not a part of
11 your regular duties? You worked on it if
12 someone was out?
13    A.   I supervised it. It came under my --
14 I managed a group that did it, the people that
15 did it.
16    Q.   Okay. You mentioned that you hold a
17 Series 27 license. Do you hold any other
18 professional licenses?
19    A.   No.
20    Q.   Have you in the past?
21    A.   Oh, sorry. I take that back. A CPA
22 license.
23    Q.   I was just going to ask you.
24    A.   No. I was thinking when you say that

Page 255

D. McIsaac

1 along the lines of other series, but, yes, CPA.
2    Q.   Are you in any professional
3 organizations?
4    A.   I'm a member of the AICPA, the New
5 York State Society of CPAs. I'm a member of the
6 Financial Management Division of SIFMA, the
7 Securities Industry and Financial Markets
8 Association. I'm past president of the
9 Financial Markets Division, the Financial
10 Management Division I think it's called, and up
11 until three weeks ago when I took the job at KPM
12 I chaired the SIFMA Capital Committee.
13    Q.   Did the AICPA study in any way SEC
14 Rule 15c3-3?
15    A.   The AICPA has issued an audit guide
16 for the auditing of securities broker-dealers.
17    Q.   Did you have any involvement in that?
18    A.   I might have had some involvement of
19 it when I was at Deloitte in a past life of
20 reviewing it possibly, but that was many
21 editions ago.
22    Q.   Okay. And did the New York State
23 Society for CPAs have any involvement in
24 interpreting Rule 15c3-3?

Page 256

D. McIsaac

1    A.   No.
2    Q.   Okay. And the same question for
3 SIFMA?
4    A.   Yes, the capital committee is
5 intimately involved in the capital rules and
6 Customer Protection Rules.
7    Q.   Okay. Have you ever served as an
8 expert witness before?
9    A.   No. Four hours ago.
10    Q.   Other than in this matter?
11    A.   No.
12    Q.   Very good. Okay. Now, as an expert
13 relating to the reports that are in front of you
14 right now, not what you discussed with Ms.
15 Bloomer this morning, how many hours of time
16 have you billed to the Trustee in putting
17 together your opinions here?
18    A.   On the two of these?
19    Q.   Uh-huh.
20    A.   I'd have to go back, but it was
21 hundreds.
22    Q.   Can you give me a range?
23    A.   Maybe three to four hundred.
24    Q.   Do you know how much you have billed?

Page 257

D. McIsaac

1    A.   No, I don't.
2    Q.   Have you ever written any
3 publications?
4    A.   No.
5    Q.   Okay. In the -- you say you've spent
6 hundreds of hours on these two reports. Do you
7 have a sense of how much was devoted to the
8 original affidavit of October 5?
9        MR. OXFORD: Objection. Form.
10        You can answer if you're able.
11    A.   Maybe a couple hundred. I don't -- I
12 don't recall how much exactly. Probably a
13 little bit more than 200, but I don't remember.
14        MS. NEUHARDT: I think under the
15        stipulation we're entitled to that
16        information, so perhaps you can provide that
17        to us later today or tomorrow.
18        MR. OXFORD: I don't think I can get
19        it to you later today, but I will certainly
20        take your request under advisement.
21        MS. NEUHARDT: Okay.
22    Q.   Have you ever been involved in a SIPC
23 liquidation before?
24    A.   No.

Page 258

D. McIsaac

1
2    Q.   Have you ever been involved in
3    performing 15c3-3 calculations at the time of a
4    merger or an acquisition?
5    A.   Yes.
6    Q.   Okay.  Could you tell me when that
7    would be?
8    A.   UBS merged with SBC on or about June
9    29, 1998.  There was a merger with various
10   acquisitions of various assets of PaineWebber
11   that were included as part of the acquisition of
12   UBS Securities acquired some of the assets, and
13   that was somewhere around November of 2000.
14   Q.   Okay.
15   A.   We at UBS purchased the prime
16   brokerage business from ABN Amro I want to say
17   it's around 2003, but I'm fuzzy on the time.
18       We purchased a futures business, but
19   that didn't have anything to do with 3-3, and
20   probably some other asset purchases or smaller
21   type purchase of assets or businesses along the
22   way.
23   Q.   Okay.  All right.  Now we're going to
24   get into the substance of your opinions.  Under
25   SEC Rule 15c3-3, prior to filing for

Page 259

D. McIsaac

1
2    liquidation, are the assets in a reserve account
3    considered the property of the broker-dealer or
4    the property of customers?
5    A.   The assets have to be the property of
6    the broker-dealer because they're their assets.
7    Q.   Okay.  So would customer property as
8    defined under SEC Rule 15c3-3 ever be put in the
9    reserve account?
10       MR. OXFORD: Objection.  Form.
11       You can answer.
12   A.   Customer's property that they own,
13   such as securities, would be included in the
14   reserve formula based on an allocation of those
15   assets and the use of those assets.
16   Q.   But would the securities be placed in
17   the reserve account?
18   A.   In the 15c3 reserve account?
19   Q.   Correct.
20   A.   No.
21   Q.   Okay.  Do you know how many accounts
22   LBI had that comprised its reserve account under
23   SEC Rule 15c3?
24   A.   You'll have to define what you mean by
25   "accounts."  I don't --

Page 260

D. McIsaac

1
2    Q.   Well, they -- are you aware that there
3    was a bank account at Wells Fargo that was used
4    for part of the reserve account?
5    A.   There was a, I believe, a reserve
6    formula account, an account for the benefit of
7    customers at Wells Fargo.
8    Q.   Correct.  Do you know how many such
9    accounts LBI held?
10   A.   If my memory is correct, it was three
11   or four, I believe.
12   Q.   Okay.  And do you remember what banks
13   those were at other than Wells Fargo, which we
14   have discussed?
15   A.   I believe there might have been
16   something at JPMorgan, but I don't remember
17   exactly, and I don't remember the other two.
18   Q.   What was the total amount as of
19   September 19, 2008 that was in LBI's reserve
20   accounts?
21   A.   I'd have to look in my report for the
22   exact number, but I believe it was about a
23   billion-17 -- a billion-760 million, something
24   on that nature.
25   Q.   Could you show me in your report where

Page 261

D. McIsaac

1
2    you got that number?
3        MR. OXFORD:  Amy, are you asking a
4    question where he got it or where it is in
5    the report?
6        MS. NEUHARDT:  It's the source, what
7    his source is for the -- his testimony that
8    that is the total amount that was locked up
9    as of that date.
10       MR. OXFORD:  Okay.
11   A.   So not where it is in here?
12   Q.   Hum?
13   A.   Not where --
14   Q.   Well --
15   A.   I'm confused.
16   Q.   -- if it's not in there, I would like
17   to know what it is that you did rely upon.  And
18   we do have materials that your counsel -- LBI's
19   counsel produced that you purported to rely on.
20   And you can check in there if you want, but if
21   it's attached to your report, that would be
22   easier.
23   A.   You'll have to give me a minute to go
24   through it.  I don't know if it's ...
25   Q.   While you're looking, I can ask the

Page 262

D. McIsaac

1  question, did you look at the bank account
2  statements for each of the three or four
3  accounts that we discussed earlier?
4     A.   No.  The Trustee's financial
5  professionals provided me with the schedule of
6  what was in the accounts.
7     Q.   And by "financial professionals," who
8  are you referring to?
9     A.   I believe it came from legal counsel.
10    Q.   From legal counsel.  It didn't come
11 from Deloitte?
12    A.   It might come from Deloitte
13 eventually, but it was given to me by legal
14 counsel.
15    Q.   And did you do any independent
16 investigation of the correctness of the
17 materials supplied to you by legal counsel?
18    A.   No.
19    Q.   You know what, why don't we have you
20 look for that on a break and go on in an effort
21 to --
22    A.   Sure.
23    Q.   -- save time.
24         Under SEC Rule 15c3-3, if there is an

Page 263

D. McIsaac

1  excess in the reserve account, is that held for
2  the exclusive benefit of customers?
3     A.   Everything in that account is held for
4  the exclusive benefit of customers.
5     Q.   So is it your testimony that even
6  amounts that are not required to be held there
7  are for the benefit of customers?
8         MR. OXFORD:  Objection.  Asked and
9  answered.  You can answer again.
10    A.   If it's held in there, it's for the
11 exclusive benefit of customers.
12    Q.   Okay.  Is a broker-dealer allowed to
13 withdraw excess?
14        MR. OXFORD:  Objection.  You can
15 answer.
16    A.   A broker-dealer can make withdrawals
17 and deposits based on calculations.
18    Q.   Okay.  And is there any requirement
19 that a broker-dealer receive SEC approval before
20 making a withdrawal of excess?
21    A.   I do not believe there's any
22 requirement to get the approval of the SEC in
23 the normal course.
24    Q.   Okay.  Now, you qualified your last

Page 264

D. McIsaac

1  answer by saying you did not believe there was a
2  requirement to get SEC approval in the normal
3  course?
4     A.   Correct.
5     Q.   Do you believe there's a requirement
6  to get SEC approval at any other time?
7     A.   Well, I would assume if you're in
8  liquidation, you can't move moneys out of the
9  account without the approval of the S.E.C., but
10 I don't know that for a fact.
11    Q.   Okay.  Are you basing your assumption
12 on anything in SEC Rule 15c3-3?
13    A.   I don't believe anything I've seen
14 there.  What I've seen in the rules is basically
15 you have to do a withdrawal -- a calculation
16 before you can do a withdrawal.
17    Q.   Okay.  In your rebuttal report,
18 paragraph 13, you state that the -- I'll give
19 you a moment to get to that.  In the second
20 sentence you state, "The only relevant point in
21 time" --
22    A.   Excuse me.  Excuse me.  What
23 paragraph?
24    Q.   13.  I'm sorry.

Page 265

D. McIsaac

1     A.   Page 13.
2     Q.   No, paragraph 13, page 6.
3     A.   Oh, I'm sorry.  I thought you said
4  page 13.
5     Q.   No, my apologies.
6     A.   Okay.
7     Q.   Okay.  Second sentence says, "The only
8  relevant point in time for the purpose of
9  determining the accuracy of LBI's reserve
10 calculation as of September 19, 2008, is
11 September 19, 2008."
12        Why -- why do you believe that
13 September 19, 2008 is the relevant date?
14    A.   That's the -- that's when the
15 calculation is as of.  So anything that has
16 happened as of that date or known as of that
17 date is what goes into the formula.
18    Q.   Why -- well, were you told to do a
19 calculation as of September 19, 2008, or did you
20 independently decide that that was the relevant
21 date for a calculation?
22        MR. OXFORD:  Objection to the form.
23 That misstates the facts and the evidence,
24 and I think you're misreading his reports.

Contains Highly Confidential Portions

Page 266

D. McIsaac

1
2    You can answer if you can.
3    A.   I believe the 19th of September 2008
4    was the last reserve requirement prepared by
5    Lehman prior to entering into SIPC protection.
6    Q.   Okay.  Do you know the date that LBI
7    entered into SIPC protection?
8    A.   I believe it was sometime on or about
9    the 19th of September.
10   Q.   Okay.  Do you know if they had
11   performed a calculation on that date prior to
12   entering into SIPC liquidation?
13   MR. OXFORD:  Objection to form.
14   A.   I have not seen any as of September
15   18, I don't believe.
16   Q.   Have you seen any as of the morning of
17   September 19?
18   A.   I'm sorry, as of the morning of
19   September 19th?  As of what period of time?
20   Q.   Prior to entering into liquidation on
21   the day of the 19th?
22   A.   Based on what period?  Based on what
23   ending period?
24   Q.   Any ending period.
25   A.   You can only do it at the end of a

Page 267

D. McIsaac

1
2    day.  You can't do it in the middle of a day.
3    Q.   Okay.  So then wasn't the last
4    calculation actually performed by LBI prior to
5    entering into liquidation done on the 17th?
6    A.   I don't think so.  I thought they were
7    required to do a calculation as of the close of
8    business on the 19th.
9    Q.   Even if they were no longer in
10   business?
11   A.   I don't know what the whole rule is
12   around SIPC, but I believe they were required to
13   do a calculation as of the close of business the
14   19th because that was the last day of business.
15   Q.   Could you show me in -- we can get you
16   Rule 15c3-3.  We're going to mark that as
17   Exhibit 694.
18   (Exhibit 694, Rule 15c3-3, marked for
19   identification, as of this date.)
20   Q.   I've put before you SEC Rule 15c3-3.
21   Could you tell me where in Rule 15c3-3 LBI would
22   have been required to do a reserve calculation
23   on the 19th despite entering into liquidation on
24   that day?
25   MR. OXFORD:  Objection.  Form.

Page 268

D. McIsaac

1
2    Misstates the witness's testimony.
3    You can answer.
4    A.   I don't think there's anything in Rule
5    15c3-3 that says when anybody is supposed to do
6    a calculation as opposed to the 19th.  I believe
7    it says that you do calculations as of Friday
8    and the last business day of the month.
9    Q.   Okay.
10   A.   That was their last business day.
11   Q.   Is it your position that 15c3-3
12   continues to apply after entering into SIPC
13   liquidation?
14   A.   I would think you would have to do a
15   final calc if it was a Friday close of business
16   to account for all your assets in this process.
17   Q.   And the basis for that belief is?
18   A.   The last day of business was a Friday.
19   I don't know if you would have to do it if the
20   last day of business was a Wednesday, but their
21   last day of business was a Friday.
22   Q.   So it's your position that even though
23   at the end of the day of business on that Friday
24   they were in liquidation, they still would have
25   had to do a 15c3-3 calculation?

Page 269

D. McIsaac

1
2    A.   I believe so.  That's my opinion.
3    Q.   Okay.  And that is based on?
4    A.   You're supposed to do calculations as
5    of Friday or month end, and that was a Friday of
6    business.
7    Q.   So you have no other basis for your
8    opinion that a 15c3-3 calculation would have
9    been required even though they had entered into
10   liquidation on that day?
11   A.   I believe the SEC required a 3-3
12   calculation to be done, but I don't know if I
13   can point to anything that says that.
14   Q.   When you say the SEC required it, do
15   you mean by rule or are you talking about events
16   as of that day, communications that day?
17   A.   I thought by rule they required it as
18   of the close of business on Friday.  I think
19   they -- did they go into -- I believe they went
20   into liquidation after the markets closed, which
21   would be the close of their business day.
22   Q.   And if that were not the case, would
23   that change your opinion in any way?
24   A.   Then I would leave it up to the
25   regulators to determine if a calculation had to

Contains Highly Confidential Portions

Page 270

D. McIsaac

1 be done at that point in time.
2 Q. So you don't have an opinion, then, if
3 the liquidation started prior to the close of
4 business on Friday?
5 A. If the --
6 MR. OXFORD: Objection. Form.
7 You can answer.
8 A. If the liquidation was at 1 o'clock --
9 9 o'clock in the morning, I might have a
10 different opinion, but it was I believe after
11 the close of business. I think it was finally
12 approved sometime Saturday morning.
13 Q. Okay.
14 A. And I'm assuming --
15 Q. I'm trying to make sure you've
16 answered my question. I don't think we've
17 established what time it was.
18 If it did happen prior to the close of
19 business, does that change your opinion?
20 MR. OXFORD: Objection. Form.
21 You can answer.
22 A. I don't know. I don't have an opinion
23 on it.
24 Q. Okay. Now, under -- for a moment

Page 271

D. McIsaac

1 we'll assume that the 19th is the appropriate
2 date, and I believe you said that under the
3 SEC -- well, rather than recharacterize your
4 testimony, how often does an operating
5 broker-dealer have to do its reserve
6 calculation?
7 A. It's based on what type of
8 broker-dealer it is. One of Lehman's stature
9 had to do one weekly and as of month end.
10 Q. And you said normally it was done on
11 Friday afternoons, correct?
12 A. As of close of business Friday and as
13 of month end.
14 Q. Okay. Now, if a calculation done on
15 the -- done as of the close of business on
16 Friday showed a shortfall, at what time would
17 the broker-dealer be required to make up the
18 shortfall?
19 A. 10 A.M. the second business day
20 following the day of closing. So on a Friday,
21 as long as Monday was a business day, 10 o'clock
22 Tuesday.
23 Q. Okay. And that's under Rule 15c3-3 as
24 well?

Page 272

D. McIsaac

1 A. Yes.
2 Q. Now, in this case, Lehman was no
3 longer operating as of 10 A.M. the following
4 Tuesday morning, correct?
5 A. I believe that's the case.
6 Q. So as of Friday, the 19th, it would
7 not have had an obligation to actually deposit a
8 shortfall into the account?
9 A. I believe --
10 MR. OXFORD: Objection to form.
11 You can answer.
12 A. I believe Lehman was still a
13 broker-dealer and had not issued a BDW as of
14 that point in time.
15 Q. I'm sorry, what is a BDW?
16 A. Withdrawal as a broker-dealer.
17 Q. Okay. So is it your testimony that
18 even after filing for liquidation LBI was an
19 operating broker-dealer?
20 A. No. I'm saying they didn't file a BDW
21 and still would have been, I think, required to
22 make a deposit on Tuesday morning if they had to
23 add to their deposit.
24 Q. Despite the fact that a Trustee had

Page 273

D. McIsaac

1 been appointed and was running the operations?
2 A. (Witness nods.)
3 Yes, I'm sorry.
4 Q. You do need to answer.
5 A. I know that.
6 Q. Could you show me or could you tell me
7 what the source of your opinion on that is?
8 A. I don't think there's anything in the
9 literature that says that. I don't think
10 there's anything in the literature that points
11 to a broker-dealer going out of business on a
12 Friday and whether or not it has to make its
13 deposit on Tuesday.
14 Q. So you're not basing your opinion on
15 anything?
16 A. Just --
17 MR. OXFORD: Objection. Form. It's
18 not what the witness said.
19 But you can answer.
20 A. Practice, common practice, and I would
21 think they would do their last computation.
22 Q. You say common practice. How often
23 have you been involved in a broker-dealer that
24 has gone into liquidation?

Page 274

D. McIsaac

1
2     A.   Never.
3     Q.   Okay.  Let's turn to the discussion of
4   FID accounts, and in your original report that
5   was at paragraphs -- I didn't put it down
6   here -- it starts on page 13 of your original
7   report.  It's relating to Fixed Income Division
8   prime broker clients that are being referred to
9   as FID accounts?
10    A.   That's correct.
11    Q.   In your original report you stated
12  that securities had been liquidated by Chase, is
13  that correct?
14    A.   That's correct.
15    Q.   And you decided that was an error for
16  your rebuttal report; is that correct?
17    A.   No, for my additional affidavit that
18  was put in.
19    Q.   Okay.  I apologize.  But your opinion
20  on that has changed?
21    A.   That's correct.
22    Q.   Okay.  Now, from where did you get the
23  number of 891 million as being the -- yes, as
24  being the relevant number?  And for reference,
25  that would be in paragraph 35 of your original

Page 275

D. McIsaac

1
2   affidavit.
3     A.   That's a combination of the 630
4   million of assets and the 281 million -- $258
5   million of the cash.
6     Q.   Okay.  Well, I'm not seeing citations
7   for either the 630 million number or the 258
8   million number.  So where did you get those
9   numbers?
10    A.   They were provided to me by the
11  Trustee's financial advisor.
12    Q.   Did you do any independent
13  investigation of the accuracy of those numbers?
14    A.   I reviewed some documents that would
15  have shown the numbers there, would have shown
16  the accounts with the balances in them and the
17  asset value.
18    Q.   Are those documents attached to your
19  affidavit?
20    A.   I don't know if they are or not.  I
21  don't think so.
22    Q.   Did you speak to anybody about the
23  accuracy of those numbers?
24    A.   The Trustee and their financial
25  advisors.

Page 276

D. McIsaac

1
2     Q.   By "financial advisors" are you
3   referring to legal counsel again?
4     A.   It would have been legal counsel
5   and/or their financial advisors, Deloitte.
6     Q.   Deloitte.  Can you tell me who you
7   spoke to at Deloitte?
8     A.   Chris Harris and Marlo Karp.
9          I'm sorry, I didn't know if that was
10  privileged.
11         MR. OXFORD:  If I might, let me
12    perhaps make this go a little more smoothly.
13    To the extent, Mr. McIsaac, you relied upon
14    advice from Deloitte -- or, not advice, you
15    relied on information as a source of the
16    facts upon which you base your opinion
17    whether in your original affidavit or
18    supplemental affidavit or your rebuttal
19    report, then I think it's fine for you to
20    answer those questions.
21         To the extent Ms. Neuhardt's questions
22    call for discussions with Deloitte or any
23    other person that you did not rely on as a
24    source of information for the opinions
25    expressed in these affidavits and reports,

Page 277

D. McIsaac

1
2   then I will instruct you not to answer that
3   question.
4          THE WITNESS:  Okay.  Thank you.
5     Q.   I'm trying to find out the underlying
6   source of the facts underneath your report.
7     A.   It would have been either Chris Harris
8   or Marlo Karp.
9     Q.   Did you speak to any employees of the
10  Trustee?
11    A.   No, I did not.  Well, employees of the
12  Trustee?  Legal counsel?
13    Q.   No.
14         MR. OXFORD:  Maybe we can clear things
15    up.  Does your question, Amy, go to the --
16         MS. NEUHARDT:  I'm going to the TSA
17    employees, basically.
18         MR. OXFORD:  Okay.  Because that's
19    different than they're not employees of the
20    trustee.
21         MS. NEUHARDT:  But they're performing
22    services for him.
23         MR. OXFORD:  Sure.  Maybe we can ask
24    this again and make sure Mr. McIsaac
25    understands the question.

Page 278

D. McIsaac

1
2     Q.    Are you aware that there are persons
3  who are normally employed by Barclays who work
4  entirely at the direction of the Trustee?
5         MR. OXFORD:  Objection.
6     A.    I'm aware that there are employees of
7  Barclays doing work under a TSA. I don't know
8  what they're doing or who they are.
9     Q.    When you say "TSA," what are you
10  referring to?
11    A.    Some kind of transfer services
12  agreement I believe is what it's call in the
13  industry.
14    Q.    Do you understand that those employees
15  are working for the Trustee?
16    A.    I don't know who they're working for.
17    Q.    Okay. Did you speak to any of those
18  individuals in relation to the FID accounts?
19    A.    No.
20    Q.    Did you speak to any of those
21  individuals in relation to anything in your
22  reports?
23    A.    No.
24    Q.    How did you determine that the $891
25  million were customer assets?

Page 279

D. McIsaac

1
2     A.    They were assets in the customer
3  accounts that went -- that went into a -- an
4  account at Chase designated for the benefit of
5  customers.
6     Q.    What I'm trying to understand is what
7  the source is for your statement that they were
8  assets in the customer accounts.
9     A.    I received a document that listed the
10  accounts and the account -- the accounts and the
11  money, monetary value and the security market
12  value in those accounts.
13    Q.    Did you do any independent
14  investigation of the accuracy of that document?
15    A.    No, I did not.  I believe I reviewed
16  the stipulation agreement that might have also
17  included information on those accounts.
18    Q.    Is that stipulation agreement attached
19  to your report?
20    A.    I don't believe it is.
21    Q.    Sorry?
22    A.    No.  No.
23         MR. OXFORD:  Just to move this along,
24    Amy, are you referring to any report or a
25    specific report?

Page 280

D. McIsaac

1
2         MS. NEUHARDT:  He said that there's a
3    document he looked at that helped him
4    determine whether or not the assets that he
5    described in his report as FID assets --
6    that he describes as customer assets, he
7    said he looked at a document and that told
8    him they were customer assets.  And then I
9    asked if he did any independent
10    investigation, and he first said no, but
11    then he said he may have looked at a
12    stipulation, and I asked whether or not he
13    attached that in his report.
14         MR. OXFORD:  Okay.  Just for ease, I
15    can represent that it's been produced to you
16    and I believe it actually may be attached to
17    his report, but I'll --
18    A.    Yes, you say reports.  I'm not sure
19  which report.  I don't think it's in the --
20    Q.    When I say report, either any of the
21  three reports sitting in front of you -- I guess
22  it's two reports and one supplemental affidavit.
23         And what was your source for stating
24  that these particular assets were seized?
25    A.    Chase took control of the assets and

Page 281

D. McIsaac

1
2  did not return them to the Trustee.
3     Q.    What's your source for that?
4     A.    The documents that were provided to me
5  by the financial.
6     Q.    On this one I'm going to need you to
7  show me which documents.  If you could look at
8  your report and show me which documents you're
9  using to rely on for the prospect that they were
10  seized. I understand, but I need you to
11  identify what you're relying on for that.  So --
12    A.    I have a list of assets.  I don't
13  believe I have any -- anything -- I don't think
14  it's in my documents.  I can look for you to see
15  in the extra documents if we provided anything
16  from Chase showing that they were moved out of
17  Chase's account.  I believe somewhere in here we
18  have the accounts showing zero balances in them.
19    Q.    Do you know what day they were seized
20  if in fact they were seized?
21    A.    Chase, from my understanding, on or
22  about the 18th of September --
23    Q.    On the 18th?
24    A.    I'm not finished.
25         -- shut off access to Lehman to have

Page 282

D. McIsaac

1
2    access to the accounts.  Somewhere along that
3    period of time, the assets were taken out of the
4    accounts of Lehman.
5        Q.    So when you say shut off access,
6    you're referring to shutting off electronic
7    ability to monitor --
8        A.    Yes.
9        Q.    -- the accounts?
10        A.    The screens were shut off.
11        Q.    Are you equating that to seizure?
12        A.    No.  I'm just saying that at that
13    point in time, LBI was not aware of what was in
14    the accounts.
15        Q.    Okay.  But do you know when the assets
16    were actually seized?
17        A.    I believe the reports that came from
18    Chase, and I'm looking for them in here because
19    I believe they're in here, showed that, as of
20    the 19th, they were removed from the accounts.
21        Q.    Do you know if it was before or after
22    LBI filed for liquidation -- sorry, filed for
23    SIPC protection?
24        A.    I don't believe Chase put a time stamp
25    on when they removed them out of the accounts.

Page 283

D. McIsaac

1
2        Q.    So you don't know one way or the
3    other?
4        A.    I'm not sure what the relevance would
5    be of that if they had no access to those assets
6    as of the 19th.
7        Q.    Well, again, are you equating the
8    inability to monitor the accounts with seizure?
9        A.    No, I'm saying that they didn't know
10    if they had them or not had them at the 19th
11    because they had no access to their accounts.
12        Q.    Are you saying that the inability to
13    monitor alone would make it no longer a good
14    control location?
15        A.    No, I just said that they wouldn't
16    have known at that point in time if they were in
17    the accounts or not.
18        Q.    So the mere fact that they could not
19    monitor would not have turned those accounts
20    into a -- strike that.
21        MR. OXFORD:  And Amy, just on the
22    seize question, maybe we could add that to
23    the list of things you want Mr. McIsaac to
24    look at at a break and it'll speed things up
25    a little bit.

Page 284

D. McIsaac

1
2        MS. NEUHARDT:  Uh-huh.
3        Q.    Is electronic access required to be a
4    good control location under 15c3-3?
5        A.    No.
6        Q.    Okay.  So it's the seizure that is
7    critical to your opinion on this?
8        A.    Yes.
9        Q.    But you do not know at what time on
10    the 19th these assets were seized?
11        A.    No, I do not.
12        Q.    Okay.  Now, what are the requirements
13    of a good control location under 15c3-3?
14        A.    You should have a letter from the
15    bank.
16        Q.    A "no lien letter"?
17        A.    Stating they have no liens on those
18    assets.
19        Q.    Are there any other requirements?
20        A.    I believe that the language in the
21    letter talks to no lien, except for payment of
22    certain fees and that.
23        Q.    Now, do you know if there was a "no
24    lien letter" from Chase with regards to these
25    accounts?

Page 285

D. McIsaac

1
2        A.    I believe there were "no lien letters"
3    from Chase with these accounts.
4        Q.    Were they revoked on or before the
5    19th?
6        A.    I believe there was certain ambiguity
7    on whether or not those accounts were being used
8    by Chase for credit purposes or reviewing the
9    equity of LBI at points in time throughout the
10    year.
11        Q.    I don't think that answers my
12    question.  Do you know if the "no lien letters"
13    were revoked on or before the 19th?
14        A.    I do not know if they were revoked
15    before.
16        Q.    Okay.  Now, you refer in your report
17    regarding the FID assets to an overdraft notice;
18    is that correct?
19        A.    Which report are we talking about now?
20        Q.    Both of them, actually.  I'm still
21    just talking about the FID reports.
22        A.    Uh-huh.
23        Q.    Did you -- did you review the
24    overdraft notice?
25        A.    I've seen documentation that showed

Page 286

D. McIsaac

1  that it was an overdraft at Chase.
2
3     Q.   Did you do any investigation into --
4  did you do any investigation into whether or not
5  the notice was properly issued?
6     A.   No.
7     Q.   Okay.  And did you inquire --
8     A.   I --
9     Q.   Sorry?
10    A.   I said, no, I don't know what notice
11 of properly issued would be in an overdraft
12 account.  Usually you would get a statement from
13 the bank or you would see it online.  I don't
14 know if that constitutes a notice.
15    Q.   Did you do any investigation into
16 whether or not Chase had acknowledged to Lehman
17 on the 19th that the notice was improperly
18 issued?
19    A.   What notice now?
20    Q.   You told me you reviewed an overdraft
21 notice.
22    A.   And did Chase say that it was
23 improperly issued?  No.
24    Q.   I'm asking if you investigated whether
25 or not that occurred?

Page 287

D. McIsaac

1     A.   I did not.
2     Q.   Okay.  If that in fact occurred, would
3  that change your opinion in any way?
4     MR. OXFORD:  Objection to the form.
5  Assumes facts not in evidence.
6     MS. NEUHARDT:  I'm sorry, I couldn't
7  hear you.
8     MR. OXFORD:  You can answer.
9     A.   If Chase sent another report to Lehman
10 at that time saying we originally told you you
11 had an overdraft of 20 billion, that was wrong,
12 you have cash of 10 billion, yes, that would
13 have an impact on what I thought.  If that's
14 what your question was.
15    Q.   That's not my question.  My question
16 is whether if Chase informed people at Lehman
17 that the notice was issued as a mistake, would
18 that change your opinion?
19    MR. OXFORD:  Same objection.
20    A.   If they said that -- if they gave
21 notice that there was no overdraft and the
22 assets weren't used to secure the overdraft,
23 yes, it would change my opinion.
24    Q.   Did you make any effort to determine
25

Page 288

D. McIsaac

1     whether or not LBI actually attempted to
2  withdraw any money from the Chase account on
3  Friday, September 19?
4     A.   No, I did not.
5     Q.   Did you make any efforts to determine
6  whether or not LBI actually attempted to
7  withdraw any securities from the Chase account
8  as of September 19?
9     A.   As I'm aware, the screens were shut
10 down, so I don't know how they would have done
11 that without electronically notifying, unless
12 they would have done it via overnight letting
13 Chase know what deliveries and receipts to make,
14 but I did not do any inquiries into that.
15    Q.   Are you saying that telephone
16 communications no longer work?
17    A.   I don't know if anybody made a
18 telephone communication to them.  I know the
19 screens were down and that's the normal mode of
20 moving securities.
21    Q.   So you don't actually know whether or
22 not LBI could have had access to that -- to the
23 cash and securities in the Chase accounts on
24 September 19, 2008?
25

Page 289

D. McIsaac

1     MR. OXFORD:  Objection to form.
2     A.   I've been informed that the screens
3  were shut down.  So having access to it other
4  than via the screens, I'm not sure how they
5  would have it other than maybe verbal
6  discussions with Chase.
7     Q.   The mere fact that the screens were
8  shut down would not substantively affect their
9  ability to withdraw money; is that correct?
10    MR. OXFORD:  Objection.  Form.
11    A.   I assume they could send instructions
12 to Chase to do it, and if Chase so desired, they
13 could follow that.
14    Q.   Okay.  If Chase in fact actually
15 seized assets on the 19th, would that have
16 affected the reserve calculation done by LBI on
17 the 17th?
18    A.   If there was ambiguity or if the "no
19 lien" language for those accounts was not in
20 force, then yes, that would have affected any
21 other calculation done at that point in time.
22    Q.   Have you seen any evidence that the
23 "no lien letter" was not enforced as of the
24 17th?
25

Contains Highly Confidential Portions

Page 290

D. McIsaac

1
2  A.  I have seen nothing that said they --
3  it was not enforced at that time.
4  Q.  Would your answer be the same as of
5  the 12th?
6  A.  The same.  I have seen nothing before
7  that time.
8  Q.  Okay.  Now, if there were -- if these
9  assets were seized on the 19th and it did cause
10  a need to adjust the amount in the reserve
11  account, at what time -- when would that deposit
12  be required?
13  A.  I believe I answered that before.  10
14  A.M. Tuesday morning, if that deposit was
15  required.
16  Q.  Okay.  Could you just tell me which
17  regulation it is that would require a credit in
18  the reserve formula for the seizure of assets on
19  the 19th?
20  A.  I believe the credit goes into the
21  reserve formula because you would have customer
22  assets allocating to a loan.
23  Q.  Okay.
24  A.  A bank loan.
25  Q.  Is that in 15c3-3?

Page 291

D. McIsaac

1
2  A.  Yes, it is.
3  Q.  Could you show me where in this
4  exhibit?
5  A.  Could you give me the interpretation
6  memos?  It would be a lot easier to find it.
7  Q.  Absolutely.  Yes.  That would be in
8  Exhibit 695.
9  (Exhibit 695, Customer Protection -
10  Reserves and Custody of Securities SEA Rule
11  15c3-3, marked for identification, as of
12  this date.)
13  A.  I believe it's on page 2625 of the
14  FINRA Interpretation Handbook.
15  Q.  Okay.  What portion of this on page
16  2625?
17  A.  It says "Proprietary Bank Loans versus
18  Customer Account Long."
19  Q.  Okay.  Do you rely on anything else
20  for your opinion that if there were assets
21  seized, there would have to be a credit to the
22  reserve calculation?
23  A.  I believe there are other portions
24  within here that talk about the same thing --
25  Q.  This is the proprietary source?

Page 292

D. McIsaac

1
2  A.  Customer property allocating to
3  proprietary bank loan.
4  Q.  Okay.  Now, I'm going to move on to
5  coding errors.  Your rebuttal report discusses
6  two alleged coding errors:  One regarding the
7  classification of Woodlands Bank as a customer
8  or non-customer?
9  A.  Right.
10  Q.  And another relating to an error in
11  the ADP system; is that correct?
12  A.  Correct.
13  Q.  Are you aware of any other alleged
14  coding errors that would have affected the
15  credit side of LBI's reserve calculation as of
16  September 19, 2008?
17  A.  The ADP -- there were two instances of
18  a ADP.  It was certain accounts were not -- were
19  picked up as customers.  They should have been
20  non-customer, as well as the allocation.  But
21  they're both this here.
22  Q.  So there's nothing other than what is
23  discussed in your reports in the way of coding
24  errors that you have identified?
25  A.  That I am aware of at this time, no.

Page 293

D. McIsaac

1
2  Q.  Were you asked by the Trustee to
3  identify transactions or events that might have
4  required adjustments on the debit side of the
5  reserve calculation?
6  A.  All issues brought to my attention by
7  the Trustee would have been reviewed.  There was
8  no indication of only reviewing the credit side.
9  In fact, the coding errors did have an impact on
10  both the debit and credit side.
11  Q.  Okay.  Did you make any independent
12  effort to look for transactions or events that
13  would have required an adjustment to the reserve
14  calculation other than what was identified by
15  the Trustee for you?
16  A.  Nothing else was brought to my
17  attention that would have required that.
18  Q.  I understand.  Did you make any
19  independent effort to look for additional
20  transactions or events?
21  A.  I did not.
22  Q.  Do you know if the Trustee looked for
23  errors that would have caused an adjustment on
24  the debit side of the reserve formula?
25  A.  I believe the Trustee and their

Contains Highly Confidential Portions

Page 294

D. McIsaac

1
2  advisors looked for all and any adjustments that
3  would have impacted the 9/19 calculation.
4      Q.   Do you know if the Trustee and its
5  advisors have completed its -- their analysis of
6  any and all adjustments that would have impacted
7  the 9/19 calculation?
8      A.   I believe the Trustee and their
9  advisors are still researching facts and figures
10  as of the 19th of September, and if anything was
11  to come to their attention, I believe they would
12  bring it up at that point in time. It was my
13  understanding as of the time I filed the
14  rebuttal report that no additional items have
15  been found.
16      Q.   So you believe the analysis is still
17  ongoing?
18      A.   I believe it's still in process, yes.
19      Q.   But you do believe that the Trustee
20  and its financial advisors have engaged in the
21  process?
22          MR. OXFORD: Objection. Form.
23      Q.   Do you understand the question?
24      A.   I don't know what process you're
25  talking about they engaged in.

Page 295

D. McIsaac

1
2      Q.   The process of identifying -- the
3  process of identifying any and all adjustments
4  that would have impacted the 9/19 calculation?
5      A.   I believe they're still doing work as
6  it relates to 9/19, and as I said in my rebuttal
7  report, I don't think anything came to their
8  attention by the time I filed that report.
9      Q.   Okay. In paragraph 16 of your
10  rebuttal report, you say that the Woodland
11  assets had actually been seized. What did you
12  base that on?
13      A.   They were part of the assets that were
14  in the free box that was taken by Chase.
15      Q.   So it's the same Chase matter as we've
16  already discussed?
17      A.   No. These were never locked up in a
18  seg account because the account was coded as a
19  non-customer, not a customer.
20      Q.   On what day do you believe these were
21  seized?
22      A.   When Chase seized all the assets
23  versus the bank loan, which I assume was the
24  19th.
25      Q.   Which you assume was the 19th?

Page 296

D. McIsaac

1
2      A.   Yes.
3      Q.   Okay. In rebuttal paragraph 18, this
4  is referring to I believe the ADP Broadridge
5  issue?
6      A.   Uh-huh.
7      Q.   You say that, "As part of a review
8  performed by Barclays," and you emphasize "by
9  Barclays," "at the request of the S.E.C.,
10  Barclays performed a partial recalculation of
11  the reserve formula to adjust for these known
12  discrepancies which revealed, as a result of the
13  coding errors, a $213 million shortfall."
14          And I -- you can turn to Exhibit 8 if
15  you want, that's what you cite, but I'd like to
16  know what your basis is for saying that Barclays
17  did a recalculation --
18      A.   I believe Barclays employees were the
19  ones sending the information to ADP and
20  requesting that a recalculation was done.
21      Q.   Okay. And do you know whether those
22  Barclays employees were Barclays employees
23  performing work for the Trustee under the TSA?
24      A.   I don't know in what capacity, but the
25  letterhead on the note to ADP at Broadridge was

Page 297

D. McIsaac

1
2  Barclays.
3      Q.   I'm going to mark as Exhibit 696 a
4  declaration of Robert Martini dated April 5,
5  2010, and after she hands it to you my first
6  question will be have you seen it before.
7          (Exhibit 696, Declaration of Robert
8  Martini, marked for identification, as of
9  this date.)
10      A.   No, I have not.
11      Q.   Would you read paragraphs 5 through 7?
12  Let me know when you're through.
13          (Document review.)
14      A.   I've read it. I'm sorry, 5 through 7?
15  Okay.
16      Q.   Okay. Assuming that what Mr. Martini
17  says in his declaration is true, would that
18  change your opinion that Barclays performed a
19  recalculation of the reserve formula as set
20  forth in paragraph 18 of your rebuttal report?
21      A.   I saw a letter going from Barclays to
22  Broadridge directing them to make the changes.
23  They did all the research and directed them to
24  make the changes. Whether the employees who
25  actually did the calculation were TSA employees

Page 298

1            D. McIsaac
2    or Barclays employees I do not know.  I don't
3    have the name of the employee who did it.
4        Q.    Okay.  Did you speak to any of the
5    employees on that letter?
6        A.    No, I did not.
7        Q.    Okay.  Do you know if the
8    recalculation that is discussed in paragraph 18
9    of your Rebuttal Report was a complete
10   recalculation of the 15c3-3 requirement as of
11   9/19 or just an adjustment for the ADP
12   Broadridge issue?
13       A.    I believe I said in here it was just
14   an adjustment for the ADP Broadridge as well as
15   the clarification of the 944 accounts.
16       Q.    By the 944 accounts, you're referring
17   to the Woodland Bank?
18       A.    No.
19       Q.    No.  What are you referring to?
20       A.    944 accounts were other accounts
21   classified as customers that should have been
22   reclassified as non-customer.
23           MS. NEUHARDT:  I'm probably at a
24   halfway point if you want to take a short
25   break.

Page 299

1            D. McIsaac
2           MR. OXFORD:  Okay.  That would be
3    great.
4           MS. NEUHARDT:  There were two
5    things we wanted him to look for.
6           Let's go off the record.
7           THE VIDEOGRAPHER:  The time is 5:54.
8    This is the end of the tape labeled number
9    6.  We're going off the record.
10          (Recess.)
11          THE VIDEOGRAPHER:  This is the start
12   of tape labeled number 7.  The time is 6:23.
13   We are back on the record.
14          MS. NEUHARDT:  Mr. Oxford, based on
15   our conversation off the record, you have
16   some statements to put on the record about
17   what Mr. McIsaac found during the break?
18          MR. OXFORD:  Yes.  Mr. McIsaac, you
19   had referenced a stipulation in response to
20   some questions that Amy asked you in
21   connection with the FID issue?
22          THE WITNESS:  Right.
23          MR. OXFORD:  Could you turn to your
24   Rebuttal Report, Exhibit 1, please.
25          THE WITNESS:  Right.

Page 300

1            D. McIsaac
2           MR. OXFORD:  Can you identify what
3    Exhibit 1, please?
4           THE WITNESS:  The substitution
5    agreement.  I apologize for calling it a
6    stipulation.  Agreement.
7           MR. OXFORD:  Is that the document you
8    referred to when you were talking about the
9    stipulation?
10          THE WITNESS:  Yes, it was.
11          MR. OXFORD:  And can you also identify
12   for me what Exhibit 2 is to your Rebuttal
13   Report?
14          THE WITNESS:  Exhibit 2 is the summary
15   by account of all of the FID accounts and
16   the assets that they had in their accounts
17   as of the 19th of September.
18          MR. OXFORD:  Okay.  Thank you.  And
19   then the other issue that I just wanted to
20   clear up, if you could turn to your original
21   affidavit, which is Exhibit 691.
22          THE WITNESS:  Right, those were in
23   693.
24          MR. OXFORD:  Yes.  And these are not
25   tabbed, but I'd like you to find Exhibit 28,

Page 301

1            D. McIsaac
2    if you could.
3           THE WITNESS:  So much easier if it was
4    tabbed.
5           MS. NEUHARDT:  It's been discussed.
6           THE WITNESS:  Okay, yes.
7           MR. OXFORD:  Do you have Exhibit 28 in
8    front of you, sir?
9           THE WITNESS:  Yes, I do.
10          MR. OXFORD:  Was that the memorandum
11   you referred to in your earlier testimony
12   that was from Barclays Capital to
13   Broadridge?
14          THE WITNESS:  Right.  This was the
15   memo that went from Barclays to Broadridge
16   Capital.
17          MR. OXFORD:  Is it your understanding
18   this was an analysis or review that was
19   conducted by these individuals on behalf of
20   LBI or Barclays Capital?
21          THE WITNESS:  I believe they were
22   Barclays Capital employees.  They reviewed
23   LBI and I think at the same time they
24   conducted a similar review of Barclays
25   Capital reports to determine whether or not

Page 302

D. McIsaac

1    they were the same issue in the ADP or
2    Broadridge allocation matrix.
3         MR. OXFORD:  Okay.  Thank you.
4         MS. NEUHARDT:  Neil, I believe you
5    also said that you would provide for us --
6    you would review and identify for us the
7    materials on which you relied for his
8    testimony that the total amount of cash and
9    securities in the reserve account as of 9/19
10   was roughly 1.769 billion; is that correct?
11        MR. OXFORD:  Yes, we will undertake to
12   do that.
13        MS. NEUHARDT:  And that you would do
14   the same for Mr. McIsaac's testimony that
15   the assets at Chase were seized on September
16   19, 2008?
17        MR. OXFORD:  Yes.  Again, we'll
18   undertake to review the reliance materials
19   that were produced to you.
20   BY MS. NEUHARDT:
21        Q.   Do you still have your report opened
22   to Exhibit 28, which we were just discussing?
23        A.   I found it very quick.
24        Q.   Is it your testimony that this is

Page 303

D. McIsaac

1    your -- is the basis for your statement in
2    paragraph 18 of your rebuttal that Barclays
3    performed a partial recalculation of the reserve
4    formula to adjust for the discrepancies
5    discussed in this portion of your rebuttal
6    report?
7         A.   Yes, I believe on or about January
8    2009, the allocation report was rerun and the
9    adjustments were made to it.
10        Q.   But your basis for that statement,
11   that it was rerun in January, is not this
12   memorandum, is it?
13        A.   This is the memorandum I believe to
14   Broadridge pointing out the issues and
15   requesting I thought to be rerun.
16        Q.   But this does not state that Barclays
17   actually reran the calculation, does it?
18        A.   I don't believe it does, no.
19        Q.   Okay.
20        MR. OXFORD:  Amy, not to interrupt,
21   but it occurs to me that there was a
22   document I marked at Mr. Vinella's
23   deposition that might be the one your
24   looking for.

Page 304

D. McIsaac

1         MS. NEUHARDT:  We can talk about that
2    off the record, but that's --
3         MR. OXFORD:  Okay.
4         MS. NEUHARDT:  If he -- are you saying
5    that he relied on that document?
6         MR. OXFORD:  That may be the document
7    he relied upon.  I don't have it with me
8    today, but -- but I'm happy to review it and
9    let you know if that was what he relied
10   upon.
11        Q.   Okay.  And then you also referred to
12   Exhibit 2 to your original -- no, I'm sorry,
13   your rebuttal?
14        A.   Rebuttal.
15        Q.   Yes.  And can you tell me what Exhibit
16   2 is?
17        A.   Exhibit 2 is a schedule of all the FID
18   accounts and the assets in their accounts on
19   9/19, and these were the assets that were at
20   Chase.
21        Q.   And from whom did you receive this?
22        A.   From the financial advisors of the
23   Trustee.
24        Q.   And did you rely upon a non-redacted

Page 305

D. McIsaac

1    version of this document?
2         A.   I believe I did.  I believe it had the
3    names of the customers in there.
4         MS. NEUHARDT:  We would like that
5    document, Neil.
6         MR. OXFORD:  I'll take your request
7    under advisement.
8         Q.   And from this document you believe you
9    were able to determine that these were customer
10   assets?
11        A.   These are the account numbers for the
12   customers and they showed the ranges of where
13   the accounts were in the customer range.
14        Q.   Can you show me what on here is
15   telling you that?
16        A.   The redacted portion doesn't have the
17   account numbers.
18        Q.   The redacted portions.
19        We definitely need the unredacted
20   version.
21        Did you do any research to confirm
22   that there were no subordination agreements
23   associated with these accounts?
24        A.   These accounts were all listed as

Page 306

1          D. McIsaac
2 customers.  So, no, I did not do any
3 subordination -- review to see if any customers
4 in the FID subordinated their accounts to the
5 Trustee.  But if they did, then I don't know why
6 they would be locked up in a separate account at
7 Chase to the benefit of customers.
8          MS. NEUHARDT:  Strike the last part of
9 his answer as nonresponsive.  Okay.
10     Q.   I think we've followed up on
11 everything from the break.  I would like to turn
12 to your discussion of -- in your rebuttal
13 report, it's paragraphs 19 through 21; in your
14 original report, it is paragraphs 39 and 40; and
15 you refer to it as "Assets Subject to LBI
16 Administration."
17          What is your basis for stating that
18 the 439 million in assets that you have
19 identified are customers assets?
20     A.   These were assets in a box listed as
21 customer box, customer security -- customer no
22 lien account at LBIE for the benefit of LBI
23 customers.
24     Q.   Did you do any independent
25 investigation of that?

Page 307

1          D. McIsaac
2     A.   I reviewed the LBIE agreement that
3 said that they were holding account free of
4 lien.
5     Q.   When say LBIE you're referring to
6 L-B-I-E, right?
7     A.   Yes.
8          They give control location memos to
9 the SEC.
10     Q.   Okay.  Were you -- were you aware of a
11 general policy at LBI that they would include
12 LBIE customers assets -- I'm sorry, LBI customer
13 assets that were held by LBIE in their lockup
14 requirement calculation?
15     A.   I don't understand the question.  I'm
16 sorry.
17     Q.   Okay.  Well, do you know whether as a
18 matter of course LBI would in fact include in
19 its reserve calculation an adjustment for the
20 LBI customer assets that were held by LBIE?
21     A.   I saw nothing in the calculations that
22 led me to believe that they were not -- that
23 they were not considered them in a good control
24 location and, therefore, putting a credit in the
25 reserve formula.

Page 308

1          D. McIsaac
2     Q.   Did you ask -- did you speak to
3 anybody about this issue?
4     A.   I did not speak to any Lehman or
5 Barclays employees.
6     Q.   Okay.  If in fact there was an
7 adjustment as a matter of course at LBI -- for
8 LBI customer assets held at LBIE, would that
9 change your opinion in any way?
10          MR. OXFORD:  Objection to form.
11     A.   If the 439 that I believe allocated to
12 a good control location and, therefore, was not
13 put into the formula, if somebody could show me
14 the adjustment putting that $439 million into
15 the formula, I guess I would change my opinion,
16 but I'm not sure why they would get a good
17 control letter and then do that, but ...
18     Q.   Your testimony is, though, that you
19 don't know one way or the other, correct?
20     A.   I did not see anything to that.
21     Q.   All right.  Let's turn to your
22 discussion of the OCC deposit, which is in your
23 rebuttal report, paragraphs 24 and 25 on pages
24 11 and 12, and in your original report it is
25 paragraph 45 on page 17.

Page 309

1          D. McIsaac
2          Now, is a broker-dealer able to
3 withdraw and transfer margin at the OCC without
4 funding the reserve account at the time of the
5 withdrawal?
6     A.   Yes.
7     Q.   Okay.  Let's go, earlier today we
8 talked about the statement in paragraph 13 of
9 your rebuttal affidavit that the only relevant
10 point in time for the purpose of determining the
11 accuracy of LBI's reserve calculation is
12 September 19, 2008?
13     A.   That's correct.
14     Q.   Do you believe that that principle
15 applies to your opinion about the OCC deposit?
16          MR. OXFORD:  Objection.  Form.
17     A.   I believe that opinion applies to it.
18     Q.   Okay.  Had the OCC margin deposit that
19 you refer to in your reports been withdrawn as
20 of September 19?
21     A.   No, but in previous discussions
22 earlier this morning on my expert report, the
23 Barclays lawyers were assuming that the margin
24 was being transferred to LBI as of the 17th, so
25 if -- if to -- I'm sorry, to Barclays as of the

Contains Highly Confidential Portions

Page 310

D. McIsaac

1       17th.
2           If LBI had agreed to transfer that
3   money, then I would assume that it was not a
4   good debit in the formula because it was
5   impaired.
6       Q.   Well, by that logic, as of the 17th,
7   hadn't LBI agreed to transfer, for example, all
8   of its private investment management accounts to
9   Barclays as of a later date?
10          MR. OXFORD: Objection. Form.
11      A.   I believe they determined what they
12  were going to transfer.  Until you transfer the
13  customers' assets and the customer accounts,
14  they're still included in the reserve formula
15  until such time as you can transfer them.
16          If you have impeded an asset, then I
17  don't think you could put it into the formula,
18  just as if I had a customer receivable that
19  wasn't fully secured, I wouldn't put it in the
20  formula.
21          So if this deposit was sold to
22  somebody else prior to the 19th, then I think it
23  probably doesn't belong in the formula as of the
24  19th.

Page 311

D. McIsaac

1       Q.   Now, do you know whether the contract
2   had been approved by the court prior to -- well,
3   you said the 17th.  Do you know if that contract
4   had been approved by the court as of the 17th?
5       A.   I don't know when the contract was
6   approved.  I believe it was sometime after the
7   fact, but if, as of the 17th, you agreed to sell
8   it and gave up your rights to that deposit, then
9   I don't know if that would be a good debit in
10  the formula.  And I'm just going by what
11  everybody was saying, that the -- they agreed to
12  sell the margin prior to that and that thought
13  process.
14      Q.   Could you show me -- well, are you
15  basing your opinion on anything in Rule 15c3-3?
16      A.   I believe there are many parts of 3-3
17  that would talk about unsecured receivables and
18  how they would not go into the formula.  This is
19  allowed in the formula because it's coming from
20  a clearing org. receivable.  If you have given
21  up your rights to that receivable, then I don't
22  think you would include it in the formula.
23      Q.   And is your position that LBI had
24  given up its rights as of the 17th prior to

Page 312

D. McIsaac

1   court approval?
2           MR. OXFORD: Objection. Form.
3   Misstates the witness's testimony.
4           You can answer the question again.
5       A.   No, my opinion is if it's determined
6   that that margin was sold prior to the 19th, or
7   as of the 19th, then it does not belong as a
8   debit in the formula.
9       Q.   Is your opinion that a contract that
10  has not yet been closed nonetheless affects the
11  15c3-3 calculation?
12      A.   My opinion is if you tell me you have
13  impeded that asset and you -- you have
14  effectively given up your right to that asset, I
15  would say that asset's not a good asset in the
16  formula.  And that's all I'm saying.  I'm not --
17  I don't know when the contract was sold.
18          I'm being told, and people are
19  negotiating that -- and I think this would be
20  decided by the court eventually -- that the
21  agreement sold the margin to Barclays as of the
22  17th if that's the date of the agreement and
23  that's when that account -- that's when that
24  asset stopped becoming I believe a good asset

Page 313

D. McIsaac

1   for LBI for reserve formula purposes.
2           They have given up their right to
3   receive that asset.  I don't think they can put
4   a debit in there.  The same as if I told a stock
5   borrow counterparty don't give me your money
6   back, I don't care.  It wouldn't go in the
7   formula.
8       Q.   If it were to turn out that the --
9   they had not given up their rights until such
10  time as the court approved of the contract,
11  would that change your opinion?
12          MR. OXFORD: Objection. Form.
13      A.   I don't know what the date would be
14  that they agreed to the contract.  I -- this --
15  I think this will be going in front of the court
16  eventually and the court will decide whether or
17  not the contract stays -- states that that was
18  being sold as at that point in time.
19          If that's the point in time I believe
20  the contract was effective or signed
21  theoretically agreed to as of the 19th, I don't
22  know if it matters when it's signed.  If I have
23  agreed to impede an asset at any point in time,
24  it doesn't matter when I sign it.  I think I

Page 314

D. McIsaac

1  
2  would not include that debit in the reserve
3  formula.
4      Q.   So even if a court were to determine
5  that the contract was not effective until it
6  were approved, it's nonetheless your opinion
7  that the asset would be impeded as of the time
8  they signed?
9      A.   As of the time that somebody agreed
10  that that asset was not an asset of theirs, that
11  they have sold -- they have given that asset
12  away, they sold that asset, I can't see how that
13  asset would be good for the -- as a debit in the
14  reserve formula.
15      Q.   Do you believe LBIE -- sorry, LBI
16  continued to be able to withdraw from that OCC
17  account after the 17th?
18      A.   I believe there were some restrictions
19  at the OCC on the 19th that they could not
20  withdraw moneys out of there on the 19th.
21      Q.   The restrictions were imposed by the
22  OCC, correct?
23      A.   Yes, they were.
24      Q.   They were not imposed by Barclays?
25      A.   I don't think Barclays imposed them,

Page 315

D. McIsaac

1  
2  no.
3      Q.   So it's not the contract that was
4  preventing them from withdrawing assets after
5  the 17th?
6      A.   As I stated earlier today, you weren't
7  here, that I would have anticipated the purchase
8  agreement to have some indication that they were
9  selling margin and at that point in time to talk
10  about the amount of margin that was being sold.
11      But once you've given up that right,
12  whether it be 500 million for a billion, I don't
13  think you can put it in the formula anymore.
14      Q.   But they could withdraw it from the
15  OCC account?
16      A.   And if it wasn't in the OCC account,
17  it wouldn't be a debit in the formula either.
18      Q.   I understand, but I'm trying to
19  understand. Essentially you're saying that the
20  asset was impaired as of the date the contract
21  was signed; is that correct?
22      A.   I'm saying if the -- if the court
23  determines that that is what happened on the --
24  as of the Asset Purchase Agreement and that the
25  margin was being sold by Lehman to Barclays,

Page 316

D. McIsaac

1  
2  that that debit should not be in the formula
3  because they have given up their right to
4  receive that debit and it is no longer there for
5  the protection of customers.
6      Q.   Yet you're also saying you
7  nonetheless had the right to withdraw those
8  funds prior to the -- or after the 17th from the
9  OCC?
10      A.   And had they withdrawn those funds,
11  they wouldn't be in the formula.
12      Q.   But they wouldn't be in the formula
13  for a different reason, correct? Because they
14  had been withdrawn?
15      A.   That's right, and I don't --
16      Q.   And not because --
17      A.   And I don't know if the agreement -- I
18  didn't see anything in the agreement stipulated
19  that the amount that was there as of the 17th is
20  what was being sold, if the amount was there at
21  the end of the day is what was being sold or if
22  anything was being sold.
23      If, if it's determined that that $507
24  million was being sold and that it was impaired
25  by the 19th by the thought process of selling

Page 317

D. McIsaac

1  
2  it, I don't think the debit should have been in
3  the formula.
4      Q.   And yet you nonetheless believe that
5  if they also contracted to transfer tens of
6  thousands of customer accounts in that same
7  contract, that that transfer of customer
8  accounts should not be included in the 15c3-3
9  calculation?
10      MR. OXFORD: Objection.
11      A.   No, I said the --
12      MR. OXFORD: Objection to form.
13      A.   The customer accounts should be
14  included in the calculation until such time as
15  they're transferred. If you're putting a debit
16  in the formula, effectively reducing your lockup
17  requirement because you have a good asset,
18  that's what I'm saying, if that was impeded, I
19  don't believe there should have been a debit in
20  the formula.
21      Q.   If there's no adjustment to the debit
22  after withdrawal, why is an adjustment by an
23  agreement to withdraw on a later date required?
24      A.   As far as I'm concerned, the agreement
25  should have stipulated if there was an asset to

Page 318

D. McIsaac

1    be sold, what amount was to be sold, or what
2    amount at what point in time should have been
3    sold.
4        What I am saying if, if in fact the
5    court determines that that was a valid
6    transaction and that LBI gave up its rights to
7    this debit, that it should not have been in the
8    formula as of the 19th.
9    Q.    And do you know whether the contract
10   stipulated an amount to be sold or at what point
11   in time to determine the amount to be sold?
12   A.    No, I did not.
13   Q.    So if in fact the amount was not
14   limited to $507 million or the date as of which
15   the transfer would be made was later than 9/19,
16   does your opinion change in any way?
17       MR. OXFORD:  Objection.
18   A.    If at any point --
19       MR. OXFORD:  Objection to the form.
20   A.    Sorry.
21       If at any point in time that was
22   determined that they had given up their rights
23   to that asset, any calculation done from that
24   point in time I do not believe should have

Page 319

D. McIsaac

1    included that asset as a debit in the formula.
2    Q.    Can you show me where in the either
3    FINRA or SEC Rule 15c3-3 it requires an
4    adjustment prior to the delivery of the assets
5    to another party.
6    A.    I don't believe there's anything in
7    3-3 that talks to this.  This is my opinion that
8    if you put a debit in the formula, it needs to
9    be realizable.  It has to be secured.  The
10   security for this would be that it's at the OCC
11   and they will return it to you when not needed.
12   Q.    Okay.  So you do not believe there's
13   anything in 3-3 that would require that?
14   A.    I don't think there's anything in 3-3
15   that talks to an OCC deposit being sold
16   during -- prior to a calculation being finalized
17   and how it should be accounted for in the
18   formula.
19   Q.    Okay.  Is there anything in the FINRA
20   interpretations of 3-3 that would cover this
21   issue?
22   A.    There's nothing that will cover this
23   issue.  There are -- there are issues within 3-3
24   and I will gladly dig them out eventually, we

Page 320

D. McIsaac

1    don't have time now, to show you that debits
2    have to be secured.  I can't put a debit in for
3    a stock borrow if it's not secured.  I can't put
4    any amount in that's not secured.
5    Q.    Have you heard of a Transfer and
6    Assumption Agreement, TAA?
7    A.    Yes.
8    Q.    Let me go back.  Until such time as
9    the account would have actually been transferred
10   to Barclays, wouldn't OCC still owe margin to
11   LBIE -- to LBI?  My apologies.
12   A.    LBI would have been the -- the
13   clearing firm at the OCC.  If at any point in
14   time I've given up my rights to that, all I'm
15   saying is I don't think it's a good debit in the
16   formula.  Whether or not OCC would give it back
17   to us or not, or give it back to LBI or not, at
18   any point in time when that sale was
19   consummated, they wouldn't get it back.
20       So putting a debit in the formula,
21   knowing that you cannot collect it, I think is
22   not in compliance with the rules.
23   Q.    And yet you acknowledge that LBI could
24   have withdrawn that money after the 17th from

Page 321

D. McIsaac

1    the OCC account?
2    A.    I --
3        MR. OXFORD:  Objection.  Form.
4    A.    Yes, I acknowledge they could have
5    done that.
6    Q.    Then how is that money less secured?
7    A.    Because as of the 19th -- you have one
8    agreement that you're telling me that they --
9    that they get the margin, and all I'm saying is
10   if Barclays believes that that agreement means
11   that they get the margin and the judge says,
12   yes, that was a binding agreement at that point
13   in time and they get the margin, all I'm saying
14   is that then that debit was impeded and I can't
15   believe that you would put a debit in the
16   formula that is impeded.  And that's all.  If
17   you don't have -- if you cannot have the right
18   to collect it, you shouldn't put the debit in
19   there.
20   Q.    I believe I had asked if you were
21   familiar, if you had heard of the TAA?
22   A.    Yes.
23   Q.    Okay.  Now, were you shown that
24   earlier today?

| Page 322 | Page 323 |
|---|---|

**Page 322**

D. McIsaac

1
2    A.    Yes, I was.
3    Q.    Do you recall whether or not that
4    agreement was signed before or after September
5    19?
6    A.    I believe it was signed on -- either
7    by some people on the 20th and some people
8    possibly on the 22nd.
9    Q.    If the court were to hold that it was
10   the TAA -- if the court were to hold that it was
11   the TAA that effected Barclays' right to the
12   margin deposits, would it still be your opinion
13   that the calculation as of the 19th should have
14   been adjusted?
15        MR. OXFORD:  Object to the form.
16   Assumes facts not in evidence.
17        MS. NEUHARDT:  I believe as an expert
18   I'm entitled to ask him hypotheticals.
19        THE WITNESS:  Is it okay to answer?
20        MR. OXFORD:  You can answer.
21   A.    I understand it might not have been
22   signed at a point in time.  I believe the OCC
23   was looking for it to be signed as of the 19th.
24   There was all kinds of e-mails that I was shown
25   before stating that they were looking for it to

**Page 323**

D. McIsaac

1
2    be signed to transfer it over effectively on the
3    morning of the 22nd to Barclays.
4        Again, that TAA is not a contract.
5    That TAA I believe is an agreement between
6    Barclays, Lehman, and the OCC to transfer
7    Lehman's contract and in the Lehman name to
8    Barclays.  It's not the sale agreement for
9    determining when that agreement was done or
10   signed.  It's a vehicle used to transfer -- for
11   the OCC to transfer the account name from Lehman
12   to Barclays.
13   Q.    That entire answer was nonresponsive.
14   I move to strike it.
15        Please answer my question, which is
16   that if the court were to hold that it was the
17   TAA that effected Barclays' right to the margin
18   deposits, would it still be your opinion that
19   the calculation as of the 19th should have been
20   adjusted?
21   A.    I would have to determine or review
22   what the court's reasoning why the TAA was the,
23   in fact, the agreement between LBI and Barclays
24   that sold that asset.  Just -- I don't -- it's a
25   hypothetical and I don't know.  I don't consider

| Page 324 | Page 325 |
|---|---|

**Page 324**

D. McIsaac

1
2    that a sale agreement.
3    Q.    If the court held that that was the
4    agreement that impaired the asset, and it was
5    not signed until the 20th or perhaps the 22nd,
6    would it change your opinion that the
7    calculation --
8    A.    No, it would not.
9    Q.    Let me finish my question.
10        -- that the calculation as of the 19th
11   should have been adjusted?
12   A.    No, it would not.
13   Q.    And why?
14   A.    Because it was negotiated, started
15   negotiating it on the 19th, and I don't think
16   you should put an asset -- a debit in the
17   formula that you have impeded, whether or not
18   you do it on Saturday or Sunday.
19   Q.    So it is your testimony that the mere
20   start of negotiations impairs the asset?
21   A.    That it is impaired because prior to
22   the next business day, I don't have that, I'm
23   not allowed to have that asset anymore.
24   Q.    Because you started the negotiations?
25   A.    Because it was finalized by the next

**Page 325**

D. McIsaac

1
2    business day, by the morning of the next
3    business day, which effectively, to me, it was
4    done as of the close of business the 19th.
5    Q.    So you're saying that even though --
6    even if an agreement is reached after the close
7    of business, it would affect the calculation of
8    that day rather than the calculation of the next
9    business day?
10        MR. OXFORD:  Objection.  Form.
11   A.    I believe that if you've sold the
12   asset prior to you needing to make your lockup,
13   the requirement, and you have impeded that asset
14   in any way, shape or form, that you should not
15   include it in the formula.
16        If that asset -- if that agreement, if
17   the court finds that that agreement is what sold
18   the asset and that was signed as of the 21st or
19   22nd, it was signed before the opening of
20   business the next day, so as effectively on the
21   19th they would not have had a receivable.
22   Q.    Well, perhaps I misunderstand your
23   earlier testimony, but I thought you said that
24   the calculation would be done on Friday, the
25   19th, and in the ordinary course of business,

Page 326

D. McIsaac

1         D. McIsaac
2 this would be done every Friday?
3   A.  Uh-huh.
4   Q.  So how would an event that happened
5 after the calculation have to be retroactively
6 included in the prior calculation?
7   A.  Because I'm only saying -- because
8 it's being done and agreed to prior to the time
9 that the calculation is finalized that it should
10 be -- should be reviewed in that respect.
11   Q.  What portion of SEC Rule 15c3-3 are
12 you relying on for that opinion?
13   A.  SEC Rule 3-3 talks about secured
14 assets, and you cannot put a customer debit in
15 the formula unless it's fully secured.
16   Q.  I just want to make very clear that it
17 is your position that a contract that was only
18 being negotiated prior to the close of business
19 on Friday, nonetheless if it reached agreement
20 prior to the opening of business the next
21 business day, it should -- it would result in a
22 retroactive recalculation of the requirement --
23 of the calculation done on Friday?
24      MR. OXFORD:  Is that -- that's a
25 statement, Amy.  Do you have a question?

Page 327

D. McIsaac

1         D. McIsaac
2   Q.  Sorry.  I did put the "it" before the
3 "is."
4      Is it your position that a contract
5 that is only being negotiated prior to the close
6 of business on Friday but that is closed prior
7 to the opening of business on Monday would
8 require a retroactive recalculation of the
9 calculation done Friday?
10   A.  My opinion is that I don't believe the
11 TAA is -- is the contract.
12   Q.  I'm not asking you whether or not the
13 TAA is the contract.  I'm asking you whether or
14 not --
15   A.  I'm trying to finish my thought.
16      MR. OXFORD:  Amy, we're all trying to
17 get out of here.  If you could let Mr.
18 McIsaac finish his answer --
19      MS. NEUHARDT:  I'm going to ask it
20 again because he's clearly not answering the
21 question.
22      MR. OXFORD:  Well, it's very hard for
23 you to reach that conclusion if you don't
24 let him finish his answer.
25   Q.  But if you're going to tell me that

Page 328

D. McIsaac

1         D. McIsaac
2 the TAA is not the contract, I'll ask it again.
3   A.  I believe that the TAA impedes the
4 asset as of the 19th.
5   Q.  Please show me what portion of 15c3-3
6 justifies that conclusion.
7   A.  I -- I don't believe you'll find
8 anything in 3-3 that will say that, but I
9 believe that the asset is impeded as of the 19th
10 if you have agreed to sell it and not receive
11 any money back in return for it that you can put
12 into the customer debit, and that's all I'm
13 saying.
14   Q.  Is there anything in FINRA that
15 supports that?
16   A.  I don't believe there's anything other
17 than talking about secured assets.
18   Q.  Let's move on to what was in your
19 original affidavit at paragraphs 46 to 49 and
20 you refer to as customer property seizure during
21 the transfer process.
22   A.  Uh-huh.
23   Q.  Now, as I understand your opinion in
24 your original affidavit, your basis for
25 identifying this 82 million was that LBI's RISC

Page 329

D. McIsaac

1         D. McIsaac
2 system did not feed into LBI's Rule 15c3-3
3 calculation; is that correct?  And I'm looking
4 at paragraph 47.
5      MR. OXFORD:  Object to the form.
6   A.  Yes, I think I say here that the RISC
7 system doesn't automatically feed the 3-3
8 calculation.
9   Q.  Have you since learned that that is
10 incorrect?
11   A.  No, I've been told and informed that
12 the RISC system is reviewed by personnel who
13 supply the preparers the debit and credit
14 balances for customer accounts to be included in
15 the formula.
16   Q.  Who did you speak to that informed you
17 of that?
18   A.  The Trustee's financial advisors.
19   Q.  Is that Deloitte?
20   A.  Yes, it is.
21   Q.  Did you speak to anyone who had been
22 an LBI employee to confirm that to be true?
23   A.  No, I have not.
24   Q.  Did you ever speak to Peter Tennyson?
25   A.  No.

Page 330

D. McIsaac

1
2    Q.    While she gets this document, in your
3    rebuttal affidavit, paragraphs 22 to 23, you
4    discuss the same issue.  You do not mention the
5    RISC system as a basis for your report in the
6    rebuttal affidavit.
7    A.    Uh-huh.
8    Q.    Why is that?
9    A.    I think we tried to further clarify
10   that these were moneys that were -- the accounts
11   were debited as if the customers were paid.  The
12   customers were never paid, so an adjustment had
13   to be made to -- to, in the normal course of
14   business, you reconcile your bank accounts, you
15   look at items that you thought were paid that
16   weren't paid, and you would make the adjustments
17   for those.
18       These moneys were never paid to the
19   customers so you effectively still have a
20   payable to the customer.
21   Q.    Okay.  And now, what is your basis for
22   saying these moneys were never paid to the --
23   paid to the customers?
24   A.    What I have seen is that the debits,
25   they debited their accounts, and there was no

Page 331

D. McIsaac

1
2    adjustment coming from the RISC system that I
3    was shown adjusting for this $82 million.
4    Q.    Do you have any other basis for saying
5    the moneys were never paid out?
6    A.    No, that is it.  I think the customers
7    actually made claims, possibly to the estate,
8    that they weren't paid their moneys.
9    Q.    If it turns out that the RISC system
10   did in fact feed into the 15c3-3 calculation,
11   would that change your opinion in any way?
12   A.    Not if these amounts were not included
13   as payables to the customers at that point in
14   time.
15   Q.    Did you do any investigation of
16   whether or not items within the RISC system
17   would or would not have been fed into the 15c3-3
18   calculation?
19   A.    I was informed that the debits and
20   credits to be included in the reserve formula
21   off of the RISC system were provided by
22   personnel responsible for the RISC system
23   independent of anything else.
24   Q.    Okay.
25   A.    They provided the adjustments to the

Page 332

D. McIsaac

1
2    formula for that day.
3    Q.    And this was Deloitte that informed
4    you of that?
5    A.    Yes.
6    Q.    We may have to come back to that when
7    she comes back.
8        Okay.  Now, your original affidavit
9    discusses a proposed adjustment of 2.3 billion
10   allegedly owed to LBIE's customers, correct?
11   A.    Uh-huh.
12   Q.    You do not discuss that in your
13   rebuttal report, correct?
14   A.    That's correct.
15   Q.    Okay.  Why is that?
16   A.    I believe the Trustee's advisor -- the
17   Trustee has removed that and put that as under
18   investigation until such time as it can be
19   concluded whether or not it is a viable
20   liability to the customers.
21   Q.    Okay.  Do you continue to have an
22   opinion on whether or not the adjustment is
23   necessary?
24   A.    If it's determined that there is a
25   liability to the omnibus customer account, yes,

Page 333

D. McIsaac

1
2    it should then go in the formula.  It was in the
3    records at that point in time as a payable and
4    was removed from the formula.
5    Q.    Okay.  But you do not know as of today
6    whether or not there was in fact a liability to
7    the omnibus customer account?
8    A.    No, that's why it's still under
9    investigation.
10   Q.    Did you believe that it was not still
11   under investigation at the time of your October
12   5 affidavit?
13   A.    I believe we -- I'll have to look at
14   my affidavit, but I believe we sort of alluded
15   to the fact that it's still being investigated,
16   and if such time it was found not to be true, we
17   wouldn't require it, but I'll have to look.
18       If you look at item -- at paragraph
19   44, I basically say I was not able to see any
20   documents to make this adjustment, and until
21   such time as we saw it, that it should be held
22   until we can determine if it should actually be
23   owed.
24   Q.    Well, your October 5 report appears to
25   be divided into, starting on page 13, items --

Contains Highly Confidential Portions

Page 334

D. McIsaac

1 you phrase it as items omitted or incorrectly
2 reported in the reserve formula, and that goes
3 through the top of page 19, and then on 19,
4 number 2, is items currently under
5 investigation, and then you list a number of
6 other items?
7   A.   Uh-huh.
8   Q.   Why did you put the 2.3 billion in
9 your first category of items discussed in your
10 original affidavit as opposed to the category of
11 items under investigation?
12   A.   Because at this point in time we had
13 shown -- been shown no documents that would
14 prove that this credit should be -- should come
15 out.  Subsequent to that, I believe the Trustee
16 has had some discussions with people and have
17 decided to remove it until such time as I've
18 seen those documents.  I'm just not putting it
19 in my affidavit until I can see something that
20 proves it or that the claim is -- the claim as I
21 believe is still out there from LBIE and until
22 such time as it can be proven incorrect.
23   Q.   So in October when you did your
24 initial affidavit, you assumed as true what the

Page 335

D. McIsaac

1 Trustee gave you?
2   A.   I saw the -- the credit coming out of
3 the formula, an adjustment to the formula for
4 the $2.3 billion.  There was no support for that
5 credit coming out of the formula.
6         Subsequent to that, I believe the
7 Trustee and his advisors may have additional
8 information that they are investigating and they
9 decided to take it out of their motion.
10   Q.   In October did you investigate whether
11 or not the amount at issue was related to an
12 LBIE customer account or proprietary account?
13   A.   It was sitting in the LBIE omnibus
14 customer account as a payable.
15   Q.   If it was in the customer account, did
16 you investigate whether or not the obligation of
17 the customer had been satisfied prior to LBIE
18 filing for administration?
19   A.   There was an -- I don't know if that
20 has anything to do with it.  What does LBIE --
21 this is owed to LBIE for its customers.
22   Q.   All right.  Then if it was a customer
23 account, did you investigate whether or not the
24 obligation to the customer was satisfied prior

Page 336

D. McIsaac

1 to 9/19?
2   A.   We saw no proof that that
3 adjustment -- there was no proof behind that
4 adjustment that we could see at that point in
5 time that I was shown or could be found
6 supporting taking the credit out of the formula.
7   Q.   Did you investigate whether or not the
8 obligation to the customer was satisfied prior
9 to 9/19?
10   A.   I don't -- the customer is LBIE.
11   Q.   The underlying customer?
12   A.   The underlying customer is LBIE's
13 responsibility.  I don't think it's LBI's
14 responsibility.
15   Q.   So is your answer no?
16   A.   No.
17   Q.   Have you conducted any further
18 analysis on this issue since the time of your
19 October 5 affidavit?
20   A.   No.
21   Q.   Now, we referred, actually, to Section
22 2 of your original affidavit as items currently
23 under investigation?
24   A.   Uh-huh.

Page 337

D. McIsaac

1   Q.   The first one you identify on page 19
2 starting with paragraph 51 is a Chase Bank
3 overdraft.  Have you done any
4 investigation on this matter since your October
5 5 report?
6   A.   No.
7   Q.   Have you done any further
8 investigation on any of the other --
9   A.   No.
10   Q.   -- issues identified?
11   A.   No.
12   Q.   Do you know of any SEC regulation that
13 would prevent Lehman Brothers Holding Company
14 from paying an amount to Barclays that was equal
15 to the amount held in the reserve account?
16         MR. OXFORD:  Objection.  Vague.
17   A.   I -- I am not fluent in all SEC rules
18 as they affect holding companies.
19   Q.   Okay.  Have you done any investigation
20 as to the propriety of the amount of customer
21 claims that have been filed against the estate?
22   A.   No, I have not reviewed the customer
23 claim process.
24   Q.   So you have no opinion on how much the

Page 338

D. McIsaac

1
2 estate will eventually have to pay out?
3     A.   No, I have not seen that number at
4 this point in time.
5         MS. NEUHARDT: Okay. Let's take a
6 five-minute break. I may be through.
7         THE VIDEOGRAPHER: The time is 7:09.
8 We are going off the record.
9         (Recess.)
10         THE VIDEOGRAPHER: The time is 7:19.
11 We're back on the record.
12 BY MS. NEUHARDT:
13     Q.   Mr. McIsaac, right before we broke,
14 you informed me that you have not conducted any
15 further investigation relating to the items
16 listed in Section 2 of your original affidavit
17 as items currently under investigation?
18     A.   That's correct.
19     Q.   Have you been informed of any progress
20 or findings of the financial advisors relating
21 to those items under consideration?
22     A.   I believe in my rebuttal report I make
23 a statement to the fact that they have to date
24 have found nothing else that would impact the
25 formula.

Page 339

D. McIsaac

1
2     Q.   And do you know -- did they inform you
3 whether or not they have completed their
4 investigation as to any of those matters?
5     A.   I don't believe they have finished it.
6     Q.   Okay. And we discussed earlier that
7 if a calculation is done on a Friday in the
8 ordinary course of business and an additional
9 deposit is required, that deposit would be done
10 the following Tuesday at 10 A.M.; is that
11 correct?
12     A.   By the following Tuesday at 10 A.M.
13     Q.   No later?
14     A.   Yes.
15     Q.   Okay. In that situation, is a
16 broker-dealer in violation of SEC rules at any
17 time prior to 10 A.M. on the following Tuesday?
18     A.   In violation of SEC rules regarding
19 what? They could be --
20     Q.   Are they in violation of any aspect of
21 SEC Rule 15c3-3?
22     A.   As it pertains to that deposit, no.
23 There could be other reasons that they're in
24 violation of rules.
25     Q.   But as it pertains to that deposit,

Page 340

D. McIsaac

1
2 they would not be in violation as of that
3 Friday?
4     A.   Correct.
5     Q.   Okay.
6         MS. NEUHARDT: I have no further
7 questions. None from anybody else?
8         THE VIDEOGRAPHER: The time is 7:20.
9 This is the end of today's deposition.
10 We're going off the record.
11         oOo
12
13
14
15
16
17
18         _____
19         DANIEL McISAAC
20 Subscribed and sworn to
   before me this    day
21 of     2010.
22
23 _____
24
25

Page 341

1
2         CERTIFICATE
3 STATE OF NEW YORK )
              : ss
4 COUNTY OF NEW YORK)
5     I, Kathy S. Klepfer, a Registered
6 Merit Reporter and Notary Public within and
7 for the State of New York, do hereby
8 certify:
9     That DANIEL McISAAC, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23     In witness whereof, I have hereunto
24 set my hand this 7th day of April, 2010.
25         ------------------------------

Page 342

1
2                    INDEX
3   TESTIMONY OF D. McISAAC:              PAGE
4   Examination by Ms. Bloomer  ................     5
5   Examination by Ms. Neuhardt ...............   241
6
7   EXHIBITS:                      PAGE
8   Exhibit 684, Expert Report of Daniel McIsaac     6
9   Exhibit 685, Declaration of Daniel Dziemian      47
10  Exhibit 686, Deposition of Gary Romain          50
11  Exhibit 687, Trustee's Memorandum in Further   121
12  Support of His Motion for Relief
13  Exhibit 688, Deposition of Bart McDade         178
14  Exhibit 689, Deposition of James Kobak         219
15  Exhibit 690, a document bearing Bates Nos.     235
16  CGSH33921 through 922
17  Exhibit 691, Affidavit of Daniel McIsaac       240
18  Exhibit 692, Supplemental Affidavit of Daniel  240
19  McIsaac
20  Exhibit 693, Rebuttal Report of Daniel McIsaac 240
21  Exhibit 694, Rule 15c3-3                        267
22  Exhibit 695, Customer Protection - Reserves    291
23  and Custody of Securities SEA Rule 15c3-3
24  Exhibit 696, Declaration of Robert Martini     297
25

Page 343

1
2              INDEX (Cont'd.)
3   REQUESTS FOR PRODUCTION:
4   Page 257, Line 15
5   Page 302, Line 5
6   Page 302, Line 14
7   Page 305, Line 5
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 344

1
2   NAME OF CASE:  In re Lehman Brothers
3   DATE OF DEPOSITION:  April 6, 2010
4   NAME OF WITNESS:  Daniel McIsaac
5   Reason Codes:
6       1. To clarify the record.
        2. To conform to the facts.
7       3. To correct transcription errors.
8   Page _____ Line _____ Reason _____
    From _____ to _____
9
    Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
    From _____ to _____
12
    Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15
    Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
    From _____ to _____
18
    Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
    From _____ to _____
21
    Page _____ Line _____ Reason _____
22  From _____ to _____
23  Page _____ Line _____ Reason _____
    From _____ to _____
24
25      _____

Contains Highly Confidential Portions

**A**

**ability (8)**
27:17 36:7 139:14
147:23 148:8
188:10 282:7
289:10
**able (23)**
23:13 27:23 54:18,23
56:3 85:9 101:13
102:2 111:21
118:18 132:20
144:25 148:10
149:7,8 185:11
193:9 247:16
257:11 305:10
309:2 314:16
333:19
**ABN (7)**
12:5,18 13:13 15:21
15:25 17:9 258:16
**ABN's (1)**
19:25
**abreast (1)**
27:19
**Absolutely (3)**
12:12 242:10 291:7
**academic (2)**
100:4 101:5
**accept (3)**
59:7 88:21 116:14
**accepted (2)**
206:16 210:16
**accepts (1)**
43:23
**access (8)**
281:25 282:2,5 283:5
283:11 284:3
288:23 289:4
**accessible (3)**
75:20,24 186:5
**accommodate (1)**
6:17
**accomplishes (1)**
207:22
**account (115)**
10:17 28:3,17 31:8,16
33:11,13,24 34:19
35:12,24 36:8 42:2
43:12,16,24 44:2,4
44:19 48:13,17,25
49:3,9,16 50:4
53:14 60:18,22
73:17 80:6 85:12
86:22 88:19 90:22

111:10 114:21,23
115:14,16,19
117:19 118:7
120:20 124:10,12
125:12 133:13,20
133:22 134:12
144:4 156:15 173:2
173:5 180:9,21
183:23 186:22
188:18 190:21
191:7 192:15
199:20 228:25
233:10 247:14
259:2,9,17,18,22
260:3,4,6,6 262:2
263:2,4 264:10
268:16 272:9 279:4
279:10 281:17
286:12 288:3,8
290:11 291:18
295:18,18 300:15
302:10 305:12,18
306:6,22 307:3
309:4 312:24
314:17 315:15,16
320:10 321:2
323:11 332:25
333:7 335:13,13,15
335:16,24 337:16
**accounted (1)**
319:18
**accounting (6)**
49:17 50:4 51:12 52:2
245:23 248:24
**accounts (156)**
17:20 18:10,11,15
19:19 28:21,22
29:17 42:22 43:10
43:17,19 44:9,11,17
49:8,12 60:4 61:15
61:17,19,24,25
71:19 74:10 79:14
84:5,7,9,13 85:6
89:8 100:2 106:12
106:18,25 107:6,10
107:22,25 109:19
109:22 110:18,21
111:13 113:25
120:22,23 124:16
124:24,25 125:2,17
125:23 126:13,24
127:23 128:2,5,5,6
128:13,14,15,23
130:11,16,19,20

132:16 144:7,15
170:23 171:11
173:6 185:20
189:12,20 190:8,9
191:20 192:17,24
194:8 198:12,13,17
205:10,19 224:14
228:21 232:23
234:8,12,18,21
236:12,14,17,23
237:10 247:12
259:21,25 260:9,20
262:4,7 274:4,9
275:16 278:18
279:3,8,10,10,12,17
281:18 282:2,4,9,14
282:20,25 283:8,11
283:17,19 284:25
285:3,7 288:24
289:20 292:18
298:15,16,20,20
300:15,16 304:19
304:19 305:14,24
305:25 306:4 310:9
310:14 317:6,8,13
329:14 330:10,14
330:25
**accuracy (8)**
78:10 147:18 148:5
265:10 275:13,23
279:14 309:11
**accurate (1)**
86:8
**accurately (1)**
21:5
**acknowledge (3)**
173:25 320:24 321:5
**acknowledged (2)**
172:20 286:16
**acquire (6)**
21:23 88:23 89:19
108:23 152:18
208:19
**acquired (11)**
12:4,17,17 17:5 18:12
21:21 150:20
202:14,18,20
258:12
**acquirer (10)**
59:14 112:4 113:7
117:8 152:15 155:2
189:20 190:24
212:14 213:13
**acquirers (1)**

112:2
**acquiring (21)**
59:22,22 94:20 96:8
132:23 153:6,13
156:4 157:7,18,23
158:15,18,21,22
159:4,7,11,18
162:15 169:5
**acquisition (19)**
14:15 15:13,20,24 17:8
19:21,22 20:11
24:15 37:11,24
51:12,15 67:9 68:8
95:6 155:16 258:4
258:11
**acquisitions (8)**
9:7 11:2,5 12:2 13:10
14:18 68:13 258:10
**act (1)**
154:14
**acting (1)**
250:11
**action (2)**
184:2 341:15
**actions (1)**
180:13
**activity (1)**
44:4
**actual (4)**
14:7 18:14 77:5
133:22
**add (5)**
130:3,8 133:8 272:24
283:22
**addition (4)**
108:15 115:10 178:24
182:13
**additional (14)**
26:20 28:12 58:24
129:7 143:19 179:2
182:15 197:20
204:18 274:17
293:19 294:14
335:8 339:8
**address (1)**
31:13
**adequate (10)**
37:5 59:20 94:12
102:24 105:16
126:20,24 128:20
138:24 171:9
**adjust (3)**
290:10 296:11 303:5
**adjusted (4)**

197:5 322:14 323:20
324:11
**adjusting (1)**
331:3
**adjustment (18)**
293:13,23 298:11,14
307:19 308:7,14
317:21,22 319:5
330:12 331:2 332:9
332:22 333:20
335:4 336:4,5
**adjustments (7)**
293:4 294:2,6 295:3
303:10 330:16
331:25
**Administered (1)**
1:8
**administration (2)**
306:16 335:19
**ADP (10)**
245:13 292:11,17,18
296:4,19,25 298:11
298:14 302:2
**advance (2)**
44:25 45:2
**advancing (1)**
41:21
**advantage (2)**
42:15 184:6
**advice (3)**
252:9 276:14,14
**advise (7)**
169:13,16,18 211:2,6
211:15,19
**advised (2)**
79:20 212:14
**advisement (2)**
257:21 305:8
**advising (8)**
79:24 160:8 169:4,8
171:14 210:23
211:12 237:12
**advisor (3)**
172:5 275:11 332:16
**advisors (16)**
7:18,19 64:24 65:8,17
275:25 276:2,5
294:2,5,9,20 304:23
329:18 335:8
338:20
**advisory (4)**
201:19,24 202:9
250:8
**affect (6)**

Contains Highly Confidential Portions

68:23 88:12 193:23
289:9 325:7 337:19
**affidavit (28)**
240:9,12 241:5,10
257:9 274:17 275:2
275:19 276:17,18
280:22 300:21
309:9 328:19,24
330:3,6 332:8
333:12,14 334:11
334:20,25 336:20
336:23 338:16
342:17,18
**affidavits (5)**
8:9 247:7 251:8,10
276:25
**affiliate (31)**
38:5,7 41:25 42:10,18
44:19 45:11,16 48:7
48:13 52:3,22 53:14
54:3,10,13 57:5,15
58:22 59:4 60:3,8
60:12,17,21 117:18
118:2,7 120:2,7
124:9
**affiliates (16)**
38:14 42:22 44:24
47:22 49:13 57:19
57:20,22 58:4 59:9
60:2 117:22,24
120:7 144:14,14
**afford (1)**
166:20
**afraid (1)**
185:13
**afternoon (6)**
146:2,10,11 199:15
199:16 240:23
**afternoons (1)**
271:12
**agent (1)**
20:4
**aggregate (1)**
164:8
**ago (6)**
77:17 85:4 100:12
255:12,22 256:10
**agree (60)**
34:16,25 35:9 37:21
53:11,16 57:13,23
69:21 72:24 74:8
75:18,23 78:13
80:13,19 82:20
84:16,25 86:7 101:3

101:25 104:19
105:18 107:18,25
109:21 110:21
111:12 114:23
118:3 119:3 121:24
122:12 123:4,14
126:11 135:25
142:22 150:6
163:17 173:12
181:16 190:8
191:19 198:10,11
198:15 200:3
202:19,21 222:6
223:24 225:3,20
229:8,14,17 231:23
239:8
**agreed (21)**
121:15 122:13 166:22
167:8,20 168:10
173:13 196:18
208:17 209:21
217:19 310:3,8
311:8,12 313:15,22
313:24 314:9 326:8
328:10
**agreeing (5)**
58:21 80:20 138:9
209:19 239:17
**agreement (87)**
39:11 40:10 41:11
42:11 43:3 63:3
69:17,18,23 87:19
104:15 171:17
172:7,13 173:12,22
173:23 174:3,4,5,10
175:9,12,17,24,25
193:3 197:7 200:15
203:6 205:12,22
206:25 207:5,11,15
207:16,17,18,21
208:24 210:24
211:9,12 212:25
215:3,9 217:2
220:13 224:13
228:6 237:21,22
238:6,25 239:4,7
247:2 278:12
279:16,18 300:5,6
307:2 312:22,23
315:8,24 316:17,18
317:23,24 320:7
321:9,11,13 322:4
323:5,8,9,23 324:2
324:4 325:6,16,17

326:19
**agreements (2)**
218:24 305:23
**agrees (2)**
43:24 44:2
**ahead (1)**
64:15
**AICPA (3)**
255:5,14,16
**al (1)**
1:8
**Albany (1)**
3:14
**alert (1)**
29:10
**alleged (2)**
292:6,13
**allegedly (1)**
332:10
**allocate (1)**
21:11
**allocated (1)**
308:11
**allocating (2)**
290:22 292:2
**allocation (2)**
241:7,9 244:12 245:9
245:11 246:16
247:19 248:14
259:14 292:20
302:3 303:9
**allow (7)**
6:7 28:15 35:23 42:13
54:11 74:14 239:2
**allowed (4)**
64:10 263:13 311:20
324:23
**alluded (1)**
333:14
**alternative (1)**
109:10
**Alternatively (1)**
121:6
**AMAN (1)**
3:24
**ambiguities (1)**
217:12
**ambiguity (4)**
210:17 211:3 285:6
289:19
**ambiguous (5)**
174:21 225:12,17
227:5,9
**America (3)**

67:12,18 214:12
**AMINA (1)**
4:16
**amount (40)**
31:19 33:10 39:14
41:20 48:15 63:9
67:8 68:7,18 72:20
76:23 86:24 95:5
96:7,11,12 114:25
135:2 184:10 185:4
185:19 190:4
210:20 260:18
261:8 290:10 302:9
315:10 316:19,20
318:2,3,11,12,14
320:5 335:12
337:15,16,21
**amounts (6)**
46:8 54:2,18 90:21
263:7 331:12
**Amro (6)**
12:5,18 13:13 15:21
15:25 258:16
**Amy (11)**
3:16 239:25 240:24
261:3 277:15
279:24 283:21
299:20 303:21
326:25 327:16
**analysis (12)**
58:17 108:11 110:6
144:21 161:20
162:12 165:19
243:14 294:5,16
301:18 336:19
**analyst (1)**
245:2
**analyze (12)**
25:16 81:11 108:13
110:10 138:21
144:25 157:19
159:10,11 164:15
192:2 246:20
**analyzing (5)**
19:7 24:14 78:22
79:21 139:13
**and/or (4)**
16:23,25 31:14 276:5
**answer (85)**
6:8,12 14:23 18:2
21:9 23:13 24:8
25:19 30:4 35:21
51:18 52:8 62:10
64:15 70:2 90:2

110:15 111:7,17
115:23 119:8
123:20 126:16
128:19 130:24
131:14 139:3,11
143:23 154:6
155:25 156:8 157:9
162:25 166:12
172:11 175:16
176:21 177:9
182:16,18 187:24
191:5 193:9,24
195:24 196:25
197:16 205:16
208:3 215:7 216:23
220:21,25 221:13
221:24 233:6
243:18 247:16
251:17,25 257:11
259:11 263:10,16
264:2 266:2 268:3
270:8,22 272:12
273:20 276:20
277:2 287:9 290:4
306:9 312:5 322:19
322:20 323:13,15
327:18,24 336:16
**answered (27)**
70:22 111:16,18
119:7 139:10 154:5
166:11 168:4 177:8
181:10 187:5,23
189:23 191:4 195:4
196:24 197:15
208:3 218:11,12
227:20 231:10
233:20 238:18
263:10 270:17
290:13
**answering (3)**
80:10 183:3 327:20
**answers (2)**
184:23 285:11
**anticipate (1)**
198:20
**anticipated (4)**
108:17 151:2 163:13
315:7
**anybody (14)**
34:22 53:19 58:16
64:18,21 215:15
228:7 236:24
246:19 268:5
275:22 288:18

Contains Highly Confidential Portions

308:3 340:7
**anybody's (1)**
159:23
**anymore (2)**
315:13 324:23
**anyplace (1)**
180:23
**anyway (1)**
187:10
**APA (7)**
40:8 62:5 63:11,25
64:7 237:16 248:5
**apologies (2)**
265:6 320:12
**apologize (5)**
90:16 144:17 245:6
274:19 300:5
**appear (1)**
94:13
**appeared (1)**
207:9
**appears (6)**
37:16 57:25 159:13
226:5 242:5 333:24
**appetite (1)**
162:7
**applies (3)**
126:12 309:15,17
**apply (1)**
268:12
**appointed (1)**
273:2
**appreciate (2)**
195:9 216:22
**approach (3)**
76:11 188:21 196:3
**approached (1)**
99:22
**appropriate (1)**
271:2
**approval (7)**
104:3 263:20,23
264:3,7,10 312:2
**approve (1)**
56:20
**approved (9)**
104:3 175:10 216:5
270:13 311:3,5,7
313:11 314:6
**approximately (7)**
5:6 9:2,12 37:16
49:11 78:3 141:25
**April (7)**
1:15 2:2 5:5 212:23

297:4 341:24 344:3
**area (4)**
30:18,25,25 242:4
**areas (3)**
9:13 26:10 38:16
**arguably (6)**
121:18 122:22 124:3
126:8 140:12 142:7
**argumentative (1)**
213:8
**arising (1)**
44:3
**arrange (2)**
169:18,24
**arrangement (1)**
171:16
**arrangements (4)**
169:9 170:11 171:8
175:4
**arranging (2)**
168:19 169:19
**aside (1)**
133:18
**asked (39)**
30:2 76:15 109:17
110:16,16 111:15
111:23 119:7
139:10 154:5
166:11 168:3 177:7
178:23 181:9 186:9
187:4,22 188:11
189:22 191:3 195:4
196:23 197:14
208:2 218:10
227:19 231:9
233:19 238:17
246:19 247:11
248:14 263:9 280:9
280:12 293:2
299:20 321:21
**asking (27)**
62:21,23,24 70:25
85:17 89:4 139:3
152:21 160:13
161:11 163:22
168:9 188:25 189:3
192:13 195:12,15
211:10,11 213:18
216:24 225:8
247:10 261:3
286:24 327:12,13
**asks (2)**
103:3,23
**aspect (1)**

339:20
**aspects (2)**
12:22 18:5
**assess (18)**
97:12 98:5,9 137:25
138:7 142:14,15
144:17,18 158:5
160:16 161:12
163:25 165:16
168:5 187:6 189:25
215:18
**assessed (2)**
55:24 216:21
**assessing (6)**
98:11,12 137:23
139:7 162:2 217:3
**assessment (8)**
96:23 138:11 160:8
160:12 161:7
166:18 215:25
216:3
**assessments (1)**
161:2
**asset (62)**
15:15 38:8 39:10 63:3
104:18 108:16
112:18 115:9,11
116:2 117:6,9
199:20,23 200:15
203:5 207:9 208:18
209:4,24 210:8,11
210:12,13 211:17
212:25 213:14
237:20 247:2
258:20 275:17
310:17 312:14,15
312:16,25,25 313:4
313:24 314:7,10,10
314:11,12,13
315:20,24 317:17
317:25 318:24
319:2 323:24 324:4
324:16,20,23
325:12,13,16,18
328:4,9
**assets (229)**
9:25 10:6,15 16:21,23
16:24 30:20 33:10
38:3,7,10,18,20,22
40:11,23 41:4,6,8
41:10,19 55:15,20
79:2,4 87:10 89:9
89:18 95:11,21,22
96:19 97:4,4 100:13

106:10 109:7
114:10,12,12,16
115:5,7,25 116:2
117:13 121:10,16
121:21 122:14,24
123:22,23,24 124:5
124:15 125:4,16,24
126:10,14 128:17
130:2,18 133:5
134:4,6 140:11
142:8,25 156:22
171:21,25 174:25
175:18 179:2,8,10
179:12,22 180:2,18
180:20,23,25 181:3
181:4,7,13,17,25
182:6,15,18,18,21
183:11,13 196:13
197:20 198:3,9,24
199:17,25 201:14
203:7,10,11,13
204:9,11 205:10,20
206:5,6,7,9,10,10
206:12,18,20,21,24
207:5,8,12,22,24,25
208:4,6,10,22,25
209:2,2,7 210:5,6
210:18,25,25 211:4
211:8,13,13,15
212:20,22 213:4,5
215:23 216:17
217:13 222:15,16
223:3 224:18,22
225:10,16 227:22
227:23 230:22
231:7 234:5,15
237:14 239:4,9,15
246:4 247:12,13
258:10,12,21 259:2
259:5,6,15,15
268:16 275:4
278:25 279:2,8
280:4,5,6,8,24,25
281:12 282:3,15
283:5 284:10,18
285:17 287:23
289:16 290:9,18,22
291:20 295:11,13
295:22 300:16
302:16 304:19,20
305:11 306:15,18
306:19,20 307:12
307:13,20 308:8
310:14 315:4 319:5

326:14 328:17
**asset's (1)**
312:16
**assigned (1)**
220:16
**assigning (1)**
61:11
**assignment (2)**
43:23 45:3
**assignments (1)**
173:9
**assigns (1)**
172:20
**assisting (1)**
253:7
**associated (13)**
57:14 98:6 137:24
138:11 139:7
147:24 148:9
150:18 186:14,16
200:4,6 305:24
**association (2)**
5:10 255:9
**assume (61)**
32:3 39:8 45:15 48:21
49:2 61:18,20 69:15
73:11 74:18 75:15
76:16 78:25 80:24
90:4,19 100:24
113:11 114:11
118:16 144:23
149:6 150:25
152:24 155:2,8,12
157:15 159:14
162:17 165:24
166:14 171:4
172:12 173:24
175:9 184:7,25
189:12 190:6 191:6
191:12 193:4
195:10 198:8 210:3
212:11,21 213:3,23
214:4,6 215:8 216:2
225:19 264:8 271:2
289:12 295:23,25
310:4
**assumed (15)**
41:7 44:7,10 59:8
90:25 108:6 109:24
110:23 117:14
118:10,11,14
182:17 207:16
334:25
**assumes (26)**

Contains Highly Confidential Portions

44:2 69:11 108:4
130:22 135:6,19,22
142:13 143:16
150:10 153:15
154:10 155:7 156:7
172:10 182:25
187:23 189:23
191:4 193:8 212:16
213:19 214:2,10
287:6 322:16
**assuming (32)**
34:7 48:16 76:18
90:20 93:15,23
103:25 107:10
120:6 128:22 142:5
150:5 153:10
158:10 161:23
166:3,17 179:24
181:24 182:2,20
191:19 193:11
216:4 223:6 229:23
236:16 237:13,18
270:15 297:16
309:23
**assumption (9)**
43:2 207:15 215:11
233:8 237:21,22
238:25 264:12
320:7
**assumptions (1)**
215:12
**atmosphere (1)**
20:13
**attached (6)**
10:24 261:21 275:18
279:18 280:13,16
**attachment (1)**
127:7
**attempted (2)**
288:2,7
**attempting (1)**
149:12
**attention (6)**
29:11 127:8 293:6,17
294:11 295:8
**attorneys (6)**
3:6,12,21 4:5,12
238:21
**AT&T (1)**
161:12
**auction (8)**
74:19,23 75:25 76:23
76:24 180:8,20
183:18

**auctioned (1)**
76:8
**auctioning (2)**
76:5,11
**audit (1)**
255:16
**auditing (1)**
255:17
**August (2)**
94:22 214:16
**Austin (1)**
73:5
**authority (2)**
21:4 175:23
**authorized (1)**
173:13
**authorizing (1)**
220:24
**automatically (1)**
329:7
**available (3)**
75:14 181:18 182:23
**Avenue (2)**
2:7 4:6
**average (5)**
34:16 35:9,15,16,20
**avoid (3)**
168:23 189:18 211:3
**avoided (1)**
73:16
**aware (21)**
28:19 35:22 36:10
41:18 58:3 74:8
140:16 142:5 170:4
180:7 236:19,24
245:25 260:2 278:2
278:6 282:13
288:10 292:13,25
307:10
**A.M (6)**
271:20 272:4 290:14
339:10,12,17

—————
**B**
—————
**bachelor (1)**
248:23
**back (55)**
13:23 45:10,24 46:12
46:23,25 47:14 48:5
48:18 49:19 50:2,7
50:11 51:2 52:21
53:2 75:12,16 91:20
105:3 109:15
111:19 130:3,8

133:8 139:24 146:7
148:15 171:12,25
172:8 176:2 177:18
184:24 186:11,12
186:18 187:9
199:13 204:8 230:5
236:25 240:20
254:22 256:21
299:13 313:7 320:9
320:17,18,20
328:11 332:6,7
338:11
**background (3)**
8:21 26:12 180:5
**bad (2)**
106:10 157:15
**balance (5)**
37:11,25 86:24
209:23,24
**balances (5)**
17:20 133:8 275:16
281:18 329:14
**bank (18)**
49:9 55:11 67:12,18
68:15 214:11 260:3
262:2 284:15
286:13 290:24
291:17 292:3,7
295:23 298:17
330:14 337:3
**bankrupt (2)**
56:23 61:21
**bankruptcy (5)**
1:2 77:12 78:23 79:21
242:19
**banks (1)**
260:12
**Barclays (193)**
3:12,21 5:24 37:11,21
37:23 38:18 41:7,18
42:7,21 43:23 44:7
44:10,14,15,24 45:9
45:15,23 47:13 48:5
48:14 49:12,19 50:6
52:12,21 53:11,22
54:2,6 56:2,3,5 57:3
57:10,21,23 58:20
59:19 60:6 61:16
62:3,16 63:10 66:17
66:22 72:8 73:6,23
80:21 87:6,15,19
88:6,20 92:6 93:3
93:23 94:4,19 96:7
98:19,22 99:18

100:19 101:21
104:15 105:4,5,13
105:14 107:25
109:22 110:21
111:13 114:24
117:14 118:5,16
119:4,25 121:8,15
126:23 127:22
128:20 129:20
130:10,17 134:25
136:7 138:12
140:10 147:13,21
147:22 148:8
149:12,17 150:20
150:21 153:5,9
159:14,17 160:9
162:15 166:7,8,13
167:20 168:19
169:2 170:11
172:21 174:15
176:11 177:5,6
178:18 191:21
202:14,20 207:18
208:18 211:25
212:7,9,16 213:19
214:21 215:13,20
218:17,25 220:16
221:3,13,18 233:11
233:14 236:15,16
236:21 238:3,12,21
239:2,10 240:24
246:2,4 247:20
278:3,7 296:8,9,10
296:16,18,22,22
297:2,18,21 298:2
301:12,15,20,22,24
303:3,17 308:5
309:23,25 310:10
312:22 314:24,25
315:25 320:11
321:11 322:11
323:3,6,8,12,17,23
337:15
**bargaining (1)**
105:21
**Bart (4)**
3:9 178:7,11 342:13
**base (8)**
19:7,10 27:21 59:15
112:18 137:3
276:16 295:12
**based (30)**
10:20 30:22 32:7,12
34:10,13,21 58:18

108:17 112:15,21
136:9 160:2,21
161:22 179:24
194:16 198:18
214:8 215:11
241:15 243:12,13
259:14 263:18
266:22,22 269:3
271:8 299:14
**basic (1)**
10:23
**basically (6)**
9:24 53:9 93:5 264:15
277:17 333:19
**basing (3)**
264:12 273:15 311:16
**basis (28)**
44:13 46:5 57:12
61:14,18 90:13 98:8
98:11 163:4,6
164:15,21 195:6,13
197:22 210:10
252:2,6 268:17
269:7 296:16 303:2
303:11 306:17
328:24 330:5,21
331:4
**basket (1)**
152:5
**Bates (2)**
235:2 342:15
**Battery (1)**
4:13
**BDW (3)**
272:14,16,21
**bearing (3)**
137:13 235:2 342:15
**becoming (1)**
312:25
**beginning (3)**
86:18 159:20 237:23
**begins (1)**
203:7
**behalf (17)**
44:19,24 103:24
170:24 183:17
219:11 228:10,19
229:3,11,12,19,21
229:22 230:8
231:18 301:19
**belief (2)**
138:23 268:17
**believe (234)**
7:11 8:14 11:5 13:7

Contains Highly Confidential Portions

17:9 27:12,25 29:10
29:13 30:3 33:24
37:3 38:5,7,13,19
39:4,17,19 41:7,8
41:16,25 42:12,21
43:19 46:7 50:17
53:25 54:6 55:14
57:3,21 58:7 59:19
63:20,23 64:9 65:25
67:12 69:2,12 70:3
70:16 71:10 72:7,14
72:21 73:4 75:11,15
76:7,14 78:18,19
79:18 82:18 83:6,9
86:13,18 87:2,17,18
87:20,24 88:5,9,16
90:9 93:8 94:22
97:24 98:2 102:4,6
104:13,25 105:6
112:16,23 114:22
117:12,21 120:5
124:11 126:2,24
136:5,25 140:22,25
141:5 142:6,14
143:12 144:12
146:16,22,23
148:13,17 153:8
163:2,11,24 164:13
169:10 170:7,8
176:14 178:13,19
187:6 196:11
200:13 203:20
204:24 207:7 212:5
215:8 216:25
217:24 218:12,13
224:7,17 226:8
227:21 228:13
232:5 233:16,24
234:10 235:15
236:19 237:12
243:20 251:12
260:5,11,15,22
262:10 263:22
264:2,6,14 265:13
266:3,8,15 267:12
268:6 269:2,11,19
270:11 271:3 272:6
272:10,13 278:12
279:15,20 280:16
281:13,17 282:17
282:19,24 284:20
285:2,6 290:13,20
291:13,23 293:25
294:8,11,16,18,19

295:5,20 296:4,18
298:13 301:21
302:5 303:8,14,19
305:3,3,9 307:22
308:11 309:14,17
310:12 311:7,17
312:25 313:20
314:15,18 317:4,19
318:25 319:7,13
321:16,21 322:6,17
322:22 323:5
325:11 327:10
328:3,7,9,16 332:16
333:10,13,14
334:16,22 335:7
338:22 339:5
**believed (12)**
107:21 109:9,18
110:17 111:9
112:25 113:8
166:23 167:10,22
169:20 196:3
**believes (1)**
321:11
**belong (3)**
134:4 310:24 312:8
**benefit (17)**
81:2,6 190:11,25
220:20 222:18
223:16,19,22 260:6
263:3,5,8,12 279:4
306:7,22
**benefits (3)**
43:25 109:4 112:22
**best (2)**
184:6 252:18
**better (8)**
42:16 51:21 82:10
103:21 105:7
108:10 110:4
149:11
**betting (2)**
136:18 138:19
**beyond (3)**
142:23 198:24 221:5
**bid (3)**
12:20 15:15 18:21
**bidders (1)**
183:21
**bill (1)**
54:16
**billed (2)**
256:17,25
**billion (44)**

37:12,17,18,22,24
39:17,18,20 41:3,5
77:3 78:3,15 84:22
84:23 94:24 95:3
97:14,14 98:3 108:7
108:8 110:2,3
114:20 115:15,16
117:13 119:10,13
141:22 143:4
181:25 189:17,19
209:17 221:16
287:12,13 302:11
315:12 332:9 334:9
335:5
**billions (1)**
172:8
**billion-dollar (1)**
119:11
**billion-17 (1)**
260:23
**billion-760 (1)**
260:23
**bills (4)**
137:8 206:14,15,16
**binding (4)**
69:23 174:4,5 321:13
**bit (10)**
6:6 13:23,23 14:22
17:2 29:11 99:11
125:8 257:14
283:25
**bits (1)**
112:20
**blood (1)**
341:16
**Bloomer (28)**
3:15 5:19,22 12:12
45:22 46:13,24
64:20 91:12,21
122:7 124:20
139:19,23 140:5
144:10 145:5 146:9
160:14 163:22
184:14 199:6,14
226:19 232:20
239:23 256:16
342:4
**blush (1)**
18:21
**board (4)**
216:5,7,9,9
**Boies (3)**
2:5 3:11 5:23
**bonds (2)**

201:11,12
**book (17)**
13:19 15:13 32:16
49:4,5,6 155:12,22
156:19 157:12,14
159:15,18 160:3,22
161:6 162:8
**booking (1)**
50:10
**books (4)**
13:5 25:16 149:20
155:10
**borne (2)**
57:19,20
**borrow (3)**
206:17 313:6 320:4
**bottom (6)**
51:22 130:3 200:16
200:17,22 217:9
**bought (17)**
13:12,22 14:8,9,12,19
15:2,6,14 67:12,19
95:11,13 96:18
112:14 214:12
215:22
**bound (1)**
43:24
**box (3)**
295:14 306:20,21
**boxed (1)**
51:7
**boxes (1)**
176:11
**break (12)**
6:16 46:14 47:12
91:11 139:18 145:6
262:21 283:24
298:25 299:17
306:11 338:6
**bridge (7)**
48:13,17,25 49:3,8,16
50:3
**brief (4)**
77:10 121:14 140:2,9
**bring (3)**
135:17 142:24 294:12
**bringing (1)**
13:5
**broad (2)**
125:9 126:3
**Broadridge (9)**
296:4,25 297:22
298:12,14 301:13
301:15 302:3

303:15
**broke (2)**
97:25 338:13
**broken (1)**
207:10
**broker (3)**
13:13 96:15 274:8
**brokerage (4)**
14:18 15:21 214:13
258:16
**brokers (5)**
14:11 125:5 168:20
170:5,9
**broker-dealer (33)**
31:16 56:8,13 62:2
67:10 68:8 79:16
94:13 96:3 97:8
101:17 102:25
106:5 132:23 151:8
154:16 169:25
214:7 259:3,6
263:13,17,20 271:6
271:9,18 272:14,17
272:20 273:12,24
309:2 339:16
**broker-dealers (3)**
241:18 242:23 255:17
**broker-dealer's (1)**
151:23
**Brothers (11)**
1:7 3:6 17:12 61:3
67:13 138:13
178:14 246:5
250:24 337:14
344:2
**brought (5)**
147:13 198:21,23
293:6,16
**building (1)**
195:11
**buildings (1)**
95:12
**business (145)**
9:6 10:21 12:5,18,19
13:13,14,16,24 14:2
14:10 15:21 16:16
17:5,12 19:11,22,24
19:25 21:3,24 24:23
24:25 25:2 58:23,25
59:2,5 61:9 67:10
68:8 84:4,6,8 85:18
86:8,16 90:19 95:23
96:8,13,14,18 99:25
101:17 102:3,5,8,11

Contains Highly Confidential Portions

102:14,17 106:2,3,5
106:6 107:13
108:18,24 109:3
112:4,16,19,20
117:22,24 136:9
145:4 159:15,18,23
162:8,9 170:14
189:25 199:21,25
200:5,8,10,17,21
201:7,8,11,18 202:4
202:9,14,20,22,24
203:12,16,18
205:11,21 207:23
208:6,25 211:14
214:7,13 228:22
232:24 249:14,16
258:16,18 267:8,10
267:13,14 268:8,10
268:15,18,20,21,23
269:6,18,21 270:5
270:12,20 271:13
271:16,20,22
273:12 324:22
325:2,3,4,7,9,20,25
326:18,20,21 327:6
327:7 330:14 339:8
**businesses (15)**
14:8 95:10,11 96:16
97:5,5 112:15
170:10 201:2,16,19
201:24 202:18
204:18 258:21
**businesspeople (1)**
18:13
**businessperson (1)**
162:7
**button (2)**
162:20 163:18
**buy (24)**
14:16,17 20:2 67:3,4
67:5,5 74:4,5 91:7
93:18 96:14 114:15
117:23 155:13
156:22 162:10
169:14 210:10
214:4,7,14 215:15
216:10
**buyer (8)**
99:23 100:14 101:6
102:3 115:9 194:9
211:7,11
**buyers (2)**
100:17 101:13
**buying (33)**

13:18 16:21,22 38:8
38:11,18 67:19 74:4
94:8,13 95:10 96:12
112:19,19 116:8,22
117:21 166:18
209:11,12 212:20
212:23 214:5,25
215:4,10,16,18
216:11,13,15,18,19

---

### C

**C (6)**
3:3 4:2 224:21 226:11
226:13 233:4
**calc (1)**
268:15
**calculate (1)**
31:3
**calculation (66)**
10:3,20 31:10,11
129:13,25 244:4,7,8
244:10,24 253:21
253:25 264:16
265:11,16,20,22
266:11 267:4,7,13
267:22 268:6,25
269:8,12,25 271:7
271:15 289:17,22
291:22 292:15
293:5,14 294:3,7
295:4 297:25
303:18 307:14,19
309:11 312:12
317:9,14 318:24
319:17 322:13
323:19 324:7,10
325:7,8,24 326:5,6
326:9,23 327:9
329:3,8 331:10,18
339:7
**calculations (10)**
9:15 35:19 243:6
253:22,22 258:3
263:18 268:7 269:4
307:21
**call (7)**
34:23 134:20 135:24
161:12 192:8
276:22 278:12
**called (7)**
5:14 26:19 28:13 45:7
86:22 251:8 255:11
**calling (1)**
300:5

**calls (16)**
32:14 91:3 135:13,14
135:20,23 173:18
174:7 176:19 177:8
177:14 179:17
204:14 205:14,24
233:5
**capable (1)**
147:14
**capacity (1)**
296:24
**capital (29)**
5:24 13:24 21:12
24:18,19,20 27:17
27:21 43:13 94:11
94:12 95:17,18 98:9
98:10,10,12 102:24
121:8 224:21
253:21 255:13
256:5,6 301:12,16
301:20,22,25
**capitalized (1)**
203:17
**Caputo (3)**
103:18 104:6,14
**care (8)**
139:12 158:9,11,19
158:21 159:3,6
313:7
**carried (1)**
80:7
**carries (1)**
43:9
**carry (2)**
80:9,12
**carving (1)**
19:12
**case (26)**
1:7 14:18 17:7 25:4
30:7 34:24 35:2
41:13 53:13 60:4
77:10 82:4 95:16
110:12 112:8
153:24 168:18
176:23 193:13
206:20 224:10
238:12 269:22
272:3,6 344:2
**cases (1)**
99:21
**cash (38)**
41:20 45:2 90:25 91:4
133:22 167:16
179:2 181:3 182:15

201:22 202:8
220:17 221:2,4,12
221:12,12,14,17,18
221:20 223:5,7,10
223:11,11,14,19
236:13,22 237:9,25
238:13,22 275:5
287:13 288:24
302:9
**categories (2)**
200:25 230:21
**category (2)**
334:10,11
**cause (1)**
290:9
**caused (1)**
293:23
**ceased (1)**
39:24
**cents (2)**
197:24,25
**certain (13)**
14:8 85:10,11 94:10
95:10 96:19 121:6
151:4 218:23
237:16 284:22
285:6 292:18
**certainly (8)**
59:25 63:17 77:7
109:5 114:4 161:17
161:19 257:20
**CERTIFICATE (1)**
341:2
**certification (1)**
249:12
**Certified (2)**
2:10,10
**certify (3)**
341:8,14,18
**CFTC (2)**
9:23 127:22
**CGSH33921 (2)**
235:3 342:16
**chair (1)**
253:2
**chaired (1)**
255:13
**chance (5)**
147:8 184:5,19 185:7
235:8
**change (18)**
66:25 84:22 92:7 93:4
193:5 197:23
269:23 270:20

287:4,19,24 297:18
308:9,15 313:12
318:17 324:6
331:11
**changed (2)**
208:12 274:20
**changes (3)**
188:6 297:22,24
**Chapter (3)**
1:6 99:21 100:18
**characterizes (1)**
57:14
**characterizing (1)**
163:23
**charge (4)**
50:2 75:12,16 187:10
**charged (5)**
45:10,24 47:14 48:5
52:21
**charging (6)**
46:11 48:18 49:19
50:7,11 53:2
**Charles (3)**
13:24 15:4,17
**Chase (37)**
220:20 222:19 223:4
223:20,23,25 224:4
274:12 279:4
280:25 281:16,21
282:18,24 284:24
285:3,8 286:2,16,22
287:10,17 288:3,8
288:14,24 289:7,13
289:13,15 295:14
295:15,22 302:16
304:21 306:7 337:3
**Chase's (1)**
281:17
**check (2)**
19:16 261:20
**Chicago (2)**
77:23 78:13
**Chris (2)**
276:8 277:7
**circumstance (4)**
80:2 108:22 172:6
217:19
**circumstances (30)**
62:25 66:6,10 68:23
69:6 92:5,8,14,20
92:24 93:2,7 98:18
98:21 100:15
119:23 192:2
193:21,22 194:14

Contains Highly Confidential Portions

194:22,24 195:19
198:11,18 217:20
217:22 218:2,4,9
**citations (1)**
275:6
**cite (3)**
46:5 47:24 296:15
**Civil (1)**
341:21
**claim (3)**
334:21,21 337:24
**claims (6)**
55:2,4,10,21 331:7
337:22
**clarification (7)**
40:7 63:4 198:25
224:8 234:4 248:8
298:15
**clarify (6)**
160:14,15 242:8
247:6 330:9 344:6
**Clark (2)**
146:14 147:11
**class (1)**
207:9
**classification (1)**
292:7
**classified (1)**
298:21
**clause (5)**
43:8 225:13 226:9,14
231:21
**clear (23)**
19:25 85:17 160:12
174:20,23 216:12
216:14,16 225:9
226:16,22 231:2,3,6
231:11,12,14,20,21
234:10 277:14
300:20 326:16
**clearance (5)**
24:24 44:11 57:5
118:23 120:7
**cleared (4)**
19:10 38:6 170:8
173:6
**clearer (2)**
14:10 247:4
**clearing (44)**
20:4 27:16 29:4 36:7
37:6 43:9 44:16,21
61:4,10 75:5,13,17
76:5 89:13 96:17
108:18 125:5,5

166:25 168:20,21
170:5,5,14 173:3
175:6 179:3 181:5
182:4,19 191:12
199:18 200:11
201:7 212:3 220:19
222:17 231:24,25
232:3,4 311:21
320:14
**clearly (5)**
6:7 230:17,18,23
327:20
**Cleary (4)**
3:20 71:25 72:3,5
**client (1)**
103:25
**clients (6)**
18:22,23 132:13
250:15,17 274:8
**close (42)**
10:21 52:10 69:13
71:18,19 74:11
77:24 85:17,19,25
86:7,15 102:15,19
102:20 103:6,7,20
104:4,12,15 106:13
106:24 113:9
134:11 143:20
145:4 186:22 267:7
267:13 268:15
269:18,21 270:4,12
270:19 271:13,16
325:4,6 326:18
327:5
**closed (17)**
16:6 45:8 69:4,14
70:7 74:19 78:14
86:15 103:5 125:13
131:20 132:6,19
186:19 269:20
312:11 327:6
**closely (2)**
9:3,12
**closeout (1)**
78:2
**close-out (1)**
48:11
**closing (19)**
45:11,25 47:15 48:6
48:19 52:22 53:23
54:3,8,13 73:2,13
73:16 85:22 86:10
105:9 134:24 169:6
271:21

**CLR (1)**
1:24
**CME (30)**
9:4,17 76:8,11,17,24
107:4,5,12 125:12
125:16 170:8 179:9
179:22 180:6,7,14
180:21,23 181:19
181:25 183:18,20
188:17 189:9,13,13
190:18 191:8
192:16
**CME's (1)**
76:24
**Code (1)**
242:19
**coded (1)**
295:18
**Codes (1)**
344:5
**coding (6)**
292:5,6,14,23 293:9
296:13
**collateral (29)**
84:5 129:7 138:24
169:9,10,14,16,16
169:19,21,25 170:2
170:15,23 171:3,9
171:11 172:8
206:16 220:13,18
222:16 234:23
236:13,22 237:9
238:2,13,23
**colleague (1)**
246:25
**collect (5)**
54:7,19,23 320:22
321:19
**collected (2)**
54:2,15
**collects (1)**
87:22
**College (1)**
248:24
**combination (1)**
275:3
**come (12)**
25:21 46:10 168:22
171:4 187:9 197:6
239:25 262:11,13
294:11 332:6
334:15
**comes (1)**
332:7

**comfortable (2)**
27:22,24
**coming (6)**
40:4 251:20 311:20
331:2 335:3,6
**commencement (1)**
99:21
**commingled (3)**
42:14 60:12,21
**commission (1)**
202:25
**committee (3)**
4:5 255:13 256:5
**commodity (1)**
128:6
**common (3)**
205:4 273:21,23
**communication (1)**
288:19
**communications (2)**
269:16 288:17
**companies (4)**
16:25 18:11 59:13
337:19
**company (8)**
28:7,16 96:4 99:24
106:4 169:4,8
337:14
**compensated (6)**
114:5,9,11,14 177:21
197:11
**compensation (6)**
116:16,25 117:2
175:4 196:17
198:17
**competitors (1)**
214:18
**complete (2)**
105:19 298:9
**completed (3)**
294:5 339:3 341:22
**completeness (1)**
110:9
**compliance (8)**
10:8 241:21 243:24
244:20 248:6,15
253:14 320:23
**complies (1)**
114:17
**complying (1)**
20:14
**comprised (2)**
37:16 259:22
**computation (1)**

273:22
**computes (1)**
30:15
**conceived (1)**
16:5
**concept (1)**
201:5
**concern (4)**
27:16 41:19 94:14,16
**concerned (9)**
36:11,15 80:12
107:14 183:9,23
185:17 192:15
317:24
**concerning (1)**
8:13
**concerns (4)**
12:8 29:9 49:17 50:4
**conclude (1)**
148:18
**concluded (1)**
332:19
**conclusion (11)**
173:19 174:8 176:20
177:8,15 204:15
205:15,25 233:6
327:23 328:6
**conditions (1)**
136:14
**conduct (1)**
144:20
**conducted (8)**
59:12 189:8 202:22
218:6 301:19,24
336:18 338:14
**conducting (2)**
18:19 188:7
**confidence (11)**
33:15 34:10,13
179:11 180:24
182:5,8,12,22
183:10,12
**confidential (19)**
1:12,17 11:8 12:1,11
13:1 14:11 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1,2 28:9
250:18,19
**confidentiality (1)**
12:8
**confirm (6)**
165:22 236:11 237:24
241:25 305:22
329:22

Contains Highly Confidential Portions

**confirmed (1)**
238:11
**conform (1)**
344:6
**confused (2)**
202:5 261:15
**connection (12)**
43:4 62:18 161:3
203:12 205:11,20
207:23 208:25
211:14 232:22
247:2 299:21
**consider (14)**
56:7,10 58:9 96:18,20
98:20 99:23 148:24
149:15 160:25
182:6 199:17 231:5
323:25
**consideration (6)**
81:8,10,23 82:3
172:18 338:21
**considered (7)**
152:17 153:4 202:3
208:6 224:7 259:3
307:23
**considering (2)**
155:16 220:7
**consist (2)**
17:23 162:3
**consisted (1)**
16:14
**consistent (2)**
220:25 221:11
**constitute (1)**
129:19
**constitutes (1)**
286:14
**construed (1)**
204:4
**consultant (5)**
250:12,13,25 252:8
253:5
**consulted (1)**
20:19
**consulting (3)**
250:21 251:5 252:21
**consumed (1)**
76:23
**consummated (4)**
67:10 70:6 138:13
320:20
**consummating (2)**
123:12 208:13
**contain (1)**

128:6
**contained (1)**
165:7
**contains (1)**
241:24
**contemplation (1)**
104:11
**context (12)**
14:15 27:13 83:19
99:12 122:17 123:5
123:6 127:25 179:8
206:8 220:12
222:11
**continue (4)**
11:9 22:3 108:21
332:21
**continued (2)**
100:21 314:16
**continues (3)**
77:20 122:8 268:12
**contract (31)**
70:5 149:24 198:22
209:20 210:12
246:3,12,20 247:11
247:19 311:2,4,6
312:10,18 313:11
313:15,18,21 314:5
315:3,20 317:7
318:10 323:4,7
326:17 327:4,11,13
328:2
**contracted (1)**
317:5
**contracts (3)**
116:21 173:8 247:22
**control (8)**
280:25 283:14 284:4
284:13 307:8,23
308:12,17
**controls (1)**
18:7
**Cont'd (3)**
4:2 146:8 343:2
**conversation (2)**
7:17 299:15
**conversations (2)**
26:25 64:7
**conversion (1)**
176:3
**convert (2)**
25:10 176:3
**copied (4)**
72:10,16 235:20
236:5

**copy (4)**
7:4 47:6 51:2 77:11
**corporation (3)**
33:16 220:19 222:18
**corporations (2)**
166:25 231:24
**correct (50)**
8:18 21:19 35:20 40:6
118:13 143:2,6
186:6,16 207:19
212:18 221:23
226:8 227:7,8 232:8
236:8,9 243:15
248:21,25 259:19
260:8,10 264:5
271:12 272:5
274:10,13,14,16,21
285:18 289:10
292:11,12 302:11
308:19 309:13
314:22 315:21
316:13 329:3
332:10,13,14
338:18 339:11
340:4 344:7
**correctly (2)**
23:7 94:25
**correctness (1)**
262:17
**corresponding (3)**
152:18 160:5,19
**cost (34)**
31:18,25 34:18 35:12
36:18 37:7 45:10,24
47:14 48:6,19 52:22
53:12 78:15 85:11
85:19 86:9 120:18
121:19 122:22
124:3,3 126:8
132:17 140:12
142:7 185:18,22,23
186:25 187:8 188:5
188:12 190:7
**costs (9)**
49:20 50:7 53:22 54:7
56:4 75:21 118:19
186:14,16
**counsel (16)**
8:12 72:14 107:20
127:22 212:6
235:16 236:8
261:18,19 262:10
262:11,15,18 276:3
276:4 277:12

**counsels (2)**
235:15,17
**counterparties (4)**
136:5,11 175:6
227:25
**counterparty (1)**
313:6
**country (4)**
17:10 97:8 137:14,15
**COUNTY (1)**
341:4
**couple (5)**
16:8 19:2,6 26:5
257:12
**course (13)**
30:7 122:5 152:9
179:10,23 188:6
263:24 264:4
307:18 308:7
325:25 330:13
339:8
**courses (3)**
249:10,11,13
**court (28)**
1:2 5:9,11 56:19
101:3 103:3,12,19
103:23 104:21
105:9 175:10
241:11 311:3,5
312:2,21 313:11,16
313:17 314:4
315:22 318:6 322:9
322:10 323:16
324:3 325:17
**court's (2)**
103:19 323:22
**court-approved (1)**
56:18
**cover (15)**
34:18 35:11 36:18
55:20 75:20 82:9,14
87:5 119:10 129:11
135:16 186:6
221:21 319:21,23
**covered (5)**
33:13 75:14 131:10
144:2,5
**CPA (3)**
249:12 254:22 255:2
**CPAs (2)**
255:6,24
**Craig (1)**
141:5
**created (1)**

147:22
**credit (27)**
19:16 56:9,11,12,14
56:20 57:19 58:9,15
135:25 136:4,12,16
138:20 285:8
290:17,20 291:21
292:15 293:8,10
307:24 329:13
334:15 335:3,6
336:7
**creditor (1)**
55:2
**Creditors (3)**
4:5 55:12,17
**credits (1)**
331:20
**creditworthiness (2)**
29:6 56:24
**creditworthy (1)**
135:20
**critical (3)**
104:22 105:5 284:7
**CRR (1)**
1:24
**crumbling (1)**
95:23
**crunch (2)**
95:18,24
**CSE (1)**
161:18
**currently (7)**
55:20 246:2 250:2,3
334:5 336:23
338:17
**Custody (2)**
291:10 342:23
**customer (151)**
9:22 13:16 14:6 18:11
18:15 19:7,9,22,24
26:17 28:21 29:2
47:21 55:5,15,21
58:25 59:15 60:13
60:22 79:6,14 96:13
96:13,16 100:2
106:16,17 109:12
120:22 124:16,24
124:25 125:12,17
125:23 127:23
128:2,16,23 129:19
129:22 130:16
133:2,3,4,6,7,8,20
133:25 134:2,14,19
134:22 135:3,7,9,10

Contains Highly Confidential Portions

136:17 138:5
190:12,14,19,20,25
191:9,11,15 201:10
202:19,22 222:24
222:25 225:4,18,20
225:22 226:4,24
227:10,18 228:18
228:20,25 229:2,4
229:10,12,19,20
230:6 233:11,13
241:19,20,21
242:24 243:24,25
244:20,21 251:9
253:14,15 256:7
259:7 278:25 279:2
279:8 280:6,8
290:21 291:9,18
292:2,7 295:19
305:10,14 306:21
306:21,21 307:12
307:20 308:8
310:14,19 317:6,7
317:13 326:14
328:12,20 329:14
330:20 332:25
333:7 335:13,15,16
335:18,23,25 336:9
336:11,12,13
337:21,23 342:22
**customers (95)**
9:25 10:5,5,13,15
13:15 18:15,17 19:3
19:17 45:16 49:13
55:9,14 59:16,17,21
59:25 79:3,7 81:3,6
94:15,15,16 95:11
107:6 126:22,24,25
127:4 128:21 129:6
129:8,12,14 130:5,6
131:5,11,17 133:10
133:17,19,23 134:4
135:12,13,19,22
136:8,21,24 137:10
137:17,18,25 138:8
138:17,18,21 191:2
201:10 206:18
223:8 225:15
227:24 259:4 260:7
263:3,5,8,12 279:5
292:19 298:21
305:4,13 306:2,3,7
306:19,23 307:12
310:14 316:5
330:11,12,19,23

331:6,13 332:10,20
335:22
**customer's (8)**
130:20 133:13,14,16
134:6 138:3 139:13
259:12
**customer-related (1)**
24:25
**C.F.R (1)**
128:9

**D**

**D (337)**
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1

152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1

314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
342:3
**daily (6)**
90:13 98:8,11 163:3,6
210:10
**Daniel (18)**
1:13 2:4 5:4,14 6:25
47:7 146:3 240:9,13
240:16 340:18
341:9 342:8,9,17,18
342:20 344:4
**date (32)**
7:3 47:9 50:22 90:11
121:11 144:13
173:2 178:9 219:9
235:4 240:11,14,17
261:9 265:14,17,18
265:22 266:6,11
267:19 271:3
291:12 297:9
310:10 312:23
313:14 315:20
317:23 318:15
338:23 344:3
**dated (1)**
297:4
**dates (2)**
13:7 83:15
**DAVID (1)**
3:24
**day (82)**
3:5 6:5 10:3,7,16 16:5
16:6 21:18 28:17
31:18 37:12 66:17
67:2 83:2 84:2,4,6,8
84:17 85:2,5,12,20
86:14,17,18 90:19
98:10 132:6,12,18
134:23,24 135:15
140:18 141:25
142:10 143:17
144:9 170:15 172:2
184:9 185:3,17,25
187:13,20 188:7,19
208:12 239:3
266:21 267:2,2,14

267:24 268:8,10,18
268:20,21,23
269:10,16,16,21
271:20,21,22
281:19 295:20
316:21 324:22
325:2,3,8,9,20
326:21 332:2
340:20 341:24
**days (9)**
66:17,19,20 86:6
104:23 140:19
143:5 169:7 210:22
**day's (1)**
85:13
**deal (44)**
16:5 28:20 33:8 63:2
65:24 66:6,10 68:3
69:7,22,24 70:4,7
72:20 73:2,7,8,25
74:6,10 98:22
104:22 105:8,20
113:9 114:5,15
137:22 139:6 168:6
171:24 177:21
197:11 208:13
210:23 214:22
217:21,25 221:2,5
221:18,19,23
222:15
**dealing (1)**
23:23
**deals (1)**
68:5
**Dean (2)**
254:8,11
**debit (29)**
293:4,10,24 310:5
311:10 312:9 313:5
314:2,13 315:17
316:2,4 317:2,15,19
317:21 318:8 319:2
319:9 320:3,16,21
321:15,16,19
324:16 326:14
328:12 329:13
**debited (2)**
330:11,25
**debits (3)**
320:2 330:24 331:19
**Debtors (1)**
1:9
**decide (10)**
63:17 67:3,4 68:17

Contains Highly Confidential Portions

158:25 177:17
189:20 197:24
265:21 313:17
**decided (15)**
63:16 77:24 98:25
99:2 119:21 123:11
131:5,16 155:13
171:5 191:23
274:15 312:21
334:18 335:10
**decision (4)**
36:15 106:6 194:21
198:16
**decisions (1)**
219:3
**declaration (17)**
46:4,9,11 47:7,24
48:4 83:25 141:5
146:13,15,21 220:2
297:4,7,17 342:9,24
**declarations (1)**
219:16
**decreased (1)**
143:8
**deduction (1)**
51:14
**deemed (1)**
53:4
**deeper (1)**
17:3
**deficit (17)**
31:7 84:7 128:7,14,23
129:4,5,6 130:4
131:6,21 132:10
133:21 134:2,7,19
135:8
**deficits (5)**
129:11,12,18 130:15
133:8
**define (5)**
112:12 208:10 209:18
233:21 259:24
**defined (8)**
200:17 203:22 205:12
205:21 220:18
230:17,18 259:8
**defines (2)**
43:12 233:22
**definitely (1)**
305:20
**definition (13)**
200:18 201:3 202:24
203:6,18 204:8,9,12
217:14 224:22

231:3,4,15
**degree (1)**
249:7
**delay (1)**
147:21
**deliver (3)**
89:16,19 91:6
**delivered (1)**
91:2
**deliveries (1)**
288:14
**delivery (3)**
91:8 121:9 319:5
**Deloitte (16)**
7:20 65:10,15,17,19
65:22 255:20
262:12,13 276:5,6,7
276:14,22 329:19
332:3
**denominated (1)**
71:15
**denote (3)**
175:18,20,23
**denoted (2)**
176:7,15
**depend (4)**
81:13,17 134:14,17
**dependent (3)**
136:4,16 188:13
**depletion (4)**
107:23 109:19 110:19
111:11
**deponent (1)**
341:19
**deposed (1)**
6:2
**deposit (20)**
128:17 173:3 224:3
247:20 272:8,23,24
273:14 290:11,14
308:22 309:15,18
310:22 311:9
319:16 339:9,9,22
339:25
**deposited (9)**
129:22 130:7 179:3,4
181:4,5 182:4,16,19
**deposition (34)**
1:13 2:4 5:4 7:15
50:16,20,24 51:8
52:18 53:17 65:14
70:15 71:2 83:8
146:18 178:7 219:7
219:10,12,20

220:11 240:2
244:11 246:7
247:24 303:24
340:9 341:10,11,21
342:10,13,14 344:3
**depositions (2)**
219:16,18
**depository (1)**
49:10
**deposits (9)**
33:14 173:4,14
174:14 176:13,16
263:18 322:12
323:18
**derivative (3)**
152:19 155:12,22
**derivatives (71)**
7:6,12 8:13,23 23:20
24:15 70:21 97:23
147:2 150:19 151:3
151:14,21 152:8,10
152:11,13,16 153:6
153:12,17,19 155:4
155:5,11,14,17,20
155:23 156:4,5,10
156:14,18 157:6,11
157:21,21 158:4,6
158:13,14 162:14
165:8,11 167:17,21
169:5 170:6 172:4
199:19,21 200:4,7
200:10,24 201:6,13
202:2,13 212:4
213:22 224:23,25
227:24 231:25
233:9,23 234:7,17
251:7
**derived (1)**
206:13
**describe (10)**
8:20 9:21 12:2 16:13
26:12 27:3 38:17
42:5 251:21 252:5
**described (6)**
27:5 39:15 98:18
201:2 231:8 280:5
**describes (2)**
83:20 280:6
**describing (5)**
26:10 51:24 59:11
193:22 242:5
**designate (1)**
12:10
**designated (3)**

1:16 11:8 279:4
**desire (1)**
120:24
**desired (1)**
289:13
**desk (4)**
21:10 164:4,22
165:18
**despite (3)**
168:13 267:23 272:25
**determination (1)**
196:2
**determine (43)**
10:6 16:17 18:15
23:17 31:22 36:20
56:5 59:16 86:9,12
93:16 97:2 98:13,15
105:9 142:18
148:23 156:2,21,25
157:13 159:25
160:21 161:24
162:7,8 163:18
166:2 181:11 187:7
197:20 214:25
269:25 278:24
280:4 287:25 288:6
301:25 305:10
314:4 318:12
323:21 333:22
**determined (8)**
20:18 60:2 62:17
310:12 312:6
316:23 318:23
332:24
**determines (2)**
315:23 318:6
**determining (7)**
155:18 162:2 166:19
175:3 265:10
309:10 323:9
**devoted (1)**
257:8
**difference (4)**
10:22 135:11 187:25
188:5
**different (23)**
10:14 14:9 16:23,24
18:8 99:3 100:14
154:22 161:9,9
170:4 189:4 200:2
201:6 209:24
217:25 218:13
222:23 230:21
231:7 270:11

277:19 316:13
**differentiation (1)**
202:7
**differently (4)**
217:25 218:8,14
231:8
**difficult (2)**
66:16 86:12
**difficulties (2)**
26:24 147:22
**difficulty (1)**
62:13
**dig (1)**
319:25
**diligence (31)**
12:19,24,24 16:11,14
17:3,23 25:12 59:13
67:23 68:17 69:15
74:3 93:12,24 94:5
94:10 95:6 104:17
105:15 112:25
136:6 166:4,6,7,9
166:14 167:10
168:14 214:15
215:13
**direct (3)**
51:5 127:8 184:4
**directed (2)**
17:2 297:23
**directing (2)**
122:11 297:22
**direction (1)**
278:4
**directly (1)**
53:3
**Director (1)**
250:8
**directors (3)**
216:5,7,10
**directs (1)**
122:7
**discernible (1)**
96:12
**disclosure (1)**
24:21
**discrepancies (2)**
296:12 303:5
**discrete (1)**
149:15
**discuss (4)**
191:17 240:25 330:4
332:12
**discussed (16)**
19:21 20:7 194:18

221:6 238:24
252:22 256:15
260:14 262:4
292:23 295:16
298:8 301:5 303:6
334:10 339:6
**discusses (2)**
292:5 332:9
**discussing (4)**
52:3 140:13 212:7
302:23
**discussion (4)**
192:22 274:3 306:12
308:22
**discussions (5)**
192:20 276:22 289:7
309:21 334:17
**disparity (1)**
105:21
**disposing (1)**
81:19
**dispute (2)**
53:21 246:2
**distinction (2)**
107:7,12
**DISTRICT (1)**
1:3
**dive (1)**
17:3
**divided (1)**
333:25
**Division (4)**
255:7,10,11 274:7
**document (56)**
33:22 39:16 42:25
46:15 47:3,10 70:8
70:12,14,19 77:6,8
83:5,14 99:13
103:16 113:21
122:3,8 127:11,18
140:25 141:4
146:12 147:9
172:15 177:16
204:21 205:14,24
206:4 207:17 219:5
222:13 224:6 226:5
226:18 233:7
234:24 235:2,7,9
279:9,14 280:3,7
297:13 300:7
303:23 304:6,7
305:2,6,9 330:2
342:15
**documentation (2)**

172:7 285:25
**documents (17)**
7:24 8:6 77:5 169:2
176:4 237:19 247:3
275:14,18 281:4,7,8
281:14,15 333:20
334:14,19
**doing (28)**
20:25 21:2,5,11,15
26:6 27:19,20 29:12
68:14 93:15 95:6
112:25 118:22
161:8 189:14,25
190:11,13,20
191:23 219:3
243:14 250:16,20
278:7,8 295:5
**dollar (21)**
114:6,6,9,9 123:15,15
177:21,22 197:3,3
197:11,12,25,25
198:2,2,7,7 210:15
210:16,19
**dollars (11)**
41:3,5 77:4 114:20
115:15,17 117:13
141:14 172:8
209:17 221:16
**dollar's (1)**
196:18
**dollar-for-dollar (5)**
116:11,15 117:2
196:17 197:22
**doubt (4)**
53:22 78:9 147:17
148:4
**downside (2)**
81:20 117:7
**downsizing (1)**
249:25
**dramatically (1)**
142:10
**drastically (2)**
141:2 208:12
**drawing (1)**
107:7
**drawn (1)**
107:12
**Drexel (2)**
95:25 96:2
**drop (2)**
134:23 135:2
**dropped (1)**
141:24

**DTC (1)**
233:12
**due (35)**
12:19,24,24 16:11,14
17:3,23 25:12 59:12
67:22 68:16 69:15
74:3 87:23 90:21
93:12,24 94:5,10
95:6 104:17 105:15
112:25 136:6 166:4
166:6,7,9,14 167:10
167:25 168:13
214:15 215:13
217:19
**duly (2)**
5:15 341:11
**duplicative (1)**
154:17
**duties (2)**
172:25 254:12
**Dziemian (5)**
46:4 47:8,24 53:9
342:9
**Dziemian's (1)**
46:9

_____

**E**

**E (4)**
3:3,3 4:2,2
**earlier (24)**
59:11 65:13 72:18
82:12 100:19
106:11 109:17
110:16 140:8,13
192:21 207:14
217:6 221:6 232:19
237:2 262:4 301:11
309:7,22 315:6
321:25 325:23
339:6
**earmark (1)**
163:11
**earn (1)**
112:16
**earnings (1)**
108:18
**ease (1)**
172:2 280:14
**easier (3)**
261:22 291:6 301:3
**easily (2)**
6:10 98:13
**East (1)**
3:7

**economic (1)**
221:19
**Ed (2)**
71:25 72:2
**editions (1)**
255:22
**education (3)**
249:4,6,17
**effect (4)**
48:11 82:19 136:22
168:24
**effected (2)**
322:11 323:17
**effective (9)**
90:10 148:20,23,25
149:16 150:3 173:2
313:21 314:5
**effectively (7)**
147:25 312:15 317:16
323:2 325:3,20
330:19
**effectually (1)**
176:2
**efficiently (1)**
171:13
**effort (4)**
262:21 287:25 293:12
293:19
**efforts (1)**
288:6
**either (17)**
45:6 74:6,18 124:24
126:6 189:19
190:23 210:18
211:20 220:14
238:20 275:7 277:7
280:20 315:17
319:3 322:6
**electronic (2)**
282:6 284:3
**electronically (1)**
288:12
**element (1)**
217:13
**eliminate (1)**
81:3
**eliminated (2)**
82:22 85:6
**eliminating (2)**
80:14,21
**EMANUEL (1)**
4:4
**emphasize (1)**
296:8

**employed (1)**
278:3
**employee (2)**
298:3 329:22
**employees (15)**
277:9,11,17,19 278:6
278:14 296:18,22
296:22 297:24,25
298:2,5 301:22
308:5
**enable (1)**
163:25
**encompass (4)**
207:5 224:13 232:15
233:2
**encompassed (3)**
201:18 232:15 233:3
**encompasses (1)**
43:16
**encountering (1)**
96:8
**ended (1)**
95:10
**Enforce (1)**
121:8
**enforced (2)**
289:24 290:3
**engaged (2)**
294:20,25
**ensure (2)**
31:6,11
**enter (3)**
94:2 171:15 216:25
**entered (7)**
62:5 160:10 166:16
212:24 215:14
266:7 269:9
**entering (7)**
61:22 266:5,12,20
267:5,23 268:12
**entire (6)**
18:25 19:5 150:11
214:7 233:10
323:13
**entirely (2)**
82:22 278:4
**entities (8)**
16:22,24,25 37:5 49:3
54:18 105:22
170:11
**entitled (5)**
129:20 133:2 237:8
257:16 322:18
**entity (19)**

14:7,9,9,19 15:2,5
15:14,16 16:21
25:17 27:15 94:9,11
94:19 95:5 99:3
169:12,22 171:14
**environment (6)**
66:13,15 138:2,8,10
138:16
**equal (1)**
337:15
**equating (2)**
282:11 283:7
**equation (1)**
117:18
**equities (11)**
14:2 48:12 97:12,17
97:22 98:2 157:2
162:14 187:20
201:22 202:8
**equity (13)**
39:3,5 94:24 129:10
149:9 151:4,12,22
158:6,14 201:8
233:12 285:9
**equivalent (1)**
48:18
**Eric (2)**
4:9 146:14
**error (2)**
274:15 292:10
**errors (8)**
292:5,6,14,24 293:9
293:23 296:13
344:7
**ESQ (10)**
3:9,15,16,17,18,24
4:9,15,16,17
**Essentially (1)**
315:19
**established (1)**
270:18
**estate (24)**
45:10,24 47:14 48:5
48:18 49:20 50:7
52:22 54:4,7 55:10
55:15,18,20 56:4,21
56:23 57:4 79:12
81:4 246:5 331:7
337:22 338:2
**et (1)**
1:8
**event (12)**
31:6 60:6 75:9,25
121:20 122:23

131:22 152:17
156:4 165:10 186:4
326:4
**events (5)**
77:22 269:15 293:3
293:12,20
**eventually (6)**
53:3 262:14 312:21
313:17 319:25
338:2
**everybody (1)**
311:12
**everybody's (1)**
120:24
**everything's (1)**
253:3
**evidence (25)**
69:11 108:4 130:23
135:6 142:13
143:16 150:10
153:15 155:7 156:7
168:17 172:10
181:20 182:25
187:23 189:23
191:4 193:8 214:10
238:19 239:18
265:24 287:6
289:23 322:16
**Evidently (1)**
215:22
**ex (1)**
89:16
**exact (1)**
260:22
**exactly (7)**
16:9 17:14 41:3 70:17
98:2 257:13 260:17
**Examination (5)**
5:18 146:8 240:21
342:4,5
**examined (2)**
5:16 247:21
**example (11)**
114:19 121:14 122:17
122:20 125:10
149:3 151:25
175:10 179:9
181:19 310:8
**exceed (1)**
187:8
**exceeded (1)**
128:16
**exceeds (2)**
31:18 187:2

**excess (13)**
28:16 31:16 35:25
36:7 84:7 135:15
221:2,16 234:21,23
263:2,14,21
**exchange (12)**
76:18 77:23,25 78:14
108:2 109:22
110:22 111:14
119:4,25 198:12
202:17
**exchanges (6)**
135:18 207:13 212:8
212:12 231:14,23
**exchange-traded (64)**
7:5,12 8:13,22 9:2
23:5,6,20 24:15
70:21 97:23 147:2
150:19 151:3,14,21
152:7,10,13,16,22
152:25 153:11,19
154:2 155:4,10,14
155:17,23 156:3,10
156:14,18 157:6,11
157:17,20 158:6,13
158:20 162:13
165:2,7,12 167:17
167:21 169:5 170:6
172:4 199:19,21
200:4,7,9,24 201:5
201:13 202:2,13
212:4 213:22
224:23 233:9
**exclude (2)**
209:8,12
**excluded (12)**
203:13 207:24 209:2
209:7 210:6 211:2,4
211:15,17,20,22,22
**excluding (6)**
33:13 117:17 203:12
207:24 209:2
211:15
**exclusive (3)**
263:3,5,12
**excuse (8)**
65:12 99:17 101:10
101:20 229:15
230:14 264:23,23
**execute (1)**
215:9
**executed (2)**
69:17,20 215:3
**execution (1)**

201:8
**executives (1)**
93:19
**exercise (3)**
18:19 45:3 89:17
**exercised (2)**
89:11 91:3
**exercises (2)**
173:8,9
**exhibit (77)**
6:24,25 7:4 42:23,24
47:6,7,11 50:18,19
50:20 70:9 77:7
83:4,13,14,25 99:5
106:19,20 121:2,3
127:6 140:2 141:6,7
146:13 172:15,16
178:6,6,7 200:14
217:7 219:6,7 224:6
234:25 235:2 240:9
240:12,15 248:17
248:17,18 267:17
267:18 291:4,8,9
296:14 297:3,7
299:24 300:3,12,14
300:21,25 301:7
302:23 304:13,16
304:18 342:8,9,10
342:11,13,14,15,17
342:18,20,21,22,24
**exhibits (4)**
241:2 248:3 252:14
342:7
**exigencies (1)**
218:19
**exist (2)**
39:20 167:25
**existed (2)**
57:15 218:4
**expect (14)**
56:3 77:7 108:16
109:2 112:9 114:13
115:4,8,11 116:9
209:3 210:8 238:10
239:7
**expectation (1)**
108:22
**expected (9)**
33:12,19,23 34:3,4,6
34:8 213:13 237:5
**expense (3)**
50:14 51:13,13
**expenses (1)**
56:2

**experience (12)**
20:21 36:5 74:13,22
98:4 112:2,14
200:25 241:15
243:14 245:23
253:12
**experienced (2)**
29:20,21
**expert (36)**
6:25 7:4 8:12,17,22
24:5,9 30:18,25
47:13 55:3,5 70:20
96:22 100:8 139:24
146:24 159:13
193:19 195:16
242:4,11,15,19,25
244:2,22,25 251:4,6
253:6 256:9,13
309:22 322:17
342:8
**expertise (2)**
26:11 79:24
**expiration (4)**
87:15,23 90:11
144:18
**expirations (1)**
88:4
**expiring (3)**
86:23 87:2 88:21
**explain (2)**
114:8 253:11
**explained (2)**
59:14 171:19
**explaining (1)**
123:8
**exposed (2)**
87:9 134:25
**exposure (32)**
80:7,9,12,14,18,22,23
81:3,8,9,21,25 82:2
82:21 83:3 85:6
86:5 87:6 119:5
126:18 131:23
132:5,8 134:10,13
142:15 145:4
154:24 156:3
161:14 165:20
212:10
**exposures (3)**
82:14 86:14 168:2
**express (1)**
7:9
**expressed (6)**
41:19 69:24 99:16

Contains Highly Confidential Portions

101:19 116:21
276:25
**extend (2)**
56:12,14
**extent (8)**
28:10 36:17 51:18
131:23 156:2
221:20 276:13,21
**extra (7)**
18:23,24 41:5 46:15
116:9,11 281:15
**extraordinary (1)**
217:20
**extrapolation (1)**
86:2
**extreme (1)**
35:18
**extremely (1)**
96:20
**e-mail (19)**
36:4 70:11,18 71:22
72:24 73:4 127:6,7
192:21 212:5 235:6
235:11,19 236:5,10
236:20,25 237:6,24
**e-mails (3)**
63:5 72:10 322:24

**F**

**face (1)**
226:5
**facing (5)**
100:16 194:23,25
195:19 196:19
**fact (32)**
10:14 34:21 49:9
51:21 53:22 64:11
69:3 137:15 167:25
176:6 180:8 198:6
218:6 238:15
264:11 272:25
281:20 283:18
287:3 289:8,15
293:9 307:18 308:6
311:8 318:5,14
323:23 331:10
333:6,15 338:23
**factions (1)**
206:13
**facts (28)**
53:13 69:11 108:4
130:22 135:6
142:13 143:16
150:10 153:15

155:7 156:7 172:10
182:25 187:23
189:23 191:4 193:8
195:18 197:17
198:18 214:10
265:24 276:16
277:6 287:6 294:9
322:16 344:6
**factual (1)**
46:5
**fair (13)**
12:15 24:4 39:24
44:15 63:8 81:15
134:24 153:9
154:25 157:25
194:12 196:15
204:11
**fairly (4)**
93:11,21 144:25
231:20
**fall (3)**
55:9 200:25 202:23
**familiar (15)**
18:9 23:2 32:25
146:15 151:7
178:12 219:12
241:16 242:22
243:23 244:18
245:4,9,12,18,21
321:22
**familiarity (2)**
26:13 138:22
**far (10)**
9:9,9 17:19 18:21
20:7 31:13 80:11
93:10 174:23
317:24
**FARA (1)**
4:17
**Fargo (3)**
260:3,7,13
**fashion (1)**
101:2
**Fast (1)**
220:3
**fathom (1)**
215:15
**FCM (2)**
17:10 129:4
**fear (4)**
184:17 185:5,10,13
**February (4)**
8:14,15,16 241:11
**fed (11)**

40:11,16,23,25 41:13
41:20 100:18,20
244:3,23 331:17
**Federal (1)**
341:20
**feed (3)**
329:2,7 331:10
**feel (5)**
31:12 51:18 105:14
105:15 122:5
**fees (1)**
284:22
**FID (10)**
274:4,9 278:18 280:5
285:17,21 299:21
300:15 304:18
306:4
**fifth (1)**
48:10
**figure (1)**
215:21
**figures (1)**
294:9
**file (1)**
98:16 272:21
**filed (11)**
94:23 102:23 241:5
241:11 251:11
253:20 282:22,22
294:13 295:8
337:22
**filing (4)**
253:23 258:25 272:19
335:19
**Fin (2)**
243:7 253:16
**final (4)**
18:21 70:5 237:19
268:15
**finalize (4)**
25:8,11,12,13
**finalized (3)**
319:17 324:25 326:9
**finally (1)**
270:12
**finance (1)**
13:4
**financial (37)**
7:18,19 9:18 12:21,25
16:15,19 18:5 21:14
24:21 26:14,23
27:22 28:6 58:3
62:12 65:17 102:22
241:17 242:22

253:17,19 255:7,8
255:10,10 262:5,8
275:11,24 276:2,5
281:5 294:20
304:23 329:18
338:20
**find (11)**
63:12 101:5,13 102:3
111:21 155:13
194:9 277:5 291:6
300:25 328:7
**findings (1)**
338:20
**finds (1)**
325:17
**fine (5)**
51:4,6 91:13 199:6
276:19
**finish (7)**
6:7 54:11 184:15
324:9 327:15,18,24
**finished (4)**
14:23 230:15 281:24
339:5
**FINRA (4)**
291:14 319:4,20
328:14
**firm (41)**
9:15,24 12:23 14:13
18:6 21:25 26:18,22
27:4,19 28:21 29:2
29:12 31:13,15
42:15 44:18 60:13
60:17 75:13 97:3,5
97:6 98:17 101:11
112:22 114:17
117:19 124:9
128:18 129:4,15,17
131:9 135:15
161:19 164:23
188:25 218:22
235:25 320:14
**firms (14)**
9:8,16 24:10 26:21
29:9 36:11,12 70:3
76:15 93:15,20
161:7,16 243:5
**firm's (5)**
9:15 24:18,20 26:14
42:14
**first (38)**
6:23 9:19 15:25 16:5
18:21 19:21 25:21
25:23 43:7,8 46:14

55:14 61:23 65:15
71:5 91:23 92:4
99:10 100:10
101:11 102:7 127:7
127:9,12,14,15
224:21 231:21
235:11 236:10
248:16,17,17
250:20 280:10
297:5 334:10 337:2
**firsthand (1)**
76:13
**fit (2)**
162:10 166:19
**five (5)**
66:17 139:19 199:5
210:22 246:23
**five-minute (2)**
91:11 338:6
**fixed (6)**
39:3 158:14 201:21
202:8 245:18 274:7
**Flexner (3)**
2:6 3:11 5:23
**Floor (1)**
4:7
**flow-through (1)**
149:10
**fluent (1)**
337:18
**Focus (3)**
94:23 253:18,23
**focusing (1)**
232:21
**follow (2)**
204:13 289:14
**followed (1)**
306:10
**following (13)**
31:18 85:5,12 102:15
103:23 134:24
142:10 204:6
271:21 272:4
339:10,12,17
**follows (4)**
5:17 146:4 204:5
205:7
**footnote (2)**
32:20,22
**force (2)**
83:18 289:21
**forcing (1)**
104:15
**foreign (1)**

Contains Highly Confidential Portions

170:10
**forensic (1)**
245:23
**forever (1)**
33:5
**forgave (1)**
38:21
**form (236)**
10:11 14:20 16:7
17:13,24 21:8 23:11
23:21 24:7 25:7,18
28:8,18 29:7,18
30:8,17 31:9,20
32:10 33:21 34:20
35:4 37:2 39:7 40:5
40:17,24 41:15 42:8
45:5 48:20 49:22
53:15 54:20 55:13
55:22 56:16 57:7,17
58:6,11 59:23 61:5
62:9 64:2,13 65:6
65:11 67:11 68:10
69:10,25 73:3 74:17
75:10 77:2 78:16,20
78:24 79:9,17 80:3
80:8,15 81:5,16,24
82:24 85:15 86:11
88:13,25 89:14,25
90:24 94:3,21 95:8
96:9,24 97:16 98:7
98:23 104:24
105:11 108:3
109:13 112:6,13
113:10 115:2,21
116:17 117:4,11
118:8,20 119:6,16
120:4,16 123:18
124:17 126:15
129:23 130:9,13,21
132:3 135:5 136:3
136:15 138:15
139:9 140:20
142:12 143:15
144:8,22 148:12,21
149:5 150:9 151:10
151:16 152:20
153:14,21 154:4
155:6 156:6 157:4
158:2,17 159:9
160:11 161:4 162:5
162:23 163:10,20
166:10 167:2,13
170:17 172:9
173:17 174:7,18,22

175:14,22 176:9,19
177:7 179:17 182:9
182:24 183:25
185:8,21 186:8
187:14,22 188:22
192:4 193:7 194:15
195:2,21 196:10,23
197:14 198:14
199:22 201:4
202:15 204:14
205:13,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:21 222:10
223:2 224:2,16
225:5 226:7 227:2
227:19 228:12
229:13 231:9
232:17 233:5
234:19 237:11
239:12 243:17
244:6 246:13
247:16 251:24
257:10 259:10
265:23 266:13
267:25 270:7,21
272:11 273:18
287:5 289:2,11
294:22 308:10
309:16 310:11
312:3 313:13
317:12 318:20
321:4 322:15
325:10,14 329:5
**formal (1)**
249:3
**former (1)**
246:4
**forming (1)**
224:9
**formula (62)**
9:11 26:17 31:5
243:20 244:12
253:21 259:14
260:6 265:18
290:18,21 293:24
296:11 297:19
303:5 307:25
308:13,15 310:5,15
310:18,21,24
311:11,19,20,23
312:9,17 313:2,8
314:3,14 315:13,17
316:2,11,12 317:3

317:16,20 318:9
319:2,9,19 320:17
320:21 321:17
324:17 325:15
326:15 329:15
331:20 332:2 333:2
333:4 334:3 335:4,4
335:6 336:7 338:25
**formulates (1)**
32:9
**forth (6)**
69:24 176:2 242:11
248:2 297:20
341:10
**forward (3)**
168:10 242:15,19
**forwarding (1)**
220:3
**found (6)**
294:15 299:17 302:24
333:16 336:6
338:24
**foundation (1)**
246:8
**four (10)**
29:8 93:9 97:8 123:7
143:5 246:6 256:10
256:24 260:11
262:3
**fourth (1)**
48:10
**fraction (1)**
132:19
**free (5)**
82:11 111:6 122:5
295:14 307:3
**Friday (30)**
10:20,22 35:22
143:20 220:5,14
268:7,15,18,21,23
269:5,5,18 270:5
271:12,13,17,21
272:7 273:13 288:4
325:24 326:2,19,23
327:6,9 339:7 340:3
**Friday's (1)**
86:7
**front (9)**
50:23 198:23 241:2
248:3 253:7 256:14
280:21 301:8
313:16
**FTC (1)**
9:4

**fulfill (1)**
27:17
**fulfilling (2)**
126:25 128:21
**full (10)**
77:18 91:23 92:4
127:9,14 131:23
134:25 151:15
155:19 200:18
**fully (13)**
133:9 149:20,21,24
150:5 153:25 155:3
159:19,23,24
241:16 310:20
326:15
**function (1)**
251:3
**Fund (1)**
173:3
**funding (1)**
309:4
**funds (6)**
179:3 181:5 182:4,19
316:8,10
**further (13)**
13:23 121:4 146:4
234:3 330:9 336:18
337:4,8 338:15
340:6 341:14,18
342:11
**futures (22)**
9:2,5,23 10:14 12:5
12:18,18 20:22
24:24 45:16 96:17
112:24 128:2,24
129:3 136:9 138:5
201:7 202:20,22,24
258:18
**futures-related (2)**
9:9 11:5
**fuzzy (3)**
13:7,23 258:17

_____ G _____

**gain (3)**
37:12 149:22,23
**gained (2)**
149:17 150:7
**gains (6)**
38:15 90:12 149:3
161:21,22 185:24
**Gary (6)**
50:15,20,23 51:10
52:8 342:10

**general (18)**
24:22,23 26:10,18
33:3,5 54:17,24
55:4,11,16,18 56:21
63:6 96:25 126:4
204:4 307:11
**generally (9)**
8:20 25:4 27:3 32:8
40:9 42:5 56:7
112:3 176:24
**generate (1)**
164:10
**getting (22)**
82:6 95:19,20 112:9
117:6 155:2 159:8
166:24 167:4,4,6,6
167:11,23 168:7,8
169:10,20 172:8
210:6 215:23,24
**Giddens (3)**
72:10,13 236:5
**give (31)**
8:22 10:15 17:4 25:15
40:14,19 45:11
82:11 91:25 120:13
120:15 125:10
126:6 151:25 158:8
164:18 186:11,12
186:18 195:15
198:8 204:20
239:23 256:23
261:23 264:19
291:5 307:8 313:6
320:17,18
**given (28)**
12:7 28:17 30:6 81:14
142:8 170:15
179:12 180:25
183:13 196:4 204:9
211:17 213:9,11,12
225:15 262:14
311:21,23 312:15
313:3,10 314:11
315:11 316:3
318:23 320:15
341:12
**gives (1)**
133:25
**giving (3)**
114:10,13 197:17
**gladly (1)**
319:25
**glanced (1)**
8:7

**go (37)**
6:4,5 43:21 64:15
73:6,7 88:8 91:7
93:18 105:3,17
106:10 111:8
132:15 138:19
143:24 155:18
167:3 168:10
177:18 192:10
208:14 210:9 221:2
240:3 256:21
261:23 262:21
269:19 276:12
277:15 299:6 309:7
311:19 313:7 320:9
333:2
**goal (5)**
36:24 37:4 150:3,5
191:10
**goes (9)**
13:22 99:22 136:18
138:23 141:18
174:24 265:18
290:20 334:3
**going (78)**
6:23 25:9 36:18 46:19
47:4 48:22 50:18
53:7 58:17 59:3
61:9 66:12 69:15,19
73:10,21 77:9 79:2
91:9,16 95:15 102:7
102:10 109:4,9
112:5 118:5,25
127:23 138:18,19
138:25 141:2
143:24 145:10
165:10 169:6,20
174:14 176:2,5,6
178:5 181:18
182:23 184:3
185:14 187:8
190:22 192:24
196:7,9,13 199:9
212:11 216:10
240:7 246:14
247:17 251:23
253:10 254:24
258:23 267:16
273:12 277:16
281:6 292:4 297:3
297:21 299:9
310:13 311:11
313:16 327:19,25
338:8 340:10

**good (41)**
5:20,21 46:14 56:9,10
77:9 81:9,11 91:11
91:12 93:17 95:22
108:10 110:4
134:18 139:17
145:6 146:10,11
158:21 172:18
199:5,15,16 240:23
241:13 243:3
256:13 283:13
284:4,13 307:23
308:12,16 310:5
311:10 312:16,25
314:13 317:17
320:16
**goodwill (1)**
51:14
**Gotshal (1)**
235:22
**gotten (1)**
186:20
**Gottlieb (4)**
3:20 72:2,4,5
**governing (2)**
241:17 242:22
**government (2)**
97:20,21
**great (2)**
46:17 299:3
**greater (1)**
136:12
**GREEN (6)**
3:9 30:10 50:9 57:8
182:10 192:5
**ground (1)**
6:5
**group (5)**
20:17,24 236:11
254:8,15
**groups (1)**
16:18
**guarantee (1)**
82:13
**guaranteed (1)**
31:6
**guess (24)**
23:15 32:11,15 35:21
47:20 74:4 85:23
87:7 98:24 108:5,9
108:25 109:24
110:3,23 117:15
155:21 156:21
177:2 179:19

191:10 230:25
280:21 308:15
**guessing (1)**
237:20
**guide (1)**
255:16
**gun (4)**
63:19 72:21 73:9,24

_____
H
_____

**haircut (1)**
21:12
**half (1)**
198:2
**halfway (1)**
298:24
**HAMILTON (1)**
3:20
**hand (1)**
341:24
**Handbook (1)**
291:14
**handing (1)**
178:5
**handling (4)**
241:20 243:24 244:19
253:13
**hands (1)**
297:5
**happen (8)**
31:23 32:7,12 104:3
171:3 183:24
185:17 270:19
**happened (23)**
28:16 32:4 60:6,9
61:15 67:21 78:18
78:19 88:10 93:20
93:21 96:2 100:3,23
102:19 131:4,14
153:23 174:2
193:10 265:17
315:23 326:4
**happening (13)**
32:5 63:7 64:5 66:14
92:10,17,22 136:22
174:24 191:17,18
207:11 208:23
**happens (1)**
105:25
**happy (2)**
6:21 304:9
**Harbeck (1)**
72:16
**hard (1)**

327:22
**Harris (2)**
276:8 277:7
**HASSAN (1)**
4:16
**head (4)**
63:19 72:22 73:9,24
**hear (2)**
62:7 287:8
**heard (6)**
34:22 36:3 77:3 222:5
320:6 321:22
**hearing (9)**
77:11,15,19 99:6
101:4 104:4,20
217:9 220:15
**HEATHER (1)**
3:18
**hedge (25)**
148:25 149:3,12,16
149:16,20,21,24
150:4,5,6,8,11,14
152:5,7,11,14 153:4
154:14,21 158:15
158:22 159:3
165:18
**hedged (17)**
151:4,22 152:2,4
153:18,25 155:3,19
159:16,19,19,23,24
161:14 164:11,17
165:17
**hedges (5)**
4:4 150:12 154:17
159:25 160:21
**hedging (13)**
150:21 152:23 153:3
154:9,11,20,23
155:11 156:11,24
157:3,11 163:7
**held (66)**
2:5 33:11 44:18,24
63:19 113:25
130:19,19 133:2
170:24 173:4,15
174:14 213:20
220:19 222:18,24
223:4,11,12,14,19
223:22,25 224:3,13
224:24 227:5,13,22
228:3,4,10,19 229:2
229:10,12,19,20,22
231:17 232:4
233:22,24 234:3,6,7

234:11,16,20
236:14,22 237:9
238:13 252:23
260:9 263:2,4,7,11
307:13,20 308:8
324:3 333:21
337:16
**help (3)**
6:5,14 247:14
**helped (1)**
280:3
**hereto (1)**
83:25
**hereunto (1)**
341:23
**he'll (2)**
134:20,20
**high (2)**
17:16,17
**highly (15)**
1:12,16 11:8 12:1,11
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1
**history (1)**
32:5
**hit (1)**
162:20
**hold (12)**
111:3,3 184:12
231:24 232:2 244:5
250:9 254:17,18
322:9,10 323:16
**holder (1)**
88:19
**holding (10)**
73:9 225:13,14 228:6
228:7 231:18
233:12 307:3
337:14,19
**Holdings (2)**
1:8 250:24
**holds (2)**
232:6,7
**Honor (5)**
77:21 99:18 100:3
101:21 104:7
**hour (2)**
91:10 199:4
**hours (10)**
62:8 69:4 77:21 214:8
215:17 246:7,23
256:10,16 257:7
**Hubbard (2)**

4:11 72:9
**Hughes (2)**
4:11 72:9
**Hum (1)**
261:12
**hundred (2)**
256:24 257:12
**hundreds (2)**
256:22 257:7
**hypothetical (1)**
323:25
**hypotheticals (1)**
322:18

**I**

**IBM (1)**
161:11
**idea (9)**
62:15 68:15,20
143:25 179:21
187:15,16,17
221:11
**identification (13)**
7:2 47:8 50:21 121:11
178:8 219:8 235:4
240:10,14,16
267:19 291:11
297:8
**identified (4)**
292:24 293:14 306:19
337:11
**identify (8)**
210:4 241:3 281:11
293:3 300:2,11
302:7 337:2
**identifying (3)**
295:2,3 328:25
**ii (1)**
173:3
**iii (1)**
173:5
**illiquidity (1)**
96:4
**immediately (4)**
71:18 106:24 147:12
204:6
**impact (14)**
9:15 18:6 24:17,20
69:5 81:19 86:2,24
143:21 144:18
188:13 287:14
293:9 338:24
**impacted (6)**
12:23 26:16,17 294:3

294:6 295:4
**impacts (1)**
26:20
**impaired (5)**
310:6 315:20 316:24
324:4,21
**impairs (1)**
324:20
**impede (1)**
313:24
**impeded (9)**
310:17 312:14 314:7
317:18 321:15,17
324:17 325:13
328:9
**impedes (1)**
328:3
**impending (1)**
36:22
**implementation (1)**
13:4
**important (1)**
218:19
**imposed (3)**
314:21,24,25
**improperly (2)**
286:17,23
**inability (2)**
283:8,12
**inaccurate (1)**
88:11
**include (23)**
13:17 19:23 27:10
47:22 114:4 116:8
164:25 176:12
177:20 197:10,21
208:10,17 209:11
209:14,14 210:18
249:13 307:11,18
311:23 314:2
325:15
**included (22)**
13:14,25 144:13
209:25 210:5
211:20,21,21
221:22 222:16
234:4 258:11
259:13 279:17
310:15 317:8,14
319:2 326:6 329:14
331:12,20
**includes (1)**
176:14
**including (14)**

130:6 173:2 203:14
203:22 204:2,3,10
204:13,23 205:2,5,6
228:19 229:2
**income (4)**
201:21 202:8 245:18
274:7
**inconsistent (2)**
52:20 221:3
**incorporate (1)**
148:11
**incorporating (1)**
147:14
**incorrect (2)**
329:10 334:23
**incorrectly (1)**
334:2
**increase (5)**
28:5 84:17 85:2
142:10 143:13
**increased (4)**
86:5 141:21 143:4,7
**incur (2)**
31:18 75:13
**incurred (5)**
53:11,22 54:2,8 57:4
**independent (14)**
250:12,13,24 251:5
252:21 253:4
262:16 275:12
279:13 280:9
293:11,19 306:24
331:23
**independently (1)**
265:21
**index (6)**
23:3,7,8 152:4 342:2
343:2
**indicate (2)**
165:14 224:17
**indicating (1)**
107:17
**indication (3)**
168:18 293:8 315:8
**individual (6)**
136:24 137:10 139:13
164:3,4 165:14
**individuals (5)**
235:21 237:13 278:18
278:21 301:19
**industry (7)**
241:19 243:4,23
244:19 253:13
255:8 278:13

**ineffective (2)**
150:8,14
**inferences (1)**
36:3
**inflated (2)**
142:17,21
**inform (3)**
238:15 239:11 339:2
**information (36)**
8:3 10:21 12:9,21
14:13 16:15 18:5
21:6,17,19 23:17
25:10,11 53:19
63:21 64:9 88:16
94:6 95:20 98:13
156:13 162:18,21
164:7,10,18 165:25
214:20 216:6
253:19 257:17
276:15,24 279:17
296:19 335:9
**informed (10)**
76:8 238:21 287:17
289:3 329:11,16
331:19 332:3
338:14,19
**infrastructure (1)**
171:7
**inherit (1)**
130:12
**initial (1)**
334:25
**inquire (2)**
155:9 286:7
**inquiries (1)**
288:15
**insecurities (1)**
29:5
**instance (1)**
180:19
**instances (1)**
292:17
**instituted (1)**
21:24
**institutional (1)**
136:8
**institutions (1)**
137:11
**instruct (2)**
251:24 277:2
**instruction (1)**
252:3
**instructions (1)**
289:12

**insufficient (2)**
34:18 35:11
**intend (1)**
239:20
**intended (8)**
209:8 228:11 229:9
229:18 236:15
238:2,22 239:9
**intent (1)**
237:7
**interact (1)**
151:13
**interest (3)**
99:17,20 101:19
**interested (2)**
79:13 341:17
**interests (1)**
172:23
**interfaced (1)**
27:18
**interim (2)**
147:25 237:18
**interpret (3)**
243:7,8 247:11
**interpretation (6)**
223:12 243:2 246:3
246:11 291:5,14
**interpretations (2)**
243:9 319:21
**interpreting (2)**
243:13 255:25
**interrupt (1)**
303:21
**interrupting (1)**
90:16
**intimately (2)**
245:21 256:6
**introduced (1)**
220:4
**inventory (2)**
97:19 116:6
**investigate (4)**
335:11,17,24 336:8
**investigated (2)**
286:24 333:15
**investigating (1)**
335:9
**investigation (22)**
64:11 262:17 275:13
279:14 280:10
286:3,4,15 306:25
331:15 332:18
333:9,11 334:6,12
336:24 337:5,9,20

Contains Highly Confidential Portions

338:15,17 339:4
**investment (1)**
310:9
**involved (21)**
13:21 16:10 19:16
20:7,10,11 25:2,3
64:22 68:12 75:2,4
75:6 178:16 180:14
183:16 195:5 256:6
257:23 258:2
273:24
**involvement (4)**
27:14 255:18,19,24
**irrational (7)**
81:23 114:22 116:14
119:23 123:14
182:7,21
**issue (11)**
296:5 298:12 299:21
300:19 302:2 308:3
319:22,24 330:4
335:12 336:19
**issued (7)**
255:16 272:14 286:5
286:11,18,23
287:18
**issues (14)**
7:6,10 8:13,23 9:4,5
20:20 147:2 248:15
251:8 293:6 303:15
319:24 337:11
**item (2)**
209:23 333:18
**items (14)**
217:15 294:14 330:15
331:16 333:25
334:2,5,7,10,12
336:23 338:15,17
338:21
**it'll (1)**
283:24
**iv (1)**
173:7

**J**

**J (2)**
3:15 4:15
**James (5)**
71:23 219:7 235:12
235:13 342:14
**January (2)**
303:8,12
**jeopardizing (1)**
100:2

**job (2)**
1:25 255:12
**Jointly (1)**
1:8
**Jones (3)**
3:5 83:24 141:5
**JPMorgan (8)**
220:20 222:19 223:4
223:12,15,20
231:19 260:16
**judge (3)**
77:12 198:23 321:12
**July (2)**
214:16 250:22
**June (4)**
214:16 249:21,22
258:8
**junior (1)**
254:2
**justifies (1)**
328:6

**K**

**Karp (2)**
276:8 277:8
**Kathy (5)**
1:24 2:7 5:9 6:9 341:5
**KAY (4)**
4:9 30:11 40:18 185:9
**keep (4)**
27:19,21,23 179:8
**kept (1)**
10:17
**kind (6)**
6:4 30:23 85:25
209:25 225:12
278:11
**kinds (1)**
322:24
**KING (1)**
3:18
**Klepfer (4)**
1:24 2:8 5:10 341:5
**knew (12)**
36:21 169:6 190:21
211:25 212:11,16
212:22 213:19,23
214:21 215:4,9
**know (305)**
6:13,17,21 13:14 15:7
17:14,19 18:18,21
19:8 21:10,22 23:14
24:16 25:11,13,20
26:15,15,18 28:10

29:19,22 30:2,12
31:22,23,24 32:4,5
32:8 33:3,7 34:23
36:22 39:8,9,22
40:20 41:23 53:6
54:9,15 55:23 56:24
57:9 58:15 59:8
60:9 61:8 62:3 63:5
63:7,14,15,21 64:6
66:2,16,16,19,20,21
67:14,17,22,24 68:7
68:13 70:6,11 71:10
71:11 72:2,5,12
73:13,20,21 74:19
76:17 77:4 79:4,8
81:10,18 82:3,4
85:9,11,22,24 86:16
86:24 88:14 90:12
91:10 92:12,17 93:9
93:10,11,17,17,18
93:20,21 94:4,5,9
94:12,15 95:9,14,14
95:16 96:20 97:2,6
97:7,11,21 98:14
99:11 102:18,19
106:8,9 107:9,11
108:9,10 110:4,5
112:5,22 118:9
119:21 120:9,18
123:22 132:8,9
136:20,24 137:2
138:3 139:17
143:18 144:6 145:3
146:21 147:7
148:22 149:19
150:2 153:16,18
155:11 158:5
159:21 160:16
161:13 162:11,16
163:8 165:21,23
166:13 168:5
170:10 171:2,3
173:25 178:12,19
180:3,11,12,13,19
180:22 181:11,15
181:22 183:3,6,14
183:15 185:10,12
187:25 189:11
192:6 193:10,11
194:17,23 195:14
195:18,25 196:9
199:4 200:8 201:11
202:10 204:19
206:3,8,22 208:5,21

209:10 210:17,22
212:19 213:4 214:3
214:5,15,20,23
215:20 216:11,19
219:14,15,16,18,24
220:6 225:6 226:10
226:12 230:3,23
231:2 235:13
246:14 248:9,11
251:10,12,20
256:25 259:21
260:8 261:17,24
262:20 264:11
266:6,10 267:11
268:19 269:12
270:23 273:6
275:20 276:9 278:7
278:16 281:19
282:15,21 283:2,9
284:9,23 285:12,14
286:10,14 288:11
288:14,18,19,22
293:22 294:4,24
296:16,21,24
297:12 298:2,7
304:10 306:5
307:17 308:19
311:2,4,6,10 312:18
313:14,23 316:17
318:10 323:25
333:5 335:20
337:13 339:2
**knowing (6)**
63:9 95:15 118:17
212:10 215:16
320:22
**knowledge (14)**
8:18 12:14,14 28:4
30:19 36:6,9 63:6
67:25 68:6 76:4
88:10 96:25 161:25
**knowledgeable (1)**
24:14
**known (7)**
85:18 101:18 102:5
102:17 265:17
283:16 296:11
**Kobak (9)**
72:10,14 219:8,11,15
222:8,13 236:4
342:14
**Kobak's (1)**
220:11
**KPM (1)**

255:12
**KPMG (4)**
250:3,4,10 252:21

**L**

**L (1)**
3:16
**labeled (11)**
5:3 91:15,19 145:9
146:6 199:8,12
240:6,19 299:8,12
**lack (6)**
101:16 149:10 182:7
182:22 217:12,14
**lacking (1)**
182:11
**laid (1)**
194:18
**language (13)**
174:12,16,20,23
178:3 225:4,21
228:2 230:13
232:25 246:11
284:20 289:20
**large (1)**
97:19
**larger (3)**
18:22 38:10,17
**largest (1)**
17:10
**late (1)**
104:5
**law (5)**
235:25 249:10,13,14
249:16
**lawyer (6)**
72:3 173:20 204:16
243:10,14,19
**lawyers (3)**
177:17 243:21 309:23
**LBHI (1)**
235:25
**LBI (155)**
17:6 29:22 35:23
42:11 45:10,16,24
47:14 48:5,13,13,14
48:17,25 49:13
52:21 54:3,7,10,13
55:19 57:4 58:4
59:22 71:19 80:19
85:5,9,11,18 87:8
106:24 107:24
109:21 110:20
111:12 113:24

Contains Highly Confidential Portions

116:24 117:18
118:17 119:24
121:14,19,20
122:13,22,23 124:3
124:4,14 125:3,11
125:15,24 126:9,13
127:23 130:18
133:3 140:13 142:7
142:22 143:18
144:17,20,20,23
147:14 153:7
162:18 170:5,24
180:20 202:3,4,22
205:10,20 206:6,7
206:10,15,21
210:23 212:3
213:20,21 220:16
220:18 222:17,24
223:11,14,22,25
224:3,15,18 227:22
228:3,10,14,19
229:3,11,12,19,21
229:23 230:9
231:18,18 232:6
233:25,25 234:5,15
236:12 238:14
259:22 260:9 266:6
267:4,21 272:19
282:13,22 285:9
288:2,7,23 289:17
301:20,23 306:15
306:22 307:11,12
307:18,20 308:7,8
309:24 310:3,8
311:24 313:2
314:15 318:7
320:12,13,18,24
323:23 329:22
**LBIE (16)**
306:22 307:2,5,12,13
307:20 308:8
314:15 320:12
334:22 335:13,14
335:18,21,22
336:11
**LBIE's (2)**
332:10 336:13
**LBI's (37)**
61:15 76:8,24 84:4,6
84:8 89:6 106:12
117:23 121:17,17
121:22 122:16,25
124:6,16 125:6,17
140:12 151:4

153:17 180:9 201:2
202:24 205:9,19
223:17 225:11
238:20 260:19
261:18 265:10
292:15 309:11
328:25 329:2
336:14
**learned (2)**
30:6 329:9
**leave (3)**
120:19 249:24 269:24
**led (2)**
148:18 307:22
**left (1)**
249:21
**legal (25)**
5:8 72:14 173:18
174:8 176:20 177:8
177:15,16 204:15
204:20 205:14,24
206:4 212:6 233:6,7
242:25 243:14
262:10,11,14,18
276:3,4 277:12
**Lehman (91)**
1:7 3:6 5:5 17:11 39:6
41:2 43:8 56:4 61:3
61:21 62:4,12,15
63:10,11 67:13,19
78:2 88:3,9,9,18
90:6,17,20 92:6
93:3,14,19 94:6
95:16,16,19 98:19
98:21,24,25 99:19
99:22 100:13,16
101:5 107:21
109:18 110:17
111:9 119:24
138:13 148:16
160:9 161:17 163:2
163:25 172:20
174:13 176:10
177:6 178:14,17,25
181:19 182:14,23
183:18 189:14
191:12 192:23
202:21 214:12
218:16,20 244:3,23
246:5 248:24
250:23 266:5 272:3
272:13 281:25
282:4 286:16
287:10,17 308:4

315:25 323:6,7,11
337:14 344:2
**Lehman's (18)**
38:21 44:8 77:25
78:14 80:6 87:16,17
87:18 101:17
105:13 166:2
167:21 172:23
173:13,14 218:25
271:9 323:7
**Leitner (4)**
8:17 92:11 159:13
212:8
**Leitner's (1)**
87:3
**letter (16)**
40:8 63:4 127:10,25
198:25 224:8,21
248:8 284:14,16,21
284:24 289:24
297:21 298:5
308:17
**letterhead (1)**
296:25
**letters (2)**
285:2,12
**letting (1)**
288:13
**let's (13)**
108:7 109:25 184:7
184:25 190:20
193:4 240:3 274:3
299:6 308:21 309:7
328:18 338:5
**level (14)**
28:14 29:9,10,12,14
29:16,22 30:5 34:10
34:13 57:14 164:16
164:22,23
**levels (3)**
29:9 33:15 164:2
**Lexington (1)**
2:6
**liabilities (9)**
10:5 37:18 42:2
121:17 122:15
221:15,21 223:6,10
**liability (5)**
38:21 117:14 332:20
332:25 333:6
**liaison (1)**
9:16
**Liberty (1)**
3:22

**license (2)**
254:18,23
**licensed (1)**
243:6
**licenses (1)**
254:19
**lien (9)**
284:16,21,24 285:2
285:12 289:20,24
306:22 307:4
**liens (2)**
10:2 284:17
**lieu (2)**
33:14 38:21
**life (1)**
255:20
**light (3)**
143:10,17 189:13
**limit (4)**
80:18 204:4 229:9,18
**limitation (4)**
204:3,23 205:2,5
**limited (4)**
121:6 204:12 225:4
318:15
**limiting (1)**
205:6
**line (22)**
48:10 51:23 52:8
178:22 201:23
220:11 228:17
343:4,5,6,7 344:8,9
344:11,12,14,15,17
344:18,20,21,23
**lines (2)**
84:19 255:2
**liquid (1)**
185:2
**liquidate (45)**
28:2 29:17 61:23
71:19 74:10 75:12
82:6,10 106:12,16
106:24 107:6,13
120:19 132:7,15,21
134:5,12 135:24
180:8 183:23 184:3
184:4,5,8,18 185:6
185:11,12,14
187:12,19 188:3,10
188:11,25 189:2,7
191:15 192:24
193:4,14,15 194:8
**liquidated (26)**
37:7 56:20 61:19 82:8

83:2 85:5 107:5
131:7,7,20 179:25
180:6 185:22,25
186:13,25 187:9
188:17,18 189:16
190:4 191:8,13
192:17 193:13
274:12
**liquidates (1)**
33:25
**liquidating (21)**
33:19,23 34:18,22
35:12 44:21 76:2,5
85:12 118:19
185:15 186:10,10
186:21 187:2 188:5
188:12,15 189:12
189:21 192:15
**liquidation (64)**
31:7,17,25 33:12 34:5
36:19 48:11 54:25
56:13,15 58:8,17
61:22 73:16 74:15
74:15,23,25 75:2,5
75:9,21 82:14
107:22 109:18
110:18 111:10
131:22 132:21,22
134:11 168:23
180:15,17 184:10
185:4,16,18,24
186:5,7,15,17 188:8
189:8,15 190:6,23
257:24 259:2 264:9
266:12,20 267:5,23
268:13,24 269:10
269:20 270:4,9
272:19 273:25
282:22
**liquidity (6)**
41:2 95:18,24 99:25
100:19,21
**list (5)**
156:17,20 281:12
283:23 334:6
**listed (5)**
201:17 279:9 305:25
306:20 338:16
**literature (2)**
273:10,11
**little (24)**
6:5 13:22,23 14:21,22
17:2 18:23,24 29:11
40:12 99:11 121:19

Contains Highly Confidential Portions

122:23 124:3 125:8
126:8 140:13 142:7
202:5 227:15 247:5
257:14 276:12
283:25
**lived (1)**
63:7
**Livenote (1)**
2:11
**LLP (6)**
2:6 3:5,11,20 4:4,11
**loan (4)**
290:22,24 292:3
295:23
**Loans (1)**
291:17
**location (6)**
283:14 284:4,13
307:8,24 308:12
**lock (4)**
129:7 130:5 133:24
134:3
**locked (7)**
10:16 132:14,15
133:5 261:8 295:17
306:6
**locked-in (1)**
90:12
**lockup (4)**
129:11 307:13 317:16
325:12
**logic (1)**
310:7
**logical (1)**
209:6
**long (56)**
16:4 18:18 19:6 25:23
28:9 32:14,25 38:23
38:25 39:14,17 40:3
40:15 41:9 64:6
66:17 67:14 68:16
68:20 82:5 88:24
89:5 94:5 97:8,11
97:14 115:7 116:3
117:15 123:25
126:19 144:4,19
151:4,12,22 152:4
157:22 160:4,18
161:11 162:11,16
166:8,13 178:24
181:15 182:13
187:11 191:25
192:6,7,8 250:4
271:22 291:18

**longer (6)**
80:23 267:9 272:4
283:13 288:17
316:4
**longest (1)**
26:3
**look (41)**
30:21 31:21 49:7 52:9
62:16 71:14 83:22
84:19 106:19 115:4
115:25 116:4,5
141:4 147:8 161:9
165:25 172:17
191:7,22 192:21
197:3 203:21
213:10 224:20
228:16 241:23
245:11 260:21
262:2,21 281:7,14
283:24 293:12,19
299:5 330:15
333:13,17,18
**looked (21)**
8:8 61:10 87:3 94:22
102:22,24 108:5
109:24 110:23
166:4 174:13
203:19 204:10
207:14 217:6
246:16 280:3,7,11
293:22 294:2
**looking (24)**
17:15 30:20 45:21
47:12 62:14 85:13
87:7,9 98:16 100:22
165:18 166:20
167:18 200:21
226:13 227:12,14
227:15 261:25
282:18 303:25
322:23,25 329:3
**looks (9)**
52:25 96:14 101:7
107:11,19 222:13
223:4,5,21
**loose (1)**
110:24
**lose (10)**
87:5 108:6 109:25
132:21 135:16
161:15 184:9 185:3
189:16 190:22
**losing (2)**
179:22 180:23

**loss (12)**
37:23 38:13 78:2
88:24 89:12,17
119:11 131:9
149:22,23 181:25
189:19
**losses (12)**
57:4 75:13 82:9 90:5
90:7,13 118:6 149:2
161:21,22 185:24
186:6
**lost (9)**
27:6,6,8 103:9 149:14
150:8 179:9 180:18
180:20
**lot (17)**
18:20 26:24 27:6,7,8
62:14 86:14 93:15
93:21 113:3 134:17
169:24 181:12
194:9 200:2 246:24
291:6
**LOUIS (1)**
3:17
**lunch (2)**
139:18 145:6
**Luncheon (1)**
145:11
**L-B-I-E (1)**
307:6

_____
**M**

**M (1)**
4:9
**Madison (1)**
4:6
**main (2)**
19:9 191:7
**maintain (3)**
9:25 27:21 98:9
**maintained (1)**
20:3
**maintaining (5)**
20:12 43:25 45:25
47:15 48:6
**major (1)**
94:16
**maker (1)**
28:22
**makers (1)**
19:11
**makeup (1)**
164:17
**making (7)**

20:13 34:22 126:3
131:9 136:19 169:8
263:21
**man (1)**
23:14
**manage (4)**
147:24 148:9,16
214:19
**managed (2)**
254:8,15
**management (10)**
24:5,10,12 96:23
147:23 148:19
163:25 255:7,11
310:9
**managers (1)**
161:9
**managing (2)**
155:22 157:14
**mandate (1)**
104:18
**manner (2)**
189:9 218:7
**margin (195)**
9:13 26:11,16,18,20
27:2 28:5 29:13
30:15,21 31:3,8
32:2,9 33:9,10,14
34:17 35:10,24
36:17,25 37:5,17,22
42:16 75:14,19,24
82:9,13 83:15,21,21
84:12,21 85:13 86:4
86:16 87:4 107:23
108:2 109:20,23
110:19,22 111:11
111:14 114:5,16,21
115:10,12,16,19
116:9,16 117:3
119:3,10,25 121:16
121:21 122:14,24
123:15 124:5,8,13
124:15,22 125:4,16
125:24 126:9,14,17
126:22 127:3
128:23 130:15
131:21 132:9
133:20 135:14,15
135:20,24 138:5
140:11,16 141:9,21
142:6,8,9,16,20,24
142:24 143:3,10,12
143:22,24 144:3,19
166:24 167:11,19

167:23 168:19,21
170:16 173:4,14
174:14 175:11
176:12,15 177:20
179:3 181:4 182:4
182:16,19 183:20
185:19,23 186:2,3
186:11,12,18 187:2
190:2,7,9,22,24
191:21 194:7
196:12,18 197:10
197:22 198:13
199:18 200:3,10
205:9,18 206:5
207:5,8,17 208:10
208:14,22 209:3,15
210:9,14 211:4,16
212:2,7,10,14,17,22
213:12,20 223:8
224:18 225:9
231:13 232:3 237:2
247:23 309:3,18,23
311:13 312:7,22
315:9,10,25 320:11
321:10,12,14
322:12 323:17
**margins (1)**
135:23
**mark (5)**
47:4 50:18 178:5
267:16 297:3
**marked (30)**
7:2 42:24 47:5,5,8,11
50:21 77:7 83:5
89:21 121:2,10
127:5 132:11,18
146:13 172:14
178:8 219:5,8 224:5
234:25 235:3
240:10,13,16
267:18 291:11
297:8 303:23
**market (56)**
19:10 23:8,10,24
28:22 30:21,22 32:7
32:11 34:15 35:3,8
35:15,17,20 36:16
57:20 86:3 89:20
90:4,15 92:21,22
102:14 120:13,15
132:5,6,11,18,19,20
134:11,12,15,19
135:12,13 136:2,13
136:18 138:2,8,9,16

Contains Highly Confidential Portions

138:19,22,23
150:18 163:14
187:21 188:2,6,14
218:9 279:11
**marketing (4)**
101:11,16 102:8,10
**marketplace (6)**
31:14 36:13 81:18
92:16,19,25
**markets (6)**
13:24 103:7 136:21
255:8,10 269:20
**market's (1)**
138:18
**market-making (3)**
13:25 14:12,13
**marking (1)**
90:3
**Marlo (2)**
276:8 277:8
**marriage (1)**
341:16
**Martini (4)**
297:4,8,16 342:24
**material (1)**
8:9
**materials (5)**
219:18 261:18 262:18
302:8,19
**matrix (2)**
164:18 302:3
**matter (27)**
5:5,24 92:7 93:4
104:22 137:6,17,20
139:4,8 143:5 169:7
184:9 185:3 196:13
220:4 232:11,12
250:14 251:5
256:11 295:15
307:18 308:7
313:25 337:5
341:17
**matters (4)**
9:18 204:6 313:23
339:4
**maximizing (1)**
79:14
**McDade (14)**
178:8,11,23 179:7,15
180:24 181:6,12,16
181:24 182:3,7,22
342:13
**McDaniel (5)**
71:23 73:5 235:12,13

238:9
**McISAAC (375)**
1:13 2:5 5:1,4,14,20
6:1 7:1,2 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1,25 47:1,11
48:1 49:1 50:1 51:1
51:17 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
65:4 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1,22
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1,6
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1,4 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,22 140:1
141:1 142:1 143:1
144:1 145:1 146:1,3
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1

177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1,23
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1,15 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
240:10,13,16,23
241:1 242:1 243:1
244:1 245:1 246:1
246:22 247:1 248:1
249:1 250:1 251:1
251:18 252:1,7
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
276:13 277:1,24
278:1 279:1 280:1
281:1 282:1 283:1
283:23 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1,17,18
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1

327:1,18 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1,13 339:1
340:1,18 341:9
342:3,8,17,19,20
344:4
**McIsaac's (1)**
302:15
**mean (42)**
40:20 44:6,23 58:12
61:24 63:20 65:20
73:8,23 92:16 95:21
95:22 96:2,6 112:17
114:8 123:6 126:5
128:12 133:21
160:17 164:20
174:16 176:18,25
177:4 183:2 197:12
204:25 206:3
222:11 227:10
228:7 229:24
232:18,20 233:7
241:7 242:9 244:10
259:24 269:15
**meaning (2)**
128:7 200:16
**means (27)**
33:20 45:6 171:13
176:22 177:10,12
179:21 183:14
203:10 204:2,17,23
205:2,3,4,6,7 206:4
211:13 225:7,13,14
225:15 231:18
239:2 242:8 321:11
**meant (11)**
95:23 107:10 154:19
164:14 181:12,22
181:23 227:6 230:2
230:3 231:21
**measured (1)**
33:14
**meet (6)**
134:20 135:14,22,23
136:11 139:14
**member (7)**
36:7 43:9 61:4 89:13
232:5 255:5,6
**members (6)**
29:4 34:23 37:8 75:16
76:18 232:2
**memo (1)**

301:15
**memorandum (5)**
121:3 301:10 303:13
303:14 342:11
**memory (1)**
260:10
**memos (2)**
291:6 307:8
**mention (1)**
330:4
**mentioned (6)**
9:20 10:25 26:9 41:24
181:13 254:17
**Mercantile (2)**
77:23 78:14
**merchant (1)**
202:25
**mere (3)**
283:18 289:8 324:19
**merged (2)**
68:15 258:8
**merger (4)**
20:11 68:17 258:4,9
**mergers (2)**
20:9 68:13
**Merit (2)**
2:9 341:6
**Merrill (1)**
67:20
**Michael (1)**
5:7
**middle (4)**
103:4 203:7 250:22
267:2
**million (38)**
38:4,9 48:15 52:12
53:12 84:17 85:2
86:6 113:2 117:16
140:18 141:10,14
141:17,25 149:14
149:17 150:7,8
208:7,7 209:18
260:23 274:23
275:4,4,5,7,8
278:25 296:13
306:18 308:14
315:12 316:24
318:15 328:25
331:3
**mind (16)**
57:10 92:20 93:2
124:18 167:5 168:6
168:16 179:8
184:21 196:2

197:24 215:21
218:25 219:2
229:25 244:16
**minds (1)**
220:6
**minimal (3)**
57:15 132:5,9
**minimum (26)**
33:12,19,23,24 34:2,2
34:4 121:16,20
122:14,24 124:4,8
124:13,14,22 125:4
125:16,24 126:9,14
126:17 140:10
142:8,24 164:3
**minute (1)**
261:23
**minutes (3)**
139:20 199:5 239:24
**Mischaracterizes (2)**
162:24 163:21
**misreading (1)**
265:25
**missed (1)**
46:15
**misstates (18)**
17:25 33:22 42:9
82:16,25 115:22
123:19 130:22
140:21 175:15
195:22,22 205:14
205:24 215:6
265:24 268:2 312:4
**mistake (1)**
287:18
**mistaken (1)**
241:22
**misunderstand (1)**
325:22
**misunderstood (1)**
164:5
**mitigated (1)**
150:20
**mode (1)**
288:20
**model (1)**
162:10
**models (6)**
16:16,17 17:22 18:3,4
30:23
**modifying (1)**
197:13
**moment (6)**
12:9 85:4 100:12

235:5 264:20
270:25
**Monday (11)**
39:21 86:9 87:24 91:5
102:16 103:8
104:12 168:22
170:21 271:22
327:7
**Mondays (1)**
10:20
**monetary (1)**
279:11
**money (31)**
27:6,7,8 76:23 95:20
129:10 130:6
132:13,14,21,22
133:25 135:16,17
135:18 136:19
159:25 160:6,20
171:18 177:5
184:10 185:4
279:11 288:3
289:10 310:4 313:6
320:25 321:7
328:11
**moneys (11)**
55:18 130:5 133:24
176:2 264:9 314:20
330:10,18,22 331:5
331:8
**monitor (7)**
149:7,8 161:8 282:7
283:8,13,19
**monitoring (1)**
212:9
**month (7)**
58:5 66:21 68:21
268:8 269:5 271:10
271:14
**monthly (1)**
243:6
**months (7)**
16:8 19:2,6 25:5,8
77:16 93:10
**morning (19)**
5:20,21 36:2 74:11
87:24 91:5 134:21
170:22 256:16
266:16,18 270:10
270:13 272:5,23
290:14 309:22
323:3 325:2
**morning's (1)**
247:24

**motion (12)**
65:19 100:11,11
121:4,8 241:6,8,9
246:16 247:19
335:10 342:12
**move (12)**
36:16 61:23 134:20
171:6 176:2,10
188:2 264:9 279:23
292:4 323:14
328:18
**moved (3)**
171:25 190:21 281:16
**movement (5)**
30:20,21 90:15
135:13 163:14
**movements (1)**
143:10
**moves (1)**
23:25
**moving (5)**
147:21 172:2,3
187:21 288:21
**multiple (3)**
16:22 140:19 163:15

———————————
**N**
———————————
**N (2)**
3:3 4:2
**naked (9)**
152:17 153:2 156:3
159:3,4,6 163:12
165:10 168:2
**name (11)**
5:7,22 21:20 176:11
178:12 240:23
298:3 323:7,11
344:2,4
**names (1)**
305:4
**nature (4)**
40:10 95:12 251:21
260:24
**necessarily (12)**
87:11 88:14 89:15
96:2 105:13 133:14
167:9 209:11
216:16 218:18
219:19 245:16
**necessary (4)**
49:8 51:18 113:8
332:23
**necessitated (2)**
49:17 50:4

**need (21)**
6:16 21:10 25:12
31:12 44:22 49:18
50:5 51:20 71:18
99:11 103:7 104:5
104:11 106:23
164:19 169:24
273:5 281:6,10
290:10 305:20
**needed (10)**
26:15 95:20 102:15
170:3 197:5,21
204:18 216:2
221:21 319:12
**needing (1)**
325:12
**needs (3)**
103:20 160:15 319:9
**negative (4)**
51:14 115:15 117:18
206:2
**negatives (1)**
115:20
**negotiate (21)**
16:4 20:20 25:6 62:4
63:11,13 70:3,4
116:19,25 118:22
118:24 120:9,10
142:19 190:5
191:16 196:12
197:3,23 198:7
**negotiated (27)**
63:2 66:7,11 69:4,12
69:17,22 73:18 93:8
113:14 119:20
120:21 122:19
123:9,11 137:16,23
139:6 194:17
198:20 214:21
218:14 237:17
238:7 324:14
326:18 327:5
**negotiating (16)**
20:15 63:25 64:4
67:15 105:8 108:25
116:20 117:23
168:6 190:2,3 197:6
210:10 237:19
312:20 324:15
**negotiation (6)**
20:18 64:22 68:14
112:5 196:14 198:4
**negotiations (16)**
65:23 67:21 68:2

69:14 73:20 76:21
87:11 92:13 93:10
112:7 178:16
183:17 214:8 218:6
324:20,24
**Neil (7)**
4:15 64:20 140:5
160:15 246:9 302:5
305:6
**neither (1)**
341:18
**net (22)**
15:15 38:8 48:11,14
48:17 81:21,25
94:23,24 108:16
112:18 115:9,11,15
116:2 117:6,9
123:24 129:10
133:7 134:23
253:21
**Neuhardt (34)**
3:16 240:22,24
246:24 247:9 252:2
252:5,10,16 257:15
257:22 261:6
277:16,21 280:2
284:2 287:7 298:23
299:4,14 301:5
302:5,14,21 304:2,5
305:5 306:8 322:17
327:19 338:5,12
340:6 342:5
**Neuhardt's (1)**
276:21
**never (12)**
29:20,21 31:22 33:8
34:21 82:13 274:2
295:17 330:12,18
330:22 331:5
**nevertheless (1)**
31:17
**new (25)**
1:3,14,14 2:7,7,12 3:8
3:8,14,23,23 4:8,8
4:14,14 21:3,3,3,24
195:8 255:5,23
341:3,4,7
**nods (3)**
6:13,15 273:3
**nonresponsive (2)**
306:9 323:13
**non-customer (4)**
292:8,20 295:19
298:22

Contains Highly Confidential Portions

**non-customers (1)**
206:18
**non-highly (1)**
22:2
**non-PIM (1)**
47:21
**non-redacted (1)**
304:25
**normal (7)**
152:9 217:22 218:8
263:24 264:3
288:20 330:13
**normally (5)**
23:16 162:6 218:24
271:11 278:3
**North (1)**
3:13
**nos (3)**
43:10 235:3 342:15
**Notary (3)**
2:11 5:15 341:6
**note (2)**
12:7 296:25
**noted (2)**
208:23 212:6
**notice (10)**
285:17,24 286:5,10
286:14,17,19,21
287:18,22
**notifying (1)**
288:12
**notwithstanding (1)**
101:15
**November (1)**
258:13
**NTS (1)**
245:17
**number (32)**
5:3 39:23 46:22 77:3
77:22 79:14 86:8
91:15,19 95:2 108:6
109:25 110:24
139:10 145:9 146:6
199:8,12 200:16
240:6,19 260:22
261:2 274:23,24
275:7,8 299:8,12
334:5,6 338:3
**numbers (8)**
17:15 53:18 275:9,13
275:15,23 305:12
305:18

**O**

**object (128)**
10:11 14:24 16:7
17:13,24 21:8 23:11
23:21 24:7 25:7,18
28:8,18 29:7,18
30:8,17 31:9 34:20
35:4 37:2 39:7 40:5
40:17,24 41:15 42:8
45:5 49:22 53:15
54:20 55:13,22
56:16 57:7,17 58:6
58:11 59:23 61:5
62:9 64:2,13 65:6
65:11 67:11 68:10
69:10,25 73:3 74:17
75:10 77:2 78:16,20
78:24 79:9 80:8,15
82:24 85:15 88:13
88:25 89:25 90:24
96:9 97:16 98:7,23
104:24 105:11
109:13 112:13
113:10 115:2,21
116:17 117:11
118:8,20 119:16
120:4,16 123:18
124:17 126:15
129:23 130:9,13,21
132:2,2 135:5 136:3
136:15 138:15
139:9 142:12
143:15 144:8,22
148:12,21 149:5
150:9 151:10,16
152:20 153:14,21
154:4 155:6 156:6
157:4 158:2,17
159:9 160:11 162:5
162:23 163:20
166:10 167:2
173:17 193:7
251:23 322:15
329:5
**objection (147)**
14:20 25:25 30:10,11
31:20 32:10 33:21
35:13 48:20 50:8,9
57:8 65:5 69:8
79:17 80:3 81:5,16
81:24 82:16 86:11
89:14,23 94:3,21
95:8 96:24 105:23
108:3 111:15 112:6
117:4 119:6 140:20

157:8 161:4 163:10
167:13 168:3
170:17 172:9 174:7
174:18,22 175:14
175:22 176:9,19
177:7,14 179:17
181:9 182:9,10,24
183:25 185:8,9,21
186:8 187:4,14,22
188:22 189:10,22
191:3 192:4,5
194:15 195:2,21
196:10,21,23
197:14 198:14
199:22 201:4
202:15 204:14
205:13,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:10,21 222:10
223:2 224:2,16
225:5 226:7 227:2
227:19 228:12
229:13 231:9
232:17 233:5,19
234:19 237:6,11
238:17 239:12
243:17 244:5,15
246:9,13 247:15
257:10 259:10
263:9,15 265:23
266:13 267:25
270:7,21 272:11
273:18 278:5 287:5
287:20 289:2,11
294:22 308:10
309:16 310:11
312:3 313:13
317:10,12 318:18
318:20 321:4
325:10 337:17
**objections (1)**
40:18
**objective (2)**
79:8 149:19
**objectives (2)**
78:22 79:25
**obligation (7)**
44:3 129:9 228:8
272:8 335:17,25
336:9
**obligations (31)**
27:18 76:19 88:21
114:17 127:2

128:22 131:11
133:6,10 136:11
139:14 172:24
173:5,7 175:7
199:25 208:5
224:24 225:11
227:23 228:15,20
229:3 231:25 232:4
233:23 234:7,12,17
234:22 236:16
**obliged (1)**
171:23
**obtain (1)**
156:12
**obtaining (1)**
158:3
**OCC (192)**
9:14,17 26:11,19
27:11,14 28:20,24
30:14 32:8,22 33:4
34:7 35:23 36:6,14
37:17,18,23 38:4,6
42:12 43:9 44:9
52:10 60:12,18,23
61:2,7,12,16,19,23
71:18 73:16,19 74:9
74:14,15 75:2,3,19
75:20,24,25 80:6
82:10 84:4,7,9,13
85:6 89:8 106:11,15
106:23 107:7,22
109:19 110:18
111:10 113:25
114:18,21 117:20
118:13 120:22
121:16,17,21
122:14,16,25
123:24 124:5,8,15
125:3,7 140:11,17
142:17 144:7
147:12,14 168:19
170:7,21,23,24
171:8 173:4,15,24
174:15,24,25
175:24 176:11
177:3,11 178:25
179:4 181:5,7,17
182:4,15,20 183:22
184:5,18 185:6
186:5,17,23 188:21
189:2,6 191:13
192:8,13,16,20,23
192:23 193:11
205:10,19 206:6,9

206:21 207:6 212:2
223:8,22 224:14,19
232:6 234:5,6,8,11
234:12,15,16,17,20
235:17,18 236:11
236:14,21,23,23
237:3,9,10,13,20,24
238:14,15,21,23
239:3,9,11,16,19
247:20,23 308:22
309:3,15,18 314:16
314:19,22 315:15
315:16 316:9
319:11,16 320:11
320:14,17 321:2
322:22 323:6,11
**occasion (1)**
77:14
**occur (4)**
79:2 88:6 91:5 198:4
**occurred (6)**
76:21 87:15 90:7
122:20 286:25
287:3
**occurs (1)**
303:22
**OCC's (12)**
29:4 30:13 31:5 36:20
36:24 75:9 142:20
220:20 222:18
223:19 232:8 237:7
**October (7)**
257:9 333:11,24
334:24 335:11
336:20 337:5
**offer (4)**
99:24 218:17,18
246:10
**offering (2)**
76:18 242:3
**offices (1)**
2:5
**offset (1)**
38:15
**offsetting (1)**
115:20
**oh (10)**
45:17 70:25 71:4
103:14 127:17
139:25 172:15
200:20 254:22
265:4
**okay (244)**
6:4,11,19,23 7:8,13

Contains Highly Confidential Portions

7:19,21,24 8:11,20
9:19 10:9,25 13:9
14:15 15:7 16:13
17:11,18 18:24 19:4
19:15,19 20:5 25:23
27:3,13 30:24 33:6
34:6,9 35:17,22
38:23 40:3 41:18
42:23 43:15 44:13
46:16 47:18,22 49:7
50:3,15,18 52:5
63:8 64:15 65:9,22
66:24 69:3 71:13
72:15 75:18 77:9
83:18 86:4 87:13
89:9 92:3 99:14
101:14 102:21
103:2,17 111:23
113:22 118:15
122:4,9,11 125:15
126:7 127:15,17,19
127:21 128:19
131:18 133:12
138:25 139:20,21
139:22,23 141:24
145:7 147:11
148:17 152:12
154:10 155:15
157:8,19 168:17
175:2 176:17
177:18 178:22
183:16 184:20
186:24 189:5
191:25 193:2 194:4
197:9 199:2 201:16
203:3,21 204:22
205:8 211:24 217:5
219:19 221:9
223:18 226:21
228:16 230:11
234:14,24 235:18
236:4 240:3 241:13
242:14,18 243:10
243:22 245:4,12,15
245:17,20,22,25
246:10 247:21
248:7,16 249:3,16
249:24 250:6,9
251:3,14,20 252:20
253:10,24 254:17
255:23 256:3,8,13
257:6,22 258:6,14
258:23 259:7,21
260:12 261:10

263:13,19,25
264:12,18 265:7,8
266:6,10 267:3
268:9 269:3 270:14
270:25 271:15,24
272:18 274:3,19,22
275:6 277:4,18
278:17 280:14
282:15 284:6,12
285:16 286:7 287:3
289:15 290:8,16,23
291:15,19 292:4
293:11 295:9 296:3
296:21 297:15,16
298:4,7 299:2
300:18 301:6 302:4
303:20 304:4,12
306:9 307:10,17
308:6 309:7,18
319:13,20 321:24
322:19 330:21
331:24 332:8,15,21
333:5 337:20 338:5
339:6,15 340:5
**OLIVER (1)**
4:4
**omitted (1)**
334:2
**omnibus (3)**
332:25 333:7 335:14
**once (2)**
100:24 315:11
**ones (3)**
19:13,13 296:19
**ongoing (3)**
109:3 150:18 294:17
**online (2)**
111:22 286:13
**oOo (1)**
340:11
**Op (2)**
243:7 253:16
**open (16)**
84:3,6,8 103:8 121:22
122:25 124:6 125:6
125:12,23,25 128:6
134:12 140:12
156:14 170:14
**opened (3)**
132:6,20 302:22
**opening (3)**
325:19 326:20 327:7
**Open-ended (1)**
210:14

**operate (2)**
99:25 200:9
**operating (3)**
271:5 272:4,20
**Operational (1)**
253:17
**operations (3)**
244:2,22 273:2
**opinion (85)**
68:24 69:5,9 88:12
95:4 115:14 119:22
132:24 137:3,13,21
137:21 139:4,8
193:6,19,23 195:16
196:4,6,8,16,22
197:2,18,18 204:20
205:8,18 207:2,4
212:13,21 213:9,10
213:11,18,25 214:2
224:12 227:21
228:4 232:14 233:3
233:15 246:11
248:2 269:2,8,23
270:3,11,20,23
273:8,15 274:19
276:16 284:7 287:4
287:19,24 291:20
297:18 308:9,15
309:15,17 311:16
312:6,10,13 313:12
314:6 318:17 319:8
322:12 323:18
324:6 326:12
327:10 328:23
331:11 332:22
337:25
**opinions (10)**
7:8 63:23 92:7 93:4
224:10 242:3
252:13 256:18
258:24 276:24
**opportunity (1)**
14:24
**opposed (10)**
6:13,15 14:6 49:19
50:6 133:22 193:25
210:5 268:6 334:11
**Opposition (1)**
121:7
**optimally (1)**
103:5
**option (8)**
90:10 117:15 131:13
152:3,4,23 153:2

176:11
**options (41)**
9:10 12:5 13:14,17,19
14:3 15:5,8 20:22
37:13,24 38:3 45:18
48:13,19 52:3 53:14
86:21 88:21 90:21
97:13 98:21,24
113:24 114:20
116:5 147:12,15,21
149:9,13,13 152:5
173:8 187:20
191:23 192:2,7
201:8 220:19
222:17
**order (12)**
62:24 75:20 103:4
104:6 109:11
152:14 156:2
157:23 163:18
168:23 190:24
217:6
**Orders (2)**
121:5,9
**ordinary (2)**
325:25 339:8
**org (4)**
27:16 75:17 175:6
311:21
**organization (5)**
72:16 75:5 170:14
199:18 200:12
**organizations (7)**
76:5 125:5 168:21
170:5 212:3 232:3
255:4
**orgs (1)**
191:12
**original (19)**
65:18 241:6,7 257:9
274:4,6,11,25
276:17 300:20
304:13 306:14
308:24 328:19,24
332:8 334:11
336:23 338:16
**originally (1)**
287:11
**outcome (1)**
341:17
**outside (4)**
39:6 125:3,7,9
**overall (4)**
28:23 36:24 37:4

220:25
**overdraft (9)**
285:17,24 286:2,11
286:20 287:12,22
287:23 337:4
**overnight (1)**
288:13
**over-the (1)**
152:22
**over-the-counter (30)**
23:5 152:6,11,14,19
152:23,24 153:6,17
154:3,11 155:5,12
155:20,22 156:5,16
157:12,21 158:4,10
158:12,12,19,23
159:2,8 165:3,8,11
**over-the-counters (1)**
156:23
**owe (7)**
10:4 129:9,10,10
132:13 133:24
320:11
**owed (6)**
45:2,2 130:5 332:10
333:23 335:22
**owned (2)**
165:19 206:15
**Oxford (332)**
4:15 10:11 12:6 14:20
16:7 17:13,24 21:8
23:11,21 24:7 25:7
25:18,25 28:8,18
29:7,18 30:8,17
31:9,20 32:10 33:21
34:20 35:4,13 37:2
39:7 40:5,17,24
41:15 42:8 45:5,20
46:16 48:20 49:22
50:8 51:17 52:4
53:15 54:20 55:13
55:22 56:16 57:7,17
58:6,11 59:23 61:5
62:9 64:2,13,16
65:3,11 67:11 68:10
69:8,10,25 73:3
74:17 75:10 77:2
78:16,20,24 79:9,17
80:3,8,15 81:5,16
81:24 82:16,24
83:23 85:15 86:11
88:13,25 89:14,22
89:25 90:24 91:9
94:3,21 95:8 96:9

Contains Highly Confidential Portions

96:24 97:16 98:7,23
104:24 105:11,23
108:3 109:13 111:3
111:15 112:6,13
113:10 115:2,21
116:17 117:4,11
118:8,20 119:6,16
120:4,16 122:4
123:18 124:17
125:20 126:15
129:23 130:9,13,21
131:2 132:2 135:5
136:3,15 138:15
139:9,16,21 140:3
140:20,23 142:12
143:15 144:8,22
145:7 148:12,21
149:5 150:9 151:10
151:16 152:20
153:14,21 154:4
155:6 156:6 157:4,8
158:2,17 159:9
160:11 161:4 162:5
162:23 163:10,20
166:10 167:2,13
168:3 170:17 172:9
173:17 174:7,18,22
175:14,22 176:9,19
177:7,14 179:17
181:9 182:9,24
183:25 184:12,16
184:20,23 185:8,21
186:8 187:4,14,22
188:22 189:10,22
191:3 192:4 193:7
194:15 195:2,21
196:10,21,23
197:14 198:14
199:3,22 201:4
202:15 204:14
205:13,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:10,21 222:10
223:2 224:2,16
225:5 226:7,16,21
227:2,19 228:12
229:13 230:14
231:9 232:17 233:5
233:19 234:19
237:11 238:17
239:12 240:3
243:17 244:5,15
245:5 246:13,21,25

247:15 251:17,23
252:4,7,15,18
257:10,19 259:10
261:3,10 263:9,15
265:23 266:13
267:25 270:7,21
272:11 273:18
276:11 277:14,18
277:23 278:5
279:23 280:14
283:21 287:5,9,20
289:2,11 294:22
299:2,14,18,23
300:2,7,11,18,24
301:7,10,17 302:4
302:12,18 303:21
304:4,7 305:7
308:10 309:16
310:11 312:3
313:13 317:10,12
318:18,20 321:4
322:15,20 325:10
326:24 327:16,22
329:5 337:17
**o'clock (3)**
270:9,10 271:22

---

**P**

**P (4)**
3:3,3 4:2,2
**page (97)**
11:9 22:3 32:19 37:9
43:8,22 45:12,14,21
50:24 51:22,23 52:7
71:13 77:18,19
78:11 91:23,24 92:5
98:20 99:8 101:12
103:2,4,11,23
106:22 108:14
113:17,19 121:12
127:9,16,17 139:25
140:6,7 147:6
150:16,16,17,24
159:12 177:19,25
178:10,22 180:3
200:16,19 203:3,4,5
203:8,19,21 204:8
217:8,8,9 220:10
224:20 226:12
228:17 230:5
232:16 233:4,16,17
265:2,3,5 274:6
291:13,15 308:25
333:25 334:4 337:2

342:3,7 343:4,5,6,7
344:8,9,11,12,14,15
344:17,18,20,21,23
**pages (6)**
1:16 11:7 45:13
112:23 222:12
308:23
**paid (17)**
56:25 57:4 81:7 90:21
112:15 171:25
175:4,18 330:11,12
330:15,16,18,22,23
331:5,8
**PaineWebber (2)**
20:10 258:10
**paper (1)**
217:12
**papers (2)**
62:14 67:18
**paragraph (64)**
37:10 42:3 43:18,21
45:14,23 47:12 48:8
48:9 49:7 71:14,15
77:19 83:20,23,24
99:15,19 101:12,15
102:7 106:23
107:18 108:15
114:3 121:13
122:12 127:9,14,21
128:4 147:7,11
150:25 172:17
177:23 180:2 183:8
224:21 226:11,13
228:17 229:9,17
232:14,18 233:4
237:15 241:14,23
264:19,24 265:3
274:25 295:9 296:3
297:20 298:8 303:3
308:25 309:8 329:4
333:18 337:3
**paragraphs (17)**
47:25 48:3 99:10
113:20,23 121:25
122:6 123:7 127:12
127:19 274:5
297:11 306:13,14
308:23 328:19
330:3
**parameter (1)**
221:19
**parameters (1)**
221:6
**Pardon (1)**

51:3
**parent (2)**
96:4 106:4
**parenthetical (8)**
225:6,9 226:20,23
232:16 233:4,15,17
**Park (1)**
4:13
**part (36)**
36:23 38:10 39:25
41:10,25 49:24,25
98:10 126:21
155:19 176:16
190:3 197:18 200:8
201:10,13 202:3,16
202:17 222:15
223:6 228:5,22
232:24 239:7 240:2
243:3 246:16,18
247:22 254:11
258:11 260:4
295:13 296:7 306:8
**partial (2)**
296:10 303:4
**PARTIALLY (1)**
1:12
**particular (9)**
19:9 21:20 33:2 72:20
144:9 164:8 217:15
242:10 280:24
**particularly (3)**
32:7 35:2 65:7
**parties (25)**
39:11 63:24 69:21
72:19,25 74:8
104:21 105:7
119:21 120:9
123:11 191:19
207:18 208:17
209:8,20 210:3
217:19 218:5 220:6
228:9 229:9,18
239:8 341:15
**partly (2)**
159:16,18
**parts (3)**
201:6 237:16 311:17
**party (7)**
42:12 88:3 105:19,20
239:19 319:6
341:19
**pay (19)**
20:18 29:11 48:22
87:25 108:17 112:3

112:9,18,21 113:7
113:13 116:7,9
135:18,20 137:8
171:12 215:24
338:2
**payable (4)**
223:7 330:20 333:3
335:15
**payables (2)**
49:6 331:13
**paying (5)**
113:8 116:23 138:5
171:23 337:15
**payment (5)**
52:11 90:17 109:3
239:5 284:21
**payments (1)**
52:9
**pays (1)**
87:22
**pay-back (2)**
88:17,18
**pay/collect (1)**
91:4
**pay/collects (1)**
88:17
**Pearl (1)**
3:13
**Peck (1)**
77:12
**people (26)**
9:13 23:16 24:2,11
58:18 62:14 112:25
113:4 136:7 137:8
155:21 157:14
161:7 184:4 197:5
214:4,6,17 243:19
245:10 254:15
287:17 312:19
322:7,7 334:17
**percent (4)**
28:12 29:13,15 51:11
**perfectly (1)**
231:6
**perform (3)**
44:2 250:23 251:14
**performed (9)**
44:3 251:22 252:12
266:11 267:4 296:8
296:10 297:18
303:4
**performing (3)**
258:3 277:21 296:23
**period (14)**

Contains Highly Confidential Portions

64:8 97:9 102:20
147:25 148:15,19
149:15 183:5
214:14 266:19,22
266:23,24 282:3
**person (4)**
80:16 162:12 254:3
276:23
**personal (1)**
68:6
**personally (2)**
75:6 253:24
**personnel (2)**
329:12 331:22
**persons (1)**
278:2
**perspective (2)**
27:22 103:6
**pertaining (1)**
133:5
**pertains (2)**
339:22,25
**Peter (1)**
329:24
**Phase (1)**
28:13
**phrase (9)**
33:19 206:23 227:12
227:14,16,17
229:10,18 334:2
**picked (1)**
292:19
**piece (3)**
59:6 91:4 217:12
**pieces (2)**
59:7 112:20
**Pineiro (1)**
5:7
**place (13)**
10:2 13:6 36:13 68:2
68:9 77:12 82:8
87:8 93:17 125:22
162:18 169:7 248:7
**placed (6)**
149:17 248:4,10,11
248:13 259:16
**places (1)**
202:6
**plans (1)**
192:17
**play (1)**
149:22
**Plaza (2)**
3:22 4:13

**pleadings (2)**
41:13,22
**please (16)**
5:11 6:17,21 32:19
50:25 51:16 54:11
77:10 89:2 91:23
113:18 229:5
299:24 300:3
323:15 328:5
**pledged (5)**
40:11,15 220:18
222:17 223:21
**plenty (2)**
93:24 170:2
**plus (1)**
112:18
**point (65)**
6:16 13:12 15:10
21:15 26:7 39:23
63:18 67:20 73:12
73:22,25 81:14 82:4
87:10,12 88:7 90:11
97:24 101:6 105:17
116:18,20 119:19
124:23 138:2,9,10
177:23 194:11
196:6 197:4 198:19
199:24 209:15
210:20,21 264:21
265:9 269:13 270:2
272:15 282:13
283:16 289:22
294:12 298:24
309:10 313:19,20
313:24 315:9 318:3
318:11,19,22,25
320:14,19 321:13
322:22 331:13
333:3 334:13 336:5
338:4
**pointed (1)**
212:9
**pointing (1)**
303:15
**points (4)**
26:21 208:4 273:11
285:9
**policy (1)**
307:11
**portfolio (45)**
14:5 19:23 38:10,17
114:15 115:5,6,25
116:2 150:12 151:5
151:9,15,23 152:3,5

153:3,12,18 154:2,3
154:18 155:3,24
156:9,11,19 157:18
157:23 162:13
163:12,13,14,19
164:8,15,21,24,25
165:7 167:16,22
169:6 185:15
201:14
**portfolios (1)**
163:15
**portion (19)**
9:23 15:11 22:2 48:9
51:5,7 77:14 97:18
97:19 150:4 167:12
202:13 247:22,24
291:15 303:6
305:17 326:11
328:5
**portions (2)**
291:23 305:19
**posed (1)**
111:19
**posing (1)**
193:25
**position (42)**
23:10 24:21 27:17
61:2,7 103:24 105:7
138:3 149:20 150:6
152:3,14,15,16,17
152:23,25 153:25
154:11,12,14 159:4
159:7,8,11 160:4,19
163:12 164:16
165:17,18 171:7
206:20 249:19
250:7,9 253:12
268:11,22 311:24
326:17 327:4
**positions (245)**
14:16 15:6,8 20:2,3
21:21 32:13 33:13
36:16 38:14,23,24
38:25 39:2,5,15
40:2,3,15 41:25
42:7,17 44:8,17,23
45:4,11,16,18,25
47:15,18 48:7,12
52:10,23 53:14,23
54:3,10,14 57:5,15
57:22,24 58:22 59:4
60:8,12,13,14,17,21
60:22 61:25 74:19
75:12 76:2,6,9,12

76:14,25 77:25
78:15 80:6,9,11,13
80:21,22,24 81:14
81:18,19,22 82:21
82:23 85:19 86:10
86:25 88:23,24 89:5
89:6,10 90:4 95:13
96:13 97:13,13 98:6
109:12 113:24
115:7,8,14 116:3,4
116:5,6 117:19,24
118:2,7,12,17,19,23
119:4,5 120:3,6,8
120:20 121:18,22
122:16,25 123:25
124:6,9 125:6,25
126:10,19,22 128:6
131:20,24 132:7,11
133:3 134:15,22
136:17,20,24
137:18 138:17,21
140:12 143:19,20
143:25 144:4,6,13
147:24 148:10,14
149:3,4,8,13,14,16
149:25 150:21
151:3,4,12,13,14,21
151:23 152:6,8
153:12 155:17,19
156:13,16,16,23
157:2,3,5,7,16,22
158:7,9,14 159:2
162:3,14 163:7,7,8
164:11,12 165:2,3,9
165:12 167:8,15,17
167:18,24 168:2
171:5,6 178:24,25
180:7,8,15,17
181:15 182:14,14
183:19,21 184:8,18
185:2,6 186:4,13,19
186:25 187:2,3,12
187:19,20 188:17
190:12,15,17,19,25
191:9,9,11,14,15
222:25 224:15
236:13 252:20,23
254:7
**positive (2)**
38:4,8
**positives (1)**
115:20
**possession (1)**
169:3

**possibility (1)**
158:25
**possible (29)**
31:15,24 32:3,12
36:14 49:16 50:3
55:25 63:24 103:20
104:14 151:20
153:20,22 166:25
167:7,14,20 168:9
168:12,15 177:12
184:6 215:2 217:18
218:16 221:22
230:24,25
**possibly (12)**
26:5 38:15 41:9 42:16
59:24 85:24 93:18
164:2 201:14
255:21 322:8 331:7
**post (7)**
168:19 169:9,13,16
169:16,19,25
**posted (59)**
31:19 32:2 75:19,24
107:23 108:2
109:20,23 110:19
110:22 111:11
114:16,21 115:10
115:16 116:8,16
117:2 119:3,24
123:14 142:24
166:24 167:11,23
169:11,21 170:3,15
170:23 175:11
181:7 183:20
185:19 186:3 187:3
190:22 198:13
199:18 200:3 205:9
205:19 206:5,12
207:6,12 213:21
225:10,11 227:6
228:14 231:13
232:10,13 233:25
234:2,3,5,15
**postgraduate (2)**
249:5,5
**posting (1)**
200:10
**postponed (2)**
73:12,15
**potential (9)**
30:20 82:9 99:23
101:6 112:4,22
131:9 142:18
183:11

Contains Highly Confidential Portions

potentially (5)
179:11 180:25 181:18
182:6 183:12
power (1)
105:21
powers (2)
108:25 172:24
practice (5)
170:13 243:13 273:21
273:21,23
practices (5)
241:19 242:15 243:23
244:19 253:13
precisely (1)
47:18
preliminary (1)
215:12
premarked (2)
70:9 247:8
premium (9)
108:17 112:3,11,12
112:15,21 113:7,8
113:13
preparation (7)
7:22,25 8:24 9:10
12:20 71:7 243:5
prepare (2)
7:14 192:7
prepared (8)
63:9,22 70:20,24 71:2
83:11 102:23 266:4
preparers (1)
329:13
preparing (15)
43:5 50:16 52:16
65:14 70:15 71:8,20
83:7 100:7,7 106:25
146:17,20 168:25
245:10
prescribes (1)
164:23
present (2)
64:25 65:22
presented (1)
54:16
preservation (1)
79:7
preserve (5)
79:12 109:12 190:12
190:19,25
preserved (1)
79:15
preserving (1)
191:11

president (2)
178:14 255:9
pressing (1)
163:17
presume (1)
48:8
pretty (1)
94:8
prevent (1)
337:14
preventing (1)
315:4
previous (1)
309:21
price (9)
15:14,15 20:20 85:22
112:18 113:16
188:6,14 216:20
pricing (1)
30:23
primarily (2)
13:16 137:10
prime (7)
13:13 14:11,18 15:20
96:15 258:15 274:8
Principal (1)
253:17
principle (1)
309:14
print (1)
162:21
prior (42)
18:20 58:16 59:13
67:15,23 104:13
123:11 146:23
148:10 195:11
202:23 203:19
215:13 245:22
254:6 258:25 266:5
266:11,20 267:4
270:4,19 310:23
311:3,13,25 312:7
316:8 319:5,17
324:21 325:12
326:6,8,18,20 327:5
327:6 335:18,25
336:9 339:17
priorities (1)
54:25
priority (3)
55:9,15 79:19
private (2)
241:16 310:9
privilege (1)

252:6
privileged (2)
252:4 276:10
privileges (1)
172:24
proactive (1)
189:15
probably (26)
16:8 17:10 18:22 33:3
33:4 41:23 45:20
52:18,19 56:18
68:21 78:7 98:3
145:5 157:16 164:3
165:13,22 184:3
198:22 211:6
225:15 257:13
258:20 298:23
310:24
probing (1)
193:21
problem (2)
96:3 183:2
problems (3)
25:16 27:4 95:19
Procedure (1)
341:21
procedures (2)
24:12 189:11
proceeded (2)
74:16,21
proceeding (1)
77:13
proceedings (3)
55:11 56:8 118:18
process (20)
18:25 19:5 21:3 36:21
49:18 50:5 162:2
172:3 245:10,11
268:16 294:18,21
294:24 295:2,3
311:14 316:25
328:21 337:24
processes (1)
24:12
processing (2)
244:3,22
produced (3)
261:19 280:15 302:20
producing (1)
21:13
product (1)
21:4
PRODUCTION (1)
343:3

professional (5)
2:8 252:9,23 254:19
255:3
professionals (5)
12:25 17:2 18:14
262:6,8
proffered (1)
252:13
profile (8)
23:10,15,19 97:12
98:5 162:13 163:18
165:6
profit (2)
59:3 88:24
profitable (2)
59:6,7
program (2)
101:16 148:25
programmer (1)
245:3
progress (1)
338:19
proof (2)
336:3,4
proper (1)
79:25
properly (7)
21:11,14,18 81:7
94:25 286:5,11
property (66)
129:19,21 133:2,4,12
133:14,17 135:4
220:18 222:24,24
223:24 224:3,13,24
225:4,18,19,22,25
226:3,4,24,25 227:3
227:5,6,10,11,13,18
228:2,14,18 229:2
229:10,11,19,20
230:6 231:24 232:6
232:7,10,12 233:18
233:21,22,24 234:6
234:11,16,20
241:19,20 242:24
243:24 244:20
253:14 259:3,4,5,7
259:12 292:2
328:20
propose (1)
192:12
proposed (4)
78:23 79:21 104:2
332:9
proprietary (50)

13:17,18 14:5,16 15:5
15:13 19:23,25
20:22 24:6 38:3,3
76:25 80:6,20
106:17,18 107:5,13
113:24 114:20
120:6,23 121:18
122:16 123:17,21
123:23,23 125:2,23
126:12 144:7
150:19 151:9
183:19 188:18
190:15,17 191:8,14
202:3,16 206:21,24
224:14 291:17,25
292:3 335:13
propriety (1)
337:21
prospect (1)
281:9
protect (3)
10:13 129:5 167:19
protected (3)
131:22 132:12 186:20
protecting (2)
79:3 239:3
protection (23)
9:22 55:6 117:7
126:20,25 128:21
130:16 135:3
166:24 167:11,24
241:18,21 242:24
243:25 251:9 256:7
266:5,7 282:23
291:9 316:5 342:22
prove (1)
334:15
proven (2)
34:24 334:23
proves (1)
334:21
provide (9)
8:12 53:19 100:21
163:5 171:17 216:6
252:9 257:17 302:6
provided (14)
52:8 99:24 127:3
163:3 207:2 219:11
251:6,7 262:6
275:10 281:4,15
331:21,25
providing (5)
41:2 56:20 100:18
117:7 193:19

Contains Highly Confidential Portions

**provision (1)**
174:12
**proxy (3)**
85:23 86:5 87:4
**prudent (6)**
172:5 211:16 238:14
239:11,14,16
**public (8)**
2:11 5:16 12:13,14
64:9 241:15 251:11
341:6
**publications (1)**
257:4
**published (1)**
35:25
**pull (2)**
46:15 99:5
**purchase (19)**
13:16 25:14 39:11
41:11 63:3 104:18
197:6 200:15 203:6
207:16,21 212:25
216:7 217:2 238:6
247:2 258:21 315:7
315:24
**purchased (17)**
16:24 152:13 197:8
203:7,10 204:9,11
207:24 209:2
210:25 211:13
213:14,17 224:22
246:4 258:15,18
**purchaser (11)**
100:22 108:16,23
109:4,5 151:2
197:19 216:25
228:21,24 232:24
**purchases (1)**
258:20
**purchasing (11)**
116:6 155:9 159:15
171:20,21 172:13
213:4,5,24 214:3
217:4
**purely (1)**
247:10
**purple (1)**
248:19
**purported (1)**
261:19
**purporting (4)**
242:25 244:2,21
246:10
**purpose (3)**

48:24 265:9 309:10
**purposes (5)**
21:12,12 182:2 285:8
313:2
**pursuant (3)**
121:5 127:20 341:20
**pushed (1)**
73:22
**put (35)**
149:23 150:12 152:2
154:17 206:13
210:11,19 211:7
215:18 216:20
223:8 224:18 241:2
259:8 267:20 274:5
274:18 282:24
299:16 308:13
310:18,20 313:4
315:13 319:9 320:3
320:4 321:16,19
324:16 326:14
327:2 328:11
332:17 334:9
**puts (2)**
32:15 91:3
**putting (10)**
143:18 242:11,14,18
256:17 307:24
308:14 317:15
320:21 334:19
**P&L (1)**
53:3

_____
**Q**
_____

**qualified (5)**
160:7,24,25,25
263:25
**qualifies (1)**
8:21
**qualify (1)**
98:5
**qualities (1)**
10:23
**quant (1)**
97:2
**quantifiable (1)**
97:10
**quantify (2)**
145:3 197:19
**quantity (1)**
134:14
**quants (1)**
23:16
**question (105)**

6:8 14:23 30:9 35:6
40:13 51:19 52:6
54:12 64:14,19 65:7
71:5 79:10 80:10,11
85:16 89:3 103:3,13
103:19 109:17
110:15,16 111:4,7
111:18,19,23,25
115:3 128:20 139:2
139:3 143:23
151:17,19 152:21
153:15 154:10
163:23 169:15
170:18,20 173:18
179:5 180:4 181:3
182:3,12,17 183:3
184:13,21 188:24
189:4 192:9,10,12
195:4,4,6,8,9,10,11
195:13 205:17
216:23 220:12,22
221:9,20 222:22
226:17,19 229:16
232:5 234:10,10,13
244:16 246:15,21
251:18,24 256:3
261:4 262:2 270:17
277:3,15,25 283:22
285:12 287:15,16
287:16 294:23
297:6 307:15 312:5
323:15 324:9
326:25 327:21
**questioning (1)**
246:23
**questions (12)**
6:6,21 64:10 113:19
193:18,25,25 247:6
276:20,21 299:20
340:7
**question?because (1)**
35:5
**quick (2)**
12:22 302:24
**quicker (1)**
247:5
**quickly (3)**
93:11,22 144:25
**quickness (1)**
92:12
**QUINN (1)**
4:4

_____
**R**
_____

**R (2)**
3:3 4:2
**raise (3)**
29:12,14 237:6
**ran (1)**
20:24
**range (3)**
98:3 256:23 305:14
**ranges (1)**
305:13
**rank (1)**
17:12
**rate (1)**
17:21
**rateably (1)**
55:16
**rates (2)**
42:16 89:20
**rational (46)**
69:6 82:2 88:20
107:24 109:11,21
110:20 111:12
113:7 114:4 115:18
116:24 118:15,21
119:2,14 120:14,17
142:4 143:9 177:20
184:17 185:5 190:8
190:23 193:20
194:5,6,7,8,9,10,13
194:19,21 195:17
196:3,5,11,16 197:2
197:10,19,21
198:11,16
**rationale (1)**
36:22
**reach (1)**
327:23
**reached (2)**
325:6 326:19
**react (1)**
196:7
**read (43)**
41:4,22 42:20 50:17
51:16,19 52:5,16,18
52:19 63:3,4,4,5
67:17 77:8 83:19
99:10,11 100:6,9
101:14 104:20
105:2,3 109:15
111:20 121:25
122:6,9 127:15,19
184:24 219:14,23
219:23,24 226:9
229:5,24 230:13

297:11,14
**reading (5)**
42:19 52:25 103:10
111:5 112:23 183:7
219:20 222:12
**reads (3)**
217:10 228:18 232:22
**ready (1)**
70:11
**realizable (1)**
319:10
**realize (3)**
51:3 174:6 245:8
**realized (1)**
170:22
**really (7)**
25:2 151:18 181:22
194:13 209:13
225:7 227:6
**realm (3)**
120:12 154:23 158:25
**Realtime (1)**
2:10
**reap (1)**
109:4
**reason (30)**
39:19,22 53:21,25
55:25 57:2 78:9
142:17,21 147:17
148:4 158:4 167:7
168:10 188:20
189:7 190:10
316:13 344:5,8,9,11
344:12,14,15,17,18
344:20,21,23
**reasonable (2)**
113:6 153:10
**reasoning (1)**
323:22
**reasons (2)**
219:4 339:23
**rebuttal (27)**
240:15 241:12,23
264:18 274:16
276:18 292:5
294:14 295:6,10
296:3 297:20 298:9
299:24 300:12
303:3,6 304:14,15
306:12 308:23
309:9 330:3,6
332:13 338:22
342:20
**recalculation (9)**

_____
TSG Reporting - Worldwide    877-702-9580

296:10,17,20
297:19 298:8,10
303:4 326:22 327:8
**recall (17)**
39:10,14 68:24 72:22
78:5 85:7 106:14
140:13 141:8
146:20 206:23
213:10 221:25
222:3,4 257:13
322:3
**receipt (1)**
172:19
**receipts (1)**
288:14
**receivable (16)**
48:14,17,21 50:14
52:12 53:2,6 128:16
133:21 134:8,18
206:17 310:19
311:21,22 325:21
**receivables (4)**
49:5 53:10 57:11
311:18
**receive (17)**
43:25 58:19 79:4
130:17,18 135:2
228:24 229:6
236:21 238:12,22
249:8 263:20
304:22 313:4 316:4
328:10
**received (6)**
37:22 81:8,10 99:20
135:4 279:9
**receiving (3)**
58:20 116:22 210:13
**recess (8)**
46:20 77:10 91:17
145:11 199:10
240:8 299:10 338:9
**recession (12)**
136:12,25 137:4,8,9,9
137:14,15,22 138:4
139:5,13
**recharacterize (1)**
271:4
**recipient (2)**
236:20 237:5
**reclassified (1)**
298:22
**recognize (3)**
42:25 83:5 224:6
**recognized (1)**

52:13
**recognizes (1)**
37:11
**recollection (2)**
78:6 100:15
**recommendation (1)**
104:8
**reconcile (1)**
330:14
**record (37)**
12:7 46:19,23 48:21
53:12 90:9 91:13,16
91:20 111:5 140:23
145:10 146:7 148:7
199:9,13 226:22
238:20 239:19,22
240:4,7,20 241:4
251:11 252:17
299:6,9,13,15,16
304:3 338:8,11
340:10 341:12
344:6
**recorded (6)**
21:18 37:23 51:13
52:25 90:5,6
**records (4)**
13:5 25:16 213:7
333:3
**recourse (9)**
172:22 173:15 174:2
176:18,25 177:2,5
177:10,13
**recover (2)**
56:4 118:6
**redacted (2)**
305:17,19
**reducing (1)**
317:16
**REED (1)**
4:11
**refer (6)**
227:22 232:25 285:16
306:15 309:19
328:20
**reference (18)**
45:12 127:24 180:22
183:4 209:7 210:2
211:3,16,19 212:14
213:13 223:5
225:24 226:2,4,23
227:17 274:24
**referenced (4)**
42:2 43:17 202:10
299:19

**references (4)**
32:22 207:8 208:18
225:21
**referred (6)**
232:19 274:8 300:8
301:11 304:12
336:22
**referring (36)**
31:2 47:19 83:22 92:8
125:8 127:25 161:5
179:22 180:4,10,11
180:12,17 181:14
181:15,24 182:21
203:18 223:13
230:2,21 231:6
233:9,10,18 244:7
253:5 262:9 276:3
278:10 279:24
282:6 296:4 298:16
298:19 307:5
**reflected (1)**
252:24
**refresh (2)**
78:5 100:14
**refuse (1)**
28:15
**refused (5)**
35:23 36:6 60:7,10
61:16
**regard (4)**
26:13 28:21 61:8
173:6
**regarding (16)**
9:4,5,13 65:12,12
100:10 239:4
241:20 243:23
244:19 246:3 251:9
253:13 285:17
292:6 339:18
**regardless (2)**
44:18 142:20
**regards (1)**
284:24
**registered (5)**
2:8,9 241:18 242:23
341:5
**regular (1)**
254:12
**regulated (1)**
27:15
**regulation (2)**
290:17 337:13
**regulations (2)**
26:19 128:8

**regulator (1)**
27:15
**regulators (5)**
9:3,17 26:25 253:20
269:25
**regulatory (7)**
16:20 18:5 20:13,24
20:25 242:12 250:8
**reimburse (1)**
118:18
**rejecting (1)**
217:11
**relate (3)**
7:9 9:14 252:12
**related (5)**
40:22 41:13 158:13
335:12 341:15
**related-costs (1)**
52:11
**relates (5)**
30:15 126:18 247:12
247:23 295:6
**relating (8)**
37:12 48:12 247:7
256:14 274:7
292:10 338:15,20
**relation (9)**
43:17 65:20 138:16
180:4,20 247:25
248:9 278:18,21
**relationship (5)**
28:23 149:2 156:15
158:16,20
**relationships (2)**
157:20,24
**relative (4)**
17:5,6 41:20 55:11
**relaying (1)**
73:5
**relevance (3)**
31:21 32:16 283:4
**relevant (7)**
138:10 264:21 265:9
265:14,21 274:24
309:9
**reliance (9)**
8:8 219:17 246:18
248:4,7,10,11,13
302:19
**relied (8)**
8:3 219:15 276:13,15
302:8 304:6,8,10
**Relief (3)**
121:4,6 342:12

**regulator (1)**
relieve (1)
83:3
**rely (7)**
224:9 261:17,19
276:23 281:9
291:19 304:25
**relying (2)**
281:11 326:12
**remained (1)**
49:13
**remedies (1)**
172:24
**remember (19)**
8:5,15 15:9,12 16:9
23:6 41:3 70:17
87:3 94:25 98:2
107:3 219:20,22,23
257:14 260:12,16
260:17
**remind (1)**
67:6
**remove (1)**
334:18
**removed (4)**
282:20,25 332:17
333:4
**remunerated (1)**
118:25
**repeat (4)**
35:5 49:21,24 52:5
**rephrase (4)**
6:22 64:19 89:2
170:19
**replicate (1)**
150:13
**repo (10)**
38:19 39:6 40:11,16
40:23 41:7,14,20
117:14 206:17
**report (96)**
6:25 7:5,9,25 8:10,17
10:7 32:17 37:10
42:3 43:5,18 45:9
45:14 47:13 50:16
52:17 57:13 62:19
63:9,23 68:22,25
70:20 71:8 83:11
91:23 98:20 100:8,9
108:14 113:18
120:5 139:25
146:24 150:15
159:13 165:6,9
177:19 197:9 213:9
213:11 225:7

Contains Highly Confidential Portions

240:15 241:12,23
245:10 251:6
260:21,25 261:5,21
264:18 274:4,7,11
274:16 276:19
277:6 279:19,24,25
280:5,13,17,19,20
281:8 285:16,19
287:10 292:5
294:14 295:7,8,10
297:20 298:9
299:24 300:13
302:22 303:7,9
306:13,14 308:23
308:24 309:22
330:5 332:13
333:24 337:6
338:22 342:8,20
**reported (2)**
1:23 334:3
**reporter (7)**
2:9,9,10,11 5:9,11
341:6
**Reporting (2)**
5:8,10
**reports (30)**
7:16 8:2,4,25 9:20,21
10:9 20:25 62:13
98:16 165:13
214:19 240:25
247:8 253:6,18,23
256:14 257:7
265:25 276:25
278:22 280:18,21
280:22 282:17
285:21 292:23
301:25 309:19
**represent (2)**
5:23 280:15
**representation (4)**
172:22 173:16 174:2
252:17
**represented (1)**
235:25
**representing (5)**
72:6,7 105:8 240:24
252:10
**reputation (1)**
24:18
**Reputational (1)**
24:16
**request (3)**
257:21 296:9 305:7
**requested (2)**

168:14 341:19
**requesting (2)**
296:20 303:16
**REQUESTS (1)**
343:3
**require (8)**
21:7 156:12 196:8
232:3 290:17
319:14 327:8
333:17
**required (45)**
10:10,13 98:8 121:16
121:21 122:15,24
124:5,8,15 125:4,16
125:25 126:10,14
129:4,12,14,15,17
130:4 135:14
140:11 142:25
196:17 244:8
249:12 263:7 267:7
267:12,22 269:9,11
269:14,17 271:18
272:22 284:3
290:12,15 293:4,13
293:17 317:23
339:9
**requirement (34)**
10:19 28:12,13 33:10
34:17 35:11 36:25
84:3,12,21 86:4,17
129:25 130:3,4
131:10 141:9,21
143:10,22,24 144:3
186:2 249:15
263:19,23 264:3,6
266:4 298:10
307:14 317:17
325:13 326:22
**requirements (37)**
9:14 26:11,16,20 27:2
28:6 29:13 30:15
31:4 32:9 35:25
36:17 83:15,21
85:14 124:8,13,22
126:18 130:12
138:6 140:17 142:6
142:9,16,21 143:4
143:13 144:19
168:22 170:16
200:11 208:14
212:7 242:12
284:12,19
**requires (4)**
9:24,24 10:19 319:4

**reran (1)**
303:18
**reread (1)**
7:16
**rerun (3)**
303:9,12,16
**research (2)**
297:23 305:22
**researching (1)**
294:9
**reserve (50)**
9:11 10:19 26:17
243:20 244:4,7,10
244:23 247:12,14
253:21,25 259:2,9
259:14,17,18,22
260:4,5,19 263:2
265:10 266:4
267:22 271:6
289:17 290:10,18
290:21 291:22
292:15 293:5,13,24
296:11 297:19
302:10 303:4
307:19,25 309:4,11
310:15 313:2 314:2
314:14 331:20
334:3 337:16
**Reserves (2)**
291:10 342:22
**resolution (1)**
120:14
**respect (23)**
15:24 28:21 40:10,15
42:6 44:4 45:15
55:2 61:3 68:5,19
93:6 172:25 173:3,4
173:7 199:19
224:14 236:14,17
236:23 237:10
326:10
**respectively (1)**
128:10
**respects (3)**
10:12 12:25 14:3
**responding (1)**
236:20
**responds (1)**
179:7
**response (4)**
103:19 104:13 181:3
299:19
**responses (1)**
6:13

**responsibility (25)**
44:7 50:12 53:8 57:6
57:22,24 58:2,21
59:9 60:7,10 61:17
87:13 118:2,12,16
120:2 130:11 232:9
232:11 241:17
242:23 253:19
336:14,15
**responsible (9)**
8:24 9:10 13:3 24:3
24:11 44:16,20
129:8 331:22
**rest (3)**
34:23 37:7 226:9
**restrictions (2)**
314:18,21
**result (6)**
107:22 109:19 110:18
111:10 296:12
326:21
**resulted (2)**
78:2 89:12
**resumed (1)**
146:3
**resumé (5)**
248:18,21 252:25
253:3,3
**retained (2)**
8:11 252:8
**retroactive (2)**
326:22 327:8
**retroactively (1)**
326:5
**return (9)**
133:18 171:22,24
228:8 232:9,11
281:2 319:12
328:11
**revealed (1)**
296:12
**revenue (1)**
16:18
**revenues (1)**
113:2
**reverse (1)**
206:17
**review (58)**
7:24 12:3,22,22 16:17
18:3,10 19:9 25:21
25:24 32:20 43:4
48:3 50:15 59:21,24
60:2 62:18,20,24
66:22 70:10,12,14

71:6 77:14 83:7,10
99:13 103:3,16
105:16 113:21
122:3,8 127:6,11,18
147:7,9 168:17
235:5,7,8 243:8
248:5,14 285:23
296:7 297:13
301:18,24 302:7,19
304:9 306:3 323:21
341:19
**reviewed (30)**
8:6 13:11 16:15,16,19
16:25 18:4,4,14
62:20,22 70:19,23
71:2,8 76:13 77:16
169:2 206:25
224:11 246:17
275:14 279:15
286:20 293:7
301:22 307:2
326:10 329:12
337:23
**reviewing (11)**
10:4 13:21 17:22 20:8
39:10 59:15 66:18
93:16 255:21 285:8
293:8
**reviews (2)**
9:7 11:2
**revoked (3)**
285:4,13,14
**reward (1)**
58:20
**rewards (3)**
58:19 160:3,23
**re-read (1)**
205:17
**rich (1)**
221:5
**rid (1)**
106:9
**right (66)**
7:6 21:17 52:19 66:23
74:6,7 75:11,16
82:15 89:7,8,9,13
96:23 106:14 107:2
109:12 111:2
113:25 120:3
123:16 127:13
133:15 134:16
135:21 141:6
142:25 174:6 176:8
186:15 188:15

Contains Highly Confidential Portions

189:3 195:8 207:2
207:20 211:23
220:8 222:4,19
226:6 232:7 242:21
245:7 249:16
250:19 253:10
256:15 258:23
292:9 299:22,25
300:22 301:14
307:6 308:21
312:15 313:3
315:11 316:3,7,15
321:18 322:11
323:17 335:23
338:13
**rights (14)**
29:4 75:9 88:23
172:23 173:7,14
220:17 311:9,22,25
313:10 318:7,23
320:15
**RISC (10)**
245:20 328:25 329:6
329:12 330:5 331:2
331:9,16,21,22
**risk (92)**
23:9,14,15,19,25 24:2
24:5,9,10,12,16,18
25:2,3 35:2 45:15
56:9,11 57:14,20
58:9,15,18,25 59:7
96:7,11,12,22,23,25
97:3,12 98:5,11,12
98:14,15,16 134:25
135:3,25 136:4,12
136:16 137:25
138:7,20 142:9,18
142:19 143:12
145:2 147:22,24
148:9,16,18 150:18
158:7 160:2,22
161:9,10,13,19,23
162:2,7,10,12 163:3
163:6,9,18 164:2,8
164:15,17 165:6,16
165:24 166:18,21
166:23 167:24
181:8 186:24 187:7
189:25 197:20
217:10
**risks (6)**
24:13 97:9 137:23
138:11 139:7
167:12

**risky (9)**
57:18 96:14,16,18,21
97:4,4,5,6
**risk-manage (1)**
148:14
**RMR (1)**
1:24
**Robert (3)**
297:4,7 342:24
**role (3)**
20:15 21:7 178:20
**roll (1)**
149:6
**Romain (6)**
50:21 51:10,23 52:9
53:16 342:10
**Romain's (3)**
50:15,23 51:20
**Rosen (3)**
71:25 72:2 73:6
**rough (1)**
66:15
**roughly (4)**
77:21 302:11
**RPR (1)**
1:24
**rule (32)**
32:22 33:2,9 34:7
121:7 244:8 255:15
255:25 258:25
259:8,23 262:25
264:13 267:11,16
267:18,20,21 268:4
269:15,17 271:24
291:10 311:16
319:4 326:11,13
329:2 339:21
341:20 342:21,23
**rules (24)**
6:5 9:23 10:8,10
26:19 55:6 241:17
241:21 242:22
243:2,8,9,25 244:21
248:6 253:15 256:6
256:7 264:15
320:23 337:18
339:16,18,24
**running (1)**
273:2
**R-I-S-C (1)**
245:20

— S —

**S (5)**

1:24 2:7 3:3 4:2 341:5
**sake (1)**
110:8
**sale (34)**
36:22 43:23 77:14
78:23,25 79:22 99:6
101:4,17 102:5,8
103:25 104:19
106:8 121:5,9
123:12 173:13,22
174:4,10 175:9,17
175:24 183:7 193:3
196:12 197:6 217:5
220:15 224:18
320:19 323:8 324:2
**sales (1)**
188:13
**sat (2)**
246:6,22
**satisfied (4)**
168:23 335:18,25
336:9
**satisfy (4)**
30:21 55:18 170:16
200:11
**Saturday (2)**
270:13 324:18
**save (1)**
262:24
**saw (20)**
46:8 78:8 88:16 95:25
97:24 106:11 113:4
118:11 136:6
146:22,23 148:18
148:22 208:14
210:24 297:21
307:21 333:21
335:3 336:3
**saying (46)**
35:17 68:24 73:9
102:4 105:4 113:13
154:22 157:10
158:24 171:22
175:13 181:2
183:11 188:24
200:20 210:5
218:12 221:15
223:5 236:25
237:15 238:9 264:2
272:21 282:12
283:9,12 287:11
288:16 296:16
304:5 311:12
312:17 315:19,22

316:6 317:18 318:5
320:16 321:10,14
325:5 326:7 328:13
330:22 331:4
**says (65)**
43:8,22 49:8 51:10
52:9 53:17,20 57:18
61:12 71:17 78:17
83:25 99:15,19
100:17 101:10
102:7,17 103:18
104:7 106:23
107:10 121:14
122:17,21 124:2
126:7 128:5,13
147:12,20 150:17
172:17 180:24
182:5 203:10,25
207:22 208:24
220:12,16 221:9,12
221:12 222:20,22
224:23 226:11,13
227:3,13 228:24
229:22 236:10
237:24 246:22
248:23 265:8 268:5
268:7 269:13
273:10 291:17
297:17 321:12
**SBC (2)**
20:12 258:8
**schedule (3)**
46:7 262:6 304:18
**Schiller (3)**
2:6 3:11 5:23
**Schwab (3)**
13:25 15:4,17
**science (1)**
248:23
**screens (6)**
282:10 288:10,20
289:3,5,8
**se (1)**
16:17
**SEA (2)**
291:10 342:23
**SEC (34)**
9:5,17 241:17,18,21
242:22,23 243:25
244:8,20 253:14
255:14 258:25
259:8,23 262:25
263:20,23 264:3,7
264:13 267:20

269:11,14 271:4
307:9 319:4 326:11
326:13 337:13,18
339:16,18,21
**second (17)**
71:13 91:25,25 99:15
101:14 106:22
126:21 128:4
129:13 131:13
147:6 200:18
237:14 239:25
264:20 265:8
271:20
**secret (1)**
26:23
**section (7)**
12:10 122:7 128:9
209:7 211:4 336:22
338:16
**sectors (1)**
241:16
**secure (41)**
9:25 121:9,17,21
122:15,25 124:5,9
124:15 125:6,17,25
126:10 133:3
140:11 167:23
186:4 187:3 198:13
199:24 208:5
213:21 222:25
224:14,24 225:11
225:16 227:13,23
228:5,14,20 229:3
231:24 233:23
234:7,11,16,21,22
287:23
**secured (22)**
8:25 9:20 17:19,20
41:4 119:4 129:13
129:24 130:20
133:9,13 134:8
253:22 310:20
319:10 320:3,4,5
321:7 326:13,15
328:17
**secures (1)**
200:5
**securing (1)**
200:7
**securities (32)**
42:13,14 44:25 91:2,6
91:7 97:20,22 134:7
165:15 220:17
233:12 236:13,22

Contains Highly Confidential Portions

237:9,25 238:13,22
249:19 253:17
255:8,17 258:12
259:13,16 274:12
288:8,21,24 291:10
302:10 342:23
**security (7)**
134:9 154:7,22
165:20 279:11
306:21 319:11
**SEC's (1)**
10:10
**see (96)**
32:23 37:13,18 38:12
43:7,22 46:2 47:16
47:20 49:14 51:7,10
52:7 53:13 59:3
61:11 71:20,22 72:9
72:15 78:3 83:14
84:9,11,15,21,23,24
100:4 101:23
103:12,18,21 104:8
107:8 108:18 114:6
118:14 121:22
123:2 128:10
141:10,14,21,23
142:2 143:3,7
146:17 147:15
148:2,13 150:22
151:5 164:19
168:18,24 173:10
177:22 178:3 179:4
179:13 192:10
200:18 201:19,21
201:23 203:6,14,22
203:25 217:16
220:20 221:7
223:20 224:25
225:24 226:2
228:22 229:4
232:25 235:20
236:4,17 237:23
238:3 245:11
281:14 286:13
306:3 308:20
314:12 316:18
333:19 334:20
336:5
**seeing (2)**
206:23 275:6
**seeking (2)**
236:11 237:24
**seen (43)**
31:22 36:4 53:17

61:12 67:9 70:16,17
71:10,11,11 74:21
74:24,25 77:4 83:6
117:22 146:16,19
146:21 148:7
178:20 183:18
206:22 207:7 212:5
221:25 222:3,5
238:19 239:18,21
264:14,15 266:14
266:16 285:25
289:23 290:2,6
297:6 330:24
334:19 338:3
**seg (8)**
8:25 10:17 17:19,20
129:24 133:13
253:22 295:18
**segregated (2)**
9:20 130:20
**segregation (1)**
10:18
**seize (1)**
283:22
**seized (13)**
280:24 281:10,19,20
282:16 284:10
289:16 290:9
291:21 295:11,21
295:22 302:16
**seizure (5)**
282:11 283:8 284:6
290:18 328:20
**select (1)**
34:11
**selected (1)**
33:15
**sell (14)**
98:25,25 99:2 105:25
106:2,7,7,8 109:11
113:15 116:19
311:8,13 328:10
**seller (25)**
109:6,8 112:10
113:15 114:4 115:4
143:9 171:12,15
172:6 177:20 196:5
196:12,16 197:2,10
197:21 198:15
201:17 203:11
207:23 211:6,12,14
218:17
**seller's (1)**
213:7

**selling (16)**
25:17 79:5 106:4,6
109:7 115:5,7 162:9
169:11,22 173:22
198:23 201:11
219:2 315:9 316:25
**sells (1)**
172:20
**send (1)**
289:12
**sending (2)**
236:24 296:19
**sense (11)**
13:18 14:16,17 17:4
30:5 108:9 110:3
128:25 129:3
175:13 257:8
**sent (3)**
10:17 235:20 287:10
**sentence (19)**
37:15 91:24 92:4,9
122:21 126:7,12
128:4 140:19 162:20
197:13 230:16
232:20 235:11
236:10 241:25
242:5 264:21 265:8
**sentences (2)**
121:13 122:12
**separate (4)**
20:17 24:11 120:23
306:6
**separately (3)**
14:14 81:12 165:16
**September (79)**
29:23 35:23 39:12,21
49:11 58:5,12,14,16
59:20 61:3 77:13
80:7 84:2,2,11,12
84:20,20 88:22
89:11 90:8,23 101:4
104:12 106:14
136:23 137:2,5
138:13 140:18
143:5,11,14,14
144:11 153:7
160:10 162:15
168:22 178:17
180:9 182:2 188:18
196:20 202:23
206:9 211:25
212:16,24 213:19
218:5 220:5,14
222:8 224:15 234:6

235:19 260:19
265:11,12,14,20
266:3,9,14,17,19
281:22 288:4,9,25
292:16 294:10
300:17 302:16
309:12,20 322:4
**series (3)**
243:7 254:18 255:2
**serve (1)**
251:3
**served (1)**
256:8
**services (5)**
251:15,22 252:11
277:22 278:11
**SESSION (1)**
146:2
**set (14)**
25:9 53:6,10 69:24
81:21 97:12 98:6
133:18 149:13
195:18 248:2
297:19 341:10,24
**sets (2)**
172:21 231:7
**setting (1)**
36:25
**settle (4)**
87:14,20 90:21 91:4
**settled (5)**
45:7 88:3,9 91:2
186:14
**settlement (16)**
44:7,11 49:9,10 57:24
58:2,21 61:17 88:7
117:25 118:11,16
118:24 120:2,7
173:5
**settlements (1)**
88:5
**settling (3)**
44:16,21 93:25
**severe (2)**
29:14 95:18
**shape (1)**
325:14
**share (1)**
55:16
**sheet (2)**
37:11,25
**shell (1)**
70:4
**shifting (1)**

140:17
**shoes (7)**
99:17,18 100:20,24
101:19,20 215:21
**shoot (1)**
73:10
**shopping (1)**
93:19
**short (36)**
32:14,14,14 38:5,24
39:2,5,15,18,20
40:2 42:17 44:23
82:21 88:22 89:6,10
90:21 97:15 108:12
110:9 115:8 116:3
118:6 151:2,20
152:2,2,3 157:22
160:5,19 161:12
178:25 182:14
298:24
**shortest (3)**
67:8 68:6,18
**shortfall (4)**
271:17,19 272:9
296:13
**shortly (1)**
220:15
**shorts (1)**
144:3
**show (15)**
6:23 47:3 53:18
260:25 267:15
273:7 281:7,8 291:3
305:15 308:13
311:15 319:3 320:2
328:5
**showed (12)**
88:16 94:23 107:3,4
140:25 141:12 165:6
192:22 271:17
282:19 285:25
305:13
**showing (15)**
42:23 47:10 70:8 77:6
83:4 120:25 127:5
146:12 172:14
200:14 219:5 224:5
234:24 281:16,18
**shown (8)**
275:15,15 321:24
322:24 331:3
334:14,14 336:6
**shows (3)**
83:14,25 249:18

Contains Highly Confidential Portions

**shut (6)**
281:25 282:5,10
288:10 289:4,9
**shutting (1)**
282:6
**side (13)**
38:5 39:3 49:4,5
97:14,15 105:13,14
292:15 293:4,8,10
293:24
**sides (5)**
49:18 50:5,11 149:8
161:14
**Sidley (4)**
71:23 73:5 235:12,14
**Sidley's (1)**
235:17
**SIFMA (3)**
255:7,13 256:4
**sign (2)**
87:19 313:25
**signed (22)**
39:11 42:10 69:23
70:5 220:14,24
221:10 237:22
253:18 313:21,23
314:8 315:21 322:4
322:6,22,23 323:2
323:10 324:5
325:18,19
**significant (10)**
15:11 25:22 38:20
77:22 88:17 96:7,11
208:22 209:4 237:3
**significantly (1)**
208:14
**sign-off (1)**
21:4
**similar (6)**
10:9,12 189:13 204:5
241:24 301:24
**simple (1)**
163:17
**simply (1)**
221:21
**single (4)**
84:17 85:2 152:25
188:19
**SIPA (2)**
4:12 242:11
**SIPC (24)**
54:25 55:3,4,10,11,14
56:8,13 61:22 78:22
79:19,20 81:4 103:6

118:17 220:4
242:15 257:23
266:5,7,12 267:12
268:12 282:23
**sir (1)**
301:8
**sitting (5)**
86:14 144:4 248:3
280:21 335:14
**situation (3)**
28:6 196:19 339:15
**situations (1)**
218:9
**six (1)**
77:16
**size (11)**
17:5 86:25 88:15 95:6
97:7 98:6 132:9
134:13,14 162:14
216:7
**slight (1)**
7:17
**slow (2)**
14:21 65:3
**smaller (2)**
18:23 258:20
**SMITH (1)**
3:17
**smoothly (2)**
6:6 276:12
**Society (2)**
255:6,24
**sold (26)**
100:13 183:15 197:7
210:22 310:22
312:7,18,22 313:19
314:11,12 315:10
315:25 316:20,21
316:22,24 318:2,2,4
318:11,12 319:16
323:24 325:11,17
**sole (1)**
79:7
**solely (1)**
247:7
**solvent (1)**
79:15
**somebody (10)**
18:3 166:4,17 187:6
213:3 228:8 254:10
308:13 310:23
314:9
**somebody's (1)**
48:22

**someplace (2)**
231:19 234:3
**somewhat (2)**
30:19 151:11
**soon (3)**
6:18 103:20 104:14
**sooner (1)**
103:21
**sorry (64)**
12:16 14:25 19:3
45:17 49:23 52:6
56:17 65:3 69:19
70:3 89:22,24 92:23
103:9,15 109:15
119:17 122:9
125:19,20 127:15
127:17 130:24
131:3,12 132:4
139:25 140:24
150:16 159:5
177:24 178:2
184:22 194:3 195:7
200:20,21 202:21
203:4,4 216:24
238:8 241:9 243:16
244:6 254:22
264:25 265:4
266:18 272:16
273:4 276:9 279:21
282:22 286:9 287:7
297:14 304:13
307:12,16 309:25
314:15 318:21
327:2
**sort (4)**
35:6 97:25 170:19
333:14
**source (10)**
261:6,7 273:8 276:15
276:24 277:6 279:7
280:23 281:3
291:25
**SOUTHERN (1)**
1:3
**space (1)**
77:21
**speak (12)**
64:24 65:9 275:22
277:9 278:17,20
298:4 308:2,4
329:16,21,24
**speaker (1)**
101:25
**speaking (1)**

222:7
**specialist (1)**
5:9
**specific (13)**
8:5 40:12 101:16
124:18 156:11
194:22,24 195:17
204:5 206:23
208:17 232:18
279:25
**specifically (8)**
33:7 63:12 66:14
127:8 210:4 212:15
213:14 253:5
**specifics (2)**
33:8 70:5
**speculate (1)**
181:21
**speculation (1)**
179:18
**speed (1)**
283:24
**spend (1)**
67:14
**spent (10)**
18:18,22 19:7 59:14
63:24 64:4 68:14
95:15 243:3 257:6
**SPIC (1)**
72:15
**spit (3)**
162:18 164:16 165:5
**spoke (6)**
7:16,21 65:14,16,19
276:7
**spot (1)**
131:7
**ss (1)**
341:3
**stable (1)**
136:13
**staff (1)**
253:7
**stamp (1)**
282:24
**standpoint (9)**
13:4 16:19,20 23:23
23:25 24:2,19 26:15
98:15
**start (25)**
5:2 10:4 29:16 46:21
51:22 53:9 58:13
91:18 113:18
116:12 127:20

133:7 146:5 159:14
169:8,19 185:15
190:3 199:11 239:2
239:25 240:18
253:10 299:11
324:20
**started (10)**
21:15 62:16 100:10
157:10 183:22
188:24 193:5 270:4
324:14,24
**starting (7)**
77:19 87:10 178:22
198:6 220:11
333:25 337:3
**starts (3)**
51:23 232:21 274:6
**state (11)**
2:12 47:13 58:4
210:18 255:6,23
264:19,21 303:17
341:3,7
**stated (5)**
196:11 211:12 237:7
274:11 315:6
**statement (22)**
24:21 46:6 47:19 48:2
48:16 78:10 103:14
121:24 122:13
125:9 126:4 147:18
148:5 204:4 241:24
279:7 286:12 303:2
303:11 309:8
326:25 338:23
**statements (4)**
21:14 102:23 262:3
299:16
**states (4)**
1:2 33:9 239:22
313:18
**stating (6)**
107:20 222:13 280:23
284:17 306:17
322:25
**stature (1)**
271:9
**status (1)**
29:10
**statutory (1)**
242:12
**stay (1)**
104:5
**stays (1)**
313:18

Contains Highly Confidential Portions

**STEEN (1)**
3:20
**step (4)**
99:17,18 101:19,20
**stepped (3)**
100:20,24 102:6
**Steve (1)**
72:16
**stipulated (3)**
316:18 317:25 318:11
**stipulation (7)**
257:16 279:16,18
280:12 299:19
300:6,9
**stock (3)**
206:17 313:5 320:4
**stocks (1)**
201:12
**stopped (1)**
312:25
**straight (1)**
149:10
**strategies (4)**
20:23 27:9,11 151:8
**strategy (1)**
21:7
**streams (1)**
16:18
**street (3)**
3:7,13 144:24
**strike (7)**
67:7 85:10 225:17,20
283:20 306:8
323:14
**structure (4)**
132:25 217:21,22,24
**structured (2)**
210:24 218:7
**structuring (2)**
68:3 69:7
**studies (1)**
30:7
**study (2)**
41:12 255:14
**stuff (1)**
42:20
**Subject (1)**
306:15
**submitted (4)**
7:5 8:17 146:14,23
**subordinated (3)**
38:7 144:14 306:4
**subordination (3)**
42:11 305:23 306:3

**subparagraphs (1)**
204:12
**Subscribed (1)**
340:20
**subsections (1)**
232:19
**Subsequent (2)**
334:16 335:7
**subsidiaries (1)**
203:11
**substance (1)**
258:24
**substantial (7)**
136:2 184:10 185:4
185:18 207:9
211:17 212:15
**substantially (2)**
143:13 187:21
**substantive (1)**
242:4
**substantively (1)**
289:9
**substitute (1)**
247:13
**substitution (1)**
300:4
**sub-bullet (1)**
150:16
**sufficiency (2)**
172:19 173:25
**sufficient (6)**
36:18 55:20 82:14
99:25 104:17
170:16
**suggest (3)**
96:6 104:10 238:5
**suggesting (4)**
102:2 115:17 179:16
181:7
**suggests (5)**
48:4 72:24 148:8
174:13 175:11
**summary (1)**
300:14
**Sunday (1)**
324:18
**supervised (3)**
12:24 253:20 254:14
**supplemental (5)**
240:12 241:10 276:18
280:22 342:18
**supplied (1)**
262:18
**supply (1)**

329:13
**support (7)**
48:2 95:21 121:4
127:4 217:13 335:5
342:12
**supporting (1)**
336:7
**supports (1)**
328:15
**supposed (4)**
10:16 79:12 268:5
269:4
**sure (91)**
10:7 12:13,15 14:22
18:8 20:13 21:5,13
21:16 23:4 35:8
36:10 37:4 38:2
40:13,14,21 46:8
52:7 53:5 57:11
58:13 61:7 63:15
64:16 69:19,20,21
71:9 74:20 76:20
79:3 80:10 85:16
89:2,3,5 92:2 99:4
100:13 105:24
106:19 108:12
110:10 114:17
118:10 120:18,21
125:10 131:9
151:11,18,19
160:12 165:4
169:15 170:18,21
176:22 181:13
182:11 184:16,21
190:15 192:9,19
193:16 195:6 202:6
204:17 206:3
209:20 211:7,8
218:22,25 219:25
223:3 234:9 242:8
242:10 247:17
251:13 262:23
270:16 277:23,24
280:18 283:4 289:5
308:16
**surmise (1)**
74:14
**surprise (3)**
62:7,11,12
**swear (1)**
5:11
**swing (1)**
30:22
**swings (1)**

142:5
**Swiss (1)**
68:15
**switched (1)**
49:11
**sworn (3)**
5:15 340:20 341:11
**system (27)**
18:7,8 49:18 50:6
148:11 149:7,10
161:17 164:10,14
165:5,14,15 166:2
245:13,15,20
292:11 329:2,7,12
330:5 331:2,9,16,21
331:22
**systems (22)**
25:9,10 49:4 144:23
144:24 145:2
147:13,13,22
161:16 162:17
163:2,5,24 164:7
165:24 244:3,22,25
245:2,2,19
**S.E.C (2)**
264:10 296:9

**T**
**TAA (16)**
57:25 63:5 118:4
176:7 320:7 321:22
322:10,11 323:4,5
323:17,22 327:11
327:13 328:2,3
**TABATABAI (1)**
4:17
**tabbed (2)**
300:25 301:4
**tag (1)**
248:19
**tagged (1)**
248:19
**take (69)**
6:10 13:6 16:4 18:16
18:17 19:13,14 25:5
25:8,24 26:2,4
40:14,19 46:14 53:3
58:18,21,24 59:5
60:3,7,10 61:16
70:10 83:19 91:11
95:5,10 97:11
118:23 120:19,20
131:5,16,19 144:20
145:6 154:20 158:8

158:25 162:11,16
166:21,22 167:8,21
169:7 183:21 184:2
187:11 189:14
191:6,25 192:8
197:24,25 199:5
216:2 217:5,10
235:5 241:23
254:22 257:21
298:24 305:7
335:10 338:5
**taken (7)**
180:2 188:21 222:11
249:10,11 282:3
295:14
**talk (15)**
64:18,21 73:19
126:22 157:13
173:21 176:4
190:20 191:13
192:16 231:16
291:24 304:2
311:18 315:9
**talked (7)**
50:2 120:5 167:15,16
195:3 247:19 309:8
**talking (31)**
45:19 63:14 64:7
92:11 94:6 113:23
123:21,22 128:24
135:7,8 140:8 157:5
182:3 183:5,5,6
190:14,16,17 192:3
220:13 223:18
226:14 231:17
269:15 285:19,21
294:25 300:8
328:17
**talks (4)**
284:21 319:8,16
326:13
**tape (12)**
5:3 46:22 91:15,19
145:9 146:6 199:8
199:12 240:6,19
299:8,12
**Team (1)**
147:23
**telephone (2)**
288:16,19
**tell (18)**
48:4 161:15 163:6,13
164:11 165:9 167:4
221:10 239:16

Contains Highly Confidential Portions

250:17 258:6
267:21 273:7 276:6
290:16 304:16
312:13 327:25
**telling (4)**
104:21 236:21 305:15
321:9
**ten (3)**
66:19,20 67:3
**tend (2)**
136:9 152:9
**Tennyson (1)**
329:24
**tens (7)**
144:12 155:16 184:7
184:25 187:12,19
317:5
**term (14)**
23:2 43:16 65:8
176:25 200:17
201:18 203:16
204:10,22 205:4,11
205:21 206:3
226:24
**terms (32)**
15:12 20:16 24:5,22
33:3,5 55:9 56:21
62:4 63:25 64:16
69:7,7,22,24 74:6
78:23 79:21 93:25
117:9 129:20
137:23 139:6
147:23 148:25
151:14 158:15
200:2 204:5 218:17
233:17 238:10
**testified (6)**
5:16 16:2 67:7 82:12
100:12 146:4
**testifying (1)**
17:7
**testimony (53)**
8:12,22 12:10 17:25
42:9 50:16,24 51:20
72:18,22 82:17,25
85:7 87:3 100:6
102:2 115:22
123:19 130:22
162:22,24 163:21
164:6,6,9 175:15
178:11 179:16
195:23 210:7 215:6
219:10,13 220:11
221:7 222:2,6

243:12 261:7 263:6
268:2 271:5 272:18
301:11 302:9,15,25
308:18 312:4
324:19 325:23
341:12 342:3
**Thank (10)**
45:22 47:2 51:6 52:4
90:2 139:15 205:8
277:4 300:18 302:4
**Thanks (5)**
46:17 64:20 139:23
140:5 145:7
**theirs (1)**
314:10
**theoretical (1)**
30:23
**theoretically (1)**
313:22
**thereof (1)**
204:2
**thereto (1)**
248:15
**therewith (1)**
232:22
**thing (8)**
9:19 105:3 106:15
157:15 183:24
191:7 247:18
291:24
**things (24)**
6:14 26:7,9 93:16,21
94:10 95:12 100:25
122:20 123:8 131:4
131:13 134:17
154:23 194:6,10,19
197:5 218:23 247:5
277:14 283:23,24
299:5
**think (180)**
8:19 16:22 17:15,17
18:20 19:11 23:5
26:23 28:13 29:8
31:10,11 36:9 41:4
41:16 44:10 45:20
46:13 47:4 48:22
54:22 55:24 56:19
57:2,18 58:19 61:23
63:18 64:3 66:12,13
70:23 72:19 73:15
73:18 74:2 78:7
79:11,11 83:23
88:10 90:6 92:11,21
96:11,12 97:6,10,17

97:18,19 104:16
105:12 107:3 109:6
109:14,16 111:8,18
111:24 112:10,24
115:24 116:20
117:5 118:5,21
119:9,11 124:21
136:4,10 139:17
142:19 143:24
145:5 146:19 152:9
152:21 157:13
159:23 162:20
169:23 173:20,21
174:4,9,11,11,19,19
174:20,23 175:17
177:4,10 181:17
185:14 187:13,18
188:20 189:7,24
191:22 194:18
196:5 198:3 207:21
208:8,22 209:12,18
209:24 210:17
212:8,19 214:13
215:2 216:8,12
219:25 225:7,8
228:9 229:25
231:16,20,20 234:2
234:4 238:24
239:14,23 246:15
248:4,13 249:14
250:18 251:7,20
255:11 257:15,19
265:25 267:6 268:4
268:14 269:18
270:12,17 272:22
273:9,10,22 275:21
276:19 280:19
281:13 285:11
295:7 301:23
306:10 310:18,23
311:23 312:20
313:4,16,25 314:25
315:13 317:2
319:15 320:16,22
324:15 329:6 330:9
331:6 336:14
**thinking (3)**
67:19 179:20 254:25
**third (1)**
228:17
**thought (47)**
36:20 57:3,10 61:8
64:3 67:18,20 70:22
88:15 117:15,23

120:10 157:10
160:3,23 167:3
168:7,16 181:19
183:15 184:2
185:16 186:9 187:8
189:18 190:16
207:10 213:6,16
215:17,22 219:3
221:22 222:15
223:9 227:4 247:18
265:4 267:6 269:17
287:14 303:16
311:13 316:25
325:23 327:15
330:15
**thoughts (1)**
66:25
**thousands (7)**
144:12 155:16 184:7
184:25 187:12,19
317:6
**threaten (1)**
28:2
**threatened (2)**
106:12 193:15
**threatening (4)**
29:17 74:9 183:22
193:14
**threats (1)**
193:4
**three (14)**
20:6 93:9 97:7 99:10
247:7 248:3 250:5,6
252:14 255:12
256:24 260:10
262:3 280:21
**time (227)**
5:6 13:12 15:2,3,10
17:8,9 18:23,25
19:8 21:15 25:15
26:8,21 32:13 33:16
33:16 36:12 39:23
46:14,18,22 58:10
58:12,13 59:20,24
59:25 61:22 62:3,13
62:15,15 63:10,13
63:18 64:4,8,25
65:15 66:10,13,15
66:16 67:8,15,20
68:7,14,18 69:13
70:10,20 72:20
73:12,22,25 74:2
81:14 82:4 83:10
88:7 90:11 91:11,13

91:14,19 92:12,17
92:22 93:12,24 94:4
95:5,9,13,14 97:9
97:24 100:16
102:14 105:16,17
108:12,13 110:9,10
116:18 119:20
124:23 125:12
132:5,19,20 134:10
137:15,22 138:2,9
138:10 139:2,5,17
145:6,8 146:6
148:10,15,19
149:15,18 157:2
166:15 167:9
169:23,24 183:4
192:20 193:10
194:2,11,23,25
195:20 196:4,6,9,13
197:4 198:4,19
199:5,7,12,24 208:4
209:16,19 210:19
210:20,21 214:14
214:23,24 215:12
215:14 216:2
217:20 218:13
219:2 220:3,7 222:8
240:5,19 251:16,16
254:9,9 256:16
258:3,17 262:24
264:7,22 265:9
266:19 270:2,18
271:17 272:15
282:3,13,24 283:16
284:9 285:9 287:11
289:22 290:3,7,11
292:25 294:12,13
295:8 299:7,12
301:23 309:4,10
310:16 313:11,19
313:20,24 314:7,9
315:9 317:14 318:3
318:12,22,25 320:2
320:9,15,19 321:14
322:22 326:8
331:14 332:18
333:3,11,16,21
334:13,18,23 336:6
336:19 338:4,7,10
339:17 340:8
**timeframe (2)**
73:2 124:18
**times (4)**
10:18 139:10 218:15

Contains Highly Confidential Portions

218:23

**timing (6)**
63:15 64:5 92:10,18
92:25 93:6
**title (1)**
172:23
**today (20)**
5:5 7:14 65:13,14
70:15 71:3,7,7
104:2 146:18
197:13 208:7 250:3
257:18,20 304:9
309:7 315:6 321:25
333:5
**today's (3)**
83:8 104:4 340:9
**told (11)**
101:4 192:23 221:15
239:19 265:19
280:7 286:20
287:11 312:19
313:5 329:11
**tomorrow (3)**
134:21 208:8 257:18
**ton (1)**
136:19
**tonight (1)**
71:18
**top (14)**
71:11 85:20 91:24
92:4 97:7 129:13,15
129:17 130:2
150:17 159:12
164:16 224:20
334:4
**topic (1)**
6:18
**topped (1)**
131:8
**total (10)**
52:11 84:3,5 97:17
151:5 161:13
165:18 260:18
261:8 302:9
**totally (1)**
148:23
**to-answer (1)**
273:5
**trade (1)**
123:12
**traded (4)**
23:4 170:6,7 212:3
**trader (3)**
161:6 164:3,22

**traders (3)**
148:16 149:24 161:8
**trades (8)**
49:18 50:5 61:10,11
87:14 90:18 157:25
223:9
**trading (27)**
14:11 20:22 21:7,16
21:21 23:8 24:6,9
27:9,10 136:22
149:20 151:8
156:18 161:6
201:12,15,19,22,24
202:4,5,9,9,14,17
239:2
**traditional (1)**
111:8
**traffic (1)**
212:6
**trail (2)**
70:18 71:12
**transaction (63)**
13:6 15:18 16:11 17:6
25:5 39:25 40:22
41:14 62:5 64:22
66:18,22 67:15
68:19,23 69:3 71:17
72:6 92:6 93:3,25
98:19 102:15 103:5
103:25 104:2,11
105:10,18 106:13
117:10 125:13
129:21 130:17
132:25 137:16,24
138:12 139:8
142:11 153:7 154:8
154:20,21 160:9
161:3 166:16
168:11 169:3
178:16 183:17
208:19 210:4,19
215:14 216:4
217:11 218:7,19
220:8 236:2 238:11
318:7
**transactions (13)**
13:10,20 20:6,16 45:7
47:21 59:12 88:8
173:6 225:16 293:3
293:12,20
**transcript (8)**
51:8 77:15 99:6
104:20 217:6,10
219:21 341:20

**transcription (1)**
344:7
**transfer (70)**
42:6 43:2,24 80:20
81:22 82:2,22 87:9
107:25 109:22
110:21 111:13
114:23 115:18
119:3,10,12,14,24
120:22 121:5,18
122:14,22 123:14
124:2 126:8,23
133:11 134:6
140:10 142:7
171:10 173:23
174:14 175:24
183:19 189:20
190:8,9,24 191:20
194:7 196:19
198:12,16 207:15
207:17 208:9
222:14 224:18
233:13 237:21
238:25 278:11
309:3 310:3,8,13,13
310:16 317:5,7
318:16 320:6 323:2
323:6,10,11 328:21
**transferred (26)**
62:2 79:15 80:25
108:7 110:2 126:19
165:12 175:12,19
175:21 176:7
217:14 221:13,14
228:21 232:23
233:11 236:15
237:14 238:2 239:5
239:10,15 309:24
317:15 320:10
**transferring (11)**
80:13,16 127:2,24
134:3 175:7 177:6
190:2 222:14 223:9
231:13
**transfers (2)**
79:18 172:21
**transpiring (4)**
179:12 181:2 183:13
201:9
**Treasury (3)**
206:14,14,15
**treatment (1)**
52:2
**Tricia (2)**

3:15 5:22
**trickles (1)**
96:5
**tried (3)**
184:8 185:2 330:9
**triple-witching (2)**
86:13 143:17
**Trish (10)**
12:6 14:22 45:21 52:4
91:9 111:5 124:19
139:16 199:3
230:14
**Trish's (1)**
226:17
**trouble (1)**
93:14
**true (7)**
132:24 238:5 297:17
329:22 333:16
334:25 341:12
**true-up (1)**
171:18
**truly (1)**
194:13
**trustee (77)**
4:12 7:18 55:10 65:18
72:13 79:8,20,25
80:20 100:10
107:21,24 109:18
109:21 110:12,17
110:20 111:9,12
114:23 115:18
119:2,14,24 121:14
123:13 124:7 142:5
144:16 173:13
192:23 194:21,24
195:5,17,19 196:19
219:11 220:4,14,23
222:7 236:7 238:14
238:20 246:2
250:14,21 251:4,15
251:22 252:8,12
256:17 272:25
275:24 277:10,12
277:20 278:4,15
281:2 293:2,7,15,22
293:25 294:4,8,19
296:23 304:24
306:5 332:17
334:16 335:2,8
**trustees (3)**
7:17 79:13 242:16
**trustee's (13)**
8:12 78:22 81:4 121:3

140:2,9 196:2
206:19 262:5
275:11 329:18
332:16 342:11
**try (9)**
6:6,9,17,22 113:11
138:25 156:25
158:5 179:19
**trying (13)**
106:8 148:14 149:22
150:11 193:18
208:9 213:8 270:16
277:5 279:6 315:18
327:15,16
**TSA (5)**
277:16 278:7,9
296:23 297:25
**TSG (2)**
5:7,10
**Tuesday (8)**
271:23 272:5,23
273:14 290:14
339:10,12,17
**turn (37)**
32:19 37:9 45:13
50:24 71:13 77:18
83:13 91:22 99:8
103:2 108:14
113:17 118:6,9
120:25 121:12
139:24,25 147:6
150:15,24 178:10
200:15 203:3,5
217:7,8 220:10
241:14 248:16
274:3 296:14
299:23 300:20
306:11 308:21
313:9
**turned (2)**
148:15 283:19
**Turning (1)**
204:8
**turns (1)**
331:9
**twice (1)**
202:11
**two (32)**
25:5,8 49:3,4 84:19
86:6 105:22 113:23
121:13,25 122:12
127:12,15 131:4,13
161:14 175:5 202:6
202:8 222:12

Contains Highly Confidential Portions

227:15 230:21
231:7 243:5 251:7
256:19 257:7
260:17 280:22
292:6,17 299:4
**two-day (1)**
30:22
**type (9)**
19:16 21:6 25:5
138:12 160:9 161:3
171:15 258:21
271:8
**types (4)**
23:19 24:13 138:21
161:2
**typical (3)**
95:5 170:13 218:17
**typically (1)**
154:17

_____
**U**

**UBS (20)**
12:4,17 15:24 17:9
19:20 20:24 27:6
68:15 249:19,20,21
249:25 250:10
253:11,12,16 254:4
258:8,12,15
**Uh-huh (41)**
5:25 11:3 13:2 16:3
32:24 42:4 51:25
59:18 63:22 71:16
71:24 72:11 80:17
86:20 99:7 101:22
103:17 106:21
108:20 114:7 122:2
129:2 141:16 178:4
201:21 203:9 207:3
220:9 226:15 236:3
242:2 256:20 284:2
285:22 296:6 326:3
328:22 330:7
332:11 334:8
336:25
**ultimately (1)**
96:20
**unambiguous (1)**
233:17
**uncollectable (1)**
53:5
**Undelivered (1)**
121:10
**underlying (5)**
149:2 150:7 277:5

336:12,13
**underneath (1)**
277:6
**understand (54)**
6:20 21:2 29:8 40:9
44:6 48:24 49:25
62:23,25 64:5 66:12
74:3 87:14 95:17
97:3 115:13 125:11
127:24 128:12
131:14 154:12
157:24 170:19
174:16 176:17,24
178:23 179:15
181:6 182:13 188:4
188:23 193:17,18
194:14 203:17
204:22 205:3
206:19 214:11
222:23 235:21,24
244:9 278:14 279:6
281:10 293:18
294:23 307:15
315:18,19 322:21
328:23
**understandable (1)**
209:13
**understanding (71)**
23:9,18,24 24:22,23
26:21 29:3 30:14
33:4,18 34:12 38:2
40:7,21,25 42:6,17
42:19 43:15 44:14
52:21,24 54:17,24
55:4,8,19 60:5,11
60:16,20,25 65:23
69:16 75:8 76:10,22
78:21 80:5 88:2
93:7 94:18 102:9
123:24 125:11
126:4 129:18 137:4
153:5 159:17,22
178:15 202:12
208:16 211:24
214:17 216:12,15
216:16 218:3
220:23 222:7
236:12 237:8,15,25
252:15,19 281:21
294:13 301:17
**understands (1)**
277:25
**understood (1)**
137:12

**undertake (3)**
151:9 302:12,19
**undertaken (1)**
39:3
**Unfortunately (1)**
111:21
**unhedged (2)**
153:11 155:14
**unilaterally (1)**
77:24
**UNITED (1)**
1:2
**unredacted (1)**
305:20
**unsecured (1)**
311:18
**urgency (4)**
72:25 105:9,12,19
**URQUHART (1)**
4:4
**usage (1)**
205:4
**use (7)**
23:16 43:19 85:23
135:17 152:10
208:4 259:15
**usual (1)**
61:9
**usually (8)**
17:21 25:22 42:15
54:21 70:4 135:15
176:3 286:12
**U.S (1)**
170:8

_____
**V**

**v (2)**
128:8,9
**Vague (5)**
23:12,22 61:6 68:11
337:17
**vagueness (1)**
65:7
**valid (3)**
120:10,11 318:6
**valuable (2)**
172:18 215:23
**value (70)**
15:15 23:25 33:12,19
33:23,24 34:2,3,4
38:9,20 41:19 79:4
79:7 81:13,17 84:5
94:19 97:3 108:16
109:7,9 112:9,9,10

112:18 113:3,4,12
114:12 115:6,9,11
116:2,7,9,11 117:6
117:9,15,18 120:13
120:15 134:23
135:2 149:14
161:19,22 163:3,6
208:11,11 210:9,12
211:18 212:16,17
212:22 213:4,6,6,20
213:24 214:3
215:19 217:3 237:3
275:17 279:11,12
**valued (1)**
112:11
**values (1)**
212:10
**variation (1)**
204:2
**various (16)**
20:19 27:9 61:24
76:14 151:7 155:10
157:24 161:7 164:2
168:20 207:12
212:8 214:18 247:3
258:9,10
**vehicle (2)**
176:10 323:10
**venture (1)**
23:15
**verbal (2)**
6:12 289:6
**version (2)**
305:2,21
**versus (5)**
97:22,22 214:24
291:17 295:23
**viability (1)**
138:4
**viable (3)**
94:11 136:10 332:19
**vice-versa (1)**
155:20
**video (1)**
5:8
**VIDEOGRAPHER...**
5:2 46:18,21 91:14,18
145:8 146:5 199:7
199:11 240:5,18
299:7,11 338:7,10
340:8
**videotaped (3)**
1:13 2:4 5:4
**Vinella's (1)**

303:23
**violation (5)**
339:16,18,20,24
340:2
**vis-a-vis (1)**
29:4
**VIX (3)**
23:2,3,10
**volatile (5)**
23:10 32:7,11 35:3
136:2
**volatility (12)**
21:16,21 23:7,8 30:16
31:13 34:16 35:9,16
35:18,21 134:15

_____
**W**

**wait (2)**
45:17 89:22
**walked (2)**
73:11,25
**want (43)**
15:22 16:23 18:17
19:14 47:3 51:2
59:10 60:3 67:4,5
73:7 94:24 109:5,6
112:10 116:19
126:3 144:16,17
156:21 157:19
173:21 179:19
181:21 193:17
197:19 198:2,5,7
204:19,20 210:11
214:14,15 226:22
234:9 246:8 258:16
261:20 283:23
296:15 298:24
326:16
**wanted (19)**
18:16 19:12,13 21:16
51:5 59:16 62:17
73:19 75:25 115:10
160:2,2,21,22
198:18 211:8
229:23 299:5
300:19
**wants (1)**
237:20
**warranty (2)**
172:22 173:16
**wasn't (20)**
19:11 94:11 96:10
107:7 109:9 113:8
129:21 133:13

Contains Highly Confidential Portions

137:7 158:22 164:9
171:20 195:5
230:15 231:11
234:13 246:17
267:3 310:20
315:16
**way (31)**
10:22 20:9 46:14 50:2
56:19 86:8 88:12
93:13 105:24 111:8
129:24 159:22
174:21 189:19
190:23 217:21
221:5 227:16
252:12 255:14
258:22 269:23
283:2 287:4 292:23
308:9,19 318:17
325:14 331:11
341:16
**Wednesday (2)**
77:20 268:20
**week (19)**
59:14,20 61:2 63:25
76:7 80:7 86:6
100:19 140:18
142:2 143:5,11,19
159:15,20 179:10
179:23 180:9,14
**weekend (17)**
26:2 67:13,16,21,23
87:15,21,23,25 88:3
88:22 89:11 90:7,22
103:7 144:18
214:13
**weekly (2)**
243:5 271:10
**weeks (5)**
26:5 59:15 250:5,6
255:12
**week's (1)**
102:20
**Weil (2)**
235:21,22
**Welcome (1)**
46:25
**Wells (3)**
260:3,7,13
**went (15)**
21:3 63:5 84:13,21
111:19 134:19
141:9,13 177:3
195:25 216:8
269:19 279:3,3

301:15
**weren't (15)**
101:11 102:10 117:21
156:4 159:8 167:4,6
168:7 169:20
210:21 245:8
287:23 315:6
330:16 331:8
**we'll (4)**
58:13 120:18 271:2
302:18
**we're (27)**
6:19 45:18 46:19 47:4
63:14 91:16 145:9
146:7 190:16 192:3
193:11 199:9,13
205:6 210:5 216:10
216:11 226:16
240:7,20 257:16
258:23 267:16
299:9 327:16
338:11 340:10
**we've (8)**
52:3 91:9 167:15,16
232:21 270:17
295:15 306:10
**whereof (1)**
341:23
**wherewithal (1)**
161:24
**willing (11)**
58:24 94:2 108:23
112:3 113:7,15
183:21 215:24
218:16 222:14
225:19
**wished (1)**
162:9
**withdraw (16)**
28:16 35:24 36:7
124:12 126:13
142:23 263:14
288:3,8 289:10
309:3 314:16,20
315:14 316:7
317:23
**withdrawal (6)**
263:21 264:16,17
272:17 309:5
317:22
**withdrawals (1)**
263:17
**withdrawing (1)**
315:4

**withdrawn (17)**
30:13 44:14 121:20
122:24 124:4,7,14
124:22 125:4,15,20
125:24 126:9
309:19 316:10,14
320:25
**witness (30)**
5:12,15 14:25 89:24
119:17 130:24
131:3 184:22 247:5
251:4 256:9 273:3
273:19 277:4
299:22,25 300:4,10
300:14,22 301:3,6,9
301:14,21 322:19
341:9,13,23 344:4
**witnesses (1)**
64:11
**witness's (9)**
115:22 123:19 162:24
163:21 175:15
195:22 215:6 268:2
312:4
**Witter (2)**
254:8,11
**woke (1)**
170:21
**Woodland (2)**
295:10 298:17
**Woodlands (1)**
292:7
**word (4)**
203:13,22,25 204:13
**words (8)**
49:2 104:5 149:11
164:9 181:22,23
227:15 234:2
**work (18)**
12:21 65:18 243:20
249:7,20 250:2,3,16
250:21,23 253:4,6
254:9 278:3,7
288:17 295:5
296:23
**worked (12)**
9:3,8,8,12 10:25
12:19,20,23 26:22
95:25 254:2,12
**working (5)**
65:18 100:10 243:4
278:15,16
**works (2)**
33:4 129:25

**world (2)**
10:14 112:24
**worldwide (4)**
12:18 13:3 101:18
102:18
**worst (2)**
82:4 87:8
**worth (7)**
115:15 196:18 198:3
212:2 213:12
216:17,20
**wouldn't (36)**
14:17 15:10 23:15
50:11 56:21 62:11
154:25 155:8
158:21 160:4,6,18
160:20 164:7,10
179:19 187:9 189:8
194:20 214:4,7
217:21 218:18,24
221:4 230:18
231:12 283:15
310:20 313:7
315:17 316:11,12
320:11,20 333:17
**wrap (1)**
6:18
**wrapped (1)**
239:24
**write (4)**
53:7 54:18,21 214:24
**writing (2)**
127:22 228:5
**written (8)**
50:13 51:11 52:14
171:16 227:16
228:10,13 257:3
**wrong (2)**
177:3 287:12
**wrote (4)**
53:4 56:2,5 57:11

_____
**X**
**x (2)**
1:4,10

_____
**Y**
**Yeah (3)**
204:16 221:14 233:7
**year (3)**
15:17 113:3 285:10
**years (7)**
9:3,12 20:25 112:17
243:3,4 252:24

**yellow (1)**
51:3
**Yesterday (1)**
77:23
**York (20)**
1:3,14,14 2:7,7,12 3:8
3:8,14,23,23 4:8,8
4:14,14 255:6,23
341:3,4,7

_____
**Z**
**zero (4)**
33:17 82:5 198:5
281:18

_____
**$**
**$1,359,001,075 (1)**
84:14
**$1,400,000,000 (1)**
84:22
**$1.1 (2)**
37:17,23
**$1.19 (1)**
37:12
**$1.2 (2)**
141:22 143:4
**$1.6 (5)**
78:3,15 181:25
189:16,19
**$10 (1)**
134:8
**$100 (7)**
114:13,14 133:17,19
133:25 134:3
209:18
**$104 (2)**
52:12 53:12
**$150 (2)**
149:17 150:7
**$2 (7)**
84:22,22 108:7,8
109:25 110:2
119:10
**$2.29 (2)**
37:17,22
**$2.3 (1)**
335:5
**$20 (1)**
134:8
**$200 (1)**
208:7
**$213 (1)**
296:13
**$250 (1)**

Contains Highly Confidential Portions

113:2
**$258 (1)**
275:4
**$300 (1)**
117:16
**$400 (1)**
141:25
**$439 (1)**
308:14
**$50 (1)**
134:2
**$500 (6)**
84:17 86:5 140:17
141:10 149:14
150:8
**$507 (2)**
316:23 318:15
**$600 (2)**
85:2 141:17
**$69 (1)**
97:14
**$70 (1)**
97:13
**$700 (1)**
208:7
**$789,583,205 (1)**
84:13
**$80 (1)**
48:15
**$82 (1)**
331:3
**$891 (1)**
278:24

_____
**0**
**074C (3)**
48:12 53:14 60:22
**074F (2)**
44:17 60:18
**074M (1)**
44:17
**08-13555(JMP) (1)**
1:7

_____
**1**
**1 (14)**
5:3 29:9 83:13,14,25
119:13 139:18
141:6,7 200:14
270:9 299:24 300:3
344:6
**1(a) (1)**
172:17
**1(b) (1)**

43:21
**1.769 (1)**
302:11
**1:05 (1)**
145:8
**10 (12)**
3:13 98:3 203:4,21
271:20,22 272:4
287:13 290:13
339:10,12,17
**10:25 (1)**
46:18
**10:43 (1)**
46:22
**100 (1)**
51:11
**10004 (1)**
4:14
**10006 (1)**
3:23
**10010 (1)**
4:8
**10017 (1)**
3:8
**101 (1)**
99:8
**11 (4)**
1:6 99:21 100:18
308:24
**11:36 (1)**
91:14
**11:57 (1)**
91:20
**12 (3)**
11:7 47:25 308:24
**12th (1)**
290:5
**12-23 (1)**
1:16
**121 (1)**
342:11
**12207 (1)**
3:14
**13 (10)**
16:23 49:7 264:19,25
265:2,3,5 274:6
309:8 333:25
**136 (2)**
121:13 122:12
**139 (1)**
51:22
**14 (6)**
16:23 32:19 47:25
48:8 220:12 343:6

**140 (1)**
52:7
**141 (1)**
50:24
**15 (12)**
20:25 52:8 59:20 61:3
80:7 84:2,12 140:18
143:6,11 180:9
343:4
**15c3 (3)**
9:11 259:18,23
**15c3-3 (35)**
243:13 244:9 255:15
255:25 258:3,25
259:8 262:25
264:13 267:16,18
267:20,21 268:5,11
268:25 269:8
271:24 284:4,13
290:25 291:11
298:10 311:16
312:12 317:8 319:4
326:11 328:5 329:2
331:10,17 339:21
342:21,23
**15th (6)**
141:8,20 193:5,12
195:3 209:22
**16 (8)**
39:12 47:25 84:12
211:25 212:16,24
213:19 295:9
**16th (3)**
141:9,13 193:3
**17 (3)**
84:20 128:9 308:25
**17th (19)**
141:12,13,18 267:5
289:18,25 309:24
310:2,7 311:4,5,8
311:25 312:23
314:17 315:5 316:8
316:19 320:25
**178 (1)**
342:13
**18 (8)**
84:20 108:15 182:2
266:15 296:3
297:20 298:8 303:3
**18th (6)**
141:12,18,20 188:19
281:22,23
**19 (30)**
35:23 77:13 84:3

136:23 137:2,5
206:9 220:5,14
222:8 224:15 234:6
260:19 265:11,12
265:14,20 266:17
288:4,9,25 292:16
302:17 306:13
309:12,20 322:5
334:4,4 337:2
**19th (56)**
85:18,23 86:13,19,23
87:2 90:10 101:4
141:3 144:10
192:25 209:17
266:3,9,19,21 267:8
267:14,23 268:6
271:2 272:7 282:20
283:6,10 284:10
285:5,13 286:17
289:16 290:9,19
294:10 295:24,25
300:17 310:23,25
312:7,8 313:22
314:19,20 316:25
318:9 321:8 322:13
322:23 323:19
324:10,15 325:4,21
325:25 328:4,9
**190.06(e)(1)(iv) (2)**
128:8,9
**1998 (1)**
258:9

_____
**2**
**2 (24)**
29:10 46:22 91:16
127:9,16,17 200:16
200:19 224:20
230:5 232:16 233:4
233:16,17 241:23
300:12,14 304:13
304:17,18 334:5
336:23 338:16
344:6
**2.3 (2)**
332:9 334:9
**2:05 (1)**
146:6
**20 (6)**
9:2,12 235:19 243:4
252:24 287:12
**20th (8)**
88:22 89:12 90:8,23
90:23 193:14 322:7

324:5
**200 (1)**
257:14
**2000 (2)**
218:4 258:13
**2003 (2)**
15:22 258:17
**2004 (2)**
15:19,22
**2005 (2)**
13:8 15:19
**2006 (3)**
13:7 15:25 19:21
**2008 (40)**
17:11 29:23 35:23
39:21 49:11 58:5
59:21 63:7 77:13
84:3,20,20 104:12
137:5 138:14
143:11 153:7
160:10 162:15
178:17 196:20
202:23 206:9
211:25 212:24
213:19 218:5 222:9
224:15 234:6
260:19 265:11,12
265:14,20 266:3
288:25 292:16
302:17 309:12
**2009 (2)**
249:22 303:9
**2010 (7)**
1:15 2:2 5:6 297:5
340:21 341:24
344:3
**21 (2)**
45:21 306:13
**21st (5)**
88:22 89:12 90:8,23
325:18
**219 (1)**
342:14
**22 (10)**
11:7 51:23 89:11
104:12 113:19
143:14 150:25
168:22 202:23
330:3
**22nd (12)**
4:7 39:21 74:10 85:20
87:20 88:18,19
106:13 322:8 323:3
324:5 325:19

Contains Highly Confidential Portions

**222 (1)**
3:7
**23 (6)**
49:11 113:17 143:14
177:19,25 330:3
**235 (1)**
342:15
**24 (5)**
62:8 69:4,4 77:21
308:23
**240 (3)**
342:17,18,20
**241 (1)**
342:5
**25 (3)**
197:25 224:6 308:23
**257 (1)**
343:4
**258 (1)**
275:7
**26 (2)**
45:13,14
**2625 (2)**
291:13,16
**267 (1)**
342:21
**27 (4)**
45:13 241:11 243:7
254:18
**273 (1)**
43:10
**275 (3)**
178:10,22 180:3
**28 (3)**
300:25 301:7 302:23
**281 (1)**
275:4
**282 (1)**
220:10
**29 (2)**
37:9 258:9
**291 (1)**
342:22
**29428 (1)**
1:25
**297 (1)**
342:24

—————— 3 ——————

**3 (13)**
28:13,14 29:12 71:15
91:19 94:24 95:3
106:23 145:9
150:16,16 178:23

344:7
**3-3 (15)**
100:11 243:6 248:5
248:14 258:19
269:11 311:17
319:8,14,15,21,24
326:13 328:8 329:7
**3:03 (1)**
199:7
**3:19 (1)**
199:13
**30 (3)**
28:12 29:13 243:3
**30(e) (1)**
341:21
**300 (2)**
38:4,9
**300-and-some-page...**
222:12
**302 (2)**
343:5,6
**305 (1)**
343:7
**35 (1)**
274:25
**39 (1)**
306:14

—————— 4 ——————

**4 (8)**
29:14 41:5 146:6
150:16 199:9 203:3
228:17 240:7
**4:13 (1)**
240:5
**4:45 (1)**
240:19
**40 (2)**
117:12 306:14
**41st (1)**
3:7
**439 (2)**
306:18 308:11
**44 (2)**
113:20 333:19
**442 (3)**
77:7 99:5 217:7
**45 (3)**
41:2 141:14 308:25
**46 (1)**
328:19
**47 (2)**
329:4 342:9
**48 (2)**

214:8 215:17
**49 (1)**
328:19

—————— 5 ——————

**5 (16)**
41:5 94:24 95:3
199:12 241:14
257:9 297:4,11,14
333:12,24 336:20
337:6 342:4 343:5,7
**5:54 (1)**
299:7
**50 (4)**
29:15 41:3 197:24
342:10
**500 (1)**
315:12
**51 (7)**
4:6 42:24 45:23 47:12
172:15,16 337:3
**54 (1)**
113:20
**55 (2)**
113:20 114:3
**575 (1)**
2:6

—————— 6 ——————

**6 (15)**
1:15 2:2 5:6 83:23,24
108:14 147:7 203:4
203:5 204:8 240:19
265:3 299:9 342:8
344:3
**6:23 (1)**
299:12
**60 (5)**
121:12 140:6,7 217:8
217:9
**60(B) (1)**
121:7
**601(c) (1)**
32:23
**61 (2)**
77:18,19
**630 (4)**
70:9 106:20 275:3,7
**648 (1)**
146:13
**659A (1)**
127:6
**66 (1)**
45:14

**676A (1)**
83:5
**684 (4)**
6:24,25 7:4 342:8
**685 (4)**
47:6,7,11 342:9
**686 (3)**
50:19,20 342:10
**687 (5)**
121:2,3 140:3,4
342:11
**688 (3)**
178:6,7 342:13
**689 (3)**
219:6,7 342:14
**69 (4)**
39:17,20 97:18 241:6
**690 (3)**
234:25 235:2 342:15
**691 (7)**
240:9 241:2,5,13
242:6 300:21
342:17
**692 (4)**
240:12 241:3,10
342:18
**693 (6)**
240:15 241:3,12
242:6 300:23
342:20
**694 (3)**
267:17,18 342:21
**695 (3)**
291:8,9 342:22
**696 (3)**
297:3,7 342:24

—————— 7 ——————

**7 (7)**
52:8 91:23 98:20
150:24 297:11,14
299:12
**7th (1)**
341:24
**7:09 (1)**
338:7
**7:19 (1)**
338:10
**7:20 (1)**
340:8
**70 (5)**
37:10 39:17 42:3
43:18 97:18
**73 (3)**

103:2,11,12
**74 (1)**
43:10

—————— 8 ——————

**8 (5)**
159:12 228:17 232:14
232:18 296:14
**82 (1)**
328:25
**84 (1)**
43:10
**891 (1)**
274:23

—————— 9 ——————

**9 (4)**
32:20,22 249:23
270:10
**9/15/2008 (1)**
83:15
**9/19 (10)**
294:3,7 295:4,6
298:11 302:10
304:20 318:16
336:2,10
**9/19/2008 (1)**
83:16
**9:37 (1)**
5:6
**922 (2)**
235:3 342:16
**944 (3)**
298:15,16,20

# EXHIBIT C

| | |
|---|---|
| **From:** | Hodge, Alasdair: CFG Mgmt (LDN) |
| **Sent:** | Tue, 16 Sep 2008 07:42:52 GMT |
| **To:** | Machell, Carole: Operations (LDN); Chapman, Paul: Operations (LDN); Freeborn, Philip: IT (LDN); Schwarz, Christoph: IT (LDN); Garcha, Sarvjeet: Treasury (LDN), Sterling, Harriet: Treasury (LDN); Morse, Stephen: Compliance (LDN); Whitehouse, Sharon: HR (LDN) |
| **CC:** | Logozzo, Joseph: Markets (NYK); Stack, Tim: Futures (NYK) |
| **Subject:** | URGENT-TIME SENSITIVE: Lehman Futures Business |

**Importance:** High

---

As you may have heard, we are evaluating the potential acquisition of the Lehman Futures business. We need to quickly assess and make a decision later today. Attached is a document including situation overview, benefits, risks, key transaction requirements and key next steps. Please review and reply with your thoughts and your area's relevant assessment as soon as possible.

Please work with Joe Logozzo & Tim Stack if you have any questions / concerns.

Al



EXHIBIT
556
1/14/10

MOVANTS' TRIAL
EXHIBIT
506

BRIEFING MEMO - Page 1
September 15, 2008

**To:**          Alasdair Hodge
**From:**        Tim Stack
**Subject:**     Potential Acquisition of Lehman Brothers' ("LB" or "Lehman") Futures
Business
**Date:**        Monday, September 15, 2008

### OBJECTIVE:

Evaluate the possibility of acquiring Lehman Brothers' futures business in a very timely fashion with little impact to their clients. LB has indicated that the desired transaction is to happen by Tuesday afternoon in order to retain their most valuable clients. In order to achieve this result Barclays would have to follow a two-step transaction: 1) assume LB's clearing clients and guarantee their obligations under current documentation, including temporarily taking on Lehman staff and technology services, and 2) novating the clients to Barclays and permanently integrating them under Barclays' umbrella.

### SITUATION OVERVIEW:

On Friday September 12th, the Chicago Mercantile Exchange ("CME") approached Tim Stack at Barclays Capital regarding potentially taking over LB's proprietary and client futures positions. On Sunday night Lehman Brothers approached Barclays about the possibility of transferring all its customer futures accounts (segregated and secured) to Barclays. Jeff Jennings, the Head of LB's Global Futures Business, contacted Tim Stack via the CME to initiate the conversations. We have had follow-up meetings with Lehman's business and operations staff today. Barclays' team included representatives of Compliance, Operations, Futures business as well as external legal counsel from Sullivan & Cromwell ("S&C").

**Lehman Brothers' Futures Business Overview:** Lehman's futures business consists of ~100 institutional clients and total global futures revenues of approximately $250 million. Current client deposits are ~$4.6 billion in segregated funds and ~$1.8 bln in secured funds. These fund balances are 32% lower than the balances at the end of July where segregated funds totalled $6.4 billion and secured funds totalled $3.2 billion. We are awaiting their current net capital requirement, but expect it to be lower than their July month end requirement $424 million (8% x maintenance margin of $5.3 billion). Lehman's client base is skewed toward real money asset managers. Lehman Futures operates under two legal entities: LBI is the U.S. based FCM and accounts for 80% of their business; LBIE is their European based FCM which accounts for the balance. Lehman does have other legal entities on some of the Asian exchanges with omnibus accounts for the two primary legal entities.

### TRANSACTION BENEFITS AND RISKS:

**Benefits to Barclays:** Taking over the LB business will allow Barcap to double its business by adding annual revenues of ~$250 million. The addition of the LB client base provides a greater diversification to Barcap's current client base into real money asset managers, which is a priority for Barclays. The business is also complementary to our market position as Lehman is strongest in the U.S. while Barclays is strongest in Europe.

**Barclays' Positioning:**      The Barclays team was given indication by the LB team that at this stage Barclays is looking at the business on an exclusive basis. Given the turmoil in the financial industry and recent events surrounding B of A's take over of Merrill Lynch, we believe that the only other potential competitor for the business could be Goldman Sachs should we fail to reach an agreement on a transaction.

**Key Risk:**      Loss of key clients due to inability to execute an expedient transaction

          BCI-EX-(S)-00187356

**KEY TRANSACTION REQUIREMENTS AND NEXT STEPS:**

1) Legal Framework to Facilitate Transaction within LB's Chapter 11 Filing:

   - Given LB's Chapter 11 filing last night, Barclays must obtain an explicit protective order from the Bankruptcy Judge in order to have assurances against potential subsequent legal proceedings and avoid preference issues. Legal documents must be put in place and approved by bankruptcy court in order for Barclays to have temporary reliable access to the required technology services. These services include futures trading technology (Pats and Tradepipe), futures clearing systems (R&N and Clearvision), post-trade web portal and customized allocation, reporting and allocation solutions. We have engaged S&C as legal adviser and they are currently drafting the legal documentation for the potential approach to the court. It will be a challenge to have this in place by tomorrow afternoon.

2) Additional Capital Requirements:

   - Taking on $6.4 billion of client deposits is expected to require Barclays to increase net capital by approximately $300 million. This estimate is based on a previous requirement of $424 million on total client deposits of $9.6 billion. Since deposits have decreased 32%, we expect similar decrease in capital requirements (Barclays has asked Lehman for more detail on their current capital requirement). We require senior management approval related to such capital increase.

3) Cost and Temporary Access to Lehman Staff:

   - To effect step 1 of the potential transaction, Barclays would need to temporarily take on key Lehman front office, operations and IT staff and systems. LB indicated to us that total front office staff is comprised of 67 employees, including 16 sales-trading staff. Total client service staff is comprised of 34 people. Total clearing operations staff is 80 people. Total staff estimate is 181 people. We have to coordinate with Barclays Human Resources on putting in place an interim employee plan. [do we have enough info and want to talk about the potential Transition Services Agreement here?]

4) Key Transaction Setup Areas:

   - Barclays KYC, Credit and Compliance must approve all new clearing relationships. Frank Principe (KYC) and Doug Freedman (Compliance) are spearheading the effort and have agreed that only KYC Lite (sanction checks, OFAC, negative news) process will be followed for new Lehman clients. Compliance and KYC agreed they are comfortable with this as Lehman is a registered and regulated broker dealer. Credit will be involved in approving new accounts, but does not expect this to be an issue for a sizable majority of the accounts given their composition.

**HIGHLY CONFIDENTIAL**

# Exhibit D

**From:**   Raisler, Kenneth
**Sent:**   Tue, 16 Sep 2008 18:49:21 GMT
**To:**     Stack, Tim: Futures (NYK)
**Subject:** FW: Lehman House Portfolio

Redacted - Privileged

-----Original Message-----
**From:** Farabi, Corey [mailto:Corey.Farabi@cmegroup.com]
**Sent:** Tuesday, September 16, 2008 11:44 AM
**To:** Raisler, Kenneth
**Cc:** Michaels, Dale; Patel, Ketan
**Subject:** Lehman House Portfolio

Ken,

Attached to this email is a zipped file that contains 6 other files.  Three relate to the CME/CBT portfolio
and three relate to the Nymex portfolio.

The three types of files are as follows:

Margin Requirement by Combined Commodity
Period Deltas by Combined Commodity
Full Positions Report

Feel free to reply to this email or give me a call if you have any questions.

Thanks,

**Corey Farabi**
Risk Management Analyst
CME Clearing

T 312 466 4408
corey.farabi@cmegroup.com

**CME Group**
A CME/Chicago Board of Trade Company
20 South Wacker Drive
Chicago, Illinois 60606
www.cmegroup.com

MOVANTS' TRIAL
EXHIBIT

520

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00231518

PC-SPAN®    **PB Requirements**

XML File:    C:\Lehman\9-15 House Span.spn
Business Date:    2008-09-15 settlement final

## Firm: 835  Acct: 835  Type:N  Seg:HOUS

| | | | | |
|---|---|---|---|---|
| Currency: | USD | | **Core Maint** | **Core Init** |
| Ledger Balance: | $0.00 | Span Req | $818,899,814.70 | $818,899,814.70 |
| Open Trade Equity: | $0.00 | - ANOV | ($17,263,379.97) | ($17,263,379.97) |
| Securities: | $0.00 | Total Req: | $836,163,194.67 | $836,163,194.67 |
| **Total Equity:** | **$0.00** | Net Liq Value: | ($17,263,379.97) | ($17,263,379.97) |
| | | Excess/Deficit: | **($818,899,814.70)** | **($818,899,814.70)** |

| Level | EC | CC | Curr | LOV | SOV | M/I | PBC | Span Req | ANOV | Scan Risk | Intra | Spot | Inter | Intex | SOM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| port | | | USD | 480,371,458.78 | 497,634,838.75 | | | | | | | | | | |
| curVal | | | CHF | 0.00 | 0.00 | | | | | | | | | | |
| curVal | | | GBP | 0.00 | 0.00 | | | | | | | | | | |
| curVal | | | JPY | 0.00 | 0.00 | | | | | | | | | | |
| curVal | | | USD | 480,371,458.78 | 497,634,838.75 | | | | | | | | | | |
| oReq | | | | | | MNT | CORE | 818,899,814.70 | | | | | | | |
| curReq | | | CHF | | | | | 300.00 | 0.00 | | | | | | |
| curReq | | | GBP | | | | | 16,500.00 | 0.00 | | | | | | |
| curReq | | | JPY | | | | | 677,860,000.00 | 0.00 | | | | | | |
| curReq | | | USD | | | | | 812,404,427.00 | 17,263,379.97 | | | | | | |
| oReq | | | | | | INIT | CORE | 818,899,814.70 | | | | | | | |
| curReq | | | CHF | | | | | 300.00 | 0.00 | | | | | | |
| curReq | | | GBP | | | | | 16,500.00 | 0.00 | | | | | | |
| curReq | | | JPY | | | | | 677,860,000.00 | 0.00 | | | | | | |
| curReq | | | USD | | | | | 812,404,427.00 | 17,263,379.97 | | | | | | |
| ecPort | CME | | | 480,371,458.78 | 497,634,838.75 | | | | | | | | | | |
| curVal | | | CHF | 0.00 | 0.00 | | | | | | | | | | |
| curVal | | | GBP | 0.00 | 0.00 | | | | | | | | | | |
| curVal | | | JPY | 0.00 | 0.00 | | | | | | | | | | |
| curVal | | | USD | 480,371,458.78 | 497,634,838.75 | | | | | | | | | | |
| oReq | | | | | | MNT | CORE | 818,899,814.70 | | | | | | | |
| curReq | | | CHF | | | | | 300.00 | 0.00 | | | | | | |
| curReq | | | GBP | | | | | 16,500.00 | 0.00 | | | | | | |
| curReq | | | JPY | | | | | 677,860,000.00 | 0.00 | | | | | | |

9/16/2008 8:50:22 AM                                           PbReq                                           Page 1 of 4

**HIGHLY CONFIDENTIAL**                                                                            BCI-EX-(S)-00231519

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| curReq | | USD | | | | | 812,404,427.00 | 17,263,379.97 |
| oReq | | | | | INIT | CORE | 818,899,814.70 | |
| curReq | | CHF | | | | | 300.00 | 0.00 |
| curReq | | GBP | | | | | 16,500.00 | 0.00 |
| curReq | | JPY | | | | | 677,860,000.00 | 0.00 |
| curReq | | USD | | | | | 812,404,427.00 | 17,263,379.97 |
| ccPort | 06 | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 446,000.00 | 0.00 |
| ccPort | 07 | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 2,629,400.00 | 0.00 |
| ccPort | 11 | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 27,014,082.00 | 0.00 |
| ccPort | 14 | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 33,000.00 | 0.00 |
| ccPort | 17 | USD | 0.00 | 0.00 | | | | |
| ccPort | 21 | USD | 42,097,784.25 | 104,110,438.50 | | | | |
| dReq | | | | | INIT | CORE | 10,987,057.00 | 62,012,654.25 |
| ccPort | 25 | USD | 0.00 | 0.00 | | | | |
| ccPort | 26 | USD | 0.00 | 0.00 | | | | |
| ccPort | 41 | USD | 17,880,994.28 | 8,902,745.00 | | | | |
| dReq | | | | | INIT | CORE | 3,225,587.00 | 8,978,249.28 |
| ccPort | 66 | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 94,095.00 | 0.00 |
| ccPort | 71 | USD | 20,846,824.00 | 20,458,224.00 | | | | |
| dReq | | | | | INIT | CORE | 2,681,110.00 | 388,600.00 |
| ccPort | AD | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 6,404,800.00 | 0.00 |
| ccPort | BP | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 8,941,022.00 | 0.00 |
| ccPort | C | USD | 5,277,250.00 | 878,750.00 | | | | |
| dReq | | | | | INIT | CORE | 10,260,519.00 | 4,398,500.00 |
| ccPort | CD | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 883,450.00 | 0.00 |
| ccPort | DA | USD | 0.00 | 0.00 | | | | |
| dReq | | | | | INIT | CORE | 362,000.00 | 0.00 |

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00231520

| ccPort | | EC | USD | 4,535,625.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 7,491,656.00 | 4,535,625.00 | | | | | |
| ccPort | | ED | USD | 384,862,525.00 | 361,603,118.75 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 65,859,767.00 | 23,259,406.25 | | | | | |
| ccPort | | EFE | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 35,200.00 | 0.00 | | | | | |
| ccPort | | EH | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 4,200.00 | 0.00 | | | | | |
| ccPort | | EM | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 4,500.00 | 0.00 | | | | | |
| ccPort | | EY | JPY | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 5,000,000.00 | 0.00 | | | | | |
| ccPort | | FC | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 1,000,100.00 | 0.00 | | | | | |
| ccPort | | JY | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 6,006,800.00 | 0.00 | | | | | |
| ccPort | | LB | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 85,800.00 | 0.00 | | | | | |
| ccPort | | LBA | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 48,000.00 | 0.00 | | | | | |
| ccPort | | LC | USD | 38,000.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 4,992,600.00 | 38,000.00 | | | | | |
| ccPort | | LN | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 4,506,700.00 | 0.00 | | | | | |
| ccPort | | MD | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 8,918,400.00 | 0.00 | | | | | |
| ccPort | | MP | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 3,958,500.00 | 0.00 | | | | | |
| ccPort | | N1 | JPY | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 656,120,000.00 | 0.00 | | | | | |
| ccPort | | ND | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 64,209,200.00 | 0.00 | | | | | |
| ccPort | | NE | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 420,645.00 | 0.00 | | | | | |
| ccPort | | NG | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 8,349,770.00 | 0.00 | | | | | |
| ccPort | | NK | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 23,244,000.00 | 0.00 | | | | | |

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00231521

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ccPort | | O | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 8,000.00 | 0.00 | | | | | |
| ccPort | | PZ | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 511,595.00 | 0.00 | | | | | |
| ccPort | | RA | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 255,800.00 | 0.00 | | | | | |
| ccPort | | RF | CHF | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 300.00 | 0.00 | | | | | |
| ccPort | | RL | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 43,541,400.00 | 0.00 | | | | | |
| ccPort | | RP | GBP | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 16,500.00 | 0.00 | | | | | |
| ccPort | | RU | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 172,000.00 | 0.00 | | | | | |
| ccPort | | RY | JPY | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 16,740,000.00 | 0.00 | | | | | |
| ccPort | | S | USD | 14,381.25 | 1,196,562.50 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 17,525,185.00 | 1,182,181.25 | | | | | |
| ccPort | | SF | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 19,795.00 | 0.00 | | | | | |
| ccPort | | SP | USD | 3,160,012.50 | 100,000.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 464,011,509.00 | 3,060,012.50 | | | | | |
| ccPort | | UN | USD | 0.00 | 0.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 1,144,800.00 | 0.00 | | | | | |
| ccPort | | W | USD | 1,658,062.50 | 385,000.00 | | | | | | | | | |
| dReq | | | | | | INIT | CORE | 12,116,383.00 | 1,273,062.50 | | | | | |

9/16/2008 8:50:22 AM

PbReq

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00231522

# BCI-EX-(S)-00231523 TO BCI-EX-(S)-00232046

## HAVE BEEN OMITTED DUE TO SIZE

# E<small>XHIBIT</small> E

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4     ---------------------------------X

5     IN RE:

6                        Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC. et al.,

9            Debtors.

10    ---------------------------------X

11

12             HIGHLY CONFIDENTIAL

13         DEPOSITION OF KENNETH RAISLER

14             New York, New York

15               March 1, 2010

16

17

18    Reported by:

      Bonnie Pruszynski, RMR

19    JOB NO. 28462

20

21

22

23

24

25

Page 2

```
 1
 2                    March 1, 2010
 3                    8:30 a.m.
 4
 5
 6         Deposition of KENNETH RAISLER, Hughes
 7    Hubbard & Reed, LLP, One Battery Park Plaza,
 8    New York, New York, before Bonnie
 9    Pruszynski, Registered Professional
10    Reporter, Registered Merit Reporter,
11    Certified LiveNote Reporter, and a Notary
12    Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    A P P E A R A N C E S:
 3    JONES DAY, LLP
 4    Attorneys for Lehman Brothers, Inc.
 5         222 East 41st Street
 6         New York, New York 10017
 7    BY:    BRIDGET A. CRAWFORD, ESQ.
 8    BOIES, SCHILLER & FLEXNER, LLP
 9    Attorneys for Barclays
10         10 North Pearl Street, 4th Floor
11         Albany, New York 12207
12    BY:    TRICIA J. BLOOMER, ESQ.
13    HUGHES HUBBARD & REED, LLP
14    Attorneys for SIPA Trustee
15         One Battery Park Plaza
16         New York, New York 10004
17    BY:    NEIL J. OXFORD, ESQ.
18    QUINN EMMANUEL
19    Attorneys for the Creditors Committee
20         51 Madison Avenue
21         New York, New York 10010
22    BY:    ERIC M. KAY, ESQ.
23
24
25
```

Page 4

```
 1
 2    A P P E A R A N C E S (continued):
 3    SULLIVAN & CROMWELL, LLP
 4    Attorneys for the Witness
 5         125 Broad Street
 6         New York, New York  10004
 7    BY:  ROBINSON B. LACY, ESQ.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            Confidential - K. Raisler
 2    KENNETH RAISLER,
 3        called as a witness, having been first
 4        duly sworn, was examined and testified
 5        as follows:
 6    EXAMINATION
 7    BY MR. OXFORD:
 8        Q    Good morning, Mr. Raisler.
 9        A    Good morning.
10        Q    As you know, my name is Neil Oxford.
11    I'm with the law firm of Hughes Hubbard & Reed.
12    We represent the SIPA trustee in this matter.
13            I'm here to take your deposition
14    today particularly in connection with a
15    declaration you submitted in support of Barclays'
16    opposition papers.
17            (Exhibit 658A marked for
18        identification as of this date.)
19        Q    You have in front of you what I have
20    marked as Exhibit 658-A, sir.
21            Do you recognize that document, sir?
22        A    Yes, I do.
23        Q    Is that in fact your declaration that
24    you submitted in support of Barclays' opposition
25    papers in this matter?
```

Page 6

Confidential - K. Raisler

1
2       A     Yes, it is.
3       Q     In paragraph three of your
4    declaration, Mr. Raisler, you describe very
5    generally that you were involved in meetings and
6    discussions between LBI and Barclays personnel
7    concerning a potential acquisition by Barclays of
8    LBI's proprietary futures business as well as its
9    business as a futures commission merchant; is that
10   correct?
11      A     Correct.
12      Q     What I would like to do is drill down
13   a little further into those generalities, sir.
14           Sullivan & Cromwell was first engaged
15   by Barclays in connection with this matter on
16   September 15th; is that correct?
17      A     No, actually on the 14th.
18      Q     How was it that Sullivan & Cromwell
19   first became engaged, sir?
20      A     I don't remember precisely, but I do
21   recall we had -- I had some phone calls with, with
22   representative of Barclays --
23           MS. BLOOMER:  I'm just going to
24        object and instruct the witness not to
25        reveal the substance of the communications.

Page 7

Confidential - K. Raisler

1
2       A     -- in the afternoon and evening of
3    Sunday, September 14th.  I believe that was the
4    first time that we were involved.  It certainly
5    was the first time I was involved.
6       Q     Other than representatives of
7    Barclay, Mr. Raisler, was anybody else on those
8    telephone calls on Sunday, the 14th of September?
9       A     Other than representatives of
10   Sullivan & Cromwell and Barclays, no.
11      Q     When was the first time, Mr. Raisler,
12   that you were involved in a meeting between Lehman
13   and Barclays personnel concerning the potential
14   acquisition by Barclays of any part of Lehman's
15   futures business?  And I should broaden my
16   question.  Not just meetings.  I'm inquiring about
17   any conference calls as well.
18      A     The morning of September 15th.
19      Q     Can you tell me about that meeting,
20   please, sir?  Well, withdrawn.
21           Was that a meeting or a conference
22   call?
23      A     It was a meeting, and it was a
24   meeting that lasted most of the day, to my best
25   recollection.

Page 8

Confidential - K. Raisler

1
2       Q     Where did it take place?
3       A     Again, this is only a recollection,
4    but I think it was at Lehman's offices on 7th
5    Avenue.
6       Q     Do you remember approximately when it
7    started, sir?
8       A     I really don't recall.  I have some
9    vague recollection that we had a pre-meeting at
10   Barclays before we went over to Lehman, but I am
11   not sure that is right.
12      Q     To your recollection, sir, did the
13   meeting with the Lehman folks start in the morning
14   or the afternoon?
15      A     Definitely in the morning.
16      Q     And the meeting lasted, you said,
17   most of the day.  Approximately when do you think
18   it finished?
19      A     The problem I have, and I should
20   probably get this on the record early, the week is
21   sort of a blur because there were meetings going
22   on steadily the whole week, so, when meetings
23   ended and when meetings started becomes sort of a
24   disconnect for me.
25           My best guess was late in the

Page 9

Confidential - K. Raisler

1
2    afternoon into the early evening.
3       Q     To the best of your recollection,
4    sir, who was in attendance at that meeting?
5       A     Here again, there is a certain amount
6    of vagueness in my recollection.  Obviously
7    representatives of Sullivan & Cromwell.
8       Q     Maybe it's easier to break it down,
9    sir.
10      A     Right.
11      Q     Who else was there from Sullivan &
12   Cromwell apart from you, sir?
13      A     I think on that day it may have only
14   been me.
15           Representatives from Barclays.
16      Q     Who were the representatives from
17   Barclays, sir?
18      A     Again, it's a little bit of a blur,
19   but my best guess would be Tim Stack, Liz James,
20   Alex Guest.  Those are the only ones I am sure of.
21   I know there were more than that in the room, but
22   I just don't remember who they were.
23      Q     Do you remember the names,
24   Mr. Raisler, of the Lehman representatives who
25   were present at that meeting on the 15th?

Page 10

Confidential - K. Raisler

1
2     A     The only person I precisely remember
3  was Jeff Jennings.  Again, there were more people
4  from Lehman than that in the room.
5     Q     Do you remember what Mr. Jennings'
6  role or title was at Lehman?
7     A     He ran the futures division for
8  Lehman.
9         If I can just amend my prior answer.
10  I also recall, I believe, that a gentleman by the
11  name of Ron Filler was in the room as well.
12     Q     Who was Mr. Filler representing?
13     A     Ron was a consultant for Lehman.  He
14  had run their futures division up until May of
15  2008, when he retired, and was brought back to
16  help on this transaction.
17     Q     To your understanding, sir, what was
18  the purpose of this meeting on the 15th?
19     A     It was to explore what was involved
20  in taking over the futures and futures-related
21  businesses of Lehman by Barclays.
22     Q     As of September 15th, Mr. Raisler,
23  did you have an understanding as to the
24  interactions, if any, or the relationship, if any,
25  between Barclays' consideration to purchase the

Page 11

Confidential - K. Raisler

1
2  futures business of Lehman, and the potential
3  purchase by Barclays of other assets of the Lehman
4  broker dealer?
5         MS. BLOOMER:  I am going to object
6      and just instruct the witness to be sure --
7      I will do this throughout the day when
8      questions seem to call for it.  As a general
9      matter, please do not convey the substance
10      of the discussions you had with counsel or
11      with Barclays.
12         I apologize.  Go ahead.
13     A     At a high level, yes.  I generally
14  knew there were other lawyers at Sullivan &
15  Cromwell working on a bigger transaction, and I
16  also knew that Cleary Gottlieb was involved in a
17  broader transaction, but I really was far from the
18  details of that.
19     Q     Were you involved, Mr. Raisler, at
20  any time prior to the closing of the transaction
21  before the markets opened on the 22nd of
22  September, in any aspect of the, what I will call
23  the broader purchase of assets from Lehman, other
24  than the futures business?
25         MS. BLOOMER:  Objection to form.

Page 12

Confidential - K. Raisler

1
2     A     The only other aspect related to the
3  business, the options business, of Lehman and, in
4  particular, dealings with the OCC.
5     Q     Do you have any notes of your meeting
6  from the 15th, sir?
7     A     I do not.
8     Q     Is it your routine practice to take
9  notes at such meetings?
10     A     Actually, it's my routine practice
11  not to take notes.  I very rarely take notes of
12  anything.
13     Q     You said, Mr. Raisler, that the
14  purpose of the meeting was to explore what would
15  be involved in Barclays taking over the futures
16  and futures-related business of Lehman.  Can you
17  be a little more specific about the discussions in
18  that regard, sir?
19     A     To not distinguish the events of the
20  15th specifically from the events of the days that
21  followed, we were looking at and engaging in due
22  diligence to explore a transfer of all of the
23  futures accounts and related assets of Lehman to
24  Barclays.
25     Q     Was it your understanding, sir, that

Page 13

Confidential - K. Raisler

1
2  a business agreement had been reached between
3  Lehman and Barclays to transfer the assets that
4  you referenced in your prior answer?
5         MS. BLOOMER:  Objection to the form,
6      vague as to time frame.
7     A     As of what time would that -- as of
8  the 15th, no.
9     Q     Did you at any time, Mr. Raisler,
10  come to learn that a business deal had been
11  reached between Lehman and Barclays to purchase
12  any assets related to Lehman's futures business?
13     A     I was vaguely familiar with the
14  negotiation of the asset purchase agreement.  I
15  don't know that it influenced what I was doing in
16  any meaningful way during the course of that week.
17     Q     How was it, sir, that you were
18  familiar with the negotiations of the asset
19  purchase agreement?
20         MS. BLOOMER:  Objection.  Just
21      instructing the witness not to disclose the
22      substance of communications with Barclays.
23     A     Can I have your question read back,
24  please?
25     Q     Sure.

Page 14

Confidential - K. Raisler

1
2    (Record read.)
3    A    To be clear, I wasn't -- I wasn't
4    familiar with the negotiations of it per se. I
5    was familiar that there had been some kind of an
6    agreement entered into. And I would have learned
7    that from counsel.
8    Q    From counsel for whom, sir?
9    A    Most likely, other colleagues at
10    Sullivan & Cromwell.
11    Q    Do you know when you learned that
12    information, sir?
13    A    Again, somewhat of a blur, but likely
14    on the 16th or 17th.
15    Q    Do you say that because you
16    understand that the asset purchase agreement was
17    finalized and signed around that time period?
18    MS. BLOOMER: Objection, form,
19    mischaracterizes his testimony.
20    A    No. I think I learned of it then.
21    Q    Is it fair to characterize the
22    meetings that you were in, sir, as due diligence
23    meetings rather than meetings in which the
24    negotiations of the underlying business deal
25    between Barclays and Lehman in connection with the

Page 15

Confidential - K. Raisler

1
2    futures business took place?
3    MS. BLOOMER: Objection to form.
4    A    I would certainly agree it was not
5    the latter.
6    Q    So you weren't involved, sir, in any
7    negotiations of the business deal as -- as it
8    related to Barclays' purchase of Lehman's futures
9    business?
10    A    To my best recollection, I was not
11    involved at all in that. I believe in answering
12    your earlier question, I would have characterized
13    it as due diligence in a very broad sense as what
14    these meetings were about.
15    Q    What, what is the reason for your
16    qualification, sir?
17    A    I think people have different
18    definitions of due diligence, and I am sure we are
19    going to get to an opportunity to discuss in more
20    detail what I did. I don't know. Some people
21    might have described what I was doing as due
22    diligence. Some people might have described it as
23    sort of something else. So I just want to leave
24    some latitude for that explanation.
25    Q    Do you have any recollection, sir, of

Page 16

Confidential - K. Raisler

1
2    the information that Barclays requested during
3    that meeting on the 15th?
4    A    Again, the meetings for me blur
5    during the course of the 15th versus 16th versus
6    17th.
7    I believe that among the information
8    that was being requested was the exchanges on
9    which Lehman had positions, either proprietary or
10    customer; the regulators that they were dealing
11    with around the world, and, broadly stated, the
12    information around the positions and assets that
13    were held in those markets.
14    Q    During that meeting on the 15th, sir,
15    were the representatives of Lehman able to provide
16    some or all of the information that you have just
17    described as requested by Barclays?
18    A    Only at the very highest level. I
19    believe we started to collect information about
20    the markets that they were in, whether they were
21    clearing members in those markets or cleared
22    through third parties, and regulators that they
23    had dealt with.
24    To be clear, the information was
25    dramatically incomplete.

Page 17

Confidential - K. Raisler

1
2    Q    Lehman was unable to provide a list
3    of the markets in which it was a clearing member?
4    A    There was vagueness and uncertainty
5    about that in certain markets around the world.
6    Q    Was Lehman able to provide any
7    information about the markets in which it was a
8    clearing member?
9    A    Yes, certainly it did provide
10    information, although it, too, was incomplete,
11    about markets in the U.S.
12    Q    In what regard was the information
13    incomplete, sir?
14    A    Well, it was able to provide us with
15    information as to where it was a clearing member.
16    It was not able to tell us whether it had any
17    positions in those markets where it was a clearing
18    member, or the size and contours of those
19    positions.
20    Q    Do you have an understanding of why
21    Lehman was unable to provide the information about
22    the positions or the size or contours of those
23    positions?
24    A    Only at the most general level. The
25    impression I had was that the days leading up to

Page 18

Confidential - K. Raisler

1  the 15th of September had been extremely chaotic
2  for the staff, and they just didn't have a handle
3  on it.
4      Q    As the meetings progressed through
5  the week of the 15th, sir, was Lehman able to
6  provide further information about the positions in
7  the markets in which it was a clearing member?
8      A    We did obtain more information as the
9  week went on, yes.
10     Q    Can you tell me about that
11 information, please.
12     A    I was delegated the responsibility to
13 reach out to each of the exchanges and, where
14 different, clearing houses, to establish contact
15 and obtain information.  And when I say obtain
16 information, I am referring to basically
17 information about what would be involved in our
18 moving the positions from Barclays to Lehman.
19     MR. LACY:  I think you misspoke.
20     A    I'm sorry, Lehman to Barclays.  Thank
21 you.  It's probably the only time I will do that
22 today; right?
23     Q    If you only do it once, sir, you will
24 be in a minority of one, and I will congratulate

Page 19

Confidential - K. Raisler

1  you.
2      Q    And in the course of that, there were
3  questions that I raised with Lehman officers, and
4  that was part of the way in which we got more
5  information.
6      Q    Which Lehman officers did you raise
7  questions with, sir?
8      A    Well, I think mostly my recollection
9  was with Jeff Jennings and Ron Filler.
10     Q    Who delegated the responsibility to
11 you, Mr. Raisler, to reach out to the exchanges
12 and clearing houses?
13     A    Probably representatives of Barclays.
14     Q    And did you reach out to all clearing
15 organizations and exchanges of which Barclays was
16 a member in the U.S. and outside of the U.S.?
17     MS. BLOOMER:  Did you mean Barclays
18 there or Lehman?
19     MR. OXFORD:  Sorry, sorry.  There we
20 go.  Thank you, Trish.  Didn't take long.
21 It's infectious.
22     THE WITNESS:  Right.
23     Q    Let me try that again.
24     Did you reach out, Mr. Raisler, to

Page 20

Confidential - K. Raisler

1  all clearing organizations and exchanges of which
2  Lehman was a member both in the U.S. and outside
3  of the U.S.?
4      A    Outside the U.S., definitely no.
5  Inside the U.S., I believe I reached out to all of
6  them.  There may have been one missing.
7      Q    Are you able, sitting here today, to
8  give me a list of the organizations that you
9  reached out to in this matter?
10     A    I can give you my best recollection.
11 It would have been the Chicago Mercantile
12 Exchange, which would have embraced the positions
13 of its divisions, including the Chicago Board of
14 Trade and NYMEX, ICE futures U.S., formerly known
15 as the New York Board of Trade, the Chicago
16 Climate Futures Exchange.
17     I don't recall initially reaching out
18 to the CBOE Futures Exchange because I don't
19 believe we knew that they had any positions there
20 for several days.
21     I think I reached out to the Kansas
22 City Board of Trade, even though Lehman was not a
23 clearing member of the Kansas City Board of Trade.
24 But we did know they had positions there.

Page 21

Confidential - K. Raisler

1  I don't recall, although I believe
2  just an absence of memory, which non-U.S.
3  exchanges I reached out to.  As a general matter,
4  Lehman, LBI, the entity that we were dealing with,
5  was not a clearing member on those foreign
6  exchanges, and that might be why I don't have a
7  distinct memory of speaking to people about them.
8      Q    If Lehman was not a clearing member
9  of foreign exchanges, sir, did it use a foreign
10 FCM?
11     A    It did use a -- well, outside the
12 U.S. they would not have been called necessarily
13 FCMs.
14     Q    I understand.
15     A    But it would have used a clearing
16 broker in those jurisdictions.  That clearing
17 broker could have been an affiliate, and in many
18 cases was.
19     Q    Did you reach out to any of Lehman's
20 clearing brokers that they used to clear futures
21 outside of the U.S., sir?
22     A    I think that was part of the problem.
23 Many of those, many of those clearing
24 relationships were with affiliates.  There wasn't

Page 22

Confidential - K. Raisler

1  anybody easily you could get ahold of to talk to
2  about it.
3
4      Q    I am limiting my question to the
5  clearing brokers outside of the U.S. who are not
6  affiliates, sir.
7      A    Okay.
8      Q    Did you reach out to any such
9  organizations in connection with the authority
10 that was delegated to you by Barclays?
11         MS. BLOOMER:  Objection, vague as to
12 time frame.
13     A    The only one I remember, and this
14 memory is not that distinct, was Macquarie in
15 Australia.
16     Q    What do you recall about reaching out
17 to Macquarie in Australia, sir?
18     A    Just an attempt to try to find
19 information about what they knew about the
20 positions in the markets in Australia.
21     Q    Do you remember if that attempt was
22 successful, sir?
23     A    I remember it as not being
24 successful.  We didn't get a very good report from
25 them as to what was going on.

Page 23

Confidential - K. Raisler

1      Just to elaborate a bit, I also
2  believe that Ron Filler was reaching out to some
3  of the foreign clearing relationships during the
4  same time period and reporting back as well.
5      Q    Reporting back to whom, or --
6      A    This group meeting that started on
7  Monday and sort of went through the week of
8  Barclays and Lehman representatives.
9      Q    Did you reach out, Mr. Raisler, to
10 any Lehman affiliates who acted as clearing
11 brokers outside of the U.S.?
12     A    To my best recollection, I did not.
13     Q    Do you know if anybody else did reach
14 out to Lehman clearing affiliates?
15     A    If anybody had, it probably would
16 have been Filler.  But I don't remember -- I guess
17 I don't remember much by way of results there, so
18 I don't know whether attempts were made or not.
19     Q    How was it that you reached out to
20 the clearing organizations and exchanges in the
21 U.S., sir?  Did you have a telephone call with
22 them?  Did you e-mail them?
23     A    In each case, it would have been by
24 phone.  I would have spoken to any number of
25

Page 24

Confidential - K. Raisler

1  people within those organizations, usually in the
2  first instance through the general counsel's
3  office.
4      Q    Turning first to the CME, sir, were
5  you able to obtain any information by reaching out
6  to the CME about what would be involved in moving
7  the Lehman positions to Barclays?
8      A    Yes.  I would say the CME was
9  probably the most transparent and cooperative, the
10 one most anxious to make sure it went smoothly.
11     Q    Did you have a primary contact at the
12 CME, sir?
13     A    Probably two people.  It would have
14 been Jerry Salzman, who is the outside counsel to
15 the CME.
16     Q    Is he at Skadden?
17     A    He is currently, yes.
18     Q    Was he with Skadden at the time?
19     A    I am not sure.  He had his own firm
20 and moved over to Skadden around that time.  I
21 don't remember precisely.  It could have been a
22 little before, a little after.
23         And Kim Taylor, who runs the CME
24 clearing house.

Page 25

Confidential - K. Raisler

1      Q    Do you remember when you first
2  reached out to the CME, Mr. Raisler?
3      A    Not precisely, but it wouldn't
4  surprise me if it had been that Monday, the 15th.
5      Q    Did you continue your discussions
6  with the CME and its representatives throughout
7  the week of the 15th, sir?
8      A    Certainly through Thursday.  I don't
9  remember any discussions with them on Friday.
10     Q    At the CME, Mr. Raisler, did you ask
11 for information about Lehman's proprietary or
12 customer positions?
13     A    In each case when I made inquiry of
14 any exchange or clearing house, I was seeking
15 information at the highest level.  I wasn't
16 looking at what the nature or type of their
17 positions was.  I was more interested in
18 understanding from them whether they saw any
19 impediments to moving those positions to Lehman,
20 from Lehman to Barclays.
21         So I think my answer to your question
22 is yes, sort of.
23     Q    Is it accurate, Mr. Raisler, to say
24 that you did not ask for any information at the

Confidential - K. Raisler

1  CME about the substance and nature of Lehman's
2  customer or proprietary positions at the CME?  Is
3  that accurate?
4        MS. BLOOMER:  Objection to form.
5     A    I would say that is not accurate. I
6  would say I asked both custom and nature, but not
7  the particulars of the positions.  So I was
8  interested in knowing which markets, on which
9  markets they had positions, and whether there were
10  any complications associated with those positions
11  that would hinder their movement to Barclays.
12     Q    But you didn't ask what the size of
13  those positions were, for example?
14     A    I did not.  I am not sure absent a
15  more complex process they would have been able to
16  give me that information, because it was not in
17  the first instance Barclays information.
18     Q    And at this stage that information is
19  proprietary to Lehman?
20     A    Correct.
21     Q    Did you consider the proprietary
22  nature of this information to be a barrier to you
23  asking for information about the size of these
24  positions and any collateral held to secure them?

Confidential - K. Raisler

1     A    I was not delegated that
2  responsibility, so I never really thought in those
3  terms.
4     Q    Was there someone else, to your
5  knowledge, Mr. Raisler, who was delegated the task
6  to attempt to ascertain whether -- at the CME or
7  elsewhere -- what the size and nature was of
8  Lehman's customer and proprietary futures
9  positions?
10     A    Generally speaking, again, based on
11  these meetings that we had, the operations people
12  within Barclays would have been attempting to get
13  information of that sort from their counterpart at
14  Lehman.
15     Q    Do you know who the operations people
16  within Barclays were who were responsible for this
17  attempt to get information?
18     A    That team would have been led by Liz
19  James.
20     Q    Do you know who else was on that team
21  reporting up to Liz James?
22     A    I am not that good at names and I
23  don't recall.
24     Q    As a general matter, sir, would you

Confidential - K. Raisler

1  expect the CME to be able to provide to Lehman a
2  list of the Lehman customer and proprietary
3  positions and any collateral the CME held in
4  respect of those positions?
5        MR. LACY:  Object to the form of the
6  question.
7     A    It's a somewhat more complicated
8  question than I think you intend.  To a certain
9  extent, the answer to your question should be yes.
10  I think some of the information, though, that
11  would be transmitted would have to be digested by
12  Lehman, because they would be the only ones who
13  would know certain pieces of information that the
14  CME would not know.
15     Q    What information would Lehman only
16  know but the CME wouldn't know in connection with
17  your last answer, sir?
18     A    The CME carries all of the customer
19  positions of Lehman in a single account, and so to
20  the extent that Lehman was able to get that -- to
21  the extent that the CME was able to get that
22  information to Lehman, it would be in an aggregate
23  form.  It wouldn't be delineated by customer.
24     Q    I understand.

Confidential - K. Raisler

1        Is there any other information that
2  you were referring to other than the breakdown by
3  customer in your answer two answers ago?
4     A    That would likely be the largest
5  impediment to getting a clean piece of
6  information.
7     Q    Would your answer also apply not just
8  to the CME, but to any clearing organization, sir?
9        MS. BLOOMER:  Objection to form.
10     A    I think that generally the answer
11  should be yes.  I believe the sophistication of
12  some of the other clearing organizations and their
13  ability to get that information may be slower, but
14  the answer should be yes, at some point in time.
15     Q    You said you also spoke to ICE
16  Futures U.S., Mr. Raisler.
17     A    Correct.
18     Q    Can you tell me about your
19  conversations with them, please?
20     A    I don't, I don't want to imply in
21  answering this question that I have given you the
22  answer to the question with respect to the CME.  I
23  don't think you asked this question with respect
24  to the CME.

Page 30

Confidential - K. Raisler

1
2     Q      I understand that.
3     A      Okay.
4     Q      Focusing specifically on the --
5     A      ICE Futures.
6     Q      -- ICE Futures U.S., can you tell me
7  about your conversation.
8     A      Again, it was a discussion about
9  moving the positions that they were carrying to
10 Barclays, but the discussion focused mostly on
11 their insecurity about Lehman's continuing ability
12 to perform and their worry if there was inadequate
13 margin at ICE Futures what would happen.
14    Q      Were those insecurities or worries
15 assuaged in any way, to your knowledge, sir?
16    A      We were not able to assuage those
17 insecurities, no.
18    Q      Did anything happen as a result of
19 this inability to assuage their concerns?
20    A      We are speaking now with respect to
21 ICE Futures?
22    Q      Yes.
23    A      They, as with any U.S. clearing
24 house, have the right, if they have this
25 insecurity, to take over the positions and to

Page 31

Confidential - K. Raisler

1
2  liquidate them or to auction them off.
3  Ultimately, that is what ICE Futures did with
4  respect to the proprietary positions of Lehman
5  that were on their exchange.
6     Q      Do you have any information, sir,
7  about the nature of the propriety positions that
8  Lehman had prior to this auctioning off?
9     A      My recollection is imprecise, but I
10 believe that Lehman had some stock index products
11 that were trading on ICE Futures, among other
12 things.
13    Q      Do you know when the auction
14 happened, sir?
15    A      I don't precisely recall whether it
16 was an auction or whether it was just a
17 liquidation.  I think it was an auction.  I only
18 recall it occurred after the CME's auction.  I
19 don't recall exactly when.  Maybe a day later.
20    Q      To the best of your recollection,
21 sir, when was the CME's auction?
22    A      The CME's auction started the morning
23 of the 18th of September.
24    Q      So you think ICE Futures had an
25 auction after the 18th or at least after the

Page 32

Confidential - K. Raisler

1
2  morning of the 18th, but was it also prior to the
3  closing of the transaction on the 22nd, sir?
4     A      My best recollection is yes.  But I
5  am not -- I am much more certain about what the
6  CME did.  The ICE position was not that large
7  compared to the CME's.
8     Q      Do you have a sense, sir, of how
9  large the ICE position was?
10    A      My recollection, in the scheme of
11 things at the time, it was a relatively small
12 position.
13    Q      Do you have any information,
14 Mr. Raisler, as to the nature and amount of any
15 collateral that Lehman held in respect of the ICE
16 Futures?
17    A      I don't.  And I wouldn't have known
18 that then.
19    Q      Do you have any information about any
20 collateral that ICE rather than Lehman would have
21 held in respect to those positions that were
22 liquidated?
23        MR. LACY:  Object to the form of the
24 question.
25    A      I am not sure I understand that

Page 33

Confidential - K. Raisler

1
2  question.
3     Q      I was simply making sure that I had
4  asked about your knowledge with respect to any
5  collateral held by Lehman and any collateral
6  posted at the exchange, sir.  Do you understand
7  the distinction I am making?
8     A      Yes.  And I wasn't intending to
9  distinguish between the two.
10    Q      Do you know, Mr. Raisler, whether or
11 not Barclays purchased any of the positions that
12 were either liquidated or auctioned by ICE?
13    A      I never heard that one way or the
14 other, no.
15    Q      Did the CME, to your knowledge, sir,
16 have similar concerns to ICE about the ability of
17 Lehman to continue to perform its obligations as a
18 clearing member?
19    A      Yes.
20    Q      How is it that you came to learn
21 that?
22    A      This was something that was mentioned
23 as early as my first conversation with them.  As I
24 testified, I think it was on the 15th.  It
25 culminated in a conversation I had with them

Page 34

Confidential - K. Raisler

1   between 11 p.m. and midnight on the 17th of
2   September, in which they asked -- let me begin
3   that sentence over again, if I can.
4           I received a call, I received several
5   calls that evening from representatives of the
6   CME, which I was at a dinner and was not able to
7   catch up with.  When I did get the messages, I
8   called them back sometime between 11 p.m. and
9   midnight.  I got a number of people at the CME at
10  that time on the phone.
11          They asked me, consistent with the
12  discussions we had had leading up to this point,
13  whether Barclays was prepared to guarantee
14  Lehman's proprietary positions at the exchange.
15          I told them I would get back to them
16  the following morning, as it was almost midnight.
17  They told me that was not satisfactory, that they
18  needed an answer within an hour, and that absent a
19  guarantee, they would commence an auction first
20  thing in the morning.
21      Q     Were you able to get them an answer
22  to their question within an hour, sir?
23      A     I was able to get them an answer
24  within an hour, and I was -- I told them that

Page 35

Confidential - K. Raisler

1   Barclays was not in a position to guarantee the
2   proprietary positions of Lehman, and that they had
3   to do what they had to do.
4       Q     And did the CME then proceed to
5   auction Lehmans' proprietary positions at the CME?
6       A     That is my understanding, yes.
7       Q     What is the basis of that
8   understanding, sir?
9       A     They told me that.
10      Q     Who told you in particular?
11      A     Kim Taylor.  Jerry Salzman.
12  Phupinder Gill, a name I am not going to be able
13  to spell or pronounce, who is the president of the
14  exchange, was also on those calls.
15      Q     Apart from those three individuals,
16  sir, do you remember anybody else being on those
17  calls?
18      A     I think there were others.  I don't
19  remember who they were.
20      Q     Did you have an understanding, based
21  on those calls or otherwise, of the size of
22  Lehman's proprietary positions at the CME?
23      A     I understood them to be huge.
24      Q     Can you be any more specific, give me

Page 36

Confidential - K. Raisler

1   an order of magnitude other than huge?
2       A     Well, the exchange had explained to
3   us that they thought that the exposure of those
4   positions was enormous.  Again, I am unable to put
5   easy dollars around them.  I do indicate in my
6   declaration that the auction resulted in a
7   movement of approximately $1.6 billion in margin
8   that had been posted at the exchange to the
9   auction winners.  I think that gives an idea of
10  the scale of the positions.
11      Q     What is the basis for your statement
12  in your declaration, which I believe is paragraph
13  four, that you understand the auctioning off of
14  LBI's proprietary futures positions at the CME led
15  to a loss of approximately $1.6 billion in
16  collateral that LBI had posted at the CME?
17      A     Someone at Barclays had told me that.
18  I don't recall precisely who that was or how I got
19  that information.
20          MS. BLOOMER:  And I am going to
21  object.  You shouldn't really go into that
22  discussion in any detail.  Sorry about the
23  late objection, but --
24      A     I don't remember the who, what or

Page 37

Confidential - K. Raisler

1   where of when I got that information.
2       Q     And you don't remember, sitting here
3   today, whether it was a legal representative of
4   Barclays, whether external or internal, or whether
5   it was a business person; is that correct?
6       A     I don't.
7       Q     And other than this conversation with
8   an unnamed and unremembered person at Barclays,
9   sir, do you have any basis for the statement that
10  you make in the last sentence of your declaration?
11      A     I have some vague recollection.  I
12  also read it in a news article at one point, but I
13  can't pin that down.
14      Q     It's not based on a review of
15  documents related to the auction, sir?
16      A     It is not.
17      Q     It not based on conversations with
18  anybody at the CME?
19      A     It is not.
20      Q     Did you have any discussions,
21  Mr. Raisler, with anybody at the CME about the
22  customer positions that Lehman held at the CME?
23      A     Yes.  The dialogue starting on Monday
24  with each of the exchanges, clearing houses, would

Page 38

```
 1         Confidential - K. Raisler
 2    have related to both the customer positions and
 3    the proprietary positions.
 4         Q     Did the CME have similar concerns in
 5    respect of the customer positions that Lehman held
 6    as it did to the proprietary futures that you just
 7    testified about?
 8              MS. BLOOMER: Object to the form.
 9         A     They had concerns.  They were not of
10    the same dimension.
11         Q     What were their concerns, sir?
12         A     Their concerns there again was that
13    Lehman customers -- let me amend that.
14              Their concerns were at two levels.
15    One is, was Lehman able to administer, continue to
16    administer the customer positions in an effective
17    way.  That is, did it have a handle on what was
18    going on.  Was it able to manage daily margin pays
19    and collects.
20              And then secondly, given the
21    volatility and uncertainties in the market, were
22    Lehman's customers going to be able to perform
23    their obligations, because under the law, if they
24    were not, Lehman would be backstopping those
25    customers, and as we just discussed, the exchange
```

Page 39

```
 1         Confidential - K. Raisler
 2    was not confident of Lehman's ability to do that
 3    in the context of its proprietary book already, so
 4    it certainly would be concerned about their
 5    ability to do that with respect to the customer
 6    positions.
 7         Q     Turning to the CME's first concern,
 8    about Lehman's ability to continue to administer
 9    or manage Lehman's customer positions, was that
10    concern at the CME resolved, to your knowledge,
11    sir?
12         A     The answer is no.  Each day they had
13    that concern, but each day they were apparently
14    getting satisfactory results.
15              I should point out that this was sort
16    of a code red event not just for the CME but also
17    for the Commodities Future Trading Commission.  We
18    haven't discussed them, but they were heavily
19    involved as well in these discussions during the
20    course of the week.
21         Q     Was the second concern of the CME the
22    ability of Lehman's customers to perform, and if
23    they were unable to perform, the ability of Lehman
24    to be a backstop as they are required?  Did that
25    performance obligation -- was that concern
```

Page 40

```
 1         Confidential - K. Raisler
 2    resolved, to your knowledge, sir?
 3         A     Not until the positions moved from
 4    Lehman to Barclays the following week.
 5         Q     Do you have an understanding --
 6    withdrawn.
 7              The CME didn't do anything to close
 8    out those futures positions held on behalf of
 9    customers by Lehman?
10         A     They did not.  They were just
11    actively and aggressively monitoring daily and
12    intraday what was going on.
13         Q     Do you have an understanding, sir, of
14    how it is that the CME got comfortable such that
15    they were willing to continue to clear Lehman's
16    customer business?
17              MR. LACY: Object to the form of that
18         question.
19         A     I think the word "comfortable" would
20    be a significant overstatement, given the amount
21    of time and attention they were spending on this.
22    Moving customer positions is not an easy process,
23    compared to auctioning off proprietary positions.
24    They needed to just monitor the positions very
25    aggressively and make sure that there were no
```

Page 41

```
 1         Confidential - K. Raisler
 2    defaults.  If there had been defaults, they would
 3    then have gone through a much more complicated
 4    process as to what to do next.
 5              So the answer is, in the few days
 6    they obviously were able to get through.
 7         Q     To your knowledge, sir, did the CME
 8    hold collateral in respect of Lehman's customer
 9    futures positions?
10         A     Absolutely.
11         Q     Can you tell me what it is you know
12    about the nature and extent of the collateral that
13    the CME held in respect of those positions?
14         A     Well, to simplify, the positions that
15    Lehman's customers had would have had initial
16    margin associated with them, and that initial
17    margin would have been posted with the CME
18    clearing house.  Typically, the clearing broker,
19    in this case Lehman, would have additional funds
20    posted with the clearing house as a buffer.
21              And each day there would be mark to
22    market variation margin that would be paid and
23    collected on behalf of those customers as a group
24    through the clearing house.
25         Q     Do you know whether in fact Lehman
```

Page 42

Confidential - K. Raisler

1 had posted additional funds as a buffer at the CME
2 for its futures business for its customers?
3      Q
4      A    I certainly came to know that.  At
5 what point in time I did know that -- I think I
6 knew that early in the week.
7      Q    When you came to learn about the
8 buffer, sir, did you come to learn about the size
9 of the buffer?
10      A    I don't think I ever really knew sort
11 of the scale of the positions, customer,
12 proprietary, and the scale of the monies involved.
13      Q    Can you tell me, please, about your
14 conversations with the Chicago Climate Futures
15 Exchange.
16      A    My best recollection is that the only
17 positions that were on that exchange were
18 proprietary.  There were no customer positions.
19 But here again, I think the positions were very
20 small.
21           I believe the conversations were
22 similar in that there were questions about
23 insecurity and Lehman not being able to perform.
24      Q    Did the Chicago Climate Futures
25 Exchange close out Lehman positions prior to the

Page 43

Confidential - K. Raisler

1 closing of the transaction, to your knowledge,
2 Mr. Raisler?
3      A    I am not sure in terms of my memory.
4 but it would be unlikely that they would have
5 closed it out.  It would have been more likely
6 that they would have auctioned it.  It would have
7 been difficult to close it out.
8      Q    Do you know whether or not the
9 Chicago Climate Futures Exchange auctioned any
10 Lehman positions?
11      A    I don't have a real good
12 recollection of that.  Again, this was a
13 relatively small matter, so it got blurred with
14 the other activities.
15      Q    Do you remember who you spoke to at
16 the Chicago Climate Futures Exchange?
17      A    Probably would have been their inside
18 counsel, a woman by the name of Ann Cresce.
19 C-R-E-S-C-E.
20      Q    I think you said you also spoke to
21 someone at the Kansas City Board of Trade; is that
22 correct?
23      A    Right.  I don't remember the name of
24 the person there.
25

Page 44

Confidential - K. Raisler

1      Q    What do you recall about the
2 substance of your conversations with that person,
3 whoever that may be, who was the representative of
4 the Kansas City Board of Trade?
5      A    In Kansas City, unlike the other U.S.
6 exchanges we have discussed, Lehman was not a
7 clearing member.  It cleared through a broker.
8 Who it was itself a member.  So I would believe
9 that the conversation was a somewhat higher level
10 one, just to make sure that they knew what we were
11 doing, and what was involved in the next steps.
12      Q    Do you recall whether the Kansas City
13 Board of Trade had similar concerns to those of
14 the CME?
15      A    Their concern -- first of all, their
16 position was significantly smaller, probably the
17 smallest of the lot.  Also, they had the comfort
18 that their clearing member provided them with,
19 with backstop, if Lehman's customers did not
20 perform, or if Lehman's proprietary positions
21 didn't perform.
22      Q    You also had conversations, albeit
23 perhaps not initially, with the CBOE?
24      A    Correct.  And just to be clear on

Page 45

Confidential - K. Raisler

1 that, also the OCC, the Options Clearing Corp.,
2 which clears for the CBOE.
3      Q    Okay.  Focusing first on your
4 conversations with the CBOE, Mr. Raisler, can you
5 tell me what you recall about your conversations
6 with the CBOE in the week of the 15th of
7 September?
8      A    I don't think I had any conversations
9 with them that week.
10      Q    Do you know whether anybody else at
11 Sullivan & Cromwell had conversations with the
12 CBOE that week?
13      A    It is possible that my partner, David
14 Gilberg, could have had conversations with them
15 that week, because he and I were splitting up some
16 of these responsibilities to reach out to
17 exchanges.
18      Q    Can you describe for me your role
19 with respect to the futures due diligence, as you
20 have described it, and Mr. Gilberg's role?
21      A    There was really not any separation
22 between us.  We worked together, and we just might
23 have split up some of the responsibilities to
24 reach out.  But it was a team.

Page 46

Confidential - K. Raisler

1
2  Q    Generally were you working separately
3  in the sense that you would call and try and get
4  information from a set list of exchanges or
5  clearing organizations, and Mr. Gilberg would be
6  tasked with getting that information from a
7  different set of organizations?
8  A    Possible. I think it was more that
9  we might -- one of us might do follow-up on the
10 other -- it wasn't as discrete as you have
11 described it.
12 Q    In the conversation, for example,
13 with the CME that you have testified to today, was
14 Mr. Gilberg also on those conference calls?
15 A    I don't recall he was on any of those
16 calls. He could have been.
17 Q    And you don't believe Mr. Gilberg was
18 in the initial meeting on the 15th, sir; is that
19 correct?
20 A    My best recollection is no, although
21 I am sure he was in some of the subsequent
22 meetings.
23 Q    Why was it you came to have a
24 conversation with the OCC in the week of the 15th,
25 Mr. Raisler?

Page 47

Confidential - K. Raisler

1
2  A    I am not sure -- first of all, I am
3  not sure I have testified to that.
4  Q    Let me lay a foundation. Perhaps I
5  misunderstood your earlier testimony. I didn't
6  mean to mischaracterize it.
7       Do you believe you had a conversation
8  with any representative of the OCC in the week
9  between the 15th of September and the closing of
10 the transaction on the 22nd?
11      MS. BLOOMER: Neil, whenever you are
12 ready for a break, we probably should take
13 one soon.
14 A    I am not sure. I know I had
15 conversations with them the week of the 22nd. I
16 don't recall conversations with them that week,
17 although I could have had some.
18      Just to elaborate on one point is
19 that OCC also clears some futures contracts in
20 addition to clearing options. And so they would
21 have been a part of my remit to the extent that
22 there were futures positions of Lehman proprietary
23 or Lehman customers that cleared OCC, separate and
24 apart from OCC's clearing of the equity options.
25 Q    Which types of futures contracts does

Page 48

Confidential - K. Raisler

1
2  the OCC clear?
3  A    They clear for the CBOE Futures
4  Exchange, CFE. And in particular, the largest
5  contract there is called the VIX contract, V-I-X,
6  which is a volatility-based contract.
7       MR. OXFORD: Okay. Does everybody
8  want to take a five-minute break?
9       MS. BLOOMER: This might be a good
10 time.
11      THE WITNESS: Sure.
12      (Recess taken.)
13 BY MR. OXFORD:
14 Q    Mr. Raisler, did you have any
15 understanding one way or the other whether
16 Barclays was one of the bidders for the Lehman
17 proprietary positions at the CME that were
18 auctioned off, I think you said the 18th of
19 September, 2008?
20 A    I did not know that at the time. I
21 heard that afterwards.
22      MS. BLOOMER: I would just remind the
23 witness not to disclose the substance of
24 communications --
25      THE WITNESS: Right.

Page 49

Confidential - K. Raisler

1
2  A    I was not involved in any of that
3  process. To the extent that Barclays was
4  involved, I just heard about it afterwards.
5  Q    Do you know whether anyone from
6  Sullivan & Cromwell was involved in that process?
7  A    I am virtually certain we were not.
8  Q    Other than the discussions you have
9  already testified to this morning, Mr. Raisler, do
10 you recall having any other discussion with the
11 Chicago Mercantile Exchange during the week of the
12 15th of September?
13 A    You know, I testified earlier that I
14 didn't recall conversations with them on that
15 Friday. But as I -- as I reflect on it, I think I
16 did have a conversation with them on Friday. In
17 particular, they had asked whether Barclays was
18 prepared to guarantee the customer positions of
19 Lehman over the weekend, 20th and 21st. I don't
20 recall whether -- what exactly they said, if we
21 weren't prepared to guarantee them, what they
22 would do, but the clear implication was that they
23 needed that guarantee; otherwise, they could
24 potentially take action.
25      And we did -- I did consult with

Page 50

Confidential - K. Raisler

1
2    Barclays and we did -- I did communicate to the
3    CME sometime on Friday afternoon, the 19th, that
4    Barclays was prepared to guarantee the customer
5    positions of Lehman over the weekend.
6        Q    What do you mean by over the weekend,
7    Mr. Raisler?  Were these positions being traded
8    over the weekend?
9        A    The positions do trade 24 hours a
10   day.  And obviously given the volatility in the
11   markets, there could be substantial movements over
12   a weekend, where there is generally less liquidity
13   but still active mark to market trading.
14       Q    Did the CME also request of Barclays
15   that Barclays guarantee the trading on the 22nd of
16   September?
17       A    I think at the time that the
18   conversation on Friday was for the weekend, which
19   I would have assumed for the opening on Monday,
20   but the transaction was expected to be
21   accomplished so that by the opening on Monday the
22   positions would be the responsibility of Barclays.
23       Q    Were you involved, Mr. Raisler, in
24   creating any documents that relate to Barclays'
25   agreement to guarantee Lehman's customer positions

Page 51

Confidential - K. Raisler

1
2    over the weekend of the 21st and I guess the 20th
3    of September?
4        A    Curious, I don't recall preparing any
5    documents.  I -- it could have been, I just don't
6    recall.
7        Q    To your knowledge, sir, was Barclay's
8    asked to guarantee any other of Lehman's customer
9    positions at any time between the 15th of
10   September and the closing of the transaction on
11   the 22nd?
12       THE WITNESS:  I'm sorry, could I have
13       that read back, please.
14       (Record read.)
15       A    OCC made a similar demand -- I think
16   before the break I was not certain about
17   conversations with OCC that week, but I did have
18   conversations with OCC that Thursday and Friday,
19   in which they were insecure.  Friday is actually
20   an expiration date for options, and they wanted to
21   make sure that the positions would be secured by
22   Barclays, again over the weekend, during the
23   settlement period.  And here specifically customer
24   positions.
25       Q    With whom at the OCC or on whose

Page 52

Confidential - K. Raisler

1
2    behalf -- withdrawn.
3        Did you talk to someone within the
4    OCC, or was it their outside counsel?
5        A    Both.  I would have spoken to Bill
6    Navin, who is the inside general counsel, and Jim
7    McDaniel at Sidley, who is their outside counsel.
8        Q    And as best you recall, sir, these
9    conversations took place on Thursday, the 18th of
10   September, and Friday, the 19th of September?
11       A    Correct.
12       Q    Was the demand made by the OCC for a
13   guarantee of customer positions at the OCC or firm
14   positions at the OCC or both?
15       A    My recollection, it was both.
16       Q    And did the demand, sir, to your
17   knowledge, relate only to the futures that were
18   cleared through the OCC or was it all positions
19   including equity options that were cleared through
20   the OCC?
21       A    It's interesting, because as of
22   Thursday and Friday, we were not aware that there
23   were any futures positions, so it would have been
24   at least in our thinking exclusively with respect
25   to the options positions.

Page 53

Confidential - K. Raisler

1
2        Q    When you say "we," sir, were not
3    aware of the futures positions, are you talking
4    about Sullivan & Cromwell or Barclays or anybody
5    representing Barclays?
6        A    Sullivan & Cromwell and Barclays were
7    not aware of any futures positions until I believe
8    Saturday, the 20th.
9        Q    How is it, sir, that you came to
10   learn about the futures positions at the OCC on
11   Saturday, the 20th of September?
12       A    I am waiting for her privilege
13   admonition.
14       MS. BLOOMER:  Whether I object or
15       not, a standing objection for sure.
16       Q    And presumably a standing admonition
17   as well.
18       A    Conversations with Barclays.
19       Q    Since you were dealing with the
20   futures side of the transaction, sir, and you just
21   told me that Barclays and certainly you didn't
22   know about the futures positions at the OCC until
23   the weekend, can you tell me how it is you came to
24   have a conversation with Mr. Navin and
25   Mr. McDaniel a day or two prior to that about

Page 54

Confidential - K. Raisler

1    Confidential - K. Raisler
2    their request that Barclays guarantee positions of
3    Lehman at the OCC?
4        A    It's a good question, actually.  It's
5    not really clear to me.  I think everybody was
6    sort of scrambling around.  I knew the people at
7    the OCC very well.  And I am -- I am assuming at
8    some point somebody asked me to reach out to them,
9    and that's why I did.  I don't recall specifically
10   sort of how that came to pass.
11       Q    Can you tell me, Mr. Raisler, as best
12   you can recall, everything about the conversations
13   you had with Mr. Navin and Mr. McDaniel about the
14   OCC's demand for this guarantee of Lehman's
15   positions, both customer and proprietary, at the
16   OCC?
17       MS. BLOOMER:  Objection to form.
18       A    My best recollection was that Friday
19   was an expiration date for options, that there was
20   very substantial volatility in the market,
21   particularly around equity and equity options
22   trading.  And it could even have been that OCC
23   reached out to me.  But that they were very
24   concerned that they were not getting good
25   information about the status of Lehman, and they

Page 55

1    Confidential - K. Raisler
2    wanted comfort that they would not have to take
3    action themselves to either auction or liquidate
4    positions.
5        And so particularly rolling into
6    Friday, they wanted to make sure that there would
7    be performance on the options that expired, and
8    that there wouldn't be any shortfall come Monday.
9        Q    As I understood your earlier
10   testimony, Mr. Raisler, OCC asked Barclays whether
11   or not they would guarantee Lehman's trading.  Did
12   I understand your testimony correctly?
13       A    Right.  I think the word "trading" is
14   a little inaccurate at the end there.  It would be
15   basically whether Barclays would be prepared to
16   guarantee Lehman's obligations to the exchange and
17   its clearing house in the event there were any
18   shortfalls, and it would involve both customer and
19   proprietary.
20       Q    When was the OCC seeking to have that
21   guarantee in place with effect from?
22       A    I believe sometime on Friday.  I
23   believe the discussions preceded that, but I
24   believe sometime on Friday was what they were
25   looking for.

Page 56

1    Confidential - K. Raisler
2        Q    Did you take that request back to
3    Barclays, sir?
4        A    I am sure I did.
5        Q    Do you remember whether or not you
6    communicated a response from Barclays back to the
7    OCC?
8        A    My best recollection is that I did,
9    and that I assured them that that would be
10   something that would be undertaken.
11       Q    Being as precise as possible, right,
12   in asking you, given all this happened about 18
13   months ago, can you tell me what it is that you
14   assured the OCC Barclays would do in respect of
15   their request to guarantee Lehman's obligations to
16   the OCC and the clearing house?
17       A    Again, my best recollection is this
18   time it was effectively memorialized in an
19   agreement.  I, myself, did not have direct
20   responsibility for the drafting of that agreement,
21   but the agreement reflected the terms of the
22   guarantee too.
23       Q    And that was a guarantee with effect
24   from the close of the transaction, sir, not prior
25   to the transaction?

Page 57

1    Confidential - K. Raisler
2        A    I believe the request that was made
3    at the end of the week of the 15th was for the
4    opening of the 22nd, something quite similar to
5    what we talked about with the CME.
6        Q    Right.  As I understood your earlier
7    testimony, Mr. Raisler, you said that the CME
8    asked for a guarantee of trading over the
9    weekend --
10       A    Right.
11       Q    -- of the 20th and 21st; right?
12       MS. BLOOMER:  Objection,
13   mischaracterizes his testimony.
14       A    The -- what the CME was asking for
15   was, when they issued margin calls for the opening
16   on Monday, that if there were any shortfall, that
17   Barclays would be responsible for it.
18       I guess theoretically there could be
19   a margin call over the weekend, but since you
20   can't wire any money over the weekend, that would
21   be quite unusual.  So I think it was much more for
22   the opening on Monday.
23       And I heard the OCC to be sort of
24   asking for the same thing.
25       Q    Is the agreement that you referenced

Page 58

Confidential - K. Raisler

1  that memorialized the understanding between the
2  OCC and Barclays something that is known as a
3  transfer and assumption agreement?
4      A    That is correct.
5      Q    You are familiar with that term?
6      A    I am, yes.
7      Q    Have you seen the document that
8  memorializes the agreement between Barclays and
9  the OCC?
10      A    I have.
11      Q    Were you involved in negotiating
12  that, sir?
13      A    I was not. I was not specifically
14  involved in the drafting of it. I did communicate
15  to the various people the issues we discussed.
16      Q    Do you know who was negotiating the
17  TA? My question is not specifically Barclays.
18      A    Right.
19      Q    But if you know who was negotiating
20  on behalf of the OCC, Barclays or Lehman.
21      A    Well, certainly the same people on
22  behalf of the OCC. I believe that Navin actually
23  signed it.
24      On behalf of Barclays, I believe it

Page 59

Confidential - K. Raisler

1  was handled more by Cleary, but I don't have a
2  specific recollection of the details of that.
3      And for Lehman, I am not really sure.
4      Q    You testified before the break,
5  Mr. Raisler, that you understand that a business
6  decision by Barclays to purchase the futures
7  business was made around the 16th or 17th of
8  September, 2008; is that correct?
9      A    Yes, that is my understanding.
10      Q    Do you know, sir, what information
11  Barclays had about the nature and extent of
12  customer positions and any associated collateral
13  at the time it made that business decision?
14      MS. BLOOMER: I am going to object
15  and make sure the witness is clear he's not
16  to disclose the substance of communications
17  with Barclays.
18      A    I do know that the information was
19  very imprecise. I also know that the positions
20  were very large.
21      Q    Beyond that answer, are you able to
22  provide any additional information in response to
23  my question?
24      MS. BLOOMER: Objection to form.

Page 60

Confidential - K. Raisler

1      A    Well, I mean I have already testified
2  that we knew to a large extent some of the
3  exchanges on which the trading occurred, and on
4  those exchanges proprietary versus customer, so,
5  you know, we had more information, I could
6  elaborate by the testimony I have given to this
7  point.
8      Q    Other than the positions --
9  withdrawn.
10      Other than the exchanges on which
11  these positions were held, do you have any
12  information that -- about the information Barclays
13  had at the time the business decision was made to
14  purchase the futures business from Lehman as to
15  the nature and extent of the customer positions
16  and any associated collateral?
17      MS. BLOOMER: Objection to form.
18  And, Neil, I assume you are not expecting
19  him to repeat everything he's already told
20  you this morning.
21      MR. OXFORD: No.
22      MS. BLOOMER: Okay.
23      A    The question is a little hard to
24  follow, so, I am going to ask you, if you could,

Page 61

Confidential - K. Raisler

1  to maybe break it down for me a little bit.
2      Q    Yes.
3      A    Okay.
4      Q    Leaving aside the identity of the
5  exchanges on which positions were held, at the
6  time Barclays made the business decision to
7  acquire the futures business of Lehman, do you
8  know what information Barclays had about the size
9  of the customer positions and the size of the
10  collateral that is associated with those
11  positions?
12      A    I think at the highest level that
13  information was known. Also, to the extent that
14  at that time we were not aware from Lehman of any
15  defaults on any of the exchanges on which they
16  were trading, one could conclude that whatever the
17  margin and collateral was, was adequate at that
18  moment in time to meet the exchanges' demands.
19      Q    When you say, Mr. Raisler, at the
20  highest level that information was known, are you
21  able to be more precise about the -- the nature
22  and extent of the customer positions, the size of
23  those positions and the collateral associated with
24  those positions?

Page 62

Confidential - K. Raisler

2  MS. BLOOMER: Objection to form.
3  A    I think there were some general
4  discussions about the types of customers that
5  Lehman had. I think there was some general
6  discussions about the size of the positions,
7  although I never saw any breakdowns of that.
8       I think there were some general
9  discussions about the amount, global amount of
10  collateral, but I couldn't tell you how much of
11  that was where at various points in time.
12  Q    Same question with respect to the
13  proprietary positions. At the time Barclays made
14  the business decision to acquire Lehman's futures
15  business, do you know what information Barclays
16  had about the size of those proprietary positions
17  and the associated collateral?
18  A    My sense is that information was less
19  precise than the customer positions, but also
20  similarly high level.
21  Q    Do you believe, Mr. Raisler, that
22  Barclays was able to make a similar conclusion as
23  to the one that you believe was possible in
24  relation to the customer business, that there was
25  sufficient collateral to secure those positions?

Page 63

Confidential - K. Raisler

2  MS. BLOOMER: Objection to form.
3  A    Yes, to be clear, I don't think I
4  said that there was sufficient collateral to
5  secure the positions. All I said was that at a
6  point in time, which would be each day when the
7  exchange marks the positions, that there had not
8  been any defaults. The adequacy of the collateral
9  to deal with what transpires or is going to
10  transpire the next day would be unknown.
11       So all I would comment on is that in
12  a retrospective way, open of business on the 16th,
13  open of business on the 17th, there was from the
14  exchange's position sufficient collateral to avoid
15  a default, and I believe that would be true for
16  the proprietary positions as well, to the extent
17  we had a handle on it.
18  Q    You described I think very well how
19  one meeting that week rolled into another meeting
20  which rolled into another meeting, sir. Do you
21  have any specific recollections of meetings that
22  you had participated in on the 16th of September,
23  or conference calls that you had on that date?
24  A    I think that after the meeting on the
25  16th, I think most of my work that week is

Page 64

Confidential - K. Raisler

2  blurred, as I was seeking information and
3  reporting back information about contacts with
4  exchanges and contacts with the regulators.
5  Q    Do you recall sitting in any other
6  meetings in conference rooms with Lehman
7  individuals?
8  A    My recollection is that those kinds
9  of meetings were sort of going on throughout the
10  week, and that I would be in those meeting and out
11  of those meetings during the course of the week.
12  Q    Other than the individuals you
13  identified towards the beginning of the deposition
14  who were in the meeting on the 15th, sir, do you
15  remember being in meetings about this, this topic,
16  Barclays' acquisition of the Lehman's futures
17  business, with any other individuals either on the
18  Lehman's side or the Barclays side?
19  A    That remained the lead cast. I know
20  that there were a lot of other people in the room
21  during the course of the week, but it's blurred
22  and I don't remember distinctly other particular
23  people.
24  Q    You understand, Mr. Raisler, that the
25  sale hearing in this matter took place in the

Page 65

Confidential - K. Raisler

2  bankruptcy court in the bankruptcy court in
3  Bowling Green on the 19th of September?
4  A    I do understand that.
5  Q    Were you present at that, sir?
6  A    I was not.
7  Q    Where were you on the 19th?
8  A    Most likely in my office, doing most
9  of this work by phone.
10       It's possible there was another
11  meeting up at Lehman or Barclays that day as well.
12  Q    Is it fair to say, Mr. Raisler, that
13  from the time you were first involved on the
14  evening of the 14th of September until the
15  transaction closed on the 22nd, that you were
16  working exclusively or almost exclusively on this
17  matter?
18  A    I would doubt that. I mean, that is,
19  not generally, but I would say this would
20  certainly have been my most significant engagement
21  that week. I am sure not everything else I was
22  doing stopped. So it would be substantial but not
23  by any means all.
24  Q    Did you continue to work on this
25  matter through the weekend of the 20th and 21st of

Page 66

Confidential - K. Raisler

1  September?
2
3      A    I did.
4      Q    Were you in your office or at
5  Lehman's office?
6      A    I know there were a lot of phone
7  calls over the weekend.  I don't recall any
8  specific meetings.
9      Q    Did you have any conversations,
10 Mr. Raisler, with any regulators of Lehman's
11 futures business?  And to give you the time frame
12 initially, my question is directed towards when
13 you were first engaged on the 14th through the
14 closing of the transaction on the 22nd.
15     A    Yes.  I mean I would have had
16 extensive discussions with the Commodity Futures
17 Trading Commission, which we call the CFTC,
18 throughout the week.
19         I also likely had conversations with
20 other regulators, but it would have been more
21 sporadic.
22     Q    Which other regulators, sir?
23     A    Probably the FSA in the U.K.
24 Potentially the Canadian regulators in Toronto.
25         I believe there were some

Page 67

Confidential - K. Raisler

1
2  communications as well with the Japanese
3  regulators, although that would have been by
4  e-mail rather than by phone.
5      Q    For what purpose, Mr. Raisler, were
6  you engaged in discussions with the CFTC?
7      A    In two broad areas.  One was to keep
8  them up-to-date on what was transpiring with
9  respect to the transaction, as they had their own
10 insecurities and their own responsibilities.
11         And two was to negotiate a bulk
12 transfer order that would allow the positions to
13 be moved from Lehman to Barclays in the event of a
14 Lehman bankruptcy.  And in this regard, I am
15 referencing LBI.
16     Q    Whom at the CFTC did you deal with
17 that week, sir?
18     A    There would have been a number of
19 people, but the primary contact would have been an
20 individual named Bob Wasserman.
21     Q    Do you remember the names of the
22 other individuals who you would have dealt with
23 that week?
24     A    I would have spoken as well to -- and
25 I will let somebody else deal with the spelling of

Page 68

Confidential - K. Raisler

1
2  this one -- Ananda Radhakrishnan, is the person to
3  whom I addressed a letter.
4      Q    R-A-D-H-A-K-R-I-S-H-N-A-N.
5      A    That sounds perfect.  It certainly
6  would have been the way I would have spelled it if
7  I was called upon to do so.
8          John Lawton also in that division.
9          Likely some folks from the general
10 counsel's office.  Perhaps also somebody from the
11 chairman's office.
12     Q    Can you tell me, Mr. Raisler, what
13 the respective roles were of Mr. Wasserman,
14 Mr. Radhakrishnan, and Mr. Lawton?
15     A    They all work in the same division.
16 Radhakrishnan is the head of the division of
17 clearing and intermediary oversight.  Wasserman
18 and Lawton work for Radhakrishnan.  Wasserman's
19 specialty is bankruptcy.
20     Q    What were the insecurities that the
21 CFTC had?
22     A    They wanted to be sure that there was
23 not going to be a default in the performance of
24 Lehman, either in its proprietary or in its
25 customer accounts, and they also, simply put, had

Page 69

Confidential - K. Raisler

1
2  the same insecurities that the clearing houses
3  did.
4      Q    You also mentioned that the CFTC had
5  its own responsibilities, sir.  What did you mean
6  by that?
7      A    As an agency responsible for
8  supervising the futures markets, they want to make
9  sure that the markets continue to operate
10 efficiently, and their concerns on -- with respect
11 to performance, are from their point of view
12 concerns that relate directly to them in addition
13 to relating to the exchanges and the clearing
14 houses.
15     Q    Did you have any conversations, sir,
16 about what, if anything, the CFTC was doing to
17 satisfy itself that there would not be a default
18 relating to Lehman's proprietary customer
19 accounts?
20     A    Basically the CFTC would get its
21 information from the exchanges, so, they would be
22 in constant contact with the exchanges to get
23 whatever information they could.  The exchanges
24 have separate responsibilities, but the CFTC could
25 encourage them to take action if they thought it

Page 70

Confidential - K. Raisler

1  was appropriate to do so.
2      Q     Do you know whether or not,
3  Mr. Raisler, the CFTC had anybody on-site at
4  Lehman's offices in the week or weeks running up
5  to the closing of the transaction?
6      A     I believe they had some people come
7  in at some point that week, but I don't have a
8  good recollection of it.
9      Q     By that week, do you mean the week
10 beginning the 15th of September?
11     A     Correct.
12     Q     Do you have any understanding of the
13 purpose for which the CFTC's employees were
14 present on-site at Lehman that week?
15     A     They would as a routine matter want
16 to look at books and records and make sure that
17 things were in order and that they could get a
18 handle on what was going on. I don't recall them
19 doing that, but it certainly would not have been
20 illogical for them to have been on-site.
21     Q     When did you first speak to anyone at
22 the CFTC in connection with this matter?
23     A     Probably Monday the 15th, the latest
24 Tuesday the 16th.

Page 71

Confidential - K. Raisler

1      Q     Do you remember whether you reached
2  out to them or they reached out to you?
3      A     I probably most likely would have
4  reached out to them, because they wouldn't have
5  most likely known to have reached out to me.
6      Q     Do you remember who was reached out
7  to? Was it Mr. Wasserman?
8      A     It probably would have been Ananda,
9  because I wouldn't have assumed who he would have
10 assigned responsibilities to.
11     Q     Can you tell me as best you can what
12 you remember about that conversation with Ananda.
13     A     My best recollection, and it's not
14 very precise, would be that I would have called
15 him, told him that we had been engaged by Barclays
16 to assist in this possible transaction, and that
17 my responsibility was to keep them informed to the
18 extent I had information, and that if they needed
19 anything from Barclays, to contact me, and that
20 one of the things we would be looking at if the
21 deal went forward was some kind of a blessing from
22 the Commission endorsing the transfer, so I would
23 be back to him to discuss that.
24     Q     And do you recall, sir, what the

Page 72

Confidential - K. Raisler

1  response was from the CFTC in -- in response to
2  that overture?
3      A     I am sure it was the usual formal
4  appreciation of the contact, and the, the
5  indication that we would be sure to have further
6  conversations.
7      Q     What is the next contact you recall
8  with the CFTC?
9      A     Again, there is a blurring here, but
10 I probably would have had a dozen or more contacts
11 with them during the course of the week.
12     Q     Were those contacts primarily with
13 Mr. Wasserman?
14     A     Yes, although oftentimes there were
15 others on the phone with him.
16     Q     And what was the purpose,
17 Mr. Raisler, of your continuing contact with the
18 CFTC that week? Was that to update them on the
19 transaction as it progressed, to your
20 understanding?
21     A     Twofold, as I indicated earlier. One
22 is to update on the transaction, and to basically
23 touch base about that, and the second was to
24 discuss with them the bulk transfer order.

Page 73

Confidential - K. Raisler

1      Q     You said you also had conversations
2  you believe with the FSA in the U.K.?
3      A     Correct.
4      Q     Can you tell me why that was?
5      A     I think basically the same thing. To
6  the extent that Lehman had positions in the U.K.
7  that potentially were going to be taken over by
8  Barclays, I just wanted to make sure that they
9  knew that I was the point person for
10 communications.
11     I must say, as I am sitting here
12 today, I don't remember having detailed or
13 extensive conversations with them. It might have
14 been just one or two quick calls.
15     Q     Do you remember who at the FSA you
16 spoke to?
17     A     It might have been Gavin Hill. I am
18 not sure.
19     Q     To your knowledge, sir, did Barclays
20 negotiate a bulk transfer order or agreement with
21 the FSA as it did with the CFTC?
22     A     No, we did not. There was no
23 requirement for that in the U.K.
24     Q     Mr. Raisler, do you know what

Confidential - K. Raisler

1  happened to Lehman's positions in the U.K.? Were
2  they actually transferred to Barclays?
3      A    I am not sure.
4          MR. LACY:  Let me object to the form
5      of the question.
6      A    I am not sure.  I don't -- as I sit
7  here today, I don't know.
8      Q    The positions that Lehman had in the
9  U.K., do you know whether they were cleared
10  through a Lehman affiliate?
11      A    My recollection is they would have
12  been cleared through a Lehman affiliate, yes.
13      Q    Was that affiliate LBIE?
14      A    That is my best recollection.
15      Q    Do you have any recollection of any
16  contact with a Canadian regulator?  I think you
17  said you --
18      A    Right.
19      Q    -- potentially had contact.
20      A    Here again, it's somewhat vague.  I
21  believe I might have.  I don't remember who I
22  would have reached out to there.  That is quite
23  vague.
24      Q    What is the name of the Japanese

Confidential - K. Raisler

1  regulator that you reached out to by e-mail?
2      A    It would have been the MOF, Ministry
3  of Finance.
4      Q    And for what purpose were you
5  reaching out to the Ministry of Finance?
6      A    Same purpose.  It is possible that
7  rather than reaching out to them directly, we
8  contacted the CFTC and asked the CFTC to reach out
9  to them, because I don't recall any specific
10  e-mails.  But I certainly, I certainly did not
11  speak to them.  That I would have remembered.
12      Q    Turning to your declaration for a
13  moment, Mr. Raisler, that is Exhibit 658-A, if you
14  turn to the second page, there is a sentence that
15  begins, "I recall," in the first line.
16          Do you see that?
17      A    Right.
18      Q    You write, "I recall that during
19  those meetings and telephone conferences, Barclays
20  was unable to get detailed information concerning
21  LBI's futures business for a number of reasons,
22  both technical and practical."
23          Do you see that?
24      A    Yes.

Confidential - K. Raisler

1      Q    I think we may have covered some of
2  this already.  I am not trying to retread ground
3  we have already gone through, but I want to make
4  sure that I have the -- your complete
5  recollection.
6          What did you mean by the technical
7  reasons that you referenced in your declaration?
8      A    I think that the systems information
9  was not readily available, particularly where it
10  was trading through affiliates.  That we were
11  not -- there weren't any -- there were requests
12  for it, but there weren't any reports about
13  positions that were made available.
14          So, I think that was sort of a
15  systems breakdown problem.
16      Q    Do you know, Mr. Raisler, who at
17  Barclays asked for this information and who at
18  Lehman they asked?
19      A    I believe these were general
20  questions raised at these meeting we were having
21  with the group around the table to get position
22  reports and the like.
23      Q    You also reference practical reasons
24  that Barclays was unable to get detailed

Confidential - K. Raisler

1  information about the futures business.  What did
2  you mean by that?
3      A    I guess broadly stated, the market
4  was in substantial turmoil during that time
5  period.  Positions were changing relatively
6  rapidly.  Particularly in the foreign markets,
7  there were rumors that positions were being taken
8  over, liquidated.
9          So, in a practical sense, there was
10  just chaos and resource constraints that were
11  driving the lack of information flow.
12      Q    You go on in the next sentence to
13  describe the obstacle to information sharing that
14  stands out most in your mind as the problems with
15  the LBI books and records.
16          Do you see that?
17      A    Yes.
18      Q    You then go on to say in the next
19  sentence, "My recollection is that due to these
20  and other issues, the discussions during these
21  meetings and calls were had at a very high level,
22  all relating generally to LBI's proprietary
23  positions and collateral, the customer segregated
24  and secured accounts through which LBI conducted

Page 78

Confidential - K. Raisler

1    that business, and the customer accounts that
2    related to that business."
3        Do you see that?
4    A    Yes, I do.
5    Q    At the start of that sentence, you
6    refer to other issues.  What did you mean by that,
7    sir?
8    A    Well, depending on what we mean by
9    technical and practical, there were some
10   situations where information was just not
11   delivered, and an example of that is with this VIX
12   position on the CFE that we didn't learn about
13   until Saturday, the 20th, even though it had been
14   on the books the entire week.
15       I mean, I don't believe -- just to be
16   clear, I don't believe anybody was withholding
17   information from us per se, but information was
18   not getting to us, and this was a proprietary
19   position and a relatively significant one that was
20   just not disclosed.
21   Q    Were you referring to anything else,
22   sir, when you referenced the other issues in your
23   declaration?
24       MS. BLOOMER:  Objection to form.

Page 79

Confidential - K. Raisler

1    A    I think there were other issues with
2    foreign markets of just not -- information just
3    not flowing in terms of where they had positions
4    and accounts, which may go beyond technical and
5    practical.
6    Q    You reference in that same sentence,
7    sir, the customer segregated and secured accounts.
8    Can you tell me, please, what those are?
9    A    Customers that trade in the U.S.
10   futures markets have collateral that they post.
11   That collateral is held pursuant to CFTC
12   regulation in a segregated account, segregated
13   from the proprietary assets of the futures
14   program.
15       If a customer wishes to trade in a
16   non-U.S. futures market through a U.S. broker,
17   generally, the funds will be held in a secured
18   account, which is a separate account from the
19   segregated account, but an account that also has
20   significant protection from the liabilities of the
21   futures broker or its affiliates.
22   Q    Do I understand from your answer,
23   Mr. Raisler, that there is a difference in the
24   degree of protection from liabilities of the

Page 80

Confidential - K. Raisler

1    broker for the customer collateral in the
2    segregated and the secured accounts?
3    A    This has never really been tested in
4    a court situation, but I think most people would
5    agree that both of them are entitled to
6    substantial protection, but that segregated
7    positions are probably a bit more protected than
8    secured positions.
9    Q    And can you explain a little more
10   with respect, firstly, to the segregated and then
11   the secured accounts, how that, how that actually
12   works?  If a customer of Lehman provides
13   collateral to Lehman, where is that held?
14   A    There are really two --
15       MS. BLOOMER:  Objection, lacks
16       foundation.
17   A    There are two locations for the
18   holding of customer funds.  One would be at a bank
19   account of the futures broker, labeled customer
20   segregated account.  It would be an aggregate
21   account holding the segregated funds of all of the
22   customers of that broker.  And the bank holding
23   those segregated funds would pledge to the broker
24   that it was holding the accounts in segregation

Page 81

Confidential - K. Raisler

1    pursuant to CFTC rules and could not use any of
2    that money to meet any of the obligations of the
3    futures broker or its affiliates.
4        The second location would be in a
5    customer segregated account in the name of Lehman,
6    in this case, held at the clearing house.
7    Q    And would the customer segregated
8    account, Mr. Raisler, have the same protection by
9    way of a pledge as the bank account would?
10   A    Yes.  And in fact, it wouldn't be
11   surprising that the clearing house has a clearing
12   bank where it keeps the money, and so the same
13   basic representations apply.
14   Q    I see references to 30.7 accounts.
15   A    30.7 refers to the secured, not the
16   segregated account regime.
17   Q    And that is for non-U.S. futures
18   markets; correct?
19   A    Correct.
20   Q    Is there a similar designation or
21   number that refers to the segregated accounts?
22   A    Generally it's referred to as either
23   4d, four small d, which is the statutory
24   provision, or 1.20, one point two zero, who is the

Page 82

Confidential - K. Raisler

1  regulatory provision.
2
3      Q     Taking Lehmans as our example, would
4  Lehman own the assets in the -- either the bank
5  account or the customer segregated account held at
6  the clearing house?
7          MS. BLOOMER: Objection, vague as to
8      time frame, and lacks foundation.
9      A     I think actually absolutely the
10 opposite.  These would be recognized as assets to
11 secure the obligations of the customers, and they
12 would not be the assets of Lehman Brothers in your
13 example.
14         I guess it's necessary to put a small
15 caveat on that, which is, as we discussed
16 earlier -- I don't want to rehash what we
17 discussed earlier, but Lehman and/or a futures
18 broker typically would have some of its own assets
19 in the segregated account as a buffer to avoid
20 concerns at the clearing house that intraday or
21 daily margins can't be met.
22     Q     And are you making a distinction as
23 to who owns the buffer assets, as you have
24 described them, and the assets that are held to
25 secure the obligations of customers?

Page 83

Confidential - K. Raisler

1
2          MS. BLOOMER: Objection to the form
3      of that question.
4      A     Correct.  If there were to be a
5  default, all of those assets would be deemed to be
6  part of the customer estate and be used by
7  the customers before the excess, if there were
8  any, were to be returned to the broker.
9          However, if there were not to be a
10 default, and the business were to be wound down,
11 hypothetically, that buffer money could be
12 returned to the broker.
13     Q     I think I got your last answer, and I
14 appreciate that.  I just want to make sure that we
15 are not talking past each other.
16         The assets of the broker dealer, that
17 the broker dealer puts into such a segregated
18 account as a buffer for intraday trading, as you
19 describe, would you consider those to be the
20 assets of the broker dealer rather than of
21 customers?
22         MS. BLOOMER: Objection to the form
23     of the question.
24     A     Two comments there.  One is, it's not
25 just for intraday.  It would just generally be to

Page 84

Confidential - K. Raisler

1
2  complete margin calls as they occur.
3          As I indicated, it's a bit of a
4  hybrid.  If there were to be a default, that money
5  would be used by the exchange or the CFTC
6  administering that default as an asset for the
7  benefit exclusively of the customers, and only if
8  there were, if there was some money left over,
9  could it be potentially returned, but if there
10 were not a default, and if it were just to be sort
11 of shut down the business, buffer money might be
12 identified as separate monies that would go back
13 to -- assuming everything else gets paid out, that
14 would go back to the FCM.
15     Q     I think I understand that.  Thank
16 you.
17         Is it correct then to say that to
18 your understanding, sir, the -- someone other than
19 the broker dealer, in this case Lehman, has an
20 interest in the assets in the segregated account?
21         MS. BLOOMER: Objection to form.  Did
22     you say other than the broker dealer, in
23     this case Lehman?
24         MR. OXFORD:  Yes.
25         MS. BLOOMER: Objection to the form

Page 85

Confidential - K. Raisler

1
2  of the question.
3      A     Just for clarity, since this probably
4  comes up a number of times, your reference to the
5  broker dealer I don't object to except for the
6  fact that it's both a joint broker dealer and a
7  futures commission merchant, and it's only in its
8  capacity as a broker dealer that this issue comes
9  up.
10         But I think the answer to your
11 question is yes.
12     Q     And is it a particular exchange or
13 clearing organization that has an interest in the
14 segregated account?
15     A     It's the customers as a whole, as a
16 group in aggregate form that have an interest in
17 that account.
18     Q     Would, for example, the CME be able
19 to draw down from a customer seg account?
20         MR. LACY:  Perhaps -- I suppose it's
21     an objection.  But the two of you are -- I
22     am not sure you are both using the same
23     understanding of the word "interest."
24     Perhaps if the question could be more
25     detailed about what an interest means.

Page 86

Confidential - K. Raisler

1
2  Q     By interest, I mean any rights to.
3  A     The clearing house and the exchange
4  have no rights to any assets except -- well, to
5  any assets period.
6     In administering a default, they
7  would take over positions and use assets in a
8  segregated account to meet market-related demands,
9  but it shouldn't be implied that the clearing
10  house can put money in its pocket.
11  Q     Right.  I think I understand, then.
12  Thank you.
13     So, other than in the event of a
14  default by the FCM, the clearing house has no
15  ability to draw down money for variation margin or
16  initial margin, for example, from a customer seg
17  account; is that correct?
18     MS. BLOOMER:  Objection to form.
19  A     No, that is not correct.  I mean I
20  think, we have to go back a little bit to first
21  principles.  Basically the segregated account is
22  there to meet the daily requirements of the
23  customers as a whole to the clearing house, and so
24  the clearing house routinely will be drawing down
25  to meet the market-based obligations of the

Page 87

Confidential - K. Raisler

1
2  customers as a whole, and that will happen daily.
3  Q     And does the clearing house have a
4  right to draw down an unlimited amount from the
5  segregated account?
6  A     To the extent that it's needed to
7  meet obligations of the clearing house, yes.
8  Q     You said obligations of the clearing
9  house.  Did you mean obligations of customers?
10  A     Obligations of the FCM's customers to
11  the clearing house.
12     And then it's also important to
13  recognize that there is a default scenario which
14  we have been speaking to, but there is also the
15  ability of the exchange, if it has insecurity, to
16  take action as well.
17  Q     And what would that action be, sir?
18  A     That action would be similar to the
19  action that they took with respect to the
20  proprietary positions at the CME.  They could
21  direct some positions to be moved to another
22  futures broker.  They would need the CFTC to
23  assist them to make that happen.
24     Or they could direct that the trading
25  be for liquidation only, or they could literally

Page 88

Confidential - K. Raisler

1
2  take over the accounts and liquidate them
3  themselves.
4  Q     Is there any requirement that an FCM
5  maintain a buffer or an excess in a segregated
6  account, or is it simply common practice?
7  A     It -- it's common practice.  The
8  legal requirement for the FCM is that it has to
9  maintain net capital.  That net capital is part of
10  its capital structure, not necessarily money that
11  it puts into a segregated account.  The net
12  capital requirements are a percentage of the funds
13  in segregation.
14  Q     So would it be accurate to say that
15  an FCM could withdraw any excess in the segregated
16  account at any time?
17  A     I think it could withdraw money that
18  it had put up as its buffer, provided the exchange
19  did not have any insecurity, in which case the
20  exchange would not let them do that.
21     And I'm sorry, when I refer to
22  exchange there, I may be referring to the clearing
23  house.  The two are interchangeable when you are
24  dealing with something like the CME.
25  Q     Would the exchange or clearing house,

Page 89

Confidential - K. Raisler

1
2  Mr. Raisler, have a right to draw down money on a
3  daily or perhaps intraday basis not only from the
4  segregated account that is held at the clearing
5  house, but if there are separate bank accounts
6  that are held by the FCM, which is I think the
7  first example you gave, would the clearing house
8  also have a right to draw down monies from that
9  account?
10  A     Yes.
11  Q     Turning to the world then of secured
12  accounts, which I think you described as non-U.S.
13  futures markets cleared through a U.S. broker.
14  A     Correct.
15  Q     Can you tell me, sir, whether or not
16  the rights of the clearing brokers or exchanges
17  ex-U.S. are any different than the rights of the
18  exchanges or clearing houses in the U.S. under the
19  segregated accounts?
20     MR. LACY:  Can I just stop for a
21  moment and say that you are using someone
22  who is supposed to be a fact witness
23  basically to give you a lecture on
24  commodities regulations.
25     All of this stuff is available in the

Page 90

Confidential - K. Raisler

1  rules for you to look up yourselves, so I
2  hope this will not go on all day, and I
3  don't think it's fair to the witness
4  basically to make him take the day off of
5  work for his other clients to explain this
6  all to you.
7      Obviously we are happy to go on for a
8  while, but this should not be the day's
9  work.
10      A    The -- in structure and concept, the
11  answer should be yes. However, each foreign
12  clearing house has its own rules, and therefore,
13  each one of these secured amount and secured
14  account situations would have to be evaluated
15  based on the rules of each of the markets.
16      Q    To your knowledge, Mr. Raisler, did
17  Lehman as an FCM calculate the amount of money in
18  its customer segregated and secured accounts on a
19  daily basis?
20      MS. BLOOMER:  Objection, lack of
21  foundation.
22      MR. LACY:  Object to the form as
23  well.
24      Q    And my question is specifically

Page 91

Confidential - K. Raisler

1  directed towards the time period when you were
2  involved, sir, from the 15th onwards.
3      A    It would be effectively required to
4  do so by regulation.
5      Q    And would the calculation that Lehman
6  performed that week show whether or not there was
7  any excess in the segregated and secured accounts
8  for customers over and above that which was
9  required under regulation to be held?
10      MS. BLOOMER:  Objection to the form.
11  It lacks foundation.
12      A    I think it's important to just stop a
13  moment here and talk about the word "excess," and
14  particularly talk about it in the context of what
15  was going on in the week of September 15th.  Given
16  the amount of volatility in the market, not just
17  for Lehman, but for any futures broker that week,
18  you wouldn't -- you would know at a snapshot in
19  time, that is when the end of day, which as we
20  indicated these markets trade 24 hours, but there
21  is an arbitrary end of day calculation done where
22  the position is marked to market, I believe
23  typically at 3:30 or 4 p.m.
24      By the time you have run that

Page 92

Confidential - K. Raisler

1  calculation, which would be sometime thereafter,
2  usually several hours, you wouldn't know at that
3  point whether you were actually in line and know
4  where you stood with respect to excess versus
5  required capital to meet obligations.
6      So, theoretically I would answer your
7  question yes, but practically, particularly in a
8  volatile market, the answer is no.
9      Q    Is it your understanding,
10  Mr. Raisler, that Lehman was required to perform
11  segregated and secured calculations on a daily
12  basis?
13      MS. BLOOMER:  Objection to the form,
14  foundation.
15      A    That is correct, yes.
16      Q    And they were required to perform
17  those calculations by a particular time each day;
18  is that correct?
19      A    Not really.
20      MS. BLOOMER:  I am just going to --
21  before you answer, I'm going to object, and
22  I am just going to -- are you asking for his
23  legal opinion on what Lehman was required to
24  do?

Page 93

Confidential - K. Raisler

1      MR. OXFORD:  I'm asking if he knows.
2      MS. BLOOMER:  You are asking him what
3  is required.  Do you mean legally required
4  under a regulation?  Is that what you are
5  asking him?
6      MR. OXFORD:  I'm asking him if he
7  knows the answer to the question.
8      A    To my knowledge, there was no
9  specific time of day required.
10      Q    Do you know whether or not the
11  segregated and secured calculations were
12  scrutinized during the week of the 15th, sir, by
13  the CFTC?
14      A    I do not know.
15      Q    Did you ever see any customer
16  segregated and secured account calculations as
17  part of the investigation or the due diligence,
18  however you describe it, as part of your work
19  prior to the closing of the transaction on the
20  22nd?
21      A    I did not.
22      Q    Did you ask to see any segregated,
23  customer segregated and secured calculations?
24      A    I don't recall doing so.

Confidential - K. Raisler

1
2     Q     Do you know whether or not anybody at
3  Barclays asked for that information?
4          MS. BLOOMER:  Objection to form and
5      foundation.
6      A     I believe that was one of the topics
7  that was discussed in the meetings early in the
8  week.
9      Q     Do you know whether or not that the
10  results of the seg and secured calculations were
11  provided to Barclays at any time during the week
12  of the 15th?
13      A     I believe some information was
14  provided.  My recollection is it was at a high
15  level.
16      Q     Can you be more specific about what
17  you mean by a high level?
18      A     I believe that aggregate numbers were
19  provided.
20      Q     And what information would be
21  included in those aggregate numbers, again
22  specifically with respect to the customer
23  segregated and secured accounts of Lehman in the
24  week of the 15th?
25      A     My recollection is some numbers were

Confidential - K. Raisler

1
2  thrown out as to what the amount of seg and the
3  amount of secured were at various times, but they
4  were always going to be out of date by the time we
5  received them.
6      Q     Why would they be out of date, sir?
7      A     Because whenever they reported them,
8  they would be several hours at a minimum after the
9  actual mark to market times, and the markets were
10  moving rapidly, so they were retrospectively
11  reliable, but current time not.
12      Q     To your understanding, sir, did
13  Barclays have information about the seg and
14  secured calculations at more than one point over
15  the week of the 15th?
16          MS. BLOOMER:  I am going to object to
17      the question as to vagueness of the term
18      calculation.  Just so you are not talking
19      past each other, are you asking him about
20      the calculation meaning the requirement or
21      the actual balance in the accounts at any
22      given point?  I think there may be some
23      confusion.
24          MR. OXFORD:  That is a fair
25      objection.

Confidential - K. Raisler

1
2      Q     My questions, Mr. Raisler, are
3  directed to trying to find out what information,
4  if any, Barclays had about, on the one hand, the
5  required amount that Barclays -- sorry, Lehman was
6  obligated to have in the customer segregated and
7  secured accounts, and how much Lehman actually had
8  locked up compared with that obligation.
9      A     My recollection, and it is not very
10  precise, is that the numbers that were thrown
11  around were the total balances, not any breakdown
12  about the required versus other amounts.
13      Q     Do you know whether or not Barclays
14  knew at any time prior to the closing of the
15  transaction, sir, whether or not Lehman had locked
16  up in its customer segregated and secured accounts
17  sufficient assets to meet its obligations to those
18  customers?
19          MR. LACY:  I am going to object to
20      the form of that question.
21      A     I think I testified about this
22  earlier.  All I could say is that up until the
23  time of the closing, there had not been a default,
24  but that doesn't tell you whether -- you know,
25  what would be adequate under the circumstances,

Confidential - K. Raisler

1
2  because of the market's rapid changing of
3  positions.
4      Q     My question is not directed towards
5  any defaults post closing, Mr. Raisler.  My
6  question is whether or not Barclays knew whether
7  or not Lehman was in compliance with its
8  obligations under the CFTC regulations with
9  respect to the amount of collateral it had locked
10  up in its customer segregated and secured
11  accounts.
12          MS. BLOOMER:  Objection.
13          MR. LACY:  Object to the form of the
14      question.
15      A     It was my understanding during the
16  course of the week of the 15th that there were, in
17  total, in the segregated and secured accounts
18  monies sufficient to meet the margin calls that
19  the exchanges had imposed on those accounts.
20          That does not specifically answer
21  your question as to whether there was adequate
22  collateral in those accounts.
23      Q     Did you ask anyone at Lehman whether
24  or not there was adequate collateral in those
25  customer segregated and secured accounts to meet,

Page 98

Confidential - K. Raisler

1 first of all, the requirement under the CFTC
2 regulations?
3      A     See, no one could know that.  That is
4 the sort of -- I mean absent -- given the
5 volatility of the market and the uncertainty of
6 the market, that is always going to be an unknown,
7 more dramatically unknown when the markets are
8 moving rapidly.  In this context it was made
9 emphatically unknown because we weren't getting
10 complete information about positions.
11          MR. OXFORD:  Do we want to take a
12 five-minute break?
13          THE WITNESS:  Sure.
14          (Recess taken.)
15          (Exhibit 659-A marked for
16 identification as of this date.)
17          MR. OXFORD:  Back on.
18      Q     Mr. Raisler, I have handed you what I
19 have marked as Exhibit 659-A.  If you could take a
20 moment to review that and let me know when you are
21 done, please.
22          In the meantime, I will just identify
23 that for the record as an e-mail with the Bates
24 number BCISC 00009676, and the document goes
25

Page 99

Confidential - K. Raisler

1 through 9688.
2          MR. LACY:  Can you make out the
3 highlighting?
4          THE WITNESS:  Yes.
5          MS. BLOOMER:  This highlighting?
6          MR. LACY:  Just so we are all on the
7 same page, the first attachment to this is a
8 comparison with highlighted material, and
9 it's extraordinarily difficult to see what
10 is highlighted on the copy.
11          THE WITNESS:  I am not even sure that
12 is the case, but --
13          MR. LACY:  Well, the description on
14 the attachments.
15          THE WITNESS:  The third one.
16          MR. LACY:  Oh, the third?
17          THE WITNESS:  Yes.
18          MR. LACY:  I'm sorry.  Why do we have
19 three attachments?
20          THE WITNESS:  One is a Word version,
21 so I am mystified by that, too.
22          MR. LACY:  Got it.
23          MS. BLOOMER:  Is that supposed to be
24 highlighted or not?
25

Page 100

Confidential - K. Raisler

1          MR. LACY:  Apparently it's not.  That
2 is apparently some sort of copying defect.
3          THE WITNESS:  Can we go off the
4 record for a moment?
5          MR. OXFORD:  Sure.
6          (Discussion held off the record.)
7          MR. LACY:  Exhibit 659-A was a copy
8 apparently of the document that was
9 produced.  The witness pointed out that the
10 third attachment is supposed to be a
11 blackline.  It's not a blackline of the same
12 document of which the first two attachments
13 are copies and which would suggest that
14 there appears to be a mistake in the
15 production, which I will clear up.
16          MR. OXFORD:  Thank you.
17      Q     Mr. Raisler, with that on the record,
18 my questions are going to focus primarily on the
19 first attachment to Exhibit 659-A.
20          Do you recognize that document, sir?
21      A     Yes, I do.
22      Q     Can you tell me what it is, please?
23      A     This is the request letter to the
24 CFTC that I previously described as the request

Page 101

Confidential - K. Raisler

1 for a bulk transfer order.
2      Q     You will see, turning to the e-mail
3 that sends this to the CFTC, it appears to be sent
4 by your partner, David Gilberg, and on Friday,
5 September 19th, just after 10 a.m.
6          Do you see that?
7      A     Yes.
8      Q     And sent to Paul Wasserman, John
9 Lawton, and there is another name that I don't
10 think you mentioned before.  Is that Natalie
11 Markman?
12      A     Yes, it is.
13      Q     Did you have any conversations with
14 Ms. Markman about the transfer of futures business
15 to Barclays from Lehman?
16      A     Yes, we did.
17      Q     Can you tell me what those
18 conversations were, please?
19      A     They would be similar to the
20 conversations we had with the other people we have
21 identified.  The only specifics is that I believe
22 working on this letter we had conversations back
23 and forth with Natalie on suggested changes or
24 clarifications.
25

Page 102

Confidential - K. Raisler

1
2    Q    Did you or anyone else at Sullivan &
3    Cromwell send drafts of this letter to the CFTC?
4    A    Yes.
5    Q    Sitting here today, do you have any
6    recollection of how many drafts were sent?
7    A    I'm sure more than one, but probably
8    only a couple.
9    Q    As best you can recall, sir, when was
10   the first draft sent?
11   A    I believe probably the prior day.  I
12   believe all of this was negotiated in about a
13   24-hour or so time period.
14   Q    The negotiation of this letter with
15   the CFTC, did it take place with the three
16   individuals who are the recipients of the e-mail
17   that is Exhibit 659-A?
18   A    Yes.
19   Q    Were there others at the CFTC who
20   were also involved?
21   A    Ananda Radhakrishnan was also
22   involved.
23   Q    If you could turn to your letter,
24   sir, that is the first attachment to the e-mail,
25   and you will see if you look on the third page, it

Page 103

Confidential - K. Raisler

1
2    appears to be an executed copy.
3    A    I believe that is a fourth page, but
4    it is signed, yes.
5    Q    I am sorry, I thought I said fourth
6    page.  My mistake.
7         Is that your signature, sir, or did
8    someone sign on your behalf?
9    A    That is not my signature.  That looks
10   like David Gilberg's signature.
11   Q    Signing on your behalf?
12   A    That's correct.
13   Q    Did you authorize Mr. Gilberg to sign
14   on your behalf?
15   A    I did.
16   Q    If you could turn to the second page
17   of your letter, please, sir.  You will see the
18   first full paragraph begins, "Pursuant to the
19   agreement."
20   A    Correct.
21   Q    Do you have that?
22   A    Yes.
23   Q    It reads, "Pursuant to the agreement
24   LBI will transfer all customer accounts, including
25   100 percent of each customer's net equity, as

Page 104

Confidential - K. Raisler

1
2    reflected on the books of LBI, to the LLC. "
3         Do you see that?
4    A    Yes.
5    Q    That letter contemplates a transfer
6    of the futures business into a newly formed
7    Delaware limited liability company; is that
8    correct?
9    A    Among other things, yes.
10   Q    Did the transfer to the LLC ever
11   happen?
12   A    To my knowledge, no.
13   Q    Were you aware, sir, whether or not
14   Barclays -- withdrawn.
15        Were you aware, Mr. Raisler, whether
16   or not Lehman cleared futures positions for its
17   affiliates either in the U.S. or ex-U.S.?
18   A    Yes, I am aware.
19   Q    Can you tell me, sitting here today,
20   do you know which affiliates that it cleared
21   positions for?
22   A    In the U.S. markets, I believe it
23   cleared for all of its affiliates.
24   Q    Do you know whether or not Lehman
25   cleared for its affiliates outside of the U.S.?

Page 105

Confidential - K. Raisler

1
2    A    Yes.  It was my understanding that in
3    the U.S. markets, LBI, so we can be more precise,
4    cleared for all of the non-U.S. affiliates of
5    Lehman trading in U.S. markets.
6    Q    Do you know whether or not LBI
7    cleared for non-U.S. affiliates in markets outside
8    of the U.S.?
9    A    I don't believe LBI had clearing
10   rights with respect to any markets outside the
11   U.S., or at least I am not aware of any.
12   Q    Was it your understanding of the
13   business agreement between Lehman and Barclays,
14   sir, that the accounts that non-U.S. affiliates
15   had with LBI for clearing futures in the U.S.,
16   that those accounts would be transferred to
17   Barclays?
18        MS. BLOOMER:  Objection to form.
19   A    My understanding was that all of the
20   accounts were to be transferred to Barclays.
21   Q    Did you ever have any discussions
22   with anyone, Mr. Raisler, as to the treatment of
23   the Lehman affiliate accounts elsewhere in the
24   transaction between Lehman and Barclays, by which
25   I mean other than as it relates to the futures

Page 106

Confidential - K. Raisler

1  business?
2  MS. BLOOMER:  Objection to form.
3  A    I am sorry, I am going to need you to
4  restate that, because I wasn't sure I followed
5  you.
6  Q    Let me try it this way.  I think you
7  just testified that if a Lehman affiliate outside
8  of the U.S., such as LBIE, for example, had an
9  account with LBI through which LBI would clear
10  LBI's business in the U.S., for example at the
11  CME, that was an account that would be transferred
12  to Barclays.
13  MS. BLOOMER:  Again I'm going to
14  object to form and vagueness of the term
15  "account."
16  MR. LACY:  You mean futures account.
17  MR. OXFORD:  Right.
18  MS. BLOOMER:  I still object.
19  BY MR. OXFORD:
20  Q    Does that accurately reflect your
21  understanding that the futures account of the
22  non-U.S. Lehman affiliate would be transferred to
23  Barclays?
24  A    Yes.  That was my understanding.

Page 107

Confidential - K. Raisler

1  Q    And did you have an understanding,
2  sir, that other than in respect of futures
3  accounts, that affiliate accounts of LBI were not
4  being transferred to Barclays?
5  MS. BLOOMER:  Objection, lacks
6  foundation.
7  THE WITNESS:  I am sorry, could you
8  read that back again.
9  (Record read.)
10  A    I was not involved in issues
11  associated with non-U.S. affiliates of Lehman's
12  accounts other than in the context of futures, so
13  I would not be in a good position to answer that
14  question.
15  Q    The answer is you don't know?
16  MS. BLOOMER:  Objection, and instruct
17  the witness not to answer to the extent it
18  calls for the disclosure of privileged
19  communications with Barclays.
20  A    I don't recall.
21  Q    That's fine, thank you.
22  Sticking with paragraph -- the
23  second -- sorry, the first full paragraph on page
24  two of your letter, Mr. Raisler, you go on to say,

Page 108

Confidential - K. Raisler

1  "Some of these accounts are accounts that contain
2  no open commodity positions and accounts that are
3  in deficit within the meaning of certain CFTC
4  regulations."
5  Do you see that?
6  A    Yes.
7  Q    Others may be, quote, house accounts
8  as defined in Regulation 190.01W.
9  A    Correct.
10  Q    Do you see that?
11  A    Yes.
12  Q    I don't mean to mischaracterize that.
13  I know there is another cite to the CFR after
14  that.
15  Was it your understanding that you
16  were seeking in this letter, Mr. Raisler, the
17  CFTC's consent for a bulk transfer of LBI
18  proprietary futures trading accounts from Lehman
19  to Barclays?
20  A    Basically this letter asks for CFTC
21  permission for the transfer of three frequent
22  types of accounts.  If I can read from the bottom
23  of page two, it would be the house accounts, as
24  you just read in the sentence that you just

Page 109

Confidential - K. Raisler

1  highlighted; accounts that are in deficit, which
2  would normally not be transferable except for
3  permission; and accounts that have no open
4  commodity contracts.
5  All three of those accounts without
6  permission would not be transferable.
7  Q    And house accounts are --
8  A    The house accounts -- I'm sorry.
9  Q    House accounts are the accounts
10  through which Lehman or LBI would conduct
11  proprietary trading; correct?
12  A    If I can restate your comment a
13  little differently.  The house accounts defined in
14  190.01W would be all of the proprietary accounts
15  of Lehman, which would include the accounts of
16  affiliates which otherwise would be customer
17  accounts on the books of Barclays.
18  Q    What do you mean when you say they
19  would otherwise be customer accounts?
20  A    When they are transferred from
21  Lehman, the affiliate accounts are not anymore
22  affiliates, they are customers.
23  Q    The second type of account permission
24  for the transfer of which you are seeking in this

Page 110

Confidential - K. Raisler

1 letter is accounts that are in deficit.  What do
2 you mean when you write accounts that are in
3 deficit?
4     A     Basically that means an individual
5 customer account on the books of Lehman -- I guess
6 technically it could include an affiliate as well,
7 but a customer account on the books of Lehman is
8 in fact in deficit, so it is -- there is a
9 shortfall in that account, and the -- that
10 individual customer owes and has an outstanding
11 margin call.
12     Q     The third category is accounts that
13 have no open commodity contracts.  Can you explain
14 what you mean by that, please?
15     A     A commodity contract for this purpose
16 would be a futures position, and some of those
17 accounts may have open, open trade equity, that is
18 cash or securities, in their segregated account,
19 but no actual active futures position.
20     Q     Would the accounts that you describe
21 in point three at the bottom of page two of your
22 letter include proprietary accounts, house
23 accounts, or would that be limited to customer
24 accounts?

Page 111

Confidential - K. Raisler

1     A     I believe that the house accounts are
2 covered by one, and so three would not refer to
3 house accounts.
4     Q     Okay.  Moving back up to the first
5 full paragraph on page two, the last sentence in
6 your letter says, "We understand that LBI has
7 sufficient segregated and secured amount funds, as
8 well as sufficient regulatory capital pursuant to
9 the provisions of the Commodity Exchange Act and
10 the Commission's regulations thereunder."
11     Do you see that?
12     A     Yes.
13     Q     Can you tell me what you meant by
14 this sentence?
15     A     I think this is some of what we
16 discussed before the break, that up until the time
17 of this letter, there had been no defaults by
18 Lehman in terms of meeting its obligations to the
19 various clearing houses of which it was a member.
20     As I indicated before the break as
21 well, that doesn't indicate how much capital and
22 collateral there was for the future obligations,
23 which obviously is the point of concern by the
24 OCC, by the CME and by the CFTC as well, and why

Page 112

Confidential - K. Raisler

1 there is a need to get this relief.
2     Q     Can you tell me, Mr. Raisler, how it
3 is you get from the position where there is a lack
4 of default by Lehman, in its futures trading, to a
5 conclusion that there is sufficient segregated and
6 secured amount funds?
7     A     Well, as indicated here, some of the
8 customers are in deficit potentially, so with
9 respect to those customers, there would be
10 inadequate clearing, segregated or secured funds,
11 so it must mean that other customers or the
12 buffer, if you will, made it, at that snapshot in
13 time, sufficient in terms of secured and
14 segregated funds, as well as the regulatory
15 capital is not -- is separate.
16     But the secured and segregated funds
17 would be an aggregate, as I indicated earlier.
18 The account would be a customer seg account which
19 would aggregate all of the customer seg positions.
20 Effectively, to oversimplify, some customers'
21 money is being used to protect those customers
22 that are in deficit, so that the total amount of
23 money is sufficient.
24     Q     And it's also true in addition to

Page 113

Confidential - K. Raisler

1 customer A potentially covering the obligations of
2 customer B, Lehman's buffer money --
3     A     Correct.
4     Q     -- would also be covering the
5 obligations of a customer who may be in default;
6 is that correct?
7     A     Be clear.  In deficit.
8     Q     Sorry.
9     A     We didn't say default.
10     Yes, that is correct.  The
11 combination of excess, some customers having more
12 in segregation than would be required, combined
13 with the buffer, allowed this representation to be
14 made at this point in time.
15     Q     Okay.  To be clear, is this
16 representation that you made to the CFTC based on
17 something other than the fact that Lehman hadn't
18 defaulted at any exchange or clearing
19 organization, up until the date on which you
20 e-mailed the letter?
21     A     That would be true with respect to
22 the seg and secured amounts.  The sufficient
23 regulatory capital would be a separate calculation
24 that would have been represented to us by Lehman.

Page 114

Confidential - K. Raisler

1
2    Q    Okay.  We will get to regulated
3    capital in a second, and I appreciate the, the
4    care with which you answered that.
5            Focusing on your statement in your
6    letter to the CFTC, "We understand that LBI has
7    sufficient segregated and secured amount funds,"
8    can you tell me what, what that statement is based
9    on.
10    A    It's based on, one, the absence of
11    default, and two, I assume some representations
12    that confirm that, that we got from Lehman.
13    Q    Focusing on the second part of your
14    answer, the representations that you assume you
15    got from Lehman, can you be more specific about
16    any representations you received that LBI has
17    sufficient segregated and secured amount funds
18    before you wrote this letter to the CFTC?
19    A    Well, I think that they were able to
20    confirm what we generally knew, which is that
21    there had not been any defaults.  We would take
22    significant comfort in that alone, and we were in
23    separate touch with the exchanges and clearing
24    houses, although that wouldn't guarantee we would
25    have been so informed.

Page 115

Confidential - K. Raisler

1
2    Q    So are the representations that,
3    underpin -- withdrawn.
4            The representations to you,
5    Mr. Raisler, that underpin your statement to the
6    CFTC, are simply representations from Lehman that
7    there have been no defaults at the exchanges or
8    clearing organizations in the customers
9    business -- sorry, futures business, or did they
10    make additional representations?
11    A    I would -- I believe that they made a
12    representation to us consistent with the words in
13    that sentence.
14    Q    So are you essentially repeating to
15    the CFTC what LBI has represented to you?
16    A    It's actually backwards, but yes.
17    And by backwards, I mean that the CFTC demanded we
18    make this representation as a condition to their
19    taking the action, and so we would have been
20    inclined to make the representation if we could
21    make it and confirmed it by the two methods I have
22    described, no default and the corresponding
23    representation from LBI.
24    Q    Why would the CFTC -- withdrawn.
25            Do you know why the CFTC demanded

Page 116

Confidential - K. Raisler

1
2    that this representation be contained in your
3    letter?
4    A    I don't believe we ever specifically
5    discussed it.  But if this were not the case, then
6    they would be looking to take more dramatic action
7    and may not be prepared to allow a movement of the
8    type described in this letter.
9    Q    Do you know -- withdrawn.
10            Mr. Raisler, do you know who at LBI
11    provided the representation to you about the
12    sufficiency of LBI's segregated and secured amount
13    funds that you then used as a basis for your
14    letter to the CFTC?
15    A    I don't precisely recall it, but
16    again it would be probably the same group led by
17    Jeff Jennings.
18    Q    I think I have this from your earlier
19    testimony, but I just want to be sure.  Is this
20    statement about your understanding of the
21    sufficiency of LBI's segregated and secured amount
22    funds, is that based on any calculations that you
23    or anyone working at your direction or Barclays'
24    saw in connection with those accounts?
25            MS. BLOOMER:  Objection.

Page 117

Confidential - K. Raisler

1
2    A    I can answer the first part, which is
3    not me nor anybody under my direction.  I don't
4    believe anybody else at Barclays, but I couldn't
5    be sure.  And just to be clear on that point, I
6    think the use of the words "we understand" are
7    important in that regard.
8    Q    Who is the "we" there, sir?
9    A    I think "we" in this context is
10    probably Sullivan & Cromwell, as best reading of
11    the letter.  We said, "on behalf of our client,"
12    Barclays Capital, Inc., this is a request, so I
13    think it would be -- and we use the term "we"
14    throughout.  I assume we are talking the firm in
15    submitting this letter requested.
16    Q    So it is Sullivan & Cromwell's
17    understanding that LBI has sufficient segregated
18    and secured amount funds for what purpose, sir?
19            MS. BLOOMER:  Objection to form.
20    A    I think the language of the sentence
21    picks it up, pursuant to the provisions of the
22    Commodity Exchange Act and Commission regulations.
23    Q    And in layman's terms, sir, is that
24    your understanding -- in the last sentence of this
25    paragraph we are looking at that begins "we

Page 118

Confidential - K. Raisler

1  understand," does that equate to your
2  understanding that there is not a shortfall in the
3  segregated and secured amount funds that LBI was
4  required under the Commodities Exchange Act and
5  the Commission's regulations to maintain?
6
7         MS. BLOOMER:  Objection to form.
8     A     That one got a little complicated.
9     Q     Yeah, sorry.  Let me try this again
10  with a little better syntax.
11    A     Okay.  Particularly if we can avoid
12  using "layman" when referring to Lehman.  That is
13  particularly confusing.
14    Q     In writing that last sentence, sir,
15  that begins, "We understand," did, did you believe
16  that LBI did not have a shortfall in the
17  segregated and secured amount funds that it was
18  required to maintain pursuant to the Commodity
19  Exchange Act and the Commission's regulations
20  thereunder?
21    A     That would have been our
22  understanding at this moment in time, yes.
23    Q     Thank you.
24         Moving down the page to the next
25  paragraph, the last sentence of that reads,

Page 119

Confidential - K. Raisler

1
2  "Moreover, regulation 190.06E2.  Do you have that,
3  sir?
4     A     Yes.
5     Q     It goes on to say, "prohibits the
6  transfer in respect of any eligible account of
7  property whose value," quotes, "would exceed the
8  funded balance of such account, based on available
9  information as at the close of business on the
10  business day immediately preceding the transfer,"
11  close quotes, "less the value of prior transfers."
12         Do you see that sentence?
13    A     Yes, yes.
14    Q     What was the purpose of including
15  that sentence in your letter, sir?
16    A     Because we were seeking an exemption
17  from that prohibition, so it clarified, as the
18  other parts of the letter did, what we were
19  seeking and the contours in which we were seeking
20  it.
21    Q     Can you explain to me what
22  prohibition you were seeking exemption for?
23    A     In this regard, there are certain
24  permitted movements of accounts between FCMs, in
25  the context of a bankruptcy or in other contexts.

Page 120

Confidential - K. Raisler

1
2  There are other things that are prohibited absent
3  CFTC express approval.
4         We were seeking express approval for
5  a number of things, one of which was if an account
6  had -- if an individual customer's account had
7  collateral in excess of that customer's
8  requirements, that that money would move with the
9  customer's account.
10    Q     In any part of your letter that I
11  marked as 659-A, the final signed one, are you
12  seeking permission from the CFTC to move to
13  Barclays from LBI any LBI funds that you have
14  described previously as a buffer, the additional
15  monies that LBI kept in the customer segregated
16  and secured accounts?
17    A     We would not need permission from the
18  CFTC to do that.
19    Q     Thank you.  That's all I have for
20  that exhibit.  Let me mark another one.
21         (Exhibit 660-A marked for
22         identification as of this date.)
23
24    Q     Mr. Raisler, I have handed you what I
25  have marked as Exhibit 660-A, which is an e-mail

Page 121

Confidential - K. Raisler

1
2  with the Bates number BCISC 00009653, and the
3  attachments run through 9665.
4         If you could take a moment to review
5  that and let me know if you have seen it before
6  and let me know when you are done, please.  Also,
7  to the extent you identify any of the possible
8  production errors we referenced earlier with this
9  document, if you can let me know that, too.
10         MS. BLOOMER:  Does anyone know why
11    the bottom Bates number is the same on all
12    of these pages, or on at least a few anyway,
13    9662?
14         THE WITNESS:  It has multiple
15    numbers.
16         MS. BLOOMER:  Right, but the bottom
17    number is the same Bates label on multiple
18    pages.
19         THE WITNESS:  It isn't so on the --
20         MR. OXFORD:  I don't know.
21         MR. LACY:  And I don't know.
22         MR. OXFORD:  As long as we can
23    refer --
24         MR. LACY:  What are you looking at?
25         MS. BLOOMER:  Do you see this says

Page 122

Confidential - K. Raisler

1    9654?  The bottom of the two Bates numbers
2    doesn't seem to be correct, but the top one
3    does.
4         MR. LACY:  The bottom should just be
5    ignored.  The bottom number should just be
6    ignored.
7    A    Okay.
8    Q    Do you recognize this document, sir?
9    A    Yes, I do.
10   Q    Can you tell me what it is, please?
11   A    We are referring specifically to the
12   first one of the three?
13   Q    Yes.  The e-mail.
14   A    The e-mail.  Oh, the e-mail.  Okay.
15        The e-mail is an update about two
16   hours later to the CFTC with a new letter that
17   changes via deletion the structure of the
18   transaction to eliminate the intermediate LLC
19   arrangement that was discussed and described in
20   the prior letter.
21   Q    And is the first attachment to that
22   letter, sir, is that the final executed letter?
23   A    Yes, it's an executed letter that is
24   intended to supersede the letter that we just

Page 123

Confidential - K. Raisler

1    finished discussing, the 659-A.
2    Q    Again, sir, on the last page, that is
3    not your signature on 660-A, is it?
4    A    No.  Again, it is Mr. Gilberg's.
5    Q    Did you authorize Mr. Gilberg to sign
6    for you?
7    A    I did.
8    Q    Is it correct, Mr. Raisler, that the
9    updated letter doesn't change in any way the
10   representation as to Sullivan & Cromwell's
11   understanding as to the sufficiency of the
12   segregated and secured amount funds that we
13   discussed earlier?
14   A    Correct.  This letter only changes,
15   as I recall it and understand it, the LLC
16   references that were in the letter that we
17   previously discussed.
18   Q    Now, this letter also makes a
19   representation, sir, as to Sullivan & Cromwell's
20   understanding of the sufficiency as to LBI's
21   regulatory capital; is that correct?
22   A    In that respect, it's not different
23   from the last letter.
24   Q    I am only asking with respect to this

Page 124

Confidential - K. Raisler

1    letter because I realize I forgot to ask you with
2    respect to the first letter.  I don't mean to
3    confuse.
4    A    Right.
5    Q    What did -- what did you mean when
6    you wrote to the CFTC that you understood that LBI
7    has sufficient regulatory capital?
8    A    As we discussed earlier, regulatory
9    capital is required under CFTC legislation and
10   rules consistent with a formula that relates to
11   the surmise of the customer seg and secured assets
12   that it's holding on behalf of customers, and so
13   here we would have received a representation, I am
14   sure, from Lehman, that they had sufficient
15   regulatory capital.
16        I did not myself check that.  I don't
17   know whether anybody at Barclays did either.
18   Q    Do you know whether or not anyone at
19   Sullivan & Cromwell checked that for you?
20   A    I am certain that nobody else at
21   Sullivan & Cromwell checked that for me.
22   Q    Are you able to testify as to the
23   source of the representation made to you about the
24   sufficiency of LBI's regulatory capital other than

Page 125

Confidential - K. Raisler

1    to say generally that someone at Lehman must have
2    done it?
3         MS. BLOOMER:  I'm going to object to
4    the extent you keep saying sufficiency of
5    the regulatory capital and leaving off the
6    regulations pursuant to which it speaks to
7    sufficiency.
8    Q    Trish's objection is a fair one.  I
9    don't mean to mischaracterize your letter.  I am
10   simply seeking that you tell me, as best you are
11   able to today, who at Lehman gave either you or
12   anyone else at Sullivan & Cromwell the
13   representation that LBI had sufficient regulatory
14   capital pursuant to the particular provisions of
15   the Commodity Exchange Act and the Commission's
16   regulations that you reference in your letter to
17   the CFTC.
18   A    In answer to your previous question,
19   you are correct.
20   Q    I am correct that you not able to
21   tell me beyond a statement generally that someone
22   at Lehman must have done so, but sitting here
23   today, sir, you are not able to tell me who that
24   person was?

Page 126

Confidential - K. Raisler

1
2     A     That is correct.
3          (Exhibit 661-A marked for
4     identification as of this date.)
5
6     Q     Mr. Raisler, I have handed you what I
7  have marked as Exhibit 661-A, which is an e-mail
8  BCISC 00009298, with an attachment that goes
9  through 9301.
10    A     Correct.
11    Q     Can you tell me, please, focusing on
12  the attachment to the e-mail, what that document
13  is, please?
14    A     I am sorry, you want me to focus on
15  the e-mail or the attachment?
16    Q     The attachment to the e-mail.
17    A     The attachment is a letter from the
18  CFTC to me, that approves the request set forth in
19  the letter we just finished discussing for
20  authorization to transfer the accounts, and the
21  terms and the conditions described in the prior
22  request.
23    Q     That it is all I have for that one,
24  sir.
25          Were you involved, Mr. Raisler, in

Page 127

Confidential - K. Raisler

1
2  Barclays' assumption of Lehman's -- I should say
3  LBI's rights and obligations in its futures
4  business, by which I mean specifically
5  implementation of how Barclays assumes
6  responsibilities for those accounts?
7          MS. BLOOMER:  Objection to form.
8     A     Generally, yes.
9     Q     Can you tell me, please, what your
10  role was in that regard.
11    A     In the week starting September 22nd,
12  after the approvals, a process began to move
13  positions and funds from Lehman to Barclays.  I
14  was involved in a series of meetings and
15  discussions about effectuating that.  In
16  particular, moving the funds was quite complex and
17  was the subject of a lot of back and forth
18  involved, not just Barclays and Lehman, but the
19  CFTC, the trustee, and JPMorgan.
20    Q     Which funds are you referring to in
21  that last answer, sir?
22    A     Broadly stated, the collateral that
23  was securing the customer positions at the U.S.
24  futures exchanges, as well as the collateral that
25  was supporting positions on non-U.S. exchanges.

Page 128

Confidential - K. Raisler

1
2     Q     Are these the same funds that were
3  held in the customer segregated and secured
4  accounts that you have testified to earlier?
5     A     Yes, that is correct.
6     Q     Why was the movement of those funds
7  complex, sir?
8     A     We hadn't anticipated it would be
9  that complex in the U.S., where the rules are
10  quite clear.  However, there was a number of
11  players who wanted to get comfort that they would
12  be protected if they moved the funds.  And so a
13  process had to be developed in order to effectuate
14  those movements.
15    Q     Who are those players, sir?
16    A     Well, I guess in particular, JPMorgan
17  as the bank that was holding the seg and secured
18  funds, they wanted to make sure that transferring
19  those funds to Barclays would be consistent with
20  authorizations that had been obtained through the
21  bankruptcy.
22    Q     To your knowledge, sir, did JPMorgan
23  get the comfort they were seeking in this regard?
24    A     They did from the trustee.
25    Q     Tell me what you know about that,

Page 129

Confidential - K. Raisler

1
2  please.
3          MS. BLOOMER:  Objection, form.
4     A     I think the, the view that Barclays
5  had, and that we had as their counsel, was that
6  the bankruptcy court's approval was sufficient and
7  should have been sufficient for JPMorgan to
8  authorize the movement of the funds.
9          JPMorgan saw it differently, and
10  sought to get express approval from the trustee.
11  The form and content of that approval was
12  negotiated and it took a number of days.
13    Q     When did those negotiations take
14  place, sir?
15    A     I think the positions, the futures
16  positions moved on the 22nd.  So I would assume
17  that discussions about the collateral moving would
18  have begun at that time.  And I believe the funds
19  started to move and finally were relocated at
20  Barclays around the 20 -- I am sorry, around the
21  first week in October.
22    Q     The customer and -- customer
23  segregated and secured funds that were moved in
24  early October, sir, to your knowledge, did they
25  include any assets that were Lehman assets,

Page 130

Confidential - K. Raisler

1    specifically the buffer that you have described
2    earlier, between, I suppose the minimum that was
3    required to be in these accounts and what was
4    desirable from a business perspective to have in
5    these accounts?
6        MS. BLOOMER: Objection to form.
7        MR. LACY: Object to the form of the
8    question.
9        MR. OXFORD: Withdrawn.
10       Q    Did, did the accounts and the funds,
11   the segregated and secured funds that were being
12   moved in October, did they include LBI assets as
13   well as assets that were the property of
14   customers?
15       A    I think I can answer that question
16   this way: It was my understanding that all of the
17   property that was in the seg and secured accounts
18   moved to Barclays.
19       Q    And at the time it was moved, sir,
20   did you have an understanding one way or the other
21   as to whether the property included property of
22   LBI as well as property of customers?
23       A    I don't believe I had an
24   understanding one way or the other, other than my

Page 131

Confidential - K. Raisler

1    best recollection was that all of the collateral
2    in those accounts moved to Barclays.
3        Q    Okay. Just based on your general
4    experience and familiarity with the industry, sir,
5    would you have expected the property in those seg
6    and secured accounts that moved to Barclays to
7    include LBI property as well as customer property?
8        MR. LACY: Object to form of the
9    question.
10       A    Yes.
11       Q    Do you know one way or the other,
12   sir, whether that expectation was also Barclays'
13   expectation at the time the funds were moved in
14   early October?
15       MS. BLOOMER: Object. And I am going
16   to instruct the witness not to disclose the
17   substance of communications with Barclays.
18       A    Yes.
19       Q    Do you know, sir, that Barclays did
20   in fact expect that the customer seg and secured
21   amounts that were moved in early October did
22   include LBI assets in addition to customer assets?
23       MS. BLOOMER: Object to the form, and
24   the same privilege objection.

Page 132

Confidential - K. Raisler

1        THE WITNESS: I'm sorry. Can I get
2    that read back. I just want to understand
3    the word "knew" in that context.
4        (Record read.)
5        A    I think so, although I don't
6    specifically recall that discussion at that time.
7        Q    Do you know, Mr. Raisler, that --
8    withdrawn.
9        Do you know whether or not Barclays
10   knew at the time of the closing of the transaction
11   on the 22nd of September, whether or not the
12   customer seg and secured funds held by Lehman
13   included not just customer property, but LBI
14   assets as well?
15       MS. BLOOMER: I am going to object,
16   and I am going to object generally to you
17   asking this witness from Sullivan & Cromwell
18   questions about what he knew about what
19   Barclays believed at the time.
20       Obviously, that would have been
21   conveyed through discussions with counsel,
22   so I am going to instruct the witness not to
23   disclose the substance or things he learned
24   through communications with Barclays.

Page 133

Confidential - K. Raisler

1        To the extent there were discussions
2    that you had in the presence of third
3    parties in which you learned information
4    that would be responsive to the question,
5    you can answer.
6        A    I don't have anything to add to my
7    prior answers on this.
8        Q    Other than the transfer of segregated
9    and secured funds, Mr. Raisler, were you involved
10   in any other of the mechanics of the
11   implementation of Barclays' purchase of the Lehman
12   futures business?
13       A    In the U.S. largely, no. But outside
14   the U.S., we were looking at not just moving of
15   funds, but also moving of positions, and that was
16   a more complicated undertaking.
17       I guess also, I don't want to leave a
18   gap. In the U.S., I was also involved in not just
19   the seg and secured funds but also the movement of
20   positions and assets of a proprietary sort, either
21   positions of LBI or of its affiliates or of
22   customers of its affiliates.
23       Q    Turning first to your involvement
24   with the transfer of the U.S. business, sir. We

## Page 134

Confidential - K. Raisler

1  Confidential - K. Raisler
2  discussed earlier the transfer and assumption
3  agreement that was executed between Barclays, the
4  OCC and SIPA trustee.  Do you recall that
5  testimony?
6      A    Yes.
7      Q    Were there any other agreements put
8  in place in connection with U.S.-based futures
9  business with any other exchange or clearing,
10 organization to your knowledge?
11     A    No, there were not, to my knowledge.
12 I also don't specifically recall, but I don't know
13 that the transfer and assumption agreement dealt
14 with futures either.
15     Q    Can you tell me, please, what your
16 involvement was, sir, in moving proprietary assets
17 or positions of LBI or LBI's affiliates from
18 Lehman to Barclays?
19     A    I can recall generally discussions
20 with Barclays, with Lehman and with the exchanges
21 on those movements of funds and positions.  The
22 specifics are a little less clear.
23     Q    Who at Lehman were you discussing the
24 movement of positions and collateral with?
25     A    This, probably during this time

## Page 135

1  Confidential - K. Raisler
2  period would be more intensely with Ron Filler
3  than anybody else.
4      Q    What were your discussions with
5  Mr. Filler?
6      A    I think we, we shared information
7  about what we respectively learned, primarily in
8  the foreign markets, about what they were doing
9  with positions and what they were doing with
10 collateral.  And we discussed less actively what
11 was going on in the U.S., which was a little bit
12 clearer.
13     Q    Did Barclays enter into an agreement
14 with the Chicago Mercantile Exchange in connection
15 with its assumption of the rights and obligations
16 from Lehman of Lehman's futures business?
17     A    No.  One wouldn't expect that there
18 would be such an agreement, because the -- between
19 the order of the CFTC, which they would have
20 gotten a copy of, and the bankruptcy approval
21 order itself, the instructions were clear as to
22 what they would have to do.  They are actually
23 copied on the CFTC letter.
24     Q    Dealing with the ex-U.S. futures
25 positions, Mr. Raisler, did Barclays enter into

## Page 136

1  Confidential - K. Raisler
2  any agreements with any exchange, clearing
3  organization or other broker dealer in connection
4  with its assumption of LBI's rights and
5  obligations to the positions and collateral?
6      A    Not to my knowledge, and I think I
7  would know.
8      Q    Why would you think you would know?
9      A    Because in part that was one of the
10 things I was working on during the time period.
11 So had there been anything negotiated, I think I
12 would have heard about it.
13          Again, the exchanges and clearing
14 houses were taking action pursuant to whatever
15 their legal regime was, and there was a very
16 substantial amount of ambiguity about the legal
17 regimes around the world and actions that would be
18 taken, in particular confusion around releasing
19 funds there were held by affiliates of LBI who
20 might have been the introducing or clearing
21 members of those foreign exchanges.
22     Q    How is it Barclays went about getting
23 access to the positions and funds that were in
24 Lehman's futures accounts outside of the U.S.?
25          MS. BLOOMER:  Objection to form,

## Page 137

1  Confidential - K. Raisler
2  assumes facts not in evidence.
3      A    Well, first of all, that project is
4  still ongoing.  Those monies that -- in some cases
5  in some jurisdictions the positions moved without
6  the collateral, and in some situations the
7  positions didn't move and the collateral didn't
8  move.
9          As a general matter, the collateral
10 has been slow to move in every location around the
11 world, in part because or in large part because
12 the position collateral was being held by an
13 affiliate of Lehman who itself had
14 bankruptcy-related issues and concerns.
15          So, this was a very difficult
16 project, one in its scale that was without
17 precedent.  And so the ability to recover these
18 monies has been an ongoing process.
19          I think there has been some limited
20 amount of success with respect to a few foreign
21 accounts that were being held by third-party
22 brokers, but even there, those brokers have not
23 been willing to give the money to Barclays but
24 instead have returned the money to, broadly
25 stated, the Lehman estate, which means in those

Page 138

1          Confidential - K. Raisler
2   situations where Lehman has taken over the
3   positions -- I mean Barclays has taken over the
4   positions of Lehman in those foreign
5   jurisdictions, it's had to fund the obligations,
6   the collateral obligations, from its own account,
7   which just highlight the complexity of the
8   transaction, broadly stated.
9          Q    Are you able to tell me on an
10  exchange by exchange or broker dealer by broker
11  dealer basis where Barclays has moved positions
12  and/or collateral?  Again, outside the U.S.
13          MS. BLOOMER:  Objection to form.
14          MR. LACY:  I'm sorry.  Go ahead.
15          A    Okay.  I can answer that question
16  with respect to some of the jurisdictions but not
17  all.
18          Q    Okay.  With respect to the
19  jurisdictions where you can answer, can you tell
20  me where Barclays has moved positions and or
21  collateral?
22          MS. BLOOMER:  Objection to form.
23          A    I can give you my best understanding
24  of that.
25          Q    That is all I am asking for.

Page 139

1          Confidential - K. Raisler
2          A    Right.
3               In the U.K. my understanding is that
4   positions have moved to Barclays, but with very
5   limited exceptions collateral has not moved.
6               With respect to Germany and Eurex,
7   here again, positions moved and collateral has not
8   moved.  I think in this context without exception
9   collateral has not moved.
10              In Japan, there is supposed to be a
11  bankruptcy hearing coming up, at which to decide
12  whether to release the collateral funds, but
13  again, the positions have moved without the
14  collateral.
15              Singapore, the same.
16              In some jurisdictions that I haven't
17  named, exchanges liquidated the positions of the
18  customers leaving in question where the and how
19  the excess collateral, if there was any excess,
20  could be released and to whom, but that being
21  subject to the local jurisdiction's bankruptcy
22  regime.
23              In Australia, as I indicated earlier,
24  the positions moved, the collateral has not moved
25  to Barclays to this date, to my knowledge.  It has

Page 140

1          Confidential - K. Raisler
2   been released back to LBI, but not to Barclays.
3               To be complete, in each of these
4   contexts that I have just addressed to you, I may
5   not be completely current on events, because
6   things continue to move, and we have not been as
7   intensely involved as we were in the weeks
8   immediately following the transaction.
9          Q    In the instances where positions have
10  moved, Mr. Raisler, did Barclays enter into any
11  agreements with the broker dealers or any other
12  third party with whom or through whom these
13  positions were placed?
14          A    As I indicated, for the most part,
15  most of the jurisdictions in the world were, the
16  futures broker that LBI was trading through was an
17  affiliate of Lehman, and in almost all of those
18  cases that affiliate is in some sort of insolvency
19  regime.
20              There have been no agreements that I
21  am aware of with respect to any of them, and that
22  has locked up money in those situations.  The
23  positions are moved at the direction of the
24  exchange and clearing house rather than the
25  direction of the broker, and so positions can move

Page 141

1          Confidential - K. Raisler
2   even and collateral is stuck in an insolvent or
3   bankrupt entity.
4          Q    Has Barclays then been in touch with
5   foreign exchanges and clearing houses in an effort
6   to get those organizations to move the positions?
7          A    And the collateral, yes, and I would
8   also add to that equation, foreign regulators.
9          Q    Has Barclays entered into any
10  agreements with foreign exchanges or clearing
11  houses in connection with its efforts to have the
12  positions and collateral moved to Barclays?
13          A    Again, not to my knowledge, and I
14  think I would know.  Again, I think each of these
15  decisions are effectively self-effectuating
16  pursuant to local law, so, one wouldn't expect
17  that there would be agreements in those
18  situations.
19          Q    Has Barclays, to your knowledge,
20  Mr. Raisler, assumed all of LBI's obligations with
21  respect to futures trading at foreign exchanges
22  and clearing houses?
23          MR. LACY:  Objection.  Could you make
24  clear whether you are talking about the
25  obligations on the clearing house side as

Page 142

```
 1        Confidential - K. Raisler
 2   opposed to the customer side?
 3        MR. OXFORD:  Yes, sorry, I meant on
 4   the clearing house side.
 5     A    I'm sorry, lost the train of the
 6   question there.
 7     Q    Let me try it this way:  Has
 8   Barclays, to your knowledge, Mr. Raisler, assumed
 9   LBI's clearing obligations with respect to the
10   former Lehman futures positions at foreign
11   exchanges and clearing houses?
12        MR. LACY:  Objection.  That made it
13   worse.
14     A    To the extent I understand your
15   question, I think the answer is yes.  When the
16   positions moved, to the extent that they moved to
17   Barclays, Barclays would assume the obligations to
18   the clearing house that previously had been
19   assumed by the affiliate or other entity that was
20   previously clearing those positions for LBI.
21        MR. OXFORD:  Can we go off for a
22   second.
23        (Recess taken.)
24   BY MR. OXFORD:
25     Q    Mr. Raisler, I am handing you what
```

Page 143

```
 1        Confidential - K. Raisler
 2   has been marked previously in these depositions as
 3   Exhibit 556.  If you could take a moment to review
 4   that and let me know whether you have seen this
 5   document before, please.
 6     A    Yes.
 7     Q    In what context have you seen that
 8   document, sir?
 9     A    I think I have seen it near
10   contemporaneous with the date on it at one of the
11   early meetings.
12     Q    Do you know who Alasdair Hodge is?
13     A    Yes, I do know who Alasdair Hodge is.
14     Q    Who is he?
15     A    Alasdair Hodge is, I guess,
16   technically I think Tim Stack's boss.  He runs
17   futures or at the time I think he ran futures
18   globally, whereas Tim Stack ran futures in the
19   U.S.
20     Q    Generally speaking, Mr. Raisler, does
21   this memorandum reflect the meeting that you
22   attended on the 15th of September, 2008, that you
23   testified to this morning?
24        MR. LACY:  Object to the form of the
25   question.
```

Page 144

```
 1        Confidential - K. Raisler
 2     A    Broadly stated.  The goal of the
 3   meeting on Monday was to talk about a potential
 4   acquisition of the Lehman Brothers futures
 5   business, and this memo speaks to that, so, to
 6   that extent, yes.
 7        I think the memo -- I think as we
 8   discussed earlier, other events sort of overtook
 9   this memo in terms of a broader acquisition
10   effort.  This is actually a siloed -- this memo
11   reflects a more siloed discussion of just looking
12   at this business and not all the other capital
13   markets activity that was going on within the
14   Lehman-Barclays world.
15     Q    If you turn to the third paragraph
16   that begins, "Lehman Brothers' future business
17   overview."  Do you see that?
18     A    Um-hum.
19     Q    It says, "Lehman's futures business
20   consists of approximately 100 institutional
21   clients and total global futures revenues of
22   approximately $250 million."
23        Do you see that?
24     A    Yes.
25     Q    Does that reflect the discussion that
```

Page 145

```
 1        Confidential - K. Raisler
 2   took place on September 15th at the meeting that
 3   you had with Barclays and Lehman that day?
 4        MR. LACY:  I object to the form of
 5   the question.  I don't know what you mean by
 6   "reflect."
 7     Q    Do you understand the question, sir?
 8     A    Let me try to answer it in my words.
 9        I think during the course of the
10   meeting, these were the broad high-level data
11   points that were shared by Lehman with the
12   Barclays team.
13     Q    And those high-level data points
14   include the sentence I just read or at least the
15   substantive information contained in the sentence
16   I just read about what Lehman's futures business
17   consists of in terms of clients and revenue?
18     A    Correct.  And while not trying to get
19   ahead of you, the rest of the paragraph as well.
20     Q    Okay, thank you.  I appreciate that.
21        Towards the bottom of that paragraph,
22   sir, in the memorandum, it notes that Lehman
23   futures operates under two legal entities, LBI
24   being the U.S.-based FCM and LBIE being the
25   European-based FCM.  Do you see that?
```

Page 146

Confidential - K. Raisler

1
2    A    Yes.
3    Q    Was it your understanding as of the
4    date of this memo, the 15th of September, that
5    Barclays was intending to buy both the U.S.-based
6    FCM and the European-based business?
7        MS. BLOOMER: Object to the form of
8    the question.
9    A    That needs a little clarification. I
10   think that, again in my words, I think that the
11   transaction was to take over all of the
12   futures-based businesses of LBI and its
13   affiliates. So, it would embrace the futures
14   customers that were -- I am pausing here because I
15   think that the transaction that was being
16   discussed was -- on the 15th was really about
17   LBI's business.
18        It interacted with its affiliates in
19   a variety of ways, and some of those affiliate
20   customers ultimately could have come over to LBI,
21   but -- to Barclays. But I think that the deal
22   that I -- as I am now thinking about it, was to
23   taking over the LBI futures business, and to the
24   extent that there were other businesses, that was
25   really not part of the transaction.

Page 147

Confidential - K. Raisler

1
2    Q    Okay, thank you.
3        Do you recall any discussion between
4    Barclays and Lehman at the meeting on the 15th or
5    at any time that week about the creditworthiness
6    of Lehman's clients?
7    A    Yes. I think that there were some
8    again high-level discussions about high-quality
9    clients.
10   Q    Can you be a little more specific
11   about what those discussion were?
12   A    I think there were some clients who
13   were identified who would have been known to us,
14   both Barclays and myself, as important or premier
15   institutional users in the market.
16   Q    Do you recall any discussions that
17   week, Mr. Raisler, about any clients that would
18   not be considered premier or might be considered a
19   credit risk for Barclays to take on as customers?
20        MS. BLOOMER: Objection to form.
21   A    I think during the course of the week
22   of September 15th, a lot of blue chip
23   institutional customers became credit risks, so,
24   it was a chaotic time period, and Lehman itself
25   might have been considered blue chip even a week

Page 148

Confidential - K. Raisler

1
2    before, so I don't know that there was any real
3    security or feeling that any individual client was
4    in fact secure during this time period. And by
5    secure, I mean creditworthy.
6    Q    Under the heading transaction
7    benefits and risks, do you see there is a -- three
8    paragraphs down, the words "key risk" appear. Do
9    you see that, Mr. Raisler?
10   A    Yes.
11   Q    It says, "Loss of key clients due to
12   inability to execute expedient transactions." Do
13   you see that?
14   A    Yes.
15   Q    At any of the meetings that you were
16   present in, between Lehman and Barclays, were any
17   other risks to Barclays identified?
18   A    Yes. The financial risk of
19   non-performance was what we were spending almost
20   all of our time on. That could be a whole range
21   of non-performances, but as we tried to get a
22   handle on the accounts and the customers and the
23   proprietary positions, the risks that they
24   presented in a volatile chaotic market were the
25   center risks that I would have described

Page 149

Confidential - K. Raisler

1
2    discussing during that week.
3    Q    In your last answer you mean
4    non-performance by whom?
5    A    Non-performance by the Lehman
6    proprietary account positions, that is not having
7    sufficient capital to meet those losing positions,
8    and non-performance by individual customers on
9    their obligations as futures customers.
10   Q    Turning the page, sir, there is --
11   the second paragraph, number two, is headed
12   "Additional Capital Requirements." Do you see
13   that?
14   A    Yes.
15   Q    Did you have any understanding, sir,
16   at any time whether or not Barclays required its
17   acquisition of the futures business of Lehman to
18   be capital accretive?
19   A    I am sorry. I'm going to have to ask
20   you to define what you mean by "capital
21   accretive."
22   Q    Do you have any understanding of what
23   that term means, sir?
24        MS. BLOOMER: Objection to form.
25   A    I would be guessing.

Page 150

Confidential - K. Raisler

1    Q    You would be guessing as to what it
2    means to you?
3    A    Right. I didn't -- my accounting
4    classes are far behind me, and I wouldn't want to
5    be wrong in making a wrong assumption about what
6    you mean there, so.
7    Q    Do you see under the second heading
8    the last sentence says, "We require senior
9    management approval related to such a capital
10    increase"?
11    A    Correct.
12    Q    Did you have any discussions with
13    anybody in the week of the 15th through the
14    closing of the transaction, sir, that Barclays be
15    required to increase their capital to take on the
16    futures business?
17        MS. BLOOMER: I object to the
18        question and instruct the witness not to
19        disclose the substance of communications
20        that were not held in the presence of Lehman
21        or any other third party.
22    A    I think from the earliest meetings
23    with Lehman and Barclays, it was understood that
24    additional capital would be required.
25

Page 151

Confidential - K. Raisler

1    Q    What is the basis for that answer,
2    sir?
3    A    The goal of the transaction was
4    substantially to increase the futures business of
5    Barclays. That was the opportunity that the
6    business people saw. And if are you going to
7    substantially increase your business, then that
8    means that you have more customer segregated funds
9    and therefore you need more capital.
10    Q    Were you ever involved, Mr. Raisler,
11    in any discussions about whether or not Lehman's
12    own proprietary assets in the futures business,
13    including but not limited to the buffer funds that
14    you described before in the customer seg and
15    secured accounts, would impact the need for
16    additional capital?
17        MS. BLOOMER: Objection to form.
18    A    None that I recall.
19    Q    Okay. That is all I have for that
20    exhibit. Thanks.
21        The letters, Mr. Raisler, that you
22    wrote to the CFTC that we looked at this morning,
23    do you remember those letters?
24    A    Yes.
25

Page 152

Confidential - K. Raisler

1    Q    I think I had marked them as 660-A
2    and 661-A.
3    A    I think 661 is the letter back. We
4    had 659-A and 660-A were the letters to, and 661-A
5    was the letter back.
6    Q    Thank you, appreciate that.
7        Did you get approval from Barclays
8    before you sent those letters to the CFTC?
9        MS. BLOOMER: Objection to form.
10        You can answer to the extent you
11        don't disclose the substance of your
12        discussions.
13    A    Yes.
14    Q    Was Barclays aware of the
15    representations from Lehman upon which you relied
16    in writing those letters, sir? And particularly,
17    I am directing this question to the
18    representations as to the sufficient segregated
19    and secured amount funds that we discussed
20    earlier.
21        MS. BLOOMER: Objection, lacks
22        foundation and same privilege objection and
23        instruction.
24    A    Again, with the caveats that we put
25

Page 153

Confidential - K. Raisler

1    on those representations from our discussion this
2    morning, the answer is yes.
3    Q    I am handing you, Mr. Raisler, a copy
4    of the asset purchase agreement in this matter
5    that has been marked previously as Exhibit 1.
6        Have you seen this document before,
7    sir?
8    A    Yes.
9    Q    When was the first time you saw this
10    document?
11    A    I don't recall, but it was
12    substantially after it was signed.
13    Q    Was it after the transaction closed
14    on September 22nd, 2008?
15    A    Yes. I may have had it sent to me by
16    somebody during the course of the dealings, but I
17    don't recall ever having sat down and read it for
18    months after.
19    Q    And you were not involved in the
20    negotiation of this document?
21    A    That is correct.
22    Q    And have you spoken with anybody who
23    was involved in the negotiation of this document,
24    specifically about the effect of this document, if

Page 154

1           Confidential - K. Raisler
2  any, on Barclays' acquisition of Lehman's futures
3  business?
4           MS. BLOOMER:  Objection, and I
5      instruct the witness not to disclose the
6      substance of discussions with Barclays or
7      its other representatives.
8      A     The answer is no.
9      Q     Is it safe to say, sir, then that you
10  don't have a view whether or not this document
11  conveys to Barclays any particular asset
12  associated with Lehman's futures business?
13          MS. BLOOMER:  Objection to form of
14     the question.
15     A     Actually, I don't have a view on this
16  document at all.
17     Q     That gets us done very quickly.
18     A     Right.
19     Q     Mr. Raisler, I am handing you what's
20  been marked as Exhibit 25 previously in this
21  matter, which is the clarification letter.  And
22  you will not be surprised to learn that I have a
23  similar set of questions with respect to this
24  document as I did --
25     A     You are not going to be surprised to

Page 155

1          Confidential - K. Raisler
2  hear the same answers then; right?
3      Q     I will not.
4           When was the first time you saw this
5  document, sir?
6      A     I might have seen it the same time I
7  saw the asset purchase agreement, which would have
8  been sometime substantially after the transaction
9  closed.
10     Q     Did anyone consult with you,
11  Mr. Raisler, to your knowledge, during the
12  drafting of this agreement?
13          MS. BLOOMER:  Objection.
14          MR. LACY:  About the agreement?
15          MR. OXFORD:  Yes.
16     A     No.
17     Q     And just so we are clear, this
18  clarification letter is dated the 20th of
19  September, but it was executed on or about the
20  22nd of September, 2008.  That doesn't change your
21  last answer, does it?
22     A     No, it does not.
23          MS. BLOOMER:  Objection to the form
24     of that question.
25     Q     And conversely, you don't have an

Page 156

1          Confidential - K. Raisler
2  opinion as to whether or not this document
3  transfers to Barclays any particular asset that
4  relates in any way to Lehman's futures business?
5          MS. BLOOMER:  Object to the form.
6      A     As with my comment on the asset
7  purchase agreement, I don't have a view on the
8  document at all.
9      Q     Okay, thank you.
10          Mr. Raisler, I'm handing you the
11  transfer and assumption agreement in this case
12  previously marked as Exhibit 51.  If you could
13  just take a moment to review that document and let
14  me know when you are done, sir.
15          MS. BLOOMER:  Do you know whose
16     handwriting is on that first page?
17          MR. OXFORD:  The underlining?
18          MS. BLOOMER:  Yes.
19          MR. OXFORD:  I do not.  To the best
20     of my knowledge, this is the execution copy.
21     A     Okay.
22     Q     You have seen this document before,
23  sir?
24     A     Yes, I have.
25     Q     When was the first time you saw this

Page 157

1          Confidential - K. Raisler
2  document?
3      A     This document I might have seen as
4  early as Friday the 19th in some kind of draft
5  form.
6      Q     How is it you came to see a draft of
7  it?
8      A     I think as I --
9      Q     Of this document, sir.
10     A     I'm sorry.
11          I think as I testified earlier, I had
12  been in contact with OCC, and they had expressed
13  concerns about their security around the Lehman
14  accounts over the Friday settlement and the
15  weekend.  And as a result, there were discussions
16  about creating some degree of certainty for OCC,
17  and while I didn't draft, and to my best
18  recollection didn't comment, on this agreement, I
19  was made aware of it, and it was the plan to
20  address OCC's concerns.
21     Q     To your understanding, Mr. Raisler,
22  does this document govern the futures that are
23  cleared through the OCC?
24     A     Yeah, I testified this morning that I
25  didn't think so.  Looking at it now, and I don't

Page 158

Confidential - K. Raisler

1 remember -- the definition here is the account,
2 and it references number 74, 84 and 273. I think
3 that -- and my recollection is a little rusty on
4 this -- I think that 84 might have been the
5 futures account, in which case I would amend my
6 testimony from this morning to say that this
7 agreement does cover the futures account.
8        The reason I didn't or I wasn't clear
9 about that this morning is that we did not and
10 were not aware as of the 19th that there were
11 futures, at least to the best of my recollection.
12    Q    Are the futures, Mr. Raisler, that
13 are cleared through the OCC, are those cleared
14 differently to futures cleared through an
15 organization like the CME?
16    A    No. They are cleared -- there is a
17 division of the OCC that is recognized as a
18 derivatives clearing organization that is
19 permitted by the CFTC to execute clearing
20 activities and clearing functions, and its
21 responsibilities are identical to any other
22 futures clearing house.
23        It is important, though, not to
24 confuse that activity with the clearing that OCC

Page 159

Confidential - K. Raisler

1 does for equity options, which is done through a
2 different part of OCC. I mean it's certainly --
3 on reflecting on my earlier comment, I apologize,
4 it would certainly make sense that the transfer
5 and assumption agreement would cover futures,
6 because presumably it would cover everything, all
7 of the obligations that may be at risk at the OCC.
8        The reason I think -- I didn't think
9 it -- the reason I testified that it may not have
10 is just because I didn't know that there were any
11 futures at the time this agreement was entered
12 into.
13    Q    That is all I have for that document,
14 sir.
15        Mr. Raisler, do you recall any
16 discussions with the CFTC as to the existence or
17 otherwise of excess seg and secured funds in
18 Lehman's accounts over and above the required
19 minimums in those accounts?
20        MS. BLOOMER: Object to -- actually,
21 I object to the form of the question.
22        MR. OXFORD: I won't object to the
23 form of that objection.
24    A    There was never any discussion with

Page 160

Confidential - K. Raisler

1 the CFTC about that, that I recall.
2    Q    Were you the only person from
3 Sullivan & Cromwell who was liaison with the CFTC
4 or was Mr. Gilberg also involved?
5    A    Mr. Gilberg was also involved, and
6 there could have been others as well, but I would
7 have been aware of what the communications were,
8 and I would be confident in saying it was never
9 discussed.
10        I should just caveat that answer by
11 saying that the way in which you characterize what
12 the account is and excess and words like that need
13 to be qualified by the answers I have given in
14 testimony I gave this morning about what that
15 means.
16    Q    I understand.
17        In your declaration, sir, you
18 describe in paragraph three in the last sentence,
19 that what you believe was the general
20 understanding of all participants was in relation
21 to what part of the LBI futures business was going
22 to be transferred to Barclays.
23    A    Correct.
24        MS. BLOOMER: I object to the form of

Page 161

Confidential - K. Raisler

1 that last question to the extent it was a
2 question.
3        MR. OXFORD: It was a question. I
4 think I got a yes.
5        MS. BLOOMER: I object to the form of
6 the question, vague use of the term "what
7 part of the business."
8 BY MR. OXFORD:
9    Q    The people who were in your meetings,
10 Mr. Raisler, the ones that you describe in your
11 declaration, were not the people who were
12 responsible for negotiating the business terms of
13 this transaction between Lehman and Barclays
14 insofar as it pertains to the futures business;
15 correct?
16        MS. BLOOMER: Object to the form.
17    A    That was my understanding, correct.
18    Q    Are you aware who, if anyone, on
19 behalf of Lehman actually agreed to transfer the
20 business, the futures business, as you describe in
21 paragraph three of your declaration?
22    A    Not in name, no.
23    Q    In any other manner are you able to
24 identify such a person for me?

Page 162

Confidential - K. Raisler

1
2      MS. BLOOMER: Objection to form.
3      A    I can't identify an individual. In
4  that sense I don't know that I can help you out.
5      Q    Is there some other unit that is
6  larger than an individual that you can identify
7  for me who you believe agreed to the transaction
8  that you described in the last sentence of
9  paragraph three of your declaration?
10      A    Well, I mean to the extent that the
11  team that I was working with was implementing a
12  strategy to effectuate this proposal, it certainly
13  was the assumption that Lehman, LBI, Inc., the
14  trustee, people responsible were the ones who were
15  going to allow us to do that. Otherwise, we were
16  wasting a lot of time. That is how I came to that
17  conclusion.
18      Q    But that conclusion is not based on a
19  conversation with anybody who represents or had
20  authority to negotiate on behalf of LBI, is it?
21      MS. BLOOMER: Objection to form and
22  foundation.
23      A    I don't think it -- it did not
24  result -- it did not come from a conversation with
25  anybody who had authority to negotiate for LBI.

Page 163

Confidential - K. Raisler

1
2      Q    And has anyone identified to you,
3  Mr. Raisler, just to close this line of
4  questioning, whether the deal that you described,
5  as your understanding based on what you say in
6  paragraph three of your declaration, was actually
7  agreed to by anybody on behalf of LP?
8      MS. BLOOMER: Object to form of the
9  question and instruct the witness --
10      MR. OXFORD: Let's try that one a
11  again.
12      Q    You told me that you don't have an
13  understanding based on any conversation with
14  anybody as to what the precise business terms of
15  the deal were as agreed to by LBI; correct?
16      MS. BLOOMER: Objection to the
17  characterization of the testimony.
18      A    I am not sure that's what I would
19  say. I think the best answer I can give you, at
20  the risk of some repetition, is that there was a
21  team of people at Barclays who spent the week
22  meeting with people at LBI to implement a transfer
23  of assets and interests consistent with paragraph
24  three.
25      Each of us were under the clear

Page 164

Confidential - K. Raisler

1
2  understanding, impression, whatever other word you
3  want to use, that this was the deal that LBI was
4  proposing to enter into with Barclays. It was not
5  as a result of a conversation with anybody
6  negotiating that deal, but the word from on high
7  came down, and this is what the people in the
8  trenches were doing. And I was there in the
9  trenches.
10      Q    I understand, thank you. I think I
11  have your testimony on that.
12      A    Right.
13      Q    Did you have any discussions with
14  anyone, Mr. Raisler, at any time about the need
15  for an accounting as to -- withdrawn.
16      Did you have any discussion with
17  anyone at any time, Mr. Raisler, about whether
18  Barclays needed to keep track of any customer seg
19  and secured funds for monies in those accounts
20  that belonged to LBI?
21      MS. BLOOMER: Object to the form of
22  the question, and an instruction not to
23  answer to the extent it requires you to
24  disclose the communications you have had
25  with Barclays.

Page 165

Confidential - K. Raisler

1
2      A    I confess I lost that question
3  somewhere in the middle.
4      Q    I think the question might have too.
5      Let me try it this way: You had
6  discussions, Mr. Raisler, that you testified to
7  earlier on about the difficulties in transferring
8  the customer segregated and secured funds to
9  Barclays; correct?
10      A    That is correct, yes.
11      Q    I believe you also testified that you
12  believed there were monies in those segregated and
13  secured accounts that exceeded the obligations to
14  customers that Barclays would be taking
15  responsibility for?
16      MS. BLOOMER: Objection,
17  mischaracterizes the testimony.
18      A    I'm struggling a little bit with
19  words likely "responsibility for." If I can
20  potentially clarify.
21      Q    Please.
22      A    It was my understanding that all of
23  those funds were both domestically and to the
24  extent there were funds outside of the U.S., were
25  to come over to Barclays. That was my

Page 166

1    Confidential - K. Raisler
2  understanding of the transaction.
3    Q    And was it also your understanding of
4  the transaction that all of those funds would come
5  over to Barclays even if there was -- there were
6  more customer seg and secured funds than were --
7  there were obligations to customers that Barclays
8  was taking responsibility for?
9    A    Yes.
10    Q    That is the buffer that we talked
11  about earlier; correct?
12        MS. BLOOMER:  Objection to form.
13    A    It could be a variety of things, one
14  of which I guess could be something like a buffer,
15  but the point I would make is that as we looked at
16  the transaction, in the week of September 15th,
17  all of those assets that were in segregated and
18  secured accounts were to be transferred to
19  Barclays along with all of the positions that were
20  represented in those various accounts; in
21  addition, the proprietary positions and the assets
22  that were supporting those proprietary positions.
23  That was my understanding.
24    Q    Did you ever have any discussions
25  with anyone, including the trustee's office, about

Page 167

1    Confidential - K. Raisler
2  whether any part of the customer seg and secured
3  funds might be returned to the LBI estate?
4    A    Absolutely not.
5    Q    Did you ever consider whether or not,
6  independent of any conversations you had with the
7  trustee or anyone representing the trustee, that
8  there might be a need for any part of the customer
9  segregated and secured amount funds to be returned
10  to the LBI estate?
11        MS. BLOOMER:  Objection to form.
12    A    I sorry.  I am not sure that is a
13  different question from the last one.
14        MR. LACY:  He's asking about your
15    understanding instead of your conversations.
16
17    Q    Rob is right.
18    A    Okay.  No, I did not.
19        (Exhibit 662-A marked for
20    identification as of this date.)
21
22    Q    I am handing you, Mr. Raisler, a
23  document that has been marked as Exhibit 662.
24        MR. LACY:  662-A, I hope.
25        MR. OXFORD:  You are keeping me

Page 168

1    Confidential - K. Raisler
2  honest today.
3        MS. BLOOMER:  I'm going to object.
4    We might have to have to call this document back,
5    Neil.  It appears that it contains contents
6    of communications between Barclays and its
7    lawyers.  So, I would like a little bit of a
8    break to consider this before we go into
9    questions about it.
10        MR. OXFORD:  Okay.  Do you want to
11    take five minutes?
12        MS. BLOOMER:  Yes, please.
13        (Recess taken.)
14        MR. OXFORD:  Ready to go back on?
15        MS. BLOOMER:  For the record,
16    Barclays inadvertently produced a privileged
17    document, Bates number BCIEXS 00116806
18    through 07.  And we are going to be formally
19    exercising our clawback rights under the
20    established process after the deposition,
21    but effective immediately, would ask that no
22    further reference be made to the document by
23    the other side or any other adverse party.
24        MR. OXFORD:  That is fine, Trish.  We
25    will review your request when we receive it,

Page 169

1    Confidential - K. Raisler
2    and I won't make any further reference to
3    that document in this deposition.
4    Q    Mr. Raisler, independent of the
5  document that I had marked as 662-A, I just want
6  to make sure that I have your testimony that you
7  never considered -- withdrawn.
8        I just want to make sure that
9  independent of 662-A, I have your testimony as to
10  whether or not you ever considered that there be a
11  need for an accounting or the possible return of
12  some portion of the customer segregated and
13  secured funds that were transferred to Barclays as
14  part of Lehman's futures business.
15        MR. LACY:  I'm sorry, hold on a
16    second.
17        I take it you mean a return to the
18    estate, not to a customer.
19        MR. OXFORD:  Yes.
20        MR. LACY:  Okay.
21    A    As I previously testified, I was not
22  aware of any consideration being given to
23  returning any of those funds, which were part of
24  the transaction and part of the transfer, as I
25  understood it.

Page 170

```
1          Confidential - K. Raisler
2          MR. OXFORD:  Can we go off for a
3     second.
4          (Discussion held off the record.)
5          MR. LACY:  Back on the record.
6          Mr. Oxford has shown me a document
7     that was produced by Sullivan & Cromwell in
8     response to a subpoena in this case, number
9     SC 3897 through 3905.
10         The top half of the first page of
11    this is privileged.  It was produced
12    inadvertently, pursuant to, I think it's the
13    protective order and provision concerning
14    the inadvertent disclosure, we request the
15    return of the top half of the first page of
16    this document.
17         No privilege is claimed with respect
18    to the bottom two e-mails or to the
19    attachment, so if you want to go ahead and
20    ask about the attachment, feel free to go
21    ahead and ask about the attachment.
22         MR. OXFORD:  You are claiming
23    privilege on the most interesting part of
24    the e-mail, so I will hold my questions for
25    now.  Thank you.
```

Page 171

```
1          Confidential - K. Raisler
2     BY MR. OXFORD:
3      Q     Just going back to the last question
4     and answer before we broke, Mr. Raisler, I
5     realized in reviewing the record I asked a
6     compound question, so I want to break it up.
7          Did you ever consider the need for an
8     accounting with respect to Barclays' acquisition
9     of Lehman's customer segregated and secured
10    accounts?
11         MS. BLOOMER:  I object to the form of
12    the question, the undefined vague use of the
13    term "accounting."
14     A    I am not sure what is meant by the
15    term "accounting," although I am inclined to think
16    that I didn't.
17     Q    In my question I mean that the
18    contents of the customer segregated and secured
19    accounts had to be tracked in case there was a
20    need to return any of those customer segregated
21    and secured funds to the Lehman estate.
22     A    No.
23         MS. BLOOMER:  Objection to form, I
24    think.
25         (Exhibit 663-A marked for
```

Page 172

```
1          Confidential - K. Raisler
2     identification as of this date.)
3      Q    Mr. Raisler, I am handing you what I
4     have marked as Exhibit 663-A, which I will
5     identify for the record as an e-mail with the
6     Bates number SC 00003451 and an attachment that
7     goes through 3453.
8          If you could take a moment to review
9     that and tell me if you have seen it before.
10     A    Yes, I am familiar with this.
11     Q    How is it you are familiar with it,
12    sir?
13     A    This was part of a discussion that I
14    was involved in with the OCC that actually dates
15    all the way pack to the transfer and assumption
16    agreement as OC -- as Barclay's was trying to
17    recover assets owed to it pursuant to the terms of
18    that agreement.
19     Q    Did Barclays, to your knowledge, ask
20    the OCC to write this letter?
21     A    My best recollection is they, they
22    proposed to write it.  We were in discussions with
23    them as they were trying to figure out what to do
24    with these assets, and they were sort of advancing
25    this in the interest of sorting that out.
```

Page 173

```
1          Confidential - K. Raisler
2      Q    Did you discuss this request with JPM
3     Chase at any time, sir?
4      A    I believe there were some discussions
5     with JPMC during the course of this.
6      Q    Were there discussions with JPM Chase
7     themselves or counsel for Chase?
8      A    I'm sure it would have been counsel.
9     I don't know whether it would have been inside
10    counsel or outside counsel.
11     Q    And did you comment on this letter
12    before it was sent, sir?
13         MS. BLOOMER:  Objection.  Before it
14    was sent to whom?
15         MR. OXFORD:  That's a good objection,
16    Trish.  Thank you.
17     Q    Did you -- let me try it this way:
18    Did you see a draft of this letter prior to the
19    November 4th draft that appears to be sent to you
20    by Jim McDaniel on the 6th of November?
21     A    I believe so.  I don't recall
22    precisely, but I believe so.
23     Q    Do you believe that draft was sent to
24    you by Mr. McDaniel?
25     A    Yes.  I'm sorry to be -- the word
```

Page 174

Confidential - K. Raisler

1  "that" in that question referring to the earlier
2  draft?
3      Q    The earlier draft, yes.
4      A    Yes.
5      Q    Did you provide comments on the
6  earlier draft provided by Mr. McDaniel?
7      A    I don't have a precise recollection,
8  but I might have been the one who referred him to
9  JPMC to make sure that their thoughts and
10 considerations were taken into account.
11     Q    Did you provide Mr. McDaniel comments
12 on the draft that is attached to the e-mail that
13 we are looking at, 663-A?
14     A    I don't believe so. I think that
15 this -- to my best recollection, this form looks
16 pretty final to me.
17     Q    That is all I have for that.
18     I make no promises, but this may be
19 my last document. I think it is.
20     A    Okay.
21     (Exhibit 664-A marked for
22     identification as of this date.)
23     Q    Mr. Raisler, I have handed you a
24 document that I have marked as 664-A, which is a

Page 175

Confidential - K. Raisler

1  Friday the 19th, 3 p.m. e-mail, with the subject
2  "Domestic and Foreign Calculations," and two
3  attachments.
4      If you could take just a moment and
5  review it and let me know whether you have seen
6  the e-mail or the attachments before.
7      A    I don't believe that I have seen this
8  before. Or at least I don't recall seeing it
9  before.
10     Q    Are you able to tell, just from your
11 review of the documents -- I understand that you
12 don't, sitting here today, think you have seen
13 this before. You don't recall seeing it before.
14     Are you able to tell me what the two
15 attachments are?
16     MR. LACY: Object for lack of
17     foundation.
18     A    I am not familiar with this form of
19 document. Obviously I could read the subject line
20 and tell you what the subject line says, but as
21 far as how the math works or anything like that, I
22 can't, I can't be helpful.
23     In fact, I can't -- on the second
24 document, I can't make the math work, so I am not

Page 176

Confidential - K. Raisler

1  really sure I follow it.
2      Q    You testified before lunch, sir,
3  about the interests that certain exchanges and
4  clearing organizations have in segregated and
5  secured accounts. Do you remember that testimony?
6      A    Yes, I think it was sort of muddled,
7  but yes.
8      Q    If it were muddled, I am not sure it
9  was the fault of the witness, rather it's the
10 questioner.
11     Is it your understanding, sir, that
12 an organization such as the CME would have a lien
13 over all assets in Lehman's, that is LBI's
14 segregated customer bank account?
15     MR. LACY: Object to the form of the
16     question.
17     A    There would be a form of a lien that
18 the CME clearing house would have. It doesn't
19 really accord very well with the traditional UCC
20 security interest type concept. So I think it can
21 be confusing.
22     But the CME would say that to the
23 extent that the customer or house accounts
24 respectively of any clearing member of the

Page 177

Confidential - K. Raisler

1  exchange are needed to meet the obligations of
2  those respective accounts, they would have a call
3  on those assets for that purpose, and they would
4  have the ability, as we discussed this morning, to
5  reach into a segregated account even at a non-CME
6  clearing house bank location to use those funds to
7  meet margin calls.
8      So in that sense, I think it probably
9  would be equivalent to, although they don't
10 usually use the term "lien."
11     MS. BLOOMER: Neil, I don't mean to
12     interrupt your questioning, but do you know
13     whose document this is? I mean I don't know
14     who the sender is, and I don't see any Bates
15     number on it. I am just wondering who --
16     whose document this is. Is it an LBI
17     document? Is it a trustee document?
18     MR. OXFORD: I think it was created
19     on Friday afternoon, September 19th, prior
20     to the appointment of the SIPA trustee.
21     MS. BLOOMER: Okay. So it's not a
22     trustee document.
23     MR. OXFORD: It's not created by the
24     trustee.

Page 178

Confidential - K. Raisler

1
2     MS. BLOOMER:  Do you know who Bianca
3   Castedo is?
4     MR. OXFORD:  Yes, I believe she was
5   formerly employed by Lehman, and I believe
6   she is currently employed by your client.
7     MS. BLOOMER:  Okay.  Thank you.
8     This document hasn't been produced by
9   anyone at all in the litigation, I take it.
10     MR. OXFORD:  Not to my knowledge.
11     Mr. Raisler, I don't think I have any
12   further questions for you at this time.  I
13   don't know if counsel for any other party
14   does.
15     MS. CRAWFORD:  The debtor doesn't.
16     MR. KAY:  No questions from the
17   committee.
18   EXAMINATION
19   BY MR. LACY:
20     Q     Mr. Raisler, you testified early this
21   morning about some uncertainty created by the fact
22   that the customer positions at a clearing house
23   are aggregated.
24     Do you remember that.
25     A     Yes, I do.

Page 179

Confidential - K. Raisler

1
2     Q     Was there a -- as part of this due
3   diligence that went on during the week of the
4   15th, was there a similar issue relating to the
5   house accounts?
6     A     Yes.  As I indicated this morning, at
7   the exchange level, they would have positions, and
8   they would have positions aggregated for all
9   customers in a single customer account.  In
10   addition, the proprietary positions would be
11   aggregated so that you won't know which positions
12   are LBI's, which positions are LBI's affiliates',
13   and which positions are the positions of customers
14   at LBI's affiliates, all of which would be
15   indicated on the proprietary -- in the proprietary
16   account at the clearing house.
17     So, while you could get certain
18   information from the clearing house, because of
19   its aggregate nature, you wouldn't be able to
20   distill out exactly where the exposures were and
21   whose responsibilities they were.
22     Q     And you also mentioned that Barclays
23   first learned of the VIX position on the morning
24   of the 21st, Saturday the 21st.
25     A     I think Saturday was the 20th.

Page 180

Confidential - K. Raisler

1
2     Q     Saturday the 20th?
3     A     Yes.
4     Q     Do you remember that?
5     A     Yes.
6     Q     What was the significance of that?
7     A     I think the significance of that is a
8   couple-fold.  It sort of highlights the
9   uncertainty around the disclosures, and it
10   emphasizes some of the points I make in my
11   declaration about not knowing exactly what was
12   going on except at the highest levels.
13     The VIX position, which was a
14   significant position, was not discovered, as I
15   recall, until Saturday, and the problem with the
16   VIX position is that it's a problem with
17   volatility, and at the time volatility was at
18   record levels, and it was a substantial position.
19   My recollection is it was a substantial portion of
20   the open interest on the exchange, in the
21   neighborhood of 30 percent, so that liquidating
22   the position would not have been easy, nor would
23   it have been easy to hedge the position.
24     I recall some discussions about that,
25   that it would have -- it would take up to two or

Page 181

Confidential - K. Raisler

1
2   even three weeks to actually unload that position
3   or to risk manage it, and so it was an example
4   where the amount of margin that had been called
5   for by the OCC for that position is -- was pretty
6   obviously in Barclays' eyes insufficient to marry
7   up with the exposure that that position had, if it
8   was going to take two to three weeks to liquidate.
9     I think it just emphasizes the levels
10   of uncertainty about positions and exposures that
11   were on the books as Barclays was trying to make
12   these decisions.
13     MR. LACY:  I have no further
14   questions.
15     MS. BLOOMER:  I don't have any
16   questions.
17     MR. OXFORD:  I have got some
18   follow-up on those questions and answers.
19   FURTHER EXAMINATION
20   BY MR. OXFORD:
21     Q     Starting at the end, Mr. Raisler, you
22   just testified that in Barclays' view the margin
23   at the OCC was not adequate -- I'm sorry, was not
24   insufficient to cover the exposure that the
25   position had if it was going to take two to weeks

Page 182

1          Confidential - K. Raisler
2    to liquidate?
3          A    Correct.
4          MR. LACY:  I think you misspoke.
5          A    Sufficient, not insufficient; right?
6          Q    Let's go back for one second.
7          Is it your testimony, sir, that the
8    margin that Lehman had posted at the OCC in
9    respect of the VIX positions was insufficient in
10   Barclays' eyes?
11         A    That is correct.
12         Q    And that is based upon a conversation
13   with Barclays; is that correct?
14         A    That's correct.
15         MS. BLOOMER:  I'm going to object and
16      instruct the witness not to disclose the
17      substance of communications with Barclay
18      that were not had in the presence of third
19      parties such as Lehman.
20         A    I think some of these conversations,
21   and I will try to remember as best I can, some of
22   them were within the presence of Lehman and some
23   were not.
24         MS. BLOOMER:  Okay.  So please stick
25      to the ones that were in the presence of

Page 183

1          Confidential - K. Raisler
2    Lehman.
3          Q    Was the basis of the testimony that
4    you gave in response to your partner's questions,
5    was that a conversation that you had in the
6    presence of Lehman or was it not?
7          MS. BLOOMER:  I'm going to object to
8      the extent that requires you to disclose the
9      ones that you had in the presence of only
10     Barclays.
11         A    My recollection is that it was a
12   conversation that was had in the presence of
13   Lehman as we were trying to figure out what the
14   exposure was of this position.
15         Q    Okay.  Who at Lehman's, sir?
16         A    Again, the same vagueness that I had
17   from this morning, but I would have assumed it
18   would be Jeff Jennings and Ron Filler, but I would
19   not be certain about that, and obviously others.
20         Q    Do you remember anyone advising you
21   that there was excess margin of approximately
22   $28 million in connection with the VIX positions?
23         MS. BLOOMER:  Objection, vague as to
24      time frame.
25         Q    Prior to the closing of the

Page 184

1          Confidential - K. Raisler
2    transaction, sir, on the 22nd.
3          A    I recall that there was some
4    discussion about the size of the margin and the --
5    a clear conclusion after discussion with Lehman
6    that the margin was significantly inadequate.
7          Q    Significantly inadequate for what
8    purpose, sir?
9          A    The risk of the position in the view
10   of Barclays, as we discussed it with Lehman, was
11   that this was an illiquid position in an extremely
12   volatile market, and it was a volatility index
13   that therefore had potential enormous swings to
14   it, and as a result, the margin that was being
15   required made assumptions about liquidity and
16   market moves that we thought were too
17   conservative, and therefore, the margin that was
18   already up at the clearing house was not by orders
19   of magnitude sufficient.
20         Q    And who calculated the required
21   margin at the clearing house, sir?  Was that the
22   OCC?
23         A    The OCC would have been the
24   calculator of that, yes.
25         Q    And it's your testimony that the

Page 185

1          Confidential - K. Raisler
2    OCC's requirement for the margins on the VIX
3    positions was unduly conservative -- withdrawn.
4          It's your testimony, sir, that the
5    margin that the OCC required Lehman at the time,
6    prior to the close of the transaction, to post in
7    respect of those VIX positions at the OCC was
8    inadequate to cover Lehman's and in turn Barclays'
9    long-term exposure to those positions?
10         A    I think the way I would characterize
11   it is that there was a significant risk that the
12   margin that had been posted would be insufficient,
13   and in that sense it was too conservative from a
14   risk-taking standpoint for the futures team to
15   take over that position with that small amount of
16   collateral.
17         Q    Was the risk that Barclays was
18   concerned about, sir, was that a risk of market
19   movement post closing?
20         A    Well, it would be a risk of -- since
21   we had guaranteed the OCC's position as of Friday
22   for Monday's close, as of Friday the 19th, it
23   would be a risk that would be in front of us at
24   the time that we discovered it on the 20th,
25   because it was already in effect as of the prior

Page 186

Confidential - K. Raisler

1  day, the 19th.
2  Q    Okay. Let's go back to the guarantee
3  on the 19th. Please tell me everything you
4  remember about Barclays' guaranteeing Lehman's
5  obligations to the OCC with effect from the 19th
6  of September, 2008.
7  MS. BLOOMER: Objection, asked and
8  answered.
9  A    I think simplistically the agreement
10  provides that we were pledging to OCC that any of
11  the obligations that occurred from the time of the
12  agreement forward would be obligations to be met
13  by Barclays.
14  Q    And when you say the agreement, sir,
15  what agreement are you referring to?
16  A    The transfer and assumption
17  agreement.
18  Q    When did Barclays sign the transfer
19  and assumption agreement, sir?
20  A    I understood it was sometime on the
21  19th.
22  Q    If I were to represent to you that
23  Barclays did not in fact sign that until a matter
24  of hours before the closing at around 8 a.m. on

Page 187

Confidential - K. Raisler

1  September 22nd, 2008, would that change your
2  testimony?
3  A    No, because it was effective as of
4  the 19th, as I understood it, regardless of when
5  it was signed.
6  Q    Because Barclays had agreed to this
7  in principle?
8  A    And ultimately when it was -- I guess
9  you could raise an interesting intellectual
10  question if Barclays had decided to walk away from
11  the agreement at that point, what would have
12  happened. I believe that the agreement when they
13  entered into it was intended to be effective as of
14  the 19th, and that was a pledge and representation
15  that had been made in order to satisfy the OCC,
16  not to take any actions with respect to these
17  positions.
18  Q    Who made that representation that the
19  transfer and assumption agreement -- withdrawn.
20  What is the basis of your testimony,
21  sir, that Barclays had agreed in principle to the
22  transfer and assumption agreement with effect from
23  some point on Friday, the 19th of September, 2008?
24  MS. BLOOMER: Objection, I think it

Page 188

Confidential - K. Raisler

1  may mischaracterize the witness' testimony.
2  He can clarify it.
3  A    The agreement itself says it's
4  effective as of September 19th close of business.
5  In the discussions that we had on the 18th and the
6  19th, that I had with OCC, it was clear to me that
7  Barclays was stepping up, as it did with the CME,
8  to take responsibility for what occurred over the
9  weekend.
10  I also understood from direct
11  conversations with the OCC, that their insecurity
12  required this type of action as of the 19th, so
13  all of those combined to lead me to that
14  conclusion.
15  Q    Did anybody at Barclays or acting on
16  behalf of Barclays tell you that with effect from
17  Friday the 19th, they had agreed to the TAA?
18  MS. BLOOMER: Object to the form of
19  the question, and I instruct the witness not
20  to disclose the contents of privileged
21  communications with Barclays.
22  A    I think that to the extent there were
23  such conversation, they would be governed by the
24  privilege that my counsel has highlighted.

Page 189

Confidential - K. Raisler

1  Q    Other than a privileged conversation,
2  sir, you are unable to tell me what the basis is
3  of your testimony that you believe Barclays agreed
4  to the TAA Friday, the 19th?
5  MS. BLOOMER: Objection. You are
6  characterizing what he said. He didn't say
7  that Barclays agreed to the TAA. He had a
8  discussion about something that was not
9  necessarily the exact same thing as the TAA,
10  Neil. You have to separate the two, I
11  think, to get a clear record.
12  A    Let me try to clarify, I think.
13  Q    Sure.
14  A    Which is sort of my answer earlier,
15  which is as a result of my conversations with the
16  OCC, as a result of my understanding of their
17  insecurities, and as a result of a demand which
18  they had made, which I had communicated back to
19  Barclays, all of those led me to understand that
20  Barclays had represented to the OCC that effective
21  the close on the 19th, that it was going to stand
22  by all of the obligations of LBI to OCC effective
23  the close of business the 19th?
24  Q    Okay. I think that is helpful, thank

Page 190

Confidential - K. Raisler

1  you. Let me just zoom in on the last part of your
2  answer there, sir.
3
4        And you said you understood that
5  Barclays had represented to OCC that effective the
6  close of the 19th, it was going to stand by all of
7  the obligations of LBI to OCC effective the close
8  of the 19th. When did Barclays make that
9  representation to the OCC, to your knowledge?
10       A    Okay. What I was trying to describe
11  was the data points that I had that led me to that
12  conclusion. I don't know when that was done. I
13  don't actually know if it was done, I don't know
14  who did it.
15       But all of the circumstances around
16  my activities and the comfort level that I got
17  from OCC at the end of the day on Friday, the
18  19th, led me to conclude that such a
19  representation almost certainly had to have been
20  made.
21       Q    But you don't know whether or not
22  such a representation was in fact made because you
23  don't have any direct knowledge, it's an
24  inference, sir?
25       A    No, no. I think we tried to separate

Page 191

Confidential - K. Raisler

1  this part of the discussion from what I may have
2  obtained through the attorney-client privilege.
3
4        Q    All right. So, I see what you are
5  saying. So, other than what you may have obtained
6  through the attorney-client privilege, you are
7  unable to identify what representation, if any,
8  was made by Barclays to the OCC as of the 19th of
9  September?
10       MR. LACY: I am going -- on the --
11       Q    As of and on the 19th of September,
12  2008.
13       MR. LACY: The agreement itself is as
14  of the 19th.
15       A    I think I have to rely on what I said
16  in answering the prior questions, yes.
17       Q    When you said, Mr. Raisler, that
18  Barclays had told you it considered the margin
19  that was posted at the OCC in respect of the VIX
20  positions we discussed was inadequate, who told
21  you it was inadequate?
22       MS. BLOOMER: I'm going to object.
23       And please, to the extent -- please.
24       Only disclose the communications that
25  you had in the presence of LBI or a third

Page 192

Confidential - K. Raisler

1        party.
2        I'm sorry, is there a concern with
3  that objection, Neil?
4        MR. OXFORD: No.
5        MS. BLOOMER: Okay. Thank you.
6       A    I am reasonably certain it would have
7  been Tim Stack.
8       Q    Was anyone else present for that
9  discussion with Mr. Stack?
10       A    We had a series of discussions, some
11  of which would be privileged, but some of which
12  would have also included, I believe, Jeff Jennings
13  and/or Ron Filler at Lehman as we were trying to
14  get to the bottom of the VIX exposure.
15       Q    And Mr. Stack told you what exactly
16  with respect to the inadequacy of the margin to
17  cover the risk to Barclays?
18       MS. BLOOMER: Same objection.
19       A    Beyond the high-level articulation I
20  have given you, I am not confident that the more
21  detailed conversations occurred in the presence of
22  Lehman rather than just with Mr. Stack alone or
23  with the team at Barclays alone.
24       Q    Did you have any discussions with

Page 193

Confidential - K. Raisler

1  anybody about the need for Barclays to have margin
2  over and above the OCC's minimum requirements in
3  order to protect Barclays against the future
4  market risk of movements of Lehman positions at
5  the OCC for which they were assuming
6  responsibility?
7        MS. BLOOMER: Same objection.
8       A    I think the discussions that we had,
9  that I had with the OCC on the 18th and the 19th,
10  highlighted that point from the OCC's perspective.
11  I know that concern was shared by Barclays as a
12  result of the meeting we had during the week
13  of the 15th.
14       Q    Do you have any other information
15  that answers my last question?
16       I am happy to have it read back.
17  Would you like it read back?
18       A    That's okay.
19       MS. BLOOMER: Again, the same
20  objection.
21       A    No more detail that doesn't implicate
22  the attorney-client privilege.
23       Q    Mr. Lacy asked you some questions
24  about the aggregation of proprietary positions.

Page 194

1           Confidential - K. Raisler
2    Do you remember that testimony?
3       A    Yes, I do.
4       Q    At which exchange or clearing
5    organization were proprietary positions
6    aggregated, sir?
7       A    Basically all of them in the U.S.,
8    and actually, I didn't discuss this in my
9    testimony earlier, but in exchanges around the
10   world, there is a commingling of customer and
11   proprietary in a single account in most
12   jurisdictions, certainly in the -- in Eurex and
13   Germany and a number of Asian exchanges.
14            Specifically in the U.S., there would
15   be a single proprietary account, as there would be
16   a single customer account, and the proprietary
17   account would include the positions of, in this
18   situation, LBI, but also LBI's affiliates and the
19   customers of LBI's affiliates.  All of them would
20   be aggregated in a proprietary account.
21      Q    Why would the customers of LBI
22   affiliates be aggregated in the proprietary
23   account?
24      A    Because under the foreign
25   jurisdictions from which those accounts would

Page 195

1           Confidential - K. Raisler
2    come, because we are talking about non-U.S.
3    affiliates of LBI, the -- those jurisdictions that
4    I just indicated don't distinguish between
5    customer and proprietary, so at the futures broker
6    level, let us say an LBIE level, they would have a
7    single account, and it would commingle proprietary
8    and customer.
9            So when it delivers the position to
10   LBI, LBI would know an account of LBIE or LBSF or
11   some other LBI entity.  It wouldn't know how much
12   of that account was proprietary to that affiliate
13   and how much of it represented customer positions
14   of that foreign affiliate.
15      Q    We covered this next series of
16   questions a little earlier, but I want to make
17   sure I understand what you know about this issue,
18   Mr. Raisler.
19            To your understanding of the business
20   deal, sir, how were the accounts of LBI affiliates
21   being treated in the transfer of the futures
22   business from Lehman to Barclays?
23            MS. BLOOMER:  Objection to form.
24      A    They would be treated -- let me be
25   sure I have this right.  I am not sure I knew then

Page 196

1           Confidential - K. Raisler
2    and I am not sure I recall now.
3       Q    Your letter to the CFTC that we
4    looked at earlier says, "Pursuant to the
5    agreement, LBI will transfer all customer accounts
6    including 100 percent of each customer's net
7    equity as reflected on the books of LBI to the
8    LLC."
9            Do you remember that passage, sir?
10      A    Yes.
11      Q    Is it your testimony that you simply
12   don't remember one way or the other whether
13   affiliates are included within what you meant when
14   you wrote to the CBTC about customer accounts
15   being transferred?
16            MR. LACY:  He has testified about
17       that at some point.
18      A    The affiliates would be included in
19   the house account provision of, of that letter,
20   not the customer provision of that letter.
21      Q    Okay.  Great.
22      A    Since the affiliate would be a house
23   account.
24            And the permission obtained from the
25   CFTC to transfer the house account to -- from LBI

Page 197

1           Confidential - K. Raisler
2    to Barclays is clear from the CFTC's letter.
3            What I don't know, did not know then
4    and don't recall now, was exactly what the terms
5    of the agreement between LBI and Barclays are in
6    terms of the -- sort of the -- not who is, if you
7    will, responsible for those positions, who gets to
8    own them.
9       Q    Do you know, sir, one way or the
10   other whether or not Barclays has charged back the
11   LBI estate for any costs incurred in connection
12   with LBI affiliate accounts?
13            MS. BLOOMER:  Objection to form and
14       to the use of the term "charged back."
15      A    I think I need some clarification.
16      Q    Do you know whether or not Barclays
17   has in any way looked to the LBI estate for the
18   costs it incurred in connection with any LBI
19   affiliate account that was transferred pursuant to
20   the provision in the CFTC letter of the 19th?
21            MS. BLOOMER:  Objection to form.
22      A    I don't know.
23      Q    I think we have covered it before.  I
24   just want to make sure I am not missing anything.
25            Do you know what steps, if any,

Page 198

Confidential - K. Raisler

1    Confidential - K. Raisler
2  Barclays has taken to close out positions on the
3  Tokyo Commodity Exchange?
4      A    I -- we talked earlier a little bit
5  about the Ministry of Finance in Japan.  My best
6  recollection is that the positions were moved,
7  that the customer positions were moved from the
8  LBI affiliate in Japan to the Barclays entity that
9  carries those positions, but that the collateral
10 supporting the positions is tied up in the LBI
11 affiliate bankruptcy in Japan.
12          And there has been communications
13 with, including the Japanese regulators, about
14 releasing those assets.  I believe that
15 proprietary positions of LBI in Japan have been
16 liquidated, but I don't know a lot of detail about
17 that.
18      Q    Do you know who they were liquidated
19 by, sir?
20      A    If they were to have been liquidated,
21 they would have been liquidated by the exchange.
22 Let me put a caveat on that.  It also could have
23 been liquidated by Lehman in the week prior.  I
24 don't know, because the discussions that we have
25 had pretty much across-the-board with the foreign

Page 199

1    Confidential - K. Raisler
2  exchanges had been around customer positions, not
3  house positions, as most of the house positions
4  had been either voluntarily or involuntarily
5  liquidated.
6          The one complication is with those
7  markets that don't distinguish between customer
8  and house, you don't really know what you got.
9      Q    With respect to the Tokyo Grain
10 Exchange, sir, do you know what steps have been
11 taken, if any, to close out any Lehman positions
12 there or to transfer them to Barclays?
13      A    I think the same across all of the
14 Japanese markets.  I don't recall a distinction
15 among them.  I think they are all sort of tied up
16 in the same bankruptcy situation.
17      Q    What about the Hong Kong Futures
18 Exchange, sir?  Do you know what steps have been
19 taken by Barclays to assume LBI's positions at the
20 Hong Kong Futures Exchange?
21      MS. BLOOMER:  Objection to form.
22      A    I think Hong Kong, the positions
23 moved, but the assets haven't, as I described in
24 some other jurisdictions.
25      Q    When the positions move in a

Page 200

1    Confidential - K. Raisler
2  jurisdiction such as Hong Kong and others, I think
3  the U.K. and Germany you described earlier, sir,
4  did Barclays have to make any payment to the
5  exchange in respect of any liability in respect to
6  those positions?
7      A    That -- insofar as the positions
8  moved to Barclays without collateral moving, there
9  would be only two choices.  One is the customer
10 would be responsible for coming up with that, with
11 a -- well, I'm sorry.
12          To be clear, there are two parts to
13 your question.  One is if there is a shortfall in
14 the account, a deficit in the account, there are
15 two sources to fund that, the customer whose
16 liability it is and have the customer put up the
17 money, or you could put up the money, Barclays
18 could have put up the money itself.
19          The other is you would have to
20 re-post initial margin, because the initial margin
21 has been swallowed up in the collateral freeze of
22 the bankrupt broker.  In that case the same, you
23 can go back to your original customer and say, I'm
24 sorry, your money has been frozen.  So if you want
25 to continue to trade, you are going to have to put

Page 201

1    Confidential - K. Raisler
2  up new initial margin.  Or Barclays could have
3  funded it for them on the assumption that Barclays
4  would get back that money at some point in the
5  future.
6          It's my understanding that generally
7  Barclays put up the money in both situations I
8  described, although I think for the most part the
9  initial margin situation was clearer.  The deficit
10 probably would be more of a case by case.
11     Q    Were there futures that Lehman had on
12 the Korea Exchange, sir, do you know?
13     A    There were positions in the Korea
14 Exchange, which were discussed, and we were also
15 trying to get monies released from there as well
16 after the positions I think moved.
17     Q    So Barclays has transferred the
18 positions from Lehman to Barclays at the Korea
19 Exchange; is that right?
20     MS. BLOOMER:  Objection to form.
21     A    I think you misspoke there, but I
22 think that the -- that Barclays as part of the
23 purchase has been able to move the positions that
24 were previously with Lehman to the Barclays
25 account in Korea.

Page 202

Confidential - K. Raisler

1
2     Q     When Barclays, you say pursuant to
3  the agreement, has been able to move these
4  positions, are you talking about the APA, sir?
5     A     It's a fair comment.  I would say in
6  aggregate all of the agreements, without trying to
7  distinguish one versus the other.
8     Q     And I am not trying to be tricky.
9     A     Pursuant to the -- perhaps the
10  oversimplification, would be pursuant to the
11  bankruptcy court order approving the agreements.
12     Q     But in no case are you aware, sir, of
13  a separate agreement other than the bankruptcy
14  court order and any related sale documents?
15     A     There would be no -- as we discussed
16  earlier, no separate or distinct agreement with a
17  foreign exchange or a foreign market that I am
18  aware of, and I would not think there would be.
19     Q     Were there also futures positions on
20  the Malaysia Bursa?
21     A     My recollection is yes, there were.
22  I believe that one or several of the Asian,
23  non-Japanese Asia market exchanges did release
24  some of the capital, some of the collateral back
25  to Barclays.  I just don't recall which markets it

Page 203

Confidential - K. Raisler

1
2  was.
3     Q     Who is responsible for dealing with
4  the Japanese and Asian market exchanges that may
5  have released back some of this collateral back to
6  Barclays?
7     A     It would be the same operations
8  people within Barclays that we discussed at the
9  inception of this deposition.
10     Q     Was that something for which you also
11  had responsibility as an outside counsel to
12  Barclays, sir?
13     A     In the broadest sense.  I was to try
14  to get a handle on that information, and also to
15  the extent clarification was available, clarity
16  around a process to move those positions and the
17  collateral.
18     Q     Did Lehman also have positions at the
19  ICE Futures in Canada?
20     A     Yes, it did.
21        MS. BLOOMER:  Objection, asked and
22  answered.
23     A     Again, we are talking the same --
24  presumably we are talking the same time frame.
25     Q     Yes.

Page 204

Confidential - K. Raisler

1
2     A     The week of September 15th.
3     Q     And have those positions been moved
4  to Barclays?
5     A     My understanding is that those
6  positions have been moved, and my best
7  understanding is the collateral has moved as well.
8        MS. BLOOMER:  Just to clarify, we are
9  talking about customer positions now as
10  opposed to proprietary?
11        MR. OXFORD:  Well, I thought
12  Mr. Raisler testified that with respect to
13  all of the foreign exchanges, he was talking
14  about customer positions.
15     A     I have been focused on customer
16  positions across-the-board, that's correct.
17     Q     So the answers that you have had in
18  response to the series of questions that I have
19  given you were intended to refer to customer
20  positions; is that correct?
21     A     Except where I have indicated that
22  the customer and proprietary may be commingled, in
23  which case it is not clear which is which, in
24  which case positions may have moved that included
25  proprietary positions.

Page 205

Confidential - K. Raisler

1
2     Q     Okay, thank you.
3     A     That would not be true of Canada,
4  where there is a distinction between customer and
5  proprietary accounts.
6     Q     Were there also -- sorry, we have
7  covered Singapore.  Forgive me.  It's getting late
8  and warm here.
9        Kansas City Board of Trade, I forgot
10  whether I asked you if the positions have been
11  moved.
12     A     We discussed the Kansas City Board of
13  Trade.  The -- as we discussed, LBI is not a
14  clearing member of the Kansas City Board of Trade,
15  so it cleared through another broker.  That other
16  broker, I can't remember, I think that Kansas City
17  did not have any customer positions.  It only had
18  affiliate positions.  I think those positions
19  were, were liquidated, but the positions and the
20  collateral did move, to my best recollection.
21     Q     Did Barclays take any steps to move
22  Lehman proprietary futures positions to its
23  account at any exchange or clearing organization
24  or broker outside of the U.S.?
25        MS. BLOOMER:  Objection, lacks

Page 206

```
 1           Confidential - K. Raisler
 2    foundation.
 3       A    I think almost all of the proprietary
 4    positions had been liquidated prior to the
 5    effective date of the transaction, the 22nd.  The
 6    only ambiguity I have around that is that some of
 7    the exchanges, as I indicated, commingled customer
 8    and futures, and therefore it would be difficult
 9    for them to know which ones were proprietary and
10    which ones were not, and so in those markets the
11    positions might well have moved and then be up to
12    Barclays to sort out which ones were customer and
13    which ones were proprietary and either take over
14    or liquidate the proprietary positions.
15           (Continued on next page with witness
16       jurat.)
17
18
19
20
21
22
23
24
25
```

Page 207

```
 1           Confidential - K. Raisler
 2           MR. OXFORD:  Thank you, Mr. Raisler.
 3    I don't have any questions, any further
 4    questions for you at this time.
 5           MR. LACY:  This deposition is closed.
 6           (Time noted:  3:31 p.m.)
 7                  oOo
 8       I, KENNETH RAISLER, the witness herein,
 9    do hereby certify that the foregoing testimony of
10    the pages of this deposition to be a true and
11    correct transcript, subject to the corrections, if
12    any, shown on the attached page.
13    _____
14           KENNETH RAISLER
15    Subscribed and sworn before me this
16    _____day of _____,_____.
17    _____
18    NOTARY PUBLIC
19
20
21
22
23
24
25
```

Page 208

```
 1
 2    STATE OF NEW YORK  )     Pg.  of Pgs.
 3    COUNTY OF NEW YORK )
 4       I wish to make the following changes
 5    for the following reasons:
 6    PAGE  LINE
 7    ____  ____  CHANGE:_____
 8           REASON:_____
 9    ____  ____  CHANGE:_____
10           REASON:_____
11    ____  ____  CHANGE:_____
12           REASON:_____
13    ____  ____  CHANGE:_____
14           REASON:_____
15    ____  ____  CHANGE:_____
16           REASON:_____
17    ____  ____  CHANGE:_____
18           REASON:_____
19    ____  ____  CHANGE:_____
20           REASON:_____
21    ____  ____  CHANGE:_____
22           REASON:_____
23    ____  ____  CHANGE:_____
24           REASON:_____
25    _____
```

Page 209

```
 1
 2           C E R T I F I C A T E
 3    STATE OF NEW YORK    )
 4                 : SS.
 5    COUNTY OF NEW YORK   )
 6
 7       I, BONNIE PRUSZYNSKI, a Notary
 8    Public with and for the State of New York,
 9    do hereby certify:
10       That KENNETH RAISLER, the witness
11    whose deposition is hereinbefore set forth,
12    was duly sworn by me and that such deposition
13    is a true record of the testimony given by
14    the witness.
15       I further certify that I am not related
16    to any of the parties to this action by
17    blood or marriage, and that I am in no way
18    interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto
20    set my hand this 1st of March, 2010.
21
22    _____
23    Bonnie Pruszynski
24
25
```

Page 210

1
2
3               I N D E X
4    WITNESS                    PAGE
5    KENNETH RAISLER
6    BY MR. OXFORD              5, 181
7    BY MR.  LACY               178
8
9               E X H I B I T S
10   Exhibit 658A Declaration of Kenneth      5
11       Raisler
12   Exhibit 659-A BCISC 00009676-88      98
13   Exhibit 660-A BCISC 00009653-65      120
14   Exhibit 661-A BCISC 00009298-301      126
15   Exhibit 662-A BCIEXS 00116806-07      167
16   Exhibit 663-A SC 00003451-53      171
17   Exhibit 664-A September 19, 2008      174
18       e-mail plus attachment
19
20
21
22
23
24
25

## A

**ability (12)**
29:14 30:11 33:16
39:2,5,8,22,23
86:15 87:15 137:17
177:5
**able (37)**
16:15 17:6,14,16 18:6
20:8 24:6 26:16
28:2,21,22 30:16
34:7,22,24 35:13
38:15,18,22 41:6
42:23 59:22 61:22
62:22 85:18 114:19
124:23 125:12,21
125:24 138:9
161:24 175:11,15
179:19 201:23
202:3
**absence (2)**
21:3 114:10
**absent (4)**
26:15 34:19 98:5
120:2
**absolutely (3)**
41:10 82:9 167:4
**access (1)**
136:23
**accomplished (1)**
50:21
**accord (1)**
176:20
**account (77)**
28:20 79:13,19,20,20
79:20 80:20,21,22
81:6,9,10,17 82:5,5
82:19 83:18 84:20
85:14,17,19 86:8,17
86:21 87:5 88:6,11
88:16 89:4,9 90:15
93:17 106:10,12,16
106:17,22 109:24
110:6,8,10,19
112:19,19 119:6,8
120:5,6,9 138:6
149:6 158:2,6,8
160:13 174:11
176:15 177:6 179:9
179:16 194:11,15
194:16,17,20,23
195:7,10,12 196:19
196:23,25 197:19
200:14,14 201:25
205:23
**accounting (6)**
150:4 164:15 169:11

171:8,13,15
**accounts (100)**
12:23 68:25 69:19
77:25 78:2 79:5,8
80:3,12,25 81:15,22
88:2 89:5,12,19
90:19 91:8 94:23
95:21 96:7,16 97:11
97:17,19,22,25
103:24 105:14,16
105:20,23 107:4,4
107:13 108:2,2,3,8
108:19,23,24 109:2
109:4,6,8,9,10,10
109:14,15,16,18,20
109:22 110:2,3,13
110:18,21,23,24,25
111:2,4 116:24
119:24 120:16
126:20 127:6 128:4
130:4,6,11,18 131:3
131:7 136:24
137:21 148:22
151:16 157:14
159:19,20 164:19
165:13 166:18,20
171:10,19 176:6,24
177:3 179:5 194:25
195:20 196:5,14
197:12 205:5
**accretive (2)**
149:18,21
**accurate (4)**
25:24 26:4,6 88:14
**accurately (1)**
106:21
**acquire (2)**
61:8 62:14
**acquisition (8)**
6:7 7:14 64:16 144:4
144:9 149:17 154:2
171:8
**across-the-board (2)**
198:25 204:16
**Act (5)**
111:10 117:22 118:5
118:19 125:16
**acted (1)**
23:11
**acting (1)**
188:16
**action (12)**
49:24 55:3 69:25
87:16,17,18,19
115:19 116:6
136:14 188:13

209:16
**actions (2)**
136:17 187:17
**active (2)**
50:13 110:20
**actively (2)**
40:11 135:10
**activities (3)**
43:15 158:21 190:16
**activity (2)**
144:13 158:25
**actual (3)**
95:9,21 110:20
**add (2)**
133:7 141:8
**addition (6)**
47:20 69:12 112:25
131:23 166:21
179:10
**additional (8)**
41:19 42:2 59:23
115:10 120:14
149:12 150:25
151:17
**address (1)**
157:20
**addressed (2)**
68:3 140:4
**adequacy (1)**
63:8
**adequate (5)**
61:18 96:25 97:21,24
181:23
**administer (1)**
38:15,16 39:8
**administering (2)**
84:6 86:6
**admonition (2)**
53:13,16
**advancing (1)**
172:24
**adverse (1)**
168:23
**advising (1)**
183:20
**affiliate (23)**
21:18 74:11,13,14
105:23 106:8,23
107:4 109:22 110:7
137:13 140:17,18
142:19 146:19
195:12,14 196:22
197:12,19 198:8,11
205:18
**affiliates (32)**
21:25 22:6 23:11,15

76:11 79:22 81:4
104:17,20,23,25
105:4,7,14 107:12
109:17,23 133:22
133:23 134:17
136:19 146:13,18
179:12,14 194:18
194:19,22 195:3,20
196:13,18
**afternoon (5)**
7:2 8:14 9:2 50:3
177:20
**agency (1)**
69:7
**aggregate (9)**
28:23 80:21 85:16
94:18,21 112:18,20
179:19 202:6
**aggregated (6)**
178:23 179:8,11
194:6,20,22
**aggregation (1)**
193:25
**aggressively (2)**
40:11,25
**ago (2)**
29:4 56:13
**agree (2)**
15:4 80:6
**agreed (9)**
161:20 162:7 163:7
163:15 187:7,22
188:18 189:4,8
**agreement (49)**
13:2,14,19 14:6,16
50:25 56:19,20,21
57:25 58:4,9 73:21
103:19,23 105:13
134:3,13 135:13,18
153:5 155:7,12,14
156:7,11 157:18
158:8 159:6,12
172:16,18 186:10
186:13,15,16,18,20
187:12,13,20,23
188:4 191:13 196:5
197:5 202:3,13,16
**agreements (8)**
134:7 136:2 140:11
140:20 141:10,17
202:6,11
**ahead (5)**
11:12 138:14 145:19
170:19,21
**ahold (1)**
22:2

**al (1)**
1:8
**Alasdair (3)**
143:12,13,15
**Albany (1)**
3:11
**albeit (1)**
44:23
**Alex (1)**
9:20
**allow (3)**
67:12 116:7 162:15
**allowed (1)**
113:14
**ambiguity (2)**
136:16 206:6
**amend (3)**
10:9 38:13 158:6
**amount (30)**
9:5 32:14 40:20 62:9
62:9 87:4 90:14,18
91:17 95:2,3 96:5
97:9 111:8 112:7,23
114:7,17 116:12,21
117:18 118:4,17
123:13 136:16
137:20 152:20
167:9 181:4 185:15
**amounts (3)**
96:12 113:23 131:22
**Ananda (4)**
68:2 71:9,13 102:21
**and/or (3)**
82:17 138:12 192:14
**Ann (1)**
43:19
**answer (50)**
10:9 13:4 25:22 28:10
28:18 29:4,8,11,15
29:23 34:19,22,24
39:12 41:5 59:22
79:23 83:13 85:10
90:12 92:7,9,22
93:8 97:20 107:14
107:16,18 114:14
117:2 125:19
127:21 130:16
133:6 138:15,19
142:15 145:8 149:3
151:2 152:11 153:3
154:8 155:21
160:11 163:19
164:23 171:4
189:15 190:3
**answered (3)**
114:4 186:9 203:22

**answering (3)**
15:11 29:22 191:16
**answers (7)**
29:4 133:8 155:2
160:14 181:18
193:16 204:17
**anticipated (1)**
128:8
**anxious (1)**
24:11
**anybody (25)**
7:7 22:2 23:14,16
35:17 37:19,22
45:11 53:4 70:4
78:17 94:2 117:3,4
124:18 135:3
150:14 153:23
162:19,25 163:7,14
164:5 188:16 193:2
**anymore (1)**
109:22
**anyway (1)**
121:12
**APA (1)**
202:4
**apart (3)**
9:12 35:16 47:24
**apologize (2)**
11:12 159:4
**apparently (4)**
39:13 100:2,3,9
**appear (1)**
148:8
**appears (5)**
100:15 101:4 103:2
168:5 173:19
**apply (2)**
29:8 81:14
**appointment (1)**
177:21
**appreciate (4)**
83:14 114:3 145:20
152:7
**appreciation (1)**
72:5
**appropriate (1)**
70:2
**approval (8)**
120:3,4 129:6,10,11
135:20 150:10
152:8
**approvals (1)**
127:12
**approves (1)**
126:18
**approving (1)**

202:11
**approximately (7)**
8:6,17 36:8,16 144:20
144:22 183:21
**arbitrary (1)**
91:22
**areas (1)**
67:7
**arrangement (1)**
122:20
**article (1)**
37:13
**articulation (1)**
192:20
**ascertain (1)**
27:7
**Asia (1)**
202:23
**Asian (3)**
194:13 202:22 203:4
**aside (1)**
61:5
**asked (19)**
26:7 29:24 33:4 34:3
34:12 49:17 51:8
54:8 55:10 57:8
75:9 76:18,19 94:3
171:5 186:8 193:24
203:21 205:10
**asking (14)**
26:24 56:12 57:14,24
92:23 93:2,3,6,7
95:19 123:25
132:18 138:25
167:14
**asks (1)**
108:21
**aspect (2)**
11:22 12:2
**asset (9)**
13:14,18 14:16 84:6
153:5 154:11 155:7
156:3,6
**assets (41)**
11:3,23 12:23 13:3,12
16:12 79:14 82:4,10
82:12,18,23,24 83:5
83:16,20 84:20 86:4
86:5,7 96:17 124:12
129:25,25 130:13
130:14 131:23,23
132:15 133:21
134:16 151:13
163:23 166:17,21
172:17,24 176:14
177:4 198:14

199:23
**assigned (1)**
71:11
**assist (2)**
71:17 87:23
**associated (9)**
26:11 41:16 59:13
60:17 61:11,24
62:17 107:12
154:12
**assuage (2)**
30:16,19
**assuaged (1)**
30:15
**assume (7)**
60:19 114:11,14
117:14 129:16
142:17 199:19
**assumed (6)**
50:19 71:10 141:20
142:8,19 183:17
**assumes (2)**
127:5 137:2
**assuming (3)**
54:7 84:13 193:6
**assumption (16)**
58:4 127:2 134:2,13
135:15 136:4 150:6
156:11 159:6
162:13 172:15
186:17,20 187:20
187:23 201:3
**assumptions (1)**
184:15
**assured (2)**
56:9,14
**attached (2)**
174:13 207:12
**attachment (15)**
99:8 100:11,20
102:24 122:22
126:8,12,15,16,17
170:19,20,21 172:6
210:18
**attachments (7)**
99:15,20 100:13
121:3 175:4,7,16
**attempt (4)**
22:18,21 27:7,18
**attempting (1)**
27:13
**attempts (1)**
23:19
**attendance (1)**
9:4
**attended (1)**

143:22
**attention (1)**
40:21
**Attorneys (5)**
3:4,9,14,19 4:4
**attorney-client (3)**
191:3,6 193:23
**auction (14)**
31:2,13,16,17,18,21
31:22,25 34:20 35:6
36:7,10 37:16 55:3
**auctioned (4)**
33:12 43:7,10 48:18
**auctioning (3)**
31:8 36:14 40:23
**Australia (4)**
22:15,17,20 139:23
**authority (3)**
22:9 162:20,25
**authorization (1)**
126:20
**authorizations (1)**
128:20
**authorize (3)**
103:13 123:6 129:8
**available (5)**
76:10,14 89:25 119:8
203:15
**Avenue (2)**
3:20 8:5
**avoid (3)**
63:14 82:19 118:11
**aware (17)**
52:22 53:3,7 61:15
104:13,15,18
105:11 140:21
152:15 157:19
158:11 160:8
161:19 169:22
202:12,18
**a.m (3)**
2:3 101:6 186:25

_____
                    **B**
_____

**B (3)**
4:7 113:3 210:9
**back (39)**
10:15 13:23 23:5,6
34:9,16 51:13 56:2
56:6 64:3 71:24
84:12,14 86:20
98:18 101:23 107:9
111:5 127:17 132:3
140:2 152:4,6 168:4
168:14 170:5 171:3
182:6 186:3 189:19

193:17,18 197:10
197:14 200:23
201:4 202:24 203:5
203:5
**backstop (2)**
39:24 44:20
**backstopping (1)**
38:24
**backwards (2)**
115:16,17
**balance (2)**
95:21 119:8
**balances (1)**
96:11
**bank (9)**
80:19,23 81:10,13
82:4 89:5 128:17
176:15 177:7
**bankrupt (2)**
141:3 200:22
**bankruptcy (15)**
1:2 65:2,2 67:14
68:19 119:25
128:21 129:6
135:20 139:11,21
198:11 199:16
202:11,13
**bankruptcy-related...**
137:14
**Barclay (2)**
7:7 182:17
**Barclays (254)**
3:9 5:15,24 6:6,7,15
6:22 7:10,13,14
8:10 9:15,17 10:21
10:25 11:3,11 12:15
12:24 13:3,11,22
14:25 15:8 16:2,17
18:19,21 19:14,16
19:18 22:10 23:9
24:8 25:21 26:12,18
27:13,17 30:10
33:11 34:14 35:2
36:18 37:5,9 40:4
48:16 49:3,17 50:2
50:4,14,15,22,24
51:22 53:4,5,6,18
53:21 54:2 55:10,15
56:3,6,14 57:17
58:3,9,18,21,25
59:7,12,18 60:13
61:7,9 62:13,15,22
64:16,18 65:11
67:13 71:16,20 73:9
73:20 74:3 75:20
76:18,25 94:3,11

95:13 96:4,5,13
97:6 101:16 104:14
105:13,17,20,24
106:13,24 107:5,20
108:20 109:18
116:23 117:4,12
120:13 124:18
127:2,5,13,18
128:19 129:4,20
130:19 131:3,7,13
131:18,20 132:10
132:20,25 133:12
134:3,18,20 135:13
135:25 136:22
137:23 138:3,11,20
139:4,25 140:2,10
141:4,9,12,19 142:8
142:17,17 145:3,12
146:5,21 147:4,14
147:19 148:16,17
149:16 150:15,24
151:6 152:8,15
154:2,6,11 156:3
160:23 161:14
163:21 164:4,18,25
165:9,14,25 166:5,7
166:19 168:6,16
169:13 171:8
172:19 179:22
181:6,11,22 182:10
182:13 183:10
184:10 185:8,17
186:5,14,19,24
187:7,11,22 188:8
188:16,17,22 189:4
189:8,20,21 190:5,8
191:8,18 192:18,24
193:2,4,12 195:22
197:2,5,10,16 198:2
198:8 199:12,19
200:4,8,17 201:2,3
201:7,17,18,22,24
202:2,25 203:6,8,12
204:4 205:21
206:12
**Barclay's (2)**
51:7 172:16
**barrier (1)**
26:23
**base (1)**
72:24
**based (18)**
27:11 35:21 37:15,18
90:16 113:17 114:8
114:10 116:22
119:8 131:4 134:8

145:24 146:5
162:18 163:5,13
182:12
**basic (1)**
81:14
**basically (11)**
18:17 55:15 69:20
72:23 73:6 86:21
89:23 90:5 108:21
110:5 194:7
**basis (12)**
35:8 36:12 37:10 89:3
90:20 92:13 116:13
138:11 151:2 183:3
187:21 189:3
**Bates (8)**
98:24 121:2,11,17
122:2 168:17 172:6
177:15
**Battery (2)**
2:7 3:15
**BCIEXS (2)**
168:17 210:15
**BCISC (6)**
98:25 121:2 126:8
210:12,13,14
**began (1)**
127:12
**beginning (2)**
64:13 70:11
**begins (5)**
75:16 103:18 117:25
118:15 144:16
**begun (1)**
129:18
**behalf (15)**
40:8 41:23 52:2 58:21
58:23,25 103:8,11
103:14 117:11
124:13 161:20
162:20 163:7
188:17
**believe (66)**
7:3 10:10 15:11 16:7
16:19 20:6,20 21:2
23:3 29:12 31:10
36:13 42:21 44:9
46:17 47:7 53:7
55:22,23,24 57:2
58:23,25 62:21,23
63:15 66:25 70:7
73:3 74:22 76:20
78:16,17 91:23 94:6
94:13,18 101:22
102:11,12 103:3
104:22 105:9 111:2

115:11 116:4 117:4
118:15 129:18
130:24 160:20
162:7 165:11 173:4
173:21,22,23
174:15 175:8 178:4
178:5 187:13 189:4
192:13 198:14
202:22
**believed (2)**
132:20 165:12
**belonged (1)**
164:20
**benefit (1)**
84:7
**benefits (1)**
148:7
**best (34)**
7:24 8:25 9:3,19
15:10 20:11 23:13
31:20 32:4 42:16
46:20 52:8 54:11,18
56:8,17 71:12,14
74:15 102:9 117:10
125:11 131:2
138:23 156:19
157:17 158:12
163:19 172:21
174:16 182:21
198:5 204:6 205:20
**better (1)**
118:10
**beyond (4)**
59:22 79:5 125:22
192:20
**Bianca (1)**
178:2
**bidders (1)**
48:16
**bigger (1)**
11:15
**Bill (1)**
52:5
**billion (2)**
36:8,16
**bit (10)**
9:18 23:2 61:2 80:8
84:3 86:20 135:11
165:18 168:7 198:4
**blackline (2)**
100:12,12
**blessing (1)**
71:22
**blood (1)**
209:17
**BLOOMER (124)**

3:12 6:23 11:5,25
13:5,20 14:18 15:3
19:18 22:11 26:5
29:10 36:21 38:8
47:11 48:9,22 53:14
54:17 57:12 59:15
59:25 60:18,23 62:2
63:2 78:25 80:16
82:7 83:2,22 84:21
84:25 86:18 90:21
91:11 92:14,21 93:3
94:4 95:16 97:12
99:6,24 105:18
106:3,14,19 107:6
107:17 116:25
117:19 118:7
121:10,16,25 125:4
127:7 129:3 130:7
131:16,24 132:16
136:25 138:13,22
146:7 147:20
149:24 150:18
151:18 152:10,22
154:4,13 155:13,23
156:5,15,18 159:21
160:25 161:6,17
162:2,21 163:8,16
164:21 165:16
166:12 167:11
168:3,12,15 171:11
171:23 173:13
177:12,22 178:2,7
181:15 182:15,24
183:7,23 186:8
187:25 188:19
189:6 191:22 192:6
192:19 193:8,20
195:23 197:13,21
199:21 201:20
203:21 204:8
205:25
**blue (2)**
147:22,25
**blur (4)**
8:21 9:18 14:13 16:4
**blurred (3)**
43:14 64:2,21
**blurring (1)**
72:10
**Board (10)**
20:14,16,23,24 43:22
44:5,14 205:9,12,14
**Bob (1)**
67:20
**BOIES (1)**
3:8

**Bonnie (4)**
1:18 2:8 209:7,23
**book (1)**
39:3
**books (9)**
70:17 77:16 78:15
104:2 109:18 110:6
110:8 181:11 196:7
**boss (1)**
143:16
**bottom (10)**
108:23 110:22 121:11
121:16 122:2,5,6
145:21 170:18
192:15
**Bowling (1)**
65:3
**break (11)**
9:8 47:12 48:8 51:16
59:5 61:2 98:13
111:17,21 168:8
171:6
**breakdown (3)**
29:3 76:16 96:11
**breakdowns (1)**
62:7
**BRIDGET (1)**
3:7
**broad (4)**
4:5 15:13 67:7 145:10
**broaden (1)**
7:15
**broader (3)**
11:17,23 144:9
**broadest (1)**
203:13
**broadly (6)**
16:11 77:4 127:22
137:24 138:8 144:2
**broke (1)**
171:4
**broker (37)**
11:4 21:17,18 41:18
44:8 79:17,22 80:2
80:20,23,24 81:4
82:18 83:8,12,16,17
83:20 84:19,22 85:5
85:6,8 87:22 89:13
91:18 136:3 138:10
138:10 140:11,16
140:25 195:5
200:22 205:15,16
205:24
**brokers (6)**
21:21 22:5 23:12
89:16 137:22,22

**Brothers (5)**
1:7 3:4 82:12 144:4
144:16
**brought (1)**
10:15
**buffer (19)**
41:20 42:2,8,9 82:19
82:23 83:11,18
84:11 88:5,18
112:13 113:3,14
120:14 130:2
151:14 166:10,14
**bulk (5)**
67:11 72:25 73:21
101:2 108:18
**Bursa (1)**
202:20
**business (82)**
6:8,9 7:15 11:2,24
12:3,3,16 13:2,10
13:12 14:24 15:2,7
15:9 37:6 40:16
42:3 59:6,8,14
60:14,15 61:7,8
62:14,15,24 63:12
63:13 64:17 66:11
75:22 77:2 78:2,3
83:10 84:11 101:15
104:6 105:13 106:2
106:11 115:9,9
119:9,10 127:4
130:5 133:13,25
134:9 135:16 144:5
144:12,16,19
145:16 146:6,17,23
149:17 150:17
151:5,7,8,13 154:3
154:12 156:4
160:22 161:8,13,15
161:21,21 163:14
169:14 188:5
189:24 195:19,22
**businesses (3)**
10:21 146:12,24
**buy (1)**
146:5

**C**

**C (4)**
3:2 4:2 209:2,2
**calculate (1)**
90:18
**calculated (1)**
184:20
**calculation (6)**
91:6,22 92:2 95:18,20

113:24
**calculations (9)**
92:12,18 93:12,17,24
94:10 95:14 116:22
175:3
**calculator (1)**
184:24
**call (11)**
7:22 11:8,22 23:22
34:5 46:3 57:19
66:17 110:12 168:4
177:3
**called (7)**
5:3 21:13 34:9 48:5
68:7 71:15 181:4
**calls (18)**
6:21 7:8,17 34:6
35:15,18,22 46:14
46:16 57:15 63:23
66:7 73:15 77:22
84:2 97:18 107:19
177:8
**Canada (2)**
203:19 205:3
**Canadian (2)**
66:24 74:17
**capacity (1)**
85:8
**capital (29)**
88:9,9,10,12 92:6
111:9,22 112:16
113:24 114:3
117:12 123:22
124:8,10,16,25
125:6,15 144:12
149:7,12,18,20
150:10,16,25
151:10,17 202:24
**care (1)**
114:4
**carries (2)**
28:19 198:9
**carrying (1)**
30:9
**case (20)**
1:7 23:24 25:14 41:19
81:7 84:19,23 88:19
99:13 116:5 156:11
158:6 170:8 171:19
200:22 201:10,10
202:12 204:23,24
**cases (3)**
21:19 137:4 140:18
**cash (1)**
110:19
**cast (1)**

64:19
**Castedo (1)**
178:3
**catch (1)**
34:8
**category (1)**
110:13
**caveat (3)**
82:15 160:11 198:22
**caveats (1)**
152:25
**CBOE (7)**
20:19 44:24 45:3,5,7
45:13 48:3
**CBTC (1)**
196:14
**center (1)**
148:25
**certain (14)**
9:5 17:5 28:9,14 32:5
49:7 51:16 108:4
119:23 124:21
176:4 179:17
183:19 192:7
**certainly (18)**
7:4 15:4 17:9 25:9
39:4 42:4 53:21
58:22 65:20 68:5
70:20 75:11,11
159:3,5 162:12
190:19 194:12
**certainty (1)**
157:16
**Certified (1)**
2:11
**certify (3)**
207:9 209:9,15
**CFE (2)**
48:4 78:13
**CFR (1)**
108:14
**CFTC (60)**
66:17 67:6,16 68:21
69:4,16,20,24 70:4
70:23 72:2,9,19
73:22 75:9,9 79:12
81:2 84:5 87:22
93:14 97:8 98:2
100:25 101:4 102:3
102:15,19 108:4,21
111:25 113:17
114:6,18 115:6,15
115:17,24,25
116:14 120:3,12,18
122:17 124:7,10
125:18 126:18

127:19 135:19,23
151:23 152:9
158:20 159:17
160:2,4 196:3,25
197:20
**CFTC's (3)**
70:14 108:18 197:2
**chairman's (1)**
68:11
**change (12)**
123:10 155:20 187:2
208:7,9,11,13,15,17
208:19,21,23
**changes (4)**
101:24 122:18 123:15
208:4
**changing (2)**
77:6 97:2
**chaos (1)**
77:11
**chaotic (3)**
18:2 147:24 148:24
**Chapter (1)**
1:6
**characterization (1)**
163:17
**characterize (3)**
14:21 160:12 185:10
**characterized (1)**
15:12
**characterizing (1)**
189:7
**charged (2)**
197:10,14
**Chase (3)**
173:3,6,7
**check (1)**
124:17
**checked (2)**
124:20,22
**Chicago (9)**
20:12,14,16 42:14,24
43:10,17 49:11
135:14
**chip (2)**
147:22,25
**choices (1)**
200:9
**circumstances (2)**
96:25 190:15
**cite (1)**
108:14
**City (10)**
20:23,24 43:22 44:5,6
44:13 205:9,12,14
205:16

**claimed (1)**
170:17
**claiming (1)**
170:22
**clarification (5)**
146:9 154:21 155:18
197:15 203:15
**clarifications (1)**
101:25
**clarified (1)**
119:17
**clarify (4)**
165:20 188:3 189:13
204:8
**clarity (2)**
85:3 203:15
**classes (1)**
150:5
**clawback (1)**
168:19
**clean (1)**
29:6
**clear (30)**
14:3 16:24 21:21
40:15 44:25 48:2,3
49:22 54:5 59:16
63:3 78:17 100:16
106:10 113:8,16
117:5 128:10
134:22 135:21
141:24 155:17
158:9 163:25 184:5
188:7 189:12 197:2
200:12 204:23
**cleared (20)**
16:21 44:8 47:23
52:18,19 74:10,13
89:13 104:16,20,23
104:25 105:4,7
157:23 158:14,14
158:15,17 205:15
**clearer (2)**
135:12 201:9
**clearing (104)**
16:21 17:3,8,15,17
18:8,15 19:13,15
20:2,24 21:6,9,16
21:17,21,24 22:5
23:4,11,15,21 24:25
25:15 29:9,13 30:23
33:18 37:25 41:18
41:18,20,24 44:8,19
45:2 46:5 47:20,24
55:17 56:16 68:17
69:2,13 81:7,12,12
82:6,20 85:13 86:3

86:9,14,23,24 87:3
87:7,8,11 88:22,25
89:4,7,16,18 90:13
105:9,15 111:20
112:11 113:19
114:23 115:8 134:9
136:2,13,20 140:24
141:5,10,22,25
142:4,9,11,18,20
158:19,20,21,23,25
176:5,19,25 177:7
178:22 179:16,18
184:18,21 194:4
205:14,23
clears (2)
45:3 47:19
Cleary (2)
11:16 59:2
client (3)
117:11 148:3 178:6
clients (8)
90:6 144:21 145:17
147:6,9,12,17
148:11
Climate (5)
20:17 42:14,24 43:10
43:17
close (16)
40:7 42:25 43:8 56:24
119:9,11 163:3
185:6,22 188:5
189:22,24 190:6,7
198:2 199:11
closed (5)
43:6 65:15 153:14
155:9 207:5
closing (16)
11:20 32:3 43:2 47:9
51:10 66:14 70:6
93:20 96:14,23 97:5
132:11 150:15
183:25 185:19
186:25
CME (61)
24:5,7,9,13,16,24
25:3,7,11 26:2,3
27:7 28:2,4,15,17
28:19,22 29:9,23,25
32:6 33:15 34:7,10
35:5,6,23 36:15,17
37:19,22,23 38:4
39:10,16,21 40:7,14
41:7,13,17 42:2
44:15 46:13 48:17
50:3,14 57:5,7,14
85:18 87:20 88:24

106:12 111:25
158:16 176:13,19
176:23 188:8
CME's (5)
31:18,21,22 32:7 39:7
code (1)
39:16
collateral (63)
26:25 28:4 32:15,20
33:5,5 36:17 41:8
41:12 59:13 60:17
61:11,18,24 62:10
62:17,25 63:4,8,14
77:24 79:11,12 80:2
80:14 97:9,22,24
111:23 120:7
127:22,24 129:17
131:2 134:24
135:10 136:5 137:6
137:7,9,12 138:6,12
138:21 139:5,7,9,12
139:14,19,24 141:2
141:7,12 185:16
198:9 200:8,21
202:24 203:5,17
204:7 205:20
colleagues (1)
14:9
collect (1)
16:19
collected (1)
41:23
collects (1)
38:19
combination (1)
113:12
combined (2)
113:13 188:14
come (9)
13:10 42:8 55:8 70:7
146:20 162:24
165:25 166:4 195:2
comes (2)
85:4,8
comfort (6)
44:18 55:2 114:22
128:11,23 190:16
comfortable (2)
40:14,19
coming (2)
139:11 200:10
commence (1)
34:20
comment (7)
63:11 109:13 156:6
157:18 159:4

173:11 202:5
comments (3)
83:24 174:6,12
commingle (1)
195:7
commingled (2)
204:22 206:7
commingling (1)
194:10
commission (6)
6:9 39:17 66:17 71:23
85:7 117:22
Commission's (4)
111:11 118:6,19
125:16
committee (2)
3:19 178:17
commodities (3)
39:17 89:24 118:5
commodity (10)
66:16 108:3 109:5
110:14,16 111:10
117:22 118:18
125:16 198:3
common (2)
88:6,7
communicate (2)
50:2 58:15
communicated (2)
56:6 189:19
communications (17)
6:25 13:22 48:24
59:17 67:2 73:11
107:20 131:18
132:25 150:20
160:8 164:24 168:6
182:17 188:22
191:24 198:12
company (1)
104:7
compared (3)
32:7 40:23 96:8
comparison (1)
99:9
complete (4)
76:5 84:2 98:11 140:3
completely (1)
140:5
complex (4)
26:16 127:16 128:7,9
complexity (1)
138:7
compliance (1)
97:7
complicated (4)
28:8 41:3 118:8

133:17
complication (1)
199:6
complications (1)
26:11
compound (1)
171:6
concept (2)
90:11 176:21
concern (9)
39:7,10,13,21,25
44:16 111:24 192:3
193:12
concerned (3)
39:4 54:24 185:18
concerning (4)
6:7 7:13 75:21 170:13
concerns (14)
30:19 33:16 38:4,9,11
38:12,14 44:14
69:10,12 82:20
137:14 157:13,20
conclude (2)
61:17 190:18
conclusion (7)
62:22 112:6 162:17
162:18 184:5
188:15 190:12
condition (1)
115:18
conditions (1)
126:21
conduct (1)
109:11
conducted (1)
77:25
conference (5)
7:17,21 46:14 63:23
64:6
conferences (1)
75:20
confess (1)
165:2
confident (3)
39:2 160:9 192:21
Confidential (204)
1:12 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1

45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
confirm (2)
114:12,20
confirmed (1)
115:21
confuse (2)
124:4 158:25

confusing (2)
118:13 176:22
confusion (2)
95:23 136:18
congratulate (1)
18:25
connection (14)
5:14 6:15 14:25 22:9
28:17 70:23 116:24
134:8 135:14 136:3
141:11 183:22
197:11,18
consent (1)
108:18
conservative (3)
184:17 185:3,13
consider (5)
26:22 83:19 167:5
168:8 171:7
consideration (2)
10:25 169:22
considerations (1)
174:11
considered (6)
147:18,18,25 169:7
169:10 191:18
consistent (5)
34:12 115:12 124:11
128:19 163:23
consists (2)
144:20 145:17
constant (1)
69:22
constraints (1)
77:11
consult (2)
49:25 155:10
consultant (1)
10:13
contact (11)
18:15 24:12 67:19
69:22 71:20 72:5,8
72:18 74:17,20
157:12
contacted (1)
75:9
contacts (4)
64:3,4 72:11,13
contain (1)
108:2
contained (2)
116:2 145:15
contains (1)
168:5
contemplates (1)
104:5

contemporaneous (1)
143:10
content (1)
129:11
contents (3)
168:5 171:18 188:21
context (9)
39:3 91:15 98:9
107:13 117:9
119:25 132:4 139:8
143:7
contexts (2)
119:25 140:4
continue (9)
25:6 33:17 38:15 39:8
40:15 65:24 69:9
140:6 200:25
continued (2)
4:2 206:15
continuing (2)
30:11 72:18
contours (3)
17:18,22 119:19
contract (4)
48:5,5,6 110:16
contracts (4)
47:19,25 109:5
110:14
conversation (21)
30:7 33:23,25 37:8
44:10 46:12,24 47:7
49:16 50:18 53:24
71:13 162:19,24
163:13 164:5
182:12 183:5,12
188:24 189:2
conversations (35)
29:20 37:18 42:14,21
44:3,23 45:5,6,9,12
45:15 47:15,16
49:14 51:17,18 52:9
53:18 54:12 66:9,19
69:15 72:7 73:2,14
101:14,19,21,23
167:6,15 182:20
188:12 189:16
192:22
conversely (1)
155:25
convey (1)
11:9
conveyed (1)
132:22
conveys (1)
154:11
cooperative (1)

24:10
copied (1)
135:23
copies (1)
100:14
copy (6)
99:11 100:8 103:2
135:20 153:4
156:20
copying (1)
100:3
Corp (1)
45:2
correct (57)
6:10,11,16 26:21
29:18 37:6 43:23
44:25 46:19 52:11
58:5 59:9 70:12
73:4 81:19,20 83:4
84:17 86:17,19
89:14 92:16,19
103:13,20 104:8
108:10 109:12
113:4,7,11 122:3
123:9,15,22 125:20
125:21 126:2,10
128:5 145:18
150:12 153:22
160:24 161:16,18
163:15 165:9,10
166:11 182:3,11,13
182:14 204:16,20
207:11
corrections (1)
207:11
correctly (1)
55:12
corresponding (1)
115:22
costs (2)
197:11,18
counsel (17)
11:10 14:7,8 24:15
43:19 52:4,6,7
129:5 132:22 173:7
173:8,10,10 178:13
188:25 203:11
counsel's (2)
24:3 68:10
counterpart (1)
27:14
COUNTY (2)
208:3 209:5
couple (1)
102:8
couple-fold (1)

180:8
course (12)
13:16 16:5 19:3 39:20
64:11,21 72:12
97:16 145:9 147:21
153:17 173:5
court (6)
1:2 65:2,2 80:5
202:11,14
court's (1)
129:6
cover (6)
158:8 159:6,7 181:24
185:8 192:18
covered (5)
76:2 111:3 195:15
197:23 205:7
covering (2)
113:2,5
CRAWFORD (2)
3:7 178:15
created (3)
177:19,24 178:21
creating (2)
50:24 157:16
credit (2)
147:19,23
Creditors (1)
3:19
creditworthiness (1)
147:5
creditworthy (1)
148:5
Cresce (1)
43:19
Cromwell (20)
4:3 6:14,18 7:10 9:7
9:12 11:15 14:10
45:12 49:6 53:4,6
102:3 117:10
124:20,22 125:13
132:18 160:4 170:7
Cromwell's (3)
117:16 123:11,20
culminated (1)
33:25
Curious (1)
51:4
current (2)
95:11 140:5
currently (2)
24:18 178:6
custom (1)
26:7
customer (122)
16:10 25:13 26:3 27:9

28:3,19,24 29:4
37:23 38:2,5,16
39:5,9 40:16,22
41:8 42:11,18 49:18
50:4,25 51:8,23
52:13 54:15 55:18
59:13 60:5,16 61:10
61:23 62:19,24
68:25 69:18 77:24
78:2 79:8,16 80:2
80:13,19,20 81:6,8
82:5 83:6 85:19
86:16 90:19 93:16
93:24 94:22 96:6,16
97:10,25 103:24
109:17,20 110:6,8
110:11,24 112:19
112:20 113:2,3,6
120:15 124:12
127:23 128:3
129:22,22 131:8,21
131:23 132:13,14
142:2 151:9,15
164:18 165:8 166:6
167:2,8 169:12,18
171:9,18,20 176:15
176:24 178:22
179:9 194:10,16
195:5,8,13 196:5,14
196:20 198:7 199:2
199:7 200:9,15,16
200:23 204:9,14,15
204:19,22 205:4,17
206:7,12
customers (51)
38:13,22,25 39:22
40:9 41:15,23 42:3
44:20 47:23 62:4
79:10 80:23 82:11
82:25 83:7,21 84:7
85:15 86:23 87:2,9
87:10 91:9 96:18
109:23 112:9,10,12
112:21,22 113:12
115:8 124:13
130:15,23 133:23
139:18 146:14,20
147:19,23 148:22
149:8,9 165:14
166:7 179:9,13
194:19,21
customer's (5)
103:25 120:6,7,9
196:6
C-R-E-S-C-E (1)
43:20

**D**

**d (2)**
81:24 210:3
**daily (8)**
38:18 40:11 82:21
86:22 87:2 89:3
90:20 92:12
**data (3)**
145:10,13 190:11
**date (17)**
5:18 51:20 54:19
63:23 95:4,6 98:17
113:20 120:22
126:4 139:25
143:10 146:4
167:20 172:2
174:23 206:5
**dated (1)**
155:18
**dates (1)**
172:14
**David (3)**
45:14 101:5 103:10
**day (26)**
3:3 7:24 8:17 9:13
11:7 31:19 39:12,13
41:21 50:10 53:25
63:6,10 65:11 90:3
90:5 91:20,22 92:18
93:10 102:11
119:10 145:3 186:2
190:17 207:16
**days (5)**
12:20 17:25 20:21
41:5 129:12
**day's (1)**
90:9
**deal (13)**
13:10 14:24 15:7 63:9
67:16,25 71:22
146:21 163:4,15
164:3,6 195:20
**dealer (12)**
11:4 83:16,17,20
84:19,22 85:5,6,8
136:3 138:10,11
**dealers (1)**
140:11
**dealing (6)**
16:10 21:5 53:19
88:24 135:24 203:3
**dealings (2)**
12:4 153:17
**dealt (3)**
16:23 67:22 134:13
**debtor (1)**

178:15
**Debtors (1)**
1:9
**decide (1)**
139:11
**decided (1)**
187:11
**decision (5)**
59:7,14 60:14 61:7
62:14
**decisions (2)**
141:15 181:12
**declaration (16)**
5:15,23 6:4 36:7,13
37:11 75:13 76:8
78:24 160:18
161:12,22 162:9
163:6 180:11
210:10
**deemed (1)**
83:5
**default (17)**
63:15 68:23 69:17
83:5,10 84:4,6,10
86:6,14 87:13 96:23
112:5 113:6,10
114:11 115:22
**defaulted (1)**
113:19
**defaults (8)**
41:2,2 61:16 63:8
97:5 111:18 114:21
115:7
**defect (1)**
100:3
**deficit (10)**
108:4 109:2 110:2,4,9
112:9,23 113:8
200:14 201:9
**define (1)**
149:20
**defined (2)**
108:9 109:14
**definitely (2)**
8:15 20:5
**definition (1)**
158:2
**definitions (1)**
15:18
**degree (2)**
79:25 157:16
**Delaware (1)**
104:7
**delegated (5)**
18:13 19:11 22:10
27:2,6

**deletion (1)**
122:18
**delineated (1)**
28:24
**delivered (1)**
78:12
**delivers (1)**
195:9
**demand (5)**
51:15 52:12,16 54:14
189:18
**demanded (2)**
115:17,25
**demands (2)**
61:19 86:8
**depending (1)**
78:9
**deposition (11)**
1:13 2:6 5:13 64:13
168:20 169:3 203:9
207:5,10 209:11,12
**depositions (1)**
143:2
**derivatives (1)**
158:19
**describe (10)**
6:4 45:19 77:14 83:19
93:19 110:21
160:19 161:11,21
190:10
**described (22)**
15:21,22 16:17 45:21
46:11 63:18 82:24
89:12 100:25
115:22 116:8
120:14 122:20
126:21 130:2
148:25 151:15
162:8 163:4 199:23
200:3 201:8
**description (1)**
99:14
**designation (1)**
81:21
**desirable (1)**
130:5
**detail (4)**
15:20 36:23 193:22
198:16
**detailed (5)**
73:13 75:21 76:25
85:25 192:22
**details (2)**
11:18 59:3
**developed (1)**
128:13

**dialogue (1)**
37:24
**difference (1)**
79:24
**different (7)**
15:17 18:15 46:7
89:17 123:23 159:3
167:13
**differently (3)**
109:14 129:9 158:15
**difficult (4)**
43:8 99:10 137:15
206:8
**difficulties (1)**
165:7
**digested (1)**
28:12
**diligence (8)**
12:22 14:22 15:13,18
15:22 45:20 93:18
179:3
**dimension (1)**
38:10
**dinner (1)**
34:7
**direct (5)**
56:19 87:21,24
188:11 190:23
**directed (4)**
66:12 91:2 96:3 97:4
**directing (1)**
152:18
**direction (4)**
116:23 117:3 140:23
140:25
**directly (2)**
69:12 75:8
**disclose (13)**
13:21 48:23 59:17
131:17 132:24
150:20 152:12
154:5 164:24
182:16 183:8
188:21 191:24
**disclosed (1)**
78:21
**disclosure (2)**
107:19 170:14
**disclosures (1)**
180:9
**disconnect (1)**
8:24
**discovered (2)**
180:14 185:24
**discrete (1)**
46:10

**discuss (5)**
15:19 71:24 72:25
173:2 194:8
**discussed (27)**
38:25 39:18 44:7
58:16 82:15,17 94:7
111:17 116:5
122:20 123:14,18
124:9 134:2 135:10
144:8 146:16
152:20 160:10
177:5 184:10
191:20 201:14
202:15 203:8
205:12,13
**discussing (4)**
123:2 126:19 134:23
149:2
**discussion (20)**
30:8,10 36:23 49:10
100:7 132:7 144:11
144:25 147:3,11
153:2 159:25
164:16 170:4
172:13 184:4,5
189:9 191:2 192:10
**discussions (43)**
6:6 11:10 12:17 25:6
25:10 34:13 37:21
39:19 49:8 55:23
62:4,6,9 66:16 67:6
77:21 105:21
127:15 129:17
132:22 133:2
134:19 135:4 147:8
147:16 150:13
151:12 152:13
154:6 157:15
159:17 164:13
165:6 166:24
172:22 173:4,6
180:24 188:6
192:11,25 193:9
198:24
**distill (1)**
179:20
**distinct (3)**
21:8 22:14 202:16
**distinction (4)**
33:7 82:22 199:14
205:4
**distinctly (1)**
64:22
**distinguish (5)**
12:19 33:9 195:4
199:7 202:7

**DISTRICT (1)**
1:3
**division (6)**
10:7,14 68:8,15,16
158:18
**divisions (1)**
20:14
**document (47)**
5:21 58:8 98:25 100:9
100:13,21 121:9
122:9 126:12 143:5
143:8 153:7,11,21
153:24,25 154:10
154:16,24 155:5
156:2,8,13,22 157:2
157:3,9,22 159:14
167:23 168:4,17,22
169:3,5 170:6,16
174:20,25 175:20
175:25 177:14,17
177:18,18,23 178:8
**documents (5)**
37:16 50:24 51:5
175:12 202:14
**doing (11)**
13:15 15:21 44:12
65:8,22 69:16 70:20
93:25 135:8,9 164:8
**dollars (1)**
36:6
**Domestic (1)**
175:3
**domestically (1)**
165:23
**doubt (1)**
65:18
**dozen (1)**
72:11
**draft (11)**
102:10 157:4,6,17
173:18,19,23 174:3
174:4,7,13
**drafting (3)**
56:20 58:15 155:12
**drafts (2)**
102:3,6
**dramatic (1)**
116:6
**dramatically (2)**
16:25 98:8
**draw (5)**
85:19 86:15 87:4 89:2
89:8
**drawing (1)**
86:24
**drill (1)**

6:12
**driving (1)**
77:12
**due (10)**
12:21 14:22 15:13,18
15:21 45:20 77:20
93:18 148:11 179:2
**duly (2)**
5:4 209:12

_____

**E**

**E (8)**
3:2,2 4:2,2 209:2,2
210:3,9
**earlier (34)**
15:12 47:5 49:13 55:9
57:6 72:22 82:16,17
96:22 112:18
116:18 121:8
123:14 124:9 128:4
130:3 134:2 139:23
144:8 152:21
157:11 159:4 165:7
166:11 174:2,4,7
189:15 194:9
195:16 196:4 198:4
200:3 202:16
**earliest (1)**
150:23
**early (11)**
8:20 9:2 33:23 42:6
94:7 129:24 131:15
131:22 143:11
157:4 178:20
**easier (1)**
9:8
**easily (1)**
22:2
**East (1)**
3:5
**easy (4)**
36:6 40:22 180:22,23
**effect (7)**
55:21 56:23 153:25
185:25 186:6
187:23 188:17
**effective (10)**
38:16 168:21 187:4
187:14 188:5
189:21,23 190:5,7
206:5
**effectively (4)**
56:18 91:4 112:21
141:15
**effectuate (2)**
128:13 162:12

**effectuating (1)**
127:15
**efficiently (1)**
69:10
**effort (2)**
141:5 144:10
**efforts (1)**
141:11
**either (14)**
16:9 33:12 55:3 64:17
68:24 81:23 82:4
104:17 124:18
125:12 133:21
134:14 199:4
206:13
**elaborate (3)**
23:2 47:18 60:7
**eligible (1)**
119:6
**eliminate (1)**
122:19
**embrace (1)**
146:13
**embraced (1)**
20:13
**EMMANUEL (1)**
3:18
**emphasizes (2)**
180:10 181:9
**emphatically (1)**
98:10
**employed (2)**
178:5,6
**employees (1)**
70:14
**encourage (1)**
69:25
**ended (1)**
8:23
**endorsing (1)**
71:23
**engaged (5)**
6:14,19 66:13 67:6
71:16
**engagement (1)**
65:20
**engaging (1)**
12:21
**enormous (2)**
36:5 184:13
**enter (4)**
135:13,25 140:10
164:4
**entered (4)**
14:6 141:9 159:12
187:14

**entire (1)**
78:15
**entities (1)**
145:23
**entitled (1)**
80:6
**entity (5)**
21:5 141:3 142:19
195:11 198:8
**equate (1)**
118:2
**equation (1)**
141:8
**equity (8)**
47:24 52:19 54:21,21
103:25 110:18
159:2 196:7
**equivalent (1)**
177:10
**ERIC (1)**
3:22
**errors (1)**
121:8
**ESQ (5)**
3:7,12,17,22 4:7
**essentially (1)**
115:14
**establish (1)**
18:15
**established (1)**
168:20
**estate (8)**
83:6 137:25 167:3,10
169:18 171:21
197:11,17
**et (1)**
1:8
**Eurex (2)**
139:6 194:12
**European-based (2)**
145:25 146:6
**evaluated (1)**
90:15
**evening (4)**
7:2 9:2 34:6 65:14
**event (4)**
39:16 55:17 67:13
86:13
**events (4)**
12:19,20 140:5 144:8
**everybody (2)**
48:7 54:5
**evidence (1)**
137:2
**exact (1)**
189:10

**exactly (6)**
31:19 49:20 179:20
180:11 192:16
197:4
**EXAMINATION (3)**
5:6 178:18 181:19
**examined (1)**
5:4
**example (11)**
26:14 46:12 78:12
82:3,13 85:18 86:16
89:7 106:9,11 181:3
**exceed (1)**
119:7
**exceeded (1)**
165:13
**exception (1)**
139:8
**exceptions (1)**
139:5
**excess (13)**
83:7 88:5,15 91:8,14
92:5 113:12 120:7
139:19,19 159:18
160:13 183:21
**exchange (55)**
20:13,17,19 25:15
31:5 33:6 34:15
35:15 36:3,9 38:25
42:15,17,25 43:10
43:17 48:4 49:11
55:16 63:7 84:5
85:12 86:3 87:15
88:18,20,22,25
111:10 113:19
117:22 118:5,19
125:16 134:9
135:14 136:2
138:10,10 140:24
177:2 179:7 180:20
194:4 198:3,21
199:10,18,20 200:5
201:12,14,19
202:17 205:23
**exchanges (47)**
16:8 18:14 19:12,16
20:2 21:4,7,10
23:21 37:25 44:7
45:18 46:4 60:4,5
60:11 61:6,16,19
64:4 69:13,21,22,23
89:16,18 97:19
114:23 115:7
127:24,25 134:20
136:13,21 139:17
141:5,10,21 142:11

176:4 194:9,13
199:2 202:23 203:4
204:13 206:7
**exchange's (1)**
63:14
**exclusively (4)**
52:24 65:16,16 84:7
**execute (2)**
148:12 158:20
**executed (5)**
103:2 122:23,24
134:3 155:19
**execution (1)**
156:20
**exemption (2)**
119:16,22
**exercising (1)**
168:19
**exhibit (30)**
5:17,20 75:14 98:16
98:20 100:8,20
102:17 120:20,21
120:25 126:3,7
143:3 151:21 153:6
154:20 156:12
167:19,23 171:25
172:4 174:22
210:10,12,13,14,15
210:16,17
**existence (1)**
159:17
**expect (4)**
28:2 131:21 135:17
141:16
**expectation (2)**
131:13,14
**expected (2)**
50:20 131:6
**expecting (1)**
60:19
**expedient (1)**
148:12
**experience (1)**
131:5
**expiration (2)**
51:20 54:19
**expired (1)**
55:7
**explain (4)**
80:10 90:6 110:14
119:21
**explained (1)**
36:3
**explanation (1)**
15:24
**explore (3)**

10:19 12:14,22
**exposure (6)**
36:4 181:7,24 183:14
185:9 192:15
**exposures (2)**
179:20 181:10
**express (3)**
120:3,4 129:10
**expressed (1)**
157:12
**extensive (2)**
66:16 73:14
**extent (33)**
28:10,21,22 41:12
47:21 49:3 59:12
60:3,16 61:14,23
63:16 71:19 73:7
87:6 107:18 121:7
125:5 133:2 142:14
142:16 144:6
146:24 152:11
161:2 162:10
164:23 165:24
176:24 183:8
188:23 191:23
203:15
**external (1)**
37:5
**extraordinarily (1)**
99:10
**extremely (2)**
18:2 184:11
**ex-U.S (3)**
89:17 104:17 135:24
**eyes (2)**
181:6 182:10
**e-mail (22)**
23:23 67:4 75:2 98:24
101:3 102:16,24
120:25 122:14,15
122:15,16 126:7,12
126:15,16 170:24
172:5 174:13 175:2
175:7 210:18
**e-mailed (1)**
113:21
**e-mails (2)**
75:11 170:18

———————————
**F**
**F (1)**
209:2
**fact (13)**
5:23 41:25 81:11 85:6
89:22 110:9 113:18
131:21 148:4

175:24 178:21
186:24 190:22
**facts (1)**
137:2
**fair (6)**
14:21 65:12 90:4
95:24 125:9 202:5
**familiar (8)**
13:13,18 14:4,5 58:6
172:10,11 175:19
**familiarity (1)**
131:5
**far (3)**
11:17 150:5 175:22
**fault (1)**
176:10
**FCM (11)**
21:11 84:14 86:14
88:4,8,15 89:6
90:18 145:24,25
146:6
**FCMs (2)**
21:14 119:24
**FCM's (1)**
87:10
**feel (1)**
170:20
**feeling (1)**
148:3
**figure (2)**
172:23 183:13
**Filler (9)**
10:11,12 19:10 23:3
23:17 135:2,5
183:18 192:14
**final (3)**
120:11 122:23 174:17
**finalized (1)**
14:17
**finally (1)**
129:19
**Finance (3)**
75:4,6 198:5
**financial (1)**
148:18
**find (2)**
22:18 96:3
**fine (2)**
107:22 168:24
**finished (3)**
8:18 123:2 126:19
**firm (4)**
5:11 24:20 52:13
117:14
**first (45)**
5:3 6:14,19 7:4,5,11

24:3,5 25:2 26:18
33:23 34:20 39:7
44:16 45:4 47:2
65:13 66:13 70:22
75:16 86:20 89:7
98:2 99:8 100:13,20
102:10,24 103:18
107:24 111:5 117:2
122:13,22 124:3
129:21 133:24
137:3 153:10 155:4
156:16,25 170:10
170:15 179:23
**firstly (1)**
80:11
**five (1)**
168:11
**five-minute (2)**
48:8 98:13
**FLEXNER (1)**
3:8
**Floor (1)**
3:10
**flow (1)**
77:12
**flowing (1)**
79:4
**focus (2)**
100:19 126:14
**focused (2)**
30:10 204:15
**focusing (5)**
30:4 45:4 114:5,13
126:11
**folks (2)**
8:13 68:9
**follow (2)**
60:25 176:2
**followed (2)**
12:21 106:5
**following (5)**
34:17 40:4 140:8
208:4,5
**follows (1)**
5:5
**follow-up (2)**
46:9 181:18
**foregoing (1)**
207:9
**foreign (23)**
21:6,10,10 23:4 77:7
79:3 90:12 135:8
136:21 137:20
138:4 141:5,8,10,21
142:10 175:3
194:24 195:14

198:25 202:17,17
204:13
**Forgive (1)**
205:7
**forgot (2)**
124:2 205:9
**form (79)**
11:25 13:5 14:18 15:3
26:5 28:6,24 29:10
32:23 38:8 40:17
54:17 59:25 60:18
62:2 63:2 74:5
78:25 83:2,22 84:21
84:25 85:16 86:18
90:23 91:11 92:14
94:4 96:20 97:13
105:18 106:3,15
117:19 118:7 127:7
129:3,11 130:7,8
131:9,24 136:25
138:13,22 143:24
145:4 146:7 147:20
149:24 151:18
152:10 154:13
155:23 156:5 157:5
159:22,24 160:25
161:6,17 162:2,21
163:8 164:21
166:12 167:11
171:11,23 174:16
175:19 176:16,18
188:19 195:23
197:13,21 199:21
201:20
**formal (1)**
72:4
**formally (1)**
168:18
**formed (1)**
104:6
**former (1)**
142:10
**formerly (2)**
20:15 178:5
**formula (1)**
124:11
**forth (4)**
101:24 126:18 127:17
209:11
**forward (2)**
71:22 186:13
**foundation (12)**
47:4 80:17 82:8 90:22
91:12 92:15 94:5
107:7 152:23
162:22 175:18

206:2
**four (2)**
36:14 81:24
**fourth (2)**
103:3,5
**frame (6)**
13:6 22:12 66:11 82:8
183:24 203:24
**free (1)**
170:20
**freeze (1)**
200:21
**frequent (1)**
108:22
**Friday (24)**
25:10 49:15,16 50:3
50:18 51:18,19
52:10,22 54:18 55:6
55:22,24 101:5
157:4,14 175:2
177:20 185:21,22
187:24 188:18
189:5 190:17
**front (2)**
5:19 185:23
**frozen (1)**
200:24
**FSA (4)**
66:23 73:3,16,22
**full (3)**
103:18 107:24 111:6
**functions (1)**
158:21
**fund (2)**
138:5 200:15
**funded (2)**
119:8 201:3
**funds (59)**
41:19 42:2 79:18
80:19,22,24 88:12
111:8 112:7,11,15
112:17 114:7,17
116:13,22 117:18
118:4,17 120:13
123:13 127:13,16
127:20 128:2,6,12
128:18,19 129:8,18
129:23 130:11,12
131:14 132:13
133:10,16,20
134:21 136:19,23
139:12 151:9,14
152:20 159:18
164:19 165:8,23,24
166:4,6 167:3,9
169:13,23 171:21

177:7
**further (10)**
6:13 18:7 72:6 168:22
169:2 178:12
181:13,19 207:3
209:15
**future (5)**
39:17 111:23 144:16
193:4 201:5
**futures (137)**
6:8,9 7:15 10:7,14,20
11:2,24 12:15,23
13:12 15:2,8 20:15
20:17,19 21:21 27:9
29:17 30:5,6,13,21
31:3,11,24 32:16
36:15 38:6 40:8
41:9 42:3,14,24
43:10,17 45:20
47:19,22,25 48:3
52:17,23 53:3,7,10
53:20,22 59:7 60:15
61:8 62:14 64:16
66:11,16 69:8 75:22
77:2 79:11,14,17,22
80:20 81:4,18 82:17
85:7 87:22 89:13
91:18 101:15 104:6
104:16 105:15,25
106:17,22 107:3,13
108:19 110:17,20
112:5 115:9 127:3
127:24 129:15
133:13 134:8,14
135:16,24 136:24
140:16 141:21
142:10 143:17,17
143:18 144:4,19,21
145:16,23 146:13
146:23 149:9,17
150:17 151:5,13
154:2,12 156:4
157:22 158:6,8,12
158:13,15,23 159:6
159:12 160:22
161:15,21 169:14
185:14 195:5,21
199:17,20 201:11
202:19 203:19
205:22 206:8
**futures-based (1)**
146:12
**futures-related (2)**
10:20 12:16

_____ G _____

**gap (1)**
133:19
**Gavin (1)**
73:18
**general (14)**
11:8 17:24 21:4 24:3
27:25 52:6 62:3,5,8
68:9 76:20 131:4
137:9 160:20
**generalities (1)**
6:13
**generally (19)**
6:5 11:13 27:11 29:11
46:2 50:12 65:19
77:23 79:18 81:23
83:25 114:20 125:2
125:22 127:8
132:17 134:19
143:20 201:6
**gentleman (1)**
10:10
**Germany (3)**
139:6 194:13 200:3
**getting (8)**
29:6 39:14 46:6 54:24
78:19 98:10 136:22
205:7
**Gilberg (9)**
45:15 46:5,14,17
101:5 103:13 123:6
160:5,6
**Gilberg's (3)**
45:21 103:10 123:5
**Gill (1)**
35:13
**give (9)**
20:9,11 26:17 35:25
66:11 89:23 137:23
138:23 163:19
**given (14)**
29:22 38:20 40:20
50:10 56:12 60:7
91:16 95:22 98:5
160:14 169:22
192:21 204:19
209:13
**gives (1)**
36:10
**global (2)**
62:9 144:21
**globally (1)**
143:18
**go (23)**
11:12 19:21 36:22
77:13,19 79:5 84:12
84:14 86:20 90:3,8

100:4 107:25
138:14 142:21
168:8,14 170:2,19
170:20 182:6 186:3
200:23
**goal (2)**
144:2 151:4
**goes (4)**
98:25 119:5 126:8
172:7
**going (53)**
6:23 8:21 11:5 15:19
22:25 35:13 36:21
38:18,22 40:12
59:15 60:25 63:9
64:9 68:23 70:19
73:8 91:16 92:21,22
92:23 95:4,16 96:19
98:7 100:19 106:4
106:14 125:4
131:16 132:16,17
132:23 135:11
144:13 149:19
151:7 154:25
160:22 162:15
168:3,18 171:3
180:12 181:8,25
182:15 183:7
189:22 190:6
191:10,22 200:25
**good (11)**
5:8,9 22:24 27:23
43:12 48:9 54:4,24
70:9 107:14 173:15
**gotten (1)**
135:20
**Gottlieb (1)**
11:16
**govern (1)**
157:22
**governed (1)**
188:24
**Grain (1)**
199:9
**Great (1)**
196:21
**Green (1)**
65:3
**ground (1)**
76:3
**group (5)**
23:7 41:23 76:22
85:16 116:16
**guarantee (22)**
34:14,20 35:2 49:18
49:21,23 50:4,15,25

51:8 52:13 54:2,14
55:11,16,21 56:15
56:22,23 57:8
114:24 186:3
**guaranteed (1)**
185:21
**guaranteeing (1)**
186:5
**guess (13)**
8:25 9:19 23:17 51:2
57:18 77:4 82:14
110:6 128:16
133:18 143:15
166:14 187:9
**guessing (2)**
149:25 150:2
**Guest (1)**
9:20

_____ H _____

**H (1)**
210:9
**half (2)**
170:10,15
**hand (2)**
96:4 209:20
**handed (4)**
98:19 120:24 126:6
174:24
**handing (6)**
142:25 153:4 154:19
156:10 167:22
172:3
**handle (6)**
18:3 38:17 63:17
70:19 148:22
203:14
**handled (1)**
59:2
**handwriting (1)**
156:16
**happen (5)**
30:13,18 87:2,23
104:11
**happened (4)**
31:14 56:12 74:2
187:13
**happy (2)**
90:8 193:17
**hard (1)**
60:24
**head (1)**
68:16
**headed (1)**
149:11
**heading (2)**

148:6 150:8
**hear (1)**
155:2
**heard (5)**
33:13 48:21 49:4
57:23 136:12
**hearing (2)**
64:25 139:11
**heavily (1)**
39:18
**hedge (1)**
180:23
**held (29)**
16:13 26:25 28:4
32:15,21 33:5 37:23
38:5 40:8 41:13
60:12 61:6 79:12,18
80:14 81:7 82:5,24
89:4,6 91:10 100:7
128:3 132:13
136:19 137:12,21
150:21 170:4
**help (2)**
10:16 162:4
**helpful (2)**
175:23 189:25
**hereinbefore (1)**
209:11
**hereunto (1)**
209:19
**high (6)**
11:13 62:20 77:22
94:14,17 164:6
**higher (1)**
44:10
**highest (5)**
16:18 25:16 61:13,21
180:12
**highlight (1)**
138:7
**highlighted (6)**
99:9,11,25 109:2
188:25 193:11
**highlighting (2)**
99:4,6
**highlights (1)**
180:8
**HIGHLY (1)**
1:12
**high-level (4)**
145:10,13 147:8
192:20
**high-quality (1)**
147:8
**Hill (1)**
73:18

**hinder (1)**
26:12
**Hodge (3)**
143:12,13,15
**hold (3)**
41:8 169:15 170:24
**holding (6)**
80:19,22,23,25
124:13 128:17
**HOLDINGS (1)**
1:8
**honest (1)**
168:2
**Hong (4)**
199:17,20,22 200:2
**hope (2)**
90:3 167:24
**hour (3)**
34:19,23,25
**hours (6)**
50:9 91:21 92:3 95:8
122:17 186:25
**house (55)**
24:25 25:15 30:24
41:18,20,24 55:17
56:16 81:7,12 82:6
82:20 86:3,10,14,23
86:24 87:3,7,9,11
88:23,25 89:5,7
90:13 108:8,24
109:8,9,10,14
110:23 111:2,4
140:24 141:25
142:4,18 158:23
176:19,24 177:7
178:22 179:5,16,18
184:18,21 196:19
196:22,25 199:3,3,8
**houses (13)**
18:15 19:13 37:25
69:2,14 89:18
111:20 114:24
136:14 141:5,11,22
142:11
**Hubbard (3)**
2:7 3:13 5:11
**huge (2)**
35:24 36:2
**Hughes (3)**
2:6 3:13 5:11
**hybrid (1)**
84:4
**hypothetically (1)**
83:11

─────────────
**I**

**ICE (16)**
20:15 29:16 30:5,6,13
30:21 31:3,11,24
32:6,9,15,20 33:12
33:16 203:19
**idea (1)**
36:10
**identical (1)**
158:22
**identification (7)**
5:18 98:17 120:22
126:4 167:20 172:2
174:23
**identified (6)**
64:13 84:12 101:22
147:13 148:17
163:2
**identify (7)**
98:23 121:7 161:25
162:3,6 172:5 191:7
**identity (1)**
61:5
**ignored (2)**
122:6,7
**illiquid (1)**
184:11
**illogical (1)**
70:21
**immediately (3)**
119:10 140:8 168:21
**impact (1)**
151:16
**impediment (1)**
29:6
**impediments (1)**
25:20
**implement (1)**
163:22
**implementation (2)**
127:5 133:12
**implementing (1)**
162:11
**implicate (1)**
193:22
**implication (1)**
49:22
**implied (1)**
86:9
**imply (1)**
29:21
**important (5)**
87:12 91:13 117:7
147:14 158:24
**imposed (1)**
97:19
**imprecise (2)**

31:9 59:20
**impression (2)**
17:25 164:2
**inability (2)**
30:19 148:12
**inaccurate (1)**
55:14
**inadequacy (1)**
192:17
**inadequate (7)**
30:12 112:11 184:6,7
185:8 191:20,21
**inadvertent (1)**
170:14
**inadvertently (2)**
168:16 170:12
**inception (1)**
203:9
**inclined (2)**
115:20 171:15
**include (9)**
109:16 110:7,23
129:25 130:13
131:8,23 145:14
194:17
**included (7)**
94:21 130:22 132:14
192:13 196:13,18
204:24
**including (8)**
20:14 52:19 103:24
119:14 151:14
166:25 196:6
198:13
**incomplete (3)**
16:25 17:10,13
**increase (4)**
150:11,16 151:5,8
**incurred (2)**
197:11,18
**independent (3)**
167:6 169:4,9
**index (2)**
31:10 184:12
**indicate (2)**
36:6 111:22
**indicated (13)**
72:22 84:3 91:21
111:21 112:8,18
139:23 140:14
179:6,15 195:4
204:21 206:7
**indication (1)**
72:6
**individual (8)**
67:20 110:5,11 120:6

148:3 149:8 162:3,6
**individuals (6)**
35:16 64:7,12,17
67:22 102:16
**industry (1)**
131:5
**infectious (1)**
19:22
**inference (1)**
190:24
**influenced (1)**
13:15
**information (85)**
14:12 16:2,7,12,16,19
16:24 17:7,10,12,15
17:21 18:7,9,12,16
18:17,18 19:6 22:19
24:6 25:12,16,25
26:17,18,19,23,24
27:14,18 28:11,14
28:16,23 29:2,7,14
31:6 32:13,19 36:20
37:2 46:4,6 54:25
59:11,19,23 60:6,13
60:13 61:9,14,21
62:15,18 64:2,3
69:21,23 71:19
75:21 76:9,18 77:2
77:12,14 78:11,18
78:18 79:3 94:3,13
94:20 95:13 96:3
98:11 119:9 133:4
135:6 145:15
179:18 193:15
203:14
**informed (2)**
71:18 114:25
**initial (8)**
41:15,16 46:18 86:16
200:20,20 201:2,9
**initially (3)**
20:18 44:24 66:12
**inquiring (1)**
7:16
**inquiry (1)**
25:14
**insecure (1)**
51:19
**insecurities (5)**
30:14,17 67:10 68:20
69:2 189:18
**insecurity (6)**
30:11,25 42:23 87:15
88:19 188:12
**inside (4)**
20:6 43:18 52:6 173:9

**insofar (2)**
161:15 200:7
**insolvency (1)**
140:18
**insolvent (1)**
141:2
**instance (2)**
24:3 26:18
**instances (1)**
140:9
**institutional (3)**
144:20 147:15,23
**instruct (10)**
6:24 11:6 107:17
131:17 132:23
150:19 154:5 163:9
182:16 188:20
**instructing (1)**
13:21
**instruction (2)**
152:24 164:22
**instructions (1)**
135:21
**insufficient (5)**
181:6,24 182:5,9
185:12
**intellectual (1)**
187:10
**intend (1)**
28:9
**intended (3)**
122:25 187:14 204:19
**intending (2)**
33:8 146:5
**intensely (2)**
135:2 140:7
**interacted (1)**
146:18
**interactions (1)**
10:24
**interchangeable (1)**
88:23
**interest (9)**
84:20 85:13,16,23,25
86:2 172:25 176:21
180:20
**interested (3)**
25:18 26:9 209:18
**interesting (3)**
52:21 170:23 187:10
**interests (2)**
163:23 176:4
**intermediary (1)**
68:17
**intermediate (1)**
122:19

**internal (1)**
37:5
**interrupt (1)**
177:13
**intraday (5)**
40:12 82:20 83:18,25
89:3
**introducing (1)**
136:20
**investigation (1)**
93:18
**involuntarily (1)**
199:4
**involve (1)**
55:18
**involved (38)**
6:5 7:4,5,12 10:19
11:16,19 12:15 15:6
15:11 18:18 24:7
39:19 42:12 44:12
49:2,4,6 50:23
58:12,15 65:13 91:3
102:20,22 107:11
126:25 127:14,18
133:10,19 140:7
151:11 153:20,24
160:5,6 172:14
**involvement (2)**
133:24 134:16
**issue (3)**
85:8 179:4 195:17
**issued (1)**
57:15
**issues (7)**
58:16 77:21 78:7,23
79:2 107:11 137:14

J

**J (2)**
3:12,17
**James (3)**
9:19 27:20,22
**Japan (5)**
139:10 198:5,8,11,15
**Japanese (3)**
67:2 74:25 198:13
199:14 203:4
**Jeff (5)**
10:3 19:10 116:17
187:12 192:13
**Jennings (6)**
10:3,5 19:10 116:17
183:18 192:13
**Jerry (2)**
24:15 35:12
**Jim (2)**

52:6 173:20
**JOB (1)**
1:19
**John (2)**
68:8 101:9
**joint (1)**
85:6
**JONES (1)**
3:3
**JPM (2)**
173:2,6
**JPMC (2)**
173:5 174:10
**JPMorgan (5)**
127:19 128:16,22
129:7,9
**jurat (1)**
206:16
**jurisdiction (1)**
200:2
**jurisdictions (11)**
21:17 137:5 138:5,16
138:19 139:16
140:15 194:12,25
195:3 199:24
**jurisdiction's (1)**
139:21

K

**K (203)**
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1

107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1
**Kansas (10)**
20:22,24 43:22 44:5,6
44:13 205:9,12,14
205:16
**KAY (2)**
3:22 178:16
**keep (4)**
67:7 71:18 125:5
164:18
**keeping (1)**
167:25
**keeps (1)**
81:13
**Kenneth (8)**
1:13 2:6 5:2 207:8,14
209:10 210:5,10
**kept (1)**
120:15
**key (2)**
148:8,11
**Kim (2)**
24:24 35:12

**kind (3)**
14:5 71:22 157:4
**kinds (1)**
64:8
**knew (17)**
11:14,16 20:20 22:19
42:6,10 44:11 54:6
60:3 73:10 96:14
97:6 114:20 132:4
132:11,19 195:25
**know (116)**
5:10 9:21 13:15 14:11
15:20 20:25 23:14
23:19 27:16,21
28:14,15,17,17
31:13 33:10 41:11
41:25 42:4,5 43:9
45:11 47:14 48:20
49:5,13 53:22 58:17
58:20 59:11,19,20
60:6 61:9 62:15
64:19 66:6 70:3
73:25 74:8,10 76:17
91:19 92:3,4 93:11
93:15 94:2,9 96:13
96:24 98:4,21
104:20,24 105:6
107:16 108:14
115:25 116:9,10
121:5,6,9,10,20,21
124:18,19 128:25
131:12,20 132:8,10
134:12 136:7,8
141:14 143:4,12,13
145:1 148:2 156:14
156:15 159:11
162:4 173:9 175:6
177:13,14 178:2,13
179:11 190:12,13
190:13,21 193:12
195:10,11,17 197:3
197:3,9,16,22,25
198:16,18,24 199:8
199:10,18 201:12
206:9
**knowing (2)**
26:9 180:11
**knowledge (29)**
27:6 30:15 33:4,15
39:10 40:2 41:7
43:2 51:7 52:17
73:20 90:17 93:9
104:12 128:22
129:24 134:10,11
136:6 139:25
141:13,19 142:8

155:11 156:20
172:19 178:10
190:9,23
**known (7)**
20:15 32:17 58:3
61:14,21 71:6
147:13
**knows (2)**
93:2,8
**Kong (4)**
199:17,20,22 200:2
**Korea (4)**
201:12,13,18,25

**L**

**label (1)**
121:17
**labeled (1)**
80:20
**lack (4)**
77:12 90:21 112:4
175:17
**lacks (6)**
80:16 82:8 91:12
107:6 152:22
205:25
**Lacy (47)**
4:7 18:20 28:6 32:23
40:17 74:5 85:20
89:20 90:23 96:19
97:13 99:3,7,14,17
99:19,23 100:2,8
106:17 121:21,24
122:5 130:8 131:9
138:14 141:23
142:12 143:24
145:4 155:14
167:14,24 169:15
169:20 170:5
175:17 176:16
178:19 181:13
182:4 191:10,13
193:24 196:16
207:5 210:7
**language (1)**
117:20
**large (5)**
32:6,9 59:21 60:3
137:11
**largely (1)**
133:14
**larger (1)**
162:6
**largest (2)**
29:5 48:4
**lasted (2)**

7:24 8:16
**late (3)**
8:25 36:24 205:7
**latest (1)**
70:24
**latitude (1)**
15:24
**law (3)**
5:11 38:23 141:16
**Lawton (3)**
68:8,14,18 101:10
**lawyers (2)**
11:14 168:7
**lay (1)**
47:4
**layman (1)**
118:12
**layman's (1)**
117:23
**LBI (79)**
6:6 21:5 36:17 67:15
77:16,25 103:24
104:2 105:3,6,9,15
106:10,10 107:4
108:18 109:11
111:7 114:6,16
115:15,23 116:10
117:17 118:4,16
120:13,13,15 124:7
125:14 130:13,23
131:8,23 132:14
133:22 134:17
136:19 140:2,16
142:20 145:23
146:12,20,23
160:22 162:13,20
162:25 163:15,22
164:3,20 167:3,10
177:17 189:23
190:7 191:25
194:18,21 195:3,10
195:10,11,20 196:5
196:7,25 197:5,11
197:12,17,18 198:8
198:10,15 205:13
**LBIE (5)**
74:14 106:9 145:24
195:6,10
**LBI's (22)**
6:8 36:15 75:22 77:23
106:11 116:12,21
123:21 124:25
127:3 134:17 136:4
141:20 142:9
146:17 176:14
179:12,12,14

194:18,19 199:19
**LBSF (1)**
195:10
**lead (2)**
64:19 188:14
**leading (2)**
17:25 34:13
**learn (7)**
13:10 33:20 42:7,8
53:10 78:13 154:22
**learned (7)**
14:6,11,20 132:24
133:4 135:7 179:23
**leave (2)**
15:23 133:18
**leaving (3)**
61:5 125:6 139:18
**lecture (1)**
89:23
**led (6)**
27:19 36:15 116:16
189:20 190:11,18
**left (1)**
84:8
**legal (6)**
37:4 88:8 92:24
136:15,16 145:23
**legally (1)**
93:4
**legislation (1)**
124:10
**Lehman (196)**
1:7 3:4 7:12 8:10,13
9:24 10:4,6,8,13,21
11:2,3,23 12:3,16
12:23 13:3,11 14:25
16:9,15 17:2,6,21
18:6,19,21 19:4,7
19:19 20:3,23 21:5
21:9 23:9,11,15
24:8 25:20,21 26:20
27:15 28:2,3,13,16
28:20,21,23 31:4,8
31:10 32:15,20 33:5
33:17 35:3 37:23
38:5,13,15,24 39:23
40:4,9 41:19,25
42:23,25 43:11 44:7
47:22,23 48:16
49:19 50:5 54:3,25
58:21 59:4 60:15
61:8,15 62:5 64:6
65:11 67:13,14
68:24 70:15 73:7
74:9,11,13 76:19
80:13,14 81:6 82:4

82:12,17 84:19,23
90:18 91:6,18 92:11
92:24 94:23 96:5,7
96:15 97:7,23
101:16 104:16,24
105:5,13,23,24
106:8,23 108:19
109:11,16,22 110:6
110:8 111:19 112:5
113:18,25 114:12
114:15 115:6
118:12 124:15
125:2,12,23 127:13
127:18 129:25
132:13 133:12
134:18,20,23
135:16 137:13,25
138:2,4 140:17
142:10 144:4,16
145:3,11,22 147:4
147:24 148:16
149:5,17 150:21,24
152:16 157:13
161:14,20 162:13
171:21 178:5 182:8
182:19,22 183:2,6
183:13 184:5,10
185:5 192:14,23
193:5 195:22
198:23 199:11
201:11,18,24
203:18 205:22
**Lehmans (2)**
35:6 82:3
**Lehman's (54)**
7:14 8:4 13:12 15:8
21:20 25:12 26:2
27:9 30:11 34:15
35:23 38:22 39:2,8
39:9,22 40:15 41:8
41:15 44:20,21
50:25 51:8 54:14
55:11,16 56:15
62:14 64:16,18 66:5
66:10 69:18 70:5
74:2 107:12 113:3
127:2 135:16
136:24 144:19
145:16 147:6
151:12 154:2,12
156:4 159:19
169:14 171:9
176:14 183:15
185:8 186:5
**Lehman-Barclays (1)**
144:14

**letter (56)**
68:3 100:24 101:23
102:3,14,23 103:17
104:5 107:25
108:17,21 110:2,23
111:7,18 113:21
114:6,18 116:3,8,14
117:11,15 119:15
119:18 120:10
122:17,21,23,23,24
122:25 123:10,15
123:17,19,24 124:2
124:3 125:10,17
126:17,19 135:23
152:4,6 154:21
155:18 172:20
173:11,18 196:3,19
196:20 197:2,20
**letters (5)**
151:22,24 152:5,9,17
**Let's (3)**
163:10 182:6 186:3
**level (15)**
11:13 16:18 17:24
25:16 44:10 61:13
61:21 62:20 77:22
94:15,17 179:7
190:16 195:6,6
**levels (4)**
38:14 180:12,18
181:9
**liabilities (2)**
79:21,25
**liability (3)**
104:7 200:5,16
**liaison (1)**
160:4
**lien (3)**
176:13,18 177:11
**limited (5)**
104:7 110:24 137:19
139:5 151:14
**limiting (1)**
22:4
**line (6)**
75:16 92:4 163:3
175:20,21 208:6
**liquidate (6)**
31:2 55:3 88:2 181:8
182:2 206:14
**liquidated (12)**
32:22 33:12 77:9
139:17 198:16,18
198:20,21,23 199:5
205:19 206:4
**liquidating (1)**

180:21
**liquidation (2)**
31:17 87:25
**liquidity (2)**
50:12 184:15
**list (4)**
17:2 20:9 28:3 46:4
**literally (1)**
87:25
**litigation (1)**
178:9
**little (22)**
6:13 9:18 12:17 24:23
24:23 55:14 60:24
61:2 80:10 86:20
109:14 118:8,10
134:22 135:11
146:9 147:10 158:4
165:18 168:7
195:16 198:4
**LiveNote (1)**
2:11
**Liz (3)**
9:19 27:19,22
**LLC (5)**
104:2,10 122:19
123:16 196:8
**LLP (5)**
2:7 3:3,8,13 4:3
**local (2)**
139:21 141:16
**location (3)**
81:5 137:10 177:7
**locations (1)**
80:18
**locked (4)**
96:8,15 97:9 140:22
**long (2)**
19:21 121:22
**long-term (1)**
185:9
**look (3)**
70:17 90:2 102:25
**looked (4)**
151:23 166:15 196:4
197:17
**looking (11)**
12:21 25:17 55:25
71:21 116:6 117:25
121:24 133:15
144:11 157:25
174:14
**looks (2)**
103:9 174:16
**losing (1)**
149:7

**loss (2)**
36:16 148:11
**lost (2)**
142:5 165:2
**lot (7)**
44:18 64:20 66:6
127:17 147:22
162:16 198:16
**LP (1)**
163:7
**lunch (1)**
176:3

---

**M**

**M (1)**
3:22
**Macquarie (2)**
22:14,17
**Madison (1)**
3:20
**magnitude (2)**
36:2 184:19
**maintain (4)**
88:5,9 118:6,18
**making (4)**
33:3,7 82:22 150:6
**Malaysia (1)**
202:20
**manage (3)**
38:18 39:9 181:3
**management (1)**
150:10
**manner (1)**
161:24
**March (3)**
1:15 2:2 209:20
**margin (33)**
30:13 36:8 38:18
41:16,17,22 57:15
57:19 61:18 84:2
86:15,16 97:18
110:12 177:8 181:4
181:22 182:8
183:21 184:4,6,14
184:17,21 185:5,12
191:18 192:17
193:2 200:20,20
201:2,9
**margins (2)**
82:21 185:2
**mark (4)**
41:21 50:13 95:9
120:20
**marked (22)**
5:17,20 91:23 98:16
98:20 120:11,21,25

126:3,7 143:2 152:2
153:6 154:20
156:12 167:19,23
169:5 171:25 172:4
174:22,25
**market (21)**
38:21 41:22 50:13
54:20 77:4 79:17
91:17,23 92:9 95:9
98:6,7 147:15
148:24 184:12,16
185:18 193:5
202:17,23 203:4
**markets (36)**
11:21 16:13,20,21
17:3,5,7,11,17 18:8
22:20 26:9,10 50:11
69:8,9 77:7 79:3,11
81:19 89:13 90:16
91:21 95:9 98:8
104:22 105:3,5,7,10
135:8 144:13 199:7
199:14 202:25
206:10
**market's (1)**
97:2
**market-based (1)**
86:25
**market-related (1)**
86:8
**Markman (2)**
101:12,15
**marks (1)**
63:7
**marriage (1)**
209:17
**marry (1)**
181:6
**material (1)**
99:9
**math (2)**
175:22,25
**matter (18)**
5:12,25 6:15 11:9
20:10 21:4 27:25
43:14 64:25 65:17
65:25 70:16,23
137:9 153:5 154:21
186:24 209:18
**McDaniel (7)**
52:7 53:25 54:13
173:20,24 174:7,12
**mean (43)**
19:18 47:6 50:6 60:2
65:18 66:15 69:5
70:10 76:7 77:3

78:7,9,16 86:2,19
87:9 93:4 94:17
98:5 105:25 106:17
108:13 109:19
110:3,15 112:12
115:17 124:3,6
125:10 127:4 138:3
145:5 148:5 149:3
149:20 150:7 159:3
162:10 169:17
171:17 177:12,14
**meaning (2)**
95:20 108:4
**meaningful (1)**
13:16
**means (8)**
65:23 85:25 110:5
137:25 149:23
150:3 151:9 160:16
**meant (4)**
111:14 142:3 171:14
196:13
**mechanics (1)**
133:11
**meet (13)**
61:19 81:3 86:8,22,25
87:7 92:6 96:17
97:18,25 149:7
177:2,8
**meeting (32)**
7:12,19,21,23,24 8:13
8:16 9:4,25 10:18
12:5,14 16:3,14
23:7 46:18 63:19,19
63:20,24 64:10,14
65:11 76:21 111:19
143:21 144:3 145:2
145:10 147:4
163:22 193:13
**meetings (28)**
6:5 7:16 8:21,22,23
12:9 14:22,23,23
15:14 16:4 18:5
27:12 46:22 63:21
64:6,9,11,15 66:8
75:20 77:22 94:7
127:14 143:11
148:15 150:23
161:10
**member (17)**
17:3,8,15,18 18:8
19:17 20:3,24 21:6
21:9 33:18 44:8,9
44:19 111:20
176:25 205:14
**members (2)**

16:21 136:21
**memo (5)**
144:5,7,9,10 146:4
**memorandum (2)**
143:21 145:22
**memorialized (2)**
56:18 58:2
**memorializes (1)**
58:9
**memory (4)**
21:3,8 22:14 43:4
**mentioned (4)**
33:22 69:4 101:11
179:22
**Mercantile (3)**
20:12 49:11 135:14
**merchant (2)**
6:9 85:7
**Merit (1)**
2:10
**messages (1)**
34:8
**met (2)**
82:21 186:13
**methods (1)**
115:21
**middle (1)**
165:3
**midnight (3)**
34:2,10,17
**million (2)**
144:22 183:22
**mind (1)**
77:15
**minimum (3)**
95:8 130:3 193:3
**minimums (1)**
159:20
**Ministry (3)**
75:3,6 198:5
**minority (1)**
18:25
**minutes (1)**
168:11
**mischaracterize (4)**
47:6 108:13 125:10
188:2
**mischaracterizes (3)**
14:19 57:13 165:17
**missing (2)**
20:7 197:24
**misspoke (3)**
18:20 182:4 201:21
**mistake (2)**
100:15 103:6
**misunderstood (1)**

47:5
**MOF (1)**
75:3
**moment (12)**
61:19 75:14 89:21
91:14 98:21 100:5
118:22 121:4 143:3
156:13 172:8 175:5
**Monday (10)**
23:8 25:5 37:24 50:19
50:21 55:8 57:16,22
70:24 144:3
**Monday's (1)**
185:22
**money (26)**
57:20 81:3,13 83:11
84:4,8,11 86:10,15
88:10,17 89:2 90:18
112:22,24 113:3
120:8 137:23,24
140:22 200:17,17
200:18,24 201:4,7
**monies (10)**
42:12 84:12 89:8
97:18 120:15 137:4
137:18 164:19
165:12 201:15
**monitor (1)**
40:24
**monitoring (1)**
40:11
**months (2)**
56:13 153:19
**morning (23)**
5:8,9 7:18 8:13,15
31:22 32:2 34:17,21
49:9 60:21 143:23
151:23 153:3
157:24 158:7,10
160:15 177:5
178:21 179:6,23
183:17
**move (16)**
120:8,12 127:12
129:19 137:7,8,10
140:6,25 141:6
199:25 201:23
202:3 203:16
205:20,21
**moved (41)**
24:21 40:3 67:13
87:21 128:12
129:16,23 130:13
130:19,20 131:3,7
131:14,22 137:5
138:11,20 139:4,5,7

139:8,9,13,24,24
140:10,23 141:12
142:16,16 198:6,7
199:23 200:8
201:16 204:3,6,7,24
205:11 206:11
**movement (8)**
26:12 36:8 116:7
128:6 129:8 133:20
134:24 185:19
**movements (5)**
50:11 119:24 128:14
134:21 193:5
**moves (1)**
184:16
**moving (15)**
18:19 24:7 25:20 30:9
40:22 95:10 98:9
111:5 118:24
127:16 129:17
133:15,16 134:16
200:8
**muddled (2)**
176:7,9
**multiple (2)**
121:14,17
**mystified (1)**
99:22

_____
**N**
**N (3)**
3:2 4:2 210:3
**name (9)**
5:10 10:11 35:13
43:19,24 74:25 81:6
101:10 161:23
**named (1)**
67:20 139:17
**names (3)**
9:23 27:23 67:21
**Natalie (2)**
101:11,24
**nature (12)**
25:17 26:2,7,23 27:8
31:7 32:14 41:12
59:12 60:16 61:22
179:19
**Navin (4)**
52:6 53:24 54:13
58:23
**near (1)**
143:9
**necessarily (3)**
21:13 88:10 189:10
**necessary (1)**
82:14

**need (14)**
87:22 106:4 112:2
120:17 151:10,16
160:13 164:14
167:8 169:11 171:7
171:20 193:2
197:15
**needed (7)**
34:19 40:24 49:23
71:19 87:6 164:18
177:2
**needs (1)**
146:9
**negotiate (4)**
67:11 73:21 162:20
162:25
**negotiated (3)**
102:12 129:12 136:11
**negotiating (5)**
58:12,17,20 161:13
164:6
**negotiation (4)**
13:14 102:14 153:21
153:24
**negotiations (5)**
13:18 14:4,24 15:7
129:13
**neighborhood (1)**
180:21
**Neil (8)**
3:17 5:10 47:11 60:19
168:5 177:12
189:11 192:4
**net (5)**
88:9,9,11 103:25
196:6
**never (7)**
27:3 33:13 62:7 80:4
159:25 160:9 169:7
**new (23)**
1:3,14,14 2:8,8,12 3:6
3:6,11,16,16,21,21
4:6,6 20:16 122:17
201:2 208:2,3 209:3
209:5,8
**newly (1)**
104:6
**news (1)**
37:13
**non-CME (1)**
177:6
**non-Japanese (1)**
202:23
**non-performance (4)**
148:19 149:4,5,8
**non-performances (...**

148:21
**non-U.S (11)**
21:3 79:17 81:18
89:12 105:4,7,14
106:23 107:12
127:25 195:2
**normally (1)**
109:3
**North (1)**
3:10
**Notary (3)**
2:11 207:18 209:7
**noted (1)**
207:6
**notes (3)**
12:5,9,11,11 145:22
**November (2)**
173:19,20
**number (21)**
23:25 34:10 67:18
75:22 81:22 85:4
98:25 120:5 121:2
121:11,17 122:6
128:10 129:12
149:11 158:3
168:17 170:8 172:6
177:16 194:13
**numbers (6)**
94:18,21,25 96:10
121:15 122:2
**NYMEX (1)**
20:15

_____
**O**
**object (46)**
6:24 11:5 28:6 32:23
36:22 38:8 40:17
53:14 59:15 74:5
85:5 90:23 92:22
95:16 96:19 97:13
106:15,19 125:4
130:8 131:9,16,24
132:16,17 143:24
145:4 146:7 150:18
156:5 159:21,22,23
160:25 161:6,17
163:8 164:21 168:3
171:11 175:17
176:16 182:15
183:7 188:19
191:22
**objection (83)**
11:25 13:5,20 14:18
15:3 22:11 26:5
29:10 36:24 53:15
54:17 57:12 59:25

60:18 62:2 63:2
78:25 80:16 82:7
83:2,22 84:21,25
85:21 86:18 90:21
91:11 92:14 94:4
95:25 97:12 105:18
106:3 107:6,17
116:25 117:19
118:7 125:9 127:7
129:3 130:7 131:25
136:25 138:13,22
141:23 142:12
147:20 149:24
151:18 152:10,22
152:23 154:4,13
155:13,23 159:24
162:2,21 163:16
165:16 166:12
167:11 171:23
173:13,15 183:23
186:8 187:25 189:6
192:4,19 193:8,21
195:23 197:13,21
199:21 201:20
203:21 205:25
**obligated (1)**
96:6
**obligation (2)**
39:25 96:8
**obligations (38)**
33:17 38:23 55:16
56:15 81:3 82:11,25
86:25 87:7,8,9,10
92:6 96:17 97:8
111:19,23 113:2,6
127:3 135:15 136:5
138:5,6 141:20,25
142:9,17 149:9
159:8 165:13 166:7
177:2 186:6,12,13
189:23 190:7
**obstacle (1)**
77:14
**obtain (4)**
18:9,16,16 24:6
**obtained (4)**
128:20 191:3,5
196:24
**obviously (9)**
9:6 41:6 50:10 90:8
111:24 132:21
175:20 181:6
183:19
**OC (1)**
172:16
**OCC (68)**

12:4 45:2 46:24
47:8,19,23 48:2
51:15,17,18,25 52:4
52:12,13,14,18,20
53:10,22 54:3,7,16
54:22 55:10,20 56:7
56:14,16 57:23 58:3
58:10,21,23 111:25
134:4 157:12,16,23
158:14,18,25 159:3
159:8 172:14,20
181:5,23 182:8
184:22,23 185:5,7
186:6,11 187:16
188:7,12 189:17,21
189:23 190:5,7,9,17
191:8,19 193:6,10
**occur (1)**
84:2
**occurred (5)**
31:18 60:4 186:12
188:9 192:22
**OCC's (7)**
47:24 54:14 157:20
185:2,21 193:3,11
**October (5)**
129:21,24 130:13
131:15,22
**office (7)**
24:4 65:8 66:4,5
68:10,11 166:25
**officers (2)**
19:4,7
**offices (2)**
8:4 70:5
**oftentimes (1)**
72:15
**Oh (2)**
99:17 122:15
**okay (35)**
22:7 30:3 45:4 48:7
60:23 61:4 111:5
113:16 114:2
118:11 122:8,15
131:4 138:15,18
145:20 147:2
151:20 156:9,21
167:18 168:10
169:20 174:21
177:22 178:7
182:24 183:15
186:3 189:25
190:10 192:6
193:19 196:21
205:2
**once (1)**

18:24
**ones (10)**
9:20 28:13 161:11
162:14 182:25
183:9 206:9,10,12
206:13
**ongoing (2)**
137:4,18
**onwards (1)**
91:3
**on-site (3)**
70:4,15,21
**oOo (1)**
207:7
**open (8)**
63:12,13 108:3 109:4
110:14,18,18
180:20
**opened (1)**
11:21
**opening (5)**
50:19,21 57:4,15,22
**operate (1)**
69:9
**operates (1)**
145:23
**operations (3)**
27:12,16 203:7
**opinion (2)**
92:24 156:2
**opportunity (2)**
15:19 151:6
**opposed (2)**
142:2 204:10
**opposite (1)**
82:10
**opposition (2)**
5:16,24
**options (11)**
12:3 45:2 47:20,24
51:20 52:19,25
54:19,21 55:7 159:2
**order (14)**
36:2 67:12 70:18
72:25 73:21 101:2
128:13 135:19,21
170:13 187:16
193:4 202:11,14
**orders (1)**
184:18
**organization (10)**
29:9 85:13 113:20
134:10 136:3
158:16,19 176:13
194:5 205:23
**organizations (12)**

19:16 20:2,9 22:9
23:21 24:2 29:13
46:5,7 115:8 141:6
176:5
**original (1)**
200:23
**outcome (1)**
209:18
**outside (21)**
19:17 20:3,5 21:12,22
22:5 23:12 24:15
52:4,7 104:25 105:7
105:10 106:8
133:14 136:24
138:12 165:24
173:10 203:11
205:24
**outstanding (1)**
110:11
**oversight (1)**
68:17
**oversimplification (1)**
202:10
**oversimplify (1)**
112:21
**overstatement (1)**
40:20
**overtook (1)**
144:8
**overture (1)**
72:3
**overview (1)**
144:17
**owed (1)**
172:17
**owes (1)**
110:11
**owns (1)**
82:23
**Oxford (50)**
3:17 5:7,10 19:20
48:7,13 60:22 84:24
93:2,7 95:24 98:12
98:18 100:6,17
106:18,20 121:20
121:22 130:10
142:3,21,24 155:15
156:17,19 159:23
161:4,9 163:10
167:25 168:10,14
168:24 169:19
170:2,6,22 171:2
173:15 177:19,24
178:4,10 181:17,20
192:5 204:11 207:2
210:6

**P**
**P (4)**
3:2,2 4:2,2
**pack (1)**
172:15
**page (20)**
75:15 99:8 102:25
103:3,6,16 107:24
108:24 110:22
111:6 118:24 123:3
149:10 156:16
170:10,15 206:15
207:12 208:6 210:4
**pages (3)**
121:12,18 207:10
**paid (2)**
41:22 84:13
**papers (2)**
5:16,25
**paragraph (17)**
6:3 36:13 103:18
107:23,24 111:6
117:25 118:25
144:15 145:19,21
149:11 160:19
161:22 162:9 163:6
163:23
**paragraphs (1)**
148:8
**Park (2)**
2:7 3:15
**part (31)**
7:14 19:5 21:23 47:21
83:6 88:9 93:18,19
114:13 117:2
120:10 136:9
137:11,11 140:14
146:25 159:3
160:22 161:8 167:2
167:8 169:14,23,24
170:23 172:13
179:2 190:2 191:2
201:8,22
**participants (1)**
160:21
**participated (1)**
63:22
**particular (13)**
12:4 35:11 48:4 49:17
64:22 85:12 92:18
125:15 127:16
128:16 136:18
154:11 156:3
**particularly (10)**
5:14 54:21 55:5 76:10
77:7 91:15 92:8

118:11,13 152:17
**particulars (1)**
26:8
**parties (4)**
16:22 133:4 182:19
209:16
**partner (2)**
45:14 101:5
**partner's (1)**
183:4
**parts (2)**
119:18 200:12
**party (5)**
140:12 150:22 168:23
178:13 192:2
**pass (1)**
54:10
**passage (1)**
196:9
**Paul (1)**
101:9
**pausing (1)**
146:14
**payment (1)**
200:4
**pays (1)**
38:18
**Pearl (1)**
3:10
**people (27)**
10:3 15:17,20,22 21:8
24:2,14 27:12,16
34:10 54:6 58:16,22
64:20,23 67:19 70:7
80:5 101:21 151:7
161:10,12 162:14
163:21,22 164:7
203:8
**percent (3)**
103:25 180:21 196:6
**percentage (1)**
88:12
**perfect (1)**
68:5
**perform (10)**
30:12 33:17 38:22
39:22,23 42:23
44:21,22 92:11,17
**performance (4)**
39:25 55:7 68:23
69:11
**performed (1)**
91:7
**period (11)**
14:17 23:5 51:23 77:6
86:5 91:2 102:13

135:2 136:10
147:24 148:4
**permission (7)**
108:22 109:4,7,24
120:12,17 196:24
**permitted (2)**
119:24 158:20
**person (10)**
10:2 37:6,9 43:25
44:3 68:2 73:10
125:25 160:3
161:25
**personnel (2)**
6:6 7:13
**perspective (2)**
130:5 193:11
**pertains (1)**
161:15
**Pg (1)**
208:2
**Pgs (1)**
208:2
**phone (7)**
6:21 23:25 34:11 65:9
66:6 67:4 72:16
**Phupinder (1)**
35:13
**picks (1)**
117:21
**piece (1)**
29:6
**pieces (1)**
28:14
**pin (1)**
37:14
**place (9)**
8:2 15:2 52:9 55:21
64:25 102:15
129:14 134:8 145:2
**placed (1)**
140:13
**plan (1)**
157:19
**players (2)**
128:11,15
**Plaza (2)**
2:7 3:15
**please (27)**
7:20 11:9 13:24 18:12
29:20 42:13 51:13
79:9 98:22 100:23
101:19 103:17
110:15 121:6
122:11 126:11,13
127:9 129:2 134:15
143:5 165:21

168:12 182:24
186:4 191:23,23
**pledge (3)**
80:24 81:10 187:15
**pledging (1)**
186:11
**plus (1)**
210:18
**pocket (1)**
86:10
**point (26)**
29:15 34:13 37:13
39:15 42:5 47:18
54:8 60:8 63:6
69:11 70:8 73:10
81:25 92:4 95:14,22
110:22 111:24
113:15 117:5
166:15 187:12,24
193:11 196:17
201:4
**pointed (1)**
100:10
**points (5)**
62:11 145:11,13
180:10 190:11
**portion (2)**
169:12 180:19
**position (32)**
32:6,9,12 35:2 44:17
63:14 76:22 78:13
78:20 91:23 107:14
110:17,20 112:4
137:12 179:23
180:13,14,16,18,22
180:23 181:2,5,7,25
183:14 184:9,11
185:15,21 195:9
**positions (226)**
16:9,12 17:17,19,22
17:23 18:7,19 20:13
20:20,25 22:20 24:8
25:13,18,20 26:3,8
26:10,11,14,25
27:10 28:4,5,20
30:9,25 31:4,7
32:21 33:11 34:15
35:3,6,23 36:5,11
36:15 37:23 38:2,3
38:5,16 39:6,9 40:3
40:8,22,23,24 41:9
41:13,14 42:11,17
42:18,19,25 43:11
44:21 47:22 48:17
49:18 50:5,7,9,22
50:25 51:9,21,24

52:13,14,18,23,25
53:3,7,10,22 54:2
54:15 55:4 59:13,20
60:9,12,16 61:6,10
61:12,23,24,25 62:6
62:13,16,19,25 63:5
63:7,16 67:12 73:7
74:2,9 76:14 77:6,8
77:24 79:4 80:8,9
86:7 87:20,21 97:3
98:11 104:16,21
108:3 112:20
127:13,23,25
129:15,16 133:16
133:21,22 134:17
134:21,24 135:9,25
136:5,23 137:5,7
138:3,4,11,20 139:4
139:7,13,17,24
140:9,13,23,25
141:6,12 142:10,16
142:20 148:23
149:6,7 166:19,21
166:22 178:22
179:7,8,10,11,12,13
179:13 181:10
182:9 183:22 185:3
185:7,9 187:18
191:20 193:5,25
194:5,17 195:13
197:7 198:2,6,7,9
198:10,15 199:2,3,3
199:11,19,22,25
200:6,7 201:13,16
201:18,23 202:4,19
203:16,18 204:3,6,9
204:14,16,20,24,25
205:10,17,18,19
205:22 206:4,11,14
**possible (9)**
45:14 46:8 56:11
62:23 65:10 71:17
75:7 121:7 169:11
**post (4)**
79:11 97:5 185:6,19
**posted (9)**
33:6 36:9,17 41:17,20
42:2 182:8 185:12
191:19
**potential (5)**
6:7 7:13 11:2 144:3
153:6 154:20
156:12 169:21
201:24
**potentially (8)**
49:24 66:24 73:8
74:20 84:9 112:9
113:2 165:20

**practical (5)**
75:23 76:24 77:10
78:10 79:6
**practically (1)**
92:8
**practice (4)**
12:8,10 88:6,7
**preceded (1)**
55:23
**precedent (1)**
137:17
**preceding (1)**
119:10
**precise (8)**
56:11 61:22 62:19
71:15 96:10 105:3
163:14 174:8
**precisely (8)**
6:20 10:2 24:22 25:4
31:15 36:19 116:15
173:22
**premier (2)**
147:14,18
**prepared (6)**
34:14 49:18,21 50:4
55:15 116:7
**preparing (1)**
51:4
**presence (10)**
133:3 150:21 182:18
182:22,25 183:6,9
183:12 191:25
192:22
**present (5)**
9:25 65:5 70:15
148:16 192:9
**presented (1)**
148:24
**president (1)**
35:14
**presumably (3)**
53:16 159:7 203:24
**pretty (3)**
174:17 181:5 198:25
**previous (1)**
125:19
**previously (11)**
100:25 120:14 123:18
142:18,20 143:2
153:6 154:20
156:12 169:21
201:24
**pre-meeting (1)**
8:9
**primarily (3)**
72:13 100:19 135:7

**primary (2)**
24:12 67:19
**principle (2)**
187:8,22
**principles (1)**
86:21
**prior (23)**
10:9 11:20 13:4 31:8
32:2 42:25 53:25
56:24 93:20 96:14
102:11 119:11
122:21 126:21
133:8 173:18
177:20 183:25
185:6,25 191:16
198:23 206:4
**privilege (9)**
53:12 131:25 152:23
170:17,23 188:25
191:3,6 193:23
**privileged (6)**
107:19 168:16 170:11
188:21 189:2
192:12
**probably (23)**
8:20 18:22 19:14
23:16 24:10,14
43:18 44:17 47:12
66:23 70:24 71:4,9
72:11 80:8 85:3
102:7,11 116:16
117:10 134:25
177:9 201:10
**problem (5)**
8:19 21:23 76:16
180:15,16
**problems (1)**
77:15
**proceed (1)**
35:5
**process (10)**
26:16 40:22 41:4 49:3
49:6 127:12 128:13
137:18 168:20
203:16
**produced (5)**
100:10 168:16 170:7
170:11 178:8
**production (2)**
100:16 121:8
**products (1)**
31:10
**Professional (1)**
2:9
**program (1)**
79:15

**progressed (2)**
18:5 72:20
**prohibited (1)**
120:2
**prohibition (2)**
119:17,22
**prohibits (1)**
119:5
**project (2)**
137:3,16
**promises (1)**
174:19
**pronounce (1)**
35:14
**property (10)**
119:7 130:14,18,22
130:22,23 131:6,8,8
132:14
**proposal (1)**
162:12
**proposed (1)**
172:22
**proposing (1)**
164:4
**proprietary (69)**
6:8 16:9 25:12 26:3
26:20,22 27:9 28:3
31:4 34:15 35:3,6
35:23 36:15 38:3,6
39:3 40:23 42:12,18
44:21 47:22 48:17
54:15 55:19 60:5
62:13,16 63:16
68:24 69:18 77:23
78:19 79:14 87:20
108:19 109:12,15
110:23 133:21
134:16 148:23
149:6 151:13
166:21,22 179:10
179:15,15 193:25
194:5,11,15,16,20
194:22 195:5,7,12
198:15 204:10,22
204:25 205:5,22
206:3,9,13,14
**propriety (1)**
31:7
**protect (2)**
112:22 193:4
**protected (2)**
80:8 128:12
**protection (4)**
79:21,25 80:7 81:9
**protective (1)**
170:13

**provide (11)**
16:15 17:2,6,9,14,21
18:7 28:2 59:23
174:6,12
**provided (7)**
44:19 88:18 94:11,14
94:19 116:11 174:7
**provides (2)**
80:13 186:11
**provision (6)**
81:25 82:2 170:13
196:19,20 197:20
**provisions (3)**
111:10 117:21 125:15
**Pruszynski (4)**
1:18 2:9 209:7,23
**Public (3)**
2:12 207:18 209:8
**purchase (15)**
10:25 11:3,23 13:11
13:14,19 14:16 15:8
59:7 60:15 133:12
153:5 155:7 156:7
201:23
**purchased (1)**
33:11
**purpose (12)**
10:18 12:14 67:5
70:14 72:17 75:5,7
110:16 117:18
119:14 177:4 184:8
**pursuant (18)**
79:12 81:2 103:18,23
111:9 117:21
118:18 125:7,15
136:14 141:16
170:12 172:17
196:4 197:19 202:2
202:9,10
**put (13)**
36:5 68:25 82:14
86:10 88:18 134:7
152:25 198:22
200:16,17,18,25
201:7
**puts (2)**
83:17 88:11
**p.m (5)**
34:2,9 91:24 175:2
207:6

_____

**Q**

**qualification (1)**
15:16
**qualified (1)**
160:14

**question (74)**
7:16 13:23 15:12 22:4
25:22 28:7,9,10
29:22,23,24 32:24
33:2 34:23 40:18
54:4 58:18 59:24
60:24 62:12 66:12
74:6 83:3,23 85:2
85:11,24 90:25 92:8
93:8 95:17 96:20
97:4,6,14,21 107:15
125:19 130:9,16
131:10 133:5
138:15 139:18
142:6,15 143:25
145:5,7 146:8
150:19 152:18
154:14 155:24
159:22 161:2,3,4,7
163:9 164:22 165:2
165:4 167:13 171:3
171:6,12,17 174:2
176:17 187:11
188:20 193:16
200:13
**questioner (1)**
176:11
**questioning (2)**
163:4 177:13
**questions (23)**
11:8 19:4,8 42:22
76:21 96:2 100:19
132:19 154:23
168:9 170:24
178:12,16 181:14
181:16,18 183:4
191:16 193:24
195:16 204:18
207:3,4
**quick (1)**
73:15
**quickly (1)**
154:17
**QUINN (1)**
3:18
**quite (5)**
57:4,21 74:23 127:16
128:10
**quote (1)**
108:8
**quotes (2)**
119:7,11

_____

**R**

**R (3)**
3:2 4:2 209:2

**Radhakrishnan (5)**
68:2,14,16,18 102:21
**raise (2)**
19:7 187:10
**raised (2)**
19:4 76:21
**Raisler (310)**
1:13 2:6 5:1,2,8 6:1,4
7:1,7,11 8:1 9:1,24
10:1,22 11:1,19
12:1,13 13:1,9 14:1
15:1 16:1 17:1 18:1
19:1,12,25 20:1
21:1 22:1 23:1,10
24:1 25:1,3,11,24
26:1 27:1,6 28:1
29:1,17 30:1 31:1
32:1,14 33:1,10
34:1 35:1 36:1 37:1
37:22 38:1 39:1
40:1 41:1 42:1 43:1
43:3 44:1 45:1,5
46:1,25 47:1 48:1
48:14 49:1,9 50:1,7
50:23 51:1 52:1
53:1 54:1,11 55:1
55:10 56:1 57:1,7
58:1 59:1,6 60:1
61:1,20 62:1,21
63:1 64:1,24 65:1
65:12 66:1,10 67:1
67:5 68:1,12 69:1
70:1,4 71:1 72:1,18
73:1,25 74:1 75:1
75:14 76:1,17 77:1
78:1 79:1,24 80:1
81:1,9 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1,2 90:1,17
91:1 92:1,11 93:1
94:1 95:1 96:1,2
97:1,5 98:1,19 99:1
100:1,18 101:1
102:1 103:1 104:1
104:15 105:1,22
106:1 107:1,25
108:1,17 109:1
110:1 111:1 112:1,3
113:1 114:1 115:1,5
116:1,10 117:1
118:1 119:1 120:1
120:24 121:1 122:1
123:1,9 124:1 125:1
126:1,6,25 127:1
128:1 129:1 130:1
131:1 132:1,8 133:1

133:10 134:1 135:1
135:25 136:1 137:1
138:1 139:1 140:1
140:10 141:1,20
142:1,8,25 143:1,20
144:1 145:1 146:1
147:1,17 148:1,9
149:1 150:1 151:1
151:11,22 152:1
153:1,4 154:1,19
155:1,11 156:1,10
157:1,21 158:1,13
159:1,16 160:1
161:1,11 162:1
163:1,3 164:1,14,17
165:1,6 166:1 167:1
167:22 168:1 169:1
169:4 170:1 171:1,4
172:1,3 173:1 174:1
174:24 175:1 176:1
177:1 178:1,11,20
179:1 180:1 181:1
181:21 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1,17
192:1 193:1 194:1
195:1,18 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1,12
205:1 206:1 207:1,2
207:8,14 209:10
210:5,11
**ran (3)**
10:7 143:17,18
**range (1)**
148:20
**rapid (1)**
97:2
**rapidly (3)**
77:7 95:10 98:9
**rarely (1)**
12:11
**reach (13)**
18:14 19:12,15,25
21:20 22:8 23:10,14
45:17,25 54:8 75:9
177:6
**reached (16)**
13:2,11 20:6,10,22
21:4 23:20 25:3
54:23 71:2,3,5,6,7
74:23 75:2
**reaching (6)**
20:18 22:16 23:3 24:6

75:6,8
**read (17)**
13:23 14:2 37:13
51:13,14 107:9,10
108:23,25 132:3,5
145:14,16 153:18
175:20 193:17,18
**readily (1)**
76:10
**reading (1)**
117:10
**reads (2)**
103:23 118:25
**ready (2)**
47:12 168:14
**real (2)**
43:12 148:2
**realize (1)**
124:2
**realized (1)**
171:5
**really (16)**
8:8 11:17 27:3 36:22
42:10 45:22 54:5
59:4 80:4,15 92:20
146:16,25 176:2,20
199:8
**reason (13)**
15:15 158:9 159:9,10
208:8,10,12,14,16
208:18,20,22,24
**reasonably (1)**
192:7
**reasons (4)**
75:22 76:8,24 208:5
**recall (58)**
6:21 8:8 10:10 20:18
21:2 22:16 27:24
31:15,18,19 36:19
44:2,13 45:6 46:15
47:16 49:10,14,20
51:4,6 52:8 54:9,12
64:5 66:7 70:19
71:25 72:8 75:10,16
75:19 93:25 102:9
107:21 116:15
123:16 132:7 134:4
134:12,19 147:3,16
151:19 153:12,18
159:16 160:2
173:21 175:9,14
180:15,24 184:3
196:2 197:4 199:14
202:25
**receive (1)**
168:25

**received (5)**
34:5,5 95:5 114:16
124:14
**Recess (4)**
48:12 98:15 142:23
168:13
**recipients (1)**
102:16
**recognize (4)**
5:21 87:13 100:21
122:9
**recognized (2)**
82:10 158:18
**recollection (48)**
7:25 8:3,9,12 9:3,6
15:10,25 19:9 20:11
23:13 31:9,20 32:4
32:10 37:12 42:16
43:13 46:20 52:15
54:18 56:8,17 59:3
64:8 70:9 71:14
74:12,15,16 76:6
77:20 94:14,25 96:9
102:6 131:2 157:18
158:4,12 172:21
174:8,16 180:19
183:11 198:6
202:21 205:20
**recollections (1)**
63:21
**record (17)**
8:20 14:2 51:14 98:24
100:5,7,18 107:10
132:5 168:15 170:4
170:5 171:5 172:5
180:18 189:12
209:13
**records (2)**
70:17 77:16
**recover (2)**
137:17 172:17
**red (1)**
39:16
**Reed (3)**
2:7 3:13 5:11
**refer (5)**
78:7 88:21 111:3
121:23 204:19
**reference (6)**
76:24 79:7 85:4
125:17 168:22
169:2
**referenced (5)**
13:4 57:25 76:8 78:23
121:8
**references (3)**

81:15 123:17 158:3
**referencing (1)**
67:15
**referred (2)**
81:23 174:9
**referring (9)**
18:17 29:3 78:22
88:22 118:12
122:12 127:20
174:2 186:16
**refers (2)**
81:16,22
**reflect (5)**
49:15 106:21 143:21
144:25 145:6
**reflected (3)**
56:21 104:2 196:7
**reflecting (1)**
159:4
**reflects (1)**
144:11
**regard (7)**
12:18 17:12 67:14
117:7 119:23
127:10 128:23
**regardless (1)**
187:5
**regime (4)**
81:17 136:15 139:22
140:19
**regimes (1)**
136:17
**Registered (2)**
2:9,10
**regulated (1)**
114:2
**regulation (6)**
79:13 91:5,10 93:5
108:9 119:2
**regulations (10)**
89:24 97:8 98:3 108:5
111:11 117:22
118:6,19 125:7,17
**regulator (2)**
74:17 75:2
**regulators (10)**
16:10,22 64:4 66:10
66:20,22,24 67:3
141:8 198:13
**regulatory (11)**
82:2 111:9 112:15
113:24 123:22
124:8,9,16,25 125:6
125:14
**rehash (1)**
82:16

**relate (3)**
50:24 52:17 69:12
**related (10)**
12:2,23 13:12 15:8
37:16 38:2 78:3
150:10 202:14
209:15
**relates (3)**
105:25 124:11 156:4
**relating (4)**
69:13,18 77:23 179:4
**relation (2)**
62:24 160:21
**relationship (1)**
10:24
**relationships (2)**
21:25 23:4
**relatively (4)**
32:11 43:14 77:6
78:20
**release (2)**
139:12 202:23
**released (4)**
139:20 140:2 201:15
203:5
**releasing (2)**
136:18 198:14
**reliable (1)**
95:11
**relied (1)**
152:16
**relief (1)**
112:2
**relocated (1)**
129:19
**rely (1)**
191:15
**remained (1)**
64:19
**remember (42)**
6:20 8:6 9:22,23 10:2
10:5 22:13,21,23
23:17,18 24:22 25:2
25:10 35:17,20
36:25 37:3 43:16,24
56:5 64:15,22 67:21
71:2,7,13 73:13,16
74:22 151:24 158:2
176:6 178:24 180:4
182:21 183:20
186:5 194:2 196:9
196:12 205:16
**remembered (1)**
75:12
**remind (1)**
48:22

**remit (1)**
47:21
**repeat (1)**
60:20
**repeating (1)**
115:14
**repetition (1)**
163:20
**report (1)**
22:24
**reported (2)**
1:18 95:7
**Reporter (3)**
2:10,10,11
**reporting (4)**
23:5,6 27:22 64:3
**reports (2)**
76:13,23
**represent (2)**
5:12 186:23
**representation (19)**
113:14,17 115:12,18
115:20,23 116:2,11
123:11,20 124:14
124:24 125:14
187:15,19 190:9,19
190:22 191:7
**representations (11)**
81:14 114:11,14,16
115:2,4,6,10 152:16
152:19 153:2
**representative (4)**
6:22 37:4 44:4 47:8
**representatives (12)**
7:6,9 9:7,15,16,24
16:15 19:14 23:9
25:7 34:6 154:7
**represented (6)**
113:25 115:15 166:20
189:21 190:5
195:13
**representing (3)**
10:12 53:5 167:7
**represents (1)**
162:19
**request (13)**
50:14 54:2 56:2,15
57:2 100:24,25
117:12 126:18,22
168:25 170:14
173:2
**requested (4)**
16:2,8,17 117:15
**requests (1)**
76:12
**require (1)**

150:9
**required (25)**
39:24 91:4,10 92:6,11
92:17,24 93:4,4,10
96:5,12 113:13
118:5,18 124:10
130:4 149:16
150:16,25 159:19
184:15,20 185:5
188:13
**requirement (6)**
73:24 88:4,8 95:20
98:2 185:2
**requirements (5)**
86:22 88:12 120:8
149:12 193:3
**requires (2)**
164:23 183:8
**resolved (2)**
39:10 40:2
**resource (1)**
77:11
**respect (50)**
28:5 29:23,24 30:20
31:4 32:15,21 33:4
38:5 39:5 41:8,13
45:20 52:24 56:14
62:12 67:9 69:10
80:11 87:19 92:5
94:22 97:9 105:10
107:3 112:10
113:22 119:6
123:23,25 124:3
137:20 138:16,18
139:6 140:21
141:21 142:9
154:23 170:17
171:8 182:9 185:7
187:17 191:19
192:17 199:9 200:5
200:5 204:12
**respective (2)**
68:13 177:3
**respectively (2)**
135:7 176:25
**response (7)**
56:6 59:23 72:2,2
170:8 183:4 204:18
**responsibilities (9)**
45:17,24 67:10 69:5
69:24 71:11 127:6
158:22 179:21
**responsibility (12)**
18:13 19:11 27:3
50:22 56:20 71:18
165:15,19 166:8

188:9 193:7 203:11
**responsible (8)**
27:17 57:17 69:7
161:13 162:14
197:7 200:10 203:3
**responsive (1)**
133:5
**rest (1)**
145:19
**restate (2)**
106:5 109:13
**result (9)**
30:18 157:15 162:24
164:5 184:14
189:16,17,18
193:13
**resulted (1)**
36:7
**results (3)**
23:18 39:14 94:10
**retired (1)**
10:15
**retread (1)**
76:3
**retrospective (1)**
63:12
**retrospectively (1)**
95:10
**return (4)**
169:11,17 170:15
171:20
**returned (6)**
83:8,12 84:9 137:24
167:3,9
**returning (1)**
169:23
**reveal (1)**
6:25
**revenue (1)**
145:17
**revenues (1)**
144:21
**review (9)**
37:15 98:21 121:4
143:3 156:13
168:25 172:8 175:6
175:12
**reviewing (1)**
171:5
**re-post (1)**
200:20
**right (32)**
8:11 9:10 18:23 19:23
30:24 43:24 48:25
55:13 56:11 57:6,10
57:11 58:19 74:19

75:18 86:11 87:4
89:2,8 106:18
121:16 124:5 139:2
150:4 154:18 155:2
164:12 167:17
182:5 191:4 195:25
201:19
**rights (9)**
86:2,4 89:16,17
105:10 127:3
135:15 136:4
168:19
**risk (14)**
147:19 148:8,18
159:8 163:20 181:3
184:9 185:11,17,18
185:20,23 192:18
193:5
**risks (5)**
147:23 148:7,17,23
148:25
**risk-taking (1)**
185:14
**RMR (1)**
1:18
**Rob (1)**
167:17
**ROBINSON (1)**
4:7
**role (4)**
10:6 45:19,21 127:10
**roles (1)**
68:13
**rolled (2)**
63:19,20
**rolling (1)**
55:5
**Ron (7)**
10:11,13 19:10 23:3
135:2 183:18
192:14
**room (1)**
9:21 10:4,11 64:20
**rooms (1)**
64:6
**routine (3)**
12:8,10 70:16
**routinely (1)**
86:24
**rules (6)**
81:2 90:2,13,16
124:11 128:9
**rumors (1)**
77:8
**run (3)**
10:14 91:25 121:3

**running (1)**
70:5
**runs (2)**
24:24 143:16
**rusty (1)**
158:4
**R-A-D-H-A-K-R-I-...**
68:4

---

## S

**S (3)**
3:2 4:2 210:9
**safe (1)**
154:9
**sale (2)**
64:25 202:14
**Salzman (2)**
24:15 35:12
**sat (1)**
153:18
**satisfactory (2)**
34:18 39:14
**satisfy (2)**
69:17 187:16
**Saturday (7)**
53:8,11 78:14 179:24
179:25 180:2,15
**saw (9)**
25:19 62:7 116:24
129:9 151:7 153:10
155:4,7 156:25
**saying (4)**
125:5 160:9,12 191:5
**says (8)**
111:7 121:25 144:19
148:11 150:9
175:21 188:4 196:4
**SC (3)**
170:9 172:6 210:16
**scale (4)**
36:11 42:11,12
137:16
**scenario (1)**
87:13
**scheme (1)**
32:10
**SCHILLER (1)**
3:8
**scrambling (1)**
54:6
**scrutinized (1)**
93:13
**se (2)**
14:4 78:18
**second (16)**
39:21 72:24 75:15

81:5 103:16 107:24
109:24 114:3,13
142:22 149:11
150:8 169:16 170:3
175:24 182:6
**secondly (1)**
38:20
**secure (7)**
26:25 62:25 63:5
82:11,25 148:4,5
**secured (67)**
51:21 77:25 79:8,18
80:3,9,12 81:16
89:11 90:14,14,19
91:8 92:12 93:12,17
93:24 94:10,23 95:3
95:14 96:7,16 97:10
97:17,25 111:8
112:7,11,14,17
113:23 114:7,17
116:12,21 117:18
118:4,17 120:16
123:13 124:12
128:3,17 129:23
130:12,18 131:7,21
132:13 133:10,20
151:16 152:20
159:18 164:19
165:8,13 166:6,18
167:2,9 169:13
171:9,18,21 176:6
**securing (1)**
127:23
**securities (1)**
110:19
**security (3)**
148:3 157:13 176:21
**see (31)**
75:17,24 77:17 78:4
81:15 93:16,23 98:4
99:10 101:3,7
102:25 103:17
104:3 108:6,11
111:12 119:12
121:25 144:17,23
145:25 148:7,9,13
149:12 150:8 157:6
173:18 177:15
191:4
**seeing (2)**
175:9,14
**seeking (13)**
25:15 55:20 64:2
108:17 109:25
119:16,19,19,22
120:4,12 125:11

128:23

**seen (13)**
58:8 121:5 143:4,7,9
153:7 155:6 156:22
157:3 172:9 175:6,8
175:13

**seg (19)**
85:19 86:16 94:10
95:2,13 112:19
113:23 124:12
128:17 130:18
131:6,21 132:13
133:20 151:15
159:18 164:18
166:6 167:2

**segregated (73)**
77:24 79:8,13,13,20
80:3,7,11,21,22,24
81:6,8,17,22 82:5
82:19 83:17 84:20
85:14 86:8,21 87:5
88:5,11,15 89:4,19
90:19 91:8 92:12
93:12,17,23,24
94:23 96:6,16 97:10
97:17,25 110:19
111:8 112:6,11,15
112:17 114:7,17
116:12,21 117:17
118:4,17 120:15
123:13 128:3
129:23 130:12
133:9 151:9 152:19
165:8,12 166:17
167:9 169:12 171:9
171:18,20 176:5,15
177:6

**segregation (3)**
80:25 88:13 113:13

**self-effectuating (1)**
141:15

**send (1)**
102:3

**sender (1)**
177:15

**sends (1)**
101:4

**senior (1)**
150:9

**sense (10)**
15:13 32:8 46:3 62:18
77:10 159:5 162:4
177:9 185:13
203:13

**sent (10)**
101:4,9 102:6,10

152:9 153:16
173:12,14,19,23

**sentence (22)**
34:4 37:11 75:15
77:13,20 78:6 79:7
108:25 111:6,15
115:13 117:20,24
118:14,25 119:12
119:15 145:14,15
150:9 160:19 162:8

**separate (12)**
47:23 69:24 79:19
84:12 89:5 112:16
113:24 114:23
189:11 190:25
202:13,16

**separately (1)**
46:2

**separation (1)**
45:22

**September (46)**
6:16 7:3,8,18 10:22
11:22 18:2 31:23
34:3 45:8 47:9
48:19 49:12 50:16
51:3,10 52:10,10
53:11 59:9 63:22
65:3,14 66:2 70:11
91:16 101:6 127:11
132:12 143:22
145:2 146:4 147:22
153:15 155:19,20
166:16 177:20
186:7 187:2,24
188:5 191:9,11
204:2 210:17

**series (4)**
127:14 192:11 195:15
204:18

**set (6)**
46:4,7 126:18 154:23
209:11,20

**settlement (2)**
51:23 157:14

**shared (3)**
135:6 145:11 193:12

**sharing (1)**
77:14

**shortfall (6)**
55:8 57:16 110:10
118:3,16 200:13

**shortfalls (1)**
55:18

**show (1)**
91:7

**shown (2)**

170:6 207:12

**shut (1)**
84:11

**side (7)**
53:20 64:18,18
141:25 142:2,4
168:23

**Sidley (1)**
52:7

**sign (5)**
103:8,13 123:6
186:19,24

**signature (4)**
103:7,9,10 123:4

**signed (6)**
14:17 58:24 103:4
120:11 153:13
187:6

**significance (2)**
180:6,7

**significant (7)**
40:20 65:20 78:20
79:21 114:22
180:14 185:11

**significantly (3)**
44:17 184:6,7

**Signing (1)**
103:11

**siloed (2)**
144:10,11

**similar (12)**
33:16 38:4 42:22
44:14 51:15 57:4
62:22 81:21 87:18
101:20 154:23
179:4

**similarly (1)**
62:20

**simplify (1)**
41:14

**simplistically (1)**
186:10

**simply (6)**
33:3 68:25 88:6 115:6
125:11 196:11

**Singapore (2)**
139:15 205:7

**single (6)**
28:20 179:9 194:11
194:15,16 195:7

**SIPA (4)**
3:14 5:12 134:4
177:21

**sir (169)**
5:20,21 6:13,19 7:20
8:7,12 9:4,9,12,17

10:17 12:6,18,25
13:17 14:8,12,22
15:6,16,25 16:14
17:13 18:6,24 19:8
21:10,22 22:6,17,22
23:6,22 24:5,13
25:8 27:25 28:18
29:9 30:15 31:6,14
31:21 32:3,8 33:6
33:15 34:23 35:9,17
37:10,16 38:11
39:11 40:2,13 41:7
42:8 46:18 51:7
52:8,16 53:2,9,20
56:3,24 58:13 59:11
63:20 64:14 65:5
66:22 67:17 69:5,15
71:25 73:20 78:8,23
79:8 84:18 87:17
89:15 91:3 93:13
95:6,12 96:15
100:21 102:9,24
103:7,17 104:13
105:14 107:3 117:8
117:18,23 118:14
119:3,15 122:9,23
123:3,20 125:24
126:24 127:21
128:7,15,22 129:14
129:24 130:20
131:5,13,20 133:25
134:16 143:8 145:7
145:22 149:10,15
149:23 150:15
151:3 152:17 153:8
154:9 155:5 156:14
156:23 157:9
159:15 160:18
172:12 173:3,12
176:3,12 182:7
183:15 184:2,8,21
185:4,18 186:15,20
187:22 189:3 190:3
190:24 194:6
195:20 196:9 197:9
198:19 199:10,18
200:3 201:12 202:4
202:12 203:12

**sit (1)**
74:7

**sitting (8)**
20:8 37:3 64:5 73:12
102:5 104:19
125:23 175:13

**situation (4)**
80:5 194:18 199:16

201:9

**situations (7)**
78:11 90:15 137:6
138:2 140:22
141:18 201:7

**size (13)**
17:18,22 26:13,24
27:8 35:22 42:8
61:9,10,23 62:6,16
184:4

**Skadden (3)**
24:17,19,21

**slow (1)**
137:10

**slower (1)**
29:14

**small (6)**
32:11 42:20 43:14
81:24 82:14 185:15

**smaller (1)**
44:17

**smallest (1)**
44:18

**smoothly (1)**
24:11

**snapshot (2)**
91:19 112:13

**somebody (4)**
54:8 67:25 68:10
153:17

**somewhat (4)**
14:13 28:8 44:10
74:21

**soon (1)**
47:13

**sophistication (1)**
29:12

**sorry (32)**
18:21 19:20,20 36:23
51:12 88:21 96:5
99:19 103:5 106:4
107:8,24 109:9
113:9 115:9 118:9
126:14 129:20
132:2 138:14 142:3
142:5 149:19
157:10 167:12
169:15 173:25
181:23 192:3
200:11,24 205:6

**sort (26)**
8:21,23 15:23 23:8
25:23 27:14 39:15
42:10 54:6,10 57:23
64:9 76:15 84:10
98:5 100:3 133:21

140:18 144:8
172:24 176:7 180:8
189:15 197:6
199:15 206:12
**sorting (1)**
172:25
**sought (1)**
129:10
**sounds (1)**
68:5
**source (1)**
124:24
**sources (1)**
200:15
**SOUTHERN (1)**
1:3
**speak (2)**
70:22 75:12
**speaking (5)**
21:8 27:11 30:20
87:14 143:20
**speaks (2)**
125:7 144:5
**specialty (1)**
68:19
**specific (10)**
12:17 35:25 59:3
63:21 66:8 75:10
93:10 94:16 114:15
147:10
**specifically (17)**
12:20 30:4 51:23 54:9
58:14,18 90:25
94:22 97:20 116:4
122:12 127:4 130:2
132:7 134:12
153:25 194:14
**specifics (2)**
101:22 134:22
**spell (1)**
35:14
**spelled (1)**
68:6
**spelling (1)**
67:25
**spending (2)**
40:21 148:19
**spent (1)**
163:21
**split (1)**
45:24
**splitting (1)**
45:16
**spoke (4)**
29:16 43:16,21 73:17
**spoken (4)**

23:25 52:5 67:24
153:23
**sporadic (1)**
66:21
**SS (1)**
209:4
**Stack (6)**
9:19 143:18 192:8,10
192:16,23
**Stack's (1)**
143:16
**staff (1)**
18:3
**stage (1)**
26:19
**stand (2)**
189:22 190:6
**standing (2)**
53:15,16
**standpoint (1)**
185:14
**stands (1)**
77:15
**start (2)**
8:13 78:6
**started (6)**
8:7,23 16:19 23:7
31:22 129:19
**starting (3)**
37:24 127:11 181:21
**State (4)**
2:12 208:2 209:3,8
**stated (6)**
16:11 77:4 127:22
137:25 138:8 144:2
**statement (7)**
36:12 37:10 114:5,8
115:5 116:20
125:22
**STATES (1)**
1:2
**status (1)**
54:25
**statutory (1)**
81:24
**steadily (1)**
8:22
**stepping (1)**
188:8
**steps (5)**
44:12 197:25 199:10
199:18 205:21
**stick (1)**
182:24
**Sticking (1)**
107:23

**stock (1)**
31:10
**stood (1)**
92:5
**stop (2)**
89:20 91:13
**stopped (1)**
65:22
**strategy (1)**
162:12
**Street (3)**
3:5,10 4:5
**structure (3)**
88:10 90:11 122:18
**struggling (1)**
165:18
**stuck (1)**
141:2
**stuff (1)**
89:25
**subject (6)**
127:17 139:21 175:2
175:20,21 207:11
**submitted (2)**
5:15,24
**submitting (1)**
117:15
**subpoena (1)**
170:8
**Subscribed (1)**
207:15
**subsequent (1)**
46:21
**substance (13)**
6:25 11:9 13:22 26:2
44:3 48:23 59:17
131:18 132:24
150:20 152:12
154:6 182:17
**substantial (8)**
50:11 54:20 65:22
77:5 80:7 136:16
180:18,19
**substantially (4)**
151:5,8 153:13 155:8
**substantive (1)**
145:15
**success (1)**
137:20
**successful (2)**
22:22,24
**sufficiency (7)**
116:12,21 123:12,21
124:25 125:5,8
**sufficient (23)**
62:25 63:4,14 96:17

97:18 111:8,9 112:6
112:14,24 113:23
114:7,17 117:17
124:8,15 125:14
129:6,7 149:7
152:19 182:5
184:19
**suggest (1)**
100:14
**suggested (1)**
101:24
**Sullivan (23)**
4:3 6:14,18 7:10 9:7
9:11 11:14 14:10
45:12 49:6 53:4,6
102:2 117:10,16
123:11,20 124:20
124:22 125:13
132:18 160:4 170:7
**Sunday (2)**
7:3,8
**supersede (1)**
122:25
**supervising (1)**
69:8
**support (2)**
5:15,24
**supporting (3)**
127:25 166:22 198:10
**suppose (2)**
85:20 130:3
**supposed (4)**
89:22 99:24 100:11
139:10
**sure (61)**
8:11 9:20 11:6 13:25
15:18 24:11,20
26:15 32:25 33:3
40:25 43:4 44:11
46:21 47:2,3,14
48:11 51:21 53:15
55:6 56:4 59:4,16
65:21 68:22 69:9
70:17 72:4,6 73:9
73:19 74:4,7 76:5
83:14 85:22 98:14
99:12 100:6 102:7
106:5 116:19 117:5
124:15 128:18
163:18 167:12
169:6,8 171:14
173:8 174:10 176:2
176:9 189:14
195:17,25,25 196:2
197:24
**surmise (1)**

124:12
**surprise (1)**
25:5
**surprised (2)**
154:22,25
**surprising (1)**
81:12
**swallowed (1)**
200:21
**swings (1)**
184:13
**sworn (3)**
5:4 207:15 209:12
**syntax (1)**
118:10
**systems (2)**
76:9,16

_____

| **T** |
|---|

**T (3)**
209:2,2 210:9
**TA (1)**
58:18
**TAA (4)**
188:18 189:5,8,10
**table (1)**
76:22
**take (42)**
5:13 8:2 12:8,11,11
19:21 30:25 47:12
48:8 49:24 55:2
56:2 69:25 86:7
87:16 88:2 90:5
98:12,20 102:15
114:21 116:6 121:4
129:13 143:3
146:11 147:19
150:16 156:13
168:11 169:17
172:8 175:5 178:9
180:25 181:8,25
185:15 187:17
188:9 205:21
206:13
**taken (13)**
48:12 73:8 77:8 98:15
136:18 138:2,3
142:23 168:13
174:11 198:2
199:11,19
**talk (5)**
22:2 52:3 91:14,15
144:3
**talked (3)**
57:5 166:10 198:4
**talking (11)**

53:3 83:15 95:18
117:14 141:24
195:2 202:4 203:23
203:24 204:9,13
**task (1)**
27:6
**tasked (1)**
46:6
**Taylor (2)**
24:24 35:12
**team (8)**
27:19,21 45:25
145:12 162:11
163:21 185:14
192:24
**technical (4)**
75:23 76:7 78:10 79:5
**technically (2)**
110:7 143:16
**telephone (3)**
7:8 23:22 75:20
**tell (41)**
7:19 17:16 18:11
29:19 30:6 41:11
42:13 45:6 53:23
54:11 56:13 62:10
68:12 71:12 73:5
79:9 89:15 96:24
100:23 101:18
104:19 111:14
112:3 114:8 122:11
125:11,22,24
126:11 127:9
128:25 134:15
138:9,19 172:9
175:11,15,21 186:4
188:17 189:3
**term (10)**
58:6 95:17 106:15
117:13 149:23
161:7 171:13,15
177:11 197:14
**terms (15)**
27:4 43:4 56:21 79:4
111:19 112:14
117:23 126:21
144:9 145:17
161:13 163:14
172:17 197:4,6
**tested (1)**
80:4
**testified (24)**
5:4 33:24 38:7 46:13
47:3 49:9,13 59:5
60:2 96:21 106:8
128:4 143:23

157:11,24 159:10
165:6,11 169:21
176:3 178:20
181:22 196:16
204:12
**testify (1)**
124:23
**testimony (30)**
14:19 47:5 55:10,12
57:7,13 60:7 116:19
134:5 158:7 160:15
163:17 164:11
165:17 169:6,9
176:6 182:7 183:3
184:25 185:4 187:3
187:21 188:2 189:4
194:2,9 196:11
207:9 209:13
**thank (20)**
18:21 19:21 84:15
86:12 100:17
107:22 118:23
120:19 145:20
147:2 152:7 156:9
164:10 170:25
173:16 178:7
189:25 192:6 205:2
207:2
**Thanks (1)**
151:21
**theoretically (2)**
57:18 92:7
**thereunder (2)**
111:11 118:20
**thing (4)**
34:21 57:24 73:6
189:10
**things (11)**
31:12 32:11 70:18
71:21 104:9 120:2,5
132:24 136:10
140:6 166:13
**think (152)**
8:4,17 9:13 14:20
15:17 18:20 19:9
20:22 21:23 25:22
28:9,11 29:11,24
31:17,24 33:24
35:19 36:10 40:19
42:5,10,19 43:21
45:9 46:8 48:18
49:15 50:17 51:15
54:5 55:13 57:21
61:13 62:3,5,8 63:3
63:18,24,25 73:6
74:17 76:2,9,15

79:2 80:5 82:9
83:13 84:15 85:10
86:11,20 87:12
88:17 89:6,12 90:4
91:13 95:22 96:21
101:11 106:7
111:16 114:19
116:18 117:6,9,13
117:20 129:4,15
130:16 132:6 135:6
136:6,8,11 137:19
139:8 141:14,14
142:15 143:9,16,17
144:7,7 145:9
146:10,10,15,21
147:7,12,21 150:23
152:2,4 157:8,11,25
158:3,5 159:9,9
161:5 162:23
163:19 164:10
165:4 170:12
171:15,24 174:15
174:20 175:13
176:7,21 177:9,19
178:11 179:25
180:7 181:9 182:4
182:20 185:10
186:10 187:25
188:23 189:12,13
189:25 190:25
191:15 193:9
197:15,23 199:13
199:15,22 200:2
201:8,16,21,22
202:18 205:16,18
206:3
**thinking (2)**
52:24 146:22
**third (12)**
16:22 99:16,17
100:11 102:25
110:13 133:3
140:12 144:15
150:22 182:18
191:25
**third-party (1)**
137:21
**thought (6)**
27:3 36:4 69:25 103:5
184:16 204:11
**thoughts (1)**
174:10
**three (17)**
6:3 35:16 99:20
102:15 108:22
109:6 110:22 111:3

122:13 148:7
160:19 161:22
162:9 163:6,24
181:2,8
**thrown (2)**
95:2 96:10
**Thursday (4)**
25:9 51:18 52:9,22
**tied (2)**
198:10 199:15
**Tim (4)**
9:19 143:16,18 192:8
**time (83)**
7:4,5,11 11:20 13:6,7
13:9 14:17 18:22
22:12 23:5 24:19,21
29:15 32:11 34:11
40:21 42:5 48:10,20
50:17 51:9 56:18
59:14 60:14 61:7,15
61:19 62:11,13 63:6
65:13 66:11 77:5
82:8 88:16 91:2,20
91:25 92:18 93:10
94:11 95:4,11 96:14
96:23 102:13
111:17 112:14
113:15 118:22
129:18 130:20
131:14 132:7,11,20
134:25 136:10
143:17 147:5,24
148:4,20 149:16
153:10 155:4,6
156:25 159:12
162:16 164:14,17
173:3 178:12
180:17 183:24
185:5,24 186:12
203:24 207:4,6
**times (3)**
85:4 95:3,9
**title (1)**
10:6
**today (13)**
5:14 18:23 20:8 37:4
46:13 73:13 74:8
102:5 104:19
125:12,24 168:2
175:13
**Tokyo (2)**
198:3 199:9
**told (13)**
34:16,18,25 35:10,11
36:18 53:21 60:20
71:16 163:12

191:18,20 192:16
**top (3)**
122:3 170:10,15
**topic (1)**
64:15
**topics (1)**
94:6
**Toronto (1)**
66:24
**total (4)**
96:11 97:17 112:23
144:21
**touch (3)**
72:24 114:23 141:4
**track (1)**
164:18
**tracked (1)**
171:19
**trade (16)**
20:15,16,23,24 43:22
44:5,14 50:9 79:10
79:16 91:21 110:18
200:25 205:9,13,14
**traded (1)**
50:7
**trading (20)**
31:11 39:17 50:13,15
54:22 55:11,13 57:8
60:4 61:17 66:17
76:11 83:18 87:24
105:5 108:19
109:12 112:5
140:16 141:21
**traditional (1)**
176:20
**train (1)**
142:5
**transaction (43)**
10:16 11:15,17,20
32:3 43:2 47:10
50:20 51:10 53:20
56:24,25 65:15
66:14 67:9 70:6
71:17 72:20,23
93:20 96:15 105:24
122:19 132:11
138:8 140:8 146:11
146:15,25 148:6
150:15 151:4
153:14 155:8
161:14 162:7 166:2
166:4,16 169:24
184:2 185:6 206:5
**transactions (1)**
148:12
**transcript (1)**

207:11
**transfer (36)**
12:22 13:3 58:4 67:12
71:23 72:25 73:21
101:2,15 103:24
104:5,10 108:18,22
109:25 119:6,10
126:20 133:9,25
134:2,13 156:11
159:5 161:20
163:22 169:24
172:15 186:17,19
187:20,23 195:21
196:5,25 199:12
**transferable (2)**
109:3,7
**transferred (13)**
74:3 105:16,20
106:12,23 107:5
109:21 160:23
166:18 169:13
196:15 197:19
201:17
**transferring (2)**
128:18 165:7
**transfers (2)**
119:11 156:3
**transmitted (1)**
28:12
**transparent (1)**
24:10
**transpire (1)**
63:10
**transpires (1)**
63:9
**transpiring (1)**
67:8
**treated (2)**
195:21,24
**treatment (1)**
105:22
**trenches (2)**
164:8,9
**TRICIA (1)**
3:12
**tricky (1)**
202:8
**tried (2)**
148:21 190:25
**Trish (3)**
19:21 168:24 173:16
**Trish's (1)**
125:9
**true (6)**
63:15 112:25 113:22
205:3 207:10

209:13
**trustee (13)**
3:14 5:12 127:19
128:24 129:10
134:4 162:14 167:7
167:7 177:18,21,23
177:25
**trustee's (1)**
166:25
**try (13)**
19:24 22:18 46:3
106:7 118:9 142:7
145:8 163:10 165:5
173:17 182:21
189:13 203:13
**trying (12)**
76:3 96:3 145:18
172:16,23 181:11
183:13 190:10
192:14 201:15
202:6,8
**Tuesday (1)**
70:25
**turmoil (1)**
77:5
**turn (5)**
75:15 102:23 103:16
144:15 185:8
**turning (7)**
24:5 39:7 75:13 89:11
101:3 133:24
149:10
**two (35)**
24:14 29:4 33:9 38:14
53:25 67:7,11 73:15
80:15,18 81:25
83:24 85:21 88:23
100:13 107:25
108:24 110:22
111:6 114:11
115:21 122:2,16
145:23 149:11
170:18 175:3,15
180:25 181:8,25
189:11 200:9,12,15
**Twofold (1)**
72:22
**type (5)**
25:17 109:24 116:8
176:21 188:13
**types (3)**
47:25 62:4 108:23
**typically (3)**
41:18 82:18 91:24

———————
**U**
———————

**UCC (1)**
176:20
**ultimately (3)**
31:3 146:20 187:9
**Um-hum (1)**
144:18
**unable (8)**
17:2,21 36:5 39:23
75:21 76:25 189:3
191:7
**uncertainties (1)**
38:21
**uncertainty (5)**
17:4 98:6 178:21
180:9 181:10
**undefined (1)**
171:12
**underlining (1)**
156:17
**underlying (1)**
14:24
**underpin (2)**
115:3,5
**understand (28)**
14:16 21:15 28:25
30:2 32:25 33:6
36:14 55:12 59:6
64:24 65:4 79:23
84:15 86:11 111:7
114:6 117:6 118:2
118:15 123:16
132:3 142:14 145:7
160:17 164:10
175:12 189:20
195:17
**understanding (59)**
10:17,23 12:25 17:20
25:19 35:7,9,21
40:5,13 48:15 58:2
59:10 70:13 72:21
84:18 85:23 92:10
95:12 97:15 105:2
105:12,19 106:22
106:25 107:2
108:16 116:20
117:17,24 118:3,22
123:12,21 130:17
130:21,25 138:23
139:3 146:3 149:15
149:22 157:21
160:21 161:18
163:5,13 164:2
165:22 166:2,3,23
167:15 176:12
189:17 195:19
201:6 204:5,7

**understood (10)**
35:24 55:9 57:6 124:7
150:24 169:25
186:21 187:5
188:11 190:4
**undertaken (1)**
56:10
**undertaking (1)**
133:17
**unduly (1)**
185:3
**unit (1)**
162:5
**UNITED (1)**
1:2
**unknown (4)**
63:10 98:7,8,10
**unlimited (1)**
87:4
**unload (1)**
181:2
**unnamed (1)**
37:9
**unremembered (1)**
37:9
**unusual (1)**
57:21
**update (3)**
72:19,23 122:16
**updated (1)**
123:10
**up-to-date (1)**
67:8
**use (12)**
21:10,12 81:2 86:7
117:6,13 161:7
164:3 171:12 177:7
177:11 197:14
**users (1)**
147:15
**usual (1)**
72:4
**usually (3)**
24:2 92:3 177:11
**U.K (8)**
66:23 73:3,7,24 74:2
74:10 139:3 200:3
**U.S (48)**
17:11 19:17,17 20:3,4
20:5,6,15 21:13,22
22:5 23:12,22 29:17
30:6,23 44:6 79:10
79:17 89:13,18
104:17,22,25 105:3
105:5,8,11,15 106:9
106:11 127:23

128:9 133:14,15,19
133:25 134:8
135:11 136:24
138:12 143:19
145:24 146:5
165:24 194:7,14
205:24

———————
**V**
———————

**vague (10)**
8:9 13:6 22:11 37:12
74:21,24 82:7 161:7
171:12 183:23
**vaguely (1)**
13:13
**vagueness (5)**
9:6 17:4 95:17 106:15
183:16
**value (2)**
119:7,11
**variation (2)**
41:22 86:15
**variety (2)**
146:19 166:13
**various (5)**
58:16 62:11 95:3
111:20 166:20
**version (1)**
99:21
**versus (6)**
16:5,5 60:5 92:5
96:12 202:7
**view (7)**
69:11 129:4 154:10
154:15 156:7
181:22 184:9
**virtually (1)**
49:7
**VIX (11)**
48:5 78:12 179:23
180:13,16 182:9
183:22 185:2,7
191:19 192:15
**volatile (3)**
92:9 148:24 184:12
**volatility (8)**
38:21 50:10 54:20
91:17 98:6 180:17
180:17 184:12
**volatility-based (1)**
48:6
**voluntarily (1)**
199:4
**V-I-X (1)**
48:5

**W**

**waiting (1)**
53:12
**walk (1)**
187:11
**want (23)**
15:23 29:21 48:8 69:8
70:16 76:4 82:16
83:14 98:12 116:19
126:14 132:3
133:18 150:5 164:3
168:10 169:5,8
170:19 171:6
195:16 197:24
200:24
**wanted (7)**
51:20 55:2,6 68:22
73:9 128:11,18
**warm (1)**
205:8
**wasn't (8)**
14:3,3 21:25 25:16
33:8 46:10 106:5
158:9
**Wasserman (6)**
67:20 68:13,17 71:8
72:14 101:9
**Wasserman's (1)**
68:18
**wasting (1)**
162:16
**way (27)**
13:16 19:5 23:18
30:15 33:13 38:17
48:15 63:12 68:6
81:10 106:7 123:10
130:17,21,25
131:12 142:7 156:4
160:12 165:5
172:15 173:17
185:10 196:12
197:9,17 209:17
**ways (1)**
146:19
**week (61)**
8:20,22 13:16 18:6,10
23:8 25:8 39:20
40:4 42:6 45:7,10
45:13,16 46:24 47:8
47:15,16 49:11
51:17 57:3 63:19,25
64:10,11,21 65:21
66:18 67:17,23 70:5
70:8,10,10,15 72:12
72:19 78:15 91:7,16
91:18 93:13 94:8,11

94:24 95:15 97:16
127:11 129:21
147:5,17,21,25
149:2 150:14
163:21 166:16
179:3 193:13
198:23 204:2
**weekend (16)**
49:19 50:5,6,8,12,18
51:2,22 53:23 57:9
57:19,20 65:25 66:7
157:15 188:10
**weeks (5)**
70:5 140:7 181:2,8,25
**went (7)**
8:10 18:10 23:8 24:11
71:22 136:22 179:3
**weren't (5)**
15:6 49:21 76:12,13
98:10
**WHEREOF (1)**
209:19
**willing (2)**
40:15 137:23
**winners (1)**
36:10
**wire (1)**
57:20
**wish (1)**
208:4
**wishes (1)**
79:16
**withdraw (2)**
88:15,17
**withdrawn (14)**
7:20 40:6 52:2 60:10
104:14 115:3,24
116:9 130:10 132:9
164:15 169:7 185:3
187:20
**withholding (1)**
78:17
**witness (42)**
4:4 5:3 6:24 11:6
13:21 19:23 48:11
48:23,25 51:12
59:16 89:22 90:4
98:14 99:5,12,16,18
99:21 100:4,10
107:8,18 121:14,19
131:17 132:2,18,23
150:19 154:5 163:9
176:10 182:16
188:2,20 206:15
207:8 209:10,14,19
210:4

**woman (1)**
43:19
**wondering (1)**
177:16
**word (9)**
40:19 55:13 85:23
91:14 99:21 132:4
164:2,6 173:25
**words (7)**
115:12 117:6 145:8
146:10 148:8
160:13 165:19
**work (9)**
63:25 65:9,24 68:15
68:18 90:6,10 93:19
175:25
**worked (1)**
45:23
**working (7)**
11:15 46:2 65:16
101:23 116:23
136:10 162:11
**works (2)**
80:13 175:22
**world (8)**
16:11 17:5 89:11
136:17 137:11
140:15 144:14
194:10
**worries (1)**
30:14
**worry (1)**
30:12
**worse (1)**
142:13
**wouldn't (16)**
25:4 28:17,24 32:17
55:8 71:5,10 81:11
91:19 92:3 114:24
135:17 141:16
150:5 179:19
195:11
**wound (1)**
83:10
**write (4)**
75:19 110:3 172:20
172:22
**writing (2)**
118:14 152:17
**wrong (2)**
150:6,6
**wrote (4)**
114:18 124:7 151:23
196:14

**X**

**X (4)**
1:4,10 210:3,9

**Y**

**Yeah (2)**
118:9 157:24
**York (21)**
1:3,14,14 2:8,8,12 3:6
3:6,11,16,16,21,21
4:6,6 20:16 208:2,3
209:3,5,8

**Z**

**zero (1)**
81:25
**zoom (1)**
190:2

**$**

**$1.6 (2)**
36:8,16
**$250 (1)**
144:22
**$28 (1)**
183:22

**0**

**00003451 (1)**
172:6
**00003451-53 (1)**
210:16
**00009298 (1)**
126:8
**00009298-301 (1)**
210:14
**00009653 (1)**
121:2
**00009653-65 (1)**
210:13
**00009676 (1)**
98:25
**00009676-88 (1)**
210:12
**00116806 (1)**
168:17
**00116806-07 (1)**
210:15
**07 (1)**
168:18
**08-13555(JMP) (1)**
1:7

**1**

**1 (3)**
1:15 2:2 153:6
**1st (1)**

209:20
**1.20 (1)**
81:25
**10 (2)**
3:10 101:6
**100 (3)**
103:25 144:20 196:6
**10004 (2)**
3:16 4:6
**10010 (1)**
3:21
**10017 (1)**
3:6
**11 (3)**
1:6 34:2,9
**120 (1)**
210:13
**12207 (1)**
3:11
**125 (1)**
4:5
**126 (1)**
210:14
**14th (5)**
6:17 7:3,8 65:14
66:13
**15th (44)**
6:16 7:18 9:25 10:18
10:22 12:6,20 13:8
16:3,5,14 18:2,6
25:5,8 33:24 45:7
46:18,24 47:9 49:12
51:9 57:3 64:14
70:11,24 91:3,16
93:13 94:12,24
95:15 97:16 143:22
145:2 146:4,16
147:4,22 150:14
166:16 179:4
193:14 204:2
**16th (7)**
14:14 16:5 59:8 63:12
63:22,25 70:25
**167 (1)**
210:15
**17th (5)**
14:14 16:6 34:2 59:8
63:13
**171 (1)**
210:16
**174 (1)**
210:17
**178 (1)**
210:7
**18 (1)**
56:12

**18th (7)**
31:23,25 32:2 48:18
   52:9 188:6 193:10
**181 (1)**
210:6
**19 (1)**
210:17
**19th (32)**
50:3 52:10 65:3,7
   101:6 157:4 158:11
   175:2 177:20
   185:22 186:2,4,6,22
   187:5,15,24 188:5,7
   188:13,18 189:5,22
   189:24 190:6,8,18
   191:8,11,14 193:10
   197:20
**190.01W (2)**
108:9 109:15
**190.06E2 (1)**
119:2

_____
**2**
**20 (1)**
129:20
**20th (11)**
49:19 51:2 53:8,11
   57:11 65:25 78:14
   155:18 179:25
   180:2 185:24
**2008 (11)**
10:15 48:19 59:9
   143:22 153:15
   155:20 186:7 187:2
   187:24 191:12
   210:17
**2010 (3)**
1:15 2:2 209:20
**21st (6)**
49:19 51:2 57:11
   65:25 179:24,24
**22nd (18)**
11:21 32:3 47:10,15
   50:15 51:11 57:4
   65:15 66:14 93:21
   127:11 129:16
   132:12 153:15
   155:20 184:2 187:2
   206:5
**222 (1)**
3:5
**24 (2)**
50:9 91:21
**24-hour (1)**
102:13
**25 (1)**

154:20
**273 (1)**
158:3
**28462 (1)**
1:19

_____
**3**
**3 (1)**
175:2
**3:30 (1)**
91:24
**3:31 (1)**
207:6
**30 (1)**
180:21
**30.7 (2)**
81:15,16
**3453 (1)**
172:7
**3897 (1)**
170:9
**3905 (1)**
170:9

_____
**4**
**4 (1)**
91:24
**4d (1)**
81:24
**4th (2)**
3:10 173:19
**41st (1)**
3:5

_____
**5**
**5 (2)**
210:6,10
**51 (2)**
3:20 156:12
**556 (1)**
143:3

_____
**6**
**6th (1)**
173:20
**658A (2)**
5:17 210:10
**658-A (2)**
5:20 75:14
**659-A (9)**
98:16,20 100:8,20
   102:17 120:11
   123:2 152:5 210:12
**660-A (6)**
120:21,25 123:4
   152:2,5 210:13

**661 (1)**
152:4
**661-A (5)**
126:3,7 152:3,5
   210:14
**662 (1)**
167:23
**662-A (5)**
167:19,24 169:5,9
   210:15
**663-A (4)**
171:25 172:4 174:14
   210:16
**664-A (3)**
174:22,25 210:17

_____
**7**
**7th (1)**
8:4
**74 (1)**
158:3

_____
**8**
**8 (1)**
186:25
**8:30 (1)**
2:3
**84 (2)**
158:3,5

_____
**9**
**9301 (1)**
126:9
**9654 (1)**
122:2
**9662 (1)**
121:13
**9665 (1)**
121:3
**9688 (1)**
99:2
**98 (1)**
210:12