**EXHIBITS F-L OF DECLARATION OF NEIL J. OXFORD
IN SUPPORT OF THE MEMORANDUM OF
MOVANTS IN OPPOSITION TO THE MOTION IN LIMINE OF BARCLAYS
CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF
DANIEL MCISAAC RELATING TO EXCHANGE TRADED
DERIVATIVES ("ETDs") AND ETD MARGIN**

# EXHIBIT F

| | |
|---|---|
| **From:** | Gilberg, David |
| **Sent:** | Friday, September 19, 2008 10:09 AM |
| **To:** | 'rwasserman@cftc.gov'; 'jlawton@cftc.gov'; 'nmarkman@cftc.gov' |
| **Cc:** | Raisler, Kenneth <Raislerk@sullcrom.com> |
| **Subject:** | Barclays Letter |
| **Attach:** | Document.pdf;NY12532-#424791-v6-CFTC_LETTER_RE_LBI.DOC;DVComparison_NY12532-#424791-v3-CFTC_LETTER_RE_LBI-NY12532-#424791-v6-CFTC_LETTER_RE_LBI.rtf |

Attached is the final version of our letter regarding the Part 190 issues in connection with the Barclays/Lehman transaction. We have also attached a blackline against the version we sent yesterday and a Word version of the unsigned letter. The revisions reflect the comments we received from Natalie, as well as the change in structure we discussed with John this morning, involving a transfer of the purchased Lehman assets into a newly organized Delaware limited liability company. Please let us know if you have any questions. In view of the timing of the bankruptcy proceeding and the scheduled closing of the transaction, we would very much appreciate receiving your letter of confirmation this afternoon.

Thanks very much.


David J. Gilberg
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Phone: 212-558-4680
Fax: 212-558-3588
E-mail: gilbergd@sullcrom.com

HIGHLY CONFIDENTIAL

EXHIBIT
6S9 A
3-1-10

BCI-SC00009676

MOVANTS' TRIAL
EXHIBIT
510

BCI-SC00009676

DOCUMENT1

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1·212·558·4000
FACSIMILE: 1·212·558·3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

September 19, 2008

Ananda K. Radhakrishnan,
  Director, Division of Clearing and Intermediary Oversight,
    Commodity Futures Trading Commission,
      Three Lafayette Centre,
        1155 21st Street, N.W.,
          Washington, D.C. 20581.

Re:    Request for Authorization to Transfer Accounts

Dear Mr. Radhakrishnan:

On behalf of our client, Barclays Capital, Inc. ("Barclays"), a registered futures commission merchant ("FCM"), this is to request that you, acting in your capacity as Director of the Division of Clearing and Intermediary Oversight ("Division"), authorize the transfer, in the event that Lehman Brothers, Inc. ("LBI") were to commence a case under the Securities Investor Protection Act of 1970 ("SIPA"), the Bankruptcy Code or otherwise, of "accounts that are not routinely eligible for transfer under section 764(b) of the Bankruptcy Code by reason of Commission Regulation 190.06(e)."

LBI's parent company, Lehman Brothers Holdings, Inc. ("LBHI"), has filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code, Chapter 11 Case No. 08-13555 (JMP). On September 16, 2008, LBHI, LBI, LB 745 LLC and Barclays entered into an Asset Purchase Agreement (the "Agreement") providing for the sale to Barclays of certain of the assets of LBI, including but not limited to the customer accounts maintained by LBI in its capacity as an FCM. Our client anticipates that LBI may seek relief under SIPA prior to the consummation of the transactions contemplated by the Agreement (the "Transactions") and that a trustee of LBI may decide to consummate the Transactions. In that event, we anticipate that the FCM business of LBI will initially be held in a newly formed Delaware limited liability company (the "LLC"), which will be a wholly owned subsidiary of Barclays. This

HIGHLY CONFIDENTIAL

BCI-SC00009677

BCI-SC00009677

Commodity Futures Trading Commission                                              -2-
Division of Clearing and Intermediary Oversight

structure will effectively require the LLC to succeed to LBI's FCM registration in connection with the LLC's assumption of the transferred FCM business. It is in anticipation of the possibility of the Transactions taking place that we are requesting the authority to transfer the registration and the customer accounts to the LLC.

Pursuant to the Agreement, LBI will transfer all customer accounts, including one hundred percent of each customer's net equity, as reflected on the books of LBI, to the LLC. Some of these accounts are accounts that contain no open commodity positions and accounts that are in deficit, within the meaning of Regulations 190.06(e)(1)(iv) and (v), 17 C.F.R. §§ 190.06(e)(1)(iv) and (v), respectively. Other accounts may be "house accounts," as defined in Commission Regulation 190.01(w); see 17 C.F.R. §§ 190.06(e)(1)(i)[1]. We understand that LBI has sufficient segregated and secured amount funds, as well as sufficient regulatory capital, pursuant to the provisions of the Commodity Exchange Act and the Commission's Regulations thereunder.

Section 764(b) of the Bankruptcy Code, 11 U.S.C. §764(b), provides in relevant part that "the trustee may not avoid a transfer made before five days after the order for relief, if such transfer is approved by the Commission by rule or order, either before or after such transfer, and if such transfer is a transfer of a commodity contract ... carried by or through the debtor on behalf of a customer, and of any cash, securities, or other property margining or securing such commodity contract ... ." Regulation 190.06(e)(1) provides that, "subject to the requirements of paragraph (e)(2) ... all accounts are eligible for transfer after the filing date pursuant to Section 764(b) of the Bankruptcy Code, except ... (i) House accounts . . . of the debtor . . .; (iv) [a]ccounts which contain no open commodity contracts; or (v) [a]ccounts which are in deficit." Moreover, Regulation 190.06(e)(2) prohibits the transfer, in respect of any eligible account, of property whose value "would exceed the funded balance of such account based on available information as of the close of business on the business day immediately preceding transfer" less the value of prior transfers.

There are therefore three specific types of accounts that LBI intends to transfer that are addressed in Regulation 190.06: (1) house accounts; (2) accounts that are in deficit, and (3) accounts that have no open commodity contracts. These three

---

[1]    We note that the positions in the house accounts may have been liquidated by the time the transfer occurs. As a result, it is possible that there will be no house accounts transferred. Nevertheless, we are including the house accounts within the scope of this request, in the event that those liquidations have not been completed by the time of the transfer.

HIGHLY CONFIDENTIAL

BCI-SC00009678

BCI-SC00009677

Commodity Futures Trading Commission                                                -3-
Division of Clearing and Intermediary Oversight

categories would be ineligible for transfer pursuant to, respectively, Regulation
190.06(e)(1)(iv) and (v).

We note that the fact that an account is not eligible for transfer pursuant to
Regulation 190.06(e)(1) does not mean that the transfer of such an account may not be
authorized. Regulation 190.06(h)(2) empowers the Commission, "[n]otwithstanding any
other provision of" Regulation 190.06, to, "in appropriate cases and to protect the public
interest … [p]ermit transfers of accounts which do not comply with the requirements of"
Regulation 190.06. Moreover, Regulation 190.10(d) delegates to the Division Director
"all the functions of the Commission set forth in" Part 190 (with an exception not here
relevant).

We do not believe there is any basis on which these transfers should be
prohibited. As discussed above, in the present case, LBI has sufficient segregated and
secured amount funds, and sufficient regulatory capital. The contemplated transfer of
one hundred percent of each customer's net equity "should approximate, to the extent
possible, the distribution which should be made in bankruptcy,"[2] which the Commission
identified as the purpose of Regulation 190.06(e)(2). Moreover, the transfer of these
accounts is an integral part of the transfer of the majority of LBI's other accounts that *are*
eligible to be transferred pursuant to Regulation 190.06(e). The Commission's
Regulations strongly encourage such transfers where possible. *See* Regulation
190.02(e)(1) (The trustee for a commodity broker must immediately use its best efforts to
effect a transfer in accordance with §§190.06 (e) and (f) … .").

We therefore respectfully request your confirmation, acting on behalf of
the Commission pursuant to delegated authority that, in the circumstances of this case
noted above, the transfer of accounts that are not "eligible" within the meaning of
Regulation 190.06(e)(1) are nonetheless authorized pursuant to Regulation 190.06(h)(2),
and that the LLC may succeed to the existing FCM registration of LBI. We also note
that, during a limited transition period following the date of the transfer of accounts from
LBI, the LLC will be completing certain aspects of the transfers, such as the form of
statements sent to customers, books and records and the manner in which reports are
submitted, but that these aspects likely will not be completed on the date of transfer.

---

[2] *See* 48 Fed. Reg. 8716, 8732 (March 1, 1983) (discussing adoption of Regulation
190.06(e)(2)).

HIGHLY CONFIDENTIAL                                    BCI-SC00009679


BCI-SC00009677

Commodity Futures Trading Commission                                              -4-
Division of Clearing and Intermediary Oversight


       If you have any questions regarding this request, please call the
undersigned at (212) 558-4675.

       Thank you for your assistance.

                              Sincerely,

                              Kenneth M. Raisler


cc: John Lawton
    (Division of Clearing and Intermediary Oversight)

**HIGHLY CONFIDENTIAL**                                              **BCI-SC00009680**


BCI-SC00009677

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

September 19, 2008

Ananda K. Radhakrishnan,
    Director, Division of Clearing and Intermediary Oversight,
        Commodity Futures Trading Commission,
            Three Lafayette Centre,
                1155 21st Street, N.W.,
                    Washington, D.C. 20581.

            Re:    Request for Authorization to Transfer Accounts

Dear Mr. Radhakrishnan:

        On behalf of our client, Barclays Capital, Inc. ("Barclays"), a registered futures commission merchant ("FCM"), this is to request that you, acting in your capacity as Director of the Division of Clearing and Intermediary Oversight ("Division"), authorize the transfer, in the event that Lehman Brothers, Inc. ("LBI") were to commence a case under the Securities Investor Protection Act of 1970 ("SIPA"), the Bankruptcy Code or otherwise, of "accounts that are not routinely eligible for transfer under section 764(b) of the Bankruptcy Code by reason of Commission Regulation 190.06(e)."

        LBI's parent company, Lehman Brothers Holdings, Inc. ("LBHI"), has filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code, Chapter 11 Case No. 08-13555 (JMP).  On September 16, 2008, LBHI, LBI, LB 745 LLC and Barclays entered into an Asset Purchase Agreement (the "Agreement") providing for the sale to Barclays of certain of the assets of LBI, including but not limited to the customer accounts maintained by LBI in its capacity as an FCM.  Our client anticipates that LBI may seek relief under SIPA prior to the consummation of the transactions contemplated by the Agreement (the "Transactions") and that a trustee of LBI may decide to consummate the Transactions.  In that event, we anticipate that the FCM business of LBI will initially be held in a newly formed Delaware limited liability company (the "LLC"), which will be a wholly owned subsidiary of Barclays.  This

HIGHLY CONFIDENTIAL

BCI-SC00009681

BCI-SC00009681

structure will effectively require the LLC to succeed to LBI's FCM registration in connection with the LLC's assumption of the transferred FCM business. It is in anticipation of the possibility of the Transactions taking place that we are requesting the authority to transfer the registration and the customer accounts to the LLC.

Pursuant to the Agreement, LBI will transfer all customer accounts, including one hundred percent of each customer's net equity, as reflected on the books of LBI, to the LLC. Some of these accounts are accounts that contain no open commodity positions and accounts that are in deficit, within the meaning of Regulations 190.06(e)(1)(iv) and (v), 17 C.F.R. §§ 190.06(e)(1)(iv) and (v), respectively. Other accounts may be "house accounts," as defined in Commission Regulation 190.01(w); see 17 C.F.R. §§ 190.06(e)(1)(i)[1]. We understand that LBI has sufficient segregated and secured amount funds, as well as sufficient regulatory capital, pursuant to the provisions of the Commodity Exchange Act and the Commission's Regulations thereunder.

Section 764(b) of the Bankruptcy Code, 11 U.S.C. §764(b), provides in relevant part that "the trustee may not avoid a transfer made before five days after the order for relief, if such transfer is approved by the Commission by rule or order, either before or after such transfer, and if such transfer is a transfer of a commodity contract ... carried by or through the debtor on behalf of a customer, and of any cash, securities, or other property margining or securing such commodity contract ... ." Regulation 190.06(e)(1) provides that, "subject to the requirements of paragraph (e)(2) ... all accounts are eligible for transfer after the filing date pursuant to Section 764(b) of the Bankruptcy Code, except ... (i) House accounts ... of the debtor ...; (iv) [a]ccounts which contain no open commodity contracts; or (v) [a]ccounts which are in deficit." Moreover, Regulation 190.06(e)(2) prohibits the transfer, in respect of any eligible account, of property whose value "would exceed the funded balance of such account based on available information as of the close of business on the business day immediately preceding transfer" less the value of prior transfers.

There are therefore three specific types of accounts that LBI intends to transfer that are addressed in Regulation 190.06: (1) house accounts; (2) accounts that are in deficit, and (3) accounts that have no open commodity contracts. These three categories would be ineligible for transfer pursuant to, respectively, Regulation 190.06(e)(1)(iv) and (v).

We note that the fact that an account is not eligible for transfer pursuant to Regulation 190.06(e)(1) does not mean that the transfer of such an account may not be authorized. Regulation 190.06(h)(2) empowers the Commission, "[n]otwithstanding any

---

[1]    We note that the positions in the house accounts may have been liquidated by the time the transfer occurs. As a result, it is possible that there will be no house accounts transferred. Nevertheless, we are including the house accounts within the scope of this request, in the event that those liquidations have not been completed by the time of the transfer.

HIGHLY CONFIDENTIAL

BCI-SC00009682

BCI-SC00009681

other provision of" Regulation 190.06, to, "in appropriate cases and to protect the public
interest ... [p]ermit transfers of accounts which do not comply with the requirements of"
Regulation 190.06. Moreover, Regulation 190.10(d) delegates to the Division Director
"all the functions of the Commission set forth in" Part 190 (with an exception not here
relevant).

We do not believe there is any basis on which these transfers should be
prohibited. As discussed above, in the present case, LBI has sufficient segregated and
secured amount funds, and sufficient regulatory capital. The contemplated transfer of
one hundred percent of each customer's net equity "should approximate, to the extent
possible, the distribution which should be made in bankruptcy,"[2] which the Commission
identified as the purpose of Regulation 190.06(e)(2). Moreover, the transfer of these
accounts is an integral part of the transfer of the majority of LBI's other accounts that *are*
eligible to be transferred pursuant to Regulation 190.06(e). The Commission's
Regulations strongly encourage such transfers where possible. *See* Regulation
190.02(e)(1) (The trustee for a commodity broker must immediately use its best efforts to
effect a transfer in accordance with §§190.06 (e) and (f) ... .").

We therefore respectfully request your confirmation, acting on behalf of
the Commission pursuant to delegated authority that, in the circumstances of this case
noted above, the transfer of accounts that are not "eligible" within the meaning of
Regulation 190.06(e)(1) are nonetheless authorized pursuant to Regulation 190.06(h)(2),
and that the LLC may succeed to the existing FCM registration of LBI. We also note
that, during a limited transition period following the date of the transfer of accounts from
LBI, the LLC will be completing certain aspects of the transfers, such as the form of
statements sent to customers, books and records and the manner in which reports are
submitted, but that these aspects likely will not be completed on the date of transfer.

---

[2] *See* 48 Fed. Reg. 8716, 8732 (March 1, 1983) (discussing adoption of Regulation
190.06(e)(2)).

HIGHLY CONFIDENTIAL

BCI-SC00009683

If you have any questions regarding this request, please call the
undersigned at (212) 558-4675.

Thank you for your assistance.

Sincerely,

Kenneth M. Raisler

cc: John Lawton
(Division of Clearing and Intermediary Oversight)

HIGHLY CONFIDENTIAL

BCI-SC00009684

BCI-SC00009681

TELEPHONE: 1-212-558-4000 FACSIMILE: 1-212-558-3588 WWW.SULLCROM.COM    *125 Broad Street New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C. FRANKFURT • LONDON • PARIS BEIJING • HONG KONG • TOKYO MELBOURNE • SYDNEY

<——————>September

<DRAFT

<[__]>**19**, 2008

Ananda K. Radhakrishnan**,**
    Director, Division of Clearing and Intermediary Oversight,
        Commodity Futures Trading Commission,
            Three Lafayette Centre,
                1155 21st Street, N.W.,
                    Washington, D.C.  20581.

                Re:    Request for Authorization to Transfer Accounts

Dear Mr. Radhakrishnan:

            On behalf of our client, Barclays Capital, Inc. ("Barclays"), a registered futures commission merchant ("FCM"), this is to request that you, acting in your capacity as Director of the Division of Clearing and Intermediary Oversight ("Division"), authorize the transfer, in the event that Lehman Brothers, Inc. ("LBI") were to commence a case under the Securities Investor Protection Act of 1970 ("SIPA"), the Bankruptcy Code or otherwise, of "accounts that are not routinely eligible for transfer under section 764(b) of the Bankruptcy Code by reason of Commission Regulation 190.06(e)."

            LBI's parent company, Lehman Brothers Holdings, Inc. ("LBHI"), has filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code, Chapter 11 Case No. 08-13555 (JMP).  On September 16, 2008, LBHI, LBI, LB 745 LLC and Barclays entered into an Asset Purchase Agreement (the "Agreement") providing for the sale to Barclays of certain of the assets of LBI, including but not limited to the customer accounts maintained by LBI in its capacity as an FCM.  Our client anticipates that LBI may seek relief under SIPA prior to the consummation of the transactions contemplated by the Agreement (the "Transactions") and that a trustee of LBI may decide to consummate the Transactions.  <It is in anticipation of that possibility->**In that event, we anticipate that the FCM business of LBI will initially be held in a newly formed Delaware limited liability company (the "LLC"), which will be a wholly owned subsidiary of Barclays.  This structure will effectively require the LLC to succeed to LBI's FCM registration in connection with the LLC's assumption of the transferred FCM business.  It is in anticipation of the possibility of the Transactions taking place** that we are requesting the authority to transfer the **registration and the** customer accounts to <Barclays>**the LLC**.

**HIGHLY CONFIDENTIAL**

Pursuant to the Agreement, LBI will transfer all customer accounts, including one hundred percent of each customer's net equity, as reflected on the books of LBI, to <Barclays> **the LLC**. Some of these accounts are <"house accounts," as defined in Commission Regulation 190.01(w)>><<->accounts that contain no open commodity positions and accounts that are in deficit, within the meaning of Regulations 190.06(e)(1)<(i),>(iv) and (v), 17 C.F.R. §§ 190.06(e)(1)<(i),>(iv) and (v), respectively. **Other accounts may be "house accounts," as defined in Commission Regulation 190.01(w); see 17 C.F.R. §§ 190.06(e)(1)(i)**[1]. We understand that<, in the present case,> LBI has sufficient segregated and secured amount funds, as well as sufficient regulatory capital, pursuant to the provisions of the Commodity Exchange Act and the Commission's Regulations thereunder.

Section 764(b) of the Bankruptcy Code, 11 U.S.C. §764(b), provides in relevant part that "the trustee may not avoid a transfer made before five days after the order for relief, if such transfer is approved by the Commission by rule or order, either before or after such transfer, and if such transfer is a transfer of a commodity contract ... carried by or through the debtor on behalf of a customer, and of any cash, securities, or other property margining or securing such commodity contract ... ." Regulation 190.06(e)(1) provides that, "subject to the requirements of paragraph (e)(2) ... all accounts are eligible for transfer after the filing date pursuant to Section 764(b) of the Bankruptcy Code, except ... (i) House accounts . . . of the debtor . . .; (iv) [a]ccounts which contain no open commodity contracts; or (v) [a]ccounts which are in deficit." Moreover, Regulation 190.06(e)(2) prohibits the transfer, in respect of any eligible account, of property whose value "would exceed the funded balance of such account based on available information as of the close of business on the business day immediately preceding transfer" less the value of prior transfers.

There are therefore three specific types of accounts that LBI intends to transfer that are addressed in Regulation 190.06:  (1) house accounts; (2) accounts that are in deficit, and (3) accounts that have no open commodity contracts.  These three categories would be ineligible for transfer pursuant to, respectively, Regulation 190.06(e)(1)(<v>**iv**) and (<iv>**v**).

We note that the fact that an account is not eligible for transfer pursuant to Regulation 190.06(e)(1) does not mean that the transfer of such an account may not be authorized.  Regulation 190.06(h)(2) empowers the Commission, "[n]otwithstanding any other provision of" Regulation 190.06, to, "in appropriate cases and to protect the public interest ... [p]ermit transfers of accounts which do not comply with the requirements of" Regulation 190.06. Moreover, Regulation 190.10(d) delegates to the Division Director "all the functions of the Commission set forth in" Part 190 (with an exception not here relevant).

We do not believe there is any basis on which these transfers should be prohibited. As discussed above, in the present case, LBI has sufficient segregated and secured amount funds, and sufficient regulatory capital.  The contemplated transfer of one hundred percent of each customer's net equity "should approximate, to the extent possible, the distribution which should be made in bankruptcy,"[2] which the Commission identified as the purpose of Regulation 190.06 (e)(2).  Moreover, the transfer of these accounts is an integral part of the transfer of the majority of LBI's other accounts that *are* eligible to be transferred pursuant to Regulation 190.06(e).  The Commission's Regulations strongly encourage such transfers where possible.  *See* Regulation 190.02(e)(1) (The trustee for a commodity broker must immediately use its best efforts to effect a

**HIGHLY CONFIDENTIAL**

**BCI-SC00009686**

BCI-SC00009685

transfer in accordance with §§190.06 (e) and (f) ... .").

        We therefore respectfully request your confirmation, acting on behalf of the Commission pursuant to delegated authority that, in the circumstances of this case noted above, the transfer of accounts that are not "eligible" within the meaning of Regulation 190.06(e)(1) are nonetheless authorized pursuant to Regulation 190.06(h)(2)**, and that the LLC may succeed to the existing FCM registration of LBI**.  We also note that, during a limited transition period following the date of the transfer of accounts from LBI, <del>Barclays</del>**the LLC** will be completing certain aspects of the transfers, such as the form of statements sent to customers**, books and records** and the manner in which reports are submitted, but that these aspects likely will not be completed on the date of transfer.

**HIGHLY CONFIDENTIAL**

**BCI-SC00009687**

BCI-SC00009685

If you have any questions regarding this request, please call the undersigned at (212) 558-4675.

Thank you for your assistance.

Sincerely,


Kenneth M. Raisler


cc: John Lawton
(Division of Clearing and Intermediary Oversight)

HIGHLY CONFIDENTIAL

# E<span>XHIBIT</span> G

1

2          UNITED STATES BANKRUPTCY COURT

           SOUTHERN DISTRICT OF NEW YORK

3      -------------------------------x

       In Re:                    Chapter 11

4      LEHMAN BROTHERS            Case No. 08-13555 (JMP)

       HOLDINGS, INC., et al.,    (Jointly Administered)

5      -------------------------------)

6

7          * * * HIGHLY CONFIDENTIAL * * *

8          DEPOSITION OF ANTHONY SAUNDERS

9              New York, New York

10          Monday, February 8, 2010

11

12

13

14

15

16

17

18

19     Reported by:

       FRANCIS X. FREDERICK, CSR, RPR, RMR

20     JOB NO. 28244

21

22

23

24

25

Page 18

1                A. SAUNDERS - CONFIDENTIAL

2      they might not have opened on the 22nd.  In my

3      opinion.

4           Q.    I think you answered something

5      different than I asked.  I'm not sure.  Let me

6      just try again.  The salutary effect which you

7      reference in your report that the transaction

8      had on the marketplace was an effect that was

9      accomplished in connection with the

10     Lehman/Barclays transaction by the court's

11     approval on September 19th and into the early

12     morning hours of September 20th, correct?

13          A.    Perhaps I'm missing what you're

14     saying.  I'm saying the salutary effect is the

15     effect on the market once it opens on a

16     Monday.  The market is closed on the weekend.

17     So I'm not quite sure I understand what you're

18     trying to get at.

19          Q.    Okay.  I understand our disconnect

20     here.  Let me try again.

21               I appreciate the market is not

22     opened on the weekend so there cannot be any

23     market impact on the weekend.  But what I'm

24     saying is that when the market opened on

25     Monday, the salutary effect that the

<sup>1</sup>                A. SAUNDERS - CONFIDENTIAL

<sup>2</sup>     transaction -- the Lehman/Barclays transaction

<sup>3</sup>     had was as a consequence of the court's

<sup>4</sup>     approval on the 19th and the 20th, correct?

<sup>5</sup>          A.    I believe as a financial economist

<sup>6</sup>     that Goldman or Morgan Stanley might not have

<sup>7</sup>     opened for business on the Monday without the

<sup>8</sup>     Lehman deal going through.  If that's not

<sup>9</sup>     salutary effect, I don't know what is because

<sup>10</sup>    if they'd gone down everybody would have gone

<sup>11</sup>    down.

<sup>12</sup>         Q.    I'm not contesting for purposes of

<sup>13</sup>    my question whether or not you're correct in

<sup>14</sup>    your conclusion about it having a salutary

<sup>15</sup>    effect or not.  I'm simply trying to

<sup>16</sup>    understand what was it that caused the

<sup>17</sup>    salutary effect and that was the approval by

<sup>18</sup>    the court, wasn't it?

<sup>19</sup>         A.    Yes.  That Barclays was going to

<sup>20</sup>    take over LBI.

<sup>21</sup>         Q.    Okay.  Now, with regard -- just

<sup>22</sup>    trying to understand the timing of things for

<sup>23</sup>    the week so we can come back and take it

<sup>24</sup>    apart.  If the transaction between Lehman and

<sup>25</sup>    Barclays had been approved on the 19th into

A. SAUNDERS - CONFIDENTIAL

1    the early morning hours of the 20th but had

2    closed on, say, Wednesday, the 24th, just to

3    get the paperwork done, would that have had

4    any adverse impact on the market?

5         A.    Well, I think Barclays had

6    committed or pre-committed to do the deal so I

7    think the markets would have known rationally

8    that the deal would have been completed on the

9    23rd or 24th.

10        Q.    Right.

11        A.    I mean, obviously, the longer the

12   time between the approval and the actual

13   conclusion of the deal then there's more

14   uncertainty.  But you asked me like two days

15   later would it make much of an effect, I would

16   say no.

17        Q.    Could you look at page -- pardon

18   me -- paragraph 77 of your report, sir.  And

19   right at the bottom of the page there is a

20   quote, the last quote referencing the

21   September 19th hearing.  And I'd like just to

22   direct your attention to the last sentence in

23   the quote where it says, "He..." meaning Mr.

24   McDade -- do you have it, sir?  I'm sorry.

# EXHIBIT H

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11

12

13

14       DEPOSITION OF ANTHONY J. LEITNER

15            New York, New York

16          February 25, 2010

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 28367

Page 2

2    February 25, 2010

4        Deposition of ANTHONY J. LEITNER,
5    held at the law offices of Hughes,
6    Hubbard & Reed, LLP, One Battery Park
7    Plaza, New York, New York, before Kathy
8    S. Klepfer, a Registered Professional
9    Reporter, Registered Merit Reporter,
10    Certified Realtime Reporter, Certified
11    Livenote Reporter, and Notary Public of
12    the State of New York.

Page 3

2            A P P E A R A N C E S :

4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6        222 East 41st Street
7        New York, New York  10017-6702
8    BY:  KELLY A. CARRERO, ESQ.

10    BOIES, SCHILLER & FLEXNER, LLP
11    Attorneys for Barclays Capital
12        10 North Pearl Street
13        4th Floor
14        Albany, New York  12207
15    BY:  TRISH BLOOMER, ESQ.

17    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18    Attorneys for the Creditors Committee
19        51 Madison Avenue, 22nd Floor
20        New York, New York  10010
21    BY:  ROBERT K. DAKIS, ESQ.

Page 4

3        A P P E A R A N C E S :  (Cont'd.)

5    HUGHES, HUBBARD & REED, LLP
6    Attorneys for the SIPA Trustee
7        One Battery Park Plaza
8        New York, New York  10004-1482
9    BY:  NEIL J. OXFORD, ESQ.
10        WILLIAM MAGUIRE, ESQ.
11        STEPHEN LUGER, ESQ.
12        AMINA HASSAN, ESQ.

Page 5

1            A. Leitner
2    ANTHONY J. LEITNER, called as a
3        witness, having been duly sworn by a Notary
4        Public, was examined and testified as
5        follows:
6    EXAMINATION BY
7    MR. OXFORD:
8        Q.   Good morning, Mr. Leitner.  We met off
9    the record.  As you know my name is Neil Oxford.
10    I'm with the law firm of Hughes, Hubbard & Reed
11    and we represent the SIPA Trustee in this
12    matter.
13            Have you been deposed before, sir?
14        A.   Yes.
15        Q.   In which matters have you been
16    deposed?
17        A.   It was a litigation involving a bunch
18    of broker-dealers suing other broker-dealers
19    several years ago on issues relating to the
20    Federal Margin Rules.
21        Q.   Who were the plaintiffs in this case,
22    sir?
23        A.   There were six or seven and I do not
24    remember who they all were.
25        Q.   Were you engaged by the plaintiffs or

Page 6

A. Leitner

1
2  the --
3      A.   Yes.
4      Q.   -- defendants?
5          Who engaged you, sir?
6      A.   I was originally approached by a
7  lawyer in California and then I was dealing with
8  a lead lawyer named -- I forget his name,
9  Richard something, down in Washington.  This was
10 so many years ago I've forgotten.
11     Q.   Can you give me an approximate
12 timeframe for the year or so?
13     A.   1994, '95.
14     Q.   You were still employed by Goldman at
15 that time, sir?
16     A.   No, I was -- I was a consultant to
17 Goldman Sachs and I am a consultant.
18     Q.   Did you testify at trial in that case,
19 sir?
20     A.   No.
21     Q.   Have you testified on any other
22 occasions?
23     A.   No.
24     Q.   Welcome to your second deposition.
25         This is not intended to be a marathon,

Page 7

A. Leitner

1
2  so if you need a break at any time, please just
3  let me know.
4      A.   Thank you.
5      Q.   If you don't understand any of my
6  questions, I'll be happy to rephrase them, so
7  please ask me to do that.
8      A.   You'll have to speak up because I have
9  hearing loss in one year.
10     Q.   Okay.  Did you hear my last question,
11 sir?  What I said was I'll be happy -- in
12 addition to speaking up, I'll be happy to
13 rephrase questions if you don't hear them for
14 that -- if you don't understand them for that
15 reason.
16     A.   Thank you.
17     Q.   Have you seen the expert stipulation
18 in this case, sir, that was negotiated between
19 Barclays and the movants?
20     A.   I believe I did.
21     Q.   And you understand that Barclays is
22 required to produce a complete statement of all
23 your opinions and the bases for them?
24     A.   Yes.
25         (Exhibit 652, Report of Anthony J.

Page 8

A. Leitner

1
2  Leitner, marked for identification, as of
3  this date.)
4      Q.   I have marked as Exhibit 652, sir,
5  your report, which I believe is dated January 8,
6  2010?
7      A.   Yes.
8      Q.   Does that, sir, include all of your
9  opinions in this case?
10     A.   All the opinions I was asked to give,
11 yes.
12     Q.   Do you have opinions in this case that
13 you were not asked to give?
14     A.   On what topic?
15     Q.   Any topic, sir.
16         MS. BLOOMER:  Objection to the form of
17 the question.
18     A.   I was only asked to focus on the
19 issues that I was asked to opine on, and I
20 frankly have not formed a specific opinion on
21 any other matter.
22     Q.   Did you form a general opinion on any
23 other matter relating to this case, sir, that is
24 not contained in your report?
25         MS. BLOOMER:  Objection to the form of

Page 9

A. Leitner

1
2  the question.
3      A.   I'm not sure I would know how to
4  respond to that because I have a general
5  understanding of what happened here, but I have
6  not formed any particular opinions other than on
7  the issue of the collateral, which I think we
8  defined as posted collateral, that is the prime
9  topic of my report.
10     Q.   You understand that discovery in this
11 case, sir, has continued past January 8, 2010,
12 correct?
13     A.   Yes.
14     Q.   Have you read any of the depositions
15 that have been taken subsequent to the signing
16 of your report?
17     A.   Yes.
18     Q.   Which ones have you signed, please,
19 sir?
20         MS. BLOOMER:  Object to the form of
21 the question.
22     Q.   Which ones have you read, sir?
23     A.   The deposition of Mr. Rosen, of Mr.
24 Dzeimian I believe are the ones I focused on.
25     Q.   I'll represent to you --

Page 10

1              A. Leitner
2       A.    And Elizabeth James.
3       Q.    I'll represent to you, sir, that Mr.
4  Dzeimian has not yet been deposed.
5       A.    Then I would change my answer to refer
6  to his declaration and not his deposition.
7       Q.    Thank you.  Did you read Jonathan
8  Hughes' deposition, sir?
9       A.    I did.  Thank you for reminding me.  I
10 read portions of his deposition.
11      Q.    Do you understand that he was deposed
12 over the course of two days, sir?
13      A.    Yes.
14      Q.    Did you read portions of both of those
15 days or just one of those days?
16      A.    Just the first day.
17      Q.    Did you read Mr. Clark's deposition?
18      A.    No.
19      Q.    Did you know, sir, that Mr. Clark was
20 deposed?
21      A.    I believe I was informed that he was.
22      Q.    And did you read Sharon Blake's
23 deposition?
24      A.    No.
25      Q.    Did you know that Ms. Blake was

Page 11

1              A. Leitner
2  deposed?
3       A.    Yes.
4       Q.    Should, during the course of your
5  questioning, you recall an additional deposition
6  that you read, if you would please just -- you
7  can interrupt my questions to answer and
8  supplement.
9            MS. BLOOMER:  I'm going to object to
10      the form of the question.  Just to clarify,
11      you mean since he filed his report, that's
12      the scope of your question?
13           MR. OXFORD:  Yes.  Yes.
14      A.    Okay, since I filed my report, I also
15 read portions of Mr. Kobak's deposition and
16 reread portions of Mr. King's deposition.
17 That's all I can recall.
18      Q.    Did you read exhibits that were
19 referenced in those depositions, sir?
20      A.    I did refer to some of the exhibits
21 referenced there.  Many of them had been -- many
22 of them I had reviewed, you know, prior to the
23 deposition, so I was already familiar with that.
24      Q.    Did you review any additional
25 materials other than those you have just

Page 12

1              A. Leitner
2  testified to since you signed your report on
3  January 8?
4       A.    Not beyond the materials that I
5  believe I identified in the exhibit to my
6  report.
7       Q.    And you're referring, sir, to Schedule
8  2 -- sorry, Schedule 1 to your report, sir?
9       A.    Yes.
10      Q.    Did any of the materials that you
11 reviewed subsequent to the filing of your
12 report, sir, did they change your opinion in any
13 way?
14      A.    On the contrary.  They reinforced my
15 opinion.
16      Q.    Could you describe for me generally
17 how they reinforced your opinion?
18      A.    Yes, I can describe generally how they
19 reinforced my opinion.
20      Q.    Please do so.
21      A.    My report, and I'll speak just
22 generally about the conclusions in my report,
23 are based in large measure on the lack of
24 information and general volatility and
25 uncertainty relating to the time period during

Page 13

1              A. Leitner
2  which Lehman was undergoing its financial
3  difficulties leading up to the conclusion and
4  closing of this transaction.
5            The one additional element that was --
6  that came out of reviewing those materials was
7  the degree of operational risk associated with
8  the transaction, which was, in my view, simply a
9  subset of the other risks referred to in my
10 opinion that would have been obvious to Barclays
11 before they signed the APA and continued through
12 the life of the transaction.
13      Q.    Can you describe for me what you mean
14 by "the degree of operational risk associated
15 with the transaction"?
16      A.    Yes, I can.
17      Q.    Would you please do so?
18      A.    Lehman Brothers had derivative
19 positions at various brokers and at the Options
20 Clearing Corp., a clearing corporation that they
21 were members of, and at through affiliate
22 companies at foreign exchanges.  A transfer of
23 positions is not something that can be
24 accomplished even in the best of circumstances
25 overnight, and not without a lot of preparation,

A. Leitner

1 and the weekend over which this transaction was
2 concluded added to the complication because it's
3 what's called an expiration weekend at the
4 Options Clearing Corp. So all of the options
5 that were expiring at that time had to be
6 settled.
7          Those settlement obligations all
8 became obligations of Barclays on November 1.
9 Barclays also had to deal with the fact that
10 some of Lehman's customers were not coming over
11 to Barclays. The customer transfers, by the
12 way, had their own issues, but just focusing on
13 the clearing side of the Lehman business that
14 Barclays was acquiring, and so although Barclays
15 had as of Monday morning, as I understand it,
16 all of Lehman's obligations to the Option
17 Clearing Corp., it took them several days to set
18 up the process for being able to manage the
19 clearance and settlement of these transactions
20 and figure out how to do that.
21          And so that's what I meant by
22 "operational risk."
23     Q. Which Lehman customers were not coming
24 over to Barclays, sir?

A. Leitner

1     A. I don't know that I've ever known
2 that. You asked me which customers, and you
3 meant by name, I assume.
4     Q. Well, can you categorize them in any
5 way, sir?
6     A. Other than -- not other than as
7 customers that for some reason, which I don't
8 completely understand, remained at Lehman
9 Brothers.
10     Q. Do you know which customers did go to
11 Barclays?
12     A. Yes.
13     Q. Which customers went to Barclays, sir?
14     A. A group of customers that were
15 generally categorized as PIM customers is what I
16 recall.
17     Q. What's a PIM customer, sir?
18     A. My understanding is that "PIM" stands
19 for private investment management.
20     Q. And what does that mean to you, sir?
21        MS. BLOOMER: Objection.
22     A. I can only describe it in terms of
23 what it means to me in general terms and based
24 on my experience in the business, although it

A. Leitner

1 might not be exactly what -- how they
2 interpreted it here.
3     Q. Did you ask anybody, sir, what type of
4 customers were going to Barclays and which type
5 of customers weren't?
6     A. No.
7     Q. What is the basis for your testimony
8 that PIM customers were going to Barclays?
9     A. The basis is that it's referred to in
10 the testimony of some of the witnesses.
11     Q. Did you understand, sir, that the
12 reason certain types of customers were not going
13 to Barclays was because Barclays didn't want
14 them?
15     A. I'm not aware of that, no. Just to be
16 clear, whether Barclays wanted them or not,
17 effective on Monday morning, they had the
18 clearance risk for all of them.
19     Q. Where did they have the clearance risk
20 for all of Barclays' customers?
21     A. Because, to the extent that
22 Barclays -- those customers that did not come
23 over had any derivative positions that had been
24 at Lehman Brothers, those responsibilities were

A. Leitner

1 acquired by Barclays effective on Monday.
2     Q. Is that opinion you have just
3 provided, sir, limited to the OCC, or is it to
4 any position at any derivative clearing
5 organization or exchange?
6        MS. BLOOMER: Objection to the form of
7     the question. Vague and ambiguous.
8        You can answer the question, if you
9     understand.
10     A. I think I understand it.
11        To the extent that the customer's
12 position was being cleared by Lehman and was on
13 Lehman's books and records and was assumed by
14 Barclays as a result of the transaction, then
15 Barclays had the risk to the broker or clearing
16 association for those positions. I believe that
17 was the understanding.
18     Q. And it's your opinion --
19     A. With respect to OCC, that would be
20 literally true.
21     Q. Leaving OCC out of my question, sir,
22 is it your understanding that customer positions
23 outside of the OCC were being assumed by
24 Barclays?

Page 18

A. Leitner

2  A.  Can we --
3      MS. BLOOMER:  Objection to the form of
4  the question.  You mean exchange-traded
5  derivatives positions, right?
6      MR. OXFORD:  Yes.
7      THE WITNESS:  I was going to say I
8  don't understand --
9  Q.  Perhaps I can give you a running
10  direction, sir.  Your report concerns
11  exchange-traded derivatives.  You told me, "I
12  don't have any opinions on matters in this case
13  other than exchange-traded derivatives," so to
14  the extent my questions are unclear but are
15  clarified by this, you can assume that they all
16  relate to exchange-traded derivatives.
17  A.  The -- what I think is important to
18  clarify is the difference between customer
19  accounts and customer positions that were
20  cleared by Lehman Brothers.
21  Q.  Okay.  Please clarify.
22  A.  To the extent that Lehman had
23  responsibility for clearing these customer
24  accounts and that was part of the
25  exchange-traded derivatives business, then

Page 19

A. Leitner

2  Barclays acquired the exchange-traded derivative
3  business and, therefore, all of the obligations
4  that related to clearing the positions that
5  Lehman had.
6      And my understanding of the facts is
7  that they included positions that were
8  proprietary positions and customer positions.
9  Q.  Could you turn to paragraph 19 of your
10  report, sir.  It's on page 7.
11      MS. BLOOMER:  What exhibit number did
12  you mark the report?
13      MR. OXFORD:  I'm sorry.  Thank you,
14  Trish.  I believe I marked it as 652.
15      MS. BLOOMER:  Thank you.  And what
16  paragraph?
17      MR. OXFORD:  19.
18  Q.  Do you have that in front of you, sir?
19  A.  Yes, I do.
20  Q.  In the first sentence of paragraph 19,
21  sir, you set out Barclays' contention as to its
22  position with respect to the acquisition of
23  exchange-traded derivatives from Lehman, do you
24  see that?
25      MS. BLOOMER:  I object to the

Page 20

A. Leitner

2  characterization of the opinion to the
3  extent that was a characterization.
4  A.  Sorry.  You want to read me something
5  from --
6  Q.  Let me ask it this way.  Can you read
7  the first sentence of paragraph 19 and tell me
8  what the basis is for that statement?
9  A.  "Barclays contends in this litigation
10  that, in the midst of the extreme and uncertain
11  circumstances surrounding its acquisition of the
12  capital markets, brokerage, futures commission
13  merchants and other ETD businesses of LBI,
14  Barclays entered into to an agreement with LBI
15  whereby (i) Barclays would assume all of LBI's
16  rights and obligations in and to all
17  exchange-traded derivatives, including options
18  and futures (hereinafter collectively called
19  'ETDs'), held for LBI's account as well as for
20  the accounts of LBI affiliates and LBI customers
21  at clearing houses or clearing brokers in
22  connection with those businesses; and (ii)
23  Barclays would receive all LBI's rights with
24  respect to the margin and related property
25  (including clearing fund deposits) held by the

Page 21

A. Leitner

2  clearing houses or clearing brokers in relation
3  to the ETDs (whether such property related to
4  proprietary positions or customer positions)
5  (hereinafter the 'posted collateral')."
6  Q.  What's the basis for that statement,
7  sir?
8  A.  I would refer you to the pages and
9  paragraphs in my report that set forth the basis
10  of that opinion.  Those paragraphs begin, I
11  believe, on page 38, where I recite the opinions
12  again, and then on page 40, where I recite the
13  analysis.  Those paragraphs set forth the basis
14  for my opinions.
15  Q.  Do you agree with me, sir, that margin
16  or collateral is something different from an
17  exchange-traded derivative?
18      MS. BLOOMER:  I object to the form of
19  the question.
20  A.  I don't understand the question.
21  Different in what respect?
22  Q.  They're different assets, sir.
23      MS. BLOOMER:  Object to the form of
24  the question.
25  A.  I don't necessarily agree with that.

Page 22

A. Leitner

1
2    Q.   Will you turn to page 94 of your
3    report, please, sir?
4    A.   Paragraph 94?
5    Q.   Sorry, paragraph 94.  Do you have
6    that, sir?
7    A.   I do.
8    Q.   Do you see that in the first sentence
9    you say, "With respect to posted collateral, in
10   normal circumstances, a buyer and seller would
11   have reached an agreement about whether the
12   transfer of ETDs would come with or without the
13   related collateral."  Do you see that, sir?
14   A.   Yes, I do.
15   Q.   Isn't it correct, sir, that in that
16   sentence you treat as different assets the
17   exchange-traded derivatives and the collateral
18   that may be related to that?
19        MS. BLOOMER:  Objection to the form of
20        the question and the characterization of the
21        testimony, that sentence.
22   A.   I'm sorry, the paragraph -- the
23   sentence speaks for itself, so what's the
24   question?
25   Q.   The question, sir, is whether or not

Page 23

A. Leitner

1
2    you believe there is a distinction between an
3    exchange-traded derivative and collateral
4    related to that derivative?
5        MS. BLOOMER:  Objection to form.
6    Q.   Are they the same assets or different
7    assets?
8        MS. BLOOMER:  I object to the form.
9        That's a different question.
10   A.   Here's why I don't understand the
11   question.  Are you asking me the question from
12   an accounting perspective or from a business
13   perspective?  How are you asking the question?
14   Q.   From a business perspective, sir.
15   A.   From a business perspective, certainly
16   in the circumstances of this transaction it was
17   all part of the business.  So you cannot
18   separate the derivative from the assets
19   supporting that business, and in my view,
20   collateral constitutes assets supporting the
21   business.
22        I think that's the way it is generally
23   understood in the industry.  Can you separate
24   them into two pieces?  You cannot have the
25   derivative if you -- if collateral is required

Page 24

A. Leitner

1
2    without posting collateral.
3    Q.   From a legal perspective, sir, is
4    collateral different from an exchange-traded
5    derivative?
6        MS. BLOOMER:  Objection to the form of
7        the question.  It requires a legal
8        conclusion.
9    A.   An exchange-traded derivative is a
10   contract.  Collateral is collateral.
11   Q.   Is that a "yes"?
12        MS. BLOOMER:  Object to the form of
13        the question.
14   A.   That's the best answer I can give.
15   Q.   From an accounting perspective, sir,
16   is an exchange-traded derivative the same as
17   collateral related to an exchange-traded
18   derivative?
19        MS. BLOOMER:  Objection.  Beyond the
20        scope of the expert's expert testimony and
21        knowledge.
22   A.   I have -- I don't pretend to be an
23   expert on the accounting treatment of
24   exchange-traded derivatives.
25   Q.   Do you have any knowledge, sir, as an

Page 25

A. Leitner

1
2    expert who has worked in this area for some 20
3    or 30 years, as to what the accounting treatment
4    is of exchange-traded derivative contracts and
5    the collateral related thereto?
6        MS. BLOOMER:  Objection.  Beyond the
7        scope of the expert's testimony and
8        knowledge.
9    A.   I do not have knowledge of the
10   accounting treatment of exchange-traded
11   derivatives and related collateral for GAAP
12   accounting purposes.
13   Q.   Do you have such knowledge for any
14   accounting purposes, sir?
15        MS. BLOOMER:  Objection to the form of
16        the question and the scope.
17   A.   I'm sorry, can you repeat the
18   question?
19        (Record read.)
20   A.   No.
21   Q.   Mr. Leitner, I'm handing you a copy of
22   the Asset Purchase Agreement in this matter
23   that's previously been marked Exhibit 1.  Have
24   you seen that document before, sir?
25   A.   Yes.

Page 26

A. Leitner

1
2    Q.   In fact, you reviewed it as part of
3    your preparation for your report; is that
4    correct?
5    A.   I have.
6    Q.   And your opinion in this matter is
7    based in part upon your review of the Asset
8    Purchase Agreement, correct?
9    A.   Yes.
10    MS. BLOOMER:  Objection to the form of
11    the question.
12    Q.   This is one of the governing
13    agreements, sir, that you believe is consistent
14    with Barclays' legal position in this matter,
15    correct?
16    A.   Yes.
17    Q.   Do you agree with me, sir, that there
18    is no reference in the Asset Purchase Agreement
19    to either margin or any other collateral that
20    relates to exchange-traded derivatives?
21    MS. BLOOMER:  Objection to the form of
22    the question.
23    A.   I do not agree with your statement.
24    Q.   Why not?
25    A.   I would refer to my opinion for a more

Page 27

A. Leitner

1
2    complete definition, but using my own words, my
3    understanding was that the transactions involved
4    in the sale of businesses and assets associated
5    with those businesses, exchange-traded
6    derivatives were specifically referred to in the
7    document.  Deposits are referred to in the
8    agreement.
9    There is a reference I think to short
10    positions as included assets that would take the
11    other side of derivatives as long positions, and
12    I don't see anything inconsistent -- I did not
13    see anything inconsistent with the agreement --
14    in the agreement with the proposition that any
15    collateral that was securing the exchange-traded
16    derivative positions was part of the business.
17    Q.   That's not quite my question, sir.  My
18    question is, is there in the Asset Purchase
19    Agreement any specific reference to margin or
20    collateral that relates to exchange-traded
21    derivatives?
22    MS. BLOOMER:  Objection to the form of
23    the question.
24    A.   I don't believe those words -- that I
25    found those words used in the APA.

Page 28

A. Leitner

1
2    Q.   And it's your opinion, sir, that the
3    reference to exchange-traded derivatives,
4    deposits, and short positions are not
5    inconsistent with Barclays' position that it
6    gets the margin under the APA, sir, is that
7    correct?
8    MS. BLOOMER:  Objection.
9    Mischaracterizes the witness's testimony.
10    A.   My opinion speaks for itself.
11    Q.   Well, sir, with respect, your opinion
12    doesn't speak for itself, which is why you're
13    sitting for a deposition today.  You have to
14    answer my questions.
15    MR. OXFORD:  Can you read that back,
16    please?
17    MS. BLOOMER:  And the question
18    mischaracterized his testimony.
19    MR. OXFORD:  Your objection is on the
20    record.  Thanks, Trish.
21    MS. BLOOMER:  You asked him a
22    different question.
23    (Record read.)
24    A.   If you'll allow me to answer without
25    using a double negative, my answer would be that

Page 29

A. Leitner

1
2    it is consistent with their position.
3    Q.   Is the Asset Purchase Agreement, sir,
4    in your opinion also consistent with the
5    position that Barclays does not acquire the
6    margin or collateral related to exchange-traded
7    derivatives under the APA?
8    MS. BLOOMER:  Objection.  Calls for
9    interpretation of the agreement.
10    MR. OXFORD:  Trish, he's offered an
11    opinion on the interpretation of the
12    agreement.  You do know that.
13    MS. BLOOMER:  He's saying what it's
14    consistent with.  I'm just making an
15    objection.  You can ask the question.  I
16    haven't instructed him not to answer.
17    Q.   Do you have the question in mind, sir?
18    A.   I'm sorry, I didn't hear you.
19    Q.   Do you have the question in mind, sir?
20    A.   Yes.
21    MS. BLOOMER:  Would you like the
22    question repeated so it can refresh your
23    memory?
24    THE WITNESS:  Are you instructing me
25    not to answer?

Page 30

1           A. Leitner
2       MS. BLOOMER:  No.  No.
3       THE WITNESS:  She's speaking into my
4   bad ear.
5       MR. OXFORD:  We can swap if it's
6   easier.
7   A.   Let me be very clear, if I can.
8   Q.   Please.
9   A.   The agreement is helpful in forming my
10  conclusion as stated in my report.  It is
11  certainly not the only factor I used in reaching
12  the conclusion that I did, but my report
13  concludes that Barclays believed at the time
14  this agreement was signed and throughout the
15  transaction, and acted on that assumption, that
16  it would be receiving all of the assets
17  necessary to run the business, which in my
18  opinion would include all the collateral
19  supporting those exchange-traded derivative
20  positions.
21      MR. OXFORD:  Can you read my question
22  back that starts with "the Asset Purchase
23  Agreement."
24      (Record read.)
25  A.   My answer would be no.

Page 31

1           A. Leitner
2   Q.   Did you talk to anybody at Barclays,
3   sir, about any of the provisions in the APA that
4   you have referred to in your testimony today?
5       MS. BLOOMER:  I object to the form of
6       the question to the extent it requires you
7       to disclose discussions that you've had with
8       attorneys.  I instruct you not to answer to
9       that extent, but otherwise, you can answer.
10  A.   I'm trying to think.  In the -- with
11  respect to the actual employees of Barclays with
12  whom I have personally met, did I ever speak
13  about provisions of the agreement, the answer is
14  I don't recall any such discussions.
15  Q.   Did you talk, sir, to the people who
16  from Barclays negotiated the Asset Purchase
17  Agreement?
18  A.   I did not.
19  Q.   You didn't talk to anybody at Barclays
20  about what they meant when they signed an
21  agreement that says "purchased assets include
22  exchange-traded derivatives"; is that correct?
23  A.   To the best of my recollection, I did
24  not have any such discussions.
25      You're asking me if I had such

Page 32

1           A. Leitner
2   discussions; is that right?
3       You want to read the question back,
4   please?
5       (Record read.)
6   A.   Correct.
7   Q.   Did you --
8   A.   I don't recall any such discussions.
9   Q.   Did you talk to anybody at Barclays
10  about what they meant when they signed an
11  agreement that included deposits in purchased
12  assets, sir?
13      MS. BLOOMER:  Object to the question.
14      Only answer to the extent that you can.  You
15      can do so without disclosing discussions
16      that you've had with lawyers.
17  A.   I believe the question was did I have
18  any discussion with people at Barclays?
19      MS. BLOOMER:  Yes.
20      THE WITNESS:  And the answer would be
21  I did not.
22  Q.   Do you agree, sir, that margin is an
23  asset that is related to a derivative contract?
24      MS. BLOOMER:  Objection to the form of
25      the question.

Page 33

1           A. Leitner
2   A.   I'm sorry, I don't mean to quibble,
3   but how do you mean "related"?
4   Q.   I'm not sure I can be more specific.
5   Do you know what the word "related" means?
6       MS. BLOOMER:  Object to the form of
7       the question.
8   A.   The problem -- here's the problem I
9   have with the question, and this transaction
10  highlights it.  "Margin" is a term generally
11  used to define, either by rule or regulation, or
12  by the rules, in this case, of a clearing house,
13  the property or cover -- I'm going to get back
14  to the word "cover" -- that it is prepared to
15  accept for the privilege of being able to have
16  an exposure to the market.
17      So, for example, the Options Clearing
18  Corp. will accept letters of credit as
19  collateral for the position.  I would not
20  characterize -- I would characterize that letter
21  of credit as meeting the margin requirement, but
22  not as an asset.
23      It may also be that, in the case of,
24  as I say in my opinion, the methodology by which
25  the margin requirement is calculated may be

Page 34

A. Leitner

1  based on offsets of long positions.
2      So this is an area where I would
3  hesitate to give you an answer to your question
4  that does not take into account the -- what is
5  meant by the word "margin."
6      Q.   In your example, sir, would the letter
7  of credit be related to the derivative contract,
8  the risk of which it was posted to cover?
9      MS. BLOOMER: Objection to the form of
10  the question.
11     A.   The letter of credit is accepted by
12  the clearing house as cover for or margin for
13  the exposures in the aggregate sense of all of
14  the derivatives that are in that clearing
15  member's account. That's the best way I can
16  answer it.
17     Q.   Sir, is it related or not related to
18  the derivatives in that account?
19     MS. BLOOMER: Objection. Asked and
20  answered.
21     A.   To the extent that the clearing house
22  recognizes any type of collateral, including
23  letters of credit, as constituting sufficient
24  cover for the assets in the account, I would

Page 35

A. Leitner

1  agree that it is related.
2      Q.   Could you turn, sir, to page 2 of the
3  Asset Purchase Agreement. Do you see towards
4  the bottom, sir, there's the definition of
5  "excluded assets"?
6      A.   Yes.
7      Q.   And do you see that the list of
8  excluded assets starts on page 2, continues
9  through page 3 and over onto page 4; do you see
10  that, sir?
11     A.   Yes.
12     Q.   Did you review that list when forming
13  your opinions, sir?
14     A.   Yes.
15     Q.   Turning your attention specifically to
16  clause (n) at if top of page 4.
17     A.   Yes.
18     Q.   And it reads, "All assets primarily
19  related to the IMD business and derivatives
20  contracts." Do you see that, sir?
21     A.   Yes.
22     Q.   Did you consider that clause in
23  forming your opinion?
24     MS. BLOOMER: Object to the form of

Page 36

A. Leitner

1  the question.
2      A.   My answer would be that generally,
3  yes, but specifically, no.
4      Q.   Do you agree, sir, that this clause
5  excludes from the definition of "purchased
6  assets" assets primarily related to derivatives
7  contracts?
8      MS. BLOOMER: Objection.
9      A.   You're asking me to interrupt the
10  contract. I --
11     Q.   Yes, I am, sir.
12     A.   Well, I -- I was not asked in my
13  opinion to interpret the contract and I can't
14  interpret the contract. I don't have enough
15  information to draw any conclusion about either
16  what the IMD business was or what derivative
17  contracts were meant with regard to the IMD
18  business.
19     Q.   Sir, you do know --
20     Sorry. I didn't mean to cut you off.
21     A.   Because the agreement elsewhere refers
22  to exchange-traded derivatives, because these
23  could well have been swaps or OTC derivatives.
24  I have no idea.

Page 37

A. Leitner

1      Q.   You've offered an opinion, sir, that
2  the governing agreements, including the APA, are
3  consistent with Barclays' position in this
4  litigation, haven't you, sir?
5      A.   I did.
6      Q.   And this is one of the governing
7  agreements you have offered an opinion on, sir?
8      MS. BLOOMER: Objection to the form of
9  the question.
10     A.   I offered an opinion about the
11  agreement in the context, as my report states,
12  of all the other relevant facts that were stated
13  in my opinion, yes.
14     Q.   And your opinion, sir, is that the
15  definition of "exchange-traded derivatives" in
16  paragraph D of the purchased assets includes
17  collateral or margins; is that correct?
18     MS. BLOOMER: Objection to the form of
19  the question. Mischaracterizes his
20  testimony. Paragraph D of what agreement
21  are you talking about?
22     MR. OXFORD: The definition of
23  "purchased assets" in the APA.
24     MS. BLOOMER: In the APA?

Page 38

```
1              A. Leitner
2        Could you refer him to a page number?
3        MR. OXFORD:  Sure.
4    Q.   Page 6, sir.
5    A.   Page 6 of what?
6    Q.   The Asset Purchase Agreement.
7        MS. BLOOMER:  Do you have the question
8    in mind?
9    A.   So what am I --
10   Q.   Your opinion is that paragraph D of
11   the definition of "purchased assets,"
12   particularly the inclusion of the phrase
13   "exchange-traded derivatives," is consistent
14   with Barclays' position in this litigation that
15   the Asset Purchase Agreement conveys to Barclays
16   the margin associated with exchange-traded
17   derivatives; isn't that correct, sir?
18       MS. BLOOMER:  Objection to the form of
19       the question.  You are selectively moving
20       from his testimony.  That mischaracterizes
21       his testimony.
22   A.   It is consistent with my opinion taken
23   together with all the other facts and
24   circumstances referred to in my opinion.
25   Q.   Is it possible, sir, that assets
```

Page 39

```
1              A. Leitner
2    primarily related to derivatives contracts in
3    the sense that it is used in paragraph (n) on
4    page 4 is intended to exclude from the purchased
5    assets going to Barclays the margin or other
6    collateral associated with derivatives
7    contracts?
8        MS. BLOOMER:  Objection to the use of
9        the undefined term "derivatives contract"
10       and to the deletion of the language in the
11       middle of assets and derivatives contracts
12       in paragraph (n).
13       THE WITNESS:  I'm sorry, can you
14       repeat the question?
15       (Record read.)
16       MS. BLOOMER:  Objection to the form of
17       the question.
18   A.   It seems to me completely inconsistent
19   with the basic agreement, as I understood it,
20   that various businesses were being transferred
21   from Lehman to Barclays and that the core of
22   those businesses were defined in the included
23   assets.  In the context of this agreement, the
24   IMD business appears to be a business they were
25   not acquiring, and therefore -- and I have no
```

Page 40

```
1              A. Leitner
2    idea why they used the word "derivatives," and
3    so I think it is completely irrelevant to any
4    aspect of my report.  But I have formed that
5    opinion because you asked me just now, but
6    that's ...
7    Q.   You didn't --
8    A.   And --
9        Sorry.  Go ahead.
10   Q.   Have you finished your answer, sir?
11   A.   I have.
12   Q.   Safe to say you didn't talk to anybody
13   at Barclays about who negotiated the Asset
14   Purchase Agreement about what they meant by
15   paragraph (n) of the excluded assets when they
16   signed this document, sir?
17       MS. BLOOMER:  Objection to the form of
18       the question and I instruct the witness not
19       to answer to the extent it would require the
20       disclosure of discussions with his attorney.
21       MR. DAKIS:  I'm sorry.  I hate to
22       interject.  He's testifying as an expert
23       today, correct?
24       MS. BLOOMER:  Yes, he is.
25       MR. DAKIS:  Well, to the extent that
```

Page 41

```
1              A. Leitner
2    he relied on a conversation with an attorney
3    in forming an opinion in his report, he
4    can't take the privilege.
5        MS. BLOOMER:  I don't think that he --
6        the question is asking whether he relied on
7        what the attorney told him in forming his
8        opinion.  He's asking about whether he
9        talked to an attorney, and there is a
10       stipulation -- let me finish, please.  There
11       is a stipulation in this case that precludes
12       Mr. Oxford from asking questions about
13       discussions that he had with counsel that
14       were separate from any underlying fact, and
15       so the question of whether he spoke with an
16       attorney is potentially calling for
17       information that is beyond what is required
18       to be disclosed and permitted to be asked
19       about in the deposition.
20       MR. DAKIS:  With all due respect, the
21       stipulation only goes to the extent he
22       didn't rely on a discussion with the
23       attorney.
24       MS. BLOOMER:  That's right, and that's
25       why I gave the exception "to the extent."
```

Page 42

1        A. Leitner
2        MR. DAKIS: We respectfully disagree
3    with your reading of the stipulation and
4    with the instruction. We'll take it up with
5    the judge at another time.
6        MS. BLOOMER: Fine.
7        THE WITNESS: So could you read back
8    the question?
9        (Record read.)
10   A.   I do not recall any such discussion.
11   Q.   It's your opinion, Mr. Leitner, isn't
12   it, that margin is such an important part of
13   this transaction that no rational purchaser of
14   Lehman's exchange-traded derivatives business
15   would agree, in the circumstances in which
16   Barclays purchased that business in September
17   2008, to buy the business without the margin,
18   correct?
19       MS. BLOOMER: Objection to the form of
20   the question.
21   A.   I would refer to my report for the
22   accurate statement, but in general terms, I
23   believe that's my conclusion.
24   Q.   If it's so important to Barclays to
25   get the margin, why wouldn't they make a

Page 43

1        A. Leitner
2    specific reference to the margin in the APA?
3        MS. BLOOMER: Objection to the form of
4    the question. Calls for speculation.
5    A.   It does call for speculation and I
6    can't speculate. I wasn't there, I don't know
7    what was in the minds of the parties, but I have
8    generally taken the view simply as a lawyer that
9    the more expansive and general terms you use the
10   more you intend it to be expansive and general.
11   Q.   You're aware, sir, that Barclays was
12   represented by sophisticated counsel in this
13   matter, correct?
14       MS. BLOOMER: Objection to the form of
15   the question.
16   A.   I believe both sides of this
17   transaction were represented by competent and
18   experienced counsel.
19   Q.   And the counsel that represented
20   Barclays knew how to draft a clause that would
21   expressly convey margin and collateral --
22       MS. BLOOMER: Objection.
23   Q.   -- in a sale document?
24       MR. OXFORD: Please let me finish the
25   question.

Page 44

1        A. Leitner
2    Q.   Correct?
3    A.   I don't mean to be facetious, but I
4    think that under the time pressure that these
5    attorneys were working, they did the best job
6    they could possibly do. So I cannot speculate
7    about whether and why people did not explore
8    every potential avenue that might have been
9    explored or clarified in the APA if you had, for
10   example, a month to do the transaction or even a
11   week.
12       I think, just as a personal comment, I
13   believe both sides did a very good job under
14   very trying circumstances.
15   Q.   In Schedule 1 to your opinion, sir,
16   you set out the documents that you reviewed in
17   forming your opinion, correct?
18   A.   I'm sorry, just --
19       (Record read.)
20   A.   Yes.
21   Q.   And there are over a hundred documents
22   in there, correct, sir?
23   A.   Yes.
24   Q.   In any of those documents that you
25   reviewed did you see a reference to margin or

Page 45

1        A. Leitner
2    collateral associated with exchange-traded
3    derivatives in a document that's dated prior to
4    the Sale Hearing?
5        MS. BLOOMER: Objection.
6    A.   Prior to the Sale Hearing?
7    Q.   Correct.
8        MS. BLOOMER: Do you know specifically
9    when the Sale Hearing was just so that you
10   can answer the question appropriately? I
11   just want to be sure it's a fair question.
12       MR. OXFORD: Sure.
13   Q.   If it helps you answer my question,
14   Mr. Leitner, I will represent to you that the
15   Sale Hearing in this case took place on
16   September 19, 2008.
17       MS. BLOOMER: And the timeframe?
18   A.   Friday?
19   Q.   Friday at around approximately 4 or 5
20   P.M.
21   A.   And so the question was, did I?
22   Q.   Have you seen any documents that are
23   dated prior to the Sale Hearing that so much as
24   reference margin or collateral?
25   A.   Yes.

Page 46

```
1            A. Leitner
2    Q.   Which documents, sir?
3         And just so we have a clean record,
4  you jumped in a little bit, I understand we're
5  trying to move forward, but my question is have
6  you seen any documents that were dated prior to
7  the Sale Hearing, as I have just explained it to
8  you, that were created by Barclays that
9  specifically reference margin or collateral
10 associated with exchange-traded derivatives?
11   A.   The answer is I believe I -- I believe
12 that I did see such a document.  I do not recall
13 if it referred to any specifics, specific
14 numbers relating to margin, but it may have
15 referred to margin generally and ...
16   Q.   Are you able to identify that document
17 for me, sir?
18   A.   Not by reference number.  Only in
19 general terms.
20   Q.   Give me the best you can in general
21 terms of your description of that document.
22   A.   My recollection was that it was a
23 document either produced by or given to Liz
24 James in connection with their examination of
25 the FCM business of Barclays, which, as I recall
```

Page 47

```
1            A. Leitner
2  either from her testimony or in preparation for
3  her declaration, occurred prior to the Sale
4  Hearing.
5    Q.   Perhaps we could leave a space in the
6  transcript and we could identify that document
7  by Bates number.
8         MS. BLOOMER:  I can try to get you --
9  I will get you the Bates number before the
10 end of the day, hopefully after the next
11 break, which by way, we might want to take
12 soon.  It's been over an hour.
13        MR. OXFORD:  Sure.  A couple more
14 minutes to finish this line and then we can
15 take a break.
16        MS. BLOOMER:  Absolutely.
17   Q.   Have you -- withdrawn.  Other than
18 that one document that relates to the futures
19 business, sir, have you seen any documents
20 created by Barclays that reference margin as it
21 relates to exchange-traded derivatives prior to
22 the date of the Sale Hearing?
23        MS. BLOOMER:  Objection.  You said
24 "other than," but you've changed the scope
25 of the question.  Now you're saying
```

Page 48

```
1            A. Leitner
2  documents created by Barclays as opposed to
3  just documents created prior to the Sale
4  Hearing?  Did you mean to change the scope?
5  I just want to make sure.
6         MR. OXFORD:  I don't think I did
7  change the scope, but my question is fine.
8         MS. BLOOMER:  Objection to the form of
9  the question.
10   A.   I don't remember.
11        MR. OXFORD:  Now is probably a good
12 time to take a couple of minutes.
13        (Recess; Time Noted:  9:39 A.M.)
14        (Time Noted:  9:52 A.M.)
15 BY MR. OXFORD:
16   Q.   Mr. Leitner, you reviewed Bart
17 McDade's testimony before you wrote your
18 opinion, correct?
19   A.   Yes.
20   Q.   Did you review Bart McDade's testimony
21 about the inclusion of margin in the transaction
22 between Lehman and Barclays?
23        MS. BLOOMER:  Objection to the form.
24   A.   As best I can recall, yes.
25   Q.   How did that affect your opinion, sir?
```

Page 49

```
1            A. Leitner
2         MS. BLOOMER:  Objection.  Lack of
3  foundation.
4    A.   As best I can recall, nothing in what
5  I read was inconsistent with the opinions that I
6  was forming.
7    Q.   Did you understand, sir, that Bart
8  McDade was Lehman's chief negotiator of the
9  transaction?
10   A.   Yes.
11   Q.   And you understand that he testified
12 at the Sale Hearing we have discussed earlier?
13   A.   That -- I'm sorry, I didn't hear you.
14 The Sale Hearing what?
15   Q.   That we discussed earlier, you
16 understand Mr. McDade testified at that hearing?
17   A.   Yes.
18   Q.   Do you understand that Mr. McDade
19 participated in all of the negotiations
20 involving the Asset Purchase Agreement?
21        MS. BLOOMER:  Objection to the form of
22 the question.
23   A.   I don't know one way or the other
24 whether he participated in all of the
25 negotiations.
```

Page 50

A. Leitner

1
2    Q.    Okay.  Well, I will represent to you
3    that Mr. McDade testified that he did
4    participate in all negotiations concerning the
5    Asset Purchase Agreement.
6        I will also represent to you that he
7    never discussed with anyone the transfer of
8    margin to Barclays under the Asset Purchase
9    Agreement, sir.
10        With those two representations in
11    mind --
12        MS. BLOOMER:  And I'm going to object
13    to the form of the question.
14    Q.    With those two representations in
15    mind, sir, how does that affect your opinion, if
16    at all?
17        MS. BLOOMER:  Object to the form of
18    the question.  I'm going to --
19    A.    Just read the question back again,
20    what was represented.
21        (Record read.)
22    A.    It doesn't affect my opinion.
23    Q.    Why not, sir?
24    A.    As my report states, I reached the
25    opinions expressed there in part because of my

Page 51

A. Leitner

1
2    understanding that there was a transfer of
3    business involved that included exchange-traded
4    derivatives, and that it would not, at the time
5    of the inception of the transaction, been
6    necessary to more precisely define what was
7    involved in the business unless you really
8    wanted to be specific about something.
9        So, for example, there is no reference
10    in the excluded asset category to margin at all,
11    so presumably one could say that the fact that
12    there wasn't any reference to the transfer of
13    margin, the Lehman side just as easily as the
14    Barclays side could have dealt with that
15    explicitly if they wished to.  I don't believe
16    it was necessary for them to explicitly deal
17    with it, and so the answer is I don't see that
18    his failure to specifically bring it up has any
19    impact on my opinion.
20    Q.    Not Mr. McDade's failure to bring it
21    up.  He never discussed with anybody for
22    Barclays the inclusion of margin in the deal as
23    reflected in the APA, sir.  Does that, with that
24    representation in mind, does that affect your
25    opinion?

Page 52

A. Leitner

1
2    A.    No.
3        MS. BLOOMER:  Objection.  Asked and
4    answered.
5    A.    Could we just pause for a second
6    because I'd like to correct a statement that it
7    occurred to me that when you were asking in a
8    line of questioning at the beginning of this
9    deposition about transfer of customers?
10    Q.    Sure.
11    A.    Just to make clear that I was
12    certainly aware that in connection with the
13    transfer of the FCM business, that is, the
14    futures business, that that was a customer
15    business, and to the extent that they took on
16    that business, obviously all of the FCM
17    customers were included, other than those that
18    might have decided on their own to go somewhere
19    else.  I think we only focused on the securities
20    options side.
21    Q.    Are you able to identify for me, sir,
22    a single businessperson who on behalf of Lehman
23    agreed to provide Barclays with the margin or
24    collateral associated with exchange-traded
25    derivatives?

Page 53

A. Leitner

1
2    A.    My report states, and my opinion is,
3    that the agreement to transfer the entire
4    businesses that are referred to in the agreement
5    that included the exchange-traded derivatives
6    aspect of those businesses and the business
7    itself necessarily comprised the assets
8    necessary to conduct those businesses, which
9    would have included the assets deployed to
10    secure the positions, and that it was, as I
11    state in my opinion, in Lehman's interest to do
12    that because the failure to do it would have
13    exposed Lehman to huge risks and to the SIPA
14    Trustee for that matter.
15        So whether it was -- so, anyway,
16    that's my opinion.
17    Q.    Is it correct, sir, that you're not
18    able to identify for me a single businessperson
19    who on behalf of Lehman specifically agreed that
20    Barclays should, in addition to the
21    exchange-traded derivatives, get the margin or
22    collateral that was related to those
23    derivatives, yes or no?
24        MS. BLOOMER:  Objection to the form of
25    the question.

Page 54

A. Leitner

1    A.   I'm not aware of anyone on the Lehman
2    side who, based on any testimony I've seen, that
3    drilled down to that level of detail in
4    connection with the APA.
5    Q.   Does that conclude your answer, sir?
6    A.   Yes.
7    Q.   Can you answer this question yes or
8    no:  Are you able to identify for me, sir, any
9    businessperson who on behalf of Lehman
10   specifically agreed that Barclays, in addition
11   to the exchange-traded derivatives, would get
12   the collateral or margin associated with those
13   exchange-traded derivatives?
14   A.   When?
15   MS. BLOOMER:  Objection to the form of
16   the question.
17   Q.   At any time.
18   MS. BLOOMER:  Objection to the form of
19   the question.
20   A.   I cannot identify any specific Lehman
21   person.
22   Q.   Can you have the Asset Purchase
23   Agreement in front of you, sir?
24   A.   Can I just complete my answer?

Page 55

A. Leitner

1    I just want to -- I'm not sure that
2    your timeframe -- I want to make sure I
3    understood the timeframe because my answer
4    related to the Asset Purchase Agreement.  There
5    were subsequent developments that clearly
6    confirm what I view was the intent of the
7    parties to transfer all of the collateral, and
8    that includes the signing of the asset -- of the
9    assignment and transfer agreement, or whatever
10   it was called, with OCC and, you know, other
11   developments.
12   So I'm only talking in terms of not
13   knowing whether anybody at Barclays specifically
14   agreed to it to the negotiations relating to the
15   APA.
16   MR. OXFORD:  Can you read back, Kathy,
17   my question that begins "can you answer this
18   question yes or no," please?
19   (Record read.)
20   MS. BLOOMER:  Objection to form and
21   asked and answered.
22   A.   I cannot identify the Barclays
23   businessperson.
24   MS. BLOOMER:  I think you mean Lehman.

Page 56

A. Leitner

1    A.   I'm sorry, I do that from time to
2    time.  I mean the -- thank you for correcting
3    me -- anyone, any businessperson on the Lehman
4    side.  I don't mean to imply that there wasn't,
5    but I can't identify.
6    Q.   Can you identify a businessperson on
7    the Barclays side who, on behalf of Barclays,
8    specifically agreed with Lehman that Barclays,
9    in addition to the exchange-traded derivatives,
10   would also get the collateral and margin
11   associated with those exchange-traded
12   derivatives?
13   MS. BLOOMER:  Objection to form.
14   Objection to the form of the question.
15   A.   I can't identify who on the Barclays
16   side were the primary negotiators of the
17   documents, so the answer is no, I can't identify
18   any such person.
19   Q.   With the APA in front of you, sir,
20   could you turn to page 6?  Do you have that in
21   front of you, sir?
22   A.   Yes.
23   Q.   Do you see that paragraph D of the
24   purchased assets includes government securities,

Page 57

A. Leitner

1    commercial paper or corporate debt, corporate
2    equity, exchange-traded derivatives, and
3    collateral short-term agreements with a book
4    value as of the date hereof of approximately $70
5    billion, do you see that?
6    A.   I do.
7    Q.   Those are defined collectively as the
8    long positions, do you see that, sir?
9    A.   Yes.
10   Q.   And if you turn to page 12 --
11   actually, initially, to page 11, you see there's
12   a definition of "assumed liabilities" in
13   paragraph 2.3?
14   A.   Yes.
15   Q.   Do you see that over the page on page
16   12, subclause "i" of 2.3, includes as assumed
17   liabilities or short positions and repos
18   relating to any securities or interests of the
19   types included in the definition of "long
20   positions" with a book value as of the date
21   hereof of approximately $69 billion, do you see
22   that?
23   A.   Yes.
24   Q.   "Collectively, short positions, and

Page 58

A. Leitner

1     A. Leitner
2    together with long positions, the positions."
3    Do you see that, sir?
4        A.   Yes.
5        Q.   With that in mind, can you turn to
6    paragraph 24 of your report, please?
7            (Exhibit 653, a document bearing Bates
8        Nos. BCI-EX-(S)-00074256 through 57, marked
9        for identification, as of this date.)
10       A.   Okay.
11       Q.   I've handed you, sir, what I have
12   marked as Exhibit 653, sir.  Do you see that
13   that is the document you reference in paragraph
14   24 of your report?
15           MS. BLOOMER:  Paragraph 24?
16           MR. OXFORD:  Paragraph 24.
17       A.   Okay.
18       Q.   Is that correct?
19       A.   Yes.
20       Q.   And in paragraph 24, you make a
21   reference to the long positions and short
22   positions in Lehman's corporate equity
23   inventory --
24       A.   Yes.
25       Q.   -- as of September 15, do you see

Page 59

A. Leitner

1    that?
2        A.   Yes.
3        Q.   If you look at the attachment to
4    Exhibit 653, that's the source for your numbers
5    in paragraph 24, correct?
6        A.   Yes.
7        Q.   And based on the e-mail that is at
8    Bates 74256, would you agree that this was the
9    balance sheet that Barclays was attempting to
10   tie out to?
11           MS. BLOOMER:  Objection to the form of
12       the question.
13       A.   Could you explain what you mean by
14   "tie out to"?
15       Q.   Yes, there's a reference on the first
16   page of the e-mail in the e-mail from Jasen Yang
17   to James Walker.  The subject is "LBI Balance
18   Sheet Tie-Out."  Do you see that?
19           MS. BLOOMER:  The question is do you
20       see that?
21           MR. OXFORD:  Yes.
22       A.   Okay, what's the question?
23       Q.   Do you see the subject line, "LBI
24   Balance Sheet Tie-Out"?

Page 60

A. Leitner

1        A.   Yes.
2        Q.   And do you see Mr. Yang writes, "This
3    is the balance sheet summary I'm trying to tie
4    out to"?
5        A.   Yes, I see that reference.
6        Q.   Does that suggest to you, sir, that
7    Barclays is trying to tie back the assets they
8    are purchasing to the balance sheet that's
9    attached to this e-mail?
10           MS. BLOOMER:  Object to the form of
11       the question and foundation.
12       A.   I don't know what they were doing.
13       Q.   Okay.  Let's try it this way, sir.
14   Your opinion is, at paragraph 24, that as of
15   September 15, 2008 LBI's corporate equity
16   inventory appears to have included long
17   positions worth approximately $8.4 billion and
18   short positions worth approximately $6.3
19   billion, correct?
20       A.   Yes.
21       Q.   And the basis for your opinion, sir,
22   is the spreadsheet that I marked as Exhibit 653,
23   correct?
24       A.   Yes.

Page 61

A. Leitner

1        Q.   Is it reasonable, then, to conclude
2    that LBI's derivatives inventory as of the same
3    date is approximately 4.8 billion long positions
4    and 4.5 billion short positions?
5            MS. BLOOMER:  Objection to the form of
6        the question and foundation.
7        A.   No, I don't think it's possible to
8    conclude that.  I look at the document as being
9    a part of the confusion surrounding exactly what
10   was going to be coming over to Barclays.  The
11   purpose of paragraph 24, in my opinion, is to
12   provide some idea of the size in dollar terms of
13   the equity book that they thought they were
14   getting.  That's the purpose of paragraph 24.
15       Q.   Okay.  And the basis for that, again,
16   is Exhibit 653, correct?
17       A.   Yes.
18       Q.   So wouldn't Exhibit 653 also give some
19   idea of the derivatives book that was also going
20   to Barclays?
21           MS. BLOOMER:  Objection to the form of
22       the question and mischaracterizes the
23       document and the vague use of the term
24       "derivatives."

Page 62

A. Leitner

1
2    A.    I can't answer that.  I don't know
3  what the word "derivatives" meant in the context
4  of this particular report.  I don't know whether
5  it included only the exchange-traded derivatives
6  or OTC derivatives as well.
7        I think there was some confusion at
8  various points in time as to whether or not
9  information provided by Lehman to Barclays
10  included or didn't include OTC options.  By
11  "OTC" I mean over-the-counter or privately
12  negotiated options as opposed to the
13  exchange-traded derivatives.
14        So I cannot answer whether there is
15  any -- whether this document is a fair
16  representation of what the exchange-traded
17  derivatives book looked like, and as I said, I
18  wasn't using those numbers for any purpose in
19  this report other than to try to give the sense
20  of the size, overall size, of the book and the
21  exposures because I felt that was relevant.
22    Q.    Do you know, sir, one way or the other
23  whether the figures for derivatives in Exhibit
24  653 include margin and other collateral related
25  to derivatives?

Page 63

A. Leitner

1
2    A.    No, I do not know.
3    Q.    If those figures did not include
4  margin on collateral related to derivatives,
5  would that support the conclusion that margin
6  was not conveyed to Barclays under the Asset
7  Purchase Agreement?
8    A.    This document doesn't support any such
9  conclusion one way or the other.  This document
10  is only relevant to a point in time where the
11  Barclays people were trying to understand what
12  it all meant, as far as I can tell from the
13  correspondence.
14    Q.    Mr. Leitner, I'm handing you what has
15  previously been marked as Exhibit 19 in these
16  depositions.  You've seen that document before,
17  haven't you, sir?
18    A.    Looks familiar.
19    Q.    In fact, you include it in the list of
20  documents that you reviewed to prepare for your
21  report, correct?
22    A.    Yes.
23    Q.    Can you tell me what you understand
24  that to be?
25    A.    It's one of the balance sheet

Page 64

A. Leitner

1
2  snapshots that the parties were dealing with.  I
3  believe it was prepared by Lehman for Barclays.
4    Q.    You read Mr. Berkenfeld's testimony as
5  part of your presentation for your report,
6  correct?
7        MS. BLOOMER:  Objection to the form of
8  the question.
9    A.    I looked at it, yes.
10    Q.    Did you look at Mr. Berkenfeld's
11  testimony on Exhibit 19?
12    A.    I have no specific recollection of
13  doing that.
14    Q.    Do you understand that Mr. Berkenfeld
15  testified that Exhibit 19 was intended to
16  explain the assets that were conveyed under the
17  APA?
18        MS. BLOOMER:  Objection to the form of
19  the question.
20    A.    I don't -- I don't recall enough of
21  his testimony to be able to say one way or the
22  other whether that's what he said or did.  I
23  just don't, don't -- I've read so many things in
24  connection with this transaction, so ...
25    Q.    There have been a lot of depositions,

Page 65

A. Leitner

1
2  that's for sure.  Yours is now being added to
3  that pile.
4        I will represent to you for the next
5  series of questions, sir, that Mr. Berkenfeld
6  did so testify, that Exhibit 19 was intended to
7  explain the assets conveyed to Barclays under a
8  the APA.  Do you understand that representation?
9        MS. BLOOMER:  I'm going to object to
10  the representation, Neil.  There are a lot
11  of things that Steve Berkenfeld may have
12  said about this document.  Your
13  representation as to one of them, without
14  having had the opportunity for Mr. Leitner
15  to review all of the testimony about this,
16  does not necessarily make for a fair
17  representation of the questioning.
18        MR. OXFORD:  I don't think we need to
19  derail the deposition for this, but I will
20  represent that Mr. Leitner included Schedule
21  1 as part of his reliance materials of Mr.
22  Berkenfeld's deposition.
23        MS. BLOOMER:  That's right, but he has
24  not represented that he read cover to cover
25  of the deposition, and you can ask him if he

Page 66

1           A. Leitner
2   did, as I think you already have, and he
3   said he didn't.
4   Q.   Do you understand that represent --
5       MR. DAKIS:  That mischaracterizes Mr.
6   Leitner's testimony.
7       THE WITNESS:  Well, let me state for
8   the record that I did not read Mr.
9   Berkenfeld's deposition cover to cover.
10      MR. OXFORD:  Can you just read back my
11  representation so we can make some progress
12  here, Kathy?
13      (Record read.)
14  A.   I understand the representation.
15  Q.   On Exhibit 19, sir, you see there's a
16  line item for "Derivatives" under "Assets"?
17  A.   Yes.
18  Q.   And you see that there's a line item
19  for "Derivatives" also under "Liabilities"?
20  A.   Yes.
21  Q.   And that the entries under both assets
22  and liabilities for derivatives is 4.5?
23  A.   Yes.
24  Q.   And you understand that, sir, to be a
25  reference to $4.5 billion, correct?

Page 67

1           A. Leitner
2       MS. BLOOMER:  Objection to the form of
3   the question.
4   A.   I have always assumed that.  If you
5   represent to me that that's what it was, then it
6   confirms my assumption.
7   Q.   I will so represent.
8       Do you have any basis, sir, to believe
9   that margin is included within the 4.5 billion
10  on either side of the balance sheet for the
11  "Derivatives" line item on Exhibit 19?
12      MS. BLOOMER:  Objection to the form of
13      the question and beyond the scope of the
14      expert's report.
15  A.   This document doesn't tell me anything
16  one way or the other about the category in which
17  collateral may have been accounted for in the
18  balance sheet.
19  Q.   Are there other categories in Exhibit
20  19, sir, that you believe might encompass margin
21  or collateral related to derivatives?
22      MS. BLOOMER:  Objection to the form of
23      the question.  Calls for speculation.
24  A.   I have no idea.
25  Q.   Did you do anything, sir, to determine

Page 68

1           A. Leitner
2   whether or not margin was included in the 4.5
3   billion of assets and liabilities associated
4   with derivatives on Exhibit 19?
5   A.   No.
6   Q.   Did you ask Barclays for the data
7   underlying this balance sheet, sir?
8       MS. BLOOMER:  Objection.  Assumes
9       facts not in evidence.
10  A.   I did not ask any person at Barclays
11  to explain what they thought this meant.
12  Q.   That's not quite my question, sir.  I
13  asked whether you asked Barclays for the data
14  that's underlying the spreadsheet, particularly
15  the data that underlies the entries for
16  derivatives under the "Assets" and the
17  "Liabilities" columns?
18      MS. BLOOMER:  Object to the form of
19      the question and, again, to the fact that it
20      assumes facts not in evidence.
21  A.   Sorry, just read back the question.
22  I'm going to be --
23      (Record read.)
24  A.   No, I did not ask Barclays for that
25  data.

Page 69

1           A. Leitner
2   Q.   Do you agree, sir, with the
3   representation as to Mr. Berkenfeld's testimony
4   in mind, do you agree, sir, that if these
5   numbers 4.5 for liabilities and assets in the
6   "Derivatives" line item of Exhibit 19 did not
7   include margin, that would support the
8   conclusion that margin was not included in the
9   Asset Purchase Agreement?
10      MS. BLOOMER:  Objection to the form of
11      the question and to the representation.  It
12      does not cover all of Mr. Berkenfeld's
13      testimony about this schedule.
14  A.   No.
15  Q.   Why not, sir?
16  A.   Because it doesn't say anything about
17  the ever-changing disposition of assets by
18  Lehman Brothers to cover the margin requirements
19  at the clearing house for both customers and the
20  firm proprietary positions.  So any portion of
21  these assets may have been deployed in
22  supporting those obligations together with, you
23  know, indirect support, such as letters of
24  credit.
25  Q.   You'll notice, sir, that the entries

Page 70

1          A. Leitner
2  under "Assets" and "Liabilities" for derivatives
3  balance, do you see that?
4      A.   I see it.
5      Q.   Assuming those figures are to be
6  correct, sir, as of the date of this schedule,
7  and assuming that they represent long and short
8  derivatives positions but not margin, in your
9  opinion, sir, would it be irrational for a
10  purchaser such as Barclays to buy the long and
11  short derivatives positions without the margin?
12      MS. BLOOMER:  Objection to the form of
13  the question and assumes facts not in
14  evidence.
15      A.   This transaction was so unique in
16  circumstances that were themselves unique that I
17  simply refuse to speculate about a different set
18  of scenarios that weren't present here.
19      My understanding from the Barclays
20  side is that they had serious doubts as to
21  whether any of these numbers were accurate.
22  So -- nor is it clear to me that a transaction
23  that involved essentially taking over businesses
24  and a bunch of assets and liabilities,
25  particularly in the derivatives side associated

Page 71

1          A. Leitner
2  with those businesses, could possibly be done
3  based on a snapshot at any given point in time
4  given the volatility in the marketplace that
5  changed the value of any of these component
6  pieces by significant size from hour to hour and
7  given the activity in the marketplace that was
8  happening with regard to those assets, as I
9  state in my report, in terms of how they were
10  being depleted.
11      So I simply cannot make any conclusion
12  about the relevance of this document to the
13  transaction much less in a hypothetical that,
14  you know, does not reflect all of the facts and
15  circumstances of this crazy situation.
16      Q.   I understand, sir, that you may not
17  agree with my hypothetical, but you still have
18  to answer the question.
19      A.   Well, I would --
20      MS. BLOOMER:  He's answered the
21  question, Neil, as best he can.  Do you have
22  a different question?
23      MR. OXFORD:  I have the same question.
24  I would like him to --
25      A.   You referred earlier to paragraph 94

Page 72

1          A. Leitner
2  of my report.  The paragraphs both before and
3  after deal with potential scenarios not present
4  here in which the parties could have done
5  something different than what I believe happened
6  here, and that's the best I can do in responding
7  to this type of line of questions.
8      So what I would say is that, given
9  perfect facts, plenty of time, and an ability
10  for a snapshot to be meaningful, the parties
11  could have explicitly determined to do something
12  with the collateral securing these positions
13  other than what they actually agreed to do and,
14  indeed, in the case of the OCC margin, did,
15  which was to move it all to Barclays.
16      Q.   So your opinion, sir, is it would not
17  be irrational if long derivatives positions were
18  equal in value to the long derivatives -- the
19  short derivative liabilities for Barclays to
20  purchase those derivative assets and liabilities
21  without the margin associated with those
22  derivatives?
23      MS. BLOOMER:  I object to the form of
24  the question and it completely
25  mischaracterizes his testimony.

Page 73

1          A. Leitner
2      A.   The problem with this balance sheet
3  and the problem with the derivatives business
4  that they were taking over is that the exposures
5  on the clearing business that Barclays took over
6  from Lehman was not solely related to the
7  proprietary positions that would be reflected on
8  this balance sheet.
9      This is an asymmetric risk that they
10  were assuming.  Let's be very clear about that.
11  And I tried to make it clear in the report that
12  what Barclays was doing for Lehman and for the
13  SIPA Trustee was to take on a package of unknown
14  and unquantifiable exposures on the day of the
15  closing that related to more than the
16  proprietary positions.
17      This balance sheet statement, as far
18  as I can see, relates only to the proprietary
19  positions of Lehman.  But Lehman took on --
20  Barclays took on every single risk associated
21  with the clearing business that they took on.
22  And so when we talk about the collateral
23  securing those exposures, we are talking about
24  collateral securing more than the exposures on
25  the proprietary business.  Clear?

Page 74

1                A. Leitner
2      Q.   Very clear.
3            Leaving aside the exposures on the
4   customer side, do you agree that if the data in
5   Exhibit 19 relating to derivatives is accurate,
6   by which I mean there's 4.5 billion of long
7   derivatives positions and 4.5 billion of short
8   derivatives positions, would it be irrational
9   for Barclays to have agreed to purchase those
10  assets and liabilities without the margin
11  associated with those derivatives contracts?
12        MS. BLOOMER: Objection. Assumes
13  facts not in evidence.
14      A.   Let me tell you again -- I cannot give
15  you a yes or no answer to that question because
16  I cannot see any abstract situation where
17  parties would be acquiring only a bunch of
18  derivative positions without the related assets
19  and liabilities and books of business that came
20  along with them.
21            So your hypothetical is simply not a
22  real-world hypothetical that I can answer other
23  than based on my experience in the business.  It
24  would never happen, and therefore, I simply
25  refuse to give a hypothetical answer to a

Page 75

1                A. Leitner
2   situation that I don't think would ever be true
3   in the real world.
4      Q.   In your opinion, sir, was Barclays
5   acquiring the book of business that went along
6   with the exchange-traded derivatives portfolio
7   that Lehman had for its proprietary business?
8      A.   As I understood the APA, they were
9   acquiring a capital markets business, a
10  brokerage business, and the exchange-traded
11  derivatives, which, upon analysis, is
12  essentially a clearing operation, as well as --
13  I mean, it's a general term to define a whole
14  bunch of things that were going on.
15            So the exchange-traded derivatives are
16  both an independent business and an ancillary
17  support operation to the other businesses that
18  they were acquiring and that presumably Barclays
19  wished to continue.
20      Q.   Can you turn to paragraph 63 of your
21  report, please, sir.  Do you have it there, sir?
22      A.   Yes, I do.
23      Q.   Is it your opinion that many of the
24  securities that -- withdrawn.  Is it your
25  opinion, sir, that many of the equity securities

Page 76

1                A. Leitner
2   that Barclays was purchasing under the Asset
3   Purchase Agreement were hedged by or hedged
4   derivatives positions that Barclays was also
5   buying under the APA?
6        MS. BLOOMER: Objection to the vague
7   use of the term "derivatives."
8      A.   My understanding relating only to that
9   portion of the exchange-traded derivatives that
10  related to the proprietary trading operations of
11  Lehman was that the positions were put on for a
12  variety of reasons and strategies, some of which
13  involved hedging of equity-related positions of
14  one sort or another that to some extent
15  included, or could have included,
16  over-the-counter transactions as well as long or
17  short equity positions.
18            I have to emphasize that we're talking
19  about long and short options that relate to both
20  long and short equity positions.
21      Q.   You say in paragraph 63, sir, that,
22  "Subsequent to the signing of the APA, the
23  exchange-traded derivatives assets and
24  liabilities were constantly changing, as was the
25  portfolio of equity securities that Barclays had

Page 77

1                A. Leitner
2   originally intended to acquire." Do you see
3   that, sir?
4      A.   Yes.
5      Q.   And you say that many of those equity
6   securities hedged or were hedged by the
7   exchange-traded derivatives, is that correct,
8   sir?
9      A.   Yes.
10      Q.   Do you have any idea, sir, of the
11  extent to which the exchange-traded derivatives
12  portfolio hedged Lehman's equities positions?
13  And my question specifically relates to the
14  exchange-traded derivatives positions and equity
15  security positions that Barclays intended to buy
16  under the APA.
17      A.   When?
18      Q.   As of the date of the APA, which is
19  September 16, 2008.
20      A.   I have no idea.  I don't think Lehman
21  had any idea and I certainly know that Barclays
22  didn't have any idea.
23      Q.   But you know some of those equity
24  positions that Barclays was intending to buy
25  under the APA were hedged by derivative

Page 78

1              A. Leitner
2    positions, exchange-traded derivative positions,
3    that Barclays also intended to buy under the
4    APA, correct?
5       A.    My understanding is that, as paragraph
6    63 says, they were constantly changing. Why
7    were they constantly changing? They were
8    constantly changing because to some extent the,
9    as I state elsewhere in the report, some of the
10   long positions were being financed and they
11   disappeared because the other side would close
12   the transactions out or the shorts were closed
13   out. Shorts would be difficult to transfer
14   under any circumstances, even though that was
15   the intent of the parties. But so that the
16   degree to which the positions were hedged at any
17   given point in time were difficult, if not
18   impossible, to determine. That's my
19   understanding of the facts.
20      Q.    Leaving aside the question of degree,
21   sir, you do know that there was some hedging of
22   positions, specifically, the long equity
23   positions and the exchange-traded derivatives
24   positions in the book of business that Barclays
25   was intending to buy under the APA?

Page 79

1              A. Leitner
2       A.    Yes.
3       Q.    Where an exchange-traded derivative
4    position is hedged by an equity position, sir,
5    does that increase or decree the risk to the
6    holder of those positions?
7       A.    In a hypothetical sense, it decreases
8    the risk.
9       Q.    So if Barclays were to purchase both
10   sides of that hedge, the derivatives position
11   and the equities position that hedges that
12   derivatives position, the risk to Barclays is
13   limited in those circumstances, correct?
14         MS. BLOOMER: Objection to the form of
15      the question.
16      A.    Well, sounds like we're going back to
17   paragraph 94 of my opinion, which describes a
18   situation where, with respect to the proprietary
19   books of business, assuming that everything was
20   coming over and you could anticipate and expect
21   that, that you could at least determine for that
22   aspect of the exposures you were taking on what
23   the potential risk would be.
24         But let me emphasize again that the
25   risks were asymmetric because Barclays was

Page 80

1              A. Leitner
2    taking on risks both for customer positions and,
3    as it turned out, for affiliate positions in the
4    clearing sense for which it had no hedges.
5       Q.    I understand that, sir. My questions
6    are just related to the propriety positions that
7    Barclays was purchasing.
8       A.    Right, but just -- I'm -- I want to be
9    as clear as I possibly can in the context of my
10   report that I did not in my report attempt to
11   distinguish in terms of the clearing risks that
12   Barclays was assuming between -- and, therefore,
13   the reason for why I conclude that it was
14   rational for them only to take on those risks
15   together with the collateral solely based on
16   their desire to acquire the proprietary
17   positions.
18      Q.    If Barclays purchases from Lehman both
19   the exchange-traded derivatives position and the
20   equity position that hedges that derivatives
21   position, does it also need the margin
22   associated with that derivatives position to
23   cover its risk?
24         MS. BLOOMER: Objection to the form of
25      the question.

Page 81

1              A. Leitner
2       A.    I believe paragraph 94 answers that
3    question in substance. If not paragraph 94
4    alone, then certainly paragraphs both prior to
5    and preceding that.
6          In a perfect world, with knowledge of
7    the full facts, which frankly neither party to
8    this transaction appears to have had, of the
9    accurate facts, by the way, the parties could
10   have negotiated a different deal than the one I
11   believe they negotiated.
12         MR. OXFORD: Can you read back my
13      question, please?
14         (Record read.)
15         MS. BLOOMER: And again, I object and
16      it's asked and answered.
17      A.    If the acquisition of this business
18   were the subject of specific detailed
19   negotiation, the parties would have dealt with
20   the business, this subset of the business
21   holistically. That's not our case. So you're
22   asking me a hypothetical question, which is not
23   these facts, and so the answer is, if that were
24   possible, could it have been done? The answer
25   is, well, sure. But there is no question that

Page 82

A. Leitner

1   those facts did not exist in this case in any
2   way, shape or form at any time.
3       Q.   Can you turn to paragraph 99 of your
4   report, please, sir?
5       A.   9, sorry?
6       Q.   99.
7       A.   Okay.
8       Q.   Do you have it there, sir?
9       A.   I do.
10      Q.   You're referring in paragraph 99 to
11  the timeframe of September 19, correct?
12      A.   Yes.
13      Q.   And you say on page 48 that, "The one
14  thing that was virtually certain by this time
15  was that the vast majority -- and perhaps the
16  entirety -- of the exchange-traded derivatives
17  were essentially naked exposures.  That is,
18  Barclays had no assurance it was acquiring (and
19  in most instances, knew that it was not
20  acquiring) the other side of these positions."
21      Do you see that, sir?
22      A.   Yes.
23      Q.   And you go on in paragraph 100 to say
24  that, "In short, the circumstances as they

Page 83

A. Leitner

1   existed the ends of the week of September 15,
2   made it not just reasonable, but imperative that
3   Barclays acquire all of the collateral held in
4   respect of LBI's various ETD accounts."
5       A.   Right.  I see that.
6       Q.   Is it your opinion, sir, that it was
7   imperative that Barclays acquire all of the
8   collateral held in respect of LBI's various ETD
9   accounts at the beginning of the week of
10  September 15?
11      MS. BLOOMER:  I'm going to, before he
12      answers, object to the fact that you read
13      certain pieces of the paragraph while
14      clearly skipping a couple of sentences, and
15      I would encourage the witness to read the
16      entire paragraph before he answers your
17      question.
18      Q.   Mr. Leitner, you should at all times
19  feel free to read any part of any document that
20  I put in front of you, including your own report
21  that you wrote.
22      A.   My opinion has always been based upon
23  the conclusion that, from Barclays' side, they
24  were supposed to get all of the collateral

Page 84

A. Leitner

1   securing the derivatives exposures from the
2   beginning of the transaction.
3       Let me be clear that the reason I
4   reached that conclusion is because anyone
5   rationally looking at the -- what they knew
6   about the derivatives business and what they
7   would be taking on was a set of clearing
8   exposures that, without regard to the nature of
9   the proprietary positions, would have only
10  protected them from unquantifiable loss if they
11  took on at least whatever margin was there
12  because they wouldn't know at that time even
13  whether they would have to put up more.  So, at
14  the very least, they would want to get whatever
15  was there and that that had to be true from the
16  beginning.
17      So my point in paragraph 99 and 100 is
18  that, by the end of the week, all the risks that
19  could be anticipated in fact happened.
20      MR. OXFORD:  Can you read back my
21      question?
22      (Record read.)
23      A.   I guess I could have just said yes.
24      MS. BLOOMER:  When you're ready for a

Page 85

A. Leitner

1   break, we've been going about an hour.
2       MR. OXFORD:  We can take five minutes.
3       (Recess; Time Noted:  10:52 A.M.)
4       (Time Noted:  11:02 A.M.)
5   BY MR. OXFORD:
6       Q.   You can have the Asset Purchase
7   Agreement in front of you, and then also let --
8       A.   Yes, sir.
9       Q.   I'm going to hand you one other
10  document that you have seen before that is the
11  Clarification Letter in this case that has
12  previously been marked as Exhibit 25.
13      You've seen the Clarification Letter
14  before, sir?
15      A.   Yes.
16      Q.   Do you see that in paragraph 1(A)(ii),
17  the Clarification Letter changes the definition
18  of "purchased assets"?
19      A.   Okay.
20      Q.   And specifically, it changes the
21  definition of "purchased assets" as defined in
22  the Asset Purchase Agreement that we were
23  looking at earlier, do you see that?
24      A.   I've read it.  I see what it says.  I

Page 86

1              A. Leitner
2   wouldn't characterize it, but, you know, it says
3   what it says.
4       Q.    Would you disagree with my
5   characterization?
6       A.    That it -- that --
7       Q.    That paragraph 1(A)(ii) changes the
8   definition of "purchased assets" as that
9   definition was reflected in the Asset Purchase
10  Agreement?
11         MS. BLOOMER:  Objection to form.
12      A.    I mean, look, not to be a pain here,
13  but it says what it says, and with regard to
14  specific clauses in the original agreement, it
15  says, you know, it -- the point is I don't know
16  the extent to which it actually changes those
17  clauses or changes the whole thing, but I'll
18  accept for purposes of moving forward here that,
19  yes, it does change the definition of "purchased
20  assets."  So ...
21      Q.    Thank you.  And it includes in that
22  definition of "purchased assets" on page 2 after
23  capital C, "exchange-traded derivatives," and in
24  parens, "and any property that may be held to
25  secure obligations under such derivatives,"

Page 87

1              A. Leitner
2   close parens, "and collateralized short-term
3   agreements," yes?
4       A.    I see what it says.
5       Q.    Do you understand the Clarification
6   Letter, in particular that clause that I just
7   read, to reflect the agreement of Lehman and
8   Barclays with respect to the transfer of
9   exchange-traded derivatives?
10         MS. BLOOMER:  Objection to form.
11      A.    I'd like to read the whole paragraph
12  to myself again just to refresh my recollection,
13  and I'd like to -- sorry, I mean read the whole
14  section, so ...
15      Q.    Yes, please do.
16         (Document review.)
17         MS. BLOOMER:  Object to the form of
18  the question.
19         (Discussion off the record.)
20      A.    Okay.  I've read the whole thing now.
21  Thank you.
22         MS. BLOOMER:  The whole agreement
23  again?
24         THE WITNESS:  No, no, I read the whole
25  Section 1 --

Page 88

1              A. Leitner
2         MS. BLOOMER:  Because the question
3   asks you about the agreement.  And maybe
4   that's why I'm objecting, just for the
5   record.
6       A.    Okay, sorry.  The point I was making
7   is that I asked for a pause so I could read
8   Section 1 of the Clarification Letter, which I
9   have now read.
10      Q.    Okay.  Great.
11         MR. OXFORD:  Can you read back,
12  please, Kathy, my question that begins "do
13  you understand"?
14         (Record read.)
15      A.    I read it in the context of the entire
16  paragraph that begins by saying, "The purchased
17  assets means all of the assets of seller used
18  primarily in the business or necessary for the
19  operation of the business," and then clause 2,
20  so that's the -- that's the basis on which I
21  understand that.
22         So I take it in context, and in that
23  regard, yes, I think it refers to the
24  exchange-traded derivatives and reflects what
25  the parties' continuing understanding to be with

Page 89

1              A. Leitner
2   regard to them.
3       Q.    Okay.  Thank you.  Could you also
4   direct your attention, sir, to paragraph 3 of
5   the Clarification Letter, sir.  It's on page 3,
6   and it's titled "Assumed and Excluded
7   Liabilities."
8       A.    Okay.
9       Q.    Do you see four lines up from the
10  bottom of the paragraph it reads, "Consistent
11  with the other provisions of this letter, no
12  liabilities described in Clause (i) of the
13  definition of assumed liabilities shall be
14  'assumed liabilities.'"  Do you see that, sir?
15      A.    Yes.
16      Q.    And if you could turn to the APA and
17  page 12, could you review Clause 2.3(i) and tell
18  me whether you agree that the Clarification
19  Letter does not require Barclays to assume any
20  liabilities for Lehman's exchange-traded
21  derivatives?
22         MS. BLOOMER:  I object to the extent
23  that the witness is not here to interpret
24  the agreement for you, but if you can
25  answer.

Page 90

```
 1              A. Leitner
 2     A.   So what's the question?
 3        (Record read.)
 4     A.   Well, you know, I'm -- I don't want to
 5  try to interpret this contract, but, you know,
 6  my understanding has always been that the
 7  parties agreed that the exchange-traded
 8  derivatives clearing operation would be assumed
 9  by Barclays, and in fact, it was assumed by
10  Barclays, and so if there is an inconsistency in
11  the language, in fact, Barclays took on all
12  those responsibilities and liabilities, which
13  seems consistent with the paragraph that we read
14  first in the -- and certainly consistent with
15  what I understood the agreement to be.
16        If I were interpreting this, you know,
17  I guess I would say that, you know, in fact the
18  short positions are difficult to transfer and
19  so -- the short positions of securities, where
20  you have to borrow in order to make a delivery.
21  So I'm not -- I wasn't the lawyers, I wasn't
22  involved in this, but if I were to guess, that's
23  what I would assume they meant.
24     Q.   Is it your testimony, sir, that as you
25  interpret the Clarification Letter to the best
```

Page 91

```
 1              A. Leitner
 2  of your ability, you believe that liability for
 3  the short positions in Lehman's exchange-traded
 4  derivative portfolio is excluded from the deal?
 5        MS. BLOOMER: Objection.
 6     Mischaracterizes his testimony.
 7     A.   I don't know what it means.  I was
 8  focusing only on the exchange-traded derivatives
 9  portion of the paragraph 1, and I think your --
10  I thought your question was does the reference
11  in the later paragraph mean that somehow
12  Barclays wasn't taking on the obligations for
13  the exchange-traded derivatives.  Wasn't that
14  your question?
15     Q.   My question is does the Clarification
16  Letter, irrespective of any other aspect of the
17  deal that you may believe are relevant, does the
18  Clarification Letter relieve Barclays of its
19  obligations to assume liabilities under the
20  exchange-traded derivatives in Lehman's
21  portfolio?
22        MS. BLOOMER: Objection to form.
23     A.   Relieve?  Relieve Barclays of the
24  obligations?
25     Q.   Yes.
```

Page 92

```
 1              A. Leitner
 2     A.   On the exchange-traded derivatives,
 3  no, it does not, and did not.
 4     Q.   Even though there are no derivative
 5  contracts under the definition of "assumed
 6  liabilities" pursuant to paragraph 3 of the
 7  Clarification Letter?
 8        MS. BLOOMER: Objection to the
 9     characterization of the agreement and to the
10     expert's scope.
11     A.   I'm sorry, Mr. Oxford, you've got me
12  confused.  Okay?  If that was your objective,
13  you have succeeded, but I'm sure it wasn't.
14     Q.   It was not, but it sometimes happens
15  along the way.
16     A.   Okay.
17     Q.   You would not be the first and you may
18  not be the last.
19        MS. BLOOMER: Is that a request that
20     he clarify his question?
21     A.   I mean, if I understand your question,
22  if you follow the logic, if I understood it
23  correctly, the Lehman estate and the SIPA
24  Trustees would have woken up on Monday morning
25  with obligations for all the short derivatives
```

Page 93

```
 1              A. Leitner
 2  and Lehman would just have been, you know,
 3  holding the longs.  I don't think that was the
 4  deal.
 5     Q.   That is my logic, sir.  I'm not asking
 6  you whether or not that's the deal.  I'm asking
 7  you whether or not you believe that's what the
 8  Clarification Letter reflects.
 9        MS. BLOOMER: And I object to the
10     request that this expert interpret the
11     contract.
12     A.   Yes, I -- the answer is I have no idea
13  what was intended to be accomplished by that
14  paragraph, by that reference that you mention in
15  paragraph 3 of the Clarification Letter.
16     Q.   You said that you didn't think it was
17  the deal that the SIPA Trustee would retain the
18  obligations under the derivatives and Barclays
19  would take the assets, the long positions --
20     A.   Correct.
21     Q.   -- in the portfolio, correct?
22        And in fact, that deal wouldn't make
23  any sense, would it, Mr. Leitner, because --
24     A.   For either party.
25        MS. BLOOMER: Just let him finish his
```

Page 94

A. Leitner

1  question so you can be sure you're answering
2  what's being asked.
3
4      Q.    And tell me why it wouldn't make sense
5  for either party?
6      A.    It wouldn't have made any sense for
7  the Lehman trustee because it would have had
8  exposures that were -- that I believe it was not
9  in a position to manage based on, you know, my
10  understanding of what was going on.  It may be
11  an incomplete understanding, but that that was,
12  you know, one of the real benefits to the estate
13  was to in fact relieve itself of the need to
14  continue to manage the derivatives book -- I'm
15  sorry, the clearing operation of the derivatives
16  book.
17      Q.    Tell me why the deal that we've agreed
18  doesn't make any sense wouldn't make any sense
19  for Barclays?
20      A.    In my report I refer to a number of
21  risks associated with clearing exchange-traded
22  derivatives, so I would let my report speak for
23  itself with regard to the characterization of
24  those risks.  All of those risks would have had
25  to have been assumed by the estate and the

Page 95

A. Leitner

1
2  trustee, the volatility risk of continuing
3  market exposure, the clearance and settlement
4  risks for -- related to exercise of options;
5  with regard to futures, the need to potentially
6  unwind at a loss futures positions; and I don't
7  know what you'd do with the exposures that
8  you're responsible for on the short side related
9  to, you know, the clearing of the affiliate
10  businesses, so -- for which you -- I have no
11  idea what margin or assets they continue to hold
12  for that.
13      So of all the risks that I describe in
14  my report, they would have been solely assumed
15  by the trustee.  I think it was to the trustee's
16  advantage and the estate's advantage to get rid
17  of those unquantifiable risks.
18      Q.    Looking at paragraph 1(C) of the
19  Clarification Letter, sir, I'd like you to have
20  in mind the following assumption:  If paragraph
21  1(C) -- sorry, 1(A)(ii) of the Clarification
22  Letter were to mean that Barclays gets all of
23  the exchange-traded derivatives, that is, the
24  long positions subject to the short positions;
25  and that if the long positions exceed the shorts

Page 96

A. Leitner

1
2  at a particular exchange at the close, then
3  those derivatives are an asset that go to
4  Barclays, but if the short positions exclude the
5  long -- sorry, the short positions exceed the
6  long position, then those derivatives are no
7  longer an asset and don't have to be assumed by
8  Barclays.
9      On that interpretation of the
10  Clarification Letter, would that be a bad deal
11  for Barclays?
12      MS. BLOOMER:  Objection to the form of
13  the question.
14      Q.    And if you would like Kathy to read it
15  back.
16      A.    No, I understand can question.  I
17  mean, your question is related to a subset of a
18  subset of the total exposures that Barclays took
19  on.  There were several accounts that Lehman had
20  that on its books that were reflected at the
21  Options Clearing Corp.  They were proprietary
22  accounts, market-making accounts, customer
23  accounts and so forth.
24      So what you're asking about is a
25  subset of the proprietary positions, I believe,

Page 97

A. Leitner

1
2  that related to positions Lehman Brothers put on
3  for itself even though the proprietary account
4  also included affiliate positions.  What are we
5  doing with those?
6      I mean, so your -- it's virtually
7  impossible to, you know, answer your question
8  unless you're going to tell me, you know,
9  what -- whether Lehman is going to actually
10  retain clearing responsibility for everything
11  else, yes or no.  I mean, because we have to
12  understand what really happened here, right?
13      Barclays stepped into Lehman's shoes
14  with respect to clearing every exchange-traded
15  derivative that Lehman had on its books
16  regardless of whether customers came over,
17  regardless of whether the affiliates margined
18  those positions, or anything else.  So it is
19  extremely difficult to take a subset of a subset
20  and make any sense out of it.  That's the best I
21  can do.
22      Q.    Assuming we're talking here, sir, only
23  about Lehman's proprietary positions, not
24  positions they were clearing for affiliates or
25  other customers, can you answer my question as

Page 98

A. Leitner

1    to whether or not that would be a bad deal for
2    Barclays?
3        MS. BLOOMER:  Objection to form of the
4        question.
5        A.   Are you -- what happens to the -- by
6    the way, when?  What point in time?
7        Q.   At the closing of the transactions.
8        A.   On Monday?  Very interesting, because
9    who's got the settlement risk for all the
10   exercised options over the weekend?  Does the
11   trustee retain those risks under your
12   hypothetical for all the shorts?  They would be
13   responsible for, normally, for settlements.  So,
14   they do?  They don't?
15       Q.   Let's take the first option.  They do,
16   the trustee does.
17       A.   Actually, it doesn't matter,
18   because -- sorry, your hypothetical was would it
19   have been a good deal?
20       Q.   Would it have been a rational deal for
21   Barclays to agree to if they get the longs
22   subject to the shorts?
23       A.   For Barclays to have agreed to that?
24       Q.   Yes.

Page 99

A. Leitner

1        MS. BLOOMER:  Objection to the form of
2    the question and beyond the scope of his
3    opinion.
4        A.   I just can't answer the question.  I
5    mean, I just -- there is -- there is no way to
6    approach it to give you an answer that's a yes
7    or no answer.
8        Q.   I'm handing you, Mr. Leitner, what has
9    previously been marked as Exhibit 622.
10       A.   Yes, sir.
11       Q.   You see that that's the declaration of
12   Mr. Ed Rosen?
13       A.   Yes, sir.
14       Q.   You read Mr. Rosen's testimony?
15       A.   Yes.
16       Q.   In preparation for your testimony
17   today?
18       A.   Yes, I did.
19       Q.   Did you also speak to Mr. Rosen?
20       A.   No.
21       Q.   Have you read Mr. Rosen's declaration?
22       A.   Yes.
23       Q.   If you could turn your attention to
24   paragraphs 4 and 5 of Mr. Rosen's declaration.

Page 100

A. Leitner

1    If you could just review that to yourself and
2    let me know when you've done so, please.
3        (Document review.)
4        A.   Okay.
5        Q.   Do you see that Mr. Rosen states in
6    his declaration that, "The language contained in
7    a draft of the Clarification Letter circulated
8    on September 20 reflected the business deal that
9    Barclays would receive the margin as well as the
10   derivatives in any account for which Barclays
11   becomes responsible at closing?
12       A.   You're referring to paragraph 4?
13       Q.   And to paragraph 5, sir.
14       A.   Paragraph 4 and 5 refer to, as far as
15   I can understand it, to various drafts being
16   passed back and forth between the lawyers on --
17   of the drafts of the Clarification Letter being
18   passed back and forth on September 20, and your
19   question was what?  You wanted me to refer to
20   specifically to what aspect of those drafts?
21       Q.   I asked you whether you agreed with me
22   that Mr. Rosen states in his declaration that
23   the language contained in the draft
24   Clarification Letter circulated on September 20,

Page 101

A. Leitner

1    which he refers to in paragraph 4 of his
2    declaration --
3        A.   Okay, so it is paragraph 4.
4        Q.   -- reflected the business deal that
5    Barclays would receive the margin as well as the
6    derivatives in any account for which Barclays
7    became responsible at the closing?
8        MS. BLOOMER:  And I object to the
9        characterization of the document.  It speaks
10       for itself and reads differently.
11       A.   Well, Mr. Rosen says in paragraph 4,
12   "I understand that the trustee's position that
13   the removal of language contained in 1(d) of the
14   draft of the Clarification Letter reflects an
15   agreement that Barclays was not acquiring cash
16   margin."  He goes on to say that position is
17   incorrect.  There was, to my or my partner's
18   knowledge, never any such agreement or
19   discussion.
20       So your question is what exactly?
21       (Record read.)
22       Q.   And sir, just before you answer, to
23   answer that question, I have directed you a
24   couple of times to paragraph 4 and to paragraph

Page 102

A. Leitner

5. I believe in order to answer my question you
will have to read paragraph 5, particularly the
first two sentences.

MS. BLOOMER: Objection to the form.
You're just asking him to tell you whether
he says among the things he says in 4 and 5
what you just said exactly? Is that the
question?

MR. OXFORD: We have the question four
times now. We can have it read back a fifth
time.

MS. BLOOMER: I object to the form of
the question.

A. Okay. Paragraphs 4 and 5 express Mr.
Rosen's belief that the transaction being
clarified in the Clarification Letter was that
Barclays would acquire all margin, including
cash, associated with exchange-traded
derivatives positions.

Q. Thank you. Do you agree with Mr.
Rosen's understanding of the transaction between
Barclays and Lehman?

MS. BLOOMER: Objection. Form and
foundation.

Page 103

A. Leitner

A. My opinion, my opinion, relates to
what a rational party would do under the
circumstances. I have said in my opinion that I
see nothing -- I think I'm just characterizing
it generally -- that I see nothing in any of the
agreements or conduct of the parties as
inconsistent with them acting rationally with
regard to this transaction, that is, as
naturally by both the Barclays' site and by the
trustee's side.

So to the extent that Mr. Rosen is
simply saying that, indeed, he believes the
parties did always have this understanding is
simply, you know, consistent with one of the
predicates of my opinion.

Q. Is it your understanding of the
business deal between Barclays and Lehman that
Barclays would get the margin as well as the
derivatives in any account for which they
assumed responsibility at closing?

MS. BLOOMER: Objection to form.

A. It is my understanding that that's
what the parties agreed to. I'm -- without
interpreting the contract, I was -- I believe

Page 104

A. Leitner

that was the rational thing to do. It appears
that's what the parties did.

Q. Could you turn to your report, sir, in
particular to footnote 1 in paragraph 10.

A. I'm sorry, paragraph?

Q. Footnote 1 on page 10.

A. Yes, sir.

Q. Do you have that in front of you, sir?

A. Yes.

Q. Do you see that you list in footnote 1
exchanges on which LBI traded exchange-traded
derivatives, correct?

MS. BLOOMER: I would --

A. Which paragraph are we looking at?

MS. BLOOMER: I would ask the witness
to refer to the text as well as the
footnotes so he's reading it in context and
can answer the question.

A. I don't have the page.

Q. Page 10, footnote 1.

A. Again, I -- you have to bear with my
hearing issues.

Sorry, what's your question now? I
see there's a list of exchanges.

Page 105

A. Leitner

Q. On which Lehman traded exchange-traded
derivatives, correct?

MS. BLOOMER: And again, I'm going to
object and suggest that you read the text
and the footnotes so you understand the
question and the context in which the
footnote is provided.

A. The reference on page 10 is to
clearing organizations that I understood Lehman
was a clearing member of. Some of them are
derivatives clearing organizations and some of
them clear securities. And your question is?

Q. Is it your understanding of the
transaction between Lehman and Barclays, sir,
that if Barclays did not assume responsibility
for the accounts at any of these exchanges, they
would not be entitled to the margin in
connection with the derivatives at any of those
exchanges?

A. My understanding is that, in
connection with some of the exchanges on which
exchange-traded derivatives were traded,
particularly the foreign exchanges, LBI was not
a clearing member but was dealing through some

Page 106

1           A. Leitner
2    clearing broker other than themselves.
3           With respect to the Option Clearing
4    Corp. and the CME, my understanding was that LBI
5    was a direct clearing member and directly
6    responsible to the clearing house. With respect
7    to the other exchanges, my understanding is that
8    they traded through third parties.
9           And your question is?
10    Q.    Is it your understanding of the
11    transaction between Lehman and Barclays, sir,
12    that if Barclays didn't assume responsibility
13    for Lehman's accounts at or in connection with
14    the trading at these exchanges listed in
15    footnote 1, then Barclays would not be entitled
16    to the margin associated with the derivatives in
17    Lehman's portfolio at those exchanges?
18           MS. BLOOMER: Object to form.
19    A.    Yes.
20    Q.    Do you have an opinion, sir, on
21    whether or not the agreement between Barclays
22    and Lehman transferred to Lehman -- sorry,
23    transferred to Barclays -- there I go --
24    surprised it took so long -- the exchange
25    memberships that Lehman held at any clearing

Page 107

1           A. Leitner
2    organization or derivatives exchange?
3           MS. BLOOMER: Objection. Assumes
4    facts not in evidence.
5    A.    I am not aware of any transfer of
6    exchange memberships at all. With regard to
7    clearing organizations, my understanding is that
8    Barclays was a clearing member of OCC and that
9    LBI was a member of OCC, but that it was not
10    necessary to assume the positions of Lehman that
11    Barclays acquire any additional memberships to
12    accomplish that.
13    Q.    At the OCC, other than the clearing
14    fund, would Lehman have a membership of the OCC
15    that was valuable as an asset?
16    A.    Was the membership an asset?
17    Q.    Yes.
18    A.    Is that your question?
19           I have no idea. I mean, you mean
20    asset on the books of the entity?
21    Q.    An asset in any sense, sir.
22           MS. BLOOMER: Objection to form.
23    A.    As a business matter, it is an asset
24    to be a clearing member of an exchange. You
25    don't have something that's transferable.

Page 108

1           A. Leitner
2    Therefore, you don't have an asset in a normally
3    understood sense of being able to sell something
4    to someone else. So that would be my answer to
5    whether or not it was an asset.
6           As a requirement of membership, you
7    have to maintain a clearing fund deposit which
8    in size, as I mention in my report, is based
9    upon the amount of business you do.
10    Q.    Turning to the --
11           Sorry. I didn't mean to interrupt.
12    Are you finished?
13    A.    Go ahead.
14    Q.    Turning to exchange membership, sir,
15    you said you're not aware of any transfers of
16    exchange memberships between Lehman and
17    Barclays, correct?
18    A.    Right.
19    Q.    And you're not aware of any business
20    deal between Lehman and Barclays that would
21    transfer the exchange memberships to --
22           MS. BLOOMER: I'm going to --
23           MR. OXFORD: Please let me finish,
24    Trish.
25    Q.    -- from Lehman to Barclays?

Page 109

1           A. Leitner
2           MS. BLOOMER: I'm going to object to
3    the form of the question and the undefined
4    definition of the term "memberships"?
5    A.    No, I'm not aware of any.
6    Q.    Taking the example of Lehman's
7    exchange membership at CME, sir, do you believe
8    Barclays -- withdrawn. Was Barclays also a
9    member of the CME?
10    A.    I believe that there was a Barclays
11    entity that was a member of the CME. I cannot
12    be assured that it was Barclays Capital, Inc.
13    That I'm not sure of.
14    Q.    Can you think of any reason why
15    Barclays Capital Inc. would need to acquire
16    Lehman's membership at the Chicago Merc, or the
17    CME?
18           MS. BLOOMER: Objection to the
19    question. Beyond the scope of the witness's
20    report and opinion.
21    A.    I don't -- I don't have any -- I've
22    not researched the question and I'm not -- have
23    not been asked to give an opinion on it, and I
24    don't know any facts relating to the CME
25    membership.

Page 110

1           A. Leitner
2     Q.   Turning to paragraph 19 of your
3   report, sir.  After setting out what you believe
4   to be Barclays' position in this dispute, seven
5   lines down you write, "Not only are the
6   governing agreements entirely consistent with
7   this position, but so too are the record facts,
8   all of which lead me to conclude, based on my
9   experience and expertise in the derivatives
10  industry, that no rational purchaser would have
11  agreed to acquire the ETDs, or to assume the
12  financial responsibility of a clearing broker
13  with respect to such ETDs, without also
14  receiving LBI's rights with respect to the
15  entirety of the posted collateral."
16          That's your opinion, sir?
17     A.   Yes.
18     Q.   And then you go on to list the three
19  separate types of risks that Barclays faced
20  which are the bases of your opinion that I just
21  read, correct?
22     A.   Yes.  And by the way, as I think I
23  testified before, I would add to those three
24  risks the what I described as operational risk,
25  which I believe was always there but became

Page 111

1           A. Leitner
2   clearer to me in reviewing declarations and
3   testimony after I completed this report.
4     Q.   It's your opinion, sir, that Barclays
5   did not have enough information to value the
6   exchange-traded derivatives that Lehman held as
7   of the 16th of September, correct?
8     A.   I don't believe I testified that they
9   didn't have the ability to value.  I may have
10  said they didn't have the ability to value, but
11  more importantly, they didn't have the ability
12  to quantify the exposures because the value of
13  the positions that they were acquiring in the
14  proprietary sense, as I indicated before, had
15  little relation to the actual exposures they
16  would be acquiring in taking on the clearing
17  business.
18     Q.   Leaving aside the exposures on the
19  clearing business for the purposes of my
20  question, sir, is it your testimony and your
21  opinion that Barclays had enough information to
22  be able to quantify the exposure to Lehman's
23  proprietary exchange-traded derivatives?
24          MS. BLOOMER:  Objection to the form of
25   the question.

Page 112

1           A. Leitner
2     Q.   On September 16?
3     A.   It is, based upon my review of the
4   facts, it's my understanding and I guess my
5   opinion that at no time, whether it was the
6   16th, 17th, 18th, 19th, that they had the
7   ability to quantify with any degree of certainty
8   either what the value of those positions was or
9   the exposures to the clearing book.
10     Q.   I believe you testified earlier about
11  this topic and described those risks as unknown
12  and unquantifiable risks?
13          MS. BLOOMER:  Objection to form.
14     A.   I mean, you certainly knew generally
15  the categories of risks, but you did not know --
16  you could not quantify them, and certainly
17  unknown in the sense that you didn't know how
18  much of the proprietary positions were carried
19  for the affiliates.  So, in that sense, it was
20  not known because that was an additional credit
21  risk.
22     Q.   When did Barclays first learn of the
23  margin at the OCC that was related to LBI's
24  derivatives book at the OCC?
25          MS. BLOOMER:  Objection.

Page 113

1           A. Leitner
2     A.   I don't actually remember the precise
3   point in time when they had that information.  I
4   believe that, generally speaking, that it wasn't
5   until the weekend, but they may have gotten a
6   report sooner than that.
7     Q.   Can you turn to paragraph 106 of your
8   report, please, sir.
9          Do you have it there, sir?
10     A.   Yes, sir.
11     Q.   Do you see, Mr. Leitner, "Because
12  Barclays had to decide whether to close the
13  transaction without sufficient knowledge of the
14  value and exposure of the ETD positions, it was
15  taking a blind risk with respect to those
16  positions."  Do you see that?
17     A.   Yes, I do.
18     Q.   You go on to say that that is
19  "something that no rational purchaser of ETDs
20  would be willing to do without the belief that
21  it was receiving a cushion in the form of excess
22  margin posted in the accounts and clearing fund
23  deposits."  Do you see that?
24     A.   Yes, I do.
25     Q.   That's your opinion, sir?

Page 114

A. Leitner

1
2    A.    Yes, it is.
3    Q.    Do you agree that even if Barclays
4    were to obtain the margin and clearing fund
5    deposits that does not -- Barclays quantified
6    the risk that it is taking with respect to the
7    ETD positions?
8        MS. BLOOMER:  Objection to the form of
9    the question.
10    A.    Sorry, just read that.  That does not
11    what?  Just read that back.
12    Q.    It does not quantify the risk that
13    Barclays is taking with respect to those
14    positions?
15        MS. BLOOMER:  Objection to the form of
16    the question.
17    A.    Let me make sure I understand the
18    question.  You're asking me that if, even if all
19    the margin came over, that does not necessarily
20    quantify the risks that they took?
21    Q.    Yes.
22    A.    That's correct.
23    Q.    So the risk that Barclays is taking
24    under the transaction as you believe it to have
25    happened, is still a blind risk for Barclays,

Page 115

A. Leitner

1
2    correct?
3        MS. BLOOMER:  Objection to form.
4    A.    On the closing date, yes, it was still
5    a blind risk.
6    Q.    Why would a rational purchaser take
7    such a blind risk, sir, in your opinion?
8    A.    Because they got the margin along with
9    the positions.
10    Q.    But if they get the margin along with
11    the position, the risk is still blind and their
12    potential exposure is less than if they don't
13    have the margin, but their potential exposure is
14    still unlimited and unquantifiable, correct?
15    A.    That's correct, but it's better than
16    the alternative.
17    Q.    Right.  On the theory that more money
18    is better than less money?
19        MS. BLOOMER:  Objection.
20    Q.    It's better than the alternative,
21    correct?
22        MS. BLOOMER:  Objection to form.
23    A.    Correct.
24    Q.    Do you believe it was rational for
25    Barclays to conclude the deal you say they did,

Page 116

A. Leitner

1
2    which was to take an unquantifiable risk on
3    Barclays exchange-traded derivatives positions,
4    albeit mitigated by the margin associated with
5    those positions?
6    A.    I'm sorry, was that a question?
7    Q.    Yes.
8    A.    I thought it was a statement.
9    Q.    Is says "do you believe" --
10        MS. BLOOMER:  Do you believe it
11    rational for Barclays to do what it did?
12    A.    Yes.
13    Q.    Why?
14    A.    They were taking a business risk and
15    they had the capital, I believe, to -- and the
16    personnel to be able to manage those risks at
17    some point in time.  So they could move to,
18    quickly to a point where they could quantify the
19    risks so they were not taking an entirely
20    open-ended exposure, but -- that is, it couldn't
21    go to infinity, but once they had all the data,
22    they can begin to figure out what to do with it.
23    Q.    Is it your opinion, sir, that after
24    the closing, Barclays was able to manage the
25    risk associated with the exchange-traded

Page 117

A. Leitner

1
2    derivatives portfolio that they assumed that you
3    said prior to closing was unquantifiable?
4        MS. BLOOMER:  Objection to form.
5    A.    I'm aware from testimony I've read
6    that they began to take action to mitigate
7    its -- their market exposure.  I don't know what
8    other steps they took to manage the other
9    exposures that they had both in terms of credit
10    and capital exposures, but just, again, and they
11    also worked hard to get a handle on the
12    operational issues involved in taking over the
13    positions, but it took them a while to do that
14    and there may well have been, you know, market
15    exposure insofar as it took them time to get
16    everything under control.
17    Q.    Your opinion as reflected in paragraph
18    106, sir, is that no rational purchaser of
19    exchange-traded derivatives would be willing to
20    take those positions without the belief that it
21    was receiving a cushion in the form of the
22    excess margin posted in the accounts and
23    clearing fund deposits, correct?
24    A.    Is that the same question you asked me
25    before?

Page 118

```
1            A. Leitner
2      Q.   I'm just reorienting you to a
3  particular portion of your opinion on paragraph
4  106.
5      A.   Okay.
6         MS. BLOOMER:  Is that a question?
7         MR. OXFORD:  I'm asking him if he sees
8      that portion of his opinion.
9      A.   The first sentence?
10     Q.   Yes.
11     A.   Yes, okay.
12     Q.   Did Barclays believe there was excess
13  margin in the accounts in clearing fund deposits
14  when it closed this transaction?
15     A.   Well, the testimony is that there was
16  a lot of uncertainty as to exactly what it was
17  getting, and given that there had been
18  fluctuations in these positions of several
19  hundred million dollars per day, I think it was
20  extremely difficult to take a snapshot.
21        If you're asking, you know, as of the
22  morning of the 21st, the Monday morning --
23     Q.   22nd?
24     A.   Or the 22nd, what did OCC tell them
25  was the margin requirement and what were the
```

Page 119

```
1            A. Leitner
2  speculation over the weekend, there was some,
3  clearly some speculation over the weekend that
4  some portion of the margin they were getting
5  would be excess, excess in terms of the OCC
6  opening on Monday and giving them a report based
7  on the valuation and calculations that they used
8  to determine what the margin would be to a
9  normal solvent entity.
10        So there was some correspondence over
11  the weekend about what that margin would be,
12  which in my view sounded like, you know,
13  questions about whether there would be enough,
14  because, if not, Barclays was going to have to
15  come up with more.  And there was a lot of
16  things changing, not only the market changing,
17  but also, you know, whether these LOCs, these --
18  if the LOCs were not there and the margin
19  requirement increased, Barclays was clearly
20  going to have to come up with, you know, more
21  capital to fund the margin requirement.
22        And I think that was, you know, in a
23  complete state of uncertainty from Friday to
24  Monday, from all I can gather.
25     Q.   In your opinion, sir, how much of a
```

Page 120

```
1            A. Leitner
2  cushion in the form of excess margin would a
3  rational purchaser need to conclude the deal
4  that Barclays concluded?
5         MS. BLOOMER:  Objection to the form.
6      A.   I can't answer that, because even if I
7  try to put myself in the position of what I
8  would have done, assuming that I had the luxury
9  of, you know, the ability to negotiate based on
10  all the facts, given the volatility of the
11  market, you know, I don't know what kind of
12  cushion I would have, you know, rationally
13  placed on this.
14        I mean, the fact is that there was
15  just too much market volatility in the equity
16  portfolio over time, and by -- so -- and I'm
17  certain, you know, the same would apply, you
18  know, at the time the APA was negotiated.  I
19  mean, the -- at that point, you know, everyone
20  thought that, you know, these businesses were
21  going to move and they understood what the
22  businesses were, and between then and Friday,
23  you know, you had all these facts changing, as
24  my opinion indicates.
25     Q.   Your opinion, sir, is that no rational
```

Page 121

```
1            A. Leitner
2  purchaser would be willing to do this deal
3  without the belief that it was receiving a
4  cushion in the form of excess margin in accounts
5  and clearing fund deposits?
6      A.   Yes.
7      Q.   Would it be rational for the purchaser
8  of Lehman's ETDs to do this deal with a $1
9  cushion?
10        MS. BLOOMER:  Objection to the form.
11     A.   I think a rational purchaser would
12  have wanted as much cushion as they could
13  possibly negotiate, particularly with respect to
14  the clearing fund deposit, because if you had a
15  business like Barclays had, which was fairly
16  small, and you were acquiring Lehman's business,
17  you would know that your clearing fund deposit
18  was going to go up exponentially, so that was
19  definitely a plus to help you be able to support
20  the business.  So that's my answer.
21     Q.   I should have done this in the correct
22  order.  What do you mean by "excess margin" in
23  paragraph 106?
24     A.   Well, first of all, let me be clear
25  that that paragraph does not relate solely to
```

Page 122

A. Leitner

1  the OCC and to the options book.  The futures
2  positions also had collateral securing the
3  futures position, and there was a little bit
4  more information, as I understood it, about what
5  the collateral picture of the future positions
6  looked like.
7  And there, I think the quantification
8  of what would be excess in relation to the
9  business was potentially more negotiable, but
10  there was definitely, in a lot of those
11  accounts, collateral over and above what was
12  necessary to meet the initial margin
13  requirement.
14  Q.   Let's stick with the OCC at the
15  moment.  In your opinion, sir, would a rational
16  purchaser of Lehman's exchange-traded
17  derivatives at the OCC be willing to do so if it
18  received the minimum margin required by the OCC
19  for those positions?
20  MS. BLOOMER:  Objection.  Calls for
21  speculation.
22  A.   It's difficult to take any of these
23  questions completely out of the context of what
24  was happening here.  You know, you would have

Page 123

A. Leitner

1  to -- you know, I'd have to assume a zillion
2  other facts.  I'm not taking any futures
3  position.  I'm not taking any other risks.  I
4  have full knowledge of the book I'm taking, and
5  I don't have, you know, 5 percent, you know,
6  market fluctuations every day.
7  MS. BLOOMER:  Let him answer your
8  question.  I'm sorry.  I didn't mean to
9  interrupt you.  I wanted you to feel
10  comfortable answering the question.
11  Q.   I think you misunderstood my question,
12  sir.
13  MS. BLOOMER:  Can he finish the answer
14  he was giving first?
15  A.   No.  No.  I was done.
16  Q.   I didn't mean to interrupt you.
17  A.   No, that's okay.  I thought you were
18  asking me about the OCC.
19  Q.   I am asking you about the OCC, and
20  your answer said you would require to know the
21  value of any exposure for those positions at the
22  OCC.  My question is a little different.
23  My question would be, with respect to
24  the OCC only for the moment, in your opinion,

Page 124

A. Leitner

1  would a rational purchaser of those derivatives
2  positions held by Lehman at the OCC take those
3  positions if there was no excess margin, but
4  only to the penny the required margin per the
5  OCC's requirements?
6  MS. BLOOMER:  I'm going to object, and
7  I'm going to ask you to let him finish his
8  answer whether you like it or not this time.
9  MR. OXFORD:  I think the witness has
10  stated that I did not interrupt him.
11  A.   Based on my experience and knowledge
12  in the industry, my advice to someone in the
13  position of acquiring a book in which all of the
14  knowledge of the exposures was known at the OCC
15  and the proprietary book only, and I had no
16  hedges against those positions, I was completely
17  relying solely on the amount of margin that was
18  there to help cover my losses, but I would
19  otherwise take all the time risk and execution
20  risk thereafter, I would want to negotiate for
21  an excess over and above the required collateral
22  that was commensurate with the volatility, the
23  displayed volatility in the market at the time.
24  So I would be making some calculation that took

Page 125

A. Leitner

1  into account the various factors that would lead
2  to carrying me over the duration risk that I had
3  before I got these positions under control.
4  I don't know what that percentage
5  would be without knowing all these factors, but
6  I would go down to a minimum only in the most
7  calm market conditions, where I could assume
8  complete management of those positions on day
9  one.  That's the only time I would ever be
10  comfortable with taking only the snapshot
11  required margin, and by "snapshot required
12  margin," I mean margin determined at the close
13  of business on the closing day so that when we
14  open for business the next day, I am ready to
15  go.
16  MS. BLOOMER:  Just when you're ready,
17  I think it's getting close to time for
18  another break.
19  Q.   And based on your --
20  A.   And by the way, that's assuming we're
21  only talking about my proprietary stuff.  I have
22  no other, you know, uncertainties involved in
23  the positions.
24  Q.   And you would require this negotiated

Page 126

A. Leitner

1        A. Leitner
2    cushion, sir, to protect against future market
3    risk and the movement of those positions after
4    the closing of the transaction, correct?
5        A.  My answer was all of the factors that
6    I would take into account, of which that was
7    one.
8        Q.  Remind me what those other factors
9    were, please.
10        MS. BLOOMER:  Objection to the form of
11    the question.  Asked and answered.  You can
12    read the question and answer again if you
13    need reminding.
14        A.  I thought my answer was pretty good.
15    Maybe she should read it back again.
16        Q.  Your statement in paragraph 106, sir,
17    about no rational purchaser would be willing to
18    do the transaction you've described in your
19    report without the belief that there was a
20    cushion, you said that that -- that opinion
21    applies to not just the closing of the
22    transaction, but you don't believe that it would
23    have been rational to make that agreement on the
24    16th of September when the parties signed the
25    APA?

Page 127

1        A. Leitner
2        MS. BLOOMER:  Objection to the form of
3    the question and to the characterization of
4    the report.
5        Q.  Let me put it another way, sir.
6        A.  Well, let me -- let me be clear.  106
7    begins with a timing, the importance of the
8    timing, that is, decide whether to close.  So
9    the entire predicate of the question and the
10    import of that sentence is based on what happens
11    Monday, and the fact that I can certainly agree
12    with you that on Monday, based on the
13    calculations of OCC, and the acquiring knowledge
14    about margin of the futures positions, that
15    there was a cushion there and that they would
16    then at that point have been willing to close.
17        That is different than my opinion that
18    no rational purchaser would have entered the
19    transaction, the APA, other than with the
20    knowledge that you were going to get all the
21    collateral and other assets supporting the
22    business and risk you were taking on.
23        So do we have that timing clear?
24        Q.  Yes, we do.
25        A.  Okay, great.

Page 128

1        A. Leitner
2        Q.  Would, in your opinion, would a
3    rational purchaser have agreed to take Lehman's
4    ETD positions without knowing the value and
5    exposure of those positions on the 16th and
6    without knowing whether or not there was excess
7    margin, the cushion that you refer to in
8    accounts and clearing fund deposits?
9        A.  Yes, it would have been rational.
10        Q.  Why?
11        A.  One of two things would happen.
12    Either the positions would be blown out, like
13    the CME did, and you wouldn't take them on and
14    Lehman would have a loss, or they wouldn't be
15    blown out or liquidated because Lehman was
16    managing to keep adequate collateral there and
17    keep the clearing houses comfortable.
18        So, by the time of the closing, I am
19    either getting exposures where I have a
20    reasonable expectation that there is enough
21    margin or not.  I have some risk that between,
22    you know, in this case, between Friday and
23    Monday, that there will be a move against me if
24    there -- if Lehman is margining every day to the
25    dollar, I may have some risk that I'll wake up

Page 129

1        A. Leitner
2    and have to put another $100 million into the
3    margin account or that, you know, half of the
4    margin is going to be in the form of letters of
5    credit and I'm going to have to either replace
6    the letters of credit or put up whatever margin
7    is reflected by the letters of credit.
8        So that's why it would be rational to
9    say at the beginning of the deal, you know, I'll
10    run that risk.
11        MS. BLOOMER:  And again, Neil,
12    whenever --
13        MR. OXFORD:  Now is probably a good
14    time for a break.
15        (Luncheon Recess; Time Noted:  12:14
16    P.M.)

Page 130

1                A. Leitner
2          AFTERNOON SESSION
3          (Time Noted:  1:03 P.M.)
4    ANTHONY J. LEITNER, resumed and
5          testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. OXFORD:
8        Q.    Mr. Leitner, I'd like to turn to the
9    section in your report where you describe the
10   market risk associated with the unvetted
11   positions in the exchange-traded portfolio?
12       A.    Paragraph?
13       Q.    Paragraph 19, sir.
14       A.    Okay.
15       Q.    Do you have that there, sir?  You
16   state in the middle of the page, "This
17   conclusion is based on the following risks that
18   Barclays faced, each of which was particularly
19   acute under the circumstances surrounding this
20   acquisition," and the first risk you identify is
21   "the market risk associated with the tens of
22   thousands of unvetted positions in LBI's
23   portfolio of ETDs, particularly given the
24   extremely volatile market conditions that
25   existed at the time of this transaction."

Page 131

1                A. Leitner
2        Do you see that, sir?
3        A.    Yes.
4        Q.    And that reflects your opinion?
5        A.    Yes.
6        Q.    When you talk about market risk in
7    your report, sir, are you talking about market
8    risk as it applies to proprietary positions only
9    or to other types of positions as well?
10       A.    I'm talking about holistically
11   associated with the risks that they were taking
12   in the derivative book, which would have
13   included all of the exposures for which they
14   were responsible and, you know, that would
15   include, you know, any associated securities
16   positions that they happened to wind up with.  I
17   did not intend to limit this only to the
18   proprietary side.
19       Q.    So it's your opinion, sir, that
20   Barclays faced a market risk in connection not
21   just with Lehman's proprietary positions, but
22   also Lehman affiliate positions and Lehman
23   customer positions?
24       A.    Yes.
25       Q.    Is that correct?

Page 132

1                A. Leitner
2        A.    Yes.
3        Q.    Is your opinion limited to equity
4    options or is it your opinion also that Lehman
5    faced a market risk in connection with the
6    futures business?
7        A.    It was across the board in all
8    derivatives.
9        Q.    Starting with options, sir, you
10   testified earlier that you understood that
11   Barclays took over the PIM customer accounts
12   from Lehman; is that correct?
13            MS. BLOOMER:  Objection to form and
14       characterization of his earlier testimony.
15       A.    It is my present understanding that
16   they took over -- or, they agreed to take over
17   the private investment management business and
18   the customer accounts associated with them.
19       Q.    Is it also your present understanding,
20   Mr. Leitner, that in connection with the
21   assumption of those same accounts, that Barclays
22   received the entirety of the assets that Lehman
23   held for those same PIM customers?
24       A.    I understand that was the intention.
25   I haven't done any analysis of the facts to

Page 133

1                A. Leitner
2    determine whether that all happened, but that
3    was -- that would be generally, in my
4    experience, what happens when you talk about a
5    transfer of accounts; that is, the account
6    positions, which would include debits as well as
7    credits, if you were extending credit to a
8    customer, would essentially pass over.
9        Q.    Mr. Leitner, I'll ask you to assume
10   for the purposes of this line of questioning
11   that Barclays has in fact received the entirety
12   of the assets that Barclays held for those same
13   PIM customers.
14            Do you know whether or not Lehman used
15   its own proprietary assets for the purpose of
16   posting margin for PIM customer options at the
17   OCC?
18       A.    My understanding is that, for the most
19   part, they did use their own assets.  For the
20   most part.
21       Q.    Why do you qualify that answer, sir,
22   to "the most part"?
23       A.    Because in connection with preparing
24   for this deposition, one of the contacts I had
25   was with a gentleman who was responsible for the

Page 134

A. Leitner

1  actual, you know, margining of the customer
2  positions, and he made clear that some of the
3  customers took advantage of the ability to use
4  what are generally in the industry called escrow
5  receipts or margin deposit letters to cover
6  their portion of the margin requirements.
7      So that would have relieved Lehman of
8  having to post, you know, its own assets to
9  secure those positions.
10     Q.   Did those customers include PIM
11  customers, sir?
12     A.   I'm not sure I understood even
13  explicitly who they were for.  They are
14  generally institutional customers who have a
15  limitation on their ability to put their assets
16  with a broker-dealer and keep their assets in a
17  bank.  So I am not certain whether they fell
18  into the PIM category, but were institutional
19  customers that did -- that were Lehman
20  customers.
21     To the extent they came to Barclays
22  and continued to use those escrow receipts, then
23  that was the reason for my qualifying my answer.
24  I have no specific knowledge as to whether those

Page 135

A. Leitner

1  institutional customers came over, but if they
2  did, then they would have continued to use that
3  method of -- of margining their position,
4  keeping in mind that their margin requirement is
5  actually a margin requirement to the broker that
6  is carrying their positions and that the market
7  has evolved this particular type of instrument
8  to satisfy both the customer's requirement to
9  the broker as well as the requirement to the
10  clearing Corp.  Pretty neat.
11     Q.   Who's the gentleman, Mr. Leitner, who
12  provided this information to you about escrow
13  receipts?
14     A.   I don't remember whether it was Dan
15  Dzeimian or -- is it Craig Jones?  There are two
16  operations guys who now work for Barclays that
17  were knowledgeable about this subject.
18     Q.   Do you agree, Mr. Leitner, that the
19  PIM customers that Barclays took over from
20  Lehman bear the risk of gain or loss on their
21  options positions rather than the broker-dealer
22  through which they placed those options?
23         MS. BLOOMER:  Objection to the form of
24  the question.

Page 136

A. Leitner

1      A.   They bear the gain or loss profit and
2  loss risk in the options that they own, and I
3  just want to make clear we distinguish that from
4  the clearing risk.  They don't bear the clearing
5  risk.  The clearing member bears the clearing
6  risk from a P&L point of view, yes.
7      Q.   To cover the clearing risk that you
8  have just described, the broker-dealer such as
9  Lehman would obtain from the customers
10  collateral or margin in order to cover that
11  risk, correct?
12     A.   Yes.
13     Q.   And that collateral or margin you
14  believe was intended to be transferred to
15  Barclays, correct?
16     A.   Yes.
17     Q.   And I've asked you to assume that that
18  collateral was in fact transferred to Barclays.
19     Assuming that to be true, do you agree
20  that in the event of the clearing risk being
21  realized, Barclays has recourse to that
22  collateral the customers originally provided to
23  Lehman and was transferred to Barclays?
24     A.   Yes.

Page 137

A. Leitner

1      Q.   So in what sense does Barclays face a
2  market risk for the options that it cleared for
3  PIM customers?
4      A.   The market risk is always the credit
5  risk.  So here the two can't be really separated
6  because the credit risk is that the customer
7  will not in fact meet its margin requirement and
8  that the clearing member still has the exposure
9  to the exchange.
10     So you hope, but you don't know for
11  certain that all the customers are creditworthy.
12  You are willing to take them on.  You assume,
13  therefore, the margin done day one and that you
14  can handle them and handle their accounts on day
15  one.  But the margin used by the acquiring,
16  because it's typical in the industry to
17  essentially use your own assets rather than the
18  customer assets to margin the positions at the
19  clearing house, that's part of the assets used
20  in the business.
21     So if you're a broker clearing for
22  people who in fact engage in exchange-traded
23  derivatives, the custom and practice in the
24  industry is to use mostly your own assets to

Page 138

1            A. Leitner
2    margin their positions.
3        Q.    Would you agree that Barclays did not
4    need, in the case of PIM customers who they took
5    on, in order to cover the market risk associated
6    with the PIM customers' positions, as you've
7    described as associated with the credit risk,
8    Barclays didn't need the margin that was posted
9    by LBI at the OCC in order to cover that risk
10   because that risk was already covered by the
11   collateral that the PIM customers provided to
12   Barclays -- to Lehman, which was then
13   transferred to Barclays?
14       MS. BLOOMER: Objection to the form of
15       the question.
16       A.    The market risk would apply to the
17   amount of collateral that would -- and would
18   affect the amount of collateral required to
19   cover the customer short positions at the
20   exchange or at the clearing house. So since
21   there was market risk in the sense that if the
22   margin requirement went up, Barclays would have
23   to put more assets to work to be able to cover
24   the customer positions, so there was certainly
25   market risk to whoever was going to be clearing

Page 139

1            A. Leitner
2    the positions, if you state it in that way, how
3    much margin, how much of your own assets are you
4    going to have to use to support the business
5    that you took on.
6        Q.    In what sense, sir, is that a market
7    risk?
8        A.    Well, I guess you could also
9    characterize it as a liquidity risk, how much
10   liquidity do you have to apply to carry the
11   business. So the market risk equals what the
12   liquidity factor is to be able to support the
13   business.
14       Q.    Because you have another opinion here
15   that one of the risks Barclays faced was the
16   open-ended risk of funding the margin
17   requirement and potentially increase clearing
18   fund deposits. Do you see that? And again, I'm
19   just --
20       A.    I just flipped the page. Let me go
21   back to that.
22       Yes, I see that.
23       Q.    And my questions are not about the
24   funding risk. We will get to that in due
25   course. My questions are about the market risk

Page 140

1            A. Leitner
2    as you describe in point 1 of paragraph 19, the
3    market risk associated with the unvetted
4    positions.
5        So can you tell me, sir, distinct and
6    apart from the risk of funding margin
7    requirements, what market risk Barclays faced in
8    clearing PIM customer option positions?
9        MS. BLOOMER: Objection to the form of
10       the question. Asked and answered.
11       A.    I would say that there is a less
12   visible market risk associated with the customer
13   positions than for the proprietary and affiliate
14   positions.
15       Q.    Okay. I appreciate that answer. It's
16   less visible. What is it?
17       A.    You're assuming that these risks, even
18   though I have mentioned them as separate risks,
19   are in fact separate. And the point I was
20   trying to make before is that they're not really
21   separate, that market, funding, liquidity and
22   credit risks are all part of a bundle,
23   especially when you're talking about customer
24   accounts.
25       So I wouldn't say that there is no

Page 141

1            A. Leitner
2    market risk associated with taking on the
3    futures positions of the customer accounts. I
4    would hesitate to say that there's none.
5        Q.    Other than the funding risk for the
6    margin requirements and the credit risk, can you
7    identify for me --
8        A.    Those are the two --
9        MS. BLOOMER: Objection.
10       A.    -- larger risks.
11       MS. BLOOMER: Can you let him finish
12       the question and give me a moment to state
13       an objection?
14       THE WITNESS: Yes.
15       MS. BLOOMER: Object to the form of
16       the question.
17       Q.    Is it your opinion, Mr. Leitner, that
18   in addition to the collateral that Barclays got
19   from Lehman for the PIM customers, Barclays
20   should also get the collateral that Lehman
21   posted at the OCC to secure the performance of
22   the options positions placed for those PIM
23   customers?
24       A.    Yes.
25       Q.    Why is that, sir?

Page 142

A. Leitner

1
2    A.    Well, because the collateral posted at
3    OCC secured everything at OCC.  So even though
4    there were separate accounts in which OCC would
5    compute a requirement for those accounts so
6    that, as I mentioned in my opinion, the customer
7    account positions were subject to a different
8    methodology for computing the margin
9    requirements in the proprietary accounts.
10        But Lehman, as would be typical in the
11    industry, even though they would get separate
12    account-by-account, that is,
13    clearing-account-by-account margin requirements,
14    tended to look at what was the total margin
15    requirement that they would have to put up
16    associated with the business.
17        And so, based on my expertise in the
18    industry, while you could look at these accounts
19    as being separate, that's not the way the firm
20    would look at the assets required to maintain
21    the -- maintain the margin.  And indeed, they
22    can move around the allocation of acceptable
23    collateral account by account.  So you can have
24    more LOCs that are associated with this account,
25    but you're looking at the gross requirement that

Page 143

A. Leitner

1
2    you have.
3        Q.    What's the basis for your testimony,
4    sir, that Lehman, even though they would get
5    separate account-by-account statements, tended
6    to look at what was the total margin requirement
7    associated with the business?
8        A.    My conversations with the --
9        MS. BLOOMER:  Objection to the form of
10    the question.
11        A.    I use that as the basis of my
12    conversations and interviews with the witnesses,
13    Dzeimian and I believe it's Jones.  Is it Jones?
14        I don't -- I'm trying to
15    remember the -- I'm -- I just confess that my
16    memory for names is not that great.  There were
17    two OCC option operations people that I talked
18    to to understand exactly how they managed the
19    business.
20        Q.    I understand.  I'm only seeking your
21    recollection.  If I would like Trish's
22    recollection, I will ask her questions, probably
23    not under oath.
24        MS. BLOOMER:  I would hesitate to give
25    my recollections under oath.

Page 144

A. Leitner

1
2        Q.    What would happen, sir, in the event
3    that all the PIM customers who moved to Barclays
4    close out their options positions and the cost
5    of closing out those options positions was not
6    greater than the collateral they provided to
7    Lehman which was transferred to Barclays to
8    cover the cost of closing out the positions?
9        MS. BLOOMER:  Objection to the form of
10    the question.
11        Q.    Would the collateral that Lehman had
12    posted at the OCC then become excess collateral
13    that could be returned to the broker-dealer?
14        A.    In the case of Lehman or any other
15    clearing firm that had, like Lehman, a bunch of
16    different accounts at which it was -- in which
17    it had margin requirements, the first thing you
18    would look at is whether you still needed that
19    collateral to margin your gross position.
20        If the answer was that -- the answer
21    to that question was no, you don't need that
22    anymore, then the clearing firm would be able to
23    withdraw it.
24        Q.    And in this case, Barclays would be
25    that clearing firm, correct?

Page 145

A. Leitner

1
2        A.    Correct.
3        Q.    Can you tell me, sir, if -- withdrawn.
4        Can you tell me, sir, why a rational
5    purchaser -- withdrawn.  I'll try a different
6    attempt.
7        Can you tell me, sir, why a rational
8    seller, when transferring its customers and the
9    collateral that the customers had provided to it
10    to another broker-dealer, would also give away
11    the collateral posted at the OCC in connection
12    with those same customers and the options that
13    it had placed at the OCC for those customers?
14        MS. BLOOMER:  Objection to the form of
15    the question.
16        A.    I can only explain that it would have
17    been -- it was indeed rational for that to
18    happen in connection with this transaction under
19    these circumstances.
20        To the extent your question is posed
21    in the abstract in relation to another set of
22    facts and circumstances, I would have to know
23    what they were to be able to answer your
24    question.  But in the context of this
25    transaction, I believe it was in fact rational

Page 146

```
1              A. Leitner
2  for the parties to agree that that was intended
3  in the context of transferring the assets
4  necessary to support the broker's business,
5  because essentially this is the part of the
6  business we're talking about.  It's the
7  brokerage business to which the exchange-traded
8  derivatives are associated.  So the two are
9  connected.
10     Q.   Why do you consider it rational, sir,
11 in the context of this transaction?
12     A.   Because it was in the interests of
13 Lehman and the trustees to see these customer
14 positions effectively transferred out, and it
15 was rational for Barclays to be willing to take
16 them along with the assets that supported that
17 business.
18     Q.   Would it have been rational, sir, for
19 Barclays to take these customer positions and
20 the margin and collateral given by the customers
21 to Lehman without also taking the additional
22 proprietary LBI assets that were posted at the
23 OCC to secure the customer positions?
24     A.   You lost me.
25         (Record read.)
```

Page 147

```
1              A. Leitner
2         MS. BLOOMER:  Objection to the form of
3     the question.  Are you limiting this to the
4     customers, the PIM customers, Neil, or to
5     the options customers?
6     A.   Or any FCM business?
7     Q.   The PIM options customers.
8     A.   Yes, it would have been rational for
9  them to have been willing to take the PIM
10 customer accounts without also taking the
11 proprietary accounts, if that was your question.
12     Q.   No, it wasn't.
13         Can you read back my question, please,
14 Kathy?
15         (Record read.)
16         MS. BLOOMER:  Are you --
17     A.   Excuse me.  I'm going to take a minute
18 to diagram what I think is happening for myself.
19 So can we go off the record for a second?  I
20 just want to make sure that I understand.
21         MR. OXFORD:  Sure.
22         MS. BLOOMER:  Before you -- I'm not
23     sure that this is an appropriate.  The
24     deposition is oral testimony.
25         THE WITNESS:  Oh, I know.
```

Page 148

```
1              A. Leitner
2         MS. BLOOMER:  So you're going to have
3     to try the give the answers in an oral way.
4     This is not, I don't think, an appropriate
5     way to answer the question, unfortunately.
6     A.   Okay.  You know, my problem is with
7  the question is that I'm trying to understand,
8  and I think it was your use of the word
9  "without" in the context in which you used it.
10 Maybe you can rephrase the question in a way I
11 can understand it.
12         So the rational is that the customer
13 accounts are coming over?
14     Q.   Yes.
15     A.   Yes.  And would it be rational to take
16 the customer accounts without also taking the
17 proprietary accounts?
18     Q.   No.  My question is this, Mr. Leitner:
19 Would it have been rational for Barclays to take
20 the PIM customer accounts plus the collateral
21 that the PIM customers had provided to Lehman,
22 but not the margin that Lehman had posted at the
23 OCC to secure the customer options placed at the
24 OCC?
25     A.   So let me get this straight.  The --
```

Page 149

```
1              A. Leitner
2  everything is coming over to Lehman -- to
3  Barclays, proprietary positions, everything else
4  is coming over, but the margin associated with
5  the customer positions is not coming over?
6     Q.   Would that be rational, sir?
7     A.   In the -- I thought I already answered
8  that, but let me say again, in the context of
9  this transaction, I don't think it would have
10 been rational because Barclays did not know all
11 of the risks it was going to take in taking the
12 full brunt of the -- I'm sorry, the full set of
13 obligations as a clearing firm for all of these
14 positions, including the customer positions.
15         Thank you for patiently going through
16 your scenario.
17     Q.   You're aware, sir, that Barclays, for
18 non-PIM customer options positions, has charged
19 back the Lehman estate for the cost of closing
20 out those positions?
21         MS. BLOOMER:  Objection to the form of
22     the question.
23     A.   Who's charged back closing out which
24 positions?
25     Q.   You understand that Lehman cleared
```

Page 150

1                A. Leitner
2  positions at the OCC for customers other than
3  PIM customers, correct?
4      A.   Yes.
5      Q.   And you understand that when Barclays,
6  after the closing of the transaction on the
7  22nd, cleared those non-PIM customer positions,
8  Barclays charged back the Lehman estate for the
9  costs incurred in closing out those positions?
10       MS. BLOOMER:  Object to the form of
11     the question.
12     A.   I may describe what I think happened
13  differently than the way you did, because my
14  understanding is that the customers that
15  remained with Lehman -- and those are the
16  customer we're talking about, right?
17     Q.   The customer accounts.
18     A.   The customer accounts that stayed at
19  Lehman?
20     Q.   Yes.
21     A.   -- who had option positions, either
22  long or short, the clearing responsibility was
23  accepted by Barclays for those accounts and an
24  operational mechanism was set up so that
25  Barclays could work with the trustee and the

Page 151

1                A. Leitner
2  customers to accommodate those customers'
3  activities.
4       My understanding was the customers
5  were still in charge of what happened in their
6  accounts and were ultimately responsible for
7  making or taking delivery, paying for securities
8  and so forth, and had to work through the
9  trustee.  That is my general understanding of
10  what happened.
11       So Barclays was fully at risk if an
12  option was exercised for one of those customers
13  and was not settled by the customer.
14     Q.   It sounds to me like you're testifying
15  about a credit risk or a risk of default by the
16  customer, sir.
17       MS. BLOOMER:  Objection to the form of
18     the question.
19     A.   I'm just expressing my understanding
20  of what happened.
21       Sorry, go ahead.
22     Q.   Is there a market risk that Barclays
23  faced in clearing for the LBI customers whose
24  accounts it did not assume?
25       MS. BLOOMER:  Objection to the form of

Page 152

1                A. Leitner
2  the question.  Asked and answered.
3      A.   Only associated with the potentiality
4  for increasing the credit risk.
5      Q.   Are you aware, Mr. Leitner, one way or
6  the other, whether or not, where there was a
7  customer default for a customer whose account
8  Barclays did not assume, Barclays charged back
9  the LBI estate for the cost associated with that
10  close-out?
11     A.   By the way, I -- I -- you're using the
12  word "charge back."  I have not object to that
13  word, but I would not use that word in
14  connection with what Barclays was doing.
15  Barclays was settling transactions, and the
16  requirement was to make or take delivery in
17  connection with option exercises and the like
18  and, therefore, to look for either the party to
19  make delivery or to compensate Barclays for the
20  cost of doing so.
21       So I'm -- I think I understand what
22  you're meaning, but I just want to make sure
23  that there is a settlement operation that in a
24  sense had its own performance risks.
25     Q.   I understand that, sir.

Page 153

1                A. Leitner
2       Is it your understanding that if the
3  customers did not fulfill their obligations to
4  Barclays, and again, these are customers whose
5  accounts Barclays did not take, then Barclays
6  has looked to the Lehman estate to make good on
7  the losses incurred by Barclays in connection
8  with the close-out of the customer whose account
9  they did not take?
10     A.   Yes, that's my understanding.
11       MS. BLOOMER:  Objection.  I object to
12     the form of the question.
13     Q.   Turning to the proprietary positions
14  taken at the OCC, sir, by Barclays, you have
15  described in your earlier testimony some of the
16  risks that are associated with taking those
17  positions, right?
18     A.   Yes.
19     Q.   Would you agree, sir, that there's
20  also a potential upside to taking those
21  positions?
22     A.   Yes.
23     Q.   Is the reason that Barclays took the
24  proprietary derivatives at the OCC because of
25  that potential upside?

Page 154

A. Leitner

1
2      A.   I have no factual basis to know how
3  Barclays valued this particular aspect of the
4  transaction.  I assume, again, as an expert in
5  the industry, that Barclays discerned some value
6  for being in the, holistically, in this
7  transaction and doing it at all, but I don't
8  know where they saw the value or in fact how
9  they valued it.
10     Q.   Were you aware, sir, that in addition
11 to Barclays' knowledge about the existence of
12 hundreds of millions of dollars of excess margin
13 at the OCC prior to the closing, Barclays
14 understood that it could expect payments of
15 almost 370 million from the firm accounts at the
16 OCC on the morning of September 22?
17         MS. BLOOMER:  I object to the form of
18    the question and the fact that it assumes
19    facts not in evidence.
20     A.   I don't have any recollection of
21 exactly, you know, which accounts were -- at the
22 OCC were which.  I think that there was in fact
23 a -- that on the 22nd, I believe there was a
24 so-called excess over the requirement there.
25     Q.   I'm handing you, Mr. Leitner, what has

Page 155

A. Leitner

1
2  been marked previously at another deposition as
3  Exhibit 627.  If you could take a moment, sir,
4  and let me know whether you've seen this
5  document before, please.
6      A.   Okay.  I've seen this.
7      Q.   In what context have you seen it, sir?
8      A.   In preparing for this deposition and
9  in reviewing materials, but I don't know when I
10 first saw it.
11     Q.   Do you agree with me, sir, that this
12 document reflects the knowledge of Barclays'
13 counsel the day before the closing of this
14 transaction that Barclays could expect to
15 receive projected settlements of almost $370
16 million from the former LBI firm accounts at the
17 Options Clearing Corporation?
18         MS. BLOOMER:  Objection to the form of
19    the question and mischaracterizes the
20    document.
21     A.   This seems to be a, as far as I can
22 determine from this document, it appears to be a
23 notification which is conditional on amounts
24 deemed at that time to be owed to Barclays, but
25 it is also my understanding that there were

Page 156

A. Leitner

1
2  clearance and settlement issues arising out of
3  the expiration of options, and I am not sure,
4  although I believe it to be the case, that they
5  had -- they would have an impact on what the net
6  was, but I don't know what that was.
7          MR. OXFORD:  Okay.  Can you read back
8     my last question?
9          (Record read.)
10         MS. BLOOMER:  If you're repeating the
11    question, I object in that it's been asked
12    and answered.
13     Q.   Can you answer my question, sir?
14     A.   I thought I did.
15     Q.   I think you tried to.  I don't think
16 you did, with respect, sir.  I'd like you to try
17 again.
18         MS. BLOOMER:  Objection.  Asked and
19    answered.  If you don't like his answer,
20    that doesn't mean he has to try and give you
21    a different answer.
22         MR. OXFORD:  I'm entitled to an
23    answer.  So, please, can you try again to
24    answer the question?
25         MS. BLOOMER:  Objection.  Asked and

Page 157

A. Leitner

1
2  answered.
3          MR. OXFORD:  That's fine.  That's on
4     the record.
5      A.   My answer was that there is a number
6  here that is due of $358 million that is a
7  collect that is subject to all margins staying
8  where it is, and my recollection is that because
9  there was also a settlement of options over the
10 weekend, I have a recollection that that will
11 impact a potential pay.  So I don't know whether
12 the net is -- that this reflects the net.  So --
13     Q.   Sir, with respect, I'm not asking you
14 about the net.
15     A.   But it may be that my recollection is
16 incorrect and that this is the number that came
17 over.  I don't know that it did.  All I know is
18 that it reflects -- it says what it says, which
19 is that it -- that there is a collect, i.e., an
20 amount due the firm based on the calculation at
21 that time.
22     Q.   And independent of your recollection,
23 sir, which you have testified may or may not be
24 correct, is it your understanding that this
25 document reflects a communication from the OCC

Page 158

A. Leitner

1    to Barclays' counsel the day before the closing
2    that Barclays could expect to receive a
3    projected settlement from the LBI accounts at
4    OCC, the firm accounts, of approximately $370
5    million?  And my question is limited to this
6    document, sir.
7        A.   Yes.
8            MS. BLOOMER:  I object to the
9        question.  You've asked and answered the
10       question.
11       Q.   Could you turn to paragraph 62 of your
12   report, please, sir?
13       A.   Page?
14       Q.   26.
15       A.   Oh.
16       Q.   Paragraph 62.
17       A.   Okay.
18       Q.   Do you have that there, sir?
19       A.   I do.
20       Q.   The first sentence of your opinion in
21   paragraph 62 says, "At the time of signing of
22   APA, Barclays had received only limited, and in
23   some respects inaccurate, information from LBI
24   concerning the long and short positions Barclays

Page 159

A. Leitner

1    had originally contracted to acquire (and even
2    less information, if any, about the
3    exchange-traded derivatives components of those
4    positions)."
5        Do you have any idea, sir, one way or
6    the other, whether or not Barclays had any
7    information about the exchange-traded derivative
8    portfolio of LBI when it signed the APA?
9            MS. BLOOMER:  Objection to the form of
10       the question.
11           THE WITNESS:  Sorry, what did you say?
12           MS. BLOOMER:  I just objected to the
13       form of the question.  I'm sorry.  I forgot
14       about the hearing issue.  I apologize.
15       A.   Would you read back the question?
16           (Record read.)
17       A.   No.
18       Q.   Do you know whether or not, sir,
19   Barclays asked anybody at Lehman, prior to
20   Barclays signing the APA, for information about
21   the derivatives portfolio that it would acquire
22   under the APA?
23       A.   Excuse me.  The timing of the document
24   was the 16th?

Page 160

A. Leitner

1        Q.   Correct.
2        A.   Which was Wednesday?
3        Q.   Tuesday, sir.
4        A.   Tuesday.
5        Q.   Tuesday, the 16th of September.
6            MS. BLOOMER:  I'm going to object.  I
7        think the agreement may have been signed on
8        the 17th, Neil.  I'm not 100 percent sure
9        about that, but I think there's some
10       confusion about that.
11           MR. DAKIS:  It's agreed to on the 16th
12       and then presented to the court at the
13       Procedures Motion Hearing on the 17th.
14           MS. BLOOMER:  Okay.
15           MR. DAKIS:  It was agreed to and I
16       think dated as of the 16th.
17           MS. BLOOMER:  It's dated as of the
18       16th?
19           MR. DAKIS:  I believe so.  I believe
20       it's agreed to on the 16th.
21           MS. BLOOMER:  Agreed to on the 16h.
22       Okay, I'll take your representation.  You
23       can take the representation as true.  I
24       wasn't sure.  Thank you.

Page 161

A. Leitner

1        A.   Not that it matters one way or the
2    other, but my recollection of the documents I
3    reviewed, the testimony I reviewed was that, as
4    stated here, they were trying to find out what
5    those positions were, but I don't know how much
6    information they had actually received prior to
7    the signing of the agreement.
8        Q.   And you actually don't know whether or
9    not Barclays even asked for that information
10   prior to signing the APA, do you, sir?
11       A.   I do not know when or who initially
12   communicated requests for that information, but
13   I am aware that they were -- that there were --
14   particularly Mr. King was looking for
15   information because he was the risk manager of
16   the transaction.
17       Q.   You spoke to Mr. King in preparation
18   for your deposition?
19       A.   No, I did not.  I only read his
20   testimony.
21       Q.   Did you speak to Mr. King in
22   connection with your report?
23       A.   No, I only read his deposition.
24       Q.   If you could turn to Schedule 2,

Page 162

A. Leitner

1    sir -- sorry, Schedule 1 to your report, in
2    particular to page 4 of Schedule 1. Do you have
3    that page, sir?
4        A.    Yes.
5        Q.    Do you see there's a list -- there's a
6    heading "Witness Interviews," do you see that,
7    sir?
8        A.    Yes.
9        Q.    And then there's a list of people
10   underneath that?
11       A.    Yes.
12       Q.    Did you compile that list, sir?
13       A.    I assisted in its compilation. I
14   reviewed it.
15       Q.    Okay. What's that list intended to
16   represent, sir?
17       A.    Any contacts, which would include
18   meetings that I attended where people may have
19   been on the phone, conference calls. I don't
20   recall being in a meeting with Mr. King, but he
21   may have been on a call with any one of those
22   parties when we were discussing aspects of the
23   transaction.
24       Q.    But you did in some sense meet or

Page 163

A. Leitner

1    interview with him prior to and pursuant to your
2    efforts to compile this January 8 report, sir?
3        MS. BLOOMER:  Object. If you can
4    remember, you can answer the question.
5        A.    I'm sorry, your question was?
6        MS. BLOOMER:  Did you meet with or
7    speak to Stephen King before the report.
8        A.    I don't recall him being in the same
9    room with me.
10       Q.    Did you speak with Mr. King on the
11   telephone, sir, in connection with preparing
12   your report?
13       A.    I believe he was on at least one
14   meeting where there were other people present
15   and I believe the subject matter had to do with
16   post-transaction issues.
17       Q.    Did you ask Mr. King if he asked
18   Lehman for information about the exchange-traded
19   derivative portfolio that Barclays intended to
20   acquire?
21       A.    No.
22       Q.    You presumably then didn't ask him
23   when he asked that question of Lehman?
24       A.    Correct.

Page 164

A. Leitner

1        Q.    The next sentence at paragraph 62 of
2    your opinion, sir, reads, "Indeed, Barclays'
3    only way to gauge the nature of the ETD
4    positions prior to the closing was to observe
5    directional movements in the OCC's margin
6    requirements." Do you see that?
7        A.    Yes.
8        Q.    Is that your opinion, sir?
9        A.    It's not an opinion. It is what I
10   understood to be a fact based on Mr. King's
11   deposition.
12       Q.    But you know, sir, that Barclays did
13   in fact have lists of Lehman's exchange-traded
14   derivatives positions prior to the closing,
15   correct?
16       MS. BLOOMER:  Objection to the form of
17   the question. Assumes facts not in
18   evidence.
19       MR. OXFORD:  It assumes facts in Mr.
20   Leitner's report.
21       MS. BLOOMER:  Do you want to specify
22   which positions they had lists of and which
23   they didn't, Neil? Because if not, it
24   assumes facts not in evidence.

Page 165

A. Leitner

1        MR. OXFORD:  I'll get there.
2        Q.    Do you have my question in mind, Mr.
3    Leitner?
4        (Record read.)
5        A.    I believe they had -- step back. At
6    some point prior to closing, I believe they had
7    a list of the OCC option positions. I'm not
8    certain that they had a list of all of the
9    futures positions traded on foreign exchanges.
10   I just don't remember -- know that they did.
11       Q.    So if your testimony that you have
12   just given is accurate, that Barclays had a list
13   of OCC options positions prior to closing, then
14   it can't be true that Barclays' only way to
15   gauge the nature of those positions prior to the
16   closing was to observe directional movements in
17   the OCC's margin requirements, can it?
18       MS. BLOOMER:  Objection to the form of
19   the question.
20       A.    If, as I recollect, they only were
21   able to receive and digest the positions over
22   the weekend, it would have been too late to do
23   anything about it. So -- and indeed, even with
24   those positions, the -- on the morning of the

Page 166

1          A. Leitner
2    closing, that would -- it would also be true
3    that they would only be able to observe the
4    directional movement, so on a gross basis.
5       Q.   Have you finished your answer, sir?
6       A.   Yes.
7       Q.   Why do you say that if Barclays did
8    not receive information on Lehman's
9    exchange-traded derivatives until the Friday
10   before the closing of the transaction it was too
11   late to do anything about it?
12      A.   I think, in order to understand that,
13   it's important to read the balance of paragraph
14   62 in which I say, "This lack of information was
15   partly the result of the setup of LBI's computer
16   system, which lumped together both
17   exchange-traded derivatives and over-the-counter
18   derivatives."
19           That was -- that statement was based
20   on Mr. King's testimony and, therefore, my
21   belief that based on that testimony, that the
22   prior statement was an accurate statement, that
23   is, that the only way to gauge the nature of the
24   positions prior to closing was to observe the
25   directional movement.

Page 167

1          A. Leitner
2           So the fact that they got a printout
3    at some point that had a list of the positions
4    did not necessarily indicate that they would be
5    in a position to take risks mitigation action
6    other than on a sort of gross basis.
7       Q.   MS. BLOOMER:  Would this be a good
8    time for a break, Neil?
9           MR. OXFORD:  Can I have -- I want to
10   do a couple of documents and then we can
11   take a break.
12      Q.   Mr. Leitner, I'm handing you, sir, a
13   document that's been previously marked in these
14   depositions as Exhibit 554.
15      A.   I have the document.
16      Q.   Okay.  Could you turn to paragraph 91
17   of your report, sir, and tell me whether or not
18   this is the first e-mail that you reference in
19   paragraph 91?
20           MS. BLOOMER:  I'm going to object to
21   the question and just ask, are you certain
22   that this is a full reproduction of the
23   exhibit to the e-mail, Neil?
24           MS. HASSAN:  Exhibit 564 is an excerpt
25   of, I think.

Page 168

1          A. Leitner
2           MS. BLOOMER:  Of a how many page
3    document?
4           MS. HASSAN:  It's a long one.
5           MS. BLOOMER:  Do you know how long?
6           MS. HASSAN:  I think it's a few
7    hundred pages.
8           MR. OXFORD:  Is this an accurate -- is
9    Exhibit 55 -- is this, is what I have
10   marked --
11          MS. HASSAN:  Right.
12          MR. OXFORD:  -- everything that's in
13   Exhibit 554?
14          MS. HASSAN:  Right, and it corresponds
15   to the Bates number in paragraph 91.
16          MS. BLOOMER:  I don't care what the
17   exhibit is.  I care about the fact that if
18   the e-mail is saying they're sending
19   something that's six pages long or that's
20   506 pages long.  What was the actual
21   attachment to the e-mail that Barclays
22   received as reflected on this cover e-mail?
23          MR. OXFORD:  It sounds like it may be
24   longer, so we can get that if you would like
25   that, Trish.

Page 169

1          A. Leitner
2           MS. BLOOMER:  I think it's important
3    context to help him answer the questions
4    you're asking him.
5       A.   Is there a question?
6       Q.   Yes.  Can you tell me whether Exhibit
7    554 is the first e-mail and attachment that you
8    reference in paragraph 91, subject to Trish's
9    question as to whether or not there may be
10   additional pages to the attachment?
11      A.   It certainly appears to be.  It's --
12   the time sequence on it of 4:45 P.M. is close to
13   what's on the e-mail, which says 4:45:22 P.M.
14          MS. BLOOMER:  Were you going to get
15   the whole document before you ask any
16   questions about it?  I mean, you can't give
17   him this and ask him to answer questions on
18   it if it's not the right document.
19          MR. OXFORD:  I can ask him whatever
20   questions I like, Trish.  You can have
21   whatever objections you like.  We'll get the
22   document.
23          MS. BLOOMER:  I'm going to object to
24   any question you ask about this document
25   before you give him the full attachment to

Page 170

A. Leitner

1 the e-mail.
2       MR. OXFORD: That's fine. I can't
3 pull a rabbit out of a hat quite that
4 quickly.
5       MS. BLOOMER: I understand. Maybe you
6 can come back to it or at least represent to
7 him how many pages this document is. Maybe
8 you can determine that out of a hat.
9       MR. OXFORD: I cannot.
10      Q.  Do you know, sir, looking at 554 which
11 computer system this report is drawn from?
12      MS. BLOOMER: Objection to the
13 question to the extent the witness said he
14 doesn't have a full and complete picture of
15 the exhibit.
16      MR. OXFORD: Your objection is noted.
17      Q.  Can you tell, sir?
18      A.  No, I can't tell.
19      Q.  Did you ask anybody?
20      A.  No.
21      MS. BLOOMER: Objection to the
22 question.
23      Q.  You didn't ask Mr. King?
24      A.  Excuse me?

Page 171

A. Leitner

1       Q.  You didn't ask Mr. King what Lehman
2 system this document came from?
3       MS. BLOOMER: Objection to the
4 question.
5       A.  No.
6       Q.  You said to prepare your report with
7 two of the former Lehman operations people with
8 responsibility for options; is that correct,
9 sir?
10      A.  Yes.
11      Q.  And those names are Dan Dzeimian and
12 Craig Jones?
13      A.  Yes.
14      Q.  Did you ask either Mr. Dzeimian or Mr.
15 Jones about what information was available in
16 Lehman's computer systems about Lehman's ETD
17 portfolio in the week of September 15?
18      A.  No.
19      Q.  Did you ask anybody in preparation for
20 your report, sir, about what information was
21 available in Lehman's computer systems about
22 Lehman's exchange-traded derivatives portfolio
23 in the week of September 15?
24      A.  No.

Page 172

A. Leitner

1       Q.  Do you have any information, sir,
2 about what information was available in Lehman's
3 computer systems about Lehman's ETD portfolio on
4 the week of 15th of September?
5       MS. BLOOMER: Objection to the form of
6 the question.
7       A.  No, no direct information. Only
8 indirect information based on documents that I
9 have received, such as the document you're
10 showing me, which was produced as a document
11 received by Barclays. So I was focusing
12 obviously in my opinion on what Barclays had and
13 what they knew and when they knew it, and as you
14 point out, if this is the position run for --
15 even if it's only the list of derivatives
16 position, it's a document they got at 4:45 on
17 Friday.
18      Q.  Do you have any reason to believe,
19 sir, that if Barclays had asked for a position
20 run from Lehman's computer systems at any time
21 during the week of September 15th, 2008, that
22 Barclays would not have received that position
23 run on the exchange-traded derivatives portfolio
24 that they intended to acquire from Barclays?

Page 173

A. Leitner

1       MS. BLOOMER: I object to the form of
2 the question. It assumes facts not in
3 evidence.
4       A.  I would like an opportunity to refer
5 to my report and refresh my recollection,
6 because I want to see whether other paragraphs
7 cover that so I can answer you.
8       Q.  Okay. Please take a moment.
9       (Discussion off the record.)
10      A.  Okay. I've reviewed the report and it
11 hasn't really helped me refresh my recollection,
12 but I do believe that there is -- there are
13 e-mail exchanges between Barclays executives
14 relating to the lack of information prior to the
15 Friday in an attempt to receive the information,
16 including OTC derivatives, but I would have to
17 look elsewhere in the record to find out if my
18 recollection is accurate.
19      But I believe that on the Thursday and
20 the Friday morning, there were attempts to get
21 this information, which is why they got it on
22 Friday because clearly somebody had asked for it
23 before then.
24      MS. BLOOMER: And just to -- you were

Page 174

A. Leitner

1
2  reviewing your report while Neil and I were
3  having a discussion, but this document, the
4  attachment to this e-mail, was 760 pages
5  long.  They were able to determine it.
6        THE WITNESS:  Yes, I know.  I have
7  seen it, I have seen the entire document,
8  which helps me to appreciate even more so
9  why there was such a post-closing
10 operational issue to try to get this data
11 migrated onto Barclays' systems.  Because
12 there was just thousands of positions.
13       MR. OXFORD:  And Trish, just so the
14 record is clear, when you were talking about
15 this document, the record should reflect you
16 were pointing to Exhibit 554.
17       MS. BLOOMER:  Thank you.
18       MR. OXFORD:  Can you read back,
19 please, Kathy, my last question?
20       (Record read.)
21       MS. BLOOMER:  And again, I object.
22 Assumes facts not in evidence.
23    A.   I have no information on the topic, so
24 I don't know.
25       MR. OXFORD:  Now might be a good time

Page 175

A. Leitner

1
2  to take a five-minute break.
3        (Recess; Time Noted:  2:13 P.M.)
4        (Time Noted:  2:29 P.M.)
5  BY MR. OXFORD:
6     Q.   Turning back to paragraph 62 of your
7  report for a moment, sir, you stated that the
8  lack of information that Barclays had about
9  Lehman's ETD positions prior to closing was
10 partly the result of the setup of LBI's computer
11 systems which lumped together both
12 exchange-traded derivatives and over-the-counter
13 derivatives.  Do you see that part of your
14 opinion, sir?
15    A.   Yes.
16    Q.   Is that opinion based on anything
17 other than a reading of Mr. King's testimony?
18    A.   No.
19    Q.   Was Mr. King, to your knowledge, ever
20 employed by Lehman, sir?
21    A.   I don't know.
22    Q.   As you understand it, he was employed
23 by Barclays, correct?
24    A.   Yes.
25       MS. BLOOMER:  Objection.

Page 176

A. Leitner

1
2     Q.   Did you do anything to test whether or
3  not Mr. King's statement about the lack of
4  information that Barclays had about the
5  exchange-traded derivatives prior to closing
6  being partly the result of the set-up of LBI's
7  computer systems?
8        MS. BLOOMER:  Objection to the form of
9  the question.
10    Q.   Sorry.  Did you do anything to test
11 whether or not that statement by Mr. King was
12 true?
13    A.   No.
14    Q.   Does it seem credible to you that a
15 sophisticated broker-dealer such as LBI would
16 have a computer system that would not be able to
17 separate exchange-traded and over-the-counter
18 derivatives?
19       MS. BLOOMER:  Objection to the form
20 and scope of his opinion.
21    A.   I would not be surprised, based on my
22 experience in the industry, that a sophisticated
23 firm for purposes of its management of its
24 equity derivatives books, trading books, would
25 combine all of its exposures in one place and

Page 177

A. Leitner

1
2  that it would take a degree of expertise based
3  on someone knowledgeable about the systems to
4  know how to extract the particular risk profiles
5  you wanted to see within that book, very much
6  dependent upon the organization structure and
7  technological capabilities of each firm, but it
8  would not surprise me if in fact the proprietary
9  equity derivatives positions were combined.
10    Q.   Would it surprise you if it were
11 impossible to extract from Lehman's computer
12 systems a report that separated the
13 exchange-traded and over-the-counter
14 derivatives?
15    A.   Would you read back the question,
16 please?
17       (Record read.)
18    A.   It would surprise me if any firm
19 couldn't eventually get a report of all its
20 exchange-traded derivatives positions.  I have
21 no knowledge of how, assuming that the document
22 with -- many-thousand-page document or whatever
23 it is, many thousand positions that were
24 delivered to Barclays on the Friday night, which
25 computer system they were extracted from.  All I

Page 178

A. Leitner

1  know is that the testimony that I was -- that I
2  based my statements on page 62 was that, prior
3  to the Friday, Mr. King's understanding,
4  presumably from something he heard from the
5  Lehman side, I don't know what, was that they
6  were having problems extracting the listed
7  positions from the OTC positions which were not
8  coming over.
9      Q.  When you met with the Lehman's
10  operations people, did, including Mr. Dzeimian
11  and Mr. Jones, did you ask them whether anybody
12  asked them in the week of September 15 to
13  extract any information from Lehman's computer
14  systems about Lehman's exchange-traded
15  derivatives portfolio?
16      A.  I did not ask them.
17      Q.  You didn't ask them whether or not Mr.
18  King's statement that you rely upon in paragraph
19  62 of your report was in any way accurate?
20      MS. BLOOMER:  That's another question?
21      MR. OXFORD:  Yes, it's another
22  question.
23      A.  My conversations with those gentlemen
24  had to do with the management of the collateral,

Page 179

A. Leitner

1  not with the risk of or composition of the
2  options book.  It would not have occurred to me
3  to ask them, given my knowledge of what their
4  job was, to test that question.  I would have
5  been shocked if they knew the answer.
6      Q.  Did you talk to anybody who would know
7  whether or not what Mr. King said was correct?
8      A.  No.
9      Q.  You're aware, sir, that Lehman had a
10  long-standing relationship with the OCC,
11  correct?
12      A.  Based on my industry experience, yes,
13  I'm aware.
14      Q.  And as a result -- withdrawn.  Based
15  on your expertise in the industry, sir, you are
16  aware, are you not, that a broker-dealer such as
17  Lehman has access to reports from the OCC's
18  computer systems?
19      A.  Yes.
20      Q.  The OCC is able to generate a report
21  from its computer systems that shows the
22  positions held by each of the broker-dealers who
23  are members of that corporation, correct?
24      A.  Yes.

Page 180

A. Leitner

1      Q.  What's the name of that report, sir?
2      A.  I don't remember.
3      Q.  Would you characterize it as a
4  positions report?
5      A.  Yes.
6      Q.  And the OCC are able to generate a
7  report for each account held by each
8  broker-dealer, correct?
9      A.  Yes.
10      Q.  They're able to do that fairly easily,
11  aren't they, sir?
12      A.  Should be able to, yes.
13      Q.  And in fact, these reports are
14  provided to broker-dealers who are OCC members
15  on a routine basis, are they not?
16      MS. BLOOMER:  Objection to the
17  question.
18      A.  My -- I'm not certain whether today
19  that's a query that the firm can make and,
20  therefore, pull it whenever they want or whether
21  they have to request a download from OCC.
22      Q.  Okay.  So whether the broker-dealer
23  has to request the data from the OCC or whether
24  the broker-dealer has direct access to the OCC's

Page 181

A. Leitner

1  computer systems, you agree that a broker-dealer
2  can quickly and easily obtain a report from the
3  OCC as to the positions that that broker-dealer
4  holds at the OCC, correct?
5      MS. BLOOMER:  Objection to the form of
6  the question.
7      A.  Yes.
8      Q.  And that holds true as of September
9  2008, correct, not just today?
10      A.  Yes.
11      Q.  Barclays is a member of the OCC as
12  well, correct?
13      A.  Yes.
14      Q.  How long has Barclays been a member of
15  the OCC for?
16      A.  I have no idea.
17      Q.  Do you know if Barclays was a member
18  of the OCC in 2008?
19      A.  Without certainty as to the structure
20  of Barclays, a Barclays entity, and it could
21  have been BCI, was a member of OCC, that's my
22  understanding.
23      Q.  And do you have any understanding,
24  sir, of how long prior to September 2008 the

Page 182

A. Leitner

1
2   Barclays entity, whether it's BCI or some other
3   Barclays entity, had been a member of --
4       A.  No.
5       Q.  -- the OCC?
6       A.  I don't have any knowledge about that.
7       Q.  Is it reasonable in your expert
8   opinion, sir, to assume that Barclays, as a
9   member of the OCC, would have had an
10  understanding of the types of reports and data
11  available to a broker-dealer such as LBI from
12  the OCC's computer systems?
13      A.  I would assume they did know that,
14  yes.  Somewhere in the organization.
15      Q.  Do you have any reason to believe,
16  sir, that the information on the OCC's computer
17  systems as of the week of September 15, 2008
18  regarding the LBI positions at the OCC was
19  inaccurate?
20          MS. BLOOMER:  Objection to the form of
21      the question.
22      A.  I have no reason to believe it was
23  inaccurate.
24      Q.  Do you have any reason to believe that
25  information on the OCC's computer systems was

Page 183

A. Leitner

1
2   incomplete in the week of September 15 --
3       A.  No.
4           MS. BLOOMER:  Objection to the form of
5       the question.
6       Q.  -- 2008?
7       A.  No.
8       Q.  You're aware, sir, are you not, that
9   Barclays was in direct contact with the OCC
10  prior to the closing of this transaction?
11          MS. BLOOMER:  Objection to the form of
12      the question.  Assumes facts not in
13      evidence.
14      A.  Can you put a context and a timeframe?
15  I mean, they were, as members of OCC,
16  Barclays -- some people at Barclays would be in
17  touch with OCC daily.  So --
18      Q.  In connection with this transaction,
19  sir, we looked at an e-mail from the OCC to Mr.
20  Ed Rosen of Cleary, who is Barclays outside
21  counsel, do you remember that?
22      A.  Correct.
23      Q.  So we know based, if nothing else, on
24  that e-mail, we know that there was direct
25  contact between the OCC and Barclays' counsel,

Page 184

A. Leitner

1
2   correct?
3           MS. BLOOMER:  Barclays' counsel did
4       you say?
5           MR. OXFORD:  Yes.
6       A.  Right.  Yes.
7       Q.  Do you have any reason to believe that
8   the OCC reports of LBI's positions during the
9   week of September 15 could not have been made
10  available to Barclays?
11          MS. BLOOMER:  Objection to the form of
12      the question.
13      A.  I don't know why they couldn't have
14  been.  I also don't know why they weren't.
15      Q.  Do you think a rational purchaser
16  would have requested a report from the OCC of
17  Lehman's derivatives positions prior to signing
18  the Asset Purchase Agreement in this case?
19          MS. BLOOMER:  Objection to the form of
20      the question.
21      A.  Under the chaotic circumstances of
22  this case, with the, what appeared to me,
23  relatively small number of people working on the
24  deal documents and transactions on both sides,
25  that is what appears to me to be the case, that

Page 185

A. Leitner

1
2   the Barclays people relied on a small number of
3   people on the Lehman side to give them the
4   information that they needed.
5           Whether it would have been a good idea
6   for them to try and get OCC to give them this
7   information at some point in time, would it have
8   been a good idea?  Well, sure.  I'm not certain,
9   by the way, that OCC would have accommodated
10  them since they have no obligation to provide
11  the information from, you know, one member to
12  another.
13          But I think it's also important to
14  keep in mind that Barclays at some point was
15  also becoming aware that, both with respect to
16  the customer positions and with respect to the
17  proprietary positions, they were -- there was
18  some quantity of option positions in there that
19  were not really proprietary positions because
20  they were positions of affiliates, and that with
21  respect to the customer positions, there were
22  similarly positions that really were being
23  carried for Lehman affiliates.
24          And so the risk management challenge
25  to Barclays was only in part based upon their

Page 186

A. Leitner

1  ability to, you know, assess the overall risk of
2  the thousands of positions for which they were
3  responsible.
4  Q.   You've testified, sir, that Barclays,
5  in assuming responsibility for Lehman's
6  exchange-traded derivative portfolio, faced
7  unquantifiable risks as of closing, correct?
8
9  A.   Yes.
10  Q.   And you agree with me --
11  MS. BLOOMER:  I object to the
12  characterization of the testimony.  Just
13  give me a moment.  I'm sorry.  I didn't get
14  my objection in quick enough.
15  THE WITNESS:  Sorry.
16  Q.   Do you believe, sir, that it would
17  have been prudent for Barclays, prior to
18  agreeing to assume that unquantifiable risk, to
19  have requested, whether directly from the OCC or
20  from the OCC via Lehman, a report of the
21  derivatives portfolio for which it was assuming
22  or proposing to assume responsibility?
23  A.   My understanding is that there was a
24  wide range of businesses, assets, people and so
25  forth involved in this transaction being managed

Page 187

A. Leitner

1  by a relatively small team on both sides.  As
2  important as the derivatives clearing business
3  was, this was a subset of all the issues that
4  people were worried about, including Mr. King,
5  and so it is not surprising to me that, in
6  trying to assess and manage all the risks of the
7  businesses that they were taking on, the fixed
8  income portfolios, which assets they were going
9  to take and not take, other aspects of the
10  transaction that were not related to the
11  equities book, that some of the things that
12  would have been good to do or even important to
13  do were not done.
14  I think that, given the short
15  timeframe and the many issues that they were
16  running with, they did as good a job they could
17  have done, but that's only my, you know,
18  assessment of, you know, the facts.  And I
19  believe they were getting -- it appears to me
20  that they were getting as much cooperation as
21  they could from the Lehman side as quickly as it
22  could be provided.
23  But the Lehman team was, you know,
24  this was just one of the many issues they were
25

Page 188

A. Leitner

1  trying to deal with.  That is the impression I
2  take away from, you know, the broader record
3  that I have seen and why, you know, in many
4  cases in the depositions that I looked at the
5  exchange-traded derivatives portion of those
6  depositions is only a small portion of the
7  deposition.
8
9  Q.   Do you believe --
10  A.   I think, in other words, I believe
11  that the context described in my report about
12  the chaotic nature of this transaction has to be
13  taken into account whenever we are dealing with
14  the "would have been's," "could have been's,"
15  "should have been's."
16  Q.   Do you believe, Mr. Leitner, that it
17  would have been prudent for Barclays, prior to
18  agreeing to assume the unquantifiable risk in
19  Lehman's exchange-traded derivatives portfolio,
20  to have requested, whether directly from the OCC
21  or from the OCC via Lehman, a report of the
22  derivatives portfolio for which it was proposing
23  to assume responsibility?
24  MS. BLOOMER:  Objection to the
25  question.  Asked and answered.

Page 189

A. Leitner

1  Q.   Would it have been prudent, sir?
2  MS. BLOOMER:  Objection to the
3  question.  Asked and answered.
4  A.   Unnecessary.  Good backup.  I wouldn't
5  call it it's of such a prudential nature that,
6  because it -- just keep in mind it wouldn't have
7  told them anything else about the, what -- about
8  the package of unquantifiable risks, when I use
9  that word, that I intended to describe, and that
10  included the credit risks related to the
11  positions that they discovered they were
12  carrying for affiliates and the like.  So it
13  wouldn't have told them anything about that.
14  And so it could have been helpful but not
15  necessary.  It didn't matter really where they
16  got the information.
17  Q.   Is that a question, it wouldn't have
18  been prudent?
19  MS. BLOOMER:  Objection.  Asked and
20  answered twice now.
21  A.   Prudent, but unnecessary.
22  Q.   Why unnecessary, sir?  Unnecessary
23  because they had the information from someone
24  else or because they didn't need the
25

## Page 190

1        A. Leitner
2  information?
3      A.   Because they wanted to do the deal.
4  And I'm talking about the entire transaction.
5  It appears that everyone was motivated to get
6  the transaction done.  And this was -- this was
7  a portion, although an important portion of the
8  transaction, and so you are -- I don't
9  understand the point of your question.
10      If you're isolating a single event as
11  being, you know, prudent or required, the reason
12  I said not required was because they were --
13  because of the context of the transaction as a
14  whole and the fact that they would be getting
15  the assets supporting the businesses, I guess
16  they were willing to work it out.
17      Q.   I thought you said, sir, that they
18  were only getting the assets or they needed the
19  assets according to the businesses because they
20  didn't know this unquantifiable risk, right,
21  that's your testimony?
22      MS. BLOOMER:  Objection to the
23  characterization of his testimony.
24      A.   I don't think I said anything
25  inconsistent with my prior testimony, so ...

## Page 191

1        A. Leitner
2      Q.   I'm trying to understand, sir, why
3  when you've testified that Lehman faced --
4  sorry, that Barclays faced an unquantifiable
5  risk in assuming responsibility for Lehman's
6  derivatives portfolio, and that, as a
7  consequence of that unquantifiable risk,
8  Barclays would only have taken that risk if it
9  had the assets, the margin securing those risks,
10  why it wouldn't have been necessary for Barclays
11  to get information such as the information from
12  the OCC about the risks inherent in the
13  derivatives portfolio that it was proposing to
14  acquire from Barclays?
15      MS. BLOOMER:  If that's what you're
16  trying to understand, then I suggest you ask
17  the question that poses that, because that's
18  a different question.  The risks inherent in
19  the derivatives.  The risks, you said this
20  time, information from the OCC asking him
21  for information from the OCC about the risks
22  inherent in the derivatives portfolio.  That
23  is a different question, Neil.  Please don't
24  confuse the witness.
25      Q.   Would a report such as the ones you

## Page 192

1        A. Leitner
2  have testified that were available from the OCC,
3  sir, would those reports help Barclays quantify
4  the risks inherent in assuming Barclays'
5  derivatives portfolio?
6      A.   Those reports and any other
7  information that they could get about the
8  portfolios would have helped them assess the
9  risk.
10      Q.   I'm going to hand to you what I've
11  marked as Exhibit 564 -- actually, what I'm
12  about to mark as Exhibit 654.
13      (Exhibit 654, an e-mail from Sheila
14  Zach to Richard Konefal at Barclays Capital
15  copied to Dan Dzeimian and others Monday,
16  September 22 at 4:41 P.M., marked for
17  identification, as of this date.)
18      Q.   Exhibit 654, sir.  I'll identify this
19  for the record, sir, as an e-mail from Sheila
20  Zach to Richard Konefal at Barclays Capital,
21  copied to Dan Dzeimian and others Monday,
22  September 22, at 4:41 P.M.
23      MS. BLOOMER:  Can you wait until I
24  have the document so that I can see that
25  you're identifying it accurately?

## Page 193

1        A. Leitner
2      MR. OXFORD:  And the exhibit I have
3  marked is the full document.  In the
4  interest of not killing trees, everybody
5  else has excerpted ones.  We can deal with
6  that if that becomes a problem.
7      Q.   Can you take a moment to review that
8  document, sir and tell me whether you've ever
9  seen it before?
10      A.   It looks familiar.
11      Q.   It looks familiar from where, sir?
12      A.   Because I believe I've seen it before.
13      Q.   In what circumstances have you seen
14  it?
15      A.   I believe this was an exhibit to
16  somebody's testimony.  I don't remember whose.
17      Q.   Did you review it in preparation for
18  your deposition today, sir?
19      A.   I reviewed it in connection with the
20  preparation of my report.
21      Q.   You see on the second page of that
22  e-mail at 3:47 P.M. on Monday, the 22nd of
23  September, Mr. Konefal at Barclays sends an
24  e-mail to Michael Evans of New York, at New
25  York, entitled "Options Positions."

Page 194

A. Leitner

1
2      A.    I'm looking -- I'm sorry, which?
3      Q.    The bottom of the second page, sir,
4  which has the Bates number 36754.
5      A.    At 3:47, is that the one?
6      Q.    Yes, 3:47 P.M.  Do you see that, sir?
7      A.    I'm reading it now.
8          Okay.
9      Q.    Do you see that Mr. Konefal of
10  Barclays asks Mr. Evans of Lehman Brothers for
11  an OCC file of open positions in 074 for the
12  firm in market-making ranges, do you see that?
13      A.    Yes.
14      Q.    Do you see that Mr. Evans then
15  forwards this request to the OCC?
16      A.    Okay.
17      Q.    And do you see that by 4:41 P.M.,
18  Sheila Zach has provided the requested report to
19  Mr. Konefal?
20      A.    Okay.
21      Q.    Do you see that, sir?
22      A.    Yes.
23      Q.    Do you agree that in less than one
24  hour of Barclays' request for an OCC positions
25  report, the OCC has provided that to Barclays?

Page 195

A. Leitner

1
2      A.    Yes.
3      Q.    Could you take a moment to look at the
4  attachments, the reports that are attached to
5  Mr. -- I'm sorry, Ms. Zach's e-mail?
6      A.    I see it.
7      Q.    Are you familiar with these types of
8  reports, sir?
9      A.    You know, I've seen them once or twice
10  in the course of my career, or reports similar
11  to this.
12      Q.    In your opinion as an expert in this
13  industry, sir, does the report that's attached
14  to the e-mail that I have marked as Exhibit 654
15  provide information that would have been useful
16  to Barclays in quantifying the risks of owning
17  Lehman's exchange-traded derivatives portfolio?
18      A.    Yes.
19      Q.    Is there any other information that
20  Barclays would have needed to know in order to
21  manage the risk inherent in Lehman's
22  exchange-traded derivatives portfolio?
23      A.    Yes.
24      Q.    What's that information, sir?
25      A.    What positions do I have behind it

Page 196

A. Leitner

1
2  that are hedging this book, are there -- are
3  these all the prop account positions or does
4  anybody else have an interest in the positions,
5  would be the among questions you would need to
6  know.
7      Q.    What else, sir?
8      A.    This, this report and data, by the
9  way, to the extent that it went to the
10  operations people, would have been necessary for
11  them to know in order to know -- be able to sort
12  the options not only by Cusip or party, but also
13  by expiration, because they would be concerned
14  about preparing for exercises on the long or
15  short side.
16      Q.    That's all I have for that exhibit,
17  sir.
18          Is it your opinion, Mr. Leitner, that
19  there was market risk to Barclays in unvetted
20  futures positions?
21      A.    Yes.
22      Q.    Can you explain for me what that
23  market risk was?
24      A.    Depends on the futures, but you either
25  have a long or a short position, and as the

Page 197

A. Leitner

1
2  market moves, you are required to either make or
3  take daily variation payment.  So for any
4  position that is on you have a potential
5  immediate funding requirement for that position,
6  usually in cash.
7          So, whereas on the option marketplace
8  you can use various types of collateral to cover
9  your existing margin requirement, the futures
10  market has a daily cash settlement requirement.
11  So there is a liquidity component that's a
12  little bit different than option margin.
13      Q.    Futures are marked to market every
14  day; isn't that correct, sir?
15      A.    Yes.
16      Q.    Was there risk to Barclays in taking
17  Lehman's option -- sorry, futures positions that
18  there would be an immediate liability when the
19  markets opened on the 22nd, or was the risk that
20  the markets would move against these positions
21  and Barclays would have to pay variation margin?
22      MS. BLOOMER:  Object to the form of
23  the question.
24      A.    If I understood your question, I don't
25  know that they're mutually exclusive.  I mean,

Page 198

1              A. Leitner
2   you have a risk, as soon as you take them over,
3   to meet your clearing obligations, and to the --
4   and the clearing obligations of all the options
5   you have taken over as a clearing member,
6   customer or firm, and to see that there is
7   adequate margin there at all times.  I think
8   I've described the risks in my report.
9       Q.   Do you believe that the risks to
10  Barclays in taking over the futures positions
11  from Lehman were the same with respect to
12  customer and firm futures?
13      A.   Well, the types of risks that I
14  described in my report apply to a clearing
15  member's responsibilities to the exchange for
16  either the proprietary or customer position.  I
17  have this mix of market, liquidity, sort of
18  funding and credit risks, and all of those are
19  present regardless of the type of
20  exchange-traded derivative you're talking about.
21      So my quibble about, you know, which
22  risks are more acute in which market, they're
23  all -- they all exist.  And then there's the
24  operational component, particularly with respect
25  to the foreign futures, of having the

Page 199

1              A. Leitner
2   responsibility but having to work out
3   arrangements to take over those positions.
4       Q.   Was there also a potential upside to
5   Barclays in taking over the Lehman firm futures
6   positions?
7       A.   Yes.
8       Q.   Did Barclays do anything to quantify
9   the risk and potential benefit of taking on
10  Lehman's foreign futures positions?
11          MS. BLOOMER:  Objection in that it
12      calls for testimony beyond the scope of his
13      expertise and report.
14      A.   I believe you asked me this question
15  before.  I would give the same answer, which is
16  I don't know that there was any specific
17  discussion.  I'm not aware of any.  In terms of
18  how they value or whether they valued this
19  aspect of the transaction in some specific way
20  as opposed to this was simply a part of this
21  larger transaction that they were doing of
22  acquiring the businesses.
23      Q.   Are you aware, sir, whether or not
24  Barclays did any due diligence on Lehman's
25  futures business?

Page 200

1              A. Leitner
2       A.   They tried.
3       Q.   Tell me what they tried to do.
4       A.   My understanding is that, as I think I
5   testified before, that -- and I believe is
6   reflected in the testimony of Elizabeth James --
7   that Barclays was contacted at some point prior
8   to the signing of the Asset Purchase Agreement
9   about whether they were interested in acquiring
10  the FCM business as a separate business from
11  Barclays, and so there was at least one
12  operational meeting to -- in which Barclays was
13  trying to learn about what that business looked
14  like and in which markets they were operating.
15      Q.   Does that answer, sir, exhaust your
16  knowledge of the due diligence that Barclays
17  did, or tried to do, on the Lehman futures
18  business?
19          MS. BLOOMER:  Objection.  At what
20      timeframe are we talking about?
21          MR. OXFORD:  Prior to closing.
22          MS. BLOOMER:  I don't know that we've
23      defined "closing."  You mean September 22,
24      2008?
25          MR. OXFORD:  Is there another closing

Page 201

1              A. Leitner
2   date you're aware of?
3           MS. BLOOMER:  I don't think you've
4       ever established with Tony Leitner what you
5       mean by "the closing," so I would like you
6       to establish the date so that he's clear on
7       the question.
8       Q.   Prior to the closing of the
9   transaction, sir, on September 22, 2008, which
10  is a Monday, other than the answer you gave me a
11  moment ago, do you have any information about
12  the due diligence that Barclays did, or
13  attempted to do, before acquiring Barclays'
14  futures business?
15      A.   Only insofar as it is described in the
16  testimony and declaration of Elizabeth King -- I
17  mean Elizabeth --
18      Q.   James?
19      A.   Liz James.
20          Elizabeth King works for the S.E.C.,
21  so ...
22      Q.   I'm sure Ms. James would take the
23  promotion.
24      A.   No, she wouldn't.
25      Q.   If not the pay cut.

Page 202

```
 1           A. Leitner
 2     A.   No, she wouldn't.  She wouldn't want
 3  Elizabeth's job.
 4     Q.   In Ms. James' testimony at her
 5  deposition she said that Barclays did not
 6  believe there was a proprietary futures business
 7  left at Lehman, so she did not believe that
 8  there were any house futures positions to take
 9  over.  Do you remember seeing that testimony?
10     A.   No.
11          MS. BLOOMER:  Objection to the
12     characterization.
13     A.   No, I don't remember seeing that
14  testimony.
15     Q.   Assuming that is Ms. James' testimony,
16  do you agree that Barclays did not take on any
17  risks, or did not knowingly take on any risks in
18  Barclays -- withdrawn.  Let me try that again
19  properly.
20          If you assume that my representation
21  that Ms. James testified that Barclays did not
22  believe it was assuming any proprietary futures
23  business from Lehman, would you agree with me,
24  sir, that Barclays did not knowingly take on any
25  risks associated with Lehman's proprietary
```

Page 203

```
 1           A. Leitner
 2  futures business?
 3          MS. BLOOMER:  Objection to the form of
 4     the question and to the characterization of
 5     Ms. James' testimony.
 6     A.   I believe my report states, and
 7  certainly my own knowledge of the transaction
 8  is, that Barclays' knowledge of the full range
 9  of derivative positions which it was agreeing to
10  take on was imperfect and that it was prepared
11  to take on the clearing responsibilities in
12  spite of its imperfect knowledge in the context
13  of this transaction, and as I indicated, that a
14  basis for them to be willing to do so was that
15  whatever collateral was there to secure those
16  positions would be part of the business and,
17  therefore, so if they wound up in fact having
18  proprietary positions that they didn't expect,
19  they would also have whatever collateral was
20  there to support that.
21     Q.   Would you agree with me, sir, that
22  because futures positions are marked to market
23  every day, they are flat at the end of the
24  trading day?
25          MS. BLOOMER:  Objection to the form.
```

Page 204

```
 1           A. Leitner
 2     A.   Traders would not use the term "flat"
 3  to describe the exposure in a futures book.
 4     Q.   Do you understand what I'm talking
 5  about when I use the term "flat"?
 6          MS. BLOOMER:  Objection.
 7     A.   I'm not sure I do.
 8     Q.   Can you tell me how a trader, then,
 9  would --
10     A.   "Flat" normally would --
11          Yes, I can --
12          MS. BLOOMER:  Let him finish his
13     question.
14     A.   -- describe how a trader would
15  describe "flat."  Would you like me to do so?
16     Q.   Please.
17     A.   The way a trader would describe "flat"
18  is he takes the position at the beginning of the
19  day.  For example, he would go long a S&P
20  futures contract, and at the end of the day he
21  would have sold that contract and, therefore, he
22  has no exposure.  He would be flat.  He has
23  generated a loss or a profit as a result of
24  being in and out of the transaction during that
25  day.
```

Page 205

```
 1           A. Leitner
 2          But to a trader, "flat" means no risk,
 3  and in this case, if the positions are still on,
 4  there is risk.  All you have done in making any
 5  variation margin payment is simply complying
 6  with an exchange or broker's requirement to
 7  reflect the change in value from the beginning
 8  of the day or the previous evening until the
 9  next day.
10          And you might receive a payment or you
11  would make a payment based on that change in
12  value, but as I think I made clear in my report,
13  it is also possible that you will be asked to
14  make a payment in the middle of the day.  That
15  is not uncommon.  And so part of the particular
16  risks of the futures business is the need for
17  liquidity to be able to make those payments,
18  particularly with respect to foreign markets,
19  where the practice is often to require that the
20  assets and the cash be there before you can even
21  trade.
22          MS. BLOOMER:  Neil, whenever you're
23     ready for another break, I think I am.
24          MR. OXFORD:  I'll take a two-minute
25     break if you guys need it.
```

Page 206

A. Leitner

1
2    (Recess; Time Noted: 3:18 P.M.)
3    (Time Noted: 3:26 P.M.)
4    BY MR. OXFORD:
5    Q.   Mr. Leitner, I want to go back to one
6    question and answer we had a few moments ago.
7        In the futures business, and I'm
8    talking about the proprietary futures business,
9    when Barclays acquired the business with effect
10   from the morning before the markets opened on
11   the 22nd of September, were the positions, the
12   futures positions, an asset or a liability?  Or
13   were they neither?  Were they a potential asset
14   or liability depending on whether the market
15   moved against or towards the position?
16       MS. BLOOMER:  Objection to the form of
17   the question.
18   A.   I'm not in a position to give an
19   accounting answer.  A future is a contract for
20   future performance subject to the rules of the
21   market on which it's traded, and I've described
22   in my report both the mechanisms for securing a
23   party's performance and the potential risks.
24   Q.   I'm not asking for an accounting
25   answer, sir.  I'm asking for your answer as an

Page 207

A. Leitner

1
2    expert in this industry in 30 or 40 years to
3    tell me whether or not, before the markets
4    opened or immediately on the market's opening on
5    September 22, 2008, there is an immediate loss
6    or gain to Barclays because they now own these
7    futures contracts?
8        MS. BLOOMER:  Objection to the form of
9    the question.
10   Q.   Do you understand my question, sir?
11   A.   Yes, I think I do.  The way I would
12   describe it is that there is an immediate
13   exposure to gain or loss as a result of market
14   movements in the underlying -- in the underlier
15   of the futures contract, whatever it happens to
16   be.
17   Q.   In your opinion, sir, would a rational
18   purchaser of futures positions in any
19   circumstances take those positions without the
20   margin that's posted to cover those positions at
21   the exchanges?
22   A.   Let me start by saying it would be
23   impossible to take on futures positions, for a
24   new party to take on futures positions without
25   them being margined, and the -- assuming the

Page 208

A. Leitner

1
2    rules for contract market would allow a change
3    of beneficial ownership of the underlying
4    contract, they would, in my opinion, tend to do
5    so only with the movement of the underlying
6    collateral.
7    Q.   And in your experience, sir --
8    A.   Excuse me.  Let me answer your
9    question.
10   Q.   Sorry.  I thought you were finished.
11   A.   Therefore, it would be -- I think your
12   question was would it be rational for someone
13   acquiring futures contracts to do so without the
14   margin?  It would be both, in my view,
15   irrational and virtually impossible to do so
16   without the movement of the underlying
17   collateral.
18   Q.   And in your experience, sir, if the
19   underlying collateral was purchased along with
20   the futures position, the contract, would the
21   purchase price reflect the acquisition of the
22   asset that is the collateral posted at the
23   exchange to secure the performance of the
24   futures contract?
25       MS. BLOOMER:  Objection to the form of

Page 209

A. Leitner

1
2    the question.
3    A.   You're asking a hypothetical that is
4    not this case, because this case is this strange
5    acquisition of a business through an ostensible
6    sale of purchase of assets and assumption of
7    liabilities.  Included in that is the
8    replacement of one clearing member of an
9    exchange by another clearing member of an
10   exchange and taking on of all the contract
11   exposures.
12       So this is not simply the acquisition
13   deliberately and independently of a book of
14   derivatives, but also of the clearing business.
15   For that reason, the consequence reached here is
16   the only basis, in my view, and as I state in my
17   opinion, on which you can accomplish that
18   transaction in a rational way.  That is, you
19   take on the positions along with the collateral,
20   and you don't establish a -- I'm not aware of
21   the establishment of any independent separate
22   value for that, and I think I've testified to
23   that before.
24   Q.   So, in your opinion, if there's a
25   billion dollars of collateral to secure Lehman's

Page 210

1             A. Leitner
2    futures positions, that's just something that
3    goes to Barclays?
4        A.   Hypothetically, yes.  Hypothetically,
5    if that's what exists on the closing date,
6    but...
7        Q.   And tell me, sir, if there is excess
8    margin on Lehman's proprietary futures accounts,
9    does a rational purchaser need the excess margin
10   to take on Lehman's proprietary futures book?
11           MS. BLOOMER:  Objection to the form of
12       the question.
13       A.   I believe that's particularly true in
14   a case of futures, where the custom is in fact
15   to, especially with regard to foreign futures,
16   maintain balances that exceed the initial margin
17   requirement in order to support the trading
18   business or, in the case of customers, the FCM
19   customer margin requirements that are required
20   to be collected by the exchange.
21           So it is, you know -- sorry.
22       Q.   And why does Barclays or a rational
23   purchaser of Lehman's futures, proprietary
24   futures book, why does Barclays need that excess
25   capital above and beyond the initial margin

Page 211

1             A. Leitner
2    that's posted to secure those proprietary
3    futures?
4            MS. BLOOMER:  Objection to the form of
5        the question.  You're turning it from
6        something that goes to Barclays that
7        something that Barclays needs.
8            MR. OXFORD:  Well, they're two
9        different questions.  I can't ask the same
10       question all day.  It may seem like it.
11           MS. BLOOMER:  I object to the form of
12       your question.  You changed the premise.
13       A.   So what was the question?
14       Q.   Why does Barclays for a rational
15   purchaser of Barclays' futures, proprietary
16   futures book, need the excess margin above and
17   beyond the initial margin that's posted to
18   secure the proprietary futures positions?
19       A.   The answer is found in my report,
20   which is that in the circumstances of this
21   transaction, taken as a whole, and given the
22   risks of assuming the clearance responsibilities
23   for both the clearance and the customer
24   accounts, that a rational purchaser under these
25   circumstances would do so only on the

Page 212

1             A. Leitner
2    understanding that whatever collateral was there
3    and with regard to futures, one would assume
4    that there would be more collateral than
5    theoretically necessary as a result of initial
6    margin requirements, would come to the
7    purchaser, namely, Barclays.
8        Q.   How would you quantify, sir, the
9    market risk for Barclays in acquiring Lehman's
10   proprietary futures positions.
11          (Record read as follows:  "How would
12       you quantify --")
13       A.   "Quantify."  Thank you.
14           I have made no judgment to quantify
15   it.  Generally speaking, you quantify risk based
16   on the nature and volatility of the underlier in
17   the particular marketplace.
18       Q.   What would Barclays do, sir, to close
19   out any proprietary futures that it acquired
20   from Lehman?  What steps would it take?
21           MS. BLOOMER:  Objection to the form.
22       A.   It would first have to establish that
23   it was in a position to give an instruction to
24   take action to close out the position, and then
25   it would give an instruction to buy or sell the

Page 213

1             A. Leitner
2    opposite side of the transaction.
3        Q.   Moving to the customer futures, sir --
4        A.   Excuse me?
5        Q.   Moving to the customer futures that
6    Barclays acquired, the customer futures?
7        A.   Yes, what about them?
8        Q.   Moving on to them.
9        A.   Okay.
10       Q.   Can you tell me, please, what the risk
11   is to Barclays in acquiring that clearing
12   business?
13       A.   The same measure of risks that I have
14   used generally to define what's involved in
15   clearing derivatives, so that would be market,
16   credit, liquidity, and operational risk.
17       Q.   Do you know, sir, whether or not
18   Barclays conducted any due diligence on the
19   customers' seg and secured calculations prior to
20   the closing of this transaction?
21           MS. BLOOMER:  Objection to the form of
22       the question.
23       A.   I don't recall specifically what steps
24   Barclays folks were able to actually accomplish.
25   I am aware that they were looking for as much

Page 214

1          A. Leitner
2    information about these positions as they could
3    get, both where they were and the nature of the
4    positions and the amount of margin that secured
5    them. I'm less certain about when and how they
6    got the information.
7       Q.   Or what information they got?
8       A.   Correct.
9            (Exhibit 655, handwritten notes,
10    marked for identification, as of this date.)
11       Q.   Mr. Leitner, I'm handing you what I
12    have marked as Exhibit 655. I'll identify for
13    the record as a set of handwritten notes that
14    were produced to me by counsel to Barclays.
15            Do you recognize those notes, sir?
16       A.   Yes.
17       Q.   Are they your notes, sir?
18       A.   Yes.
19       Q.   Could you turn to page 3, please?
20            MS. BLOOMER: Back to back or which?
21            MR. OXFORD: No, counting from the
22    middle.
23            MS. BLOOMER: No, one, two, the third
24    page, or the third --
25            MR. OXFORD: The third page.

Page 215

1          A. Leitner
2            MS. BLOOMER: -- side of the page?
3       A.   They're not numbered, so ...
4       Q.   The third page. Do you want to
5    identify it by what's on the top, please?
6       A.   That's the fifth page.
7       Q.   I think I have something -- I now have
8    a Bates-stamped copy.
9            MS. BLOOMER: That would be helpful.
10       Q.   297510.
11       A.   Okay.
12            MS. BLOOMER: For the record, that's
13    the second page of the copy I have.
14       Q.   Do you have that page, sir?
15       A.   Yes.
16       Q.   Can you tell me what it says, those
17    first three lines say?
18       A.   "Customer gain. LBI buffer. 5
19    percent excess - secured account."
20       Q.   Are these notes of a conversation with
21    someone you had to prepare your report, sir?
22       A.   This was I think a conversation with
23    Liz James.
24       Q.   What's the reference to customer gain
25    to?

Page 216

1          A. Leitner
2       A.   I don't remember.
3       Q.   What does "LBI buffer" mean?
4       A.   I was interested to know what the LBI
5    practice, if Liz knew, of about what -- how much
6    excess collateral they put up in connection with
7    customer -- the customer FCM positions.
8       Q.   And the next line you said reads "5
9    percent excess"?
10       A.   5 percent excess, dash, secured
11    account.
12       Q.   What's the reference to a secured
13    account, sir?
14       A.   That's the account maintained for
15    customer foreign futures positions. I don't
16    recall whether that reference was a reference to
17    what LBI did or what Barclays' practice was
18    because we were going back and forth with, okay,
19    what did you guys do, what do we do, and so
20    forth. So I do not know whether that note
21    specifically in fact references LBI practices or
22    Barclays' practices.
23       Q.   Do you remember what, if anything, Liz
24    James told you about what she knew about
25    Lehman's practice with respect to an excess in

Page 217

1          A. Leitner
2    the secured account?
3       A.   I don't remember.
4       Q.   A few lines down toward the right-hand
5    side, there's a reference that looks like "700
6    MM excess." Do you see that, sir?
7       A.   Yes.
8            MS. BLOOMER: Wait. I don't. Can you
9    show me?
10            (Witness indicates.)
11            MS. BLOOMER: Thank you.
12       Q.   Did I read that correctly? Is that
13    what it says, "700 MM excess"?
14       A.   Yes.
15       Q.   What does that mean?
16       A.   I have no recollection of what that
17    was from.
18       Q.   Does it perhaps reflect that there was
19    a $700 million excess in Lehman's customers' seg
20    or secured account prior to closing?
21       A.   I don't remember. I don't know
22    whether that was, you know, a reference to what
23    was in the OCC account or the -- or the futures
24    account. I just don't have any recollection.
25       Q.   The next line down, it appears -- you

Page 218

```
1            A. Leitner
2  appear to write, "Generally left greater than 5
3  percent?"
4      A.  Yes.
5      Q.  Do you know what that's a reference
6  to?
7      A.  Again, I don't remember -- I believe
8  that was again with respect to the futures
9  discussion, and I don't remember whether that
10 was a note that reflected Liz James talking
11 about the Barclays practice or the Lehman
12 practice, but I think it -- my best recollection
13 is that it -- my best recollection is that it
14 was Liz's description of what she had found that
15 Barclays was doing, which was generally to put
16 more than 5 percent in.
17        And just to step back, my experience
18 in the industry is that how much of a cushion
19 you have for customer FCM positions depends very
20 much on the customer activity and the nature of
21 the futures that they are trading.  The larger
22 the customer base the more they trade.  The
23 larger the margin requirement the more excess
24 you tend to put in.
25        And understanding that this is largely
```

Page 219

```
1            A. Leitner
2  an institutional business, it would not have
3  surprised me if -- if LBI in fact maintained
4  balances well in excess of 5 percent.
5      Q.  Would it have surprised you, sir, to
6  learn that Lehman had in excess in their
7  customer seg and secured account that ran into
8  hundreds of millions of dollars?
9        MS. BLOOMER:  Objection to the form.
10     A.  No.
11     Q.  Would it surprise you, sir, to learn
12 that Lehman had in excess in its customer seg
13 and secured accounts in excess of $1 million?
14     A.  No.
15     Q.  Why not, sir?
16     A.  I was generally aware that Lehman was
17 one of the largest FCMs in the world, maybe
18 second or third behind my former employer, and
19 that these numbers would not be out of question
20 for the business that they did.
21     Q.  Is it your opinion, sir, that Barclays
22 is entitled to any excess in the customer seg
23 and secured accounts for the Lehman futures
24 business it acquired?
25        MS. BLOOMER:  Objection to the form of
```

Page 220

```
1            A. Leitner
2  the question; the scope that you're seeking.
3        You can answer.
4      A.  Again, my -- I would put this in the
5  context of my report and of all the bases for my
6  report and simply say that these were assets
7  supporting the business, that the parties
8  intended to move to support the business,
9  particularly the FCM business.
10     Q.  You testified earlier, sir, that
11 Barclays had more information about the
12 collateral that was posted in the futures
13 business than it did for the collateral posted
14 in the options business.  Do you remember saying
15 that, sir?
16        MS. BLOOMER:  Objection to the form.
17     A.  I remember saying that.
18     Q.  What information do you believe that
19 Barclays had about the collateral supporting the
20 futures business before it closed the deal with
21 Lehman?
22     A.  I am not sure they had more detailed
23 information.  My reference was to the fact that
24 there had been conversations about the FCM
25 business by Liz James prior to the signing of
```

Page 221

```
1            A. Leitner
2  the APA and an attempt on her part to understand
3  that business, and so I think that she had
4  acquired -- I'm not sure this is her exact
5  testimony -- some degree of knowledge about how
6  that business was run, so -- and she was, of
7  course, a professional at Barclays which had a
8  similar business, maybe not as -- I don't know
9  whether it was as large or not.
10        So that was the basis for my
11 statement.  I don't know that she had any
12 detailed customer- or collateral-related
13 information.  I haven't looked at her deposition
14 for that purpose, so ...
15     Q.  Is it your opinion, sir, that a
16 rational purchaser of Lehman's FCM business
17 would have required 100 percent of the excess in
18 the seg and secured amounts in order to accept
19 the risk associated with managing that customer
20 business?
21     A.  I'm sorry, I thought I answered that
22 already.  The answer is that, as my opinion
23 states, in the context of this transaction, it
24 was the rational thing to do, and given the --
25 all of the factors that I cite in my report,
```

Page 222

A. Leitner

1   A. Leitner
2   including the lack of knowledge, the
3   uncertainties in volatility of the markets, and
4   the -- all the other risk I described.
5   Q.   Lack of knowledge about who, sir?
6   A.   They didn't know who the customers
7   were or how they -- I think that, you know, they
8   knew little more than the general structure of
9   the business.  I don't know how much information
10  they had.  They knew which markets they traded
11  in.
12  Q.   So if you assume for purposes of my
13  question, sir, that there was an excess in the
14  customer seg and secured accounts of
15  approximately a billion dollars, it's your
16  testimony that, in order to take on the risk of
17  managing Lehman's FCM business, Barclays needed
18  to have that billion dollars, otherwise it
19  wouldn't close?
20      MS. BLOOMER:  I object to the question
21  and to the vague timeframe that you're
22  asking about.
23  A.   Look, I -- it's impossible for me to
24  answer this question in the abstract because
25  what's -- just as we found in the options

Page 223

1   A. Leitner
2   clearance business, where there was a 500 -- up
3   to a $500 million move in the margin requirement
4   any given day, the appropriate question to ask,
5   if you had perfect knowledge, was what was the
6   volatility of this FCM business and how much
7   excess could disappear in a particular day of
8   volatility.  I don't know that they knew that.
9   I don't know that -- certainly Barclays didn't
10  know that.
11      And so that's one of the reasons why I
12  said, when you asked me is a billion dollars a
13  lot, I said not necessarily, or words to that
14  effect.  Would I have been surprised if it was a
15  billion dollars, and the answer was no, because
16  it depended on the, you know, customer base and
17  the potential that, you know, because there
18  could have been many hundreds of billions of
19  dollars of underlier for which a move could
20  generate a margin requirement or a mark to
21  market requirement that was substantial.  And if
22  a customer did not post that margin immediately,
23  then there had to be, you know, money in the seg
24  account to be able to cover it.
25  Q.   I'm handing you, sir, what has

Page 224

1   A. Leitner
2   previously been marked as Exhibit 556.  Have you
3   seen this document before, sir?
4   A.   Yes.
5   Q.   When have you seen it, sir?
6   A.   I don't know.  Sometime in the last
7   month.
8   Q.   Do you see, sir, that this is an
9   internal Barclays briefing memo about the
10  potential acquisition of Lehman's futures
11  business?
12  A.   Yes.
13  Q.   It's dated Monday, September 15,
14  correct?
15  A.   Yes.
16  Q.   Can you tell me whether or not
17  Barclays, in this memorandum or elsewhere,
18  identified any of the risks that you have
19  testified are inherent in acquiring Lehman's
20  futures business?
21      MS. BLOOMER:  I would ask that you let
22  him read the document if you're asking if
23  there's something anywhere in the document.
24      MR. OXFORD:  Sure.  We can go off the
25  record for a second if you want to read the

Page 225

1   A. Leitner
2   whole document.
3       (Pause in the proceedings.)
4   A.   Okay.  I've read this.
5       Sorry, what was the question?
6   Q.   Can you tell me whether or not
7   Barclays, in the memorandum that you have in
8   front of you, identified any of the risks that
9   you have testified are inherent in Barclays'
10  acquisition of Lehman's futures business?
11  A.   I don't see any such discussion in
12  this memorandum.
13  Q.   Okay.  Actually, just while you have
14  that in front of you, sir, do you agree that
15  Barclays identifies as a benefit to Barclays'
16  taking over Lehman's FCM business that it will
17  allow BarCap to double its business in size by
18  adding annual revenues of approximately $250
19  million?
20  A.   I see the statement.
21  Q.   Do you disagree with that statement?
22      MS. BLOOMER:  Objection.
23  A.   I don't disagree with the fact that
24  it's in the memorandum.
25  Q.   Do you disagree with it?

Page 226

A. Leitner

1
2    A.    I have no opinion one way or the other
3    as to whether it's true.
4    Q.    You have no reason to disbelieve that
5    it's true?
6        MS. BLOOMER:  Objection to the form of
7    the question.
8    Q.    No reason to doubt that statement,
9    sir?
10       MS. BLOOMER:  Object to the form of
11   the question.
12   A.    I have no reason to believe it.  I
13   have no reason to doubt it.  I have no opinion
14   whatsoever.
15       (Exhibit 656, and article from Futures
16   Magazine, marked for identification, as of
17   this date.)
18   Q.    I'm handing you, sir, what I have
19   marked as Exhibit 656.
20       Do you recognize that document, sir?
21   A.    Yes, I do.
22   Q.    Can you tell me what it is, please?
23   A.    It's an article that I wrote for
24   Futures Magazine.
25   Q.    Could you turn to the third page, sir?

Page 227

A. Leitner

1
2    A.    Okay.
3    Q.    Do you agree in the shaded box you
4    identify some of the risks inherent in the
5    business of a futures commission merchant?
6        MS. BLOOMER:  Which page and which
7    shaded box?  Can you give me a page number?
8        MR. OXFORD:  The third page, Trish.
9    It's page 58.
10       MS. BLOOMER:  Okay.  Again, we have
11   double-sided copies, so it's just confusing
12   to say "the third page."
13       Page 58.  And where is the shaded
14   portion?
15   Q.    Do you see, sir, there's a box
16   entitled "Understanding the Differences in
17   Securities and Futures" --
18       MS. BLOOMER:  I don't see a box and I
19   don't see a shaded portion.  I see the
20   title.  I just want you to know there's no
21   shaded on our versions.  He needs to know
22   what you're directing him to.
23   Q.    Do you see the words, sir,
24   "Understanding the Differences in Securities and
25   Future Margin Rules"?

Page 228

A. Leitner

1
2    A.    Yes.  What's your question?
3        MS. BLOOMER:  Do you need a moment to
4    familiarize yourself with the article?
5        THE WITNESS:  Yes, I saw it a little
6    while ago.  So what's the question?
7    Q.    Could you turn your attention, sir, to
8    the penultimate paragraph on that page that
9    begins "in futures land"?
10   A.    Yes.
11   Q.    Do you see that, sir?
12   A.    Yes.
13   Q.    It says, "In futures land, margin is
14   passed through the futures commission merchant
15   to the clearing house.  The FCM is not, in the
16   usual case, extending its own credit to the
17   customer.  That is not to imply that there is no
18   intermediary credit risk in futures.  FCMs, like
19   broker-dealers, face customer default risk."
20       Do you see that, sir?
21   A.    Yes, I do.
22   Q.    You go on to write that, "To mitigate
23   their risk to their clearing members, derivative
24   clearing houses -- both the futures clearing
25   houses and the OCC for U.S. listed options --

Page 229

A. Leitner

1
2    have developed models to determine the market
3    risks inherent in the portfolio positions
4    carried by their members and to collect margin
5    commensurate with that risk."
6        Do you believe that's an accurate
7    statement, sir?
8    A.    I would call it accurate, but
9    incomplete in one respect.
10   Q.    In what respect is it incomplete, sir?
11   A.    It is not the practice, necessarily,
12   in respect to foreign futures that the customer
13   margin is passed through to the clearing house,
14   and in fact, in the institutional marketplace,
15   customers will negotiate with a FCM essentially
16   to earn interest from their futures margin
17   deposits that necessitate the FCM using its own
18   funds to post at the clearing house and/or in
19   the futures account.
20       So sometimes the margin is not, quote,
21   passed through, unquote, to the clearing house.
22   The point I was making in the mitigation section
23   is that, at the intermediary level, in some
24   cases they may collect more margin from the
25   customer than is required for initial margin.

Page 230

A. Leitner

1  
2  Although, again, the practice in the
3  institutional marketplace is that institutions
4  usually have the market power to put up only
5  what they're required to put up.
6      Q.   Do you know whether or not Lehman
7  collected more margin from its customers than
8  was required by the initial margin?
9      A.   I don't know.
10         MR. OXFORD:  Can we go off the record
11  for one second?
12         Can we take a short break?
13         (Recess; Time Noted:  4:07 P.M.)
14         (Time Noted:  4:13 P.M.)
15  BY MR. OXFORD:
16      Q.   New topic.  Sir, could you turn to
17  paragraph 20 of your report, please.  Is it your
18  opinion, sir, that there was a substantial risk
19  that if Lehman did not transfer its
20  exchange-traded derivatives to Barclays and its
21  responsibilities as a clearing broker to
22  Barclays, that the accounts would have been
23  liquidated and some or all of the collateral
24  supporting those positions would have been wiped
25  out?

Page 231

A. Leitner

1  
2      A.   Yes.
3      Q.   You say in your report, sir, at
4  paragraph 46 and 47 that margin is calculated to
5  ensure that the net liquidating value of
6  positions is not less than zero, correct?
7      A.   Yes.
8      Q.   And what that means, sir, is the OCC
9  requires a broker-dealer to post sufficient
10  collateral such that if it had to liquidate
11  those positions, the OCC is comfortable it
12  wouldn't make a loss; is that correct?
13         MS. BLOOMER:  Objection to form.
14      A.   Yes, that's the purpose of the
15  calculation.
16      Q.   And would you agree with me that the
17  OCC builds in a cushion to protect itself when
18  it's calculating those margin requirements?
19      A.   Yes.
20      Q.   Have you, in your experience, sir,
21  ever come across a situation where the OCC has
22  liquidated a broker-dealer's positions and all
23  of the margin posted in the OCC has been
24  exhausted in liquidating those positions?
25      A.   I cannot remember the outcome of the

Page 232

A. Leitner

1  
2  liquidation of a firm in Chicago that -- and
3  exactly, you know, what the outcome was, but
4  there's been at least one liquidation of a
5  firm's positions, but I don't know.
6         I mean, let's keep in mind that the
7  OCC also has the right, and does in fact
8  exercise that right, to conclude that the model
9  run overnight for the beginning of the day is
10  not enough and to make an intraday call, and has
11  done so in periods of market volatility for all
12  members.
13      Q.   So, back to my question, sir.  You're
14  not aware, in your experience in the industry,
15  of a situation where it has ever happened that
16  the OCC liquidating a broker-dealer's position
17  has run through the entirety of the margin
18  posted by that member at the OCC?
19      A.   Unlike the CME, I'm not aware of an
20  option of a clearing member.  I am -- exhausting
21  the margin.  But similar models are used by
22  intermediaries for market professionals, and I
23  am aware that those models are not perfect and
24  there have been defaults by clearing firms of
25  market members using exactly the same portfolio

Page 233

A. Leitner

1  
2  margin modeling strategy that have exhausted the
3  collateral put up at the -- at the clearing
4  member.
5         So that would be, by the way,
6  essentially what Barclays was doing in OCC for
7  the affiliates.  They were clearing those folks
8  as though they were members.
9      Q.   In the circumstances that you just
10  testified to, where intermediaries from market
11  professionals use a similar margining system as
12  the OCC?
13      A.   Right.
14      Q.   Was there excess margin above and
15  beyond the exchange minimum requirements that
16  was also exhausted?
17      A.   Absolutely.
18      Q.   What were those situations, sir?
19      A.   They were situations that were -- I
20  don't remember the specific circumstances, but
21  prior to the acquisition of First Options
22  Corporation by Goldman Sachs, and in connection
23  with the market break of 1987 when First Options
24  was operating on its own and almost went under,
25  it was brought under by the fact that it was

Page 234

A. Leitner

1  performing that business for a number of, you
2  know, market professionals and they blew them
3  out.
4       Again, that was 1987. It was a period
5  of extreme volatility, just like we had at the
6  time that Lehman went under and for the month
7  thereafter. So those are -- those periods are,
8  fortunately, infrequent, but they were true here
9  in this case.
10       Q. Is it your testimony, sir, that the
11  rules used to margin by First Options
12  Corporation back in 1987 were identical to the
13  OCC's margin rules in 2008?
14       A. My recollection is that models were
15  being use at that time.
16       Q. I understand models were being used at
17  that time, sir, but is it the same model? Is it
18  exactly the same?
19       A. I don't remember. Don't remember.
20       Q. You can't testify one way or the other
21  whether the same model was used in the example
22  you gave as was used by the OCC to margin in
23  2008, correct?
24       A. No.

Page 235

A. Leitner

1       Q. Is it consistent with your experience
2  when the OCC liquidated a broker-dealer's
3  positions and all of the margin was not
4  exhausted --
5       A. I don't have any specific case in mind
6  to answer that question.
7       Q. Okay. Well, let me ask this question,
8  Mr. Leitner. If the scenario that you described
9  at paragraph 20 of your report happened, by
10  which I mean to say that the OCC had stepped in
11  and liquidated Lehman's positions, if the
12  margining requirements worked as they were
13  intended to and protected the OCC, there would
14  be margin left over to return to the
15  broker-dealer, or at least the broker-dealer
16  should be flat?
17       A. Absolutely not.
18       Q. Why not?
19       A. All you need is two market moves like
20  you had between the, I think it was the 15th and
21  16th, or one of those days, when the market
22  moved adversely to the proprietary positions by
23  a significant amount. If you had that movement
24  two days and you started the liquidation on day

Page 236

A. Leitner

1  one, you would have -- and they hadn't put the
2  collateral up, you would have blown through
3  everything.
4       So the risk is that the model works
5  assuming you can have an orderly liquidation and
6  a fairly static market, but if the volatility is
7  over and above the volatility used in the model,
8  then it suddenly doesn't work. And I think
9  there was every reason to believe by the folks
10  at Barclays on Monday and Tuesday when they were
11  deciding to do this deal that that was a
12  substantial risk.
13       Q. Sir --
14       A. And nor would they know at that time
15  whether they would have enough collateral, too
16  much, too little by the time they closed the
17  deal on Monday when they had to make the
18  decision about whether to do it and to sign the
19  APA. That would be true of futures, it would be
20  true of options, and all of the OTC derivatives
21  that they had.
22       Q. In the event that the OCC did go ahead
23  and close out Lehman's positions and all of the
24  margin was not used up, do you agree that in

Page 237

A. Leitner

1  that situation the remaining margin would be
2  returned to the LBI estate?
3       A. I'm sorry, would you help me make sure
4  I understand your hypothetical?
5       Q. Of course.
6       A. Just say it again. Let's go through
7  it in steps.
8       Q. In the event that the OCC had
9  liquidated LBI's positions at the OCC and the
10  margin that LBI had posted to the OCC was not
11  exhausted by that liquidation process, the
12  remaining margin would be returned to the LBI
13  estate, correct?
14       A. I believe I refer to the OCC rules in
15  my report. I believe that would be the outcome,
16  that any assets left over would be returned to
17  the defaulting member.
18       Q. But it's your opinion, sir, that a
19  liquidation by the OCC could have wiped out all
20  of the margin held by the OCC, correct?
21       A. Absolutely.
22       Q. But you can't testify as to what would
23  have happened?
24       MS. BLOOMER: You have to answer

Page 238

A. Leitner

1 verbally.
2    A.    I can only testify that the rules
3 allow for a liquidation, and you would need to
4 know what the market conditions were under which
5 the liquidation occurred in order to make any
6 determination as to what the outcome would be.
7    Q.    Did you do any analysis, sir, of what
8 the outcome would have been if Barclays had not
9 bought LBI's derivatives business?
10    A.    No.
11    Q.    You haven't done any analysis to allow
12 you to testify that all of the margin that LBI
13 posted at the OCC would have been exhausted by a
14 close-out, a liquidation by the OCC?
15    A.    Could have been, not would have been I
16 believe was what I said in my opinion, and I
17 gave you a scenario just a short time ago in
18 which that could have happened, and it was a
19 scenario that in fact it occurred during that
20 week at least on one day.
21    Q.    And it also could have happened, sir,
22 that there would have been substantial margin
23 left over after the OCC liquidation, correct?
24    A.    Take a snapshot anytime you want and

Page 239

A. Leitner

1 you will get a different outcome.
2    Q.    You just don't know one way or the
3 other whether or not there would have been any
4 margin left over by the liquidation by the OCC
5 of Lehman's positions, correct?
6    A.    The point is that on Monday and
7 Tuesday of that week, nobody knew.  What they
8 did know is that the risks existed.
9    Q.    Can you tell me, sir, going back to
10 your rational purchaser example -- actually, to
11 take a rational seller example, why would a
12 rational seller of Lehman's positions and margin
13 at the OCC prefer to give that margin to
14 Barclays, including up to $700 million of excess
15 margin, rather than take the chance that, after
16 an OCC liquidation, there would be excess margin
17 to return to the estate?
18    A.    You're assuming that on Monday and
19 Tuesday of that week that Lehman would have
20 known those numbers and known those factors.
21 They didn't know them.  The question was
22 whether, given the knowledge that Lehman had and
23 that Barclays had prior to the execution of the
24 Asset Purchase Agreement, what motivated them to

Page 240

A. Leitner

1 do the transaction.
2        My conclusion was that a person in
3 Lehman's position, thinking of the derivatives
4 book and knowing the issues -- and I'm, by the
5 way, assuming that Lehman had certainly
6 knowledge of -- more knowledge than Barclays had
7 about the risks inherent in having to carry the
8 positions of the affiliates and so forth and the
9 ability to get rid of those risks and move them
10 over to Barclays, that they would have been well
11 motivated for all the reasons I stated to get
12 rid of it and to do so with the margin moving
13 over.
14    Q.    Do you agree, sir, that if Lehman had
15 not agreed to transfer the exchange-traded
16 derivatives business to Barclays, in the event
17 of the OCC's liquidation of its positions, it
18 would have been rational for Lehman to prefer to
19 have the OCC close out its positions in the
20 expectation that some of that margin posted at
21 the OCC would have been returned to Lehman?
22        MS. BLOOMER:  Object to the form of
23    the question.
24        To prefer it to what, Neil?

Page 241

A. Leitner

1        MR. OXFORD:  To prefer it to a
2    transfer to Barclays.
3    A.    Again, on Monday and Tuesday of that
4 week, the entire discussion, as I understand it
5 and have stated in my report, is based on a sale
6 of businesses that included this exchange-traded
7 derivatives clearing operation, and I believe
8 that LBI was appropriately highly motivated to
9 move all of the risks of that business.
10        And you are now doing what we did
11 earlier in this deposition in which you're
12 asking for a hypothetical on a subset of the
13 risks that would evolve in the business deal.
14 And frankly, I refuse to go there because I
15 don't believe that that's relevant to my report.
16 And so dealing with hypotheticals that have to
17 do with something that was never on the table
18 and the parties never considered doesn't seem to
19 me to advance the ball.
20        You know, would have, could have,
21 should have could be asked throughout this
22 transaction when, you know, under the unique set
23 of pressures that everybody was under, this was
24 the way to get the deal done.

Page 242

A. Leitner

1  
2     Q.   Are you familiar at all, sir, with the
3  S.E.C.'s Customer Protection Rules?
4     A.   In a general way, I am.
5     Q.   Do you understand that margin that's
6  posted at the OCC for customer positions is a
7  debit in the customer protection formula, the
8  S.E.C. Rule 15c3 formula?
9        MS. BLOOMER:  Objection.  Beyond the
10     scope of his opinion and expertise.
11     A.   I'm aware that it is, yes.
12     Q.   I'd like you to assume that Lehman had
13  a $507 million debit in its 15c3 calculation as
14  of September 19 and that debit relates to the
15  margin that it had posted at the OCC for its
16  customer business.  You with me so far?
17     A.   Okay.  What day?
18     Q.   September 19.
19     A.   Okay.
20     Q.   And I'd also like you to assume for me
21  that if it did not have that debit, there would
22  be a shortfall in the customer reserve fund.
23        With me so far?
24     A.   Sort of.
25     Q.   Do you agree that if that margin, sir,

Page 243

A. Leitner

1  
2  that $507 million for which Lehman placed a
3  debit in the customer reserve formula, if that
4  $507 million was sold to Barclays for its own
5  account, there would be a deficit in Lehman's
6  15c3 reserve fund?
7        MS. BLOOMER:  I object to the form of
8     the question, to the factual basis for the
9     assumptions, and to the vagueness of the
10     timeframe that you're asking about.
11     A.   The answer is I can't answer that
12  because you haven't given me enough facts
13  because the customer reserve formula is based
14  upon all the position you have for customers,
15  and my question is where did the customers go.
16  So I have to find out where the credits are.
17        If you transfer the customer accounts,
18  then you've transferred the credits.  So the
19  actual reserve formula is subject to a
20  recalculation at some point.  What I do is call
21  Mike Macchiaroli and say what should I do.
22        MR. OXFORD:  Can we go off for a
23     second?
24        (Pause in the proceedings.)
25     A.   Just, if I could for the record, I've

Page 244

A. Leitner

1  
2  known Mike Macchiaroli for a long time and so
3  I've discussed a lot of issues with him, so my
4  remark was a facetious remark.
5        I mean, I know this was a complicated
6  matter in which the S.E.C. was all over it, but,
7  you know, I don't pretend to be an expert in the
8  formula.  I know a little bit more about custody
9  and control than I do about the formula.  I know
10  enough to know I've got to ask my former
11  colleague at Goldman, who's the real expert.
12     Q.   Could you turn to paragraph 94 of your
13  report, sir.
14        Do you have it there, sir?
15     A.   Yes, sir.
16     Q.   You see, "With respect to posted
17  collateral, under normal circumstances, a buyer
18  and seller would have reached an agreement about
19  whether the transfer of ETDs would come with or
20  without the related collateral."  Do you see
21  that, sir?
22     A.   Yes, sir.
23     Q.   Can you give me some examples of
24  business deals you are familiar with in which
25  the transfer of exchange-traded derivatives came

Page 245

A. Leitner

1  
2  without the related collateral?
3     A.   First of all, this situation is so
4  unique.  The answer would be that all the
5  situations that I'm aware of were done in the
6  normal course of acquiring the company and,
7  therefore, all of its assets including all of
8  the collateral securing its position.
9        So, you know, normally when you buy a
10  business, you buy all of the assets supporting
11  that business through an acquisition of stock.
12  This transaction was extraordinarily complicated
13  because it was -- of its being structured as an
14  asset purchase and liability assumption.
15        I mean, that was the whole purpose of
16  my report, was to say how complicated it is, and
17  although we are focusing on paragraph 94, I
18  would just want to, you know, note for the
19  record that my discussion of the unusual
20  circumstances of this case and sort of normal
21  ways you would do this begins on paragraph 91.
22     Q.   Okay.  With that narrative, sir, can
23  you answer my question?
24     A.   You have to read the question again.
25        (Record read.)

Page 246

A. Leitner

1
2    A.    No, I do not know of any business
3    deals where they did not come without the
4    related collateral.
5    Q.    And in the business deals where the
6    exchange-traded derivatives came with the
7    related collateral, sir, how was that collateral
8    valued?
9        MS. BLOOMER:  Objection to the form.
10    A.    In the cases I'm familiar with, the
11    collateral was not separately valued.  The
12    business as a whole was valued and there was a
13    consideration given for the acquisition of the
14    business.  Easy to do in an ongoing concern
15    case.
16    Q.    I understand your point, sir.
17        In the transaction that you are
18    familiar with where the collateral was valued as
19    part of the business as a whole, is that
20    collateral valued typically dollar for dollar?
21        MS. BLOOMER:  Objection to the form of
22    the question and to the characterization of
23    his testimony.
24    A.    I don't know the answer to that
25    question.  I'm not trying to be vague here, but

Page 247

A. Leitner

1
2    as I've stated in the report, for a firm that's
3    anywhere like Lehman, you are starting with a
4    whole book of business, long and short -- again,
5    just talking about the equity business -- long
6    and short equity business, all of the trading
7    that they do, market-making and so forth, you've
8    got all these businesses and you've got
9    exchange-traded derivatives, and you've got the
10    collateral supporting those businesses, and that
11    total book, including the capital and the
12    liquidity and related costs of maintaining that
13    collateral position, has a cost and a value.
14        And so the assessment about, quote,
15    what it's worth is based on, you know, numerous
16    factors because it may be the case that
17    collateral is provided by letters of credit or
18    by assets you might have hanging around or
19    assets that you've brought in through borrowing.
20        So it is not just simple to say
21    whether the collateral is just assets free and
22    clear.  The fact is that collateral are not free
23    and clear assets once they're posted as
24    collateral.
25    Q.    Do you know, sir, why Barclays wanted

Page 248

A. Leitner

1
2    to buy Lehman's derivatives positions?
3        MS. BLOOMER:  Objection.  Assumes
4    facts not in evidence.
5    A.    No, I don't know specifically why,
6    other than, again, as I state in my report, if
7    they were buying the businesses, the capability
8    and the exchange-traded derivatives were an
9    integral part of all of the businesses that they
10    were buying, the FCM business and the capital
11    markets business.
12        For them to be intermediaries in the
13    capital market business, they would have needed
14    to have and maintain exchange-traded
15    derivatives, so they were integrally related to
16    these other businesses.
17        MR. OXFORD:  Can we go off the record
18    and take another short break?  I think we
19    may be close to finishing up.
20        MS. BLOOMER:  Sure.
21        (Recess; Time Noted:  4:45 P.M.)
22        (Time Noted:  4:51 P.M.)
23    BY MR. OXFORD:
24    Q.    Mr. Leitner, I'm handing you what is a
25    complete copy of the document that was

Page 249

A. Leitner

1
2    previously marked at a deposition as Exhibit
3    554.
4        I handed you an excerpt before and
5    said I would get you the full copy, so now I've
6    handed you the full copy.
7    A.    Great.  As long as I don't have to
8    take it with me.
9    Q.    I'll leave that between you and your
10    counsel.
11        MS. BLOOMER:  I hope I don't have to
12    take it with me either.
13    Q.    Are you able to tell me, sir, now that
14    you have the full document, whether that is the
15    document you reference in page 91 of your
16    report -- sorry, paragraph 91 of your report?
17        MS. BLOOMER:  Is this the first or the
18    second of the two e-mails that had a list of
19    options positions?  Because I just don't
20    want him to be confused.  There were two
21    different sets of lists that went on the
22    same day at about the same time.
23        MR. OXFORD:  This I believe is the
24    first, based on the time stamp.
25    A.    Okay.  Yes, it is.

Page 250

A. Leitner

1
2    Q.   Do you agree, sir, that this
3    information would have been important for
4    Barclays to have to enable it to assess the
5    risks it was facing in acquiring Lehman's
6    derivatives portfolio?
7        MS. BLOOMER:  Objection.  Asked and
8        answered, I believe.
9        A.   It would have been nice for them to
10   have it before they signed the APA.
11       Q.   My question is a little different,
12   though, with respect, sir.  My question is would
13   it have been important for Barclays to have this
14   document to enable it to assess the risks it was
15   facing in acquiring Lehman's derivatives
16   portfolio?
17       A.   Yes, it would have been important to
18   help them assess the risks.
19       Q.   And you don't know, sir, whether or
20   not Barclays asked for this document or
21   information to be produced to them prior to the
22   afternoon of Friday, September 19?
23       A.   No, I do not.
24       Q.   Are you able to tell me, sir, by
25   reviewing this document, whether it contains

Page 251

A. Leitner

1
2    information on exchange-traded derivatives only
3    or also over-the-counter derivatives?
4        A.   I have not examined the document for
5    that purpose, so I couldn't tell you.
6        Q.   Can you take a moment to tell me
7    whether you're able to answer that question?
8    Obviously I'm not expecting you to read every
9    single line of 760 pages, but --
10       MS. BLOOMER:  I'm going to object to
11       the form of the question.
12       A.   Since this document is not identified
13   as an OCC report that is one generated from the
14   Options Clearing Corp. related solely to its
15   positions, and because there are not identifiers
16   for the options with which I would be familiar
17   with, which is either the option identifier,
18   Cusip number, or the like, I actually can't -- I
19   can't make that distinction.
20       Q.   Okay.  Do you, on the last page, have
21   a subtotal and a total?
22       A.   Yes, okay, subtotal and total.
23       Q.   And between the lines of "Subtotal"
24   and "Total," do you have a line that reads "OCC
25   Options Netting"?

Page 252

A. Leitner

1
2    A.   Yes.
3        Q.   Does that suggest to you, sir, that
4    this report includes only exchange-traded
5    derivatives at the Options Clearing Corporation?
6        A.   Without more information, it doesn't
7    suggest anything to me.  I've made no judgment
8    about what this would mean, and in any case,
9    these guys got it apparently on Friday after the
10   deal had already been struck on
11   Tuesday/Wednesday.
12       Q.   Do you know which computer system this
13   is generated from?
14       A.   No, I don't.
15       Q.   And do you have any information, sir,
16   about source data or data feed for the system
17   that generated this report, sir?
18       A.   I -- I'm not sure I've ever known
19   where this came from.  If I knew, I've
20   forgotten.
21       (Exhibit 657, a document bearing Bates
22   Nos. BCI-EX-(S)-00075257 with attachment,
23   marked for identification, as of this date.)
24       Q.   Handing you, Mr. Leitner, another
25   weighty document that I've marked as Exhibit

Page 253

A. Leitner

1
2    657, sir.  You see that the e-mail has the Bates
3    number BCI-EX-(S)-00075257, you see that, sir?
4        A.   Yes.
5        Q.   Does that help you answer my question
6    as to whether or not this is the document, the
7    second document referenced in paragraph 91 of
8    your report?
9        A.   I'm sorry, the second document?
10       Q.   Yes.  You referenced two documents in
11   paragraph 91, sir.  I'm asking you if that's the
12   second document.
13       A.   Yes.
14       Q.   It appears, sir, to be in similar form
15   to the last exhibit we looked at, is that
16   correct?
17       A.   I'm sorry?
18       Q.   It appears to be a document in similar
19   form to the document we just looked at, the
20   exhibit we just looked at?
21       MS. BLOOMER:  Objection to the form of
22       the question.
23       A.   Well, it is formatted differently and
24   it has different data.  I also note that the --
25   both documents contain a reference to what looks

Page 254

A. Leitner

1  to be like an internal Lehman Brothers business
2  unit or division responsible for the maintenance
3  of the positions, for example, Equity
4  Strategies, Liquid Market Americas, and the
5  like.
6        So I guess I would amend my prior
7  statement to say that this was not a -- these
8  documents are not OCC-generated, but are,
9  rather, internally generated documents by Lehman
10 Brothers, because there is no way that OCC would
11 know which internal profit center was
12 responsible for these positions.
13    Q.   On the first page of the attachment,
14 sir, do you see that there is a heading that
15 reads "Long Options"?
16    A.   Which attachment?
17    Q.   The --
18    A.   The second one?
19    Q.   Yes, Exhibit --
20    A.   The one 657?
21    Q.   657, the one I just handed you.
22        MS. BLOOMER:  Can you repeat the
23 question?
24        MR. OXFORD:  Sure.

Page 255

A. Leitner

1    Q.   Do you see there's a heading entitled
2  "Long Options"?
3    A.   Yes.
4    Q.   And at the bottom of that page headed
5  "Long Options," there's a total, sir?
6    A.   Yes.
7    Q.   And the total of long options on this
8  report is approximately $2.9 billion, do you see
9  that, sir?
10        MS. BLOOMER:  Objection to the form of
11 the question.  Mischaracterizes the
12 document.  I don't think I see a dollar sign
13 anywhere.
14    A.   Well, there's a number 2.9 million and
15 it says "total," but I don't know what's the
16 total of what.  If it's subtotal minus OCC
17 option netting and then total, but I have no
18 idea what the OCC option netting means, nor is
19 it clear whether this report speaks of -- what
20 date it speaks of, whether it was a report
21 produced as all the options at the close of
22 business on the 19th --
23    Q.   Well, sir, I don't mean to interrupt
24 you, but perhaps --

Page 256

A. Leitner

1        MS. BLOOMER:  You shouldn't interrupt
2  him.  Let him finish his answer.
3    Q.   If you look at the e-mail, sir, it'll
4  answer that question.
5    A.   Oh, "9/18 close."  Okay, so --
6    Q.   Okay.  So if you turn your attention
7  to the e-mail, then I think we can get out of
8  here.
9    A.   Okay.
10   Q.   You see that the bottom e-mail
11 Christopher Mincak sends to you, Stephen King
12 and others at Barclays on September 19 at 4:45
13 P.M.?
14   A.   Yes, sir.
15   Q.   You see that?  "Net long options.
16 Attached are the options.  Awaiting the risk
17 report from Risk.  Chris."  Do you see that,
18 sir?
19   A.   Yes.
20   Q.   Does that appear to be Exhibit 556
21 which we marked earlier in the deposition and I
22 have now given you the full 760-page --
23        MS. BLOOMER:  I think we need to ask
24 the question again.  That was very -- I

Page 257

A. Leitner

1  don't even understand what you're asking.
2        MR. OXFORD:  You know what, it doesn't
3  matter.
4    Q.   Do you see the top of the e-mail, sir?
5  And again, I'm looking at 657, sir.
6    A.   Yes, sir.
7    Q.   Mr. Mincak writes to Mr. Yang, Mr.
8  King and others at Barclays, "As included short
9  options, long/shorts as of yesterday's close,
10 9/18"?
11   A.   Yes.
12   Q.   Do you see that, sir?
13   A.   Yes.
14   Q.   Again, would this information
15 contained in this report have been useful to
16 Barclays in assessing the risk attendant in
17 assuming responsibility for Lehman's
18 exchange-traded derivatives positions?
19        MS. BLOOMER:  Objection.  Vague and
20 ambiguous.
21   A.   The answer is I don't know how useful
22 it would have been.  Better than nothing, but I
23 don't -- I can't say anything beyond that
24 because it's already a day old.  You don't know

Page 258

A. Leitner

1  how many of the positions may have changed over
2  the day, and they may have been significant
3  positions that changed over the day.  And most
4  importantly, you don't know at this point
5  exactly which options that are still on the
6  books are going to now be in the money and
7  exercised the next day.
8       So, in order to do a kind of full
9  analysis of where you're going to be at the
10 opening of business Monday is going to take the
11 whole weekend is going to take this.  None of this
12 information was known on Tuesday when these guys
13 agreed to do this deal.
14      So the fact that they got it by the
15 weekend is good, but there's very little, I
16 believe, that Barclays could have done with this
17 other than to say, oh, we've got some gross
18 numbers here, we seem to be this amount short,
19 this amount long, maybe we should sell some S&P
20 puts or something or buy something.
21      And I don't know, you know, what they
22 would have done with this other than also with
23 the operations people for them to start figuring
24 out how are we going to get these on our books.

Page 259

A. Leitner

1       So from the operations point of view,
2  you know, it would be very useful because they
3  now have an idea of the size of the positions
4  that they have to convert to their own books and
5  records and to try to figure out how to do that.
6       For the risk managers I think it would
7  be been useful, but less useful.
8    Q.   And for the risk managers, Mr.
9  Leitner, would it be more useful if Barclays had
10 had this information earlier in the week,
11 correct?
12   A.   Absolutely.
13      MS. BLOOMER:  Object to the form of
14   the question.
15   A.   Yes, it would have been useful for
16 them to have it earlier in the week, and it
17 would have been -- but the deal was already
18 done.  I mean, I don't know when you mean
19 "earlier in the week," but the deal was struck
20 on Tuesday and signed Wednesday.  That was the
21 sequence of events, and so your, as far as I'm
22 aware, there was very little information known
23 other than that they were acquiring the books
24 and in some kind of general size at the time

Page 260

A. Leitner

1  they actually signed the deal.
2       MR. OXFORD:  Mr. Leitner, I don't
3    think I have any further questions for you
4    at this time.
5       THE WITNESS:  Thank you for your
6    courtesies and thanks very much for lunch.
7       (Continued on the next page to include
8    the jurat.)

Page 261

A. Leitner

1       MR. DAKIS:  In the interest of time,
2    the Committee has no questions.  However, to
3    the extent the deposition is reopened or
4    continued for any reason, we reserve our
5    right to ask questions at that time.
6       MS. CARRERO:  The estate has no
7    questions either.
8       MS. BLOOMER:  Thank you.
9       MR. OXFORD:  Thank you for your
10   courtesy, sir.
11      (Time noted:  5:08 P.M.)
12          oOo

18      _____

          ANTHONY J. LEITNER

20   Subscribed and sworn to
     before me this    day
21   of      2010.

22   _____

Page 262

```
 1              A. Leitner
 2           CERTIFICATE
 3    STATE OF NEW YORK )
                        : ss
 4    COUNTY OF NEW YORK)
 5         I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9         That ANTHONY J. LEITNER, the witness
10    whose deposition is herein before set forth,
11    was duly sworn by me and that such
12    deposition is a true record of the testimony
13    given by such witness.
14         I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18         I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23         In witness whereof, I have hereunto
24    set my hand this 25th day of February, 2010.
25         -------------------------------
```

Page 263

```
 1              A. Leitner
 2            INDEX
 3    TESTIMONY OF A. LEITNER:               PAGE
 4    Examination by Mr. Oxford ................    5
 5
 6    EXHIBITS:                    PAGE
 7    Exhibit 652, Report of Anthony J. Leitner       8
 8    Exhibit 653, a document bearing Bates Nos.     58
 9    BCI-EX-(S)-00074256 through 57
10    Exhibit 654, an e-mail from Sheila Zach to    192
11    Richard Konefal at Barclays Capital copied to
12    Dan Dzeimian and others Monday, September 22
13    at 4:41 P.M.
14    Exhibit 655, handwritten notes           214
15    Exhibit 656, and article from Futures Magazine 226
16    Exhibit 657, a document bearing Bates Nos.    252
17    BCI-EX-(S)-00075257 with attachment
18
19
20
21
22
23
24
25
```

Page 264

```
 1              A. Leitner
 2    NAME OF CASE:  In re:  Lehman Brothers
 3    DATE OF DEPOSITION:  February 25, 2010
 4    NAME OF WITNESS:  Anthony J. Leitner
 5    Reason Codes:
 6       1. To clarify the record.
         2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
      From _____ to _____
 9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25         _____
```

## A

**ability (11)**
72:9 91:2 111:9,10,11
112:7 120:9 134:4
134:16 186:2
240:10
**able (31)**
14:19 33:15 46:16
52:21 53:18 54:9
64:21 108:3 111:22
116:16,24 121:19
138:23 139:12
144:22 145:23
165:22 166:3 174:5
176:16 179:21
180:7,11,13 196:11
205:17 213:24
223:24 249:13
250:24 251:7
**Absolutely (5)**
47:16 233:17 235:18
237:22 259:13
**abstract (3)**
74:16 145:21 222:24
**accept (4)**
33:15,18 86:18
221:18
**acceptable (1)**
142:22
**accepted (2)**
34:12 150:23
**access (2)**
179:18 180:25
**accommodate (1)**
151:2
**accommodated (1)**
185:9
**accomplish (3)**
107:12 209:17 213:24
**accomplished (2)**
13:24 93:13
**account (34)**
20:19 34:5,16,19,25
97:3 100:11 101:7
103:20 125:2 126:6
129:3 133:5 142:7
142:23,23,24 152:7
153:8 180:8 188:13
196:3 215:19
216:11,13,14 217:2
217:20,23,24 219:7
223:24 229:19
243:5
**accounted (1)**
67:17
**accounting (9)**

23:12 24:15,23 25:3
25:10,12,14 206:19
206:24
**accounts (53)**
18:19,24 20:20 83:5
83:10 96:19,22,22
96:23 105:17
106:13 113:22
117:22 118:13
121:4 122:12 128:8
132:11,18,21 133:5
137:15 140:24
141:3 142:4,5,9,18
144:16 147:10,11
148:13,16,17,20
150:17,18,23 151:6
151:24 153:5
154:15,21 155:16
158:4,5 210:8
211:24 219:13,23
222:14 230:22
243:17
**account-by-account...**
142:12 143:5
**accurate (11)**
42:22 70:21 74:5 81:9
165:13 166:22
168:8 173:19
178:20 229:6,8
**accurately (1)**
192:25
**acquire (14)**
29:5 77:2 80:16 83:4
83:8 102:18 107:11
109:15 110:11
159:2,22 163:21
172:25 191:14
**acquired (7)**
17:2 19:2 206:9
212:19 213:6
219:24 221:4
**acquiring (26)**
14:15 39:25 74:17
75:5,9,18 82:19,21
101:16 111:13,16
121:16 124:14
127:13 137:16
199:22 200:9
201:13 208:13
212:9 213:11
224:19 245:6 250:5
250:15 259:24
**acquisition (12)**
19:22 20:11 81:17
130:20 208:21
209:5,12 224:10

225:10 233:21
245:11 246:13
**acted (1)**
30:15
**acting (1)**
103:8
**action (4)**
117:6 167:5 212:24
262:15
**activities (1)**
151:3
**activity (2)**
71:7 218:20
**actual (5)**
31:11 111:15 134:2
168:20 243:19
**acute (2)**
130:19 198:22
**add (1)**
110:23
**added (2)**
14:3 65:2
**adding (1)**
225:18
**addition (6)**
7:12 53:20 54:11
56:10 141:18
154:10
**additional (7)**
11:5,24 13:5 107:11
112:20 146:21
169:10
**adequate (2)**
128:16 198:7
**Administered (1)**
1:8
**advance (1)**
241:20
**advantage (3)**
95:16,16 134:4
**adversely (1)**
235:23
**advice (1)**
124:13
**affect (5)**
48:25 50:15,22 51:24
138:18
**affiliate (6)**
13:21 80:3 95:9 97:4
131:22 140:13
**affiliates (9)**
20:20 97:17,24
112:19 185:20,23
189:13 233:7 240:9
**afternoon (2)**
130:2 250:22

**aggregate (1)**
34:14
**ago (6)**
5:19 6:10 201:11
206:6 228:6 238:18
**agree (37)**
21:15,25 26:17,23
32:22 35:2 36:5
42:15 59:9 69:2,4
71:17 74:4 89:18
98:22 102:21 114:3
127:11 135:19
136:20 138:3 146:2
153:19 155:11
181:2 186:10
194:23 202:16,23
203:21 225:14
227:3 231:16
236:25 240:15
242:25 250:2
**agreed (21)**
52:23 53:19 54:11
55:15 56:9 72:13
74:9 90:7 94:17
98:24 100:22
103:24 110:11
128:3 132:16
160:12,16,21,22
240:16 258:14
**agreeing (3)**
186:18 188:18 203:9
**agreement (59)**
20:14 22:11 25:22
26:8,18 27:8,13,14
27:19 29:3,9,12
30:9,14,23 31:13,17
31:21 32:11 35:4
36:22 37:12,21 38:6
38:15 39:19,23
40:14 49:20 50:5,9
53:3,4 54:24 55:5
55:10 63:7 69:9
76:3 85:8,23 86:10
86:14 87:7,22 88:3
89:24 90:15 92:9
101:16,19 106:21
126:23 160:8 161:8
184:18 200:8
239:25 244:18
**agreements (7)**
26:13 37:3,8 57:4
87:3 103:7 110:6
**ahead (4)**
40:9 108:13 151:21
236:23
**al (1)**

1:8
**Albany (1)**
3:14
**albeit (1)**
116:4
**allocation (1)**
142:22
**allow (5)**
28:24 208:2 225:17
238:4,12
**alternative (2)**
115:16,20
**ambiguous (2)**
17:8 257:21
**amend (1)**
254:7
**Americas (1)**
254:5
**AMINA (1)**
4:12
**amount (9)**
108:9 124:18 138:17
138:18 157:20
214:4 235:24
258:19,20
**amounts (2)**
155:23 221:18
**analysis (6)**
21:13 75:11 132:25
238:8,12 258:10
**ancillary (1)**
75:16
**and/or (1)**
229:18
**annual (1)**
225:18
**answer (103)**
10:5 11:7 17:9 24:14
28:14,24,25 29:16
29:25 30:25 31:8,9
31:13 32:14,20 34:4
34:17 36:3 40:10,19
45:10,13 46:11
51:17 54:6,8,25
55:4,18 56:18 62:2
62:14 71:18 74:15
74:22,25 81:23,24
89:25 93:12 97:7,25
99:5,7,8 101:23,24
102:2 104:19 108:4
120:6 121:20 123:8
123:14,21 124:9
126:5,12,14 133:21
134:24 140:15
144:20,20 145:23
148:5 156:13,19,21

156:23,24 157:5
163:5 166:5 169:3
169:17 173:8 179:6
199:15 200:15
201:10 206:6,19,25
206:25 208:8
211:19 220:3
221:22 222:24
223:15 235:7
237:25 243:11,11
245:4,23 246:24
251:7 253:5 256:3,5
257:22
**answered (18)**
34:21 52:4 55:22
71:20 81:16 126:11
140:10 149:7 152:2
156:12,19 157:2
158:10 188:25
189:4,21 221:21
250:8
**answering (2)**
94:2 123:11
**answers (4)**
81:2 83:13,17 148:3
**Anthony (9)**
1:14 2:4 5:2 7:25
130:4 261:18 262:9
263:7 264:4
**anticipate (1)**
79:20
**anticipated (1)**
84:20
**anybody (13)**
16:4 31:2,19 32:9
40:12 51:21 55:14
159:20 170:20
171:20 178:12
179:7 196:4
**anymore (1)**
144:22
**anytime (1)**
238:25
**anyway (1)**
53:15
**APA (36)**
13:11 27:25 28:6 29:7
31:3 37:3,24,25
43:2 44:9 51:23
54:5 55:16 56:20
64:17 65:8 75:8
76:5,22 77:16,18,25
78:4,25 89:16
120:18 126:25
127:19 158:23
159:9,21,23 161:11

221:2 236:20
250:10
**apart (1)**
140:6
**apologize (1)**
159:15
**apparently (1)**
252:9
**appear (2)**
218:2 256:21
**appeared (1)**
184:22
**appears (12)**
39:24 60:17 81:8
104:2 155:22
169:11 184:25
187:20 190:5
217:25 253:14,18
**applies (2)**
126:21 131:8
**apply (4)**
120:17 138:16 139:10
198:14
**appreciate (2)**
140:15 174:8
**approach (1)**
99:7
**approached (1)**
6:6
**appropriate (3)**
147:23 148:4 223:4
**appropriately (2)**
45:10 241:9
**approximate (1)**
6:11
**approximately (10)**
45:19 57:5,22 60:18
60:19 61:4 158:5
222:15 225:18
255:9
**area (2)**
25:2 34:3
**arising (1)**
156:2
**arrangements (1)**
199:3
**article (4)**
226:15,23 228:4
263:15
**aside (3)**
74:3 78:20 111:18
**asked (44)**
8:10,13,18,19 15:3
28:21 34:20 36:13
40:5 41:18 52:3
55:22 68:13,13

81:16 88:7 94:3
100:22 109:23
117:24 126:11
136:18 140:10
152:2 156:11,18,25
158:10 159:20
161:10 163:18,24
172:20 173:23
178:13 188:25
189:4,20 199:14
205:13 223:12
241:22 250:7,20
**asking (30)**
23:11,13 31:25 36:10
41:6,8,12 52:7
81:22 93:5,6 96:24
102:6 114:18 118:7
118:21 123:19,20
157:13 169:4
191:20 206:24,25
209:3 222:22
224:22 241:13
243:10 253:11
257:2
**asks (2)**
88:3 194:10
**aspect (7)**
40:4 53:6 79:22 91:16
100:21 154:3
199:19
**aspects (2)**
162:23 187:10
**assess (6)**
186:2 187:7 192:8
250:4,14,18
**assessing (1)**
257:17
**assessment (2)**
187:19 247:14
**asset (42)**
25:22 26:7,18 27:18
29:3 30:22 31:16
32:23 33:22 35:4
38:6,15 40:13 49:20
50:5,8 51:10 54:23
55:5,9 63:6 69:9
76:2 85:7,23 86:9
96:3,7 107:15,16,20
107:21,23 108:2,5
184:18 200:8
206:12,13 208:22
239:25 245:14
**assets (88)**
21:22 22:16 23:6,7,18
23:20 27:4,10 30:16
31:21 32:12 34:25

35:6,9,19 36:7,7
37:17,24 38:11,25
39:5,11,23 40:15
53:7,9 56:25 60:8
64:16 65:7 66:16,21
68:3,16 69:5,17,21
70:2,24 71:8 72:20
74:10,18 76:23
85:19,22 86:8,20,22
88:17,17 93:19
95:11 127:21
132:22 133:12,15
133:19 134:9,16,17
137:18,19,20,25
138:23 139:3
142:20 146:3,16,22
186:24 187:9
190:15,18,19 191:9
205:20 209:6 220:6
237:17 245:7,10
247:18,19,21,23
**assignment (1)**
55:10
**assisted (1)**
162:14
**associated (41)**
13:7,14 27:4 38:16
39:6 45:2 46:10
52:24 54:13 56:12
68:3 70:25 72:21
73:20 74:11 80:22
94:21 102:19
106:16 116:4,25
130:10,21 131:11
131:15 132:18
138:5,7 140:3,12
141:2 142:16,24
143:7 146:8 149:4
152:3,9 153:16
202:25 221:19
**association (1)**
17:17
**assume (29)**
15:4 18:15 20:15
89:19 90:23 91:19
105:16 106:12
107:10 110:11
123:2 125:8 133:9
136:18 137:13
151:24 152:8 154:4
182:8,13 186:18,22
188:18,23 202:20
212:3 222:12
242:12,20
**assumed (16)**
17:14,24 57:13,17

67:4 89:6,13,14
90:8,9 92:5 94:25
95:14 96:7 103:21
117:2
**assumes (13)**
68:8,20 70:13 74:12
107:3 154:18
164:18,20,25 173:3
174:22 183:12
248:3
**assuming (23)**
70:5,7 73:10 79:19
80:12 97:22 120:8
125:21 136:20
140:17 177:21
186:6,21 191:5
192:4 202:15,22
207:25 211:22
236:6 239:19 240:6
257:18
**assumption (6)**
30:15 67:6 95:20
132:21 209:6
245:14
**assumptions (1)**
243:9
**assurance (1)**
82:19
**assured (1)**
109:12
**asymmetric (2)**
73:9 79:25
**attached (4)**
60:10 195:4,13
256:17
**attachment (10)**
59:4 168:21 169:7,10
169:25 174:4
252:22 254:14,17
263:17
**attachments (1)**
195:4
**attempt (4)**
80:10 145:6 173:16
221:2
**attempted (1)**
201:13
**attempting (1)**
59:10
**attempts (1)**
173:21
**attendant (1)**
257:17
**attended (1)**
162:19
**attention (5)**

35:16 89:4 99:24
228:7 256:7
**attorney (6)**
40:20 41:2,7,9,16,23
**attorneys (6)**
3:5,11,18 4:6 31:8
44:5
**available (6)**
171:16,22 172:3
182:11 184:10
192:2
**avenue (2)**
3:19 44:8
**Awaiting (1)**
256:17
**aware (30)**
16:16 43:11 52:12
54:2 107:5 108:15
108:19 109:5 117:5
149:17 152:5
154:10 161:14
179:10,14,17 183:8
185:15 199:17,23
201:2 209:20
213:25 219:16
232:14,19,23
242:11 245:5
259:23
**A.M (4)**
48:13,14 85:4,5

_____

**B**
**back (42)**
28:15 30:22 32:3
33:13 42:7 50:19
55:17 60:8 66:10
68:21 79:16 81:12
84:21 88:11 96:15
100:17,19 102:11
114:11 126:15
139:21 147:13
149:19,23 150:8
152:8,12 156:7
159:16 165:6 170:7
174:18 175:6
177:15 206:5
214:20,20 216:18
218:17 232:13
234:13 239:10
**backup (1)**
189:5
**bad (3)**
30:4 96:10 98:2
**balance (14)**
59:10,18,25 60:4,9
63:25 67:10,18 68:7

70:3 73:2,8,17
166:13
**balances (2)**
210:16 219:4
**ball (1)**
241:20
**bank (1)**
134:18
**BANKRUPTCY (1)**
1:2
**BarCap (1)**
225:17
**Barclays (364)**
3:11 7:19,21 13:10
14:9,10,12,15,15,25
15:12,14 16:5,9,14
16:14,17,21,23 17:2
17:15,16,25 19:2,21
20:9,14,15,23 26:14
28:5 29:5 30:13
31:2,11,16,19 32:9
32:18 37:4 38:14,15
39:5,21 40:13 42:16
42:24 43:11,20 46:8
46:25 47:20 48:2,22
50:8 51:14,22 52:23
53:20 54:11 55:14
55:23 56:8,8,9,16
59:10 60:8 61:11,21
62:9 63:6,11 64:3
65:7 68:6,10,13,24
70:10,19 72:15,19
73:5,12,20 74:9
75:4,18 76:2,4,25
77:15,21,24 78:3,24
79:9,12,25 80:7,12
80:18 82:19 83:4,8
83:24 87:8 89:19
90:9,10,11 91:12,18
91:23 93:18 94:19
95:22 96:4,8,11,18
97:13 98:3,22,24
100:10,11 101:6,7
101:16 102:18,23
103:10,18,19
105:15,16 106:11
106:12,15,21,23
107:8,11 108:17,20
108:25 109:8,8,10
109:12,15 110:4,19
111:4,21 112:22
113:12 114:3,5,13
114:23,25 115:25
116:3,11,24 118:12
119:14,19 120:4
121:15 130:18

131:20 132:11,21
133:11,12 134:22
135:17,20 136:16
136:19,22,24 137:2
138:3,8,12,13,22
139:15 140:7
141:18,19 144:3,7
144:24 146:15,19
148:19 149:3,10,17
150:5,8,23,25
151:11,22 152:8,8
152:14,15,19 153:4
153:5,5,7,14,23
154:3,5,11,13
155:12,14,24 158:2
158:3,23,25 159:7
159:20,21 161:10
163:20 164:3,13
165:13,15 166:7
168:21 172:12,13
172:20,23,25
173:14 174:11
175:8,23 176:4
177:24 181:12,15
181:18,21,21 182:2
182:3,8 183:9,16,16
183:20,25 184:3,10
185:2,14,25 186:5
186:17 188:17
191:4,8,10,14 192:3
192:4,14,20 193:23
194:10,24,25
195:16,20 196:19
197:16,21 198:10
199:5,8,24 200:7,11
200:12,16 201:12
201:13 202:5,16,18
202:21,24 203:8
206:9 207:6 210:3
210:22,24 211:6,7
211:14,15 212:7,9
212:18 213:6,11,18
213:24 214:14
216:17,22 218:11
218:15 219:21
220:11,19 221:7
222:17 223:9 224:9
224:17 225:7,9,15
225:15 230:20,22
233:6 236:11 238:9
239:15,24 240:7,11
240:17 241:3 243:4
247:25 250:4,13,20
256:13 257:9,17
258:17 259:10
263:11

**Bart (3)**
48:16,20 49:7
**base (2)**
218:22 223:16
**based (41)**
12:23 15:24 26:7 34:2
54:3 59:8 71:3
74:23 80:15 83:23
94:9 108:8 110:8
112:3 119:6 120:9
124:12 125:20
127:10,12 130:17
142:17 157:20
164:11 166:19,21
172:9 175:16
176:21 177:2 178:3
179:13,15 183:23
185:25 205:11
212:15 241:6
243:13 247:15
249:24
**bases (3)**
7:23 110:20 220:5
**basic (1)**
39:19
**basis (20)**
16:8,10 20:8 21:6,9
21:13 60:22 61:16
67:8 88:20 143:3,11
154:2 166:4 167:6
180:16 203:14
209:16 221:10
243:8
**Bates (10)**
47:7,9 58:7 59:9
168:15 194:4
252:21 253:2 263:8
263:16
**Bates-stamped (1)**
215:8
**Battery (2)**
2:6 4:7
**BCI (2)**
181:22 182:2
**BCI-EX (5)**
58:8 252:22 253:3
263:9,17
**bear (4)**
104:22 135:21 136:2
136:5
**bearing (4)**
58:7 252:21 263:8,16
**bears (1)**
136:6
**becoming (1)**
185:15

**been's (3)**
188:14,14,15
**began (1)**
117:6
**beginning (8)**
52:8 83:10 84:3,17
129:9 204:18 205:7
232:9
**begins (6)**
55:18 88:12,16 127:7
228:9 245:21
**behalf (4)**
52:22 53:19 54:10
56:8
**belief (6)**
102:16 113:20 117:20
121:3 126:19
166:21
**believe (91)**
7:20 8:5 9:24 10:21
12:5 17:17 19:14
21:11 23:2 26:13
27:24 32:17 42:23
43:16 44:13 46:11
46:11 51:15 64:3
67:8,20 72:5 81:2
81:11 91:2,17 93:7
94:8 96:25 102:2
103:25 109:7,10
110:3,25 111:8
112:10 113:4
114:24 115:24
116:9,10,15 118:12
126:22 136:15
143:13 145:25
154:23 156:4
160:20,20 163:14
163:16 165:6,7
172:19 173:13,20
182:15,22,24 184:7
186:16 187:20
188:9,10,16 193:12
193:15 198:9
199:14 200:5 202:6
202:7,22 203:6
210:13 218:7
220:18 226:12
229:6 236:10
237:15,16 238:17
241:8,16 249:23
250:8 258:17
**believed (1)**
30:13
**believes (1)**
103:13
**beneficial (1)**

**beneficial (1)**
208:3
**benefit (2)**
199:9 225:15
**benefits (1)**
94:12
**Berkenfeld (3)**
64:14 65:5,11
**Berkenfeld's (6)**
64:4,10 65:22 66:9
69:3,12
**best (14)**
13:24 24:14 31:23
34:16 44:5 46:20
48:24 49:4 71:21
72:6 90:25 97:20
218:12,13
**better (4)**
115:15,18,20 257:23
**beyond (13)**
12:4 24:19 25:6 41:17
67:13 99:3 109:19
199:12 210:25
211:17 233:15
242:9 257:24
**billion (17)**
57:6,22 60:18,20 61:4
61:5 66:25 67:9
68:3 74:6,7 209:25
222:15,18 223:12
223:15 255:9
**billions (1)**
223:18
**bit (4)**
46:4 122:4 197:12
244:8
**Blake (1)**
10:25
**Blake's (1)**
10:22
**blew (1)**
234:3
**blind (5)**
113:15 114:25 115:5
115:7,11
**blood (1)**
262:16
**BLOOMER (283)**
3:15 8:16,25 9:20
11:9 15:22 17:7
18:3 19:11,15,25
21:18,23 22:19 23:5
23:8 24:6,12,19
25:6,15 26:10,21
27:22 28:8,17,21
29:8,13,21 30:2

31:5 32:13,19,24
33:6 34:10,20 35:25
36:9 37:9,19,25
38:7,18 39:8,16
40:17,24 41:5,24
42:6,19 43:3,14,22
45:5,8,17 47:8,16
47:23 48:8,23 49:2
49:21 50:12,17 52:3
53:24 54:16,19
55:21,25 56:14
58:15 59:12,20
60:11 61:6,22 64:7
64:18 65:9,23 67:2
67:12,22 68:8,18
69:10 70:12 71:20
72:23 74:12 76:6
79:14 80:24 81:15
83:12 84:25 86:11
87:10,17,22 88:2
89:22 91:5,22 92:8
92:19 93:9,25 96:12
98:4 99:2 101:9
102:5,13,24 103:22
104:14,16 105:4
106:18 107:3,22
108:22 109:2,18
111:24 112:13,25
114:8,15 115:3,19
115:22 116:10
117:4 118:6 120:5
121:10 122:21
123:8,14 124:7
125:17 126:10
127:2 129:11
132:13 135:24
138:14 140:9 141:9
141:11,15 143:9,24
144:9 145:14 147:2
147:16,22 148:2
149:21 150:10
151:17,25 153:11
154:17 155:18
156:10,18,25 158:9
159:10,13 160:7,15
160:18,22 163:4,7
164:17,22 165:19
167:7,20 168:2,5,16
169:2,14,23 170:6
170:13,22 171:4
172:6 173:2,25
174:17,21 175:25
176:8,19 178:21
180:17 181:6
182:20 183:4,11
184:3,11,19 186:11

188:24 189:3,20
190:22 191:15
192:23 197:22
199:11 200:19,22
201:3 202:11 203:3
203:25 204:6,12
205:22 206:16
207:8 208:25
210:11 211:4,11
212:21 213:21
214:20,23 215:2,9
215:12 217:8,11
219:9,25 220:16
222:20 224:21
225:22 226:6,10
227:6,10,18 228:3
231:13 237:25
240:23 242:9 243:7
246:9,21 248:3,20
249:11,17 250:7
251:10 253:21
254:23 255:11
256:2,24 257:20
259:14 261:9
**blown (3)**
128:12,15 236:3
**board (1)**
132:7
**BOIES (1)**
3:10
**book (29)**
57:4,21 61:14,20
62:17,20 75:5 78:24
94:14,16 112:9,24
122:2 123:5 124:14
124:16 131:12
177:5 179:3 187:12
196:2 204:3 209:13
210:10,24 211:16
240:5 247:4,11
**books (12)**
17:14 74:19 79:19
96:20 97:15 107:20
176:24,24 258:7,25
259:5,24
**borrow (1)**
90:20
**borrowing (1)**
247:19
**bottom (5)**
35:5 89:10 194:3
255:5 256:11
**bought (1)**
238:10
**box (4)**
227:3,7,15,18

**break (14)**
7:2 47:11,15 85:2
125:19 129:14
167:8,11 175:2
205:23,25 230:12
233:23 248:18
**briefing (1)**
224:9
**bring (2)**
51:18,20
**broader (1)**
188:3
**broker (7)**
17:16 106:2 110:12
135:6,10 137:22
230:21
**brokerage (3)**
20:12 75:10 146:7
**brokers (3)**
13:19 20:21 21:2
**broker's (2)**
146:4 205:6
**broker-dealer (16)**
134:17 135:22 136:9
144:13 145:10
176:15 179:17
180:9,23,25 181:2,4
182:11 231:9
235:16,16
**broker-dealers (5)**
5:18,18 179:23
180:15 228:19
**broker-dealer's (3)**
231:22 232:16 235:3
**Brothers (12)**
1:7 3:5 13:18 15:10
16:25 18:20 69:18
97:2 194:10 254:2
254:11 264:2
**brought (2)**
233:25 247:19
**brunt (1)**
149:12
**buffer (2)**
215:18 216:3
**builds (1)**
231:17
**bunch (5)**
5:17 70:24 74:17
75:14 144:15
**bundle (1)**
140:22
**business (145)**
14:14 15:25 18:25
19:3 23:12,14,15,17
23:19,21 27:16

30:17 35:20 36:17
36:19 39:24,24
42:14,16,17 46:25
47:19 51:3,7 52:13
52:14,15,16 53:6
73:3,5,21,25 74:19
74:23 75:5,7,9,10
75:16 78:24 79:19
81:17,20,20 84:7
88:18,19 100:9
101:5 103:18
107:23 108:9,19
111:17,19 116:14
121:15,16,20
122:10 125:14,15
127:22 132:6,17
137:21 139:4,11,13
142:16 143:7,19
146:4,6,7,17 147:6
187:3 199:25
200:10,10,13,18
201:14 202:6,23
203:2,16 205:16
206:7,8,9 209:5,14
210:18 213:12
219:2,20,24 220:7,8
220:9,13,14,20,25
221:3,6,8,16,20
222:9,17 223:2,6
224:11,20 225:10
225:16,17 227:5
234:2 238:10
240:17 241:10,14
242:16 244:24
245:10,11 246:2,5
246:12,14,19 247:4
247:5,6 248:10,11
248:13 254:2
255:23 258:11
**businesses (26)**
20:13,22 27:4,5 39:20
39:22 53:4,6,8
70:23 71:2 75:17
95:10 120:20,22
186:24 187:8
190:15,19 199:22
241:7 247:8,10
248:7,9,16
**businessperson (6)**
52:22 53:18 54:10
55:24 56:4,7
**buy (11)**
42:17 70:10 77:15,24
78:3,25 212:25
245:9,10 248:2
258:21

**buyer (2)**
22:10 244:17
**buying (3)**
76:5 248:7,10

**C**

**C (3)**
3:2 4:3 86:23
**calculated (2)**
33:25 231:4
**calculating (1)**
231:18
**calculation (4)**
124:25 157:20 231:15
242:13
**calculations (3)**
119:7 127:13 213:19
**California (1)**
6:7
**call (6)**
43:5 162:22 189:6
229:8 232:10
243:20
**called (5)**
5:2 14:4 20:18 55:11
134:5
**calling (1)**
41:16
**calls (6)**
29:8 43:4 67:23
122:21 162:20
199:12
**calm (1)**
125:8
**capabilities (1)**
177:7
**capability (1)**
248:7
**capital (16)**
3:11 20:12 75:9 86:23
109:12,15 116:15
117:10 119:21
192:14,20 210:25
247:11 248:10,13
263:11
**care (2)**
168:16,17
**career (1)**
195:10
**CARRERO (2)**
3:8 261:7
**carried (3)**
112:18 185:23 229:4
**carry (2)**
139:10 240:8
**carrying (3)**

**case (38)**
1:7 5:21 6:18 7:18 8:9
8:12,23 9:11 18:12
33:12,23 41:11
45:15 72:14 81:21
82:2 85:12 128:22
138:4 144:14,24
156:4 184:18,22,25
205:3 209:4,4
210:14,18 228:16
234:10 235:6
245:20 246:15
247:16 252:8 264:2
**cases (3)**
188:5 229:24 246:10
**cash (5)**
101:16 102:19 197:6
197:10 205:20
**categories (2)**
67:19 112:15
**categorize (1)**
15:5
**categorized (1)**
15:16
**category (3)**
51:10 67:16 134:19
**center (1)**
254:12
**certain (11)**
16:13 82:15 83:14
120:17 134:18
137:12 165:9
167:21 180:19
185:8 214:5
**certainly (14)**
23:15 30:11 52:12
77:21 81:4 90:14
112:14,16 127:11
138:24 169:11
203:7 223:9 240:6
**certainty (2)**
112:7 181:20
**CERTIFICATE (1)**
262:2
**Certified (2)**
2:10,10
**certify (3)**
262:8,14,18
**challenge (1)**
185:24
**chance (1)**
239:16
**change (8)**
10:5 12:12 48:4,7
86:19 205:7,11

**208:2**
**changed (5)**
47:24 71:5 211:12
258:2,4
**changes (5)**
85:18,21 86:7,16,17
**changing (7)**
76:24 78:6,7,8 119:16
119:16 120:23
**chaotic (2)**
184:21 188:12
**Chapter (1)**
1:6
**characterization (14)**
20:2,3 22:20 86:5
92:9 94:23 101:10
127:3 132:14
186:12 190:23
202:12 203:4
246:22
**characterize (5)**
33:20,20 86:2 139:9
180:4
**characterizing (1)**
103:5
**charge (2)**
151:5 152:12
**charged (4)**
149:18,23 150:8
152:8
**Chicago (2)**
109:16 232:2
**chief (1)**
49:8
**choosing (1)**
38:19
**Chris (1)**
256:18
**Christopher (1)**
256:12
**circulated (2)**
100:8,25
**circumstances (25)**
13:24 20:11 22:10
23:16 38:24 42:15
44:14 70:16 71:15
78:14 79:13 82:25
103:4 130:19
145:19,22 184:21
193:13 207:19
211:20,25 233:9,20
244:17 245:20
**cite (1)**
221:25
**Civil (1)**
262:21

**Clarification (21)**
85:12,14,18 87:5 88:8
89:5,18 90:25 91:15
91:18 92:7 93:8,15
95:19,21 96:10
100:8,18,25 101:15
102:17
**clarified (3)**
18:15 44:9 102:17
**clarify (5)**
11:10 18:18,21 92:20
264:6
**Clark (1)**
10:19
**Clark's (1)**
10:17
**clause (8)**
35:17,23 36:5 43:20
87:6 88:19 89:12,17
**clauses (2)**
86:14,17
**clean (1)**
46:3
**clear (22)**
16:17 30:7 52:11
70:22 73:10,11,25
74:2 80:9 84:4
105:13 121:24
127:6,23 134:3
136:4 174:14 201:6
205:12 247:22,23
255:20
**clearance (8)**
14:20 16:19,20 95:3
156:2 211:22,23
223:2
**cleared (5)**
17:13 18:20 137:3
149:25 150:7
**clearer (1)**
111:2
**clearing (108)**
13:20,20 14:5,14,18
17:5,16 18:23 19:4
20:21,21,25 21:2,2
33:12,17 34:13,15
34:22 69:19 73:5,21
75:12 80:4,11 84:8
90:8 94:15,21 95:9
96:21 97:10,14,24
105:10,11,12,25
106:2,3,5,6,25
107:7,8,13,24 108:7
110:12 111:16,19
112:9 113:22 114:4
117:23 118:13

**121:5,14,17 128:8**
128:17 135:11
136:5,5,6,6,8,21
137:9,20,22 138:20
138:25 139:17
140:8 144:15,22,25
149:13 150:22
151:23 155:17
187:3 198:3,4,5,14
203:11 209:8,9,14
213:11,15 228:15
228:23,24,24
229:13,18,21
230:21 232:20,24
233:3,7 241:8
251:14 252:5
**clearing-account-b...**
142:13
**clearly (5)**
55:6 83:15 119:3,19
173:23
**Cleary (1)**
183:20
**close (19)**
78:11 87:2 96:2
113:12 125:13,18
127:8,16 144:4
169:12 212:18,24
222:19 236:24
240:20 248:19
255:22 256:6
257:10
**closed (4)**
78:12 118:14 220:20
236:17
**close-out (3)**
152:10 153:8 238:15
**closing (42)**
13:4 73:15 98:8
100:12 101:8
103:21 115:4
116:24 117:3
125:14 126:4,21
128:18 144:5,8
149:19,23 150:6,9
154:13 155:13
158:2 164:5,15
165:7,14,17 166:2
166:10,24 175:9
176:5 183:10 186:8
200:21,23,25 201:5
201:8 210:5 213:20
217:20
**CLR (1)**
1:24
**CME (8)**

106:4 109:7,9,11,17
109:24 128:13
232:19
**Codes (1)**
264:5
**collateral (110)**
9:7,8 21:5,16 22:9,13
22:17 23:3,20,25
24:2,4,10,10,17
25:5,11 26:19 27:15
27:20 29:6 30:18
33:19 34:23 37:18
39:6 43:21 45:2,24
46:9 52:24 53:22
54:13 55:8 56:11
57:4 62:24 63:4
67:17,21 72:12
73:22,24 80:15 83:4
83:9,25 110:15
122:3,6,12 124:22
127:21 128:16
136:11,14,19,23
138:11,17,18
141:18,20 142:2,23
144:6,11,12,19
145:9,11 146:20
148:20 178:25
197:8 203:15,19
208:6,17,19,22
209:19,25 212:2,4
216:6 220:12,13,19
230:23 231:10
233:3 236:3,16
244:17,20 245:2,8
246:4,7,7,11,18,20
247:10,13,17,21,22
247:24
**collateralized (1)**
87:2
**collateral-related (1)**
221:12
**colleague (1)**
244:11
**collect (4)**
157:7,19 229:4,24
**collected (2)**
210:20 230:7
**collectively (3)**
20:18 57:8,25
**columns (1)**
68:17
**combine (1)**
176:25
**combined (1)**
177:9
**come (9)**

16:23 22:12 119:15
119:20 170:7 212:6
231:21 244:19
246:3
**comfortable (4)**
123:11 125:11 128:17
231:11
**coming (9)**
14:11,24 61:11 79:20
148:13 149:2,4,5
178:9
**commensurate (2)**
124:23 229:5
**comment (1)**
44:12
**commercial (1)**
57:2
**commission (3)**
20:12 227:5 228:14
**Committee (2)**
3:18 261:3
**communicated (1)**
161:13
**communication (1)**
157:25
**companies (1)**
13:22
**company (1)**
245:6
**compensate (1)**
152:19
**competent (1)**
43:17
**compilation (1)**
162:14
**compile (2)**
162:13 163:3
**complete (7)**
7:22 27:2 54:25
119:23 125:9
170:15 248:25
**completed (2)**
111:3 262:22
**completely (6)**
15:9 39:18 40:3 72:24
122:24 124:17
**complicated (3)**
244:5 245:12,16
**complication (1)**
14:3
**complying (1)**
205:5
**component (3)**
71:5 197:11 198:24
**components (1)**
159:4

**composition (1)**
179:2
**comprised (1)**
53:7
**compute (1)**
142:5
**computer (19)**
166:15 170:12 171:17
171:22 172:4,21
175:10 176:7,16
177:11,25 178:14
179:19,22 181:2
182:12,16,25
252:12
**computing (1)**
142:8
**concern (1)**
246:14
**concerned (1)**
196:13
**concerning (2)**
50:4 158:25
**concerns (1)**
18:10
**conclude (8)**
54:6 61:2,9 80:13
110:8 115:25 120:3
232:8
**concluded (2)**
14:3 120:4
**concludes (1)**
30:13
**conclusion (14)**
13:3 24:8 30:10,12
36:16 42:23 63:5,9
69:8 71:11 83:24
84:5 130:17 240:3
**conclusions (1)**
12:22
**conditional (1)**
155:23
**conditions (3)**
125:8 130:24 238:5
**conduct (2)**
53:8 103:7
**conducted (1)**
213:18
**conference (1)**
162:20
**confess (1)**
143:15
**confirm (1)**
55:7
**confirms (1)**
67:6
**conform (1)**

264:6
**confuse (1)**
191:24
**confused (2)**
92:12 249:20
**confusing (1)**
227:11
**confusion (3)**
61:10 62:7 160:11
**connected (1)**
146:9
**connection (23)**
20:22 46:24 52:12
54:5 64:24 105:19
105:22 106:13
131:20 132:5,20
133:23 145:11,18
152:14,17 153:7
161:23 163:12
183:18 193:19
216:6 233:22
**consequence (2)**
191:7 209:15
**consider (2)**
35:23 146:10
**consideration (1)**
246:13
**considered (1)**
241:19
**consistent (13)**
26:13 29:2,4,14 37:4
38:13,22 89:10
90:13,14 103:15
110:6 235:2
**constantly (4)**
76:24 78:6,7,8
**constitutes (1)**
23:20
**constituting (1)**
34:24
**consultant (2)**
6:16,17
**contact (2)**
183:9,25
**contacted (1)**
200:7
**contacts (2)**
133:24 162:18
**contain (1)**
253:25
**contained (5)**
8:24 100:7,24 101:14
257:16
**contains (1)**
250:25
**contends (1)**

20:9
**contention (1)**
19:21
**context (22)**
37:12 39:23 62:3 80:9
88:15,22 104:18
105:7 122:24
145:24 146:3,11
148:9 149:8 155:7
169:3 183:14
188:11 190:13
203:12 220:5
221:23
**continue (3)**
75:19 94:14 95:11
**continued (6)**
9:11 13:11 134:23
135:3 260:8 261:5
**continues (1)**
35:9
**continuing (2)**
88:25 95:2
**contract (19)**
24:10 32:23 34:8
36:11,14,15 39:9
90:5 93:11 103:25
204:20,21 206:19
207:15 208:2,4,20
208:24 209:10
**contracted (1)**
159:2
**contracts (11)**
25:4 35:21 36:8,18
39:2,7,11 74:11
92:5 207:7 208:13
**contrary (1)**
12:14
**control (3)**
117:16 125:4 244:9
**Cont'd (2)**
4:3 130:6
**conversation (3)**
41:2 215:20,22
**conversations (4)**
143:8,12 178:24
220:24
**convert (1)**
259:5
**convey (1)**
43:21
**conveyed (3)**
63:6 64:16 65:7
**conveys (1)**
38:15
**cooperation (1)**
187:21

copied (3)
192:15,21 263:11
copies (1)
227:11
copy (6)
25:21 215:8,13
248:25 249:5,6
core (1)
39:21
Corp (8)
13:20 14:5,18 33:18
96:21 106:4 135:11
251:14
corporate (4)
57:2,2 58:22 60:16
corporation (6)
13:20 155:17 179:24
233:22 234:13
252:5
correct (85)
9:12 22:15 26:4,8,15
28:7 31:22 32:6
37:18 38:17 40:23
42:18 43:13 44:2,17
44:22 45:7 48:18
52:6 53:17 58:18
59:6 60:20,24 61:17
63:21 64:6 66:25
70:6 77:7 78:4
79:13 82:12 93:20
93:21 104:13 105:3
108:17 110:21
111:7 114:22 115:2
115:14,15,21,23
117:23 121:21
126:4 131:25
132:12 136:12,16
144:25 145:2 150:3
157:24 160:2
163:25 164:16
171:9 175:23 179:8
179:12,24 180:9
181:5,10,13 183:22
184:2 186:8 197:14
214:8 224:14 231:6
231:12 234:24
237:14,21 238:24
239:6 253:16
259:12 264:7
correcting (1)
56:3
correctly (2)
92:23 217:12
correspondence (2)
63:13 119:10
corresponds (1)

168:14
cost (6)
144:4,8 149:19 152:9
152:20 247:13
costs (2)
150:9 247:12
counsel (11)
41:13 43:12,18,19
155:13 158:2
183:21,25 184:3
214:14 249:10
counting (1)
214:21
COUNTY (1)
262:4
couple (5)
47:13 48:12 83:15
101:25 167:10
course (7)
10:12 11:4 139:25
195:10 221:7 237:6
245:6
court (2)
1:2 160:13
courtesies (1)
260:7
courtesy (1)
261:11
cover (26)
33:13,14 34:9,13,25
65:24,24 66:9,9
69:12,18 80:23
124:19 134:6 136:8
136:11 138:5,9,19
138:23 144:8
168:22 173:8 197:8
207:20 223:24
covered (1)
138:10
Craig (2)
135:16 171:13
crazy (1)
71:15
created (4)
46:8 47:20 48:2,3
credible (1)
176:14
credit (25)
33:18,21 34:8,12,24
69:24 112:20 117:9
129:5,6,7 133:7
137:5,7 138:7
140:22 141:6
151:15 152:4
189:11 198:18
213:16 228:16,18

247:17
Creditors (1)
3:18
credits (3)
133:7 243:16,18
creditworthy (1)
137:12
CRR (1)
1:24
cushion (13)
113:21 117:21 120:2
120:12 121:4,9,12
126:2,20 127:15
128:7 218:18
231:17
Cusip (2)
196:12 251:18
custody (1)
244:8
custom (2)
137:24 210:14
customer (85)
14:12 15:18 17:23
18:18,19,23 19:8
21:4 52:14 74:4
80:2 96:22 131:23
132:11,18 133:8,16
134:2 137:7,19
138:19,24 140:8,12
140:23 141:3 142:6
146:13,19,23
147:10 148:12,16
148:20,23 149:5,14
149:18 150:7,16,17
150:18 151:13,16
152:7,7 153:8
185:16,21 198:6,12
198:16 210:19
211:23 213:3,5,6
215:18,24 216:7,7
216:15 218:19,20
218:22 219:7,12,22
221:12,19 222:14
223:16,22 228:17
228:19 229:12,25
242:3,6,7,16,22
243:3,13,17
customers (68)
14:11,24 15:3,8,11,14
15:15,16 16:5,6,9
16:13,21,23 20:20
52:9,17 69:19 97:16
97:25 132:23
133:13 134:4,11,12
134:15,20,21 135:2
135:20 136:10,23

137:4,12 138:4,6,11
141:19,23 144:3
145:8,9,12,13
146:20 147:4,4,5,7
148:21 150:2,3,14
151:2,2,4,12,23
153:3,4 210:18
213:19 217:19
222:6 229:15 230:7
243:14,15
customer's (2)
17:12 135:9
cut (2)
36:21 201:25

─────── D ───────

D (4)
37:17,21 38:10 56:24
daily (3)
183:17 197:3,10
DAKIS (10)
3:21 40:21,25 41:20
42:2 66:5 160:12,16
160:20 261:2
Dan (5)
135:15 171:12 192:15
192:21 263:12
dash (1)
216:10
data (13)
68:6,13,15,25 74:4
116:21 174:10
180:24 182:10
196:8 252:16,16
253:24
date (18)
8:3 47:22 57:5,21
58:9 61:4 70:6
77:18 115:4 192:17
201:2,6 210:5
214:10 226:17
252:23 255:21
264:3
dated (7)
8:5 45:3,23 46:6
160:17,18 224:13
day (37)
3:4 10:16 47:10 73:14
118:19 123:7 125:9
125:14,15 128:24
137:14,15 155:13
158:2 197:14
203:23,24 204:19
204:20,25 205:8,9
205:14 211:10
223:4,7 232:9

235:25 238:21
242:17 249:22
257:25 258:3,4,8
261:20 262:24
days (6)
10:12,15,15 14:18
235:22,25
deal (39)
14:10 51:16,22 72:3
81:10 91:4,17 93:4
93:6,17,22 94:17
96:10 98:2,20,21
100:9 101:5 103:18
108:20 115:25
120:3 121:2,8 129:9
184:24 188:2 190:3
193:5 220:20
236:12,18 241:14
241:25 252:10
258:14 259:18,20
260:2
dealing (5)
6:7 64:2 105:25
188:13 241:17
deals (3)
244:24 246:3,5
dealt (2)
51:14 81:19
debit (5)
242:7,13,14,21 243:3
debits (1)
133:6
debt (1)
57:2
Debtors (1)
1:9
decide (2)
113:12 127:8
decided (1)
52:18
deciding (1)
236:12
decision (1)
236:19
declaration (9)
10:6 47:3 99:12,22,25
100:7,23 101:3
201:16
declarations (1)
111:2
decreases (1)
79:7
decree (1)
79:5
deemed (1)
155:24

**default (3)**
151:15 152:7 228:19
**defaulting (1)**
237:18
**defaults (1)**
232:24
**defendants (1)**
6:4
**deficit (1)**
243:5
**define (4)**
33:11 51:6 75:13
213:14
**defined (5)**
9:8 39:22 57:8 85:22
200:23
**definitely (2)**
121:19 122:11
**definition (17)**
27:2 35:5 36:6 37:16
37:23 38:11 57:13
57:20 85:18,22 86:8
86:9,19,22 89:13
92:5 109:4
**degree (7)**
13:7,14 78:16,20
112:7 177:2 221:5
**deletion (1)**
39:10
**deliberately (1)**
209:13
**delivered (1)**
177:24
**delivery (4)**
90:20 151:7 152:16
152:19
**depended (1)**
223:16
**dependent (1)**
177:6
**depending (1)**
206:14
**depends (2)**
196:24 218:19
**depleted (1)**
71:10
**deployed (2)**
53:9 69:21
**deponent (1)**
262:19
**deposed (6)**
5:13,16 10:4,11,20
11:2
**deposit (4)**
108:7 121:14,17
134:6

**deposition (39)**
1:14 2:4 6:24 9:23
10:6,8,10,17,23
11:5,15,16,23 28:13
41:19 52:9 65:19,22
65:25 66:9 133:24
147:24 155:2,8
161:19,24 164:12
188:8 193:18 202:5
221:13 241:12
249:2 256:22 261:4
262:10,12,21 264:3
**depositions (7)**
9:14 11:19 63:16
64:25 167:14 188:5
188:7
**deposits (12)**
20:25 27:7 28:4 32:11
113:23 114:5
117:23 118:13
121:5 128:8 139:18
229:17
**derail (1)**
65:19
**derivative (35)**
13:18 16:24 17:5 19:2
21:17 23:3,4,18,25
24:5,9,16,18 25:4
27:16 30:19 32:23
34:8 36:17 72:19,20
74:18 77:25 78:2
79:3 91:4 92:4
97:15 131:12 159:8
163:20 186:7
198:20 203:9
228:23
**derivatives (189)**
18:5,11,13,16,25
19:23 20:17 22:17
24:24 25:11 26:20
27:6,11,21 28:3
29:7 31:22 34:15,19
35:20 36:7,23,24
37:16 38:13,17 39:2
39:6,9,11 40:2
42:14 45:3 46:10
47:21 51:4 52:25
53:5,21,23 54:12,14
56:10,13 57:3 61:3
61:20,25 62:3,5,6
62:13,17,23,25 63:4
66:16,19,22 67:11
67:21 68:4,16 69:6
70:2,8,11,25 72:17
72:18,22 73:3 74:5
74:7,8,11 75:6,11

75:15 76:4,7,9,23
77:7,11,14 78:23
79:10,12 80:19,20
80:22 82:17 84:2,7
86:23,25 87:9 88:24
89:21 90:8 91:8,13
91:20 92:2,25 93:18
94:14,15,22 95:23
96:3,6 100:11 101:7
102:20 103:20
104:13 105:3,12,19
105:23 106:16
107:2 110:9 111:6
111:23 112:24
116:3 117:2,19
122:18 124:2 132:8
137:24 146:8
153:24 159:4,22
164:15 166:9,17,18
171:23 172:16,24
173:17 175:12,13
176:5,18,24 177:9
177:14,20 178:16
184:17 186:21
187:3 188:6,19,22
191:6,13,19,22
192:5 195:17,22
209:14 213:15
230:20 236:21
238:10 240:4,17
241:8 244:25 246:6
247:9 248:2,8,15
250:6,15 251:2,3
252:5 257:19
**describe (14)**
12:16,18 13:13 15:23
95:13 130:9 140:2
150:12 189:10
204:3,14,15,17
207:12
**described (14)**
89:12 110:24 112:11
126:18 136:9 138:7
153:15 188:11
198:8,14 201:15
206:21 222:4 235:9
**describes (1)**
79:17
**description (2)**
46:21 218:14
**desire (1)**
80:16
**detail (1)**
54:4
**detailed (3)**
81:18 220:22 221:12

**determination (1)**
238:7
**determine (9)**
67:25 78:18 79:21
119:8 133:2 155:22
170:9 174:5 229:2
**determined (2)**
72:11 125:13
**developed (1)**
229:2
**developments (2)**
55:6,12
**diagram (1)**
147:18
**difference (1)**
18:18
**Differences (2)**
227:16,24
**different (26)**
21:16,21,22 22:16
23:6,9 24:4 28:22
70:17 71:22 72:5
81:10 123:23
127:17 142:7
144:16 145:5
156:21 191:18,23
197:12 211:9 239:2
249:21 250:11
253:24
**differently (3)**
101:11 150:13 253:23
**difficult (6)**
78:13,17 90:18 97:19
118:20 122:23
**difficulties (1)**
13:3
**digest (1)**
165:22
**diligence (4)**
199:24 200:16 201:12
213:18
**direct (6)**
89:4 106:5 172:8
180:25 183:9,24
**directed (1)**
101:24
**directing (1)**
227:22
**direction (1)**
18:10
**directional (4)**
164:6 165:17 166:4
166:25
**directly (3)**
106:5 186:19 188:20
**disagree (5)**

42:2 86:4 225:21,23
225:25
**disappear (1)**
223:7
**disappeared (1)**
78:11
**disbelieve (1)**
226:4
**discerned (1)**
154:5
**disclose (1)**
31:7
**disclosed (1)**
41:18
**disclosing (1)**
32:15
**disclosure (1)**
40:20
**discovered (1)**
189:12
**discovery (1)**
9:10
**discussed (5)**
49:12,15 50:7 51:21
244:3
**discussing (1)**
162:23
**discussion (12)**
32:18 41:22 42:10
87:19 101:20
173:10 174:3
199:17 218:9
225:11 241:5
245:19
**discussions (8)**
31:7,14,24 32:2,8,15
40:20 41:13
**displayed (1)**
124:24
**disposition (1)**
69:17
**dispute (1)**
110:4
**distinct (1)**
140:5
**distinction (2)**
23:2 251:19
**distinguish (2)**
80:11 136:4
**DISTRICT (1)**
1:3
**division (1)**
254:3
**document (78)**
25:24 27:7 40:16
43:23 45:3 46:12,16

46:21,23 47:6,18
58:7,13 61:9,24
62:15 63:8,9,16
65:12 67:15 71:12
83:20 85:11 87:16
100:4 101:10 155:5
155:12,20,22
157:25 158:7
159:24 167:13,15
168:3 169:15,18,22
169:24 170:8 171:3
172:10,11,17 174:3
174:7,15 177:21,22
192:24 193:3,8
224:3,22,23 225:2
226:20 248:25
249:14,15 250:14
250:20,25 251:4,12
252:21,25 253:6,7,9
253:12,18,19
255:13 263:8,16
**documents (19)**
44:16,21,24 45:22
46:2,6 47:19 48:2,3
56:18 63:20 161:3
167:10 172:9
184:24 253:10,25
254:9,10
**doing (11)**
60:13 64:13 73:12
97:5 152:14,20
154:7 199:21
218:15 233:6
241:11
**dollar (5)**
61:13 128:25 246:20
246:20 255:13
**dollars (9)**
118:19 154:12 209:25
219:8 222:15,18
223:12,15,19
**double (2)**
28:25 225:17
**double-sided (1)**
227:11
**doubt (2)**
226:8,13
**doubts (1)**
70:20
**download (1)**
180:22
**draft (4)**
43:20 100:8,24
101:15
**drafts (3)**
100:16,18,21

**draw (1)**
36:16
**drawn (1)**
170:12
**drilled (1)**
54:4
**due (8)**
41:20 139:24 157:6
157:20 199:24
200:16 201:12
213:18
**duly (2)**
5:3 262:11
**duration (1)**
125:3
**Dzeimian (10)**
9:24 10:4 135:16
143:13 171:12,15
178:11 192:15,21
263:12

---

**E**

**E (4)**
3:2,2 4:3,3
**ear (1)**
30:4
**earlier (14)**
49:12,15 71:25 85:24
112:10 132:10,14
153:15 220:10
241:12 256:22
259:11,17,20
**earn (1)**
229:16
**easier (1)**
30:6
**easily (3)**
51:13 180:11 181:3
**East (1)**
3:6
**Easy (1)**
246:14
**Ed (2)**
99:13 183:20
**effect (2)**
206:9 223:14
**effective (2)**
16:18 17:2
**effectively (1)**
146:14
**efforts (1)**
163:3
**either (21)**
26:19 33:11 36:16
46:23 47:2 67:10
93:24 94:5 112:8

128:12,19 129:5
150:21 152:18
171:15 196:24
197:2 198:16
249:12 251:17
261:8
**element (1)**
13:5
**Elizabeth (5)**
10:2 200:6 201:16,17
201:20
**Elizabeth's (1)**
202:3
**EMANUEL (1)**
3:17
**emphasize (2)**
76:18 79:24
**employed (3)**
6:14 175:20,22
**employees (1)**
31:11
**employer (1)**
219:18
**enable (2)**
250:4,14
**encompass (1)**
67:20
**encourage (1)**
83:16
**ends (1)**
83:2
**engage (1)**
137:23
**engaged (2)**
5:25 6:5
**ensure (1)**
231:5
**entered (2)**
20:14 127:18
**entire (7)**
53:3 83:17 88:15
127:9 174:7 190:4
241:5
**entirely (2)**
110:6 116:19
**entirety (5)**
82:17 110:15 132:22
133:11 232:17
**entitled (7)**
105:18 106:15 156:22
193:25 219:22
227:16 255:2
**entity (6)**
107:20 109:11 119:9
181:21 182:2,3
**entries (3)**

66:21 68:15 69:25
**equal (1)**
72:18
**equals (1)**
139:11
**equities (3)**
77:12 79:11 187:12
**equity (21)**
57:3 58:22 60:16
61:14 75:25 76:17
76:20,25 77:5,14,23
78:22 79:4 80:20
120:15 132:3
176:24 177:9 247:5
247:6 254:4
**equity-related (1)**
76:13
**errors (1)**
264:7
**escrow (3)**
134:5,23 135:13
**especially (2)**
140:23 210:15
**ESQ (7)**
3:8,15,21 4:9,10,11
4:12
**essentially (8)**
70:23 75:12 82:18
133:8 137:18 146:5
229:15 233:6
**establish (3)**
201:6 209:20 212:22
**established (1)**
201:4
**establishment (1)**
209:21
**estate (11)**
92:23 94:12,25
149:19 150:8 152:9
153:6 237:3,14
239:18 261:7
**estate's (1)**
95:16
**et (1)**
1:8
**ETD (10)**
20:13 83:5,9 113:14
114:7 128:4 164:4
171:17 172:4 175:9
**ETDs (9)**
20:19 21:3 22:12
110:11,13 113:19
121:8 130:23
244:19
**Evans (3)**
193:24 194:10,14

**evening (1)**
205:8
**event (6)**
136:21 144:2 190:10
236:23 237:9
240:17
**events (1)**
259:22
**eventually (1)**
177:19
**everybody (2)**
193:4 241:24
**ever-changing (1)**
69:17
**evidence (12)**
68:9,20 70:14 74:13
107:4 154:19
164:19,25 173:4
174:22 183:13
248:4
**evolve (1)**
241:14
**evolved (1)**
135:8
**exact (1)**
221:4
**exactly (11)**
16:2 61:10 101:21
102:8 118:16
143:18 154:21
232:3,25 234:19
258:6
**examination (4)**
5:6 46:24 130:6 263:4
**examined (2)**
5:4 251:4
**example (10)**
33:17 34:7 44:10 51:9
109:6 204:19
234:22 239:11,12
254:4
**examples (1)**
244:23
**exceed (3)**
95:25 96:5 210:16
**exception (1)**
41:25
**excerpt (2)**
167:24 249:4
**excerpted (1)**
193:5
**excess (39)**
113:21 117:22 118:12
119:5,5 120:2 121:4
121:22 122:9 124:4
124:22 128:6

144:12 154:12,24
210:7,9,24 211:16
215:19 216:6,9,10
216:25 217:6,13,19
218:23 219:4,6,12
219:13,22 221:17
222:13 223:7
233:14 239:15,17
**exchange (19)**
17:6 96:2 106:24
107:2,6,24 108:14
108:16,21 109:7
137:10 138:20
198:15 205:6
208:23 209:9,10
210:20 233:15
**exchanges (13)**
13:22 104:12,25
105:17,20,22,24
106:7,14,17 165:10
173:14 207:21
**exchange-traded (1...**
18:4,11,13,16,25 19:2
19:23 20:17 21:17
22:17 23:3 24:4,9
24:16,17,24 25:4,10
26:20 27:5,15,20
28:3 29:6 30:19
31:22 36:23 37:16
38:13,16 42:14 45:2
46:10 47:21 51:3
52:24 53:5,21 54:12
54:14 56:10,12 57:3
62:5,13,16 75:6,10
75:15 76:9,23 77:7
77:11,14 78:2,23
79:3 80:19 82:17
86:23 87:9 88:24
89:20 90:7 91:3,8
91:13,20 92:2 94:21
95:23 97:14 102:19
104:12 105:2,23
111:6,23 116:3,25
117:19 122:17
130:11 137:23
146:7 159:4,8
163:19 164:14
166:9,17 171:23
172:24 175:12
176:5,17 177:13,20
178:15 186:7 188:6
188:19 195:17,22
198:20 230:20
240:16 241:7
244:25 246:6 247:9
248:8,14 251:2

252:4 257:19
**exclude (2)**
39:4 96:4
**excluded (6)**
35:6,9 40:15 51:10
89:6 91:4
**excludes (1)**
36:6
**exclusive (1)**
197:25
**Excuse (5)**
147:17 159:24 170:25
208:8 213:4
**execution (2)**
124:20 239:24
**executives (1)**
173:14
**exercise (2)**
95:4 232:8
**exercised (3)**
98:11 151:12 258:8
**exercises (2)**
152:17 196:14
**exhaust (1)**
200:15
**exhausted (6)**
231:24 233:2,16
235:5 237:12
238:14
**exhausting (1)**
232:20
**exhibit (60)**
7:25 8:4 12:5 19:11
25:23 58:7,12 59:5
60:23 61:17,19
62:23 63:15 64:11
64:15 65:6 66:15
67:11,19 68:4 69:6
74:5 85:13 99:10
155:3 167:14,23,24
168:9,13,17 169:6
170:16 174:16
192:11,12,13,18
193:2,15 195:14
196:16 214:9,12
224:2 226:15,19
249:2 252:21,25
253:15,20 254:20
256:21 263:7,8,10
263:14,15,16
**exhibits (3)**
11:18,20 263:6
**exist (2)**
82:2 198:23
**existed (3)**
83:2 130:25 239:9

**existence (1)**
154:11
**existing (1)**
197:9
**exists (1)**
210:5
**expansive (2)**
43:9,10
**expect (5)**
79:20 154:14 155:14
158:3 203:18
**expectation (2)**
128:20 240:21
**expecting (1)**
251:8
**experience (13)**
15:25 74:23 110:9
124:12 133:4
176:22 179:13
208:7,18 218:17
231:20 232:14
235:2
**experienced (1)**
43:18
**expert (12)**
7:17 24:20,23 25:2
40:22 93:10 154:4
182:7 195:12 207:2
244:7,11
**expertise (6)**
110:9 142:17 177:2
179:16 199:13
242:10
**expert's (4)**
24:20 25:7 67:14
92:10
**expiration (3)**
14:4 156:3 196:13
**expiring (1)**
14:6
**explain (6)**
59:14 64:16 65:7
68:11 145:16
196:22
**explained (1)**
46:7
**explicitly (4)**
51:15,16 72:11
134:14
**explore (1)**
44:7
**explored (1)**
44:9
**exponentially (1)**
121:18
**exposed (1)**

53:13
**exposure (15)**
33:16 95:3 111:22
113:14 115:12,13
116:20 117:7,15
123:22 128:5 137:9
204:3,22 207:13
**exposures (25)**
34:14 62:21 73:4,14
73:23,24 74:3 79:22
82:18 84:2,9 94:8
95:7 96:18 111:12
111:15,18 112:9
117:9,10 124:15
128:19 131:13
176:25 209:11
**express (1)**
102:15
**expressed (1)**
50:25
**expressing (1)**
151:19
**expressly (1)**
43:21
**extending (2)**
133:7 228:16
**extent (25)**
16:22 17:12 18:14,22
20:3 31:6,9 32:14
34:22 40:19,25
41:21,25 52:15
76:14 77:11 78:8
86:16 89:22 103:12
134:22 145:20
170:14 196:9 261:4
**extract (3)**
177:4,11 178:14
**extracted (1)**
177:25
**extracting (1)**
178:7
**extraordinarily (1)**
245:12
**extreme (2)**
20:10 234:6
**extremely (3)**
97:19 118:20 130:24
**e-mail (28)**
59:8,17,17 60:10
167:18,23 168:18
168:21,22 169:7,13
170:2 173:14 174:4
183:19,24 192:13
192:19 193:22,24
195:5,14 253:2
256:4,8,11 257:5

263:10
**e-mails (1)**
249:18

_____

**F**

**face (2)**
137:2 228:19
**faced (10)**
110:19 130:18 131:20
132:5 139:15 140:7
151:23 186:7 191:3
191:4
**facetious (2)**
44:3 244:4
**facing (2)**
250:5,15
**fact (43)**
14:10 26:2 41:14
51:11 63:19 68:19
83:13 84:20 90:9,11
90:17 93:22 94:13
120:14 127:11
133:11 136:19
137:8,23 140:19
145:25 154:8,18,22
164:11,14 167:2
168:17 177:8
180:14 190:14
203:17 210:14
216:21 219:3
220:23 225:23
229:14 232:7
233:25 238:20
247:22 258:15
**factor (2)**
30:11 139:12
**factors (7)**
125:2,6 126:5,8
221:25 239:21
247:16
**facts (34)**
19:6 37:13 38:23 68:9
68:20 70:13 71:14
72:9 74:13 78:19
81:7,9,23 82:2
107:4 109:24 110:7
112:4 120:10,23
123:3 132:25
145:22 154:19
164:18,20,25 173:3
174:22 183:12
187:19 243:12
248:4 264:6
**factual (2)**
154:2 243:8
**failure (3)**

51:18,20 53:12
**fair (3)**
45:11 62:15 65:16
**fairly (3)**
121:15 180:11 236:7
**familiar (10)**
11:23 63:18 193:10
193:11 195:7 242:2
244:24 246:10,18
251:16
**familiarize (1)**
228:4
**far (7)**
63:12 73:17 100:15
155:21 242:16,23
259:22
**FCM (18)**
46:25 52:13,16 147:6
200:10 210:18
216:7 218:19 220:9
220:24 221:16
222:17 223:6
225:16 228:15
229:15,17 248:10
**FCMs (2)**
219:17 228:18
**February (4)**
1:16 2:2 262:24 264:3
**Federal (2)**
5:20 262:20
**feed (1)**
252:16
**feel (2)**
83:20 123:10
**fell (1)**
134:18
**felt (1)**
62:21
**fifth (2)**
102:11 215:6
**figure (4)**
14:21 116:22 258:12
259:6
**figures (3)**
62:23 63:3 70:5
**figuring (1)**
258:24
**file (1)**
194:11
**filed (2)**
11:11,14
**filing (1)**
12:11
**financed (1)**
78:10
**financial (2)**

13:2 110:12
**find (3)**
161:5 173:18 243:16
**fine (4)**
42:6 48:7 157:3 170:3
**finish (10)**
41:10 43:24 47:14
93:25 108:23
123:14 124:8
141:11 204:12
256:3
**finished (4)**
40:10 108:12 166:5
208:10
**finishing (1)**
248:19
**firm (21)**
5:10 69:20 142:19
144:15,22,25
149:13 154:15
155:16 157:20
158:5 176:23 177:7
177:18 180:20
194:12 198:6,12
199:5 232:2 247:2
**firms (1)**
232:24
**firm's (1)**
232:5
**first (28)**
10:16 19:20 20:7 22:8
59:16 90:14 92:17
98:16 102:4 112:22
118:9 121:24
123:15 130:20
144:17 155:10
158:21 167:18
169:7 212:22
215:17 233:21,23
234:12 245:3
249:17,24 254:14
**five (1)**
85:3
**five-minute (1)**
175:2
**fixed (1)**
187:8
**flat (9)**
203:23 204:2,5,10,15
204:17,22 205:2
235:17
**FLEXNER (1)**
3:10
**flipped (1)**
139:20
**Floor (2)**

3:13,19
**fluctuations (2)**
118:18 123:7
**focus (1)**
8:18
**focused (2)**
9:24 52:19
**focusing (4)**
14:13 91:8 172:12
245:17
**folks (3)**
213:24 233:7 236:10
**follow (1)**
92:22
**following (2)**
95:20 130:17
**follows (3)**
5:5 130:5 212:11
**footnote (6)**
104:5,7,11,21 105:8
106:15
**footnotes (2)**
104:18 105:6
**foreign (9)**
13:22 105:24 165:10
198:25 199:10
205:18 210:15
216:15 229:12
**forget (1)**
6:8
**forgot (1)**
159:14
**forgotten (2)**
6:10 252:20
**form (145)**
8:16,22,25 9:20 11:10
17:7 18:3 21:18,23
22:19 23:5,8 24:6
24:12 25:15 26:10
26:21 27:22 31:5
32:24 33:6 34:10
35:25 37:9,19 38:18
39:16 40:17 42:19
43:3,14 48:8,23
49:21 50:13,17
53:24 54:16,19
55:21 56:14,15
59:12 60:11 61:6,22
64:7,18 67:2,12,22
68:18 69:10 70:12
72:23 79:14 80:24
82:3 86:11 87:10,17
91:22 96:12 98:4
99:2 102:5,13,24
103:22 106:18
107:22 109:3

111:24 112:13
113:21 114:8,15
115:3,22 117:4,21
120:2,5 121:4,10
126:10 127:2 129:4
132:13 135:24
138:14 140:9
141:15 143:9 144:9
145:14 147:2
149:21 150:10
151:17,25 153:12
154:17 155:18
159:10,14 164:17
165:19 172:6 173:2
176:8,19 181:6
182:20 183:4,11
184:11,19 197:22
203:3,25 206:16
207:8 208:25
210:11 211:4,11
212:21 213:21
219:9,25 220:16
226:6,10 231:13
240:23 243:7 246:9
246:21 251:11
253:14,19,21
255:11 259:14
**formatted (1)**
253:23
**formed (3)**
8:20 9:6 40:4
**former (4)**
155:16 171:8 219:18
244:10
**forming (7)**
30:9 35:13,24 41:3,7
44:17 49:6
**formula (7)**
242:7,8 243:3,13,19
244:8,9
**forth (12)**
21:9,13 96:23 100:17
100:19 151:8
186:25 216:18,20
240:9 247:7 262:10
**fortunately (1)**
234:9
**forward (2)**
46:5 86:18
**forwards (1)**
194:15
**found (4)**
27:25 211:19 218:14
222:25
**foundation (4)**
49:3 60:12 61:7

102:25
**four (2)**
89:9 102:10
**frankly (3)**
8:20 81:7 241:15
**free (3)**
83:20 247:21,22
**Friday (14)**
45:18,19 119:23
120:22 128:22
166:9 172:18
173:16,21,23
177:24 178:4
250:22 252:9
**front (5)**
19:18 54:24 56:20,22
83:21 85:8 104:9
225:8,14
**fulfill (1)**
153:3
**full (14)**
81:7 123:5 149:12,12
167:22 169:25
170:15 193:3 203:8
249:5,6,14 256:23
258:9
**fully (1)**
151:11
**fund (15)**
20:25 107:14 108:7
113:22 114:4
117:23 118:13
119:21 121:5,14,17
128:8 139:18
242:22 243:6
**funding (7)**
139:16,24 140:6,21
141:5 197:5 198:18
**funds (1)**
229:18
**further (4)**
130:5 260:4 262:14
262:18
**future (5)**
122:6 126:2 206:19
206:20 227:25
**futures (86)**
20:12,18 47:18 52:14
95:5,6 122:2,4
123:3 127:14 132:6
141:3 165:10
196:20,24 197:9,13
197:17 198:10,12
198:25 199:5,10,25
200:17 201:14
202:6,8,22 203:2,22

204:3,20 205:16
206:7,8,12 207:7,15
207:18,23,24
208:13,20,24 210:2
210:8,10,14,15,23
210:24 211:3,15,16
211:18 212:3,10,19
213:3,5,6 216:15
217:23 218:8,21
219:23 220:12,20
224:10,20 225:10
226:15,24 227:5,17
228:9,13,14,18,24
229:12,16,19
236:20 263:15

**G**

**GAAP (1)**
25:11
**gain (6)**
135:21 136:2 207:6
207:13 215:18,24
**gather (1)**
119:24
**gauge (2)**
164:4 165:16 166:23
**general (14)**
8:22 9:4 12:24 15:24
42:22 43:9,10 46:19
46:20 75:13 151:9
222:8 242:4 259:25
**generally (20)**
12:16,18,22 15:16
23:22 33:10 36:3
43:8 46:15 103:6
112:14 113:4 133:3
134:5,15 212:15
213:14 218:2,15
219:16
**generate (3)**
179:21 180:7 223:20
**generated (5)**
204:23 251:13 252:13
252:17 254:10
**gentleman (2)**
133:25 135:12
**gentlemen (1)**
178:24
**getting (9)**
61:15 118:17 119:4
125:18 128:19
187:20,21 190:14
190:18
**give (30)**
6:11 8:10,13 18:9
24:14 34:4 46:20

61:19 62:19 74:14
74:25 99:7 109:23
141:12 143:24
145:10 148:3
156:20 169:16,25
185:3,6 186:13
199:15 206:18
212:23,25 227:7
239:14 244:23
**given (21)**
46:23 71:3,4,7 72:8
78:17 118:17
120:10 130:23
146:20 165:13
179:4 187:15
211:21 221:24
223:4 239:23
243:12 246:13
256:23 262:13
**giving (2)**
119:6 123:15
**go (27)**
15:11 40:9 52:18
82:24 96:3 106:23
108:13 110:18
113:18 116:21
121:18 125:7,16
139:20 147:19
151:21 204:19
206:5 224:24
228:22 230:10
236:23 237:7
241:15 243:15,22
248:17
**goes (4)**
41:21 101:17 210:3
211:6
**going (52)**
11:9 16:5,9,13 18:7
33:13 39:5 50:12,18
61:11,20 65:9 68:22
75:14 79:16 83:12
85:2,10 94:10 97:8
97:9 105:4 108:22
109:2 119:14,20
120:21 121:18
124:7,8 127:20
129:4,5 138:25
139:4 147:17 148:2
149:11,15 160:7
167:20 169:14,23
187:9 192:10
216:18 239:10
251:10 258:7,10,11
258:25
**Goldman (4)**

6:14,17 233:22
244:11
**good (15)**
5:8 44:13 48:11 98:20
126:14 129:13
153:6 167:7 174:25
185:5,8 187:13,17
189:5 258:16
**gotten (1)**
113:5
**governing (4)**
26:12 37:3,7 110:6
**government (1)**
56:25
**great (4)**
88:10 127:25 143:16
249:7
**greater (2)**
144:6 218:2
**gross (5)**
142:25 144:19 166:4
167:6 258:18
**group (1)**
15:15
**guess (7)**
84:24 90:17,22 112:4
139:8 190:15 254:7
**guys (5)**
135:17 205:25 216:19
252:9 258:13

**H**

**half (1)**
129:3
**hand (3)**
85:10 192:10 262:24
**handed (4)**
58:11 249:4,6 254:22
**handing (10)**
25:21 63:14 99:9
154:25 167:12
214:11 223:25
226:18 248:24
252:24
**handle (3)**
117:11 137:15,15
**handwritten (3)**
214:9,13 263:14
**hanging (1)**
247:18
**happen (4)**
74:24 128:11 144:2
145:18
**happened (16)**
9:5 72:5 84:20 97:12
114:25 131:16

133:2 150:12 151:5
151:10,20 232:15
235:10 237:24
238:19,22
**happening (3)**
71:8 122:25 147:18
**happens (5)**
92:14 98:6 127:10
133:4 207:15
**happy (3)**
7:6,11,12
**hard (1)**
117:11
**HASSAN (6)**
4:12 167:24 168:4,6
168:11,14
**hat (2)**
170:4,9
**hate (1)**
40:21
**headed (1)**
255:5
**heading (3)**
162:7 254:15 255:2
**hear (4)**
7:10,13 29:18 49:13
**heard (1)**
178:5
**hearing (16)**
7:9 45:4,6,9,15,23
46:7 47:4,22 48:4
49:12,14,16 104:23
159:15 160:14
**hedge (1)**
79:10
**hedged (8)**
76:3,3 77:6,6,12,25
78:16 79:4
**hedges (5)**
3:17 79:11 80:4,20
124:17
**hedging (3)**
76:13 78:21 196:2
**held (14)**
2:5 20:19,25 83:4,9
86:24 106:25 111:6
124:3 132:23
133:12 179:23
180:8 237:21
**help (7)**
121:19 124:19 169:3
192:3 237:4 250:18
253:5
**helped (2)**
173:12 192:8
**helpful (3)**

30:9 189:15 215:9
**helps (2)**
45:13 174:8
**hereinafter (2)**
20:18 21:5
**hereof (2)**
57:5,22
**hereunto (1)**
262:23
**hesitate (3)**
34:4 141:4 143:24
**highlights (1)**
33:10
**highly (1)**
241:9
**hold (1)**
95:11
**holder (1)**
79:6
**holding (1)**
93:3
**HOLDINGS (1)**
1:8
**holds (2)**
181:5,9
**holistically (3)**
81:21 131:10 154:6
**hope (2)**
137:11 249:11
**hopefully (1)**
47:10
**hour (5)**
47:12 71:6,6 85:2
194:24
**house (12)**
33:12 34:13,22 69:19
106:6 137:20
138:20 202:8
228:15 229:13,18
229:21
**houses (5)**
20:21 21:2 128:17
228:24,25
**Hubbard (3)**
2:6 4:5 5:10
**huge (1)**
53:13
**Hughes (4)**
2:5 4:5 5:10 10:8
**hundred (3)**
44:21 118:19 168:7
**hundreds (3)**
154:12 219:8 223:18
**hypothetical (12)**
71:13,17 74:21,22,25
79:7 81:22 98:13,19

209:3 237:5 241:13
**Hypothetically (2)**
210:4,4
**hypotheticals (1)**
241:17

_____

**I**

**idea (18)**
36:25 40:2 61:13,20
67:24 77:10,20,21
77:22 93:12 95:11
107:19 159:6
181:17 185:5,8
255:19 259:4
**identical (1)**
234:13
**identification (6)**
8:2 58:9 192:17
214:10 226:16
252:23
**identified (4)**
12:5 224:18 225:8
251:12
**identifier (1)**
251:17
**identifiers (1)**
251:15
**identifies (1)**
225:15
**identify (17)**
46:16 47:6 52:21
53:18 54:9,21 55:23
56:6,7,16,18 130:20
141:7 192:18
214:12 215:5 227:4
**identifying (1)**
192:25
**ii (1)**
20:22
**IMD (4)**
35:20 36:17,18 39:24
**immediate (4)**
197:5,18 207:5,12
**immediately (2)**
207:4 223:22
**impact (3)**
51:19 156:5 157:11
**imperative (2)**
83:3,8
**imperfect (2)**
203:10,12
**imply (2)**
56:5 228:17
**import (1)**
127:10
**importance (1)**

127:7
**important (12)**
18:17 42:12,24
166:13 169:2
185:13 187:3,13
190:7 250:3,13,17
**importantly (2)**
111:11 258:5
**impossible (6)**
78:18 97:7 177:11
207:23 208:15
222:23
**impression (1)**
188:2
**inaccurate (3)**
158:24 182:19,23
**inception (1)**
51:5
**include (13)**
8:8 30:18 31:21 62:10
62:24 63:3,19 69:7
131:15 133:6
134:11 162:18
260:8
**included (24)**
19:7 27:10 32:11
39:22 51:3 52:17
53:5,9 57:20 60:17
62:5,10 65:20 67:9
68:2 69:8 76:15,15
97:4 131:13 189:11
209:7 241:7 257:9
**includes (6)**
37:17 55:9 56:25
57:17 86:21 252:4
**including (14)**
20:17,25 34:23 37:3
83:21 102:18
149:14 173:17
178:11 187:5 222:2
239:15 245:7
247:11
**inclusion (3)**
38:12 48:21 51:22
**income (1)**
187:9
**incomplete (4)**
94:11 183:2 229:9,10
**inconsistency (1)**
90:10
**inconsistent (7)**
27:12,13 28:5 39:18
49:5 103:8 190:25
**incorrect (2)**
101:18 157:16
**increase (2)**

79:5 139:17
**increased (1)**
119:19
**increasing (1)**
152:4
**incurred (2)**
150:9 153:7
**independent (3)**
75:16 157:22 209:21
**independently (1)**
209:13
**INDEX (1)**
263:2
**indicate (1)**
167:4
**indicated (2)**
111:14 203:13
**indicates (2)**
120:24 217:10
**indirect (2)**
69:23 172:9
**industry (16)**
23:23 110:10 124:13
134:5 137:17,25
142:11,18 154:5
176:22 179:13,16
195:13 207:2
218:18 232:14
**infinity (1)**
116:21
**information (67)**
12:24 36:16 41:17
62:9 111:5,21 113:3
122:5 135:13
158:24 159:3,8,21
161:7,10,13,16
163:19 166:8,14
171:16,21 172:2,3,8
172:9 173:15,16,22
174:23 175:8 176:4
178:14 182:16,25
185:4,7,11 189:17
189:24 190:2
191:11,11,20,21
192:7 195:15,19,24
201:11 214:2,6,7
220:11,18,23
221:13 222:9 250:3
250:21 251:2 252:6
252:15 257:15
258:13 259:11,23
**informed (1)**
10:21
**infrequent (1)**
234:9
**inherent (10)**

191:12,18,22 192:4
195:21 224:19
225:9 227:4 229:3
240:8
**initial (7)**
122:13 210:16,25
211:17 212:5
229:25 230:8
**initially (2)**
57:12 161:12
**insofar (2)**
117:15 201:15
**instances (1)**
82:20
**institutional (6)**
134:15,19 135:2
219:2 229:14 230:3
**institutions (1)**
230:3
**instruct (2)**
31:8 40:18
**instructed (1)**
29:16
**instructing (1)**
29:24
**instruction (3)**
42:4 212:23,25
**instrument (1)**
135:8
**integral (1)**
248:9
**integrally (1)**
248:15
**intend (2)**
43:10 131:17
**intended (16)**
6:25 39:4 64:15 65:6
77:2,15 78:3 93:13
136:15 146:2
162:16 163:20
172:25 189:10
220:8 235:14
**intending (2)**
77:24 78:25
**intent (2)**
55:7 78:15
**intention (1)**
132:24
**interest (5)**
53:11 193:4 196:4
229:16 261:2
**interested (3)**
200:9 216:4 262:17
**interesting (1)**
98:9
**interests (2)**

57:19 146:12
**interject (1)**
40:22
**intermediaries (3)**
232:22 233:10 248:12
**intermediary (2)**
228:18 229:23
**internal (3)**
224:9 254:2,12
**internally (1)**
254:10
**interpret (6)**
36:14,15 89:23 90:5
90:25 93:10
**interpretation (3)**
29:9,11 96:9
**interpreted (1)**
16:3
**interpreting (2)**
90:16 103:25
**interrupt (8)**
11:7 36:10 108:11
123:10,17 124:11
255:24 256:2
**interview (1)**
163:2
**interviews (2)**
143:12 162:7
**intraday (1)**
232:10
**inventory (3)**
58:23 60:17 61:3
**investment (2)**
15:20 132:17
**involved (10)**
27:3 51:3,7 70:23
76:13 90:22 117:12
125:23 186:25
213:14
**involving (2)**
5:17 49:20
**irrational (4)**
70:9 72:17 74:8
208:15
**irrelevant (1)**
40:3
**irrespective (1)**
91:16
**isolating (1)**
190:10
**issue (3)**
9:7 159:15 174:10
**issues (12)**
5:19 8:19 14:13
104:23 117:12
156:2 163:17 187:4

187:16,25 240:5
244:3
**item (4)**
66:16,18 67:11 69:6
**it'll (1)**
256:4
**i.e (1)**
157:19

---
**J**
---

**J (10)**
1:14 2:4 4:9 5:2 7:25
130:4 261:18 262:9
263:7 264:4
**James (15)**
10:2 46:24 59:18
200:6 201:18,19,22
202:4,15,21 203:5
215:23 216:24
218:10 220:25
**January (4)**
8:5 9:11 12:3 163:3
**Jasen (1)**
59:17
**job (6)**
1:25 44:5,13 179:5
187:17 202:3
**Jointly (1)**
1:8
**Jonathan (1)**
10:7
**Jones (7)**
3:4 135:16 143:13,13
171:13,16 178:12
**judge (1)**
42:5
**judgment (2)**
212:14 252:7
**jumped (1)**
46:4
**jurat (1)**
260:9

---
**K**
---

**K (1)**
3:21
**Kathy (9)**
1:24 2:7 55:17 66:12
88:12 96:14 147:14
174:19 262:5
**keep (6)**
128:16,17 134:17
185:14 189:7 232:6
**keeping (1)**
135:5
**KELLY (1)**

3:8
**killing (1)**
193:4
**kind (3)**
120:11 258:9 259:25
**King (17)**
161:15,18,22 162:21
163:8,11,18 170:24
171:2 175:19
176:11 179:8 187:5
201:16,20 256:12
257:9
**King's (7)**
11:16 164:11 166:20
175:17 176:3 178:4
178:19
**Klepfer (3)**
1:24 2:8 262:5
**knew (14)**
43:20 82:20 84:6
112:14 172:14,14
179:6 216:5,24
222:8,10 223:8
239:8 252:19
**know (188)**
5:9 7:3 9:3 10:19,25
11:22 15:2,11 29:12
33:5 36:20 43:6
45:8 49:23 55:11
60:13 62:2,4,22
63:2 69:23 71:14
77:21,23 78:21
84:13 86:2,15,15
90:4,5,16,17 91:7
93:2 94:9,12 95:7,9
97:7,8 100:3 103:15
109:24 112:15,17
117:7,14 118:21
119:12,17,20,22
120:9,11,11,12,17
120:18,19,20,23
121:17 122:25
123:2,6,6,21 125:5
125:23 128:22
129:3,9 131:14,15
133:14 134:2,9
137:11 145:22
147:25 148:6
149:10 154:2,8,21
155:4,9 156:6
157:11,17,17
159:19 161:6,9,12
164:13 165:11
168:5 170:11 174:6
174:24 175:21
177:4 178:2,6 179:7

181:18 182:13
183:23,24 184:13
184:14 185:11
186:2 187:18,19,24
188:3,4 190:11,20
195:9,20 196:6,11
196:11 197:25
198:21 199:16
200:22 210:21
213:17 216:4,20
217:21,22 218:5
221:8,11 222:6,7,9
223:8,9,10,16,17,23
224:6 227:20,21
230:6,9 232:3,5
234:3 236:15 238:5
239:3,9,22 241:21
241:23 244:5,7,8,9
244:10 245:9,18
246:2,24 247:15,25
248:5 250:19
252:12 254:12
255:16 257:3,22,25
258:5,22,22 259:3
259:19
**knowing (5)**
55:14 125:6 128:4,6
240:5
**knowingly (2)**
202:17,24
**knowledge (31)**
24:21,25 25:8,9,13
81:6 101:19 113:13
123:5 124:12,15
127:13,20 134:25
154:11 155:12
175:19 177:21
179:4 182:6 200:16
203:7,8,12 221:5
222:2,5 223:5
239:23 240:7,7
**knowledgeable (2)**
135:18 177:3
**known (9)**
15:2 112:20 124:15
239:21,21 244:2
252:18 258:13
259:23
**Kobak's (1)**
11:15
**Konefal (6)**
192:14,20 193:23
194:9,19 263:11

---
**L**
---

**lack (8)**

12:23 49:2 166:14
173:15 175:8 176:3
222:2,5
**land (2)**
228:9,13
**language (5)**
39:10 90:11 100:7,24
101:14
**large (2)**
12:23 221:9
**largely (1)**
218:25
**larger (4)**
141:10 199:21 218:21
218:23
**largest (1)**
219:17
**late (2)**
165:23 166:11
**law (2)**
2:5 5:10
**lawyer (3)**
6:7,8 43:8
**lawyers (3)**
32:16 90:21 100:17
**LBI (32)**
20:13,14,20,20 59:18
59:24 104:12
105:24 106:4 107:9
138:9 146:22
151:23 152:9
155:16 158:4,24
159:9 176:15
182:11,18 215:18
216:3,4,17,21 219:3
237:3,11,13 238:13
241:9
**LBI's (16)**
20:15,19,23 60:16
61:3 83:5,9 110:14
112:23 130:22
166:15 175:10
176:6 184:8 237:10
238:10
**lead (3)**
6:8 110:8 125:2
**leading (1)**
13:3
**learn (4)**
112:22 200:13 219:6
219:11
**leave (2)**
47:5 249:9
**Leaving (4)**
17:22 74:3 78:20
111:18

**left (6)**
202:7 218:2 235:15
237:17 238:24
239:5
**legal (3)**
24:3,7 26:14
**Lehman (138)**
1:7 3:5 13:2,18 14:14
14:24 15:9 16:25
17:13 18:20,22 19:5
19:23 39:21 48:22
51:13 52:22 53:13
53:19 54:2,10,21
55:25 56:4,9 62:9
64:3 69:18 73:6,12
73:19,19 75:7 76:11
77:20 80:18 87:7
92:23 93:2 94:7
96:19 97:2,9,15
102:23 103:18
105:2,10,15 106:11
106:22,22,25
107:10,14 108:16
108:20,25 111:6
124:3 128:14,15,24
131:22,22 132:4,12
132:22 133:14
134:8,20 135:21
136:10,24 138:12
141:19,20 142:10
143:4 144:7,11,14
144:15 146:13,21
148:21,22 149:2,19
149:25 150:8,15,19
153:6 159:20
163:19,24 171:2,8
175:20 178:6
179:10,18 185:3,23
186:20 187:22,24
188:21 191:3
194:10 198:11
199:5 200:17 202:7
202:23 212:20
218:11 219:6,12,16
219:23 220:21
230:6,19 234:7
239:20,23 240:6,15
240:19,22 242:12
243:2 247:3 254:2
254:10 264:2
**Lehman's (70)**
14:11,17 17:14 42:14
49:8 53:11 58:22
77:12 89:20 91:3,20
97:13,23 106:13,17
109:6,16 111:22

121:8,16 122:17
128:3 131:21
164:14 166:8
171:17,17,22,23
172:3,4,21 175:9
177:11 178:10,14
178:15 184:17
186:6 188:19 191:5
195:17,21 197:17
199:10,24 202:25
209:25 210:8,10,23
212:9 216:25
217:19 221:16
222:17 224:10,19
225:10,16 235:12
236:24 239:6,13
240:4 243:5 248:2
250:5,15 257:18
**Leitner (303)**
1:14 2:4 5:1,2,8 6:1
7:1 8:1,2 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1,21
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1,11 43:1 44:1
45:1,14 46:1 47:1
48:1,16 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1,14 64:1 65:1
65:14,20 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
83:19 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
93:23 94:1 95:1
96:1 97:1 98:1 99:1
99:9 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
113:11 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1

128:1 129:1 130:1,4
130:8 131:1 132:1
132:20 133:1,9
134:1 135:1,12,19
136:1 137:1 138:1
139:1 140:1 141:1
141:17 142:1 143:1
144:1 145:1 146:1
147:1 148:1,18
149:1 150:1 151:1
152:1,5 153:1 154:1
154:25 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1,4
166:1 167:1,12
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
188:16 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
196:18 197:1 198:1
199:1 200:1 201:1,4
202:1 203:1 204:1
205:1 206:1,5 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1,11 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1,9 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
248:24 249:1 250:1
251:1 252:1,24
253:1 254:1 255:1
256:1 257:1 258:1
259:1,10 260:1,3
261:1,18 262:1,9
263:1,3,7 264:1,4
**Leitner's (2)**
66:6 164:21
**letter (25)**
33:20 34:7,12 85:12
85:14,18 87:6 88:8

89:5,11,19 90:25
91:16,18 92:7 93:8
93:15 95:19,22
96:10 100:8,18,25
101:15 102:17
**letters (8)**
33:18 34:24 69:23
129:4,6,7 134:6
247:17
**let's (6)**
60:14 73:10 98:16
122:15 232:6 237:7
**level (2)**
54:4 229:23
**liabilities (23)**
57:13,18 66:19,22
68:3,17 69:5 70:2
70:24 72:19,20
74:10,19 76:24 89:7
89:12,13,14,20
90:12 91:19 92:6
209:7
**liability (5)**
91:2 197:18 206:12
206:14 245:14
**life (1)**
13:12
**limit (1)**
131:17
**limitation (1)**
134:16
**limited (5)**
17:4 79:13 132:3
158:6,23
**limiting (1)**
147:3
**line (24)**
47:14 52:8 59:24
66:16,18 67:11 69:6
72:7 133:10 216:8
217:25 251:9,24
264:8,9,11,12,14,15
264:17,18,20,21,23
**lines (5)**
89:9 110:5 215:17
217:4 251:23
**Liquid (1)**
254:5
**liquidate (1)**
231:10
**liquidated (6)**
128:15 230:23 231:22
235:3,12 237:10
**liquidating (3)**
231:5,24 232:16
**liquidation (13)**

232:2,4 235:25 236:6
237:12,20 238:4,6
238:15,24 239:5,17
240:18
**liquidity (9)**
139:9,10,12 140:21
197:11 198:17
205:17 213:16
247:12
**list (16)**
35:8,13 63:19 104:11
104:25 110:18
162:6,10,13,16
165:8,9,13 167:3
172:16 249:18
**listed (3)**
106:14 178:7 228:25
**lists (3)**
164:14,23 249:21
**literally (1)**
17:21
**litigation (4)**
5:17 20:9 37:5 38:14
**little (12)**
46:4 111:15 122:4
123:23 197:12
222:8 228:5 236:17
244:8 250:11
258:16 259:23
**Livenote (1)**
2:11
**Liz (7)**
46:23 201:19 215:23
216:5,23 218:10
220:25
**Liz's (1)**
218:14
**LLP (5)**
2:6 3:4,10,17 4:5
**LOCs (3)**
119:17,18 142:24
**logic (2)**
92:22 93:5
**long (46)**
27:11 34:2 57:9,20
58:2,21 60:17 61:4
70:7,10 72:17,18
74:6 76:16,19,20
78:10,22 93:19
95:24,25 96:5,6
106:24 150:22
158:25 168:4,5,19
168:20 174:5
181:15,25 196:14
196:25 204:19
244:2 247:4,5 249:7

254:16 255:3,6,8
256:16 258:20
**longer (2)**
96:7 168:24
**longs (2)**
93:3 98:22
**long-standing (1)**
179:11
**long/shorts (1)**
257:10
**look (14)**
59:4 61:9 64:10 86:12
142:14,18,20 143:6
144:18 152:18
173:18 195:3
222:23 256:4
**looked (11)**
62:17 64:9 122:7
153:6 183:19 188:5
200:13 221:13
253:15,19,20
**looking (10)**
84:6 85:24 95:18
104:15 142:25
161:15 170:11
194:2 213:25 257:6
**looks (5)**
63:18 193:10,11
217:5 253:25
**loss (11)**
7:9 84:11 95:6 128:14
135:21 136:2,3
204:23 207:5,13
231:12
**losses (2)**
124:19 153:7
**lost (1)**
146:24
**lot (8)**
13:25 64:25 65:10
118:16 119:15
122:11 223:13
244:3
**LUGER (1)**
4:11
**lumped (2)**
166:16 175:11
**lunch (1)**
260:7
**Luncheon (1)**
129:15
**luxury (1)**
120:8

-----
**M**
-----
**Macchiaroli (2)**

243:21 244:2
**Madison (1)**
3:19
**Magazine (3)**
226:16,24 263:15
**MAGUIRE (1)**
4:10
**maintain (5)**
108:7 142:20,21
210:16 248:14
**maintained (2)**
216:14 219:3
**maintaining (1)**
247:12
**maintenance (1)**
254:3
**majority (1)**
82:16
**making (6)**
29:14 88:6 124:25
151:7 205:4 229:22
**manage (8)**
14:19 94:9,14 116:16
116:24 117:8 187:7
195:21
**managed (2)**
143:18 186:25
**management (6)**
15:20 125:9 132:17
176:23 178:25
185:24
**manager (1)**
161:16
**managers (2)**
259:7,9
**managing (3)**
128:16 221:19 222:17
**many-thousand-pa...**
177:22
**marathon (1)**
6:25
**margin (183)**
5:20 20:24 21:15
26:19 27:19 28:6
29:6 32:22 33:10,21
33:25 34:6,13 38:16
39:5 42:12,17,25
43:2,21 44:25 45:24
46:9,14,15 47:20
48:21 50:8 51:10,13
51:22 52:23 53:21
54:13 56:11 62:24
63:4,5 67:9,20 68:2
69:7,8,18 70:8,11
72:14,21 74:10
80:21 84:12 95:11

100:10 101:6,17
102:18 103:19
105:18 106:16
112:23 113:22
114:4,19 115:8,10
115:13 116:4
117:22 118:13,25
119:4,8,11,18,21
120:2 121:4,22
122:13,19 124:4,5
124:18 125:12,13
125:13 127:14
128:7,21 129:3,4,6
133:16 134:6,7
135:5,6 136:11,14
137:8,14,16,19
138:2,8,22 139:3,16
140:6 141:6 142:8
142:13,14,21 143:6
144:17,19 146:20
148:22 149:4
154:12 164:6
165:18 191:9 197:9
197:12,21 198:7
205:5 207:20
208:14 210:8,9,16
210:19,25 211:16
211:17 212:6 214:4
218:23 223:3,20,22
227:25 228:13
229:4,13,16,20,24
229:25 230:7,8
231:4,18,23 232:17
232:21 233:2,14
234:12,14,23 235:4
235:15 236:25
237:2,11,13,21
238:13,23 239:5,13
239:14,16,17
240:13,21 242:5,15
242:25
**margined (2)**
97:17 207:25
**margining (5)**
128:24 134:2 135:4
233:11 235:13
**margins (2)**
37:18 157:7
**mark (3)**
19:12 192:12 223:20
**marked (28)**
8:2,4 19:14 25:23
58:8,12 60:23 63:15
85:13 99:10 155:2
167:13 168:10
192:11,16 193:3

195:14 197:13
203:22 214:10,12
224:2 226:16,19
249:2 252:23,25
256:22
**market (63)**
33:16 95:3 117:7,14
119:16 120:11,15
123:7 124:24 125:8
126:2 130:10,21,24
131:6,7,20 132:5
135:7 137:3,5 138:5
138:16,21,25 139:6
139:11,25 140:3,7
140:12,21 141:2
151:22 196:19,23
197:2,10,13 198:17
198:22 203:22
206:14,21 207:13
208:2 212:9 213:15
223:21 229:2 230:4
232:11,22,25
233:10,23 234:3
235:20,22 236:7
238:5 248:13 254:5
**marketplace (6)**
71:4,7 197:7 212:17
229:14 230:3
**markets (11)**
20:12 75:9 197:19,20
200:14 205:18
206:10 207:3 222:3
222:10 248:11
**market's (1)**
207:4
**market-making (3)**
96:22 194:12 247:7
**marriage (1)**
262:16
**materials (6)**
11:25 12:4,10 13:6
65:21 155:9
**matter (15)**
5:12 8:21,23 25:22
26:6,14 43:13 53:14
98:18 107:23
163:16 189:16
244:6 257:4 262:17
**matters (3)**
5:15 18:12 161:2
**McDade (4)**
49:8,16,18 50:3
**McDade's (3)**
48:17,20 51:20
**mean (52)**
11:11 13:13 15:21

18:4 33:2,3 36:21
44:3 48:4 55:25
56:3,5 59:14 62:11
74:6 75:13 86:12
87:13 91:11 92:21
95:22 96:17 97:6,11
99:6 107:19,19
108:11 112:14
120:14,19 121:22
123:9,17 125:13
156:20 169:16
183:15 197:25
200:23 201:5,17
216:3 217:15 232:6
235:11 244:5
245:15 252:8
255:24 259:19,19
**meaning (1)**
152:22
**meaningful (1)**
72:10
**means (7)**
15:24 33:5 88:17 91:7
205:2 231:8 255:19
**meant (11)**
14:22 15:4 31:20
32:10 34:6 36:18
40:14 62:3 63:12
68:11 90:23
**measure (2)**
12:23 213:13
**mechanism (1)**
150:24
**mechanisms (1)**
206:22
**meet (5)**
122:13 137:8 162:25
163:7 198:3
**meeting (4)**
33:21 162:21 163:15
200:12
**meetings (1)**
162:19
**member (24)**
105:11,25 106:5
107:8,9,24 109:9,11
136:6 137:9 181:12
181:15,18,22 182:3
182:9 185:11 198:5
209:8,9 232:18,20
233:4 237:18
**members (9)**
13:21 179:24 180:15
183:15 228:23
229:4 232:12,25
233:8

**membership (7)**
107:14,16 108:6,14
109:7,16,25
**memberships (6)**
106:25 107:6,11
108:16,21 109:4
**member's (2)**
34:16 198:15
**memo (1)**
224:9
**memorandum (4)**
224:17 225:7,12,24
**memory (2)**
29:23 143:16
**mention (2)**
93:14 108:8
**mentioned (2)**
140:18 142:6
**Merc (1)**
109:16
**merchant (2)**
227:5 228:14
**merchants (1)**
20:13
**Merit (2)**
2:9 262:6
**met (3)**
5:8 31:12 178:10
**method (1)**
135:4
**methodology (2)**
33:24 142:8
**Michael (1)**
193:24
**middle (4)**
39:11 130:16 205:14
214:22
**midst (1)**
20:10
**migrated (1)**
174:11
**Mike (2)**
243:21 244:2
**million (15)**
118:19 129:2 154:15
155:16 157:6 158:6
217:19 219:13
223:3 225:19
239:15 242:13
243:2,4 255:15
**millions (2)**
154:12 219:8
**Mincak (2)**
256:12 257:8
**mind (15)**
29:17,19 38:8 50:11

50:15 51:24 58:5
69:4 95:20 135:5
165:3 185:14 189:7
232:6 235:6
**minds (1)**
43:7
**minimum (3)**
122:19 125:7 233:15
**minus (1)**
255:17
**minute (1)**
147:17
**minutes (3)**
47:14 48:12 85:3
**mischaracterized (1)**
28:18
**mischaracterizes (9)**
28:9 37:20 38:20
61:23 66:5 72:25
91:6 155:19 255:12
**misunderstood (1)**
123:12
**mitigate (2)**
117:6 228:22
**mitigated (1)**
116:4
**mitigation (2)**
167:5 229:22
**mix (1)**
198:17
**MM (2)**
217:6,13
**model (5)**
232:8 234:18,22
236:5,8
**modeling (1)**
233:2
**models (5)**
229:2 232:21,23
234:15,17
**moment (12)**
122:16 123:25 141:12
155:3 173:9 175:7
186:13 193:7 195:3
201:11 228:3 251:6
**moments (1)**
206:6
**Monday (23)**
14:16 16:18 17:2
92:24 98:9 118:22
119:6,24 127:11,12
128:23 192:15,21
193:22 201:10
224:13 236:11,18
239:7,19 241:4
258:11 263:12

**money (4)**
115:17,18 223:23
258:7
**month (3)**
44:10 224:7 234:7
**morning (10)**
5:8 14:16 16:18 92:24
118:22,22 154:16
165:25 173:21
206:10
**Motion (1)**
160:14
**motivated (4)**
190:5 239:25 240:12
241:9
**movants (1)**
7:19
**move (12)**
46:5 72:15 116:17
120:21 128:23
142:22 197:20
220:8 223:3,19
240:10 241:10
**moved (3)**
144:3 206:15 235:23
**movement (6)**
126:3 166:4,25 208:5
208:16 235:24
**movements (3)**
164:6 165:17 207:14
**moves (2)**
197:2 235:20
**moving (5)**
86:18 213:3,5,8
240:13
**mutually (1)**
197:25

_____
**N**

**n (6)**
3:2 4:3 35:17 39:3,12
40:15
**naked (1)**
82:18
**name (6)**
5:9 6:8 15:4 180:2
264:2,4
**named (1)**
6:8
**names (2)**
143:16 171:12
**narrative (1)**
245:22
**naturally (1)**
103:10
**nature (9)**

84:9 164:4 165:16
166:23 188:12
189:6 212:16 214:3
218:20
**neat (1)**
135:11
**necessarily (7)**
21:25 53:7 65:16
114:19 167:4
223:13 229:11
**necessary (12)**
30:17 51:6,16 53:8
88:18 107:10
122:13 146:4
189:16 191:10
196:10 212:5
**necessitate (1)**
229:17
**need (22)**
7:2 65:18 80:21 94:13
95:5 109:15 120:3
126:13 138:4,8
144:21 189:25
196:5 205:16,25
210:9,24 211:16
228:3 235:20 238:4
256:24
**needed (6)**
144:18 185:4 190:18
195:20 222:17
248:13
**needs (2)**
211:7 227:21
**negative (1)**
28:25
**negotiable (1)**
122:10
**negotiate (4)**
120:9 121:13 124:21
229:15
**negotiated (8)**
7:18 31:16 40:13
62:12 81:10,11
120:18 125:25
**negotiation (1)**
81:19
**negotiations (4)**
49:19,25 50:4 55:15
**negotiator (1)**
49:8
**negotiators (1)**
56:17
**Neil (14)**
4:9 5:9 65:10 71:21
129:11 147:4 160:9
164:24 167:8,23

174:2 191:23
205:22 240:25
**neither (3)**
81:7 206:13 262:18
**net (6)**
156:5 157:12,12,14
231:5 256:16
**netting (3)**
251:25 255:18,19
**never (6)**
50:7 51:21 74:24
101:19 241:18,19
**new (20)**
1:3,15,15 2:7,7,12 3:7
3:7,14,20,20 4:8,8
193:24,24 207:24
230:16 262:3,4,7
**nice (1)**
250:9
**night (1)**
177:24
**non-PIM (2)**
149:18 150:7
**normal (5)**
22:10 119:9 244:17
245:6,20
**normally (4)**
98:14 108:2 204:10
245:9
**North (1)**
3:12
**Nos (4)**
58:8 252:22 263:8,16
**Notary (3)**
2:11 5:3 262:6
**note (4)**
216:20 218:10 245:18
253:24
**noted (16)**
48:13,14 85:4,5
129:15 130:3
170:17 175:3,4
206:2,3 230:13,14
248:21,22 261:12
**notes (6)**
214:9,13,15,17
215:20 263:14
**notice (1)**
69:25
**notification (1)**
155:23
**November (1)**
14:9
**number (17)**
19:11 38:2 46:18 47:7
47:9 94:20 157:5,16

168:15 184:23
185:2 194:4 227:7
234:2 251:18 253:3
255:15
**numbered (1)**
215:3
**numbers (8)**
46:14 59:5 62:18 69:5
70:21 219:19
239:21 258:19
**numerous (1)**
247:15

_____
**O**

**oath (2)**
143:23,25
**object (50)**
9:20 11:9 19:25 21:18
21:23 23:8 24:12
31:5 32:13 33:6
35:25 50:12,17
60:11 65:9 68:18
72:23 81:15 83:13
87:17 89:22 93:9
101:9 102:13 105:5
106:18 109:2 124:7
141:15 150:10
152:12 153:11
154:17 156:11
158:9 160:7 163:4
167:20 169:23
173:2 174:21
186:11 197:22
211:11 222:20
226:10 240:23
243:7 251:10
259:14
**objected (1)**
159:13
**objecting (1)**
88:4
**objection (155)**
8:16,25 15:22 17:7
18:3 22:19 23:5
24:6,19 25:6,15
26:10,21 27:22 28:8
28:19 29:8,15 32:24
34:10,20 36:9 37:9
37:19 38:18 39:8,16
40:17 42:19 43:3,14
43:22 45:5 47:23
48:8,23 49:2,21
52:3 53:24 54:16,19
55:21 56:14,15
59:12 61:6,22 64:7
64:18 67:2,12,22

**TSG Reporting - Worldwide    800-702-9580**

68:8 69:10 70:12
74:12 76:6 79:14
80:24 86:11 87:10
91:5,22 92:8 96:12
98:4 99:2 102:5,24
103:22 107:3,22
109:18 111:24
112:13,25 114:8,15
115:3,19,22 117:4
120:5 121:10
122:21 126:10
127:2 132:13
135:24 138:14
140:9 141:9,13
143:9 144:9 145:14
147:2 149:21
151:17,25 153:11
155:18 156:18,25
159:10 164:17
165:19 170:13,17
170:22 171:4 172:6
175:25 176:8,19
180:17 181:6
182:20 183:4,11
184:11,19 186:14
188:24 189:3,20
190:22 199:11
200:19 202:11
203:3,25 204:6
206:16 207:8
208:25 210:11
211:4 212:21
213:21 219:9,25
220:16 225:22
226:6 231:13 242:9
246:9,21 248:3
250:7 253:21
255:11 257:20
**objections (1)**
169:21
**objective (1)**
92:12
**obligation (1)**
185:10
**obligations (16)**
14:8,9,17 19:3 20:16
69:22 86:25 91:12
91:19,24 92:25
93:18 149:13 153:3
198:3,4
**observe (4)**
164:5 165:17 166:3
166:24
**obtain (3)**
114:4 136:10 181:3
**obvious (1)**

13:10
**obviously (3)**
52:16 172:13 251:8
**OCC (122)**
17:4,20,22,24 55:11
72:14 107:8,9,13,14
112:23,24 118:24
119:5 122:2,15,18
122:19 123:19,20
123:23,25 124:3,15
127:13 133:17
138:9 141:21 142:3
142:3,4 143:17
144:12 145:11,13
146:23 148:23,24
150:2 153:14,24
154:13,16,22
157:25 158:5 165:8
165:14 179:11,21
180:7,15,22,24
181:4,5,12,16,19,22
182:5,9,18 183:9,15
183:17,19,25 184:8
184:16 185:6,9
186:19,20 188:20
188:21 191:12,20
191:21 192:2
194:11,15,24,25
217:23 228:25
231:8,11,17,21,23
232:7,16,18 233:6
233:12 234:23
235:3,11,14 236:23
237:9,10,11,15,20
237:21 238:14,15
238:24 239:5,14,17
240:20,22 242:6,15
251:13,24 254:11
255:17,19
**occasions (1)**
6:22
**occurred (5)**
47:3 52:7 179:3 238:6
238:20
**OCC's (10)**
124:6 164:6 165:18
179:18 180:25
182:12,16,25
234:14 240:18
**OCC-generated (1)**
254:9
**offered (4)**
29:10 37:2,8,11
**offices (1)**
2:5
**offsets (1)**

34:2
**oh (4)**
147:25 158:16 256:6
258:18
**okay (58)**
7:10 11:14 18:21 50:2
58:10,17 59:23
60:14 61:16 82:8
85:20 87:20 88:6,10
89:3,8 92:12,16
100:5 101:4 102:15
118:5,11 123:18
127:25 130:14
140:15 148:6 155:6
156:7 158:18
160:15,23 162:16
167:16 173:9,11
180:23 194:8,16,20
213:9 215:11
216:18 225:4,13
227:2,10 235:8
242:17,19 245:22
249:25 251:20,22
256:6,7,10
**old (1)**
257:25
**OLIVER (1)**
3:17
**once (3)**
116:21 195:9 247:23
**ones (5)**
9:18,22,24 191:25
193:5
**ongoing (1)**
246:14
**oOo (1)**
261:13
**open (2)**
125:15 194:11
**opened (3)**
197:19 206:10 207:4
**opening (3)**
119:6 207:4 258:11
**open-ended (2)**
116:20 139:16
**operating (2)**
200:14 233:24
**operation (7)**
75:12,17 88:19 90:8
94:15 152:23 241:8
**operational (10)**
13:7,14 14:23 110:24
117:12 150:24
174:10 198:24
200:12 213:16
**operations (8)**

76:10 135:17 143:17
171:8 178:11
196:10 258:24
259:2
**opine (1)**
8:19
**opinion (114)**
8:20,22 12:12,15,17
12:19 13:10 17:3,19
20:2 21:10 26:6,25
28:2,10,11 29:4,11
30:18 33:24 35:24
36:14 37:2,8,11,14
37:15 38:10,22,24
40:5 41:3,8 42:11
44:15,17 48:18,25
50:15,22 51:19,25
53:2,11,16 60:15,22
61:12 70:9 72:16
75:4,23,25 79:17
83:7,23 99:4 103:2
103:2,4,16 106:20
109:20,23 110:16
110:20 111:4,21
112:5 113:25 115:7
116:23 117:17
118:3,8 119:25
120:24,25 122:16
123:25 126:20
127:17 128:2 131:4
131:19 132:3,4
139:14 141:17
142:6 158:21 164:3
164:9,10 172:13
175:14,16 176:20
182:8 195:12
196:18 207:17
208:4 209:17,24
219:21 221:15,22
226:2,13 230:18
237:19 238:17
242:10
**opinions (11)**
7:23 8:9,10,12 9:6
18:12 21:11,14
35:14 49:5 50:25
**opportunity (2)**
65:14 173:5
**opposed (3)**
48:2 62:12 199:20
**opposite (1)**
213:2
**option (17)**
14:17 98:16 106:3
140:8 143:17
150:21 151:12

152:17 165:8
185:18 197:7,12,17
232:20 251:17
255:18,19
**options (58)**
13:19 14:5,5 20:17
33:17 52:20 62:10
62:12 76:19 95:4
96:21 98:11 122:2
132:4,9 133:16
135:22,23 136:3
137:3 141:22 144:4
144:5 145:12 147:5
147:7 148:23
149:18 155:17
156:3 157:9 165:14
171:9 179:3 193:25
196:12 198:4
220:14 222:25
228:25 233:21,23
234:12 236:21
249:19 251:14,16
251:25 252:5
254:16 255:3,6,8,22
256:16,17 257:10
258:6
**oral (2)**
147:24 148:3
**order (14)**
90:20 102:2 121:22
136:11 138:5,9
166:12 195:20
196:11 210:17
221:18 222:16
238:6 258:9
**orderly (1)**
236:6
**organization (4)**
17:6 107:2 177:6
182:14
**organizations (3)**
105:10,12 107:7
**original (1)**
86:14
**originally (4)**
6:6 77:2 136:23 159:2
**ostensible (1)**
209:5
**OTC (7)**
36:24 62:6,10,11
173:17 178:8
236:21
**outcome (7)**
231:25 232:3 237:16
238:7,9 239:2
262:17

**outside (2)**
17:24 183:20
**overall (2)**
62:20 186:2
**overnight (2)**
13:25 232:9
**over-the-counter (7)**
62:11 76:16 166:17
175:12 176:17
177:13 251:3
**owed (1)**
155:24
**ownership (1)**
208:3
**owning (1)**
195:16
**Oxford (81)**
4:9 5:7,9 11:13 18:6
19:13,17 28:15,19
29:10 30:5,21 37:23
38:3 41:12 43:24
45:12 47:13 48:6,11
48:15 55:17 58:16
59:22 65:18 66:10
71:23 81:12 84:21
85:3,6 88:11 92:11
102:10 108:23
118:7 124:10
129:13 130:7
147:21 156:7,22
157:3 164:20 165:2
167:9 168:8,12,23
169:19 170:3,10,17
174:13,18,25 175:5
178:22 184:5 193:2
200:21,25 205:24
206:4 211:8 214:21
214:25 224:24
227:8 230:10,15
241:2 243:22
248:17,23 249:23
254:25 257:3 260:3
261:10 263:4

**P**

**P (4)**
3:2,2 4:3,3
**package (2)**
73:13 189:9
**page (70)**
19:10 21:11,12 22:2
35:3,9,10,10,17
38:2,4,5 39:4 56:21
57:11,12,16,16
59:17 82:14 86:22
89:5,17 104:7,20,21

105:9 130:16
139:20 158:14
162:3,4 168:2 178:3
193:21 194:3
214:19,24,25 215:2
215:4,6,13,14
226:25 227:6,7,8,9
227:12,13 228:8
249:15 251:20
254:14 255:5 260:8
263:3,6 264:8,9,11
264:12,14,15,17,18
264:20,21,23
**pages (8)**
21:8 168:7,19,20
169:10 170:8 174:4
251:9
**pain (1)**
86:12
**paper (1)**
57:2
**paragraph (94)**
19:9,16,20 20:7 22:4
22:5,22 37:17,21
38:10 39:3,12 40:15
56:24 57:14 58:6,13
58:15,16,20 59:6
60:15 61:12,15
71:25 75:20 76:21
78:5 79:17 81:2,3
82:4,11,24 83:14,17
84:18 85:17 86:7
87:11 88:16 89:4,10
90:13 91:9,11 92:6
93:14,15 95:18,20
100:13,14,15 101:2
101:4,12,25,25
102:3 104:5,6,15
110:2 113:7 117:17
118:3 121:23,25
126:16 130:12,13
140:2 158:12,17,22
164:2 166:13
167:16,19 168:15
169:8 175:6 178:19
228:8 230:17 231:4
235:10 244:12
245:17,21 249:16
253:7,11
**paragraphs (8)**
21:9,10,13 72:2 81:4
99:25 102:15 173:7
**parens (2)**
86:24 87:2
**Park (2)**
2:6 4:7

**part (25)**
18:24 23:17 26:2,7
27:16 42:12 50:25
61:10 64:5 65:21
83:20 133:19,20,22
137:20 140:22
146:5 175:13
185:25 199:20
203:16 205:15
221:2 246:19 248:9
**participate (1)**
50:4
**participated (2)**
49:19,24
**particular (13)**
9:6 62:4 87:6 96:2
104:5 118:3 135:8
154:3 162:3 177:4
205:15 212:17
223:7
**particularly (13)**
38:12 68:14 70:25
102:3 105:24
121:13 130:18,23
161:15 198:24
205:18 210:13
220:9
**parties (22)**
43:7 55:8 64:2 72:4
72:10 74:17 78:15
81:9,19 88:25 90:7
103:7,14,24 104:3
106:8 126:24 146:2
162:23 220:7
241:19 262:15
**partly (3)**
166:15 175:10 176:6
**partner's (1)**
101:18
**party (8)**
81:7 93:24 94:5 103:3
152:18 196:12
207:24 262:19
**party's (1)**
206:23
**pass (1)**
133:8
**passed (5)**
100:17,19 228:14
229:13,21
**patiently (1)**
149:15
**pause (4)**
52:5 88:7 225:3
243:24
**pay (3)**

157:11 197:21 201:25
**paying (1)**
151:7
**payment (5)**
197:3 205:5,10,11,14
**payments (2)**
154:14 205:17
**Pearl (1)**
3:12
**penny (1)**
124:5
**penultimate (1)**
228:8
**people (19)**
31:15 32:18 44:7
63:11 137:23
143:17 162:10,19
163:15 171:8
178:11 183:16
184:23 185:2,3
186:24 187:5
196:10 258:24
**percent (9)**
123:6 160:9 215:19
216:9,10 218:3,16
219:4 221:17
**percentage (1)**
125:5
**perfect (4)**
72:9 81:6 223:5
232:23
**performance (5)**
141:21 152:24 206:20
206:23 208:23
**performing (1)**
234:2
**period (2)**
12:25 234:5
**periods (2)**
232:11 234:8
**permitted (1)**
41:18
**person (4)**
54:22 56:19 68:10
240:3
**personal (1)**
44:12
**personally (1)**
31:12
**personnel (1)**
116:16
**perspective (6)**
23:12,13,14,15 24:3
24:15
**phone (1)**
162:20

**phrase (1)**
38:12
**picture (2)**
122:6 170:15
**pieces (3)**
23:24 71:6 83:14
**pile (1)**
65:3
**PIM (25)**
15:16,18,19 16:9
132:11,23 133:13
133:16 134:11,19
135:20 137:4 138:4
138:6,11 140:8
141:19,22 144:3
147:4,7,9 148:20,21
150:3
**place (2)**
45:15 176:25
**placed (6)**
120:13 135:23 141:22
145:13 148:23
243:2
**plaintiffs (2)**
5:21,25
**Plaza (2)**
2:7 4:7
**please (38)**
7:2,7 9:18 11:6 12:20
13:17 18:21 22:3
28:16 30:8 32:4
41:10 43:24 55:19
58:6 75:21 81:13
82:5 87:15 88:12
100:3 108:23 113:8
126:9 147:13 155:5
156:23 158:13
173:9 174:19
177:16 191:23
204:16 213:10
214:19 215:5
226:22 230:17
**plenty (1)**
72:9
**plus (2)**
121:19 148:20
**point (28)**
63:10 71:3 78:17
84:18 86:15 88:6
98:7 113:3 116:17
116:18 120:19
127:16 136:7 140:2
140:19 165:7 167:3
172:15 185:7,14
190:9 200:7 229:22
239:7 243:20

246:16 258:5 259:2
**pointing (1)**
174:16
**points (1)**
62:8
**portfolio (33)**
75:6 76:25 77:12 91:4
91:21 93:21 106:17
117:2 120:16
130:11,23 159:9,22
163:20 171:18,23
172:4,24 178:16
186:7,21 188:19,22
191:6,13,22 192:5
195:17,22 229:3
232:25 250:6,16
**portfolios (2)**
187:9 192:8
**portion (13)**
69:20 76:9 91:9 118:3
118:8 119:4 134:7
188:6,7 190:7,7
227:14,19
**portions (4)**
10:10,14 11:15,16
**posed (1)**
145:20
**poses (1)**
191:17
**position (52)**
17:5,13 19:22 26:14
28:5 29:2,5 33:19
37:4 38:14 79:4,4
79:10,11,12 80:19
80:20,21,22 94:9
96:6 101:13,17
110:4,7 115:11
120:7 122:4 123:4
124:14 135:4
144:19 167:5
172:15,17,20,23
196:25 197:4,5
198:16 204:18
206:15,18 208:20
212:23,24 232:16
240:4 243:14 245:8
247:13
**positions (256)**
13:19,23 16:24 17:17
17:23 18:5,19 19:4
19:7,8,8 21:4,4
27:10,11,16 28:4
30:20 34:2 53:10
57:9,18,21,25 58:2
58:2,21,22 60:18,19
61:4,5 69:20 70:8

70:11 72:12,17 73:7
73:16,19 74:7,8,18
76:4,11,13,17,20
77:12,14,15,24 78:2
78:2,10,16,22,23,24
79:6 80:2,3,6,17
82:21 84:10 90:18
90:19 91:3 93:19
95:6,24,24,25 96:4
96:5,25 97:2,4,18
97:23,24 102:20
107:10 111:13
112:8,18 113:14,16
114:7,14 115:9
116:3,5 117:13,20
118:18 122:3,6,20
123:22 124:3,4,17
125:4,9,24 126:3
127:14 128:4,5,12
130:11,22 131:8,9
131:16,21,22,23
133:6 134:3,10
135:7,22 137:19
138:2,6,19,24 139:2
140:4,8,13,14 141:3
141:22 142:7 144:4
144:5,8 146:14,19
146:23 149:3,5,14
149:14,18,20,24
150:2,7,9,21 153:13
153:17,21 158:25
159:5 161:6 164:5
164:15,23 165:8,10
165:14,16,22,25
166:24 167:3
174:12 175:9 177:9
177:20,23 178:8,8
179:23 180:5 181:4
182:18 184:8,17
185:16,17,18,19,20
185:21,22 186:3
189:12 193:25
194:11,24 195:25
196:3,4,20 197:17
197:20 198:10
199:3,6,10 202:8
203:9,16,18,22
205:3 206:11,12
207:18,19,20,23,24
209:19 210:2
211:18 212:10
214:2,4 216:7,15
218:19 229:3
230:24 231:6,11,22
231:24 232:5 235:4
235:12,23 236:24

237:10 239:6,13
240:9,18,20 242:6
248:2 249:19
251:15 254:4,13
257:19 258:2,4
259:4
**possible (4)**
38:25 61:8 81:24
205:13
**possibly (4)**
44:6 71:2 80:9 121:13
**post (4)**
134:9 223:22 229:18
231:9
**posted (29)**
9:8 21:5 22:9 34:9
110:15 113:22
117:22 138:8
141:21 142:2
144:12 145:11
146:22 148:22
207:20 208:22
211:2,17 220:12,13
231:23 232:18
237:11 238:14
240:21 242:6,15
244:16 247:23
**posting (2)**
24:2 133:16
**post-closing (1)**
174:9
**post-transaction (1)**
163:17
**potential (15)**
44:8 72:3 79:23
115:12,13 153:20
153:25 157:11
197:4 199:4,9
206:13,23 223:17
224:10
**potentiality (1)**
152:3
**potentially (4)**
41:16 95:5 122:10
139:17
**power (1)**
230:4
**practice (9)**
137:24 205:19 216:5
216:17,25 218:11
218:12 229:11
230:2
**practices (2)**
216:21,22
**preceding (1)**
81:5

**precise (1)**
113:2
**precisely (1)**
51:6
**precludes (1)**
41:11
**predicate (1)**
127:9
**predicates (1)**
103:16
**prefer (4)**
239:14 240:19,25
241:2
**premise (1)**
211:12
**preparation (8)**
13:25 26:3 47:2 99:17
161:18 171:20
193:17,20
**prepare (3)**
63:20 171:7 215:21
**prepared (3)**
33:14 64:3 203:10
**preparing (4)**
133:23 155:8 163:12
196:14
**present (6)**
70:18 72:3 132:15,19
163:15 198:19
**presentation (1)**
64:5
**presented (1)**
160:13
**pressure (1)**
44:4
**pressures (1)**
241:24
**presumably (4)**
51:11 75:18 163:23
178:5
**pretend (2)**
24:22 244:7
**pretty (2)**
126:14 135:11
**previous (1)**
205:8
**previously (8)**
25:23 63:15 85:13
99:10 155:2 167:13
224:2 249:2
**price (1)**
208:21
**primarily (4)**
35:19 36:7 39:2 88:18
**primary (1)**
56:17

**prime (1)**
9:8
**printout (1)**
167:2
**prior (42)**
11:22 45:3,6,23 46:6
47:3,21 48:3 81:4
117:3 154:13
159:20 161:7,11
163:2 164:5,15
165:7,14,16 166:22
166:24 173:15
175:9 176:5 178:3
181:25 183:10
184:17 186:17
188:17 190:25
200:7,21 201:8
213:19 217:20
220:25 233:21
239:24 250:21
254:7
**private (2)**
15:20 132:17
**privately (1)**
62:11
**privilege (2)**
33:15 41:4
**probably (2)**
48:11 129:13 143:22
**problem (6)**
33:8,8 73:2,3 148:6
193:6
**problems (1)**
178:7
**Procedure (1)**
262:21
**Procedures (1)**
160:14
**proceedings (2)**
225:3 243:24
**process (2)**
14:19 237:12
**produce (1)**
7:22
**produced (5)**
46:23 172:11 214:14
250:21 255:22
**professional (2)**
2:8 221:7
**professionals (3)**
232:22 233:11 234:3
**profiles (1)**
177:4
**profit (3)**
136:2 204:23 254:12
**progress (1)**

66:11
**projected (2)**
155:15 158:4
**promotion (1)**
201:23
**prop (1)**
196:3
**properly (1)**
202:19
**property (4)**
20:24 21:3 33:13
86:24
**proposing (3)**
186:22 188:22 191:13
**proposition (1)**
27:14
**proprietary (51)**
19:8 21:4 69:20 73:7
73:16,18,25 75:7
76:10 79:18 80:16
84:10 96:21,25 97:3
97:23 111:14,23
112:18 124:16
125:22 131:8,18,21
133:15 140:13
142:9 146:22
147:11 148:17
149:3 153:13,24
177:8 185:17,19
198:16 202:6,22,25
203:18 206:8 210:8
210:10,23 211:2,15
211:18 212:10,19
235:23
**propriety (1)**
80:6
**protect (2)**
126:2 231:17
**protected (2)**
84:11 235:14
**protection (2)**
242:3,7
**provide (4)**
52:23 61:13 185:10
195:15
**provided (14)**
17:4 62:9 105:8
135:13 136:23
138:11 144:6 145:9
148:21 180:15
187:23 194:18,25
247:17
**provisions (3)**
31:3,13 89:11
**prudent (6)**
186:17 188:17 189:2

189:19,22 190:11
**prudential (1)**
189:6
**Public (3)**
2:11 5 42:6 262:6
**pull (2)**
170:4 180:21
**purchase (31)**
25:22 26:8,18 27:18
29:3 30:22 31:16
35:4 38:6,15 40:14
49:20 50:5,8 54:23
55:5 63:7 69:9
72:20 74:9 76:3
79:9 85:7,23 86:9
184:18 200:8
208:21 209:6
239:25 245:14
**purchased (16)**
31:21 32:11 36:6
37:17,24 38:11 39:4
42:16 56:25 85:19
85:22 86:8,19,22
88:16 208:19
**purchaser (25)**
42:13 70:10 110:10
113:19 115:6
117:18 120:3 121:2
121:7,11 122:17
124:2 126:17
127:18 128:3 145:5
184:15 207:18
210:9,23 211:15,24
212:7 221:16
239:11
**purchases (1)**
80:18
**purchasing (3)**
60:9 76:2 80:7
**purpose (8)**
61:12,15 62:18
133:15 221:14
231:14 245:15
251:5
**purposes (7)**
25:12,14 86:18
111:19 133:10
176:23 222:12
**pursuant (3)**
92:6 163:2 262:20
**put (20)**
76:11 83:21 84:14
97:2 120:7 127:5
129:2,6 134:16
138:23 142:15
183:14 216:6

218:15,24 220:4
230:4,5 233:3 236:2
**puts (1)**
258:21
**P&L (1)**
136:7
**P.M (21)**
45:20 129:16 130:3
169:12,13 175:3,4
192:16,22 193:22
194:6,17 206:2,3
230:13,14 248:21
248:22 256:14
261:12 263:13

---

**Q**

**qualify (1)**
133:21
**qualifying (1)**
134:24
**quantification (1)**
122:8
**quantified (1)**
114:5
**quantify (14)**
111:12,22 112:7,16
114:12,20 116:18
192:3 199:8 212:8
212:12,13,14,15
**quantifying (1)**
195:16
**quantity (1)**
185:18
**query (1)**
180:20
**question (284)**
7:10 8:17 9:2,21
11:10,12 17:8,9,22
18:4 21:19,20,24
22:20,24,25 23:9,11
23:11,13 24:7,13
25:16,18 26:11,22
27:17,18,23 28:17
28:22 29:15,17,19
29:22 30:21 31:6
32:3,13,17,25 33:7
33:9 34:4,11 36:2
37:10,20 38:7,19
39:14,17 40:18 41:6
41:15 42:8,20 43:4
43:15,25 45:10,11
45:13,21 46:5 47:25
48:7,9 49:22 50:13
50:18,19 53:25 54:8
54:17,20 55:18,19
56:15 59:13,20,23

60:12 61:7,23 64:8
64:19 67:3,13,23
68:12,19,21 69:11
70:13 71:18,21,22
71:23 72:24 74:15
77:13 78:20 79:15
80:25 81:3,13,22,25
83:18 84:22 87:18
88:2,12 90:2 91:10
91:14,15 92:20,21
94:2 96:13,16,17
97:7,25 98:5 99:3,5
100:20 101:21,24
102:2,9,10,14
104:19,24 105:7,13
106:9 107:18 109:3
109:19,22 111:20
111:25 114:9,16,18
116:6 117:24 118:6
123:9,11,12,23,24
126:11,12 127:3,9
135:25 138:15
140:10 141:12,16
143:10 144:10,21
145:15,20,24 147:3
147:11,13 148:5,7
148:10,18 149:22
150:11 151:18
152:2 153:12
154:18 155:19
156:8,11,13,24
158:6,10,11 159:11
159:14,16 163:5,6
163:24 164:18
165:3,20 167:21
169:5,9,24 170:14
170:23 171:5 172:7
173:3 174:19 176:9
177:15 178:21,23
179:5 180:18 181:7
182:21 183:5,12
184:12,20 188:25
189:4,18 190:9
191:17,18,23
197:23,24 199:14
201:7 203:4 204:13
206:6,17 207:9,10
208:9,12 209:2
210:12 211:5,10,12
211:13 213:22
219:19 220:2
222:13,20,24 223:4
225:5 226:7,11
228:2,6 232:13
235:7,8 239:22
240:24 243:8,15

245:23,24 246:22
246:25 250:11,12
251:7,11 253:5,22
254:24 255:12
256:5,25 259:15
**questioning (4)**
11:5 52:8 65:17
133:10
**questions (24)**
7:6,13 11:7 18:14
28:14 41:12 65:5
72:7 80:5 119:13
122:24 139:23,25
143:22 169:3,16,17
169:20 196:5 211:9
260:4 261:3,6,8
**quibble (2)**
33:2 198:21
**quick (1)**
186:14
**quickly (4)**
116:18 170:5 181:3
187:22
**QUINN (1)**
3:17
**quite (3)**
27:17 68:12 170:4
**quote (2)**
229:20 247:14

---

**R**

**R (2)**
3:2 4:3
**rabbit (1)**
170:4
**ran (1)**
219:7
**range (2)**
186:24 203:8
**ranges (1)**
194:12
**rational (50)**
42:13 80:14 98:21
103:3 104:2 110:10
113:19 115:6,24
116:11 117:18
120:3,25 121:7,11
122:16 124:2
126:17,23 127:18
128:3,9 129:8 145:4
145:7,17,25 146:10
146:15,18 147:8
148:12,15,19 149:6
149:10 184:15
207:17 208:12
209:18 210:9,22

211:14,24 221:16
221:24 239:11,12
239:13 240:19
**rationally (3)**
84:6 103:8 120:12
**reached (5)**
22:11 50:24 84:5
209:15 244:18
**reaching (1)**
30:11
**read (92)**
9:14,22 10:7,10,14,17
10:22 11:6,15,18
20:4,6 25:19 28:15
28:23 30:21,24 32:3
32:5 39:15 42:7,9
44:19 49:5 50:19,21
55:17,20 64:4,23
65:24 66:8,10,13
68:21,23 81:12,14
83:13,16,20 84:21
84:23 85:25 87:7,11
87:13,20,24 88:7,9
88:11,14,15 90:3,13
96:14 99:15,22
101:22 102:3,11
105:5 110:21
114:10,11 117:5
126:12,15 146:25
147:13,15 156:7,9
159:16,17 161:20
161:24 165:5
166:13 174:18,20
177:15,17 212:11
217:12 224:22,25
225:4 245:24,25
251:8
**reading (4)**
42:3 104:18 175:17
194:7
**reads (7)**
35:19 89:10 101:11
164:3 216:8 251:24
254:16
**ready (4)**
84:25 125:15,17
205:23
**real (3)**
75:3 94:12 244:11
**realized (1)**
136:22
**really (8)**
51:7 97:12 137:6
140:20 173:12
185:19,22 189:16
**Realtime (1)**

2:10
**real-world (1)**
74:22
**reason (33)**
7:15 15:8 16:13 80:13
84:4 109:14 134:24
153:23 172:19
182:15,22,24 184:7
190:11 209:15
226:4,8,12,13
236:10 261:5 264:5
264:8,9,11,12,14,15
264:17,18,20,21,23
**reasonable (4)**
61:2 83:3 128:20
182:7
**reasons (3)**
76:12 223:11 240:12
**recalculation (1)**
243:20
**recall (15)**
11:5,17 15:17 31:14
32:8 42:10 46:12,25
48:24 49:4 64:20
162:21 163:9
213:23 216:16
**receipts (3)**
134:6,23 135:14
**receive (9)**
20:23 100:10 101:6
155:15 158:3
165:22 166:8
173:16 205:10
**received (9)**
122:19 132:22 133:11
158:23 161:7
168:22 172:10,12
172:23
**receiving (5)**
30:16 110:14 113:21
117:21 121:3
**Recess (7)**
48:13 85:4 129:15
175:3 206:2 230:13
248:21
**recite (2)**
21:11,12
**recognize (2)**
214:15 226:20
**recognizes (1)**
34:23
**recollect (1)**
165:21
**recollection (20)**
31:23 46:22 64:12
87:12 143:21,22

154:20 157:8,10,15
157:22 161:3 173:6
173:12,19 217:16
217:24 218:12,13
234:15
**recollections (1)**
143:25
**record (49)**
5:9 25:19 28:20,23
30:24 32:5 39:15
42:9 44:19 46:3
50:21 55:20 66:8,13
68:23 81:14 84:23
87:19 88:5,14 90:3
101:22 110:7
146:25 147:15,19
156:9 157:4 159:17
165:5 173:10,18
174:14,15,20
177:17 188:3
192:19 212:11
214:13 215:12
224:25 230:10
243:25 245:19,25
248:17 262:12
264:6
**records (2)**
17:14 259:6
**recourse (1)**
136:22
**Reed (3)**
2:6 4:5 5:10
**refer (13)**
10:5 11:20 21:8 26:25
38:2 42:21 94:20
100:15,20 104:17
128:7 173:5 237:15
**reference (32)**
26:18 27:9,19 28:3
43:2 44:25 45:24
46:9,18 47:20 51:9
51:12 58:13,21
59:16 60:6 66:25
91:10 93:14 105:9
167:18 169:8
215:24 216:12,16
216:16 217:5,22
218:5 220:23
249:15 253:25
**referenced (4)**
11:19,21 253:7,10
**references (1)**
216:21
**referred (10)**
13:9 16:10 27:6,7
31:4 38:24 46:13,15

53:4 71:25
**referring (3)**
12:7 82:11 100:13
**refers (3)**
36:22 88:23 101:2
**reflect (6)**
71:14 87:7 174:15
205:7 208:21
217:18
**reflected (11)**
51:23 73:7 86:9 96:20
100:9 101:5 117:17
129:7 168:22 200:6
218:10
**reflects (8)**
88:24 93:8 101:15
131:4 155:12
157:12,18,25
**refresh (4)**
29:22 87:12 173:6,12
**refuse (3)**
70:17 74:25 241:15
**regard (7)**
36:18 71:8 84:9 86:13
88:23 89:2 94:23
95:5 103:9 107:6
210:15 212:3
**regarding (1)**
182:18
**regardless (3)**
97:16,17 198:19
**Registered (3)**
2:8,9 262:5
**regulation (1)**
33:11
**reinforced (3)**
12:14,17,19
**relate (3)**
18:16 76:19 121:25
**related (45)**
19:4 20:24 21:3 22:13
22:18 23:4 24:17
25:5,11 29:6 32:23
33:3,5 34:8,18,18
35:2,20 36:7 39:2
53:22 55:5 62:24
63:4 67:21 73:6,15
74:18 76:10 80:6
95:4,8 96:17 97:2
112:23 187:11
189:11 244:20
245:2 246:4,7
247:12 248:15
251:14 262:15
**relates (8)**
26:20 27:20 47:18,21

73:18 77:13 103:2
242:14
**relating (10)**
5:19 8:23 12:25 46:14
55:15 57:19 74:5
76:8 109:24 173:15
**relation (4)**
21:2 111:15 122:9
145:21
**relationship (1)**
179:11
**relatively (2)**
184:23 187:2
**relevance (1)**
71:12
**relevant (5)**
37:13 62:21 63:10
91:17 241:16
**reliance (1)**
65:21
**relied (3)**
41:2,6 185:2
**relieve (4)**
91:18,23,23 94:13
**relieved (1)**
134:8
**rely (2)**
41:22 178:19
**relying (1)**
124:18
**remained (2)**
15:9 150:15
**remaining (2)**
237:2,13
**remark (2)**
244:4,4
**remember (24)**
5:24 48:10 113:2
135:15 143:15
163:5 165:11 180:3
183:21 193:16
202:9,13 216:2,23
217:3,21 218:7,9
220:14,17 231:25
233:20 234:20,20
**Remind (1)**
126:8
**reminding (2)**
10:9 126:13
**removal (1)**
101:14
**reopened (1)**
261:4
**reorienting (1)**
118:2
**repeat (3)**

25:17 39:14 254:23
**repeated (1)**
29:22
**repeating (1)**
156:10
**rephrase (3)**
7:6,13 148:10
**replace (1)**
129:5
**replacement (1)**
209:8
**report (124)**
7:25 8:5,24 9:9,16
  11:11,14 12:2,6,8
  12:12,21,22 18:10
  19:10,12 21:9 22:3
  26:3 30:10,12 37:12
  40:4 41:3 42:21
  50:24 53:2 58:6,14
  62:4,19 63:21 64:5
  67:14 71:9 72:2
  73:11 75:21 78:9
  80:10,10 82:5 83:21
  94:20,22 95:14
  104:4 108:8 109:20
  110:3 111:3 113:6,8
  119:6 126:19 127:4
  130:9 131:7 158:13
  161:23 162:2 163:3
  163:8,13 164:21
  167:17 170:12
  171:7,21 173:6,11
  174:2 175:7 177:12
  177:19 178:20
  179:21 180:2,5,8
  181:3 184:16
  186:20 188:11,21
  191:25 193:20
  194:18,25 195:13
  196:8 198:8,14
  199:13 203:6
  205:12 206:22
  211:19 215:21
  220:5,6 221:25
  230:17 231:3
  235:10 237:16
  241:6,16 244:13
  245:16 247:2 248:6
  249:16,16 251:13
  252:4,17 253:8
  255:9,20,21 256:18
  257:16 263:7
**Reported (1)**
1:23
**Reporter (5)**
2:9,9,10,11 262:6

**reports (9)**
179:18 180:14 182:10
  184:8 192:3,6 195:4
  195:8,10
**repos (1)**
57:18
**represent (14)**
5:11 9:25 10:3 45:14
  50:2,6 65:4,20 66:4
  67:5,7 70:7 162:17
  170:7
**representation (13)**
51:24 62:16 65:8,10
  65:13,17 66:11,14
  69:3,11 160:23,24
  202:20
**representations (2)**
50:10,14
**represented (5)**
43:12,17,19 50:20
  65:24
**reproduction (1)**
167:22
**request (6)**
92:19 93:10 180:22
  180:24 194:15,24
**requested (5)**
184:16 186:19 188:20
  194:18 262:19
**requests (1)**
161:13
**require (5)**
40:19 89:19 123:21
  125:25 205:19
**required (18)**
7:22 23:25 41:17
  122:19 124:5,22
  125:12,12 138:18
  142:20 190:11,12
  197:2 210:19
  221:17 229:25
  230:5,8
**requirement (29)**
33:21,25 108:6
  118:25 119:19,21
  122:14 135:5,6,9,10
  137:8 138:22
  139:17 142:5,15,25
  143:6 152:16
  154:24 197:5,9,10
  205:6 210:17
  218:23 223:3,20,21
**requirements (15)**
69:18 124:6 134:7
  140:7 141:6 142:9
  142:13 144:17

164:7 165:18
210:19 212:6
231:18 233:15
235:13
**requires (3)**
24:7 31:6 231:9
**reread (1)**
11:16
**researched (1)**
109:22
**reserve (6)**
242:22 243:3,6,13,19
  261:5
**respect (37)**
17:20 19:22 20:24
  21:21 22:9 28:11
  31:11 41:20 79:18
  83:5,9 87:8 97:14
  106:3,6 110:13,14
  113:15 114:6,13
  121:13 123:24
  156:16 157:13
  185:15,16,21
  198:11,24 205:18
  216:25 218:8 229:9
  229:10,12 244:16
  250:12
**respectfully (1)**
42:2
**respects (1)**
158:24
**respond (1)**
9:4
**responding (1)**
72:6
**responsibilities (6)**
16:25 90:12 198:15
  203:11 211:22
  230:21
**responsibility (14)**
18:23 97:10 103:21
  105:16 106:12
  110:12 150:22
  171:9 186:6,22
  188:23 191:5 199:2
  257:18
**responsible (11)**
95:8 98:14 100:12
  101:8 106:6 131:14
  133:25 151:6 186:4
  254:3,13
**result (8)**
17:15 166:15 175:10
  176:6 179:15
  204:23 207:13
  212:5

**resumed (1)**
130:4
**retain (3)**
93:17 97:10 98:12
**return (2)**
235:15 239:18
**returned (5)**
144:13 237:3,13,17
  240:22
**revenues (1)**
225:18
**review (13)**
11:24 26:7 35:13
  48:20 65:15 87:16
  89:17 100:2,4 112:3
  193:7,17 262:19
**reviewed (12)**
11:22 12:11 26:2
  44:16,25 48:16
  63:20 161:4,4
  162:15 173:11
  193:19
**reviewing (5)**
13:6 111:2 155:9
  174:2 250:25
**Richard (4)**
6:9 192:14,20 263:11
**rid (3)**
95:16 240:10,13
**right (20)**
18:5 32:2 41:24 65:23
  80:8 83:6 97:12
  108:18 115:17
  150:16 153:17
  168:11,14 169:18
  184:6 190:20 232:7
  232:8 233:13 261:6
**rights (3)**
20:16,23 110:14
**right-hand (1)**
217:4
**risk (121)**
13:7,14 14:23 16:19
  16:20 17:16 34:9
  73:9,20 79:5,8,12
  79:23 80:23 95:2
  98:10 110:24
  112:21 113:15
  114:6,12,23,25
  115:5,7,11 116:2,14
  116:25 124:20,21
  125:3 126:3 127:22
  128:21,25 129:10
  130:10,20,21 131:6
  131:8,20 132:5
  135:21 136:3,5,6,7

136:8,12,21 137:3,5
  137:6,7 138:5,7,9
  138:10,16,21,25
  139:7,9,11,16,24,25
  140:3,6,7,12 141:2
  141:5,6 151:11,15
  151:15,22 152:4
  161:16 177:4 179:2
  185:24 186:2,18
  188:18 190:20
  191:5,7,8 192:9
  195:21 196:19,23
  197:16,19 198:2
  199:9 205:2,4 212:9
  212:15 213:10,16
  221:19 222:4,16
  228:18,19,23 229:5
  230:18 236:5,13
  256:17,18 257:17
  259:7,9
**risks (69)**
13:9 53:13 79:25 80:2
  80:11,14 84:19
  94:21,24,24 95:4,13
  95:17 98:12 110:19
  110:24 112:11,12
  112:15 114:20
  116:16,19 123:4
  130:17 131:11
  139:15 140:17,18
  140:22 141:10
  149:11 152:24
  153:16 167:5 186:8
  187:7 189:9,11
  191:9,12,18,19,21
  192:4 195:16 198:8
  198:9,13,18,22
  202:17,17,25
  205:16 206:23
  211:22 213:13
  224:18 225:8 227:4
  229:3 239:9 240:8
  240:10 241:10,14
  250:5,14,18
**RMR (1)**
1:24
**ROBERT (1)**
3:21
**room (1)**
163:10
**Rosen (8)**
9:23 99:13,20 100:6
  100:23 101:12
  103:12 183:20
**Rosen's (5)**
99:15,22,25 102:16

102:22
**routine (1)**
180:16
**RPR (1)**
1:24
**rule (3)**
33:11 242:8 262:20
**rules (10)**
5:20 33:12 206:20
208:2 227:25
234:12,14 237:15
238:3 242:3
**run (8)**
30:17 129:10 172:15
172:21,24 221:6
232:9,17
**running (2)**
18:9 187:17

**S**

**s (11)**
1:24 2:8 3:2 4:3 58:8
242:3 252:22 253:3
262:5 263:9,17
**Sachs (2)**
6:17 233:22
**Safe (1)**
40:12
**sale (15)**
27:4 43:23 45:4,6,9
45:15,23 46:7 47:3
47:22 48:3 49:12,14
209:6 241:6
**satisfy (1)**
135:9
**saw (3)**
154:8 155:10 228:5
**saying (8)**
29:13 47:25 88:16
103:13 168:18
207:22 220:14,17
**says (21)**
31:21 78:6 85:25 86:2
86:3,13,13,15 87:4
101:12 102:7,7
116:9 157:18,18
158:22 169:13
215:16 217:13
228:13 255:16
**scenario (4)**
149:16 235:9 238:18
238:20
**scenarios (2)**
70:18 72:3
**schedule (9)**
12:7,8 44:15 65:20

69:13 70:6 161:25
162:2,3
**SCHILLER (1)**
3:10
**scope (15)**
11:12 24:20 25:7,16
47:24 48:4,7 67:13
92:10 99:3 109:19
176:20 199:12
220:2 242:10
**second (15)**
6:24 52:5 147:19
193:21 194:3
215:13 219:18
224:25 230:11
243:23 249:18
253:7,9,12 254:19
**section (5)**
87:14,25 88:8 130:9
229:22
**secure (11)**
53:10 86:25 134:10
141:21 146:23
148:23 203:15
208:23 209:25
211:2,18
**secured (13)**
142:3 213:19 214:4
215:19 216:10,12
217:2,20 219:7,13
219:23 221:18
222:14
**securing (9)**
27:15 72:12 73:23,24
84:2 122:3 191:9
206:22 245:8
**securities (13)**
52:19 56:25 57:19
75:24,25 76:25 77:6
90:19 105:13
131:15 151:7
227:17,24
**security (1)**
77:15
**see (94)**
19:24 22:8,13 27:12
27:13 35:4,8,10,21
44:25 46:12 51:17
56:24 57:6,9,12,16
57:22 58:3,12,25
59:19,21,24 60:3,6
66:15,18 70:3,4
73:18 74:16 77:2
82:22 83:6 85:17,24
85:25 87:4 89:9,14
99:12 100:6 103:5,6

104:11,25 113:11
113:16,23 131:2
139:18,22 146:13
162:6,7 164:7 173:7
175:13 177:5
192:24 193:21
194:6,9,12,14,17,21
195:6 198:6 217:6
224:8 225:11,20
227:15,18,19,19,23
228:11,20 244:16
244:20 253:2,3
254:15 255:2,9,13
256:11,16,18 257:5
257:13
**seeing (2)**
202:9,13
**seeking (2)**
143:20 220:2
**seen (21)**
7:17 25:24 45:22 46:6
47:19 54:3 63:16
85:11,14 155:4,6,7
174:7,7 188:4 193:9
193:12,13 195:9
224:3,5
**sees (1)**
118:7
**seg (8)**
213:19 217:19 219:7
219:12,22 221:18
222:14 223:23
**selectively (1)**
38:19
**sell (3)**
108:3 212:25 258:20
**seller (6)**
22:10 88:17 145:8
239:12,13 244:18
**sending (1)**
168:18
**sends (2)**
193:23 256:12
**sense (7)**
34:14 39:3 62:19 79:7
80:4 93:23 94:4,6
94:18,18 97:20
107:21 108:3
111:14 112:17,19
137:2 138:21 139:6
152:24 162:25
**sentence (10)**
19:20 20:7 22:8,16,21
22:23 118:9 127:10
158:21 164:2
**sentences (2)**

83:15 102:4
**separate (14)**
23:18,23 41:14
110:19 140:18,19
140:21 142:4,11,19
143:5 176:17
200:10 209:21
**separated (2)**
137:6 177:12
**separately (1)**
246:11
**September (39)**
42:16 45:16 58:25
60:16 77:19 82:12
83:2,11 100:9,19,25
111:7 112:2 126:24
154:16 160:6
171:18,24 172:5,22
178:13 181:9,25
182:17 183:2 184:9
192:16,22 193:23
200:23 201:9
206:11 207:5
224:13 242:14,18
250:22 256:13
263:12
**sequence (2)**
169:12 259:22
**series (1)**
65:5
**serious (1)**
70:20
**SESSION (1)**
130:2
**set (14)**
14:18 19:21 21:9,13
44:16 70:17 84:8
145:21 149:12
150:24 214:13
241:23 262:10,24
**sets (1)**
249:21
**setting (1)**
110:3
**settled (2)**
14:7 151:13
**settlement (9)**
14:8,20 95:3 98:10
152:23 156:2 157:9
158:4 197:10
**settlements (2)**
98:14 155:15
**settling (1)**
152:15
**setup (2)**
166:15 175:10

**set-up (1)**
176:6
**seven (2)**
5:23 110:4
**shaded (5)**
227:3,7,13,19,21
**shape (1)**
82:3
**Sharon (1)**
10:22
**sheet (12)**
59:10,19,25 60:4,9
63:25 67:10,18 68:7
73:2,8,17
**Sheila (4)**
192:13,19 194:18
263:10
**shocked (1)**
179:6
**shoes (1)**
97:13
**short (36)**
27:9 28:4 57:18,25
58:21 60:19 61:5
70:7,11 72:19 74:7
76:17,19,20 82:25
90:18,19 91:3 92:25
95:8,24 96:4,5
138:19 150:22
158:25 187:15
196:15,25 230:12
238:18 247:4,6
248:18 257:9
258:19
**shortfall (1)**
242:22
**shorts (5)**
78:12,13 95:25 98:13
98:23
**short-term (2)**
57:4 87:2
**show (1)**
217:9
**showing (1)**
172:11
**shows (1)**
179:22
**side (26)**
14:14 27:11 51:13,14
52:20 54:3 56:5,8
56:17 67:10 70:20
70:25 74:4 78:11
82:21 83:24 95:8
103:11 131:18
178:6 185:3 187:22
196:15 213:2 215:2

217:5
**sides (5)**
43:16 44:13 79:10
    184:24 187:2
**sign (2)**
236:19 255:13
**signed (13)**
9:18 12:2 13:11 30:14
    31:20 32:10 40:16
    126:24 159:9 160:8
    250:10 259:21
    260:2
**significant (3)**
71:6 235:24 258:3
**signing (10)**
9:15 55:9 76:22
    158:22 159:21
    161:8,11 184:17
    200:8 220:25
**similar (6)**
195:10 221:8 232:21
    233:11 253:14,18
**similarly (1)**
185:22
**simple (1)**
247:20
**simply (12)**
13:8 43:8 70:17 71:11
    74:21,24 103:13,15
    199:20 205:5
    209:12 220:6
**single (5)**
52:22 53:18 73:20
    190:10 251:9
**SIPA (6)**
4:6 5:11 53:13 73:13
    92:23 93:17
**sir (367)**
5:13,22 6:5,15,19
    7:11,18 8:4,8,15,23
    9:11,19,22 10:3,8
    10:12,19 11:19 12:7
    12:8,12 14:25 15:6
    15:14,18,21 16:4,12
    17:4,22 18:10 19:10
    19:18,21 21:7,15,22
    22:3,6,13,15,25
    23:14 24:3,15,25
    25:14,24 26:13,17
    27:17 28:2,6,11
    29:3,17,19 31:3,15
    32:12,22 34:7,18
    35:3,5,11,14,21
    36:5,12,20 37:2,5,8
    37:15 38:4,17,25
    40:10,16 43:11

44:15,22 46:2,17
47:19 48:25 49:7
50:9,15,23 51:23
52:21 53:17 54:6,9
54:24 56:20,22 57:9
58:3,11,12 60:7,14
60:22 62:22 63:17
65:5 66:15,24 67:8
67:20,25 68:7,12
69:2,4,15,25 70:6,9
71:16 72:16 75:4,21
75:21,25 76:21 77:3
77:8,10 78:21 79:4
80:5 82:5,9,22 83:7
85:9,15 89:4,5,14
90:24 93:5 95:19
97:22 99:11,14
100:14 101:23
104:4,8,9 105:15
106:11,20 107:21
108:14 109:7 110:3
110:16 111:4,20
113:8,9,10,25 115:7
116:23 117:18
119:25 120:25
122:16 123:13
126:2,16 127:5
130:13,15 131:2,7
131:19 132:9
133:21 134:12
139:6 140:5 141:25
143:4 144:2 145:3,4
145:7 146:10,18
149:6,17 151:16
152:25 153:14,19
154:10 155:3,7,11
156:13,16 157:13
157:23 158:7,13,19
159:6,19 160:4
161:11 162:2,4,8,13
162:17 163:3,12
164:3,9,13 166:5
167:12,17 170:11
170:18 171:10,21
172:2,20 175:7,14
175:20 179:10,16
180:2,12 181:25
182:8,16 183:8,19
186:5,16 189:2,23
190:17 191:2 192:3
192:18,19 193:8,11
193:18 194:3,6,21
195:8,13,24 196:7
196:17 197:14
199:23 200:15
201:9 202:24

203:21 206:25
207:10,17 208:7,18
210:7 212:8,18
213:3,17 214:15,17
215:14,21 216:13
217:6 219:5,11,15
219:21 220:10,15
221:15 222:5,13
223:25 224:3,5,8
225:14 226:9,18,20
226:25 227:15,23
228:7,11,20 229:7
229:10 230:16,18
231:3,8,20 232:13
233:18 234:11,18
236:14 237:19
238:8,22 239:10
240:15 242:2,25
244:13,14,15,21,22
245:22 246:7,16
247:25 249:13
250:2,12,19,24
252:3,15,17 253:2,3
253:11,14 254:15
255:6,10,24 256:4
256:15,19 257:5,6,7
257:13 261:11
**site (1)**
103:10
**sitting (1)**
28:13
**situation (8)**
71:15 74:16 75:2
    79:18 231:21
    232:15 237:2 245:3
**situations (3)**
233:18,19 245:5
**six (2)**
5:23 168:19
**size (8)**
61:13 62:20,20 71:6
    108:8 225:17 259:4
    259:25
**skipping (1)**
83:15
**small (5)**
121:16 184:23 185:2
    187:2 188:7
**snapshot (6)**
71:3 72:10 118:20
    125:11,12 238:25
**snapshots (1)**
64:2
**sold (2)**
204:21 243:4
**solely (6)**

73:6 80:15 95:14
    121:25 124:18
    251:14
**solvent (1)**
119:9
**somebody (1)**
173:23
**somebody's (1)**
193:16
**soon (2)**
47:12 198:2
**sooner (1)**
113:6
**sophisticated (3)**
43:12 176:15,22
**sorry (52)**
12:8 19:13 20:4 22:5
    22:22 25:17 29:18
    33:2 36:21 39:13
    40:9,21 44:18 49:13
    56:2 68:21 82:6
    87:13 88:6 92:11
    94:15 95:21 96:5
    98:19 104:6,24
    106:22 108:11
    114:10 116:6 123:9
    149:12 151:21
    159:12,14 162:2
    163:6 176:10
    186:13,15 191:4
    194:2 195:5 197:17
    208:10 210:21
    221:21 225:5 237:4
    249:16 253:9,17
**sort (6)**
76:14 167:6 196:11
    198:17 242:24
    245:20
**sounded (1)**
119:12
**sounds (3)**
79:16 151:14 168:23
**source (2)**
59:5 252:16
**SOUTHERN (1)**
1:3
**so-called (1)**
154:24
**space (1)**
47:5
**speak (9)**
7:8 12:21 28:12 31:12
    94:22 99:20 161:22
    163:8,11
**speaking (4)**
7:12 30:3 113:4

212:15
**speaks (5)**
22:23 28:10 101:10
    255:20,21
**specific (15)**
8:20 27:19 33:4 43:2
    46:13 51:8 54:21
    64:12 81:18 86:14
    134:25 199:16,19
    233:20 235:6
**specifically (17)**
27:6 35:16 36:4 45:8
    46:9 51:18 53:19
    54:11 55:14 56:9
    77:13 78:22 85:21
    100:21 213:23
    216:21 248:5
**specifics (1)**
46:13
**specify (1)**
164:22
**speculate (3)**
43:6 44:6 70:17
**speculation (6)**
43:4,5 67:23 119:2,3
    122:22
**spite (1)**
203:12
**spoke (2)**
41:15 161:18
**spreadsheet (2)**
60:23 68:14
**ss (1)**
262:3
**stamp (1)**
249:24
**stands (1)**
15:19
**start (2)**
207:22 258:24
**started (1)**
235:25
**starting (2)**
132:9 247:3
**starts (2)**
30:22 35:9
**state (13)**
2:12 53:11 66:7 71:9
    78:9 119:23 130:16
    139:2 141:12
    209:16 248:6 262:3
    262:7
**stated (8)**
30:10 37:13 124:11
    161:5 175:7 240:12
    241:6 247:2

| | | | | |
|---|---|---|---|---|
| **statement (21)** | 57:17 | 134:13 147:20,21 | 175:2 177:2 187:10 | 142:14 143:5 |
| 7:22 20:8 21:6 26:23 | **subject (12)** | 147:23 152:22 | 187:10 188:3 193:7 | **tens (1)** |
| 42:22 52:6 73:17 | 59:18,24 81:18 95:24 | 156:3 160:9,25 | 195:3 197:3 198:2 | 130:21 |
| 116:8 126:16 | 98:23 135:18 142:7 | 185:8 201:22 204:7 | 199:3 201:22 202:8 | **term (8)** |
| 166:19,22,22 176:3 | 157:7 163:16 169:8 | 220:22 221:4 | 202:16,17,24 | 33:10 39:9 61:24 |
| 176:11 178:19 | 206:20 243:19 | 224:24 237:4 | 203:10,11 205:24 | 75:13 76:7 109:4 |
| 221:11 225:20,21 | **Subscribed (1)** | 248:20 252:18 | 207:19,23,24 | 204:2,5 |
| 226:8 229:7 254:8 | 261:20 | 254:25 | 209:19 210:10 | **terms (13)** |
| **statements (2)** | **subsequent (4)** | **surprise (4)** | 212:20,24 222:16 | 15:23,24 42:22 43:9 |
| 143:5 178:3 | 9:15 12:11 55:6 76:22 | 177:8,10,18 219:11 | 230:12 238:25 | 46:19,21 51:13 |
| **states (8)** | **subset (9)** | **surprised (5)** | 239:12,16 248:18 | 61:13 71:9 80:11 |
| 1:2 37:12 50:24 53:2 | 13:9 81:20 96:17,18 | 106:24 176:21 219:3 | 249:8,12 251:6 | 117:9 119:5 199:17 |
| 100:6,23 203:6 | 96:25 97:19,19 | 219:5 223:14 | 258:11 | **test (3)** |
| 221:23 | 187:4 241:13 | **surprising (1)** | **taken (8)** | 176:2,10 179:5 |
| **static (1)** | **substance (1)** | 187:6 | 9:15 38:22 43:8 | **testified (23)** |
| 236:7 | 81:3 | **surrounding (3)** | 153:14 188:13 | 5:4 6:21 12:2 49:11 |
| **stayed (1)** | **substantial (4)** | 20:11 61:10 130:19 | 191:8 198:5 211:21 | 49:16 50:3 64:15 |
| 150:18 | 223:21 230:18 236:13 | **swap (1)** | **takes (1)** | 110:23 111:8 |
| **staying (1)** | 238:23 | 30:5 | 204:18 | 112:10 130:5 |
| 157:7 | **subtotal (4)** | **swaps (1)** | **talk (9)** | 132:10 157:23 |
| **step (2)** | 251:21,22,23 255:17 | 36:24 | 31:2,15,19 32:9 40:12 | 186:5 191:3 192:2 |
| 165:6 218:17 | **succeeded (1)** | **sworn (3)** | 73:22 131:6 133:4 | 200:5 202:21 |
| **Stephen (3)** | 92:13 | 5:3 261:20 262:11 | 179:7 | 209:22 220:10 |
| 4:11 163:8 256:12 | **suddenly (1)** | **system (8)** | **talked (2)** | 224:19 225:9 |
| **stepped (2)** | 236:9 | 166:16 170:12 171:3 | 41:9 143:17 | 233:10 |
| 97:13 235:11 | **sufficient (3)** | 176:16 177:25 | **talking (19)** | **testify (6)** |
| **steps (4)** | 34:24 113:13 231:9 | 233:11 252:12,16 | 37:22 55:13 73:23 | 6:18 65:6 234:21 |
| 117:8 212:20 213:23 | **suggest (5)** | **systems (16)** | 76:18 97:22 125:22 | 237:23 238:3,13 |
| 237:8 | 60:7 105:5 191:16 | 171:17,22 172:4,21 | 131:7,10 140:23 | **testifying (2)** |
| **Steve (1)** | 252:3,7 | 174:11 175:11 | 146:6 150:16 | 40:22 151:14 |
| 65:11 | **suing (1)** | 176:7 177:3,12 | 174:14 190:4 | **testimony (61)** |
| **stick (1)** | 5:18 | 178:15 179:19,22 | 198:20 200:20 | 16:8,11 22:21 24:20 |
| 122:15 | **summary (1)** | 181:2 182:12,17,25 | 204:4 206:8 218:10 | 25:7 28:9,18 31:4 |
| **stipulation (5)** | 60:4 | **S&P (2)** | 247:5 | 37:21 38:20,21 47:2 |
| 7:17 41:10,11,21 42:3 | **supplement (1)** | 204:19 258:20 | **team (2)** | 48:17,20 54:3 64:4 |
| **stock (1)** | 11:8 | **S.E.C (4)** | 187:2,24 | 64:11,21 65:15 66:6 |
| 245:11 | **support (12)** | 201:20 242:3,8 244:6 | **technological (1)** | 69:3,13 72:25 90:24 |
| **straight (1)** | 63:5,8 69:7,23 75:17 | | 177:7 | 91:6 99:15,17 111:3 |
| 148:25 | 121:19 139:4,12 | **T** | **telephone (1)** | 111:20 117:5 |
| **strange (1)** | 146:4 203:20 | **table (1)** | 163:12 | 118:15 132:14 |
| 209:4 | 210:17 220:8 | 241:18 | **tell (34)** | 143:3 147:24 |
| **strategies (2)** | **supported (1)** | **take (78)** | 20:7 63:12,23 67:15 | 153:15 161:4,21 |
| 76:12 254:5 | 146:16 | 27:10 34:5 41:4 42:4 | 74:14 89:17 94:4,17 | 165:12 166:20,21 |
| **strategy (1)** | **supporting (11)** | 47:11,15 48:12 | 97:8 102:6 118:24 | 175:17 178:2 |
| 233:2 | 23:19,20 30:19 69:22 | 73:13 80:14 85:3 | 140:5 145:3,4,7 | 186:12 190:21,23 |
| **Street (2)** | 127:21 190:15 | 88:22 93:19 97:19 | 167:17 169:6 | 190:25 193:16 |
| 3:6,12 | 220:7,19 230:24 | 98:16 115:6 116:2 | 170:18,19 193:8 | 199:12 200:6 |
| **struck (2)** | 245:10 247:10 | 117:6,20 118:20 | 200:3 204:8 207:3 | 201:16 202:4,9,14 |
| 252:10 259:20 | **supposed (1)** | 122:23 124:3,20 | 210:7 213:10 | 202:15 203:5 221:5 |
| **structure (3)** | 83:25 | 126:6 128:3,13 | 215:16 224:16 | 222:16 234:11 |
| 177:6 181:20 222:8 | **sure (34)** | 132:16 137:13 | 225:6 226:22 | 246:23 262:12 |
| **structured (1)** | 9:3 33:4 38:3 45:11 | 146:15,19 147:9,17 | 239:10 249:13 | 263:3 |
| 245:13 | 45:12 47:13 48:5 | 148:15,19 149:11 | 250:24 251:5,6 | **text (2)** |
| **stuff (1)** | 52:10 55:2,3 65:2 | 152:16 153:5,9 | **tend (2)** | 104:17 105:5 |
| 125:22 | 81:25 92:13 94:2 | 155:3 160:23,24 | 208:4 218:24 | **thank (19)** |
| **subclause (1)** | 109:13 114:17 | 167:5,11 173:9 | **tended (2)** | 7:4,16 10:7,9 19:13 |

19:15 56:3 86:21
87:21 89:3 102:21
149:15 160:25
174:17 212:13
217:11 260:6 261:9
261:10
**thanks (2)**
28:20 260:7
**theoretically (1)**
212:5
**theory (1)**
115:17
**thereto (1)**
25:5
**thing (6)**
82:15 86:17 87:20
104:2 144:17
221:24
**things (7)**
64:23 65:11 75:14
102:7 119:16
128:11 187:12
**think (76)**
9:7 17:11 18:17 23:22
27:9 31:10 40:3
41:5 44:4,12 48:6
52:19 55:25 61:8
62:7 65:18 66:2
75:2 77:20 88:23
91:9 93:3,16 95:15
103:5 109:14
110:22 118:19
119:22 121:11
122:8 123:12
124:10 125:18
147:18 148:4,8
149:9 150:12
152:21 154:22
156:15,15 160:8,10
160:17 166:12
167:25 168:6 169:2
184:15 185:13
187:15 188:10
190:24 198:7 200:4
201:3 205:12,23
207:11 208:11
209:22 215:7,22
218:12 221:3 222:7
235:21 236:9
248:18 255:13
256:8,24 259:7
260:4
**thinking (1)**
240:4
**third (9)**
106:8 214:23,24,25

215:4 219:18
226:25 227:8,12
**thought (12)**
61:14 68:11 91:10
116:8 120:20
123:18 126:14
149:7 156:14
190:17 208:10
221:21
**thousand (1)**
177:23
**thousands (3)**
130:22 174:12 186:3
**three (3)**
110:18,23 215:17
**Thursday (1)**
173:20
**tie (4)**
59:11,15 60:4,8
**Tie-Out (2)**
59:19,25
**time (73)**
6:15 7:2 12:25 14:6
30:13 42:5 44:4
48:12,13,14 51:4
54:18 56:2,3 62:8
63:10 71:3 72:9
78:17 82:3,15 84:13
85:4,5 98:7 102:12
112:5 113:3 116:17
117:15 120:16,18
124:9,20,24 125:10
125:18 128:18
129:14,15 130:3,25
155:24 157:21
158:22 167:8
169:12 172:21
174:25 175:3,4
185:7 191:20 206:2
206:3 230:13,14
234:7,16,18 236:15
236:17 238:18
244:2 248:21,22
249:22,24 259:25
260:5 261:2,6,12
**timeframe (10)**
6:12 45:17 55:3,4
82:12 183:14
187:16 200:20
222:21 243:10
**times (4)**
83:19 101:25 102:11
198:7
**timing (4)**
127:7,8,23 159:24
**title (1)**

227:20
**titled (1)**
89:6
**today (7)**
28:13 31:4 40:23
99:18 180:19
181:10 193:18
**told (5)**
18:11 41:7 189:8,14
216:24
**Tony (1)**
201:4
**top (3)**
35:17 215:5 257:5
**topic (6)**
8:14,15 9:9 112:11
174:23 230:16
**total (12)**
96:18 142:14 143:6
247:11 251:21,22
251:24 255:6,8,16
255:17,18
**touch (1)**
183:17
**trade (2)**
205:21 218:22
**traded (7)**
104:12 105:2,23
106:8 165:10
206:21 222:10
**trader (4)**
204:8,14,17 205:2
**Traders (1)**
204:2
**trading (7)**
76:10 106:14 176:24
203:24 210:17
218:21 247:6
**transaction (69)**
13:4,8,12,15 14:2
17:15 23:16 30:15
33:9 42:13 43:17
44:10 48:21 49:9
51:5 64:24 70:15,22
71:13 81:8 84:3
102:16,22 103:9
105:15 106:11
113:13 114:24
118:14 126:4,18,22
127:19 130:25
145:18,25 146:11
149:9 150:6 154:4,7
155:14 161:17
162:24 166:10
183:10,18 186:25
187:11 188:12

190:4,6,8,13 199:19
199:21 201:9 203:7
203:13 204:24
209:18 211:21
213:2,20 221:23
240:2 241:23
245:12 246:17
**transactions (7)**
14:20 27:3 76:16
78:12 98:8 152:15
184:24
**transcript (2)**
47:6 262:20
**transcription (1)**
264:7
**transfer (22)**
13:22 22:12 50:7 51:2
51:12 52:9,13 53:3
55:8,10 78:13 87:8
90:18 107:5 108:21
133:5 230:19
240:16 241:3
243:17 244:19,25
**transferable (1)**
107:25
**transferred (10)**
39:20 106:22,23
136:15,19,24
138:13 144:7
146:14 243:18
**transferring (2)**
145:8 146:3
**transfers (2)**
14:12 108:15
**treat (1)**
22:16
**treatment (3)**
24:23 25:3,10
**trees (1)**
193:4
**trial (1)**
6:18
**tried (5)**
73:11 156:15 200:2,3
200:17
**Trish (9)**
3:15 19:14 28:20
29:10 108:24
168:25 169:20
174:13 227:8
**Trish's (2)**
143:21 169:8
**true (16)**
17:21 75:2 84:16
136:20 160:24
165:15 166:2

176:12 181:9
210:13 226:3,5
234:9 236:20,21
262:12
**trustee (12)**
4:6 5:11 53:14 73:13
93:17 94:7 95:2,15
98:12,17 150:25
151:9
**trustees (2)**
92:24 146:13
**trustee's (3)**
95:15 101:13 103:11
**try (14)**
47:8 60:14 62:19 90:5
120:7 145:5 148:3
156:16,20,23
174:10 185:6
202:18 259:6
**trying (16)**
31:10 44:14 46:5 60:4
60:8 63:11 140:20
143:14 148:7 161:5
187:7 188:2 191:2
191:16 200:13
246:25
**Tuesday (9)**
160:4,5,6 236:11
239:8,20 241:4
258:13 259:21
**Tuesday/Wednesda...**
252:11
**turn (22)**
19:9 22:2 35:3 56:21
57:11 58:5 75:20
82:4 89:16 99:24
104:4 113:7 130:8
158:12 161:25
167:16 214:19
226:25 228:7
230:16 244:12
256:7
**turned (1)**
80:3
**turning (7)**
35:16 108:10,14
110:2 153:13 175:6
211:5
**twice (2)**
189:21 195:9
**two (19)**
10:12 23:24 50:10,14
102:4 128:11
135:16 137:6 141:8
143:17 146:8 171:8
211:8 214:23

235:20,25 249:18
249:20 253:10
**two-minute (1)**
205:24
**type (6)**
16:4,5 34:23 72:7
135:8 198:19
**types (8)**
16:13 57:20 110:19
131:9 182:10 195:7
197:8 198:13
**typical (2)**
137:17 142:10
**typically (1)**
246:20

_____
**U**

**ultimately (1)**
151:6
**uncertain (1)**
20:10
**uncertainties (2)**
125:23 222:3
**uncertainty (3)**
12:25 118:16 119:23
**unclear (1)**
18:14
**uncommon (1)**
205:15
**undefined (2)**
39:9 109:3
**undergoing (1)**
13:2
**underlier (3)**
207:14 212:16 223:19
**underlies (1)**
68:15
**underlying (8)**
41:14 68:7,14 207:14
208:3,5,16,19
**underneath (1)**
162:11
**understand (62)**
7:5,14,21 9:10 10:11
14:16 15:9 16:12
17:10,11 18:8 21:20
23:10 46:4 49:7,11
49:16,18 63:11,23
64:14 65:8 66:4,14
66:24 71:16 80:5
87:5 88:13,21 92:21
96:16 97:12 100:16
101:13 105:6
114:17 132:24
143:18,20 147:20
148:7,11 149:25

150:5 152:21,25
166:12 170:6
175:22 190:9 191:2
191:16 204:4
207:10 221:2
234:17 237:5 241:5
242:5 246:16 257:2
**understanding (47)**
9:5 15:19 17:18,23
19:6 27:3 51:2
70:19 76:8 78:5,19
88:25 90:6 94:10,11
102:22 103:14,17
103:23 105:14,21
106:4,7,10 107:7
112:4 132:15,19
133:18 150:14
151:4,9,19 153:2,10
155:25 157:24
178:4 181:23,24
182:10 186:23
200:4 212:2 218:25
227:16,24
**understood (15)**
23:23 39:19 55:4 75:8
90:15 92:22 105:10
108:3 120:21 122:5
132:10 134:13
154:14 164:11
197:24
**unfortunately (1)**
148:5
**unique (4)**
70:15,16 241:23
245:4
**unit (1)**
254:3
**UNITED (1)**
1:2
**unknown (3)**
73:13 112:11,17
**unlimited (1)**
115:14
**unnecessary (4)**
189:5,22,23,23
**unquantifiable (14)**
73:14 84:11 95:17
112:12 115:14
116:2 117:3 186:8
186:18 188:18
189:9 190:20 191:4
191:7
**unquote (1)**
229:21
**unusual (1)**
245:19

**unvetted (4)**
130:10,22 140:3
196:19
**unwind (1)**
95:6
**upside (3)**
153:20,25 199:4
**URQUHART (1)**
3:17
**use (20)**
39:8 43:9 61:24 76:7
133:19 134:4,23
135:3 137:18,25
139:4 143:11 148:8
152:13 189:9 197:8
204:2,5 233:11
234:16
**useful (8)**
195:15 257:16,22
259:3,8,8,10,16
**usual (1)**
228:16
**usually (2)**
197:6 230:4
**U.S (1)**
228:25

_____
**V**

**vague (6)**
17:8 61:24 76:6
222:21 246:25
257:20
**vagueness (1)**
243:9
**valuable (1)**
107:15
**valuation (1)**
119:7
**value (20)**
57:5,21 71:5 72:18
111:5,9,10,12 112:8
113:14 123:22
128:4 154:5,8
199:18 205:7,12
209:22 231:5
247:13
**valued (8)**
154:3,9 199:18 246:8
246:11,12,18,20
**variation (2)**
197:3,21 205:5
**variety (1)**
76:12
**various (8)**
13:19 39:20 62:8 83:5
83:9 100:16 125:2

197:8
**vast (1)**
82:16
**verbally (1)**
238:2
**versions (1)**
227:21
**view (9)**
13:8 23:19 43:8 55:7
119:12 136:7
208:14 209:16
259:2
**virtually (3)**
82:15 97:6 208:15
**visible (2)**
140:12,16
**volatile (1)**
130:24
**volatility (15)**
12:24 71:4 95:2
120:10,15 124:23
124:24 212:16
222:3 223:6,8
232:11 234:6 236:7
236:8

_____
**W**

**wait (2)**
192:23 217:8
**wake (1)**
128:25
**Walker (1)**
59:18
**want (27)**
16:14 20:4 32:3 45:11
47:11 48:5 55:2,3
80:8 84:15 90:4
124:21 136:4
147:20 152:22
164:22 167:9 173:7
180:21 202:2 206:5
215:4 224:25
227:20 238:25
245:18 249:20
**wanted (8)**
16:17 51:8 100:20
121:12 123:10
177:5 190:3 247:25
**Washington (1)**
6:9
**wasn't (12)**
43:6 51:12 56:5 62:18
90:21,21 91:12,13
92:13 113:4 147:12
160:25
**way (50)**

12:13 14:13 15:6 20:6
23:22 34:16 47:11
49:23 60:14 62:22
63:9 64:21 67:16
81:9 82:3 92:15
98:7 99:6 110:22
125:21 127:5 139:2
142:19 148:3,5,10
150:13 152:5,11
159:6 161:2 164:4
165:15 166:23
178:20 185:9 196:9
199:19 204:17
207:11 209:18
226:2 233:5 234:21
239:3 240:6 241:25
242:4 254:11
262:16
**ways (1)**
245:21
**Wednesday (2)**
160:3 259:21
**week (19)**
44:11 83:2,10 84:19
171:18,24 172:5,22
178:13 182:17
183:2 184:9 238:21
239:8,20 241:5
259:11,17,20
**weekend (11)**
14:2,4 98:11 113:5
119:2,3,11 157:10
165:23 258:12,16
**weighty (1)**
252:25
**Welcome (1)**
6:24
**went (7)**
15:14 75:5 138:22
196:9 233:24 234:7
249:21
**weren't (3)**
16:6 70:18 184:14
**We'll (2)**
42:4 169:21
**we're (7)**
46:4 76:18 79:16
97:22 125:21 146:6
150:16
**we've (4)**
85:2 94:17 200:22
258:18
**whatsoever (1)**
226:14
**whereof (1)**
262:23

**wide (1)**
186:24
**WILLIAM (1)**
4:10
**willing (11)**
113:20 117:19 121:2
122:18 126:17
127:16 137:13
146:15 147:9
190:16 203:14
**wind (1)**
131:16
**wiped (2)**
230:24 237:20
**wished (2)**
51:15 75:19
**withdraw (1)**
144:23
**withdrawn (7)**
47:17 75:24 109:8
145:3,5 179:15
202:18
**witness (29)**
5:3 18:7 29:24 30:3
32:20 39:13 40:18
42:7 66:7 83:16
87:24 89:23 104:16
124:10 141:14
147:25 159:12
162:7 170:14 174:6
186:15 191:24
217:10 228:5 260:6
262:9,13,23 264:4
**witnesses (2)**
16:11 143:12
**witness's (2)**
28:9 109:19
**woken (1)**
92:24
**word (10)**
33:5,14 34:6 40:2
62:3 148:8 152:12
152:13,13 189:10
**words (6)**
27:2,24,25 188:10
223:13 227:23
**work (7)**
135:17 138:23 150:25
151:8 190:16 199:2
236:9
**worked (3)**
25:2 117:11 235:13
**working (2)**
44:5 184:23
**works (2)**
201:20 236:5

**world (3)**
75:3 81:6 219:17
**worried (1)**
187:5
**worth (3)**
60:18,19 247:15
**wouldn't (21)**
42:25 61:19 84:13
86:2 93:22 94:4,6
94:18 128:13,14
140:25 189:5,7,14
189:18 191:10
201:24 202:2,2
222:19 231:12
**wound (1)**
203:17
**write (3)**
110:5 218:2 228:22
**writes (2)**
60:3 257:8
**wrote (3)**
48:17 83:22 226:23

─────── **X** ───────

**x (2)**
1:4,10

─────── **Y** ───────

**Yang (3)**
59:17 60:3 257:8
**year (2)**
6:12 7:9
**years (4)**
5:19 6:10 25:3 207:2
**yesterday's (1)**
257:10
**York (18)**
1:3,15,15 2:7,7,12 3:7
3:7,14,20,20 4:8,8
193:24,25 262:3,4,7

─────── **Z** ───────

**Zach (4)**
192:14,20 194:18
263:10
**Zach's (1)**
195:5
**zero (1)**
231:6
**zillion (1)**
123:2

─────── **$** ───────

**$1 (2)**
121:8 219:13
**$100 (1)**

129:2
**$2.9 (1)**
255:9
**$250 (1)**
225:18
**$358 (1)**
157:6
**$370 (2)**
155:15 158:5
**$4.5 (1)**
66:25
**$500 (1)**
223:3
**$507 (3)**
242:13 243:2,4
**$6.3 (1)**
60:19
**$69 (1)**
57:22
**$70 (1)**
57:5
**$700 (2)**
217:19 239:15
**$8.4 (1)**
60:18

─────── **0** ───────

**00074256 (2)**
58:8 263:9
**00075257 (3)**
252:22 253:3 263:17
**074 (1)**
194:11
**08-13555(JMP) (1)**
1:7

─────── **1** ───────

**1 (17)**
12:8 14:9 25:23 44:15
65:21 87:25 88:8
91:9 104:5,7,11,21
106:15 140:2 162:2
162:3 264:6
**1(A)(ii) (3)**
85:17 86:7 95:21
**1(C) (2)**
95:18,21
**1(d) (1)**
101:14
**1:03 (1)**
130:3
**10 (5)**
3:12 104:5,7,21 105:9
**10:52 (1)**
85:4
**100 (4)**

82:24 84:18 160:9
221:17
**10004-1482 (1)**
4:8
**10010 (1)**
3:20
**10017-6702 (1)**
3:7
**106 (6)**
113:7 117:18 118:4
121:23 126:16
127:6
**11 (2)**
1:6 57:12
**11:02 (1)**
85:5
**12 (3)**
57:11,17 89:17
**12:14 (1)**
129:15
**12207 (1)**
3:14
**15 (11)**
58:25 60:16 83:2,11
171:18,24 178:13
182:17 183:2 184:9
224:13
**15c3 (3)**
242:8,13 243:6
**15th (3)**
172:5,22 235:21
**16 (2)**
77:19 112:2
**16h (1)**
160:22
**16th (11)**
111:7 112:6 126:24
128:5 159:25 160:6
160:12,17,19,21
235:22
**17th (3)**
112:6 160:9,14
**18th (1)**
112:6
**19 (23)**
19:9,17,20 20:7 45:16
63:15 64:11,15 65:6
66:15 67:11,20 68:4
69:6 74:5 82:12
110:2 130:13 140:2
242:14,18 250:22
256:13
**19th (2)**
112:6 255:23
**192 (1)**
263:10

**1987 (3)**
233:23 234:5,13
**1994 (1)**
6:13

─────── **2** ───────

**2 (7)**
12:8 35:3,9 86:22
88:19 161:25 264:6
**2.3 (2)**
57:14,17
**2.3(i) (1)**
89:17
**2.9 (1)**
255:15
**2:13 (1)**
175:3
**2:29 (1)**
175:4
**20 (6)**
25:2 100:9,19,25
230:17 235:10
**2008 (15)**
42:17 45:16 60:16
77:19 172:22
181:10,19,25
182:17 183:6
200:24 201:9 207:5
234:14,24
**2010 (7)**
1:16 2:2 8:6 9:11
261:21 262:24
264:3
**21st (1)**
118:22
**214 (1)**
263:14
**22 (7)**
154:16 192:16,22
200:23 201:9 207:5
263:12
**22nd (8)**
3:19 118:23,24 150:7
154:23 193:22
197:19 206:11
**222 (1)**
3:6
**226 (1)**
263:15
**24 (9)**
58:6,14,15,16,20 59:6
60:15 61:12,15
**25 (4)**
1:16 2:2 85:13 264:3
**25th (1)**
262:24

**252 (1)**
263:16
**26 (1)**
158:15
**28367 (1)**
1:25
**297510 (1)**
215:10
_____ 3 _____
**3 (7)**
35:10 89:4,5 92:6
93:15 214:19 264:7
**3:18 (1)**
206:2
**3:26 (1)**
206:3
**3:47 (3)**
193:22 194:5,6
**30 (2)**
25:3 207:2
**30(e) (1)**
262:21
**36754 (1)**
194:4
**370 (1)**
154:15
**38 (1)**
21:11
_____ 4 _____
**4 (14)**
35:10,17 39:4 45:19
99:25 100:13,15
101:2,4,12,25 102:7
102:15 162:3
**4th (1)**
3:13
**4.5 (7)**
61:5 66:22 67:9 68:2
69:5 74:6,7
**4.8 (1)**
61:4
**4:07 (1)**
230:13
**4:13 (1)**
230:14
**4:41 (4)**
192:16,22 194:17
263:13
**4:45 (4)**
169:12 172:17 248:21
256:13
**4:45:22 (1)**
169:13
**4:51 (1)**

248:22
**40 (2)**
21:12 207:2
**41st (1)**
3:6
**46 (1)**
231:4
**47 (1)**
231:4
**48 (1)**
82:14
_____ 5 _____
**5 (16)**
45:19 99:25 100:14
100:15 102:2,3,7,15
123:6 215:18 216:8
216:10 218:2,16
219:4 263:4
**5:08 (1)**
261:12
**500 (1)**
223:2
**506 (1)**
168:20
**51 (1)**
3:19
**55 (1)**
168:9
**554 (6)**
167:14 168:13 169:7
170:11 174:16
249:3
**556 (2)**
224:2 256:21
**564 (2)**
167:24 192:11
**57 (2)**
58:8 263:9
**58 (3)**
227:9,13 263:8
_____ 6 _____
**6 (3)**
38:4,5 56:21
**62 (8)**
158:12,17,22 164:2
166:14 175:6 178:3
178:20
**622 (1)**
99:10
**627 (1)**
155:3
**63 (3)**
75:20 76:21 78:6
**652 (4)**

7:25 8:4 19:14 263:7
**653 (8)**
58:7,12 59:5 60:23
61:17,19 62:24
263:8
**654 (5)**
192:12,13,18 195:14
263:10
**655 (3)**
214:9,12 263:14
**656 (3)**
226:15,19 263:15
**657 (6)**
252:21 253:2 254:21
254:22 257:6
263:16
_____ 7 _____
**7 (1)**
19:10
**700 (2)**
217:5,13
**74256 (1)**
59:9
**760 (2)**
174:4 251:9
**760-page (1)**
256:23
_____ 8 _____
**8 (5)**
8:5 9:11 12:3 163:3
263:7
_____ 9 _____
**9 (1)**
82:6
**9/18 (2)**
256:6 257:11
**9:39 (1)**
48:13
**9:52 (1)**
48:14
**91 (9)**
167:16,19 168:15
169:8 245:21
249:15,16 253:7,11
**94 (9)**
22:2,4,5 71:25 79:17
81:2,3 244:12
245:17
**95 (1)**
6:13
**99 (4)**
82:4,7,11 84:18

# EXHIBIT I

.

**To:**    Stephen.King@barclayscapital.com[Stephen.King@barclayscapital.com];
Jasen.Yang@barclayscapital.com[Jasen.Yang@barclayscapital.com]
**Cc:**    Peam, Francis J[francis.peam@lehman.com]; McInerney, Lily[lily.mcinerney@lehman.com]; Shi, Jerry[jerry.shi@lehman.com]; Reilly, Gerard[greilly@lehman.com]
**From:**    Mincak, Christopher
**Sent:**    Fri 9/19/2008 4:45:22 PM
**Subject:**    Net Long Options - 9/18
**Categories:**    um:content-classes:message

Top Derivs by Position_091808 copy.zip

Attached are the options.  Awaiting the risk report from Risk.

Chris

.



MOVANTS' TRIAL
EXHIBIT

504

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | LBI | | | | | |
| 2 | Pre Netted Options | | | | | |
| 3 | 9/18 | | | | | |
| 4 | | | | | | |
| 5 | | Options | | | | |
| 6 | | | | | | |
| 7 | Product Name | Long | Division | BPM Level 0 | ISIN | Px |
| 8 | MORTGAGE TBA'S - a/c 11083 | 1,363,227,177 | | | | |
| 9 | F/X Forwards LBI a/c 11083-00004 | 900,700,624 | | | | |
| 10 | PUT S&P 500 INDX DEC 1425CBOE | 432,192,225 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 220.45 |
| 11 | PUT S&P 500 INDX DEC 1400CBOE | 152,489,600 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 197.60 |
| 12 | PUT S&P 500 INDX SEP 1375CBOE | 143,650,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 176.80 |
| 13 | PUT S&P 500 INDX MAR 1300CBOELONG TERM OPTIONS EXP 03/21/09 | 129,577,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 132.90 |
| 14 | PUT S&P 500 INDX JUN 1250CBOE | 102,650,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 121.00 |
| 15 | PUT S&P 500 INDX DEC 1500CBOELONG TERM OPTIONS EXP 12/19/09 | 82,134,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 304.20 |
| 16 | PUT S&P 500 INDX DEC 1350CBOE | 63,996,076 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 155.60 |
| 17 | DPL INC WTS $21.00 EXP 3-13-12RESTRICTED | 62,956,421 | SUM-EQUITIES | VOLATILITY AMERICAS | | 5.25 |
| 18 | PUT S&P 500 INDX JUN 1325CBOE | 61,200,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 163.20 |
| 19 | PUT S&P 500 INDX DEC 1350CBOE | 48,247,178 | SUM-EQUITIES | EQUITY STRATEGIES | | 153.80 |
| 20 | PUT ISHARES TR NOV 125 ****ADJ 3 FOR 1 STOCK SPLIT    DEL: 300 SHS OF FXI | 46,313,890 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 23.15 |
| 21 | PUT S&P 500 INDX SEP 1275CBOE | 45,619,200 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 76.80 |
| 22 | PUT S&P 500 INDX SEP 1365CBOE | 44,368,800 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 166.80 |
| 23 | PUT S&P 500 INDX MAR 1200CBOELONG TERM OPTIONS EXP 03/21/09 | 44,036,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 80.80 |
| 24 | PUT S&P 500 INDX SEP 1325CBOE | 41,780,600 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 126.80 |
| 25 | PUT S&P 500 INDX SEP 1350CBOE | 40,177,105 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 151.80 |
| 26 | PUT S&P 500 INDX SEP 1335CBOE | 33,794,880 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 136.80 |
| 27 | PUT S&P 500 INDX SEP 1475CBOE | 30,618,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 226.80 |
| 28 | PUT S&P 500 INDX OCT 1300CBOE | 29,870,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 103.00 |
| 29 | PUT S&P 500 INDX SEP 1450CBOE | 21,730,340 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 251.80 |
| 30 | PUT S&P 500 INDX JUN 1200CBOE | 21,538,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 97.90 |
| 31 | PUT AMER INTL GP JAN 040 **** | 21,084,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 37.65 |
| 32 | PUT S&P 500 INDX MAR 1325CBOELONG TERM OPTIONS EXP 03/21/09 | 20,846,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 148.90 |
| 33 | PUT S&P 500 INDX DEC 1350CBOE | 20,810,426 | SUM-EQUITIES | VOLATILITY EUROPE | | 154.00 |
| 34 | PUT S&P 500 INDX MAR 1250CBOELONG TERM OPTIONS EXP 03/21/09 | 20,338,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 104.30 |
| 35 | CALL TARGET CORP JAN 040 ****LONG TERM OPTIONS EXP 01/16/10 | 18,915,558 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 20.68 |
| 36 | PUT S&P 500 INDX SEP 1290CBOE | 18,791,460 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 91.80 |
| 37 | PUT S&P 500 INDX SEP 1255CBOE | 18,641,760 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 56.80 |
| 38 | PUT ISH EMG MKT JAN 160 ****ADJ 3 FOR 1 STOCK SPLIT    DEL: 300 SHS OF EEM | 17,400,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 58.00 |
| 39 | PUT S&P 500 INDX OCT 1200CBOE | 17,182,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 39.50 |
| 40 | PUT S&P 500 INDX SEP 1345CBOE | 16,162,680 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 146.80 |
| 41 | PUT S&P 500 INDX SEP 1260CBOE | 16,152,442 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 61.80 |
| 42 | PUT S&P 500 INDX DEC 1275CBOE | 15,500,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 100.00 |
| 43 | PUT FREEPORT    JAN 060 **** | 15,379,455 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 18.53 |
| 44 | CALL S&P 500 INDX DEC 1250CBOE | 14,863,845 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 40.90 |
| 45 | PUT GENERAL ELEC JAN 025 **** | 14,442,570 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 2.70 |
| 46 | CALL GENERAL ELEC JAN 025 **** | 14,027,012 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 2.29 |
| 47 | PUT GOLDMAN SACH OCT 160 **** | 13,098,363 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 52.63 |
| 48 | PUT CITIGROUP    JAN 045 **** | 12,956,125 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 27.83 |
| 49 | PUT S&P 500 INDX DEC 1100CBOELONG TERM OPTIONS EXP 12/19/09 | 12,915,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 86.10 |
| 50 | **EKSPORTFINANS ASA    REVERSE EXCHANGEABLE NT    LKD APPLE INC COM | 12,374,835 | SUM-EQUITIES | VOLATILITY AMERICAS | US2826455899 | 155.38 |
| 51 | PUT ISH EMG MKT DEC 155 ****ADJ 3 FOR 1 STOCK SPLIT    DEL: 300 SHS OF EEM | 12,011,750 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 52.23 |
| 52 | PUT ABERCROMBIE& JAN 060 **** | 11,581,218 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 16.90 |
| 53 | PUT AMER INTL GP SEP 017 **** | 11,423,885 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 14.58 |
| 54 | PUT S&P 500 INDX DEC 1290CBOELONG TERM OPTIONS EXP 12/19/09 | 11,262,000 | SUM-EQUITIES | VOLATILITY EUROPE | | 143.40 |
| 55 | PUT OIL SVC HLDR SEP 185 **** | 11,223,750 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 30.75 |
| 56 | PUT CIA VALE DO SEP 030 **** | 10,882,985 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 9.48 |
| 57 | PUT ISHS RUS IND MAR 068 **** | 10,856,250 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 4.83 |
| 58 | PUT S&P 500 INDX SEP 1625CBOE | 10,670,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 426.80 |
| 59 | PUT AMER INTL GP OCT 017 **** | 10,602,633 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 14.58 |
| 60 | PUT S&P 500 INDX SEP 1475CBOE | 10,380,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 276.80 |
| 61 | PUT PWRSHS QQQ OCT 043 **** | 9,858,808 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 1.98 |
| 62 | PUT AMER INTL GP NOV 020 **** | 9,767,030 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 17.58 |
| 63 | CALL AMGEN INC    OCT 045 **** | 9,589,388 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 15.38 |
| 64 | PUT HANSEN NATU SEP 035 CBOE | 9,229,080 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 8.40 |
| 65 | PUT S&P 500 INDX OCT 1275CBOE | 9,163,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 83.30 |

INTERMEDIATE PAGES OMITTED DUE TO SIZE

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 48556 | PUT  RUSSELL 2000 SEP 620 CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48557 | CALL CBOE MINI-ND SEP187.5CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48558 | CALL NASD 100 IND SEP 1825CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48559 | CALL S&P 500 INDX SEP 1280CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48560 | CALL CBOE MINI-ND SEP177.5CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48561 | CALL S&P 500 INDX SEP 1550CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48562 | CALL S&P 500 INDX SEP 1300CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48563 | CALL S&P 500 INDX SEP 1475CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48564 | CALL S&P 500 INDX SEP 1625CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48565 | PUT  S&P 500 INDX SEP 1150CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48566 | CALL S&P 500 INDX SEP 1375CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48567 | PUT  CBOE MINI-ND SEP 135 CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48568 | CALL NYMEX HOLDGS SEP 085 ****ADJ ELECTION MERGER | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48569 | CALL KOMAG INC   JAN 035 ****LONG TERM OPTIONS EXP 01/17/09 | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48570 | PUT  RUSSELL 2000 SEP 680 CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48571 | CALL CBOE MINI-ND SEP 195 CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48572 | CALL NASD 100 IND SEP 1850CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48573 | PUT  S&P 500 INDX SEP 1175CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48574 | CALL NYMEX HOLDGS DEC 085 ****ADJ ELECTION MERGER | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48575 | CALL S&P 500 INDX SEP 1235CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48576 | CALL RUSSELL 2000 SEP 780 CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48577 | PUT  NYMEX HOLDGS JAN 080 ****ADJ ELECTION MERGER | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48578 | CALL CBOE MINI-ND SEP 190 CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48579 | PUT  RUSSELL 2000 SEP 700 CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48580 | PUT  NYMEX HOLDGS SEP 065 ****ADJ ELECTION MERGER | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48581 | CALL S&P MIDCAP I SEP 810 **** | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48582 | PUT  CBOE MINI-ND SEP147.5CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48583 | CALL INDYMAC BNCP JAN 005 AMEX | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48584 | CALL S&P 500 INDX SEP 1390CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48585 | PUT  NYMEX HOLDGS SEP 075 ****ADJ ELECTION MERGER | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48586 | CALL NASD 100 IND SEP 1725CBOE | 0 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 0.00 |
| 48587 | CALL CBOE MINI-ND SEP 205 CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48588 | PUT  NYMEX HOLDGS JAN 060 ****LONG TERM OPTIONS EXP 01/16/10ADJ ELECTION M | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48589 | CALL CBOE MINI-ND SEP207.5CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48590 | CALL NYMEX HOLDGS SEP 090 ****ADJ ELECTION MERGER | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48591 | CALL WCI COMM   SEP 2.50PBW | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48592 | PUT  WCI COMM    JAN 7.50PBW | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48593 | CALL INDYMAC BNCP JAN17.50AMEX | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48594 | PUT  KOMAG INC   JAN 030 ****LONG TERM OPTIONS EXP 01/17/09 | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48595 | CALL CBOE MINI-ND SEP197.5CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48596 | CALL NYMEX HOLDGS JAN 085 ****ADJ ELECTION MERGER | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48597 | CALL NYMEX HOLDGS JAN 090 ****ADJ ELECTION MERGER | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48598 | CALL CBOE MINI-ND SEP187.5CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48599 | CALL S&P 500 INDX SEP 1240CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48600 | CALL S&P 500 INDX SEP 1285CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48601 | CALL S&P 500 INDX SEP 1280CBOE | 0 | SUM-EQUITIES | EQUITY STRATEGIES | | 0.00 |
| 48602 | Subtotal | 7,965,964,768 | | | | |
| 48603 | OCC Options Netting | (5,051,098,411) | | | | |
| 48604 | Total | 2,914,866,357 | | | | |
| 48605 | | | | | | |

# EXHIBIT J

**From:**  Mincak, Christopher
**Sent:**  Fri, 19 Sep 2008 21:41:00 GMT
**To:**  Yang, Jasen: Markets (NYK); King, Stephen: Markets (NYK)
**CC:**  Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
**Subject:** RE: Net Long Options - 9/18

I've included short options, longs/shorts as of yesterday's close, 9/18.

-----Original Message-----
From: Jasen.Yang@barclayscapital.com
[mailto:Jasen.Yang@barclayscapital.com]
Sent: Friday, September 19, 2008 5:23 PM
To: Mincak, Christopher; Stephen.King@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: RE: Net Long Options - 9/18

is there a short options book as well?

these are current as of yesterday's close?

thanks,

jasen

-----Original Message-----
From: Mincak, Christopher [mailto:christopher.mincak@lehman.com]
Sent: Friday, September 19, 2008 4:45 PM
To: King, Stephen: Markets (NYK); Yang, Jasen: Markets (NYK)
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: Net Long Options - 9/18

Attached are the options  Awaiting the risk report from Risk.

Chris
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any

HIGHLY CONFIDENTIAL

Δ π EXHIBIT
Deponent
Date       Rptr
www.DEPOBOOK.COM

BCI-EX-(S)-00075257

MOVANTS' TRIAL
EXHIBIT
509

transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such. All information is
subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.


This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.


This message is intended only for the personal and confidential use of the designated recipient(s) named
above. If you are not the intended recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly prohibited. This communication is for
information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to
buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman
Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as such. All
information is subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including
any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or
matter addressed herein.

HIGHLY CONFIDENTIAL

## LONG OPTIONS

| Product Name | Long | Division | BPM Level 0 | ISIN | Px |
|---|---|---|---|---|---|
| MORTGAGE TBA'S  - a/c 11083 | 1,363,227,177 | SUM-FIXED INCOME | GLOBAL RATES | | |
| F/X Forwards LBI a/c 11083-00004 | 900,700,624 | SUM-FIXED INCOME | FOREIGN EXCHANGE | | |
| PUT S&P 500 INDX CBOE | 432,192,225 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 220.45 |
| PUT S&P 500 INDX DEC 1400CBOE | 152,469,600 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 197.60 |
| PUT S&P 500 INDX SEP 1375CBOE | 143,650,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 176.80 |
| PUT S&P 500 INDX MAR 1300CBOELONG TERM OPTIONS EXP 03/21/09 | 129,577,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 132.89 |
| PUT S&P 500 INDX JUN 1250CBOE | 107,850,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 121.00 |
| PUT S&P 500 INDX MAR 1250CBOELONG TERM OPTIONS EXP 12/19/09 | 82,134,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 124.30 |
| PUT S&P 500 INDX DEC 1350CBOE | 63,996,078 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 155.60 |
| DPL INC WTS $21.00 EXP 3-13-12RESTRICTED | 62,956,421 | SUM-EQUITIES | VOLATILITY AMERICAS | | 5.25 |
| PUT S&P 500 INDX JUN 1325CBOE | 61,200,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 163.20 |
| PUT S&P 500 INDX JUN 1360CBOE | 48,247,178 | SUM-EQUITIES | EQUITY STRATEGIES | | 153.80 |
| PUT ISHARES TR  NOV 125 ****ADJ 3 FOR 1 STOCK SPLIT    DEL: 300 SHS OF FXI | 46,313,890 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 23.15 |
| PUT S&P 500 INDX SEP 1275CBOE | 45,619,200 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 78.80 |
| PUT S&P 500 INDX SEP 1365CBOE | 44,368,800 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 166.80 |
| PUT S&P 500 INDX MAR 1200CBOELONG TERM OPTIONS EXP 03/21/09 | 44,036,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 80.80 |
| PUT S&P 500 INDX SEP 1325CBOE | 41,780,600 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 126.80 |
| PUT S&P 500 INDX SEP 1350CBOE | 40,177,105 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 151.80 |
| PUT S&P 500 INDX SEP 1035CBOE | 33,734,880 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 136.80 |
| PUT S&P 500 INDX SEP 1425CBOE | 30,616,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 226.80 |
| PUT S&P 500 INDX OCT 1300CBOE | 29,670,600 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 103.00 |
| PUT S&P 500 INDX SEP 1450CBOE | 21,730,340 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 251.90 |
| PUT S&P 500 INDX JUN 1200CBOE | 21,538,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 97.90 |
| PUT AMER INTL GP JAN 040 **** | 21,084,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 37.65 |
| PUT S&P 500 INDX MAR 1325CBOELONG TERM OPTIONS EXP 03/21/09 | 20,946,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 149.90 |
| PUT S&P 500 INDX DEC 1550CBOE | 20,810,425 | SUM-EQUITIES | VOLATILITY EUROPE | | 154.00 |
| PUT S&P 500 INDX MAR 1250CBOELONG TERM OPTIONS EXP 03/21/09 | 20,338,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 104.30 |
| CALL TARGET CORP  JAN 040 ****LONG TERM OPTIONS EXP 01/16/10 | 18,915,558 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 20.68 |
| PUT S&P 500 INDX SEP 1290CBOE | 18,761,460 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 91.80 |
| PUT S&P 500 INDX SEP 1255CBOE | 18,641,760 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 56.80 |
| PUT ISH EMG MKT JAN 160 ****ADJ 3 FOR 1 STOCK SPLIT    DEL: 300 SHS OF EEM | 17,400,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 58.00 |
| PUT S&P 500 INDX OCT 1200CBOE | 17,162,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 39.50 |
| PUT S&P 500 INDX SEP 1345CBOE | 16,162,660 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 149.80 |
| PUT S&P 500 INDX SEP 1760CBOE | 16,152,442 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 61.80 |
| PUT S&P 500 INDX DEC 1275CBOE | 15,500,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 100.00 |
| PUT FREEPORT   JAN 080 **** | 15,379,456 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 18.53 |
| CALL S&P 500 INDX DEC 1250CBOE | 14,663,845 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 40.00 |
| PUT GENERAL ELEC JAN 025 **** | 14,442,570 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 2.70 |
| CALL GENERAL ELEC JAN 025 **** | 14,027,012 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 2.29 |
| PUT GOLDMAN SACH QCT 160 **** | 13,098,363 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 52.63 |
| PUT CITIGROUP   JAN 045 **** | 12,956,125 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 27.63 |
| PUT S&P 500 INDX DEC 1100CBOELONG TERM OPTIONS EXP 12/19/09 | 12,815,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 86.10 |
| ***EKSPORTFINANS ASA    REVERSE EXCHANGEABLE NT    LKD APPLE INC COM | 12,374,839 | SUM-EQUITIES | VOLATILITY AMERICAS | US2826455899 | 155.38 |
| PUT ISH EMG MKT DEC 155 ****ADJ 3 FOR 1 STOCK SPLIT    DEL: 300 SHS OF EEM | 12,011,750 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 52.23 |
| PUT ABERCROMBIE& JAN 060 **** | 11,581,218 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 16.90 |
| PUT AMER INTL GP SEP 017 **** | 11,423,285 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 14.58 |
| PUT S&P 500 INDX DEC 1260CBOELONG TERM OPTIONS EXP 12/19/09 | 11,262,000 | SUM-EQUITIES | VOLATILITY EUROPE | | 143.40 |
| PUT OIL SVC HLDR SEP 185 **** | 11,223,750 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 30.75 |
| PUT CIA VALE DO  SEP 030 **** | 10,892,965 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 9.48 |
| PUT ISHRS RUS INDX MAR 068 **** | 10,856,250 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 4.63 |
| PUT S&P 500 INDX SEP 1625CBOE | 10,670,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 420.80 |
| PUT AMER INTL GP OCT 017 **** | 10,602,633 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 14.58 |
| PUT S&P 500 INDX SEP 1475CBOE | 10,360,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 276.60 |
| PUT PWRSHS QQQ  OCT 043 **** | 9,458,609 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 1.98 |
| PUT AMER INTL GP NOV 029 **** | 9,767,030 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 17.58 |
| CALL AMGEN INC   OCT 045 **** | 9,589,388 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 15.38 |
| PUT HANSEN NATU SEP 035.CBOE | 9,229,080 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 8.40 |
| PUT S&P 500 INDX OCT 1275CBOE | 9,163,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 83.30 |
| PUT FANNIE MAE  SEP 015 **** | 9,058,700 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 14.50 |
| PUT ISH EMG MKT DEC 044 CBOE | 8,978,275 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 9.85 |
| PUT NASD 100 IND DEC 1875CBOE | 8,568,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 190.40 |
| CALL TARGET CORP  JAN 050 **** | 8,506,095 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 8.85 |
| PUT RUSSELL 2000 DEC 700 CBOE | 8,393,775 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 37.65 |
| PUT APPLE INC   OCT 200 **** | 8,046,390 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 65.90 |
| PUT PFIZER INC   JAN 025 **** | 7,966,490 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 7.30 |
| PUT MERCK & CO   JAN 055 **** | 7,898,350 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 23.50 |
| PUT FINL SECTOR SEP 033 **** | 7,835,124 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 3.55 |
| PUT S&P 500 INDX SEP 1245CBOE | 7,689,240 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 46.80 |
| PUT ISHARES BRAZ SEP 090 CBOE | 7,591,815 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 34.65 |
| PUT BANK OF AMER JAN47.50**** | 7,473,255 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 16.80 |
| CALL AMGEN INC   OCT42.50**** | 7,362,848 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 17.68 |
| PUT PFIZER INC   JAN 020 ****LONG TERM OPTIONS EXP 01/16/10 | 7,175,318 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 4.23 |
| PUT S&P 500 INDX JUN 1350CBOE | 7,168,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 179.20 |
| PUT S&P 500 INDX SEP 1350CBOE | 7,093,415 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 151.80 |
| PUT AMERN EXPRES JAN 060 **** | 7,080,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 23.60 |
| GOLD 30YR FHLMC-CALL | 6,964,797 | SUM-FIXED INCOME | GLOBAL RATES | | 0.03 |
| PUT CONSTLLATION OCT 080 **** | 6,896,880 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 55.60 |
| PUT AMYLINPHARMA JAN 035****LONG TERM OPTIONS EXP 01/16/10 | 6,869,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 13.75 |
| PUT SECTOR ENRGY SEP 088 **** | 6,828,410 | SUM-EQUITIES | EQUITY STRATEGIES | | 21.55 |
| PUT GOLDMAN SACH JAN 180 **** | 6,682,440 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 71.70 |
| PUT AMER INTL GP SEP 021 **** | 6,452,340 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 18.60 |
| PUT S&P 500 INDX DEC 1625CBOE | 6,366,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 318.30 |
| PUT S&P 500 INDX OCT 1175CBOE | 6,330,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 31.65 |
| CALL S&P 500 INDX JUN 1400CBOE | 6,300,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 70.00 |
| PUT FINL SECTOR  SEP 028 **** | 6,200,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 6.20 |
| PUT RUSSELL 2000 DEC 720 CBOE | 6,012,500 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 46.25 |
| CALL WAL-MART STR JAN 065 ****LONG TERM OPTIONS EXP 01/16/10 | 5,952,375 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 7.15 |
| CALL RUSSELL 2000 SEP 670 CBOE | 5,790,250 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 47.50 |
| PUT UTD STS STL  SEP 115 **** | 5,697,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 21.10 |
| PUT CITIGROUP   JAN32.50**** | 5,605,463 | SUM-EQUITIES | EQUITY STRATEGIES | | 15.86 |
| PUT ALUMINUM COR JAN 055 CBOE | 5,553,600 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 39.30 |
| PUT S&P 500 INDX JUN 1275CBOE | 5,360,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 134.00 |
| CALL S&P 500 INDX DEC 1700CBOELONG TERM OPTIONS EXP 12/19/09 | 5,321,250 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 5.50 |
| PUT VMWARE INC   JAN 060 **** | 5,255,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 52.65 |
| PUT S&P 500 INDX SEP 1600CBOE | 5,218,640 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 81.60 |
| CALL VISA INC    JAN 070 ****LONG TERM OPTIONS EXP 01/16/10 | 5,157,440 | SUM-EQUITIES | EQUITY STRATEGIES | | 14.20 |
| PUT MERRIL LYNCH JAN 045 **** | 5,095,550 | SUM-EQUITIES | EQUITY STRATEGIES | | 22.85 |
| CALL S&P 500 INDX MAR 1275CBOELONG TERM OPTIONS EXP 03/21/09 | 5,090,000 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 50.90 |
| PUT SECTOR ENRGY SEP 085 **** | 5,089,565 | SUM-EQUITIES | EQUITY STRATEGIES | | 18.65 |
| PUT OIL SVC INDX DEC 340 PBW | 5,070,150 | SUM-EQUITIES | LIQUID MARKETS AMERICAS | | 86.95 |
| **Subtotal** | **7,965,964,769** | | | | |
| **OCC Options Netting** | **(5,051,098,411)** | | | | |
| **Total** | **2,914,866,357** | | | | |

REMAINING PAGES OMITTED DUE TO SIZE

# EXHIBIT K

| From: | wnavin@theocc.com |
|---|---|
| Sent: | Sunday, September 21, 2008 11:05 AM |
| To: | erosen@cgsh.com; jmcdaniel@sidley.com |
| Subject: | Fw: Barclays Capital Inc. Lehman related OCC Settlements |

William H. Navin
Executive Vice President and General Counsel
The Options Clearing Corporation
312-322-1817
312-322-1836 (fax)
----- Forwarded by William Navin/TheOCC on 09/21/2008 10:05 AM -----

John Fennell/TheOCC

09/21/2008 10:01 AM

To
vincent.ciaravino@barcap.com, peter.conti@barcap.com, peter.justini@barcap.com
cc
William Navin/TheOCC@TheOCC, Mike Cahill/TheOCC, Joe Wegesin/TheOCC, Mike
Walinskas/TheOCC@TheOCC, Tom Pappageorge/TheOCC@TheOCC, Michael
McClain/TheOCC@TheOCC
Subject
Barclays Capital Inc. Lehman related OCC Settlements

Mr. Ciaravino,

Below are the projected settlements for the former Lehman Brothers Inc. (LBI)
OCC accounts.  These collects (i.e. pay from OCC to the clearing member)
include:

| #074 | Customer | $ | 9,693,978.77 | collect |
|---|---|---|---|---|
| #074 | Firm | $ | 358,905,701.00 | collect |
| #074 | Market Maker | $ | 0.00 | |
| #084 | Customer | $ | 16,180.00 | collect |
| #084 | Firm | $ | 9,173,290.00 | collect |
| #273 | Customer | $ | 0.00 | |

These settlement projections are assuming all margin collateral posted by
Lehman Brothers Inc. continues to be part of the account on a going forward
basis or has been replaced with good collateral of equal value.  Assuming that
the sale of assets by LBI to Barclays has closed, we expect to settle these
cash movements through Barclay Capital Inc.'s Bank of New York settlement
account (the same ones used for OCC Clearing Member #576) Monday morning unless
we are advised otherwise and able to comply.



EXHIBIT
627
2/9/16 WS

MOVANTS' TRIAL
EXHIBIT
421

CONFIDENTIAL

If you should have any questions with these settlement amounts or should
require additional detailed information please do not hesitate to contact any
of the following:

John Fennell         817.562.3593 or 469.235.5522 cell
Joe Wegesin          312.322.4500
Tom Papageorge       312.322.7518

cc: Peter Justini (BCI - Financial Reporting) and Peter Conti (BCI -
Operations)

John Fennell
FVP Risk Management &
 Treasury Operations
Office:  817.562.3593
Cell:  469.235.5522

CONFIDENTIAL

CGSH00034492

# Exhibit L

**From:** Pearn, Francis J
**Sent:** Sun, 21 Sep 2008 20:07:37 GMT
**To:** Stack, Tim: Futures (NYK)
**CC:** McInerney, Lily; Jones, Craig L; Dziemian, Daniel
**Subject:** FW: Net Long Options - 9/18

---

Tim
Here are the OCC statements for LBI as of 9/22 reflecting our cash and securities collateral held for LBI account 074. Dan and Craig provided these and can answer your questions. WE have a list of option contracts still open that is being prepared for the firm/house and market making accounts that we'll forward to you very shortly. Thanks.
Frank

-----Original Message-----
From: Jones, Craig L
Sent: Sunday, September 21, 2008 2:19 PM
To: Pearn, Francis J; Tennyson, Peter A; Butryn, Kirk; Blackwell, Alastair; Reilly, Gerard; Stucchio, Anthony
Cc: McInerney, Lily
Subject: RE: Net Long Options - 9/18

Attached are the current statements for the OCC.

-----Original Message-----
From: Pearn, Francis J
Sent: Sunday, September 21, 2008 1:14 PM
To: Tennyson, Peter A; Jones, Craig L; Butryn, Kirk; Blackwell, Alastair; Reilly, Gerard; Stucchio, Anthony
Cc: McInerney, Lily
Subject: FW: Net Long Options - 9/18

Who can get the OCC information and statement for Friday and determine if these contracts are still outstanding?

-----Original Message-----
From: Tim.Stack@barclayscapital.com
[mailto:Tim.Stack@barclayscapital.com]
Sent: Sunday, September 21, 2008 1:12 PM
To: Pearn, Francis J
Cc: McInerney, Lily; Richard.Konefal@barclayscapital.com; Liz.James@barclayscapital.com; alexandra.guest@barclayscapital.com
Subject: RE: Net Long Options - 9/18

This is for the futures options contracts that were liquidated as you say on Thursday and will now be flat.



MOVANTS' TRIAL EXHIBIT

505

**HIGHLY CONFIDENTIAL**

This does not include the OCC exchange positions..ie the VIX futures and
all the equity option positions. We need the OCC statement...

-----Original Message-----
From: Pearn, Francis J [mailto:francis.pearn@lehman.com]
Sent: Sunday, September 21, 2008 1:05 PM
To: Stack, Tim: Futures (NYK)
Cc: McInerney, Lily
Subject: RE: Net Long Options - 9/18


Tim
I'm getting some information that leads me to think that all the
exchange traded option contracts were liquidated by the exchanges on
Friday.  Here is a spreadsheet that shows $0 House account balances as
of the 19th at a number of exchanges.  I am imploring Operations to get
us a definitive answer as to whether these contracts have in fact been
liquidated and will come back to you immediately upon hearing from them.
Thanks. Frank


-----Original Message-----
From: Tim.Stack@barclayscapital.com
[mailto:Tim.Stack@barclayscapital.com]
Sent: Sunday, September 21, 2008 12:05 PM
To: Stephen.King@barclayscapital.com; Pearn, Francis J; McInerney, Lily;
Reilly, Gerard; Mincak, Christopher; Jasen.Yang@barclayscapital.com
Cc: Shi, Jerry; Liz.James@barclayscapital.com
Subject: RE: Net Long Options - 9/18

Frank
I have just been speaking to Stephen
Can you please call me on this one at 2124121834.
Thanks
Tim

-----Original Message-----
From: King, Stephen: Markets (NYK)
Sent: Sunday, September 21, 2008 11:26 AM
To: 'Pearn, Francis J'; McInerney, Lily; Reilly, Gerard; Mincak,
Christopher; Yang, Jasen: Markets (NYK)
Cc: Shi, Jerry; Stack, Tim: Futures (NYK)
Subject: RE: Net Long Options - 9/18



Just tried to call.

-----Original Message-----
From: Pearn, Francis J [mailto:francis.pearn@lehman.com]
Sent: Sunday, September 21, 2008 11:22 AM
To: King, Stephen: Markets (NYK); McInerney, Lily; Reilly, Gerard;

HIGHLY CONFIDENTIAL

Mincak, Christopher; Yang, Jasen: Markets (NYK)
Cc: Shi, Jerry; Stack, Tim: Futures (NYK)
Subject: Re: Net Long Options - 9/18

Stephen
I spoke with Gerry Reilly this morning and am reaching out to Lily and
Chris to get the most recent exchange traded option info. I am at 516
741 4541 if you want to speak. I will give you an update once Lily and I
connect.


Frank

----- Original Message -----
From: Stephen.King@barclayscapital.com
<Stephen.King@barclayscapital.com>
To: McInerney, Lily; Reilly, Gerard; Mincak, Christopher;
Jasen.Yang@barclayscapital.com <Jasen.Yang@barclayscapital.com>
Cc: Pearn, Francis J; Shi, Jerry; Tim.Stack@barclayscapital.com
<Tim.Stack@barclayscapital.com>
Sent: Sun Sep 21 11:18:47 2008
Subject: RE: Net Long Options - 9/18

Lily,

What's I'm trying to be sure about is that we have a clear list of all
exchange traded positions (options, futures, etc) as of Friday close.
Need this today.  Very important. Also, I need to know what the net
margin is at the relevant clearing house, and whether that reflects the
Friday close marks.

What is you number? Either tim or I will call you.

thx

-----Original Message-----
From: McInerney, Lily [mailto:lily.mcinerney@lehman.com]
Sent: Sunday, September 21, 2008 11:10 AM
To: King, Stephen: Markets (NYK); Reilly, Gerard; Mincak, Christopher;
Yang, Jasen: Markets (NYK)
Cc: Pearn, Francis J; Shi, Jerry
Subject: RE: Net Long Options - 9/18

Only equity exchange traded options as of 9/18 were included.

-----Original Message-----
From: Stephen.King@barclayscapital.com
[mailto:Stephen.King@barclayscapital.com]
Sent: Sunday, September 21, 2008 9:12 AM
To: Reilly, Gerard; Mincak, Christopher; Jasen.Yang@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry
Subject: RE: Net Long Options - 9/18

Don't forget we only want the exchange traded options, not the otc.

-----Original Message-----
From: Reilly, Gerard [mailto:greilly@lehman.com]
Sent: Sunday, September 21, 2008 9:11 AM
To: Mincak, Christopher; Yang, Jasen: Markets (NYK); King, Stephen:
Markets (NYK)
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry
Subject: RE: Net Long Options - 9/18

Chris

Does this include all equity exchange traded options?

-----Original Message-----
From: Mincak, Christopher
Sent: Friday, September 19, 2008 5:41 PM
To: 'Jasen.Yang@barclayscapital.com'; Stephen.King@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: RE: Net Long Options - 9/18

I've included short options, longs/shorts as of yesterday's close, 9/18.




-----Original Message-----
From: Jasen.Yang@barclayscapital.com
[mailto:Jasen.Yang@barclayscapital.com]
Sent: Friday, September 19, 2008 5:23 PM
To: Mincak, Christopher; Stephen.King@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: RE: Net Long Options - 9/18

is there a short options book as well?

these are current as of yesterday's close?

thanks,

jasen

-----Original Message-----
From: Mincak, Christopher [mailto:christopher.mincak@lehman.com]
Sent: Friday, September 19, 2008 4:45 PM
To: King, Stephen: Markets (NYK); Yang, Jasen: Markets (NYK)
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: Net Long Options - 9/18

Attached are the options.  Awaiting the risk report from Risk.

Chris
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

BCI-EX-(S)-00188228

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing. Barclays Capital is the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP. This email may relate to or be sent from other members of the Barclays Group.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

_____

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing. Barclays Capital is the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP. This email may relate to or be sent from other members of the Barclays Group.

_____
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s) named above.  If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited.  This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers.  Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such.  All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

_____

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that

you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free. Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such. All information is subject to change
without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)

HIGHLY CONFIDENTIAL

with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.

------------------------------------
--------

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such. All information is
subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.


This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.

**HIGHLY CONFIDENTIAL**

```
THE OPTIONS CLEARING CORPORATION           ACTIVITY DATE: 09/22/2008 CYCLE-ID:            CMO PAGE 1
ACCOUNT SUMMARY BY CMO                      SYSTEM DATE: 09/22/2008 SYSTEM TIME: 21:52:43   CX PAGE 1

CMO:                         LEHMAN BROTHERS INC.
CLEARING MEMBER:             OCC  00074

TIER ACCOUNT:                OCC  00074 C
SETTLEMENT TIER ACCOUNT:     OCC  00074 C
```

| ACCOUNT SUMMARY PRIOR TO CASH CONVERSION | | ACCOUNT SUMMARY AFTER CASH CONVERSION | |
|---|---|---|---|
| COLLATERAL TYPE (ALL IN USD) | | COLLATERAL TYPE (ALL IN USD) | |
| CASH: | | CASH: | |
| USD: | 162,681,324.65 | USD: | 162,681,324.65 |
| FOREIGN: | 0.00 | FOREIGN: | 0.00 |
| CASH TOTAL: | 162,681,324.65 | CASH TOTAL: | 162,681,324.65 |
| GOVERNMENT (GS & GE) TOTAL: | 344,736,724.57 | GOVERNMENT (GS & GE) TOTAL: | 344,736,724.57 |
| LETTERS OF CREDIT TOTAL: | 0.00 | LETTERS OF CREDIT TOTAL: | 0.00 |
| MONEY MARKET FUNDS TOTAL: | 0.00 | MONEY MARKET FUNDS TOTAL: | 0.00 |
| VALUED SECURITIES TOTAL: | 0.00 | VALUED SECURITIES TOTAL: | 0.00 |
| TOTAL COLLATERAL VALUE (IN USD): | 507,418,049.22 | TOTAL COLLATERAL VALUE (IN USD): | 507,418,049.22 |
| TOTAL REQUIREMENT: | 320,149,775.00 | TOTAL REQUIREMENT: | 320,149,775.00 |
| MARGIN CREDIT: | 0.00 | MARGIN CREDIT: | 0.00 |
| ROLLED-UP MARGIN DEFICIT: | 0.00 | ROLLED-UP MARGIN DEFICIT: | 0.00 |
| EXCESS/DEFICIT: | 187,268,274.22  EXC | EXCESS/DEFICIT: | 187,268,274.22  EXC |

```
        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                      9,693,978.77  COL
CASH CONVERSION
   CASH GAINED FROM CONVERSION:              0.00
   CASH USED FOR CONVERSION:                 0.00
DEFICIT:                                     0.00
NET SETTLEMENT:                      9,693,978.77  COL
================================================================
```

ENP0450                              ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL                                                      BCI-EX-(S)-00188233

```
THE OPTIONS CLEARING CORPORATION                ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 2
ACCOUNT SUMMARY BY CMO                          SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:53          CM  PAGE 2

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00074

SETTLEMENT TIER ACCOUNT:      OCC  00074 C

    PAY/COLLECT TYPE                                        AMOUNT     PAY/COL
    ─────────────────────────────────────────────────────────────────────────
    INDEX CASH DIFFERENCE                              13,469,519.00   COL
    EQUITY CASH FIXED                                           7.56   COL
    INDEX CASH FIXED                                       70,000.00   COL
    EQUITY POST TRADE PREMIUM                           3,237,702.80   PAY
    INDEX POST TRADE PREMIUM                              641,289.99   PAY
    EQUITY TRADE PREMIUM                                   33,445.00   COL
    ─────────────────────────────────────────────────────────────────────────
    NET PAY/COLLECT                                     9,693,978.77   COL
```

ENP0450                          ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL                                                    BCI-EX-(S)-00188234

```
THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/22/2008 CYCLE-ID:              CMO PAGE 3
ACCOUNT SUMMARY BY CMO                     SYSTEM DATE: 09/22/2008 SYSTEM TIME: 21:52:43    CMO PAGE 3

CMO:                        LEHMAN BROTHERS INC.
CLEARING MEMBER:            OCC  00074

TIER ACCOUNT:               OCC  00074 F
SETTLEMENT TIER ACCOUNT:    OCC  00074 F
```

|        ACCOUNT SUMMARY PRIOR TO CASH CONVERSION         |        ACCOUNT SUMMARY AFTER CASH CONVERSION        |

```
COLLATERAL TYPE (ALL IN USD)                          COLLATERAL TYPE (ALL IN USD)
  CASH:                                                 CASH:
    USD:                        578,689,010.23            USD:                        578,689,010.23
    FOREIGN:                              0.00            FOREIGN:                              0.00
  CASH TOTAL:                   578,689,010.23          CASH TOTAL:                   578,689,010.23
  GOVERNMENT (GS & GE) TOTAL:   332,558,398.49          GOVERNMENT (GS & GE) TOTAL:   332,558,398.49
  LETTERS OF CREDIT TOTAL:          500,000.00          LETTERS OF CREDIT TOTAL:          500,000.00
  MONEY MARKET FUNDS TOTAL:               0.00          MONEY MARKET FUNDS TOTAL:               0.00
  VALUED SECURITIES TOTAL:                0.00          VALUED SECURITIES TOTAL:                0.00

TOTAL COLLATERAL VALUE (IN USD):  911,747,408.72        TOTAL COLLATERAL VALUE (IN USD):  911,747,408.72

TOTAL REQUIREMENT:                641,926,510.00        TOTAL REQUIREMENT:                641,926,510.00

MARGIN CREDIT:                             0.00         MARGIN CREDIT:                             0.00

ROLLED-UP MARGIN DEFICIT:                  0.00         ROLLED-UP MARGIN DEFICIT:                  0.00

EXCESS/DEFICIT:                  269,820,898.72  EXC    EXCESS/DEFICIT:                  269,820,898.72  EXC
```

|        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY         |

```
NET PAY/COLLECT:                 358,905,701.00  COL
CASH CONVERSION
  CASH GAINED FROM CONVERSION:            0.00
  CASH USED FOR CONVERSION:               0.00
DEFICIT:                                  0.00
NET SETTLEMENT:                  358,905,701.00  COL
=============================================================
```

```
ENP0450                          ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL

```
THE OPTIONS CLEARING CORPORATION                ACTIVITY DATE: 09/22/2008 CYCLE-ID:                        CMO PAGE 4
ACCOUNT SUMMARY BY CMO                           SYSTEM DATE: 09/20/2008 SYSTEM TIME: 21:52:43             CX PAGE 4

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                      LEHMAN BROTHERS INC.
CLEARING MEMBER:          OCC  00074

SETTLEMENT TIER ACCOUNT:     OCC  00074 F
```

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---:|---|
| INDEX CASH DIFFERENCE | 353,810,801.00 | COL |
| INDEX CASH FIXED | 480,000.00 | COL |
| STOCK LOAN MARK TO MARKET | 4,614,900.00 | COL |
| NET PAY/COLLECT | 358,905,701.00 | COL |

```
ENP0450                          ****CONTINUED ON NEXT PAGE****
```

**HIGHLY CONFIDENTIAL**                                                              **BCI-EX-(S)-00188236**

```
THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 5
ACCOUNT SUMMARY BY CMO                     SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:53:43          CMO PAGE 5

CMO:                      LEHMAN BROTHERS INC.
CLEARING MEMBER:          OCC  00074

TIER ACCOUNT:             OCC  00074 M
SETTLEMENT TIER ACCOUNT:  OCC  00074 M
```

|           ACCOUNT SUMMARY PRIOR TO CASH CONVERSION           |          ACCOUNT SUMMARY AFTER CASH CONVERSION           |
|---|---|
| COLLATERAL TYPE (ALL IN USD) | COLLATERAL TYPE (ALL IN USD) |
| CASH: | CASH: |
| USD:                            255,919,157.59 | USD:                            252,683,574.59 |
| FOREIGN:                                  0.00 | FOREIGN:                                  0.00 |
| CASH TOTAL:                     255,919,157.59 | CASH TOTAL:                     252,683,574.59 |
| GOVERNMENT (GS & GE) TOTAL:      78,415,351.16 | GOVERNMENT (GS & GE) TOTAL:      78,415,351.16 |
| LETTERS OF CREDIT TOTAL:        211,550,000.00 | LETTERS OF CREDIT TOTAL:        211,550,000.00 |
| MONEY MARKET FUNDS TOTAL:                 0.00 | MONEY MARKET FUNDS TOTAL:                 0.00 |
| VALUED SECURITIES TOTAL:                  0.00 | VALUED SECURITIES TOTAL:                  0.00 |
| TOTAL COLLATERAL VALUE (IN USD):  545,884,508.75 | TOTAL COLLATERAL VALUE (IN USD):  542,648,925.75 |
| TOTAL REQUIREMENT:                        0.00 | TOTAL REQUIREMENT:                        0.00 |
| MARGIN CREDIT:                            0.00 | MARGIN CREDIT:                            0.00 |
| ROLLED-UP MARGIN DEFICIT:        379,138,758.00 | ROLLED-UP MARGIN DEFICIT:        379,138,758.00 |
| EXCESS/DEFICIT:                 166,745,750.75  EXC | EXCESS/DEFICIT:                 163,510,167.75  EXC |

```
        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                 3,235,583.00  PAY
CASH CONVERSION
   CASH GAINED FROM CONVERSION:           0.00
   CASH USED FOR CONVERSION:      3,235,583.00
DEFICIT:                                  0.00
NET SETTLEMENT:                           0.00
===========================================================
```

```
ENP0450                          ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL

THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 6
ACCOUNT SUMMARY BY CMO                               SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:57          CM PAGE 6

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00074

SETTLEMENT TIER ACCOUNT:      OCC  00074 M

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| INDEX CASH DIFFERENCE | 3,235,583.00 | PAY |
| NET PAY/COLLECT | 3,235,583.00 | PAY |

ENP0450                              ****CONTINUED ON NEXT PAGE****

**HIGHLY CONFIDENTIAL**                                                          **BCI-EX-(S)-00188238**

```
THE OPTIONS CLEARING CORPORATION                 ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 7
ACCOUNT SUMMARY BY CMO                           SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:53          CX  PAGE 7
                                                 OCC ID: 00074/00074-M/00074-M

CMO:                        LEHMAN BROTHERS INC.
CLEARING MEMBER:            OCC  00074

TIER ACCOUNT:               OCC  00074 M P
SETTLEMENT TIER ACCOUNT:    OCC  00074 M

                    MARGIN ACCOUNT DETAIL


COLLATERAL TYPE (ALL IN USD)
    GOVERNMENT (GS & GE) TOTAL:             0.00
    LETTERS OF CREDIT TOTAL:                0.00
    MONEY MARKET FUNDS TOTAL:               0.00
    VALUED SECURITIES TOTAL:                0.00

TOTAL COLLATERAL VALUE (IN USD):           0.00

TOTAL REQUIREMENT:               379,138,758.00

MARGIN CREDIT:                             0.00

ROLLED-UP MARGIN DEFICIT:                  0.00

EXCESS/DEFICIT:                  379,138,758.00  DEF
```

ENP0450                          ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL                                                    BCI-EX-(S)-00188239

```
THE OPTIONS CLEARING CORPORATION               ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 8
ACCOUNT SUMMARY BY CMO                         SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:53          CMO PAGE 8
                                               ...PROD...007  ...PROD...007

CMO:                           LEHMAN BROTHERS INC.
CLEARING MEMBER:               OCC  00074

TIER ACCOUNT:                  OCC  00074 Z X
SETTLEMENT TIER ACCOUNT:       OCC  00074 Z X

                   CLEARING FUND ACCOUNT DETAIL
```

```
COLLATERAL TYPE (ALL IN USD)
  CASH:
    USD:                                     0.00
  CASH TOTAL:                                0.00
  GOVERNMENT (GS) TOTAL:          171,121,642.25

TOTAL COLLATERAL VALUE (IN USD):  171,121,642.25

TOTAL REQUIREMENT:                170,993,187.75

EXCESS/DEFICIT:                       128,454.50   EXC
```

ENP0450                          ****END OF DATA****

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00188240

```
THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/22/2008 CYCLE-ID:              CMO PAGE 9
ACCOUNT SUMMARY BY CMO                     SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:43    CX PAGE 1

CMO:                      LEHMAN BROTHERS INC.
CLEARING MEMBER:          OCC  00084

TIER ACCOUNT:             OCC  00084 C
SETTLEMENT TIER ACCOUNT:  OCC  00084 C
```

```
        ACCOUNT SUMMARY PRIOR TO CASH CONVERSION              ACCOUNT SUMMARY AFTER CASH CONVERSION


COLLATERAL TYPE (ALL IN USD)                          COLLATERAL TYPE (ALL IN USD)
  CASH:                                                 CASH:
    USD:                      33,108,960.00               USD:                      33,108,960.00
    FOREIGN:                           0.00               FOREIGN:                           0.00
  CASH TOTAL:                 33,108,960.00             CASH TOTAL:                 33,108,960.00
  GOVERNMENT (GS & GE) TOTAL:          0.00             GOVERNMENT (GS & GE) TOTAL:          0.00
  LETTERS OF CREDIT TOTAL:       800,000.00             LETTERS OF CREDIT TOTAL:       800,000.00
  MONEY MARKET FUNDS TOTAL:            0.00             MONEY MARKET FUNDS TOTAL:            0.00
  VALUED SECURITIES TOTAL:             0.00             VALUED SECURITIES TOTAL:             0.00

TOTAL COLLATERAL VALUE (IN USD):   33,908,960.00      TOTAL COLLATERAL VALUE (IN USD):   33,908,960.00

TOTAL REQUIREMENT:                    352,402.00      TOTAL REQUIREMENT:                    352,402.00

MARGIN CREDIT:                              0.00      MARGIN CREDIT:                              0.00

ROLLED-UP MARGIN DEFICIT:                   0.00      ROLLED-UP MARGIN DEFICIT:                   0.00

EXCESS/DEFICIT:                    33,556,558.00  EXC EXCESS/DEFICIT:                    33,556,558.00  EXC
```

```
        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY


NET PAY/COLLECT:                  16,180.00  COL
CASH CONVERSION
  CASH GAINED FROM CONVERSION:         0.00
  CASH USED FOR CONVERSION:            0.00
DEFICIT:                               0.00
NET SETTLEMENT:                   16,180.00  COL
=================================================
```

```
ENP0450                              ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL

THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 10
ACCOUNT SUMMARY BY CMO                              SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:53:43          CX PAGE 2

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                        LEHMAN BROTHERS INC.
CLEARING MEMBER:            OCC  00084

SETTLEMENT TIER ACCOUNT:    OCC  00084 C

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| INDEX FUTURES MARK TO MARKET | 16,180.00 | COL |
| NET PAY/COLLECT | 16,180.00 | COL |

ENP0450                            ****CONTINUED ON NEXT PAGE****

**HIGHLY CONFIDENTIAL**                                                          **BCI-EX-(S)-00188242**

```
THE OPTIONS CLEARING CORPORATION              ACTIVITY DATE: 09/22/2008 CYCLE-ID:            CMO PAGE 11
ACCOUNT SUMMARY BY CMO                        SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:43  CY PAGE 1

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00084

TIER ACCOUNT:                 OCC  00084 F
SETTLEMENT TIER ACCOUNT:      OCC  00084 F
```

| ACCOUNT SUMMARY PRIOR TO CASH CONVERSION | | ACCOUNT SUMMARY AFTER CASH CONVERSION | |
|---|---|---|---|
| COLLATERAL TYPE (ALL IN USD) | | COLLATERAL TYPE (ALL IN USD) | |
| CASH: | | CASH: | |
| USD: | 46,406,394.00 | USD: | 46,406,394.00 |
| FOREIGN: | 0.00 | FOREIGN: | 0.00 |
| CASH TOTAL: | 46,406,394.00 | CASH TOTAL: | 46,406,394.00 |
| GOVERNMENT (GS & GE) TOTAL: | 0.00 | GOVERNMENT (GS & GE) TOTAL: | 0.00 |
| LETTERS OF CREDIT TOTAL: | 39,350,000.00 | LETTERS OF CREDIT TOTAL: | 39,350,000.00 |
| MONEY MARKET FUNDS TOTAL: | 0.00 | MONEY MARKET FUNDS TOTAL: | 0.00 |
| VALUED SECURITIES TOTAL: | 0.00 | VALUED SECURITIES TOTAL: | 0.00 |
| TOTAL COLLATERAL VALUE (IN USD): | 85,756,394.00 | TOTAL COLLATERAL VALUE (IN USD): | 85,756,394.00 |
| TOTAL REQUIREMENT: | 57,727,824.00 | TOTAL REQUIREMENT: | 57,727,824.00 |
| MARGIN CREDIT: | 0.00 | MARGIN CREDIT: | 0.00 |
| ROLLED-UP MARGIN DEFICIT: | 0.00 | ROLLED-UP MARGIN DEFICIT: | 0.00 |
| EXCESS/DEFICIT: | 28,028,570.00 EXC | EXCESS/DEFICIT: | 28,028,570.00 EXC |

```
        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                    9,173,290.00  COL
CASH CONVERSION
   CASH GAINED FROM CONVERSION:             0.00
   CASH USED FOR CONVERSION:                0.00
DEFICIT:                                    0.00
NET SETTLEMENT:                     9,173,290.00  COL
===================================================
```

```
ENP0450                        ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL

```
THE OPTIONS CLEARING CORPORATION            ACTIVITY DATE: 09/22/2008 CYCLE-ID:            CMO PAGE 12
ACCOUNT SUMMARY BY CMO                      SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:53:23   CR  PAGE 1
                                            ACTIVITY DATE: 09/22/2008

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                        LEHMAN BROTHERS INC.
CLEARING MEMBER:            OCC  00084

SETTLEMENT TIER ACCOUNT:    OCC  00084 F


     PAY/COLLECT TYPE                                       AMOUNT     PAY/COL
     ─────────────────────────────────────────────────────────────────────
     EQUITY FUTURES MARK TO MARKET                       798,640.00    COL
     INDEX FUTURES MARK TO MARKET                      8,374,650.00    COL
     ─────────────────────────────────────────────────────────────────────

     NET PAY/COLLECT                                   9,173,290.00    COL
```

ENP0450                          ****CONTINUED ON NEXT PAGE****

```
THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 13
ACCOUNT SUMMARY BY CMO                     SYSTEM DATE: 09/22/2008 SYSTEM TIME: 21:52:43          CM PAGE 1

CMO:                     LEHMAN BROTHERS INC.
CLEARING MEMBER:         OCC  00084

TIER ACCOUNT:            OCC  00084 M
SETTLEMENT TIER ACCOUNT: OCC  00084 M

      ACCOUNT SUMMARY PRIOR TO CASH CONVERSION                    ACCOUNT SUMMARY AFTER CASH CONVERSION
      ─────────────────────────────────────                      ─────────────────────────────────────
COLLATERAL TYPE (ALL IN USD)                              COLLATERAL TYPE (ALL IN USD)
   CASH:                                                     CASH:
     USD:                            0.00                       USD:                            0.00
     FOREIGN:                        0.00                       FOREIGN:                        0.00
   CASH TOTAL:                       0.00                    CASH TOTAL:                        0.00
   GOVERNMENT (GS & GE) TOTAL:       0.00                    GOVERNMENT (GS & GE) TOTAL:        0.00
   LETTERS OF CREDIT TOTAL:          0.00                    LETTERS OF CREDIT TOTAL:           0.00
   MONEY MARKET FUNDS TOTAL:         0.00                    MONEY MARKET FUNDS TOTAL:          0.00
   VALUED SECURITIES TOTAL:          0.00                    VALUED SECURITIES TOTAL:           0.00
                              ────────────                                               ────────────
TOTAL COLLATERAL VALUE (IN USD):     0.00                 TOTAL COLLATERAL VALUE (IN USD):     0.00

TOTAL REQUIREMENT:                   0.00                 TOTAL REQUIREMENT:                    0.00

MARGIN CREDIT:                       0.00                 MARGIN CREDIT:                        0.00

ROLLED-UP MARGIN DEFICIT:            0.00                 ROLLED-UP MARGIN DEFICIT:             0.00

EXCESS/DEFICIT:                      0.00                 EXCESS/DEFICIT:                       0.00


      NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
      ────────────────────────────────────────────
NET PAY/COLLECT:                     0.00
CASH CONVERSION
   CASH GAINED FROM CONVERSION:      0.00
   CASH USED FOR CONVERSION:         0.00
DEFICIT:                             0.00
NET SETTLEMENT:                      0.00
==========================================================
```

ENP0450                          ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL                                                        BCI-EX-(S)-00188245

THE OPTIONS CLEARING CORPORATION              ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 14
ACCOUNT SUMMARY BY CMO                         SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:53:53         CM PAGE 6

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                       LEHMAN BROTHERS INC.
CLEARING MEMBER:           OCC  00084

SETTLEMENT TIER ACCOUNT:   OCC  00084 M

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| NET PAY/COLLECT | 0.00 | |

ENP0450                        ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00188246

```
THE OPTIONS CLEARING CORPORATION                 ACTIVITY DATE: 09/22/2008 CYCLE-ID:                      CMO PAGE 15
ACCOUNT SUMMARY BY CMO                           SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:53            CMO PAGE 7

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00084

TIER ACCOUNT:                 OCC  00084 M P
SETTLEMENT TIER ACCOUNT:      OCC  00084 M

                    MARGIN ACCOUNT DETAIL


COLLATERAL TYPE (ALL IN USD)
   GOVERNMENT (GS & GE) TOTAL:                       0.00
   LETTERS OF CREDIT TOTAL:                          0.00
   MONEY MARKET FUNDS TOTAL:                         0.00
   VALUED SECURITIES TOTAL:                          0.00

TOTAL COLLATERAL VALUE (IN USD):                     0.00

TOTAL REQUIREMENT:                                   0.00

MARGIN CREDIT:                                       0.00

ROLLED-UP MARGIN DEFICIT:                            0.00

EXCESS/DEFICIT:                                      0.00




ENP0450                                   ****END OF DATA****
```

**HIGHLY CONFIDENTIAL**                                                                              **BCI-EX-(S)-00188247**

```
THE OPTIONS CLEARING CORPORATION            ACTIVITY DATE: 09/22/2008 CYCLE-ID:              CMO PAGE 16
ACCOUNT SUMMARY BY CMO                       SYSTEM DATE: 09/22/2008 SYSTEM TIME: 21:52:43   CM PAGE 16

CMO:                           LEHMAN BROTHERS INC.
CLEARING MEMBER:               OCC  00273

TIER ACCOUNT:                  OCC  00273 C
SETTLEMENT TIER ACCOUNT:       OCC  00273 C
```

|  ACCOUNT SUMMARY PRIOR TO CASH CONVERSION | | ACCOUNT SUMMARY AFTER CASH CONVERSION | |
|---|---|---|---|
| COLLATERAL TYPE (ALL IN USD) | | COLLATERAL TYPE (ALL IN USD) | |
| CASH: | | CASH: | |
| USD: | 4,880,701.00 | USD: | 4,880,701.00 |
| FOREIGN: | 0.00 | FOREIGN: | 0.00 |
| CASH TOTAL: | 4,880,701.00 | CASH TOTAL: | 4,880,701.00 |
| GOVERNMENT (GS & GE) TOTAL: | 0.00 | GOVERNMENT (GS & GE) TOTAL: | 0.00 |
| LETTERS OF CREDIT TOTAL: | 0.00 | LETTERS OF CREDIT TOTAL: | 0.00 |
| MONEY MARKET FUNDS TOTAL: | 0.00 | MONEY MARKET FUNDS TOTAL: | 0.00 |
| VALUED SECURITIES TOTAL: | 0.00 | VALUED SECURITIES TOTAL: | 0.00 |
| TOTAL COLLATERAL VALUE (IN USD): | 4,880,701.00 | TOTAL COLLATERAL VALUE (IN USD): | 4,880,701.00 |
| TOTAL REQUIREMENT: | 770,881.00 | TOTAL REQUIREMENT: | 770,881.00 |
| MARGIN CREDIT: | 0.00 | MARGIN CREDIT: | 0.00 |
| ROLLED-UP MARGIN DEFICIT: | 0.00 | ROLLED-UP MARGIN DEFICIT: | 0.00 |
| EXCESS/DEFICIT: | 4,109,820.00  EXC | EXCESS/DEFICIT: | 4,109,820.00  EXC |

```
        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                           0.00
CASH CONVERSION
   CASH GAINED FROM CONVERSION:            0.00
   CASH USED FOR CONVERSION:               0.00
DEFICIT:                                   0.00
NET SETTLEMENT:                            0.00
==========================================================
```

```
ENP0450                        ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL                                                    BCI-EX-(S)-00188248

```
THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/22/2008 CYCLE-ID:              CMO PAGE 17
ACCOUNT SUMMARY BY CMO                     SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:53:53    CX  PAGE 2

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                       LEHMAN BROTHERS INC.
CLEARING MEMBER:           OCC  00273

SETTLEMENT TIER ACCOUNT:   OCC  00273 C


    PAY/COLLECT TYPE                                        AMOUNT    PAY/COL
   _____

    NET PAY/COLLECT                                          0.00
```


ENP0450                        ****CONTINUED ON NEXT PAGE****

THE OPTIONS CLEARING CORPORATION                ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 18
ACCOUNT SUMMARY BY CMO                          SYSTEM DATE: 09/22/2008 SYSTEM TIME: 21:52:43          CX PAGE 1

08-13555-mg    Doc 10269-2    Filed 07/16/10    Entered 07/16/10 19:43:20    Exhibits F
through L to Declaration    Pg 159 of 179

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00273

TIER ACCOUNT:                 OCC  00273 F
SETTLEMENT TIER ACCOUNT:      OCC  00273 F

```
        ACCOUNT SUMMARY PRIOR TO CASH CONVERSION              ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)                          COLLATERAL TYPE (ALL IN USD)
  CASH:                                                 CASH:
   USD:                        0.00                       USD:                        0.00
   FOREIGN:                    0.00                       FOREIGN:                    0.00
  CASH TOTAL:                  0.00                      CASH TOTAL:                  0.00
  GOVERNMENT (GS & GE) TOTAL:  0.00                      GOVERNMENT (GS & GE) TOTAL:  0.00
  LETTERS OF CREDIT TOTAL:     0.00                      LETTERS OF CREDIT TOTAL:     0.00
  MONEY MARKET FUNDS TOTAL:    0.00                      MONEY MARKET FUNDS TOTAL:    0.00
  VALUED SECURITIES TOTAL:     0.00                      VALUED SECURITIES TOTAL:     0.00

TOTAL COLLATERAL VALUE (IN USD):   0.00                TOTAL COLLATERAL VALUE (IN USD):   0.00

TOTAL REQUIREMENT:             0.00                    TOTAL REQUIREMENT:             0.00

MARGIN CREDIT:                 0.00                    MARGIN CREDIT:                 0.00

ROLLED-UP MARGIN DEFICIT:      0.00                    ROLLED-UP MARGIN DEFICIT:      0.00

EXCESS/DEFICIT:                0.00                    EXCESS/DEFICIT:                0.00


        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:               0.00
CASH CONVERSION
  CASH GAINED FROM CONVERSION: 0.00
  CASH USED FOR CONVERSION:    0.00
DEFICIT:                       0.00
NET SETTLEMENT:                0.00
```

ENP0450                          ****CONTINUED ON NEXT PAGE****

**HIGHLY CONFIDENTIAL**                                               BCI-EX-(S)-00188250

```
THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 19
ACCOUNT SUMMARY BY CMO                    SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:53:43           CM PAGE 4

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                      LEHMAN BROTHERS INC.
CLEARING MEMBER:          OCC  00273

SETTLEMENT TIER ACCOUNT:     OCC  00273 F


      PAY/COLLECT TYPE                                  AMOUNT    PAY/COL
      _____

      NET PAY/COLLECT                                     0.00
```

ENP0450                        ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL                                                        BCI-EX-(S)-00188251

```
THE OPTIONS CLEARING CORPORATION              ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 20
ACCOUNT SUMMARY BY CMO                        SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:43          CM PAGE 5

CMO:                       LEHMAN BROTHERS INC.
CLEARING MEMBER:           OCC  00273

TIER ACCOUNT:              OCC  00273 M
SETTLEMENT TIER ACCOUNT:   OCC  00273 M


    ACCOUNT SUMMARY PRIOR TO CASH CONVERSION                      ACCOUNT SUMMARY AFTER CASH CONVERSION


COLLATERAL TYPE (ALL IN USD)                           COLLATERAL TYPE (ALL IN USD)
  CASH:                                                  CASH:
    USD:                              0.00                 USD:                              0.00
    FOREIGN:                          0.00                 FOREIGN:                          0.00
  CASH TOTAL:                         0.00               CASH TOTAL:                         0.00
  GOVERNMENT (GS & GE) TOTAL:         0.00               GOVERNMENT (GS & GE) TOTAL:         0.00
  LETTERS OF CREDIT TOTAL:            0.00               LETTERS OF CREDIT TOTAL:            0.00
  MONEY MARKET FUNDS TOTAL:           0.00               MONEY MARKET FUNDS TOTAL:           0.00
  VALUED SECURITIES TOTAL:            0.00               VALUED SECURITIES TOTAL:            0.00

TOTAL COLLATERAL VALUE (IN USD):      0.00             TOTAL COLLATERAL VALUE (IN USD):      0.00

TOTAL REQUIREMENT:                    0.00             TOTAL REQUIREMENT:                    0.00

MARGIN CREDIT:                        0.00             MARGIN CREDIT:                        0.00

ROLLED-UP MARGIN DEFICIT:             0.00             ROLLED-UP MARGIN DEFICIT:             0.00

EXCESS/DEFICIT:                       0.00             EXCESS/DEFICIT:                       0.00


    NET PAY/COLLECT AND CASH CONVERSION ACTIVITY


NET PAY/COLLECT:                      0.00
CASH CONVERSION
  CASH GAINED FROM CONVERSION:        0.00
  CASH USED FOR CONVERSION:           0.00
DEFICIT:                              0.00
NET SETTLEMENT:                       0.00
=========================================================


ENP0450                           ****CONTINUED ON NEXT PAGE****
```

**HIGHLY CONFIDENTIAL**

**BCI-EX-(S)-00188252**

```
THE OPTIONS CLEARING CORPORATION                ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 21
ACCOUNT SUMMARY BY CMO                          SYSTEM DATE: 09/22/2008 SYSTEM TIME: 21:52:53           CM  PAGE 2

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00273

SETTLEMENT TIER ACCOUNT:      OCC  00273 M


    PAY/COLLECT TYPE                                          AMOUNT     PAY/COL
    _____

    NET PAY/COLLECT                                            0.00
```

****CONTINUED ON NEXT PAGE****

ENP0450

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00188253

```
THE OPTIONS CLEARING CORPORATION              ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 22
ACCOUNT SUMMARY BY CMO                        SYSTEM DATE: 09/26/2008 SYSTEM TIME: 21:52:43          CM  PAGE 7

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00273

TIER ACCOUNT:                 OCC  00273 M N
SETTLEMENT TIER ACCOUNT:      OCC  00273 M

                       MARGIN ACCOUNT DETAIL


COLLATERAL TYPE (ALL IN USD)
   GOVERNMENT (GS & GE) TOTAL:              0.00
   LETTERS OF CREDIT TOTAL:                 0.00
   MONEY MARKET FUNDS TOTAL:                0.00
   VALUED SECURITIES TOTAL:                 0.00

TOTAL COLLATERAL VALUE (IN USD):           0.00

TOTAL REQUIREMENT:                         0.00

MARGIN CREDIT:                             0.00

ROLLED-UP MARGIN DEFICIT:                  0.00

EXCESS/DEFICIT:                            0.00
```

ENP0450                          ****END OF DATA****

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00188254

```
THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/19/2008 CYCLE-ID:                          CMO PAGE 1
COLLATERAL INVENTORY BY CMO                         SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:02:22

CMO:            LEHMAN BROTHERS INC.

TOTALS BY CURRENCY    USD
```

| COLLATERAL TYPE | RECORD QTY | FACE VALUE | QUANTITY | CONTRACT QTY |
|---|---|---|---|---|
| LETTERS OF CREDIT | 7 | 252,200,000.00 | | |
| CASH | 6 | 1,081,685,547.47 | | |
| GOVERNMENTS (GS & GE) | 15 | 814,295,000 | | |
| MONEY MARKET FUNDS (SHRS) | 0 | | 0 | |
| VALUED SECURITIES | 0 | | 0 | |
| SPECIFIC DEPOSITS | 273 | | 7,733,700 | |
| ESCROW DEPOSITS | 20 | | | 3,116 |

```
ENP0450                          ****CONTINUED ON NEXT PAGE****
```

**HIGHLY CONFIDENTIAL**                                                                    BCI-EX-(S)-00188255

```
THE OPTIONS CLEARING CORPORATION              ACTIVITY DATE: 09/19/2008 CYCLE-ID:                       CMO PAGE 2
COLLATERAL INVENTORY BY CMO                   SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:07:22

CMO:              LEHMAN BROTHERS INC.

COLLATERAL TYPE:  LETTERS OF CREDIT
```

| ASSET MANAGER | LC# | RSTR | ISSUE DATE | EXP DATE | FACE VALUE | FV CURN | MARKET VALUE | COLLATERAL VALUE |
|---|---|---|---|---|---|---|---|---|
| ANZBUS33XXX | SO4743/8200 | | 09/01/2008 | 03/01/2009 | 0.00 | USD | 0.00 | 0.00 |
| ANZBUS33XXX | SO4744/8200 | | 09/01/2008 | 03/01/2009 | 0.00 | USD | 0.00 | 0.00 |
| BNPAUS3NXXX | 91903950 | | 08/28/2008 | 03/01/2009 | 800,000.00 | USD | 800,000.00 | 800,000.00 |
| | CG    CM#    AT ID | | | | | | | |
| | OCC    00084 C | | | | 800,000.00 | | 800,000.00 | 800,000.00 |
| BNPAUS3NXXX | 91903955 | | 08/28/2008 | 03/01/2009 | 251,400,000.00 | USD | 251,400,000.00 | 251,400,000.00 |
| | CG    CM#    AT ID | | | | | | | |
| | OCC    00074 F | | | | 500,000.00 | | 500,000.00 | 500,000.00 |
| | OCC    00074 M | | | | 211,550,000.00 | | 211,550,000.00 | 211,550,000.00 |
| | OCC    00084 F | | | | 39,350,000.00 | | 39,350,000.00 | 39,350,000.00 |
| BOTKUS33XXX | S015193 | | 09/01/2008 | 03/01/2009 | 0.00 | USD | 0.00 | 0.00 |
| HYVEUS33XXX | SB237405 | | 09/03/2008 | 03/01/2009 | 0.00 | USD | 0.00 | 0.00 |
| LOYDUS33NYB | NYSB2008730 | | 09/01/2008 | 03/01/2009 | 0.00 | USD | 0.00 | 0.00 |
| USD TOTAL | | | | | 252,200,000.00 | | 252,200,000.00 | 252,200,000.00 |
| GRAND TOTAL | | | | | 252,200,000.00 | | 252,200,000.00 | 252,200,000.00 |

```
ENP0450                          ****CONTINUED ON NEXT PAGE****
```

**HIGHLY CONFIDENTIAL**                                                                    **BCI-EX-(S)-00188256**

```
THE OPTIONS CLEARING CORPORATION                     ACTIVITY DATE: 09/19/2008 CYCLE-ID:                       CMO PAGE 3
COLLATERAL INVENTORY BY CMO                          SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:02:33             CM  PAGE 1

CMO:                 LEHMAN BROTHERS INC.
CLEARING MEMBER:     OCC  00074

COLLATERAL TYPE:     CASH

                      ASSET                SEG                        FV
AT    ID              MANAGER              CASH     FACE VALUE        CURN      MARKET VALUE         COLLATERAL VALUE
C                     BOFAUS6SXXX                   162,681,324.65    USD       162,681,324.65       162,681,324.65
F                     BOFAUS6SXXX                   578,689,010.23    USD       578,689,010.23       578,689,010.23
M                     BOFAUS6SXXX                   255,919,157.59    USD       255,919,157.59       255,919,157.59
USD TOTAL                                           997,289,492.47              997,289,492.47       997,289,492.47

CM TOTAL                                            997,289,492.47              997,289,492.47       997,289,492.47

ENP0450                          ****CONTINUED ON NEXT PAGE****
```

**HIGHLY CONFIDENTIAL**                                                                   **BCI-EX-(S)-00188257**

```
THE OPTIONS CLEARING CORPORATION                ACTIVITY DATE: 09/19/2008 CYCLE-ID:                      CMO PAGE 4
COLLATERAL INVENTORY BY CMO                     SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:07:23            CM PAGE 2

CMO:                   LEHMAN BROTHERS INC.
CLEARING MEMBER:       OCC  00074

COLLATERAL TYPE:       GOVERNMENTS (GS & GE)

ASSET      PLGR                 GOV   COUPON              SUB                    FV
MANAGER    ACCT CUSIP           CT TYPE  RATE  MAT DATE   TYPE      FACE VALUE CURN       MARKET VALUE      COLLATERAL VALUE
```

| ASSET MANAGER | PLGR ACCT | CUSIP | GOV CT | TYPE | COUPON RATE | MAT DATE | SUB TYPE | FACE VALUE | FV CURN | MARKET VALUE | COLLATERAL VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AT: C    ID: | | | | | | | | | | | |
| CHASUS33XXX | | 912810FD5 | GS | BOND | 3.625 | 04/15/2028 | PR | 59,175,000 | USD | 96,873,025.50 | 92,029,374.23 |
| CHASUS33XXX | | 912810FR4 | GS | BOND | 2.375 | 01/15/2025 | PR | 175,000,000 | USD | 207,135,250.00 | 196,778,487.50 |
| CHASUS33XXX | | 912810FS2 | GS | BOND | 2.000 | 01/15/2026 | PR | 55,560,000 | USD | 58,872,487.20 | 55,928,862.84 |
| | | | | | | | | | | | |
| AT: F    ID: | | | | | | | | | | | |
| CHASUS33XXX | | 912810FH6 | GS | BOND | 3.875 | 04/15/2029 | PR | 86,585,000 | USD | 144,880,082.95 | 137,636,078.80 |
| CHASUS33XXX | | 912810FR4 | GS | BOND | 2.375 | 01/15/2025 | PR | 119,445,000 | USD | 141,378,685.35 | 134,309,751.08 |
| CHASUS33XXX | | 912810FR4 | GS | BOND | 2.375 | 01/15/2025 | PR | 26,260,000 | USD | 31,082,123.80 | 29,528,017.61 |
| CHASUS33XXX | | 912810PV4 | GS | BOND | 1.750 | 01/15/2028 | PR | 34,000,000 | USD | 32,720,580.00 | 31,084,551.00 |
| | | | | | | | | | | | |
| AT: M    ID: | | | | | | | | | | | |
| CHASUS33XXX | | 912810PV4 | GS | BOND | 1.750 | 01/15/2028 | PR | 85,770,000 | USD | 82,542,474.90 | 78,415,351.16 |
| | | | | | | | | | | | |
| AT: Z    ID: X | | | | | | | | | | | |
| CHASUS33XXX | | 912795G88 | GS | BILL | | 10/02/2008 | PR | 19,000,000 | USD | 18,996,200.00 | 18,901,219.00 |
| CHASUS33XXX | | 912795H95 | GS | BILL | | 12/04/2008 | PR | 42,000,000 | USD | 41,869,800.00 | 41,660,451.00 |
| CHASUS33XXX | | 912795J28 | GS | BILL | | 12/11/2008 | PR | 41,000,000 | USD | 40,901,600.00 | 40,697,092.00 |
| CHASUS33XXX | | 912795J36 | GS | BILL | | 12/18/2008 | PR | 14,500,000 | USD | 14,466,650.00 | 14,394,316.75 |
| CHASUS33XXX | | 912795J44 | GS | BILL | | 12/26/2008 | PR | 25,000,000 | USD | 24,897,500.00 | 24,773,012.50 |
| CHASUS33XXX | | 912795J93 | GS | BILL | | 01/29/2009 | PR | 28,000,000 | USD | 27,868,400.00 | 27,729,058.00 |
| CHASUS33XXX | | 912795K59 | GS | BILL | | 02/26/2009 | PR | 3,000,000 | USD | 2,981,400.00 | 2,966,493.00 |
| | | | | | | | | | | | |
| GS TOTAL | | | | | | | | 814,295,000 | | 967,466,259.70 | 926,832,116.47 |
| | | | | | | | | | | | |
| GE TOTAL | | | | | | | | 0 | | 0.00 | 0.00 |
| | | | | | | | | | | | |
| USD TOTAL | | | | | | | | 814,295,000 | | 967,466,259.70 | 926,832,116.47 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| CM TOTAL | | | | | | | | 814,295,000 | | 967,466,259.70 | 926,832,116.47 |

```
ENP0450                                     ****CONTINUED ON NEXT PAGE****
```

**HIGHLY CONFIDENTIAL**                                                                 **BCI-EX-(S)-00188258**

```
THE OPTIONS CLEARING CORPORATION                  ACTIVITY DATE: 09/19/2008 CYCLE-ID:                    CMO PAGE 5
COLLATERAL INVENTORY BY CMO                       SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:02:23           CR PAGE 1

CMO:                  LEHMAN BROTHERS INC.
CLEARING MEMBER:      OCC  00074

COLLATERAL TYPE:      MONEY MARKET FUNDS

                      ASSET          PLGR           SEC    SEC
AT    ID              MANAGER        ACCT    CUSIP  SYMB   CURN        SHARE QTY      MARKET VALUE    COLLATERAL VALUE
     ───────────────────────────────────────────────────────────────────────────────────────────────────────────────

NO DATA
```

ENP0450                                    ****CONTINUED ON NEXT PAGE****

**HIGHLY CONFIDENTIAL**                                                                        BCI-EX-(S)-00188259

```
THE OPTIONS CLEARING CORPORATION                  ACTIVITY DATE: 09/19/2008 CYCLE-ID:                      CMO PAGE 6
COLLATERAL INVENTORY BY CMO                       SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:02:23            CMO PAGE 6

CMO:                      LEHMAN BROTHERS INC.
CLEARING MEMBER:          OCC  00074

COLLATERAL TYPE:          VALUED SECURITIES

                  ASSET           PLGR              SEC    SEC
AT    ID          MANAGER         ACCT    CUSIP     RSTR   SYMB   CURN   CLASS   EQ TYPE           QUANTITY      MARKET VALUE


NO DATA




ENP0450                                           ****CONTINUED ON NEXT PAGE****
```

**HIGHLY CONFIDENTIAL**

BCI-EX-(S)-00188260

```
THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/19/2008 CYCLE-ID:                CMO PAGE 7
COLLATERAL INVENTORY BY CMO                         SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:07:22      CMO PAGE 7

CMO:                LEHMAN BROTHERS INC.
CLEARING MEMBER:    OCC  00074

COLLATERAL TYPE:    SPECIFIC DEPOSITS
```

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C P | SER/CTR DATE | STRIKE | EXP DATE | SHARE QTY / MARKET VALUE |
|----|----|---------------|-----------|-------|------|----------|----------|----------|-----|--------------|--------|----------|--------------------------|
| C |  | DTCCUS33XXX | 2669 | G7945J104 |  | STX | USD | STX | C | 01/17/2009 | 17 4/8 | 01/17/2009 | 28,100 / 361,085.00 |
| C |  | DTCCUS33XXX | 2669 | G7945J104 |  | STX | USD | STX | C | 12/20/2008 | 22 4/8 | 12/20/2008 | 50,500 / 648,925.00 |
| C |  | DTCCUS33XXX | 2669 | G7945J104 |  | STX | USD | STX | C | 01/17/2009 | 25 | 01/17/2009 | 50,500 / 648,925.00 |
| C |  | DTCCUS33XXX | 2146 | 001765106 |  | AMR | USD | AMR | C | 09/20/2008 | 10 | 09/20/2008 | 80,000 / 1,035,200.00 |
| C |  | DTCCUS33XXX | 2146 | 001765106 |  | AMR | USD | AMR | C | 11/22/2008 | 15 | 11/22/2008 | 80,000 / 1,035,200.00 |
| C |  | DTCCUS33XXX | 2669 | 002896207 |  | ANF | USD | ANF | C | 11/22/2008 | 60 | 11/22/2008 | 13,200 / 582,120.00 |
| C |  | DTCCUS33XXX | 2316 | 018490102 |  | AGN | USD | AGN | C | 09/20/2008 | 60 | 09/20/2008 | 3,000 / 176,040.00 |
| C |  | DTCCUS33XXX | 2170 | 025537101 |  | AEP | USD | AEP | C | 01/17/2009 | 45 | 01/17/2009 | 4,100 / 156,538.00 |
| C |  | DTCCUS33XXX | 2669 | 026874107 |  | AIG | USD | AIG | C | 11/22/2008 | 39 | 11/22/2008 | 34,800 / 133,980.00 |
| C |  | DTCCUS33XXX | 2669 | 031162100 |  | AMGN | USD | AMQ | C | 10/18/2008 | 50 | 10/18/2008 | 2,200 / 131,934.00 |
| C |  | DTCCUS33XXX | 2669 | 031162100 |  | AMGN | USD | YAA | C | 10/18/2008 | 55 | 10/18/2008 | 24,900 / 1,493,253.00 |
| C |  | DTCCUS33XXX | 2669 | 031162100 |  | AMGN | USD | YAA | C | 09/20/2008 | 65 | 09/20/2008 | 55,100 / 3,304,347.00 |
| C |  | DTCCUS33XXX | 2450 | 031162100 |  | AMGN | USD | YAA | C | 01/17/2009 | 75 | 01/17/2009 | 102,500 / 6,146,925.00 |
| C |  | DTCCUS33XXX | 2139 | 032511107 |  | APC | USD | APC | C | 09/20/2008 | 65 | 09/20/2008 | 45,000 / 2,600,100.00 |
| C |  | DTCCUS33XXX | 2139 | 032511107 |  | APC | USD | APC | C | 01/17/2009 | 70 | 01/17/2009 | 22,500 / 1,300,050.00 |
| C |  | DTCCUS33XXX | 2139 | 032511107 |  | APC | USD | APC | C | 01/17/2009 | 80 | 01/17/2009 | 10,900 / 629,802.00 |
| C |  | DTCCUS33XXX | 2316 | 037411105 |  | APA | USD | APA | C | 01/17/2009 | 100 | 01/17/2009 | 500 / 60,575.00 |
| C |  | DTCCUS33XXX | 2316 | 037411105 |  | APA | USD | APA | C | 01/17/2009 | 140 | 01/17/2009 | 1,500 / 181,725.00 |

```
ENP0450                              ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00188261

```
THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/19/2008  CYCLE-ID:              CMO PAGE 8
COLLATERAL INVENTORY BY CMO                         SYSTEM DATE: 09/19/2008  SYSTEM TIME: 21:07:22    CK PAGE 8

CMO:              LEHMAN BROTHERS INC.
CLEARING MEMBER:  OCC 00074

COLLATERAL TYPE:  SPECIFIC DEPOSITS
```

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C/P | SER/CTR DATE | STRIKE | EXP DATE | SHARE QTY / MARKET VALUE |
|----|----|---------------|-----------|-------|------|----------|----------|----------|-----|--------------|--------|----------|--------------------------|
| C |  | DTCCUS33XXX | 2139 | 037833100 |  | AAPL | USD | APV | C | 10/18/2008 | 190 | 10/18/2008 | 1,000 / 140,910.00 |
| C |  | DTCCUS33XXX | 2139 | 03938L104 |  | MT | USD | MT | C | 01/17/2009 | 40 | 01/17/2009 | 9,100 / 591,500.00 |
| C |  | DTCCUS33XXX | 2139 | 03938L104 |  | MT | USD | MT | C | 01/17/2009 | 60 | 01/17/2009 | 23,200 / 1,508,000.00 |
| C |  | DTCCUS33XXX | 0901 | 053611109 |  | AVY | USD | AVY | C | 09/20/2008 | 50 | 09/20/2008 | 15,000 / 698,250.00 |
| C |  | DTCCUS33XXX | 2316 | 055622104 |  | BP | USD | BP | C | 01/17/2009 | 75 | 01/17/2009 | 12,600 / 687,080.00 |
| C |  | DTCCUS33XXX | 2316 | 060505104 |  | BAC | USD | BAC | C | 01/17/2009 | 40 | 01/17/2009 | 21,000 / 787,080.00 |
| C |  | DTCCUS33XXX | 2139 | 060505104 |  | BAC | USD | BAC | C | 01/17/2009 | 42 4/8 | 01/17/2009 | 600 / 22,488.00 |
| C |  | DTCCUS33XXX | 2139 | 067383109 |  | BCR | USD | BCR | C | 01/17/2009 | 90 | 01/17/2009 | 1,000 / 94,980.00 |
| C |  | DTCCUS33XXX | 0901 | 086516101 |  | BBY | USD | BBY | C | 09/20/2008 | 50 | 09/20/2008 | 6,500 / 269,685.00 |
| C |  | DTCCUS33XXX | 0992 | 086516101 |  | BBY | USD | BBY | C | 09/20/2008 | 50 | 09/20/2008 | 32,000 / 1,327,680.00 |
| C |  | DTCCUS33XXX | 2170 | 097023105 |  | BA | USD | 8BA 12 | C | 09/12/2011 | 80 | 09/12/2011 | 20,000 / 1,195,200.00 |
| C |  | DTCCUS33XXX | 2669 | 109641100 |  | EAT | USD | EAT | C | 01/17/2009 | 22 4/8 | 01/17/2009 | 23,900 / 498,076.00 |
| C |  | DTCCUS33XXX | 2669 | 109641100 |  | EAT | USD | EAT | C | 10/18/2008 | 22 4/8 | 10/18/2008 | 4,100 / 85,444.00 |
| C |  | DTCCUS33XXX | 2170 | 125509109 |  | CI | USD | CI | C | 01/17/2009 | 36 5/8 | 01/17/2009 | 12,900 / 475,365.00 |
| C |  | DTCCUS33XXX | 2669 | 125509109 |  | CI | USD | CI | C | 10/18/2008 | 50 | 10/18/2008 | 20,500 / 755,425.00 |
| C |  | DTCCUS33XXX | 2316 | 126650100 |  | CVS | USD | CVS | C | 09/20/2008 | 37 4/8 | 09/20/2008 | 4,000 / 144,440.00 |
| C |  | DTCCUS33XXX | 2316 | 126650100 |  | CVS | USD | CVS | C | 11/22/2008 | 40 | 11/22/2008 | 800 / 28,888.00 |
| C |  | DTCCUS33XXX | 2139 | 134429109 |  | CPB | USD | CPB | C | 01/17/2009 | 45 | 01/17/2009 | 1,100 / 42,460.00 |

```
ENP0450                          ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL                                                    BCI-EX-(S)-00188262

```
THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/19/2008 CYCLE-ID:                    CMO PAGE 9
COLLATERAL INVENTORY BY CMO                         SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:07:13           CR  PAGE 7

CMO:                      LEHMAN BROTHERS INC.
CLEARING MEMBER:          OCC  00074

COLLATERAL TYPE:          SPECIFIC DEPOSITS
```

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C P | SER/CTR DATE | STRIKE | EXP DATE | SHARE QTY / MARKET VALUE |
|----|----|---------------|-----------|-------|------|----------|----------|----------|-----|--------------|--------|----------|--------------------------|
| C |  | DTCCUS33XXX | 0992 | 143658300 |  | CCL | USD | CCL | C | 10/18/2008 | 40 | 10/18/2008 | 300 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 11,928.00 |
| C |  | DTCCUS33XXX | 2316 | 166764100 |  | CVX | USD | CVX | C | 12/20/2008 | 100 | 12/20/2008 | 1,400 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 122,920.00 |
| C |  | DTCCUS33XXX | 2316 | 166764100 |  | CVX | USD | CVX | C | 09/20/2008 | 100 | 09/20/2008 | 1,000 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 87,800.00 |
| C |  | DTCCUS33XXX | 2316 | 166764100 |  | CVX | USD | CVX | C | 09/20/2008 | 115 | 09/20/2008 | 400 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 35,120.00 |
| C |  | DTCCUS33XXX | 2316 | 166764100 |  | CVX | USD | CVX | C | 09/20/2008 | 85 | 09/20/2008 | 500 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 43,900.00 |
| C |  | DTCCUS33XXX | 2139 | 166764100 |  | CVX | USD | CVX | C | 01/17/2009 | 90 | 01/17/2009 | 2,000 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 175,600.00 |
| C |  | DTCCUS33XXX | 2316 | 166764100 |  | CVX | USD | CVX | C | 09/20/2008 | 95 | 09/20/2008 | 1,700 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 149,260.00 |
| C |  | DTCCUS33XXX | 2316 | 166764100 |  | CVX | USD | CVX | C | 01/17/2009 | 95 | 01/17/2009 | 1,400 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 122,920.00 |
| C |  | DTCCUS33XXX | 2669 | 171046105 |  | CBK | USD | CBK | C | 12/20/2008 | 10 | 12/20/2008 | 34,900 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 400,303.00 |
| C |  | DTCCUS33XXX | 2669 | 171046105 |  | CBK | USD | CBK | C | 09/20/2008 | 10 | 09/20/2008 | 52,800 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 605,616.00 |
| C |  | DTCCUS33XXX | 2669 | 171046105 |  | CBK | USD | CBK | C | 12/20/2008 | 12 4/8 | 12/20/2008 | 114,600 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 1,314,462.00 |
| C |  | DTCCUS33XXX | 2316 | 17275R102 |  | CSCO | USD | CWY | C | 01/17/2009 | 30 | 01/17/2009 | 1,000 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 24,290.00 |
| C |  | DTCCUS33XXX | 2139 | 17275R102 |  | CSCO | USD | CWY | C | 01/17/2009 | 30 | 01/17/2009 | 1,900 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 46,151.00 |
| C |  | DTCCUS33XXX | 2669 | 172967101 |  | C | USD | C | C | 09/20/2008 | 22 4/8 | 09/20/2008 | 33,800 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 697,970.00 |
| C |  | DTCCUS33XXX | 2316 | 172967101 |  | C | USD | C | C | 09/20/2008 | 22 4/8 | 09/20/2008 | 4,200 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 86,730.00 |
| C |  | DTCCUS33XXX | 2669 | 172967101 |  | C | USD | C | C | 09/20/2008 | 25 | 09/20/2008 | 1,200 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 24,780.00 |
| C |  | DTCCUS33XXX | 2669 | 172967101 |  | C | USD | C | C | 01/17/2009 | 25 | 01/17/2009 | 31,200 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 644,280.00 |
| C |  | DTCCUS33XXX | 2139 | 172967101 |  | C | USD | C | C | 01/17/2009 | 35 | 01/17/2009 | 900 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 18,585.00 |

```
ENP0450                              ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL                                                          BCI-EX-(S)-00188263

THE OPTIONS CLEARING CORPORATION
COLLATERAL INVENTORY BY CMO

ACTIVITY DATE: 09/19/2008   CYCLE-ID:
SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:07:22

CMO PAGE 10
CX PAGE 10

08-13555-mg   Doc 10269-2   Filed 07/16/10   Entered 07/16/10 19:43:20   Exhibits F through L to Declaration   Pg 173 of 179

CMO:              LEHMAN BROTHERS INC.
CLEARING MEMBER:  OCC  00074

COLLATERAL TYPE:  SPECIFIC DEPOSITS

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C/P | SER/CTR DATE | STRIKE | EXP DATE | SHARE QTY / MARKET VALUE |
|----|----|---------------|-----------|-------|------|----------|----------|----------|-----|--------------|--------|----------|--------------------------|
| C |  | DTCCUS33XXX | 2316 | 189054109 |  | CLX | USD | CLX | C | 01/17/2009 | 70 | 01/17/2009 | 1,000<br>62,820.00 |
| C |  | DTCCUS33XXX | 2316 | 191216100 |  | KO | USD | KO | C | 01/17/2009 | 60 | 01/17/2009 | 1,000<br>52,720.00 |
| C |  | DTCCUS33XXX | 2316 | 192446102 |  | CTSH | USD | UPU | C | 09/20/2008 | 32 4/8 | 09/20/2008 | 5,200<br>138,164.00 |
| C |  | DTCCUS33XXX | 2669 | 20030N101 |  | CMCSA | USD | CCQ | C | 01/17/2009 | 22 4/8 | 01/17/2009 | 92,900<br>1,923,959.00 |
| C |  | DTCCUS33XXX | 2669 | 20030N101 |  | CMCSA | USD | CCQ | C | 04/18/2009 | 25 | 04/18/2009 | 40,800<br>844,968.00 |
| C |  | DTCCUS33XXX | 2669 | 20825C104 |  | COP | USD | YRO | C | 01/16/2010 | 110 | 01/16/2010 | 23,000<br>1,801,130.00 |
| C |  | DTCCUS33XXX | 2316 | 20825C104 |  | COP | USD | COP | C | 11/22/2008 | 90 | 11/22/2008 | 400<br>31,324.00 |
| C |  | DTCCUS33XXX | 2316 | 20825C104 |  | COP | USD | COP | C | 09/20/2008 | 90 | 09/20/2008 | 2,100<br>164,451.00 |
| C |  | DTCCUS33XXX | 2316 | 20825C104 |  | COP | USD | COP | C | 09/20/2008 | 95 | 09/20/2008 | 1,500<br>117,465.00 |
| C |  | DTCCUS33XXX | 2316 | 210371100 |  | CEG | USD | CEG | C | 09/20/2008 | 70 | 09/20/2008 | 1,000<br>25,760.00 |
| C |  | DTCCUS33XXX | 2146 | 210795308 |  | CAL | USD | CAL | C | 09/20/2008 | 15 | 09/20/2008 | 27,500<br>506,000.00 |
| C |  | DTCCUS33XXX | 2146 | 210795308 |  | CAL | USD | CAL | C | 09/20/2008 | 17 4/8 | 09/20/2008 | 27,500<br>506,000.00 |
| C |  | DTCCUS33XXX | 2316 | 219350105 |  | GLW | USD | GLW | C | 02/21/2009 | 20 | 02/21/2009 | 300<br>5,127.00 |
| C |  | DTCCUS33XXX | 2316 | 244199105 |  | DE | USD | DE | C | 09/20/2008 | 70 | 09/20/2008 | 5,000<br>316,900.00 |
| C |  | DTCCUS33XXX | 0997 | 244199105 |  | DE | USD | DE | C | 09/20/2008 | 80 | 09/20/2008 | 75,000<br>4,753,500.00 |
| C |  | DTCCUS33XXX | 2669 | 24702R101 |  | DELL | USD | DLY | C | 01/17/2009 | 20 | 01/17/2009 | 15,800<br>262,754.00 |
| C |  | DTCCUS33XXX | 2803 | 253651103 |  | DBD | USD | DBD | C | 09/20/2008 | 40 | 09/20/2008 | 12,000<br>411,240.00 |
| C |  | DTCCUS33XXX | 2669 | 256746108 |  | DLTR | USD | DQO | C | 11/22/2008 | 35 | 11/22/2008 | 42,100<br>1,582,118.00 |

ENP0450                          ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00188264

THE OPTIONS CLEARING CORPORATION                          ACTIVITY DATE: 09/19/2008  CYCLE-ID:              CMO PAGE 11
COLLATERAL INVENTORY BY CMO                               SYSTEM DATE: 09/19/2008  SYSTEM TIME: 21:07:13       PAGE 11

CMO:             LEHMAN BROTHERS INC.
CLEARING MEMBER:     OCC  00074

COLLATERAL TYPE:     SPECIFIC DEPOSITS

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C/P | SER/CTR DATE | STRIKE | EXP DATE | SHARE QTY / MARKET VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C |  | DTCCUS33XXX | 2139 | 263534109 |  | DD | USD | DD | C | 10/18/2008 | 45 | 10/18/2008 | 10,000 / 480,400.00 |
| C |  | DTCCUS33XXX | 2316 | 294549100 |  | EQT | USD | EQT | C | 09/20/2008 | 60 | 09/20/2008 | 16,000 / 687,520.00 |
| C |  | DTCCUS33XXX | 2316 | 294549100 |  | EQT | USD | EQT | C | 09/20/2008 | 65 | 09/20/2008 | 300 / 12,891.00 |
| C |  | DTCCUS33XXX | 2316 | 30231G102 |  | XOM | USD | XOM | C | 10/18/2008 | 100 | 10/18/2008 | 6,800 / 541,348.00 |
| C |  | DTCCUS33XXX | 2316 | 30231G102 |  | XOM | USD | XOM | C | 01/17/2009 | 100 | 01/17/2009 | 41,100 / 3,271,971.00 |
| C |  | DTCCUS33XXX | 2139 | 30231G102 |  | XOM | USD | WXO | C | 01/16/2010 | 100 | 01/16/2010 | 7,900 / 628,919.00 |
| C |  | DTCCUS33XXX | 2139 | 30231G102 |  | XOM | USD | XOM | C | 01/17/2009 | 75 | 01/17/2009 | 16,600 / 1,321,526.00 |
| C |  | DTCCUS33XXX | 2139 | 30231G102 |  | XOM | USD | XOM | C | 01/17/2009 | 80 | 01/17/2009 | 2,800 / 222,908.00 |
| C |  | DTCCUS33XXX | 2316 | 30231G102 |  | XOM | USD | XOM | C | 09/20/2008 | 80 | 09/20/2008 | 600 / 47,766.00 |
| C |  | DTCCUS33XXX | 2316 | 30231G102 |  | XOM | USD | XOM | C | 01/17/2009 | 90 | 01/17/2009 | 5,500 / 437,855.00 |
| C |  | DTCCUS33XXX | 2139 | 30231G102 |  | XOM | USD | XOM | C | 10/18/2008 | 90 | 10/18/2008 | 1,200 / 95,532.00 |
| C |  | DTCCUS33XXX | 2139 | 30231G102 |  | XOM | USD | XOM | C | 01/17/2009 | 90 | 01/17/2009 | 12,500 / 995,125.00 |
| C |  | DTCCUS33XXX | 2039 | 30231G102 |  | XOM | USD | XOM | C | 01/17/2009 | 90 | 01/17/2009 | 500 / 39,805.00 |
| C |  | DTCCUS33XXX | 2039 | 30231G102 |  | XOM | USD | XOM | C | 01/17/2009 | 95 | 01/17/2009 | 500 / 39,805.00 |
| C |  | DTCCUS33XXX | 2170 | 30231G102 |  | XOM | USD | XOM | C | 01/17/2009 | 95 | 01/17/2009 | 2,000 / 159,220.00 |
| C |  | DTCCUS33XXX | 2316 | 302571104 |  | FPL | USD | FPL | C | 09/20/2008 | 60 | 09/20/2008 | 3,000 / 167,910.00 |
| C |  | DTCCUS33XXX | 2669 | 313400301 |  | FRE | USD | FRE | C | 10/18/2008 | 14 | 10/18/2008 | 37,300 / 20,515.00 |
| C |  | DTCCUS33XXX | 2669 | 313400301 |  | FRE | USD | FRE | C | 10/18/2008 | 15 | 10/18/2008 | 55,600 / 30,580.00 |

ENP0450                                     ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL                                                                                          BCI-EX-(S)-00188265

THE OPTIONS CLEARING CORPORATION                          ACTIVITY DATE: 09/19/2008 CYCLE-ID:                      CMO PAGE 12
COLLATERAL INVENTORY BY CMO                               SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:07:23           CX PAGE 16

CMO:                  LEHMAN BROTHERS INC.
CLEARING MEMBER:      OCC  00074

COLLATERAL TYPE:      SPECIFIC DEPOSITS

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C P | SER/CTR DATE | STRIKE | EXP DATE | SHARE QTY / MARKET VALUE |
|----|----|---------------|-----------|-------|------|----------|----------|----------|-----|--------------|--------|----------|--------------------------|
| C |  | DTCCUS33XXX | 2669 | 313586109 |  | FNM | USD | FNM | C | 09/20/2008 | 28 | 09/20/2008 | 37,400 / 25,806.00 |
| C |  | DTCCUS33XXX | 2669 | 313586109 |  | FNM | USD | FNM | C | 12/20/2008 | 28 | 12/20/2008 | 34,400 / 23,736.00 |
| C |  | DTCCUS33XXX | 2669 | 31428X106 |  | FDX | USD | FDX | C | 10/18/2008 | 85 | 10/18/2008 | 11,300 / 1,017,904.00 |
| C |  | DTCCUS33XXX | 2319 | 31428X106 |  | FDX | USD | FDX | C | 10/18/2008 | 85 | 10/18/2008 | 2,600 / 234,208.00 |
| C |  | DTCCUS33XXX | 2669 | 31428X106 |  | FDX | USD | FDX | C | 01/17/2009 | 90 | 01/17/2009 | 10,200 / 918,816.00 |
| C |  | DTCCUS33XXX | 2316 | 354613101 |  | BEN | USD | BEH | C | 01/17/2009 | 130 | 01/17/2009 | 600 / 64,800.00 |
| C |  | DTCCUS33XXX | 2316 | 35671D857 |  | FCX | USD | FCX | C | 09/20/2008 | 100 | 09/20/2008 | 800 / 58,816.00 |
| C |  | DTCCUS33XXX | 2316 | 369604103 |  | GE | USD | GE | C | 12/20/2008 | 32 | 12/20/2008 | 12,900 / 343,398.00 |
| C |  | DTCCUS33XXX | 2316 | 369604103 |  | GE | USD | GE | C | 01/17/2009 | 32 4/8 | 01/17/2009 | 4,000 / 106,480.00 |
| C |  | DTCCUS33XXX | 2316 | 369604103 |  | GE | USD | GE | C | 09/20/2008 | 35 | 09/20/2008 | 3,000 / 79,860.00 |
| C |  | DTCCUS33XXX | 2139 | 369604103 |  | GE | USD | GE | C | 01/17/2009 | 37 4/8 | 01/17/2009 | 13,200 / 351,384.00 |
| C |  | DTCCUS33XXX | 2316 | 369604103 |  | GE | USD | GE | C | 09/20/2008 | 37 4/8 | 09/20/2008 | 1,000 / 26,620.00 |
| C |  | DTCCUS33XXX | 2316 | 369604103 |  | GE | USD | GE | C | 09/20/2008 | 39 | 09/20/2008 | 1,000 / 26,620.00 |
| C |  | DTCCUS33XXX | 2316 | 369604103 |  | GE | USD | GE | C | 09/20/2008 | 40 | 09/20/2008 | 2,400 / 63,888.00 |
| C |  | DTCCUS33XXX | 2139 | 369604103 |  | GE | USD | GE | C | 01/17/2009 | 42 4/8 | 01/17/2009 | 8,000 / 212,960.00 |
| C |  | DTCCUS33XXX | 2316 | 37733W105 |  | GSK | USD | GSK | C | 11/22/2008 | 52 4/8 | 11/22/2008 | 5,300 / 235,956.00 |
| C |  | DTCCUS33XXX | 2316 | 38141G104 |  | GS | USD | GPY | C | 09/20/2008 | 180 | 09/20/2008 | 500 / 64,900.00 |
| C |  | DTCCUS33XXX | 2669 | 38141G104 |  | GS | USD | GPY | C | 01/17/2009 | 200 | 01/17/2009 | 5,900 / 765,820.00 |

ENP0450                                 ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL                                                                    BCI-EX-(S)-00188266

```
THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/19/2008 CYCLE-ID:                        CMO PAGE 13
COLLATERAL INVENTORY BY CMO                         SYSTEM DATE  09/19/2008 SYSTEM TIME: 21:07:12            CM PAGE 11

CMO:                   LEHMAN BROTHERS INC.
CLEARING MEMBER:       OCC  00074

COLLATERAL TYPE:       SPECIFIC DEPOSITS
```

|    |    |              |       |           |      |     |      | SERIES |     |            | SHARE QTY |
|----|----|--------------|-------|-----------|------|-----|------|--------|-----|------------|-----------|
| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C SER/CTR P DATE | STRIKE | EXP DATE | MARKET VALUE |
| C |  | DTCCUS33XXX | 2669 | 38141G104 |  | GS | USD | GPY | C 04/18/2009 | 200 | 04/18/2009 | 4,300 |
|   |  |  |  |  |  |  |  |  |  |  |  | 558,140.00 |
| C |  | DTCCUS33XXX | 2669 | 38141G104 |  | GS | USD | GPY | C 10/18/2008 | 200 | 10/18/2008 | 8,300 |
|   |  |  |  |  |  |  |  |  |  |  |  | 1,077,340.00 |
| C |  | DTCCUS33XXX | 2316 | 38259P508 |  | GOOG | USD | GOP | C 09/20/2008 | 550 | 09/20/2008 | 400 |
|   |  |  |  |  |  |  |  |  |  |  |  | 179,660.00 |
| C |  | DTCCUS33XXX | 0901 | 416515104 |  | HIG | USD | HIG | C 09/20/2008 | 65 | 09/20/2008 | 41,300 |
|   |  |  |  |  |  |  |  |  |  |  |  | 2,608,095.00 |
| C |  | DTCCUS33XXX | 2316 | 428236103 |  | HPQ | USD | HPQ | C 11/22/2008 | 50 | 11/22/2008 | 2,000 |
|   |  |  |  |  |  |  |  |  |  |  |  | 96,520.00 |
| C |  | DTCCUS33XXX | 2316 | 436440101 |  | HOLX | USD | QHX | C 01/17/2009 | 20 | 01/17/2009 | 3,300 |
|   |  |  |  |  |  |  |  |  |  |  |  | 64,878.00 |
| C |  | DTCCUS33XXX | 2316 | 436440101 |  | HOLX | USD | QHX | C 12/20/2008 | 22 4/8 | 12/20/2008 | 1,000 |
|   |  |  |  |  |  |  |  |  |  |  |  | 19,660.00 |
| C |  | DTCCUS33XXX | 2316 | 436440101 |  | HOLX | USD | QHX | C 01/17/2009 | 30 | 01/17/2009 | 17,500 |
|   |  |  |  |  |  |  |  |  |  |  |  | 344,050.00 |
| C |  | DTCCUS33XXX | 2669 | 437076102 |  | HD | USD | HD | C 11/22/2008 | 27 4/8 | 11/22/2008 | 13,200 |
|   |  |  |  |  |  |  |  |  |  |  |  | 361,284.00 |
| C |  | DTCCUS33XXX | 2316 | 437076102 |  | HD | USD | HD | C 09/20/2008 | 27 4/8 | 09/20/2008 | 7,000 |
|   |  |  |  |  |  |  |  |  |  |  |  | 191,590.00 |
| C |  | DTCCUS33XXX | 2316 | 437076102 |  | HD | USD | HD | C 11/22/2008 | 30 | 11/22/2008 | 2,500 |
|   |  |  |  |  |  |  |  |  |  |  |  | 68,425.00 |
| C |  | DTCCUS33XXX | 2316 | 437076102 |  | HD | USD | HD | C 01/17/2009 | 32 4/8 | 01/17/2009 | 2,000 |
|   |  |  |  |  |  |  |  |  |  |  |  | 54,740.00 |
| C |  | DTCCUS33XXX | 2316 | 437076102 |  | HD | USD | WHD | C 01/16/2010 | 35 | 01/16/2010 | 1,000 |
|   |  |  |  |  |  |  |  |  |  |  |  | 27,370.00 |
| C |  | DTCCUS33XXX | 2316 | 438128308 |  | HMC | USD | HMC | C 10/18/2008 | 35 | 10/18/2008 | 1,800 |
|   |  |  |  |  |  |  |  |  |  |  |  | 58,590.00 |
| C |  | DTCCUS33XXX | 2316 | 438516106 |  | HON | USD | HON | C 09/20/2008 | 65 | 09/20/2008 | 6,500 |
|   |  |  |  |  |  |  |  |  |  |  |  | 294,580.00 |
| C |  | DTCCUS33XXX | 2316 | 458140100 |  | INTC | USD | INQ | C 10/18/2008 | 25 | 10/18/2008 | 3,000 |
|   |  |  |  |  |  |  |  |  |  |  |  | 57,690.00 |
| C |  | DTCCUS33XXX | 2139 | 458140100 |  | INTC | USD | INQ | C 01/17/2009 | 30 | 01/17/2009 | 1,300 |
|   |  |  |  |  |  |  |  |  |  |  |  | 24,999.00 |
| C |  | DTCCUS33XXX | 2316 | 458140100 |  | INTC | USD | WNL | C 01/16/2010 | 30 | 01/16/2010 | 2,000 |
|   |  |  |  |  |  |  |  |  |  |  |  | 38,460.00 |

```
ENP0450                                    ****CONTINUED ON NEXT PAGE****
```

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00188267

```
THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/19/2008  CYCLE-ID:              CMO PAGE 14
COLLATERAL INVENTORY BY CMO                         SYSTEM DATE: 09/19/2008  SYSTEM TIME: 21:07:33    CX PAGE 12

CMO:                  LEHMAN BROTHERS INC.
CLEARING MEMBER:      OCC  00074

COLLATERAL TYPE:      SPECIFIC DEPOSITS
```

|    |    |         |      |           |      |      |      |      | SERIES  |        |            | SHARE QTY |
|----|----|---------|------|-----------|------|------|------|------|---------|--------|------------|-----------|
| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C P SER/CTR DATE | STRIKE | EXP DATE | MARKET VALUE |
| C  |    | DTCCUS33XXX | 2139 | 459200101 |      | IBM  | USD  | IBM  | C 01/17/2009 | 115   | 01/17/2009 | 1,000 |
|    |    |         |      |           |      |      |      |      |         |        |            | 118,850.00 |
| C  |    | DTCCUS33XXX | 2316 | 459200101 |      | IBM  | USD  | IBM  | C 10/18/2008 | 140   | 10/18/2008 | 1,200 |
|    |    |         |      |           |      |      |      |      |         |        |            | 142,620.00 |
| C  |    | DTCCUS33XXX | 2669 | 460146103 |      | IP   | USD  | IP   | C 10/18/2008 | 32 4/8 | 10/18/2008 | 16,100 |
|    |    |         |      |           |      |      |      |      |         |        |            | 465,612.00 |
| C  |    | DTCCUS33XXX | 2803 | 46428R107 |      | GSG  | USD  | GSG  | C 09/20/2008 | 63    | 09/20/2008 | 80,000 |
|    |    |         |      |           |      |      |      |      |         |        |            | 4,360,000.00 |
| C  |    | DTCCUS33XXX | 2316 | 464286400 |      | EWZ  | USD  | EWZ  | C 09/20/2008 | 100   | 09/20/2008 | 400 |
|    |    |         |      |           |      |      |      |      |         |        |            | 25,320.00 |
| C  |    | DTCCUS33XXX | 2316 | 464287168 |      | DVY  | USD  | DVY  | C 09/20/2008 | 70    | 09/20/2008 | 500 |
|    |    |         |      |           |      |      |      |      |         |        |            | 30,500.00 |
| C  |    | DTCCUS33XXX | 2316 | 464287234 |      | EEM  | USD  | EGH  | C 09/20/2008 | 150   | 09/20/2008 | 29,100 |
|    |    |         |      |           |      |      |      |      |         |        |            | 1,119,477.00 |
| C  |    | DTCCUS33XXX | 2316 | 464287556 |      | IBB  | USD  | IBB  | C 09/20/2008 | 85    | 09/20/2008 | 100 |
|    |    |         |      |           |      |      |      |      |         |        |            | 8,400.00 |
| C  |    | DTCCUS33XXX | 2669 | 464287564 |      | ICF  | USD  | ICV  | C 11/22/2008 | 74    | 11/22/2008 | 300 |
|    |    |         |      |           |      |      |      |      |         |        |            | 24,990.03 |
| C  |    | DTCCUS33XXX | 2669 | 464287564 |      | ICF  | USD  | ICV  | C 11/22/2008 | 90    | 11/22/2008 | 6,100 |
|    |    |         |      |           |      |      |      |      |         |        |            | 508,130.62 |
| C  |    | DTCCUS33XXX | 2316 | 46625H100 |      | JPM  | USD  | JPM  | C 09/20/2008 | 40    | 09/20/2008 | 4,000 |
|    |    |         |      |           |      |      |      |      |         |        |            | 188,200.00 |
| C  |    | DTCCUS33XXX | 2669 | 46625H100 |      | JPM  | USD  | JPM  | C 12/20/2008 | 40    | 12/20/2008 | 38,200 |
|    |    |         |      |           |      |      |      |      |         |        |            | 1,797,310.00 |
| C  |    | DTCCUS33XXX | 2669 | 46625H100 |      | JPM  | USD  | JPM  | C 12/20/2008 | 42 4/8 | 12/20/2008 | 21,800 |
|    |    |         |      |           |      |      |      |      |         |        |            | 1,025,690.00 |
| C  |    | DTCCUS33XXX | 0901 | 46625H100 |      | JPM  | USD  | JPM  | C 10/18/2008 | 45    | 10/18/2008 | 12,300 |
|    |    |         |      |           |      |      |      |      |         |        |            | 578,715.00 |
| C  |    | DTCCUS33XXX | 2669 | 46625H100 |      | JPM  | USD  | JPM  | C 12/20/2008 | 47 4/8 | 12/20/2008 | 22,500 |
|    |    |         |      |           |      |      |      |      |         |        |            | 1,058,625.00 |
| C  |    | DTCCUS33XXX | 2139 | 478160104 |      | JNJ  | USD  | JNJ  | C 01/17/2009 | 70    | 01/17/2009 | 1,000 |
|    |    |         |      |           |      |      |      |      |         |        |            | 69,990.00 |
| C  |    | DTCCUS33XXX | 2139 | 478160104 |      | JNJ  | USD  | JNJ  | C 01/17/2009 | 75    | 01/17/2009 | 40,700 |
|    |    |         |      |           |      |      |      |      |         |        |            | 2,848,593.00 |
| C  |    | DTCCUS33XXX | 2316 | 48242W106 |      | KBR  | USD  | KBR  | C 09/20/2008 | 25    | 09/20/2008 | 4,000 |
|    |    |         |      |           |      |      |      |      |         |        |            | 77,760.00 |

```
ENP0450                              ****CONTINUED ON NEXT PAGE****
```

**HIGHLY CONFIDENTIAL**

**BCI-EX-(S)-00188268**

THE OPTIONS CLEARING CORPORATION                          ACTIVITY DATE: 09/19/2008 CYCLE-ID:                          CMO PAGE 15
COLLATERAL INVENTORY BY CMO                               SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:07:32          OR PAGE 13

CMO:                    LEHMAN BROTHERS INC.
CLEARING MEMBER:        OCC  00074

COLLATERAL TYPE:        SPECIFIC DEPOSITS

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C P | SER/CTR DATE | STRIKE | EXP DATE | SHARE QTY / MARKET VALUE |
|----|----|---------------|-----------|-------|------|----------|----------|----------|-----|--------------|--------|----------|--------------------------|
| C | | DTCCUS33XXX | 0997 | 485170302 | | KSU | USD | KSU | C | 09/20/2008 | 60 | 09/20/2008 | 200,000 |
| | | | | | | | | | | | | | 10,234,000.00 |
| C | | DTCCUS33XXX | 2669 | 500255104 | | KSS | USD | KSS | C | 10/18/2008 | 50 | 10/18/2008 | 54,800 |
| | | | | | | | | | | | | | 2,738,904.00 |
| C | | DTCCUS33XXX | 2669 | 500255104 | | KSS | USD | KSS | C | 01/17/2009 | 50 | 01/17/2009 | 56,600 |
| | | | | | | | | | | | | | 2,828,868.00 |
| C | | DTCCUS33XXX | 2803 | 524908100 | | LEHMQ | USD | NJS | C | 10/18/2008 | 12 4/8 | 10/18/2008 | 500,000 |
| | | | | | | | | | | | | | 107,550.00 |
| C | | DTCCUS33XXX | 2803 | 524908100 | | LEHMQ | USD | NJS | C | 01/17/2009 | 12 4/8 | 01/17/2009 | 500,000 |
| | | | | | | | | | | | | | 107,550.00 |
| C | | DTCCUS33XXX | 2669 | 524908100 | | LEHMQ | USD | LYH | C | 09/20/2008 | 21 | 09/20/2008 | 47,600 |
| | | | | | | | | | | | | | 10,238.76 |
| C | | DTCCUS33XXX | 2669 | 524908100 | | LEHMQ | USD | LYH | C | 01/17/2009 | 27 | 01/17/2009 | 31,700 |
| | | | | | | | | | | | | | 6,818.67 |
| C | | DTCCUS33XXX | 2669 | 532457108 | | LLY | USD | LLY | C | 10/18/2008 | 50 | 10/18/2008 | 17,900 |
| | | | | | | | | | | | | | 835,751.00 |
| C | | DTCCUS33XXX | 2316 | 539830109 | | LMT | USD | LMT | C | 09/20/2008 | 120 | 09/20/2008 | 200 |
| | | | | | | | | | | | | | 22,176.00 |
| C | | DTCCUS33XXX | 2669 | 548661107 | | LOW | USD | LOW | C | 01/17/2009 | 27 4/8 | 01/17/2009 | 92,200 |
| | | | | | | | | | | | | | 2,353,866.00 |
| C | | DTCCUS33XXX | 2316 | 55616P104 | | M | USD | M | C | 01/17/2009 | 25 | 01/17/2009 | 3,400 |
| | | | | | | | | | | | | | 67,864.00 |
| C | | DTCCUS33XXX | 2669 | 565849106 | | MRO | USD | MRO | C | 10/18/2008 | 55 | 10/18/2008 | 18,300 |
| | | | | | | | | | | | | | 793,122.00 |
| C | | DTCCUS33XXX | 2316 | 565849106 | | MRO | USD | MRO | C | 01/17/2009 | 55 | 01/17/2009 | 1,200 |
| | | | | | | | | | | | | | 52,008.00 |
| C | | DTCCUS33XXX | 2316 | 576206106 | | MEE | USD | MEE | C | 09/20/2008 | 70 | 09/20/2008 | 100 |
| | | | | | | | | | | | | | 4,249.00 |
| C | | DTCCUS33XXX | 2316 | 579064106 | | MFE | USD | MFE | C | 09/20/2008 | 40 | 09/20/2008 | 40,100 |
| | | | | | | | | | | | | | 1,496,131.00 |
| C | | DTCCUS33XXX | 0901 | 594918104 | | MSFT | USD | MSQ | C | 10/18/2008 | 29 | 10/18/2008 | 65,000 |
| | | | | | | | | | | | | | 1,635,400.00 |
| C | | DTCCUS33XXX | 2316 | 594918104 | | MSFT | USD | MSQ | C | 10/18/2008 | 29 | 10/18/2008 | 1,000 |
| | | | | | | | | | | | | | 25,160.00 |
| C | | DTCCUS33XXX | 2316 | 594918104 | | MSFT | USD | MSQ | C | 01/17/2009 | 30 | 01/17/2009 | 500 |
| | | | | | | | | | | | | | 12,580.00 |

ENP0450                                          ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL

08-13555-mg    Doc 10269-2    Filed 07/16/10    Entered 07/16/10 19:43:20    Exhibits F through L to Declaration    Pg 179 of 179

CMO:                    LEHMAN BROTHERS INC.
CLEARING MEMBER:        OCC  00074

COLLATERAL TYPE:        SPECIFIC DEPOSITS

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | OPT SYMB | C P | SER/CTR DATE | STRIKE | EXP DATE | SHARE QTY / MARKET VALUE |
|----|----|---------------|-----------|-------|------|----------|----------|----------|-----|--------------|--------|----------|--------------------------|
| C |  | DTCCUS33XXX | 2139 | 594918104 |  | MSFT | USD | MSQ | C | 01/17/2009 | 40 | 01/17/2009 | 9,000 / 226,440.00 |
| C |  | DTCCUS33XXX | 2669 | 595112103 |  | MU | USD | MU | C | 01/17/2009 | 5 | 01/17/2009 | 105,800 / 512,072.00 |
| C |  | DTCCUS33XXX | 2316 | 61166W101 |  | MON | USD | MFP | C | 01/17/2009 | 140 | 01/17/2009 | 14,100 / 1,669,581.00 |
| C |  | DTCCUS33XXX | 2316 | 617446448 |  | MS | USD | MS | C | 09/20/2008 | 43 | 09/20/2008 | 4,600 / 125,166.00 |
| C |  | DTCCUS33XXX | 2669 | 617446448 |  | MS | USD | MFZ | C | 01/17/2009 | 50 | 01/17/2009 | 27,400 / 745,554.00 |
| C |  | DTCCUS33XXX | 2139 | 635405103 |  | NCC | USD | NCC | C | 01/17/2009 | 20 | 01/17/2009 | 3,000 / 16,830.00 |
| C |  | DTCCUS33XXX | 2316 | 635405103 |  | NCC | USD | NCC | C | 09/20/2008 | 5 | 09/20/2008 | 100,000 / 561,000.00 |
| C |  | DTCCUS33XXX | 2450 | 651290108 |  | NFX | USD | NFX | C | 09/20/2008 | 65 | 09/20/2008 | 91,300 / 3,704,041.00 |
| C |  | DTCCUS33XXX | 2669 | 654902204 |  | NOK | USD | NOK | C | 10/18/2008 | 30 | 10/18/2008 | 35,900 / 767,183.00 |
| C |  | DTCCUS33XXX | 2450 | 655664100 |  | JWN | USD | JWN | C | 01/17/2009 | 40 | 01/17/2009 | 95,000 / 3,223,350.00 |
| C |  | DTCCUS33XXX | 2669 | 655844108 |  | NSC | USD | NSC | C | 09/20/2008 | 60 | 09/20/2008 | 10,000 / 703,600.00 |
| C |  | DTCCUS33XXX | 2669 | 655844108 |  | NSC | USD | NSC | C | 12/20/2008 | 70 | 12/20/2008 | 11,900 / 837,284.00 |
| C |  | DTCCUS33XXX | 2316 | 665859104 |  | NTRS | USD | NRQ | C | 10/18/2008 | 85 | 10/18/2008 | 600 / 45,930.00 |
| C |  | DTCCUS33XXX | 2146 | 667280408 |  | NWA | USD | NWA | C | 09/20/2008 | 10 | 09/20/2008 | 35,000 / 403,550.00 |
| C |  | DTCCUS33XXX | 2146 | 667280408 |  | NWA | USD | NWA | C | 09/20/2008 | 12 4/8 | 09/20/2008 | 35,000 / 403,550.00 |
| C |  | DTCCUS33XXX | 2316 | 674599105 |  | OXY | USD | OXY | C | 09/20/2008 | 80 | 09/20/2008 | 2,000 / 161,000.00 |
| C |  | DTCCUS33XXX | 2316 | 68389X105 |  | ORCL | USD | ORQ | C | 09/20/2008 | 22 4/8 | 09/20/2008 | 7,000 / 140,490.00 |
| C |  | DTCCUS33XXX | 2316 | 704549104 |  | BTU | USD | BTU | C | 01/17/2009 | 65 | 01/17/2009 | 31,800 / 1,821,822.00 |

ENP0450                                    ****CONTINUED ON NEXT PAGE****

HIGHLY CONFIDENTIAL                                                        BCI-EX-(S)-00188270