**HUGHES HUBBARD & REED LLP**
William R. Maguire
One Battery Park Plaza
New York, New York 10004

Attorneys for James W. Giddens, as Trustee
for the SIPA Liquidation of Lehman Brothers
Inc

**JONES DAY**
Robert W. Gaffey
222 East 41st Street
New York, New York 10017

Attorneys for Debtors
and Debtors in Possession

**QUINN EMANUEL URQUHART OLIVER
& SULLIVAN**
James C. Tecce
51 Madison Avenue
22nd Floor
New York, New York 10010

Attorneys for Official Committee
of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13555<br><br>(Jointly Administered) |
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) SIPA |

**MEMORANDUM OF MOVANTS IN OPPOSITION TO THE MOTION *IN LIMINE* OF
BARCLAYS CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT
TESTIMONY OF DANIEL MCISAAC REGARDING LBI'S OBLIGATIONS UNDER
SEC RULES 15c3-1, 15c3-3 AND/OR THE SECURITIES INVESTOR PROTECTION ACT**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers, Inc. ("LBI"), Lehman Brothers Holdings Inc. ("LBHI"), and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. and its affiliated debtors and debtors-in-possession (the "Committee," and collectively, the "Movants"), submit this memorandum in opposition to the Motion in Limine of Barclays Capital Inc. for an Order Excluding the Expert Testimony of Daniel McIsaac Regarding LBI's Obligations Under SEC Rules 15c3-1, 15c3-3 And/Or The Securities Investor Protection Act ("SIPA"), dated April 19, 2010 ("Barclays Motion"), by Barclays Capital Inc. ("Barclays").  Movants respectfully request that the Court deny the Motion.

## INTRODUCTION

1. Mr. McIsaac's testimony concerns the Rule 15c3-3 assets in dispute between Movants and Barclays.  The Clarification Letter provides for the transfer, "to the extent permitted by applicable law," of $769 million in securities that were held in LBI's Rule 15c3-3 Customer Reserve Accounts ("Customer Reserve Accounts" or "Accounts").  Barclays' right to these securities was conditioned on, among other things, the existence of a sufficient excess in the Accounts above the amount that SEC Rule 15c3-3 ("Rule 15c3-3" or the "Customer Protection Rule") required to be reserved for customer claims.

2. Relying on calculations done by Lehman employees who were motivated to find an excess in the Customer Reserve Accounts in the hectic days leading up to the Closing, Barclays asserts that there was, in fact, an excess in the Accounts. (Reply Memorandum of Barclays Capital Inc. In Further Support of Motion of Barclays Capital Inc. To Enforce The Sale Order And Secure Delivery Of All Undelivered Assets, dated April 5, 2010, at ¶ 96.)  Mr. McIsaac's testimony rebuts that assertion.  Mr. McIsaac reviewed the Rule 15c3-3 reserve

2

calculation that LBI performed as of September 19, 2008 and concluded that the calculation was subject to numerous errors that put LBI out of compliance with Rule 15c3-3. Adjusting the reserve calculation to account for these errors demonstrates that there was a substantial deficit in the Customer Reserve Accounts as of September 19, 2008.[1]

3. Mr. McIsaac's expert testimony regarding LBI's obligations under the Customer Protection Rule and the compliance errors in LBI's September 19 reserve calculation is based on his more than 30 years of work experience related to regulatory reporting for broker-dealers, and on his analysis of facts and documents concerning the September 19 reserve calculation. (*See generally* Affidavit of Daniel McIsaac, dated October 5, 2009 ("McIsaac Oct. 5 Aff.") & Ex. 1 (Curriculum Vitae of Daniel McIsaac); Supplemental Affidavit of Daniel McIsaac, dated February 18, 2010 ("McIsaac Feb. 18 Aff."); Rebuttal Report of Daniel McIsaac, dated March 14, 2010 ("McIsaac Rebuttal Report").)

4. Barclays fails to point to any defect in Mr. McIsaac's methodology or opinions that would render his testimony inadmissible. Contrary to Barclays' assertions, Mr. McIsaac permissibly relied on the Trustee's financial professionals to provide him with materials relating to LBI's September 19 reserve calculation, which Mr. McIsaac independently analyzed based on his extensive experience regarding a broker-dealer's obligations under the Customer Protection Rule. Mr. McIsaac's reports discuss LBI's obligations under the Customer Protection Rule – a topic that has been recognized as properly the subject of expert testimony – and do not

