**EXHIBITS A-E OF DECLARATION OF NEIL J. OXFORD
IN SUPPORT OF THE MEMORANDUM OF
MOVANTS IN OPPOSITION TO THE MOTION IN LIMINE OF BARCLAYS
CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF
DANIEL MCISAAC REGARDING LBI'S OBLIGATIONS UNDER SEC RULES 15c3-1,
15c3-3 AND/OR THE SECURITIES INVESTOR PROTECTION ACT**

# EXHIBIT A

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4

5     In re:                      )
                                  ) Chapter 11
6     LEHMAN BROTHERS             ) Case No. 08-13555(JMP)
                                  )
7     HOLDINGS, INC., et al.,     )
                                  )
8              Debtors.           )
      --------------------------)

9

10

11

12

13

14         HIGHLY CONFIDENTIAL DEPOSITION OF

15              ALASTAIR BLACKWELL

16            New York, New York

17          Friday, August 7, 2009

18

19

20

21

22

23    Reported by:

24    KRISTIN KOCH, RPR, RMR, CRR, CLR

25    JOB NO. 24037

Page 2

1
2
3
4          August 7, 2009
5          9:21 a.m.
6
7
8          Deposition of ALASTAIR BLACKWELL,
9    held at the offices of JONES DAY, LLP, 222
10   East 41st Street, New York, New York,
11   before Kristin Koch, a Registered
12   Professional Reporter, Registered Merit
13   Reporter, Certified Realtime Reporter,
14   Certified Livenote Reporter and Notary
15   Public of the State of New York.
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide   (877) 702-9580

Page 3

1
2    A P P E A R A N C E S:
3
4
5    JONES DAY, LLP
6    Attorneys for Lehman Brothers, Inc.
7       222 East 41st Street
8       New York, New York 10017-6702
9    BY:   WILLIAM J. HINE, ESQ.
10      GEORGE E. SPENCER, ESQ.
11
12
13   BOIES, SCHILLER & FLEXNER, LLP
14   Attorneys for Barclays and Alastair
15   Blackwell
16      5301 Wisconsin Avenue, N.W.
17      Washington, D.C. 20015
18   BY:   JONATHAN M. SHAW, ESQ.
19
20
21   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
22   Attorneys for Creditors Committee
23      51 Madison Avenue
24      New York, New York 10010
25   BY:   ROBERT K. DAKIS, ESQ.

TSG Reporting - Worldwide   (877) 702-9580

Page 4

1
2    A P P E A R A N C E S:  (Continued)
3
4
5    JENNER & BLOCK LLP
6    Attorneys for Examiner
7       330 North Wabash Avenue
8       Chicago, Illinois 60611-7603
9    BY:   ROBERT L. BYMAN, ESQ.
10
11
12   HUGHES HUBBARD & REED LLP
13   Attorneys for SIPA Trustee
14      One Battery Park Plaza
15      New York, New York 10004-1482
16   BY:   SETH D. ROTHMAN, ESQ.
17      NEIL J. OXFORD, ESQ.
18      AMINA HASSAN, ESQ.
19
20
21   ALSO PRESENT:
22
23      RAJESH ANKALKOTI, Alvarez & Marsal
24
25

TSG Reporting - Worldwide   (877) 702-9580

Page 5

1
2          IT IS HEREBY STIPULATED AND AGREED
3    by and between the attorneys for the
4    respective parties herein, that filing and
5    sealing be and the same are hereby waived.
6          IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial.
10         IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn
15   to before the Court.
16
17
18
19
20          - oOo -
21
22
23
24
25

TSG Reporting - Worldwide   (877) 702-9580

Page 6

```
1
2    A L A S T A I R   B L A C K W E L L,
3       called as a witness, having been duly sworn
4       by a Notary Public, was examined and
5       testified as follows:
6    EXAMINATION BY
7    MR. HINE:
8       Q.   Good morning, Mr. Blackwell.
9       A.   Good morning.
10      Q.   How are you?
11      A.   Very good, thanks.
12      Q.   I am sure your counsel has told you
13   what's going on here today, but we are here
14   taking a deposition involving the Lehman
15   bankruptcy proceedings.
16        My name is Bill Hine and I am from
17   Jones Day, which is the firm that's special
18   counsel to LBHI.  Several of the other counsel
19   along the table will introduce themselves
20   later, but they represent various entities that
21   are involved in this proceeding.
22        So the way this is going to work is
23   I am going to ask you a bunch of questions
24   first and they will all take turns with you
25   later as we progress.
```

Page 7

```
1       Blackwell - Highly Confidential
2       A.   Understood.
3       Q.   As we go, I am going to be asking
4    you a series of questions.  You are under oath,
5    so you will answer the questions.  At some
6    points in time you will hear your counsel state
7    an objection.  That doesn't mean you don't have
8    to answer the question.  That just means he is
9    either preserving the record or he wants to ask
10   me to clarify the question.  If he instructs
11   you not to answer, that's up to you as well,
12   but the mere fact that he makes an objection
13   doesn't mean you don't have to answer the
14   question.
15        In that vein, I'd like to ask you
16   just please ask me to clarify any question
17   where I might misuse an acronym or a word.  I
18   feel like I am learning a new language here
19   reading all you folks' e-mail, so I know there
20   is technical financial words that you guys use
21   and you understand readily, but if you need me
22   to clarify one, I want to have a clear question
23   so you can answer it.
24        I think your counsel has probably
25   told you, but you have been designated as a
```

Page 8

```
1       Blackwell - Highly Confidential
2    30(b)(6) witness for a select set of issues in
3    this case and those issues relate to Schedules
4    A and B of the Clarification Letter.  We will
5    get to that later, but I just want to let you
6    know that, and that I will alert you to that
7    fact when we get to that portion of the
8    deposition, so in that portion you will be
9    speaking on behalf of Barclays.
10        So I am ready to proceed if you are.
11   Are we ready to do this?
12      A.   Absolutely, yes.  Thank you.
13      Q.   Can we start off with a little
14   background information about you.
15        You are currently employed by
16   Barclays Capital; correct?
17      A.   I am, yes.
18      Q.   And what is your present position?
19      A.   I am responsible for the Americas
20   operations department for capital markets.
21      Q.   Okay.  And do you have a title?
22      A.   I am a managing director.
23      Q.   When did you start your employment
24   at Barclays?
25      A.   I received a contract after
```

Page 9

```
1       Blackwell - Highly Confidential
2    bankruptcy, I don't know exactly when I signed
3    that, but it would have been, I think, two
4    weeks after bankruptcy that I signed a contract
5    to join Barclays.  I wasn't one of those people
6    that received an e-mail and clicked off on it,
7    for instance.
8       Q.   Okay.  When did you -- that's the
9    contract, we will get to that in a second, but
10   when did you consider yourself a Barclays
11   employee?
12      A.   Post bankruptcy.
13      Q.   Was it upon the closing of the sale
14   transaction?
15      A.   I would think so, yes.
16      Q.   And just as we go forward, if I
17   refer to the sale transaction, can we agree
18   that that will be the transaction that closed
19   on the 22nd of September 2008 whereby certain
20   assets were transferred to Barclays?  Can we
21   agree on that?
22      A.   What time is that?
23      Q.   I don't know the time.
24      A.   Midnight from that day.
25      Q.   Okay.  So is it fair to say after
```

1  **Blackwell - Highly Confidential**
2  **that day you were a Barclays employee?**
3  A.  Yes.
4  **Q.  Can you just tell me, describe for**
5  **me generally your duties and responsibilities**
6  **in your present position.**
7  A.  There are approximately 900 staff in
8  the Americas and the majority of which are in
9  New York and New Jersey that provide support,
10  and when I say "support," I mean that there is
11  a function to help capture transactions, verify
12  transactions and record them on the books and
13  records of Barclays Capital, or the BCI entity
14  predominantly, and to ensure the securities in
15  cash, consideration is received on these
16  transactions.  My responsibility is to manage
17  that across all of the asset classes that
18  Barclays transacts in the region.  That does
19  not include the wealth business in the region.
20  The wealth business is a client of BCI.  We do
21  provide a shared -- what we would describe as a
22  shared service to provide operational support
23  in the sense that I clear -- our organization
24  clears transactions on behalf of the wealth
25  business.

TSG Reporting - Worldwide  (877) 702-9580

1  Blackwell - Highly Confidential
2  MR. SHAW:  Before you go on, I
3  forgot to put this on the record at the
4  beginning.  Under the protective order I
5  believe the way we were proceeding is we
6  have been designating the entire deposition
7  as highly confidential and then within
8  seven days we re-designate more precisely
9  based on the content.
10  MR. HINE:  That's no problem.
11  **Q.  I think I understood what you just**
12  **told me, but is that different in any way from**
13  **the duties you had when you were with Lehman?**
14  A.  In breadth, yes.  It's a narrower
15  remit.
16  **Q.  Excuse me?**
17  A.  It's a narrower remit.
18  **Q.  "Remit" meaning?**
19  A.  My responsibilities were broader at
20  Lehman.
21  **Q.  In what way?**
22  A.  I had global responsibility for
23  operations, for capital markets, and I was also
24  responsible for what was called the IMD
25  division, so that's the investment management

TSG Reporting - Worldwide  (877) 702-9580

1  Blackwell - Highly Confidential
2  division, globally at Lehman Brothers.
3  **Q.  So is the difference in**
4  **responsibility geographic?**
5  A.  Geographic and the fact that it also
6  encompassed the investment management division.
7  **Q.  Okay.**
8  A.  And there are functional
9  definitions -- every firm on Wall Street
10  defines operations slightly differently in
11  terms of content.  So an example would be the
12  treasury function sits in finance in the former
13  Lehman organization, but sits in operations at
14  Barclays Capital.  So there are definitional
15  components which would be different, but
16  substantially very similar.
17  **Q.  Who do you report to at Barclays?**
18  A.  I report to Carol Machell.
19  **Q.  Can you spell that?**
20  A.  M-A-C-H-E-L-L.
21  **Q.  Anyone else?**
22  A.  That's my global report.  She is
23  based in London.  And I report to Gerard
24  LaRocco regionally, who is the regional CAO for
25  the Americas.

TSG Reporting - Worldwide  (877) 702-9580

1  Blackwell - Highly Confidential
2  **Q.  Any other reports that you have?**
3  A.  No.
4  **Q.  And who reports to you in your**
5  **present position?**
6  A.  Again, this is where the functional
7  construct of Barclays is different to Lehman.
8  In my regional role the people with primary
9  responsibility for the products are actually
10  the global heads of the product line, so there
11  was a global head of rates, credit, prime
12  brokerage, equities, et cetera, who have
13  primary responsibility.  People who report to
14  me directly are Samantha Hoban, who is the COO
15  for the region, and I have responsibility for
16  tax, that's Lisa Ryer, and Alex Crepeau, who is
17  responsible for regulatory reporting.  I also
18  have responsibility for the TSA effort within
19  operations, which it had historically, but we
20  no longer support the LBHI Alvarez Marsal
21  clean-up effort of LBHI.  That organization has
22  transitioned in its entirety.  That was managed
23  by a gentleman called Greg Eickbush.  He is now
24  an employee of LBHI.  I still have
25  responsibility for the LBI TSA operations team,

TSG Reporting - Worldwide  (877) 702-9580

Page 14

1       Blackwell - Highly Confidential
2   which is led by James Black and informally
3   managed by Alex Crepeau until about a week ago.
4       Q.   When you talk about operations
5   function, is there a component of that of your
6   work that covers valuing or marking assets?
7       A.   I want to be very precise about the
8   way I would describe that.  There is a function
9   in operations that values positions, but that's
10  using data, pricing data, that is either
11  purchased from a third party or is consumed
12  from a front office trading source, so we are
13  not determining a valuation on a security.  We
14  do not determine valuation.
15      Q.   But you mark the security with this
16  information that you receive from a third
17  source?
18      A.   It's a mechanical process.
19  Inventory, mark, it gives you a result.  It's
20  not -- you are not applying any thought to it
21  other than is that actually the security that
22  our mark ties out to.
23      Q.   Could we go back now to your last
24  position you held at Lehman.
25          First of all, how long did you work

TSG Reporting - Worldwide  (877) 702-9580

Page 15

1       Blackwell - Highly Confidential
2   for Lehman?
3       A.   I worked for Lehman from November
4   27th, 2000 until the 22nd of September, 2008.
5       Q.   And what was the last position you
6   held at Lehman?
7       A.   I was global head of operations for
8   both capital markets and IMD.  I was in the
9   process of taking responsibility for Aurora
10  loan services, but I hadn't been formally
11  announced, so that was matter of a few weeks'
12  worth of effort, but I didn't have any formal
13  management responsibility at that point, so you
14  will see information in my e-mails associated
15  with Aurora.
16      Q.   And who did you report directly to
17  in that position?
18      A.   I reported to Ian Lowitt.
19      Q.   Anyone else?
20      A.   No.
21      Q.   And who were your direct reports?
22      A.   In the United States, Neal Ullman,
23  who is global head of our clearance and custody
24  function.  Monty Forrest, who is global head of
25  prime services operations.  Kirk Butryn who was

TSG Reporting - Worldwide  (877) 702-9580

Page 16

1       Blackwell - Highly Confidential
2   co-head of equity operations.  Alex Crepeau,
3   who was responsible for regulatory operations,
4   tax, operations control, client valuations and
5   margin.  I believe that's all of them from
6   memory.  In the U.K. there is a gentleman
7   called Garth Barker Goldie, who is responsible
8   for European operations, and in Asia,
9   Christopher Flanagan, who was responsible for
10  our Asian operations.  And there was also --
11  actually, there is another gentleman called
12  Stewart Nineham who was my CAO in -- global
13  CAO.
14      Q.   Can you explain to me in your Lehman
15  role whether your group was responsible for
16  valuing or marking securities?  Same question
17  only I am trying to see if the Lehman role was
18  the same.
19      A.   It was identical.  In terms of
20  consumption of data, any model-driven pricing
21  would be front-end trading, trading
22  responsibility to provide a mark, and finance
23  function at Lehman Brothers, product control,
24  for want of a better term, was responsible for
25  price testing, so they would test the models to

TSG Reporting - Worldwide  (877) 702-9580

Page 17

1       Blackwell - Highly Confidential
2   ensure that those were accurate and produce the
3   result that they were intended to do.
4       Q.   And who were in charge of those
5   functions at Lehman; do you recall?
6       A.   The front office was various
7   different business heads, so, I mean,
8   ultimately it would have been Bart as president
9   and head of risk effectively, but Gelband was
10  responsible for the fixed income division and
11  Jerry Donini was responsible for equities, and
12  the IMD business theoretically didn't take any
13  risk.
14      Q.   I don't mean to be intrusive, but I
15  have to ask you some questions about your
16  compensation.
17          MR. SHAW:  This is all highly
18  confidential.
19          MR. HINE:  Yes.
20      Q.   When you transitioned from Lehman,
21  your position at Lehman to your position at
22  Barclays, did your compensation increase?
23      A.   No, actually, it declined.
24      Q.   Declined.  In what way?
25      A.   I had a two-year guarantee from

TSG Reporting - Worldwide  (877) 702-9580

1    Blackwell - Highly Confidential
2  Lehman Brothers in 2007 and the first year of
3  that guarantee was -- for 2007 I think was
4  $2.7 million.  The second year was
5  $3.5 million.  My -- obviously the majority of
6  that comp gets paid in stock.  At the point of
7  transition there was a process which you
8  probably see in my e-mail where I was offered a
9  certain role and I considered it over a period
10  of time and decided to do something slightly
11  different and at that point we agreed that I
12  would have a two-year contract because of
13  uncertainty about where the future would lead
14  and the compensation was tied to my 2007
15  number, so it was probably approximately
16  $700,000 less.  There were some additional
17  incentive payments for longevity at two points
18  in September of this year and September of
19  next, but I think the headline number was
20  probably less than overall what my Lehman
21  compensation would have been in 2008.
22    Q.   And what position were you
23  considered for that -- you alluded to a
24  suggestion of a position and you opted for
25  something else.  Could you just explain to me

1    Blackwell - Highly Confidential
2  what you meant by that?
3    A.   I had been global head at Lehman
4  for, I think, three or four months, a
5  relatively a short period of time.  The role
6  that I was offered was running Americas
7  operations and being co-head of the equity
8  operations organization.  In my mind that was
9  taking me back four or five years in my career
10  and I didn't really see the -- it didn't feel
11  appropriate, so I was a little unhappy that
12  that was what I was being offered and I
13  certainly wasn't -- yeah, I was -- it wasn't --
14  it didn't feel like the right thing for me at
15  that point, but I was very keen to help
16  everyone with the integration process.  I felt
17  I had a moral obligation to my team to make
18  sure that happened, and though I was being
19  offered jobs externally for some period of
20  time, I felt I wanted to stay and see this
21  through and put faith in the organization to
22  find me a role in the future, which I am still
23  hoping will happen.
24    Q.   You said you were head of global for
25  only three months.  What was your position

1    Blackwell - Highly Confidential
2  prior to your position as head of global for
3  Lehman?
4    A.   I had global responsibility for
5  prime services operations.  I also had global
6  responsibility for equity operations, and in
7  addition to that I was European head of
8  operations, so I commuted back and forth
9  between London and New York almost on a weekly
10  basis for about a year, little less than a
11  year.
12    Q.   Back to your compensation, can we
13  just break it into some components here just so
14  I understand it.  I take it at Lehman you had a
15  base salary?
16    A.   Yes.
17    Q.   And what was that?
18    A.   I think it was $200,000.
19    Q.   And then you had -- am I correct to
20  say you had a cash component bonus and an
21  equity component bonus?
22    A.   Yes, that's correct.  Off the top of
23  my head I wouldn't be able to tell you.  I
24  could go back and look at documents and confirm
25  it, but the number I recall would be

1    Blackwell - Highly Confidential
2  $2.5 million of bonus, of which somewhere
3  between 50 and -- I would imagine somewhere
4  around 50 percent would be cash, 50 percent
5  securities, deferred five-year equity.
6    Q.   And that was for 2007, you said?
7    A.   Correct.
8    Q.   Now, in 2008 your base salary was
9  still the same; correct?
10    A.   Correct.
11    Q.   Okay.  And then you expected to make
12  3.2 in bonus, whether it's cash or equity?
13    A.   No, my base was 200.  I was
14  expecting 3.5, so I was expecting 3.3.
15    Q.   You are right.  I am bad at math.
16         When you went to Barclays, out of
17  that 3.3 did you receive any of it?
18    A.   No.
19    Q.   Did you receive any payment from
20  Barclays that was supposed to have compensated
21  you for your 2008 bonus?
22    A.   I received a bonus in February in
23  the normal compensation cycle, so yes, I
24  received a bonus payment, but I think it was to
25  compensate me for -- that it was to retain me

1          Blackwell - Highly Confidential
2    as an employee of the organization and I was
3    performing an important role within the
4    organization.
5          **Q.   Okay.  So you didn't view it as**
6    **reimbursing you or compensating you for the**
7    **first nine months of the year that you have**
8    **spent at Lehman; is that right?**
9          A.   No.
10         **Q.   No, it's not right or -- I asked a**
11   **strange question.**
12         **Did you view it as compensating you**
13   **for your first nine months of work that you had**
14   **spent at Lehman in 2008?**
15         A.   No.
16         MR. HINE:  I want to show you a
17   document here which we are going to mark as
18   Exhibit 55 B.
19         (Exhibit 55 B, letter dated October
20   2, 2008, Bates stamped BCI-EX-00077291
21   through BCI-EX-00077293, marked for
22   identification.)
23         **Q.   Mr. Blackwell, I have just handed**
24   **you a document marked as 55 B.  I just wanted**
25   **to ask you if you have ever seen that document**

1          **Blackwell - Highly Confidential**
2    **before.**
3          A.   Yes.
4          **Q.   What is that?**
5          A.   That is the contract that Carol
6    Machell handed me, offered me to become an
7    employee of Barclays Capital.
8          **Q.   And is that your signature on the**
9    **last page?**
10         A.   Yes.
11         **Q.   You said you wanted to say something**
12   **in addition to supplement your prior testimony.**
13         A.   Yes.  I just wanted to mention that
14   in addition to my regular compensation in 2008,
15   Lehman Brothers awarded me a special stock
16   award, I think it was in July, of some deferred
17   stock issued at a discounted price, which would
18   vest in three years.  There was no partial
19   vesting.  It was full vesting in three years.
20   So I just wanted to put that on the record as
21   well.
22         **Q.   And that is part of your Lehman**
23   **compensation for 2008?**
24         A.   It was approximately --
25         MR. SHAW:  Objection.  Foundation.

1          Blackwell - Highly Confidential
2          A.   Sorry.  Could you ask the question
3    again?
4          **Q.   Why did they give you this award?**
5          MR. SHAW:  Objection.  Foundation.
6          MR. HINE:  You can answer.
7          A.   My understanding is that we were
8    obviously seeing a lot of employees leave the
9    firm at that point in time, there was a lot of
10   movement in the marketplace, people moving
11   around, and I think my understanding was it was
12   to show that I was a valued employee.
13         **Q.   Okay.  And what was the value of**
14   **this -- did you say it was an option?**
15         A.   Deferred stock.  I don't have the
16   document, I haven't looked at it for a very
17   long time, but it was approximately a million
18   dollars of deferred discounted Lehman
19   securities.
20         **Q.   And did you consider that part of**
21   **your compensation for your work in 2008?**
22         A.   I considered it as part of my
23   compensation in 2008, yes.  I didn't consider
24   it in the headline number I gave you of
25   $2.7 million.  That was in addition.

1          Blackwell - Highly Confidential
2          **Q.   I understand.  We will just look at**
3    **your contract here for a second.  You have**
4    **testified about some of this.  I just want to**
5    **make sure I understand it.**
6          **Where it says "Compensation," the**
7    **heading Compensation, it mentions a base salary**
8    **of 200,000.  That's what you testified earlier;**
9    **correct?**
10         A.   Correct.
11         **Q.   So that's your base salary now at**
12   **Barclays?**
13         A.   It is.
14         **Q.   Then it talks about a 2008**
15   **guaranteed cash bonus.  Do you see that line?**
16         A.   I do.
17         **Q.   And now is that -- have you been**
18   **paid that?**
19         A.   I have.
20         **Q.   And is that -- what is that for?**
21   **Why were you paid that?**
22         MR. SHAW:  Objection.  Foundation.
23         A.   Compensation for my employment by
24   Barclays.
25         **Q.   Okay.  So that's compensation for**

Blackwell - Highly Confidential

1    your employment by Barclays for the period that
2    you worked for them in 2008?
3
4         MR. SHAW:  Objection.  Foundation.
5         MR. HINE:  You can answer.
6    A.   I would think of these in the normal
7    course of business when you transfer between
8    companies, if I moved to Citibank, for
9    instance, I would have expected to receive a
10   guarantee or award to move in a half year, so
11   when I think of this, this is for my period of
12   employment with Barclays, I think it's
13   relatively standard practice that somebody at
14   my level leaving between organizations, which
15   is effectively what happened, would be
16   compensated and I would think of that as my OA
17   comp.
18        Q.   Later on I see 2008 EPP
19   Recommendation.  Do you see that heading?
20        A.   I do.
21        Q.   Can you describe for me what this
22   is?
23        A.   I understand this to be deferred
24   compensation, a stock award, to the value --
25   and I'm not sure what it was awarded at, I

Blackwell - Highly Confidential

1    haven't paid any attention to it, but it's an
2    award that will vest over a three-year period,
3    so if I am an employee in three years from now
4    at Barclays, then I will receive that -- I will
5    receive that stock.
6         Q.   Okay.  Did you, in fact, receive
7    this award on March 15th, 2009?
8         A.   I received the award, but not on
9    March 15th.
10        Q.   When did you receive it?
11        A.   I don't know the precise date, but
12   it was late.  It was later in the year.
13        Q.   Okay.  Do you have an approximate
14   date you can give me?
15        A.   No.
16        Q.   Then I see something called 2009
17   guaranteed cash bonus.  Do you see that?
18        A.   I do.
19        Q.   Now, is that the bonus that you
20   previously described when you were talking
21   about the bonus that you expect to receive from
22   Barclays going forward?
23        A.   This is the bonus I expect to
24   receive for my work and performance in 2009.

Blackwell - Highly Confidential

1         Q.   And continuing down on the list we
2    see 2009 EPP recommendation, which appears to
3    be a stock award.
4              Is that what you expect to receive
5    as a stock bonus for your work in 2009?
6         A.   Yes.
7         Q.   Now, continuing further down you see
8    a special cash award which mentions the sum of
9    $1.225 million.  Do you see that?
10        A.   I do.
11        Q.   What is that for?
12        A.   I think this is --
13             MR. SHAW:  Objection.  Foundation.
14        A.   I think this is an award, it's
15   effectively a retention payment to encourage me
16   to stay at the firm over that period of time,
17   because, again, there have been alternatives
18   along the way and I want to stay at Barclays,
19   so I think that's what that payment is for.
20        Q.   And you haven't received that yet?
21        A.   No.
22        Q.   But you expect to receive it on the
23   anniversary of your employment?
24        A.   Yes.  22nd of September I would

Blackwell - Highly Confidential

1    expect to receive the first half of that
2    payment.
3         Q.   Can you tell me when you first began
4    discussions with Barclays about your employment
5    arrangement that you expected to have with
6    them?
7         A.   It was in the week immediately
8    after -- immediately after LBI's filing after
9    the 22nd.  I don't think discussions began
10   until later in that week.  I think around the
11   24th or 25th, but I can't recall precisely.
12        Q.   Okay.  Can I just clarify some
13   dates.  I will represent LBHI filed on the
14   15th.
15        A.   Absolutely.
16        Q.   Correct?  Okay.  LBI filed on the
17   19th; correct?
18        A.   Yes.
19        Q.   Okay.  And during that week did you
20   have any discussions with Barclays about your
21   potential employment there?
22        A.   No.
23        Q.   Did you have any discussions with
24   anyone else?

1      Blackwell - Highly Confidential
2      A.    I was incredibly busy, incredibly
3   busy.  Friends and family were concerned and
4   it's possible that I made reference to the fact
5   that I would become a Barclays employee at some
6   point, I assumed.  I had an assumption.  I had
7   no knowledge that I would be and I had no
8   discussions that were suggested I would be.
9      Q.    And so did I understand you
10  correctly to say that you didn't have such
11  discussions until after the closing of the sale
12  transaction?
13     A.    Yes.  It wasn't until, I think, the
14  earliest the 24th.  It was certainly into
15  the -- post LBI's bankruptcy after the APA was
16  signed.
17     Q.    And who did you have those
18  discussions with at Barclays?
19     A.    Carol Machell.  At Barclays, Carol
20  Machell.
21     Q.    Did you discuss it with Michael
22  Evans at all?
23     A.    Absolutely not.
24     Q.    And Carol Machell is the person who
25  ultimately became your supervisor?

1      Blackwell - Highly Confidential
2      A.    Absolutely.
3      Q.    What do you recall about those
4   discussions?
5      A.    The financial component was of
6   little interest to me, frankly.  I was
7   expecting that we would discuss a role and the
8   discussion didn't go very well, because I
9   wasn't very happy in terms of the role.  The
10  focus wasn't on the financial components.  I
11  have no dependents.  I don't -- the money isn't
12  the main motivator in why I go to work.  I was
13  looking for an interesting role in an
14  organization which I thought would be an
15  interesting place to be and the role that I was
16  initially offered I thought was -- didn't meet
17  my expectations and, therefore, I actually
18  considered leaving.  What we had discussed in
19  that first set of conversations was that I
20  would go away and think about it and, again, I
21  wanted to be responsible and work with Carol to
22  ensure there was a smooth integration, so that
23  wouldn't mean I would leave immediately, but
24  work for a period of time, certainly into the
25  new year to help with a smooth transition of my

1      Blackwell - Highly Confidential
2   staff.
3      Q.    Was there any back-and-forth on the
4   numbers?
5      A.    Yes, because it was -- the original
6   contract I was offered was more money than
7   this.
8      Q.    So could you just summarize what the
9   back-and-forth was?
10     A.    It was more about the duration, the
11  value of the contract, the cash award or
12  whatever -- I don't recall the numbers exactly,
13  but it was more than this contract.
14     Q.    When you say "the duration," you
15  mean the length of your expected employment?
16     A.    This contract effectively has
17  several components, but I would look at it as a
18  two-year contract, and the contract that I was
19  offered was a one-year contract with two years
20  of incentive payments.  From memory.  I may not
21  be precise.  But certainly the role was the
22  core part of my focus.
23     Q.    During the week of the 15th, in
24  other words, after LBHI's filing leading up to
25  eventually LBI's filing, did you have any

1      Blackwell - Highly Confidential
2   understanding of the arrangements that had been
3   made as to compensation for former Lehman
4   employees?
5      A.    No.
6      Q.    Did you have any knowledge of the
7   provisions in the APA that related to
8   compensation?
9      A.    No.
10     Q.    Did you have any role in negotiating
11  those types of provisions?
12     A.    No.  I was asked to make lists of
13  people who were critical to certain things, but
14  that was it.
15     Q.    Did you hear any rumors about how
16  former Lehman employees were going to be
17  compensated when they moved to Barclays?
18     A.    Can you be precise about the time
19  frame you are talking about?
20     Q.    I am talking about the week of --
21  let's talk about the week of September 15th.
22  In other words, LBHI has filed, LBI has not yet
23  filed, but that five-day period.
24     A.    All I had heard was speculation in
25  the press, and from my recollection I can't

1           Blackwell - Highly Confidential
2    determine exactly -- again, that period of time
3    is a strange period, but I'm sure my e-mail
4    would highlight anything that I knew at the
5    time.  My understanding, there was press
6    speculation which was rife amongst the staff,
7    so they were talking about it, and my concern
8    was to calm people, because a lot of people at
9    Lehman were just leaving the building, so,
10   again, just trying to hear what they were
11   seeing and reading so I could respond in a way.
12   If I didn't know anything, I would tell them I
13   didn't know anything, it wasn't necessarily
14   true.  So it wasn't information I was receiving
15   from people negotiating the deal or from my
16   superiors.
17       **Q.    Am I correct to say that you had no**
18   **specific knowledge of how these folks would be**
19   **compensated?**
20       A.    None whatsoever.
21       **Q.    And so you did not communicate to**
22   **your subordinates the compensation arrangements**
23   **that they could be expecting?**
24       A.    Expecting, no.
25       **Q.    No, you did not?**
        TSG Reporting - Worldwide  (877) 702-9580

1        **Blackwell - Highly Confidential**
2        A.    I didn't.
3        **Q.    All right.  So let's -- I'd like to**
4    **turn to that -- that week is of great interest**
5    **to us lawyers here, so can we just talk**
6    **generally about your role during that week and**
7    **maybe the couple of days prior to that.**
8        A.    So just to clarify, this is the 15th
9    through to the 22nd?
10       **Q.    Correct.  Let's just start prior to**
11   **the 15th.**
12       **You are aware that Barclays and**
13   **Lehman had some discussions prior to the filing**
14   **of bankruptcy about a possible transaction?**
15       A.    Yes.
16       **Q.    Were you involved in any of those**
17   **discussions at all?**
18       A.    No.  I was asked by Ian to come to a
19   meeting on the -- I don't know what day it was.
20   It was in the week pre -- sorry, it was pre
21   LBHI's bankruptcy, in the week prior to that,
22   and I was in a -- I joined a meeting for about
23   half an hour.  It had been going on for a long
24   time.  I don't really have any recollection as
25   to what was actually even being discussed,
        TSG Reporting - Worldwide  (877) 702-9580

1           Blackwell - Highly Confidential
2    frankly, and Ian actually asked me to come over
3    and talk about some business-related issue, so
4    it was not in terms of any negotiation,
5    understanding what content there was.  There
6    were lots of Barclays people, lots of lawyers
7    and lots of bankers on the floor, but I had no
8    documentation, no exposure to anything that was
9    relevant to that.
10       **Q.    And where was this meeting?**
11       A.    I believe it was on the 32rd floor
12   of 745.
13       **Q.    Do you know the date?**
14       A.    No, I don't.
15       **Q.    Do you have any recollection of what**
16   **was being discussed?**
17       A.    In the room, absolutely none, and I
18   think -- Ian, I think, just wanted to make sure
19   I was okay.  That was probably the --
20       **Q.    Ian being?**
21       A.    Ian Lowitt.  Just wanted to make
22   sure I was okay.  That's why he had asked me to
23   come over really and talk about some
24   business-related thing.
25       **Q.    Did you have any role in the**
        TSG Reporting - Worldwide  (877) 702-9580

1        **Blackwell - Highly Confidential**
2    **preparation or the filing of bankruptcy by**
3    **LBHI?**
4        A.    Absolutely not.
5        **Q.    Did you know about it before it**
6    **happened?**
7        A.    Yes.  I think I knew about it before
8    it was going to happen because I was asked to
9    go and see Ian in the board room and,
10   coincidentally, I don't know how many times
11   this happened over the course of that day, but
12   whilst I was in the board room, and I was in
13   the evening of the -- I'm not sure what day it
14   was, but I think it was pre the filing, Dick
15   Fuld walked in and said that we would be
16   filing.  At the time I had no understanding
17   what that meant, was that LBI, LBHI, it wasn't
18   clear, but it was clear that some bankruptcy
19   proceeding was going to be -- and there were
20   Weil lawyers in the room at the time, so what I
21   was asked -- Ian asked me to -- I was being
22   asked to carry out a certain set of functions
23   and that's why I was in attendance for a very
24   brief period of time, left and went to carry
25   out that instruction or instructions.
        TSG Reporting - Worldwide  (877) 702-9580

Blackwell - Highly Confidential
1
2  Q.  Was that instruction related to the
3  bankruptcy?
4  A.  No, it wasn't related to the
5  bankruptcy.  It was related to LBI's
6  functioning, ongoing functioning.
7  Q.  Did you have any discussion -- when
8  you say "LBI's functioning," is that -- are you
9  talking about the fact that LBI did not file
10  for bankruptcy until several days later?
11  A.  Correct.
12  Q.  Okay.  So what were you doing to
13  assure LBI's functioning?
14  A.  Ian asked me to do two things.  Be
15  able to be -- be able to function -- have LBI
16  function as an entity by itself from an
17  operational standpoint, so -- and also work
18  with treasury to create a funding ladder for
19  the week, so based on the settlement activity
20  that would be taking place over the course of
21  that week, lay out a cash flow, and also put a
22  payment protocol in so that no payment, no cash
23  could leave LBI.  So that was done.  Myself and
24  Bridget O'Connor, who was the Lehman head of
25  technology, went away and worked with our

Blackwell - Highly Confidential
1
2  respective teams and our teams then worked
3  together to execute that.  We worked into, I
4  think, the early hours of the night to
5  determine what we thought the cash flows would
6  be.  I provided that ladder, funding ladder, to
7  the treasury department, which is run by Paolo
8  Tonucci.
9  Q.  So you used a lot of words there.  I
10  just want to see if I understand.
11  Is this the financing that was
12  provided by the Fed to LBI?
13  A.  No.  This is -- the cash flows -- in
14  the securities business, exchange securities
15  for cash.  In the exchange of securities for
16  cash, obviously some security is leaving, some
17  securities are coming into inventory.  Some
18  client securities are coming in and leaving.
19  And the associated cash flows that went with
20  that was to understand what the net cash
21  position each day would be if the firm had
22  perfect settlement.  And when I say "perfect
23  settlement," I mean all transactions, so all
24  securities and consideration settled on the
25  contractual settlement date.

Blackwell - Highly Confidential
1
2  Q.  So back to your role during that
3  week, now on the 15th you learned that LBHI has
4  filed for bankruptcy; correct?
5  A.  Is that -- what day of the week --
6  Q.  That's Monday.
7  A.  That's the Monday.  I think it was
8  Sunday night.
9  Q.  So you heard about it Sunday night?
10  A.  I think so.  It was the 14th.  Late
11  Sunday night.
12  Q.  What did you hear -- apparently on
13  the 15th Barclays and Lehman start speaking
14  again and they eventually arrive at an APA.
15  Can you describe for me any role you
16  played in that process?
17  A.  I didn't know that Barclays -- I
18  wasn't involved in any of those discussions, so
19  I played no role.
20  Q.  Okay.  So did the APA come as a
21  surprise to you when you heard that?
22  A.  I didn't know -- does the
23  agreement --
24  Q.  That was a bad question.
25  How did you first hear that there

Blackwell - Highly Confidential
1
2  was going to be a sale transaction between
3  Barclays and Lehman?
4  A.  I think on the Monday what I was
5  asked to do as another set of actions was work
6  towards a conversion and the way I would
7  interpret a conversion is that there is going
8  to be some -- either some asset sale or the
9  whole organization is going to be sold as a
10  going concern ,the LBI organization would be
11  sold as a going concern.  So I'm sure you can
12  see it in my e-mail as well, there was a series
13  of meetings to create a project plan, to
14  work -- which involved technology, finance,
15  operations, to have -- create a fully
16  functioning broker/dealer for whenever that was
17  going to be.  So that was an incredibly onerous
18  piece of work.  These things normally take
19  months and years to create and we were given a
20  very compressed time frame to try and do that,
21  so I was trying to get a business up and
22  running again potentially.  That's the way I
23  interpreted that.  Those were my marching
24  orders at that point.  So I had no idea what
25  the content -- what sale meant.

Blackwell - Highly Confidential

1
2    Q.   Did you have an understanding of the
3  terms of the Asset Purchase Agreement?
4    A.   I didn't know an Asset Purchase
5  Agreement existed at that point.
6    Q.   Have you ever seen an Asset Purchase
7  Agreement?
8    A.   I have, but not -- I have, yes, I
9  have, but much, much, much post bankruptcy.
10  Maybe weeks afterwards.
11    Q.   Okay.  That was a badly phrased
12  question.
13       Have you -- when I meant "Asset
14  Purchase Agreement," I meant the Asset Purchase
15  Agreement that's at issue in this case, which
16  is the one between Barclays and Lehman.
17       So am I correct to understand you to
18  say you didn't see that agreement until after
19  the closing of the sale transaction?
20    A.   I believe so.  It may have hit my
21  e-mail.  I don't ever remember reading it.  I
22  think it's highly unlikely that I saw it until
23  after bankruptcy, and it's certainly the case
24  that I was asking Jonathan Hughes post
25  bankruptcy --

1      Blackwell - Highly Confidential
2       MR. SHAW:  Let's not get into any
3  discussions you had with Jonathan.
4       MR. HINE:  Is Jonathan a lawyer?
5       MR. SHAW:  He is the general
6  counsel.
7       MR. HINE:  So you are asserting a
8  privilege over that conversation?
9       MR. SHAW:  Yes.
10    Q.   I just want to be clear.  When we
11  talk here, when you said "bankruptcy," you were
12  talking LBI's bankruptcy?
13    A.   I am talking about LBI's bankruptcy,
14  yes.  I had no knowledge of an APA pre
15  bankruptcy and the content of it.
16    Q.   Did you have any understanding of
17  what the sale transaction was supposed to
18  accomplish?
19    A.   I had a set of actions to perform,
20  which was providing data to my supervisor, to
21  Ian Lowitt, and those components were
22  clearly -- at certain points it became clear
23  they were part of the transaction, but I didn't
24  know what part, and I had very limited
25  understanding.  It was perform this task, get

1      Blackwell - Highly Confidential
2  the task done, and that's what I tried to
3  execute as effectively as I could.
4    Q.   And so did you ever -- again, I
5  understand that and we will go through those
6  tasks as we go, but did you ever have any
7  inkling about a $70 billion figure with respect
8  to the assets that were going to be transferred
9  to Barclays?
10    A.   70 billion?
11    Q.   Yes.
12    A.   That's not a number that sticks out
13  in my memory, no.
14    Q.   Did you ever hear anyone talk about
15  a discount that was being awarded to Barclays
16  with respect to Lehman assets?
17    A.   No.  And I think when I was asked
18  what the deal content was by one of my
19  colleagues, I pointed them in someone else's
20  direction to the deal lawyers.  I didn't have
21  details of that.
22    Q.   Did you have any -- I'm not asking
23  about whether you were involved in discussions,
24  but did you hear any rumors or, you know, water
25  cooler talk about a discount being awarded to

1      Blackwell - Highly Confidential
2  Barclays as to Lehman assets?
3    A.   I don't think so, no.
4    Q.   Did you ever hear the phrase "block
5  discount" used in connection with the sale
6  transaction?
7    A.   Block discount, no.
8    Q.   Did you ever hear that phrase or a
9  similar phrase used when it came to valuing
10  assets that were supposed to be transferred to
11  Barclays?
12    A.   No.  I wasn't focused on anything
13  related to valuation, so that wasn't really --
14  making lists of securities was different than
15  determining what they should be worth in
16  aggregate.
17    Q.   We will get into that more.  I
18  understand.
19       Did you ever hear anyone refer to
20  the transaction as a wash transaction or words
21  to that effect?
22    A.   No.
23    Q.   Is it fair to say that you really
24  were fairly unfamiliar with the specific
25  contractual terms of that transaction during

1      **Blackwell - Highly Confidential**
2  **that week?**
3      A.   Very unfamiliar.
4      **Q.   I want to show you a document --**
5  **some of these documents I am going to show you**
6  **just to see if you know about them or what you**
7  **know about them.**
8      A.   I'd just like to make a point.  I
9  was sending or receiving about a thousand
10 e-mails a day at that time, I think,
11 approximately, so documents passed across my
12 e-mail.  It was physically impossible for me to
13 consume all that information.
14      MR. HINE:  I understand.
15      Let's mark this as the next exhibit.
16      (Exhibit 56 B, e-mail dated May 29,
17      2009, Bates stamped 10295594, with attached
18      fax, Bates stamped 10300652, marked for
19      identification.)
20      **Q.   Mr. Blackwell, I am handing you a**
21 **document that's marked as Exhibit 56 B, which**
22 **appears to be an e-mail in or about Monday,**
23 **September 15th, 2008, and attached to it is a**
24 **fax that's addressed to you and it's attaching**
25 **a document entitled Custodial Undertaking in**

1      **Blackwell - Highly Confidential**
2  **Connection With Master Repurchase Agreement.**
3      A.   The repo agreement.
4      **Q.   Right.  So my question to you is**
5  **have you ever seen this agreement or this**
6  **document?**
7      MR. SHAW:  Take a chance to look
8      through it.
9      (Document review.)
10     A.   I don't recall looking at this.  I
11 think it's a standard repo agreement.
12     **Q.   Can I just ask you a question or two**
13 **about -- this repo agreement relates to an**
14 **agreement between Lehman, Barclays and JPMC or**
15 **JPMorgan Chase.**
16     **In your role as head of operations,**
17 **did you deal with repurchase agreements of this**
18 **nature?**
19     A.   We processed repurchase agreements.
20 We didn't agree to commercial terms of a
21 repurchase agreement, but we processed it.
22     **Q.   What do you mean by process it?**
23     A.   So in terms of the technical way
24 that you would manage a tri-party repo
25 agreement is that you have a tri-party agent

1      Blackwell - Highly Confidential
2  and two counterparties.  A firm's tri-party
3  agent selects the collateral based on the
4  agreement terms, what collateral becomes
5  eligible, and will pledge that.  You book
6  something called a shell on -- operations book
7  a shell to the value that the tri-party agent
8  has pledged based upon their market value, and
9  so those components are then fed into a system
10 to record the repo transaction.  So that is
11 sort of bread and butter activity for a
12 broker/dealer, how a broker/dealer would fund
13 itself.  So it's a daily event with multiple
14 counterparties.  Chase were Lehman's primary
15 tri-party agent.
16     **Q.   So there was a pre-existing Master**
17 **Repurchase Agreement involving these three**
18 **parties; is that right?**
19     A.   I believe so.  I don't know.
20     **Q.   My real question is do you know why**
21 **this was executed or this was either presented**
22 **to you or executed on the 15th, which is the**
23 **date of the LBHI bankruptcy?**
24     A.   From looking at this it looks like
25 they were trying to set up a new agreement.  I

1      Blackwell - Highly Confidential
2  don't think it was used ultimately.
3      **Q.   You don't think --**
4      A.   I don't think so, because I think --
5  because Bank of New York were Barclays' -- I
6  think the attempt here was due to a technical
7  constraint, Lehman Brothers did not have
8  tri-party structure in place because of the
9  volume of transactions.  The operational
10 technicalities of doing this were too complex.
11 So the goal was to set up -- I think, I may be
12 wrong, because I'm not the expert, the team
13 that run this are the experts, hence why they
14 are on here.  The finance team and the treasury
15 team and the operations team responsible for
16 processing the repo are the experts.  I believe
17 from memory that there was an attempt to set up
18 a Barclays arrangement with Chase at that
19 point.  I think this was scrapped as a
20 structure.  I think so, but I may be wrong.
21     **Q.   Who should I ask -- who would you**
22 **ask if you really wanted -- I understand you**
23 **don't have intimate knowledge, but who should I**
24 **ask that question?**
25     A.   Well, the business person that would

Page 50

Blackwell - Highly Confidential

1 have been responsible for this ultimately is
2 John Coghlan, he would be responsible for the
3 commercial terms, and the people that work for
4 him on here would be John Feraca, who is on the
5 e-mail. Others may -- the rest of them are
6 treasury and operations people.
7     MR. HINE:  Okay.  I am going to hand
8 you another document now.
9     (Exhibit 57 B, Amendment Agreement,
10     marked for identification.)
11    Q.   Mr. Blackwell, I am handing you a
12 document marked as Exhibit 57 B, which is
13 entitled Amendment Agreement as of -- it's
14 dated as of September 15, 2008 and it's between
15 Barclays and Lehman Brothers.
16    A.   September 2008.  Okay.
17    Q.   Right.  On the front it says "dated
18 as of September 15, 2008."  Do you see that?
19    A.   Yes.
20    Q.   My question is have you ever seen
21 this document before?
22    MR. SHAW:  Take a minute and look
23     through it.
24     (Document review.)

TSG Reporting - Worldwide  (877) 702-9580

Page 51

Blackwell - Highly Confidential

1    A.   No, I have not seen this agreement.
2 I certainly haven't read it.
3    Q.   Do you have any understanding or
4 guess as to why this document would have been
5 signed during this time period?
6    MR. SHAW:  Objection.  Calls for
7     speculation.
8    A.   This seems to be determining some
9 set of commercial terms which I wouldn't have
10 been involved in negotiating, so I have no idea
11 what the purpose of this agreement would be.
12    Q.   So should I ask the same folks that
13 you mentioned earlier?
14    A.   I think you would -- I would ask
15 John Coghlan, yes.
16    Q.   Let's get back to our discussion of
17 the week of September 15th.
18     At some point in time -- well, some
19 point in time you learn on Monday, say, that
20 there is going to be a sale transaction of some
21 nature between Barclays and Lehman; correct?
22    A.   There was -- I understood that there
23 was negotiations.  I didn't know what that
24 would mean.

TSG Reporting - Worldwide  (877) 702-9580

Page 52

Blackwell - Highly Confidential

1    Q.   Okay.  And so what were you asked to
2 do in support of those negotiations or
3 agreement?  Let's try to take it day by day.
4 Let's talk about Monday.
5    A.   My recollection of what I was being
6 asked to do was, again, figure out the funding
7 settlement matter, monitor the settlement
8 activity.  So there were teams of people.
9 Monitoring settlement activity would be with
10 the various clearing bodies, which as you will
11 see over the course of the week became
12 increasingly challenging.  Fielding client
13 questions when they -- or the team were
14 fielding client questions as they were arising.
15 And then the bulk of the effort in the early
16 part of the week was trying to put together a
17 project plan and a set of actions to build
18 towards a conversion, which was yet -- which
19 wasn't fully specified.
20    Q.   When you use the term "conversion,"
21 are you saying -- does that mean moving the
22 broker/dealer business to Barclays?
23    A.   That was my assumption.  I don't
24 think I was ever told that.  Conversions

TSG Reporting - Worldwide  (877) 702-9580

Page 53

Blackwell - Highly Confidential

1 normally mean that you are converting on to
2 someone else's systems or you are moving your
3 systems.  And so we were working towards a set
4 of scenarios where, for instance, I was aware
5 that Barclays had a relatively small equities
6 business and we had a very substantial one at
7 Lehman Brothers.  Lehman had a very substantial
8 equity business and so it would be physically
9 impossible to transact the equity business on
10 the Barclays technologies.  It's just
11 impractical.  A year's worth of volume in a
12 day.  So it's just technically not possible.
13 So we were working towards various things of
14 that nature, which, again, is very operational
15 in nature, time-consuming, complex and very,
16 very detailed, so a lot of my team were focused
17 on that.
18    Q.   Was it your expectation that your
19 team and most of the employees of Lehman in the
20 broker/dealer business would move over to
21 Barclays?
22    A.   That was my hope.
23    Q.   No one ever told you that?
24    A.   No.

TSG Reporting - Worldwide  (877) 702-9580

1      Blackwell - Highly Confidential
2    **Q.  Okay. Can we go through some**
3 **terminology here just so I understand.**
4      **I see in a lot of e-mails the phrase**
5 **"BONY tri-party." Can you just tell me what**
6 **that is meant to encompass?**
7    A.  BONY is Bank of New York. Tri-party
8 is a type -- is a repo.
9    **Q.  Okay. I didn't mean to interrupt**
10 **you, but we have been discussing a repurchase**
11 **transaction on September 18th involving**
12 **Barclays, Lehman and BONY.**
13      **Is that what you folks call the BONY**
14 **tri-party in the e-mail, generally?**
15    A.  I think that's very broad.
16    **Q.  What would you understand that BONY**
17 **tri-party to be?**
18    A.  Depends on the context.
19    **Q.  Okay. Did there come a point in**
20 **time -- well, let's step back to the Monday**
21 **again.**
22      **Did you learn at some point that the**
23 **fed was providing some kind of financing to LBI**
24 **during that week?**
25    A.  Yes. We had been pledging more and

1      Blackwell - Highly Confidential
2 more of our -- we had a large repo under
3 various different schemes with the Fed.
4    **Q.  When you say various different**
5 **schemes, is that -- I see acronyms PDFC, OMO**
6 **and TSLF. Is that what --**
7    A.  Correct.
8    **Q.  So those are three different Fed**
9 **programs?**
10    A.  Yes.
11    **Q.  Am I correct to say that on Monday**
12 **night, Tuesday night and Wednesday night of**
13 **that week the Fed was providing some sort of**
14 **financing under those programs to Lehman?**
15    A.  It was a repo, again, pledging
16 assets through Chase and a tri-party agent to
17 the Fed and the Fed provided cash.
18    **Q.  And now were you involved in**
19 **selecting the assets that were pledged?**
20    A.  The mechanism by which assets are
21 selected are driven by the repurchase
22 agreements and the schedules attached to the
23 repurchase agreements that are in place. So it
24 was eligible collateral. So that's an
25 automated process in a normal course of

1      Blackwell - Highly Confidential
2 business in that your tri-party agent will look
3 at the eligible collateral and pledge that on
4 your behalf to the Fed and then you get a file
5 from in this instance Chase, which is uploaded
6 into your system, into your repo shell to
7 reflect the securities that are being pledged.
8    **Q.  Okay. Is that what took place in**
9 **this instance?**
10    A.  As far as I understand, in the early
11 part of the week, that's absolutely what
12 occurred.
13    **Q.  So, again, I'm not trying to put**
14 **words in your mouth. I am just trying to**
15 **translate it into something that a non-finance**
16 **person can understand.**
17      **Is it correct to say that JPMC or**
18 **Chase selected the securities that were pledged**
19 **to the Fed?**
20    A.  That would be my understanding of
21 the mechanism. The individuals within the
22 business, treasury and operations that
23 transacted or carried out those functions could
24 give you a much more precise answer.
25    **Q.  So you are talking about within**

1      **Blackwell - Highly Confidential**
2 **Lehman's treasury department?**
3    A.  Yes, and operations, Jim Hraska.
4    **Q.  Jim Hraska?**
5    A.  Yes.
6    **Q.  And at some point you learned, I**
7 **take it, that there was going to be some kind**
8 **of transaction where Barclays would be**
9 **providing that financing instead of the Fed;**
10 **correct?**
11    A.  Correct.
12    **Q.  Tell me what you understood about**
13 **that.**
14    A.  I was initially contacted -- I think
15 conversations had already been taking place
16 between John Coghlan, treasury and Barclays
17 about how a repo process would take place. A
18 gentleman called David Aranow and John Feraca
19 were -- both of them were asked by John Coghlan
20 to basically run the process of moving the
21 collateral that was currently pledged to the
22 Fed under the various programs, and I am going
23 to caveat that, I will come back to that in a
24 second, under the various programs, and the
25 collateral that was eligible over to Bank of

Blackwell - Highly Confidential
1  New York. Now, I think the first conversations
2  were had on the 17th -- sorry, I think --
3  that's when I first started to hear about this,
4  I think, around the 17th, and I think it was
5  determined it was technically -- not say
6  impossible, but incredibly difficult to move
7  that amount of collateral on that day, which
8  was, I think, what had been discussed, so it
9  was then determined that that would then happen
10  the following -- I think it was the following
11  day, so there was some setup work that was
12  required and you will see that communication
13  flying around between treasury, operations and
14  business as how to set this -- set the
15  mechanism up to facilitate that. And this is a
16  very large amount of collateral --
17      Q.   Sure.
18      A.   -- so there are a lot of operational
19  complexities to it. So at that point that's
20  when I was aware that we were in the process
21  of -- that Barclays were going to be funding
22  the LBI entity through the repo and taking the
23  Fed's exposure away or relieving Fed's
24  exposure.

Blackwell - Highly Confidential
1      MR. SHAW: When you reach a logical
2  stopping point, we have been going about an
3  hour.
4      MR. HINE: Do you want to take a
5  break?
6      THE WITNESS: Another five minutes
7  or so.
8      Q.   I think I understood what you just
9  said. Now, do you know if the same collateral
10  that was supporting the Fed financing on
11  Wednesday night was, in fact, transferred to
12  Barclays to support its tri-party?
13      A.   It wasn't. No, it wasn't. It
14  was -- again, there is -- it's an awful lot of
15  operational complexity, it's a huge number of
16  securities and no -- there were differences in
17  the schedule that the Fed held versus what
18  actually then ended up in Bank of New York's --
19  in Bank of New York's tri-party account.
20      Q.   Okay. So this is -- when I see the
21  phrase "Bank of New York tri-party," that's --
22  if it's dated at this time, it's probably
23  talking about the Barclays tri-party with Bank
24  of New York acting as the agent; correct?

Blackwell - Highly Confidential
1      MR. SHAW: Objection to form.
2      A.   Again, it's a broad term. I'd need
3  specific --
4      Q.   I will withdraw that question. I
5  understand.
6      So what is the difference, if you
7  know, between the collateral that was
8  supporting the Fed financing on Wednesday night
9  and the collateral that was transferred to
10  Barclays on sometime Thursday?
11      MR. SHAW: Objection to form.
12      A.   There were a series of operational
13  issues that occurred at Chase, first of all,
14  and also the repurchase agreement, collateral
15  that's eligible to be transferred to BONY,
16  create a difference, so, you know, those
17  operational processes at Chase which were -- I
18  don't have any visibility over and, frankly,
19  have limited visibility at what's happened at
20  Chase post the event as well, resulted in some
21  of the collateral being delivered from the Fed
22  into the Lehman box and pended settlement took
23  place, so that the securities that were
24  released from the Fed were delivered into the

Blackwell - Highly Confidential
1  Lehman box and trades that were pended for
2  settlement were settled that were unrelated to
3  the repo, but were trades that had been entered
4  into by Lehman Brothers on a previous date.
5      Q.   So am I correct -- so Chase settled
6  other trades with the money -- with the
7  securities that had been released from the Fed
8  funds?
9      A.   So Barclays had paid $5 billion to
10  Chase and paid that to the Fed, the Fed
11  released $5 billion worth of collateral, what
12  the Fed believed is $5 billion worth of
13  collateral to Chase, and that went into the
14  clearance box and settlement took place.
15      Q.   Okay. And then so then what
16  collateral was ultimately transferred to
17  support the Barclays repo?
18      A.   There are schedules that show that
19  collateral. So again, collateral that was
20  eligible under the repurchase agreement was
21  delivered. The remaining securities that came
22  back from the Fed, some portion of them, again,
23  subject to operational friction and
24  eligibility, were then delivered to Bank of New

1      Blackwell - Highly Confidential
2  York.
3      Q.    And were you involved in that
4  process of the delivery to Bank of New York?
5      A.    My team were actively involved. I
6  was doing very many different things at that
7  time, so Monty Forrest and Jim and the team of
8  people within the repo ops area in conjunction
9  with the treasury department and with the
10  trading desk, the financing trading desk, were
11  all working hard to get that. I was being
12  asked also questions by my management and
13  whether these things were happening. I was
14  also liaising with Barclays when -- certainly
15  when the first 5 billion -- we were trying to
16  do it in 5 billion pieces so there was no
17  daylight exposure to Lehman. That mechanism
18  resulted in the outcome I described before,
19  which was some leakage, because of Chase's
20  method -- Chase's internal operational issues,
21  and so there was some discussion, but it went
22  very quiet for a period of time until the 40
23  billion of cash was paid by Barclays or the 45
24  billion of cash was paid by Barclays, and then
25  settlement took place with the Fed and DTC.

1      Blackwell - Highly Confidential
2  Settlement processes were kept open until the
3  early hours of the morning, which is
4  unprecedented, to allow this massive volume of
5  collateral to work its way through the system
6  and settle.
7      Q.    You mentioned someone named Jim. Is
8  that Jim Hraska?
9      A.    Jim Hraska.
10      Q.    Is it fair to say he was more mired
11  in the details of this transfer of collateral
12  than you were?
13      A.    Absolutely. He is an industry
14  expert in the space. The Fed consult with Jim,
15  so he is expert in this process.
16      MR. HINE: Okay. Why don't we take
17      a break now. I have some documents to show
18      you about this whole topic, so you need to
19      rest up.
20      (Recess was taken from 10:31 to
21      10:42.)
22  BY MR. HINE:
23      Q.    Mr. Blackwell, we were talking about
24  the transition from the Fed repo arrangement on
25  Wednesday to the replacement transaction with

1      Blackwell - Highly Confidential
2  Barclays and BONY on Thursday.
3      Before we get into how that took
4  place and any problems that had to do with
5  that, could I just run a couple documents by
6  you just so I can understand what's being said
7  in these e-mails to the extent you remember. I
8  know you had several e-mails during that period
9  of time, but let's just start with this one.
10      MR. HINE: Let's mark that.
11      (Exhibit 58 B, e-mail dated
12      September 17, 2008, Bates stamped 77752,
13      marked for identification.)
14      ( Exhibit 59 B, e-mail dated
15      9-17-2008, marked for identification.)
16      Q.    Mr. Blackwell, I handed you an
17  e-mail which we have marked as Exhibit 58 B
18  which is an exchange between you and some other
19  folks on Wednesday, September 17th, and some
20  earlier e-mails below.
21      I just wanted to understand
22  what's -- you appear to be congratulating some
23  folks here about doing a good job. In one of
24  the e-mails Mr. Feraca talks about yielding the
25  max from both PDCF and Barclays financing.

1      Blackwell - Highly Confidential
2      Could you just give me a sense of --
3  was this a difficult effort to get this
4  financing in place on Tuesday?
5      A.    I think it was hard all week. It
6  was a very challenging environment to be
7  operating in, to say the least. I just think
8  John as the person responsible for financing
9  and I think it's just congratulating everyone
10  for -- under the construct of the agreement to
11  delivering an excellent result and just
12  thanking people. I have no more information
13  about this than that.
14      Q.    My question is this was a Tuesday
15  night e-mail, the one in the middle. Now, the
16  PDCF, that's referring to the Fed's financing;
17  correct?
18      A.    The Primary Dealer's Credit
19  Facility.
20      Q.    That's a Fed program?
21      A.    Fed facility, yes.
22      Q.    Now, it also refers to Barclays
23  financings in the same sentence.
24      What financings does Barclays have
25  in place on Tuesday?

1    **Blackwell - Highly Confidential**
2       A.   I don't recall. I'm assuming it's
3    referring to a repo, but I have no idea.
4            MR. SHAW: Bill, just so it's clear,
5       although the date that appears on the sent
6       line says Wednesday, September 17th, it's
7       Greenwich meantime, so it's also Tuesday.
8            MR. HINE: You are right.
9       Q.   I guess my main point for that
10   document is you don't really have any knowledge
11   of other of Barclays' financings on the Monday,
12   Tuesday, Wednesday of that week?
13      A.   Correct.
14      Q.   So your role during that week with
15   respect to Barclays' financing was the one that
16   was put in place on Thursday to replace the Fed
17   financings of Wednesday night; is that right?
18      A.   Yes.
19      Q.   Okay.  If you could turn to the next
20   document, which is marked as Exhibit 59 B,
21   again, it's an e-mail stream involving yourself
22   and others.  It talks in the bottom about not
23   doing the Barclays PDCF trade tonight.  Do you
24   see that language?
25      A.   Yes.

1       Blackwell - Highly Confidential
2       Q.   Now, this is Wednesday night, and I
3    believe you previously testified, was there a
4    discussion of possibly doing that transition
5    transaction on Wednesday night?
6            MR. SHAW: Objection to form. It's
7       not clear to me what the "this is Wednesday
8       night" refers to.
9            MR. HINE: Let me just rephrase it.
10      Q.   You see the e-mail at the bottom of
11   this document which is sent says it's sent on
12   Wednesday, September 17th.  Do you see that?
13      A.   Yes.
14      Q.   And the first line of that e-mail
15   says "we are not doing the Barclays' PDCF trade
16   tonight."  Do you see that?
17      A.   I do.
18      Q.   And that's Mr. Ullman sending that
19   e-mail to you; correct?
20           MR. SHAW: Can I just note for the
21      record the witness is underlining the
22      phrases you have pointed out to him on the
23      exhibit.
24           MR. HINE: Okay.
25           MR. SHAW: I'm not allowed to do

1       Blackwell - Highly Confidential
2    that, I take it.
3            MR. HINE: Probably a good idea just
4       to --
5            THE WITNESS: It's a habit.
6            MR. HINE: Okay.  Not a problem.
7       Q.   My question was what discussions
8    were there about possibly having the Barclays
9    take over this financing role from the Fed on
10   Wednesday night?
11           MR. SHAW: Objection.  Foundation.
12      A.   I don't have any -- I wasn't
13   involved in those discussions, so -- you would
14   probably -- yeah, I wasn't involved in those
15   discussions.
16      Q.   Okay.  Continuing on with that
17   e-mail, it says "we will be increasing the
18   tri-party trade we have been doing with
19   Barclays at BONY to 13 billion."  Do you see
20   that?
21      A.   I do.
22      Q.   What is that referring to?
23      A.   It refers to the fact that Barclays
24   would be extending financing for that night of
25   13 million.

1       Blackwell - Highly Confidential
2       Q.   So this is a separate tri-party that
3    Barclays has with Lehman and BONY?
4       A.   The same tri -- they are a
5    tri-party.  A tri-party agreement is one
6    tri-party agreement.  So this is an arrangement
7    where Barclays are providing cash in return for
8    securities.
9       Q.   Okay.  So the 13 billion refers to
10   the amount that's apparently needed to get
11   through that night or to get into the next day;
12   is that right?
13      A.   Or that was the available
14   collateral.  I don't know why 13 billion was 13
15   billion, but that was the transaction that was
16   done.
17      Q.   Could you just -- what is your
18   understanding of why Barclays did not affect
19   this transaction on Wednesday as opposed to
20   Thursday?
21      A.   My understanding was that it wasn't
22   the case of Barclays -- it wasn't the case that
23   Barclays didn't want to.  It was technically
24   un -- it wasn't feasible to actually put a
25   mechanism in place to allow that transaction to

Blackwell - Highly Confidential

1      Blackwell - Highly Confidential
2 happen.
3     **Q.  Okay.**
4     A.  Because of the scale and complexity.
5     **Q.  So why was it possible to do that on**
6 **Thursday?**
7     A.  Because a mechanism was put in
8 place.
9     **Q.  So you folks had been working on**
10 **putting this mechanism in place previously?**
11     A.  No, that day.  So it was -- when --
12 on the Wednesday, then through Wednesday
13 through Thursday there was a mechanism put in
14 place.
15     **Q.  As to the collateral that was**
16 **originally supporting the Fed, and you**
17 **described that some of it made it to Barclays**
18 **but there were issues as to that transfer, did**
19 **you have any role in placing a value on that**
20 **collateral?**
21     A.  Operations are not placing a value
22 on the collateral.  The systems that operations
23 use have a value associated with them, so not
24 figuring out that this equity or this bond is
25 worth -- we are not marking the security in

1     Blackwell - Highly Confidential
2 that regard.  Chase, again, would have primary
3 role in terms of collateral selection based on
4 the schedules of the agreement.
5     **Q.  And did you ever hear any**
6 **discussions about a discount or a haircut that**
7 **was applied to that collateral?**
8     MR. SHAW:  Asked and answered.
9     A.  No.  Not that I recall, no.
10     **Q.  Okay.  What do you understand the**
11 **term "haircut" to mean with respect to repos**
12 **generally?**
13     MR. SHAW:  Objection.  Foundation.
14     A.  I would -- I'm not an expert in
15 terms of that process, so, again, commercial
16 components would be agreed by the business.
17     **Q.  Could you describe for me -- well,**
18 **let me just ask about two other documents**
19 **before we go further.**
20     **(Exhibit 60 B, e-mail dated**
21 **9-18-2008, marked for identification.)**
22     **Q.  Mr. Blackwell, I am handing you a**
23 **copy of the document marked as Exhibit 60 B,**
24 **which is an e-mail stream which appears to be**
25 **dated September 18th, 2008, and attached to it**

1     **Blackwell - Highly Confidential**
2 **is a spread sheet of some sort.  I know that --**
3 **I don't see your name on this e-mail, but I**
4 **wanted to ask you about the spread sheet that's**
5 **attached.**
6     **Have you ever seen a spread sheet**
7 **like this?**
8     MR. SHAW:  Objection.  Form.
9     A.  It's possible I have seen one.  I
10 don't recall seeing one, but it's a schedule of
11 collateral values.  It's being provided by -- I
12 assume this is being provided by JPMorgan.
13     **Q.  Why do you say that?**
14     A.  Because of who it's being sent from.
15     **Q.  The title of the spread sheet says**
16 **BONY Transaction Anticipated Pre Funding.  Do**
17 **you have any idea what that could mean?**
18     A.  No.
19     **Q.  Do you have any idea what the column**
20 **to the far right means where it says**
21 **Anticipated Pre Funding Dollar Amount?**
22     A.  Only just the literal interpretation
23 of the title.  It's a valuation.
24     **Q.  Do you have any understanding of the**
25 **value of the different types of collateral that**

1     **Blackwell - Highly Confidential**
2 **were posted to the different Fed programs**
3 **listed here?**
4     A.  At the time?
5     **Q.  Yes.**
6     A.  Possibly.  I mean, I didn't look at
7 the detail.  And, again, the detail is
8 thousands of CUSIPs.  It's meaningless looking
9 at lists.  It does have to be applied based on
10 the rules.
11     **Q.  Do you have any understanding of the**
12 **aggregate amounts of the collateral you were**
13 **trying to transfer?**
14     A.  I knew we were trying to transfer
15 $45 billion.  That was the headline number,
16 approximate number.
17     **Q.  Is it fair to say there were some**
18 **problems in transferring the collateral to or**
19 **unexpected issues arose with respect to**
20 **transferring the collateral from the Fed**
21 **program to the Barclays repo?**
22     MR. SHAW:  Objection to form.
23     A.  There were problems, yes, there
24 were.
25     **Q.  Could you just generally describe**

Blackwell - Highly Confidential

1  for me what the problems were and how they
2  resolved themselves or didn't resolve
3  themselves?
4      A.   The process was designed that Chase
5  would pay -- sorry, Barclays would pay
6  $5 billion, and I explained this earlier,
7  $5 billion to -- Barclays would pay that to
8  Chase, Chase would pay that to the Fed, the Fed
9  would deliver $5 billion in collateral.
10      MR. BYMAN:  Could I ask you to speak
11  a little louder.
12      THE WITNESS:  Okay.  Do you want me
13  to repeat that?
14      MR. BYMAN:  If you would, I'd
15  appreciate it.
16      A.   Barclays paid -- my understanding
17  was Barclays paid Chase -- paid Lehman, their
18  tri-party agent, Chase, $5 billion.  $5 billion
19  was paid to the Fed.  The Fed released
20  $5 billion worth of collateral.  Their
21  valuations, not Lehman's valuations, but their
22  valuations based on what had been pledged the
23  previous night.  That collateral came into
24  Chase's box and was not delivered to BONY, to

Blackwell - Highly Confidential

1  Bank of New York.
2      Q.   To satisfy other transactions that
3  you mentioned earlier?
4      A.   Yeah, and I don't have visibility
5  over what those transactions were.
6      Q.   So was this -- could you just kind
7  of relay what you tried to do to resolve this
8  issue?
9      A.   I didn't try and resolve the issue.
10  A team of people that were managing it for me,
11  Monty, the global head of that function, and
12  Jim worked hard with treasury and my
13  settlements team as well to try and resolve
14  that issue, but it was mainly a dialogue with
15  Chase, the Fed, and there was an open line in
16  place that was being managed out of Jim's
17  office.
18      Q.   Okay.  And were you -- when you say
19  "open line," what do you mean by that?
20      A.   Open conference -- a phone line that
21  every participant could dial into.
22      Q.   And did you participate in that
23  conference call?
24      A.   I may have been on it briefly, very,

Blackwell - Highly Confidential

1  very briefly.  I wasn't sitting in that room.
2  I was in and out.
3      Q.   Is it fair to say that Jim Hraska or
4  the other individual you mentioned are the ones
5  that have in-depth knowledge of how this
6  problem was addressed?
7      A.   Jim Hraska.
8      Q.   Okay.  Do you have an understanding
9  of whether the full compliment of collateral
10  that Barclays was expecting to be posted to
11  their repo ever made it to Barclays?
12      A.   I don't believe the full value made
13  it, no.
14      Q.   Do you know what amount did not?
15      A.   Exact numbers, no, but the full
16  amount did not make it.
17      Q.   Do you have approximate numbers?
18      A.   Off the top of my head, I don't.  It
19  would be in an e-mail, but it wasn't the
20  complete amount.
21      Q.   Is there a $7 billion number that --
22  does that sound like the approximate amount?
23      A.   There was a cash repo that I
24  understood that was put on for 7 billion that

Blackwell - Highly Confidential

1  night as well which was pledged to Barclays to
2  make up some of the shortfall.
3      Q.   Okay.  Did that money go to
4  Barclays?
5      A.   I understand that it did or should
6  have done, but it was held properly -- I don't
7  know.  Actually, I don't want to misspeak.
8  It's probably in my -- again, it would be in my
9  e-mail.
10      Q.   And when you said put in place, that
11  was Thursday night?
12      A.   Overnight Thursday, yes, into the
13  early hours of Friday.
14      (Exhibit 61 B, e-mail dated
15  9-17-2008, marked for identification.)
16      Q.   Mr. Blackwell, I am handing you a
17  document that's been marked as 61 B, which is
18  an e-mail stream dated September 17th, 2008,
19  and the subject line reads "key points from
20  today's call with Alastair pertinent to
21  equities."
22      My question to you is have you ever
23  seen this document?
24      A.   I would have seen it in my -- I was

1         Blackwell - Highly Confidential
2    probably on the distribution.
3         Q.   Well, this is one of my questions
4    where I am not sure I'm on the same topic we
5    were just talking about.
6              Can you tell me what this call you
7    had had to deal with?
8         A.   About conversion.  John Neave was
9    one of the project managers who worked with
10   Samantha Hoban.  He wasn't an employee --
11   direct employee of mine, a resource within the
12   project team looking at conversion.  So these
13   meetings were happening periodically.  More
14   than probably daily.  Talk about what we knew
15   and what we didn't know and where we were in
16   terms of the project, and I would imagine that
17   you will see there are project plans that
18   updated project plans that go with each one of
19   these meetings, so these meetings were intended
20   to facilitate the conversion as we understood
21   it.  So as information became available, the
22   project plan would change.
23        Q.   Okay.  And so this is, just to
24   clarify, so this is not related to the repo
25   issue we were just talking about, this was your

1         Blackwell - Highly Confidential
2    plan or this is your folks' effort to
3    transition the broker business to Barclays in
4    some form?
5         A.   Yes.
6         Q.   I just had a couple of questions
7    about some of these lines here.
8              In the second sentence it says "the
9    074 box will simply roll up to the existing
10   Barclays B/D, i.e., a second DTC network."
11             Can you just tell me what that's
12   referring to?
13        A.   Okay, so that's as it relates to a
14   broker/dealer, Barclays broker/dealer.  074 was
15   Lehman's DTC clearing box.  At that point there
16   had been a discussion or assumptions made that
17   the clearing boxes would move at that point.
18   That subsequently changed.
19        Q.   How did it change?
20        A.   Over the course of the weekend it
21   was clear that Barclays were not taking
22   responsibility for the clearing boxes or any of
23   their liabilities in the clearing boxes and
24   that became a point of negotiation, I
25   understand, with the regulators.  I wasn't

1         Blackwell - Highly Confidential
2    involved in those discussion, but it became
3    clear that that assumption was, in fact,
4    faulty.
5         Q.   Okay.  Could you just tell me, you
6    said you were not involved in those
7    discussions?
8         A.   No, I wasn't.
9         Q.   What did you understand about them?
10        A.   Nothing apart from really what I
11   have just shared with you.
12        Q.   Okay.  So how -- were you involved
13   in any discussions or did you have any
14   understanding relating to a payment of
15   $250 million between Barclays and the DTC?
16        A.   I'm aware of that.  Again, I'm not
17   sure how that number was calculated or what
18   consideration it is related to, to be honest.
19        Q.   Are you aware whether that payment
20   was ever made or how it all ended up?
21        A.   No.
22        Q.   The next bullet here talks about an
23   inventory of unencumbered LBI assets will be
24   identified based on the stock record on
25   Thursday night and will be priced at Thursday's

1         Blackwell - Highly Confidential
2    close.  Then it goes on to refer to the assets
3    that underpin the purchase agreement.
4              Do you see that paragraph I am
5    reading?
6         A.   I do.
7         Q.   Could you tell me what's at issue in
8    that discussion?
9         A.   At that point I had an understanding
10   that there were a schedule of assets that were
11   going to be purchased and transferred.  Again,
12   I believe the model -- and this is a point in
13   time.  That was the understanding of what was
14   happening at that point.  Post that things may
15   have changed, but that was the understanding.
16   So in terms of thinking about this from an
17   operational perspective, I would be given that
18   list and then I would figure out a way to
19   mechanically transfer it.  So this is what the
20   action here is thinking -- is considering.  I
21   don't know that I ever saw a list.
22        Q.   Okay.  So just not to -- I just want
23   to understand what you said.  At this time on
24   Wednesday you are thinking that you are going
25   to be given a list of assets and that you need

1    **Blackwell - Highly Confidential**
2    **to somehow figure out how to transfer them to**
3    **Barclays. Okay.**
4        **Were you told at some point that**
5    **that was not going to take place?**
6        A.    After the Friday.
7        Q.    **What were you told?**
8        A.    That there wasn't a conversion, and
9    I think you will see that in my e-mail trails
10    as well, that I was asked to come to a meeting
11    on Friday night, I think it was Friday night,
12    Friday about 5:00, and was told that there
13    wasn't a conversion and I needed to be working
14    towards being ready for business as Barclays on
15    Barclays -- get Barclays Capital ready for
16    business on the Monday.
17        Q.    **I guess I don't understand what you**
18    **mean by there is no conversion in that context.**
19        A.    Again, all the work that we had done
20    over the course of that week, how we
21    collectively, this group of people, thought a
22    transaction -- assumed a transaction might take
23    place, there wasn't going to be a conversion of
24    LBI as a going concern or any of these entities
25    or any of the contents of the entities as a

1    Blackwell - Highly Confidential
2    going concern.
3        Q.    **And what was going to take its**
4    **place?**
5        A.    I didn't know at that point. I
6    didn't know at that point. And an agreement
7    hadn't been signed, so that wasn't shared with
8    me. So my marching orders became quite clear
9    that I should go off again, similar to a
10    conversion, be ready to be able to transact as
11    Barclays on the Monday. To support -- let me
12    correct that. I don't transact. Support
13    transactions as Barclays Capital.
14        Q.    **So by that you meant -- you**
15    **understood -- is it correct to say that you**
16    **understood that to mean you were going to be**
17    **moved over to Barclays and somehow some assets**
18    **were going to be transferred, or did you have**
19    **any understanding of what assets were going to**
20    **be transferred to Barclays?**
21        A.    None. Wasn't making an assumption
22    that any assets were to transfer. At this
23    point what I was talking about was the
24    ability -- whether I was going to be a Barclays
25    employee or not was unclear and that wasn't a

1        Blackwell - Highly Confidential
2    consideration. What I was being asked to do,
3    to try and facilitate Barclays Capital's
4    ability to transact on the Monday or the
5    Tuesday, whenever we were going to go live,
6    various different asset classes. So that
7    was the -- my primary driver, again, was get
8    everyone together to start to be able to
9    support business as much as possible as usual.
10        Q.    **And this was as of Friday you were**
11    **told this?**
12        A.    On Friday, I think late on Friday we
13    were told that that was going to happen. I
14    actually -- it may have actually been -- the
15    marching orders may have been given to me the
16    following morning, actually, because I think at
17    that point it was unclear exactly what was
18    going to happen, but I was told there was no
19    conversion at that point. That was very clear.
20    So the details that were in here, a lot of
21    these things were becoming obsolete or -- as
22    time passed, so this is a point in time in a
23    process that operations and finance would go
24    through.
25        MR. SHAW:  And just so it's clear,

1        Blackwell - Highly Confidential
2    when the witness said "on here," he was
3    pointing to Exhibit 61 B.
4        Q.    **Were you told that the assets that**
5    **had been posted as collateral to the Barclays**
6    **BONY repo were going to be sold to Barclays?**
7        A.    Sold, no. I didn't -- I wouldn't
8    assume that, no.
9        Q.    **Were you told that they were going**
10    **to be somehow rolled into the Asset Purchase**
11    **Agreement as purchased assets?**
12        A.    I didn't know there was an Asset
13    Purchase Agreement at that point.
14        Q.    **Did you have any involvement in the**
15    **Clarification Letter that was prepared over**
16    **that weekend?**
17        A.    I don't believe so. I contributed
18    data to my superiors who may -- my supervisors
19    and others that asked, but who may have then
20    used that as part of the clarification letter,
21    but I didn't contribute directly.
22        Q.    **So when I use the term**
23    **"Clarification Letter," is that a new term to**
24    **you?**
25        A.    At that time it was something I was

1    Blackwell - Highly Confidential
2  unfamiliar with.  Post of the event, yes, it's
3  something I became aware of.
4    **Q.   Since you have been at Barclays you**
5  **have seen it?**
6    A.   Yes, I don't know whether I have
7  seen it, but I am aware of its existence.
8    **Q.   And what's your understanding of**
9  **what that Clarification Letter did with respect**
10  **to the transaction?**
11    MR. SHAW:  Foundation.
12    A.   I actually don't know.  I really --
13  I don't know.  I know a Clarification Letter
14  exists and I don't recall reading it.  It's
15  been referred to.  That's all.
16    **Q.   Do you have any understanding of the**
17  **two schedules that are attached to the**
18  **Clarification Letter, which are called**
19  **Schedules A and B?**
20    A.   I am aware of Schedules A and B,
21  yes.
22    **Q.   What are you aware of about them?**
23    A.   Schedule A is the original repo
24  transaction, the original Fed repo transaction,
25  the assets are transferred to BONY.  Schedule B

1    Blackwell - Highly Confidential
2  was unencumbered assets within the clearing
3  boxes.
4    **Q.   Just so I understand that, we have**
5  **been talking about the Fed repo which was**
6  **replaced by a Barclays repo and those -- that**
7  **collateral was to comprise Schedule A; is that**
8  **right?**
9    MR. SHAW:  Objection to form.
10    A.   My understanding is Schedule A was
11  the collateral that made it to Barclays.  Now,
12  in a normal repo process there is substitution
13  and change, so it doesn't always work, it's not
14  always going to be precise, and that's just
15  reality.  Every single repo that would be
16  processed would be different.
17    **Q.   So your understanding was that the**
18  **collateral that was posted to the Barclays repo**
19  **was to become -- was to be included in**
20  **Schedule A?**
21    MR. SHAW:  Objection to form.
22    MR. HINE:  You can answer.
23    A.   I think that would be my
24  understanding.
25    **Q.   And is this an understanding that**

1    **Blackwell - Highly Confidential**
2  **you had during that weekend or is this**
3  **something you developed later?**
4    A.   Afterwards.  I didn't spend any time
5  in terms of reconciling -- as an operations
6  organization we are reconciling and there was a
7  transfer of information between the parties
8  that would share information and Chase stopped
9  providing us with information on the Friday
10  morning, so we had no visibility over what was
11  going on there, but we did compare what had
12  transferred between Barclays and Lehman to
13  ensure that we were reconciled, and seen there
14  a very small difference of -- what we had
15  recorded on our books was less than
16  $30 million.  So it was an accurate reflection
17  of what transferred.  Or our books are an
18  accurate reflection of what transferred.
19    **Q.   How about Schedule B, did you have**
20  **any role with respect to Schedule B over that**
21  **weekend?**
22    A.   Yes.  I mean, over the course of the
23  weekend my team were working with treasury to
24  refine a list of unencumbered assets sitting
25  within the clearance boxes.

1    Blackwell - Highly Confidential
2    **Q.   And why were you doing that?**
3    A.   Because I was asked to do it.
4    **Q.   Did you have any understanding as**
5  **part of the transaction why that was being**
6  **done?**
7    A.   That was part of -- all I had was
8  there was negotiations going on and I was asked
9  to find -- to identify a set of securities that
10  were unencumbered in the clearance box.
11    **Q.   Did you have any understanding about**
12  **that being used to fill some shortfall in the**
13  **assets that were supposed to have been**
14  **transferred to Barclays?**
15    A.   I didn't know why precisely, so no.
16  What I was trying to do was mechanically create
17  a list or assist in mechanically creating a
18  list of assets that were unencumbered.
19    **Q.   And when you say "unencumbered,"**
20  **what does that mean in that context?**
21    A.   Unencumbered means there was a
22  methodology applied which would be firm --
23  predominantly firm inventory or assets that
24  were available to be re-hypothecated.
25    **Q.   And were you only looking in the**

Blackwell - Highly Confidential

1  clearance boxes at DTC?
2
3      A.   We were looking -- we looked at
4  Euroclear.  We looked in several places.
5      Q.   Could you just tell me the places
6  you looked.
7      A.   From memory, I think it was Canada,
8  the Canadian depo, DTC, and Euroclear.  Two --
9  I think two boxes at DTC and a physical box at
10  Chase, I think.  Again, this is -- I may not be
11  a hundred percent precise, but those depos
12  would be the primary locations.
13     Q.   When you say "we looked," can you
14  describe for me is this -- when did you start
15  looking?
16     A.   I think there was an ongoing process
17  over the course of the weekend.  I don't know
18  when precisely.  Again, I think you will find I
19  was actually in the office all of the night on
20  Thursday, so Thursday, Friday became one day
21  and all that time I don't have an exact
22  recollection of when that happened.
23     Q.   Okay.  But is it fair to say it was
24  sometime at end of the week, it wasn't an
25  effort started Monday or Tuesday?

Blackwell - Highly Confidential

1
2      A.   Oh, absolutely not.
3      Q.   And did you look at the OCC as well?
4      A.   Possibly.  I can't comment on that.
5      Q.   Just for my own, I see reference to
6  an 074 box and then a 636 box.  Could you
7  explain to me the difference between the two?
8      A.   The 074 box is predominantly an
9  equity clearing box, DTC clearing box, and --
10  sorry, 626 box?
11     Q.   636.
12     A.   636 is predominantly corporates,
13  corporate bonds.
14     Q.   I see something else referred to as
15  a non-actionable box.  Is that a term you are
16  familiar with?
17     A.   Yeah.  The non-actionable box, I
18  believe, was the list of securities that we
19  thought were -- some securities are actionable,
20  some securities are not.  Securities that are
21  customer assets, for instance, you wouldn't --
22  they are not unencumbered, they are
23  fully-paid-for customer assets, so that's the
24  difference between the two.
25     Q.   Now, when you did this effort over

Blackwell - Highly Confidential

1  the weekend to assemble these assets that were
2  to go into Schedule B, did you know there was
3  going to be a Schedule B or were you shooting
4  towards that goal?
5      MR. SHAW:  Objection to form.
6      Q.   Bad question, but you can still
7  answer it.
8      A.   I was creating a schedule.  I didn't
9  know what it was going to be called, what it
10  was going to be used for.  Again, I was working
11  with a very large group of people to produce
12  this, so...
13     Q.   I guess I was asking did you know
14  the term "Schedule B" or that it was going to
15  be a schedule to a Clarification Letter at that
16  time?
17     A.   I didn't know it was going to be a
18  schedule to a Clarification Letter.  It may
19  have been labeled as Schedule B, but, again, I
20  didn't know its purpose.
21     Q.   Fair to say you were not involved in
22  any of the court proceedings in the bankruptcy?
23     A.   No.
24     Q.   Is it fair to say that you didn't

Blackwell - Highly Confidential

1  help prepare documents that were filed in any
2  of the courts?
3      A.   Not directly, no.
4      MR. SHAW:  I think we had a slight
5  ambiguity.  I believe you asked is it fair
6  to say he was not involved and he said no,
7  but I think the intent was --
8      MR. HINE:  Let me just ask it again.
9      Q.   Were you ever involved in preparing
10  documents that were to be filed in the
11  bankruptcy proceeding in this case?
12     A.   I prepared documents for my
13  management which would invariably -- some
14  content of that would have gone into the
15  bankruptcy proceedings.
16     Q.   Is it fair to say that you were not
17  involved in preparing the Clarification Letter
18  and its schedules that were ultimately filed
19  with the court?
20     A.   I certainly didn't prepare the
21  letter, but there may have been data that came
22  from -- that I contributed to that were part.
23     Q.   Let's get back to this effort to
24  locate unencumbered assets.

1    **Blackwell - Highly Confidential**
2        **How many assets did you locate?**
3    **What's the value of the assets that you**
4    **located, if you recall?**
5        A.    I think it was -- initially it was
6    about -- it was over $2 billion, but there was
7    Lehman paper within there, so it's difficult to
8    put a value on that, so...
9        **Q.    And who places the value on those**
10    **assets?**
11        A.    Normally that would be model driven,
12    so the finance organization would place a value
13    on it or a third-party source.
14        **Q.    And is it fair to say that your**
15    **operations group did not place the value on**
16    **those assets?**
17        A.    That's fair.
18        **Q.    I apologize for jumping back to the**
19    **Schedule A and the repo, but as to the**
20    **valuation of the assets that are posted as**
21    **collateral for the Barclays repo, we see**
22    **reference in some of the documents to BONY**
23    **placing a value on them.  Why is BONY placing a**
24    **value on those assets?**
25        A.    Because they are Barclays' tri-party

1        Blackwell - Highly Confidential
2    agent.  You would expect to place a value
3    on the collateral that they received.
4        **Q.    And is that valuation that's**
5    **different or was different than the valuation**
6    **that Lehman had placed on those assets?**
7        MR. SHAW:  Objection.  Foundation.
8        A.    I believe it was different by -- I'm
9    not sure the exact amount.
10        **Q.    Do you recall any discussions about**
11    **the difference between those two values?**
12        A.    I didn't have any of those
13    discussions, so no, I don't recall those
14    discussions.
15        **Q.    That would not fall within the**
16    **operation group's purview generally?**
17        A.    Jim may have had conversations with
18    them, with Bank of New York, Chase and the Fed
19    at that time, but he would be the right person
20    to ask.
21        **Q.    So is it fair to say you would not**
22    **have intimate knowledge of BONY's valuation of**
23    **those assets?**
24        A.    No, I wouldn't.
25        MR. HINE:  I want to show you

1        Blackwell - Highly Confidential
2    another document.
3        (Exhibit 62 B, e-mail dated
4    September 17, 2008, Bates stamped 10293351,
5    marked for identification.)
6        **Q.    Mr. Blackwell, I am handing you a**
7    **copy of a document marked 62 B, which is an**
8    **e-mail between Mr. Ullman and yourself on**
9    **September 17th, 2008.**
10        **Have you ever seen this document**
11    **before?**
12        A.    I would have thought so, yes.
13        **Q.    Can you just take a minute and**
14    **review it and see -- my question to you is**
15    **going to be what is Mr. Ullman being cynical**
16    **about or concerned about?**
17        MR. SHAW:  Objection.  Foundation.
18        A.    I don't know exactly what's going
19    through his mind, but I think you can see from
20    the e-mail that he has uncertainty about we
21    don't know the terms of a deal and he is
22    speculating about -- he is speculating about
23    what is going on.  That is all.  I have no idea
24    why he thought this.  You would have to ask
25    him.

1        Blackwell - Highly Confidential
2        **Q.    Do you have any recollection of**
3    **discussing this issue with him or anyone else?**
4        A.    No.  I didn't have time to discuss
5    conjecture and speculation at that point in
6    time.  I was purely doing my function as much
7    as I possibly could.
8        MR. HINE:  I want to show you
9    another document.
10        (Exhibit 63 B, e-mail dated
11    September 19, 2008, Bates stamped 10294630,
12    marked for identification.)
13        **Q.    Mr. Blackwell, I am handing you a**
14    **document marked as Exhibit 63 B, which is an**
15    **e-mail stream involving yourself from the**
16    **period September 19th, 2008 dating back to the**
17    **prior date, September 18th.  I don't have many**
18    **questions about this document.**
19        **What I really want to ask you about**
20    **is I see a series of documents like this,**
21    **e-mails, discussing fails, so I just want to**
22    **understand what fails are and how they related**
23    **to what you were doing at this point in time.**
24        A.    I think there were a lot of
25    questions being asked about the clearance

1    Blackwell - Highly Confidential
2  boxes, exposure in the clearance boxes, and I
3  think this relates to ultimately the conclusion
4  that the only assets being transferred were the
5  unencumbered assets of the clearance boxes, but
6  not the fails.
7    Q.   Could you just tell me what fails
8  are in this context?
9    A.   Fails are transactions that have
10  been entered into where you are receiving cash
11  or securities --
12    MR. BYMAN:  I'm sorry,
13  Mr. Blackwell, I cannot hear you.
14    A.   Definition of a fail is where a
15  security is to be delivered and cash to be paid
16  with either counterparty, and so fails would be
17  a list of failed to receive securities and
18  failed to receive cash where securities were to
19  be delivered.  So that is a fail.  So that --
20  if you are taking responsibility for the fails,
21  you are taking responsibility for the overall
22  clearance box.  If you are not taking
23  responsibility for the clearance box, you are
24  not taking responsibility for the fails.  And
25  that is -- this is where the questions -- where

1    Blackwell - Highly Confidential
2  questions are arising.  There were questions
3  over the weekend as to the amount of fails and,
4  again, the visibility that we had was very,
5  very -- was limited because of the data that we
6  had received.
7    Q.   When you say "visibility," you mean
8  DTC had this data and you guys couldn't tell
9  the percentage of fails?
10    A.   We couldn't see data properly, but
11  that -- we had given -- yes, absolutely.  We
12  had limited -- Chase in particular, that was a
13  major challenge for us, because it hadn't
14  provided us with any activity data that had
15  taken place on the Friday or I think since the
16  Thursday night.
17    Q.   Aren't you entitled to that as their
18  client or customer?
19    A.   Yes.
20    Q.   And did you argue with them about
21  that?
22    A.   Yes.
23    Q.   And what was the result of that?
24    A.   We still didn't get the data and I
25  believe Hughes Hubbard has been fighting to try

1    Blackwell - Highly Confidential
2  and get it from Chase ever since bankruptcy.
3    Q.   Can you tell me the position that
4  Barclays took with respect to fails?
5    MR. SHAW:  Objection to form.
6    A.   I was asked by my -- again, my
7  superiors to try and explain what the fails
8  situation was and I think on several occasions
9  over the course of the week we provided data --
10  I provided data to the Barclays, Barclays'
11  lawyers or to my management with a status and I
12  think there was some communication where I said
13  I wasn't going to focus on this, I am going to
14  focus on the conversion now again, so we
15  provided the fails data and moved on and then
16  that sort of died as far as in my thought -- in
17  my recollection the issue died until the -- I
18  think the Sunday, I think it's the 21st, when
19  that was then brought up again in -- I think
20  that was -- I was started -- I was asked
21  another set of questions around that.
22    Q.   And what do you remember about that
23  conversation?
24    A.   Just to explain what fails were.
25    Q.   And who was that with, Barclays

1    **Blackwell - Highly Confidential**
2  **or --**
3    A.   No, that was with my own management.
4  And then I think I had some conversations with
5  our trading desks about that as well.
6    Q.   Your management in this regard is
7  who, Mr. Lowitt?
8    A.   It was probably Ian.  It may have
9  been Alex Crepeau as well.
10    Q.   Were you party to any discussions
11  they might have then had with Barclays about
12  this issue?
13    A.   No.
14    Q.   Do you know how this issue was
15  resolved between Barclays and Lehman?
16    A.   I left the Weil offices at that
17  point.  I hadn't been in any of the rooms
18  negotiating anything.  I had just been in an
19  ante-room providing information to my
20  management, as I said.  I returned to the
21  office to continue working on the unencumbered
22  assets.
23    Q.   What date was this?
24    A.   I think that was a Sunday.  Again,
25  the timing may be slightly off, it may be

1     Blackwell - Highly Confidential
2  Saturday or Sunday, but it was over the
3  weekend.
4    **Q.   So in the end did Barclays end up**
5  **getting the fails?**
6    A.   No.  Barclays did not take
7  responsibility for the clearance box, just the
8  unencumbered assets sitting in the clearance
9  box.
10    **Q.   Okay.  I am not trying to put words**
11  **in your mouth.  So you were able or your team**
12  **was able to take certain unencumbered assets**
13  **out of the clearance box and somehow it was**
14  **transferred to Barclays, just those assets?**
15    MR. SHAW:  Objection.
16  Mischaracterizes prior testimony.
17    A.   I made a schedule of unencumbered
18  assets and in the following week there was
19  discussion with the trustee of LBI to move some
20  assets and some assets did move based on that
21  schedule.
22    **Q.   Okay.  And those were unencumbered**
23  **assets?**
24    A.   Unencumbered assets.
25    **Q.   So just so I understand, that would**

1    **Blackwell - Highly Confidential**
2  **not have included the fails?**
3    A.   Does not include the fails.  Now, I
4  want to clarify one point here as it relates to
5  PIM, because PIM was the private investment
6  management business.  That hadn't transferred
7  at that point.  Assets did transfer
8  subsequently and the PIM business doesn't have
9  any fails either, its contractually-settling
10  business, so it's a non-fail environment.  So
11  the full set of customer assets are in the
12  customer accounts.
13    MR. HINE:  Let's mark this.
14    (Exhibit 64 B, e-mail dated
15  9-18-2008, marked for identification.)
16    **Q.   Mr. Blackwell, I am handing you a**
17  **document marked as Exhibit 64 B, which is an**
18  **e-mail between yourself and Mr. Eickbush dated**
19  **September 18th, 2008 and it references in the**
20  **subject line something called a fails call, and**
21  **I believe this is the topic we have just been**
22  **discussing?**
23    A.   I'm sorry, what day is this?
24    **Q.   Upper right-hand corner says**
25  **September 18th.**

1    **Blackwell - Highly Confidential**
2    A.   Okay, yes.
3    **Q.   Do you have any recollection of that**
4  **fails call?**
5    A.   I don't think Greg was on that call.
6  I have a recollection of a call with the
7  Barclays lawyers on that -- I think over that
8  night, so that's the Thursday night.  Again, we
9  were trying to ascertain the value and the
10  number of fails and, again, it's sort of
11  pertaining to taking control of the box or just
12  taking the inventory.
13    **Q.   Okay.  And do you recall anything**
14  **else about that call?**
15    A.   I provided data, which is, again, in
16  my e-mail, which was provided to the Weil
17  lawyers as well, and that was the end of the
18  discussion.  I think we spoke to Bart and just
19  told him what we had done and that was it and
20  that was the end of the issue until the
21  weekend.
22    **Q.   I see the use of a phrase in this**
23  **e-mail "cherrypicking of assets."  Do you see**
24  **that?**
25    A.   Yeah.  I don't -- he wasn't on the

1    Blackwell - Highly Confidential
2  call, so this is conjecture and speculation on
3  his part.  I don't know.  You would have to ask
4  him why.
5    **Q.   Does that phrase have any meaning to**
6  **you in this context?**
7    A.   I think the latter part of that
8  sentence makes more sense.  I think what he is
9  saying is, my interpretation of this, and you
10  should ask Greg for his perspective, would be
11  that the unencumbered securities within the box
12  are part of any transaction potentially, and,
13  again, he wasn't party to any deal details or
14  nor was I, so this is his speculation, so he is
15  speculating that it's unencumbered assets.
16    (Exhibit 65 B, e-mail dated
17  September 19, 2008, Bates stamped 10298087,
18  marked for identification.)
19    **Q.   Mr. Blackwell, I am handing you a**
20  **copy of an exhibit marked 65 B, which is Bates**
21  **stamped 102 -- not Bates stamped, but it's**
22  **marked with numbers at the bottom 10298087**
23  **through -- well, actually, they are all marked**
24  **087, but it appears to be an e-mail stream from**
25  **September 19th in which you are one of the**

1   **Blackwell - Highly Confidential**
2   recipients.
3       MR. SHAW:  Take your time.
4       A.   It is just going to take a little
5   bit of time for me to read.
6       **Q.   Sure.  If it helps you, my question**
7   **is going to be on the first page.**
8       A.   Yeah, but I would still like to read
9   the --
10      **Q.   Sure.  Sure.**
11          (Document review.)
12      A.   Okay.
13      **Q.   Have you had a chance to review the**
14  **document?**
15      A.   I have.  Thank you.
16      **Q.   My question relates to the e-mail**
17  **from Mr. Dolan to several people including**
18  **yourself where he says "let's be very clear**
19  **here, there is no such thing as cherrypicking.**
20  **Per Berkenfeld and Lodato, all positions will**
21  **move."**
22          **Could you just tell me what is the**
23  **issue here?  I see the phrase "cherrypicking"**
24  **and I just want to know what's at issue in this**
25  **communication.**

1   **Blackwell - Highly Confidential**
2       MR. SHAW:  Objection.  Foundation.
3       A.   The whole e-mail trail is about a
4   conversion, a conversion position.
5       **Q.   Okay.**
6       A.   And I'm just trying to ascertain
7   exactly when this was, but, again, it looks
8   like this was on the Thursday and there was an
9   assumption, as you can see, by everyone
10  involved here that there is an assumption that
11  a conversion is taking place, therefore, the
12  boxes are moving -- the clearing boxes are
13  moving over.  What this, in fact, is then
14  talking about is just firm accounts.  I think
15  the title of the e-mail is talking about firm
16  account transitions and is very specific about
17  trading, trading positions, but this is
18  redundant.  This is redundant.  This is up to a
19  point in time and this is not what then came to
20  pass ultimately, I don't believe, so, again,
21  this is based on a team of people, technology
22  operations, finance and business working on a
23  set of assumptions which were faulty ultimately
24  or became redundant because another set of
25  decisions were made by senior management.

1       Blackwell - Highly Confidential
2       **Q.   Okay.  Let me just see if I**
3   **understand that.**
4           **Are you saying that this use of the**
5   **term "cherrypicking" does not relate to the**
6   **fails that we just talked about previously;**
7   **correct?**
8       A.   No.  As far as I -- the way I am
9   interpreting this document, it's not.  I would
10  interpret this by looking at firm accounts and
11  saying we have this position from the firm
12  accounts and I think what he is saying is that
13  isn't happening and it's not relevant to the
14  fails.
15      **Q.   So when you are using the phrase**
16  **"conversion," am I correct to say that in the**
17  **conversion context all the accounts would go**
18  **over including every aspect of the clearance**
19  **boxes?**
20      A.   No.  Sorry, carry on.  I apologize
21  for interrupting.
22      **Q.   I am trying to understand.**
23          **Previously you had talked about**
24  **finding unencumbered assets in the clearing**
25  **boxes; correct?**

1   **Blackwell - Highly Confidential**
2       A.   Yes.
3       **Q.   Is that not the case in a**
4   **conversion?  Does the entire clearing box go**
5   **over?**
6       A.   These are two different things.
7   This is two different exercises completely.
8   This is about a way a deal potentially may have
9   been -- having been conceived up to a point in
10  time and something completely different
11  afterwards, so it's comparing apples with
12  oranges.
13      **Q.   So is it correct to say the**
14  **conversion effort started earlier in the week**
15  **worked its way through different iterations up**
16  **to some point in time and then was abandoned?**
17      A.   And then abandoned on the Friday at
18  5 p.m.  I think I called a meeting and told
19  everyone the conversion -- all these people
20  were working feverishly to try and create a --
21  to do certain things and to facilitate whatever
22  we believed the transaction was.  It was
23  irrelevant.
24      **Q.   And then you shifted gears and I**
25  **think you testified before that you then were**

Page 110

Blackwell - Highly Confidential

1    tasked with getting yourself set up so you
2    could run your operations on behalf of Barclays
3    Capital as of Monday; is that right?
4       A.   Or some form of that still to be
5    determined with conversations with Barclays'
6    operations staff, which I wasn't really able to
7    have.
8       Q.   Okay.  That was going to be my next
9    question.  What did you, in fact, do with
10   respect to that task?
11      A.   A number of the people involved in
12   what was perceived to be the original
13   conversion then started to work on a plan to
14   create our ADP stream, which is the back office
15   clearance system, a new DTC clearance box
16   linking up to Barclays' back office
17   infrastructure, and we built a whole plethora
18   of pieces of technology or replicated
19   technologies.  On -- I think it was on
20   Sunday -- there was clarification over the
21   weekend and at one point I asked a question is
22   prime brokerage going to be live in the first
23   week and it was agreed that that wasn't going
24   to be the case.  That was passed to me from

Page 111

Blackwell - Highly Confidential

1    Ian.  And we continued to work through that
2    process.  On -- I think it was late on Sunday I
3    was told -- or may have been Monday morning I
4    was told that we wouldn't be trading for a week
5    and so it became moot.  So post bankruptcy we
6    did a -- we had a combined plan, not a plan
7    where Lehman employees try to figure out how
8    they would be working at Barclays, but one
9    where we were coming together as a group of
10   people to determine exactly what we were doing,
11   set goals and then deliver those goals, and
12   that wasn't really done until -- I can't
13   remember the meeting, but it was in the board
14   room at 745.
15      Q.   This was after the closing?
16      A.   I believe so, yes.  I can't -- we
17   could clarify when it was.
18      Q.   Do you have any recollection of any
19   issues arising during this weekend period about
20   assets that were, I guess, belonged to LBIE
21   versus LBI?
22      A.   I think there may have been some
23   discussion.  I don't recall it.
24      Q.   You don't recall any problems with

Page 112

Blackwell - Highly Confidential

1    assets that were previously supposed to go to
2    Barclays that ended up being from LBIE and they
3    couldn't go?
4       A.   I don't, but it's possible.
5       Q.   You weren't involved?
6       A.   I don't recall that.
7            MR. HINE:  Do you want to take a
8    break?
9            MR. SHAW:  Sure.
10           (Recess was taken from 11:43 to
11   11:53.)
12           (Exhibit 66 B, e-mail dated
13   September 19, 2008, Bates stamped 10298186,
14   marked for identification.)
15   BY MR. HINE:
16      Q.   Mr. Blackwell, I am handing you a
17   copy of a document marked as Exhibit 66 B,
18   which is an e-mail stream dated Friday, the
19   19th of September, and you are listed as a
20   recipient on the last of the e-mail stream.
21           I wanted to ask you if you have ever
22   seen this e-mail before, if you recall seeing
23   it.
24      A.   What time is this?  What time is the

Page 113

Blackwell - Highly Confidential

1    original flow here?  Is that the accurate time?
2       Q.   I don't know.
3       A.   Is that middle of the day, middle of
4    the night?  I can't tell.  Where Paolo says
5    "got it."
6       Q.   Well, here is my question:  The part
7    of the e-mail stream that you were referring to
8    is an e-mail from David Aranow to Paolo Tonucci
9    which says, and let me just read it:
10   "Barclays' operations team has recalculated the
11   value of the collateral that they received from
12   us last night and they are more than fully
13   collateralized including the haircuts applied.
14   Senior management at Barclays, I am told, are
15   very satisfied with the results of the effort."
16   And then it goes on.
17           Do you recall any discussions about
18   this issue on that Friday?
19      A.   No.
20           MR. SHAW:  Objection to form.
21      Q.   Am I understanding your prior
22   testimony correctly that not all the collateral
23   got transferred to Barclays that they expected
24   on Thursday night?

Blackwell - Highly Confidential
1
2     A.   I don't know what this is referring
3  to precisely.
4     Q.   Okay.
5     A.   So I can't comment on this e-mail.
6  I'm on the e-mail trail. There is -- the
7  commercial components are -- you have John
8  Wickham, John Feraca and John Coghlan on here
9  that are the people that would have an opinion,
10  and same with Paolo. I don't know what this is
11  referring to.
12     Q.   Do you recall any debate or
13  discussion on either Thursday night or Friday
14  of that week about whether the collateral had,
15  in fact, all been transferred to Barclays under
16  the repo?
17     A.   There was a mechanism put in place
18  to move collateral, so there was debate and
19  discussion about what was moving in terms of
20  the mechanism. Had a lot of conversation about
21  the mechanism. So that's where the focus,
22  again, from an operations standpoint had, and
23  what moved was reconciled. So I think that's
24  understood what physically moved. I don't know
25  what this is referring to. I don't know what

1     Blackwell - Highly Confidential
2  the value is, so I don't have a -- don't really
3  have any opinion on this.
4     Q.   Okay.  I understand your testimony.
5  I just want to make sure I got it all.
6        Where it says "fully collateralized
7  including the haircuts," do you have any
8  understanding what haircuts they are talking
9  about there?
10     A.   I don't know what Barclays would
11  have applied.
12     Q.   And I take it also you don't
13  understand what the phrase "fully
14  collateralized" in this context is?
15     A.   I don't know exactly. I think this
16  is -- yes.
17        MR. HINE:  That's fine.
18        Let's mark this.
19        (Exhibit 67 B, e-mail dated
20        9-18-2008, marked for identification.)
21     Q.   Mr. Blackwell I am handing you a
22  document marked as Exhibit 67 B, which is an
23  e-mail dated September 18th apparently late in
24  the evening between Mr. Hraska and yourself,
25  and there is other aspects of the e-mail, but

Blackwell - Highly Confidential
1
2  my question to you relates to the middle e-mail
3  in this stream in which Mr. Hraska writes
4  "without margin we are 1.5 billion short. With
5  margin, we owe them 7 billion." Do you see
6  that?
7     A.   Yes, I do.
8     Q.   I think I understand your prior
9  testimony as to the last document, but do you
10  have an understanding what this is talking
11  about?
12     A.   I think this is discussing a
13  shortfall. Most of my conversations with Jim
14  were face to face, because he was down the
15  hallway, but it looks like there was a
16  shortfall in terms of what was actually
17  delivered, as I understood it, and that he was
18  attempting to arrange a loan against the Chase
19  depo positions and pledge cash. Whether that
20  was successful or not, I --
21     Q.   Just so I understand that, you mean
22  he was attempting to affect a loan from Chase
23  and then the cash would then be transferred to
24  Barclays to make up for the shortfall?
25     A.   Would fill the repo. I think that's

1     Blackwell - Highly Confidential
2  what he was saying here. He would be the
3  person who could describe this precisely, but
4  that would be my interpretation.
5     Q.   And do you have an understanding
6  that there was a $7 billion shortfall in the
7  repo or do you --
8     A.   That -- I have a recollection of
9  that kind of number, but, again, I wouldn't be
10  able to talk as eloquently as Mr. Hraska would.
11     Q.   I just want to see what you recall.
12        Do you recall that that 7 billion --
13     A.   It sounds familiar.
14     Q.   -- shortfall was ever satisfied?
15     A.   I don't.
16     Q.   Can you explain to me your
17  understanding of why there is a $7 billion
18  shortfall when there is with margin and then it
19  says without margin a smaller shortfall? Do
20  you know what that means?
21     A.   These would be the commercial terms
22  of a repo. So a margin -- you have to deliver
23  a higher value which is margin, so I think you
24  need to -- you would have to ask Jim what
25  exactly this meant or, indeed, the front office

Page 118

Blackwell - Highly Confidential

1 as to the terms that were agreed.
2
3     Q.    Okay.  So you don't have any
4 independent recollection --
5     A.    No.
6     Q.    -- of what that issue is?
7     A.    No, I don't.
8         (Exhibit 68 B, e-mail dated
9 9-20-2008, marked for identification.)
10     Q.    Mr. Blackwell, I am handing you a
11 copy of an exhibit marked 68 B, which is an
12 e-mail stream dated September 20th apparently
13 from a great part of your life and I just
14 wanted to have you take a look at it and see if
15 you recall this e-mail stream.
16         (Document review.)
17     A.    I recall this.
18     Q.    Could you tell me what was making
19 your life a living hell at that time?
20     A.    Just trying to do my job, frankly.
21 That was it.  It was just the volume of
22 information and data I was being asked to
23 provide.  The environment I was working in was
24 very, very difficult.  It wasn't an environment
25 where we had perfect information.  So there was

TSG Reporting - Worldwide  (877) 702-9580

Page 119

Blackwell - Highly Confidential

1
2 a lot of uncertainty in terms of the data that
3 we were trying to gather and we weren't
4 operating in normal course of business, so
5 being put under enormous pressure to generate
6 data from a substandard environment which
7 wasn't designed to create the data.  The way we
8 were having to extract it at that point in time
9 was incredibly, incredibly challenging, and so
10 that was the living hell.
11     Q.    Okay.  But when you say "data," what
12 data are you referring to?
13     A.    All of the work streams that are in
14 my e-mail that I was being asked to work on, so
15 all contribute.
16     Q.    Was it a particular -- was this just
17 venting about the general situation or was it a
18 particular task that you were being asked that
19 you were particularly mad about or stressed
20 about at that point?
21     A.    No, I don't really recall exactly.
22 John Dorogoff used to run the investment
23 management division for me and was off at
24 Neuberger, so he wasn't part of whatever deal
25 was going on, he was dealing with a separate

TSG Reporting - Worldwide  (877) 702-9580

Page 120

Blackwell - Highly Confidential

1
2 set of issues, so I have -- I was being
3 challenged.  I think the reference to being
4 offended was I think Rich Ricci was unhappy
5 that -- I think I showed him something and it
6 wasn't the same as something else that somebody
7 else had shown him which was very similar, or I
8 had been in the room when something was shown
9 to him and that was in 745 and I don't know
10 what data it refers to, frankly, but I know
11 that he wasn't -- he had seen a similar piece
12 of information that was different, so, again,
13 it's around having to try and do a work to the
14 standard that I am used to doing in my daily
15 life under incredibly difficult circumstances,
16 which hopefully not many people have to live
17 through, and trying to perform to the standard
18 I want to as a professional.  And that was the
19 challenge.
20     Q.    Well, can you -- at the bottom of
21 this first page you write something about "if I
22 can't figure out what assets are in and out of
23 the deal, the deal can't close."
24         Is that -- I am just trying to
25 understand what assets you are probably

TSG Reporting - Worldwide  (877) 702-9580

Page 121

Blackwell - Highly Confidential

1
2 referring to there.
3     A.    I don't know.
4     Q.    You don't know?
5     A.    I don't know.  I mean, I could
6 speculate, but it's not meaningful.
7     Q.    Okay.  Is this during the period
8 when you are trying to locate the unencumbered
9 assets that we talked about earlier?
10     A.    What date is this?  This is the
11 20th.  It's possible.  It's possible.  I was
12 doing lots of things at that time.  I was also
13 trying to figure out -- yes, I was doing many,
14 many, many different things, you can see that,
15 so it could be a reference to anything.  It's
16 more of a reference to my state of mind than it
17 is to individual task I am carrying out.
18     Q.    Above that you talk about a
19 conversation with Bob Diamond's number 2.  Who
20 is that?
21     A.    Rich Ricci.
22     Q.    Okay.  So that's what you were
23 talking about before when you said he would
24 have been offended?
25     A.    Yes.

TSG Reporting - Worldwide  (877) 702-9580

1      Blackwell - Highly Confidential
2      **Q.   Do you recall anything else about**
3  **that conversation?**
4      A.   No, not really apart from -- I
5  really don't -- I don't even know what I was
6  talking about, to be honest.  I don't know what
7  the subject of the conversation was about, but
8  it was some piece of data that I handed over
9  and -- or something of that nature.  I really
10 can't recall.
11     **Q.   At the very top you talk about what**
12 **they bought.  Do you see that phrase?**
13     A.   Yes.  I didn't know.
14     **Q.   You didn't know what they bought?**
15     A.   No.
16     **Q.   My question was is there push-back**
17 **from Barclays during this period of time about**
18 **the assets that they thought they bought but**
19 **they are not getting?**
20     MR. SHAW:  Objection to form.
21     A.   I wasn't having conversations with
22 Barclays about what assets.  I was doing my
23 task.  I didn't know what the deal was, so I
24 don't know.  In terms of data that was being
25 shared, I was sharing information with my
   TSG Reporting - Worldwide  (877) 702-9580

1      Blackwell - Highly Confidential
2  management and attending in meetings at 745
3  with people and that was happening constantly
4  24 hours a day pretty much, so I don't recall
5  what it's specifically referring to.
6      **Q.   Okay.  I understand you weren't in**
7  **conversations with Barclays, but do you recall**
8  **any just general scuttlebutt or your general**
9  **understanding about Barclays pushing back as to**
10 **the assets they thought they were buying?**
11     A.   The only thing I recall was the
12 clearance boxes and there are obviously assets
13 that fall under the Fed repo, but that was
14 before this point, fall under the Fed repo that
15 would not be eligible as collateral to be
16 delivered to -- as part of a regular repo,
17 because the Fed takes lower-quality assets, but
18 that's standard commercial terms.
19     **Q.   The Fed takes lower-quality assets**
20 **than a repo between private parties?**
21     A.   Yes.
22     **Q.   That's pretty standard?**
23     A.   The PDCF was created to create
24 liquidity for that very purpose, to allow
25 poorer quality assets to be lent so that it
   TSG Reporting - Worldwide  (877) 702-9580

1      Blackwell - Highly Confidential
2  would create liquidity in the market.
3      **Q.   And does the Fed get a bigger**
4  **haircut or discount as to the collateral that's**
5  **posted for those?**
6      A.   I'm not sure.
7      **Q.   You are not sure?**
8      A.   I'm not sure.
9      (Exhibit 69 B, e-mail dated
10     September 19, 2008, Bates stamped 93219,
11     marked for identification.)
12     **Q.   Mr. Blackwell, I am handing you a**
13 **document which is marked as 69 B which is an**
14 **e-mail stream taking place on Friday the 19th.**
15 **You are involved in this stream.**
16     **My question has to do with the part**
17 **of it that's on the second page.  Please take**
18 **your time to look at it.**
19     (Document review.)
20     A.   Okay.
21     **Q.   In that e-mail -- have you had a**
22 **chance to review the document?**
23     A.   Yes.
24     **Q.   In the e-mail that I am referring**
25 **to, which is between Mr. John Palchynsky and**
   TSG Reporting - Worldwide  (877) 702-9580

1      **Blackwell - Highly Confidential**
2  **Mr. Hraska and others, CC'd to you on the 19th**
3  **at 3:57 p.m., he discusses seven -- "as per**
4  **Barclays' request, 7 billion cash was allocated**
5  **to their lock-up last night.  If securities**
6  **were/can be used instead, that would free up**
7  **margin collateral by reducing the amount of**
8  **higher haircut securities allocated to the JP**
9  **Chase Bank loan."**
10     **Could you explain to me what that**
11 **means, if you understand it?**
12     MR. SHAW:  Objection.  Foundation.
13     A.   The technical experts would be
14 better to explain this to you.  I think that
15 would be -- I can make an attempt to explain it
16 to you, but I think --
17     **Q.   Do you have an understanding of what**
18 **it means?  I understand you are not the**
19 **technical expert.**
20     A.   Just almost literally that 7 billion
21 of cash, collateral, the loan I think was
22 referred to earlier where securities were
23 pledged to Chase as a loan and 7 billion of
24 cash was pledged to Barclays.  That 7 billion.
25 And I think John is referring -- John
   TSG Reporting - Worldwide  (877) 702-9580

1      Blackwell - Highly Confidential
2  Palchynsky is referring to different commercial
3  terms dependent on the quality of collateral.
4  What he is referring to in that last sentence
5  in terms of the JPMorgan Chase situation, I
6  don't know what he is referring to precisely
7  there, so I'd rather not speculate, but, again,
8  the middle part of that paragraph he is just
9  referring to substitution or changes based on
10  collateral quality, as far as I understand,
11  which would give you different commercial --
12      **Q.   Higher haircut securities are lower
13  quality?**
14      A.   I believe so, but you have to ask
15  them for confirmation.
16      **Q.   Do you have any recollection of the
17  discussion discussing this with your folks?**
18      A.   No.  No.  This wasn't an environment
19  where we were having lots of discussion.
20      **Q.   Are you copied simply because you
21  are in the chain of command?**
22      A.   Yes.
23      **Q.   You are not the guy on the ground
24  doing this type of deal?**
25      A.   No.  I had 2 and a half thousand

1      Blackwell - Highly Confidential
2  people working for me.  I didn't do this kind
3  of detail.
4      (Exhibit 70 B, e-mail dated May 29,
5      2009, Bates stamped 10296524, marked for
6      identification.)
7      **Q.   Mr. Blackwell, I am handing you a
8  copy of a document marked as Exhibit 70.  It's
9  an e-mail on Friday, September 19th, from Neal
10  Ullman to several people -- two people
11  including yourself titled "did you hear that
12  this is on hold."  Do you recall this e-mail?**
13      A.   Yes.  It's in relation to the Kathy
14  Bopp Flynn, who is the originator of this
15  e-mail, was referring -- was sending a note to
16  Neal around the conversion work.  Again,
17  thinking, this is Friday, that we are all
18  working towards a conversion.  That conversion
19  is now stopping.  It's on hold.  And Neal is
20  speculating again that the assets have gone as
21  part of a repo.  I have no idea why he thought
22  that or otherwise.  I don't know.
23      **Q.   Do you recall any discussion at all
24  about being out-smarted because the assets are
25  now in their possession due to the repo?**

1      **Blackwell - Highly Confidential**
2      A.   I think there was speculation
3  amongst a lot of people as to what was
4  happening.  We didn't know at that point.  So
5  again, this may be Neal's theory at that time.
6      **Q.   Okay.  But your recollection of the
7  phrase "did you hear that this is on hold" is a
8  reference to the conversion effort?**
9      A.   Absolutely.  And that was Kathy's
10  role, as I think she was responsible for -- she
11  was head of audit at the time, so, again, a
12  process role.
13      (Exhibit 71 B, e-mail dated
14      September 19, 2008, Bates stamped 138587,
15      marked for identification.)
16      **Q.   Mr. Blackwell, I am handing you an
17  exhibit marked 71 B, which is an e-mail from
18  yourself to Paolo Tonucci on Friday the 19th.**
19      A.   Right.
20      **Q.   First of all, do you recall this
21  e-mail?**
22      A.   I don't recall the e-mail, but I
23  understand it.
24      **Q.   Could you explain to me what you are
25  discussing here with Mr. Tonucci?**

1      **Blackwell - Highly Confidential**
2      A.   I am asking him -- again, I thought
3  I was doing a conversion, so I had -- I was
4  asking him the question that as a repo going
5  into default the conversion, have we converted,
6  that's it, because the conversion -- I then
7  actually went to Ian's office and met Paolo and
8  that's when I was told at I think 5 p.m. that
9  day there isn't a conversion.  So I am
10  speculating is that what's happened.  I didn't
11  know.  Been working towards a conversion and we
12  had been working hard to process a repo trade
13  and that's the question I am asking.  So I went
14  into Ian's office and was told that there
15  wasn't a conversion and all of the things that
16  I have told you previously.
17      **Q.   Okay.  And when you say "putting the
18  repo into default is my conversion," what does
19  that mean?  What does putting the repo into
20  default mean?**
21      A.   The financing trade, by Lehman going
22  bankrupt, my understanding would be that repo
23  is going to default.
24      **Q.   You mean LBI going bankrupt?**
25      A.   Yes.

Page 130

1    Blackwell - Highly Confidential
2        Q.   So you are --
3        A.   I'm sorry, go ahead.
4        Q.   I am just trying to understand what
5    you are talking about.
6            Is it your understanding at that
7    time that if LBI goes bankrupt, the repo goes
8    into default?
9        A.   That's standard terms.
10       Q.   Okay.  And --
11       A.   If the counterparty puts you in
12   default, ultimately.
13       Q.   Do you recall any discussions about
14   the repo going into default?
15       A.   Absolutely not at this point.
16       Q.   Did you have any water cooler
17   conversation or any speculation about whether
18   the repo would go into default at the time?
19       A.   Not that I recall, no.  No.
20       Q.   Did anyone ever discuss with you the
21   possibility that if the repo went in default,
22   those assets would be left with Barclays?
23       A.   It's possible.  Again, I don't
24   recall a specific conversation of that nature.
25       Q.   Do you recall any conversations with

Page 131

1    Blackwell - Highly Confidential
2    anyone about a possible default under the repo?
3        A.   I don't remember specific
4    conversations, no, on that.
5        Q.   Do you have any general
6    recollections that it was a topic of
7    discussion?
8        A.   I think it was a topic of
9    speculation.
10       Q.   Did you raise that topic when you
11   met with Mr. Tonucci or Mr. Lowitt?
12       A.   I was asked -- I was told -- I went
13   to the room.  There was a conversation already
14   under way.  I can't remember who exactly was in
15   the room, but I was told that there wasn't a
16   conversion, and so I asked what's next, and so
17   that's when I got my -- I started to get the
18   marching orders for the following week, so that
19   was really the bulk of that conversation.  Now,
20   I think I was in a cab potentially on my way
21   back into the office or just got back into the
22   office at this point from being up all night.
23   I had just gone home to shower and come back
24   again, so I was kind of in the process of being
25   in transit to an office.

Page 132

1    Blackwell - Highly Confidential
2        Q.   But when you did go in and met with
3    Mr. Tonucci and Mr. Lowitt, was anyone else in
4    the office?
5        A.   Yes, there were.  I can't remember
6    who it was.  It was some combination of Gerry
7    Reilly, Martin Kelly, potentially, and there
8    may have been other people as well, but it
9    wasn't -- there weren't any more than that, I
10   don't think.
11       Q.   Did you hear the notion of a repo
12   default mentioned at all in that meeting?
13       A.   I don't recall that.  I don't think
14   so.
15       Q.   Do you recall anything about a
16   default being discussed in that meeting?
17       A.   No, I don't recall anything being
18   discussed in that meeting in terms of a
19   default.  The conversation had moved on by the
20   time I had got into the room to here, my
21   conversation.
22           (Exhibit 72 B, e-mail dated
23   9-20-2008, marked for identification.)
24       Q.   Mr. Blackwell, I am handing you a
25   copy of an exhibit marked 72 B, which is an

Page 133

1    Blackwell - Highly Confidential
2    e-mail stream on September 20th between
3    Mr. Hraska, Mr. Tonucci and you are CC'd.
4            My question is do you recall that
5    e-mail discussion?
6            (Document review.)
7        A.   I have read the mail.
8        Q.   Do you see in the first paragraph on
9    the page it discusses Barclays closing the repo
10   under default.  Do you see that phrase?
11       A.   I do, yes.
12       Q.   Does this ring a bell with you or do
13   you recall any discussions on repo default?
14       A.   In terms of timing, this starts to
15   ring a bell.  It wasn't a Friday conversation I
16   was having.  So I think Jim is saying that in
17   order to protect the pledge positions of the
18   securities that are being pledged, they would
19   need to carry out a certain process, put the
20   repo in default, Barclays would have to put the
21   repo in default.
22       Q.   Can you explain to me what you mean
23   by "in order to protect the pledge positions"?
24       A.   Well, if you have placed cash with a
25   counterparty and you have securities as

Page 134

Blackwell - Highly Confidential

1  collateral, if you put a repo into default,
2  keep the securities and the cash stays with the
3  counterparty, and that's a standard term of a
4  repo agreement.
5
6      Q.   Is it standard to keep excess
7  collateral?
8      A.   I don't know.
9      Q.   And so what is -- do you recall
10 any -- this exchange between Mr. Hraska and
11 Mr. Tonucci?
12     A.   I received a lot of e-mails.  I saw
13 it at the time, so I'm sure -- I don't have --
14 it doesn't stick out in my memory as something
15 particularly.
16     Q.   Do you recall -- I guess ultimately
17 the repo was not put into default; correct?
18         MR. SHAW:  Objection.
19     A.   Actually, I'm not a hundred percent
20 sure of the fact pattern what happened around
21 the repo in terms of its legal standing.
22     Q.   Okay.  Do you ever recall hearing
23 that it was put in default?
24     A.    In terms of how it was -- no, not in
25 terms of -- it may have been used as a

Page 135

Blackwell - Highly Confidential

1  shorthand for recording it.  Not in a legal
2  sense.  More about how we were recording --
3  trying to capture things on the books and
4  records of Lehman Brothers post bankruptcy.
5
6      Q.   Can you explain what you mean by
7  that?
8      A.   Just cleaning up the books to try
9  and reflect real-world activity, which has been
10 something that continues to today.
11     Q.   So on the books now it's reflected
12 as a default?
13         MR. SHAW:  Objection to form.
14     A.   I would need to look at it exactly
15 how it's been recorded, but it's been recorded
16 how Hughes Hubbard and their professionals
17 wanted it recorded.
18     Q.   You don't recall how it's recorded?
19     A.   No, not at this point, no.
20     Q.   Do you recall any discussion about
21 the possibility of defaulting the repo as it
22 relates to the Clarification Letter?
23     A.   No, not -- no.
24     Q.   We talked about the Clarification
25 Letter earlier.

Page 136

Blackwell - Highly Confidential

1      Do you recall any discussion about
2  the modifications to the transaction that were
3  embodied in the Clarification Letter being used
4  instead of defaulting the repo?
5      A.   No.  I wasn't party to the
6  Clarification Letter.
7          (Exhibit 73 B, e-mail dated
8  September 20, 2008, Bates stamped 10222586,
9  marked for identification.)
10     Q.   Mr. Blackwell, I am handing you a
11 copy of an exhibit marked 73 B, which is an
12 e-mail between yourself and Bart McDade on
13 Saturday the 20th.
14
15     My question to you is do you recall
16 your exchange with Mr. McDade on this day and
17 what the topic was?
18     A.   I recall conversations with Bart.  I
19 don't know exactly what Bart is referring to
20 here.  The conversations I was having with Bart
21 focused on the fails, those fails conversation
22 previously, so I can't -- I don't actually -- I
23 know there are other e-mails between myself and
24 Bart and that's what I recall.  I don't know
25 exactly what we were talking about here.  I

Page 137

Blackwell - Highly Confidential

1  don't know.
2      Q.   You don't recall?
3      A.   No.
4      Q.   Did you ever set up an account to
5  capture Barclays' dough and send securities to
6  them?
7      A.   On Saturday?
8      Q.   At any time.
9      A.   No.  No.  I mean, we had a repo
10 agreement and so on and so forth, but not this.
11     Q.   This is not ringing any bells at
12 all?
13     A.   No, not -- the actions I took
14 immediately after this would probably be
15 helpful.
16     Q.   What I am trying to figure out, was
17 there any discussions of alternative types of
18 transactions instead of defaulting the repo or
19 any other alternative, were you a party to any
20 discussion where alternative transactions were
21 discussed?
22         MR. SHAW:  Objection to form.
23     A.   No, I wasn't party to any
24 discussions in terms of -- I had my marching

Page 138

1       Blackwell - Highly Confidential
2   orders for that weekend, which are 15C3 and the
3   unencumbered securities in the clearance boxes.
4       Q.   Can you tell me what you recall of
5   the 15C3 securities you just mentioned?
6       MR. SHAW:  Is this a logical time to
7   take our lunch break?
8       MR. HINE:  Yes.  Do you want to
9   break for lunch?  Okay.  Sounds good.
10      (Lunch recess was taken at 12:30.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
        TSG Reporting - Worldwide  (877) 702-9580

Page 139

1       Blackwell - Highly Confidential
2       (Time noted:  1:14.)
3   A L A S T A I R   B L A C K W E L L,
4   resumed as a witness, was examined and
5   testified as follows:
6   CONTINUED EXAMINATION BY
7   MR. HINE:
8       Q.   Good afternoon, Mr. Blackwell.
9       A.   Good afternoon.
10      Q.   Hope you had a good lunch.  We have
11  some more talking to do here, unfortunately for
12  you.  I think we had left off with -- we had
13  mentioned 15C3.
14          Could you just explain to me what
15  you were doing over that weekend as far as
16  trying to locate assets in 15C3 accounts?  And
17  I meant the weekend of the 20th, 21st.
18      A.   I wasn't trying to locate assets in
19  15C3.
20      Q.   Okay.  What were you trying to do
21  with respect to 15C3 accounts?
22      A.   It isn't an account.  It's not an
23  account.  It's a calculation that historically
24  was run once a week and is designed for
25  customer protection.  It's a regulatory
        TSG Reporting - Worldwide  (877) 702-9580

Page 140

1       Blackwell - Highly Confidential
2   requirement you run this calculation and what I
3   was doing was trying -- working in conjunction
4   with the people that were responsible for
5   producing that, which is the finance
6   organization, was to rerun a calculation.
7       Q.   And why did it need to be rerun?
8       A.   To come up with -- I was asked to
9   come up with what is the number, what is the
10  sum, basically, run the calculation and come up
11  with a number.  That is the 15C3 calculation.
12      Q.   Okay.  And then what was to be done
13  with that calculation once you did it?
14      A.   Provide it to the -- my supervisors
15  and for them to have an understanding of what
16  that number was.
17      Q.   Did you have any understanding of
18  how that calculation related to the transaction
19  that was going on between Barclays and Lehman?
20      A.   In terms of -- running the
21  calculation was to find out whether -- what the
22  calculation was, come up with a number.
23      Q.   And did you have any understanding
24  of what your superiors were going to do with
25  that number once you gave it to them?
        TSG Reporting - Worldwide  (877) 702-9580

Page 141

1       Blackwell - Highly Confidential
2       A.   Compare that to what was locked up
3   as cash to -- cash and securities to protect
4   customers.
5       Q.   And am I correct if that calculation
6   yielded a number that was lower than what was
7   previously locked up, that would release some
8   assets to Barclays; is that right?
9       MR. SHAW:  Objection.  Foundation.
10      A.   It would mean there is an excess.
11  It would mean there is an excess of cash locked
12  up or securities locked up as part of customer
13  protection.
14      Q.   And why were they trying to find out
15  whether there was an excess?
16      MR. SHAW:  Objection.  Foundation.
17      A.   I was asked to go recalculate the
18  numbers, so I worked with the finance people
19  who own the calculation as a whole, operations
20  are an input to some of the lines in the
21  calculation and we work towards creating that.
22      Q.   And who at finance are charged with
23  doing this calculation?
24      A.   At the time, Tony Stucchio, Anthony
25  Stucchio, who reported to Martin Kelly.
        TSG Reporting - Worldwide  (877) 702-9580

1          Blackwell - Highly Confidential
2          (Exhibit 74 B, e-mail dated
3      9-20-2008, marked for identification.)
4          Q.   Mr. Blackwell, I am handing you a
5  copy of a document marked as Exhibit 74 B,
6  which is an e-mail stream dated September 20th,
7  2008 involving yourself and several others
8  including Ian Lowitt and some of your people in
9  your group. I think I am mixing two concepts
10 here, so I just want to get some clarification
11 on what we have just been talking about after
12 you have had a chance to look at the e-mail.
13          (Document review.)
14     A.   Okay.
15     Q.   Have you had a chance to look at it?
16     A.   I have.
17     Q.   Could you tell me what you recall
18 about this discussion that's embodied in this
19 e-mail?
20     A.   It's just a -- it's a list of things
21 that we were working on. It's two things that
22 we were working on. Looking for the
23 unencumbered -- trying to define a list of
24 unencumbered assets, and what it's saying here
25 is that 15C3, if there is excess, and that

1          Blackwell - Highly Confidential
2  potentially there is money that can be released
3  as an unencumbered asset of the firm.
4          Q.   I think I understand what you said.
5  I just want to make sure.
6              This is during a period of time when
7  your group is trying to locate unencumbered
8  assets which would then presumably be
9  transferred to Barclays for whatever purpose?
10     A.   Right.
11          MR. SHAW: Objection. Foundation.
12     Q.   And I see here mentioned the goal is
13 1.9 billion. Do you see that?
14     A.   Yes.
15     Q.   Who set that goal or where did that
16 goal come from?
17     A.   Ian is saying guys, we need 1.95
18 billion.
19     Q.   Okay. Ian is after the below
20 e-mail; right? The e-mails are from the bottom
21 up in sequence?
22     A.   Yes. It would have come from Ian or
23 Paolo.
24     Q.   Do you recall any discussions about
25 why we need 1.9 billion in unencumbered assets?

1          Blackwell - Highly Confidential
2     A.   Again, people closer to the deal
3  were negotiating whatever they were
4  negotiating. I was being asked to carry out an
5  action. I have a goal. Find 1.9 billion of
6  unencumbered assets.
7     Q.   I just want to make sure, you were
8  not involved in the setting of that goal or --
9  am I correct to say you don't have any
10 knowledge of why that number was passed down to
11 you?
12     A.   I haven't -- no, I don't have
13 knowledge.
14     Q.   And now as I read this e-mail, the
15 bottom e-mail is Monty Forrest reporting on
16 some of the efforts to find unencumbered
17 assets; correct?
18     A.   Yes.
19     Q.   Okay. And as we get to the upper
20 e-mail, Ian says he really needs 1.95 billion;
21 is that right?
22     A.   Yes.
23     Q.   But I don't understand what he means
24 by a shortfall in the 15C3 lock-up release.
25 Can you explain that?

1          Blackwell - Highly Confidential
2     A.   I don't know exactly -- the way I
3  would interpret this would be if he is looking
4  for -- if the target is to find 1.95 billion of
5  unencumbered securities, then -- if there is no
6  excess in the 15C3 or there is an excess, we
7  don't know at this point, because we haven't
8  rerun the calculation, then potentially finding
9  more unencumbered assets because you wouldn't
10 take -- if it is not an excess, you can't take
11 it, so it's a sum.
12     Q.   Is it correct to say he is asking
13 for a little more in the assets in case there
14 was no excess in 15C3, but actually there was a
15 shortfall --
16          MR. SHAW: Objection. Foundation.
17     Q.   -- in 15C3? Is that right?
18     A.   No, I wouldn't interpret it like
19 that. I think he is saying find -- review --
20 we are not looking for assets that aren't
21 there. We are going through a process in a
22 very methodical way based on a set of -- an
23 understood approach which are under the rules
24 that we would apply to our depos, to the boxes
25 of Lehman Brothers, to find unencumbered

1        Blackwell - Highly Confidential
2    securities based on those rules to come up with
3    a list.  The data that we had, because Chase
4    had failed to send files for a period of time,
5    was incredibly difficult to work with.
6    Broker/dealer systems aren't run -- aren't used
7    to running over a weekend, they work on a
8    five-day week normally, so trying to create
9    this data was difficult.  So we are combing
10   through the data to create a list of
11   unencumbered assets.  We are recalculating the
12   15C3 to see what the segregation -- what the
13   lock-up requirement would be, on a hypothesis
14   that as customer assets had left Lehman
15   Brothers, then the requirement for a lock-up
16   would be reduced, so that would create an
17   unencumbered asset.  So we weren't looking for
18   things that weren't there.  We were looking for
19   things that were there based on the
20   challenge -- very challenged and uncertain data
21   that we had.
22       **Q.   I think I understood what you just**
23   **said, but did you mean that over the previous**
24   **week presumably customers had left Lehman and**
25   **that would reduce the requirement for the 15C3**

1        **Blackwell - Highly Confidential**
2    **lock-up or reserve?**
3        A.   That was a hypothesis.
4        **Q.   And you were doing the calculation**
5    **to test that hypothesis?**
6        A.   Yes.
7        **Q.   Did it prove to be correct?**
8        A.   I don't know what conclusion we
9    ultimately reached, because the data was so
10   challenging we didn't reach a conclusion that
11   weekend.
12       **Q.   So do you know if there was an**
13   **excess in the end?**
14       A.   I don't.  I don't recall whether
15   there was an excess or not.
16       **Q.   When you say the data was so -- what**
17   **data are you talking about?**
18       A.   Stock record data.  Books and
19   records of the firm are dependent on several
20   data feeds; trade data -- new trade data that
21   comes from the front office, external trade
22   data, so repo, for instance, coming from Chase,
23   these are all of the trades -- securities we
24   have pledged, I need that data, that needs to
25   be fed in, and then you carry out third

1        Blackwell - Highly Confidential
2    world -- a third-party check of your depos
3    versus the outside world, so your custody
4    information.  We had partial information around
5    repo coming back in and we had no visibility
6    over our depo at Chase, because they had
7    removed access to their systems, so we couldn't
8    operate in the normal course of business.
9        **Q.   Depo means deposit?**
10       A.   Depo means like a clearing box.  I
11   would use that term interchangeably.
12       **Q.   And why had Chase cut off this data**
13   **stream?**
14       A.   As a result of the funding activity
15   that is taking place.  I believe -- and this
16   is -- I didn't have a conversation with Chase,
17   but they rescinded access.  I passed that
18   information on to Paolo and asked him to speak
19   to Chase, because -- he in the end called Chase
20   and they still would not give us access to the
21   systems.
22       **Q.   Did they ever restore access to the**
23   **system?**
24       A.   Not that I'm aware of.
25       **Q.   Were you party to any of those**

1        **Blackwell - Highly Confidential**
2    **conversations between Lehman and Chase about**
3    **this issue?**
4        A.   No, I was not.
5        **Q.   Do you have any understanding of why**
6    **they were restricting access to the system?**
7        A.   I believe it's a dispute that they
8    had with Barclays around the financing trades
9    that were put on at that point.
10       **Q.   Do you have any more detail in your**
11   **understanding than that?**
12       A.   Just around -- just that.
13          (Exhibit 75 B, e-mail dated
14   9-20-2008, marked for identification.)
15       **Q.   Mr. Blackwell, I am handing you a**
16   **document marked as Exhibit 75 B, which is a**
17   **similar e-mail stream to the one you previously**
18   **just looked at marked as sent on September**
19   **20th, 2008.  It appears to me to be the same**
20   **e-mail stream, only the last entry is a little**
21   **different than previously.  So my question has**
22   **to do with the first entry on page 1 after you**
23   **have had a chance to look at it.**
24          **(Document review.)**
25       A.   Okay.

Page 150

1    Blackwell - Highly Confidential
2    Q.  Have you had a chance to look at it?
3    A.  I have.
4    Q.  In the first paragraph of this
5    e-mail it's mentioning an 8:00 call and it
6    appears to relay certain groups of assets and
7    eventually there is a line that says the total
8    is 2.181 billion.  Do you see that?
9    A.  I do.
10    Q.  Are these the assets that your group
11    identified as unencumbered assets?
12    MR. SHAW: Objection.  Vague as to
13    time.
14    Q.  Do you have an understanding of what
15    this list of assets is?
16    A.  I understand what is trying to be
17    shown here, yes.
18    Q.  Could you tell me what it is?
19    A.  The team of people, so finance,
20    operations working through the process I
21    described to identify assets on the books and
22    records that were highlighted as inventory,
23    unencumbered inventory, this is the breakdown
24    by clearance boxes.
25    Q.  I think previously you testified
TSG Reporting - Worldwide  (877) 702-9580

Page 151

1    Blackwell - Highly Confidential
2    that there was about $2 billion in assets that
3    you ultimately identified.
4    A.  Which is consistent.
5    Q.  My question for you is do you
6    believe this is pretty close to the end result
7    of your effort to find unencumbered assets?
8    A.  This was a point in time.  That work
9    continued.  I can't emphasize enough how
10    challenging the system environments were.
11    Getting information was happening.  We had
12    technology teams working through the night to
13    extract data from the systems in a non-standard
14    environment.  This is not what we are designed
15    to do and when they were designed to do them,
16    and we weren't getting the third-party feeds we
17    needed to to give us the hundred percent
18    confidence on the data that we had.  So there
19    is uncertainty here.  So at that point in time
20    there was a call -- I'm not sure that I was
21    actually on that call.  I think I was tied up
22    on another issue.  But this was the result of
23    that night's work, the overnight work that was
24    done by the technology and operations and
25    finance to come up with that list.
TSG Reporting - Worldwide  (877) 702-9580

Page 152

1    Blackwell - Highly Confidential
2    Q.  Okay.  Do you know when that process
3    came to a conclusion?
4    MR. SHAW: Objection.  Assumes facts
5    not in evidence.  Foundation.
6    MR. HINE:  You can answer.
7    A.  It continued.  It continued.  My
8    team continued working on this to try and
9    identify the unencumbered assets into the early
10    part of the following week.
11    Q.  So even after the closing it
12    continued?
13    A.  We didn't have access to data and
14    then we had virtually no access then, so it
15    just stopped.  The work stopped.
16    Q.  When did it stop?
17    A.  I don't know precisely.
18    Q.  If you look at this list, there is
19    four different classes of assets.
20    Do you recall any other classes of
21    assets that were identified as being
22    unencumbered other than the four listed here?
23    A.  No. These were the main buckets.  I
24    described these earlier as well.
25    Q.  Now, when it says "mortgages," do
TSG Reporting - Worldwide  (877) 702-9580

Page 153

1    Blackwell - Highly Confidential
2    you see that on number 4?  Do you recall any
3    discussions or -- any discussions over that
4    weekend about Barclays getting a greater
5    percentage of the mortgage-based assets than
6    was previously agreed to?
7    A.  No.
8    Q.  Is the term resi's used to describe
9    this type of asset, mortgage-based asset?
10    A.  Possibly.  Without seeing the list
11    of securities, I would be speculating.
12    Q.  Am I correct to say that you were
13    not -- would have no knowledge of discussions
14    between Barclays and Lehman as to the
15    disposition of residential mortgage-based
16    assets?
17    A.  That's correct.  I think there is
18    one point worth mentioning here.  You can see
19    even here that Chase are taking assets, again,
20    so we don't know exactly what's in the real
21    world box.  That's really showing you the
22    uncertainty of the data.
23    Q.  And you are pointing to something.
24    Can you just tell me which line you are
25    pointing to?
TSG Reporting - Worldwide  (877) 702-9580

Page 154

1    **Blackwell - Highly Confidential**
2    A.    It's the second to last paragraph or
3    sentence in the "we are also looking" --
4    **Q.    "To valuate how much JP Chase put a**
5    **lien on Friday by CUSIP"?**
6    A.    Yes.  We couldn't.
7    **Q.    Just so I understand, you are trying**
8    **to figure out what assets Chase is holding in**
9    **the system and not releasing?**
10    A.    What Chase has seized.
11    **Q.    And did you ever figure the amount?**
12    A.    That work, I believe, is still
13    ongoing in terms of what was being done.
14    (Exhibit 76 B, e-mail dated
15    September 21, 2008, Bates stamped 138124,
16    marked for identification.)
17    **Q.    Mr. Blackwell, I am handing you a**
18    **copy of an exhibit marked as 76 B, which is an**
19    **e-mail dated September 21st, Sunday, from**
20    **yourself to Ian Lowitt, a copy to some others.**
21    **Take a minute to look at it, if you would.**
22    (Document review.)
23    **Q.    Have you had a chance to look at it?**
24    A.    I have, yes.
25    **Q.    Do you recall what this e-mail**

TSG Reporting - Worldwide  (877) 702-9580

Page 155

1    **Blackwell - Highly Confidential**
2    about or could you explain to me what it's
3    about?
4    A.    I can.  This is in relation to
5    fails.  What I had been asked to do was
6    determine what the fails were, and as I
7    previously stated around the quality of data,
8    the Lehman systems at that time hadn't consumed
9    the data from the third parties.  The
10    third-party sources, in regular course of
11    business that you would have expected, would
12    give you a completely 100 percent accurate
13    statement of your real world positions.  What I
14    was suggesting we could make available to
15    Barclays is give Barclays access to DTC -- give
16    DTC, the Depository Trust Company, authority to
17    allow Barclays to look at the depos so that it
18    could see the fails for themselves, which would
19    be maybe an even more accurate reflection than
20    our books at that time, but that's on Sunday in
21    the night, I think, so I am just trying to help
22    solve the problem around the clearance box.
23    **Q.    And was your suggestion acted on?**
24    A.    I think it was after the event -- I
25    think -- at some point -- I don't think

TSG Reporting - Worldwide  (877) 702-9580

Page 156

1    Blackwell - Highly Confidential
2    actually as it relates to DTC that happened,
3    actually.  I don't think that ever happened.
4    **Q.    I think previously you discussed**
5    **fails, you said you thought it had been put to**
6    **bed and then it came back for you on Sunday.**
7    A.    This is it coming back.
8    **Q.    And do you recall your**
9    **conversations -- or did you have a conversation**
10    **with Bart McDade about this issue at this time?**
11    A.    Not then.  It was third party.
12    **Q.    So you don't know if, in fact,**
13    **Barclays was granted access to the DTC so they**
14    **could look at the fails themselves?**
15    A.    I don't know.  I don't know.  That
16    was only a suggestion.
17    **Q.    Would someone else in your**
18    **department know that?**
19    A.    Unlikely.
20    **Q.    Would someone else at Lehman know**
21    **that?**
22    A.    If it was granted, it would be in my
23    e-mail, because I probably would have had to
24    grant it.
25    (Exhibit 77 B, e-mail dated

TSG Reporting - Worldwide  (877) 702-9580

Page 157

1    Blackwell - Highly Confidential
2    September 21, 2008, Bates stamped 459680,
3    marked for identification.)
4    **Q.    Mr. Blackwell, I am handing you a**
5    **copy of Exhibit 77 B, which is an e-mail dated**
6    **September 21st, 2008 on which you are one of**
7    **the recipients and the subject of the e-mail is**
8    **17.9 billion, 9:15 p.m. update.**
9    (Document review.)
10    **Q.    Have you had a chance to look at the**
11    **document?**
12    A.    I have, yes.
13    **Q.    My question really has to do with if**
14    **you see on the first line, it says:  "Monty,**
15    **you and Alastair need to be at that 7 a.m.**
16    **meeting."**
17    **My question is do you recall having**
18    **a meeting 7 a.m. on Monday morning?**
19    A.    Is it Monday or Sunday?
20    **Q.    That's what I am trying to figure**
21    **out.**
22    A.    No, I don't think it was a Monday
23    morning meeting.
24    **Q.    It was a Sunday meeting?**
25    A.    What time is that?  I can't tell

TSG Reporting - Worldwide  (877) 702-9580

1    Blackwell - Highly Confidential
2 from here. Is it a 7 p.m. or 7 a.m. meeting?
3 It's a 7 a.m. meeting. I possibly was, but I
4 don't recall the meeting. Yeah, I don't recall
5 that meeting specifically. It would probably
6 be in my diary if I was there. I don't know.
7    **Q.   I think I might have misled you as
8 to the day. If you read this correctly, this
9 is sent at Sunday, 2 a.m., Greenwich meantime,
10 so that would be Saturday night here, correct,
11 so that the suggestion, as I read this, would
12 mean that it's suggesting a Sunday morning
13 meeting; do you recall?**
14    A.   That makes more sense, yes.
15    **Q.   Does that ring a bell then about a
16 meeting?**
17    A.   There was a meeting. I don't think
18 I was in that meeting. Monty took -- was in
19 that meeting, if there was one. I don't know
20 if it actually took place, but effectively this
21 is just a continuation of the process of
22 creating a list, which is -- looking at the
23 list by itself is pretty meaningless. It's a
24 list of CUSIPs with the price next to it.
25    **Q.   So you don't recall being at that**

1    **Blackwell - Highly Confidential
2 meeting?**
3    A.   I don't recall being at that
4 meeting. I certainly was discussing this topic
5 constantly.
6    (Exhibit 78 B, e-mail dated
7    September 21, 2008, Bates stamped 10252597,
8    marked for identification.)
9    **Q.   Mr. Blackwell, I am handing you a
10 copy of Exhibit 78 B, which is an e-mail dated
11 Sunday, September 21st, and the title -- the
12 topic is update 15C3-3.
13       My question to you has to do with
14 the first line where you write: "This won't be
15 perfect. Perfect is Tony taking that
16 approach."
17       My question is what were you talking
18 about when you said "this won't be perfect"?**
19    A.   The systems and the data were
20 imperfect, so that was my --
21    **Q.   So are you referring to the
22 calculation of the 15C3 number that we
23 previously discussed?**
24    A.   I'm referring to the inputs. The
25 calculation should be correct, because it's a

1    Blackwell - Highly Confidential
2 standard calculation. Some of the inputs into
3 that calculation are being produced in a
4 non-standard way to the best of everyone's
5 ability at that point in time. So that is my
6 point. It's not going to be a perfect
7 calculation. I think the last calculation was
8 done on the 17th.
9    **Q.   So it's not going to be perfect
10 because the inputs are not perfect?**
11    A.   Yes. Not because we were changing
12 the way you do the calculation. The
13 calculation was done the same way as it had
14 been done for twenty-odd years.
15    (Exhibit 79 B, e-mail dated
16    9-21-2008, marked for identification.)
17    **Q.   Mr. Blackwell, I am handing you a
18 copy of Exhibit 79 B, which is an e-mail dated
19 September 21st, 2008 from yourself to Ian
20 Lowitt.**
21    A.   Yes.
22    **Q.   Have you had a chance to look at it?
23 Can you tell me what you are talking about in
24 this e-mail? Because it's entitled "they are
25 talking about tri-party fail," so I just want**

1    **Blackwell - Highly Confidential
2 to see if you recall what this e-mail is
3 discussing.**
4    A.   Yes. I was in a room at Weil. Ian
5 and Paolo were outside of it and I think from a
6 Lehman perspective Bart, myself, those are the
7 people I remember. There were representatives
8 from the Fed, from Chase, from Barclays, from
9 most of the regulators in the room, and this is
10 where discussions, I think, started around the
11 clearance box. I think Chase made -- this is
12 my recollection, so it may be imperfect. Chase
13 made reference to the fact that there was a
14 repo for 15.8 billion, what was called the HIC
15 loan, so held in custody repo, which was a loan
16 that they wanted to assign to Barclays, which
17 Barclays wouldn't take at that time, because
18 they hadn't authorized the trade, which would
19 appear reasonable. I wasn't the expert on
20 this. And what I was actually doing was trying
21 to get -- and what you will see is an e-mail to
22 Bart from me at this same meeting saying we
23 need Paolo in here and Paolo came into the room
24 and I left, I think, at that point, and so
25 that's what it relates to.

Page 162

1        Blackwell - Highly Confidential
2        Q.   So the 15.8 repo that's mentioned in
3    your e-mail is the HIC loan that you just
4    talked about?
5        A.   Yes.
6        Q.   And "Chase want to liquidate," the
7    phrase you use there, that's meant to --
8        A.   I think that meeting is probably
9    documented, because I think Hughes Hubbard were
10   present at the time as well and Weil, so I
11   can -- there is a lot of information around
12   that meeting.
13       Q.   Do you recall anything else about
14   that meeting?
15       A.   It was -- yeah, there was -- it was
16   a discussion around the repo transactions,
17   Barclays' and Chase's position at that point.
18       Q.   Okay.  Do you recall anything other
19   than what you just told us?
20       A.   That was -- I believe that was the
21   main thrust.  Rich Ricci at the time also
22   stated that we weren't taking responsibility
23   for the clearance boxes and that's when I think
24   the meeting broke up, pretty much broke up, or
25   was about to break up, but I think I left the

Page 163

1        Blackwell - Highly Confidential
2    room.
3        Q.   Do you have any knowledge of how
4    this issue was resolved ultimately, if at all?
5        A.   No.  Not the 15.8, no.
6        Q.   Did you have any other follow-on
7    interaction with this 15.8 issue?
8        A.   No.  Just one of the repos that were
9    on.
10       (Exhibit 80 B, e-mail dated
11   September 22, 2008, Bates stamped 464767,
12   marked for identification.)
13       Q.   Mr. Blackwell, I am handing you a
14   copy of Exhibit 80 B, which is an e-mail stream
15   dated September 22nd, 2008 in which you are
16   involved, and after you have had a chance to
17   look at it, I have a quick question about it.
18       (Document review.)
19       A.   Okay.
20       Q.   Do you see on the second page where
21   it says -- an e-mail from Mr. Scagnelli where
22   he says "DTC has a free pledge chill on 636,"
23   do you see that?
24       A.   Yes.
25       Q.   Can you explain to me what that

Page 164

1        Blackwell - Highly Confidential
2    means, if you know?
3        A.   I would interpret that as meaning
4    that DTC has locked everyone out of the system,
5    that they are controlling the clearance box at
6    this point.  They are not taking direction.
7        Q.   Okay.  And that --
8        A.   That means we couldn't do anything.
9        Q.   Okay.  And later on I see your
10   e-mail which says "we need to get to DTC PDQ."
11       A.   Yes.
12       Q.   Do you recall what -- did you, in
13   fact, get to the DTC?
14       A.   Yes.  They didn't release anything.
15   DTC -- I don't think I actually spoke to them.
16   I don't believe we were in a position to be
17   able to -- we weren't controlling the box.  It
18   was in the hands of the trustee.
19       Q.   Okay.  And so was there a meeting
20   about this or do you have any knowledge of what
21   happened after this?
22       A.   No.  We didn't -- we ceased to have
23   any ability to impact the books and records of
24   LBI.  That's my recollection.  And this was
25   just, again, another part of the data issues

Page 165

1        Blackwell - Highly Confidential
2    that we were experiencing and probably close to
3    the end.
4        Q.   Can you describe for me what your
5    role has been with respect to these assets,
6    these unencumbered assets after the closing,
7    since you have gone to Barclays?
8        A.   Most of my -- my focus is obviously
9    trying to get management and structure in
10   place, so some -- I have been in some meetings
11   along the way.  Jim Hraska has worked probably
12   most closely with Martin Kelly, Robert Azerad
13   in the post -- at Barclays to assist.  I'd
14   say -- so it's been limited to the series of
15   meetings as it relates to these two specific
16   issues.
17       Q.   Two issues meaning the unencumbered
18   assets and --
19       A.   The 15C3.
20       Q.   And do you have a recollection of
21   what's gone on since the closing as to these
22   issues or --
23       A.   Again, more on the periphery of what
24   I have done, I have reviewed methodology to
25   ensure that I feel comfortable that the

1      Blackwell - Highly Confidential
2   approach that someone like Monty or Jim has
3   taken makes sense to me, which it does, and I
4   feel very comfortable with the methodology
5   under the terms of the agreement, so where it's
6   been necessary to have my input, then I have
7   been involved.  So I think we have created
8   additional schedules since bankruptcy at
9   Barclays which have been made available, so
10  that's been the extent of my involvement.  And
11  the 15C3 calculation is rerun every week by the
12  trustee of LBI.
13      Q.   Previously I mentioned that you have
14  been designated as a 30(b)(6) witness for
15  select issues in this case by Barclays, so I
16  just wanted to take a few minutes to address
17  that issue in this deposition, so for this
18  portion of the deposition it will be a 30(b)(6)
19  deposition.
20      Have you ever -- did you review the
21  30(b)(6) deposition notice that we provided to
22  Barclays?
23      A.   I don't believe I have seen it.
24      MR. SHAW:  If you show it to him, he
25      might know it.

1      Blackwell - Highly Confidential
2      MR. HINE:  Let's mark this as an
3      exhibit.
4      (Exhibit 81 B, Debtors' Second Rule
5      30(b)(6) Deposition Notice to Barclays on
6      Issues Relating to the Transfer of Assets,
7      marked for identification.)
8      Q.   Mr. Blackwell, I am handing you a
9   copy of Exhibit 81 B, which is a copy of the
10  Debtors' Second Rule 30(b)(6) Deposition Notice
11  to Barclays on Issues Relating to the Transfer
12  of Assets.
13      My first question is have you ever
14  seen this document before?
15      A.   In my discussions with Jonathan I
16  think I may have seen some portion --
17      MR. SHAW:  We are not going to get
18      into the substance of those discussions.
19      Q.   I don't want to ask you about a
20  privileged communication you might have had,
21  but can you please turn to Schedule A of that
22  document.
23      As I understand from Barclays, you
24  have been designated as a witness as to the
25  first two topics listed on that schedule, so

1      Blackwell - Highly Confidential
2   could you just take a minute and just take a
3   look at those topics.
4      (Document review.)
5      A.   Understood.
6      Q.   Okay.  You will see those topics
7   relate to Schedules A and B that we have talked
8   about previously in the deposition, so I just
9   want to spend a little time talking about those
10  two schedules.
11      Let's look at topic number 1.  Were
12  you involved in the selection of the securities
13  that made their way into Schedule A?
14      MR. SHAW:  Objection to form.
15      Q.   Let me rephrase it.
16      Were you involved in the selection
17  of the securities that are listed in Schedule A
18  to the Clarification Letter?
19      A.   I was involved in the transfer of
20  the Fed assets over to Barclays, so in terms of
21  selecting the assets, the selection was done as
22  I -- was done as I described, which was under
23  the terms of the repo agreement that was in
24  place between Lehman and Barclays at that time,
25  so eligible collateral is a component of that

1      Blackwell - Highly Confidential
2   agreement and had been in place for some time.
3   So selection is done -- was done -- the assets
4   were put into the Fed repo.  We know that there
5   were operational issues that I described in
6   terms of the assets changing because of the
7   settlement that took place at Chase, and then
8   there is also a subset of securities that
9   weren't eligible under the legal terms -- under
10  the commercial terms of the repo agreement
11  Barclays had in place with Lehman, which was
12  standard practice, that's why the Fed had
13  stepped in and provided liquidity to the whole
14  market with the PDCF, so poorer quality
15  collateral was funded by the Fed.
16      So it was clear based on the
17  schedules which securities fell outside of that
18  in terms of their quality.  So yes, my team
19  worked with finance with the treasury team to
20  refine that list based on that requirement, and
21  in addition to that there were obviously some
22  substitutions that had to take place to make up
23  value, so my team worked again with finance and
24  the clearance teams to drive that -- to
25  finalize that list, but the list is a

1 Blackwell - Highly Confidential
2 reflection of what moved.
3 MR. HINE: Okay. Let me go at it a
4 different way here. I have, unfortunately,
5 some hefty exhibits to pass to you.
6 (Exhibit 82 B, e-mail dated
7 September 20, 2008, Bates stamped BCI-CG
8 00035134, marked for identification.)
9 Q. Mr. Blackwell, I am handing you a
10 lengthy exhibit marked as 82 B, which is a
11 list -- it's a document Bates stamped BCI-CG
12 00035134 through 35954. I am not going to ask
13 you about the contents of this entire document,
14 but I would like to direct your attention, if
15 you could take a minute and look at the page --
16 first page after the e-mail cover, the covering
17 e-mail, which is marked with the Bates number
18 35138. Do you see that page?
19 A. Yes.
20 Q. Can you tell me whether -- you will
21 see in this page a little summary of different
22 classes of collateral and their market value.
23 Do you see that?
24 A. I do.
25 Q. Could you tell me whether this is

1 Blackwell - Highly Confidential
2 the collateral that made its way into
3 Schedule A?
4 A. I would assume that it is, based on
5 the fact I provided the data to Paolo, but it's
6 Paolo's team that would have put this together,
7 so would have interpreted the valuations and
8 the content based on that.
9 Q. Do you know if the value of the
10 securities listed on Schedule A is what's
11 listed here under the column Market Value?
12 A. I don't know. It would be dependent
13 on how -- again, how -- I don't know how Paolo
14 ultimately put this together.
15 Q. And when you say "Paolo," you are
16 talking about Mr. Tonucci?
17 A. Yes.
18 Q. So it's his team that would do the
19 valuation of this schedule?
20 A. It's his team that created the
21 summary. Jim Hraska and my team, Monty
22 Forrest, helped create the data and pushed it
23 up to the treasury team for them to package.
24 Q. Now, did the list of securities that
25 ultimately were listed on Schedule A change

1 Blackwell - Highly Confidential
2 over time?
3 A. Not that I understand, no.
4 Q. Okay.
5 A. What was at the Fed and what made it
6 to Barclays was different for a very sensible
7 set of reasons as I described, so -- and
8 perfectly legitimate reasons based on the legal
9 contracts that were in place at the time.
10 Q. I understand that, but then at some
11 point the securities that made it to Barclays
12 were listed in Schedule A; correct?
13 A. Right. So then it would be -- there
14 was a reconciliation carried out to the best of
15 our ability to what BONY had received, so that
16 would be part -- that would be what's in
17 Schedule A.
18 Q. What are you reconciling when you
19 did that reconciliation?
20 A. Lehman books and records to a BONY
21 statement. So effectively Barclays to Lehman,
22 what moved.
23 Q. Barclays to Lehman?
24 A. Yes.
25 Q. Once the September 18th repurchase

1 Blackwell - Highly Confidential
2 agreement was put in place and the securities
3 or assets that were collateral for the Fed
4 moved, some of which I understand didn't make
5 it because of the issues you have talked about
6 with respect to BONY, but once that set of
7 securities made it into the Barclays -- to
8 support the Barclays repo, were there any other
9 further changes to that set of collateral
10 between that time and the time that it was
11 listed on Schedule A?
12 A. Not that I'm aware of. I can't --
13 Paolo would be better placed to describe that,
14 if there had been any change.
15 Q. Mr. Tonucci would know specifically
16 about that?
17 A. Yes.
18 (Exhibit 83 B, e-mail dated
19 September 21, 2008, Bates stamped BCI
20 006647 through BCI 006653, marked for
21 identification.)
22 Q. Mr. Blackwell, I am handing you a
23 copy of Exhibit 83 B, which is a document Bates
24 stamped BCI 006647 through 6653. My first
25 question is if you have ever seen this document

1    **Blackwell - Highly Confidential**
2    **before.**
3        A.    I think I saw it in conversations
4    with Jonathan.
5        **Q.    In preparation for this deposition**
6    **you saw it?**
7        A.    In preparation, yes.  That's the
8    first time I saw it.
9        **Q.    Okay.  My question is if you look in**
10    **the center of the first page, it says "we**
11    **should book all positions from the Lehman**
12    **financing facility to BCI, approximately 45**
13    **billion securities, see attached file."  Do you**
14    **see that?**
15        A.    I do.
16        **Q.    And the attached file is a list of**
17    **securities; correct?**
18        A.    It's not a list of securities.  It's
19    types, security types.
20        **Q.    My question is do you know why this**
21    **approximately $45 billion worth of securities**
22    **listed in this file and why that's different**
23    **than the numbers listed on the previous**
24    **exhibit?**
25        A.    I don't.

1    Blackwell - Highly Confidential
2        **Q.    Who would have knowledge of that?**
3        A.    Again, Paolo would probably be --
4    Paolo Tonucci would probably be the best person
5    to ask.
6        **Q.    Again, I'm not trying to trip you up**
7    **here.  I just want to know, you are not the**
8    **person with knowledge as to the value of how I**
9    **would compare 45 billion cited here with the 49**
10    **billion on the previous exhibit; correct?**
11        A.    No, I'm not.
12        **Q.    And it's probably someone in**
13    **Mr. Tonucci's shop who would be that person?**
14        A.    Also somebody within Barclays as
15    well, heritage Barclays.
16        (Exhibit 84 B, e-mail dated
17    September 22, 2008, Bates stamped BCI
18    008149 through BCI 008670, marked for
19    identification.)
20        **Q.    Mr. Blackwell, I am handing you a**
21    **copy of Exhibit marked 84 B, which is a**
22    **document with a Bates ranges BCI 008149 -- I**
23    **can't use the Bates ranges, because they appear**
24    **to have disappeared, but the first page is**
25    **marked BCI 008149, and attached to it is a**

1    **Blackwell - Highly Confidential**
2    **lengthy spread sheet of some sort.**
3        **My question is if you have ever seen**
4    **this document before.**
5        A.    Again, in preparation for this
6    deposition.
7        **Q.    My question, similar to last time,**
8    **if you see on the front page it mentions a**
9    **total BONY market value of approximately 45**
10    **million.  Do you see that?**
11        A.    Yeah, I think that's a typo.
12        **Q.    Why do you think that's a typo?**
13        A.    This looks like more than
14    $45 million of securities.
15        **Q.    I think I might have misspoke.  I**
16    **believe it says 45 billion.  Is that right?**
17        A.    Like I said, I saw this in
18    preparation.
19        **Q.    Am I correct -- well, let me just**
20    **ask the question.**
21        **Could you explain to me the**
22    **difference in valuation between the securities**
23    **listed in this exhibit versus the first**
24    **Exhibit 82 that we just discussed?**
25        A.    Is this Schedule A or Schedule B?

1    Blackwell - Highly Confidential
2        **Q.    That's my question to you.**
3        A.    I don't know.
4        **Q.    Is it fair to say that someone in**
5    **Mr. Tonucci's shop is probably the person I**
6    **should ask as to the difference in values as to**
7    **the different schedules?**
8        A.    Yes.
9        **Q.    If I showed you some more schedules**
10    **like this, would you give me that same answer?**
11        A.    You are probably going to get the
12    same answer, yes.
13        MR. HINE:  I did want to show you
14    one other massive exhibit, though.
15        (Exhibit 85 B, e-mail dated
16    September 30, 2008, Bates stamped
17    BCI-EX-(S)-00004396 through
18    BCI-EX-(S)-00004675, marked for
19    identification.)
20        **Q.    Mr. Blackwell, I am handing you a**
21    **copy of Exhibit 85 B, which is Bates marked**
22    **BCI-EX-(S)-00004396 through 4675.  I am not**
23    **going to ask you to look through this entire**
24    **document, Mr. Blackwell, but I would direct**
25    **your attention to the first three or four**

Blackwell - Highly Confidential

1    pages, in particular what's entitled APA Lead
2    Sheet, page marked number 1.  Do you see that?
3        A.   Yes.
4        Q.   My first question is on the covering
5    page this is an e-mail from Mary Korycki to
6    yourself.  Do you recall getting this e-mail?
7        A.   I don't recall getting the e-mail.
8        Q.   Do you recall receiving this
9    document?
10       A.   No, and I would not have printed it
11    off.
12       Q.   Have you ever seen this document
13    before?
14       A.   Not that I recall, no, I don't,
15    going to an APA schedules meeting.
16       Q.   Can you refer now to that third page
17    I pointed you to which says APA Lead Sheet.
18       Have you ever seen a schedule like
19    that before?
20       A.   Possibly, but I don't really --
21    quite possibly.
22       Q.   Could you tell me if the -- do you
23    see the first part talks about Schedule A?
24       A.   Yes.


1    Blackwell - Highly Confidential
2    pages, in particular what's entitled APA Lead
3    Sheet, page marked number 1.  Do you see that?
4       A.   Yes.
5       Q.   My first question is on the covering
6    page this is an e-mail from Mary Korycki to
7    yourself.  Do you recall getting this e-mail?
8       A.   I don't recall getting the e-mail.
9       Q.   Do you recall receiving this
10   document?
11      A.   No, and I would not have printed it
12   off.
13      Q.   Have you ever seen this document
14   before?
15      A.   Not that I recall, no, I don't,
16   going to an APA schedules meeting.
17      Q.   Can you refer now to that third page
18   I pointed you to which says APA Lead Sheet.
19      Have you ever seen a schedule like
20   that before?
21      A.   Possibly, but I don't really --
22   quite possibly.
23      Q.   Could you tell me if the -- do you
24   see the first part talks about Schedule A?
25      A.   Yes.

1    Blackwell - Highly Confidential
2      Q.   And it comes to a total transferred
3   under repo agreement of $44 billion.  Do you
4   see that?
5      A.   I do.
6      Q.   Can you tell me if that's actually
7   what is the value of the securities on
8   Schedule A?
9      A.   I can't.
10     Q.   Okay.  Do you --
11     A.   It should be equal to what's on
12   Schedule A, but I can't tell you definitively.
13     Q.   Is this it something, again, I
14   should ask folks in Mr. Tonucci's department?
15     A.   Yes, and Jim Hraska.
16     Q.   If you go further down on that list
17   you see two entries entitled Positions Not With
18   No Memo Seg.  Do you see that?
19     A.   I do.
20     Q.   Can you tell me, do you know what
21   that means?
22     A.   I do.
23     Q.   Can you tell me what it means?
24     A.   It's a term that refers to the way
25   that clearing boxes work, so that a clearance

1    Blackwell - Highly Confidential
2   box will put a memo segregation on a position
3   if there is a stock break, if there is a record
4   break, i.e., if your books and records have a
5   difference versus the outside -- the real
6   world, as it were.  And in addition to that
7   memo seg is also put on securities where they
8   are customer assets, so they are not
9   unencumbered.  So this is saying that there
10   are -- Schedule B-1 has $235 million worth of
11   security positions which are unencumbered and
12   in addition to that there isn't a memo seg in
13   the system.
14     Q.   And were you involved in preparing
15   that schedule?
16     A.   I was involved in the methodology
17   and talking through the methodology.  My team
18   worked with finance to produce the schedule, so
19   yes.
20     Q.   And so that would be -- would that
21   be Mr. Hraska as well?
22     A.   Yes.
23     Q.   And am I correct to say that he
24   would supply the lists of securities to
25   Mr. Tonucci's team who then arrives at this

1    Blackwell - Highly Confidential
2   valuation?
3     A.   Correct, or the valuations in the
4   system.
5     Q.   Positions with memo seg means?
6     A.   So where there was an excess -- I
7   will try and walk you through a real -- take an
8   example.  There may have been a memo seg in the
9   system for a hundred thousand shares of IBM.
10   The total position of IBM may have been a
11   million shares, so in this instance the
12   methodology would mean that we extract the
13   hundred thousand shares, you would be left with
14   900,000 shares of IBM as unencumbered
15   securities, which were available.  So any
16   customer assets that were segged or any breaks,
17   so, again, it is a conservative approach to --
18   a methodology to identify unencumbered assets.
19     Q.   So can I just to go with your
20   hypothetical, you said if there was a million
21   shares of IBM, 900,000 were unencumbered, they
22   would go into the first entry on this -- they
23   would go into Schedule B-1?
24     A.   No, they would go into B-2.
25     Q.   Did I say that backwards?

Blackwell - Highly Confidential
1
2      A.    Do you want me to explain it again?
3      Q.    Yes.
4      A.    Positions not with -- positions, I
5  think, is a typo anyway.  Positions with no
6  memo seg.  So what no memo seg means, in a
7  scenario where there are a million shares
8  assigned to what would have been probably a 931
9  trading account, i.e., firm inventory, so
10  unencumbered assets, and there is no portion of
11  that position which is being segregated by memo
12  seg applied, then a hundred percent of that
13  position would be applied as available
14  unencumbered security.  So that's B-1.
15      B-2 is saying positions with a memo
16  seg, so in the scenario where there are a
17  million shares of IBM, some of which is
18  customer asset, potentially a hundred thousand
19  shares, there is a segregation, so in order to
20  protect the customers, only 900,000 of those
21  securities would be available as firm
22  inventory, again, comparing that versus the
23  firm inventory account only.  That's important.
24  It's only the firm inventory accounts that are
25  being looked at.  And any excess over and above

1  Blackwell - Highly Confidential
2  the seg is being applied in B-2.
3      Q.    Okay.  I understand.
4      Now, if we continue down this chart,
5  you see 636 on the left-hand side, and can you
6  tell me what those securities are?
7      A.    That's going to be unencumbered
8  corporates, I think.
9      Q.    And does your department identify
10  them?
11      A.    They would have helped identify
12  those, yes.
13      Q.    Mr. Tonucci's crew would determine
14  the value?
15      A.    Probably, or it would be system
16  driven, and it's not -- Paolo Tonucci's team
17  would not necessarily be determining value.
18  It's going to be a third-party source of data
19  in most instances or model driven, so it's an
20  application of pricing data, not generation of
21  valuation.
22      Q.    Okay.  I understand that.  But
23  that's done in his department as opposed to
24  yours?
25      A.    It would have been in the systems.

1  Blackwell - Highly Confidential
2      Q.    So let's continue down.  You see
3  Friday, 9-26, transfers.  What is that entry
4  meant to embody?
5      A.    I think that's additional securities
6  being transferred as part of a repo on Friday
7  morning, securities that hadn't necessarily
8  made it over the previous night.
9      Q.    That's not your effort to identify
10  unencumbered securities that we talked about
11  earlier?
12      A.    I don't know, actually.  I don't
13  want to comment on that.  I don't think so.
14      Q.    Okay.  So you are not the guy to ask
15  on what that entry is about?
16      A.    No.
17      Q.    How about the following entries
18  where it says "Monday transfer" and then there
19  is one that says "Monday transfers par value,"
20  do you see that?
21      A.    Yes, I do.  I think talking to Paolo
22  Tonucci or Jim would be more fruitful.
23      Q.    You don't have any knowledge of
24  what's that meant to embody?
25      A.    Not exactly, no.

1  Blackwell - Highly Confidential
2      Q.    And where it says "footnote 1,
3  includes 14 billion in chilled securities not
4  delivered," do you understand what that means?
5      A.    I think that's a reference to the
6  point on the early e-mail where DTC had put a
7  chill on the account, effectively frozen the
8  account -- actually, that's not correct.
9  That's not correct.  Chilled securities are
10  securities that I think are going through some
11  corporate event of some sort that are
12  undeliverable at that point, potentially.
13  Again, I may be misspeaking.
14      Q.    You are not the person to ask about
15  it?
16      A.    No.
17      (Exhibit 86 B, chart, Bates stamped
18  BCI-EX-00099519 through BCI-EX-00099521,
19  marked for identification.)
20      Q.    Mr. Blackwell, I am handing you a
21  copy of an exhibit marked 86 B, which is Bates
22  stamped BCI-EX-00099519 through 521.
23      My question is have you ever seen
24  that document before?
25      A.    No, I don't think I have seen it at

1       Blackwell - Highly Confidential
2  all.
3     Q.   Would you know if the entries in the
4  upper third of the chart relate to Schedule A
5  securities?
6     A.   I couldn't say that definitively.
7     Q.   Do you know if the values listed on
8  line 14 where it shows PCG value of
9  approximately 42.5 billion, do you see that?
10    A.   Yes.
11     Q.   Do you know if that's the value of
12  the Schedule A securities?
13    A.   No. I don't know.
14     Q.   Could you look at the top, the
15  entries, you see it says "PCG value." Do you
16  know what that means?
17    A.   I could speculate. I think maybe
18  that may stand for product control group.
19     Q.   That's a Lehman division?
20    A.   Yes, that's the finance function.
21  If that's the -- if that's what it stands for.
22     Q.   You see the entry to the left of
23  that BONY value, do you see that?
24    A.   Bank of New York.
25     Q.   Right. Can you tell me why the

1     Blackwell - Highly Confidential
2  values are different between those two columns?
3    A.   I can't, no.
4     Q.   How about to the right of the PCG,
5  do you see an entry that says "MV 922 with bid
6  offer," do you see that?
7    A.   I do.
8     Q.   Do you know what that column is
9  meant to signify?
10    A.   I don't know how it was created, but
11  the heading seems to suggest it as being
12  updated market data on the Monday.
13     Q.   Were you involved in creating that
14  column?
15    A.   I don't think I was.
16     Q.   Could you explain to me the
17  difference between that column and the prior
18  two?
19    A.   The market value has declined,
20  that's what that is showing, as far as I can
21  tell.
22     Q.   Okay, but can you explain to me how
23  the valuations were arrived at to create
24  column E?
25    A.   No, I can't.

1     Blackwell - Highly Confidential
2     (Exhibit 87 B, JPM Chase assets,
3  Bates stamped BCI-EX-00108700, marked for
4  identification.)
5     Q.   Mr. Blackwell, I am handing you a
6  copy of Exhibit 87 B, which is a spread sheet
7  with Bates stamps BCI-EX-00108700 through --
8  the second page is marked 109154.
9     THE COURT REPORTER: There is only
10  one page.
11     Q.   My question is only on the first
12  page, so let me ask you, page 108700, do you
13  see that page?
14    A.   I do.
15     Q.   Are you familiar with how this chart
16  was derived and prepared?
17    A.   No.
18     Q.   Do you know what JPM Chase assets
19  it's referring to?
20    A.   I don't.
21     Q.   Would that be something I should ask
22  someone in Mr. Tonucci's group?
23    A.   Yes.
24     (Exhibit 88 B, chart, Bates stamped
25  BCI-EX-00109154 through BCI-EX-00109161,

1     Blackwell - Highly Confidential
2  marked for identification.)
3     Q.   Mr. Blackwell, I am handing you a
4  copy of Exhibit 88 B, which is Bates marked
5  BCI-EX-00109154 through 161. My questions have
6  to do with page 109156.
7    A.   This is a Barclays document. I have
8  never seen an acquisition balance sheet.
9     Q.   Okay. That was my question. Did
10  you ever see this before?
11    A.   No.
12     Q.   Do you know -- could you tell me, if
13  you look down the left-hand column, whether --
14  which of those assets made it to Schedule A
15  versus Schedule B?
16    A.   Absolutely no idea.
17     Q.   Could you tell me what the valuation
18  adjustment entry on number 12 is, on line 12?
19    A.   No.
20     MR. SHAW: You are ranging a little
21  far afield from the two topics.
22     MR. HINE: I hear you.
23     Q.   These are topics that you have no
24  knowledge of; right?
25    A.   No, I don't.

Page 190

Blackwell - Highly Confidential
1    Blackwell - Highly Confidential
2        MR. HINE:  Mr. Blackwell, I have no
3    further questions for you.  Thank you for
4    your cooperation.  And I think some of my
5    colleagues would like to ask you a few
6    questions.
7        MR. SHAW:  Can we take five minutes.
8        (Recess was taken from 2:26 to
9    2:32.)
10   EXAMINATION BY
11   MR. OXFORD:
12       Q.   Mr. Blackwell, we met earlier off
13   the record.  As you know, my name is Neil
14   Oxford.  I am with Hughes Hubbard & Reed and we
15   represent the SIPA trustee in this case.
16       I would like to follow up on some of
17   Mr. Hine's questions and your answers thereto.
18       You testified about a set of actions
19   that you took to provide Mr. Lowitt with data.
20   Do you remember testifying about that?
21       A.   Yes, I do.
22       Q.   And you said that at some point it
23   became clear to you that certain of these
24   components became part of the transaction with
25   Barclays.  Do you remember saying that?
TSG Reporting - Worldwide  (877) 702-9580

Page 191

1        Blackwell - Highly Confidential
2        MR. SHAW:  Objection to form.
3        A.   What components were we talking
4    about at the time?
5        Q.   I think you answered the question in
6    very general terms, which is why I am following
7    up.
8        A.   Can we refresh?
9        Q.   Sure.  Let's try it this way.  At
10   some point you said Mr. Lowitt gave you your
11   marching orders over the weekend of the 21st
12   and 22nd.  Do you remember saying that?
13       A.   Yes, I do.
14       Q.   Can you tell me everything you
15   recall about those marching orders.
16       A.   My instructions were to work with
17   the finance team to determine at one point --
18   well, to find out if there was any unencumbered
19   collateral in the boxes and to work with
20   finance to recalculate the 15C3.
21       Q.   Did you understand Mr. Lowitt to be
22   asking you and your team to go and find and
23   identify $1.9 billion of unencumbered
24   collateral in what you called the clearance
25   box?
TSG Reporting - Worldwide  (877) 702-9580

Page 192

1        Blackwell - Highly Confidential
2        A.   I think initially the goal -- there
3    was a target set.  Actually, let me correct
4    that.  Initially we were working to just
5    determine if there was any unencumbered.  Then
6    there was a target set and then it changed
7    again ultimately to be that any of the assets
8    in the clearance box, unencumbered assets in
9    the clearance boxes were -- were potentially
10   included in the deal.
11       Q.   Okay.  I'd like to break that down.
12       Do you remember when you first had a
13   conversation with Mr. Lowitt about your role in
14   determining the existence or otherwise of
15   unencumbered assets over the weekend of
16   September 20th and 21st?
17       A.   I don't know when precisely that
18   took place, no, I don't.
19       Q.   Do you know if it was before or
20   after the sale hearing in the bankruptcy court
21   on September 19th?
22       A.   So that was on the Friday?
23       Q.   That was on Friday.
24       A.   No, it would have been -- that would
25   have taken place over the course of the
TSG Reporting - Worldwide  (877) 702-9580

Page 193

1        Blackwell - Highly Confidential
2    weekend, so actually Saturday, Sunday.  My
3    marching orders of 5:00 on that Friday were to
4    be ready for business on Monday.  That was my
5    recollection.
6        MR. SHAW:  Let me offer a belated
7    clarification, because, of course, the
8    hearing actually carried through into
9    Saturday morning, so you may want to
10   clarify that as well.
11       MR. OXFORD:  That's a good
12   clarification.
13       Q.   To the best of your recollection, it
14   is sometime on Saturday morning that Mr. Lowitt
15   had that conversation with you rather than
16   Friday evening?
17       A.   I think it was over the course of
18   Saturday, yes, because I think in -- if you
19   look at my e-mail, which I'm sure you have,
20   there is -- the process starts and as that
21   process starts, we are working through as a
22   team, again, how we are going to review -- what
23   available data there is or how to go and get
24   the data, so it's about the process of
25   gathering data to determine what is
TSG Reporting - Worldwide  (877) 702-9580

1         Blackwell - Highly Confidential
2   unencumbered.
3       Q.    Did you have a number of
4   conversations with Mr. Lowitt over the weekend
5   about the subject of the unencumbered assets?
6       A.    I would imagine so, yes.
7       Q.    But is it fair to say they kind of
8   blur a little bit into one?
9       A.    It was -- yes. It was -- they did.
10  It's hard to know exactly when and where these
11  conversations took place, but clearly we were
12  using e-mail a lot as well to just ask people
13  to create it.
14      Q.    Were any of your conversations with
15  Mr. Lowitt face to face?
16      A.    Some of them would be, yes. Ian was
17  not -- some of them might have been. Fairly
18  infrequently.
19      Q.    Did Mr. Lowitt prefer to communicate
20  by e-mail?
21      A.    I just had a very narrow set of
22  actions I was focused on, right, so I think it
23  wasn't a question whether he preferred to
24  communicate or not. I was doing the task that
25  had been sent me and he wanted updates. He

1         Blackwell - Highly Confidential
2   would send "any update." I think there are
3   lots of e-mails like that, and there were lots
4   of e-mails from me to the various teams that
5   were working on these things saying "any
6   updates."
7       Q.    Understood. Do you remember when
8   your first conversation with Mr. Lowitt was
9   about this task that he had sent you?
10      A.    No, and it's possible it was Paolo
11  that initiated the work even. Paolo Tonucci
12  may have even initiated the work.
13      Q.    So you may have gotten your marching
14  orders indirectly from Mr. Lowitt?
15      A.    That's quite possible.
16      Q.    You said that your task changed over
17  time and that your first task was to determine
18  whether there was, in fact, any unencumbered
19  assets; is that correct?
20      A.    Correct.
21      Q.    Did you have any understanding of
22  why it was you had been sent this task?
23          MR. SHAW: Objection. Asked and
24  answered.
25      A.    As I stated earlier, I had a goal

1         Blackwell - Highly Confidential
2   that was sent me. It wasn't a period of time
3   when we were asking lots of questions about why
4   we were doing it.
5       Q.    Did you come to learn at any time
6   that the purpose of you and your team
7   identifying unencumbered assets was that they
8   be transferred to Barclays?
9           MR. SHAW: Objection. Asked and
10  answered.
11      A.    There was a -- my understanding was
12  at some point later on over the course of the
13  weekend, I actually think it may even have been
14  the Monday that we were talking about
15  transferring these assets, talking with I think
16  the trustee of LBI even at that point.
17      Q.    That was a conversation you had with
18  the trustee of LBI?
19      A.    I didn't, no, but people within my
20  organization or people within the former Lehman
21  organization were having those conversations.
22      Q.    Okay. What do you remember about
23  that conversation?
24      A.    I don't -- I didn't have it, so I
25  don't recall it.

1         Blackwell - Highly Confidential
2       Q.    You just remember that there was a
3   conversation with the trustee?
4       A.    Yes.
5           MR. SHAW: Objection.
6       Q.    About the subject of transferring
7   assets?
8       A.    I recall that there were -- there
9   was a dialogue with the trustee.
10      Q.    When you say "the trustee," do you
11  mean the trustee directly or the trustee's
12  office and his staff?
13      A.    I think it's probably something like
14  Anson Frelinghuysen.
15      Q.    We will put that under staff.
16          The second part of your marching
17  orders appears to be to ascertain the existence
18  or otherwise of any excess in Lehman's 15C3
19  account; is that correct?
20      A.    It was to recalculate the 15C3. The
21  moneys and securities that were locked up in
22  association with that were managed by the
23  treasury function, I contributed data into the
24  calculation which finance ran and we ran that
25  calculation.

Blackwell - Highly Confidential

1
2    Q.   And as I understand it, it is
3  Mr. Tonucci's team I think you said owns that
4  calculation?
5    A.   No, it's not. It's Tony Stucchio
6  who reported to Martin Kelly.
7    Q.   And Mr. Kelly's position at the time
8  was?
9    A.   Financial controller.
10    Q.   And that's a separate reporting
11  stream from yourself and separate --
12    A.   Reported to Ian.
13    Q.   And separate from Mr. Tonucci?
14    A.   Paolo reported to Ian.
15    Q.   Did anybody tell you at any point,
16  Mr. Blackwell, that a certain amount of the
17  excess, if any, in the 15C3 fund was to be
18  transferred to Barclays?
19      MR. SHAW: Objection to form. Asked
20  and answered.
21    A.   There was a discussion about a
22  mechanism potentially, and I think I had that
23  conversation with Gerard LaRocco, to transfer
24  cash if the SEC, Mike Macchiaroli, signed off
25  that there was, indeed, an excess at a point in

Blackwell - Highly Confidential

1  time. Now, that changed. That was a mechanism
2  we looked at and discarded. So that's the only
3  conversation that I had around moving cash.
4
5    Q.   When did you have that conversation
6  with Mr. LaRocco?
7    A.   I don't recall, again, exactly the
8  exact time. It was probably on -- late on
9  Saturday, maybe Sunday, but certainly over that
10  weekend.
11    Q.   Mr. LaRocco was employed by Barclays
12  at that time; correct?
13    A.   Correct, but that was more about how
14  do you technically move money over a weekend.
15    Q.   What was the mechanism you discussed
16  with Mr. LaRocco?
17    A.   This is an operational process. You
18  can't move money on a weekend, so discussing
19  opening up a bank account at -- I think it was
20  at Wells Fargo. We didn't pursue that any
21  further.
22    Q.   It sounded like you also discussed
23  with Mr. LaRocco the need for the SEC to sign
24  off on any transfer of 15C3 funds; is that
25  accurate?

Blackwell - Highly Confidential

1
2    A.   Well, the SEC would have to give --
3  it is a bankrupt entity -- or the SEC would
4  need to approve any cash movement out of the C3
5  lock-up.
6    Q.   What's the basis of your knowledge
7  about that subject?
8    A.   Just -- what do you mean by the
9  "basis"?
10    Q.   How is it you are able to testify
11  about that fact?
12    A.   What fact?
13    Q.   That the SEC would have to approve
14  any transfer from a bankrupt entity.
15    A.   Because of the experience that I
16  have had.
17    Q.   That's all I was asking.
18      Did you have any conversations with
19  the SEC that weekend about the subject of the
20  15C3 in particular?
21    A.   Not over that weekend, no. I think
22  I had conversations with -- I had many
23  conversations with the SEC post, but not over
24  that weekend.
25    Q.   The conversations that you have had

Blackwell - Highly Confidential

1
2  with the SEC subsequent to that weekend, are
3  they related to the transfer of funds from
4  Lehman's 15C3 account to Barclays?
5      MR. SHAW: Objection. Form.
6    A.   I wouldn't characterize them that
7  way. The -- no, I wouldn't characterize them
8  that way.
9    Q.   How would you characterize them?
10    A.   The conversations I had with the SEC
11  have been around asset transfers, not
12  necessarily related to moneys due from the
13  15C3, although I think I have had one
14  conversation post the LBI bankruptcy with Mike
15  Macchiaroli and some other members of his
16  office where we discussed this and provided --
17  I think we may have -- we had a discussion
18  around the 15C3. That was probably the only
19  direct conversation we have had specifically
20  around the 15C3. Then in relation to other
21  asset transfers, the PIM asset transfer, we
22  have had a plethora of conversations of which
23  the 15C3 is a source of customer protection
24  and, therefore, moneys that you would expect
25  would be released as it relates to the PIM

1      Blackwell - Highly Confidential
2  transfer, so it's slightly tangential.
3      Q.   When did you have this conversation
4  with Mr. Macchiaroli?
5      A.   I don't know the exact date.  It was
6  probably on the Tuesday -- sometime in the
7  first week.
8      Q.   And when you say "the first week,"
9  just so we have a clear record --
10     A.   My first week at Barclays.
11     Q.   Who else was present for that
12  conversation with Mr. Macchiaroli?
13     A.   Kendall McLaughlin and Alex Crepeau,
14  I think.  I may not be correct.
15     Q.   Who is Kendall McLaughlin?
16     A.   He was responsible for regulatory
17  operations at Lehman Brothers.
18     Q.   Does he work for Barclays now?
19     A.   He does not at present.  He did
20  transfer.  He subsequently left.
21     Q.   Do you know where he is employed
22  now?
23     A.   Citibank.
24     Q.   And Mr. Crepeau you mentioned
25  earlier.  Was he --

1      Blackwell - Highly Confidential
2      A.   Kendall's boss.
3      Q.   Did he transfer to Barclays?
4      A.   He did.
5      Q.   And is he still employed by
6  Barclays?
7      A.   He is.
8      Q.   Do you know what his position is?
9      A.   He is responsible for regulatory
10  operations.  He replaced Kendall.  He had
11  previously post bankruptcy been responsible for
12  the LBI TSA, the services provided by Barclays
13  to LBI for operations only.
14     Q.   Do you recall why it is you met with
15  Mr. Macchiaroli?
16     A.   Yes.  We discussed the potential
17  transfer of -- we wanted to transfer the
18  initial funding of the PIM accounts so -- this
19  is actually -- this meeting is later.  This is
20  a week later, actually.  Sorry.  My
21  recollection is wrong.  This is later on, this
22  meeting.
23     Q.   So if we are talking about the
24  closing of the deal on Monday, the 22nd, of
25  September, you think it's sometime the week

1      Blackwell - Highly Confidential
2  of --
3      A.   I think it's later.
4      Q.   The week of Monday 29th?
5      A.   Or even possibly later.
6      Q.   Possibly afterwards?
7      A.   Yes.  So we were talking about the
8  transfer of the loan, the cash in the 15C3 that
9  was related to the margin loans, and that was,
10  I think, the first element of the conversation,
11  and I think the second component of the
12  conversation was as it related to the
13  $769 million worth of securities, Ginnie Maes
14  held at Chase that potentially were going to be
15  delivered as part of the -- that was one way to
16  satisfy the component of the APA, it would
17  either be securities or some alternative value.
18     Q.   Can you explain to me a little more
19  about your conversation that related to the
20  first alternative, the first part.  You said it
21  was cash in the 15C3 account or fund that
22  related to the margin.  What do you mean by
23  that?
24     A.   That's related to PIM.  PIM
25  customers take, borrow money against their

1      Blackwell - Highly Confidential
2  positions.  They can borrow up to 440 percent
3  of value.
4      Q.   And you said the second subject, I
5  think probably the subject that I am most
6  interested in, is the $769 million of Ginnie
7  Mae securities that you said were potentially
8  to be transferred pursuant to the agreement
9  with Barclays; correct?
10     A.   769 value, so that was either going
11  to be satisfied through Ginnie Maes or other
12  alternative value, if there is an excess in the
13  C3, the 769 value.
14     Q.   It sounds like you have an
15  understanding now of the deal between Barclays
16  and Lehman, is that correct, at least in this
17  respect?
18     A.   Yes.
19     Q.   Can you tell me without waiving any
20  privilege, of course, and any of my questions
21  are not designed to discover information that
22  you discussed with your attorneys, but can you
23  tell me how it is you came to have that
24  understanding of the APA.  I ask because your
25  answers to Mr. Hine's questions suggested you

Page 206

Blackwell - Highly Confidential

1  weren't really involved and have no knowledge
2  of the deal and now you are telling me you have
3  some knowledge of the deal.
4      A.    This was after the event, after the
5  deal had closed, I believe, and that was where
6  these conversations began, in terms of
7  actioning the content of the deal.
8      Q.    Right.  Okay.
9      A.    It doesn't mean I had an
10 understanding of the whole deal.
11     Q.    I understand.  I don't think you
12 quite answered my question, though, which is
13 how is it that you came to have an
14 understanding that this was a term of the deal?
15         MR. SHAW:  If you can answer the
16     question without revealing discussions with
17     counsel.
18     A.    That is probably the most likely
19 source.
20     Q.    Okay.  Let's try it this way.  What
21 did you and Mr. Macchiaroli discuss in this
22 meeting that you testified about that took
23 place sometime in the week of September 29th or
24 perhaps later?

TSG Reporting - Worldwide  (877) 702-9580

Page 207

Blackwell - Highly Confidential

1      A.    Asking the SEC to review the
2  calculation and release and authorize --
3  provide their sign-off that the C3 had an
4  excess or otherwise, but have an opinion on the
5  C3 and authorize a sign-off to the trustee of
6  LBI to release the cash related to the margin
7  balances, as I mentioned before, another
8  element of the PIM transfer, and securities
9  from -- securities from JPMorgan Chase.
10     Q.    Was this a meeting that you had
11 requested, Mr. Blackwell?
12     A.    I don't recall whether I requested
13 it.  It's quite possible I did.  The SEC set up
14 an office at 745, so were available.
15     Q.    Where did the meeting take place, at
16 the SEC's office at 745?
17     A.    Correct.
18     Q.    And this was Mr. Macchiaroli's
19 office?
20     A.    Yes.
21     Q.    Do you have any notes of the
22 conversation you had there?
23     A.    I don't believe I do.  I could go
24 back to my -- I could go back and try and

TSG Reporting - Worldwide  (877) 702-9580

Page 208

Blackwell - Highly Confidential

1  review my papers.
2      Q.    Where would they be if you had them?
3      A.    Where would they be?  They are most
4  likely going to be in my e-mail and they are
5  also potentially in my boxes of files which I
6  have already reviewed and looked through, so I
7  can do that based on these questions.
8      Q.    Your counsel and I can talk off the
9  record about our document requests.
10         What was Mr. Macchiaroli's response
11 to your request that the SEC review and sign
12 off the 15C3 calculation?
13     A.    I don't think he was comfortable
14 doing it, doing that at that point.  He wanted
15 to get a better understanding of the books and
16 records at that point.  So I think we continued
17 to work with members of the SEC and to try and
18 provide them with a better understanding and
19 the finance team probably led that effort in
20 terms of the overall 15C3.
21     Q.    At the time you asked
22 Mr. Macchiaroli to sign off on this
23 calculation -- withdrawn.  I am going to set
24 that up a little better.

TSG Reporting - Worldwide  (877) 702-9580

Page 209

Blackwell - Highly Confidential

1          You testified in response to
2  Mr. Hine's questions that you were
3  uncomfortable about the accuracy of the C3
4  calculation over the weekend of September 20th
5  and 21st; correct?
6      A.    To be precise, what I said, I was
7  uncomfortable about some of the inputs into the
8  calculation, not the calculation itself.
9      Q.    I didn't mean to mischaracterize
10 your testimony.  I didn't mean to suggest that
11 somehow the formula wasn't properly applied,
12 but it seemed to me that as of Sunday night,
13 the 21st, you were not comfortable that the
14 calculation, because of the reasons you have
15 testified to, you are not comfortable that the
16 calculation or the result of the calculation
17 was a hundred percent accurate; is that
18 correct?
19     A.    That's correct.
20     Q.    And what happened between Sunday the
21 21st of September and this meeting with the SEC
22 a week or so hence that allowed you to become
23 comfortable that the calculation was correct?
24     A.    I wasn't talking about the accuracy

TSG Reporting - Worldwide  (877) 702-9580

Blackwell - Highly Confidential

1  of the calculation. I was talking about the
2  components that we would request from the C3.
3  So the request was there are certain components
4  that are owed to Barclays as under the terms of
5  the APA and, therefore, would you be
6  comfortable signing off based on the value of
7  the moneys that are locked up. So the
8  conversation, as far as I recall it, wasn't
9  about how accurate the calculation was. So if
10  Mike had concerns about the accuracy, then,
11  again, we were working with him to try to
12  provide him with some level of comfort as to
13  how the calculation had been constructed and he
14  wanted to carry out that review.
15  **Q.  I am going to try that question**
16  **again, because I'm not sure that you answered**
17  **it.**
18      **You were talking with**
19  **Mr. Macchiaroli about the components you would**
20  **request from the C3. That's what you just**
21  **said?**
22      A.  Let me --
23      **Q.  Can you explain that a little more.**
24      A.  The request related to the

Blackwell - Highly Confidential

1  calculation itself. There is a component
2  that's associated with margin debits and margin
3  credits, so these margin loans related to PIM
4  customers. I was asking that Mike sign off --
5  the SEC sign off the release of that money from
6  within the 15C3, because it was in the
7  calculation, and I think that component we
8  could highlight very accurately as being
9  correct without any question. So we were
10  asking for that money to be released and that
11  was the main driver of my conversation, I
12  believe, that's what I recall anyway, with
13  Mike. In addition to that I think in the same
14  meeting that I had with Mike I asked if he was
15  able to authorize the release of the securities
16  as well.
17      **Q.  When you say "the securities,"**
18  **again, just so we have a clear record, you mean**
19  **the 769 Ginnie Mae securities that were held at**
20  **JPMorgan Chase that are referenced in the**
21  **Clarification Letter?**
22      A.  Yes.
23      **Q.  Why did you ask him to do that, sir?**
24      A.  Because that was part of the

Blackwell - Highly Confidential

1  agreement.
2      **Q.  Had you become comfortable between**
3  **the night of Sunday the 21st of September and**
4  **the date of your request to the SEC some week**
5  **or so later that the C3 calculation you had**
6  **performed was a hundred percent accurate?**
7      A.  I wasn't --
8      MR. SHAW:  Objection to form.
9      A.  I was not saying that the
10  calculation was a hundred percent accurate. I
11  wasn't making that assertion.
12      **Q.  So why did you ask Mr. Macchiaroli**
13  **to authorize the release of this money?**
14      A.  Because that was part of the
15  agreement.
16      **Q.  What was part of the agreement?**
17      A.  That if there was an excess in the
18  calculation, and I'm not the person that is
19  going to determine whether there is an excess
20  or not, I think Mike and the finance team would
21  be the people that would determine whether
22  there was, that if there was an excess,
23  $769 million worth of Ginnie Mae securities
24  held at Chase were part of the agreement and

Blackwell - Highly Confidential

1  that value should be paid to Barclays.
2      **Q.  Were you comfortable at the time of**
3  **your request to Mr. Macchiaroli that there was**
4  **at least $769 million of excess in the C3**
5  **account at Lehman?**
6      A.  Again, I'm not the expert on the C3
7  calculation, so I'm not making -- I'm making a
8  request based on the components that I'm
9  involved in. So not the whole calculation. I
10  don't have -- I would need to look at the
11  schedules that were shown to Mike at the time.
12  But if the schedules had shown an excess, then
13  that would give me a level of comfort.
14      **Q.  I don't wish to belabor the point,**
15  **but it seems to me that you have two choices.**
16  **Either you got comfortable that the C3**
17  **calculation was accurate between Sunday night,**
18  **the 21st, and whenever you asked**
19  **Mr. Macchiaroli to release this, or you asked**
20  **him to release it not knowing whether or not**
21  **these calculations showing an excess of 769**
22  **million or more was accurate.**
23      MR. SHAW:  Objection to form.
24      A.  That's not what I was representing.

Page 214

Blackwell - Highly Confidential

1       Blackwell - Highly Confidential
2    I was discussing with Mike the fact that there
3    are multiple components for 15C3 calculation,
4    multiple components, of which I am not expert
5    at the multiple components.  Over the course of
6    the weekend leading -- the 21st, 20th, 21st,
7    the work that was done was to determine the
8    operational components that go into a 15C3
9    calculation which is some of the components
10   that we would -- that operations would provide,
11   and there are many other components that make
12   that up.  That calculation then determines how
13   much money is locked up.  I don't know at that
14   point in time when that conversation happened
15   how much money was locked up.  Mike and the
16   trustee of LBI knew how much money was locked
17   up and what the value of that calculation was.
18   But I would need to look at papers from there
19   to determine whether there was an excess.  The
20   request was on the basis that if Mike felt
21   there was an excess, when could we discuss
22   having the $769 million worth of securities.
23   If there isn't an excess, then I'm not
24   expecting him to release the securities.  But
25   then alternative value would need to be found

TSG Reporting - Worldwide  (877) 702-9580

Page 215

Blackwell - Highly Confidential

1       Blackwell - Highly Confidential
2    away from the C3.
3       Q.   We will come back to the alternative
4    value in a little bit.
5            Have you had any subsequent
6    conversations with the SEC about the subject of
7    C3?
8       A.   Yes.  Again, as it pertained to the
9    margin debits and the PIM asset transfer,
10   multiple.  Too many to list.
11      Q.   Have you had any conversations with
12   the SEC about the $769 million?
13      A.   I don't think I have had any
14   subsequent conversations.
15      Q.   Do you know if anybody else at
16   Barclays has had conversations with the SEC
17   about the release of 769 from the 15C3 account?
18      A.   I don't know is the -- I don't know.
19      Q.   Were you ever asked over the
20   weekend, sir, the weekend of September 20th and
21   21st, to do any work as it relates to Lehman's
22   margin or deposits at the OCC or any other
23   exchange?
24      A.   I don't recall doing any work on
25   that.

TSG Reporting - Worldwide  (877) 702-9580

Page 216

Blackwell - Highly Confidential

1       Blackwell - Highly Confidential
2       Q.   Do you recall ever hearing that
3    Lehman's margin or deposits at the OCC or any
4    other exchange were ever part of the deal
5    between Lehman and Barclays?
6       A.   Over the deal weekend, no.
7       Q.   That answer suggests to me that
8    subsequently to the deal weekend you have heard
9    that.
10      A.   I understand that to be the deal.
11      Q.   And, again, without wishing to
12   invade any privilege that you may have, can you
13   tell me how it is you came to learn that piece
14   of information?
15      A.   I learned that as part of some
16   conversations that I think took place --
17   meetings that took place between the trustee of
18   LBI, a member of my staff, and Barclays'
19   counsel, so I...
20      Q.   That's fine.  It's probably not
21   privileged, but I don't need to go into it.
22           You said in response to one of
23   Mr. Hine's questions that one of your
24   responsibilities over the weekend was to
25   monitor settlement activity between various

TSG Reporting - Worldwide  (877) 702-9580

Page 217

Blackwell - Highly Confidential

1       Blackwell - Highly Confidential
2    clearing organizations.
3       A.   Not over the weekend, because there
4    is no settlement can take place over the
5    weekend.
6       Q.   I'm sorry.  I misspoke.
7            Was monitoring settlement activity
8    in various clearing organizations part of your
9    responsibility in the week preceding the LBI
10   bankruptcy on the 19th of September?
11      A.   Correct.
12      Q.   Can you tell me a little more about
13   your role in monitoring the settlement
14   activity, please.
15      A.   My settlement teams were obviously
16   working very closely with these exchanges to
17   try and clear the business and working with the
18   treasury team to fund -- to make sure the boxes
19   were funded as much as they possibly could, and
20   over the course of that week funding obviously
21   started to disappear, so settlement started to
22   wind down.  The most notable event apart from
23   Chase not providing clearance on the Friday
24   before bankruptcy was DTC raising the debit cap
25   to zero, which basically prevented us from

TSG Reporting - Worldwide  (877) 702-9580

1      Blackwell - Highly Confidential
2   being able to settle transactions.
3      Q.   What does that mean, raising the
4   debit cap to zero?
5      A.   It means that the account is
6   effectively not funded, so the process of
7   settlement can't take place.
8      Q.   I have heard that over the week
9   prior to LBI's bankruptcy that DTC was
10  threatening not to clear trades.
11       Is that the same thing that you have
12  just told me in slightly different language?
13     A.   Yes.
14     Q.   Do you have an understanding of why
15  DTC was threatening not to clear trades?
16     A.   Because the account -- because of
17  funding, funding the account, cash being made
18  available to fund the account.  The treasury
19  organization would fund all the clearing
20  systems.  If they had insufficient cash to fund
21  or insufficient cash to fund a clearing
22  mechanism, then the mechanism doesn't work.
23     Q.   Did you have any conversations with
24  anybody at DTC about the funding issues you
25  just described?

1      Blackwell - Highly Confidential
2      A.   I was informed by Neal Ullman, who
3   had a direct call with DTC, I had a
4   conversation, I think it was an e-mail
5   conversation and then ultimately a conversation
6   directly with Ian when we became aware of the
7   situation.  I asked Paolo as well if he could
8   fund the account.  So that was -- and asked him
9   to -- I think there is an e-mail me asking for
10  $1.2 billion to be put into the clearance box.
11     Q.   What was Mr. Tonucci's response to
12  your request?
13     A.   I don't remember one.
14     Q.   You took that as a no?
15     A.   I, yeah, moved on.
16     Q.   At any point did you have an
17  understanding, Mr. Blackwell, of the terms of
18  the deal between Lehman and Barclays as to
19  Lehman's DTC box?
20     A.   I think I have discussed this in
21  some of my earlier answers.  I was under the
22  working assumption that there would be a
23  conversion of, I think, the 074 box, the DTC
24  box.  That was not accurate.  There was
25  definitely dialogue between the regulators,

1      Blackwell - Highly Confidential
2   which I wasn't in, but I'm aware of, between
3   the regulators, DTC and Barclays and Lehman as
4   to Barclays taking responsibility.  I think
5   Barclays was very clear that we not take
6   responsibility for the liabilities of the
7   boxes.
8      Q.   You testified earlier that you had
9   made a suggestion that Barclays go and look at
10  Lehman's DTC books.  Do you remember that?
11     A.   I do.
12     Q.   For what purpose were you making
13  that suggestion?
14       MR. SHAW:  Asked and answered.
15     A.   So that it was possible to
16  understand any settlement risk.
17     Q.   Was that suggestion made at a time
18  when Barclays was considering stepping into
19  Lehman's shoes at DTC?
20       MR. SHAW:  Objection.  Foundation.
21     A.   I don't know what the -- I don't
22  know.
23     Q.   Well, let me ask it this way:  The
24  conversion plan about which you have testified,
25  you said that as of, I believe, Friday

1      Blackwell - Highly Confidential
2   afternoon, maybe around 5:00, you said the
3   conversion plan was no longer going to be
4   affected; is that correct?
5      A.   Correct.
6      Q.   Did you understand at any point
7   after 5:00 on Friday Barclays was still
8   assessing the risk in Lehman's DTC box?
9      A.   Not at that point.  That issue
10  didn't come up until Sunday.
11     Q.   Do you have any understanding as to
12  why the issue arose on Sunday?
13     A.   I believe it's because the
14  regulators and other entities that were
15  involved in signing off on the deal were
16  insisting that the box should be -- Barclays
17  should take responsibility for the box, which
18  they did not want to do.
19     Q.   Where did you get that
20  understanding, that the regulators wanted
21  Barclays to take over the box?
22     A.   I would have heard it either from
23  Ian or from -- maybe even from Alex Crepeau.
24     Q.   Does that answer exhaust your
25  recollection of the regulators' interactions

Page 222

1   **Blackwell - Highly Confidential**
2   **with Barclays on this issue?**
3   A.   I was not part of them, so yes, it
4   does.
5   **Q.   Do you understand that Barclays --**
6   **withdrawn.**
7   **Did Barclays decide to take over the**
8   **box in whole or did they decide to just take**
9   **the assets rather than the liabilities?**
10   MR. SHAW: Objection. Foundation.
11   A.   My understanding is that Barclays
12   agreed to take unencumbered assets.  This is a
13   post-event recollection.  Agreed to take
14   unencumbered assets and not take responsibility
15   for clearance boxes of Lehman Brothers.
16   **Q.   Do you have any understanding as to**
17   **the reasons that decision was made?**
18   A.   No.
19   **Q.   You never talked to anybody about**
20   **it?**
21   A.   It's possible, but, again, we were
22   moving on to a building mode at Barclays.
23   MR. OXFORD: I'd like to show you a
24   few documents, please.
25   (Exhibit 89 B, e-mail dated
TSG Reporting - Worldwide  (877) 702-9580

Page 223

1   Blackwell - Highly Confidential
2   9-19-2008, marked for identification.)
3   Q.   Mr. Blackwell, you have in front of
4   you a document I have marked as Exhibit 89 B.
5   Can you read that and let me know when you have
6   had a chance to look over it.
7   (Document review.)
8   A.   Okay.
9   Q.   You will see in the e-mail that's
10   ultimately forwarded to you, the bottom e-mail
11   in the chain is an e-mail from Chris Concannnon
12   at NASDAQ to Gerald Donini.  Do you see that?
13   A.   I do.
14   Q.   Who is Mr. Donini?
15   A.   Gerry Donini is -- or was head of
16   equities at Lehman Brothers.
17   Q.   Where is Mr. Donini now?
18   A.   He is at Barclays Capital.  Holds
19   the same position.
20   Q.   You see the last line of the first
21   paragraph, the last sentence of the first
22   paragraph says: "DTC is contemplating a cease
23   act notice for LEHM tonight."  Do you see that?
24   A.   I do.
25   Q.   That e-mail chain is ultimately
TSG Reporting - Worldwide  (877) 702-9580

Page 224

1   **Blackwell - Highly Confidential**
2   **forwarded to you and to Mr. Joseph Lodato by**
3   **Gerald Donini.  Do you see that?**
4   A.   I do.
5   **Q.   Mr. Donini writes to you and**
6   **Mr. Lodato "need an answer and help."**
7   A.   I think Gerry probably answered
8   that.  Gerry was responsible for compliance for
9   the equity division.  At that point I had no
10   understanding of what Barclays' intent was
11   around the boxes other than to assume they were
12   taking responsibility for them at that point.
13   **Q.   Why was it you assumed they were**
14   **taking responsibility for it?  Is that because**
15   **you were still in your conversion mindset, as**
16   **it were?**
17   A.   Yes.  So I don't think I confirmed
18   or denied -- I don't think I responded to this.
19   **Q.   You don't recall speaking to**
20   **Mr. Donini or Mr. Lodato about this?**
21   A.   It's possible I did, but, again, in
22   light of the number of things going on, it was
23   possible that I didn't follow through on that
24   particular item.
25   MR. OXFORD: Okay.  That's all I
TSG Reporting - Worldwide  (877) 702-9580

Page 225

1   Blackwell - Highly Confidential
2   have for that document.
3   (Exhibit 90 B, e-mail dated
4   9-19-2008, marked for identification.)
5   Q.   Mr. Blackwell, you have in front of
6   you Exhibit 90 B.  I should say, just so we are
7   clear, there is a somewhat complicating factor
8   when these e-mails were processed in the
9   timing, so the first line of the "sent," which
10   is up here as 2:53 p.m., is actually in
11   Greenwich meantime, so that is an e-mail that
12   was sent at 10:53 a.m. on Friday.
13   A.   10:53 --
14   Q.   A.M. on Friday, but the e-mails
15   below the chain -- sorry, in the chain, are in
16   Eastern standard time.
17   A.   Okay.  So this is the morning of
18   Friday.
19   Q.   Friday morning.
20   A.   We are still in conversion mode.
21   Q.   Still in conversion mode.
22   Mr. Nicholson writes to you and Mr. Lodato
23   again asking for guidelines as to what is going
24   presumably to Barclays.  Correct?  That's how
25   you read it?
TSG Reporting - Worldwide  (877) 702-9580

Page 226

1    Blackwell - Highly Confidential
2        A.   I would read it that way, yes.
3        Q.   And you reply "currently being
4    argued, they are taking all the DTC 074 box."
5        A.   And, again, that was an assumption
6    at that point in time that the box was going.
7            (Exhibit 91 B, e-mail dated
8        9-21-2008, marked for identification.)
9        Q.   Mr. Blackwell, you have in front of
10   you what I have marked as Exhibit 91 B, which
11   at the top is an e-mail that's sent by you on
12   Sunday, the 21st of September, at 2:43 a.m.,
13   that's what it bears, but it would have been
14   sent at Saturday, 10:43 p.m. on the 20th.
15       A.   Okay.
16       Q.   I say this as much for your benefit
17   as to try to keep myself --
18       A.   I was definitely --
19       Q.   Below you write an e-mail at
20   10:38 p.m. to Mr. McDade and to Mr. Lowitt
21   saying "DTC suggestion."
22           Does this reflect a suggestion by
23   you that Barclays review the Lehman assets at
24   DTC?
25       A.   Yes, it does.  To give -- it's to

TSG Reporting - Worldwide  (877) 702-9580

Page 227

1        Blackwell - Highly Confidential
2    give -- I think we discussed this earlier.
3    This is to give Barclays access to the DTC
4    clearance boxes either to review unencumbered
5    assets or fails.  I don't know what topic I am
6    referring to.  Probably on the Saturday it's
7    referring to unencumbered.
8        Q.   Sorry, can you explain that last
9    answer.
10           MR. SHAW:  You are going to need to
11       ask a more precise question.
12       Q.   You said "either to review
13   unencumbered assets or fails."  What do you
14   mean by reviewing unencumbered assets?
15       A.   What do I mean by reviewing
16   unencumbered assets?  That's probably not
17   accurate.  I am just thinking in terms of the
18   timeline of when this was sent and what I was
19   focused on.  So I think the primary purpose of
20   this effort was to allow Barclays to review the
21   failing transactions.  I do think that was the
22   primary purpose, but I can't be a hundred
23   percent sure.  I'm sure there are more e-mails
24   associated with this.
25       Q.   In the context of Barclays' review

TSG Reporting - Worldwide  (877) 702-9580

Page 228

1        Blackwell - Highly Confidential
2    of Lehman's DTC box, what did TBAs mean to you?
3    They are not on this document.
4        A.   I wasn't in -- I don't -- I don't
5    know.  It's a type of security.
6        Q.   Was it a type of security that was
7    in Lehman's DTC box?
8        A.   It's quite possible.
9        Q.   Was it a type of security that you
10   had any understanding Barclays was concerned
11   about?
12       A.   I don't know.
13       Q.   Is it a type of security that comes
14   with any potential liabilities?
15       A.   I think any security comes with a
16   sort of liability.  They go up and down, so any
17   security has liability.
18           (Exhibit 92 B, e-mail dated
19       9-20-2008, marked for identification.)
20       Q.   I've marked as Exhibit 92 B what I
21   think is a double-sided document.  It's a
22   two-page document that is ultimately
23   forwarded -- sorry -- that is ultimately sent
24   by you on Saturday at 7:14 p.m. Eastern.
25   Subject, 1.4 billion update.  If I can direct

TSG Reporting - Worldwide  (877) 702-9580

Page 229

1        Blackwell - Highly Confidential
2    your attention to the original e-mail in the
3    chain, which is on the reverse of your exhibit,
4    there is an e-mail that is not sent to you at
5    this stage, but it's forwarded up to you.  It's
6    from Mr. Lowitt to Mr. McDade and
7    Mr. Berkenfeld on Saturday, September 20 at
8    5:53 a.m.
9            Mr. Lowitt writes:  "Did the court
10   accept the 15C3 lock-up and unencumbered box
11   make it through to Barcap."
12           Do you remember, when you received
13   this e-mail, scrolling down and reading this
14   part of the chain?
15       A.   Probably not.  Just the sheer volume
16   of mail I'm getting, my goals are here, the
17   e-mail from Monty, which I think we have
18   actually looked at several times in other
19   exhibits.
20       Q.   If you go two up the chain, Beth
21   Rudofker sends an e-mail to Mr. Berkenfeld and
22   copies you amongst others.
23       A.   Yes.
24       Q.   Is that the point at which you would
25   become focused on this e-mail?

TSG Reporting - Worldwide  (877) 702-9580

Page 230

Blackwell - Highly Confidential

1
2    A.   Quite possibly, but again, the focus
3  of this e-mail on this e-mail trail and the
4  focus of what I am doing as the operations
5  manager is trying to identify based on the set
6  of criteria unencumbered securities.  I don't
7  know what was discussed in court.  I have no
8  idea.  And it was, frankly, of little interest
9  to me at that point.
10    Q.   Miss Rudofker writes:  "Alastair" --
11  and she spells your name wrong -- "and Neal are
12  working on getting it ring-fenced/moved if
13  needed."
14        Was that your understanding of what
15  your marching orders were that weekend, to get
16  the 15C3 assets and the unencumbered box
17  ring-fenced and moved, if needed?
18    A.   I couldn't technically do that.  I
19  could identify assets.  I can't move anything
20  over the weekend.  I couldn't move cash at the
21  weekend and I couldn't move securities related
22  to it, so practically that's not possible, so
23  my marching orders, as I said, was to identify
24  the assets and provide that information, what
25  are the assets that are currently unencumbered,

Page 231

Blackwell - Highly Confidential

1
2  and recalculate the C3.
3    Q.   Did anyone ever tell you that cash
4  had been removed from the deal between Lehman
5  and Barclays?
6    A.   That was my understanding of why 769
7  cash couldn't move, it had to be securities,
8  but I think that was a post -- that was a
9  post-weekend event.  That's my recollection.
10    Q.   Your recollection -- and the event
11  you are talking about is you learning that the
12  reason the transfer is 769, not some number in
13  cash, is because, as you understood it, the
14  terms of the deal was that no cash could go to
15  Barclays?
16    A.   That was after the weekend, as I
17  thought 769 was a strange number.
18    Q.   Okay.  I think you have answered my
19  question as to timing, but not actually my
20  question.
21        Is it correct that your
22  understanding was that the reason the deal
23  between Barclays and Lehman was the transfer of
24  $769 million in Ginnie Mae securities rather
25  than that number or some other number in cash

Page 232

Blackwell - Highly Confidential

1
2  was because cash had been excluded from the
3  deal with Barclays?
4    A.   I don't think -- I don't think I
5  would have known that.  I think I may have
6  learned that subsequently.  Around the time my
7  understanding would have been securities needed
8  to move or alternative value.
9    Q.   From whom did you gain that
10  understanding, sir?
11    A.   It's going to have been from a
12  similar set of people you see in my e-mails.
13  It's going to be Ian, Martin or Paolo who would
14  have informed me of that.
15    Q.   So one of the three, to the best of
16  your recollection, you can't remember which,
17  would have told you that the reason the deal
18  changed from I think it was a billion
19  dollars -- does that sound right to you?
20        MR. SHAW:  Objection.  Foundation.
21    Q.   I think there is probably a number
22  of proper objections to that question.
23        Did you ever have an understanding
24  that some other value different to $769 million
25  was to be transferred from Lehman's C3 account

Page 233

Blackwell - Highly Confidential

1
2  to Barclays?
3    A.   Over the course of the weekend I had
4  spent time, that conversation I had with Gerard
5  around the billion dollars of cash at Wells
6  Fargo, so I had a conversation about the
7  mechanism to potentially move that.  That's
8  where my involvement was.
9    Q.   So based on your conversation with
10  Mr. LaRocco, you had understood that one
11  component of the deal between Barclays and
12  Lehman was to move a billion dollars of cash
13  which was held in that Wells Fargo account
14  which was that 15C3 account?
15    A.   Correct, dependent, though, on
16  determining there was an excess, and there
17  would be alternative value.
18    Q.   And when the deal is finally inked
19  in the Clarification Letter, that number has
20  changed, hasn't it?  It's no longer $1 billion;
21  correct?
22    A.   That is my understanding, yes.
23    Q.   That number has changed from
24  $1 billion to $769 million; correct?
25    A.   Correct.

Page 234

Blackwell - Highly Confidential

1       Blackwell - Highly Confidential
2     Q.  And just so we have got a clear
3 record, I think we are there, but one more
4 question, your understanding of the reason that
5 the deal changed from $1 billion in cash from
6 Wells Fargo, assuming there is an excess in the
7 C3 account, the reason it changed from that
8 $1 billion to 769 of Ginnie Mae securities was
9 a belief that no cash was to go to Barclays
10 under this deal?
11     MR. SHAW:  Objection to form.
12     A.  I don't have -- over the course of
13 the weekend when the Clarification Letter was
14 being produced, I have no understanding of that
15 at all.
16     Q.  I understand that, sir.  That wasn't
17 my question.
18     A.  Post the event that is a
19 possibility.  It is not something I spent a
20 huge amount of my time discussing.
21     Q.  But you believe the basis of your
22 knowledge, such as it is, comes from
23 conversations with Mr. Lowitt, Mr. Tonucci and
24 Mr. Kelly?
25     A.  Most likely.

TSG Reporting - Worldwide  (877) 702-9580

Page 235

Blackwell - Highly Confidential

1       Blackwell - Highly Confidential
2     (Exhibit 93 B, Management of the
3 Unencumbered Asset Gap, marked for
4 identification.)
5     (Recess was taken from 3:33 to
6 3:38.)
7 BY MR. OXFORD:
8     Q.  Mr. Blackwell, you have in front of
9 you what I have marked as Exhibit 93 B, which
10 is a document -- a one-page document
11 entitled -- two-page document entitled
12 Management of the Unencumbered Asset Gap.
13     Do you recall seeing this document
14 before?
15     A.  When I was reviewing my e-mail, I
16 think I saw something like this, if not this
17 one.
18     Q.  And when you say reviewing your
19 e-mail, do you mean in preparation for this
20 deposition?
21     A.  Absolutely.
22     Q.  Did that review refresh your
23 recollection about the events that took place
24 at the time this document was created?
25     A.  I think this is the -- to the extent

TSG Reporting - Worldwide  (877) 702-9580

Page 236

Blackwell - Highly Confidential

1       Blackwell - Highly Confidential
2 that it is consistent with the attempt to look
3 for 1.95 billion of collateral.  At that point
4 that was a target.  I don't know why that
5 target was set, but that was the target.  That
6 target subsequently became irrelevant or
7 raised.
8     Q.  When did it become irrelevant or
9 raised?
10     A.  It was -- the target ceased to be --
11 over the course of the weekend it ceased to be
12 about finding a specific number.  It was what
13 is available unencumbered collateral.
14     Q.  And was that change in emphasis
15 something that Mr. Lowitt communicated to you?
16     A.  I believe so, yes.
17     Q.  And again, just so we are clear, the
18 idea then was to find as much unencumbered
19 collateral as possible so that it could be
20 transferred to Barclays?
21     A.  No, that wasn't my understanding.
22 It was to identify unencumbered collateral and
23 determine what value -- determine what was a
24 list of unencumbered securities so that a value
25 could be applied to it.  I don't know that the

TSG Reporting - Worldwide  (877) 702-9580

Page 237

Blackwell - Highly Confidential

1       Blackwell - Highly Confidential
2 intent was to transfer all of it to Barclays.
3 I think the terms of the APA state that the
4 contents of the clearance boxes, i.e., the
5 unencumbered securities in the clearance boxes
6 would be transferred, so I think this is an
7 earlier iteration of that.
8     Q.  When you say the APA, Mr. Blackwell,
9 the APA to me means the Asset Purchase
10 Agreement that was signed on 16th of September.
11 Is that a document you are referring to?
12     A.  I'm not sure which date.  Whatever
13 legal agreement was in place.  I've seen it
14 subsequently, but my understanding is it was --
15 that was my understanding.
16     Q.  And is it your understanding that
17 whatever legal agreement this may be, the APA
18 or something else, transfers in terms of
19 unencumbered collateral, it transfers what to
20 Barclays?
21     MR. SHAW:  Asked and answered.
22     A.  The contents of the -- the
23 unencumbered assets in the clearing box.
24     Q.  Clearance box was broader to your
25 mind than DTC; correct?

TSG Reporting - Worldwide  (877) 702-9580

1  Blackwell - Highly Confidential
2     A.   Yes, it would be.
3     Q.   Was it -- I think you testified that
4  it included Euroclear?
5     A.   Correct.
6     Q.   It also included Canadian exchanges?
7     A.   Not exchanges.
8     Q.   Sorry.  Then I apologize for my
9  layman's language.  It included certain
10 clearance corporations in Canada?
11    A.   Correct.
12    Q.   What else were you -- withdrawn.
13        Where else were you looking for
14 unencumbered collateral, if anywhere else?
15    A.   We were looking in the clearance
16 depos of LBI, and I don't know all the numbers
17 off the top of my head, but there are a list of
18 depos that would fall under LBI and we would --
19 the teams would have looked in those depos and
20 discounted some of them as not being depos, so
21 the focus is really on, I think, three or four
22 core pools of unencumbered securities.
23    Q.   The document that I have marked as
24 93 B says:  "The objective is to deliver to BCI
25 $195 billion as unencumbered collateral by COB

1  Blackwell - Highly Confidential
2  Friday, September 19th."  Do you see that?
3     A.   I do.
4     Q.   I read COB to be short for close of
5  business.  Do you read that also?
6     A.   I do.
7     Q.   Do you know why this document has as
8  its objective the delivery of unencumbered
9  collateral by the close of business on Friday,
10 September 19th?
11    A.   I actually don't, and I think
12 somebody like Paolo would be better answering
13 this question.
14    Q.   Did you ever have an understanding
15 that there was any effort to transfer
16 unencumbered collateral to Barclays by close of
17 business on Friday, September 19th?
18    A.   Possibly.  I don't recall that as a
19 major part of the fact pattern that we were
20 working towards at that time, but that's
21 possible.
22    Q.   Do you recall anything else about an
23 effort to transfer collateral to Barclays on
24 Friday, the 19th?
25    A.   No.

1  Blackwell - Highly Confidential
2     Q.   Can you explain for me what your
3  understanding is of a 15C3 account, just to
4  make sure we are not passing each other when we
5  are talking about it?
6        MR. SHAW:  Objection.  Asked and
7     answered, and I think also the problem you
8     are going to run into, again, is the use of
9     15C3 account.
10       MR. OXFORD:  You are right.  He did
11    correct that earlier.
12    Q.   Do you have an understanding of what
13 the requirements are of SEC rule 15C33?
14    A.   I'm at an expert on that rule.
15    Q.   Okay.  That's useful.  That was my
16 next question.
17        Do you have a general understanding
18 of what the rule requires?
19    A.   I have a general understanding what
20 it requires.
21    Q.   Can you tell me what that general
22 understanding is?
23    A.   The purpose of the calculation is to
24 protect customer assets by calculating a figure
25 and that figure is then -- it then requires you

1  Blackwell - Highly Confidential
2  to deposit either cash or securities, whichever
3  the security types are eligible, into an
4  account for that customer's protection.
5     Q.   And do you have an understanding of
6  the various elements of the calculation --
7     A.   No, I don't.
8     Q.   -- that goes into the 15C3
9  calculation?  You don't know?
10    A.   I don't.
11    Q.   Do you have any understanding of how
12 secured loans are treated under 15C3?
13    A.   No.
14    Q.   Do you have any understanding of how
15 overdrafts are treated under 15C3?
16    A.   I don't.
17    Q.   Do you have any understanding of how
18 margin that is posted at the options clearing
19 corporation is treated under 15C3?
20    A.   I don't.
21       (Exhibit 94 B, e-mail dated
22    9-22-2008, marked for identification.)
23    Q.   Okay, Mr. Blackwell, I have put in
24 front of you a document marked Exhibit 94 B,
25 which is a one-page e-mail that at the bottom

Page 242

Blackwell - Highly Confidential
1       Blackwell - Highly Confidential
2   is sent to you at 5:22 a.m. on Monday, the 22nd
3   of September.  Do you see that?
4       A.  I do.
5       Q.  The re line is 15C3, and do you see
6   that Mr. Tonucci writes to Chris O'Meara, Ian
7   Lowitt, it looks like a Russian version of
8   Martin Kelly, I'm not quite sure why, to Robert
9   Azerad and copying you?  Do you see that?
10      A.  I do.
11      Q.  He says:  "The final agreement was
12  limited to 769 million, MM, of treasuries, so
13  should be more comfortable to accomplish."  Do
14  you recall receiving that?
15      A.  That is probably when I learned it
16  was a different number.
17      Q.  Just so we are clear, a different
18  number, you are referring to your earlier
19  testimony about a change in the business terms
20  of the deal between Barclays and Lehman from
21  $1 billion of excess to 15C3 -- sorry -- from
22  the 15C3 reserve to 769 million of treasuries?
23      A.  When I became aware that it was 769
24  million of treasuries that was included in the
25  agreement.  I didn't know that the -- I didn't
TSG Reporting - Worldwide  (877) 702-9580

Page 243

1       Blackwell - Highly Confidential
2   know that cash had definitively been included
3   in any agreement.
4       Q.  Did you know that it had
5   definitively been excluded from any agreement?
6       A.  All I knew at this point was 769 had
7   been included.
8       Q.  Do you think you had a subsequent
9   conversation with Mr. Tonucci, Mr. Lowitt or
10  Mr. Kelly about this topic?
11      A.  Quite probably.  It's probable that
12  I did.  Possible that I did and probably I did.
13          (Exhibit 95, e-mail dated 9-21-2008,
14      marked for identification.)
15      Q.  Okay, Mr. Blackwell, I have marked
16  as Exhibit 95 B what is a five-page e-mail
17  with, I believe, two attachments entitled
18  Forward Net Long Options - 9/18, which is sent
19  from Francis Pearn to a distribution list, and
20  you are copied, on Sunday, September 21st at
21  4:03 Eastern standard time.
22          If you could just take a moment to
23  review that e-mail and tell me when you have
24  had a chance to read it.
25      A.  I've read it.
TSG Reporting - Worldwide  (877) 702-9580

Page 244

1       Blackwell - Highly Confidential
2       Q.  Do you recall receiving this e-mail,
3   Mr. Blackwell?
4       A.  No.  This isn't something I was
5   focusing on at all.
6       Q.  Can you tell me what you were doing
7   at 4:00 on Sunday afternoon of the 21st?
8       A.  21st is a Sunday?
9       Q.  21st is a Sunday.  The deal closes
10  on Monday, the 22nd.  Where physically were
11  you?
12      A.  I am possibly at Weil's offices at
13  that point.  I am possibly at Weil's offices.
14  I can't remember the timing exactly, but I was
15  there for some of the day, so that's quite
16  possible I was there.
17      Q.  And your focus at that time was not
18  on OCC.  What was it on?
19      A.  The major topics for me that day
20  were, again, the unencumbered collateral and
21  the 15C3 and the fails topic was raised again
22  in the course of that day, so I was in a room
23  away from where the deal was being discussed,
24  but it was somewhere in Weil's offices with
25  people, and questions were being put to me,
TSG Reporting - Worldwide  (877) 702-9580

Page 245

1       Blackwell - Highly Confidential
2   information was coming back, so I was trying to
3   carry out the task that I had been set from
4   there and be available to Ian and anyone else
5   that needed me.
6       Q.  You testified earlier that someone
7   called Alex Crepeau works for you; is that
8   right?
9       A.  That's correct, yes.
10      Q.  Forgive me if I am mispronouncing
11  his name.  You said that he was responsible for
12  client valuation and margin.
13      A.  Correct.
14      Q.  Does he have responsibility for
15  margin at the OCC or is that a different
16  functional area?
17      A.  Yes, it's a different functional
18  area.
19      Q.  Do you have responsibility --
20  withdrawn.
21          Did you in your position at Lehman
22  in September of 2008, did you have
23  responsibility for the OCC?
24      A.  Clearance of trades at the OCC, yes.
25  Treasury were responsible for the margin,
TSG Reporting - Worldwide  (877) 702-9580

Page 246

1    Blackwell - Highly Confidential
2 pledging margin to -- all of the exchange
3 margin, so the names mentioned here, Craig
4 Jones, Dan Fleming. I believe you are speaking
5 to Dan at some point.
6    Q.   Mr. Fleming has operational
7 responsibility for or had, rather, operational
8 responsibility for the margin at OCC during the
9 month of September '08?
10    A.   Correct.
11    Q.   Did he report to Mr. Jones or did
12 Mr. Jones report to him?
13    A.   Mr. Jones reported to Dan Fleming.
14    Q.   Are both of those individuals still
15 at Barclays?
16    A.   They are.
17    Q.   Do you know why the other Lehman
18 individuals would be copied on an e-mail about
19 this subject? Did they also have
20 responsibility for this area?
21    A.   I don't. There seem to be
22 regulatory people, regulatory finance people on
23 here, so I don't know what -- reading through
24 the e-mail trail, I don't know what the
25 ultimate genesis of this trail of work is.
TSG Reporting - Worldwide  (877) 702-9580

Page 247

1    Blackwell - Highly Confidential
2    Q.   Which are the regulatory finance
3 people?
4    A.   Peter Tennison and Tony Stucchio,
5 and then there are product controllers in Frank
6 Pearn and Gerry Reilly.
7    Q.   Thank you. That's all I have for
8 that document.
9    Can you have in front of you, it's
10 one of the big fat ones that Mr. Hine marked,
11 85 B. Can you open the page to the last
12 document in there which starts at Bates range
13 4607 and it's entitled at the top Exhibit B6
14 Source Schedule B Final, Schedule B. Do you
15 see that?
16    A.   I do.
17    Q.   Do you recognize this document or
18 know what it is?
19    A.   I believe I know what it is.
20    Q.   Can you tell me what it is, please.
21    A.   I believe this is the unencumbered
22 collateral list.
23    Q.   When you say "the unencumbered
24 collateral list," can you be a little more
25 specific, please?
TSG Reporting - Worldwide  (877) 702-9580

Page 248

1    Blackwell - Highly Confidential
2    A.   List of securities that were
3 unencumbered in the clearance box of Lehman
4 Brothers.
5    Q.   As of which date?
6    A.   I don't know the date. I'm not
7 going to say what date it was, but the schedule
8 being created over that weekend is my
9 understanding.
10    Q.   This might be a slightly vague
11 question. It's not intended to be in any way
12 tricky. I am just trying to get a sense of
13 whether you think this is in some way the
14 product of the work that your team did over the
15 weekend to identify unencumbered assets. Is
16 that a fair reading of the situation?
17    A.   I'm aware of a Schedule B that we
18 contributed to, so I'm assuming based on the
19 title of the document, but without a number to
20 compare it, it's difficult for me to --
21    Q.   It is in alphabetical order, but I
22 take your point.
23    MR. SHAW: I will note that on
24 page 1, Schedule B6, which I think is what
25 you are looking at, has a title by it
TSG Reporting - Worldwide  (877) 702-9580

Page 249

1    Blackwell - Highly Confidential
2 saying Monday Transfers Par Amount.
3    A.   Right. So it's only one component
4 of Schedule B.
5    MR. OXFORD: Which page?
6    MR. SHAW: Third page of the
7    document after the first blue page. You
8    see there is F/N and exhibit.
9    MR. OXFORD: Yeah, I don't think
10    that's got anything to do with that. Okay.
11    A.   So this document equals that 2.6
12 number?
13    Q.   Is that your understanding?
14    A.   Well, that's -- I don't know how
15 this is laid out, so I think that's a fair
16 point.
17    Q.   In compiling your list of
18 unencumbered assets, which may not be exactly
19 what is at Bates range 4607 and following, did
20 you or your team undertake any effort to take
21 out securities that were owned by Lehman's
22 customers?
23    MR. SHAW: Objection. Vague as to
24    time.
25    Q.   At any point over the weekend when
TSG Reporting - Worldwide  (877) 702-9580

Page 250

1    **Blackwell - Highly Confidential**
2    **you were combining a list of unencumbered**
3    **assets that informs this Schedule B that we are**
4    **looking at, did you or your team undertake any**
5    **efforts to deduct from that list of CUSIPs any**
6    **CUSIPs that were owned by Lehman customers?**
7        MR. SHAW:  Objection to form.
8        You can answer.
9        A.   Of course.  Unencumbered assets by
10   definition are not customer assets, however, we
11   had data within the -- we had data challenges,
12   so some of the accuracy of the data was
13   challenging.  We applied a rationale, as I
14   described before, around memo seg and memo to
15   just take firm inventory, we excluded customer
16   inventory and were -- we applied a methodology
17   absolutely with the intent of protecting
18   customer assets all the way through the
19   process.
20       **Q.   Have you ever done any analysis to**
21   **determine whether or not any customer assets**
22   **ended up on Schedule B?**
23       A.   I think there were some analysis,
24   that's possible.  I can't -- there was
25   definitely analysis on Schedule B and
         TSG Reporting - Worldwide  (877) 702-9580

Page 251

1        Blackwell - Highly Confidential
2    refinement of it, and it's possible, but I
3    think if that happened, then there was a
4    correction that took place.
5        **Q.   And who did that analysis?**
6        A.   I would imagine it's going to be the
7    finance team and Jim Hraska in conjunction
8    maybe with the regulatory ops team.
9        **Q.   Were you involved in that analysis?**
10       A.   Not doing the analysis.  I think I
11   have seen analysis over the months post
12   bankruptcy.
13       **Q.   Were you involved in reviewing the**
14   **analysis that was done by others?**
15       A.   It's possible.  I can't confirm that
16   a hundred percent, but it's possible I reviewed
17   analysis.  There was no intent to move customer
18   assets.
19       **Q.   When you say there was no intent to**
20   **move customer assets, do you include in your**
21   **definition of customers Lehman affiliates?**
22       A.   I include the way these schedules
23   were created or the way that the unencumbered
24   assets were created was using 931 inventory
25   accounts, which are firm positions, firm being
         TSG Reporting - Worldwide  (877) 702-9580

Page 252

1        Blackwell - Highly Confidential
2    LBI positions.
3        **Q.   Why do you use the date of 9/31?**
4        A.   I don't use the date.  It's an
5    account identifier.  931 is an account range.
6        **Q.   I understand.**
7        A.   So it's a distinct account range
8    that we analyze, firm inventory accounts.
9        **Q.   Is it possible that Lehman's system**
10   **showed that multiple parties, including**
11   **customers of Lehman and Lehman itself, could**
12   **have entitlement to the same security in the**
13   **clearance box?**
14       A.   Yes, but there was a methodology
15   applied to identify that.
16       **Q.   What was that methodology?**
17       A.   Again, using 931 accounts, taking
18   the difference between the value of the
19   customer -- taking a total value of the
20   position in the box, taking only the component
21   which was a -- taking only the component that
22   was the trading book component, and if that
23   trading book component was bigger than the
24   total position, then there was an adjustment
25   there as well, so absolutely we are taking the
         TSG Reporting - Worldwide  (877) 702-9580

Page 253

1        Blackwell - Highly Confidential
2    most conservative component and if there was
3    any doubt in terms of total position and if the
4    position in the box was less than the -- was
5    less than the -- less than or equal to the
6    customer position, we left that position there.
7    So we didn't -- there was a methodology for
8    each of the schedules that absolutely was
9    designed to protect the customer assets.
10       **Q.   So I understand this, if, for**
11   **example, there were a million shares of IBM and**
12   **Lehman's books and records showed that there**
13   **was an entitlement to those million shares by a**
14   **customer and by Lehman, those under your**
15   **methodology would have been excluded from your**
16   **list of unencumbered assets?**
17       A.   Yes.  That was the intent.
18       **Q.   Does the same apply to securities**
19   **that Lehman's books and records show an**
20   **entitlement to by not only Lehman, by which I**
21   **mean LBI, the broker/dealer, but also a Lehman**
22   **affiliate?**
23       A.   Jim would be a better person to
24   explain exactly how he applied the methodology,
25   but there was deliberate methodology applied to
         TSG Reporting - Worldwide  (877) 702-9580

Page 254

1    Blackwell - Highly Confidential
2  each one of the schedules.
3    Q.   Do you have any understanding that
4  on Schedule B that's attached to the APA a
5  number of the securities that were included in
6  the repo transaction and also on Schedule A to
7  the -- withdrawn.
8         Do you have any understanding that
9  Schedule B to the Clarification Letter includes
10  repo securities that are also on Schedule A to
11  the Clarification Letter?
12    A.   I didn't.
13    Q.   Do you have any reason to believe
14  that they should be on there?
15    A.   I don't have a view.
16    Q.   Did you follow up with
17  Mr. Macchiaroli after your meeting with him in
18  late September, early October 2008 about the
19  15C3 account?
20         MR. SHAW:  Asked and answered.
21    A.   Yes, many times.
22    Q.   Did you follow up with him on the
23  question of your request that he authorize the
24  release of moneys from -- specifically
25  $769 million of securities from Lehman's 15C3?

Page 255

1    Blackwell - Highly Confidential
2    A.   I don't think I did.
3         MR. SHAW:  Asked and answered.
4         MR. OXFORD:  I don't think I have
5  anything further at this time.
6  EXAMINATION BY
7  MR. DAKIS:
8    Q.   I think we met earlier off the
9  record.  My name is Robert Dakis.  I am from
10  the law firm of Quinn Emanuel Urquhart Oliver &
11  Hedges and I represent the Unsecured Creditors
12  Committee of Lehman Brothers Holdings, Inc.
13         I want to go back to the discussion
14  of collateral posted for the Fed and the
15  tri-party repos.  Just a couple of things I
16  want to make sure that I understood from your
17  prior testimony about them.
18         Now, I believe you explained the
19  process was the clearing bank, either JPMorgan
20  Chase or Bank of New York depending on where we
21  were, would value the collateral that's posted
22  under the repurchase agreements.
23    A.   Yes.
24    Q.   Okay.  And the clearance bank then
25  selected the collateral that's pledged under

Page 256

1    Blackwell - Highly Confidential
2  the repos?
3    A.   Under normal course of business,
4  that's correct, yes, they did.  There are some
5  exceptions, but yes.
6    Q.   Were there any exceptions in the
7  week of September 15th, 2008?
8    A.   Not in the -- not that I'm aware of,
9  no.
10    Q.   Okay.  Typically, in your
11  experience, when does the clearing bank inform
12  Lehman of the value it's assigning to the
13  collateral?
14    A.   I think that's part of the process
15  of closing the tri-party agreement in any one
16  day, so I don't know exactly what time, but
17  once the tri-party is closed down or tri-party
18  is set, we would understand what the value was.
19  I don't know when that is in the normal course
20  of business.
21    Q.   After the clearing bank assigns the
22  value and sets the securities that are going to
23  be transferred, does the buyer under a repo
24  have the discretion to refuse delivery of any
25  securities?

Page 257

1    Blackwell - Highly Confidential
2         MR. SHAW:  Objection.  Foundation.
3    A.   I don't know.  On what basis?  If it
4  falls outside of the agreed schedules.
5    Q.   Let me try to make it a little more
6  clear so that we can create some foundation for
7  this.
8         You understand that a repurchase
9  agreement typically has a buyer who buys
10  securities for some short-term subject to an
11  obligation to sell them back to the seller at
12  the maturity date of the repurchase agreement;
13  correct?
14    A.   I understand what a repo is.
15    Q.   Just trying to set it up for the
16  record.
17         The entity who buys under the
18  repurchase agreement typically sets a schedule
19  or at least under these repurchase agreements
20  it's your understanding that the buyer sets a
21  schedule of specific categories of securities
22  that it will accept.
23    A.   There are schedules attached to the
24  repo agreement that says these are the types of
25  collateral that are eligible for this

Page 258

1    Blackwell - Highly Confidential
2 agreement, yes.
3    Q.   In your experience, does the buyer
4 under these repurchase agreements have
5 discretion to refuse delivery of a security
6 that falls within those schedules?
7        MR. SHAW: Objection to form.
8    A.  I'm not aware.
9        MR. DAKIS:  I am going to show you
10 an exhibit.
11        (Exhibit 96 B, e-mail dated
12 September 18, 2008, Bates stamped 77882,
13 marked for identification.)
14    Q.   I believe you have been handed a
15 document that's been marked as Exhibit 96.
16 This is an e-mail chain.  The top e-mail in the
17 chain is an e-mail from you to Ian Lowitt dated
18 Thursday, September 18th at 8:56 p.m. GMT.  In
19 the lower right-hand corner is a Bates number
20 77882.
21        Did I accurately describe that?
22    A.  77882, yes.
23    Q.   I want to focus on in the fourth
24 e-mail in the chain, which is an e-mail from
25 Ian Lowitt to you on Thursday, September 18th,

TSG Reporting - Worldwide  (877) 702-9580

Page 259

1    Blackwell - Highly Confidential
2 Ian asks you "are we still papering the 18
3 billion repo with Barclays or is that all part
4 of the same transfer."
5        Did you understand at the time what
6 Mr. Lowitt meant by that?
7    A.  Sorry, where are you looking at?
8 Oh, here.  What I understood was that there was
9 a -- away from the Fed repo in the days
10 preceding I guess -- in the week between LBHI
11 and LBI's bankruptcy Barclays were extending
12 some -- were financing the organization through
13 some -- through a repo arrangement and that had
14 been rolled for the previous two nights, so
15 yes, my understanding was at that point it was
16 possible that that would get rolled again for
17 another night.
18    Q.   And just to be sure that I am clear,
19 this is a separate repo from the Fed repo?
20    A.  Absolutely, yes, it's a Barclays --
21 Barclays to Lehman repo directly.
22    Q.   Okay.  And is it your understanding
23 that that repo rolled again on the night of the
24 18th?
25    A.  It didn't.  At the end of the

TSG Reporting - Worldwide  (877) 702-9580

Page 260

1    Blackwell - Highly Confidential
2 process of settling the Fed repo out to BONY, a
3 discussion was had at I think it was probably
4 about 2 in the morning, I think it was e-mails,
5 where the Barclays repo was not being rolled.
6 We thought it would be.  And a HIC loan, I
7 think, was put on that -- held-in-custody loan
8 for $15 billion, and at that time I -- when Jim
9 informed me of that, I tried to contact a
10 number of people at Barclays, Harry Harrison,
11 Gerard LaRocco, I think I tried to get ahold of
12 Ian and Paolo and I don't think I had any luck
13 in getting contact with anyone to tell them
14 that it happened, so the following day we
15 started the day with a -- I think there was
16 this HIC loan for 15.8 billion.
17    Q.   You said that there was a discussion
18 at about 2 in the morning about the Barclays
19 repo not rolling.
20    A.  Yes.  At that point.
21    Q.   Who was on that discussion?
22    A.  When I say discussion, I think Jim
23 Hraska probably coming down to tell me or vice
24 versa.  I can't recall exactly how.  Or Monty.
25    Q.   And by "Monty" you mean?

TSG Reporting - Worldwide  (877) 702-9580

Page 261

1    Blackwell - Highly Confidential
2    A.  Forrest.
3    Q.   And do you know who at Barclays made
4 the decision not to roll the repo?
5    A.  No.
6    Q.   Now, could you explain the HIC loan
7 to me.  What was the purpose of the HIC loan?
8    A.  A HIC loan is a held-in-custody
9 loan, so it's a loan against the collateral in
10 the Lehman box.
11    Q.   Who provided the loan?
12    A.  Chase.  JPMorgan Chase.  I don't
13 believe the repo -- that the held in custody
14 was for the full value of what was in the box.
15    Q.   And I believe you testified earlier
16 that you were in a room with a bunch of Weil
17 lawyers at some point before the repo rolled
18 when you learned that the repo wasn't going to
19 roll.  You said that it was reasonable that it
20 didn't roll?
21        MR. SHAW:  Objection.
22 Mischaracterizes prior testimony.
23    A.  Yes, the timing is wrong there.
24        MR. DAKIS:  Could we take a
25 two-minute break while I find it on

TSG Reporting - Worldwide  (877) 702-9580

1      Blackwell - Highly Confidential
2  Livenote so I can pull up the right
3  testimony.
4      MR. SHAW: Sure.
5      (Recess was taken from 4:19 to
6  4:20.)
7  BY MR. DAKIS:
8    Q.   Okay.  Going back to my prior
9  question, you testified earlier in the day that
10 at some point you were in the room with Weil,
11 Ian and Paolo were outside --
12     MR. DAKIS: Can you read it.
13     (Record read.)
14   Q.   Does that refresh your recollection
15 of your prior testimony?
16   A.   Yes.
17   Q.   Okay.  Why did you think at the time
18 that it was reasonable Barclays wouldn't take
19 the loan?
20   A.   Because repos roll generally and
21 this repo was rolled over a 24-hour period.
22 At 2 in the morning there is no economic
23 outcome either way for any of the organizations
24 involved.  A HIC loan unwinds instantly in the
25 morning.  So if Barclays had taken a trade,

1      Blackwell - Highly Confidential
2  they would have delivered cash and got cash
3  straight back, so net net, nobody gained or was
4  harmed, so in effect the HIC loan was there to
5  protect Chase and put a back value entry into
6  their books to give their credit department
7  comfort.  That would be my opinion.
8    Q.   Do you know how the Fed valued
9  collateral that was pledged to the Fed wire?
10   A.   I don't know how they did it.  I
11 don't know what mechanism they used.
12   Q.   Can you please put Exhibit 85 B in
13 front of the witness again.  It's one of those
14 large books.
15   A.   I have it.
16   Q.   Just a couple more questions.  We
17 are almost done.
18     I believe when we were talking -- if
19 you could turn to page 4398.  It's, I believe,
20 the third page.
21     We were talking about the values on
22 this first page earlier and I believe your
23 testimony was that the values were either
24 system driven or model driven and you didn't
25 know which.  Is that correct?

1      Blackwell - Highly Confidential
2    A.   I wouldn't know without looking at
3  the assets.  I wouldn't know even looking at
4  the assets, frankly.
5    Q.   Fair enough.  Could you just explain
6  what you mean by a value is system driven?
7    A.   What I was referring to was that the
8  systems would have had close of business Friday
9  prices in or whatever close of business price
10 had been fed in.  When I say system driven, I
11 mean that's been sourced from a pricing venue,
12 so Bloomberg or Reuters, some other price feed
13 that the firm purchased.
14   Q.   Was there anyone at Lehman that was
15 responsible for ensuring that the systems were
16 updated regularly?
17   A.   Absolutely.  It was a continuous
18 process every day and to manage stale pricing.
19   Q.   Who was the key person responsible
20 for this process?
21   A.   The systemic prices, to make sure
22 there was a price being fed in, that was done
23 by operations, by Alex Crepeau.
24   Q.   And you had said that it's a
25 possibility that these values were model

1      Blackwell - Highly Confidential
2  driven.  Could you explain what you meant by
3  "model driven"?
4    A.   I'm not sure if they are included in
5  this list, but model-driven prices would be
6  that a trader or a comp team would create a
7  model.  That model then -- or apply a model, an
8  existing model, to a product that prices it
9  based on a series of inputs.
10   Q.   And who at Lehman was responsible
11 for the models?
12   A.   In terms of testing the models, it
13 would be finance that would test the models, or
14 product controllers.
15   Q.   Who would be in charge of the
16 product controllers or finance?
17   A.   At the time I think it was Gerry
18 Reilly.
19   Q.   If you could please turn to the page
20 that starts 4402.  At the top it says
21 Exhibit A-1, Source Barclays Financing
22 Collateral List, Barcops 9-20-2008, Fed
23 Settled.
24   A.   Yes.
25   Q.   Can you tell what this is a schedule

Page 266

1    **Blackwell - Highly Confidential**
2    of based on the document or based on the actual
3    title?
4        A.   Not really, no.
5        **Q.   Could you now turn to page 4607.  I**
6    **know one of my colleagues spent a fair amount**
7    **of time on this, so I am not going to belabor**
8    **the point.  I just want to ask one or two more**
9    **follow-up questions.**
10       A.   46- --
11       **Q.   -07. It's in front of the last blue**
12   **sheet.  Behind the last blue sheet.  Sorry.**
13       A.   Schedule B.
14       **Q.   Now, this says it's Schedule B**
15   **Final.  Would you be able to -- strike that.**
16       **Earlier in the day I think you**
17   **testified that Barclays didn't receive all of**
18   **the collateral it had bargained for under the**
19   **APA and the revised APA; correct?**
20       A.   Correct.
21       **Q.   Would you be able to point where on**
22   **Schedule B, which securities it didn't receive?**
23       A.   Absolutely not.
24       **Q.   Okay.  Would you be able to tell us**
25   **which categories it didn't receive?**

Page 267

1    **Blackwell - Highly Confidential**
2        A.   I wouldn't without being able to run
3    reports in to produce it.
4        **Q.   Let me ask you the same question.**
5    **If I were to put Schedule A in front of you,**
6    **would you be able to point out which securities**
7    **on Schedule A Barclays didn't receive?**
8        A.   No, not without a certain comparison
9    document.
10       MR. DAKIS:  I have nothing further.
11       (Time noted:  4:27 p.m.)
12
13
14   ---------------------
15       ALASTAIR BLACKWELL
16
17   Subscribed and sworn to before me
18   this      day of          2009.
19
20   --------------------------------------
21
22
23
24
25

Page 268

1
2        C E R T I F I C A T E
3
4    STATE OF NEW YORK   )
5                       ) ss.:
6    COUNTY OF NASSAU   )
7
8        I, KRISTIN KOCH, a Notary Public
9    within and for the State of New York, do
10   hereby certify:
11       That ALASTAIR BLACKWELL, the witness
12   whose deposition is hereinbefore set
13   forth, was duly sworn by me and that such
14   deposition is a true record of the
15   testimony given by such witness.
16       I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I am
19   in no way interested in the outcome of
20   this matter.
21       IN WITNESS WHEREOF, I have hereunto
22   set my hand this 7th day August, 2009.
23   -------------------------
24       KRISTIN KOCH, RPR, RMR, CRR, CLR
25

Page 269

1
2    ------------------I N D E X-----------------
3
     WITNESS          EXAMINATION BY      PAGE
4
5    ALASTAIR BLACKWELL   MR. HINE        6
6                         MR. OXFORD     190
7                         MR. DAKIS      255
8
     -------------------EXHIBITS-----------------
9
10   NUMBER               PAGE LINE
11
     Exhibit 55 B
12   Letter dated October 2, 2008, Bates
     stamped BCI-EX-00077291 through
13   BCI-EX-00077293................... 22  19
14   Exhibit 56 B
     E-mail dated May 29, 2009, Bates
15   stamped 10295594, with attached
     fax, Bates stamped 10300652.......... 46  16
16
     Exhibit 57 B
17   Amendment Agreement................. 50  10
18   Exhibit 58 B
     E-mail dated September 17, 2008,
19   Bates stamped 77752................. 64  11
20   Exhibit 59 B
     E-mail dated 9-17-2008.............. 64  14
21
     Exhibit 60 B
22   E-mail dated 9-18-2008.............. 71  20
23   Exhibit 61 B
     E-mail dated 9-17-2008.............. 77  15
24
     Exhibit 62 B
25   E-mail dated September 17, 2008,

Page 270

1
2    ------------------EXHIBITS-----------------
3

     NUMBER                    PAGE LINE
4
5    Exhibit 63 B
     E-mail dated September 19, 2008,
6    Bates stamped 10294630.............. 97  10
7    Exhibit 64 B
     E-mail dated 9-18-2008............. 103  14

     Exhibit 65 B
9    E-mail dated September 19, 2008,
     Bates stamped 10298087.............. 105  16
10
     Exhibit 66 B
11   E-mail dated September 19, 2008,
     Bates stamped 10298186.............. 112  13

     Exhibit 67 B
13   E-mail dated 9-18-2008............. 115  19
14   Exhibit 68 B
     E-mail dated 9-20-2008............. 118  8
15
     Exhibit 69 B
16   E-mail dated September 19, 2008,
     Bates stamped 93219................. 124  9
17
     Exhibit 70 B
18   E-mail dated May 29, 2009, Bates
     stamped 10296524.................... 127  4
19
     Exhibit 71 B
20   E-mail dated September 19, 2008,
     Bates stamped 138587................ 128  13
21
     Exhibit 72 B
22   E-mail dated 9-20-2008............. 132  22
23   Exhibit 73 B
     E-mail dated September 20, 2008,
24   Bates stamped 10222586............. 136  8
25   Exhibit 74 B

Page 271

1
2    ------------------EXHIBITS-----------------
3

     NUMBER                    PAGE LINE
4
5    Exhibit 75 B
     E-mail dated 9-20-2008.............. 149  13
6
     Exhibit 76 B
7    E-mail dated September 21, 2008,
     Bates stamped 138124................ 154  14

     Exhibit 77 B
9    E-mail dated September 21, 2008,
     Bates stamped 459680................ 156  25
10
     Exhibit 78 B
11   E-mail dated September 21, 2008,
     Bates stamped 10252597.............. 159  6
12
     Exhibit 79 B
13   E-mail dated 9-21-2008............. 160  15
14   Exhibit 80 B
     E-mail dated September 22, 2008,
15   Bates stamped 464767................ 163  10
16   Exhibit 81 B
     Debtors' Second Rule 30(b)(6)
17   Deposition Notice to Barclays on
     Issues Relating to the Transfer of
18   Assets.............................. 167  4
19   Exhibit 82 B
     E-mail dated September 20, 2008,
20   Bates stamped BCI-CG 00035134........ 170  6
21   Exhibit 83 B
     E-mail dated September 21, 2008,
22   Bates stamped BCI 006647 through
     BCI 006653.......................... 173  18
23
     Exhibit 84 B
24   E-mail dated September 22, 2008,
     Bates stamped BCI 008149 through
25   BCI 008670.......................... 175  16

Page 272

1
2    ------------------EXHIBITS-----------------
3

     NUMBER                    PAGE LINE
4
5    Exhibit 85 B
     E-mail dated September 30, 2008,
6    Bates stamped BCI-EX-(S)-00004396
     through BCI-EX-(S)-00004675.......... 177  15
7
     Exhibit 86 B
8    Chart, Bates stamped
     BCI-EX-00099519 through
9    BCI-EX-00099521..................... 185  17
10   Exhibit 87 B
     JPM Chase assets, Bates stamped
11   BCI-EX-00108700..................... 188  2
12   Exhibit 88 B
     Chart, Bates stamped
13   BCI-EX-00109154 through
     BCI-EX-00109161..................... 188  24
14
     Exhibit 89 B
15   E-mail dated 9-19-2008............. 222  25
16   Exhibit 90 B
     E-mail dated 9-19-2008............. 225  3
17
     Exhibit 91 B
18   E-mail dated 9-21-2008............. 226  7
19   Exhibit 92 B
     E-mail dated 9-20-2008............. 228  18
20
     Exhibit 93 B
21   Management of the Unencumbered
     Asset Gap........................... 235  2
22
     Exhibit 94 B
23   E-mail dated 9-22-2008............. 241  21
24   Exhibit 95
     E-mail dated 9-21-2008............. 243  13
25

Page 273

1
2    -------------------EXHIBITS------------------
3

     NUMBER                         PAGE LINE
4
5    Exhibit 96 B
     E-mail dated September 18, 2008,
6    Bates stamped 77882................. 258  11
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 274

1
2        ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:        In re:  Lehman Brothers
     Dep. Date:        August 7, 2009
4    Deponent:        Alastair Blackwell
5            CORRECTIONS:
6    Pg. Ln.  Now Reads        Should Read      Reason
7    ___ ___  _____  _____  _____
8    ___ ___  _____  _____  _____
9    ___ ___  _____  _____  _____
10   ___ ___  _____  _____  _____
11   ___ ___  _____  _____  _____
12   ___ ___  _____  _____  _____
13   ___ ___  _____  _____  _____
14   ___ ___  _____  _____  _____
15   ___ ___  _____  _____  _____
16   ___ ___  _____  _____  _____
17   ___ ___  _____  _____  _____
18
19           _____
20           Signature of Deponent
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS____DAY OF_____, 2009.
23
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
         TSG Reporting - Worldwide  (877) 702-9580

**A**

**abandoned (2)**
109:16,17
**ability (5)**
83:24 84:4 160:5
164:23 172:15
**able (18)**
20:23 38:15,15 83:10
84:8 102:11,12
110:7 117:10
164:17 200:10
211:16 218:2
266:15,21,24 267:2
267:6
**absolutely (20)**
8:12 29:16 30:23 31:2
36:17 37:4 56:11
63:13 91:2 99:11
128:9 130:15
189:16 235:21
250:17 252:25
253:8 259:20
264:17 266:23
**accept (2)**
229:10 257:22
**access (10)**
148:7,17,20,22 149:6
152:13,14 155:15
156:13 227:3
**accomplish (2)**
43:18 242:13
**account (31)**
59:20 107:16 137:5
139:22,23 182:9,23
185:7,8 197:19
199:19 201:4
204:21 213:6
215:17 218:5,16,17
218:18 219:8
232:25 233:13,14
234:7 240:3,9 241:4
252:5,5,7 254:19
**accounts (12)**
103:12 107:14 108:10
108:12,17 139:16
139:21 182:24
203:18 251:25
252:8,17
**accuracy (4)**
209:4,25 210:11
250:12
**accurate (15)**
17:2 88:16,18 113:2
155:12,19 199:25
209:18 210:10
212:7,11 213:18,23
219:24 227:17
**accurately (2)**

**acquisition (1)**
189:8
**acronym (1)**
7:17
**acronyms (1)**
55:5
**act (1)**
223:23
**acted (1)**
155:23
**acting (1)**
59:25
**action (3)**
81:20 144:5 268:18
**actionable (1)**
91:19
**actioning (1)**
206:8
**actions (6)**
41:5 43:19 52:18
137:14 190:18
194:22
**actively (1)**
62:5
**activity (10)**
38:19 48:11 52:9,10
99:14 135:9 148:14
216:25 217:7,14
**actual (1)**
266:2
**addition (8)**
20:7 23:12,14 24:25
169:21 180:6,12
211:14
**additional (3)**
18:16 166:8 184:5
**address (1)**
166:16
**addressed (2)**
46:24 76:7
**adjustment (2)**
189:18 252:24
**administer (1)**
5:13
**ADP (1)**
110:15
**affect (2)**
69:18 116:22
**affiliate (1)**
253:22
**affiliates (1)**
251:21
**afield (1)**
189:21
**afternoon (4)**
139:8,9 221:2 244:7
**agent (9)**

47:25 48:3,7,15 55:16
56:2 59:25 74:19
95:2
**aggregate (2)**
45:16 73:12
**ago (1)**
14:3
**agree (3)**
9:17,21 47:20
**agreed (11)**
5:2,6,10 18:11 71:16
110:24 118:2 153:6
222:12,13 257:4
**agreement (60)**
40:23 42:3,5,7,14,15
42:18 47:2,3,5,11
47:13,14,21,25 48:4
48:17,25 50:10,14
51:2,12 52:4 60:15
61:21 65:10 69:5,6
71:4 81:3 83:6
85:11,13 134:5
137:11 166:5
168:23 169:2,10
173:2 179:3 205:8
212:2,16,17,25
237:10,13,17
242:11,25 243:3,5
256:15 257:9,12,18
257:24 258:2
269:17
**agreements (7)**
47:17,19 55:22,23
255:22 257:19
258:4
**ahead (1)**
130:3
**ahold (1)**
260:11
**al (1)**
1:7
**Alastair (10)**
1:15 2:8 3:14 77:21
157:15 230:10
267:15 268:11
269:5 274:4
**alert (1)**
8:6
**Alex (8)**
13:16 14:3 16:2 101:9
202:13 221:23
245:7 264:23
**allocated (2)**
125:4,8
**allow (5)**
63:4 69:25 123:24
155:17 227:20
**allowed (2)**
67:25 209:23

**alluded (1)**
18:23
**alphabetical (1)**
248:21
**alternative (10)**
137:18,20,21 204:17
204:20 205:12
214:25 215:3 232:8
233:17
**alternatives (1)**
28:18
**Alvarez (2)**
4:23 13:20
**ambiguity (1)**
93:6
**Amendment (3)**
50:10,14 269:17
**Americas (4)**
8:19 10:8 12:25 19:6
**AMINA (1)**
4:18
**amount (16)**
58:8,17 69:10 72:21
76:15,17,21,23 95:9
99:3 125:7 154:11
198:16 234:20
249:2 266:6
**amounts (1)**
73:12
**analysis (9)**
250:20,23,25 251:5,9
251:10,11,14,17
**analyze (1)**
252:8
**ANKALKOTI (1)**
4:23
**anniversary (1)**
28:24
**announced (1)**
15:11
**Anson (1)**
197:14
**answer (19)**
7:5,8,11,13,23 24:6
26:5 56:24 87:22
92:8 152:6 177:10
177:12 206:16
216:7 221:24 224:6
227:9 250:8
**answered (14)**
71:8 191:5 195:24
196:10 198:20
206:13 210:17
220:14 224:7
231:18 237:21
240:7 254:20 255:3
**answering (1)**
239:12
**answers (3)**

190:17 205:25 219:21
**ante-room (1)**
101:19
**Anthony (1)**
141:24
**Anticipated (2)**
72:16,21
**anybody (4)**
198:15 215:15 218:24
222:19
**anyway (2)**
182:5 211:13
**APA (18)**
30:15 33:7 40:14,20
43:14 178:2,16,18
204:16 205:24
210:6 237:3,8,9,17
254:4 266:19,19
**apart (3)**
80:10 122:4 217:22
**apologize (3)**
94:18 108:20 238:8
**apparently (4)**
40:12 69:10 115:23
118:12
**appear (3)**
64:22 161:19 175:23
**appears (8)**
28:3 46:22 66:5 71:24
105:24 149:19
150:6 197:17
**apples (1)**
109:11
**application (1)**
183:20
**applied (15)**
71:7 73:9 89:22
113:14 115:11
182:12,13 183:2
209:12 236:25
250:13,16 252:15
253:24,25
**apply (3)**
145:24 253:18 265:7
**applying (1)**
14:20
**appreciate (1)**
74:16
**approach (4)**
145:23 159:16 166:2
181:17
**appropriate (1)**
19:11
**approve (2)**
200:4,13
**approximate (4)**
27:14 73:16 76:18,23
**approximately (9)**

10:7 18:15 23:24
24:17 46:11 174:12
174:21 176:9 186:9
**Aranow (2)**
57:18 113:9
**area (4)**
62:8 245:16,18
246:20
**argue (1)**
99:20
**argued (1)**
226:4
**arising (3)**
52:15 99:2 111:20
**arose (2)**
73:19 221:12
**arrange (1)**
116:18
**arrangement (5)**
29:6 49:18 63:24 69:6
259:13
**arrangements (2)**
33:2 34:22
**arrive (1)**
40:14
**arrived (1)**
187:23
**arrives (1)**
180:25
**ascertain (3)**
104:9 107:6 197:17
**Asia (1)**
16:8
**Asian (1)**
16:10
**asked (52)**
22:10 33:12 35:18
36:2,22 37:8,21,21
37:22 38:14 41:5
44:17 52:2,7 57:19
62:12 71:8 82:10
84:2 85:19 89:3,8
93:6 97:25 100:6,20
110:22 118:22
119:14,18 131:12
131:16 140:8
141:17 144:4
148:18 155:5
195:23 196:9
198:19 208:22
211:15 213:19,20
215:19 219:7,8
220:14 237:21
240:6 254:20 255:3
**asking (16)**
7:3 42:24 44:22 92:14
129:2,4,13 145:12
191:22 196:3
200:17 207:2 211:5

211:11 219:9
225:23
**asks (1)**
259:2
**aspect (1)**
108:18
**aspects (1)**
115:25
**assemble (1)**
92:2
**asserting (1)**
43:7
**assertion (1)**
212:12
**assessing (1)**
221:8
**asset (23)**
10:17 41:8 42:3,4,6
42:13,14 84:6 85:10
85:12 143:3 146:17
153:9,9 182:18
201:11,21,21 215:9
235:3,12 237:9
272:21
**assets (149)**
9:20 14:6 44:8,16
45:2,10 55:16,19,20
80:23 81:2,10,25
83:17,19,22 85:4,11
86:25 87:2 88:24
89:13,18,23 91:21
91:23 92:2 93:25
94:2,3,10,16,20,24
95:6,23 98:4,5
101:22 102:8,12,14
102:18,20,20,23,24
103:7,11 104:23
105:15 108:24
111:21 112:2
120:22,25 121:9
122:18,22 123:10
123:12,17,19,25
127:20,24 130:22
139:16,18 141:8
142:24 143:8,25
144:6,17 145:9,13
145:20 146:11,14
150:6,10,11,15,21
151:2,7 152:9,19,21
153:5,16,19 154:8
165:5,6,18 167:6,12
168:20,21 169:3,6
173:3 180:8 181:16
181:18 182:10
188:2,18 191:6
192:7,8,15 194:5
195:19 196:7,15
197:7 222:9,12,14
226:23 227:5,13,14

227:16 230:16,19
230:24,25 237:23
240:24 248:15
249:18 250:3,9,10
250:18,21 251:18
251:20,24 253:9,16
264:3,4 271:18
272:10
**assign (1)**
161:16
**assigned (1)**
182:8
**assigning (1)**
256:12
**assigns (1)**
256:21
**assist (2)**
89:17 165:13
**associated (5)**
15:14 39:19 70:23
211:3 227:24
**association (1)**
197:22
**assume (4)**
72:12 85:8 171:4
224:11
**assumed (3)**
30:6 82:22 224:13
**Assumes (1)**
152:4
**assuming (3)**
66:2 234:6 248:18
**assumption (8)**
30:6 52:24 80:3 83:21
107:9,10 219:22
226:5
**assumptions (2)**
79:16 107:23
**assure (1)**
38:13
**attached (12)**
46:17,23 55:22 71:25
72:5 86:17 174:13
174:16 175:25
254:4 257:23
269:15
**attaching (1)**
46:24
**attachments (1)**
243:17
**attempt (4)**
49:6,17 125:15 236:2
**attempting (2)**
116:18,22
**attendance (1)**
37:23
**attending (1)**
123:2

**attention (4)**
27:2 170:14 177:25
229:2
**attorneys (7)**
3:6,14,22 4:6,13 5:3
205:22
**audit (1)**
128:11
**August (4)**
1:17 2:4 268:22 274:3
**Aurora (2)**
15:9,15
**authority (1)**
155:16
**authorize (5)**
207:3,6 211:16
212:14 254:23
**authorized (2)**
5:12 161:18
**automated (1)**
55:25
**available (13)**
69:13 78:21 89:24
155:14 166:9
181:15 182:13,21
193:23 207:15
218:18 236:13
245:4
**Avenue (3)**
3:16,23 4:7
**award (11)**
23:16 24:4 26:10,24
27:3,8,9 28:4,9,15
32:11
**awarded (4)**
23:15 26:25 44:15,25
**aware (17)**
35:12 53:5 58:21
80:16,19 86:3,7,20
86:22 148:24
173:12 219:6 220:2
242:23 248:17
256:8 258:8
**awful (1)**
59:15
**Azerad (2)**
165:12 242:9
**A-1 (1)**
265:21
**a.m (11)**
2:5 157:15,18 158:2,3
158:9 225:12,14
226:12 229:8 242:2

---
**B**
---

**B (154)**
6:2 8:4 22:18,19,24
46:16,21 50:10,13
64:11,14,17 66:20

71:20,23 77:15,18
85:3 86:19,20,25
88:19,20 92:3,4,15
92:20 96:3,7 97:10
97:14 103:14,17
105:16,20 112:13
112:18 115:19,22
118:8,11 124:9,13
127:4 128:13,17
132:22,25 136:8,12
139:3 142:2,5
149:13,16 154:14
154:18 156:25
157:5 159:6,10
160:15,18 163:10
163:14 167:4,9
168:7 170:6,10
173:18,23 175:16
175:21 176:25
177:15,21 185:17
185:21 188:2,6,24
189:4,15 222:25
223:4 225:3,6 226:7
226:10 228:18,20
235:2,9 238:24
241:21,24 243:16
247:11,14,14
248:17 249:4 250:3
250:22,25 254:4,9
258:11 263:12
266:13,14,22
269:11,14,16,18,20
269:21,23,24 270:5
270:7,8,10,12,14,15
270:17,19,21,23,25
271:5,6,8,10,12,14
271:16,19,21,23
272:5,7,10,12,14,16
272:17,19,20,22
273:5
**back (31)**
14:23 19:9 20:8,12,24
40:2 51:17 54:20
57:23 61:23 93:24
94:18 97:16 110:15
110:17 123:9
131:21,21,23 148:5
156:6,7 207:25,25
215:3 245:2 255:13
257:11 262:8 263:3
263:5
**background (1)**
8:14
**backwards (1)**
181:25
**back-and-forth (2)**
32:3,9
**bad (3)**
21:15 40:24 92:7

**badly (1)**
42:11
**balance (1)**
189:8
**balances (1)**
207:8
**bank (19)**
49:5 54:7 57:25 59:19
59:20,22,24 61:25
62:4 75:2 95:18
125:9 186:24
199:19 255:19,20
255:24 256:11,21
**bankers (1)**
36:7
**bankrupt (5)**
129:22,24 130:7
200:3,14
**bankruptcy (37)**
1:2 6:15 9:2,4,12
30:15 35:14,21 37:2
37:18 38:3,5,10
40:4 42:9,23,25
43:11,12,13,15
48:23 92:23 93:12
93:16 100:2 111:6
135:5 166:8 192:20
201:14 203:11
217:10,24 218:9
251:12 259:11
**Barcap (1)**
229:11
**Barclays (244)**
3:14 8:9,16,24 9:5,10
9:20 10:2,13,18
12:14,17 13:7 17:22
21:16,20 23:7 25:12
25:24 26:2,12 27:5
30:5,18,19 33:17
35:12 36:6 40:13,17
41:3 42:16 44:9,15
45:2,11 47:14 49:5
49:18 50:16 51:22
52:23 53:6,11,22
54:12 57:8,16 58:22
59:13,24 60:11
61:10,18 62:14,23
62:24 64:2,25 65:22
65:24 66:11,15,23
67:15 68:8,19,23
69:3,7,18,22,23
70:17 73:21 74:6,8
74:17,18 76:11,12
77:2,5 79:3,10,14
79:21 80:15 82:3,14
82:15,15 83:11,13
83:17,20,24 84:3
85:5,6 86:4 87:6,11

87:18 88:12 89:14
94:21,25 100:4,10
100:10,25 101:11
101:15 102:4,6,14
104:7 110:3,6,17
111:9 112:3 113:11
113:15,24 114:15
115:10 116:24
122:17,22 123:7,9
125:4,24 130:22
133:9,20 137:6
140:19 141:8 143:9
149:8 153:4,14
155:15,15,17
156:13 161:8,16,17
162:17 165:7,13
166:9,15,22 167:5
167:11,23 168:20
168:24 169:11
172:6,11,21,23
173:7,8 175:14,15
189:7 190:25 196:8
198:18 199:11
201:4 202:10,18
203:3,6,12 205:9,15
210:5 213:2 215:16
216:5,18 219:18
220:3,4,5,9,18
221:7,16,21 222:2,5
222:7,11,22 223:18
224:10 225:24
226:23 227:3,20,25
228:10 231:5,15,23
232:3 233:2,11
234:9 236:20 237:2
237:20 239:16,23
242:20 246:15
259:3,11,20,21
260:5,10,18 261:3
262:18,25 265:21
266:17 267:7
271:17
**Barcops (1)**
265:22
**bargained (1)**
266:18
**Barker (1)**
16:7
**Bart (10)**
17:8 104:18 136:13
136:18,19,20,24
156:10 161:6,22
**base (5)**
20:15 21:8,13 25:7,11
**based (29)**
11:9 12:23 38:19 48:3
48:8 71:3 73:9
74:23 80:24 102:20
107:21 126:9

145:22 146:2,19
169:16,20 171:4,8
172:8 208:8 210:7
213:9 230:5 233:9
248:18 265:9 266:2
266:2
**basically (3)**
57:20 140:10 217:25
**basis (6)**
20:10 200:6,9 214:20
234:21 257:3
**Bates (61)**
22:20 46:17,18 64:12
96:4 97:11 105:17
105:20,21 112:14
124:10 127:5
128:14 136:9
154:15 157:2 159:7
163:11 170:7,11,17
173:19,23 175:17
175:22,23 177:16
177:21 185:17,21
188:3,7,24 189:4
247:12 249:19
258:12,19 269:12
269:14,15,19 270:6
270:9,11,16,18,20
270:24 271:7,9,11
271:15,20,22,24
272:6,8,10,12 273:6
**Battery (1)**
4:14
**BCI (15)**
10:13,20 173:19,20
173:24 174:12
175:17,18,22,25
238:24 271:22,22
271:24,25
**BCI-CG (3)**
170:7,11 271:20
**BCI-EX (5)**
177:17,18,22 272:6,6
**BCI-EX-00077291 ...**
22:20 269:12
**BCI-EX-00077293 ...**
22:21 269:13
**BCI-EX-00099519 ...**
185:18,22 272:8
**BCI-EX-00099521 ...**
185:18 272:9
**BCI-EX-00108700 ...**
188:3,7 272:11
**BCI-EX-00109154 ...**
188:25 189:5 272:13
**BCI-EX-00109161 ...**
188:25 272:13
**bears (1)**
226:13
**becoming (1)**

84:21
**bed (1)**
156:6
**began (3)**
29:4,10 206:7
**beginning (1)**
11:4
**behalf (4)**
8:9 10:24 56:4 110:3
**belabor (2)**
213:15 266:7
**belated (1)**
193:6
**belief (1)**
234:9
**believe (45)**
11:5 16:5 36:11 42:20
48:19 49:16 67:3
76:13 81:12 85:17
91:18 93:6 95:8
99:25 103:21
107:20 111:17
126:14 148:15
149:7 151:6 154:12
162:20 164:16
166:23 176:16
206:6 207:24
211:13 220:25
221:13 234:21
236:16 243:17
246:4 247:19,21
254:13 255:18
258:14 261:13,15
263:18,19,22
**believed (2)**
61:13 109:22
**bell (3)**
133:12,15 158:15
**bells (1)**
137:12
**belonged (1)**
111:21
**benefit (1)**
226:16
**Berkenfeld (3)**
106:20 229:7,21
**best (5)**
160:4 172:14 175:4
193:13 232:15
**Beth (1)**
229:20
**better (8)**
16:24 125:14 173:13
208:16,19,25
239:12 253:23
**bid (1)**
187:5
**big (1)**
247:10

**bigger (2)**
124:3 252:23
**Bill (2)**
6:16 66:4
**billion (66)**
44:7,10 61:10,12,13
62:15,16,23,24
68:19 69:9,14,15
73:15 74:7,8,10,19
74:19,21 76:22,25
94:6 116:4,5 117:6
117:12,17 125:4,20
125:23,24 143:13
143:18,25 144:5,20
145:4 150:8 151:2
157:8 161:14
174:13,21 175:9,10
176:16 179:3 185:3
186:9 191:23
219:10 228:25
232:18 233:5,12,20
233:24 234:5,8
236:3 238:25
242:21 259:3 260:8
260:16
**bit (3)**
106:5 194:8 215:4
**Black (1)**
14:2
**Blackwell (319)**
1:15 2:8 3:15 6:8 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1,23
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
46:20 47:1 48:1
49:1 50:1,12 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
63:23 64:1,16 65:1
66:1 67:1 68:1 69:1
70:1 71:1,22 72:1
73:1 74:1 75:1 76:1
77:1,17 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1,6 97:1,13 98:1
98:13 99:1 100:1
101:1 102:1 103:1
103:16 104:1 105:1

105:19 106:1 107:1
108:1 109:1 110:1
111:1 112:1,17
113:1 114:1 115:1
115:21 116:1 117:1
118:1,10 119:1
120:1 121:1 122:1
123:1 124:1,12
125:1 126:1 127:1,7
128:1,16 129:1
130:1 131:1 132:1
132:24 133:1 134:1
135:1 136:1,11
137:1 138:1 139:1,8
140:1 141:1 142:1,4
143:1 144:1 145:1
146:1 147:1 148:1
149:1,15 150:1
151:1 152:1 153:1
154:1,17 155:1
156:1 157:1,4 158:1
159:1,9 160:1,17
161:1 162:1 163:1
163:13 164:1 165:1
166:1 167:1,8 168:1
169:1 170:1,9 171:1
172:1 173:1,22
174:1 175:1,20
176:1 177:1,20,24
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1,20
186:1 187:1 188:1,5
189:1,3 190:1,2,12
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1,16
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
207:12 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1,17 220:1
221:1 222:1 223:1,3
224:1 225:1,5 226:1
226:9 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1,8 236:1 237:1
237:8 238:1 239:1
240:1 241:1,23
242:1 243:1,15
244:1,3 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1

259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
267:15 268:11
269:5 274:4
**block (3)**
4:5 45:4,7
**blood (1)**
268:18
**Bloomberg (1)**
264:12
**blue (3)**
249:7 266:11,12
**blur (1)**
194:8
**board (3)**
37:9,12 111:14
**Bob (1)**
121:19
**bodies (1)**
52:11
**BOIES (1)**
3:13
**bond (1)**
70:24
**bonds (1)**
91:13
**bonus (13)**
20:20,21 21:2,12,21
21:22,24 25:15
27:18,20,22,24 28:6
**BONY (21)**
54:5,7,12,13,16 60:16
64:2 68:19 69:3
72:16 74:25 85:6
86:25 94:22,23
172:15,20 173:6
176:9 186:23 260:2
**BONY's (1)**
95:22
**book (5)**
48:5,6 174:11 252:22
252:23
**books (18)**
10:12 88:15,17 135:4
135:8,11 147:18
150:21 155:20
164:23 172:20
180:4 208:16
220:10 253:12,19
263:6,14
**Bopp (1)**
127:14
**borrow (2)**
204:25 205:2
**boss (1)**
203:2
**bottom (8)**
66:22 67:10 105:22

120:20 143:20
144:15 223:10
241:25
**bought (3)**
122:12,14,18
**box (57)**
60:23 61:2,15 74:25
79:9,15 89:10 90:9
91:6,6,8,9,9,10,15
91:17 98:22,23
102:7,9,13 104:11
105:11 109:4
110:16 148:10
153:21 155:22
161:11 164:5,17
180:2 191:25 192:8
219:10,19,23,24
221:8,16,17,21
222:8 226:4,6 228:2
228:7 229:10
230:16 237:23,24
248:3 252:13,20
253:4 261:10,14
**boxes (30)**
79:17,22,23 87:3
88:25 90:2,9 98:2,2
98:5 107:12,12
108:19,25 123:12
138:3 145:24
150:24 162:23
179:25 191:19
192:9 208:6 217:18
220:7 222:15
224:11 227:4 237:4
237:5
**bread (1)**
48:11
**breadth (1)**
11:14
**break (11)**
20:13 59:6 63:17
112:9 138:7,9
162:25 180:3,4
192:11 261:25
**breakdown (1)**
150:23
**breaks (1)**
181:16
**Bridget (1)**
38:24
**brief (1)**
37:24
**briefly (2)**
75:25 76:2
**broad (2)**
54:15 60:3
**broader (2)**
11:19 237:24
**broke (2)**

162:24,24
**broker (1)**
79:3
**brokerage (2)**
13:12 110:23
**broker/dealer (9)**
41:16 48:12,12 52:23
53:21 79:14,14
146:6 253:21
**Brothers (19)**
1:6 3:6 12:2 16:23
18:2 23:15 49:7
50:16 53:8 61:5
135:5 145:25
146:15 202:17
222:15 223:16
248:4 255:12 274:3
**brought (1)**
100:19
**buckets (1)**
152:23
**build (1)**
52:18
**building (2)**
34:9 222:22
**built (1)**
110:18
**bulk (2)**
52:16 131:19
**bullet (1)**
80:22
**bunch (2)**
6:23 261:16
**business (39)**
10:19,20,25 17:7,12
26:7 39:14 41:21
49:25 52:23 53:7,9
53:10,21 56:2,22
58:15 71:16 79:3
82:14,16 84:9 103:6
103:8,10 107:22
119:4 148:8 155:11
193:4 217:17 239:5
239:9,17 242:19
256:3,20 264:8,9
**business-related (2)**
36:3,24
**busy (2)**
30:2,3
**Butryn (1)**
15:25
**butter (1)**
48:11
**buyer (4)**
256:23 257:9,20
258:3
**buying (1)**
123:10
**buys (2)**

257:9,17
**BYMAN (4)**
4:9 74:11,15 98:12
**B-1 (3)**
180:10 181:23 182:14
**B-2 (3)**
181:24 182:15 183:2
**B/D (1)**
79:10
**B6 (2)**
247:13 248:24

_____

**C**

**C (6)**
3:2 4:2 6:2 139:3
268:2,2
**cab (1)**
131:20
**calculated (1)**
80:17
**calculating (1)**
240:24
**calculation (55)**
139:23 140:2,6,10,11
140:13,18,21,22
141:5,19,21,23
145:8 147:4 159:22
159:25 160:2,3,7,7
160:12,13 166:11
197:24,25 198:4
207:3 208:13,24
209:5,9,9,15,17,17
209:24 210:2,10,14
211:2,8 212:6,11,19
213:8,10,18 214:3,9
214:12,17 240:23
241:6,9
**calculations (1)**
213:22
**call (14)**
54:13 75:24 77:21
78:6 103:20 104:4,5
104:6,14 105:2
150:5 151:20,21
219:3
**called (16)**
6:3 11:24 13:23 16:7
16:11 27:17 48:6
57:18 86:18 92:10
103:20 109:18
148:19 161:14
191:24 245:7
**Calls (1)**
51:7
**calm (1)**
34:8
**Canada (2)**
90:7 238:10
**Canadian (2)**

90:8 238:6
**CAO (3)**
12:24 16:12,13
**cap (2)**
217:24 218:4
**capital (11)**
8:16,20 10:13 11:23
12:14 15:8 23:7
82:15 83:13 110:4
223:18
**Capital's (1)**
84:3
**capture (3)**
10:11 135:4 137:6
**career (1)**
19:9
**Carol (6)**
12:18 23:5 30:19,19
30:24 31:21
**carried (3)**
56:23 172:14 193:8
**carry (8)**
37:22,24 108:20
133:19 144:4
147:25 210:15
245:3
**carrying (1)**
121:17
**case (13)**
1:6 8:3 42:15,23
69:22,22 93:12
109:3 110:25
145:13 166:15
190:15 274:3
**cash (58)**
10:15 20:20 21:4,12
25:15 27:18 28:9
32:11 38:21,22 39:5
39:13,15,16,19,20
55:17 62:23,24 69:7
76:24 98:10,15,18
116:19,23 125:4,21
125:24 133:24
134:3 141:3,3,11
198:24 199:4 200:4
204:8,21 207:7
218:17,20,21
230:20 231:3,7,13
231:14,25 232:2
233:5,12 234:5,9
241:2 243:2 263:2,2
**categories (2)**
257:21 266:25
**caveat (1)**
57:23
**CC'd (2)**
125:2 133:3
**cease (1)**
223:22

**ceased (3)**
164:22 236:10,11
**center (1)**
174:10
**certain (14)**
9:19 18:9 33:13 37:22
43:22 102:12
109:21 133:19
150:6 190:23
198:16 210:4 238:9
267:8
**certainly (10)**
19:13 30:14 31:24
32:21 42:23 51:3
62:14 93:21 159:4
199:9
**Certified (2)**
2:13,14
**certify (2)**
268:10,16
**cetera (1)**
13:12
**chain (11)**
126:21 223:11,25
225:15,15 229:3,14
229:20 258:16,17
258:24
**challenge (3)**
99:13 120:19 146:20
**challenged (2)**
120:3 146:20
**challenges (1)**
250:11
**challenging (6)**
52:13 65:6 119:9
147:10 151:10
250:13
**chance (13)**
47:7 106:13 124:22
142:12,15 149:23
150:2 154:23
157:10 160:22
163:16 223:6
243:24
**change (7)**
78:22 79:19 87:13
171:25 173:14
236:14 242:19
**changed (10)**
79:18 81:15 192:6
195:16 199:2
232:18 233:20,23
234:5,7
**changes (2)**
126:9 173:9
**changing (2)**
160:11 169:6
**Chapter (1)**
1:5

**characterize (3)**
201:6,7,9
**charge (2)**
17:4 265:15
**charged (1)**
141:22
**chart (7)**
183:4 185:17 186:4
188:15,24 272:8,12
**Chase (58)**
47:15 48:14 49:18
55:16 56:5,18 60:14
60:18,21 61:6,11,14
71:2 74:5,9,9,18,19
75:16 88:8 90:10
95:18 99:12 100:2
116:18,22 125:9,23
126:5 146:3 147:22
148:6,12,16,19,19
149:2 153:19 154:4
154:8,10 161:8,11
161:12 162:6 169:7
188:2,18 204:14
207:10 211:21
212:25 217:23
255:20 261:12,12
263:5 272:10
**Chase's (4)**
62:19,20 74:25
162:17
**check (1)**
148:2
**cherrypicking (4)**
104:23 106:19,23
108:5
**Chicago (1)**
4:8
**chill (2)**
163:22 185:7
**chilled (2)**
185:3,9
**choices (1)**
213:16
**Chris (2)**
223:11 242:6
**Christopher (1)**
16:9
**circumstances (1)**
120:15
**cited (1)**
175:9
**Citibank (2)**
26:8 202:23
**clarification (24)**
8:4 85:15,20,23 86:9
86:13,18 92:16,19
93:18 110:21
135:22,24 136:4,7
142:10 168:18

193:7,12 211:22
233:19 234:13
254:9,11
**clarify (9)**
7:10,16,22 29:13 35:8
78:24 103:4 111:18
193:10
**classes (5)**
10:17 84:6 152:19,20
170:22
**cleaning (1)**
135:8
**clean-up (1)**
13:21
**clear (28)**
7:22 10:23 37:18,18
43:10,22 66:4 67:7
79:21 80:3 83:8
84:19,25 106:18
169:16 190:23
202:9 211:19
217:17 218:10,15
220:5 225:7 234:2
236:17 242:17
257:6 259:18
**clearance (41)**
15:23 61:15 88:25
89:10 90:2 97:25
98:2,5,22,23 102:7
102:8,13 108:18
110:16,16 123:12
138:3 150:24
155:22 161:11
162:23 164:5
169:24 179:25
191:24 192:8,9
217:23 219:10
222:15 227:4 237:4
237:5,24 238:10,15
245:24 248:3
252:13 255:24
**clearing (22)**
52:11 79:15,17,22,23
87:2 91:9,9 107:12
108:24 109:4
148:10 179:25
217:2,8 218:19,21
237:23 241:18
255:19 256:11,21
**clearly (2)**
43:22 194:11
**clears (1)**
10:24
**clicked (1)**
9:6
**client (7)**
10:20 16:4 39:18
52:13,15 99:18
245:12

**close (9)**
81:2 120:23 151:6
165:2 239:4,9,16
264:8,9
**closed (3)**
9:18 206:6 256:17
**closely (2)**
165:12 217:16
**closer (1)**
144:2
**closes (1)**
244:9
**closing (10)**
9:13 30:11 42:19
111:16 133:9
152:11 165:6,21
203:24 256:15
**CLR (2)**
1:24 268:24
**COB (2)**
238:25 239:4
**Coghlan (5)**
50:3 51:16 57:16,19
114:8
**coincidentally (1)**
37:10
**collateral (83)**
48:3,4 55:24 56:3
57:21,25 58:8 57:7
59:10 60:8,10,15,22
61:12,14,17,20,20
63:5,11 69:14 70:15
70:20,22 71:3,7
72:11,25 73:12,18
73:20 74:10,21,24
76:10 85:5 87:7,11
87:18 94:21 95:3
113:12,23 114:14
114:18 123:15
124:4 125:7,21
126:3,10 134:2,7
168:25 169:15
170:22 171:2 173:3
173:9 191:19,24
236:3,13,19,22
237:19 238:14,25
239:9,16,23 244:20
247:22,24 255:14
255:21,25 256:13
257:25 261:9 263:9
265:22 266:18
**collateralized (3)**
113:14 115:6,14
**colleagues (3)**
44:19 190:5 266:6
**collectively (1)**
82:21
**column (7)**
72:19 171:11 187:8

187:14,17,24
189:13
**columns (1)**
187:2
**combination (1)**
132:6
**combined (1)**
111:7
**combing (1)**
146:9
**combining (1)**
250:2
**come (19)**
35:18 36:2,23 40:20
54:19 57:23 82:10
131:23 140:8,9,10
140:22 143:16,22
146:2 151:25 196:5
215:3 221:10
**comes (5)**
147:21 179:2 228:13
228:15 234:22
**comfort (3)**
210:13 213:14 263:7
**comfortable (11)**
165:25 166:4 208:14
209:14,16,24 210:7
212:3 213:3,17
242:13
**coming (8)**
39:17,18 111:10
147:22 148:5 156:7
245:2 260:23
**command (1)**
126:21
**comment (3)**
91:4 114:5 184:13
**commercial (10)**
47:20 50:4 51:10
71:15 114:7 117:21
123:18 126:2,11
169:10
**COMMISSION (1)**
274:25
**Committee (2)**
3:22 255:12
**communicate (3)**
34:21 194:19,24
**communicated (1)**
236:15
**communication (4)**
58:13 100:12 106:25
167:20
**commuted (1)**
20:8
**comp (3)**
18:6 26:17 265:6
**companies (1)**
26:8

**Company (1)**
155:16
**compare (4)**
88:11 141:2 175:9
248:20
**comparing (2)**
109:11 182:22
**comparison (1)**
267:8
**compensate (1)**
21:25
**compensated (4)**
21:20 26:16 33:17
34:19
**compensating (2)**
22:6,12
**compensation (18)**
17:16,22 18:14,21
20:12 21:23 23:14
23:23 24:21,23 25:6
25:7,23,25 26:24
33:3,8 34:22
**compiling (1)**
249:17
**complete (1)**
76:21
**completely (3)**
109:7,10 155:12
**complex (2)**
49:10 53:16
**complexities (1)**
58:20
**complexity (2)**
59:16 70:4
**compliance (1)**
224:8
**complicating (1)**
225:7
**compliment (1)**
76:10
**component (16)**
14:5 20:20,21 31:5
168:25 204:11,16
211:2,8 233:11
249:3 252:20,21,22
252:23 253:2
**components (20)**
12:15 20:13 31:10
32:17 43:21 48:9
71:16 114:7 190:24
191:3 210:3,4,20
213:9 214:3,4,5,8,9
214:11
**compressed (1)**
41:20
**comprise (1)**
87:7
**Concannnon (1)**

223:11
**conceived (1)**
109:9
**concepts (1)**
142:9
**concern (5)**
34:7 41:10,11 82:24
83:2
**concerned (3)**
30:3 96:16 228:10
**concerns (1)**
210:11
**conclusion (4)**
98:3 147:8,10 152:3
**conference (2)**
75:21,24
**confidence (1)**
151:18
**confidential (264)**
1:14 7:1 8:1 9:1 10:1
11:1,7 12:1 13:1
14:1 15:1 16:1 17:1
17:18 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1

148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
**confirm (2)**
20:24 251:15
**confirmation (1)**
126:15
**confirmed (1)**
224:17
**congratulating (2)**
64:22 65:9
**conjecture (2)**
97:5 105:2
**conjunction (3)**
62:8 140:3 251:7
**connection (2)**
45:5 47:2
**conservative (2)**
181:17 253:2
**consider (3)**
9:10 24:20,23
**consideration (4)**

10:15 39:24 80:18
84:2
**considered (4)**
18:9,23 24:22 31:18
**considering (2)**
81:20 220:18
**consistent (2)**
151:4 236:2
**constantly (2)**
123:3 159:5
**constraint (1)**
49:7
**construct (2)**
13:7 65:10
**constructed (1)**
210:14
**consult (1)**
63:14
**consume (1)**
46:13
**consumed (2)**
14:11 155:8
**consumption (1)**
16:20
**contact (2)**
260:9,13
**contacted (1)**
57:14
**contemplating (1)**
223:22
**content (9)**
11:9 12:11 36:5 41:25
43:15 44:18 93:15
171:8 206:8
**contents (4)**
82:25 170:13 237:4
237:22
**context (8)**
54:18 82:18 89:20
98:8 105:6 108:17
115:14 227:25
**continuation (1)**
158:21
**continue (3)**
101:21 183:4 184:2
**continued (9)**
4:2 111:2 139:6 151:9
152:7,7,8,12 208:17
**continues (1)**
135:10
**continuing (3)**
28:2,8 68:16
**continuous (1)**
264:17
**contract (13)**
8:25 9:4,9 18:12 23:5
25:3 32:6,11,13,16
32:18,18,19

**contracts (1)**
172:9
**contractual (2)**
39:25 45:25
**contractually-settli...**
103:9
**contribute (2)**
85:21 119:15
**contributed (4)**
85:17 93:23 197:23
248:18
**control (4)**
16:4,23 104:11
186:18
**controller (1)**
198:9
**controllers (3)**
247:5 265:14,16
**controlling (2)**
164:5,17
**conversation (43)**
43:8 100:23 114:20
121:19 122:3,7
130:17,24 131:13
131:19 132:19,21
133:15 136:21
148:16 156:9
192:13 193:15
195:8 196:17,23
197:3 198:23 199:4
199:5 201:14,19
202:3,12 204:10,12
204:19 207:23
210:9 211:12
214:14 219:4,5,5
233:4,6,9 243:9
**conversations (34)**
31:19 57:15 58:2
95:17 101:4 110:6
116:13 122:21
123:7 130:25 131:4
136:18,20 149:2
156:9 174:3 194:4
194:11,14 196:21
200:18,22,23,25
201:10,22 206:7
215:6,11,14,16
216:16 218:23
234:23
**conversion (41)**
41:6,7 52:19,21 78:8
78:12,20 82:8,13,18
82:23 83:10 84:19
100:14 107:4,4,11
108:16,17 109:4,14
109:19 110:14
127:16,18,18 128:8
129:3,5,6,9,11,15
129:18 131:16

219:23 220:24
221:3 224:15
225:20,21
**Conversions (1)**
52:25
**converted (1)**
129:5
**converting (1)**
53:2
**COO (1)**
13:14
**cooler (2)**
44:25 130:16
**cooperation (1)**
190:4
**copied (3)**
126:20 243:20 246:18
**copies (1)**
229:22
**copy (23)**
71:23 96:7 105:20
112:18 118:11
127:8 132:25
136:12 142:5
154:18,20 157:5
159:10 160:18
163:14 167:9,9
173:23 175:21
177:21 185:21
188:6 189:4
**copying (1)**
242:9
**core (2)**
32:22 238:22
**corner (2)**
103:24 258:19
**corporate (2)**
91:13 185:11
**corporates (2)**
91:12 183:8
**corporation (1)**
241:19
**corporations (1)**
238:10
**correct (86)**
8:16 20:19,22 21:7,9
21:10 25:9,10 29:17
29:18 34:17 35:10
38:11 40:4 42:17
51:22 55:7,11 56:17
57:10,11 59:25 61:6
65:17 66:13 67:19
83:12,15 108:7,16
108:25 109:13
134:17 141:5 144:9
144:17 145:12
147:7 153:12,17
158:10 159:25
172:12 174:17

175:10 176:19
180:23 181:3 185:8
185:9 192:3 195:19
195:20 197:19
199:12,13 202:14
205:9,16 207:18
209:6,19,20,24
211:10 217:11
221:4,5 225:24
231:21 233:15,21
233:24,25 237:25
238:5,11 240:11
245:9,13 246:10
256:4 257:13
263:25 266:19,20
**correction (1)**
251:4
**CORRECTIONS (1)**
274:5
**correctly (3)**
30:10 113:23 158:8
**counsel (9)**
6:12,18,18 7:6,24
43:6 206:18 208:9
216:19
**counterparties (2)**
48:2,14
**counterparty (4)**
98:16 130:11 133:25
134:4
**COUNTY (1)**
268:6
**couple (5)**
35:7 64:5 79:6 255:15
263:16
**course (27)**
26:7 37:11 38:20
52:12 55:25 79:20
82:20 88:22 90:17
100:9 119:4 148:8
155:10 192:25
193:7,17 196:12
205:20 214:5
217:20 233:3
234:12 236:11
244:22 250:9 256:3
256:19
**court (8)**
1:2 5:15 92:23 93:20
188:9 192:20 229:9
230:7
**courts (1)**
93:3
**cover (1)**
170:16
**covering (2)**
170:16 178:5
**covers (1)**
14:6

**co-head (2)**
16:2 19:7
**Craig (1)**
246:3
**create (19)**
38:18 41:13,15,19
60:17 89:16 109:20
110:15 119:7
123:23 124:2 146:8
146:10,16 171:22
187:23 194:13
257:6 265:6
**created (8)**
123:23 166:7 171:20
187:10 235:24
248:8 251:23,24
**creating (5)**
89:17 92:9 141:21
158:22 187:13
**credit (3)**
13:11 65:18 263:6
**Creditors (2)**
3:22 255:11
**credits (1)**
211:4
**Crepeau (9)**
13:16 14:3 16:2 101:9
202:13,24 221:23
245:7 264:23
**crew (1)**
183:13
**criteria (1)**
230:6
**critical (1)**
33:13
**CRR (2)**
1:24 268:24
**currently (4)**
8:15 57:21 226:3
230:25
**CUSIP (1)**
154:5
**CUSIPs (4)**
73:8 158:24 250:5,6
**Custodial (1)**
46:25
**custody (4)**
15:23 148:3 161:15
261:13
**customer (23)**
91:21,23 99:18
103:11,12 139:25
141:12 146:14
180:8 181:16
182:18 201:23
240:24 250:10,15
250:18,21 251:17
251:20 252:19
253:6,9,14

**customers (9)**
141:4 146:24 182:20
204:25 211:5
249:22 250:6
251:21 252:11
**customer's (1)**
241:4
**cut (1)**
148:12
**cycle (1)**
21:23
**cynical (1)**
96:15
**C3 (16)**
200:4 205:13 207:4,6
209:4 210:3,21
212:6 213:5,7,17
215:2,7 231:2
232:25 234:7

_____

                D

**D (2)**
4:16 269:2
**daily (3)**
48:13 78:14 120:14
**Dakis (9)**
3:25 255:7,9 258:9
261:24 262:7,12
267:10 269:7
**Dan (3)**
246:4,5,13
**data (59)**
14:10,10 16:20 43:20
85:18 93:22 99:5,8
99:10,14,24 100:9
100:10,15 104:15
118:22 119:2,6,7,11
119:12 120:10
122:8,24 146:3,9,10
146:20 147:9,16,17
147:18,20,20,20,22
147:24 148:12
151:13,18 152:13
153:22 155:7,9
159:19 164:25
171:5,22 183:18,20
187:12 190:19
193:23,24,25
197:23 250:11,11
250:12
**date (20)**
27:12,15 36:13 39:25
48:23 61:5 66:5
97:17 101:23
121:10 202:5 212:5
237:12 248:5,6,7
252:3,4 257:12
274:3
**dated (87)**

22:19 46:16 50:15
50:18 59:23 64:11
64:14 71:20,25
77:15,19 96:3 97:10
103:14,18 105:16
112:13,19 115:19
115:23 118:8,12
124:9 127:4 128:13
132:22 136:8 142:2
142:6 149:13
154:14,19 156:25
157:5 159:6,10
160:15,18 163:10
163:15 170:6
173:18 175:16
177:15 222:25
225:3 226:7 228:18
241:21 243:13
258:11,17 269:12
269:14,18,20,22,23
269:25 270:5,7,9,11
270:13,14,16,18,20
270:22,23 271:5,7,9
271:11,13,14,19,21
271:24 272:5,15,16
272:18,19,23,24
273:5
**dates (1)**
29:14
**dating (1)**
97:16
**David (2)**
57:18 113:9
**day (37)**
2:9 3:5 6:17 9:24 10:2
35:19 37:11,13
39:21 40:5 46:10
52:4,4 53:13 58:8
58:12 69:11 70:11
90:20 103:23 113:4
123:4 129:9 136:16
158:8 244:15,19,22
256:16 260:14,15
262:9 264:18
266:16 267:18
268:22 274:22
**daylight (1)**
62:17
**days (4)**
11:8 35:7 38:10 259:9
**deal (41)**
34:15 44:18,20 47:17
78:7 96:21 105:13
109:8 119:24
120:23,23 122:23
126:24 144:2
192:10 203:24
205:15 206:3,4,6,8
206:11,15 216:4,6,8

216:10 219:18
221:15 231:4,14,22
232:3,17 233:11,18
234:5,10 242:20
244:9,23
**Dealer's (1)**
65:18
**dealing (1)**
119:25
**debate (2)**
114:12,18
**debit (2)**
217:24 218:4
**debits (2)**
211:3 215:9
**Debtors (4)**
1:8 167:4,10 271:16
**decide (2)**
222:7,8
**decided (1)**
18:10
**decision (2)**
222:17 261:4
**decisions (1)**
107:25
**declined (3)**
17:23,24 187:19
**deduct (1)**
250:5
**default (21)**
129:5,18,20,23 130:8
130:12,14,18,21
131:2 132:12,16,19
133:10,13,20,21
134:2,17,23 135:12
**defaulting (3)**
135:21 136:5 137:19
**deferred (5)**
21:5 23:16 24:15,18
26:23
**define (1)**
142:23
**defines (1)**
12:10
**definitely (3)**
219:25 226:18 250:25
**definition (3)**
98:14 250:10 251:21
**definitional (1)**
12:14
**definitions (1)**
12:9
**definitively (4)**
179:12 186:6 243:2,5
**deliberate (1)**
253:25
**deliver (4)**
74:10 111:12 117:22

238:24
**delivered (12)**
60:22,25 61:22,25
74:25 98:15,19
116:17 123:16
185:4 204:15 263:2
**delivering (1)**
65:11
**delivery (4)**
62:4 239:8 256:24
258:5
**denied (1)**
224:18
**Dep (1)**
274:3
**department (9)**
8:20 39:7 57:2 62:9
156:18 179:14
183:9,23 263:6
**dependent (4)**
126:3 147:19 171:12
233:15
**dependents (1)**
31:11
**depending (1)**
255:20
**Depends (1)**
54:18
**depo (5)**
90:8 116:19 148:6,9
148:10
**Deponent (2)**
274:4,20
**depos (8)**
90:11 145:24 148:2
155:17 238:16,18
238:19,20
**deposit (2)**
148:9 241:2
**deposition (19)**
1:14 2:8 5:11 6:14 8:8
11:6 166:17,18,19
166:21 167:5,10
168:8 174:5 176:6
235:20 268:12,14
271:17
**Depository (1)**
155:16
**deposits (2)**
215:22 216:3
**derived (1)**
188:16
**describe (13)**
10:4,21 14:8 26:21
40:15 71:17 73:25
90:14 117:3 153:8
165:4 173:13
258:21
**described (10)**

27:21 62:18 70:17
150:21 152:24
168:22 169:5 172:7
218:25 250:14
**designated (3)**
7:25 166:14 167:24
**designating (1)**
11:6
**designed (7)**
74:5 119:7 139:24
151:14,15 205:21
253:9
**desk (2)**
62:10,10
**desks (1)**
101:5
**detail (4)**
73:7,7 127:3 149:10
**detailed (1)**
53:17
**details (4)**
44:21 63:11 84:20
105:13
**determine (17)**
14:14 34:2 39:5
111:11 155:6
183:13 191:17
192:5 193:25
195:17 212:20,22
214:7,19 236:23,23
250:21
**determined (3)**
58:6,10 110:6
**determines (1)**
214:12
**determining (6)**
14:13 45:15 51:9
183:17 192:14
233:16
**developed (1)**
88:3
**dial (1)**
75:22
**dialogue (3)**
75:15 197:9 219:25
**Diamond's (1)**
121:19
**diary (1)**
158:6
**Dick (1)**
37:14
**died (2)**
100:16,17
**difference (12)**
12:3 60:7,17 88:14
91:7,24 95:11
176:22 177:6 180:5
187:17 252:18
**differences (1)**

59:17
**different (39)**
11:12 12:15 13:7 17:7
18:11 45:14 55:3,4
55:8 62:6 72:25
73:2 84:6 87:16
95:5,5,8 109:6,7,10
109:15 120:12
121:14 126:2,11
149:21 152:19
170:4,21 172:6
174:22 177:7 187:2
218:12 232:24
242:16,17 245:15
245:17
**differently (1)**
12:10
**difficult (8)**
58:7 65:3 94:7 118:24
120:15 146:5,9
248:20
**direct (7)**
15:21 78:11 170:14
177:24 201:19
219:3 228:25
**direction (2)**
44:20 164:6
**directly (7)**
13:14 15:16 85:21
93:4 197:11 219:6
259:21
**director (1)**
8:22
**disappear (1)**
217:21
**disappeared (1)**
175:24
**discarded (1)**
199:3
**discount (6)**
44:15,25 45:5,7 71:6
124:4
**discounted (3)**
23:17 24:18 238:20
**discover (1)**
205:21
**discretion (2)**
256:24 258:5
**discuss (6)**
30:21 31:7 97:4
130:20 206:22
214:21
**discussed (19)**
31:18 35:25 36:16
58:9 132:16,18
137:22 156:4
159:23 176:24
199:15,22 201:16
203:16 205:22

219:20 227:2 230:7
244:23
**discusses (2)**
125:3 133:9
**discussing (12)**
54:10 97:3,21 103:22
116:12 126:17
128:25 159:4 161:3
199:18 214:2
234:20
**discussion (30)**
31:8 38:7 51:17 62:21
67:4 79:16 80:2
81:8 102:19 104:18
111:24 114:13,19
126:17,19 127:23
131:7 133:5 135:20
136:2 137:21
142:18 162:16
198:21 201:17
255:13 260:3,17,21
260:22
**discussions (36)**
29:5,10,21,24 30:8,11
30:18 31:4 35:13,17
40:18 43:3 44:23
68:7,13,15 71:6
80:7,13 95:10,13,14
101:10 113:18
130:13 133:13
137:18,25 143:24
153:3,3,13 161:10
167:15,18 206:17
**disposition (1)**
153:15
**dispute (1)**
149:7
**distinct (1)**
252:7
**distribution (2)**
78:2 243:19
**DISTRICT (1)**
1:3
**division (7)**
11:25 12:2,6 17:10
119:23 186:19
224:9
**document (86)**
22:17,24,25 24:16
46:4,21,25 47:6,9
50:9,13,22,25 51:5
66:10,20 67:11
71:23 77:18,24 96:2
96:7,10 97:9,14,18
103:17 106:11,14
108:9 112:18
115:22 116:9
118:16 124:13,19
124:22 127:8 133:6

142:5,13 149:16,24
154:22 157:9,11
163:18 167:14,22
168:4 170:11,13
173:23,25 175:22
176:4 177:24
178:10,13 185:24
189:7 208:10 223:4
223:7 225:2 228:3
228:21,22 235:10
235:10,11,13,24
237:11 238:23
239:7 241:24 247:8
247:12,17 248:19
249:7,11 258:15
266:2 267:9
**documentation (1)**
36:8
**documented (1)**
162:9
**documents (12)**
20:24 46:5,11 63:17
64:5 71:18 93:2,11
93:13 94:22 97:20
222:24
**doing (31)**
38:12 49:10 62:6
64:23 66:23 67:4,15
68:18 89:2 97:6,23
111:11 120:14
121:12,13 122:22
126:24 129:3
139:15 140:3
141:23 147:4
161:20 194:24
196:4 208:15,15
215:24 230:4 244:6
251:10
**Dolan (1)**
106:17
**Dollar (1)**
72:21
**dollars (4)**
24:18 232:19 233:5
233:12
**Donini (8)**
17:11 223:12,14,15
223:17 224:3,5,20
**Dorogoff (1)**
119:22
**double-sided (1)**
228:21
**doubt (1)**
253:3
**dough (1)**
137:6
**drive (1)**
169:24
**driven (10)**

55:21 94:11 183:16
183:19 263:24,24
264:6,10 265:2,3
**driver (2)**
84:7 211:12
**DTC (39)**
62:25 79:10,15 80:15
90:2,8,9 91:9 99:8
110:16 155:15,16
156:2,13 163:22
164:4,10,13,15
185:6 217:24 218:9
218:15,24 219:3,19
219:23 220:3,10,19
221:8 223:22 226:4
226:21,24 227:3
228:2,7 237:25
**due (2)**
49:6 127:25 201:12
**duly (2)**
6:3 268:13
**duration (2)**
32:10,14
**duties (2)**
10:5 11:13
**D.C (1)**
3:17

---

E

**E (11)**
3:2,2,10 4:2,2 6:2
139:3 187:24 268:2
268:2 269:2
**earlier (26)**
25:8 51:14 64:20 74:7
75:4 109:14 121:9
125:22 135:25
152:24 184:11
190:12 195:25
202:25 219:21
220:8 227:2 237:7
240:11 242:18
245:6 255:8 261:15
262:9 263:22
266:16
**earliest (1)**
30:14
**early (8)**
39:4 52:16 56:10 63:3
77:14 152:9 185:6
254:18
**East (2)**
2:10 3:7
**Eastern (3)**
225:16 228:24 243:21
**economic (1)**
262:22
**effect (3)**
5:14 45:21 263:4

**effectively (9)**
17:9 26:15 28:16
32:16 44:3 158:20
172:21 185:7 218:6
**effort (19)**
13:18,21 15:12 52:16
65:3 79:2 90:25
91:25 93:24 109:14
113:16 128:8 151:7
184:9 208:20
227:20 239:15,23
249:20
**efforts (2)**
144:16 250:5
**Eickbush (2)**
13:23 103:18
**either (17)**
7:9 14:10 41:8 48:21
98:16 103:9 114:13
204:17 205:10
213:17 221:22
227:4,12 241:2
255:19 262:23
263:23
**element (2)**
204:10 207:9
**elements (1)**
241:6
**eligibility (1)**
61:25
**eligible (11)**
48:5 55:24 56:3 57:25
60:16 61:21 123:15
168:25 169:9 241:3
257:25
**eloquently (1)**
117:10
**else's (2)**
44:19 53:3
**Emanuel (2)**
3:21 255:10
**embodied (2)**
136:4 142:18
**embody (2)**
184:4,24
**emphasis (1)**
236:14
**emphasize (1)**
151:9
**employed (4)**
8:15 199:11 202:21
203:5
**employee (11)**
9:11 10:2 13:24 22:2
23:7 24:12 27:4
30:5 78:10,11 83:25
**employees (5)**
24:8 33:4,16 53:20
111:8

**employment (8)**
8:23 25:23 26:2,12
28:24 29:5,22 32:15
**encompass (1)**
54:6
**encompassed (1)**
12:6
**encourage (1)**
28:16
**ended (4)**
59:19 80:20 112:3
250:22
**enormous (1)**
119:5
**ensure (5)**
10:14 17:2 31:22
88:13 165:25
**ensuring (1)**
264:15
**entered (2)**
61:4 98:10
**entire (4)**
11:6 109:4 170:13
177:23
**entirety (1)**
13:22
**entities (4)**
6:20 82:24,25 221:14
**entitled (10)**
46:25 50:14 99:17
160:24 178:2
179:17 235:11,11
243:17 247:13
**entitlement (3)**
252:12 253:13,20
**entity (6)**
10:13 38:16 58:23
200:3,14 257:17
**entries (4)**
179:17 184:17 186:3
186:15
**entry (9)**
149:20,22 181:22
184:3,15 186:22
187:5 189:18 263:5
**environment (7)**
65:6 103:10 118:23
118:24 119:6
126:18 151:14
**environments (1)**
151:10
**EPP (2)**
26:18 28:3
**equal (2)**
179:11 253:5
**equals (1)**
249:11
**equities (5)**

13:12 17:11 53:6
77:22 223:16
**equity (11)**
16:2 19:7 20:6,21
21:5,12 53:9,10
70:24 91:9 224:9
**ERRATA (1)**
274:2
**ESQ (8)**
3:9,10,18,25 4:9,16
4:17,18
**et (2)**
1:7 13:12
**Euroclear (3)**
90:4,8 238:4
**European (2)**
16:8 20:7
**Evans (1)**
30:22
**evening (3)**
37:13 115:24 193:16
**event (10)**
48:13 60:21 86:2
155:24 185:11
206:5 217:22 231:9
231:10 234:18
**events (1)**
235:23
**eventually (3)**
32:25 40:14 150:7
**everyone's (1)**
160:4
**evidence (1)**
152:5
**exact (5)**
76:16 90:21 95:9
199:8 202:5
**exactly (24)**
9:2 32:12 34:2 84:17
96:18 107:7 111:11
115:15 117:25
119:21 131:14
135:14 136:19,25
145:2 153:20
184:25 194:10
199:7 244:14
249:18 253:24
256:16 260:24
**EXAMINATION (5)**
6:6 139:6 190:10
255:6 269:3
**examined (2)**
6:4 139:4
**Examiner (1)**
4:6
**example (3)**
12:11 181:8 253:11
**excellent (1)**
65:11

**exceptions (2)**
256:5,6
**excess (30)**
134:6 141:10,11,15
142:25 145:6,6,10
145:14 147:13,15
181:6 182:25
197:18 198:17,25
205:12 207:5
212:18,20,23 213:5
213:13,22 214:19
214:21,23 233:16
234:6 242:21
**exchange (8)**
39:14,15 64:18
134:10 136:16
215:23 216:4 246:2
**exchanges (3)**
217:16 238:6,7
**excluded (4)**
232:2 243:5 250:15
253:15
**Excuse (1)**
11:16
**execute (2)**
39:3 44:3
**executed (2)**
48:21,22
**exercises (1)**
109:7
**exhaust (1)**
221:24
**exhibit (138)**
22:18,19 46:15,16,21
50:10,13 64:11,14
64:17 66:20 67:23
71:20,23 77:15 85:3
96:3 97:10,14
103:14,17 105:16
105:20 112:13,18
115:19,22 118:8,11
124:9 127:4,8
128:13,17 132:22
132:25 136:8,12
142:2,5 149:13,16
154:14,18 156:25
157:5 159:6,10
160:15,18 163:10
163:14 167:3,4,9
170:6,10 173:18,23
174:24 175:10,16
175:21 176:23,24
177:14,15,21
185:17,21 188:2,6
188:24 189:4
222:25 223:4 225:3
225:6 226:7,10
228:18,20 229:3
235:2,9 241:21,24

243:13,16 247:13
249:8 258:10,11,15
263:12 265:21
269:11,14,16,18,20
269:21,23,24 270:5
270:7,8,10,12,14,15
270:17,19,21,23,25
271:5,6,8,10,12,14
271:16,19,21,23
272:5,7,10,12,14,16
272:17,19,20,22,24
273:5
**exhibits (7)**
170:5 229:19 269:8
270:2 271:2 272:2
273:2
**existed (1)**
42:5
**existence (3)**
86:7 192:14 197:17
**existing (2)**
79:9 265:8
**exists (1)**
86:14
**expect (7)**
27:22,24 28:5,23 29:2
95:2 201:24
**expectation (1)**
53:19
**expectations (1)**
31:17
**expected (6)**
21:11 26:9 29:6 32:15
113:24 155:11
**expecting (7)**
21:14,14 31:7 34:23
34:24 76:11 214:24
**experience (3)**
200:15 256:11 258:3
**experiencing (1)**
165:2
**expert (9)**
49:12 63:14,15 71:14
125:19 161:19
213:7 214:4 240:14
**experts (3)**
49:13,16 125:13
**EXPIRES (1)**
274:25
**explain (28)**
16:14 18:25 91:7
100:7,24 117:16
125:10,14,15
128:24 133:22
135:6 139:14
144:25 155:2
163:25 176:21
182:2 187:16,22
204:18 210:24

227:8 240:2 253:24
261:6 264:5 265:2
**explained (2)**
74:7 255:18
**exposure (5)**
36:8 58:24,25 62:17
98:2
**extending (2)**
68:24 259:11
**extent (3)**
64:7 166:10 235:25
**external (1)**
147:21
**externally (1)**
19:19
**extract (3)**
119:8 151:13 181:12
**e-mail (191)**
7:19 9:6 18:8 34:3
41:12 42:21 46:12
46:16,22 50:6 54:14
64:11,14,17 65:15
66:21 67:10,14,19
68:17 71:20,24 72:3
76:20 77:10,15,19
82:9 96:3,8,20
97:10,15 103:14,18
104:16,23 105:16
105:24 106:16
107:3,15 112:13,19
112:21,23 113:8,9
114:5,6 115:19,23
115:25 116:2 118:8
118:12,15 119:14
124:9,14,21,24
127:4,9,12,15
128:13,17,21,22
132:22 133:2,5
136:8,13 142:2,6,12
142:19 143:20
144:14,15,20
149:13,17,20 150:5
154:14,19,25
156:23,25 157:5,7
159:6,10 160:15,18
160:24 161:2,21
162:3 163:10,14,21
164:10 170:6,16,17
173:18 175:16
177:15 178:6,7,8
185:6 193:19
194:12,20 208:5
219:4,9 222:25
223:9,10,11,25
225:3,11 226:7,11
226:19 228:18
229:2,4,13,17,21,25
230:3,3 235:15,19
241:21,25 243:13

243:16,23 244:2
246:18,24 258:11
258:16,16,17,24,24
269:14,18,20,22,23
269:25 270:5,7,9,11
270:13,14,16,18,20
270:22,23 271:5,7,9
271:11,13,14,19,21
271:24 272:5,15,16
272:18,19,23,24
273:5
**e-mails (18)**
15:14 46:10 54:4 64:7
64:8,20,24 97:21
134:12 136:23
143:20 195:3,4
225:8,14 227:23
232:12 260:4

---

**F**

**F (1)**
268:2
**face (4)**
116:14,14 194:15,15
**facilitate (4)**
58:16 78:20 84:3
109:21
**facility (3)**
65:19,21 174:12
**fact (22)**
7:12 8:7 12:5 27:7
30:4 38:9 59:12
68:23 80:3 107:13
110:10 114:15
134:20 156:12
161:13 164:13
171:5 195:18
200:11,12 214:2
239:19
**factor (1)**
225:7
**facts (1)**
152:4
**fail (3)**
98:14,19 160:25
**failed (3)**
98:17,18 146:4
**failing (1)**
227:21
**fails (33)**
97:21,22 98:6,7,9,16
98:20,24 99:3,9
100:4,7,15,24 102:5
103:2,3,9,20 104:4
104:10 108:6,14
136:21,21 155:5,6
155:18 156:5,14
227:5,13 244:21
**fair (19)**

9:25 45:23 63:10
73:17 76:4 90:23
92:22,25 93:6,17
94:14,17 95:21
177:4 194:7 248:16
249:15 264:5 266:6
**fairly (2)**
45:24 194:17
**faith (1)**
19:21
**fall (4)**
95:15 123:13,14
238:18
**falls (2)**
257:4 258:6
**familiar (3)**
91:16 117:13 188:15
**family (1)**
30:3
**far (9)**
56:10 72:20 100:16
108:8 126:10
139:15 187:20
189:21 210:9
**Fargo (4)**
199:20 233:6,13
234:6
**fat (1)**
247:10
**faulty (2)**
80:4 107:23
**fax (3)**
46:18,24 269:15
**feasible (1)**
69:24
**February (1)**
21:22
**fed (62)**
39:12 48:9 54:23 55:3
55:8,13,17,17 56:4
56:19 57:9,22 59:11
59:18 60:9,22,25
61:8,11,11,13,23
62:25 63:14,24
65:20,21 66:16 68:9
70:16 73:2,20 74:9
74:9,20,20 75:16
86:24 87:5 95:18
123:13,14,17,19
124:3 147:25 161:8
168:20 169:4,12,15
172:5 173:3 255:14
259:9,19 260:2
263:8,9 264:10,22
265:22
**Fed's (3)**
58:24,24 65:16
**feed (1)**
264:12

**feeds (2)**
147:20 151:16
**feel (5)**
7:18 19:10,14 165:25
166:4
**fell (1)**
169:17
**felt (3)**
19:16,20 214:20
**Feraca (4)**
50:5 57:18 64:24
114:8
**feverishly (1)**
109:20
**fielding (2)**
52:13,15
**fighting (1)**
99:25
**figure (13)**
44:7 52:7 81:18 82:2
111:8 120:22
121:13 137:17
154:8,11 157:20
240:24,25
**figuring (1)**
70:24
**file (5)**
38:9 56:4 174:13,16
174:22
**filed (8)**
29:14,17 33:22,23
40:4 93:2,11,19
**files (2)**
146:4 208:6
**filing (8)**
5:4 29:9 32:24,25
35:13 37:2,14,16
**fill (2)**
89:12 116:25
**final (3)**
242:11 247:14 266:15
**finalize (1)**
169:25
**finally (1)**
233:18
**finance (26)**
12:12 16:22 41:14
49:14 84:23 94:12
107:22 140:5
141:18,22 150:19
151:25 169:19,23
180:18 186:20
191:17,20 197:24
208:20 212:21
246:22 247:2 251:7
265:13,16
**financial (4)**
7:20 31:5,10 198:9
**financing (19)**

39:11 54:23 55:14
57:9 59:11 60:9
62:10 64:25 65:4,8
65:16 66:15 68:9,24
129:21 149:8
174:12 259:12
265:21
**financings (4)**
65:23,24 66:11,17
**find (15)**
19:22 89:9 90:18
140:21 141:14
144:5,16 145:4,19
145:25 151:7
191:18,22 236:18
261:25
**finding (3)**
108:24 145:8 236:12
**fine (2)**
115:17 216:20
**firm (23)**
6:17 12:9 24:9 28:17
39:21 89:22,23
107:14,15 108:10
108:11 143:3
147:19 182:9,21,23
182:24 250:15
251:25,25 252:8
255:10 264:13
**firm's (1)**
48:2
**first (50)**
6:24 14:25 18:2 22:7
22:13 29:2,4 31:19
40:25 58:2,4 60:14
62:15 67:14 106:7
110:23 120:21
128:20 133:8
149:22 150:4
157:14 159:14
167:13,25 170:16
173:24 174:8,10
175:24 176:23
177:25 178:5,24
181:22 188:11
192:12 195:8,17
202:7,8,10 204:10
204:20,20 223:20
223:21 225:9 249:7
263:22
**five (3)**
19:9 59:7 190:7
**five-day (2)**
33:23 146:8
**five-page (1)**
243:16
**five-year (1)**
21:5
**fixed (1)**

17:10
**Flanagan (1)**
16:9
**Fleming (3)**
246:4,6,13
**FLEXNER (1)**
3:13
**floor (2)**
36:7,11
**flow (2)**
38:21 113:2
**flows (3)**
39:5,13,19
**flying (1)**
58:14
**Flynn (1)**
127:14
**focus (11)**
31:10 32:22 100:13
100:14 114:21
165:8 230:2,4
238:21 244:17
258:23
**focused (6)**
45:12 53:17 136:21
194:22 227:19
229:25
**focusing (1)**
244:5
**folks (10)**
7:19 34:18 51:13
54:13 64:19,23 70:9
79:2 126:17 179:14
**follow (4)**
190:16 224:23 254:16
254:22
**following (10)**
58:11,11 84:16
102:18 131:18
152:10 184:17
191:6 249:19
260:14
**follows (2)**
6:5 139:5
**follow-on (1)**
163:6
**follow-up (1)**
266:9
**footnote (1)**
185:2
**force (1)**
5:14
**Forgive (1)**
245:10
**forgot (1)**
11:3
**form (25)**
5:7 60:2,12 67:6 72:8

73:22 79:4 87:9,21
92:6 100:5 110:5
113:21 122:20
135:13 137:23
168:14 191:2
198:19 201:5 212:9
213:24 234:11
250:7 258:7
**formal (1)**
15:12
**formally (1)**
15:10
**former (4)**
12:12 33:3,16 196:20
**formula (1)**
209:12
**Forrest (5)**
15:24 62:7 144:15
171:22 261:2
**forth (3)**
20:8 137:11 268:13
**forward (3)**
9:16 27:23 243:18
**forwarded (4)**
223:10 224:2 228:23
229:5
**found (1)**
214:25
**foundation (22)**
23:25 24:5 25:22 26:4
28:14 68:11 71:13
86:11 95:7 96:17
107:2 125:12 141:9
141:16 143:11
145:16 152:5
220:20 222:10
232:20 257:2,6
**four (6)**
19:4,9 152:19,22
177:25 238:21
**fourth (1)**
258:23
**frame (2)**
33:19 41:20
**Francis (1)**
243:19
**Frank (1)**
247:5
**frankly (7)**
31:6 36:2 60:19
118:20 120:10
230:8 264:4
**free (2)**
125:6 163:22
**Frelinghuysen (1)**
197:14
**friction (1)**
61:24
**Friday (40)**

1:17 77:14 82:6,11
82:11,12 84:10,12
84:12 88:9 90:20
99:15 109:17
112:19 113:19
114:13 124:14
127:9,17 128:18
133:15 154:5 184:3
184:6 192:22,23
193:3,16 217:23
220:25 221:7
225:12,14,18,19
239:2,9,17,24 264:8

**Friends (1)**
30:3

**front (15)**
14:12 17:6 50:18
117:25 147:21
176:8 223:3 225:5
226:9 235:8 241:24
247:9 263:13
266:11 267:5

**front-end (1)**
16:21

**frozen (1)**
185:7

**fruitful (1)**
184:22

**Fuld (1)**
37:15

**full (6)**
23:19 76:10,13,16
103:11 261:14

**fully (5)**
41:15 52:20 113:13
115:6,13

**fully-paid-for (1)**
91:23

**function (12)**
10:11 12:12 14:5,8
15:24 16:23 38:15
38:16 75:12 97:6
186:20 197:23

**functional (4)**
12:8 13:6 245:16,17

**functioning (5)**
38:6,6,8,13 41:16

**functions (3)**
17:5 37:22 56:23

**fund (9)**
48:12 198:17 204:21
217:18 218:18,19
218:20,21 219:8

**funded (3)**
169:15 217:19 218:6

**funding (12)**
38:18 39:6 52:7 58:22
72:16,21 148:14
203:18 217:20

218:17,17,24
**funds (3)**
61:9 199:24 201:3
**further (11)**
5:6,10 28:8 71:19
173:9 179:16 190:3
199:21 255:5
267:10 268:16
**future (2)**
18:13 19:22
**F/N (1)**
249:8

___
**G**

**gain (1)**
232:9
**gained (1)**
263:3
**Gap (3)**
235:3,12 272:21
**Garth (1)**
16:7
**gather (1)**
119:3
**gathering (1)**
193:25
**gears (1)**
109:24
**Gelband (1)**
17:9
**general (9)**
43:5 119:17 123:8,8
131:5 191:6 240:17
240:19,21
**generally (7)**
10:5 35:6 54:14 71:12
73:25 95:16 262:20
**generate (1)**
119:5
**generation (1)**
183:20
**genesis (1)**
246:25
**gentleman (4)**
13:23 16:6,11 57:18
**geographic (2)**
12:4,5
**GEORGE (1)**
3:10
**Gerald (2)**
223:12 224:3
**Gerard (4)**
12:23 198:23 233:4
260:11
**Gerry (6)**
132:6 223:15 224:7,8
247:6 265:17
**getting (11)**

102:5 110:2 122:19
151:11,16 153:4
178:7,8 219:16
230:12 260:13
**Ginnie (7)**
204:13 205:6,11
211:20 212:24
231:24 234:8
**give (17)**
24:4 27:15 56:24 65:2
126:11 148:20
151:17 155:12,15
155:15 177:10
200:2 213:14
226:25 227:2,3
263:6
**given (6)**
41:19 81:17,25 84:15
99:11 268:15
**gives (1)**
14:19
**global (14)**
11:22 12:22 13:10,11
15:7,23,24 16:12
19:3,24 20:2,4,5
75:12
**globally (1)**
12:2
**GMT (1)**
258:18
**go (45)**
7:3 9:16 11:2 14:23
20:24 31:8,12,20
37:9 44:5,6 54:2
71:19 77:4 78:18
83:9 84:5,23 92:3
108:17 109:4 112:2
112:4 130:3,18
132:2 141:17 170:3
179:16 181:19,22
181:23,24 191:22
193:23 207:24,25
214:8 216:21 220:9
228:16 229:20
231:14 234:9
255:13
**goal (9)**
49:11 92:5 143:12,15
143:16 144:5,8
192:2 195:25
**goals (3)**
111:12,12 229:16
**goes (5)**
81:2 113:17 130:7,7
241:8
**going (99)**
6:13,22,23 7:3 22:17
27:23 33:16 35:23
37:8,19 41:2,7,9,10

41:11,17 44:8 46:5
50:8 51:21 57:7,22
58:22 59:3 81:11,24
82:5,23,24 83:2,3
83:16,18,19,24 84:5
84:13,18 85:6,9
87:14 88:11 89:8
92:4,10,11,15,18
96:15,18,23 100:13
100:13 106:4,7
110:9,23,24 119:25
129:4,21,23,24
130:14 140:19,24
145:21 160:6,9
167:17 170:12
177:11,23 178:16
183:7,18 185:10
193:22 204:14
205:10 208:5,24
210:16 212:20
221:3 224:22
225:23 226:6
227:10 232:11,13
240:8 248:7 251:6
256:22 258:9
261:18 262:8 266:7
**Goldie (1)**
16:7
**good (10)**
6:8,9,11 64:23 68:3
138:9 139:8,9,10
193:11
**gotten (1)**
195:13
**grant (1)**
156:24
**granted (2)**
156:13,22
**great (2)**
35:4 118:13
**greater (1)**
153:4
**Greenwich (3)**
66:7 158:9 225:11
**Greg (3)**
13:23 104:5 105:10
**ground (1)**
126:23
**group (10)**
16:15 82:21 92:12
94:15 111:10 142:9
143:7 150:10
186:18 188:22
**groups (1)**
150:6
**group's (1)**
95:16
**guarantee (3)**
17:25 18:3 26:10

**guaranteed (2)**
25:15 27:18
**guess (7)**
51:5 66:9 82:17 92:14
111:21 134:16
259:10
**guidelines (1)**
225:23
**guy (2)**
126:23 184:14
**guys (3)**
7:20 99:8 143:17

___
**H**

**habit (1)**
68:5
**haircut (5)**
71:6,11 124:4 125:8
126:12
**haircuts (3)**
113:14 115:7,8
**half (4)**
26:10 29:2 35:23
126:25
**hallway (1)**
116:15
**hand (2)**
50:8 268:22
**handed (5)**
22:23 23:6 64:16
122:8 258:14
**handing (31)**
46:20 50:12 71:22
77:17 96:6 97:13
103:16 105:19
112:17 115:21
118:10 124:12
127:7 128:16
132:24 136:11
142:4 149:15
154:17 157:4 159:9
160:17 163:13
167:8 170:9 173:22
175:20 177:20
185:20 188:5 189:3
**hands (1)**
164:18
**happen (6)**
19:23 37:8 58:10 70:2
84:13,18
**happened (15)**
19:18 26:15 37:6,11
60:20 90:22 129:10
134:20 156:2,3
164:21 209:21
214:14 251:3
260:14
**happening (7)**
62:13 78:13 81:14

108:13 123:3 128:4
151:11
**happy (1)**
31:9
**hard (5)**
62:11 65:5 75:13
129:12 194:10
**harmed (1)**
263:4
**Harrison (1)**
260:10
**Harry (1)**
260:10
**HASSAN (1)**
4:18
**head (17)**
13:11 15:7,23,24 17:9
19:3,24 20:2,7,23
38:24 47:16 75:12
76:19 128:11
223:15 238:17
**heading (3)**
25:7 26:19 187:11
**headline (3)**
18:19 24:24 73:15
**heads (2)**
13:10 17:7
**hear (17)**
7:6 33:15 34:10 40:12
40:25 44:14,24 45:4
45:8,19 58:4 71:5
98:13 127:11 128:7
132:11 189:22
**heard (6)**
33:24 40:9,21 216:8
218:8 221:22
**hearing (4)**
134:22 192:20 193:8
216:2
**Hedges (2)**
3:21 255:11
**hefty (1)**
170:5
**held (11)**
2:9 14:24 15:6 59:18
77:7 161:15 204:14
211:20 212:25
233:13 261:13
**held-in-custody (2)**
260:7 261:8
**hell (2)**
118:19 119:10
**help (6)**
10:11 19:15 31:25
93:2 155:21 224:6
**helped (2)**
171:22 183:11
**helpful (1)**
137:16

**helps (1)**
106:6
**hereinbefore (1)**
268:12
**hereunto (1)**
268:21
**heritage (1)**
175:15
**HIC (9)**
161:14 162:3 260:6
260:16 261:6,7,8
262:24 263:4
**higher (3)**
117:23 125:8 126:12
**highlight (2)**
34:4 211:9
**highlighted (1)**
150:22
**highly (265)**
1:14 7:1 8:1 9:1 10:1
11:1,7 12:1 13:1
14:1 15:1 16:1 17:1
17:17 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1,22
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1

147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1
**Hine (39)**
3:9 6:7,16 11:10
17:19 22:16 24:6
26:5 43:4,7 46:14
50:8 59:5 63:16,22
64:10 66:8 67:9,24
68:3,6 87:22 93:9
95:25 97:8 103:13
112:8,16 115:17
138:8 139:7 152:6
167:2 170:3 177:13
189:22 190:2
247:10 269:5
**Hine's (4)**
190:17 205:25 209:3
216:23
**historically (2)**
13:19 139:23

**hit (1)**
42:20
**Hoban (2)**
13:14 78:10
**hold (3)**
127:12,19 128:7
**holding (1)**
154:8
**Holdings (2)**
1:7 255:12
**Holds (1)**
223:18
**home (1)**
131:23
**honest (2)**
80:18 122:6
**hope (2)**
53:23 139:10
**hopefully (1)**
120:16
**hoping (1)**
19:23
**hour (2)**
35:23 59:4
**hours (4)**
39:4 63:3 77:14 123:4
**Hraska (18)**
57:3,4 63:8,9 76:4,8
115:24 116:3
117:10 125:2 133:3
134:10 165:11
171:21 179:15
180:21 251:7
260:23
**Hubbard (5)**
4:12 99:25 135:16
162:9 190:14
**huge (2)**
59:16 234:20
**Hughes (6)**
4:12 42:24 99:25
135:16 162:9
190:14
**hundred (12)**
90:11 134:19 151:17
181:9,13 182:12,18
209:18 212:7,11
227:22 251:16
**hypothesis (3)**
146:13 147:3,5
**hypothetical (1)**
181:20

**I**
**Ian (33)**
15:18 35:18 36:2,18
36:20,21 37:9,21
38:14 43:21 101:8

111:2 142:8 143:17
143:19,22 144:20
154:20 160:19
161:4 194:16
198:12,14 219:6
221:23 232:13
242:6 245:4 258:17
258:25 259:2
260:12 262:11
**Ian's (2)**
129:7,14
**IBM (6)**
181:9,10,14,21
182:17 253:11
**idea (11)**
41:24 51:11 66:3 68:3
72:17,19 96:23
127:21 189:16
230:8 236:18
**identical (1)**
16:19
**identification (42)**
22:22 46:19 50:11
64:13,15 71:21
77:16 96:5 97:12
103:15 105:18
112:15 115:20
118:9 124:11 127:6
128:15 132:23
136:10 142:3
149:14 154:16
157:3 159:8 160:16
163:12 167:7 170:8
173:21 175:19
177:19 185:19
188:4 189:2 223:2
225:4 226:8 228:19
235:4 241:22
243:14 258:13
**identified (4)**
80:24 150:11 151:3
152:21
**identifier (1)**
252:5
**identify (14)**
89:9 150:21 152:9
181:18 183:9,11
184:9 191:23 230:5
230:19,23 236:22
248:15 252:15
**identifying (1)**
196:7
**Illinois (1)**
4:8
**imagine (4)**
21:3 78:16 194:6
251:6
**IMD (3)**
11:24 15:8 17:12

**immediately (4)**
29:8,9 31:23 137:15
**impact (1)**
164:23
**imperfect (2)**
159:20 161:12
**important (2)**
22:3 182:23
**impossible (3)**
46:12 53:10 58:7
**impractical (1)**
53:12
**incentive (2)**
18:17 32:20
**include (4)**
10:19 103:3 251:20
251:22
**included (11)**
87:19 103:2 192:10
238:4,6,9 242:24
243:2,7 254:5 265:4
**includes (2)**
185:3 254:9
**including (7)**
106:17 108:18 113:14
115:7 127:11 142:8
252:10
**income (1)**
17:10
**increase (1)**
17:22
**increasing (1)**
68:17
**increasingly (1)**
52:13
**incredibly (8)**
30:2,2 41:17 58:7
119:9,9 120:15
146:5
**independent (1)**
118:4
**indirectly (1)**
195:14
**individual (2)**
76:5 121:17
**individuals (3)**
56:21 246:14,18
**industry (1)**
63:13
**inform (1)**
256:11
**informally (1)**
14:2
**information (24)**
8:14 14:16 15:14
34:14 46:13 65:12
78:21 88:7,8,9
101:19 118:22,25

120:12 122:25
148:4,4,18 151:11
162:11 205:21
216:14 230:24
245:2
**informed (3)**
219:2 232:14 260:9
**informs (1)**
250:3
**infrastructure (1)**
110:18
**infrequently (1)**
194:18
**initial (1)**
203:18
**initially (5)**
31:16 57:14 94:5
192:2,4
**initiated (2)**
195:11,12
**inked (1)**
233:18
**inkling (1)**
44:7
**input (2)**
141:20 166:6
**inputs (5)**
159:24 160:2,10
209:8 265:9
**insisting (1)**
221:16
**instance (8)**
9:7 26:9 53:5 56:5,9
91:21 147:22
181:11
**instances (1)**
183:19
**instantly (1)**
262:24
**instruction (2)**
37:25 38:2
**instructions (2)**
37:25 191:16
**instructs (1)**
7:10
**insufficient (2)**
218:20,21
**integration (2)**
19:16 31:22
**intended (3)**
17:3 78:19 248:11
**intent (7)**
93:8 224:10 237:2
250:17 251:17,19
253:17
**interaction (1)**
163:7
**interactions (1)**

221:25
**interchangeably (1)**
148:11
**interest (3)**
31:6 35:4 230:8
**interested (2)**
205:6 268:19
**interesting (2)**
31:13,15
**internal (1)**
62:20
**interpret (5)**
41:7 108:10 145:3,18
164:3
**interpretation (3)**
72:22 105:19 117:4
**interpreted (2)**
41:23 171:7
**interpreting (1)**
108:9
**interrupt (1)**
54:9
**interrupting (1)**
108:21
**intimate (2)**
49:23 95:22
**introduce (1)**
6:19
**intrusive (1)**
17:14
**invade (1)**
216:12
**invariably (1)**
93:14
**inventory (15)**
14:19 39:17 80:23
89:23 104:12
150:22,23 182:9,22
182:23,24 250:15
250:16 251:24
252:8
**investment (4)**
11:25 12:6 103:5
119:22
**involved (37)**
6:21 35:16 40:18
41:14 44:23 51:11
55:18 62:3,5 68:13
68:14 80:2,6,12
92:22 93:7,10,18
107:10 110:12
112:6 124:15 144:8
163:16 166:7
168:12,16,19
180:14,16 187:13
206:2 213:10
221:15 251:9,13
262:24
**involvement (3)**

85:14 166:10 233:8
**involving (6)**
6:14 48:17 54:11
66:21 97:15 142:7
**in-depth (1)**
76:6
**irrelevant (3)**
109:23 236:6,8
**issue (25)**
36:3 42:15 75:9,10,15
78:25 81:7 97:3
100:17 101:12,14
104:20 106:23,24
113:19 118:6 149:3
151:22 156:10
163:4,7 166:17
221:9,12 222:2
**issued (1)**
23:17
**issues (19)**
8:2,3 60:14 62:20
70:18 73:19 111:20
120:2 164:25
165:16,17,22
166:15 167:6,11
169:5 173:5 218:24
271:17
**item (1)**
224:24
**iteration (1)**
237:7
**iterations (1)**
109:15
**i.e (4)**
79:10 180:4 182:9
237:4

---
**J**
---

**J (2)**
3:9 4:17
**James (1)**
14:2
**JENNER (1)**
4:5
**Jerry (1)**
17:11
**Jersey (1)**
10:9
**Jim (23)**
57:3,4 62:7 63:7,8,9
63:14 75:13 76:4,8
95:17 116:13
117:24 133:16
165:11 166:2
171:21 179:15
184:22 251:7
253:23 260:8,22
**Jim's (1)**
75:17

**job (3)**
1:25 64:23 118:20
**jobs (1)**
19:19
**John (15)**
50:3,5 51:16 57:16,18
57:19 65:8 78:8
114:7,8,8 119:22
124:25 125:25,25
**join (1)**
9:5
**joined (1)**
35:22
**Jonathan (6)**
3:18 42:24 43:3,4
167:15 174:4
**Jones (7)**
2:9 3:5 6:17 246:4,11
246:12,13
**Joseph (1)**
224:2
**JP (2)**
125:8 154:4
**JPM (3)**
188:2,18 272:10
**JPMC (2)**
47:14 56:17
**JPMorgan (7)**
47:15 72:12 126:5
207:10 211:21
255:19 261:12
**July (1)**
23:16
**jumping (1)**
94:18

---
**K**
---

**K (3)**
3:25 6:2 139:3
**Kathy (1)**
127:13
**Kathy's (1)**
128:9
**keen (1)**
19:15
**keep (3)**
134:3,6 226:17
**Kelly (7)**
132:7 141:25 165:12
198:6 234:24 242:8
243:10
**Kelly's (1)**
198:7
**Kendall (3)**
202:13,15 203:10
**Kendall's (1)**
203:2
**kept (1)**

63:2
**key (2)**
77:20 264:19
**kind (7)**
54:23 57:7 75:7 117:9
127:2 131:24 194:7
**Kirk (1)**
15:25
**knew (6)**
34:4 37:7 73:14 78:14
214:16 243:6
**know (157)**
7:19 8:6 9:2,23 27:12
34:12,13 35:19
36:13 37:5,10 40:17
40:22 42:4 43:24
44:24 46:6,7 48:19
48:20 51:24 59:10
60:8,17 64:8 69:14
72:2 76:15 77:8
78:15 81:21 83:5,6
85:12 86:6,12,13,13
89:15 90:17 92:3,10
92:14,18,21 96:18
96:21 101:14 105:3
106:24 113:3 114:2
114:10,24,25
115:10,15 117:20
120:9,10 121:3,4,5
122:5,6,13,14,23,24
126:6 127:22 128:4
129:11 134:8
136:19,23,24 137:2
145:2,7 147:8,12
152:2,17 153:20
156:12,15,15,18,20
158:6,19 164:2
166:25 169:4 171:9
171:12,13 173:15
174:20 175:7 177:3
179:20 184:12
186:3,7,11,13,16
187:8,10 188:18
189:12 190:13
192:17,19 194:10
202:5,21 203:8
214:13 215:15,18
215:18 220:21,22
223:5 227:5 228:5
228:12 230:7 236:4
236:25 238:16
239:7 241:9 242:25
243:2,4 246:17,23
246:24 247:18,19
248:6 249:14
256:16,19 257:3
261:3 263:8,10,11
263:25 264:2,3
266:6

**knowing (1)**
213:21
**knowledge (21)**
30:7 33:6 34:18 43:14
49:23 66:10 76:6
95:22 144:10,13
153:13 163:3
164:20 175:2,8
184:23 189:24
200:6 206:2,4
234:22
**known (1)**
232:5
**Koch (4)**
1:24 2:11 268:8,24
**Korycki (1)**
178:6
**Kristin (4)**
1:24 2:11 268:8,24

_____
L
_____

**L (9)**
4:9 6:2,2,2,2 139:3,3
139:3,3
**labeled (1)**
92:20
**ladder (3)**
38:18 39:6,6
**laid (1)**
249:15
**language (4)**
7:18 66:24 218:12
238:9
**large (4)**
55:2 58:17 92:12
263:14
**LaRocco (8)**
12:24 198:23 199:6
199:11,16,23
233:10 260:11
**late (7)**
27:13 40:10 84:12
111:3 115:23 199:8
254:18
**law (1)**
255:10
**lawyer (1)**
43:4
**lawyers (8)**
35:5 36:6 37:20 44:20
100:11 104:7,17
261:17
**lay (1)**
38:21
**layman's (1)**
238:9
**LBHI (11)**
6:18 13:20,21,24

29:14 33:22 37:3,17
40:3 48:23 259:10
**LBHI's (2)**
32:24 35:21
**LBI (32)**
13:25 29:17 33:22
37:17 38:9,15,23
39:12 41:10 54:23
58:23 80:23 82:24
102:19 111:22
129:24 130:7
164:24 166:12
196:16,18 201:14
203:12,13 207:7
214:16 216:18
217:9 238:16,18
252:2 253:21
**LBIE (2)**
111:21 112:3
**LBI's (10)**
29:9 30:15 32:25 38:5
38:8,13 43:12,13
218:9 259:11
**lead (3)**
18:13 178:2,18
**leading (2)**
32:24 214:6
**leakage (1)**
62:19
**learn (4)**
51:20 54:22 196:5
216:13
**learned (6)**
40:3 57:6 216:15
232:6 242:15
261:18
**learning (2)**
7:18 231:11
**leave (3)**
24:8 31:23 38:23
**leaving (5)**
26:14 31:18 34:9
39:16,18
**led (2)**
14:2 208:20
**left (12)**
37:24 101:16 130:22
139:12 146:14,24
161:24 162:25
181:13 186:22
202:20 253:6
**left-hand (2)**
183:5 189:13
**legal (6)**
134:21 135:2 169:9
172:8 237:13,17
**legitimate (1)**
172:8
**LEHM (1)**

223:23
**Lehman (107)**
1:6 3:6 6:14 11:13,20
12:2,13 13:7 14:24
15:2,3,6 16:14,17
16:23 17:5,20,21
18:2,20 19:3 20:3
20:14 22:8,14 23:15
23:22 24:18 33:3,16
34:9 35:13 38:24
40:13 41:3 42:16
44:16 45:2 47:14
49:7 50:16 51:22
53:8,8,20 54:12
55:14 60:23 61:2,5
62:17 69:3 74:18
88:12 94:7 95:6
101:15 111:8
129:21 135:5
140:19 145:25
146:14,24 149:2
153:14 155:8
156:20 161:6
168:24 169:11
172:20,21,23
174:11 186:19
196:20 202:17
205:16 213:6 216:5
219:18 220:3
222:15 223:16
226:23 231:4,23
233:12 242:20
245:21 246:17
248:3 250:6 251:21
252:11,11 253:14
253:20,21 255:12
256:12 259:21
261:10 264:14
265:10 274:3
**Lehman's (20)**
48:14 57:2 74:22
79:15 197:18 201:4
215:21 216:3
219:19 220:10,19
221:8 228:2,7
232:25 249:21
252:9 253:12,19
254:25
**length (1)**
32:15
**lengthy (2)**
170:10 176:2
**lent (1)**
123:25
**letter (23)**
8:4 22:19 85:15,20,23
86:9,13,18 92:16,19
93:18,22 135:22,25
136:4,7 168:18

211:22 233:19
234:13 254:9,11
269:12
**let's (20)**
33:21 35:3,10 43:2
46:15 51:17 52:4,5
54:20 64:9,10 93:24
103:13 106:18
115:18 167:2
168:11 184:2 191:9
206:21
**level (3)**
26:14 210:13 213:14
**liabilities (4)**
79:23 220:6 222:9
228:14
**liability (2)**
228:16,17
**liaising (1)**
62:14
**lien (1)**
154:5
**life (3)**
118:13,19 120:15
**light (1)**
224:22
**limited (6)**
43:24 60:20 99:5,12
165:14 242:12
**line (23)**
13:10 25:15 66:6
67:14 75:16,20,21
77:20 103:20 150:7
153:24 157:14
159:14 186:8
189:18 223:20
225:9 242:5 269:10
270:3 271:3 272:3
273:3
**lines (2)**
79:7 141:20
**linking (1)**
110:17
**liquidate (1)**
162:6
**liquidity (3)**
123:24 124:2 169:13
**Lisa (1)**
13:16
**list (41)**
28:2 81:18,21,25
88:24 89:17,18
91:18 98:17 142:20
142:23 146:3,10
150:15 151:25
152:18 153:10
158:22,23,24
169:20,25,25
170:11 171:24

174:16,18 179:16
215:10 236:24
238:17 243:19
247:22,24 248:2
249:17 250:2,5
253:16 265:5,22
**listed (14)**
73:3 112:20 152:22
167:25 168:17
171:10,11,25
172:12 173:11
174:22,23 176:23
186:7
**lists (4)**
33:12 45:14 73:9
180:24
**literal (1)**
72:22
**literally (1)**
125:20
**little (20)**
8:13 19:11 20:10 31:6
74:12 106:4 145:13
149:20 168:9
170:21 189:20
194:8 204:18
208:25 210:24
215:4 217:12 230:8
247:24 257:5
**live (3)**
84:5 110:23 120:16
**Livenote (2)**
2:14 262:2
**living (2)**
118:19 119:10
**LLP (6)**
2:9 3:5,13,21 4:5,12
**Ln (1)**
274:6
**loan (22)**
15:10 116:18,22
125:9,21,23 161:15
161:15 162:3 204:8
260:6,7,16 261:6,7
261:8,9,9,11 262:19
262:24 263:4
**loans (3)**
204:9 211:4 241:12
**locate (6)**
93:25 94:2 121:8
139:16,18 143:7
**located (1)**
94:4
**locations (1)**
90:12
**locked (10)**
141:2,7,11,12 164:4
197:21 210:8
214:13,15,16

**lock-up (7)**
125:5 144:24 146:13
146:15 147:2 200:5
229:10
**Lodato (5)**
106:20 224:2,6,20
225:22
**logical (2)**
59:2 138:6
**London (2)**
12:23 20:9
**long (4)**
14:25 24:17 35:23
243:18
**longer (3)**
13:20 221:3 233:20
**longevity (1)**
18:17
**look (36)**
20:24 25:2 32:17 47:7
50:23 56:2 73:6
91:3 118:14 124:18
135:14 142:12,15
149:23 150:2
152:18 154:21,23
155:17 156:14
157:10 160:22
163:17 168:3,11
170:15 174:9
177:23 186:14
189:13 193:19
213:11 214:18
220:9 223:6 236:2
**looked (11)**
24:16 90:3,4,6,13
149:18 182:25
199:3 208:7 229:18
238:19
**looking (23)**
31:13 47:10 48:24
73:8 78:12 89:25
90:3,15 108:10
142:22 145:3,20
146:17,18 154:3
158:22 238:13,15
248:25 250:4 259:7
264:2,3
**looks (5)**
48:24 107:7 116:15
176:13 242:7
**lot (16)**
24:8,9 34:8 39:9
53:17 54:4 58:19
59:15 84:20 97:24
114:20 119:2 128:3
134:12 162:11
194:12
**lots (8)**
36:6,6,7 121:12

126:19 195:3,3
196:3
**louder (1)**
74:12
**lower (3)**
126:12 141:6 258:19
**lower-quality (2)**
123:17,19
**Lowitt (29)**
15:18 36:21 43:21
101:7 131:11 132:3
142:8 154:20
160:20 190:19
191:10,21 192:13
193:14 194:4,15,19
195:8,14 226:20
229:6,9 234:23
236:15 242:7 243:9
258:17,25 259:6
**luck (1)**
260:12
**lunch (4)**
138:7,9,10 139:10

---

**M**

**M (1)**
3:18
**Macchiaroli (12)**
198:24 201:15 202:4
202:12 203:15
206:22 208:23
210:20 212:13
213:4,20 254:17
**Macchiaroli's (2)**
207:19 208:11
**Machell (5)**
12:18 23:6 30:19,20
30:24
**mad (1)**
119:19
**Madison (1)**
3:23
**Mae (5)**
205:7 211:20 212:24
231:24 234:8
**Maes (2)**
204:13 205:11
**mail (2)**
133:7 229:16
**main (5)**
31:12 66:9 152:23
162:21 211:12
**major (3)**
99:13 239:19 244:19
**majority (2)**
10:8 18:5
**making (7)**
45:14 83:21 118:18
212:12 213:8,8

220:12
**manage (3)**
10:16 47:24 264:18
**managed (4)**
13:22 14:3 75:17
197:22
**management (18)**
11:25 12:6 15:13
62:12 93:14 100:11
101:3,6,20 103:6
107:25 113:15
119:23 123:2 165:9
235:2,12 272:21
**manager (1)**
230:5
**managers (1)**
78:9
**managing (2)**
8:22 75:11
**March (2)**
27:8,10
**marching (12)**
41:23 83:8 84:15
131:18 137:25
191:11,15 193:3
195:13 197:16
230:15,23
**margin (24)**
16:5 116:4,5 117:18
117:19,22,23 125:7
204:9,22 207:7
211:3,3,4 215:9,22
216:3 241:18
245:12,15,25 246:2
246:3,8
**mark (10)**
14:15,19,22 16:22
22:17 46:15 64:10
103:13 115:18
167:2
**marked (85)**
22:21,24 46:18,21
50:11,13 64:13,15
64:17 66:20 71:21
71:23 77:16,18 96:5
96:7 97:12,14
103:15,17 105:18
105:20,22,23
112:15,18 115:20
115:22 118:9,11
124:11,13 127:5,8
128:15,17 132:23
132:25 136:10,12
142:3,5 149:14,16
149:18 154:16,18
157:3 159:8 160:16
163:12 167:7 170:8
170:10,17 173:20
175:18,21,25

177:18,21 178:3
185:19,21 188:3,8
189:2,4 223:2,4
225:4 226:8,10
228:19,20 235:3,9
238:23 241:22,24
243:14,15 247:10
258:13,15
**market (8)**
48:8 124:2 169:14
170:22 171:11
176:9 187:12,19
**marketplace (1)**
24:10
**markets (3)**
8:20 11:23 15:8
**marking (3)**
14:6 16:16 70:25
**marriage (1)**
268:18
**Marsal (2)**
4:23 13:20
**Martin (6)**
132:7 141:25 165:12
198:6 232:13 242:8
**Mary (1)**
178:6
**massive (2)**
63:4 177:14
**Master (2)**
47:2 48:16
**math (1)**
21:15
**matter (3)**
15:11 52:8 268:20
**maturity (1)**
257:12
**max (1)**
64:25
**McDade (5)**
136:13,16 156:10
226:20 229:6
**McLaughlin (2)**
202:13,15
**mean (51)**
7:7,13 10:10 17:7,14
31:23 32:15 39:23
47:22 51:25 52:22
53:2 54:9 71:11
72:17 73:6 75:20
82:18 83:16 88:22
89:20 99:7 116:21
121:5 129:19,20,24
133:22 135:6
137:10 141:10,11
146:23 158:12
181:12 197:11
200:8 204:22
206:10 209:10,11

211:19 218:3
227:14,15 228:2
235:19 253:21
260:25 264:6,11
**meaning (4)**
11:18 105:5 164:3
165:17
**meaningful (1)**
121:6
**meaningless (2)**
73:8 158:23
**means (19)**
7:8 72:20 89:21
117:20 125:11,18
144:23 148:9,10
164:2,8 179:21,23
181:5 182:6 185:4
186:16 218:5 237:9
**meant (15)**
19:2 37:17 41:25
42:13,14 54:6 83:14
117:25 139:17
162:7 184:4,24
187:9 259:6 265:2
**mechanical (1)**
14:18
**mechanically (3)**
81:19 89:16,17
**mechanism (18)**
55:20 56:21 58:16
62:17 69:25 70:7,10
70:13 114:17,20,21
198:22 199:2,15
218:22,22 233:7
263:11
**meet (1)**
31:16
**meeting (39)**
35:19,22 36:10 82:10
109:18 111:14
132:12,16,18
157:16,18,23,24
158:2,3,4,5,13,16
158:17,18,19 159:2
159:4 161:22 162:8
162:12,14,24
164:19 178:16
203:19,22 206:23
207:11,16 209:22
211:15 254:17
**meetings (8)**
41:13 78:13,19,19
123:2 165:10,15
216:17
**member (1)**
216:18
**members (2)**
201:15 208:18
**memo (12)**

179:18 180:2,7,12
181:5,8 182:6,6,11
182:15 250:14,14
**memory (6)**
16:6 32:20 44:13
49:17 90:7 134:14
**mention (1)**
23:13
**mentioned (13)**
51:14 63:7 75:4 76:5
132:12 138:5
139:13 143:12
162:2 166:13
202:24 207:8 246:3
**mentioning (2)**
150:5 153:18
**mentions (3)**
25:7 28:9 176:8
**mere (1)**
7:12
**Merit (1)**
2:12
**met (6)**
129:7 131:11 132:2
190:12 203:14
255:8
**method (1)**
62:20
**methodical (1)**
145:22
**methodology (14)**
89:22 165:24 166:4
180:16,17 181:12
181:18 250:16
252:14,16 253:7,15
253:24,25
**Michael (1)**
30:21
**middle (5)**
65:15 113:4,4 116:2
126:8
**Midnight (1)**
9:24
**Mike (11)**
198:24 201:14 210:11
211:5,14,15 212:21
213:12 214:2,15,20
**million (32)**
18:4,5 21:2 24:17,25
28:10 68:25 80:15
88:16 176:10,14
180:10 181:11,20
182:7,17 204:13
205:6 212:24 213:5
213:23 214:22
215:12 231:24
232:24 233:24
242:12,22,24
253:11,13 254:25

**mind (4)**
19:8 96:19 121:16
237:25
**mindset (1)**
224:15
**mine (1)**
78:11
**minute (5)**
50:23 96:13 154:21
168:2 170:15
**minutes (3)**
59:7 166:16 190:7
**mired (1)**
63:10
**mischaracterize (1)**
209:10
**Mischaracterizes (2)**
102:16 261:22
**misled (1)**
158:7
**mispronouncing (1)**
245:10
**misspeak (1)**
77:8
**misspeaking (1)**
185:13
**misspoke (2)**
176:15 217:6
**misuse (1)**
7:17
**mixing (1)**
142:9
**MM (1)**
242:12
**mode (3)**
222:22 225:20,21
**model (10)**
81:12 94:11 183:19
263:24 264:25
265:3,7,7,7,8
**models (4)**
16:25 265:11,12,13
**model-driven (1)**
16:20 265:5
**modifications (1)**
136:3
**moment (1)**
243:22
**Monday (28)**
40:6,7 41:4 46:22
51:20 52:5 54:20
55:11 66:11 82:16
83:11 84:4 90:25
110:4 111:4 157:18
157:19,22 184:18
184:19 187:12
193:4 196:14
203:24 204:4 242:2

244:10 249:2
**money (14)**
31:11 32:6 61:7 77:4
143:2 199:14,18
204:25 211:6,11
212:14 214:13,15
214:16
**moneys (5)**
197:21 201:12,24
210:8 254:24
**monitor (2)**
52:8 216:25
**monitoring (3)**
52:10 217:7,13
**month (1)**
246:9
**months (6)**
19:4,25 22:7,13 41:19
251:11
**Monty (11)**
15:24 62:7 75:12
144:15 157:14
158:18 166:2
171:21 229:17
260:24,25
**moot (1)**
111:6
**moral (1)**
19:17
**morning (18)**
6:8,9 63:3 84:16
88:10 111:4 157:18
157:23 158:12
184:7 193:9,14
225:17,19 260:4,18
262:22,25
**mortgages (1)**
152:25
**mortgage-based (3)**
153:5,9,15
**motivator (1)**
31:12
**mouth (2)**
56:14 102:11
**move (19)**
26:10 53:21 58:7
79:17 102:19,20
106:21 114:18
199:14,18 230:19
230:20,21 231:7
232:8 233:7,12
251:17,20
**moved (12)**
26:8 33:17 83:17
100:15 114:23,24
132:19 170:2
172:22 173:4
219:15 230:17
**movement (2)**

24:10 200:4
**moving (9)**
24:10 52:22 53:3
57:10 107:12,13
114:19 199:4
222:22
**multiple (6)**
48:13 214:3,4,5
215:10 252:10
**MV (1)**
187:5
**M-A-C-H-E-L-L (1)**
12:20

_____
**N**

**N (3)**
3:2 4:2 269:2
**name (7)**
6:16 72:3 190:13
230:11 245:11
255:9 274:3
**named (1)**
63:7
**names (1)**
246:3
**narrow (1)**
194:21
**narrower (2)**
11:14,17
**NASDAQ (1)**
223:12
**NASSAU (1)**
268:6
**nature (6)**
47:18 51:22 53:15,16
122:9 130:24
**Neal (6)**
15:22 127:9,16,19
219:2 230:11
**Neal's (1)**
128:5
**Neave (1)**
78:8
**necessarily (4)**
34:13 183:17 184:7
201:12
**necessary (1)**
166:6
**need (22)**
7:21 60:3 63:18 81:25
117:24 133:19
135:14 140:7
143:17,25 147:24
157:15 161:23
164:10 199:23
200:4 213:11
214:18,25 216:21
224:6 227:10

**needed (7)**
69:10 82:13 151:17
230:13,17 232:7
245:5
**needs (2)**
144:20 147:24
**negotiating (6)**
33:10 34:15 51:11
101:18 144:3,4
**negotiation (2)**
36:4 79:24
**negotiations (3)**
51:24 52:3 89:8
**Neil (2)**
4:17 190:13
**net (4)**
39:20 243:18 263:3,3
**network (1)**
79:10
**Neuberger (1)**
119:24
**never (2)**
189:8 222:19
**new (36)**
1:3,16,16 2:10,10,15
3:8,8,24,24 4:15,15
7:18 10:9,9 20:9
31:25 48:25 49:5
54:7 58:2 59:19,20
59:22,25 61:25 62:4
75:2 85:23 95:18
110:16 147:20
186:24 255:20
268:4,9
**Nicholson (1)**
225:22
**night (42)**
39:4 40:8,9,11 55:12
55:12,12 59:12 60:9
65:15 66:17 67:2,5
67:8 68:10,24 69:11
74:24 77:2,12 80:25
82:11,11 90:19
99:16 104:8,8 113:5
113:13,25 114:13
125:5 131:22
151:12 155:21
158:10 184:8
209:13 212:4
213:18 259:17,23
**nights (1)**
259:14
**night's (1)**
151:23
**nine (2)**
22:7,13
**Nineham (1)**
16:12
**non-actionable (2)**

91:15,17
**non-fail (1)**
103:10
**non-finance (1)**
56:15
**non-standard (2)**
151:13 160:4
**normal (8)**
21:23 26:6 55:25
87:12 119:4 148:8
256:3,19
**normally (4)**
41:18 53:2 94:11
146:8
**North (1)**
4:7
**notable (1)**
217:22
**Notary (4)**
2:14 6:4 268:8 274:25
**note (3)**
67:20 127:15 248:23
**noted (2)**
139:2 267:11
**notes (1)**
207:22
**notice (5)**
166:21 167:5,10
223:23 271:17
**notion (1)**
132:11
**November (1)**
15:3
**number (49)**
18:15,19 20:25 24:24
44:12 59:16 73:15
73:16 76:22 80:17
104:10 110:12
117:9 121:19 140:9
140:11,16,22,25
141:6 144:10 153:2
159:22 168:11
170:17 178:3
189:18 194:3
224:22 231:12,17
231:25,25 232:21
233:19,23 236:12
242:16,18 248:19
249:12 254:5
258:19 260:10
269:10 270:3 271:3
272:3 273:3
**numbers (8)**
32:4,12 76:16,18
105:22 141:18
174:23 238:16
**N.W (1)**
3:16

---
**O**
---
**OA (1)**
26:16
**oath (2)**
5:13 7:4
**objection (54)**
7:7,12 23:25 24:5
25:22 26:4 28:14
51:7 60:2,12 67:6
68:11 71:13 72:8
73:22 87:9,21 92:6
95:7 96:17 100:5
102:15 107:2
113:21 122:20
125:12 134:18
135:13 137:23
141:9,16 143:11
145:16 150:12
152:4 168:14 191:2
195:23 196:9 197:5
198:19 201:5 212:9
213:24 220:20
222:10 232:20
234:11 240:6
249:23 250:7 257:2
258:7 261:21
**objections (2)**
5:7 232:22
**objective (2)**
238:24 239:8
**obligation (2)**
19:17 257:11
**obsolete (1)**
84:21
**obviously (8)**
18:5 24:8 39:16
123:12 165:8
169:21 217:15,20
**OCC (8)**
91:3 215:22 216:3
244:18 245:15,23
245:24 246:8
**occasions (1)**
100:8
**occurred (2)**
56:12 60:14
**October (3)**
22:19 254:18 269:12
**offended (2)**
120:4 121:24
**offer (2)**
187:6 193:6
**offered (8)**
18:8 19:6,12,19 23:6
31:16 32:6,19
**office (20)**
14:12 17:6 75:18
90:19 101:21

110:15,17 117:25
129:7,14 131:21,22
131:25 132:4
147:21 197:12
201:16 207:15,17
207:20
**officer (1)**
5:12
**offices (5)**
2:9 101:16 244:12,13
244:24
**Oh (2)**
91:2 259:8
**okay (108)**
8:21 9:8,25 12:7
21:11 22:5 24:13
25:25 27:7,14 29:13
29:17,20 36:19,22
38:12 40:20 42:11
50:8,17 52:2 54:2,9
54:19 56:8 59:21
61:16 63:16 66:19
67:24 68:6,16 69:9
70:3 71:10 74:13
75:19 76:9 77:4
78:23 79:13 80:5,12
81:22 82:3 90:23
102:10,22 104:2,13
106:12 107:5 108:2
110:9 114:4 115:4
118:3 119:11 121:7
121:22 123:6
124:20 128:6
129:17 130:10
134:22 138:9
139:20 140:12
142:14 143:19
144:19 149:25
152:2 162:18
163:19 164:7,9,19
168:6 170:3 172:4
174:9 179:10 183:3
183:22 184:14
187:22 189:9
192:11 196:22
206:9,21 223:8
224:25 225:17
226:15 231:18
240:15 241:23
243:15 249:10
255:24 256:10
259:22 262:8,17
266:24
**Oliver (2)**
3:21 255:10
**OMO (1)**
55:5
**once (6)**
139:24 140:13,25

172:25 173:6
256:17
**onerous (1)**
41:17
**ones (2)**
76:5 247:10
**one-page (2)**
235:10 241:25
**one-year (1)**
32:19
**ongoing (3)**
38:6 90:16 154:13
**oOo (1)**
5:20
**open (5)**
63:2 75:16,20,21
247:11
**opening (1)**
199:19
**operate (1)**
148:8
**operating (2)**
65:7 119:4
**operation (1)**
95:16
**operational (16)**
10:22 38:17 49:9
53:15 58:19 59:16
60:13,18 61:24
62:20 81:17 169:5
199:17 214:8 246:6
246:7
**operations (47)**
8:20 11:23 12:10,13
13:19,25 14:4,9
15:7,25 16:2,3,4,8
16:10 19:7,8 20:5,6
20:8 41:15 47:16
48:6 49:15 50:7
56:22 57:3 58:14
70:21,22 84:23 88:5
94:15 107:22 110:3
110:7 113:11
114:22 141:19
150:20 151:24
202:17 203:10,13
214:10 230:4
264:23
**opinion (4)**
114:9 115:3 207:5
263:7
**opposed (2)**
69:19 183:23
**ops (2)**
62:8 251:8
**opted (1)**
18:24
**option (1)**
24:14

options (2)
241:18 243:18
oranges (1)
109:12
order (5)
11:4 133:17,23
182:19 248:21
orders (12)
41:24 83:8 84:15
131:18 138:2
191:11,15 193:3
195:14 197:17
230:15,23
organization (17)
10:23 12:13 13:21
19:8,21 22:2,4
31:14 41:9,10 88:6
94:12 140:6 196:20
196:21 218:19
259:12
organizations (4)
26:14 217:2,8 262:23
original (6)
32:5 86:23,24 110:13
113:2 229:2
originally (1)
70:16
originator (1)
127:14
outcome (3)
62:18 262:23 268:19
outside (6)
148:3 161:5 169:17
180:5 257:4 262:11
out-smarted (1)
127:24
overall (3)
18:20 98:21 208:21
overdrafts (1)
241:15
overnight (2)
77:13 151:23
owe (1)
116:5
owed (1)
210:5
owned (2)
249:21 250:6
owns (1)
198:3
Oxford (12)
4:17 190:11,14
193:11 222:23
224:25 235:7
240:10 249:5,9
255:4 269:6
O'Connor (1)
38:24

O'Meara (1)
242:6

_____
P

P (4)
3:2,2 4:2,2
package (1)
171:23
page (39)
23:9 106:7 120:21
124:17 133:9
149:22 163:20
170:15,16,18,21
174:10 175:24
176:8 178:3,6,17
188:8,10,12,12,13
189:6 247:11
248:24 249:5,6,7
263:19,20,22
265:19 266:5 269:3
269:10 270:3 271:3
272:3 273:3
pages (1)
178:2
paid (14)
18:6 25:18,21 27:2
61:10,11 62:23,24
74:17,18,18,20
98:15 213:2
Palchynsky (2)
124:25 126:2
Paolo (27)
39:7 113:5,9 114:10
128:18 129:7
143:23 148:18
161:5,23,23 171:5
171:13,15 173:13
175:3,4 183:16
184:21 195:10,11
198:14 219:7
232:13 239:12
260:12 262:11
Paolo's (1)
171:6
paper (1)
94:7
papering (1)
259:2
papers (2)
208:2 214:18
par (2)
184:19 249:2
paragraph (7)
81:4 126:8 133:8
150:4 154:2 223:21
223:22
Park (1)
4:14
part (44)

23:22 24:20,22 32:22
43:23,24 52:17
56:11 85:20 89:5,7
93:23 105:3,7,12
113:7 118:13
119:24 123:16
124:16 126:8
127:21 141:12
152:10 164:25
172:16 178:24
184:6 190:24
197:16 204:15,20
211:25 212:15,17
212:25 216:4,15
217:8 222:3 229:14
239:19 256:14
259:3
partial (2)
23:18 148:4
participant (1)
75:22
participate (1)
75:23
particular (6)
99:12 119:16,18
178:2 200:20
224:24
particularly (2)
119:19 134:15
parties (7)
5:4 48:18 88:7 123:20
155:9 252:10
268:17
party (8)
14:11 101:10 105:13
136:6 137:20,24
148:25 156:11
pass (2)
107:20 170:5
passed (5)
46:11 84:22 110:25
144:10 148:17
passing (1)
240:4
pattern (2)
134:20 239:19
pay (4)
74:6,6,8,9
payment (9)
21:19,24 28:16,20
29:3 38:22,22 80:14
80:19
payments (2)
18:17 32:20
PCG (3)
186:8,15 187:4
PDCF (6)
64:25 65:16 66:23
67:15 123:23

169:14
PDFC (1)
55:5
PDQ (1)
164:10
Pearn (2)
243:19 247:6
pended (2)
60:23 61:2
people (46)
9:5 13:8,13 24:10
33:13 34:8,8,15
36:6 50:4,7 52:9
62:8 65:12 75:11
82:21 92:12 106:17
107:21 109:19
110:12 111:11
114:9 120:16 123:3
127:2,10,10 128:3
132:8 140:4 141:18
142:8 144:2 150:19
161:7 194:12
196:19,20 212:22
232:12 244:25
246:22,22 247:3
260:10
perceived (1)
110:13
percent (13)
21:4,4 90:11 134:19
151:17 155:12
182:12 205:2
209:18 212:7,11
227:23 251:16
percentage (2)
99:9 153:5
perfect (9)
39:22,22 118:25
159:15,15,18 160:6
160:9,10
perfectly (1)
172:8
perform (3)
43:19,25 120:17
performance (1)
27:25
performed (1)
212:7
performing (1)
22:3
period (23)
18:9 19:5,19 26:2,11
27:3 28:17 31:24
33:23 34:2,3 37:24
51:6 62:22 64:8
97:16 111:20 121:7
122:17 143:6 146:4
196:2 262:21
periodically (1)

78:13
periphery (1)
165:23
person (14)
30:24 49:25 56:16
65:8 95:19 117:3
175:4,8,13 177:5
185:14 212:19
253:23 264:19
perspective (3)
81:17 105:10 161:6
pertained (1)
215:8
pertaining (1)
104:11
pertinent (1)
77:21
Peter (1)
247:4
Pg (1)
274:6
phone (1)
75:21
phrase (14)
45:4,8,9 54:4 59:22
104:22 105:5
106:23 108:15
115:13 122:12
128:7 133:10 162:7
phrased (1)
42:11
phrases (1)
67:22
physical (1)
90:9
physically (4)
46:12 53:9 114:24
244:10
piece (4)
41:18 120:11 122:8
216:13
pieces (2)
62:16 110:19
PIM (11)
103:5,5,8 201:21,25
203:18 204:24,24
207:9 211:4 215:9
place (52)
31:15 38:20 49:8
55:23 56:8 57:15,17
60:24 61:15 62:25
64:4 65:4,25 66:16
69:25 70:8,10,14
75:17 77:11 82:5,23
83:4 94:12,15 95:2
99:15 107:11
114:17 124:14
148:15 158:20
165:10 168:24

169:2,7,11,22 172:9
173:2 192:18,25
194:11 206:24
207:16 216:16,17
217:4 218:7 235:23
237:13 251:4
**placed (3)**
95:6 133:24 173:13
**places (3)**
90:4,5 94:9
**placing (4)**
70:19,21 94:23,23
**plan (9)**
41:13 52:18 78:22
79:2 110:14 111:7,7
220:24 221:3
**plans (2)**
78:17,18
**played (2)**
40:16,19
**Plaza (1)**
4:14
**please (9)**
7:16 124:17 167:21
217:14 222:24
247:20,25 263:12
265:19
**pledge (6)**
48:5 56:3 116:19
133:17,23 163:22
**pledged (13)**
48:8 55:19 56:7,18
57:21 74:23 77:2
125:23,24 133:18
147:24 255:25
263:9
**pledging (3)**
54:25 55:15 246:2
**plethora (2)**
110:18 201:22
**point (95)**
15:13 18:6,11 19:15
24:9 30:6 41:24
42:5 46:8 49:19
51:19,20 54:19,22
57:6 58:20 59:3
66:9 79:15,17,24
81:9,12,14 82:4
83:5,6,23 84:17,19
84:22 85:13 97:5,23
101:17 103:4,7
107:19 109:9,16
110:22 119:8,20
123:14 128:4
130:15 131:22
135:19 145:7 149:9
151:8,19 153:18
155:25 160:5,6
161:24 162:17

164:6 172:11 185:6
185:12 190:22
191:10,17 196:12
196:16 198:15,25
208:15,17 213:15
214:14 219:16
221:6,9 224:9,12
226:6 229:24 230:9
236:3 243:6 244:13
246:5 248:22
249:16,25 259:15
260:20 261:17
262:10 266:8,21
267:6
**pointed (3)**
44:19 67:22 178:18
**pointing (3)**
85:3 153:23,25
**points (4)**
7:6 18:17 43:22 77:20
**pools (1)**
238:22
**poorer (2)**
123:25 169:14
**portion (6)**
8:7,8 61:23 166:18
167:16 182:10
**position (32)**
8:18 10:6 13:5 14:24
15:5,17 17:21,21
18:22,24 19:25 20:2
39:21 100:3 107:4
108:11 162:17
164:16 180:2
181:10 182:11,13
198:7 203:8 223:19
245:21 252:20,24
253:3,4,6,6
**positions (18)**
14:9 106:20 107:17
116:19 133:17,23
155:13 174:11
179:17 180:11
181:5 182:4,4,5,15
205:2 251:25 252:2
**possession (1)**
127:25
**possibility (4)**
130:21 135:21 234:19
264:25
**possible (30)**
30:4 35:14 53:13 70:5
72:9 84:9 112:5
121:11,11 130:23
131:2 195:10,15
207:14 220:15
222:21 224:21,23
228:8 230:22
236:19 239:21

243:12 244:16
250:24 251:2,15,16
252:9 259:16
**possibly (16)**
67:4 68:8 73:6 91:4
97:7 153:10 158:3
178:21,22 204:5,6
217:19 230:2
239:18 244:12,13
**post (16)**
9:12 30:15 42:9,24
60:21 81:14 86:2
111:6 135:5 165:13
200:23 201:14
203:11 231:8
234:18 251:11
**posted (9)**
73:2 76:11 85:5 87:18
94:20 124:5 241:18
255:14,21
**post-event (1)**
222:13
**post-weekend (1)**
231:9
**potential (3)**
29:22 203:16 228:14
**potentially (15)**
41:22 105:12 109:8
131:20 132:7 143:2
145:8 182:18
185:12 192:9
198:22 204:14
205:7 208:6 233:7
**practically (1)**
230:22
**practice (2)**
26:13 169:12
**pre (6)**
35:20,20 37:14 43:14
72:16,21
**preceding (2)**
217:9 259:10
**precise (9)**
14:7 27:12 32:21
33:18 56:24 87:14
90:11 209:7 227:11
**precisely (9)**
11:8 29:12 89:15
90:18 114:3 117:3
126:6 152:17
192:17
**predominantly (4)**
10:14 89:23 91:8,12
**prefer (1)**
194:19
**preferred (1)**
194:23
**preparation (6)**
37:2 174:5,7 176:5,18

235:19
**prepare (2)**
93:2,21
**prepared (3)**
85:15 93:13 188:16
**preparing (3)**
93:10,18 180:14
**present (7)**
4:21 8:18 10:6 13:5
162:10 202:11,19
**presented (1)**
48:21
**preserving (1)**
7:9
**president (1)**
17:8
**press (2)**
33:25 34:5
**pressure (1)**
119:5
**presumably (3)**
143:8 146:24 225:24
**pretty (5)**
123:4,22 151:6
158:23 162:24
**prevented (1)**
217:25
**previous (7)**
61:5 74:24 146:23
174:23 175:10
184:8 259:14
**previously (19)**
27:21 67:3 70:10
108:6,23 112:2
129:16 136:22
141:7 149:17,21
150:25 153:6 155:7
156:4 159:23
166:13 168:8
203:11
**pre-existing (1)**
48:16
**price (6)**
16:25 23:17 158:24
264:9,12,22
**priced (1)**
80:25
**prices (4)**
264:9,21 265:5,8
**pricing (5)**
14:10 16:20 183:20
264:11,18
**primary (9)**
13:8,13 48:14 65:18
71:2 84:7 90:12
227:19,22
**prime (4)**
13:11 15:25 20:5
110:23

**printed (1)**
178:11
**prior (16)**
20:2 23:12 35:7,10,13
35:21 97:17 102:16
113:22 116:8
187:17 218:9
255:17 261:22
262:8,15
**private (2)**
103:5 123:20
**privilege (3)**
43:8 205:20 216:12
**privileged (2)**
167:20 216:21
**probable (1)**
243:11
**probably (44)**
7:24 18:8,15,20 36:19
59:23 68:3,14 77:9
78:2,14 101:8
120:25 137:15
156:23 158:5 162:8
165:2,11 175:3,4,12
177:5,11 182:8
183:15 197:13
199:8 201:18 202:6
205:5 206:19
208:20 216:20
224:7 227:6,16
229:15 232:21
242:15 243:11,12
260:3,23
**problem (5)**
11:10 68:6 76:7
155:22 240:7
**problems (5)**
64:4 73:18,23 74:2
111:25
**proceed (1)**
8:10
**proceeding (4)**
6:21 11:5 37:19 93:12
**proceedings (3)**
6:15 92:23 93:16
**process (37)**
14:18 15:9 18:7 19:16
40:16 47:22 55:25
57:17,20 58:21 62:4
63:15 71:15 74:5
84:23 87:12 90:16
111:3 128:12
129:12 131:24
133:19 145:21
150:20 152:2
158:21 193:20,21
193:24 199:17
218:6 250:19
255:19 256:14

260:2 264:18,20
**processed (4)**
47:19,21 87:16 225:8
**processes (2)**
60:18 63:2
**processing (1)**
49:16
**produce (4)**
17:2 92:12 180:18
267:3
**produced (2)**
160:3 234:14
**producing (1)**
140:5
**product (8)**
13:10 16:23 186:18
247:5 248:14 265:8
265:14,16
**products (1)**
13:9
**professional (2)**
2:12 120:18
**professionals (1)**
135:16
**program (2)**
65:20 73:21
**programs (5)**
55:9,14 57:22,24 73:2
**progress (1)**
6:25
**project (8)**
41:13 52:18 78:9,12
78:16,17,18,22
**proper (1)**
232:22
**properly (3)**
77:7 99:10 209:12
**protect (7)**
133:17,23 141:3
182:20 240:24
253:9 263:5
**protecting (1)**
250:17
**protection (4)**
139:25 141:13 201:23
241:4
**protective (1)**
11:4
**protocol (1)**
38:22
**prove (1)**
147:7
**provide (12)**
10:9,21,22 16:22
118:23 140:14
190:19 207:4
208:19 210:13
214:10 230:24

**provided (17)**
39:6,12 55:17 72:11
72:12 99:14 100:9
100:10,15 104:15
104:16 166:21
169:13 171:5
201:16 203:12
261:11
**providing (8)**
43:20 54:23 55:13
57:9 69:7 88:9
101:19 217:23
**provisions (2)**
33:7,11
**Public (4)**
2:15 6:4 268:8 274:25
**pull (1)**
262:2
**purchase (9)**
42:3,4,6,14,14 81:3
85:10,13 237:9
**purchased (4)**
14:11 81:11 85:11
264:13
**purely (1)**
97:6
**purpose (10)**
51:12 92:21 123:24
143:9 196:6 220:12
227:19,22 240:23
261:7
**pursuant (1)**
205:8
**pursue (1)**
199:20
**purview (1)**
95:16
**pushed (1)**
171:22
**pushing (1)**
123:9
**push-back (1)**
122:16
**put (39)**
11:3 19:21 23:20
38:21 52:17 56:13
66:16 69:24 70:7,13
76:25 77:11 94:8
102:10 114:17
119:5 133:19,20
134:2,17,23 149:9
154:4 156:5 169:4
171:6,14 173:2
180:2,7 185:6
197:15 219:10
241:23 244:25
260:7 263:5,12
267:5
**puts (1)**

130:11
**putting (3)**
70:10 129:17,19
**p.m (11)**
109:18 125:3 129:8
157:8 158:2 225:10
226:14,20 228:24
258:18 267:11

---
**Q**
---

**quality (7)**
123:25 126:3,10,13
155:7 169:14,18
**question (71)**
5:8 7:8,10,14,16,22
16:16 22:11 24:2
40:24 42:12 47:4,12
48:20 49:24 50:21
60:5 65:14 68:7
77:23 92:7 96:14
106:6,16 110:10,22
113:7 116:2 122:16
124:16 129:4,13
133:4 136:15
149:21 151:5
157:13,17 159:13
159:17 163:17
167:13 173:25
174:9,20 176:3,7,20
177:2 178:5 185:23
188:11 189:9 191:5
194:23 206:13,17
210:16 211:10
227:11 231:19,20
232:22 234:4,17
239:13 240:16
248:11 254:23
262:9 267:4
**questions (28)**
6:23 7:4,5 17:15
52:14,15 62:12 78:3
79:6 97:18,25 98:25
99:2,2 100:21 189:5
190:3,6,17 196:3
205:20,25 208:8
209:3 216:23
244:25 263:16
266:9
**quick (1)**
163:17
**quiet (1)**
62:22
**Quinn (2)**
3:21 255:10
**quite (10)**
83:8 178:22 195:15
206:13 207:14
228:8 230:2 242:8
243:11 244:15

---
**R**
---

**R (5)**
3:2 4:2 6:2 139:3
268:2
**raise (1)**
131:10
**raised (3)**
236:7,9 244:21
**raising (2)**
217:24 218:3
**RAJESH (1)**
4:23
**ran (2)**
197:24,24
**range (4)**
247:12 249:19 252:5
252:7
**ranges (2)**
175:22,23
**ranging (1)**
189:20
**rates (1)**
13:11
**rationale (1)**
250:13
**reach (2)**
59:2 147:10
**reached (1)**
147:9
**read (18)**
51:3 106:5,8 113:10
133:7 144:14 158:8
158:11 223:5
225:25 226:2 239:4
239:5 243:24,25
262:12,13 274:6
**readily (1)**
7:21
**reading (8)**
7:19 34:11 42:21 81:5
86:14 229:13
246:23 248:16
**reads (2)**
77:20 274:6
**ready (6)**
8:10,11 82:14,15
83:10 193:4
**real (5)**
48:20 153:20 155:13
180:5 181:7
**reality (1)**
87:15
**really (25)**
19:10 35:24 36:23
45:13,23 49:22
66:10 80:10 86:12
97:19 110:7 111:13
115:2 119:21 122:4

122:5,9 131:19
144:20 153:21
157:13 178:21
206:2 238:21 266:4
**Realtime (1)**
2:13
**real-world (1)**
135:9
**reason (7)**
231:12,22 232:17
234:4,7 254:13
274:6
**reasonable (3)**
161:19 261:19 262:18
**reasons (4)**
172:7,8 209:15
222:17
**recalculate (4)**
141:17 191:20 197:20
231:2
**recalculated (1)**
113:11
**recalculating (1)**
146:11
**recall (92)**
17:5 20:25 29:12 31:3
32:12 47:10 66:2
71:9 72:10 86:14
94:4 95:10,13
104:13 111:24,25
112:7,23 113:18
114:12 117:11,12
118:15,17 119:21
122:2,10 123:4,7,11
127:12,23 128:20
128:22 130:13,19
130:24,25 132:13
132:15,17 133:4,13
134:9,16,22 135:18
135:20 136:2,15,18
136:24 137:3 138:4
142:17 143:24
147:14 152:20
153:2 154:25 156:8
157:17 158:4,4,13
158:25 159:3 161:2
162:13,18 164:12
178:7,8,9,15 191:15
196:25 197:8 199:7
203:14 207:13
210:9 211:13
215:24 216:2
224:19 235:13
239:18,22 242:14
244:2 260:24
**receive (19)**
14:16 21:17,19 26:9
27:5,6,7,11,22,25
28:5,23 29:2 98:17

98:18 266:17,22,25
267:7
**received (13)**
8:25 9:6 10:15 21:22
21:24 27:9 28:21
95:3 99:6 113:12
134:12 172:15
229:12
**receiving (6)**
34:14 46:9 98:10
178:9 242:14 244:2
**recess (6)**
63:20 112:11 138:10
190:8 235:5 262:5
**recipient (1)**
112:21
**recipients (2)**
106:2 157:7
**recognize (1)**
247:17
**recollection (27)**
33:25 35:24 36:15
52:6 90:22 97:2
100:17 104:3,6
111:19 117:8 118:4
126:16 128:6
161:12 164:24
165:20 193:5,13
203:21 221:25
222:13 231:9,10
232:16 235:23
262:14
**recollections (1)**
131:6
**recommendation (2)**
26:19 28:3
**reconciled (2)**
88:13 114:23
**reconciliation (2)**
172:14,19
**reconciling (3)**
88:5,6 172:18
**record (18)**
7:9 10:12 11:3 23:20
48:10 67:21 80:24
147:18 180:3
190:13 202:9
208:10 211:19
234:3 255:9 257:16
262:13 268:14
**recorded (5)**
88:15 135:15,15,17
135:18
**recording (2)**
135:2,3
**records (10)**
10:13 135:5 147:19
150:22 164:23
172:20 180:4

208:17 253:12,19
**reduce (1)**
146:25
**reduced (1)**
146:16
**reducing (1)**
125:7
**redundant (3)**
107:18,18,24
**Reed (2)**
4:12 190:14
**refer (4)**
9:17 45:19 81:2
178:17
**reference (9)**
30:4 91:5 94:22 120:3
121:15,16 128:8
161:13 185:5
**referenced (1)**
211:21
**references (1)**
103:19
**referred (3)**
86:15 91:14 125:22
**referring (27)**
65:16 66:3 68:22
79:12 113:8 114:2
114:11,25 119:12
121:2 123:5 124:24
125:25 126:2,4,6,9
127:15 136:19
159:21,24 188:19
227:6,7 237:11
242:18 264:7
**refers (6)**
65:22 67:8 68:23 69:9
120:10 179:24
**refine (2)**
88:24 169:20
**refinement (1)**
251:2
**reflect (3)**
56:7 135:9 226:22
**reflected (1)**
135:11
**reflection (4)**
88:16,18 155:19
170:2
**refresh (3)**
191:8 235:22 262:14
**refuse (2)**
256:24 258:5
**regard (2)**
71:2 101:6
**region (3)**
10:18,19 13:15
**regional (2)**
12:24 13:8

regionally (1)
12:24
**Registered (2)**
2:11,12
**regular (3)**
23:14 123:16 155:10
**regularly (1)**
264:16
**regulators (7)**
79:25 161:9 219:25
220:3 221:14,20,25
**regulatory (9)**
13:17 16:3 139:25
202:16 203:9
246:22,22 247:2
251:8
**Reilly (3)**
132:7 247:6 265:18
**reimbursing (1)**
22:6
**relate (4)**
8:3 108:5 168:7 186:4
**related (21)**
33:7 38:2,4,5 45:13
78:24 80:18 97:22
140:18 201:3,12
204:9,12,19,22,24
207:7 210:25 211:4
230:21 268:17
**relates (12)**
47:13 79:13 98:3
103:4 106:16 116:2
135:22 156:2
161:25 165:15
201:25 215:21
**relating (4)**
80:14 167:6,11
271:17
**relation (3)**
127:13 155:4 201:20
**relatively (3)**
19:5 26:13 53:6
**relay (2)**
75:8 150:6
**release (13)**
141:7 144:24 164:14
207:3,7 211:6,16
212:14 213:20,21
214:24 215:17
254:24
**released (7)**
60:25 61:8,12 74:20
143:2 201:25
211:11
**releasing (1)**
154:9
**relevant (2)**
36:9 108:13
**relieving (1)**

58:24
**remaining (1)**
61:22
**remember (20)**
42:21 64:7 100:22
111:14 131:3,14
132:5 161:7 190:20
190:25 191:12
192:12 195:7
196:22 197:2
219:13 220:10
229:12 232:16
244:14
**remit (3)**
11:15,17,18
**removed (2)**
148:7 231:4
**repeat (1)**
74:14
**rephrase (2)**
67:9 168:15
**replace (1)**
66:16
**replaced (2)**
87:6 203:10
**replacement (1)**
63:25
**replicated (1)**
110:19
**reply (1)**
226:3
**repo (96)**
47:3,11,13,24 48:10
49:16 54:8 55:2,15
56:6 57:17 58:23
61:4,18 62:8 63:24
66:3 73:21 76:12,24
78:24 85:6 86:23,24
87:5,6,12,15,18
94:19,21 114:16
116:25 117:7,22
123:13,14,16,20
127:21,25 129:4,12
129:18,19,22 130:7
130:14,18,21 132:1
132:11 133:9,13,20
133:21 134:2,5,17
134:21 135:21
136:5 137:10,19
147:22 148:5
161:14,15 162:2,16
168:23 169:4,10
173:8 179:3 184:6
254:6,10 256:23
257:14,24 259:3,9
259:13,19,19,21,23
260:2,5,19 261:4,13
261:17,18 262:21
**report (8)**

12:17,18,22,23 13:13
15:16 246:11,12
**reported (7)**
1:23 15:18 141:25
198:6,12,14 246:13
**Reporter (5)**
2:12,13,13,14 188:9
**reporting (3)**
13:17 144:15 198:10
**reports (5)**
13:2,4 15:21 267:3
**repos (5)**
71:11 163:8 255:15
256:2 262:20
**represent (4)**
6:20 29:14 190:15
255:11
**representatives (1)**
161:7
**representing (1)**
213:25
**repurchase (17)**
47:2,17,19,21 48:17
54:10 55:21,23
60:15 61:21 172:25
255:22 257:8,12,18
257:19 258:4
**request (12)**
125:4 208:12 210:3,4
210:21,25 212:5
213:4,9 214:20
219:12 254:23
**requested (2)**
207:12,13
**requests (1)**
208:10
**required (1)**
58:13
**requirement (5)**
140:2 146:13,15,25
169:20
**requirements (1)**
240:13
**requires (3)**
240:18,20,25
**rerun (4)**
140:6,7 145:8 166:11
**rescinded (1)**
148:17
**reserve (2)**
147:2 242:22
**reserved (1)**
5:8
**residential (1)**
153:15
**resi's (1)**
153:8
**resolve (4)**

74:3 75:8,10,14
**resolved (3)**
74:3 101:15 163:4
**resource (1)**
78:11
**respect (13)**
44:7,16 66:15 71:11
73:19 86:9 88:20
100:4 110:11
139:21 165:5 173:6
205:17
**respective (2)**
5:4 39:2
**respond (1)**
34:11
**responded (1)**
224:18
**response (4)**
208:11 209:2 216:22
219:11
**responsibilities (3)**
10:5 11:19 216:24
**responsibility (33)**
10:16 11:22 12:4 13:9
13:13,15,18,25 15:9
15:13 16:22 20:4,6
79:22 98:20,21,23
98:24 102:7 162:22
217:9 220:4,6
221:17 222:14
224:12,14 245:14
245:19,23 246:7,8
246:20
**responsible (26)**
8:19 11:24 13:17 16:3
16:7,9,15,24 17:10
17:11 31:21 49:15
50:2,3 65:8 128:10
140:4 202:16 203:9
203:11 224:8
245:11,25 264:15
264:19 265:10
**rest (2)**
50:6 63:19
**restore (1)**
148:22
**restricting (1)**
149:6
**result (8)**
14:19 17:3 65:11
99:23 148:14 151:6
151:22 209:17
**resulted (2)**
60:21 62:18
**results (1)**
113:16
**resumed (1)**
139:4
**retain (1)**

21:25
**retention (1)**
28:16
**return (1)**
69:7
**returned (1)**
101:20
**Reuters (1)**
264:12
**revealing (1)**
206:17
**reverse (1)**
229:3
**review (30)**
47:9 50:25 96:14
106:11,13 118:16
124:19,22 133:6
142:13 145:19
149:24 154:22
157:9 163:18
166:20 168:4
193:22 207:2 208:2
208:12 210:15
223:7 226:23 227:4
227:12,20,25
235:22 243:23
**reviewed (3)**
165:24 208:7 251:16
**reviewing (5)**
227:14,15 235:15,18
251:13
**revised (1)**
266:19
**re-designate (1)**
11:8
**re-hypothecated (1)**
89:24
**Ricci (3)**
120:4 121:21 162:21
**Rich (3)**
120:4 121:21 162:21
**rife (1)**
34:6
**right (33)**
19:14 21:15 22:8,10
35:3 47:4 48:18
50:18 66:8,17 69:12
72:20 87:8 95:19
110:4 128:19 141:8
143:10,20 144:21
145:17 172:13
176:16 186:25
187:4 189:24
194:22 206:9
232:19 240:10
245:8 249:3 262:2
**right-hand (2)**
103:24 258:19
**ring (3)**

133:12,15 158:15
**ringing (1)**
137:12
**ring-fenced (1)**
230:17
**ring-fenced/moved ...**
230:12
**risk (4)**
17:9,13 220:16 221:8
**RMR (2)**
1:24 268:24
**Robert (5)**
3:25 4:9 165:12 242:8
255:9
**role (29)**
13:8 16:15,17 18:9
19:5,22 22:3 31:7,9
31:13,15 32:21
33:10 35:6 36:25
40:2,15,19 47:16
66:14 68:9 70:19
71:3 88:20 128:10
128:12 165:5
192:13 217:13
**roll (5)**
79:9 261:4,19,20
262:20
**rolled (7)**
85:10 259:14,16,23
260:5 261:17
262:21
**rolling (1)**
260:19
**room (7)**
36:17 37:9,12,20 76:2
111:15 120:8
131:13,15 132:20
161:4,9,23 163:2
244:22 261:16
262:10
**rooms (1)**
101:17
**ROTHMAN (1)**
4:16
**RPR (2)**
1:24 268:24
**Rudofker (2)**
229:21 230:10
**rule (6)**
167:4,10 240:13,14
240:18 271:16
**rules (3)**
73:10 145:23 146:2
**rumors (2)**
33:15 44:24
**run (12)**
39:7 49:13 57:20 64:5
110:3 119:22
139:24 140:2,10

146:6 240:8 267:2
**running (4)**
19:6 41:22 140:20
146:7
**Russian (1)**
242:7
**Ryer (1)**
13:16

**S**

**S (9)**
3:2 4:2 6:2 139:3
177:17,18,22 272:6
272:6
**salary (4)**
20:15 21:8 25:7,11
**sale (11)**
9:13,17 30:11 41:2,8
41:25 42:19 43:17
45:5 51:21 192:20
**Samantha (2)**
13:14 78:10
**satisfied (3)**
113:16 117:14 205:11
**satisfy (2)**
75:3 204:16
**Saturday (13)**
102:2 136:14 137:8
158:10 193:2,9,14
193:18 199:9
226:14 227:6
228:24 229:7
**saw (8)**
42:22 81:21 134:12
174:3,6,8 176:17
235:16
**saying (19)**
52:22 105:9 108:4,11
108:12 117:2
133:16 142:24
143:17 145:19
161:22 180:9
182:15 190:25
191:12 195:5
212:10 226:21
249:2
**says (36)**
25:6 50:18 66:6 67:11
67:15 68:17 72:15
72:20 79:8 103:24
106:18 113:5,10
115:6 117:19
144:20 150:7
152:25 157:14
163:21,22 164:10
174:10 176:16
178:18 184:18,19
185:2 186:15 187:5
223:22 238:24

242:11 257:24
265:20 266:14
**Scagnelli (1)**
163:21
**scale (1)**
70:4
**scenario (2)**
182:7,16
**scenarios (1)**
53:5
**schedule (66)**
59:18 72:10 81:10
86:23,25 87:7,10,20
88:19,20 92:3,4,9
92:15,16,19,20
94:19 102:17,21
167:21,25 168:13
168:17 171:3,10,19
171:25 172:12,17
173:11 176:25,25
178:19,24 179:8,12
180:10,15,18
181:23 186:4,12
189:14,15 247:14
247:14 248:7,17,24
249:4 250:3,22,25
254:4,6,9,10 257:18
257:21 265:25
266:13,14,22 267:5
267:7
**schedules (23)**
8:3 55:22 61:19 71:4
86:17,19,20 93:19
166:8 168:7,10
169:17 177:7,9
178:16 213:12,13
251:22 253:8 254:2
257:4,23 258:6
**schemes (2)**
55:3,5
**SCHILLER (1)**
3:13
**scrapped (1)**
49:19
**scrolling (1)**
229:13
**scuttlebutt (1)**
123:8
**sealing (1)**
5:5
**SEC (20)**
198:24 199:23 200:2
200:3,13,19,23
201:2,10 207:2,14
208:12,18 209:22
211:6 212:5 215:6
215:12,16 240:13
**second (16)**
9:9 18:4 25:3 57:24

79:8,10 124:17
154:2 163:20 167:4
167:10 188:8
197:16 204:11
205:4 271:16
**secured (1)**
241:12
**securities (106)**
10:14 16:16 21:5
24:19 39:14,14,15
39:17,18,24 45:14
56:7,18 59:17 60:24
61:8,22 69:8 89:9
91:18,19,20,20
98:11,17,18 105:11
125:5,8,22 126:12
133:18,25 134:3
137:6 138:3,5 141:3
141:12 145:5 146:2
147:23 153:11
168:12,17 169:8,17
171:10,24 172:11
173:2,7 174:13,17
174:18,21 176:14
176:22 179:7 180:7
180:24 181:15
182:21 183:6 184:5
184:7,10 185:3,9,10
186:5,12 197:21
204:13,17 205:7
207:9,10 211:16,18
211:20 212:24
214:22,24 230:6,21
231:7,24 232:7
234:8 236:24 237:5
238:22 241:2 248:2
249:21 253:18
254:5,10,25 256:22
256:25 257:10,21
266:22 267:6
**security (18)**
14:13,15,21 39:16
70:25 98:15 174:19
180:11 182:14
228:5,6,9,13,15,17
241:3 252:12 258:5
**SEC's (1)**
207:17
**see (101)**
15:14 16:17 18:8
19:10,20 25:15
26:18,19 27:17,18
28:3,8,10 37:9
39:10 41:12 42:18
46:6 50:19 52:12
54:4 55:5 58:13
59:21 66:24 67:10
67:12,16 68:19 72:3
78:17 81:4 82:9

91:5,14 94:21 96:14
96:19 97:20 99:10
104:22,23 106:23
107:9 108:2 116:5
117:11 118:14
121:14 122:12
133:8,10 143:12,13
146:12 150:8 153:2
153:18 155:18
157:14 161:2,21
163:20,23 164:9
168:6 170:18,21,23
174:13,14 176:8,10
178:3,24 179:4,17
179:18 183:5 184:2
184:20 186:9,15,22
186:23 187:5,6
188:13 189:10
223:9,12,20,23
224:3 232:12 239:2
242:3,5,9 247:15
249:8
**seeing (6)**
24:8 34:11 72:10
112:23 153:10
235:13
**seen (27)**
22:25 42:6 47:5 50:21
51:2 72:6,9 77:24
77:25 86:5,7 88:13
96:10 112:23
120:11 166:23
167:14,16 173:25
176:3 178:13,19
185:23,25 189:8
237:13 251:11
**seg (11)**
179:18 180:7,12
181:5,8 182:6,6,12
182:16 183:2
250:14
**segged (1)**
181:16
**segregated (1)**
182:11
**segregation (3)**
146:12 180:2 182:19
**seized (1)**
154:10
**select (2)**
8:2 166:15
**selected (3)**
55:21 56:18 255:25
**selecting (2)**
55:19 168:21
**selection (5)**
71:3 168:12,16,21
169:3
**selects (1)**

48:3
**sell (1)**
257:11
**seller (1)**
257:11
**send (3)**
137:6 146:4 195:2
**sending (3)**
46:9 67:18 127:15
**sends (1)**
229:21
**senior (2)**
107:25 113:15
**sense (7)**
10:23 65:2 105:8
135:3 158:14 166:3
248:12
**sensible (1)**
172:6
**sent (19)**
66:5 67:11,11 72:14
149:18 158:9
194:25 195:9,22
196:2 225:9,12
226:11,14 227:18
228:23 229:4 242:2
243:18
**sentence (6)**
65:23 79:8 105:8
126:4 154:3 223:21
**separate (6)**
69:2 119:25 198:10
198:11,13 259:19
**September (93)**
9:19 15:4 18:18,18
28:25 33:21 46:23
50:15,17,19 51:18
54:11 64:12,19 66:6
67:12 71:25 77:19
96:4,9 97:11,16,17
103:19,25 105:17
105:25 112:14,20
115:23 118:12
124:10 127:9
128:14 133:2 136:9
142:6 149:18
154:15,19 157:2,6
159:7,11 160:19
163:11,15 170:7
172:25 173:19
175:17 177:16
192:16,21 203:25
206:24 209:5,22
212:4 215:20
217:10 226:12
229:7 237:10 239:2
239:10,17 242:3
243:20 245:22
246:9 254:18 256:7

258:12,18,25
269:18,25 270:5,9
270:11,16,20,23
271:7,9,11,14,19,21
271:24 272:5 273:5
**sequence (1)**
143:21
**series (6)**
7:4 41:12 60:13 97:20
165:14 265:9
**service (1)**
10:22
**services (4)**
15:10,25 20:5 203:12
**set (41)**
8:2 31:19 37:22 41:5
43:19 48:25 49:11
49:17 51:10 52:18
53:4 58:15,15 89:9
100:21 103:11
107:23,24 110:2
111:12 120:2 137:5
143:15 145:22
172:7 173:6,9
190:18 192:3,6
194:21 207:14
208:24 230:5
232:12 236:5 245:3
256:18 257:15
268:12,22
**SETH (1)**
4:16
**sets (3)**
256:22 257:18,20
**setting (1)**
144:8
**settle (2)**
63:6 218:2
**settled (4)**
39:24 61:3,6 265:23
**settlement (21)**
38:19 39:22,23,25
52:8,8,10 60:23
61:3,15 62:25 63:2
169:7 216:25 217:4
217:7,13,15,21
218:7 220:16
**settlements (1)**
75:14
**settling (1)**
260:2
**setup (1)**
58:12
**seven (2)**
11:8 125:3
**share (1)**
88:8
**shared (5)**
10:21,22 80:11 83:7

122:25
**shares (10)**
181:9,11,13,14,21
182:7,17,19 253:11
253:13
**sharing (1)**
122:25
**SHAW (85)**
3:18 11:2 17:17 23:25
24:5 25:22 26:4
28:14 43:2,5,9 47:7
50:23 51:7 59:2
60:2,12 66:4 67:6
67:20,25 68:11 71:8
71:13 72:8 73:22
84:25 86:11 87:9,21
92:6 93:5 95:7
96:17 100:5 102:15
106:3 107:2 112:10
113:21 122:20
125:12 134:18
135:13 137:23
138:6 141:9,16
143:11 145:16
150:12 152:4
166:24 167:17
168:14 189:20
190:7 191:2 193:6
195:23 196:9 197:5
198:19 201:5
206:16 212:9
213:24 220:14,20
222:10 227:10
232:20 234:11
237:21 240:6
248:23 249:6,23
250:7 254:20 255:3
257:2 258:7 261:21
262:4
**sheer (1)**
229:15
**sheet (12)**
72:2,4,6,15 176:2
178:3,18 188:6
189:8 266:12,12
274:2
**shell (1)**
48:6,7 56:6
**shifted (1)**
109:24
**shoes (1)**
220:19
**shooting (1)**
92:4
**shop (2)**
175:13 177:5
**short (3)**
19:5 116:4 239:4
**shortfall (11)**

77:3 89:12 116:13
116:16,24 117:6,14
117:18,19 144:24
145:15
**shorthand (1)**
135:2
**short-term (1)**
257:10
**show (13)**
22:16 24:12 46:4,5
61:19 63:17 95:25
97:8 166:24 177:13
222:23 253:19
258:9
**showed (4)**
120:5 177:9 252:10
253:12
**shower (1)**
131:23
**showing (3)**
153:21 187:20 213:22
**shown (5)**
120:7,8 150:17
213:12,13
**shows (1)**
186:8
**side (1)**
183:5
**sign (5)**
199:23 208:12,23
211:5,6
**signature (2)**
23:8 274:20
**signed (9)**
5:12,14 9:2,4 30:16
51:6 83:7 198:24
237:10
**signify (1)**
187:9
**signing (2)**
210:7 221:15
**sign-off (2)**
207:4,6
**similar (8)**
12:16 45:9 83:9 120:7
120:11 149:17
176:7 232:12
**simply (2)**
79:9 126:20
**single (1)**
87:15
**SIPA (2)**
4:13 190:15
**sir (4)**
211:24 215:20 232:10
234:16
**sits (2)**
12:12,13

**sitting (3)**
76:2 88:24 102:8
**situation (5)**
100:8 119:17 126:5
219:7 248:16
**slight (1)**
93:5
**slightly (6)**
12:10 18:10 101:25
202:2 218:12
248:10
**small (2)**
53:6 88:14
**smaller (1)**
117:19
**smooth (2)**
31:22,25
**sold (4)**
41:9,11 85:6,7
**solve (1)**
155:22
**somebody (4)**
26:13 120:6 175:14
239:12
**somewhat (1)**
225:7
**sorry (18)**
24:2 35:20 58:3 74:6
91:10 98:12 103:23
108:20 130:3
203:20 217:6
225:15 227:8
228:23 238:8
242:21 259:7
266:12
**sort (8)**
48:11 55:13 72:2
100:16 104:10
176:2 185:11
228:16
**sound (2)**
76:23 232:19
**sounded (1)**
199:22
**sounds (3)**
117:13 138:9 205:14
**source (8)**
14:12,17 94:13
183:18 201:23
206:20 247:14
265:21
**sourced (1)**
264:11
**sources (1)**
155:10
**SOUTHERN (1)**
1:3
**space (1)**
63:14

**speak (2)**
74:11 148:18
**speaking (4)**
8:9 40:13 224:19
246:4
**special (3)**
6:17 23:15 28:9
**specific (10)**
34:18 45:24 60:4
107:16 130:24
131:3 165:15
236:12 247:25
257:21
**specifically (5)**
123:5 158:5 173:15
201:19 254:24
**specified (1)**
52:20
**speculate (3)**
121:6 126:7 186:17
**speculating (6)**
96:22,22 105:15
127:20 129:10
153:11
**speculation (9)**
33:24 34:6 51:8 97:5
105:2,14 128:2
130:17 131:9
**spell (1)**
12:19
**spells (1)**
230:11
**SPENCER (1)**
3:10
**spend (2)**
88:4 168:9
**spent (5)**
22:8,14 233:4 234:19
266:6
**spoke (2)**
104:18 164:15
**spread (6)**
72:2,4,6,15 176:2
188:6
**ss (1)**
268:5
**staff (7)**
10:7 32:2 34:6 110:7
197:12,15 216:18
**stage (1)**
229:5
**stale (1)**
264:18
**stamped (52)**
22:20 46:17,18 64:12
96:4 97:11 105:17
105:21,21 112:14
124:10 127:5
128:14 136:9

154:15 157:2 159:7
163:11 170:7,11
173:19,24 175:17
177:16 185:17,22
188:3,24 258:12
269:12,15,15,19
270:6,9,11,16,18,20
270:24 271:7,9,11
271:15,20,22,24
272:6,8,10,12 273:6
**stamps (1)**
188:7
**stand (1)**
186:18
**standard (13)**
26:13 47:11 120:14
120:17 123:18,22
130:9 134:4,6 160:2
169:12 225:16
243:21
**standing (1)**
134:21
**standpoint (2)**
38:17 114:22
**stands (1)**
186:21
**start (7)**
8:13,23 35:10 40:13
64:9 84:8 90:14
**started (10)**
58:4 90:25 100:20
109:14 110:14
131:17 161:10
217:21,21 260:15
**starts (5)**
133:14 193:20,21
247:12 265:20
**state (6)**
2:15 7:6 121:16 237:3
268:4,9
**stated (3)**
155:7 162:22 195:25
**statement (2)**
155:13 172:21
**States (2)**
1:2 15:22
**status (1)**
100:11
**stay (3)**
19:20 28:17,19
**stays (1)**
134:3
**step (1)**
54:20
**stepped (1)**
169:13
**stepping (1)**
220:18
**Stewart (1)**

16:12
**stick (1)**
134:14
**sticks (1)**
44:12
**STIPULATED (3)**
5:2,6,10
**stock (11)**
18:6 23:15,17 24:15
26:24 27:6 28:4,6
80:24 147:18 180:3
**stop (1)**
152:16
**stopped (3)**
88:8 152:15,15
**stopping (2)**
59:3 127:19
**straight (1)**
263:3
**strange (3)**
22:11 34:3 231:17
**stream (21)**
66:21 71:24 77:19
97:15 105:24
110:15 112:19,21
113:8 116:3 118:12
118:15 124:14,15
133:2 142:6 148:13
149:17,20 163:14
198:11
**streams (1)**
119:13
**Street (3)**
2:10 3:7 12:9
**stressed (1)**
119:19
**strike (1)**
266:15
**structure (3)**
49:8,20 165:9
**Stucchio (4)**
141:24,25 198:5
247:4
**subject (15)**
61:24 77:20 103:20
122:7 157:7 194:5
197:6 200:7,19
205:4,5 215:6
228:25 246:19
257:10
**subordinates (1)**
34:22
**Subscribed (2)**
267:17 274:21
**subsequent (4)**
201:2 215:5,14 243:8
**subsequently (7)**
79:18 103:8 202:20
216:8 232:6 236:6

237:14
**subset (1)**
169:8
**substance (1)**
167:18
**substandard (1)**
119:6
**substantial (2)**
53:7,8
**substantially (1)**
12:16
**substitution (2)**
87:12 126:9
**substitutions (1)**
169:22
**successful (1)**
116:20
**suggest (2)**
187:11 209:11
**suggested (2)**
30:8 205:25
**suggesting (2)**
155:14 158:12
**suggestion (9)**
18:24 155:23 156:16
158:11 220:9,13,17
226:21,22
**suggests (1)**
216:7
**sum (3)**
28:9 140:10 145:11
**summarize (1)**
32:8
**summary (2)**
170:21 171:21
**Sunday (29)**
40:8,9,11 100:18
101:24 102:2
110:21 111:3
154:19 155:20
156:6 157:19,24
158:9,12 159:11
193:2 199:9 209:13
209:21 212:4
213:18 221:10,12
226:12 243:20
244:7,8,9
**superiors (4)**
34:16 85:18 100:7
140:24
**supervisor (2)**
30:25 43:20
**supervisors (2)**
85:18 140:14
**supplement (1)**
23:12
**supply (1)**
180:24

**support (11)**
10:9,10,22 13:20 52:3
59:13 61:18 83:11
83:12 84:9 173:8
**supporting (3)**
59:11 60:9 70:16
**supposed (5)**
21:20 43:17 45:10
89:13 112:2
**sure (40)**
6:12 19:18 25:5 26:25
34:3 36:18,22 37:13
41:11 58:18 78:4
80:17 95:9 106:6,10
106:10 112:10
115:5 124:6,7,8
134:13,20 143:5
144:7 151:20 191:9
193:19 210:17
217:18 227:23,23
237:12 240:4 242:8
255:16 259:18
262:4 264:21 265:4
**surprise (1)**
40:21
**sworn (6)**
5:11,14 6:3 267:17
268:13 274:21
**system (17)**
48:9 56:6 63:5 110:16
148:23 149:6
151:10 154:9 164:4
180:13 181:4,9
183:15 252:9
263:24 264:6,10
**systemic (1)**
264:21
**systems (13)**
53:3,4 70:22 146:6
148:7,21 151:13
155:8 159:19
183:25 218:20
264:8,15

**T**
**T (4)**
6:2 139:3 268:2,2
**table (1)**
6:19
**take (55)**
6:24 17:12 20:14
41:18 47:7 50:23
52:4 57:7,17 59:5
63:16 68:2,9 82:5
82:22 83:3 96:13
102:6,12 106:3,4
112:8 115:12
118:14 124:17
138:7 145:10,10

154:21 161:17
166:16 168:2,2
169:22 170:15
181:7 190:7 204:25
207:16 217:4 218:7
220:5 221:17,21
222:7,8,12,13,14
243:22 248:22
249:20 250:15
261:24 262:18
**taken (10)**
63:20 99:15 112:11
138:10 166:3 190:8
192:25 235:5 262:5
262:25
**takes (2)**
123:17,19
**talk (14)**
14:4 33:21 35:5 36:3
36:23 43:11 44:14
44:25 52:5 78:14
117:10 121:18
122:11 208:9
**talked (9)**
108:6,23 121:9
135:24 162:4 168:7
173:5 184:10
222:19
**talking (44)**
27:21 33:19,20 34:7
38:9 43:12,13 56:25
59:24 63:23 78:5,25
83:23 87:5 107:14
107:15 115:8
116:10 121:23
122:6 130:5 136:25
139:11 142:11
147:17 159:17
160:23,25 168:9
171:16 180:17
184:21 191:3
196:14,15 203:23
204:7 209:25 210:2
210:19 231:11
240:5 263:18,21
**talks (5)**
25:14 64:24 66:22
80:22 178:24
**tangential (1)**
202:2
**target (8)**
145:4 192:3,6 236:4,5
236:5,6,10
**task (12)**
43:25 44:2 110:11
119:18 121:17
122:23 194:24
195:9,16,17,22
245:3

**tasked (1)**
110:2
**tasks (1)**
44:6
**tax (2)**
13:16 16:4
**TBAs (1)**
228:2
**team (45)**
13:25 19:17 49:12,14
49:15,15 52:14
53:17,20 62:5,7
75:11,14 78:12
88:23 102:11
107:21 113:11
150:19 152:8
169:18,19,23 171:6
171:18,20,21,23
180:17,25 183:16
191:17,22 193:22
196:6 198:3 208:20
212:21 217:18
248:14 249:20
250:4 251:7,8 265:6
**teams (8)**
39:2,2 52:9 151:12
169:24 195:4
217:15 238:19
**technical (5)**
7:20 47:23 49:6
125:13,19
**technicalities (1)**
49:10
**technically (5)**
53:13 58:6 69:23
199:14 230:18
**technologies (2)**
53:11 110:20
**technology (6)**
38:25 41:14 107:21
110:19 151:12,24
**tell (50)**
10:4 20:23 29:4 34:12
54:5 57:12 78:6
79:11 80:5 81:7
90:5 98:7 99:8
100:3 106:22 113:5
118:18 138:4
142:17 150:18
153:24 157:25
160:23 170:20,25
178:23 179:6,12,20
179:23 183:6
186:25 187:21
189:12,17 191:14
198:15 205:19,23
216:13 217:12
231:3 240:21
243:23 244:6

247:20 260:13,23
265:25 266:24
**telling (1)**
206:3
**Tennison (1)**
247:4
**term (14)**
16:24 52:21 60:3
71:11 85:22,23
91:15 92:15 108:5
134:4 148:11 153:8
179:24 206:15
**terminology (1)**
54:3
**terms (54)**
12:11 16:19 31:9 36:4
42:3 45:25 47:20,23
48:4 50:4 51:10
71:3,15 78:16 81:16
88:5 96:21 114:19
116:16 117:21
118:2 119:2 122:24
123:18 126:3,5
130:9 132:18
133:14 134:21,24
134:25 137:25
140:20 154:13
166:5 168:20,23
169:6,9,10,18 191:6
206:7 208:21 210:5
219:17 227:17
231:14 237:3,18
242:19 253:3
265:12
**test (3)**
16:25 147:5 265:13
**testified (18)**
6:5 25:4,8 67:3
109:25 139:5
150:25 190:18
206:23 209:2,16
220:8,24 238:3
245:6 261:15 262:9
266:17
**testify (1)**
200:10
**testifying (1)**
190:20
**testimony (13)**
23:12 102:16 113:23
115:4 116:9 209:11
242:19 255:17
261:22 262:3,15
263:23 268:15
**testing (2)**
16:25 265:12
**Thank (4)**
8:12 106:15 190:3
247:7

**thanking (1)**
65:12
**thanks (1)**
6:11
**theoretically (1)**
17:12
**theory (1)**
128:5
**thereto (1)**
190:17
**thing (5)**
19:14 36:24 106:19
123:11 218:11
**things (21)**
33:13 38:14 41:18
53:14 62:6,13 81:14
84:21 109:6,21
121:12,14 129:15
135:4 142:20,21
146:18,19 195:5
224:22 255:15
**think (238)**
7:24 9:3,15 11:11
18:3,19 19:4 20:18
21:24 23:16 24:11
26:6,11,12,16 28:13
28:15,20 29:10,11
30:13 31:20 36:18
36:18 37:7,14 39:4
40:7,10 41:4 42:22
44:17 45:3 46:10
47:11 49:2,3,4,4,6
49:11,19,20 51:15
52:25 54:15 57:14
58:2,3,5,5,9,11 59:9
65:5,7,9 82:9,11
84:12,16 87:23 90:7
90:9,10,16,18 93:5
93:8 94:5 96:19
97:24 98:3 99:15
100:8,12,18,18,19
101:4,24 104:5,7,18
105:7,8 107:14
108:12 109:18,25
110:20 111:3,23
114:23 115:15
116:8,12,25 117:23
120:3,4,5 125:14,16
125:21,25 128:2,10
129:8 131:8,20
132:10,13 133:16
139:12 142:9 143:4
145:19 146:22
150:25 151:21
153:17 155:21,24
155:25,25 156:3,4
157:22 158:7,17
160:7 161:5,10,11
161:24 162:8,9,23

162:25 164:15
166:7 167:16 174:3
176:11,12,15 182:5
183:8 184:5,13,21
185:5,10,25 186:17
187:15 190:4 191:5
192:2 193:17,18
194:22 195:2
196:13,15 197:13
198:3,22 199:19
200:21 201:13,17
202:14 203:25
204:3,10,11 205:5
206:12 208:14,17
211:8,14 212:21
215:13 216:16
219:4,9,20,23 220:4
224:7,17,18 227:2
227:19,21 228:15
228:21 229:17
231:8,18 232:4,4,5
232:18,21 234:3
235:16,25 237:3,6
238:3,21 239:11
240:7 243:8 248:13
248:24 249:9,15
250:23 251:3,10
255:2,4,8 256:14
260:3,4,7,11,12,15
262:17 265:17
266:16
**thinking (5)**
81:16,20,24 127:17
227:17
**third (9)**
14:11,16 147:25
155:9 156:11
178:17 186:4 249:6
263:20
**third-party (5)**
94:13 148:2 151:16
155:10 183:18
**thought (16)**
14:20 31:14,16 39:5
82:21 91:19 96:12
96:24 100:16
122:18 123:10
127:21 129:2 156:5
231:17 260:6
**thousand (5)**
46:9 126:25 181:9,13
182:18
**thousands (1)**
73:8
**threatening (2)**
218:10,15
**three (10)**
19:4,25 23:18,19 27:4
48:17 55:8 177:25

232:15 238:21
**three-year (1)**
27:3
**thrust (1)**
162:21
**Thursday (18)**
60:11 64:2 66:16
69:20 70:6,13 77:12
77:13 80:25 90:20
90:20 99:16 104:8
107:8 113:25
114:13 258:18,25
**Thursday's (1)**
80:25
**tied (2)**
18:14 151:21
**ties (1)**
14:22
**time (117)**
5:9 7:6 9:22,23 18:10
19:5,20 24:9,17
28:17 31:24 33:18
34:2,5 35:24 37:16
37:20,24 41:20
46:10 51:6,19,20
54:20 59:23 62:7,22
64:9 73:4 81:13,23
84:22,22 85:25 88:4
90:21 92:17 95:19
97:4,6,23 106:3,5
107:19 109:10,16
112:25,25 113:2
118:19 119:8
121:12 122:17
124:18 128:5,11
130:7,18 132:20
134:13 137:9 138:6
139:2 141:24 143:6
146:4 150:13 151:8
151:19 155:8,20
156:10 157:25
160:5 161:17
162:10,21 168:9,24
169:2 172:2,9
173:10,10 174:8
176:7 191:4 195:17
196:2,5 198:7 199:2
199:8,12 208:22
213:3,12 214:14
220:17 225:16
226:6 232:6 233:4
234:20 235:24
239:20 243:21
244:17 249:24
255:5 256:16 259:5
260:8 262:17
265:17 266:7
267:11
**timeline (1)**

227:18
**times (3)**
37:10 229:18 254:21
**time-consuming (1)**
53:16
**timing (6)**
101:25 133:14 225:9
231:19 244:14
261:23
**title (8)**
8:21 72:15,23 107:15
159:11 248:19,25
266:3
**titled (1)**
127:11
**today (2)**
6:13 135:10
**today's (1)**
77:21
**told (26)**
6:12 7:25 11:12 52:25
53:24 82:4,7,12
84:11,13,18 85:4,9
104:19 109:18
111:4,5 113:15
129:8,14,16 131:12
131:15 162:19
218:12 232:17
**tonight (3)**
66:23 67:16 223:23
**Tonucci (17)**
39:8 113:9 128:18,25
131:11 132:3 133:3
134:11 171:16
173:15 175:4
184:22 195:11
198:13 234:23
242:6 243:9
**Tonucci's (9)**
175:13 177:5 179:14
180:25 183:13,16
188:22 198:3
219:11
**Tony (4)**
141:24 159:15 198:5
247:4
**top (9)**
20:22 76:19 122:11
186:14 226:11
238:17 247:13
258:16 265:20
**topic (13)**
63:18 78:4 103:21
131:6,8,10 136:17
159:4,12 168:11
227:5 243:10
244:21
**topics (6)**
167:25 168:3,6

189:21,23 244:19
**total (7)**
150:7 176:9 179:2
181:10 252:19,24
253:3
**trade (10)**
66:23 67:15 68:18
129:12,21 147:20
147:20,21 161:18
262:25
**trader (1)**
265:6
**trades (8)**
61:2,4,7 147:23 149:8
218:10,15 245:24
**trading (12)**
14:12 16:21,21 62:10
62:10 101:5 107:17
107:17 111:5 182:9
252:22,23
**trail (5)**
107:3 114:6 230:3
246:24,25
**trails (1)**
82:9
**transact (4)**
53:10 83:10,12 84:4
**transacted (1)**
56:23
**transaction (35)**
9:14,17,18 30:12
35:14 41:2 42:19
43:17,23 45:6,20,20
45:25 48:10 51:21
54:11 57:8 63:25
67:5 69:15,19,25
72:16 82:22,22
86:10,24,24 89:5
105:12 109:22
136:3 140:18
190:24 254:6
**transactions (15)**
10:11,12,16,24 39:23
49:9 75:3,6 83:13
98:9 137:19,21
162:16 218:2
227:21
**transacts (1)**
10:18
**TRANSCRIPT (1)**
274:2
**transfer (34)**
26:7 63:11 70:18
73:13,14 81:19 82:2
83:22 88:7 103:7
167:6,11 168:19
184:18 198:23
199:24 200:14
201:3,21 202:2,20

203:3,17,17 204:8
207:9 215:9 231:12
231:23 237:2
239:15,23 259:4
271:17
**transferred (31)**
9:20 44:8 45:10 59:12
60:10,16 61:17
81:11 83:18,20
86:25 88:12,17,18
89:14 98:4 102:14
103:6 113:24
114:15 116:23
143:9 179:2 184:6
196:8 198:18 205:8
232:25 236:20
237:6 256:23
**transferring (4)**
73:18,20 196:15
197:6
**transfers (7)**
184:3,19 201:11,21
237:18,19 249:2
**transit (1)**
131:25
**transition (5)**
18:7 31:25 63:24 67:4
79:3
**transitioned (2)**
13:22 17:20
**transitions (1)**
107:16
**translate (1)**
56:15
**treasuries (3)**
242:12,22,24
**treasury (18)**
12:12 38:18 39:7
49:14 50:7 56:22
57:2,16 58:14 62:9
75:13 88:23 169:19
171:23 197:23
217:18 218:18
245:25
**treated (3)**
241:12,15,19
**tri (1)**
69:4
**trial (1)**
5:9
**tricky (1)**
248:12
**tried (4)**
44:2 75:8 260:9,11
**trip (1)**
175:6
**tri-party (28)**
47:24,25 48:2,7,15
49:8 54:5,7,14,17

55:16 56:2 59:13,20
59:22,24 68:18 69:2
69:5,5,6 74:19
94:25 160:25
255:15 256:15,17
256:17
**true (2)**
34:14 268:14
**Trust (1)**
155:16
**trustee (14)**
4:13 102:19 164:18
166:12 190:15
196:16,18 197:3,9
197:10,11 207:6
214:16 216:17
**trustee's (1)**
197:11
**try (22)**
41:20 52:4 75:10,14
84:3 99:25 100:7
109:20 111:8
120:13 135:8 152:8
181:7 191:9 206:21
207:25 208:18
210:12,16 217:17
226:17 257:5
**trying (43)**
16:17 34:10 41:21
48:25 52:17 56:13
56:14 62:15 73:13
73:14 89:16 102:10
104:9 107:6 108:22
118:20 119:3
120:17,24 121:8,13
130:4 135:4 137:17
139:16,18,20 140:3
141:14 142:23
143:7 146:8 150:16
154:7 155:21
157:20 161:20
165:9 175:6 230:5
245:2 248:12
257:15
**TSA (3)**
13:18,25 203:12
**TSLF (1)**
55:6
**Tuesday (9)**
55:12 65:4,14,25 66:7
66:12 84:5 90:25
202:6
**turn (6)**
35:4 66:19 167:21
263:19 265:19
266:5
**turns (1)**
6:24
**twenty-odd (1)**

160:14
**two (31)**
9:3 18:17 32:19 38:14
47:12 48:2 71:18
86:17 90:8,9 91:7
91:24 95:11 109:6,7
127:10 142:9,21
165:15,17 167:25
168:10 179:17
187:2,18 189:21
213:16 229:20
243:17 259:14
266:8
**two-minute (1)**
261:25
**two-page (2)**
228:22 235:11
**two-year (3)**
17:25 18:12 32:18
**type (7)**
54:8 126:24 153:9
228:5,6,9,13
**types (7)**
33:11 72:25 137:18
174:19,19 241:3
257:24
**typically (3)**
256:10 257:9,18
**typo (1)**
176:11,12 182:5

_____

### U

**Ullman (6)**
15:22 67:18 96:8,15
127:10 219:2
**ultimate (1)**
246:25
**ultimately (22)**
17:8 30:25 49:2 50:2
61:17 93:19 98:3
107:20,23 130:12
134:16 147:9 151:3
163:4 171:14,25
192:7 219:5 223:10
223:25 228:22,23
**un (1)**
69:24
**uncertain (1)**
146:20
**uncertainty (5)**
18:13 96:20 119:2
151:19 153:22
**unclear (2)**
83:25 84:17
**uncomfortable (2)**
209:4,8
**undeliverable (1)**
185:12
**underlining (1)**

67:21
**underpin (1)**
81:3
**understand (67)**
7:21 20:14 25:2,5
26:23 30:9 39:10,20
42:17 44:5 45:18
46:14 49:22 54:3,16
56:10,16 60:6 64:6
64:21 71:10 77:6
79:25 80:9 81:23
82:17 87:4 97:22
102:25 108:3,22
115:4,13 116:8,21
120:25 123:6
125:11,18 126:10
128:23 130:4 143:4
144:23 150:16
154:7 167:23 172:3
172:10 173:4 183:3
183:22 185:4
191:21 198:2
206:12 216:10
220:16 221:6 222:5
234:16 252:6
253:10 256:18
257:8,14 259:5
**understanding (91)**
24:7,11 33:2 34:5
36:5 37:16 42:2
43:16,25 51:4 56:20
69:18,21 72:24
73:11 74:17 76:9
80:14 81:9,13,15
83:19 86:8,16 87:10
87:17,24,25 89:4,11
113:22 115:8
116:10 117:5,17
123:9 125:17
129:22 130:6
140:15,17,23 149:5
149:11 150:14
195:21 196:11
205:15,24 206:11
206:15 208:16,19
218:14 219:17
221:11,20 222:11
222:16 224:10
228:10 230:14
231:6,22 232:7,10
232:23 233:22
234:4,14 236:21
237:14,15,16
239:14 240:3,12,17
240:19,24 241:5,11
241:14,17 248:9
249:13 254:3,8
257:20 259:15,22
**understood (19)**

7:2 11:11 51:23 57:12
59:9 76:25 78:20
83:15,16 114:24
116:17 145:23
146:22 168:5 195:7
231:13 233:10
255:16 259:8
**undertake (2)**
249:20 250:4
**Undertaking (1)**
46:25
**unencumbered (94)**
80:23 87:2 88:24
89:10,18,19,21
91:22 93:25 98:5
101:21 102:8,12,17
102:22,24 105:11
105:15 108:24
121:8 138:3 142:23
142:24 143:3,7,25
144:6,14 145:5,9,25
146:11,17 150:11
150:23 151:7 152:9
152:22 165:6,17
180:9,11 181:14,18
181:21 182:10,14
183:7 184:10
191:18,23 192:5,8
192:15 194:2,5
195:18 196:7
222:12,14 227:4,7
227:13,14,16
229:10 230:6,16,25
235:3,12 236:13,18
236:22,24 237:5,19
237:23 238:14,22
238:25 239:8,16
244:20 247:21,23
248:3,15 249:18
250:2,9 251:23
253:16 272:21
**unexpected (1)**
73:19
**unfamiliar (3)**
45:24 46:3 86:2
**unfortunately (2)**
139:11 170:4
**unhappy (2)**
19:11 120:4
**United (2)**
1:2 15:22
**unprecedented (1)**
63:4
**unrelated (1)**
61:3
**Unsecured (1)**
255:11
**unwinds (1)**
262:24

**update (4)**
157:8 159:12 195:2
228:25
**updated (3)**
78:18 187:12 264:16
**updates (2)**
194:25 195:6
**uploaded (1)**
56:5
**upper (3)**
103:24 144:19 186:4
**Urquhart (2)**
3:21 255:10
**use (12)**
7:20 52:21 70:23
85:22 104:22 108:4
148:11 162:7
175:23 240:8 252:3
252:4
**useful (1)**
240:15
**usual (1)**
84:9
**U.K (1)**
16:6

_____
**V**

**vague (3)**
150:12 248:10 249:23
**valuate (1)**
154:4
**valuation (14)**
14:13,14 45:13 72:23
94:20 95:4,5,22
171:19 176:22
181:2 183:21
189:17 245:12
**valuations (7)**
16:4 74:22,22,23
171:7 181:3 187:23
**value (61)**
24:13 26:24 32:11
48:7,8 70:19,21,23
72:25 76:13 94:3,8
94:9,12,15,23,24
95:2 104:9 113:12
115:2 117:23
169:23 170:22
171:9,11 175:8
176:9 179:7 183:14
183:17 184:19
186:8,11,15,23
187:19 204:17
205:3,10,12,13
210:7 213:2 214:17
214:25 215:4 232:8
232:24 233:17
236:23,24 252:18
252:19 255:21

256:12,18,22
261:14 263:5 264:6
**valued (2)**
24:12 263:8
**values (9)**
14:9 72:11 95:11
177:6 186:7 187:2
263:21,23 264:25
**valuing (3)**
14:6 16:16 45:9
**various (13)**
6:20 17:6 52:11 53:14
55:3,4 57:22,24
84:6 195:4 216:25
217:8 241:6
**vein (1)**
7:15
**venting (1)**
119:17
**venue (1)**
264:11
**verify (1)**
10:11
**versa (1)**
260:24
**version (1)**
242:7
**versus (7)**
59:18 111:22 148:3
176:23 180:5
182:22 189:15
**vest (2)**
23:18 27:3
**vesting (2)**
23:19,19
**vice (1)**
260:23
**view (3)**
22:5,12 254:15
**virtually (1)**
152:14
**visibility (7)**
60:19,20 75:5 88:10
99:4,7 148:5
**volume (5)**
49:9 53:12 63:4
118:21 229:15

_____
**W**

**W (2)**
6:2 139:3
**Wabash (1)**
4:7
**waived (1)**
5:5
**waiving (1)**
205:19
**walk (1)**

181:7
**walked (1)**
37:15
**Wall (1)**
12:9
**want (43)**
7:22 8:5 14:7 16:24
22:16 25:4 28:19
39:10 43:10 46:4
59:5 69:23 74:13
77:8 81:22 95:25
97:8,19,21 103:4
106:24 112:8 115:5
117:11 120:18
138:8 142:10 143:5
144:7 160:25 162:6
167:19 168:9 175:7
177:13 182:2
184:13 193:9
221:18 255:13,16
258:23 266:8
**wanted (21)**
19:20 22:24 23:11,13
23:20 31:21 36:18
36:21 49:22 64:21
72:4 112:22 118:14
135:17 161:16
166:16 194:25
203:17 208:15
210:15 221:20
**wants (1)**
7:9
**wash (1)**
45:20
**Washington (1)**
3:17
**wasn't (66)**
9:5 19:13,13 30:13
31:9,10 34:13,14
37:17 38:4 40:18
45:12,13 52:20
59:14,14 68:12,14
69:21,22,24 76:2,20
78:10 79:25 80:8
82:8,13,23 83:7,21
83:25 90:24 100:13
104:25 105:13
110:7,24 111:13
118:24 119:7,24
120:6,11 122:21
126:18 129:15
131:15 132:9
133:15 136:6
137:24 139:18
161:19 194:23
196:2 209:12,25
210:9 212:8,12
220:2 228:4 234:16
236:21 261:18

**water (2)**
44:24 130:16
**way (43)**
6:22 11:5,12,21 14:8
17:24 28:19 34:11
41:6,22 47:23 63:5
81:18 108:8 109:8
109:15 119:7
131:14,20 145:2,22
160:4,12,13 165:11
168:13 170:4 171:2
179:24 191:9 201:7
201:8 204:15
206:21 220:23
226:2 248:11,13
250:18 251:22,23
262:23 268:19
**wealth (3)**
10:19,20,24
**Wednesday (17)**
55:12 59:12 60:9
63:25 64:19 66:6,12
66:17 67:2,5,7,12
68:10 69:19 70:12
70:12 81:24
**week (53)**
14:3 29:8,11,20 32:23
33:20,21 35:4,6,20
35:21 38:19,21 40:3
40:5 46:2 51:18
52:12,17 54:24
55:13 56:11 65:5
66:12,14 82:20
90:24 100:9 102:18
109:14 110:24
111:5 114:14
131:18 139:24
146:8,24 152:10
166:11 202:7,8,10
203:20,25 204:4
206:24 209:23
212:5 217:9,20
218:8 256:7 259:10
**weekend (49)**
79:20 85:16 88:2,21
88:23 90:17 92:2
99:3 102:3 104:21
110:22 111:20
138:2 139:15,17
146:7 147:11 153:4
191:11 192:15
193:2 194:4 196:13
199:10,14,18
200:19,21,24 201:2
209:5 214:6 215:20
215:20 216:6,8,24
217:3,5 230:15,20
230:21 231:16
233:3 234:13

236:11 248:8,15
249:25
**weekly (1)**
20:9
**weeks (3)**
9:4 15:11 42:10
**Weil (7)**
37:20 101:16 104:16
161:4 162:10
261:16 262:10
**Weil's (3)**
244:12,13,24
**Wells (4)**
199:20 233:5,13
234:6
**went (10)**
21:16 37:24 38:25
39:19 61:14 62:21
129:7,13 130:21
131:12
**weren't (11)**
112:6 119:3 123:6
132:9 146:17,18
151:16 162:22
164:17 169:9 206:2
**were/can (1)**
125:6
**whatsoever (1)**
34:20
**WHEREOF (1)**
268:21
**whichever (1)**
241:2
**whilst (1)**
37:12
**Wickham (1)**
114:8
**WILLIAM (1)**
3:9
**wind (1)**
217:22
**wire (1)**
263:9
**Wisconsin (1)**
3:16
**wish (1)**
213:15
**wishing (1)**
216:11
**withdraw (1)**
60:5
**withdrawn (5)**
208:24 222:6 238:12
245:20 254:7
**witness (15)**
6:3 8:2 59:7 67:21
68:5 74:13 85:2
139:4 166:14

167:24 263:13
268:11,15,21 269:3
**word (1)**
7:17
**words (7)**
7:20 32:24 33:22 39:9
45:20 56:14 102:10
**work (46)**
6:22 14:6,25 22:13
24:21 27:25 28:6
31:12,21,24 38:17
41:5,14,18 50:4
58:12 63:5 82:19
87:13 110:14 111:2
119:13,14 120:13
127:16 141:21
146:5,7 151:8,23,23
152:15 154:12
179:25 191:16,19
195:11,12 202:18
208:18 214:7
215:21,24 218:22
246:25 248:14
**worked (13)**
15:3 26:3 38:25 39:2
39:3 75:13 78:9
109:15 141:18
165:11 169:19,23
180:18
**working (31)**
53:4,14 62:11 70:9
82:13 88:23 92:11
101:21 107:22
109:20 111:9
118:23 127:2,18
129:11,12 140:3
142:21,22 150:20
151:12 152:8 192:4
193:21 195:5
210:12 217:16,17
219:22 230:12
239:20
**works (1)**
245:7
**world (5)**
148:2,3 153:21
155:13 180:6
**worth (13)**
15:12 45:15 53:12
61:12,13 70:25
74:21 153:18
174:21 180:10
204:13 212:24
214:22
**wouldn't (17)**
20:23 31:23 51:10
85:7 91:21 95:24
111:5 117:9 145:9
145:18 161:17

201:6,7 262:18
264:2,3 267:2
**write (3)**
120:21 159:14 226:19
**writes (6)**
116:3 224:5 225:22
229:9 230:10 242:6
**wrong (5)**
49:12,20 203:21
230:11 261:23

_____
**X**
_____
**X (1)**
269:2

_____
**Y**
_____
**yeah (11)**
19:13 68:14 75:5
91:17 104:25 106:8
158:4 162:15
176:11 219:15
249:9
**year (9)**
18:2,4,18 20:10,11
22:7 26:10 27:13
31:25
**years (7)**
19:9 23:18,19 27:4
32:19 41:19 160:14
**year's (1)**
53:12
**yielded (1)**
141:6
**yielding (1)**
64:24
**York (27)**
1:3,16,16 2:10,10,15
3:8,8,24,24 4:15,15
10:9 20:9 49:5 54:7
58:2 59:22,25 62:2
62:4 75:2 95:18
186:24 255:20
268:4,9
**York's (2)**
59:19,20

_____
**Z**
_____
**zero (2)**
217:25 218:4

_____
**$**
_____
**$1 (5)**
233:20,24 234:5,8
242:21
**$1.2 (1)**
219:10
**$1.225 (1)**
28:10

**$1.9 (1)**
191:23
**$15 (1)**
260:8
**$195 (1)**
238:25
**$2 (2)**
94:6 151:2
**$2.5 (1)**
21:2
**$2.7 (2)**
18:4 24:25
**$200,000 (1)**
20:18
**$235 (1)**
180:10
**$250 (1)**
80:15
**$3.5 (1)**
18:5
**$30 (1)**
88:16
**$44 (1)**
179:3
**$45 (3)**
73:15 174:21 176:14
**$5 (9)**
61:10,12,13 74:7,8,10
74:19,19,21
**$7 (3)**
76:22 117:6,17
**$70 (1)**
44:7
**$700,000 (1)**
18:16
**$769 (10)**
204:13 205:6 212:24
213:5 214:22
215:12 231:24
232:24 233:24
254:25

_____
**0**
_____
**00004396 (3)**
177:17,22 272:6
**00004675 (2)**
177:18 272:6
**00035134 (3)**
170:8,12 271:20
**006647 (3)**
173:20,24 271:22
**006653 (2)**
173:20 271:22
**008149 (4)**
175:18,22,25 271:24
**008670 (2)**
175:18 271:25
**07 (1)**

266:11
**074 (6)**
79:9,14 91:6,8 219:23
226:4
**08 (1)**
246:9
**08-13555(JMP) (1)**
1:6
**087 (1)**
105:24

_____
**1**
_____
**1 (5)**
149:22 168:11 178:3
185:2 248:24
**1.4 (1)**
228:25
**1.5 (1)**
116:4
**1.9 (3)**
143:13,25 144:5
**1.95 (4)**
143:17 144:20 145:4
236:3
**1:14 (1)**
139:2
**10 (3)**
269:17 270:6 271:15
**10:31 (1)**
63:20
**10:38 (1)**
226:20
**10:42 (1)**
63:21
**10:43 (1)**
226:14
**10:53 (2)**
225:12,13
**100 (1)**
155:12
**10004-1482 (1)**
4:15
**10010 (1)**
3:24
**10017-6702 (1)**
3:8
**102 (1)**
105:21
**10222586 (2)**
136:9 270:24
**10252597 (2)**
159:7 271:11
**10293351 (1)**
96:4
**10294630 (2)**
97:11 270:6
**10295594 (2)**
46:17 269:15

**10296524 (2)**
127:5 270:18
**10298087 (3)**
105:17,22 270:9
**10298186 (2)**
112:14 270:11
**103 (1)**
270:7
**10300652 (2)**
46:18 269:15
**105 (1)**
270:9
**108700 (1)**
188:12
**109154 (1)**
188:8
**109156 (1)**
189:6
**11 (3)**
1:5 269:19 273:6
**11:43 (1)**
112:11
**11:53 (1)**
112:12
**112 (1)**
270:11
**115 (1)**
270:13
**118 (1)**
270:14
**12 (2)**
189:18,18
**12:30 (1)**
138:10
**124 (1)**
270:16
**127 (1)**
270:18
**128 (1)**
270:20
**13 (9)**
68:19,25 69:9,14,14
270:11,20 271:5
272:24
**132 (1)**
270:22
**136 (1)**
270:24
**138124 (2)**
154:15 271:7
**138587 (2)**
128:14 270:20
**14 (5)**
185:3 186:8 269:20
270:7 271:7
**14th (1)**
40:10
**149 (1)**

271:5
**15 (5)**
50:15,19 269:23
271:13 272:6
**15C3 (51)**
138:2,5 139:13,16,19
139:21 140:11
142:25 144:24
145:6,14,17 146:12
146:25 159:22
165:19 166:11
191:20 197:18,20
198:17 199:24
200:20 201:4,13,18
201:20,23 204:8,21
208:13,21 211:7
214:3,8 215:17
229:10 230:16
233:14 240:3,9
241:8,12,15,19
242:5,21,22 244:21
254:19,25
**15C3-3 (1)**
159:12
**15C33 (1)**
240:13
**15th (13)**
27:8,10 29:15 32:23
33:21 35:8,11 40:3
40:13 46:23 48:22
51:18 256:7
**15.8 (5)**
161:14 162:2 163:5,7
260:16
**154 (1)**
271:7
**156 (1)**
271:9
**159 (1)**
271:11
**16 (3)**
269:15 270:9 271:25
**16th (1)**
237:10
**160 (1)**
271:13
**161 (1)**
189:5
**163 (1)**
271:15
**167 (1)**
271:18
**17 (5)**
64:12 96:4 269:18,25
272:9
**17th (8)**
58:3,5 64:19 66:6
67:12 77:19 96:9
160:8

**17.9 (1)**
157:8
**170 (1)**
271:20
**173 (1)**
271:22
**175 (1)**
271:25
**177 (1)**
272:6
**18 (5)**
258:12 259:2 271:22
272:19 273:5
**18th (10)**
54:11 71:25 97:17
103:19,25 115:23
172:25 258:18,25
259:24
**185 (1)**
272:9
**188 (2)**
272:11,13
**19 (12)**
97:11 105:17 112:14
124:10 128:14
269:13 270:5,9,11
270:13,16,20
**19th (14)**
29:18 97:16 105:25
112:20 124:14
125:2 127:9 128:18
192:21 217:10
239:2,10,17,24
**190 (1)**
269:6

_____

**2**

**2 (10)**
22:20 121:19 126:25
158:9 260:4,18
262:22 269:12
272:11,21
**2.181 (1)**
150:8
**2.6 (1)**
249:11
**2:26 (1)**
190:8
**2:32 (1)**
190:9
**2:43 (1)**
226:12
**2:53 (1)**
225:10
**20 (6)**
136:9 170:7 229:7
269:22 270:23
271:19

**20th (12)**
118:12 121:11 133:2
136:14 139:17
142:6 149:19
192:16 209:5 214:6
215:20 226:14
**200 (1)**
21:13
**200,000 (1)**
25:8
**2000 (1)**
15:4
**20015 (1)**
3:17
**2007 (4)**
18:2,3,14 21:6
**2008 (66)**
9:19 15:4 18:21 21:8
21:21 22:14,20
23:14,23 24:21,23
25:14 26:3,18 46:23
50:15,17,19 64:12
71:25 77:19 96:4,9
97:11,16 103:19
105:17 112:14
124:10 128:14
136:9 142:7 149:19
154:15 157:2,6
159:7 160:19
163:11,15 170:7
173:19 175:17
177:16 245:22
254:18 256:7
258:12 269:12,18
269:25 270:5,9,11
270:16,20,23 271:7
271:9,11,14,19,21
271:24 272:5 273:5
**2009 (15)**
1:17 2:4 27:8,17,25
28:3,6 46:17 127:5
267:18 268:22
269:14 270:18
274:3,22
**21 (9)**
154:15 157:2 159:7
173:19 271:7,9,11
271:21 272:23
**21st (21)**
100:18 139:17 154:19
157:6 159:11
160:19 191:11
192:16 209:6,14,22
212:4 213:19 214:6
214:6 215:21
226:12 243:20
244:7,8,9
**22 (6)**
163:11 175:17 269:13

270:22 271:14,24
**22nd (10)**
9:19 15:4 28:25 29:10
35:9 163:15 191:12
203:24 242:2
244:10
**222 (3)**
2:9 3:7 272:15
**225 (1)**
272:16
**226 (1)**
272:18
**228 (1)**
272:19
**235 (1)**
272:21
**24 (2)**
123:4 272:13
**24th (2)**
29:12 30:14
**24-hour (1)**
262:21
**24037 (1)**
1:25
**241 (1)**
272:23
**243 (1)**
272:24
**25 (2)**
271:9 272:15
**25th (1)**
29:12
**255 (1)**
269:7
**258 (1)**
273:6
**27th (1)**
15:4
**29 (4)**
46:16 127:4 269:14
270:18
**29th (2)**
204:4 206:24

_____

**3**

**3 (1)**
272:16
**3.2 (1)**
21:12
**3.3 (2)**
21:14,17
**3.5 (1)**
21:14
**3:33 (1)**
235:5
**3:38 (1)**
235:6
**3:57 (1)**

125:3
**30 (2)**
177:16 272:5
**30(b)(6) (7)**
8:2 166:14,18,21
167:5,10 271:16
**32rd (1)**
36:11
**330 (1)**
4:7
**35138 (1)**
170:18
**35954 (1)**
170:12

_____

**4**

**4 (3)**
153:2 270:18 271:18
**4:00 (1)**
244:7
**4:03 (1)**
243:21
**4:19 (1)**
262:5
**4:20 (1)**
262:6
**4:27 (1)**
267:11
**40 (1)**
62:22
**41st (2)**
2:10 3:7
**42.5 (1)**
186:9
**4398 (1)**
263:19
**440 (1)**
205:2
**4402 (1)**
265:20
**45 (5)**
62:23 174:12 175:9
176:9,16
**459680 (2)**
157:2 271:9
**46 (2)**
266:10 269:15
**4607 (3)**
247:13 249:19 266:5
**464767 (2)**
163:11 271:15
**4675 (1)**
177:22
**49 (1)**
175:9

_____

**5**

**5 (4)**

62:15,16 109:18
129:8
**5:00 (4)**
82:12 193:3 221:2,7
**5:22 (1)**
242:2
**5:53 (1)**
229:8
**50 (4)**
21:3,4,4 269:17
**51 (1)**
3:23
**521 (1)**
185:22
**5301 (1)**
3:16
**55 (4)**
22:18,19,24 269:11
**56 (3)**
46:16,21 269:14
**57 (3)**
50:10,13 269:16
**58 (3)**
64:11,17 269:18
**59 (3)**
64:14 66:20 269:20

─────────── **6** ───────────

**6 (3)**
269:5 271:11,20
**60 (3)**
71:20,23 269:21
**60611-7603 (1)**
4:8
**61 (4)**
77:15,18 85:3 269:23
**62 (3)**
96:3,7 269:24
**626 (1)**
91:10
**63 (3)**
97:10,14 270:5
**636 (5)**
91:6,11,12 163:22
183:5
**64 (5)**
103:14,17 269:19,20
270:7
**65 (3)**
105:16,20 270:8
**66 (3)**
112:13,18 270:10
**6653 (1)**
173:24
**67 (3)**
115:19,22 270:12
**68 (3)**
118:8,11 270:14

**69 (3)**
124:9,13 270:15

─────────── **7** ───────────

**7 (16)**
1:17 2:4 76:25 116:5
117:12 125:4,20,23
125:24 157:15,18
158:2,2,3 272:18
274:3
**7th (1)**
268:22
**7:14 (1)**
228:24
**70 (4)**
44:10 127:4,8 270:17
**71 (4)**
128:13,17 269:22
270:19
**72 (3)**
132:22,25 270:21
**73 (3)**
136:8,12 270:23
**74 (3)**
142:2,5 270:25
**745 (6)**
36:12 111:15 120:9
123:2 207:15,17
**75 (3)**
149:13,16 271:5
**76 (3)**
154:14,18 271:6
**769 (13)**
205:10,13 211:20
213:22 215:17
231:6,12,17 234:8
242:12,22,23 243:6
**77 (4)**
156:25 157:5 269:23
271:8
**77752 (2)**
64:12 269:19
**77882 (4)**
258:12,20,22 273:6
**78 (3)**
159:6,10 271:10
**79 (3)**
160:15,18 271:12

─────────── **8** ───────────

**8 (2)**
270:14,24
**8:00 (1)**
150:5
**8:56 (1)**
258:18
**80 (3)**
163:10,14 271:14

**81 (3)**
167:4,9 271:16
**82 (4)**
170:6,10 176:24
271:19
**83 (3)**
173:18,23 271:21
**84 (3)**
175:16,21 271:23
**85 (5)**
177:15,21 247:11
263:12 272:5
**86 (3)**
185:17,21 272:7
**87 (3)**
188:2,6 272:10
**88 (3)**
188:24 189:4 272:12
**89 (3)**
222:25 223:4 272:14

─────────── **9** ───────────

**9 (1)**
270:16
**9-17-2008 (4)**
64:15 77:16 269:20
269:23
**9-18-2008 (6)**
71:21 103:15 115:20
269:22 270:7,13
**9-19-2008 (4)**
223:2 225:4 272:15
272:16
**9-20-2008 (10)**
118:9 132:23 142:3
149:14 228:19
265:22 270:14,22
271:5 272:19
**9-21-2008 (6)**
160:16 226:8 243:13
271:13 272:18,24
**9-22-2008 (2)**
241:22 272:23
**9-26 (1)**
184:3
**9/18 (1)**
243:18
**9/31 (1)**
252:3
**9:15 (1)**
157:8
**9:21 (1)**
2:5
**90 (3)**
225:3,6 272:16
**900 (1)**
10:7
**900,000 (3)**

181:14,21 182:20
**91 (3)**
226:7,10 272:17
**92 (3)**
228:18,20 272:19
**922 (1)**
187:5
**93 (3)**
235:2,9 238:24
272:20
**931 (4)**
182:8 251:24 252:5
252:17
**93219 (2)**
124:10 270:16
**94 (3)**
241:21,24 272:22
**95 (3)**
243:13,16 272:24
**96 (3)**
258:11,15 273:5
**97 (1)**
270:6

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 |
| Debtors. | Case No. 08-13555 |
| | (Jointly Administered) |
| In re: | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

## STIPULATION REGARDING EXPERT DISCOVERY

WHEREAS, the following motions have been filed with the Court seeking, *inter alia*, modifications of (i) the Court's Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008, or (ii) the Court's Order Approving, and Incorporating by Reference for Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding; or both such Orders (individually or collectively, the "Sale Order"):

    (1) Debtor's Motion for An Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, dated September 15, 2009 ("LBHI's Motion");

    (2) The Trustee's Motion for Relief Pursuant to the Sale Order or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009 ("T Trustee's Motion"); and (3) Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. §§ 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, For Relief From Order Under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rule of Bankruptcy Procedure 2002,

6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (and Related SIPA Sale Order) and Joinder In Debtor's and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order ("Committee's Motion");

(4) Motion of Lehman Brothers Holdings Inc., Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying The SIPA Sale Order and Joinder in Official Committee of Unsecured Creditors' Motion for Relief From SIPA Sale Order ("LBHI's Joinder"); and

(5) The Trustee's Motion to Join in Debtors' Motion for an Order Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. 9024, Modifying the September 20, 2009 Sale Order and Granting Other Relief ("LBI's Joinder," and collectively with the above-referenced motions, the "Rule 60 Motions").

WHEREAS, Barclays Capital Inc. ("Barclays") has issued discovery requests and third party subpoenas and plans to take certain depositions in connection with its intention to file an opposition to the Rule 60 Motions;

WHEREAS, Lehman Brothers Holdings Inc. ("LBHI"), James W. Giddens (the "Trustee"), as Trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI"), and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. ("Creditors Committee") have issued, or plan to issue, discovery requests and third party subpoenas and plan to take certain depositions in connection with their Rule 60 Motions;

WHEREAS, a Scheduling Order Concerning Certain Motions Filed by LBHI, the Trustee and Creditors Committee was entered on October 27, 2009 (LBHI Docket No. 5636, LBI Docket No. 1989) (the "Scheduling Order"), and

WHEREAS, as provided for in Fed. R. Civ. P. 26(a)(2)(B), counsel for LBHI, the Trustee, the Creditors Committee, and Barclays, in connection with the Scheduling Order the Rule 60(b) Motions, the adversary complaints, and all related proceedings herein, have agreed

have agreed to define and limit the material subject to discovery and disclosure with respect to expert opinion and testimony.

IT IS HEREBY STIPULATED AND AGREED, by and between the parties, through their undersigned counsel, that:

1.      Subject to the provisions of paragraphs 2 and 3 below, any party that discloses the identity of any expert who is one retained or specially employed to provide expert testimony in this case or whose duties as a party's employee regularly involve giving expert testimony (hereinafter referred to as the "Expert"), shall be obligated to produce, in accordance with applicable scheduling order(s), only the following to all other parties in this action with respect to each identified Expert:

(a)     A complete statement of all opinions the Expert will express and the bases and reasons for them (the "Expert Report");

(b)     The data or other information relied upon by the Expert in forming the opinions set forth in his or her Expert Report;

(c)     Any exhibits to be used as a summary of, or support for, the opinions set forth in his or her Expert Report (this shall not preclude any party from graphically presenting information or data by way of an exhibit or illustrative aid so long as the Expert Report specifically identified all the data and all the information presented in the exhibit or illustrative aid);

(d)     The qualifications of the Expert, including a list of all publications authored by the Expert within the ten years preceding the disclosure and a list, to the best of the Expert's ability, of all matters in which the Expert has testified as an expert at a trial, hearing, or

deposition (regardless of whether the Expert was qualified as an expert) within the four years preceding the disclosure;

(e)     The parties are obligated to exchange with each other any additional material supplied to the Expert subsequent to the issuance of the Expert Report to the extent the expert will rely upon such material in his or her testimony;

(f)     A statement of total compensation paid or to be paid, and expenses reimbursed or to be reimbursed, to the Expert in connection with this matter, which total shall include, but not be limited to, payments made for the review and analysis of information, preparation of the Expert Report and any testimony in connection therewith; and

(g)     A statement of the total number of hours billed by each testifying expert.

2.    The following data, information and materials shall not be subject to discovery or disclosure (including by deposition questions):

(a)     Drafts or markups of the Expert Report or any portions thereof, draft affidavits, or draft work papers; preliminary or intermediate calculations, computations or data; or other preliminary, intermediate or draft materials prepared by, for, or at the direction of a testifying expert witness;

(b)     Documents constituting or reflecting communications between the Expert or any person working under the Expert's direction or the party disclosing such Expert, such party's counsel or any consultant that performed services at the direction of such party's counsel, except to the extent that such communications are an original source of facts upon which the Expert relied in forming the opinions;

(c)    Notes created by or for the Expert or any person working under the Expert's direction that are not an original source of information relied upon by the Expert in forming the Expert's opinions;

(d)    Nothing herein precludes a party from inquiring as to the identity of persons with whom the Expert has communicated in connection with his or her Expert engagement.

3.    A party need not re-produce data or other information subject to disclosure pursuant to Paragraph 1 above that previously has been disclosed or produced in this action, provided that such party shall identify such data or other information for the other parties by Bates number or deposition exhibit number or page(s) of a deposition transcript.

4.    A party need not disclose or produce data or information subject to disclosure pursuant to Paragraph 1 above that constitutes a treatise or other readily accessible public source materials, provided that the party identifies the treatise or readily accessible source material in sufficient detail so that it may be readily located. Upon request, the treatise or other source of materials shall be produced.

5.    Nothing in this stipulation and order shall be construed to prevent or prohibit any party from asking an Expert questions at deposition or trial concerning the substance of the Expert's opinions, including without limitation any alternative theories, methodologies, variables or assumptions that the Expert may or may not have considered in forming the opinions or preparing the Expert Report.

6.    No subpoena shall be served upon any Expert. As a condition of presenting the testimony of any Expert at trial, the parties shall identify Experts, produce any Expert Reports, and make their Experts available for deposition, at a time and place agreed upon by the parties,

in compliance with the Scheduling Order, and produce the data and other information called for

under Paragraph 1 above (other than the Expert Report) on or before respective dates to be set

forth in a separate stipulation or scheduling order.

   7.  For purposes of this stipulation, none of the following entities or their

representatives shall be considered "Experts": Weil, Gotshal & Manges LLP, Hughes, Hubbard

& Reed, LLP, Houlihan Lokey, Milbank, Tweed, Hadley & McCoy LLP, Deloitte & Touche

LLP, Sullivan & Cromwell LLP, Cleary Gottlieb Steen & Hamilton LLP, Simpson, Thacher &

Bartlett LLP, Alvarez & Marsal, FTI Consulting, or Lazard Ltd.

Dated:   New York, New York
      December 1, 2009

**HUGHES HUBBARD & REED LLP**

By: _____
   William R. Maguire
   Seth D. Rothman
   Neil J. Oxford

One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood (*pro hac vice*)
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

*Attorneys for James W. Giddens, as Trustee for
the SIPA Liquidation of Lehman Brothers Inc.*

**QUINN EMANUEL URQUHART
OLIVER & HEDGES**

By:_____
   James C. Tecce

51 Madison Ave
22nd Floor
New York, NY 10010
212 849-7000 (telephone)
212 849-7100 (facsimile)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

*Attorneys for Official Committee of
Unsecured Creditors*

6

in compliance with the Scheduling Order, and produce the data and other information called for under Paragraph 1 above (other than the Expert Report) on or before respective dates to be set forth in a separate stipulation or scheduling order.

7.    For purposes of this stipulation, none of the following entities or their representatives shall be considered "Experts":  Weil, Gotshal & Manges LLP, Hughes, Hubbard & Reed, LLP, Houlihan Lokey, Milbank, Tweed, Hadley & McCoy LLP, Deloitte & Touche LLP, Sullivan & Cromwell LLP, Cleary Gottlieb Steen & Hamilton LLP, Simpson, Thacher & Bartlett LLP, Alvarez & Marsal, FTI Consulting, or Lazard Ltd.

Dated:        New York, New York
              December 1, 2009

**HUGHES HUBBARD & REED LLP**

By: _____
        William R. Maguire
        Seth D. Rothman
        Neil J. Oxford

One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood (*pro hac vice*)
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

*Attorneys for James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**QUINN EMANUEL URQUHART OLIVER & HEDGES**

By: _____
        James C. Tecce

51 Madison Ave
22nd Floor
New York, NY 10010
212 849-7000 (telephone)
212 849-7100 (facsimile)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

*Attorneys for Official Committee of Unsecured Creditors*

6

JONES DAY

By: _____

Robert W. Gaffey
Jayant W. Tambe
William J. Hine
222 East 41st Street
New York, New York  10017
(212) 326-3939 (telephone)
(212) 755-7306 (facsimile)
rwgaffey@jonesday.com

*Attorneys for Debtors*
*and Debtors in Possession*


**BOIES, SCHILLER & FLEXNER LLP**

By: _____

Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern

575 Lexington Avenue
New York, NY 10022
(212) 446-2300 (telephone)
hhume@bsfllp.com

*Attorneys for Barclays Capital Inc.*

**JONES DAY**

By: _____
    Robert W. Gaffey
    Jayant W. Tambe
    William J. Hine
222 East 41st Street
New York, New York 10017
(212) 326-3939 (telephone)
(212) 755-7306 (facsimile)
rwgaffey@jonesday.com

*Attorneys for Debtors
and Debtors in Possession*

**BOIES, SCHILLER & FLEXNER LLP**

By: *Hamish Hume/en*
    Jonathan D. Schiller
    Hamish P.M. Hume
    Jack G. Stern

575 Lexington Avenue
New York, NY 10022
(212) 446-2300 (telephone)
hhume@bsfllp.com

*Attorneys for Barclays Capital Inc.*

# Exhibit C

Contains Highly Confidential Portions

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                           Chapter 11

7     LEHMAN BROTHERS         Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

      ----------------------x

11

12          PARTIALLY HIGHLY CONFIDENTIAL

13     VIDEOTAPED DEPOSITION OF DANIEL McISAAC

14               New York, New York

15                April 6, 2010

16     * * *(Pages 12-23 have been designated highly

17     confidential.)* * *

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 29428

Page 2

```
 1
 2              April 6, 2010
 3
 4         VIDEOTAPED deposition of DANIEL
 5    McISAAC, held at offices of Boies
 6    Schiller & Flexner, LLP, 575 Lexington
 7    Avenue, New York, New York, before Kathy S.
 8    Klepfer, a Registered Professional
 9    Reporter, Registered Merit Reporter,
10    Certified Realtime Reporter, Certified
11    Livenote Reporter, and Notary Public
12    of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3            A P P E A R A N C E S :
 4
 5    JONES DAY, LLP
 6    Attorneys for Lehman Brothers, Inc.
 7       222 East 41st Street
 8       New York, New York  10017
 9    BY:  BART GREEN, ESQ.
10
11    BOIES, SCHILLER & FLEXNER, LLP
12    Attorneys for Barclays
13       10 North Pearl Street
14       Albany, New YOrk  12207
15    BY:  TRICIA J. BLOOMER, ESQ.
16       AMY L. NEUHARDT, ESQ.
17       LOUIS SMITH, ESQ.
18       HEATHER KING, ESQ.
19       - AND -
20    CLEARY GOTTLIEB STEEN & HAMILTON LLP
21    Attorneys for Barclays
22       One Liberty Plaza
23       New York, New York  10006
24    BY:  DAVID AMAN, ESQ.
25
```

Page 4

```
 1
 2       A P P E A R A N C E S :  (Cont'd.)
 3
 4    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
 5    Attorneys for the Creditors Committee
 6       51 Madison Avenue
 7       22nd Floor
 8       New York, New York  10010
 9    BY:  ERIC M. KAY, ESQ.
10
11    HUGHES, HUBBARD & REED, LLP
12    Attorneys for the SIPA Trustee
13       One Battery Park Plaza
14       New York, New York  10004
15    BY:  NEIL J. OXFORD, ESQ.
16       AMINA HASSAN, ESQ.
17       FARA TABATABAI, ESQ.
18
19
20
21
22
23
24
25
```

Page 5

```
 1            D. McIsaac
 2         THE VIDEOGRAPHER:  This is the start
 3    of the tape labeled number 1 of the
 4    videotaped deposition of Daniel McIsaac in
 5    the matter In re:  Lehman.  Today is April
 6    6, 2010.  The time is approximately 9:37.
 7         My name is Michael Pineiro from TSG
 8    Reporting, Inc. and I'm the legal video
 9    specialist.  The court reporter is Kathy
10    Klepfer, in association with TSG Reporting.
11         Will the court reporter please swear
12    in the witness.
13              * * *
14    DANIEL McISAAC, called as a
15       witness, having been duly sworn by a Notary
16       Public, was examined and testified as
17       follows:
18    EXAMINATION BY
19    MS. BLOOMER:
20       Q.   Good morning, Mr. McIsaac.
21       A.   Good morning.
22       Q.   My name is Tricia Bloomer.  I'm with
23    Boies, Schiller & Flexner and we represent
24    Barclays Capital in this matter.
25       A.   Uh-huh.
```

Contains Highly Confidential Portions

Page 6

D. McIsaac

1
2    Q.   Have you ever been deposed before?
3    A.   No, I have not.
4    Q.   Okay.  Just to go over a few kind of
5    ground rules that will help the day go a little
6    bit more smoothly.  I'll try to ask my questions
7    clearly, and if you could allow me to finish a
8    question before you begin your answer, and I'll
9    try to do the same for you so that Kathy can
10   take down everything that we say more easily.
11   A.   Okay.
12   Q.   If you can answer with verbal
13   responses as opposed to, you know, nods or
14   anything like that, that will help things.
15   A.   As opposed to (nods)--
16   Q.   And if you need a break at any point,
17   please let me know and I'll try to accommodate
18   you as soon as we can wrap up whatever topic
19   we're on.  Okay?
20        If you don't understand any of my
21   questions, please let me know and I'm happy to
22   try to rephrase it for you.
23        Okay.  I'm going to show you the first
24   exhibit, 684.
25        (Exhibit 684, Expert Report of Daniel

Page 7

D. McIsaac

1
2    McIsaac, marked for identification, as of
3    this date.)
4    Q.   Exhibit 684 is a copy of the expert
5    report that you submitted on exchange-traded
6    derivatives issues; is that right?
7    A.   Yes, it is.
8    Q.   Okay.  Do you have any opinions that
9    you didn't express in this report that relate to
10   the issues --
11   A.   No, I don't believe so.
12   Q.   -- on exchange-traded derivatives?
13   Okay.
14        And what did you do today to prepare
15   for your deposition?
16   A.   I reread my reports, I spoke to the
17   trustees, and did have a slight conversation
18   with the financial advisors for the Trustee.
19   Q.   Okay.  And what financial advisors?
20   A.   Deloitte.
21   Q.   Okay.  Anyone else that you spoke with
22   in preparation?
23   A.   No.
24   Q.   Okay.  Did you review any documents in
25   preparation other than your report?

Page 8

D. McIsaac

1
2    A.   The reports and some of the
3    information that I would have relied on for my
4    reports.
5    Q.   Do you remember any of the specific
6    documents that you reviewed?
7    A.   I just glanced at everything that was
8    there or looked at whatever was in my reliance
9    material, would have been affidavits and the
10   like in his report.
11   Q.   Okay.  When were you retained by the
12   Trustee's counsel to provide expert testimony
13   concerning exchange-traded derivatives issues?
14   A.   Sometime in February, I believe.
15   Q.   In February.  Do you remember whether
16   it was -- so February would have been after Mr.
17   Leitner submitted his expert report; is that
18   correct, to your knowledge?
19   A.   I think it was, yes.
20   Q.   Okay.  Can you describe generally for
21   me what your background is that qualifies you to
22   give expert testimony on exchange-traded
23   derivatives issues?
24   A.   I was responsible for the preparation
25   of seg and secured reports for the

Page 9

D. McIsaac

1
2    exchange-traded futures for approximately 20
3    years.  I worked closely with the regulators,
4    the FTC, CME, on the issues regarding that, as
5    well as the SEC on issues regarding the futures
6    business.
7        I did some reviews of acquisitions
8    that one of my firms worked for -- that I worked
9    for did as far as futures-related.  As far as
10   options, I was responsible for the preparation
11   of the reserve formula for 15c3 for
12   approximately 20 years, worked closely with our
13   people in the areas regarding margin
14   requirements at the OCC as they relate to the
15   firm and the impact on the firm's calculations,
16   and was the liaison for my firms with the
17   regulators, both the OCC, CME, SEC, on all
18   financial matters.
19   Q.   Okay.  The first thing that you
20   mentioned was segregated and secured reports.
21   Can you describe those reports?
22   A.   Yes, that's the customer protection
23   portion of the futures rules, CFTC, and it
24   basically requires you or requires the firm to
25   maintain all the customers' assets in a secure

Page 10

1          D. McIsaac
2 place with no liens on them.
3          Calculation is done every day.  You
4 start out by reviewing what the -- you owe the
5 customers, your liabilities to the customers,
6 and then determine where the assets are.  And
7 you do a report every day and make sure you're
8 in compliance with the rules.
9     Q.   Okay.  Is that similar to the reports
10 that are required under the SEC's rules?
11          MR. OXFORD:  Object to the form.
12     A.   Similar in some respects because
13 they're both required to protect customers.
14 Different from the fact that, futures world, all
15 of the assets that the customers give you should
16 be locked up from day one.  They're supposed to
17 be sent into a seg. account and kept in
18 segregation at all times.
19          The reserve requirement requires you
20 to do a calculation Mondays as of Friday based
21 on information that as of the close of business
22 Friday.  So there is a difference in the way
23 it's done, but it has the same basic qualities
24 attached.
25     Q.   Okay.  You mentioned that you worked

Page 11

1          D. McIsaac
2 on reviews of acquisitions?
3     A.   Uh-huh.
4     Q.   Can you -- and you said that was
5 futures-related acquisitions, I believe?
6     A.   Yes.
7          (Pages 12 through 22 have been
8     designated highly confidential and will
9     continue on the next page.)

Page 12

1          HIGHLY CONFIDENTIAL - D. McISAAC
2     Q.   Can you describe how many acquisitions
3 did you review?
4     A.   When I was at UBS, we acquired the
5 futures and options business of ABN Amro.
6          MR. OXFORD:  And Trish, if I can just
7     note for the record that, given some
8     confidentiality concerns about this
9     information, we would like for the moment to
10     designate this section of the testimony as
11     highly confidential.
12          MS. BLOOMER:  Absolutely.
13     A.   Just not sure what -- what's public
14 knowledge, what's not public knowledge.
15     Q.   Fair enough.  Sure.
16          So, I'm sorry, I --
17     A.   We acquired the -- UBS acquired the
18 futures business from ABN Amro worldwide futures
19 business.  I worked on the due diligence.  I
20 worked on the preparation of our bid, although I
21 didn't work on the financial information, more
22 of a review, quick review of the aspects of it,
23 how it would have impacted our firm.  Worked on
24 the due diligence, supervised the due diligence
25 in some respects of our financial professionals.

Page 13

1          HIGHLY CONFIDENTIAL - D. McISAAC
2     Q.   Uh-huh.
3     A.   And was responsible for the worldwide
4 implementation from the finance standpoint of
5 bringing them onto our books and records.
6     Q.   When did this transaction take place?
7     A.   Dates are fuzzy.  2006, I believe.
8 Maybe 2005.
9     Q.   Okay.  Were there any other
10 transactions that you -- or, acquisitions that
11 you reviewed?
12     A.   We also at one point in time bought
13 the prime broker business of ABN Amro also,
14 which included, you know, the options business
15 that they did for their customers, but it was
16 primarily a purchase of the customer business.
17     Q.   Did it include proprietary options?
18     A.   No.  No sense in buying proprietary
19 options.  You book your own.
20     Q.   Any other transactions that you were
21 involved in reviewing?
22     A.   We also bought -- this goes a little
23 bit further back, a little bit more fuzzy on
24 it -- the capital markets business of Charles
25 Schwab, which included their market-making

Page 14

HIGHLY CONFIDENTIAL - D. McISAAC

1  HIGHLY CONFIDENTIAL - D. McISAAC
2  business in -- in equities and, in some
3  respects, options.
4      Q.    And that would have been an
5  acquisition of the proprietary portfolio as
6  opposed to a customer?
7      A.    It would have been an actual entity as
8  well as certain businesses that were bought into
9  a different entity.  We bought a whole entity
10  that did some business as a clearer for some
11  prime brokers as well as trading for them,
12  market-making for them, and we bought in some
13  market-making information into the firm
14  separately.
15      Q.    Okay.  Why is it that in that context
16  it made sense to buy proprietary positions
17  whereas it wouldn't make sense to buy them in
18  the case of the prime brokerage acquisitions?
19      A.    We bought a whole entity.
20          MR. OXFORD:  Objection to the form.
21      If you could just slow down a little a
22      little bit to make sure that Trish gets her
23      question finished before you answer and so
24      that I have an opportunity to object.
25          THE WITNESS:  Sorry about that.

Page 15

HIGHLY CONFIDENTIAL - D. McISAAC

1  HIGHLY CONFIDENTIAL - D. McISAAC
2      We bought a whole entity at the time.
3      Q.    Which time?
4      A.    With the Charles Schwab.  So the
5  entity had proprietary -- might have had options
6  positions in it when we bought it.
7      Q.    Okay.  Do you know whether it had
8  options positions?
9      A.    I don't remember if it did or not at
10  this point in time.  It wouldn't have been a
11  significant portion of it.
12      Q.    Do you remember the terms of the
13  acquisition of the proprietary book?
14      A.    We bought the entity at a price, at a
15  bid price, and whatever the net asset value of
16  the entity would have been.
17      Q.    What year was the Charles Schwab
18  transaction?
19      A.    Maybe 2004, 2005.
20      Q.    And the acquisition of the prime
21  brokerage business of ABN Amro?
22      A.    I want to say around 2003, 2004,
23  somewhere around there.
24      Q.    With respect to the UBS acquisition of
25  ABN Amro in 2006, the first one that you

Page 16

HIGHLY CONFIDENTIAL - D. McISAAC

1  HIGHLY CONFIDENTIAL - D. McISAAC
2  testified about?
3      A.    Uh-huh.
4      Q.    How long did it take to negotiate that
5  deal from the day it was first conceived to the
6  day it closed?
7          MR. OXFORD:  Object to the form.
8      A.    It probably took a couple of months.
9  I don't remember exactly.
10      Q.    And you said that you were involved in
11  the due diligence on that transaction?
12      A.    Yes.
13      Q.    Okay.  Can you describe for me what
14  the due diligence consisted of?
15      A.    We reviewed the financial information
16  of their business, reviewed their models.  I
17  didn't review the models per se to determine the
18  revenue streams.  That was done by other groups.
19      I reviewed from a financial standpoint
20  and from a regulatory standpoint for both the
21  assets we were buying from one entity as well as
22  multiple other entities we were buying, I think
23  I want to say 13 or 14 different assets and/or
24  entities at -- purchased assets from different
25  companies and/or entities and reviewed that and

Page 17

HIGHLY CONFIDENTIAL - D. McISAAC

1  HIGHLY CONFIDENTIAL - D. McISAAC
2  directed our professionals that did a little bit
3  deeper dive on due diligence.
4      Q.    Can you give me a sense of the
5  relative size of the business that was acquired
6  relative to the LBI transaction that you're
7  testifying about in this case?
8      A.    Well, at the time of the acquisition,
9  I believe ABN, with what UBS had at the time,
10  made us probably the largest FCM in the country.
11      Q.    Okay.  And in 2008 where did Lehman
12  Brothers' business rank?
13          MR. OXFORD:  Object to the form.
14      A.    I don't know exactly where it was.  I
15  don't, looking at the numbers, I don't think it
16  was very high.
17      Q.    You don't think it was very high.
18  Okay.
19      A.    As far as, you know, seg and secured
20  accounts.  Seg and secured balances, that's how
21  you usually rate it.
22      Q.    Other than reviewing models, what else
23  did your due diligence consist of?
24          MR. OXFORD:  Object to the form.
25      Misstates his testimony.

Contains Highly Confidential Portions

Page 18

1      HIGHLY CONFIDENTIAL - D. McISAAC
2          You can answer.
3      A.    I didn't review the models. Somebody
4  else reviewed the models. I reviewed the
5  financial information, the regulatory aspects,
6  the impact that it would have on the firm, the
7  controls, the system they were using, they were
8  using a different system, to make sure we were
9  familiar with it.
10     Q.    Did you review the accounts, the
11 customer accounts of the companies you were
12 acquired?
13     A.    No, the businesspeople along with some
14 of their professionals reviewed the actual
15 customer accounts to determine which customers
16 they may not -- they wanted to take and which
17 customers they didn't want to take.
18     Q.    Do you know how long they spent
19 conducting that exercise?
20     A.    I think a lot of it was done prior to
21 the final bid as far as, you know, first blush,
22 on the larger clients. They probably spent a
23 little extra time on the smaller clients.
24     Q.    Okay. And when you say a little extra
25 time, you said that the entire process took a

Page 19

1      HIGHLY CONFIDENTIAL - D. McISAAC
2  couple of months --
3      A.    Some of the customers -- I'm sorry.
4      Q.    That's okay.
5          You said that the entire process took
6  a couple of months. How long would you say was
7  spent on analyzing the customer base?
8      A.    I don't know how much time in
9  particular. The main review for the customer
10 base was that they cleared for some market
11 makers and it wasn't a business, I think, that
12 we wanted to be in, so it was carving out which
13 ones you wanted to take and which ones you
14 didn't want to take.
15     Q.    Okay. Did you do a -- were you
16 involved in any type of credit check of the
17 customers that you were -- that were in the --
18     A.    No.
19     Q.    -- accounts? Okay.
20          And did you say that the UBS -- this
21 first acquisition from 2006 that we discussed
22 was an acquisition of just a customer business,
23 or did it also include proprietary portfolio?
24     A.    It was just the customer business. We
25 took over ABN's proprietary business to clear it

Page 20

1      HIGHLY CONFIDENTIAL - D. McISAAC
2  for them, so we didn't buy the positions. They
3  maintained the positions and we were the
4  clearing agent for them.
5      Q.    Okay. Were there any other
6  transactions other than the three that we
7  discussed so far that you were involved in
8  reviewing?
9      A.    Just along the way we did some mergers
10 and I was involved in the PaineWebber
11 acquisition. I was involved in the merger we
12 did with SBC, but more for maintaining the
13 regulatory atmosphere, making sure we were
14 complying with that.
15     Q.    Did you have any role in negotiating
16 the terms of any of those transactions?
17     A.    I -- we had a separate group that did
18 the negotiation that determined how much to pay
19 for them. I was consulted by them for various
20 issues but didn't negotiate the price.
21     Q.    Do you have any experience with
22 proprietary options or futures trading
23 strategies?
24     A.    I ran the regulatory group at UBS for
25 15 years, so in doing the regulatory reports,

Page 21

1      HIGHLY CONFIDENTIAL - D. McISAAC
2  you had to understand what we were doing. As we
3  went into a new business or a new process or new
4  product, I had sign-off authority over it to
5  make sure we were doing it accurately.
6      Q.    And what type of information would you
7  require in that role about the trading strategy?
8          MR. OXFORD: Object to the form.
9          You can answer.
10     A.    We need to know what the desk was
11 doing so that we could allocate it properly for
12 capital purposes and for haircut purposes as
13 well as to make sure we were producing it
14 properly on our financial statements.
15          At one point in time we started doing
16 volatility trading and wanted to make sure that
17 we had all the right information and that it was
18 recorded properly, at the end of the day we had
19 all the correct information.
20     Q.    Was there a particular name of the
21 volatility trading positions that were acquired,
22 do you know?
23     A.    No, we didn't acquire them. They were
24 a new business that we instituted within the
25 firm.

Page 22

1    HIGHLY CONFIDENTIAL - D. McISAAC
2        (The non-highly confidential portion
3      will continue on the next page.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 23

1              D. McIsaac
2      Q.   Are you familiar with the term "VIX"?
3      A.   VIX is a -- it's an index that's
4    traded over the -- I'm not sure if it's
5    over-the-counter or exchange-traded.  I think
6    it's exchange-traded, but it's, if I remember
7    correctly, it's the volatility index of the
8    market.  You're trading the volatility index.
9      Q.   What's your understanding of the risk
10   profile of a VIX position in a volatile market?
11           MR. OXFORD:  Object to the form.
12   Vague.
13           You can answer if you're able.
14     A.   I'm not a risk man so I don't know.  I
15   wouldn't venture to guess what the risk profile
16   is.  We would normally use quants and people
17   like that to determine that information.
18     Q.   Do you have an understanding of the
19   risk profile of any other types of
20   exchange-traded derivatives?
21           MR. OXFORD:  Object to the form.
22   Vague.
23     A.   Just from the standpoint of dealing
24   with them and understanding how the market
25   moves, not from a risk standpoint or a value at

Page 24

1              D. McIsaac
2    risk standpoint.  We would have other people
3    that were responsible for that.
4      Q.   Is it fair to say that you're not an
5    expert on risk management in terms of
6    proprietary trading?
7           MR. OXFORD:  Object to the form.
8           You can answer.
9      A.   I'm not an expert on risk trading, on
10   risk management.  Again, in our firms we would
11   have separate people that were responsible for
12   risk management processes and procedures.
13     Q.   What types of risks would you be
14   knowledgeable about when analyzing an
15   exchange-traded derivatives acquisition?
16     A.   Reputational risk, and, you know, if
17   we were taking on something, the impact it would
18   have on the firm's reputation; capital risk,
19   from a standpoint of how much capital would be
20   used and how it would impact the firm's capital
21   position; financial statement disclosure and
22   understanding that, and in general, the terms --
23   general understanding of the business.  So, in
24   such when we took over our futures and clearance
25   business, again, it's a customer-related

Page 25

1              D. McIsaac
2    business, really not much risk involved.
3      Q.   If there's not much risk involved,
4    what is -- why is it generally the case that a
5    transaction of this type would take two months
6    to negotiate?
7           MR. OXFORD:  Object to the form.
8      A.   It would take two months to finalize,
9    to set up the systems because you're going to
10   convert their information onto your systems, and
11   to, you know, finalize all the information you
12   need to finalize on it to do your due diligence
13   and to, you know, to finalize everything around
14   the purchase.
15     Q.   And would that give you enough time to
16   analyze any problems with the books and records
17   of the selling entity?
18           MR. OXFORD:  Object to the form.
19           You can answer.
20     A.   It would, although, you know, your
21   first review would come up with anything
22   significant usually.
23     Q.   Okay.  And how long would the first
24   review take?
25           MR. OXFORD:  Same objection.

Contains Highly Confidential Portions

Page 26

D. McIsaac

1
2    A.    Sometimes it could take a weekend.
3    Q.    And what's the longest that it could
4    take?
5    A.    It may be a couple weeks, possibly.
6    It's according to what you're doing and how --
7    what other things you have to do at that point
8    in time.
9    Q.    One of the things that you mentioned
10   when you were describing your general areas of
11   expertise was margin requirements at the OCC.
12   Can you describe for me what your background and
13   familiarity is in that regard?
14   A.    Well, from the firm's financial
15   standpoint, you know, we needed to know what the
16   margin requirements were, how they impacted the
17   customer reserve formula, how they impacted the
18   firm in general to know what margin was being
19   called; the rules and regulations of the OCC,
20   how it impacts additional margin requirements at
21   points in time for firms, an understanding of
22   that. I worked for a firm that was -- I don't
23   think it's a secret -- was having some financial
24   difficulties, so we did have a lot of
25   conversations with the regulators over the

Page 27

D. McIsaac

1
2    margin requirements.
3    Q.    Okay. Can you describe generally what
4    the problems were with the firm that you just
5    described?
6    A.    We lost a lot of money. UBS lost a
7    lot of money.
8    Q.    Lost a lot of money on what?
9    A.    On various trading strategies.
10   Q.    Would that include their trading
11   strategies at the OCC?
12   A.    I do not believe so.
13   Q.    Okay. What was the context of your
14   involvement with the OCC?
15   A.    As a regulator, a regulated entity, as
16   our clearing org., they had a concern on our
17   capital position and our ability to fulfill our
18   obligations to it. I interfaced with them to
19   keep abreast of what the firm was doing, how we
20   were doing, and what we were -- what we were
21   taking to maintain our capital base and keep
22   them comfortable from a financial perspective.
23   Q.    Were you able to keep them
24   comfortable?
25   A.    I believe so.

Page 28

D. McIsaac

1
2    Q.    Did they ever threaten to liquidate
3    the account?
4    A.    Not to my knowledge.
5    Q.    Did they ever increase the margin
6    requirements because of the financial situation
7    of the company?
8        MR. OXFORD: Object to the form.
9    A.    As long as this is confidential, yes.
10   Q.    Do you know the extent to which they
11   did that?
12   A.    30 percent requirement, additional
13   requirement. I think it was called Phase 3 or
14   Level 3.
15   Q.    Did they ever refuse to allow the
16   company to withdraw excess that happened to be
17   in an account on any given day?
18       MR. OXFORD: Object to the form.
19   A.    Not that I'm aware of.
20   Q.    Did you deal with the OCC in this
21   regard with respect to customer accounts, firm
22   or market maker accounts, or both?
23   A.    It was the overall relationship we had
24   with the OCC.
25   Q.    So they were both?

Page 29

D. McIsaac

1
2    A.    So it was firm and customer.
3    Q.    Do you have an understanding of what
4    the OCC's rights are vis-a-vis clearing members
5    when they have insecurities about
6    creditworthiness?
7        MR. OXFORD: Object to the form.
8    A.    I understand I think they have four
9    levels for firms. Level 1 being no concerns; I
10   believe that Level 2 is an alert status, where
11   they pay a little bit more attention to how the
12   firm is doing; Level 3 is where they raise the
13   margin requirements by 30 percent; and I believe
14   Level 4 is even more severe, where they raise it
15   to 50 percent.
16   Q.    At what level do they start
17   threatening to liquidate accounts?
18       MR. OXFORD: Object to the form.
19   A.    I don't know.
20   Q.    You've never experienced that?
21   A.    I've never experienced that.
22   Q.    Do you know what level LBI was at in
23   September of 2008?
24   A.    No, I do not.
25   Q.    Did you ask anyone that?

Page 30

D. McIsaac

1
2    A.   I may have asked, and I don't know if
3  I ever got -- I don't believe I ever got an
4  answer.
5    Q.   Do you have a sense of which level
6  they would be at given what you have learned
7  under the course of your studies in this case?
8         MR. OXFORD:  I'll object to the form
9  of the question.
10        MR. GREEN:  Objection also.
11        MR. KAY:  Objection.
12    A.   I don't know.
13    Q.   What are the OCC's -- withdrawn.  Do
14  you have an understanding of how the OCC
15  computes margin requirements as it relates to
16  volatility?
17        MR. OXFORD:  Object to the form.
18    A.   Again, I'm not an expert in that area.
19  I have somewhat of a knowledge that they are
20  looking at the potential movement in the assets
21  and look for margin to satisfy a market movement
22  of a one- or two-day market swing based on some
23  kind of theoretical pricing models.
24    Q.   Okay.  You just said that you're not
25  an expert in the area.  What area were you

Page 31

D. McIsaac

1
2  referring to?
3    A.   In how they calculate the margin
4  requirements.
5    Q.   Are the -- is the OCC's formula
6  guaranteed to ensure that in the event of a
7  liquidation there would not be a deficit in the
8  margin account?
9         MR. OXFORD:  Object to the form.
10    A.   I don't think any calculation can
11  ensure anything.  I think their calculation is
12  there for whatever they feel they need to
13  address as far as the volatility of the firm
14  and/or the marketplace.
15    Q.   Is it possible that a firm, a
16  broker-dealer could have an excess in an account
17  and nevertheless, upon a liquidation the
18  following day, incur a cost that exceeds the
19  amount that they had posted?
20         MR. OXFORD:  Objection to the form.
21    A.   I don't have a relevance to look at to
22  determine that.  I don't know.  I've never seen
23  it happen.  I don't know.
24    Q.   You don't know if it's possible for
25  the liquidation to cost more than the

Page 32

D. McIsaac

1
2  margin posted?
3    A.   I would assume anything is possible.
4  I don't know if it's ever happened or there's
5  any, you know, history of it happening.
6    Q.   Would it be more or less likely to
7  happen in a particularly volatile market based
8  on what you know about how the OCC generally
9  formulates their margin requirements?
10        MR. OXFORD:  Objection to the form.
11    A.   I guess in a volatile market anything
12  is more possible to happen.  It would be based
13  on what their positions were at the time, were
14  they long or short, were they short calls, short
15  puts.  It's, I guess, it's according to what the
16  relevance is of their -- of their book.
17    Q.   You have your report there with you?
18    A.   Yes.
19    Q.   Could you turn to page 14, please, and
20  could you review footnote 9?
21    A.   Yes.
22    Q.   Footnote 9 references an OCC Rule
23  601(c), do you see that?
24    A.   Uh-huh.  Yes, I do.
25    Q.   How long have you been familiar with

Page 33

D. McIsaac

1
2  this particular rule?
3    A.   In general terms, probably, you know,
4  understanding how the OCC, probably, in
5  general terms, forever.
6    Q.   Okay.
7    A.   You know, but not specifically.  I've
8  never had to deal with it in specifics.
9    Q.   The rule states that the margin
10  requirement shall be the amount of margin assets
11  that must be held in the account such that the
12  minimum expected liquidation value of the
13  account after excluding positions covered by
14  deposits in lieu of margin, measured at
15  confidence levels as may be selected by the
16  corporation from time to time, will not be less
17  than zero.
18         Do you have an understanding of what
19  the phrase "minimum expected liquidating value"
20  means?
21         MR. OXFORD:  Objection to the form.
22  Misstates the document.
23    A.   "Minimum expected liquidating value" I
24  believe is the minimum value of the account
25  after it liquidates.

Page 34

D. McIsaac

1
2   Q.   Is it the minimum value or the minimum
3   expected value?
4   A.   Minimum expected value upon
5   liquidation.
6   Q.   Okay.  And expected by whom?
7   A.   I'm assuming this is an OCC rule, so
8   it's expected by them.
9   Q.   Okay.
10   A.   Based on the confidence level they
11   select.
12   Q.   Do you have any understanding of what
13   their confidence level would be based on?
14   A.   No, I do not.
15   Q.   In a market in which there's more than
16   average volatility, would you agree that it's
17   more likely that their margin requirement will
18   be insufficient to cover the liquidating cost of
19   an account?
20   MR. OXFORD:  Object to the form.
21   A.   Based on the fact that I have never
22   heard of them liquidating anybody and making a
23   call to the rest of the members, I don't know if
24   it's ever been proven that that's the case.
25   Q.   Do you agree that there's more of a

Page 35

D. McIsaac

1
2   risk of that being the case in a particularly
3   volatile market?
4   MR. OXFORD:  Object to the form.
5   A.   Could you repeat your question?because
6   it was sort of one question, then another?
7   Could you --
8   Q.   Sure.  In a market in which there's
9   more than average volatility, would you agree
10   that it's more likely that their margin
11   requirement will be insufficient to cover the
12   liquidating cost of an account?
13   MR. OXFORD:  Same objection.
14   A.   More likely than what?
15   Q.   Than in an average -- than in a market
16   with average volatility.
17   A.   Okay, so if you're saying in a market
18   that has extreme volatility, could their
19   calculations be more likely to -- to not be
20   correct than in a market that has average
21   volatility?  I guess the answer would be yes.
22   Q.   Okay.  Are you aware that on Friday,
23   September 19, 2008, the OCC refused to allow LBI
24   to withdraw margin from its account that was in
25   excess of the requirements it had published that

Page 36

D. McIsaac

1
2   morning?
3   A.   I have heard inferences to that.  I
4   might have seen an e-mail to that.
5   Q.   Have you -- in your experience, has
6   the OCC ever, to your knowledge, refused a
7   clearing member the ability to withdraw excess
8   from its account?
9   A.   To my knowledge, I don't think so that
10   I'm aware of, but I'm sure if they were
11   concerned with other firms, they might have done
12   the same with other firms.  It was a time and
13   place in the marketplace.
14   Q.   Is it possible that the OCC made that
15   decision because it was concerned that the
16   market may move away from the positions to the
17   extent that the margin requirements were not
18   going to be sufficient to cover the cost of a
19   liquidation?
20   A.   I can't determine what OCC's thought
21   process was.  Maybe they knew there was an
22   impending sale.  I don't know what the rationale
23   was on their part.
24   Q.   What is the OCC's overall goal in
25   setting a margin requirement?

Page 37

D. McIsaac

1
2   MR. OXFORD:  Object to the form.
3   A.   Again, I'm not there, but I believe
4   their overall goal is to make sure that there's
5   adequate margin so that the entities that
6   they're clearing for can be or could be
7   liquidated at no cost to the rest of the
8   members.
9   Q.   Can you turn to page 29 of your
10   report.  In paragraph 70, you say here that
11   "Barclays' acquisition balance sheet recognizes
12   a day one gain of $1.19 billion relating to
13   options."  Do you see that?
14   A.   Yes.
15   Q.   And in the next sentence, you say that
16   "this appears to be comprised of approximately
17   $2.29 billion of margin at the OCC less $1.1
18   billion of liabilities at the OCC."  Do you see
19   that?
20   A.   Yes.
21   Q.   Would you agree that if Barclays had
22   not received the $2.29 billion of margin at the
23   OCC, Barclays would have recorded a loss of $1.1
24   billion on these options on its acquisition
25   balance sheet?

Contains Highly Confidential Portions

Page 38

D. McIsaac

1
2    A.   I'm not sure. From my understanding
3  the proprietary assets, proprietary options at
4  OCC were positive by about 300 million. I
5  believe the short side was an affiliate that
6  cleared through the OCC through -- that was a
7  subordinated affiliate. So I believe the assets
8  they were buying were positive or net asset
9  value of about 300 million as well as they were
10  part of a larger portfolio of assets that they
11  were buying.
12        So they might have -- I don't see
13  where the loss came from because I believe it
14  was affiliates positions, but even if there was,
15  it would be offset by possibly gains in other
16  areas.
17    Q.   Can you describe the larger portfolio
18  of assets that Barclays was buying?
19    A.   I believe there was a repo that had
20  significant value of assets for which they
21  forgave a liability of Lehman's in lieu of the
22  assets.
23    Q.   Okay. Were they long positions or
24  short positions?
25    A.   Long positions.

Page 39

D. McIsaac

1
2    Q.   Were there any short positions
3  undertaken on the fixed equity side?
4    A.   I don't believe so.
5    Q.   Were there short equity positions at
6  Lehman outside of that repo?
7        MR. OXFORD: Object to the form.
8    A.   I don't know. I would assume there
9  might have been, but I don't know.
10    Q.   Do you recall reviewing the Asset
11  Purchase Agreement that the parties signed on
12  September 16?
13    A.   Yes.
14    Q.   Do you recall what the amount of long
15  and short positions was that was described in
16  that document?
17    A.   I believe it was 70 billion long, 69
18  billion short.
19    Q.   Do you have any reason to believe that
20  the 69 billion short didn't still exist by
21  Monday, the 22nd of September, 2008?
22    A.   I have no reason to know what the
23  number was at that point in time.
24    Q.   Is it fair to say that those ceased
25  being part of the transaction?

Page 40

D. McIsaac

1
2    A.   Those short positions, yes.
3    Q.   Okay. And the long positions still
4  were coming over?
5        MR. OXFORD: Object to the form.
6    Q.   Is that correct?
7    A.   My understanding of the Clarification
8  Letter and the APA, yes.
9    Q.   And do you understand, generally, the
10  nature of the agreement with respect to the
11  assets that were pledged under the Fed repo?
12    A.   Could you be a little more specific?
13  I'm not sure what your question is.
14    Q.   Sure. Was there a give and take with
15  respect to the long positions that were pledged
16  at the Fed repo?
17        MR. OXFORD: Object to the form.
18        MR. KAY: Same objections.
19    A.   What's give and take? I just don't
20  know what you mean by that. If you could --
21    Q.   Sure. What is your understanding of
22  the -- of the transaction as it related to the
23  assets in the Fed repo?
24        MR. OXFORD: Object to the form.
25    A.   My understanding is that the Fed was

Page 41

D. McIsaac

1
2  providing Lehman with liquidity, somewhere 45,
3  50 billion dollars, I don't remember exactly,
4  and that was secured by assets of I think I read
5  somewhere about 4 to 5 billion dollars extra in
6  assets.
7        I believe Barclays assumed that repo.
8  I believe they took over most of the assets,
9  possibly, not all of them, and those were long
10  assets that they -- that was part of the
11  purchase agreement at the end.
12    Q.   Do you have any -- did you study the
13  pleadings in this case that related to the Fed
14  repo transaction?
15        MR. OXFORD: Object to the form.
16    A.   I don't believe so. I don't think I
17  did.
18    Q.   Okay. Are you aware that Barclays had
19  expressed concern over the value of the assets
20  in the Fed repo relative to the amount of cash
21  it was advancing?
22    A.   No. If I didn't read the pleadings, I
23  probably don't know that.
24    Q.   You mentioned that there were
25  affiliate positions that you believe were part

Contains Highly Confidential Portions

Page 42

D. McIsaac

1
2  of the account that you referenced liabilities
3  for in paragraph 70 of your report?
4      A.   Uh-huh.
5      Q.   Can you describe generally what your
6  understanding was with respect to the transfer
7  of those positions to Barclays?
8          MR. OXFORD:  Object to the form.
9  Misstates his testimony.
10     A.   There was an affiliate that signed a
11 subordination agreement between them and LBI,
12 and I believe the OCC is a party to that,
13 whereby they would allow their securities to be
14 commingled with the firm's securities.  It's an
15 advantage usually for the firm because it gets
16 them better margin rates, possibly.  And it was
17 my understanding it was short positions of the
18 affiliate.
19         From my understanding of reading most
20 of the stuff I've read, I didn't -- I do not
21 believe that Barclays was taking over any
22 affiliates accounts.
23     Q.   Okay.  I'm showing you an exhibit
24 that's been marked as Exhibit 51.  Do you
25 recognize this document?

Page 43

D. McIsaac

1
2      A.   Yes, it's the Transfer and Assumption
3  Agreement.
4      Q.   And did you review this in connection
5  with preparing your report?
6      A.   Yes.
7      Q.   Do you see in the first "whereas"
8  clause on the first page where it says, "Lehman
9  is a clearing member of OCC and carries one or
10 more accounts (nos. 74, 84 and 273)"?
11     A.   Yes, I do.
12     Q.   And it defines that as "Account," with
13 a capital A?
14     A.   Yes.
15     Q.   Okay.  Is it your understanding that
16 the term "account" there encompasses the
17 accounts that you referenced in relation to
18 paragraph 70 of your report?
19     A.   I believe they use the same accounts,
20 yes.
21     Q.   If you go down to paragraph 1(b) on
22 that same page, do you see where it says,
23 "Barclays hereby accepts such sale, assignment,
24 and transfer of the Account, agrees to be bound
25 by and receive the benefits of maintaining such

Page 44

D. McIsaac

1
2  Account, and assumes and agrees to perform each
3  obligation arising out of or to be performed
4  with respect to the activity in the Account"?
5      A.   Yes.
6      Q.   Do you understand that to mean that
7  Barclays assumed settlement responsibility for
8  all of the positions in all of the Lehman's
9  accounts at the OCC?
10     A.   Yes.  I think Barclays assumed
11 clearance and settlement of all the accounts
12 there.
13     Q.   Okay.  And what is the basis for your
14 understanding that Barclays -- withdrawn.
15         Is it fair to say that Barclays was
16 responsible for settling and clearing the
17 positions in the 074F and 074M accounts
18 regardless of whether they were held on the firm
19 account on behalf of an affiliate?
20     A.   Yes, they would have been responsible
21 for settling and clearing and liquidating if
22 need be.
23     Q.   Does that mean that on short positions
24 that were held on behalf of affiliates Barclays
25 would have to advance any securities that were

Page 45

D. McIsaac

1
2  owed or advance any cash that was owed on an
3  exercise or an assignment of one of those
4  positions?
5          MR. OXFORD:  Object to the form.
6      A.   It means they would have either
7  settled the transactions if they were called or
8  closed them out.
9      Q.   You say in your report that Barclays
10 charged back the LBI estate for the cost of
11 closing out affiliate positions.  Let me give
12 you the page reference.
13         If you turn to pages 26 and 27 of your
14 report, paragraph 66 on page 26, you say,
15 "Barclays did not assume any risk with respect
16 to LBI affiliate customers' futures positions."
17         Oh, wait.  I'm sorry.  Let me get to
18 the options positions because that's what we're
19 talking about now.
20         MR. OXFORD:  I think it's probably
21 page 21, Trish, you're looking for.
22         MS. BLOOMER:  Thank you.
23     Q.   You say in paragraph 51 that Barclays
24 has charged back the LBI estate for the cost of
25 maintaining and closing out those positions.

Contains Highly Confidential Portions

Page 46

D. McIsaac

1  D. McIsaac
2  You see that?
3      A.  Yes.
4      Q.  What is -- is the Dziemian declaration
5  that you cite here the only factual basis for
6  that statement?
7      A.  I believe there's a schedule that I
8  saw that had those amounts in it.  I'm not sure
9  if it came from Dziemian's declaration or where
10  else it might have come from, but his
11  declaration did say they were charging them
12  back.
13          MS. BLOOMER:  I think maybe this is a
14      good time to take a first break and that way
15      I can pull an extra document that I missed.
16          MR. OXFORD:  Okay.  That would be
17      great.  Thanks.
18          THE VIDEOGRAPHER:  The time is 10:25.
19      We're going off the record.
20          (Recess.)
21          THE VIDEOGRAPHER:  This is the start
22      of tape number 2.  The time is 10:43.  We
23      are back on the record.
24  BY MS. BLOOMER:
25      Q.  Welcome back, Mr. McIsaac.

Page 47

D. McIsaac

1  D. McIsaac
2      A.  Thank you.
3      Q.  I want to show you a document -- I
4  think we're going to have to mark this.  It's
5  already been marked, but I don't have the marked
6  copy.  So, Exhibit 685.
7          (Exhibit 685, Declaration of Daniel
8      Dziemian, marked for identification, as of
9      this date.)
10      Q.  I'm showing you a document that's
11  marked as Exhibit 685, Mr. McIsaac.  We were
12  looking before the break at paragraph 51 of your
13  expert report in which you state that Barclays
14  has charged back the LBI estate for the cost of
15  maintaining and closing out those positions.
16          You see that?
17      A.  Yes.
18      Q.  Okay.  And which positions precisely
19  were you referring to in this statement?
20      A.  Let me just see.  I guess it would be
21  non-PIM customer transactions.
22      Q.  Okay.  Would that include affiliates?
23      A.  Yes.
24      Q.  And you cite the Dziemian declaration
25  at paragraphs 12 and 14 through 16 as the

Page 48

D. McIsaac

1  D. McIsaac
2  support for that statement.
3          Can you review those paragraphs and
4  tell me where in this declaration it suggests
5  that Barclays charged back the LBI estate for
6  the cost of maintaining and closing out the
7  affiliate positions?
8      A.  I presume it's in paragraph 14.
9      Q.  And what portion of the paragraph?
10      A.  The fourth or fifth line down, "The
11  net effect of the close-out and liquidation of
12  all positions and equities relating to the 074C
13  LBI Affiliate Options on the LBI Bridge Account
14  is a net receivable from LBI to Barclays in the
15  amount of $80 million."
16      Q.  And are you assuming in that statement
17  that a net receivable on the LBI Bridge Account
18  is the equivalent of charging back the estate
19  for the cost of closing out those options?
20          MR. OXFORD:  Objection to the form.
21      A.  If you record a receivable, I assume
22  you think somebody's going to pay you for that,
23  yes.
24      Q.  Do you understand what the purpose of
25  the LBI Bridge Account was?

Page 49

D. McIsaac

1  D. McIsaac
2      A.  I'm -- by the words there, I assume
3  it's a bridge account between two entities or
4  between two systems.  On one side you book --
5  you may book the receivables.  On the other side
6  you book the payables.
7      Q.  Okay.  If you look at paragraph 13, it
8  says, "The bridge accounts were necessary to
9  account for the fact that the settlement bank
10  and the settlement depository as of
11  approximately September 23, 2008, were switched
12  to Barclays while the accounts of these
13  customers and affiliates remained with LBI."
14  You see that?
15      A.  Yes.
16      Q.  Is it possible that the bridge account
17  was necessitated by accounting concerns and the
18  need to process trades on both sides on a system
19  as opposed to because Barclays was charging back
20  the estate for any of those costs?
21      A.  Could you repeat --
22          MR. OXFORD:  Object to the form.
23      A.  Sorry.
24          Could you repeat the last part?
25  Because I don't understand the part where you

Page 50

D. McIsaac

1
2 talked about charge back, the way you said it.
3    Q.   Okay.  Is it possible that the bridge
4 account was necessitated by accounting concerns
5 and the need to process trades on both sides on
6 a system as opposed to because Barclays was
7 charging back the estate for any of those costs?
8         MR. OXFORD:  Same objection.
9         MR. GREEN:  Objection.
10    A.   If they were booking them on both
11 sides, then wouldn't they be charging them back?
12 If they were taking responsibility for them,
13 then they would have written them off to an
14 expense, not a receivable.
15    Q.   Okay.  Did you review Gary Romain's
16 deposition testimony in preparing your report?
17    A.   I believe I read it, yes.
18    Q.   Okay.  I'm going to mark this exhibit
19 as Exhibit 686.
20         (Exhibit 686, Deposition of Gary
21    Romain, marked for identification, as of
22    this date.)
23    Q.   You have in front of you Gary Romain's
24 deposition testimony.  Can you turn to page 141,
25 please?

Page 51

D. McIsaac

1
2    A.   Do you want your copy back?
3    Q.   Pardon?  I realize it's yellow.
4    A.   That's fine.
5    Q.   I wanted to direct you to that portion
6 of it, so it's fine.  Thank you.
7         Do you see the portion that's boxed in
8 that deposition transcript?
9    A.   Yes.
10    Q.   And do you see where Gary Romain says
11 that "we had written off 100 percent of it and
12 in the acquisition accounting, but it's been
13 recorded as an expense, an expense being a
14 deduction from the negative goodwill on the
15 acquisition"?
16    A.   Let me read it, please.
17         MR. OXFORD:  And Mr. McIsaac, to the
18    extent you feel necessary to answer the
19    question, you should read as much as you
20    need of Mr. Romain's testimony.
21    Q.   In fact, perhaps it would be better
22 for you to start on page 139 at the bottom of
23 the page, line 22, when Mr. Romain starts
24 describing --
25    A.   Uh-huh.

Page 52

D. McIsaac

1
2    Q.   -- the accounting treatment on the
3 affiliate options that we've been discussing.
4         MR. OXFORD:  Thank you, Trish.
5    A.   Okay.  I've read it.  Can you repeat
6 your question?  I'm sorry.
7    Q.   Sure.  Do you see in on page 140 in
8 the answer provided on line 7 through 15 Gary
9 Romain says, "So if you look at the payments
10 made to close out positions and for some OCC
11 related-costs, the total payment made by
12 Barclays was $104 million and the receivable,
13 which might otherwise have been recognized, has
14 been written off"?
15    A.   Yes.
16    Q.   Did you read that in preparing your
17 report?
18    A.   I probably read this, this deposition,
19 so yes, I probably read this, right.
20    Q.   Is this inconsistent with your
21 understanding that Barclays charged back the LBI
22 estate for the cost of closing out affiliate
23 positions?
24    A.   My understanding, and even from
25 reading here, it looks like they recorded a

Page 53

D. McIsaac

1
2 receivable which was charging them back, they
3 didn't take them to P&L directly, and eventually
4 wrote them off.  Maybe they deemed them
5 uncollectable, I'm not sure why, but I don't
6 know why you would set them up as a receivable
7 if you were going to write them off if you
8 didn't -- if you were taking responsibility from
9 the start.  So Mr. Dziemian basically said that
10 they were being set up as receivables.
11    Q.   Would you agree that Barclays incurred
12 a cost of $104 million according to the record
13 facts that you've seen in this case on the
14 affiliate options positions in the 074C account?
15         MR. OXFORD:  Object to the form.
16    A.   I agree that's what Mr. Romain
17 says in his deposition.  I have not seen
18 anything to show me what the numbers are or had
19 anybody provide information, but that's what he
20 says here.
21    Q.   Do you have any reason to dispute or
22 doubt the fact that Barclays incurred costs in
23 closing out these positions?
24    A.   No, I do not.
25    Q.   Do you have any reason to believe that

Contains Highly Confidential Portions

Page 54

D. McIsaac

1
2 Barclays collected the amounts that it incurred
3 in closing out affiliate positions from the LBI
4 estate?
5     A.   No, I do not.
6     Q.   Do you believe that Barclays did
7 collect the costs from the LBI estate that it
8 incurred in closing out --
9     A.   I don't know if they did or didn't.
10    Q.   -- the LBI affiliate positions?
11        Please allow me to finish the
12 question.
13        -- in closing out the LBI affiliate
14 positions?
15    A.   I don't know if they collected or not
16 or presented a bill or not.
17    Q.   Is it your general understanding that
18 entities write off amounts that they were able
19 to collect?
20        MR. OXFORD:  Object to the form.
21    A.   No.  You usually write them off when
22 you think there might be a -- you may not be
23 able to collect them.
24    Q.   Do you have a general understanding of
25 the priorities in a SIPC liquidation with

Page 55

D. McIsaac

1
2 respect to creditor claims?
3     A.   I'm not a SIPC expert.  I have a
4 general understanding of the SIPC claims.
5     Q.   Are you an expert in Customer
6 Protection Rules?
7     A.   Yes.
8     Q.   What's your understanding of where
9 customers fall in terms of priority when they
10 have claims against a SIPC Trustee or an estate
11 and bank in SIPC proceedings relative to general
12 Creditors?
13        MR. OXFORD:  Object to the form.
14    A.   I believe SIPC customers have first
15 priority to the assets in the customer estate
16 and then share rateably with the general
17 Creditors if there's not enough -- not enough
18 moneys in the general estate to satisfy them.
19    Q.   Is it your understanding that the LBI
20 estate has sufficient assets currently to cover
21 all customer claims?
22        MR. OXFORD:  Object to the form.
23    A.   I don't know if they have or don't
24 have.  I think that's still being assessed.
25    Q.   Is it possible that the reason

Page 56

D. McIsaac

1
2 Barclays wrote these expenses off is because
3 Barclays didn't expect it would ever be able to
4 recover these costs from the Lehman estate?
5     A.   I can't determine why Barclays wrote
6 them off.
7     Q.   Do you generally consider a
8 broker-dealer who is in SIPC proceedings to be a
9 good credit risk?
10    A.   No, I would not consider them a good
11 credit risk.
12    Q.   Would you extend credit to a
13 broker-dealer in SIPC liquidation?
14    A.   Would I extend credit to them after
15 they were in liquidation?
16        MR. OXFORD:  Object to the form.
17    A.   Sorry.
18        Probably if it was court-approved, I
19 think there's some way where the court can
20 approve you providing credit to a liquidated
21 estate, but no, in general terms, I wouldn't.
22    Q.   Why not?
23    A.   Because you have a bankrupt estate
24 that you don't know the creditworthiness of
25 whether or not you'll be paid.

Page 57

D. McIsaac

1
2     Q.   Do you think -- do you have any reason
3 to believe that Barclays thought it would be
4 paid by the LBI estate for losses it incurred on
5 affiliate positions that it took clearance
6 responsibility for?
7         MR. OXFORD:  Object to the form.
8         MR. GREEN:  Objection.
9     A.   Again, I don't know what was in
10 Barclays' mind and what they thought when they
11 wrote off the receivables.  I'm not sure what
12 the basis was.
13    Q.   Would you agree that your report
14 characterizes the level of risk associated with
15 affiliate positions to be minimal, if it existed
16 at all?
17        MR. OXFORD:  Object to the form.
18    A.   Yes, I think it says it's less risky
19 because the credit is borne by the affiliates,
20 the market risk is borne by the affiliates, and
21 that I believe Barclays was not taking
22 responsibility for any affiliates' positions.
23    Q.   But you agree that Barclays was taking
24 settlement responsibility for those positions?
25    A.   It appears that in the TAA that they

Page 58

D. McIsaac

1 took settlement responsibility for them.
2 Q.   And are you aware of the financial
3 state of the LBI affiliates themselves during
4 the month of September 2008?
5      MR. OXFORD: Object to the form.
6 A.   I believe some of them were in
7 liquidation and some of them may not have been.
8 Q.   Would you consider them a credit risk
9 at that time?
10      MR. OXFORD: Object to the form. You
11 mean any time in September?
12 Q.   Sure. We'll start with any time in
13 September.
14 A.   I don't know what the credit risk
15 would have been in September prior to anybody
16 going into liquidation, what the analysis would
17 have been, and people will take risk based on
18 what the rewards they think they will receive.
19 Q.   What reward was Barclays receiving by
20 agreeing to take over settlement responsibility
21 for the affiliate positions?
22 A.   Maybe the business that was there and
23 maybe they were willing to take on an additional
24 risk to -- to get the customer business and

Page 59

D. McIsaac

1 whatever other business was there.
2 Q.   Were they going to see any profit from
3 taking over the affiliate positions themselves?
4 A.   When you take over a business, not
5 every piece of it may be profitable. So you may
6 accept some risk to get the profitable pieces of
7 it. I don't know why they assumed the
8 responsibility for the affiliates if they didn't
9 want them.
10 Q.   Earlier you were describing
11 transactions in which you conducted due
12 diligence in one of your prior companies, and
13 you explained that the acquirer spent a week to
14 several weeks reviewing the customer base to
15 determine which customers it wanted and which
16 customers it didn't?
17 A.   Uh-huh.
18 Q.   Do you believe that Barclays had
19 adequate time during the week of September 15,
20 2008 to review all of the customers that it was
21 acquiring or not acquiring from LBI?
22      MR. OXFORD: Object to the form.
23 A.   It possibly didn't have time to review
24 all the customers, but it certainly had time to

Page 60

D. McIsaac

1 review the affiliates and could have determined
2 that they didn't want to take the affiliate
3 accounts if that was the case.
4 Q.   What is your understanding of what
5 would have happened in the event that Barclays
6 had refused to take responsibility for the
7 affiliate positions?
8 A.   I don't know what would have happened
9 if they refused to take responsibility for it.
10 Q.   Is it your understanding that the
11 affiliate positions were commingled at the OCC
12 with firm positions and also with customer
13 positions?
14 A.   Yes.
15 Q.   Is it your understanding that there
16 were both affiliate and firm positions in the
17 074F account at the OCC?
18 A.   Yes.
19 Q.   And is it your understanding that
20 there were affiliate positions commingled with
21 customer positions in the 074C account at the
22 OCC?
23 A.   Yes.
24 Q.   What is your understanding of the

Page 61

D. McIsaac

1 position that the OCC took during the week of
2 September 15 with respect to Lehman Brothers as
3 a clearing member?
4      MR. OXFORD: Object to the form.
5 Vague.
6 A.   I'm not sure what position the OCC
7 took with regard to them. You know, I thought
8 they were going on as business as usual. They
9 looked like they were clearing their trades and
10 assigning their trades, so I don't see any -- I
11 haven't seen anything that says what the OCC did
12 or didn't do.
13 Q.   Do you have any basis to say what
14 would have happened to LBI's accounts with the
15 OCC if Barclays had refused to take over
16 settlement responsibility for those accounts?
17 A.   I don't have a basis, but I assume the
18 OCC would have liquidated the accounts.
19 Q.   Why do you assume that?
20 A.   Because Lehman was bankrupt at the
21 time or was entering into SIPC liquidation, so I
22 think the OCC as a first move would liquidate
23 the accounts. It doesn't mean that various
24 positions in those accounts couldn't be

Contains Highly Confidential Portions

Page 62

D. McIsaac

1  transferred to another broker-dealer.
2
3      Q.   Do you know how much time Barclays and
4  Lehman had to negotiate the terms of this
5  transaction before they entered into the APA?
6      A.   No, I do not.
7      Q.   Would it surprise you to hear that it
8  was less than 24 hours?
9          MR. OXFORD:  Object to the form.  You
10  can answer.
11      A.   It would -- wouldn't surprise me or
12  not surprise me.  Lehman was in financial
13  difficulty at that time and there were reports
14  in the papers that a lot of people were looking
15  at Lehman from time to time.  So I have no idea
16  when Barclays started to look at it and
17  determined what they wanted to do.
18      Q.   You didn't review that in connection
19  with this report?
20      A.   Review?  What would I have reviewed to
21  say that?  I'm asking what -- what would I have
22  reviewed?
23      Q.   I understand that you're asking that,
24  but I'm asking you what did you review in order
25  to understand the circumstances in which this

Page 63

D. McIsaac

1  deal was negotiated?
2
3      A.   I read the Asset Purchase Agreement.
4  I read the Clarification Letter.  I read the
5  TAA.  You know, I read some e-mails that went
6  around.  As a general knowledge of what was
7  happening in 2008, you know, I lived it.
8      Q.   Okay.  So is it fair to say that you
9  prepared your report without knowing the amount
10  of time that it took Lehman -- that Barclays and
11  Lehman had to negotiate the APA?
12      A.   I didn't specifically find out how
13  much time they took to negotiate it and I don't
14  know what that has to do with what we're talking
15  about.  I'm not sure what the timing, you know,
16  has to do with what they decided or what they
17  didn't decide to do.  They certainly didn't have
18  to do it, I don't think, at any point in time.
19  There was not a gun held to their head, I don't
20  believe.  I mean, unless I didn't -- there's
21  more information than I know.
22      Q.   Uh-huh.  So when you prepared your
23  opinions in your report, did you believe it was
24  possible that the parties had spent more than a
25  week negotiating the terms of the APA?

Page 64

D. McIsaac

1
2          MR. OXFORD:  Object to the form.
3      A.   I don't think I gave much thought to
4  how much time they spent negotiating it.  I
5  understand the timing of what was happening
6  around then.  I don't know how long they were
7  talking about the APA, what conversations they
8  may have had during the time period.  I don't
9  believe that's public information.
10      Q.   Were you allowed to ask questions of
11  fact witnesses during your investigation?
12      A.   I --
13          MR. OXFORD:  I'll object to the form
14  of the question.
15      Q.   Okay.  Go ahead.  You can answer.
16          MR. OXFORD:  I'm not sure in terms
17  of --
18      Q.   Did you talk to anybody -- let me
19  rephrase the question.
20          MS. BLOOMER:  Thanks, Neil.
21      Q.   Did you talk to anybody who was
22  involved in the negotiation of the transaction?
23      A.   No, I did not.
24      Q.   Did you speak with the advisors who
25  were present at the time?

Page 65

D. McIsaac

1
2      A.   No, I did not.
3          MR. OXFORD:  Sorry.  If you can slow
4  down, Mr. McIsaac, to let me get my
5  objection.
6          I'll object to the form of the
7  question and particularly to the vagueness
8  of the term "advisors."
9      Q.   Okay.  When did you speak with
10  Deloitte?
11          MR. OXFORD:  Object to the form.
12      A.   Regarding?  Excuse me, regarding what?
13      Q.   You said earlier today that in
14  preparing for your deposition today you spoke
15  with Deloitte.  Was that the first time that you
16  spoke with them?
17      A.   Deloitte is the financial advisors for
18  the Trustee.  In working on the original work I
19  did with the motion, I spoke to Deloitte, if
20  that's what you mean, but not in relation to
21  this.
22      Q.   Okay.  Was Deloitte present, to your
23  understanding, during the negotiations of this
24  deal?
25      A.   I don't believe they were, but I don't

Contains Highly Confidential Portions

Page 66

D. McIsaac

1          D. McIsaac
2    know.
3        Q.    Did you ask them?
4        A.    No, I did not.
5        Q.    Did you ask them any of the
6    circumstances under which the deal was
7    negotiated?
8        A.    No, I did not.
9        Q.    Did you ask anyone what the
10   circumstances were of the deal at the time it
11   was negotiated?
12       A.    I think I understand what was going on
13   in the environment at that time.  I don't think
14   I had to ask specifically what was happening in
15   the environment at that time.  It was a rough,
16   you know, a difficult time and I don't know if
17   Barclays had one day or five days or how long
18   they were reviewing the transaction.
19       Q.    You don't know if it was ten days?
20       A.    I don't know if it was ten days.
21       Q.    And you don't know if it was a month
22   that Barclays had to review the transaction?
23       A.    That's right.
24       Q.    Okay.
25       A.    But that doesn't change my thoughts on

Page 67

D. McIsaac

1          D. McIsaac
2    it because whether or not you had one day or
3    ten, you could still decide to buy something or
4    not buy something.  You can decide what you want
5    to buy and what you don't want to buy.
6        Q.    Can you remind me, if you haven't
7    testified to this already -- strike that.
8            What is the shortest amount of time
9    that you've ever seen an acquisition of a
10   broker-dealer business consummated in?
11           MR. OXFORD:  Object to the form.
12       A.    I believe Bank of America bought
13   Lehman Brothers over a weekend.
14       Q.    Do you know how long -- did they spend
15   any time negotiating that transaction prior to
16   that weekend?
17       A.    All I know is what I read in the
18   papers, and I thought Bank of America was
19   thinking of buying Lehman and instead bought
20   Merrill at that point in time.  I thought the
21   negotiations happened over a weekend.
22       Q.    Do you know whether they had done due
23   diligence prior to that weekend?
24       A.    I don't know.
25       Q.    Do you have any knowledge at all of

Page 68

D. McIsaac

1          D. McIsaac
2    the negotiations that took place during the
3    structuring of that deal?
4        A.    No, I do not.
5        Q.    With respect to the deals that you
6    have personal knowledge of, what's the shortest
7    amount of time that you know of in which an
8    acquisition of a broker-dealer business took
9    place?
10           MR. OXFORD:  Object to the form.
11           Vague.
12       A.    I -- I've been involved in some
13   acquisitions and mergers that I don't know how
14   much time was spent in doing the negotiation.
15   When UBS and Swiss Bank merged, I have no idea
16   how long it took for them to do the due
17   diligence and decide on the merger.
18       Q.    What's the shortest amount of time
19   with respect to a transaction that you do have
20   an idea of how long it took?
21       A.    Probably a month or so.
22       Q.    You say in your report that the
23   circumstances of this transaction don't affect
24   your opinion.  Do you recall saying that in your
25   report?

Page 69

D. McIsaac

1          D. McIsaac
2        A.    I believe so.
3        Q.    Okay.  The fact that this transaction
4    closed in 24 -- was negotiated in 24 hours
5    doesn't have any impact on your opinion as to
6    what was rational under those circumstances in
7    terms of structuring the terms of the deal?
8            MR. OXFORD:  Objection.
9        Q.    Is that your opinion?
10           MR. OXFORD:  Object to the form.
11           Assumes facts not in evidence.
12       A.    I believe it was negotiated.  It
13   didn't have to close, and until such time as it
14   closed, there was still negotiations and I
15   assume due diligence going on.
16       Q.    Is it your understanding that an
17   agreement can be negotiated after it's executed?
18       A.    An agreement can be -- I don't -- I'm
19   sorry, I'm not sure where you're going on that.
20   "After it's executed," I'm not sure.
21       Q.    Sure.  Do you agree that the parties
22   would have negotiated the terms of the deal
23   before they signed a binding agreement that
24   expressed and set forth the terms of that deal?
25           MR. OXFORD:  Object to the form.

Contains Highly Confidential Portions

Page 70

D. McIsaac

1  You can answer.
2  A.   I'm sorry.  I believe firms negotiate
3  a shell of a deal and then usually negotiate the
4  specifics.  Until a final contract is signed and
5  it's consummated, that is not, you know, it's
6  not a closed deal.
7  Q.   Showing you a document that's been
8  premarked as Exhibit 630.
9  Can you take the time to review this
10  e-mail and let me know when you're ready?
11  (Document review.)
12  A.   Yes.
13  Q.   Did you review this document in
14  preparing for your deposition today?
15  A.   I believe I might have seen this.  I
16  don't remember exactly, but I might have seen
17  this e-mail trail.
18  Q.   And had you reviewed this document at
19  the time you prepared your expert report on
20  exchange-traded derivatives?
21  A.   I thought I just answered that.  I
22  think I might have reviewed this when I -- when
23  I prepared it.
24  Q.   Oh, I was asking you whether you

Page 71

D. McIsaac

1  reviewed it when you prepared for the deposition
2  today --
3  A.   Oh, no.
4  Q.   -- was my first question.
5  A.   No, no, I did not review it before
6  today, for preparation today.  I might have
7  reviewed it in preparing my report.
8  Q.   You're not sure?  You might --
9  A.   I believe I've seen this.  I know I've
10  seen the top of it.  I don't know if I've seen
11  the whole other trail.
12  Q.   Okay.  If you turn to the second page,
13  will you look at the paragraph that's
14  denominated paragraph 3?
15  A.   Uh-huh.
16  Q.   It says, "If the transaction does not
17  close tonight, OCC would need to immediately
18  liquidate and close out the LBI accounts and is
19  preparing to do so."  Do you see that?
20  A.   Yes.
21  Q.   You see that this is an e-mail from
22  James McDaniel of Sidley?
23  A.   Uh-huh.
24  Q.   And it's to Ed Rosen of Cleary

Page 72

D. McIsaac

1  Gottlieb.  Do you know who Ed Rosen is?
2  A.   Yes.  He's a lawyer for Cleary
3  Gottlieb.
4  Q.   And do you know who Cleary Gottlieb
5  was representing in this transaction?
6  A.   I believe they were representing
7  Barclays.
8  Q.   And you see Hughes Hubbard is also
9  copied on these e-mails, Giddens and Kobak?
10  A.   Uh-huh.
11  Q.   Do you know who they are?
12  A.   Mr. Giddens is the Trustee and Mr.
13  Kobak is his legal counsel, I believe.
14  Q.   Okay.  And you see that the SPIC
15  organization, Steve Harbeck, was also copied?
16  A.   Yes.
17  Q.   You said earlier in your testimony
18  that you don't think the parties had to do the
19  deal in any particular amount of time, and I
20  believe you said they didn't have a gun to their
21  head.  Do you recall that testimony?
22  A.   Yes.
23  Q.   Do you agree that this e-mail suggests
24  that there was some urgency to the parties in

Page 73

D. McIsaac

1  closing the deal in the timeframe that they did?
2  MR. OXFORD:  Object to the form.
3  A.   I believe the e-mail from the -- Mr.
4  McDaniel at Sidley Austin was relaying that to
5  Mr. Rosen.  Barclays still did not have to go
6  through with the deal if they didn't want to go
7  through with the deal.  I mean, again, nobody
8  was holding a gun to their head saying if you
9  don't do this, I'm going to shoot you.  They
10  could have walked away from it, I assume, at
11  that point in time or they could have postponed
12  the closing.  I don't know if they could have
13  done that, but --
14  Q.   Do you think they could have postponed
15  the closing and avoided liquidation of the OCC
16  account?
17  A.   I think you could have negotiated
18  anything with the OCC if they wanted to talk to
19  them about it.  I don't know what negotiations
20  were going on.  I don't know why this was being
21  pushed at this point in time.
22  I mean, Barclays, when I said they
23  didn't have a gun to their head, they could have
24  walked away from the deal at any point in time.

Page 74

D. McIsaac

1  D. McIsaac
2  If they didn't think they had enough time to do
3  the due diligence and to understand what they
4  were buying, they didn't have to buy it I guess.
5     Q.    And they didn't have to buy it if they
6  didn't like the terms of the deal either, right?
7     A.   Right.
8     Q.   You agree that the parties were aware
9  that the OCC was at least threatening to
10 liquidate the accounts on the 22nd if the deal
11 didn't close that morning?
12    A.   Yes.
13    Q.   Do you have any experience that would
14 allow you to surmise on what an OCC
15 liquidation -- how an OCC liquidation would have
16 proceeded?
17       MR. OXFORD:  Object to the form.
18    A.   I would assume they would either
19 auction the positions off or, you know, closed
20 them out.  I'm not sure how they would have
21 proceeded.  I'm not -- I have not seen one in my
22 past experience.
23    Q.   Any liquidation or any auction have
24 you seen?
25    A.   I have not seen a liquidation at the

Page 75

1  D. McIsaac
2  OCC.  I have not been involved in a liquidation
3  at the OCC.
4     Q.   Have you been involved in a
5  liquidation at any other clearing organization?
6     A.   I have not personally been involved,
7  no.
8     Q.   What is your understanding of what the
9  OCC's rights are in the event of a liquidation?
10       MR. OXFORD:  Object to the form.
11    A.   I believe they have the right to
12 liquidate the positions and charge back to the
13 clearing firm any losses they incur that's not
14 covered by the margin that they have available,
15 and if they don't, I assume -- I believe they
16 have the right to charge back to other members
17 of the clearing org.
18    Q.   Okay.  So you would agree then that
19 any margin that was posted at the OCC was
20 accessible to the OCC in order to cover the
21 costs of a liquidation?
22    A.   Yes.
23    Q.   And would you agree that all of the
24 margin posted at the OCC was accessible to the
25 OCC in the event that they wanted to auction off

Page 76

1  D. McIsaac
2  the positions instead of liquidating them?
3     A.   Yes.
4     Q.   Do you have any knowledge of any other
5  clearing organizations liquidating or auctioning
6  off positions?
7     A.   I believe that during the week I've
8  been informed that the CME auctioned off LBI's
9  positions.
10    Q.   Do you have any understanding of the
11 approach that the CME took to auctioning off the
12 positions?
13    A.   I haven't reviewed anything firsthand,
14 but I believe they took the various positions
15 and would have gone to other firms and asked
16 them to assume them.
17    Q.   And do you know what the CME was
18 offering in exchange for other members assuming
19 those obligations?
20    A.   No, I'm not, I'm not sure of the
21 negotiations that occurred with them.
22    Q.   Do you have an understanding of the
23 amount of money that was consumed in the auction
24 of the CME -- in the CME's auction of LBI's
25 proprietary positions?

Page 77

1  D. McIsaac
2       MR. OXFORD:  Object to the form.
3     A.   I have heard a number maybe a billion
4  dollars, but I don't know if I've seen the
5  actual documents.
6     Q.   I'm showing you a document that's
7  marked as Exhibit 442.  I certainly don't expect
8  you to read the whole document.
9     A.   Okay, good.  I was going to say can I
10 please get a brief recess if that's the case.
11    Q.   This is a copy of the hearing that
12 took place before Judge Peck in the bankruptcy
13 proceeding on September 19, 2008.  Have you had
14 occasion to review any portion of the sale
15 hearing transcript?
16    A.   I have reviewed this maybe six months
17 ago.
18    Q.   Can you turn to page 61, the full
19 paragraph on page 61 starting "Since the hearing
20 last Wednesday," and it continues, "and in the
21 space of roughly 24 hours, your Honor, there
22 have been a number of significant events.
23 Yesterday the Chicago Mercantile Exchange
24 unilaterally decided to close out all of
25 Lehman's positions on that exchange.  That

Page 78

```
                 D. McIsaac
 1
 2    closeout resulted in a loss to Lehman of
 3    approximately $1.6 billion." Do you see that?
 4        A.   Yes, I do.
 5        Q.   Do you recall, does this refresh your
 6    recollection --
 7        A.   Yes, I think this is probably where I
 8    saw it.
 9        Q.   Do you have any reason to doubt the
10    accuracy of the statement that's made on this
11    page?
12        A.   No, I do not.
13        Q.   So you'd agree that the Chicago
14    Mercantile Exchange closed out Lehman's
15    positions at a cost of $1.6 billion?
16            MR. OXFORD:  Object to the form.
17        A.   That's what it says here.
18        Q.   And that's what you believe happened?
19        A.   That's what I believe happened.
20            MR. OXFORD:  Object to the form.
21        Q.   What's your understanding of what a
22    SIPC trustee's objectives are when analyzing the
23    terms of a proposed bankruptcy sale?
24            MR. OXFORD:  I'll object to the form.
25        A.   I assume that they -- any sale is
```

Page 79

```
                 D. McIsaac
 1
 2    going to occur of any assets, they would have to
 3    make sure that they are protecting the customers
 4    and receive, you know, value for the assets
 5    they're selling.
 6        Q.   And is the customer -- is the
 7    preservation of value for customers the sole
 8    objective of a trustee, do you know?
 9            MR. OXFORD:  I'll object to the form
10    of the question.
11        A.   No, I don't think so.  I think they're
12    supposed to preserve the whole estate.
13        Q.   Are trustees also interested in
14    maximizing the number of customer accounts that
15    can be preserved and transferred to a solvent
16    broker-dealer?
17            MR. OXFORD:  Objection to the form.
18        A.   I believe both transfers are a
19    priority of SIPC.
20        Q.   Have you ever advised the SIPC trustee
21    in analyzing the terms of a proposed bankruptcy
22    sale?
23        A.   No, I have not.
24        Q.   Do you have any expertise in advising
25    on what the proper objectives are of a trustee
```

Page 80

```
                 D. McIsaac
 1
 2    in that circumstance?
 3            MR. OXFORD:  Objection to the form.
 4        A.   No, I do not.
 5        Q.   Is it your understanding that the
 6    proprietary positions in Lehman's OCC account as
 7    of the week of September 15 carried exposure?
 8            MR. OXFORD:  Object to the form.
 9        A.   All positions carry exposure.  I'm not
10    sure if I'm answering the question, your
11    question, but all positions, as far as I'm
12    concerned, carry exposure.
13        Q.   By transferring positions do you agree
14    that you're eliminating that exposure?
15            MR. OXFORD:  I object to the form.
16        A.   By the person transferring them?
17        Q.   Uh-huh.
18        A.   Yes, they would limit their exposure.
19        Q.   So you would agree that LBI and the
20    Trustee, by agreeing to transfer the proprietary
21    positions to Barclays, was eliminating any
22    exposure that it had on those positions?
23        A.   They would no longer have exposure on
24    those positions, I assume, after they have
25    transferred them.
```

Page 81

```
                 D. McIsaac
 1
 2        Q.   And would that be to the benefit of
 3    customers, to eliminate exposure to the -- to a
 4    SIPC trustee's estate?
 5            MR. OXFORD:  Objection to the form.
 6        A.   It would benefit customers if you were
 7    paid properly for them, yes.  So if you took
 8    exposure off and received consideration, then it
 9    would be good.  If you just took exposure off
10    and received no consideration, I don't know if
11    it would be good.  You'd have to analyze each
12    one separately.
13        Q.   That would depend on the value of the
14    positions at any given point in time, is that
15    fair to say?
16            MR. OXFORD:  Objection to the form.
17        A.   It would depend on the value of the
18    positions, the marketplace, you know, what --
19    what the impact of disposing of those positions
20    would have or the downside it could have.
21        Q.   If there's net exposure on a set of
22    positions that you transfer, would it be
23    irrational to do that for no consideration?
24            MR. OXFORD:  Objection to the form.
25        A.   When you say "net exposure," there's
```

Contains Highly Confidential Portions

Page 82

D. McIsaac

1
2   exposure, so would it be rational to transfer
3   them for no consideration?  I don't know at the
4   point in time.  I don't know -- the worst case
5   you could be is zero if you're long.  So not
6   getting anything for them, if you liquidate
7   them, gave them away for nothing or had them
8   liquidated, you would be at the same place, and
9   if the margin would cover any potential losses,
10  you might be better off having the OCC liquidate
11  them than give them away for free.
12      Q.   You testified earlier that you could
13  never guarantee that the margin would be
14  sufficient to cover exposures in a liquidation;
15  is that right?
16          MR. OXFORD:  Objection.  Misstates
17      testimony.
18      A.   Yes, I believe I said something to
19  that effect.
20      Q.   So would you agree that if you have
21  short positions, there's exposure that can't be
22  eliminated entirely unless you transfer the
23  positions?
24          MR. OXFORD:  Object to the form.
25      Misstates his testimony.

Page 83

D. McIsaac

1
2      A.   They could be liquidated the next day
3   and you would relieve your exposure.
4      Q.   I'm showing you an exhibit that's been
5   marked 676A.  Do you recognize this document?
6      A.   Yes, I believe I've seen this before.
7      Q.   Did you review it in preparing for
8   today's deposition?
9      A.   No, I don't believe so.
10     Q.   Did you review it at the time that you
11  prepared your report?
12     A.   Yes.
13     Q.   If you could turn to Exhibit 1 of this
14  document.  You see that Exhibit 1 shows the
15  margin requirements on dates from 9/15/2008
16  through 9/19/2008?
17     A.   Yes.
18     Q.   Okay.  And just so that I don't force
19  you to take this out of context, you should read
20  the paragraph where he describes what the
21  margin -- which margin requirements he's
22  referring to.  So if you look at --
23          MR. OXFORD:  Paragraph 6, I think.
24     Q.   -- paragraph 6 of Mr. Jones'
25  declaration, he says, "Exhibit 1 hereto shows

Page 84

D. McIsaac

1
2   for each day from September 15 through September
3   19, 2008, the total requirement at the open of
4   business for each day across all of LBI's OCC
5   accounts, the total value of collateral of the
6   open business of each day across all of LBI's
7   OCC accounts, and the excess or deficit at the
8   open of business on each day across all of LBI's
9   OCC accounts."  Do you see that?
10     A.   Yes.
11     Q.   Do you see that on between September
12  15 and September 16 the margin requirement for
13  the OCC accounts went from $789,583,205 to
14  $1,359,001,075?
15     A.   Yes, I see that.
16     Q.   Would you agree with me that's an
17  increase of over $500 million in a single day?
18     A.   Yes.
19     Q.   If you look two lines down from
20  September 17, 2008 to September 18, 2008, do you
21  see that the margin requirement went from
22  $1,400,000,000 and change to $2 billion, over $2
23  billion, do you see that?
24     A.   Yes, I see that.
25     Q.   Would you agree that that's over a

Page 85

D. McIsaac

1
2   $600 million increase in a single day?
3      A.   Yes.
4      Q.   You said a moment ago that the -- that
5   LBI could have liquidated the following day and
6   eliminated their exposure on their OCC accounts.
7   Do you recall that testimony?
8      A.   Yes.
9      Q.   Would LBI have been able to know for
10  certain that it would not -- strike that.  Would
11  LBI know for certain what the cost of
12  liquidating the account on the following day
13  would have been by looking at that day's margin
14  requirements?
15          MR. OXFORD:  Object to the form.
16     A.   Let me make sure I have your question
17  clear.  You're asking me as of the close of
18  business the 19th, would LBI have known what the
19  cost would be to close out their positions on
20  top day the 22nd?
21     Q.   Yes.
22     A.   They would know what the closing price
23  was on the 19th and use that as I guess a proxy
24  for what, you know, for what they could possibly
25  close it out and do some kind of an

Page 86

D. McIsaac

1  extrapolation on how they might impact the
2  market.
3  Q.   Okay.  And if the margin requirement
4  is a proxy for exposure and increased by $500
5  million, as it had on two other days this week,
6  would you agree that using Friday's close of
7  business number may not be an accurate way to
8  determine what the cost would be on Monday of
9  closing out the positions?
10  MR. OXFORD:  Objection.  Form.
11  A.   It's very difficult to determine that
12  because I believe the 19th was a triple-witching
13  day, so a lot of the exposures that were sitting
14  there would have been closed out close of
15  business.  I don't know if this margin
16  requirement is at the end of the day or the -- I
17  believe this is the beginning of the day on the
18  19th.
19  Q.   Uh-huh.
20  A.   So when all the options that they --
21  that were in their account were called, anything
22  that was expiring on the 19th would have had an
23  impact on this amount.  I don't know the balance
24  or the size of the positions they had that were

Page 87

D. McIsaac

1  expiring on the 19th, but again, I believe if I
2  remember Mr. Leitner's testimony, he looked at
3  the margin as being a proxy for the most they
4  could lose or the most that would cover
5  Barclays' exposure.
6  So, by looking at that, my guess this
7  would be the worst place LBI would be in if they
8  exposed.  So if they were looking to transfer
9  their assets, this might be a starting point for
10  negotiations but not necessarily the ending
11  point.
12  Q.   Okay.  Whose responsibility do you
13  understand it was to settle the trades that
14  occurred over the expiration weekend, Barclays
15  or Lehman's?
16  A.   I believe it was Lehman's.
17  Q.   You believe it was Lehman's?
18  A.   Barclays didn't sign the agreement
19  until the 22nd.  I believe they all settle over
20  the weekend.
21  Q.   And when would the pays and collects
22  from a weekend expiration be due?
23  A.   Monday morning, I believe, because you
24  can't pay anything on the weekend.

Page 88

D. McIsaac

1  Q.   And it's your understanding that
2  Lehman is the party that settled those weekend
3  expirations?
4  A.   I believe any settlements would have
5  had to occur because Barclays didn't own them at
6  that point in time.  So all of the settlement
7  transactions would have had to go through
8  Lehman, and I believe Lehman settled them all.
9  To my knowledge, I think that's what happened.
10  Q.   If that's inaccurate, would that
11  affect your opinion in any way?
12  MR. OXFORD:  Object to the form.
13  A.   Not necessarily, because I don't know
14  the size of it, although I thought I -- I
15  believe I saw some information that showed the
16  pay/collects being a significant pay-back to
17  Lehman on the 22nd or pay-back to the -- to the
18  holder of the account on the 22nd.
19  Q.   Would it be rational for Barclays to
20  accept the obligations on options expiring over
21  the weekend of September 20th and 21st for short
22  positions and yet not acquire the rights for any
23  profit and loss on long positions?
24  MR. OXFORD:  Object to the form.

Page 89

D. McIsaac

1  A.   I'm not sure -- please rephrase it.
2  I'm not sure where -- what the question is
3  asking.
4  Q.   Sure.  There were long positions and
5  short positions both in LBI's --
6  A.   Right.
7  Q.   -- OCC accounts; is that right?
8  A.   Right.  Okay.  Yes.
9  Q.   And any short positions that were
10  exercised over the weekend of September 22 --
11  20th and 21st would have resulted in a loss to
12  the clearing member; is that right?
13  MR. OXFORD:  Objection to form.
14  A.   Not necessarily.  If they had the
15  assets to deliver against the ex -- the
16  exercise, there would be no loss.
17  Q.   And if they didn't have the assets to
18  deliver and they had to acquire them at the then
19  market rates?
20  A.   If they had marked them --
21  MR. OXFORD:  Wait.  I'm sorry.  Can
22  you just let me get my objection in?
23  THE WITNESS:  I'm sorry.
24  MR. OXFORD:  I'll object to the form.

Contains Highly Confidential Portions

Page 90

D. McIsaac

1  
2    You can answer.  Thank you.
3    A.    If they would have been marking their
4  positions to market, they would have, I assume
5  already, recorded those losses.
6    Q.    When do you think that Lehman recorded
7  the losses that occurred over the weekend of
8  September 20th and 21st?
9    A.    I believe you would record those
10 effective the 19th because that's the option
11 expiration date.  At that point in time, you
12 know what your locked-in is on your gains and
13 losses.  You would do that on a daily basis --
14   Q.    And when --
15   A.    -- of the market movement.
16   Q.    I apologize for interrupting you.
17        And when would Lehman make the payment
18 on those trades?
19   A.    I would assume the next business day.
20   Q.    And so you're assuming that Lehman
21 paid any amounts due to settle short options
22 that were in its account over the weekend of
23 September 20th and -- 20th and 21st?
24        MR. OXFORD:  I'll object to the form.
25   A.    I assumed that not everything is cash

Page 91

D. McIsaac

1  
2  settled so they might have delivered securities
3  against those exercised calls or puts, and on
4  the cash settle piece, that the pay/collect
5  would occur on Monday morning.  And if they
6  didn't have securities to deliver, they would
7  have to go out and buy the securities and make a
8  delivery.
9        MR. OXFORD:  Trish, we've been going
10 about another hour.  I don't know if this is
11 a good time to take a five-minute break.
12        MS. BLOOMER:  This is actually a good
13 time.  That would be fine.  Off the record.
14        THE VIDEOGRAPHER:  The time is 11:36.
15 This is the end of the tape labeled number
16 2. We're going off the record.
17        (Recess.)
18        THE VIDEOGRAPHER:  This is the start
19 of the tape labeled number 3.  The time is
20 11:57.  We are back on the record.
21 BY MS. BLOOMER:
22   Q.    Mr. McIsaac, could you turn in your
23 report to page 7, please.  The first full
24 sentence at the top of the page --
25   A.    Give me one second.  One second.

Page 92

D. McIsaac

1  
2    Q.    Sure.
3    A.    Okay.
4    Q.    The first full sentence at the top of
5  the page, you say, "The circumstances of the
6  transaction between Lehman and Barclays do not
7  change my opinions in this matter."
8        What circumstances were you referring
9  to in that sentence?
10   A.    The timing of everything happening,
11 the -- I think Mr. Leitner was talking about how
12 much time, you know, it took the quickness of
13 the negotiations.
14   Q.    Any other circumstances that you
15 were --
16   A.    No.  I mean, the marketplace, you
17 know, everything that was happening at the time.
18   Q.    Anything other than the timing and the
19 marketplace that you were -- that you had in
20 mind when you said the circumstances of --
21   A.    No, I think just the market, what was
22 happening in the market at the time --
23        I'm sorry.
24   Q.    Are there any circumstances other than
25 the timing and the marketplace that you had in

Page 93

D. McIsaac

1  
2  mind when you said "the circumstances of the
3  transaction between Lehman and Barclays do not
4  change my opinions in this matter"?
5    A.    No.  Basically that was it.
6    Q.    With respect to the timing, what was
7  your understanding of the circumstances?
8    A.    I believe that it was negotiated in
9  a -- it didn't have, you know, three or four
10 months of negotiations, as far as I know.  It
11 was done fairly quickly, although I don't know
12 how much time and how much due diligence was
13 done along the way.
14        Lehman had been in trouble for a
15 while, so I'm assuming a lot of firms were doing
16 some things, reviewing it to determine, you
17 know, if there was a, you know, a good place to
18 go in and buy and, you know, there possibly was
19 the Lehman executives might have been shopping
20 the firms.  I don't know what happened, but I do
21 know that a lot of things happened fairly
22 quickly.
23   Q.    Were you assuming that Barclays had
24 plenty of time to do due diligence before
25 settling on the terms of the transaction it was

Contains Highly Confidential Portions

Page 94

D. McIsaac

1      willing to enter into?
2             MR. OXFORD:  Objection to the form.
3         A.   I don't know how much time Barclays
4      had to do due diligence.  I don't know how long
5      they were talking to Lehman and what information
6      they had.
7             And they were buying pretty much the
8      whole entity, so, you know, it's not like they
9      had to do due diligence on certain things.  It
10     was a viable entity.  It wasn't capital -- it
11     had adequate capital.  You know, it didn't
12     appear that they were buying the broker-dealer,
13     that there was that much of a concern around it.
14     The customers were the customers.  I don't know
15     if there was any major concern on the customers
16     they had.
17        Q.   Do you have an understanding of what
18     the value of the entity was that Barclays was
19     acquiring?
20            MR. OXFORD:  Objection to the form.
21        A.   I believe if I looked at the August
22     Focus that was not filed, it showed a net -- a
23     net equity of I want to say 3 to 5 billion, if I
24     remember properly, correctly.

Page 95

D. McIsaac

1         Q.   What was that number?
2         A.   3 to 5 billion.
3         Q.   What, in your opinion, would be a
4      typical amount of time for an entity to take
5      doing due diligence on an acquisition the size
6      of this one?
7             MR. OXFORD:  Objection to the form.
8         A.   I don't know how much time it would
9      take.  They ended up buying certain businesses,
10     the customers' businesses, they bought assets
11     like the buildings, things of that nature, and
12     they bought some positions.  How much time, I
13     don't know.  I don't know how much time they
14     spent knowing what was going on.
15            In the Lehman case, you know, Lehman
16     was not in, from what I understand, capital,
17     severe capital -- it was a liquidity crunch, and
18     Lehman was having problems getting the
19     information, getting the money they needed to
20     support their assets.  It didn't mean they
21     didn't have good assets, it didn't mean the
22     business was crumbling, it just meant they were
23     having a liquidity crunch.
24            I worked at Drexel.  I saw what

Page 96

D. McIsaac

1      happened to Drexel.  It didn't necessarily mean
2      the broker-dealer had a problem.  There was
3      illiquidity at the parent company, and that
4      trickles down.
5         Q.   Do you mean to suggest that there was
6      not a significant amount of risk that Barclays
7      was encountering in acquiring this business?
8             MR. OXFORD:  Object to the form.
9         A.   I didn't say there wasn't a
10     significant amount of risk.  I think there was a
11     discernible amount of risk.  I think that buying
12     customer positions, customer business, not that
13     risky a business.  Looks like they didn't buy
14     the prime broker, which would have been the more
15     risky of the customer businesses.
16            Futures clearing is not what I would
17     consider a very risky business.  They bought
18     certain assets, again, not everything that was
19     what I consider ultimately, you know, extremely
20     risky.
21        Q.   You're not an expert in risk
22     management or risk assessment; is that right?
23            MR. OXFORD:  Objection to the form.
24        A.   General knowledge of risk I have.  I'm

Page 97

D. McIsaac

1      not a quant.  I don't, you know, determine the
2      value what risk for a firm.  I understand what
3      assets are risky, what assets are not risky at a
4      firm, what businesses are risky, what businesses
5      are not risky, and I think, you know, in a firm
6      of this size, it was a top, you know, three or
7      four broker-dealer in the country for a long
8      period of time.  So, yes, there were risks
9      there, but I think they were quantifiable.
10        Q.   Do you know how long it would take to
11     assess the risk profile in a set of equities
12     positions and options positions that was $70
13     billion on the long side and $69 billion on the
14     short side?
15            MR. OXFORD:  Object to the form.
16        A.   I don't think equities were the total
17     70 and 69.  I think there were a portion of
18     that.  I think a large portion of that inventory
19     was government securities.
20        Q.   Do you know how much government
21     securities were in that versus equities versus
22     exchange-traded derivatives?
23        A.   I believe at one point in time I saw
24     something that sort of broke it down, but I

Page 98

D. McIsaac

1
2    don't remember exactly, but I believe equities
3    were probably maybe 10 billion range.
4        Q.    Would you have experience that would
5    qualify you to assess the risk profile
6    associated with a set of positions of that size?
7        MR. OXFORD:  Object to the form.
8        A.    On a daily basis they are required to
9    maintain capital.  They have to assess their
10   capital every day.  Part of their capital is
11   assessing the risk.  They were on a daily basis
12   assessing the risk of their capital.  You could
13   have easily used that information to determine
14   where the risk was and, you know, from that
15   standpoint, yes, determine the risk.  When I
16   file reports, I'm looking at the risk of the
17   firm.
18       Q.    When you described the circumstances
19   of the transaction between Lehman and Barclays
20   on page 7 of your report, did you consider among
21   those circumstances the options that Lehman had
22   to the deal with Barclays?
23       MR. OXFORD:  Object to the form.
24       A.    The options that Lehman had?  I guess
25   Lehman could have decided to sell or not sell.

Page 99

D. McIsaac

1
2        Q.    Could they have decided to sell to a
3    different entity?
4        A.    I'm sure they could have.
5        Q.    Could you pull Exhibit 442 out.
6    That's the sale hearing transcript.
7        A.    Uh-huh.
8        Q.    And turn to page 101.
9        A.    Yes.
10       Q.    If you read the first three paragraphs
11   or, you know, if you need to read a little bit
12   more to get context.
13       (Document review.)
14       A.    Okay.
15       Q.    In the second paragraph, it says,
16   "And, yet, he would say nobody has expressed an
17   interest to step into the shoes of -- excuse me,
18   step into the shoes of Barclays, your Honor."
19   The next paragraph says, "Lehman has not
20   received any other interest since the
21   commencement of the Chapter 11 cases."  And it
22   goes on to say, "If Lehman was approached by
23   another potential buyer that he would consider
24   the offer, provided that the company had
25   sufficient liquidity to operate the business

Page 100

D. McIsaac

1
2    without jeopardizing customer accounts.  That
3    has not happened, your Honor.  So it is almost
4    academic."  Do you see that?
5        A.    Yes, I do.
6        Q.    Had you read this testimony in
7    preparing for your -- or, in preparing your
8    expert report?
9        A.    I read this report in the -- when I
10   first started working with the Trustee regarding
11   the motion, the motion on the 3-3.
12       Q.    You testified a moment ago that you
13   were sure Lehman could have sold the assets to a
14   different buyer.  Does this refresh your
15   recollection at all on the circumstances that
16   Lehman was facing at the time?
17       A.    This says they have no buyers.  It's
18   Chapter 11.  The Fed was providing them with
19   liquidity earlier in the week before Barclays
20   stepped into the shoes.  The Fed could have
21   continued to provide liquidity while they were
22   looking for another purchaser.
23       That has happened before.  If they
24   stepped in the shoes once before, I assume
25   things could have been done, still been done in

Page 101

D. McIsaac

1
2    that fashion.
3        Q.    Do you agree that the court is being
4    told at the September 19th sale hearing that it
5    is almost academic for Lehman to find another
6    potential buyer at that point?
7        A.    That's what it looks like here, yes,
8    but I --
9        Q.    And if you --
10       A.    Excuse me.  But it also says they
11   weren't marketing the firm in the first
12   paragraph on that page.  So maybe if they did,
13   they might have been able to find other buyers.
14       Q.    Okay.  Can you read the second
15   paragraph for me?  "That notwithstanding the
16   lack of a specific program for marketing, the
17   sale of Lehman's broker-dealer business has been
18   known worldwide.  And, yet, he would say nobody
19   has expressed an interest to step into the shoes
20   of -- excuse me, step into the shoes of
21   Barclays, your Honor."
22       A.    Uh-huh.
23       Q.    Do you see that?
24       A.    Yes.
25       Q.    Do you agree that the speaker in this

Contains Highly Confidential Portions

Page 102

D. McIsaac

1  D. McIsaac
2  testimony is suggesting that they were not able
3  to find another buyer for the business?
4      A.    No, I believe he's saying that it was
5  known that the business might be for sale and
6  nobody else has stepped up, but I believe the
7  first paragraph says that they were not going
8  out and marketing the sale of the business.
9      Q.    Do you have any understanding of why
10 they weren't going out and marketing the
11 business?
12     A.    No, I do not.
13     Q.    Could it be because they didn't have
14 time to market the business because the
15 transaction needed to close by the following
16 Monday?
17     A.    This says the business has been known
18 worldwide, so I don't know why it had to
19 close -- I don't know what happened that made it
20 have to close within a week's period.
21     Q.    Okay.
22     A.    If I looked at the financial
23 statements that were not filed but prepared, it
24 looked like they had adequate capital for the
25 broker-dealer.

Page 103

D. McIsaac

1  D. McIsaac
2      Q.    Okay.  Can you turn to page 73.  If
3  you review where the court asks a question in
4  the middle of the page, "In order for this
5  transaction to be optimally closed from the
6  perspective of SIPC, when should it close?  Does
7  it need to close this weekend before the markets
8  open on Monday?"
9      A.    I'm sorry, I lost where you're
10 reading.
11     Q.    Page 73.
12     A.    Yes, I'm on 73.  I see, "The Court:
13 Let me ask a question."
14     Q.    Oh, the next statement.
15     A.    I'm sorry.
16         (Document review.)
17     A.    Uh-huh.  Okay.
18     Q.    So you see where Mr. Caputo says to
19 the court, in response to the court's question,
20 "As soon as possible it needs to close.  The
21 sooner the better."  Do you see that?
22     A.    Yes.
23     Q.    On the following page, the court asks,
24 "Would it be your position on behalf of your
25 client that, assuming the transaction, the sale

Page 104

D. McIsaac

1  D. McIsaac
2  transaction that has been proposed to me today
3  is approved, that the approval should happen
4  before the close of today's hearing?  In other
5  words, we should stay here as late as we need to
6  in order to get this done?"  And Mr. Caputo
7  says, "Yes, your Honor.  That would be our
8  recommendation."  Do you see that?
9      A.    Yes.
10     Q.    Does this suggest to you that the
11 transaction under contemplation did not need to
12 close by Monday, September 22, 2008?
13     A.    I believe in the prior response by Mr.
14 Caputo he said as soon as possible, and nothing
15 was forcing Barclays to close this agreement.
16 They did not have to do it if they didn't think
17 they had done sufficient due diligence to -- to
18 mandate a purchase of an asset like this.
19     Q.    Would you agree that at this sale
20 hearing, which you read the transcript of, the
21 parties were telling the court that it was
22 critical to get this deal done within a matter
23 of days?
24         MR. OXFORD:  Object to the form.
25     A.    I believe that's what was said here.

Page 105

D. McIsaac

1  D. McIsaac
2  I don't -- I haven't read anything here, or I'd
3  have to go back and read the whole thing, of
4  what Barclays was saying why it would be
5  critical for Barclays to get it done.
6      Q.    Do you believe that you are in a
7  better position than the parties who were
8  negotiating this deal and representing it to the
9  court to determine the urgency of the closing of
10 this transaction?
11         MR. OXFORD:  Object to the form.
12     A.    No, I think the urgency was on
13 Lehman's side, not necessarily on Barclays'
14 side.  Barclays, if they didn't feel they had
15 done enough due diligence and didn't feel they
16 had adequate time to review it, didn't have to
17 go through with it at that point in time.
18     Q.    Would you agree that in a transaction
19 where one party has an urgency to complete a
20 deal and another party doesn't, that there is a
21 disparity in bargaining power as between those
22 two entities?
23         MR. OXFORD:  Objection.
24     A.    Yes, but I'm not sure which way.  If I
25 don't sell it, what happens?  I'm out of

## Page 106

1              D. McIsaac
2  business.  If I sell it, I'm still out of
3  business.
4         So if the parent company is selling
5  the business or if the broker-dealer, they're
6  selling the business, they have a decision to
7  whether or not they sell it or not sell it.  You
8  know, this isn't a sale where I'm trying to sell
9  something and, you know, just get rid of some
10 bad assets and go on.
11     Q.    And we saw earlier that the OCC had
12 threatened to liquidate LBI's accounts if it
13 didn't close this transaction by the 22nd of
14 September; is that right?  Do you recall that?
15     A.    Yes, but the one thing the OCC said
16 they would liquidate was that the customer and
17 proprietary or just the customer -- just
18 proprietary accounts?
19     Q.    Sure, we can look at the exhibit
20 together.  It was Exhibit 630.
21     A.    Uh-huh.
22     Q.    And it was on the second page under
23 paragraph 3, and it says, "OCC would need to
24 immediately liquidate and close out the LBI
25 accounts, and is preparing to do so."

## Page 107

1              D. McIsaac
2     A.    Right, but I, after -- I don't
3  remember which -- I think you showed me this and
4  then you showed me something from the CME, and
5  the CME just liquidated the proprietary
6  accounts.  It didn't liquidate the customers.
7     Q.    The OCC wasn't drawing a distinction
8  in that, do you see that?
9     A.    Well, I don't know if they were -- it
10 says "the accounts," so I'm assuming they meant
11 all, but it looks like, you know, they could
12 have drawn the same distinction that the CME did
13 and just liquidate the proprietary business if
14 they were concerned.
15     Q.    They could have?
16     A.    Yes.
17     Q.    But that's not what they're indicating
18 in this paragraph, would you agree?
19     A.    That's not what it looks like the
20 counsel was stating.
21     Q.    If the Lehman Trustee believed that a
22 liquidation of the OCC accounts would result in
23 a depletion of all of the posted margin, would
24 it have been rational for the LBI Trustee to
25 agree to transfer those accounts to Barclays in

## Page 108

1              D. McIsaac
2  exchange for the posted margin?
3         MR. OXFORD:  Objection to the form.
4         Assumes facts not in evidence.
5     A.    If they looked at it and I guess
6  assumed that they would lose whatever the number
7  was, let's say $2 billion, or transferred
8  something like $2 billion, yes, it would make, I
9  guess, sense to do it or, you know, if there was
10 a better good to be had by it, but I don't know
11 if that analysis was done.  You said it was a
12 very short time, so I'm not sure if they had
13 time to analyze that.
14     Q.    If you turn in your report to page 6,
15 you say in paragraph 18 that, "In addition to
16 the net asset value, I would expect a purchaser
17 to pay a premium based on the anticipated
18 earnings of the clearing business."  Do you see
19 that?
20     A.    Uh-huh.
21     Q.    Would you continue to have that
22 expectation in a circumstance in which there was
23 only one purchaser willing to acquire a
24 business?
25     A.    I would guess their negotiating powers

## Page 109

1              D. McIsaac
2  would not be the same, but I would still expect
3  some payment for an ongoing business that was
4  going to reap benefits for the purchaser.
5  Certainly the purchaser would want to get it for
6  nothing.  I think the seller would want to get
7  some value for the assets they were selling.
8     Q.    But as you said, if the seller
9  believed that it wasn't going to get value in
10 the alternative, then it would have been
11 rational to sell it for nothing in order to
12 preserve the customer positions; is that right?
13         MR. OXFORD:  Object to the form.
14     A.    I don't think I said that.
15         I'm sorry, could you read back my -- I
16 don't think I said that.
17     Q.    Earlier I asked you the question:  "If
18 the Lehman Trustee believed that a liquidation
19 of the OCC accounts would result in a depletion
20 of all of the posted margin, would it have been
21 rational for the LBI Trustee to agree to
22 transfer those accounts to Barclays in exchange
23 for the posted margin?"  And you said, "If they
24 looked at it and I guess assumed that they would
25 lose whatever the number was, let's say $2

| Page 110 |
|---|

D. McIsaac

1        D. McIsaac
2  billion, or transferred something like $2
3  billion, yes, it would make, I guess, sense to
4  do it or, you know, if there was a better good
5  to be had by it, but I don't know if that
6  analysis was done."
7     A.  Yes.
8     Q.  You also said, just for the sake of
9  completeness, you said it was a very short time
10  so I'm not sure if they had time to analyze
11  that.
12     A.  The Trustee in that case.
13     Q.  Yes.
14     A.  Yes.
15     Q.  So the question and answer that I just
16  asked you was, earlier I asked you the question,
17  if the Lehman Trustee believed that a
18  liquidation of the OCC accounts would result in
19  a depletion of all of the posted margin, would
20  it have been rational for the LBI Trustee to
21  agree to transfer those accounts to Barclays in
22  exchange for the posted margin, and you said
23  that if they looked at it and, I guess, assumed
24  that they would loose whatever the number was
25  and so on.

| Page 111 |
|---|

D. McIsaac

1        D. McIsaac
2     A.  Right.
3     MR. OXFORD:  Hold on.  Hold on.  Is
4  there a question?  You just have been
5  reading from the record, Trish, which you're
6  free to do, but if you could ask Mr. McIsaac
7  a question, then he could answer it.  I
8  think that's the traditional way to go.
9     Q.  If the Lehman Trustee believed that a
10  liquidation of the OCC account would result in a
11  depletion of all of the posted margin, would it
12  have been rational for the LBI Trustee to agree
13  to transfer those accounts to Barclays in
14  exchange for that margin?
15     MR. OXFORD:  Objection.  Asked and
16  answered.
17     You can answer it again.
18     A.  I think I answered that question.  You
19  posed another question when you went back to
20  read that.
21     Q.  Unfortunately, I'm not able to find it
22  online.
23     A.  Okay.  That's the question you asked
24  that I didn't think was the same as that
25  question.

| Page 112 |
|---|

D. McIsaac

1        D. McIsaac
2     Q.  Are acquirers, in your experience,
3  generally willing to pay a premium if they are
4  the only potential acquirer for a business and
5  they know that going into a negotiation?
6     MR. OXFORD:  Objection to the form.
7     A.  I haven't been in negotiations where
8  that would be the case, but you still would
9  expect to pay some value for getting value.  I
10  would think the seller would want some value.
11     Q.  But a premium is valued -- what do you
12  define a premium to mean?
13     MR. OXFORD:  Object to the form.
14     A.  In my experience, you bought
15  businesses and paid a premium based on how much
16  you believe that that business will earn for you
17  over the next few years, and then that's the
18  base price plus you pay the net asset value of
19  the business you're buying if you're just buying
20  bits and pieces of the business.
21     So you pay a premium based on you,
22  know, potential benefits to your firm.  I
23  believe in some of the pages I was reading
24  through here in the futures world, I think
25  people doing the due diligence believed that

| Page 113 |
|---|

D. McIsaac

1        D. McIsaac
2  they would make $250 million in revenues over
3  the next year.  So there's a lot of value there,
4  so maybe they saw value where other people
5  didn't.
6     Q.  And would a reasonable -- would a
7  rational acquirer be willing to pay premium if
8  it believed paying a premium wasn't necessary to
9  close the deal?
10     MR. OXFORD:  Object to the form.
11     A.  I would assume they would try to get
12  value for nothing if they could.  So if you're
13  saying would they pay a premium if they didn't
14  have to, that would be negotiated and whether or
15  not the seller would be willing to sell it for
16  that price.
17     Q.  Can you turn to page 23 of your
18  report, please?  Actually, if you could start at
19  page 22.  I'd like to ask you some questions
20  about paragraphs 44 -- 54 and 55.
21     (Document review.)
22     A.  Okay.
23     Q.  In these two paragraphs you're talking
24  about the proprietary options positions that LBI
25  held in accounts at the OCC; is that right?

Page 114

1          D. McIsaac
2      A.   Yes.
3      Q.   At the end of paragraph 55, you say,
4  "Certainly a rational seller would not include
5  margin in a deal it was being compensated
6  dollar for dollar."  Do you see that?
7      A.   Uh-huh.
8      Q.   Can you explain what you mean by
9  "compensated dollar for dollar"?
10     A.   They were giving other assets and I
11 would assume they would be compensated for the
12 assets.  So if the value of the assets they were
13 giving was $100, I would expect them to be
14 compensated $100.
15          The deal was to buy the portfolio of
16 assets, not the margin that's posted to make
17 sure that the firm complies with its obligations
18 to the OCC.
19     Q.   So if there was, for example, a
20 billion dollars in the proprietary options
21 account posted as margin with the OCC, you
22 believe that it would have been irrational for
23 the Trustee to agree to transfer that account to
24 Barclays for anything less than that same
25 amount?

Page 115

1          D. McIsaac
2      MR. OXFORD:  Object to the form of the
3  question.
4      A.   I would expect the seller to look at
5  the portfolio of assets that they were selling
6  and to get the value for the portfolio of
7  assets.  So if they were selling long positions
8  and short positions, I would expect them to get
9  the net asset value for that, and if the buyer
10 wanted the margin that was posted in addition, I
11 would expect them to get the net asset value for
12 the margin.
13     Q.   Just so that I understand your
14 opinion, so if the positions in an account are
15 worth negative a billion dollars on net, and the
16 margin posted in an account were a billion
17 dollars, are you suggesting that it would have
18 been rational for the Trustee to transfer the
19 account with the margin because they were
20 offsetting positives and negatives?
21     MR. OXFORD:  Object to the form.
22 Misstates the witness's testimony.
23          You can answer again.
24     A.   I think what I said is there was a
25 portfolio of assets, and you would look at the

Page 116

1          D. McIsaac
2  net asset value of the portfolio of assets,
3  which was the long positions and the short
4  positions.  And I don't look at it just as the
5  options positions, I'd look at it as the whole
6  inventory positions that they were purchasing,
7  and they would pay value for what they were
8  buying.  If you were to include the posted
9  margin, I would expect to pay extra value for
10 that.
11     Q.   Dollar-for-dollar extra value?
12     A.   That's where I would start at least,
13 yes.
14     Q.   Would it be irrational to accept
15 anything less than dollar-for-dollar
16 compensation for the posted margin?
17     MR. OXFORD:  Object to the form.
18     A.   That would be at the point in time you
19 would negotiate what you want to sell it for.  I
20 would think it would be a negotiating point and
21 it would be expressed in the contracts what you
22 were buying and what you were receiving and how
23 much you were paying for it.
24     Q.   Would it be rational for LBI to
25 negotiate for compensation less than

Page 117

1          D. McIsaac
2  dollar-for-dollar compensation for the posted
3  margin?
4      MR. OXFORD:  Objection to the form.
5      A.   I don't think so, because if they were
6  getting net asset value, then you'd be almost
7  providing the downside protection for the
8  acquirer.
9      Q.   And the net asset value in the terms
10 of this transaction was what?
11     MR. OXFORD:  Object to the form.
12     A.   I believe there was 40 something
13 billion dollars of assets, less than that in a
14 repo liability that was assumed by Barclays, I
15 guess, and the long option value that I thought
16 was about $300 million.
17     Q.   So you are excluding from your
18 equation the negative value of the LBI affiliate
19 positions that were in the firm account at the
20 OCC?
21     A.   I believe they weren't buying the
22 affiliates business.  That's what I've seen.  So
23 I thought they were negotiating to buy LBI's
24 business and not the affiliates positions.
25     Q.   They were taking settlement

Contains Highly Confidential Portions

Page 118

D. McIsaac

1    responsibility for the affiliate positions as
2    well, you agree with that?
3        A.    From the TAA, yes.
4        Q.    Where do you think Barclays was going
5    to turn to recover the losses on the short
6    affiliate positions in that account?
7        MR. OXFORD:  Object to the form.
8        A.    I don't know where they would turn.
9    I'm not sure why they would have assumed them.
10       Q.    You saw that they assumed settlement
11   responsibility for all of the positions at the
12   OCC, correct?
13       A.    I see that they assumed it, yes.
14       Q.    Okay.  Would it have been rational for
15   Barclays to assume settlement responsibility for
16   those positions knowing that LBI was in SIPC
17   proceedings and would not be able to reimburse
18   it for the costs of liquidating those positions?
19       MR. OXFORD:  Object to the form.
20       A.    I think it would have been rational to
21   negotiate what you were doing with those
22   positions and, if you had to take over clearance
23   and settlement of them, negotiate how you were
24   going to be remunerated for that.
25

Page 119

D. McIsaac

1    Q.    Would it be rational for the Trustee
2    to agree to transfer the posted margin that
3    secured those positions in exchange for Barclays
4    taking on the exposure for those positions?
5        MR. OXFORD:  Objection to the form.
6    Asked and answered.
7        You can answer again.
8        A.    I don't think it would have been to
9    transfer $2 billion of margin to cover a
10   billion-dollar loss.  I don't think you would
11   transfer that much, no.
12       Q.    How about 1 billion, would that have
13   been rational for the Trustee to transfer?
14       A.    It might have been.
15       MR. OXFORD:  Object to the form.
16       THE WITNESS:  Sorry.
17       Q.    It might have been?
18       A.    It might have been.  At that point in
19   time, if they negotiated it and -- and, you
20   know, that's what the parties decided.
21       Q.    So it's not your opinion that it would
22   have been irrational under any circumstances for
23   Lehman or the LBI Trustee to transfer posted
24   margin to Barclays in exchange for taking
25

Page 120

D. McIsaac

1    settlement responsibility for the affiliate
2    positions; is that right?
3        MR. OXFORD:  Object to the form.
4        A.    I believe in my report I talked about
5    the proprietary positions.  If they're assuming
6    affiliate clearance and settlement of affiliates
7    positions, that would be something they should
8    negotiate.  You know, the parties there would
9    negotiate it and whatever they thought was valid
10   would be valid.
11       Would it be out of the realm to say,
12   yes, give me the market value of that?  No.
13       Q.    Would that be a rational resolution,
14   to give them the market value of that?
15       MR. OXFORD:  Object to the form.
16       A.    It would be rational to say this is
17   the cost of it, sure, or, you know, we'll
18   liquidate it, leave it in -- don't take those
19   positions, don't take that account.
20       I'm sure it could have been negotiated
21   with the OCC to transfer the customer accounts
22   separate from the proprietary accounts if that
23   was -- if that was everybody's desire.
24       Q.    If you could turn -- I'm showing you
25

Page 121

D. McIsaac

1    what has been marked as Exhibit 687.
2        (Exhibit 687, Trustee's Memorandum in
3    Further Support of His Motion for Relief
4    Pursuant to the Sale Orders or,
5    Alternatively, For Certain Limited Relief
6    under Rule 60(B) and in Opposition to the
7    Motion of Barclays Capital Inc. to Enforce
8    the Sale Orders and Secure Delivery of all
9    Undelivered Assets, marked for
10   identification, as of this date.)
11       Q.    If you could turn to page 60.  In
12   paragraph 136, the last two sentences, the
13   Trustee says in his brief, "For example, LBI
14   could have agreed to transfer to Barclays the
15   minimum margin assets that the OCC required to
16   secure LBI's liabilities to the OCC for LBI's
17   proprietary positions.  Such a transfer arguably
18   would have cost LBI little because, in any
19   event, LBI could not have withdrawn the minimum
20   margin assets required by the OCC to secure
21   LBI's open positions."  Do you see that?
22       A.    Yes, I do.
23       Q.    Do you agree with that statement?
24       A.    Can I read the whole two paragraphs?

Contains Highly Confidential Portions

Page 122

```
1              D. McIsaac
2      Q.  Uh-huh.
3          (Document review.)
4      MR. OXFORD:  Okay.  And Mr. McIsaac,
5   you should feel free, of course, not to just
6   read those paragraphs, but the whole of the
7   section to which Ms. Bloomer directs you.
8          (Document review continues.)
9      A.  Okay.  Now, I'm sorry, I've read it
10  now, so ...
11     Q.  Okay.  Directing you again to the last
12  two sentences of paragraph 136, do you agree
13  with the statement that, "LBI could have agreed
14  to transfer the minimum margin assets that OCC
15  required to secure all of the liabilities to the
16  OCC for LBI's proprietary positions"?
17     A.  In context, it says, for example, they
18  could have done it.  They have also said that it
19  could have been negotiated, so this was just one
20  example of things that could have occurred.
21     Q.  And in the next sentence, it says,
22  "Such a transfer arguably would have cost LBI
23  little because, in any event, LBI could not have
24  withdrawn the minimum margin assets required by
25  the OCC to secure LBI's open positions."  Do you
```

Page 123

```
1              D. McIsaac
2   see that?
3      A.  Yes.
4      Q.  Do you agree with that?
5      A.  In the context here, yes.
6      Q.  What do you mean in the context here?
7      A.  There's four paragraphs here
8   explaining things they could have been done if
9   it was negotiated.  All I've said all along is
10  this was something that should have been
11  negotiated and decided upon by the parties prior
12  to consummating the trade of the sale.
13     Q.  You said that the Trustee would have
14  been irrational to agree to transfer the posted
15  margin for anything less than dollar for dollar,
16  isn't that right?
17     A.  For the proprietary --
18     MR. OXFORD:  Object to the form.
19  Misstates the witness's testimony.
20      You can answer.
21     A.  I was talking about proprietary
22  assets.  I don't know if this was talking about
23  all the proprietary assets.  The proprietary
24  assets at the OCC, my understanding, were net
25  long positions.
```

Page 124

```
1              D. McIsaac
2      Q.  This says that the transfer would have
3   cost -- would arguably have cost LBI little
4   because LBI could not have withdrawn the minimum
5   margin assets required by the OCC to secure
6   LBI's open positions.
7          Could the Trustee have withdrawn the
8   minimum margin requirements required by the OCC
9   to secure the affiliate positions in the firm
10  account?
11     A.  No, I do not believe so.  Because
12  they're in the account, they could not withdraw
13  any of the minimum margin requirements.
14     Q.  Could LBI have withdrawn the minimum
15  margin assets required by the OCC to secure
16  LBI's customer accounts?
17     MR. OXFORD:  Object to the form.  Do
18  you have a specific timeframe in mind,
19  Trish?
20     MS. BLOOMER:  No, I don't.
21     A.  I don't think they could have
22  withdrawn any of the minimum margin requirements
23  at that point in time.
24     Q.  For the customer accounts either?
25     A.  For the customer accounts or the
```

Page 125

```
1              D. McIsaac
2   proprietary accounts.
3      Q.  Outside of the OCC, could LBI have
4   withdrawn the minimum margin assets required by
5   other clearing organizations or clearing brokers
6   to secure LBI's open positions?
7      A.  When you say "outside the OCC," what
8   are you referring to?  A little bit -- it's a
9   very broad statement outside --
10     Q.  Sure.  I'll give an example.  Your
11  understanding -- do you understand that LBI had
12  a customer account open at the CME at the time
13  the transaction closed?
14     A.  Yes.
15     Q.  Okay.  Could LBI have withdrawn the
16  minimum margin assets required by the CME to
17  secure LBI's customer accounts?
18     A.  No.
19      I'm sorry.
20     MR. OXFORD:  Sorry.  Withdrawn.
21     A.  No.
22     Q.  And at any other place where there
23  were open customer or proprietary accounts could
24  LBI have withdrawn the minimum margin assets
25  required to secure those open positions?
```

Page 126

D. McIsaac

1
2       A.   I don't believe they could have.
3  You're making it broad, so I don't want to make
4  a general statement, but my understanding, no,
5  they could not have.  But it didn't mean they
6  had to give them away either.
7       Q.   Okay.  The sentence says that "a
8  transfer arguably would have cost little because
9  LBI could not have withdrawn the minimum margin
10 assets required to secure the positions."
11           Would you agree that that same
12 sentence applies not just to proprietary, but to
13 any accounts for which LBI could not withdraw
14 the minimum margin assets required?
15           MR. OXFORD:  Object to the form.
16           You can answer.
17      A.   I would say the minimum margin
18 requirements as it relates to the exposure of
19 the positions would be transferred as long as
20 they were not -- did not get adequate protection
21 elsewhere.  So in the second part where they
22 talk about the customers' margin positions,
23 the -- Barclays in the transfer of the
24 customers' accounts I believe had adequate
25 protection against the customers fulfilling

Page 127

D. McIsaac

1
2  their obligations.  So, transferring those, they
3  already got the margin that was provided by the
4  customers to support that.
5       Q.   I'm showing you what has been marked
6  as Exhibit 659A.  If you could review the e-mail
7  and the first attachment to the e-mail.
8  Specifically, I would direct your attention to
9  the first full paragraph on page 2 of the
10 letter.
11           (Document review.)
12      A.   You said the first two paragraphs,
13 right?
14      Q.   I said the first full paragraph.
15      A.   I'm sorry, I read the first two, okay.
16      Q.   On page 2.
17      A.   Oh, on page 2.  Okay.  Sorry.
18           (Document review.)
19      A.   Yes, okay, I've read those paragraphs
20 that start "pursuant to."
21      Q.   Okay.  Now, in this paragraph
22 Barclays' counsel is writing to the CFTC about
23 the customer accounts that LBI is going to be
24 transferring.  Do you understand that reference
25 in the context of this letter to be referring to

Page 128

D. McIsaac

1
2  the futures customer accounts?
3       A.   Yes.
4       Q.   The second sentence of that paragraph
5  says, "Some of these accounts are accounts that
6  contain no open commodity positions and accounts
7  that are in deficit, within the meaning of
8  Regulations 190.06(e)(1)(iv) and (v)," and then
9  "17 C.F.R. Section 190.06(e)(1)(iv) and (v),
10 respectively."  Do you see that?
11      A.   Yes.
12      Q.   What do you understand this to mean
13 when it says that "some of these accounts are
14 accounts that are in deficit"?
15      A.   That would be accounts that had -- you
16 had a receivable from the customer that exceeded
17 any assets he had on deposit with you as the
18 firm.
19      Q.   Okay.  And you said in the answer to
20 the last question that Barclays had adequate
21 protection against the customers fulfilling
22 their obligations.  Were you assuming that the
23 customer margin accounts were not in deficit?
24      A.   Are we talking about in the futures
25 sense?

Page 129

D. McIsaac

1
2       Q.   Uh-huh.
3       A.   In the futures sense, even if you're
4  in deficit, the firm -- the FCM is required to
5  make up that deficit to protect all the
6  customers that are not in deficit.  So they
7  would have to lock up additional collateral.
8  They're responsible for all the customers that
9  they owe -- they have an obligation to where
10 they owe them money or owe them net equity to
11 cover them in their lockup.  The deficits -- the
12 customers or deficits, they would be required to
13 top them off in the second secured calculation.
14      Q.   The customers would be required to --
15      A.   No, the firm would be required to top
16 them off.
17      Q.   And if the firm was required to top
18 off any deficits, is it your understanding that
19 that would constitute customer property to which
20 Barclays was entitled under the terms of this
21 transaction even though it wasn't property
22 deposited by any customer?
23           MR. OXFORD:  Object to the form.
24      A.   The way the seg and secured
25 calculation works, you have a requirement on the

Page 130

1            D. McIsaac
2    top and you have where the assets are on the
3    bottom. The requirement would add back to your
4    requirement that deficit. So you'd be required
5    to lock up all moneys owed to all customers.
6    Q.    Including money that the customers had
7    not deposited?
8    A.    They would add it back.
9        MR. OXFORD:  Object to the form.
10   Q.    And when Barclays took over
11   responsibility for these accounts, did it
12   inherit those requirements?
13       MR. OXFORD:  I object to the form.
14   A.    Yes.
15   Q.    And if there were margin deficits in
16   the customer accounts, what protection did
17   Barclays receive in this transaction if it
18   didn't receive any of the LBI assets that were
19   held in those accounts, that were held in the
20   customer's segregated and secured accounts?
21       MR. OXFORD:  Object to the form.
22   Misstates his testimony. Assumes facts not
23   in evidence.
24       THE WITNESS:  I'm sorry, can I answer
25   or --

Page 131

1            D. McIsaac
2        MR. OXFORD:  Yes.
3        THE WITNESS:  I'm sorry.
4        Two things could have happened: They
5    could have decided not to take the customers
6    that were in deficit and had them
7    liquidated, liquidated them on the spot, and
8    they would have been topped up for that
9    potential loss by the firm making sure that
10   they covered the requirement which would
11   have been all the obligations to customers.
12   Q.    I'm sorry, can you -- what was the
13   second option? You said two things could have
14   happened. I don't understand your answer. Can
15   you --
16   A.    They could have decided not to take
17   those customers.
18   Q.    Okay.
19   A.    Or, if they did take them, could have
20   liquidated their positions and closed them out.
21   Q.    If there was a margin deficit, were
22   they protected in the event of a liquidation to
23   the full extent of the exposure on the
24   positions?
25   A.    They would have --

Page 132

1            D. McIsaac
2        MR. OXFORD:  Object. Object to the
3    form.
4    A.    Sorry. They would have had some
5    minimal exposure from the time that the market
6    closed on one day to the market opened on the
7    next to liquidate the positions.
8    Q.    How do you know that the exposure is
9    minimal if you don't know the size of the margin
10   deficit?
11   A.    The positions are marked to market
12   every day. You have protected all of the
13   clients who have -- that you owe money to. You
14   have locked up -- all of that money has been
15   locked up. Then you go and you would liquidate
16   those accounts.
17       Whatever the cost is, because it's
18   marked to market every day, you only have that
19   fraction of from the time the market closed to
20   the time the market opened and you were able to
21   liquidate to lose any money on the liquidation.
22   And you could make money on the liquidation.
23   Q.    But as the acquiring broker-dealer,
24   isn't it true that you're only, in your opinion,
25   under the structure of this transaction,

Page 133

1            D. McIsaac
2    entitled to the customer property that was held
3    by LBI to secure those customer positions?
4    A.    And that customer property is what it
5    would be locked up as assets pertaining to the
6    customer. That's for the obligations of the
7    customer. So you start out with your net
8    customer balances, you add back any deficits
9    that aren't fully secured, and that's your
10   obligations to your customers. And that's what
11   they would get in a transfer.
12   Q.    Okay. So they would get property in a
13   customer's seg and secured account that wasn't
14   necessarily a customer's property; is that
15   right?
16   A.    No, it would be the customer's
17   property. The customers gave you $100. You'll
18   return -- they -- you have to set aside that
19   $100 for the customers.
20   Q.    If the customer account is in a margin
21   deficit, does that mean you have a receivable as
22   opposed to actual cash in that account?
23   A.    Yes. And but for the customers that
24   you owe moneys to, you have to lock up all of
25   that money. So if a customer gives you $100 and

Page 134

D. McIsaac

1    another customer is in deficit for $50, you have
2    to lock up $100.  So you would be transferring
3    all the assets that belong to the customers.
4          You would then liquidate -- you would
5    also transfer whatever assets the customer's in
6    deficit because he may have securities -- he may
7    have a receivable of $20 and secured for $10.
8    You would have some security against it, but
9    your exposure is only between the time of
10    liquidation, from the close of the market to the
11    open of the market to liquidate that account.
12       Q.    And that size of that exposure would
13    depend on the quantity and size of the customer
14    positions as well as the market volatility; is
15    that right?
16       A.    It would depend on a lot of things.
17    It also may be a very good receivable because
18    maybe the customer went in deficit for a market
19    move and he'll make -- he'll meet his call
20    tomorrow morning.
21       Q.    If the customer positions were to, on
22    net, drop in value between the day of the
23    closing and the following day, is it fair to say
24    that Barclays was exposed to the full risk of

Page 135

D. McIsaac

1    the amount of drop in value and did not receive
2    protection against that risk from the customer
3    property that it received?
4          MR. OXFORD:  Object to the form.
5          Assumes facts not in evidence.
6       A.    Are we talking about just the customer
7    who's in deficit or are we talking about the
8    whole customer?
9       Q.    Any customer.
10       A.    No, there would be no difference for
11    the other customers because you have market
12    movement and you make market calls.  Customers
13    are required to meet their margin calls every
14    day.  Usually, a firm will have excess margin
15    there to cover themselves.  If they lose money,
16    they bring in money and you -- you use that
17    money to pay the exchanges.
18       Q.    And that assumes that the customers
19    are creditworthy and pay their margin calls; is
20    that right?
21       A.    That assumes that the customers meet
22    their margins calls.  If they don't meet their
23    margin call, you liquidate them.
24       Q.    Would you agree that credit risk is

Page 136

D. McIsaac

1    more substantial in a volatile market?
2          MR. OXFORD:  Object to the form.
3       A.    I think credit risk is dependent on
4    who your counterparties are.  I believe, from
5    what I saw in the due diligence done by the
6    Barclays people, that it was mainly
7    institutional customers that were in their
8    futures business.  Based on that, I would tend
9    to think that they would be viable
10    counterparties to meet their obligations.
11       Q.    Is credit risk greater in a recession
12    than it is in a -- under stable market
13    conditions?
14          MR. OXFORD:  Object to the form.
15       A.    The credit risk is dependent on the
16    customer and the positions they have.  They
17    could be betting that the market goes down and
18    making a ton of money.
19          So I don't know what the positions
20    that the customers had, in what markets they
21    were trading, and what effect that was happening
22    at September 19 that would have affected
23    individual customers' positions, you know, so
24    there was I don't believe a recession on

Page 137

D. McIsaac

1    September 19, but I don't know.
2       Q.    Do you -- did you base your opinion on
3    the understanding that there was not a recession
4    as of September 19, 2008?
5       A.    It doesn't matter to me if there was
6    or wasn't or if we were or were not in a
7    recession.  People pay their bills when they're
8    in a recession and when there's not a recession.
9    These are not individual customers, primarily.
10    These are institutions, from what I've
11    understood.
12       Q.    So it has no bearing on your opinion
13    that the country was in a recession -- if the
14    country were in fact in a recession at the time
15    this transaction was negotiated?
16       A.    It would matter what the customers had
17    and the positions they had and who the customers
18    were.
19       Q.    Would it matter at all to your
20    opinion, at all to your opinion, whether or not
21    there was a recession at the time that this deal
22    was negotiated in terms of assessing the risks
23    associated with the transaction?
24       A.    You assess the risk of the customers

## Page 138

D. McIsaac

1  and the market environment at that point in time
2  and the customer's position. I don't know if a
3  recession has anything to do with the viability
4  of a futures customer paying their margin
5  requirements.
6    Q.   You just said you assess the risk of
7  the customers and the market environment at that
8  point in time. Are you agreeing that the market
9  environment at that point in time is relevant to
10  an assessment of the risks associated with a
11  transaction of the type that Barclays
12  consummated with Lehman Brothers in September of
13  2008?
14      MR. OXFORD: Object to the form.
15    A.   The market environment in relation to
16  the positions that the customers had on. If the
17  market's going down and the customers were
18  betting that the market is going to go down,
19  they're not a credit risk. So you have to
20  analyze the customers, the types of positions
21  they are, their familiarity with the market, and
22  your belief on where the market goes and whether
23  or not you have adequate collateral.
24    Q.   Okay. I'm going to try to ask the

## Page 139

D. McIsaac

1  question one more time, and if you could just
2  answer the question that I'm asking.
3    Would it matter at all to your opinion
4  whether or not there was a recession at the time
5  that this deal was negotiated in terms of
6  assessing the risks associated with the
7  transaction? Would that matter to your opinion?
8      MR. OXFORD: Object to the form. It's
9  been asked and answered a number of times.
10    You can answer it again.
11    A.   I would not care if there was a
12  recession in analyzing individual customer's
13  ability to meet their obligations.
14    Q.   Thank you.
15      MR. OXFORD: Trish, if you can let me
16  know when you think it's a good time to
17  break for lunch? It's 1.
18      MS. BLOOMER: Just like five more
19  minutes, if that's okay with everyone.
20      MR. OXFORD: If it's okay with Mr.
21  McIsaac, it's okay with me.
22      MS. BLOOMER: Okay. Thanks.
23    Q.   Could you turn back in your expert
24  report to page -- oh, I'm sorry. Could you turn

## Page 140

D. McIsaac

1  in the Trustee's brief, which was Exhibit --
2      MR. OXFORD: 687.
3    Q.   687.
4      MS. BLOOMER: Thanks, Neil.
5    Q.   To page 60.
6    A.   Page 60.
7    Q.   We were talking earlier about the
8  sentence in the Trustee's brief in which they
9  say that a transfer to Barclays of the minimum
10  margin assets required by the OCC to secure
11  LBI's open positions would arguably have cost
12  LBI little. Do you recall earlier discussing
13  that?
14    A.   Yes.
15    Q.   Are you aware that the margin
16  requirements at the OCC were shifting by $500
17  million a day during the week of September 15 on
18  multiple days?
19      MR. OXFORD: Objection to form.
20    Misstates --
21    A.   I believe --
22      MR. OXFORD: -- the record.
23    A.   Sorry.
24    I believe you showed me a document

## Page 141

D. McIsaac

1  that showed it going up and then drastically
2  down on the 19th.
3    Q.   Perhaps we can look at that document.
4  I believe it was the declaration of Craig Jones.
5    A.   Right, Exhibit 1.
6    Q.   In Exhibit 1.
7    Do you recall that between the 15th
8  and the 16th the margin requirement went up by
9  over $500 million, do you see that?
10    A.   Yes, I do.
11    Q.   And then between the 17th and 18th --
12  well, between the 16th and the 17th it went up
13  another 45 million or so dollars, do you see
14  that?
15    A.   Uh-huh. Yes.
16    Q.   And then it goes up over $600 million
17  between the 17th and the 18th?
18    A.   Yes.
19    Q.   So between the 15th and the 18th, you
20  see that the margin requirement increased by
21  over $1.2 billion?
22    A.   Yes, I see that.
23    Q.   Okay. And then it dropped by
24  approximately $400 million on that last day of

Contains Highly Confidential Portions

Page 142

1  D. McIsaac
2  the week, do you see that?
3  A.  Yes.
4  Q.  Would it have been rational for the
5  Trustee, assuming he was aware of the swings in
6  the margin requirements, to believe that it
7  would have arguably cost LBI little to transfer
8  even more than the minimum margin assets given
9  the risk that those margin requirements could
10 increase dramatically over the following day
11 after the transaction?
12 MR. OXFORD:  Object to the form.
13 Assumes facts not in evidence.
14 A.  I believe you would have to assess
15 what your exposure was there, assess whether or
16 not the margin requirements might have been
17 inflated by the OCC for whatever reason, and
18 determine what your potential risk or what you
19 think the risk is and negotiate from there.
20 Q.  Regardless of whether the OCC's margin
21 requirements were inflated or what the reason
22 for them was, you agree that LBI couldn't
23 withdraw anything beyond -- anything that would
24 bring the posted margin below the minimum margin
25 assets required, right?

Page 143

1  D. McIsaac
2  A.  Correct.
3  Q.  And you see that the margin
4  requirements increased by $1.2 billion in a
5  matter of four days during the week of September
6  15, correct?
7  A.  I see that they increased and then
8  decreased.
9  Q.  Would it be rational for a seller, in
10 light of these margin requirement movements,
11 during the week of September 15, 2008, to
12 believe that there was a risk that the margin
13 requirements would increase again substantially
14 on September 22 and September 23?
15 MR. OXFORD:  Object to the form.
16 Assumes facts not in evidence.
17 A.  In light of triple-witching day, I
18 don't know if -- if LBI was putting on
19 additional positions during the week or the
20 positions that would close out on Friday would
21 have -- what impact they would have on the
22 margin requirement.
23 I can't answer a question of where I
24 think the margin requirement is going to go
25 without having any idea what the positions were

Page 144

1  D. McIsaac
2  and how they had them already covered.  Maybe
3  the margin requirement was on shorts that we had
4  long positions already sitting in the account
5  and they would have been covered.
6  Q.  Do you know how many positions were in
7  the proprietary accounts at the OCC?
8  MR. OXFORD:  Object to the form.  Do
9  you have a particular day?
10 MS. BLOOMER:  On the 19th of
11 September.
12 A.  I believe there were tens of thousands
13 of positions in there that date that included
14 the affiliates, subordinated affiliates
15 accounts.
16 Q.  So if a Trustee were to want to
17 assess -- or, if LBI, I apologize, were to want
18 to assess the impact that the expiration weekend
19 would have on the margin requirements, how long
20 would it take the LBI -- LBI to conduct that
21 analysis?
22 MR. OXFORD:  Object to the form.
23 A.  I would assume LBI, if their systems
24 were like any other systems on the street, would
25 have been able to analyze that fairly quickly.

Page 145

1  D. McIsaac
2  They -- they have risk systems that would
3  quantify this and they would know what their
4  exposure was as of close of business.
5  MS. BLOOMER:  I think this is probably
6  a good time to take our break for lunch.
7  MR. OXFORD:  Okay.  Thanks.
8  THE VIDEOGRAPHER:  The time is 1:05.
9  This is the tape labeled number 3.  We're
10 going off the record.
11 (Luncheon recess.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 146

D. McIsaac

1    D. McIsaac
2        AFTERNOON SESSION
3    DANIEL McISAAC, resumed and
4        testified further as follows:
5        THE VIDEOGRAPHER:  This is the start
6    of tape labeled number 4.  The time is 2:05.
7    We're back on the record.
8    EXAMINATION BY (Cont'd.)
9    MS. BLOOMER:
10    Q.   Good afternoon.
11    A.   Good afternoon.
12    Q.   I'm showing you a document that's been
13    marked as Exhibit 648.  This is a declaration
14    that was submitted by Eric Clark.  Are you
15    familiar with this declaration?
16    A.   I believe I've seen it, yes.
17    Q.   And did you see it preparing for your
18    deposition today?
19    A.   I think I might have seen it, but I
20    don't recall if it was in preparing or not.  But
21    I know I've seen the declaration.
22    Q.   Do you believe you saw it -- do you
23    believe you saw it prior to when you submitted
24    your expert report?
25    A.   Yes.

Page 147

D. McIsaac

1    D. McIsaac
2    Q.   On exchange-traded derivatives issues?
3    A.   Yes.
4    Q.   Yes?
5    A.   Yes.
6    Q.   If you could turn to the second page,
7    paragraph 6, and review that and let me know
8    when you've had a chance to look at it.
9        (Document review.)
10    A.   Yes.
11    Q.   Okay.  In this paragraph, Mr. Clark
12    says that the OCC options were not immediately
13    brought onto Barclays' systems, as the systems
14    were not capable of incorporating the LBI OCC
15    options.  Do you see that?
16    A.   Yes.
17    Q.   Do you have any reason to doubt the
18    accuracy of that statement?
19    A.   No, I do not.
20    Q.   In the next sentence he says, "The
21    delay in moving the options on the Barclays'
22    systems created difficulties for Barclays' Risk
23    Management Team in terms of their ability to
24    manage the risk associated with these positions
25    effectively during the interim period."

Page 148

D. McIsaac

1    D. McIsaac
2        Do you see that?
3    A.   Yes.
4    Q.   Do you have any reason to doubt the
5    accuracy of that statement?
6    A.   No, I do not.
7    Q.   Have you seen anything in the record
8    that suggests that Barclays did have the ability
9    to manage the risk associated with these
10    positions prior to the time it was able to
11    incorporate them onto its system?
12        MR. OXFORD:  Object to the form.
13    A.   I believe I did see something where
14    they were trying to risk-manage the positions
15    for a period of time and then turned them back
16    to the Lehman traders to manage the risk.
17    Q.   Okay.  And do you believe that what
18    you saw led you to conclude that that risk
19    management during that period of time was
20    effective?
21        MR. OXFORD:  Object to the form.
22    A.   I don't know if I saw enough within
23    that to determine if it was totally effective.
24    Q.   What would you consider to be an
25    effective hedge program in terms of the

Page 149

D. McIsaac

1    D. McIsaac
2    relationship between losses on underlying
3    positions, for example, and gains onto hedge
4    positions?
5        MR. OXFORD:  Object to the form.
6    A.   I would assume, having them roll up
7    into a system, that you would be able to monitor
8    both sides of the positions, be able to monitor
9    the options as well as the equity into one
10    straight -- one flow-through system, for lack of
11    better words.
12    Q.   If Barclays were attempting to hedge a
13    set of options positions, and those options
14    positions lost $500 million in value over a
15    discrete period of time, would you consider an
16    effective hedge if the hedge positions that
17    Barclays placed only gained $150 million during
18    that same time?
19    A.   I don't know if their objective was to
20    fully hedge the position.  Most trading books do
21    not fully hedge because then there would be no
22    gain or loss unless you were just trying to play
23    the -- the gain or loss when you put on the
24    contract.  So most traders don't fully hedge
25    their positions.

Page 150

D. McIsaac

1
2    But I don't know if that was
3    effective. Their goal might have been to only
4    hedge a portion of it.
5        Q.    Assuming their goal was to fully hedge
6    the position, would you agree that a hedge that
7    only gained $150 million against underlying that
8    lost $500 million was an ineffective hedge?
9        MR. OXFORD:  Object to the form.
10    Assumes facts not in evidence.
11        A.    If you were trying to hedge the entire
12    portfolio and you put on hedges that didn't
13    replicate it, that would have been an
14    ineffective hedge.
15        Q.    If you would turn in your report to
16    page 3 -- I'm sorry, page 4, sub-bullet 3 at the
17    top of the page. It says there that, "Any
18    ongoing market risk associated with the
19    proprietary exchange-traded derivatives that
20    Barclays acquired could be and was mitigated by
21    Barclays by hedging these positions." Do you
22    see that?
23        A.    Yes.
24        Q.    And then if you turn to page 7,
25    paragraph 22, you say, "I would assume that the

Page 151

D. McIsaac

1
2    purchaser would have anticipated that the short
3    exchange-traded derivatives positions would be
4    hedged by certain long equity positions in LBI's
5    total portfolio."  Do you see that?
6        A.    Yes.
7        Q.    Are you familiar with the various
8    trading strategies that a broker-dealer could
9    undertake for a proprietary portfolio?
10        MR. OXFORD:  Object to the form.
11        A.    Somewhat, yes, sure.
12        Q.    Are long equity positions the only
13    positions that would interact with
14    exchange-traded derivatives positions in terms
15    of the full portfolio?
16        MR. OXFORD:  I'll object to the form
17    of the question.
18        A.    Yes, I'm not sure really what the
19    question is. I'm not sure what you're --
20        Q.    Is it possible that short
21    exchange-traded derivatives positions would be
22    hedged by anything other than long equity
23    positions in a broker-dealer's portfolio?
24        A.    Yes.
25        Q.    Can you give me an example?

Page 152

D. McIsaac

1
2        A.    A short put might be hedged by a short
3    position in a portfolio. A short option could
4    be hedged by a long option. An index could
5    hedge a portfolio of a basket of other options.
6        Q.    And could over-the-counter positions
7    also be used to hedge exchange-traded
8    derivatives positions?
9        A.    I would tend to think normal course
10    would be to use exchange-traded derivatives to
11    hedge over-the-counter derivatives.
12        Q.    Okay. And if you were to have
13    purchased an exchange-traded derivatives
14    position in order to hedge an over-the-counter
15    position, would the acquirer of the
16    exchange-traded derivatives position be
17    considered to have a naked position in the event
18    it didn't also acquire the corresponding
19    over-the-counter derivative?
20        MR. OXFORD:  Object to the form.
21        A.    I think if the question you're asking
22    is if there was an over-the -- exchange-traded
23    option hedging an over-the-counter position,
24    that if you didn't assume the over-the-counter
25    position, would that single exchange-traded

Page 153

D. McIsaac

1
2    option be naked?  Unless you had something else
3    in your portfolio that was hedging it or could
4    be considered a hedge to it, yes.
5        Q.    Is it your understanding that Barclays
6    was acquiring the over-the-counter derivatives
7    of LBI in the September 2008 transaction?
8        A.    I do not believe they were.
9        Q.    Is it fair to say, then, that Barclays
10    would have been reasonable in assuming that
11    there may be unhedged exchange-traded
12    derivatives positions in the portfolio it was
13    acquiring?
14        MR. OXFORD:  Object to the form of the
15    question. Assumes facts not in evidence.
16        A.    I don't know if there were
17    over-the-counter derivatives in the -- in LBI's
18    portfolio, nor do I know if they hedged them
19    with exchange-traded derivatives. The --
20        Q.    Is it possible that they did?
21        MR. OXFORD:  Object to the form.
22        A.    Yes, it's possible that could have
23    happened.
24        Q.    And if that was the case, would that
25    position then not be fully hedged if you were

Contains Highly Confidential Portions

Page 154

D. McIsaac

1          D. McIsaac
2 taking the exchange-traded portfolio and not the
3 over-the-counter portfolio?
4      MR. OXFORD:  Object to the form.
5 Asked and answered.
6      You can answer again.
7    A.  Unless there was another security or
8 another transaction out there that that was
9 hedging.
10    Q.  Okay.  My question assumes that the
11 position is hedging the over-the-counter
12 position.  Do you understand?
13    A.  Yes, but there could be another
14 position that that would also act as a hedge
15 for.
16    Q.  Do you -- does a broker-dealer
17 typically put duplicative hedges on its
18 portfolio?
19    A.  No.  What I meant is they could be
20 hedging this transaction.  You take that
21 transaction off, it may be now a hedge for a
22 different security out there.  All I'm saying
23 is, in the realm things, it could be hedging
24 another exposure.
25    Q.  Is it fair to say that you wouldn't

Page 155

1          D. McIsaac
2 assume as an acquirer that you were getting a
3 fully hedged portfolio if you were taking
4 exchange-traded derivatives and not
5 over-the-counter derivatives?
6      MR. OXFORD:  Object to the form.  That
7 assumes facts not in evidence.
8    A.  I wouldn't assume anything.  I would
9 inquire as to what I was purchasing and what the
10 various books were, and if I had exchange-traded
11 derivatives hedging an, you know, an
12 over-the-counter derivative book, I would assume
13 I'd find that out before I decided to buy the
14 unhedged exchange-traded derivatives.
15    Q.  Okay.  When you're -- if you were
16 considering an acquisition of tens of thousands
17 of exchange-traded derivatives positions, how
18 would you go about determining whether or not
19 those positions were hedged in full or in part
20 by over-the-counter derivatives or vice-versa?
21    A.  I guess I'd ask the people who were
22 managing the over-the-counter derivative book if
23 they had exchange-traded derivatives in their
24 portfolio.
25    Q.  And if the answer was yes, what would

Page 156

1          D. McIsaac
2 you do in order to determine the extent of the
3 naked exposure on those exchange-traded
4 derivatives in the event you weren't acquiring
5 the over-the-counter derivatives?
6      MR. OXFORD:  Object to the form.
7 Assumes facts not in evidence.
8      You can answer.
9    A.  I would ask them what their portfolio
10 of exchange-traded derivatives was that was
11 hedging it, specific portfolio.
12    Q.  And would that require you to obtain
13 information not only about the positions that
14 were open in an exchange-traded derivatives
15 account, but also the relationship between those
16 positions and any over-the-counter positions?
17    A.  No, I would just ask for a list of the
18 exchange-traded derivatives in his trading
19 portfolio book.
20    Q.  And what would you do with that list?
21    A.  I would, I guess, determine if I want
22 to buy those assets without the
23 over-the-counters positions that they may or may
24 not be hedging.
25    Q.  Would you also try to determine at the

Page 157

1          D. McIsaac
2 same time whether there were equities positions
3 that were hedging those positions?
4      MR. OXFORD:  Object to the form.
5 Which positions are you talking about?
6    Q.  The exchange-traded derivatives
7 positions that you were -- would be acquiring?
8      MR. OXFORD:  Okay.  Same objection.
9      You can answer.
10    A.  I thought we started this by saying if
11 we had exchange-traded derivatives hedging an
12 over-the-counter book, well, how would I
13 determine that?  And I think I said I would talk
14 to the people managing that book.  I would
15 assume, and maybe that's a bad thing, I would
16 probably ask them also what other positions do
17 they have that's exchange-traded that is in the
18 portfolio that I might be acquiring.
19    Q.  Okay.  And you would want to analyze
20 the relationships between the exchange-traded
21 derivatives, the over-the-counter derivatives,
22 and the other long and short positions in the
23 portfolio that you were acquiring in order to
24 understand the relationships between the various
25 trades, is that fair?

Page 158

1          D. McIsaac
2          MR. OXFORD: Object to the form.
3      A.   If I was not obtaining the
4    over-the-counter derivatives and had no reason
5    to know about them, I would try to assess the
6    exchange-traded derivatives and the equity
7    positions on the risk that it was -- that it
8    would give me perhaps to take over those
9    positions.  I don't care what they did with the
10   over-the-counter if I'm not assuming that.
11     Q.   Do you care what they did with the
12   over-the-counter if the over-the-counter
13   derivatives were related to the exchange-traded
14   derivatives or the fixed equity positions that
15   you were acquiring in terms of a hedge
16   relationship?
17         MR. OXFORD: Object to the form.
18     A.   Again, if I'm not acquiring the
19   over-the-counter, why would I care their
20   relationship to the exchange-traded that I was
21   acquiring?  I wouldn't care if it was a good
22   hedge or not because I wasn't acquiring the
23   over-the-counter.
24         Unless you're saying that I, in the
25   realm of possibility, I may decide to take over

Page 159

1          D. McIsaac
2    the over-the-counter positions.
3      Q.   Would you care if it was naked hedge
4    that you were acquiring, a naked position -- I'm
5    sorry.
6          Would you care if it was a naked
7    position that you were acquiring because you
8    weren't getting the over-the-counter position?
9          MR. OXFORD: Object to the form.
10     A.   I would analyze that just as any other
11   position I was acquiring I would analyze.
12     Q.   You say on the top of page 8 in your
13   expert report that, "Mr. Leitner appears to
14   assume that Barclays was, at least at the start
15   of the week, purchasing a book of business that
16   was at least partly hedged."
17         Is it your understanding that Barclays
18   was acquiring a book of business that was partly
19   hedged or that was fully hedged as of the
20   beginning of the week?
21     A.   I don't know if I have an
22   understanding one way or the other.  I don't
23   think anybody's business would be fully hedged,
24   because if you're fully hedged, then you don't
25   make money.  So you would determine what hedges

Page 160

1          D. McIsaac
2    you wanted based on the risk that you wanted in
3    that book and where you thought your rewards
4    were.  You wouldn't, for every long position,
5    have a corresponding short because then you
6    wouldn't make any money.
7      Q.   Would you be qualified to do that
8    assessment yourself if you were advising on a
9    transaction of the type that Lehman and Barclays
10   entered into in September of 2008?
11         MR. OXFORD: Object to the form.  I'm
12     not sure it's clear what assessment you're
13     asking about.
14         MS. BLOOMER: He can ask me to clarify
15     if he needs me to clarify, Neil.
16     A.   I don't know, when you say "assess,"
17   what you mean by it.
18     Q.   You said you wouldn't for every long
19   position have a corresponding short because you
20   wouldn't make any money.  You said you would
21   determine what hedges you wanted based on the
22   risk that you wanted in that book and where you
23   thought your rewards were.
24         Were you qualified -- are you
25   qualified, do you consider yourself qualified to

Page 161

1          D. McIsaac
2    make those types of assessments in the
3    connection with a transaction of this type?
4          MR. OXFORD: Objection to the form.
5      A.   What I was referring there is the
6    trader who's trading that book would make that
7    assessment.  Firms have various people that
8    monitor what the traders are doing and there are
9    different risk managers that look at different
10   risk.
11         If you're asking me if I was long IBM
12   and short a call on AT&T, could I assess the
13   total risk on that, I would know that I have
14   exposure on two sides and I'm not hedged.  Could
15   I tell you how much I could lose on each?  No,
16   but firms will have systems that do that.
17         Lehman certainly had a system that did
18   that because they were on -- they were a CSE
19   firm so they certainly had value at risk and
20   they did -- they did analysis of what their
21   gains and losses were, and I'm -- what their
22   gains and losses could be based on the value at
23   risk, and I'm assuming that they had the
24   wherewithal to determine that.
25     Q.   Do you have knowledge of how the

Page 162

D. McIsaac

1
2  process of assessing this risk and determining
3  what positions you are taking over would consist
4  of?
5      MR. OXFORD: Object to the form.
6      A.    Again, you normally have a
7  businessperson determine what risk appetite he
8  had for his business and determine if the book
9  of business that they were selling he wished to
10 buy and it fit into his risk model.
11     Q.    Do you know how long it would take
12 that person to do an analysis of the risk
13 profile of a portfolio of exchange-traded
14 derivatives and equities positions the size that
15 Barclays was acquiring in September of 2008?
16     A.    I do not know how long it would take,
17 but I would assume that the systems already in
18 place at LBI would have spit that information
19 out.
20     Q.    You think that you could hit a button
21 and print that information out; is that your
22 testimony?
23     MR. OXFORD: Object to the form.
24     Mischaracterizes the witness's testimony.
25     You can answer.

Page 163

D. McIsaac

1
2      A.    I believe Lehman had systems that
3  provided them with value at risk on a daily
4  basis.
5      Q.    And do those systems that provide
6  value at risk on a daily basis tell you which
7  positions are hedging which positions so that if
8  you're not taking all of the positions, you know
9  what's at risk?
10     MR. OXFORD: Objection to the form.
11     A.    I don't believe it will earmark every
12 naked position that's in the portfolio. It will
13 tell you the portfolio and what the anticipated
14 market movement could be in that portfolio.
15     Q.    And if there are multiple portfolios,
16 and you're not taking all of them, would you
17 agree that it's not as simple as pressing a
18 button in order to determine the risk profile of
19 the portfolio that you're taking over?
20     MR. OXFORD: Object to the form.
21     Mischaracterizes the witness's testimony.
22     MS. BLOOMER: I'm asking him a
23 question. I'm not characterizing anything.
24     A.    I would believe that the systems would
25 enable the management of Lehman to assess the

Page 164

D. McIsaac

1
2  risk at various levels, possibly down to the
3  individual trader, but at a minimum probably
4  down to the individual desk.
5      Q.    Was it -- maybe I misunderstood your
6  testimony. Was it your testimony that the
7  systems wouldn't have information other than the
8  aggregate risk of a particular portfolio? So,
9  in other words, wasn't it your testimony that
10 the system wouldn't generate information that
11 would tell you which positions are hedged by
12 which other positions?
13     A.    I believe what I said, and if I said
14 that, it's not what I meant to say, the system
15 would analyze your risk on a portfolio basis.
16 It may not at a top level spit out this position
17 is not hedged. In the makeup of the risk
18 matrix, it would give you information that you
19 need to see.
20     Q.    What do you mean when you say "on a
21 portfolio basis"?
22     A.    Well, on a trader level, on a desk
23 level, whatever the firm prescribes to be a
24 portfolio.
25     Q.    And could any one portfolio include

Page 165

D. McIsaac

1
2  both exchange-traded positions and
3  over-the-counter positions?
4      A.    Sure.
5      Q.    And if the system were to spit out a
6  report that showed the risk profile of a
7  portfolio that contained both exchange-traded
8  and over-the-counter derivatives, would that
9  report tell you which of those positions were
10 going to be naked in the event that the
11 over-the-counter derivatives were not to be
12 transferred with the exchange-traded positions?
13     A.    There would probably be reports in the
14 system that would indicate all the individual
15 securities that are in that system. It may not
16 assess them separately as to the risk of that
17 one position that's hedged because it may be
18 looking to hedge on the total desk position, but
19 you would have the analysis of what was owned
20 and what the exposure was on that security.
21     Q.    Do you know that or you -- you said
22 "probably." I would like to confirm. Do you
23 know that or not?
24     A.    I would assume most risk systems would
25 have that information. I did not look at

Page 166

D. McIsaac

1  Lehman's system and I can't determine whether or
2  not they did, but I'm assuming that during the
3  due diligence somebody would have looked at
4  that.
5
6  Q.   During what due diligence?
7  A.   Barclays' due diligence.
8  Q.   And how long did Barclays have to do
9  that due diligence?
10        MR. OXFORD:  Object to the form.
11  Asked and answered.
12        You can answer again.
13  A.   I don't know how long Barclays had to
14  do the due diligence.  I assume they had enough
15  time to do it or else they would not have
16  entered into the transaction.
17        Somebody, I'm assuming, made an
18  assessment of the risk of what they were buying
19  and determining whether or not it fit into what
20  they were looking for and they could afford to
21  take on that risk.
22  Q.   Could it be that they agreed to take
23  on the risk because they believed they were
24  getting protection of the posted margin at the
25  clearing corporations, is that possible?

Page 167

D. McIsaac

1
2        MR. OXFORD:  Object to the form.
3  A.   I can't go into what they thought they
4  were getting and weren't getting.  I cannot tell
5  you what is in their mind and what they were
6  getting and what they weren't getting.
7  Q.   Is it possible that the reason they
8  agreed to take on these positions was not
9  necessarily because they had the time to do all
10  of the due diligence, but because they believed
11  they were getting posted margin as protection
12  against some portion of those risks?
13        MR. OXFORD:  Objection to the form.
14  Q.   Is that possible?
15  A.   Which positions?  We've talked about
16  the portfolio.  We've talked about cash
17  positions and exchange-traded derivatives.
18        What positions are we looking for
19  margin to protect?
20  Q.   Is it possible that Barclays agreed to
21  take over Lehman's exchange-traded derivatives
22  portfolio because it believed that it was
23  getting the margin that was posted to secure
24  those positions as protection against any risk
25  that may exist due to the fact that those

Page 168

D. McIsaac

1
2  positions may or may not be naked exposures?
3        MR. OXFORD:  Objection.  Asked and
4  answered.
5  A.   I don't know if I could assess what
6  was in their mind on negotiating the deal and
7  what they thought they were getting and weren't
8  getting.
9  Q.   I'm asking you if it's possible that
10  that's the reason that they agreed to go forward
11  with the transaction --
12  A.   It is possible --
13  Q.   -- despite having not done the due
14  diligence that they requested.
15  A.   It is possible that that was in their
16  mind and they thought of that, yes.
17  Q.   Okay.  In your review of the evidence
18  in this case, did you see any indication that
19  Barclays was arranging to post margin to the OCC
20  or the various other clearing brokers and
21  clearing organizations such that the margin
22  requirements come Monday, September 22, would be
23  satisfied in order to avoid a liquidation?
24  A.   I didn't see anything to the effect
25  that they were preparing to do that, but I

Page 169

D. McIsaac

1
2  haven't reviewed all the documents that Barclays
3  has in their possession as to the transaction.
4  Q.   If you were advising a company who was
5  acquiring an exchange-traded derivatives
6  portfolio, and you knew the closing was going to
7  take place in a matter of days, would you be
8  advising that company to start making
9  arrangements to post the collateral if you
10  didn't believe you were getting the collateral
11  that had already been posted by the selling
12  entity?
13  A.   Where would I advise them to post the
14  collateral if they didn't buy anything as yet?
15  I'm not sure what the question is.  How would I
16  advise them to post collateral?  Post collateral
17  where?
18  Q.   To arrange.  Would you advise them to
19  start arranging to post that collateral if you
20  believed you weren't going to be getting the
21  collateral that was already posted by the
22  selling entity?
23  A.   How much time would I -- I don't think
24  they would need a lot of time to arrange for
25  collateral to post if they were a broker-dealer.

Contains Highly Confidential Portions

Page 170

D. McIsaac

1
2  They had plenty of collateral that could have
3  been posted if they needed to.
4      Q.   Are you aware of how many different
5  clearing organizations and clearing brokers LBI
6  traded in exchange-traded derivatives through?
7      A.   I believe they traded through the OCC,
8  the CME in the U.S. I believe they cleared
9  through other brokers for some of the other
10 foreign businesses.  I don't know what
11 arrangements Barclays had with those entities
12 already.
13     Q.   What is the typical practice of a
14 clearing organization at the open of business on
15 a given day if collateral is not posted
16 sufficient to satisfy the margin requirements?
17         MR. OXFORD:  Objection.  Form.
18     A.   I'm not sure what the question --
19 could you sort of rephrase it so I understand
20 what the question is?
21     Q.   Sure.  If the OCC woke up on Monday
22 morning and realized that there was no
23 collateral posted in the OCC accounts that were
24 held on behalf of LBI, what would the OCC have
25 done?

Page 171

D. McIsaac

1
2      A.   Well, I don't know how that could
3  happen because I don't know how the collateral
4  could come out.  So I assume when they were
5  taking over the positions, however they decided
6  to move those positions into their
7  infrastructure into their position, that they
8  would make arrangements with the OCC to have the
9  adequate collateral there.
10         Sometimes you may transfer the
11 collateral that's in the accounts already and
12 then pay it back to the -- to the seller just as
13 a means to do it efficiently.
14     Q.   And if you were advising an entity, a
15 seller, to enter into that type of an
16 arrangement, would you have something written
17 into an agreement somewhere to provide for a
18 true-up of that money?
19     A.   I would have something that explained
20 what I was purchasing, and if I wasn't
21 purchasing those assets, I might have something
22 in there saying I'll return them or else.  If
23 I'm not paying for them, I'd be obliged to
24 return them.  I've done a deal before, we have
25 moved those assets over and then paid them back

Page 172

D. McIsaac

1
2  the next day.  It was just the ease of moving it
3  into the -- into the process of moving the
4  exchange-traded derivatives over.
5      Q.   Would it be prudent as an advisor to a
6  seller in that circumstance to have a
7  documentation of the agreement that you would be
8  getting back billions of dollars in collateral?
9          MR. OXFORD:  Objection to the form.
10 Assumes facts not in evidence.
11         You can answer.
12     A.   I would assume that as well as what
13 you were purchasing would be in the agreement.
14     Q.   I'm showing you what has been marked
15 as Exhibit 51.  Oh, you already have a document
16 that's Exhibit 51.
17         If you look at paragraph 1(a), it says
18 here, "For good and valuable consideration, the
19 receipt and sufficiency of which are hereby
20 acknowledged, Lehman hereby sells, assigns,
21 transfers and sets over to Barclays, without
22 recourse or without representation or warranty,
23 all of Lehman's rights, title, interests,
24 powers, privileges, remedies, obligations, and
25 duties in, to, under, and in respect of the

Page 173

D. McIsaac

1
2  Account, as of the Effective Date including with
3  respect to (i) the Clearing Fund deposit; (ii)
4  all margin deposits held by OCC with respect to
5  the account; (iii) all settlement obligations
6  with regard to transactions in cleared accounts;
7  and (iv) all rights and obligations in respect
8  of exercises of options contracts and
9  assignments of such exercises."
10         Do you see that?
11     A.   Yes.
12     Q.   Do you agree that under this agreement
13 the Trustee agreed -- authorized Lehman's sale
14 of Lehman's rights in the margin deposits that
15 were held at the OCC without recourse or
16 representation of warranty?
17         MR. OXFORD:  I'll object to the form
18 of the question.  Calls for a legal
19 conclusion.
20     A.   I don't think -- I'm not a lawyer, so
21 I don't want to talk about it, but I don't think
22 this is selling -- this is the sale agreement.
23 This is an agreement just to transfer at the
24 OCC, and I assume when they say hereby
25 acknowledge for, you know, sufficiency, without

Contains Highly Confidential Portions

Page 174

D. McIsaac

1
2       recourse, representation, whatever has happened,
3       is in another agreement. This is not the
4       binding sale agreement, I don't think.
5           Q.   This is a binding agreement, you
6       realize that, right?
7               MR. OXFORD: Objection to form. Calls
8           for a legal conclusion.
9           A.   I think what I said is this is not a
10      sale agreement.
11          Q.   Do you think that it's -- do you think
12      that the language of this provision that we just
13      looked at together suggests that Lehman was
14      going to transfer the margin deposits held by
15      the OCC to Barclays? Is that what you
16      understand this language to mean?
17          A.   Yes.
18              MR. OXFORD: Objection to form.
19          Q.   Do you think that -- do you think that
20      that language is clear or do you think it's
21      ambiguous in some way?
22              MR. OXFORD: Objection to form.
23          A.   I think the language is clear as far
24      as the OCC goes as to what is happening with the
25      assets at the OCC.

Page 175

D. McIsaac

1
2           Q.   Okay.
3           A.   It is not determining what
4       compensation was paid or how the arrangements
5       were made. All this is between two
6       counterparties who are at the clearing org.
7       transferring their obligations from one to
8       another.
9           Q.   So you assume that the sale agreement,
10      for example, that was approved by the court
11      suggests that the posted margin would be
12      transferred and then this agreement would make
13      sense to you; is that what you're saying?
14              MR. OXFORD: Objection to form.
15          Misstates the witness's testimony.
16              You can answer.
17          A.   I think the sale agreement would
18      denote what was being paid for the assets, not
19      how they were being transferred.
20          Q.   And this would denote how it's being
21      transferred?
22              MR. OXFORD: Objection. Form.
23          A.   This would denote the authority for
24      OCC to transfer it. You have a sale agreement
25      and you may have another agreement on how you're

Page 176

D. McIsaac

1
2       going to effectually move moneys back and forth.
3       Usually you convert, do a conversion, and you'll
4       have some documents that talk about how you're
5       going to do that.
6           Q.   But the fact that it was going to be
7       transferred, that is denoted in the TAA; is that
8       right?
9               MR. OXFORD: Objection. Form.
10          A.   This is a vehicle to move the Lehman
11      option boxes at OCC into Barclays' name.
12          Q.   And that would include the margin
13      deposits?
14          A.   I believe it includes everything
15      that's denoted here, which is the margin
16      deposits is part of it.
17          Q.   Okay. What do you understand "without
18      recourse" to mean?
19              MR. OXFORD: Objection. Form. Calls
20          for a legal conclusion.
21              You can answer.
22          A.   I'm not sure what it means in this
23      case.
24          Q.   What do you generally understand the
25      term "without recourse" to mean?

Page 177

D. McIsaac

1
2           A.   I would guess there's no recourse to
3       the OCC if something went wrong.
4           Q.   You don't think it may mean without
5       recourse to Barclays for any of the money that
6       Lehman is transferring to Barclays?
7               MR. OXFORD: Objection. Form. Asked
8           and answered. Calls for a legal conclusion.
9               You can answer again.
10          A.   As I said, I think this means recourse
11      to the OCC.
12          Q.   Is it possible that it means without
13      recourse to anyone?
14              MR. OXFORD: Objection. Calls for a
15          legal conclusion.
16          A.   It's a legal document. I'll let the
17      lawyers decide.
18          Q.   Okay. I'd like to go back in your
19      report to page 23 again where you say that "a
20      rational seller would not include margin in the
21      deal unless it was being compensated dollar for
22      dollar," do you see that?
23          A.   Could you point out what paragraph?
24      I'm sorry.
25          Q.   Page 23 at the last --

Page 178

D. McIsaac

1
2    A.    Got it.  Sorry.
3    Q.    You see that language?
4    A.    Uh-huh.
5    Q.    I'm handing you -- I'm going to mark
6    it as an exhibit -- Exhibit 688.
7         (Exhibit 688, Deposition of Bart
8    McDade, marked for identification, as of
9    this date.)
10    Q.    If you could turn with me to page 275.
11    This is testimony of Bart McDade.  Are you
12    familiar with that name?  Do you know who he is?
13    A.    I believe he might have been the
14    president at Lehman Brothers, Inc.
15    Q.    Is it your understanding that he was
16    involved in the negotiations of the transaction
17    in September of 2008 between Lehman and
18    Barclays?
19    A.    I believe he was, but I don't know if
20    I've ever seen anything that said what his role
21    was in it.
22    Q.    Okay.  On page 275, starting at line
23    3, Mr. McDade was asked:  "Did you understand
24    that, in addition to the long positions that Lehman had at OCC, it also
25    short positions that Lehman had at OCC, it also

Page 179

D. McIsaac

1
2    had additional cash and assets that were
3    deposited as margin and also clearing funds
4    deposited at the OCC?"  Do you see that
5    question?
6    A.    Yes.
7    Q.    Mr. McDade responds, "Yes, I did, but
8    keep in mind the context that we had had assets
9    like that, for example, at the CME and they lost
10    those assets over the course of the week.  So we
11    had no confidence that those were potentially
12    our assets given what had been transpiring."
13         Do you see that?
14    A.    Yes.
15    Q.    What do you understand Mr. McDade to
16    be suggesting in this testimony?
17         MR. OXFORD:  Objection.  Form.  Calls
18    for speculation.
19    A.    I wouldn't want to try to guess what
20    he's thinking.
21    Q.    Do you have any idea what he means
22    when he's referring to the CME losing assets
23    over the course of the week?
24    A.    I'm assuming based on what we said
25    before that maybe he liquidated some of their

Page 180

D. McIsaac

1
2    assets.  But this is a paragraph taken out of
3    this page 275, so I don't know where it is in
4    relation to what this question is referring to
5    or where the background for it is.
6    Q.    You said the CME could have liquidated
7    positions.  Aren't you aware that the CME in
8    fact did liquidate or auction off positions in
9    LBI's account during the week of September 15?
10    A.    I said this could have been referring
11    to that.  I don't know if this is referring to
12    that.  I don't know what it's referring to.
13    Q.    Do you know of any other actions by
14    the CME during that week that involved
15    liquidation of positions?
16    A.    He doesn't say anything here about
17    liquidation of positions.  He just is referring
18    to they lost assets.
19    Q.    Do you know of any instance other than
20    the auction in which LBI lost assets in relation
21    to the CME account?
22    A.    I don't know of any other reference
23    anyplace else of them losing assets at the CME.
24    Q.    Mr. McDade says, "We had no confidence
25    that those were potentially our assets given

Page 181

D. McIsaac

1
2    what had been transpiring," and he was saying in
3    response to a question about assets, cash and
4    assets, that were deposited as margin in its
5    clearing funds deposited at the OCC.
6         Do you understand Mr. McDade to be
7    suggesting that the assets posted at the OCC
8    were at risk?
9         MR. OXFORD:  Objection.  Asked and
10    answered.
11    A.    Again, I don't know if I can determine
12    what Mr. McDade meant.  There were a lot of
13    assets mentioned above that.  I'm not sure what
14    he's referring to there.  He might have been
15    referring to long positions.  I don't know.
16    Q.    Do you agree that Mr. McDade seemed to
17    think that there were some assets at the OCC
18    that were potentially not going to be available
19    to Lehman and that he thought the CME example
20    was evidence of that?
21    A.    I don't want to speculate what he
22    meant by these words.  I don't know really what
23    he meant by these words.
24    Q.    Assuming Mr. McDade was referring to
25    the loss of $1.6 billion in assets at the CME on

Page 182

D. McIsaac

1  September 18, and assuming for purposes of this
2  question that Mr. McDade was talking about the
3  margin and clearing funds deposited at the OCC
4  when he says they had no confidence that these
5  were potentially our assets, would you consider
6  it irrational for Mr. McDade to lack that
7  confidence?
8      MR. OXFORD:  Objection to form.
9      MR. GREEN:  Objection.
10     A.   Again, I'm not sure what his lacking
11  of confidence is.  The question is did you
12  understand that, in addition to the long
13  positions and short positions that Lehman had at
14  the OCC, it also had additional cash assets that
15  were deposited as margin, so the answer is --
16     Q.   And my question assumed that the
17  assets in the answer that he gave was the assets
18  that were deposited as margin and clearing funds
19  at the OCC.  So assuming that that's what the
20  assets were referring to, was it irrational for
21  Mr. McDade to lack confidence that those were
22  going to be available to Lehman?
23     MR. OXFORD:  Objection.  Form.
24     Assumes facts not in evidence.

Page 183

D. McIsaac

1      A.   I mean, I -- I'm having a problem
2  answering the question only because I don't know
3  what he said in reference to and what the time
4  period was that this was talking -- even talking
5  about.  I don't know if this is talking about
6  the sale or anything else.  I'm reading one
7  paragraph.
8          It seems somehow that he's concerned
9  about that there was confidence in that
10  potential assets -- what is he saying?  "So we
11  had no confidence that those were potentially
12  our assets given to what was transpiring."  I
13  don't know what he means by that.  Maybe he
14  thought he sold them already.  I don't know.
15     Q.   Okay.  If you were involved in the
16  negotiations of this transaction on behalf of
17  Lehman and you had just seen the CME auction off
18  all of your proprietary positions and transfer
19  the margin that was posted at the CME to the
20  bidders who were willing to take those positions
21  over, and then the OCC started threatening to
22  liquidate your account, would you be concerned
23  that the same thing might happen?
24     MR. OXFORD:  Objection.  Form.

Page 184

D. McIsaac

1      A.   I would take action if I thought they
2  were going to liquidate them for me and probably
3  direct my people to liquidate them before the
4  OCC had a chance to liquidate them.  So I would
5  be at my best possible advantage.
6      Q.   Let's assume you had tens of thousands
7  of positions, and if you tried to liquidate them
8  all in a matter of a day, you would lose a
9  substantial amount of money on that liquidation.
10     A.   Again --
11     MR. OXFORD:  Hold on.  Is there a
12  question?
13     MS. BLOOMER:  Yes, there is, if I
14  could finish.
15     MR. OXFORD:  Sure.
16     Q.   Would it be rational for you to fear
17  that the OCC might liquidate those positions
18  before you would get a chance to?
19     MR. OXFORD:  Okay.  Can we just make
20  sure we have that question in mind before --
21     THE WITNESS:  Sorry.
22     MR. OXFORD:  -- Mr. McIsaac answers?
23     A.   Could you just read back the whole --
24     Q.   Let's assume you had tens of thousands

Page 185

D. McIsaac

1  of positions, and if you tried to liquid them
2  all in a matter of day, you would lose a
3  substantial amount of money on that liquidation.
4          Would it be rational for you to fear
5  that the OCC would liquidate those positions
6  before you would get a chance to?
7      MR. OXFORD:  Objection.  Form.
8      MR. KAY:  Objection.
9      A.   I don't know why you would fear that
10  they would be able to liquidate them before you
11  could liquidate them.  I don't know why you
12  would have that fear.  If you were afraid that
13  they were going to liquidate them, I would think
14  you would start liquidating your portfolio.
15     Q.   If you thought the liquidation would
16  happen all in one day, would you be concerned
17  that that liquidation may cost you a substantial
18  amount of the margin you had posted in those
19  accounts?
20     MR. OXFORD:  Objection.  Form.
21     A.   If I liquidated, it would cost me none
22  of the margin.  It may cost me -- I may have
23  gains and losses in the liquidation, but at the
24  end of the day, if I liquidated everything, I

Page 186

```
1              D. McIsaac
2   would have no margin requirement.
3      Q.   And the margin that was posted to
4   secure those positions in the event of a
5   liquidation would be accessible to the OCC,
6   correct, to cover any losses on that
7   liquidation?
8         MR. OXFORD:  Objection.  Form.
9      A.   I thought you asked me if I was
10  liquidating them.  If I was liquidating them,
11  no, they would give me back my margin.
12     Q.   They would give you back your margin
13  after you had liquidated the positions and
14  settled any costs associated with that
15  liquidation, right?
16     A.   Correct, any costs associated with the
17  OCC on the liquidation.
18     Q.   Would they give you back your margin
19  before the positions were closed out and before
20  they had gotten protected themselves?
21     A.   No, that's why I would be liquidating
22  them so that I could close out my account with
23  the OCC.
24     Q.   Okay.  And is there a risk that you
25  liquidated those positions and the cost of
```

Page 187

```
1              D. McIsaac
2   liquidating the positions exceeds the margin
3   that you had posted to secure those positions?
4         MR. OXFORD:  Objection.  Asked and
5   answered.
6      A.   I believe somebody would assess that
7   risk and determine what to do, and if they
8   thought the cost was going to exceed it, then if
9   it was liquidated, wouldn't they come back and
10  charge me for it anyway?
11     Q.   How long would it take you to
12  liquidate tens of thousands of positions, do you
13  think?  A day?
14         MR. OXFORD:  Objection to form.
15     A.   I have no idea.
16     Q.   You have no idea?
17     A.   I have no idea.
18     Q.   Do you think it's likely that you
19  could liquidate tens of thousands of positions,
20  equities options positions in a day, without
21  substantially moving the market?
22         MR. OXFORD:  Objection.  Form.  Asked
23  and answered.  Assumes facts not evidence.
24         You can answer.
25     A.   I don't know what the difference is if
```

Page 188

```
1              D. McIsaac
2   you move the market whether or not you could
3   liquidate them.
4      Q.   Do you understand that there could be
5   a difference in the cost of liquidating them if
6   the market price changes throughout the course
7   of the day that you're conducting your
8   liquidation?
9      A.   Yes.  But what does that have to do
10  with me, my ability to liquidate them?  You
11  asked me could I liquidate them?  I said yes.
12     Q.   And the cost of liquidating them would
13  be dependent upon the impact that the sales
14  would have on the market price of what you're
15  liquidating, isn't that right?
16     A.   Yes.
17     Q.   CME liquidated the positions when it
18  liquidated the proprietary account on September
19  18th in a single day.
20         Do you have any reason to think that
21  the OCC would not have taken the same approach?
22         MR. OXFORD:  Objection.  Form.
23     A.   I'm not -- I don't understand what the
24  question is.  We started out my saying that the
25  firm should liquidate.  Now you're asking me
```

Page 189

```
1              D. McIsaac
2   would the OCC liquidate.
3      Q.   That's right.  I'm asking you a
4   different question now.
5      A.   Okay.
6      Q.   Which is:  If the OCC were to
7   liquidate, do you have any reason to think that
8   they wouldn't have conducted that liquidation in
9   the same manner in which the CME did?
10         MR. OXFORD:  Same objection.
11     A.   I don't know their procedures for
12  liquidating accounts.  I would assume it could
13  be similar to the CME, but in light of the CME
14  doing that, if I was Lehman, I would take -- I
15  would be proactive and do my own liquidation
16  before they liquidated me and I could lose $1.6
17  billion.
18     Q.   If you thought you couldn't avoid the
19  loss of $1.6 billion either way, might you just
20  decide to transfer the accounts to an acquirer
21  instead of liquidating them yourself?
22         MR. OXFORD:  Objection.  Asked and
23  answered.  Assumes facts not in evidence.
24     A.   Again, I think I've said I would
25  assess the risk of doing the business, but if I
```

Contains Highly Confidential Portions

Page 190

D. McIsaac

1  was negotiating transferring the margin, that
2  would be a part to start my negotiating.  If
3  they were liquidated, that would be the amount;
4  I would negotiate from there.
5      Q.    And if you assume that the liquidation
6  would cost you all of the margin, would it be
7  rational to agree to transfer the accounts and
8  transfer the margin with the accounts?
9      A.    For what reason?  Why would I have to
10  do that?  What benefit do I get by doing that?
11     Q.    Do you preserve customer positions by
12  doing that?
13     A.    Are we talking about customer
14  positions or proprietary?  I'm not sure what
15  we're talking about here.  I thought we were
16  talking proprietary positions.  That's what the
17  CME --
18     Q.    Would it preserve customer positions
19  by doing that?  Let's talk about the customer
20  account.  If you moved -- if you knew that you
21  were going to lose the posted margin in a
22  liquidation either way, would it be rational to
23  transfer that margin to an acquirer in order to
24  preserve the customer positions for the benefit

Page 191

D. McIsaac

1  of those customers?
2      MR. OXFORD:  Objection.  Asked and
3  answered.  Assumes facts not in evidence.
4  You can answer.
5      A.    I would assume you would take all that
6  into account.  The main thing I would look at is
7  that the CME liquidated the proprietary
8  positions and not the customer positions.
9      There is some, I guess some goal in
10  preserving the customer positions even from the
11  clearing orgs., so I would assume Lehman would
12  talk to the OCC and said if we liquidated all of
13  our proprietary positions, maybe they would not
14  liquidate the customer positions.  That would be
15  something you would negotiate when that is
16  happening.  You would discuss it when that is
17  happening.
18     Q.    Assuming the parties didn't agree to
19  just transfer all of the accounts with all of
20  the margin to Barclays?
21     A.    I would think you would look at all
22  your options before you decided on doing
23  something.
24     Q.    Okay.  And how long does it take to

Page 192

D. McIsaac

1  analyze all of your options in the circumstances
2  that we're talking about here?
3      MR. OXFORD:  Objection.  Form.
4      MR. GREEN:  Same objection.
5      A.    I don't know how long they had to
6  prepare for these options and how long -- how
7  long it would take to call the OCC and ask them
8  the question.  I'm sure you could ask them the
9  question and go from there and see what they
10  said.
11     Q.    And what question would you propose
12  asking the OCC?
13     A.    Well, you're -- you seem to be
14  concerned about them liquidating the account.  I
15  would talk to the OCC and say, "The CME just
16  liquidated my accounts.  What are your plans?"
17     Q.    And --
18     A.    Or I'm sure maybe they were having
19  discussions with the OCC at the time.
20     Q.    Didn't we look at an e-mail earlier
21  that showed that -- that had the discussion with
22  the OCC and the OCC told Lehman and the Trustee
23  that it was going to liquidate their accounts?
24     A.    That was after the 19th.

Page 193

D. McIsaac

1      Q.    Okay.
2      A.    The sale agreement was the 16th.
3      Q.    Let's assume the threats to liquidate
4  started on the 15th.  Does that change your
5  opinion?
6      MR. OXFORD:  Object to the form.  It
7  assumes facts not in evidence.
8      You can answer if you're able.
9      A.    I don't know what happened at the time
10  and I don't know -- we're assuming if the OCC
11  came in on the 15th and said unless you
12  liquidated, if that was the case, then why on
13  the 20th were they threatening to liquidate it
14  if they already threatened to liquidate it and
15  didn't do it?  I'm not sure --
16     Q.    I understand, but I want you to
17  understand that I'm trying to ask you questions
18  because you are providing an expert opinion
19  about what would have been rational under these
20  circumstances, and I'm probing that by
21  describing to you the circumstances that may or
22  may not affect your opinion.
23      So I would like you to answer my
24  questions as opposed to posing questions each

Contains Highly Confidential Portions

Page 194

D. McIsaac

1  time.
2      A.   Sorry about that.
3      Q.   That's okay.
4      A.   I -- would it be rational?  It would
5  be rational to do many things.  It might be
6  rational to transfer the margin.  It might be
7  rational to liquidate your accounts.  It may be
8  rational to find another buyer.  There's a lot
9  of rational things that could be done at that
10  point in time.
11      Q.   And is it fair to say that you can't
12  really say what would be truly rational if you
13  didn't understand the circumstances?
14          MR. OXFORD:  Objection.  Form.
15      A.   I can say that based -- and I was not
16  there, I don't know what was negotiated and what
17  was discussed.  I think what I laid out was
18  rational things you could do.
19      Q.   How can you say that it wouldn't have
20  been rational for the Trustee to make a decision
21  under the specific circumstances that it was
22  facing at the time if you don't know the
23  specific circumstances that the Trustee was
24  facing at the time?

Page 195

D. McIsaac

1          MR. OXFORD:  Objection.  Form.
2      A.   We talked about the 15th is what I
3  asked the question -- answered a question on,
4  and the Trustee wasn't involved then.  So I'm
5  not sure, this question now, what's the basis of
6  it.  I'm sorry.
7      Q.   Right.  Each question I ask is a new
8  question, so I would appreciate it if you would
9  not assume for every question I ask that I'm
10  building on a prior question.
11      A.   No.  No.  That's why I'm asking what's
12  the basis for this question, because I don't
13  know.
14      Q.   I'm asking you how you can give an
15  expert opinion about what it would have been
16  rational for the Trustee to do under a specific
17  set of facts when you don't know the
18  circumstances that the Trustee was facing at the
19  time?
20          MR. OXFORD:  Objection.  Form.
21  Misstates -- misstates the witness's
22  testimony.
23          But you can answer.
24      A.   I don't know what went through the

Page 196

D. McIsaac

1  Trustee's mind and what his determination was
2  and what he believed to be a rational approach
3  at that time.  What I've given an opinion on is
4  what I think a rational seller would do in my
5  opinion at that point in time, how they would
6  react to what was going on.
7      Q.   Doesn't that opinion require you to
8  know what was going on at that time?
9          MR. OXFORD:  Objection.  Form.
10      A.   I believe I've stated that a rational
11  seller would negotiate the sale of the margin
12  assets.  No matter what was going on at the time
13  you would do that negotiation.
14      Q.   Is it fair to say that it is not your
15  opinion that a rational seller would have
16  required dollar-for-dollar compensation for
17  every dollar's worth of margin that it agreed to
18  transfer in this situation facing this Trustee
19  in September of 2008, or --
20          MR. OXFORD:  Objection.
21      Q.   -- is it not your opinion?
22          MR. OXFORD:  Objection.  Form.  Asked
23  and answered.
24          You can answer it again.

Page 197

D. McIsaac

1      A.   My opinion is a rational seller would
2  look for dollar for dollar, they would negotiate
3  from there, and at this point in time if there
4  were things that needed to be adjusted, people
5  negotiating the sale and the purchase would come
6  to an agreement on what was being sold and what
7  was being purchased.
8      Q.   Okay.  So when you say in your report
9  a rational seller would not include margin in
10  the deal unless it was being compensated dollar
11  for dollar, do you mean what you say in that
12  sentence or are you modifying it here today?
13          MR. OXFORD:  Objection.  Form.  Asked
14  and answered.
15          You can answer it again.
16      A.   You are giving me facts that were not
17  part of my opinion.  What I said in my opinion
18  was a rational purchaser would want to quantify
19  the risk to determine what additional assets it
20  needed, and a rational seller would include
21  margin on dollar-for-dollar basis.
22          As you negotiate that, you may change
23  your mind.  You may decide I'll take 50 cents on
24  the dollar, I may take 25 cents on the dollar, I

Contains Highly Confidential Portions

Page 198

D. McIsaac

1
2    may want a dollar and a half on a dollar because
3    I think the assets are worth more.  That's a
4    negotiation that would occur at that time.
5        Q.    You might want zero --
6        A.    But the starting fact would be I would
7    want dollar for dollar and I would negotiate
8    from there.  I would assume I would not give
9    away assets for nothing.
10       Q.    Would you agree that there could be
11   circumstances in which it was rational to agree
12   to transfer the accounts in exchange for the
13   margin that was posted to secure those accounts?
14       MR. OXFORD:  Objection.  Form.
15       A.    I would agree that the seller could
16   make a rational decision to transfer the
17   accounts with no compensation, if that's what
18   they wanted, based on facts and circumstances at
19   that point in time if that's what they
20   negotiated, but I would anticipate that that
21   would be somehow brought into -- into the
22   contract that that was being done and probably
23   brought in front of the judge if he was selling
24   assets above and beyond what was in the
25   Clarification Letter.

Page 199

D. McIsaac

1
2        Q.    Okay.
3        MR. OXFORD:  Trish, that's about
4    another hour.  I don't know if this is a
5    good time to take five minutes.
6        MS. BLOOMER:  Yes, it's fine.
7        THE VIDEOGRAPHER:  The time is 3:03.
8    This is the end of the tape labeled number
9    4.  We're going off the record.
10       (Recess.)
11       THE VIDEOGRAPHER:  This is the start
12   of the tape labeled number 5.  The time is
13   3:19.  We're back on the record.
14   BY MS. BLOOMER:
15       Q.    Good afternoon again.
16       A.    Good afternoon.
17       Q.    Would you consider assets that were
18   posted as margin at a clearing organization with
19   respect to an exchange-traded derivatives
20   account to be an asset that's used in the
21   business of the exchange-traded derivatives?
22       MR. OXFORD:  Objection.  Form.
23       A.    It would be an asset that at that
24   point in time was being used to secure the
25   obligations.  Assets used in the business may

Page 200

D. McIsaac

1
2    have a lot of different terms.
3        Q.    Do you agree that posted margin is
4    associated with the exchange-traded derivatives
5    business that it secures?
6        A.    It's associated with the
7    exchange-traded derivatives that it's securing.
8    I don't know what business it would be part of.
9        Q.    Can you operate an exchange-traded
10   derivatives business without posting margin to
11   satisfy the requirements of a clearing
12   organization?
13       A.    I don't believe so.
14       Q.    I'm showing you Exhibit 1, which is
15   the Asset Purchase Agreement.  If you could turn
16   to page 2 at the bottom, meaning the number on
17   the bottom.  The term "business" is defined, do
18   you see that?  It's the second full definition
19   on page 2.
20       A.    You're saying -- oh, I'm sorry.
21   Business, yes, I'm sorry.  I was looking at the
22   bottom, actually.
23       Yes.
24       Q.    Would exchange-traded derivatives in
25   your experience fall under any of the categories

Page 201

D. McIsaac

1
2    of LBI's businesses that are described in this
3    definition?
4        MR. OXFORD:  Objection.  Form.
5        A.    The concept of exchange-traded
6    derivatives -- there are different parts of the
7    business.  You have futures that are clearing
8    and execution business.  You have equity options
9    that are just -- that are transpiring for
10   customers that are just part of the customer
11   business as well as selling bonds, you know,
12   stocks and bonds, and then you have trading of
13   exchange-traded derivatives that could be part
14   of a portfolio of assets or you could possibly
15   just be trading them by themselves.
16       Q.    Okay.  And one of the businesses
17   that's listed here of the seller that are
18   encompassed within the term "business" is the
19   trading and advisory businesses.  Do you see
20   that?
21       A.    Uh-huh.  I see fixed income and
22   equities cash trading.
23       Q.    And then in the next line do you see
24   trading and advisory businesses?
25       A.    Yes.

Page 202

D. McIsaac

1
2     Q.    Would exchange-traded derivatives that
3   were proprietary to LBI be considered part of
4   the trading business of LBI?
5     A.    I'm a little confused why trading
6   would be used in two places. I'm not sure
7   what -- what the differentiation is between the
8   two of them. Fixed income and equities cash
9   trading and trading and advisory business, I
10  just don't know why it would be referenced
11  twice.
12    Q.    Is it your understanding that the
13  exchange-traded derivatives were a portion of
14  the trading business that Barclays acquired?
15          MR. OXFORD: Objection. Form.
16    A.    The proprietary part of it would have
17  been part of the exchange -- the trading
18  businesses that they acquired.
19    Q.    And would you agree that the customer
20  futures business that Barclays acquired from
21  Lehman was -- I'm sorry. Would you agree that
22  the customer futures business that LBI conducted
23  prior to September 22, 2008 would fall within
24  the definition of LBI's business as a futures
25  commission merchant?

Page 203

D. McIsaac

1
2     A.    Yes.
3     Q.    Okay. If you turn to page 4 -- I'm
4   sorry, page 10. I'm sorry, 6.
5          If you turn to page 6 of the Asset
6   Purchase Agreement, do you see the definition of
7   "purchased assets" that begins around the middle
8   of that page?
9     A.    Uh-huh.
10    Q.    It says, "Purchased Assets means all
11  of the assets of seller and its subsidiaries
12  used in connection with the business, excluding
13  the excluded assets," and then the word
14  "including," do you see that?
15    A.    Yes.
16    Q.    And the term "business" that's
17  capitalized there, do you understand that to be
18  referring to the business definition that we
19  just looked at on the prior page?
20    A.    I believe so.
21    Q.    Okay. If you look at page 10, there's
22  a word "including" that's defined. Do you see
23  that?
24    A.    Yes.
25    Q.    And do you see that it says, "The word

Page 204

D. McIsaac

1
2   'including' or any variation thereof means
3   including, without limitation, and shall not be
4   construed to limit any general statement that it
5   follows to the specific or similar terms or
6   matters immediately following it."
7     A.    Yes.
8     Q.    Turning back to page 6, the definition
9   of "purchased assets," given the definition we
10  just looked at of the term "including," is it
11  fair to say that the "purchased assets"
12  definition is not limited by the subparagraphs
13  that follow the word "including"?
14          MR. OXFORD: Objection. Form. Calls
15      for a legal conclusion.
16    A.    Yeah, I'm not a lawyer, so this is --
17  I'm not sure what it means and if you had before
18  businesses, why you needed additional, but I
19  don't know. I'm not -- I don't want to -- I
20  don't want to give an opinion on a legal
21  document.
22    Q.    Okay. You understand what the term
23  "including without limitation" means?
24    A.    I believe so.
25    Q.    What does that mean?

Page 205

D. McIsaac

1
2     A.    It means including without limitation.
3     Q.    And you understand what that means,
4   the common usage of that term means?
5     A.    I -- "including without limitation"
6   means including, we're not limiting it to what
7   it means, what follows it.
8     Q.    Okay. Thank you. Is it your opinion
9   that the margin that was posted in LBI's
10  accounts at the OCC were not assets of LBI used
11  in connection with the business, as that term is
12  defined in this agreement?
13          MR. OXFORD: Objection. Form.
14      Misstates the document. Calls for a legal
15      conclusion.
16          You can answer.
17    A.    Could you re-read that question?
18    Q.    Is it your opinion that the margin
19  that was posted in LBI's accounts at the OCC
20  were not assets of LBI used in connection with
21  the business as that term is defined in this
22  agreement?
23          MR. OXFORD: Objection. Form. Again,
24      misstates the document. Calls for a legal
25      conclusion.

Contains Highly Confidential Portions

Page 206

D. McIsaac

1
2     A.   There was a negative in there and I'm
3   not sure -- I mean, I don't know what that term
4   means in a legal document.
5     Q.   Are the assets posted as margin at the
6   OCC assets of LBI?
7     A.   They may or may not be assets of LBI.
8     Q.   Do you know in the context of the
9   assets at the OCC as of September 19, 2008
10  whether they were assets of LBI or assets of
11  someone else?
12    A.   The assets posted there could have
13  been derived from many factions.  If they put
14  Treasury bills up, it could have been Treasury
15  bills owned by LBI.  It could have been Treasury
16  bills that were accepted as collateral against a
17  receivable for a reverse repo or a stock borrow.
18  It could be customers or non-customers assets.
19    Q.   Do you understand the Trustee's
20  position in this case to be the assets at the
21  OCC were not LBI proprietary assets?
22    A.   I don't know if I have seen that -- I
23  don't recall seeing that specific phrase, that
24  they were not proprietary assets.
25    Q.   You reviewed this agreement when you

Page 207

D. McIsaac

1
2   provided your opinion; is that right?
3     A.   Yes.  Uh-huh.
4     Q.   And is it your opinion that this
5   agreement does not encompass the margin assets
6   that were posted at the OCC?
7     A.   I don't believe I've seen anything in
8   here that references margin assets, and it
9   appeared to be a very substantial asset class.
10  I would have thought they would have been broken
11  out in the agreement as to what was happening
12  with the assets that were posted at various
13  exchanges.
14    Q.   You said earlier when we looked at the
15  Transfer and Assumption Agreement that you would
16  have assumed that the purchase agreement would
17  document the agreement to transfer margin to
18  Barclays if that were the parties' agreement,
19  correct?
20    A.   Right.
21    Q.   Do you think this purchase agreement
22  accomplishes that when it says "all assets of
23  seller used in connection with the business,
24  excluding the excluded assets, are purchased
25  assets"?

Page 208

D. McIsaac

1
2     MR. OXFORD:  Objection.  Form.  Asked
3   and answered.  You can answer.
4     A.   At points in time you may use assets
5   to secure your obligations.  I don't know if
6   they would be considered assets of the business.
7   If they were $700 million today and $200 million
8   tomorrow, what would they be?  So I would think
9   if you were trying to transfer or somehow
10  include those margin assets, you would define
11  them and what the value was because that value
12  could have changed drastically from day one to
13  whenever you're consummating the deal.  As you
14  saw, the margin requirements go significantly up
15  and then down.
16    Q.   Is it your understanding that the
17  parties agreed that they would include specific
18  references to every asset that Barclays was to
19  acquire in this transaction?
20    MR. OXFORD:  Objection.  Form.
21    A.   I don't know if they did or not.  I
22  would think significant assets such as margin
23  would be noted and what was happening with it.
24    Q.   The agreement says that all of the
25  assets used in connection with the business are

Page 209

D. McIsaac

1
2   purchased assets, excluding the excluded assets.
3     Would you expect that since margin was
4   such a significant asset, as you say, that it
5   would have, therefore, had to have been -- that
6   it would, therefore, have been logical to
7   reference it in the excluded assets section if
8   indeed the parties intended to exclude it?
9     MR. OXFORD:  Objection.  Form.
10    A.   I don't know if you -- I would always
11  include what you're buying, not necessarily
12  exclude what you're not buying.  I think to make
13  something really understandable, you would say
14  include this, include that.
15    Like I said, the margin at the point
16  in time when this was done might have been a
17  billion dollars.  On the 19th, it might have
18  been $100 million.  I think you would define
19  that at the time you were agreeing to the
20  contract so that you made sure both parties came
21  to what their -- with what they agreed to.
22    So if it was on the 15th or something,
23  it was one item, one balance, later on it's a
24  different balance.  I don't think an asset like
25  that would be included without some kind of

Page 210

D. McIsaac

1    reference.
2        Q.   So you would assume the parties to a
3    transaction would specifically identify the
4    included assets as opposed to saying we're
5    getting everything except the excluded assets;
6    is that your testimony?
7        A.   I would expect if it's an asset like
8    margin, that would go up and down in value on a
9    daily basis.  If you were negotiating to buy
10   that asset, you would want to put into the
11   contract what the value of that asset is, what
12   that asset is that you're receiving.
13       Open-ended margin could be, again, it
14   could have been a dollar.  Would they have
15   accepted it if it was only a dollar?  I don't
16   know.  So I think for any ambiguity, you would
17   include the assets and you would either state at
18   the time of the transaction or put a dollar
19   amount at that point in time so that if they
20   were used at one point in time, they weren't
21   sold out, you know, five days later.
22       Q.   If you were advising LBI on this deal,
23   and you saw that the agreement was structured so
24   that all of the assets were purchased assets

Page 211

D. McIsaac

1    except what was excluded, would you advise them
2    that to avoid ambiguity they should reference
3    margin in the excluded assets section?
4        MR. OXFORD:  Objection to form.
5        A.   I would probably advise the seller --
6    the buyer to make sure that they put in all the
7    assets that they wanted to make sure they got in
8    the agreement, not --
9        Q.   I'm not asking you what you would do
10   for the buyer.  I'm asking you if you were
11   advising the seller and their agreement stated
12   "purchased assets means all of the assets of
13   seller used in connection with the business,
14   excluding the excluded assets, would you advise
15   him that it was prudent to reference margin as
16   an excluded asset given how substantial the
17   value was.
18       A.   I would advise them to reference it
19   either as excluded or included.
20       Q.   Included if it was included and
21   excluded if it was excluded?
22       A.   Right.
23       Q.   Okay.  Is it your understanding that
24   Barclays knew on September 16, 2008 what the

Page 212

D. McIsaac

1    margin was worth at the OCC and at the other
2    clearing organizations to which LBI traded in
3    exchange-traded derivatives?
4        A.   I believe I've seen some e-mail
5    traffic that noted that the legal counsel for
6    Barclays had been discussing margin requirements
7    of various exchanges.  I think Mr. Leitner
8    pointed out that Barclays was monitoring their
9    exposure by knowing what the margin values were.
10   So I assume they knew something that was going
11   on at the exchanges.
12       Q.   Is it your opinion that you would have
13   advised the acquirer to reference margin
14   specifically because it was so substantial in
15   value assumes that Barclays knew on September 16
16   what the value of the margin was; is that
17   correct?
18       A.   I would think they would know what
19   assets they were buying.
20       Q.   And does your opinion assume that they
21   knew what assets, what the value of the margin
22   was that they were buying on April -- on
23   September 16, 2008 when they entered into this
24   Asset Purchase Agreement?

Page 213

D. McIsaac

1        MR. OXFORD:  Objection.  Form.
2        A.   I would have to assume somebody
3    purchasing assets would know the value of the
4    assets they were purchasing, if not what they
5    thought the value was, at least what the value
6    was on the seller's records.
7        Q.   I'm not trying to be argumentative.
8    You've given an opinion in your report, and we
9    can look at the opinion if you don't recall it.
10       You've given an opinion in your report
11   that, given how much this margin was worth, you
12   would have expected the acquirer to reference it
13   specifically as a purchased asset --
14       A.   Yes.
15       Q.   -- if indeed they thought it was being
16   purchased.
17       I'm asking you whether that opinion
18   assumes that Barclays knew on September 16, 2008
19   what the value of the margin was that LBI held
20   or that LBI had posted to secure the
21   exchange-traded derivatives?
22       A.   Again, I would assume they knew the
23   value of what they were purchasing.  So I --
24       Q.   Does your opinion --

Page 214

D. McIsaac

1     A.    My opinion assumes that they would
2  know the value they were purchasing.  I would
3  assume most people wouldn't buy something that
4  they didn't know what they were buying.
5     Q.    Would you assume that most people
6  wouldn't buy an entire broker-dealer business
7  based on 48 hours of negotiations as well?
8        MR. OXFORD:  Objection.  Form.
9     Assumes facts not in evidence.
10    A.    From what I understand, Bank of
11  America bought Lehman, more than just the
12  brokerage business, over a weekend.  So I think
13  you can buy anything you want in any time period
14  you want.  I don't know how much due diligence
15  was done in July, in August, in June.
16        People have an understanding of the
17  various competitors and what they do and how
18  they manage it.  There are reports out there.
19  There's information out there.  So I don't know
20  what Barclays knew when they negotiated the
21  deal.
22        I don't know how much time they took
23  to write this versus how much time it took to
24  determine what they were buying.

Page 215

D. McIsaac

1     Q.    And again, you think it's possible
2  that they executed this agreement before they
3  knew what they were buying?
4        MR. OXFORD:  Objection.  Form.
5     Misstates the witness' testimony.
6        You can answer.
7     A.    I believe I said I assume when they
8  execute an agreement they knew what they were
9  buying.
10    Q.    Is that assumption based on any
11  preliminary assumptions about how much time
12  Barclays had to do the due diligence prior to
13  the time it entered into this transaction?
14    A.    I can't fathom why anybody would buy
15  anything without knowing what they were buying.
16  So if they took 48 hours and thought that was
17  enough to assess what they were buying and put a
18  value on it, then that's what they did.
19        I don't know -- I can't be in Barclays
20  shoes to figure out what was in their mind when
21  they bought this.  Evidently, they thought they
22  were getting valuable assets.  How much they
23  were getting and what they were willing to pay
24  for it they had to make an assessment, and I

Page 216

D. McIsaac

1  assume they took whatever time it needed to take
2  to do that assessment.
3        And I'm assuming that this transaction
4  had to be approved by the board of directors.
5  They had to provide some information to their
6  board of directors on a purchase of this size.
7        I don't think they went to
8  the board -- would have gone to the board of
9  directors and said we're going to buy this, but
10  we don't know what we're buying.  So I would
11  think they would have had a clear understanding
12  of what they were buying.
13    Q.    Might they have had a clear
14  understanding of what they were buying but not
15  necessarily a clear understanding of what all of
16  those assets were worth?
17    A.    Then what were they buying if they
18  didn't know what they were buying, what the
19  worth -- how could you put a price on something
20  unless you assessed it?
21    Q.    I would appreciate it if you would
22  answer my question.
23    A.    I'm sorry.  I'm asking you, I don't
24  believe a purchaser would enter into an

Page 217

D. McIsaac

1  agreement to purchase something without
2  assessing what the value is that they were
3  purchasing.
4     Q.    Okay.  If you could take the Sale
5  Order transcript that we had looked at earlier,
6  it's Exhibit 442, and if you could turn to
7  page -- if you could turn to page 60.
8        At the bottom of page 60, the hearing
9  transcript reads: "We cannot take the risk of
10  rejecting this transaction because of
11  ambiguities, the lack of a piece of paper to
12  support every element of the assets to be
13  transferred, the lack of a definition as to
14  particular items."
15        Do you see that?
16    A.    Yes.
17    Q.    Is it possible that in this
18  circumstance the parties agreed, due to the
19  extraordinary circumstances at the time, to
20  structure a deal in a way that they wouldn't
21  structure under normal circumstances?
22        MR. OXFORD:  Objection.  Form.
23    A.    I believe that they might structure a
24  deal differently than they would under different

Contains Highly Confidential Portions

Page 218

D. McIsaac

1   circumstances, yes.
2   Q.   And is it your understanding that the
3   circumstances that existed in 2000 -- in
4   September of 2008 made it such that the parties
5   in fact conducted their negotiations and
6   structured this transaction in a manner
7   differently than they would have under normal
8   market situations, circumstances?
9       MR. OXFORD:  Objection.  Asked and
10      answered.
11      A.   I believe I answered that saying yes,
12  I believe this was a different time and they
13  negotiated this differently than they would have
14  at other times.
15      Q.   Is it possible that Lehman was willing
16  to offer terms to Barclays that a typical seller
17  wouldn't necessarily offer because of the
18  exigencies that made this transaction important
19  to Lehman?
20      MR. OXFORD:  Objection.  Form.
21      A.   I'm not sure how -- why a firm would
22  do certain things at times.  It couldn't make
23  agreements that it normally wouldn't make.  I'm
24  not sure what was in Lehman's mind or Barclays'

Page 219

D. McIsaac

1   mind at the time of selling this and what
2   decisions they thought they were doing and for
3   what reasons.
4       Q.   I'm showing you a document marked as
5   Exhibit 689.
6       (Exhibit 689, Deposition of James
7       Kobak, marked for identification, as of this
8       date.)
9       Q.   This is deposition testimony that was
10  provided on behalf of the Trustee by Mr. Kobak.
11      Are you familiar with this deposition
12  testimony?
13      A.   I don't know if I've read it and
14  relied upon it.  I know Mr. Kobak made
15  declarations and depositions.  I don't know if
16  this was something that was in my reliance
17  materials, but I know he made the depositions.
18      Q.   Okay.  So you haven't necessarily --
19  do you remember reading this deposition
20  transcript?
21      A.   I don't remember, but I might have
22  read it.  I don't remember.  I read a few of
23  them and -- I don't know if I read this one.  I
24  think I might have.  I'm not sure if it was this

Page 220

D. McIsaac

1   or the declaration.
2       Q.   Fast forwarding to the time that the
3   SIPC Trustee was introduced into this matter on
4   Friday, September 19, you said that you don't
5   know what was in the minds of the parties at the
6   time that they were considering this
7   transaction; is that right?
8       A.   Uh-huh.
9       Q.   If you could turn to page 282 of Mr.
10  Kobak's deposition testimony, starting on line
11  14, the question says, and this is, for context,
12  talking about a Collateral Agreement that the
13  Trustee signed on Friday, September 19, either
14  at or shortly after the sale hearing:
15      It says, "LBI has assigned to Barclays
16  all rights and securities, cash, and other
17  property defined as collateral pledged by LBI to
18  the Options Clearing Corporation and held for
19  OCC's benefit at JPMorgan Chase.  Did you see
20  that?"  The answer is, "Yes."
21      The next question:  "And was it your
22  understanding that that's what the Trustee was
23  authorizing when you signed this?"  And the
24  answer is, "Yes, consistent with the overall

Page 221

D. McIsaac

1   deal that there be no cash excess that would go
2   to Barclays, because that would be inconsistent
3   with the no cash and that this wouldn't make the
4   deal so rich that it would be way beyond the
5   parameters that we discussed earlier."
6       Do you see that testimony?
7       A.   Yes.
8       Q.   Okay.  The next question says:  "Did
9   you tell anyone this?  When you say you signed
10  this consistent with the idea that there would
11  be no cash, this says cash.  This says cash will
12  be transferred to Barclays."  And the answer,
13  "Yeah, but cash would be transferred against the
14  liabilities.  What I'm saying is nobody told us
15  there might be in excess of a billion dollars of
16  cash or something like that that would end up at
17  Barclays when the deal was no cash and when
18  there was an economic parameter to the deal."
19      Question:  "So to the extent the cash
20  was simply needed to cover the liabilities, you
21  thought it was possible to be included in the
22  deal; is that correct?"
23      Answer:  "Yes."
24      Do you recall having ever seen this

Page 222

D. McIsaac

1  testimony before?
2      A.   I don't recall, but I might have seen
3  it, yes. I don't recall right now, but it seems
4  something I might have heard or seen.
5      Q.   Would you agree that this testimony is
6  speaking to the understanding that the Trustee
7  and Mr. Kobak had at the time on September 19,
8  2008?
9      MR. OXFORD: Objection. Form.
10     A.   I mean, it's taken out of context.
11  I'm reading two pages of a 300-and-some-page
12  document. It looks like Mr. Kobak is stating
13  that he was transferring or willing to transfer
14  assets that he thought was part of the deal.
15     Q.   And those assets included collateral
16  pledged by LBI to the Options Clearing
17  Corporation and held for OCC's benefit at
18  JPMorgan Chase, right?
19     A.   That's what it says, yes.
20     Q.   That --
21     A.   That's what the question says.
22     Q.   You understand that to be different
23  from property, customer property held by LBI to
24  secure customer positions?

Page 223

D. McIsaac

1      MR. OXFORD: Objection. Form.
2      A.   I'm not sure of what assets were being
3  held at JPMorgan Chase. It looks like he's
4  saying cash in this reference and it looks like
5  he's assuming it was part of the liabilities.
6  So it might have been the cash that was payable
7  to the customers who put up margin for the OCC
8  trades, and he thought he was just transferring
9  the cash against those liabilities.
10     Q.   Would that be cash held by LBI or cash
11  held by JPMorgan under your interpretation of
12  what this may be referring to?
13     A.   It would be cash held by LBI at
14  JPMorgan.
15     Q.   For whose benefit?
16     A.   LBI's.
17     Q.   Okay. This seems to be talking about
18  cash that was held for the OCC's benefit at
19  JPMorgan Chase, do you see that?
20     A.   It looks like it's being pledged to
21  the OCC for the benefit of LBI and it's held at
22  Chase.
23     Q.   And you agree that this is property
24  held at Chase, not at LBI?

Page 224

D. McIsaac

1      MR. OXFORD: Objection. Form.
2      A.   It's property held at LBI on deposit
3  at Chase.
4      Q.   I'm showing you what has been marked
5  as Exhibit 25. Do you recognize this document?
6      A.   I believe this is what's considered
7  the Clarification Letter.
8      Q.   Did you rely on this in forming your
9  opinions in this case?
10     A.   I reviewed this, yes.
11     Q.   And is it your opinion that this
12  agreement does not encompass property held in
13  respect of OCC accounts to secure proprietary
14  positions of LBI as of September 19, 2008?
15     MR. OXFORD: Objection. Form.
16     A.   I believe this does not indicate the
17  transfer or sale of LBI assets put up as margin
18  at the OCC.
19     Q.   If you look at the top of page 2,
20  capital letter C in that first paragraph. And
21  this is a definition of the purchased assets.
22  It says, "Exchange-traded derivatives and any
23  property that may be held to secure obligations
24  under such derivatives." Do you see that?

Page 225

D. McIsaac

1      A.   Yes, I do.
2      Q.   Do you agree with me that this
3  language is not limited to customer property?
4      MR. OXFORD: Objection. Form.
5      A.   I don't know what the parenthetical
6  really means. I think in my report, if that's
7  what you're asking me, I think the
8  parenthetical, to be clear, if this was margin
9  posted, it would say -- it would say assets
10  posted to secure LBI's obligations. It doesn't
11  say that, so it's kind of ambiguous on what I'm
12  holding and what this clause means.
13     To me it means I'm holding it, which
14  means probably customers have given it to me to
15  secure their assets -- their transactions.
16     Q.   It doesn't strike you as ambiguous
17  that it doesn't say customer property and you're
18  willing to assume that any property is
19  customer -- strike that. Do you agree with me
20  that the language here nowhere references
21  customer property?
22     A.   Yes.
23     Q.   Do you see the reference to any
24  property?

Contains Highly Confidential Portions

Page 226

1                 D. McIsaac
2      A.   No.  I see a reference to any
3  property.
4      Q.    No reference to customer property
5  appears on the face of this document; is that
6  right?
7           MR. OXFORD:  Objection.  Form.
8      A.    I believe that's correct.  I haven't
9  read the rest of it, but in that clause there's
10  nothing there.  I don't know if in -- if
11  anything in paragraph C says anything to -- you
12  said the whole page.  I don't know if anything
13  in paragraph C says anything.  I'm just looking
14  at this clause you're talking about.
15      Q.   Uh-huh.
16           MR. OXFORD:  Just so we're clear,
17  Trish's question was about the whole
18  document.
19           MS. BLOOMER:  No, my question is about
20  this parenthetical.
21           MR. OXFORD:  Okay.  Then you might
22  want to clear up the record.
23      Q.    Does this parenthetical reference the
24  term "customer property" or does it say "any
25  property"?

Page 227

1                 D. McIsaac
2           MR. OXFORD:  Objection.  Form.
3      A.    It says "any property."
4      Q.    You said that you thought it would be
5  ambiguous to say "property that may be held" if
6  what you really meant was "property posted,"
7  correct?
8      A.    Yes, that's correct.
9      Q.    Is it also ambiguous to say "any
10  property" if what you mean is "customer
11  property"?
12      A.    I'm looking at the whole phrase and it
13  says "any property that may be held to secure."
14  I'm looking at the whole phrase, not just the
15  two little words.  I'm looking at the whole
16  phrase and the way it's written.
17      Q.    And does the whole phrase reference
18  customer property?
19           MR. OXFORD:  Objection.  Form.  Asked
20  and answered.
21      A.    I believe to me, my opinion, this
22  would refer to assets held by LBI, and the only
23  assets they would have to secure obligations on
24  the derivatives would be with customers or for
25  counterparties.

Page 228

1                 D. McIsaac
2      Q.    Does the language say "any property
3  that may be held by LBI"?
4      A.    No, but to me, my opinion held to
5  secure, if I'm writing this, if I'm part of this
6  agreement, I would have to be holding it, not
7  anybody else; and holding it, I mean and I have
8  the obligation to return it to somebody.
9      Q.    Do you think the parties could have
10  written "it may be held by or on behalf of LBI"
11  if that's what they intended?
12           MR. OXFORD:  Objection.  Form.
13      A.    I believe they could have written "and
14  any property posted by LBI to secure their
15  obligations."
16      Q.    Okay.  If you look with me at
17  paragraph 8 on page 4, the third line down
18  reads, "Any and all property of any customer,
19  including any held by or on behalf of LBI, to
20  secure the obligations of any customer whose
21  accounts are being transferred to purchaser as
22  part of the business."  Do you see that?
23      A.    Yes.
24      Q.    And it says "purchaser shall receive
25  for the account of the customer any and all

Page 229

1                 D. McIsaac
2  property of any customer, including any held by
3  or on behalf of LBI to secure the obligations of
4  any customer."  Do you see that?
5      A.    Just let me read it again, please.
6  "Shall receive ..."
7           Yes.
8      Q.    So would you agree that in this
9  paragraph when the parties intended to limit a
10  phrase to "customer property held by or on
11  behalf of LBI," they said "property of any
12  customer held by or on behalf of LBI"?
13           MR. OXFORD:  Objection to form.
14      Q.    Would you agree with that?
15      A.    What -- excuse me.  What was the
16  question?
17      Q.    Would you agree that in this paragraph
18  when the parties intended to limit a phrase to
19  "customer property held by or on behalf of LBI,"
20  they said "property of any customer held by or
21  on behalf of LBI"?
22      A.    It says here "held by or on behalf of
23  LBI."  So I'm assuming that's what they wanted
24  it to mean, but yes, I can't read into their
25  mind what they said because I think you were

Page 230

D. McIsaac

1    referring is this what they meant to say, and I
2    don't know if this is what they meant to say.
3    This is what they said.
4        Q.    And back to page 2, they didn't say
5    "any property of any customer," did they?
6        A.    No, they did not.
7        Q.    And they didn't say "by or on behalf
8    of LBI," did they?
9        A.    No, they did not.
10        Q.    Okay.
11        A.    But they --
12        Q.    But you would read this language --
13        MR. OXFORD:  Excuse me, Trish.  Mr.
14    McIsaac wasn't finished with his last
15    sentence.
16        A.    But as clearly as they defined it
17    here, why wouldn't they have clearly defined it
18    over here?
19        Q.    Perhaps because -- could it be because
20    they were referring to two different categories
21    of assets?
22        A.    I don't know, but they clearly --
23        Q.    Is that possible?
24        A.    I guess anything is possible.  I don't

Page 231

D. McIsaac

1    know why they would have been so clear in a
2    definition here and not so clear in the
3    definition over here.
4        Q.    Did you consider that they were being
5    perfectly clear and that they were referring to
6    two different sets of assets and that's why they
7    described them differently?
8        MR. OXFORD:  Objection.  Form.  Asked
9    and answered.
10        A.    To me, it wasn't clear.  So, no, it
11    wouldn't have been clear to me because to me if
12    I was transferring the margin that I had posted
13    at exchanges, that would be the clear
14    definition.
15        I think over here, where they talk
16    about -- they're talking about held by and on
17    the behalf of LBI, that means LBI is holding it,
18    but it may be at JPMorgan or someplace else.  So
19    I think this is fairly clear.  I don't think the
20    first clause is that clear as to what they meant
21    by it.
22        Q.    Do you agree that exchanges and
23    clearing corporations hold property to secure
24    obligations of derivatives that their clearing

Page 232

D. McIsaac

1    members hold?
2        A.    Clearing organizations require margin
3    to be held for the obligations of the clearing
4    member.  I believe that was your question.
5        Q.    So the OCC holds property just as LBI
6    holds property; is that right?
7        A.    That's correct, and the OCC's
8    responsibility would be to return to me the
9    property because I posted it with them and my
10    responsibility no matter where it is to return
11    that property to whoever gave it to me no matter
12    where I posted it.
13        Q.    In your opinion does paragraph 8
14    encompass anything that is not encompassed by
15    the parenthetical on page 2?
16        MR. OXFORD:  Objection.  Form.  You
17    mean the whole of paragraph 8 or to specific
18    subsections you referred him to earlier?
19        MS. BLOOMER:  I mean the sentence that
20    we've been focusing on, which starts "in
21    connection therewith" and reads through
22    "whose accounts are being transferred to
23    purchaser as part of the business."
24        Q.    Do you see the language that I refer

Page 233

D. McIsaac

1    you to?  Does this encompass anything, in your
2    opinion, that's not already encompassed by
3    paragraph C on page 2 and the parenthetical?
4        MR. OXFORD:  Objection.  Form.  Calls
5    for a legal conclusion, but you can answer.
6        A.    Yeah, I mean, it's a legal document.
7    My assumption is that on this is this is not
8    just referring to exchange-traded derivatives,
9    this is referring to the entire account of a
10    customer that would be transferred to Barclays.
11    So if they were holding equity securities at DTC
12    for the customer, we would transfer them to
13    Barclays.
14        Q.    And in your opinion, the parenthetical
15    on page 2 -- do you believe that the
16    parenthetical on page 2 is unambiguous in terms
17    of the property that it's referring to?
18        MR. OXFORD:  Objection.  Asked and
19    answered.
20        A.    It doesn't define the property.  It
21    just defines any property that may be held to
22    secure obligations under such derivatives.
23    Again, I believe that's any property held by
24    LBI, not posted by LBI, because if it was

Contains Highly Confidential Portions

Page 234

D. McIsaac

1       posted, I think the words would have been used
2       "posted" or "held by" or someplace else further
3       clarification I think would be included.
4           Q.   Are assets posted at the OCC by LBI as
5       of September 19, 2008 property held by the OCC
6       to secure obligations under the derivatives held
7       in the OCC accounts?
8           A.   I just want to make sure I have your
9       question clear.  I believe the question was, is
10      the property held at OCC there to secure the
11      obligations in the accounts at OCC?
12          Q.   No, that wasn't my question.
13          A.   Okay.
14          Q.   Are assets posted at the OCC by LBI
15      property that is held by the OCC to secure
16      obligations under the derivatives in the OCC
17      accounts?
18              MR. OXFORD:  Objection.  Form.
19          A.   It's property held by OCC.  It may be
20      excess, but it's in the accounts to secure it.
21      Some of it may be used to secure obligations.
22      Some of it may be excess collateral.
23          Q.   Okay.  I'm showing you a document
24      that's marked as Exhibit 690.

Page 235

D. McIsaac

1           (Exhibit 690, a document bearing Bates
2       Nos. CGSH33921 through 922, marked for
3       identification, as of this date.)
4           Q.   Could you take a moment to review this
5       e-mail.
6               (Document review.)
7           Q.   Have you had a chance to review the
8       document?
9           A.   Yes.  Yes.
10          Q.   The first sentence of the e-mail from
11      James McDaniel at Sidley --
12              Do you know who James McDaniel at
13      Sidley is?
14          A.   I believe he's one of their counsels.
15          Q.   One of whose counsel?
16          A.   Sidley's counsels for the OCC.
17          Q.   For the OCC.  Okay.
18              And on September 20, this e-mail is
19      sent.  You see that it's copied to several
20      individuals from Weil?  Do you understand that
21      to be Weil Gotshal?
22          A.   Yes.
23          Q.   And you understand that that is the
24      law firm that represented LBHI in this

Page 236

D. McIsaac

1       transaction?
2           A.   Uh-huh.
3           Q.   Okay.  And then you see that Mr. Kobak
4       and Mr. Giddens are also copied on this e-mail?
5           A.   Yes.
6           Q.   And that's the Trustee and his
7       counsel, correct?
8           A.   That's correct.
9           Q.   The first sentence of the e-mail says,
10      "To the group:  OCC is seeking to confirm its
11      understanding that the LBI accounts and all
12      positions, cash and securities collateral that
13      are held by OCC in respect of those accounts are
14      intended to be transferred to Barclays and that
15      Barclays is assuming all obligations with
16      respect to those accounts."  Do you see that?
17          A.   Yes.
18          Q.   Do you believe -- are you aware of any
19      recipient of this e-mail responding to this and
20      telling the OCC that Barclays was not to receive
21      the cash and securities collateral held by the
22      OCC in respect of the OCC accounts?
23          A.   I am not aware of anybody sending an
24      e-mail back saying that.

Page 237

D. McIsaac

1           Q.   You said earlier that the margin at
2       the OCC was of significant value, did you not?
3           A.   Yes.
4           Q.   Would you have expected any recipient
5       of this e-mail to raise an objection to the
6       OCC's stated intent if they were not of the same
7       understanding as to who would be entitled to the
8       cash and securities collateral held by OCC in
9       respect of the OCC accounts?
10              MR. OXFORD:  Objection.  Form.
11          A.   I believe this is advising the
12      individuals that the OCC is assuming that the
13      assets are being transferred, and in the second
14      paragraph it is saying, "It is our understanding
15      that certain parts of the APA are still being
16      negotiated."
17              So I'm assuming in the interim while
18      they're negotiating the final documents that the
19      OCC wants the -- I'm guessing this is the Asset
20      and Assumption Agreement -- Transfer and
21      Assumption Agreement to be signed.
22          Q.   You see at the very beginning of the
23      e-mail it says, "OCC is seeking to confirm its
24      understanding that all cash and securities

Contains Highly Confidential Portions

Page 238

D. McIsaac

1    collateral are intended to be transferred to
2    Barclays"; Do you see that?
3        A.    Yes.
4        Q.    If it's true, as you suggest it may
5    be, that the Purchase Agreement is still being
6    negotiated --
7        A.    I didn't say that.  I'm sorry.  Mr.
8    McDaniel is saying that.
9        Q.    Would you expect when the terms of
10   this transaction were confirmed, that if indeed
11   it was the case that Barclays was not to receive
12   the cash and securities collateral held at the
13   OCC, the Trustee and LBI would have been prudent
14   to inform the OCC of that fact?
15       A.    Yes.
16           MR. OXFORD:  Objection.  Asked and
17   answered.
18       Q.    Have you seen any evidence in the
19   record that either the Trustee or LBI's
20   attorneys informed the OCC that Barclays was not
21   intended to receive the cash and securities
22   collateral at the OCC?
23       A.    No.  I think, as I've discussed
24   before, the Transfer and Assumption Agreement is

Page 239

D. McIsaac

1    a means to allow Barclays to start trading the
2    next day and protecting the OCC.  Whatever the
3    agreement was regarding those assets that are
4    being transferred and what payment had to be
5    made for them or not be made for them would I
6    expect to be part of an agreement.
7        Q.    Do you agree that if the parties
8    hadn't intended for these assets at the OCC to
9    be transferred to Barclays, it would have been
10   prudent for them to inform the OCC of that?
11           MR. OXFORD:  Objection.  Form.
12       A.    Yes.  As I said, it would have been
13   prudent, if they didn't think that all the
14   assets should have been transferred, it would
15   have been prudent to tell the OCC that they were
16   not agreeing to that.
17       Q.    And have you seen any evidence in the
18   record in which any party told the OCC that they
19   did not intend that?
20       A.    No, I have not seen anything in the
21   record that states that.
22           MS. BLOOMER:  I think if you'll give
23   me a few minutes, I might be wrapped up and
24   we can have Amy come in and start the second

Page 240

D. McIsaac

1    part of the deposition.
2        MR. OXFORD:  Okay.  Let's go off the
3    record.
4        THE VIDEOGRAPHER:  The time is 4:13.
5    This is the end of the tape labeled number
6    4.  We're going off the record.
7        (Recess.)
8        (Exhibit 691, Affidavit of Daniel
9    McIsaac, marked for identification, as of
10   this date.)
11       (Exhibit 692, Supplemental Affidavit
12   of Daniel McIsaac, marked for
13   identification, as of this date.)
14       (Exhibit 693, Rebuttal Report of
15   Daniel McIsaac, marked for identification,
16   as of this date.)
17       THE VIDEOGRAPHER:  This is the start
18   of tape labeled number 6.  The time is 4:45.
19   We're back on the record.
20   EXAMINATION BY
21   MS. NEUHARDT:
22       Q.    Good afternoon, Mr. McIsaac.  My name
23   is Amy Neuhardt and I'm representing Barclays
24   and I'm here to discuss with you the reports

Page 241

D. McIsaac

1    that I have put in front of you as Exhibits 691,
2    692 and 693.  And could you identify those for
3    the record for me?
4        A.    691 is my affidavit that was filed
5    with the original motion.  69 --
6        Q.    Do you mean the original allocation
7    motion?
8        A.    Allocation motion.  I'm sorry.
9        692 is the Supplemental Affidavit
10   filed with the court on or about February 27,
11   and 693 is the Rebuttal Report.
12       Q.    Okay.  Very good.  Now, in 691 if you
13   could turn to paragraph 5, and in that you say,
14   "Based on my experience in the public and
15   private sectors, I am fully familiar with the
16   SEC rules governing financial responsibility of
17   SEC registered broker-dealers and the protection
18   of customer property and with industry practices
19   regarding the handling of customer property and
20   compliance with SEC Customer Protection Rules."
21       And unless I'm mistaken, which you may
22   take a look, paragraph 2 of your Rebuttal Report
23   contains a very similar statement.  Can you just
24   confirm that?  It's the last sentence.

Page 242

```
1              D. McIsaac
2     A.  Uh-huh.
3     Q.  So are you offering opinions as an
4  expert in any substantive area other than what
5  you're describing in this sentence that appears
6  in 691 and 693?
7     A.  When you say -- I'm -- if you can
8  clarify what that means.  I'm not sure what you
9  mean by that.
10    Q.  Sure.  Absolutely.  In particular, are
11 you putting yourself forth as an expert in SIPA
12 statutory or regulatory requirements?
13    A.  No.
14    Q.  Okay.  Are you putting yourself
15 forward as an expert on the practices of SIPC
16 trustees?
17    A.  No.
18    Q.  Okay.  Are you putting yourself
19 forward as an expert on the Bankruptcy Code?
20    A.  No.
21    Q.  All right.  Now, when you say you were
22 familiar with the SEC rules governing financial
23 responsibility of SEC registered broker-dealers
24 and the protection of customer property, are you
25 purporting to be an expert in the legal
```

Page 243

```
1              D. McIsaac
2  interpretation of those rules?
3     A.  I have spent a good part of 30 years
4  in the industry working on the last 20 years of
5  the preparation of the -- my two firms weekly.
6  I have monthly 3-3 calculations.  I'm a licensed
7  Fin. Op., Series 27, so I interpret -- I would
8  have to review and interpret the rules and the
9  interpretations of those rules.
10    Q.  Okay.  Are you a lawyer?
11    A.  No, I am not.
12    Q.  So your testimony is based on your
13 practice in interpreting 15c3-3, but not based
14 on experience as a lawyer doing legal analysis;
15 is that correct?
16    A.  I am -- sorry.
17         MR. OXFORD:  Objection.  Form.  You
18 can answer.
19    A.  I'm not a lawyer and most people who
20 work on the reserve formula I believe are not
21 lawyers.
22    Q.  Okay.  Now, when you say you are
23 familiar with industry practices regarding the
24 handling of customer property and compliance
25 with SEC Customer Protection Rules, are you
```

Page 244

```
1              D. McIsaac
2  purporting to be an expert in the operations and
3  processing systems used by Lehman that were fed
4  into the reserve calculation?
5         MR. OXFORD:  Hold on.  Objection to
6  form.  Sorry.
7     Q.  By reserve calculation, I am referring
8  to the calculation required under SEC Rule
9  15c3-3.  Will you understand that that's what I
10 mean when I say "reserve calculation" throughout
11 the deposition?
12    A.  The allocation formula?
13    Q.  Yes.
14    A.  Yes.
15         MR. OXFORD:  Same objection.  Do you
16 have the question in mind?
17    A.  No, maybe --
18    Q.  So when you say you were familiar with
19 industry practices regarding the handling of
20 customer property and compliance with SEC
21 customer rules, are you purporting to be an
22 expert in the operations and processing systems
23 used by Lehman that were fed into the reserve
24 calculation?
25    A.  When you say an expert in the systems,
```

Page 245

```
1              D. McIsaac
2  I am not a systems analyst.  I am not a systems
3  programmer.  I --
4     Q.  Okay.  So you are not familiar with --
5         MR. OXFORD:  Let him --
6     Q.  I apologize.
7     A.  That's all right.
8     Q.  I realize you weren't through.
9     A.  I am very familiar with the allocation
10 process and what people preparing the report
11 will look to see out of the allocation process.
12    Q.  Okay.  So are you familiar with the
13 ADP system?
14    A.  Yes, I am.
15    Q.  Okay.  The ITS system?
16    A.  No, not necessarily.
17    Q.  Okay.  NTS?
18    A.  I am familiar with fixed income
19 systems.
20    Q.  Okay.  And the RISC, R-I-S-C, system?
21    A.  I am not intimately familiar with it.
22    Q.  Okay.  Have you ever had any prior
23 experience in forensic accounting?
24    A.  No.
25    Q.  Okay.  Now, are you aware that the
```

Contains Highly Confidential Portions

Page 246

D. McIsaac

1  Trustee and Barclays are currently in a dispute
2  regarding the interpretation of a contract under
3  which Barclays purchased assets from the former
4  Lehman Brothers estate?
5     A.   Yes, I am.  I sat here through four
6  hours of a deposition on that.
7     Q.   Yes.  I just don't want a foundation
8  objection from Neil over there.
9        Okay.  Are you purporting to offer any
10 opinion on the interpretation of the language in
11 that contract?
12       MR. OXFORD:  Objection.  Form.
13    A.   I don't know if you're going to ask me
14 a question on it, but I don't -- I don't think
15 this allocation motion was part of -- looked
16 at -- I might have reviewed that, but it wasn't
17 part of reliance.
18    Q.   Have you been asked by anybody to
19 analyze the contract?
20       MR. OXFORD:  Is your question, because
21    as Mr. McIsaac says, we have sat through
22    almost five hours of questioning --
23       MS. NEUHARDT:  A lot.
24       MR. OXFORD:  -- from your colleague in

Page 247

D. McIsaac

1  connection with the Asset Purchase Agreement
2  and various other documents.  It would be
3  clearer for me and perhaps also for the
4  witness it will make things a little quicker
5  if you could clarify if your questions are
6  relating solely to the three affidavits and
7  reports that you have premarked.
8       MS. NEUHARDT:  Yes, they are.
9     Q.   I am purely asking whether you have
10 been asked to interpret the contract as it
11 relates to assets in the reserve accounts or
12 substitute assets for what would be in the
13 reserve account?  That doesn't help --
14       MR. OXFORD:  I still have an objection
15 to form, but you can answer if you're able.
16    A.   I'm not sure where you're going.  I
17 thought there was only one thing in the
18 allocation motion that talked to the contract
19 with Barclays, and that's the OCC deposit.
20    Q.   Okay.  Have you examined any other
21 part of the contracts other than the portion
22 that relates to the OCC margin other than in
23 this morning's portion of the deposition?
24    A.   In relation to?

Page 248

D. McIsaac

1     Q.   To your opinion as set forth in the
2  three exhibits sitting in front of you?
3     A.   I don't think I placed reliance on the
4  APA to review whether or not the 3-3 was in
5  compliance with the rules.
6     Q.   Okay.  Did you place any reliance on
7  the Clarification Letter?
8     A.   Again, I don't know, in relation to
9  this, if I placed any reliance on it.
10    Q.   You don't know if you placed reliance
11 on it?
12    A.   I don't think I placed any reliance on
13 that.  I was asked to review the 3-3 allocation
14 and what could be or compliance issues thereto.
15    Q.   Okay.  If you could turn to the first
16 exhibit in -- the first exhibit in the first
17 exhibit, which is your resumé, and it should be
18 tagged with a purple tag.
19    A.   Yes.
20    Q.   This is your resumé, correct?
21    A.   Yes, it is.
22    Q.   It says you have a bachelor of science
23 in accounting from Lehman College; is that
24 correct?

Page 249

D. McIsaac

1     A.   Yes.
2     Q.   Okay.  Do you have any other formal
3  education?
4     A.   No postgraduate.  No postgraduate
5  education.
6     Q.   So you did no work toward a degree
7  that you then did not receive?
8     A.   No.
9     Q.   So you've taken the courses in law?
10    A.   I've taken the courses that were
11 required for my CPA certification.
12    Q.   Did that include any courses in law?
13    A.   Yes.  Business law I think was a
14 requirement.
15    Q.   Business law, okay.  All right, that's
16 all I have about your education.
17       Now, this shows the most recent
18 position as you being at UBS Securities.  You do
19 not still work at UBS, do you?
20    A.   No, I left UBS in June.
21    Q.   In June of 2009?
22    A.   9.
23    Q.   Okay.  And why did you leave?
24    A.   There was downsizing at UBS.

Contains Highly Confidential Portions

Page 250

D. McIsaac

1
2      Q.    And where do you currently work?
3      A.    Currently today I work for KPMG.
4      Q.    And how long have you been at KPMG?
5      A.    Three weeks.
6      Q.    Three weeks?  Okay.  What's your
7  position there?
8      A.    Director of Regulatory Advisory.
9      Q.    Okay.  And did you hold any position
10  between UBS and KPMG?
11     A.    Between then I was acting as an
12  independent consultant.
13     Q.    And was that as independent consultant
14  to the Trustee on this matter?
15     A.    That, and I had other clients I was
16  doing work for.
17     Q.    Can you tell me the other clients?
18     A.    It's confidential, I would think.
19     Q.    It's confidential.  All right.
20         When did you first begin doing
21  consulting work for the Trustee?
22     A.    On or about the middle of July.
23     Q.    Did you perform any work for Lehman
24  Brothers Holdings, Inc. as an independent
25  consultant?

Page 251

D. McIsaac

1
2      A.    No.
3      Q.    Okay.  Did you serve any function for
4  the Trustee other than as an expert witness for
5  this matter in your independent consulting?
6      A.    I provided an expert report on the
7  derivatives, and I provided two other -- I think
8  they're called affidavits for other issues
9  regarding customer property.
10     Q.    Do you know if those affidavits were
11  filed in the public record?
12     A.    I believe they were, but I don't know.
13  I can't say for sure.
14     Q.    Okay.  And did you perform any other
15  services for the Trustee?
16     A.    From time to time.
17         MR. OXFORD:  I'll let you answer that
18     question yes or no, Mr. McIsaac.
19     A.    Yes.
20     Q.    Okay.  I think I know what's coming.
21         Can you describe for me the nature of
22  the services you performed for the Trustee?
23         MR. OXFORD:  I'm going to object to
24     the form of that question and instruct you
25     not to answer.

Page 252

D. McIsaac

1
2         MS. NEUHARDT:  And what's the basis of
3     your instruction?
4         MR. OXFORD:  It's privileged.
5         MS. NEUHARDT:  Can you describe for me
6     the basis of the privilege?
7         MR. OXFORD:  Yes.  Mr. McIsaac has
8     been retained as a consultant by the Trustee
9     to provide professional advice.
10        MS. NEUHARDT:  Are you representing
11     that none of the other services that he
12     performed for the Trustee relate in any way
13     to his opinions that have been proffered in
14     these three exhibits?
15        MR. OXFORD:  That is my understanding.
16        MS. NEUHARDT:  That's your
17     representation on the record?
18        MR. OXFORD:  That's my best
19     understanding.
20     Q.    Okay.  Now, other than the positions
21  with KPMG and your independent consulting that
22  we have discussed, are there any other
23  professional positions that you have held in the
24  last 20 years that are not reflected on this
25  resumé?

Page 253

D. McIsaac

1
2      A.    I've been a chair -- well, it's in the
3  resumé.  So, no, everything's in the resumé.
4      Q.    Now, in your work as an independent
5  consultant, and I'm referring specifically to
6  your work on the expert reports that are in
7  front of you, did you have any staff assisting
8  you?
9      A.    No, I did not.
10     Q.    Okay.  All right.  I'm going to start
11  with at UBS, could you explain to me how your
12  position at UBS gave you experience with
13  industry practices regarding the handling of
14  customer property and compliance with SEC
15  customer rules?
16     A.    Yes.  I was the Fin. Op. for UBS
17  Securities Financial Operational Principal.  I
18  signed the Focus Reports.  I took all
19  responsibility on the financial information
20  filed with the regulators.  I supervised the
21  reserve formula calculation, the net capital
22  calculations, the seg and secured calculations,
23  as well as the filing of the Focus Reports.
24     Q.    Okay.  And did you ever personally do
25  the reserve calculation?

Page 254

D. McIsaac

1        D. McIsaac
2      A.  I worked on it as a more junior
3  person.
4      Q.  When you were at UBS?
5      A.  No. No.
6      Q.  Was that in one of your prior
7  positions?
8      A.  At Dean Witter I managed a group.  I
9  also did some work on it from time to time when
10  somebody was out.
11      Q.  At Dean Witter that was not a part of
12  your regular duties?  You worked on it if
13  someone was out?
14      A.  I supervised it.  It came under my --
15  I managed a group that did it, the people that
16  did it.
17      Q.  Okay.  You mentioned that you hold a
18  Series 27 license.  Do you hold any other
19  professional licenses?
20      A.  No.
21      Q.  Have you in the past?
22      A.  Oh, sorry.  I take that back.  A CPA
23  license.
24      Q.  I was just going to ask you.
25      A.  No.  I was thinking when you say that

Page 255

D. McIsaac

1  along the lines of other series, but, yes, CPA.
2      Q.  Are you in any professional
3  organizations?
4      A.  I'm a member of the AICPA, the New
5  York State Society of CPAs.  I'm a member of the
6  Financial Management Division of SIFMA, the
7  Securities Industry and Financial Markets
8  Association.  I'm past president of the
9  Financial Markets Division, the Financial
10  Management Division I think it's called, and up
11  until three weeks ago when I took the job at KPM
12  I chaired the SIFMA Capital Committee.
13      Q.  Did the AICPA study in any way SEC
14  Rule 15c3-3?
15      A.  The AICPA has issued an audit guide
16  for the auditing of securities broker-dealers.
17      Q.  Did you have any involvement in that?
18      A.  I might have had some involvement of
19  it when I was at Deloitte in a past life of
20  reviewing it possibly, but that was many
21  editions ago.
22      Q.  Okay.  And did the New York State
23  Society for CPAs have any involvement in
24  interpreting Rule 15c3-3?

Page 256

D. McIsaac

1        D. McIsaac
2      A.  No.
3      Q.  Okay.  And the same question for
4  SIFMA?
5      A.  Yes, the capital committee is
6  intimately involved in the capital rules and
7  Customer Protection Rules.
8      Q.  Okay.  Have you ever served as an
9  expert witness before?
10      A.  No.  Four hours ago.
11      Q.  Other than in this matter?
12      A.  No.
13      Q.  Very good.  Okay.  Now, as an expert
14  relating to the reports that are in front of you
15  right now, not what you discussed with Ms.
16  Bloomer this morning, how many hours of time
17  have you billed to the Trustee in putting
18  together your opinions here?
19      A.  On the two of these?
20      Q.  Uh-huh.
21      A.  I'd have to go back, but it was
22  hundreds.
23      Q.  Can you give me a range?
24      A.  Maybe three to four hundred.
25      Q.  Do you know how much you have billed?

Page 257

D. McIsaac

1        D. McIsaac
2      A.  No, I don't.
3      Q.  Have you ever written any
4  publications?
5      A.  No.
6      Q.  Okay.  In the -- you say you've spent
7  hundreds of hours on these two reports.  Do you
8  have a sense of how much was devoted to the
9  original affidavit of October 5?
10          MR. OXFORD:  Objection.  Form.
11          You can answer if you're able.
12      A.  Maybe a couple hundred.  I don't -- I
13  don't recall how much exactly.  Probably a
14  little bit more than 200, but I don't remember.
15          MS. NEUHARDT:  I think under the
16  stipulation we're entitled to that
17  information, so perhaps you can provide that
18  to us later today or tomorrow.
19          MR. OXFORD:  I don't think I can get
20  it to you later today, but I will certainly
21  take your request under advisement.
22          MS. NEUHARDT:  Okay.
23      Q.  Have you ever been involved in a SIPC
24  liquidation before?
25      A.  No.

Contains Highly Confidential Portions

Page 258

D. McIsaac

1
2    Q.   Have you ever been involved in
3  performing 15c3-3 calculations at the time of a
4  merger or an acquisition?
5    A.   Yes.
6    Q.   Okay.  Could you tell me when that
7  would be?
8    A.   UBS merged with SBC on or about June
9  29, 1998.  There was a merger with various
10  acquisitions of various assets of PaineWebber
11  that were included as part of the acquisition of
12  UBS Securities acquired some of the assets, and
13  that was somewhere around November of 2000.
14    Q.   Okay.
15    A.   We at UBS purchased the prime
16  brokerage business from ABN Amro I want to say
17  it's around 2003, but I'm fuzzy on the time.
18       We purchased a futures business, but
19  that didn't have anything to do with 3-3, and
20  probably some other asset purchases or smaller
21  type purchase of assets or businesses along the
22  way.
23    Q.   Okay.  All right.  Now we're going to
24  get into the substance of your opinions.  Under
25  SEC Rule 15c3-3, prior to filing for

Page 259

D. McIsaac

1
2  liquidation, are the assets in a reserve account
3  considered the property of the broker-dealer or
4  the property of customers?
5    A.   The assets have to be the property of
6  the broker-dealer because they're their assets.
7    Q.   Okay.  So would customer property as
8  defined under SEC Rule 15c3-3 ever be put in the
9  reserve account?
10       MR. OXFORD:  Objection.  Form.
11       You can answer.
12    A.   Customer's property that they own,
13  such as securities, would be included in the
14  reserve formula based on an allocation of those
15  assets and the use of those assets.
16    Q.   But would the securities be placed in
17  the reserve account?
18    A.   In the 15c3 reserve account?
19    Q.   Correct.
20    A.   No.
21    Q.   Okay.  Do you know how many accounts
22  LBI had that comprised its reserve account under
23  SEC Rule 15c3?
24    A.   You'll have to define what you mean by
25  "accounts."  I don't --

Page 260

D. McIsaac

1
2    Q.   Well, they -- are you aware that there
3  was a bank account at Wells Fargo that was used
4  for part of the reserve account?
5    A.   There was a, I believe, a reserve
6  formula account, an account for the benefit of
7  customers at Wells Fargo.
8    Q.   Correct.  Do you know how many such
9  accounts LBI held?
10    A.   If my memory is correct, it was three
11  or four, I believe.
12    Q.   Okay.  And do you remember what banks
13  those were at other than Wells Fargo, which we
14  have discussed?
15    A.   I believe there might have been
16  something at JPMorgan, but I don't remember
17  exactly, and I don't remember the other two.
18    Q.   What was the total amount as of
19  September 19, 2008 that was in LBI's reserve
20  accounts?
21    A.   I'd have to look in my report for the
22  exact number, but I believe it was about a
23  billion-17 -- a billion-760 million, something
24  on that nature.
25    Q.   Could you show me in your report where

Page 261

D. McIsaac

1
2  you got that number?
3       MR. OXFORD:  Amy, are you asking a
4  question where he got it or where it is in
5  the report?
6       MS. NEUHARDT:  It's the source, what
7  his source is for the -- his testimony that
8  that is the total amount that was locked up
9  as of that date.
10       MR. OXFORD:  Okay.
11    A.   So not where it is in here?
12    Q.   Hum?
13    A.   Not where --
14    Q.   Well --
15    A.   I'm confused.
16    Q.   -- if it's not in there, I would like
17  to know what it is that you did rely upon.  And
18  we do have materials that your counsel -- LBI's
19  counsel produced that you purported to rely on.
20  And you can check in there if you want, but if
21  it's attached to your report, that would be
22  easier.
23    A.   You'll have to give me a minute to go
24  through it.  I don't know if it's ...
25    Q.   While you're looking, I can ask the

Contains Highly Confidential Portions

Page 262

D. McIsaac

1    question, did you look at the bank account
2    statements for each of the three or four
3    accounts that we discussed earlier?
4        A.   No.  The Trustee's financial
5    professionals provided me with the schedule of
6    what was in the accounts.
7        Q.   And by "financial professionals," who
8    are you referring to?
9        A.   I believe it came from legal counsel.
10       Q.   From legal counsel.  It didn't come
11   from Deloitte?
12       A.   It might come from Deloitte
13   eventually, but it was given to me by legal
14   counsel.
15       Q.   And did you do any independent
16   investigation of the correctness of the
17   materials supplied to you by legal counsel?
18       A.   No.
19       Q.   You know what, why don't we have you
20   look for that on a break and go on in an effort
21   to --
22       A.   Sure.
23       Q.   -- save time.
24            Under SEC Rule 15c3-3, if there is an

Page 263

D. McIsaac

1    excess in the reserve account, is that held for
2    the exclusive benefit of customers?
3        A.   Everything in that account is held for
4    the exclusive benefit of customers.
5        Q.   So is it your testimony that even
6    amounts that are not required to be held there
7    are for the benefit of customers?
8            MR. OXFORD:  Objection.  Asked and
9    answered.  You can answer again.
10       A.   If it's held in there, it's for the
11   exclusive benefit of customers.
12       Q.   Okay.  Is a broker-dealer allowed to
13   withdraw excess?
14           MR. OXFORD:  Objection.  You can
15   answer.
16       A.   A broker-dealer can make withdrawals
17   and deposits based on calculations.
18       Q.   Okay.  And is there any requirement
19   that a broker-dealer receive SEC approval before
20   making a withdrawal of excess?
21       A.   I do not believe there's any
22   requirement to get the approval of the SEC in
23   the normal course.
24       Q.   Okay.  Now, you qualified your last

Page 264

D. McIsaac

1    answer by saying you did not believe there was a
2    requirement to get SEC approval in the normal
3    course?
4        A.   Correct.
5        Q.   Do you believe there's a requirement
6    to get SEC approval at any other time?
7        A.   Well, I would assume if you're in
8    liquidation, you can't move moneys out of the
9    account without the approval of the S.E.C., but
10   I don't know that for a fact.
11       Q.   Okay.  Are you basing your assumption
12   on anything in SEC Rule 15c3-3?
13       A.   I don't believe anything I've seen
14   there.  What I've seen in the rules is basically
15   you have to do a withdrawal -- a calculation
16   before you can do a withdrawal.
17       Q.   Okay.  In your rebuttal report,
18   paragraph 13, you state that the -- I'll give
19   you a moment to get to that.  In the second
20   sentence you state, "The only relevant point in
21   time" --
22       A.   Excuse me.  Excuse me.  What
23   paragraph?
24       Q.   13.  I'm sorry.

Page 265

D. McIsaac

1        A.   Page 13.
2        Q.   No, paragraph 13, page 6.
3        A.   Oh, I'm sorry.  I thought you said
4    page 13.
5        Q.   No, my apologies.
6        A.   Okay.
7        Q.   Okay.  Second sentence says, "The only
8    relevant point in time for the purpose of
9    determining the accuracy of LBI's reserve
10   calculation as of September 19, 2008, is
11   September 19, 2008."
12           Why -- why do you believe that
13   September 19, 2008 is the relevant date?
14       A.   That's the -- that's when the
15   calculation is as of.  So anything that has
16   happened as of that date or known as of that
17   date is what goes into the formula.
18       Q.   Why -- well, were you told to do a
19   calculation as of September 19, 2008, or did you
20   independently decide that that was the relevant
21   date for a calculation?
22           MR. OXFORD:  Objection to the form.
23   That misstates the facts and the evidence,
24   and I think you're misreading his reports.

Contains Highly Confidential Portions

Page 266

D. McIsaac

1             D. McIsaac
2    You can answer if you can.
3    A.   I believe the 19th of September 2008
4 was the last reserve requirement prepared by
5 Lehman prior to entering into SIPC protection.
6    Q.   Okay.  Do you know the date that LBI
7 entered into SIPC protection?
8    A.   I believe it was sometime on or about
9 the 19th of September.
10    Q.   Okay.  Do you know if they had
11 performed a calculation on that date prior to
12 entering into SIPC liquidation?
13       MR. OXFORD:  Objection to form.
14    A.   I have not seen any as of September
15 18, I don't believe.
16    Q.   Have you seen any as of the morning of
17 September 19?
18    A.   I'm sorry, as of the morning of
19 September 19th?  As of what period of time?
20    Q.   Prior to entering into liquidation on
21 the day of the 19th?
22    A.   Based on what period?  Based on what
23 ending period?
24    Q.   Any ending period.
25    A.   You can only do it at the end of a

Page 267

D. McIsaac

1             D. McIsaac
2 day.  You can't do it in the middle of a day.
3    Q.   Okay.  So then wasn't the last
4 calculation actually performed by LBI prior to
5 entering into liquidation done on the 17th?
6    A.   I don't think so.  I thought they were
7 required to do a calculation as of the close of
8 business on the 19th.
9    Q.   Even if they were no longer in
10 business?
11    A.   I don't know what the whole rule is
12 around SIPC, but I believe they were required to
13 do a calculation as of the close of business the
14 19th because that was the last day of business.
15    Q.   Could you show me in -- we can get you
16 Rule 15c3-3.  We're going to mark that as
17 Exhibit 694.
18    (Exhibit 694, Rule 15c3-3, marked for
19 identification, as of this date.)
20    Q.   I've put before you SEC Rule 15c3-3.
21 Could you tell me where in Rule 15c3-3 LBI would
22 have been required to do a reserve calculation
23 on the 19th despite entering into liquidation on
24 that day?
25       MR. OXFORD:  Objection.  Form.

Page 268

D. McIsaac

1             D. McIsaac
2 Misstates the witness's testimony.
3    You can answer.
4    A.   I don't think there's anything in Rule
5 15c3-3 that says when anybody is supposed to do
6 a calculation as opposed to the 19th.  I believe
7 it says that you do calculations as of Friday
8 and the last business day of the month.
9    Q.   Okay.
10    A.   That was their last business day.
11    Q.   Is it your position that 15c3-3
12 continues to apply after entering into SIPC
13 liquidation?
14    A.   I would think you would have to do a
15 final calc if it was a Friday close of business
16 to account for all your assets in this process.
17    Q.   And the basis for that belief is?
18    A.   The last day of business was a Friday.
19 I don't know if you would have to do it if the
20 last day of business was a Wednesday, but their
21 last day of business was a Friday.
22    Q.   So it's your position that even though
23 at the end of the day of business on that Friday
24 they were in liquidation, they still would have
25 had to do a 15c3-3 calculation?

Page 269

D. McIsaac

1             D. McIsaac
2    A.   I believe so.  That's my opinion.
3    Q.   Okay.  And that is based on?
4    A.   You're supposed to do calculations as
5 of Friday or month end, and that was a Friday of
6 business.
7    Q.   So you have no other basis for your
8 opinion that a 15c3-3 calculation would have
9 been required even though they had entered into
10 liquidation on that day?
11    A.   I believe the SEC required a 3-3
12 calculation to be done, but I don't know if I
13 can point to anything that says that.
14    Q.   When you say the SEC required it, do
15 you mean by rule or are you talking about events
16 as of that day, communications that day?
17    A.   I thought by rule they required it as
18 of the close of business on Friday.  I think
19 they -- did they go into -- I believe they went
20 into liquidation after the markets closed, which
21 would be the close of their business day.
22    Q.   And if that were not the case, would
23 that change your opinion in any way?
24    A.   Then I would leave it up to the
25 regulators to determine if a calculation had to

Contains Highly Confidential Portions

Page 270

D. McIsaac

1  be done at that point in time.
2      Q.  So you don't have an opinion, then, if
3  the liquidation started prior to the close of
4  business on Friday?
5      A.  If the --
6          MR. OXFORD:  Objection.  Form.
7          You can answer.
8      A.  If the liquidation was at 1 o'clock --
9  9 o'clock in the morning, I might have a
10  different opinion, but it was I believe after
11  the close of business.  I think it was finally
12  approved sometime Saturday morning.
13      Q.  Okay.
14      A.  And I'm assuming --
15      Q.  I'm trying to make sure you've
16  answered my question.  I don't think we've
17  established what time it was.
18          If it did happen prior to the close of
19  business, does that change your opinion?
20          MR. OXFORD:  Objection.  Form.
21          You can answer.
22      A.  I don't know.  I don't have an opinion
23  on it.
24      Q.  Okay.  Now, under -- for a moment

Page 271

D. McIsaac

1  we'll assume that the 19th is the appropriate
2  date, and I believe you said that under the
3  SEC -- well, rather than recharacterize your
4  testimony, how often does an operating
5  broker-dealer have to do its reserve
6  calculation?
7      A.  It's based on what type of
8  broker-dealer it is.  One of Lehman's stature
9  had to do one weekly and as of month end.
10      Q.  And you said normally it was done on
11  Friday afternoons, correct?
12      A.  As of close of business Friday and as
13  of month end.
14      Q.  Okay.  Now, if a calculation done on
15  the -- done as of the close of business on
16  Friday showed a shortfall, at what time would
17  the broker-dealer be required to make up the
18  shortfall?
19      A.  10 A.M. the second business day
20  following the day of closing.  So on a Friday,
21  as long as Monday was a business day, 10 o'clock
22  Tuesday.
23      Q.  Okay.  And that's under Rule 15c3-3 as
24  well?

Page 272

D. McIsaac

1      A.  Yes.
2      Q.  Now, in this case, Lehman was no
3  longer operating as of 10 A.M. the following
4  Tuesday morning, correct?
5      A.  I believe that's the case.
6      Q.  So as of Friday, the 19th, it would
7  not have had an obligation to actually deposit a
8  shortfall into the account?
9      A.  I believe --
10          MR. OXFORD:  Objection to form.
11          You can answer.
12      A.  I believe Lehman was still a
13  broker-dealer and had not issued a BDW as of
14  that point in time.
15      Q.  I'm sorry, what is a BDW?
16      A.  Withdrawal as a broker-dealer.
17      Q.  Okay.  So is it your testimony that
18  even after filing for liquidation LBI was an
19  operating broker-dealer?
20      A.  No.  I'm saying they didn't file a BDW
21  and still would have been, I think, required to
22  make a deposit on Tuesday morning if they had to
23  add to their deposit.
24      Q.  Despite the fact that a Trustee had

Page 273

D. McIsaac

1  been appointed and was running the operations?
2      A.  (Witness nods.)
3          Yes, I'm sorry.
4      Q.  You do need to answer.
5      A.  I know that.
6      Q.  Could you show me or could you tell me
7  what the source of your opinion on that is?
8      A.  I don't think there's anything in the
9  literature that says that.  I don't think
10  there's anything in the literature that points
11  to a broker-dealer going out of business on a
12  Friday and whether or not it has to make its
13  deposit on Tuesday.
14      Q.  So you're not basing your opinion on
15  anything?
16      A.  Just --
17          MR. OXFORD:  Objection.  Form.  It's
18          not what the witness said.
19          But you can answer.
20      A.  Practice, common practice, and I would
21  think they would do their last computation.
22      Q.  You say common practice.  How often
23  have you been involved in a broker-dealer that
24  has gone into liquidation?

Contains Highly Confidential Portions

Page 274

D. McIsaac

1  A.  Never.
2  Q.  Okay.  Let's turn to the discussion of
3  FID accounts, and in your original report that
4  was at paragraphs -- I didn't put it down
5  here -- it starts on page 13 of your original
6  report.  It's relating to Fixed Income Division
7  prime broker clients that are being referred to
8  as FID accounts?
9  A.  That's correct.
10 Q.  In your original report you stated
11 that securities had been liquidated by Chase, is
12 that correct?
13 A.  That's correct.
14 Q.  And you decided that was an error for
15 your rebuttal report; is that correct?
16 A.  No, for my additional affidavit that
17 was put in.
18 Q.  Okay.  I apologize.  But your opinion
19 on that has changed?
20 A.  That's correct.
21 Q.  Okay.  Now, from where did you get the
22 number of 891 million as being the -- yes, as
23 being the relevant number?  And for reference,
24 that would be in paragraph 35 of your original

Page 275

D. McIsaac

1  affidavit.
2  A.  That's a combination of the 630
3  million of assets and the 281 million -- $258
4  million of the cash.
5  Q.  Okay.  Well, I'm not seeing citations
6  for either the 630 million number or the 258
7  million number.  So where did you get those
8  numbers?
9  A.  They were provided to me by the
10 Trustee's financial advisor.
11 Q.  Did you do any independent
12 investigation of the accuracy of those numbers?
13 A.  I reviewed some documents that would
14 have shown the numbers there, would have shown
15 the accounts with the balances in them and the
16 asset value.
17 Q.  Are those documents attached to your
18 affidavit?
19 A.  I don't know if they are or not.  I
20 don't think so.
21 Q.  Did you speak to anybody about the
22 accuracy of those numbers?
23 A.  The Trustee and their financial
24 advisors.

Page 276

D. McIsaac

1  Q.  By "financial advisors" are you
2  referring to legal counsel again?
3  A.  It would have been legal counsel
4  and/or their financial advisors, Deloitte.
5  Q.  Deloitte.  Can you tell me who you
6  spoke to at Deloitte?
7  A.  Chris Harris and Marlo Karp.
8      I'm sorry, I didn't know if that was
9  privileged.
10     MR. OXFORD:  If I might, let me
11 perhaps make this go a little more smoothly.
12 To the extent, Mr. McIsaac, you relied upon
13 advice from Deloitte -- or, not advice, you
14 relied on information as a source of the
15 facts upon which you base your opinion
16 whether in your original affidavit or
17 supplemental affidavit or your rebuttal
18 report, then I think it's fine for you to
19 answer those questions.
20     To the extent Ms. Neuhardt's questions
21 call for discussions with Deloitte or any
22 other person that you did not rely on as a
23 source of information for the opinions
24 expressed in these affidavits and reports,

Page 277

D. McIsaac

1  then I will instruct you not to answer that
2  question.
3      THE WITNESS:  Okay.  Thank you.
4  Q.  I'm trying to find out the underlying
5  source of the facts underneath your report.
6  A.  It would have been either Chris Harris
7  or Marlo Karp.
8  Q.  Did you speak to any employees of the
9  Trustee?
10 A.  No, I did not.  Well, employees of the
11 Trustee?  Legal counsel?
12 Q.  No.
13     MR. OXFORD:  Maybe we can clear things
14 up.  Does your question, Amy, go to the --
15     MS. NEUHARDT:  I'm going to the TSA
16 employees, basically.
17     MR. OXFORD:  Okay.  Because that's
18 different than they're not employees of the
19 trustee.
20     MS. NEUHARDT:  But they're performing
21 services for him.
22     MR. OXFORD:  Sure.  Maybe we can ask
23 this again and make sure Mr. McIsaac
24 understands the question.

Contains Highly Confidential Portions

Page 278

D. McIsaac

1
2    Q.   Are you aware that there are persons
3  who are normally employed by Barclays who work
4  entirely at the direction of the Trustee?
5       MR. OXFORD:  Objection.
6    A.   I'm aware that there are employees of
7  Barclays doing work under a TSA. I don't know
8  what they're doing or who they are.
9    Q.   When you say "TSA," what are you
10 referring to?
11   A.   Some kind of transfer services
12 agreement I believe is what it's call in the
13 industry.
14   Q.   Do you understand that those employees
15 are working for the Trustee?
16   A.   I don't know who they're working for.
17   Q.   Okay. Did you speak to any of those
18 individuals in relation to the FID accounts?
19   A.   No.
20   Q.   Did you speak to any of those
21 individuals in relation to anything in your
22 reports?
23   A.   No.
24   Q.   How did you determine that the $891
25 million were customer assets?

Page 279

D. McIsaac

1
2    A.   They were assets in the customer
3  accounts that went -- that went into a -- an
4  account at Chase designated for the benefit of
5  customers.
6    Q.   What I'm trying to understand is what
7  the source is for your statement that they were
8  assets in the customer accounts.
9    A.   I received a document that listed the
10 accounts and the account -- the accounts and the
11 money, monetary value and the security market
12 value in those accounts.
13   Q.   Did you do any independent
14 investigation of the accuracy of that document?
15   A.   No, I did not. I believe I reviewed
16 the stipulation agreement that might have also
17 included information on those accounts.
18   Q.   Is that stipulation agreement attached
19 to your report?
20   A.   I don't believe it is.
21   Q.   Sorry?
22   A.   No. No.
23       MR. OXFORD:  Just to move this along,
24   Amy, are you referring to any report or a
25   specific report?

Page 280

D. McIsaac

1
2       MS. NEUHARDT:  He said that there's a
3  document he looked at that helped him
4  determine whether or not the assets that he
5  described in his report as FID assets --
6  that he describes as customer assets, he
7  said he looked at a document and that told
8  him they were customer assets. And then I
9  asked if he did any independent
10 investigation, and he first said no, but
11 then he said he may have looked at a
12 stipulation, and I asked whether or not he
13 attached that in his report.
14       MR. OXFORD:  Okay. Just for ease, I
15 can represent that it's been produced to you
16 and I believe it actually may be attached to
17 his report, but I'll --
18   A.   Yes, you say reports. I'm not sure
19 which report. I don't think it's in the --
20   Q.   When I say report, either any of the
21 three reports sitting in front of you -- I guess
22 it's two reports and one supplemental affidavit.
23       And what was your source for stating
24 that these particular assets were seized?
25   A.   Chase took control of the assets and

Page 281

D. McIsaac

1
2  did not return them to the Trustee.
3    Q.   What's your source for that?
4    A.   The documents that were provided to me
5  by the financial.
6    Q.   On this one I'm going to need you to
7  show me which documents. If you could look at
8  your report and show me which documents you're
9  using to rely on for the prospect that they were
10 seized. I understand, but I need you to
11 identify what you're relying on for that. So --
12   A.   I have a list of assets. I don't
13 believe I have any -- anything -- I don't think
14 it's in my documents. I can look for you to see
15 in the extra documents if we provided anything
16 from Chase showing that they were moved out of
17 Chase's account. I believe somewhere in here we
18 have the accounts showing zero balances in them.
19   Q.   Do you know what day they were seized
20 if in fact they were seized?
21   A.   Chase, from my understanding, on or
22 about the 18th of September --
23   Q.   On the 18th?
24   A.   I'm not finished.
25       -- shut off access to Lehman to have

Contains Highly Confidential Portions

Page 282

D. McIsaac

1
2  access to the accounts.  Somewhere along that
3  period of time, the assets were taken out of the
4  accounts of Lehman.
5      Q.   So when you say shut off access,
6  you're referring to shutting off electronic
7  ability to monitor --
8      A.   Yes.
9      Q.   -- the accounts?
10      A.   The screens were shut off.
11      Q.   Are you equating that to seizure?
12      A.   No.  I'm just saying that at that
13  point in time, LBI was not aware of what was in
14  the accounts.
15      Q.   Okay.  But do you know when the assets
16  were actually seized?
17      A.   I believe the reports that came from
18  Chase, and I'm looking for them in here because
19  I believe they're in here, showed that, as of
20  the 19th, they were removed from the accounts.
21      Q.   Do you know if it was before or after
22  LBI filed for liquidation -- sorry, filed for
23  SIPC protection?
24      A.   I don't believe Chase put a time stamp
25  on when they removed them out of the accounts.

Page 283

D. McIsaac

1
2      Q.   So you don't know one way or the
3  other?
4      A.   I'm not sure what the relevance would
5  be of that if they had no access to those assets
6  as of the 19th.
7      Q.   Well, again, are you equating the
8  inability to monitor the accounts with seizure?
9      A.   No, I'm saying that they didn't know
10  if they had them or not had them at the 19th
11  because they had no access to their accounts.
12      Q.   Are you saying that the inability to
13  monitor alone would make it no longer a good
14  control location?
15      A.   No, I just said that they wouldn't
16  have known at that point in time if they were in
17  the accounts or not.
18      Q.   So the mere fact that they could not
19  monitor would not have turned those accounts
20  into a -- strike that.
21      MR. OXFORD:  And Amy, just on the
22  seize question, maybe we could add that to
23  the list of things you want Mr. McIsaac to
24  look at at a break and it'll speed things up
25  a little bit.

Page 284

D. McIsaac

1
2      MS. NEUHARDT:  Uh-huh.
3      Q.   Is electronic access required to be a
4  good control location under 15c3-3?
5      A.   No.
6      Q.   Okay.  So it's the seizure that is
7  critical to your opinion on this?
8      A.   Yes.
9      Q.   But you do not know at what time on
10  the 19th these assets were seized?
11      A.   No, I do not.
12      Q.   Okay.  Now, what are the requirements
13  of a good control location under 15c3-3?
14      A.   You should have a letter from the
15  bank.
16      Q.   A "no lien letter"?
17      A.   Stating they have no liens on those
18  assets.
19      Q.   Are there any other requirements?
20      A.   I believe that the language in the
21  letter talks to no lien, except for payment of
22  certain fees and that.
23      Q.   Now, do you know if there was a "no
24  lien letter" from Chase with regards to these
25  accounts?

Page 285

D. McIsaac

1
2      A.   I believe there were "no lien letters"
3  from Chase with these accounts.
4      Q.   Were they revoked on or before the
5  19th?
6      A.   I believe there was certain ambiguity
7  on whether or not those accounts were being used
8  by Chase for credit purposes or reviewing the
9  equity of LBI at points in time throughout the
10  year.
11      Q.   I don't think that answers my
12  question.  Do you know if the "no lien letters"
13  were revoked on or before the 19th?
14      A.   I do not know if they were revoked
15  before.
16      Q.   Okay.  Now, you refer in your report
17  regarding the FID assets to an overdraft notice;
18  is that correct?
19      A.   Which report are we talking about now?
20      Q.   Both of them, actually.  I'm still
21  just talking about the FID reports.
22      A.   Uh-huh.
23      Q.   Did you -- did you review the
24  overdraft notice?
25      A.   I've seen documentation that showed

Page 286

D. McIsaac

1  D. McIsaac
2  that it was an overdraft at Chase.
3      Q.   Did you do any investigation into --
4  did you do any investigation into whether or not
5  the notice was properly issued?
6      A.   No.
7      Q.   Okay.  And did you inquire --
8      A.   I --
9      Q.   Sorry?
10     A.   I said, no, I don't know what notice
11 of properly issued would be in an overdraft
12 account.  Usually you would get a statement from
13 the bank or you would see it online.  I don't
14 know if that constitutes a notice.
15     Q.   Did you do any investigation into
16 whether or not Chase had acknowledged to Lehman
17 on the 19th that the notice was improperly
18 issued?
19     A.   What notice now?
20     Q.   You told me you reviewed an overdraft
21 notice.
22     A.   And did Chase say that it was
23 improperly issued?  No.
24     Q.   I'm asking if you investigated whether
25 or not that occurred?

Page 287

1  D. McIsaac
2      A.   I did not.
3      Q.   Okay.  If that in fact occurred, would
4  that change your opinion in any way?
5          MR. OXFORD:  Objection to the form.
6  Assumes facts not in evidence.
7          MS. NEUHARDT:  I'm sorry, I couldn't
8  hear you.
9          MR. OXFORD:  You can answer.
10     A.   If Chase sent another report to Lehman
11 at that time saying we originally told you you
12 had an overdraft of 20 billion, we were wrong,
13 you have cash of 10 billion, yes, that would
14 have an impact on what I thought.  If that's
15 what your question was.
16     Q.   That's not my question.  My question
17 is whether if Chase informed people at Lehman
18 that the notice was issued as a mistake, would
19 that change your opinion?
20         MR. OXFORD:  Same objection.
21     A.   If they said that -- if they gave
22 notice that there was no overdraft and the
23 assets weren't used to secure the overdraft,
24 yes, it would change my opinion.
25     Q.   Did you make any effort to determine

Page 288

1  D. McIsaac
2  whether or not LBI actually attempted to
3  withdraw any money from the Chase account on
4  Friday, September 19?
5      A.   No, I did not.
6      Q.   Did you make any efforts to determine
7  whether or not LBI actually attempted to
8  withdraw any securities from the Chase account
9  as of September 19?
10     A.   As I'm aware, the screens were shut
11 down, so I don't know how they would have done
12 that without electronically notifying, unless
13 they would have done it via overnight letting
14 Chase know what deliveries and receipts to make,
15 but I did not do any inquiries into that.
16     Q.   Are you saying that telephone
17 communications no longer work?
18     A.   I don't know if anybody made a
19 telephone communication to them.  I know the
20 screens were down and that's the normal mode of
21 moving securities.
22     Q.   So you don't actually know whether or
23 not LBI could have had access to that -- to the
24 cash and securities in the Chase accounts on
25 September 19, 2008?

Page 289

1  D. McIsaac
2          MR. OXFORD:  Objection to form.
3      A.   I've been informed that the screens
4  were shut down.  So having access to it other
5  than via the screens, I'm not sure how they
6  would have it other than maybe verbal
7  discussions with Chase.
8      Q.   The mere fact that the screens were
9  shut down would not substantively affect their
10 ability to withdraw money; is that correct?
11         MR. OXFORD:  Objection.  Form.
12     A.   I assume they could send instructions
13 to Chase to do it, and if Chase so desired, they
14 could follow that.
15     Q.   Okay.  If Chase in fact actually
16 seized assets on the 19th, would that have
17 affected the reserve calculation done by LBI on
18 the 17th?
19     A.   If there was ambiguity or if the "no
20 lien" language for those accounts was not in
21 force, then yes, that would have affected any
22 other calculation done at that point in time.
23     Q.   Have you seen any evidence that the
24 "no lien letter" was not enforced as of the
25 17th?

Contains Highly Confidential Portions

Page 290

D. McIsaac

1
2   A.   I have seen nothing that said they --
3  it was not enforced at that time.
4   Q.   Would your answer be the same as of
5  the 12th?
6   A.   The same.  I have seen nothing before
7  that time.
8   Q.   Okay.  Now, if there were -- if these
9  assets were seized on the 19th and it did cause
10 a need to adjust the amount in the reserve
11 account, at what time -- when would that deposit
12 be required?
13  A.   I believe I answered that before.  10
14 A.M. Tuesday morning, if that deposit was
15 required.
16  Q.   Okay.  Could you just tell me which
17 regulation it is that would require a credit in
18 the reserve formula for the seizure of assets on
19 the 19th?
20  A.   I believe the credit goes into the
21 reserve formula because you would have customer
22 assets allocating to a loan.
23  Q.   Okay.
24  A.   A bank loan.
25  Q.   Is that in 15c3-3?

Page 291

D. McIsaac

1
2   A.   Yes, it is.
3   Q.   Could you show me where in this
4  exhibit?
5   A.   Could you give me the interpretation
6  memos?  It would be a lot easier to find it.
7   Q.   Absolutely.  Yes.  That would be in
8  Exhibit 695.
9       (Exhibit 695, Customer Protection -
10 Reserves and Custody of Securities SEA Rule
11 15c3-3, marked for identification, as of
12 this date.)
13  A.   I believe it's on page 2625 of the
14 FINRA Interpretation Handbook.
15  Q.   Okay.  What portion of this on page
16 2625?
17  A.   It says "Proprietary Bank Loans versus
18 Customer Account Long."
19  Q.   Okay.  Do you rely on anything else
20 for your opinion that if there were assets
21 seized, there would have to be a credit to the
22 reserve calculation?
23  A.   I believe there are other portions
24 within here that talk about the same thing --
25  Q.   This is the proprietary source?

Page 292

D. McIsaac

1
2   A.   Customer property allocating to
3  proprietary bank loan.
4   Q.   Okay.  Now, I'm going to move on to
5  coding errors.  Your rebuttal report discusses
6  two alleged coding errors:  One regarding the
7  classification of Woodlands Bank as a customer
8  or non-customer?
9   A.   Right.
10  Q.   And another relating to an error in
11 the ADP system; is that correct?
12  A.   Correct.
13  Q.   Are you aware of any other alleged
14 coding errors that would have affected the
15 credit side of LBI's reserve calculation as of
16 September 19, 2008?
17  A.   The ADP -- there were two instances of
18 a ADP.  It was certain accounts were not -- were
19 picked up as customers.  They should have been
20 non-customer, as well as the allocation.  But
21 they're both this here.
22  Q.   So there's nothing other than what is
23 discussed in your reports in the way of coding
24 errors that you have identified?
25  A.   That I am aware of at this time, no.

Page 293

D. McIsaac

1
2   Q.   Were you asked by the Trustee to
3  identify transactions or events that might have
4  required adjustments on the debit side of the
5  reserve calculation?
6   A.   All issues brought to my attention by
7  the Trustee would have been reviewed.  There was
8  no indication of only reviewing the credit side.
9  In fact, the coding errors did have an impact on
10 both the debit and credit side.
11  Q.   Okay.  Did you make any independent
12 effort to look for transactions or events that
13 would have required an adjustment to the reserve
14 calculation other than what was identified by
15 the Trustee for you?
16  A.   Nothing else was brought to my
17 attention that would have required that.
18  Q.   I understand.  Did you make any
19 independent effort to look for additional
20 transactions or events?
21  A.   I did not.
22  Q.   Do you know if the Trustee looked for
23 errors that would have caused an adjustment on
24 the debit side of the reserve formula?
25  A.   I believe the Trustee and their

Page 294

D. McIsaac

1    D. McIsaac
2    advisors looked for all and any adjustments that
3    would have impacted the 9/19 calculation.
4    Q.    Do you know if the Trustee and its
5    advisors have completed its -- their analysis of
6    any and all adjustments that would have impacted
7    the 9/19 calculation?
8    A.    I believe the Trustee and their
9    advisors are still researching facts and figures
10   as of the 19th of September, and if anything was
11   to come to their attention, I believe they would
12   bring it up at that point in time. It was my
13   understanding as of the time I filed the
14   rebuttal report that no additional items have
15   been found.
16   Q.    So you believe the analysis is still
17   ongoing?
18   A.    I believe it's still in process, yes.
19   Q.    But you do believe that the Trustee
20   and its financial advisors have engaged in the
21   process?
22       MR. OXFORD: Objection. Form.
23   Q.    Do you understand the question?
24   A.    I don't know what process you're
25   talking about they engaged in.

Page 295

1    D. McIsaac
2    Q.    The process of identifying -- the
3    process of identifying any and all adjustments
4    that would have impacted the 9/19 calculation?
5    A.    I believe they're still doing work as
6    it relates to 9/19, and as I said in my rebuttal
7    report, I don't think anything came to their
8    attention by the time I filed that report.
9    Q.    Okay. In paragraph 16 of your
10   rebuttal report, you say that the Woodland
11   assets had actually been seized. What did you
12   base that on?
13   A.    They were part of the assets that were
14   in the free box that was taken by Chase.
15   Q.    So it's the same Chase matter as we've
16   already discussed?
17   A.    No. These were never locked up in a
18   seg account because the account was coded as a
19   non-customer, not a customer.
20   Q.    On what day do you believe these were
21   seized?
22   A.    When Chase seized all the assets
23   versus the bank loan, which I assume was the
24   19th.
25   Q.    Which you assume was the 19th?

Page 296

1    D. McIsaac
2    A.    Yes.
3    Q.    Okay. In rebuttal paragraph 18, this
4    is referring to I believe the ADP Broadridge
5    issue?
6    A.    Uh-huh.
7    Q.    You say that, "As part of a review
8    performed by Barclays," and you emphasize "by
9    Barclays," "at the request of the S.E.C.,
10   Barclays performed a partial recalculation of
11   the reserve formula to adjust for these known
12   discrepancies which revealed, as a result of the
13   coding errors, a $213 million shortfall."
14       And I -- you can turn to Exhibit 8 if
15   you want, that's what you cite, but I'd like to
16   know what your basis is for saying that Barclays
17   did a recalculation --
18   A.    I believe Barclays employees were the
19   ones sending the information to ADP and
20   requesting that a recalculation was done.
21   Q.    Okay. And do you know whether those
22   Barclays employees were Barclays employees
23   performing work for the Trustee under the TSA?
24   A.    I don't know in what capacity, but the
25   letterhead on the note to ADP at Broadridge was

Page 297

1    D. McIsaac
2    Barclays.
3    Q.    I'm going to mark as Exhibit 696 a
4    declaration of Robert Martini dated April 5,
5    2010, and after she hands it to you my first
6    question will be have you seen it before.
7       (Exhibit 696, Declaration of Robert
8       Martini, marked for identification, as of
9       this date.)
10   A.    No, I have not.
11   Q.    Would you read paragraphs 5 through 7?
12   Let me know when you're through.
13       (Document review.)
14   A.    I've read it. I'm sorry, 5 through 7?
15       Okay.
16   Q.    Okay. Assuming that what Mr. Martini
17   says in his declaration is true, would that
18   change your opinion that Barclays performed a
19   recalculation of the reserve formula as set
20   forth in paragraph 18 of your rebuttal report?
21   A.    I saw a letter going from Barclays to
22   Broadridge directing them to make the changes.
23   They did all the research and directed them to
24   make the changes. Whether the employees who
25   actually did the calculation were TSA employees

Contains Highly Confidential Portions

Page 298

D. McIsaac

1 or Barclays employees I do not know. I don't
2 have the name of the employee who did it.
3    Q.   Okay.  Did you speak to any of the
4 employees on that letter?
5    A.   No, I did not.
6    Q.   Okay.  Do you know if the
7 recalculation that is discussed in paragraph 18
8 of your Rebuttal Report was a complete
9 recalculation of the 15c3-3 requirement as of
10 9/19 or just an adjustment for the ADP
11 Broadridge issue?
12    A.   I believe I said in here it was just
13 an adjustment for the ADP Broadridge as well as
14 the clarification of the 944 accounts.
15    Q.   By the 944 accounts, you're referring
16 to the Woodland Bank?
17    A.   No.
18    Q.   No.  What are you referring to?
19    A.   944 accounts were other accounts
20 classified as customers that should have been
21 reclassified as non-customer.
22    MS. NEUHARDT:  I'm probably at a
23 halfway point if you want to take a short
24 break.

Page 299

D. McIsaac

1    MR. OXFORD:  Okay.  That would be
2 great.
3    MS. NEUHARDT:  There were two
4 things we wanted him to look for.
5 Let's go off the record.
6    THE VIDEOGRAPHER:  The time is 5:54.
7 This is the end of the tape labeled number
8 6.  We're going off the record.
9    (Recess.)
10    THE VIDEOGRAPHER:  This is the start
11 of tape labeled number 7.  The time is 6:23.
12 We are back on the record.
13    MS. NEUHARDT:  Mr. Oxford, based on
14 our conversation off the record, you have
15 some statements to put on the record about
16 what Mr. McIsaac found during the break?
17    MR. OXFORD:  Yes.  Mr. McIsaac, you
18 had referenced a stipulation in response to
19 some questions that Amy asked you in
20 connection with the FID issue?
21    THE WITNESS:  Right.
22    MR. OXFORD:  Could you turn to your
23 Rebuttal Report, Exhibit 1, please.
24    THE WITNESS:  Right.

Page 300

D. McIsaac

1    MR. OXFORD:  Can you identify what
2 Exhibit 1, please?
3    THE WITNESS:  The substitution
4 agreement.  I apologize for calling it a
5 stipulation.  Agreement.
6    MR. OXFORD:  Is that the document you
7 referred to when you were talking about the
8 stipulation?
9    THE WITNESS:  Yes, it was.
10    MR. OXFORD:  And can you also identify
11 for me what Exhibit 2 is to your Rebuttal
12 Report?
13    THE WITNESS:  Exhibit 2 is the summary
14 by account of all of the FID accounts and
15 the assets that they had in their accounts
16 as of the 19th of September.
17    MR. OXFORD:  Okay.  Thank you.  And
18 then the other issue that I just wanted to
19 clear up, if you could turn to your original
20 affidavit, which is Exhibit 691.
21    THE WITNESS:  Right, those were in
22 693.
23    MR. OXFORD:  Yes.  And these are not
24 tabbed, but I'd like you to find Exhibit 28,

Page 301

D. McIsaac

1 if you could.
2    THE WITNESS:  So much easier if it was
3 tabbed.
4    MS. NEUHARDT:  It's been discussed.
5    THE WITNESS:  Okay, yes.
6    MR. OXFORD:  Do you have Exhibit 28 in
7 front of you, sir?
8    THE WITNESS:  Yes, I do.
9    MR. OXFORD:  Was that the memorandum
10 you referred to in your earlier testimony
11 that was from Barclays Capital to
12 Broadridge?
13    THE WITNESS:  Right.  This was the
14 memo that went from Barclays to Broadridge
15 Capital.
16    MR. OXFORD:  Is it your understanding
17 this was an analysis or review that was
18 conducted by these individuals on behalf of
19 LBI or Barclays Capital?
20    THE WITNESS:  I believe they were
21 Barclays Capital employees.  They reviewed
22 LBI and I think at the same time they
23 conducted a similar review of Barclays
24 Capital reports to determine whether or not

Page 302

D. McIsaac

1    they were the same issue in the ADP or
2    Broadridge allocation matrix.
3        MR. OXFORD:  Okay.  Thank you.
4        MS. NEUHARDT:  Neil, I believe you
5    also said that you would provide for us --
6    you would review and identify for us the
7    materials on which you relied for his
8    testimony that the total amount of cash and
9    securities in the reserve account as of 9/19
10   was roughly 1.769 billion; is that correct?
11       MR. OXFORD:  Yes, we will undertake to
12   do that.
13       MS. NEUHARDT:  And that you would do
14   the same for Mr. McIsaac's testimony that
15   the assets at Chase were seized on September
16   19, 2008?
17       MR. OXFORD:  Yes.  Again, we'll
18   undertake to review the reliance materials
19   that were produced to you.
20   BY MS. NEUHARDT:
21       Q.   Do you still have your report opened
22   to Exhibit 28, which we were just discussing?
23       A.   I found it very quick.
24       Q.   Is it your testimony that this is

Page 303

D. McIsaac

1    your -- is the basis for your statement in
2    paragraph 18 of your rebuttal that Barclays
3    performed a partial recalculation of the reserve
4    formula to adjust for the discrepancies
5    discussed in this portion of your rebuttal
6    report?
7        A.   Yes, I believe on or about January
8    2009, the allocation report was rerun and the
9    adjustments were made to it.
10       Q.   But your basis for that statement,
11   that it was rerun in January, is not this
12   memorandum, is it?
13       A.   This is the memorandum I believe to
14   Broadridge pointing out the issues and
15   requesting I thought to be rerun.
16       Q.   But this does not state that Barclays
17   actually reran the calculation, does it?
18       A.   I don't believe it does, no.
19       Q.   Okay.
20       MR. OXFORD:  Amy, not to interrupt,
21   but it occurs to me that there was a
22   document I marked at Mr. Vinella's
23   deposition that might be the one your
24   looking for.

Page 304

D. McIsaac

1        MS. NEUHARDT:  We can talk about that
2    off the record, but that's --
3        MR. OXFORD:  Okay.
4        MS. NEUHARDT:  If he -- are you saying
5    that he relied on that document?
6        MR. OXFORD:  That may be the document
7    he relied upon.  I don't have it with me
8    today, but -- but I'm happy to review it and
9    let you know if that was what he relied
10   upon.
11       Q.   Okay.  And then you also referred to
12   Exhibit 2 to your original -- no, I'm sorry,
13   your rebuttal?
14       A.   Rebuttal.
15       Q.   Yes.  And can you tell me what Exhibit
16   2 is?
17       A.   Exhibit 2 is a schedule of all the FID
18   accounts and the assets in their accounts on
19   9/19, and these were the assets that were at
20   Chase.
21       Q.   And from whom did you receive this?
22       A.   From the financial advisors of the
23   Trustee.
24       Q.   And did you rely upon a non-redacted

Page 305

D. McIsaac

1    version of this document?
2        A.   I believe I did.  I believe it had the
3    names of the customers in there.
4        MS. NEUHARDT:  We would like that
5    document, Neil.
6        MR. OXFORD:  I'll take your request
7    under advisement.
8        Q.   And from this document you believe you
9    were able to determine that these were customer
10   assets?
11       A.   These are the account numbers for the
12   customers and they showed the ranges of where
13   the accounts were in the customer range.
14       Q.   Can you show me what on here is
15   telling you that?
16       A.   The redacted portion doesn't have the
17   account numbers.
18       Q.   The redacted portions.
19           We definitely need the unredacted
20   version.
21           Did you do any research to confirm
22   that there were no subordination agreements
23   associated with these accounts?
24       A.   These accounts were all listed as

Contains Highly Confidential Portions

Page 306

D. McIsaac

1  customers.  So, no, I did not do any
2  subordination -- review to see if any customers
3  in the FID subordinated their accounts to the
4  Trustee.  But if they did, then I don't know why
5  they would be locked up in a separate account at
6  Chase to the benefit of customers.
7      MS. NEUHARDT:  Strike the last part of
8  his answer as nonresponsive.  Okay.
9      Q.   I think we've followed up on
10 everything from the break.  I would like to turn
11 to your discussion of -- in your rebuttal
12 report, it's paragraphs 19 through 21; in your
13 original report, it is paragraphs 39 and 40; and
14 you refer to it as "Assets Subject to LBI
15 Administration."
16      What is your basis for stating that
17 the 439 million in assets that you have
18 identified are customers assets?
19      A.   These were assets in a box listed as
20 customer box, customer security -- customer no
21 lien account at LBIE for the benefit of LBI
22 customers.
23      Q.   Did you do any independent
24 investigation of that?
25

Page 307

D. McIsaac

1      A.   I reviewed the LBIE agreement that
2  said that they were holding account free of
3  lien.
4      Q.   When say LBIE you're referring to
5  L-B-I-E, right?
6      A.   Yes.
7      They give control location memos to
8  the SEC.
9      Q.   Okay.  Were you -- were you aware of a
10 general policy at LBI that they would include
11 LBIE customers assets -- I'm sorry, LBI customer
12 assets that were held by LBIE in their lockup
13 requirement calculation?
14      A.   I don't understand the question.  I'm
15 sorry.
16      Q.   Okay.  Well, do you know whether as a
17 matter of course LBI would in fact include in
18 its reserve calculation an adjustment for the
19 LBI customer assets that were held by LBIE?
20      A.   I saw nothing in the calculations that
21 led me to believe that they were not -- that
22 they were not considered them in a good control
23 location and, therefore, putting a credit in the
24 reserve formula.
25

Page 308

D. McIsaac

1      Q.   Did you ask -- did you speak to
2  anybody about this issue?
3      A.   I did not speak to any Lehman or
4  Barclays employees.
5      Q.   Okay.  If in fact there was an
6  adjustment as a matter of course at LBI -- for
7  LBI customer assets held at LBIE, would that
8  change your opinion in any way?
9      MR. OXFORD:  Objection to form.
10      A.   If the 439 that I believe allocated to
11 a good control location and, therefore, was not
12 put into the formula, if somebody could show me
13 the adjustment putting that $439 million into
14 the formula, I guess I would change my opinion,
15 but I'm not sure why they would get a good
16 control letter and then do that, but ...
17      Q.   Your testimony is, though, that you
18 don't know one way or the other, correct?
19      A.   I did not see anything to that.
20      Q.   All right.  Let's turn to your
21 discussion of the OCC deposit, which is in your
22 rebuttal report, paragraphs 24 and 25 on pages
23 11 and 12, and in your original report it is
24 paragraph 45 on page 17.
25

Page 309

D. McIsaac

1      Now, is a broker-dealer able to
2  withdraw and transfer margin at the OCC without
3  funding the reserve account at the time of the
4  withdrawal?
5      A.   Yes.
6      Q.   Okay.  Let's go, earlier today we
7  talked about the statement in paragraph 13 of
8  your rebuttal affidavit that the only relevant
9  point in time for the purpose of determining the
10 accuracy of LBI's reserve calculation is
11 September 19, 2008?
12      A.   That's correct.
13      Q.   Do you believe that that principle
14 applies to your opinion about the OCC deposit?
15      MR. OXFORD:  Objection.  Form.
16      A.   I believe that opinion applies to it.
17      Q.   Okay.  Had the OCC margin deposit that
18 you refer to in your reports been withdrawn as
19 of September 19?
20      A.   No, but in previous discussions
21 earlier this morning on my expert report, the
22 Barclays lawyers were assuming that the margin
23 was being transferred to LBI as of the 17th, so
24 if -- if to -- I'm sorry, to Barclays as of the
25

Page 310

D. McIsaac

1  17th.
2      If LBI had agreed to transfer that
3  money, then I would assume that it was not a
4  good debit in the formula because it was
5  impaired.
6      Q.    Well, by that logic, as of the 17th,
7  hadn't LBI agreed to transfer, for example, all
8  of its private investment management accounts to
9  Barclays as of a later date?
10     MR. OXFORD:  Objection.  Form.
11     A.    I believe they determined what they
12 were going to transfer.  Until you transfer the
13 customers' assets and the customer accounts,
14 they're still included in the reserve formula
15 until such time as you can transfer them.
16     If you have impeded an asset, then I
17 don't think you could put it into the formula,
18 just as if I had a customer receivable that
19 wasn't fully secured, I wouldn't put it in the
20 formula.
21     So if this deposit was sold to
22 somebody else prior to the 19th, then I think it
23 probably doesn't belong in the formula as of the
24 19th.

Page 311

D. McIsaac

1      Q.    Now, do you know whether the contract
2  had been approved by the court prior to -- well,
3  you said the 17th.  Do you know if that contract
4  had been approved by the court as of the 17th?
5      A.    I don't know when the contract was
6  approved.  I believe it was sometime after the
7  fact, but if, as of the 17th, you agreed to sell
8  it and gave up your rights to that deposit, then
9  I don't know if that would be a good debit in
10 the formula.  And I'm just going by what
11 everybody was saying, that the -- they agreed to
12 sell the margin prior to that and that thought
13 process.
14     Q.    Could you show me -- well, are you
15 basing your opinion on anything in Rule 15c3-3?
16     A.    I believe there are many parts of 3-3
17 that would talk about unsecured receivables and
18 how they would not go into the formula.  This is
19 allowed in the formula because it's coming from
20 a clearing org. receivable.  If you have given
21 up your rights to that receivable, then I don't
22 think you would include it in the formula.
23     Q.    And is your position that LBI had
24 given up its rights as of the 17th prior to

Page 312

D. McIsaac

1  court approval?
2      MR. OXFORD:  Objection.  Form.
3  Misstates the witness's testimony.
4      You can answer the question again.
5      A.    No, my opinion is if it's determined
6  that margin was sold prior to the 19th, or
7  as of the 19th, then it does not belong as a
8  debit in the formula.
9      Q.    Is your opinion that a contract that
10 has not yet been closed nonetheless affects the
11 15c3-3 calculation?
12     A.    My opinion is if you tell me you have
13 impeded that asset and you -- you have
14 effectively given up your right to that asset, I
15 would say that asset's not a good asset in the
16 formula.  And that's all I'm saying.  I'm not --
17 I don't know when the contract was sold.
18     I'm being told, and people are
19 negotiating that -- and I think this would be
20 decided by the court eventually -- that the
21 agreement sold the margin to Barclays as of the
22 17th if that's the date of the agreement and
23 that's when that account -- that's when that
24 asset stopped becoming I believe a good asset

Page 313

D. McIsaac

1  for LBI for reserve formula purposes.
2      They have given up their right to
3  receive that asset.  I don't think they can put
4  a debit in there.  The same as if I told a stock
5  borrow counterparty don't give me your money
6  back, I don't care.  It wouldn't go in the
7  formula.
8      Q.    If it were to turn out that the --
9  they had not given up their rights until such
10 time as the court approved of the contract,
11 would that change your opinion?
12     MR. OXFORD:  Objection.  Form.
13     A.    I don't know what the date would be
14 that they agreed to the contract.  I -- this --
15 I think this will be going in front of the court
16 eventually and the court will decide whether or
17 not the contract stays -- states that that was
18 being sold as at that point in time.
19     If that's the point in time I believe
20 the contract was effective or signed
21 theoretically agreed to as of the 19th, I don't
22 know if it matters when it's signed.  If I have
23 agreed to impede an asset at any point in time,
24 it doesn't matter when I sign it.  I think I

Page 314

D. McIsaac

1
2  would not include that debit in the reserve
3  formula.
4      Q.   So even if a court were to determine
5  that the contract was not effective until it
6  were approved, it's nonetheless your opinion
7  that the asset would be impeded as of the time
8  they signed?
9      A.   As of the time that somebody agreed
10 that that asset was not an asset of theirs, that
11 they have sold -- they have given that asset
12 away, they sold that asset, I can't see how that
13 asset would be good for the -- as a debit in the
14 reserve formula.
15     Q.   Do you believe LBIE -- sorry, LBI
16 continued to be able to withdraw from that OCC
17 account after the 17th?
18     A.   I believe there were some restrictions
19 at the OCC on the 19th that they could not
20 withdraw moneys out of there on the 19th.
21     Q.   The restrictions were imposed by the
22 OCC, correct?
23     A.   Yes, they were.
24     Q.   They were not imposed by Barclays?
25     A.   I don't think Barclays imposed them,

Page 315

D. McIsaac

1
2  no.
3      Q.   So it's not the contract that was
4  preventing them from withdrawing assets after
5  the 17th?
6      A.   As I stated earlier today, you weren't
7  here, that I would have anticipated the purchase
8  agreement to have some indication that they were
9  selling margin and at that point in time to talk
10 about the amount of margin that was being sold.
11     But once you've given up that right,
12 whether it be 500 million for a billion, I don't
13 think you can put it in the formula anymore.
14     Q.   But they could withdraw it from the
15 OCC account?
16     A.   And if it wasn't in the OCC account,
17 it wouldn't be a debit in the formula either.
18     Q.   I understand, but I'm trying to
19 understand.  Essentially you're saying that the
20 asset was impaired as of the date the contract
21 was signed; is that correct?
22     A.   I'm saying if the -- if the court
23 determines that that is what happened on the --
24 as of the Asset Purchase Agreement and that the
25 margin was being sold by Lehman to Barclays,

Page 316

D. McIsaac

1
2  that that debit should not be in the formula
3  because they have given up their right to
4  receive that debit and it is no longer there for
5  the protection of customers.
6      Q.   Yet you're also saying they
7  nonetheless had the right to withdraw those
8  funds prior to the -- or after the 17th from the
9  OCC?
10     A.   And had they withdrawn those funds,
11 they wouldn't be in the formula.
12     Q.   But they wouldn't be in the formula
13 for a different reason, correct?  Because they
14 had been withdrawn?
15     A.   That's right, and I don't --
16     Q.   And not because --
17     A.   And I don't know if the agreement -- I
18 didn't see anything in the agreement stipulated
19 that the amount that was there as of the 17th is
20 what was being sold, if the amount was there at
21 the end of the day is what was being sold or if
22 anything was being sold.
23     If, if it's determined that that $507
24 million was being sold and that it was impaired
25 by the 19th by the thought process of selling

Page 317

D. McIsaac

1
2  it, I don't think the debit should have been in
3  the formula.
4      Q.   And yet you nonetheless believe that
5  if they also contracted to transfer tens of
6  thousands of customer accounts in that same
7  contract, that that transfer of customer
8  accounts should not be included in the 15c3-3
9  calculation?
10     MR. OXFORD:  Objection.
11     A.   No, I said the --
12     MR. OXFORD:  Objection to form.
13     A.   The customer accounts should be
14 included in the calculation until such time as
15 they're transferred.  If you're putting a debit
16 in the formula, effectively reducing your lockup
17 requirement because you have a good asset,
18 that's what I'm saying, if that was impeded, I
19 don't believe there should have been a debit in
20 the formula.
21     Q.   If there's no adjustment to the debit
22 after withdrawal, why is an adjustment by an
23 agreement to withdraw on a later date required?
24     A.   As far as I'm concerned, the agreement
25 should have stipulated if there was an asset to

Page 318

D. McIsaac

1 be sold, what amount was to be sold, or what
2 amount at what point in time should have been
3 sold.
4    What I am saying if, if in fact the
5 court determines that that was a valid
6 transaction and that LBI gave up its rights to
7 this debit, that it should not have been in the
8 formula as of the 19th.
10    Q.   And do you know whether the contract
11 stipulated an amount to be sold or at what point
12 in time to determine the amount to be sold?
13    A.   No, I did not.
14    Q.   So if in fact the amount was not
15 limited to $507 million or the date as of which
16 the transfer would be made was later than 9/19,
17 does your opinion change in any way?
18       MR. OXFORD:  Objection.
19    A.   If at any point --
20       MR. OXFORD:  Objection to the form.
21    A.   Sorry.
22       If at any point in time that was
23 determined that they had given up their rights
24 to that asset, any calculation done from that
25 point in time I do not believe should have

Page 319

D. McIsaac

1 included that asset as a debit in the formula.
2    Q.   Can you show me where in the either
3 FINRA or SEC Rule 15c3-3 it requires an
4 adjustment prior to the delivery of the assets
5 to another party.
6    A.   I don't believe there's anything in
7 3-3 that talks to this.  This is my opinion that
8 if you put a debit in the formula, it needs to
9 be realizable.  It has to be secured.  The
10 security for this would be that it's at the OCC
11 and they will return it to you when not needed.
12    Q.   Okay.  So you do not believe there's
13 anything in 3-3 that would require that?
14    A.   I don't think there's anything in 3-3
15 that talks to an OCC deposit being sold
16 during -- prior to a calculation being finalized
17 and how it should be accounted for in the
18 formula.
19    Q.   Okay.  Is there anything in the FINRA
20 interpretations of 3-3 that would cover this
21 issue?
22    A.   There's nothing that will cover this
23 issue.  There are -- there are issues within 3-3
24 and I will gladly dig them out eventually, we

Page 320

D. McIsaac

1 don't have time now, to show you that debits
2 have to be secured.  I can't put a debit in for
3 a stock borrow if it's not secured.  I can't put
4 any amount in that's not secured.
5    Q.   Have you heard of a Transfer and
6 Assumption Agreement, TAA?
7    A.   Yes.
8    Q.   Let me go back.  Until such time as
9 the account would have actually been transferred
10 to Barclays, wouldn't OCC still owe margin to
11 LBIE -- to LBI?  My apologies.
12    A.   LBI would have been the -- the
13 clearing firm at the OCC.  If at any point in
14 time I've given up my rights to that, all I'm
15 saying is I don't think it's a good debit in the
16 formula.  Whether or not OCC would give it back
17 to us or not, or give it back to LBI or not, at
18 any point in time when that sale was
19 consummated, they wouldn't get it back.
20    So putting a debit in the formula,
21 knowing that you cannot collect it, I think is
22 not in compliance with the rules.
23    Q.   And yet you acknowledge that LBI could
24 have withdrawn that money after the 17th from

Page 321

D. McIsaac

1 the OCC account?
2    A.   I --
3       MR. OXFORD:  Objection.  Form.
4    A.   Yes, I acknowledge they could have
5 done that.
6    Q.   Then how is that money less secured?
7    A.   Because as of the 19th -- you have one
8 agreement that you're telling me that they --
9 that they get the margin, and all I'm saying is
10 if Barclays believes that that agreement means
11 that they get the margin and the judge says,
12 yes, that was a binding agreement at that point
13 in time and they get the margin, all I'm saying
14 is that then that debit was impeded and I can't
15 believe that you would put a debit in the
16 formula that is impeded.  And that's all.  If
17 you don't have -- if you cannot have the right
18 to collect it, you shouldn't put the debit in
19 there.
20    Q.   I believe I had asked if you were
21 familiar, if you had heard of the TAA?
22    A.   Yes.
23    Q.   Okay.  Now, were you shown that
24 earlier today?

Page 322

D. McIsaac

1
2    A.   Yes, I was.
3    Q.   Do you recall whether or not that
4    agreement was signed before or after September
5    19?
6    A.   I believe it was signed on -- either
7    by some people on the 20th and some people
8    possibly on the 22nd.
9    Q.   If the court were to hold that it was
10   the TAA -- if the court were to hold that it was
11   the TAA that effected Barclays' right to the
12   margin deposits, would it still be your opinion
13   that the calculation as of the 19th should have
14   been adjusted?
15   MR. OXFORD:  Object to the form.
16   Assumes facts not in evidence.
17   MS. NEUHARDT:  I believe as an expert
18   I'm entitled to ask him hypotheticals.
19   THE WITNESS:  Is it okay to answer?
20   MR. OXFORD:  You can answer.
21   A.   I understand it might not have been
22   signed at a point in time.  I believe the OCC
23   was looking for it to be signed as of the 19th.
24   There was all kinds of e-mails that I was shown
25   before stating that they were looking for it to

Page 323

D. McIsaac

1
2    be signed to transfer it over effectively on the
3    morning of the 22nd to Barclays.
4    Again, that TAA is not a contract.
5    That TAA I believe is an agreement between
6    Barclays, Lehman, and the OCC to transfer
7    Lehman's contract and in the Lehman name to
8    Barclays.  It's not the sale agreement for
9    determining when that agreement was done or
10   signed.  It's a vehicle used to transfer -- for
11   the OCC to transfer the account name from Lehman
12   to Barclays.
13   Q.   That entire answer was nonresponsive.
14   I move to strike it.
15   Please answer my question, which is
16   that if the court were to hold that it was the
17   TAA that effected Barclays' right to the margin
18   deposits, would it still be your opinion that
19   the calculation as of the 19th should have been
20   adjusted?
21   A.   I would have to determine or review
22   what the court's reasoning why the TAA was the,
23   in fact, the agreement between LBI and Barclays
24   that sold that asset.  Just -- I don't -- it's a
25   hypothetical and I don't know.  I don't consider

Page 324

D. McIsaac

1
2    that a sale agreement.
3    Q.   If the court held that that was the
4    agreement that impaired the asset, and it was
5    not signed until the 20th or perhaps the 22nd,
6    would it change your opinion that the
7    calculation --
8    A.   No, it would not.
9    Q.   Let me finish my question.
10   -- that the calculation as of the 19th
11   should have been adjusted?
12   A.   No, it would not.
13   Q.   And why?
14   A.   Because it was negotiated, started
15   negotiating it on the 19th, and I don't think
16   you should put an asset -- a debit in the
17   formula that you have impeded, whether or not
18   you do it on Saturday or Sunday.
19   Q.   So it is your testimony that the mere
20   start of negotiations impairs the asset?
21   A.   That it is impaired because prior to
22   the next business day, I don't have that, I'm
23   not allowed to have that asset anymore.
24   Q.   Because you started the negotiations?
25   A.   Because it was finalized by the next

Page 325

D. McIsaac

1
2    business day, by the morning of the next
3    business day, which effectively, to me, it was
4    done as of the close of business the 19th.
5    Q.   So you're saying that even though --
6    even if an agreement is reached after the close
7    of business, it would affect the calculation of
8    that day rather than the calculation of the next
9    business day?
10   MR. OXFORD:  Objection.  Form.
11   A.   I believe that if you've sold the
12   asset prior to you needing to make your lockup,
13   the requirement, and you have impeded that asset
14   in any way, shape or form, that you should not
15   include it in the formula.
16   If that asset -- if that agreement, if
17   the court finds that that agreement is what sold
18   the asset and that was signed as of the 21st or
19   22nd, it was signed before the opening of
20   business the next day, so as effectively on the
21   19th they would not have had a receivable.
22   Q.   Well, perhaps I misunderstand your
23   earlier testimony, but I thought you said that
24   the calculation would be done on Friday, the
25   19th, and in the ordinary course of business,

Page 326

D. McIsaac

1 this would be done every Friday?
2 A. Uh-huh.
3 Q. So how would an event that happened
4 after the calculation have to be retroactively
5 included in the prior calculation?
6 A. Because I'm only saying -- because
7 it's being done and agreed to prior to the time
8 that the calculation is finalized that it should
9 be -- should be reviewed in that respect.
10 Q. What portion of SEC Rule 15c3-3 are
11 you relying on for that opinion?
12 A. SEC Rule 3-3 talks about secured
13 assets, and you cannot put a customer debit in
14 the formula unless it's fully secured.
15 Q. I just want to make very clear that it
16 is your position that a contract that was only
17 being negotiated prior to the close of business
18 on Friday, nonetheless if it reached agreement
19 prior to the opening of business the next
20 business day, it should -- it would result in a
21 retroactive recalculation of the requirement --
22 of the calculation done on Friday?
23 MR. OXFORD: Is that -- that's a
24 statement, Amy. Do you have a question?

Page 327

D. McIsaac

1 Q. Sorry. I did put the "it" before the
2 "is."
3 Is it your position that a contract
4 that is only being negotiated prior to the close
5 of business on Friday but that is closed prior
6 to the opening of business on Monday would
7 require a retroactive recalculation of the
8 calculation done Friday?
9 A. My opinion is that I don't believe the
10 TAA is -- is the contract.
11 Q. I'm not asking you whether or not the
12 TAA is the contract. I'm asking you whether or
13 not --
14 A. I'm trying to finish my thought.
15 MR. OXFORD: Amy, we're all trying to
16 get out of here. If you could let Mr.
17 McIsaac finish his answer --
18 MS. NEUHARDT: I'm going to ask it
19 again because he's clearly not answering the
20 question.
21 MR. OXFORD: Well, it's very hard for
22 you to reach that conclusion if you don't
23 let him finish his answer.
24 Q. But if you're going to tell me that

Page 328

D. McIsaac

1 the TAA is not the contract, I'll ask it again.
2 A. I believe that the TAA impedes the
3 asset as of the 19th.
4 Q. Please show me what portion of 15c3-3
5 justifies that conclusion.
6 A. I -- I don't believe you'll find
7 anything in 3-3 that will say that, but I
8 believe that the asset is impeded as of the 19th
9 if you have agreed to sell it and not receive
10 any money back in return for it that you can put
11 into the customer debit, and that's all I'm
12 saying.
13 Q. Is there anything in FINRA that
14 supports that?
15 A. I don't believe there's anything other
16 than talking about secured assets.
17 Q. Let's move on to what was in your
18 original affidavit at paragraphs 46 to 49 and
19 you refer to as customer property seizure during
20 the transfer process.
21 A. Uh-huh.
22 Q. Now, as I understand your opinion in
23 your original affidavit, your basis for
24 identifying this 82 million was that LBI's RISC

Page 329

D. McIsaac

1 system did not feed into LBI's Rule 15c3-3
2 calculation; is that correct? And I'm looking
3 at paragraph 47.
4 MR. OXFORD: Object to the form.
5 A. Yes, I think I say here that the RISC
6 system doesn't automatically feed the 3-3
7 calculation.
8 Q. Have you since learned that that is
9 incorrect?
10 A. No, I've been told and informed that
11 the RISC system is reviewed by personnel who
12 supply the preparers the debit and credit
13 balances for customer accounts to be included in
14 the formula.
15 Q. Who did you speak to that informed you
16 of that?
17 A. The Trustee's financial advisors.
18 Q. Is that Deloitte?
19 A. Yes, it is.
20 Q. Did you speak to anyone who had been
21 an LBI employee to confirm that to be true?
22 A. No, I have not.
23 Q. Did you ever speak to Peter Tennyson?
24 A. No.

Contains Highly Confidential Portions

Page 330

D. McIsaac

1
2      Q.    While she gets this document, in your
3  rebuttal affidavit, paragraphs 22 to 23, you
4  discuss the same issue.  You do not mention the
5  RISC system as a basis for your report in the
6  rebuttal affidavit.
7      A.    Uh-huh.
8      Q.    Why is that?
9      A.    I think we tried to further clarify
10  that these were moneys that were -- the accounts
11  were debited as if the customers were paid.  The
12  customers were never paid, so an adjustment had
13  to be made to -- to, in the normal course of
14  business, you reconcile your bank accounts, you
15  look at items that you thought were paid that
16  weren't paid, and you would make the adjustments
17  for those.
18         These moneys were never paid to the
19  customers so you effectively still have a
20  payable to the customer.
21      Q.    Okay.  And now, what is your basis for
22  saying these moneys were never paid to the --
23  paid to the customers?
24      A.    What I have seen is that the debits,
25  they debited their accounts, and there was no

Page 331

D. McIsaac

1
2  adjustment coming from the RISC system that I
3  was shown adjusting for this $82 million.
4      Q.    Do you have any other basis for saying
5  the moneys were never paid out?
6      A.    No, that is it.  I think the customers
7  actually made claims, possibly to the estate,
8  that they weren't paid their moneys.
9      Q.    If it turns out that the RISC system
10  did in fact feed into the 15c3-3 calculation,
11  would that change your opinion in any way?
12      A.    Not if these amounts were not included
13  as payables to the customers at that point in
14  time.
15      Q.    Did you do any investigation of
16  whether or not items within the RISC system
17  would or would not have been fed into the 15c3-3
18  calculation?
19      A.    I was informed that the debits and
20  credits to be included in the reserve formula
21  off of the RISC system were provided by
22  personnel responsible for the RISC system
23  independent of anything else.
24      Q.    Okay.
25      A.    They provided the adjustments to the

Page 332

D. McIsaac

1
2  formula for that day.
3      Q.    And this was Deloitte that informed
4  you of that?
5      A.    Yes.
6      Q.    We may have to come back to that when
7  she comes back.
8         Okay.  Now, your original affidavit
9  discusses a proposed adjustment of 2.3 billion
10  allegedly owed to LBIE's customers, correct?
11      A.    Uh-huh.
12      Q.    You do not discuss that in your
13  rebuttal report, correct?
14      A.    That's correct.
15      Q.    Okay.  Why is that?
16      A.    I believe the Trustee's advisor -- the
17  Trustee has removed that and put that as under
18  investigation until such time as it can be
19  concluded whether or not it is a viable
20  liability to the customers.
21      Q.    Okay.  Do you continue to have an
22  opinion on whether or not the adjustment is
23  necessary?
24      A.    If it's determined that there is a
25  liability to the omnibus customer account, yes,

Page 333

D. McIsaac

1
2  it should then go in the formula.  It was in the
3  records at that point in time as a payable and
4  was removed from the formula.
5      Q.    Okay.  But you do not know as of today
6  whether or not there was in fact a liability to
7  the omnibus customer account?
8      A.    No, that's why it's still under
9  investigation.
10      Q.    Did you believe that it was not still
11  under investigation at the time of your October
12  5 affidavit?
13      A.    I believe we -- I'll have to look at
14  my affidavit, but I believe we sort of alluded
15  to the fact that it's still being investigated,
16  and if such time it was found not to be true, we
17  wouldn't require it, but I'll have to look.
18         If you look at item -- at paragraph
19  44, I basically say I was not able to see any
20  documents to make this adjustment, and until
21  such time as we saw it, that it should be held
22  until we can determine if it should actually be
23  owed.
24      Q.    Well, your October 5 report appears to
25  be divided into, starting on page 13, items --

Page 334

D. McIsaac

1  you phrase it as items omitted or incorrectly
2  reported in the reserve formula, and that goes
3  through the top of page 19, and then on 19,
4  number 2, is items currently under
5  investigation, and then you list a number of
6  other items?
7     A.   Uh-huh.
8     Q.   Why did you put the 2.3 billion in
9  your first category of items discussed in your
10 original affidavit as opposed to the category of
11 items under investigation?
12    A.   Because at this point in time we had
13 shown -- been shown no documents that would
14 prove that this credit should be -- should come
15 out.  Subsequent to that, I believe the Trustee
16 has had some discussions with people and have
17 decided to remove it until such time as I've
18 seen those documents.  I'm just not putting it
19 in my affidavit until I can see something that
20 proves it or that the claim is -- the claim as I
21 believe is still out there from LBIE and until
22 such time as it can be proven incorrect.
23    Q.   So in October when you did your
24 initial affidavit, you assumed as true what the

Page 335

D. McIsaac

1  Trustee gave you?
2     A.   I saw the -- the credit coming out of
3  the formula, an adjustment to the formula for
4  the $2.3 billion.  There was no support for that
5  credit coming out of the formula.
6        Subsequent to that, I believe the
7  Trustee and his advisors may have additional
8  information that they are investigating and they
9  decided to take it out of their motion.
10    Q.   In October did you investigate whether
11 or not the amount at issue was related to an
12 LBIE customer account or proprietary account?
13    A.   It was sitting in the LBIE omnibus
14 customer account as a payable.
15    Q.   If it was in the customer account, did
16 you investigate whether or not the obligation of
17 the customer had been satisfied prior to LBIE
18 filing for administration?
19    A.   There was an -- I don't know if that
20 has anything to do with it.  What does LBIE --
21 this is owed to LBIE for its customers.
22    Q.   All right.  Then if it was a customer
23 account, did you investigate whether or not the
24 obligation to the customer was satisfied prior

Page 336

D. McIsaac

1  to 9/19?
2     A.   We saw no proof that that
3  adjustment -- there was no proof behind that
4  adjustment that we could see at that point in
5  time that I was shown or could be found
6  supporting taking the credit out of the formula.
7     Q.   Did you investigate whether or not the
8  obligation to the customer was satisfied prior
9  to 9/19?
10    A.   I don't -- the customer is LBIE.
11    Q.   The underlying customer?
12    A.   The underlying customer is LBIE's
13 responsibility.  I don't think it's LBI's
14 responsibility.
15    Q.   So is your answer no?
16    A.   No.
17    Q.   Have you conducted any further
18 analysis on this issue since the time of your
19 October 5 affidavit?
20    A.   No.
21    Q.   Now, we referred, actually, to Section
22 2 of your original affidavit as items currently
23 under investigation?
24    A.   Uh-huh.

Page 337

D. McIsaac

1     Q.   The first one you identify on page 19
2  starting with paragraph 51 is a Chase Bank
3  overdraft.  Have you done any
4  investigation on this matter since your October
5  5 report?
6     A.   No.
7     Q.   Have you done any further
8  investigation on any of the other --
9     A.   No.
10    Q.   -- issues identified?
11    A.   No.
12    Q.   Do you know of any SEC regulation that
13 would prevent Lehman Brothers Holding Company
14 from paying an amount to Barclays that was equal
15 to the amount held in the reserve account?
16        MR. OXFORD:  Objection.  Vague.
17    A.   I -- I am not fluent in all SEC rules
18 as they affect holding companies.
19    Q.   Okay.  Have you done any investigation
20 as to the propriety of the amount of customer
21 claims that have been filed against the estate?
22    A.   No, I have not reviewed the customer
23 claim process.
24    Q.   So you have no opinion on how much the

Page 338

D. McIsaac

1 estate will eventually have to pay out?
2     A.    No, I have not seen that number at
3 this point in time.
4         MS. NEUHARDT:  Okay.  Let's take a
5 five-minute break.  I may be through.
6         THE VIDEOGRAPHER:  The time is 7:09.
7 We are going off the record.
8         (Recess.)
9         THE VIDEOGRAPHER:  The time is 7:19.
10 We're back on the record.
11 BY MS. NEUHARDT:
12     Q.    Mr. McIsaac, right before we broke,
13 you informed me that you have not conducted any
14 further investigation relating to the items
15 listed in Section 2 of your original affidavit
16 as items currently under investigation?
17     A.    That's correct.
18     Q.    Have you been informed of any progress
19 or findings of the financial advisors relating
20 to those items under consideration?
21     A.    I believe in my rebuttal report I make
22 a statement to the fact that they have to date
23 have found nothing else that would impact the
24 formula.

Page 339

D. McIsaac

1     Q.    And do you know -- did they inform you
2 whether or not they have completed their
3 investigation as to any of those matters?
4     A.    I don't believe they have finished it.
5     Q.    Okay.  And we discussed earlier that
6 if a calculation is done on a Friday in the
7 ordinary course of business and an additional
8 deposit is required, that deposit would be done
9 the following Tuesday at 10 A.M.; is that
10 correct?
11     A.    By the following Tuesday at 10 A.M.
12     Q.    No later?
13     A.    Yes.
14     Q.    Okay.  In that situation, is a
15 broker-dealer in violation of SEC rules at any
16 time prior to 10 A.M. on the following Tuesday?
17     A.    In violation of SEC rules regarding
18 what?  They could be --
19     Q.    Are they in violation of any aspect of
20 SEC Rule 15c3-3?
21     A.    As it pertains to that deposit, no.
22 There could be other reasons that they're in
23 violation of rules.
24     Q.    But as it pertains to that deposit,

Page 340

D. McIsaac

1 they would not be in violation as of that
2 Friday?
3     A.    Correct.
4     Q.    Okay.
5         MS. NEUHARDT:  I have no further
6 questions.  None from anybody else?
7         THE VIDEOGRAPHER:  The time is 7:20.
8 This is the end of today's deposition.
9 We're going off the record.
10             oOo
11
12
13
14
15
16
17
         _____
18
         DANIEL McISAAC
19
20 Subscribed and sworn to
   before me this    day
21 of       2010.
22
   _____
23
24
25

Page 341

1
2         CERTIFICATE
3 STATE OF NEW YORK )
             : ss
4 COUNTY OF NEW YORK)
5     I, Kathy S. Klepfer, a Registered
6 Merit Reporter and Notary Public within and
7 for the State of New York, do hereby
8 certify:
9     That DANIEL McISAAC, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23     In witness whereof, I have hereunto
24 set my hand this 7th day of April, 2010.
25     ------------------------------

Page 342

```
 1
 2                    INDEX
 3    TESTIMONY OF D. McISAAC:              PAGE
 4    Examination by Ms. Bloomer  ................    5
 5    Examination by Ms. Neuhardt ...............    241
 6
 7    EXHIBITS:                          PAGE
 8    Exhibit 684, Expert Report of Daniel McIsaac     6
 9    Exhibit 685, Declaration of Daniel Dziemian     47
10    Exhibit 686, Deposition of Gary Romain       50
11    Exhibit 687, Trustee's Memorandum in Further    121
12    Support of His Motion for Relief
13    Exhibit 688, Deposition of Bart McDade      178
14    Exhibit 689, Deposition of James Kobak      219
15    Exhibit 690, a document bearing Bates Nos.    235
16    CGSH33921 through 922
17    Exhibit 691, Affidavit of Daniel McIsaac      240
18    Exhibit 692, Supplemental Affidavit of Daniel   240
19    McIsaac
20    Exhibit 693, Rebuttal Report of Daniel McIsaac  240
21    Exhibit 694, Rule 15c3-3              267
22    Exhibit 695, Customer Protection - Reserves    291
23    and Custody of Securities SEA Rule 15c3-3
24    Exhibit 696, Declaration of Robert Martini     297
25
```

Page 343

```
 1
 2                 INDEX (Cont'd.)
 3    REQUESTS FOR PRODUCTION:
 4    Page 257, Line 15
 5    Page 302, Line 5
 6    Page 302, Line 14
 7    Page 305, Line 5
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 344

```
 1
 2    NAME OF CASE:  In re Lehman Brothers
 3    DATE OF DEPOSITION:  April 6, 2010
 4    NAME OF WITNESS:  Daniel McIsaac
 5    Reason Codes:
 6        1.  To clarify the record.
          2.  To conform to the facts.
 7        3.  To correct transcription errors.
 8    Page _____ Line _____ Reason _____
      From _____ to _____
 9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25        _____
```

Contains Highly Confidential Portions

## A

**ability (8)**
27:17 36:7 139:14
147:23 148:8
188:10 282:7
289:10
**able (23)**
23:13 27:23 54:18,23
56:3 85:9 101:13
102:2 111:21
118:18 132:20
144:25 148:10
149:7,8 185:11
193:9 247:16
257:11 305:10
309:2 314:16
333:19
**ABN (7)**
12:5,18 13:13 15:21
15:25 17:9 258:16
**ABN's (1)**
19:25
**abreast (1)**
27:19
**Absolutely (3)**
12:12 242:10 291:7
**academic (2)**
100:4 101:5
**accept (3)**
59:7 88:21 116:14
**accepted (2)**
206:16 210:16
**accepts (1)**
43:23
**access (8)**
281:25 282:2,5 283:5
283:11 284:3
288:23 289:4
**accessible (3)**
75:20,24 186:5
**accommodate (1)**
6:17
**accomplishes (1)**
207:22
**account (115)**
10:17 28:3,17 31:8,16
33:11,13,24 34:19
35:12,24 36:8 42:2
43:12,16,24 44:2,4
44:19 48:13,17,25
49:3,9,16 50:4
53:14 60:18,22
73:17 80:6 85:12
86:22 88:19 90:22

111:10 114:21,23
115:14,16,19
117:19 118:7
120:20 124:10,12
125:12 133:13,20
133:22 134:12
144:4 156:15 173:2
173:5 180:9,21
183:23 186:22
188:18 190:21
191:7 192:15
199:20 228:25
233:10 247:14
259:2,9,17,18,22
260:3,4,6,6 262:2
263:2,4 264:10
268:16 272:9 279:4
279:10 281:17
286:12 288:3,8
290:11 291:18
295:18,18 300:15
302:10 305:12,18
306:6,22 307:3
309:4 312:24
314:17 315:15,16
320:10 321:2
323:11 332:25
333:7 335:13,13,15
335:16,24 337:16
**accounted (1)**
319:18
**accounting (6)**
49:17 50:4 51:12 52:2
245:23 248:24
**accounts (156)**
17:20 18:10,11,15
19:19 28:21,22
29:17 42:22 43:10
43:17,19 44:9,11,17
49:8,12 60:4 61:15
61:17,19,24,25
71:19 74:10 79:14
84:5,7,9,13 85:6
89:8 100:2 106:12
106:18,25 107:6,10
107:22,25 109:19
109:22 110:18,21
111:13 113:25
120:22,23 124:16
124:24,25 125:2,17
125:23 126:13,24
127:23 128:2,5,5,6
128:13,14,15,23
130:11,16,19,20

132:16 144:7,15
170:23 171:11
173:6 185:20
189:12,20 190:8,9
191:20 192:17,24
194:8 198:12,13,17
205:10,19 224:14
228:21 232:23
234:8,12,18,21
236:12,14,17,23
237:10 247:12
259:21,25 260:9,20
262:4,7 274:4,9
275:16 278:18
279:3,8,10,10,12,17
281:18 282:2,4,9,14
282:20,25 283:8,11
283:17,19 284:25
285:3,7 288:24
289:20 292:18
298:15,16,20,20
300:15,16 304:19
304:19 305:14,24
305:25 306:4 310:9
310:14 317:6,8,13
329:14 330:10,14
330:25
**accuracy (8)**
78:10 147:18 148:5
265:10 275:13,23
279:14 309:11
**accurate (1)**
86:8
**accurately (1)**
21:5
**acknowledge (3)**
173:25 320:24 321:5
**acknowledged (2)**
172:20 286:16
**acquire (6)**
21:23 88:23 89:19
108:23 152:18
208:19
**acquired (11)**
12:4,17,17 17:5 18:12
21:21 150:20
202:14,18,20
258:12
**acquirer (10)**
59:14 112:4 113:7
117:8 152:15 155:2
189:20 190:24
212:14 213:13
**acquirers (1)**

112:2
**acquiring (21)**
59:22,22 94:20 96:8
132:23 153:6,13
156:4 157:7,18,23
158:15,18,21,22
159:4,7,11,18
162:15 169:5
**acquisition (19)**
14:5 15:13,20,24 17:8
19:21,22 20:11
24:15 37:11,24
51:12,15 67:9 68:8
95:6 155:16 258:4
258:11
**acquisitions (8)**
9:7 11:2,5 12:2 13:10
14:18 68:13 258:10
**act (1)**
154:14
**acting (1)**
250:11
**action (2)**
184:2 341:15
**actions (1)**
180:13
**activity (1)**
44:4
**actual (4)**
14:7 18:14 77:5
133:22
**add (5)**
130:3,8 133:8 272:24
283:22
**addition (4)**
108:15 115:10 178:24
182:13
**additional (14)**
26:20 28:12 58:24
129:7 143:19 179:2
182:15 197:20
204:18 274:17
293:19 294:14
335:8 339:8
**address (1)**
31:13
**adequate (10)**
37:5 59:20 94:12
102:24 105:16
126:20,24 128:20
138:24 171:9
**adjust (3)**
290:10 296:11 303:5
**adjusted (4)**

197:5 322:14 323:20
324:11
**adjusting (1)**
331:3
**adjustment (18)**
293:13,23 298:11,14
307:19 308:7,14
317:21,22 319:5
330:12 331:2 332:9
332:22 333:20
335:4 336:4,5
**adjustments (7)**
293:4 294:2,6 295:3
303:10 330:16
331:25
**Administered (1)**
1:8
**administration (2)**
306:16 335:19
**ADP (10)**
245:13 292:11,17,18
296:4,19,25 298:11
298:14 302:2
**advance (2)**
44:25 45:2
**advancing (1)**
41:21
**advantage (2)**
42:15 184:6
**advice (3)**
252:9 276:14,14
**advise (7)**
169:13,16,18 211:2,6
211:15,19
**advised (2)**
79:20 212:14
**advisement (2)**
257:21 305:8
**advising (8)**
79:24 160:8 169:4,8
171:14 210:23
211:12 237:12
**advisor (3)**
172:5 275:11 332:16
**advisors (16)**
7:18,19 64:24 65:8,17
275:25 276:2,5
294:2,5,9,20 304:23
329:18 335:8
338:20
**advisory (4)**
201:19,24 202:9
250:8
**affect (6)**

Contains Highly Confidential Portions

68:23 88:12 193:23
289:9 325:7 337:19
**affidavit (28)**
240:9,12 241:5,10
257:9 274:17 275:2
275:19 276:17,18
280:22 300:21
309:9 328:19,24
330:3,6 332:8
333:12,14 334:11
334:20,25 336:20
336:23 338:16
342:17,18
**affidavits (5)**
8:9 247:7 251:8,10
276:25
**affiliate (31)**
38:5,7 41:25 42:10,18
44:19 45:11,16 48:7
48:13 52:3,22 53:14
54:3,10,13 57:5,15
58:22 59:4 60:3,8
60:12,17,21 117:18
118:2,7 120:2,7
124:9
**affiliates (16)**
38:14 42:22 44:24
47:22 49:13 57:19
57:20,22 58:4 59:9
60:2 117:22,24
120:7 144:14,14
**afford (1)**
166:20
**afraid (1)**
185:13
**afternoon (6)**
146:2,10,11 199:15
199:16 240:23
**afternoons (1)**
271:12
**agent (1)**
20:4
**aggregate (1)**
164:8
**ago (6)**
77:17 85:4 100:12
255:12,22 256:10
**agree (60)**
34:16,25 35:9 37:21
53:11,16 57:13,23
69:21 72:24 74:8
75:18,23 78:13
80:13,19 82:20
84:16,25 86:7 101:3

101:25 104:19
105:18 107:18,25
109:21 110:21
111:12 114:23
118:3 119:3 121:24
122:12 123:4,14
126:11 135:25
142:22 150:6
163:17 173:12
181:16 190:8
191:19 198:10,11
198:15 200:3
202:19,21 222:6
223:24 225:3,20
229:8,14,17 231:23
239:8
**agreed (21)**
121:15 122:13 166:22
167:8,20 168:10
173:13 196:18
208:17 209:21
217:19 310:3,8
311:8,12 313:15,22
313:24 314:9 326:8
328:10
**agreeing (5)**
58:21 80:20 138:9
209:19 239:17
**agreement (87)**
39:11 40:10 41:11
42:11 43:3 63:3
69:17,18,23 87:19
104:15 171:17
172:7,13 173:12,22
173:23 174:3,4,5,10
175:9,12,17,24,25
193:3 197:7 200:15
203:6 205:12,22
206:25 207:5,11,15
207:16,17,18,21
208:24 210:24
211:9,12 212:25
215:3,9 217:2
220:13 224:13
228:6 237:21,22
238:6,25 239:4,7
247:2 278:12
279:16,18 300:5,6
307:2 312:22,23
315:8,24 316:17,18
317:23,24 320:7
321:9,11,13 322:4
323:5,8,9,23 324:2
324:4 325:6,16,17

326:19
**agreements (2)**
218:24 305:23
**agrees (2)**
43:24 44:2
**ahead (1)**
64:15
**AICPA (3)**
255:5,14,16
**al (1)**
1:8
**Albany (1)**
3:14
**alert (1)**
29:10
**alleged (2)**
292:6,13
**allegedly (1)**
332:10
**allocate (1)**
21:11
**allocated (1)**
308:11
**allocating (2)**
290:22 292:2
**allocation (7)**
241:7,9 244:12 245:9
245:11 246:16
247:19 248:14
259:14 292:20
302:3 303:9
**allow (7)**
6:7 28:15 35:23 42:13
54:11 74:14 239:2
**allowed (4)**
64:10 263:13 311:20
324:23
**alluded (1)**
333:14
**alternative (1)**
109:10
**Alternatively (1)**
121:6
**AMAN (1)**
3:24
**ambiguities (1)**
217:12
**ambiguity (4)**
210:17 211:3 285:6
289:19
**ambiguous (5)**
174:21 225:12,17
227:5,9
**America (3)**

67:12,18 214:12
**AMINA (1)**
4:16
**amount (40)**
31:19 33:10 39:14
41:20 48:15 63:9
67:8 68:7,18 72:20
76:23 86:24 95:5
96:7,11,12 114:25
135:2 184:10 185:4
185:19 190:4
210:20 260:18
261:8 290:10 302:9
315:10 316:19,20
318:2,3,11,12,14
320:5 335:12
337:15,16,21
**amounts (6)**
46:8 54:2,18 90:21
263:7 331:12
**Amro (6)**
12:5,18 13:13 15:21
15:25 258:16
**Amy (11)**
3:16 239:25 240:24
261:3 277:15
279:24 283:21
299:20 303:21
326:25 327:16
**analysis (12)**
58:17 108:11 110:6
144:21 161:20
162:12 165:19
243:14 294:5,16
301:18 336:19
**analyst (1)**
245:2
**analyze (12)**
25:16 81:11 108:13
110:10 138:21
144:25 157:19
159:10,11 164:15
192:2 246:20
**analyzing (5)**
19:7 24:14 78:22
79:21 139:13
**and/or (4)**
16:23,25 31:14 276:5
**answer (85)**
6:8,12 14:23 18:2
21:9 23:13 24:8
25:19 30:4 35:21
51:18 52:8 62:10
64:15 70:2 90:2

110:15 111:7,17
115:23 119:8
123:20 126:16
128:19 130:24
131:14 139:3,11
143:23 154:6
155:25 156:8 157:9
162:25 166:12
172:11 175:16
176:21 177:9
182:16,18 187:24
191:5 193:9,24
195:24 196:25
197:16 205:16
208:3 215:7 216:23
220:21,25 221:13
221:24 233:6
243:18 247:16
251:17,25 257:11
259:11 263:10,16
264:2 266:2 268:3
270:8,22 272:12
273:20 276:20
277:2 287:9 290:4
306:9 312:5 322:19
322:20 323:13,15
327:18,24 336:16
**answered (27)**
70:22 111:16,18
119:7 139:10 154:5
166:11 168:4 177:8
181:10 187:5,23
189:23 191:4 195:4
196:24 197:15
208:3 218:11,12
227:20 231:10
233:20 238:18
263:10 270:17
290:13
**answering (3)**
80:10 183:3 327:20
**answers (2)**
184:23 285:11
**anticipate (1)**
198:20
**anticipated (4)**
108:17 151:2 163:13
315:7
**anybody (14)**
34:22 53:19 58:16
64:18,21 215:15
228:7 236:24
246:19 268:5
275:22 288:18

Contains Highly Confidential Portions

308:3 340:7
**anybody's (1)**
159:23
**anymore (2)**
315:13 324:23
**anyplace (1)**
180:23
**anyway (1)**
187:10
**APA (7)**
40:8 62:5 63:11,25
64:7 237:16 248:5
**apologies (2)**
265:6 320:12
**apologize (5)**
90:16 144:17 245:6
274:19 300:5
**appear (1)**
94:13
**appeared (1)**
207:9
**appears (6)**
37:16 57:25 159:13
226:5 242:5 333:24
**appetite (1)**
162:7
**applies (3)**
126:12 309:15,17
**apply (1)**
268:12
**appointed (1)**
273:2
**appreciate (2)**
195:9 216:22
**approach (3)**
76:11 188:21 196:3
**approached (1)**
99:22
**appropriate (1)**
271:2
**approval (7)**
104:3 263:20,23
264:3,7,10 312:2
**approve (1)**
56:20
**approved (9)**
104:3 175:10 216:5
270:13 311:3,5,7
313:11 314:6
**approximately (7)**
5:6 9:2,12 37:16
49:11 78:3 141:25
**April (7)**
1:15 2:2 5:5 212:23

297:4 341:24 344:3
**area (4)**
30:18,25,25 242:4
**areas (3)**
9:13 26:10 38:16
**arguably (6)**
121:18 122:22 124:3
126:8 140:12 142:7
**argumentative (1)**
213:8
**arising (1)**
44:3
**arrange (2)**
169:18,24
**arrangement (1)**
171:16
**arrangements (4)**
169:9 170:11 171:8
175:4
**arranging (2)**
168:19 169:19
**aside (1)**
133:18
**asked (39)**
30:2 76:15 109:17
110:16,16 111:15
111:23 119:7
139:10 154:5
166:11 168:3 177:7
178:23 181:9 186:9
187:4,22 188:11
189:22 191:3 195:4
196:23 197:14
208:2 218:10
227:19 231:9
233:19 238:17
246:19 247:11
248:14 263:9 280:9
280:12 293:2
299:20 321:21
**asking (27)**
62:21,23,24 70:25
85:17 89:4 139:3
152:21 160:13
161:11 163:22
168:9 188:25 189:3
192:13 195:12,15
211:10,11 213:18
216:24 225:8
247:10 261:3
286:24 327:12,13
**asks (2)**
103:3,23
**aspect (1)**

339:20
**aspects (2)**
12:22 18:5
**assess (18)**
97:12 98:5,9 137:25
138:7 142:14,15
144:17,18 158:5
160:16 161:12
163:25 165:16
168:5 187:6 189:25
215:18
**assessed (2)**
55:24 216:21
**assessing (6)**
98:11,12 137:23
139:7 162:2 217:3
**assessment (8)**
96:23 138:11 160:8
160:12 161:7
166:18 215:25
216:3
**assessments (1)**
161:2
**asset (62)**
15:15 38:8 39:10 63:3
104:18 108:16
112:18 115:9,11
116:2 117:6,9
199:20,23 200:15
203:5 207:9 208:18
209:4,24 210:8,11
210:12,13 211:17
212:25 213:14
237:20 247:2
258:20 275:17
310:17 312:14,15
312:16,25,25 313:4
313:24 314:7,10,10
314:11,12,13
315:20,24 317:17
317:25 318:24
319:2 323:24 324:4
324:16,20,23
325:12,13,16,18
328:4,9
**assets (229)**
9:25 10:6,15 16:21,23
16:24 30:20 33:10
38:3,7,10,18,20,22
40:11,23 41:4,6,8
41:10,19 55:15,20
79:2,4 87:10 89:16
89:18 95:11,21,22
96:19 97:4,4 100:13

106:10 109:7
114:10,12,12,16
115:5,7,25 116:2
117:13 121:10,16
121:21 122:14,24
123:22,23,24 124:5
124:15 125:4,16,24
126:10,14 128:17
130:2,18 133:5
134:4,6 140:11
142:8,25 156:22
171:21,25 174:25
175:18 179:2,8,10
179:12,22 180:2,18
180:20,23,25 181:3
181:4,7,13,17,25
182:6,15,18,18,21
183:11,13 196:13
197:20 198:3,9,24
199:17,25 201:14
203:7,10,11,13
204:9,11 205:10,20
206:5,6,7,9,10,10
206:12,18,20,21,24
207:5,8,12,22,24,25
208:4,6,10,22,25
209:2,2,7 210:5,6
210:18,25,25 211:4
211:8,13,13,15
212:20,22 213:4,5
215:23 216:17
217:13 222:15,16
223:3 224:18,22
225:10,16 227:22
227:23 230:22
231:7 234:5,15
237:14 239:4,9,15
246:4 247:12,13
258:10,12,21 259:2
259:5,6,15,15
268:16 275:4
278:25 279:2,8
280:4,5,6,8,24,25
281:12 282:3,15
283:5 284:10,18
285:17 287:23
289:16 290:9,18,22
291:20 295:11,13
295:22 300:16
302:16 304:19,20
305:11 306:15,18
306:19,20 307:12
307:13,20 308:8
310:14 315:4 319:5

326:14 328:17
**asset's (1)**
312:16
**assigned (1)**
220:16
**assigning (1)**
61:11
**assignment (2)**
43:23 45:3
**assignments (1)**
173:9
**assigns (1)**
172:20
**assisting (1)**
253:7
**associated (13)**
57:14 98:6 137:24
138:11 139:7
147:24 148:9
150:18 186:14,16
200:4,6 305:24
**association (2)**
5:10 255:9
**assume (61)**
32:3 39:8 45:15 48:21
49:2 61:18,20 69:15
73:11 74:18 75:15
76:16 78:25 80:24
90:4,19 100:24
113:11 114:11
118:16 144:23
149:6 150:25
152:24 155:2,8,12
157:15 159:14
162:17 165:24
166:14 171:4
172:12 173:24
175:9 184:7,25
189:12 190:6 191:6
191:12 193:4
195:10 198:8 210:3
212:11,21 213:3,23
214:4,6 215:8 216:2
225:19 264:8 271:2
289:12 295:23,25
310:4
**assumed (15)**
41:7 44:7,10 59:8
90:25 108:6 109:24
110:23 117:14
118:10,11,14
182:17 207:16
334:25
**assumes (26)**

Contains Highly Confidential Portions

44:2 69:11 108:4
130:22 135:6,19,22
142:13 143:16
150:10 153:15
154:10 155:7 156:7
172:10 182:25
187:23 189:23
191:4 193:8 212:16
213:19 214:2,10
287:6 322:16
**assuming (32)**
34:7 48:16 76:18
90:20 93:15,23
103:25 107:10
120:6 128:22 142:5
150:5 153:10
158:10 161:23
166:3,17 179:24
181:24 182:2,20
191:19 193:11
216:4 223:6 229:23
236:16 237:13,18
270:15 297:16
309:23
**assumption (9)**
43:2 207:15 215:11
233:8 237:21,22
238:25 264:12
320:7
**assumptions (1)**
215:12
**atmosphere (1)**
20:13
**attached (6)**
10:24 261:21 275:18
279:18 280:13,16
**attachment (1)**
127:7
**attempted (2)**
288:2,7
**attempting (1)**
149:12
**attention (6)**
29:11 127:8 293:6,17
294:11 295:8
**attorneys (6)**
3:6,12,21 4:5,12
238:21
**AT&T (1)**
161:12
**auction (8)**
74:19,23 75:25 76:23
76:24 180:8,20
183:18

**auctioned (1)**
76:8
**auctioning (2)**
76:5,11
**audit (1)**
255:16
**auditing (1)**
255:17
**August (2)**
94:22 214:16
**Austin (1)**
73:5
**authority (2)**
21:4 175:23
**authorized (1)**
173:13
**authorizing (1)**
220:24
**automatically (1)**
329:7
**available (3)**
75:14 181:18 182:23
**Avenue (2)**
2:7 4:6
**average (5)**
34:16 35:9,15,16,20
**avoid (3)**
168:23 189:18 211:3
**avoided (1)**
73:16
**aware (21)**
28:19 35:22 36:10
41:18 58:3 74:8
140:16 142:5 170:4
180:7 236:19,24
245:25 260:2 278:2
278:6 282:13
288:10 292:13,25
307:10
**A.M (6)**
271:20 272:4 290:14
339:10,12,17

——————————
**B**
**bachelor (1)**
248:23
**back (55)**
13:23 45:10,24 46:12
46:23,25 47:14 48:5
48:18 49:19 50:2,7
50:11 51:2 52:21
53:2 75:12,16 91:20
105:3 109:15
111:19 130:3,8

133:8 139:24 146:7
148:15 171:12,25
172:8 176:2 177:18
184:24 186:11,12
186:18 187:9
199:13 204:8 230:5
236:25 240:20
254:22 256:21
299:13 313:7 320:9
320:17,18,20
328:11 332:6,7
338:11
**background (3)**
8:21 26:12 180:5
**bad (2)**
106:10 157:15
**balance (5)**
37:11,15 86:24
209:23,24
**balances (5)**
17:20 133:8 275:16
281:18 329:14
**bank (18)**
49:9 55:11 67:12,18
68:15 214:11 260:3
262:2 284:15
286:13 290:24
291:17 292:3,7
295:23 298:17
330:14 337:3
**bankrupt (2)**
56:23 61:21
**bankruptcy (5)**
1:2 77:12 78:23 79:21
242:19
**banks (1)**
260:12
**Barclays (193)**
3:12,21 5:24 37:11,21
37:23 38:18 41:7,18
42:7,21 43:23 44:7
44:10,14,15,24 45:9
45:15,23 47:13 48:5
48:14 49:12,19 50:6
52:12,21 53:11,22
54:2,6 56:2,3,5 57:3
57:10,21,23 58:20
59:19 60:6 61:16
62:3,16 63:10 66:17
66:22 72:8 73:6,23
80:21 87:6,15,19
88:6,20 92:6 93:3
93:23 94:4,19 96:7
98:19,22 99:18

100:19 101:21
104:15 105:4,5,13
105:14 107:25
109:22 110:21
111:13 114:24
117:14 118:5,16
119:4,25 121:8,15
126:23 127:22
128:20 129:20
130:10,17 134:25
136:7 138:12
140:10 147:13,21
147:22 148:8
149:12,17 150:20
150:21 153:5,9
159:14,17 160:9
162:15 166:7,8,13
167:20 168:19
169:2 170:11
172:21 174:15
176:11 177:5,6
178:18 191:21
202:14,20 207:18
208:18 211:25
212:7,9,16 213:19
214:21 215:13,20
218:17,25 220:16
221:3,13,18 233:11
233:14 236:15,16
236:21 238:3,12,21
239:2,10 240:24
246:2,4 247:20
278:3,7 296:8,9,10
296:16,18,22,22
297:2,18,21 298:2
301:12,15,20,22,24
303:3,17 308:5
309:23,25 310:10
312:22 314:24,25
315:25 320:11
321:11 322:11
323:3,6,8,12,17,23
337:15
**bargaining (1)**
105:21
**Bart (4)**
3:9 178:7,11 342:13
**base (8)**
19:7,10 27:21 59:15
112:18 137:3
276:16 295:12
**based (30)**
10:20 30:22 32:7,12
34:10,13,21 58:18

108:17 112:15,21
136:9 160:2,21
161:22 179:24
194:16 198:18
214:8 215:11
241:15 243:12,13
259:14 263:18
266:22,22 269:3
271:8 299:14
**basic (1)**
10:23
**basically (6)**
9:24 53:9 93:5 264:15
277:17 333:19
**basing (3)**
264:12 273:15 311:16
**basis (28)**
44:13 46:5 57:12
61:14,18 90:13 98:8
98:11 163:4,6
164:15,21 195:6,13
197:22 210:10
252:2,6 268:17
269:7 296:16 303:2
303:11 306:17
328:24 330:5,21
331:4
**basket (1)**
152:5
**Bates (2)**
235:2 342:15
**Battery (1)**
4:13
**BDW (3)**
272:14,16,21
**bearing (3)**
137:13 235:2 342:15
**becoming (1)**
312:25
**beginning (3)**
86:18 159:20 237:23
**begins (1)**
203:7
**behalf (17)**
44:19,24 103:24
170:24 183:17
219:11 228:10,19
229:3,11,12,19,21
229:22 230:8
231:18 301:19
**belief (2)**
138:23 268:17
**believe (234)**
7:11 8:14 11:5 13:7

Contains Highly Confidential Portions

17:9 27:12,25 29:10
29:13 30:3 33:24
37:3 38:5,7,13,19
39:4,17,19 41:7,8
41:16,25 42:12,21
43:19 46:7 50:17
53:25 54:6 55:14
57:3,21 58:7 59:19
63:20,23 64:9 65:25
67:12 69:2,12 70:3
70:16 71:10 72:7,14
72:21 73:4 75:11,15
76:7,14 78:18,19
79:18 82:18 83:6,9
86:13,18 87:2,17,18
87:20,24 88:5,9,16
90:9 93:8 94:22
97:24 98:2 102:4,6
104:13,25 105:6
112:16,23 114:22
117:12,21 120:5
124:11 126:2,24
136:5,25 140:22,25
141:5 142:6,14
143:12 144:12
146:16,22,23
148:13,17 153:8
163:2,11,24 164:13
169:10 170:7,8
176:14 178:13,19
187:6 196:11
200:13 203:20
204:24 207:7 212:5
215:8 216:25
217:24 218:12,13
224:7,17 226:8
227:21 228:13
232:5 233:16,24
234:10 235:15
236:19 237:12
243:20 251:12
260:5,11,15,22
262:10 263:22
264:2,6,14 265:13
266:3,8,15 267:12
268:6 269:2,11,19
270:11 271:3 272:6
272:10,13 278:12
279:15,20 280:16
281:13,17 282:17
282:19,24 284:20
285:2,6 290:13,20
291:13,23 293:25
294:8,11,16,18,19

295:5,20 296:4,18
298:13 301:21
302:5 303:8,14,19
305:3,3,9 307:22
308:11 309:14,17
310:12 311:7,17
312:25 313:20
314:15,18 317:4,19
318:25 319:7,13
321:16,21 322:6,17
322:22 323:5
325:11 327:10
328:3,7,9,16 332:16
333:10,13,14
334:16,22 335:7
338:22 339:5
**believed (12)**
107:21 109:9,18
110:17 111:9
112:25 113:8
166:23 167:10,22
169:20 196:3
**believes (1)**
321:11
**belong (3)**
134:4 310:24 312:8
**benefit (17)**
81:2,6 190:11,25
220:20 222:18
223:16,19,22 260:6
263:3,5,8,12 279:4
306:7,22
**benefits (3)**
43:25 109:4 112:22
**best (2)**
184:6 252:18
**better (8)**
42:16 51:21 82:10
103:21 105:7
108:10 110:4
149:11
**betting (2)**
136:18 138:19
**beyond (3)**
142:23 198:24 221:5
**bid (3)**
12:20 15:15 18:21
**bidders (1)**
183:21
**bill (1)**
54:16
**billed (2)**
256:17,25
**billion (44)**

37:12,17,18,22,24
39:17,18,20 41:3,5
77:3 78:3,15 84:22
84:23 94:24 95:3
97:14,14 98:3 108:7
108:8 110:2,3
114:20 115:15,16
117:13 119:10,13
141:22 143:4
181:25 189:17,19
209:17 221:16
287:12,13 302:11
315:12 332:9 334:9
335:5
**billions (1)**
172:8
**billion-dollar (1)**
119:11
**billion-17 (1)**
260:23
**billion-760 (1)**
260:23
**bills (4)**
137:8 206:14,15,16
**binding (4)**
69:23 174:4,5 321:13
**bit (10)**
6:6 13:23,23 14:22
17:2 29:11 99:11
125:8 257:14
283:25
**bits (1)**
112:20
**blood (1)**
341:16
**Bloomer (28)**
3:15 5:19,22 12:12
45:22 46:13,24
64:20 91:12,21
122:7 124:20
139:19,23 140:5
144:10 145:5 146:9
160:14 163:22
184:14 199:6,14
226:19 232:20
239:23 256:16
342:4
**blush (1)**
18:21
**board (4)**
216:5,7,9,9
**Boies (3)**
2:5 3:11 5:23
**bonds (2)**

201:11,12
**book (17)**
13:19 15:13 32:16
49:4,5,6 155:12,22
156:19 157:12,14
159:15,18 160:3,22
161:6 162:8
**booking (1)**
50:10
**books (4)**
13:5 25:16 149:20
155:10
**borne (2)**
57:19,20
**borrow (3)**
206:17 313:6 320:4
**bottom (6)**
51:22 130:3 200:16
200:17,22 217:9
**bought (17)**
13:12,22 14:8,9,12,19
15:2,6,14 67:12,19
95:11,13 96:18
112:14 214:12
215:22
**bound (1)**
43:24
**box (3)**
295:14 306:20,21
**boxed (1)**
51:7
**boxes (1)**
176:11
**break (12)**
6:16 46:14 47:12
91:11 139:18 145:6
262:21 283:24
298:25 299:17
306:11 338:6
**bridge (7)**
48:13,17,25 49:3,8,16
50:3
**brief (4)**
77:10 121:14 140:2,9
**bring (3)**
135:17 142:24 294:12
**bringing (1)**
13:5
**broad (2)**
125:9 126:3
**Broadridge (9)**
296:4,25 297:22
298:12,14 301:13
301:15 302:3

303:15
**broke (2)**
97:25 338:13
**broken (1)**
207:10
**broker (3)**
13:13 96:15 274:8
**brokerage (4)**
14:18 15:21 214:13
258:16
**brokers (5)**
14:11 125:5 168:20
170:5,9
**broker-dealer (33)**
31:16 56:8,13 62:2
67:10 68:8 79:16
94:13 96:3 97:8
101:17 102:25
106:5 132:23 151:8
154:16 169:25
214:7 259:3,6
263:13,17,20 271:6
271:9,18 272:14,17
272:20 273:12,24
309:2 339:16
**broker-dealers (3)**
241:18 242:23 255:17
**broker-dealer's (1)**
151:23
**Brothers (11)**
1:7 3:6 17:12 61:3
67:13 138:13
178:14 246:5
250:24 337:14
344:2
**brought (5)**
147:13 198:21,23
293:6,16
**building (1)**
195:11
**buildings (1)**
95:12
**business (145)**
9:6 10:21 12:5,18,19
13:13,14,16,24 14:2
14:10 15:21 16:16
17:5,12 19:11,22,24
19:25 21:3,24 24:23
24:25 25:2 58:23,25
59:2,5 61:9 67:10
68:8 84:4,6,8 85:18
86:8,16 90:19 95:23
96:8,13,14,18 99:25
101:17 102:3,5,8,11

Contains Highly Confidential Portions

102:14,17 106:2,3,5
106:6 107:13
108:18,24 109:3
112:4,16,19,20
117:22,24 136:9
145:4 159:15,18,23
162:8,9 170:14
189:25 199:21,25
200:5,8,10,17,21
201:7,8,11,18 202:4
202:9,14,20,22,24
203:12,16,18
205:11,21 207:23
208:6,25 211:14
214:7,13 228:22
232:24 249:14,16
258:16,18 267:8,10
267:13,14 268:8,10
268:15,18,20,21,23
269:6,18,21 270:5
270:12,20 271:13
271:16,20,22
273:12 324:22
325:2,3,4,7,9,20,25
326:18,20,21 327:6
327:7 330:14 339:8
**businesses (15)**
14:8 95:10,11 96:16
97:5,5 112:15
170:10 201:2,16,19
201:24 202:18
204:18 258:21
**businesspeople (1)**
18:13
**businessperson (1)**
162:7
**button (2)**
162:20 163:18
**buy (24)**
14:16,17 20:2 67:3,4
67:5,5 74:4,5 91:7
93:18 96:14 114:15
117:23 155:13
156:22 162:10
169:14 210:10
214:4,7,14 215:15
216:10
**buyer (8)**
99:23 100:14 101:6
102:3 115:9 194:9
211:7,11
**buyers (2)**
100:17 101:13
**buying (33)**

13:18 16:21,22 38:8
38:11,18 67:19 74:4
94:8,13 95:10 96:12
112:19,19 116:8,22
117:21 166:18
209:11,12 212:20
212:23 214:5,25
215:4,10,16,18
216:11,13,15,18,19

_____
**C**
_____

**C (6)**
3:3 4:2 224:21 226:11
226:13 233:4
**calc (1)**
268:15
**calculate (1)**
31:3
**calculation (66)**
10:3,20 31:10,11
129:13,25 244:4,7,8
244:10,24 253:21
253:25 264:16
265:11,16,20,22
266:11 267:4,7,13
267:22 268:6,25
269:8,12,25 271:7
271:15 289:17,22
291:22 292:15
293:5,14 294:3,7
295:4 297:25
303:18 307:14,19
309:11 312:12
317:9,14 318:24
319:17 322:13
323:19 324:7,10
325:7,8,24 326:5,6
326:9,23 327:9
329:3,8 331:10,18
339:7
**calculations (10)**
9:15 35:19 243:6
253:22,22 258:3
263:18 268:7 269:4
307:21
**call (7)**
34:23 134:20 135:24
161:12 192:8
276:22 278:12
**called (7)**
5:14 26:19 28:13 45:7
86:22 251:8 255:11
**calling (1)**
300:5

**calls (16)**
32:14 91:3 135:13,14
135:20,23 173:18
174:7 176:19 177:8
177:14 179:17
204:14 205:14,24
233:5
**capable (1)**
147:14
**capacity (1)**
296:24
**capital (29)**
5:24 13:24 21:12
24:18,19,20 27:17
27:21 43:13 94:11
94:12 95:17,18 98:9
98:10,10,12 102:24
121:8 224:21
253:21 255:13
256:5,6 301:12,16
301:20,22,25
**capitalized (1)**
203:17
**Caputo (3)**
103:18 104:6,14
**care (8)**
139:12 158:9,11,19
158:21 159:3,6
313:7
**carried (1)**
80:7
**carries (1)**
43:9
**carry (2)**
80:9,12
**carving (1)**
19:12
**case (26)**
1:7 14:18 17:7 25:4
30:7 34:24 35:2
41:13 53:13 60:4
77:10 82:4 95:16
110:12 112:8
153:24 168:18
176:23 193:13
206:20 224:10
238:12 269:22
272:3,6 344:2
**cases (1)**
99:21
**cash (38)**
41:20 45:2 90:25 91:4
133:22 167:16
179:2 181:3 182:15

201:22 202:8
220:17 221:2,4,12
221:12,12,14,17,18
221:20 223:5,7,10
223:11,11,14,19
236:13,22 237:9,25
238:13,22 275:5
287:13 288:24
302:9
**categories (2)**
200:25 230:21
**category (2)**
334:10,11
**cause (1)**
290:9
**caused (1)**
293:23
**ceased (1)**
39:24
**cents (2)**
197:24,25
**certain (13)**
14:8 85:10,11 94:10
95:10 96:19 121:6
151:4 218:23
237:16 284:22
285:6 292:18
**certainly (8)**
59:25 63:17 77:7
109:5 114:4 161:17
161:19 257:20
**CERTIFICATE (1)**
341:2
**certification (1)**
249:12
**Certified (2)**
2:10,10
**certify (3)**
341:8,14,18
**CFTC (2)**
9:23 127:22
**CGSH33921 (2)**
235:3 342:16
**chair (1)**
253:2
**chaired (1)**
255:13
**chance (5)**
147:8 184:5,19 185:7
235:8
**change (18)**
66:25 84:22 92:7 93:4
193:5 197:23
269:23 270:20

287:4,19,24 297:18
308:9,15 313:12
318:17 324:6
331:11
**changed (2)**
208:12 274:20
**changes (3)**
188:6 297:22,24
**Chapter (3)**
1:6 99:21 100:18
**characterizes (1)**
57:14
**characterizing (1)**
163:23
**charge (4)**
50:2 75:12,16 187:10
**charged (5)**
45:10,24 47:14 48:5
52:21
**charging (6)**
46:11 48:18 49:19
50:7,11 53:2
**Charles (3)**
13:24 15:4,17
**Chase (37)**
220:20 222:19 223:4
223:20,23,25 224:4
274:12 279:4
280:25 281:16,21
282:18,24 284:24
285:3,8 286:2,16,22
287:10,17 288:3,8
288:14,24 289:7,13
289:13,15 295:14
295:15,22 302:16
304:21 306:7 337:3
**Chase's (1)**
281:17
**check (2)**
19:16 261:20
**Chicago (2)**
77:23 78:13
**Chris (2)**
276:8 277:7
**circumstance (4)**
80:2 108:22 172:6
217:19
**circumstances (30)**
62:25 66:6,10 68:23
69:6 92:5,8,14,20
92:24 93:2,7 98:18
98:21 100:15
119:23 192:2
193:21,22 194:14

Contains Highly Confidential Portions

194:22,24 195:19
198:11,18 217:20
217:22 218:2,4,9
**citations (1)**
275:6
**cite (3)**
46:5 47:24 296:15
**Civil (1)**
341:21
**claim (3)**
334:21,21 337:24
**claims (6)**
55:2,4,10,21 331:7
337:22
**clarification (7)**
40:7 63:4 198:25
224:8 234:4 248:8
298:15
**clarify (6)**
160:14,15 242:8
247:6 330:9 344:6
**Clark (2)**
146:14 147:11
**class (1)**
207:9
**classification (1)**
292:7
**classified (1)**
298:21
**clause (5)**
43:8 225:13 226:9,14
231:21
**clear (23)**
19:25 85:17 160:12
174:20,23 216:12
216:14,16 225:9
226:16,22 231:2,3,6
231:11,12,14,20,21
234:10 277:14
300:20 326:16
**clearance (5)**
24:24 44:11 57:5
118:23 120:7
**cleared (4)**
19:10 38:6 170:8
173:6
**clearer (2)**
14:10 247:4
**clearing (44)**
20:4 27:16 29:4 36:7
37:6 43:9 44:16,21
61:4,10 75:5,13,17
76:5 89:13 96:17
108:18 125:5,5

166:25 168:20,21
170:5,5,14 173:3
175:6 179:3 181:5
182:4,19 191:12
199:18 200:11
201:7 212:3 220:19
222:17 231:24,25
232:3,4 311:21
320:14
**clearly (5)**
6:7 230:17,18,23
327:20
**Cleary (4)**
3:20 71:25 72:3,5
**client (1)**
103:25
**clients (6)**
18:22,23 132:13
250:15,17 274:8
**close (42)**
10:21 52:10 69:13
71:18,19 74:11
77:24 85:17,19,25
86:7,15 102:15,19
102:20 103:6,7,20
104:4,12,15 106:13
106:24 113:9
134:11 143:20
145:4 186:22 267:7
267:13 268:15
269:18,21 270:4,12
270:19 271:13,16
325:4,6 326:18
327:5
**closed (17)**
16:6 45:8 69:4,14
70:7 74:19 78:14
86:15 103:5 125:13
131:20 132:6,19
186:19 269:20
312:11 327:6
**closely (2)**
9:3,12
**closeout (1)**
78:2
**close-out (1)**
48:11
**closing (19)**
45:11,25 47:15 48:6
48:19 52:22 53:23
54:3,8,13 73:2,13
73:16 85:22 86:10
105:9 134:24 169:6
271:21

**CLR (1)**
1:24
**CME (30)**
9:4,17 76:8,11,17,24
107:4,5,12 125:12
125:16 170:8 179:9
179:22 180:6,7,14
180:21,23 181:19
181:25 183:18,20
188:17 189:9,13,13
190:18 191:8
192:16
**CME's (1)**
76:24
**Code (1)**
242:19
**coded (1)**
295:18
**Codes (1)**
344:5
**coding (6)**
292:5,6,14,23 293:9
296:13
**collateral (29)**
84:5 129:7 138:24
169:9,10,14,16,16
169:19,21,25 170:2
170:15,23 171:3,9
171:11 172:8
206:16 220:13,18
222:16 234:23
236:13,22 237:9
238:2,13,23
**colleague (1)**
246:25
**collect (5)**
54:7,19,23 320:22
321:19
**collected (2)**
54:2,15
**collects (1)**
87:22
**College (1)**
248:24
**combination (1)**
275:3
**come (12)**
25:21 46:10 168:22
171:4 187:9 197:6
239:25 262:11,13
294:11 332:6
334:15
**comes (1)**
332:7

**comfortable (2)**
27:22,24
**coming (6)**
40:4 251:20 311:20
331:2 335:3,6
**commencement (1)**
99:21
**commingled (3)**
42:14 60:12,21
**commission (1)**
202:25
**committee (3)**
4:5 255:13 256:5
**commodity (1)**
128:6
**common (3)**
205:4 273:21,23
**communication (1)**
288:19
**communications (2)**
269:16 288:17
**companies (4)**
16:25 18:11 59:13
337:19
**company (8)**
28:7,16 96:4 99:24
106:4 169:4,8
337:14
**compensated (6)**
114:5,9,11,14 177:21
197:11
**compensation (6)**
116:16,25 117:2
175:4 196:17
198:17
**competitors (1)**
214:18
**complete (2)**
105:19 298:9
**completed (3)**
294:5 339:3 341:22
**completeness (1)**
110:9
**compliance (8)**
10:8 241:21 243:24
244:20 248:6,15
253:14 320:23
**complies (1)**
114:17
**complying (1)**
20:14
**comprised (2)**
37:16 259:22
**computation (1)**

273:22
**computes (1)**
30:15
**conceived (1)**
16:5
**concept (1)**
201:5
**concern (4)**
27:16 41:19 94:14,16
**concerned (9)**
36:11,15 80:12
107:14 183:9,23
185:17 192:15
317:24
**concerning (1)**
8:13
**concerns (4)**
12:8 29:9 49:17 50:4
**conclude (1)**
148:18
**concluded (1)**
332:19
**conclusion (11)**
173:19 174:8 176:20
177:8,15 204:15
205:15,25 233:6
327:23 328:6
**conditions (1)**
136:14
**conduct (1)**
144:20
**conducted (8)**
59:12 189:8 202:22
218:6 301:19,24
336:18 338:14
**conducting (2)**
18:19 188:7
**confidence (11)**
33:15 34:10,13
179:11 180:24
182:5,8,12,22
183:10,12
**confidential (19)**
1:12,17 11:8 12:1,11
13:1 14:11 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1,2 28:9
250:18,19
**confidentiality (1)**
12:8
**confirm (6)**
165:22 236:11 237:24
241:25 305:22
329:22

Contains Highly Confidential Portions

**confirmed (1)**
238:11
**conform (1)**
344:6
**confused (2)**
202:5 261:15
**connection (12)**
43:4 62:18 161:3
203:12 205:11,20
207:23 208:25
211:14 232:22
247:2 299:21
**consider (14)**
56:7,10 58:9 96:18,20
98:20 99:23 148:24
149:15 160:25
182:6 199:17 231:5
323:25
**consideration (6)**
81:8,10,23 82:3
172:18 338:21
**considered (7)**
152:17 153:4 202:3
208:6 224:7 259:3
307:23
**considering (2)**
155:16 220:7
**consist (2)**
17:23 162:3
**consisted (1)**
16:14
**consistent (2)**
220:25 221:11
**constitute (1)**
129:19
**constitutes (1)**
286:14
**construed (1)**
204:4
**consultant (5)**
250:12,13,25 252:8
253:5
**consulted (1)**
20:19
**consulting (3)**
250:21 251:5 252:21
**consumed (1)**
76:23
**consummated (4)**
67:10 70:6 138:13
320:20
**consummating (2)**
123:12 208:13
**contain (1)**

128:6
**contained (1)**
165:7
**contains (1)**
241:24
**contemplation (1)**
104:11
**context (12)**
14:15 27:13 83:19
99:12 122:17 123:5
123:6 127:25 179:8
206:8 220:12
222:11
**continue (4)**
11:9 22:3 108:21
332:21
**continued (2)**
100:21 314:16
**continues (3)**
77:20 122:8 268:12
**contract (31)**
70:5 149:24 198:22
209:20 210:12
246:3,12,20 247:11
247:19 311:2,4,6
312:10,18 313:11
313:15,18,21 314:5
315:3,20 317:7
318:10 323:4,7
326:17 327:4,11,13
328:2
**contracted (1)**
317:5
**contracts (3)**
116:21 173:8 247:22
**control (8)**
280:25 283:14 284:4
284:13 307:8,23
308:12,17
**controls (1)**
18:7
**Cont'd (3)**
4:2 146:8 343:2
**conversation (2)**
7:17 299:15
**conversations (2)**
26:25 64:7
**conversion (1)**
176:3
**convert (2)**
25:10 176:3
**copied (4)**
72:10,16 235:20
236:5

**copy (4)**
7:4 47:6 51:2 77:11
**corporation (3)**
33:16 220:19 222:18
**corporations (2)**
166:25 231:24
**correct (50)**
8:18 21:19 35:20 40:6
118:13 143:2,6
186:6,16 207:19
212:18 221:23
226:8 227:7,8 232:8
236:8,9 243:15
248:21,25 259:19
260:8,10 264:5
271:12 272:5
274:10,13,14,16,21
285:18 289:10
292:11,12 302:11
308:19 309:13
314:22 315:21
316:13 329:3
332:10,13,14
338:18 339:11
340:4 344:7
**correctly (2)**
23:7 94:25
**correctness (1)**
262:17
**corresponding (3)**
152:18 160:5,19
**cost (34)**
31:18,25 34:18 35:12
36:18 37:7 45:10,24
47:14 48:6,19 52:22
53:12 78:15 85:11
85:19 86:9 120:18
121:19 122:22
124:3,3 126:8
132:17 140:12
142:7 185:18,22,23
186:25 187:8 188:5
188:12 190:7
**costs (9)**
49:20 50:7 53:22 54:7
56:4 75:21 118:19
186:14,16
**counsel (16)**
8:12 72:14 107:20
127:22 212:6
235:16 236:8
261:18,19 262:10
262:11,15,18 276:3
276:4 277:12

**counsels (2)**
235:15,17
**counterparties (4)**
136:5,11 175:6
227:25
**counterparty (1)**
313:6
**country (4)**
17:10 97:8 137:14,15
**COUNTY (1)**
341:4
**couple (5)**
16:8 19:2,6 26:5
257:12
**course (13)**
30:7 122:5 152:9
179:10,23 188:6
263:24 264:4
307:18 308:7
325:25 330:13
339:8
**courses (3)**
249:10,11,13
**court (28)**
1:2 5:9,11 56:19
101:3 103:3,12,19
103:23 104:21
105:9 175:10
241:11 311:3,5
312:2,21 313:11,16
313:17 314:4
315:22 318:6 322:9
322:10 323:16
324:3 325:17
**court's (2)**
103:19 323:22
**court-approved (1)**
56:18
**cover (15)**
34:18 35:11 36:18
55:20 75:20 82:9,14
87:5 119:10 129:11
135:16 186:6
221:21 319:21,23
**covered (5)**
33:13 75:14 131:10
144:2,5
**CPA (3)**
249:12 254:22 255:2
**CPAs (2)**
255:6,24
**Craig (1)**
141:5
**created (1)**

147:22
**credit (27)**
19:16 56:9,11,12,14
56:20 57:19 58:9,15
135:25 136:4,12,16
138:20 285:8
290:17,20 291:21
292:15 293:8,10
307:24 329:13
334:15 335:3,6
336:7
**creditor (1)**
55:2
**Creditors (3)**
4:5 55:12,17
**credits (1)**
331:20
**creditworthiness (2)**
29:6 56:24
**creditworthy (1)**
135:20
**critical (3)**
104:22 105:5 284:7
**CRR (1)**
1:24
**crumbling (1)**
95:23
**crunch (2)**
95:18,24
**CSE (1)**
161:18
**currently (7)**
55:20 246:2 250:2,3
334:5 336:23
338:17
**Custody (2)**
291:10 342:23
**customer (151)**
9:22 13:16 14:6 18:11
18:15 19:7,9,22,24
26:17 28:21 29:2
47:21 55:5,15,21
58:25 59:15 60:13
60:22 79:6,14 96:13
96:13,16 100:2
106:16,17 109:12
120:22 124:16,24
124:25 125:12,17
125:23 127:23
128:2,16,23 129:19
129:22 130:16
133:2,3,4,6,7,8,20
133:25 134:2,14,19
134:22 135:3,7,9,10

136:17 138:5
190:12,14,19,20,25
191:9,11,15 201:10
202:19,22 222:24
222:25 225:4,18,20
225:22 226:4,24
227:10,18 228:18
228:20,25 229:2,4
229:10,12,19,20
230:6 233:11,13
241:19,20,21
242:24 243:24,25
244:20,21 251:9
253:14,15 256:7
259:7 278:25 279:2
279:8 280:6,8
290:21 291:9,18
292:2,7 295:19
305:10,14 306:21
306:21,21 307:12
307:20 308:8
310:14,19 317:6,7
317:13 326:14
328:12,20 329:14
330:20 332:25
333:7 335:13,15,16
335:18,23,25 336:9
336:11,12,13
337:21,23 342:22
**customers (95)**
9:25 10:5,5,13,15
13:15 18:15,17 19:3
19:17 45:16 49:13
55:9,14 59:16,17,21
59:25 79:3,7 81:3,6
94:15,15,16 95:11
107:6 126:22,24,25
127:4 128:21 129:6
129:8,12,14 130:5,6
131:5,11,17 133:10
133:17,19,23 134:4
135:12,13,19,22
136:8,21,24 137:10
137:17,18,25 138:8
138:17,18,21 191:2
201:10 206:18
223:8 225:15
227:24 259:4 260:7
263:3,5,8,12 279:5
292:19 298:21
305:4,13 306:2,3,7
306:19,23 307:12
310:14 316:5
330:11,12,19,23

331:6,13 332:10,20
335:22
**customer's (8)**
130:20 133:13,14,16
134:6 138:3 139:13
259:12
**customer-related (1)**
24:25
**C.F.R (1)**
128:9

**D**

**D (337)**
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1

152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1

314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
342:3
**daily (6)**
90:13 98:8,11 163:3,6
210:10
**Daniel (18)**
1:13 2:4 5:4,14 6:25
47:7 146:3 240:9,13
240:16 340:18
341:9 342:8,9,17,18
342:20 344:4
**date (32)**
7:3 47:9 50:22 90:11
121:11 144:13
173:2 178:9 219:9
235:4 240:11,14,17
261:9 265:14,17,18
265:22 266:6,11
267:19 271:3
291:12 297:9
310:10 312:23
313:14 315:20
317:23 318:15
338:23 344:3
**dated (1)**
297:4
**dates (2)**
13:7 83:15
**DAVID (1)**
3:24
**day (82)**
3:5 6:5 10:3,7,16 16:5
16:6 21:18 28:17
31:18 37:12 66:17
67:2 83:2 84:2,4,6,8
84:17 85:2,5,12,20
86:14,17,18 90:19
98:10 132:6,12,18
134:23,24 135:15
140:18 141:25
142:10 143:17
144:9 170:15 172:2
184:9 185:3,17,25
187:13,20 188:7,19
208:12 239:3
266:21 267:2,2,14

267:24 268:8,10,18
268:20,21,23
269:10,16,16,21
271:20,21,22
281:19 295:20
316:21 324:22
325:2,3,8,9,20
326:21 332:2
340:20 341:24
**days (9)**
66:17,19,20 86:6
104:23 140:19
143:5 169:7 210:22
**day's (1)**
85:13
**deal (44)**
16:5 28:20 33:8 63:2
65:24 66:6,10 68:3
69:7,22,24 70:4,7
72:20 73:2,7,8,25
74:6,10 98:22
104:22 105:8,20
113:9 114:5,15
137:22 139:6 168:6
171:24 177:21
197:11 208:13
210:23 214:22
217:21,25 221:2,5
221:18,19,23
222:15
**dealing (1)**
23:23
**deals (1)**
68:5
**Dean (2)**
254:8,11
**debit (29)**
293:4,10,24 310:5
311:10 312:9 313:5
314:2,13 315:17
316:2,4 317:2,15,19
317:21 318:8 319:2
319:9 320:3,16,21
321:15,16,19
324:16 326:14
328:12 329:13
**debited (2)**
330:11,25
**debits (3)**
320:2 330:24 331:19
**Debtors (1)**
1:9
**decide (10)**
63:17 67:3,4 68:17

158:25 177:17
189:20 197:24
265:21 313:17
**decided (15)**
63:16 77:24 98:25
99:2 119:21 123:11
131:5,16 155:13
171:5 191:23
274:15 312:21
334:18 335:10
**decision (4)**
36:15 106:6 194:21
198:16
**decisions (1)**
219:3
**declaration (17)**
46:4,9,11 47:7,24
48:4 83:25 141:5
146:13,15,21 220:2
297:4,7,17 342:9,24
**declarations (1)**
219:16
**decreased (1)**
143:8
**deduction (1)**
51:14
**deemed (1)**
53:4
**deeper (1)**
17:3
**deficit (17)**
31:7 84:7 128:7,14,23
129:4,5,6 130:4
131:6,21 132:10
133:21 134:2,7,19
135:8
**deficits (5)**
129:11,12,18 130:15
133:8
**define (5)**
112:12 208:10 209:18
233:21 259:24
**defined (8)**
200:17 203:22 205:12
205:21 220:18
230:17,18 259:8
**defines (2)**
43:12 233:22
**definitely (1)**
305:20
**definition (13)**
200:18 201:3 202:24
203:6,18 204:8,9,12
217:14 224:22

231:3,4,15
**degree (1)**
249:7
**delay (1)**
147:21
**deliver (3)**
89:16,19 91:6
**delivered (1)**
91:2
**deliveries (1)**
288:14
**delivery (3)**
91:8 121:9 319:5
**Deloitte (16)**
7:20 65:10,15,17,19
65:22 255:20
262:12,13 276:5,6,7
276:14,22 329:19
332:3
**denominated (1)**
71:15
**denote (3)**
175:18,20,23
**denoted (2)**
176:7,15
**depend (4)**
81:13,17 134:14,17
**dependent (3)**
136:4,16 188:13
**depletion (4)**
107:23 109:19 110:19
111:11
**deponent (1)**
341:19
**deposed (1)**
6:2
**deposit (20)**
128:17 173:3 224:3
247:20 272:8,23,24
273:14 290:11,14
308:22 309:15,18
310:22 311:9
319:16 339:9,9,22
339:25
**deposited (9)**
129:22 130:7 179:3,4
181:4,5 182:4,16,19
**deposition (34)**
1:13 2:4 5:4 7:15
50:16,20,24 51:8
52:18 53:17 65:14
70:15 71:2 83:8
146:18 178:7 219:7
219:10,12,20

220:11 240:2
244:11 246:7
247:24 303:24
340:9 341:10,11,21
342:10,13,14 344:3
**depositions (2)**
219:16,18
**depository (1)**
49:10
**deposits (9)**
33:14 173:4,14
174:14 176:13,16
263:18 322:12
323:18
**derivative (3)**
152:19 155:12,22
**derivatives (71)**
7:6,12 8:13,23 23:20
24:15 70:21 97:23
147:2 150:19 151:3
151:14,21 152:8,10
152:11,13,16 153:6
153:12,17,19 155:4
155:5,11,14,17,20
155:23 156:4,5,10
156:14,18 157:6,11
157:21,21 158:4,6
158:13,14 162:14
165:8,11 167:17,21
169:5 170:6 172:4
199:19,21 200:4,7
200:10,24 201:6,13
202:2,13 212:4
213:22 224:23,25
227:24 231:25
233:9,23 234:7,17
251:7
**derived (1)**
206:13
**describe (10)**
8:20 9:21 12:2 16:13
26:12 27:3 38:17
42:5 251:21 252:5
**described (6)**
27:5 39:15 98:18
201:2 231:8 280:5
**describes (2)**
83:20 280:6
**describing (5)**
26:10 51:24 59:11
193:22 242:5
**designate (1)**
12:10
**designated (3)**

1:16 11:8 279:4
**desire (1)**
120:24
**desired (1)**
289:13
**desk (4)**
21:10 164:4,22
165:18
**despite (3)**
168:13 267:23 272:25
**determination (1)**
196:2
**determine (43)**
10:6 16:17 18:15
23:17 31:22 36:20
56:5 59:16 86:9,12
93:16 97:2 98:13,15
105:9 142:18
148:23 156:2,21,25
157:13 159:25
160:21 161:24
162:7,8 163:18
166:2 181:11 187:7
197:20 214:25
269:25 278:24
280:4 287:25 288:6
301:25 305:10
314:4 318:12
323:21 333:22
**determined (8)**
20:18 60:2 62:17
310:12 312:6
316:23 318:23
332:24
**determines (2)**
315:23 318:6
**determining (7)**
155:18 162:2 166:19
175:3 265:10
309:10 323:9
**devoted (1)**
257:8
**difference (4)**
10:22 135:11 187:25
188:5
**different (23)**
10:14 14:9 16:23,24
18:8 99:3 100:14
154:22 161:9,9
170:4 189:4 200:2
201:6 209:24
217:25 218:13
222:23 230:21
231:7 270:11

277:19 316:13
**differentiation (1)**
202:7
**differently (4)**
217:25 218:8,14
231:8
**difficult (2)**
66:16 86:12
**difficulties (2)**
26:24 147:22
**difficulty (1)**
62:13
**dig (1)**
319:25
**diligence (31)**
12:19,24,24 16:11,14
17:3,23 25:12 59:13
67:23 68:17 69:15
74:3 93:12,24 94:5
94:10 95:6 104:17
105:15 112:25
136:6 166:4,6,7,9
166:14 167:10
168:14 214:15
215:13
**direct (3)**
51:5 127:8 184:4
**directed (2)**
17:2 297:23
**directing (2)**
122:11 297:22
**direction (1)**
278:4
**directly (1)**
53:3
**Director (1)**
250:8
**directors (3)**
216:5,7,10
**directs (1)**
122:7
**discernible (1)**
96:12
**disclosure (1)**
24:21
**discrepancies (2)**
296:12 303:5
**discrete (1)**
149:15
**discuss (4)**
191:17 240:25 330:4
332:12
**discussed (16)**
19:21 20:7 194:18

Contains Highly Confidential Portions

221:6 238:24
252:22 256:15
260:14 262:4
292:23 295:16
298:8 301:5 303:6
334:10 339:6
**discusses (2)**
292:5 332:9
**discussing (4)**
52:3 140:13 212:7
302:23
**discussion (4)**
192:22 274:3 306:12
308:22
**discussions (5)**
192:20 276:22 289:7
309:21 334:17
**disparity (1)**
105:21
**disposing (1)**
81:19
**dispute (2)**
53:21 246:2
**distinction (2)**
107:7,12
**DISTRICT (1)**
1:3
**dive (1)**
17:3
**divided (1)**
333:25
**Division (4)**
255:7,10,11 274:7
**document (56)**
33:22 39:16 42:25
46:15 47:3,10 70:8
70:12,14,19 77:6,8
83:5,14 99:13
103:16 113:21
122:3,8 127:11,18
140:25 141:4
146:12 147:9
172:15 177:16
204:21 205:14,24
206:4 207:17 219:5
222:13 224:6 226:5
226:18 233:7
234:24 235:2,7,9
279:9,14 280:3,7
297:13 300:7
303:23 304:6,7
305:2,6,9 330:2
342:15
**documentation (2)**

172:7 285:25
**documents (17)**
7:24 8:6 77:5 169:2
176:4 237:19 247:3
275:14,18 281:4,7,8
281:14,15 333:20
334:14,19
**doing (28)**
20:25 21:2,5,11,15
26:6 27:19,20 29:12
68:14 93:15 95:6
112:25 118:22
161:8 189:14,25
190:11,13,20
191:23 219:3
243:14 250:16,20
278:7,8 295:5
**dollar (21)**
114:6,6,9,9 123:15,15
177:21,22 197:3,3
197:11,12,25,25
198:2,2,7,7 210:15
210:16,19
**dollars (11)**
41:3,5 77:4 114:20
115:15,17 117:13
141:14 172:8
209:17 221:16
**dollar's (1)**
196:18
**dollar-for-dollar (5)**
116:11,15 117:2
196:17 197:22
**doubt (4)**
53:22 78:9 147:17
148:4
**downside (2)**
81:20 117:7
**downsizing (1)**
249:25
**dramatically (1)**
142:10
**drastically (2)**
141:2 208:12
**drawing (1)**
107:7
**drawn (1)**
107:12
**Drexel (2)**
95:25 96:2
**drop (2)**
134:23 135:2
**dropped (1)**
141:24

**DTC (1)**
233:12
**due (35)**
12:19,24,24 16:11,14
17:3,23 25:12 59:12
67:22 68:16 69:15
74:3 87:23 90:21
93:12,24 94:5,10
95:6 104:17 105:15
112:25 136:6 166:4
166:6,7,9,14 167:10
167:25 168:13
214:15 215:13
217:19
**duly (2)**
5:15 341:11
**duplicative (1)**
154:17
**duties (2)**
172:25 254:12
**Dziemian (5)**
46:4 47:8,24 53:9
342:9
**Dziemian's (1)**
46:9

_____

**E**
**E (4)**
3:3,3 4:2,2
**earlier (24)**
59:11 65:13 72:18
82:12 100:19
106:11 109:17
110:16 140:8,13
192:21 207:14
217:6 221:6 232:19
237:2 262:4 301:11
309:7,22 315:6
321:25 325:23
339:6
**earmark (1)**
163:11
**earn (1)**
112:16
**earnings (1)**
108:18
**ease (1)**
172:2 280:14
**easier (3)**
261:22 291:6 301:3
**easily (2)**
6:10 98:13
**East (1)**
3:7

**economic (1)**
221:19
**Ed (2)**
71:25 72:2
**editions (1)**
255:22
**education (3)**
249:4,6,17
**effect (3)**
48:11 82:19 136:22
168:24
**effected (2)**
322:11 323:17
**effective (9)**
90:10 148:20,23,25
149:16 150:3 173:2
313:21 314:5
**effectively (7)**
147:25 312:15 317:16
323:2 325:3,20
330:19
**effectually (1)**
176:2
**efficiently (1)**
171:13
**effort (4)**
262:21 287:25 293:12
293:19
**efforts (1)**
288:6
**either (17)**
45:6 74:6,18 124:24
126:6 189:19
190:23 210:18
211:20 220:14
238:20 275:7 277:7
280:20 315:17
319:3 322:6
**electronic (2)**
282:6 284:3
**electronically (1)**
288:12
**element (1)**
217:13
**eliminate (1)**
81:3
**eliminated (2)**
82:22 85:6
**eliminating (2)**
80:14,21
**EMANUEL (1)**
4:4
**emphasize (1)**
296:8

**employed (1)**
278:3
**employee (2)**
298:3 329:22
**employees (15)**
277:9,11,17,19 278:6
278:14 296:18,22
296:22 297:24,25
298:2,5 301:22
308:5
**enable (1)**
163:25
**encompass (4)**
207:5 224:13 232:15
233:2
**encompassed (3)**
201:18 232:15 233:3
**encompasses (1)**
43:16
**encountering (1)**
96:8
**ended (1)**
95:10
**Enforce (1)**
121:8
**enforced (2)**
289:24 290:3
**engaged (2)**
294:20,25
**ensure (2)**
31:6,11
**enter (3)**
94:2 171:15 216:25
**entered (7)**
62:5 160:10 166:16
212:24 215:14
266:7 269:9
**entering (7)**
61:22 266:5,12,20
267:5,23 268:12
**entire (6)**
18:25 19:5 150:11
214:7 233:10
323:13
**entirely (2)**
82:22 278:4
**entities (8)**
16:22,24,25 37:5 49:3
54:18 105:22
170:11
**entitled (5)**
129:20 133:2 237:8
257:16 322:18
**entity (19)**

Contains Highly Confidential Portions

14:7,9,9,19 15:2,5
15:14,16 16:21
25:17 27:15 94:9,11
94:19 95:5 99:3
169:12,22 171:14
**environment (6)**
66:13,15 138:2,8,10
138:16
**equal (1)**
337:15
**equating (2)**
282:11 283:7
**equation (1)**
117:18
**equities (11)**
14:2 48:12 97:12,17
97:22 98:2 157:2
162:14 187:20
201:22 202:8
**equity (13)**
39:3,5 94:24 129:10
149:9 151:4,12,22
158:6,14 201:8
233:12 285:9
**equivalent (1)**
48:18
**Eric (2)**
4:9 146:14
**error (2)**
274:15 292:10
**errors (8)**
292:5,6,14,24 293:9
293:23 296:13
344:7
**ESQ (10)**
3:9,15,16,17,18,24
4:9,15,16,17
**Essentially (1)**
315:19
**established (1)**
270:18
**estate (24)**
45:10,24 47:14 48:5
48:18 49:20 50:7
52:22 54:4,7 55:10
55:15,18,20 56:4,21
56:23 57:4 79:12
81:4 246:5 331:7
337:22 338:2
**et (1)**
1:8
**event (12)**
31:6 60:6 75:9,25
121:20 122:23

131:22 152:17
156:4 165:10 186:4
326:4
**events (5)**
77:22 269:15 293:3
293:12,20
**eventually (6)**
53:3 262:14 312:21
313:17 319:25
338:2
**everybody (1)**
311:12
**everybody's (1)**
120:24
**everything's (1)**
253:3
**evidence (25)**
69:11 108:4 130:23
135:6 142:13
143:16 150:10
153:15 155:7 156:7
168:17 172:10
181:20 182:25
187:23 189:23
191:4 193:8 214:10
238:19 239:18
265:24 287:6
289:23 322:16
**Evidently (1)**
215:22
**ex (1)**
89:16
**exact (1)**
260:22
**exactly (7)**
16:9 17:14 41:3 70:17
98:2 257:13 260:17
**Examination (5)**
5:18 146:8 240:21
342:4,5
**examined (2)**
5:16 247:21
**example (11)**
114:19 121:14 122:17
122:20 125:10
149:3 151:25
175:10 179:9
181:19 310:8
**exceed (1)**
187:8
**exceeded (1)**
128:16
**exceeds (2)**
31:18 187:2

**excess (13)**
28:16 31:16 35:25
36:7 84:7 135:15
221:2,16 234:21,23
263:2,14,21
**exchange (12)**
76:18 77:23,25 78:14
108:2 109:22
110:22 111:14
119:4,25 198:12
202:17
**exchanges (6)**
135:18 207:13 212:8
212:12 231:14,23
**exchange-traded (64)**
7:5,12 8:13,22 9:2
23:5,6,20 24:15
70:21 97:23 147:2
150:19 151:3,14,21
152:7,10,13,16,22
152:25 153:11,19
154:2 155:4,10,14
155:17,23 156:3,10
156:14,18 157:6,11
157:17,20 158:6,13
158:20 162:13
165:2,7,12 167:17
167:21 169:5 170:6
172:4 199:19,21
200:4,7,9,24 201:5
201:13 202:2,13
212:4 213:22
224:23 233:9
**exclude (2)**
209:8,12
**excluded (12)**
203:13 207:24 209:2
209:7 210:6 211:2,4
211:15,17,20,22,22
**excluding (6)**
33:13 117:17 203:12
207:24 209:2
211:15
**exclusive (3)**
263:3,5,12
**excuse (8)**
65:12 99:17 101:10
101:20 229:15
230:14 264:23,23
**execute (1)**
215:9
**executed (2)**
69:17,20 215:3
**execution (1)**

201:8
**executives (1)**
93:19
**exercise (3)**
18:19 45:3 89:17
**exercised (2)**
89:11 91:3
**exercises (2)**
173:8,9
**exhibit (77)**
6:24,25 7:4 42:23,24
47:6,7,11 50:18,19
50:20 70:9 77:7
83:4,13,14,25 99:5
106:19,20 121:2,3
127:6 140:2 141:6,7
146:13 172:15,16
178:6,6,7 200:14
217:7 219:6,7 224:6
234:25 235:2 240:9
240:12,15 248:17
248:17,18 267:17
267:18 291:4,8,9
296:14 297:3,7
299:24 300:3,12,14
300:21,25 301:7
302:23 304:13,16
304:18 342:8,9,10
342:11,13,14,15,17
342:18,20,21,22,24
**exhibits (4)**
241:2 248:3 252:14
342:7
**exigencies (1)**
218:19
**exist (2)**
39:20 167:25
**existed (2)**
57:15 218:4
**expect (14)**
56:3 77:7 108:16
109:2 112:9 114:13
115:4,8,11 116:9
209:3 210:8 238:10
239:7
**expectation (1)**
108:22
**expected (9)**
33:12,19,23 34:3,4,6
34:8 213:13 237:5
**expense (3)**
50:14 51:13,13
**expenses (1)**
56:2

**experience (12)**
20:21 36:5 74:13,22
98:4 112:2,14
200:25 241:15
243:14 245:23
253:12
**experienced (2)**
29:20,21
**expert (36)**
6:25 7:4 8:12,17,22
24:5,9 30:18,25
47:13 55:3,5 70:20
96:22 100:8 139:24
146:24 159:13
193:19 195:16
242:4,11,15,19,25
244:2,22,25 251:4,6
253:6 256:9,13
309:22 322:17
342:8
**expertise (2)**
26:11 79:24
**expiration (4)**
87:15,23 90:11
144:18
**expirations (1)**
88:4
**expiring (3)**
86:23 87:2 88:21
**explain (2)**
114:8 253:11
**explained (2)**
59:14 171:19
**explaining (1)**
123:8
**exposed (2)**
87:9 134:25
**exposure (32)**
80:7,9,12,14,18,22,23
81:3,8,9,21,25 82:2
82:21 83:3 85:6
86:5 87:6 119:5
126:18 131:23
132:5,8 134:10,13
142:15 145:4
154:24 156:3
161:14 165:20
212:10
**exposures (3)**
82:14 86:14 168:2
**express (1)**
7:9
**expressed (6)**
41:19 69:24 99:16

Contains Highly Confidential Portions

101:19 116:21
276:25
**extend (2)**
56:12,14
**extent (8)**
28:10 36:17 51:18
131:23 156:2
221:20 276:13,21
**extra (7)**
18:23,24 41:5 46:15
116:9,11 281:15
**extraordinary (1)**
217:20
**extrapolation (1)**
86:2
**extreme (1)**
35:18
**extremely (1)**
96:20
**e-mail (19)**
36:4 70:11,18 71:22
72:24 73:4 127:6,7
192:21 212:5 235:6
235:11,19 236:5,10
236:20,25 237:6,24
**e-mails (3)**
63:5 72:10 322:24

**F**

**face (1)**
226:5
**facing (5)**
100:16 194:23,25
195:19 196:19
**fact (32)**
10:14 34:21 49:9
51:21 53:22 64:11
69:3 137:15 167:25
176:6 180:8 198:6
218:6 238:15
264:11 272:25
281:20 283:18
287:3 289:8,15
293:9 307:18 308:6
311:8 318:5,14
323:23 331:10
333:6,15 338:23
**factions (1)**
206:13
**facts (28)**
53:13 69:11 108:4
130:22 135:6
142:13 143:16
150:10 153:15

155:7 156:7 172:10
182:25 187:23
189:23 191:4 193:8
195:18 197:17
198:18 214:10
265:24 276:16
277:6 287:6 294:9
322:16 344:6
**factual (1)**
46:5
**fair (13)**
12:15 24:4 39:24
44:15 63:8 81:15
134:24 153:9
154:25 157:25
194:12 196:15
204:11
**fairly (4)**
93:11,21 144:25
231:20
**fall (3)**
55:9 200:25 202:23
**familiar (15)**
18:9 23:2 32:25
146:15 151:7
178:12 219:12
241:16 242:22
243:23 244:18
245:4,9,12,18,21
321:22
**familiarity (2)**
26:13 138:22
**far (10)**
9:9,9 17:19 18:21
20:7 31:13 80:11
93:10 174:23
317:24
**FARA (1)**
4:17
**Fargo (3)**
260:3,7,13
**fashion (1)**
101:2
**Fast (1)**
220:3
**fathom (1)**
215:15
**FCM (2)**
17:10 129:4
**fear (4)**
184:17 185:5,10,13
**February (4)**
8:14,15,16 241:11
**fed (11)**

40:11,16,23,25 41:13
41:20 100:18,20
244:3,23 331:17
**Federal (1)**
341:20
**feed (3)**
329:2,7 331:10
**feel (5)**
31:12 51:18 105:14
105:15 122:5
**fees (1)**
284:22
**FID (10)**
274:4,9 278:18 280:5
285:17,21 299:21
300:15 304:18
306:4
**fifth (1)**
48:10
**figure (1)**
215:21
**figures (1)**
294:9
**file (1)**
98:16 272:21
**filed (11)**
94:23 102:23 241:5
241:11 251:11
253:20 282:22,22
294:13 295:8
337:22
**filing (4)**
253:23 258:25 272:19
335:19
**Fin (2)**
243:7 253:16
**final (4)**
18:21 70:5 237:19
268:15
**finalize (4)**
25:8,11,12,13
**finalized (3)**
319:17 324:25 326:9
**finally (1)**
270:12
**finance (1)**
13:4
**financial (37)**
7:18,19 9:18 12:21,25
16:15,19 18:5 21:14
24:21 26:14,23
27:22 28:6 58:3
62:12 65:17 102:22
241:17 242:22

253:17,19 255:7,8
255:10,10 262:5,8
275:11,24 276:2,5
281:5 294:20
304:23 329:18
338:20
**find (11)**
63:12 101:5,13 102:3
111:21 155:13
194:9 277:5 291:6
300:25 328:7
**findings (1)**
338:20
**finds (1)**
325:17
**fine (5)**
51:4,6 91:13 199:6
276:19
**finish (7)**
6:7 54:11 184:15
324:9 327:15,18,24
**finished (4)**
14:23 230:15 281:24
339:5
**FINRA (4)**
291:14 319:4,20
328:14
**firm (41)**
9:15,24 12:23 14:13
18:6 21:25 26:18,22
27:4,19 28:21 29:2
29:12 31:13,15
42:15 44:18 60:13
60:17 75:13 97:3,5
97:6 98:17 101:11
112:22 114:17
117:19 124:9
128:18 129:4,15,17
131:9 135:15
161:19 164:23
188:25 218:22
235:25 320:14
**firms (14)**
9:8,16 24:10 26:21
29:9 36:11,12 70:3
76:15 93:15,20
161:7,16 243:5
**firm's (5)**
9:15 24:18,20 26:14
42:14
**first (38)**
6:23 9:19 15:25 16:5
18:21 19:21 25:21
25:23 43:7,8 46:14

55:14 61:23 65:15
71:5 91:23 92:4
99:10 100:10
101:11 102:7 127:7
127:9,12,14,15
224:21 231:21
235:11 236:10
248:16,17,17
250:20 280:10
297:5 334:10 337:2
**firsthand (1)**
76:13
**fit (2)**
162:10 166:19
**five (5)**
66:17 139:19 199:5
210:22 246:23
**five-minute (2)**
91:11 338:6
**fixed (6)**
39:3 158:14 201:21
202:8 245:18 274:7
**Flexner (3)**
2:6 3:11 5:23
**Floor (1)**
4:7
**flow-through (1)**
149:10
**fluent (1)**
337:18
**Focus (3)**
94:23 253:18,23
**focusing (1)**
232:21
**follow (2)**
204:13 289:14
**followed (1)**
306:10
**following (13)**
31:18 85:5,12 102:15
103:23 134:24
142:10 204:6
271:21 272:4
339:10,12,17
**follows (4)**
5:17 146:4 204:5
205:7
**footnote (2)**
32:20,22
**force (2)**
83:18 289:21
**forcing (1)**
104:15
**foreign (1)**

Contains Highly Confidential Portions

170:10
**forensic (1)**
245:23
**forever (1)**
33:5
**forgave (1)**
38:21
**form (236)**
10:11 14:20 16:7
17:13,24 21:8 23:11
23:21 24:7 25:7,18
28:8,18 29:7,18
30:8,17 31:9,20
32:10 33:21 34:20
35:4 37:2 39:7 40:5
40:17,24 41:15 42:8
45:5 48:20 49:22
53:15 54:20 55:13
55:22 56:16 57:7,17
58:6,11 59:23 61:5
62:9 64:2,13 65:6
65:11 67:11 68:10
69:10,25 73:3 74:17
75:10 77:2 78:16,20
78:24 79:9,17 80:3
80:8,15 81:5,16,24
82:24 85:15 86:11
88:13,25 89:14,25
90:24 94:3,21 95:8
96:9,24 97:16 98:7
98:23 104:24
105:11 108:3
109:13 112:6,13
113:10 115:2,21
116:17 117:4,11
118:8,20 119:6,16
120:4,16 123:18
124:17 126:15
129:23 130:9,13,21
132:3 135:5 136:3
136:15 138:15
139:9 140:20
142:12 143:15
144:8,22 148:12,21
149:5 150:9 151:10
151:16 152:20
153:14,21 154:4
155:6 156:6 157:4
158:2,17 159:9
160:11 161:4 162:5
162:23 163:10,20
166:10 167:2,13
170:17 172:9
173:17 174:7,18,22

175:14,22 176:9,19
177:7 179:17 182:9
182:24 183:25
185:8,21 186:8
187:14,22 188:22
192:4 193:7 194:15
195:2,21 196:10,23
197:14 198:14
199:22 201:4
202:15 204:14
205:13,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:21 222:10
223:2 224:2,16
225:5 226:7 227:2
227:19 228:12
229:13 231:9
232:17 233:5
234:19 237:11
239:12 243:17
244:6 246:13
247:16 251:24
257:10 259:10
265:23 266:13
267:25 270:7,21
272:11 273:18
287:5 289:2,11
294:22 308:10
309:16 310:11
312:3 313:13
317:12 318:20
321:4 322:15
325:10,14 329:5
**formal (1)**
249:3
**former (1)**
246:4
**forming (1)**
224:9
**formula (62)**
9:11 26:17 31:5
243:20 244:12
253:21 259:14
260:6 265:18
290:18,21 293:24
296:11 297:19
303:5 307:25
308:13,15 310:5,15
310:18,21,24
311:11,19,20,23
312:9,17 313:2,8
314:3,14 315:13,17
316:2,11,12 317:3

317:16,20 318:9
319:2,9,19 320:17
320:21 321:17
324:17 325:15
326:15 329:15
331:20 332:2 333:2
333:4 334:3 335:4,4
335:6 336:7 338:25
**formulates (1)**
32:9
**forth (6)**
69:24 176:2 242:11
248:2 297:20
341:10
**forward (3)**
168:10 242:15,19
**forwarding (1)**
220:3
**found (6)**
294:15 299:17 302:24
333:16 336:6
338:24
**foundation (1)**
246:8
**four (10)**
29:8 93:9 97:8 123:7
143:5 246:6 256:10
256:24 260:11
262:3
**fourth (1)**
48:10
**fraction (1)**
132:19
**free (5)**
82:11 111:6 122:5
295:14 307:3
**Friday (30)**
10:20,22 35:22
143:20 220:5,14
268:7,15,18,21,23
269:5,5,18 270:5
271:12,13,17,21
272:7 273:13 288:4
325:24 326:2,19,23
327:6,9 339:7 340:3
**Friday's (1)**
86:7
**front (9)**
50:23 198:23 241:2
248:3 253:7 256:14
280:21 301:8
313:16
**FTC (1)**
9:4

**fulfill (1)**
27:17
**fulfilling (2)**
126:25 128:21
**full (10)**
77:18 91:23 92:4
127:9,14 131:23
134:25 151:15
155:19 200:18
**fully (13)**
133:9 149:20,21,24
150:5 153:25 155:3
159:19,23,24
241:16 310:20
326:15
**function (1)**
251:3
**Fund (1)**
173:3
**funding (1)**
309:4
**funds (6)**
179:3 181:5 182:4,19
316:8,10
**further (13)**
13:23 121:4 146:4
234:3 330:9 336:18
337:4,8 338:15
340:6 341:14,18
342:11
**futures (22)**
9:2,5,23 10:14 12:5
12:18,18 20:22
24:24 45:16 96:17
112:24 128:2,24
129:3 136:9 138:5
201:7 202:20,22,24
258:18
**futures-related (2)**
9:9 11:5
**fuzzy (3)**
13:7,23 258:17

_____

**G**

**gain (3)**
37:12 149:22,23
**gained (2)**
149:17 150:7
**gains (6)**
38:15 90:12 149:3
161:21,22 185:24
**Gary (3)**
50:15,20,23 51:10
52:8 342:10

**general (18)**
24:22,23 26:10,18
33:3,5 54:17,24
55:4,11,16,18 56:21
63:6 96:25 126:4
204:4 307:11
**generally (9)**
8:20 25:4 27:3 32:8
40:9 42:5 56:7
112:3 176:24
**generate (1)**
164:10
**getting (22)**
82:6 95:19,20 112:9
117:6 155:2 159:8
166:24 167:4,4,6,6
167:11,23 168:7,8
169:10,20 172:8
210:6 215:23,24
**Giddens (3)**
72:10,13 236:5
**give (31)**
8:22 10:15 17:4 25:15
40:14,19 45:11
82:11 91:25 120:13
120:15 125:10
126:6 151:25 158:8
164:18 186:11,12
186:18 195:15
198:8 204:20
239:23 256:23
261:23 264:19
291:5 307:8 313:6
320:17,18
**given (28)**
12:7 28:17 30:6 81:14
142:8 170:15
179:12 180:25
183:13 196:4 204:9
211:17 213:9,11,12
225:15 262:14
311:21,23 312:15
313:3,10 314:11
315:11 316:3
318:23 320:15
341:12
**gives (1)**
133:25
**giving (3)**
114:10,13 197:17
**gladly (1)**
319:25
**glanced (1)**
8:7

Contains Highly Confidential Portions

**go (37)**
6:4,5 43:21 64:15
73:6,7 88:8 91:7
93:18 105:3,17
106:10 111:8
132:15 138:19
143:24 155:18
167:3 168:10
177:18 192:10
208:14 210:9 221:2
240:3 256:21
261:23 262:21
269:19 276:12
277:15 299:6 309:7
311:19 313:7 320:9
333:2
**goal (5)**
36:24 37:4 150:3,5
191:10
**goes (9)**
13:22 99:22 136:18
138:23 141:17
174:24 265:18
290:20 334:3
**going (78)**
6:23 25:9 36:18 46:19
47:4 48:22 50:18
53:7 58:17 59:3
61:9 66:12 69:15,19
73:10,21 77:9 79:2
91:9,16 95:15 102:7
102:10 109:4,9
112:5 118:5,25
127:23 138:18,19
138:25 141:2
143:24 145:10
165:10 169:6,20
174:14 176:2,5,6
178:5 181:18
182:23 184:3
185:14 187:8
190:22 192:24
196:7,9,13 199:9
212:11 216:10
240:7 246:14
247:17 251:23
253:10 254:24
258:23 267:16
273:12 277:16
281:6 292:4 297:3
297:21 299:9
310:13 311:11
313:16 327:19,25
338:8 340:10

**good (41)**
5:20,21 46:14 56:9,10
77:9 81:9,11 91:11
91:12 93:17 95:22
108:10 110:4
134:18 139:17
145:6 146:10,11
158:21 172:18
199:5,15,16 240:23
241:13 243:3
256:13 283:13
284:4,13 307:23
308:12,16 310:5
311:10 312:16,25
314:13 317:17
320:16
**goodwill (1)**
51:14
**Gotshal (1)**
235:22
**gotten (1)**
186:20
**Gottlieb (4)**
3:20 72:2,4,5
**governing (2)**
241:17 242:22
**government (2)**
97:20,21
**great (2)**
46:17 299:3
**greater (1)**
136:12
**GREEN (6)**
3:9 30:10 50:9 57:8
182:10 192:5
**ground (1)**
6:5
**group (5)**
20:17,24 236:11
254:8,15
**groups (1)**
16:18
**guarantee (1)**
82:13
**guaranteed (1)**
31:6
**guess (24)**
23:15 32:11,15 35:21
47:20 74:4 85:23
87:7 98:24 108:5,9
108:25 109:24
110:3,23 117:15
155:21 156:21
177:2 179:19

191:10 230:25
280:21 308:15
**guessing (1)**
237:20
**guide (1)**
255:16
**gun (4)**
63:19 72:21 73:9,24

———————

**H**

**haircut (1)**
21:12
**half (1)**
198:2
**halfway (1)**
298:24
**HAMILTON (1)**
3:20
**hand (1)**
341:24
**Handbook (1)**
291:14
**handing (1)**
178:5
**handling (4)**
241:20 243:24 244:19
253:13
**hands (1)**
297:5
**happen (8)**
31:23 32:7,12 104:3
171:3 183:24
185:17 270:19
**happened (23)**
28:16 32:4 60:6,9
61:15 67:21 78:18
78:19 88:10 93:20
93:21 96:2 100:3,23
102:19 131:4,14
153:23 174:2
193:10 265:17
315:23 326:4
**happening (13)**
32:5 63:7 64:5 66:14
92:10,17,22 136:22
174:24 191:17,18
207:11 208:23
**happens (1)**
105:25
**happy (2)**
6:21 304:9
**Harbeck (1)**
72:16
**hard (1)**

327:22
**Harris (2)**
276:8 277:7
**HASSAN (1)**
4:16
**head (4)**
63:19 72:22 73:9,24
**hear (2)**
62:7 287:8
**heard (6)**
34:22 36:3 77:3 222:5
320:6 321:22
**hearing (9)**
77:11,15,19 99:6
101:4 104:4,20
217:9 220:15
**HEATHER (1)**
3:18
**hedge (25)**
148:25 149:3,12,16
149:16,20,21,24
150:4,5,6,8,11,14
152:5,7,11,14 153:4
154:14,21 158:15
158:22 159:3
165:18
**hedged (17)**
151:4,22 152:2,4
153:18,25 155:3,19
159:16,19,19,23,24
161:14 164:11,17
165:17
**hedges (5)**
4:4 150:12 154:17
159:25 160:21
**hedging (13)**
150:21 152:23 153:3
154:9,11,20,23
155:11 156:11,24
157:3,11 163:7
**held (66)**
2:5 33:11 44:18,24
63:19 113:25
130:19,19 133:2
170:24 173:4,15
174:14 213:20
220:19 222:18,24
223:4,11,12,14,19
223:22,25 224:3,13
224:24 227:5,13,22
228:3,4,10,19 229:2
229:10,12,19,20,22
231:17 232:4
233:22,24 234:3,6,7

234:11,16,20
236:14,22 237:9
238:13 252:23
260:9 263:2,4,7,11
307:13,20 308:8
324:3 333:21
337:16
**help (3)**
6:5,14 247:14
**helped (1)**
280:3
**hereto (1)**
83:25
**hereunto (1)**
341:23
**he'll (2)**
134:20,20
**high (2)**
17:16,17
**highly (15)**
1:12,16 11:8 12:1,11
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1
**history (1)**
32:5
**hit (1)**
162:20
**hold (12)**
111:3,3 184:12
231:24 232:2 244:5
250:9 254:17,18
322:9,10 323:16
**holder (1)**
88:19
**holding (10)**
73:9 225:13,14 228:6
228:7 231:18
233:12 307:3
337:14,19
**Holdings (2)**
1:8 250:24
**holds (2)**
232:6,7
**Honor (5)**
77:21 99:18 100:3
101:21 104:7
**hour (2)**
91:10 199:4
**hours (10)**
62:8 69:4 77:21 214:8
215:17 246:7,23
256:10,16 257:7
**Hubbard (2)**

4:11 72:9
**Hughes (2)**
4:11 72:9
**Hum (1)**
261:12
**hundred (2)**
256:24 257:12
**hundreds (2)**
256:22 257:7
**hypothetical (1)**
323:25
**hypotheticals (1)**
322:18

**I**

**IBM (1)**
161:11
**idea (9)**
62:15 68:15,20
143:25 179:21
187:15,16,17
221:11
**identification (13)**
7:2 47:8 50:21 121:11
178:8 219:8 235:4
240:10,14,16
267:19 291:11
297:8
**identified (4)**
292:24 293:14 306:19
337:11
**identify (8)**
210:4 241:3 281:11
293:3 300:2,11
302:7 337:2
**identifying (3)**
295:2,3 328:25
**ii (1)**
173:3
**iii (1)**
173:5
**illiquidity (1)**
96:4
**immediately (4)**
71:18 106:24 147:12
204:6
**impact (14)**
9:15 18:6 24:17,20
69:5 81:19 86:2,24
143:21 144:18
188:13 287:14
293:9 338:24
**impacted (6)**
12:23 26:16,17 294:3

**impacts (1)**
294:6 295:4
**impaired (5)**
26:20
**impaired (5)**
310:6 315:20 316:24
324:4,21
**impairs (1)**
324:20
**impede (1)**
313:24
**impeded (9)**
310:17 312:14 314:7
317:18 321:15,17
324:17 325:13
328:9
**impedes (1)**
328:3
**impending (1)**
36:22
**implementation (1)**
13:4
**important (1)**
218:19
**imposed (3)**
314:21,24,25
**improperly (2)**
286:17,23
**inability (2)**
283:8,12
**inaccurate (1)**
88:11
**include (23)**
13:17 19:23 27:10
47:22 114:4 116:8
164:25 176:12
177:20 197:10,21
208:10,17 209:11
209:14,14 210:18
249:13 307:11,18
311:23 314:2
325:15
**included (22)**
13:14,25 144:13
209:25 210:5
211:20,21,21
221:22 222:16
234:4 258:11
259:13 279:17
310:15 317:8,14
319:2 326:6 329:14
331:12,20
**includes (1)**
176:14
**including (14)**

130:6 173:2 203:14
203:22 204:2,3,10
204:13,23 205:2,5,6
228:19 229:2
**income (4)**
201:21 202:8 245:18
274:7
**inconsistent (2)**
52:20 221:3
**incorporate (1)**
148:11
**incorporating (1)**
147:14
**incorrect (2)**
329:10 334:23
**incorrectly (1)**
334:2
**increase (5)**
28:5 84:17 85:2
142:10 143:13
**increased (4)**
86:5 141:21 143:4,7
**incur (2)**
31:18 75:13
**incurred (5)**
53:11,22 54:2,8 57:4
**independent (14)**
250:12,13,24 251:5
252:21 253:4
262:16 275:12
279:13 280:9
293:11,19 306:24
331:23
**independently (1)**
265:21
**index (6)**
23:3,7,8 152:4 342:2
343:2
**indicate (2)**
165:14 224:17
**indicating (1)**
107:17
**indication (3)**
168:18 293:8 315:8
**individual (6)**
136:24 137:10 139:13
164:3,4 165:14
**individuals (5)**
235:21 237:13 278:18
278:21 301:19
**industry (7)**
241:19 243:4,23
244:19 253:13
255:8 278:13

**ineffective (2)**
150:8,14
**inferences (1)**
36:3
**inflated (2)**
142:17,21
**inform (3)**
238:15 239:11 339:2
**information (36)**
8:3 10:21 12:9,21
14:13 16:15 18:5
21:6,17,19 23:17
25:10,11 53:19
63:21 64:9 88:16
94:6 95:20 98:13
156:13 162:18,21
164:7,10,18 165:25
214:20 216:6
253:19 257:17
276:15,24 279:17
296:19 335:9
**informed (10)**
76:8 238:21 287:17
289:3 329:11,16
331:19 332:3
338:14,19
**infrastructure (1)**
171:7
**inherit (1)**
130:12
**initial (1)**
334:25
**inquire (2)**
155:9 286:7
**inquiries (1)**
288:15
**insecurities (1)**
29:5
**instance (1)**
180:19
**instances (1)**
292:17
**instituted (1)**
21:24
**institutional (1)**
136:8
**institutions (1)**
137:11
**instruct (2)**
251:24 277:2
**instruction (1)**
252:3
**instructions (1)**
289:12

**insufficient (2)**
34:18 35:11
**intend (1)**
239:20
**intended (8)**
209:8 228:11 229:9
229:18 236:15
238:2,22 239:9
**intent (1)**
237:7
**interact (1)**
151:13
**interest (3)**
99:17,20 101:19
**interested (2)**
79:13 341:17
**interests (1)**
172:23
**interfaced (1)**
27:18
**interim (2)**
147:25 237:18
**interpret (3)**
243:7,8 247:11
**interpretation (6)**
223:12 243:2 246:3
246:11 291:5,14
**interpretations (2)**
243:9 319:21
**interpreting (2)**
243:13 255:25
**interrupt (1)**
303:21
**interrupting (1)**
90:16
**intimately (2)**
245:21 256:6
**introduced (1)**
220:4
**inventory (2)**
97:19 116:6
**investigate (4)**
335:11,17,24 336:8
**investigated (2)**
286:24 333:15
**investigating (1)**
335:9
**investigation (22)**
64:11 262:17 275:13
279:14 280:10
286:3,4,15 306:25
331:15 332:18
333:9,11 334:6,12
336:24 337:5,9,20

Contains Highly Confidential Portions

338:15,17 339:4
**investment (1)**
310:9
**involved (21)**
13:21 16:10 19:16
20:7,10,11 25:2,3
64:22 68:12 75:2,4
75:6 178:16 180:14
183:16 195:5 256:6
257:23 258:2
273:24
**involvement (4)**
27:14 255:18,19,24
**irrational (7)**
81:23 114:22 116:14
119:23 123:14
182:7,21
**issue (11)**
296:5 298:12 299:21
300:19 302:2 308:3
319:22,24 330:4
335:12 336:19
**issued (7)**
255:16 272:14 286:5
286:11,18,23
287:18
**issues (14)**
7:6,10 8:13,23 9:4,5
20:20 147:2 248:15
251:8 293:6 303:15
319:24 337:11
**item (2)**
209:23 333:18
**items (14)**
217:15 294:14 330:15
331:16 333:25
334:2,5,7,10,12
336:23 338:15,17
338:21
**it'll (1)**
283:24
**iv (1)**
173:7

**J**

**J (2)**
3:15 4:15
**James (5)**
71:23 219:7 235:12
235:13 342:14
**January (2)**
303:8,12
**jeopardizing (1)**
100:2

**job (2)**
1:25 255:12
**Jointly (1)**
1:8
**Jones (3)**
3:5 83:24 141:5
**JPMorgan (8)**
220:20 222:19 223:4
223:12,15,20
231:19 260:16
**judge (3)**
77:12 198:23 321:12
**July (2)**
214:16 250:22
**June (4)**
214:16 249:21,22
258:8
**junior (1)**
254:2
**justifies (1)**
328:6

**K**

**Karp (2)**
276:8 277:8
**Kathy (5)**
1:24 2:7 5:9 6:9 341:5
**KAY (4)**
4:9 30:11 40:18 185:9
**keep (4)**
27:19,21,23 179:8
**kept (1)**
10:17
**kind (6)**
6:4 30:23 85:25
209:25 225:12
278:11
**kinds (1)**
322:24
**KING (1)**
3:18
**Klepfer (4)**
1:24 2:8 5:10 341:5
**knew (12)**
36:21 169:6 190:21
211:25 212:11,16
212:22 213:19,23
214:21 215:4,9
**know (305)**
6:13,17,21 13:14 15:7
17:14,19 18:18,21
19:8 21:10,22 23:14
24:16 25:11,13,20
26:15,15,18 28:10

29:19,22 30:2,12
31:22,23,24 32:4,5
32:8 33:3,7 34:23
36:22 39:8,9,22
40:20 41:23 53:6
54:9,15 55:23 56:24
57:9 58:15 59:8
60:9 61:8 62:3 63:5
63:7,14,15,21 64:6
66:2,16,19,20,21
67:14,17,22,24 68:7
68:13 70:6,11 71:10
71:11 72:2,5,12
73:13,20,21 74:19
76:17 77:4 79:4,8
81:10,18 82:3,4
85:9,11,22,24 86:16
86:24 88:14 90:12
91:10 92:12,17 93:9
93:10,11,17,17,18
93:20,21 94:4,5,9
94:12,15 95:9,14,14
95:16 96:20 97:2,6
97:7,11,21 98:14
99:11 102:18,19
106:8,9 107:9,11
108:9,10 110:4,5
112:5,22 118:9
119:21 120:9,18
123:22 132:8,9
136:20,24 137:2
138:3 139:17
143:18 144:6 145:3
146:21 147:7
148:22 149:19
150:2 153:16,18
155:11 158:5
159:21 160:16
161:13 162:11,16
163:8 165:21,23
166:13 168:5
170:10 171:2,3
173:25 178:12,19
180:3,11,12,13,19
180:22 181:11,15
181:22 183:3,6,14
183:15 185:10,12
187:25 189:11
192:6 193:10,11
194:17,23 195:14
195:18,25 196:9
199:4 200:8 201:11
202:10 204:19
206:3,8,22 208:5,21

209:10 210:17,22
212:19 213:4 214:3
214:5,15,20,23
215:20 216:11,19
219:14,15,16,18,24
220:6 225:6 226:10
226:12 230:3,23
231:2 235:13
246:14 248:9,11
251:10,12,20
256:25 259:21
260:8 261:17,24
262:20 264:11
266:6,10 267:11
268:19 269:12
270:23 273:6
275:20 276:9 278:7
278:16 281:19
282:15,21 283:2,9
284:9,23 285:12,14
286:10,14 288:11
288:14,18,19,22
293:22 294:4,24
296:16,21,24
297:12 298:2,7
304:10 306:5
307:17 308:19
311:2,4,6,10 312:18
313:14,23 316:17
318:10 323:25
333:5 335:20
337:13 339:2
**knowing (6)**
63:9 95:15 118:17
212:10 215:16
320:22
**knowledge (14)**
8:18 12:14,14 28:4
30:19 36:6,9 63:6
67:25 68:6 76:4
88:10 96:25 161:25
**knowledgeable (1)**
24:14
**known (7)**
85:18 101:18 102:5
102:17 265:17
283:16 296:11
**Kobak (9)**
72:10,14 219:8,11,15
222:8,13 236:4
342:14
**Kobak's (1)**
220:11
**KPM (1)**

255:12
**KPMG (4)**
250:3,4,10 252:21

**L**

**L (1)**
3:16
**labeled (11)**
5:3 91:15,19 145:9
146:6 199:8,12
240:6,19 299:8,12
**lack (6)**
101:16 149:10 182:7
182:22 217:12,14
**lacking (1)**
182:11
**laid (1)**
194:18
**language (13)**
174:12,16,20,23
178:3 225:4,21
228:2 230:13
232:25 246:11
284:20 289:20
**large (1)**
97:19
**larger (3)**
18:22 38:10,17
**largest (1)**
17:10
**late (1)**
104:5
**law (5)**
235:25 249:10,13,14
249:16
**lawyer (6)**
72:3 173:20 204:16
243:10,14,19
**lawyers (3)**
177:17 243:21 309:23
**LBHI (1)**
235:25
**LBI (155)**
17:6 29:22 35:23
42:11 45:10,16,24
47:14 48:5,13,13,14
48:17,25 49:13
52:21 54:3,7,10,13
55:19 57:4 58:4
59:22 71:19 80:19
85:5,9,11,18 87:8
106:24 107:24
109:21 110:20
111:12 113:24

Contains Highly Confidential Portions

116:24 117:18
118:17 119:24
121:14,19,20
122:13,22,23 124:3
124:4,14 125:3,11
125:15,24 126:9,13
127:23 130:18
133:3 140:13 142:7
142:22 143:18
144:17,20,20,23
147:14 153:7
162:18 170:5,24
180:20 202:3,4,22
205:10,20 206:6,7
206:10,15,21
210:23 212:3
213:20,21 220:16
220:18 222:17,24
223:11,14,22,25
224:3,15,18 227:22
228:3,10,14,19
229:3,11,12,19,21
229:23 230:9
231:18,18 232:6
233:25,25 234:5,15
236:12 238:14
259:22 260:9 266:6
267:4,21 272:19
282:13,22 285:9
288:2,7,23 289:17
301:20,23 306:15
306:22 307:11,12
307:18,20 308:7,8
309:24 310:3,8
311:24 313:2
314:15 318:7
320:12,13,18,24
323:23 329:22
**LBIE (16)**
306:22 307:2,5,12,13
307:20 308:8
314:15 320:12
334:22 335:13,14
335:18,21,22
336:11
**LBIE's (2)**
332:10 336:13
**LBI's (37)**
61:15 76:8,24 84:4,6
84:8 89:6 106:12
117:23 121:17,17
121:22 122:16,25
124:6,16 125:6,17
140:12 151:4

153:17 180:9 201:2
202:24 205:9,19
223:17 225:11
238:20 260:19
261:18 265:10
292:15 309:11
328:25 329:2
336:14
**learned (2)**
30:6 329:9
**leave (3)**
120:19 249:24 269:24
**led (2)**
148:18 307:22
**left (1)**
249:21
**legal (25)**
5:8 72:14 173:18
174:8 176:20 177:8
177:15,16 204:15
204:20 205:14,24
206:4 212:6 233:6,7
242:25 243:14
262:10,11,14,18
276:3,4 277:12
**Lehman (91)**
1:7 3:6 5:5 17:11 39:6
41:2 43:8 56:4 61:3
61:21 62:4,12,15
63:10,11 67:13,19
78:2 88:3,9,9,18
90:6,17,20 92:6
93:3,14,19 94:6
95:16,16,19 98:19
98:21,24,25 99:19
99:22 100:13,16
101:5 107:21
109:18 110:17
111:9 119:24
138:13 148:16
160:9 161:17 163:2
163:25 172:20
174:13 176:10
177:6 178:14,17,25
181:19 182:14,23
183:18 189:14
191:12 192:23
202:21 214:12
218:16,20 244:3,23
246:5 248:24
250:23 266:5 272:3
272:13 281:25
282:4 286:16
287:10,17 308:4

315:25 323:6,7,11
337:14 344:2
**Lehman's (18)**
38:21 44:8 77:25
78:14 80:6 87:16,17
87:18 101:17
105:13 166:2
167:21 172:23
173:13,14 218:25
271:9 323:7
**Leitner (4)**
8:17 92:11 159:13
212:8
**Leitner's (1)**
87:3
**letter (16)**
40:8 63:4 127:10,25
198:25 224:8,21
248:8 284:14,16,21
284:24 289:24
297:21 298:5
308:17
**letterhead (1)**
296:25
**letters (2)**
285:2,12
**letting (1)**
288:13
**let's (13)**
108:7 109:25 184:7
184:25 190:20
193:4 240:3 274:3
299:6 308:21 309:7
328:18 338:5
**level (14)**
28:14 29:9,10,12,14
29:16,22 30:5 34:10
34:13 57:14 164:16
164:22,23
**levels (3)**
29:9 33:15 164:2
**Lexington (1)**
2:6
**liabilities (9)**
10:5 37:18 42:2
121:17 122:15
221:15,21 223:6,10
**liability (5)**
38:21 117:14 332:20
332:25 333:6
**liaison (1)**
9:16
**Liberty (1)**
3:22

**license (2)**
254:18,23
**licensed (1)**
243:6
**licenses (1)**
254:19
**lien (9)**
284:16,21,24 285:2
285:12 289:20,24
306:22 307:4
**liens (2)**
10:2 284:17
**lieu (2)**
33:14 38:21
**life (1)**
255:20
**light (3)**
143:10,17 189:13
**limit (4)**
80:18 204:4 229:9,18
**limitation (4)**
204:3,23 205:2,5
**limited (4)**
121:6 204:12 225:4
318:15
**limiting (1)**
205:6
**line (22)**
48:10 51:23 52:8
178:22 201:23
220:11 228:17
343:4,5,6,7 344:8,9
344:11,12,14,15,17
344:18,20,21,23
**lines (2)**
84:19 255:2
**liquid (1)**
185:2
**liquidate (45)**
28:2 29:17 61:23
71:19 74:10 75:12
82:6,10 106:12,16
106:24 107:6,13
120:19 132:7,15,21
134:5,12 135:24
180:8 183:23 184:3
184:4,5,8,18 185:6
185:11,12,14
187:12,19 188:3,10
188:11,25 189:2,7
191:15 192:24
193:4,14,15 194:8
**liquidated (26)**
37:7 56:20 61:19 82:8

83:2 85:5 107:5
131:7,7,20 179:25
180:6 185:22,25
186:13,25 187:9
188:17,18 189:16
190:4 191:8,13
192:17 193:13
274:12
**liquidates (1)**
33:25
**liquidating (21)**
33:19,23 34:18,22
35:12 44:21 76:2,5
85:12 118:19
185:15 186:10,10
186:21 187:2 188:5
188:12,15 189:12
189:21 192:15
**liquidation (64)**
31:7,17,25 33:12 34:5
36:19 48:11 54:25
56:13,15 58:8,17
61:22 73:16 74:15
74:15,23,25 75:2,5
75:9,21 82:14
107:22 109:18
110:18 111:10
131:22 132:21,22
134:11 168:23
180:15,17 184:10
185:4,16,18,24
186:5,7,15,17 188:8
189:8,15 190:6,23
257:24 259:2 264:9
266:12,20 267:5,23
268:13,24 269:10
269:20 270:4,9
272:19 273:25
282:22
**liquidity (6)**
41:2 95:18,24 99:25
100:19,21
**list (5)**
156:17,20 281:12
283:23 334:6
**listed (5)**
201:17 279:9 305:25
306:20 338:16
**literature (2)**
273:10,11
**little (24)**
6:5 13:22,23 14:21,22
17:2 18:23,24 29:11
40:12 99:11 121:19

Contains Highly Confidential Portions

122:23 124:3 125:8
126:8 140:13 142:7
202:5 227:15 247:5
257:14 276:12
283:25
**lived (1)**
63:7
**Livenote (1)**
2:11
**LLP (6)**
2:6 3:5,11,20 4:4,11
**loan (4)**
290:22,24 292:3
295:23
**Loans (1)**
291:17
**location (6)**
283:14 284:4,13
307:8,24 308:12
**lock (4)**
129:7 130:5 133:24
134:3
**locked (7)**
10:16 132:14,15
133:5 261:8 295:17
306:6
**locked-in (1)**
90:12
**lockup (4)**
129:11 307:13 317:16
325:12
**logic (1)**
310:7
**logical (1)**
209:6
**long (56)**
16:4 18:18 19:6 25:23
28:9 32:14,25 38:23
38:25 39:14,17 40:3
40:15 41:9 64:6
66:17 67:14 68:16
68:20 82:5 88:24
89:5 94:5 97:8,11
97:14 115:7 116:3
117:15 123:25
126:19 144:4,19
151:4,12,22 152:4
157:22 160:4,18
161:11 162:11,16
166:8,13 178:24
181:15 182:13
187:11 191:25
192:6,7,8 250:4
271:22 291:18

**longer (6)**
80:23 267:9 272:4
283:13 288:17
316:4
**longest (1)**
26:3
**look (41)**
30:21 31:21 49:7 52:9
62:16 71:14 83:22
84:19 106:19 115:4
115:25 116:4,5
141:4 147:8 161:9
165:25 172:17
191:7,22 192:21
197:3 203:21
213:10 224:20
228:16 241:23
245:11 260:21
262:2,21 281:7,14
283:24 293:12,19
299:5 330:15
333:13,17,18
**looked (21)**
8:8 61:10 87:3 94:22
102:22,24 108:5
109:24 110:23
166:4 174:13
203:19 204:10
207:14 217:6
246:16 280:3,7,11
293:22 294:2
**looking (24)**
17:15 30:20 45:21
47:12 62:14 85:13
87:7,9 98:16 100:22
165:18 166:20
167:18 200:21
226:13 227:12,14
227:15 261:25
282:18 303:25
322:23,25 329:3
**looks (9)**
52:25 96:14 101:7
107:11,19 222:13
223:4,5,21
**loose (1)**
110:24
**lose (10)**
87:5 108:6 109:25
132:21 135:16
161:15 184:9 185:3
189:16 190:22
**losing (2)**
179:22 180:23

**loss (12)**
37:23 38:13 78:2
88:24 89:12,17
119:11 131:9
149:22,23 181:25
189:19
**losses (12)**
57:4 75:13 82:9 90:5
90:7,13 118:6 149:2
161:21,22 185:24
186:6
**lost (9)**
27:6,6,8 103:9 149:14
150:8 179:9 180:18
180:20
**lot (17)**
18:20 26:24 27:6,7,8
62:14 86:14 93:15
93:21 113:3 134:17
169:24 181:12
194:9 200:2 246:24
291:6
**LOUIS (1)**
3:17
**lunch (2)**
139:18 145:6
**Luncheon (1)**
145:11
**L-B-I-E (1)**
307:6

_____

**M**

**M (1)**
4:9
**Madison (1)**
4:6
**main (2)**
19:9 191:7
**maintain (3)**
9:25 27:21 98:9
**maintained (1)**
20:3
**maintaining (5)**
20:12 43:25 45:25
47:15 48:6
**major (1)**
94:16
**maker (1)**
28:22
**makers (1)**
19:11
**makeup (1)**
164:17
**making (7)**

20:13 34:22 126:3
131:9 136:19 169:8
263:21
**man (1)**
23:14
**manage (4)**
147:24 148:9,16
214:19
**managed (2)**
254:8,15
**management (10)**
24:5,10,12 96:23
147:23 148:19
163:25 255:7,11
310:9
**managers (1)**
161:9
**managing (2)**
155:22 157:14
**mandate (1)**
104:18
**manner (2)**
189:9 218:7
**margin (195)**
9:13 26:11,16,18,20
27:2 28:5 29:13
30:15,21 31:3,8
32:2,9 33:9,10,14
34:17 35:10,24
36:17,25 37:5,17,22
42:16 75:14,19,24
82:9,13 83:15,21,21
84:12,21 85:13 86:4
86:16 87:4 107:23
108:2 109:20,23
110:19,22 111:11
111:14 114:5,16,21
115:10,12,16,19
116:9,16 117:3
119:3,10,25 121:16
121:21 122:14,24
123:15 124:5,8,13
124:15,22 125:4,16
125:24 126:9,14,17
126:22 127:3
128:23 130:15
131:21 132:9
133:20 135:14,15
135:20,24 138:5
140:11,16 141:9,21
142:6,8,9,16,20,24
142:24 143:3,10,12
143:22,24 144:3,19
166:24 167:11,19

167:23 168:19,21
170:16 173:4,14
174:14 175:11
176:12,15 177:20
179:3 181:4 182:4
182:16,19 183:20
185:19,23 186:2,3
186:11,12,18 187:2
190:2,7,9,22,24
191:21 194:7
196:12,18 197:10
197:22 198:13
199:18 200:3,10
205:9,18 206:5
207:5,8,17 208:10
208:14,22 209:3,15
210:9,14 211:4,16
212:2,7,10,14,17,22
213:12,20 223:8
224:18 225:9
231:13 232:3 237:2
247:23 309:3,18,23
311:13 312:7,22
315:9,10,25 320:11
321:10,12,14
322:12 323:17
**margins (1)**
135:23
**mark (5)**
47:4 50:18 178:5
267:16 297:3
**marked (30)**
7:2 42:24 47:5,5,8,11
50:21 77:7 83:5
89:21 121:2,10
127:5 132:11,18
146:13 172:14
178:8 219:5,8 224:5
234:25 235:3
240:10,13,16
267:18 291:11
297:8 303:23
**market (56)**
19:10 23:8,10,24
28:22 30:21,22 32:7
32:11 34:15 35:3,8
35:15,17,20 36:16
57:20 86:3 89:20
90:4,15 92:21,22
102:14 120:13,15
132:5,6,11,18,19,20
134:11,12,15,19
135:12,13 136:2,13
136:18 138:2,8,9,16

Contains Highly Confidential Portions

138:19,22,23
150:18 163:14
187:21 188:2,6,14
218:9 279:11
**marketing (4)**
101:11,16 102:8,10
**marketplace (6)**
31:14 36:13 81:18
92:16,19,25
**markets (6)**
13:24 103:7 136:21
255:8,10 269:20
**market's (1)**
138:18
**market-making (3)**
13:25 14:12,13
**marking (1)**
90:3
**Marlo (2)**
276:8 277:8
**marriage (1)**
341:16
**Martini (4)**
297:4,8,16 342:24
**material (1)**
8:9
**materials (5)**
219:18 261:18 262:18
302:8,19
**matrix (2)**
164:18 302:3
**matter (27)**
5:5,24 92:7 93:4
104:22 137:6,17,20
139:4,8 143:5 169:7
184:9 185:3 196:13
220:4 232:11,12
250:14 251:5
256:11 295:15
307:18 308:7
313:25 337:5
341:17
**matters (4)**
9:18 204:6 313:23
339:4
**maximizing (1)**
79:14
**McDade (14)**
178:8,11,23 179:7,15
180:24 181:6,12,16
181:24 182:3,7,22
342:13
**McDaniel (5)**
71:23 73:5 235:12,13

238:9
**McISAAC (375)**
1:13 2:5 5:1,4,14,20
6:1 7:1,2 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1,25 47:1,11
48:1 49:1 50:1 51:1
51:17 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
65:4 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1,22
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1,6
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1,4 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,22 140:1
141:1 142:1 143:1
144:1 145:1 146:1,3
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1

177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1,23
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1,15 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
240:10,13,16,23
241:1 242:1 243:1
244:1 245:1 246:1
246:22 247:1 248:1
249:1 250:1 251:1
251:18 252:1,7
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
276:13 277:1,24
278:1 279:1 280:1
281:1 282:1 283:1
283:23 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1,17,18
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1

327:1,18 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1,13 339:1
340:1,18 341:9
342:3,8,17,19,20
344:4
**McIsaac's (1)**
302:15
**mean (42)**
40:20 44:6,23 58:12
61:24 63:20 65:20
73:8,23 92:16 95:21
95:22 96:2,6 112:12
114:8 123:6 126:5
128:12 133:21
160:17 164:20
174:16 176:18,25
177:4 183:2 197:12
204:25 206:3
222:11 227:10
228:7 229:24
232:18,20 233:7
241:7 242:9 244:10
259:24 269:15
**meaning (2)**
128:7 200:16
**means (27)**
33:20 45:6 171:13
176:22 177:10,12
179:21 183:14
203:10 204:2,17,23
205:2,3,4,6,7 206:4
211:13 225:7,13,14
225:15 231:18
239:2 242:8 321:11
**meant (11)**
95:23 107:10 154:19
164:14 181:12,22
181:23 227:6 230:2
230:3 231:21
**measured (1)**
33:14
**meet (6)**
134:20 135:14,22,23
136:11 139:14
**member (7)**
36:7 43:9 61:4 89:13
232:5 255:5,6
**members (6)**
29:4 34:23 37:8 75:16
76:18 232:2
**memo (1)**

301:15
**memorandum (5)**
121:3 301:10 303:13
303:14 342:11
**memory (1)**
260:10
**memos (2)**
291:6 307:8
**mention (1)**
330:4
**mentioned (6)**
9:20 10:25 26:9 41:24
181:13 254:17
**Mercantile (2)**
77:23 78:14
**merchant (1)**
202:25
**mere (3)**
283:18 289:8 324:19
**merged (2)**
68:15 258:8
**merger (4)**
20:11 68:17 258:4,9
**mergers (2)**
20:9 68:13
**Merit (2)**
2:9 341:6
**Merrill (1)**
67:20
**Michael (1)**
5:7
**middle (4)**
103:4 203:7 250:22
267:2
**million (38)**
38:4,9 48:15 52:12
53:12 84:17 85:2
86:6 113:2 117:16
140:18 141:10,14
141:17,25 149:14
149:17 150:7,8
208:7,7 209:18
260:23 274:23
275:4,4,5,7,8
278:25 296:13
306:18 308:14
315:12 316:24
318:15 328:25
331:3
**mind (16)**
57:10 92:20 93:2
124:18 167:5 168:6
168:16 179:8
184:21 196:2

Contains Highly Confidential Portions

197:24 215:21
218:25 219:2
229:25 244:16
**minds (1)**
220:6
**minimal (3)**
57:15 132:5,9
**minimum (26)**
33:12,19,23,24 34:2,2
34:4 121:16,20
122:14,24 124:4,8
124:13,14,22 125:4
125:16,24 126:9,14
126:17 140:10
142:8,24 164:3
**minute (1)**
261:23
**minutes (3)**
139:20 199:5 239:24
**Mischaracterizes (2)**
162:24 163:21
**misreading (1)**
265:25
**missed (1)**
46:15
**misstates (18)**
17:25 33:22 42:9
82:16,25 115:22
123:19 130:22
140:21 175:15
195:22,22 205:14
205:24 215:6
265:24 268:2 312:4
**mistake (1)**
287:18
**mistaken (1)**
241:22
**misunderstand (1)**
325:22
**misunderstood (1)**
164:5
**mitigated (1)**
150:20
**mode (1)**
288:20
**model (1)**
162:10
**models (6)**
16:16,17 17:22 18:3,4
30:23
**modifying (1)**
197:13
**moment (6)**
12:9 85:4 100:12

235:5 264:20
270:25
**Monday (11)**
39:21 86:9 87:24 91:5
102:16 103:8
104:12 168:22
170:21 271:22
327:7
**Mondays (1)**
10:20
**monetary (1)**
279:11
**money (31)**
27:6,7,8 76:23 95:20
129:10 130:6
132:13,14,21,22
133:25 135:16,17
135:18 136:19
159:25 160:6,20
171:18 177:5
184:10 185:4
279:11 288:3
289:10 310:4 313:6
320:25 321:7
328:11
**moneys (11)**
55:18 130:5 133:24
176:2 264:9 314:20
330:10,18,22 331:5
331:8
**monitor (7)**
149:7,8 161:8 282:7
283:8,13,19
**monitoring (1)**
212:9
**month (7)**
58:5 66:21 68:21
268:8 269:5 271:10
271:14
**monthly (1)**
243:6
**months (7)**
16:8 19:2,6 25:5,8
77:16 93:10
**morning (19)**
5:20,21 36:2 74:11
87:24 91:5 134:21
170:22 256:16
266:16,18 270:10
270:13 272:5,23
290:14 309:22
323:3 325:2
**morning's (1)**
247:24

**motion (12)**
65:19 100:11,11
121:4,8 241:6,8,9
246:16 247:19
335:10 342:12
**move (12)**
36:16 61:23 134:20
171:6 176:2,10
188:2 264:9 279:23
292:4 323:14
328:18
**moved (3)**
171:25 190:21 281:16
**movement (5)**
30:20,21 90:15
135:13 163:14
**movements (1)**
143:10
**moves (1)**
23:25
**moving (5)**
147:21 172:2,3
187:21 288:21
**multiple (3)**
16:22 140:19 163:15

**N**

**N (3)**
3:3 4:2
**naked (9)**
152:17 153:2 156:3
159:3,4,6 163:12
165:10 168:2
**name (11)**
5:7,22 21:20 176:11
178:12 240:23
298:3 323:7,11
344:2,4
**names (1)**
305:4
**nature (4)**
40:10 95:12 251:21
260:24
**necessarily (12)**
87:11 88:14 89:15
96:2 105:13 133:14
167:9 209:11
216:16 218:18
219:19 245:16
**necessary (4)**
49:8 51:18 113:8
332:23
**necessitated (2)**
49:17 50:4

**need (21)**
6:16 21:10 25:12
31:12 44:22 49:18
50:5 51:20 71:18
99:11 103:7 104:5
104:11 106:23
164:19 169:24
273:5 281:6,10
290:10 305:20
**needed (10)**
26:15 95:20 102:15
170:3 197:5,21
204:18 216:2
221:21 319:12
**needing (1)**
325:12
**needs (3)**
103:20 160:15 319:9
**negative (4)**
51:14 115:15 117:18
206:2
**negatives (1)**
115:20
**negotiate (21)**
16:4 20:20 25:6 62:4
63:11,13 70:3,4
116:19,25 118:22
118:24 120:9,10
142:19 190:5
191:16 196:12
197:3,23 198:7
**negotiated (27)**
63:2 66:7,11 69:4,12
69:17,22 73:18 93:8
113:14 119:20
120:21 122:19
123:9,11 137:16,23
139:6 194:17
198:20 214:21
218:14 237:17
238:7 324:14
326:18 327:5
**negotiating (16)**
20:15 63:25 64:4
67:15 105:8 108:25
116:20 117:23
168:6 190:2,3 197:6
210:10 237:19
312:20 324:15
**negotiation (6)**
20:18 64:22 68:14
112:5 196:14 198:4
**negotiations (16)**
65:23 67:21 68:2

69:14 73:20 76:21
87:11 92:13 93:10
112:7 178:16
183:17 214:8 218:6
324:20,24
**Neil (7)**
4:15 64:20 140:5
160:15 246:9 302:5
305:6
**neither (1)**
341:18
**net (22)**
15:15 38:8 48:11,14
48:17 81:21,25
94:23,24 108:16
112:18 115:9,11,15
116:2 117:6,9
123:24 129:10
133:7 134:23
253:21
**Neuhardt (34)**
3:16 240:22,24
246:24 247:9 252:2
252:5,10,16 257:15
257:22 261:6
277:16,21 280:2
284:2 287:7 298:23
299:4,14 301:5
302:5,14,21 304:2,5
305:5 306:8 322:17
327:19 338:5,12
340:6 342:5
**Neuhardt's (1)**
276:21
**never (12)**
29:20,21 31:22 33:8
34:21 82:13 274:2
295:17 330:12,18
330:22 331:5
**nevertheless (1)**
31:17
**new (25)**
1:3,14,14 2:7,7,12 3:8
3:8,14,23,23 4:8,8
4:14,14 21:3,3,3,24
195:8 255:5,23
341:3,4,7
**nods (3)**
6:13,15 273:3
**nonresponsive (2)**
306:9 323:13
**non-customer (4)**
292:8,20 295:19
298:22

Contains Highly Confidential Portions

**non-customers (1)**
206:18
**non-highly (1)**
22:2
**non-PIM (1)**
47:21
**non-redacted (1)**
304:25
**normal (7)**
152:9 217:22 218:8
263:24 264:3
288:20 330:13
**normally (5)**
23:16 162:6 218:24
271:11 278:3
**North (1)**
3:13
**nos (3)**
43:10 235:3 342:15
**Notary (3)**
2:11 5:15 341:6
**note (2)**
12:7 296:25
**noted (2)**
208:23 212:6
**notice (10)**
285:17,24 286:5,10
286:14,17,19,21
287:18,22
**notifying (1)**
288:12
**notwithstanding (1)**
101:15
**November (1)**
258:13
**NTS (1)**
245:17
**number (32)**
5:3 39:23 46:22 77:3
77:22 79:14 86:8
91:15,19 95:2 108:6
109:25 110:24
139:10 145:9 146:6
199:8,12 200:16
240:6,19 260:22
261:2 274:23,24
275:7,8 299:8,12
334:5,6 338:3
**numbers (8)**
17:15 53:18 275:9,13
275:15,23 305:12
305:18

**O**

**object (128)**
10:11 14:24 16:7
17:13,24 21:8 23:11
23:21 24:7 25:7,18
28:8,18 29:7,18
30:8,17 31:9 34:20
35:4 37:2 39:7 40:5
40:17,24 41:15 42:8
45:5 49:22 53:15
54:20 55:13,22
56:16 57:7,17 58:6
58:11 59:23 61:5
62:9 64:2,13 65:6
65:11 67:11 68:10
69:10,25 73:3 74:17
75:10 77:2 78:16,20
78:24 79:9 80:8,15
82:24 85:15 88:13
88:25 89:25 90:24
96:9 97:16 98:7,23
104:24 105:11
109:13 112:13
113:10 115:2,21
116:17 117:11
118:8,20 119:16
120:4,16 123:18
124:17 126:15
129:23 130:9,13,21
132:2,2 135:5 136:3
136:15 138:15
139:9 142:12
143:15 144:8,22
148:12,21 149:5
150:9 151:10,16
152:20 153:14,21
154:4 155:6 156:6
157:4 158:2,17
159:9 160:11 162:5
162:23 163:20
166:10 167:2
173:17 193:7
251:23 322:15
329:5
**objection (147)**
14:20 25:25 30:10,11
31:20 32:10 33:21
35:13 48:20 50:8,9
57:8 65:5 69:8
79:17 80:3 81:5,16
81:24 82:16 86:11
89:14,23 94:3,21
95:8 96:24 105:23
108:3 111:15 112:6
117:4 119:6 140:20

157:8 161:4 163:10
167:13 168:3
170:17 172:9 174:7
174:18,22 175:14
175:22 176:9,19
177:7,14 179:17
181:9 182:9,10,24
183:25 185:8,9,21
186:8 187:4,14,22
188:22 189:10,22
191:3 192:4,5
194:15 195:2,21
196:10,21,23
197:14 198:14
199:22 201:4
202:15 204:14
205:13,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:10,21 222:10
223:2 224:2,16
225:5 226:7 227:2
227:19 228:12
229:13 231:9
232:17 233:5,19
234:19 237:6,11
238:17 239:12
243:17 244:5,15
246:9,13 247:15
257:10 259:10
263:9,15 265:23
266:13 267:25
270:7,21 272:11
273:18 278:5 287:5
287:20 289:2,11
294:22 308:10
309:16 310:11
312:3 313:13
317:10,12 318:18
318:20 321:4
325:10 337:17
**objections (1)**
40:18
**objective (2)**
79:8 149:19
**objectives (2)**
78:22 79:25
**obligation (7)**
44:3 129:9 228:8
272:8 335:17,25
336:9
**obligations (31)**
27:18 76:19 88:21
114:17 127:2

128:22 131:11
133:6,10 136:11
139:14 172:24
173:5,7 175:7
199:25 208:5
224:24 225:11
227:23 228:15,20
229:3 231:25 232:4
233:23 234:7,12,17
234:22 236:16
**obliged (1)**
171:23
**obtain (1)**
156:12
**obtaining (1)**
158:3
**OCC (192)**
9:14,17 26:11,19
27:11,14 28:20,24
30:14 32:8,22 33:4
34:7 35:23 36:6,14
37:17,18,23 38:4,6
42:12 43:9 44:9
52:10 60:12,18,23
61:2,7,12,16,19,23
71:18 73:16,19 74:9
74:14,15 75:2,3,19
75:20,24,25 80:6
82:10 84:4,7,9,13
85:6 89:8 106:11,15
106:23 107:7,22
109:19 110:18
111:10 113:25
114:18,21 117:20
118:13 120:22
121:16,17,21
122:14,16,25
123:24 124:5,8,15
125:3,7 140:11,17
142:17 144:7
147:12,14 168:19
170:7,21,23,24
171:8 173:4,15,24
174:15,24,25
175:24 176:11
177:3,11 178:25
179:4 181:5,7,17
182:4,15,20 183:22
184:5,18 185:6
186:5,17,23 188:21
189:2,6 191:13
192:8,13,16,20,23
192:23 193:11
205:10,19 206:6,9

206:21 207:6 212:2
223:8,22 224:14,19
232:6 234:5,6,8,11
234:12,15,16,17,20
235:17,18 236:11
236:14,21,23,23
237:3,9,10,13,20,24
238:14,15,21,23
239:3,9,11,16,19
247:20,23 308:22
309:3,15,18 314:16
314:19,22 315:15
315:16 316:9
319:11,16 320:11
320:14,17 321:2
322:22 323:6,11
**occasion (1)**
77:14
**occur (4)**
79:2 88:6 91:5 198:4
**occurred (6)**
76:21 87:15 90:7
122:20 286:25
287:3
**occurs (1)**
303:22
**OCC's (12)**
29:4 30:13 31:5 36:20
36:24 75:9 142:20
220:20 222:18
223:19 232:8 237:7
**October (7)**
257:9 333:11,24
334:24 335:11
336:20 337:5
**offer (4)**
99:24 218:17,18
246:10
**offering (2)**
76:18 242:3
**offices (1)**
2:5
**offset (1)**
38:15
**offsetting (1)**
115:20
**oh (10)**
45:17 70:25 71:4
103:14 127:17
139:25 172:15
200:20 254:22
265:4
**okay (244)**
6:4,11,19,23 7:8,13

7:19,21,24 8:11,20
9:19 10:9,25 13:9
14:15 15:7 16:13
17:11,18 18:24 19:4
19:15,19 20:5 25:23
27:3,13 30:24 33:6
34:6,9 35:17,22
38:23 40:3 41:18
42:23 43:15 44:13
46:16 47:18,22 49:7
50:3,15,18 52:5
63:8 64:15 65:9,22
66:24 69:3 71:13
72:15 75:18 77:9
83:18 86:4 87:13
89:9 92:3 99:14
101:14 102:21
103:2,17 111:23
113:22 118:15
122:4,9,11 125:15
126:7 127:15,17,19
127:21 128:19
131:18 133:12
138:25 139:20,21
139:22,23 141:24
145:7 147:11
148:17 152:12
154:10 155:15
157:8,19 168:17
175:2 176:17
177:18 178:22
183:16 184:20
186:24 189:5
191:25 193:2 194:4
197:9 199:2 201:16
203:3,21 204:22
205:8 211:24 217:5
219:19 221:9
223:18 226:21
228:16 230:11
234:14,24 235:18
236:4 240:3 241:13
242:14,18 243:10
243:22 245:4,12,15
245:17,20,22,25
246:10 247:21
248:7,16 249:3,16
249:24 250:6,9
251:3,14,20 252:20
253:10,24 254:17
255:23 256:3,8,13
257:6,22 258:6,14
258:23 259:7,21
260:12 261:10

263:13,19,25
264:12,18 265:7,8
266:6,10 267:3
268:9 269:3 270:14
270:25 271:15,24
272:18 274:3,19,22
275:6 277:4,18
278:17 280:14
282:15 284:6,12
285:16 286:7 287:3
289:15 290:8,16,23
291:15,19 292:4
293:11 295:9 296:3
296:21 297:15,16
298:4,7 299:2
300:18 301:6 302:4
303:20 304:4,12
306:9 307:10,17
308:6 309:7,18
319:13,20 321:24
322:19 330:21
331:24 332:8,15,21
333:5 337:20 338:5
339:6,15 340:5
**OLIVER (1)**
4:4
**omitted (1)**
334:2
**omnibus (3)**
332:25 333:7 335:14
**once (2)**
100:24 315:11
**ones (3)**
19:13,13 296:19
**ongoing (3)**
109:3 150:18 294:17
**online (2)**
111:22 286:13
**oOo (1)**
340:11
**Op (2)**
243:7 253:16
**open (16)**
84:3,6,8 103:8 121:22
122:25 124:6 125:6
125:12,23,25 128:6
134:12 140:12
156:14 170:14
**opened (3)**
132:6,20 302:22
**opening (3)**
325:19 326:20 327:7
**Open-ended (1)**
210:14

**operate (2)**
99:25 200:9
**operating (3)**
271:5 272:4,20
**Operational (1)**
253:17
**operations (3)**
244:2,22 273:2
**opinion (85)**
68:24 69:5,9 88:12
95:4 115:14 119:22
132:24 137:3,13,21
137:21 139:4,8
193:6,19,23 195:16
196:4,6,8,16,22
197:2,18,18 204:20
205:8,18 207:2,4
212:13,21 213:9,10
213:11,18,25 214:2
224:12 227:21
228:4 232:14 233:3
233:15 246:11
248:2 269:2,8,23
270:3,11,20,23
273:8,15 274:19
276:16 284:7 287:4
287:19,24 291:20
297:18 308:9,15
309:15,17 311:16
312:6,10,13 313:12
314:6 318:17 319:8
322:12 323:18
324:6 326:12
327:10 328:23
331:11 332:22
337:25
**opinions (10)**
7:8 63:23 92:7 93:4
224:10 242:3
252:13 256:18
258:24 276:24
**opportunity (1)**
14:24
**opposed (10)**
6:13,15 14:6 49:19
50:6 133:22 193:25
210:5 268:6 334:11
**Opposition (1)**
121:7
**optimally (1)**
103:5
**option (8)**
90:10 117:15 131:13
152:3,4,23 153:2

176:11
**options (41)**
9:10 12:5 13:14,17,19
14:3 15:5,8 20:22
37:13,24 38:3 45:18
48:13,19 52:3 53:14
86:21 88:21 90:21
97:13 98:21,24
113:24 114:20
116:5 147:12,15,21
149:9,13,13 152:5
173:8 187:20
191:23 192:2,7
201:8 220:19
222:17
**order (12)**
62:24 75:20 103:4
104:6 109:11
152:14 156:2
157:23 163:18
168:23 190:24
217:6
**Orders (2)**
121:5,9
**ordinary (2)**
325:25 339:8
**org (4)**
27:16 75:17 175:6
311:21
**organization (5)**
72:16 75:5 170:14
199:18 200:12
**organizations (7)**
76:5 125:5 168:21
170:5 212:3 232:3
255:4
**orgs (1)**
191:12
**original (19)**
65:18 241:6,7 257:9
274:4,6,11,25
276:17 300:20
304:13 306:14
308:24 328:19,24
332:8 334:11
336:23 338:16
**originally (1)**
287:11
**outcome (1)**
341:17
**outside (4)**
39:6 125:3,7,9
**overall (4)**
28:23 36:24 37:4

220:25
**overdraft (9)**
285:17,24 286:2,11
286:20 287:12,22
287:23 337:4
**overnight (1)**
288:13
**over-the (1)**
152:22
**over-the-counter (30)**
23:5 152:6,11,14,19
152:23,24 153:6,17
154:3,11 155:5,12
155:20,22 156:5,16
157:12,21 158:4,10
158:12,12,19,23
159:2,8 165:3,8,11
**over-the-counters (1)**
156:23
**owe (7)**
10:4 129:9,10,10
132:13 133:24
320:11
**owed (6)**
45:2,2 130:5 332:10
333:23 335:22
**owned (2)**
165:19 206:15
**Oxford (332)**
4:15 10:11 12:6 14:20
16:7 17:13,24 21:8
23:11,21 24:7 25:7
25:18,25 28:8,18
29:7,18 30:8,17
31:9,20 32:10 33:21
34:20 35:4,13 37:2
39:7 40:5,17,24
41:15 42:8 45:5,20
46:16 48:20 49:22
50:8 51:17 52:4
53:15 54:20 55:13
55:22 56:16 57:7,17
58:6,11 59:23 61:5
62:9 64:2,13,16
65:3,11 67:11 68:10
69:8,10,25 73:3
74:17 75:10 77:2
78:16,20,24 79:9,17
80:3,8,15 81:5,16
81:24 82:16,24
83:23 85:15 86:11
88:13,25 89:14,22
89:25 90:24 91:9
94:3,21 95:8 96:9

Contains Highly Confidential Portions

96:24 97:16 98:7,23
104:24 105:11,23
108:3 109:13 111:3
111:15 112:6,13
113:10 115:2,21
116:17 117:4,11
118:8,20 119:6,16
120:4,16 122:4
123:18 124:17
125:20 126:15
129:23 130:9,13,21
131:2 132:2 135:5
136:3,15 138:15
139:9,16,21 140:3
140:20,23 142:12
143:15 144:8,22
145:7 148:12,21
149:5 150:9 151:10
151:16 152:20
153:14,21 154:4
155:6 156:6 157:4,8
158:2,17 159:9
160:11 161:4 162:5
162:23 163:10,20
166:10 167:2,13
168:3 170:17 172:9
173:17 174:7,18,22
175:14,22 176:9,19
177:7,14 179:17
181:9 182:9,24
183:25 184:12,16
184:20,23 185:8,21
186:8 187:4,14,22
188:22 189:10,22
191:3 192:4 193:7
194:15 195:2,21
196:10,21,23
197:14 198:14
199:3,22 201:4
202:15 204:14
205:13,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:10,21 222:10
223:2 224:2,16
225:5 226:7,16,21
227:2,19 228:12
229:13 230:14
231:9 232:17 233:5
233:19 234:19
237:11 238:17
239:12 240:3
243:17 244:5,15
245:5 246:13,21,25

247:15 251:17,23
252:4,7,15,18
257:10,19 259:10
261:3,10 263:9,15
265:23 266:13
267:25 270:7,21
272:11 273:18
276:11 277:14,18
277:23 278:5
279:23 280:14
283:21 287:5,9,20
289:2,11 294:22
299:2,14,18,23
300:2,7,11,18,24
301:7,10,17 302:4
302:12,18 303:21
304:4,7 305:7
308:10 309:16
310:11 312:3
313:13 317:10,12
318:18,20 321:4
322:15,20 325:10
326:24 327:16,22
329:5 337:17
o'clock (3)
270:9,10 271:22

_____

**P**

**P (4)**
3:3,3 4:2,2
**page (97)**
11:9 22:3 32:19 37:9
43:8,22 45:12,14,21
50:24 51:22,23 52:7
71:13 77:18,19
78:11 91:23,24 92:5
98:20 99:8 101:12
103:2,4,11,23
106:22 108:14
113:17,19 121:12
127:9,16,17 139:25
140:6,7 147:6
150:16,16,17,24
159:12 177:19,25
178:10,22 180:3
200:16,19 203:3,4,5
203:8,19,21 204:8
217:8,8,9 220:10
224:20 226:12
228:17 230:5
232:16 233:4,16,17
265:2,3,5 274:6
291:13,15 308:25
333:25 334:4 337:2

342:3,7 343:4,5,6,7
344:8,9,11,12,14,15
344:17,18,20,21,23
**pages (6)**
1:16 11:7 45:13
112:23 222:12
308:23
**paid (17)**
56:25 57:4 81:7 90:21
112:15 171:25
175:4,18 330:11,12
330:15,16,18,22,23
331:5,8
**PaineWebber (2)**
20:10 258:10
**paper (1)**
217:12
**papers (2)**
62:14 67:18
**paragraph (64)**
37:10 42:3 43:18,21
45:14,23 47:12 48:8
48:9 49:7 71:14,15
77:19 83:20,23,24
99:15,19 101:12,15
102:7 106:23
107:18 108:15
114:3 121:13
122:12 127:9,14,21
128:4 147:7,11
150:25 172:17
177:23 180:2 183:8
224:21 226:11,13
228:17 229:9,17
232:14,18 233:4
237:15 241:14,23
264:19,24 265:3
274:25 295:9 296:3
297:20 298:8 303:3
308:25 309:8 329:4
333:18 337:3
**paragraphs (17)**
47:25 48:3 99:10
113:20,23 121:25
122:6 123:7 127:12
127:19 274:5
297:11 306:13,14
308:23 328:19
330:3
**parameter (1)**
221:19
**parameters (1)**
221:6
**Pardon (1)**

51:3
**parent (2)**
96:4 106:4
**parenthetical (8)**
225:6,9 226:20,23
232:16 233:4,15,17
**Park (1)**
4:13
**part (36)**
36:23 38:10 39:25
41:10,25 49:24,25
98:10 126:21
155:19 176:16
190:3 197:18 200:8
201:10,13 202:3,16
202:17 222:15
223:6 228:5,22
232:24 239:7 240:2
243:3 246:16,18
247:22 254:11
258:11 260:4
295:13 296:7 306:8
**partial (2)**
296:10 303:4
**PARTIALLY (1)**
1:12
**particular (9)**
19:9 21:20 33:2 72:20
144:9 164:8 217:15
242:10 280:24
**particularly (3)**
32:7 35:2 65:7
**parties (25)**
39:11 63:24 69:21
72:19,25 74:8
104:21 105:7
119:21 120:9
123:11 191:19
207:18 208:17
209:8,20 210:3
217:19 218:5 220:6
228:9 229:9,18
239:8 341:15
**partly (2)**
159:16,18
**parts (3)**
201:6 237:16 311:17
**party (7)**
42:12 88:3 105:19,20
239:19 319:6
341:19
**pay (19)**
20:18 29:11 48:22
87:25 108:17 112:3

112:9,18,21 113:7
113:13 116:7,9
135:18,20 137:8
171:12 215:24
338:2
**payable (4)**
223:7 330:20 333:3
335:15
**payables (2)**
49:6 331:13
**paying (5)**
113:8 116:23 138:5
171:23 337:15
**payment (5)**
52:11 90:17 109:3
239:5 284:21
**payments (1)**
52:9
**pays (1)**
87:22
**pay-back (2)**
88:17,18
**pay/collect (1)**
91:4
**pay/collects (1)**
88:17
**Pearl (1)**
3:13
**Peck (1)**
77:12
**people (26)**
9:13 23:16 24:2,11
58:18 62:14 112:25
113:4 136:7 137:8
155:21 157:14
161:7 184:4 197:5
214:4,6,17 243:19
245:10 254:15
287:17 312:19
322:7,7 334:17
**percent (4)**
28:12 29:13,15 51:11
**perfectly (1)**
231:6
**perform (3)**
44:2 250:23 251:14
**performed (9)**
44:3 251:22 252:12
266:11 267:4 296:8
296:10 297:18
303:4
**performing (3)**
258:3 277:21 296:23
**period (14)**

Contains Highly Confidential Portions

64:8 97:9 102:20
147:25 148:15,19
149:15 183:5
214:14 266:19,22
266:23,24 282:3
**person (4)**
80:16 162:12 254:3
276:23
**personal (1)**
68:6
**personally (2)**
75:6 253:24
**personnel (2)**
329:12 331:22
**persons (1)**
278:2
**perspective (2)**
27:22 103:6
**pertaining (1)**
133:5
**pertains (2)**
339:22,25
**Peter (1)**
329:24
**Phase (1)**
28:13
**phrase (9)**
33:19 206:23 227:12
227:14,16,17
229:10,18 334:2
**picked (1)**
292:19
**piece (3)**
59:6 91:4 217:12
**pieces (2)**
59:7 112:20
**Pineiro (1)**
5:7
**place (13)**
10:2 13:6 36:13 68:2
68:9 77:12 82:8
87:8 93:17 125:22
162:18 169:7 248:7
**placed (6)**
149:17 248:4,10,11
248:13 259:16
**places (1)**
202:6
**plans (1)**
192:17
**play (1)**
149:22
**Plaza (2)**
3:22 4:13

**pleadings (2)**
41:13,22
**please (16)**
5:11 6:17,21 32:19
50:25 51:16 54:11
77:10 89:2 91:23
113:18 229:5
299:24 300:3
323:15 328:5
**pledged (5)**
40:11,15 220:18
222:17 223:21
**plenty (2)**
93:24 170:2
**plus (1)**
112:18
**point (65)**
6:16 13:12 15:10
21:15 26:7 39:23
63:18 67:20 73:12
73:22,25 81:14 82:4
87:10,12 88:7 90:11
97:24 101:6 105:17
116:18,20 119:19
124:23 138:2,9,10
177:23 194:11
196:6 197:4 198:19
199:24 209:15
210:20,21 264:21
265:9 269:13 270:2
272:15 282:13
283:16 289:22
294:12 298:24
309:10 313:19,20
313:24 315:9 318:3
318:11,19,22,25
320:14,19 321:13
322:22 331:13
333:3 334:13 336:5
338:4
**pointed (1)**
212:9
**pointing (1)**
303:15
**points (4)**
26:21 208:4 273:11
285:9
**policy (1)**
307:11
**portfolio (45)**
14:5 19:23 38:10,17
114:15 115:5,6,25
116:2 150:12 151:5
151:9,15,23 152:3,5

153:3,12,18 154:2,3
154:18 155:3,24
156:9,11,19 157:18
157:23 162:13
163:12,13,14,19
164:8,15,21,24,25
165:7 167:16,22
169:6 185:15
201:14
**portfolios (1)**
163:15
**portion (19)**
9:23 15:11 22:2 48:9
51:5,7 77:14 97:18
97:19 150:4 167:12
202:13 247:22,24
291:15 303:6
305:17 326:11
328:5
**portions (2)**
291:23 305:19
**posed (1)**
111:19
**posing (1)**
193:25
**position (42)**
23:10 24:21 27:17
61:2,7 103:24 105:7
138:3 149:20 150:6
152:3,14,15,16,17
152:23,25 153:25
154:11,12,14 159:4
159:7,8,11 160:4,19
163:12 164:16
165:17,18 171:7
206:20 249:19
250:7,9 253:12
268:11,22 311:24
326:17 327:4
**positions (245)**
14:16 15:6,8 20:2,3
21:21 32:13 33:13
36:16 38:14,23,24
38:25 39:2,5,15
40:2,3,15 41:25
42:7,17 44:8,17,23
45:4,11,16,18,25
47:15,18 48:7,12
52:10,23 53:14,23
54:3,10,14 57:5,15
57:22,24 58:22 59:4
60:8,12,13,14,17,21
60:22 61:25 74:19
75:12 76:2,6,9,12

76:14,25 77:25
78:15 80:6,9,11,13
80:21,22,24 81:14
81:18,19,22 82:21
82:23 85:19 86:10
86:25 88:23,24 89:5
89:6,10 90:4 95:13
96:13 97:13,13 98:6
109:12 113:24
115:7,8,14 116:3,4
116:5,6 117:19,24
118:2,7,12,17,19,23
119:4,5 120:3,6,8
120:20 121:18,22
122:16,25 123:25
124:6,9 125:6,25
126:10,19,22 128:6
131:20,24 132:7,11
133:3 134:15,22
136:17,20,24
137:18 138:17,21
140:12 143:19,20
143:25 144:4,6,13
147:24 148:10,14
149:3,4,8,13,14,16
149:25 150:21
151:3,4,12,13,14,21
151:23 152:6,8
153:12 155:17,19
156:13,16,16,23
157:2,3,5,7,16,22
158:7,9,14 159:2
162:3,14 163:7,7,8
164:11,12 165:2,3,9
165:12 167:8,15,17
167:18,24 168:2
171:5,6 178:24,25
180:7,8,15,17
181:15 182:14,14
183:19,21 184:8,18
185:2,6 186:4,13,19
186:25 187:2,3,12
187:19,20 188:17
190:12,15,17,19,25
191:9,9,11,14,15
222:25 224:15
236:13 252:20,23
254:7
**positive (2)**
38:4,8
**positives (1)**
115:20
**possession (1)**
169:3

76:14,25 77:25
**possibility (1)**
158:25
**possible (29)**
31:15,24 32:3,12
36:14 49:16 50:3
55:25 63:24 103:20
104:14 151:20
153:20,22 166:25
167:7,14,20 168:9
168:12,15 177:12
184:6 215:2 217:18
218:16 221:22
230:24,25
**possibly (12)**
26:5 38:15 41:9 42:16
59:24 85:24 93:18
164:2 201:14
255:21 322:8 331:7
**post (7)**
168:19 169:9,13,16
169:16,19,25
**posted (59)**
31:19 32:2 75:19,24
107:23 108:2
109:20,23 110:19
110:22 111:11
114:16,21 115:10
115:16 116:8,16
117:2 119:3,24
123:14 142:24
166:24 167:11,23
169:11,21 170:3,15
170:23 175:11
181:7 183:20
185:19 186:3 187:3
190:22 198:13
199:18 200:3 205:9
205:19 206:5,12
207:6,12 213:21
225:10,11 227:6
228:14 231:13
232:10,13 233:25
234:2,3,5,15
**postgraduate (2)**
249:5,5
**posting (1)**
200:10
**postponed (2)**
73:12,15
**potential (9)**
30:20 82:9 99:23
101:6 112:4,22
131:9 142:18
183:11

Contains Highly Confidential Portions

**potentially (5)**
179:11 180:25 181:18
182:6 183:12
**power (1)**
105:21
**powers (2)**
108:25 172:24
**practice (5)**
170:13 243:13 273:21
273:21,23
**practices (5)**
241:19 242:15 243:23
244:19 253:13
**precisely (1)**
47:18
**preliminary (1)**
215:12
**premarked (2)**
70:9 247:8
**premium (9)**
108:17 112:3,11,12
112:15,21 113:7,8
113:13
**preparation (7)**
7:22,25 8:24 9:10
12:20 71:7 243:5
**prepare (2)**
7:14 192:7
**prepared (8)**
63:9,22 70:20,24 71:2
83:11 102:23 266:4
**preparers (1)**
329:13
**preparing (15)**
43:5 50:16 52:16
65:14 70:15 71:8,20
83:7 100:7,7 106:25
146:17,20 168:25
245:10
**prescribes (1)**
164:23
**present (2)**
64:25 65:22
**presented (1)**
54:16
**preservation (1)**
79:7
**preserve (5)**
79:12 109:12 190:12
190:19,25
**preserved (1)**
79:15
**preserving (1)**
191:11

**president (2)**
178:14 255:9
**pressing (1)**
163:17
**presume (1)**
48:8
**pretty (1)**
94:8
**prevent (1)**
337:14
**preventing (1)**
315:4
**previous (1)**
309:21
**price (9)**
15:14,15 20:20 85:22
112:18 113:16
188:6,14 216:20
**pricing (1)**
30:23
**primarily (2)**
13:16 137:10
**prime (7)**
13:13 14:11,18 15:20
96:15 258:15 274:8
**Principal (1)**
253:17
**principle (1)**
309:14
**print (1)**
162:21
**prior (42)**
18:20 58:16 59:13
67:15,23 104:13
123:11 146:23
148:10 195:11
202:23 203:19
215:13 245:22
254:6 258:25 266:5
266:11,20 267:4
270:4,19 310:23
311:3,13,25 312:7
316:8 319:5,17
324:21 325:12
326:6,8,18,20 327:5
327:6 335:18,25
336:9 339:17
**priorities (1)**
54:25
**priority (3)**
55:9,15 79:19
**private (2)**
241:16 310:9
**privilege (1)**

252:6
**privileged (2)**
252:4 276:10
**privileges (1)**
172:24
**proactive (1)**
189:15
**probably (26)**
16:8 17:10 18:22 33:3
33:4 41:23 45:20
52:18,19 56:18
68:21 78:7 98:3
145:5 157:16 164:3
165:13,22 184:3
198:22 211:6
225:15 257:13
258:20 298:23
310:24
**probing (1)**
193:21
**problem (2)**
96:3 183:2
**problems (3)**
25:16 27:4 95:19
**Procedure (1)**
341:21
**procedures (2)**
24:12 189:11
**proceeded (2)**
74:16,21
**proceeding (1)**
77:13
**proceedings (3)**
55:11 56:8 118:18
**process (20)**
18:25 19:5 21:3 36:21
49:18 50:5 162:2
172:3 245:10,11
268:16 294:18,21
294:24 295:2,3
311:14 316:25
337:3 337:24
**processes (1)**
24:12
**processing (2)**
244:3,22
**produced (3)**
261:19 280:15 302:20
**producing (1)**
21:13
**product (1)**
21:4
**PRODUCTION (1)**
343:3

**professional (5)**
2:8 252:9,23 254:19
255:3
**professionals (5)**
12:25 17:2 18:14
262:6,8
**proffered (1)**
252:13
**profile (8)**
23:10,15,19 97:12
98:5 162:13 163:18
165:6
**profit (2)**
59:3 88:24
**profitable (2)**
59:6,7
**program (2)**
101:16 148:25
**programmer (1)**
245:3
**progress (1)**
338:19
**proof (2)**
336:3,4
**proper (1)**
79:25
**properly (7)**
21:11,14,18 81:7
94:25 286:5,11
**property (66)**
129:19,21 133:2,4,12
133:14,17 135:4
220:18 222:24,24
223:24 224:3,13,24
225:4,18,19,22,25
226:3,4,24,25 227:3
227:5,6,10,11,13,18
228:2,14,18 229:2
229:10,11,19,20
230:6 231:24 232:6
232:7,10,12 233:18
233:21,22,24 234:6
234:11,16,20
241:19,20 242:24
243:24 244:20
253:14 259:3,4,5,7
259:12 292:2
328:20
**propose (1)**
192:12
**proposed (4)**
78:23 79:21 104:2
332:9
**proprietary (50)**

13:17,18 14:5,16 15:5
15:13 19:23,25
20:22 24:6 38:3,3
76:25 80:6,20
106:17,18 107:5,13
113:24 114:20
120:6,23 121:18
122:16 123:17,21
123:23,23 125:2,23
126:12 144:7
150:19 151:9
183:19 188:18
190:15,17 191:8,14
202:3,16 206:21,24
224:14 291:17,25
292:3 335:13
**propriety (1)**
337:21
**prospect (1)**
281:9
**protect (3)**
10:13 129:5 167:19
**protected (3)**
131:22 132:12 186:20
**protecting (2)**
79:3 239:3
**protection (23)**
9:22 55:6 117:7
126:20,25 128:21
130:16 135:3
166:24 167:11,24
241:18,21 242:24
243:25 251:9 256:7
266:5,7 282:23
291:9 316:5 342:22
**prove (1)**
334:15
**proven (2)**
34:24 334:23
**proves (1)**
334:21
**provide (9)**
8:12 53:19 100:21
163:5 171:17 216:6
252:9 257:17 302:6
**provided (14)**
52:8 99:24 127:3
163:3 207:2 219:11
251:6,7 262:6
275:10 281:4,15
331:21,25
**providing (5)**
41:2 56:20 100:18
117:7 193:19

Contains Highly Confidential Portions

**provision (1)**
174:12
**proxy (3)**
85:23 86:5 87:4
**prudent (6)**
172:5 211:16 238:14
239:11,14,16
**public (8)**
2:11 5:16 12:13,14
64:9 241:15 251:11
341:6
**publications (1)**
257:4
**published (1)**
35:25
**pull (2)**
46:15 99:5
**purchase (19)**
13:16 25:14 39:11
41:11 63:3 104:18
197:6 200:15 203:6
207:16,21 212:25
216:7 217:2 238:6
247:2 258:21 315:7
315:24
**purchased (17)**
16:24 152:13 197:8
203:7,10 204:9,11
207:24 209:2
210:25 211:13
213:14,17 224:22
246:4 258:15,18
**purchaser (11)**
100:22 108:16,23
109:4,5 151:2
197:19 216:25
228:21,24 232:24
**purchases (1)**
258:20
**purchasing (11)**
116:6 155:9 159:15
171:20,21 172:13
213:4,5,24 214:3
217:4
**purely (1)**
247:10
**purple (1)**
248:19
**purported (1)**
261:19
**purporting (4)**
242:25 244:2,21
246:10
**purpose (3)**

48:24 265:9 309:10
**purposes (5)**
21:12,12 182:2 285:8
313:2
**pursuant (3)**
121:5 127:20 341:20
**pushed (1)**
73:22
**put (35)**
149:23 150:12 152:2
154:17 206:13
210:11,19 211:7
215:18 216:20
223:8 224:18 241:2
259:8 267:20 274:5
274:18 282:24
299:16 308:13
310:18,20 313:4
315:13 319:9 320:3
320:4 321:16,19
324:16 326:14
327:2 328:11
332:17 334:9
**puts (2)**
32:15 91:3
**putting (10)**
143:18 242:11,14,18
256:17 307:24
308:14 317:15
320:21 334:19
**P&L (1)**
53:3

_____
**Q**

**qualified (5)**
160:7,24,25,25
263:25
**qualifies (1)**
8:21
**qualify (1)**
98:5
**qualities (1)**
10:23
**quant (1)**
97:2
**quantifiable (1)**
97:10
**quantify (2)**
145:3 197:19
**quantity (1)**
134:14
**quants (1)**
23:16
**question (105)**

6:8 14:23 30:9 35:6
40:13 51:19 52:6
54:12 64:14,19 65:7
71:5 79:10 80:10,11
85:16 89:3 103:3,13
103:19 109:17
110:15,16 111:4,7
111:18,19,23,25
115:3 128:20 139:2
139:3 143:23
151:17,19 152:21
153:15 154:10
163:23 169:15
170:18,20 173:18
179:5 180:4 181:3
182:3,12,17 183:3
184:13,21 188:24
189:4 192:9,10,12
195:4,4,6,8,9,10,11
195:13 205:17
216:23 220:12,22
221:9,20 222:22
226:17,19 229:16
232:5 234:10,10,13
244:16 246:15,21
251:18,24 256:3
261:4 262:2 270:17
277:3,15,25 283:22
285:12 287:15,16
287:16 294:23
297:6 307:15 312:5
323:15 324:9
326:25 327:21
**questioning (1)**
246:23
**questions (12)**
6:6,21 64:10 113:19
193:18,25,25 247:6
276:20,21 299:20
340:7
**question?because (1)**
35:5
**quick (2)**
12:22 302:24
**quicker (1)**
247:5
**quickly (3)**
93:11,22 144:25
**quickness (1)**
92:12
**QUINN (1)**
4:4

_____
**R**

**R (2)**
3:3 4:2
**raise (3)**
29:12,14 237:6
**ran (1)**
20:24
**range (3)**
98:3 256:23 305:14
**ranges (1)**
305:13
**rank (1)**
17:12
**rate (1)**
17:21
**rateably (1)**
55:16
**rates (2)**
42:16 89:20
**rational (46)**
69:6 82:2 88:20
107:24 109:11,21
110:20 111:12
113:7 114:4 115:18
116:24 118:15,21
119:2,14 120:14,17
142:4 143:9 177:20
184:17 185:5 190:8
190:23 193:20
194:5,6,7,8,9,10,13
194:19,21 195:17
196:3,5,11,16 197:2
197:10,19,21
198:11,16
**rationale (1)**
36:22
**reach (1)**
327:23
**reached (2)**
325:6 326:19
**react (1)**
196:7
**read (43)**
41:4,22 42:20 50:17
51:16,19 52:5,16,18
52:19 63:3,4,4,5
67:17 77:8 83:19
99:10,11 100:6,9
101:14 104:20
105:2,3 109:15
111:20 121:25
122:6,9 127:15,19
184:24 219:14,23
219:23,24 226:9
229:5,24 230:13

297:11,14
**reading (5)**
42:19 52:25 103:10
111:5 112:23 183:7
219:20 222:12
**reads (3)**
217:10 228:18 232:22
**ready (1)**
70:11
**realizable (1)**
319:10
**realize (3)**
51:3 174:6 245:8
**realized (1)**
170:22
**really (7)**
25:2 151:18 181:22
194:13 209:13
225:7 227:6
**realm (3)**
120:12 154:23 158:25
**Realtime (1)**
2:10
**reap (1)**
109:4
**reason (30)**
39:19,22 53:21,25
55:25 57:2 78:9
142:17,21 147:17
148:4 158:4 167:7
168:10 188:20
189:7 190:10
316:13 344:5,8,9,11
344:12,14,15,17,18
344:20,21,23
**reasonable (2)**
113:6 153:10
**reasoning (1)**
323:22
**reasons (2)**
219:4 339:23
**rebuttal (27)**
240:15 241:12,23
264:18 274:16
276:18 292:5
294:14 295:6,10
296:3 297:20 298:9
299:24 300:12
303:3,6 304:14,15
306:12 308:23
309:9 330:3,6
332:13 338:22
342:20
**recalculation (9)**

296:10,17,20
297:19 298:8,10
303:4 326:22 327:8
**recall (17)**
39:10,14 68:24 72:22
78:5 85:7 106:14
140:13 141:8
146:20 206:23
213:10 221:25
222:3,4 257:13
322:3
**receipt (1)**
172:19
**receipts (1)**
288:14
**receivable (16)**
48:14,17,21 50:14
52:12 53:2,6 128:16
133:21 134:8,18
206:17 310:19
311:21,22 325:21
**receivables (4)**
49:5 53:10 57:11
311:18
**receive (17)**
43:25 58:19 79:4
130:17,18 135:2
228:24 229:6
236:21 238:12,22
249:8 263:20
304:22 313:4 316:4
328:10
**received (6)**
37:22 81:8,10 99:20
135:4 279:9
**receiving (3)**
58:20 116:22 210:13
**recess (8)**
46:20 77:10 91:17
145:11 199:10
240:8 299:10 338:9
**recession (12)**
136:12,25 137:4,8,9,9
137:14,15,22 138:4
139:5,13
**recharacterize (1)**
271:4
**recipient (2)**
236:20 237:5
**reclassified (1)**
298:22
**recognize (3)**
42:25 83:5 224:6
**recognized (1)**

52:13
**recognizes (1)**
37:11
**recollection (2)**
78:6 100:15
**recommendation (1)**
104:8
**reconcile (1)**
330:14
**record (37)**
12:7 46:19,23 48:21
53:12 90:9 91:13,16
91:20 111:5 140:23
145:10 146:7 148:7
199:9,13 226:22
238:20 239:19,22
240:4,7,20 241:4
251:11 252:17
299:6,9,13,15,16
304:3 338:8,11
340:10 341:12
344:6
**recorded (6)**
21:18 37:23 51:13
52:25 90:5,6
**records (4)**
13:5 25:16 213:7
333:3
**recourse (9)**
172:22 173:15 174:2
176:18,25 177:2,5
177:10,13
**recover (2)**
56:4 118:6
**redacted (2)**
305:17,19
**reducing (1)**
317:16
**REED (1)**
4:11
**refer (6)**
227:22 232:25 285:16
306:15 309:19
328:20
**reference (18)**
45:12 127:24 180:22
183:4 209:7 210:2
211:3,16,19 212:14
213:13 223:5
225:24 226:2,4,23
227:17 274:24
**referenced (4)**
42:2 43:17 202:10
299:19

**references (4)**
32:22 207:8 208:18
225:21
**referred (6)**
232:19 274:8 300:8
301:11 304:12
336:22
**referring (36)**
31:2 47:19 83:22 92:8
125:8 127:25 161:5
179:22 180:4,10,11
180:12,17 181:14
181:15,24 182:21
203:18 223:13
230:2,21 231:6
233:9,10,18 244:7
253:5 262:9 276:3
278:10 279:24
282:6 296:4 298:16
298:19 307:5
**reflected (1)**
252:24
**refresh (2)**
78:5 100:14
**refuse (1)**
28:15
**refused (5)**
35:23 36:6 60:7,10
61:16
**regard (4)**
26:13 28:21 61:8
173:6
**regarding (16)**
9:4,5,13 65:12,12
100:10 239:4
241:20 243:23
244:19 246:3 251:9
253:13 285:17
292:6 339:18
**regardless (2)**
44:18 142:20
**regards (1)**
284:24
**registered (3)**
2:8,9 241:18 242:23
341:5
**regular (1)**
254:12
**regulated (1)**
27:15
**regulation (2)**
290:17 337:13
**regulations (2)**
26:19 128:8

**regulator (1)**
27:15
**regulators (5)**
9:3,17 26:25 253:20
269:25
**regulatory (7)**
16:20 18:5 20:13,24
20:25 242:12 250:8
**reimburse (1)**
118:18
**rejecting (1)**
217:11
**relate (3)**
7:9 9:14 252:12
**related (5)**
40:22 41:13 158:13
335:12 341:15
**related-costs (1)**
52:11
**relates (5)**
30:15 126:18 247:12
247:23 295:6
**relating (8)**
37:12 48:12 247:7
256:14 274:7
292:10 338:15,20
**relation (9)**
43:17 65:20 138:16
180:4,20 247:25
248:9 278:18,21
**relationship (5)**
28:23 149:2 156:15
158:16,20
**relationships (2)**
157:20,24
**relative (4)**
17:5,6 41:20 55:11
**relaying (1)**
73:5
**relevance (3)**
31:21 32:16 283:4
**relevant (7)**
138:10 264:21 265:9
265:14,21 274:24
309:9
**reliance (9)**
8:8 219:17 246:18
248:4,7,10,11,13
302:19
**relied (8)**
8:3 219:15 276:13,15
302:8 304:6,8,10
**Relief (3)**
121:4,6 342:12

**relieve (1)**
83:3
**rely (7)**
224:9 261:17,19
276:23 281:9
291:19 304:25
**relying (2)**
281:11 326:12
**remained (1)**
49:13
**remedies (1)**
172:24
**remember (19)**
8:5,15 15:9,12 16:9
23:6 41:3 70:17
87:3 94:25 98:2
107:3 219:20,22,23
257:14 260:12,16
260:17
**remind (1)**
67:6
**remove (1)**
334:18
**removed (4)**
282:20,25 332:17
333:4
**remunerated (1)**
118:25
**repeat (4)**
35:5 49:21,24 52:5
**rephrase (4)**
6:22 64:19 89:2
170:19
**replicate (1)**
150:13
**repo (10)**
38:19 39:6 40:11,16
40:23 41:7,14,20
117:14 206:17
**report (96)**
6:25 7:5,9,25 8:10,17
10:7 32:17 37:10
42:3 43:5,18 45:9
45:14 47:13 50:16
52:17 57:13 62:19
63:9,23 68:22,25
70:20 71:8 83:11
91:23 98:20 100:8,9
108:14 113:18
120:5 139:25
146:24 150:15
159:13 165:6,9
177:19 197:9 213:9
213:11 225:7

Contains Highly Confidential Portions

240:15 241:12,23
245:10 251:6
260:21,25 261:5,21
264:18 274:4,7,11
274:16 276:19
277:6 279:19,24,25
280:5,13,17,19,20
281:8 285:16,19
287:10 292:5
294:14 295:7,8,10
297:20 298:9
299:24 300:13
302:22 303:7,9
306:13,14 308:23
308:24 309:22
330:5 332:13
333:24 337:6
338:22 342:8,20
**reported (2)**
1:23 334:3
**reporter (7)**
2:9,9,10,11 5:9,11
341:6
**Reporting (2)**
5:8,10
**reports (30)**
7:16 8:2,4,25 9:20,21
10:9 20:25 62:13
98:16 165:13
214:19 240:25
247:8 253:6,18,23
256:14 257:7
265:25 276:25
278:22 280:18,21
280:22 282:17
285:21 292:23
301:25 309:19
**represent (2)**
5:23 280:15
**representation (4)**
172:22 173:16 174:2
252:17
**represented (1)**
235:25
**representing (5)**
72:6,7 105:8 240:24
252:10
**reputation (1)**
24:18
**Reputational (1)**
24:16
**request (3)**
257:21 296:9 305:7
**requested (2)**

168:14 341:19
**requesting (2)**
296:20 303:16
**REQUESTS (1)**
343:3
**require (8)**
21:7 156:12 196:8
232:3 290:17
319:14 327:8
333:17
**required (45)**
10:10,13 98:8 121:16
121:21 122:15,24
124:5,8,15 125:4,16
125:25 126:10,14
129:4,12,14,15,17
130:4 135:14
140:11 142:25
196:17 244:8
249:12 263:7 267:7
267:12,22 269:9,11
269:14,17 271:18
272:22 284:3
290:12,15 293:4,13
293:17 317:23
339:9
**requirement (34)**
10:19 28:12,13 33:10
34:17 35:11 36:25
84:3,12,21 86:4,17
129:25 130:3,4
131:10 141:9,21
143:10,22,24 144:3
186:2 249:15
263:19,23 264:3,6
266:4 298:10
307:14 317:17
325:13 326:22
**requirements (37)**
9:14 26:11,16,20 27:2
28:6 29:13 30:15
31:4 32:9 35:25
36:17 83:15,21
85:14 124:8,13,22
126:18 130:12
138:6 140:17 142:6
142:9,16,21 143:4
143:13 144:19
168:22 170:16
200:11 208:14
212:7 242:12
284:12,19
**requires (4)**
9:24,24 10:19 319:4

**reran (1)**
303:18
**reread (1)**
7:16
**rerun (3)**
303:9,12,16
**research (2)**
297:23 305:22
**researching (1)**
294:9
**reserve (50)**
9:11 10:19 26:17
243:20 244:4,7,10
244:23 247:12,14
253:21,25 259:2,9
259:14,17,18,22
260:4,5,19 263:2
265:10 266:4
267:22 271:6
289:17 290:10,18
290:21 291:22
292:15 293:5,13,24
296:11 297:19
302:10 303:4
307:19,25 309:4,11
310:15 313:2 314:2
314:14 331:20
334:3 337:16
**Reserves (2)**
291:10 342:22
**resolution (1)**
120:14
**respect (23)**
15:24 28:21 40:10,15
42:6 44:4 45:15
55:2 61:3 68:5,19
93:6 172:25 173:3,4
173:7 199:19
224:14 236:14,17
236:23 237:10
326:10
**respectively (1)**
128:10
**respects (3)**
10:12 12:25 14:3
**responding (1)**
236:20
**responds (1)**
179:7
**response (4)**
103:19 104:13 181:3
299:19
**responses (1)**
6:13

**responsibility (25)**
44:7 50:12 53:8 57:6
57:22,24 58:2,21
59:9 60:7,10 61:17
87:13 118:2,12,16
120:2 130:11 232:9
232:11 241:17
242:23 253:19
336:14,15
**responsible (9)**
8:24 9:10 13:3 24:3
24:11 44:16,20
129:8 331:22
**rest (3)**
34:23 37:7 226:9
**restrictions (2)**
314:18,21
**result (6)**
107:22 109:19 110:18
111:10 296:12
326:21
**resulted (2)**
78:2 89:12
**resumed (1)**
146:3
**resumé (5)**
248:18,21 252:25
253:3,3
**retained (2)**
8:11 252:8
**retroactive (2)**
326:22 327:8
**retroactively (1)**
326:5
**return (9)**
133:18 171:22,24
228:8 232:9,11
281:2 319:12
328:11
**revealed (1)**
296:12
**revenue (1)**
16:18
**revenues (1)**
113:2
**reverse (1)**
206:17
**review (58)**
7:24 12:3,22,22 16:17
18:3,10 19:9 25:21
25:24 32:20 43:4
48:3 50:15 59:21,24
60:2 62:18,20,24
66:22 70:10,12,14

71:6 77:14 83:7,10
99:13 103:3,16
105:16 113:21
122:3,8 127:6,11,18
147:7,9 168:17
235:5,7,8 243:8
248:5,14 285:23
296:7 297:13
301:18,24 302:7,19
304:9 306:3 323:21
341:19
**reviewed (30)**
8:6 13:11 16:15,16,19
16:25 18:4,4,14
62:20,22 70:19,23
71:2,8 76:13 77:16
169:2 206:25
224:11 246:17
275:14 279:15
286:20 293:7
301:22 307:2
326:10 329:12
337:23
**reviewing (11)**
10:4 13:21 17:22 20:8
39:10 59:15 66:18
93:16 255:21 285:8
293:8
**reviews (2)**
9:7 11:2
**revoked (3)**
285:4,13,14
**reward (1)**
58:20
**rewards (3)**
58:19 160:3,23
**re-read (1)**
205:17
**rich (1)**
221:5
**rid (1)**
106:9
**right (66)**
7:6 21:17 52:19 66:23
74:6,7 75:11,16
82:15 89:7,8,9,13
96:23 106:14 107:2
109:12 111:2
113:25 120:3
123:16 127:13
133:15 134:16
135:21 141:6
142:25 174:6 176:8
186:15 188:15

189:3 195:8 207:2
207:20 211:23
220:8 222:4,19
226:6 232:7 242:21
245:7 249:16
250:19 253:10
256:15 258:23
292:9 299:22,25
300:22 301:14
307:6 308:21
312:15 313:3
315:11 316:3,7,15
321:18 322:11
323:17 335:23
338:13
rights (14)
29:4 75:9 88:23
172:23 173:7,14
220:17 311:9,22,25
313:10 318:7,23
320:15
RISC (10)
245:20 328:25 329:6
329:12 330:5 331:2
331:9,16,21,22
risk (92)
23:9,14,15,19,25 24:2
24:5,9,10,12,16,18
25:2,3 35:2 45:15
56:9,11 57:14,20
58:9,15,18,25 59:7
96:7,11,12,22,23,25
97:3,12 98:5,11,12
98:14,15,16 134:25
135:3,25 136:4,12
136:16 137:25
138:7,20 142:9,18
142:19 143:12
145:2 147:22,24
148:9,16,18 150:18
158:7 160:2,22
161:9,10,13,19,23
162:2,7,10,12 163:3
163:6,9,18 164:2,8
164:15,17 165:6,16
165:24 166:18,21
166:23 167:24
181:8 186:24 187:7
189:25 197:20
217:10
risks (6)
24:13 97:9 137:23
138:11 139:7
167:12

risky (9)
57:18 96:14,16,18,21
97:4,4,5,6
risk-manage (1)
148:14
RMR (1)
1:24
Robert (3)
297:4,7 342:24
role (3)
20:15 21:7 178:20
roll (1)
149:6
Romain (6)
50:21 51:10,23 52:9
53:16 342:10
Romain's (3)
50:15,23 51:20
Rosen (3)
71:25 72:2 73:6
rough (1)
66:15
roughly (4)
77:21 302:11
RPR (1)
1:24
rule (32)
32:22 33:2,9 34:7
121:7 244:8 255:15
255:25 258:25
259:8,23 262:25
264:13 267:11,16
267:18,20,21 268:4
269:15,17 271:24
291:10 311:16
319:4 326:11,13
329:2 339:21
341:20 342:21,23
rules (24)
6:5 9:23 10:8,10
26:19 55:6 241:17
241:21 242:22
243:2,8,9,25 244:21
248:6 253:15 256:6
256:7 264:15
320:23 337:18
339:16,18,24
running (1)
273:2
R-I-S-C (1)
245:20

———— S ————

S (5)

1:24 2:7 3:3 4:2 341:5
sake (1)
110:8
sale (34)
36:22 43:23 77:14
78:23,25 79:22 99:6
101:4,17 102:5,8
103:25 104:19
106:8 121:5,9
123:12 173:13,22
174:4,10 175:9,17
175:24 183:7 193:3
196:12 197:6 217:5
220:15 224:18
320:19 323:8 324:2
sales (1)
188:13
sat (2)
246:6,22
satisfied (4)
168:23 335:18,25
336:9
satisfy (4)
30:21 55:18 170:16
200:11
Saturday (2)
270:13 324:18
save (1)
262:24
saw (20)
46:8 78:8 88:16 95:25
97:24 106:11 113:4
118:11 136:6
146:22,23 148:18
148:22 208:14
210:24 297:21
307:21 333:21
335:3 336:3
saying (46)
35:17 68:24 73:9
102:4 105:4 113:13
154:22 157:10
158:24 171:22
175:13 181:2
183:11 188:24
200:20 210:5
218:12 221:15
223:5 236:25
237:15 238:9 264:2
272:21 282:12
283:9,12 287:11
288:16 296:16
304:5 311:12
312:17 315:19,22

316:6 317:18 318:5
320:16 321:10,14
325:5 326:7 328:13
330:22 331:4
says (65)
43:8,22 49:8 51:10
52:9 53:17,20 57:18
61:12 71:17 78:17
83:25 99:15,19
100:17 101:10
102:7,17 103:18
104:7 106:23
107:10 121:14
122:17,21 124:2
126:7 128:5,13
147:12,20 150:17
172:17 180:24
182:5 203:10,25
207:22 208:24
220:12,16 221:9,12
221:12 222:20,22
224:23 226:11,13
227:3,13 228:24
229:22 236:10
237:24 246:22
248:23 265:8 268:5
268:7 269:13
273:10 291:17
297:17 321:12
SBC (2)
20:12 258:8
schedule (3)
46:7 262:6 304:18
Schiller (3)
2:6 3:11 5:23
Schwab (3)
13:25 15:4,17
science (1)
248:23
screens (6)
282:10 288:10,20
289:3,5,8
se (1)
16:17
SEA (2)
291:10 342:23
SEC (34)
9:5,17 241:17,18,21
242:22,23 243:25
244:8,20 253:14
255:14 258:25
259:8,23 262:25
263:20,23 264:3,7
264:13 267:20

269:11,14 271:4
307:9 319:4 326:11
326:13 337:13,18
339:16,18,21
second (17)
71:13 91:25,25 99:15
101:14 106:22
126:21 128:4
129:13 131:13
147:6 200:18
237:14 239:25
264:20 265:8
271:20
secret (1)
26:23
section (7)
12:10 122:7 128:9
209:7 211:4 336:22
338:16
sectors (1)
241:16
secure (41)
9:25 121:9,17,21
122:15,25 124:5,9
124:15 125:6,17,25
126:10 133:3
140:11 167:23
186:4 187:3 198:13
199:24 208:5
213:21 222:25
224:14,24 225:11
225:16 227:13,23
228:5,14,20 229:3
231:24 233:23
234:7,11,16,21,22
287:23
secured (22)
8:25 9:20 17:19,20
41:4 119:4 129:13
129:24 130:20
133:9,13 134:8
253:22 310:20
319:10 320:3,4,5
321:7 326:13,15
328:17
secures (1)
200:5
securing (1)
200:7
securities (32)
42:13,14 44:25 91:2,6
91:7 97:20,22 134:7
165:15 220:17
233:12 236:13,22

237:9,25 238:13,22
249:19 253:17
255:8,17 258:12
259:13,16 274:12
288:8,21,24 291:10
302:10 342:23
**security (7)**
134:9 154:7,22
165:20 279:11
306:21 319:11
**SEC's (1)**
10:10
**see (96)**
32:23 37:13,18 38:12
43:7,22 46:2 47:16
47:20 49:14 51:7,10
52:7 53:13 59:3
61:11 71:20,22 72:9
72:15 78:3 83:14
84:9,11,15,21,23,24
100:4 101:23
103:12,18,21 104:8
107:8 108:18 114:6
118:14 121:22
123:2 128:10
141:10,14,21,23
142:2 143:3,7
146:17 147:15
148:2,13 150:22
151:5 164:19
168:18,24 173:10
177:22 178:3 179:4
179:13 192:10
200:18 201:19,21
201:23 203:6,14,22
203:25 217:16
220:20 221:7
223:20 224:25
225:24 226:2
228:22 229:4
232:25 235:20
236:4,17 237:23
238:3 245:11
281:14 286:13
306:3 308:20
314:12 316:18
333:19 334:20
336:5
**seeing (2)**
206:23 275:6
**seeking (2)**
236:11 237:24
**seen (43)**
31:22 36:4 53:17

61:12 67:9 70:16,17
71:10,11,11 74:21
74:24,25 77:4 83:6
117:22 146:16,19
146:21 148:7
178:20 183:18
206:22 207:7 212:5
221:25 222:3,5
238:19 239:18,21
264:14,15 266:14
266:16 285:25
289:23 290:2,6
297:6 330:24
334:19 338:3
**seg (8)**
8:25 10:17 17:19,20
129:24 133:13
253:22 295:18
**segregated (2)**
9:20 130:20
**segregation (1)**
10:18
**seize (1)**
283:22
**seized (13)**
280:24 281:10,19,20
282:16 284:10
289:16 290:9
291:21 295:11,21
295:22 302:16
**seizure (5)**
282:11 283:8 284:6
290:18 328:20
**select (1)**
34:11
**selected (1)**
33:15
**sell (14)**
98:25,25 99:2 105:25
106:2,7,7,8 109:11
113:15 116:19
311:8,13 328:10
**seller (25)**
109:6,8 112:10
113:15 114:4 115:4
143:9 171:12,15
172:6 177:20 196:5
196:12,16 197:2,10
197:21 198:15
201:17 203:11
207:23 211:6,12,14
218:17
**seller's (1)**
213:7

**selling (16)**
25:17 79:5 106:4,6
109:7 115:5,7 162:9
169:11,22 173:22
198:23 201:11
219:2 315:9 316:25
**sells (1)**
172:20
**send (1)**
289:12
**sending (2)**
236:24 296:19
**sense (11)**
13:18 14:16,17 17:4
30:5 108:9 110:3
128:25 129:3
175:13 257:8
**sent (3)**
10:17 235:20 287:10
**sentence (19)**
37:15 91:24 92:4,9
122:21 126:7,12
128:4 140:19 167:20
197:13 230:16
232:20 235:11
236:10 241:25
242:5 264:21 265:8
**sentences (2)**
121:13 122:12
**separate (4)**
20:17 24:11 120:23
306:6
**separately (3)**
14:14 81:12 165:16
**September (79)**
29:23 35:23 39:12,21
49:11 58:5,12,14,16
59:20 61:3 77:13
80:7 84:2,2,11,12
84:20,20 88:22
89:11 90:8,23 101:4
104:12 106:14
136:23 137:2,5
138:13 140:18
143:5,11,14,14
144:11 153:7
160:10 162:15
168:22 178:17
180:9 182:2 188:18
196:20 202:23
206:9 211:25
212:16,24 213:19
218:5 220:5,14
222:8 224:15 234:6

235:19 260:19
265:11,12,14,20
266:3,9,14,17,19
281:22 288:4,9,25
292:16 294:10
300:17 302:16
309:12,20 322:4
**series (3)**
243:7 254:18 255:2
**serve (1)**
251:3
**served (1)**
256:8
**services (5)**
251:15,22 252:11
277:22 278:11
**SESSION (1)**
146:2
**set (14)**
25:9 53:6,10 69:24
81:21 97:12 98:6
133:18 149:13
195:18 248:2
297:19 341:10,24
**sets (2)**
172:21 231:7
**setting (1)**
36:25
**settle (4)**
87:14,20 90:21 91:4
**settled (5)**
45:7 88:3,9 91:2
186:14
**settlement (16)**
44:7,11 49:9,10 57:24
58:2,21 61:17 88:7
117:25 118:11,16
118:24 120:2,7
173:5
**settlements (1)**
88:5
**settling (3)**
44:16,21 93:25
**severe (2)**
29:14 95:18
**shape (1)**
325:14
**share (1)**
55:16
**sheet (2)**
37:11,25
**shell (1)**
70:4
**shifting (1)**

140:17
**shoes (7)**
99:17,18 100:20,24
101:19,20 215:21
**shoot (1)**
73:10
**shopping (1)**
93:19
**short (36)**
32:14,14,14 38:5,24
39:2,5,15,18,20
40:2 42:17 44:23
82:21 88:22 89:6,10
90:21 97:15 108:12
110:9 115:8 116:3
118:6 151:2,20
152:2,2,3 157:22
160:5,19 161:12
178:25 182:14
298:24
**shortest (3)**
67:8 68:6,18
**shortfall (4)**
271:17,19 272:9
296:13
**shortly (1)**
220:15
**shorts (1)**
144:3
**show (15)**
6:23 47:3 53:18
260:25 267:15
273:7 281:7,8 291:3
305:15 308:13
311:15 319:3 320:2
328:5
**showed (12)**
88:16 94:23 107:3,4
140:25 141:12 165:6
192:22 271:17
282:19 285:25
305:13
**showing (15)**
42:23 47:10 70:8 77:6
83:4 120:25 127:5
146:12 172:14
200:14 219:5 224:5
234:24 281:16,18
**shown (8)**
275:15,15 321:24
322:24 331:3
334:14,14 336:6
**shows (3)**
83:14,25 249:18

Contains Highly Confidential Portions

**shut (6)**
281:25 282:5,10
288:10 289:4,9
**shutting (1)**
282:6
**side (13)**
38:5 39:3 49:4,5
97:14,15 105:13,14
292:15 293:4,8,10
293:24
**sides (5)**
49:18 50:5,11 149:8
161:14
**Sidley (4)**
71:23 73:5 235:12,14
**Sidley's (1)**
235:17
**SIFMA (3)**
255:7,13 256:4
**sign (2)**
87:19 313:25
**signed (22)**
39:11 42:10 69:23
70:5 220:14,24
221:10 237:22
253:18 313:21,23
314:8 315:21 322:4
322:6,22,23 323:2
323:10 324:5
325:18,19
**significant (10)**
15:11 25:22 38:20
77:22 88:17 96:7,11
208:22 209:4 237:3
**significantly (1)**
208:14
**sign-off (1)**
21:4
**similar (6)**
10:9,12 189:13 204:5
241:24 301:24
**simple (1)**
163:17
**simply (1)**
221:21
**single (4)**
84:17 85:2 152:25
188:19
**SIPA (2)**
4:12 242:11
**SIPC (24)**
54:25 55:3,4,10,11,14
56:8,13 61:22 78:22
79:19,20 81:4 103:6

118:17 220:4
242:15 257:23
266:5,7,12 267:12
268:12 282:23
**sir (1)**
301:8
**sitting (5)**
86:14 144:4 248:3
280:21 335:14
**situation (3)**
28:6 196:19 339:15
**situations (1)**
218:9
**six (1)**
77:16
**size (11)**
17:5 86:25 88:15 95:6
97:7 98:6 132:9
134:13,14 162:14
216:7
**slight (1)**
7:17
**slow (2)**
14:21 65:3
**smaller (2)**
18:23 258:20
**SMITH (1)**
3:17
**smoothly (2)**
6:6 276:12
**Society (2)**
255:6,24
**sold (26)**
100:13 183:15 197:7
210:22 310:22
312:7,18,22 313:19
314:11,12 315:10
315:25 316:20,21
316:22,24 318:2,2,4
318:11,12 319:16
323:24 325:11,17
**sole (1)**
79:7
**solely (1)**
247:7
**solvent (1)**
79:15
**somebody (10)**
18:3 166:4,17 187:6
213:3 228:8 254:10
308:13 310:23
314:9
**somebody's (1)**
48:22

**someplace (2)**
231:19 234:3
**somewhat (2)**
30:19 151:11
**soon (3)**
6:18 103:20 104:14
**sooner (1)**
103:21
**sorry (64)**
12:16 14:25 19:3
45:17 49:23 52:6
56:17 65:3 69:19
70:3 89:22,24 92:23
103:9,15 109:15
119:17 122:9
125:19,20 127:15
127:17 130:24
131:3,12 132:4
139:25 140:24
150:16 159:5
177:24 178:2
184:22 194:3 195:7
200:20,21 202:21
203:4,4 216:24
238:8 241:9 243:16
244:6 254:22
264:25 265:4
266:18 272:16
273:4 276:9 279:21
282:22 286:9 287:7
297:14 304:13
307:12,16 309:25
314:15 318:21
327:2
**sort (4)**
35:6 97:25 170:19
333:14
**source (10)**
261:6,7 273:8 276:15
276:24 277:6 279:7
280:23 281:3
291:25
**SOUTHERN (1)**
1:3
**space (1)**
77:21
**speak (12)**
64:24 65:9 275:22
277:9 278:17,20
298:4 308:2,4
329:16,21,24
**speaker (1)**
101:25
**speaking (1)**

222:7
**specialist (1)**
5:9
**specific (13)**
8:5 40:12 101:16
124:18 156:11
194:22,24 195:17
204:5 206:23
208:17 232:18
279:25
**specifically (8)**
33:7 63:12 66:14
127:8 210:4 212:15
213:14 253:5
**specifics (2)**
33:8 70:5
**speculate (1)**
181:21
**speculation (1)**
179:18
**speed (1)**
283:24
**spend (1)**
67:14
**spent (10)**
18:18,22 19:7 59:14
63:24 64:4 68:14
95:15 243:3 257:6
**SPIC (1)**
72:15
**spit (3)**
162:18 164:16 165:5
**spoke (6)**
7:16,21 65:14,16,19
276:7
**spot (1)**
131:7
**ss (1)**
341:3
**stable (1)**
136:13
**staff (1)**
253:7
**stamp (1)**
282:24
**standpoint (9)**
13:4 16:19,20 23:23
23:25 24:2,19 26:15
98:15
**start (25)**
5:2 10:4 29:16 46:21
51:22 53:9 58:13
91:18 113:18
116:12 127:20

133:7 146:5 159:14
169:8,19 185:15
190:3 199:11 239:2
239:25 240:18
253:10 299:11
324:20
**started (10)**
21:15 62:16 100:10
157:10 183:22
188:24 193:5 270:4
324:14,24
**starting (7)**
77:19 87:10 178:22
198:6 220:11
333:25 337:3
**starts (3)**
51:23 232:21 274:6
**state (11)**
2:12 47:13 58:4
210:18 255:6,23
264:19,21 303:17
341:3,7
**stated (5)**
196:11 211:12 237:7
274:11 315:6
**statement (22)**
24:21 46:6 47:19 48:2
48:16 78:10 103:14
121:24 122:13
125:9 126:4 147:18
148:5 204:4 241:24
279:7 286:12 303:2
303:11 309:8
326:25 338:23
**statements (4)**
21:14 102:23 262:3
299:16
**states (4)**
1:2 33:9 239:22
313:18
**stating (6)**
107:20 222:13 280:23
284:17 306:17
322:25
**stature (1)**
271:9
**status (1)**
29:10
**statutory (1)**
242:12
**stay (1)**
104:5
**stays (1)**
313:18

Contains Highly Confidential Portions

**STEEN (1)**
3:20
**step (4)**
99:17,18 101:19,20
**stepped (3)**
100:20,24 102:6
**Steve (1)**
72:16
**stipulated (3)**
316:18 317:25 318:11
**stipulation (7)**
257:16 279:16,18
280:12 299:19
300:6,9
**stock (3)**
206:17 313:5 320:4
**stocks (1)**
201:12
**stopped (1)**
312:25
**straight (1)**
149:10
**strategies (4)**
20:23 27:9,11 151:8
**strategy (1)**
21:7
**streams (1)**
16:18
**street (3)**
3:7,13 144:24
**strike (7)**
67:7 85:10 225:17,20
283:20 306:8
323:14
**structure (4)**
132:25 217:21,22,24
**structured (2)**
210:24 218:7
**structuring (2)**
68:3 69:7
**studies (1)**
30:7
**study (2)**
41:12 255:14
**stuff (1)**
42:20
**Subject (1)**
306:15
**submitted (4)**
7:5 8:17 146:14,23
**subordinated (3)**
38:7 144:14 306:4
**subordination (3)**
42:11 305:23 306:3

**subparagraphs (1)**
204:12
**Subscribed (1)**
340:20
**subsections (1)**
232:19
**Subsequent (2)**
334:16 335:7
**subsidiaries (1)**
203:11
**substance (1)**
258:24
**substantial (7)**
136:2 184:10 185:4
185:18 207:9
211:17 212:15
**substantially (2)**
143:13 187:21
**substantive (1)**
242:4
**substantively (1)**
289:9
**substitute (1)**
247:13
**substitution (1)**
300:4
**sub-bullet (1)**
150:16
**sufficiency (2)**
172:19 173:25
**sufficient (6)**
36:18 55:20 82:14
99:25 104:17
170:16
**suggest (3)**
96:6 104:10 238:5
**suggesting (4)**
102:2 115:17 179:16
181:7
**suggests (5)**
48:4 72:24 148:8
174:13 175:11
**summary (1)**
300:14
**Sunday (1)**
324:18
**supervised (3)**
12:24 253:20 254:14
**supplemental (5)**
240:12 241:10 276:18
280:22 342:18
**supplied (1)**
262:18
**supply (1)**

329:13
**support (7)**
48:2 95:21 121:4
127:4 217:13 335:5
342:12
**supporting (1)**
336:7
**supports (1)**
328:15
**supposed (4)**
10:16 79:12 268:5
269:4
**sure (91)**
10:7 12:13,15 14:22
18:8 20:13 21:5,13
21:16 23:4 35:8
36:10 37:4 38:2
40:13,14,21 46:8
52:7 53:5 57:11
58:13 61:7 63:15
64:16 69:19,20,21
71:9 74:20 76:20
79:3 80:10 85:16
89:2,3,5 92:2 99:4
100:13 105:24
106:19 108:12
110:10 114:17
118:10 120:18,21
125:10 131:9
151:11,18,19
160:12 165:4
169:15 170:18,21
176:22 181:13
182:11 184:16,21
190:15 192:9,19
193:16 195:6 202:6
204:17 206:3
209:20 211:7,8
218:22,25 219:25
223:3 234:9 242:8
242:10 247:17
251:13 262:23
270:16 277:23,24
280:18 283:4 289:5
308:16
**surmise (1)**
74:14
**surprise (3)**
62:7,11,12
**swear (1)**
5:11
**swing (1)**
30:22
**swings (1)**

142:5
**Swiss (1)**
68:15
**switched (1)**
49:11
**sworn (3)**
5:15 340:20 341:11
**system (27)**
18:7,8 49:18 50:6
148:11 149:7,10
161:17 164:10,14
165:5,14,15 166:2
245:13,15,20
292:11 329:2,7,12
330:5 331:2,9,16,21
331:22
**systems (22)**
25:9,10 49:4 144:23
144:24 145:2
147:13,13,22
161:16 162:17
163:2,5,24 164:7
165:24 244:3,22,25
245:2,2,19
**S.E.C (2)**
264:10 296:9

**T**

**TAA (16)**
57:25 63:5 118:4
176:7 320:7 321:22
322:10,11 323:4,5
323:17,22 327:11
327:13 328:2,3
**TABATABAI (1)**
4:17
**tabbed (2)**
300:25 301:4
**tag (1)**
248:19
**tagged (1)**
248:19
**take (69)**
6:10 13:6 16:4 18:16
18:17 19:13,14 25:5
25:8,24 26:2,4
40:14,19 46:14 53:3
58:18,21,24 59:5
60:3,7,10 61:16
70:10 83:19 91:11
95:5,10 97:11
118:23 120:19,20
131:5,16,19 144:20
145:6 154:20 158:8

158:25 162:11,16
166:21,22 167:8,21
169:7 183:21 184:2
187:11 189:14
191:6,25 192:8
197:24,25 199:5
216:2 217:5,10
235:5 241:23
254:22 257:21
298:24 305:7
335:10 338:5
**taken (7)**
180:2 188:21 222:11
249:10,11 282:3
295:14
**talk (15)**
64:18,21 73:19
126:22 157:13
173:21 176:4
190:20 191:13
192:16 231:16
291:24 304:2
311:18 315:9
**talked (7)**
50:2 120:5 167:15,16
195:3 247:19 309:8
**talking (31)**
45:19 63:14 64:7
92:11 94:6 113:23
123:21,22 128:24
135:7,8 140:8 157:5
182:3 183:5,5,6
190:14,16,17 192:3
220:13 223:18
226:14 231:17
269:15 285:19,21
294:25 300:8
328:17
**talks (4)**
284:21 319:8,16
326:13
**tape (12)**
5:3 46:22 91:15,19
145:9 146:6 199:8
199:12 240:6,19
299:8,12
**Team (1)**
147:23
**telephone (2)**
288:16,19
**tell (18)**
48:4 161:15 163:6,13
164:11 165:9 167:4
221:10 239:16

250:17 258:6
267:21 273:7 276:6
290:16 304:16
312:13 327:25
**telling (4)**
104:21 236:21 305:16
321:9
**ten (3)**
66:19,20 67:3
**tend (2)**
136:9 152:9
**Tennyson (1)**
329:24
**tens (7)**
144:12 155:16 184:7
184:25 187:12,19
317:5
**term (14)**
23:2 43:16 65:8
176:25 200:17
201:18 203:16
204:10,22 205:4,11
205:21 206:3
226:24
**terms (32)**
15:12 20:16 24:5,22
33:3,5 55:9 56:21
62:4 63:25 64:16
69:7,7,22,24 74:6
78:23 79:21 93:25
117:9 129:20
137:23 139:6
147:23 148:25
151:14 158:15
200:2 204:5 218:17
233:17 238:10
**testified (6)**
5:16 16:2 67:7 82:12
100:12 146:4
**testifying (1)**
17:7
**testimony (53)**
8:12,22 12:10 17:25
42:9 50:16,24 51:20
72:18,22 82:17,25
85:7 87:3 100:6
102:2 115:22
123:19 130:22
162:22,24 163:21
164:6,6,9 175:15
178:11 179:16
195:23 210:7 215:6
219:10,13 220:11
221:7 222:2,6

243:12 261:7 263:6
268:2 271:5 272:18
301:11 302:9,15,25
308:18 312:4
324:19 325:23
341:12 342:3
**Thank (10)**
45:22 47:2 51:6 52:4
90:2 139:15 205:8
277:4 300:18 302:4
**Thanks (5)**
46:17 64:20 139:23
140:5 145:7
**theirs (1)**
314:10
**theoretical (1)**
30:23
**theoretically (1)**
313:22
**thereof (1)**
204:2
**thereto (1)**
248:15
**therewith (1)**
232:22
**thing (8)**
9:19 105:3 106:15
157:15 183:24
191:7 247:18
291:24
**things (24)**
6:14 26:7,9 93:16,21
94:10 95:12 100:25
122:20 123:8 131:4
131:13 134:17
154:23 194:6,10,19
197:5 218:23 247:5
277:14 283:23,24
299:5
**think (180)**
8:19 16:22 17:15,17
18:20 19:11 23:5
26:23 28:13 29:8
31:10,11 36:9 41:4
41:16 44:10 45:20
46:13 47:4 48:22
54:22 55:24 56:19
57:2,18 58:19 61:23
63:18 64:3 66:12,13
70:23 72:19 73:15
73:18 74:2 78:7
79:11,11 83:23
88:10 90:6 92:11,21
96:11,12 97:6,10,17

97:18,19 104:16
105:12 107:3 109:6
109:14,16 111:8,18
111:24 112:10,24
115:24 116:20
117:5 118:5,21
119:9,11 124:21
136:4,10 139:17
142:19 143:24
145:5 146:19 152:9
152:21 157:13
159:23 162:20
169:23 173:20,21
174:4,9,11,11,19,19
174:20,23 175:17
177:4,10 181:17
185:14 187:13,18
188:20 189:7,24
191:22 194:18
196:5 198:3 207:21
208:8,22 209:12,18
209:24 210:17
212:8,19 214:13
215:2 216:8,12
219:25 225:7,8
228:9 229:25
231:16,20,20 234:2
234:4 238:24
239:14,23 246:15
248:4,13 249:14
250:18 251:7,20
255:11 257:15,19
265:25 267:6 268:4
268:14 269:18
270:12,17 272:22
273:9,10,22 275:21
276:19 280:19
281:13 285:11
295:7 301:23
306:10 310:18,23
311:23 312:20
313:4,16,25 314:25
315:13 317:2
319:15 320:16,22
324:15 329:6 330:9
331:6 336:14
**thinking (3)**
67:19 179:20 254:25
**third (1)**
228:17
**thought (47)**
36:20 57:3,10 61:8
64:3 67:18,20 70:22
88:15 117:15,23

120:10 157:10
160:3,23 167:3
168:7,16 181:19
183:15 184:2
185:16 186:9 187:8
189:18 190:16
207:10 213:6,16
215:17,22 219:3
221:22 222:15
223:9 227:4 247:18
265:4 267:6 269:17
287:14 303:16
311:13 316:25
325:23 327:15
330:15
**thoughts (1)**
66:25
**thousands (7)**
144:12 155:16 184:7
184:25 187:12,19
317:6
**threaten (1)**
28:2
**threatened (2)**
106:12 193:15
**threatening (4)**
29:17 74:9 183:22
193:14
**threats (1)**
193:4
**three (14)**
20:6 93:9 97:7 99:10
247:7 248:3 250:5,6
252:14 255:12
256:24 260:10
262:3 280:21
**time (227)**
5:6 13:12 15:2,3,10
17:8,9 18:23,25
19:8 21:15 25:15
26:8,21 32:13 33:16
33:16 36:12 39:23
46:14,18,22 58:10
58:12,13 59:20,24
59:25 61:22 62:3,13
62:15,15 63:10,13
63:18 64:4,8,25
65:15 66:10,13,15
66:16 67:8,15,20
68:7,14,18 69:13
70:10,20 72:20
73:12,22,25 74:2
81:14 82:4 83:10
88:7 90:11 91:11,13

91:14,19 92:12,17
92:22 93:12,24 94:4
95:5,9,13,14 97:9
97:24 100:16
102:14 105:16,17
108:12,13 110:9,10
116:18 119:20
124:23 125:12
132:5,19,20 134:10
137:15,22 138:2,9
138:10 139:2,5,17
145:6,8 146:6
148:10,15,19
149:15,18 157:2
166:15 167:9
169:23,24 183:4
192:20 193:10
194:2,11,23,25
195:20 196:4,6,9,13
197:4 198:4,19
199:5,7,12,24 208:4
209:16,19 210:19
210:20,21 214:14
214:23,24 215:12
215:14 216:2
217:20 218:13
219:2 220:3,7 222:8
240:5,19 251:16,16
254:9,9 256:16
258:3,17 262:24
264:7,22 265:9
266:19 270:2,18
271:17 272:15
282:3,13,24 283:16
284:9 285:9 287:11
289:22 290:3,7,11
292:25 294:12,13
295:8 299:7,12
301:23 309:4,10
310:16 313:11,19
313:20,24 314:7,9
315:9 317:14 318:3
318:12,22,25 320:2
320:9,15,19 321:14
322:22 326:8
331:14 332:18
333:3,11,16,21
334:13,18,23 336:6
336:19 338:4,7,10
339:17 340:8
**timeframe (2)**
73:2 124:18
**times (4)**
10:18 139:10 218:15

Contains Highly Confidential Portions

218:23
**timing (6)**
63:15 64:5 92:10,18
92:25 93:6
**title (1)**
172:23
**today (20)**
5:5 7:14 65:13,14
70:15 71:3,7,7
104:2 146:18
197:13 208:7 250:3
257:18,20 304:9
309:7 315:6 321:25
333:5
**today's (3)**
83:8 104:4 340:9
**told (11)**
101:4 192:23 221:15
239:19 265:19
280:7 286:20
287:11 312:19
313:5 329:11
**tomorrow (3)**
134:21 208:8 257:18
**ton (1)**
136:19
**tonight (1)**
71:18
**top (14)**
71:11 85:20 91:24
92:4 97:7 129:13,15
129:17 130:2
150:17 159:12
164:16 224:20
334:4
**topic (1)**
6:18
**topped (1)**
131:8
**total (10)**
52:11 84:3,5 97:17
151:5 161:13
165:18 260:18
261:8 302:9
**totally (1)**
148:23
**to-answer (1)**
273:5
**trade (1)**
123:12
**traded (4)**
23:4 170:6,7 212:3
**trader (3)**
161:6 164:3,22

**traders (3)**
148:16 149:24 161:8
**trades (8)**
49:18 50:5 61:10,11
87:14 90:18 157:25
223:9
**trading (27)**
14:11 20:22 21:7,16
21:21 23:8 24:6,9
27:9,10 136:22
149:20 151:8
156:18 161:6
201:12,15,19,22,24
202:4,5,9,9,14,17
239:2
**traditional (1)**
111:8
**traffic (1)**
212:6
**trail (2)**
70:18 71:12
**transaction (63)**
13:6 15:18 16:11 17:6
25:5 39:25 40:22
41:14 62:5 64:22
66:18,22 67:15
68:19,23 69:3 71:17
72:6 92:6 93:3,25
98:19 102:15 103:5
103:25 104:2,11
105:10,18 106:13
117:10 125:13
129:21 130:17
132:25 137:16,24
138:12 139:8
142:11 153:7 154:8
154:20,21 160:9
161:3 166:16
168:11 169:3
178:16 183:17
208:19 210:4,19
215:14 216:4
217:11 218:7,19
220:8 236:2 238:11
318:7
**transactions (13)**
13:10,20 20:6,16 45:7
47:21 59:12 88:8
173:6 225:16 293:3
293:12,20
**transcript (8)**
51:8 77:15 99:6
104:20 217:6,10
219:21 341:20

**transcription (1)**
344:7
**transfer (70)**
42:6 43:2,24 80:20
81:22 82:2,22 87:9
107:25 109:22
110:21 111:13
114:23 115:18
119:3,10,12,14,24
120:22 121:15,18
122:14,22 123:14
124:2 126:8,23
133:11 134:6
140:10 142:7
171:10 173:23
174:14 175:24
190:8,9,24 191:20
194:7 196:19
198:12,16 207:15
207:17 208:9
222:14 224:18
233:13 237:21
238:25 278:11
309:3 310:3,8,13,13
310:16 317:5,7
318:16 320:6 323:2
323:6,10,11 328:21
**transferred (26)**
62:2 79:15 80:25
108:7 110:2 126:19
165:12 175:12,19
175:21 176:7
217:14 221:13,14
228:21 232:23
233:11 236:15
237:14 238:2 239:5
239:10,15 309:24
317:15 320:10
**transferring (11)**
80:13,16 127:2,24
134:3 175:7 177:6
190:2 222:14 223:9
231:13
**transfers (2)**
79:18 172:21
**transpiring (4)**
179:12 181:2 183:13
201:9
**Treasury (3)**
206:14,14,15
**treatment (1)**
52:2
**Tricia (2)**

3:15 5:22
**trickles (1)**
96:5
**tried (3)**
184:8 185:2 330:9
**triple-witching (2)**
86:13 143:17
**Trish (10)**
12:6 14:22 45:21 52:4
91:9 111:5 124:19
139:16 199:3
230:14
**Trish's (1)**
226:17
**trouble (1)**
93:14
**true (7)**
132:24 238:5 297:17
329:22 333:16
334:25 341:12
**true-up (1)**
171:18
**truly (1)**
194:13
**trustee (77)**
4:12 7:18 55:10 65:18
72:13 79:8,20,25
80:20 100:10
107:21,24 109:18
109:21 110:12,17
110:20 111:9,12
114:23 115:18
119:2,14,24 121:14
123:13 124:7 142:5
144:16 173:13
192:23 194:21,24
195:5,17,19 196:19
219:11 220:4,14,23
222:7 236:7 238:14
238:20 246:2
250:14,21 251:4,15
251:22 252:8,12
256:17 272:25
275:24 277:10,12
277:20 278:4,15
281:2 293:2,7,15,22
293:25 294:4,8,19
296:23 304:24
306:5 332:17
334:16 335:2,8
**trustees (3)**
7:17 79:13 242:16
**trustee's (13)**
8:12 78:22 81:4 121:3

140:2,9 196:2
206:19 262:5
275:11 329:18
332:16 342:11
**try (9)**
6:6,9,17,22 113:11
138:25 156:25
158:5 179:19
**trying (13)**
106:8 148:14 149:22
150:11 193:18
208:9 213:8 270:16
277:5 279:6 315:18
327:15,16
**TSA (5)**
277:16 278:7,9
296:23 297:25
**TSG (2)**
5:7,10
**Tuesday (8)**
271:23 272:5,23
273:14 290:14
339:10,12,17
**turn (37)**
32:19 37:9 45:13
50:24 71:13 77:18
83:13 91:22 99:8
103:2 108:14
113:17 118:6,9
120:25 121:12
139:24,25 147:6
150:15,24 178:10
200:15 203:3,5
217:7,8 220:10
241:14 248:16
274:3 296:14
299:23 300:20
306:11 308:21
313:9
**turned (2)**
148:15 283:19
**Turning (1)**
204:8
**turns (1)**
331:9
**twice (1)**
202:11
**two (32)**
25:5,8 49:3,4 84:19
86:6 105:22 113:23
121:13,25 122:12
127:12,15 131:4,13
161:14 175:5 202:6
202:8 222:12

Contains Highly Confidential Portions

227:15 230:21
231:7 243:5 251:7
256:19 257:7
260:17 280:22
292:6,17 299:4
**two-day (1)**
30:22
**type (9)**
19:16 21:6 25:5
138:12 160:9 161:3
171:15 258:21
271:8
**types (4)**
23:19 24:13 138:21
161:2
**typical (3)**
95:5 170:13 218:17
**typically (1)**
154:17

_____

**U**

**UBS (20)**
12:4,17 15:24 17:9
19:20 20:24 27:6
68:15 249:19,20,21
249:25 250:10
253:11,12,16 254:4
258:8,12,15
**Uh-huh (41)**
5:25 11:3 13:2 16:3
32:24 42:4 51:25
59:18 63:22 71:16
71:24 72:11 80:17
86:20 99:7 101:22
103:17 106:21
108:20 114:7 122:2
129:2 141:16 178:4
201:21 203:9 207:3
220:9 226:15 236:3
242:2 256:20 284:2
285:22 296:6 326:3
328:22 330:7
332:11 334:8
336:25
**ultimately (1)**
96:20
**unambiguous (1)**
233:17
**uncollectable (1)**
53:5
**Undelivered (1)**
121:10
**underlying (5)**
149:2 150:7 277:5

336:12,13
**underneath (1)**
277:6
**understand (54)**
6:20 21:2 29:8 40:9
44:6 48:24 49:25
62:23,25 64:5 66:12
74:3 87:14 95:17
97:3 115:13 125:11
127:24 128:12
131:14 154:12
157:24 170:19
174:16 176:17,24
178:23 179:15
181:6 182:13 188:4
188:23 193:17,18
194:14 203:17
204:22 205:3
206:19 214:11
222:23 235:21,24
244:9 278:14 279:6
281:10 293:18
294:23 307:15
315:18,19 322:21
328:23
**understandable (1)**
209:13
**understanding (71)**
23:9,18,24 24:22,23
26:21 29:3 30:14
33:4,18 34:12 38:2
40:7,21,25 42:6,17
42:19 43:15 44:14
52:21,24 54:17,24
55:4,8,19 60:5,11
60:16,20,25 65:23
69:16 75:8 76:10,22
78:21 80:5 88:2
93:7 94:18 102:9
123:24 125:11
126:4 129:18 137:4
153:5 159:17,22
178:15 202:12
208:16 211:24
214:17 216:12,15
216:16 218:3
220:23 222:7
236:12 237:8,15,25
252:15,19 281:21
294:13 301:17
**understands (1)**
277:25
**understood (1)**
137:12

**undertake (3)**
151:9 302:12,19
**undertaken (1)**
39:3
**Unfortunately (1)**
111:21
**unhedged (2)**
153:11 155:14
**unilaterally (1)**
77:24
**UNITED (1)**
1:2
**unredacted (1)**
305:20
**unsecured (1)**
311:18
**urgency (4)**
72:25 105:9,12,19
**URQUHART (1)**
4:4
**usage (1)**
205:4
**use (7)**
23:16 43:19 85:23
135:17 152:10
208:4 259:15
**usual (1)**
61:9
**usually (8)**
17:21 25:22 42:15
54:21 70:4 135:15
176:3 286:12
**U.S (1)**
170:8

_____

**V**

**v (2)**
128:8,9
**Vague (5)**
23:12,22 61:6 68:11
337:17
**vagueness (1)**
65:7
**valid (3)**
120:10,11 318:6
**valuable (2)**
172:18 215:23
**value (70)**
15:15 23:25 33:12,19
33:23,24 34:2,3,4
38:9,20 41:19 79:4
79:7 81:13,17 84:5
94:19 97:3 108:16
109:7,9 112:9,9,10

112:18 113:3,4,12
114:12 115:6,9,11
116:2,7,9,11 117:6
117:9,15,18 120:13
120:15 134:23
135:2 149:14
161:19,22 163:3,6
208:11,11 210:9,12
211:18 212:16,17
212:22 213:4,6,6,20
213:24 214:3
215:19 217:3 237:3
275:17 279:11,12
**valued (1)**
112:11
**values (1)**
212:10
**variation (1)**
204:2
**various (16)**
20:19 27:9 61:24
76:14 151:7 155:10
157:24 161:7 164:2
168:20 207:12
212:8 214:18 247:3
258:9,10
**vehicle (2)**
176:10 323:10
**venture (1)**
23:15
**verbal (2)**
6:12 289:6
**version (2)**
305:2,21
**versus (5)**
97:22,22 214:24
291:17 295:23
**viability (1)**
138:4
**viable (3)**
94:11 136:10 332:19
**vice-versa (1)**
155:20
**video (1)**
5:8
**VIDEOGRAPHER...**
5:2 46:18,21 91:14,18
145:8 146:5 199:7
199:11 240:5,18
299:7,11 338:7,10
340:8
**videotaped (3)**
1:13 2:4 5:4
**Vinella's (1)**

303:23
**violation (5)**
339:16,18,20,24
340:2
**vis-a-vis (1)**
29:4
**VIX (3)**
23:2,3,10
**volatile (5)**
23:10 32:7,11 35:3
136:2
**volatility (12)**
21:16,21 23:7,8 30:16
31:13 34:16 35:9,16
35:18,21 134:15

_____

**W**

**wait (5)**
45:17 89:22
**walked (2)**
73:11,25
**want (43)**
15:22 16:23 18:17
19:14 47:3 51:2
59:10 60:3 67:4,5
73:7 94:24 109:5,6
112:10 116:19
126:3 144:16,17
156:21 157:19
173:21 179:19
181:21 193:17
197:19 198:2,5,7
204:19,20 210:11
214:14,15 226:22
234:9 246:8 258:16
261:20 283:23
296:15 298:24
326:16
**wanted (19)**
18:16 19:12,13 21:16
51:5 59:16 62:17
73:19 75:25 115:10
160:2,2,21,22
198:18 211:8
229:23 299:5
300:19
**wants (1)**
237:20
**warranty (2)**
172:22 173:16
**wasn't (20)**
19:11 94:11 96:10
107:7 109:9 113:8
129:21 133:13

Contains Highly Confidential Portions

137:7 158:22 164:9
171:20 195:5
230:15 231:11
234:13 246:17
267:3 310:20
315:16
**way (31)**
10:22 20:9 46:14 50:2
56:19 86:8 88:12
93:13 105:24 111:8
129:24 159:22
174:21 189:19
190:23 217:21
221:5 227:16
252:12 255:14
258:22 269:23
283:2 287:4 292:23
308:9,19 318:17
325:14 331:11
341:16
**Wednesday (2)**
77:20 268:20
**week (19)**
59:14,20 61:2 63:25
76:7 80:7 86:6
100:19 140:18
142:2 143:5,11,19
159:15,20 179:10
179:23 180:9,14
**weekend (17)**
26:2 67:13,16,21,23
87:15,21,23,25 88:3
88:22 89:11 90:7,22
103:7 144:18
214:13
**weekly (2)**
243:5 271:10
**weeks (5)**
26:5 59:15 250:5,6
255:12
**week's (1)**
102:20
**Weil (2)**
235:21,22
**Welcome (1)**
46:25
**Wells (3)**
260:3,7,13
**went (15)**
21:3 63:5 84:13,21
111:19 134:19
141:9,13 177:3
195:25 216:8
269:19 279:3,3

301:15
**weren't (15)**
101:11 102:10 117:21
156:4 159:8 167:4,6
168:7 169:20
210:21 245:8
287:23 315:6
330:16 331:8
**we'll (4)**
58:13 120:18 271:2
302:18
**we're (27)**
6:19 45:18 46:19 47:4
63:14 91:16 145:9
146:7 190:16 192:3
193:11 199:9,13
205:6 210:5 216:10
216:11 226:16
240:7,20 257:16
258:23 267:16
299:9 327:16
338:11 340:10
**we've (8)**
52:3 91:9 167:15,16
232:21 270:17
295:15 306:10
**whereof (1)**
341:23
**wherewithal (1)**
161:24
**willing (11)**
58:24 94:2 108:23
112:3 113:7,15
183:21 215:24
218:16 222:14
225:19
**wished (1)**
162:9
**withdraw (16)**
28:16 35:24 36:7
124:12 126:13
142:23 263:14
288:3,8 289:10
309:3 314:16,20
315:14 316:7
317:23
**withdrawal (6)**
263:21 264:16,17
272:17 309:5
317:22
**withdrawals (1)**
263:17
**withdrawing (1)**
315:4

**withdrawn (17)**
30:13 44:14 121:20
122:24 124:4,7,14
124:22 125:4,15,20
125:24 126:9
309:19 316:10,14
320:25
**witness (30)**
5:12,15 14:25 89:24
119:17 130:24
131:3 184:22 247:5
251:4 256:9 273:3
273:19 277:4
299:22,25 300:4,10
300:14,22 301:3,6,9
301:14,21 322:19
341:9,13,23 344:4
**witnesses (1)**
64:11
**witness's (9)**
115:22 123:19 162:24
163:21 175:15
195:22 215:6 268:2
312:4
**Witter (2)**
254:8,11
**woke (1)**
170:21
**Woodland (2)**
295:10 298:17
**Woodlands (1)**
292:7
**word (4)**
203:13,22,25 204:13
**words (8)**
49:2 104:5 149:11
164:9 181:22,23
227:15 234:2
**work (18)**
12:21 65:18 243:20
249:7,20 250:2,3,16
250:21,23 253:4,6
254:9 278:3,7
288:17 295:5
296:23
**worked (12)**
9:3,8,8,12 10:25
12:19,20,23 26:22
95:25 254:2,12
**working (5)**
65:18 100:10 243:4
278:15,16
**works (2)**
33:4 129:25

**world (2)**
10:14 112:24
**worldwide (4)**
12:18 13:3 101:18
102:18
**worst (2)**
82:4 87:8
**worth (7)**
115:15 196:18 198:3
212:2 213:12
216:17,20
**wouldn't (36)**
14:17 15:10 23:15
50:11 56:21 62:11
154:25 155:8
158:21 160:4,6,18
160:20 164:7,10
179:19 187:9 189:8
194:20 214:4,7
217:21 218:18,24
221:4 230:18
231:12 283:15
310:20 313:7
315:17 316:11,12
320:11,20 333:17
**wrap (1)**
6:18
**wrapped (1)**
239:24
**write (4)**
53:7 54:18,21 214:24
**writing (2)**
127:22 228:5
**written (8)**
50:13 51:11 52:14
171:16 227:16
228:10,13 257:3
**wrong (2)**
177:3 287:12
**wrote (4)**
53:4 56:2,5 57:11

_____
**X**
**x (2)**
1:4,10

_____
**Y**
**Yeah (3)**
204:16 221:14 233:7
**year (3)**
15:17 113:3 285:10
**years (7)**
9:3,12 20:25 112:17
243:3,4 252:24

**yellow (1)**
51:3
**Yesterday (1)**
77:23
**York (20)**
1:3,14,14 2:7,7,12 3:8
3:8,14,23,23 4:8,8
4:14,14 255:6,23
341:3,4,7

_____
**Z**
**zero (4)**
33:17 82:5 198:5
281:18

_____
**$**
**$1,359,001,075 (1)**
84:14
**$1,400,000,000 (1)**
84:22
**$1.1 (2)**
37:17,23
**$1.19 (1)**
37:12
**$1.2 (2)**
141:22 143:4
**$1.6 (5)**
78:3,15 181:25
189:16,19
**$10 (1)**
134:8
**$100 (7)**
114:13,14 133:17,19
133:25 134:3
209:18
**$104 (2)**
52:12 53:12
**$150 (2)**
149:17 150:7
**$2 (7)**
84:22,22 108:7,8
109:25 110:2
119:10
**$2.29 (2)**
37:17,22
**$2.3 (1)**
335:5
**$20 (1)**
134:8
**$200 (1)**
208:7
**$213 (1)**
296:13
**$250 (1)**

Contains Highly Confidential Portions

| | | | | |
|---|---|---|---|---|
| 113:2 | 43:21 | **140 (1)** | 136:23 137:2,5 | 324:5 |
| **$258 (1)** | **1.769 (1)** | 52:7 | 206:9 220:5,14 | **200 (1)** |
| 275:4 | 302:11 | **141 (1)** | 222:8 224:15 234:6 | 257:14 |
| **$300 (1)** | **1:05 (1)** | 50:24 | 260:19 265:11,12 | **2000 (2)** |
| 117:16 | 145:8 | **15 (12)** | 265:14,20 266:17 | 218:4 258:13 |
| **$400 (1)** | **10 (12)** | 20:25 52:8 59:20 61:3 | 288:4,9,25 292:16 | **2003 (2)** |
| 141:25 | 3:13 98:3 203:4,21 | 80:7 84:2,12 140:18 | 302:17 306:13 | 15:22 258:17 |
| **$439 (1)** | 271:20,22 272:4 | 143:6,11 180:9 | 309:12,20 322:5 | **2004 (2)** |
| 308:14 | 287:13 290:13 | 343:4 | 334:4,4 337:2 | 15:19,22 |
| **$50 (1)** | 339:10,12,17 | **15c3 (3)** | **19th (56)** | **2005 (2)** |
| 134:2 | **10:25 (1)** | 9:11 259:18,23 | 85:18,23 86:13,19,23 | 13:8 15:19 |
| **$500 (6)** | 46:18 | **15c3-3 (35)** | 87:2 90:10 101:4 | **2006 (3)** |
| 84:17 86:5 140:17 | **10:43 (1)** | 243:13 244:9 255:15 | 141:3 144:10 | 13:7 15:25 19:21 |
| 141:10 149:14 | 46:22 | 255:25 258:3,25 | 192:25 209:17 | **2008 (40)** |
| 150:8 | **100 (1)** | 259:8 262:25 | 266:3,9,19,21 267:8 | 17:11 29:23 35:23 |
| **$507 (2)** | 51:11 | 264:13 267:16,18 | 267:14,23 268:6 | 39:21 49:11 58:5 |
| 316:23 318:15 | **10004 (1)** | 267:20,21 268:5,11 | 271:2 272:7 282:20 | 59:21 63:7 77:13 |
| **$600 (2)** | 4:14 | 268:25 269:8 | 283:6,10 284:10 | 84:3,20,20 104:12 |
| 85:2 141:17 | **10006 (1)** | 271:24 284:4,13 | 285:5,13 286:17 | 137:5 138:14 |
| **$69 (1)** | 3:23 | 290:25 291:11 | 289:16 290:9,19 | 143:11 153:7 |
| 97:14 | **10010 (1)** | 298:10 311:16 | 294:10 295:24,25 | 160:10 162:15 |
| **$70 (1)** | 4:8 | 312:12 317:8 319:4 | 300:17 310:23,25 | 178:17 196:20 |
| 97:13 | **10017 (1)** | 326:11 328:5 329:2 | 312:7,8 313:22 | 202:23 206:9 |
| **$700 (1)** | 3:8 | 331:10,17 339:21 | 314:19,20 316:25 | 211:25 212:24 |
| 208:7 | **101 (1)** | 342:21,23 | 318:9 321:8 322:13 | 213:19 218:5 222:9 |
| **$789,583,205 (1)** | 99:8 | **15th (6)** | 322:23 323:19 | 224:15 234:6 |
| 84:13 | **11 (4)** | 141:8,20 193:5,12 | 324:10,15 325:4,21 | 260:19 265:11,12 |
| **$80 (1)** | 1:6 99:21 100:18 | 195:3 209:22 | 325:25 328:4,9 | 265:14,20 266:3 |
| 48:15 | 308:24 | **16 (8)** | **190.06(e)(1)(iv) (2)** | 288:25 292:16 |
| **$82 (1)** | **11:36 (1)** | 39:12 47:25 84:12 | 128:8,9 | 302:17 309:12 |
| 331:3 | 91:14 | 211:25 212:16,24 | **1998 (1)** | **2009 (2)** |
| **$891 (1)** | **11:57 (1)** | 213:19 295:9 | 258:9 | 249:22 303:9 |
| 278:24 | 91:20 | **16th (3)** | | **2010 (7)** |
| | **12 (3)** | 141:9,13 193:3 | | 1:15 2:2 5:6 297:5 |
| | 11:7 47:25 308:24 | **17 (3)** | **2** | 340:21 341:24 |
| **0** | **12th (1)** | 84:20 128:9 308:25 | **2 (24)** | 344:3 |
| **074C (3)** | 290:5 | **17th (19)** | 29:10 46:22 91:16 | **21 (2)** |
| 48:12 53:14 60:22 | **12-23 (1)** | 141:12,13,18 267:5 | 127:9,16,17 200:16 | 45:21 306:13 |
| **074F (2)** | 1:16 | 289:18,25 309:24 | 200:19 224:20 | **21st (5)** |
| 44:17 60:18 | **121 (1)** | 310:2,7 311:4,5,8 | 230:5 232:16 233:4 | 88:22 89:12 90:8,23 |
| **074M (1)** | 342:11 | 311:25 312:23 | 233:16,17 241:23 | 325:18 |
| 44:17 | **12207 (1)** | 314:17 315:5 316:8 | 300:12,14 304:13 | **219 (1)** |
| **08-13555(JMP) (1)** | 3:14 | 316:19 320:25 | 304:17,18 334:5 | 342:14 |
| 1:7 | **13 (10)** | **178 (1)** | 336:23 338:16 | **22 (10)** |
| | 16:23 49:7 264:19,25 | 342:13 | 344:6 | 11:7 51:23 89:11 |
| **1** | 265:2,3,5 274:6 | **18 (8)** | **2.3 (2)** | 104:12 113:19 |
| **1 (14)** | 309:8 333:25 | 84:20 108:15 182:2 | 332:9 334:9 | 143:14 150:25 |
| 5:3 29:9 83:13,14,25 | **136 (2)** | 266:15 296:3 | **2:05 (1)** | 168:22 202:23 |
| 119:13 139:18 | 121:13 122:12 | 297:20 298:8 303:3 | 146:6 | 330:3 |
| 141:6,7 200:14 | **139 (1)** | **18th (6)** | **20 (6)** | **22nd (12)** |
| 270:9 299:24 300:3 | 51:22 | 141:12,18,20 188:19 | 9:2,12 235:19 243:4 | 4:7 39:21 74:10 85:20 |
| 344:6 | **14 (6)** | 281:22,23 | 252:24 287:12 | 87:20 88:18,19 |
| **1(a) (1)** | 16:23 32:19 47:25 | **19 (30)** | **20th (8)** | 106:13 322:8 323:3 |
| 172:17 | 48:8 220:12 343:6 | 35:23 77:13 84:3 | 88:22 89:12 90:8,23 | 324:5 325:19 |
| **1(b) (1)** | | | 90:23 193:14 322:7 | |

Contains Highly Confidential Portions

**222 (1)**
3:7
**23 (6)**
49:11 113:17 143:14
177:19,25 330:3
**235 (1)**
342:15
**24 (5)**
62:8 69:4,4 77:21
308:23
**240 (3)**
342:17,18,20
**241 (1)**
342:5
**25 (3)**
197:25 224:6 308:23
**257 (1)**
343:4
**258 (1)**
275:7
**26 (2)**
45:13,14
**2625 (2)**
291:13,16
**267 (1)**
342:21
**27 (4)**
45:13 241:11 243:7
254:18
**273 (1)**
43:10
**275 (3)**
178:10,22 180:3
**28 (3)**
300:25 301:7 302:23
**281 (1)**
275:4
**282 (1)**
220:10
**29 (2)**
37:9 258:9
**291 (1)**
342:22
**29428 (1)**
1:25
**297 (1)**
342:24

_____
3
_____

**3 (13)**
28:13,14 29:12 71:15
91:19 94:24 95:3
106:23 145:9
150:16,16 178:23

344:7
**3-3 (15)**
100:11 243:6 248:5
248:14 258:19
269:11 311:17
319:8,14,15,21,24
326:13 328:8 329:7
**3:03 (1)**
199:7
**3:19 (1)**
199:13
**30 (3)**
28:12 29:13 243:3
**30(e) (1)**
341:21
**300 (2)**
38:4,9
**300-and-some-page...**
222:12
**302 (2)**
343:5,6
**305 (1)**
343:7
**35 (1)**
274:25
**39 (1)**
306:14

_____
4
_____

**4 (8)**
29:14 41:5 146:6
150:16 199:9 203:3
228:17 240:7
**4:13 (1)**
240:5
**4:45 (1)**
240:19
**40 (2)**
117:12 306:14
**41st (1)**
3:7
**439 (2)**
306:18 308:11
**44 (2)**
113:20 333:19
**442 (3)**
77:7 99:5 217:7
**45 (3)**
41:2 141:14 308:25
**46 (1)**
328:19
**47 (2)**
329:4 342:9
**48 (2)**

214:8 215:17
**49 (1)**
328:19

_____
5
_____

**5 (16)**
41:5 94:24 95:3
199:12 241:14
257:9 297:4,11,14
333:12,24 336:20
337:6 342:4 343:5,7
**5:54 (1)**
299:7
**50 (4)**
29:15 41:3 197:24
342:10
**500 (1)**
315:12
**51 (7)**
4:6 42:24 45:23 47:12
172:15,16 337:3
**54 (1)**
113:20
**55 (2)**
113:20 114:3
**575 (1)**
2:6

_____
6
_____

**6 (15)**
1:15 2:2 5:6 83:23,24
108:14 147:7 203:4
203:5 204:8 240:19
265:3 299:9 342:8
344:3
**6:23 (1)**
299:12
**60 (5)**
121:12 140:6,7 217:8
217:9
**60(B) (1)**
121:7
**601(c) (1)**
32:23
**61 (2)**
77:18,19
**630 (4)**
70:9 106:20 275:3,7
**648 (1)**
146:13
**659A (1)**
127:6
**66 (1)**
45:14

**676A (1)**
83:5
**684 (4)**
6:24,25 7:4 342:8
**685 (4)**
47:6,7,11 342:9
**686 (3)**
50:19,20 342:10
**687 (5)**
121:2,3 140:3,4
342:11
**688 (3)**
178:6,7 342:13
**689 (3)**
219:6,7 342:14
**69 (4)**
39:17,20 97:18 241:6
**690 (3)**
234:25 235:2 342:15
**691 (7)**
240:9 241:2,5,13
242:6 300:21
342:17
**692 (4)**
240:12 241:3,10
342:18
**693 (6)**
240:15 241:3,12
242:6 300:23
342:20
**694 (3)**
267:17,18 342:21
**695 (3)**
291:8,9 342:22
**696 (3)**
297:3,7 342:24

_____
7
_____

**7 (7)**
52:8 91:23 98:20
150:24 297:11,14
299:12
**7th (1)**
341:24
**7:09 (1)**
338:7
**7:19 (1)**
338:10
**7:20 (1)**
340:8
**70 (5)**
37:10 39:17 42:3
43:18 97:18
**73 (3)**

103:2,11,12
**74 (1)**
43:10

_____
8
_____

**8 (5)**
159:12 228:17 232:14
232:18 296:14
**82 (1)**
328:25
**84 (1)**
43:10
**891 (1)**
274:23

_____
9
_____

**9 (4)**
32:20,22 249:23
270:10
**9/15/2008 (1)**
83:15
**9/19 (10)**
294:3,7 295:4,6
298:11 302:10
304:20 318:16
336:2,10
**9/19/2008 (1)**
83:16
**9:37 (1)**
5:6
**922 (2)**
235:3 342:16
**944 (3)**
298:15,16,20

# EXHIBIT D

Page 1

1                   Highly Confidential

2        UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    --------------------------X

5    IN RE:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC. et al.,

9                   Debtors.

10   ------------------------------X

11

12           HIGHLY CONFIDENTIAL

13       DEPOSITION OF PETER VINELLA

14           New York, New York

15            February 5, 2010

16

17

18   Reported by:

     Bonnie Pruszynski, RMR

19   JOB NO. 28243

20

21

22

23

24

25

## Page 2

Highly Confidential

February 5, 2010

9:30 a.m.

Deposition of PETER VINELLA, held at Jones Day, LLP, 222 East 41st Street, New York, New York, before Bonnie Pruszynski, Registered Professional Reporter, Registered Merit Reporter, Certified LiveNote Reporter, and a Notary Public of the State of New York.

TSG Reporting - Worldwide    877-702-9580

## Page 3

Highly Confidential

A P P E A R A N C E S:

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
    222 East 41st Street
    New York, New York 10017-6702
BY:    KELLY CARRERO, ESQ.
    K. ADAM BLOOM, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays
    5301 Wisconsin Avenue, N.W.
    Washington, D.C. 20015
BY:    AMY NEUHARDT, ESQ.
    HEATHER KING, ESQ.

HUGHES HUBBARD & REED, LLP
Attorneys for SIPA Trustee
    One Battery Park Plaza
    New York, New York 10004
BY:    NEIL J. OXFORD, ESQ.
    FARA TABATABAI, ESQ.

QUINN EMMANUEL
Attorneys for the Creditors Committee
    51 Madison Avenue
    New York, New York
BY:    ROBERT DAKIS, ESQ.

TSG Reporting - Worldwide    877-702-9580

## Page 4

Highly Confidential

A P P E A R A N C E S (continued):
Also Present:  David Aman, Esq.
    Cleary, Gottlieb Steen & Hamilton
    Chris Harris, Deloitte & Touche

TSG Reporting - Worldwide    877-702-9580

## Page 5

Highly Confidential - P. Vinella

(Exhibit 590 marked for identification as of this date.)
(Exhibit 591 marked for identification as of this date.)
(Exhibit 592 marked for identification as of this date.)
(Exhibit 593 marked for identification as of this date.)
(Exhibit 594 marked for identification as of this date.)
(Exhibit 595 marked for identification as of this date.)
(Exhibit 596 marked for identification as of this date.)
(Exhibit 597 marked for identification as of this date.)
(Witness sworn.)
PETER VINELLA,
    called as a witness, having been first
    duly sworn, was examined and testified
    as follows:
EXAMINATION
BY MR. OXFORD:
    Q    Good morning, Mr. Vinella.

TSG Reporting - Worldwide    877-702-9580

Page 6

```
 1              P. Vinella
 2          We met off the record.  My name is
 3  Neil Oxford.  I'm with the law firm of Hughes
 4  Hubbard & Reed, and we represent the SIPA trustee
 5  in this litigation.
 6          I have handed you some exhibits that
 7  I have premarked that I will just identify now for
 8  the record.
 9          Exhibit 590 is the report -- rather
10  the affidavit of Daniel McIsaac, dated
11  October 5th, 2009.
12          Exhibit 591 is your expert report
13  dated January 8th, 2010.
14          And Exhibits 592 through 597 were
15  produced to me by your counsel, and I understand
16  them to be your reliance notes in this matter, and
17  we will be referring to these throughout the
18  deposition.  I thought it would just be handy for
19  you to have those in front of you.
20      A   Thank you.
21      Q   Tell me, sir, have you been deposed
22  before?
23      A   Yes, I have.
24      Q   How many times?
25      A   I believe four.
```
TSG Reporting - Worldwide    877-702-9580

Page 7

```
 1              P. Vinella
 2      Q   So you know the routine here.  I'm
 3  going to ask questions and you will answer them.
 4  If you'll try to make your answers clear so that
 5  Bonnie can take them down, that would be helpful.
 6          If you could wait until I finish my
 7  question before you answer it, because if we start
 8  to talk over each other, it's going to be again
 9  hard for Bonnie to take it down.
10          When I ask a question and you answer
11  it, I will assume that you understand it.  Is that
12  fair?
13      A   Yes.
14      Q   But if you don't understand any
15  question, I would be happy to try to clarify that.
16      A   Okay.
17      Q   Also, this deposition -- it may seem
18  like it at some times, but it's not intended to be
19  an endurance exercise.  If you need a break at any
20  time, just let me know.
21      A   Okay.
22      Q   Mr. Vinella, do you consider yourself
23  to be an expert in regulatory compliance for
24  broker dealers?
25      A   I do.  I look at the regulatory
```
TSG Reporting - Worldwide    877-702-9580

Page 8

```
 1              P. Vinella
 2  compliance function, especially the 3-3
 3  calculation, as being the result of the operations
 4  and processing systems of a broker dealer, and I
 5  am very familiar with that aspect, as well as the
 6  data that goes into the calculations, as well as
 7  the reporting requirements themselves.
 8      Q   Okay.  Do you currently hold any
 9  professional licenses?
10      A   I do not.
11      Q   Have you held professional licenses
12  in the past?
13      A   No, I have not.
14      Q   You never held a Series 27 license.
15      A   No, I have not.
16      Q   Your report says that you are a past
17  member of SIFMA, S-I-F-M-A; is that correct?
18      A   I was the representative of
19  Wilmington Trust Company to SIFMA.
20      Q   During which time, sir?
21      A   That started in the beginning of
22  2007, continued through December of 2008.
23      Q   Were you a member of a particular
24  division or group of SIFMA?
25      A   I was the bank's overall
```
TSG Reporting - Worldwide    877-702-9580

Page 9

```
 1              P. Vinella
 2  representative, and I was also the bank's
 3  representative to the American Securitization
 4  Forum.  That is a committee within the -- within
 5  SIFMA.
 6      Q   You were also a member of the
 7  European Securitization Forum; is that correct?
 8      A   I was.
 9      Q   During what time period?
10      A   That would have been the fall of
11  2006, I believe that started, and continued
12  through the time I left Wilmington Trust Conduit
13  Services in December of 2008.
14          MS. NEUHARDT:  If it helps you to
15      look at your own CV on some of these
16      questions, you should feel free to do so.
17      Q   Did any of these activities you
18  undertook when you were a member of the European
19  Securitization Forum relate to SEC Rule 15c3?
20      A   They related in the sense that we
21  were involved with the same type of operations
22  that produced the data that goes into the
23  calculations, and we produced similar types of
24  calculations.
25      Q   When you say we produced similar
```
TSG Reporting - Worldwide    877-702-9580

P. Vinella

1  types of calculations, can you be more specific?
2      A      Well, I was representing Wilmington
3  Trust Conduit Service and Wilmington Trust
4  Company, as the bank.  The bank was a custodian,
5  and was also a registrar transfer agent.
6          Wilmington Trust Conduit Services
7  provided the books and records for the
8  securitizations that we were supporting.  So we
9  did the accounting.  We did regulatory reporting.
10 We did compliance reporting.
11     Q      Was Wilmington Trust a broker dealer?
12     A      It had a broker dealer.  I mean, I
13 did not operate within the broker dealer.
14     Q      Which part of Wilmington Trust did
15 you operate within?
16     A      I was an owner of a joint venture
17 that we created called Wilmington Trust Conduit
18 Service, and that was specifically set up to
19 support securitization such as CDOs,
20 mortgage-backed securities, asset-backed
21 commercial paper, conduits, SIV's.
22     Q      You also were a member of the Loan
23 Syndication and Trading Association; is that
24 correct?

P. Vinella

1      A      I was the representative for
2  Wilmington Trust Conduit Services, yes.
3      Q      Is that during the same time period
4  we discussed before?
5      A      During the same time period, yes.
6      Q      Fall of 2006 through the end of '08?
7      A      I believe fall of 2006 is when we
8  became members.
9      Q      Did any of your activities as a
10 member of that association relate to Rule 15c3?
11     A      In that case, no.  That was
12 specifically loan-to-loan processing.
13     Q      You were also a member of the
14 International Swaps and Derivatives Association;
15 is that correct?
16     A      I wasn't a member.  I was the bank's
17 representative to ISDA, and I was also a member of
18 a committee that was involved in setting computer
19 language standards for loans and derivatives on
20 loans.
21     Q      In connection with any of your
22 dealings with ISDA, did you have -- withdrawn.
23 Let me start that again.
24         In connection with your activities

P. Vinella

1  that you undertook in connection with ISDA, did
2  any of your activities relate in any way to
3  Rule 15c3?
4      A      No.
5      Q      You're currently a managing director
6  at LECG?
7      A      I am.
8      Q      What does LECG stand for?
9      A      Now it's the actual name of the
10 company.  The origins, I believe, is Legal and
11 Accounting Consulting Group, or Legal and Economic
12 Consulting Group.  I'm sorry.
13     Q      Can you tell me what LECG does,
14 please?
15     A      LECG is a publicly traded company
16 that provides a variety of advisory services,
17 primarily to corporations, law firms, and
18 government agencies.
19     Q      And also provides expert witness
20 services too; correct?
21     A      That is part of the services, yes.
22     Q      What is your role as a managing
23 director at LECG?
24     A      I'm considered one of the experts,

P. Vinella

1  primarily in the area of financial services, and I
2  provide consulting services, again, to
3  corporations, law firms, and government agencies.
4  So, I am one of the professionals within the firm.
5      Q      Could you turn to your report, sir,
6  which is Exhibit 591, please.
7      A      Sure.
8      Q      In particular, if you could turn to
9  your curriculum vitae, which is at page 28.
10         Do you have it in front of you, sir?
11     A      I do.
12     Q      Did you write this CV, sir?
13     A      I wrote the basic outline of it.  I
14 believe it was proofread and checked by the
15 company.
16     Q      You see that three lines down there
17 is a sentence beginning, "His areas of expertise"?
18     A      Yes.
19     Q      Do you see that?
20         Your CV says that your areas of
21 expertise include trading and investment
22 management, risk management, quantitative
23 analysis, operations, trading and
24 investment-related accounting, technology, in

P. Vinella

1
2  parentheses, included software development, trust
3  administration, and fund administration.
4        Do you see that?
5    A    Yes.
6    Q    Does that accurately represent your
7  expertise, sir?
8    A    I would believe it's a reasonable
9  synopsis of the areas of expertise that the firm
10 and I felt would be the most applicable from a
11 marketing point of view.
12   Q    It's correct that you don't list
13 regulatory compliance as one of your areas of
14 expertise there, sir?
15   A    That is true, that I don't list that.
16 I also don't list operational risk, and I am
17 considered an expert in that area. It's just that
18 there is not a lot of opportunities for consulting
19 services around that, so.
20       Also, I would consider operations to
21 be a major component of regulatory reporting, as
22 is -- in trading management a major issue of that
23 is maintaining regulatory reporting, so.
24       I'm not saying this is an
25 all-inclusive list. It's just again high-level

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1
2  labels intended for more of a marketing purpose.
3    Q    Can you tell me, sir, in taking each
4  of these areas in turn, how is it that they relate
5  to SEC Rule 15c3?
6    A    Well, first of all, the SEC Rule 15c3
7  is a rather broad rule. It's considered one of
8  the core regulatory requirements for broker
9  dealers. It involves, at a most fundamental
10 level, the net capital rule, and as a trader, one
11 of the most important aspects of trading is the
12 use of your capital. In many cases you
13 actually -- your compensation is based on return
14 on capital.
15       So, as a trading manager you are
16 usually allocated capital, and how you use that
17 capital is considered an important aspect of the
18 business. So, you look at the trading management
19 point of view, risk management point of view and
20 the like.
21       The correct use of capital is a key
22 issue. If you are talking specifically around
23 15c3-3, the customer protection rule, there are a
24 number of components of that, again, that deal
25 with trading, making sure that when you are

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1
2  trading, you are trading either customer assets on
3  behalf of the customer or you are trading customer
4  assets at the direction of the customer, if it's a
5  directed account, and that you are not commingling
6  those with the house assets.
7        Operations, I get back to that.
8  Every broker dealer I have ever been exposed to,
9  the 15c3-3 calculation is actually produced in the
10 operations processing systems. They may be
11 aggregated later on at some direct reporting area,
12 but usually the 3-3 calculation is based on
13 results of processing trades, processing the
14 corporate actions and principal and interest
15 payments associated with positions, monitoring
16 stock lending, margins on derivatives, margins in
17 retail trading accounts.
18       So, again, I believe that is the core
19 aspect of regulatory reporting. It actually comes
20 out of the operations systems.
21       The trading and investment-related
22 accounting, there are special FASB standards that
23 are applied to that, as well as the valuation of
24 assets. In the 3-3 calculation there actually is
25 an issue around market value. Again, market

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1
2  valuation usually is performed either by the front
3  office area, the trading side or the operations
4  area.
5    Q    I appreciate that answer, sir, and
6  it's helpful, I think, in narrowing my questions.
7        When I ask you about 15c3 today, my
8  questions are, unless I specifically say
9  otherwise, directed towards the Customer
10 Protection Rule within that.
11   A    Okay.
12   Q    Do you understand that?
13   A    Yes.
14   Q    Would you say, sir, that your
15 expertise is in the systems used to calculate the
16 requirement under the Customer Protection Rule?
17   A    That is part of my expertise, yes.
18   Q    Do you have expertise in the actual
19 computation of the reserve requirements under c3?
20   A    The actual computation is the
21 addition of eight odd numbers and subtracting --
22 of the sum of four to six odd numbers, depending
23 on how you look at margin.
24       So, from a mathematician's point of
25 view, I would say I am an expert because we are

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1  dealing with arithmetic. I believe I am also an
2  experts as to the actual components that were used
3  in that calculation, how those numbers are arrived
4  at.
5
6      Q      Do you consider yourself an expert in
7  the interpretation and application of Rule 15c3?
8      A      Could you be a little more specific?
9      Q      Let's break it down. Do you consider
10 yourself to be an expert in the interpretation of
11 Rule 15c3?
12     A      When you mean interpretation, that's
13 what I am asking, what in context, interpreting?
14     Q      Have you ever had to look at the rule
15 and understand what it means and then apply that?
16     A      As setting up systems, that has been
17 part of the functions, that we would look at that
18 as being a functional requirement, and then we
19 would look at the system to see if it was actually
20 meeting that requirement.
21     Q      Okay. And in those circumstances,
22 sir, were you considered the 15c3 expert on what
23 the rule required, or were you the technology
24 person who was following the direction of someone
25 else in setting up that system?

P. Vinella

1
2      MS. NEUHARDT: Objection, form.
3      A      We would have normally someone from
4  the regulatory reporting group that would be there
5  to insure that what we were incorporating in the
6  code was consistent with what he would be
7  expecting in terms of the data that was going into
8  the calculation, as well as the end result of the
9  calculation.
10     Q      You qualified your answer there, sir.
11 You said you would normally have someone from the
12 regulatory reporting group.
13     A      Yes.
14     Q      Are there circumstances in your
15 experience where you have been the subject matter
16 expert in the interpretation of the Customer
17 Protection Rule under c3?
18     MS. NEUHARDT: Objection to form.
19     A      When you say subject matter expert,
20 again, if it's adding up cash balances, we
21 wouldn't call in a reg reporting person for that.
22 Normally what would happen is, we would ask the
23 end user -- we wouldn't call it a subject matter
24 expert, we would call it the end user -- what
25 their specific requirements would be.

P. Vinella

1
2      In most cases, they would also be
3  part of the testing group to insure that what was
4  set up was actually producing the numbers that
5  they thought they would be receiving. But again,
6  a lot of the calculations are coming directly out
7  of the processing systems, and the report itself
8  is a relatively simple report.
9      Q      In your last answer, sir, who is the
10 end user?
11     A      In most firms there is a group that
12 is a regulatory reporting group. Sometimes there
13 is a financial control group. Other times an
14 operational control group. It depends how the
15 broker dealer is set up.
16     In some cases that area reports into
17 the finance area. Sometimes it reports into
18 regulatory compliance. There is no set rules on
19 how it has to be done.
20     But there usually is a group that is
21 responsible for producing the reports and showing
22 them to executive management as well as to the
23 regulators.
24     Q      We will go through your experience in
25 detail, sir. Before we do that, can you tell me

P. Vinella

1
2  if you have ever been in your employment part of
3  the regulatory reporting group that you have just
4  described?
5      A      No, I have never been part of the
6  regulatory reporting group. I should comment
7  on -- at a broker dealer.
8      Q      Have you prepared any reserve formula
9  calculations?
10     A      I have prepared calculations in
11 connection with the testing of processing systems.
12     Q      For which firm, sir?
13     A      We were involved in a consultancy
14 that I owned in a number of projects that were
15 either starting de novo broker dealers for
16 international banks or converting from one
17 processing system to another processing system.
18     So, in a de novo bank situation we
19 helped Sociéte Génerale set up a U.S. broker
20 dealer, as well as they acquired a U.S. broker
21 dealer called Cowen and Company that had to be
22 integrated.
23     We also helped ABN Amro set up a
24 local fixed-income broker dealer in New York.
25 Both of those entailed identifying systems

Page 22

P. Vinella

1  requirements, identifying systems, purchasing the
2  systems, configuring the systems, and making sure
3  that the systems produced the correct type of
4  reports both for internal management as well as
5  for regulatory reporting.
6        In those cases, we did both the net
7  capital rule as well as the 3-3 rule.
8        For several other banks we actually
9  helped them replace -- or broker dealers that were
10 associated with banks -- we helped them replace
11 their core processing systems, which included BNP
12 Paribas Fixed Income, a group here in New York.
13 We did that work also at Daiwa Securities.
14       We were also involved in doing the
15 due diligence when Bankers Trust bought NatWest's
16 equity businesses, and one of the issues there, we
17 had to do -- they had a lot of problems with the
18 U.S. and British regulators at one point. We had
19 to go in to show that the operations were now
20 clean at the time of purchase, and how to
21 integrate them into the Bankers Trust model.
22       So, part of that was looking at their
23 3-3 calculations and understanding did the books
24 and records of NatWest markets actually confirm

TSG Reporting - Worldwide    877-702-9580

Page 23

P. Vinella

1  the 3-3 reports, and how to get those assets into
2  the broker dealer business.
3        So, as consultancy, I have had a
4  number of experiences with that.
5        Also, if I can add, when I was at
6  Smith Barney, I was in charge of integrating the
7  fixed-income businesses of Shearson, and part of
8  that work was bringing over tens of millions of
9  dollars of customer assets from the Shearson legal
10 entity into the Smith Barney broker dealer.
11       I was responsible for making sure
12 that all the regulatory reporting was being
13 produced, that it was being produced accurately,
14 and that when they asked us for transfer, that
15 they were transferred cleanly.
16   Q    I would like to break those down --
17   A    Sure.
18   Q    -- a little bit and explore those in
19 more detail.
20       Turning first to Wilmington Trust
21 Conduit Services. You were president and CEO of
22 Wilmington Trust Conduit Services from
23 September '06 through January '09?
24   A    I was.

TSG Reporting - Worldwide    877-702-9580

Page 24

P. Vinella

1    Q    I think we have covered this before.
2  I just want to be clear. Wilmington Trust is not
3  a broker dealer; is that correct?
4    A    Wilmington Trust Company has a broker
5  dealer.
6    Q    Wilmington Trust Conduit Services,
7  the company which you were president and CEO of,
8  was not a broker dealer?
9    A    We were not a broker dealer.
10   Q    Did you have any responsibility for
11 the Wilmington Trust broker dealer?
12   A    No, I did not have any operational
13 responsibilities. I was on the management
14 committee of the bank, and as such I was involved
15 in decisions on how much capital to give to the
16 broker dealer, what type of assets they were
17 allowed to take on from a proprietary trading
18 point of view, which will was rather small.
19       So I was involved in certain
20 decisions involving the broker dealer, but I was
21 not part of the day-to-day operations of the
22 broker dealer.
23   Q    You didn't have any responsibilities
24 for the compliance with the Customer Protection

TSG Reporting - Worldwide    877-702-9580

Page 25

P. Vinella

1  Rule on behalf of the Wilmington broker dealer,
2  did you?
3    A    If I can think for one second.
4    Q    Sure. Take your time.
5    A    I believe there were certain
6  instances where we were acting as a custodial
7  agent for the broker dealer, and I can think of
8  two specific cases. One, we were doing money
9  sweeps on behalf of our customers into the broker
10 dealer, and part of that was maintaining
11 segregated accounts both within the bank, so that
12 the customer accounts were segregated and were
13 actually put in trust accounts, and then when they
14 were swept into the broker dealer for the mutual
15 fund that they were investing in, those were also
16 maintained in segregated accounts, and my group
17 was responsible for making sure those were
18 segregated from a reporting point back to the
19 actual investor.
20       So I think from that point of view,
21 yes, I was involved in the Customer Protection
22 Rule.
23   Q    Other than simply insuring that
24 Wilmington Trust as a holder of assets of the

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1
2  broker dealer were held in a seg account, did you
3  have any other responsibility for compliance with
4  the Customer Protection Rule in your time at the
5  Wilmington Trust Conduit Services?
6      MS. NEUHARDT:  Objection to form.
7      A    That would be the extent of my
8  experience with the Customer Protection Rule at
9  Wilmington Trust Conduit Services.
10         Again, if I can say, the operations
11  that we did are very consistent with the broker
12  dealer and custodial agents.  In fact, most broker
13  dealers are not their own custodians.  They go to
14  a custodial bank.  And in many cases we were doing
15  that.
16         And the calculations that we were
17  doing for the equivalent of a Customer Protection
18  Rule were very similar to the 3-3 calculation.
19      Q    How many customers did Wilmington
20  Trust Conduit Services have?
21      MS. NEUHARDT:  Objection.  What do
22  you mean by customer?
23      Q    Do you understand the question, sir?
24      A    I understand the question.
25      Q    Okay.

P. Vinella

1
2      A    It's easier for me to talk about the
3  number of deals we were supporting than the number
4  of customers, if I can put it that way.
5         We supported securitizations, in the
6  sense that the securitization was our customer,
7  not necessarily an entity that would have an
8  operating function.
9         We, as I remember, had 17 deals that
10  we were supporting, plus six hedge funds.  So 17
11  securitizations and six hedge funds.
12      Q    What was the average number of
13  trades, sir, that Wilmington Trust Conduit
14  Services cleared every day?
15      A    In addition to the money sweeps,
16  because we had money sweeps every single day -- we
17  would take excess cash balances and sweep that
18  into money funds.  Some of those were again
19  Wilmington Trust mutual funds.  In some cases they
20  were third-party mutual funds.
21         We probably averaged three to ten
22  trades a day.
23      Q    Do you know, sir, how that number of
24  an average of three to ten trades per day cleared
25  by Wilmington Trust Conduit Services compares to

P. Vinella

1
2  the average number of trades cleared a day by the
3  LBI broker dealer in, say, 2009?
4      A    I believe we heard that --
5      MS. NEUHARDT:  2009?  Did you mean
6  2008?
7      MR. OXFORD:  Sorry.  2008.  Thank
8  you.
9      A    I was going to say, I think we didn't
10  do anything.
11         I think when we talked to some of the
12  operations staff at Lehman Brothers, they
13  mentioned that there were over a couple million
14  transactions per day.
15      Q    Did Wilmington Trust Conduit Services
16  provide any margin lending, sir?
17      A    We did not extend credit as a bank to
18  our customers.  That was one of the things that
19  Wilmington Trust Company did not do.
20      Q    Okay.  If I could turn to your next
21  experience, chronologically going backwards.  I
22  believe you were the CEO of an organization called
23  Toucan, T-O-U-C-A-N, Partners?
24      A    Right.
25      Q    Was that organization at some point

P. Vinella

1
2  also called PVA International?
3      A    They were the same company, yes.
4      Q    At what point did the name change?
5      A    We set up a separate legal entity
6  called Toucan Partners that was minority owned and
7  women owned, primarily to qualify for World Bank
8  projects.
9         It was the same offices with the same
10  people, same owners, slightly different ownership
11  structure, so, again, we could qualify for these
12  World Bank projects.
13      Q    Can you tell me, sir, what was
14  your -- what were your primary responsibilities as
15  CEO of Toucan Partners and/or PVA International?
16      A    I was primarily responsible for
17  managing projects as a consultancy.  We didn't
18  have a lot of overhead and management structure,
19  so I was engaged probably 80 percent of my time on
20  client projects.  And the other majority of my
21  time was based on sales.
22         There was a small, you know, amount
23  set aside to do administrative tasks, such as
24  accounting and HR type of work, and in the
25  projects I primarily acted as either the lead

P. Vinella

1      P. Vinella
2  business analyst and/or the chief, what we called
3  business architect, the person that would design
4  the solution to meet the client's needs.
5      **Q    Okay.  Was it in your capacity as CEO**
6  **of Toucan Partners that you gained the experience**
7  **referenced in Exhibit B of your report for Bankers**
8  **Trust, Société Générale and Daiwa Securities?**
9          **Exhibit B starts at page 38.**
10     A    Okay.
11         All of the projects that you
12  mentioned were performed when I was at Toucan,
13  yes.
14     **Q    Is that the same for the work you**
15  **provided to ADP, Bank of America Securities,**
16  **JPMorgan Securities and ABN Amro?**
17     A    It was.
18     **Q    Okay.  Thank you.**
19         **Which of your clients of Toucan**
20  **Partners were broker dealers?**
21     A    All of the projects that I listed
22  here were broker dealers, except for ADP, which
23  was a vendor system to broker dealers.  We had a
24  number of other broker dealers as well as clients.
25  I would say 90 percent of our business was related

P. Vinella

1      P. Vinella
2  to trading and investment management, and it
3  would -- it would fall 50/50 between a bank, and
4  primarily the treasury area of the bank or the
5  derivatives area of the bank, or the broker dealer
6  of a bank.
7          In some cases we just did work with
8  strict broker dealers, such as Merrill Lynch or
9  Lehman Brothers.  I think we probably worked with
10  20 to 30 broker dealers over that period of ten
11  years.
12     **Q    Looking at Page 39 of your report,**
13  **sir, you say that in relation to Bankers Trust,**
14  **you played the lead role during the due diligence**
15  **and post-merger integration planning of Bankers**
16  **Trust's acquisition of NatWest's markets, equity**
17  **and derivatives operations from National**
18  **Westminster Bank.**
19     A    Yes.
20     **Q    Can you describe in a little more**
21  **detail what your personal role was on this**
22  **project.**
23     A    Actually, that was an interesting
24  project.  I was at the time a consultant to
25  Bankers Trust.  They had an organizational

P. Vinella

1      P. Vinella
2  structure where they had a head of operations and
3  technology for all of their major business lines.
4  I believe there was ten.
5          And they would have a monthly
6  committee meeting, and I was invited as an outside
7  member to that committee to bring in different
8  perspectives, and also, as they started to get
9  into lots of internal fighting, I would try to be
10  the calming influence.  Most of the fighting was
11  around budgeting, so you can imagine it wasn't a
12  fun time.
13         During that engagement I was
14  contacted by the head of equities at Bankers
15  Trust, who mentioned that they were in the process
16  of buying Barclays' equity businesses, and he had
17  heard from Barclays that I had had a long
18  relationship with BZW, which was at that time the
19  investment bank of Barclays, and I helped set up
20  all the equity businesses for Barclays in Japan
21  and in Singapore, so I knew the people, I knew the
22  systems at Barclays.
23         So, they said can I get on a plane
24  that night because of that background.  Three
25  hours later I was called to say the deal was dead,

P. Vinella

1      P. Vinella
2  don't get on the plane.
3          A week later they said, we are buying
4  NatWest.  Can you get on the plane again.
5          I said, I don't know anything about
6  NatWest.  They said, you are the only expert we
7  have, so you go.
8          So when I arrived in London, NatWest
9  at that point was so tired of people coming into
10  their organization, I mean they had six or seven
11  firms that were trying to buy it at that point in
12  time, that we, my partner and I were designated as
13  the only two non-Bankers Trust consultants they
14  would allow to come into the facility, and we were
15  the only ones, including Bankers Trust staff, that
16  they would allow to see the actual operations, the
17  books and records of the firm, all the regulatory
18  reports.
19         So, other than the revenue-generating
20  areas of NatWest -- we didn't interview, for
21  instance, the traders, and we didn't talk to the
22  sales staff -- my partner and I were the only
23  people that were allowed to go in and actually
24  interview all the staff, look at the systems and
25  the areas.

P. Vinella

1  And I ended up actually negotiating
2  on behalf of Bankers Trust, wearing my Virgin
3  Airlines sweats, by the way, and reduced the
4  acquisition price by about 150 million
5  pounds, 120 to 150, I can't remember the exact
6  number.
7  Actually I'm a character in a book
8  that was written about that specific issue because
9  the British bankers didn't particularly like the
10  fact that I was in my Virgin Airlines sweats, and
11  the Americans thought it was absolutely hilarious,
12  so.
13  At that point we had to go in -- it
14  was a $500 million acquisition. We had to go in
15  and look at every single position they had, every
16  single open item, understand why the open items
17  were there.
18  We talked to people at the FSA to
19  understand what the problems were that they saw
20  six months earlier, when they put a sanction on
21  the operations.
22  And we came up with a remediation
23  plan, as well as a plan to take the businesses and
24  integrate that into Bankers Trust International.

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1  Q    In your report, sir, you say that the
2  work involved a review of a number of things,
3  including regulatory compliance reporting.
4  A    Yes.
5  Q    Was that something you were
6  personally involved in, sir?
7  A    I was.
8  Q    Can you tell me about that, please.
9  A    We -- as I mentioned, NatWest had had
10  some regulatory problems, I believe it was six to
11  nine months earlier, due to a number of problems
12  involving unreported large outstanding breaks, and
13  if I use the term "breaks," by the way, it's a
14  term of art within the industry. It usually just
15  means that you have had a problem so you are
16  trying to investigate.
17  So it can be when you are reconciling
18  your account against your depository, there is a
19  reconciliation break. It could be the fact that
20  you have outstanding trades that haven't settled.
21  Those could be considered breaks as well.
22  What we did was look at all the
23  regulatory compliance reporting that was produced
24  both for the FSA as well as for the SEC, and at

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1  that point it was NASD not FINRA. And we then
2  went and looked at the operational reports that
3  generated those compliance reports to show that
4  the -- to see to what extent the reports had been
5  manually updated or amended, versus the
6  operational reports.
7  And then we looked at the reports
8  after the supposed fixes had been put in place to
9  see were indeed those fixes actually taken care
10  of. In several cases we found that actually the
11  outstanding items weren't on the regulatory
12  reports any longer, but they were actually still
13  in the operating systems. Hence, the negotiations
14  and the change in the acquisition price.
15  Q    The regulatory compliance reporting,
16  sir, that you have just told me about, at least in
17  part relates to the U.K. regulations; correct?
18  A    It does, yes.
19  Q    Does it, in fact, all relate to the
20  U.K. regulations?
21  A    No. There was -- they also bought
22  the operations of NatWest in the United States as
23  well.
24  Q    Was NatWest a U.S. broker dealer?

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1  A    They had a U.S. broker dealer
2  component. They maintained -- I believe at that
3  point it was called Greenwich Capital, and it was
4  primarily fixed income. They did have a small
5  equity division, and that's what went over to
6  Bankers Trust.
7  The Greenwich Capital fixed-income
8  businesses stayed with NatWest.
9  Q    How large was the U.S. broker dealer
10  component of this transaction, sir?
11  A    It would have probably been about
12  15 percent of the total business in terms of the
13  amount of capital that was being used.
14  Q    And how many trades a day did the
15  U.S. broker dealer clear?
16  A    I can't even remember that. I'm
17  sorry.
18  Q    The regulatory compliance reporting
19  that you just told me you were responsible for,
20  did that include the Customer Protection Rule
21  under c3?
22  A    Well, again, when you say c3 and you
23  are saying Customer Protection Rule, it is
24  slightly different to me.

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1  But we looked primarily at the net
2  capital rule issues, as opposed to customer rules.
3
4  **Q    Did you spend any time looking at the**
5  **customer rules in the NatWest/Bankers Trust**
6  **engagement?**
7  A    We looked at the segregated accounts.
8  In Europe it's slightly different than the United
9  States in terms of segregated accounts.  We looked
10  at segregated accounts here.  We looked at
11  segregated accounts in the U.K.  We looked at the
12  balances in them, and we insured that the assets
13  were in segregated accounts at their custodians
14  and depositories and at their commercial banks.
15  So we did validate that that was done
16  and that the reports reflected the balances as
17  they were reported.
18  **Q    In the answer to my last question,**
19  **sir, were you talking about the U.K. rules as well**
20  **as the U.S. rules?**
21  A    Both.  Both entities were part of our
22  purview.
23  **Q    Right.  My question is a little**
24  **narrower than your answer.**
25  A    Okay.

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1
2  **Q    My question is directed only towards**
3  **Rule 15c3-3, the Customer Protection Rule.**
4  **What I want to know is:  What work**
5  **did you do in connection with the U.S. broker**
6  **dealer that Bankers Trust acquired from NatWest in**
7  **connection with that U.S. rule?**
8  A    Again, we looked at their operational
9  systems and evaluated the segregated accounts that
10  were in the broker dealer system.  We then also
11  looked at the accounts that maintained at the
12  DTC to -- and these were all the DTC settling
13  instruments, so we didn't have to look at Fed or
14  other types of depositories.
15  And we also looked at their cash
16  accounts that were maintained, and confirmed that
17  they were segregated and that the balances that
18  were reflected in the systems were also the same
19  balances that were reflected in the depository.
20  **Q    In your testimony earlier, you talked**
21  **about an end user.**
22  A    Yes.
23  **Q    Do you remember that testimony?**
24  A    Yes.
25  **Q    Who is the end user in the context of**

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1
2  **the work you just told me about in your last**
3  **answer?**
4  A    At that point, we weren't facing off
5  with an end user.  There was an acquisition team
6  that Bankers Trust had put together and we were
7  reporting into that group.  That group happened to
8  be led by a gentleman named Salia Newsy who was
9  the head of compliance for Bankers Trust, which is
10  kind of odd.  Normally you have a business manager
11  in charge of an acquisition.  They had their head
12  compliance officer who was in charge of it.
13  So I reported in to Sal on a weekly
14  basis, and on a daily basis I reported in to the
15  business manager for trading at Bankers Trust.
16  **Q    Were you the regulatory compliance**
17  **expert in this transaction, sir?  Again, my**
18  **question goes narrowly to the U.S. rule, not the**
19  **U.K. rules.  And specifically, with respect to the**
20  **Customer Protection Rule under Rule 15c3.**
21  MS. NEUHARDT:  Objection, form.
22  A    I was, and my partner, were the only
23  people that looked at the segregated accounts and
24  the only ones that confirmed, to my knowledge,
25  that those balances in those segregated accounts

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1
2  were indeed what they were reported to be.
3  I don't know of anyone else within
4  Bankers Trust that may have looked at it after us,
5  but we were the only ones who were looking at it
6  at that point in time.
7  **Q    Who was your partner?**
8  A    Jeanette Jin.  She was my partner at
9  Toucan Partners, and she was also my partner at
10  Wilmington Trust Conduit Services.
11  **Q    And you reported the results of your**
12  **work in connection with the Customer Protection**
13  **Rule up to -- sorry, you are going to have to give**
14  **me the name again.**
15  A    Salia Newsy.
16  **Q    Can you spell that for me?**
17  A    Actually, I can't.
18  **Q    S-A-L?**
19  A    Yeah, let's call him Sal.
20  I reported that with a number of
21  other aspects around their operational systems,
22  and I think it initially went in to a gentleman
23  named Armand D'Accordo, who was the business
24  manager, as I mentioned, of all the trading within
25  the Bankers Trust.

TSG Reporting - Worldwide    877-702-9580

Page 42

1          P. Vinella
2      Q    Are you familiar with something
3  called a KEOP report, sir?
4      A    No, I am not.
5      Q    Also known as a key operational
6  indicator report, sir.
7      A    I do not know of a report that is
8  called that, no.
9      Q    You were not responsible, I take it,
10 for filing a KEOP report with FINRA in connection
11 with your work for Bankers Trust?
12     A    FINRA did not exist when I did my
13 work at Bankers Trust.  As I mentioned, that was
14 a -- there was NASDR, at that point was the
15 regulatory agency, as I remember.
16     Q    Were you responsible, sir, for filing
17 any reports to NASDR in connection with your work
18 for Bankers Trust?
19     A    No, I was not responsible.
20     Q    Who was responsible for that, sir?
21     A    I don't know who in Bankers Trust
22 would have been responsible for getting the
23 regulatory approval for the acquisition.
24     Q    My question was a little more
25 specific, sir.
       TSG Reporting - Worldwide    877-702-9580

Page 43

1          P. Vinella
2      Q    Were you responsible for filing any
3  regulatory reports with NASDR in connection with
4  the conversion of the broker dealer from NatWest
5  to Bankers Trust?
6      A    No, I did not face off with the
7  regulators.
8      Q    And you don't know who did?
9      A    No.
10     Q    Moving on to Société Générale.  You
11 state that you acted as interim CIO leading the
12 formulation of a five-year strategic technology
13 plan, and then acting as an overall -- sorry, the
14 overall program manager and chief business analyst
15 in the bank's formation of an SEC registered
16 broker dealer and the post-merger integration of
17 U.S. broker dealer Cowen and Company.
18         Is that correct?
19     A    Yes.
20     Q    You go on to say, and this is
21 referring to page 40 of your report, "This work
22 required a detailed understanding of broker dealer
23 operations, including but not limited to customer
24 accounts, SEC Rule 15c3, and repos."
25         Is that correct?
       TSG Reporting - Worldwide    877-702-9580

Page 44

1          P. Vinella
2          MS. NEUHARDT:  It says 3-3, actually.
3      A    Yes.
4      Q    Can you tell me, sir, in your work
5  for Société Générale, what aspects of the Rule
6  15c3 reserve formula you were responsible for?
7      A    We had to set up the relationships at
8  the DTC.  At that point in time -- I am just going
9  to call it SG, so we don't have to say Société
10 Générale.
11         SG was not a member of the DTC at
12 that point, so they became a member.  We had to
13 set up segregated accounts.
14         They did not do customer business in
15 the United States, so there was a large amount of
16 regulatory filings to get the broker dealer
17 license.
18         We also had to get systems that would
19 produce broker dealer regulatory reporting that
20 were different than the bank's normal reporting
21 systems that would go to the Federal Reserve.
22         In this case I worked directly with
23 the head of compliance, as well as the general
24 counsel of the bank.
25     Q    Who is head of compliance?
       TSG Reporting - Worldwide    877-702-9580

Page 45

1          P. Vinella
2      A    The gentleman I reported in to
3  primarily was a gentleman named Governor Tipton.
4  His first name is Governor.
5      Q    He had ambitious parents.
6      A    It was difficult when we were dealing
7  with the Brits from Merrill Lynch, because they
8  kept calling him the Governor.  I said his name is
9  Governor.
10         He was the gentleman I faced off with
11 pretty much on a weekly basis for the regulatory
12 components in terms of filing regulatory licenses
13 and also setting up the regulatory systems.
14     Q    Was he the head of compliance?
15     A    He was the -- he was the head lawyer
16 that -- that the head of compliance reported in
17 to.
18         And I also worked directly with the
19 Chief Operating Officer of the business unit that
20 was in charge of setting up the broker dealer, and
21 I also reported in to the general manager of the
22 U.S. branch.
23         So, those are the three people I
24 worked with most closely.
25     Q    Was Mr. Tipton responsible for the
       TSG Reporting - Worldwide    877-702-9580

Page 46

P. Vinella

1
2  regulatory compliance aspects of the systems that
3  you were setting up, sir?
4      A    He was, yes.
5      Q    Did you consider him to be the
6  subject matter expert in the area of the Customer
7  Protection Rule under c3?
8      MS. NEUHARDT:  Objection, form.
9      A    No.  I -- his background was more in
10 bank regulatory reporting as a broker dealer.  He
11 had a gentleman, and I can't remember the
12 gentleman's name right now, who was the head of
13 compliance who had worked, I think it was at First
14 Boston, and understood the broker dealer business,
15 but he also understood bank regulatory, so that
16 would have be the gentleman that would have been
17 the subject matter expert.
18     Q    Just so we are clear, the subject
19 matter expert in your work for SG in the area of
20 Customer Protection Rule 15c3 was not you, it was
21 someone else; correct?
22     MS. NEUHARDT:  Objection, that's
23 mischaracterizing his testimony.
24     A    There was a gentleman that ran
25 compliance that I was responsible for delivering

TSG Reporting - Worldwide    877-702-9580

Page 47

P. Vinella

1
2  requirements.  He would have his requirements and
3  we would do our best to insure that what we were
4  doing met those requirements.  Yes.
5      Q    Right.  So, it wasn't you or your
6  team from Toucan, sir, who were defining the
7  requirements for the regulatory reporting system
8  that you were setting up, it was someone else; is
9  that correct?
10     A    Well, again, I think you are
11 bifurcating this in a way that is not how it works
12 in practice.  All of the operations of a broker
13 dealer feed into the 3-3 calculation.  So, the
14 head of compliance, which is -- I'm sorry, I can't
15 remember the gentleman's name.  He didn't know
16 anything about how to settle and clear a trade.
17 He understood what cash balances in customer
18 accounts were, but he didn't understand what
19 systems were necessary to provide that
20 information, how to set those systems up.
21     So, we didn't rely on him to say,
22 okay, if you are going to be looking at stock loan
23 of customer assets and then rehypothecate it, this
24 is the way you account for it.  He didn't
25 understand it.  He just knew there was a line

TSG Reporting - Worldwide    877-702-9580

Page 48

P. Vinella

1
2  number that said that someone has to fill in that
3  and there were operational staff behind it that
4  could demonstrate those numbers had been filled in
5  correctly.
6      So that was what I was responsible
7  for, putting together the entire, we call it
8  business architecture, so when data comes into the
9  environment, all the processing systems that had
10 to handle it and then the different various
11 reporting systems, whether those were operational
12 reporting systems, regulatory reporting systems,
13 financial reporting systems, how those were fed
14 in.
15     So, his requirement was I need a
16 report in this format that has this data, and then
17 our responsibility was to go and say, okay, where
18 do you get that data from and how does it feed
19 into it.
20     So I think it's really important when
21 you look at the 3-3 calculation, it's the end
22 results of the processing of the 2 million trades
23 a day that we talked about earlier.
24     I think it's also important, if I
25 look at Mr. McIsaac's report, everything he's

TSG Reporting - Worldwide    877-702-9580

Page 49

P. Vinella

1
2  talking about are operational problems.  He's not
3  talking about addition problems in the
4  calculation.  What he's talking about is
5  securities that weren't kept in good control
6  locations or assets that had been seized at a
7  custodial bank or a third party.
8      So, those are operational issues that
9  would be not resolved by regulatory reporting but
10 someone in the operations area and someone going
11 into the systems and understanding that.
12     Q    We will come to Mr. McIsaac's report
13 in a little while.
14     A    Sure.
15     Q    Just while you raised that, the
16 operational problems that you have just described,
17 are those common in your experience?
18     A    Well, in operations, every day there
19 is an error, and the reason there is errors is for
20 a variety of reasons.  One, you are dealing with
21 usually third parties, and trade tickets could be
22 incorrectly written, instructions and delivery
23 could be incorrectly written, there could be a
24 problem where you are expecting something to come
25 in and it doesn't come in, therefore you can't

TSG Reporting - Worldwide    877-702-9580

Page 50

1     P. Vinella
2 deliver it.
3         So, the nature of operations is
4 solving problem, and every operations I have ever
5 been involved with, there is a group that's
6 usually called investigations, and they are in
7 charge of handling it.
8         So, in general, operations are
9 dealing with solving problems as much as
10 processing.
11        The week that Lehman Brothers -- the
12 week preceding Lehman Brothers' liquidation, a lot
13 of things that were not common happened in terms
14 of seizing of assets and things like that, and at
15 Wilmington Trust we actually had a lot of business
16 with Lehman Brothers, so I understand from a
17 personal point of view that Citibank bought the --
18 not the broker dealer assets, but other affiliates
19 of Lehman Brothers, they actually seized assets
20 that belonged to us, and we had to get it back
21 from Citibank.
22        So, that week there were some things
23 that would not be normally in daily operations,
24 but daily operations, yes, you have lots of
25 problems.

TSG Reporting - Worldwide    877-702-9580

Page 51

1         P. Vinella
2     Q   Getting back to your experience, sir,
3 and turning to Daiwa Securities.  It's D-A-I-W-A.
4         Down on page 40 of your report, you
5 say you played a lead advisory role on several
6 projects designed to expand Daiwa Securities'
7 services to its U.S. and Japanese clients,
8 including implementation of a new back office
9 processing system, the launch of a de novo prime
10 broker operation, and the evaluation of
11 establishing a managed account business for high
12 net worth individuals.
13        Is that correct?
14    A   Yes.
15    Q   Did your work at Daiwa Securities
16 involve performing any Rule 15c3 reserve
17 calculations?
18    A   We set up the systems that fed the
19 3-3 calculations.  In the case of the broker
20 dealer operation, they set that up as completely
21 separate from the broker dealer operation, so it
22 had separate staff, separate systems, separate
23 accounts at DTC.
24        And part of that was making sure that
25 everything was set up so that we could, again,

TSG Reporting - Worldwide    877-702-9580

Page 52

1         P. Vinella
2 guarantee the accounts had been correctly
3 segregated and that they would map into the reg
4 reporting system.
5     Q   Who was responsible for the reg
6 reporting system at Daiwa, sir?
7     A   At that point we were dealing with
8 the Chief Operating Officer, named Rich Beggs, and
9 we had two Japanese gentlemen, who I can't
10 remember their names, that came in and oversaw the
11 work product that we were doing.
12        At that point I wasn't dealing with
13 their internal compliance officer.  I was just
14 dealing with Rich Beggs, and he would face off
15 with who he needed to face off with.
16    Q   Did Mr. Beggs give you -- withdrawn.
17        Did Mr. Beggs give you instructions
18 as to his requirements under the Customer
19 Protection Rule?
20    A   In this case, the system that the
21 broker dealer went with actually had a package
22 that produced the 3-3 calculation, so once you set
23 up all the calculations -- all the accounts and
24 identified which accounts were customer accounts
25 and which accounts weren't, it would then

TSG Reporting - Worldwide    877-702-9580

Page 53

1         P. Vinella
2 automatically just populate the report.
3         So, I don't know that there were any
4 specific requirements beyond that, that aspect of
5 it.  So, we just made sure that the accounts were
6 set up and that they were -- when a trade ticket
7 was entered, you would -- if you put in the
8 customer account, then the rest of the processing
9 would be rather transparent.
10    Q   So if I understand your testimony
11 correctly, Daiwa Securities purchased an
12 off-the-shelf software package that included
13 within that software to calculate the customer
14 protection requirements under c3?
15    A   Right.
16    Q   Okay.  Turning to ADP.  You state
17 that you played a lead advisory role in several
18 projects to expand ADP's presence in the
19 fixed-income markets.
20        Can you tell me if that experience
21 has anything to do with SEC Rule 15c3, and in
22 particular the Customer Protection Rules?
23    A   It did.  I was actually recruited to
24 ADP to be the president of a new division they
25 were starting around fixed-income processing.  The

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1  majority of their brokerage processing at that
2  point was domestic equities and listed
3  derivatives, and they wanted to get into the
4  fixed-income market.
5       So the first thing we did was write
6  down what the requirements were to support
7  primarily broker dealer businesses dealing with
8  fixed income, as well as banks that might be using
9  it in the treasury area.  Then as part of that
10  business analysis, we came up with a set of
11  requirements that a system or systems would have
12  to have, one of which was the reg reporting.  It
13  wasn't specifically the 3-3.  It was around all
14  the broker dealer regulatory reporting.
15       And the question was, would we take
16  those fixed-income systems that they were looking
17  at acquiring, or I should say I wrote the business
18  plan, and I identified the possible acquisition
19  targets, whether that made sense to put it into
20  the ADP BPS brokerage system and have that do all
21  the regulatory reporting, or should we have a
22  separate regulatory reporting environment just for
23  the fixed-income businesses.
24       At that point, we identified, I

P. Vinella

1  think, in the neighborhood of nine to ten
2  acquisition candidates, and we went out and
3  evaluated the businesses that -- you know, that
4  they had as well as the technology, and part of
5  that again was to understand how robust the
6  regulatory reporting was and how much we could
7  rely on it.
8       The decision was eventually made to
9  purchase a system that was called ICI or a
10  business called ICI and to have ICI do all the
11  regulatory reporting independently of BPS, so if
12  you were a BPS client and a ICI client, you got
13  two 3-3 calculations out of that, as well as two
14  net capital calculations, and then you would, in a
15  spreadsheet primarily, add those two together to
16  get an overall view of fixed income and equity
17  businesses.
18       It didn't seem to be practical to try
19  to put that into the ADP systems, since it didn't
20  really handle -- because you couldn't go backwards
21  and show that the numbers actually tied out to the
22  positions, since the positions wouldn't be
23  maintained at ADP.
24       Q    You said at the start of that answer,

P. Vinella

1  sir, that you were recruited to be president of a
2  new division of ADP?
3       A    I was.
4       Q    So while you were at -- who were you
5  employed by at that time?
6       A    I was at Smith Barney at that point.
7       Q    I think I must have misunderstood
8  your earlier testimony.  I thought the ADP work
9  you did while you were a consultant and employed
10  by Toucan.
11       A    That actually is correct.  This is
12  how Toucan started.  When I was recruited to ADP,
13  the package they offered me was to get 10 percent
14  of the revenues of the business.  When I asked
15  them how many -- what kind of revenues they had,
16  they said zero.  We want you to start it.
17       So I said 10 percent is not very
18  good.  I said I was willing to leave with the
19  package I was getting at Smith Barney, at which
20  point they told me I would be getting paid more
21  than the CEO and chairman of ADP, and that the
22  easiest way they could give me the package I
23  needed was if I was a consultant as opposed to an
24  employee.  That would be very easy.

P. Vinella

1       So, my first two years of PVA/Toucan,
2  basically my only client was ADP.
3       When we finished the analysis, I had
4  so much demand on the consulting business, it
5  didn't make sense to stay at ADP, because I could
6  make more money being a consultant, and quite
7  frankly, it was a lot more time.
8       So that's how PVA and Toucan Partners
9  started.
10       Q    In your work for ADP, sir, that you
11  have just told me about, who was the subject
12  matter expert on the Customer Protection Rule
13  under 15c3?
14       MS. NEUHARDT:  Objection, form.
15       A    There, again, you are talking back so
16  far, I can't remember the gentleman's name.  There
17  was a gentleman within ADP who was considered to
18  be the BPS expert, and again, a large part of BPS
19  was producing regulatory reports, so, we worked
20  with him a lot to understand -- again, we were
21  looking at the fixed-income systems -- could they
22  go in the ADP regulatory reporting.
23       So we relied on him specifically on
24  how to feed the data into the BPS system.  The

Page 58

P. Vinella

1  P. Vinella
2  package that we ended up going with already had a
3  3-3 calculation in it. We didn't rely on him. We
4  just validated with him the buckets that the 3-3
5  calculation relies on were being filled in
6  correctly from the operational side of the
7  processing system.
8      MR. OXFORD: Okay. We have been
9  going about an hour. It might be a good
10  time to take five minutes.
11      THE WITNESS: Sure.
12      (Recess taken.)
13  BY MR. OXFORD:
14      Q    Again, on page 40 of your report,
15  Mr. Vinella, you discuss your role with respect to
16  Bank of America Securities. Do you see that?
17      A    Yes.
18      Q    Were you employed by Toucan at that
19  time, sir?
20      A    I was.
21      Q    What time frame are we talking about,
22  when you did this work for Bank of America?
23      A    I believe this was 2004.
24      Q    You state that the work you did
25  included performing extensive interviews with

TSG Reporting - Worldwide    877-702-9580

Page 59

P. Vinella

1  P. Vinella
2  numerous operations staff defining thousands of
3  requirements, including customer accounts and SEC
4  Rule 15c3 requirements.
5      Do you see that?
6      A    Yes.
7      Q    Can you tell me about the work you
8  did in defining SEC Rule 15c3 requirements for
9  Bank of America?
10      A    At this point in time, we had
11  developed a rather rich methodology that had
12  captured requirements from dozens of other
13  projects, and we had a way of identifying the
14  types of products that would be processed, whether
15  those were equity products or fixed-income
16  products, whether those would be traded under a
17  broker dealer license or a bank license, whether
18  those would be the types of requirements in terms
19  of the users, whether those would be traders,
20  salesmen, operations, and as a result, we were
21  able to generate many of these requirements
22  without relying on the Bank of America staff.
23      So, we first put that together. We
24  then validated the -- they had picked a vendor
25  package they wanted to use. They called us in to

TSG Reporting - Worldwide    877-702-9580

Page 60

P. Vinella

1  P. Vinella
2  validate that selection. So we used those
3  requirements, which included the 3-3 calculations,
4  as well as the segregated account requirements,
5  and then the other aspects of the 3-3 calculation
6  that would -- the components of those calculations
7  that were based on the operations.
8      We would validate that those -- there
9  was two vendor packages we were looking at, that
10  either one of those packages actually met those
11  requirements. So most of the requirements were
12  generated from this kind of methodology that we
13  had.
14      We then also worked with the
15  operations areas to make sure that the
16  requirements that we had were ones that they felt
17  comfortable with.
18      Q    Which off-the-shelf vendor systems
19  was Bank of America considering?
20      A    The primary candidate was a company
21  with the odd name of Shadow Financials, and I
22  think that is probably why the executives were a
23  little worried about the selection. And that was
24  a spinoff of a broker dealer called Refco. And
25  they believed that that system could replace the

TSG Reporting - Worldwide    877-702-9580

Page 61

P. Vinella

1  P. Vinella
2  ADP system. Bank of America had been trying to
3  replace the ADP BPS system for about ten years at
4  that point.
5      There was a second system, developed
6  by Solomon Brothers, and the new head of equity
7  trading that had come over to Bank of America
8  Securities had come from Solomon Brothers, and
9  they were thinking about trying to buy that
10  package from -- at that point it would have been
11  Citigroup.
12      Q    Is it correct, sir, that you were
13  asked by Bank of America to validate the 15c3-3
14  portion of those two vendor packages?
15      A    That was part of my assignment, was
16  to show that it could handle customer as well as
17  proprietary trading, and that, again, the
18  segregated accounts and the activity around those
19  segregated accounts would map directly to the
20  regulatory reporting requirements.
21      Q    And who -- withdrawn.
22      Were you the subject matter expert on
23  15c3, in particular the Customer Protection Rule?
24      MS. NEUHARDT: Objection.
25      Q    In your work for Bank of America?

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1
2     MS. NEUHARDT:  Objection to form.
3     A     At that point, again, when you look
4 at the entire flow of what goes into that
5 calculation, I was the, the lead, you know,
6 business architect, as we call it.  How all the
7 operational information flows into these various
8 reporting systems, that's what I was responsible
9 for.
10     Q     If you had a question about the
11 application of the Customer Protection Rule, who
12 would you go to, sir?
13     A     In this case, we didn't have anyone
14 in the compliance group that was part of the
15 vendor selection process.  We did ask various
16 people in the operations area that were
17 responsible for showing that the numbers that were
18 being input into the calculation -- again, there
19 is eight credits and I think six debits in the
20 calculation, and you add the credits together and
21 you subtract the debits, so it's a relatively
22 simple calculation.
23     But the operations areas that were --
24 the head of margin was part of the group, and
25 margining is a major part of the 3-3 calculation,

TSG Reporting - Worldwide     877-702-9580

P. Vinella

1
2 and we had the head of stock loan operations was
3 part of that group, and stock lending is a major
4 part of the calculation.
5     So there were people there that we
6 would rely on, but we relied on -- and I think
7 this is consistent with many of the other
8 opportunities here.  We relied on them not as the
9 people telling us how the systems worked, but they
10 were the ones that were going to use it and they
11 wanted to have certain screens, they wanted
12 certain reports.
13     So, we weren't going there and saying
14 how do you calculate margin requirements.  We knew
15 how to do that.  We were saying, when you see the
16 margin requirements, how would you like to see it
17 broken down.  Would you like to see it broken down
18 by day, by security type?  Do you want to see a
19 variance in market value?
20     So, a lot of the requirements were
21 dealing with how they wanted to use the system as
22 opposed to how the computations would be done.
23 They'd rely on us for the.
24     Q     And the end user of the package that
25 you just described would include the regulatory

TSG Reporting - Worldwide     877-702-9580

P. Vinella

1
2 compliance function of Bank of America, correct?
3     A     I would assume they were part of this
4 dealer group, yes.  Again, they were not part of
5 the selection committee.  The selection committee
6 was almost entirely operations staff.
7     Q     Did you -- did you interview members
8 of Bank of America who were responsible for making
9 the 15c3-3 reserve calculation?
10     A     We talked to the people that produced
11 the components of the 3-3 calculation, not
12 necessarily the final addition and subtraction of
13 the numbers.
14     Again, the operations staff was
15 responsible for showing that the free cash
16 balances that were input into the calculation were
17 actually the right free cash balances.  The reg
18 reporting group doesn't know if that's true or
19 not.  They would have to talk to the operations
20 area.
21     So, the operations area was making
22 sure that those calculations were being performed
23 correctly.  Again, it was more from, were they
24 getting the types of reports and screens that
25 would allow them to easily validate that those

TSG Reporting - Worldwide     877-702-9580

P. Vinella

1
2 numbers were there, plus help them during their
3 daily operations, whether it's selling, clearing
4 trades, moving cash, reconciling cash.
5     So, those were the kinds of things we
6 really focused on more, how they would interact
7 with the system as opposed to how the system
8 itself would be designed.
9     Q     Turning next to JPMorgan Securities,
10 again, was the work you did for JPMorgan something
11 you did while you were employed by Toucan?
12     A     Yes, it was.
13     Q     What time period did this work take
14 place in?
15     A     This was probably 1999, 2000.  I
16 think it was before the millennium, so I think it
17 was 1999.
18     Q     You state, sir, that you evaluated.
19 JPMorgan Securities' business plan and operational
20 design for the launch of the de novo prime broker
21 operation; is that correct?
22     A     Yes.
23     Q     Did that prime broker operation
24 actually become operational?
25     A     I don't know if that specific one

TSG Reporting - Worldwide     877-702-9580

P. Vinella

1
2   did. They did launch one shortly thereafter.
3   Part of our analysis was that they weren't going
4   to be able to rely on the broker dealer
5   environment primarily, because it didn't have good
6   segregation rules in the accounts set up, so that
7   if they were going to launch it, they had to do it
8   as a separate operation, which is consistent with
9   the way most prime broker operations are set up.
10          But I was not involved in the actual
11  launch of that business. I was really again
12  looking at the business plan they came up with,
13  the operational design, and seeing if that could
14  support the businesses they were talking about
15  supporting.
16      Q    As a prime broker operation, would
17  **this contemplated entity have to comply with SEC**
18  **Rule 15c3?**
19      A    It would, because they were going to
20  be the -- custodying customer assets. One of the
21  major issues around a prime broker's operation is
22  the basically securities lending and the extension
23  of credit to the prime brokers, which is actually
24  different than the margin account requirements for
25  retail brokers.

P. Vinella

1
2   So, there is usually much more, there
3   is much more processing associated with computing
4   margin accounts, margin requirements, and there is
5   also a direct link to your securities lending
6   operation. So, we did a lot of work in
7   understanding margin requirements, segregated
8   accounts, so they wouldn't get -- when they were
9   doing stock lending, that the rehypothecation was
10  done correctly.
11         That was a large part of the design,
12  was evaluating the current JPMorgan systems at
13  that time and seeing if they could handle these
14  new margin requirements, as well as the
15  segregation and sec lending or securities lending.
16      Q    This contemplated prime broker would
17  **have to comply with the Customer Protection Rule?**
18      A    Yes. It would, it would have.
19      Q    And it would have had to make a
20  **reserve requirement calculation under the Customer**
21  **Protection Rules; is that correct?**
22      A    It would have had to feed that
23  calculation, yes.
24      Q    But it wouldn't actually have
25  **responsibility for -- it wouldn't be obliged**

P. Vinella

1
2   **rather or required under the Customer Protection**
3   **Rules to make that reserve calculation every week;**
4   **is that correct?**
5       A    If it was part of the broker dealer
6   operation as -- operating under that license, it
7   wouldn't have a separate requirement. It would be
8   part of the broker dealer's requirement.
9          In general, the way these work is the
10  various business units, and it's primarily because
11  of the processing systems, they usually produce
12  their own subset of a 3-3 calculation, and those
13  are all added up together, to produce the broker
14  dealer-wide 3-3 calculation.
15         So, they would have been -- this
16  operation would have been part of the 3-3
17  calculation. How that was actually computed
18  was -- now can vary from organization to
19  organization.
20      Q    Were you the 15c3-3 expert on the
21  **team that was working on this assignment for**
22  **JPMorgan Securities?**
23      MS. NEUHARDT: Objection to form.
24      A    I was the one that was asked could
25  this meet the requirements of the business in

P. Vinella

1
2   terms of volumes and the like, and also if it met
3   the regulatory requirements.
4          I was the one that was saying, you
5   know, can this produce the 3-3 calculation
6   accurately, does it support segregated accounts,
7   will there be the right Chinese wall between the
8   proprietary trading of JPMorgan Securities and the
9   prime broker's operation, the customers of the
10  prime broker's operation.
11      Q    Did you report in to someone with
12  **regulatory responsibility at JPMorgan?**
13      A    I reported directly to the business
14  sponsor, who was trying to start the prime broker
15  operation, as well as a gentleman from Ernst &
16  Young who they had hired to kind of oversee the
17  whole launch of the prime brokerage businesses.
18         MR. OXFORD: Can you just read my
19  question back, please.
20      (Record read.)
21      A    And I mentioned I reported in to the
22  business sponsor who was trying to launch that
23  business, as well as an Ernst & Young consultant
24  who they had hired to help launch the prime
25  brokerage business.

---

Page 70

1          P. Vinella
2          The answer is, those are the people I
3  reported in to.
4      Q    My question is a little more
5  specific. Did they have regulatory reporting
6  responsibility at JPMorgan?
7      A    I don't know if they did or not.
8      Q    The next item you have in your list
9  of experience, sir, is ABN Amro Securities.
10     A    Yes.
11     Q    You state that you played a lead
12 advisory role on several projects related to the
13 founding of a new global fixed-income investment
14 bank for ABN Amro.  Do you see that?
15     A    Yes.
16     Q    And that this work involved the
17 integration of several U.S. -- sorry -- several
18 affiliated U.S. and offshore broker dealers, and
19 the implementation of a new back office
20 operational system which required a detailed
21 understanding of broker dealer operations.  Is
22 that right?
23     A    Yes.
24     Q    Can you describe in a little more
25 detail what your role was in connection with this

TSG Reporting - Worldwide    877-702-9580

---

Page 71

1          P. Vinella
2  project, particularly with respect to Rule 15c3
3  and the Customer Protection Rule?
4      A    Some gentleman that I had done
5  extensive work with at BZW or Barclay's de Zoete
6  Wedd had been recruited by ABN Amro to start this
7  new business unit, and they asked me to come over
8  to help design, again, all the operational duties
9  as well as what systems would be required to
10 support that.
11         ABN Amro actually had a U.S. broker
12 dealer that was called Chicago Corp. that was
13 located in Chicago, Illinois, and was actually
14 very tightly linked to LaSalle Bank, which ABN
15 Amro had recently purchased.  So, a part of the
16 work was to evaluate what Chicago Corp. had in the
17 way of processing capabilities and operations, and
18 decide whether it was worthwhile to try to grow
19 that to support this new global business or
20 whether it was preferable to start a new operation
21 in New York.
22         The decision was made to actually
23 start a new operation in New York to support
24 certain aspects of the business and to leverage
25 the Chicago Corp. operations for other parts of

TSG Reporting - Worldwide    877-702-9580

---

Page 72

1          P. Vinella
2  the business, and the new processing system they
3  picked was the ICI package, that ADP had purchased
4  that company.
5          So, we were involved in making sure
6  again that the Chicago Corp. processing and the
7  New York processing was integrated, and that they
8  could produce integrated financial and regulatory
9  reports.  So, part of that process, you know, part
10 of my mandate was to insure that, again, the
11 financial and regulatory reporting was being
12 performed correctly across these two different
13 processing environments.
14     Q    And how did you go about insuring
15 that the financial and the regulatory reporting
16 was being performed correctly across these two
17 environments?
18     A    What we did was we put a test
19 scenario together that showed how each of them
20 worked independently and then we showed how they
21 integrated, and it's not -- some of the financial
22 reports are much more complicated, especially
23 where you're dealing with risk reports.  You can't
24 just add them together like the 3-3.  There is
25 some -- a mathematician would call it nonlinear

TSG Reporting - Worldwide    877-702-9580

---

Page 73

1          P. Vinella
2  aspects to these calculations.  You have to be
3  more careful than simply adding the numbers
4  together.
5          We put a test scenario together that
6  would show how they worked independently and how
7  we expected them to work together and produced
8  those reports.
9      Q    And who did you report in to, sir?
10     A    I reported in to the chief operating
11 officer, a gentleman named Irv Cohen.
12     Q    Did Mr. Cohen have regulatory
13 compliance and reporting obligations?
14     A    That reported in to him, yes.
15     Q    Did you actually perform any reserve
16 calculation under Rule 15c3 for ABN Amro?
17     A    For these test scenarios, yes.
18     Q    Other than the test scenarios, did
19 you actually perform any live 15c3 calculations?
20     A    Once we set all the systems up, they
21 were performing them.  Again, I think one of
22 the -- it might be helpful to describe again how a
23 3-3 calculation is performed.
24         There is not a separate group within
25 regulatory reporting that runs a computer

TSG Reporting - Worldwide    877-702-9580

Page 74

                    P. Vinella
1  
2   application that they are responsible for that
3   produce these numbers.  These are all numbers that
4   are actually produced in the operational area, and
5   in fact, many times the entire 3-3 calculation as
6   well as the net capital calculation is performed
7   in these systems and they are reconciled by
8   operations people.
9          Sometimes there might be someone in
10  financial control that insures that the numbers
11  tie out to the cash balances.  Once that's been
12  performed, it usually goes to a regulatory
13  reporting group who is then responsible for facing
14  off with regulators if there is a problem.
15         So, they are not performing
16  calculations.  Normally what they are doing is
17  looking at the results of these calculations, and
18  if there is a problem, first of all, understanding
19  what the magnitude of the problem is, and then
20  escalating it usually to a regulator as well as
21  the general counsel's office.
22         So, reg reporting isn't performing
23  calculations as much as being responsible for
24  applying the results of those reports.
25     Q    In your expertise, sir, who is, who
       TSG Reporting - Worldwide    877-702-9580

Page 75

                    P. Vinella
1  
2   is typically within a broker dealer responsible
3   for insuring that the c3 calculation, in
4   particular the reserve calculation, is done
5   correctly?
6      A    It's -- my experience has been that
7   it's usually the CFO, because they are responsible
8   primarily for the financial reporting, and most
9   places also would have the regulatory reporting
10  responsibility there as well.
11         In some cases it's slightly
12  different.  For instance, at Société Générale,
13  that went through the general counsel's office.
14  They thought compliance was really more
15  appropriate in that area.
16     Q    Would you agree with me, sir, that
17  the regulatory compliance and reporting function
18  of a broker dealer is responsible not simply for
19  interfacing with regulators but also for insuring
20  that there are systems in place and that the
21  calculations under c3 and in particular the
22  Customer Protection Rule are performed correctly?
23         MS. NEUHARDT:  Objection to form.
24     A    That actually is an interesting
25  question, because I am thinking back.  I can't
       TSG Reporting - Worldwide    877-702-9580

Page 76

                    P. Vinella
1  
2   remember very many instances where regulatory
3   reporting signed off that a system had been
4   implemented correctly.
5          In the applications that I have
6   listed here where they have had a steering
7   committee and a group that was responsible for
8   saying yes, it's ready to go, I don't remember
9   that compliance was part of the testing team.
10  Now, they may have been behind the scenes, part of
11  a committee that approved things.
12         My experience has been it was the
13  operations area that would sign off that all of
14  the operations were being performed correctly,
15  that the numbers that would be used in the 3-3
16  calculation were done correctly, and in nearly
17  every case I had, the CFO was on the acceptance
18  committee, and they would say, okay.  And again,
19  usually because the compliance would report in to
20  them.
21         So, I can't think of a time where the
22  compliance group had to sign off that yes, these
23  calculations were being done correctly.
24         If we -- in a couple of cases we
25  built specific applications for the reg reporting
       TSG Reporting - Worldwide    877-702-9580

Page 77

                    P. Vinella
1  
2   group, and in those cases they would sign off that
3   those operations had been -- and usually there
4   were screened the way they wanted it to sort
5   through data, that they would say that had been
6   done correctly.
7          There is one other point I think that
8   is worthwhile making.
9          In general, the 3-3 calculation is
10  not considered as important as the overall net
11  capital rule.  Most people think of the 3-3 as
12  part of that overall requirement, and in order to
13  get the net capital rule correct, you have to do
14  all that operations as well.
15         Where the extra onus on the 3-3
16  component is, is making sure that you still have
17  good control locations and you are still
18  accounting for things correctly, in the sense that
19  if you have done the net capital rule correctly
20  and you still maintain good control locations, the
21  3-3 would be relatively straightforward.
22         So, in most of the engagements that I
23  was involved in, there was a very strong emphasis
24  on the net capital rule being correct.  In most
25  broker dealers, that is performed daily, where the
       TSG Reporting - Worldwide    877-702-9580

P. Vinella

1  P. Vinella
2  3-3 calculation is done weekly.
3       There is a little bit of difference
4  of emphasis there.
5       **Q    If you can leave out of your answer,**
6  **sir, because you have already addressed it, that**
7  **setting up and designing, initially implementing,**
8  **financial systems.**
9       **Is it your experience, sir, that on a**
10 **day-to-day, week-to-week basis, it's the**
11 **compliance and regulatory reporting function**
12 **within a broker dealer that is responsible for**
13 **ensuring that a c3 calculation, particularly the**
14 **Customer Protection Rules, are properly applied?**
15      MS. NEUHARDT:  Objection to form.
16      A    I think that is a simplification,
17 because the operations area is responsible for
18 insuring that the segregated accounts are
19 maintained and that customer assets are put into
20 the right place.  So, there is a huge emphasis
21 within the operations area to insure, again, that
22 the data that is being sent to the 3-3 calculation
23 is correct.
24      There is a -- traditionally it's
25 called a financial control group who is making

1  P. Vinella
2  sure the cash has been segregated correctly and
3  that the cash reconciles with the cash balances at
4  the bank, and that the bank's accounts are still
5  in good standing and in a good control location.
6       So, there is lots of people within an
7  operation that is responsible for insuring that
8  the 3-3 calculation is correct.  There is a
9  regulatory reporting group who is responsible for
10 filing that report, but I think that you can't
11 separate the responsibilities of all those
12 different organizations.
13      **Q    In the event, sir, that within a**
14 **broker dealer there is a requirement to interpret**
15 **the Customer Protection Rules under c3, is that**
16 **an -- is that interpretation function typically**
17 **the responsibility of the operations staff or is**
18 **it typically the responsibility of the regulatory**
19 **reporting and compliance people?**
20      MS. NEUHARDT:  Objection to form.
21      A    I don't know that there is a set
22 rule.  For instance, FINRA, and before that NASDR,
23 and the New York Stock Exchange, had
24 interpretations that were available online or in
25 hard copy of the 3-3 calculation, so there is the

1  P. Vinella
2  statute and then there is the actual
3  interpretations of how to implement it.
4       And in many cases that implementation
5  is really responsible -- is the responsibility of
6  an operations area.  If someone says you have
7  segregated accounts, there may be a discussion
8  with an attorney within the firm saying, well, can
9  you use a fluid account or does it have to be a
10 physical account that separates the two.  There
11 might be discussion along that line.  But it
12 wouldn't necessarily be a compliance officer.  In
13 many cases you actually go to an attorney in the
14 firm for those types of interpretations.
15      **Q    Are you an attorney, sir?**
16      A    Oh, no.
17      MS. NEUHARDT:  Smarter than that.
18      **Q    Moving on to Smith Barney, we are on**
19 **page 41 of your report, sir.  You say you gained**
20 **significant related experience during your tenure**
21 **at Smith Barney, a U.S. broker dealer that is now**
22 **part of Citigroup.**
23      **Can you tell me, sir, what experience**
24 **you had at Citigroup that is related to the issue**
25 **of 15c3, and in particular to the Customer**

1  **P. Vinella**
2  **Protection Rules?**
3       A    As I mentioned earlier, I oversaw the
4  integration of the Shearson businesses,
5  fixed-income businesses into Smith Barney, and
6  that was the entire aspect of the fixed-income
7  businesses.
8       One of the reasons that Sandy Weill
9  wanted to purchase Shearson was that, one, it had
10 a system that they had spent, according to him,
11 several billions of dollars developing, that Smith
12 Barney didn't have, and in order to grow the
13 business the way he wanted, that was an important
14 aspect.
15      And one of the unique features of
16 that was that the institutional desk could set
17 prices for retail brokers on fixed-income
18 securities, which for people who don't know, that
19 used to be very time consuming.  You had to call
20 people on the phone.  You had a lot of
21 intermediaries involved in the firm that were
22 making two to three hundred thousand dollars a
23 year.
24      Mr. Weill believed that by bringing
25 this new system in, he could make it faster, have

Page 82

P. Vinella

1 more control, and dramatically reduce the cost of
2 supporting that retail fixed-income business.
3 That was one component.
4        A second component was the fact that
5 Shearson was one of the only retail brokers at
6 that point, and maybe the only one, to sell
7 mortgage-backed securities into the retail
8 network.
9        And then the third aspect was
10 Shearson had just started ramping up a business at
11 the time that was called a wrap business, which is
12 a managed account for individuals, like a small
13 money management function.  They are pretty
14 popular at this point in time, but at that point I
15 think Shearson was the inventor of that.
16        So, part of my job of overseeing all
17 the fixed-income area was, one, to make sure that
18 the system we were acquiring was actually going to
19 be implemented within the Smith Barney
20 environment.
21        Two, that we would bring over all the
22 retail accounts, and there was tens of millions of
23 retail accounts at that point.  I can't remember
24 the exact number.  There was 25 million accounts

TSG Reporting - Worldwide    877-702-9580

Page 83

P. Vinella

1 that would be coming over.
2        And then, three, that we were able to
3 service these new types of businesses, the wrap
4 businesses as well as the mortgage-backed
5 business.
6        As part of my overall responsibility,
7 I had to make sure, one, as we were doing the
8 integration, both the Shearson businesses and the
9 Smith Barney businesses were compliant.
10        Two, once we decided to cut over the
11 legal entity of Shearson into Smith Barney, that
12 there were no problems going forward on that.
13        And number three, once those
14 businesses were going together, that the new
15 operating environment could support the joint
16 businesses, and a major part of that was
17 regulatory reporting
18   Q    I'm glad you got to that at the end
19 of the answer.  I would hate to start again.
20        **Focusing you on the last couple of
21 lines of your answer, sir, what did you do to make
22 sure that both businesses, the Shearson and the
23 Smith Barney businesses, were compliant with the
24 Customer Protection Rule under c3?**

TSG Reporting - Worldwide    877-702-9580

Page 84

**P. Vinella**

1   A    At that point I was relying on the
2 compliance officer at Smith Barney.  It was her
3 responsibility to look at the regulatory reporting
4 on the Shearson side and the Smith Barney side,
5 and she reported in to my area.
6   Q    **Same question for when the businesses
7 merged, sir.  What did you do, if anything, to
8 make sure that the merged businesses that you have
9 just described were compliant with the Customer
10 Protection Rule under c3?**
11   A    We had a very extensive testing
12 program of not just the systems but of the
13 operations, including trading.  We actually had
14 several work sessions over the weekend or several
15 weekends where we would bring up Lehman Brothers
16 staff and Shearson staff to midtown with Smith
17 Barney and do mock trading and mock operations, do
18 mock, what's called end of days, where you close
19 out the books and records, to show that when we
20 were operating as one unit everything was working
21 correctly.
22        So, that it took about, as I
23 remember, close to ten months from the time that
24 they announced the acquisition of Shearson to

TSG Reporting - Worldwide    877-702-9580

Page 85

P. Vinella

1 where we actually cut that business over to Smith
2 Barney.
3        So, during that period of time,
4 again, there was a lot of testing.  Once it went
5 live, we had what we call day one support.  So for
6 the next month or so, until we put out the first
7 customer statements, we were operating with lots
8 of technology people and extra operations staff to
9 make sure that it was working correctly.
10        And after that period of time, people
11 believed that it was relatively stable, and I went
12 off and my responsibilities changed.
13   Q    **As part of the testing you have just
14 described, sir, was it part of your responsibility
15 to make sure that the systems were compliant with
16 the Customer Protection Rule under c3?**
17   A    We looked at net capital as well as
18 the 3-3 calculation, yes.
19   Q    **To whom did you report in that
20 endeavor, sir?**
21   A    I reported to Jamie Diamond, who was
22 the CEO of Smith Barney, and I reported to Bob
23 Druskin who, was the head of operations.
24        So, on the business, business issues,

TSG Reporting - Worldwide    877-702-9580

Page 86

1              P. Vinella
2    I reported to Jamie, and for the operational
3    issues I reported to Bob.
4         **Q    Did you report in to anybody who has**
5    **responsibility for regulatory compliance and**
6    **reporting?**
7         A    All of regulatory reports, as I
8    understood it, reported in to Bob Druskin.
9         **Q    Did you actually perform any live c3**
10   **calculations when you were at Smith Barney?**
11        A    During that month period after we cut
12   over the legal entity from Shearson to Smith
13   Barney, they were producing 3-3 calculations, yes,
14   and I was -- again, had overall responsibility.
15        And the easiest way to look at it, I
16   was in the sense the CEO of the fixed-income
17   business, so I was responsible for accounting, I
18   was responsible for operations, I was responsible
19   for trading and sales, I was responsible for risk
20   management, as my overall purview.
21        MR. OXFORD:  Can you read my last
22   question back, please, Bonnie.
23        (Record read.)
24        **Q    I don't think you answered that**
25   **question, sir.  Could you try again, please.**
     TSG Reporting - Worldwide    877-702-9580

Page 87

1              P. Vinella
2         MS. NEUHARDT:  I believe he did
3    answer the question.
4         MR. OXFORD:  We can agree to
5    disagree.
6         MS. NEUHARDT:  He said that he was
7    responsible for the live calculations.
8         You can answer it again.
9         A    I wasn't the compliance officer, but
10   I was responsible for insuring that those
11   calculations were done, and if there was some
12   variance of -- in the reports, I would have been
13   the one that they would have come to and said that
14   they had a problem.
15        **Q    Lastly, just moving to Drexel, sir.**
16        A    Yes.
17        **Q    You said, as a result of your**
18   **experience as a senior executive of an affiliate**
19   **of Drexel Burnham Lambert, you were well aware of**
20   **the many operational challenges faced by LBI.**
21        **Do you see that?**
22        A    I do.
23        **Q    Which operational challenges are you**
24   **referring to here?**
25        A    One of the areas that I was
     TSG Reporting - Worldwide    877-702-9580

Page 88

1              P. Vinella
2    responsible for supporting was the government
3    trading desk at Drexel.  When the parent company
4    filed Chapter 11, I believe, the broker dealer
5    went into liquidation.  The subsidiary that
6    actually performed the government trading, which
7    was called Drexel Burnham GSI, actually was not
8    allowed to go into liquidation or receivership.
9    It was actually operating for several months after
10   both the parent and the broker dealer had gone
11   into liquidation.  And we were supporting that
12   trading desk.
13        So, it was -- some of the things --
14   there is not a lot of people that have been
15   involved when broker dealers go down, and I think
16   this was somewhat unique with Lehman Brothers,
17   that the holding company went into receivership
18   and the broker dealer tried to stay.  Very similar
19   operational issues in Drexel, where you are
20   relying on other entities to perform certain
21   services for you that just don't exist, whether
22   those are financial services or technology
23   services or operational services.
24        **Q    Did you have any responsibility, sir,**
25   **while you were at Drexel in any way in connection**
     TSG Reporting - Worldwide    877-702-9580

Page 89

1              P. Vinella
2    **with customer reserve requirements and rules under**
3    **15c3?**
4         A    Not at that time, no.
5         **Q    If you would turn to page 34 of your**
6    **report, sir.  Actually, page 33, please.  And in**
7    **particular, to the section on expert testimony.**
8         A    Okay.
9         **Q    And does the testimony that you have**
10   **listed here, whether it's the commercial Mexicana**
11   **matters, the Cantor Fitzgerald matter, or the**
12   **O'Connor matter, does any of that relate in any**
13   **way to Rule 15c3?**
14        A    No.
15        **Q    It appears from your report, sir,**
16   **that in the Cantor Fitzgerald and O'Connor**
17   **Associates matters, you testified as a live**
18   **witness in court; is that right?**
19        A    I did, yes.
20        **Q    To your knowledge, sir, have you ever**
21   **been excluded from expressing an opinion at trial?**
22        A    Not to my knowledge, no.
23        **Q    Just turning the page, to the section**
24   **on Congressional testimony, sir.  Looking at the**
25   **four items listed there, do any of those four**
     TSG Reporting - Worldwide    877-702-9580

P. Vinella

1     items relate in any way to Rule 15c3 reserve
2     calculations?
3         A     The work that I did with the GAO
4     around the terrorist attacks of 2001 dealt with a
5     lot of operational issues, especially around
6     clearing banks and the ability for customers to
7     get their assets out.  So, from that point of
8     view, I would say yes, it was highly germane.
9         We -- part of my mandate was to look
10    at ways that the financial system could be taken
11    down, and one of the key components was to
12    evaluate whether customers would be able to get
13    either cash or their collateral assets out of a
14    broker dealer or a bank as promptly as they would
15    like to get them.  If they couldn't, what would
16    happen to the financial system going forward.
17        So, there was substantial work in
18    that area, yes.
19        Q     Did you provide the GAO with a
20    report, sir?
21        A     We did not actually produce a report.
22    We produced -- we would analyze specific questions
23    they asked us to come up with scenarios.  I
24    wouldn't say it was a report in a traditional

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1     sense, but there was lots of paper involved.
2         Q     Whom at the GAO did you deal with
3     primarily?
4         A     I can't even remember their names
5     right now.  I can get that for you if you think
6     it's important.
7         I'm actually in the report that they
8     filed.  I was listed as one of the resources that
9     they relied on.
10        Q     Do you remember the name of the
11    report that they filed, sir?
12        A     I think it actually is something like
13    the vulnerability of the U.S. financial system to
14    terrorist attacks, but that is pure memory.
15        Q     Okay.  Turning to your publications,
16    sir, at the bottom of page 34 of your report, it
17    has a section Representative Publications.
18        A     Yes.
19        Q     Are there any publications that you
20    were responsible for that relate to the topic of
21    15c3 that are not listed here?
22        A     That are not listed?
23        Q     Yes.
24        A     No.  This is, to my knowledge, the

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1     total list in the last ten years of publications.
2         Q     So it's not in fact representative,
3     it's a complete list of your publications, to the
4     best of your knowledge?
5         A     Of the last ten years.  There is
6     substantially more publications prior to this.  I
7     didn't include those.
8         Q     Do any of those publications that are
9     older than ten years relate in any way to 15c3?
10        A     I don't believe so.
11        Q     Turning to page 36, sir, you list
12    some representative presentations.
13        A     Yes.
14        Q     How did you go about compiling that
15    list of representative presentations?
16        A     I keep a calendar as well as the
17    presentations that I made.  So, and again, this is
18    from the period of PVA/Toucan through Wilmington
19    Trust Conduit Services.
20        So, to answer your question, I just
21    maintain a calendar, and I keep the presentations
22    online.
23        Q     Keep them online?
24        A     On my computer system.

TSG Reporting - Worldwide    877-702-9580

P. Vinella

1         Q     And these are all presentations that
2     you have given from 2005 onwards?
3         A     I believe it's all the presentations
4     since earlier than 2005, but includes everything
5     that I know of from 2005.
6         Q     From what date did you start looking
7     when you were trying to compile this list of
8     publications, sir -- sorry, presentations?
9         A     Again, from the beginning of
10    PVA/Toucan through my period of time at Wilmington
11    Trust Conduit Services.
12        Q     That is approximately 1995 onwards?
13        A     Yeah.
14        Q     Do any of these presentations deal
15    with the topic of SEC Rule 15c3?
16        MS. NEUHARDT:  Objection to form.
17        A     In the context of how can executive
18    management be assured that their operations, and I
19    am using that meaning revenue generation and not
20    just back office operations, are in compliance
21    with regulations, one of the things that Jeanette
22    Jin and I developed was a way for executive
23    management to independently verify the
24    calculations, such as the 3-3, were being, one,

TSG Reporting - Worldwide    877-702-9580

Page 94

P. Vinella

1  performed; two, being performed in a timely
2  manner, and three, that the management could have
3  faith that they were being performed accurately.
4      So, in the context of being able to
5  monitor the quality of the operations, as well as
6  the actual output of the operations, we did a lot
7  of work in that area.
8      **Q    And you testified, sir, that you have**
9  **copies of all these presentations sitting on your**
10 **computer.**
11     A    I believe I do have copies of all of
12 these, yes.
13     **Q    Have you provided them to counsel?**
14     A    No.
15         MR. OXFORD:  We can deal with it
16 afterwards.
17         MS. NEUHARDT:  I would need to look
18 at the stip.
19         MR. OXFORD:  I would like to request
20 a copy of those.
21         MS. NEUHARDT:  We will do it during a
22 break.
23         MR. OXFORD:  Thanks.
24     **Q    Sir, when were you first engaged by**
25     TSG Reporting - Worldwide    877-702-9580

Page 95

P. Vinella

1  **Barclays in this matter?**
2      A    I believe it was around Thanksgiving
3  of 2009.
4      **Q    And you submitted your report on**
5  **January 8th, 2010; correct?**
6      A    Yes.
7      **Q    When did you first start working on**
8  **that report?**
9      A    I believe it was sometime in the
10 second week of December.  Let me clarify.  When I
11 physically started to write the report.  We
12 actually started doing analysis that we then used
13 in the report very shortly after we had been
14 retained.
15     **Q    Okay.  Who is the "we," sir?**
16     A    I used a team from LECG.  One was
17 Jeanette Jin.  The second one was Armand
18 D'Accordo, who was the Bankers Trust business
19 manager that I've mentioned.
20     Also, two other gentlemen from
21 Wilmington Trust Conduit Services, one named
22 Andrea Calderoni, and a second named Sergio
23 Godinho.
24     And we also had someone, a very
25     TSG Reporting - Worldwide    877-702-9580

Page 96

P. Vinella

1  junior person, to do proofreading and things like
2  that of the drafts, named David Li.
3      **Q    As much for my benefit as Bonnie's,**
4  **can you give me the names and the spellings of**
5  **each of those five individuals.**
6          **Jeanette Jin?**
7      A    Sure.  Jeanette is J-E-A-N-E-T-T-E.
8  The last name is J-I-N, or -- J-I-N, yes.  Sorry.
9      Armand is A-R-M-A-N-D.  D'Accordo is
10 D apostrophe A-C-C-O-R-D-O.
11     Andrea is A-N-D-R-E-A, and the last
12 name is Calderoni, C-A-L-O-N --
13 C-A-L-D-E-R-O-N-I.
14     And Sergio is S-E-R-G-I-O.  And
15 Godinho is -- I should get people who have very
16 Anglo names.  Much easier to spell.  But Godinho
17 is G-O-D-H-N -- I need a pen.  G-O-D-I-N-H-O.
18     And Li is just -- David Li is L-I.
19     **Q    Are these five individuals, sir,**
20 **employed by LECG?**
21     A    They are contracted to LECG.
22     I should point out that that is the
23 common model for LECG.  We don't have lots of
24 employees.  We have mostly contractors.
25     TSG Reporting - Worldwide    877-702-9580

Page 97

P. Vinella

1      **Q    You said that the team of you and the**
2  **five people you have just listed for me started on**
3  **analysis shortly after you were engaged, sir.**
4      **Can you tell me what analysis that**
5  **you embarked upon shortly after you were engaged?**
6          MS. NEUHARDT:  To the extent the
7  analysis is relevant to your report -- and
8  actually, you know what?  Can we just take a
9  break.  I want to check the stip real quick.
10     (Pause)
11         MS. NEUHARDT:  You can answer the
12 question to the extent it relates to things
13 that actually ended up in your report and do
14 not include any discussion of the people at
15 LECG, your discussions among the people.
16 You can say in broad terms what you did to
17 gather information for the opinions that
18 ended up in your report
19         MR. OXFORD:  I'm sorry.  Can I
20 understand correctly --
21         MS. NEUHARDT:  Sure.
22         MR. OXFORD:  -- what it is you are
23 instructing the witness to answer and not
24 answer?
25     TSG Reporting - Worldwide    877-702-9580

Page 98

P. Vinella

1
2    MS. NEUHARDT: Well, you asked him a
3    very broad question at first, which
4    obviously I assumed then you would break it
5    down after he started to answer.
6        But I specifically want to make sure
7    that he does not get into -- and I am
8    looking at the stip, if you have the stip
9    available. Maybe we can go off the record
10   if you don't and we can talk about it.
11       He does not have to disclose
12   communications between people working under
13   his direction, so that is all these
14   contractors he just named for you.
15       He does not have to disclose
16   communications with the party disclosing the
17   expert, so that would include people at
18   Barclays except to the extent that he relied
19   on those communications for original facts,
20   which I believe we produced the notes that
21   show that.
22       And drafts I don't think is really
23   relevant to that particular question you
24   asked.
25       So, that is what I am relying on with

TSG Reporting - Worldwide    877-702-9580

Page 99

P. Vinella

1
2    my instruction to him
3        MR. OXFORD: Your instruction, just
4    so we have a clear record, is what, Amy?
5        MS. NEUHARDT: The instruction is --
6    well, first, let's go -- the question is,
7    how did you -- let's go back to the
8    question, which I think was, what did you do
9    to analyze -- let's get the question read.
10       (Recess taken.)
11       MR. OXFORD: Back on the record.
12       Could you repeat my question, please,
13   Bonnie.
14       (Record read.)
15       MS. NEUHARDT: And I would instruct
16   the witness that when you respond to that
17   question, you should not reveal any
18   information gleaned in that analysis that
19   ended up not being a source you relied upon
20   in your report.
21       THE WITNESS: Okay.
22   A    The first document that I received
23   was Mr. McIsaac's affidavit, and we were asked to
24   read through that and come up with some basic
25   questions around the scope of Mr. McIsaac's

TSG Reporting - Worldwide    877-702-9580

Page 100

P. Vinella

1
2    affidavit, some of the conclusions he made and the
3    supporting documentation he provided to make those
4    conclusions.
5        The other thing we looked into was
6    the ability or the possibility of independently
7    computing the 3-3 reserve calculation.
8    **Q    Taking those in reverse order, sir,**
9    **is it correct to say that you elected not to**
10   **independently compute the 3-3 reserve computation?**
11   A    That's true.
12   **Q    Tell me why that is.**
13       MS. NEUHARDT: Without revealing
14   communications with counsel.
15   A    We had a very short time frame in
16   which to produce the report, and we were working
17   over the holiday season, so it didn't seem to be
18   practical to try to attempt a calculation like
19   that.
20       Also, we set up a phone call with a
21   number -- and this through the attorneys -- with a
22   number of the ex-Lehman staff that was still at
23   Barclays to find out how many people were still
24   available that understood the operations.
25       Again, the 3-3 calculation was the

TSG Reporting - Worldwide    877-702-9580

Page 101

P. Vinella

1
2    result of lots of operational systems and
3    operations staff working with those systems, and
4    we needed to know how many were still available
5    that could help us understand that, where the data
6    was.
7        We were told that there had been a
8    staff of close to 100 Deloitte consultants trying
9    to recreate the books and records of Lehman, and
10   given the fact that not all the people were
11   available, that they already had a very large
12   staff working for close to a year at that point,
13   not longer than a year, trying to recreate the
14   books and records, it didn't seem to be practical
15   to try to independently compute the 3-3
16   calculation in this time frame.
17       And there was also a question of
18   whether we would even have access to the data that
19   Deloitte had. If we had access to that, that
20   might have made a difference in the decision.
21   **Q    What was the answer to the question**
22   **how many people of the ex-Lehman operations staff**
23   **were available who understood the operations that**
24   **you would need to recalculate the c3 calculation**
25   **as of 9/19?**

TSG Reporting - Worldwide    877-702-9580

Page 102

1           **P. Vinella**
2       A     Could you repeat the question. I'm
3   sorry.
4       **Q     You said you were on a telephone call**
5   **with a number of ex-Lehman staff who were still at**
6   **Barclays, and you said that there was a question**
7   **about how many were available who actually**
8   **understood the relevant operations; is that**
9   **correct?**
10      A     Yes.
11      **Q     What was the answer to that question**
12  **that you just posed?**
13      A     There were a couple of problems.
14  One, some of the -- of the staff actually didn't
15  go from Lehman Brothers to Barclays. They went to
16  other banks or were unemployed.
17          There was also an agreement which I
18  was -- it was referred to as the TSA agreement,
19  and a number of the staff that would have had
20  firsthand knowledge of either the operations or
21  the 3-3 calculation itself, were, quote/unquote,
22  ring-fenced by the TSA agreement. And we wouldn't
23  necessarily have access to them as well.
24          And there was also a question of
25  whether we would have access to all the data in

TSG Reporting - Worldwide     877-702-9580

Page 103

1           P. Vinella
2   the Lehman systems, you know, that would have data
3   through the week of the 15th, if we would have
4   access actually to that data.
5           So those were the major issues.
6       **Q     Which data did you believe, sir, you**
7   **did not have access to, that you would have needed**
8   **to recalculate the c3 calculation from 9/19/08?**
9       A     I believe during that conversation we
10  were told that data that was required to support
11  the customers that went from Lehman to Barclays
12  was available; however, that they weren't sure if
13  the entire set of all the Lehman customer data was
14  available at that point.
15      **Q     Can you be more specific about the**
16  **data that might not have been available to you if**
17  **you decided to recalculate the c3 computation with**
18  **effect from 9/19/08?**
19      A     We would have had to have access to
20  all the customer accounts, both cash and
21  collateral.
22          We would have had to have access to
23  reconciliation records showing that the balances
24  that were portrayed in those accounts, in either
25  MTS, ITS or the ADP system, were actually correct.

TSG Reporting - Worldwide     877-702-9580

Page 104

1           P. Vinella
2           We would have to have access to stock
3   loan information that was using customer assets.
4           We would have to have information
5   about fixed-income sales to customers that were
6   out of principal positions.
7           Basically all the operational
8   components that go into the eight credits and the
9   six debits of the calculation. And again, it
10  can't be a subset of customer activity. It would
11  have to be all customers.
12      **Q     Can you identify for me who the**
13  **ex-Lehman staff who were on this call were?**
14      A     I can't tell you all the names
15  because there were quite a few, and this is our
16  first meeting, and the purpose of the call, again,
17  was to understand who we needed to talk to.
18          The gentlemen that I remember was
19  Bill Burke, Alastair Blackwell, Alex Crepeau or
20  Crepeau.
21          MS. NEUHARDT: Crepeau.
22      **Q     Is that C-R-E-P-E-A-U?**
23          MS. NEUHARDT: Yes.
24      A     Those are the gentlemen that I
25  remember most clearly talking on the phone.

TSG Reporting - Worldwide     877-702-9580

Page 105

1           P. Vinella
2       **Q     Did those gentlemen tell you that**
3   **Barclay's position was that it purchased the LBI**
4   **broker dealer books and records?**
5       A     That question didn't come up.
6       **Q     Okay. The records that you testified**
7   **to which you believe there was a question as**
8   **to whether or not Barclays had access, do you have**
9   **any basis to believe that the SIPA trustee has**
10  **access to all of that data?**
11      A     I would -- I believe that one of the
12  conversations that -- in fact, with Bill Burke, I
13  believe he said that, and he mentioned that that's
14  what the TSA team was working on, and the Deloitte
15  team was trying to reconcile the books and records
16  as of the 19th.
17          So I -- if it wasn't explicitly
18  stated that they had it, it was implied, based on
19  the work that they were doing.
20      **Q     I want to be very clear on this. Did**
21  **Mr. Burke tell you that the SIPA trustee and the**
22  **professionals at his disposal had access to all of**
23  **the data necessary to rerun the c3 calculation**
24  **with effect from September 19th, 2008?**
25      A     I believe the way he put it was they

TSG Reporting - Worldwide     877-702-9580

Page 106

1          P. Vinella
2  had the ability to reconstruct the books and
3  records, not that they necessarily had the data.
4      Q    What is the difference between those
5  two concepts, sir?
6      A    One is, the ability to reconstruct
7  the books and records means that you have enough
8  information about the breaks that you can go in
9  and resolve them in some acceptable way.
10         To me, the data would mean that it's
11  already been resolved, it's sitting on a system,
12  and you just have to push a button for the
13  calculation.
14      Q    Do you agree that the recreation of
15  the c3 reserve calculation as of 9/19/2008 is a
16  substantial undertaking?
17      A    Given my understanding of the number
18  of breaks and the fact that Lehman Brothers on the
19  19th really had no independent way of
20  understanding what cash or collateral came in or
21  out of its clearing accounts, especially the ones
22  at Chase, yes, it would be a large undertaking.
23      Q    Do you agree that an important part
24  of any such undertaking would be the need to use
25  the ex-Lehman staff who were responsible for the
          TSG Reporting - Worldwide    877-702-9580

Page 107

1          P. Vinella
2  operations that fed into the c3 reserve
3  calculation prior to LBI's liquidation?
4          MS. NEUHARDT:  Objection, form.
5      A    It's not necessary.  It's helpful,
6  but it's not necessary.  Our -- again, it's just
7  not necessary.
8      Q    Can you describe for me Ms. Jin's
9  experience with respect to SEC Rule 15c3 and in
10  particular the Customer Protection Rules?
11      A    She worked on most of the projects
12  that I have listed in my report.  And she was a
13  senior business analyst on -- that was basically
14  her title on those types of engagements.
15         Also, she ran all of operations at
16  Wilmington Trust Conduit Services, so she was
17  responsible for setting up the segregated accounts
18  for customers, responsible for monitoring all the
19  activity in those accounts.
20         We actually had the gentleman who ran
21  global broker dealer operations for ABN Amro
22  reported in to her as part of that work.
23         She was responsible for all financial
24  reporting and regulatory reporting associated with
25  the deals that we supported, so she was very
          TSG Reporting - Worldwide    877-702-9580

Page 108

1          P. Vinella
2  familiar with the operational aspects of the 3-3
3  calculations as well.
4      Q    When you say she was responsible for
5  the regulatory reporting associated with the deals
6  that you supported --
7      A    Yes.
8      Q    -- can you be a little more specific
9  about what you mean by that?
10         MS. NEUHARDT:  Jeanette is not the
11  expert here.  I will let him go a little
12  bit.  But I am having a hard time seeing the
13  relevance here, because she is not the one
14  who has provided an opinion here.
15         You can answer the question.
16      A    In the -- the securitizations that we
17  supported, the majority issued securities that
18  were registered in the United States and/or
19  registered offshore, and as registered securities
20  they would have to -- there was regulatory
21  reporting associated with that, whether that was
22  registered at the DTC or it was registered at the
23  Dublin Stock Exchange.
24         So part of our duties were to file
25  those types of reports showing that indeed the
          TSG Reporting - Worldwide    877-702-9580

Page 109

1          P. Vinella
2  condition of those securities were correct, that
3  the collateral that backed those securities was
4  actually kept in a segregated account and the
5  like.
6          So, she was responsible for that type
7  of report.
8      Q    Do you know whether Ms. Jin filed
9  reports under the Customer Protection Rules of c3?
10      A    Not the c3.
11      Q    The same questions for Mr. Armand
12  D'Accordo.
13         MS. NEUHARDT:  This is really
14  irrelevant.  What is your basis for
15  inquiring into this?  I don't see how it has
16  anything to do with Mr. Vinella's
17  qualifications.
18         MR. OXFORD:  I think it's germane.
19  These are people who worked under him at his
20  direction on this report.
21         MS. NEUHARDT:  It's his experience
22  that is at issue here, not theirs.
23         You can answer the question if you
24  want.
25         It's a continuing objection to the
          TSG Reporting - Worldwide    877-702-9580

Page 110

```
1            P. Vinella
2    relevance of inquiring into the
3    qualifications of people who are not being
4    presented as experts.
5         MR. OXFORD:  That's fine.  I will
6    give you a running objection, if that is
7    helpful.
8         A    Mr. D'Accordo was the business
9    manager for the trading businesses at Bankers
10   Trust.  He's a CPA, and he -- part of his duty was
11   to review call reports and focus reports.  Both
12   bank operations and broker dealer operations
13   reported in to him, so as part of his mandate he
14   reviewed the results of the 3-3 calculations that
15   were included in the focus report.
16        Q    For what purpose was Mr. D'Accordo
17   reviewing the c3 calculations, if you know?
18        A    As business manager, he's responsible
19   for all the financial reporting and regulatory
20   reporting for the trading businesses at Bankers
21   Trust.  So he reported in to -- a business manager
22   oversaw all of that trading activity, and he was
23   just insuring that the business was running
24   correctly, and that there were no large
25   discrepancies, either in terms of risk they were
```

TSG Reporting - Worldwide    877-702-9580

Page 111

```
1            P. Vinella
2    taking, changes in P & L, compliance breaks and
3    the like.
4         So, she was responsible for that type
5    of report.
6         Q    Do you know whether Ms. Jin filed
7    reports under the Customer Protection Rules of c3?
8         A    Not the c3.
9         Q    The same questions for Mr. Armand
10   D'Accordo.
11        MS. NEUHARDT:  This is really
12   irrelevant.  What is your basis for
13   inquiring into this?  I don't see how it has
14   anything to do with Mr. Vinella's
15   qualifications.
16        MR. OXFORD:  I think it's germane.
17   These are people who worked under him at his
18   direction on this report.
19        MS. NEUHARDT:  It's his experience
20   that is at issue here, not theirs.
21        You can answer the question if you
22   want.
23        It's a continuing objection to the
24   relevance of inquiring into the
25   qualifications of people who are not being
```

TSG Reporting - Worldwide    877-702-9580

Page 112

```
1            P. Vinella
2    presented as experts.
3         MR. OXFORD:  That's fine.  I will
4    give you a running objection, if that is
5    helpful.
6         A    Mr. D'Accordo was the business
7    manager for the trading businesses at Bankers
8    Trust.  He's a CPA, and he -- part of his duty was
9    to review call reports and focus reports.  Both
10   bank operations and broker dealer operations
11   reported in to him, so as part of his mandate he
12   reviewed the results of the 3-3 calculations that
13   were included in the focus report.
14        Q    For what purpose was Mr. D'Accordo
15   reviewing the c3 calculations, if you know?
16        A    As business manager, he's responsible
17   for all the financial reporting and regulatory
18   reporting for the trading businesses at Bankers
19   Trust.  So he reported in to -- a business manager
20   oversaw all of that trading activity, and he was
21   just insuring that the business was running
22   correctly, and that there were no large
23   discrepancies, either in terms of risk they were
24   taking, changes in P & L, compliance breaks and
25   the like.
```

TSG Reporting - Worldwide    877-702-9580

Page 113

```
1            P. Vinella
2         Q    Same questions for Andrea Calderoni.
3         A    Andrea was at Wilmington Trust
4    Conduit Services.  His title was risk analyst, and
5    part of his job was to review all the results of
6    the operations, make sure that they were done
7    correctly, and then produce all the risk
8    management compliance reports associated with the
9    transactions Wilmington Trust Conduit Service was
10   managing.  I believe he was overseeing two of the
11   CDOs that we were managing.
12        Q    I think you testified earlier that
13   Wilmington Trust wasn't a broker dealer.
14        A    Wilmington Trust Conduit Services was
15   not a broker dealer.
16        Q    Did he work for the broker dealer arm
17   of Wilmington Trust?
18        A    Well, he -- excuse me for
19   interrupting.  He worked for the Wilmington Trust
20   Conduit Services.
21        (Discussion held off the record.)
22        Q    Same questions for Mr. Godinho.
23        A    Sergio was the manager of the risk
24   analyst group, and as such, he was responsible for
25   overseeing Andrea and his peers, and he also
```

TSG Reporting - Worldwide    877-702-9580

Page 114

1     P. Vinella
2  oversaw the more complicated securitizations that
3  we were administering.
4      **Q      The rate at which you are billing out**
5  **your services, sir, to Barclays is $650 per hour;**
6  **is that correct?**
7      A    Yes, it is.
8      **Q      Is that the same rate for all the**
9  **other members of your team?**
10     A    No.
11     **Q      Can you tell me the rates for the**
12 **other members of your team.**
13     A    Jeanette Jin is $550 an hour.
14         Andrea and Sergio are in the three to
15 350 range.
16         I believe Armand was 375 or something
17 in that range.
18     **Q      And Mr. Li?**
19     A    I -- I can't even tell you.  He
20 was -- Jeanette would know that answer.
21     **Q      Approximately how many hours did you**
22 **personally spend on the work that led up to the**
23 **preparation of your report?**
24         MS. NEUHARDT:  Excluding the drafting
25     of the report?

TSG Reporting - Worldwide    877-702-9580

Page 115

1     P. Vinella
2     MR. OXFORD:  No.  The hours total.
3     MS. NEUHARDT:  Including the
4     drafting?
5     MR. OXFORD:  Yes.
6     A    I believe it's somewhere in the
7  180-hour range from the beginning of my work
8  through the end of January.
9      **Q      Do you know how many hours total your**
10 **team, not just you, but the five people who worked**
11 **at your direction, spent in the work that led up**
12 **to the preparation of and completion of your**
13 **report?**
14     A    I, I didn't track that.  Jeanette was
15 the one tracking it.  So I can't even hazard a
16 guess.
17         I also don't want to make it sound
18 like I was detached from the team.  We had daily
19 meetings, but I was not the person who was
20 tracking the time.
21     **Q      180 hours doesn't sound detached to**
22 **me, sir.**
23     A    No.
24     **Q      Did you or anyone at your direction,**
25 **sir, conduct any interviews in connection with**

TSG Reporting - Worldwide    877-702-9580

Page 116

1         **P. Vinella**
2  **your work that resulted in this report?**
3      A    Yes.
4      **Q      Who did -- who did you interview?**
5         MS. NEUHARDT:  You can, you can name
6     who you talked to.  When he gets into the
7     substance, you can only talk about the
8     substance that ended up underlying the
9     conclusions of your report.  But you can say
10     who you talked to.
11     A    Again, there were gentlemen on the
12 phone call that I didn't get their names, and the
13 three that I remember were Bill Burke, Alex
14 Crepeau and Alastair Blackwell.
15         Subsequent to that phone call we had
16 a meeting in New York where we interviewed some
17 additional people, and there, we met with Ricky
18 Policke, David Roden, Alex Crepeau again.
19         We also interviewed two gentlemen
20 from Barclays, two Johns.  One is John Haley.  And
21 if I could look at the notes to --
22     **Q      John Rodefeld.**
23     A    John Rodefeld, thank you.
24         We had -- and we also met with Lenny
25 Legotte.

TSG Reporting - Worldwide    877-702-9580

Page 117

1         P. Vinella
2         Then we also interviewed Paolo
3  Tonucci on the phone.  We interviewed Tony
4  Stucchio.  Excuse me.  And we also interviewed
5  Joel Potenciano.
6         It sounds like a social club here in
7  Italy, but --
8      **Q      When did the call with Mr. Burke,**
9  **Mr. Crepeau and Mr. Blackwell happen?**
10     A    I believe that was in the first week
11 of December or the last week of November.
12     **Q      Who else was on the call, to the best**
13 **of your recollection?**
14     A    Well, Jeanette Jin on my side.
15 Heather King was on the phone.  I believe Amy
16 Neuhardt was on the phone as well.
17     **Q      Was there any information provided to**
18 **you in that conference call, sir, that you relied**
19 **on in your January 8th report?**
20     A    Not to my recollection.  Again, that
21 was more of just an introduction to who was still
22 available, were the systems available, and who
23 would we want to follow up with.
24     **Q      Did you have any interviews with**
25 **anybody between that conference call in the first**

TSG Reporting - Worldwide    877-702-9580

Page 118

1           P. Vinella
2  week of December '09 and the meeting in New York?
3       A    I believe we talked to Paolo Tonucci,
4  the global treasurer of Lehman Brothers. I think
5  that actually happened prior to the meeting in
6  New York.
7       Q    Can you give me an estimated date of
8  that call, please?
9       A    Not without looking at my calendar,
10 but my belief is it was the second week of
11 December.
12      Q    And that interview with Mr. Tonucci
13 was a conference call; is that right?
14      A    It was, yes.
15      Q    As best you recall, who was on that
16 telephone call?
17      A    Jeanette Jin, Ms. Neuhardt, Miss
18 King. I don't believe there was anyone else on
19 that call.
20           MS. NEUHARDT: Mr. Tonucci's counsel.
21 It's okay that you don't remember that.
22      Q    You said Ms. King?
23      A    I think she was on the phone call as
24 well.
25      Q    And of course you personally were on

TSG Reporting - Worldwide     877-702-9580

Page 119

1           P. Vinella
2  that telephone call?
3       A    Oh, yes.
4       Q    And I should have asked the same
5  question with respect to the initial call with
6  Mr. Burke and others. You were personally on that
7  telephone call?
8       A    Yes.
9       Q    Did Mr. Tonucci give you any
10 information that you relied upon in your report?
11      A    Yes.
12      Q    Tell me what that information is,
13 please.
14      A    We discussed the general state of the
15 broker dealer. He was, again, the group
16 treasurer, so he was responsible for funding and
17 managing the balance sheet of all of the Lehman
18 entities, but we specifically talked about the
19 broker dealer, what is normally --
20           THE WITNESS: Now, should this be --
21 can I ask a question? This should be
22 specifically what I relied on for the report
23 or --
24           MS. NEUHARDT: Yes.
25      A    We also asked questions about how he

TSG Reporting - Worldwide     877-702-9580

Page 120

1           P. Vinella
2  felt about the operations during that week. Did
3  he feel that the operations were sound, was he
4  getting enough information to adequately fund the
5  balance sheet, which is the primary duty of the
6  treasurer. Did he make forecasts of his funding
7  needs, and did -- was the forecasts during the
8  week of the 15th reasonable forecasts.
9           Did he feel that the operations were
10 in -- I use the word chaos, or were they something
11 that was manageable.
12          Also, we asked him if he was involved
13 in the 3-3 calculation in any way. And we asked
14 him to what extent did he use systems
15 independently of MTS, ITS and the ADP BPS.
16          That is the majority of the types of
17 questions we asked him.
18      Q    Taking each of those questions in
19 turn, what did Mr. Tonucci tell you?
20          MS. NEUHARDT: Well, he listed a lot.
21 Maybe you can remind him.
22      Q    I'm happy to do it from my notes.
23          You asked him about the general state
24 of the broker dealer in the week leading up to
25 insolvency.

TSG Reporting - Worldwide     877-702-9580

Page 121

1           P. Vinella
2       A    He mentioned that there was a
3  challenge, because before he was looking at
4  various source of funds from the various legal
5  entities within the Lehman Brothers family, and
6  the broker dealer operating independently was
7  something that no one had really ever thought of.
8  That was kind of, I think, a last-minute decision,
9  was his term, based on the fact that the holding
10 company was going to have to declare bankruptcy.
11          There was also the issue with LBIE
12 going into administration, which caused some
13 issues.
14          But he believed that in general, he
15 was able to meet all the cash requirements that
16 the broker dealer had specifically, and that they
17 were able to find other sources of funds that if
18 they needed to buy money.
19          And he believed that in -- that the
20 numbers that he was getting were accurate numbers.
21 He felt very comfortable that the end-of-day
22 numbers that he was looking at that he would be
23 using for the next day's cash projections were
24 accurate.
25      Q    Can you be more specific about the

TSG Reporting - Worldwide     877-702-9580

Page 122

P. Vinella

1 numbers he said he was getting. **The numbers with**
2 **respect to what?**
3
4     A     Again, what his responsibility was
5 for was -- a broker dealer cannot be overdrawn in
6 cash accounts, and they cannot be overdrawn in
7 collateral accounts at the depositories. So, his
8 job is to make sure, one, they are not overdrawn,
9 and number two, if there is excess, he has the
10 ability to actually then sell that money out as a
11 profit center.
12         So, in terms of the first
13 requirement, he believed that if there was
14 deficits, that deficits were being correctly
15 identified, and he was getting it within enough
16 time to actually go out and buy money. It turns
17 out they didn't buy large amounts of money like a
18 commercial bank would, but he was able to go out
19 and buy the money if he needed it.
20         He was also able to -- he was
21 involved in the 3-3 calculation to the extent that
22 they were withdrawing funds from the reserve
23 account, and so he was -- he would -- felt
24 comfortable in taking the excesses out of that
25 reserve account and using that as part of his

TSG Reporting - Worldwide     877-702-9580

Page 123

P. Vinella

1 funding requirements.
2
3     Q     Mr. Tonucci told you that he was
4 **involved in the c3 calculation, specifically the**
5 **customer reserve allocation?**
6     A     He mentioned that he reviewed the
7 results of the 3-3 calculation, that he would then
8 ask that the excesses be withdrawn as is
9 appropriate and permitted by the regulation, and
10 he was using that cash as part of his, his funding
11 of the balance sheet.
12     Q     Did you ask Mr. Tonucci whether he
13 **was aware of the FID accounts being seized by**
14 **Chase?**
15     A     We didn't talk to him specifically
16 about that.
17     Q     Why not?
18     A     As the treasurer, that would not be
19 something that he would normally be involved in.
20     Q     Who would normally be involved in
21 **that issue?**
22     A     Usually it would be the operations
23 staff would come and say we no longer have access
24 to that collateral, and then there would normally
25 be a reporting through the compliance area, and

TSG Reporting - Worldwide     877-702-9580

Page 124

P. Vinella

1 presumably the CFO's office.
2
3         It would be rare that it actually
4 would go to a treasurer.
5     Q     Did you ask Mr. Tonucci if he knew
6 **that the Woodlands Bank was improperly coded as a**
7 **non-customer?**
8     A     No, we didn't ask that.
9     Q     Why did you not ask Mr. Tonucci that?
10     A     Again, as the treasurer, he would
11 only see the results of the 3-3 calculation, and
12 the excess, and unless there was reason for him to
13 believe that that number wasn't correct, that he
14 could use that excess -- I'm sure there was an
15 approval process. He mentioned that there was an
16 approval process to withdraw that excess.
17         So, it didn't seem he would be the
18 person to talk to about specific discrepancies or
19 alleged discrepancies in the calculation.
20     Q     What did Mr. Tonucci tell you about
21 **the approval process to withdraw the excess from**
22 **the c3 reserve?**
23     A     As I remember, he said there was a
24 number of people that were involved in the
25 end-of-day review of books and records of Lehman

TSG Reporting - Worldwide     877-702-9580

Page 125

P. Vinella

1 Brothers. Part of it, again, was looking at the
2 3-3 calculation and determining how much they
3 could take out.
4         Lehman Brothers' normal course of
5 business, we were told, was to leave a cushion in
6 the account. There was a question of how big that
7 cushion should be. So, when I use the term
8 "approval process," that may be more formal
9 sounding than it was, in terms of it was a
10 collaborative effort of people looking at it.
11         I don't remember that he mentioned
12 the specific names of the people that were
13 involved.
14     Q     Did you ask Mr. Tonucci about the
15 **account coding errors that are mentioned in the**
16 **Broadridge memo that is Exhibit 28 --**
17     A     No.
18     Q     -- to Mr. McIsaac's affidavit?
19     A     No.
20     Q     And is that because you didn't
21 **believe that in his position, Mr. Tonucci would**
22 **have specific knowledge about that error?**
23     A     That is a fair characterization.
24     Q     Okay. Did you also ask Mr. Tonucci

TSG Reporting - Worldwide     877-702-9580

Page 126

P. Vinella

1        P. Vinella
2    about the customer securities that LBI held at
3    LBIE --
4        A    No.
5        Q    -- in the week running up to the
6    insolvency of the 19th?
7        A    No.
8        Q    Why not?
9        A    Again, the treasurer's
10   responsibilities are for maintaining positive
11   balances in their cash and collateral accounts,
12   and those responsibilities would be normally
13   performed by someone else.
14        I should also point out that
15   Mr. Tonucci had a very senior job at Lehman
16   Brothers, and having been in this business for
17   over 20 years, you don't ask lots of details of
18   very senior people.  Not that they don't know
19   them, but they tend to get annoyed when you ask
20   them that.
21        So, trying to keep him in a favorable
22   mood, we thought it was better to talk more about
23   what he was specifically responsible for.
24        Q    You don't know whether or not he
25   talked to anybody at Lehman in the week running up

Page 127

P. Vinella

1    to the insolvency of LBI on the 19th of September
2    about whether or not the customer reserve account
3    was adjusted to take account of any securities
4    that belonged to customers that were held at LBIE?
5        A    We did not ask that question.
6        Q    Did you ask Mr. Tonucci about the
7    82 million in payments to customers that were
8    seized by Citibank that Mr. McIsaac references in
9    his affidavit?
10        A    No.
11        Q    The reason that you didn't do that is
12   the same answer you gave me when I asked that
13   question with respect to the other four issues;
14   correct?
15        A    Yes.
16        Q    Did you take any notes of your
17   conversation with Mr. Tonucci?
18        A    I did not, personally, no.
19        Q    Do you know whether anybody at your
20   direction took notes?
21        A    There were notes that someone on the
22   team took, yes.
23        Q    By someone on the team, do you mean
24   the LECG team?

Page 128

P. Vinella

1        P. Vinella
2        A    The LECG team.
3        Q    Those notes relate to a conversation
4    that you had with Mr. Tonucci that you relied upon
5    in preparing your final report; correct?
6        A    Yes.
7        Can I clarify that.  I didn't review
8    the notes in preparing the report.  When we had
9    discussions among the team, the team members would
10   look at their notes.  I wouldn't take their notes
11   and rely on those notes for the report.
12        Q    You relied on their recollection or
13   their communication to you of what Mr. Tonucci
14   said on this conference call in December of 2009;
15   correct?
16        A    Yes.  Since I was part of the
17   conversation, it was in context.  Yes.
18        MR. OXFORD:  Can we go off for one
19   second.
20        (Discussion held off the record.)
21        MR. OXFORD:  Back on.
22        I mean, I don't believe we have had
23   those produced to us.
24        MS. NEUHARDT:  Yeah, you have all the
25   notes of Jeanette, Peter, Sergio and Andrea.

Page 129

P. Vinella

1        P. Vinella
2    Right.  I don't know if Armand ever made any
3    notes.
4        THE WITNESS:  He wasn't part of any
5    of the interviews.
6        MS. NEUHARDT:  You should have two
7    different, handwriting and then typed.
8        MR. OXFORD:  Perhaps we can deal with
9    this question when we go through the notes.
10   I am just asking general questions.
11        MS. NEUHARDT:  We at least attempted
12   to produce for four of the five people, and
13   the fifth person did not take notes, so.
14        MR. OXFORD:  Okay.
15        Q    Did you have any conversations with
16   anyone else, sir, in connection with your final
17   report, prior to the meeting that took place in
18   New York?
19        A    I believe that the call with
20   Mr. Tonucci was the only call before the meeting
21   in New York.
22        Q    Okay.  The meeting in New York took
23   place approximately when, sir?
24        A    I believe it was December 18th, or
25   thereabout.

Page 130

P. Vinella

1
2    **Q**    Where did it take place?
3    A    It took place at the old Lehman
4    headquarters in Times Square, which is now, I
5    guess, Barclays Capital.
6    **Q**    And you gave me a list of names, sir.
7    **Ricky Policke --**
8    A    Yes.
9    **Q**    -- was present at that meeting?
10   A    He was.
11   **Q**    David Roden?
12   A    Yes.
13        MS. NEUHARDT:  It was an all-day
14   meeting, but all these people were present
15   at some point, so.
16        MR. OXFORD:  That's fine.  I was
17   going to get there.
18   **Q**    Alex Crepeau was present?
19   A    Yes.
20   **Q**    John Haley?
21   A    Yes.
22   **Q**    John Rodefeld?
23   A    Yes.
24   **Q**    And Lenny Legotte?
25   A    Yes.

TSG Reporting - Worldwide    877-702-9580

Page 131

P. Vinella

1
2    **Q**    Is that L-E-G-O-T-T-E?
3    A    I believe it is.
4    **Q**    Was Mr. Burke present at any point
5    **that day?**
6    A    No, he was not.
7    **Q**    Mr. Flemming, Dan Flemming?
8    A    Daniel Flemming was also there.
9    **Q**    Mr. Flemming is a former Lehman
10   **employee; correct?**
11   A    I believe so, yes.
12   **Q**    And who attended the meeting from
13   **LECG?**
14   A    That was myself, Jeanette Jin, Andrea
15   and Sergio.
16   **Q**    And who else?  Was there anybody else
17   **present for these meetings?**
18   A    Amy Neuhardt and Heather King, and
19   Mr. Amman, David Amman, Cleary Gottlieb.
20   **Q**    And as Amy suggested, were these
21   **interviews held seriatim?  Did you meet with one**
22   **person at a time or in groups or in one big happy**
23   **session?**
24   A    I know seriatim, by the way.  I took
25   seven years on Latin.

TSG Reporting - Worldwide    877-702-9580

Page 132

P. Vinella

1
2        Yes, they were actually a series of
3    meetings.  In some cases there were two people in
4    the meeting, in some cases there was a single
5    individual that we would be interviewing.
6    **Q**    And taking these people one at a
7    **time, what did Mr. Policke tell you, if anything,**
8    **that you relied upon in creating your final**
9    **report?**
10   A    We asked the questions about his
11   responsibility, which appeared to be the MTS
12   system and the operations around the MTS system.
13        We asked him to categorize or
14   characterize, I should say, the operating
15   environment that week of the 15th.
16        We asked him about -- again, I'll use
17   the term "chaos," if he thought it was chaotic or
18   if it was something controlled.
19        We asked him about the end-of-day
20   process with which they would close their books.
21   They had a daily trial balance, and part of that
22   was making sure the books and records were clean,
23   and he mentioned that he thought at the end of
24   every one of those days it was correct.
25        We asked him if the MTS system

TSG Reporting - Worldwide    877-702-9580

Page 133

P. Vinella

1
2    produced the 3-3 calculation, which he confirmed
3    that it did.
4        We asked him who was responsible for
5    reviewing 3-3 calculations, and he said it was
6    basically his area, and then it would be sent over
7    to the reg reporting group.
8        We asked him about the different
9    types of customer accounts that were kept in MTS.
10   And so he mentioned that there were prime broker
11   accounts, PIM accounts and PAM accounts.
12        We asked him how they segregated the
13   accounts at the depositories and at the banks, and
14   we relied on that as well.
15        We asked questions about the 19th
16   specifically, what his -- you know, was Lehman
17   Brothers still in business in the morning or the
18   afternoon, or when it stopped.  We relied on some
19   of his recollections on that area.
20        And we talked a lot about account
21   setups and how customer accounts were identified
22   with an MTS, and what processes were in place to
23   assure that they were set up correctly.
24        I think that is a general overview of
25   what we relied on.

TSG Reporting - Worldwide    877-702-9580

Page 134

P. Vinella

1  
2      **Q    What did Mr. Policke tell you, if**
3  **anything, about the chaos within Lehman and Lehman**
4  **systems in the week leading up to Lehman's**
5  **insolvency, LBI's insolvency on the 19th?**
6      MS. NEUHARDT: Objection to form.
7      A    He mentioned that one of the
8  struggles for him was that a lot of the prime
9  broker clients were actually clients of LBIE.
10  Because there had been a change in some
11  regulations, that it seemed more beneficial to
12  have U.S. prime broker clients, clients of LBIE.
13  So there were some issues there about client
14  assets that were either in MTS or ITS, and there
15  was no longer an LBIE to face off with.
16      But they were able to control that,
17  because all the data was actually in the systems
18  that they had. He believed that the settlement
19  clearance function of trades coming in and out,
20  they were able to do. They didn't seem to have a
21  lot of settlement breaks.
22      They did have a lot of account
23  transfers that were going -- you know, accounts
24  that were not buying and selling assets but were
25  moving their assets to other broker dealers, and

TSG Reporting - Worldwide    877-702-9580

Page 135

P. Vinella

1  that towards the end of the day on the 18th, that
2  the ACAT system, which is a Depository Trust
3  Company facility that allows you to transfer these
4  assets and registration of the assets between
5  broker dealers, actually got bogged down.
6      So, there was a lot of volume on
7  that, and it was primarily the Lehman Brothers
8  assets that were moving to other areas. There was
9  a lot of unwinding of tri-party repos, but they
10  were able to do that successfully.
11      So, the volumes were extremely high.
12  There was a lot of unusual activity, compared to
13  the week previously. But he felt very comfortable
14  at the end of every day, they were able to tie out
15  their books and records. In fact, he used the
16  term, they were able to balance their accounts
17  every single day up until the 19th.
18      It turns out from his recollection
19  that the morning of the 19th, they opened up
20  business as usual. There were transactions coming
21  in and out of the systems. It wasn't until later
22  in the morning when JPMorgan Chase turned off
23  access to their systems, where -- that's really
24  when chaos started, because they no longer had the

TSG Reporting - Worldwide    877-702-9580

Page 136

P. Vinella

1  
2  ability to see what was settling and clearing at
3  Chase. They no longer had the ability to see the
4  balances in their accounts.
5      At that point, they felt they were
6  just totally flying blind.
7      **Q    Did Mr. Policke tell you that he was**
8  **able to balance his accounts on the 19th at the**
9  **close of the day?**
10      A    No. In fact, he mentioned he was not
11  able to balance his accounts.
12      **Q    But he told you he was able to**
13  **balance his accounts at the close of the day on**
14  **the 18th?**
15      A    As of the 18th. It was a very late
16  close, I should point out. As he kind of talked,
17  he said the end of the 18th and the beginning of
18  the 19th were pretty much at the same time.
19      **Q    I think we have all been there.**
20      **Did Mr. Policke explain to you what**
21  **he meant by close his accounts?**
22      A    Well, when you -- closing your books
23  basically in the industry means that you are able
24  to reconcile your positions. It doesn't mean
25  there are not errors. What it means is you have

TSG Reporting - Worldwide    877-702-9580

Page 137

P. Vinella

1  
2  identified the errors and that you are able to
3  take the appropriate action with those errors,
4  which typically means putting things into a
5  suspense account.
6      But they were able to see all the
7  trades that cleared, all the trades that didn't
8  clear. They were able to recognize any
9  discrepancies within the depository boxes versus
10  their internal systems.
11      And one of the other things that
12  happened during that week that Mr. Policke
13  mentioned was that the DTC at that point wanted to
14  have money upfront for all the settlements that
15  day, so they had to do projections of settlements
16  and they were able to do that correctly.
17      **Q    You said Mr. Policke also told you**
18  **that the c3 calculation was essentially his area,**
19  **his responsibility; is that correct?**
20      A    For the fixed-income instruments that
21  were kept on MTS. He also mentioned, which I
22  failed to point out, that they were able to
23  successfully compute the 3-3 reserve calculation
24  as of the 16th, and as of the 17th, in addition to
25  being able to do the normal 3-3 calculation that

TSG Reporting - Worldwide    877-702-9580

Page 138

P. Vinella

1 would have been as of the 12th that was performed
2 on the 15th.
3    Q    Did you ask Mr. Policke what he meant
4 by successfully computing the reserve computation
5 as of the 16th and 17th?
6    A    I didn't ask him to clarify what
7 success meant.  To me it was obvious that he
8 believed that the numbers that came out were
9 correct.
10    Q    Did you ask Mr. Policke whether he
11 was aware of the FID accounts that were seized by
12 Chase on the 19th?
13    A    I don't mean to interrupt you.  Can I
14 take another bio break?
15    Q    Please.
16    A    Otherwise, I will start talking too
17 fast again.
18        (Recess taken.)
19        (Recess.)
20        MR. OXFORD:  Back on.
21        Can you read back my last question?
22        (Record read.)
23    A    Yes.
24    Q    What did Mr. Policke tell you in

TSG Reporting - Worldwide    877-702-9580

Page 139

P. Vinella

1 connection with those FID securities?
2    A    We asked him, first of all, did he
3 know about the issue that had been raised in the
4 McIsaac report, and he said he was aware of that,
5 that all of those assets were maintained on the
6 MTS system; that they were in connection with the
7 broker dealer business -- excuse me, the prime
8 broker business, and that he was not -- he did not
9 know if they had actually been seized or not
10 seized on the 19th.
11        His recollection was that when the
12 system, when the system access went dead, or they
13 wouldn't -- Chase would no longer allow access to
14 their systems, at that point they didn't know what
15 the condition of the securities were, and they had
16 discussion throughout the day with Chase trying to
17 get access reconnected.
18        But he said that that was
19 approximately the right amount of assets in terms
20 of cash and collateral, and again, that they were
21 primarily prime brokerage assets that were fed
22 eligible.
23    Q    But Mr. Policke told you he simply
24 didn't know whether or not Chase had seized the

TSG Reporting - Worldwide    877-702-9580

Page 140

P. Vinella

1 assets that Mr. McIsaac references in the FID
2 securities section of his report?
3    A    He said that as of the 19th, he was
4 not aware of the disposition of those assets.
5    Q    Did Mr. Policke, subsequent to the
6 19th of September, 2008, come to any knowledge as
7 to whether or not those same FID securities
8 references by Mr. McIsaac in his affidavit had in
9 fact been seized by Chase?
10    A    I think he mentioned after the fact
11 that Chase had seized the assets.
12    Q    Did Mr. Policke tell you when he came
13 to learn that Chase had seized the assets?
14    A    As we discussed during the 19th, he
15 mentioned that the access to the systems had been
16 cut off, that the clearing accounts were,
17 quote/unquote, frozen, and what he thought that
18 meant was that they didn't have access to the
19 activity going through the clearance accounts, but
20 he did not know -- no one was telling him what was
21 going on with the customer accounts or even the
22 other accounts they maintained at Chase at that
23 point.
24        His recollection was, again, after --

TSG Reporting - Worldwide    877-702-9580

Page 141

P. Vinella

1 you know, after the fact.  He didn't mention if it
2 was the 22nd or the 23rd, but it was sometime
3 after the 19th.
4    Q    And Mr. Policke told you that he
5 learned sometime after the 19th of September,
6 2008, that Chase had seized the FID securities
7 referenced in Mr. McIsaac's affidavit; correct?
8    A    Yes.
9    Q    And did Mr. Policke tell you as to
10 what his knowledge was as to the date as of which
11 Chase seized those FID securities?
12    A    I don't think we discussed those, as
13 I remember.
14    Q    Did you ask him if he knew when Chase
15 seized the FID securities?
16    A    Again, as of -- in reference to the
17 19th, the thing that Mr. Policke talked about was
18 the system being -- access to the system being
19 denied and that the clearing accounts were frozen.
20 I don't know exactly when he learned that they
21 were seized or what day they were seized on.  I
22 don't know that we asked that question.
23    Q    Can you tell me, sir, as an expert in
24 15c3, what would be the requirement under c3 if

TSG Reporting - Worldwide    877-702-9580

Page 142

P. Vinella

1  the condition and control of those customer assets
2  could not be ascertained on a particular date?
3  A    Well --
4      THE WITNESS:  Did you --
5      MS. NEUHARDT:  You can answer.  I am
6  just objecting to the form of the question.
7      A    The requirement is that it's
8  considered a good control location, so if you have
9  evidence that it's not a good control location,
10 then you have to treat it differently in the 3-3
11 calculation.
12     There is not a specific definition of
13 what that kind of evidence would be.  There is a
14 definition of what a good control location is in
15 terms of, in the sense that you can get prompt
16 delivery of your assets without any financial
17 consideration.
18     So, if they believed they were not
19 going to be able to promptly get those assets
20 without consideration, then they would have to
21 treat that differently.
22 Q    Okay.  If, Mr. Vinella, there was
23 uncertainty as to whether or not LBI had control
24 for the securities at Chase, the securities that

TSG Reporting - Worldwide    877-702-9580

Page 143

P. Vinella

1  Mr. McIsaac references, what would be the
2  requirement under 15c3 with respect to those
3  securities?
4      A    If they had questions around the
5  ability to promptly get those back, the correct
6  treatment would be to now put collateral up in the
7  reserve -- excuse me, put cash or collateral in
8  the reserve account to account for that they would
9  no longer be considered good control locations.
10 Q    Did you ask Mr. Policke about
11 Woodlands Bank and whether or not he had any
12 knowledge whether Woodlands Bank was improperly
13 coded as a non-customer?
14     A    We talked about Woodlands Bank, yes.
15 Q    Tell me what you recall of the
16 conversation with Mr. Policke about Woodlands
17 Bank.
18     A    We asked him generally how customers
19 are identified, who was the group in control of
20 setting up the customers, was there a separate
21 group within operations that would do it for MTS
22 and ADP.  And how were customers uniquely
23 identified within the MTS environment.
24     Then we specifically asked about

TSG Reporting - Worldwide    877-702-9580

Page 144

P. Vinella

1  Woodlands Bank.
2  Q    What did he tell you about Woodlands
3  Bank specifically?
4      A    At that point he was not very -- as
5  he put it, he was not in the loop.  I guess that
6  discrepancy was found much after -- a time after
7  the collapse of the broker dealer, so we were
8  talking more specifically about controls in
9  general as opposed to that specific instance.
10     He did know of the Woodlands Bank
11 issue, but he didn't know it in any depth.
12 Q    So he didn't know whether or not
13 Woodlands Bank was properly coded as a
14 non-customer?
15     A    He couldn't speak authoritatively to
16 that.  He only knew that there was an incident
17 around Woodlands Bank.
18 Q    Do you know whether Woodlands as a
19 customer was on the ADP system or the MTS system?
20     A    I think it was on both, because
21 Woodlands Bank had mostly fixed-income
22 instruments, as I recall, and MTS was the sole
23 processing system for MTS.
24     Also, in the way that they told us

TSG Reporting - Worldwide    877-702-9580

Page 145

P. Vinella

1  the accounts were set up, they would set up
2  customer accounts on basically all the systems
3  that they thought would -- based on the types of
4  instruments they would trade.
5  Q    Did you ask Mr. Policke about the
6  account coding errors that are noted in the
7  Broadridge memo, which is Exhibit 28 to
8  Mr. McIsaac's affidavit?
9      A    We asked if he knew anything about
10 that.  He pointed out it was an ADP error.
11     My recollection was, he wasn't even
12 aware of that specific issue.  And if he was, he
13 basically said it was part of the ADP environment
14 and he wouldn't have been responsible for that.
15 Q    Because Mr. Policke was principally
16 responsible for the MTS area?
17     A    That was his principal area of
18 responsibility.
19 Q    Who was responsible for the ADP
20 system?
21     A    Actually, we never had a chance to
22 talk to that person.
23 Q    Who was that person?
24     A    I can't even tell you the name right

TSG Reporting - Worldwide    877-702-9580

## Page 146

P. Vinella

1  now without looking back at my notes.
2
3     Q     Why did you not have the chance to
4  talk to the ADP person?
5     A     Again, we were trying to hold these
6  interviews with very short notice over the holiday
7  season, and it was just getting people's time and
8  access.
9     Q     Did you talk to Mr. Policke about the
10  439 million of customer securities that are held
11  at LBIE that are referenced in Mr. McIsaac's
12  affidavit?
13     A     No.
14     Q     Is there a reason you did not?
15     A     Mr. Roden, who was also part of that
16  meeting, addressed that issue directly.
17     Q     Did you talk to Mr. Policke about the
18  82 million in payments by customers that were
19  seized by Citibank that is referenced in the
20  McIsaac affidavit?
21     A     We asked him about the RISC system
22  and was that a books and records system and would
23  the $82 million make sense being booked on that
24  system, and did that system feed into the 3-3
25  calculation. We asked him about that aspect of

TSG Reporting - Worldwide    877-702-9580

## Page 147

P. Vinella

1  the 82 million.
2
3     Q     What did he tell you?
4     A     That the RISC system, which is
5  R-I-S-C, was not a books and records system. That
6  it didn't make sense to post positions on that
7  system, and that indeed it was not -- there was no
8  feed from that system into the 3-3 calculations.
9           He wasn't aware of the $82 million
10  discrepancy.
11     Q     Did you talk to Mr. Policke about
12  when the different types of customer accounts
13  moved from the LBI broker dealer?
14     A     Could you repeat the question,
15  please.
16     Q     Did you talk to Mr. Policke about
17  when the different types of customer accounts
18  moved from the LBI broker dealer?
19     A     We didn't specifically talk about
20  types of accounts. We --
21     Q     I thought you said he told you about
22  the different types of accounts, prime broker --
23     A     He did discuss the different types of
24  customer accounts that were maintained on MTS,
25  yes.

TSG Reporting - Worldwide    877-702-9580

## Page 148

P. Vinella

1
2     Q     But Mr. Policke didn't tell you about
3  when any of these accounts moved?
4     A     We didn't discuss movements of
5  customer assets in terms of accounts.
6     Q     Okay. You told me that Mr. Policke
7  had described to you the ACATS, A-C-A-T-S,
8  transfers that got bogged down on the 18th. Do
9  you remember telling me about that?
10     A     Yes.
11     Q     If those transfers never happened
12  because they were bogged down with DTC, should
13  they be reflected in the customer reserve formula
14  under c3 or not?
15     A     First, I can't say that they weren't
16  transferred. And my understanding was that that
17  happened at night, so again, they could have come
18  back the next day.
19           If they physically did not leave
20  Lehman Brothers' possession, they would be
21  included in the 3-3 calculation.
22     Q     Okay. Turning to Mr. Roden, you met
23  with Mr. Roden, David Roden?
24     A     Yes.
25     Q     In the meeting in New York?

TSG Reporting - Worldwide    877-702-9580

## Page 149

P. Vinella

1
2     A     Yes.
3     Q     Can you tell me what information
4  Mr. Roden gave you that you relied upon in your
5  final report.
6     A     His area of responsibility was the
7  ITS system, which was their international trading
8  system, and we asked what type of businesses
9  were -- you know, were supported by the system,
10  how that system related to the ADP system and the
11  MTS system. How customers were set up in the ITS
12  system. How the 3-3 calculation was computed.
13  What his feeling of the operations were during
14  that week, and specifically about the interactions
15  between LBIE and LBI.
16     Q     What was Mr. Roden's responsibility
17  with respect to the preparation of the 15c3
18  calculation at LBI?
19     A     Again, all of the customer assets
20  that were maintained on ITS would go into a 3-3
21  calculation, and then that 3-3 calculation would
22  be added together with that produced by MTS and
23  ADP.
24     Q     Did Mr. Roden tell you whether he
25  thought the c3 calculation performed by Lehman at

TSG Reporting - Worldwide    877-702-9580

Page 150

P. Vinella

1  any time during the week ending Friday, the 19th
2  of September, 2008, was successful?
3
4      A    He agreed that he thought it was
5  successful, yes.
6      Q    He agreed with whom, sir?
7      A    Mr. Policke.
8      Q    Did you meet with Mr. Policke and
9  Mr. Roden at the same time?
10     A    At the time, yes.
11     Q    Was anybody else in terms of the
12  interviewees also in the room at the same time as
13  Mr. Policke and Mr. Roden?
14     A    No.  They were together, and no other
15  Lehman or Barclay staff was there.
16     Q    Did you talk to Mr. Roden about the
17  FID accounts that were seized by Chase as
18  referenced in Mr. McIsaac's affidavit?
19     A    No.
20     Q    Why not?
21     A    Our understanding was that those were
22  U.S. assets and Mr. Policke seemed to give a good
23  discussion of that topic.
24     Q    Did you talk to Mr. Roden about the
25  Woodlands Bank issue that is referenced in

TSG Reporting - Worldwide    877-702-9580

Page 151

P. Vinella

1
2  Mr. McIsaac's affidavit?
3      A    No.
4      Q    And that is the same reason you
5  didn't do that?
6      A    The same reasons.
7      Q    Did you talk to Mr. Policke about the
8  account coding errors referenced in the Broadridge
9  memo?
10     A    For the same reason, we didn't ask
11  him as well.
12     Q    I think you told me you did ask
13  Mr. Roden about the 439 million of customer
14  securities that were held at LBIE; correct?
15     A    We did.
16     Q    What did Mr. Roden tell you about
17  that issue?
18     A    He was aware of the issue.  We asked
19  how that would have impacted the 3-3 calculation,
20  and he said that the ITS system would have fed the
21  3-3 calculation correctly in terms of any accounts
22  that had been no longer a good control location.
23  However, he wasn't the person that made the
24  decision if it was a good control location or not.
25     Q    Who did make the decision as to

TSG Reporting - Worldwide    877-702-9580

Page 152

P. Vinella

1
2  whether or not, once LBIE went into bankruptcy on
3  September 15, 2008, whether or not LBIE was still
4  a good control location under the terms of
5  Rule 15c3?
6      MS. NEUHARDT:  Objection to form.
7      A    We didn't ask that question.
8      Q    Did you ask Mr. Roden whether or not
9  the 439 million of customer securities at LBIE
10  were at any point in the week leading up to
11  September 19th, 2008, included in the 15c3
12  customer reserve calculation?
13     A    We didn't ask that question.
14     Q    Why not?
15     A    We were asking at that point more
16  general questions of controls, and how customers
17  were set up, and how they understood the assets
18  had been segregated.
19          Mr. Roden was not as knowledgeable
20  about the operational aspects around ITS as
21  Mr. Policke was around MTS.  Mr. Roden seemed to
22  be very much more focused on systems than on
23  operations, so he didn't seem to be the authority
24  on a lot of these issues.
25     Q    And as an expert in c3, sir, do you

TSG Reporting - Worldwide    877-702-9580

Page 153

P. Vinella

1
2  agree that a bankrupt entity such as LBIE would
3  not be considered a good control location under
4  the Customer Protection Rules of 15c3?
5      A    I would agree with that.
6      Q    And what effect, sir, would LBIE not
7  being a good control location under Rule 15c3 have
8  on the computation of the reserve formula under
9  c3?
10     A    Once it was determined it wasn't a
11  good control location, the value of those assets
12  would be added to the reserve requirement.
13     Q    Did you talk to Mr. Roden about the
14  $82 million in payments to customers that were
15  seized by Citibank that Mr. McIsaac discusses in
16  his affidavit?
17     A    We did.
18     Q    What did Mr. Roden tell you about
19  that?
20     A    We asked if ITS was the
21  multi-currency system, why such a transaction
22  would have been kept on ADP as opposed to ITS.
23  And he wasn't aware of why that decision was made,
24  and he wasn't knowledgeable about the specifics,
25  he wasn't knowledgable about the specifics of the

TSG Reporting - Worldwide    877-702-9580

Page 154

P. Vinella

1  P. Vinella
2  82 million.
3      Q    Did you have any other discussions
4  with Mr. Roden, other than the ones you have
5  testified to, that were the support or basis for
6  any facts or opinions that you stated in your
7  report?
8      A    We had a subsequent phone call with
9  both Mr. Policke and Mr. Roden.  I believe that
10 was either late December, early January.  And that
11 was to confirm a number of the -- we asked for the
12 call to confirm a number of the conclusions we
13 came to and substantiate some of the facts again.
14     Q    Okay.  Taking the facts first, which
15 facts did you resubstantiate with Mr. Roden and
16 Mr. Policke in that subsequent call?
17     A    I believe we talked primarily about,
18 again, the multi-currency issues of, you know, why
19 these foreign -- excuse me -- foreign money market
20 funds were not booked on ITS.  And did we get that
21 correctly.  Mr. Roden agreed with that.
22          We also asked, again, about the
23 account control functions that they had to show
24 that customers would be either set up correctly as
25 customers, or if they weren't, how such errors had

Page 155

1  P. Vinella
2  been discovered, and that was -- most of the
3  conversation was around that, that -- you know,
4  how coding errors would have been prevented in the
5  beginning, and if they were found, how would they
6  would be found.
7      Q    Did you have a specific example of an
8  account coding error that you were discussing with
9  Mr. Roden and Mr. Policke?
10     A    We mentioned the Woodlands Bank as an
11 example.
12     Q    What did they tell you about the
13 Woodlands Bank?
14     A    Again, they didn't know any of the
15 specifics.  We described the situation where an
16 affiliate of Lehman Brothers had not signed a
17 subordination agreement, was entered in as a
18 non-customer, which was incorrect.  How would --
19 how did that take place, and what, what were the
20 normal controls that would be in place to discover
21 that a coding error had taken place.
22          It was more general again about
23 operations than about specifically Woodlands Bank.
24     Q    And what did Mr. Policke and/or
25 Mr. Roden tell you about the procedures that were

Page 156

1  P. Vinella
2  in place to detect such a coding error that you
3  have described?
4      A    They had a number of variance reports
5  that they would look at that would show changes in
6  activity across customers.  They also mentioned
7  that there was a monthly statement process that
8  would go to customers that wouldn't go to
9  non-customers.
10          There was also a customer
11 relationship management system, which it didn't
12 sound like a real system as much as it may have
13 just been kind of reports that were put together
14 to also show variance in customer activity.
15          By monitoring those, they would be
16 able to see if something was miscoded.  And they
17 believed it usually was in a four- to six-week
18 time frame they were able to find any kind of
19 material miscoding problems.
20     Q    Did Mr. Roden or Mr. Policke have any
21 specific information about whether or not
22 Woodlands Bank was correctly coded as a
23 non-customer on LBIE's books and records in the
24 week leading up to the 19th of September?
25     A    Again, they weren't aware of any

Page 157

1  P. Vinella
2  problems with Woodlands Bank prior to the collapse
3  of LBI, and --
4      Q    When -- I'm sorry.
5      A    And they weren't even aware of any
6  problems until something came up, I guess in the
7  TSA investigation.
8      Q    When something came up in the TSA
9  investigation, did Mr. Policke or Mr. Roden, to
10 your knowledge, conduct any investigation of that
11 issue?
12     A    No, not to my knowledge.
13     Q    Mr. Policke or Mr. Roden didn't tell
14 you whether or not there was, in fact, a
15 subordination agreement signed by Woodlands Bank?
16     A    They weren't, again, aware of that
17 specific instance.
18     Q    When did this conversation subsequent
19 to your in-person meeting in New York, when did
20 that take place?
21     A    As I said, it was either the last
22 week of December or the first week of January.
23          There was one other topic that we did
24 talk about that I forgot, which was whether MTS
25 could perform a full trial balance.  There was a

TSG Reporting - Worldwide    877-702-9580

Page 158

P. Vinella

1
2 disagreement among my team, where they heard that
3 they could do a full trial balance or they
4 couldn't do a full trial balance.
5    **Q    What was the response of Mr. Roden**
6 **and Mr. Policke on that issue?**
7    A    That both MTS and ITS did not have
8 full accounting capabilities and were not capable
9 of doing a full trial balance.
10    **Q    Did anyone take notes of the meetings**
11 **with Mr. Roden and Mr. Policke either in person or**
12 **over the phone?**
13    A    In person -- there are notes on that
14 phone call. I didn't take any notes because I
15 was -- and Jeanette Jin who was on that call, may
16 have taken notes. I would have to look at her
17 notes.
18    **Q    Okay. Turning to Alex Crepeau. You**
19 **met in person with Alex Crepeau at your**
20 **December 18th meeting in New York?**
21    A    Yes, yes.
22    **Q    Did you meet with Alex Crepeau on his**
23 **own in terms of interviewees, or were there other**
24 **interviewees in the room?**
25    A    As I recall, he was by himself.

TSG Reporting - Worldwide    877-702-9580

Page 159

P. Vinella

1
2    **Q    What, if anything, did Mr. Crepeau**
3 **tell you that you relied upon in your final**
4 **January 8th report?**
5    A    Actually, there was nothing that came
6 up in that conversation that subsequently was
7 included in the report.
8    **Q    What was Mr. Crepeau's position at**
9 **LBI?**
10    A    I can't recall that right now. I
11 believe it was in either the financial control --
12 I mean the financial reporting group or operations
13 control group, as I recall.
14    **Q    Did you ask Mr. Crepeau about the FID**
15 **accounts issues, the seizure by Chase of those FID**
16 **accounts?**
17    A    As I remember, he may have been
18 either ring-fenced by the TSA or had some issues
19 that we discussed in the beginning, and I think
20 that subsequently limited a lot of the
21 conversation that we had, so I don't know that I
22 even went into anything that was specific to
23 Mr. McIsaac's report. I think it was more just
24 general, what do you do, who do you report to type
25 of questions.

TSG Reporting - Worldwide    877-702-9580

Page 160

P. Vinella

1
2    **Q    So, you don't remember whether or not**
3 **you asked Mr. Crepeau about the Woodlands Bank**
4 **issues?**
5    A    I can't remember asking him anything
6 specific about the Mr. McIsaac report, or
7 affidavit, I should say.
8    **Q    Turning to John Haley, did you meet**
9 **in person with Mr. Haley on December 18th?**
10    A    Yes.
11    **Q    Was Mr. Haley the only interviewee in**
12 **the room at the time?**
13    A    No. Mr. Rodefeld was also in the
14 room at the time.
15    **Q    About how long did you meet with**
16 **Mr. Haley and Mr. Rodefeld for?**
17    A    Somewhere between an hour and an
18 hour-and-a-half.
19    **Q    How long was the meeting with**
20 **Mr. Crepeau?**
21    A    That was actually very short. I
22 think it was a half an hour.
23    **Q    And the meeting with Mr. Roden --**
24    A    That was an hour, I believe.
25    **Q    And the meeting with Mr. Roden and**

TSG Reporting - Worldwide    877-702-9580

Page 161

P. Vinella

1
2 **Mr. Policke together was approximately one hour?**
3    A    Yes.
4    **Q    Did Mr. Haley or Mr. Rodefeld provide**
5 **you with any information that you relied upon in**
6 **your January 8th report?**
7    A    No.
8    **Q    Mr. Rodefeld was not employed by LBI**
9 **in 2008; is that correct?**
10    A    It's my understanding he wasn't.
11    **Q    To your understanding, he was a**
12 **Barclays employee?**
13    A    I believe so, yes.
14    **Q    Mr. Haley, was he a legacy Lehman**
15 **employee or was he a Barclays employees?**
16    A    I believe they are both Barclays
17 employees.
18    **Q    Did you ask either Mr. Haley or**
19 **Mr. Rodefeld about any of the specific factual**
20 **issues referenced in Mr. McIsaac's affidavit?**
21    A    The only thing that we talked about
22 in Mr. McIsaac's affidavit was the repo between
23 Barclays and Lehman Brothers.
24    **Q    And what did he tell you about the**
25 **repo between Barclays and Lehman Brothers?**

TSG Reporting - Worldwide    877-702-9580

Page 162

P. Vinella

1
2    MS. NEUHARDT:  Objection.  He's
3    already testified that he didn't rely on
4    this in his report.  So it's beyond the
5    scope of the appropriate testimony.
6    Q    Turning to Lenny Legotte.
7    MS. NEUHARDT:  Legotte.
8    MR. OXFORD:  Legotte?
9    MS. NEUHARDT:  Yes.
10    A    You have to say it with a Bronx
11    accent.
12    Q    I will do everybody a favor and not
13    attempt a Bronx accent.
14    Did Mr. Legotte provide you, sir,
15    with any information that you relied upon in your
16    final January 8th report?
17    A    I believe the major issues again were
18    around how accounts, customer accounts were set
19    up, and how margin requirements were maintained
20    across the various systems.
21    Q    Was Mr. Legotte a legacy Lehman
22    employee?
23    A    I believe he was.
24    Q    Do you know what his position was at
25    Lehman?

TSG Reporting - Worldwide    877-702-9580

Page 163

P. Vinella

1
2    A    He was in the operations area, and I
3    think specifically around margins and margin
4    management.
5    Q    Did you talk to Mr. Legotte about any
6    of the factual issues that were raised by
7    Mr. McIsaac in his affidavit?
8    A    Not to my knowledge, no.
9    Q    You don't remember talking to him
10    about the seizure of the FID accounts by Chase?
11    A    No.  I don't remember that, no.
12    Q    You don't remember talking to him
13    about the improper coding of Woodlands Bank as a
14    non-customer?
15    A    Not specifically Woodlands Bank.
16    Q    Did you talk generally with
17    Mr. Legotte about the improper coding of customers
18    as non-customers?
19    A    We did talk about that.
20    Q    Tell me about that discussion,
21    please.
22    A    Well, again, the issue was how could
23    you -- how are you able to monitor margin
24    requirements across various systems, how was a
25    customer identified.  Was there one customer ID or

TSG Reporting - Worldwide    877-702-9580

Page 164

P. Vinella

1
2    were there multiple customer ID's in the various
3    systems.
4    So, we got a lot into just how a
5    customer's instantiated in the various systems and
6    how he would use those reports.
7    And then we asked him, again, if
8    there was an error, what did he -- what kind of
9    processes would he have that would show that there
10    was an error.
11    Q    What did he tell you about the
12    processes that he had to detect such an error?
13    A    Well, again, there were these
14    variance reports that if there was a customer that
15    wasn't identified as a customer, margin
16    requirements would be off, compared to what they
17    knew from a separate calculation.  If it was done
18    the other way, again, the margin requirements
19    would be different.
20    So they knew -- I guess they had a
21    system to monitor margins across the entire firm.
22    Q    Did Mr. Legotte have any information
23    about whether or not Woodlands Bank was improperly
24    coded as a non-customer?
25    A    We didn't discuss that with him, I

TSG Reporting - Worldwide    877-702-9580

Page 165

P. Vinella

1
2    don't believe.
3    Q    You didn't ask whether or not he had
4    any specific knowledge as to the correctness or
5    otherwise of the coding of Woodlands Bank as a
6    non-customer?
7    A    We didn't discuss Woodlands Bank with
8    him directly.  I think, again, if I can just kind
9    of say this for all the interviewees, Woodland
10    Bank was an error that showed up in December, late
11    December of 2008.  Most of these people, as I
12    understood it, did not have access to the Lehman
13    Brothers systems at that point.  They were working
14    with Barclays' system.
15    Woodlands Bank was a Lehman Brothers
16    affiliate, and we didn't have access to the people
17    that were involved in the TSA aspect of finding
18    these kinds of problems, so it didn't -- it wasn't
19    surprising to us that we didn't ask specifically
20    about Woodlands Bank, because it didn't seem to be
21    something that these people would know about.
22    Q    Did you ask Mr. Legotte about the
23    account coding errors that were noted in the
24    Broadridge memo in Exhibit 28 to the McIsaac
25    affidavit?

TSG Reporting - Worldwide    877-702-9580

42 (Pages 162 to 165)

Page 166

P. Vinella

1      A      We asked about that, but we didn't
2  qualify that as an account coding error.  That is
3  actually software problems, not a
4  miscategorization of a customer account as
5  non-customer or vice versa.
6          We asked him if he was aware of any
7  of these issues around the ADP allocations,
8  pre-allocations of the 3-3 calculation, and he was
9  aware of such -- that there was such a problem,
10  but he wasn't in the loop of how that problem was
11  resolved.
12      Q      Did he tell you who was in the loop
13  of how that problem was resolved?
14      A      He suggested that we talk to people
15  in technology.
16      Q      Did he give you specific names?
17      A      He did give us the name of a woman,
18  and I can't remember her name right now, who I
19  believe was in charge of systems at Lehman
20  Brothers at the time that Lehman Brothers went
21  into liquidation.
22      Q      Did you talk to that person whose
23  name you can't recall sitting here today?
24      A      We did have a call with her, yes.

TSG Reporting - Worldwide    877-702-9580

Page 167

P. Vinella

1      Q      Tell me everything that you remember
2  about that call.
3      A      That she had come from a
4  non-financial institution, three months before she
5  was at Lehman Brothers, and knew basically zero
6  about the broker dealer business, so after being
7  nice a few minutes, we decided that was enough of
8  a phone call.
9      Q      Safe to say you did not rely upon --
10      A      No.
11      Q      -- anything you learned in that
12  conversation --
13      A      No.
14      Q      -- in your final report?
15      A      She was very nice, but no
16  information.
17      Q      Do you know if there are notes of
18  your meeting with Mr. Legotte?
19      A      There are notes, yes.
20      Q      Who took those notes?
21      A      I believe Jeanette Jin had notes, and
22  Sergio Godinho has notes.
23      Q      Did you talk to Mr. Legotte at any
24  time after your in-person meeting?

TSG Reporting - Worldwide    877-702-9580

Page 168

P. Vinella

1      A      Not that I recall, no.
2      Q      Did you talk to Mr. Haley or
3  Mr. Rodefeld at any time after your in-person
4  meeting?
5      A      I don't believe so, no.
6      Q      You testified early on the 18th of
7  December you also met with Dan Flamming; is that
8  correct?
9      A      Yes.
10      Q      Did you meet with Dan Flamming along
11  with other interviewees or just Mr. Flamming?
12      A      Just Mr. Flamming.
13      Q      Did you rely in your final report,
14  sir, on anything that Mr. Flamming told you in
15  that December 18th meeting?
16      A      Yes.
17      Q      Tell me, please, what you relied
18  upon.
19      A      We asked him about the operating
20  environment from the week of the 15th through the
21  19th.  We asked him about how he felt the
22  integrity of the operations and the operational
23  reports were through that week.  And we asked if
24  he was involved in the 3-3 calculations.

TSG Reporting - Worldwide    877-702-9580

Page 169

P. Vinella

1      Q      What did he tell you about those
2  issues, sir?
3      A      There was one other issue I should --
4  what systems did he rely on for his business.
5      Q      Taking first the operating
6  environment, sir.  What did Mr. Flamming tell you
7  about the operating environment that week?
8      A      He said it was quite stressful, in
9  volumes that he hadn't experienced before, that
10  throughout the business day, I think his word was
11  we were flying blind or something to that effect.
12  That billions of dollars of cash was going out the
13  door, and it wasn't clear during the day where
14  that money was going and why such large sums were
15  going out.
16          And that he was in close contact with
17  Paolo Tonucci, the treasurer, throughout the day,
18  so that they could make cash estimates of where
19  they would be at the end of the day.
20          When we asked him were they able to
21  balance their books at the end of the day, he said
22  yes, by the end of the day everything was clean,
23  but during the day it was very, very stressful.
24      Q      What did Mr. Flamming tell you about

TSG Reporting - Worldwide    877-702-9580

Page 170

P. Vinella

1  the 3-3 calculation?
2      A    He was not involved in the 3-3
3  calculation.  That was outside of his area.
4      Q    What did Mr. Flamming tell you about
5  the systems that he relied upon?
6      A    They got position data out of ITS,
7  MTS and ADP.  And they had their own system that
8  they used for cash movements.  So, they would take
9  the balances out of the back office processing
10 systems, put it into their system that would do
11 projections, and then also physically move cash
12 between bank accounts.
13     Q    Did you ask Mr. Flamming about any of
14 the factual issues raised by Mr. McIsaac in his
15 affidavit such as the FID account seizure by
16 Chase?
17     A    We did ask him generally about
18 account seizures, because, again, they had cash
19 balances.  He wasn't aware of many of
20 Mr. McIsaac's issues.
21     Q    Was he aware of any of the issues
22 that Mr. McIsaac states in his affidavit would
23 result in an adjustment of the reserve formula as
24 of 9/19?

Page 171

P. Vinella

1      MS. NEUHARDT:  Objection, form.
2      A    He was not aware of it.  That was
3  outside his area of responsibility.
4      Q    Okay.  Have we covered all of the
5  interviewees that you met with, sir, at the
6  meeting on the 18th of December?
7      A    If I could just check the notes.
8          I believe that is the extent of the
9  interviews.
10     Q    Okay.  Just so the record is clear,
11 sir, can you tell me what the exhibit number is on
12 the set of notes that you just picked up.
13     A    592.
14         MS. NEUHARDT:  Is that the only set
15     you referred to, to figure out the answer to
16     his question?
17         THE WITNESS:  Yes.
18     Q    Subsequent to the meeting with
19 Mr. Flamming, on the 18th of December, did you
20 talk to him again in connection with your report?
21     A    No, we did not.
22     Q    Who was the -- who is the next
23 interviewee after your December 18th meeting, sir?
24 And again, my question is limited to interviewees

Page 172

P. Vinella

1  who provided you with knowledge upon which you
2  relied in your final report.
3      A    Okay.  I believe the next call was
4  with Tony Stucchio.
5      Q    Is that S-T-U-C-C-H-I-O?
6      A    C-C-I-O.
7          MS. NEUHARDT:  I think he got the
8      spelling right.
9          MR. OXFORD:  Can we have me being
10     right on the record?
11     Q    When you spoke to Mr. Stucchio, sir,
12 was it in person or on the telephone?
13     A    It was on the telephone.
14     Q    When did that happen?
15     A    I believe that was early January.
16     Q    And did you speak to Mr. Stucchio
17 only on one occasion?
18     A    On the one occasion, yes.
19     Q    Who was on that telephone call, sir?
20     A    I believe from LECG, besides myself,
21 Jeanette Jin, Andrea Calderoni and Sergio Godinho,
22 and then Ms. King was on the phone, and I believe
23 also Ms. Neuhardt was on the phone, but I don't
24 remember that, but I believe so.

Page 173

P. Vinella

1      Q    Approximately how long did this
2  telephone call last?
3      A    Somewhere between 45 minutes and an
4  hour.
5      Q    What information did Mr. Stucchio
6  provide to you that you relied upon in your final
7  report, sir?
8      A    We asked what his position was, and
9  he -- basically all regulatory reporting I think
10 reported in to him at that point, so the net
11 capital as well as the 3-3 calculations.
12         We asked was he hands on the
13 calculations, and he said during that week he was.
14         We asked about specifically every one
15 of the items in the McIsaac report, and asked his
16 recollection about whether those events happened,
17 and if they did, how they were resolved.
18         We asked him about the general
19 operating environment that week, and at that point
20 I think that is kind of the limit of the questions
21 we asked.
22     Q    Tell me, sir, what Mr. Stucchio told
23 you about the items in Mr. McIsaac's affidavit
24 that you discussed with him, please.

Page 174

P. Vinella

1  A     With relation -- with regard to the
2  FID accounts, we asked, you know, was he familiar
3  with the issues.  He mentioned he was.
4         We asked when did Chase notify Lehman
5  Brothers that there was -- they had frozen these
6  assets or seized the assets.  He was not aware of
7  that on the 19th.  He believe that happened again
8  after the fact.
9         He said that they were on the phone
10 constantly with Chase trying to figure out exactly
11 what was going on, and finally Chase refused to
12 answer their phone calls.  Therefore, they didn't
13 know what the status of the situation was.
14        He was also involved in the -- in
15 trying to come up with the 3-3 calculation over
16 the weekend that would have been as of the 19th,
17 and being part of the overall discussion about
18 discrepancies that had to be fixed because they
19 were trying to put one together.
20        So his recollection was that the --
21 on the date of the 19th, they weren't sure exactly
22 what the status of assets were or were not.  He
23 did confirm there was a no lien letter and that
24 there was no indication that these assets were at

Page 175

P. Vinella

1  risk at that point.
2         And I -- he basically confirmed the
3  overall size of the amount of assets that were
4  maintained in the FID accounts.
5  Q     Did you raise any other of the issues
6  that are discussed in Mr. McIsaac's affidavit with
7  Mr. Stucchio?
8  A     We talked about the $2.3 billion in
9  Mr. McIsaac's report that reportedly was
10 associated with an LBIE client that was that was
11 executed through LBI here in the United States.
12 We asked if he was aware of that.  He said that he
13 was very well aware of that and that that had been
14 resolved.  It was not a customer obligation, but
15 that it was an obligation between LBI and LBIE,
16 and it should have never been in the reserve
17 calculation, and that was correctly treated.
18        We asked about the $82 million at
19 Citi.  His recollection was that was such a small
20 payment of money that on the 19th they weren't
21 even thinking about things like that, they were
22 just trying to get the calculation done.  But he
23 does not recall that -- whether there was a no
24 lien letter with Citi at that point, and he wasn't

Page 176

P. Vinella

1  sure when Citi actually seized those.  He didn't
2  believe that they were actually seized on the
3  19th, but the following week.
4         We also asked about the overdraft, at
5  which point he said there was no overdraft.  That
6  was a mistake by Chase, and that Chase actually
7  changed the amount of overdraft several times
8  throughout the morning, and then finally, when
9  everything seemed to have gotten resolved, that's
10 when Chase stopped answering the phone.  In his
11 mind there should never have been an adjustment
12 for an overdraft because an overdraft never
13 occurred.
14        We asked him about the account coding
15 errors, and he was, again, not aware of
16 specifically about Woodlands Bank, and he didn't
17 believe that the coding errors were a major
18 problem.  He wasn't with Barclays, and I don't
19 believe he was involved in any of the subsequent
20 cleaning of the books and records, so I don't
21 remember him having any knowledge of Woodlands
22 Bank specifically.
23 Q     But Mr. Stucchio, he did not believe
24 that coding errors were a major problem?

Page 177

P. Vinella

1  A     That was his thing.  He said we have
2  all kinds of operational controls that would find
3  these things if they happened.  He didn't think
4  they would be widespread.
5  Q     He didn't have any specific knowledge
6  as to whether or not despite the controls, there
7  was miscoding for Woodlands Bank where they were
8  reflected as a non-customer when it should have
9  been a customer?
10 A     Exactly.
11 Q     Did you discuss with Mr. Stucchio the
12 errors that are reflected in the Broadridge memo,
13 Exhibit 28 to the McIsaac affidavit?
14 A     We did talk about the Broadridge
15 errors.  Again, he knew there was an issue dealing
16 with the pre-allocation and allocation to the 3-3
17 buckets, but he wasn't aware of any significant
18 impact of that, other than the fact that there was
19 an error.
20 Q     Did Mr. Stucchio tell you whether or
21 not the error of which he was aware in connection
22 with the Broadridge memo would have had an impact
23 on the reserve calculation had it been corrected?
24 A     I believe that the error was actually

Page 178

P. Vinella

1  found after Lehman Brothers liquidated. I am not
2  sure exactly when Mr. Stucchio's tenure with
3  Lehman Brothers and/or Barclays ended. So, I
4  think he was aware there was an issue, but I don't
5  think he was aware of the magnitude of the issue
6  or how it was being proposed to be solved.
7     Q     And do you have notes of that
8  conversation with Mr. Stucchio, sir?
9     A     Yes, we do. Yes.
10    Q     Did you talk to Mr. Stucchio -- I
11 think you said you only talked to him on one
12 occasion; correct?
13    A     One occasion.
14    Q     The next and possibly the final
15 interviewee I have noted down is a Joel
16 Potenciano? Is that P-O-T-E-N-C-I-A-N-O?
17    A     That is the way I believe it's
18 spelled.
19    Q     Did Mr. Potenciano provide you with
20 any information on which you -- upon which you
21 relied in connection with your final January 8th
22 report?
23    A     Yes.
24    Q     Tell me what that information was,

Page 179

P. Vinella

1  sir.
2     A     Well, Mr. Potenciano appeared to be
3  the person that was responsible for reviewing --
4  well, first, confirming the fact that a 33
5  calculation had been performed, and then reviewing
6  it to insure that it was reasonable.
7     So, we relied on his recall of the
8  week of the 15th quite heavily. He -- we went
9  through every point in Mr. McIsaac's report.
10    We asked him also about the operating
11 environment the week of the 15th, and he actually
12 was aware of some of the fixes that were trying to
13 be implemented post the 19th, so not only the week
14 after the 19th were they trying to do the 3-3
15 calculation, but even Woodlands Bank and all of
16 that.
17    Excuse me. You mentioned something I
18 have to correct. We also talked to Alastair
19 Blackwell on the phone sometime between -- I think
20 it was either right before Tony Stucchio or right
21 after Tony Stucchio.
22    Q     Okay. We will get to that. Thank
23 you for that clarification. I will come to
24 Mr. Blackwell when we are finished with Mr.

Page 180

P. Vinella

1  Potenciano.
2     What did Mr. Potenciano tell you with
3  respect to the errors in the c3 calculation that
4  are identified in the McIsaac affidavit?
5     A     We talked about the FID accounts.
6  His recollection was that in the morning, when
7  they were -- when the business day started, they
8  were actually transacting through the Chase
9  clearing accounts. There was no reason to believe
10 that those -- that any of the accounts at Chase
11 were in jeopardy. At that point there was no lien
12 letter. Customer assets were still segregated.
13    And that at some point in the late
14 morning, when the systems were -- when access to
15 systems was denied by JPMorgan Chase, they had
16 verbal conversations with Chase, and Chase was
17 telling them yes, that we are still clearing and
18 settling some of your securities.
19    And that at some point in the morning
20 Chase just decided not to communicate anymore, and
21 they had no idea of where they were, and at that
22 point, the decision was made that it made sense to
23 file for liquidation, because they no longer
24 could -- could no longer conduct business in any

Page 181

P. Vinella

1  reasonable way.
2     So, whether assets had been seized or
3  not seized, he wasn't aware of it at the 19th, but
4  they were definitely aware that they didn't have
5  any access to their clearing boxes or the
6  collateral and cash that was kept at JPMorgan
7  Chase, and that JPMorgan Chase was no longer
8  communicating to them even over the phone. That
9  was it on the FID accounts.
10    Around the -- let me address this in
11 the correct order. Let me look at my report so I
12 can keep this straight.
13    In terms of the coding errors, he was
14 aware of the Woodlands Bank. We asked was that
15 indeed an affiliate that did not have a
16 subordination letter. He said that there was no
17 subordination letter at that time when the error
18 was discovered.
19    We asked were they included in the
20 3-3 calculation, and he said he did not think they
21 were included in the 3-3 calculation, as they
22 should have been treated as a customer without the
23 subordination letter.
24    We asked was the mistake that there

Page 182

P. Vinella

1  should have been a subordination letter and they
2  should not have been treated like a customer, or
3  was it miscoded. He mentioned that when LBI --
4  the holding company, LBHI, when they went into
5  receivership, they started to transition a number
6  of the affiliates from customer to non-customer,
7  and there was a queue they were trying to go
8  through to get the subordination letters executed.
9        He was not aware of whether Woodlands
10 Bank was in that -- was in that queue, although he
11 doubted it. Since it was a bank, it would be very
12 difficult to have a subordination letter of a bank
13 to a broker dealer. Most likely the bank
14 regulators, he thought, wouldn't approve.
15       So, he thought the error was just
16 that they were miscategorized as a non-customer.
17   Q    Did Mr. Potenciano tell you whether
18 or not to his knowledge Woodlands Bank had ever
19 signed a subordination letter?
20   A    No, he didn't believe they had ever
21 signed a subordination letter. Again, he pointed
22 out this was discovered in the December time
23 frame, and as he put it, people at that point were
24 going through all the accounts with a fine-toothed
25

TSG Reporting - Worldwide    877-702-9580

Page 183

P. Vinella

1  comb. This was the one that had come up.
2        Woodlands Bank also had been -- it
3  was only entered into the system three or four
4  weeks by beforehand. So, we asked him at length
5  how many other customers had been added during the
6  two weeks prior to LBHI going into bankruptcy. He
7  understood that was a small number, less than 100.
8    Q    Mr. Potenciano told you that as far
9  as he was concerned, Woodlands Bank should have
10 been treated as a customer for the purposes of the
11 c3 calculation as of September 19th, 2008; is that
12 correct?
13       MS. NEUHARDT: Objection, form.
14   A    Based on his understanding of the
15 fact that a subordination letter was not on record
16 and had not been executed.
17   Q    Is your answer to my question, yes,
18 based on his understanding that there was a
19 subordination letter not on record? Correct?
20   A    That there was no subordination
21 letter on record.
22   Q    Thank you.
23       Did you talk to Mr. Potenciano about
24 the errors noted in the Broadridge memo,
25

TSG Reporting - Worldwide    877-702-9580

Page 184

P. Vinella

1  Exhibit 28 to the McIsaac affidavit?
2    A    We did ask him about that as well.
3    Q    What did Mr. Potenciano have to tell
4  you about that?
5    A    He said that that was an error that
6  had been discovered, I think by actually Barclays
7  in performing their duties, as opposed to
8  something that had been discovered at Lehman
9  Brothers, and that there was an error that was --
10 if certain accounts were set up in a certain way,
11 that there was a double allocation, which would
12 cause a decrease in the reserve requirement.
13   Q    Mr. Potenciano told you that the
14 issues identified in the Broadridge memo would
15 result in a decrease in the reserve requirement?
16   A    Excuse me, an increase. Thank you.
17   Q    Was Mr. Potenciano able to quantify
18 the increase in the reserve requirement as of 9/19
19 that would have been required if the errors
20 discussed in that same memorandum had been
21 corrected?
22   A    No. He was not aware, one, that
23 there would have been an error on that date,
24 because, again, it was not the principal DTC
25

TSG Reporting - Worldwide    877-702-9580

Page 185

P. Vinella

1  account that the problems occurred in. It was in
2  an alternative account that wasn't used regularly.
3        And he had no idea, one again, if
4  there would have been a discrepancy on the 19th
5  or, two, if there was, what the size of that would
6  have been.
7    Q    Did you discuss with Mr. Potenciano
8  the 82 million in the payments to customers that
9  were seized by Citibank?
10   A    We did.
11   Q    What did Mr. Potenciano tell you
12 about that?
13   A    He believed that that actually had
14 been entered into the reserve calculation, to the
15 best of his recollection, and that there wasn't an
16 error in the calculation as a result.
17   Q    Did Mr. Potenciano tell you that he
18 believed the 82 million in payments to customers
19 that were seized by Citibank had been accounted
20 for in Lehman's calculation of the reserve formula
21 in the week of the -- ending on the 19th of
22 September?
23   A    He believed that it was actually
24 correctly accounted for in the reserve
25

TSG Reporting - Worldwide    877-702-9580

Page 186

1          P. Vinella
2  requirements.
3          Now, I don't know if that meant as
4  Mr. McIsaac said that that amount was not in a
5  good control location, therefore it should have
6  been added to the reserve requirement, or that
7  the -- Mr. Potenciano believed and his colleagues
8  that it was a good control location and therefore
9  it didn't have to be added.
10         I don't know what the resolution of
11 that was, but he was aware of it and he said it
12 was correctly treated.
13    **Q    Did you ask him whether or not he**
14 **believed that the $82 million referenced in the**
15 **McIsaac affidavit was still in a good control**
16 **location as of the 19th?**
17    A    He confirmed that subsequent to the
18 19th, the following week, that it was seized.  But
19 as of the 19th, he -- again, he just said it was
20 correctly treated.
21    **Q    But he didn't know whether or not**
22 **that $82 million had been seized by Citibank on**
23 **the 19th?**
24    A    He mentioned that it was seized
25 subsequent to the 19th.
          TSG Reporting - Worldwide    877-702-9580

Page 187

1          P. Vinella
2    **Q    He did not believe it was seized on**
3  **the 19th but subsequent to the 19th; is that**
4  **correct?**
5    A    That was his belief.
6    **Q    Okay.  Did any of these -- let me do**
7  **Mr. Blackwell first.**
8          MS. NEUHARDT:  Actually, can we take
9  a break?
10         MR. OXFORD:  Yes.
11         (Recess taken.)
12         MR. OXFORD:  Back on.
13    **Q    Just sticking with Mr. Potenciano,**
14 **for a second, sir, did he tell you when you met**
15 **with him whether or not any balances from the RISC**
16 **system were brought into the c3 calculation the**
17 **week of -- the week ending September 19th, 2008?**
18    A    He didn't believe that any data from
19 the RISC system was used in the 3-3 calculation.
20    **Q    I think you told me you had a**
21 **subsequent conversation with Mr. Blackwell after**
22 **the meeting on the 18th; is that correct?**
23    A    No.  We actually talked to him on the
24 initial phone call, sometime in late November, and
25 then we had a subsequent phone call with him after
          TSG Reporting - Worldwide    877-702-9580

Page 188

1          P. Vinella
2  the meetings on the 18th.
3    **Q    Do you remember when the phone call**
4  **took place?**
5    A    Again, the last week of December,
6  first week of January, that type of time frame.
7    **Q    Approximately how long did the call**
8  **last?**
9    A    About 30 minutes.
10    **Q    Who was on the call?**
11    A    That would have been Jeanette Jin,
12 myself, Ms. King, and Ms. Neuhardt.
13    **Q    Do you have any notes of that**
14 **conversation?**
15    A    We didn't rely on anything
16 Mr. Blackwell said at that.  You asked who I had
17 talked to, so I thought --
18    **Q    I appreciate the answer.**
19         **In your testimony, sir, have you**
20 **given an exhaustive account of the interviews on**
21 **which you relied in the creation of your final**
22 **report?**
23    A    To the best of my knowledge, those
24 were the people we interviewed that we ended up
25 relying on aspects of those interviews.
          TSG Reporting - Worldwide    877-702-9580

Page 189

1          P. Vinella
2    **Q    Have we covered in your testimony**
3  **today not just all of the individuals but each of**
4  **the conversations you have had with them upon**
5  **which you relied?**
6    A    To my knowledge, yes.
7          Excuse me.  We had a subsequent phone
8  call with Mr. Potenciano, if I didn't mention
9  that.
10    **Q    We will get to that one in a moment.**
11 **Thank you for mentioning that.**
12         **Other than the subsequent phone call**
13 **with Mr. Potenciano that we will talk about in**
14 **just a second, have we exhausted your recollection**
15 **on all discussions with any individuals upon whom**
16 **you relied as a source of material for your expert**
17 **report?**
18    A    I believe that is the entire list.
19    **Q    And not just the list of people we**
20 **have exhausted, we have also exhausted the**
21 **information that they conveyed to you that you**
22 **relied upon in creating your report; is that**
23 **correct?**
24    A    Yes.
25    **Q    Thank you.**
          TSG Reporting - Worldwide    877-702-9580

Page 190

P. Vinella

1    The subsequent conversation with
2    Mr. Potenciano, when did that take place?
3        A    I believe it was three or four days
4    after the initial phone call.
5        Q    Approximately how long did that last?
6        A    My recollection, it was a half an
7    hour or so.
8        Q    Did Mr. Potenciano give you any
9    information in that subsequent conversation that
10   you relied upon in creating your final report?
11       A    It was more to confirm the earlier
12   conversation and understand how to put it in the
13   correct context.  Other than that, what we
14   discussed was not relevant to the report.
15       Q    Did Mr. Potenciano provide you with
16   any additional information that he did not provide
17   you with in his original conversation with you?
18       A    Not at that time, no.
19       Q    At any time subsequent?
20       A    No.  I mean it was confirmation of
21   the earlier call.
22       Q    Okay.  In any of these meetings, sir,
23   that you have testified about, did anyone provide
24   you with any documents.

TSG Reporting - Worldwide    877-702-9580

Page 191

P. Vinella

1        A    During the meetings, I don't recall
2    anyone giving us documents, no.
3        Q    Did people provide you with documents
4    in advance of the meetings?
5        A    We had documents that the attorneys
6    had given us that we relied on in terms of
7    prepping for the meetings.
8        Q    Could you take a moment to have your
9    report in front of you, sir, and turn to page 42.
10       MS. NEUHARDT:  Thirty-two?
11       MR. OXFORD:  Forty-two.
12       Q    Do you have that page, sir?
13       A    I do.
14       Q    Do you see it's headed "Exhibit C,
15   Documents Reviewed"?
16       A    Yes.
17       Q    Can you tell me whether or not that
18   is an exhaustive and complete list of the
19   documents that you and your team reviewed in
20   creating your final January 8th report?
21       A    Actually, the exhibit is mistitled.
22   That shouldn't be "Documents Reviewed."  It should
23   be "Documents Relied Upon."
24       So, these are, to the best of my

TSG Reporting - Worldwide    877-702-9580

Page 192

P. Vinella

1    knowledge, all of the documents that we relied on
2    in terms of preparing the report.
3        Q    If I understand your testimony
4    correctly, you reviewed other documents but you
5    did not rely upon them in creating your final
6    report?
7        A    That's true.
8        Q    Were there documents, other than the
9    documents listed in Exhibit C, that I now
10   understand to be the documents that you relied
11   upon in your final report, were there documents
12   other than the Exhibit C documents provided to you
13   at any of the meetings with interviewees that we
14   have been discussing today?
15       MS. NEUHARDT:  Objection.  A, he's
16       already answered that he didn't get
17       documents from the interviewees, but B, to
18       the extent he didn't rely upon them, they
19       are not discoverable.
20       Q    You said, sir, that you did not
21   receive any documents at these meetings?
22       A    I did not receive any documents to
23   the best of my knowledge.
24       Q    The individuals with whom you met,

TSG Reporting - Worldwide    877-702-9580

Page 193

P. Vinella

1    sir, in person, do you recall if they brought
2    documents with them to the meetings?
3        A    To the best of my memory, I don't
4    recall anyone bringing notes or any other types of
5    documents.
6        Q    So, when you were interviewing with
7    them, they weren't referencing written materials
8    of any kind?
9        A    Not that I recall, no.
10       Q    Did you ask any of the individuals
11   whom you interviewed and upon whom you relied,
12   whether or not they had any documentary support
13   for information that they provided to you?
14       A    We didn't ask the question that way.
15       Q    How did you ask the question, sir?
16       A    We asked if they had access to
17   specific reports based on our knowledge of how
18   operations work.
19       Q    And what was the answer to those
20   questions?
21       A    In some cases they did have the
22   ability to reproduce those reports and in some
23   cases they didn't have the ability.
24       Q    Did you ask them to reproduce any

TSG Reporting - Worldwide    877-702-9580

Page 194

P. Vinella

1    specific reports?
2        A    Yes.
3        Q    Which reports did you ask them to
4    reproduce?
5            MS. NEUHARDT: Objection. To the
6        extent he didn't rely upon them, it's
7        irrelevant, so you should ask the
8        foundational question of whether he ended up
9        relying on anything that, that he asked them
10       to reproduce.
11           MR. OXFORD: Well, we can come back
12       to this. I actually disagree with you, I
13       think, about the scope of that stip, but we
14       can discuss that at a break, and we can take
15       it up afterwards.
16           MS. NEUHARDT: Okay.
17       Q    Did you have any -- withdrawn.
18           The reports that you asked your
19   interviewees to run, sir, did you rely upon any of
20   them in your final report?
21       A    We did, and they are listed in the
22   exhibit.
23       Q    Could you direct my attention to
24   those reports, please?
25           TSG Reporting - Worldwide    877-702-9580

Page 195

P. Vinella

1        A    They would have been the focus report
2    that is attached as an exhibit, Exhibit D, and
3    also the 3-3 calculations as of the 16th and the
4    17th, which I believe are also attached as
5    exhibits.
6        Q    You are referencing in terms of focus
7    reports, sir, Exhibits D and E --
8        A    Yes.
9        Q    -- to your final report; is that
10   correct?
11       A    Right. Yes.
12       Q    And these were run specifically at
13   your request; is that correct, sir?
14       A    I don't know if these were run at my
15   request or were copies of existing focus reports
16   that existed.
17       Q    Okay. Tell me what you know about
18   the creation of Exhibit F, sir.
19       A    My understanding of Exhibit F is that
20   this was the reserve calculation, the 3-3 reserved
21   calculation that was performed by Lehman or LBI as
22   of the 16th and as of the 17th. This one seems to
23   be only the 17th. I have got an old copy.
24           We should have attached the one as of
25           TSG Reporting - Worldwide    877-702-9580

Page 196

P. Vinella

1    the 16th, if it's not here, because we did rely on
2    that, and it was in the same spreadsheet. So I
3    guess it didn't get printed up most likely.
4            MS. NEUHARDT: I will check the
5        original that was served and see what the
6        error is.
7            MR. OXFORD: Okay. I think this was
8        as served, so to the extent --
9            MS. NEUHARDT: Yeah.
10           MR. OXFORD: To the extent we are
11       missing the reliance materials --
12           MS. NEUHARDT: We will send you the
13       16th if it wasn't in what was originally
14       served.
15           MR. OXFORD: Obviously we will have
16       to reserve our rights.
17           THE WITNESS: Oh, the 16th is another
18       column. Oh, okay.
19           MS. NEUHARDT: Yeah.
20           THE WITNESS: Oh, I see it, okay. In
21       the front.
22           MS. NEUHARDT: Is this what you
23       thought you --
24           THE WITNESS: Yeah. This is what we
25           TSG Reporting - Worldwide    877-702-9580

Page 197

P. Vinella

1    saw where they had the 16th and 17th.
2        Q    Okay. Let me ask this as a
3    foundational question, sir: Did you ask any of
4    your interviewees to run reports on which you did
5    not end up relying? And I just want a yes or no
6    answer to this question at this time.
7        A    Yes.
8        Q    Did you ask any of your interviewees
9    for any -- any other document, sir?
10           MS. NEUHARDT: That is a yes or no
11       question again; right?
12       A    They were included in the reports.
13   Those documents and the reports to me are
14   synonymous.
15       Q    Did you ask the people who you
16   interviewed to provide contemporaneously created
17   documents, by which I mean documents that were
18   created at a time prior to the closing of the
19   transaction between Barclays and Lehman on the
20   morning of Monday, the 22nd of September?
21       A    You will have to rephrase that.
22           MR. OXFORD: Can you repeat that,
23       please, Bonnie.
24           (Record read.)
25           TSG Reporting - Worldwide    877-702-9580

Page 198

P. Vinella

1
2     A    If I can rephrase the question to you
3  to see if I get the question right.
4          Are you asking was I -- did I get
5  access to reports that were produced prior to the
6  22nd?
7     Q    Or documents or e-mails.
8     A    We did, I believe.  For instance, the
9  focus reports that we had were produced --
10    Q    Right.
11    A    -- prior.
12    Q    Other than the documents that are
13  actually attached to your report, did you ask any
14  of the people who you interviewed for documents
15  that were created prior to the closing of the
16  transaction?
17    A    We did.
18    Q    Again, for the moment just yes or no,
19  sir.  Did they provide those documents to you?
20    A    In some cases yes, in some cases no.
21    Q    Other than reviewing the documents
22  that are listed in Exhibit C and interviewing the
23  individuals who you have testified about today,
24  sir, did you do anything else to prepare your
25  report?

TSG Reporting - Worldwide    877-702-9580

Page 199

P. Vinella

1
2     A    We looked at other documents that
3  were available in the public domain.
4     Q    Which documents, sir?
5     A    All of the documents that we used are
6  listed here, so there is news stories, there is
7  discussions of -- you know, there is a 3-3
8  calculation, specifications.
9     Q    Right.  And my question was intended
10  to, if it did not in fact, exclude the documents
11  that were listed in Exhibit C.
12          Other than the interviews you have
13  testified to, other than the documents that are
14  listed in Exhibit C, and I presume because I don't
15  see them listed in Exhibit C, the documents that
16  are actually attached to your report, did you do
17  anything to prepare your report, sir?
18    A    Not that -- everything we relied on
19  is in that list.
20    Q    Have you reviewed additional
21  documents that are relevant to your report and
22  Mr. McIsaac's report subsequent to January 8, sir?
23    A    I have seen the brief that attorneys
24  filed with respect to this.
25    Q    And that is Barclay's opposition

TSG Reporting - Worldwide    877-702-9580

Page 200

P. Vinella

1
2  papers that were filed last Friday, I believe?
3     A    Yes.
4     Q    Have you seen any other documents,
5  sir?
6     A    Not that I recall.
7     Q    I don't see it on your list of
8  documents on Exhibit C, sir.  Did you review a
9  brief that was filed by the SEC in connection with
10  the SIPA trustee's allocation motion?
11    A    I actually -- I believe I did get
12  that after the 8th, now that you bring that up.
13    Q    When did you get it, sir?
14    A    I can't -- I -- once the report was
15  done, I was taking a little bit of a break, to be
16  quite frank, so I can't tell you exactly what date
17  I got it or looked at it.
18    Q    Have you reviewed that SEC brief,
19  sir?
20    A    I looked at it, yes.
21    Q    Was there anything in there that you
22  disagreed with?
23    A    Again, I don't recall looking at it
24  in any depth, and in fact, I am even having an
25  issue whether I actually saw it or not, to tell

TSG Reporting - Worldwide    877-702-9580

Page 201

P. Vinella

1
2  you the truth.
3     Q    I can show it to you in --
4     A    That would probably help.  If you
5  could show it to me, then I can tell you if I
6  actually saw that document or not.
7     Q    Okay.  We will get to that in a
8  moment.
9          Did you talk to any of LBI's
10  regulators in preparing this report, sir?
11    A    No.
12    Q    You didn't talk to anybody at the
13  SEC?
14    A    No.
15    Q    You didn't talk to anybody at FINRA?
16    A    No.
17    Q    Did any of the -- withdrawn.
18          This report, sir, appears to reflect
19  your opinion as of January 8th; is that correct?
20    A    It does.
21    Q    It's February 4th, I think, today.
22          MS. NEUHARDT:  Fifth.
23    Q    Fifth.
24          Do you today have any changes that
25  you wish to make to this report other than the

TSG Reporting - Worldwide    877-702-9580

Page 202

P. Vinella

1  title of Exhibit C?
2     A    Not -- there is no changes I would
3  make as of this time.
4     **Q    Did you do anything to prepare for**
5  **your deposition, sir?**
6     A   I did.
7     **Q    What did you do?**
8     A    First, I reread Mr. McIsaac's
9  affidavit. I reread my report. I reread the 3-3
10  calculations, as well as the overall 15c3
11  regulation.
12     I also reviewed notes that I took as
13  well as discussed some of the issues with Jeanette
14  Jin.
15     **Q    The notes that you reviewed, sir --**
16  **we placed in front of you at the start of the**
17  **deposition the notes that were marked at 592**
18  **through 597. Could you take a few moments, not**
19  **necessarily to read every line, but just to look**
20  **through those and tell me whether those are the**
21  **notes which you reviewed to prepare for your**
22  **deposition.**
23     A    Since I was looking at them as we
24  were talking at various points, these are the
25  TSG Reporting - Worldwide    877-702-9580

Page 203

P. Vinella

1  notes we used.
2     **Q    Were there any other notes that you**
3  **used to prepare for your deposition, sir?**
4     A    We reviewed notes to see specifically
5  if there were things we had relied on to look at
6  the report -- relied on in terms of forming our
7  opinions in the report, or my opinions I should
8  say.
9     **Q    And you looked at the notes in the**
10  **context of preparing for your deposition, sir; is**
11  **that correct?**
12     A    We were asked to review our notes and
13  to highlight the areas of those notes that we
14  relied on, and that's the results that you have.
15     **Q    Those are the notes that are**
16  **reflected in Exhibits 592 through 597; correct?**
17     A   Yes.
18     **Q    The notes that you reviewed to**
19  **prepare for your deposition -- separate and apart**
20  **from the request to produce notes that were**
21  **reliance material, the notes that you used to**
22  **prepare for the deposition, sir, were those**
23  **redacted? Did they have the black marks, or not?**
24     A    The only purpose of reviewing the
25  TSG Reporting - Worldwide    877-702-9580

Page 204

P. Vinella

1  notes was actually to go through the redaction
2  process.
3     **Q   I see.**
4     **Did you do anything else to prepare**
5  **for your deposition today?**
6     A   I did.
7     **Q    What else did you do?**
8     A    I met with counsel on Wednesday and
9  Thursday prior to this deposition today.
10     **Q    Was anyone other than counsel present**
11  **for that?**
12     A    Just the three attorneys here,
13  Mr. Amman, Ms. King and Ms. Neuhardt.
14     **Q    You said that to prepare for your**
15  **deposition, you discussed the issues with Jeanette**
16  **Jin; is that correct?**
17     A   Yes.
18     **Q    Tell me what you discussed with**
19  **Ms. Jin.**
20     MS. NEUHARDT: Objection. I believe
21  that is beyond the scope of what is
22  discoverable in the stipulation, unless that
23  conversation was the source of original
24  information relied upon in your report.
25  TSG Reporting - Worldwide    877-702-9580

Page 205

P. Vinella

1  THE WITNESS: No.
2     **Q    You answered no, sir, but I hadn't**
3  **asked the question. Were you answering Ms.**
4  **Neuhardt's question?**
5     A    Yes. She appeared to ask me a
6  question, so I answered her question.
7     **Q    Did your discussion with Ms. Jin**
8  **refresh your recollection about any matter that**
9  **relates to Mr. McIsaac's affidavit or your report?**
10     A    It helped refresh it, yes.
11     **Q    Tell me in what respects your**
12  **recollection was refreshed by the conversation**
13  **with Ms. Jin.**
14     MS. NEUHARDT: You mean with respect
15  to topics that ended up in your report?
16     A    Basically we went through the report,
17  we went through Mr. McIsaac's affidavit, and we
18  discussed whether we would -- whether we would
19  have changed our opinions in any way, or if we
20  wanted to further investigate Mr. McIsaac's
21  allegations, what type of materials and time
22  frames and resources we would need to do that.
23     **Q    Tell me about that discussion about**
24  **if you wanted to further investigate Mr. McIsaac's**
25  TSG Reporting - Worldwide    877-702-9580

Page 206

P. Vinella

1 **allegations, what materials, time frame and**
2 **resources would you need.**
3
4      A     Can you be a little more specific?
5      **Q      With respect, sir, you had the**
6 **conversation, not me.  I am trying to establish**
7 **what it is specifically you talked about under the**
8 **topic you just told me about, which was whether**
9 **you --**
10           MS. NEUHARDT:  Why don't we read the
11      question back and maybe he can -- maybe if
12      you hear it a second time.
13           MR. OXFORD:  I think we need the
14      answer back.  Could you read the answer.
15           MS. NEUHARDT:  The answer is, can you
16      be more specific.
17           MR. OXFORD:  We need the answer at
18      195, line 12 on, please.
19           (Record read.)
20      A     I'm understanding the question to
21 talk about the discussion, and the discussion we
22 had, as I mentioned, we would go through the
23 points.  Mr. McIsaac made a number of what we
24 considered unsubstantiated claims, and we were
25 discussing what type of materials we would need to

TSG Reporting - Worldwide    877-702-9580

Page 207

P. Vinella

1
2 be able to substantiate, one, that indeed an error
3 occurred as alleged by Mr. McIsaac; number two, if
4 an error occurred, would it be a direct
5 dollar-for-dollar impact on the reserve
6 requirements or would it have a lesser impact or
7 maybe an ambiguous impact.  And then also, how
8 could we quantify the size of some of these
9 issues.
10           So that was the basic discussion that
11 we had.
12      **Q      Okay.  What materials would you need**
13 **to substantiate whether or not the errors**
14 **Mr. McIsaac said occurred did, in fact, occur?**
15      A     I would have to go through each of
16 the single points.  If you want me to do that, I
17 can do that.
18      **Q      Sure.**
19      A     Well, in the FID accounts, we start
20 with them, and if I can refer to his report, it
21 will make it a little easier for me.
22      **Q      Just so the record is clear, that is**
23 **Exhibit 590.**
24      A     On the FID accounts, there seemed to
25 be an issue around the amount of securities and

TSG Reporting - Worldwide    877-702-9580

Page 208

P. Vinella

1
2 the amount of cash that were kept.  Mr. McIsaac I
3 don't believe referenced any exhibit that showed
4 that there was $630 million of customer securities
5 or $258 million in cash.
6           There was also an issue of when
7 Lehman Brothers first believed that those accounts
8 were no long good control locations.  So in order
9 to look at the specific allegation, we needed, we
10 needed more information.
11           In terms of the account coding
12 errors, that we had an issue with, one, with
13 Woodlands Bank security.  Again, the $534 million
14 doesn't seem to be documented in either the
15 affidavit or the exhibit, that we could find.
16           The next component was these customer
17 errors, he didn't give any specific ones around
18 there, so if he actually had specific instances
19 other than Woodlands Bank that there was a
20 problem, we would have wanted to see that.
21           We also, in Section 38, we couldn't
22 find any evidence of this $213 million that he
23 wanted to add to the reserve requirement, and it
24 wasn't clear to us if that was a combination of
25 the coding errors as well as the software error,

TSG Reporting - Worldwide    877-702-9580

Page 209

P. Vinella

1
2 or that was due just to the software error.
3           Also, it would have been helpful for
4 us to understand exactly when the software error
5 was first discovered.  We have an exhibit that
6 shows an e-mail trail of their communications with
7 the vendor Broadridge, but we didn't see when
8 either Lehman Brothers or Barclays suspected that
9 there was an error.
10           In terms of the LBIE assets that were
11 maintained -- I mean the LBI assets that were
12 maintained in LBIE, we just need to see -- we saw
13 a report that was in an exhibit that appeared to
14 be a spreadsheet as opposed to an operational
15 report, and we can't substantiate that that is the
16 right dollar amount, that those were the right
17 securities, that they weren't actually kept in a
18 good control account, and that after LBIE went
19 into administration, that those were transferred
20 to another good control location.
21           So, there is no way for us to
22 validate that indeed those assets were at risk, or
23 if they were at risk, they weren't subsequently
24 moved to a good control location shortly
25 thereafter.

TSG Reporting - Worldwide    877-702-9580

## Page 210

P. Vinella

1  In terms of this $82 million on the
2  Citibank account, it was the same situation, we
3  just wanted to show -- we didn't see any evidence
4  that Mr. McIsaac provided that the account was
5  improperly set up with a no lien letter. For
6  instance, if it was set up as a trust account, you
7  don't need a no lien letter.
8  We didn't see any substantiation of
9  the $82 million. So, again, was that really the
10  right amount of money? Was it really kept in an
11  account that Lehman Brothers did not have good
12  control over?
13  So, we had a number of those issues.
14  The other issue we had was probably
15  the biggest issue, was even if you look at all of
16  these instances that Mr. McIsaac points out that
17  could be issues with the reserve calculation, and
18  the requirement, we weren't actually given what
19  the account balance was as of the 19th, and we
20  didn't -- we don't know what the excess was in
21  that account. So, we can't verify that the actual
22  account would have been in deficit to the extent
23  that Mr. McIsaac says it was.
24  Just because you have --

## Page 211

1  P. Vinella
2  MS. NEUHARDT: I just want to make
3  sure that you -- as you were giving your
4  answer, you saw these two as well.
5  THE WITNESS: Those were ones we
6  didn't have questions about.
7  MS. NEUHARDT: I just wanted to make
8  sure.
9  A  And so what we would like to have
10  seen is an account balance as of the 19th in the
11  reserve account, and then we would have actually
12  liked to have seen the effect of not just adding
13  these items to the reserve requirement, but
14  actually adding it to the credits and possibly
15  debits of the requirement, and see how that
16  actually would affect the overall calculation.
17  So, just to look at Mr. McIsaac's
18  information that he had here, there would have
19  been a lot more material we would have liked to
20  have seen.
21  Q  Can you turn to paragraph 16 of
22  Mr. McIsaac's report.
23  A  Yes.
24  Q  It's headed "Safekeeping of Customer
25  Securities." Do you see that, sir, on page five?

## Page 212

1  P. Vinella
2  A  I'm on page five?
3  Q  Yes, sir.
4  MS. NEUHARDT: Paragraph 16.
5  A  Oh, paragraph 16.
6  Q  Do you see that, sir?
7  Can you read just to yourself
8  paragraph 16, please.
9  A  Okay, yes.
10  Q  Do you agree with everything that
11  Mr. McIsaac writes in paragraph 16?
12  A  Yes.
13  Q  There is nothing in there that you
14  disagree with?
15  A  No.
16  Q  Could you read the next paragraph,
17  17, sir.
18  A  Okay, I have read it.
19  Q  Do you agree with what Mr. McIsaac
20  writes in paragraph 17 of his affidavit, sir?
21  A  Yes.
22  Q  There is nothing in there that you
23  disagree with, is there?
24  A  No.
25  MS. NEUHARDT: I would just like to

## Page 213

1  P. Vinella
2  point out that Mr. Vinella's report was
3  focused purely on Mr. McIsaac's analysis of
4  the supposed, supposedly necessary
5  adjustments. He actually did not opine on
6  any of this essentially legal discussion of
7  SEC requirements, which we don't even think
8  are appropriate topics for expert testimony.
9  Leaving that aside, you are kind of
10  asking him things that are beyond the scope
11  of the report.
12  MR. DAKIS: I would like to move to
13  strike counsel's testimony from the record.
14  MS. NEUHARDT: It's not testimony.
15  It's an objection.
16  MR. DAKIS: The federal rules allow
17  for an objection to form, not a lengthy
18  speaking objection.
19  I would like to note an objection to
20  your objection on the record.
21  BY MR. OXFORD:
22  Q  Could you read paragraph 18, sir, and
23  let me know when you are done.
24  A  Okay, I have read it.
25  Q  Is there anything in there you

Page 214

P. Vinella

1
2  disagree with, sir?
3      A    I agree with it.
4      Q    Next paragraph, 19, please.  If you
5  could just let me know when you have read it.
6  Thanks.
7      A    Okay.
8      Q    Do you agree with what Mr. McIsaac
9  writes in paragraph 19, sir?
10      A    I agree.
11      Q    Nothing in there you disagree with?
12      A    Nothing I disagree with.
13      Q    Next paragraph, 20, sir, could you
14  read that.
15      A    Okay.
16      Q    Is there anything in there that you
17  disagree with, sir?
18      A    The only thing I would disagree with
19  is that the computation can actually be run at
20  other times during the week.  It doesn't have to
21  only be done on Friday.
22          So, at least once a week on the close
23  of business on Friday.  It doesn't preclude other
24  computations from taking place.
25      Q    Is Mr. McIsaac correct that a

TSG Reporting - Worldwide    877-702-9580

Page 215

P. Vinella

1
2  computation under the reserve formula is typically
3  made at the close of business on a Friday in the
4  industry?
5      A    He doesn't say it that way.  That's
6  why I was pointing it out.
7      Q    Is it accurate to say that the
8  reserve formula computation is within the industry
9  typically done after the close of business on
10  Friday?
11      A    If you are not using an alternative
12  method, so the big broker dealers, that would be
13  true?
14      Q    So it would be true for LBI, for
15  example?
16      A    Yes.
17      Q    Could you read paragraph 21, please,
18  and let me know when you are done.
19      A    Okay, I have read it.
20      Q    Do you agree with what Mr. McIsaac
21  writes in paragraph 21?
22      A    No.
23      Q    What is it that he writes in
24  paragraph 21 that you disagree with, sir?
25      A    First, I think he mischaracterizes

TSG Reporting - Worldwide    877-702-9580

Page 216

P. Vinella

1
2  the concept of a free credit balance.  It's not
3  money that is an obligation to the customer.  It's
4  the customer's money.  The broker dealer has no
5  rights to that money.  Therefore, there is no
6  obligation to repay the customer.
7          So, I think that is a
8  misrepresentation of the concept of free credit
9  balances.
10          I am not aware of the term of art
11  "customer property" in regards to the SEC
12  regulations.  I know that in terms of SIPA.  So, I
13  don't know why that term would have been used
14  there.
15          It -- the regulation is actually
16  fairly -- the 3-3 calculation is actually very
17  simple.  He should have just listed the eight
18  credits.  But I'm assuming here he's taking about
19  money associated with the lending of customer
20  securities through a rehypothecation agreement,
21  and I don't think what he actually puts here, the
22  use of customer property, is specific enough or
23  accurate.
24          There is no reserve that I know of
25  for operational inefficiencies.  There is a

TSG Reporting - Worldwide    877-702-9580

Page 217

P. Vinella

1
2  reserve for failure to receive securities.  I
3  would not call a failure to receive as an
4  operational deficiency.  An operational deficiency
5  to me is two people doing one person's job.
6          So, I think the entire way that the
7  credit side of the reserve calculation, or formula
8  as he calls it, is wrong.  And I would disagree
9  with the way the debit items have been
10  categorized.  Even though he listed it as an
11  exhibit, he should have just listed the eight
12  credits and six debit items, rather than trying to
13  paraphrase it.
14      Q    Any other points of disagreement
15  between you and Mr. McIsaac on what he writes in
16  paragraph 21?
17      A    I think I pretty much disagreed with
18  everything, so I have nothing else.
19      Q    Can you read paragraph 22, please,
20  sir.
21      A    Okay, I have read it.
22      Q    Okay.  Can you tell me, sir, if you
23  agreed with what Mr. McIsaac writes in paragraph
24  22.
25      A    I agree with that.

TSG Reporting - Worldwide    877-702-9580

Page 218

P. Vinella

1
2      Q      Nothing in there that you disagree
3   with?
4      A      No.
5      Q      Thank you.
6             Could you have in front of you your
7   report, sir.
8      A      Okay.
9      Q      And turn to page six.  Do you have
10  that, sir?
11     A      I do.
12     Q      The last full paragraph on page six
13  reads, "While he points to few concrete issues."
14  Do you see that?
15     A      Yes.
16     Q      You say, "While he," being
17  Mr. McIsaac, "points to few concrete issues that
18  if substantiated could indeed increase the reserve
19  requirement as of September 19, Mr. McIsaac
20  discusses many speculative and unsupported issues
21  that if accurate with his opinion materially
22  increase the credit component of the reserve
23  requirement formula, hence increasing the reserve
24  requirement."
25             Do you see that?

TSG Reporting - Worldwide    877-702-9580

Page 219

P. Vinella

1
2      A      Yes.
3      Q      Could you categorize for me --
4   withdrawn.
5             Which of the issues that Mr. McIsaac
6   raises fall into your taxonomy of concrete issues
7   that if substantiated could increase the reserve
8   requirement as of September 19?
9      A      I would, I would say concrete issues,
10  those would be the ones enumerated in his report,
11  specifically the FID assets that were allegedly
12  seized by Chase.
13            I would also look at the account
14  coding errors.  The LBI assets maintained at LBIE.
15  The customer cash claims were the LBI's customer
16  who formerly had a claim against LBIE.  Excuse me,
17  LBI.
18            The OCC deposit.  The error in the
19  Broadridge software.
20            Those would be the concrete examples.
21            MS. NEUHARDT:  That is the 19th.  Go
22       back and look at the -- the question is
23       could you categorize for me --
24            MR. OXFORD:  Amy, it's fine.  The
25       witness has the question, has answered the

TSG Reporting - Worldwide    877-702-9580

Page 220

P. Vinella

1
2   question.  If you want to conduct direct
3   afterwards, you are more than welcome to do
4   that, but please object to the form.  Thank
5   you.
6      A      And what I was going to actually
7   preface it at the end, this will probably help
8   you, was the fact that some of these actually were
9   not known on the 19th.  They may not have occurred
10  on the 19th.  That's why I said allegedly seized,
11  for instance.
12            We would have to substantiate as well
13  that the dates that -- the dates that these events
14  occurred or were known to Lehman Brothers were
15  effective as of the 19th as well.
16     Q      You make a distinction, sir, between
17  whether the events were known to Lehman Brothers
18  or whether they occurred effective as of the 19th.
19  Is there any distinction in your mind, sir --
20  withdrawn.
21            Any of these errors which Mr. McIsaac
22  points out in his affidavit occurred on the 19th
23  of September but were not known to LBI until after
24  the 19th, in your mind, sir, in your expert
25  opinion, sir, were those errors required to be

TSG Reporting - Worldwide    877-702-9580

Page 221

P. Vinella

1
2   corrected in a reserve account calculation that is
3   dated as of September 19, 2008?
4      A      First, and just to make the process
5   go faster, you have used the word "errors"
6   throughout Mr. McIsaac's report.  I don't know
7   that they are errors.  In some cases it's been, I
8   think, fairly clear to me in terms of doing the
9   analysis that in fact no error occurred.
10            So, I don't want to typify these as
11  errors.  Rather than say alleged errors every
12  time, I'm just going to say errors.  That is
13  number one.
14            Number two, I am not a lawyer and I
15  am not a legal expert, but I don't know of any
16  requirement that says that a 3-3 calculation has
17  to be performed after a SIPA liquidation.  SIPA
18  liquidation is a different regulatory regime than
19  the SEC regime.
20            I don't know that there is a
21  requirement that if you find an error in December
22  around coding, that you have to go back and
23  recalculate a 3-3 calculation as of the 19th.  I
24  am just not an expert on that, so I can't opine.
25     Q      Okay, thank you.

TSG Reporting - Worldwide    877-702-9580

Page 222

1              P. Vinella
2         The second part of this, where you
3    talk about the speculative and unsupported issues
4    that you say, if accurate, could increase the
5    credit component, which items fall into that
6    category, sir?
7         A    I could read them all again.  As I
8    mentioned, many of Mr. McIsaac's issues that he
9    brings up in his affidavit, there is nothing to
10   show, one, that the reserve calculation did not
11   correctly account for these, or that these events
12   actually occurred the way that Mr. McIsaac said,
13   or that the amount of money was actually the right
14   amount of money.
15         In most instances, he doesn't refer
16   to an exhibit or a document or a report that says
17   this is where I have got this information from.
18   It's very difficult for me to go in and say yes,
19   that is correct or not correct.
20         (Exhibit 598 marked for
21         identification as of this date.)
22
23         Q    Sir, I have handed you what I have
24   marked as Exhibit 598, which is the brief the SEC
25   filed in the trustee's allocation motion.

TSG Reporting - Worldwide    877-702-9580

Page 223

1              P. Vinella
2         If you'll take a moment to flip
3    through that and tell me whether you have seen
4    that document before or not.
5         A    No, I don't believe I have seen this
6    document.  I may have received it, but I didn't
7    look at it.  So this is not familiar to me.
8         Q    You will see, sir, if you turn to the
9    last page, that it's dated December 11, 2009.
10        Actually the very last page, sir.
11        A    Yes.
12        Q    And that is approximately one month
13   before you completed your report; correct?
14        A    Yes.
15        Q    Do you believe you received it before
16   you completed your report, sir?
17        A    As I said, I may have received it.  I
18   can't even attest to that.  I am fairly certain
19   that I did not read this.
20        Q    Could you turn to page eight, please,
21   sir.
22        Do you see there is a paragraph
23   beginning, "Accordingly," about five lines down?
24        A    Yes.
25        Q    It reads:  "Accordingly, the

TSG Reporting - Worldwide    877-702-9580

Page 224

1              P. Vinella
2    Commission had adopted the Customer Protection
3    Rule," and it has a cite to Rule 15c3, "which
4    imposes on firms obligations to protect both
5    customer securities and customer funds.  Taken
6    together, the provisions concerning securities and
7    the provisions concerning funds are designed to
8    insure that there will be sufficient assets to
9    meet customer net equity claims upon liquidation."
10        Do you see that?
11        A    Yes.
12        Q    Do you agree with that, sir, as a c3
13   expert?
14        A    First of all, I don't know who the
15   Commission is, so I would have to go to the
16   defined terms.
17        MS. NEUHARDT:  It's the SEC.
18        Are you asking him to interpret the
19   validity of the SEC legal argument?
20        MR. OXFORD:  He's testifying as a c3
21   expert.  I am asking whether he agrees with
22   this or not.
23        MS. NEUHARDT:  I think he said
24   repeatedly that he's an expert side on the
25   operations side of 15c3-3.

TSG Reporting - Worldwide    877-702-9580

Page 225

1              P. Vinella
2         I object to -- plus what the SEC said
3    in a legal brief to the court is not
4    necessarily what the law is.
5         I object to this line of questioning.
6         You are allowed to answer, if you
7    feel you can.
8         A    I don't have -- I am not an expert in
9    this aspect of the -- of the SEC regulations.  I
10   can't tell you what applies and what doesn't apply
11   after the fact.
12        I am assuming this is -- if you are
13   saying after SIPA liquidation -- is that the
14   context that this is put in?  Because without
15   reading the entire document, I don't know what
16   context this is in.
17        Q    The question simply is, sir, do you
18   agree with that statement in the SEC brief,
19   particularly the second sentence, where it says
20   that "taken together, the provisions of Rule 15c3
21   concerning securities and the provisions
22   concerning funds are designed to insure that there
23   will be sufficient assets to meet customer net
24   equity claims upon liquidation"?
25        MS. NEUHARDT:  Are you asking him

TSG Reporting - Worldwide    877-702-9580

Page 226

1          P. Vinella
2     about paragraph 11 without reading the
3     entire document?
4          MR. OXFORD:  He's welcome to read the
5     entire document.
6     Q     The question is, do you or do you not
7     agree with that statement?
8     A     I am going to have to read,
9     unfortunately -- I know we all want to go home,
10    but I can't -- I have no concept of what context
11    it is.  Is it referring to broker dealers or other
12    entities that may not be covered by the SEC?  Does
13    it happen before or after liquidation?
14          So unless I read the document to be
15    able to put enough context on it, I have no way to
16    give an opinion on it one way or another.
17    Q     Do you agree, sir, that Rule 15c3 is
18    intended to insure that fully paid customer
19    property and excess margin securities are
20    unconditionally available to satisfy customer
21    claims in the event of a broker dealer's
22    liquidation?
23          MS. NEUHARDT:  I just want a running
24    objection to this line of questioning.
25    A     First, the term of art, as I

Page 227

1          P. Vinella
2     mentioned, "customer property," as far as I know,
3     is not a concept within the SEC regulatory
4     framework, and specifically 15c3-3, I don't recall
5     that term ever being used.  It's usually mostly
6     referred to as customer assets.
7          So there -- I would take objection to
8     that categorization.
9          If you are asking is 15c3 a provision
10    that is intended to protect customer assets, I
11    would agree with that, and if it's the ability of
12    the customer to promptly receive possession of
13    those assets, I would agree with that.
14    Q     Okay.  Can you turn to page one of
15    the brief.  Not the first page, but the page that
16    is headed up "Interest of the Commission."
17    A     Could you point out where I am
18    supposed to look?
19    Q     Yes.  If you see the second paragraph
20    begins, "We urge."
21    A     Yes.
22    Q     Do you see where it reads:  "We urge
23    here that in the event that there is a shortfall
24    in the reserve bank account at the time of the --
25    of a brokerage firm's liquidation, the relevant

Page 228

1          P. Vinella
2     statutory and regulatory provisions of SIPA
3     require that an amount equal to shortfall be
4     allocated to customer property, to be used to
5     repay customers for securities and cash entrusted
6     to the firm," and it goes on to say, "rather than
7     to the general estate that is available to other
8     creditors," sir?
9     A     Yes.
10    Q     Are you able to tell me whether or
11    not you agree with that statement?
12    A     I am not qualified to provide a
13    statement either way.
14    Q     In your capacity as an expert on c3,
15    have you ever heard the 15c3 customer reserve
16    funds referred to as margin?
17    A     No.
18    Q     Have you ever heard 15c3 reserve
19    funds referred to as guarantee funds?
20    A     I believe I have heard it in the
21    context of 3-3, but it's not -- it's not a common
22    application.
23    Q     Where in the, in the context of c3,
24    have you heard reserve funds being referred to as
25    guarantee funds, sir?

Page 229

1          P. Vinella
2     A     I believe it was used by -- in one of
3     the projects someone called it that.  I have a
4     recollection of it, and I can't recall exactly
5     when it happened and what client it was, but I
6     believe that the person called it -- it was
7     either -- it may have been called a guarantee
8     account or something like that, as opposed to a
9     reserve account.
10    Q     Other than one occasion when a client
11    referred to a guarantee account, sir, can you
12    think of any other instance in your experience
13    working with Rule 15c3-3, that customer reserve
14    funds were ever referred to as guarantee funds or
15    guarantee accounts?
16    A     Not that I can recall other than that
17    one instance.  I have always referred to it as the
18    reserve account, and in conversations, that is the
19    way we have talked about it.
20          MR. OXFORD:  Okay.  Now might be a
21    good time for a five-minute break.
22    A     Can I qualify that?
23    Q     Of course.
24    A     We also have called them seg account.
25    We've called them customer seg accounts or reserve

Page 230

P. Vinella

1  accounts, and that is actually quite common we
2  will call them a seg account.
3       MR. OXFORD:  If we can take a little
4       over five minutes, I might be able to
5       shorten this a little bit.
6       MS. NEUHARDT:  Okay.  That would be
7       good.
8       (Recess taken.)
9  BY MR. OXFORD:
10      Q    Mr. Vinella, you have in front of you
11  your expert report, please, and turn to page ten.
12      Just after footnote 14, sir, you
13  write, "Moreover, it was able to successfully
14  compute its reserve requirement at least through
15  September 17th."
16      Do you see that?
17      A    Yes, I do.
18      Q    It meaning LBI the broker dealer;
19  correct?
20      A    Yes.
21      Q    What is the basis of your opinion
22  that LBI was able to successfully compute its
23  reserve requirement through September 17th?
24      A    It was based on interviews with Tony

*TSG Reporting - Worldwide    877-702-9580*

Page 231

P. Vinella

1  Stucchio, Joel Potenciano, Ricky Policke,
2  specifically, who mentioned that they were
3  involved in those computations.
4       I even believe it came up in that
5  initial phone call that had with Bill Burke and
6  Alex Crepeau on the phone as well.
7       And there was a general consensus
8  that they were able to close their books and
9  records, balance each of the nights prior to the
10 19th, and that they were able to calculate a 3-3
11 requirement that was reasonable.
12      They all mentioned that the SEC and
13 FINRA was there, and I am not saying that SEC and
14 FINRA guaranteed that the numbers were right, but
15 they believed, as an operating group, they were
16 under more scrutiny than what they might have
17 normally been.  They felt still very comfortable
18 that the numbers they were coming up with were
19 reasonable.
20      Q    "Reasonable" means what, sir,
21 reasonably accurate?
22      A    Well, you can never be certain that
23 every number that is produced is 100 percent
24 accurate.  There is a standard of care that most

*TSG Reporting - Worldwide    877-702-9580*

Page 232

P. Vinella

1  people have, which is reasonability, commercial
2  reasonability, are usually the one that is used;
3  and in this case they felt that, within that
4  standard, those numbers were reasonable, and they
5  felt comfortable taking money out of the reserve
6  account that represented the excess.
7       Q    And you had a specific discussion
8  with the individuals you mentioned, Mr. Stucchio
9  and others, about the commercially reasonable
10 standard you have just testified to?
11      A    We asked them what, you know, did
12 they think these were reasonable numbers, and did
13 they feel comfortable that the results were right.
14      As they pointed out, the accounts
15 being balanced and the books being balanced at the
16 end of the day, they felt, from an operational
17 point of view -- again, it doesn't mean there are
18 not errors in the operations.  It means they have
19 identified the errors and they have correctly
20 accounted for them, either in the suspended
21 accounts, or some other type of area, and that
22 they were able to take the results of the
23 end-of-day operations and feed those into the 3-3
24 calculations, which were produced automatically by

*TSG Reporting - Worldwide    877-702-9580*

Page 233

P. Vinella

1  the systems.  When they reviewed them, especially
2  based on the number of customers that were leaving
3  that week, that they expected the reserve
4  requirements to go down substantially, and that
5  the calculations seemed to be within the context
6  of their expectations.
7       Q    Did you, sir, undertake any analysis
8  of the September 17th LBI c3 reserve formulation
9  calculation to test whether it was accurate?
10      A    What we were hoping to get was
11 operational information that could have done that.
12 We weren't able to get that in the time frame we
13 had, and there were some issues of whether that
14 was even accessible.
15      We also had hoped, and this gets to
16 the other point, of actually getting the results
17 of the Deloitte and Touche analysis, because I
18 understand they had 100 people working over a year
19 to resolve the books and records as of the 19th.
20 So, our hope was, actually, to be able to look at
21 those, and look at the adjustments that would have
22 been made to the reserve calculations, as a result
23 of the operational analysis that they had done.
24      Q    So, the answer is, no, you did not

*TSG Reporting - Worldwide    877-702-9580*

Page 234

P. Vinella

1  undertake any analysis of September 17th
2  calculations to test whether it was accurate or
3  not?
4  
5      A    That is fair.
6          I should also point out that I don't
7  believe Mr. McIssac did either.
8      Q    Did you undertake any analysis of
9  LBI's September 19th c3 reserve calculation to
10 test whether that was accurate or not?
11     A    We looked at the exhibits that Mr.
12 McIssac included, and in talking to the
13 operational staff, they did not have any -- first
14 of all, they could not close the books on the
15 19th, the 20th, the 21st, as far as we understood.
16         There were a large number of open
17 items that they weren't able to correctly classify
18 and, as a result, it didn't seem reasonable to try
19 to reconstruct the 3-3 calculation as of the 19th.
20         One of the things, again, we were
21 hoping to be able to get was the analysis that
22 Deloitte and Touche had done, and then we would
23 have enough information to be able validate that
24 the 3-3 calculation was done correctly.
25     Q    So, it's your testimony that without

TSG Reporting - Worldwide    877-702-9580

Page 235

P. Vinella

1  relying on the work that others have done to
2  reconcile the books and records for the 19th of
3  September, you wouldn't be able to rerun the c3
4  calculation with respect -- from that date; is
5  that correct?
6  
7      A    Without either going back and doing
8  all that work ourselves or relying on Deloitte and
9  Touche, I agree with that.
10         And I think this is an important
11 aspect that hasn't really come up clearly, I
12 think, in the discussion.
13         When Mr. McIssac, for instance, says
14 that a customer has been incorrectly coded as a
15 non-customer or vice-versa, that just doesn't
16 automatically push cash balances, for instance,
17 into the credit.  There is also debits that may be
18 entailed about failure to deliver securities and
19 the like.  So, it's not just, "Here's one item.
20 Let me send to it the reserve account."
21         You have to take that change and
22 apply to it all the buckets of the credits and all
23 the buckets of the debits and then recalculate it,
24 and I think that is one of the things that doesn't
25 come out in Mr. McIssac's report, is that even if

TSG Reporting - Worldwide    877-702-9580

Page 236

P. Vinella

1          there is a discrepancy, it doesn't necessarily
2  have a one-to-one effect on the reserve
3  calculation, much less the account balance.
4      Q    You identified, sir, the exodus of
5  customers in the week of and the weeks prior to
6  the SIPA liquidation as an item that would
7  increase debits in the reserve formula; correct?
8      A    Well, it wouldn't increase the
9  debits.  It would reduce, if you look at the 3-3
10 reserve requirement as a way of protecting
11 customer assets, as customer assets go down
12 substantially, you would expect that reserve
13 requirement to go down proportionately.
14     Q    What other debit items might exist
15 that, in your opinion, would decrease the reserve
16 requirement?
17     A    Could you say that again?
18         (Record read.)
19     A    Again, if you look at the debit
20 items, there are some associated with LBI pledging
21 assets to cover customer margins at futures and
22 options exchanges and clearing houses.
23         I think probably the biggest one in
24 this period of time was a failure to deliver

TSG Reporting - Worldwide    877-702-9580

Page 237

P. Vinella

1  securities as their clearing bank had problems;
2  that would probably be a substantial one that
3  could increase the debit side of the calculation.
4          I don't -- and then, again, if they
5  are extending customer margins, you know, and
6  things like that, that would be include.
7      Q    Did you undertake any analysis to
8  identify these debit items you have just testified
9  to?
10     A    We talked to the operations staff.
11 Their belief was that the biggest factor that
12 would dwarf everything else would be the number of
13 assets themselves had just gone down.  So, there
14 would be less debit items, there would be less
15 credit items, just primarily because there are
16 less customer assets you would have to worry
17 about.  So, there wouldn't be as much margin
18 lending.  There probably would be a lot of option
19 activity.  They did all agree there would be a
20 significant number of failure to delivers, and
21 probably much less failure to delivers than
22 failure to receives, which would tend to reduce
23 the requirement, but we did not independently
24 validate that.

TSG Reporting - Worldwide    877-702-9580

60 (Pages 234 to 237)

P. Vinella

1
2    Q    Why not, sir?
3    A    Again, we didn't have access to the
4  information that would have been necessary to do
5  that and we didn't have the necessary time.
6        So, if we could have had access to
7  the full books and records of Lehman Brothers, and
8  a reasonable period of time; or if we had access
9  to the results of the Deloitte and Touche
10  analysis, we would be able to do that in a much
11  shorter time frame.
12    Q    Page 11 of your report, sir, you
13  **assert that the September 17th calculation was the**
14  **last clean reserve requirement calculation**
15  **performed by LBI.**
16        **Do you see that?**
17    A    I do.
18    Q    What do you mean by that, the "last
19  clean reserve requirement calculation"?
20    A    A term of art in the financial
21  industry, when someone says it's "clean," usually
22  it's based on books and records that were able to
23  be closed, balanced at the end of the day; that a
24  trial balance was able to be run, showing that,
25  you know, assets minus liabilities equal

P. Vinella

1
2  shareholder equity type of issues and, therefore,
3  any of the resulting calculations that use that
4  data, such as a 3-3 calculation, would then be
5  considered, within reasonable standards, accurate.
6        And the 17th was the one we were
7  told, they were the last one they ran prior to
8  trying to run the -- report as of the 19th.
9    Q    **You also testified, sir, that the**
10  **calculation was -- withdrawn.**
11        **You also testified, sir, that the**
12  **September 17th reserve formula calculation**
13  **performed by LBI was observed by the SEC and**
14  **FINRA.**
15    A    I believe I said that the FINRA and
16  the SEC representatives were there. I am not
17  saying that they observed the calculations.
18        In fact, the calculations are
19  produced in an automated report, but that they
20  were present and looking over all the operations.
21    Q    Okay. Can you turn to page 11 of
22  your report, sir?
23    A    Sure.
24    Q    **That last paragraph that begins, "the**
25  **last clean reserve requirement," it says, "the**

P. Vinella

1
2  **last clean reserve requirement calculation**
3  **performed by LBI as of September 17th and observed**
4  **by the SEC and FINRA, did, indeed, show a**
5  **significant drop of approximately $4 billion."**
6        **What did you mean, sir, when you said**
7  **that the last clean equipment was observed by the**
8  **SEC and FINRA?**
9    A    Again, to me, the calculations are
10  the operations necessary to produce data, and they
11  were observing the operations. They weren't
12  watching someone push a button and a report come
13  out. So, I think it's probably more accurate if I
14  would have added "and the operations were observed
15  by the calculation."
16    Q    What operations did the SEC and FINRA
17  observe?
18    A    My understanding was they were
19  watching settlement clearance activities, they
20  were watching money going in and out of various
21  accounts.
22        If certain issues came up in the
23  operations area, my understanding was they went
24  directly to the SEC and asked for clarifications
25  on what they had done.

P. Vinella

1
2        During the interviews, it became
3  pretty clear that a broker dealer staying in
4  business when the parent had gone bankrupt was a
5  fairly new situation for the regulators, as well
6  as for people working at LBI. So, there was a
7  very cooperative environment in terms of making
8  sure that they were able to maintain integrity as
9  an operation, maintain regulatory compliance and
10  still have to do things in a slightly different,
11  in some cases a very different, way than they had
12  done it the previous week.
13    Q    **Who were the individuals, sir, who**
14  **gave you this information about the SEC observing**
15  **the LBI operations in the week leading up to the**
16  **filing on the 19th?**
17    A    I believe that came up in every
18  single interview that we had. I can't think of a
19  single time that that didn't come up. Part of
20  that could have been because, once we heard it, we
21  asked: Were you aware that the SEC was there are
22  and FINRA was there, and what role they played.
23  But I do believe it came up in every interview.
24    Q    **Can you turn to page 12, footnote 25,**
25  **sir?**

Page 242

P. Vinella

1
2    A    Page 12?
3    Q    Page 12, footnote 25.
4    A    Okay.
5    Q    You again say, with respect to the
6    calculations of the reserve formula during the
7    week of the 15th, that these calculations and
8    subsequent withdrawals were observed closely by
9    the SEC and FINRA.
10        Do you see that?
11    A    Yeah, I do.
12    Q    What do you mean by that?
13    A    We were told in interviews with Paolo
14    Tonucci, as well as Tony Stucchio, that they
15    informed the SEC and FINRA that they were going to
16    do daily calculations of the reserve requirement.
17    There was a general consensus this requirement
18    will go down again because of the number of assets
19    that were leaving, and that they would show the
20    results of the calculations to the SEC and FINRA
21    before they withdrew money from the reserve
22    account.
23    Q    And who told that you they showed the
24    results of the reserve calculation before
25    withdrawing money to the SEC and FINRA?

TSG Reporting - Worldwide    877-702-9580

Page 243

P. Vinella

1
2    A    Again, that was Paolo Tonucci, the
3    treasurer, and Tony Stucchio.
4    Q    They, personally, showed the results
5    of that formula to the SEC and FINRA?
6    A    I don't know that they, personally,
7    showed it.  They stated that the results were
8    shown to the SEC and FINRA representatives, and
9    before they would go ahead and take money out the
10    reserve account.
11    Q    So, I am clear, the basis of your
12    testimony is, sir, is that someone told
13    Mr. Tonucci or Mr. Stucchio that someone had shown
14    the SEC or FINRA a reserve calculation, and that
15    someone at the SEC and FINRA approved the release
16    of monies from the c3 account?
17        MS. NEUFELDT:  Objection.
18    Q    Is that your testimony, sir?
19    A    First of all, I mentioned there was
20    an approval process, whether that was a formal
21    approval process or whether that was somewhat of a
22    group of people that would get together before
23    they do the withdrawal.
24    Q    That is the internal process, sir.
25    I'm asking about the SEC and the FINRA approval.

TSG Reporting - Worldwide    877-702-9580

Page 244

P. Vinella

1
2    A    You asked a question.  If I could
3    answer that question --
4    Q    I would like to you answer that
5    question.
6    A    Are you withdrawing the first
7    question?
8    Q    No.  I would like to you answer the
9    question I asked, not the question you would like
10    to.
11    A    I think I did answer it.
12        MR. OXFORD:  Can you read it back
13    please?
14        (Record read.)
15        MS. NEUFELDT:  Same objection to
16    form.
17    A    And as I was stating there, I did not
18    say that someone told Mr. Stucchio or someone told
19    Mr. Tonucci that they had shown anything to the
20    SEC or FINRA.
21        What I said was I don't know if those
22    individuals talked to the SEC and FINRA
23    representatives directly or not; that there was an
24    internal approval process to have this removed.
25    Mr. Tonucci may have been there directly talking

TSG Reporting - Worldwide    877-702-9580

Page 245

P. Vinella

1
2    to the SEC representatives.  I don't know.
3        I do know that before, according to
4    Mr. Tonucci and Mr. Stucchio, that before money
5    was withdrawn from those accounts, and those would
6    have been withdrawn by the treasury area, that
7    someone had shown these to the SEC.
8        Now, I am also not saying that the
9    SEC or FINRA approved.  I'm not saying that they
10    had to say, "yes, you can do it" or "don't do it."
11    That was not discussed as an issue.
12    Q    You didn't ask Mr. Tonucci or
13    Mr. Stucchio whether or not the SEC or FINRA
14    approved these withdrawals?
15    A    We asked them did they believe the
16    SEC and FINRA had to approve the withdrawals,
17    because it's not in the statute or the
18    regulations, themselves; and their response was,
19    at that point, they were overly cautious with
20    everything they did that was regulatory and they
21    showed them.
22        So, I think their belief was that
23    showing it to them was prudent.  I am not saying
24    that they had to get an approval or not get an
25    approval.  I don't know the answer to that.

TSG Reporting - Worldwide    877-702-9580

Page 246

P. Vinella

1
2    **Q    And you don't know who at Lehman**
3    **showed any reserve calculation or the basis for**
4    **that calculation during the week of the**
5    **September 15th, 2008, to the SEC and FINRA staff;**
6    **is that correct?**
7    A    Well, one of the unfortunate aspects
8    of our analysis was that Bill Burke, who we had
9    initially had access to and was responsible for
10   this area, we didn't have access to interview him
11   afterwards; and it appeared, through discussions,
12   that he actually may have been the person who
13   would have done that.  I don't want to say he was
14   or wasn't because we didn't have a chance to
15   validate that.
16   **Q    But nobody you talked to actually**
17   **spoke directly the SEC?**
18   A    No.  Tony Stucchio and Paolo Tonucci
19   were speaking directly to the SEC.  I don't know
20   that they said, "Here is the report.  What do you
21   think?"  I know they were taking to them about
22   moving funds understand out the reserve account.
23   **Q    What did they tell you about their**
24   **discussions with the SEC about moving funds out**
25   **the reserve account?**

TSG Reporting - Worldwide    877-702-9580

Page 247

P. Vinella

1
2    A    Exactly what I mentioned, that said
3    they showed it to the representatives of the SEC
4    and FINRA.
5    **Q    Who is "they"?**
6    A    Lehman Brothers, LBI.
7    **Q    Some unknown person at Lehman?**
8        MS. NEUFELDT:  Objection.
9    A    Again, Lehman Brothers
10   representatives, we don't know who, exactly, it
11   was.  We had some belief it might have been Bill
12   Burke.  We know that Mr. Tonucci spoke directly to
13   the head SEC regulator.  They talked about the
14   reserve calculations, they talked about moving
15   money out of the reserve calculations.
16       Your question was specifically who
17   showed them the report.  I don't know who showed
18   them the exact report.
19   **Q    Did ask you Mr. Tonucci who showed**
20   **anyone at the SEC any report of the c3**
21   **calculations during the week of September 15th?**
22   A    He just mentioned that they had --
23   that the SEC was aware of these reports and was
24   aware of the withdrawals.  So, I don't know who.
25   **Q    My question is a little different.**

TSG Reporting - Worldwide    877-702-9580

Page 248

P. Vinella

1
2    **Did you ask Mr. Tonucci who showed,**
3    **the SEC or FINRA, any of these reports that were**
4    **supposedly shown to them during the week of the**
5    **15th?**
6    A    I don't think that we asked that
7    specific question.
8    **Q    Did you ask Mr. Tonucci, Mr. Stucchio**
9    **or --**
10   A    If I can point out one thing.  I
11   don't think that is relevant to this report.
12   We are not stating that the SEC approved it.  We
13   are not stating that the SEC said it was correct.
14   All we are saying is that these gentlemen believed
15   that they had enough comfort, because the SEC was
16   observing what they were doing on an operational
17   point of view, and they observed the withdrawals
18   of those accounts.  So, it's not like we weren't
19   doing our job.  For the report that we were
20   writing, it didn't seem to be that we were being
21   asked to go into what was the withdrawal process
22   and was it done correctly.
23   **Q    You understand the reason I am asking**
24   **these questions is because you made these**
25   **statements in your report.  They are not in Mr.**

TSG Reporting - Worldwide    877-702-9580

Page 249

P. Vinella

1
2    McIssac's report?
3    A    I didn't say in my report that the
4    SEC approved it, I didn't say that Mr. Tonucci
5    provided information to the SEC, I didn't say the
6    SEC got any specific information.
7        I said the SEC and FINRA we
8    observing, and as I corrected myself, the
9    operations.
10   **Q    And in your expert opinion, sir, does**
11   **the SEC typically approve 15c3 reserve**
12   **calculations?**
13   A    Typically, no.
14   **Q    In your experience, would the SEC**
15   **approve a reserve calculation in the circumstances**
16   **such as that in which LBI found itself in in the**
17   **week of September 15th, 2008?**
18       MS. NEUFELDT:  Objection.
19   A    I have no --
20       MS. NEUFELDT:  You can answer.
21   A    I have no way of saying that, because
22   this is a fairly rare occurrence, and I don't know
23   what the SEC or FINRA decided to do in this
24   specific case.
25   **Q    Okay.  In your expert opinion, sir,**

TSG Reporting - Worldwide    877-702-9580

Page 250

P. Vinella

1  **does FINRA typically approve 15c3 reserve**
2  **calculations?**
3
4      A    No.
5      Can I amend that?  Those calculations
6  are included in their monthly focus reports, and
7  in that case you have to file those with the --
8  the SEC.  There is an issue there, but the
9  weekly -- the weekly 3-3 calculations by itself, I
10  don't know that they approve those or the SEC
11  approves those.
12     **Q    Sir, did you ask Mr. Tonucci and**
13  **Mr. Stucchio, or any of the others with whom you**
14  **discussed the SEC's observation of the operations**
15  **in Lehman in the week of September 15th, whether**
16  **or not any of the errors, you might say alleged**
17  **errors, that are contained in Mr. McIssac's**
18  **affidavit were brought to the attention of the**
19  **SEC?**
20     MS. NEUFELDT:  Objection to form.
21     A    In many cases, the issues raised by
22  Mr. McIssac weren't known prior to the 19th, and
23  the ones that were known as of the 19th, my
24  understanding is that Lehman's operations didn't
25  really have an end of business day, somewhere in

TSG Reporting - Worldwide    877-702-9580

Page 251

P. Vinella

1  the late morning.
2      So, when we discussed with
3  Mr. Stucchio, not Mr. Tonucci, was he aware of any
4  of these errors, such as Woodlands Bank and the
5  like, many of them, he said, they didn't come up
6  during that week, they came up subsequently.
7      So, they would not have had
8  discussions with the SEC about that.
9     **Q    Okay.  Is the same answer also true**
10  **of FINRA for the same reason?**
11     A    I would believe so, yes.
12     **Q    Page 12, footnote 23 of your report,**
13  **sir, you write, "the maximum reserve requirement**
14  **is calculated based on the amount of customer**
15  **assets held at the broker dealer."**
16      **Do you see that?**
17     A    Yes.
18     **Q    Is that a complete statement about**
19  **how the maximum reserve requirement is calculated?**
20     A    Well, it might have been better
21  worded to say is -- is -- I am trying to think of
22  the exact word I would use there.
23      I wouldn't say it's calculated based
24  on.  I would say that the amount is highly

TSG Reporting - Worldwide    877-702-9580

Page 252

P. Vinella

1  associated with the amount of customer assets.
2     **Q    Right.**
3      **Isn't the amount of the reserve**
4  **requirement also highly associated with the debits**
5  **that are in the reserve formula?**
6     A    Both the credits and the debits.
7     **Q    Right.  But you only talk about**
8  **assets here, sir.**
9     A    Assets aren't credits.
10      What this was intending to say was
11  that the maximum value that the reserve can have
12  would be the total amount of cash the customers
13  have at a broker dealer, plus the total number of
14  securities.  So, the total number of customer
15  assets.
16      So, you assume every asset is kept in
17  a bad control location, for instance; and that
18  there is no margin.  There is a maximum reserve
19  requirement, which is actually that number.
20      So, it shouldn't be really calculated
21  based on, it should be the maximum reserve
22  requirement in the sense is a total number of
23  customer assets.  It would be reduced by assets
24  being kept in good control locations, which would

TSG Reporting - Worldwide    877-702-9580

Page 253

P. Vinella

1  reduce the credit side.  It would also be reduced
2  by margin, which would increase the debit side.
3      So, if you looked at what's the total
4  number that the reserve requirement could be, if
5  you only had $5 billion of customer assets the
6  reserve requirement could never be higher than
7  $5 billion.
8     **Q    I understand.**
9      **You go on in your footnote to say,**
10  **"as such as billions of dollars of assets left**
11  **LBI, one would expect a significant drop in the**
12  **reserve requirement."**
13      **Correct?**
14     A    Yes.
15     **Q    Would you agree that the customer**
16  **account leaving LBI would not necessarily reduce**
17  **the reserve requirement?**
18     A    It's possible to have an account that
19  has absolutely nothing in it and, therefore, when
20  an account left, it would have no effect, right.
21     **Q    Is it possible you could have a**
22  **customer account that has an excess of debit over**
23  **credits?**
24     A    You could.

TSG Reporting - Worldwide    877-702-9580

Page 254

P. Vinella

1
2     Q     And if that account left, what effect
3  would that have on the reserve requirements or
4  would that accounts increase or decrease the
5  reserve requirements?
6     A     It would increase it; it would reduce
7  the debits.
8     Q     So it's not necessarily an automatic
9  assumption that if an account leaves a broker
10 dealer, the reserve requirement goes down?
11    A     Typically, though, accounts don't
12 have net customer assets.  That would be a very
13 rare situation.  Most of them have positive
14 assets, because if you leave their margin
15 requirements, their margin requirements have to
16 stay at the broker dealer in order not to be added
17 as a credit, again, to the reserve requirement or
18 removed from a debit item; and, you know, most of
19 them have a certain amount of cash that is kept
20 there.
21       So, it would be rare to have large
22 numbers of clients that had more debits than
23 credits.
24    Q     You say --
25    A     If I could also point our, in Mr.

TSG Reporting - Worldwide    877-702-9580

Page 255

P. Vinella

1
2  McIssac's report he shows that the average reserve
3  requirement, prior to the week of the 19th, was
4  relatively large; that is because most customer
5  have more credits than debits.
6     Q     You say, on page 12, sir, that "tens
7  of thousands of customer accounts were transferred
8  from LBI to other broker dealers in the weeks
9  prior to the SIPA liquidation, including some of
10 the PAM accounts."
11    A     That's what we were told, yes.
12    Q     Who told you that?
13    A     That was -- Mr. Stucchio mentioned
14 that he believed the PAM accounts started leaving
15 on the Wednesday prior to, I think that would have
16 been the 17th.
17    Q     Have you seen any evidence of this,
18 sir, other than a telephone conversation with
19 Mr. Stucchio?
20    A     No.
21    Q     Do you know how many PAM accounts of
22 the tens of thousands -- withdrawn.
23       Do you know how many PAM accounts
24 Mr. Stucchio believes left in the week or weeks
25 prior to September 19?

TSG Reporting - Worldwide    877-702-9580

Page 256

P. Vinella

1
2     A     I believe that in terms of PAM
3  accounts specifically, they started, was his term,
4  on the 17th if 18th; or maybe the transfers were
5  put in on the 17th and effective the 18th.  But he
6  didn't go into, whether it was 20 percent or 80
7  percent.  He didn't mention any numbers of that.
8     Q     And you haven't seen any documents
9  that support your opinion that tens of thousands
10 of customer accounts were transferred from LBI to
11 other broker dealers in the weeks prior to the
12 SIPA liquidation?
13    A     They weren't just PAM accounts.  We
14 were told --
15    Q     I didn't ask about PAM accounts.
16       I asked generally whether or not you
17 had seen any evidence of whether or not tens of
18 thousands of customer accounts were transferred to
19 other broker dealers in the week prior to the SIPA
20 liquidation.
21    A     I understand.  I was prefacing it by
22 saying, aside from the PAM accounts, we heard that
23 a large number of prime broker accounts had left.
24 We heard that from Ricky Policke, specifically.
25       And that that actually had started

TSG Reporting - Worldwide    877-702-9580

Page 257

P. Vinella

1
2  several weeks before the collapse of the holding
3  company and LBIE.  At that period of time,
4  Lehman's stock was getting beaten up pretty badly,
5  so most of the senior institutional investors,
6  especially the ones that were on Lehman as a
7  credit provider, were leaving.
8        They also had a large number of
9  institutional clients that were leaving that week
10 after LBI went.
11       So, we were told that, both by
12 Mr. Roden and Mr. Policke, from an operations
13 point of view, that week there was lots, and they
14 use the word mass exodus, tens of thousands of
15 accounts that had left, or taken most of their
16 assets outs.  And we also heard from Mr. Stucchio,
17 specifically, about the PAM.
18    Q     My question was whether or not you
19 had seen any documentary evidence of the number of
20 accounts that you say left --
21    A     No.
22    Q     -- LBI --
23    A     No.
24    Q     -- in the weeks prior to the SIPA
25 liquidation?

TSG Reporting - Worldwide    877-702-9580

## Page 258

1     **P. Vinella**
2   MS. NEUFELDT: Let him finish his
3 question.
4   If you have finished your question
5 now, you can answer.
6  A  Excuse me for interrupting.
7   No, we did not see any documented
8 evidence.
9 BY MR. OXFORD:
10  **Q  Is it your opinion, sir, that the**
11 **customer accounts that left LBI in the weeks prior**
12 **to the SIPA liquidation, or at least through the**
13 **17th, were taken account of in the September 17th**
14 **calculation, the one that you referred to as the**
15 **last clean calculation that was observed by the**
16 **SEC and FINRA?**
17  A  Could you repeat the question? I'm
18 sorry.
19   (Record read.)
20   MS. NEUFELDT: Objection to form.
21  A  That is what we were told.
22  **Q  And that's what you meant when you**
23 **wrote in your report at page five, sir, that the**
24 **September 16th and September 17th calculations**
25 **more accurately reflected the declining customer**
  TSG Reporting - Worldwide  877-702-9580

## Page 259

1     **P. Vinella**
2 **base; correct?**
3   MS. NEUFELDT: Objection. He's
4 testified extensively to the numerous
5 aspects of what he meant by that.
6  **Q  Can you answer the question, sir?**
7  A  What I meant was that they believe
8 that they are accurate, and that the books and
9 records accurately reflected the customer assets.
10 So, yes.
11  **Q  Do you have any opinion, sir, on**
12 **whether the September 19th calculation run by LBI**
13 **did not also take account of the declining**
14 **customer base in the weeks leading up to and**
15 **including September 17th, 2008?**
16  A  Again, since I was told that the --
17 they were not able to close their books as of the
18 19th, I can't say what was included or wasn't
19 include.
20  **Q  You think those accounts might have**
21 **been added back in, the ones that were taken out**
22 **on the 17th that you think were accurately**
23 **reflected?**
24   MS. NEUFELDT: First, you need to let
25 him finish.
  TSG Reporting - Worldwide  877-702-9580

## Page 260

1     P. Vinella
2  A  I think I answered the question.
3   MS. NEUFELDT: Then I object to the
4 form.
5   MR. OXFORD: How about we all let me
6 finish, and then maybe we can have a record
7 that at least someone will understand at the
8 end of this.
9  **Q  Do you have any basis to believe,**
10 **sir, that the accounts that left LBI, prior to the**
11 **17th of September, 2008, that you believe were**
12 **reflected in the September 17th calculation, were**
13 **somehow not accounted for in the September 19th**
14 **calculation done by LBI?**
15  A  That sounded like a double negative
16 question, so, I am just -- could you just read it
17 back to me so I make sure I be precise?
18   (Record read.)
19  A  I have no evidence that accounts
20 either were entered or taken out incorrectly on
21 the 19th. But, again, because the books and
22 records weren't closed correctly, I can't make an
23 opinion of what happened.
24  **Q  Okay. Let me ask it this way.**
25  **Looking at what you see on page one,**
  TSG Reporting - Worldwide  877-702-9580

## Page 261

1     **P. Vinella**
2 **you see, "third, Mr. McIssac does not include in**
3 **his affidavit any analysis of the impact of**
4 **customer accounts, numbering in the tens of**
5 **thousands, that were transferred from LBI to other**
6 **broker dealers in the weeks prior to the SIPA**
7 **liquidation."**
8  A  Yes.
9  **Q  I think your testimony is that the**
10 **exodus of accounts, prior to the 17th of**
11 **September, was included in the reserve formula**
12 **calculation; correct?**
13  A  I believe so.
14  **Q  So, is it your testimony that Mr.**
15 **McIssac didn't take account of the exodus on the**
16 **18th and the 19th?**
17  A  I believe that is true.
18  **Q  Do you believe that Mr. McIssac's**
19 **affidavit doesn't also take account of the exodus**
20 **from the 17th prior?**
21  A  Again, his focus is a calculation as
22 of the 19th. He doesn't talk about calculations
23 prior to the 19th. So, I don't know what his
24 analysis would be on the impact of customers
25 leaving before that.
  TSG Reporting - Worldwide  877-702-9580

Page 262

P. Vinella

1
2       Q    What's the purpose, sir, of broker
3  dealers keeping a cushion in their reserve formula
4  calculations under c3?
5       A    Generally, to stay out of trouble
6  with the regulators.
7       Q    How does a cushion help them stay out
8  of trouble with the regulators?
9       A    Violating the 15c3-3 reserve
10 requirement is a major violation, according to the
11 SEC.  It's also incredibly embarrassing to have to
12 go to the SEC to say, "by the way, we have used
13 customer assets."
14      So, just to avoid that, they usually
15 put a relatively large cushion in the account, so
16 that if there are discrepancies that are found,
17 which they are still responsible for going back to
18 the SEC to report, they can still say, "oh, by the
19 way, we were still in compliance with minimum
20 requirement."
21      Q    Do you remember what the cushion was
22 in LBI's September 17th c3 calculation?
23      A    I can look it up.
24      Q    If you want to, perhaps, look at
25 Exhibit F to your report, sir.

TSG Reporting - Worldwide    877-702-9580

Page 263

P. Vinella

1
2       A    I believe it was 25 odd million
3  dollars, almost $26 million.
4       Q    Where are you reading from, sir?
5       A    I am reading from page four -- it
6  would be 49, at the bottom of the page, there is a
7  spreadsheet.  There is a number that is called
8  cushion.
9       Q    Um-hum.
10      A    And this is in thousands of dollars.
11 So, it's $25,880,000.
12      Now, I should point out that Lehman
13 Brothers also kept excess money in the account
14 itself.  So, this is a cushion that they added to
15 the calculation, but they also would maintain
16 excess balances in the account.  So, this would be
17 the minimum amount of excess that they would have.
18 They could have had more.
19      Q    Okay.  Would this, leaving aside any
20 excess in the account, itself, would the cushion
21 that you have referred into the formula in Exhibit
22 F, of approximately $25 million --
23      A    Yes.
24      Q    -- that wouldn't be sufficient to
25 cover an adjustment, an increase to the formula of

TSG Reporting - Worldwide    877-702-9580

Page 264

P. Vinella

1
2  more than $25 million, would it?
3       A    Barring any other excess in the
4  account, you are right, yes.
5       Q    Okay.  Can turn to page 17 of your
6  report, please.
7       Do you have it there?
8       A    Yes, I do.
9       Q    When you say, "Mr. McIssac also
10 claims that other errors detected in LBI's service
11 providers allocation program used in the
12 calculation of the reserve requirement caused
13 additional shortfalls in the reserve amount."
14      Do you see that?
15      A    Yes.
16      Q    You go on to say that "Mr. McIssac
17 provides a single memorandum of support for this
18 assertion, a December 30 memorandum from LBI to
19 Boradridge, LBI's ADP outsource provider, which
20 discusses an alleged error condition regarding he
21 alleged duplicate allocation of, quote, street
22 side positions."
23      Do you see that?
24      A    Yes.
25      Q    Did you ask Barclays what their

TSG Reporting - Worldwide    877-702-9580

Page 265

P. Vinella

1
2  position was on -- on the account coding errors
3  identified by Mr. McIssac here?
4       MS. NEUFELDT:  Objection.  You should
5  only respond to that to the extent that it
6  had bearing on the final conclusions reached
7  in your report.
8       A    First of all, again, I wouldn't
9  typify this is as an account coding error.  This
10 was a software error, that the software wasn't
11 correctly doing what it was intended to do.
12      We had discussions with various
13 people on the Lehman Brothers side, who are now
14 with Barclays, and none of them are familiar with
15 the details of this.
16      Q    Did ask you anybody who is on
17 Barclays' side --
18      A    Not that --
19      Q    -- whether they were familiar with
20 this or not?
21      Are you aware, sir, that it was
22 Barclays, not LBI, who identified the errors
23 discussed by Mr. McIssac in the Broadridge memo?
24      MS. NEUFELDT:  You have two questions
25 pending.  Which one do you want him to

TSG Reporting - Worldwide    877-702-9580

Page 266

P. Vinella

1 answer?
2         MR. OXFORD:  The second one.
3         Can you read it back?
4         (Record read.)
5    A    I'm aware from reading the memo that
6 Barclays was aware of the error. I don't know if
7 Lehman Brothers also wasn't aware of the error or
8 that wasn't a Lehman Brothers employee that then
9 became a Barclays employee.
10   Q    Are you aware, sir, that it was
11 Barclays rather than Lehman, and by which I mean
12 any employee of Barclays, who identified the $213
13 million of coding errors that is referenced in Mr.
14 McIssac's report?
15        MS. NEUFELDT:  Objection to form.
16   A    I couldn't find a reference to the
17 $213 million in the exhibit. So, that I can't
18 speak to.
19   Q    Okay.  Leaving a side the computation
20 of the adjustment for one second, were you aware,
21 sir, that it was Barclays, rather than Lehman, who
22 identified the errors that Mr. McIssac say result
23 in a $213 million adjustment?
24   A    If you are saying did the memo come
25

TSG Reporting - Worldwide    877-702-9580

Page 267

P. Vinella

1 from Barclay to Broadridge, that memo, yes.
2    Q    But you write Mr. McIssac provides a
3 memorandum from LBI to Broadridge.  You don't say
4 that it's from Barclays to Broadridge.
5    A    Then I stand corrected.
6    Q    So, if you wanted to amend your
7 report --
8    A    I would be happy to do that.
9    Q    And the amendment would be that you
10 would say that Exhibit 28 to Mr. McIssac's
11 affidavit is from Barclays?
12   A    Right.
13   Q    Not from LBI; correct?
14   A    If you read it, it does state it is
15 from Barclays.
16   Q    Do you have Exhibit 28 in front of
17 you, sir.  It's exhibit 28 to Mr. McIssac's
18 affidavit.
19   A    Okay.
20   Q    Do you have it in front of you, sir?
21   A    I do.
22   Q    Do you see that it reads that it's
23 Barclays Capital to Broadridge; correct?
24   A    Right. and the reason I think that I
25

TSG Reporting - Worldwide    877-702-9580

Page 268

P. Vinella

1 made the mistake is that Kendall, whose name came
2 up several times, that we were not able to talk
3 to, I understand that he was an LBI employee.  So
4 that is my mistake for reading the name and not
5 necessarily the company's name.
6    Q    But so you never talked to
7 Mr. McLaughlin; correct?
8    A    No.  We were never able to arrange a
9 call.
10   Q    Did you talk to Daniram Sudarsan?
11   A    No.
12   Q    Why not?
13   A    Again, we had very limited time
14 trying to find people and get the interview set
15 up. It was Christmastime. We were able to see
16 the people we were able to see.
17        I don't mean to it say it in any kind
18 of flippant way, but trying to arrange 15 to 20
19 interviews over the Christmas vacation, it was
20 difficult.
21   Q    Are you aware, sir, that Barclays
22 drafted a new c3 reserve calculation as of
23 September 19th that corrects the errors discussed
24 in the Broadridge memo, Exhibit 28 to Mr.
25

TSG Reporting - Worldwide    877-702-9580

Page 269

P. Vinella

1 McIssac's affidavit?
2    A    Are you saying that they did a 3-3
3 calculation for Barclays Capital, the broker
4 dealer?
5    Q    No. I am saying they did a 3-3
6 calculation for LBI, the broker dealer, with
7 effect from 9/19, that take account of the errors
8 discussed in Barclays memo to Broadridge, which is
9 Exhibit 28 to the Mr. McIssac affidavit?
10   A    I am not aware of any such
11 calculation.
12   Q    No one showed you that?
13   A    No.
14   Q    Could we mark this as our next one.
15        (Exhibit 599 marked for
16 identification as of this date.)
17 BY MR. OXFORD:
18   Q    Sir, I have handed you what I have
19 marked as Exhibit 599.
20        It's a e-mail from Bill Burke, from
21 Barclays Capital, on Friday the 9th of January at
22 4:15 p.m.
23        If you would take a look at the
24 e-mail, it has a spreadsheet attached to it.  Tell
25

TSG Reporting - Worldwide    877-702-9580

Page 270

P. Vinella

1  me whether or not you have seen this document
2  before.
3
4      A    No.  I have not seen this document.
5      Q    Barclays didn't provide this to you?
6          MS. NEUFELDT:  This is dated after
7  his report.
8      A    My report was the 10th.
9          MR. OXFORD:  It's 364 days.
10     A    No.  We did not get this.
11     Q    Do you think that is the sort of
12  document that would have been important to see
13  before your report, sir?
14     A    Obviously, the more information you
15  have, the more complete you could always be.  So,
16  I can't say, just glancing at it, that this is
17  something that either substantiates or refutes
18  anything in Mr. McIssac's report; but, obviously,
19  getting something is always good.
20     Q    Did anybody, of the dozen or so
21  people that you interviewed, tell you that
22  Barclays was rerunning LBI's calculation with
23  effect from 9/19?
24     A    To my knowledge, Barclays was not
25  doing that.  My understanding that they were

TSG Reporting - Worldwide    877-702-9580

Page 271

P. Vinella

1  Barclays people that were either part of the TSA
2  or they were helping the TSA.  Some were ring
3  fenced and some weren't.
4          So, no one told me that Barclays was
5  independently calculating these as well.
6      Q    Did you ask that question of anybody
7  you met, sir?
8      A    No.
9      Q    You see that just below the initial
10  e-mail, there is an e-mail, it's sent from Daniram
11  Sudarsan to Kendall McLaughlin and others
12  including Mr. Potenciano --
13     A    Yes.
14     Q    -- on Thursday, January 8th.
15          Do you see that?
16     A    Yes.
17     Q    And the subject is revised LBI
18  reserve formula, September 19th, 2008.
19          You spoke with Mr. Potenciano, didn't
20  you?
21     A    We did.
22     Q    Did you -- Mr. Potenciano didn't tell
23  you that Barclays was recalculating LBI's reserve
24  formula as of September 19, 2008, did he?

TSG Reporting - Worldwide    877-702-9580

Page 272

P. Vinella

1      A    Well, as a matter of course, we
2  didn't ask a lot of questions about what happened
3  post the 19th.  In some cases, it was specifically
4  because we believed that they either were part of
5  the TSA effort, or had knowledge of what the TSA
6  was doing, and we were told that that was an area
7  that we were not allowed to look into.
8  Specifically, it came up around Bill Burke and
9  then got extended to other people.
10     Q    Was Mr. Potenciano included within
11  that crowd of people that was employed under the
12  TSA?
13     A    I don't think he was one of the ring
14  fenced, but I think he actually had done some work
15  with the TSA shortly after LBI collapsed.
16          And so, again, just on a matter of
17  caution, we specifically did not ask questions
18  about those periods of time.
19     Q    But you did talk to Mr. Potenciano
20  about the Broadridge memo?
21     A    I don't think we did talk to him
22  about the account issue, the coding issue.
23     Q    You see that the e-mail says -- it's
24  addressed to "Kendall, we had a meeting where Sal

TSG Reporting - Worldwide    877-702-9580

Page 273

P. Vinella

1  and myself discussed with Bill and Joe the revised
2  reserve formula as of 9/19/08, based on the
3  revised allocation reports produced by
4  Broadridge."
5          Do you see that?
6      A    Yes, I do.
7      Q    It says, "the net effect was that the
8  reserve requirement increased by 213 million."
9          Do you see that?
10     A    I do.
11     Q    Does that change your opinion as to
12  whether or not the errors reflected in the
13  Barclays Capital memo to Broadridge of
14  December 30th, 2008, in Exhibit 28 to the McIssac
15  affidavit would have correctly increased the
16  reserve requirement for LBI as of 9/19/08 by
17  213 million?
18          MS. NEUFELDT:  You should take your
19  time to review the entire exhibit.
20     A    Well, what I would say is I
21  understand now where the $213 million comes from,
22  but I have no way on determine, without even
23  looking at more information than is specifically
24  here, that that number was corrected, unless they

TSG Reporting - Worldwide    877-702-9580

Page 274

P. Vinella

1
2 actually had the reports from Broadridge attached
3 to this. Here is the allocation.
4        And, so even if all the information
5 is here, it's something I wouldn't be able to just
6 look at and say, "Well, that's it." It would take
7 some analysis and some time.
8        And as I mentioned in my report, I am
9 happy to, as more information is made available,
10 revise my report based on the information that was
11 made available.
12    Q    Did anyone tell you, sir, that the
13 $82 million of customer assets that were seized by
14 Citibank was accounted for in the PIM settlement
15 that Barclays was a party to in December of 2008?
16    A    No.
17    Q    Do you agree, sir, that LBI's
18 9/19 calculation of the c3 reserve requirement
19 included a debit of $507 million for customer
20 margin of the OCC?
21    A    I believe that was included as a
22 debit item.
23    Q    And do you also agree that without
24 this debit item, the lockup requirement from
25 9/19 would increase?

TSG Reporting - Worldwide    877-702-9580

Page 275

P. Vinella

1
2    A    If you took it out, it would
3 increase.
4    Q    And the lockup amount would include
5 if you took that debit out, actually, by
6 $507 million; correct?
7    A    The requirement, yes, the minimum
8 requirement would go up, not necessarily the
9 lockup requirement because that adds the cushion.
10    Q    But the requirement, itself?
11    A    The requirement, itself, yes.
12    Q    And if there was a deficiency in the
13 15c3 lockup, not just the requirement but the
14 actual lockup as against the requirement, removing
15 this debit would increase that deficiency further,
16 would you agree with that?
17    A    If there was a reason to remove it,
18 yes.
19    Q    And, in fact, again, it would
20 increase that deficiency further by $507 million;
21 correct?
22    A    I don't necessarily like the word
23 "deficiency," because if there was an excess of a
24 billion dollars, there isn't a deficiency. That
25 is the --

TSG Reporting - Worldwide    877-702-9580

Page 276

P. Vinella

1
2    Q    Well, let's define our terms here,
3 sir.
4        If there is a requirement of
5 $2 billion, and there is a lockup of a billion
6 dollars, would you agree there is a deficiency of
7 a billion dollars?
8    A    If there was a $3 billion balance in
9 the account, no.
10    Q    But I have told you there is a $1
11 billion.
12    A    You said there was a lockup. I
13 misunderstood what you were saying by lockup.
14    Q    Let's try this again.
15        If you assume that there was a
16 1 billion, one billion dollars locked up in the
17 reserve account for a broker dealer, and the
18 reserve requirement under 15c3 was $2 billion,
19 would you agree with me, under that scenario, sir,
20 there would be a deficiency in the lockup under c3
21 of $1 billion?
22    A    Yes.
23    Q    And if one were to remove a debit
24 item, such as the 507 million for customer margin
25 with the OCC, that would decrease the deficiency

TSG Reporting - Worldwide    877-702-9580

Page 277

P. Vinella

1
2 further?
3    A    Yes.
4    Q    And it would increase the deficiency
5 further by 507 million?
6    A    In this case, yes.
7    Q    As an expert in 15c3, sir, do you a
8 agree that if there was a business deal to
9 transfer to Barclays property that counted towards
10 a customer reserve requirement, that is something
11 that ought to have been disclosed to interested
12 parties, such as the bankruptcy court?
13    A    I am not a bankruptcy expert, so I
14 can't say what is appropriate to disclose or not
15 disclose.
16    Q    Okay. As an expert in 15c3, sir, do
17 you agree if there was a business deal to sell to
18 Barclays property that counted toward the customer
19 reserve requirement, that is something that the
20 SEC would be interested in knowing?
21        MS. NEUFELDT: Objection to form.
22        What date are you talking about?
23        And objecting to is this something
24 the SEC would be interested in knowing. I
25 mean that is -- you are asking him to get

TSG Reporting - Worldwide    877-702-9580

Page 278

1              P. Vinella
2    into the mind of the SEC.  It's a very
3    objectionable question.
4    BY MR. OXFORD:
5        Q    Okay.  Sir, as an expert in c3, which
6    is an SEC regulation, correct?
7        A    Yes.
8        Q    As an answer expert in one of the
9    SEC's regulations, if there was an agreement to
10    sell from Lehman to Barclays property that counted
11    towards the customer reserve requirement, and if
12    it were removed from the calculation it would
13    increase that reserve requirement, do you believe
14    that is something the SEC would be interested in
15    knowing?
16        MS. NEUFELDT:  Same objections.
17        A    Not before the fact.
18        Once there was an agreement, I could
19    see an issue; but prior to an actual agreement
20    being executed, and then the actual balance being
21    withdrawn, I don't believe that that would be part
22    of the calculation.
23        If they agree to leave it in there
24    for a year, why would I go back and change the
25    reserve requirements?  I think the timing is --
              TSG Reporting - Worldwide    877-702-9580

Page 279

1              P. Vinella
2        Q    If they agreed to leave it in there
3    for a period of less than a year or withdraw the
4    property immediately, and that counted towards the
5    customer reserve requirement, do you think that is
6    something that the SEC ought to have been advised
7    of?
8        MS. NEUFELDT:  Same objection.
9        A    If you are saying would you run
10    another 3-3 calculation, that is something that is
11    different than advising the SEC.
12        So, it's a strange hypothetical.
13        I mean, if you are saying that you
14    are already in deficit, the SEC is already going
15    to know everything you are doing, and you are
16    already going to be there.
17        If this would cause to you go into
18    deficit, my belief is that, normally, the
19    operations and compliance people would go to
20    business people and, say, listen, you are going to
21    have to replace this so we are not in violation.
22    The idea is to avoid that from happening.
23        If it they did go into a deficit,
24    then at that point, yes, you have to go to the SEC
25    and advise him.  I don't know that there is a
              TSG Reporting - Worldwide    877-702-9580

Page 280

1              P. Vinella
2    requirement to go to them until you actually know
3    that you are in violation.
4        MR. OXFORD:  I have got a few
5    questions on your notes, but it might be
6    easier, if I take a break for five minutes
7    and see if I can shorten it.
8        (Recess taken.)
9        MR. OXFORD:  Back on the record.
10        Q    Mr. Vinella --
11        MS. SCOFIELD:  Actually, I believe he
12    would like to clarify his last answer.
13        A    Is it possible?
14        Q    Sure.
15        A    When we were discussing whether there
16    was a -- the $503 million that was at the OCC, and
17    what would be the responsibility of Lehman
18    Brothers in that case to adjust the 33
19    calculation, I just think it's important to state
20    that, one, when they run a 3-3 calculation, it's
21    as of a date, and until something materiality
22    changes -- let me put it --
23        You run your report.  If you find
24    that there is an error after the fact, you have to
25    report there was an error, and you may be asked to
              TSG Reporting - Worldwide    877-702-9580

Page 281

1              P. Vinella
2    recalculate the 3-3 calculation.
3        If another event happens in between
4    your normal reporting period, there is no
5    requirement that you have to actually run another
6    report.
7        Most firms would run another report
8    if they believed that there was a substantial
9    event that they knew that could impact the
10    requirement, such as, okay, we are going to take
11    this $503 million out.  We know that that is a
12    debit item.  That may significantly change our
13    requirements, but they would run a whole new
14    calculation.  They wouldn't just sit and adjust
15    one debit item, they would go and say, "Well,
16    other changes to debits and credits happened."
17    And then they would make a deposit, if they had to
18    in addition to the lockup; or they might have an
19    excess already in place, and they wouldn't have to
20    make a deposit.
21        I didn't want to you give you the
22    feeling that if there was something that they knew
23    would materially change it, they wouldn't
24    necessarily act on it, but they would run a whole
25    new calculation to see exactly what the situation
              TSG Reporting - Worldwide    877-702-9580

Page 282

P. Vinella

1  was.  If they did find a mistake, as I mentioned,
2  they would go backwards in time and make an
3  adjustment if necessary.  This was not a mistake.
4     Again, the key element is you do you
5  the whole calculation, all the credits, all the
6  debit and see what the impact would be as of that
7  date.
8  BY MR. OXFORD:
9     Q    You have in front of you 592, sir?
10    A    Okay.
11    Q    Can you tell me what these are,
12 please, sir.
13    A    These are redacted copies of notes
14 that I, or other members of the LECG team, took
15 during the interviews on the 18th, as well as, I
16 believe, some of the phone interviews, and the
17 areas that were not redacted are ones that we
18 relied on in producing the report or I relied on
19 in producing the report.
20    Q    Looking at Exhibit 592, sir --
21    A    Yes.
22    Q    -- are you able to tell whether these
23 are notes of the meetings in New York on
24 December 18?
25     TSG Reporting - Worldwide    877-702-9580

Page 283

P. Vinella

1     A    These are meetings of the 18th, yes.
2     Q    Do you know who took these notes?
3     A    These ones, I believe, were prepared
4  by Andrea Calderoni.
5     Q    Can you turn your attention to the
6  penultimate page, please?
7     A    It's good I took all that Latin.
8     Q    It's okay.  You have reached my
9  quota.
10    A    You are already over it now.
11    Q    My quota has gone up to three.
12       Do you see on the last line it says,
13 "the overdraft was notified, in res calc was done
14 as of Thursday."
15       Do you see that?
16    A    Yes, Um-hum.
17    Q    Do you know what that is a reference
18 to, sir?
19    A    At this point, we were having a
20 discussion with Dan regarding the supposed
21 overdraft with JPMorgan that led to the cutting
22 off of the JPMorgan systems.
23    Q    The res calc there is a reference to
24 15c3 reserve calculation, is that correct?
25     TSG Reporting - Worldwide    877-702-9580

Page 284

P. Vinella

1     A    I believe that is true.
2     Q    Do you understand that to be a
3  reflection of what Mr. Flamming told that you the
4  reserve calculation was done as of Thursday, the
5  18th of September, 2008?
6     A    Actually during that discussion,
7  Mr. Flamming believed that there was a calculation
8  that was done on the 18th.  We subsequently found
9  that there was no such calculation done.
10    Q    Can you turn to 593, please, which I
11 believe are your notes with Mr. Stucchio?
12    A    Yes.
13    Q    Do you recall who took these notes,
14 sir?
15    A    This, I believe, is also Andrea
16 Calderoni.
17    Q    Without telling me the contents, sir,
18 of what is under those black lines, can you tell
19 me if they reflect conversations with Mr. Stucchio
20 or with some other person?
21    A    Those were conversations with
22 Mr. Stucchio.
23    Q    Okay.  Okay.  Turning to 594, sir,
24 can you tell me what these notes refers to, sir?
25     TSG Reporting - Worldwide    877-702-9580

Page 285

P. Vinella

1     A    Again, these were notes that were
2  taken during the meetings on the 18th.
3     Q    Do you know who took them, sir?
4     A    I believe Sergio Godinho.
5     Q    Okay.  That is all I have for that
6  one.
7        If you could turn to 595, please.
8        These are handwritten notes, sir?
9     A    Yes.
10    Q    Do you know whose handwriting it is?
11    A    This is mine.
12    Q    What do these notes reflect, sir?
13    A    Again, the meetings on the 18th.
14    Q    If you could turn, sir, to the sixth
15 page.
16       To make sure, these are not Bates
17 stamped, but to make sure we are on the same page
18 here, I have as the last line, "Chase still
19 cleared Lehman's business on Friday."
20    A    Yes.
21    Q    Do you see up a few lines from that
22 you appear to write something, "recalc 3-3."
23    A    Yes.
24    Q    Then you have an arrow towards what
25     TSG Reporting - Worldwide    877-702-9580

Page 286

P. Vinella

1   appears to be reg reporting?
2
3       A    Yes.
4       Q    Can you tell me what that is a
5   reference to, sir?
6       A    That was that they were recalculating
7   the 3-3 reserve requirement during the week of the
8   15th.  They had initially thought they were going
9   to try to do it daily.  They ended up doing it at
10  least two or three times that week, and there was
11  a discrepancy between how many times they had done
12  it, and that the -- and this was, we were talking
13  to the operations area at this point, and that
14  they passed on the results to the reporting group.
15      Q    There is a reference below that, sir,
16  to Chase overdraft.
17           Do you see that?
18      A    Yes.
19      Q    What is that a reference to?
20      A    Again, we spent a great deal of time
21  talking about the -- the tri-party repo between
22  Barclays and Chase that we did not use in the
23  report, but we were interested in the overdraft,
24  since that was of the elements that Mr. McIssac
25  had talked about.

TSG Reporting - Worldwide    877-702-9580

Page 287

P. Vinella

1       So, when they were discussing the
2   overdraft, at first they couldn't figure out the
3   initial number, which turned out to be 52 billion,
4   then Chase came back with 42 billion, and they
5   believed that they had a total exposure of
6   somewhere between, you know, 7 billion to
7   23 billion.  They never were able to find out the
8   42 billion.
9           Eventually, Chase came back and said
10  there wasn't an overdraft.  So, this was just
11  memorializing that discussion.
12      Q    Who at Chase told who at Barclays
13  that there wasn't an overdraft?
14      A    My understanding was that was where
15  they had got -- this was Ricky Policke mentioning
16  that he was on the phone with people at Chase
17  trying to figure this out, and he believed that
18  Dan Flamming had also, was involved with talking
19  to the people at Chase about the overdraft.
20           And this, you know, may have been
21  Ricky presenting things he heard internally.  He
22  did not say that this came specifically came from,
23  this discussion came between him and Chase people.
24      Q    You say at the bottom, "Chase still

TSG Reporting - Worldwide    877-702-9580

Page 288

P. Vinella

1   cleared Lehman's business on Friday."
2       A    Right.
3       Q    Okay.  Who told you that?
4       A    Ricky Policke specifically talked
5   about that fixed income trades were still clearing
6   in the morning and, actually, the first trades,
7   this collateral that was going between Lehman
8   Brothers and Barclays specifically that he
9   mentioned, and then somewhere around 10 o'clock is
10  when the access to the systems were turned off.
11      Q    10 a.m. Friday morning?
12      A    That was about the timeframe, right.
13      Q    That's I have for that exhibit, sir.
14           Can we take out 596, please?
15      A    Yes.
16      Q    Can you tell me whose notes these
17  are?
18      A    These are Jeanette Jin's notes?
19      Q    And do you know what they relate to?
20  Are these also the December 18th?
21      A    Well, this would include
22  December 18th.  I also believe that she included
23  some of the phone conversations that we had
24  subsequent to the 18th.

TSG Reporting - Worldwide    877-702-9580

Page 289

P. Vinella

1       Q    Okay.  Turning to the third page,
2   sir, which is Bates stamped BCI EX 00297277.  Do
3   you have that page, sir?
4       A    Yes.
5       Q    Can you read what the first line
6   says?
7       A    All monies were sent out for
8   customers' something fund, I think.
9       Q    You don't know what that word is
10  before "fund"?
11      A    No.
12      Q    And then below that, can you read the
13  next sentence, please.
14      A    I believe it says -- I don't know
15  what the second word is, but every something
16  withdraw is under review of the SEC.
17      Q    And then it says what, SEC --
18      A    "SEC," I am not sure what that next
19  word is, "specific instructions with their
20  approval."
21      Q    And do you know who, which interview
22  rather, these notes reflect?
23      A    I believe this is the Ricky Policke
24  and David Roden interview.

TSG Reporting - Worldwide    877-702-9580

Page 290

P. Vinella

1    P. Vinella
2        MR. OXFORD:  Off the record for a
3    second.
4        (Discussion held off the record.)
5    BY MR. OXFORD:
6        Q    Could you turn to the page that ends
7    in Bates number 7294, sir?
8        A    Okay.
9        Q    Do you see at the top, it appears to
10   read, "clients left, all high net worth"?
11       A    Yes.
12       Q    Is that how you read that, too?
13       A    I do.
14       Q    It also says, "90,000 accounts to
15   Barclays."
16       A    Yes.
17       Q    Whose interview does this reflect, if
18   you know, sir?
19       A    This is actually the interview, the
20   phone call with Allister Blackwell.
21       Q    Did Mr. Blackwell tell you when these
22   90,000 accounts went to Barclays?
23       A    I believe that was subsequent to
24   LBI's liquidation.
25       Q    So, sometime after the close of
TSG Reporting - Worldwide    877-702-9580

Page 291

P. Vinella

1    P. Vinella
2    business on the 19th?
3        A    Yeah.  I don't know if it was the
4    week of the 22nd or the following week when it
5    started and I'm not sure when they finally all
6    went over.
7        If I can also correct the record for
8    one thing I said earlier.  You were asking who
9    mentioned the PAM accounts had left.  Now that I
10   am looking at this, it's Allister Blackwell was
11   the person that told us that, not Tony Stucchio.
12       Q    And Mr. Blackwell told you, to your
13   recollection, sir, that the PAM accounts left LBI
14   prior to the 19th of September?
15       A    They started to leave, is what he
16   mentioned; and, again, I didn't know what
17   proportion had left or not.
18       Q    You don't know if one PAM account
19   left or ten or more than ten?
20       A    Right.
21       Q    Can you turn to the page that has the
22   Bates number ending 7298?
23       Do you have the page, sir?
24       A    I do.
25       Q    Are you able to read for me what
TSG Reporting - Worldwide    877-702-9580

Page 292

P. Vinella

1        P. Vinella
2    appears above that black line?
3        A    "Calculates in reg reporting group,
4    SEC Mike -- reviewed anything done $3.6 billion in
5    cash with a down arrow," and then people not
6    something something either.  I can't read the last
7    of those notes.
8        Q    "People not pay them either,"
9    perhaps?
10       A    It could be that, yes.
11       Q    Do you know what these notes are a
12   reference to, sir?
13       A    They are -- in reference to the
14   process of drawing down the reserve account during
15   the week of the 15th, and I think the reserve
16   initially started at $3.6 billion prior to that
17   and it went down over time.  This is the result of
18   the calculation on the 16th and the 17th.
19       Q    Do you know which interviewee had
20   provided the information reflected in those notes?
21       A    Without talking to Jeanette, I -- I
22   can't confirm exactly which interview this was.
23   It was a phone interview, I believe.
24       Q    Down the page, sir, about a third of
25   the way from the bottom, there is a reference
TSG Reporting - Worldwide    877-702-9580

Page 293

P. Vinella

1        P. Vinella
2    to -- there is three words that appear to say "the
3    clean stuff."
4        Do you see that?
5        A    Yes.
6        Q    Do you know what -- first of all, do
7    you agree that is what the words read?
8        A    I can agree with, that that is an
9    interpretation.  Again, without talking to
10   Jeanette, I wouldn't know exactly what she wrote.
11       Q    You don't know what it's a reference
12   to, sir?
13       A    No.
14       By the way, I do want to stand
15   corrected.
16       I think this was the meeting on the
17   18th in New York, and this is probably with -- I
18   would say with Ricky Policke, just looking at the
19   contents of the discussion.
20       Q    It's not one of the phone interviews?
21       A    I don't think it's one of the phone
22   interviews, now that I am looking at it in
23   context.
24       Just so you understand, I don't
25   review all the individual's notes.  We talk with
TSG Reporting - Worldwide    877-702-9580

## Page 294

P. Vinella

1  P. Vinella
2  each other and they go through their notes. So,
3  again I am putting this in context of other things
4  I have seen.
5      Q   Can you turn to the page that ends
6  with Bates number 7301?
7          Can you look at that page, and can
8  you tell me which interviewee this relates to,
9  sir, if you can?
10      A   I would say this was Dan Flamming.
11      Q   And Dan Flamming you met with,
12  personally, on the 18th in New York; correct?
13      A   Yes, we did.
14      Q   Do you see below the second black
15  box --
16      A   Yes.
17      Q   -- there in the middle of the page,
18  there is a sentence that begins or appears to
19  begin "his team."
20          Do you see that?
21      A   Yes.
22      Q   Can you read, can you read that, and
23  the next couple of sentences, please, until you
24  get to next blank line?
25      A   "His team got approval from SEC for

TSG Reporting - Worldwide    877-702-9580

## Page 295

P. Vinella

1  P. Vinella
2  any movement. Dave" something "confirmed he
3  talked to SEC how things involve LBI not the
4  15c3-3."
5      Q   And it's your testimony, sir, that
6  these are notes of a discussion that you and your
7  team had with Dan Flamming; is that correct.
8      A   I do believe this is true, yes.
9      Q   Do you know who the "he" is in his
10  team that these notes reflect?
11      A   I believe he was talking about Bill
12  Burke at that point.
13      Q   And what did Mr. Flamming tell you
14  when he -- withdrawn.
15          What did Mr. Flamming mean when he
16  told you that Bill Burke's team got approval from
17  the SEC for any movement?
18      MS. NEUFELDT: Objection.
19      He hasn't testified then this is a
20  verbatim transcript of Mr. Flamming's
21  statements.
22      A   During the discussions with
23  Mr. Flamming, Mr. Flamming, again, was responsible
24  for making cash movements associated with the
25  treasury area. So, once the reserves were drawn

TSG Reporting - Worldwide    877-702-9580

## Page 296

P. Vinella

1  P. Vinella
2  down, that money was put into the treasury cash
3  account so that the treasurer, Paolo Tonucci, that
4  he could use that; and his belief was that there
5  was an approval from the SEC when they did the 3-3
6  calculations to withdraw those funds, but he
7  wasn't first-hand in that loop; and in subsequent
8  interviews, we didn't believe that that was
9  actually the case. But Mr. Flamming believed that
10  the SEC, quote unquote, was somehow approving
11  these withdrawals.
12      The second part of that question is
13  this "he" is, actually, I believe, Dan Flamming,
14  who had had conversations with the SEC, but
15  nothing specific to the 3-3 calculations. There
16  were other issues outside that.
17      Q   Do you know what the reference to
18  Dave is?
19      A   I don't remember a Dave coming up.
20  So, I can't even hazard a guess who that might be.
21      Q   Can you turn to the page with the
22  Bates number 7310 on the end, please.
23      A   Okay.
24      Q   These are still Jeanette's notes?
25      A   I believe so, yes.

TSG Reporting - Worldwide    877-702-9580

## Page 297

P. Vinella

1  P. Vinella
2      Q   Do you know, sir, which interview is
3  reflected in these notes?
4      A   I believe this is the telephone call
5  that we had as a follow-up with Ricky Policke and
6  David Roden.
7      Q   You see there are three black boxed,
8  sir?
9      A   Yes.
10      Q   Can you read for me, if you are able,
11  what appears between the second and third black
12  boxes?
13      A   "Reserve formula is not real." It
14  sounds like -- there is an up arrow. It sounds
15  like the increase in the reserve formula is not
16  real.
17      Q   Do you know what that, what that is a
18  reference to, sir?
19      A   We talked to Mr. Policke, Mr. Roden
20  about a number of the issues, as I mentioned, in
21  the McIssac report.
22      I believe this was specific to the
23  $2.3 billion discrepancy that Mr. McIssac alleged
24  where there was an obligation between LBI, LBIE
25  and an LBIE customer, and they were saying

TSG Reporting - Worldwide    877-702-9580

Page 298

P. Vinella

1  that that wasn't a real event.
2
3      Q     Just turn over to the next page, sir.
4  Can you read what the first three
5  lines say there?
6      A     I really can't, other than ITS.  I
7  can't make head or tail of.  There is 500 million
8  and looks to be 350 million and some arrows.  I
9  really have no way of deciphering this one.
10     Q     After the number that appears on the
11 second one, can you read the third line?
12     A     "Because never be perfect."
13     Q     Do you know what that is a reference
14 to?
15     A     I have no context to put that note in
16 there.
17     Q     You don't know who it was a
18 discussion with?
19     A     Again, it could have been a note,
20 just Jeanette to remind her of something, as
21 opposed to something someone was saying.
22           So, I don't know without talking to
23 her what that alludes to.
24     Q     Can you turn to the last page of the
25 document, sir, with Bates number 7314.

TSG Reporting - Worldwide     877-702-9580

---

Page 299

P. Vinella

1
2      A     Yes.
3      Q     Can you read what appears above the
4  black box, please?
5      A     I believe it said "15c3-3 done
6  daily."  I am not sure what the word after that
7  is.  There is an arrow going to the third line,
8  which I am not sure was supposed to be read
9  afterwards, but the second line is "all" something
10 "take money out," and then "should something done
11 with SEC under supervision."
12           That is the best I can get out of
13 that, too.
14     Q     Do you know whose interview that
15 reflects, sir?
16     A     I believe this is still that same
17 phone interview with Mr. Policke and Mr. Roden.
18     Q     What did Mr. Policke tell you about
19 the SEC's supervision in the context of this c3
20 reserve requirement calculation?
21     A     Again, they used the term that the --
22 the members of the SEC, or representatives of the
23 SEC were shown the calculations, and it was done
24 under their supervision was I think the term he
25 actually used.

TSG Reporting - Worldwide     877-702-9580

---

Page 300

P. Vinella

1
2      Q     That's all I have for that document,
3  sir.
4            If you could take out the last set of
5  notes that I have marked as Exhibit 597, please?
6      A     Yes.
7      Q     Whose notes are these, sir?
8      A     This is Jeanette as well.
9      Q     And do you know which interview they
10 are notes from?
11     A     I believe this is one of the phone
12 interviews with Joel Potenciano.
13     Q     Can you read for me what it says
14 immediately under the black box on page one, sir?
15     A     "82 million, Bill Burke raised a
16 question of this," and then it says, "Mike" and
17 some completely undecipherable name, but I happen
18 to know that it was -- I'm not going to try to
19 pronounce his name.  It was an Italian name.  I
20 believe he was the head SEC supervisor at Lehman
21 Brothers at the time, Gregolia or something like
22 that.
23     Q     Is it a reference, perhaps, to Mike
24 Macchiardi?
25     A     Macchiardi, that is the name.

TSG Reporting - Worldwide     877-702-9580

---

Page 301

P. Vinella

1
2      Q     Can you tell by looking at these
3  notes what Mr. Potenciano was telling you in
4  connection with the $82 million that are
5  referenced here?
6      A     My recollection of the conversation
7  was that Bill Burke understood there might be an
8  issue with this, that he had gone to
9  Mr. Macchiaroli to discuss how this should be put
10 into the 3-3 calculation, and there seemed to be
11 an agreement, and this is Mr. Potenciano talking
12 that it was handled correctly.
13           Since we didn't have access to
14 Mr. Burke, we didn't want -- we -- and
15 Mr. Potenciano didn't know exactly how that was
16 corrected, we just, I think, and in my discussion
17 today, just said it was handled correctly, but we
18 don't know what that meant.
19     Q     And you didn't talk to
20 Mr. Macchiaroli?
21     A     No.
22     Q     Or anyone at the SEC about this?
23     A     No.
24     Q     Did Mr. Potenciano explain when
25 Mr. Burke knew there was an issue with the

TSG Reporting - Worldwide     877-702-9580

P. Vinella

1  $82 million?
2
3       A    No.
4       Q    You don't know whether it was before
5  or after the liquidation of -- the SIPA
6  liquidation of LBI on the 19th?
7       A    No.  I do not know if it was prior to
8  the 19th or after the 19th.
9       Q    You see midway down the unredacted
10  passage there are the words, "second piece."
11      A    Yes.
12      Q    Could you read for me everything that
13  is below that, please, if you can?
14      A    "Second piece is the error.  Bring up
15  to SEC attention.  Reserve on daily.  They see
16  adjustment for calculated?"
17          Do you want me to keep going.
18      Q    Yes, please?
19      A    "It's for NBD.  If LBIE BD not
20  customer."
21      Q    And then --
22      A    Continue.
23      Q    Yes, please.
24      A    "Woodland miscode communicated
25  December of '08" -- 2008, sorry.

P. Vinella

1
2       Q    And below that?
3       A    "He only, he only know December of
4  '08."
5       Q    What is that a reference to, sir, the
6  Woodland piece?
7       A    That is the coding error, when we
8  asked Mr. Potenciano were they aware that there
9  was a problem with the Woodlands Bank account
10  treatment, and he said that they only, he only
11  found out that it was a miscoding problem in
12  December of 2008.
13      Q    Turning to the second page of those
14  notes, sir, can you read what appears after the
15  number four, please?
16      A    "436 million hold by LBI for LBIE in
17  the 088 account, ITS.  It's an intercompany
18  amount, not necessary know if customer or not
19  customer."
20      Q    Again, is this, does this reflect
21  notes of the telephone interview with
22  Mr. Potenciano?
23      A    It does, yes.
24      Q    And what was Mr. Potenciano telling
25  you in this phone interview as reflected in these

P. Vinella

1
2  notes?
3       A    We were discussing the $436 million
4  of LBI assets kept at LBIE, and he was mentioning
5  that how it was specifically accounted for in the
6  ITS system, and it had been recognized either as
7  an intercompany asset or a customer asset, and he
8  believed at that point, since it had been put into
9  those accounts that way, that it had been treated
10  correctly in the 3-3 calculation.
11      Q    And then number five, 15c3
12  calculation, as of September 15, is that what it
13  says?
14      A    Yes.
15      Q    And then it's got numbers 16, 17 and
16  then 19; correct?
17      A    Yes.
18      Q    The 19 is underlined.  Do you know
19  why that is?
20      A    What we were trying to find out was
21  exactly how many 3-3 calculations were run during
22  the week of the 15th.  There was one that was run
23  on Monday as of the 12th, there was another one
24  run on the 17th as of the 16th, one run on the
25  18th as the 17th.

P. Vinella

1
2          They were not able to correctly run
3  one on the 19th because of, again, the operational
4  problems they had.
5       Q    Can you tell me, sir, where, if
6  anywhere in these notes that I marked as Exhibits
7  592 through 597, where the interview with
8  Mr. Tonucci is reflected?  If you need to flip
9  through them again, please do so.
10      A    I don't know that we kept notes with
11  Mr. Tonucci hat that point.
12      Q    Which point is this?
13      A    Most of the discussions that we had
14  with Mr. Tonucci, we didn't rely on for the
15  report, and I don't -- and those areas we did, we
16  didn't take notes for it, so.
17      Q    I thought you testified earlier that
18  notes were taken of Mr. Tonucci's.
19      A    I don't recall saying that all --
20  that all interviews we took notes.
21      Q    All right.  I didn't ask you about
22  all interviews, sir, I asked you about
23  Mr. Tonucci's interview and you told me that notes
24  were taken for that interview.
25      A    I will look through it.  I don't know

Page 306

P. Vinella

1    P. Vinella
2  right offhand if such notes exist, but I will be
3  happy to look through them for you.
4      Q    Thank you.
5          MR. OXFORD:  We can go off the record
6  for a second.
7          (Discussion held off the record.)
8      A    The problem, again, is looking at the
9  redacted notes.  It would be much easier if I
10 could look at some unredacted notes because again,
11 we didn't --
12     Q    You will find no disagreement, sir
13 from this side of the table.
14     A    In terms of notes being taken versus
15 notes being relied on, I don't believe that there
16 was anything in the Tonucci notes that we relied
17 on, and that's why.
18         MS. NEUFELDT:  Did you initial your
19 answer?
20         THE WITNESS:  Yes.
21         MR. OXFORD:  Amy, given the
22 testimony, which was pretty extensive, from
23 Mr. Vinella this morning about his
24 conversations with Mr. Tonucci --
25         MS. NEUFELDT:  Hum.

TSG Reporting - Worldwide    877-702-9580

Page 307

P. Vinella

1          MR. OXFORD:  -- which were
2  exclusively related to the information on
3  which he said he relied upon in his report,
4  and given his testimony that notes were, in
5  fact, taken of that conversation, I would
6  ask you to go back and check to see whether
7  or not --
8          MS. NEUFELDT:  With the understanding
9  that not everything gets written down.  You
10 probably noticed he, himself, didn't have a
11 lot of notes.
12         We will go back and confirm that any
13 notes of the conversation with Mr. Tonucci,
14 relevant to the issues that he discussed
15 today, we will make sure that they have been
16 produced or, if not, we will produce them.
17         MR. OXFORD:  I appreciate that.
18 Obviously, we have to reserve our rights
19 with respect to questioning Mr. Vinella on
20 that subject until such time as we see those
21 notes.
22     Q    Mr. Vinella, did anybody provide you
23 with documentary support for the alleged errors
24 that Mr. McIssac discusses in his affidavit?
25

TSG Reporting - Worldwide    877-702-9580

Page 308

P. Vinella

1      A    Other than the exhibits that Mr.
2  McIssac included, there was nothing specific that
3  I can think of.
4      Q    Did you ask anybody for that, sir?
5          MS. NEUFELDT:  Objection to form.
6      A    Again, we asked for more specific
7  types of reports that would have helped
8  demonstrate the those errors exist or didn't
9  exist, but we didn't specifically say, can you
10 show us the document that the $2.3 billion, for
11 instance, was a customer trade, but we asked for
12 trade tickets and things like that.
13         MR. OXFORD:  Okay.  At this time, I
14 don't have any further questions for you
15 Mr. Vinella.
16         I will reserve my rights with respect
17 to your attorney's interpretation of the
18 expert stipulation and we can take that up
19 at another time, but today I don't have
20 anything further for you.
21         I don't know if any other counsel has
22 any questions.
23         MS. CARRERO:  No questions.
24         MR. DAKIS:  No questions for the

TSG Reporting - Worldwide    877-702-9580

Page 309

P. Vinella

1  Committee.
2          THE WITNESS:  I did have one other
3  clarification, if I may add, just to hold
4  everyone a little longer.
5          You asked about a KEOP report, and I
6  mentioned I wasn't familiar with that.  You
7  then provided the actual name associated
8  with that report independent of the -- well,
9  you mentioned.
10         MR. OXFORD:  Acronym?
11         THE WITNESS:  I don't want to say
12 acronym, but I guess it is an acronym as
13 opposed to abbreviation.
14         I am not familiar with that term.  I
15 am familiar with operational risk reports
16 that are part of the CSE regulatory regime,
17 the CSE being the SEC's implementation of
18 ball 2.  If they now call those a specific
19 name, I wouldn't understand it.  But when
20 you mentioned they were key operational
21 indicators, actually, I was one of the
22 fathers of coming up with operational risk
23 indicators and operational performance
24 indicators for both banks and broker

TSG Reporting - Worldwide    877-702-9580

## Page 310

```
 1                  P. Vinella
 2    dealers.  So, I think what you are talking
 3    about is that report and, yes, I am very
 4    familiar with it.
 5          And Lehman Brothers used to call it
 6    an attestation report and we did request
 7    copies of that, but never were able to get
 8    them in the timeframes.
 9          MR. OXFORD:  No further questions.
10    Thank you.
11          (Time noted:  5:58 p.m.)
12                  oOo
13          I, PETER VINELLA, the witness herein, do
14    hereby certify that the foregoing testimony of the
15    pages of this deposition to be a true and correct
16    transcript, subject to the corrections, if any,
17    shown on the attached page.
18          _____
                  PETER VINELLA
19    Subscribed and sworn to before me this
20    _____day of _____,_____.
21    _____
                  NOTARY PUBLIC
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

## Page 311

```
 1
 2    STATE OF NEW YORK  )      Pg.  of Pgs.
 3    COUNTY OF NEW YORK  )
 4          I wish to make the following changes
 5    for the following reasons:
 6    PAGE  LINE
 7    ____  ____  CHANGE:_____
 8          REASON:_____
 9    ____  ____  CHANGE:_____
10          REASON:_____
11    ____  ____  CHANGE:_____
12          REASON:_____
13    ____  ____  CHANGE:_____
14          REASON:_____
15    ____  ____  CHANGE:_____
16          REASON:_____
17    ____  ____  CHANGE:_____
18          REASON:_____
19    ____  ____  CHANGE:_____
20          REASON:_____
21    ____  ____  CHANGE:_____
22          REASON:_____
23    ____  ____  CHANGE:_____
24          REASON:_____
25          _____
```

TSG Reporting - Worldwide    877-702-9580

## Page 312

```
 1
 2              C E R T I F I C A T E
 3    STATE OF NEW YORK    )
 4                    : SS.
 5    COUNTY OF NEW YORK    )
 6
 7          I, BONNIE PRUSZYNSKI, a Notary
 8    Public with and for the State of New York,
 9    do hereby certify:
10          That PETER VINELLA, the witness
11    whose deposition is hereinbefore set forth,
12    was duly sworn by me and that such deposition
13    is a true record of the testimony given by
14    the witness.
15          I further certify that I am not related
16    to any of the parties to this action by
17    blood or marriage, and that I am in no way
18    interested in the outcome of this matter.
19          IN WITNESS WHEREOF, I have hereunto
20    set my hand this 5th of February, 2010.
21
22          _____
23              Bonnie Pruszynski
24
25
```

TSG Reporting - Worldwide    877-702-9580

## Page 313

```
 1
 2
 3                I N D E X
 4    WITNESS                    PAGE
 5    PETER VINELLA
 6    BY MR. OXFORD                  5
 7
 8            E X H I B I T S
 9    Exhibit 590 Affidavit of Daniel      5
10        McIssac
11    Exhibit 591 Report of Peter Vinella    5
12    Exhibit 592 BCI EX 00297254-260      5
13    Exhibit 593 BCI EX 00297261        5
14    Exhibit 594 BCI EX 00297262-265      5
15    Exhibit 595 BCI EX 297266-274      5
16    Exhibit 596 BCI EX 00297275-314      5
17    Exhibit 597 BCI EX 297315-316      5
18    Exhibit 598 SEC brief          222
19    Exhibit 599 E-mail            269
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

## A

**abbreviation (1)**
309:14
**ability (11)**
90:7 100:6 106:2,6
122:10 136:2,3
143:6 193:23,24
227:11
**able (61)**
59:21 66:4 83:3 90:13
94:5 121:15,17
122:18,20 134:16
134:20 135:11,15
135:17 136:8,11,12
136:23 137:2,6,8,16
137:22,25 142:20
156:16,18 163:23
169:21 184:18
207:2 226:15
228:10 230:5,14,23
231:9,11 232:23
233:13,21 234:17
234:21,23 235:4
238:10,22,24 241:8
259:17 268:3,9,16
268:17 274:5
282:23 287:8
291:25 297:10
305:2 310:7
**ABN (9)**
21:23 30:16 70:9,14
71:6,11,14 73:16
107:21
**absolutely (2)**
34:12 253:20
**ACAT (1)**
135:3
**ACATS (1)**
148:7
**accent (2)**
162:11,13
**acceptable (1)**
106:9
**acceptance (1)**
76:17
**access (34)**
101:18,19 102:23,25
103:4,7,19,22 104:2
105:8,10,22 123:23
135:24 139:13,14
139:18 140:16,19
141:19 146:8
165:12,16 180:15
181:6 193:17 198:5
238:3,6,8 246:9,10
288:11 301:13
**accessible (1)**
233:15

**account (91)**
16:5 26:2 35:19 47:24
51:11 53:8 60:4
66:24 80:9,10 82:13
109:4 122:23,25
125:7,16 127:3,4
133:20 134:22
137:5 143:9,9 145:7
151:8 154:23 155:8
165:23 166:3,5
170:16,19 176:15
185:2,3 188:20
208:11 209:18
210:3,5,7,12,20,22
210:23 211:10,11
219:13 221:2
222:11 227:24
229:8,9,11,18,24
230:3 232:7 235:20
236:4 242:22
243:10,16 246:22
246:25 253:17,19
253:21,23 254:2,9
258:13 259:13
261:15,19 262:15
263:13,16,20 264:4
265:2,9 269:8
272:23 276:9,17
291:18 292:14
296:3 303:9,17
**accounted (6)**
185:20,25 232:21
260:13 274:14
304:5
**accounting (8)**
10:10 12:12 13:25
16:22 29:24 77:18
86:17 158:8
**accounts (129)**
16:17 25:12,13,14,17
38:7,9,10,11,13
39:9,11,16 40:23,25
43:24 44:13 47:18
51:23 52:2,23,24,24
52:25 53:5 59:3
61:18,19 66:6 67:4
67:8 69:6 78:18
79:4 80:7 82:23,24
82:25 103:20,24
106:21 107:17,19
122:6,7 123:13
126:11 133:9,11,11
133:11,13,21
134:23 135:17
136:4,8,11,13,21
138:12 140:17,20
140:22,23 141:20
145:2,3 147:12,17
147:20,22,24 148:3

148:5 150:17
151:21 159:15,16
162:18,18 163:10
170:13 174:3 175:5
180:6,10,11 181:10
182:25 184:11
207:19,24 208:7
229:15,25 230:2
232:15,22 240:21
245:5 248:18 254:4
254:11 255:7,10,14
255:21,23 256:3,10
256:13,15,18,22,23
257:15,20 258:11
259:20 260:10,19
261:4,10 290:14,22
291:9,13 304:9
**accurate (14)**
121:20,24 215:7
216:23 218:21
222:4 231:22,25
233:10 234:3,10
239:5 240:13 259:8
**accurately (7)**
14:6 23:14 69:6 94:4
258:25 259:9,22
**acquired (2)**
21:20 39:6
**acquiring (2)**
54:18 82:19
**acquisition (10)**
31:16 34:5,15 36:15
40:5,11 42:23 54:19
55:3 84:25
**acronym (3)**
309:11,13,13
**act (1)**
281:24
**acted (2)**
29:25 43:11
**acting (2)**
25:7 43:13
**action (2)**
137:3 312:16
**actions (1)**
16:14
**activities (5)**
9:17 11:10,25 12:3
240:19
**activity (10)**
61:18 104:10 107:19
110:22 112:20
135:13 140:20
156:6,14 237:20
**actual (14)**
12:10 17:18,20 18:3
25:20 33:16 66:10
80:2 94:7 210:22
275:14 278:19,20

309:8
**ADAM (1)**
3:7
**add (6)**
23:6 55:16 62:20
72:24 208:23 309:4
**added (10)**
68:13 149:22 153:12
183:6 186:6,9
240:14 254:16
259:21 263:14
**adding (4)**
19:20 73:3 211:12,14
**addition (6)**
17:21 27:15 49:3
64:12 137:24
281:18
**additional (4)**
116:17 190:17 199:20
264:13
**address (1)**
181:11
**addressed (3)**
78:6 146:16 272:25
**adds (1)**
275:9
**adequately (1)**
120:4
**adjust (2)**
280:18 281:14
**adjusted (1)**
127:4
**adjustment (7)**
170:24 176:12 263:25
266:21,24 282:4
302:16
**adjustments (2)**
213:5 233:22
**administering (1)**
114:3
**administration (4)**
14:3,3 121:12 209:19
**administrative (1)**
29:23
**adopted (1)**
224:2
**ADP (33)**
30:15,22 53:16,24
54:21 55:20,24 56:3
56:9,13,22 57:3,6
57:11,18,23 61:2,3
72:3 103:25 120:15
143:23 144:20
145:11,14,20 146:4
149:10,23 153:22
166:8 170:8 264:19
**ADP's (1)**
53:18
**advance (1)**

191:5
**advise (1)**
279:25
**advised (1)**
279:6
**advising (1)**
279:11
**advisory (4)**
12:17 51:5 53:17
70:12
**affect (1)**
211:16
**affidavit (43)**
6:10 99:23 100:2
125:19 127:10
140:9 141:8 145:9
146:12,20 150:18
151:2 153:16 160:7
161:20,22 163:7
165:25 170:16,23
173:24 175:7
177:14 180:5 184:2
186:15 202:10
205:10,18 208:15
212:20 220:22
222:9 250:18 261:3
261:19 267:12,19
269:2,10 273:16
307:25 313:9
**affiliate (4)**
87:18 155:16 165:16
181:16
**affiliated (1)**
70:18
**affiliates (2)**
50:18 182:7
**afternoon (1)**
133:18
**agencies (2)**
12:19 13:4
**agency (1)**
42:15
**agent (2)**
10:6 25:8
**agents (1)**
26:12
**aggregated (1)**
16:11
**agree (33)**
75:16 87:4 106:14,23
153:2,5 212:10,19
214:3,8,10 215:20
217:25 224:12
225:18 226:7,17
227:11,13 228:11
235:9 237:20
253:16 274:17,23
275:16 276:6,19
277:8,17 278:23

293:7,8
**agreed (5)**
150:4,6 154:21
217:23 279:2
**agreement (10)**
102:17,18,22 155:17
157:15 216:20
278:9,18,19 301:11
**agrees (1)**
224:21
**ahead (1)**
243:9
**Airlines (2)**
34:4,11
**al (1)**
1:8
**Alastair (3)**
104:19 116:14 179:19
**Alex (8)**
104:19 116:13,18
130:18 158:18,19
158:22 231:7
**allegation (1)**
208:9
**allegations (2)**
205:22 206:2
**alleged (8)**
124:19 207:3 221:11
250:16 264:20,21
297:23 307:24
**allegedly (2)**
219:11 220:10
**Allister (2)**
290:20 291:10
**allocated (2)**
15:16 228:4
**allocation (9)**
123:5 177:17 184:12
200:10 222:25
264:11,21 273:4
274:3
**allocations (1)**
166:8
**allow (5)**
33:14,16 64:25
139:14 213:16
**allowed (5)**
24:18 33:23 88:8
225:6 272:8
**allows (1)**
135:4
**alludes (1)**
298:23
**all-day (1)**
130:13
**all-inclusive (1)**
14:25
**alternative (2)**

185:3 215:11
**Aman (1)**
4:3
**ambiguous (1)**
207:7
**ambitious (1)**
45:5
**amend (2)**
250:5 267:7
**amended (1)**
36:6
**amendment (1)**
267:10
**America (12)**
30:15 58:16,22 59:9
59:22 60:19 61:2,7
61:13,25 64:2,8
**American (1)**
9:3
**Americans (1)**
34:12
**Amman (3)**
131:19,19 204:14
**amount (24)**
29:22 37:14 44:15
139:20 175:4 176:8
186:4 207:25 208:2
209:16 210:11
222:13,14 228:3
251:15,25 252:2,4
252:13 254:19
263:17 264:13
275:4 303:18
**amounts (1)**
122:17
**Amro (9)**
21:23 30:16 70:9,14
71:6,11,15 73:16
107:21
**Amy (7)**
3:13 99:4 117:15
131:18,20 219:24
306:21
**analysis (23)**
13:24 54:11 57:4 66:3
95:13 97:4,5,8
99:18 213:3 221:9
233:8,18,24 234:2,8
234:21 237:8
238:10 246:8 261:3
261:24 274:7
**analyst (5)**
30:2 43:14 107:13
113:4,24
**analyze (2)**
90:23 99:9
**Andrea (11)**
95:23 96:12 113:2,3
113:25 114:14

128:25 131:14
172:22 283:5
284:16
**and/or (5)**
29:15 30:2 108:18
155:24 178:4
**Anglo (1)**
96:17
**announced (1)**
84:25
**annoyed (1)**
126:19
**answer (55)**
7:3,7,10 17:5 19:10
20:9 38:18,24 40:3
55:25 70:2 78:5
83:20,22 87:3,8
92:21 97:12,24,25
98:5 101:21 102:11
108:15 109:23
111:21 114:20
127:13 142:6
171:16 174:13
183:18 188:18
193:20 197:7
206:14,14,15,17
211:4 225:6 233:25
244:3,4,8,11 245:25
249:20 251:10
258:5 259:6 266:2
278:8 280:12
306:19
**answered (6)**
86:24 192:17 205:3,7
219:25 260:2
**answering (2)**
176:11 205:4
**answers (1)**
7:4
**anybody (13)**
86:4 117:25 126:25
127:20 131:16
150:11 201:12,15
265:16 270:20
271:7 307:23 308:5
**anymore (1)**
180:21
**apart (1)**
203:20
**apostrophe (1)**
96:11
**appear (2)**
285:23 293:2
**appeared (5)**
132:11 179:3 205:6
209:13 246:11
**appears (10)**
89:15 201:18 286:2
290:9 292:2 294:18

297:11 298:10
299:3 303:14
**applicable (1)**
14:10
**application (4)**
18:7 62:11 74:2
228:22
**applications (2)**
76:5,25
**applied (2)**
16:23 78:14
**applies (1)**
225:10
**apply (3)**
18:15 225:10 235:22
**applying (1)**
74:24
**appreciate (3)**
17:5 188:18 307:18
**appropriate (6)**
75:15 123:9 137:3
162:5 213:8 277:14
**approval (15)**
42:23 124:15,16,21
125:9 243:20,21,25
244:24 245:24,25
289:21 294:25
295:16 296:5
**approve (6)**
182:15 245:16 249:11
249:15 250:2,10
**approved (6)**
76:11 243:15 245:9
245:14 248:12
249:4
**approves (1)**
250:11
**approving (1)**
296:10
**approximately (11)**
93:13 114:21 129:23
139:20 161:2 173:2
188:7 190:6 223:12
240:5 263:22
**architect (2)**
30:3 62:6
**architecture (1)**
48:8
**area (43)**
13:2 14:17 16:11 17:3
17:4 20:16,17 31:4
31:5 46:6,19 49:10
54:10 62:16 64:20
64:21 74:4 75:15
76:13 78:17,21 80:6
82:18 84:6 90:19
94:8 123:25 133:6
133:19 137:18
145:17,18 149:6

163:2 170:4 171:4
232:22 240:23
245:6 246:10 272:7
286:13 295:25
**areas (14)**
13:18,21 14:9,13 15:4
33:20,25 60:15
62:23 87:25 135:9
203:14 282:18
305:15
**argument (1)**
224:19
**arithmetic (1)**
18:2
**arm (1)**
113:16
**Armand (7)**
41:23 95:18 96:10
109:11 111:9
114:16 129:2
**arrange (2)**
268:9,19
**arrived (2)**
18:4 33:8
**arrow (4)**
285:25 292:5 297:14
299:7
**arrows (1)**
298:8
**art (4)**
35:15 216:10 226:25
238:20
**ascertained (1)**
142:3
**aside (4)**
29:23 213:9 256:22
263:19
**asked (83)**
23:15 56:15 61:13
68:24 71:7 90:24
98:2,24 99:23 119:4
119:25 120:12,13
120:17,23 127:13
132:10,13,16,19,25
133:4,8,12,15 139:3
141:23 143:19,25
145:10 146:21,25
149:8 151:18
153:20 154:11,22
160:3 164:7 166:2,7
168:20,22,24
169:21 173:9,13,15
173:16,19,22 174:3
174:5 175:13,19
176:5,15 179:11
181:15,20,25 183:5
188:16 193:17
194:10,19 203:13
205:4 232:12

240:24 241:21
244:2,9 245:15
248:6,21 256:16
280:25 303:8
305:22 308:7,12
309:6
**asking (14)**
18:13 129:10 152:15
160:5 198:4 213:10
224:18,21 225:25
227:9 243:25
248:23 277:25
291:8
**aspect (11)**
8:5 15:17 16:19 53:4
81:6,14 82:10
146:25 165:17
225:9 235:11
**aspects (12)**
15:11 41:21 44:5 46:2
60:5 71:24 73:2
108:2 152:20
188:25 246:7 259:5
**assert (1)**
238:13
**assertion (1)**
264:18
**asset (3)**
252:17 304:7,7
**assets (80)**
16:2,4,6,24 23:2,10
24:17 25:25 38:12
47:23 49:6 50:14,18
50:19 66:20 78:19
90:8,14 104:3
134:14,24,25 135:5
135:5,9 139:6,20,22
140:2,5,12,14 142:2
142:17,20 148:5
149:19 150:22
152:17 153:11
174:7,7,23,25 175:4
180:13 181:3
209:10,11,22
219:11,14 224:8
225:23 227:6,10,13
236:12,12,22
237:14,17 238:25
242:18 251:16
252:2,9,10,16,24,24
253:6,11 254:12,14
257:16 259:9
262:13 274:13
304:4
**asset-backed (1)**
10:21
**assignment (2)**
61:15 68:21
**associated (14)**

16:15 22:11 67:3
107:24 108:5,21
113:8 175:11
216:19 236:21
252:2,5 295:24
309:8
**Associates (1)**
89:17
**association (3)**
10:24 11:11,15
**assume (4)**
7:11 64:3 252:17
276:15
**assumed (1)**
98:4
**assuming (2)**
216:18 225:12
**assumption (1)**
254:9
**assure (1)**
133:23
**assured (1)**
93:19
**attached (8)**
195:3,5,25 198:13
199:16 269:25
274:2 310:17
**attacks (2)**
90:5 91:15
**attempt (2)**
100:18 162:13
**attempted (1)**
129:11
**attended (1)**
131:12
**attention (4)**
194:24 250:18 283:6
302:15
**attest (1)**
223:18
**attestation (1)**
310:6
**attorney (3)**
80:8,13,15
**attorneys (8)**
3:4,10,16,22 100:21
191:6 199:23
204:13
**attorney's (1)**
308:18
**authoritatively (1)**
144:16
**authority (1)**
152:23
**automated (1)**
239:19
**automatic (1)**
254:8

**automatically (3)**
53:2 232:25 235:16
**available (17)**
79:24 98:9 100:24
101:4,11,23 102:7
103:12,14,16
117:22,22 199:3
226:20 228:7 274:9
274:11
**Avenue (2)**
3:11,23
**average (4)**
27:12,24 28:2 255:2
**averaged (1)**
27:21
**avoid (2)**
262:14 279:22
**aware (46)**
87:19 123:13 138:12
139:5 140:5 145:13
147:9 151:18
153:23 156:25
157:5,16 166:7,10
170:20,22 171:3
174:7 175:13,14
176:16 177:18,22
178:5,6 179:13
181:4,5,15 182:10
184:23 186:11
216:10 241:21
247:23,24 251:4
265:21 266:6,7,8,11
266:21 268:22
269:11 303:8
**A-C-A-T-S (1)**
148:7
**A-C-C-O-R-D-O (1)**
96:11
**A-N-D-R-E-A (1)**
96:12
**A-R-M-A-N-D (1)**
96:10
**a.m (2)**
2:3 288:12

_____

**B**

**B (4)**
30:7,9 192:18 313:8
**back (38)**
16:7 25:19 50:20 51:2
51:8 57:16 69:19
70:19 75:25 86:22
93:21 99:7,11
128:21 138:21,22
143:6 146:2 148:18
170:10 187:12
194:12 206:11,14
219:22 221:22
235:7 244:12

259:21 260:17
262:17 266:4
278:24 280:9 287:5
287:10 307:7,13
**backed (1)**
109:3
**background (2)**
32:24 46:9
**backwards (3)**
28:21 55:21 282:3
**bad (1)**
252:18
**badly (1)**
257:4
**balance (21)**
119:17 120:5 123:11
132:21 135:17
136:8,11,13 157:25
158:3,4,9 169:22
210:20 211:10
216:2 231:10 236:4
238:24 276:8
278:20
**balanced (3)**
232:16,16 238:23
**balances (21)**
19:20 27:17 38:12,16
39:17,19 40:25
47:17 64:16,17
74:11 79:3 103:23
126:11 136:4
170:10,20 187:15
216:9 235:16
263:16
**ball (1)**
309:19
**bank (85)**
10:5,5 21:18 24:15
25:12 26:14 28:17
29:7,12 30:15 31:3
31:4,5,6,18 32:19
44:24 46:10,15 49:7
58:16,22 59:9,17,22
60:19 61:2,7,13,25
64:2,8 70:14 71:14
79:4 90:15 110:12
112:10 122:18
124:6 143:12,13,15
143:18 144:2,4,11
144:14,18,22
150:25 155:10,13
155:23 156:22
157:2,15 160:3
163:13,15 164:23
165:5,7,10,15,20
170:13 176:17,23
177:8 179:16
181:15 182:11,12
182:13,14,19 183:3

183:10 208:13,19
227:24 237:2 251:5
303:9
**bankers (28)**
22:16,22 30:7 31:13
31:15,25 32:14
37:7 39:6 40:6,9,15
41:4,25 42:11,13,18
42:21 43:5 95:19
110:9,20 112:7,18
**bankrupt (2)**
153:2 241:4
**bankruptcy (6)**
1:2 121:10 152:2
183:7 277:12,13
**banks (9)**
21:16 22:9,11 38:14
54:9 90:7 102:16
133:13 309:25
**bank's (6)**
8:25 9:2 11:17 43:15
44:20 79:4
**Barclay (2)**
150:15 267:2
**Barclays (60)**
3:10 32:16,17,19,20
32:22 95:2 98:18
100:23 102:6,15
103:11 105:8 114:5
116:20 130:5
161:12,15,16,23,25
165:14 176:19
178:4 184:7 197:20
209:8 264:25
265:14,17,22 266:7
266:10,12,13,22
267:5,12,16,24
268:22 269:4,9,22
270:5,22,24 271:2,5
271:24 273:14
274:15 277:9,18
278:10 286:22
287:13 288:9
290:15,22
**Barclay's (3)**
71:5 105:3 199:25
**Barney (19)**
23:7,11 56:7,20 80:18
80:21 81:5,12 82:20
83:10,12,24 84:3,5
84:18 85:3,23 86:10
86:13
**Barring (1)**
264:3
**base (2)**
259:2,14
**based (18)**
15:13 16:12 29:21

60:7 105:18 121:9
145:4 183:15,19
193:18 230:25
233:3 238:22
251:15,24 252:22
273:3 274:10
**basic (3)**
13:14 99:24 207:10
**basically (12)**
57:3 66:22 104:7
107:13 133:6
136:23 145:3,14
167:6 173:10 175:3
205:17
**basis (12)**
40:14,14 45:11 78:10
105:9 109:14
111:12 154:5
230:22 243:11
246:3 260:9
**Bates (7)**
285:17 289:3 290:7
291:22 294:6
296:22 298:25
**Battery (1)**
3:17
**BCI (7)**
289:3 313:12,13,14
313:15,16,17
**BD (1)**
302:19
**bearing (1)**
265:6
**beaten (1)**
257:4
**Beggs (4)**
52:8,14,16,17
**beginning (8)**
8:21 13:18 93:10
115:7 136:17 155:5
159:19 223:23
**begins (3)**
227:20 239:24 294:18
**behalf (4)**
16:3 25:2,10 34:3
**belief (7)**
118:10 187:5 237:12
245:22 247:11
279:18 296:4
**believe (128)**
6:25 9:11 11:8 12:11
13:15 14:8 16:18
18:2 25:6 28:4,22
32:4 35:11 37:3
58:23 87:2 88:4
92:11 93:4 94:12
95:3,10 98:20 103:6
103:9 105:7,9,11,13
105:25 113:10

114:16 115:6
117:10,15 118:3,18
124:13 125:22
128:22 129:19,24
131:3,11 154:9,17
159:11 160:24
161:13,16 162:17
162:23 165:2
166:20 167:22
168:6 171:9 172:4
172:16,21,23,25
174:8 176:3,18,20
176:24 177:25
178:18 180:10
182:21 187:2,18
189:18 190:4 195:5
198:8 200:2,11
204:21 208:3 223:5
223:15 228:20
229:2,6 231:5 234:7
239:15 241:17,23
245:15 251:12
256:2 259:7 260:9
260:11 261:13,17
261:18 263:2
274:21 278:13,21
280:11 282:17
283:4 284:2,12,16
285:5 288:23
289:15,24 290:23
292:23 295:8,11
296:8,13,25 297:4
297:22 299:5,16
300:11,20 306:15
**believed (26)**
60:25 81:24 85:12
121:14,19 122:13
134:18 138:9
142:19 156:17
185:14,19,24 186:7
186:14 208:7
231:16 248:14
255:14 272:5 281:8
284:8 287:6,18
296:9 304:8
**believes (1)**
255:24
**belonged (2)**
50:20 127:5
**beneficial (1)**
134:11
**benefit (1)**
96:4
**best (10)**
47:3 92:5 117:12
118:15 185:16
188:23 191:25
192:24 193:4
299:12

**better (2)**
126:22 251:21
**beyond (4)**
53:4 162:4 204:22
213:10
**bifurcating (1)**
47:11
**big (3)**
125:7 131:22 215:12
**biggest (3)**
210:16 236:24 237:12
**Bill (13)**
104:19 105:12 116:13
231:6 246:8 247:11
269:21 272:9 273:2
295:11,16 300:15
301:7
**billing (1)**
114:4
**billion (23)**
175:9 240:5 253:6,8
275:24 276:5,5,7,8
276:11,16,16,18,21
287:4,5,7,8,9 292:4
292:16 297:23
308:11
**billions (3)**
81:11 169:13 253:11
**bio (1)**
138:15
**bit (5)**
23:19 78:3 108:12
200:15 230:6
**black (8)**
203:24 284:19 292:2
294:14 297:7,11
299:4 300:14
**Blackwell (12)**
104:19 116:14 117:9
179:20,25 187:7,21
188:16 290:20,21
291:10,12
**blank (1)**
294:24
**blind (2)**
136:6 169:12
**blood (1)**
312:17
**BLOOM (1)**
3:7
**BNP (1)**
22:12
**Bob (3)**
85:23 86:3,8
**bogged (3)**
135:6 148:8,12
**BOIES (1)**
3:9

**Bonnie (9)**
1:18 2:8 7:5,9 86:22
99:13 197:24 312:7
312:23
**Bonnie's (1)**
96:4
**book (1)**
34:8
**booked (2)**
146:23 154:20
**books (30)**
10:8 22:24 33:17
84:20 101:9,14
105:4,15 106:2,7
124:25 132:20,22
135:16 136:22
146:22 147:5
156:23 169:22
176:21 231:9
232:16 233:20
234:14 235:3 238:7
238:22 259:8,17
260:21
**Boradridge (1)**
264:19
**Boston (1)**
46:14
**bottom (4)**
91:17 263:6 287:25
292:25
**bought (3)**
22:16 36:22 50:17
**box (3)**
294:15 299:4 300:14
**boxed (1)**
297:7
**boxes (3)**
137:9 181:6 297:12
**BPS (8)**
54:21 55:12,13 57:19
57:19,25 61:3
120:15
**branch (1)**
45:22
**break (13)**
7:19 18:9 23:17 35:20
94:23 97:10 98:4
138:15 187:9
194:15 200:15
229:21 280:6
**breaks (8)**
35:13,14,22 106:8,18
111:2 112:24
134:21
**brief (8)**
199:23 200:9,18
222:24 225:3,18
227:15 313:18
**bring (5)**

32:7 82:22 84:16
200:12 302:14
**bringing (3)**
23:9 81:24 193:5
**brings (1)**
222:9
**British (2)**
22:19 34:10
**Brits (1)**
45:7
**broad (3)**
15:7 97:17 98:3
**Broadridge (22)**
125:17 145:8 151:8
165:24 177:13,15
177:23 183:25
184:15 209:7
219:19 265:23
267:2,4,5,24 268:25
269:9 272:21 273:5
273:14 274:2
**broken (2)**
63:17,17
**broker (134)**
7:24 8:4 10:12,13,14
15:8 16:8 20:15
21:7,15,19,20,24
24:5,9,10,12,17,21
24:23 25:2,8,10,15
26:2,11,12 28:3
30:20,22,23,24 31:5
31:8,10 36:25 37:2
37:10,16 39:5,10
43:4,16,17,22 44:16
44:19 45:20 46:10
46:14 47:12 50:18
51:10,19,21 52:21
54:8,15 59:17 60:24
65:20,23 66:4,9,16
67:16 68:5,8,13
69:14 70:18,21
71:11 75:2,18 77:25
78:12 79:14 80:21
88:4,10,15,18 90:15
105:4 107:21
110:12 112:10
113:13,15,16
119:15,19 120:24
121:6,16 122:5
133:10 134:9,12,25
135:6 139:8,9 144:8
147:13,18,22 167:7
182:14 215:12
216:4 226:11,21
230:19 241:3
251:16 252:14
254:9,16 255:8
256:11,19,23 261:6

262:2 269:4,7
276:17 309:25
**brokerage (6)**
54:2,21 69:17,25
139:22 227:25
**brokers (4)**
66:23,25 81:17 82:6
**broker's (3)**
66:21 69:9,10
**Bronx (2)**
162:10,13
**Brothers (50)**
1:7 3:4 28:12 31:9
50:11,12,16,19 61:6
61:8 84:16 88:16
102:15 106:18
118:4 121:5 125:2,5
126:16 133:17
135:8 148:20
155:16 161:23,25
165:13,15 166:21
166:21 167:6 174:6
178:2,4 184:10
208:7 209:8 210:12
220:14,17 238:7
247:6,9 263:13
265:13 266:8,9
280:18 288:9
300:21 310:5
**brought (3)**
187:16 193:2 250:18
**buckets (4)**
58:4 177:18 235:22
235:23
**budgeting (1)**
32:11
**built (1)**
76:25
**Burke (17)**
104:19 105:12,21
116:13 117:8 119:6
131:4 231:6 246:8
247:12 269:21
272:9 295:12
300:15 301:7,14,25
**Burke's (1)**
295:16
**Burnham (2)**
87:19 88:7
**business (77)**
15:18 23:3 30:2,3,25
32:3 37:13 40:10,15
41:23 43:14 44:14
45:19 46:14 48:8
50:15 51:11 54:11
54:18 55:11 56:15
57:5 62:6 65:19
66:11,12 68:10,25
69:13,22,23,25 71:7

71:19,24 72:2 81:13
82:3,11,12 83:6
85:2,25,25 86:17
95:19 107:13 110:8
110:18,21,23 112:6
112:16,19,21 125:6
126:16 133:17
135:21 139:8,9
167:7 169:5,11
180:8,25 214:23
215:3,9 241:4
250:25 277:8,17
279:20 285:20
288:2 291:2
**businesses (30)**
22:17 23:8 32:16,20
34:24 37:9 54:8,24
55:4,18 66:14 69:17
81:4,5,7 83:4,5,9,10
83:15,17,23,24 84:7
84:9 110:9,20 112:7
112:18 149:8
**button (2)**
106:12 240:12
**buy (6)**
33:11 61:9 121:18
122:16,17,19
**buying (3)**
32:16 33:3 134:24
**BZW (2)**
32:18 71:5

_____

**C**

**C (13)**
3:2 4:2 191:15 192:10
192:13 198:22
199:11,14,15 200:8
202:2 312:2,2
**calc (2)**
283:14,24
**calculate (4)**
17:15 53:13 63:14
231:11
**calculated (5)**
251:15,20,24 252:21
302:16
**Calculates (1)**
292:3
**calculating (1)**
271:6
**calculation (163)**
8:3 16:9,12,24 18:4
19:8,9 26:18 47:13
48:21 49:4 52:22
58:3,5 60:5 62:5,18
62:20,22,25 63:4
64:9,11,16 67:20,23
68:3,12,14,17 69:5
73:16,23 74:5,6

75:3,4 76:16 77:9
78:2,13,22 79:8,25
85:19 100:7,18,25
101:16,24 102:21
103:8 104:9 105:23
106:13,15 107:3
120:13 122:21
123:4,7 124:11,19
125:3 133:2 137:18
137:23,25 142:12
146:25 148:21
149:12,18,21,21,25
151:19,21 152:12
164:17 166:9 170:2
170:4 174:16
175:18,23 177:24
179:6,16 180:4
181:21,22 183:12
185:15,17,21
187:16,19 195:21
195:22 199:8
210:18 211:16
216:16 217:7 221:2
221:16,23 222:10
233:10 234:9,19,24
235:5 236:4 237:4
238:13,14,19 239:4
239:10,12 240:2,15
242:24 243:14
246:3,4 249:15
258:14,15 259:12
260:12,14 261:12
261:21 262:22
263:15 264:12
268:23 269:4,7,12
270:22 274:18
278:12,22 279:10
280:19,20 281:2,14
281:25 282:6
283:25 284:5,8,10
292:18 299:20
301:10 304:10,12
**calculations (68)**
8:6 9:23,24 10:2 20:6
21:9,10 22:24 26:16
51:17,19 52:23
55:14,15 60:3,6
64:22 73:2,19 74:16
74:17,23 75:21
76:23 86:10,13 87:7
87:11 90:3 93:25
108:3 110:14,17
112:12,15 133:5
147:8 168:25
173:12,14 195:4
202:11 232:25
233:6,23 234:3
239:3,17,18 240:9
242:6,7,16,20

247:14,15,21
249:12 250:3,5,9
258:24 261:22
262:4 296:6,15
299:23 304:21
**Calderoni (6)**
95:23 96:13 113:2
172:22 283:5
284:17
**calendar (3)**
92:17,22 118:9
**call (61)**
19:21,23,24 41:19
44:9 48:7 62:6
72:25 81:19 85:6
100:20 102:4
104:13,16 110:11
112:9 116:12,15
117:8,12,18,25
118:8,13,16,19,23
119:2,5,7 128:14
129:19,20 154:8,12
154:16 158:14,15
166:25 167:3,9
172:4,20 173:3
187:24,25 188:3,7
188:10 189:8,12
190:5,22 217:3
230:3 231:6 268:10
290:20 297:4
309:19 310:5
**called (27)**
5:20 10:18 21:21
28:22 29:2,6 30:2
32:25 37:4 42:3,8
50:6 55:10,11 59:25
60:24 71:12 78:25
82:12 84:19 88:7
229:3,6,7,24,25
263:7
**calling (1)**
45:8
**calls (2)**
174:13 217:8
**calming (1)**
32:10
**candidate (1)**
60:20
**candidates (1)**
55:3
**Cantor (2)**
89:11,16
**capabilities (2)**
71:17 158:8
**capable (1)**
158:8
**capacity (2)**
30:5 228:14
**capital (25)**

15:10,12,14,16,17,21
22:8 24:16 37:4,8
37:14 38:3 55:15
74:6 77:11,13,19,24
85:18 130:5 173:12
267:24 269:4,22
273:14
**captured (1)**
59:12
**care (2)**
36:10 231:25
**careful (1)**
73:3
**CARRERO (2)**
3:7 308:24
**case (13)**
1:7 11:12 44:22 51:19
52:20 62:13 76:17
232:4 249:24 250:7
277:6 280:18 296:9
**cases (24)**
15:12 20:2,16 22:7
25:9 26:14 27:19
31:7 36:11 75:11
76:24 77:2 80:4,13
132:3,4 193:22,24
198:20,20 221:7
241:11 250:21
272:4
**cash (38)**
19:20 27:17 39:15
47:17 64:15,17 65:4
65:4 74:11 79:2,3,3
90:14 103:20
106:20 121:15,23
122:6 123:10
126:11 139:21
143:8 169:13,19
170:9,12,19 181:7
208:2,5 219:15
228:5 235:16
252:13 254:19
292:5 295:24 296:2
**categorization (1)**
227:8
**categorize (3)**
132:13 219:3,23
**categorized (1)**
217:10
**category (1)**
222:6
**cause (2)**
184:13 279:17
**caused (2)**
121:12 264:12
**caution (1)**
272:18
**cautious (1)**
245:19

CDOs (2)
10:20 113:11
center (1)
122:11
CEO (8)
23:22 24:8 28:22
29:15 30:5 56:22
85:23 86:16
certain (12)
24:20 25:6 63:11,12
71:24 88:20 184:11
184:11 223:18
231:23 240:22
254:19
Certified (1)
2:10
certify (3)
310:14 312:9,15
CFO (2)
75:7 76:17
CFO's (1)
124:2
chairman (1)
56:22
challenge (1)
121:3
challenges (2)
87:20,23
chance (3)
145:22 146:3 246:14
change (17)
29:4 36:15 134:10
235:21 273:12
278:24 281:12,23
311:7,9,11,13,15,17
311:19,21,23
changed (3)
85:13 176:8 205:20
changes (8)
111:2 112:24 156:5
201:24 202:3
280:22 281:16
311:4
chaos (4)
120:10 132:17 134:3
135:25
chaotic (1)
132:17
Chapter (2)
1:6 88:4
character (1)
34:8
characterization (1)
125:24
characterize (1)
132:14
charge (6)
23:7 40:11,12 45:20

50:7 166:20
Chase (45)
106:22 123:14 135:23
136:3 138:13
139:14,17,25
140:10,12,14,23
141:7,12,15 142:25
150:17 159:15
163:10 170:17
174:5,11,12 176:7,7
176:11 180:9,11,16
180:17,17,21 181:8
181:8 219:12
285:19 286:16,22
287:5,10,13,17,20
287:24,25
check (4)
97:10 171:8 196:5
307:7
checked (1)
13:15
Chicago (5)
71:12,13,16,25 72:6
chief (5)
30:2 43:14 45:19 52:8
73:10
Chinese (1)
69:7
Chris (1)
4:5
Christmas (1)
268:20
Christmastime (1)
268:16
chronologically (1)
28:21
CIO (1)
43:11
circumstances (3)
18:21 19:14 249:15
cite (1)
224:3
Citi (3)
175:20,25 176:2
Citibank (10)
50:17,21 127:9
146:19 153:15
185:10,20 186:22
210:3 274:14
Citigroup (2)
61:11 80:22,24
claim (1)
219:16
claims (6)
206:24 219:15 224:9
225:24 226:21
264:10
clarification (2)
179:24 309:4

clarifications (1)
240:24
clarify (5)
7:15 95:11 128:7
138:7 280:12
classify (1)
234:17
clean (11)
22:21 132:22 169:23
238:14,19,21
239:25 240:2,7
258:15 293:3
cleaning (1)
176:21
cleanly (1)
23:16
clear (15)
7:4 24:3 37:16 46:18
47:16 99:4 105:20
137:8 169:14
171:11 207:22
208:24 221:8 241:3
243:11
clearance (3)
134:19 140:20 240:19
cleared (6)
27:14,24 28:2 137:7
285:20 288:2
clearing (12)
65:3 90:7 106:21
136:2 140:17
141:20 180:10,18
181:6 236:23 237:2
288:6
clearly (2)
104:25 235:11
Cleary (2)
4:4 131:19
client (8)
29:20 55:13,13 57:3
134:13 175:11
229:5,10
clients (10)
30:19,24 51:7 134:9,9
134:12,12 254:22
257:9 290:10
client's (1)
30:4
close (17)
84:19,24 101:8,12
132:20 136:9,13,16
136:21 169:17
214:22 215:3,9
231:9 234:14
259:17 290:25
closed (2)
238:23 260:22
closely (2)
45:24 242:8

closing (3)
136:22 197:19 198:15
club (1)
117:6
code (1)
19:6
coded (6)
124:6 143:14 144:14
156:22 164:24
235:14
coding (25)
125:16 145:7 151:8
155:4,8,21 156:2
163:13,17 165:5,23
166:3 176:15,18,25
181:14 208:11,25
219:14 221:22
265:2,9 266:14
272:23 303:7
Cohen (2)
73:11,12
collaborative (1)
125:11
collapse (3)
144:8 157:2 257:2
collapsed (1)
272:16
collateral (12)
90:14 103:21 106:20
109:3 122:7 123:24
126:11 139:21
143:7,8 181:7 288:8
colleagues (1)
186:7
column (1)
196:19
comb (1)
183:2
combination (1)
208:24
come (25)
33:14 49:12,24,25
61:7,8 71:7 87:13
90:24 99:24 105:5
123:23 140:7
148:17 167:4
174:16 179:24
183:2 194:12
235:11,25 240:12
241:19 251:6
266:25
comes (3)
16:19 48:8 273:22
comfort (1)
248:15
comfortable (7)
60:17 121:21 122:24
135:14 231:18
232:6,14

coming (8)
20:6 33:9 83:2 134:19
135:21 231:19
296:19 309:23
comment (1)
21:6
commercial (5)
10:22 38:14 89:10
122:18 232:2
commercially (1)
232:10
commingling (1)
16:5
Commission (3)
224:2,15 227:16
committee (12)
3:22 9:4 11:9 24:15
32:6,7 64:5,5 76:7
76:11,18 309:2
common (5)
49:17 50:13 96:24
228:21 230:2
communicate (1)
180:21
communicated (1)
302:24
communicating (1)
181:9
communication (1)
128:13
communications (5)
98:12,16,19 100:14
209:6
company (19)
8:19 10:5 12:11,16
13:16 21:21 24:5,8
28:19 29:3 43:17
60:20 72:4 88:3,17
121:10 135:4 182:5
257:3
company's (1)
268:6
compared (2)
135:13 164:16
compares (1)
27:25
compensation (1)
15:13
compile (1)
93:8
compiling (1)
92:15
complete (4)
92:4 191:19 251:19
270:15
completed (2)
223:13,16
completely (2)

51:20 300:17
**completion (1)**
115:12
**compliance (46)**
7:23 8:2 10:11 14:13
20:18 24:25 26:3
35:4,24 36:4,16
37:19 40:9,12,16
44:23,25 45:14,16
46:2,13,25 47:14
52:13 62:14 64:2
73:13 75:14,17 76:9
76:19,22 78:11
79:19 80:12 84:3
86:5 87:9 93:21
111:2 112:24 113:8
123:25 241:9
262:19 279:19
**compliant (4)**
83:10,24 84:10 85:16
**complicated (2)**
72:22 114:2
**comply (2)**
66:17 67:17
**component (9)**
14:21 37:3,11 77:16
82:4,5 208:16
218:22 222:5
**components (7)**
15:24 18:3 45:12 60:6
64:11 90:12 104:8
**computation (10)**
17:19,20 100:10
103:17 138:5 153:8
214:19 215:2,8
266:20
**computations (3)**
63:22 214:24 231:4
**compute (5)**
100:10 101:15 137:23
230:15,23
**computed (2)**
68:17 149:12
**computer (4)**
11:19 73:25 92:25
94:11
**computing (3)**
67:3 100:7 138:5
**concept (4)**
216:2,8 226:10 227:3
**concepts (1)**
106:5
**concerned (1)**
183:10
**concerning (4)**
224:6,7 225:21,22
**conclusions (5)**
100:2,4 116:9 154:12
265:6

**concrete (5)**
218:13,17 219:6,9,20
**condition (4)**
109:2 139:16 142:2
264:20
**conduct (4)**
115:25 157:10 180:25
220:2
**Conduit (23)**
9:12 10:4,7,18 11:3
23:22,23 24:7 26:5
26:9,20 27:13,25
28:15 41:10 92:20
93:12 95:22 107:16
113:4,9,14,20
**conduits (1)**
10:22
**conference (4)**
117:18,25 118:13
128:14
**Confidential (6)**
1:1,12 2:1 3:1 4:1 5:1
**configuring (1)**
22:3
**confirm (7)**
22:25 154:11,12
174:24 190:12
292:22 307:13
**confirmation (1)**
190:21
**confirmed (6)**
39:16 40:24 133:2
175:3 186:17 295:2
**confirming (1)**
179:5
**Congressional (1)**
89:24
**connection (21)**
11:22,25 12:2 21:11
39:5,7 41:12 42:10
42:17 43:3 70:25
88:25 115:25
129:16 139:2,7
171:21 177:22
178:22 200:9 301:4
**consensus (2)**
231:8 242:17
**consider (5)**
7:22 14:20 18:6,9
46:5
**consideration (2)**
142:18,21
**considered (13)**
12:25 14:17 15:7,17
18:22 35:22 57:18
77:10 142:9 143:10
153:3 206:24 239:5
**considering (1)**
60:19

**consistent (4)**
19:6 26:11 63:7 66:8
**constantly (1)**
174:11
**consultancy (3)**
21:13 23:4 29:17
**consultant (5)**
31:24 56:10,24 57:7
69:23
**consultants (2)**
33:13 101:8
**consulting (5)**
12:12,13 13:3 14:18
57:5
**consuming (1)**
81:19
**contact (1)**
169:17
**contacted (1)**
32:14
**contained (1)**
250:17
**contemplated (2)**
66:17 67:16
**contemporaneously...**
197:17
**contents (2)**
284:18 293:19
**context (18)**
18:13 39:25 93:18
94:5 128:17 190:14
203:11 225:14,16
226:10,15 228:21
228:23 233:6
293:23 294:3
298:15 299:19
**Continue (1)**
302:22
**continued (3)**
4:2 8:22 9:11
**continuing (2)**
109:25 111:23
**contracted (1)**
96:22
**contractors (2)**
96:25 98:14
**control (36)**
20:13,14 49:5 74:10
77:17,20 78:25 79:5
82:2 134:16 142:2,9
142:10,15,24
143:10,20 151:22
151:24 152:4 153:3
153:7,11 154:23
159:11,13 186:5,8
186:15 208:8
209:18,20,24
210:13 252:18,25
**controlled (1)**

132:18
**controls (5)**
144:9 152:16 155:20
177:3,7
**conversation (24)**
103:9 127:18 128:3
128:17 143:17
155:3 157:18 159:6
159:21 167:13
178:9 187:21
188:14 190:2,10,13
190:18 204:24
205:13 206:6
255:18 301:6 307:6
307:14
**conversations (10)**
105:12 129:15 180:17
189:4 229:18
284:20,22 288:24
296:14 306:24
**conversion (1)**
43:4
**converting (1)**
21:16
**conveyed (1)**
189:21
**cooperative (1)**
241:7
**copies (5)**
94:10,12 195:16
282:14 310:7
**copy (3)**
79:25 94:21 195:24
**core (3)**
15:8 16:18 22:12
**Corp (4)**
71:12,16,25 72:6
**corporate (1)**
16:14
**corporations (2)**
12:18 13:4
**correct (83)**
8:17 9:7 10:25 11:16
12:21 14:12 15:21
22:4 24:4 36:18
43:18,25 46:21 47:9
51:13 56:12 61:12
64:2 65:21 67:21
68:4 77:13,24 78:23
79:8 95:6 100:9
102:9 103:25 109:2
114:6 124:13
127:15 128:5,15
131:10 132:24
137:19 138:10
141:8 143:6 151:14
161:9 168:9 178:13
179:19 181:12
183:13,20 187:4,22

189:23 190:14
195:11,14 201:19
203:12,17 204:17
214:25 222:19,19
223:13 230:20
235:6 236:8 246:6
248:13 253:14
259:2 261:12
267:14,24 268:8
275:6,21 278:6
283:25 291:7
294:12 295:7
304:16 310:15
**corrected (8)**
177:24 184:22 221:2
249:8 267:6 273:25
293:15 301:16
**corrections (1)**
310:16
**correctly (48)**
48:5 52:2 53:11 58:6
64:23 67:10 72:12
72:16 75:5,22 76:4
76:14,16,23 77:6,18
77:19 79:2 84:22
85:10 97:21 110:24
112:22 113:7
122:14 133:23
137:16 151:21
154:21,24 156:22
175:18 185:25
186:12,20 192:5
222:11 232:20
234:17,24 248:22
260:22 265:11
273:16 301:12,17
304:10 305:2
**correctness (1)**
165:4
**corrects (1)**
268:24
**cost (1)**
82:2
**counsel (8)**
6:15 44:24 94:14
100:14 118:20
204:9,11 308:22
**counsel's (3)**
74:21 75:13 213:13
**counted (4)**
277:9,18 278:10
279:4
**COUNTY (2)**
311:3 312:5
**couple (5)**
28:13 76:24 83:21
102:13 294:23
**course (4)**
118:25 125:5 229:23

272:2
**court (4)**
1:2 89:18 225:3
277:12
**cover (2)**
236:22 263:25
**covered (4)**
24:2 171:5 189:2
226:12
**Cowen (2)**
21:21 43:17
**CPA (2)**
110:10 112:8
**created (4)**
10:18 197:17,19
198:15
**creating (5)**
132:8 189:22 190:11
191:21 192:6
**creation (2)**
188:21 195:19
**credit (12)**
28:17 66:23 216:2,8
217:7 218:22 222:5
235:17 237:16
253:2 254:17 257:7
**creditors (2)**
3:22 228:8
**credits (14)**
62:19,20 104:8
211:14 216:18
217:12 235:22
252:7,10 253:24
254:23 255:5
281:16 282:6
**Crepeau (15)**
104:19,20,21 116:14
116:18 117:9
130:18 158:18,19
158:22 159:2,14
160:3,20 231:7
**Crepeau's (1)**
159:8
**crowd (1)**
272:12
**CSE (2)**
309:17,18
**current (1)**
67:12
**currently (2)**
8:8 12:6
**curriculum (1)**
13:10
**cushion (10)**
125:6,8 262:3,7,15,21
263:8,14,20 275:9
**custodial (4)**
25:7 26:12,14 49:7
**custodian (1)**

10:5
**custodians (2)**
26:13 38:13
**custodying (1)**
66:20
**customer (160)**
15:23 16:2,3,3,4 17:9
17:16 19:16 23:10
24:25 25:13,22 26:4
26:8,17,22 27:6
37:21,24 38:3,5
39:3 40:20 41:12
43:23 44:14 46:6,20
47:17,23 52:18,24
53:8,13,22 57:13
59:3 61:16,23 62:11
66:20 67:17,20 68:2
71:3 75:22 78:14,19
79:15 80:25 83:25
84:10 85:8,17 89:2
103:13,20 104:3,10
107:10 109:9 111:7
123:5 126:2 127:3
133:9,21 140:22
142:2 144:20 145:3
146:10 147:12,17
147:24 148:5,13
149:19 151:13
152:9,12 153:4
156:10,14 162:18
163:25,25 164:2,14
164:15 166:5
175:15 177:10
180:13 181:23
182:3,7 183:11
208:4,16 211:24
216:3,6,11,19,22
219:15,15 224:2,5,5
224:9 225:23
226:18,20 227:2,6
227:10,12 228:4,15
229:13,25 235:14
236:12,12,22 237:6
237:17 251:15
252:2,15,24 253:6
253:16,23 254:12
255:4,7 256:10,18
258:11,25 259:9,14
261:4 262:13
274:13,19 276:24
277:10,18 278:11
279:5 297:25
302:20 303:18,19
304:7 308:12
**customers (34)**
25:10 26:19 27:4
28:18 69:9 90:7,13
103:11 104:5,11
107:18 127:5,8

143:19,21,23
146:18 149:11
152:16 153:14
154:24,25 156:6,8
163:17 183:6 185:9
185:19 228:5 233:3
236:6 252:13
261:24 289:9
**customer's (2)**
164:5 216:4
**cut (4)**
83:11 85:2 86:11
140:17
**cutting (1)**
283:22
**CV (3)**
9:15 13:13,21
**C-A-L-D-E-R-O-N-...**
96:14
**C-A-L-O-N (1)**
96:13
**C-C-I-O (1)**
172:7
**C-R-E-P-E-A-U (1)**
104:22
**c3 (53)**
17:19 19:17 37:22,23
46:7 53:14 75:3,21
78:13 79:15 83:25
84:11 85:17 86:9
101:24 103:8,17
105:23 106:15
107:2 109:9,10
110:17 111:7,8
112:15 123:4
124:22 137:18
141:25 148:14
149:25 152:25
153:9 180:4 183:12
187:16 224:12,20
228:14,23 233:9
234:9 235:4 243:16
247:20 262:4,22
268:23 274:18
276:20 278:5
299:19

---

**D**

**D (4)**
96:11 195:3,8 313:3
**daily (11)**
40:14 50:23,24 65:3
77:25 115:18
132:21 242:16
286:9 299:6 302:15
**Daiwa (7)**
22:14 30:8 51:3,6,15
52:6 53:11
**DAKIS (4)**

3:25 213:12,16
308:25
**Dan (9)**
131:7 168:8,11
283:21 287:19
294:10,11 295:7
296:13
**Daniel (3)**
6:10 131:8 313:9
**Daniram (2)**
268:11 271:11
**data (27)**
8:6 9:22 19:7 48:8,16
48:18 57:25 77:5
78:22 101:5,18
102:25 103:2,4,6,10
103:13,16 105:10
105:23 106:3,10
134:17 170:7
187:18 239:4
240:10
**date (21)**
5:3,5,7,9,11,13,15,17
93:7 118:7 141:11
142:3 174:22
184:24 200:16
222:21 235:5
269:17 277:22
280:21 282:8
**dated (5)**
6:10,13 221:3 223:9
270:6
**dates (2)**
220:13,13
**Dave (3)**
295:2 296:18,19
**David (9)**
4:3 96:3,19 116:18
130:11 131:19
148:23 289:25
297:6
**day (35)**
2:7 3:3 27:14,16,22
27:24 28:2,14 37:15
48:23 49:18 63:18
85:6 131:5 135:2,15
135:18 136:9,13
137:15 139:17
141:22 148:18
169:11,14,18,20,22
169:23,24 180:8
232:17 238:23
250:25 310:20
**days (4)**
84:19 132:24 190:4
270:9
**day's (1)**
121:23
**day-to-day (2)**

24:22 78:10
**de (5)**
21:15,18 51:9 65:20
71:5
**dead (2)**
32:25 139:13
**deal (9)**
15:24 32:25 91:3
93:15 94:16 129:8
277:8,17 286:20
**dealer (95)**
8:4 10:12,13,14 16:8
20:15 21:7,20,21,24
23:3,11 24:4,6,9,10
24:12,17,21,23 25:2
25:8,11,15 26:2,12
28:3 31:5 36:25
37:2,10,16 39:6,10
43:4,16,17,22 44:16
44:19 45:20 46:10
46:14 47:13 50:18
51:20,21 52:21 54:8
54:15 59:17 60:24
64:4 66:4 68:5
70:21 71:12 75:2,18
78:12 79:14 80:21
88:4,10,18 90:15
105:4 107:21
110:12 112:10
113:13,15,16
119:15,19 120:24
121:6,16 122:5
139:8 144:8 147:13
147:18 167:7
182:14 216:4
230:19 241:3
251:16 252:14
254:10,16 269:5,7
276:17
**dealers (24)**
7:24 15:9 21:15 22:10
26:13 30:20,22,23
30:24 31:8,10 70:18
77:25 88:15 134:25
135:6 215:12
226:11 255:8
256:11,19 261:6
262:3 310:2
**dealer's (2)**
68:8 226:21
**dealer-wide (1)**
68:14
**dealing (11)**
18:2 45:6 49:20 50:9
52:7,12,14 54:8
63:21 72:23 177:16
**dealings (1)**
11:23
**deals (4)**

27:3,9 107:25 108:5
**dealt (1)**
90:5
**debit (19)**
217:9,12 236:15,20
237:4,9,15 253:3,23
254:18 274:19,22
274:24 275:5,15
276:23 281:12,15
282:7
**debits (14)**
62:19,21 104:9
211:15 235:17,23
236:8,10 252:5,7
254:7,22 255:5
281:16
**Debtors (1)**
1:9
**December (32)**
8:22 9:13 95:11
117:11 118:2,11
128:14 129:24
154:10 157:22
158:20 160:9
165:10,11 168:8,16
171:7,20,24 182:23
188:5 221:21 223:9
264:18 273:15
274:15 282:25
288:21,23 302:25
303:3,12
**decide (1)**
71:18
**decided (5)**
83:11 103:17 167:8
180:21 249:23
**deciphering (1)**
298:9
**decision (8)**
55:9 71:22 101:20
121:8 151:24,25
153:23 180:23
**decisions (2)**
24:16,21
**declare (1)**
121:10
**declining (2)**
258:25 259:13
**decrease (5)**
184:13,16 236:16
254:4 276:25
**deficiency (11)**
217:4,4 275:12,15,20
275:23,24 276:6,20
276:25 277:4
**deficit (4)**
210:23 279:14,18,23
**deficits (2)**
122:14,14

**define (1)**
276:2
**defined (1)**
224:16
**defining (3)**
47:6 59:2,8
**definitely (1)**
181:5
**definition (2)**
142:13,15
**deliver (3)**
50:2 235:18 236:25
**delivering (1)**
46:25
**delivers (2)**
237:21,22
**delivery (2)**
49:22 142:17
**Deloitte (8)**
4:5 101:8,19 105:14
233:18 234:22
235:8 238:9
**demand (1)**
57:5
**demonstrate (2)**
48:4 308:9
**denied (2)**
141:20 180:16
**depending (1)**
17:22
**depends (1)**
20:14
**deposed (1)**
6:21
**deposit (3)**
219:18 281:17,20
**deposition (17)**
1:13 2:6 6:18 7:17
202:6,18,23 203:4
203:11,20,23 204:6
204:10,16 310:15
312:11,12
**depositories (4)**
38:14 39:14 122:7
133:13
**depository (4)**
35:19 39:19 135:3
137:9
**depth (2)**
144:12 200:24
**derivatives (6)**
11:15,20 16:16 31:5
31:17 54:4
**describe (4)**
31:20 70:24 73:22
107:8
**described (8)**
21:4 49:16 63:25

84:10 85:15 148:7
155:15 156:3
**design (5)**
30:3 65:20 66:13
67:11 71:8
**designated (1)**
33:12
**designed (4)**
51:6 65:8 224:7
225:22
**designing (1)**
78:7
**desk (3)**
81:16 88:3,12
**despite (1)**
177:7
**detached (2)**
115:18,21
**detail (4)**
20:25 23:20 31:21
70:25
**detailed (2)**
43:22 70:20
**details (2)**
126:17 265:15
**detect (2)**
156:2 164:12
**detected (1)**
264:10
**determine (1)**
273:23
**determined (1)**
153:10
**determining (1)**
125:3
**developed (3)**
59:11 61:5 93:23
**developing (1)**
81:11
**development (1)**
14:2
**Diamond (1)**
85:22
**difference (3)**
78:3 101:20 106:4
**different (22)**
29:10 32:7 37:25 38:8
44:20 48:10 66:24
72:12 75:12 79:12
129:7 133:8 147:12
147:17,22,23
164:19 221:18
241:10,11 247:25
279:11
**differently (2)**
142:11,22
**difficult (4)**
45:6 182:13 222:18

268:21
**diligence (2)**
22:16 31:14
**direct (5)**
16:11 67:5 194:24
207:4 220:2
**directed (3)**
16:5 17:9 39:2
**direction (8)**
16:4 18:24 98:13
109:20 111:18
115:11,24 127:21
**directly (13)**
20:6 44:22 45:18
61:19 69:13 146:16
165:8 240:24
244:23,25 246:17
246:19 247:12
**director (2)**
12:6,24
**disagree (12)**
87:5 194:13 212:14
212:23 214:2,11,12
214:17,18 215:24
217:8 218:2
**disagreed (2)**
200:22 217:17
**disagreement (3)**
158:2 217:14 306:12
**disclose (4)**
98:11,15 277:14,15
**disclosed (1)**
277:11
**disclosing (1)**
98:16
**discover (1)**
155:20
**discoverable (2)**
192:20 204:23
**discovered (6)**
155:2 181:19 182:23
184:7,9 209:5
**discrepancies (7)**
110:25 112:23 124:18
124:19 137:9
174:19 262:16
**discrepancy (6)**
144:7 147:10 185:5
236:2 286:11
297:23
**discuss (9)**
58:15 147:23 148:4
164:25 165:7
177:12 185:8
194:15 301:9
**discussed (21)**
11:5 119:14 140:15
141:13 159:19
173:25 175:7

184:21 190:15
202:14 204:16,19
205:19 245:11
250:14 251:3
265:23 268:24
269:9 273:2 307:15
**discusses (4)**
153:15 218:20 264:20
307:25
**discussing (6)**
155:8 192:15 206:25
280:15 287:2 304:3
**discussion (27)**
80:7,11 97:15 113:21
128:20 139:17
150:23 163:20
174:18 205:8,24
206:21,21 207:10
213:6 232:8 235:12
283:21 284:7
287:12,24 290:4
293:19 295:6
298:18 301:16
306:7
**discussions (11)**
97:16 128:9 154:3
189:15 199:7
246:11,24 251:9
265:12 295:22
305:13
**disposal (1)**
105:22
**disposition (1)**
140:5
**distinction (2)**
220:16,19
**DISTRICT (1)**
1:3
**division (6)**
8:24 37:6 53:24 56:3
**document (16)**
99:22 197:10 201:6
222:16 223:4,6
225:15 226:3,5,14
270:2,4,12 298:25
300:2 308:11
**documentary (3)**
193:13 257:19 307:24
**documentation (1)**
100:3
**documented (2)**
208:14 258:7
**documents (38)**
190:25 191:3,4,6,16
191:20,23,24 192:2
192:5,9,10,11,12,13
192:18,22,23 193:3
193:6 197:14,18,18
198:7,12,14,19,21

199:2,4,5,10,13,15
199:21 200:4,8
256:8
**doing (22)**
22:15 25:9 26:14,17
47:4 52:11 67:9
74:16 83:8 95:13
105:19 158:9 217:5
221:8 235:7 248:16
248:19 265:11
270:25 272:7
279:15 286:9
**dollar (1)**
209:16
**dollars (11)**
23:10 81:11,22
169:13 253:11
263:3,10 275:24
276:6,7,16
**dollar-for-dollar (1)**
207:5
**domain (1)**
199:3
**domestic (1)**
54:3
**door (1)**
169:14
**double (2)**
184:12 260:15
**doubted (1)**
182:12
**dozen (1)**
270:20
**dozens (1)**
59:12
**drafted (1)**
268:23
**drafting (2)**
114:24 115:4
**drafts (2)**
96:3 98:22
**dramatically (1)**
82:2
**drawing (1)**
292:14
**drawn (1)**
295:25
**Drexel (6)**
87:15,19 88:3,7,19,25
**drop (2)**
240:5 253:12
**Druskin (2)**
85:24 86:8
**DTC (9)**
39:12,12 44:8,11
51:23 108:22
137:13 148:12
184:25

**Dublin (1)**
108:23
**due (4)**
22:16 31:14 35:12
209:2
**duly (2)**
5:21 312:12
**duplicate (1)**
264:21
**duties (3)**
71:8 108:24 184:8
**duty (3)**
110:10 112:8 120:5
**dwarf (1)**
237:13
**D'Accordo (9)**
41:23 95:19 96:10
109:12 110:8,16
111:10 112:6,14
**D-A-I-W-A (1)**
51:3
**D.C (1)**
3:12

_____
**E**

**E (9)**
3:2,2 4:2,2 195:8
312:2,2 313:3,8
**earlier (12)**
34:21 35:12 39:20
48:23 56:9 81:3
93:5 113:12 190:12
190:22 291:8
305:17
**early (3)**
154:10 168:7 172:16
**easier (5)**
27:2 96:17 207:21
280:6 306:9
**easiest (2)**
56:23 86:15
**easily (1)**
64:25
**East (2)**
2:7 3:5
**easy (1)**
56:25
**Economic (1)**
12:12
**effect (11)**
103:18 105:24 153:6
169:12 211:12
236:3 253:21 254:2
269:8 270:23 273:8
**effective (3)**
220:15,18 256:5
**effort (2)**
125:11 272:6

**eight (6)**
17:21 62:19 104:8
216:17 217:11
223:20
**either (33)**
16:2 17:2 21:15 29:25
60:10 90:14 102:20
103:24 110:25
112:23 134:14
154:10,24 157:21
158:11 159:11,18
161:18 179:21
208:14 209:8
228:13 229:7
232:21 234:7 235:7
260:20 270:17
271:2 272:5 292:6,8
304:6
**elected (1)**
100:9
**element (1)**
282:5
**elements (1)**
286:24
**eligible (1)**
139:23
**embarked (1)**
97:6
**embarrassing (1)**
262:11
**EMMANUEL (1)**
3:21
**emphasis (3)**
77:23 78:4,20
**employed (7)**
56:6,10 58:18 65:11
96:21 161:8 272:12
**employee (9)**
56:25 131:10 161:12
161:15 162:22
266:9,10,13 268:4
**employees (3)**
96:25 161:15,17
**employment (1)**
21:2
**endeavor (1)**
85:21
**ended (11)**
34:2 58:2 97:14,19
99:19 116:8 178:4
188:24 194:9
205:16 286:9
**ends (2)**
290:6 294:5
**endurance (1)**
7:19
**end-of-day (4)**
121:21 124:25 132:19
232:24

**engaged (4)**
29:19 94:25 97:4,6
**engagement (2)**
32:13 38:6
**engagements (2)**
77:22 107:14
**ensuring (1)**
78:13
**entailed (2)**
21:25 235:18
**entered (5)**
53:7 155:17 183:4
185:15 260:20
**entire (12)**
48:7 62:4 74:5 81:6
103:13 164:21
189:18 217:6
225:15 226:3,5
273:20
**entirely (1)**
64:6
**entities (5)**
38:21 88:20 119:18
121:5 226:12
**entity (7)**
23:11 27:7 29:5 66:17
83:12 86:12 153:2
**entrusted (1)**
228:5
**enumerated (1)**
219:10
**environment (14)**
48:9 54:23 66:5 82:21
83:16 132:15
143:24 145:14
168:21 169:7,8
173:20 179:12
241:7
**environments (2)**
72:13,17
**equal (2)**
228:3 238:25
**equipment (1)**
240:7
**equities (2)**
32:14 54:3
**equity (11)**
22:17 31:16 32:16,20
37:6 55:17 59:15
61:6 224:9 225:24
239:2
**equivalent (1)**
26:17
**Ernst (2)**
69:15,23
**error (39)**
49:19 125:23 145:11
155:8,21 156:2
164:8,10,12 165:10

**engaged (4)**
166:3 177:20,22,25
181:18 182:16
184:6,10,24 185:17
196:7 207:2,4
208:25 209:2,4,9
219:18 221:9,21
264:20 265:9,10
266:7,8 280:24,25
302:14 303:7
**errors (46)**
49:19 125:16 136:25
137:2,3 145:7 151:8
154:25 155:4
165:23 176:16,18
176:25 177:13,16
180:4 181:14
183:25 184:20
207:13 208:12,17
208:25 219:14
220:21,25 221:5,7
221:11,11,12
232:19,20 250:16
250:17 251:5
264:10 265:2,22
266:14,23 268:24
269:8 273:13
307:24 308:9
**escalating (1)**
74:20
**especially (6)**
8:2 72:22 90:6 106:21
233:2 257:6
**Esq (8)**
3:7,7,13,14,19,20,25
4:3
**essentially (2)**
137:18 213:6
**establish (1)**
206:6
**establishing (1)**
51:11
**estate (1)**
228:7
**estimated (1)**
118:7
**estimates (1)**
169:19
**et (1)**
1:8
**Europe (1)**
38:8
**European (2)**
9:7,18
**evaluate (2)**
71:16 90:13
**evaluated (3)**
39:9 55:4 65:18
**evaluating (1)**
67:12

evaluation (1)
51:10
event (6)
79:13 226:21 227:23
281:3,9 298:2
events (4)
173:17 220:13,17
222:11
eventually (2)
55:9 287:10
everybody (1)
162:12
evidence (9)
142:10,14 208:22
210:4 255:17
256:17 257:19
258:8 260:19
EX (7)
289:3 313:12,13,14
313:15,16,17
exact (4)
34:6 82:25 247:18
251:23
exactly (15)
141:21 174:11,22
177:11 178:3
200:16 209:4 229:4
247:2,10 281:25
292:22 293:10
301:15 304:21
EXAMINATION (1)
5:23
examined (1)
5:21
example (3)
155:7,11 215:15
examples (1)
219:20
excess (17)
27:17 122:9 124:12
124:14,16,21
210:21 226:19
232:7 253:23
263:13,16,17,20
264:3 275:23
281:19
excesses (2)
122:24 123:8
Exchange (2)
79:23 108:23
exchanges (1)
236:23
exclude (1)
199:10
excluded (1)
89:21
Excluding (1)
114:24
exclusively (1)

307:3
excuse (10)
113:18 117:4 139:8
143:8 154:19
179:18 184:17
189:7 219:16 258:6
executed (4)
175:12 182:9 183:17
278:20
executive (4)
20:22 87:18 93:18,23
executives (1)
60:22
exercise (1)
7:19
exhausted (3)
189:14,20,20
exhaustive (2)
188:20 191:19
exhibit (68)
5:2,4,6,8,10,12,14,16
6:9,12 13:7 30:7,9
125:17 145:8
165:24 171:12
177:14 184:2
191:15,22 192:10
192:13 194:23
195:3,3,19,20
198:22 199:11,14
199:15 200:8 202:2
207:23 208:3,15
209:5,13 217:10
222:16,20,24
262:25 263:21
266:18 267:11,17
267:18 268:25
269:10,16,20
273:15,20 282:21
288:14 300:5 313:9
313:11,12,13,14,15
313:16,17,18,19
exhibits (8)
6:6,14 195:6,8 203:17
234:11 305:6 308:2
exist (6)
42:12 88:21 236:15
306:2 308:9,10
existed (1)
195:17
existing (1)
195:16
exodus (5)
236:5 257:14 261:10
261:15,19
expand (2)
51:6 53:18
expect (2)
236:13 253:12
expectations (1)

233:7
expected (2)
73:7 233:4
expecting (2)
19:7 49:24
experience (20)
19:15 20:24 26:8
28:21 30:6 49:17
51:2 53:20 70:9
75:6 76:12 78:9
80:20,23 87:18
107:9 109:21
111:19 229:12
249:14
experienced (1)
169:10
experiences (1)
23:5
expert (44)
6:12 7:23 12:20 14:17
17:25 18:6,10,22
19:16,19,24 33:6
40:17 46:6,17,19
57:13,19 61:22
68:20 89:7 98:17
108:11 141:24
152:25 189:16
213:8 220:24
221:15,24 224:13
224:21,24 225:8
228:14 230:12
249:10,25 277:7,13
277:16 278:5,8
308:19
expertise (9)
13:18,22 14:7,9,14
17:15,17,18 74:25
experts (4)
12:25 18:3 110:4
112:2
explain (2)
136:20 301:24
explicitly (1)
105:17
explore (1)
23:19
exposed (1)
16:8
exposure (1)
287:6
expressing (1)
89:21
extend (1)
28:17
extended (1)
272:10
extending (1)
237:6
extension (1)

66:22
extensive (4)
58:25 71:5 84:12
306:22
extensively (1)
259:4
extent (14)
26:7 36:5 97:7,13
98:18 120:14
122:21 171:19
192:19 194:7 196:9
196:11 210:23
265:5
extra (2)
77:15 85:9
extremely (1)
135:12
ex-Lehman (5)
100:22 101:22 102:5
104:13 106:25
e-mail (7)
209:6 269:21,25
271:11,11 272:24
313:19
e-mails (1)
198:7

**F**

F (5)
195:19,20 262:25
263:22 312:2
face (4)
43:6 52:14,15 134:15
faced (2)
45:10 87:20
facility (2)
33:14 135:4
facing (2)
40:4 74:13
fact (32)
26:12 34:11 35:20
36:20 74:5 82:5
92:3 101:10 105:12
106:18 121:9
135:16 136:10
140:10,11 141:2
157:14 174:9
177:19 179:5
183:16 199:10
200:24 207:14
220:8 221:9 225:11
239:18 275:19
278:17 280:24
307:6
factor (1)
237:12
facts (5)
98:19 154:6,13,14,15
factual (3)

161:19 163:6 170:15
failed (1)
137:22
failure (7)
217:2,3 235:18
236:25 237:21,22
237:23
fair (3)
7:12 125:24 234:5
fairly (5)
216:16 221:8 223:18
241:5 249:22
faith (1)
94:4
fall (6)
9:10 11:7,8 31:3
219:6 222:5
familiar (11)
8:5 42:2 108:2 174:3
223:7 265:14,19
309:7,15,16 310:4
family (1)
121:5
far (4)
57:17 183:9 227:2
234:15
FARA (1)
3:20
FASB (1)
16:22
fast (1)
138:18
faster (2)
81:25 221:5
fathers (1)
309:23
favor (1)
162:12
favorable (1)
126:21
features (1)
81:15
February (4)
1:15 2:2 201:21
312:20
fed (6)
39:13 48:13 51:18
107:2 139:22
151:20
federal (2)
44:21 213:16
feed (7)
47:13 48:18 57:25
67:22 146:24 147:8
232:24
feel (5)
9:16 120:3,9 225:7
232:14

**feeling (2)**
149:13 281:22
**felt (12)**
14:10 60:16 120:2
121:21 122:23
135:14 136:5
168:22 231:18
232:4,6,17
**fenced (2)**
271:4 272:15
**FID (20)**
123:13 138:12 139:2
140:2,8 141:7,12,16
150:17 159:14,15
163:10 170:16
174:3 175:5 180:6
181:10 207:19,24
219:11
**fifth (3)**
129:13 201:22,23
**fighting (2)**
32:9,10
**figure (4)**
171:16 174:11 287:3
287:18
**file (3)**
108:24 180:24 250:7
**filed (9)**
88:4 91:9,12 109:8
111:6 199:24 200:2
200:9 222:25
**filing (6)**
42:10,16 43:2 45:12
79:10 241:16
**filings (1)**
44:16
**fill (1)**
48:2
**filled (2)**
48:4 58:5
**final (21)**
64:12 128:5 129:16
132:8 149:5 159:3
162:16 167:15
168:14 172:3 173:7
178:15,22 188:21
190:11 191:21
192:6,12 194:21
195:10 265:6
**finally (3)**
174:12 176:9 291:5
**finance (1)**
20:17
**financial (22)**
13:2 20:13 48:13 72:8
72:11,15,21 74:10
75:8 78:8,25 88:22
90:11,17 91:14
107:23 110:19

112:17 142:17
159:11,12 238:20
**Financials (1)**
60:21
**find (14)**
100:23 121:17 156:18
177:3 208:15,22
221:21 266:17
268:15 280:23
282:2 287:8 304:20
306:12
**finding (1)**
165:17
**fine (4)**
110:5 112:3 130:16
219:24
**fine-toothed (1)**
182:25
**finish (4)**
7:6 258:2 259:25
260:6
**finished (3)**
57:4 179:25 258:4
**FINRA (35)**
36:2 42:10,12 79:22
201:15 231:14,15
239:14,15 240:4,8
240:16 241:22
242:9,15,20,25
243:5,8,14,15,25
245:16 246:5 247:4
248:3 249:7,23
250:2 251:11
258:16
**firm (10)**
6:3 13:5 14:9 21:12
33:17 80:8,14 81:21
164:21 228:6
**firms (6)**
12:18 13:4 20:11
33:11 224:4 281:7
**firm's (1)**
227:25
**first (45)**
5:20 15:6 23:21 45:4
46:13 54:6 57:2
59:23 74:18 85:7
94:25 95:8 98:3
99:6,22 104:16
117:10,25 122:12
139:3 148:15
154:14 157:22
169:6 179:5 187:7
188:6 202:9 208:7
209:5 215:25 221:4
224:14 226:25
227:15 234:13
243:19 244:6

259:24 265:8 287:3
288:7 289:6 293:6
298:4
**firsthand (1)**
102:20
**first-hand (1)**
296:7
**Fitzgerald (2)**
89:11,16
**five (13)**
58:10 96:6,20 97:3
115:10 129:12
211:25 212:2
223:23 230:5
258:23 280:6
304:11
**five-minute (1)**
229:21
**five-year (1)**
43:12
**fixed (6)**
22:13 37:5 54:9 55:17
174:19 288:6
**fixed-income (20)**
21:24 23:8 37:8 53:19
53:25 54:5,17,24
57:22 59:15 70:13
81:5,6,17 82:3,18
86:16 104:5 137:20
144:22
**fixes (3)**
36:9,10 179:13
**Flamming (22)**
168:8,11,12,13,15
169:7,25 170:5,14
171:20 284:4,8
287:19 294:10,11
295:7,13,15,23,23
296:9,13
**Flamming's (1)**
295:20
**Flemming (4)**
131:7,7,8,9
**FLEXNER (1)**
3:9
**flip (2)**
223:2 305:8
**flippant (1)**
268:19
**flow (1)**
62:4
**flows (1)**
62:7
**fluid (1)**
80:9
**flying (2)**
136:6 169:12
**focus (10)**
110:11,15 112:9,13

195:2,7,16 198:9
250:6 261:21
**focused (3)**
65:6 152:22 213:3
**Focusing (1)**
83:21
**follow (1)**
117:23
**following (6)**
18:24 176:4 186:18
291:4 311:4,5
**follows (1)**
5:22
**follow-up (1)**
297:5
**footnote (5)**
230:13 241:24 242:3
251:13 253:10
**forecasts (3)**
120:6,7,8
**foregoing (1)**
310:14
**foreign (2)**
154:19,19
**forgot (1)**
157:24
**form (27)**
19:2,18 26:6 40:21
46:8 57:15 62:2
68:23 75:23 78:15
79:20 93:17 107:4
134:6 142:7 152:6
171:2 183:14
213:17 220:4
244:16 250:20
258:20 260:4
266:16 277:21
308:6
**formal (2)**
125:9 243:20
**format (1)**
48:16
**formation (1)**
43:15
**former (1)**
131:9
**formerly (1)**
219:16
**forming (1)**
203:7
**formula (24)**
21:8 44:6 148:13
153:8 170:24
185:21 215:2,8
217:7 218:23 236:8
239:12 242:6 243:5
252:6 261:11 262:3
263:21,25 271:19
271:25 273:3

297:13,15
**formulation (2)**
43:12 233:9
**forth (1)**
312:11
**Forty-two (1)**
191:12
**Forum (3)**
9:4,7,19
**forward (2)**
83:13 90:17
**found (9)**
36:11 144:7 155:5,6
178:2 249:16
262:16 284:9
303:11
**foundational (2)**
194:9 197:4
**founding (1)**
70:13
**four (11)**
6:25 17:22 89:25,25
127:14 129:12
156:17 183:4 190:4
263:5 303:15
**frame (9)**
58:21 100:15 101:16
156:18 182:24
188:6 206:2 233:13
238:11
**frames (1)**
205:23
**framework (1)**
227:4
**frank (1)**
200:16
**frankly (1)**
57:8
**free (5)**
9:16 64:15,17 216:2,8
**Friday (10)**
150:2 200:2 214:21
214:23 215:3,10
269:22 285:20
288:2,12
**front (11)**
6:19 13:11 17:2
191:10 196:22
202:17 218:6
230:11 267:17,21
282:10
**frozen (3)**
140:18 141:20 174:6
**FSA (2)**
34:19 35:25
**full (7)**
157:25 158:3,4,8,9
218:12 238:7
**fully (1)**

226:18
**fun (1)**
32:12
**function (8)**
8:2 27:8 64:2 75:17
78:11 79:16 82:14
134:19
**functional (1)**
18:18
**functions (2)**
18:17 154:23
**fund (5)**
14:3 25:16 120:4
289:9,11
**fundamental (1)**
15:9
**funding (4)**
119:16 120:6 123:2
123:10
**funds (22)**
27:10,11,18,19,20
121:4,17 122:22
154:20 224:5,7
225:22 228:16,19
228:19,24,25
229:14,14 246:22
246:24 296:6
**further (10)**
205:21,25 275:15,20
277:2,5 308:15,21
310:9 312:15
**futures (1)**
236:22

_____
G
**gained (2)**
30:6 80:19
**GAO (3)**
90:4,20 91:3
**gather (1)**
97:18
**general (20)**
44:23 45:21 50:8 68:9
74:21 75:13 77:9
119:14 120:23
121:14 129:10
133:24 144:10
152:16 155:22
159:24 173:19
228:7 231:8 242:17
**generally (5)**
143:19 163:16 170:18
256:16 262:5
**generate (1)**
59:21
**generated (2)**
36:4 60:12
**generation (1)**
93:20

**gentleman (13)**
40:8 41:22 45:2,3,10
46:11,16,24 57:18
69:15 71:4 73:11
107:20
**gentleman's (3)**
46:12 47:15 57:17
**gentlemen (8)**
52:9 95:21 104:18,24
105:2 116:11,19
248:14
**germane (3)**
90:9 109:18 111:16
**getting (13)**
42:22 51:2 56:20,21
64:24 120:4 121:20
122:2,15 146:7
233:17 257:4
270:19
**give (17)**
24:16 41:13 52:16,17
56:23 96:5 110:6
112:4 118:7 119:9
150:22 166:17,18
190:9 208:17
226:16 281:21
**given (9)**
93:3 101:10 106:17
188:20 191:7
210:19 306:21
307:5 312:13
**giving (2)**
191:3 211:3
**glad (1)**
83:19
**glancing (1)**
270:16
**gleaned (1)**
99:18
**global (4)**
70:13 71:19 107:21
118:4
**go (66)**
20:24 22:20 26:13
33:23 34:14,15
43:20 44:21 48:17
55:21 57:23 62:12
72:14 76:8 80:13
88:8,15 92:15 98:9
99:6,7 102:15 104:8
106:8 108:11
122:16,18 124:4
128:18 129:9
149:20 156:8,8
182:8 204:2 206:22
207:15 219:21
221:5,22 222:18
224:15 226:9 233:5
236:12,14 242:18

243:9 248:21
253:10 256:6
262:12 264:16
275:8 278:24
279:17,19,23,24
280:2 281:15 282:3
294:2 306:5 307:7
307:13
**Godinho (7)**
95:24 96:16,17
113:22 167:23
172:22 285:5
**goes (7)**
8:6 9:22 40:18 62:4
74:12 228:6 254:10
**going (50)**
7:3,8 19:7 28:9,21
33:7 41:13 44:8
47:22 49:10 58:2,9
63:10,13 66:3,7,19
82:19 83:13,15
90:17 121:10,12
130:17 134:23
140:20,22 142:20
169:13,15,16
174:12 182:25
183:7 220:6 221:12
226:8 235:7 240:20
242:15 262:17
279:14,16,20
281:10 286:8 288:8
299:7 300:18
302:17
**good (33)**
5:25 49:5 56:19 58:9
66:5 77:17,20 79:5
79:5 142:9,10,15
143:10 150:22
151:22,24 152:4
153:3,7,11 186:5,8
186:15 208:8
209:18,20,24
210:12 229:21
230:8 252:25
270:19 283:8
**gotten (1)**
176:10
**Gottlieb (2)**
4:4 131:19
**government (4)**
12:19 13:4 88:2,6
**Governor (4)**
45:3,4,8,9
**great (1)**
286:20
**Greenwich (2)**
37:4,8
**Gregolia (1)**
300:21

**group (41)**
8:24 12:12,13 19:4,12
20:3,11,12,13,14,20
21:3,6 22:13 25:17
40:7,7 50:5 62:14
62:24 63:3 64:4,18
73:24 74:13 76:7,22
77:2 78:25 79:9
113:24 119:15
133:7 143:20,22
159:12,13 231:16
243:22 286:14
292:3
**groups (1)**
131:22
**grow (2)**
71:18 81:12
**GSI (1)**
88:7
**guarantee (7)**
52:2 228:19,25 229:7
229:11,14,15
**guaranteed (1)**
231:15
**guess (8)**
115:16 130:5 144:6
157:6 164:20 196:4
296:20 309:13
**G-O-D-H-N (1)**
96:18
**G-O-D-I-N-H-O (1)**
96:18
**Générale (6)**
21:19 30:8 43:10 44:5
44:10 75:12

_____
H
**H (1)**
313:8
**Haley (10)**
116:20 130:20 160:8
160:9,11,16 161:4
161:14,18 168:3
**half (2)**
160:22 190:7
**Hamilton (1)**
4:4
**hand (1)**
312:20
**handed (3)**
6:6 222:23 269:19
**handle (4)**
48:10 55:21 61:16
67:13
**handled (2)**
301:12,17
**handling (1)**
50:7

**hands (1)**
173:13
**handwriting (2)**
129:7 285:11
**handwritten (1)**
285:9
**handy (1)**
6:18
**happen (6)**
19:22 90:17 117:9
172:15 226:13
300:17
**happened (13)**
40:7 50:13 118:5
137:12 148:11,17
173:17 174:8 177:4
229:5 260:23 272:3
281:16
**happening (1)**
279:22
**happens (1)**
281:3
**happy (6)**
7:15 120:22 131:22
267:9 274:9 306:3
**hard (5)**
7:9 79:25 108:12
**Harris (1)**
4:5
**hat (1)**
305:11
**hate (1)**
83:20
**hazard (2)**
115:15 296:20
**head (18)**
32:2,14 40:9,11 44:23
44:25 45:14,15,16
46:12 47:14 61:6
62:24 63:2 85:24
247:13 298:7
300:20
**headed (3)**
191:15 211:24 227:16
**headquarters (1)**
130:4
**hear (1)**
206:12
**heard (12)**
28:4 32:17 158:2
228:15,18,20,24
241:20 256:22,24
257:16 287:22
**Heather (3)**
3:14 117:15 131:18
**heavily (1)**
179:9
**hedge (2)**

27:10,11
**held (14)**
2:6 8:11,14 26:2
113:21 126:2 127:5
128:20 131:21
146:10 151:14
251:16 290:4 306:7
**help (7)**
65:2 69:24 71:8 101:5
201:4 220:7 262:7
**helped (7)**
21:19,23 22:10,11
32:19 205:11 308:8
**helpful (7)**
7:5 17:6 73:22 107:5
110:7 112:5 209:3
**helping (1)**
271:3
**helps (1)**
9:14
**hereinbefore (1)**
312:11
**hereunto (1)**
312:19
**high (3)**
51:11 135:12 290:10
**higher (1)**
253:7
**highlight (1)**
203:14
**highly (9)**
1:1,12 2:1 3:1 4:1 5:1
90:9 251:25 252:5
**high-level (1)**
14:25
**hilarious (1)**
34:12
**hired (2)**
69:16,24
**hold (4)**
8:8 146:5 303:16
309:4
**holder (1)**
25:25
**holding (4)**
88:17 121:9 182:5
257:2
**HOLDINGS (1)**
1:8
**holiday (2)**
100:17 146:6
**home (1)**
226:9
**hope (1)**
233:21
**hoped (1)**
233:16
**hoping (2)**

233:11 234:21
**hour (9)**
58:9 114:5,13 160:17
160:22,24 161:2
173:5 190:8
**hours (5)**
32:25 114:21 115:2,9
115:21
**hour-and-a-half (1)**
160:18
**house (1)**
16:6
**houses (1)**
236:23
**HR (1)**
29:24
**Hubbard (2)**
3:15 6:4
**huge (1)**
78:20
**Hughes (2)**
3:15 6:3
**Hum (1)**
306:25
**hundred (1)**
81:22
**hypothetical (1)**
279:12

_____

**I**

**ICI (5)**
55:10,11,11,13 72:3
**ID (1)**
163:25
**idea (3)**
180:22 185:4 279:22
**identification (10)**
5:3,5,7,9,11,13,15,17
222:21 269:17
**identified (18)**
52:24 54:19,25
122:15 133:21
137:2 143:20,24
163:25 164:15
180:5 184:15
232:20 236:5 265:3
265:22 266:13,23
**identify (3)**
6:7 104:12 237:9
**identifying (3)**
21:25 22:2 59:13
**ID's (1)**
164:2
**Illinois (1)**
71:13
**imagine (1)**
32:11
**immediately (2)**

279:4 300:14
**impact (9)**
177:19,23 207:5,6,7
261:3,24 281:9
282:7
**impacted (1)**
151:19
**implement (1)**
80:3
**implementation (4)**
51:8 70:19 80:4
309:18
**implemented (3)**
76:4 82:20 179:14
**implementing (1)**
78:7
**implied (1)**
105:18
**important (11)**
15:11,17 48:20,24
77:10 81:13 91:7
106:23 235:10
270:12 280:19
**imposes (1)**
224:4
**improper (2)**
163:13,17
**improperly (4)**
124:6 143:13 164:23
210:6
**incident (1)**
144:17
**include (11)**
13:22 37:21 63:25
92:8 97:15 98:17
237:7 259:19 261:2
275:4 288:22
**included (22)**
14:2 22:12 53:12
58:25 60:3 110:15
112:13 148:21
152:11 159:7
181:20,22 197:13
234:12 250:6
259:18 261:11
272:11 274:19,21
288:23 308:3
**includes (1)**
93:5
**including (10)**
33:15 35:4 43:23 51:8
59:3 84:14 115:3
255:9 259:15
271:13
**income (5)**
22:13 37:5 54:9 55:17
288:6
**incorporating (1)**
19:5

**incorrect (1)**
155:18
**incorrectly (4)**
49:22,23 235:14
260:20
**increase (20)**
184:17,19 218:18,22
219:7 222:4 236:8,9
237:4 253:3 254:4,6
263:25 274:25
275:3,15,20 277:4
278:13 297:15
**increased (2)**
273:9,16
**increasing (1)**
218:23
**incredibly (1)**
262:11
**independent (2)**
106:19 309:9
**independently (11)**
55:12 72:20 73:6
93:24 100:6,10
101:15 120:15
121:6 237:24 271:6
**indication (1)**
174:25
**indicator (1)**
42:6
**indicators (3)**
309:22,24,25
**individual (1)**
132:5
**individuals (12)**
51:12 82:13 96:6,20
189:3,15 192:25
193:11 198:23
232:9 241:13
244:22
**individual's (1)**
293:25
**industry (5)**
35:15 136:23 215:4,8
238:21
**inefficiencies (1)**
216:25
**influence (1)**
32:10
**information (41)**
47:20 62:7 97:18
99:18 104:3,4 106:8
117:17 119:10,12
120:4 149:3 156:21
161:5 162:15
164:22 167:17
173:6 178:21,25
189:21 190:10,17
193:14 204:25
208:10 211:18

222:17 233:12
234:23 238:4
241:14 249:5,6
270:14 273:24
274:4,9,10 292:20
307:3
**informed (1)**
242:15
**initial (7)**
119:5 187:24 190:5
231:6 271:10 287:4
306:18
**initially (5)**
41:22 78:7 246:9
286:8 292:16
**input (2)**
62:18 64:16
**inquiring (4)**
109:15 110:2 111:13
111:24
**insolvency (5)**
120:25 126:6 127:2
134:5,5
**instance (14)**
33:21 75:12 79:22
144:10 157:17
198:8 210:7 220:11
229:12,17 235:13
235:16 252:18
308:12
**instances (5)**
25:7 76:2 208:18
210:17 222:15
**instantiated (1)**
164:5
**institution (1)**
167:5
**institutional (3)**
81:16 257:5,9
**instruct (1)**
99:15
**instructing (1)**
97:24
**instruction (3)**
99:2,3,5
**instructions (3)**
49:22 52:17 289:20
**instruments (4)**
39:13 137:20 144:23
145:5
**insure (9)**
19:5 20:3 47:3 72:10
78:21 179:7 224:8
225:22 226:18
**insured (1)**
38:12
**insures (1)**
74:10
**insuring (9)**

25:24 72:14 75:3,19
78:18 79:7 87:10
110:23 112:21
**integrate (2)**
22:22 34:25
**integrated (4)**
21:22 72:7,8,21
**integrating (1)**
23:7
**integration (5)**
31:15 43:16 70:17
81:4 83:9
**integrity (2)**
168:23 241:8
**intended (6)**
7:18 15:2 199:9
226:18 227:10
265:11
**intending (1)**
252:11
**interact (1)**
65:6
**interactions (1)**
149:14
**intercompany (2)**
303:17 304:7
**interest (2)**
16:14 227:16
**interested (6)**
277:11,20,24 278:14
286:23 312:18
**interesting (2)**
31:23 75:24
**interfacing (1)**
75:19
**interim (1)**
43:11
**intermediaries (1)**
81:21
**internal (6)**
22:5 32:9 52:13
137:10 243:24
244:24
**internally (1)**
287:22
**international (6)**
11:15 21:16 29:2,15
34:25 149:7
**interpret (2)**
79:14 224:18
**interpretation (7)**
18:7,10,12 19:16
79:16 293:9 308:18
**interpretations (3)**
79:24 80:3,14
**interpreting (1)**
18:13
**interrupt (1)**

138:14
**interrupting (2)**
113:19 258:6
**interview (24)**
33:20,24 64:7 116:4
118:12 241:18,23
246:10 268:15
289:22,25 290:17
290:19 292:22,23
297:2 299:14,17
300:9 303:21,25
305:7,23,24
**interviewed (10)**
116:16,19 117:2,3,4
188:24 193:12
197:17 198:14
270:21
**interviewee (5)**
160:11 171:24 178:16
292:19 294:8
**interviewees (12)**
150:12 158:23,24
165:9 168:12 171:6
171:25 192:14,18
194:20 197:5,9
**interviewing (3)**
132:5 193:7 198:22
**interviews (22)**
58:25 115:25 117:24
129:5 131:21 146:6
171:10 188:20,25
199:12 230:25
241:2 242:13
268:20 282:16,17
293:20,22 296:8
300:12 305:20,22
**introduction (1)**
117:21
**inventor (1)**
82:16
**investigate (3)**
35:17 205:21,25
**investigation (3)**
157:7,9,10
**investigations (1)**
50:6
**investing (1)**
25:16
**investment (4)**
13:22 31:2 32:19
70:13
**investment-related ...**
13:25 16:21
**investor (1)**
25:20
**investors (1)**
257:5
**invited (1)**
32:6

**involve (2)**
51:16 295:3
**involved (31)**
9:21 11:19 21:13
22:15 24:15,20
25:22 35:3,7 50:5
66:10 70:16 72:5
77:23 81:21 88:15
91:2 120:12 122:21
123:4,19,20 124:24
125:14 165:17
168:25 170:3
174:15 176:20
231:4 287:19
**involves (1)**
15:9
**involving (2)**
24:21 35:13
**in-person (3)**
157:19 167:25 168:4
**irrelevant (3)**
109:14 111:12 194:8
**Irv (1)**
73:11
**ISDA (3)**
11:18,23 12:2
**issue (36)**
14:22 15:22 16:25
34:9 80:24 109:22
111:20 121:11
123:21 139:4
144:12 145:13
146:16 150:25
151:17,18 157:11
158:6 163:22 169:4
177:16 178:5,6
200:25 207:25
208:6,12 210:15,16
245:11 250:8
272:23,23 278:19
301:8,25
**issued (1)**
108:17
**issues (48)**
22:17 38:3 49:8 66:21
85:25 86:3 88:19
90:6 103:5 121:13
127:14 134:13
152:24 154:18
159:15,18 160:4
161:20 162:17
163:6 166:8 169:3
170:15,21,22 174:4
175:6 184:15
202:14 204:16
207:9 210:14,18
218:13,17,20 219:5
219:6,9 222:3,8
233:14 239:2

240:22 250:21
296:16 297:20
307:15
**Italian (1)**
300:19
**Italy (1)**
117:7
**item (10)**
34:17 70:8 235:19
236:7 254:18
274:22,24 276:24
281:12,15
**items (16)**
34:17 36:12 89:25
90:2 173:16,24
211:13 217:9,12
222:5 234:17
236:15,21 237:9,15
237:16

---
**J**
---

**J (1)**
3:19
**Jamie (2)**
85:22 86:2
**January (18)**
6:13 23:24 95:6 115:8
117:19 154:10
157:22 159:4 161:6
162:16 172:16
178:22 188:6
191:21 199:22
201:19 269:22
271:15
**Japan (1)**
32:20
**Japanese (2)**
51:7 52:9
**Jeanette (24)**
41:8 93:22 95:18 96:7
96:8 108:10 114:13
114:20 115:14
117:14 118:17
128:25 131:14
158:15 167:22
172:22 188:11
202:14 204:16
288:19 292:21
293:10 298:20
300:8
**Jeanette's (1)**
296:24
**jeopardy (1)**
180:12
**Jin (19)**
41:8 93:23 95:18 96:7
109:8 111:6 114:13
117:14 118:17
131:14 158:15

167:22 172:22
188:11 202:15
204:17,20 205:8,14
**Jin's (2)**
107:8 288:19
**job (7)**
1:19 82:17 113:5
122:8 126:15 217:5
248:19
**Joe (1)**
273:2
**Joel (4)**
117:5 178:16 231:2
300:12
**John (6)**
116:20,22,23 130:20
130:22 160:8
**Johns (1)**
116:20
**joint (2)**
10:17 83:16
**Jones (2)**
2:7 3:3
**JPMorgan (15)**
30:16 65:9,10,19
67:12 68:22 69:8,12
70:6 135:23 180:16
181:7,8 283:22,23
**junior (1)**
96:2
**J-E-A-N-E-T-T-E (1)**
96:8
**J-I-N (2)**
96:9,9

---
**K**
---

**K (1)**
3:7
**keep (6)**
92:17,22,24 126:21
181:13 302:17
**keeping (1)**
262:3
**KELLY (1)**
3:7
**Kendall (3)**
268:2 271:12 272:25
**KEOP (3)**
42:3,10 309:6
**kept (16)**
45:8 49:5 109:4 133:9
137:21 153:22
181:7 208:2 209:17
210:11 252:17,25
254:19 263:13
304:4 305:10
**key (5)**
15:21 42:5 90:12

282:5 309:21
**kind (15)**
40:10 56:16 60:12
69:16 121:8 136:16
142:14 156:13,18
164:8 165:8 173:21
193:9 213:9 268:18
**kinds (1)**
65:5 165:18 177:3
**King (8)**
3:14 117:15 118:18
118:22 131:18
172:23 188:12
204:14
**knew (15)**
32:21,21 47:25 63:14
124:5 141:15
144:17 145:10
164:17,20 167:6
177:16 281:9,22
301:25
**know (145)**
7:2,20 27:23 29:22
33:5 39:4 41:3 42:7
42:21 43:8 47:15
53:3 55:4 62:5
64:18 65:25 69:5
70:7 72:9 79:21
81:18 93:6 97:9
101:4 103:2 109:8
110:17 111:6
112:15 114:20
115:9 126:18,24
127:20 129:2
131:24 133:16
134:23 139:4,10,15
139:25 140:21
141:2,21,23 144:11
144:12,13,19 149:9
154:18 155:3,14
159:21 162:24
165:21 167:18
174:3,14 186:3,10
186:21 195:15,18
199:7 210:21
213:23 214:5
215:18 216:12,13
216:24 221:6,15,20
224:14 225:15
226:9 227:2 232:12
237:6 238:25 243:6
244:21 245:2,3,25
246:2,19,21 247:10
247:12,17,24
249:22 250:10
254:18 255:21,23
261:23 266:7
279:15,25 280:2
281:11 283:3,18

285:4,11 287:7,21
288:20 289:10,15
289:22 290:18
291:3,16,18 292:11
292:19 293:6,10,11
295:9 296:17 297:2
297:17 298:13,17
298:22 299:14
300:9,18 301:15,18
302:4,7 303:3,18
304:18 305:10,25
308:22
**knowing (3)**
277:20,24 278:15
**knowledgable (1)**
153:25
**knowledge (25)**
40:24 89:20,22 91:25
92:5 102:20 125:23
140:7 141:11
143:13 157:10,12
163:8 165:4 172:2
176:22 177:6
182:19 188:23
189:6 192:2,24
193:18 270:24
272:6
**knowledgeable (2)**
152:19 153:24
**known (7)**
42:5 220:9,14,17,23
250:22,23

———————
**L**

**L (2)**
111:2 112:24
**labels (1)**
15:2
**Lambert (1)**
87:19
**language (1)**
11:20
**large (17)**
35:13 37:10 44:15
57:19 67:11 101:11
106:22 110:24
112:22 122:17
169:15 234:16
254:21 255:4
256:23 257:8
262:15
**LaSalle (1)**
71:14
**Lastly (1)**
87:15
**last-minute (1)**
121:8
**late (6)**
136:15 154:10 165:10

180:14 187:24
251:2
**Latin (2)**
131:25 283:8
**launch (8)**
51:9 65:20 66:2,7,11
69:17,22,24
**law (4)**
6:3 12:18 13:4 225:4
**lawyer (2)**
45:15 221:14
**LBHI (2)**
182:5 183:7
**LBI (59)**
28:3 87:20 105:3
126:2 127:2 142:24
147:13,18 149:15
149:18 157:3 159:9
161:8 175:12,16
182:4 195:22
209:11 215:14
219:14,17 220:23
230:19,23 233:9
236:21 238:15
239:13 240:3 241:6
241:15 247:6
249:16 253:12,17
255:8 256:10
257:10,22 258:11
259:12 260:10,14
261:5 264:18
265:22 267:4,14
268:4 269:7 271:18
272:16 273:17
291:13 295:3
303:16 304:4
**LBIE (27)**
121:11 126:3 127:5
134:9,12,15 146:11
149:15 151:14
152:2,3,9 153:2,6
175:11,16 209:10
209:12,18 219:14
219:16 257:3
297:24,25 302:19
303:16 304:4
**LBIE's (1)**
156:23
**LBI's (12)**
107:3 134:5 201:9
219:15 234:9
262:22 264:10,19
270:22 271:24
274:17 290:24
**lead (6)**
29:25 31:14 51:5
53:17 62:5 70:11
**leading (7)**

43:11 120:24 134:4
152:10 156:24
241:15 259:14
**learn (1)**
140:14
**learned (3)**
141:6,21 167:12
**leave (8)**
56:19 78:5 125:6
148:19 254:14
278:23 279:2
291:15
**leaves (1)**
254:9
**leaving (10)**
213:9 233:3 242:19
253:17 255:14
257:7,9 261:25
263:19 266:20
**LECG (15)**
12:7,9,14,16,24 95:17
96:21,22,24 97:16
127:25 128:2
131:13 172:21
282:15
**led (6)**
40:8 114:22 115:11
283:22
**left (15)**
9:12 253:11,21 254:2
255:24 256:23
257:15,20 258:11
260:10 290:10
291:9,13,17,19
**legacy (2)**
161:14 162:21
**legal (11)**
12:11,12 23:10 29:5
83:12 86:12 121:4
213:6 221:15
224:19 225:3
**Legotte (13)**
116:25 130:24 162:6
162:7,8,14,21 163:5
163:17 164:22
165:22 167:19,24
**Lehman (72)**
1:7 3:4 28:12 31:9
50:11,12,16,19
84:16 88:16 101:9
102:15 103:2,11,13
106:18 118:4
119:17 121:5
124:25 125:5
126:15,25 130:3
131:9 133:16 134:3
134:3 135:8 148:20
149:25 150:15
155:16 161:14,23

161:25 162:21,25
165:12,15 166:20
166:21 167:6 174:5
178:2,4 184:9
195:22 197:20
208:7 209:8 210:12
220:14,17 238:7
246:2 247:6,7,9
250:15 257:6
263:12 265:13
266:8,9,12,22
278:10 280:17
288:8 300:20 310:5
**Lehman's (6)**
134:4 185:21 250:24
257:4 285:20 288:2
**lending (10)**
16:16 28:16 63:3
66:22 67:5,9,15,15
216:19 237:19
**length (1)**
183:5
**lengthy (1)**
213:17
**Lenny (3)**
116:24 130:24 162:6
**lesser (1)**
207:6
**letter (15)**
174:24 175:25 180:13
181:17,18,24 182:2
182:13,20,22
183:16,20,22 210:6
210:8
**letters (1)**
182:9
**let's (7)**
18:9 41:19 99:6,7,9
276:2,14
**level (1)**
15:10
**leverage (1)**
71:24
**Li (4)**
96:3,19,19 114:18
**liabilities (1)**
238:25
**license (5)**
8:14 44:17 59:17,17
68:6
**licenses (3)**
8:9,11 45:12
**lien (5)**
174:24 175:25 180:12
210:6,8
**liked (2)**
211:12,19
**limit (1)**
173:21

limited (4)
43:23 159:20 171:25
268:14
line (15)
47:25 80:11 202:20
206:18 225:5
226:24 283:13
285:19 289:6 292:2
294:24 298:11
299:7,9 311:6
lines (7)
13:17 32:3 83:22
223:23 284:19
285:22 298:5
link (1)
67:5
linked (1)
71:14
liquidated (1)
178:2
liquidation (25)
50:12 88:5,8,11 107:3
166:22 180:24
221:17,18 224:9
225:13,24 226:13
226:22 227:25
236:7 255:9 256:12
256:20 257:25
258:12 261:7
290:24 302:5,6
list (16)
14:12,15,16,25 70:8
92:2,4,12,16 93:8
130:6 189:18,19
191:19 199:19
200:7
listed (21)
30:21 54:3 76:6 89:10
89:25 91:9,22,23
97:3 107:12 120:20
192:10 194:22
198:22 199:6,11,14
199:15 216:17
217:10,11
listen (1)
279:20
litigation (1)
6:5
little (19)
18:8 23:19 31:20
38:23 42:24 49:13
60:23 70:4,24 78:3
108:8,11 200:15
206:4 207:21 230:4
230:6 247:25 309:5
live (5)
73:19 85:6 86:9 87:7
89:17
LiveNote (1)

2:10
LLP (4)
2:7 3:3,9,15
loan (4)
10:23 47:22 63:2
104:3
loans (2)
11:20,21
loan-to-loan (1)
11:13
local (1)
21:24
located (1)
71:13
location (16)
79:5 142:9,10,15
151:22,24 152:4
153:3,7,11 186:5,8
186:16 209:20,24
252:18
locations (6)
49:6 77:17,20 143:10
208:8 252:25
locked (1)
276:16
lockup (10)
274:24 275:4,9,13,14
276:5,12,13,20
281:18
London (1)
33:8
long (7)
32:17 160:15,19
173:2 188:7 190:6
208:8
longer (13)
36:13 101:13 123:23
134:15 135:25
136:3 139:14
143:10 151:22
180:24,25 181:8
309:5
look (45)
7:25 9:15 15:18 17:23
18:14,17,19 33:24
34:16 35:23 39:13
48:21,25 62:3 84:4
86:15 90:10 94:18
116:21 128:10
156:5 158:16
181:12 202:20
203:6 208:9 210:16
211:17 219:13,22
223:7 227:18
233:21,22 236:10
236:20 262:23,24
269:24 272:8 274:6
294:7 305:25 306:3
306:10

looked (20)
36:3,8 38:2,7,9,10,11
39:8,11,15 40:23
41:4 85:18 100:5
199:2 200:17,20
203:10 234:11
253:4
looking (30)
22:23 31:12 38:4 41:5
47:22 54:17 57:22
60:9 66:12 74:17
89:24 93:7 98:8
118:9 121:3,22
125:2,11 146:2
200:23 202:24
239:20 260:25
273:24 282:21
291:10 293:18,22
301:2 306:8
looks (1)
298:8
loop (4)
144:6 166:11,13
296:7
lot (30)
14:18 20:6 22:18
29:18 50:12,15 57:8
57:21 63:20 67:6
81:20 85:5 88:14
90:6 94:7 120:20
133:20 134:8,21,22
135:7,10,13 152:24
159:20 164:4
211:19 237:19
272:3 307:12
lots (9)
32:9 50:24 79:6 85:8
91:2 96:24 101:2
126:17 257:13
Lynch (2)
31:8 45:7
L-E-G-O-T-T-E (1)
131:2
L-I (1)
96:19

————————
M
————————
Macchiardi (2)
300:24,25
Macchiaroli (2)
301:9,20
Madison (1)
3:23
magnitude (2)
74:19 178:6
maintain (5)
77:20 92:22 241:8,9
263:15
maintained (15)

25:17 37:3 39:11,16
55:24 78:19 139:6
140:23 147:24
149:20 162:19
175:5 209:11,12
219:14
maintaining (3)
14:23 25:11 126:10
major (12)
14:21,22 32:3 62:25
63:3 66:21 83:17
103:5 162:17
176:18,25 262:10
majority (4)
29:20 54:2 108:17
120:16
making (15)
15:25 22:3 23:12
25:18 51:24 64:8,21
72:5 77:8,16 78:25
81:22 132:22 241:7
295:24
manageable (1)
120:11
managed (2)
51:11 82:13
management (18)
13:23,23 14:22 15:18
15:19 20:22 22:5
24:14 29:18 31:2
82:14 86:20 93:19
93:24 94:3 113:8
156:11 163:4
manager (14)
15:15 40:10,15 41:24
43:14 45:21 95:20
110:9,18,21 112:7
112:16,19 113:23
managing (6)
12:6,23 29:17 113:10
113:11 119:17
mandate (4)
72:10 90:10 110:13
112:11
manner (1)
94:3
manually (1)
36:6
map (2)
52:3 61:19
margin (24)
17:23 28:16 62:24
63:14,16 66:24 67:4
67:4,7,14 162:19
163:3,23 164:15,18
226:19 228:16
237:18 252:19
253:3 254:14,15
274:20 276:24

margining (1)
62:25
margins (6)
16:16,16 163:3
164:21 236:22
237:6
mark (1)
269:15
marked (15)
5:2,4,6,8,10,12,14,16
202:18 222:20,24
269:16,20 300:5
305:6
market (5)
16:25,25 54:5 63:19
154:19
marketing (2)
14:11 15:2
markets (3)
22:25 31:16 53:19
marks (1)
203:24
marriage (1)
312:17
mass (1)
257:14
material (4)
156:19 189:16 203:22
211:19
materiality (1)
280:21
materially (2)
218:21 281:23
materials (4)
193:8 196:12 205:22
206:2,25 207:12
mathematician (1)
72:25
mathematician's (1)
17:24
matter (16)
6:16 19:15,19,23 46:6
46:17,19 57:13
61:22 89:11,12 95:2
205:9 272:2,17
312:18
matters (2)
89:11,17
maximum (5)
251:14,20 252:12,19
252:22
McIsaac (38)
6:10 127:9 139:5
140:2,9 143:2
146:20 153:15
160:6 163:7 165:24
170:15,23 173:16
177:14 180:5 184:2
186:4,15 206:23

207:3,14 208:2
210:5,17,24 212:11
212:19 214:8,25
215:20 217:15,23
218:17,19 219:5
220:21 222:12
**McIsaac's (29)**
48:25 49:12 99:23,25
125:19 141:8 145:9
146:11 150:18
151:2 159:23
161:20,22 170:21
173:24 175:7,10
179:10 199:22
202:9 205:10,18,21
205:25 211:17,22
213:3 221:6 222:8
**McIssac (20)**
234:7,12 235:13
250:22 261:2,15
264:9,16 265:3,23
266:23 267:3
269:10 273:15
286:24 297:21,23
307:25 308:3
313:10
**McIssac's (10)**
235:25 249:2 250:17
255:2 261:18
266:15 267:11,18
269:2 270:18
**McLaughlin (2)**
268:8 271:12
**mean (25)**
10:13 18:12 26:22
28:5 33:10 106:10
108:9 127:24
128:22 136:24
138:14 159:12
190:21 197:18
205:15 209:11
232:18 238:18
240:6 242:12
266:12 268:18
277:25 279:13
295:15
**meaning (2)**
93:20 230:19
**means (8)**
18:15 35:16 106:7
136:23,25 137:4
231:21 232:19
**meant (9)**
136:21 138:4,8
140:19 186:3
258:22 259:5,7
301:18
**meet (11)**
30:4 68:25 121:15

131:21 150:8
158:22 160:8,15
168:11 224:9
225:23
**meeting (30)**
18:20 32:6 104:16
116:16 118:2,5
129:17,20,22 130:9
130:14 131:12
132:4 146:16
148:25 157:19
158:20 160:19,23
160:25 167:19,25
168:5,16 171:7,19
171:24 187:22
272:25 293:16
**meetings (16)**
115:19 131:17 132:3
158:10 188:2
190:23 191:2,5,8
192:14,22 193:3
282:24 283:2 285:3
285:14
**member (12)**
8:17,23 9:6,18 10:23
11:11,14,17,18 32:7
44:11,12
**members (7)**
11:9 64:7 114:9,12
128:9 282:15
299:22
**memo (16)**
125:17 145:8 151:9
165:24 177:13,23
183:25 184:15
265:23 266:6,25
267:2 268:25 269:9
272:21 273:14
**memorandum (4)**
184:21 264:17,18
267:4
**memorializing (1)**
287:12
**memory (2)**
91:15 193:4
**mention (3)**
141:2 189:8 256:7
**mentioned (48)**
28:13 30:12 32:15
35:10 41:24 42:13
69:21 81:3 95:20
105:13 121:2 123:6
124:15 125:12,16
132:23 133:10
134:7 136:10
137:13,21 140:11
140:16 155:10
156:6 174:4 179:18
182:4 186:24

206:22 222:8 227:2
231:3,13 232:9
243:19 247:2,22
255:13 274:8 282:2
288:10 291:9,16
297:20 309:7,10,21
**mentioning (3)**
189:11 287:16 304:4
**merged (2)**
84:8,9
**Merit (1)**
2:10
**Merrill (2)**
31:8 45:7
**met (15)**
6:2 47:4 60:10 69:2
116:17,24 148:22
158:19 168:8 171:6
187:14 192:25
204:9 271:8 294:11
**method (1)**
215:12
**methodology (2)**
59:11 60:12
**Mexicana (1)**
89:10
**middle (1)**
294:17
**midtown (1)**
84:17
**midway (1)**
302:9
**Mike (3)**
292:4 300:16,23
**millennium (1)**
65:16
**million (51)**
28:13 34:5,15 48:22
82:25 127:8 146:10
146:18,23 147:2,9
151:13 152:9
153:14 154:2
175:19 185:9,19
186:14,22 208:4,5
208:13,22 210:2,10
263:2,3,22 264:2
266:14,18,24 273:9
273:18,22 274:13
274:19 275:6,20
276:24 277:5
280:16 281:11
298:7,8 300:15
301:4 302:2 303:16
304:3
**millions (2)**
23:9 82:23
**mind (4)**
176:12 220:19,24
278:2

**mine (1)**
285:12
**minimum (3)**
262:19 263:17 275:7
**minority (1)**
29:6
**minus (1)**
238:25
**minutes (6)**
58:10 167:8 173:4
188:9 230:5 280:6
**miscategorization (1)**
166:5
**miscategorized (1)**
182:17
**mischaracterizes (1)**
215:25
**mischaracterizing (1)**
46:23
**miscode (1)**
302:24
**miscoded (2)**
156:16 182:4
**miscoding (3)**
156:19 177:8 303:11
**misrepresentation (1)**
216:8
**missing (1)**
196:12
**mistake (6)**
176:7 181:25 268:2,5
282:2,4
**mistitled (1)**
191:22
**misunderstood (2)**
56:8 276:13
**mock (5)**
84:18,18,19
**model (2)**
22:22 96:24
**moment (5)**
189:10 191:9 198:18
201:8 223:2
**moments (1)**
202:19
**Monday (2)**
197:21 304:23
**money (32)**
25:9 27:15,16,18 57:7
82:14 121:18
122:10,16,17,19
137:14 154:19
169:15 175:21
210:11 216:3,4,5,19
222:13,14 232:6
240:20 242:21,25
243:9 245:4 247:15
263:13 296:2

299:10
**monies (2)**
243:16 289:8
**monitor (3)**
94:6 163:23 164:21
**monitoring (3)**
16:15 107:18 156:15
**month (3)**
85:7 86:11 223:12
**monthly (3)**
32:5 156:7 250:6
**months (5)**
34:21 35:12 84:24
88:9 167:5
**mood (1)**
126:22
**morning (13)**
5:25 133:17 135:20
135:23 176:9 180:7
180:15,20 197:21
251:2 288:7,12
306:23
**mortgage-backed (3)**
10:21 82:8 83:5
**motion (2)**
200:10 222:25
**move (2)**
170:12 213:12
**moved (4)**
147:13,18 148:3
209:24
**movement (2)**
295:2,17
**movements (3)**
148:4 170:9 295:24
**moving (9)**
43:10 65:4 80:18
87:15 134:25 135:9
246:22,24 247:14
**MTS (23)**
103:25 120:15 132:11
132:12,25 133:9,22
134:14 137:21
139:7 143:22,24
144:20,23,24
145:17 147:24
149:11,22 152:21
157:24 158:7 170:8
**multiple (1)**
164:2
**multi-currency (2)**
153:21 154:18
**mutual (3)**
25:15 27:19,20

_____

**N**

_____

**N (3)**
3:2 4:2 313:3

**name (27)**
6:2 12:10 29:4 41:14
45:4,8 46:12 47:15
57:17 60:21 91:11
96:9,13 116:5
145:25 166:18,19
166:24 268:2,5,6
300:17,19,19,25
309:8,20
**named (9)**
40:8 41:23 45:3 52:8
73:11 95:22,23 96:3
98:14
**names (9)**
52:10 91:5 96:5,17
104:14 116:12
125:13 130:6
166:17
**narrower (1)**
38:24
**narrowing (1)**
17:6
**narrowly (1)**
40:18
**NASD (1)**
36:2
**NASDR (4)**
42:14,17 43:3 79:22
**National (1)**
31:17
**nature (1)**
50:3
**NatWest (11)**
22:25 33:4,6,8,20
35:10 36:23,25 37:9
39:6 43:4
**NatWest's (2)**
22:16 31:16
**NatWest/Bankers (1)**
38:5
**NBD (1)**
302:19
**nearly (1)**
76:16
**necessarily (14)**
27:7 64:12 80:12
102:23 106:3
202:20 225:4 236:2
253:17 254:8 268:6
275:8,22 281:24
**necessary (11)**
47:19 105:23 107:5,6
107:7 213:4 238:4,5
240:10 282:4
303:18
**need (16)**
7:19 48:15 94:18
96:18 101:24
106:24 205:23

206:3,13,17,25
207:12 209:12
210:8 259:24 305:8
**needed (9)**
52:15 56:24 101:4
103:7 104:17
121:18 122:19
208:9,10
**needs (2)**
30:4 120:7
**negative (1)**
260:15
**negotiating (1)**
34:2
**negotiations (1)**
36:14
**neighborhood (1)**
55:2
**Neil (2)**
3:19 6:3
**net (17)**
15:10 22:7 38:2 51:12
55:15 74:6 77:10,13
77:19,24 85:18
173:11 224:9
225:23 254:12
273:8 290:10
**network (1)**
82:9
**NEUFELDT (24)**
243:17 244:15 247:8
249:18,20 250:20
258:2,20 259:3,24
260:3 265:4,24
266:16 270:6
273:19 277:21
278:16 279:8
295:18 306:18,25
307:9 308:6
**Neuhardt (92)**
3:13 9:14 19:2,18
26:6,21 28:5 40:21
44:2 46:8,22 57:15
61:24 62:2 68:23
75:23 78:15 79:20
80:17 87:2,6 93:17
94:18,22 97:7,12,22
98:2 99:5,15 100:13
104:21,23 107:4
108:10 109:13,21
111:11,19 114:24
115:3 116:5 117:16
118:17,20 119:24
120:20 128:24
129:6,11 130:13
131:18 134:6 142:6
152:6 162:2,7,9
171:2,15 172:8,24
183:14 187:8

188:12 191:11
192:16 194:6,17
196:5,10,13,20,23
197:11 201:22
204:14,21 205:15
206:10,15 211:2,7
212:4,25 213:14
219:21 224:17,23
225:25 226:23
230:7
**Neuhardt's (1)**
205:5
**never (14)**
8:14 21:5 145:22
148:11 175:17
176:12,13 231:23
253:7 268:7,9 287:8
298:12 310:7
**new (54)**
1:3,14,14 2:7,8,11 3:6
3:6,18,18,24,24
21:24 22:13 51:8
53:24 56:3 61:6
67:14 70:13,19 71:7
71:19,20,21,23,23
72:2,7 79:23 81:25
83:4,15 116:16
118:2,6 129:18,21
129:22 148:25
157:19 158:20
241:5 268:23
281:13,25 282:24
293:17 294:12
311:2,3 312:3,5,8
**news (1)**
199:6
**Newsy (2)**
40:8 41:15
**nice (2)**
167:8,16
**night (2)**
32:24 148:17
**nights (1)**
231:10
**nine (2)**
35:12 55:2
**nonlinear (1)**
72:25
**non-Bankers (1)**
33:13
**non-customer (13)**
124:7 143:14 144:15
155:18 156:23
163:14 164:24
165:6 166:6 177:9
182:7,17 235:15
**non-customers (2)**
156:9 163:18
**non-financial (1)**

167:5
**normal (5)**
44:20 125:5 137:25
155:20 281:4
**normally (13)**
19:3,11,22 40:10
50:23 74:16 119:19
123:19,20,24
126:12 231:18
279:18
**Notary (3)**
2:11 310:21 312:7
**note (3)**
213:19 298:15,19
**noted (5)**
145:7 165:23 178:16
183:25 310:11
**notes (92)**
6:16 98:20 116:21
120:22 127:17,21
127:22 128:3,8,10
128:10,11,25 129:3
129:9,13 146:2
158:10,13,14,16,17
167:18,20,21,22,23
171:8,13 178:8
188:13 193:5
202:13,16,18,22
203:2,3,5,10,13,14
203:16,19,21,22
204:2 280:5 282:14
282:24 283:3
284:12,14,25 285:2
285:9,13 288:17,19
289:23 292:7,11,20
293:25 294:2 295:6
295:10 296:24
297:3 300:5,7,10
301:3 303:14,21
304:2 305:6,10,16
305:18,20,23 306:2
306:9,10,14,15,16
307:5,12,14,22
**notice (1)**
146:6
**noticed (1)**
307:11
**notified (1)**
283:14
**notify (1)**
174:5
**November (2)**
117:11 187:24
**novo (4)**
21:15,18 51:9 65:20
**number (61)**
15:24 21:14 23:5 27:3
27:3,12,23 28:2
30:24 34:7 35:3,12

41:20 48:2 82:25
83:14 100:21,22
102:5,19 106:17
122:9 124:13,24
154:11,12 156:4
171:12 182:6 183:8
206:23 207:3
210:14 221:13,14
231:24 233:3
234:16 237:13,21
242:18 252:14,15
252:20,23 253:5
256:23 257:8,19
263:7 273:25 287:4
290:7 291:22 294:6
296:22 297:20
298:10,25 303:15
304:11
**numbering (1)**
261:4
**numbers (27)**
17:21,22 18:4 20:4
48:4 55:22 62:17
64:13 65:2 73:3
74:3,3,10 76:15
121:20,20,22 122:2
122:2 138:9 231:15
231:19 232:5,13
254:22 256:7
304:15
**numerous (2)**
59:2 259:4
**N.W (1)**
3:11

---

**O**

**object (4)**
220:4 225:2,5 260:3
**objecting (2)**
142:7 277:23
**objection (48)**
19:2,18 26:6,21 40:21
46:8,22 57:15 61:24
62:2 68:23 75:23
78:15 79:20 93:17
107:4 109:25 110:6
111:23 112:4 134:6
152:6 162:2 171:2
183:14 192:16
194:6 204:21
213:15,17,18,19,20
226:24 227:7
243:17 244:15
247:8 249:18
250:20 258:20
259:3 265:4 266:16
277:21 279:8
295:18 308:6
**objectionable (1)**

278:3
**objections (1)**
278:16
**obligation (5)**
175:15,16 216:3,6
297:24
**obligations (2)**
73:13 224:4
**obliged (1)**
67:25
**observation (1)**
250:14
**observe (1)**
240:17
**observed (8)**
239:13,17 240:3,7,14
242:8 248:17
258:15
**observing (4)**
240:11 241:14 248:16
249:8
**obvious (1)**
138:8
**obviously (5)**
98:4 196:16 270:14
270:18 307:19
**OCC (4)**
219:18 274:20 276:25
280:16
**occasion (5)**
172:18,19 178:13,14
229:10
**occur (1)**
207:14
**occurred (11)**
176:14 185:2 207:3,4
207:14 220:9,14,18
220:22 221:9
222:12
**occurrence (1)**
249:22
**October (1)**
6:11
**odd (5)**
17:21,22 40:10 60:21
263:2
**offered (1)**
56:14
**offhand (1)**
306:2
**office (8)**
17:3 51:8 70:19 74:21
75:13 93:21 124:2
170:10
**officer (8)**
40:12 45:19 52:8,13
73:11 80:12 84:3
87:9

**offices (1)**
29:9
**offshore (2)**
70:18 108:19
**off-the-shelf (2)**
53:12 60:18
**oh (7)**
80:16 119:3 196:18
196:19,21 212:5
262:18
**okay (79)**
7:16,21 8:8 17:11
18:21 26:25 28:20
30:5,10,18 38:25
47:22 48:17 53:16
58:8 76:18 89:8
91:16 95:16 99:21
105:6 118:21
125:25 129:14,22
142:23 148:6,22
154:14 158:18
171:5,11 172:4
179:23 187:6
190:23 194:17
195:18 196:8,19,21
197:3 201:7 207:12
212:9,18 213:24
214:7,15 215:19
217:21,22 218:8
221:25 227:14
229:20 230:7
239:21 242:4
249:25 251:10
260:24 263:19
264:5 266:20
267:20 277:16
278:5 281:10
282:11 283:9
284:24,24 285:6
288:4 289:2 290:8
296:23 308:14
**old (2)**
130:3 195:24
**older (1)**
92:10
**once (13)**
52:22 73:20 74:11
83:11,14 85:5 152:2
153:10 200:14
214:22 241:20
278:18 295:25
**ones (15)**
33:15 40:24 41:5
60:16 63:10 106:21
154:4 208:17 211:5
219:10 250:23
257:6 259:21
282:18 283:4
**one-to-one (1)**

236:3
**online (3)**
79:24 92:23,24
**onus (1)**
77:15
**onwards (2)**
93:3,13
**oOo (1)**
310:12
**open (3)**
34:17,17 234:16
**opened (1)**
135:20
**operate (2)**
10:14,16
**operating (18)**
27:8 36:14 45:19 52:8
68:6 73:10 83:16
84:21 85:8 88:9
121:6 132:14
168:20 169:6,8
173:20 179:11
231:16
**operation (18)**
51:10,20,21 65:21,23
66:8,16,21 67:6
68:6,16 69:9,10,15
71:20,23 79:7 241:9
**operational (46)**
14:16 20:14 24:13
36:3,7 39:8 41:21
42:5 48:3,11 49:2,8
49:16 58:6 62:7
65:19,24 66:13
70:20 71:8 74:4
86:2 87:20,23 88:23
90:6 101:2 104:7
108:2 152:20
168:23 177:3
209:14 216:25
217:4,4 232:17
233:12,24 234:13
248:16 305:3
309:16,21,23,24
**operationnal (1)**
88:19
**operations (104)**
8:3 9:21 13:24 14:20
16:7,10,20 17:3
22:20 24:22 26:10
28:12 31:17 32:2
33:16 34:22 36:23
43:23 47:12 49:10
49:18 50:3,4,8,23
50:24 59:2,20 60:7
60:15 62:16,23 63:2
64:6,14,19,21 65:3
66:9 70:21 71:17,25
74:8 76:13,14 77:3

77:14 78:17,21
79:17 80:6 84:14,18
85:9,24 86:18 93:19
93:21 94:6,7 100:24
101:3,22,23 102:8
102:20 107:2,15,21
110:12,12 112:10
112:10 113:6 120:2
120:3,9 123:22
132:12 143:22
149:13 152:23
155:23 159:12
163:2 168:23
193:19 224:25
232:19,24 237:11
239:20 240:10,11
240:14,16,23
241:15 249:9
250:14,24 257:12
279:19 286:13
**opine (2)**
213:5 221:24
**opinion (15)**
89:21 108:14 201:19
218:21 220:25
226:16 230:22
236:16 249:10,25
256:9 258:10
259:11 260:23
273:12
**opinions (5)**
97:18 154:6 203:8,8
205:20
**opportunities (2)**
14:18 63:8
**opposed (11)**
38:3 56:24 63:22 65:7
144:10 153:22
184:8 209:14 229:8
298:21 309:14
**opposition (1)**
199:25
**option (1)**
237:19
**options (1)**
236:23
**order (6)**
77:12 81:12 100:8
181:12 208:8
254:16
**organization (5)**
28:22,25 33:10 68:18
68:19
**organizational (1)**
31:25
**organizations (1)**
79:12
**original (4)**
98:19 190:18 196:6

204:24
**originally (1)**
196:14
**origins (1)**
12:11
**ought (2)**
277:11 279:6
**outcome (1)**
312:18
**outline (1)**
13:14
**output (1)**
94:7
**outs (1)**
257:16
**outside (4)**
32:6 170:4 171:4
296:16
**outsource (1)**
264:19
**outstanding (3)**
35:13,21 36:12
**overall (13)**
8:25 43:13,14 55:17
77:10,12 83:7 86:14
86:20 174:18 175:4
202:11 211:16
**overdraft (13)**
176:5,6,8,13,13
283:14,22 286:16
286:23 287:3,11,14
287:20
**overdrawn (3)**
122:5,6,8
**overhead (1)**
29:18
**overly (1)**
245:19
**oversaw (5)**
52:10 81:3 110:22
112:20 114:2
**oversee (1)**
69:16
**overseeing (3)**
82:17 113:10,25
**overview (1)**
133:24
**owned (3)**
21:14 29:6,7
**owner (1)**
10:17
**owners (1)**
29:10
**ownership (1)**
29:10
**Oxford (67)**
3:19 5:24 6:3 28:7
58:8,13 69:18 86:21

87:4 94:16,20,24
97:20,23 99:3,11
109:18 110:5
111:16 112:3 115:2
115:5 128:18,21
129:8,14 130:16
138:21 162:8
172:10 187:10,12
191:12 194:12
196:8,11,16 197:23
206:13,17 213:21
219:24 224:20
226:4 229:20 230:4
230:10 244:12
258:9 260:5 266:3
269:18 270:9 278:4
280:4,9 282:9 290:2
290:5 306:5,21
307:2,18 308:14
309:11 310:9 313:6
**o'clock (1)**
288:10
**O'Connor (2)**
89:12,16

**P**

**P (312)**
3:2,2 4:2,2 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1,2
112:1,24 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1

123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1

300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1
**package (10)**
52:21 53:12 56:14,20
56:23 58:2 59:25
61:10 63:24 72:3
**packages (3)**
60:9,10 61:14
**page (57)**
13:10 30:9 31:12
43:21 51:4 58:14
80:19 89:5,6,23
91:17 92:12 191:10
191:13 211:25
212:2 218:9,12
223:9,10,20 227:14
227:15,15 230:12
238:12 239:21
241:24 242:2,3
251:13 255:6
258:23 260:25
263:5,6 264:5 283:7
285:16,18 289:2,4
290:6 291:21,23
292:24 294:5,7,17
296:21 298:3,24
300:14 303:13
310:17 311:6 313:4
**pages (1)**
310:15
**paid (2)**
56:21 226:18
**PAM (13)**
133:11 255:10,14,21
255:23 256:2,13,15
256:22 257:17
291:9,13,18
**Paolo (7)**
117:2 118:3 169:18
242:13 243:2
246:18 296:3
**paper (2)**
10:22 91:2
**papers (1)**
200:2
**paragraph (22)**
211:21 212:4,5,8,11
212:16,20 213:22
214:4,9,13 215:17
215:21,24 217:16
217:19,23 218:12
223:22 226:2
227:19 239:24
**paraphrase (1)**
217:13
**parent (3)**
88:3,10 241:4

**parentheses (1)**
14:2
**parents (1)**
45:5
**Paribas (1)**
22:13
**Park (1)**
3:17
**part (67)**
10:15 12:22 17:17
18:17 20:3 21:2,5
22:23 23:8 24:22
25:11 36:18 38:21
51:24 54:10 55:5
57:19 61:15 62:14
62:24,25 63:3,4
64:3,4 66:3 67:11
68:5,8,16 71:15
72:9,9 76:9,10
77:12 80:22 82:17
83:7,17 85:14,15
90:10 106:23
107:22 108:24
110:10,13 112:8,11
113:5 122:25
123:10 125:2
128:16 129:4
132:21 145:14
146:15 174:18
222:2 241:19 271:2
272:5 278:21
296:12 309:17
**particular (11)**
8:23 13:9 53:22 61:23
75:4,21 80:25 89:7
98:23 107:10 142:3
**particularly (4)**
34:10 71:2 78:13
225:19
**parties (3)**
49:21 277:12 312:16
**partner (6)**
33:12,22 40:22 41:7,8
41:9
**Partners (7)**
28:23 29:6,15 30:6,20
41:9 57:9
**parts (1)**
71:25
**party (3)**
49:7 98:16 274:15
**passage (1)**
302:10
**passed (1)**
286:14
**Pause (1)**
97:11
**pay (1)**
292:8

**payment (1)**
175:21
**payments (6)**
16:15 127:8 146:18
153:14 185:9,19
**peers (1)**
113:25
**pen (1)**
96:18
**pending (1)**
265:25
**penultimate (1)**
283:7
**people (73)**
29:10 32:21 33:9,23
34:19 40:23 45:23
62:16 63:5,9 64:10
70:2 74:8 77:11
79:6,19 81:18,20
85:9,11 88:14 96:16
97:3,15,16 98:12,17
100:23 101:10,22
109:19 110:3
111:17,25 115:10
116:17 124:24
125:11,13 126:18
129:12 130:14
132:3,6 165:11,16
165:21 166:15
182:24 188:24
189:19 191:4
197:16 198:14
217:5 232:2 233:19
241:6 243:22
265:13 268:15,17
270:21 271:2
272:10,12 279:19
279:20 287:17,20
287:24 292:5,8
**people's (1)**
146:7
**percent (8)**
29:19 30:25 37:13
56:14,18 231:24
256:6,7
**perfect (1)**
298:12
**perform (5)**
73:15,19 86:9 88:20
157:25
**performance (1)**
309:24
**performed (24)**
17:2 30:12 64:22
72:12,16 73:23 74:6
74:12 75:22 76:14
77:25 88:6 94:2,2,4
126:13 138:2
149:25 179:6

195:22 221:17
238:15 239:13
240:3
**performing (6)**
51:16 58:25 73:21
74:15,22 184:8
**period (15)**
9:9 11:4,6 31:10
65:13 85:4,11 86:11
92:19 93:11 236:25
238:8 257:3 279:3
281:4
**periods (1)**
272:19
**permitted (1)**
123:9
**person (25)**
18:24 19:21 30:3 96:2
115:19 124:18
129:13 131:22
145:23,24 146:4
151:23 158:11,13
158:19 160:9
166:23 172:13
179:4 193:2 229:6
246:12 247:7
284:21 291:11
**personal (2)**
31:21 50:17
**personally (8)**
35:7 114:22 118:25
119:6 127:19 243:4
243:6 294:12
**person's (1)**
217:5
**perspectives (1)**
32:8
**Peter (9)**
1:13 2:6 5:19 128:25
310:13,18 312:10
313:5,11
**Pg (1)**
311:2
**Pgs (1)**
311:2
**phone (38)**
81:20 100:20 104:25
116:12,15 117:3,15
117:16 118:23
154:8 158:12,14
167:9 172:23,24
174:10,13 176:11
179:20 181:9
187:24,25 188:3
189:7,12 190:5
231:6,7 282:17
287:17 288:24
290:20 292:23
293:20,21 299:17

300:11 303:25
**physical (1)**
80:10
**physically (3)**
95:12 148:19 170:12
**picked (3)**
59:24 72:3 171:13
**piece (3)**
302:10,14 303:6
**PIM (2)**
133:11 274:14
**place (18)**
36:9 65:14 75:20
78:20 129:17,23
130:2,3 133:22
155:19,20,21 156:2
157:20 188:4 190:3
214:24 281:19
**placed (1)**
202:17
**places (1)**
75:9
**plan (6)**
34:24,24 43:13 54:19
65:19 66:12
**plane (3)**
32:23 33:2,4
**planning (1)**
31:15
**played (5)**
31:14 51:5 53:17
70:11 241:22
**Plaza (1)**
3:17
**please (42)**
12:15 13:7 35:9 69:19
86:22,25 89:6 99:12
118:8 119:13
138:16 147:15
163:21 168:18
173:25 194:25
197:24 206:18
212:8 214:4 215:17
217:19 220:4
223:20 230:12
244:13 264:6
282:13 283:7
284:11 285:8
288:15 289:14
294:23 296:22
299:4 300:5 302:13
302:18,23 303:15
305:9
**pledging (1)**
236:21
**plus (4)**
27:10 65:2 225:2
252:14
**point (83)**

14:11 15:19,19 17:24
22:19 24:19 25:19
25:21 28:25 29:4
33:9,11 34:14 36:2
37:4 40:4 41:6
42:14 44:8,12 50:17
52:7,12 54:3,25
56:7,21 59:10 61:4
61:10 62:3 77:7
82:7,15,15,24 84:2
90:8 96:23 101:12
103:14 126:14
130:15 131:4 136:5
136:16 137:13,22
139:15 140:24
144:5 152:10,15
165:13 173:11,20
175:2,25 176:6
179:10 180:12,14
180:20,23 182:24
213:2 227:17
232:18 233:17
234:6 245:19
248:10,17 254:25
257:13 263:12
279:24 283:20
286:13 295:12
304:8 305:11,12
**pointed (1)**
145:11 182:22 232:15
**pointing (1)**
215:6
**points (8)**
202:25 206:23 207:16
210:17 217:14
218:13,17 220:22
**Policke (54)**
116:18 130:7 132:7
134:2 136:7,20
137:12,17 138:4,11
138:25 139:24
140:6,13 141:5,10
141:18 143:11,17
145:6,16 146:9,17
147:11,16 148:2,6
150:7,8,13,22 151:7
152:21 154:9,16
155:9,24 156:20
157:9,13 158:6,11
161:2 231:2 256:24
257:12 287:16
288:5 289:24
293:18 297:5,19
299:17,18
**popular (1)**
82:15
**populate (1)**
53:2
**portion (1)**

61:14
**portrayed (1)**
103:24
**posed (1)**
102:12
**position (8)**
34:16 105:3 125:22
159:8 162:24 170:7
173:9 265:2
**positions (7)**
16:15 55:23,23 104:6
136:24 147:6
264:22
**positive (2)**
126:10 254:13
**possession (2)**
148:20 227:12
**possibility (1)**
100:6
**possible (4)**
54:19 253:19,22
280:13
**possibly (2)**
178:15 211:14
**post (3)**
147:6 179:14 272:4
**post-merger (2)**
31:15 43:16
**Potenciano (36)**
117:5 178:17,20
179:3 180:2,3
182:18 183:9,24
184:4,14,18 185:8
185:12,18 186:7
187:13 189:8,13
190:3,9,16 231:2
271:13,20,23
272:11,20 300:12
301:3,11,15,24
303:8,22,24
**pounds (1)**
34:6
**practical (3)**
55:19 100:18 101:14
**practice (1)**
47:12
**preceding (1)**
50:12
**precise (1)**
260:17
**preclude (1)**
214:23
**preface (1)**
220:7
**prefacing (1)**
256:21
**preferable (1)**
71:20

**premarked (1)**
6:7
**preparation (3)**
114:23 115:12 149:17
**prepare (9)**
198:24 199:17 202:5
202:22 203:4,20,23
204:5,15
**prepared (3)**
21:8,10 283:4
**preparing (5)**
128:5,8 192:3 201:10
203:11
**prepping (1)**
191:8
**presence (1)**
53:18
**present (9)**
4:3 130:9,14,18 131:4
131:17 204:11
239:20
**presentations (9)**
92:13,16,18,22 93:2,4
93:9,15 94:10
**presented (2)**
110:4 112:2
**presenting (1)**
287:22
**president (4)**
23:22 24:8 53:24 56:2
**presumably (1)**
124:2
**presume (1)**
199:14
**pretty (7)**
45:11 82:14 136:18
217:17 241:3 257:4
306:22
**prevented (1)**
155:4
**previous (1)**
241:12
**previously (1)**
135:14
**pre-allocation (1)**
177:17
**pre-allocations (1)**
166:9
**price (3)**
34:5,5 36:15
**prices (1)**
81:17
**primarily (19)**
12:18 13:2 29:7,16,25
31:4 37:5 38:2 45:3
54:8 55:16 66:5
68:10 75:8 91:4
135:8 139:22

154:17 237:16
**primary (3)**
29:14 60:20 120:5
**prime (20)**
51:9 65:20,23 66:9,16
66:21,23 67:16 69:9
69:10,14,17,24
133:10 134:8,12
139:8,22 147:22
256:23
**principal (4)**
16:14 104:6 145:18
184:25
**principally (1)**
145:16
**printed (1)**
196:4
**prior (32)**
92:7 107:3 118:5
129:17 157:2 183:7
197:19 198:5,11,15
204:10 231:10
236:6 239:7 250:22
255:3,9,15,25
256:11,19 257:24
258:11 260:10
261:6,10,20,23
278:19 291:14
292:16 302:7
**probably (16)**
27:21 29:19 31:9
37:12 60:22 65:15
201:4 210:15 220:7
236:24 237:3,19,22
240:13 293:17
307:11
**problem (16)**
35:16 49:24 50:4
74:14,18,19 87:14
166:10,11,14
176:19,25 208:20
303:9,11 306:8
**problems (19)**
22:18 34:20 35:11,12
49:2,3,16 50:9,25
83:13 102:13
156:19 157:2,6
165:18 166:4 185:2
237:2 305:4
**procedures (1)**
155:25
**process (17)**
32:15 62:15 72:9
124:15,16,21 125:9
132:20 156:7 204:3
221:4 243:20,21,24
244:24 248:21
292:14
**processed (1)**

59:14
**processes (3)**
133:22 164:9,12
**processing (27)**
8:4 11:13 16:10,13,13
20:7 21:11,17,17
22:12 48:9,22 50:10
51:9 53:8,25 54:2
58:7 67:3 68:11
71:17 72:2,6,7,13
144:24 170:10
**produce (13)**
44:19 68:11,13 69:5
72:8 74:3 90:22
100:16 113:7
129:12 203:21
240:10 307:17
**produced (25)**
6:15 9:22,23,25 16:9
22:4 23:14,14 35:24
52:22 64:10 73:7
74:4 90:23 98:20
128:23 133:2
149:22 198:5,9
231:24 232:25
239:19 273:4
307:17
**producing (6)**
20:4,21 57:20 86:13
282:19,20
**product (1)**
52:11
**products (3)**
59:14,15,16
**professional (3)**
2:9 8:9,11
**professionals (2)**
13:5 105:22
**profit (1)**
122:11
**program (3)**
43:14 84:13 264:11
**project (3)**
31:22,24 71:2
**projections (3)**
121:23 137:15 170:12
**projects (14)**
21:14 29:8,12,17,20
29:25 30:11,21 51:6
53:18 59:13 70:12
107:11 229:3
**prompt (1)**
142:16
**promptly (4)**
90:15 142:20 143:6
227:12
**pronounce (1)**
300:19
**proofread (1)**

13:15
**proofreading (1)**
96:2
**properly (2)**
78:14 144:14
**property (9)**
216:11,22 226:19
227:2 228:4 277:9
277:18 278:10
279:4
**proportion (1)**
291:17
**proportionately (1)**
236:14
**proposed (1)**
178:7
**proprietary (3)**
24:18 61:17 69:8
**protect (2)**
224:4 227:10
**protecting (1)**
236:11
**protection (38)**
15:23 17:10,16 19:17
24:25 25:22 26:4,8
26:17 37:21,24 39:3
40:20 41:12 46:7,20
52:19 53:14,22
57:13 61:23 62:11
67:17,21 68:2 71:3
75:22 78:14 79:15
81:2 83:25 84:11
85:17 107:10 109:9
111:7 153:4 224:2
**provide (17)**
13:3 28:16 47:19
90:20 161:4 162:14
173:7 178:20
190:16,17,24 191:4
197:17 198:19
228:12 270:5
307:23
**provided (13)**
10:8 30:15 94:14
100:3 108:14
117:17 172:2
192:13 193:14
210:5 249:5 292:20
309:8
**provider (2)**
257:7 264:19
**providers (1)**
264:11
**provides (4)**
12:17,20 264:17
267:3
**provision (1)**
227:9
**provisions (5)**

224:6,7 225:20,21
228:2
**prudent (1)**
245:23
**Pruszynski (4)**
1:18 2:8 312:7,23
**public (4)**
2:11 199:3 310:21
312:8
**publications (8)**
91:16,18,20 92:2,4,7
92:9 93:9
**publicly (1)**
12:16
**purchase (3)**
22:21 55:10 81:9
**purchased (4)**
53:11 71:15 72:3
105:3
**purchasing (1)**
22:2
**pure (1)**
91:15
**purely (1)**
213:3
**purpose (6)**
15:2 104:16 110:16
112:14 203:25
262:2
**purposes (1)**
183:11
**purview (2)**
38:22 86:20
**push (3)**
106:12 235:16 240:12
**put (31)**
25:14 27:4 34:21 36:9
40:6 53:7 54:20
55:20 59:23 72:18
73:5 78:19 85:7
105:25 143:7,8
144:6 156:13
170:11 174:20
182:24 190:13
225:14 226:15
256:5 262:15
280:22 296:2
298:15 301:9 304:8
**puts (1)**
216:21
**putting (3)**
48:7 137:4 294:3
**PVA (3)**
29:2,15 57:9
**PVA/Toucan (3)**
57:2 92:19 93:11
**P-O-T-E-N-C-I-A-...**
178:17
**p.m (2)**

269:23 310:11

_____
**Q**
_____
**qualifications (4)**
109:17 110:3 111:15
111:25
**qualified (2)**
19:10 228:12
**qualify (4)**
29:7,11 166:3 229:22
**quality (1)**
94:6
**quantify (2)**
184:18 207:8
**quantitative (1)**
13:23
**question (94)**
7:7,10,15 26:23,24
38:18,23 39:2 40:18
42:24 54:16 62:10
69:19 70:4 75:25
84:7 86:22,25 87:3
92:21 97:13 98:3,23
99:6,8,9,12,17
101:17,21 102:2,6
102:11,24 105:5,7
108:15 109:23
111:21 119:5,21
125:7 127:6,14
129:9 138:22
141:23 142:7
147:14 152:7,13
171:17,25 183:18
193:15,16 194:9
197:4,7,12 198:2,3
199:9 205:4,5,7,7
206:11,20 219:22
219:25 220:2
225:17 226:6 244:2
244:3,5,7,9,9
247:16,25 248:7
257:18 258:3,4,17
259:6 260:2,16
271:7 278:3 296:12
300:16
**questioning (3)**
225:5 226:24 307:20
**questions (32)**
7:3 9:16 17:6,8 90:23
99:25 109:11 111:9
113:2,22 119:25
120:17,18 129:10
132:10 133:15
143:5 152:16
159:25 173:21
193:21 211:6
248:24 265:24
272:3,18 280:5
308:15,23,24,25

310:9
queue (2)
182:8,11
quick (1)
97:10
QUINN (1)
3:21
quite (6)
57:7 104:15 169:9
179:9 200:16 230:2
quota (2)
283:10,12
quote (2)
264:21 296:10
quote/unquote (2)
102:21 140:18
_____

**R**

R (3)
3:2 4:2 312:2
raise (1)
175:6
raised (6)
49:15 139:4 163:6
170:15 250:21
300:15
raises (1)
219:6
ramping (1)
82:11
ran (4)
46:24 107:15,20
239:7
range (3)
114:15,17 115:7
rare (4)
124:3 249:22 254:13
254:21
rate (2)
114:4,8
rates (1)
114:11
reached (2)
265:6 283:9
read (56)
69:18,20 86:21,23
99:9,14,24 138:22
138:23 197:25
202:20 206:10,14
206:19 212:7,16,18
213:22,24 214:5,14
215:17,19 217:19
217:21 222:7
223:19 226:4,8,14
236:19 244:12,14
258:19 260:16,18
266:4,5 267:15
289:6,13 290:10,12
291:25 292:6 293:7

294:22,22 297:10
298:4,11 299:3,8
300:13 302:12
303:14
reading (6)
225:15 226:2 263:4,5
266:6 268:5
reads (4)
218:13 223:25 227:22
267:23
ready (1)
76:8
real (5)
97:10 156:12 297:13
297:16 298:2
really (20)
48:20 55:21 65:6
66:11 75:14 80:5
98:22 106:19
109:13 111:11
121:7 135:24
190:15 210:10,11
235:11 250:25
252:21 298:6,9
reason (20)
49:19 124:12 127:12
146:14 151:4,10
180:10 248:23
251:11 267:25
275:17 311:8,10,12
311:14,16,18,20,22
311:24
reasonability (2)
232:2,3
reasonable (13)
14:8 120:8 179:7
181:2 231:12,20,21
232:5,10,13 234:18
238:8 239:5
reasonably (1)
231:22
reasons (4)
49:20 81:8 151:6
311:5
recalc (1)
285:23
recalculate (6)
101:24 103:8,17
221:23 235:23
281:2
recalculating (2)
271:24 286:6
recall (21)
118:15 143:16 144:23
158:25 159:10,13
166:24 168:2
175:24 179:8 191:2
193:2,5,10 200:6,23
227:4 229:4,16

284:14 305:19
receive (5)
192:22,23 217:2,3
227:12
received (4)
99:22 223:6,15,17
receivership (3)
88:8,17 182:6
receives (1)
237:23
receiving (1)
20:5
Recess (5)
58:12 99:10 138:19
138:20 187:11
230:9 280:8
recognize (1)
137:8
recognized (1)
304:6
recollection (19)
117:13,20 128:12
135:19 139:12
140:25 145:12
173:17 174:21
175:20 180:7
185:16 189:14
190:7 205:9,13
229:4 291:13 301:6
recollections (1)
133:19
reconcile (3)
105:15 136:24 235:3
reconciled (1)
74:7
reconciles (1)
79:3
reconciliation (2)
35:20 103:23
reconciling (2)
35:18 65:4
reconnected (1)
139:18
reconstruct (3)
106:2,6 234:19
record (34)
6:2,8 69:20 86:23
98:9 99:4,11,14
113:21 128:20
138:23 171:11
172:11 183:16,20
183:22 197:25
206:19 207:22
213:13,20 236:19
244:14 258:19
260:6,18 266:5
280:9 290:2,4 291:7
306:5,7 312:13
records (26)

10:8 22:25 33:17
84:20 101:9,14
103:23 105:4,6,15
106:3,7 124:25
132:22 135:16
146:22 147:5
156:23 176:21
231:10 233:20
235:3 238:7,22
259:9 260:22
recreate (2)
101:9,13
recreation (1)
106:14
recruited (4)
53:23 56:2,13 71:6
redacted (4)
203:24 282:14,18
306:9
redaction (1)
204:2
reduce (6)
82:2 236:10 237:23
253:2,17 254:6
reduced (3)
34:4 252:24 253:2
Reed (2)
3:15 6:4
Refco (1)
60:24
refer (2)
207:20 222:15
reference (16)
141:17 266:17 283:18
283:24 286:5,15,19
292:12,13,25
293:11 296:17
297:18 298:13
300:23 303:5
referenced (12)
30:7 141:8 146:11,19
150:18,25 151:8
161:20 186:14
208:3 266:14 301:5
references (4)
127:9 140:2,9 143:2
referencing (2)
193:8 195:7
referred (11)
102:18 171:16 227:6
228:16,19,24
229:11,14,17
258:14 263:21
referring (4)
6:17 43:21 87:24
226:11
refers (1)
284:25
reflect (7)

201:18 284:20 285:13
289:23 290:17
295:10 303:20
reflected (16)
38:16 39:18,19
148:13 177:9,13
203:17 258:25
259:9,23 260:12
273:13 292:20
297:3 303:25 305:8
reflection (1)
284:4
reflects (1)
299:15
refresh (2)
205:9,11
refreshed (1)
205:13
refused (1)
174:12
refutes (1)
270:17
reg (10)
19:21 52:3,5 54:13
64:17 74:22 76:25
133:7 286:2 292:3
regard (1)
174:2
regarding (2)
264:20 283:21
regards (1)
216:11
regime (3)
221:18,19 309:17
registered (8)
2:9,9 43:15 108:18,19
108:19,22,22
registrar (1)
10:6
registration (1)
135:5
regularly (1)
185:3
regulation (4)
123:9 202:12 216:15
278:6
regulations (8)
36:18,21 93:22
134:11 216:12
225:9 245:18 278:9
regulator (2)
74:20 247:13
regulators (10)
20:23 22:19 43:7
74:14 75:19 182:15
201:10 241:5 262:6
262:8
regulatory (78)
7:23,25 10:10 14:13

14:21,23 15:8 16:19
19:4,12 20:12,18
21:3,6 22:6 23:13
33:17 35:4,11,24
36:12,16 37:19
40:16 42:15,23 43:3
44:16,19 45:11,12
45:13 46:2,10,15
47:7 48:12 49:9
54:15,22,23 55:7,12
57:20,23 61:20
63:25 69:3,12 70:5
72:8,11,15 73:12,25
74:12 75:9,17 76:2
78:11 79:9,18 83:18
84:4 86:5,7 107:24
108:5,20 110:19
112:17 173:10
221:18 227:3 228:2
241:9 245:20
309:17

**rehypothecate (1)**
47:23
**rehypothecation (2)**
67:9 216:20
**relate (11)**
9:19 11:11 12:3 15:4
36:20 89:12 90:2
91:21 92:10 128:3
288:20
**related (8)**
9:20 30:25 70:12
80:20,24 149:10
307:3 312:15
**relates (4)**
36:18 97:13 205:10
294:8
**relation (2)**
31:13 174:2
**relationship (2)**
32:18 156:11
**relationships (1)**
44:7
**relatively (6)**
20:8 62:21 77:21
85:12 255:4 262:15
**release (1)**
243:15
**relevance (3)**
108:13 110:2 111:24
**relevant (8)**
97:8 98:23 102:8
190:15 199:21
227:25 248:11
307:15
**reliance (3)**
6:16 196:12 203:22
**relied (45)**
57:24 63:6,8 91:10

98:18 99:19 117:18
119:10,22 128:4,12
132:8 133:14,18,25
149:4 159:3 161:5
162:15 168:18
170:6 172:3 173:7
178:22 179:8
188:21 189:5,16,22
190:11 191:7,24
192:2,11 193:12
199:18 203:6,7,15
204:25 282:19,19
306:15,16 307:4
**relies (1)**
58:5
**rely (18)**
47:21 55:8 58:3 63:6
63:23 66:4 128:11
162:3 167:10
168:14 169:5
188:15 192:6,19
194:7,20 196:2
305:14
**relying (9)**
59:22 84:2 88:20
98:25 188:25
194:10 197:6 235:2
235:8
**remediation (1)**
34:23
**remember (36)**
27:9 34:6 37:17 39:23
42:15 46:11 47:15
52:10 57:17 76:2,8
82:24 84:24 91:5,11
104:18,25 116:13
118:21 124:23
125:12 141:14
148:9 159:17 160:2
160:5 163:9,11,12
166:19 167:2
172:25 176:22
188:3 262:21
296:19
**remind (2)**
120:21 298:20
**remove (2)**
275:17 276:23
**removed (3)**
244:24 254:18 278:12
**removing (1)**
275:14
**repay (2)**
216:6 228:5
**repeat (5)**
99:12 102:2 147:14
197:23 258:17
**repeatedly (1)**
224:24

**rephrase (2)**
197:22 198:2
**replace (5)**
22:10,11 60:25 61:3
279:21
**repo (3)**
161:22,25 286:21
**report (174)**
6:9,12 8:16 13:6 20:7
20:8 30:7 31:12
35:2 42:3,6,7,10
43:21 48:16,25
49:12 51:4 53:2
58:14 69:11 73:9
76:19 79:10 80:19
85:20 86:4 89:6,15
90:21,22,25 91:8,12
91:17 95:5,9,12,14
97:8,14,19 99:20
100:16 107:12
109:7,20 110:15
111:5,18 112:13
114:23,25 115:13
116:2,9 117:19
119:10,22 128:5,8
128:11 129:17
132:9 139:5 140:3
149:5 154:7 159:4,7
159:23,24 160:6
161:6 162:4,16
167:15 168:14
171:21 172:3 173:8
173:16 175:10
178:23 179:10
181:12 188:22
189:17,22 190:11
190:15 191:10,21
192:3,7,12 194:21
195:2,10 198:13,25
199:16,17,21,22
200:14 201:10,18
201:25 202:10
203:7,8 204:25
205:10,16,17
207:20 209:13,15
211:22 213:2,11
218:7 219:10 221:6
222:16 223:13,16
230:12 235:25
238:12 239:8,19,22
240:12 246:20
247:17,18,20
248:11,19,25 249:2
249:3 251:13 255:2
258:23 262:18,25
264:6 265:7 266:15
267:8 270:7,8,13,18
274:8,10 280:23,25
281:6,7 282:19,20

286:23 297:21
305:15 307:4 309:6
309:9 310:3,6
313:11
**reported (27)**
1:18 38:17 40:13,14
41:2,11,20 45:2,16
45:21 69:13,21 70:3
73:10,14 84:6 85:22
85:23 86:2,3,8
107:22 110:13,21
112:11,19 173:11
**reportedly (1)**
175:10
**Reporter (3)**
2:9,10,10
**reporting (76)**
8:7 10:10,11 14:21,23
16:11,19 19:4,12,21
20:12 21:3,6 22:6
23:13 25:19 35:4,24
36:16 37:19 40:7
44:19,20 46:10 47:7
48:11,12,13 49:9
52:4,6 54:13,15,22
54:23 55:7,12 57:23
61:20 62:8 64:18
70:5 72:11,15 73:13
73:25 74:13,22 75:8
75:9,17 76:3,25
78:11 79:9,19 83:18
84:4 86:6 107:24,24
108:5,21 110:19,20
112:17,18 123:25
133:7 159:12
173:10 281:4 286:2
286:14 292:3
**reports (58)**
20:16,17,21 22:5 23:2
33:18 36:3,4,5,7,8
36:13 38:16 42:17
43:3 57:20 63:12
64:24 72:9,22,23
73:8 74:24 86:7
87:12 108:25 109:9
110:11,11 111:7
112:9,9 113:8 156:4
156:13 164:6,14
168:24 193:18,23
194:2,4,19,25 195:8
195:16 197:5,13,14
198:5,9 247:23
248:3 250:6 273:4
274:2 308:8 309:16
**repos (2)**
43:24 135:10
**represent (2)**
6:4 14:6
**representative (9)**

8:18 9:2,3 11:2,18
91:18 92:3,13,16
**representatives (7)**
239:16 243:8 244:23
245:2 247:3,10
299:22
**represented (1)**
232:7
**representing (1)**
10:3
**reproduce (4)**
193:23,25 194:5,11
**request (5)**
94:20 195:14,16
203:21 310:6
**require (1)**
228:3
**required (8)**
18:23 43:22 68:2
70:20 71:9 103:10
184:20 220:25
**requirement (79)**
17:16 18:18,20 48:15
67:20 68:7,8 77:12
79:14 122:13
141:25 142:8 143:3
153:12 184:13,16
184:19 186:6
208:23 210:19
211:13,15 218:19
218:23,24 219:8
221:16,21 230:15
230:24 231:12
236:11,14,17
237:24 238:14,19
239:25 240:2
242:16,17 251:14
251:20 252:5,20,23
253:5,7,13,18
254:10,17 255:3
262:10,20 264:12
273:9,17 274:18,24
275:7,8,9,10,11,13
275:14 276:4,18
277:10,19 278:11
278:13 279:5 280:2
281:5,10 286:7
299:20
**requirements (52)**
8:7 15:8 17:19 19:25
22:2 47:2,2,4,7
52:18 53:4,14 54:7
54:12 59:3,4,8,12
59:18,21 60:3,4,11
60:11,16 61:20
63:14,16,20 66:24
67:4,7,14 68:25
69:3 89:2 121:15
123:2 162:19

163:24 164:16,18
186:2 207:6 213:7
233:5 234:3,5,15,15
278:25 281:13
**reread (3)**
202:9,10,10
**rerun (2)**
105:23 235:4
**rerunning (1)**
270:22
**res (2)**
283:14,24
**reserve (144)**
17:19 21:8 44:6,21
51:16 64:9 67:20
68:3 73:15 75:4
89:2 90:2 100:7,10
106:15 107:2
122:22,25 123:5
124:22 127:3
137:23 138:5 143:8
143:9 148:13
152:12 153:8,12
170:24 175:17
177:24 184:13,16
184:19 185:15,21
185:25 186:6
195:21 196:17
207:5 208:23
210:18 211:11,13
215:2,8 216:24
217:2,7 218:18,22
218:23 219:7 221:2
222:10 227:24
228:15,18,24 229:9
229:13,18,25
230:15,24 232:6
233:4,9,23 234:9
235:20 236:3,8,11
236:13,16 238:14
238:19 239:12,25
240:2 242:6,16,21
242:24 243:10,14
246:3,22,25 247:14
247:15 249:11,15
250:2 251:14,20
252:4,6,12,19,22
253:5,7,13,18 254:3
254:5,10,17 255:2
261:11 262:3,9
264:12,13 268:23
271:19,24 273:3,9
273:17 274:18
276:17,18 277:10
277:19 278:11,13
278:25 279:5
283:25 284:5 286:7
292:14,15 297:13
297:15 299:20

302:15 307:19
308:17
**reserved (1)**
195:21
**reserves (1)**
295:25
**resolution (1)**
186:10
**resolve (2)**
106:9 233:20
**resolved (7)**
49:9 106:11 166:12
166:14 173:18
175:15 176:10
**resources (3)**
91:9 205:23 206:3
**respect (17)**
40:19 58:15 71:2
107:9 119:5 122:3
127:14 143:3
149:17 180:4
199:24 205:15
206:5 235:5 242:5
307:20 308:17
**respects (1)**
205:12
**respond (2)**
99:16 265:5
**response (2)**
158:5 245:18
**responsibilities (7)**
24:14,24 29:14 79:11
85:13 126:10,12
**responsibility (24)**
24:11 26:3 48:17
67:25 69:12 70:6
75:10 79:17,18 80:5
83:7 84:4 85:15
86:5,14 88:24 122:4
132:11 137:19
145:19 149:6,16
171:4 280:17
**responsible (60)**
20:21 23:12 25:18
29:16 37:20 42:9,16
42:19,20,22 43:2
44:6 45:25 46:25
48:6 52:5 62:8,17
64:8,15 74:2,13,23
75:2,7,18 76:7
78:12,17 79:7,9
80:5 86:17,18,18,19
87:7,10 88:2 91:21
106:25 107:17,18
107:23 108:4 109:6
110:18 111:4
112:16 113:24
119:16 126:23
133:4 145:15,17,20

179:4 246:9 262:17
295:23
**rest (1)**
53:8
**resubstantiate (1)**
154:15
**result (12)**
8:3 19:8 59:20 87:17
101:2 170:24
184:16 185:17
233:23 234:18
266:23 292:17
**resulted (1)**
116:2
**resulting (1)**
239:3
**results (20)**
16:13 41:11 48:22
74:17,24 110:14
112:12 113:5 123:7
124:11 203:15
232:14,23 233:17
238:9 242:20,24
243:4,7 286:14
**retail (8)**
16:17 66:25 81:17
82:3,6,8,23,24
**retained (1)**
95:15
**return (1)**
15:13
**reveal (1)**
99:17
**revealing (1)**
100:13
**revenue (1)**
93:20
**revenues (2)**
56:15,16
**revenue-generating...**
33:19
**reverse (1)**
100:8
**review (11)**
35:3 110:11 112:9
113:5 124:25 128:7
200:8 203:13
273:20 289:17
293:25
**reviewed (16)**
110:14 112:12 123:6
191:16,20,23 192:5
199:20 200:18
202:13,16,22 203:5
203:19 233:2 292:4
**reviewing (7)**
110:17 112:15 133:5
179:4,6 198:21
203:25

**revise (1)**
274:10
**revised (3)**
271:18 273:2,4
**rich (3)**
52:8,14 59:11
**Ricky (10)**
116:17 130:7 231:2
256:24 287:16,22
288:5 289:24
293:18 297:5
**right (43)**
28:24 38:23 46:12
47:5 53:15 64:17
69:7 70:22 78:20
89:18 91:6 118:13
129:2 139:20
145:25 159:10
166:19 172:9,11
179:21,21 195:12
197:12 198:3,10
199:9 209:16,16
210:11 222:13
231:15 232:14
252:3,8 253:21
264:4 267:13,25
288:3,13 291:20
305:21 306:2
**rights (4)**
196:17 216:5 307:19
308:17
**ring (2)**
271:3 272:14
**ring-fenced (2)**
102:22 159:18
**RISC (4)**
146:21 147:4 187:15
187:19
**risk (15)**
13:23 14:16 15:19
72:23 86:19 110:25
112:23 113:4,7,23
175:2 209:22,23
309:16,23
**RMR (1)**
1:18
**ROBERT (1)**
3:25
**robust (1)**
55:6
**Rodefeld (9)**
116:22,23 130:22
160:13,16 161:4,8
161:19 168:4
**Roden (37)**
116:18 130:11 146:15
148:22,23,23 149:4
149:24 150:9,13,16
150:24 151:13,16

152:8,19,21 153:13
153:18 154:4,9,15
154:21 155:9,25
156:20 157:9,13
158:5,11 160:23,25
257:12 289:25
297:6,19 299:17
**Roden's (1)**
149:16
**role (9)**
12:23 31:14,21 51:5
53:17 58:15 70:12
70:25 241:22
**room (4)**
150:12 158:24 160:12
160:14
**routine (1)**
7:2
**rule (69)**
9:19 11:11 12:4 15:5
15:6,7,10,23 17:10
17:16 18:7,11,14,23
19:17 22:8,8 25:2
25:23 26:4,8,18
37:21,24 38:3 39:3
39:3,7 40:18,20,20
41:13 43:24 44:5
46:7,20 51:16 52:19
53:21 57:13 59:4,8
61:23 62:11 66:18
67:17 71:2,3 73:16
75:22 77:11,13,19
77:24 79:22 83:25
84:11 85:17 89:13
90:2 93:16 107:9
152:5 153:7 224:3,3
225:20 226:17
229:13
**rules (19)**
20:18 38:3,5,19,20
40:19 53:22 66:6
67:21 68:3 78:14
79:15 81:2 89:2
107:10 109:9 111:7
153:4 213:16
**run (20)**
194:20 195:13,15
197:5 214:19
238:24 239:8
259:12 279:9
280:20,23 281:5,7
281:13,24 304:21
304:22,24,24 305:2
**running (7)**
110:6,23 112:4,21
126:5,25 226:23
**runs (1)**
73:25
**R-I-S-C (1)**

147:5

**S**

**S (3)**
3:2 4:2 313:8
**Safe (1)**
167:10
**Safekeeping (1)**
211:24
**Sal (3)**
40:13 41:19 272:25
**sales (4)**
29:21 33:22 86:19
104:5
**salesmen (1)**
59:20
**Salia (2)**
40:8 41:15
**sanction (1)**
34:21
**Sandy (1)**
81:8
**satisfy (1)**
226:20
**saw (6)**
34:20 197:2 200:25
201:6 209:12 211:4
**saying (25)**
14:24 37:24 63:13,15
69:4 76:8 80:8
225:13 231:14
239:17 245:8,9,23
248:14 249:21
256:22 266:25
269:3,6 276:13
279:9,13 297:25
298:21 305:19
**says (21)**
8:16 13:21 44:2 80:6
210:24 221:16
222:16 225:19
235:13 238:21
239:25 272:24
273:8 283:13 289:7
289:15,18 290:14
300:13,16 304:13
**scenario (3)**
72:19 73:5 276:19
**scenarios (3)**
73:17,18 90:24
**scenes (1)**
76:10
**SCHILLER (1)**
3:9
**SCOFIELD (1)**
280:11
**scope (5)**
99:25 162:5 194:14
204:22 213:10

**screened (1)**
77:4
**screens (2)**
63:11 64:24
**scrutiny (1)**
231:17
**season (2)**
100:17 146:7
**sec (106)**
9:19 15:5,6 35:25
43:15,24 53:21 59:3
59:8 66:17 67:15
93:16 107:9 200:9
200:18 201:13
213:7 216:11
221:19 222:24
224:17,19 225:2,9
225:18 226:12
227:3 231:13,14
239:13,16 240:4,8
240:16,24 241:14
241:21 242:9,15,20
242:25 243:5,8,14
243:15,25 244:20
244:22 245:2,7,9,13
245:16 246:5,17,19
246:24 247:3,13,20
247:23 248:3,12,13
248:15 249:4,5,6,7
249:11,14,23 250:8
250:10,19 251:9
258:16 262:11,12
262:18 277:20,24
278:2,6,14 279:6,11
279:14,24 289:17
289:18,19 292:4
294:25 295:3,17
296:5,10,14 299:11
299:22,23 300:20
301:22 302:15
313:18
**second (27)**
25:4 61:5 82:5 95:11
95:18,23 118:10
128:19 187:14
189:14 206:12
222:2 225:19
227:19 266:3,21
289:16 290:3
294:14 296:12
297:11 298:11
299:9 302:10,14
303:13 306:6
**section (5)**
89:7,23 91:18 140:3
208:21
**securities (56)**
10:21 22:14 30:8,15
30:16 49:5 51:3,6

51:15 53:11 58:16
61:8 65:9,19 66:22
67:5,15 68:22 69:8
70:9 81:18 82:8
108:17,19 109:2,3
126:2 127:4 139:2
139:16 140:3,8
141:7,12,16 142:25
142:25 143:4
146:10 151:14
152:9 180:19
207:25 208:4
209:17 211:25
216:20 217:2 224:5
224:6 225:21
226:19 228:5
235:18 237:2
252:15
**securitization (5)**
9:3,7,19 10:20 27:6
**securitizations (5)**
10:9 27:5,11 108:16
114:2
**security (2)**
63:18 208:13
**SEC's (4)**
250:14 278:9 299:19
309:18
**see (80)**
13:17,20 14:4 18:19
33:16 36:5,10 58:16
59:5 63:15,16,17,18
70:14 87:21 109:15
111:13 124:11
136:2,3 137:6
156:16 191:15
196:6,21 198:3
199:15 200:7 203:5
204:4 208:20 209:7
209:12 210:4,9
211:15,25 212:6
218:14,25 223:8,22
224:10 227:19,22
230:17 238:16
242:10 251:17
258:7 260:25 261:2
264:14,23 267:23
268:16,17 270:12
271:10,16 272:24
273:6,10 278:19
280:7 281:25 282:7
283:13,16 285:22
286:17 290:9 293:4
294:14,20 297:7
302:9,15 307:7,21
**seeing (3)**
66:13 67:13 108:12
**seen (14)**
199:23 200:4 211:10

211:12,20 223:3,5
255:17 256:8,17
257:19 270:2,4
294:4
**seg (4)**
26:2 229:24,25 230:3
**segregated (28)**
25:12,13,17,19 38:7,9
38:10,11,13 39:9,17
40:23,25 44:13 52:3
60:4 61:18,19 67:7
69:6 78:18 79:2
80:7 107:17 109:4
133:12 152:18
180:13
**segregation (2)**
66:6 67:15
**seized (33)**
49:6 50:19 123:13
127:9 138:12
139:10,11,25
140:10,12,14 141:7
141:12,16,22,22
146:19 150:17
153:15 174:7 176:2
176:3 181:3,4
185:10,20 186:18
186:22,24 187:2
219:12 220:10
274:13
**seizing (1)**
50:14
**seizure (3)**
159:15 163:10 170:16
**seizures (1)**
170:19
**selection (5)**
60:2,23 62:15 64:5,5
**sell (4)**
82:7 122:10 277:17
278:10
**selling (2)**
65:3 134:24
**send (2)**
196:13 235:20
**senior (5)**
87:18 107:13 126:15
126:18 257:5
**sense (12)**
9:20 27:6 54:20 57:6
77:18 86:16 91:2
142:16 146:23
147:6 180:23
252:23
**sent (4)**
78:22 133:6 271:11
289:8
**sentence (4)**
13:18 225:19 289:14

294:18
**sentences (1)**
294:23
**separate (13)**
29:5 51:21,22,22,22
54:23 66:8 68:7
73:24 79:11 143:21
164:17 203:20
**separates (1)**
80:10
**September (47)**
23:24 105:24 127:2
140:7 141:6 150:3
152:3,11 156:24
187:17 197:21
218:19 219:8
220:23 221:3
230:16,24 233:9
234:2,9 235:4
238:13 239:12
240:3 246:5 247:21
249:17 250:15
255:25 258:13,24
258:24 259:12,15
260:11,12,13
261:11 262:22
268:24 271:19,25
284:6 291:14
304:12
**Sergio (9)**
95:23 96:15 113:23
114:14 128:25
131:15 167:23
172:22 285:5
**seriatim (2)**
131:21,24
**series (2)**
8:14 132:2
**served (3)**
196:6,9,15
**service (5)**
10:4,19 83:4 113:9
264:10
**services (32)**
9:13 10:7 11:3 12:17
12:21,22 13:2,3
14:19 23:22,23 24:7
26:5,9,20 27:14,25
28:15 41:10 51:7
88:21,22,23,23
92:20 93:12 95:22
107:16 113:4,14,20
114:5
**session (1)**
131:23
**sessions (1)**
84:15
**set (41)**

10:19 20:4,15,18
21:19,23 29:5,23
32:19 44:7,13 47:20
51:18,20,25 52:22
53:6 54:11 66:6,9
73:20 79:21 81:16
100:20 103:13
133:23 145:2,2
149:11 152:17
154:24 162:18
171:13,15 184:11
210:6,7 268:15
300:4 312:11,20
**setting (10)**
11:19 18:16,25 45:13
45:20 46:3 47:8
78:7 107:17 143:21
**settle (1)**
47:16
**settled (1)**
35:21
**settlement (4)**
134:18,21 240:19
274:14
**settlements (2)**
137:14,15
**settling (3)**
39:12 136:2 180:19
**setups (1)**
133:21
**seven (2)**
33:10 131:25
**SG (3)**
44:9,11 46:19
**Shadow (1)**
60:21
**shareholder (1)**
239:2
**Shearson (14)**
23:8,10 81:4,9 82:6
82:11,16 83:9,12,23
84:5,17,25 86:12
**sheet (3)**
119:17 120:5 123:11
**short (3)**
100:15 146:6 160:21
**shorten (2)**
230:6 280:7
**shorter (1)**
238:11
**shortfall (2)**
227:23 228:3
**shortfalls (1)**
264:13
**shortly (6)**
66:2 95:14 97:4,6
209:24 272:16
**show (18)**
22:20 36:4 55:22

61:16 73:6 84:20
98:21 154:23 156:5
156:14 164:9 201:3
201:5 210:4 222:10
240:4 242:19
308:11
**showed (15)**
72:19,20 165:10
208:3 242:23 243:4
243:7 245:21 246:3
247:3,17,17,19
248:2 269:13
**showing (7)**
20:21 62:17 64:15
103:23 108:25
238:24 245:23
**shown (7)**
243:8,13 244:19
245:7 248:4 299:23
310:17
**shows (2)**
209:6 255:2
**side (16)**
17:3 58:6 84:5,5
117:14 217:7
224:24,25 237:4
253:2,3 264:22
265:13,17 266:20
306:13
**SIFMA (4)**
8:17,19,24 9:5
**sign (3)**
76:13,22 77:2
**signed (5)**
76:3 155:16 157:15
182:20,22
**significant (5)**
80:20 177:18 237:21
240:5 253:12
**significantly (1)**
281:12
**similar (4)**
9:23,25 26:18 88:18
**simple (3)**
20:8 62:22 216:17
**simplification (1)**
78:16
**simply (5)**
25:24 73:3 75:18
139:24 225:17
**Singapore (1)**
32:21
**single (9)**
27:16 34:16,17 132:4
135:18 207:16
241:18,19 264:17
**SIPA (18)**
3:16 6:4 105:9,21
200:10 216:12

221:17,17 225:13
228:2 236:7 255:9
256:12,19 257:24
258:12 261:6 302:5
**sir (251)**
6:21 8:20 13:6,11,13
14:7,14 15:3 17:5
17:14 18:22 19:10
20:9,25 21:12 26:23
27:13,23 28:16
29:13 31:13 35:2,7
36:17 37:11 38:19
40:17 42:3,6,16,20
42:25 44:4 46:3
47:6 51:2 52:6 56:2
57:11 58:19 61:12
62:12 65:18 70:9
73:9 74:25 75:16
78:6,9 79:13 80:15
80:19,23 83:22 84:8
85:15,21 86:25
87:15 88:24 89:6,15
89:20,24 90:21
91:12,17 92:12 93:9
94:9,25 95:16 96:20
97:4 100:8 103:6
106:5 114:5 115:22
115:25 117:18
129:16,23 130:6
141:24 150:6
152:25 153:6
162:14 168:15
169:3,7 171:6,12,24
172:12,20 173:8,23
178:9 179:2 187:14
188:19 190:23
191:10,13 192:21
193:2,16 194:20
195:8,14,19 197:4
197:10 198:19,24
199:4,17,22 200:5,8
200:13,19 201:10
201:18 202:6,16
203:4,11,23 205:3
206:5 211:25 212:3
212:6,17,20 213:22
214:2,9,13,17
215:24 217:20,22
218:7,10 220:16,19
220:24,25 222:6,23
223:8,10,16,21
224:12 225:17
226:17 228:8,25
229:11 230:13
231:21 233:8 236:5
238:2,12 239:9,11
239:22 240:6
241:13,25 243:12
243:18,24 249:10

249:25 250:12
251:14 252:9 255:6
255:18 258:10,23
259:6,11 260:10
262:2,25 263:4
265:21 266:11,22
267:18,21 268:22
269:19 270:13
271:8 274:12,17
276:3,19 277:7,16
278:5 282:10,13,21
283:19 284:15,18
284:24,25 285:4,9
285:13,15 286:5,15
288:14 289:3,4
290:7,18 291:13,23
292:12,24 293:12
294:9 295:5 297:2,8
297:18 298:3,25
299:15 300:3,7,14
303:5,14 305:5,22
306:12 308:5
**sit (1)**
281:14
**sitting (3)**
94:10 106:11 166:24
**situation (7)**
21:18 155:15 174:14
210:3 241:5 254:13
281:25
**SIV's (1)**
10:22
**six (11)**
17:22 27:10,11 33:10
34:21 35:11 62:19
104:9 217:12 218:9
218:12
**sixth (1)**
285:15
**six-week (1)**
156:17
**size (3)**
175:4 185:6 207:8
**slightly (5)**
29:10 37:25 38:8
75:11 241:10
**small (6)**
24:19 29:22 37:5
82:13 175:20 183:8
**Smarter (1)**
80:17
**Smith (19)**
23:7,11 56:7,20 80:18
80:21 81:5,11 82:20
83:10,12,24 84:3,5
84:17 85:2,23 86:10
86:12
**social (1)**
117:6

**Sociéte (6)**
21:19 30:8 43:10 44:5
44:9 75:12
**software (10)**
14:2 53:12,13 166:4
208:25 209:2,4
219:19 265:10,10
**sole (1)**
144:23
**Solomon (2)**
61:6,8
**solution (1)**
30:4
**solved (1)**
178:7
**solving (2)**
50:4,9
**somewhat (2)**
88:16 243:21
**sorry (14)**
12:13 28:7 37:18
41:13 43:13 47:14
70:17 93:9 96:9
97:20 102:3 157:4
258:18 302:25
**sort (2)**
77:4 270:11
**sound (4)**
115:17,21 120:3
156:12
**sounded (2)**
260:15
**sounding (1)**
125:10
**sounds (3)**
117:6 297:14,14
**source (4)**
99:19 121:4 189:16
204:24
**sources (1)**
121:17
**SOUTHERN (1)**
1:3
**speak (3)**
144:16 172:17 266:19
**speaking (2)**
213:18 246:19
**special (1)**
16:22
**specific (47)**
10:2 18:8 19:25 25:9
34:9 42:25 53:4
65:25 70:5 76:25
90:23 103:15 108:8
121:25 124:18
125:13,23 142:13
144:10 145:13
155:7 156:21
157:17 159:22

160:6 161:19 165:4
166:17 177:6
193:18 194:2 206:4
206:16 208:9,17,18
216:22 232:8 248:7
249:6,24 289:20
296:15 297:22
308:3,7 309:19
**specifically (46)**
10:19 11:13 15:22
17:8 40:19 54:14
57:24 98:6 119:18
119:22 121:16
123:4,15 126:23
133:16 143:25
144:4,9 147:19
149:14 155:23
163:3,15 165:19
173:15 176:17,23
195:13 203:5 206:7
219:11 227:4 231:3
247:16 256:3,24
257:17 272:4,9,18
273:24 287:23
288:5,9 304:5
308:10
**specifications (1)**
199:8
**specifics (3)**
153:24,25 155:15
**speculative (2)**
218:20 222:3
**spell (2)**
41:16 96:17
**spelled (1)**
178:19
**spelling (1)**
172:9
**spellings (1)**
96:5
**spend (2)**
38:4 114:22
**spent (3)**
81:10 115:11 286:20
**spinoff (1)**
60:24
**spoke (4)**
172:12 246:17 247:12
271:20
**sponsor (2)**
69:14,22
**spreadsheet (5)**
55:16 196:3 209:14
263:7 269:25
**Square (1)**
130:4
**SS (1)**
312:4
**stable (1)**

85:12
**staff (29)**
28:12 33:15,22,24
48:3 51:22 59:2,22
64:6,14 79:17 84:17
84:17 85:9 100:22
101:3,8,12,22 102:5
102:14,19 104:13
106:25 123:23
150:15 234:13
237:11 246:5
**stamped (2)**
285:18 289:3
**stand (3)**
12:9 267:6 293:14
**standard (3)**
231:25 232:5,11
**standards (3)**
11:20 16:22 239:5
**standing (1)**
79:5
**start (14)**
7:7 11:24 55:25 56:17
69:14 71:6,20,23
83:20 93:7 95:8
138:17 202:17
207:19
**started (19)**
8:21 9:11 32:8 56:13
57:10 82:11 95:12
95:13 97:3 98:5
135:25 180:8 182:6
255:14 256:3,25
291:5,15 292:16
**starting (2)**
21:15 53:25
**starts (1)**
30:9
**state (13)**
2:11 43:11 53:16
58:24 65:18 70:11
119:14 120:23
267:15 280:19
311:2 312:3,8
**stated (3)**
105:18 154:6 243:7
**statement (6)**
156:7 225:18 226:7
228:11,13 251:19
**statements (3)**
85:8 248:25 295:21
**states (7)**
1:2 36:23 38:9 44:15
108:18 170:23
175:12
**stating (3)**
244:17 248:12,13
**status (2)**
174:14,23

**statute (2)**
80:2 245:17
**statutory (1)**
228:2
**stay (5)**
57:6 88:18 254:16
262:5,7
**stayed (1)**
37:9
**staying (1)**
241:3
**Steen (1)**
4:4
**steering (1)**
76:6
**sticking (1)**
187:13
**stip (5)**
94:19 97:10 98:8,8
194:14
**stipulation (2)**
204:23 308:19
**stock (9)**
16:16 47:22 63:2,3
67:9 79:23 104:2
108:23 257:4
**stopped (2)**
133:18 176:11
**stories (1)**
199:6
**straight (1)**
181:13
**straightforward (1)**
77:21
**strange (1)**
279:12
**strategic (1)**
43:12
**street (3)**
2:7 3:5 264:21
**stressful (2)**
169:9,24
**strict (1)**
31:8
**strike (1)**
213:13
**strong (1)**
77:23
**structure (3)**
29:11,18 32:2
**struggles (1)**
134:8
**Stucchio (34)**
117:4 172:5,12,17
173:6,23 175:8
176:24 177:12,21
178:9,11 179:21,22
231:2 232:9 242:14

243:3,13 244:18
245:4,13 246:18
248:8 250:13 251:4
255:13,19,24
257:16 284:12,20
284:23 291:11
**Stucchio's (1)**
178:3
**stuff (1)**
293:3
**subject (11)**
19:15,19,23 46:6,17
46:18 57:12 61:22
271:18 307:21
310:16
**submitted (1)**
95:5
**subordination (13)**
155:17 157:15 181:17
181:18,24 182:2,9
182:13,20,22
183:16,20,21
**Subscribed (1)**
310:19
**subsequent (22)**
116:15 140:6 154:8
154:16 157:18
171:19 176:20
186:17,25 187:3,21
187:25 189:7,12
190:2,10,20 199:22
242:8 288:25
290:23 296:7
**subsequently (5)**
159:6,20 209:23
251:7 284:9
**subset (2)**
68:12 104:10
**subsidiary (1)**
88:5
**substance (2)**
116:7,8
**substantial (4)**
90:18 106:16 237:3
281:8
**substantially (3)**
92:7 233:5 236:13
**substantiate (5)**
154:13 207:2,13
209:15 220:12
**substantiated (2)**
218:18 219:7
**substantiates (1)**
270:17
**substantiation (1)**
210:9
**subtract (1)**
62:21
**subtracting (1)**

17:21
**subtraction (1)**
64:12
**success (1)**
138:8
**successful (2)**
150:3,5
**successfully (5)**
135:11 137:23 138:5
230:14,23
**Sudarsan (2)**
268:11 271:12
**sufficient (3)**
224:8 225:23 263:24
**suggested (2)**
131:20 166:15
**sum (1)**
17:22
**sums (1)**
169:15
**supervision (3)**
299:11,19,24
**supervisor (1)**
300:20
**support (15)**
10:20 54:7 66:14 69:6
71:10,19,23 83:16
85:6 103:10 154:5
193:13 256:9
264:17 307:24
**supported (5)**
27:5 107:25 108:6,17
149:9
**supporting (8)**
10:9 27:3,10 66:15
82:3 88:2,11 100:3
**supposed (5)**
36:9 213:4 227:18
283:21 299:8
**supposedly (2)**
213:4 248:4
**sure (47)**
13:8 15:25 22:3 23:12
23:18 25:5,18 49:14
51:24 53:5 58:11
60:15 64:22 72:5
77:16 79:2 82:18
83:8,23 84:9 85:10
85:16 96:8 97:22
98:6 103:12 113:6
122:8 124:14
132:22 174:22
176:2 178:3 207:18
211:3,8 239:23
241:8 260:17
280:14 285:17,18
289:19 291:5 299:6
299:8 307:16
**surprising (1)**

165:19
**suspected (1)**
209:8
**suspended (1)**
232:21
**suspense (1)**
137:5
**Swaps (1)**
11:15
**sweats (2)**
34:4,11
**sweep (1)**
27:17
**sweeps (3)**
25:10 27:15,16
**swept (1)**
25:15
**sworn (4)**
5:18,21 310:19
312:12
**Syndication (1)**
10:24
**synonymous (1)**
197:15
**synopsis (1)**
14:9
**system (75)**
18:19,25 21:17,17
30:23 39:10 47:7
51:9 52:4,6,20
54:12,21 55:10
57:25 58:7 60:25
61:2,3,5 63:21 65:7
65:7 70:20 72:2
76:3 81:10,25 82:19
90:11,17 91:14
92:25 103:25
106:11 132:12,12
132:25 135:3 139:7
139:13,13 141:19
141:19 144:20,20
144:24 145:21
146:21,22,24,24
147:4,5,7,8 149:7,8
149:9,10,10,11,12
151:20 153:21
156:11,12 164:21
165:14 170:8,11
183:4 187:16,19
304:6
**systems (77)**
8:4 16:10,20 17:15
18:16 20:7 21:11,25
22:2,3,3,4,12 32:22
33:24 36:14 39:9,18
41:21 44:18,21
45:13 46:2 47:19,20
48:9,11,12,12,13
49:11 51:18,22

54:12,17 55:20
57:22 60:18 62:8
63:9 67:12 68:11
71:9 73:20 74:7
75:20 78:8 84:13
85:16 101:2,3 103:2
117:22 120:14
134:4,17 135:22,24
137:10 139:15
140:16 145:3
152:22 162:20
163:24 164:3,5
165:13 166:20
169:5 170:6,11
180:15,16 233:2
283:23 288:11
**S-A-L (1)**
41:18
**S-E-R-G-I-O (1)**
96:15
**S-I-F-M-A (1)**
8:17
**S-T-U-C-C-H-I-O (1)**
172:6

_____

**T**

**T (3)**
312:2,2 313:8
**TABATABAI (1)**
3:20
**table (1)**
306:13
**tail (1)**
298:7
**take (49)**
7:5,9 24:18 25:5
27:17 34:24 42:9
54:16 58:10 65:13
97:9 125:4 127:4,17
128:10 129:13
130:2 137:3 138:15
155:19 157:20
158:10,14 170:9
187:8 190:3 191:9
194:15 202:19
223:2 227:7 230:4
232:23 235:21
243:9 259:13
261:15,19 269:8,24
273:19 274:6 280:6
281:10 288:15
299:10 300:4
305:16 308:19
**taken (21)**
36:10 58:12 90:11
99:10 138:19
155:21 158:16
187:11 224:5
225:20 230:9

257:15 258:13
259:21 260:20
280:8 285:3 305:18
305:24 306:14
307:6
**talk (47)**
7:8 27:2 33:21 64:19
98:10 104:17 116:7
123:15 124:18
126:22 145:23
146:4,9,17 147:11
147:16,19 150:16
150:24 151:7
153:13 157:24
163:5,16,19 166:15
166:23 167:24
168:3 171:21
177:15 178:11
183:24 189:13
201:9,12,15 206:21
222:3 252:8 261:22
268:3,11 272:20,22
293:25 301:19
**talked (34)**
28:11 34:19 39:20
48:23 64:10 116:6
116:10 118:3
119:18 126:25
133:20 136:16
141:18 143:15
154:17 161:21
175:9 178:12
179:19 180:6
187:23 188:17
206:7 229:19
237:11 244:22
246:16 247:13,14
268:7 286:25 288:5
295:3 297:19
**talking (26)**
15:22 38:19 49:2,3,4
57:16 58:21 66:14
104:25 138:17
144:9 163:9,12
202:25 234:12
244:25 277:22
286:12,21 287:19
292:21 293:9
295:11 298:22
301:11 310:2
**targets (1)**
54:20
**tasks (1)**
29:23
**taxonomy (1)**
219:6
**team (26)**
40:5 47:6 68:21 76:9
95:17 97:2 105:14

105:15 114:9,12
115:10,18 127:23
127:24,25 128:2,9,9
158:2 191:20
282:15 294:19,25
295:7,10,16
**technology (8)**
13:25 18:23 32:3
43:12 55:5 85:9
88:22 166:16
**telephone (11)**
102:4 118:16 119:2,7
172:13,14,20 173:3
255:18 297:4
303:21
**tell (90)**
6:21 12:14 15:3 20:25
29:13 35:9 44:4
53:20 59:7 80:23
97:5 100:12 104:14
105:2,21 114:11,19
119:12 120:19
124:20 132:7 134:2
136:7 138:25
140:13 141:10,24
143:16 144:3
145:25 147:3 148:2
149:3,24 151:16
153:18 155:12,25
157:13 159:3
161:24 163:20
164:11 166:13
167:2 168:18 169:2
169:7,25 170:5
171:12 173:23
177:21 178:25
180:3 182:18 184:4
185:12,18 187:14
191:18 195:18
200:16,25 201:5
202:21 204:19
205:12,24 217:22
223:3 225:10
228:10 246:23
269:25 270:21
271:23 274:12
282:12,23 284:19
284:25 286:4
288:17 290:21
294:8 295:13
299:18 301:2 305:5
**telling (7)**
63:9 140:21 148:9
180:18 284:18
301:3 303:24
**ten (13)**
27:21,24 31:10 32:4
55:2 61:3 84:24
92:2,6,10 230:12

291:19,19
**tend (2)**
126:19 237:23
**tens (8)**
23:9 82:23 255:6,22
256:9,17 257:14
261:4
**tenure (2)**
80:20 178:3
**term (15)**
35:14,15 121:9 125:8
132:17 135:17
216:10,13 226:25
227:5 238:20 256:3
299:21,24 309:15
**terms (34)**
19:7 37:13 38:9 45:12
50:13 59:18 69:2
97:17 110:25
112:23 122:12
125:10 139:20
142:16 148:5
150:11 151:21
152:4 158:23
181:14 191:7 192:3
195:7 203:7 208:11
209:10 210:2
216:12 221:8
224:16 241:7 256:2
276:2 306:14
**terrorist (2)**
90:5 91:15
**test (7)**
72:18 73:5,17,18
233:10 234:3,10
**testified (18)**
5:21 89:17 94:9 105:6
113:12 154:5 162:3
168:7 190:24
198:23 199:13
232:11 237:9 239:9
239:11 259:4
295:19 305:17
**testifying (1)**
224:20
**testimony (25)**
39:20,23 46:23 53:10
56:9 89:7,9,24
162:5 188:19 189:2
192:4 213:8,13,14
234:25 243:12,18
261:9,14 295:5
306:22 307:5
310:14 312:13
**testing (6)**
20:3 21:11 76:9 84:12
85:5,14
**thank (14)**
6:20 28:7 30:18

116:23 179:23
183:23 184:17
189:11,25 218:5
220:4 221:25 306:4
310:10
**Thanks (2)**
94:24 214:6
**Thanksgiving (1)**
95:3
**theirs (2)**
109:22 111:20
**thereabout (1)**
129:25
**They'd (1)**
63:23
**thing (8)**
54:6 100:5 141:18
161:21 177:2
214:18 248:10
291:8
**things (26)**
28:18 35:3 50:13,14
50:22 65:5 76:11
77:18 88:13 93:22
96:2 97:13 137:4,11
175:22 177:4 203:6
213:10 234:20
235:24 237:7
241:10 287:22
294:3 295:3 308:13
**think (109)**
17:6 24:2 25:4,8,21
28:9,11 31:9 41:22
46:13 47:10 48:20
48:24 55:2 56:8
60:22 62:19 63:6
65:16,16 73:21
76:21 77:7,11 78:16
79:10 82:16 86:24
88:15 91:6,13 98:22
99:8 109:18 111:16
113:12 118:4,23
121:8 133:24
136:19 140:11
141:13 144:21
151:12 159:19,23
160:22 163:3 165:8
169:11 172:8
173:10,21 177:4
178:5,6,12 179:20
181:21 184:7
187:20 194:14
196:8 201:21
206:13 213:7
215:25 216:7,21
217:6,17 221:8
224:23 229:12
232:13 235:10,12
235:24 236:24

240:13 241:18
244:11 245:22
246:21 248:6,11
251:22 255:15
259:20,22 260:2
261:9 267:25
270:11 272:14,15
272:22 278:25
279:5 280:19 289:9
292:15 293:16,21
299:24 301:16
308:4 310:2
**thinking (3)**
61:9 75:25 175:22
**third (9)**
49:7,21 82:10 261:2
289:2 292:24
297:11 298:11
299:7
**third-party (1)**
27:20
**Thirty-two (1)**
191:11
**thought (20)**
6:18 20:5 34:12 56:9
75:14 121:7 126:22
132:17,23 140:18
145:4 147:21
149:25 150:4
182:15,16 188:17
196:24 286:8
305:17
**thousand (1)**
81:22
**thousands (8)**
59:2 255:7,22 256:9
256:18 257:14
261:5 263:10
**three (20)**
13:17 27:21,24 32:24
45:23 81:22 83:3,14
94:3 114:14 116:13
167:5 183:4 190:4
204:13 283:12
286:10 293:2 297:7
298:4
**Thursday (4)**
204:10 271:15 283:15
284:5
**ticket (1)**
53:6
**tickets (2)**
49:21 308:13
**tie (2)**
74:11 135:15
**tied (1)**
55:22
**tightly (1)**
71:14

**time (88)**
7:20 8:20 9:9,12 11:4
11:6 22:21 25:5
26:4 29:19,21 31:24
32:12,18 33:12 38:4
41:6 44:8 56:6 57:8
58:10,19,21 59:10
65:13 67:13 76:21
81:19 82:12,15
84:24 85:4,11 89:4
93:11 100:15
101:16 108:12
115:20 122:16
131:22 132:7
136:18 144:7 146:7
150:2,9,10,12
156:18 160:12,14
166:21 167:25
168:4 181:18
182:23 188:6
190:19,20 197:7,19
202:4 205:22 206:2
206:12 221:12
227:24 229:21
233:13 236:25
238:5,8,11 241:19
257:3 268:14
272:19 273:20
274:7 282:3 286:20
292:17 300:21
307:21 308:14,20
310:11
**timeframe (1)**
288:13
**timeframes (1)**
310:8
**timely (1)**
94:2
**times (10)**
6:24 7:18 20:13 74:5
130:4 176:8 214:20
268:3 286:10,11
**timing (1)**
278:25
**Tipton (2)**
45:3,25
**tired (1)**
33:9
**title (3)**
107:14 113:4 202:2
**today (12)**
17:7 166:24 189:3
192:15 198:23
201:21,24 204:6,10
301:17 307:16
308:20
**told (45)**
36:17 37:20 40:2
56:21 57:12 101:7

103:10 123:3 125:6
136:12 137:17
139:24 141:5
144:25 147:21
148:6 151:12
168:15 173:23
183:9 184:14
187:20 206:8 239:7
242:13,23 243:12
244:18,18 255:11
255:12 256:14
257:11 258:21
259:16 271:5 272:7
276:10 284:4
287:13 288:4
291:11,12 295:16
305:23
**Tonucci (42)**
117:3 118:3,12 119:9
120:19 123:3,12
124:5,9,20 125:15
125:22,25 126:15
127:7,18 128:4,13
129:20 169:18
242:14 243:2,13
244:19,25 245:4,12
246:18 247:12,19
248:2,8 249:4
250:12 251:4 296:3
305:8,11,14 306:16
306:24 307:14
**Tonucci's (3)**
118:20 305:18,23
**Tony (9)**
117:3 172:5 179:21
179:22 230:25
242:14 243:3
246:18 291:11
**top (1)**
290:9
**topic (5)**
91:21 93:16 150:23
157:23 206:8
**topics (2)**
205:16 213:8
**total (10)**
37:13 92:2 115:2,9
252:13,14,15,23
253:4 287:6
**totally (1)**
136:6
**Toucan (13)**
28:23 29:6,15 30:6,12
30:19 41:9 47:6
56:11,13 57:9 58:18
65:11
**Touche (5)**
4:5 233:18 234:22
235:9 238:9

**track (1)**
115:14
**tracking (2)**
115:15,20
**trade (6)**
47:16 49:21 53:6
145:5 308:12,13
**traded (2)**
12:16 59:16
**trader (1)**
15:10
**traders (2)**
33:21 59:19
**trades (14)**
16:13 27:13,22,24
28:2 35:21 37:15
48:22 65:4 134:19
137:7,7 288:6,7
**trading (34)**
10:24 13:22,24 14:22
15:11,15,18,25 16:2
16:2,3,17,21 17:3
24:18 31:2 40:15
41:24 61:7,17 69:8
84:14,18 86:19 88:3
88:6,12 110:9,20,22
112:7,18,20 149:7
**traditional (1)**
90:25
**traditionally (1)**
78:24
**trail (1)**
209:6
**transacting (1)**
180:9
**transaction (5)**
37:11 40:17 153:21
197:20 198:16
**transactions (3)**
28:14 113:9 135:21
**transcript (2)**
295:20 310:16
**transfer (4)**
10:6 23:15 135:4
277:9
**transferred (7)**
23:16 148:16 209:19
255:7 256:10,18
261:5
**transfers (4)**
134:23 148:8,11
256:4
**transition (1)**
182:6
**transparent (1)**
53:9
**treasurer (9)**
118:4 119:16 120:6
123:18 124:4,10

169:18 243:3 296:3
**treasurer's (1)**
126:9
**treasury (5)**
31:4 54:10 245:6
295:25 296:2
**treat (2)**
142:11,22
**treated (7)**
175:18 181:23 182:3
183:11 186:12,20
304:9
**treatment (2)**
143:7 303:10
**trial (7)**
89:21 132:21 157:25
158:3,4,9 238:24
**tried (1)**
88:18
**tri-party (2)**
135:10 286:21
**trouble (2)**
262:5,8
**true (12)**
14:15 64:18 100:11
192:8 215:13,14
251:10 261:17
284:2 295:8 310:15
312:13
**trust (68)**
8:19 9:12 10:4,4,7,12
10:15,18 11:3 14:2
22:16,22 23:21,23
24:3,5,7,12 25:14
25:25 26:5,9,20
27:13,19,25 28:15
28:19 30:8 31:13,25
32:15 33:13,15 34:3
34:25 37:7 38:5
39:6 40:6,9,15 41:4
41:10,25 42:11,13
42:18,21 43:5 50:15
92:20 93:12 95:19
95:22 107:16
110:10,21 112:8,19
113:3,9,13,14,17,19
135:3 210:7
**trustee (4)**
3:16 6:4 105:9,21
**trustee's (2)**
200:10 222:25
**Trust's (1)**
31:16
**truth (1)**
201:2
**try (12)**
7:4,15 32:9 55:19
71:18 86:25 100:18
101:15 234:18

276:14 286:9
300:18
**trying (28)**
33:11 35:17 61:2,9
69:14,22 93:8 101:8
101:13 105:15
126:21 139:17
146:5 174:11,16,20
175:23 179:13,15
182:8 206:6 217:12
239:8 251:22
268:15,19 287:18
304:20
**TSA (13)**
102:18,22 105:14
157:7,8 159:18
165:17 271:2,3
272:6,6,13,16
**turn (26)**
13:6,9 15:4 28:20
89:5 120:19 191:10
211:21 218:9 223:8
223:20 227:14
230:12 239:21
241:24 264:5 283:6
284:11 285:8,15
290:6 291:21 294:5
296:21 298:3,24
**turned (1)**
135:23 287:4 288:11
**turning (14)**
23:21 51:3 53:16 65:9
89:23 91:16 92:12
148:22 158:18
160:8 162:6 284:24
289:2 303:13
**turns (2)**
122:16 135:19
**two (32)**
25:9 33:13 52:9 55:14
55:14,16 57:2 60:9
61:14 72:12,16
80:10 81:22 82:22
83:11 94:2 95:21
106:5 113:10
116:19,20 122:9
129:6 132:3 183:7
185:6 207:3 211:4
217:5 221:14
265:24 286:10
**type (14)**
9:21 22:4 24:17 29:24
63:18 109:6 111:4
149:8 159:24 188:6
205:22 206:25
232:22 239:2
**typed (1)**
129:7
**types (20)**

9:23 10:2 39:14 59:14
59:18 64:24 80:14
83:4 107:14 108:25
120:16 133:9 145:4
147:12,17,20,22,23
193:5 308:3
**typically (10)**
75:2 79:16,18 137:4
215:2,9 249:11,13
250:2 254:11
**typify (2)**
221:10 265:9
**T-O-U-C-A-N (1)**
28:23

_____

**U**

**Um-hum (2)**
263:9 283:17
**uncertainty (1)**
142:24
**unconditionally (1)**
226:20
**undecipherable (1)**
300:17
**underlined (1)**
304:18
**underlying (1)**
116:8
**understand (33)**
6:15 7:11,14 17:12
18:15 26:23,24
34:17,20 47:18,25
50:16 53:10 55:6
57:21 97:21 101:5
104:17 190:13
192:4,11 209:4
233:19 246:22
248:23 253:9
256:21 260:7 268:4
273:22 284:3
293:24 309:20
**understanding (22)**
22:24 43:22 49:11
67:7 70:21 74:18
106:17,20 148:16
150:21 161:10,11
183:15,19 195:20
206:20 240:18,23
250:24 270:25
287:15 307:9
**understood (12)**
46:14,15 47:17 86:8
100:24 101:23
102:8 152:17
165:12 183:8
234:15 301:7
**undertake (4)**
233:8 234:2,8 237:8
**undertaking (3)**

106:16,22,24
**undertook (2)**
9:18 12:2
**unemployed (1)**
102:16
**unfortunate (1)**
246:7
**unfortunately (1)**
226:9
**unique (2)**
81:15 88:16
**uniquely (1)**
143:23
**unit (3)**
45:19 71:7 84:21
**United (6)**
1:2 36:23 38:8 44:15
108:18 175:12
**units (1)**
68:10
**unknown (1)**
247:7
**unquote (1)**
296:10
**unredacted (2)**
302:9 306:10
**unreported (1)**
35:13
**unsubstantiated (1)**
206:24
**unsupported (2)**
218:20 222:3
**unusual (1)**
135:13
**unwinding (1)**
135:10
**updated (1)**
36:6
**upfront (1)**
137:14
**urge (2)**
227:20,22
**use (21)**
15:12,16,21 35:14
59:25 63:10,21 80:9
106:24 120:10,14
124:14 125:8
132:16 164:6
216:22 239:3
251:23 257:14
286:22 296:4
**user (7)**
19:23,24 20:10 39:21
39:25 40:5 63:24
**users (1)**
59:19
**usual (1)**
135:21

**usually (20)**
15:16 16:12 17:2
20:20 35:15 49:21
50:6 67:2 68:11
74:12,20 75:7 76:19
77:3 123:22 156:17
227:5 232:3 238:21
262:14
**U.K (5)**
36:18,21 38:11,19
40:19
**U.S (21)**
21:19,20 22:19 36:25
37:2,10,16 38:20
39:5,7 40:18 43:17
45:22 51:7 70:17,18
71:11 80:21 91:14
134:12 150:22

_____

**V**

**vacation (1)**
268:20
**validate (9)**
38:15 60:2,8 61:13
64:25 209:22
234:23 237:25
246:15
**validated (2)**
58:4 59:24
**validity (1)**
224:19
**valuation (2)**
16:23 17:2
**value (4)**
16:25 63:19 153:11
252:12
**variance (5)**
63:19 87:12 156:4,14
164:14
**variety (2)**
12:17 49:20
**various (13)**
48:10 62:7,15 68:10
121:4,4 162:20
163:24 164:2,5
202:25 240:20
265:12
**vary (1)**
68:18
**vendor (7)**
30:23 59:24 60:9,18
61:14 62:15 209:7
**venture (1)**
10:17
**verbal (1)**
180:17
**verbatim (1)**
295:20
**verify (2)**

93:24 210:22
**versa (1)**
166:6
**versus (3)**
36:6 137:9 306:14
**vice (1)**
166:6
**vice-versa (1)**
235:15
**view (12)**
14:11 15:19,19 17:25
24:19 25:21 50:17
55:17 90:9 232:18
248:17 257:13
**Vinella (324)**
1:13 2:6 5:1,19,25 6:1
7:1,22 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
58:15 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1,23 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1

156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
230:11 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
280:10 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
306:23 307:1,20,23
308:1,16 309:1
310:1,13,18 312:10
313:5,11
**Vinella's (3)**
109:16 111:14 213:2
**Violating (1)**
262:9

**violation (3)**
262:10 279:21 280:3
**Virgin (2)**
34:3,11
**vitae (1)**
13:10
**volume (1)**
135:7
**volumes (3)**
69:2 135:12 169:10
**vulnerability (1)**
91:14

---

**W**

**wait (1)**
7:6
**wall (1)**
69:7
**want (26)**
24:3 39:4 56:17 63:18
97:10 98:6 105:20
109:24 111:22
115:17 117:23
197:6 207:16 211:2
220:2 221:10 226:9
226:23 246:13
262:24 265:25
281:21 293:14
301:14 302:17
309:12
**wanted (16)**
54:4 59:25 63:11,11
63:21 77:4 81:9,13
137:13 205:21,25
208:20,23 210:4
211:7 267:7
**Washington (1)**
3:12
**wasn't (42)**
11:17 32:11 47:5
52:12 54:14 87:9
105:17 113:13
124:13 129:4
135:22 145:12
147:9 151:23
153:10,23,24,25
161:10 164:15
165:18 166:11
169:14 170:20
175:25 176:19
177:18 181:4 185:3
185:16 196:14
208:24 246:14
259:18 265:10
266:8,9 287:11,14
296:7 298:2 309:7
**watching (3)**
240:12,19,20
**way (53)**

12:3 27:4 34:4 35:14
47:11,24 56:23
59:13 66:9 68:9
71:17 77:4 81:13
86:15 88:25 89:13
90:2 92:10 93:23
105:25 106:9,19
120:13 131:24
144:25 164:18
178:18 181:2
184:11 193:15
205:20 209:21
215:5 217:6,9
222:12 226:15,16
228:13 229:19
236:11 241:11
249:21 260:24
262:12,19 268:19
273:23 292:25
293:14 298:9 304:9
312:17
**ways (1)**
90:11
**wearing (1)**
34:3
**Wedd (1)**
71:6
**Wednesday (2)**
204:9 255:15
**week (65)**
33:3 50:11,12,22 68:3
95:11 103:3 117:10
117:11 118:2,10
120:2,8,24 126:5,25
132:15 134:4
135:14 137:12
149:14 150:2
152:10 156:24
157:22,22 168:21
168:24 169:8
173:14,20 176:4
179:9,12,14 185:22
186:18 187:17,17
188:5,6 214:20,22
233:4 236:6 241:12
241:15 242:7 246:4
247:21 248:4
249:17 250:15
251:7 255:3,24
256:19 257:9,13
286:7,10 291:4,4
292:15 304:22
**weekend (2)**
84:15 174:17
**weekends (1)**
84:16
**weekly (5)**
40:13 45:11 78:2
250:9,9

**weeks (11)**
183:5,7 236:6 255:8
255:24 256:11
257:2,24 258:11
259:14 261:6
**week-to-week (1)**
78:10
**Weill (2)**
81:8,24
**welcome (2)**
220:3 226:4
**went (26)**
36:3 37:6 41:22 52:21
55:3 75:13 85:5,12
88:5,17 102:15
103:11 139:13
152:2 159:22
166:21 179:9 182:5
205:17,18 209:18
240:23 257:10
290:22 291:6
292:17
**weren't (26)**
36:12 40:4 49:5 52:25
63:13 66:3 103:12
148:15 154:25
156:25 157:5,16
174:22 175:21
193:8 209:17,23
210:19 233:13
234:17 240:11
248:18 250:22
256:13 260:22
271:4
**Westminster (1)**
31:18
**We've (1)**
229:25
**WHEREOF (1)**
312:19
**widespread (1)**
177:5
**willing (1)**
56:19
**Wilmington (37)**
8:19 9:12 10:3,4,7,12
10:15,18 11:3 23:21
23:23 24:3,5,7,12
25:2,25 26:5,9,19
27:13,19,25 28:15
28:19 41:10 50:15
92:19 93:11 95:22
107:16 113:3,9,13
113:14,17,19
**Wisconsin (1)**
3:11
**wish (2)**
201:25 311:4
**withdraw (5)**

124:16,21 279:3
289:17 296:6
**withdrawal (2)**
243:23 248:21
**withdrawals (6)**
242:8 245:14,16
247:24 248:17
296:11
**withdrawing (3)**
122:22 242:25 244:6
**withdrawn (14)**
11:23 52:16 61:21
123:8 194:18
201:17 219:4
220:20 239:10
245:5,6 255:22
278:21 295:14
**withdrew (1)**
242:21
**witness (26)**
5:18,20 12:20 58:11
89:18 97:24 99:16
99:21 119:20 129:4
142:5 171:18
196:18,21,25 205:2
211:5 219:25
306:20 309:3,12
310:13 312:10,14
312:19 313:4
**woman (1)**
166:18
**women (1)**
29:7
**Woodland (3)**
165:9 302:24 303:6
**Woodlands (40)**
124:6 143:12,13,15
143:17 144:2,3,11
144:14,18,19,22
150:25 155:10,13
155:23 156:22
157:2,15 160:3
163:13,15 164:23
165:5,7,15,20
176:17,22 177:8
179:16 181:15
182:10,19 183:3,10
208:13,19 251:5
303:9
**word (10)**
120:10 169:11 221:5
251:23 257:14
275:22 289:10,16
289:20 299:6
**worded (1)**
251:22
**words (3)**
293:2,7 302:10
**work (46)**

22:14 23:9 29:24
30:14 31:7 35:3
39:4 40:2 41:12
42:11,13,17 43:21
44:4 46:19 51:15
52:11 56:9 57:11
58:22,24 59:7 61:25
65:10,13 67:6 68:9
70:16 71:5,16 73:7
84:15 90:4,18 94:8
105:19 107:22
113:16 114:22
115:7,11 116:2
193:19 235:2,8
272:15
**worked (15)**
31:9 44:22 45:18,24
46:13 57:20 60:14
63:9 72:20 73:6
107:11 109:19
111:17 113:19
115:10
**working (13)**
68:21 84:21 85:10
95:8 98:12 100:16
101:3,12 105:14
165:13 229:13
233:19 241:6
**works (1)**
47:11
**World (2)**
29:7,12
**worried (1)**
60:23
**worry (1)**
237:17
**worth (2)**
51:12 290:10
**worthwhile (2)**
71:18 77:8
**wouldn't (27)**
19:21,23 55:23 67:8
67:24,25 68:7 80:12
90:25 102:22
128:10 139:14
145:15 156:8
182:15 235:4 236:9
237:18 251:24
263:24 265:8 274:5
281:14,19,23
293:10 309:20
**wrap (2)**
82:12 83:4
**write (7)**
13:13 54:6 95:12
230:14 251:14
267:3 285:23
**writes (7)**
212:11,20 214:9

215:21,23 217:15
217:23
**writing (1)**
248:20
**written (5)**
34:9 49:22,23 193:8
307:10
**wrong (1)**
217:8
**wrote (4)**
13:14 54:18 258:23
293:10

### X

**X (4)**
1:4,10 313:3,8

### Y

**Yeah (8)**
41:19 93:14 128:24
196:10,20,25
242:11 291:3
**year (6)**
81:23 101:12,13
233:19 278:24
279:3
**years (8)**
31:11 57:2 61:3 92:2
92:6,10 126:17
131:25
**York (35)**
1:3,14,14 2:8,8,12 3:6
3:6,18,18,24,24
21:24 22:13 71:21
71:23 72:7 79:23
116:16 118:2,6
129:18,21,22
148:25 157:19
158:20 282:24
293:17 294:12
311:2,3 312:3,5,8
**Young (2)**
69:16,23

### Z

**zero (2)**
56:17 167:6
**Zoete (1)**
71:5

### $

**$1 (2)**
276:10,21
**$2 (2)**
276:5,18
**$2.3 (3)**
175:9 297:23 308:11
**$213 (5)**

208:22 266:13,18,24
273:22
**$25 (2)**
263:22 264:2
**$25,880,000 (1)**
263:11
**$258 (1)**
208:5
**$26 (1)**
263:3
**$3 (1)**
276:8
**$3.6 (2)**
292:4,16
**$4 (1)**
240:5
**$436 (1)**
304:3
**$5 (2)**
253:6,8
**$500 (1)**
34:15
**$503 (2)**
280:16 281:11
**$507 (3)**
274:19 275:6,20
**$534 (1)**
208:13
**$550 (1)**
114:13
**$630 (1)**
208:4
**$650 (1)**
114:5
**$82 (11)**
146:23 147:9 153:14
175:19 186:14,22
210:2,10 274:13
301:4 302:2

### 0

**00297254-260 (1)**
313:12
**00297261 (1)**
313:13
**00297262-265 (1)**
313:14
**00297275-314 (1)**
313:16
**00297277 (1)**
289:3
**06 (1)**
23:24
**08 (3)**
11:7 302:25 303:4
**08-13555(JMP) (1)**
1:7
**088 (1)**

303:17
**09 (2)**
23:24 118:2

### 1

**1 (1)**
276:16
**10 (4)**
56:14,18 288:10,12
**10th (1)**
270:8
**100 (4)**
101:8 183:8 231:24
233:19
**10004 (1)**
3:18
**10017-6702 (1)**
3:6
**11 (6)**
1:6 88:4 223:9 226:2
238:12 239:21
**12 (6)**
206:18 241:24 242:2
242:3 251:13 255:6
**12th (2)**
138:2 304:23
**120 (1)**
34:6
**14 (1)**
230:13
**15 (4)**
37:13 152:3 268:19
304:12
**15c3 (5)**
9:19 11:11 12:4 15:5
15:6 17:7 18:7,11
18:22 40:20 43:24
44:6 46:20 51:16
53:21 57:14 59:4,8
61:23 66:18 71:2
73:16,19 80:25 89:3
89:13 90:2 91:22
92:10 93:16 107:9
141:25 143:3
149:17 152:5,11
153:4,7 202:11
224:3 225:20
226:17 227:9
228:15,18 249:11
250:2 275:13
276:18 277:7,16
283:25 304:11
**15c3-3 (12)**
15:23 16:9 39:3 61:13
64:9 68:20 224:25
227:4 229:13 262:9
295:4 299:5
**15th (16)**
103:3 120:8 132:15

138:3 168:21 179:9
179:12 242:7 246:5
247:21 248:5
249:17 250:15
286:8 292:15
304:22
**150 (2)**
34:5,6
**16 (6)**
211:21 212:4,5,8,11
304:15
**16th (11)**
137:24 138:6 195:4
195:23 196:2,14,18
197:2 258:24
292:18 304:24
**17 (6)**
27:9,10 212:17,20
264:5 304:15
**17th (30)**
137:24 138:6 195:5
195:23,24 197:2
230:16,24 233:9
234:2 238:13 239:6
239:12 240:3
255:16 256:4,5
258:13,13,24
259:15,22 260:11
260:12 261:10,20
262:22 292:18
304:24,25
**18 (2)**
213:22 282:25
**18th (30)**
129:24 135:2 136:14
136:15,17 148:8
158:20 160:9 168:7
168:16 171:7,20,24
187:22 188:2 256:4
256:5 261:16
282:16 283:2 284:6
284:9 285:3,14
288:21,23,25
293:17 294:12
304:25
**180 (1)**
115:21
**180-hour (1)**
115:7
**19 (9)**
214:4,9 218:19 219:8
221:3 255:25
271:25 304:16,18
**19th (79)**
105:16,24 106:19
126:6 127:2 133:15
134:5 135:18,20
136:8,18 138:13
139:11 140:4,7,15

141:4,6,18 150:2
152:11 156:24
168:22 174:8,17,22
175:21 176:4
179:14,15 181:4
183:12 185:5,22
186:16,18,19,23,25
187:3,3,17 210:20
211:10 219:21
220:9,10,15,18,22
220:24 221:23
231:11 233:20
234:9,15,19 235:3
239:8 241:16
250:22,23 255:3
259:12,18 260:13
260:21 261:16,22
261:23 268:24
271:19 272:4 291:2
291:14 302:6,8,8
305:3
**195 (1)**
206:18
**1995 (1)**
93:13
**1999 (2)**
65:15,17

_____
**2**

**2 (2)**
48:22 309:19
**20 (5)**
31:10 126:17 214:13
256:6 268:19
**20th (1)**
234:15
**2000 (1)**
65:15
**2001 (1)**
90:5
**20015 (1)**
3:12
**2004 (1)**
58:23
**2005 (3)**
93:3,5,6
**2006 (3)**
9:11 11:7,8
**2007 (1)**
8:22
**2008 (26)**
8:22 9:13 28:6,7
105:24 140:7 141:7
150:3 152:3,11
161:9 165:11
183:12 187:17
221:3 246:5 249:17
259:15 260:11
271:19,25 273:15

274:15 284:6
302:25 303:12
**2009 (6)**
6:11 28:3,5 95:4
128:14 223:9
**2010 (5)**
1:15 2:2 6:13 95:6
312:20
**21 (4)**
215:17,21,24 217:16
**21st (1)**
234:15
**213 (2)**
273:9,18
**22 (2)**
217:19,24
**22nd (4)**
141:3 197:21 198:6
291:4
**222 (3)**
2:7 3:5 313:18
**23 (2)**
251:13 287:8
**23rd (1)**
141:3
**25 (4)**
82:25 241:24 242:3
263:2
**269 (1)**
313:19
**27 (1)**
8:14
**28 (12)**
13:10 125:17 145:8
165:24 177:14
184:2 267:11,17,18
268:25 269:10
273:15
**28243 (1)**
1:19
**297266-274 (1)**
313:15
**297315-316 (1)**
313:17

_____
**3**

**3-3 (103)**
8:2 16:12,24 22:8,24
23:2 26:18 44:2
47:13 48:21 51:19
52:22 54:14 55:14
58:3,4 60:3,5 62:25
64:11 68:12,14,16
69:5 72:24 73:23
74:5 76:15 77:9,11
77:15,21 78:2,22
79:8,25 85:19 86:13
93:25 100:7,10,25
101:15 102:21

108:2 110:14
112:12 120:13
122:21 123:7
124:11 125:3 133:2
133:5 137:23,25
142:11 146:24
147:8 148:21
149:12,20,21
151:19,21 166:9
168:25 170:2,3
173:12 174:16
177:17 179:15
181:21,22 187:19
195:4,21 199:7
202:10 216:16
221:16,23 228:21
231:11 232:24
234:19,24 236:10
239:4 250:9 269:3,6
279:10 280:20
281:2 285:23 286:7
296:5,15 301:10
304:10,21
**30 (3)**
31:10 188:9 264:18
**30th (1)**
273:15
**33 (3)**
89:6 179:5 280:18
**34 (2)**
89:5 91:17
**350 (2)**
114:15 298:8
**36 (1)**
92:12
**364 (1)**
270:9
**375 (1)**
114:16
**38 (2)**
30:9 208:21
**39 (1)**
31:12

_____
**4**

**4th (1)**
201:21
**4:15 (1)**
269:23
**40 (3)**
43:21 51:4 58:14
**41 (1)**
80:19
**41st (2)**
2:7 3:5
**42 (3)**
191:10 287:5,9
**436 (1)**
303:16

**439 (3)**
146:10 151:13 152:9
**45 (1)**
173:4
**49 (1)**
263:6

_____
**5**

**5 (11)**
1:15 2:2 313:6,9,11
313:12,13,14,15,16
313:17
**5th (2)**
6:11 312:20
**5:58 (1)**
310:11
**50/50 (1)**
31:3
**500 (1)**
298:7
**507 (2)**
276:24 277:5
**51 (1)**
3:23
**52 (1)**
287:4
**5301 (1)**
3:11
**590 (4)**
5:2 6:9 207:23 313:9
**591 (4)**
5:4 6:12 13:7 313:11
**592 (9)**
5:6 6:14 171:14
202:18 203:17
282:10,21 305:7
313:12
**593 (3)**
5:8 284:11 313:13
**594 (3)**
5:10 284:24 313:14
**595 (3)**
5:12 285:8 313:15
**596 (3)**
5:14 288:15 313:16
**597 (7)**
5:16 6:14 202:19
203:17 300:5 305:7
313:17
**598 (3)**
222:20,24 313:18
**599 (3)**
269:16,20 313:19

_____
**7**

**7 (1)**
287:7
**7294 (1)**

290:7
**7298 (1)**
291:22
**7301 (1)**
294:6
**7310 (1)**
296:22
**7314 (1)**
298:25

---
**8**
---

**8 (1)**
199:22
**8th (11)**
6:13 95:6 117:19
    159:4 161:6 162:16
    178:22 191:21
    200:12 201:19
    271:15
**80 (2)**
29:19 256:6
**82 (7)**
127:8 146:18 147:2
    154:2 185:9,19
    300:15

---
**9**
---

**9th (1)**
269:22
**9/19 (7)**
101:25 170:25 184:19
    269:8 270:23
    274:18,25
**9/19/08 (4)**
103:8,18 273:3,17
**9/19/2008 (1)**
106:15
**9:30 (1)**
2:3
**90 (1)**
30:25
**90,000 (2)**
290:14,22

# EXHIBIT E

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ------------------------x

5     In Re:

6                           Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al,   (Jointly Administered)

9              Debtors.

10    ------------------------x

11

12         DEPOSITION OF ROBERT A. MARTINI

13              New York, New York

14              June 24, 2010

15

16    Reported by:

17    MARY F. BOWMAN, RPR, CRR

18    JOB NO. 31568

19

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                    June 24, 2010
 5                    11:00 a.m.
 6
 7
 8          Deposition of ROBERT A. MARTINI, held
 9   at the offices of Hughes, Hubbard & Reed, LLP,
10   One Battery Park Plaza, New York, New York,
11   before Mary F. Bowman, a Registered Professional
12   Reporter, Certified Realtime Reporter, and
13   Notary Public of the State of New York and New
14   Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1
 2                    APPEARANCES:
 3
 4   JONES DAY, LLP
 5   Attorneys for Lehman Brothers, Inc.
 6        222 East 41st Street
 7        New York, New York  10017-6702
 8   BY:  TERRY McMAHON, ESQ.
 9
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays and The Witness
13        5301 Wisconsin Ave. NW
14        Washington, DC  20015
15   BY:  AMY NEUHARDT, ESQ.
16        HEATHER KING, ESQ.
17
18   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19   Attorneys for the Creditors Committee
20        51 Madison Avenue, 22nd Floor
21        New York, New York  10010
22   BY:  ROBERT DAKIS, ESQ.
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1
 2                    APPEARANCES:
 3
 4   HUGHES, HUBBARD & REED, LLP
 5   Attorneys for the SIPA Trustee
 6        One Battery Park Plaza
 7        New York, New York  10004-1482
 8   BY:  NEIL OXFORD, ESQ.
 9        FARA TABATABAI, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9          IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15          IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 6

MARTINI

1         MARTINI
2    ROBERT A. MARTINI,
3         called as a witness by the parties,
4         having been duly sworn, testified as follows:
5    EXAMINATION BY
6    MR. OXFORD:
7         Q.    Good morning, Mr. Martini.
8         A.    Good morning.
9         Q.    As you know, my name is Neil Oxford.
10   We met off the record.  I represent the SIPA
11   trustee in this matter.
12        Can you tell me if you have ever been
13   deposed previously?
14        A.    Several years ago in a motor vehicle
15   accident case.
16        Q.    Then you know the basic ground rules
17   of a deposition.  I am going to ask you
18   questions, you are going to answer them.  If you
19   could wait until I finish my question before you
20   try to answer it, it will give Amy a chance to
21   object, in the unlikely event that she chooses
22   to do so.
23        MS. NEUHARDT:  I can't imagine how
24   that would happen.
25        Q.    And it will allow Mary to take

TSG Reporting - Worldwide    877-702-9580

Page 7

MARTINI

1         MARTINI
2    everything down.
3         If you could make sure that your
4    answers are verbal rather than nodding or
5    shaking your head, for example, that will help
6    things go quickly as well.
7         This is not intended to be some sort
8    of endurance test, so if you need a break at any
9    time, let me know and I will be happy to give
10   you one.
11        It may also happen that you don't
12   understand one or more of my questions fully, in
13   which case just ask me to clarify and I would be
14   more than happy to do so.
15        A.    OK.
16        Q.    Can you tell me what your educational
17   background is, starting with college?
18        A.    I received a BS in accounting from the
19   University of Dayton.  And no further formal
20   education.  I have industry licenses, a
21   Series 7, Series 24 and Series 27.
22        Q.    Are those licenses current, sir?
23        A.    Yes.
24        Q.    How long have you held those?
25        A.    Since -- Series 27 and Series 7 since

TSG Reporting - Worldwide    877-702-9580

Page 8

MARTINI

1         MARTINI
2    1998, and Series 24 is sometime soon after.  I'm
3    not sure of the exact date.
4         Q.    When did you graduate from Dayton,
5    sir?
6         A.    1983.
7         Q.    Did you have a minor?
8         A.    No.
9         Q.    Did you take any courses in law?
10        A.    No.
11        Q.    You said you have no formal education
12   after Dayton; is that correct?
13        A.    Correct.
14        Q.    How were you first employed after you
15   graduated, sir?
16        A.    First worked in a municipal bond firm,
17   worked there for -- from 1983 to 1990.
18        Q.    What's the name of the firm?
19        A.    Halpert Oberst & Company,
20   H-a-l-p-e-r-t, O-b-e-r-s-t, & Company.
21        Q.    Is that based in New York?
22        A.    It is based in Millburn, New Jersey.
23        Q.    What did you do for Halpert Oberst?
24        A.    At the end, I was their chief
25   compliance officer.

TSG Reporting - Worldwide    877-702-9580

Page 9

MARTINI

1         MARTINI
2         Q.    Can you briefly describe what your
3    responsibilities were as chief compliance
4    officer?
5         A.    Responsibilities was for the FOCUS
6    report, which would include net capital and
7    customer reserve calculation, as well as the
8    registration of registered representatives,
9    anything related to their support.
10        Q.    By customer reserve calculation, just
11   so I make sure we are talking the same language
12   here, is that the calculation that is performed
13   as required under SEC Rule 15(c) 3-3?
14        A.    Correct.
15        Q.    So if I use either of those terms, you
16   will understand what we are talking about?
17        A.    Yes, yes.
18        Q.    Did you perform the customer reserve
19   calculations yourself in this role, sir, or was
20   it something that you supervised?
21        A.    I was a participant in that
22   calculation.  It was supervised by the chief
23   financial officer.
24        Q.    Can you describe your participation in
25   that calculation of the customer reserve

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2 calculation in the time you were at Halpert
3 Oberst?
4    A.   It would have been in the allocation
5 of the stock record, which was a manual stock
6 record allocation.
7    Q.   Are you able to describe in lay terms
8 what you mean by allocation of stock record in
9 this context?
10   A.   Sure.  We would take a manual stock
11 record, and several people would, based on
12 hierarchy, allocate the positions.  So box
13 location versus customer long.  First we would
14 go through a priority that was set by the firm,
15 agreed by the NASD.
16   Q.   OK.  What was your next position after
17 Halpert?
18   A.   I moved in 1990, later in the year, to
19 Mabon Securities Corp.
20   Q.   M-a-y-b-o-n-d?
21   A.   M-a-b-o-n.
22   Q.   Where is Mabon based?
23   A.   New York.
24   Q.   What was your title when you joined
25 Mabon?

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2    A.   I honestly don't know.  Sorry.
3    Q.   How long were you with Mabon?
4    A.   I was with Mabon until 1993.
5    Q.   Do you remember your title when you
6 left?
7    A.   I'm not sure.  I mean I have been --
8 the title may have been something like associate
9 or something.
10   Q.   Can you describe your responsibilities
11 in the three years you were at Mabon?
12   A.   I was responsible for the net capital
13 computation, so SEC Rule 15c3-1.
14   Q.   Did you have any responsibility for
15 the customer reserve calculation in that time?
16   A.   No.  I had some interaction with the
17 customer reserve, but I did not supervise it.
18   Q.   What was your interaction with the
19 customer reserve calculation?
20   A.   It may have been a backup to the
21 person who did the formula, so I would have had
22 to have known how to do it, but -- so on days
23 when the individual was out on vacation, I would
24 have stepped in and performed the calculation.
25   Q.   Is it correct that Mabon was a

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2 registered broker/dealer?
3    A.   Yes.
4    Q.   Is that also correct for Halpert?
5    A.   Yes.
6    Q.   After you left Mabon in 1993, where
7 did you go?
8    A.   Yamiachi International.
9    Q.   I'm sorry, UAG?
10   A.   Y-a-m-i-a-c-h-i.
11   Q.   They're based where, sir?
12   A.   New York, headquarters in Tokyo.  New
13 York.  SEC broker/dealer was headquartered in
14 New York.
15   Q.   How long were you with Yamiachi?
16   A.   1995.
17   Q.   What was your title there, sir?
18   A.   AVP.
19   Q.   Which stands for what?
20   A.   Assistant vice president.
21   Q.   And what were your responsibilities as
22 AVP?
23   A.   I was in charge of the reg. reporting
24 group, which would have included the FOCUS
25 report, net capital computation and customer

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2 reserve calculations.
3    Q.   Were you involved in the actual
4 computation of the customer reserve calculation,
5 sir, or were you supervising it?
6       MS. NEUHARDT:  Objection, form.
7    A.   I was both.  Sorry.  Say that again,
8 please.
9    Q.   Were you involved in the actual
10 computation of the customer reserve calculation
11 in this time, sir?
12   A.   Yes.
13   Q.   So on a week-to-week basis, you would
14 have a role in computing --
15   A.   Yes.
16   Q.   -- the requirement under SEC Rule
17 15c3-3?
18   A.   Yes.
19      MS. NEUHARDT:  You have to let him
20 finish the question, please.
21   Q.   Yes.
22      Did you have a particular role in that
23 computation, sir?
24   A.   It was to compute the reserve formula.
25 So I would have over time eventually had one

TSG Reporting - Worldwide    877-702-9580

MARTINI

1 individual working for me eventually I would
2 have supervised, but initially it was a one-man
3 show and eventually turned into a two-person
4 department.
5    Q.   How large a broker/dealer was
6 Yamiachi?
7    A.   In terms of number of people?
8    Q.   In terms of the number of trades per
9 day.
10   A.   That I don't know.  I can tell you
11 they had somewhere around a 20 billion dollar
12 balance sheet.  Very diverse business, so --
13   Q.   Have you finished your answer, sir?
14   A.   Yes.
15   Q.   Was the 20 billion balance sheet just
16 the broker/dealer balance sheet or was that the
17 corporation as a whole?
18   A.   Just the broker/dealer.
19   Q.   Where did you go after you left
20 Yamiachi in 1995?
21   A.   Back to Mabon.
22   Q.   For how long, sir?
23   A.   1995.
24   Q.   You were there for less than a year?

MARTINI

1    A.   Yeah.
2         MR. OXFORD:  Off the record.
3         (Discussion held off the record)
4    Q.   Was your role in Mabon, sir, in 1995
5 the same as it was when you were employed by
6 them previously?
7    A.   When I came back, I was in charge of
8 the reg. reporting team.
9    Q.   In that capacity sir, were you also in
10 charge of the customer reserve calculation?
11   A.   Yeah, customer reserve and net
12 capital.
13   Q.   Later in 1995, when you left Mabon
14 again, where did you go?
15   A.   Nikko Securities.  N-i-k-k-o.
16   Q.   For how long, sir?
17   A.   Until 1998, when they closed their
18 U.S. operation.
19   Q.   What was your title at Nikko, sir?
20   A.   First vice president and controller.
21   Q.   What were your responsibilities in
22 that capacity, sir?
23   A.   Responsible for the regulatory filings
24 for broker/dealer, general ledger, legal entity

MARTINI

1 controller for the broker/dealer.
2    Q.   Were you responsible for the
3 computation of the customer reserve calculation?
4    A.   Yes.
5    Q.   Was that a supervisory responsibility,
6 sir, or were you involved in computing it on a
7 weekly basis yourself?
8         MS. NEUHARDT:  Objection to form.
9    A.   Supervised.
10   Q.   From 1998, sir, where were you
11 employed?
12   A.   Worked for Weiss, Peck & Greer.
13   Q.   G-r-e-e-r?
14   A.   Yup.
15   Q.   Where are they located?
16   A.   New York.
17   Q.   For how long, sir?
18   A.   2005.
19   Q.   And your title there, sir, in those
20 seven years?
21   A.   Senior vice president.
22   Q.   What were your responsibilities?
23   A.   Managed the broker/dealer control
24 functions, so again, legal entity control and

MARTINI

1 reg. reporting for the entity, for the U.S.
2 broker/dealer.
3    Q.   Did you have any responsibility for
4 the computation of the customer reserve
5 calculation?
6    A.   Yes.
7    Q.   What was that responsibility?
8    A.   Responsible for supervision of that.
9    Q.   You joined Barclays in 2007, correct,
10 sir?
11   A.   Yes.
12   Q.   Where were you employed between 2005
13 and 2007?
14   A.   New York Stock Exchange.
15   Q.   What was your title there, sir?
16   A.   Principal finance coordinator.
17   Q.   Can you briefly describe your
18 responsibilities?
19   A.   I was responsible for the
20 surveillance, financial operational compliance
21 and surveillance of 20 U.S. broker/dealers.
22   Q.   Was one of those U.S. broker/dealers
23 LBI?
24   A.   The last three months of my employment

Page 18

MARTINI

there, I had LBI.

Q.   Can you explain to me what was involved in your surveillance of the U.S. broker/dealers during your time at the New York Stock Exchange?

A.   I would review FOCUS reports that were submitted monthly and be the point of contact for any firm that we were responsible for in terms of issues that they had with the relationship manager.

Q.   What's a FOCUS report, sir?

A.   It is -- stands for financial and operational combined uniform single report. It is -- contains -- a monthly report that contains balance sheet, P&L, reserve calc., net capital calc., CFTC seg. and secure calcs, and any other operational and market risk and credit risk schedules.

Q.   When you say reserve calc., sir, what are you referring to?

A.   15c3-3 calculation as of the month-end date.

Q.   So the broker/dealers would report in the FOCUS report a variety of data, including

TSG Reporting - Worldwide    877-702-9580

Page 19

MARTINI

what their 15c3-3 reserve calculation was; is that correct?

A.   Correct.

Q.   And you at the New York Stock Exchange would review it for what purposes, sir?

A.   We would review it for sharp variances, things that raised questions. You know, potentially looking for anything that would represent change in business, things along those lines.

Q.   Sharp variance from what, sir?

A.   Month to month.

Q.   So if they -- if the reserve calculation showed a sharp increase or decrease from month to month, that would raise questions in your mind; is that correct?

A.   Correct. Or even within lines in the reserve calculation, if we saw sharp swings, we may contact the firm.

Q.   Did the New York Stock Exchange conduct any other regular review of the 15c3-3 calculations of broker/dealers during the time you were employed there?

MS. NEUHARDT:  Objection, form.

TSG Reporting - Worldwide    877-702-9580

Page 20

MARTINI

A.   Actually, please say that for me one more time.

Q.   Sure.

MR. OXFORD:  Can you read it back.

(Record read)

A.   They have a separate team, an examination team that would perform annual reviews of the firms' books and records and financial regulatory reports.

Q.   Did you have any involvement with that team, sir?

A.   No.

(Exhibit 828, declaration marked for identification, as of this date.)

Q.   I should have asked you this at the start of the deposition, sir. What -- did you do anything to prepare for this deposition today?

A.   I reviewed my declaration, as well as the McIsaac rebuttal or affidavit.

Q.   The declaration you are referring to, sir, is the document that I have marked as Exhibit 828 to your deposition; is that correct?

A.   Correct.

TSG Reporting - Worldwide    877-702-9580

Page 21

MARTINI

Q.   I am also handing you what's been marked previously as Exhibit 590, as well as Exhibit 693.

For the record, I will identify Exhibit 590 as the affidavit of Daniel McIsaac dated October 5, 2009, and Exhibit 693 as a rebuttal report of Dan McIsaac dated March 14, 2010.

Is it your testimony, sir, you reviewed both -- withdrawn.

Is it your testimony, sir, you reviewed all three of these documents in preparation for your deposition?

A.   I reviewed 828 and 693.

Q.   You did not review 590 in preparation for your deposition?

A.   No.

Q.   Have you seen that document before, sir?

A.   Not to my knowledge.

Q.   Did you do anything else to prepare for your deposition, sir?

A.   I spoke to members of my team and members in operations. Member in operation.

TSG Reporting - Worldwide    877-702-9580

MARTINI

Managing directors, who would have knowledge
of -- or former Lehman employees that would have
knowledge of their customer reserve
calculations.

Q.   Who on your team did you speak to in
preparation for this deposition?

A.   Joel Potenciano.

Q.   What is Mr. Potenciano's role?

A.   He is vice president in charge of our
net capital team.

Q.   Is he a former Lehman employee, sir?

A.   Yes.

Q.   Currently employed by Barclays,
correct?

A.   Correct.

Q.   What did you talk to Mr. Potenciano
about?

A.   We spoke about his access to LBI
information and his interaction with employees
of the TSA.

Q.   Let's focus on the first part of your
answer, sir.  What access to LBI information did
you discuss with Mr. Potenciano?

A.   My discussion was what information

TSG Reporting - Worldwide    877-702-9580

MARTINI

that he has access to, so, for example, what I
found is -- what I also know from my personal
knowledge of being a senior member of finance,
that Barclays when they acquired certain assets
or businesses from LBI, that information, our
reg. team, whether they are Barclays or Lehman
employees, have access to that information.

Q.   I am confused by your last answer,
sir.  You said, "our reg. team, whether they are
Barclays or Lehman employees, have access to
that information."  Do you mean to say that your
regulatory team, Barclays, employs Lehman
employees?

A.   Legacy Barclays and legacy Lehman
employees, are now Barclays employees.

Q.   OK, I appreciate that clarification.
Can you tell me what Mr. Potenciano
told you as -- in as much detail as you can
about the information, the LBI information to
which he has access?

A.   Mr. Potenciano does not have access to
LBI information, that he is only permitted to
access information through the trustee, at the
trustee's direction.  And that would come

TSG Reporting - Worldwide    877-702-9580

MARTINI

through Bill Burke, who is their main employee
regarding 15c3-3.

Q.   Whose main employee regarding 15c3-3?

A.   TSA, the trustee.

Q.   Let's define some terms here.

A.   Sure.

Q.   The TSA stands for what, sir?

A.   I think transition -- I could check.
Transition services agreement, I believe.

Q.   What is that, to your understanding,
sir?

A.   It is a group of people that work for
the trustee.  They may be Barclays employees in
name, so they may be paid by Barclays, but they
work at the direction and instruction of the
trustee and do not work for the U.S.
broker/dealer, Barclays Capital, Inc.

Q.   And you said that Mr. Bill Burke is
the main employee of the TSA?

A.   As it relates to 15c3-3, my knowledge
of Bill Burke in the industry is he is the
senior most knowledgeable person of LBI's 15c3-3
calculation.

Q.   Have you ever spoken to Mr. Burke?

TSG Reporting - Worldwide    877-702-9580

MARTINI

A.   I have.

Q.   Did you speak to Mr. Burke in
connection with your deposition?

A.   No.

Q.   Did you speak to Mr. Burke in
connection with your declaration?

A.   No.

Q.   Have you spoken to Mr. Burke in
connection with -- have you spoken to Mr. Burke
since you joined Barclays Capital?

A.   Yes, as hello, things like that.

Q.   Have you spoken to him in any
professional capacity, sir?

A.   We may have discussed topics regarding
interpretive issues in general, but never
regarding the business of LBI.

Q.   What interpretive issues do you think
you have discussed with Mr. Burke?

A.   I may have asked Mr. Burke his opinion
of capital treatment for certain types of
assets, which is a very common thing that we do
in the industry.  I speak to many of my
counterparts across the firm, Goldman, Morgan
Stanley.

TSG Reporting - Worldwide    877-702-9580

MARTINI

Q.   And does the capital treatment that you have just testified to, the topic you discussed with Mr. Burke, does that relate in any way to the customer reserve calculation?

A.   No.

Q.   Have you had any discussions with Mr. Burke in connection with the customer reserve calculation, whether LBI or BCI?

A.   No.

Q.   Does the capital treatment which was the topic of your conversation with Mr. Burke, does that relate to the net capital rule?

A.   Net capital rule, yes.

Q.   That's a SEC rule, correct?

A.   Correct.

Q.   Is it your testimony, sir, it is common within the industry for people in positions such as yours to consult with their peers about how these SEC rules are interpreted?

A.   Yes.

MS. NEUHARDT:  Objection to form.

Q.   And why do you do so, sir?

A.   Make sure that the treatment is consistent across the industry.  Rules are

MARTINI

relatively in many cases hard to interpret without getting a little sense of how everybody interprets them.

Q.   Is it part of your responsibility at Barclays, sir, to interpret the SEC rules?

A.   Yes.

Q.   And just so we are clear, it is part of your responsibility at Barclays to interpret SEC Rule 15c3-3, correct?

A.   Correct.

Q.   Was it also your responsibility to interpret that same rule when you held the positions in the various broker/dealers that you have told me you worked in from 1983 onwards?

MS. NEUHARDT:  Objection to form.

A.   If you could break that up for me, please.

Q.   Well, I can.  I'm not sure anybody wants me to, but if you want me to, I am happy to do so.

What I am trying to understand, sir, is whether your role in interpreting Rule 15c3-3 is unique to your employment with Barclays or whether you had a similar role in any other

MARTINI

broker/dealer which employed you prior to your employment with Barclays.

A.   At Weiss, Peck & Greer, I would have been responsible for interpreting 15c3-3 and 15c3.

At Nikko, I would have been responsible for interpreting those rules as well.  And at Yamiachi as well.

Q.   Now, you're not a lawyer, sir, are you?

A.   No.

Q.   Do you have any training in law?

A.   No.

Q.   Can you tell me how it is that you consider yourself qualified to interpret SEC Rule 15c3-3?

MS. NEUHARDT:  Objection.

A.   From my extensive experience in the industry, having -- in my roles throughout my career, having managed SEC, New York Stock Exchange examinations, through my role of working with the business and all of these companies.

These rules are financial operational

MARTINI

in nature.

Q.   Can you explain what you mean by the last comment?

MS. NEUHARDT:  Objection, form.

A.   So the rules are related to the -- they are financial and operational in nature.  So the rules are not -- are about how you treat things for reserve computation.  They are going to be about operational issues or financial issues or net capital or capital treatment issues as opposed to nonfinancial or operational issues, such as sales practice or things along those lines.

Q.   Are you drawing a distinction, sir, between the financial and operational nature of these rules and the legal nature of these rules?

A.   I don't understand really.

Q.   You don't understand my question?

A.   No.

Q.   I can try another question.

In your extensive experience in the industry, sir, are the individuals who are responsible in broker/dealers in the U.S. for interpreting SEC Rule 15c3-3 generally lawyers

MARTINI

1 or legally qualified personnel or are they
2 people with a background such as yours?
3        MS. NEUHARDT:  Objection to form.
4     A.   Backgrounds such as mine.
5     Q.   Does that answer apply to how Barclays
6 runs its regulatory reporting department today,
7 sir?
8        MS. NEUHARDT:  Objection to form.
9     A.   Yes.
10    Q.   I would like to go back to where we
11 got a little distracted, or at least I did, and
12 go back to your conversation with
13 Mr. Potenciano.
14        Mr. Potenciano, you said he was in
15 charge of net capital at Barclays?
16    A.   Yes.
17    Q.   Does he have any responsibility for
18 calculating the customer reserve requirement at
19 Barclays?
20    A.   No.
21    Q.   Is it part of his role to have access
22 to LBI information that would be relevant to the
23 calculation of the 15c3-3 reserve requirement
24 that relates to LBI on September 19, 2008?

TSG Reporting - Worldwide    877-702-9580

MARTINI

1        MS. NEUHARDT:  Objection, form.
2     A.   My discussions with Mr. Potenciano, he
3 does not have access to the information, the
4 data contained in the systems to compute the LBI
5 reserve computation.
6     Q.   Would Mr. Potenciano have, in the
7 course of his duties at Barclays, any reason to
8 have access to that data, sir?
9        MS. NEUHARDT:  Objection to form.
10    A.   I'm sorry, can you rephrase that for
11 me.
12    Q.   Sure.
13        Mr. Potenciano is responsible, he is
14 in charge of the net capital computation at
15 Barclays, correct?
16    A.   Correct.
17    Q.   He is not responsible for the 15c3-3
18 calculation at Barclays, correct?
19    A.   Correct.
20    Q.   Would there be any reason for
21 Mr. Potenciano on a day-to-day basis at Barclays
22 to have access to the information that he would
23 need to compute the 15c3-3 reserve calculation
24 for LBI back from September 19, 2008?

TSG Reporting - Worldwide    877-702-9580

MARTINI

1        MS. NEUHARDT:  Objection to form.
2     A.   The focus of that question for
3 Mr. Potenciano is regarding his interaction with
4 TSA and Bill Burke regarding several times when
5 he needed to work with them per the trustee's
6 instruction.
7     Q.   OK, we are going to have to break that
8 out a little more.
9        What interaction did Mr. Potenciano
10 have with the TSA and Bill Burke that was the
11 subject of the conversation that you had with
12 Mr. Potenciano?
13    A.   My discussions with Mr. Potenciano,
14 over time the trustee, as per the -- my
15 understanding of the TSA arrangement, who are
16 ring-fenced employees for the trustee, that at
17 times at the direction of the trustee,
18 Mr. Potenciano would be requested to assist
19 Mr. Burke in whatever he was working on.
20        When that occurred, I was alerted so
21 that I knew, number one, how long he would be
22 doing that, so I could make sure we had backup.
23 In other words, Mr. Potenciano was not able to
24 discuss information with me regarding what

TSG Reporting - Worldwide    877-702-9580

MARTINI

1 occurred in his discussions with LBI, nor did he
2 speak to Mr. Burke about information about
3 Barclays Capital.
4     Q.   I see.  So you're -- what you are
5 telling me is there was a wall -- withdrawn.
6 Let's back up.
7        Mr. Potenciano is employed by
8 Barclays, correct?
9     A.   Correct.
10    Q.   He is not part of the ring-fenced
11 group that works at the direction of the trustee
12 under the TSA, correct?
13        MS. NEUHARDT:  You're talking about
14 today?
15        MR. OXFORD:  That's a good
16 clarification, Amy.
17    Q.   Today does he work under the direction
18 of the trustee under the TSA?
19    A.   No.  He works for me under Barclays
20 Capital, Inc., U.S. broker/dealer.
21    Q.   At any time, to your knowledge, has
22 Mr. Potenciano worked for the TSA under the
23 direction of the trustee?
24    A.   That I don't know, only because the

TSG Reporting - Worldwide    877-702-9580

MARTINI

1  
2  early days of the integration, I don't know who
3  worked for who.
4      Q.   Is it your testimony, sir, that there
5  **is a wall in effect between the TSA employees**
6  **and the Barclays employees through which**
7  **information about the TSA activities and the**
8  **Barclays activities cannot pass?  May not, no**
9  **passing, wall.**
10     A.   That is my understanding.
11         MS. NEUHARDT:  Object to the form of
12  that.
13     Q.   Have you ever seen the TSA, sir?
14     A.   The agreement?
15     Q.   Yes.
16     A.   No, sir, not read it.
17     Q.   What's the basis of your understanding
18  about what the TSA provides?
19     A.   Mainly because of my -- I have a
20  senior role in finance, so I interact with
21  senior management of the firm, so I have known
22  that the TSA, through my conversations with
23  senior management, what is in place to do.
24  Additionally, per my discussions with
25  Mr. Potenciano, his interactions with the TSA, I

TSG Reporting - Worldwide    877-702-9580

MARTINI

1  
2  have learned that.
3         Additionally, I have spoken to Alex
4  Crepeau, who is managing director in the
5  regulatory ops for Barclays Capital, Inc.
6  Mr. Crepeau was a TSA employee for some period
7  of time and has given me insight into
8  information that the TSA has and what they --
9  the purpose.
10     Q.   So I understand the basis of your
11  **knowledge about the TSA, sir, it's based on**
12  **conversations with Mr. Potenciano, correct?**
13     A.   Correct.
14     Q.   It is based on conversations with
15  **Mr. Crepeau, correct?**
16     A.   Correct.
17     Q.   Is it based on anything else, sir?
18     A.   And my knowledge of how the TSA
19  operates through my interactions with senior
20  members of Barclays Capital.
21     Q.   Who are they, sir?
22     A.   CFO of the firm, who may be gone at
23  the moment, T.J. Gavenda.  Terry Scott, who was
24  COO of the U.S. broker/dealer.
25         So in other words, when the TSA was in

TSG Reporting - Worldwide    877-702-9580

MARTINI

1  
2  place, we were told, whether it be e-mail
3  communication or verbal communication, that at
4  times some of our employees that work for me may
5  have to work with TSA employees on behalf of the
6  trustee.
7      Q.   So in addition to Mr. Crepeau and
8  **Mr. Potenciano, your knowledge of the TSA is**
9  **based on conversations with -- did you say the**
10  **CFO?**
11     A.   Yes.
12     Q.   Who may be gone at the moment?
13     A.   I'm saying conversations would have
14  been with regard to T.J. Gavenda, who was CFO
15  when this first came into play, as well as Terry
16  Scott, who would have been the COO of finance.
17     Q.   Other than these four people, sir, and
18  **the conversations you had with them, is your**
19  **knowledge such as it is about the TSA based on**
20  **anything else?**
21         MS. NEUHARDT:  Objection to form.
22     A.   Such as -- I don't interact, I am
23  not -- I have never been instructed to work with
24  the trustee or employees of the TSA, so that
25  would be the only interaction that I have.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1  
2      Q.   Sir, so when in your declaration, you
3  **refer to your personal knowledge of the TSA, you**
4  **were referring to conversations with these four**
5  **people, correct?**
6         MS. NEUHARDT:  Objection, asked and
7  answered, and it mischaracterizes his
8  testimony.
9      Q.   You can answer, sir.
10     A.   Based on my personal knowledge of our
11  firm's business, and because of the
12  conversations I had with individuals in my firm
13  who have intimate knowledge of that.  I mean,
14  there are not a lot of employees who interact
15  with the TSA, from my understanding.  And within
16  my team, I only have one individual that has, to
17  my knowledge, been asked to do that.
18     Q.   Who is that, sir?
19     A.   Joel Potenciano.
20     Q.   And he is one of those employees who
21  **you just testified had intimate knowledge of the**
22  **workings of the TSA?**
23     A.   Yes, he had -- he has had interactions
24  with the TSA.
25     Q.   Would you agree that each of those

TSG Reporting - Worldwide    877-702-9580

MARTINI

four employees have more knowledge about the TSA
than you do, sir?

MS. NEUHARDT: Objection to form.

A.   I would say as far as the structure of
the TSA, I have the same knowledge as they do.
As far as what the TSA is working on, I have no
intimate knowledge of what they do.  They
would -- those individuals, at least Mr. Crepeau
and Mr. Potenciano, would have more insight.

Q.   What do you mean when you say
structure of the TSA, sir?

A.   That they are ring-fenced employees
and they are at the direction of the trustee and
not employees that -- for instance, they don't
work for me, they don't work for Barclays
Capital, Inc., U.S. broker/dealer.

Q.   Did you mean anything else when you
referenced structure of the TSA, sir?

A.   No.

Q.   What -- you also mentioned the -- your
knowledge of the TSA was based on your personal
knowledge of the firm's business.  Do you
remember telling me that a moment ago?

A.   Um-hm.

TSG Reporting - Worldwide    877-702-9580

MARTINI

Q.   What do you mean by that, sir?

A.   Meaning my role as a senior member of
finance, that I interact with senior members of
the firm.  I know that the firm has -- while I
was not involved in the sale of Lehman,
certainly I am aware of the transaction, some of
the high-level components, and that the TSA was
put in place as a result of that acquisition or
transaction.

Q.   So your knowledge of the TSA that is
based on your personal knowledge of the firm's
business extends to the existence, your
knowledge about the existence of the TSA,
correct?

A.   Yes.

MS. NEUHARDT: Objection, form.

Q.   Does it extend any further?

MS. NEUHARDT: Objection to form.

A.   Like what -- I'm -- I don't
understand.  Any further than -- I don't
interact with the TSA.  I am not permitted and I
don't have access to them.

Q.   Sir, do you purport to have any
knowledge about what data --

TSG Reporting - Worldwide    877-702-9580

MARTINI

MS. NEUHARDT: About what data?

Q.   About what data Barclays is permitted
under the TSA to access?

A.   I know, based on the business that we
acquired, that we have access to acquired assets
or businesses that are on, for example, ADP224,
which is one of the main systems that we used to
perform a reserve calculation today on behalf of
the acquired businesses, that Barclays acquired.

How that works is that there is
ADP012, which happens to be the system that
houses or contains 100 percent of the LBI
business, and that is what our team does not
have access to.

Q.   My question is a little different,
sir.  I will read it again to you.

Do you purport to have any knowledge
about what data Barclays is permitted to access
under the TSA?

MS. NEUHARDT: Objection to form.

A.   Through my -- I have not read the TSA
agreement.  I have spoken to Mr. Crepeau and
understand that we have access to the
businesses, assets only that we acquired, and I

TSG Reporting - Worldwide    877-702-9580

MARTINI

confirmed that with my team as far as the access
that they had.

Q.   Did Mr. Crepeau tell you that this
access related in any way to the TSA?

A.   My interaction with Mr. Crepeau, who
was a TSA employee, explained that, through his
operational knowledge, that the information
relative to systems that contain LBI information
or information as contained -- as access of the
trustee -- excuse me, that the trustee has
access to.

Q.   And did he tell you whether or not --
withdrawn.

If I understand your testimony, sir,
Mr. Crepeau told you that Barclays has access to
only certain of the data relating to LBI's
broker/dealer, correct?

MS. NEUHARDT: Objection to form.

A.   Mr. Potenciano, Mr. Crepeau, and
through my own knowledge, understand that we
have access only to the -- Barclays has access
only to the businesses or assets that it
acquired.  Those assets and businesses are
ring-fenced, if you will, in an ADP system

TSG Reporting - Worldwide    877-702-9580

MARTINI

1 called 224, which my team accesses on a weekly
2 basis to do customer reserves.
3        Speaking to my team as well, they
4 don't have the ability to access any information
5 that was contained in the other businesses of
6 LBI.
7    Q.   Which other businesses, sir?
8    A.   Whatever was not acquired by Barclays
9 Capital. Otherwise, I was not involved in the
10 sale or transaction, I can't speak to which
11 assets were and were not, but I do know from my
12 understanding of the transaction in the early
13 days that Barclays did not acquire 100 percent.
14 It was an asset purchase.
15   Q.   Do you have any understanding, sir, of
16 what parts of the LBI business Barclays did and
17 did not acquire?
18   A.   I would say that's not my area of
19 expertise.
20   Q.   OK. With that caveat in mind, sir,
21 can you answer my question?
22   A.   I think the wealth business was
23 acquired, but as far as any more intricate
24 knowledge for specific businesses, I can't speak

TSG Reporting - Worldwide   877-702-9580

MARTINI

1 to.
2    Q.   So the full extent of your knowledge
3 about what Barclays did and did not acquire
4 relating to LBI is Barclays acquired the wealth
5 business, correct?
6        MS. NEUHARDT: Objection to form.
7    A.   I think initially I have said that
8 they have not -- they have not acquired 100
9 percent of the business. One of the major
10 components of the businesses and assets we
11 acquired was the wealth business. And I'm
12 speaking from a 15-3-3 perspective -- 15c3-3
13 perspective.
14   Q.   We can call it the customer reserve
15 perspective, if that's easier.
16   A.   That's easier.
17   Q.   So I understand you're not an expert
18 on it, sir, and I'm not trying to make you into
19 an expert. I am just trying to understand what
20 it is you know and what you don't know.
21   A.   OK.
22   Q.   So it is your understanding, sir, that
23 Barclays acquired the wealth business from LBI;
24 is that correct?

TSG Reporting - Worldwide   877-702-9580

MARTINI

1    A.   That is my understanding.
2    Q.   And was that also known as the PIM,
3 P-I-M, business when it was at LBI? Is that
4 correct?
5        MS. NEUHARDT: Objection, form.
6    A.   Correct.
7    Q.   And other than that, you don't know
8 one way or the other whether Barclays acquired
9 any other part of LBI's business, correct?
10       MS. NEUHARDT: Objection, form.
11   A.   I was not involved in the sale.
12   Q.   That's fine, I understand that, sir, I
13 just need an answer to my question.
14   A.   Yeah, I don't know the intricate
15 details of what was acquired and not acquired.
16   Q.   I am not asking about the intricate
17 details. I am just asking you what you know
18 about what Barclays acquired and what Barclays
19 did not acquire from LBI.
20   A.   I do not know the specific businesses
21 that were acquired and not acquired.
22   Q.   Do you know, sir, whether there were
23 any businesses or data that Barclays did not
24 acquire from LBI that would have fed into LBI's

TSG Reporting - Worldwide   877-702-9580

MARTINI

1 customer reserve calculation as of September 19,
2 2008?
3        MS. NEUHARDT: Objection to form.
4    A.   Yeah, I don't understand that
5 question, sorry.
6    Q.   Well, I'm -- we can look at your
7 declaration, sir, but it is your testimony, is
8 it not, sir, looking particularly in
9 paragraph 7, that Barclays is not entitled to
10 access all of the relevant information on LBI's
11 systems as of on or about September 17, 2008, or
12 September 19, 2008, with regard to the 15c3-3
13 reserve calculations?
14       MS. NEUHARDT: There is no question.
15 Oh, is it your testimony, OK.
16   Q.   Is that your testimony, sir?
17   A.   That is what I read.
18   Q.   Do you believe that's accurate, sir?
19   A.   Yes, I believe that's accurate.
20   Q.   Can you tell me which information on
21 LBI's systems Barclays doesn't have access to?
22       MS. NEUHARDT: Objection, form.
23   Q.   That you referred to in this sentence?
24 You said, "Barclays is not entitled to access

TSG Reporting - Worldwide   877-702-9580

**MARTINI**

1  all of the relevant information on LBI's
2  systems," as of those two dates in September,
3  with regard to the 15c3-3 reserve calculations.
4  Do you see that?
5     A.   Yes.
6     Q.   When you say all the relevant
7  information that Barclays is not entitled to
8  access to, what are you talking about?
9     A.   So in order to do a 3-3 calculation,
10  we need information, all information for the
11  firm, not just the customer assets. I know that
12  there were systems, three major systems that
13  went into the LBI reserve comp, ITS, MTS and
14  ADP. From talking to my team and others, Alex
15  Crepeau, Barclays did not have access to the
16  data contained in those systems.
17     Q.   So you understand, sir, that you said
18  at the start of your declaration, "I make this
19  declaration on my personal knowledge," right?
20  What do you understand that to mean, sir?
21     MS. NEUHARDT:  Objection to form.
22     A.   Personal knowledge means that of my
23  position in the firm, understanding of the
24  business and my discussions with people on my
25

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1  team and Alex Crepeau.
2     Q.   And your statement that Barclays is
3  not entitled to access all of the relevant
4  information on LBI's systems as of those two
5  dates with regard to the 15c3-3 reserve
6  calculations is based on your conversation with
7  Mr. Crepeau, correct?
8     MS. NEUHARDT:  Objection, form.
9     Q.   Yes?
10     A.   Yes.
11     Q.   What else is it based on?
12     A.   Conversations with Mr. Potenciano.
13     Q.   Anything else?
14     A.   And the fact that I know assets that
15  were acquired sit within ADP224, and that is
16  what my team that does a 3-3 calculation on a
17  weekly basis utilizes. So I know that legacy
18  Barclays employees do not have access to
19  Lehman's systems, and that Mr. Potenciano, any
20  access that he had was at some point revoked by
21  the trustee.
22     Q.   Are you able to testify, sir, as to
23  the nature of the data that Barclays is not
24  entitled to access as you reference in this
25

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1  sentence?
2     MS. NEUHARDT:  Objection.  You spent a
3  good half hour this morning going over his
4  experience on 15c3-3 calculations.  This has
5  been asked and answered and answered over
6  and over.
7     MR. OXFORD:  Do you have an objection
8  to form?
9     MS. NEUHARDT:  That too.  But also
10  asked and answered.
11     A.   So to do a reserve computation, I need
12  to look at the entire data in sub ledgers of the
13  broker/dealer to come up with the reserve
14  calculation. We take all the population of
15  information; it is a population test.  The
16  population has to be correct for the calculation
17  to be correct.  You need the full population to
18  determine which assets belong in the customer
19  reserve account.
20     Q.   And you know, sir, that there is data
21  to which Barclays doesn't have access that it
22  would need to rerun the LBI c3 calculation, but
23  you don't know specifically what that data is;
24  is that correct?
25

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1     MS. NEUHARDT:  Objection, form.
2     A.   So the data would be what is contained
3  in ITS, MTS and ADP.  So that would include
4  customer receivable, payables, fail accounts,
5  stock records, subsidiary ledgers, anything that
6  represents the books and records of the
7  broker/dealer, on their books and records.
8     Q.   It is your testimony that there is
9  data within ITS and MTS that Barclays doesn't
10  have access to?
11     A.   Yes.
12     Q.   You mentioned Mr. Potenciano at one
13  point had access to some data and that access
14  was revoked by the trustee.  Do you remember
15  telling me that a minute ago?
16     A.   Yes.
17     Q.   Can you explain what you meant by
18  that?
19     A.   He was a Lehman employee, so he had
20  access at some point to those systems.
21     Q.   Right.  I understand that, sir.  I'm
22  not asking --
23     MS. NEUHARDT:  He is not done with his
24  answer.
25

TSG Reporting - Worldwide    877-702-9580

Page 50

MARTINI

1
2      Q.   I don't mean to interrupt you, but
3  just so we can clarify the question, I am not
4  asking about the time when Mr. Potenciano was
5  employed by Lehman.  Of course when he was
6  employed by Lehman he had access to the data.  I
7  am asking what you meant when you said that
8  Mr. Potenciano had access to certain LBI data
9  and that access was revoked.
10     A.   Mr. Potenciano had log-ins to the
11  systems that contained LBI data.  At some point
12  it was revoked.  I don't know that date when it
13  was revoked.
14     Q.   Do you know whether Mr. Potenciano had
15  those log-ins after September 22, 2008?
16     A.   I don't know for certain.
17     Q.   How is it that you know that those
18  log-ins were revoked, sir?
19     A.   I asked him.  I asked Mr. Potenciano,
20  "Do you have access to those systems, ADP, ITS,
21  MTS?"
22         He says, "No."
23         I said, "How do you know that?"
24         He says, "Because my log-ins were
25  revoked," and he doesn't remember when they were

TSG Reporting - Worldwide    877-702-9580

Page 51

MARTINI

1
2  revoked.
3      Q.   Does he remember what year they were
4  revoked?
5      A.   I didn't ask him.  Would it be safe to
6  say that at some point they came over?  I would
7  say yes.  I could -- at some point through 2008,
8  did he have access?  I'm sure they didn't get
9  cut off immediately, but I don't know when it
10  was cut off.
11         MS. NEUHARDT:  When you get to a good
12  stopping point, I could use a break.
13         MR. OXFORD:  We can take a few minutes
14  now if you like.
15         MS. NEUHARDT:  Now?
16         MR. OXFORD:  Sure.
17         MS. NEUHARDT:  Great.
18         (Recess)
19  BY MR. OXFORD:
20     Q.   Mr. Martini, do you know whether or
21  not Mr. Potenciano has access to any -- at any
22  time after he began employment with Barclays,
23  did he have any access to any shared drives onto
24  which LBI data was downloaded?
25     A.   I don't know for certain.

TSG Reporting - Worldwide    877-702-9580

Page 52

MARTINI

1
2      Q.   You qualified that last sentence "for
3  certain."  Do you have any idea one way or the
4  other?
5      A.   I don't know.
6      Q.   Have we exhausted your recollection of
7  the conversations you had with Mr. Potenciano in
8  connection with the preparation for this
9  deposition?
10     A.   Just I would have asked him what he
11  worked on with Mr. Burke.  So in other words,
12  not worked on but what was his interaction.
13     Q.   In what context were you asking --
14  withdrawn.
15         Were you asking him about his
16  interaction with Bill Burke in a particular time
17  frame?
18     A.   Just in general, when he was asked to
19  work for the trustee, my question was, what were
20  you being asked to do?  It was because he was a
21  mechanical type person, that he would do some of
22  the mechanical work for Mr. Burke.
23     Q.   Did you have any other discussions
24  with Mr. Potenciano in connection with either in
25  preparation for the deposition or your

TSG Reporting - Worldwide    877-702-9580

Page 53

MARTINI

1
2  declaration?
3      A.   No.
4      Q.   What about Mr. Crepeau, have we
5  exhausted your recollection of the conversations
6  you had with Mr. Crepeau in connection with
7  either your deposition or your declaration?
8      A.   Yes.  Mr. Crepeau, the conversations
9  with him were, number one, what the TSA was
10  working on, working on reconciliations over a
11  two-year period; regarding access, did they have
12  access to all the information, and did he have
13  access to anything that was MTS, ITS or ADP.
14     Q.   Mr. Crepeau was or was not a TSA
15  employee?
16     A.   He was at one point.
17     Q.   Do you know the time frame under which
18  he was working for the TSA?
19     A.   No.  Originally he was with TSA.  He
20  came to Barclays at some point later.  I'm not
21  sure when.  It was at some point in '09.  I
22  don't know when exactly.
23     Q.   Mr. Crepeau told you, when you say
24  number one, what the TSA was working on?
25     A.   Number one, what was the nature of the

TSG Reporting - Worldwide    877-702-9580

MARTINI

1  TSA, was reconciliations of the books and
2  records.  Access, confirming my understanding
3  that TSA had access to all the LBI data, and
4  then additionally, did he have access currently
5  to any of the ITS, MTS or ADP data that was LBI.
6      Q.   When did you have the conversation
7  with Mr. Crepeau?
8      A.   Before I -- the time leading up to
9  the April 5 declaration.
10     Q.   Did you talk to him in preparation for
11 your deposition?
12     A.   I spoke to Mr. Crepeau, yes.
13     Q.   When did you talk to him?
14     A.   This morning.
15     Q.   Do you have any notes of the
16 conversations you had with any of the
17 individuals you spoke to in connection with
18 either your deposition or your declaration?
19     A.   No.  I mean my conversations were
20 actually quite short.  It was more of, you know,
21 confirmation of the information that I said
22 initially, my knowledge of the firm, what I
23 would have known.  It was more along
24 confirmation as to access, things like that.  So

MARTINI

1  my conversations were very short.
2      Q.   You mentioned that Mr. Crepeau told
3  you that something was a two-year project with
4  the TSA.  Can you expand a little on that?
5      A.   So in the declaration which talks
6  about when Mr. McIsaac's affidavit about 3-3
7  calculations, I'm saying to run a 3-3
8  calculation, you need the data.  Data needs to
9  be correct.  The books and records,
10 understanding that the books and records had to
11 be reconciled, possibly third parties.  I'm not
12 sure of all the details.
13     But number one, it's getting the
14 population correct, reconciled, getting the
15 system, access to the systems, and then finally
16 access to the appropriate people who have
17 knowledge of Lehman's business in order to do a
18 3-3 calculation.
19     Q.   Is it your testimony, sir, that the
20 TSA has undertaken all of the activities you
21 have just told me about?
22     MS. NEUHARDT:  Objection to form.
23     A.   Meaning --
24     Q.   Your last answer, sir, when you said

MARTINI

1  that books and records need to be reconciled,
2  possibly with third-party data, and that access
3  to appropriate people who have knowledge of
4  Lehman's business would need to be obtained in
5  order to do a c3 calculation; is that what you
6  told me?
7      A.   My understanding and knowledge, that's
8  what TSA was doing, has been doing,
9  reconciliations, as well as they contain the one
10 most single most important person to perform a
11 3-3 calculation of LBI.
12     Q.   And who is that person, sir?
13     A.   Bill Burke.
14     Q.   How is it that you know that he is the
15 single most important person for doing a 3-3
16 calculation of LBI?
17     A.   I know Bill Burke's position in the
18 firm.  I've known him through the industry for a
19 long period of time.  The head of Lehman's reg.
20 team, Tony Stucchio, does not work at the firm
21 anymore, moved on.
22     Bill Burke ran the 3-3 calculation.
23 My discussions, knowledge with Mr. Potenciano
24 and my knowledge of how Lehman worked, my years,

MARTINI

1  the short period I worked at the Exchange,
2  interacted with him as well in that role, and
3  that my knowledge of Mr. Potenciano in terms of
4  his expertise in terms of 3-3.
5      Q.   You also had conversations, you said,
6  with T.J. Gavenda; is that correct?
7      MS. NEUHARDT:  Objection to form.
8      Q.   In preparation for your deposition or
9  your declaration?
10     A.   No.
11     Q.   You did not?
12     A.   No conversations, no.  My, my comment
13 about Mr. Gavenda was that we talked about TSA
14 and what they did, as CFO at the time.  I would
15 have gotten knowledge through him as to what the
16 role of the TSA was.
17     Q.   Is that also true of your
18 conversations with Mr. Scott, the COO?
19     A.   Ms., yeah.
20     Q.   Ms. Scott.  Did you talk to her in
21 preparation for your deposition?
22     A.   No.
23     Q.   Did you talk to her in preparation for
24 your declaration?

**MARTINI**

1  A.   No.
2
3      Q.   Did you talk to anybody else in
4  preparation for your -- either your deposition
5  or your declaration?
6      A.   No.
7      Q.   Have you ever -- withdrawn.
8          You mentioned that Bill Burke had a
9  certain reputation in the industry, correct?
10     A.   Yes.
11     Q.   Can you tell me again what the
12  reputation is?
13     A.   Someone who was seen as an expert in
14  SEC rules, 15c3-1, customer reserve and net
15  capital.  Excuse me.
16     Q.   Do you know who Daniel McIsaac is?
17     A.   Yes.
18     Q.   And before you reviewed his report,
19  were you familiar with Mr. McIsaac?
20     A.   Yes.
21     Q.   How is it you were familiar with
22  Mr. McIsaac?
23     A.   I know where he works, know his role
24  in past firms and know his role through the
25  SIFMA Capital Committee.  S-I-F-M-A.

**MARTINI**

1
2      Q.   Have you ever met Mr. McIsaac?
3      A.   Yes.
4          MR. OXFORD:  Off the record.
5          (Discussion held off the record)
6  BY MR. OXFORD:
7      Q.   You said you met Mr. McIsaac before
8  you read his affidavit?
9      A.   Yeah.  I have met him previously.  I
10  know him through the industry.
11     Q.   Mr. McIsaac is someone with
12  considerable experience in the industry; is that
13  correct?
14         MS. NEUHARDT:  Objection to form.
15     A.   There are many people with
16  considerable industry experience, including
17  myself.  Burke, yes, he is one of them as well.
18     Q.   Does Mr. McIsaac have a reputation in
19  the industry, sir?
20     A.   He does.
21     Q.   What is that reputation?
22     A.   I think his name is -- again, if you
23  are on the SIFMA Capital Committee, you are
24  running the reg. teams at a major broker/dealer.
25  So with that comes a reputation of you're

**MARTINI**

1
2  knowledgeable.
3      Q.   So you said Mr. Burke you considered
4  to be an expert in the industry and in
5  particular in SEC rules, including 15c3-3?  Do
6  you remember telling me that?
7      A.   Um-hm.
8      Q.   Would you also consider from your
9  experience in the industry that Mr. McIsaac was
10  similarly an expert in SEC Rule 15c3-3?
11         MS. NEUHARDT:  Object to the extent
12     that you are asking him for a legal
13     conclusion on whether or not either
14     Mr. Burke or Mr. McIsaac should be qualified
15     as experts in this litigation.
16         Otherwise, you can answer.
17     A.   First of all, Mr. McIsaac held a
18  higher position.  So I don't know -- he was a
19  CFO, if I am not mistaken.  So I don't know
20  whether he has as intimate knowledge as someone
21  like Bill Burke who manages the day-to-day 3-3
22  calculations.
23         I'm sure at some point in
24  Mr. McIsaac's career, he managed a 3-3
25  calculation.  I have nothing to base an opinion

**MARTINI**

1
2  that he does not have expertise in 3-3.
3      Q.   And before your counsel entered her
4  speaking objection, I had asked you a question
5  which was as follows:  Would you also consider
6  from your experience in the industry that
7  Mr. McIsaac is qualified as an expert in the
8  interpretation of Rule 15c3-3?
9          MS. NEUHARDT:  Same objection.
10     A.   I have not discussed ever a 15c3 issue
11  with Mr. McIsaac, but I know him in the
12  industry, know he holds that high position and
13  has run reg. teams most of his career, so I have
14  nothing that would make me believe he does not
15  have expertise in that area.
16     Q.   Have you ever spoken to a gentleman by
17  the name of Peter Vinella?
18     A.   No.
19     Q.   Do you understand that Mr. Vinella is
20  someone who has been retained by Barclays as an
21  expert in this litigation?
22         MS. NEUHARDT:  Objection to form.
23     A.   I know his name is involved in this
24  proceeding, yes.  I don't know what role he has.
25     Q.   Other than seeing his name referenced

MARTINI

1  in documents submitted by Mr. McIsaac, do you
2  have any awareness of Mr. Vinella's role in this
3  litigation?
4     A.    No.
5     Q.    When you joined Barclays, sir, you
6  were associate director on the regulatory
7  reporting team at Barclays Capital, correct?
8     A.    Correct.
9     Q.    And that was a position you held
10 between August 2007 and March 1, 2009, correct?
11    A.    Correct.
12    Q.    And in March 1, 2009, you were
13 promoted, correct?
14    A.    Correct.
15    Q.    You were promoted to director of the
16 regulatory reporting team at Barclays Capital?
17    A.    Correct.
18    Q.    That's the position you hold today,
19 correct?
20    A.    Correct.
21    Q.    When you were -- withdrawn.
22          You were associate director on the
23 reg. reporting team at the time that Barclays
24 acquired certain assets and/or businesses of

MARTINI

1  LBI, correct?
2     A.    Correct.
3     Q.    That was in September of 2008,
4  correct?
5     A.    Correct.
6     Q.    Did you have any responsibility in
7  September of 2008 for computing out -- sorry,
8  Barclays' 15c3-3 reserve requirement?
9     A.    September of 2008, my role was in
10 charge of reg. policy for Barclays Capital, Inc.
11 So I would be someone who faced off with the
12 business on new products, new businesses, to let
13 them know the impact from our net capital and
14 customer reserve perspective.
15          So I would have to be intimately
16 knowledgeable of Barclays' process for net
17 capital and customer reserve, but at that time,
18 I did not manage the calculations.
19    Q.    Who did manage the calculations, sir?
20    A.    At that time, Matthew Huey was in
21 charge of reg. for the U.S. for Barclays
22 Capital.
23    Q.    Does he hold the position you hold
24 today, sir?

MARTINI

1     A.    The group has been restructured
2  subsequent, so his position is actually held by
3  someone named Anna Yu, and in the restructuring,
4  they then broke off the management of the
5  broker/dealer teams and the bank teams. I run
6  the broker/dealer team and somebody else runs
7  the bank team.
8     Q.    Do you have any knowledge about
9  Barclays' calculation of the -- its 15c3-3
10 reserve requirement in September of 2008 and in
11 October of 2008, after it had acquired certain
12 assets and businesses from LBI?
13          MS. NEUHARDT:  Objection to form.
14    A.    Can you explain "knowledge," what that
15 means?
16    Q.    Do you know anything about it?
17    A.    I mean I'm aware of the reserve
18 calculations. I just did not manage them or
19 supervise them.
20    Q.    How is it that you are aware of the
21 reserve calculations, sir?
22    A.    One is done every week, and as a
23 manager, senior manager within the team, I would
24 still see the reserve calculations.

MARTINI

1     Q.    Do you have any knowledge about how
2  that calculation was performed in that time
3  period, September, October, 2008?
4          MS. NEUHARDT:  Objection to form.
5     A.    My recollection for that period would
6  not be really specific as to how they'd do it
7  then. If it was as of today, for example, it
8  would be a different story.
9     Q.    Do you -- I take it from your last
10 answer, you're now directly responsible for the
11 computation of the c3 reserve calculation within
12 Barclays Capital?
13    A.    My current role, I am responsible for
14 a reg. policy team for the broker/dealer and for
15 all the SEC reporting for the U.S.
16 broker/dealer, CFTC reporting. So in that is a
17 3-3 calculation. That's one of the aspects. I
18 do not manage it. I have a VP who manages it
19 and reports to a director who reports to me.
20    Q.    So it is fair to say, sir, you have
21 indirect but managerial or supervisory
22 responsibility for Barclays Capital's
23 calculation of the customer reserve formula
24 today?

**MARTINI**

1  A. I have managerial responsibility, but
2  I am intimately aware of our processes.
3  Barclays is a hands-on place, despite the size.
4  Q. Do you know, sir, how Barclays --
5  withdrawn.
6  **Barclays was a smaller broker/dealer**
7  **than LBI prior to September of 2008, correct?**
8  MS. NEUHARDT: Objection to form.
9  A. Smaller in which way?
10  **Q. Any way, sir.**
11  A. In terms of balance sheet?
12  **Q. Any way, sir.**
13  A. Balance sheet may have been
14  comparable. Smaller in terms of number of
15  people in the reg. team, yes.
16  **Q. Do you know one way or the other**
17  **whether the balance sheet of Barclays Capital**
18  **and LBI was comparable in the fall of 2008?**
19  A. I haven't looked at those for a long
20  time, but I believe they were comparable.
21  **Q. Do you have any understanding, sir, of**
22  **how Barclays Capital managed the integration of**
23  **the LBI customer accounts and assets --**
24  MS. NEUHARDT: Objection to form.

---

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1  MR. OXFORD: I hadn't finished.
2  MS. NEUHARDT: Sorry.
3  **Q. -- that it acquired from LBI from a**
4  **15c3-3 reserve perspective?**
5  MS. NEUHARDT: It's objectionable.
6  A. That I don't -- I don't understand the
7  question, I'm sorry.
8  **Q. You understand that Barclays acquired**
9  **certain customers and certain customer assets**
10  **from LBI, correct?**
11  A. Um-hm, yes.
12  **Q. You understand, sir, that those**
13  **customers and customer assets would have an**
14  **impact on Barclays' computation of the 15c3-3**
15  **reserve formula, yes?**
16  A. Correct.
17  **Q. Do you have any understanding of how**
18  **Barclays managed the integration of those**
19  **customers and customer assets into its**
20  **computation of the c3 formula?**
21  MS. NEUHARDT: Objection to form.
22  A. So if -- are you asking how the assets
23  came over from LBI to Barclays?
24  **Q. No, no.**

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1  A. You're asking how the computation is
2  now computed for Barclays Capital with the new
3  acquired assets?
4  **Q. I am asking, sir, whether you have any**
5  **information about what steps Barclays took in**
6  **order to manage its 15c3-3 calculations at a**
7  **time when Barclays had acquired a significant**
8  **amount of new customers and a significant amount**
9  **of assets along with those customers.**
10  MS. NEUHARDT: Objection, form.
11  **Q. Do you understand the question?**
12  A. Yeah. So I'll -- the integration
13  date, there was many things occurring, so I,
14  myself, at that point in time was not managing,
15  as I mentioned, the 3-3 calculations. So as far
16  as how they integrated everything initially, I
17  don't know how they ultimately got to those
18  points.
19  I do know the Friday after the
20  acquisition that we performed a 3-3 calculation
21  that would have contained those assets.
22  **Q. And do you know whether there were any**
23  **difficulties in performing that calculation?**
24  A. Don't recall the actual details.

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1  **Q. Do you know what steps were taken to**
2  **insure that that calculation was correct?**
3  MS. NEUHARDT: Objection to form.
4  A. I don't.
5  **Q. I meant to ask you about professional**
6  **associations, sir, when I was going through your**
7  **bio, but I forgot. Are you a member of any**
8  **professional associations?**
9  A. I am a member of the SIFMA Capital
10  Committee, and on the Financial Management
11  Society Board of SIFMA.
12  **Q. Do you have a particular role on the**
13  **Capital Committee of SIFMA, sir?**
14  A. I represent Barclays Capital.
15  **Q. Other than that, sir, do you have any**
16  **particular role?**
17  A. No, nobody does. I mean if issues
18  come up that will require separate committees, I
19  would be involved in that, but that's how the
20  committee works.
21  **Q. Does your work on the Capital**
22  **Committee of SIFMA relate to 15c3-3?**
23  A. I mean the SIFMA Capital Committee is
24  a lobbyist to the regulators, so, you know,

TSG Reporting - Worldwide    877-702-9580

MARTINI

1 regulators, SEC, FINRA attend those meetings as
2 well. So there is a give and take, back and
3 forth on regulatory issues, and 3-3 may be an
4 issue from time to time.
5    Q.   Is it an issue that actually has come
6 up during your membership of the Capital
7 Committee?
8    A.   I've heard issues around the customer
9 reserve, yes, absolutely.
10    Q.   Do you recall what any of those issues
11 were in particular?
12    A.   Could be regarding potential to change
13 the calculation frequency, changes as to the
14 haircuts that are applied on a 15c3 calculation,
15 3 percent to 1 percent, things along those
16 lines. Potential rules that regulators are
17 considering. New businesses and the impact of
18 3-3.
19    Q.   How long have you been a member of the
20 Capital Committee, sir?
21    A.   It was, sorry, sometime -- I don't
22 remember the exact date -- early 2009, and I was
23 appointed to the FSM board of SIFMA, I believe
24 it was April or May of this year, 2010.
25

TSG Reporting - Worldwide    877-702-9580

MARTINI

1    Q.   What's the FSM board of SIFMA?
2    A.   It is an accounting/regulatory group
3 within SIFMA. It looks at new accounting issues
4 and has some overlap on the Capital Committee
5 with regulatory issues.
6    Q.   OK. So I have this clear, you're a
7 member of the FSM board of SIFMA?
8       You're also a member -- sorry, you
9 have to say yes or no.
10    A.   Yes.
11    Q.   You are also a member of the Capital
12 Committee of SIFMA; is that correct?
13    A.   Correct.
14    Q.   You have been a member of the Capital
15 Committee since early 2009, correct?
16    A.   Correct.
17    Q.   And tell me again when you were
18 appointed to the FSM board of SIFMA.
19    A.   Either April or May of 2010.
20    Q.   I guess I should say congratulations.
21    A.   None needed.
22    Q.   More of a curse than a blessing.
23       Does your role as a member of the FSM
24 board of SIFMA have anything to do with Rule
25

TSG Reporting - Worldwide    877-702-9580

MARTINI

1 15c3-3?
2    A.   Because I have only been to one
3 meeting, I would say not to this point.
4    Q.   You also said you were a member of the
5 Financial Management Society of SIPA?
6    A.   No. That's FMS -- the FMS board of
7 SIFMA.
8    Q.   SIFMA?
9    A.   And the Capital Committee of SIFMA.
10    Q.   I understand.
11       Do you understand, sir, what SIPA,
12 S-I-P-A, stands for?
13    A.   I don't remember what the A stands
14 for. Something related to SIPC, I believe.
15    Q.   I believe so.
16       Do you have any expertise in
17 interactions with SIPC?
18    A.   No.
19    Q.   Do you have any -- I'll represent that
20 SIPA is the Securities Investor Protection Act.
21 Does that sound familiar to you?
22    A.   Yes.
23    Q.   Do you have any expertise in the
24 interpretation of SIPA?
25

TSG Reporting - Worldwide    877-702-9580

MARTINI

1    A.   No.
2    Q.   If I could ask you to turn to
3 paragraph 3 of your declaration, sir. You see
4 that with reference to Mr. McIsaac's rebuttal
5 report dated March 14, which is Deposition
6 Exhibit 693, you say, "Mr. McIsaac makes four
7 assertions, all of which are incorrect."
8    A.   Correct.
9    Q.   You see that?
10    A.   Yes.
11    Q.   Turning to the first bullet point
12 there, sir, you say that "Mr. McIsaac asserts
13 after Barclays acquired certain assets of LBI's
14 U.S. broker/dealer business in September of
15 2008, Barclays took control of all LBI systems
16 stored information necessary to rerun the SEC
17 Rule 15c3-3 reserve calculation as of
18 September 19, 2008."
19       Do you see that?
20    A.   Yes.
21    Q.   What do you mean by the term "rerun"
22 here, sir?
23    A.   Calculate.
24    Q.   And what steps would be involved in
25

TSG Reporting - Worldwide    877-702-9580

Page 74

**MARTINI**

1
2   calculating or rerunning the calculation as you
3   meant it in that sentence?
4       A.   What has to happen is first Barclays
5   Capital, someone on my team would need access to
6   the data.  Secondly, they would need a complete
7   population of reconciled books and records, so
8   that the information going in is accurate so
9   that the output can be accurate.
10      And then within the subset of that
11  data, and I'm talking of specifically the ADP,
12  MTS, ITS, stock records, trial balances,
13  subsidiary ledgers, whatever will be required to
14  perform a 15c3 calc.
15      Q.   Anything else, sir?
16      A.   In terms of --
17      Q.   In terms of rerunning the
18  calculations, what would be needed by Barclays?
19      MS. NEUHARDT:  Objection, form.
20      A.   Barclays would need a full picture of
21  the firm's books and records and access to their
22  stock record allocations and access to
23  individuals in operations, individuals'
24  knowledge of Lehman's business, so that we can
25  interpret the information properly for the

TSG Reporting - Worldwide    877-702-9580

Page 75

MARTINI

1
2   reserve computation to be done.
3       Q.   You mentioned that Barclays would need
4   a complete population, reconciled books and
5   records.  Do you remember telling me that a
6   minute ago?
7       A.   Yes.
8       Q.   What do you mean by reconciled books
9   and records?
10      A.   My understanding, I've not worked at
11  Lehman, but my understanding was that they may
12  have issues with their fail ledgers, bank loan
13  ledgers, things that would potentially give you
14  the impression that the information that feeds
15  into the allocation may not be entirely correct
16  or accurate.
17      Q.   What's the basis for that
18  understanding, sir?
19      A.   Discussions again with individuals
20  that have worked at Lehman Brothers.  Alex
21  Crepeau who is intimately aware of the firm as a
22  senior operations person.  And 15c3-3 is an
23  operational intensive calculation.
24      Q.   And any basis for the testimony you
25  have just given other than a conversation with

TSG Reporting - Worldwide    877-702-9580

Page 76

**MARTINI**

1
2   Mr. Crepeau?
3       MS. NEUHARDT:  Objection, form.
4       A.   I was not a legacy Lehman employee, so
5   I can't speak to the order of their books and
6   records.
7       Q.   OK, I understand that.  And I
8   appreciate that, sir.  I think I do have a
9   picture of what your role was.  I'm just seeking
10  to understand -- when you testify, I need to
11  understand how it is that you can testify.
12      Can you turn to the McIsaac report,
13  Exhibit 693, please.  In particular,
14  paragraph 31.  Do you have that there, sir?
15      A.   Yes.
16      Q.   You should feel free of course to read
17  the whole thing.  I'm going to direct your
18  attention to the last three lines, sir.  Let me
19  know when you have had a chance to review that.
20      A.   OK.
21      Q.   Thank you.
22      Turning to the third last line that
23  begins, "the trustee's professionals."  Do you
24  have that, sir?
25      A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 77

MARTINI

1
2       Q.   Mr. McIsaac writes, "The trustee's
3   professionals did not, as Mr. Vinella suggests,
4   perform an analysis of possible errors that
5   would have increased the reserve requirement and
6   deliberately failed to perform a similar
7   analysis of possible errors that would have
8   decreased the reserve requirement, nor were they
9   in a position to do so."
10      Do you see that?
11      A.   Yes.
12      Q.   He goes on to say, "Performing such
13  analysis would require the trustee's
14  professional to review and verify every line
15  item included in the reserve calculation,
16  correct any erroneous entries and then rerun the
17  reserve calculation to gauge the effect of each
18  correction.  As noted below, this would not as a
19  practical matter be cost effective or possible
20  to complete."
21      Do you see that?
22      A.   I do.
23      Q.   Do you agree with the last two
24  sentences of paragraph 31 of Mr. McIsaac's
25  report?

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2      MS. NEUHARDT:  Objection.
3      A.   Yeah, I can't answer the --
4  performing -- you are saying performing such
5  analysis will require the trustee's
6  professionals to review, verify and rely on --
7      **Q.   Um-hm.**
8      A.   I agree with that.
9      **Q.   So we have a clear record, you agree**
10 **with Mr. McIsaac's sentence which is the**
11 **penultimate sentence of paragraph 31, that**
12 **performing such an analysis would require the**
13 **trustee's professionals to review and verify**
14 **every line item included in the reserve**
15 **calculation, correct any erroneous entries and**
16 **then rerun the reserve calculation to gauge the**
17 **effect of each correction?**
18     A.   Right.  In order to do a reserve
19 calculation, that's what you would have to do.
20     **Q.   Is that analysis, including reviewing**
21 **and verifying every line item in the reserve**
22 **calculation, something that is done routinely in**
23 **the industry on a week-to-week basis when the**
24 **reserve calculation is computed?**
25     A.   On a week --

MARTINI

1
2      MS. NEUHARDT:  Objection, form.
3      A.   On a week-to-week basis, the reserve
4  team that does the calculation is dependent on
5  the internal controls of the firm's books and
6  records.  So if the books and records are
7  accurate, the firm would not do that.
8      If the firm felt it had something
9  incorrect systematic with its books and records,
10 then they would have to do that if they wanted
11 an accurate calculation, in my opinion.
12     **Q.   Do you have any information one way or**
13 **the other, sir, as to whether or not LBI**
14 **believed that there was something systematically**
15 **incorrect with its books and records in the week**
16 **beginning September 15 of 2008?**
17     MS. NEUHARDT:  Objection to form.
18     A.   Because I was not an employee, I can't
19 speak to the specifics, but my discussions with
20 Mr. Crepeau, my interactions with him tell me
21 that they had some issues, most notably bank
22 balances and fail balances.
23     **Q.   And specifically what did Mr. Crepeau**
24 **tell you about those issues?**
25     A.   He said that there was activity

MARTINI

1
2  happening and that got the sense that the firm
3  lost control of the books and records.
4      **Q.   When did the firm lose control of its**
5  **books and records according to what Mr. Crepeau**
6  **told you?**
7      A.   It wasn't specific to a date.
8      **Q.   Generally when did he say?**
9      A.   In the week or so leading up to
10 bankruptcy.
11     **Q.   Back to Mr. McIsaac's declaration.  In**
12 **paragraph 32, he says, "Even if the trustee had**
13 **unlimited access to LBI's systems and former" --**
14     MS. NEUHARDT:  Where are you?  I am
15 sorry.
16     MR. OXFORD:  32.  Do you have it, Amy?
17     MS. NEUHARDT:  Um-hm.
18     **Q.   Paragraph 32, Mr. McIsaac says, "Even**
19 **if the trustee had unlimited access to LBI's**
20 **systems and former LBI employees, rerunning the**
21 **reserve calculation as of September 19th would**
22 **be a substantial undertaking that would require**
23 **many months, significant funds and a large**
24 **number of knowledgeable personnel to complete."**
25     **Do you see that, sir?**

**MARTINI**

1
2      A.   Yes.
3      **Q.   Do you agree with that sentence?**
4      A.   Having not intimate knowledge of
5  Lehman's books and records, I can't disagree or
6  agree with that.  But I do know at least through
7  my discussions with Mr. Crepeau that my
8  understanding is that was what was occurring,
9  was over the last couple of years with the TSA,
10 it was reconciling books and records.
11     **Q.   When did you have that conversation**
12 **with Mr. Crepeau?**
13     A.   In the time leading up to my
14 declaration.
15     **Q.   In the spring of 2010?**
16     A.   Yeah, but additionally as a member of
17 Barclays Capital, I think there are many
18 employees that work at Lehman that are Barclays
19 Capital employees working for not TSA but
20 Barclays Capital, Inc., the U.S. broker/dealer.
21 It seems to have been common knowledge that that
22 was happening in TSA and what was the state of
23 the books and records of Lehman Brothers.
24     **Q.   And did Mr. Crepeau tell you that this**
25 **effort that he said was being undertaken by the**

**MARTINI**

1  TSA to reconcile the books and records of
2  Lehman, did he ever tell you that was complete?
3  A.   He did not.
4      Q.   Did you tell you it was a significant
5  undertaking?
6          MS. NEUHARDT:  Objection to form.
7      A.   He didn't say that.  He just said -- I
8  do believe he said he is not sure that they are
9  done or something along those lines.
10     Q.   Did he tell you that it was taking a
11  long time?
12     A.   You could imply that from the
13  conversation, that it has been taking a long
14  time.
15     Q.   I'm not asking if I can imply it, sir.
16  I am asking if you --
17     A.   I would imply that from the
18  discussions.
19     Q.   Did you also learn from Mr. Crepeau
20  that a substantial number of individuals are
21  involved in TSA's work to reconcile the books
22  and records of LBI?
23         MS. NEUHARDT:  Objection to form.
24     A.   Never really spoke about number of

**MARTINI**

1  people.  I don't know.
2      Q.   This is part of the common knowledge
3  that you testified about earlier on, that there
4  are --
5          MS. NEUHARDT:  Objection to form.
6          MR. OXFORD:  Please, Amy.
7          MS. NEUHARDT:  I am objecting to form.
8  It is not a speaking objection.
9          MR. OXFORD:  I understand, but if you
10  can wait until I finish, then we will have a
11  clearer record.
12         MS. NEUHARDT:  OK.  I will still
13  object, though.
14     Q.   You remember you testified earlier,
15  sir, that there was common knowledge within
16  Barclays about some of the work that was being
17  conducted by the TSA, sir?  Do you remember
18  telling me that?
19     A.   Common knowledge about what the
20  trustee was doing, TSA was doing, working on
21  reconciliations of books and records for
22  whatever date, September 19, yes.
23     Q.   And was it also common knowledge that
24  there was a substantial number of people

**MARTINI**

1  involved in this effort?
2          MS. NEUHARDT:  Objection to form.
3      A.   I would say that there is -- I would
4  imply from the discussions that there were quite
5  a few people, I don't know how many, that were
6  involved in that effort.  I don't know how many
7  employees were working with the TSA.
8      Q.   Continuing on with paragraph 32,
9  Mr. McIsaac says, "As a threshold matter, all of
10  LBI's books and records as of September 19, 2008
11  would have to be reviewed and reconciled, a
12  process that would itself take months to
13  accomplish."
14         Do you have any reason to agree or
15  disagree with Mr. McIsaac in that sentence?
16         MS. NEUHARDT:  Objection to form.
17     A.   I would have no reason to agree or
18  disagree.
19     Q.   Next sentence.  "At that point
20  personnel would need to modify the information
21  in the allocations in LBI's legacy systems
22  manually, or in the likely event that the legacy
23  system could not be modified manually,
24  reconstruct those systems, including all of the

**MARTINI**

1  accounts, balances and codings from the ground
2  up."
3          Do you see that?
4      A.   Yes.
5      Q.   Do you have any reason to agree or
6  disagree with Mr. McIsaac there?
7          MS. NEUHARDT:  Objection to form.
8      A.   To my knowledge of 3-3 calculations,
9  if the data isn't correct, and you have
10  adjustments, you have to run those adjustments
11  through.  Whether that means manually or whether
12  you have the ability to do that systematically,
13  I don't know Lehman's process of how they would
14  do it.
15     Q.   You don't know that LBI's legacy
16  systems don't allow a user to update stock
17  record information as of a date in the past?
18         MS. NEUHARDT:  Objection, form.
19     A.   I don't know intimately how their
20  allocation system works.  I can only speak how a
21  firm like Barclays works, is that we have the
22  ability to change our allocation for
23  adjustments.  We have an automated solution to
24  do that.  Most large firms have the ability to

MARTINI

1  do that.
2      Q.   But you don't know whether or not the
3  legacy Lehman systems have that ability?
4      A.   No.  I don't have intimate knowledge
5  of how that works.
6      Q.   Do you agree that if there is no
7  ability to update stock record information in
8  legacy LBI systems, it would be necessary to
9  construct a database that would mimic the stock
10 records in the legacy systems?
11         MS. NEUHARDT:  Objection, form.
12     A.   It seems logical that that would be
13 the case.
14     Q.   Given the size of LBI's business, that
15 would involve recreating the accounts, balances
16 and coding for tens of thousands of CUSIPs?
17         MS. NEUHARDT:  Objection to form.
18     A.   I'm not sure of that magnitude.  I
19 have no basis to comment on that.
20     Q.   You have no basis to think that that's
21 incorrect, do you, sir?
22         MS. NEUHARDT:  Objection, form.
23     A.   No.
24     Q.   Do you agree that recreating the

MARTINI

1  codings and balances for that many CUSIPs would
2  be a significant undertaking?
3          MS. NEUHARDT:  Objection, form.
4      A.   It sounds that way.  Sounds like it
5  would be significant.  If that is, in fact, what
6  the situation is.
7      Q.   Would you agree it could be
8  time-consuming?
9          MS. NEUHARDT:  Objection to form.
10     A.   It could.  Could be.
11     Q.   Do you agree that the stock record
12 information for each CUSIP would then have to be
13 reconciled against custodian records?
14         MS. NEUHARDT:  Objection, form.
15     A.   Again, it would depend on exactly, you
16 know, what is incorrect.  But normally, that is
17 the process that a broker/dealer has.  They have
18 that in their control process, the books and
19 records tie to third-party statements.
20     Q.   Do you also agree, Mr. Martini, that
21 in order to rerun the calculation, the
22 corrections and updates to the stock record
23 information would have to be entered manually?
24         MS. NEUHARDT:  Objection to form.

MARTINI

1      A.   If there is not an automated solution,
2  the manual is the only way to do it.
3      Q.   Assuming there were thousands of
4  adjustments to make, this process alone could
5  take many months, correct?
6          MS. NEUHARDT:  Objection to form.
7      A.   I mean I couldn't comment on the
8  length of time.
9      Q.   And in rerunning the calculation, sir,
10 for LBI's c3 calculation from September 19,
11 2008, once those stock records were corrected,
12 do you agree that codings in the allocation
13 program would need to be reviewed?
14         MS. NEUHARDT:  Objection to form.
15     A.   The first step in a 3-3 calculation is
16 population correctness, and without question
17 coding accounts is critical to having the right
18 output.
19     Q.   Is that a yes?
20     A.   Yes.
21     Q.   So the answer to my question is yes?
22     A.   Yes.
23     Q.   And as part of that process, documents
24 supporting the codings would need to be reviewed

MARTINI

1  to confirm that, correct?  Do you agree?
2      A.   I am sorry, repeat that, please.
3      Q.   As part of that process, documents
4  supporting the codings would need to be reviewed
5  to insure that they were correct?
6          MS. NEUHARDT:  Objection, form.
7      A.   Sorry, I don't understand.  What --
8  process documents?  Is that what you said?
9      Q.   As part of the process of reviewing
10 the codings in the allocation program, it would
11 be necessary to review documents supporting the
12 codings to confirm they were correct.  Do you
13 agree?
14         MS. NEUHARDT:  Objection, form.
15     A.   I don't know what that means.  Does
16 that mean going back to account setups, things
17 like that?
18     Q.   Let me ask it this way:  What would be
19 necessary, what steps would be involved in
20 reviewing the codings in the allocation program?
21     A.   Based on the nature of the account.
22 So LBI would have already coded their accounts.
23 They should have been -- I would think their
24 codings are correct.

Page 90

MARTINI

1
2       Q.   So is it your testimony there would be
3    no need to review the codings in the accounts
4    because LBI had already coded them?
5       MS. NEUHARDT:  Objection, form.
6       A.   I don't know their -- I just don't
7    know their process.  So in other words, we
8    spend -- when I do a calculation, we spend a lot
9    of time on -- codes is the most important aspect
10   to the reserve formula.  If an account is not
11   coded properly, it will not go through the
12   system with the right output.
13      Q.   And how would you go about reviewing
14   the codings in the allocation program if that
15   were necessary?
16      A.   I think you would have to know the
17   business and understand what the accounts
18   represent and the nature of those accounts.
19      Q.   Would you also need, in order to rerun
20   the c3 calculation, to review and reconcile
21   money balances?
22      A.   I am sorry, I missed that.  One more
23   time.
24      Q.   Would you also need, in order to rerun
25   the c3 calculation of LBI, to review and

TSG Reporting - Worldwide    877-702-9580

Page 91

MARTINI

1
2    reconcile money balances?
3       A.   Yes.
4       Q.   What would the purpose of that review
5    and reconciliation be?
6       A.   To insure that the balances that drive
7    the formula are accurate, tie into the firm's
8    general ledger and books and records.
9       Q.   You have no basis to disagree with
10   Mr. McIsaac's conclusion that this undertaking
11   would require many months, significant funds and
12   a large number of knowledgeable personnel to
13   complete, do you?
14      MS. NEUHARDT:  Objection to form.
15      A.   Yeah, I can't say that that's
16   incorrect.  I don't have enough knowledge with
17   Lehman's system or that process or exactly what
18   they are trying to accomplish.
19      MS. NEUHARDT:  When you get to a
20   subject matter break, can we take a quick
21   lunch?
22      MR. OXFORD:  Yeah, we can take a quick
23   lunch right now.
24      (Recess)
25

TSG Reporting - Worldwide    877-702-9580

Page 92

MARTINI

1
2       Q.   Mr. Martini, can you have in front of
3    you Exhibit 828, your declaration, please.
4       A.   Yes.
5       Q.   Please turn to paragraph 3.  If you
6    look at the third bullet, you write that
7    "Mr. McIsaac asserts that the trustee cannot
8    rerun the reserve calculation to account for any
9    identified discrepancies."  Do you see that?
10      A.   Right, yes.
11      Q.   Could you explain to me what you meant
12   by identified discrepancies?
13      A.   Any problems with the underlying data.
14      Q.   Could you turn to Mr. McIsaac's report
15   which is Exhibit 693 and can you show me where
16   in Mr. McIsaac's report he says that?
17      WITNESS' ATTORNEY:  Objection to form.
18      A.   I don't see where that exact phrase is
19   stated.  It was --
20      Q.   I am sorry, I didn't mean to
21   interrupt.
22      A.   In total, the entire affidavit
23   regarding running the reserve calculation.
24      Q.   Is there a particular section of the
25   report that you are referring to, sir?

TSG Reporting - Worldwide    877-702-9580

Page 93

MARTINI

1
2       A.   Well, in paragraph 32, so the general
3    theme is that the trustee didn't have -- didn't
4    have the ability to rerun the reserve
5    calculation.  And paragraph 31.
6       Q.   Maybe we have a definitional issue.
7    When you refer to "identified discrepancy," sir,
8    that you say that McIsaac claims the trustee
9    can't rerun the reserve calculation to account
10   for, you are aware, sir, that the trustee has
11   identified particular discrepancies in the
12   reserve calculation from September 19, 2008,
13   correct?
14      WITNESS' ATTORNEY:  Objection, to
15   form.
16      Q.   Let me try this again.  Are you aware,
17   Mr. Martini, that Mr. McIsaac has identified
18   certain adjustments that need to be made to the
19   LBI customer reserve calculation as of
20   September 19, 2008?
21      WITNESS' ATTORNEY:  Objection to form.
22      A.   There are excerpts in the report that
23   I have seen where he talks about discrepancies,
24   correct.
25      Q.   And you're aware, sir, that

TSG Reporting - Worldwide    877-702-9580

MARTINI

1  MARTINI
2  Mr. McIsaac's conclusion is that if those
3  adjustments were made to the September 19, 2008
4  reserve calculation, then there would be a
5  shortfall in the amount that should have been
6  set aside for customers?
7       WITNESS' ATTORNEY:  Objection to form.
8    A.  Yeah, so my view is a complete
9  calculation needs to be undertaken.
10   Q.  OK, and why is that, sir?
11   A.  To account for any discrepancies, all
12  discrepancies.
13   Q.  Are you aware of any discrepancies
14  that existed in the September 19, 2008 reserve
15  calculation that Mr. McIsaac didn't take account
16  of?
17       WITNESS' ATTORNEY:  Objection, he
18  never worked at LBI.
19   A.  I have no specifics, just it is the
20  nature of the process of doing a reserve comp,
21  the calculation of a reserve calculation, not
22  just some identified errors.  It is looking at
23  the entire calculation, scrubbing all the data.
24   Q.  OK, let's try this again.  Mr.
25  Martini, are you aware of a single discrepancy
       TSG Reporting - Worldwide     877-702-9580

1  MARTINI
2  that existed in LBI's 9/19/2008 15c3-3 reserve
3  computation that Mr. McIsaac did not take
4  account of in either his affidavits or reports
5  in this litigation?
6       WITNESS' ATTORNEY:  Same objection.
7    A.  Don't know the process that he
8  undertook.  In other words, does he have all of
9  the discrepancies, does he have all the errors.
10   Q.  OK, let me try this the third time.
11  Are you aware of a single discrepancy that
12  existed in LBI's 9/19/2008 15c3 reserve
13  computation that Mr. McIsaac did not take
14  account of in either of his affidavits or
15  reports in this litigation?
16       WITNESS' ATTORNEY:  Same objection,
17  plus asked and answered.
18   Q.  It is a yes or no question, sir.  Do
19  you know one way or the other?
20   A.  I did not know.  I did not work at
21  Lehman, so I don't know specifically.
22   Q.  And you haven't reviewed Mr. McIsaac's
23  original affidavit in this matter, have you?
24   A.  No.
25   Q.  And you haven't reviewed Mr. McIsaac's
       TSG Reporting - Worldwide     877-702-9580

1  MARTINI
2  testimony in this matter, have you?
3    A.  No.
4    Q.  Back to your affidavit, sir -- sorry,
5  your declaration.  The fourth bullet that you
6  say Mr. McIsaac asserts and is incorrect, is
7  that Barclays is able to rerun the reserve
8  calculation for the identified discrepancies.
9  Could you turn to Mr. McIsaac's report, Exhibit
10  693, and can you tell me where Mr. McIsaac says
11  that?
12       WITNESS' ATTORNEY:  You should look
13  over the entire declaration.
14   Q.  Take your time, sir.
15   A.  Sorry, I am on 29.  Paragraph 29, the
16  last sentence after the closing of a sale
17  transaction on September 22, 2008, Barclays took
18  control of LBI's system including the legacy
19  systems to store the information necessary to
20  rerun the reserve calculation of September 19.
21   Q.  OK, and is that the sum and substance
22  of your -- the basis for your assertion that
23  Mr. McIsaac says Barclays is able to rerun the
24  reserve calculation for identified
25  discrepancies?
       TSG Reporting - Worldwide     877-702-9580

1  MARTINI
2    A.  That, and in connection with 31 where
3  he says that the trustee cannot run the
4  calculation.  So saying that the information --
5  that Barclays has access to the information to
6  run the -- a 15c3-3 calculation and the trustee
7  did not have the time -- the significant
8  undertaking, so on and so forth.  That's where
9  that comment comes from.
10   Q.  Anything else?
11   A.  That's it.
12   Q.  Do you agree, sir, that Barclays could
13  adjust the September 19, 2008 reserve
14  calculation for LBI to account for identified
15  discrepancies?
16       WITNESS' ATTORNEY:  Object to form.
17   A.  Anybody could adjust the reserve
18  calculation, but to me, that's -- I can't say
19  that that's correct, you can't say that's full,
20  a full process.
21   Q.  You can't say it is a full process in
22  what respect, sir?
23   A.  To do a reserve calc. is -- a recalc.
24  to me means you start from the beginning.
25   Q.  And tell me again why it is your
       TSG Reporting - Worldwide     877-702-9580

MARTINI

1  opinion that a recalculation was necessary in
2  this case?
3        WITNESS' ATTORNEY:  Objection to form.
4  That mischaracterizes his testimony.
5     Q.  OK.  Well, let's deal with that.  Is
6  it your belief, sir, that in order to ascertain
7  what the reserve requirement was on
8  September 19, 2008, it was necessary for
9  someone, whether that be the trustee, his staff
10 or Barclays, to do a full recalculation of the
11 reserve requirement?
12       WITNESS' ATTORNEY:  Object to form.
13    A.  I am sorry, can you repeat that
14 question.
15    Q.  Sure, can you read it back.
16       (Record read)
17       WITNESS' ATTORNEY:  Same objection.
18    A.  I would say yes.
19    Q.  Why?
20    A.  Based on the nature of the
21 discrepancies outlined here.
22    Q.  Where is here, sir?  You're pointing
23 to your declaration, which discrepancies do you
24 outline in your declaration?
25

TSG Reporting - Worldwide    877-702-9580

MARTINI

1        WITNESS' ATTORNEY:  Objection to form.
2     A.  There were discrepancies in paragraph
3  18,--
4     Q.  Paragraph 18 of what, sir?
5     A.  693.
6     Q.  Anything else, sir?
7        WITNESS' ATTORNEY:  Objection, form.
8     A.  He has them.  I have to go through
9  every paragraph.  He has them in paragraph 7 --
10    Q.  Well, maybe we can do it this way, is
11 it your belief, sir, that because of the
12 specified and identified discrepancies in
13 Mr. McIsaac's report and affidavit, it is
14 necessary to do a full recalculation of the 15c3
15 reserve calculation as of September 19, 2008?
16       WITNESS' ATTORNEY:  Objection to form.
17    A.  I would say the process to do the
18 recalculation would be to start from scratch.
19    Q.  I understand what the process is, sir.
20 I am asking why it is your belief that that
21 process is necessary in order to come to a
22 determination of the 15c3-3 reserve requirement
23 as of September 19, 2008?
24    A.  The fact he has noted discrepancies,
25

TSG Reporting - Worldwide    877-702-9580

MARTINI

1  as well as conversation that I have had as I
2  previously stated with individuals that have
3  said that there is a reconciliation being --
4  taking place by the TSA team.
5     Q.  I am handing you what has been marked
6  previously in these depositions as Exhibit 599.
7  You are welcome of course to look at the whole
8  document.  I am only going to ask you I think
9  about the e-mail.  But let me know when you have
10 had an opportunity to review that document and
11 then we can proceed.
12    A.  OK.
13    Q.  Have you seen this document before,
14 sir?
15    A.  I've seen this e-mail.
16    Q.  Have you seen the attachment to the
17 e-mail or just the e-mail?
18    A.  I have -- I'm not sure if I have seen
19 the attachment or all of these schedules.  I may
20 have.  I can't recall if I have seen the entire
21 schedule.  I've seen the e-mail though.
22    Q.  When did you see the e-mail?
23    A.  I think this goes back to some point
24 in early 2009 as there was identified an issue

TSG Reporting - Worldwide    877-702-9580

MARTINI

1  with the ADP system that may have impacted
2  Barclays' calculation as well.  So in that
3  e-mail, there was -- something was identified as
4  being a problem within ADP's allocation.  Many
5  firms use ADP, so it was a street-wide issue so
6  that information was sent to me, sent to me
7  through Matt Huey.
8     Q.  Matt Huey sent you this e-mail, sir?
9     A.  Either sent me the e-mail or discussed
10 the issue with me.  Or maybe, maybe it came from
11 Joel, Joel could have done it as well.  I don't
12 know who I got the e-mail from.  Honestly, I
13 would have to go back and check, but I've seen
14 it.  I remember seeing this.
15    Q.  Do you remember seeing this e-mail at
16 about the time it was sent early January of
17 2009?
18    A.  I remember this as being an issue some
19 point in '09.
20    Q.  OK, did you see this document in
21 preparation for your deposition?
22    A.  I did.
23    Q.  We have talked about who Bill Burke
24 is?
25

TSG Reporting - Worldwide    877-702-9580

Page 102

**MARTINI**

1
2    A.    Um-hm, yes.
3    Q.    Who is Daniram Sudarsan?  Apologies if
4    I am murdering that.
5    A.    A individual who works for Alex
6    Crepeau.
7    Q.    And he was an employee of Barclays in
8    January '09?
9    WITNESS' ATTORNEY:  Objection, form.
10   A.    Yes, I believe so.
11   Q.    Who is Kendall McLaughlin?
12   A.    He was the predecessor to Alex
13   Crepeau.
14   Q.    What was his title if you know in
15   January 2009?
16   A.    I believe senior vice president or,
17   excuse me, director.
18   Q.    What was he responsible for?
19   A.    Regulatory operations.
20   Q.    Is he with Barclays today, sir?
21   A.    No.
22   Q.    Do you know where he is employed?
23   A.    Citigroup.
24   Q.    When did he move to Citigroup if you
25   know?

TSG Reporting - Worldwide    877-702-9580

Page 103

**MARTINI**

1
2    A.    Some point in the summer of 2009, I
3    believe.
4    Q.    Salvatore Buonocore?
5    A.    He is somebody in operations.  I don't
6    really interact with him.  I don't know if he is
7    still here or not.
8    Q.    He was, to your knowledge, a Barclays
9    employee?
10   A.    Yup.
11   Q.    In January of '09?
12   A.    Yup.  Yes.
13   Q.    Do you see the Sudarsan writes to
14   Mr. McLaughlin, "Kendall, we had a meeting where
15   Sal and myself discussed with Bill and Joel the
16   revised reserve formula as of 9/19/08 based on
17   the revised allocation of the books produced by
18   Broadridge.  The net effect was that the reserve
19   requirement increased by 213 ml, do you see
20   that?
21   A.    Um-hm.  Yes.
22   Q.    Can you, do you have an understanding
23   of what Mr. Sudarsan was talking about when he
24   sent that e-mail?
25   A.    I understand what the issue is, yes.

TSG Reporting - Worldwide    877-702-9580

Page 104

**MARTINI**

1
2    Q.    Can you tell me what the issue is on
3    this?
4    A.    He is saying he identified two issues
5    and a net impact of 213 million.  One impact
6    increased the requirement by 468 million due to
7    a double allocation and another issue resulted
8    in a benefit of 255 million.
9    Q.    Were you involved in contemporaneous
10   discussions with the individuals on this e-mail
11   about this subject?
12   WITNESS' ATTORNEY:  Objection, form.
13   A.    This issue was only raised to me as a
14   result of the ADP issue, the fact that there was
15   a double allocation of 097.  So make sure that
16   that was not an impact to Barclays Capital,
17   Barclays Capital ADP 293 allocation which is a
18   legacy system for Barclays.
19   Q.    This e-mail concerns Barclays'
20   employees revising the LBI reserve formula as of
21   September 19, 2008, do you agree?
22   WITNESS' ATTORNEY:  Objection,
23   mischaracterizes the document.
24   A.    Say that one more time, please.
25   Q.    Do you agree, sir, that this e-mail

TSG Reporting - Worldwide    877-702-9580

Page 105

**MARTINI**

1
2    concerns Barclays' employees calculating a
3    revised LBI reserve formula as of September
4    18 -- sorry, 19, 2008?
5    WITNESS' ATTORNEY:  Same objection.
6    A.    I would say this is not a revised
7    reserve formula.  This is two issues that were
8    identified and someone is saying the net effect
9    of those two issues will have X amount of impact
10   to the reserve requirement.
11   Q.    But not to the Barclays reserve
12   requirement, the LBI reserve requirement,
13   correct?
14   A.    Correct.
15   Q.    And with effect from or on the LBI
16   reserve formula as of September 19, 2008,
17   correct?
18   A.    Correct.
19   Q.    Do you know why they did that?
20   WITNESS' ATTORNEY:  Objection to form.
21   A.    Why they did --
22   Q.    Why they calculated the effect of
23   these adjustments on the LBI reserve requirement
24   as of September 19, 2008?
25   A.    I don't know.  My understanding would

TSG Reporting - Worldwide    877-702-9580

Page 106

MARTINI

1
2  be having some understanding of this particular
3  issue that was happening was -- there was
4  questions from the SEC for, I believe, Kendall
5  McLaughlin to go back and ascertain customer
6  assets or location of customer assets that were
7  not segregated and through that review, two
8  issues came up, these two issues.
9      Q.   How is it you came to this
10  understanding, sir?
11     A.   Discussions with individuals at the
12  time.
13     Q.   And which individuals, sir?
14     A.   Kendall, Daniram would have been aware
15  that they were doing something like that.
16     Q.   Do you know, sir, whether the net
17  effect of these adjustments on the LBI reserve
18  formula as of September 19, 2008, this 213
19  million adjustment referenced in Exhibit 599 was
20  communicated by Barclays to the SEC?
21         WITNESS' ATTORNEY:  Objection to form.
22     A.   I don't know.
23     Q.   Do you agree that this e-mail reflects
24  an adjustment to the reserve requirement for LBI
25  as of September 19, 2008 on September 17, 2008?

TSG Reporting - Worldwide    877-702-9580

Page 107

MARTINI

1
2         WITNESS' ATTORNEY:  Objection to form.
3      A.   Based on this is what the document
4  says.  So it says as of 9/19.  I have no
5  knowledge what day they looked at it.
6      Q.   Do you agree, sir, that Barclays was
7  able to account for those identified
8  discrepancies that you have just testified to by
9  adjusting the reserve calculation to the tune of
10  213 million dollars?
11         WITNESS' ATTORNEY:  Objection to form.
12     A.   Sorry, if you can rephrase that for
13  me.
14         MR. OXFORD:  Sure, can you read it
15  back, please, Mary.
16         (Record read)
17     Q.   NOTE: 213)?
18         WITNESS' ATTORNEY:  Same objection.
19     A.   I don't know the answer to that
20  question.  You are saying is Barclays able to
21  adjust the reserve formula for this?
22     Q.   Yes.
23     A.   This one adjustment?  I suppose
24  somebody could say that you could put that as
25  one component or one adjustment to a number, to

TSG Reporting - Worldwide    877-702-9580

Page 108

MARTINI

1
2  the reserve calculation, yes.
3      Q.   Do you know whether Barclays reran the
4  LBI reserve formula as of September 19, 2008 --
5      A.   When we say --
6         WITNESS' ATTORNEY:  Objection to form.
7      A.   When you say Barclays, who do we mean?
8      Q.   I mean anybody employed by Barclays or
9  working at the direction of Barclays.
10         WITNESS' ATTORNEY:  Those are two
11  different things.
12     A.   So nobody at the direction -- working
13  for Barclays for Barclays Capital Inc. would
14  have performed any 15c3 calculation for LBI.
15     Q.   Why not?
16     A.   We weren't asked to.  Why would we?
17     Q.   Was Barclays asked to calculate the
18  net effect of the adjustments reflected in this
19  e-mail on the reserve formula for LBI as of
20  September 19, 2008?
21         WITNESS' ATTORNEY:  Objection to form.
22     A.   I was never instructed.  I did not --
23  first of all, the time of this e-mail, it would
24  have been Matthew Huey, and to my knowledge, he
25  was not instructed by the SEC or anyone to do a

TSG Reporting - Worldwide    877-702-9580

Page 109

MARTINI

1
2  calculation.
3      Q.   To your knowledge, sir, was anybody at
4  Barclays asked to calculate the net effect on
5  the reserve requirement for LBI as of
6  September 19th, 2008 as a consequence of the
7  errors that are identified in Exhibit 599?
8         WITNESS' ATTORNEY:  Objection to form.
9      A.   I have no knowledge of those
10  discussions, no knowledge of anybody who
11  instructed to change the reserve requirement as
12  of 9/19.
13     Q.   You have no knowledge whether Barclays
14  was asked to calculate the net effect on LBI's
15  reserve requirement?
16     A.   Not to my knowledge.
17         WITNESS' ATTORNEY:  Objection to form.
18     Q.   Back to your declaration, sir.
19  Keeping with paragraph 4, after you say that
20  Mr. McIsaac's statements are incorrect, you say,
21  "Although Barclays acquired LBI's systems, its
22  employees are entitled to access only the
23  information located on those systems that is
24  associated with the 'Business' acquired by
25  Barclays from Lehman pursuant to the asset

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  purchase agreement, including the clarification
3  letter thereto between Barclays, LBI and other
4  Lehman entities," and you define that as the
5  "purchase agreement."  Do you see that, sir?
6      A.  Yes.
7      Q.  Have you ever seen the asset purchase
8  agreement?
9      A.  No.
10     Q.  Have you ever seen the clarification
11 letter to the purchase agreement?
12     A.  No.
13     Q.  And you're not a lawyer, sir?
14     A.  No.
15         WITNESS' ATTORNEY:  I am sorry, what's
16 the question?  OK.
17     Q.  Is this statement in paragraph 4 that
18 I just read based on your personal knowledge,
19 sir?
20         WITNESS' ATTORNEY:  Objection to form.
21     A.  This is based on my personal knowledge
22 of understanding the business of Barclays
23 Capital, knowing that it acquired certain assets
24 of LBI and that those assets were contained in a
25 system called ADP 224, that my team computed

MARTINI

1
2  reserve calculations for after the acquisition.
3      Q.  OK, and you testified, sir, under
4  penalty of perjury, that you have personal
5  knowledge that pursuant to the asset purchase
6  agreement and the clarification letter, Barclays
7  only has -- sorry, is only entitled to access to
8  information located on those systems associated
9  with "the business acquired by Lehman," correct?
10     A.  Yes.
11         WITNESS' ATTORNEY:  No, that
12 mischaracterizes the statement in his
13 declaration.  You can quote the declaration,
14 but you reversed it there.
15     A.  Please repeat for me.
16     Q.  Well, I think I had my answer, but
17 let's try and break it up.  You say that you
18 have -- withdrawn.
19         Do you have personal knowledge, sir,
20 of what -- of what the business is that Barclays
21 acquired from Lehman pursuant to the asset
22 purchase agreement and the clarification letter?
23     A.  I have knowledge in my position at
24 Barclays that we did not acquire 100 percent of
25 the assets of LBI.  We acquired certain assets

MARTINI

1
2  that, quote/unquote, is referred to as the
3  business.  The most notable business, as I have
4  said before, was the wealth business, and that
5  those assets that we acquired, my team has
6  access to the computer reserve calculation for.
7      Q.  It is true, sir, your knowledge about
8  what Barclays acquired is based on a practical
9  experience in the business, correct?
10     A.  Practical experience in the business
11 and my understanding of the activities of
12 Barclays Capital.
13     Q.  You haven't reviewed the asset
14 purchase agreement, have you, sir?
15         WITNESS' ATTORNEY:  Asked and
16 answered.
17     A.  I am sorry?
18         WITNESS' ATTORNEY: I objected.  You
19 can answer.
20     A.  I have not reviewed the asset purchase
21 agreement.
22     Q.  You have never seen it?
23     A.  I've not seen it.
24     Q.  You have never seen the clarification
25 letter, sir?

MARTINI

1
2      A.  No.
3      Q.  Do you even know what the
4  clarification letter is, sir?
5          WITNESS' ATTORNEY:  Object to form.
6      A.  No.
7      Q.  Would you recognize the document if I
8  put it in front of you?
9      A.  No.
10     Q.  Would you recognize the asset purchase
11 agreement if I put it in front of you?
12     A.  By the title maybe.
13     Q.  But you don't know?
14     A.  Don't know.
15     Q.  Tell me how it is that you're able to
16 testify from your personal knowledge about what
17 Barclays is entitled to do underneath those --
18 under those two documents that you have never
19 seen and you may not recognize?
20         WITNESS' ATTORNEY:  Objection, you are
21 mischaracterizing his declaration.
22     A.  My statement refers to the assets that
23 Barclays acquired that I see in our books and
24 records subsequent to the acquisition date that
25 my team creates a customer reserve from.

---

Page 114

MARTINI

1
2     So I'm not a lawyer.  I was not
3  involved in the sale.  I could not tell you
4  specifically if you put all the assets on a
5  schedule which ones we acquired, which one we
6  didn't.  But I know, to my personal knowledge of
7  the firm, we did not acquire 100 percent of the
8  LBI assets and I can look at a record under the
9  control of my team and having access to the
10  records of what we have on our books and
11  records.
12     Q.   You mentioned, I believe it was this
13  morning, sir, that one of the things that
14  Barclays would need in order to rerun LBI's
15  reserve calculation as of September 19, 2008
16  would be certain key employees?
17     A.   Yes.
18     Q.   Of LBI?  Yes?
19     A.   Yes.
20     Q.   And I think you mentioned Bill Burke
21  as one of those key employees?
22     A.   Yes.
23     Q.   Is there anybody else who is on that
24  list of key employees?
25     A.   I don't know the full list.  I only

TSG Reporting - Worldwide    877-702-9580

---

Page 115

MARTINI

1
2  know that Bill Burke, to my knowledge, ran the
3  15c3 calculation for LBI.  So he is the point
4  person.  He is responsible for the calculation.
5  Are there other people in the firm?  Yes,
6  probably.
7     Q.   To your knowledge, sir, was Mr. Burke
8  involved in calculating the effect on the
9  reserve requirement of the -- of LBI as of
10  September 19, 2008 that was identified in
11  Exhibit 599?
12          WITNESS' ATTORNEY:  Objection to form.
13     A.   I don't know.  I don't know what his
14  role was.
15     Q.   Is it your testimony, sir, because
16  Mr. Burke worked for the TSA, he wouldn't be
17  available to Barclays to assist them with
18  rerunning LBI's 15c3 calculation as of
19  September 19, 2008?
20     A.   My understanding is Barclays doesn't
21  have access to Mr. Burke regarding the LBI
22  calculation unless the trustee instructs us.
23     Q.   Could you know whether request has
24  been made by Barclays at any time to the trustee
25  for Barclays to use the services of Mr. Burke

TSG Reporting - Worldwide    877-702-9580

---

Page 116

MARTINI

1
2  notwithstanding that he is primarily employed
3  under the TSA?
4          WITNESS' ATTORNEY:  You can answer
5  only to the extent that you don't reveal
6  matters that were discussed in
7  attorney/client conversations.
8     A.   Please rephrase that question.
9     Q.   Sure.  Do you know whether any request
10  has been made by Barclays at any time to the
11  trustee for Barclays to use the services of Mr.
12  Burke notwithstanding that he is primarily
13  employed by TSA?
14          WITNESS' ATTORNEY:  Same instruction.
15     A.   I'm not aware that Barclays has asked
16  the trustee to use Bill Burke.  I'm not aware of
17  that.
18     Q.   Was Mr. Potenciano involved in the
19  calculation of the 15c3-3 reserve formula when
20  he was employed by Lehman?
21     A.   Yes.
22     Q.   And he is now employed by Barclays,
23  correct?
24     A.   Yes.
25     Q.   And you have unfettered access to

TSG Reporting - Worldwide    877-702-9580

---

Page 117

MARTINI

1
2  Mr. Potenciano's services, right?
3          WITNESS' ATTORNEY:  Object to form.
4     A.   Yeah, Mr. Potenciano worked within my
5  team, yes.
6     Q.   And Mr. Sudarson is also employed on
7  your team, right?
8     A.   Not on my team.  He is operations.
9     Q.   He is part of the operations control
10  group?
11     A.   Yes.
12     Q.   And he is employed by Barclays,
13  correct?
14     A.   Yes.
15     Q.   And he used to be employed by Lehman,
16  correct?
17     A.   Yes.
18     Q.   And he was in Lehman's operations
19  control group, wasn't he?
20     A.   Yes, I believe regulatory operations.
21     Q.   And in that capacity, he was involved
22  in the calculations of Lehman's 15c3-3 reserve
23  formulas during his employment by Lehman?
24     A.   He would have -- the nature of that
25  role is he would have worked with Bill Burke

TSG Reporting - Worldwide    877-702-9580

Page 118

MARTINI

1  team to analyze information.
2  **Q. So that's a yes?**
3      WITNESS' ATTORNEY: Objection form.
4      A. The answer is, I am saying, he does
5  not compute the reserve requirement. He is an
6  individual who may supply information to Bill
7  Burke or his team.
8  **Q. Do you know Kleber Rodriguez?**
9      A. I know of him.
10  **Q. Have you ever met him?**
11      A. I've met him.
12  **Q. Do you know what his position was at
13  Lehman in the fall of 2008?**
14      A. I don't know specifically what his
15  role was.
16  **Q. Do you know whether he had any
17  involvement in the computation of the Lehman's
18  15c3-3 reserve formula?**
19      A. I don't know specifically what his
20  involvement was.
21  **Q. Can you turn to paragraph 6 of your
22  declaration, please.**
23      A. OK.
24  **Q. You write, sir, that the trustee has**

TSG Reporting - Worldwide    877-702-9580

Page 119

MARTINI

1  **or has access to the relevant information
2  necessary to rerun LBI's September 17, 2008 or
3  September 19, 2008 reserve calculations
4  including to account for any discrepancies that
5  may have to be identified later by the trustee
6  related to those calculations. Do you see that?**
7      A. Yes.
8  **Q. What do you mean by "relevant
9  information," sir?**
10      A. I mean any adjustments that would be
11  needed to be incorporated, adjustments from
12  identified errors or reconciliation processes.
13  **Q. But you don't know one way or the
14  other whether any such errors have been
15  identified here, sir?**
16      WITNESS' ATTORNEY: Objection to form.
17      A. To the trustee?
18  **Q. I think you said "by the trustee" not
19  "to the trustee" in your sentence here, sir.**
20      WITNESS' ATTORNEY: Objection, he
21  didn't say anything about the trustee in his
22  original answer.
23      MR. OXFORD: I am not talking about
24  his original answer. I'm talking about his

TSG Reporting - Worldwide    877-702-9580

Page 120

MARTINI

1  declaration.
2  **Q. Let's start this again. You said that
3  by relevant information, sir, in paragraph 6 of
4  your declaration, you made any adjustments that
5  would be needed to be incorporated from
6  identification errors or reconciliation
7  processes, correct?**
8      A. Yes, sir, any relevant information
9  meaning books and records of LBI.
10  **Q. But sitting here today, sir, you don't
11  know one way or the other whether or not there
12  are any adjustments that need to be incorporated
13  in the reserve formula calculation --**
14      WITNESS' ATTORNEY: Objection to form.
15  **Q. -- to take account of identified
16  errors through the reconciliation process, do
17  you?**
18      WITNESS' ATTORNEY: Same objection.
19      A. I am sorry, that one you are going to
20  have to break up for me. Sorry, I apologize.
21      MR. OXFORD: Can you read it back
22  please, Mary.
23      (Record read)
24      A. Yeah, I would say I don't work on the

TSG Reporting - Worldwide    877-702-9580

Page 121

MARTINI

1  LBI calculation. I was not a Lehman employee,
2  so I don't know the full scope of what they have
3  identified or not identified.
4  **Q. In fact, you don't know anything about
5  the scope of what has been identified, if
6  anything, do you, sir?**
7      WITNESS' ATTORNEY: Objection to form.
8      A. As far as?
9  **Q. Errors that would need to be accounted
10  for in the rerunning of Lehman's 15c3-3
11  calculation as of September 19, 2008?**
12      WITNESS' ATTORNEY: Objection, form.
13      A. I don't have knowledge of items except
14  for what's in here of an identifier that I have
15  been exposed to.
16  **Q. And just for the record, sir, do you
17  agree that when you said in here --**
18      A. Yes.
19  **Q. -- you were referring to the errors
20  identified and described in Exhibit 599?**
21      A. Yes.
22      MR. OXFORD: We have been going about
23  an hour after lunch, if we want to take five
24  minutes.

TSG Reporting - Worldwide    877-702-9580

Page 122

MARTINI

1     MARTINI
2         (Recess)
3         Q.  Mr. Martini, do you agree that the
4     purpose of Rule 15c3-3 is to protect customers
5     or broker/dealers?
6             WITNESS' ATTORNEY:  Objection, form.
7         A.  The rule is put in place to protect
8     customers.  It is the customer protection rule,
9     that's the name of it.
10        Q.  Do you agree that Rule 15c3-3 is
11    intended to insure that fully paid customer
12    property and excess margin securities are
13    unconditionally available to satisfy customer
14    claims in the event of a broker deal
15    liquidation?
16            WITNESS' ATTORNEY:  Objection to form.
17        A.  The purpose of the capital rule,
18    reserve rule is that in a liquidation scenario,
19    the firm either has enough capital to support
20    its obligations or it would have enough funds in
21    a reserve account to unwind the broker/dealer in
22    an orderly fashion.
23        Q.  And to satisfy customer claims in that
24    scenario, sir, correct?
25            WITNESS' ATTORNEY:  Objection, form.

TSG Reporting - Worldwide    877-702-9580

Page 123

MARTINI

1     MARTINI
2         A.  Not being a SIPC attorney, I think
3     that's the theory of the rule.  The practice of
4     the rule, I'm not sure.
5         Q.  Have you ever heard of 15c3-3 reserve
6     funds being referred to as "margin"?
7         A.  I don't understand.
8         Q.  You understand that pursuant to Rule
9     15c3-3, a broker/dealer is required to do a
10    calculation on a weekly basis, correct?
11        A.  Yup, and a monthly basis, yeah.
12        Q.  And pursuant to that calculation, a
13    certain sum of money or other assets has to be
14    locked up in a reserve account, correct?
15        A.  Correct.
16        Q.  Have you ever heard of that reserve
17    account or the funds in that reserve account
18    being referred to as "margin," M-A-R-G-I-N?
19            WITNESS' ATTORNEY:  Object to form.
20        A.  No, I'm not sure of the context of
21    that.
22        Q.  Have you ever heard of them referred
23    to as "guarantee funds"?
24        A.  No.
25            WITNESS' ATTORNEY:  Object to form.

TSG Reporting - Worldwide    877-702-9580

Page 124

MARTINI

1     MARTINI
2         Q.  Could you have Exhibit 590 in front of
3     you please, sir.
4             WITNESS' ATTORNEY:  599?
5         Q.  590. Do you have that, sir?
6         A.  Yes.
7         Q.  That's Mr. McIsaac's affidavit,
8     October 5, 2009.
9         A.  OK.
10        Q.  Could you take a look at paragraph 16.
11    It's on page 5.
12        A.  OK.
13        Q.  Do you agree with what Mr. McIsaac
14    says in paragraph 16.
15            WITNESS' ATTORNEY:  Object to form.
16        A.  So the first sentence, that a
17    broker/dealer -- the rule requires a
18    broker/dealer to have physical possession or
19    control of fully paid and excess margin
20    securities.  So that's right out of the rule?
21    Excess margin securities are --
22        Q.  Well, if you can just stop there.
23    It's -- do you agree with the first sentence
24    that Mr. McIsaac has in paragraph 16?
25            WITNESS' ATTORNEY:  Object to form.

TSG Reporting - Worldwide    877-702-9580

Page 125

MARTINI

1     MARTINI
2         A.  That is the purpose of the rule.  The
3     purpose of the rule is the possession or control
4     of fully paid and excess margin securities.
5         Q.  So that's a yes, you do agree?
6         A.  I agree that is the object of the
7     rule.
8         Q.  Can you tell me if you agree with the
9     second sentence?
10            WITNESS' ATTORNEY:  Object to form.
11        A.  Understand what excess margin
12    securities are, so they are above -- a
13    broker/dealer may hypothecate based on the
14    margin debit.
15        Q.  So is the answer to my question, do
16    you agree with what Mr. McIsaac writes in
17    sentence 2 of paragraph 16 yes?
18            WITNESS' ATTORNEY:  I object to form.
19        A.  It is accurate, accurate per the rule.
20        Q.  Do you agree with what Mr. McIsaac
21    writes in the third sentence of paragraph 16?
22            WITNESS' ATTORNEY:  Object to form.
23        A.  I'm not sure what he means there, so
24    what does it mean when he is saying he is not in
25    actual possession of a customer security?  I

TSG Reporting - Worldwide    877-702-9580

Page 126

MARTINI

1  don't know what that means.
2      Q.   Well, do you know, sir, that
3  broker/dealers often have customer securities
4  custodied at third parties?
5      A.   Yes.
6      Q.   If that's what Mr. McIsaac means, do
7  you agree with his third sentence in paragraph
8  16?
9      WITNESS' ATTORNEY:  Object to form.
10     A.   OK, it seems accurate.
11     Q.   OK.  And I'm happy to do this line by
12  line or sentence by sentence or paragraph by
13  paragraph.
14     I am going to start with the paragraph
15  by paragraph and see if we can do it this way
16  for speed, but if we need to break it down, I am
17  happy to do so further.
18     Could you read paragraph 17 of
19  Mr. McIsaac's October 5 affidavit and tell me
20  whether you agree with it.
21     WITNESS' ATTORNEY:  Object to form.
22     A.   It seems accurate.
23     Q.   Same question for paragraph 18, can
24  you read that and tell me whether you agree with

TSG Reporting - Worldwide    877-702-9580

Page 127

MARTINI

1  it?
2      WITNESS' ATTORNEY:  Object to form.
3      A.   That seems accurate.
4      Q.   Thank you.  Same question for
5  paragraph 19, do you agree with what Mr. McIsaac
6  writes in paragraph 19?
7      WITNESS' ATTORNEY:  Object to form.
8      A.   It comes out of the rule, it's
9  accurate.
10     Q.   Same question for paragraph 20, do you
11  agree with that?
12     WITNESS' ATTORNEY:  Object to form.
13     A.   Correct.
14     Q.   Correct, you agree that Mr. -- with
15  what Mr. McIsaac writes in paragraph 20?
16     A.   Yes.
17     Q.   Do you agree with what Mr. McIsaac
18  writes in paragraph 21?
19     WITNESS' ATTORNEY:  Object to form.
20     A.   Correct.
21     Q.   Do you agree with what Mr. McIsaac
22  writes in paragraph 21, yes?
23     WITNESS' ATTORNEY:  Object to form.
24     A.   Correct.

TSG Reporting - Worldwide    877-702-9580

Page 128

MARTINI

1      Q.   And same question for paragraph 22, do
2  you agree with what Mr. McIsaac writes in
3  paragraph 22?
4      WITNESS' ATTORNEY:  Object to form.
5      A.   22, yes, 22 correct.
6      Q.   So you agree with everything that
7  Mr. McIsaac writes in paragraph 16 through 22?
8      WITNESS' ATTORNEY:  Object to form.
9      A.   The excerpts he has here are correctly
10  from the rule itself.
11     Q.   So that's a yes, Mr. Oxford, I agree
12  with Mr. McIsaac in everything he writes in
13  paragraphs 16 through 22?
14     WITNESS' ATTORNEY:  Object to form.
15     A.   Mr. McIsaac has the appropriate rule
16  references for those paragraphs.
17     Q.   And not just the appropriate rule
18  references.  To the extent he characterizes
19  those rules and the effect of those rules, you
20  agree with them, correct?
21     WITNESS' ATTORNEY:  Object to form.
22     A.   That is the essence, that is the
23  essence of the customer reserve rule.
24     Q.   Can you tell me what is a good control

TSG Reporting - Worldwide    877-702-9580

Page 129

MARTINI

1  location in the context of Rule 15c3-3?
2      WITNESS' ATTORNEY:  Object to form.
3      A.   Control location are locations
4  approved by the SEC and specific locations per
5  the rule, possession or control is not required
6  to take over a certain period of time.  So I
7  really can't go through every scenario.  To be
8  honest, that is an actual function performed by
9  an operations team, not my team.
10     Q.   Do you know how the good control
11  requirements of 15c3-3 apply to securities
12  launched abroad?
13     WITNESS' ATTORNEY:  Object to form.
14     A.   Do you have an example?
15     Q.   I can give you a example, but before
16  we get to that, I wonder if you are able to tell
17  me in general terms how the good control
18  requirements of Rule 15c3-3 apply to the
19  securities that are launched outside of the
20  U.S.?
21     WITNESS' ATTORNEY:  Object to form.
22     A.   I have an understanding of that
23  process, that rule.
24     Q.   Can you tell me how they apply, how

TSG Reporting - Worldwide    877-702-9580

Page 130

**MARTINI**

1  the requirements of that rule apply to
2  securities launched outside of the U.S.?
3
4       **WITNESS' ATTORNEY: Object to form.**
5       A.   It applies to other locations, whether
6  those locations are considered a good control
7  locations per the SEC.
8       **Q.   So the SEC has to approve a location**
9  **as a good control location outside of the U.S.,**
10 **correct?**
11      A.   Correct.
12      WITNESS' ATTORNEY: Object to form.
13      **Q.   It is true also the securities must be**
14 **free of any lien or claim of any kind, correct?**
15      **WITNESS' ATTORNEY: Object to form.**
16      A.   Correct.
17      **Q.   It also true the securities must be**
18 **freely transferable?**
19      **WITNESS' ATTORNEY: Object to form.**
20      A.   Correct.
21      **Q.   Do you agree, sir, that, any property**
22 **that's not in a good control location must be**
23 **added to the c3 reserve calculation until such**
24 **time as it is placed in a good control location?**
25      **WITNESS' ATTORNEY: Object to form.**

TSG Reporting - Worldwide    877-702-9580

Page 131

**MARTINI**

1
2       A.   A location that doesn't meet the
3  definition of a good control location in a
4  specified time periods as allowed by the rule,
5  if something is in a location, it goes into the
6  reserve formula.
7       **Q.   I'm not sure I quite followed your**
8  **answer.  I think I did, but I want to make sure**
9  **we are understanding each other.**
10      **Is it your testimony, sir, that if**
11 **property that is required to be in a good**
12 **control location per Rule 15c3-3 is not in a**
13 **good control location, then it must be added to**
14 **the reserve formula calculation until such time**
15 **as it is placed in a good control location?**
16      **WITNESS' ATTORNEY: Object to form.**
17      A.   Generally that is the case.
18      **Q.   And you agree that the point at which**
19 **the property must be added to the reserve**
20 **calculation is the point at which the control**
21 **location is no longer good?**
22      **WITNESS' ATTORNEY: Object to form.**
23      A.   Sounds correct.
24      **Q.   Do you agree, sir, that an entity that**
25 **is in insolvency proceedings is not a good**

TSG Reporting - Worldwide    877-702-9580

Page 132

**MARTINI**

1
2  **control location?**
3       **WITNESS' ATTORNEY: Object to form.**
4       A.   Having not looked at that issue
5  specifically, that would seem to make sense.
6       **Q.   Would it also make sense to you, sir,**
7  **that customer property that is held in an entity**
8  **that becomes insolvent must be added to the**
9  **reserve calculation?**
10      **WITNESS' ATTORNEY: Object to form.**
11      A.   I'm not sure.  Can you rephrase that
12 or say that again, please.
13      **Q.   Sure.  Would it also make sense to you**
14 **that customer property that is held in an entity**
15 **that becomes insolvent must then be added to the**
16 **c3 reserve calculation?**
17      **WITNESS' ATTORNEY: Object to form.**
18      A.   Yeah, I would say that that's correct.
19      **Q.   Do you agree, sir, if customer cash is**
20 **being transferred from a broker/dealer to a**
21 **customer through an intermediary and the**
22 **intermediary does not pay the customer, the**
23 **broker/dealer will still owe the cash to the**
24 **customer?**
25      **WITNESS' ATTORNEY: Object to form.**

TSG Reporting - Worldwide    877-702-9580

Page 133

**MARTINI**

1
2       A.   Explain that to me slowly how that
3  works, please.
4       **Q.   If a broker/dealer whose customer --**
5  **owes the customer cash?**
6       A.   The broker/dealer, sorry, owes the
7  customer cash?
8       **Q.   Yes, and attempts to transfer that**
9  **cash to the customer through an intermediary,**
10 **but the intermediary does not pay the customer,**
11 **do you agree that the broker/dealer still owes**
12 **that cash to the customer?**
13      **WITNESS' ATTORNEY: Object to form.**
14      A.   We are talking general or a
15 bankruptcy?
16      **Q.   Yeah, in general terms.**
17      A.   So the intermediary never gave the
18 cash to the customer?  That sounds like
19 possession, a possession or control requirement
20 for the broker/dealer.
21      **Q.   And that means that that cash that is**
22 **owed to the customer should be accounted for**
23 **in the 15c3 reserve formula computation, correct?**
24      **WITNESS' ATTORNEY: Object to form.**
25      A.   I have no basis to dispute that,

TSG Reporting - Worldwide    877-702-9580

Page 134

MARTINI

without seeing specific examples. In general,
that makes sense, but of course, nothing is ever
simple in real terms.
   Q.   Ain't that the truth.
        Can we go off the record. I think I
may be done. Could you give us two minutes
and I can consult.
        (Recess)
   Q.   Mr. Martini, one more question. Could
you have your declaration in front of you.
   A.   Yes.
   Q.   Turn to paragraph 6.
   A.   OK.
   Q.   You see you reference two dates in
there, September 17 and September 19, 2008?
   A.   Um-hm.
   Q.   What was the reason you referenced
September 17, 2008, sir?
   A.   Because those are the calculation
dates referenced in Issacson's affidavit -- I am
sorry, McIsaac's rebuttal.
   Q.   I'll come back to that in just a
second, sir. I'm reminded that when I asked you
initially, sir, what documents you looked at in

Page 135

MARTINI

preparation for your deposition, you mentioned
two documents, do you remember that? You
identified your declaration, sir, and you
identified the March 14 McIsaac report, right?
   A.   McIsaac rebuttal.
   Q.   Yes, the McIsaac rebuttal report --
   A.   March 14.
   Q.   Which is Exhibit 693, correct?
   A.   Correct.
   Q.   And then later on, during the course
of the deposition, you identified when I showed
you Exhibit 599, you said you had also seen that
in preparation for your deposition?
   A.   OK, correct.
   Q.   Are there any other documents that you
saw in preparation for your deposition?
        WITNESS' ATTORNEY: Object to the
extent that the documents shown to you by
counsel did not refresh your recollection in
any way.
        You can answer with that instruction.
   Q.   Let's try this in stages, sir. You
have identified three documents that you saw in
preparation for your deposition so far?

Page 136

MARTINI

   A.   OK.
   Q.   Did you see more than three documents,
sir? Just answer that yes or no?
   A.   No.
   Q.   No?
   A.   No.
   Q.   And turning to the rebuttal report,
sir, Exhibit 693, can you show me where
Mr. McIsaac references this September 17
calculation?
        WITNESS' ATTORNEY: Objection to form.
   A.   Identified that there was a reserve
calculation, paragraph 26.
   Q.   Is it your understanding, sir, that in
order to determine whether or not there was a
excess or deficit in the reserve, customer
reserve account on September 17, 2008, the same
rerunning exercise that you have testified to
with respect to the September 19, 2008 date
would also need to be undertaken?
        WITNESS' ATTORNEY: Object to form.
   A.   It depends on the context of the -- or
I should say it depends on the status of the
books and records for that date.

Page 137

MARTINI

   Q.   Do you have any more information about
the status of the books and records as of the
17th of September of 2008 than you do the books
and records of LBI as of September 19, 2008?
        WITNESS' ATTORNEY: Objection, form.
   A.   No, no.
        MR. OXFORD: I don't have any further
questions for you at this time, sir, but I
believe your counsel does.
        WITNESS' ATTORNEY: I do, but -- off
the record.
        (Recess)
EXAMINATION BY
MS. NEUHARDT:
   Q.   Mr. Oxford asked you a number of
questions about your personal knowledge. Do you
have personal knowledge of what goes into a
15c3-3 calculation?
   A.   Yes.
        MR. OXFORD: Object to the form.
   Q.   You need to give him a chance to
object now.
   A.   Sorry.
   Q.   And from where does that personal

MARTINI

1 knowledge come?
2
3    A.   From my 25 years of experience in the
4 industry.  I've worked at, as we went through my
5 background, I have done the 15c3 calculation in
6 some way, shape or form at several
7 broker/dealers.
8    Q.   Do you have personal knowledge of what
9 databases LBI used in putting together its
10 15c3-3 calculations?
11    WITNESS' ATTORNEY:  Object to form.
12    A.   I know that information from my
13 knowledge of having been at the exchange, I'm
14 aware of the systems that Lehman used as well as
15 discussions with my team who were legacy Lehman
16 employees.
17    Q.   Do you have personal knowledge of the
18 general structure of the TSA?
19    MR. OXFORD:  Object to the form.
20    A.   Yeah.
21    Q.   Can you tell me from where you get
22 that -- first of all, when I say the general
23 structure of the TSA, maybe you can elaborate on
24 what your understanding of the TSA is.
25    A.   The TSA was a group of employees that

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2 worked at the instruction and direction of the
3 trustee.  While they might be Barclays employees
4 in name and they're paid by Barclays, they were
5 not directed by Barclays Capital Inc., the
6 broker/dealer which is what I work for.  And
7 that these employees are ring-fenced and I don't
8 have access to them, and to the extent anybody
9 on my team is required to work with them, that
10 information is not to be shared.
11    Q.   Are all TSA employees ring-fenced?
12    A.   Not to my knowledge.
13    Q.   OK, are there any employees of
14 Barclays who at times work for the TSA and at
15 times for work Barclays?
16    MR. OXFORD:  Object to the form.
17    A.   Yes, yes.
18    Q.   OK, and now when employees work for
19 the TSA, who whom do they report to?
20    A.   My understanding is --
21    MR. OXFORD:  Object to form.
22    A.   My understanding is the trustee.
23    Q.   Do they report to anybody at Barclays
24 to your knowledge?
25    A.   Not to my knowledge.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2    Q.   You said Barclays pays their salary.
3 Do you know if Barclays gets reimbursed for
4 their salary?
5    A.   My understanding is they do.
6    Q.   And from whom do they get reimbursed?
7    A.   My understanding is from the trustee.
8    Q.   Now, from where do you get these
9 understandings of the TSA that we just
10 discussed?  We established that you said this
11 is -- that's a terrible question so you can --
12 withdrawn.
13    What we have just discussed about the
14 TSA is, are those answers based on personal
15 knowledge?
16    MR. OXFORD:  Objection, form.
17    A.   Personal knowledge from my knowledge
18 of the firm and my discussions with senior
19 people as to what the TSA's intent was.
20    Q.   OK, and Mr. Oxford asked you about
21 whether or not there was a, in effect, a wall
22 between people who had worked for the TSA and
23 now worked for Barclays or who did part, part --
24 whether there was a wall which they could not
25 discuss and I want you to answer it again

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2 because I believe your answer was unclear.
3    So is there a wall, when an employee
4 works for both the TSA and for Barclays, either
5 at different parts in time or they are part-time
6 for both, is there a wall between their roles as
7 TSA and Barclays employees?
8    A.   Yes, that's my understanding and I
9 confirmed that with Joel Potenciano who worked
10 for me who has worked with TSA on several
11 occasions and has told me himself that there is
12 a wall there.
13    Q.   And you said you confirmed that with
14 Mr. Potenciano.  Do you have personal knowledge
15 otherwise of that wall?
16    A.   Just as I said, similar to the TSA
17 structure, is that those employees are not to be
18 sharing information across the lines between the
19 Barclays and the trustee.
20    Q.   And this is from your role as the head
21 of operations?
22    MR. OXFORD:  Object to the form.
23    Q.   What is the basis of your personal
24 knowledge?
25    MR. OXFORD:  Objection, form.

TSG Reporting - Worldwide    877-702-9580

Page 142

MARTINI

1   MARTINI
2       A.   From my position of a senior position
3   in finance, run the regulatory reporting team
4   for the broker/dealer and interact with senior
5   management of the firm on a regular basis.
6       Q.   In your declaration, did you purport
7   to do a legal analysis of the TSA contract?
8       MR. OXFORD:  Objection to form.
9       A.   No.
10      Q.   In your declaration, did you purport
11  to do a legal analysis of the APA?
12      MR. OXFORD:  Objection to form.
13      A.   No.
14      Q.   In your declaration, did you purport
15  to do a legal analysis of the clarification
16  letter?
17      MR. OXFORD:  Objection to form.
18      A.   No.
19      Q.   Now, in your declaration and in your
20  discussions with Mr. Oxford today, you have
21  referred to who has access to the records of
22  LBI.  What do you mean by "access"?
23      MR. OXFORD:  Objection, form, which
24  records of LBI?
25      Q.   Can you answer the question?
TSG Reporting - Worldwide    877-702-9580

Page 143

1   MARTINI
2       A.   Access to me means log on to the
3   systems, ability to get the information from
4   those systems.
5       Q.   Does Barclays control who can log on
6   to those systems?
7       MR. OXFORD:  Objection, form.
8       A.   No.
9       Q.   Just to make the record clear, which
10  systems are you referring to when you refer to
11  those systems?
12      MR. OXFORD:  Objection, form.
13      A.   ITS, MTS and ADP 012.
14      Q.   Do you know who does control the --
15  who can log on to MTS, ITS and ADP 012?
16      A.   My understanding is the trustee or the
17  people that work under his direction.
18      Q.   OK, is that understanding based on
19  your personal knowledge?
20      A.   Personal knowledge --
21      MR. OXFORD:  Objection, form.
22      A.   My discussions with Joel Potenciano
23  who has done work with the TSA and has told me
24  that his system access has been revoked.
25      Q.   Do you have access to MTS, ITS or ADP
TSG Reporting - Worldwide    877-702-9580

Page 144

1   MARTINI
2   012?
3       A.   No.
4       Q.   Do you know of any Barclays employee
5   who does have access?
6       A.   No.
7       Q.   Do you know whether the trustee has
8   access to those systems?
9       MR. OXFORD:  Objection, form, asked
10  and answered.
11      A.   My conversations with Alex Crepeau is
12  affirmative.
13      Q.   Right, and do you have personal
14  knowledge of that as well?
15      A.   Personal knowledge --
16      Q.   Of what the trustee can access or that
17  the trustee is able to access MTS, ITS and ADP
18  012?
19      A.   I know from my work with Barclays
20  Capital in the rate department, I know what we
21  have access to and it is specific to certain
22  records that we have acquired.  So the logic is
23  that the trustee has access to the rest
24  because -- through that logic.
25      Q.   And then you confirmed that
TSG Reporting - Worldwide    877-702-9580

Page 145

1   MARTINI
2   understanding with other individuals, you said?
3       A.   Yes, I spoke to Alex Crepeau and Joel
4   as well.
5       Q.   You have you been designated as an
6   expert in this litigation?
7       A.   No.
8       MR. OXFORD:  Objection, form.
9       Can I hear that question back.
10      (Record read)
11      Q.   And you're not a lawyer, correct?
12      A.   Correct.
13      Q.   Earlier today, you testified that you
14  interpret Rule 15c3-3 in your position at
15  Barclays.  What did you mean by that?
16      A.   I mean that I am responsible for doing
17  customer reserve calculations and that I
18  interpret my role in practical application of
19  those calculations.
20      Q.   Do you do any legal interpretation of
21  the rules?
22      A.   No, I'm not an attorney.
23      Q.   Earlier today, you referred to, I
24  believe, Mr. Burke as an expert in 15c3-3.  What
25  did you mean by that?
TSG Reporting - Worldwide    877-702-9580

Page 146

**MARTINI**

1
2    A.   I mean, I know he has extensive
3    knowledge as well in the practical application
4    of customer reserve calculations.
5    **Q.   Would you consider him to be a legal**
6    **expert?**
7    A.   No.
8    **Q.   And you were asked various questions**
9    **about Mr. McIsaac's reputation.  Do you have any**
10    **knowledge one way or the other about whether or**
11    **not he is a legal expert in 15c3-3?**
12    A.   My understanding from Mr. McIsaac's
13    background is he is a financial employee like
14    myself and is not an attorney.
15    **Q.   Mr. Oxford asked you various questions**
16    **about what you believed was or was not**
17    **transferred over as part of the business of LBI**
18    **and I believe he referred to paragraph 4 of the**
19    **declaration, if you could find that.**
20    A.   OK.
21    **Q.   And I believe you testified that you**
22    **knew that Barclays had acquired the wealth**
23    **portion of LBI's business but you weren't sure**
24    **as to other aspects of the business, is that**
25    **correct?**

TSG Reporting - Worldwide    877-702-9580

Page 147

**MARTINI**

1
2    A.   Correct.
3    **Q.   Do you know whether or not Barclays**
4    **acquired all of the customers of LBI?**
5    A.   My understanding was no.
6    **Q.   Does Barclays have the ability to**
7    **access records for customers that did not come**
8    **over to LBI?**
9    A.   Barclays only has ability to access
10    customer assets that are on its books.  The
11    assets that are on its books are housed solely
12    in ADP 224.
13    **Q.   Does ADP 224 include customers who did**
14    **not come over to Barclays?**
15    A.   No.
16    **Q.   For those customers who did come over**
17    **to Barclays, does ADP 224 include the history of**
18    **their accounts from prior to the acquisition?**
19    A.   No.
20    **Q.   Would you need -- for a reserve**
21    **calculation to be rerun, -- actually, you know**
22    **withdraw that.**
23    **Is there a difference between a**
24    **reserve calculation and a reserve requirement?**
25    A.   It's the calculation -- the components

TSG Reporting - Worldwide    877-702-9580

Page 148

**MARTINI**

1
2    to the requirement and the requirement is the
3    net result.
4    **Q.   In order to do -- in order to**
5    **determine what the reserve requirement should**
6    **be, would you need to have information relating**
7    **to -- should be as of September 19, 2008 for**
8    **LBI, would you need to have information relating**
9    **to customers that did not come to Barclays?**
10    A.   I am sorry, can you could repeat that
11    for me.
12    **Q.   Yeah, that's terrible.**
13    **In order to determine what the reserve**
14    **requirement for LBI should have been as of**
15    **September 19, 2008, would you need to have**
16    **access to information relating to customers that**
17    **did not go to Barclays?**
18    A.   Yes.
19    **Q.   Why is that?**
20    A.   Because that would be the basis for
21    the reserve component.  It's going to be the
22    entire population, books of assets and
23    liabilities on the books of LBI, not just
24    customer assets.  Proprietary assets as well.
25    **Q.   You said not just customer assets,**

TSG Reporting - Worldwide    877-702-9580

Page 149

**MARTINI**

1
2    **proprietary assets as well.  What did you mean**
3    **by "proprietary assets"?**
4    A.   Entire books and records.  It means
5    fails, financial transactions, inventory
6    positions.  All those of those are components to
7    the reserve calculation.
8    **Q.   Is Barclays able to access any of that**
9    **information for LBI prior to the acquisition?**
10    MR. OXFORD:  Objection, form.
11    A.   No.  Barclays can only access ADP 224.
12    **Q.   Would it also be -- would it also be**
13    **necessary to have access to records relating to**
14    **the customers that did go over to Barclays but**
15    **for activity in their accounts prior to the**
16    **acquisition in order to determine the reserve**
17    **requirement as of September 19, 2008 for LBI?**
18    A.   Yes.
19    **Q.   And why is that?**
20    A.   Because as of September 19, 2008, LBI
21    was the legal entity that held the assets and
22    they belong to LBI, not to Barclays.
23    **Q.   OK, I guess I don't really understand**
24    **how that affects -- how would the records for**
25    **customer who came over, but for a date prior to**

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2  the acquisition, be relevant to the calculation
3  and then the ensuing requirement that would be
4  calculated under the 15c3?
5      A.  I am sorry, if you can break that up
6  for me.
7      Q.  OK, September 19 -- September -- well,
8  the acquisition was September 22.
9      A.  OK.
10     Q.  How would pre-September 22, 2008
11 information for customers that did, in fact, go
12 over to Barclays be relevant to the reserve
13 calculation and then the ensuing reserve
14 requirement done for LBI on either September 17
15 or September 19, 2008?
16     MR. OXFORD:  Objection, form.
17     A.  It being -- because those were the
18 assets of that legal entity.
19     Q.  I think we are talking past each other
20 a little bit.  I'll come back to that.
21     MR. OXFORD:  I'm glad it is not just
22 me.
23     Q.  Mr. Oxford showed you Exhibit 599.  Do
24 you still have that in front of you?
25     A.  Yes.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2      Q.  I believe you discussed who Bill Burke
3  is.  Do you consider him to be a Barclays
4  employee?
5      MR. OXFORD:  Objection, form.
6      A.  No.
7      Q.  Why is that?
8      A.  Because he does not work for Barclays
9  Capital Inc., the U.S. broker/dealer.  He is an
10 employee of TSA.  My team does not have access
11 to without the express permission of the
12 trustee.
13     Q.  Dan Sudarsan, do you know if he has
14 ever worked for the TSA?
15     A.  I don't know for certain, but I
16 understand that many Lehman employees work for
17 the TSA at some point but where those lines were
18 drawn is confusing.
19     Q.  So at the time of this e-mail, you
20 don't know whether or not Dan Sudarsan may have
21 worked for the TSA?
22     A.  I don't know.
23     Q.  Do you know whether Mr. McLaughlin may
24 have?
25     A.  I'm not certain.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2      Q.  Do you know whether Mr. Buonocore may
3  have?
4      A.  Actually, I'm not familiar with him
5  personally.
6      Q.  Do you know whether Mr. Potenciano
7  ever did?
8      MR. OXFORD:  Objection to form.
9      A.  I'm not sure.
10     Q.  In this e-mail, there is a discussion
11 of a revised reserve formula.  Are you able to
12 determine from this e-mail who did the revised
13 reserve formula?
14     A.  No.
15     Q.  So you have no idea whether it was
16 done by Barclays or by TSA or by anyone else?
17     A.  Correct.  I mean, our team would do it
18 for Barclays and our team did not do the
19 calculation.
20     Q.  And then there is a sentence about
21 halfway down the first page by Mr. Sudarsan in
22 his e-mail to Mr. McLaughlin.  It says, "The net
23 effect was that the reserve requirement was
24 increased by 213 million."
25         Now, you said there is a difference

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2  between reserve calculation and reserve
3  requirement.  Do you agree that whenever there
4  is an adjustment to the reserve calculation,
5  there necessarily is an adjustment to the
6  reserve requirement?
7      A.  No, I think the reason for my past
8  comments is that you have to look at the
9  entirety of the reserve computation.  So these
10 net impacts would have affected individual lines
11 of the calculation, but you have to look at the
12 entire calculation.
13         Based on my experiences, having done
14 reserve calculations at many firms, there are
15 cushions and additional credits inherent within
16 the reserve computations.  Those could come
17 about from the result of just the fact that
18 firms are usually unable to get through all of
19 the data in the course of a reserve computation.
20 So there could be logical positions that the
21 firm just can't resolve so they take the credits
22 in.
23         Firms sometimes make management
24 decisions based on particular reserve
25 requirement -- determining how many operational

TSG Reporting - Worldwide    877-702-9580

Page 154

MARTINI

1  adjustments there were, how sloppy or clean that
2  particular calculation was, that they may feel
3  that they need to put additional credits in the
4  reserve.
5      Q.   So do you agree with Mr. Sudarsan's
6  statement that the net effect of the adjustment
7  to the calculation was that the reserve
8  requirement increased by 213 million?
9      A.   No, I don't believe that you can make
10  an affirmative statement that that is the impact
11  of the reserve requirement without doing a full
12  analysis.
13     Q.   OK.  Now, Mr. Oxford asked you
14  questions about access to various people.  He
15  referred to Mr. Potenciano.  And I believe you
16  testified that you're able to talk to
17  Mr. Potenciano, is that correct?
18     A.   Correct.
19     Q.   Are you able to talk to Mr. Potenciano
20  about work that you may have done for the TSA?
21     A.   No.
22     Q.   And why is that?
23     A.   That information was privy between
24  himself and the trustee or employee of the

TSG Reporting - Worldwide    877-702-9580

Page 155

MARTINI

1  trustee.
2      Q.   Is the same true for Mr. Sudarsan?
3  Are you able to talk to Mr. Sudarsan about work
4  that he may have done for the TSA?
5      A.   It depends.  I would not know
6  specifically Mr. Sudarsan's relationship to the
7  TSA.  I know Joel Potenciano has worked under
8  the express permission of the trustee, is in --
9  and in those particular cases, he has come to
10  me.  Mr. Sudarsan, I don't know.  He has not
11  come to me and I don't know.
12     Q.   If he worked for the TSA, though,
13  would you be able to discuss --
14     A.   No, if he was working in a similar
15  fashion as Mr. Potenciano, I would not be able
16  to discuss this issue.
17     Q.   Mr. Rodriguez, do you know if he
18  worked for the TSA?
19     A.   My understanding Mr. Rodriguez was a
20  TSA employee.
21     Q.   Would you be able to talk to
22  Mr. Rodriguez about work that he did for the
23  TSA?
24     A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 156

MARTINI

1      Q.   Now, even if you were able to talk to
2  these individuals about LBI's 15c3-3
3  calculations, would Barclays be able to rerun
4  LBI's reserve calculation as of September 19 or
5  September 17, 2008 without access to MTS, ITS
6  and I have forgotten the number of the ADP
7  system, but that system that you identified
8  earlier?
9      A.   Can't do it without systems access,
10  full populations data and interaction with the
11  key regulatory people from LBI who know the
12  underlying business and can interpret that data.
13     Q.   I believe Mr. Oxford established that
14  you're not familiar with SIPA, is that correct?
15     A.   I'm not an attorney and I do not know
16  how that rule works in practice.
17     Q.   So you don't know whether or not Rule
18  15c3-3 would apply after a SIPA liquidation?
19     A.   No.
20     Q.   In the ordinary course of business,
21  calculations are done once a week, correct?
22     A.   Correct.
23     Q.   If an event occurs after the
24  calculation for one week, let's say -- when are

TSG Reporting - Worldwide    877-702-9580

Page 157

MARTINI

1  they normally done?
2      Withdraw the prior question.  What day
3  of the week are the calculations normally done?
4      A.   They are normally done on Mondays.
5      Q.   And what date would that be as of?
6      A.   As of Friday.
7      Q.   And on what day -- then if there needs
8  to be an adjustment to the account as a result
9  of the calculation, when does that have to be
10  done by?
11     A.   Tuesday morning.
12         MR. OXFORD:  Object to form.
13     A.   Tuesday morning by 10 a.m.
14     Q.   So if there is an event that occurs on
15  a Wednesday, when -- that would result
16  ultimately in a necessary adjustment to the
17  reserve requirement, when would that adjustment
18  need to be made --
19         MR. OXFORD:  Object to form.
20     Q.   -- in the ordinary course of business?
21         MR. OXFORD:  Object to form,
22  incomplete hypothetical.
23     A.   That adjustment would roll to the next
24  Friday's calculation.

TSG Reporting - Worldwide    877-702-9580

Page 158

MARTINI

1
2    Q.    And when would, if --
3    A.    Or to the next calculation, I'm sorry.
4    Q.    The next calculation would be on
5    Monday?
6    A.    As of Friday.
7    Q.    And when would the money have to go
8    into the account?
9    A.    On the following Tuesday.
10    Q.    So if there had been an event that
11    occurred on a Wednesday and there had not yet
12    been any sort of adjustment in the reserve
13    account to account for that event, would the
14    broker/dealer ordinarily be out of compliance
15    with 15c3-3?
16        MR. OXFORD:  Objection, form.
17    A.    No.
18    Q.    Mr. Oxford asked you a bunch of
19    questions about why it would be necessary to do
20    a complete recalculation.  If there is an
21    error -- withdraw that.
22        If there is an error in one line item
23    of the reserve calculation, does that correlate
24    to a necessary -- to a change in the reserve
25    account?

TSG Reporting - Worldwide    877-702-9580

Page 159

MARTINI

1
2        MR. OXFORD:  Objection, form.
3    A.    I'm sorry, I can't understand that.
4    Q.    If it -- if there is a discrepancy
5    that requires an adjustment to the reserve
6    calculation in some form, does that necessarily
7    require an adjustment to the reserve account?
8        MR. OXFORD:  Objection.
9    A.    You wouldn't know that unless you
10    looked at, as I mentioned previously, the entire
11    calculation that was performed so you would have
12    to go back and scrub the rest of the data.
13    Q.    So to know what actually had to be in
14    a reserve account as of a particular day, you
15    would have to do a complete recalculation?
16    A.    You would need to have a complete
17    reserve formula.  So if I had any given formula
18    day, if I have an adjustment after the fact, I
19    would look to everything in that formula before
20    I did anything to the reserve account.
21    Q.    Mr. McIsaac asked you a number of
22    questions about the state of LBI's books in the
23    last week of -- the last week before it filed
24    for SIPA protection.
25        MR. OXFORD:  I know we are often

TSG Reporting - Worldwide    877-702-9580

Page 160

MARTINI

1
2    confused because we look alike, but I am
3    Mr. Oxford.
4        MS. NEUHARDT:  What did I call you?
5        MR. OXFORD:  Mr. McIsaac.
6        MS. NEUHARDT:  Sorry.  You don't look
7    a thing like Mr. McIsaac.
8    Q.    Mr. Oxford asked you a bunch of
9    questions about the state of LBI's books prior
10    to LBI's filing for SIPA protection.  Even if --
11    you were not an employee of Lehman Brothers,
12    right?
13    A.    Correct.
14    Q.    So you actually don't have personal
15    knowledge of whether or not the books were in
16    disarray prior to the SIPA proceeding, correct?
17    A.    I don't.
18    Q.    Is that relevant to your conclusion
19    that Barclays cannot rerun the calculation of
20    LBI's 15c3-3 calculation for September 19 or
21    September 17, 2008?
22    A.    No, the only reason that we can't run
23    the calculation for those dates is access to the
24    data and access to the people.
25    Q.    So, if the books were in disarray,

TSG Reporting - Worldwide    877-702-9580

Page 161

MARTINI

1
2    would you need access to any reconciliation of
3    those books?
4        MR. OXFORD:  Object to the form.
5    A.    Yes, if there is a systematic problem
6    of the data and there is a view that the data is
7    materially inaccurate, then yes.
8    Q.    But you couldn't rerun it regardless?
9        MR. OXFORD:  Objection.
10    A.    No, I couldn't rerun it.
11    Q.    When you did your declaration, were
12    you intending to respond to the entirety of
13    Mr. McIsaac's report?  I am sorry, declaration?
14    A.    No.
15    Q.    What portions of Mr. McIsaac's
16    affidavit which I think you have in front of you
17    as 693 were you intending to respond to?
18    A.    Paragraphs 18, 29 through 33.
19    Q.    So did you do any independent
20    investigation of the other matters raised in
21    Mr. McIsaac's rebuttal affidavit?
22    A.    No.
23        MS. NEUHARDT:  I may be done, just
24    give me one minute.
25        No further questions.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1 EXAMINATION BY
2 BY MR. OXFORD:
3    Q.  Mr. Martini, I have a few follow-up
4    questions.
5        I have -- this is a complete version
6    of Exhibit 590. I have shown you previously,
7    sir, just the affidavit of Mr. McIsaac. This is
8    the one with the exhibits.
9        MS. NEUHARDT: Is this the original?
10        MR. OXFORD: This has the exhibits to
11    it.
12    Q.  This is the October 5 affidavit.
13    Would you turn to tab 28 please, sir, Exhibit
14    28.
15    A.  OK.
16    Q.  Would you take a look at that document
17    and tell me if you have seen it before, please.
18    A.  I'm not sure if I have seen this
19    document, but I was made aware of this issue at
20    some point in 2009.
21    Q.  This is the same issue that you
22    testified to previously where there was a
23    problem in the allocation of certain LBI
24    securities that Mr. McLaughlin and Mr. Sudarsan

TSG Reporting - Worldwide    877-702-9580

MARTINI

1 discovered in 2008, correct?
2        WITNESS' ATTORNEY: Objection to form
3    and mischaracterizes his prior testimony.
4    A.  This document relates to the issue --
5 I am sorry, I apologize. If you could restate
6 that, please.
7    Q.  Let me try it a better way. This
8    document relates to the issue, the adjustment
9    that is the section of Exhibit 599A that's the
10    January e-mail that I believe we spent some time
11    looking at earlier.
12        MS. NEUHARDT: 599A or 599?
13        MR. OXFORD: 599.
14    A.  This represents one of the issues in
15 that document.
16    Q.  You are not sure whether you have seen
17    this document before?
18    A.  I'm not sure if I have seen it. I
19 know the issue, but I'm not sure whether in the
20 past I have seen this document.
21    Q.  You see it was memo written to
22    Broadridge?
23    A.  Correct.
24    Q.  Who is that memo written by, sir?

TSG Reporting - Worldwide    877-702-9580

MARTINI

1    A.  It says from Barclays Capital, Daniram
2    Sudarsan and Kendall McLaughlin.
3    Q.  Is that consistent with work that was
4    done by employees at the direction of the TSA?
5        WITNESS' ATTORNEY: Objection to form.
6    A.  I honestly don't know how this work
7 was performed and by who.
8    Q.  But on the face of the document, there
9    is no indication, is there, that this work was
10    done by anybody other than Barclays, correct?
11        WITNESS' ATTORNEY: Objection to form.
12    A.  It says Barclays Capital. I can't
13 imply from the context what that means.
14    Q.  Sticking with Exhibit 599A --
15        WITNESS' ATTORNEY: There is no A.
16        MR. OXFORD: Sorry, 599.
17    Q.  Ms. Neuhardt asked you with respect to
18    599 if you agreed with Mr. Sudarsan's statement
19    that the net effect of the adjustment to the
20    calculation was that the reserve requirement
21    increased by 213 million. Do you remember that
22    question?
23    A.  I remember that question.
24    Q.  Do you remember your answer is, "No, I

TSG Reporting - Worldwide    877-702-9580

MARTINI

1 don't believe I could make an affirmative
2 statement that that is the impact of the reserve
3 requirement without doing a full analysis." Do
4 you remember that answer?
5    A.  Yes.
6    Q.  Is that your testimony, sir?
7    A.  Yes.
8    Q.  Do you know what analysis Mr. Sudarson
9    did to reach his conclusion that the net effect
10    was the reserve requirement increased by 213
11    million?
12        WITNESS' ATTORNEY: Objection to form.
13    A.  I don't.
14    Q.  Ms. Neuhardt also asked you a question
15    about where there is a discrepancy that requires
16    an adjustment to the reserve calculation in some
17    form and whether that necessarily requires an
18    adjustment to the reserve account. Do you
19    remember her asking you that question?
20    A.  Um-hm.
21    Q.  And your answer is you wouldn't know
22    that unless you looked at the entire calculation
23    that was performed so you would have to go back
24    and scrub the rest of the data.

TSG Reporting - Worldwide    877-702-9580

Page 166

MARTINI

1
2   A.   Um-hm.
3   Q.   **Is that your answer, sir?**
4   A.   That was my --
5   Q.   **Is that accurate?**
6   A.   Please rephrase that or repeat the
7   question again.
8   Q.   **You said, "You wouldn't know that**
9   **unless you looked at, as I mentioned previously,**
10  **the entire calculation that was performed, so**
11  **you would have to go back and scrub the rest of**
12  **the data."**
13  A.   So my answer was that if there was
14  adjustment to the reserve computation, that we
15  would have to look at other aspects of the
16  reserve computation.
17  Q.   **OK.**
18  A.   The reserve requirement.
19  Q.   **Is that consistent with your practice**
20  **and the practice of your team at Barclays on a**
21  **week-to-week basis, sir?**
22  A.   So, for example, I mean, if I did a
23  reserve calculation on Monday for Friday and
24  Wednesday I found that there was an error, would
25  I go back and do a full calculation?

Page 167

MARTINI

1
2   I would go back to determine the
3   materiality of the impact and make sure it was
4   material and I look at other areas where I could
5   have gotten benefit to make sure that I could
6   have mitigated it.
7   Q.   **You wouldn't rerun the whole**
8   **calculation would you, sir?**
9   A.   It would depend on the issue.  If the
10  issue was a systemic issue or it looked like
11  problems with the integrity of the data, you
12  would.
13  Q.   **And if there was no indication of a**
14  **systemic issue, sir, in the adjustment, would**
15  **you then rerun the whole calculation, sir?**
16       **WITNESS' ATTORNEY:  Objection to form.**
17  A.   If it was an isolated case, I would
18  look at the materiality of the adjustment and I
19  would go back in my reserve formula, scrub the
20  other numbers in there to look for other credits
21  that I could find, and if it wasn't something
22  that I believed to be an internal control issue
23  with the data, I would not go back and do an
24  entire new calculation.
25       MR. OXFORD:  No more questions, sir.

Page 168

MARTINI

1
2       WITNESS' ATTORNEY:  No further
3   questions for me.
4       MR. DAKIS:  Nothing from the
5   committee.
6       MR. McMAHON:  Nothing from the debtor.
7
8       _____
            ROBERT A. MARTINI
9
10  Subscribed and sworn to
11  before me this      day
12  of _____, 2010.
13
14  _____
15
16
17
18
19
20
21
22
23
24
25

Page 169

MARTINI
INDEX:

1
2
3   WITNESS      EXAM BY:          PAGE:
4   R. Martini      Mr. Oxford        5, 162
5                   Ms. Neuhardt      137
6
7       EXHIBITS
8   Exhibit No.                  Marked
9   Exhibit 828   Declaration          20
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 170

```
 1              MARTINI
 2           CERTIFICATE
 3    STATE OF NEW YORK )
 4              )ss:
 5    COUNTY OF NEW YORK)
 6        I, MARY F. BOWMAN, a Registered
 7    Professional Reporter, Certified Realtime
 8    Reporter, and Notary Public within and for
 9    the State of New York, do hereby certify:
10        That ROBERT A. MARTINI, the witness
11    whose deposition is hereinbefore set forth,
12    was duly sworn by me and that such
13    deposition is a true record of the testimony
14    given by such witness.
15        I further certify that I am not
16    related to any of the parties to this action
17    by blood or marriage and that I am in no way
18    interested in the outcome of this matter.
19        In witness whereof, I have hereunto
20    set my hand this 24th day of June, 2010.
21
22    _____
          MARY F. BOWMAN, RPR, CRR
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 171

```
 1              MARTINI
 2        * * *ERRATA SHEET* * *
 3    NAME OF CASE:  In Re: Lehman Bros.
 4    DATE OF DEPOSITION:  6/24/10
 5    NAME OF WITNESS:  RICHARD A. MARTINI
 6    Reason codes:
 7        1. To clarify the record.
          2. To conform to the facts.
 8        3. To correct transcription errors.
 9    Page ____ Line ____ Reason____
      From _____ to_____
10
11    Page ____ Line ____ Reason____
      From _____ to_____
12
13    Page ____ Line ____ Reason____
      From _____ to_____
14
15    Page ____ Line ____ Reason____
      From _____ to_____
16
17    Page ____ Line ____ Reason____
      From _____ to_____
18
19    Page ____ Line ____ Reason____
      From _____ to_____
20
21    Page ____ Line ____ Reason____
      From _____ to_____
22
23
24    _____
          RICHARD A. MARTINI
25
```

TSG Reporting - Worldwide    877-702-9580

## A

**ability (10)**
42:5 85:13,23,25 86:4
86:8 93:4 143:3
147:6,9

**able (20)**
10:7 32:24 47:23 96:7
96:23 107:7,20
113:15 129:17
144:17 149:8
152:11 154:17,20
155:4,14,16,22
156:2,4

**abroad (1)**
129:13

**absolutely (1)**
70:10

**access (95)**
22:19,23 23:2,8,11,21
23:22,24 30:22 31:4
31:9,23 39:23 40:4
40:6,15,19,24 41:2
41:5,10,12,16,22,22
42:5 45:11,22,25
46:9,16 47:4,19,21
47:25 48:22 49:11
49:14,14,21 50:6,8
50:9,20 51:8,21,23
53:11,12,13 54:3,4
54:5,25 55:16,17
56:3 74:5,21,22
80:13,19 97:5
109:22 111:7 112:6
114:9 115:21
116:25 119:2 139:8
142:21,22 143:2,24
143:25 144:5,8,16
144:17,21,23 147:7
147:9 148:16 149:8
149:11,13 151:10
154:15 156:6,10
160:23,24 161:2

**accesses (1)**
42:2

**accident (1)**
6:15

**accomplish (2)**
84:14 91:18

**account (28)**
48:20 89:17,22 90:10
92:8 93:9 94:11,15
95:4,14 97:14 107:7
119:5 120:16
122:21 123:14,17
123:17 136:18
157:9 158:8,13,13
158:25 159:7,14,20
165:19

**accounted (2)**
121:10 133:22

**accounting (2)**
7:18 71:4

**accounting/regulat...**
71:3

**accounts (11)**
49:5 66:24 85:2 86:16
88:18 89:23 90:3,17
90:18 147:18
149:15

**accurate (15)**
45:19,20 74:8,9 75:16
79:7,11 91:7 125:19
125:19 126:11,23
127:4,10 166:5

**acquire (7)**
42:14,18 43:4 44:20
44:25 111:24 114:7

**acquired (40)**
23:5 40:6,6,10,10,25
41:24 42:9,24 43:5
43:9,12,24 44:9,16
44:16,19,22,22
47:16 62:25 64:12
67:4,9 68:4,8 73:14
109:21,24 110:23
111:9,21,25 112:5,8
113:23 114:5
144:22 146:22
147:4

**acquisition (9)**
39:9 68:21 111:2
113:24 147:18
149:9,16 150:2,8

**Act (1)**
72:21

**action (1)**
170:16

**activities (4)**
34:7,8 55:21 112:11

**activity (2)**
79:25 149:15

**actual (5)**
13:3,9 68:25 125:25
129:9

**added (5)**
130:23 131:13,19
132:8,15

**addition (1)**
36:7

**additional (2)**
153:15 154:4

**additionally (4)**
34:24 35:3 54:5 81:16

**adjust (3)**
97:13,17 107:21

**adjusting (1)**
107:9

**adjustment (22)**
106:19,24 107:23,25
153:4,5 154:7 157:9
157:17,18,24
158:12 159:5,7,18
163:9 164:20
165:17,19 166:14
167:14,18

**adjustments (14)**
85:11,11,24 88:5
93:18 94:3 105:23
106:17 108:18
119:11,12 120:5,13
154:2

**administer (1)**
5:18

**Administered (1)**
1:8

**ADP (21)**
41:25 46:15 49:4
50:20 53:13 54:6
74:11 101:2,6
104:14,17 110:25
143:13,15,25
144:17 147:12,13
147:17 149:11
156:7

**ADP's (1)**
101:5

**ADP012 (1)**
40:12

**ADP224 (2)**
40:7 47:16

**affidavit (15)**
20:21 21:6 55:7 59:8
92:22 95:23 96:4
99:14 124:7 126:20
134:21 161:16,21
162:8,13

**affidavits (2)**
95:4,14

**affirmative (3)**
144:12 154:11 165:2

**ago (4)**
6:14 38:24 49:16 75:6

**agree (51)**
37:25 77:23 78:8,9
81:3,6 84:15,18
85:6 86:7,25 87:8
87:12,21 88:13 89:2
89:14 97:12 104:21
104:25 106:23
107:6 121:18 122:3
122:10 124:13,23
125:5,6,8,16,20
126:8,21,25 127:6
127:12,15,18,22
128:3,7,12,21
130:21 131:18,24

**132:19 133:11**
153:3 154:6

**agreed (5)**
5:5,9,15 10:15 164:19

**agreement (12)**
24:10 34:14 40:23
110:2,5,8,11 111:6
111:22 112:14,21
113:11

**Ain't (1)**
134:5

**al (1)**
1:8

**alerted (1)**
32:21

**Alex (8)**
35:3 46:15 47:2 75:20
102:5,12 144:11
145:3

**alike (1)**
160:2

**allocate (1)**
10:12

**allocation (16)**
10:4,6,8 75:15 85:21
85:23 88:13 89:11
89:21 90:14 101:5
103:17 104:7,15,17
162:24

**allocations (2)**
74:22 84:22

**allow (2)**
6:25 85:17

**allowed (1)**
131:4

**amount (4)**
68:9,9 94:5 105:9

**Amy (5)**
3:15 6:20 33:17 80:16
83:7

**analysis (12)**
77:4,7,13 78:5,12,20
142:7,11,15 154:13
165:4,9

**analyze (1)**
118:2

**and/or (1)**
62:25

**Anna (1)**
64:4

**annual (1)**
20:8

**answer (34)**
6:18,20 14:14 22:23
23:9 30:6 37:9
42:22 44:14 49:25
55:25 60:16 65:11
78:3 88:22 107:19
111:16 112:19

**116:4 118:5 119:23**
119:25 125:15
131:8 135:22 136:4
140:25 141:2
142:25 164:25
165:5,22 166:3,13

**answered (7)**
37:7 48:6,6,11 95:17
112:16 144:10

**answers (2)**
7:4 140:14

**anybody (10)**
27:19 58:3 97:17
108:8 109:3,10
114:23 139:8,23
164:11

**anymore (1)**
56:22

**APA (1)**
142:11

**Apologies (1)**
102:3

**apologize (2)**
120:21 163:6

**APPEARANCES (2)**
3:2 4:2

**application (2)**
145:18 146:3

**applied (1)**
70:15

**applies (1)**
130:5

**apply (6)**
30:6 129:12,19,25
130:2 156:19

**appointed (2)**
70:24 71:19

**appreciate (2)**
23:17 76:8

**appropriate (4)**
55:17 56:4 128:16,18

**approve (1)**
130:8

**approved (1)**
129:5

**April (3)**
54:10 70:25 71:20

**area (2)**
42:19 61:15

**areas (1)**
167:4

**arrangement (1)**
32:16

**ascertain (2)**
98:7 106:5

**aside (1)**
94:6

**asked (31)**

20:16 25:20 37:6,17
48:6,11 50:19,19
52:10,18,20 61:4
95:17 108:16,17
109:4,14 112:15
116:15 134:24
137:16 140:20
144:9 146:8,15
154:14 158:18
159:21 160:8
164:18 165:15
**asking (15)**
44:17,18 49:23 50:4,7
52:13,15 60:12
67:23 68:2,5 82:16
82:17 99:21 165:20
**aspect (1)**
90:9
**aspects (3)**
65:18 146:24 166:15
**assertion (1)**
96:22
**assertions (1)**
73:8
**asserts (3)**
73:13 92:7 96:6
**asset (8)**
42:15 109:25 110:7
111:5,21 112:13,20
113:10
**assets (43)**
23:5 25:22 40:6,25
41:23,24 42:12
43:11 46:12 47:15
48:19 62:25 64:13
66:24 67:10,14,20
67:23 68:4,10,22
73:14 106:6,6
110:23,24 111:25
111:25 112:5
113:22 114:4,8
123:13 147:10,11
148:22,24,24,25
149:2,3,21 150:18
**assist (2)**
32:19 115:17
**Assistant (1)**
12:20
**associate (3)**
11:8 62:7,23
**associated (2)**
109:24 111:8
**associations (2)**
69:7,9
**Assuming (1)**
88:4
**attachment (2)**
100:17,20
**attempts (1)**

133:8
**attend (1)**
70:2
**attention (1)**
76:18
**attorney (102)**
92:17 93:14,21 94:7
94:17 95:6,16 96:12
97:16 98:4,13,18
99:2,8,17 102:9
104:12,22 105:5,20
106:21 107:2,11,18
108:6,10,21 109:8
109:17 110:15,20
111:11 112:15,18
113:5,20 115:12
116:4,14 117:3
118:4 119:17,21
120:15,19 121:8,13
122:6,16,25 123:2
123:19,25 124:4,15
124:25 125:10,18
125:22 126:10,22
127:3,8,13,20,24
128:5,9,15,22 129:3
129:14,22 130:4,12
130:15,19,25
131:16,22 132:3,10
132:17,25 133:13
133:24 135:18
136:12,22 137:6,11
138:11 145:22
146:14 156:16
163:3 164:6,12,16
165:13 167:16
168:2
**attorneys (5)**
3:5,12,19 4:5 5:6
**attorney/client (1)**
116:7
**August (1)**
62:11
**authorized (1)**
5:17
**automated (2)**
85:24 88:2
**available (2)**
115:17 122:13
**Ave (1)**
3:13
**Avenue (1)**
3:20
**AVP (2)**
12:18,22
**aware (16)**
39:7 64:18,21 66:3
75:21 93:10,16,25
94:13,25 95:11
106:14 116:15,16

138:14 162:20
**awareness (1)**
62:3
**a.m (2)**
2:6 157:14

---

**B**

---

**back (28)**
14:22 15:8 20:5 30:11
30:13 31:25 33:7
70:3 80:11 89:17
96:4 98:16 100:24
101:14 106:5
107:15 109:18
120:22 134:23
145:9 150:20
159:12 165:24
166:11,25 167:2,19
167:23
**background (4)**
7:17 30:3 138:5
146:13
**Backgrounds (1)**
30:5
**backup (2)**
11:20 32:23
**balance (7)**
14:13,16,17 18:16
66:12,14,18
**balances (9)**
74:12 79:22,22 85:2
86:16 87:2 90:21
91:2,6
**bank (4)**
64:6,8 75:12 79:21
**bankruptcy (3)**
1:2 80:10 133:15
**Barclays (183)**
3:12 17:10 22:14 23:5
23:7,11,13,15,16
24:14,15,18 25:11
27:6,9,24 28:3 30:6
30:16,20 31:8,16,19
31:22 33:4,9,20
34:6,8 35:5,20
38:16 40:3,10,19
41:16,22 42:9,14,17
43:4,5,24 44:9,19
44:19,24 45:10,22
45:25 46:8,16 47:3
47:19,24 48:22
49:10 51:22 53:20
61:20 62:6,8,17,24
63:9,11,17,22 64:10
65:13,23 66:4,5,7
66:18,23 67:9,15,19
67:24 68:3,6,8
69:15 73:14,16 74:4
74:18,20 75:3 81:17

81:18,20 83:17
85:22 96:7,17,23
97:5,12 98:11 101:3
102:7,20 103:8
104:16,17,18,19
105:2,11 106:20
107:6,20 108:3,7,8
108:9,13,13,17
109:4,13,21,25
110:3,22 111:6,20
111:24 112:8,12
113:17,23 114:14
115:17,20,24,25
116:10,11,15,22
117:12 139:3,4,5,14
139:15,23 140:2,3
140:23 141:4,7,19
143:5 144:4,19
145:15 146:22
147:3,6,9,14,17
148:9,17 149:8,11
149:14,22 150:12
151:3,8 152:16,18
156:4 160:19 164:2
164:11,13 166:20
**base (1)**
60:25
**based (28)**
8:21,22 10:11,22
12:11 35:11,14,17
36:9,19 37:10 38:22
39:12 40:5 47:7,12
89:22 98:21 103:16
107:3 110:18,21
112:8 125:13
140:14 143:18
153:13,24
**basic (1)**
6:16
**basis (22)**
13:13 16:8 31:22
34:17 35:10 42:3
47:18 75:17,24
78:23 79:3 86:20,21
91:9 96:22 123:10
123:11 133:25
141:23 142:5
148:20 166:21
**Battery (2)**
2:10 4:6
**BCI (1)**
26:9
**began (1)**
51:22
**beginning (2)**
79:16 97:24
**begins (1)**
76:23
**behalf (2)**

36:5 40:9
**belief (3)**
98:7 99:12,21
**believe (26)**
24:10 45:19,20 61:14
66:21 70:24 72:15
72:16 82:9 102:10
102:16 103:3 106:4
114:12 117:20
137:10 141:2
145:24 146:18,21
151:2 154:10,16
156:14 163:11
165:2
**believed (3)**
79:14 146:16 167:22
**belong (2)**
48:19 149:22
**benefit (2)**
104:8 167:5
**better (1)**
163:8
**Bill (19)**
24:2,19,22 32:5,11
52:16 56:14,18,23
58:8 60:21 101:24
103:15 114:20
115:2 116:16
117:25 118:7 151:2
**billion (2)**
14:12,16
**bio (1)**
69:8
**bit (1)**
150:20
**blessing (1)**
71:23
**blood (1)**
170:17
**board (7)**
69:12 70:24 71:2,8,19
71:25 72:7
**BOIES (1)**
3:11
**bond (1)**
8:16
**books (44)**
20:9 49:7,8 54:2
55:10,11 56:2 74:7
74:21 75:4,8 76:5
79:5,6,9,15 80:3,5
81:5,10,23 82:2,22
83:22 84:11 87:19
91:8 103:17 113:23
114:10 120:10
136:25 137:3,4
147:10,11 148:22
148:23 149:4
159:22 160:9,15,25

161:3
**Bowman (4)**
1:17 2:11 170:6,22
**box (1)**
10:12
**break (9)**
7:8 27:17 32:8 51:12
91:20 111:17
120:21 126:17
150:5
**briefly (2)**
9:2 17:18
**Broadridge (2)**
103:18 163:23
**broke (1)**
64:5
**broker (1)**
122:14
**broker/dealer (41)**
12:2,13 14:6,17,19
15:25 16:2,24 17:3
24:18 28:2 33:21
35:24 38:17 41:18
48:14 49:8 59:24
64:6,7 65:15,17
66:7 73:15 81:20
87:18 122:21 123:9
124:17,18 125:13
132:20,23 133:4,6
133:11,20 139:6
142:4 151:9 158:14
**broker/dealers (10)**
17:22,23 18:5,24
19:23 27:14 29:24
122:5 126:4 138:7
**Bros (1)**
171:3
**Brothers (5)**
1:7 3:5 75:20 81:23
160:11
**BS (1)**
7:18
**bullet (3)**
73:12 92:6 96:5
**bunch (2)**
158:18 160:8
**Buonocore (2)**
103:4 152:2
**Burke (40)**
24:2,19,22,25 25:3,6
25:9,10,19,20 26:4
26:8,12 32:5,11,20
33:3 52:11,16,22
56:14,23 58:8 59:17
60:3,14,21 101:24
114:20 115:2,7,16
115:21,25 116:12
116:16 117:25
118:8 145:24 151:2

**Burke's (1)**
56:18
**business (40)**
14:13 19:10 25:17
28:23 37:11 38:23
39:13 40:5,14 42:17
42:23 43:6,10,12,24
44:4,10 46:25 55:18
56:5 63:13 73:15
74:24 86:15 90:17
109:24 110:22
111:9,20 112:3,3,4
112:9,10 146:17,23
146:24 156:13,21
157:21
**businesses (16)**
23:6 40:7,10,25 41:23
41:24 42:6,8,25
43:11 44:21,24
62:25 63:13 64:13
70:18

---
**C**
---

**calc (5)**
18:16,17,20 74:14
97:23
**calcs (1)**
18:17
**calculate (4)**
73:24 108:17 109:4
109:14
**calculated (2)**
105:22 150:4
**calculating (4)**
30:19 74:2 105:2
115:8
**calculation (148)**
9:7,10,12,22,25 10:2
11:15,19 13:4,10
15:11 16:4 17:6
18:22 19:2,15,19
24:24 26:5,9 30:24
31:19,24 40:9 45:2
46:10 47:17 48:15
48:17,23 55:9,19
56:6,12,17,23 60:25
64:10 65:3,12,18,24
68:21,24 69:3 70:14
70:15 73:18 74:2
75:23 77:15,17
78:15,16,19,22,24
79:4,11 80:21 87:22
88:10,11,16 90:8,20
90:25 92:8,23 93:5
93:9,12,19 94:4,9
94:15,21,21,23 96:8
96:20,24 97:4,6,14
97:18 99:16 101:3
107:9 108:2,14

109:2 112:6 114:15
115:3,4,18,22
116:19 120:14
121:2,12 123:10,12
130:23 131:14,20
132:9,16 134:20
136:11,14 137:19
138:5 147:21,24,25
149:7 150:2,13
152:19 153:2,4,11
153:12 154:3,8
156:5,25 157:10,25
158:3,4,23 159:6,11
160:19,20,23
164:21 165:17,23
166:10,23,25 167:8
167:15,24
**calculations (31)**
9:19 13:2 19:23 22:5
45:14 46:4 47:7
48:5 55:8 60:22
63:19,20 64:19,22
64:25 68:7,16 74:18
85:9 111:2 117:22
119:4,7 138:10
145:17,19 146:4
153:14 156:4,22
157:4
**call (2)**
43:15 160:4
**called (3)**
6:3 42:2 110:25
**capacity (4)**
15:10,23 25:14
117:21
**capital (63)**
9:6 11:12 12:25 15:13
18:16 22:11 24:18
25:11,21 26:2,11,13
26:14 29:11,11
30:16 31:15 33:4,21
35:5,20 38:17 42:10
58:15,25 59:23 62:8
62:17 63:11,14,18
63:23 65:13 66:18
66:23 68:3 69:10,14
69:15,22,24 70:7,21
71:5,12,15 72:10
74:5 81:17,19,20
104:16,17 108:13
110:23 112:12
122:17,19 139:5
144:20 151:9 164:2
164:13
**Capital's (1)**
65:23
**career (3)**
28:21 60:24 61:13
**case (8)**

1:7 6:15 7:13 86:14
98:3 131:17 167:17
171:3
**cases (2)**
27:2 155:10
**cash (8)**
132:19,23 133:5,7,9
133:12,18,21
**caveat (1)**
42:21
**certain (23)**
23:5 25:21 41:17 50:8
50:16 51:25 52:3
58:9 62:25 64:12
67:10,10 73:14
93:18 110:23
111:25 114:16
123:13 129:7
144:21 151:15,25
162:24
**certainly (1)**
39:7
**CERTIFICATE (1)**
170:2
**Certified (2)**
2:12 170:7
**certify (3)**
170:9,15
**CFO (5)**
35:22 36:10,14 57:15
60:19
**CFTC (2)**
18:17 65:17
**chance (3)**
6:20 76:19 137:22
**change (5)**
19:10 70:13 85:23
109:11 158:24
**changes (1)**
70:14
**Chapter (1)**
1:6
**characterizes (1)**
128:19
**charge (8)**
12:23 15:8,11 22:10
30:16 31:15 63:11
63:22
**check (2)**
24:9 101:14
**chief (3)**
8:24 9:3,22
**chooses (1)**
6:21
**Citigroup (2)**
102:23,24
**claim (1)**
130:14

**claims (3)**
93:8 122:14,23
**clarification (9)**
23:17 33:17 110:2,10
111:6,22 112:24
113:4 142:15
**clarify (3)**
7:13 50:3 171:7
**clean (1)**
154:2
**clear (4)**
27:8 71:7 78:9 143:9
**clearer (1)**
83:12
**closed (1)**
15:18
**closing (1)**
96:16
**coded (3)**
89:23 90:4,11
**codes (2)**
90:9 171:6
**coding (2)**
86:17 88:18
**codings (11)**
85:2 87:2 88:13,25
89:5,11,13,21,25
90:3,14
**college (1)**
7:17
**combined (1)**
18:14
**come (15)**
23:25 48:14 69:19
70:6 99:22 134:23
138:2 147:7,14,16
148:9 150:20
153:16 155:10,12
**comes (3)**
59:25 97:9 127:9
**comment (5)**
29:4 57:13 86:20 88:8
97:9
**comments (1)**
153:8
**committee (15)**
3:19 58:25 59:23
69:11,14,21,23,24
70:8,21 71:5,13,16
72:10 168:5
**committees (1)**
69:19
**common (7)**
25:22 26:18 81:21
83:3,16,20,24
**communicated (1)**
106:20
**communication (2)**

36:3,3
**comp (2)**
46:14 94:20
**companies (1)**
28:24
**Company (2)**
8:19,20
**comparable (3)**
66:15,19,21
**complete (11)**
74:6 75:4 77:20 80:24
82:3 91:13 94:8
158:20 159:15,16
162:6
**compliance (4)**
8:25 9:3 17:21 158:14
**component (2)**
107:25 148:21
**components (4)**
39:8 43:11 147:25
149:6
**computation (24)**
11:13 12:25 13:4,10
13:23 16:4 17:5
29:9 31:6,15 48:12
65:12 67:15,21 68:2
75:2 95:3,13 118:18
133:23 153:9,19
166:14,16
**computations (1)**
153:16
**compute (4)**
13:24 31:5,24 118:6
**computed (3)**
68:3 78:24 110:25
**computer (1)**
112:6
**computing (3)**
13:14 16:7 63:8
**concerns (2)**
104:19 105:2
**conclusion (5)**
60:13 91:10 94:2
160:18 165:10
**conduct (1)**
19:22
**conducted (1)**
83:18
**confirm (2)**
89:2,13
**confirmation (2)**
54:22,25
**confirmed (4)**
41:2 141:9,13 144:25
**confirming (1)**
54:3
**conform (1)**
171:7

**confused (2)**
23:9 160:2
**confusing (1)**
151:18
**congratulations (1)**
71:21
**connection (9)**
25:4,7,10 26:8 52:8
52:24 53:6 54:18
97:2
**consequence (1)**
109:6
**consider (5)**
28:16 60:8 61:5 146:5
151:3
**considerable (2)**
59:12,16
**considered (2)**
60:3 130:6
**considering (1)**
70:18
**consistent (3)**
26:25 164:4 166:19
**construct (1)**
86:10
**consult (2)**
26:19 134:8
**contact (2)**
18:8 19:20
**contain (2)**
41:9 56:10
**contained (8)**
31:5 41:10 42:6 46:17
49:3 50:11 68:22
110:24
**contains (3)**
18:15,15 40:13
**contemporaneous (1)**
104:9
**context (6)**
10:9 52:13 123:20
129:2 136:23
164:14
**Continuing (1)**
84:9
**contract (1)**
142:7
**control (31)**
16:24,25 73:16 80:3,4
87:19 96:18 114:9
117:9,19 124:19
125:3 128:25 129:4
129:6,11,18 130:6,9
130:22,24 131:3,12
131:13,15,20 132:2
133:19 143:5,14
167:22
**controller (2)**

15:21 16:2
**controls (1)**
79:5
**conversation (9)**
26:12 30:13 32:12
47:7 54:7 75:25
81:11 82:14 100:2
**conversations (20)**
34:22 35:12,14 36:9
36:13,18 37:4,12
47:13 52:7 53:5,8
54:17,20 55:2 57:6
57:13,19 116:7
144:11
**COO (3)**
35:24 36:16 57:19
**coordinator (1)**
17:17
**Corp (1)**
10:19
**corporation (1)**
14:18
**correct (127)**
8:12,13 9:14 11:25
12:4 17:10 19:3,4
19:17,18 20:24,25
22:15,16 26:15,16
27:10,11 31:16,17
31:19,20 33:9,10,13
35:12,13,15,16 37:5
39:15 41:18 43:6,25
44:5,7,10 47:8
48:17,18,25 55:10
55:15 57:7 58:9
59:13 62:8,9,11,12
62:14,15,18,20,21
63:2,3,5,6 66:8
67:11,17 69:3 71:13
71:14,16,17 73:9
75:15 77:16 78:15
85:10 88:6 89:2,6
89:13,25 93:13,24
97:19 105:13,14,17
105:18 111:9 112:9
116:23 117:13,16
120:8 122:24
123:10,14,15
127:14,15,21,25
128:6,21 130:10,11
130:14,16,20
131:23 132:18
133:23 135:9,10,15
145:11,12 146:25
147:2 152:17
154:18,19 156:15
156:22,23 160:13
160:16 163:2,24
164:11 171:8
**corrected (1)**

88:12
**correction (2)**
77:18 78:17
**corrections (1)**
87:23
**correctly (1)**
128:10
**correctness (1)**
88:17
**correlate (1)**
158:23
**cost (1)**
77:19
**counsel (3)**
61:3 135:20 137:10
**counterparts (1)**
25:24
**COUNTY (1)**
170:5
**couple (1)**
81:9
**course (9)**
31:8 50:5 76:16 100:8
134:3 135:11
153:19 156:21
157:21
**courses (1)**
8:9
**Court (3)**
1:2 5:20
**creates (1)**
113:25
**credit (1)**
18:18
**Creditors (1)**
3:19
**credits (4)**
153:15,21 154:4
167:20
**Crepeau (34)**
35:4,6,15 36:7 38:9
40:23 41:4,6,16,20
46:16 47:2,8 53:4,6
53:8,14,23 54:8,13
55:3 75:21 76:2
79:20,23 80:5 81:7
81:12,24 82:20
102:6,13 144:11
145:3
**critical (1)**
88:18
**CRR (2)**
1:17 170:22
**current (2)**
7:22 65:14
**currently (2)**
22:14 54:5
**curse (1)**

71:23
**cushions (1)**
153:15
**CUSIP (1)**
87:13
**CUSIPs (2)**
86:17 87:2
**custodian (1)**
87:14
**custodied (1)**
126:5
**customer (66)**
9:7,10,18,25 10:13
11:15,17,19 12:25
13:4,10 15:11,12
16:4 17:5 22:4 26:5
26:8 30:19 42:3
43:15 45:2 46:12
48:19 49:5 58:14
63:15,18 65:24
66:24 67:10,14,20
70:9 93:19 106:5,6
113:25 122:8,11,13
122:23 125:25
126:4 128:24 132:7
132:14,19,21,22,24
133:4,5,7,9,10,12
133:18,22 136:17
145:17 146:4
147:10 148:24,25
149:25
**customers (16)**
67:10,14,20 68:9,10
94:6 122:4,8 147:4
147:7,13,16 148:9
148:16 149:14
150:11
**cut (2)**
51:9,10
**c3 (9)**
48:23 56:6 65:12
67:21 88:11 90:20
90:25 130:23
132:16

_____

**D**

**DAKIS (2)**
3:22 168:4
**Dan (3)**
21:8 151:13,20
**Daniel (2)**
21:6 58:16
**Daniram (3)**
102:3 106:14 164:2
**data (42)**
18:25 31:5,9 39:25
40:2,3,19 41:17
44:24 46:17 47:24
48:13,21,24 49:3,10

49:14 50:6,8,11
51:24 54:4,6 55:9,9
56:3 74:6,11 85:10
92:13 94:23 153:19
156:11,13 159:12
160:24 161:6,6
165:25 166:12
167:11,23
**database (1)**
86:10
**databases (1)**
138:9
**date (15)**
8:3 18:23 20:15 50:12
68:14 70:23 80:7
83:23 85:18 113:24
136:20,25 149:25
157:6 171:4
**dated (1)**
21:7,8 73:6
**dates (5)**
46:3 47:6 134:15,21
160:23
**day (9)**
3:4 14:10 107:5 157:3
157:8 159:14,18
168:11 170:20
**days (3)**
11:22 34:2 42:14
**Dayton (3)**
7:19 8:4,12
**day-to-day (1)**
31:22 60:21
**DC (1)**
3:14
**deal (2)**
98:6 122:14
**debit (1)**
125:14
**debtor (1)**
168:6
**Debtors (1)**
1:9
**decisions (1)**
153:24
**declaration (41)**
20:14,20,22 25:7 37:2
45:8 46:19,20 53:2
53:7 54:10,19 55:6
57:10,25 58:5 73:4
80:11 81:14 92:3
96:5,13 98:24,25
109:18 111:13,13
113:21 118:23
120:2,5 134:11
135:4 142:6,10,14
142:19 146:19
161:11,13 169:9
**decrease (1)**

19:15
**decreased (1)**
77:8
**deficit (1)**
136:17
**define (2)**
24:6 110:4
**definition (1)**
131:3
**definitional (1)**
93:6
**deliberately (1)**
77:6
**department (3)**
14:5 30:7 144:20
**depend (2)**
87:16 167:9
**dependent (1)**
79:4
**depends (3)**
136:23,24 155:6
**deposed (1)**
6:13
**deposition (30)**
1:12 2:8 5:16 6:17
20:17,18,24 21:14
21:17,23 22:7 25:4
52:9,25 53:7 54:12
54:19 57:9,22 58:4
73:6 101:22 135:2
135:12,14,17,25
170:11,13 171:4
**depositions (1)**
100:7
**describe (5)**
9:2,24 10:7 11:10
17:18
**described (1)**
121:21
**designated (1)**
145:5
**despite (1)**
66:4
**detail (1)**
23:19
**details (4)**
44:16,18 55:13 68:25
**determination (1)**
99:23
**determine (7)**
48:19 136:16 148:5
148:13 149:16
152:12 167:2
**determining (1)**
153:25
**difference (2)**
147:23 152:25
**different (4)**

40:16 65:9 108:11
141:5
**difficulties (1)**
68:24
**direct (1)**
76:17
**directed (1)**
139:5
**direction (12)**
23:25 24:16 32:18
33:12,18,24 38:14
108:9,12 139:2
143:17 164:5
**directly (1)**
65:11
**director (6)**
35:4 62:7,16,23 65:20
102:17
**directors (1)**
22:2
**disagree (5)**
81:5 84:16,19 85:7
91:9
**disarray (2)**
160:16,25
**discovered (1)**
163:2
**discrepancies (18)**
92:9,12 93:11,23
94:11,12,13 95:9
96:8,25 97:15 98:22
98:24 99:3,13,25
107:8 119:5
**discrepancy (5)**
93:7 94:25 95:11
159:4 165:16
**discuss (1)**
22:24 32:25 140:25
155:14,17
**discussed (10)**
25:15,19 26:4 61:10
101:10 103:15
116:6 140:10,13
151:2
**discussion (4)**
15:4 22:25 59:5
152:10
**discussions (20)**
26:7 31:3 32:14 33:2
34:24 46:25 52:23
56:24 75:19 79:19
81:7 82:19 84:5
104:10 106:11
109:10 138:15
140:18 142:20
143:22
**dispute (1)**
133:25
**distinction (1)**

29:15
**distracted (1)**
30:12
**DISTRICT (1)**
1:3
**diverse (1)**
14:13
**document (17)**
20:23 21:19 100:9,11
100:14 101:21
104:23 107:3 113:7
162:17,20 163:5,9
163:16,18,21 164:9
**documents (13)**
21:13 62:2 88:24 89:4
89:9,12 113:18
134:25 135:3,16,19
135:24 136:3
**doing (11)**
32:23 56:9,9,16 83:21
83:21 94:20 106:15
145:16 154:12
165:4
**dollar (1)**
14:12
**dollars (1)**
107:10
**double (2)**
104:7,15
**downloaded (1)**
51:24
**drawing (1)**
29:15
**drawn (1)**
151:18
**drive (1)**
91:6
**drives (1)**
51:23
**due (1)**
104:6
**duly (2)**
6:4 170:12
**duties (1)**
31:8

---

**E**

**earlier (6)**
83:4,15 145:13,23
156:9 163:12
**early (6)**
34:2 42:13 70:23
71:16 100:25
101:17
**easier (2)**
43:16,17
**East (1)**
3:6

**education (2)**
7:20 8:11
**educational (1)**
7:16
**effect (19)**
5:19 34:5 77:17 78:17
103:18 105:8,15,22
106:17 108:18
109:4,14 115:8
128:20 140:21
152:23 154:7
164:20 165:10
**effective (1)**
77:19
**effort (3)**
81:25 84:2,7
**either (13)**
9:15 52:24 53:7 54:19
58:4 60:13 71:20
95:4,14 101:10
122:19 141:4
150:14
**elaborate (1)**
138:23
**EMANUEL (1)**
3:18
**employed (19)**
8:14 15:6 16:12 17:13
19:24 22:14 28:2
33:8 50:5,6 102:22
108:8 116:2,13,20
116:22 117:6,12,15
**employee (21)**
22:12 24:2,4,20 35:6
41:7 49:20 53:15
76:4 79:18 102:7
103:9 121:2 141:3
144:4 146:13 151:4
151:10 154:25
155:21 160:11
**employees (41)**
22:3,20 23:8,11,14,16
23:16 24:14 32:17
34:5,6 36:4,5,24
37:14,20 38:2,13,15
47:19 80:20 81:18
81:19 84:8 104:20
105:2 109:22
114:16,21,24
138:16,25 139:3,7
139:11,13,18 141:7
141:17 151:16
164:5
**employment (5)**
17:25 27:24 28:3
51:22 117:23
**employs (1)**
23:13
**endurance (1)**

7:8
ensuing (2)
150:3,13
entered (2)
61:3 87:24
entire (12)
48:13 92:22 94:23
96:13 100:21
148:22 149:4
153:12 159:10
165:23 166:10
167:24
entirely (1)
75:15
entirety (2)
153:9 161:12
entities (1)
110:4
entitled (8)
45:10,25 46:8 47:4,25
109:22 111:7
113:17
entity (8)
15:25 16:25 17:2
131:24 132:7,14
149:21 150:18
entries (2)
77:16 78:15
ERRATA (1)
171:2
erroneous (2)
77:16 78:15
error (3)
158:21,22 166:24
errors (12)
77:4,7 94:22 95:9
109:7 119:13,15
120:7,17 121:10,20
171:8
ESQ (6)
3:8,15,16,22 4:8,9
essence (2)
128:23,24
established (2)
140:10 156:14
et (1)
1:8
event (7)
6:21 84:23 122:14
156:24 157:15
158:10,13
eventually (3)
13:25 14:2,4
everybody (1)
27:3
exact (3)
8:3 70:23 92:18
exactly (3)

53:22 87:16 91:17
EXAM (1)
169:3
examination (4)
6:5 20:8 137:14 162:2
examinations (1)
28:22
example (7)
7:5 23:2 40:7 65:8
129:15,16 166:22
examples (1)
134:2
excerpts (2)
93:22 128:10
excess (6)
122:12 124:19,21
125:4,11 136:17
exchange (7)
17:15 18:6 19:5,21
28:22 57:2 138:13
excuse (3)
41:11 58:15 102:17
exercise (1)
136:19
exhausted (2)
52:6 53:5
Exhibit (27)
20:14,24 21:3,4,6,7
73:7 76:13 92:3,15
96:9 100:7 106:19
109:7 115:11
121:21 124:2 135:9
135:13 136:9
150:23 162:7,14
163:10 164:15
169:8,9
exhibits (3)
162:9,11 169:7
existed (3)
94:14 95:2,12
existence (2)
39:13,14
expand (1)
55:5
experience (10)
28:19 29:22 48:5
59:12,16 60:9 61:6
112:9,10 138:3
experiences (1)
153:13
expert (11)
43:18,20 58:13 60:4
60:10 61:7,21 145:6
145:24 146:6,11
expertise (6)
42:20 57:5 61:2,15
72:17,24
experts (1)
60:15

explain (6)
18:3 29:3 49:18 64:15
92:11 133:2
explained (1)
41:7
exposed (1)
121:16
express (2)
151:11 155:9
extend (1)
39:18
extends (1)
39:13
extensive (3)
28:19 29:22 146:2
extent (6)
43:3 60:11 116:5
128:19 135:19
139:8
e-mail (24)
36:2 100:10,16,18,18
100:22,23 101:4,9
101:10,13,16
103:24 104:10,19
104:25 106:23
108:19,23 151:19
152:10,12,22
163:11

F

F (4)
1:17 2:11 170:6,22
face (1)
164:9
faced (1)
63:12
fact (8)
47:15 87:6 99:25
104:14 121:5
150:11 153:17
159:18
facts (1)
171:7
fail (3)
49:5 75:12 79:22
failed (1)
77:6
fails (1)
149:5
fair (1)
65:21
fall (2)
66:19 118:14
familiar (5)
58:19,21 72:22 152:4
156:15
far (7)
38:5,7 41:2 42:24

68:16 121:9 135:25
FARA (1)
4:9
fashion (2)
122:22 155:16
fed (1)
44:25
feeds (1)
75:14
feel (2)
76:16 154:3
felt (1)
79:8
filed (1)
159:23
filing (2)
5:7 160:10
filings (1)
15:24
finally (1)
55:16
finance (6)
17:17 23:4 34:20
36:16 39:4 142:3
financial (12)
9:23 17:21 18:13
20:10 28:25 29:7,10
29:16 69:11 72:6
146:13 149:5
find (2)
146:19 167:21
fine (1)
44:13
finish (3)
6:19 13:20 83:11
finished (2)
14:14 67:2
FINRA (1)
70:2
firm (28)
8:16,18 10:14 18:9
19:20 25:24 34:21
35:22 37:12 39:5,5
46:12,24 54:23
56:19,21 75:21 79:7
79:8 80:2,4 85:22
114:7 115:5 122:19
140:18 142:5
153:21
firms (7)
20:9 58:24 85:25
101:6 153:14,18,23
firm's (6)
37:11 38:23 39:12
74:21 79:5 91:7
first (15)
8:14,16 10:13 15:21
22:22 36:15 60:17
73:12 74:4 88:16

108:23 124:16,23
138:22 152:21
five (1)
121:24
FLEXNER (1)
3:11
Floor (1)
3:20
FMS (2)
72:7,7
focus (7)
9:5 12:24 18:7,12,25
22:22 32:3
followed (1)
131:7
following (1)
158:9
follows (2)
6:4 61:5
follow-up (1)
162:4
force (1)
5:18
forgot (1)
69:8
forgotten (1)
156:7
form (168)
5:10 13:6 16:9 19:25
26:22 27:16 29:5
30:4,9 31:2,10 32:2
34:11 36:21 38:4
39:17,19 40:21
41:19 43:7 44:6,11
45:4,23 46:22 47:9
48:9 49:2 55:23
57:8 59:14 61:22
64:14 65:5 66:9,25
67:22 68:11 69:4
74:19 76:3 79:2,17
82:7,24 83:6,8 84:3
84:17 85:8,19 86:12
86:18,23 87:4,10,15
87:25 88:7,15 89:7
89:15 90:5 91:14
92:17 93:15,21 94:7
97:16 98:4,13 99:2
99:8,17 102:9
104:12 105:20
106:21 107:2,11
108:6,21 109:8,17
110:20 113:5
115:12 117:3 118:4
119:17 120:15
121:8,13 122:6,16
122:25 123:19,25
124:15,25 125:10
125:18,22 126:10
126:22 127:3,8,13

127:20,24 128:5,9
128:15,22 129:3,14
129:22 130:4,12,15
130:19,25 131:16
131:22 132:3,10,17
132:25 133:13,24
136:12,22 137:6,21
138:6,11,19 139:16
139:21 140:16
141:22,25 142:8,12
142:17,23 143:7,12
143:21 144:9 145:8
149:10 150:16
151:5 152:8 157:13
157:20,22 158:16
159:2,6 161:4 163:3
164:6,12 165:13,18
167:16
**formal (2)**
7:19 8:11
**former (4)**
22:3,12 80:13,20
**formula (29)**
11:21,24 13:24 65:24
67:16,21 90:10 91:7
103:16 104:20
105:3,7,16 106:18
107:21 108:4,19
116:19 118:19
120:14 131:6,14
133:23 152:11,13
159:17,17,19
167:19
**formulas (1)**
117:23
**forth (3)**
70:4 97:8 170:11
**found (2)**
23:3 166:24
**four (4)**
36:17 37:4 38:2 73:7
**fourth (1)**
96:5
**frame (2)**
52:17 53:17
**free (2)**
76:16 130:14
**freely (1)**
130:18
**frequency (1)**
70:14
**Friday (4)**
68:20 157:7 158:6
166:23
**Friday's (1)**
157:25
**front (7)**
92:2 113:8,11 124:2
134:11 150:24

161:16
**FSM (5)**
70:24 71:2,8,19,24
**full (14)**
43:3 48:18 74:20
97:19,20,21 98:11
99:15 114:25 121:3
154:12 156:11
165:4 166:25
**fully (4)**
7:12 122:11 124:19
125:4
**function (1)**
129:9
**functions (1)**
16:25
**funds (6)**
80:23 91:11 122:20
123:6,17,23
**further (10)**
5:9,15 7:19 39:18,21
126:18 137:8
161:25 168:2
170:15

_____

**G**

**gauge (2)**
77:17 78:16
**Gavenda (4)**
35:23 36:14 57:7,14
**general (11)**
15:25 25:16 52:18
91:8 93:2 129:18
133:14,16 134:2
138:18,22
**generally (3)**
29:25 80:8 131:17
**gentleman (1)**
61:16
**getting (3)**
27:3 55:14,15
**give (8)**
6:20 7:9 70:3 75:13
129:16 134:7
137:22 161:24
**given (5)**
35:7 75:25 86:15
159:17 170:14
**glad (1)**
150:21
**go (25)**
7:6 10:14 12:7 14:20
15:15 30:11,13
90:11,13 99:9
101:14 106:5 129:8
134:6 148:17
149:14 150:11
158:7 159:12
165:24 166:11,25

167:2,19,23
**goes (4)**
77:12 100:24 131:5
137:18
**going (14)**
6:17,18 29:9 32:8
48:4 69:7 74:8
76:17 89:17 100:9
120:20 121:23
126:15 148:21
**Goldman (1)**
25:24
**good (18)**
6:7,8 33:16 48:4
51:11 128:25
129:11,18 130:6,9
130:22,24 131:3,11
131:13,15,21,25
**gotten (2)**
57:16 167:5
**graduate (1)**
8:4
**graduated (1)**
8:15
**Great (1)**
51:17
**Greer (2)**
16:13 28:4
**ground (2)**
6:16 85:2
**group (8)**
12:24 24:13 33:12
64:2 71:3 117:10,19
138:25
**guarantee (1)**
123:23
**guess (2)**
71:21 149:23
**G-r-e-e-r (1)**
16:14

_____

**H**

**haircuts (1)**
70:15
**half (1)**
48:4
**halfway (1)**
152:21
**Halpert (5)**
8:19,23 10:2,17 12:4
**hand (1)**
170:20
**handing (2)**
21:2 100:6
**hands-on (1)**
66:4
**happen (3)**
6:24 7:11 74:4

**happening (3)**
80:2 81:22 106:3
**happens (1)**
40:12
**happy (5)**
7:9,14 27:20 126:12
126:18
**hard (1)**
27:2
**head (3)**
7:5 56:20 141:20
**headquartered (1)**
12:13
**headquarters (1)**
12:12
**hear (1)**
145:9
**heard (4)**
70:9 123:5,16,22
**HEATHER (1)**
3:16
**HEDGES (1)**
3:18
**held (11)**
2:8 7:24 15:4 27:13
59:5 60:17 62:10
64:3 132:7,14
149:21
**hello (1)**
25:12
**help (1)**
7:5
**hereinbefore (1)**
170:11
**hereunto (1)**
170:19
**hierarchy (1)**
10:12
**high (1)**
61:12
**higher (1)**
60:18
**high-level (1)**
39:8
**history (1)**
147:17
**hold (3)**
62:19 63:24,24
**HOLDINGS (1)**
1:8
**holds (1)**
61:12
**honest (1)**
129:9
**honestly (3)**
11:2 101:13 164:7
**hour (2)**
48:4 121:24

**housed (1)**
147:11
**houses (1)**
40:13
**Hubbard (2)**
2:9 4:4
**Huey (4)**
63:21 101:8,9 108:24
**Hughes (2)**
2:9 4:4
**hypothecate (1)**
125:13
**hypothetical (1)**
157:23
**H-a-l-p-e-r-t (1)**
8:20

_____

**I**

**idea (2)**
52:3 152:15
**identification (2)**
20:15 120:7
**identified (31)**
92:9,12 93:7,11,17
94:22 96:8,24 97:14
99:13 100:25 101:4
104:4 105:8 107:7
109:7 115:10 119:6
119:13,16 120:16
121:4,4,6,21 135:4
135:5,12,24 136:13
156:8
**identifier (1)**
121:15
**identify (1)**
21:5
**imagine (1)**
6:23
**immediately (1)**
51:9
**impact (10)**
63:14 67:15 70:18
104:5,5,16 105:9
154:11 165:3 167:3
**impacted (1)**
101:2
**impacts (1)**
153:10
**imply (5)**
82:13,16,18 84:5
164:14
**important (3)**
56:11,16 90:9
**impression (1)**
75:14
**inaccurate (1)**
161:7
**include (4)**

9:6 49:4 147:13,17
**included (3)**
12:24 77:15 78:14
**including (8)**
18:25 59:16 60:5
78:20 84:25 96:18
110:2 119:5
**incomplete (1)**
157:23
**incorporated (3)**
119:12 120:6,13
**incorrect (8)**
73:8 79:9,15 86:22
87:17 91:16 96:6
109:20
**increase (1)**
19:15
**increased (7)**
77:5 103:19 104:6
152:24 154:9
164:22 165:11
**independent (1)**
161:19
**INDEX (1)**
169:2
**indication (2)**
164:10 167:13
**indirect (1)**
65:22
**individual (6)**
11:23 14:2 37:16
102:5 118:7 153:10
**individuals (14)**
29:23 37:12 38:9
54:18 74:23,23
75:19 82:21 100:3
104:10 106:11,13
145:2 156:3
**industry (19)**
7:20 24:22 25:23
26:18,25 28:20
29:23 56:19 58:9
59:10,12,16,19 60:4
60:9 61:6,12 78:23
138:4
**information (65)**
22:20,23,25 23:6,8,12
23:20,20,23,24
30:23 31:4,23 32:25
33:3 34:7 35:8 41:8
41:9,10 42:5 45:11
45:21 46:2,8,11,11
47:5 48:16 53:12
54:22 68:6 73:17
74:8,25 75:14 79:12
84:21 85:18 86:8
87:13,24 96:19 97:4
97:5 101:7 109:23
111:8 118:2,7 119:2

119:10 120:4,9
137:2 138:12
139:10 141:18
143:3 148:6,8,16
149:9 150:11
154:24
**inherent (1)**
153:15
**initially (5)**
14:3 43:8 54:23 68:17
134:25
**insight (2)**
35:7 38:10
**insolvency (1)**
131:25
**insolvent (2)**
132:8,15
**instance (1)**
38:15
**instructed (4)**
36:23 108:22,25
109:11
**instruction (5)**
24:16 32:7 116:14
135:22 139:2
**instructs (1)**
115:22
**insure (4)**
69:3 89:6 91:6 122:11
**integrated (1)**
68:17
**integration (4)**
34:2 66:23 67:19
68:13
**integrity (1)**
167:11
**intended (2)**
7:7 122:11
**intending (2)**
161:12,17
**intensive (1)**
75:23
**intent (1)**
140:19
**interact (7)**
34:20 36:22 37:14
39:4,22 103:6 142:4
**interacted (1)**
57:3
**interaction (10)**
11:16,18 22:20 32:4
32:10 36:25 41:6
52:12,16 156:11
**interactions (5)**
34:25 35:19 37:23
72:18 79:20
**interested (1)**
170:18

**intermediary (5)**
132:21,22 133:9,10
133:17
**internal (2)**
79:5 167:22
**International (1)**
12:8
**interpret (9)**
27:2,6,9,13 28:16
74:25 145:14,18
156:13
**interpretation (3)**
61:8 72:25 145:20
**interpreted (1)**
26:20
**interpreting (4)**
27:23 28:5,8 29:25
**interpretive (2)**
25:16,18
**interprets (1)**
27:4
**interrupt (2)**
50:2 92:21
**intimate (6)**
37:13,21 38:8 60:20
81:4 86:5
**intimately (4)**
63:16 66:3 75:21
85:20
**intricate (3)**
42:24 44:15,17
**inventory (1)**
149:5
**investigation (1)**
161:20
**Investor (1)**
72:21
**involve (1)**
86:16
**involved (19)**
13:3,9 16:7 18:4 39:6
42:10 44:12 61:23
69:20 73:25 82:22
84:2,7 89:20 104:9
114:3 115:8 116:18
117:21
**involvement (3)**
20:11 118:18,21
**isolated (1)**
167:17
**Issacson's (1)**
134:21
**issue (26)**
61:10 70:5,6 93:6
100:25 101:6,11,19
103:25 104:2,7,13
104:14 106:3 132:4
155:17 162:20,22

163:5,9,20 167:9,10
167:10,14,22
**issues (22)**
18:10 25:16,18 29:10
29:11,12,13 69:18
70:4,9,11 71:4,6
75:12 79:21,24
104:4 105:7,9 106:8
106:8 163:15
**item (4)**
77:15 78:14,21
158:22
**items (1)**
121:14

—————————
**J**
—————————
**January (5)**
101:17 102:8,15
103:11 163:11
**Jersey (2)**
2:14 8:22
**JOB (1)**
1:18
**Joel (9)**
22:8 37:19 101:12,12
103:15 141:9
143:22 145:3 155:8
**joined (4)**
10:24 17:10 25:11
62:6
**Jointly (1)**
1:8
**JONES (1)**
3:4
**June (3)**
1:14 2:5 170:20

—————————
**K**
—————————
**Keeping (1)**
109:19
**Kendall (5)**
102:11 103:14 106:4
106:14 164:3
**key (4)**
114:16,21,24 156:12
**kind (1)**
130:14
**KING (1)**
3:16
**Kleber (1)**
118:9
**knew (2)**
32:22 146:22
**know (144)**
6:9,16 7:9 11:2 14:11
19:9 23:3 33:25
34:2 39:5 40:5
42:12 43:21,21 44:8

44:15,18,21,23
46:12 47:15,18
48:21,24 50:12,14
50:16,17,23 51:9,20
51:25 52:5 53:17,22
54:21 56:15,18
58:16,23,23,24
59:10 60:18,19
61:11,12,23,24
63:14 64:17 66:5,17
68:18,20,23 69:2,25
76:19 81:6 83:2
84:6,7 85:14,16,20
86:3 87:17 89:16
90:6,7,16 95:7,19
95:20,21 100:10
101:13 102:14,22
102:25 103:6
105:19,25 106:16
106:22 107:19
108:3 113:3,13,14
114:6,25 115:2,13
115:13,23 116:9
118:9,10,13,15,17
118:20 119:14
120:12 121:3,5
126:2,3 129:11
138:12 140:3
143:14 144:4,7,19
144:20 146:2 147:3
147:21 151:13,15
151:20,22,23 152:2
152:6 155:6,8,11,12
155:18 156:12,16
156:18 159:9,13,25
163:20 164:7 165:9
165:22 166:8
**knowing (1)**
110:23
**knowledge (93)**
21:21 22:2,4 23:4
24:21 33:22 35:11
35:18 36:8,19 37:3
37:10,13,17,21 38:2
38:6,8,22,23 39:11
39:12,14,25 40:18
41:8,21 42:25 43:3
46:20,23 54:23
55:18 56:4,8,24,25
57:4,16 60:20 64:9
64:15 65:2 74:24
81:4,21 83:3,16,20
83:24 85:9 86:5
91:16 103:8 107:5
108:24 109:3,9,10
109:13,16 110:18
110:21 111:5,19,23
112:7 113:16 114:6
115:2,7 121:14

137:17,18 138:2,8
138:13,17 139:12
139:24,25 140:15
140:17,17 141:14
141:24 143:19,20
144:14,15 146:3,10
160:15
**knowledgeable (5)**
24:23 60:2 63:17
80:24 91:12
**known (5)**
11:22 34:21 44:3
54:24 56:19

**L**

**language (1)**
9:11
**large (4)**
14:6 80:23 85:25
91:12
**launched (3)**
129:13,20 130:3
**law (2)**
8:9 28:13
**lawyer (4)**
28:10 110:13 114:2
145:11
**lawyers (1)**
29:25
**lay (1)**
10:7
**LBI (89)**
17:24 18:2 22:19,23
23:6,20,23 25:17
26:9 30:23,25 31:5
31:25 33:2 40:13
41:9 42:7,17 43:5
43:24 44:4,20,25
46:14 48:23 50:8,11
51:24 54:4,6 56:12
56:17 63:2 64:13
66:8,19,24 67:4,11
67:24 73:16 79:13
80:20 82:23 86:9
89:23 90:4,25 93:19
94:18 97:14 104:20
105:3,12,15,23
106:17,24 108:4,14
108:19 109:5 110:3
110:24 111:25
114:8,18 115:3,9,21
120:10 121:2 137:5
138:9 142:22,24
146:17 147:4,8
148:8,14,23 149:9
149:17,20,22
150:14 156:12
162:24
**LBI's (31)**

24:23 41:17 44:10,25
45:11,22 46:2 47:5
73:14 80:13,19
84:11,22 85:16
86:15 88:11 95:2,12
96:18 109:14,21
114:14 115:18
119:3 146:23 156:3
156:5 159:22 160:9
160:10,20
**leading (3)**
54:9 80:9 81:13
**learn (1)**
82:20
**learned (1)**
35:2
**ledger (2)**
15:25 91:8
**ledgers (5)**
48:13 49:6 74:13
75:12,13
**left (4)**
11:6 12:6 14:20 15:14
**legacy (13)**
23:15,15 47:18 76:4
84:22,23 85:16 86:4
86:9,11 96:18
104:18 138:15
**legal (12)**
15:25 16:25 29:17
60:12 142:7,11,15
145:20 146:5,11
149:21 150:18
**legally (1)**
30:2
**Lehman (35)**
1:7 3:5 22:3,12 23:7
23:11,13,15 39:6
49:20 50:5,6 56:25
75:11,20 76:4 81:18
81:23 82:3 86:4
95:21 109:25 110:4
111:9,21 116:20
117:15,23 118:14
121:2 138:14,15
151:16 160:11
171:3
**Lehman's (12)**
47:20 55:18 56:5,20
74:24 81:5 85:14
91:17 117:18,22
118:18 121:11
**length (1)**
88:9
**letter (7)**
110:3,11 111:6,22
112:25 113:4
142:16
**let's (9)**

22:22 24:6 33:7 94:24
98:6 111:17 120:3
135:23 156:25
**liabilities (1)**
148:23
**licenses (2)**
7:20,22
**lien (1)**
130:14
**line (14)**
76:22 77:14 78:14,21
126:12,13 158:22
171:9,11,13,15,17
171:19,21
**lines (9)**
19:11,18 29:14 70:17
76:18 82:10 141:18
151:17 153:10
**liquidation (3)**
122:15,18 156:19
**list (2)**
114:24,25
**litigation (6)**
60:15 61:21 62:4 95:5
95:15 145:6
**little (6)**
27:3 30:12 32:9 40:16
55:5 150:20
**LLP (5)**
2:9 3:4,11,18 4:4
**loan (1)**
75:12
**lobbyist (1)**
69:25
**located (3)**
16:16 109:23 111:8
**location (16)**
10:13 106:6 129:2,4
130:8,9,22,24 131:2
131:3,5,12,13,15,21
132:2
**locations (5)**
129:4,5 130:5,6,7
**locked (1)**
123:14
**log (3)**
143:2,5,15
**logic (2)**
144:22,24
**logical (2)**
86:13 153:20
**log-ins (4)**
50:10,15,18,24
**long (13)**
7:24 10:13 11:3 12:15
14:23 15:17 16:18
32:22 56:20 66:20
70:20 82:12,14

**longer (1)**
131:21
**look (17)**
45:7 48:13 92:6 96:12
100:8 114:8 124:10
153:8,11 159:19
160:2,6 162:17
166:15 167:4,18,20
**looked (8)**
66:20 107:5 132:4
134:25 159:10
165:23 166:9
167:10
**looking (4)**
19:9 45:9 94:22
163:12
**looks (1)**
71:4
**lose (1)**
80:4
**lost (1)**
80:3
**lot (2)**
37:14 90:8
**lunch (3)**
91:21,23 121:24

**M**

**Mabon (11)**
10:19,22,25 11:3,4,11
11:25 12:6 14:22
15:5,14
**Madison (1)**
3:20
**magnitude (1)**
86:19
**main (4)**
24:2,4,20 40:8
**major (3)**
43:10 46:13 59:24
**manage (5)**
63:19,20 64:19 65:19
68:7
**managed (5)**
16:24 28:21 60:24
66:23 67:19
**management (7)**
34:21,23 64:5 69:11
72:6 142:5 153:23
**manager (3)**
18:11 64:24,24
**managerial (2)**
65:22 66:2
**manages (2)**
60:21 65:19
**managing (3)**
22:2 35:4 68:15
**manual (3)**

10:5,10 88:3
**manually (4)**
84:23,24 85:12 87:24
**March (6)**
21:8 62:11,13 73:6
135:5,8
**margin (8)**
122:12 123:6,18
124:19,21 125:4,11
125:14
**marked (5)**
20:14,23 21:3 100:6
169:8
**market (1)**
18:18
**marriage (1)**
170:17
**Martini (183)**
1:12 2:8 6:1,2,7 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
51:20 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1,21 88:1
89:1 90:1 91:1 92:1
92:2 93:1,17 94:1
94:25 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1,3 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1,10
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1

144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1,4 163:1 164:1
165:1 166:1 167:1
168:1,8 169:1,4
170:1,10 171:1,5,24
**Mary (7)**
1:17 2:11 6:25 107:15
120:23 170:6,22
**material (1)**
167:4
**materiality (2)**
167:3,18
**materially (1)**
161:7
**Matt (2)**
101:8,9
**matter (7)**
6:11 77:19 84:10
91:20 95:23 96:2
170:18
**matters (2)**
116:6 161:20
**Matthew (2)**
63:21 108:24
**McIsaac (54)**
20:21 21:6,8 58:16,19
58:22 59:2,7,11,18
60:9,14,17 61:7,11
62:2 73:7,13 76:12
77:2 80:18 84:10,16
85:7 92:7 93:8,17
94:15 95:3,13 96:6
96:10,23 124:13,24
125:16,20 126:7
127:6,16,18,22
128:3,8,13,16 135:5
135:6,7 136:10
159:21 160:5,7
162:8
**McIsaac's (23)**
55:7 60:24 73:5 77:24
78:10 80:11 91:10
92:14,16 94:2 95:22
95:25 96:9 99:14
109:20 124:7
126:20 134:22
146:9,12 161:13,15
161:21
**McLaughlin (7)**
102:11 103:14 106:5
151:23 152:22
162:25 164:3
**McMAHON (2)**
3:8 168:6

**mean (32)**
10:8 11:7 23:12 29:3
37:13 38:11,18 39:2
46:21 50:2 54:20
64:18 69:18,24
73:22 75:8 88:8
89:17 92:20 108:7,8
119:9,11 125:24
142:22 145:15,16
145:25 146:2 149:2
152:17 166:22
**meaning (3)**
39:3 55:24 120:10
**means (12)**
46:23 64:16 85:12
89:16 97:24 125:23
126:2,7 133:21
143:2 149:4 164:14
**meant (5)**
49:18 50:7 69:6 74:3
92:11
**mechanical (2)**
52:21,22
**meet (1)**
131:2
**meeting (2)**
72:4 103:14
**meetings (1)**
70:2
**member (13)**
21:25 23:4 39:3 69:8
69:10 70:20 71:8,9
71:12,15,24 72:5
81:16
**members (4)**
21:24,25 35:20 39:4
**membership (1)**
70:7
**memo (2)**
163:22,25
**mentioned (11)**
38:21 49:13 55:3 58:8
68:16 75:3 114:12
114:20 135:2
159:10 166:9
**met (6)**
6:10 59:2,7,9 118:11
118:12
**Millburn (1)**
8:22
**million (9)**
104:5,6,8 106:19
107:10 152:24
154:9 164:22
165:12
**mimic (1)**
86:10
**mind (2)**
19:17 42:21

**mine (1)**
30:5
**minor (1)**
8:7
**minute (3)**
49:16 75:6 161:24
**minutes (3)**
51:13 121:25 134:7
**mischaracterizes (5)**
37:7 98:5 104:23
111:12 163:4
**mischaracterizing (1)**
113:21
**missed (1)**
90:22
**mistaken (1)**
60:19
**mitigated (1)**
167:6
**ml (1)**
103:19
**modified (1)**
84:24
**modify (1)**
84:21
**moment (3)**
35:23 36:12 38:24
**Monday (2)**
158:5 166:23
**Mondays (1)**
157:5
**money (4)**
90:21 91:2 123:13
158:7
**month (4)**
19:13,13,16,16
**monthly (3)**
18:8,15 123:11
**months (5)**
17:25 80:23 84:13
88:6 91:11
**month-end (1)**
18:22
**Morgan (1)**
25:24
**morning (7)**
6:7,8 48:4 54:15
114:13 157:12,14
**motor (1)**
6:14
**move (1)**
102:24
**moved (2)**
10:18 56:22
**MTS (12)**
46:14 49:4,10 50:21
53:13 54:6 74:12
143:13,15,25

144:17 156:6
**municipal (1)**
8:16
**murdering (1)**
102:4
**M-a-b-o-n (1)**
10:21
**M-A-R-G-I-N (1)**
123:18
**M-a-y-b-o-n-d (1)**
10:20

**N**

**name (11)**
6:9 8:18 24:15 59:22
61:17,23,25 122:9
139:4 171:3,5
**named (1)**
64:4
**NASD (1)**
10:15
**nature (11)**
29:2,7,16,17 47:24
53:25 89:22 90:18
94:20 98:21 117:24
**necessarily (3)**
153:5 159:6 165:18
**necessary (15)**
73:17 86:9 89:12,20
90:15 96:19 98:2,9
99:15,22 119:3
149:13 157:17
158:19,24
**need (37)**
7:8 31:24 44:14 46:11
48:12,18,23 55:9
56:2,5 74:5,6,20
75:3 76:10 84:21
88:14,25 89:5 90:3
90:19,24 93:18
114:14 120:13
121:10 126:17
136:21 137:22
147:20 148:6,8,15
154:4 157:19
159:16 161:2
**needed (5)**
32:6 71:22 74:18
119:12 120:6
**needs (3)**
55:9 94:9 157:8
**Neil (2)**
4:8 6:9
**net (27)**
9:6 11:12 12:25 15:12
18:16 22:11 26:13
26:14 29:11 30:16
31:15 58:14 63:14
63:17 103:18 104:5

105:8 106:16
108:18 109:4,14
148:3 152:22
153:10 154:7
164:20 165:10
**Neuhardt (94)**
3:15 6:23 13:6,19
16:9 19:25 26:22
27:16 28:18 29:5
30:4,9 31:2,10 32:2
33:14 34:11 36:21
37:6 38:4 39:17,19
40:2,21 41:19 43:7
44:6,11 45:4,15,23
46:22 47:9 48:3,10
49:2,24 51:11,15,17
55:23 57:8 59:14
60:11 61:9,22 64:14
65:5 66:9,25 67:3,6
67:22 68:11 69:4
74:19 76:3 78:2
79:2,17 80:14,17
82:7,24 83:6,8,13
84:3,17 85:8,19
86:12,18,23 87:4,10
87:15,25 88:7,15
89:7,15 90:5 91:14
91:19 137:15 160:4
160:6 161:23
162:10 163:13
164:18 165:15
169:5
**never (9)**
25:16 36:23 82:25
94:18 108:22
112:22,24 113:18
133:17
**new (35)**
1:3,13,13 2:10,10,13
2:13 3:7,7,21,21 4:7
4:7 8:21,22 10:23
12:12,12,14 16:17
17:15 18:5 19:5,21
28:21 63:13,13 68:3
68:9 70:18 71:4
167:24 170:3,5,9
**Nikko (3)**
15:16,20 28:7
**nodding (1)**
7:4
**nonfinancial (1)**
29:12
**normally (4)**
87:17 157:2,4,5
**notable (1)**
112:3
**notably (1)**
79:21
**Notary (2)**

2:13 170:8
**NOTE (1)**
107:17
**noted (2)**
77:18 99:25
**notes (1)**
54:16
**notwithstanding (2)**
116:2,12
**number (17)**
14:8,9 32:22 53:9,24
53:25 55:14 66:15
80:24 82:21,25
83:25 91:12 107:25
137:16 156:7
159:21
**numbers (1)**
167:20
**NW (1)**
3:13
**N-i-k-k-o (1)**
15:16

**O**

**oath (1)**
5:18
**Oberst (3)**
8:19,23 10:3
**object (56)**
6:21 34:11 60:11
83:14 97:16 98:13
113:5 117:3 123:19
123:25 124:15,25
125:6,10,18,22
126:10,22 127:3,8
127:13,20,24 128:5
128:9,15,22 129:3
129:14,22 130:4,12
130:15,19,25
131:16,22 132:3,10
132:17,25 133:13
133:24 135:18
136:22 137:21,23
138:11,19 139:16
139:21 141:22
157:13,20,22 161:4
**objected (1)**
112:18
**objecting (1)**
83:8
**objection (132)**
13:6 16:9 19:25 26:22
27:16 28:18 29:5
30:4,9 31:2,10 32:2
36:21 37:6 38:4
39:17,19 40:21
41:19 43:7 44:6,11
45:4,23 46:22 47:9
48:3,8 49:2 55:23

57:8 59:14 61:4,9
61:22 64:14 65:5
66:9,25 67:22 68:11
69:4 74:19 76:3
78:2 79:2,17 82:7
82:24 83:6,9 84:3
84:17 85:8,19 86:12
86:18,23 87:4,10,15
87:25 88:7,15 89:7
89:15 90:5 91:14
92:17 93:14,21 94:7
94:17 95:6,16 98:4
98:18 99:2,8,17
102:9 104:12,22
105:5,20 106:21
107:2,11,18 108:6
108:21 109:8,17
110:20 113:20
115:12 118:4
119:17,21 120:15
120:19 121:8,13
122:6,16,25 136:12
137:6 140:16
141:25 142:8,12,17
142:23 143:7,12,21
144:9 145:8 149:10
150:16 151:5 152:8
158:16 159:2,8
161:9 163:3 164:6
164:12 165:13
167:16
**objectionable (1)**
67:6
**objections (1)**
5:10
**obligations (1)**
122:20
**obtained (1)**
56:5
**occasions (1)**
141:11
**occurred (3)**
32:21 33:2 158:11
**occurring (2)**
68:14 81:8
**occurs (2)**
156:24 157:15
**October (6)**
21:7 64:12 65:4 124:8
126:20 162:13
**officer (4)**
5:17 8:25 9:4,23
**offices (1)**
2:9
**Oh (1)**
45:16
**OK (39)**
7:15 10:16 23:17 32:8
42:21 43:22 45:16

71:7 76:7,20 83:13
94:10,24 95:10
96:21 98:6 100:13
101:21 110:16
111:3 118:24 124:9
124:12 126:11,12
134:14 135:15
136:2 139:13,18
140:20 143:18
146:20 149:23
150:7,9 154:14
162:16 166:17
**OLIVER (1)**
3:18
**once (2)**
88:12 156:22
**ones (1)**
114:5
**one-man (1)**
14:3
**onwards (1)**
27:15
**operates (1)**
35:19
**operation (2)**
15:19 21:25
**operational (11)**
17:21 18:14,18 28:25
29:7,10,12,16 41:8
75:23 153:25
**operations (11)**
21:25 74:23 75:22
102:19 103:5 117:8
117:9,18,20 129:10
141:21
**opinion (4)**
25:20 60:25 79:11
98:2
**opportunity (1)**
100:11
**opposed (1)**
29:12
**ops (1)**
35:5
**order (17)**
46:10 55:18 56:6 68:7
76:5 78:18 87:22
90:19,24 98:7 99:22
114:14 136:16
148:4,4,13 149:16
**orderly (1)**
122:22
**ordinarily (1)**
158:14
**ordinary (2)**
156:21 157:21
**original (4)**
95:23 119:23,25
162:10

**Originally (1)**
53:19
**outcome (1)**
170:18
**outline (1)**
98:25
**outlined (1)**
98:22
**output (3)**
74:9 88:19 90:12
**outside (3)**
129:20 130:3,9
**overlap (1)**
71:5
**owe (1)**
132:23
**owed (1)**
133:22
**owes (3)**
133:5,6,11
**Oxford (70)**
4:8 6:6,9 15:3 20:5
33:16 48:8 51:13,16
51:19 59:4,6 67:2
80:16 83:7,10 91:22
107:14 119:24
120:22 121:23
128:12 137:8,16,21
138:19 139:16,21
140:16,20 141:22
141:25 142:8,12,17
142:20,23 143:7,12
143:21 144:9 145:8
146:15 149:10
150:16,21,23 151:5
152:8 154:14
156:14 157:13,20
157:22 158:16,18
159:2,8,25 160:3,5
160:8 161:4,9 162:3
162:11 163:14
164:17 167:25
169:4
**O-b-e-r-s-t (1)**
8:20

**P**

**page (10)**
124:11 152:21 169:3
171:9,11,13,15,17
171:19,21
**paid (5)**
24:15 122:11 124:19
125:4 139:4
**paragraph (44)**
45:10 73:4 76:14
77:24 78:11 80:12
80:18 84:9 92:5
93:2,5 96:15 99:3,5

99:10,10 109:19
110:17 118:22
120:4 124:10,14,24
125:17,21 126:8,13
126:14,15,16,19,24
127:6,7,11,16,19,23
128:2,4,8 134:13
136:14 146:18
**paragraphs (3)**
128:14,17 161:18
**Park (2)**
2:10 4:6
**part (14)**
22:22 27:5,8 30:22
33:11 44:10 83:3
88:24 89:4,10 117:9
140:23,23 146:17
**participant (1)**
9:21
**participation (1)**
9:24
**particular (14)**
13:22 52:16 60:5
69:13,17 70:12
76:13 92:24 93:11
106:2 153:24 154:3
155:10 159:14
**particularly (1)**
45:9
**parties (5)**
5:7 6:3 55:12 126:5
170:16
**parts (2)**
42:17 141:5
**part-time (1)**
141:5
**pass (1)**
34:8
**passing (1)**
34:9
**pay (2)**
132:22 133:10
**payables (1)**
49:5
**pays (1)**
140:2
**Peck (2)**
16:13 28:4
**peers (1)**
26:20
**penalty (1)**
111:4
**penultimate (1)**
78:11
**people (22)**
10:11 14:8 24:13
26:18 30:3 36:17
37:5 46:25 55:17
56:4 59:15 66:16

83:2,25 84:6 115:5
140:19,22 143:17
154:15 156:12
160:24
**percent (7)**
40:13 42:14 43:10
70:16,16 111:24
114:7
**perform (7)**
9:18 20:8 40:9 56:11
74:14 77:4,6
**performed (10)**
9:12 11:24 65:3 68:21
108:14 129:9
159:11 164:8
165:24 166:10
**performing (5)**
68:24 77:12 78:4,4,12
**period (7)**
35:6 53:11 56:20 57:2
65:4,6 129:7
**periods (1)**
131:4
**perjury (1)**
111:4
**permission (2)**
151:11 155:9
**permitted (4)**
23:23 39:22 40:3,19
**person (8)**
11:21 24:23 52:21
56:11,13,16 75:22
115:4
**personal (27)**
23:3 37:3,10 38:22
39:12 46:20,23
110:18,21 111:4,19
113:16 114:6
137:17,18,25 138:8
138:17 140:14,17
141:14,23 143:19
143:20 144:13,15
160:14
**personally (1)**
152:5
**personnel (4)**
30:2 80:24 84:21
91:12
**perspective (5)**
43:13,14,16 63:15
67:5
**Peter (1)**
61:17
**phrase (1)**
92:18
**physical (1)**
124:18
**picture (2)**
74:20 76:9

**PIM (1)**
44:3
**place (6)**
34:23 36:2 39:9 66:4
100:5 122:7
**placed (1)**
130:24 131:15
**play (1)**
36:15
**Plaza (2)**
2:10 4:6
**please (22)**
13:8,20 20:2 27:18
76:13 83:7 89:3
92:3,5 104:24
107:15 111:15
116:8 118:23
120:23 124:3
132:12 133:3
162:14,18 163:7
166:6
**plus (1)**
95:17
**point (24)**
18:8 47:21 49:14,21
50:11 51:6,7,12
53:16,20,21 60:23
68:15 72:4 73:12
84:20 100:24
101:20 103:2 115:3
131:18,20 151:17
162:21
**pointing (1)**
98:23
**points (1)**
68:19
**policy (2)**
63:11 65:15
**population (9)**
48:15,16,17,18 55:15
74:7 75:4 88:17
148:22
**populations (1)**
156:11
**portion (1)**
146:23
**portions (1)**
161:15
**position (15)**
10:16 46:24 56:18
60:18 61:12 62:10
62:19 63:24 64:3
77:9 111:23 118:13
142:2,2 145:14
**positions (5)**
10:12 26:19 27:14
149:6 153:20
**possession (6)**
124:18 125:3,25

129:6 133:19,19
**possible (3)**
77:4,7,19
**possibly (2)**
55:12 56:3
**Potenciano (49)**
22:8,17,24 23:18,22
30:14,15 31:3,7,14
31:22 32:4,10,13,14
32:19,24 33:8,23
34:25 35:12 36:8
37:19 38:10 41:20
47:13,20 49:13 50:4
50:8,10,14,19 51:21
52:7,24 56:24 57:4
116:18 117:4 141:9
141:14 143:22
152:6 154:16,18,20
155:8,16
**Potenciano's (2)**
22:9 117:2
**potential (2)**
70:13,17
**potentially (2)**
19:9 75:13
**practical (5)**
77:19 112:8,10
145:18 146:3
**practice (5)**
29:13 123:3 156:17
166:19,20
**predecessor (1)**
102:17
**preparation (15)**
21:14,16 22:7 52:8,25
54:11 57:9,22,24
58:4 101:22 135:2
135:14,17,25
**prepare (2)**
20:18 21:22
**president (5)**
12:20 15:21 16:22
22:10 102:16
**previously (10)**
6:13 15:7 21:3 59:9
100:3,7 159:10
162:7,23 166:9
**pre-September (1)**
150:10
**primarily (2)**
116:2,12
**Principal (1)**
17:17
**prior (10)**
28:2 66:8 147:18
149:9,15,25 157:3
160:9,16 163:4
**priority (1)**
10:14

**privy (1)**
154:24
**probably (1)**
115:6
**problem (3)**
101:5 161:5 162:24
**problems (2)**
92:13 167:11
**proceed (1)**
100:12
**proceeding (2)**
61:24 160:16
**proceedings (1)**
131:25
**process (21)**
63:17 84:13 85:14
87:18,19 88:5,24
89:4,9,10 90:7
91:17 94:20 95:7
97:20,21 99:18,20
99:22 120:17
129:24
**processes (3)**
66:3 119:13 120:8
**produced (1)**
103:17
**products (1)**
63:13
**professional (6)**
2:11 25:14 69:6,9
77:14 170:7
**professionals (4)**
76:23 77:3 78:6,13
**program (4)**
88:14 89:11,21 90:14
**project (1)**
55:4
**promoted (2)**
62:14,16
**properly (2)**
74:25 90:11
**property (6)**
122:12 130:21 131:11
131:19 132:7,14
**proprietary (3)**
148:24 149:2,3
**protect (2)**
122:4,7
**protection (4)**
72:21 122:8 159:24
160:10
**provides (1)**
34:18
**Public (2)**
2:13 170:8
**purchase (10)**
42:15 110:2,5,7,11
111:5,22 112:14,20

113:10
**purport (5)**
39:24 40:18 142:6,10
142:14
**purpose (6)**
35:9 91:4 122:4,17
125:2,3
**purposes (1)**
19:6
**pursuant (5)**
109:25 111:5,21
123:8,12
**put (7)**
39:9 107:24 113:8,11
114:4 122:7 154:4
**putting (1)**
138:9
**P&L (1)**
18:16
**P-I-M (1)**
44:4

_____

**Q**

**qualified (5)**
28:16 30:2 52:2 60:14
61:7
**question (38)**
5:11 6:19 13:20 29:19
29:21 32:3 40:16
42:22 44:14 45:6,15
50:3 52:19 61:4
67:8 68:12 88:17,22
95:18 98:15 107:20
110:16 116:8
125:15 126:24
127:5,11 128:2
134:10 140:11
142:25 145:9 157:3
164:23,24 165:15
165:20 166:7
**questions (17)**
6:18 7:12 19:8,16
106:4 137:9,17
146:8,15 154:15
158:19 159:22
160:9 161:25 162:5
167:25 168:3
**quick (2)**
91:20,22
**quickly (1)**
7:6
**QUINN (1)**
3:18
**quite (3)**
54:21 84:5 131:7
**quote (1)**
111:13
**quote/unquote (1)**
112:2

**R**

**R (1)**
169:4
**raise (1)**
19:16
**raised (3)**
19:8 104:13 161:20
**ran (2)**
56:23 115:2
**rate (1)**
144:20
**reach (1)**
165:10
**read (18)**
20:5,6 34:16 40:17,22
45:18 59:8 76:16
98:16,17 107:14,16
110:18 120:22,24
126:19,25 145:10
**real (1)**
134:4
**really (6)**
29:18 65:7 82:25
103:6 129:8 149:23
**Realtime (2)**
2:12 170:7
**reason (16)**
31:8,21 84:15,18 85:6
134:18 153:7
160:22 171:6,9,11
171:13,15,17,19,21
**rebuttal (8)**
20:21 21:8 73:5
134:22 135:6,7
136:8 161:21
**recalc (1)**
97:23
**recalculation (6)**
98:2,11 99:15,19
158:20 159:15
**recall (3)**
68:25 70:11 100:21
**receivable (1)**
49:5
**received (1)**
7:18
**Recess (5)**
51:18 91:24 122:2
134:9 137:13
**recognize (3)**
113:7,10,19
**recollection (4)**
52:6 53:5 65:6 135:20
**reconcile (4)**
82:2,22 90:20 91:2
**reconciled (8)**
55:12,15 56:2 74:7
75:4,8 84:12 87:14

**reconciliation (6)**
91:5 100:4 119:13
120:7,17 161:2
**reconciliations (4)**
53:10 54:2 56:10
83:22
**reconciling (1)**
81:10
**reconstruct (1)**
84:25
**record (29)**
6:10 10:5,6,8,11 15:3
15:4 20:6 21:5 59:4
59:5 74:22 78:9
83:12 85:18 86:8
87:12,23 98:17
107:16 114:8
120:24 121:17
134:6 137:12 143:9
145:10 170:13
171:7
**records (46)**
20:9 49:6,7,8 54:3
55:10,11 56:2 74:7
74:12,21 75:5,9
76:6 79:6,6,9,15
80:3,5 81:5,10,23
82:2,23 83:22 84:11
86:11 87:14,20
88:12 91:8 113:24
114:10,11 120:10
136:25 137:3,5
142:21,24 144:22
147:7 149:4,13,24
**recreating (2)**
86:16,25
**Reed (2)**
2:9 4:4
**refer (3)**
37:3 93:7 143:10
**reference (3)**
47:25 73:5 134:15
**referenced (5)**
38:19 61:25 106:19
134:18,21
**references (3)**
128:17,19 136:10
**referred (9)**
45:24 112:2 123:6,18
123:22 142:21
145:23 146:18
154:16
**referring (6)**
18:21 20:22 37:4
92:25 121:20
143:10
**refers (1)**
113:22
**reflected (1)**

108:18
**reflects (1)**
106:23
**refresh (1)**
135:20
**reg (13)**
12:23 15:9 17:2 23:7
23:10 56:20 59:24
61:13 62:24 63:11
63:22 65:15 66:16
**regard (4)**
36:14 45:13 46:4 47:6
**regarding (11)**
24:3,4 25:15,17 32:4
32:5,25 53:11 70:13
92:23 115:21
**regardless (1)**
161:8
**registered (4)**
2:11 9:8 12:2 170:6
**registration (1)**
9:8
**regular (2)**
19:22 142:5
**regulators (3)**
69:25 70:2,17
**regulatory (13)**
15:24 20:10 23:13
30:7 35:5 62:7,17
70:4 71:6 102:19
117:20 142:3
156:12
**reimbursed (2)**
140:3,6
**relate (3)**
26:4,13 69:23
**related (6)**
9:9 29:6 41:5 72:15
119:7 170:16
**relates (4)**
24:21 30:25 163:5,9
**relating (6)**
41:17 43:5 148:6,8,16
149:13
**relationship (2)**
18:11 155:7
**relative (1)**
41:9
**relatively (1)**
27:2
**relevant (12)**
30:23 45:11 46:2,7
47:4 119:2,9 120:4
120:9 150:2,12
160:18
**rely (1)**
78:6
**remember (20)**

11:5 38:24 49:15
50:25 51:3 60:6
70:23 72:14 75:5
83:15,18 101:15,16
101:19 135:3
164:22,24,25 165:5
165:20
**reminded (1)**
134:24
**repeat (5)**
89:3 98:14 111:15
148:10 166:6
**rephrase (5)**
31:11 107:12 116:8
132:11 166:6
**report (24)**
9:6 12:25 18:12,14,15
18:24,25 21:8 58:18
73:6 76:12 77:25
92:14,16,25 93:22
96:9 99:14 135:5,7
136:8 139:19,23
161:13
**Reported (1)**
1:16
**Reporter (4)**
2:12,12 170:7,8
**reporting (10)**
12:23 15:9 17:2 30:7
62:8,17,24 65:16,17
142:3
**reports (6)**
18:7 20:10 65:20,20
95:4,15
**represent (5)**
6:10 19:10 69:15
72:20 90:18
**representatives (1)**
9:8
**represents (2)**
49:7 163:15
**reputation (6)**
58:9,12 59:18,21,25
146:9
**request (2)**
115:23 116:9
**requested (1)**
32:19
**require (7)**
69:19 77:13 78:5,12
80:22 91:11 159:7
**required (6)**
9:13 74:13 123:9
129:6 131:11 139:9
**requirement (42)**
13:16 30:19,24 63:9
64:11 77:5,8 98:8
98:12 99:23 103:19
104:6 105:10,12,12

105:23 106:24
109:5,11,15 115:9
118:6 133:19
147:24 148:2,2,5,14
149:17 150:3,14
152:23 153:3,6,25
154:9,12 157:18
164:21 165:4,11
166:18
**requirements (3)**
129:12,19 130:2
**requires (4)**
124:17 159:5 165:16
165:18
**reran (1)**
108:3
**rerun (23)**
48:23 73:17,22 77:16
78:16 87:22 90:19
90:24 92:8 93:4,9
96:7,20,23 114:14
119:3 147:21 156:4
160:19 161:8,10
167:7,15
**rerunning (7)**
74:2,17 80:20 88:10
115:18 121:11
136:19
**reserve (182)**
9:7,10,18,25 11:15,17
11:19 13:2,4,10,24
15:11,12 16:4 17:5
18:16,20 19:2,14,19
22:4 26:5,9 29:9
30:19,24 31:6,24
40:9 43:15 45:2,14
46:4,14 47:6 48:12
48:14,20 58:14 63:9
63:15,18 64:11,18
64:22,25 65:12,24
67:5,16 70:10 73:18
75:2 77:5,8,15,17
78:14,16,18,21,24
79:3 80:21 90:10
92:8,23 93:4,9,12
93:19 94:4,14,20,21
95:2,12 96:7,20,24
97:13,17,23 98:8,12
99:16,23 103:16,18
104:20 105:3,7,10
105:11,12,16,23
106:17,24 107:9,21
108:2,4,19 109:5,11
109:15 111:2 112:6
113:25 114:15
115:9 116:19
117:22 118:6,19
119:4 120:14
122:18,21 123:5,14

123:16,17 128:24
130:23 131:6,14,19
132:9,16 133:23
136:13,17,18
145:17 146:4
147:20,24,24 148:5
148:13,21 149:7,16
150:12,13 152:11
152:13,23 153:2,2,4
153:6,9,14,16,19,24
154:5,8,12 156:5
157:18 158:12,23
158:24 159:5,7,14
159:17,20 164:21
165:3,11,17,19
166:14,16,18,23
167:19
**reserved (1)**
5:11
**reserves (1)**
42:3
**resolve (1)**
153:21
**respect (3)**
97:22 136:20 164:18
**respective (1)**
5:6
**respond (2)**
161:12,17
**responsibilities (7)**
9:3,5 11:10 12:21
15:22 16:23 17:19
**responsibility (11)**
11:14 16:6 17:4,8
27:5,9,12 30:18
63:7 65:23 66:2
**responsible (16)**
11:12 15:24 16:3 17:9
17:20 18:9 28:5,8
29:24 31:14,18
65:11,14 102:18
115:4 145:16
**rest (4)**
144:23 159:12 165:25
166:11
**restate (1)**
163:6
**restructured (1)**
64:2
**restructuring (1)**
64:4
**result (6)**
39:9 104:14 148:3
153:17 157:9,16
**resulted (1)**
104:7
**retained (1)**
61:20
**reveal (1)**

116:5
**reversed (1)**
111:14
**review (16)**
18:7 19:6,7,22 21:16
76:19 77:14 78:6,13
89:12 90:3,20,25
91:4 100:11 106:7
**reviewed (13)**
20:20 21:11,13,15
58:18 84:12 88:14
88:25 89:5 95:22,25
112:13,20
**reviewing (4)**
78:20 89:10,21 90:13
**reviews (1)**
20:9
**revised (2)**
103:16,17 105:3,6
152:11,12
**revising (1)**
104:20
**revoked (10)**
47:21 49:15 50:9,12
50:13,18,25 51:2,4
143:24
**RICHARD (2)**
171:5,24
**right (13)**
46:20 49:22 78:18
88:18 90:12 91:23
92:10 117:2,7
124:20 135:5
144:13 160:12
**ring-fenced (6)**
32:17 33:11 38:13
41:25 139:7,11
**risk (2)**
18:18,18
**ROBERT (6)**
1:12 2:8 3:22 6:2
168:8 170:10
**Rodriguez (4)**
118:9 155:18,20,23
**role (28)**
9:19 13:14,22 15:5
22:9 27:23,25 28:22
30:22 34:20 39:3
57:3,17 58:23,24
61:24 62:3 63:10
65:14 69:13,17
71:24 76:9 115:14
117:25 118:16
141:20 145:18
**roles (2)**
28:20 141:6
**roll (1)**
157:24
**routinely (1)**

78:22
**RPR (2)**
1:17 170:22
**rule (45)**
9:13 11:13 13:16
26:13,14,15 27:10
27:13,23 28:17
29:25 60:10 61:8
71:25 73:18 122:4,7
122:8,10,17,18
123:3,4,8 124:17,20
125:2,3,7,19 127:9
128:11,16,18,24
129:2,6,19,24 130:2
131:4,12 145:14
156:17,18
**rules (16)**
6:16 26:20,25 27:6
28:8,25 29:6,8,17
29:17 58:14 60:5
70:17 128:20,20
145:21
**run (8)**
55:8 61:13 64:6 85:11
97:3,6 142:3 160:22
**running (1)**
59:24 92:23
**runs (2)**
30:7 64:7

S

**safe (1)**
51:5
**Sal (1)**
103:15
**salary (2)**
140:2,4
**sale (5)**
39:6 42:11 44:12
96:16 114:3
**sales (1)**
29:13
**Salvatore (1)**
103:4
**satisfy (2)**
122:13,23
**saw (3)**
19:19 135:17,24
**saying (9)**
36:13 55:8 78:4 97:4
104:4 105:8 107:20
118:5 125:24
**says (15)**
50:22,24 80:12,18
84:10 92:16 96:10
96:23 97:3 107:4,4
124:14 152:22
164:2,13
**scenario (3)**

122:18,24 129:8
**schedule (2)**
100:22 114:5
**schedules (2)**
18:19 100:20
**SCHILLER (1)**
3:11
**scope (2)**
121:3,6
**Scott (4)**
35:23 36:16 57:19,21
**scratch (1)**
99:19
**scrub (4)**
159:12 165:25 166:11
167:19
**scrubbing (1)**
94:23
**sealing (1)**
5:7
**SEC (23)**
9:13 11:13 12:13
13:16 26:15,20 27:6
27:10 28:16,21
29:25 58:14 60:5,10
65:16 70:2 73:17
106:4,20 108:25
129:5 130:7,8
**second (2)**
125:9 134:24
**Secondly (1)**
74:6
**section (2)**
92:24 163:10
**secure (1)**
18:17
**securities (15)**
10:19 15:16 72:21
122:12 124:20,21
125:4,12 126:4
129:12,20 130:3,13
130:17 162:25
**security (1)**
125:25
**see (23)**
33:5 46:5 64:25 73:4
73:10,20 77:10,21
80:25 85:4 92:9,18
100:23 101:21
103:13,19 110:5
113:23 119:7
126:16 134:15
136:3 163:22
**seeing (4)**
61:25 101:15,16
134:2
**seeking (1)**
76:9
**seen (23)**

21:19 34:13 58:13
93:23 100:14,16,17
100:19,21,22
101:14 110:7,10
112:22,23,24
113:19 135:13
162:18,19 163:17
163:19,21
**seg (1)**
18:17
**segregated (1)**
106:7
**senior (15)**
16:22 23:4 24:23
34:20,21,23 35:19
39:3,4 64:24 75:22
102:16 140:18
142:2,4
**sense (6)**
27:3 80:2 132:5,6,13
134:3
**sent (6)**
101:7,7,9,10,17
103:24
**sentence (20)**
45:24 48:2 52:2 74:3
78:10,11 81:3 84:16
84:20 96:16 119:20
124:16,23 125:9,17
125:21 126:8,13,13
152:20
**sentences (1)**
77:24
**separate (2)**
20:7 69:19
**September (67)**
30:25 31:25 45:2,12
45:13 46:3 50:15
63:4,8,10 64:11
65:4 66:8 73:15,19
79:16 80:21 83:23
84:11 88:11 93:12
93:20 94:3,14 96:17
96:20 97:13 98:9
99:16,24 104:21
105:3,16,24 106:18
106:25,25 108:4,20
109:6 114:15
115:10,19 119:3,4
121:12 134:16,16
134:19 136:10,18
136:20 137:4,5
148:7,15 149:17,20
150:7,7,8,14,15
156:5,6 160:20,21
**Series (6)**
7:21,21,21,25,25 8:2
**services (4)**
24:10 115:25 116:11

117:2
**set (4)**
10:14 94:6 170:11,20
**setups (1)**
89:17
**seven (1)**
16:21
**shaking (1)**
7:5
**shape (1)**
138:6
**shared (2)**
51:23 139:10
**sharing (1)**
141:18
**sharp (4)**
19:7,12,15,19
**sheet (8)**
14:13,16,17 18:16
66:12,14,18 171:2
**short (3)**
54:21 55:2 57:2
**shortfall (1)**
94:5
**show (3)**
14:4 92:15 136:9
**showed (3)**
19:15 135:12 150:23
**shown (2)**
135:19 162:7
**SIFMA (17)**
58:25 59:23 69:10,12
69:14,23,24 70:24
71:2,4,8,13,19,25
72:8,9,10
**signed (2)**
5:17,19
**significant (8)**
68:8,9 80:23 82:5
87:3,6 91:11 97:7
**similar (4)**
27:25 77:6 141:16
155:15
**similarly (1)**
60:10
**simple (1)**
134:4
**single (5)**
18:14 56:11,16 94:25
95:11
**SIPA (11)**
4:5 6:10 72:6,12,21
72:25 156:15,19
159:24 160:10,16
**SIPC (3)**
72:15,18 123:2
**sir (193)**
7:22 8:5,15 9:19

12:11,17 13:5,11,23
14:14,23 15:5,10,17
15:20,23 16:7,11,18
16:20 17:11,16
18:12,20 19:6,12
20:12,17,23 21:10
21:11,20,23 22:12
22:23 23:10 24:8,12
25:14 26:17,23 27:6
27:22 28:10 29:15
29:23 30:8 31:9
34:4,13,16 35:11,17
35:21 36:17 37:2,9
37:18 38:3,12,19
39:2,24 40:17 41:15
42:8,16,21 43:19,23
44:13,23 45:8,9,17
45:19 46:18,21
47:23 48:21 49:22
50:18 55:20,25
56:13 59:19 62:6
63:20,25 64:22
65:21 66:5,11,13,22
67:13 68:5 69:7,14
69:16 70:21 72:12
73:4,13,23 74:15
75:18 76:8,14,18,24
79:13 80:25 82:16
83:16,18 86:22
88:10 92:25 93:7,10
93:25 94:10 95:18
96:4,14 97:12,22
98:7,23 99:5,7,12
99:20 100:15 101:9
102:20 104:25
106:10,13,16 107:6
109:3,18 110:5,13
110:19 111:3,19
112:7,14,25 113:4
114:13 115:7,15
118:25 119:10,16
119:20 120:4,9,11
121:7,17 122:24
124:3,5 126:3
130:21 131:10,24
132:6,19 134:19,24
134:25 135:4,23
136:4,9,15 137:9
162:8,14 163:25
165:7 166:3,21
167:8,14,15,25
**sit (1)**
47:16
**sitting (1)**
120:11
**situation (1)**
87:7
**size (2)**
66:4 86:15

**sloppy (1)**
154:2
**slowly (1)**
133:2
**smaller (3)**
66:7,10,15
**Society (2)**
69:12 72:6
**solely (1)**
147:11
**solution (2)**
85:24 88:2
**somebody (3)**
64:7 103:5 107:24
**soon (1)**
8:2
**sorry (36)**
11:2 12:9 13:7 31:11
45:6 63:8 67:3,8
70:22 71:9 80:15
89:3,8 90:22 92:20
96:4,15 98:14 105:4
107:12 110:15
111:7 112:17
120:20,21 133:6
134:22 137:24
148:10 150:5 158:3
159:3 160:6 161:13
163:6 164:17
**sort (2)**
7:7 158:12
**sound (1)**
72:22
**sounds (4)**
87:5,5 131:23 133:18
**SOUTHERN (1)**
1:3
**speak (10)**
22:6 25:3,6,23 33:3
42:11,25 76:5 79:19
85:21
**speaking (4)**
42:4 43:13 61:4 83:9
**specific (7)**
42:25 44:21 65:7 80:7
129:5 134:2 144:21
**specifically (9)**
48:24 74:11 79:23
95:21 114:4 118:15
118:20 132:5 155:7
**specifics (2)**
79:19 94:19
**specified (2)**
99:13 131:4
**speed (1)**
126:17
**spend (2)**
90:8,8

**spent (2)**
48:3 163:11
**spoke (6)**
21:24 22:19 54:13,18
82:25 145:3
**spoken (7)**
24:25 25:9,10,13 35:3
40:23 61:16
**spring (1)**
81:15
**ss (1)**
170:4
**staff (1)**
98:10
**stages (1)**
135:23
**stands (5)**
12:19 18:13 24:8
72:13,14
**Stanley (1)**
25:25
**start (6)**
20:17 46:19 97:24
99:19 120:3 126:15
**starting (1)**
7:17
**state (6)**
2:13 81:22 159:22
160:9 170:3,9
**stated (2)**
92:19 100:3
**statement (8)**
47:3 110:17 111:12
113:22 154:7,11
164:19 165:3
**statements (2)**
87:20 109:20
**STATES (1)**
1:2
**status (2)**
136:24 137:3
**step (1)**
88:16
**stepped (1)**
11:24
**steps (4)**
68:6 69:2 73:25 89:20
**Sticking (1)**
164:15
**STIPULATED (3)**
5:5,9,15
**stock (18)**
10:5,5,8,10 17:15
18:6 19:5,21 28:21
49:6 74:12,22 85:17
86:8,10 87:12,23
88:12
**stop (1)**

124:22
**stopping (1)**
51:12
**store (1)**
96:19
**stored (1)**
73:17
**story (1)**
65:9
**Street (1)**
3:6
**street-wide (1)**
101:6
**structure (6)**
38:5,12,19 138:18,23
141:17
**Stucchio (1)**
56:21
**sub (1)**
48:13
**subject (3)**
32:12 91:20 104:11
**submitted (2)**
18:8 62:2
**Subscribed (1)**
168:10
**subsequent (1)**
64:3 113:24
**subset (1)**
74:10
**subsidiary (2)**
49:6 74:13
**substance (1)**
96:21
**substantial (3)**
80:22 82:21 83:25
**Sudarsan (11)**
102:3 103:13,23
151:13,20 152:21
155:3,4,11 162:25
164:3
**Sudarsan's (3)**
154:6 155:7 164:19
**Sudarson (2)**
117:6 165:9
**suggests (1)**
77:3
**sum (2)**
96:21 123:13
**summer (1)**
103:2
**supervise (2)**
11:17 64:20
**supervised (4)**
9:20,22 14:3 16:10
**supervising (1)**
13:5
**supervision (1)**

17:9
**supervisory (2)**
16:6 65:22
**supply (1)**
118:7
**support (2)**
9:9 122:19
**supporting (3)**
88:25 89:5,12
**suppose (1)**
107:23
**sure (38)**
7:3 8:3 9:11 10:10
11:7 20:4 24:7
26:24 27:19 31:13
32:23 51:8,16 53:21
55:13 60:23 82:9
86:19 98:16 100:19
104:15 107:14
116:9 123:4,20
125:23 131:7,8
132:11,13 146:23
152:9 162:19
163:17,19,20 167:3
167:5
**surveillance (3)**
17:21,22 18:4
**swings (1)**
19:19
**sworn (5)**
5:16,19 6:4 168:10
170:12
**system (14)**
40:12 41:25 55:16
84:24 85:21 90:12
91:17 96:18 101:2
104:18 110:25
143:24 156:8,8
**systematic (2)**
79:9 161:5
**systematically (2)**
79:14 85:13
**systemic (2)**
167:10,14
**systems (36)**
31:5 40:8 41:9 45:12
45:22 46:3,13,17,17
47:5,20 49:21 50:11
50:20 55:16 73:16
80:13,20 84:22,25
85:17 86:4,9,11
96:19 109:21,23
111:8 138:14 143:3
143:4,6,10,11 144:8
156:10
**S-I-F-M-A (1)**
58:25
**S-I-P-A (1)**
72:13

**T**

**tab (1)**
162:14
**TABATABAI (1)**
4:9
**take (21)**
6:25 8:9 10:10 48:15
51:13 65:10 70:3
84:13 88:6 91:20,22
94:15 95:3,13 96:14
120:16 121:24
124:10 129:7
153:21 162:17
**taken (1)**
69:2
**talk (11)**
22:17 54:11,14 57:21
57:24 58:3 154:17
154:20 155:4,22
156:2
**talked (2)**
57:14 101:24
**talking (11)**
9:11,16 33:14 46:9,15
74:11 103:23
119:24,25 133:14
150:19
**talks (2)**
55:6 93:23
**team (48)**
15:9 20:7,8,12 21:24
22:6,11 23:7,10,13
37:16 40:14 41:2
42:2,4 46:15 47:2
47:17 56:21 62:8,17
62:24 64:7,8,24
65:15 66:16 74:5
79:4 100:5 110:25
112:5 113:25 114:9
117:5,7,8 118:2,8
129:10,10 138:15
139:9 142:3 151:10
152:17,18 166:20
**teams (4)**
59:24 61:13 64:6,6
**tell (29)**
6:12 7:16 14:11 23:18
28:15 41:4,13 45:21
58:11 71:18 79:20
79:24 81:24 82:3,5
82:11 96:10 97:25
104:2 113:15 114:3
125:8 126:20,25
128:25 129:17,25
138:21 162:18
**telling (6)**
33:6 38:24 49:16 60:6
75:5 83:19

**tens (1)**
86:17
**term (1)**
73:22
**terms (15)**
9:15 10:7 14:8,9
18:10 24:6 57:4,5
66:12,15 74:16,17
129:18 133:16
134:4
**terrible (2)**
140:11 148:12
**Terry (3)**
3:8 35:23 36:15
**test (2)**
7:8 48:16
**testified (12)**
6:4 26:3 37:21 83:4
83:15 107:8 111:3
136:19 145:13
146:21 154:17
162:23
**testify (4)**
47:23 76:10,11
113:16
**testimony (20)**
21:10,12 26:17 34:4
37:8 41:15 45:8,16
45:17 49:9 55:20
75:24 90:2 96:2
98:5 115:15 131:10
163:4 165:7 170:13
**Thank (2)**
76:21 127:5
**theme (1)**
93:3
**theory (1)**
123:3
**thereto (1)**
110:3
**they'd (1)**
65:7
**thing (3)**
25:22 76:17 160:7
**things (13)**
7:6 19:8,10 25:12
29:9,13 54:25 68:14
70:16 75:13 89:17
108:11 114:13
**think (21)**
24:9 25:18 42:23 43:8
59:22 76:8 81:17
86:21 89:24 90:16
100:9,24 111:16
114:20 119:19
123:2 131:8 134:6
150:19 153:7
161:16
**third (7)**

55:12 76:22 92:6
95:10 125:21 126:5
126:8
**third-party (2)**
56:3 87:20
**thousands (2)**
86:17 88:4
**three (7)**
11:11 17:25 21:13
46:13 76:18 135:24
136:3
**threshold (1)**
84:10
**tie (2)**
87:20 91:7
**time (51)**
5:12 7:9 10:2 11:15
13:11,25 18:5 19:23
20:3 32:15 33:22
35:7 50:4 51:22
52:16 53:17 54:9
56:20 57:15 62:24
63:18,21 65:3 66:21
68:8,15 70:5,5
81:13 82:12,15 88:9
90:9,23 95:10 96:14
97:7 101:17 104:24
106:12 108:23
115:24 116:10
129:7 130:24 131:4
131:14 137:9 141:5
151:19 163:11
**times (5)**
32:5,18 36:4 139:14
139:15
**time-consuming (1)**
87:9
**title (9)**
10:24 11:5,8 12:17
15:20 16:20 17:16
102:14 113:12
**today (14)**
20:19 30:7 33:15,18
40:9 62:19 63:25
65:8,25 102:20
120:11 142:20
145:13,23
**Tokyo (1)**
12:12
**told (11)**
23:19 27:15 36:2
41:16 53:23 55:3,22
56:7 80:6 141:11
143:23
**Tony (1)**
56:21
**topic (2)**
26:3,12
**topics (1)**

25:15
**total (1)**
92:22
**trades (1)**
14:9
**training (1)**
28:13
**transaction (5)**
39:7,10 42:11,13
96:17
**transactions (1)**
149:5
**transcription (1)**
171:8
**transfer (1)**
133:8
**transferable (1)**
130:18
**transferred (2)**
132:20 146:17
**transition (2)**
24:9,10
**treat (1)**
29:8
**treatment (5)**
25:21 26:2,11,24
29:11
**trial (2)**
5:12 74:12
**true (6)**
57:18 112:7 130:13
130:17 155:3
170:13
**trustee (53)**
4:5 6:11 23:24 24:5
24:14,17 32:15,17
32:18 33:12,19,24
36:6,24 38:14 41:11
41:11 47:22 49:15
52:19 80:12,19
83:21 92:7 93:3,8
93:10 97:3,6 98:10
115:22,24 116:11
116:16 118:25
119:6,18,19,20,22
139:3,22 140:7
141:19 143:16
144:7,16,17,23
151:12 154:25
155:2,9
**trustee's (7)**
23:25 32:6 76:23 77:2
77:13 78:5,13
**truth (1)**
134:5
**try (8)**
6:20 29:21 93:16
94:24 95:10 111:17
135:23 163:8

**trying (4)**
27:22 43:19,20 91:18
**TSA (96)**
22:21 24:5,8,20 32:5
32:11,16 33:13,19
33:23 34:5,7,13,18
34:22,25 35:6,8,11
35:18,25 36:5,8,19
36:24 37:3,15,22,24
38:2,6,7,12,19,22
39:8,11,14,22 40:4
40:20,22 41:5,7
53:9,14,18,19,24
54:2,4 55:5,21 56:9
57:14,17 81:9,19,22
82:2 83:18,21 84:8
100:5 115:16 116:3
116:13 138:18,23
138:24,25 139:11
139:14,19 140:9,14
140:22 141:4,7,10
141:16 142:7
143:23 151:10,14
151:17,21 152:16
154:21 155:5,8,13
155:19,21,24 164:5
**TSA's (2)**
82:22 140:19
**Tuesday (3)**
157:12,14 158:9
**tune (1)**
107:9
**turn (8)**
73:3 76:12 92:5,14
96:9 118:22 134:13
162:14
**turned (1)**
14:4
**turning (3)**
73:12 76:22 136:8
**two (13)**
46:3 47:5 77:23 104:4
105:7,9 106:7,8
108:10 113:18
134:7,15 135:3
**two-person (1)**
14:4
**two-year (2)**
53:11 55:4
**type (1)**
52:21
**types (1)**
25:21
**T.J (3)**
35:23 36:14 57:7

_____
U
_____

**UAG (1)**
12:9

**ultimately (2)**
68:18 157:17
**Um-hm (10)**
38:25 60:7 67:12 78:7
80:17 102:2 103:21
134:17 165:21
166:2
**unable (1)**
153:18
**unclear (1)**
141:2
**unconditionally (1)**
122:13
**underlying (2)**
92:13 156:13
**underneath (1)**
113:17
**understand (38)**
7:12 9:16 27:22 29:18
29:19 35:10 39:21
40:24 41:15,21
43:18,20 44:13 45:5
46:18,21 49:22
61:19 67:7,9,13
68:12 72:11,12 76:7
76:10,11 83:10 89:8
90:17 99:20 103:25
123:7,8 125:11
149:23 151:16
159:3
**understanding (41)**
24:11 32:16 34:10,17
37:15 42:13,16
43:23 44:2 46:24
54:3 55:11 56:8
66:22 67:18 75:10
75:11,18 81:8
103:22 105:25
106:2,10 110:22
112:11 115:20
129:23 131:9
136:15 138:24
139:20,22 140:5,7
141:8 143:16,18
145:2 146:12 147:5
155:20
**understandings (1)**
140:9
**undertaken (4)**
55:21 81:25 94:9
136:21
**undertaking (5)**
80:22 82:6 87:3 91:10
97:8
**undertook (1)**
95:8
**unfettered (1)**
116:25
**uniform (1)**

18:14
**unique (1)**
27:24
**UNITED (1)**
1:2
**University (1)**
7:19
**unlimited (2)**
80:13,19
**unwind (1)**
122:21
**update (2)**
85:17 86:8
**updates (1)**
87:23
**URQUHART (1)**
3:18
**use (6)**
9:15 51:12 101:6
115:25 116:11,16
**user (1)**
85:17
**usually (1)**
153:18
**utilizes (1)**
47:18
**U.S (18)**
15:19 17:2,22,23 18:4
24:17 29:24 33:21
35:24 38:17 63:22
65:16 73:15 81:20
129:21 130:3,9
151:9

_____
V
_____

**vacation (1)**
11:23
**variance (1)**
19:12
**variances (1)**
19:8
**variety (1)**
18:25
**various (4)**
27:14 146:8,15
154:15
**vehicle (1)**
6:14
**verbal (2)**
7:4 36:3
**verify (3)**
77:14 78:6,13
**verifying (1)**
78:21
**version (1)**
162:6
**versus (1)**
10:13

**vice (5)**
12:20 15:21 16:22
22:10 102:16
**view (2)**
94:8 161:6
**Vinella (3)**
61:17,19 77:3
**Vinella's (1)**
62:3
**VP (1)**
65:19

_____
W
_____

**wait (2)**
6:19 83:11
**waived (1)**
5:8
**wall (9)**
33:6 34:5,9 140:21,24
141:3,6,12,15
**want (4)**
27:20 121:24 131:8
140:25
**wanted (1)**
79:10
**wants (1)**
27:20
**Washington (1)**
3:14
**wasn't (3)**
80:7 117:19 167:21
**way (22)**
26:5 41:5 44:9 52:3
66:10,11,13,17
79:12 87:5 88:3
89:19 95:19 99:11
119:14 120:12
126:16 135:21
138:6 146:10 163:8
170:17
**wealth (6)**
42:23 43:5,12,24
112:4 146:22
**Wednesday (3)**
157:16 158:11 166:24
**week (9)**
64:23 78:25 79:15
80:9 156:22,25
157:4 159:23,23
**weekly (4)**
16:8 42:2 47:18
123:10
**week-to-week (4)**
13:13 78:23 79:3
166:21
**Weiss (2)**
16:13 28:4
**welcome (1)**

100:8
**went (2)**
46:14 138:4
**weren't (2)**
108:16 146:23
**whereof (1)**
170:19
**Wisconsin (1)**
3:13
**withdraw (3)**
147:22 157:3 158:21
**withdrawn (9)**
21:11 33:6 41:14
52:14 58:7 62:22
66:6 111:18 140:12
**witness (105)**
3:12 6:3 92:17 93:14
93:21 94:7,17 95:6
95:16 96:12 97:16
98:4,13,18 99:2,8
99:17 102:9 104:12
104:22 105:5,20
106:21 107:2,11,18
108:6,10,21 109:8
109:17 110:15,20
111:11 112:15,18
113:5,20 115:12
116:4,14 117:3
118:4 119:17,21
120:15,19 121:8,13
122:6,16,25 123:19
123:25 124:4,15,25
125:10,18,22
126:10,22 127:3,8
127:13,20,24 128:5
128:9,15,22 129:3
129:14,22 130:4,12
130:15,19,25
131:16,22 132:3,10
132:17,25 133:13
133:24 135:18
136:12,22 137:6,11
138:11 163:3 164:6
164:12,16 165:13
167:16 168:2 169:3
170:10,14,19 171:5
**wonder (1)**
129:17
**words (5)**
32:24 35:25 52:11
90:7 95:8
**work (35)**
24:13,16,17 32:6
33:18 36:4,5,23
38:16,16 52:19,22
56:21 69:22 81:18
82:22 83:17 95:20
120:25 139:6,9,14
139:15,18 143:17

143:23 144:19
151:8,16 154:21
155:4,23 164:4,7,10
**worked (27)**
8:16,17 16:13 27:15
33:23 34:3 52:11,12
56:25 57:2 75:10,20
94:18 115:16 117:4
117:25 138:4 139:2
140:22,23 141:9,10
151:14,21 155:8,13
155:19
**working (14)**
14:2 28:23 32:20 38:7
53:10,10,18,24
81:19 83:21 84:8
108:9,12 155:15
**workings (1)**
37:22
**works (12)**
33:12,20 40:11 58:23
69:21 85:21,22 86:6
102:5 133:3 141:4
156:17
**wouldn't (5)**
115:16 159:9 165:22
166:8 167:7
**write (2)**
92:6 118:25
**writes (11)**
77:2 103:13 125:16
125:21 127:7,16,19
127:23 128:3,8,13
**written (2)**
163:22,25

_____
**X**

**x (3)**
1:4,10 105:9

_____
**Y**

**Yamiachi (5)**
12:8,15 14:7,21 28:9
**yeah (19)**
15:2,12 44:15 45:5
57:20 59:9 68:13
78:3 81:16 91:15,22
94:8 117:4 120:25
123:11 132:18
133:16 138:20
148:12
**year (4)**
10:18 14:25 51:3
70:25
**years (6)**
6:14 11:11 16:21
56:25 81:9 138:3
**York (26)**
1:3,13,13 2:10,10,13

3:7,7,21,21 4:7,7
8:21 10:23 12:12,13
12:14 16:17 17:15
18:5 19:5,21 28:21
170:3,5,9
**Yu (1)**
64:4
**Yup (4)**
16:15 103:10,12
123:11
**Y-a-m-i-a-c-h-i (1)**
12:10

_____
**0**

**012 (4)**
143:13,15 144:2,18
**08-13555(JMP) (1)**
1:7
**09 (4)**
53:21 101:20 102:8
103:11
**097 (1)**
104:15

_____
**1**

**1 (4)**
62:11,13 70:16 171:7
**10 (1)**
157:14
**100 (5)**
40:13 42:14 43:9
111:24 114:7
**10004-1482 (1)**
4:7
**10010 (1)**
3:21
**10017-6702 (1)**
3:7
**11 (1)**
1:6
**11:00 (1)**
2:6
**137 (1)**
169:5
**14 (4)**
21:8 73:6 135:5,8
**15 (1)**
79:16
**15c3 (12)**
28:6 61:10 70:15
74:14 95:12 99:15
108:14 115:3,18
133:23 138:5 150:4
**15c3-1 (2)**
11:13 58:14
**15c3-3 (57)**
13:17 18:22 19:2,22
24:3,4,21,23 27:10

27:23 28:5,17 29:25
30:24 31:18,24
43:13 45:13 46:4
47:6 48:5 60:5,10
61:8 63:9 64:10
67:5,15 68:7 69:23
72:2 73:18 75:22
95:2 97:6 99:23
116:19 117:22
118:19 121:11
122:4,10 123:5,9
129:2,12,19 131:12
137:19 138:10
145:14,24 146:11
156:3,19 158:15
160:20
**15(c) (1)**
9:13
**15-3-3 (1)**
43:13
**16 (8)**
124:10,14,24 125:17
125:21 126:9 128:8
128:14
**162 (1)**
169:4
**17 (11)**
45:12 106:25 119:3
126:19 134:16,19
136:10,18 150:14
156:6 160:21
**17th (1)**
137:4
**18 (5)**
99:4,5 105:4 126:24
161:18
**19 (43)**
30:25 31:25 45:2,13
73:19 83:23 84:11
88:11 93:12,20 94:3
94:14 96:20 97:13
98:9 99:16,24
104:21 105:4,16,24
106:18,25 108:4,20
114:15 115:10,19
119:4 121:12 127:6
127:7 134:16
136:20 137:5 148:7
148:15 149:17,20
150:7,15 156:5
160:20
**19th (2)**
80:21 109:6
**1983 (3)**
8:6,17 27:15
**1990 (2)**
8:17 10:18
**1993 (2)**
11:4 12:6

**1995 (5)**
12:16 14:21,24 15:5
15:14
**1998 (3)**
8:2 15:18 16:11

_____
**2**

**2 (2)**
125:17 171:7
**20 (6)**
14:12,16 17:22
127:11,16 169:9
**20015 (1)**
3:14
**2005 (2)**
16:19 17:13
**2007 (3)**
17:10,14 62:11
**2008 (61)**
30:25 31:25 45:3,12
45:13 50:15 51:7
63:4,8,10 64:11,12
65:4 66:8,19 73:16
73:19 79:16 84:11
88:12 93:12,20 94:3
94:14 96:17 97:13
98:9 99:16,24
104:21 105:4,16,24
106:18,25,25 108:4
108:20 109:6
114:15 115:10,19
118:14 119:3,4
121:12 134:16,19
136:18,20 137:4,5
148:7,15 149:17,20
150:10,15 156:6
160:21 163:2
**2009 (11)**
21:7 62:11,13 70:23
71:16 100:25
101:18 102:15
103:2 124:8 162:21
**2010 (8)**
1:14 2:5 21:9 70:25
71:20 81:15 168:12
170:20
**21 (2)**
127:19,23
**213 (9)**
103:19 104:5 106:18
107:10,17 152:24
154:9 164:22
165:11
**22 (10)**
50:15 96:17 128:2,4,6
128:6,8,14 150:8,10
**22nd (1)**
3:20
**222 (1)**

3:6
**224 (6)**
42:2 110:25 147:12
147:13,17 149:11
**24 (4)**
1:14 2:5 7:21 8:2
**24th (1)**
170:20
**25 (7)**
138:3
**255 (1)**
104:8
**26 (1)**
136:14
**27 (2)**
7:21,25
**28 (2)**
162:14,15
**29 (3)**
96:15,15 161:18
**293 (1)**
104:17

_____
**3**

**3 (4)**
70:16 73:4 92:5 171:8
**3-3 (20)**
9:13 46:10 47:17 55:7
55:8,19 56:12,16,23
57:5 60:21,24 61:2
65:18 68:16,21 70:4
70:19 85:9 88:16
**31 (5)**
76:14 77:24 78:11
93:5 97:2
**31568 (1)**
1:18
**32 (5)**
80:12,16,18 84:9 93:2
**33 (1)**
161:18

_____
**4**

**4 (3)**
109:19 110:17 146:18
**41st (1)**
3:6
**468 (1)**
104:6

_____
**5**

**5 (7)**
21:7 54:10 124:8,11
126:20 162:13
169:4
**51 (1)**
3:20
**5301 (1)**

```
  3:13
590 (6)
 21:3,6,16 124:2,5
  162:7
599 (12)
 100:7 106:19 109:7
  115:11 121:21
  124:4 135:13
  150:23 163:13,14
  164:17,19
599A (3)
 163:10,13 164:15

              6
6 (3)
 118:22 120:4 134:13
6/24/10 (1)
 171:4
693 (11)
 21:4,7,15 73:7 76:13
  92:15 96:10 99:6
  135:9 136:9 161:17

              7
7 (4)
 7:21,25 45:10 99:10

              8
828 (5)
 20:14,24 21:15 92:3
  169:9

              9
9/19 (2)
 107:4 109:12
9/19/08 (1)
 103:16
9/19/2008 (2)
 95:2,12
```