---

1. Mr. McIsaac is not the only one to question the accuracy of LBI's September 19 reserve calculation. Following the Closing, Barclays sought the SEC's consent to release the Customer Reserve Account securities, and the SEC refused because of concerns regarding whether there was, in fact, an excess in the Accounts. (*See* 5/5/10 Trial Tr. [Kobak] at 34:19-35:10; Declaration of Neil J. Oxford In Support of the Memorandum of Movants In Opposition To The Motion In Limine Of Barclays Capital Inc. For An Order Excluding The Expert Testimony Of Daniel McIsaac Regarding LBI's Obligations Under SEC Rules 15c3-1, 15c3-3 And/Or The Securities

(Footnote continued on next page)

opine or purport to opine on the requirements of SIPA. Finally, there is no merit to Barclays' criticism of Mr. McIsaac for assessing LBI's compliance with the Customer Protection Rule based on the September 19 reserve calculation. It makes far more sense and is more consistent with SIPA to assess any deficiencies in LBI's Customer Reserve Accounts as of September 19, rather than the earlier dates to which Barclays points.

5. As Barclays itself has recognized, the Second Circuit "has expressed a clear preference for admission of expert testimony." (Memorandum of Barclays Capital Inc. in Opposition to Motion in Limine for an Order Excluding the Expert Testimony of Professor Paul Pfleiderer, dated April 19, 2010 ("Pfleiderer Motion Opp."), at 2-3 (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (noting that the Supreme Court has "advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable"); *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) ("As the Second Circuit has noted, district courts should presume expert evidence is reliable").)) Barclays fails to provide a sufficient basis for excluding Mr. McIsaac's testimony, and Movants respectfully request that the Motion be denied.

**ARGUMENT**

I. **Mr. McIsaac's Independent Analysis of Compliance Issues Regarding LBI's Reserve Calculation Is Admissible Expert Testimony**

6. Mr. McIsaac's expert testimony is based on his considerable industry experience in interpreting and applying the requirements of Rule 15c3-3 and on his independent

---

(Footnote continued from previous page)

Investor Protection Act, dated July 16, 2010 ("Oxford Decl."), Ex. A (Blackwell Tr.) 206:21-208:21.)

analysis of the facts relating to LBI's September 19 reserve calculation.  As discussed below, Mr. McIsaac properly relied on the Trustee's financial professionals to provide him with facts and documents relating to the September 19 reserve calculation, which Mr. McIsaac then analyzed based on his expertise in Rule 15c3-3.  Contrary to Barclays' assertions, the mere fact that Mr. McIsaac did not re-run the reserve calculation as of September 19 – an unnecessary exercise that would not, as a practical matter, be possible to complete – neither renders Mr. McIsaac's testimony inadmissible, nor changes the existence or overall effect of the compliance errors that Mr. McIsaac identified.

### A.    Mr. McIsaac Permissibly Relied On Facts and Documents That The Trustee's Financial Professionals Provided To Him

7.    Barclays argues that Mr. McIsaac's testimony should be excluded because it is "not based on empirical analysis but instead [on] mere superficial acceptance of the results of investigation and analysis provided to Mr. McIsaac by the Trustee and its financial advisor Deloitte & Touche." (Barclays Motion ¶ 8.)  This argument fundamentally misconstrues the scope of Mr. McIsaac's analysis and opinions.  Mr. McIsaac has not, and does not claim to have, undertaken a full forensic analysis of LBI's books and records.  Rather, Mr. McIsaac "provide[d] expert analysis and opinions on various matters related to formulations of principles and methodology for the allocation of the LBI assets under the Trustee's control between the fund of customer property and LBI's general estate." (McIsaac Oct. 5 Aff. ¶ 1.)  Specifically, Mr. McIsaac opined on LBI's obligations under Rule 15c3-3 to set aside and protect customer property, and identified instances in which LBI had not complied with Rule 15c3-3.  As acknowledged in his reports, Mr. McIsaac relied on the Trustee's financial advisors to provide him with information about the customer accounts that were the subject of LBI's compliance failures. (*See*, *e.g.*, McIsaac Oct. 5 Aff. ¶¶ 31, 37, 43.)  His opinions, however, were directed to

5

whether these customer accounts were properly treated in LBI's reserve formula calculations, and whether LBI had fully complied with its obligations under the Customer Protection Rule. (*See* McIsaac Oct. 5 Aff. ¶¶ 23-62; McIsaac Rebuttal Report ¶¶ 5-28.)

8.   An expert analyzing or relying on information assembled by others is not unusual. As Barclays itself recognized in its opposition to the Pfleiderer Motion, "[c]ourts regularly allow expert testimony that relies on work done by someone other than the expert." (Pfleiderer Motion Opp. at 18 n.16 (citing *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (8th Cir. 2008)).) Indeed, expert testimony that relies on the opinions or factual findings of third parties is "perfectly permissible." *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789-90 (7th Cir. 2000) (allowing expert testimony that relied on the opinions and data of third parties); *see also Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007) (an expert "[a]nalyzing data assembled by others is neither illicit nor unusual, even if the data were prepared for litigation by an interested party"); *Am. Home Assur. Co. v. Merck & Co., Inc.*, 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006) (experts may permissibly rely on the factual investigation of a third party). Thus, as Barclays concedes, the mere fact that Mr. McIsaac relied for his opinions on data and documents that Deloitte provided to him is not a sufficient basis for the exclusion of his testimony.[2]

---

2. Barclays' complaint that "[t]he Trustee's invocation of privilege as to Deloitte of course prevents Barclays from examining McIsaac's superficial approval of Deloitte's and the Trustee's investigation" is simply false. (Barclays Motion ¶ 8 n.3.) Under the Stipulation Regarding Expert Discovery, agreed to on December 2, 2009 by the Trustee, Barclays, the Debtors, and the Official Committee of Unsecured Creditors, Barclays is entitled to inquire as to any investigation and analysis performed by Deloitte upon which Mr. McIsaac relied for the opinions in his affidavits and rebuttal report. (Oxford Decl. Ex. B (Stipulation Regarding Expert Discovery) ¶ 1(b).) At Mr. McIsaac's deposition, counsel for the Trustee explicitly instructed Mr. McIsaac to answer any questions regarding information that he received from Deloitte upon which he relied. (Oxford Decl. Ex. C (McIsaac Tr.) 276:11-20.) Moreover, counsel for the Trustee did not invoke privilege at any point during the deposition with respect to questions about information upon which Mr. McIsaac relied. (*See generally id.*)

6

9. The cases that Barclays cites in support of its argument are unavailing. In *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), the court did not exclude the defendant's expert, but found that the expert's failure to offer "empirical analysis to support his position" and his "cursory examination of selected facts" went to the weight of his opinions, rather than their admissibility. *Id.* at 402-04. In so finding, the court focused on the fact that the expert's testimony was "belied by the uncontradicted record evidence." *Id.* at 402. Here, Barclays has not offered any evidence, let alone uncontradicted record evidence, to suggest that the compliance issues that Mr. McIsaac identified do not exist or would not impact LBI's reserve calculation. (*See generally* Barclays Motion; Expert Report of Peter Vinella, dated January 8, 2010 ("Vinella Report").)

10. Barclays' remaining cases are similarly inapposite. *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F. 2d 505, 510-11 (2d Cir. 1977), stands only for the unremarkable proposition that expert testimony on the legal interpretation of a contract is impermissible because contract interpretation is not properly an issue of fact. *Montefiore Medical Center v. American Protection Insurance Co.*, No. 00 Civ. 3235, 2003 WL 21108232 (S.D.N.Y. May 14, 2003), involved an expert who had "proffered nothing to indicate that [he had] any expertise" in the matters that were at issue in the case and had provided "no data, testing methodology, or empirical evidence" to support his conclusions. *Id.* at *2. And *Li v. Aponte*, No. 05 Civ. 6237, 2009 WL 1285928 (S.D.N.Y. May 5, 2009), concerned proffered testimony from a chiropractor who had not seen the plaintiff in more than 17 months and who had never reviewed the plaintiff's prior medical records. *Id.* at *6-7. On those facts, the *Li* court found that the expert had failed "to obtain and consider all the available and relevant information." *Id.*

7

11. In contrast to the experts in Barclays' cases, Mr. McIsaac has more than 30 years of experience that bears directly on the complex Rule 15c3-3 regulatory compliance issues before the Court. Moreover, far from providing "no data . . . or empirical evidence" in support of his conclusions, Mr. McIsaac's reports attach numerous exhibits and contain detailed analysis of the impact of relevant facts on the accuracy of LBI's Rule 15c3-3 reserve calculation. (*See* McIsaac Oct. 5. Aff. & Exs. 1-42; McIsaac Feb. 18 Aff. & Ex. 1; McIsaac Rebuttal Report & Exs. 1-14.) Mr. McIsaac reviewed the "available and relevant information" regarding LBI's Rule 15c3-3 reserve calculation as of September 19, 2008, including prior reserve calculations, drafts of the September 19 calculation, emails and other documents concerning the September 19 calculation, and documents relating to each of the compliance issues and issues under investigation contained in his reports. (*See*, *e.g.*, McIsaac Oct. 5 Aff. Exs. 1-42; McIsaac Feb. 18 Aff. Ex. 1; McIsaac Rebuttal Report Exs. 1-14.) Tellingly, Barclays has not pointed to any relevant document concerning the September 19 reserve calculation or any of the related compliance issues that it claims Mr. McIsaac failed to review. (*See generally* Barclays Motion.)

12. Barclays is incorrect when it claims that Mr. McIsaac "made no effort to identify errors that would have resulted in downward adjustments to the SEC Rule 15c3-3 requirement" and "relied solely on the Trustee to identify matters he should examine." (Barclays Motion ¶ 10.) As Mr. McIsaac has explained, the Trustee's financial professionals, in the course of reconciling LBI's books and records, brought to his attention *all* potential compliance issues that they identified, regardless of the effect that those issues might have on LBI's reserve requirement. (*See* McIsaac Rebuttal Report ¶¶ 31, 33.) As noted in the passage from Mr. McIsaac's deposition that Barclays quotes in its Motion, the coding errors Mr. McIsaac

8

identified in his reports resulted in both upward and downward adjustments to LBI's reserve requirement. (Barclays Motion ¶ 10.)

13. Barclays makes too much of the fact that, after Mr. McIsaac submitted his October 5, 2009 Affidavit, the Trustee re-classified the compliance issue related to "Customer Cash Claimed by LBIE" as an item under investigation.[3] The re-classification of this item has no bearing on the admissibility of Mr. McIsaac's testimony. As Mr. McIsaac explained at his deposition, the Trustee and his financial professionals received additional information relating to this issue. (Oxford Decl. Ex. C (McIsaac Tr.) 334:24-336:7.) Mr. McIsaac testified that if the Trustee's investigation of this additional information confirmed the facts as Mr. McIsaac understood them at the time of his October 5, 2009 Affidavit, then his opinion would remain the same and an adjustment to the reserve calculation would be necessary. (*Id.* at 332:21-333:2 ("Q. Do you continue to have an opinion on whether or not the adjustment is necessary? A. If it's determined that there is a liability to the omnibus customer account, yes, it should then go in the formula.").)

14. Barclays argues that this testimony demonstrates that Mr. McIsaac "deferred to the Trustee's decision" on whether an adjustment to the reserve formula for the Customer Cash Claimed by LBIE was necessary. (Barclays Motion ¶¶ 11-13.) But this testimony demonstrates nothing of the sort. Mr. McIsaac's opinion on the Customer Cash Claimed by LBIE was based on his independent analysis of the facts that were available at the time of his October 5, 2009 Affidavit. (McIsaac Oct. 5 Aff. ¶¶ 41-44.) Contrary to Barclays'

---

3. Although Barclays asserts that Mr. McIsaac's rebuttal report "made no mention of this massive supposed error" (Barclays Motion ¶ 11), the rebuttal report clearly states that "the Trustee is continuing to investigate the Customer Cash Claimed by LBIE and may seek determination on this issue at a later date." (McIsaac Rebuttal Report ¶ 7 n.2.)

9

suggestion, Mr. McIsaac did not state at his deposition that he has now changed his opinion based on the decision of the Trustee to continue investigating this item. Rather, Mr. McIsaac stated only that, if the additional information that the Trustee has received corroborates the facts as stated in his October 5, 2009 Affidavit, Mr. McIsaac's opinion would be that the adjustment described in his October 5, 2009 Affidavit would be necessary. (Oxford Decl. Ex. C (McIsaac Tr.) 332:21-333:4.)[4]

### B. Mr. McIsaac's Acknowledgement That It Would Not Be Necessary, Cost-Effective, Or Practical To Recalculate LBI's Reserve Requirement As Of September 19, 2008 Is Not A Basis For Excluding His Testimony

15. Barclays next argues that Mr. McIsaac's expert testimony should be excluded because Mr. McIsaac "acknowledges that he did not attempt to do a complete recalculation [of the September 19, 2008 reserve requirement] for that date." (Barclays Motion ¶ 16.) Barclays does not identify a single reason why Mr. McIsaac's failure to run a complete recalculation of the reserve requirement renders his expert testimony inadmissible, nor does Barclays cite a single authority for the proposition that a complete recalculation is necessary.

16. Barclays does not offer any basis to dispute Mr. McIsaac's opinion that a complete recalculation of the reserve requirement "would be a substantial undertaking that would require many months, significant funds, and a large number of knowledgeable personnel" and "would not, as a practical matter, be cost effective or possible to complete." (McIsaac Rebuttal Report ¶¶ 31-32.) In fact, Barclays' own expert on Rule 15c3-3, as well as Barclays' Director of

---

4. Barclays argues that Mr. McIsaac "purports to further base his conclusion that LBI's Reserve Account was underfunded as of September 19, 2008" on the errors identified in his October 5, 2009 Affidavit as "under investigation." (Barclays Motion ¶¶ 7, 15.) This is incorrect. Mr. McIsaac's opinion on the underfunding of LBI's Customer Reserve Accounts does not take into account the items that are currently "under investigation," nor has Mr. McIsaac offered an opinion or any proposed expert testimony on those items. (*See* McIsaac Oct. 5 Aff. ¶¶ 50-62.)

10

Regulatory Reporting, agree that re-running the reserve calculation would be a significant and time-consuming process. (Oxford Decl. Ex. D (Vinella Tr.) 106:14-22; Oxford Decl. Ex. E (Martini Tr.) 84:9-91:18.) Furthermore, when over a year ago Barclays' own staff identified errors in the September 19 reserve calculation, they did not believe it necessary to re-examine each and every item in the calculation, nor did they attempt to rerun the calculation. Rather, Barclays simply adjusted the existing calculation for the identified errors, and determined that the reserve requirement had been understated by $213 million. (McIsaac Oct. 5 Aff. ¶ 38 & Ex. 28; McIsaac Rebuttal Report ¶ 18 & Ex. 8; Oxford Decl. Ex. F (Jan. 8, 2009 email and attachment from D. Sudarsan to K. McLaughlin et al.); Oxford Decl. Ex. E (Martini Tr.) 100:6-106:8.)

## II. Mr. McIsaac's Opinions On The Obligations Of A Broker-Dealer Under Rule 15c3-3 Are Properly The Subject Of Expert Testimony

17. As a Certified Public Accountant ("CPA") and an expert in regulatory compliance with more than 30 years of experience in the field, including decades of private sector experience with regulated broker-dealers dealing with Rule 15c3-3 compliance and SEC reporting requirements, Mr. McIsaac is qualified to opine on the obligations of a broker-dealer under the Customer Protection Rule.

18. Ignoring the fact that the Trustee offers Mr. McIsaac to rebut Barclays' claim that there was an excess in LBI's Customer Reserve Accounts as of September 19, 2008, Barclays argues that any testimony regarding the Rule 15c3-3 reserve calculation "improperly opines on interpretations of law" and must be excluded. (Barclays Motion ¶ 17.) Courts in this District disagree. *See*, *e.g.*, *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 66 n.10, 68-70, 109-12 (Bankr. S.D.N.Y. 1999) (considering expert testimony from a CPA regarding a broker-dealer's obligations under Rule 15c3-1); *Robbins v. Moore Med. Corp.*, 894 F. Supp. 661, 670-

11

71 (S.D.N.Y. 1995) (granting summary judgment to defendant where defendant offered undisputed expert testimony from a CPA regarding a firm's obligations under SEC regulations); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 548 (S.D.N.Y. 1990) (considering expert testimony from a former SEC staff accountant regarding a broker-dealer's obligations under Rule 15c3-3).[5]

19.     Courts routinely admit expert testimony concerning SEC regulations from CPAs such as Mr. McIsaac because they are the experts in the field.  Indeed, in each of the cases cited above concerning expert testimony on the interpretation of an SEC Rule, the experts were qualified by their industry experience, rather than by any legal training or knowledge.  *See In re Adler, Coleman*, 247 B.R. at 66 n.10; *Robbins*, 894 F. Supp. at 670 n.6; *Mishkin*, 744 F. Supp. at 548.  Barclays' own Director of Regulatory Reporting conceded this point when he testified that it is non-lawyers working in the regulatory compliance and reporting fields who are typically responsible for interpreting the requirements of Rule 15c3-3, both in the industry in general and in Barclays' regulatory reporting department in particular.  (Oxford Decl. Ex. E (Martini Tr.) 29:22-30:10.)  Accordingly, there is no legal basis to categorically exclude Mr. McIsaac's opinions on the application of Rule 15c3-3.

### III.    Mr. McIsaac Opined Only On Matters Within His Expertise

20.     There is no merit to Barclays' argument that Mr. McIsaac "should be precluded from opining on what is or is not required of a broker-dealer that has filed for SIPA

---

5. In contrast, none of the cases that Barclays cites concern expert testimony regarding a party's obligations under a securities rule or regulation, *see In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61 (S.D.N.Y. 2001) (precluding expert testimony on whether a trial judge should recuse herself); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450 (precluding expert testimony regarding a party's obligations under a contract), and *United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994), actually *permitted* the proffered expert testimony stating that the defendant's falsified tax returns had impeded the function of the Internal Revenue Service.

liquidation" because "Mr. McIsaac admits that he has *no experience* in the conduct of SIPA liquidations, and that he is not an expert on SIPA." (Barclays Motion ¶¶ 18-19 (emphasis in original).) The Trustee has not proffered Mr. McIsaac as an expert on SIPA, but as an expert on the proper application of the Customer Protection Rule. (*See generally* McIsaac Oct. 5. Aff.; McIsaac Feb. 18 Aff.; McIsaac Rebuttal Report.)

21.     Nor is there any merit to Barclays' argument that Mr. McIsaac's testimony "regarding LBI's ability to conduct proper Reserve Calculations on or around September 19, 2008 also should be excluded" because he "acknowledges lack of familiarity in the very systems used by LBI." (Barclays Motion ¶ 20.) Mr. McIsaac's testimony does not concern LBI's *ability* to conduct a reserve calculation, but rather addresses the *accuracy* of the reserve calculation that LBI actually completed as of September 19, 2008. To the extent Mr. McIsaac's reports discuss issues concerning LBI's ability to perform the September 19 calculation, they do so only to present the context under which errors in the calculation arose. (*See* McIsaac Oct. 5 Aff. ¶¶ 23-31.)

## IV.    September 19, 2008 – The Filing Date – Is The Appropriate Date To Measure Customer Reserve Account Deficiencies

22.     Barclays contends that Mr. McIsaac's opinions on the accuracy of LBI's Rule 15c3-3 reserve calculation as of September 19, 2008, the date that LBI filed for SIPA protection (the "Filing Date"), are irrelevant, and that the relevant date for assessing any deficiency in the Customer Reserve Accounts is either September 12 or September 17.[6]

---

6. As Barclays notes, LBI was required to perform a calculation on September 17 to support a withdrawal from the Reserve Account. (Barclays Motion ¶ 22 n.6; *see also* 17 C.F.R. § 240.15c3-3(g) (requiring a reserve calculation to establish excess in a Customer Reserve Account).) As the September 17 calculation resulted in a reduction of over $1 billion in the reserve requirement, the SEC permitted LBI to withdraw $1 billion from the Customer Reserve Accounts. (*See* Oxford Decl. Ex. G (Sept. 19, 2008 email from J. Potenciano to J. Abate et

(Footnote continued on next page)

13

(Barclays Motion ¶¶ 21-22.) Barclays' position cannot be reconciled with SIPA and liquidations performed thereunder. Nor does it make any sense to analyze prior calculations when the more up-to-date September 19 calculation is available, particularly as LBI performed the September 19 calculation at the SEC's request.

### A. The Law Supports Use Of The Filing Date To Measure Customer Reserve Account Deficiencies

23. Barclays acknowledges that, in the ordinary course of business, LBI would have been required to perform a reserve calculation as of September 19, 2008, LBI's last business day. (Barclays Motion ¶ 21.) Barclays claims, however, that any deficiencies that existed in LBI's Customer Reserve Accounts on September 19 are irrelevant because LBI was in liquidation when the cure period expired. (*Id.* ¶¶ 21-22.) This argument is nonsensical, and Barclays offers no legal authority in support of its position that deficiencies in a firm's Customer Reserve Accounts should not be measured as of the date a SIPA liquidation commences.

24. Barclays also notes that the SIPA liquidation prevented LBI from making its required reserve deposits on September 23, 2008, the date when it would typically make any necessary deposits pursuant to Rule 15c3-3. But this does not change the fact that there was a deficiency in LBI's Customer Reserve Accounts on September 19. *See* 17 C.F.R. § 240.15c3-3(e)(3). Indeed, the existence of a deficiency on that date meant that LBI was in violation of Rule 15c3-3's requirement that a firm "at all times maintain in [its Customer Reserve Accounts] through deposits made therein, cash and/or qualified securities in an amount not less than the

---

(Footnote continued from previous page)

al.).)

amount computed in accordance with the formula set forth in § 240.15c3-3a." 17 C.F.R. § 240.15c3-3(e)(1).[7]

25.  No published decision appears to have directly addressed this issue. However, in *In re MJK Clearing, Inc.*, the court accepted the use of the filing date as the appropriate date to measure deficiencies in the broker-dealer's customer reserve accounts. *In re MJK Clearing, Inc.*, 286 B.R. 109, 129-33 (Bankr. D. Minn. 2002) (applying 15 U.S.C. § 78lll(4)(D) to treat other property of the debtor as customer property where the property set aside for customers was deficient as of the filing date). The use of the filing date in this context makes sense. As the court stated in *MJK*, "[a] calculation of the Reserve Formula for the debtor *on the filing date* indicates that all cash held by the debtor should have been set aside for customers." *Id.* at 131 (emphasis added); *see also SIPC v. Lehman Bros. Inc.*, No. 08-1420 (JMP), 2010 WL 2163358 (Bankr. S.D.N.Y. June 1, 2010) (holding that the filing date was the appropriate date for valuing short positions for customer claim purposes).

26.  Use of the Filing Date to measure deficiencies in LBI's Customer Reserve Accounts is also consistent with the liquidation framework established by SIPA, which uses a firm's filing date as a basis for determining net equity in customer accounts. SIPA states: "For purposes of allocating customer property under [15 U.S.C. § 78fff-2(c)(1)], securities to be delivered in payment of net equity claims for securities of the same class and series of an issuer shall be valued as of the close of business on the filing date." 15 U.S.C. § 78fff-2(c)(1)(D). Similarly, the SIPA trustee is directed to purchase securities in satisfaction of customer claims

---

7. Barclays does not even attempt to argue that Rule 15c3-3 would permit LBI to *withdraw* assets from its Customer Reserve Accounts to transfer to Barclays for its own account in the absence of a reserve calculation as of the withdrawal date. Under Rule 15c3-3, only excess funds in a reserve account, as established through a reserve calculation performed on the withdrawal date, may be withdrawn. 17 C.F.R. § 240.15c3-3(g).

15

"in order to restore the accounts of such customers as of the filing date." 15 U.S.C. § 78fff-2(d); *accord* 15 U.S.C. § 78fff-2(b) ("For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date."); 15 U.S.C. § 78lll(11) ("The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . minus (B) any indebtedness of such customer to the debtor on the filing date.").

27. Thus, SIPA seeks to return to the former broker-dealer's customers the property that those customers had entrusted to the broker-dealer at the filing date. *See* 15 U.S.C. § 78fff-2(b), 2(c)(1)(D), 2(d). Rule 15c3-3 is designed to set aside the property necessary to achieve this goal. *See* SEC Release No. 34-9856, 37 Fed. Reg. 25,225 (Nov. 29, 1972) (Rule 15c3-3 is meant "to facilitate the liquidations of insolvent broker-dealers and to protect customer assets in the event of a SIPC liquidation"). If a date other than the filing date were used to test for deficiencies in a customer reserve account, the property set aside for customers would not match – or necessarily even be close to – the amount required for satisfaction of customer claims. Such a mismatch, caused by using a date other than the filing date to measure the property required to be set aside for customers, would undermine the purpose and objective of SIPA and Rule 15c3-3 to protect the customers of a failed broker-dealer.

**B.    The SEC Required LBI To Re-Calculate Its Reserve Requirement Before Considering Whether To Release Any Excess**

28. Barclays' argument that the Filing Date was not the relevant date for purposes of LBI's reserve calculation also overlooks the fact that, in order to substantiate the existence of an excess in the Customer Reserve Accounts that could potentially be transferred to

16

Barclays, the SEC required LBI to re-calculate its reserve requirement. (*See* Oxford Decl. Ex. H (Sept. 21, 2008 email from M. Kelly to A. Stucchio et al. ("Guys - s e c told us we need to do a 15c3 calc for each of the accounts that transfer and those which will not before they are comfortable releasing cushion/surplus to Barclays")); Oxford Decl. Ex. I (Sept. 21, 2008 email from C. O'Meara to B. McDade ("[The SEC] want to see the info once the reconciliation break has been resolved, and want to ensure that all customer balances are moved cleanly before authorizing the release of the cushions")); McIsaac Oct. 5 Aff. Ex. 21 (Sept. 23, 2008 email from W. Burke to A. Stucchio et al., attaching 15c3-3 reserve calculation as of September 19) ("Senior staff of both the SEC and FINRA have stated that the firm cannot withdraw any funds/securities from the Reserve Accounts without their staff reviewing the calculation and their approval")).) Thus, the SEC itself requested that LBI complete a new reserve calculation, rather than rely on the calculations that LBI had performed as of September 12 or September 17, the dates to which Barclays points.[8] In accordance with the SEC's instructions, LBI staff worked throughout the September 20-21 weekend to calculate the reserve requirement as of September 19. (*See, e.g.,* McIsaac Oct. 5. Aff. Exs. 5, 8-17.)

29.    Consistent with the SEC's requirement that LBI perform a new reserve calculation, the Clarification Letter states that Barclays would receive "to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI *on the date hereof* pursuant to Rule 15c3-3." (Oxford Decl. Ex. J

---

8.   By the time the SEC requested that LBI re-calculate its reserve requirement, LBI had already completed its September 12 and September 17 calculations. In requiring a final calculation of the reserve requirement, the SEC could only have been requiring a new calculation as of September 19, rather than the already-completed calculations as of September 12 or September 17. LBI evidently understood the SEC to be requiring a September 19 calculation, as that is what LBI undertook to produce in response to the SEC's request. (*See, e.g.,* McIsaac Oct. 5 Aff. Exs. 5, 8-17.)

17

(Clarification Letter) ¶ 8(ii) (emphasis added).) On the date of the Clarification Letter, which was "[a]s of September 20, 2008," the parties believed, based on the preliminary September 19 calculation, that the excess in the Customer Reserve Accounts might be as much as $1.7 billion. (*See* Oxford Decl. Ex. K (Jan. 15, 2010 Hughes Tr.) 220:6-23; Oxford Decl. Ex. L (Lewkow Tr.) 122:12-20; Oxford Decl. Ex. M (Lowitt Tr.) 189:16-18; Oxford Decl. Ex. N (Rosen Tr.) 93:14-94:7.) In contrast, prior calculations had shown only $353.9 million of excess in the Accounts as of September 12 and only $225.6 million of excess in the Accounts as of September 17. (*See* Oxford Decl. Ex. O (Sept. 16, 2008 email and attachment from J. Potenciano to A. Savoca et al.); Oxford Decl. Ex. P (Oct. 21, 2008 email and attachments from W. Burke to M. Macchiaroli et al.).) Thus, when the Clarification Letter referred to $769 million in securities, which the parties believed might be in excess of the reserve requirement, it could only have been referring to the September 19 calculation.

30. Indeed, Barclays itself used September 19, 2008 as the date to measure LBI's reserve requirement. When, at the SEC's request, Barclays undertook to "demonstrate that Lehman Brothers adequately reserved for all customers long positions that were not segregated," Barclays conducted an "in-depth analysis" of LBI's reserve calculation *as of September 19*. (McIsaac Oct. 5 Aff. Ex. 28.) The result of this analysis was that Barclays produced a revised reserve calculation, also *as of September 19*, that adjusted for certain coding errors that Barclays had identified. (McIsaac Rebuttal Report ¶ 18 & Ex. 8.) As Barclays has offered no legitimate basis to challenge the use of September 19 as the appropriate date for measuring LBI's reserve requirement, and has itself adopted that date for its own purposes more than a year ago, its

18

newfound dislike of the September 19 measurement date does not provide a basis to preclude Mr. McIsaac's testimony regarding the accuracy of LBI's reserve calculation.[9]

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court enter an Order denying Barclays' motion to exclude the proffered expert testimony of Mr. McIsaac with respect to LBI's Rule 15c3-3 reserve calculation.

---

9. Even if September 17 were the correct measurement date for purposes of assessing the deficiencies in LBI's Customer Reserve Accounts, it would still have to be adjusted for at least two of the five compliance issues that Mr. McIsaac identified in connection with his review of the September 19 calculation: (1) LBI lost control of the assets custodied at LBIE when LBIE entered insolvency proceedings on September 15, 2008 (*see* McIsaac Rebuttal Report ¶ 19); and (2) the OCC deposit, if transferred to Barclays pursuant to the Asset Purchase Agreement as Barclays claims, was no longer a good debit in the reserve calculation as of September 16, 2008. (*See* McIsaac Rebuttal Report ¶¶ 24-25; Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, dated January 29, 2010, ¶¶ 145, 382-83). The excess in the Customer Reserve Accounts as of September 17, 2008 was only $225.6 million (Oxford Decl. Ex. P), so correcting for even just these two compliance errors would increase the reserve requirement by $946 million, leading to a substantial deficit in the Accounts as of September 17. Other than identifying these two compliance errors, neither Mr. McIsaac nor the Trustee's financial professionals have conducted any analysis of the accuracy of the reserve calculations as of September 12 and September 17.

Dated:  New York, New York
July 16, 2010

                            Respectfully submitted,

| | |
|---|---|
| /s/ Neil J. Oxford | /s/ Robert W. Gaffey |
| HUGHES HUBBARD & REED LLP | JONES DAY |
| William R. Maguire | Robert W. Gaffey |
| Seth D. Rothman | Jayant W. Tambe |
| Neil J. Oxford | William J. Hine |
| One Battery Park Plaza | Todd R. Geremia |
| New York, New York 10004 | 222 East 41st Street |
| (212) 837-6000 (telephone) | New York, New York  10017 |
| (212) 422-4726 (facsimile) | (212) 326-3939 (telephone) |
| maguire@hugheshubbard.com | (212) 755-7306 (facsimile) |
| | rwgaffey@jonesday.com |
| John F. Wood (*pro hac vice*) | |
| 1775 I Street, N.W., Suite 600 | |
| Washington, D.C. 20006 | |
| (202) 721-4600 (telephone) | |
| (202) 721-4646 (facsimile) | |
| woodj@hugheshubbard.com | |
| | |
| *Attorneys for James W. Giddens,* | *Attorneys for Debtors* |
| *as Trustee for the SIPA Liquidation* | *and Debtors in Possession* |
| *of Lehman Brothers Inc.* | |

   /s/ James C. Tecce
QUINN EMANUEL URQUHART
OLIVER & SULLIVAN
Susheel Kirpalani
James C. Tecce
51 Madison Ave 22nd Floor
New York, New York 10010
212 849-7000 (telephone)
212 849-7100 (facsimile)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

*Attorneys for Official Committee*
*of Unsecured Creditors*