**EXHIBITS J-L OF DECLARATION OF NEIL J. OXFORD
IN SUPPORT OF THE MEMORANDUM OF
MOVANTS IN OPPOSITION TO THE MOTION IN LIMINE OF BARCLAYS
CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF
DANIEL MCISAAC REGARDING LBI'S OBLIGATIONS UNDER SEC RULES 15c3-1,
15c3-3 AND/OR THE SECURITIES INVESTOR PROTECTION ACT**

# EXHIBIT J

## BARCLAYS CAPITAL INC.

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery. All references herein to the Original Agreement are to the conformed copy attached hereto of the hand marked Original Agreement.

      1.    Purchased Assets; Excluded Assets.

      (a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

      (i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

      (ii)    with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A previously delivered by Seller and accepted by Purchaser, (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

1





elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and (C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements;

      (iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

      (iv)    all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business); and

      (v)    any rights or interests Seller may have with respect to any escrow or other account established in connection with the Global Research Analyst Settlement entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or funds otherwise set aside for the procurement of independent research pursuant to the Research Settlement, but only to the extent that Purchaser is required to make payments in accordance with the Research Settlement as a result of its acquisition of LBI's investment banking and research operations.

      (b)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement).

      (c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement, and until any securities pledged as collateral under Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than those referred to in Section 1(a)(ii) of the Letter). Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The

reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes
any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets
in the Original Agreement is hereby amended to remove the following clause: "other than
customer account insurance supplemental to SIPC coverage included in the Business."

(d)    Sections 3 and 4 of the First Amendment are hereby deleted in their
entirety and shall be of no effect *ab initio*. LBI hereby instructs Purchaser to pay at the Closing
$250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for
deposit as collateral against LBI's obligations to DTC (including its affiliated clearing
organizations). Such collateral account shall be maintained in accordance with the agreement
among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)    Seller hereby represents and warrants to Purchaser that LB I Group Inc.
has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend
Analytics, Ltd., LB I Group Inc. no indebtedness.

2.    IMD Business. For purposes of the Agreement, the IMD Business
consists of the asset management and the alternatives – private equity businesses of Seller and
the Subsidiaries, but not the private investment management business of Seller and the
Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets
include the asset management business, the alternatives-private equity business and the CTS
(Corporate Cash) business. The private investment management business (other than the CTS
(Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets
shall include the assets of the Seller used exclusively in the PIM Business. The forgivable notes
issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset. Excluded
Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA
accounts for the benefit of clients of the PIM Business.

3.    Assumed and Excluded Liabilities. Clause (a) of the definition of
"Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the
Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in
the Original Agreement is understood as though it read as follows: "accounts payable incurred
in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller,
the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter
7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts
payable arising out of or in connection with any Excluded Contract), including, for the avoidance
of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but
uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities
described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities."
For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-
party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall
be "Excluded Liabilities."

4.    Consideration. The parties, after considering the available appraisal
information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue ,
the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the
aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission

and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

     5.     License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

     6.     Subordinated Notes of LBI.  The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

     7.     Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

     8.     Transfer of Customer Accounts.  All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser.  In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value.  Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

     9.     Deletion of Purchase Price Adjustment Provisions.  Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

     10.     Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

     11.     Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations

between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

14.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within
a commercially reasonable period of time following the Closing Date, negotiate in good
faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to
both Purchaser and Seller and subject to the terms of the applicable underlying lease,
pursuant to which a portion of the demised premises under such underlying lease (such
portion of the premises to be agreed upon by the parties) shall be subleased to (A) with
respect to the SF Property, the Purchaser, and (B) with respect to the LA Property,
Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of
Seller) or any person who purchases the IMD Business (provided that any such purchaser
entering into the sublease agreement as a subtenant shall be reasonably acceptable to the
Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and
the tenant under such sublease being referred to as the "Subtenant"), in each case, upon
such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided
that (1) the Subtenant shall pay rent and other charges under such sublease agreement
equal to its proportionate share of the rent and other charges payable by the Sublandlord
to the landlord under the underlying lease (which proportionate share shall be based upon
the relative square footage of the subleased space in proportion to the square footage of
the overall demised space under the underlying lease), (2) the term of the sublease
agreement shall be a period commencing on the Closing Date and ending on the day
immediately preceding the expiration date of the underlying lease (as the same may be
extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to
the demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces.  Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable premises security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to the

6

party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

7

21.    <u>Definition of Excluded Contract.</u> As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    <u>PIM Business Leases.</u>

(a) Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "<u>PIM Leases</u>"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b) Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "<u>New York Property</u>"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "<u>NY Sublease Premises</u>"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein. If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

23.    <u>No Overseas Assets.</u> Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies that would otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original Agreement as a result of being subject to governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time or until such assets and rights can be so sold. Except with respect to Purchased Intellectual Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

8

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _Howard A Breed_
Name: _Gerald S Carleen_
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


*[SIGNATURE PAGE TO CLARIFICATION LETTER]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:  Anson B. Frelinghuysen
Title:  as Counsel for James W. Giddens,
        Trustee for the SIPA Liquidation
        of Lehman Brothers Inc.

LB 745 LLC


By: _____
Name:
Title:

*[SIGNATURE PAGE TO CLARIFICATION LETTER]*

SEP-20-2008  19:48                                                      P.04/05
Sep-20-08 06:41P                                    516 365 0150          P.04
  SEP-20-2008  18:39

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC

By: _____
Name: *Mark Marcucci*
Title: *President*

# Schedule 1(a) - Excluded Real Estate Assets

### New York
1301 Avenue of the Americas - 7th Floor
1271 Avenue of the Americas
399 Park Avenue
605 Third Avenue
85 Tenth Avenue

### New Jersey
Jersey City - 101 Hudson St.
Livingston - 2 Peachtree Hill Road (Co-location)
Florham Park - 230 Park Avenue
Hoboken - 111 River Street (Sublease)

### Branches
Atlanta - 3414 Peachtree Road
Calgary - 150 Sixth Avenue, Suite 3370 - PetroCanada
Columbia - Little Patuxent Parkway (NB)
Dallas - 200 Crescent Court
Dallas - 325 N. St. Paul Street (former Crossroads)
Greenwich - 8 Sound Shore Drive
Houston - 600 Travis Street
Los Angeles - 10880 Wilshire Blvd.
Menlo Park - 3000 Sand Hill Road
Miami - 1111 Brickell Avenue - Barclay's Financial Center
Newport Beach - 680 Newport Center Dr, Suite150
Palm Beach - 450 Royal Palm Way (License agreement for 1,704 on 6th floor)
Philadelphia - 1735 Market Street - Mellon Bank Center
San Francisco - 555 California Street
Tampa - 401 East Jackson Street, 24th flr (NB)
Wilmington - 1000 West Street - Brandywine Building (LBB)

### South America Branches
Mexico City - Av. Paseo de la Reforma 265 Col. Cuauhtemoc

## Schedule 1(b) - Included Real Estate Assets

## SCHEDULE 1(C)

## PIM LEASES

| | City | State | Address | Tenant | Landlord |
|---|---|---|---|---|---|
| 1. | Atlanta | GA | 3414 Peachtree Road, NE | Lehman Brothers Inc. | Monarch Centre Associates, LLC |
| 2. | Dallas | TX | 200 Crescent Court | Lehman Brothers Inc. | Crescent TC Investors LP |
| 3. | Greenwich | CT | 8 Sound Shore Drive | Lehman Brothers Holdings Inc. | 8 Sound Shore Associates, LLC |
| 4. | Miami | FL | 1111 Brickell Avenue | Lehman Brothers Inc. | 1111 Brickell Office, LLC |
| 5. | Newport Beach | CA | 680 Newport Center Drive | Lehman Brothers Holdings Inc. | The Irving Company |
| 6. | Palm Beach | FL | 450 Royal Palm Way | Lehman Brothers Inc. | Palm Beach Centre 1, LLC |
| 7. | Philadelphia | PA | 1735 Market Street | Lehman Brothers Inc. | Nine Penn Center Associates, LP |
| 8. | New York | NY | 399 Park Avenue | Lehman Brothers Inc. | Boston Properties LP |

# EXHIBIT K

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4      ------------------------x

5      In Re:

6                               Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,   (Jointly Administered)

9               Debtors.

10     ------------------------x

11

12           DEPOSITION OF JONATHAN HUGHES

13               New York, New York

14               January 15, 2010

15

16     Reported by:

17     MARY F. BOWMAN, RPR, CRR

18     JOB NO. 27056

19

20

21

22

23

24

25

Page 2

```
1
2
3
4                January 15, 2010
5                10:15 a.m.
6
7
8        Deposition of JONATHAN HUGHES, held at
9   the offices of Hughes, Hubbard & Reed, LLP, One
10  Battery Park Plaza, New York, New York, before
11  Mary F. Bowman, a Registered Professional
12  Reporter, Certified Realtime Reporter, and
13  Notary Public of the State of New York and New
14  Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2                APPEARANCES:
3
4   JONES DAY, LLP
5   Attorneys for Lehman Brothers, Inc.
6       222 East 41st Street
7       New York, New York   10017-6702
8   BY:  ROBERT W. GAFFEY, ESQ.
9        BRIDGET CRAWFORD, ESQ.
10
11
12  BOIES, SCHILLER & FLEXNER, LLP
13  Attorneys for Barclays and The Witness
14      575 Lexington Avenue
15      New York, New York   10022
16  BY:  JACK STERN, ESQ.
17
18
19  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
20  Attorneys for the Creditors Committee
21      51 Madison Avenue - 22nd Floor
22      New York, New York   10010
23  BY:  ERIC KAY, ESQ.
24
25
```

Page 4

```
1
2                APPEARANCES:
3
4   HUGHES, HUBBARD & REED, LLP
5   Attorneys for the SIPA Trustee
6       One Battery Park Plaza
7       New York, New York   10004-1482
8   BY:  WILLIAM R. MAGUIRE, ESQ.
9        FARA TABATABAI, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1
2
3
4
5        IT IS HEREBY STIPULATED AND AGREED, by
6   and between the attorneys for the respective
7   parties herein, that filing and sealing be
8   and the same are hereby waived.
9        IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to the form
11  of the question, shall be reserved to the
12  time of the trial.
13
14
15        IT IS FURTHER STIPULATED AND AGREED
16  that the within deposition may be sworn to
17  and signed before any officer authorized to
18  administer an oath, with the same force and
19  effect as if signed and sworn to before the
20  Court.
21
22
23
24
25
```

J. HUGHES

MR. STERN:  Before we begin, let me just state for the record a point that we have discussed off the record.  Mr. Hughes is obviously a senior legal advisor to Barclays.  By designating Mr. Hughes as a 30(b)(6) representative to address certain topics, we do not intend to have Mr. Hughes testify to privileged communications.

He will testify to facts that he learned from various sources, including in some instances from counsel.  And that testimony concerning facts, even if facts learned from counsel, does not constitute a waiver of the attorney/client privilege. And if we can have an agreement on that premise, we can proceed.

MR. MAGUIRE:  I have no problem with that.

MR. GAFFEY:  That's fine with us.

MR. KAY:  Us as well.

- - - -

J. HUGHES

JONATHAN HUGHES,
   called as a witness by the Parties,
   having been duly sworn, testified as follows:
EXAMINATION BY
MR. MAGUIRE:

Q.   Mr. Hughes, good morning.  As you know, I am Bill Maguire.  I am going to be asking you some questions today.  If any question is unclear, that may happen, let me know and we will try to clear it up.

If you answer, we can assume that you understand the question?

A.   Absolutely.

Q.   If you need to take a break at any time, just let us know and we will find a convenient stopping point.

A.   Thank you.

Q.   I would like to start by asking you about the sale hearing, and that's the hearing that was held next door in the bankruptcy court on September 19, 2008.  Did you attend that hearing?

A.   I did not.

Q.   Can you tell me who attended that

J. HUGHES

hearing on behalf of Barclays?

A.   I think it included a number of Barclays employees and advisors.  Those that I recall would include Michael Klein, who I think you know is an external advisor to Barclays; I think Archie Cox; Jason White, who is a member of the legal department at Barclays Capital.

I think Alan Kaplan was there, too, another member of the legal department at Barclays Capital, and several representatives from Cleary Gottlieb, who were the principal legal advisors to Barclays Capital at the time, so including Lindsee Granfield and probably Vic Lewkow, L-E-W-K-O-W.

There may have been more.  I can't bring them to mind.  I don't think there were any other Barclays employees there.

Q.   Any other advisors or representatives?

A.   I'm struggling to remember any more. There may have been.

Q.   In preparation for this deposition, did you take any steps to refresh or to gather any information as to who was present at the sale hearing?

J. HUGHES

A.   I did, yes.

Q.   What did you do?

A.   I spoke to a number of people, including those that I have mentioned, including other employees of Barclays, to try to establish whether, in fact, they were there.

Q.   And is there anyone else that you learned was present?

A.   I can't now recall any additional names.

MR. STERN:  Can we go off the record for just a second.

MR. MAGUIRE:  Certainly.

(Discussion held off the record.)

MR. MAGUIRE:  So counsel is just going to give us a list.

MR. STERN:  Yes.  Mr. Hughes' recollection is correct, and in addition, in preparing for this deposition, we learned that for Barclays, Gerard LaRocca was present at the very beginning of the hearing, but he left early in anticipation of the possibility of needing to prepare for a closing.

Page 10

J. HUGHES

1
2         The individuals from Cleary were
3    Victor Lewkow, Lindsee Granfield, Lisa
4    Schweitzer, Joel Moss, Seth Kleinman.
5         In addition, there were attorneys from
6    Sullivan & Cromwell present, Rob Lacy, Jay
7    Clayton, Hydee Feldstein, Elizabeth Summers,
8    Ken Myers.
9         And I believe that's the complete
10   list.
11        Q.    Sir, what was Mr. Klein's role in
12   attending the sale hearing?
13        A.    I'm not sure he had a specific role
14   with respect to the hearing, but he had been,
15   throughout the course of that week and in the
16   period following the hearing, both an advisor to
17   Barclays and also one of the principal
18   negotiators of the transaction from the
19   Barclays' perspective.
20        Q.    And what about Mr. Cox's role?
21        A.    Mr. Cox was also one of the principal
22   negotiators of the transaction.  So again, would
23   have had an actual interest to be there.
24        Q.    And what about Mr. White?
25        A.    Mr. White was one of my colleagues in

Page 11

J. HUGHES

1
2    the legal function who was one of the legal
3    advisors to Barclays on the transaction.
4        Q.    And is the same true of Mr. Kaplan?
5        A.    Correct.
6        Q.    Can you tell me what you have learned
7    in terms of what explanations were made at the
8    sale hearing off the record about the
9    transaction?
10       A.    Are you asking me if I recall or if I
11   have learned that there were some off-the-record
12   descriptions of the transaction at the sale
13   hearing?
14       Q.    Yeah.  If I understood your earlier
15   answers correctly, you weren't personally
16   present.
17       A.    Correct.
18       Q.    The question is, what information does
19   Barclays have as to what was said off the record
20   at the sale hearing?
21       A.    Right.  My understanding is that there
22   was at one point in the proceedings an
23   off-the-record description, as you say, provided
24   to the assembled mass.  Whether it was aimed at
25   the entirety of the assembled mass of

Page 12

J. HUGHES

1
2    population, I don't know.
3         I believe it did include a
4    presentation, so to speak, of Weil Gotshal's
5    meaningful thoughts about certain aspects of the
6    transaction, and that that presentation -- or
7    the presentation included representatives of
8    Lehman, Weil Gotshal, the creditors committee,
9    the trustee, and possibly others who were also
10   in attendance.
11        Q.    And who gave that presentation?
12        A.    I believe it was Lori Fife who was a
13   partner or is a partner at Weil Gotshal, I
14   believe.
15        Q.    Anyone in addition to Ms. Fife?
16        A.    I don't think that I have ascertained
17   with any certainty that anybody else made any
18   representations.  It's possible that there were
19   other partners of Weil Gotshal that also
20   participated in it.  But the recollections are
21   not all abundantly clear.
22        Q.    But the efforts that you have gone to
23   as Barclays' designated 30(b)(6) representative
24   are that Barclays is not aware of anyone else
25   who spoke other than Ms. Fife in this

Page 13

J. HUGHES

1
2    off-the-record presentation?
3        A.    There are some recollections that
4    Michael Klein may have also discussed certain
5    aspects of the transaction with similar
6    groupings.  Whether it was part of that same
7    presentation or whether it was different, I
8    haven't been able to establish.
9        Q.    Anyone other than Ms. Fife and
10   Mr. Klein?
11       A.    Not that I'm aware of.
12       Q.    Did you speak with Mr. Klein about any
13   off-the-record discussion?
14       A.    I have spoken to Mr. Klein about that,
15   yes.
16       Q.    And what did he tell you?
17       A.    I think it's fair to say his
18   recollection was not precise, which is why a
19   moment ago I mentioned that not all
20   recollections were clear.
21       Q.    Can you tell me what is the best
22   recollection that you were able to get as to
23   what Mr. Klein had said?
24       A.    It is hard, it is hard to be clear
25   about it, because I would be repeating what were

J. HUGHES

1  answers from Mr. Klein that weren't sufficiently
2  certain for me to be able to represent exactly
3  what it is that he had said.
4      Q.   If you could tell me what you were
5  told.  I understand there may be some
6  uncertainties, but just tell me what it is that
7  you were told about what he said, whether he
8  told you or anybody else remembers him saying
9  it.
10     A.   The best that I could say is that
11  while Mr. Klein didn't have a strong
12  recollection of the events, that the -- there
13  was a recollection that he had referred to
14  certain changes to some aspects of the
15  negotiations that had happened earlier in the
16  week, and that Mr. Klein had described some of
17  those to people at court at that time, during
18  that after -- late afternoon, early evening.
19     Q.   Who had that recollection?
20         MR. STERN:  Hold on for a second.
21     I don't want you to intrude on the
22  conversations that Mr. Hughes had in
23  preparing for this deposition.  You can ask
24  him about the facts that he learned, but I

J. HUGHES

1  don't think you're entitled to know who told
2  him precisely what.
3      So I'll allow you to testify to facts
4  that you learned, as best you can recall
5  them, but not to the conversations that you
6  had in preparation for the deposition.
7         MR. MAGUIRE:  Well, I think it is a
8  fact as to who has a recollection, so I
9  think if the witness -- that's a factual
10  thing.  That's not a legal advice or
11  opinion.  So I think I am entitled to know
12  who had the recollection.
13         MR. STERN:  So what is the question?
14     Q.   So the question is, when you testified
15  about the recollection that somebody had, who
16  was the person who had that recollection?
17         MR. STERN:  I'll allow you to answer
18  that, if you remember.
19     A.   My best recollection is that Lindsee
20  Granfield and Jason White recalled some form of
21  discussion.  That's about as much as I can
22  remember from the various discussions that I
23  have had on the topic.
24     And as I say, those recollections were

J. HUGHES

1  uncertain, and as you can observe, my own
2  recollections are uncertain.
3      Q.   I just wanted to get the extent of
4  what information you were able to get in that
5  regard.
6      A.   I understand.
7      Q.   Did anyone recall what changes
8  Mr. Klein referred to?
9      A.   Again, with the same proviso as to
10  certainty, there were references to, principally
11  references to agreements made earlier that
12  Friday between Lehman Brothers and Barclays with
13  respect to what was subsequently termed
14  clearance box assets, as a very convenient
15  summary label, and another convenient summary
16  label, some 15c3 assets, each of which had been
17  the topic of discussions throughout the course
18  of the day.
19     Q.   And when you say with the same proviso
20  as to certainty of recollection, what do you
21  mean?
22     A.   I mean that because they were -- each
23  of those items were thought to be part of what
24  Mr. Klein may have described to people at court,

J. HUGHES

1  and that those -- that very description was not
2  certainly recollected that they are -- by
3  definition, the content of the description was
4  not certainly recollected.
5      Q.   Is what you gathered that certain
6  people thought those two subjects are what
7  Mr. Klein may have spoken about, or do they
8  actually recall that he had spoken about each of
9  those subjects?
10     A.   The latter.
11     Q.   And what did people recall him saying
12  about clearance boxes?
13     A.   That there had been a discussion and
14  an agreement about the clearance box assets, and
15  most importantly, I think, that Lehman Brothers
16  had represented to Barclays that there were
17  assets in what were termed the clearance boxes,
18  which assets were unencumbered assets of Lehman
19  Brothers, which were earlier in the day
20  identified as being capable of being delivered
21  in the transaction to Barclays.
22     Q.   And who recalled Mr. Klein saying all
23  that?
24     A.   The people that I have mentioned, so I

J. HUGHES

1 think Lindsee Granfield and Jason White.
2    Q.    And did Lindsee Granfield and Jason
3 White make clear to you that was a recollection,
4 a clear recollection that they had?
5    A.    Again, as I said earlier, I wouldn't
6 describe their recollections as certain
7 recollections, but that was my impression.
8    Q.    I'm sorry.  Your impression as --
9    A.    That they recalled, first of all, a
10 description of some facets of the transaction by
11 Mr. Klein, but -- and that that included
12 reference to the clearance box assets.
13    Q.    Did they tell you who was present when
14 Mr. Klein made his, I'll call it presentation?
15    A.    No.  Save that they thought it took
16 place at court.
17    Q.    Did anyone tell you that Mr. Klein
18 referred to any other changes in the
19 transaction?
20    A.    As I mentioned a moment ago, I think
21 it included the 15c3 assets.  I don't recall
22 that it included anything else.  So that's
23 possible that it did, but I don't recall
24 anything else.

J. HUGHES

1    Q.    Did anyone tell you that they recalled
2 Mr. Klein saying anything about margin?
3    A.    No.
4    Q.    Did anyone tell you that they recalled
5 Mr. Klein saying anything about clearing fund?
6    A.    No.
7    Q.    Is there anything else that anyone
8 told you they recalled Mr. Klein saying at the
9 sale hearing?
10    A.    Not that I recall.
11    Q.    Is there anything else that was --
12 leaving aside Lori Fife's presentation for right
13 now, is there anything else that you understand
14 was said off the record in court other than what
15 you have told us about Mr. Klein?
16    A.    No.
17    Q.    Can you tell us, please, what you
18 understand Lori Fife said off the record?
19    A.    The best I've been able to establish
20 is that Ms. Fife referred to some of her earlier
21 descriptions with respect to the transaction, by
22 which I mean descriptions made at the hearing
23 which preceded the sale hearing, namely on the
24 17th of September, and that she, both off the

J. HUGHES

1 record and then subsequently on the record, made
2 references to what were hers or Weil Gotshal's
3 impressions relating to certain changes to the
4 descriptions that had been made earlier at the
5 September 17 hearing.
6    Q.    With respect to the descriptions at
7 the earlier 17th hearing, that's with respect to
8 the -- that included the description of the
9 assets that Barclays was acquiring and the
10 liabilities that it was assuming; is that
11 correct?
12    A.    There was a description on the 17th, I
13 believe, with respect to the transaction as a
14 whole, and that that description included
15 reference to certain assets and certain
16 liabilities, yes.
17    Q.    And you understand that at the sale
18 hearing on the 19th, Ms. Fife referred back to
19 that?
20    A.    Yes.  In part, yes.
21    Q.    Let's just focus on the part where she
22 is referring back to the September 17 hearing.
23 You understand that the -- Ms. Fife had earlier
24 described the transaction as an acquisition, as

J. HUGHES

1 including an acquisition by Barclays of
2 70 billion dollars of long positions and the
3 assumption of liabilities that had a book value
4 that was described to the court on the 17th?
5    A.    I understand the description to have
6 been first and foremost a description of the
7 asset purchase agreement between Lehman Brothers
8 and Barclays, which at its heart was an
9 agreement pursuant to which Barclays was to
10 acquire the whole of the North American business
11 of Lehman Brothers, and any of the assets used
12 in connection with that business.
13        That rather broadly based transaction
14 was qualified in a couple of respects, one of
15 which was to recognize that certain assets were
16 to be excluded and equally certain liabilities
17 were to be excluded.
18        Ms. Fife, I believe, did refer to and
19 gave valuation numbers with respect to certain
20 assets and certain liabilities.
21    Q.    I'm going to just focus on that part
22 of your answer where the court was advised on
23 the 17th about the book value of certain assets
24 and certain liabilities.  OK?

J. HUGHES

1
2    A.    Um-hm.
3    Q.    Do you understand that Ms. Fife in her
4  off-the-record presentation on the 19th referred
5  back to the earlier disclosures to the court
6  about the book values of the assets and the
7  liabilities that were the subject of the
8  acquisition?
9    A.    I believe she did that both off the
10 record and on the record, yes.
11   Q.    And did her off-the-record discussion
12 include a description that the values had
13 changed from a book value that had been
14 described to the court on the 17th to a book
15 value on the 19th of 47.4 billion dollars?
16   A.    I do believe that she made reference
17 to the 70 billion dollars of long positions, and
18 that she also made a reference to a reduction in
19 that number.  It's not certain in my mind or I
20 believe in Barclays' mind how she arrived at
21 that different number, but I do believe she did
22 present a different number, both in the
23 off-the-record and in the on-the-record
24 description.
25   Q.    In the off-the-record description, she

J. HUGHES

1
2  also referred to a change in the book value of
3  the liabilities that Barclays was assuming?
4    A.    Again, I think it is more accurate to
5  state it that she referred to liabilities and
6  gave a number with respect to those liabilities
7  of I believe 45.5 billion, and that that was a
8  different number from the number mentioned on
9  the 17th.
10        Again, what Ms. Fife -- the basis upon
11 which Ms. Fife made those parts of her
12 presentation, I couldn't -- I couldn't
13 establish.
14   Q.    I am only asking you what she --
15 whether she used that number and whether she
16 was, in using that number, describing that it
17 was a change in what had earlier been described
18 as the book value of the liabilities that
19 Barclays was assuming.
20   A.    I don't think it is apparent to
21 Barclays either from the recollection of the
22 people that were there or from my own review of
23 the transcript that necessarily there was a
24 direct correlation between or a direct match
25 between the liabilities and the number described

J. HUGHES

1
2  and given on the 19th on the one hand and the
3  liabilities and the number given and described
4  on the 17th.
5    Q.    But in the off-the-record discussion,
6  Ms. Fife did give values both for the book value
7  of the assets and the liabilities, and they were
8  consistent with what she later said then in open
9  court on the record?
10   A.    I believe so, yes.
11   Q.    Is there anything else that you can
12 tell us about what Ms. Fife said in the
13 off-the-record discussion?
14   A.    I think there were certainly one or
15 two additional points that I believe she made.
16 First of all, I think she, and possibly others,
17 by which I mean other representatives of Lehman
18 Brothers in the form of Weil Gotshal partners,
19 did remind the court both on and off the record
20 that there was substantial uncertainty around
21 the values and numbers that were being referred
22 to, principally for two reasons.
23        One, the difficulty throughout the
24 course of the week that Lehman Brothers had had
25 in establishing accuracy around such numbers and

J. HUGHES

1
2  values, and as importantly, the presentation, as
3  I think we all now know, took place at a time of
4  remarkable uncertainty and difficulty with
5  respect to the markets as a whole.
6        The numbers that Ms. Fife referred to
7  with respect to the long positions, I believe
8  she also mentioned to the court that among the
9  major reasons for the reduction in values with
10 respect to those positions was the tremendous
11 market events in the intervening period, by
12 which I mean substantial amounts of those assets
13 were no longer available to Lehman, and I think,
14 in addition, the values of those assets had
15 depleted materially.
16   Q.    In your last answer, was that based on
17 the part of the proceeding at the sale hearing
18 that was on the record and before the judge, or
19 was it exclusively based on the off-the-record
20 discussion?
21   A.    It's a reference to both discussions,
22 but actually at least as much a reference to
23 what she said on the record as off the record.
24   Q.    Is there anything you recall her
25 saying off the record that she did not repeat on

J. HUGHES

1  the record?
2        MR. STERN:  I'll just object to the
3  form because it is not his specific
4  recollection.  He is testifying to
5  information he has learned.  He wasn't
6  present.
7        MR. MAGUIRE:  Absolutely.  Frankly --
8        MR. STERN:  With that objection, you
9  can answer.
10       Q.   So the record is clear, and we are all
11 on the same page, I'm asking you about something
12 where you weren't even present, so all of my
13 questions and I'm assuming all of your answers
14 today are going to be not just from your
15 personal knowledge but also informed by whatever
16 information Barclays has.  Is that your
17 understanding?
18       A.   Yes.
19            I don't recall any other aspect of the
20 presentation off the record that was not relayed
21 to the court on the record.  And I'm not -- I
22 don't recall having been told by others of
23 anything that was described off the record that
24 was not also described on the record.

J. HUGHES

1        Q.   And when you say you don't recall any
2  other aspect of the presentation, are you saying
3  in addition to what you understand Mr. Klein may
4  have said?
5        A.   I'm referring to the presentations
6  that Lori Fife made.
7        Q.   Yeah.  What I wanted to find out,
8  frankly, is what Ms. Fife said off the record
9  that was not said to the court on the record.
10 Is there anything that you can point to that you
11 understand, that Barclays understands Ms. Fife
12 disclosed to everybody in court off the record
13 and then failed to disclose to the court on the
14 record?
15       A.   I believe that Ms. Fife did not say
16 anything off the record that she did not also
17 say on the record.
18       Q.   Thank you.
19            Are you aware of any description of
20 what happened in court that was prepared by
21 Barclays or relayed to other people within the
22 Barclays organization by any of those who
23 attended the hearing?
24       A.   Sorry, could you repeat that.

J. HUGHES

1        Q.   You had quite a crew present at the
2  sale hearing.  Are you aware of any
3  explanation -- let me take it first, any written
4  summary or explanation of what happened in court
5  that was transmitted to those who were not
6  present?
7        A.   By a Barclays representative?
8        Q.   Yeah.
9        A.   No, I'm not aware of any such
10 description.
11       Q.   Let me ask you about the
12 representations that were made to the court at
13 the sale hearing.  Did you understand that the
14 representations were made to the court
15 accurately described the deal?
16       A.   I believe the descriptions were
17 accurate.  I believe that most importantly,
18 representatives of Weil Gotshal described what
19 was the essence of the transaction, namely, the
20 acquisition by Barclays of the North American
21 business of Lehman Brothers.
22            I believe also that to the extent that
23 there was reference to any aspects of that
24 transaction, that it was essentially a fair and

J. HUGHES

1  accurate description of what had been agreed.
2        Q.   You understand that in the course of
3  the hearing, the court was advised that no cash
4  was being conveyed to Barclays?
5        A.   That's not my understanding of what
6  was said at court.  My understanding of what was
7  said at court with respect to cash -- and I
8  should just say as an aside that I assume we are
9  still talking about the hearing on the 19th?
10       Q.   Absolutely.
11       A.   There had at the hearing on the 17th
12 been reference to what I believe was described
13 as retained cash, and because in the intervening
14 period between the 17th and the 19th there had
15 been a change in this respect with respect to
16 the agreement, that the court was told that
17 there had been that change with respect to cash,
18 and that retained cash was no longer in the
19 deal.
20            So I believe that the amounts
21 previously discussed were firstly 1.3 billion of
22 cash, which subsequently was reduced to
23 700 million, but that that cash was no longer in
24 the deal.

Page 30

J. HUGHES

1
2    Q.   So is it your understanding that,
3    other than the retained cash, cash was being
4    conveyed to Barclays?
5          MR. STERN:  Objection to the form.
6          You can answer if you understand it.
7    A.   I -- I'm not aware of any other
8    discussions specifically with reference -- that
9    referenced cash prior to discussions with
10   respect to the 15c3 asset that I otherwise --
11   that I mentioned earlier.
12   Q.   Again, limiting everything just to the
13   sale hearing, is it Barclays' understanding that
14   what was said to the court concerning cash at
15   the sale hearing was accurate?
16   A.   I believe it was accurate, because it
17   was a reference to discussions and changes with
18   respect to an earlier agreement relating to what
19   I have said was referred to as retained cash.  I
20   do believe that the court heard a fair and
21   accurate description of how that part of the
22   negotiation between Lehman and Barclays had
23   changed.
24   Q.   You know that in the course of the
25   hearing, Ms. Fife described how Barclays was

Page 31

J. HUGHES

1
2    acquiring 47.4 billion dollars of assets.  Is
3    Barclays' understanding that that was an
4    accurate representation?
5          MR. STERN:  Objection to the form.
6    A.   As you have put the question, I
7    understand you to be asking me whether a -- let
8    me start again.
9          Your question, if I may say, raises
10   two points.  One, was Ms. Fife's use of the
11   47.4 number accurate, and two, was it -- if it
12   was, was it an accurate description of the
13   assets that were to be acquired in the
14   transaction.
15         My belief -- and I think -- and
16   Barclays' belief is that the reference to 47.4
17   was a reference by Ms. Fife to assets which had
18   previously been described as long positions in
19   the 17th hearing.  It is also possible that it
20   included other assets.
21         Nobody at Barclays had any discussions
22   with Ms. Fife about the composition of that 47.4
23   number.  But it is clear and always was clear to
24   Barclays, and I believe also to Lehman Brothers
25   and Ms. Fife, that there were significant assets

Page 32

J. HUGHES

1
2    in addition that were also part of the agreement
3    and indeed part of the business of Lehman
4    Brothers, which, as I have said, was really the
5    heart of the transaction.
6          So I believe there were, and I believe
7    the court was otherwise informed, both on the
8    17th and on the 19th, that Barclays was
9    acquiring all of the assets of the Lehman
10   Brothers businesses, and that included any
11   assets used in connection with those businesses.
12         The 47.4, as I said, I believe, was a
13   reference to the earlier described long
14   positions that you asked me about a few moments
15   ago.  But I believe it was both in detail and in
16   broad terms a fair and accurate description to
17   the court of what the transaction was all about.
18   Q.   What are the significant assets in
19   addition to what Ms. Fife described as the 47.4
20   billion?  What are the significant assets in
21   addition that you referred to in your last
22   answer?
23   A.   I'm not sure I can recount every one.
24   I think there were, in the asset purchase
25   agreement, roughly 18 or maybe 19 categories of

Page 33

J. HUGHES

1
2    assets.  Included among them were buildings,
3    people, the as yet to be defined or valued other
4    assets in the business, and there was an
5    enormous amount of uncertainty about those
6    values.
7          It included all of the exchange-traded
8    derivatives business, all of the capital markets
9    business, and other aspects of the Lehman
10   business in the Americas, which I think were set
11   out in the asset purchase agreement.
12         I'm not sure that's an exhaustive
13   answer, but it certainly included each of those
14   items that I have mentioned.
15   Q.   What about the 15c3 asset?
16   A.   It certainly included the 15c3 assets.
17   It included the clearance box assets.  Not least
18   because they were also all assets in -- held by
19   Lehman Brothers in -- and used in connection
20   with Lehman Brothers' bid in North America.
21   Q.   When we talk about the significant
22   assets in addition to what Ms. Fife described as
23   the 47.4 billion, you say there are 18 or 19
24   categories, starting with buildings, personnel,
25   exchange-traded derivatives business and

J. HUGHES

1 including the 15c3 asset and the clearance box?
2     A.    Yeah, I don't view any of them as
3 additional assets.  I view them as identified
4 assets in the business.  I think there is a
5 difference, or at least I view it as a
6 difference.
7     Q.    When you say identified assets, what
8 do you mean?
9     A.    I mean that the agreement in the APA
10 was to -- was for Barclays to acquire all of the
11 assets used in connection with Lehman Brothers'
12 business.  So it was from certainly the 15th --
13 no later than the 15th of September onwards, an
14 agreement to acquire the business of Lehman
15 Brothers.
16     It was deliberately not ever
17 described, approached or otherwise discussed as
18 a balance sheet deal, referring to the
19 acquisition of specific assets.  There was,
20 during the course of the week of the 15th to the
21 22nd, a lot of discussion about particular
22 assets within the business and how those might
23 be best identified.
24     So when I use the term "identified"

J. HUGHES

1 rather than "additional," it's because I think
2 it is important to understand that the deal was
3 about the business as a whole, with some
4 limitations, as I mentioned a while ago, with
5 respect to excluded assets.  And that's why the
6 asset purchase agreement described purchased
7 assets in the way that it did.
8     So there was, from time to time,
9 during the course of that week, specific
10 reference to particular assets that had been
11 identified in the discussion and in the
12 negotiations.  So for example, the clearance box
13 assets and the 15c3 assets were not identified
14 by Lehman Brothers as assets in the business
15 available to be transferred until, you know,
16 probably sometime on Friday, which was the 19th.
17     So to refer to each of these different
18 assets as additional assets, I think is
19 something of an inaccuracy.  I think Barclays
20 viewed them as identified, and there were
21 certainly discussions about the particularities
22 of the transaction in that way.
23     Q.    It was Barclays' understanding that
24 the clearance box and 15c3 assets were always

J. HUGHES

1 part of the deal because they were part of the
2 business; is that right?
3     A.    I think by definition, they were part
4 of the business of Lehman Brothers and were --
5 while they had not been discussed or
6 specifically identified before Friday, I think
7 they were by definition purchased assets.
8     Q.    So -- I understand.  So they were all
9 covered by the original APA?
10     A.    Correct.
11     Q.    All the assets we have been
12 discussing, I understand it is Barclays'
13 understanding that they were all part of the
14 business and part of the original APA; is that
15 right?
16     A.    I think that's right, yes.
17     Q.    Now, let me just ask you to break it
18 up into two parts.  One is, which of those
19 various assets did you understand were part of
20 the 47.4 billion and which did you understand
21 were not part of the 47.4?
22     A.    I think I said earlier that I do not
23 know how Ms. Fife arrived at that 47.4 number.
24 So I'm not in a position to tell you what that

J. HUGHES

1 number comprised.
2     Q.    And is Barclays in a position to
3 provide any understanding as to what it believed
4 comprised the 47.4 billion dollars that was
5 represented to the court at the sale hearing?
6     MR. STERN:  Objection to the form.
7 Are you talking about speculation or --
8     MR. MAGUIRE:  No.  I'm asking him did
9 Barclays have an understanding at the sale
10 hearing.
11     MR. STERN:  I thought he has already
12 answered that, but go ahead.
13     A.    My understanding was that Ms. Fife was
14 describing or explaining to the court changes in
15 the valuations of long positions which she
16 previously described.  Whether that was a
17 description by Ms. Fife that was limited to
18 that, I don't know.
19     Q.    And your preparation for this
20 deposition has not shed any additional light on
21 that from the people you have spoken to at
22 Barclays?
23     A.    From the people I have spoken to at
24 Barclays, their recollections are consistent

Page 38

1              J. HUGHES
2    with what I have just said.  I have not had the
3    opportunity to speak to Ms. Fife or Mr. Miller,
4    so I can't say with certainty what was in her
5    mind when she presented the number.
6        Q.   I'm only asking for Barclays'
7    understanding.
8            MR. STERN:  Should we take a short
9        break for five minutes?  Do you want to
10       finish a line of questions?
11           MR. MAGUIRE:  That's fine, we can take
12       a break now.  Now is fine.
13           (Recess)
14   BY MR. MAGUIRE:
15       Q.   Sir, is Barclays aware of any
16   disclosure to the court of any profit or gain
17   that Barclays anticipated it would make from the
18   sale transaction?
19           MR. STERN:  Are you talking about
20       September 19?
21           MR. MAGUIRE:  Yes.
22       A.   On September the 19th, I'm not aware
23   of anybody identifying to the court a gain, nor
24   am I aware that anybody who made any
25   representations to the court was in a position

Page 39

1              J. HUGHES
2    to know one way or another whether Barclays
3    would have had a gain.
4            I do think there were objections at
5    that hearing based on the notion that Barclays
6    would make a windfall profit from the
7    transaction.  There were some meaningful
8    complaints, for want of a better word, made on
9    behalf of creditors, I believe, that identified
10   to the court a strong likelihood that Barclays
11   would make what in their description was a
12   windfall profit, and I believe that the judge
13   heard those complaints and dismissed them as
14   being insignificant in light of the importance
15   of the transaction and the importance of
16   approving the transaction, among other things,
17   for the benefit of the estate, creditors,
18   customers.
19           And I believe also that the court felt
20   that it was not relevant whether or not that
21   windfall profit did or did not exist.  Even if
22   it did, I think that the judge explained that
23   there was a greater need in light of the turmoil
24   in the markets at that point in time.  But as I
25   mentioned, in particular for the benefit of the

Page 40

1              J. HUGHES
2    estate and the creditors.
3        Q.   At the time of the sale hearing, did
4    Barclays expect to make a gain on the closing of
5    the transaction?
6        A.   Sorry, could you just repeat, at which
7    point in time?
8        Q.   At the sale hearing.
9        A.   At the sale hearing, yes, I believe
10   so.  I believe in fact we had even made the
11   public announcement that we would make a -- that
12   we expected to make a meaningful accounting gain
13   on the transaction.
14       Q.   And when you say the public
15   announcement, you are referring to the
16   announcement and analyst call on the 17th?
17       A.   Yes.
18       Q.   In the course of that analyst call,
19   Mr. Varley described the deal as having been
20   derisked.  Do you recall that?
21       A.   I don't recall that specific term, no.
22       Q.   Did Barclays understand the sale to
23   have been derisked?
24       A.   I'm not sure I understand what you
25   mean by derisked.

Page 41

1              J. HUGHES
2        Q.   Did you participate in the analyst
3    call?
4        A.   No, no, I did not.
5        Q.   I'll represent to you that on the
6    call, Mr. Varley said, and I quote, "What we
7    have taken is a portfolio of trading assets and
8    liabilities that are first of all derisked, and
9    secondly, those that need to support the ongoing
10   parts of the business that we have acquired."
11           Is it Barclays' understanding that
12   that was a true and correct statement?
13           MR. STERN:  I am going to object.  I
14       think you can ask your questions however you
15       want, Bill, but I think in fairness to the
16       witness, if you are going to quote from
17       something, he should be allowed to review
18       it.
19           But subject to that, if you can
20       answer.
21       A.   I've no reason to believe that what
22   Mr. Varley may have said was inaccurate.  I
23   haven't spoken to Mr. Varley about that or
24   indeed any portion of his involvement in order
25   to prepare for this deposition.

Page 42

1          J. HUGHES
2          From the extract -- I assume it is an
3    extract, what you have just read to me, it would
4    appear that that was one or a series of comments
5    with respect to parts of a greater whole, namely
6    a larger transaction.
7    Q.   Did you understand that the
8    transaction had been derisked?
9          MR. STERN:  Objection to the form.
10   A.   The trans- -- if by the transaction
11   you mean the acquisition of the businesses, the
12   North American businesses of Lehman Brothers,
13   and that -- using the term "derisked," you mean
14   there was no risk in the transaction, no, I did
15   not understand it to mean that.
16   Q.   In what sense did Barclays not derisk
17   the transaction?
18   A.   The assets and liabilities in the
19   transaction and substantial portions of the
20   business of Lehman Brothers were incredibly
21   uncertain, both in terms of definition and
22   value.  So there was, I think, enormous risk in
23   the transaction throughout its negotiation and
24   indeed following the closing of the transaction.
25        There was enormous risk to Barclays in

Page 43

1          J. HUGHES
2    my view.  There were enormous risks that the
3    people, for example, who we hoped would come
4    along with that business may or may not have
5    come along, either on day one or stayed on day
6    two.
7          There was incredible uncertainty
8    around the valuation of all of the assets, which
9    is one of the reasons why there were no specific
10   numbers represented or warranted in the
11   transaction to be the actual numbers.  I believe
12   that's part of the reason also why there was no
13   explanation to the court at any time that there
14   was any certainty with respect to any of those
15   numbers.
16        And indeed, there was clearly during
17   the course of that week almost unending
18   possibility to establish that there was risk in
19   any valuation of any asset or any liability.
20        So I think that there was always,
21   during the course of that week of negotiations
22   and in the period following, significant risk to
23   Barclays.
24   Q.   With respect to the liabilities, what
25   was the greatest risk that Barclays understood?

Page 44

1          J. HUGHES
2          MR. STERN:  Objection to the form.
3    A.   I don't think we ever have assessed
4    the liabilities in the sense of valuing one
5    specifically as compared to another.  There are
6    certainly -- there has certainly been work done
7    by -- principally by our finance department to
8    establish assets, assets and liability
9    valuations, both during the course of the week
10   and thereafter.
11        So I don't think we have got to the
12   point of identifying the top ten liabilities and
13   what they may actually look like.  There were
14   clearly substantial liabilities of varying
15   types.
16   Q.   Did Barclays ever identify any
17   particular -- any specific single exposure that
18   it felt was the greatest from among the various
19   liabilities that it was assuming in this
20   transaction?
21        MR. STERN:  You're talking about
22   before the closing or --
23   Q.   Yeah, anytime before the closing, did
24   Barclays say, this particular liability could
25   blow us up?

Page 45

1          J. HUGHES
2          MR. STERN:  Objection, objection to
3    the form.
4          But you can answer.
5    A.   I think Barclays was extremely
6    concerned about the -- about a number of
7    liabilities, included among which were the
8    assets in the repo transaction, the unknown or
9    unidentified size of liabilities with respect to
10   the exchange-traded derivatives business.  There
11   were concerns about the liabilities that we took
12   on with respect to employees, with respect to
13   the buildings.
14        So I think it is fair to say that all
15   of the liabilities that were identified were
16   items of concern because, first and foremost,
17   there had been -- there was no ability to
18   establish whether representations made by Lehman
19   Brothers with respect to each and every one of
20   those liabilities was accurate or not, and as I
21   think I mentioned, it was a period in which
22   valuations, prices were changing, essentially
23   all the time.  And there was -- the degree of
24   volatility during that period was so extreme,
25   that I think it would have been surprising to

J. HUGHES

1  
2  anybody if anybody at that point had been sure
3  about the liabilities that were being taken on.
4       So I think Barclays was at all times
5  very concerned about the size or impact of each
6  of the key categories of liabilities in the
7  transaction.
8       Q.  I would like to focus on just one of
9  those, and that's the, what you describe as the
10  unknown and unidentified size of the liabilities
11  in the exchange-traded derivatives business.  So
12  my next questions will just focus on that.
13       A.  Yup.
14       Q.  What did Barclays understand was its
15  total exposure in taking on the exchange-traded
16  derivatives business?
17       A.  I think at the time, we agreed with
18  Lehman Brothers that we would acquire all of the
19  exchange-traded derivatives business.  First of
20  all, it was right at the beginning of the
21  discussion, by which I mean very early in the
22  week of September 15th, and I think at that
23  point in time, and indeed for an appreciable
24  period following the closing, not only was
25  Lehman Brothers unable to represent to us what

J. HUGHES

1  
2  the extent of the assets and liabilities were,
3  Barclays was also not in the position to
4  establish for itself what the extent of those
5  assets and liabilities were.
6       Q.  What was the worst, what was Barclays'
7  worst case in terms of what it was facing as its
8  total exposure on the exchange-traded
9  derivatives business?
10       A.  Again, at that point in time we were
11  not in a position to establish the extent of
12  such an exposure.  It was partly for that reason
13  that it was made clear that we had to take all
14  of the assets together with all of the
15  liabilities, which included any property or
16  any -- of any sort or description that was being
17  held to secure or to support or was being used
18  in the business of managing that exchange-traded
19  derivatives exposure.
20       Q.  Did anyone at Barclays get a handle on
21  whether the total maximum exposure in taking on
22  that business was a particular figure?  1
23  billion, 10 billion, 100 billion?
24       MR. STERN:  Objection, asked and
25  answered.

J. HUGHES

1  
2       A.  At what point in time?
3       Q.  Prior to the closing.
4       A.  I don't think that prior to the
5  closing Barclays had any ability to conclude any
6  work on that point.
7       Q.  And did the negotiators for Barclays
8  have authority to enter into the deal and close
9  the transaction without getting a handle on what
10  the total maximum exposure was on the
11  exchange-traded derivatives business?
12       A.  Can you define what you mean by get a
13  handle on?
14       Q.  Limit the -- get an understanding as
15  to what the maximum exposure to the company was
16  by taking on this business.  Whatever that
17  number was, at least say it can be no worse than
18  this?
19       A.  I think your question was, were
20  representatives of Barclays authorized to
21  conclude the transaction, without getting a
22  handle on.
23       I don't think that the authority
24  either expressly or impliedly delegated to the
25  Barclays representatives at any point would have

J. HUGHES

1  
2  or did refer to that particular assessment.  I
3  believe that the Barclays representatives at the
4  time were authorized to agree to acquire the
5  whole of the exchange-traded derivatives
6  business of Lehman Brothers, and that it was
7  reasonable in so doing for those representatives
8  to determine as best they could that if we were
9  to acquire all of the assets of the
10  exchange-traded derivatives business, that we
11  would also include in that any property which
12  was in part designed to limit exposures with
13  respect to those businesses.
14       So for example, if there were open
15  exchange-traded derivatives positions on any
16  futures or options exchange, there would
17  necessarily have been assets held in connection
18  with those open positions to secure and to
19  support the exposure either in those particular
20  positions or with respect to other aspects of
21  that business.
22       So I believe that because all of the
23  assets of any description and of any type were
24  to -- were part of what was identified to be
25  transferred in the transaction, that it was a

J. HUGHES

1    J. HUGHES
2  reasonable assessment on the part of the
3  Barclays representatives to take -- to reach
4  that agreement with Lehman Brothers or that part
5  of the agreement with Lehman Brothers.
6    There was, in any event, I guess,
7  residual risk in that assessment.
8    Q.  Did anyone tell the Barclays board
9  that it's people had been unable to quantify the
10  maximum exposure to Barclays in taking on the
11  exchange-traded derivatives business?
12    MR. STERN:  One second.  I'm just not
13  sure what topic this relates to.  I'm also
14  concerned that this may call for privileged
15  communications.
16    MR. MAGUIRE:  I am only looking for
17  the facts of the disclosure, and we are
18  clearly talking about the gain.  I
19  understand that in disclosing the gain, any
20  contingency would be an issue there.  So it
21  is simply a factual question.  I'm not
22  looking for any legal advice.
23    MR. STERN:  I am trying to figure out
24  what topic this.
25    MR. MAGUIRE:  Actually, it's on a

J. HUGHES

1    J. HUGHES
2  number of topics, but right now I think it
3  is --
4    MR. STERN:  I am going to allow it.  I
5  am not going to be overly strict about that,
6  but -- OK.
7    Q.  Again, I'm not interested in any legal
8  advice.  I am just asking whether there was a
9  disclosure to the Barclays board as to the fact
10  that it was unable to quantify the maximum
11  exposure involved in taking on the derivatives
12  business?
13    A.  I am not aware of specific comments
14  made to the board with respect to an inability
15  to assess the exposures you referred to.  I am
16  aware that there were, on a number of different
17  topics, and I believe with respect to the
18  transaction as a whole, comments, as I say, and
19  descriptions to the board, among others, of how
20  uncertain all of the valuations were in this
21  transaction and there could at no point be any
22  absolute certainty about estimated values.
23    None of the -- most if -- most of the
24  valuations with respect to particular assets, to
25  the extent that we had them, were received from

J. HUGHES

1    J. HUGHES
2  Lehman Brothers in the bizarre market
3  circumstances that I have already described, and
4  so it was very clear to the board of Barclays
5  and indeed I believe to the board of Lehman
6  Brothers and anybody involved in the transaction
7  at all that there was no certainty with respect
8  to estimations of valuations, and therefore,
9  with respect to the estimations of what the
10  exposure to Barclays may be.
11    I believe that the representatives of
12  Barclays who were involved in the discussions
13  with respect to particular assets, be they
14  exchange-traded derivatives or otherwise, made
15  their best effort at the time to estimate what
16  those exposures might be, and made those
17  estimations recognizing that it was certainly
18  fundamental to Barclays to insure that there was
19  sufficient comfort that we would gain more value
20  than ultimately we would liabilities, primarily
21  because it was important to the bank to insure
22  that in capital terms, this was not a negative
23  transaction for the bank and its shareholders.
24    Q.  My last question was specific to the
25  liabilities involved in the exchange-traded

J. HUGHES

1    J. HUGHES
2  derivatives.  I am going to ask you a slightly
3  broader question now that is specific to all of
4  the liabilities.
5    Are you aware of whether the board was
6  told that Barclays was unable to quantify the
7  maximum exposure to the company from the
8  liabilities it was assuming in this transaction?
9    A.  I'm not aware of a communication in
10  those terms.  I believe that the board was given
11  some estimated values with respect to
12  liabilities of one form or another, and again, I
13  believe the board was told that there was no
14  certainty with respect to those valuations.
15    Q.  Did the board -- is it your position
16  that the board understood that Barclays could
17  not quantify the maximum exposure of the
18  liabilities it was assuming in this deal?
19    MR. STERN:  Objection to the form.
20    A.  Could you repeat the question.
21    Q.  Yeah.  The question is, while somebody
22  may not have said specifically that --
23  specifically told the board that the company
24  couldn't quantify the maximum exposure of the
25  liabilities it was assuming, is it your

J. HUGHES

1  understanding that the board understood that
2  without having to be told that specific fact?
3      MR. STERN: Objection to the form.
4      A.  I'm not sure I could say what the
5  board understood. I believe that the board was
6  told that the representatives of Barclays
7  responsible for negotiating the transaction had
8  done their best to estimate what the assets and
9  liabilities within the transaction were worth or
10  what their proper values were. But that that
11  was, as I say, an estimation.
12      So I believe that it was clear to the
13  board at the time from the representations made
14  by Barclays employees that in the time available
15  and in the circumstances again that I have
16  mentioned, Barclays had tried to estimate what
17  those values were, but couldn't be absolutely
18  sure.
19      Q.  I've been asking you about disclosures
20  that were made to the board, and I'll broaden
21  that a little bit now to senior management. Are
22  you aware of any disclosures to members of
23  senior management that Barclays was unable to
24  quantify the maximum exposure of assuming the

J. HUGHES

1  liabilities in this transaction?
2      A.  When you say senior management, are
3  you excluding the board? Because the board is
4  not management.
5      Q.  Yeah, I am excluding the board.
6      A.  Right.
7      Again, I'm not aware of a disclosure
8  in the specific terms that you describe. It was
9  made clear on several occasions to senior
10  management that it was very difficult for
11  Barclays to conclude with certainty values with
12  respect to both assets and liabilities in the
13  transaction.
14      But I think senior management was
15  given enough inputs that it was reasonable for
16  it to conclude that it was acquiring or it was
17  concluding a transaction which ultimately would
18  be positive for the bank.
19      Q.  And how was management able to make
20  that conclusion without quantifying what the
21  risk was of taking on the exchange-traded
22  derivatives business?
23      A.  I think it was able to do it by
24  estimating and making judgments about the risk

J. HUGHES

1  associated with those estimations, which is
2  different from an absolute quantification.
3      Q.  And how did it do that?
4      A.  I -- how did it, "it" meaning --
5      Q.  How did management make that
6  assessment?
7      A.  Fundamentally by taking
8  representations of value from Lehman Brothers
9  and where we were -- where Barclays was able to
10  make its own judgments as to those valuations
11  and reach conclusions off the back of that
12  analysis.
13      You mentioned exchange-traded
14  derivatives. I don't think that prior to
15  closing we had been given -- I may be wrong
16  about this -- it is possible there had been some
17  numbers discussed, but I don't think that there
18  was -- that it was clear at the time of closing
19  what the quantification of the assets and
20  liabilities may have been with respect to the
21  exchange-traded derivatives business itself.
22      Q.  So with respect to that business, how
23  was it reasonable for management to make the
24  conclusion that it was in Barclays' interest to

J. HUGHES

1  take on that business?
2      A.  Primarily because it was acquiring all
3  of -- any type of asset of whatever form that
4  was held in connection with that business. And
5  I think there both were and are sufficient
6  numbers of expert people in the Barclays
7  organization to make an assessment about the way
8  the futures and options business is conducted,
9  such that if all of the assets that were held in
10  connection with that business were going to be a
11  part of the deal and come to Barclays, that
12  there would be a reasonable risk and a
13  reasonable estimation of risk to reach the
14  conclusion we did.
15      Q.  And that's the piece I'm missing. How
16  was management able to come to that conclusion
17  that the assets would basically cover the
18  liabilities if they weren't able to quantify
19  what the liabilities were?
20      MR. STERN: Let me hear that again.
21      (Record read)
22      MR. STERN: I may be missing it in the
23  topics, but I'm just not sure where that
24  fits.

J. HUGHES

1
2     MR. MAGUIRE:  I think we are well into
3  a discussion, and we are simply following up
4  on the witness' answer.
5     MR. STERN:  No, no, no.
6     MR. MAGUIRE:  If you want to make an
7  objection or you want to direct the witness
8  not to answer, Jack, that's fine.  I'm
9  not -- just so you know, I am not going to
10 spend the day referring you back and forth
11 to topics in the notice.
12    So I leave it to you.  If you think
13 there is something inappropriate and you
14 want to take a position, then by all means,
15 but the proper way to do that is to direct
16 the witness not to --
17    MR. STERN:  No, no.  I am not trying
18 to be difficult, Bill.  All I'm trying to do
19 is to clarify if you are asking Mr. Hughes
20 to testify to something he is prepared on
21 for this deposition or if you are asking
22 about his own personal knowledge aside from
23 his preparation.  But I'm not trying to be
24 difficult.
25    I'll allow you to answer this.  I'm

J. HUGHES

1
2  just not sure that this is a 30(b)(6) topic
3  here.
4     So if you could repeat the question.
5     (Record read)
6     MR. STERN:  I'll object and I think it
7  is asked and answered as well.
8     But go ahead.  You can answer.
9     A.   Management I think fairly relied upon
10 employees at Barclays who both understood the
11 nature and conduct of the exchange-traded
12 derivatives business and who were able to make
13 assessments with respect to that business at the
14 material time.
15    I believe that those assessments would
16 have included -- though I have not spoken
17 specifically to anybody about this exact
18 point -- but my belief is it would have included
19 recognition that by definition, exchange-traded
20 business in derivatives has to be conducted in
21 accordance with exchange-trading rules, and
22 included within those rules are requirements
23 that assets are always held in connection with
24 such business to, among other things, limit
25 exposures with respect to that business.

J. HUGHES

1
2     So that people at Barclays able to
3  recognize those important issues were able to
4  form the view that to agree to acquire all of
5  the exchange-traded business was a reasonable
6  judgment to make at the time.
7     Q.   The business that was being acquired
8  was exclusively exchange traded; is that right?
9     A.   No.  The only specific reference to
10 exchange traded was to exchange-traded
11 derivatives.  As I said earlier, the business
12 that was being acquired was the whole of the
13 businesses in North America of Lehman Brothers.
14 So the exchange-traded derivatives business was
15 the -- was just one identified aspect of that
16 business.
17    Q.   And were there off-exchange
18 derivatives that were also acquired by Barclays?
19    A.   I wouldn't use the term "off
20 exchange."  I would use the term "OTC
21 derivatives."  OTC derivatives were excluded
22 from the transaction.
23    Q.   So the assets that Barclays was
24 acquiring was exclusively exchange-traded
25 derivatives; is that right?

J. HUGHES

1
2     A.   No.
3     MR. STERN:  Objection to the form.
4     Q.   When you say no, within the
5  exchange-traded derivatives -- was Barclays
6  acquiring any derivatives other than
7  exchange-traded derivatives?
8     A.   It depends how you define a
9  derivative.  If by that you mean Barclays agreed
10 to acquire the exchange-traded derivatives
11 business but by contrast did not agree to
12 acquire the OTC derivatives business, then I
13 would agree with you.
14    Q.   Do I understand from your previous
15 answer that the business people -- at least it
16 is your belief that the business people
17 understood that the exchanges require customers
18 to keep assets that offset any liabilities on
19 the exchange?
20    A.   Could you repeat the question.
21    Q.   Let me strike that.
22    Have you spoken to any of the business
23 people who made the assessment as to whether it
24 was reasonable for Barclays to acquire the
25 exchange-traded derivatives business?

J. HUGHES

1
2    MR. STERN:  You mean in preparation
3  for the deposition or generally?
4    Q.    In preparation.
5    A.    I have not spoken to anybody in
6  preparation for today about the question you
7  pose with respect to the judgment made.
8    Q.    Other than in preparation for today,
9  have you spoken to the people who made the
10  assessment that Barclays should acquire the
11  exchange-traded derivatives business?
12    A.    I've spoken to at least two people who
13  were knowledgeable at the time about that
14  portion of the transaction.
15    Q.    Who is that?
16    A.    It would include Stephen King and Rich
17  Ricci.  It's possible that I have spoken to
18  others over time, but I couldn't recall right
19  now specifically whether there were more or not.
20    Q.    What have you spoken to Stephen King
21  about specifically with respect to how he became
22  comfortable that it was appropriate for Barclays
23  to acquire the exchange-traded derivatives
24  business?
25    MR. STERN:  Excuse me, I'm concerned

J. HUGHES

1
2  that this might call for a privileged
3  communication.  I mean it is one thing if
4  you ask the witness as a 30(b)(6) witness
5  what facts he has learned concerning the
6  subject.  But it is a different matter when
7  you're asking him about conversations.
8    So I would rather stick with the facts
9  that Mr. Hughes learned.
10    MR. MAGUIRE:  Well, I'm only looking
11  for facts.  I certainly don't want any legal
12  advice.
13    Q.    All I am looking for is how Mr. King
14  made the assessment that whatever the
15  liabilities were in the exchange-traded
16  derivatives, it was nonetheless -- even without
17  quantifying them, it was nonetheless reasonable
18  for Barclays to acquire that business.
19    MR. STERN:  If you know those facts,
20  you can testify to those facts, without
21  describing your conversation.
22    A.    I don't think I can say that from my
23  specific discussions with Mr. King that we
24  addressed those facts as you describe them.  I
25  would expect that in any discussion that I might

J. HUGHES

1
2  have with a representative of Barclays who is
3  knowledgeable about the futures and options
4  business -- by using "options" in that sense, I
5  mean exchange-traded options -- that it would be
6  implicit in such a discussion that it would be
7  representative of Barclays would understand that
8  any exchange-traded derivatives position would
9  have associated with it assets at least in part
10  held to limit exposures with respect to those
11  positions.
12    So I can't recall any specific
13  discussion on the topic, but going back to your
14  earlier question, which I understood to be
15  related to assessments of exposures, I believe
16  that Barclays was in a position at least to
17  estimate that there were assets held in
18  connection with those exposures, albeit that it
19  was not at that point in time to establish
20  precisely either the actual exposures or the
21  value of the assets held in connection with
22  them.
23    Q.    And without knowing the specific
24  amount of the assets or the -- or being able to
25  quantify what the liabilities were, how do you

J. HUGHES

1
2  understand Barclays' decision makers were able
3  to make the decision that it was reasonable to
4  acquire the exchange-traded derivatives
5  business?
6    MR. STERN:  Objection, asked and
7  answered.
8    A.    Again, I don't -- I don't think I
9  have -- let me start again.
10    I haven't had a discussion with
11  anybody of that particular type.  It's my belief
12  that knowledge of the conduct of that business
13  allows a reasonable person to conclude, with
14  respect to exchange-traded derivatives business,
15  that exposures by definition are limited.  They
16  are not at any point in time absolutely
17  quantified.
18    Indeed, outside of the context of this
19  transaction, I think it would be hard for
20  somebody ever to tell you that with respect to a
21  futures or options exchange-traded position,
22  that there was an absolute quantification of the
23  exposure.  That may be feasible with respect to
24  some futures and options positions, but I don't
25  think it's fair to say it's feasible with

1          J. HUGHES
2   respect to all.
3          By definition, there is risk in an
4   open exchange-traded futures or -- not
5   exchange-traded futures, but exchange-traded
6   options or futures position.
7      Q.   When you say the risk is limited by
8   the conduct of the business, are you including
9   in that the rules of the exchanges?
10     A.   The rules of the exchanges and the
11  clearing houses that are associated with them,
12  and primarily what I am referring to there is
13  any form of collateral which is held in
14  connection with those exchange-traded positions.
15     Q.   The need for collateral and the fact
16  that if you don't have collateral, the exchange
17  will liquidate the position?
18     A.   Correct, in part.  I guess it is more
19  accurate to say the exchange and/or the clearing
20  house has the right to do that.  Whether it
21  chooses to do so or not is a matter for that
22  clearing house or exchange.
23     Q.   We talked about Mr. King.  Have you
24  had a discussion with Mr. Ricci specifically
25  about how it was reasonable to acquire this

1          J. HUGHES
2   business?
3      A.   I have discussed with Mr. Ricci
4   whether or not it was clear to Barclays that
5   Barclays had intended to and had acquired those
6   businesses.
7          MR. STERN:  I want to caution
8      Mr. Hughes not to disclose any privileged
9      communications with Mr. Ricci, and I'm sorry
10     for interrupting.
11     A.   I think I was saying that I have -- I
12  have discussed with Mr. Ricci Barclays'
13  intention to and agreement to acquire those
14  businesses or that part of the business.  I do
15  not recall speaking specifically with Mr. Ricci
16  about judgments of the type we have been
17  discussing in the last few minutes.
18     Q.   OK.  Did the Barclays negotiators have
19  authority from the board to close this
20  transaction if it did not produce an immediate
21  gain to Barclays?
22     A.   The short answer to that is I don't
23  know.  I do believe that there was authority to
24  conclude the transaction that was concluded,
25  first of all.  I do believe there was authority

1          J. HUGHES
2   to conclude a transaction that yielded an
3   accounting gain.  I believe there was authority
4   to conclude a transaction that was, from a
5   capital perspective, positive for Barclays.
6          I'm not aware of any discussion that
7   referred to an immediate gain.  It's possible
8   that there was a discussion with respect to the
9   immediacy of a gain, but I think most
10  importantly the intention of Barclays and the
11  hope was that we would be able to conclude a
12  transaction that was positive in accounting and
13  capital terms and would have yielded an
14  accounting gain.
15     Q.   Is it your understanding that based on
16  all of the work that the Barclays due diligence
17  teams did, that Mr. Diamond was properly in a
18  position to be highly confident in telling the
19  board that this transaction was capital
20  accretive?
21     A.   I believe that was Mr. Diamond's view,
22  and I believe that it was supported by
23  sufficient information, albeit that that
24  information was qualified with respect to
25  certainty around values.

1          J. HUGHES
2          But I think he was in a position to be
3   highly confident that it would be positive from
4   the bank's perspective.
5      Q.   So none of the various uncertainties
6   that existed precluded Mr. Diamond from
7   accurately representing to the board that he was
8   highly confident this was capital accretive?
9      A.   I think that's correct.
10     Q.   When did Barclays first raise with the
11  SIPA trustee its demand for all of the assets in
12  the DTC clearance box?
13     A.   Did you say the SIPA trustee?
14     Q.   Yes.
15     A.   Sorry, I thought you said SIVA.
16     Q.   Maybe I did, but I meant to say SIPA
17  trustee.
18     A.   I apologize.  Could you repeat the
19  question.
20         MR. STERN:  I take it this is
21     topic 10, communications between Barclays
22     and the trustee that occurred between
23     September 22 and December 23?
24         MR. MAGUIRE:  Yes.
25     Q.   I'm shifting gears, just so you know

                    J. HUGHES
1    where we are.
2        A.    I appreciate your shifting gears.
3        Q.    And what I am now asking is
4    communications -- you have had a number of
5    communications with the trustee over the last
6    long time, and they have involved from time to
7    time Barclays' demand for the securities or
8    assets that are in the DTC clearance box, right?
9        A.    That's correct.
10        Q.    And my question is, when did you first
11    raise that issue with the trustee?
12        A.    The subject of assets in the clearance
13    boxes of Lehman Brothers was first raised
14    between Lehman Brothers and Barclays on Friday,
15    the 19th.  At some point from the morning of
16    Friday, the 19th -- let me say it again.
17        At various points, starting, I would
18    think before the morning of the 19th but
19    during the period of the 19th to the 22nd --
20    when I say the 22nd, I mean by closing on the
21    22nd -- there were discussions relating to the
22    assets in the clearance boxes that both Barclays
23    representatives, be they internal or external,
24    and I believe the trustee and/or the trustee's

                    J. HUGHES
1    representatives participated in.
2        So if by your question you mean when
3    were the assets in the clearance boxes first
4    discussed among the trustee and its
5    representatives and Barclays, I would say at
6    some point during that period.
7        If your question refers to Barclays'
8    desire that the trustee transfer those assets,
9    then that first communication requesting a
10    transfer I think necessarily happened at some
11    point after, but close in time to the closing on
12    the morning of the 22nd.
13        Q.    And after the 22nd, when was the next
14    time that Barclays demanded all of the assets
15    from the DTC clearance box from the trustee?
16        A.    I don't recall the first specific
17    time.  I do both recall and think there were
18    several occasions upon which Barclays made that
19    request and/or demand, and it was repeated on
20    many occasions both directly and indirectly
21    either to the trustee or to the trustee's
22    representatives.
23        Q.    Do you recall participating in any of
24    those?

                    J. HUGHES
1        A.    Yes.
2        Q.    And what's the first one that you
3    recall participating in?
4        A.    I don't recall exactly when -- I don't
5    recall -- I don't have a personal recollection
6    of exactly when.
7        Q.    You couldn't pin it down to the month?
8        A.    Again, without being able to pinpoint
9    the moment, the place or the time, I think
10    either I or people working with me made plain,
11    certainly during September, and my belief is
12    that consistently and persistently since the
13    closing, we have made it plain that we demand
14    from the trustee all of the assets you
15    described.
16        I also believe that from my personal
17    interactions with the trustee and the trustee's
18    representatives, that it was clear both during
19    the period of 19th to 22nd of September and at
20    all times since then, firstly, that Barclays
21    believes that the trustee agreed to transfer all
22    of those assets, and that it has always been
23    abundantly clear to the trustee that Barclays
24    has an outstanding demand for those assets, and

                    J. HUGHES
1    at no point in my many discussions that I have
2    had with the trustee's representatives has
3    anything different emerged with respect to that
4    understanding.
5        Q.    Let me shift gears and direct your
6    attention to the clarification letter for the
7    next series of questions.
8        A.    OK.
9        Q.    I believe you mentioned earlier that
10    Mr. LaRocca left the sale hearing early?
11        MR. STERN:  I said that.
12        MR. MAGUIRE:  Is that right?
13        MR. STERN:  Yes.
14        Q.    Do you have an understanding as to why
15    he left early?
16        A.    No.
17        MR. STERN:  I think what I said was
18    that he was there originally and he left
19    early because he thought there was a
20    possibility that he would have to make
21    arrangements for a closing.
22        MR. MAGUIRE:  OK.
23        Q.    Was it Barclays' understanding that
24    the closing would follow right after the sale

Page 74

```
 1            J. HUGHES
 2   hearing?
 3       A.   I think it was Barclays' understanding
 4   that we would seek to close as soon after the
 5   sale hearing as we could.
 6       Q.   And did you understand that a
 7   clarifying letter was being prepared?
 8       A.   Yes, I believe a clarification letter
 9   as it has subsequently become known was expected
10   to be completed.  Indeed, I believe the drafting
11   of it had commenced prior to the sale hearing.
12   And ultimately it was concluded at or just
13   before the closing on the morning of the 22nd.
14       Q.   Did Barclays understand that the
15   clarifying or clarification letter was intended
16   to change the economics of the transaction that
17   had been disclosed to the court?
18       A.   No.  I believe it was intended to
19   clarify some of the aspects of the transaction
20   for the benefit of the court, but also for the
21   benefit of all of the parties interested in the
22   transaction.
23       Q.   And is it Barclays' understanding that
24   the clarification letter does in any way change
25   the economics of the transaction from what was
```

Page 75

```
 1            J. HUGHES
 2   disclosed to the court?
 3       A.   I think in large part the economics
 4   are not meaningfully different, because, as I
 5   have said a few times, the economics of the
 6   transaction were most appropriately assessed in
 7   the context of the asset purchase agreement as a
 8   whole, by which I mean the sale of the business
 9   of Lehman Brothers as a whole.
10            To the extent there was any ultimate
11   economic difference, it's possible that after
12   the conclusion of the clarification letter and
13   the negotiations that surrounded it, that there
14   may have been a diminution in some of the assets
15   that Barclays received, but -- so for example,
16   there had been some discussions with respect to
17   some residential mortgages, just as an example,
18   and those discussions had taken place earlier in
19   the week.  By the time the clarification letter
20   was concluded, those residential mortgages were
21   I believe unavailable, but in any event were not
22   part of the different categories of assets that
23   Barclays ultimately received or agreed would be
24   received.
25       Q.   Did anyone at Barclays ever perform a
```

Page 76

```
 1            J. HUGHES
 2   valuation of what you refer to as the RESIs?
 3       A.   I believe that during -- while the
 4   RESIs were being discussed as a possible portion
 5   of the transfer of assets, there were some
 6   attempts to value them.  I'm not aware of any
 7   particular -- sorry, let me start again.
 8            I'm not aware of any conclusion to any
 9   analysis that Barclays was able to conduct.  I
10   believe that I can't now recall the full value,
11   but there were estimations of the values
12   presented by Lehman Brothers.
13       Q.   And do you know whether Barclays ever
14   attributed any value to any of those RESIs?
15       A.   I don't know whether we specifically
16   attributed value.  I think there were -- that
17   the RESIs were included with the received values
18   applied to them by Lehman Brothers in certain
19   more detailed analyses around different
20   categories of assets and liabilities.  They were
21   probably included in particular renditions of
22   what some of those different categories of
23   assets and valuations may have looked like.
24            So I think that Barclays used some of
25   those received values and presented them
```

Page 77

```
 1            J. HUGHES
 2   together with other received values, among other
 3   things, while trying to calculate what different
 4   categories of assets and liabilities may
 5   ultimately have been worth.
 6            But I don't recall Barclays ever
 7   coming to its own view about actually what those
 8   RESIs were worth, if that's what you're really
 9   after.
10       Q.   That's what I really wanted to
11   understand, whether Barclays itself attributed
12   any value to the RESIs.
13       A.   I don't think we reached a conclusion,
14   because in common with all of the numbers that
15   Lehman gave us, we were very conscious that they
16   were both presented as estimations and were
17   inherently uncertain.  That's not true just of
18   the RESIs, but it was particularly true of the
19   RESIs, I think, because the valuation of
20   residential mortgages, leaving aside all other
21   asset classes, at that particular time was a
22   very difficult thing.
23            MR. STERN:  Let me just consult with
24       the witness for a moment.
25            (Pause)
```

J. HUGHES

1
2    Q.   Do you want to clarify your answer?
3    A.   Yes, in the following way, just to
4  establish that my answers to your questions are
5  given in the belief that you're referring to a
6  particular category of RESIs as you described
7  them which had formed an identified asset within
8  the negotiation, as distinct from residential
9  mortgages as a whole.
10    Q.   We are just talking about a specific
11  category that was identified in the APA,
12  residential mortgage-backed securities.
13    A.   Yes.  Identified in the APA prior to
14  Friday, the 19th?
15    Q.   Yeah.
16    A.   Yes.
17    Q.   And it is your understanding that none
18  of those were included in any of the assets that
19  were acquired by Barclays?
20    A.   That's not my understanding.  I don't
21  know with certainty whether there were any of
22  the components of the class we have thus far
23  been describing as the RESIs that ultimately
24  were delivered to Barclays.
25        I do believe that Barclays received

J. HUGHES

1
2  some assets that you would describe as
3  residential mortgage assets in transfers of
4  assets from Lehman Brothers, be that assets
5  received in the repo transaction, or it's
6  possible the clearance boxes included them,
7  though I think that's less likely.  I don't
8  particularly recall.  But --
9    Q.   And what about the fed settlement
10  transfers from JPMorgan Chase?  Do you know
11  whether the RESIs were included in that
12  transfer?
13    A.   The RESIs, as you previously described
14  them, I think were not intended to be included
15  in that JP Morgan settlement.  Again, I couldn't
16  tell you whether -- what ultimately the makeup
17  was of each of those different categories of
18  assets, the repo, the JP Morgan settlement, the
19  clearance boxes.
20        I believe that others are able to
21  describe accurately, if they haven't already,
22  what those -- what the makeup of each of those
23  different pools was.  Or is.
24    Q.   With respect to the securities that
25  were delivered as part of the fed settlement in

J. HUGHES

1
2  December of 2008, you know what I am referring
3  to?
4    A.   I assume -- I think I do, but I
5  typically refer to it as the JP Morgan
6  settlement.
7    Q.   That makes more sense, the JP Morgan
8  settlement.  Who would be the person who would
9  know whether any of the RESIs were included in
10  that?
11    A.   I would think Stephen King would know
12  the answer to that. I would think that it's
13  possible that -- it's possible that Jim Hraska,
14  Alastair Blackwell and other people working in
15  the operations function at Barclays would be
16  able to establish that.
17    Q.   You described earlier how you believe
18  that --
19    A.   Sorry to interrupt you.  Can I -- I'm
20  not sure whether I made it clear earlier, but
21  the RESIs as a defined term were not intended to
22  be included, and so I believe it's fair to say
23  that they were not.
24        There may, as I say, have been
25  residential mortgages that were ultimately

J. HUGHES

1
2  delivered in one or more parts of the total
3  transfer.
4    Q.   Did you understand that the court at
5  the sale hearing had expressed a view that it
6  would regard any changes in the transaction
7  of -- certainly in the amount of 500 million
8  dollars or more as being material?
9        MR. STERN:  Objection to the form.
10    A.   From my review of the transcript of
11  the sale hearing -- and I must just note that
12  for the -- for this particular purpose, I have
13  not read that portion of the transcript, but my
14  recollection of the transcript is that the judge
15  was made aware that there were -- that the
16  clarification letter was being finalized, that
17  discussions were continuing with respect to some
18  of the detailed terms, but the clarification
19  letter was hoped to be concluded promptly, and
20  that the judge wanted to insure that there were
21  no material changes to the transaction or that
22  if there had been or if there were to be
23  material changes in the transaction, that there
24  were -- there would be an opportunity for those
25  interested to return to court to discuss any

Page 82

J. HUGHES

1   such material changes with him.
2       Q.   And Barclays understood that?
3       A.   Yes, I believe we did understand that.
4   I believe we also had reached, prior to the sale
5   hearing, an agreement with Lehman Brothers with
6   respect to all of the terms of the transaction.
7   I believe the clarification letter did clarify
8   some aspects of that discussion and agreement,
9   but that there were, in fact, no material
10  changes to the transaction from the 19th through
11  to the 22nd of September.
12      Q.   Was it Barclays' view then that the
13  clarification letter did not cause any material
14  change to the transaction from what had been
15  described to the court?
16      A.   Correct.
17      Q.   And there was no need then to return
18  to the court to advise the court of the
19  provisions or the economic deal as reflected in
20  the clarification letter?
21      A.   I believe that Barclays did conclude
22  there was no need to return to the court to
23  describe anything to the court.  I believe that
24  that was also the understanding of Lehman

Page 83

J. HUGHES

1   Brothers and its representatives at the time.  I
2   believe that representatives of Lehman Brothers
3   considered whether that was necessary on the --
4   prior to closing and concluded that it was not
5   necessary.  And all of that was, is consistent
6   with Barclays' understanding.
7       The court had already heard, as I said
8   at the outset, that this was a transaction that
9   was intended to deliver the whole of the
10  business of Lehman Brothers in North America and
11  not specific pieces of that business.  The court
12  understood that any valuations that had been
13  given or described were no more than estimates
14  of value.
15      I believe the court understood and all
16  the interested parties understood that the --
17  that those valuations were uncertain and that
18  therefore, there would be no representations or
19  warranties about any aspect, any valuation
20  aspects of the deal.
21      I believe that Barclays and Lehman
22  Brothers and its respective representatives
23  understood that all the interested parties, be
24  they the estate, the trustee, the creditors

Page 84

J. HUGHES

1   committee, had all participated in all the
2   relevant discussions associated with the
3   transaction, and most particularly with respect
4   to all aspects of the clarification letter, and
5   that everybody who had an interest had an
6   opportunity to review those terms, to review --
7   to participate in discussions and to reach
8   agreements about them.
9       I also believe that the fact that for
10  a considerable period of time, nobody who was
11  either a participant or interested in the
12  proceedings did, in fact, go back to the court
13  to ask the court to review that clarification
14  letter suggests to me that that was everybody's
15  belief at the time.
16      Q.   Did Barclays consider going back to
17  the court to present the clarification letter?
18      A.   No, we did not, and Weil Gotshal I
19  believe did file the clarification letter with
20  the court on the 22nd, I believe.
21      Q.   Did Barclays consider going back to
22  the court to disclose the amount of the clearing
23  fund and margin that it was acquiring in the
24  transaction?

Page 85

J. HUGHES

1       A.   Barclays --
2       MR. STERN:  I am going to object to
3   the form.  Just to be clear, when you talk
4   about consider, you're not calling for
5   attorney/client communications.
6       Q.   Just the business.
7       A.   Can you describe what you mean by the
8   clearing fund?
9       Q.   Just whatever Barclays is claiming by
10  way of collateral held to secure exchange-traded
11  derivatives, I'm including that and margin
12  together.
13      A.   Well, I wouldn't use the term
14  "clearing fund" for that purpose.
15      I think your question is, did we
16  consider going back to the court with respect to
17  those sorts of property, and the answer is no.
18      Q.   And why wouldn't you include clearing
19  fund in that?
20      A.   I just -- I just wouldn't use the term
21  "clearing fund" because it is -- it is not clear
22  to me exactly what you mean by it, but also, it
23  would, it would likely be just one portion of a
24  greater whole, namely, any property of any

Page 86

1            J. HUGHES
2    description that was relevant to the
3    exchange-traded futures and options business.
4            But there was no need to go back to
5    the court for -- on any portion of that, because
6    the agreement was already clear to the court.
7        Q.    Can you tell me in -- how it was clear
8    to the court that Barclays would be acquiring
9    margin?
10        A.    It was clear to the court because
11    margin is necessarily part of the
12    exchange-traded business of Lehman Brothers.
13        Q.    And was there any disclosure to the
14    court of the amount of the margin that Barclays
15    was acquiring?
16        A.    I don't believe there was a figure
17    given with respect to it.
18        Q.    What about with respect to the 15c3
19    asset?  Are you aware of any disclosure to the
20    court that Barclays was acquiring the 15c3
21    asset?
22        A.    I believe the court was told that
23    there was to be -- I can't be certain about
24    this, but I believe the court was told that
25    there was to be transfer of a 15c3 asset, as you

Page 87

1            J. HUGHES
2    describe.  I can't remember whether there was
3    any quantification of that.
4        Q.    And when you say the court --
5        A.    Specifically.
6        Q.    -- the court was told, you are saying
7    in the on-the-record session on the 19th?
8        A.    I believe so.  But I could be wrong
9    about that.
10        Q.    Can you tell me how it was clear to
11    the court that Barclays was obtaining as part of
12    this sale the assets in the clearance boxes?
13        A.    The assets in the clearance boxes were
14    unencumbered assets of the business of Lehman
15    Brothers and were purchased assets as defined --
16    purchased assets had been defined in the asset
17    purchase agreement which was disclosed to the
18    court, and so I think from all of that, if
19    nothing else, it was clear to the court.
20            Might I just refer back to one of your
21    earlier questions, because as I think further on
22    the topic of margin, I believe that in the sale
23    order, there is reference to margin, and I
24    think -- I don't always remember paragraph
25    numbers or letters clearly, but I think there is

Page 88

1            J. HUGHES
2    paragraph N in the sale order which makes
3    particular reference to margin, and I think
4    again, from that, I did -- I think it is clear
5    that the court understood that the margin and
6    collateral held with respect to the
7    exchange-traded derivatives business was also --
8    was included within the transaction and included
9    within the assets to be transferred to Barclays.
10            I might just add furthermore that I
11    think it would have been very surprising to
12    Barclays, indeed to most onlookers, that -- if
13    margin or collateral held with respect to that
14    exchange-traded business was not included.
15    Indeed, I think it would be shocking if it had
16    not been included.
17        MR. STERN:  Let me ask you a question
18    in terms of timing.  Are you planning to
19    break for lunch around 1 o'clock or earlier?
20    If we are going to break around 1:00, I
21    would like to take a five-minute break now.
22    If we are going to stop around 12:30, then
23    we might as well keep going.
24        MR. MAGUIRE:  Why don't we take a
25    break and I'll check on lunch.

Page 89

1            J. HUGHES
2        MR. STERN:  OK, just five minutes.
3        MR. MAGUIRE:  Yeah.
4        (Recess)
5    BY MR. MAGUIRE:
6        Q.    The witness wishes to add something to
7    a previous answer?
8        A.    Yeah.  Just, you asked me more than
9    one question about what was clear to the court
10    and why.  I think it is just worth noting that
11    all of the relevant commentary or description to
12    the court was presented by Harvey Miller and
13    other representatives of Lehman at Weil Gotshal.
14    Indeed, I think there was an actual agreement
15    that Barclays would not be allowed to make any
16    representations to the court without some prior
17    agreement.  He may even not have included that
18    proviso.
19            But fundamentally all the
20    representations to the court and all of the
21    determinations or judgments made about what was
22    appropriate to be described to the court were
23    made I think essentially by Harvey Miller and
24    Weil Gotshal on behalf of Lehman Brothers.
25            I don't know whether that's helpful,

J. HUGHES

1  but I think it was as a factual matter the way
2  it was done, and therefore what was made clear
3  to the court, to use your terms, was made clear
4  largely by Harvey Miller, sometimes by Lori
5  Fife.  By agreement, Barclays didn't really have
6  the opportunity to make those determinations or
7  judgments.
8      ,Now, I believe that in fact Harvey
9  Miller and others gave a very fair and accurate
10  rendition of the transaction.  And indeed they
11  didn't change beyond -- after those descriptions
12  had been given.
13      In any event, I thought that would be
14  useful to add.
15  Q.    What's the agreement that you referred
16  to?
17  A.    I can't remember exactly where it
18  appears, but I believe there was a provision in
19  one of the transaction documents in which it was
20  agreed that the transaction would be described
21  to the court only by Weil Gotshal.  I can't
22  remember its precise terms, but that was the --
23  that was the effect of it.
24  Q.    Did Barclays believe that it was

J. HUGHES

1  constrained and unable to say anything to the
2  court that it felt appropriate concerning the
3  transaction?
4  A.    I don't know whether people at court
5  at the time felt that, but I think that that
6  provision did exist.  I don't think that
7  Barclays felt that it hurt anything or that it
8  was either unfair or inaccurate.  And nor do I
9  think that anybody who was present felt there
10  was any need on Barclays' part to say anything.
11      So I don't raise the point to suggest
12  that there might have been such a need on
13  Barclays' part, but just to make plain that to
14  the extent there were comments made at court by
15  anybody, they were, they were in large part, if
16  not in fact in totality, made by Harvey Miller
17  and other representatives at Weil Gotshal.
18  Q.    You think you could find that
19  provision that you're thinking of and tell us
20  what it is?
21      MR. STERN:  I can find it.  In the
22  APA, I believe it's Section 7.2.
23      MR. MAGUIRE:  That's appreciated.
24  Thanks.

J. HUGHES

1      MR. STERN:  Which states, "Purchaser
2  shall not, without the prior written consent
3  of seller, file, join in or otherwise
4  support in any manner whatsoever any motion
5  or other pleading relating to the sale of
6  the purchased assets."
7  Q.    And did you understand there was any
8  need for you to get any such consent?
9  A.    I think there was a need to get
10  consent if we felt the need to say anything or
11  make any representation or make any filing with
12  respect to the sale up until that point, but I
13  don't think anything happened or anything was
14  said that led anybody at Barclays who was
15  present to think that there was any need for
16  anybody at Barclays to say anything.
17  Q.    Right.
18      Now, did you understand that the
19  purpose of the sale hearing was for the court to
20  determine whether or not to approve the sale?
21  A.    Yes.
22  Q.    And did Barclays understand that it
23  was important for the court to understand the
24  economics of the transaction in making that

J. HUGHES

1  determination?
2      MR. STERN:  Objection to the form.
3  Vague.
4      You can answer.
5  A.    I think the court had to take a gander
6  at a whole variety of issues with respect to the
7  transaction in order to determine whether to
8  approve it or not.  I think it is clear from the
9  transcript that there were, there were many
10  issues to be taken account of, most notable
11  among which I believe were the extreme
12  circumstances of that period in financial
13  markets, and the pressing need in time -- not
14  least in terms of timing, to preserve as much
15  value as possible in the estate, in the
16  business, for the benefit of the estate, the
17  creditors, and a whole variety of additional
18  people associated with Lehman Brothers, and
19  indeed for the benefit of the economy as a
20  whole.
21      And I think that those driving forces
22  behind the transaction and the need to act
23  quickly to preserve that value in the business
24  and in the estate for all of those parties comes

J. HUGHES

1. across quite firmly as, not the only factors,
2. but certainly among the most important.
3. So economics is part of that
4. certainly, but it is not of itself the single
5. issue.
6. Q.   So one thing but by no means the only
7. thing that the court needed to have an
8. understanding of was the economics of the
9. transaction; is that correct?
10. MR. STERN:  Objection to the form.
11. A.   I think the court had to understand
12. the transaction, yes.
13. Q.   And did Barclays believe that the
14. court had an understanding of the economics of
15. the transaction?
16. MR. STERN:  Objection to the form.
17. A.   I'm not sure I know exactly what you
18. mean by economics.  I believe the court
19. understood that the transaction was proposed and
20. indeed did transfer to Barclays the business of
21. Lehman Brothers in North America, and I believe
22. it gained a clear understanding of those
23. detailed aspects of that transaction that Harvey
24. Miller and Weil Gotshal determined were

J. HUGHES

1. appropriate to display to the court, be it on
2. the 17th or the 19th or in a clarification
3. letter that was filed on the morning of the
4. 22nd.
5. So I believe that the court had a very
6. clear understanding of the transaction.
7. Q.   Does Barclays believe that the court
8. had a clear understanding of the total value of
9. the assets that Barclays was acquiring?
10. MR. STERN:  Objection to the form.
11. A.   I believe the court understood that
12. it -- that the transaction included assets and
13. liabilities that people had made a good faith
14. effort to value, but whether or not the court
15. felt that it had an exact valuation for each and
16. every asset or liability, I doubt.  But I don't
17. think that any part of the transaction or an
18. understanding of it required that degree of
19. exactitude or certainty.
20. Q.   I'm not asking you about specific
21. parts.  I'm asking you whether Barclays believed
22. that the court understood the total value of the
23. assets that Barclays was acquiring.
24. MR. STERN:  Objection to the form.

J. HUGHES

1. You have already asked that question.  Are
2. you asking again?
3. MR. MAGUIRE:  No, no.  I asked that
4. question, you're right.  The witness
5. answered with respect to the specific
6. components of the total value.  That's not
7. what I want.
8. Q.   What I want is whether Barclays
9. understood that the court had an understanding
10. of the total value of all of the assets that
11. Barclays was acquiring.
12. MR. STERN:  Objection to the form.
13. A.   I believe the court understood certain
14. estimations of value, most importantly
15. understood that those valuations were estimates,
16. but that more importantly, to understand the
17. transaction, the court understood everything it
18. needed to, to be able to approve the
19. transaction.
20. Q.   So I am still waiting for you to
21. explain to me whether Barclays believed the
22. court was told what the total value was of the
23. assets that Barclays was acquiring.
24. MR. STERN:  Objection to the form.

J. HUGHES

1. A.   I believe the court was given an
2. estimation of that total value.
3. Q.   And what was that estimation?
4. A.   I don't know what the total number
5. was.  I don't think a total number was actually
6. given.
7. Q.   So you're saying there were a couple
8. of numbers that were given to the court, and if
9. you were to add those numbers up, you would get
10. the total value of the assets that Barclays is
11. acquiring; is that what you are saying?
12. MR. STERN:  Objection to the form.
13. A.   No, I am not saying that.  I am saying
14. in the APA and through the various
15. representations of Harvey Miller, Lori Fife and
16. so on, that some numbers were given.  The court
17. understood that those were estimations.  The
18. court understood from the various
19. categorizations of assets what the total assets
20. were that were included and described in the
21. transaction.
22. I'm not aware that a total number was
23. ever given for that.  And again, I don't think
24. the court either expected at the sale hearing or

J. HUGHES

1  needed at the sale hearing a total number, an
2  exact number for the total amount of assets or
3  liabilities, because that wasn't the deal.  The
4  deal was Lehman agreed to sell and Barclays
5  agreed to buy the North American businesses of
6  Lehman Brothers.
7        The court understood, it was very
8  clear in the asset purchase agreement, it was
9  not possible at that particular point in time to
10 give an absolute amount for the total assets or
11 liabilities, and that's why nobody ever
12 represented or warranted anything about those
13 total values.
14       So to come back to your question, I
15 don't think the court heard a specific number
16 for the total value of assets and liabilities,
17 but I believe that that was not necessary.  It
18 was not contemplated as part of the transaction.
19 Had it been a different type of transaction,
20 often referred to as a balance sheet
21 transaction, it might have been different.  But
22 that was not the deal.
23 Q.    At the time that the court approved
24 the sale then, did the court know what the total

J. HUGHES

1  value of the assets was that Barclays was
2  acquiring?
3        MR. STERN:  Objection to the form.
4        You can answer.
5  A.    I'm pausing because I'm trying to
6  think of a different way of answering the same
7  question.
8        I think the court had been given
9  estimations of values.  I think the court
10 understood that they were estimations.  I'm not
11 aware of a total number that was presented to
12 the court as a precise number for those total --
13 for those total values.
14       I believe it's clear from the
15 transcript that the court understood
16 sufficiently the value of assets and
17 liabilities, and understood that in approving
18 the transaction, there was an opportunity to
19 preserve those values, and not to do so would
20 likely not only destroy those values but destroy
21 lots of other value too.
22       I'm not sure I can say it in any other
23 way.
24 Q.    Did the court -- let me put it

J. HUGHES

1  differently then.  Did the court have the
2  ability based on what was presented at the sale
3  hearing to figure out roughly, not precisely or
4  with certainty, but roughly what the total value
5  was of the assets that Barclays was acquiring?
6        MR. STERN:  Objection to the form.
7  A.    I think the court had the opportunity
8  to understand the value of the categories of
9  assets that were to be delivered.  I'm not aware
10 that at any point every single one of those
11 categories was given a valuation during the sale
12 hearing.
13       But I don't think that it was
14 necessary for the court to hear specific values
15 with respect to each and every category of
16 assets in order to make a judgment as to whether
17 it made sense or was the right thing to approve
18 the transaction.
19 Q.    In each of your answers, you have
20 referred to specific categories, and for my next
21 series of questions, I don't want to address
22 specific categories.  What I want to address is
23 the overall economic result and specifically the
24 total value of all of the assets that were

J. HUGHES

1  included in the sale.
2        Did Barclays understand that the court
3  would be interested in knowing what the total
4  value of the assets that Barclays was acquiring
5  was?
6        MR. STERN:  Objection.  Before you
7  answer that, I'll object to the form, and
8  you can try to answer that again.
9        Did Barclays understand that the court
10 would be interested in knowing.  You can
11 answer that if you understand it.
12 A.    I don't know what Judge Peck was
13 interested in knowing about the total value of
14 assets.  I do believe that the court was
15 interested in understanding the transaction and
16 its salient elements in order to determine
17 whether it was the right thing to approve the
18 sale.
19       I think the court heard fair and
20 accurate descriptions of some assets and their
21 estimated values, and again, that that was
22 sufficient for the court to make a judgment.
23 The ability to calculate total values with
24 respect to all of the assets was probably not --

1          J. HUGHES
2  let me say that again.  The ability to
3  accurately value the total amounts was dependent
4  on a whole variety of additional factors that
5  were hard to describe at that point in time.
6          So I think the court made its
7  assessment recognizing that.  To take one
8  example, a number of the securities that
9  Barclays received in the transaction were not
10 capable of being accurately valued by Barclays
11 specifically at that point in time.  Indeed, I
12 think you have heard from other Barclays
13 witnesses that an enormous amount of effort was
14 required to come to specific valuations with
15 respect to particular assets.
16         And that was one of the difficulties
17 of the week and one of the risks that Barclays
18 took in agreeing to acquire certain types of
19 assets in the transaction.
20     Q.   Did Barclays believe that the court
21 could approve a sale without knowing what the,
22 at least on an estimated basis, what the total
23 value of the assets were that Barclays was
24 acquiring?
25         MR. STERN:  Let me just think about

1          J. HUGHES
2  this, because I'm concerned that this
3  question now intrudes on the attorney/client
4  privilege, and the advice that --
5      A.   I think I agree with that actually.
6          MR. STERN:  I don't know if there was
7  any advice on this subject, but if there
8  was, it would be privileged.
9          I think I'll instruct you not to
10 answer this, and you can formulate a
11 different question.
12     Q.   And I take it you will follow the
13 advice of your counsel?
14     A.   As always.
15     Q.   Did Barclays consider disclosing to
16 the court the values -- let me strike that.
17         Was the court told of the total
18 liabilities that Barclays was acquiring in the
19 transaction?
20         MR. STERN:  That you can answer.  If
21 you remember.
22     A.   I think the answer to that is no.  I
23 won't repeat all of the attendant descriptions
24 that I gave you with respect to the assets, but
25 the same commentary applies to liabilities as it

1          J. HUGHES
2  does to assets.
3      Q.   Can you tell me what were the most
4  significant liabilities that were not disclosed
5  to the court?
6          MR. STERN:  Objection to the form.
7      A.   I don't think any meaningful liability
8  was not disclosed to the court.
9      Q.   And then can you tell me in what
10 respect was there not a full disclosure to the
11 court with respect to the liabilities that
12 Barclays was assuming?
13         MR. STERN:  Objection to form.
14     A.   I didn't say that.
15     Q.   Let me ask you that question.  Was
16 there a full disclosure to the court of all of
17 the liabilities that Barclays was assuming?
18     A.   Yes.
19     Q.   Was there a full disclosure to the
20 court of all of the assets that Barclays was
21 acquiring?
22     A.   I believe so, yes.
23     Q.   With respect to the liabilities, was
24 there a full disclosure with respect to the
25 value of those liabilities?

1          J. HUGHES
2          MR. STERN:  Objection to the form.
3      A.   If by full disclosure you mean
4  disclosure of what the court needed to know with
5  respect to those assets and liabilities, my
6  answer is yes.
7      Q.   Did that full disclosure include what
8  the overall estimated value of the assets were?
9          MR. STERN:  Objection to the form.
10     A.   I think as I said a moment ago, and I
11 really was trying not to repeat the lengthy
12 answers I gave you with respect to assets, that
13 the court heard estimations of value with
14 respect to some liabilities.  Those estimations
15 were given by representatives of Lehman
16 Brothers, and I think they were a fair and -- a
17 fair description, given with the best intentions
18 and by people who had tried under very difficult
19 circumstances to come up with real, accurate,
20 precise numbers for all of those liabilities and
21 indeed the assets.
22         But they were estimations, and
23 everybody understood them to be that.
24     Q.   At the time that the liabilities were
25 estimated to the court, did Barclays believe

Page 106

J. HUGHES

1
2  that those estimates were appropriate?
3         MR. STERN: Objection to the form.
4     A.    There were estimations of liabilities
5  that Barclays received from Lehman Brothers both
6  during the week. Some of them were described on
7  the 17th. Some of them were described on the
8  19th.
9         Barclays was -- there was no reason
10 that I can recall or that anybody has recalled
11 to me to believe that there wasn't a good faith
12 effort made by the Lehman Brothers
13 representatives to come up with those
14 valuations. There was certainly disagreements
15 with respect to valuations during the course of
16 the week, with respect to some of the assets.
17 Whether we made a judgment specifically with
18 respect to all of them and were able to conclude
19 that they were all accurate, I don't think we
20 had that ability at that time.
21        Some of the information was
22 necessarily information of the type not only
23 that Barclays could not have had in its
24 possession other than by receiving it from
25 Lehman Brothers, some of it was information

Page 107

J. HUGHES

1
2  which we had no ability to test.
3     Q.    Did you have any reason to disagree
4  with the numbers that were presented by Weil
5  with respect to liabilities?
6     A.    Represented by Weil when?
7     Q.    At the sale hearing.
8     A.    At the sale hearing? There was
9  nothing that Weil said at the sale hearing that
10 to the people present seemed to be wildly
11 inaccurate or in any way misleading to anybody
12 with respect to values.
13        As I said more than once, they were
14 not -- by "they," I mean the people at Barclays
15 present, were not privy to the basis upon which
16 those numbers were arrived at. But there was
17 nothing that any of them heard at the time, and
18 there is nothing that, on reviewing the
19 transcript, that suggests to me that there was
20 either any confusion or any meaningful
21 inaccuracies, albeit bearing in mind the proviso
22 neither I nor the Barclays representatives sat
23 with Harvey Miller or anybody else to figure out
24 what the numbers should look like.
25    Q.    There were certain assets -- you

Page 108

J. HUGHES

1
2  described earlier how there were certain long
3  positions that were identified as 47.4 billion
4  dollars. You recall that?
5         MR. STERN: Objection to the form.
6     A.    Again, I don't think I did say that.
7  I think you said that.
8     Q.    OK. What did Barclays understand was
9  included within the 47.4 billion dollars that
10 Ms. Fife represented to the court?
11        MR. STERN: I will object.
12        But I will let you answer, but this
13        has been asked and answered.
14    A.    I believe I did answer that question
15 earlier. I believe what I said, what I now
16 believe is that the number you are referring to
17 was a number given by Lori Fife to describe
18 changes, as best I can tell from the transcript,
19 with respect to numbers that had previously been
20 given and previously described as long
21 positions.
22        I do not know, nor have I been able to
23 find anybody that does know, exactly what Lori
24 Fife intended to say by that number. I can tell
25 very clearly from the transcript that her

Page 109

J. HUGHES

1
2  primary aim was to describe from that part of
3  her presentation what -- a change in what she
4  viewed as the valuation of some assets that were
5  previously agreed to be transferred in the sale.
6         As it happens, or as things turned
7  out, it was largely a meaningless, in my view,
8  description -- "meaningless" is the wrong word.
9  It was -- it was not a full description of some
10 additional points which were then later dealt
11 with, by which I mean the long positions as
12 previously described related to a part of the
13 negotiation, which by the sale hearing had
14 changed, and by the sale hearing the securities
15 that had previously formed that 70 billion long
16 position were no longer either in character or
17 by type the same securities that were going to
18 be acquired, because by the sale hearing, there
19 had been the intervention of a repo transaction
20 which changed the meaning of that 70 billion in
21 any event.
22    Q.    Now, did Barclays understand whether
23 the 47.4 that Ms. Fife represented to the court,
24 whether that included the repo securities?
25        MR. STERN: Objection to the form.

28

Page 110

1           J. HUGHES
2       Asked and answered.
3       A.   Again, I don't know what Lori Fife
4   included.  I think my best reading of the
5   transcript is that she intended to include
6   securities that were -- that formed -- that were
7   part of the repo.  I can't say whether she had
8   included all of those or whether she had
9   included additional securities.  But again, they
10  were all estimations, whether they referred to
11  the repo securities or some of the repo
12  securities or whether it referred to other
13  assets.
14      Q.   Did Barclays understand the
15  47.4 billion number to include the 15c3 asset?
16          MR. STERN:  Objection to the form.
17      Asked and answered.
18      A.   I don't think she was referring to the
19  15c3 asset at that point in time.  But again, I
20  don't know, for the reasons I've already
21  described.
22      Q.   Did you understand that Ms. Fife's
23  47.4 billion included the clearance box assets?
24          MR. STERN:  Objection to the form.
25      Asked and answered.

Page 111

1           J. HUGHES
2       A.   I don't know the constituent parts of
3   the 47.4.  As I said earlier, the clearance box
4   assets were clearly within the definition of
5   purchased assets.  And so whether or not they
6   were, I think was not a matter of significance
7   at the time.
8           MR. STERN:  I think it is after
9   1 o'clock.  Are we going to take a lunch
10  break?
11          MR. MAGUIRE:  Yeah.  We will go
12  another five or ten minutes, and then we
13  will take a break.
14      Q.   Did you understand the margin to be
15  included in the 47.4?  Did Barclays understand
16  that?
17          MR. STERN:  Objection to the form.
18      A.   I'm not -- I don't think that the
19  people who were present at the time were
20  considering specific assets, specific valuations
21  and whether they were at that point in time
22  included in the number.
23          And again, I think the reason for that
24  is that the margin and other specific assets
25  that were clearly purchased assets were already

Page 112

1           J. HUGHES
2   attended to.  But I don't recall anybody at
3   Barclays break -- attempting to break down that
4   47.4 number at the time, because I don't think
5   anybody thought it was necessary or worthwhile
6   to do so.
7       Q.   Did Barclays understand that the
8   47.4 billion did not include a number of
9   additional assets that were part of the sale?
10          MR. STERN:  Objection to the form.
11      A.   It --
12          MR. STERN:  Let me hear the question
13  again.
14          MR. MAGUIRE:  Well, let me put it
15  slightly differently.
16      Q.   I take it from your earlier testimony
17  that Barclays' view at the time of the sale
18  hearing was, when Ms. Fife said, mentioned the
19  47.4 billion dollar number, Barclays understood
20  that did not -- that referred to some but by no
21  means all of the assets that Barclays was
22  acquiring?
23          MR. STERN:  Objection to the form.
24          You can answer.
25      A.   I think it by definition did not

Page 113

1           J. HUGHES
2   include all of the assets, because all of the
3   assets had been described already in the APA.
4   So she didn't need to refer to that part of the
5   APA, because it was clear to all that that was
6   the better description of the transaction and
7   the better description of the assets.
8           Why she used that particular number, I
9   haven't been able to establish.
10      Q.   Did Barclays understand that the
11  additional assets that were not included,
12  whatever they were, that were not included in
13  the 47.4, that the court would want or need to
14  know what the value of those assets was in order
15  to understand the economics of the deal?
16          MR. STERN:  Objection to the form.
17      A.   Well, first of all, as I said earlier,
18  I don't view any of the assets that you are
19  referring to as additional assets, first and
20  foremost.
21          And I'm not meaning to be pedantic.
22  It is just by definition impossible that if --
23  that an identified asset that is already part of
24  the business that we were acquiring would be an
25  additional asset.

Page 114

```
1              J. HUGHES
2         I think the court, as I have said
3    again earlier, heard descriptions of some of the
4    assets and heard sufficient descriptions of
5    assets and liabilities to enable it to take
6    those estimations, add that to the additional
7    factors that were important, to determine
8    whether to approve the transaction or not, and
9    it came to an appropriate conclusion.
10        Q.    Did the court know the total value of
11   the assets that Barclays was acquiring at the
12   time that it approved the deal?
13        MR. STERN:  I think at this point this
14   question has now been asked three or four
15   times.  I'm really -- I think at this point
16   we should take a break for lunch and maybe
17   you should review your outline.
18        MR. MAGUIRE:  Why don't we get this
19   answer, and then maybe you are right.
20        MR. STERN:  I am actually going to
21   instruct him not to answer, because I think
22   this is now getting past the point.  So if
23   you have another question, you can ask that.
24        MR. MAGUIRE:  All right.  We will take
25   our break at this point and reserve our
```

Page 115

```
1              J. HUGHES
2    rights.
3         MR. STERN:  Good.
4         (Luncheon recess)
5    BY MR. MAGUIRE:
6         Q.    When did margin become part of the
7    sale transaction?
8         A.    When did margin become part of the
9    sale transaction?  At the beginning.
10        Q.    In the original APA?
11        A.    It was agreed orally before it ever
12   got reduced to writing in the APA, but it was
13   subsequently included in the APA.
14        Q.    When you say it was agreed orally, who
15   from Barclays agreed to that?
16        A.    I haven't asked that specific question
17   of anybody, so I can't tell you a specific
18   answer.  The people negotiating on behalf of
19   Barclays at that time, and indeed throughout,
20   included the names we mentioned before, Michael
21   Klein, Archie Cox.
22        There were also a number of people in
23   the early part of the week of the 15th
24   discussing certain types of assets, and it is
25   probable, though I haven't yet checked, that
```

Page 116

```
1              J. HUGHES
2    there was a discussion among some of those
3    people with respect to the exchange-traded
4    derivatives.
5         Q.    Let me be clear, because you referred
6    in your answer to exchange-traded derivatives.
7    I'm going to address my questions specifically
8    to margin as opposed to exchange-traded
9    derivatives.
10        Do you know whether there was a
11   discussion between Barclays and anyone at Lehman
12   concerning margin, specifically using that word
13   "margin" as opposed to some general reference to
14   exchange-traded derivatives?
15        MR. STERN:  I am going to object to
16   the form.
17        You can answer if you understand the
18   term.
19        A.    I was going to ask you, what do you
20   mean by "margin"?
21        Q.    You have referred to, earlier, to
22   collateral that was at exchanges where Lehman
23   was a member.
24        A.    Yeah.
25        Q.    I take that as meaning margin.
```

Page 117

```
1              J. HUGHES
2         Are you aware of any discussions
3    between Barclays and Lehman concerning the
4    collateral that Lehman had deposited with the
5    exchanges where it traded derivatives?
6         A.    I believe there were discussions
7    between representatives of Barclays and
8    representatives of Lehman and indeed involving
9    representatives of the trustee, possibly also
10   the creditors committee, between Friday, the
11   19th, and the 22nd, which related to margin as
12   you have just described it.
13        I'm not aware that there was any
14   specific reference to margin prior to the 19th.
15   Nor does that surprise me.
16        Q.    And it doesn't surprise you because
17   you understand margin to be included in the
18   transfer of exchange-traded derivatives?
19        A.    It would be shocking to me if anybody
20   thought it was otherwise.
21        Q.    Are you aware of any decision on the
22   part of Barclays to acquire any part of Lehman's
23   futures business independently of whether this
24   sale transaction closed?
25        A.    I'm not sure I understand.  I'm not
```

Page 118

J. HUGHES

1 sure I understand the question.
2 Q. Are you aware -- did Barclays have any
3 discussions with anyone from Lehman or the
4 Chicago Mercantile Exchange concerning taking on
5 any part of Lehman's futures business?
6 MR. STERN: Objection, to the form.
7 A. When?
8 Q. In the week or so prior to the sale.
9 A. When you say the week or so prior to
10 the sale, do you mean the week preceding the
11 19th or the week preceding the 15th?
12 Q. Any of that two-week period up to the
13 19th.
14 A. There were -- there was an agreement
15 reached during the week of the 15th, and indeed
16 an agreement -- that agreement was recorded in
17 the APA, certainly by the 17th, when it was
18 filed with the court, for Barclays to acquire,
19 among other things, the FCM business of Lehman
20 Brothers. In other words, the futures
21 commission merchant business of Lehman Brothers,
22 which included the exchange-traded derivatives
23 business.
24 And that being the agreement, it was

Page 119

J. HUGHES

1 clear to the parties that margin, as you
2 previously described it, among other things, was
3 included in that part of the agreement.
4 Q. And you say it was clear because --
5 can you explain why it was clear?
6 A. Because the -- because it was clear
7 that the agreement was to transfer the assets
8 and all the assets and liabilities of that
9 business. So that necessarily would include
10 collateral, margin held in connection with that
11 business.
12 Q. Did Barclays provide any guarantee to
13 the Chicago Mercantile Exchange of any -- of
14 Lehman's settlement obligations at any time
15 prior to September 22?
16 A. Any guarantee to the CME prior to the
17 September -- prior to September 22?
18 Q. Yes.
19 A. Not that I am aware of.
20 Q. Did Barclays consider providing such a
21 guarantee to the CME at any time prior to
22 September 22?
23 A. I'm not aware of any such
24 consideration. I think it unlikely that

Page 120

J. HUGHES

1 Barclays would have given a guarantee with
2 respect to aspects of the sale transaction
3 before closing. Or at least before it was clear
4 what the closing terms were going to be.
5 Q. I am going to ask you about your
6 testimony concerning margin and the APA, so I
7 will show you a copy of the final APA. It is
8 without all the schedules, but it has all the
9 provisions.
10 Can you point me, sir, to where the
11 APA undertook to convey margin to Barclays.
12 A. I think the first reference comes in
13 the definition of "business." And I should just
14 add that I have not reviewed the asset purchase
15 agreement with that specific question in mind.
16 So for me to be able to pick out quickly each
17 and every part of the APA which is relevant to
18 assessing whether the margin associated with the
19 futures commission merchant business, for
20 example, was included, would obviously take me a
21 while. There are several aspects of it.
22 But it certainly starts with an --
23 with the definition of business, which as you
24 will see on page 2 includes the words "business

Page 121

J. HUGHES

1 as a futures commission merchant." In my view,
2 that includes, particularly if one adds other --
3 I think there are additional facets of the
4 agreement that are relevant for this purpose,
5 but I would have to look through it to be
6 absolutely sure, but I think that the
7 acquisition of the futures commission merchant
8 business includes margin, collateral held in
9 connection with that business.
10 Q. So is it Barclays' understanding that
11 this definition picks up any margin that Lehman
12 had at any exchanges?
13 MR. STERN: The only concern I have
14 about this is whether you're calling for
15 privileged information. If you are asking
16 Mr. Hughes to interpret the contract, my
17 concern is that is -- his interpretation of
18 the contract is privileged.
19 MR. MAGUIRE: If you want to direct
20 him not to answer, we can move along.
21 All I'm looking for is Barclays' --
22 Barclays has an understanding, it has a
23 claim. I'm simply asking where in the
24 contract is the source of that claim.

Page 122

J. HUGHES

1
2     MR. STERN:  You are asking about a
3  contract interpretation.  Let me just
4  confer.
5     Let's just step out for a second and
6  confer about that.
7     MR. MAGUIRE:  The record will reflect
8  that the witness has stepped out of the room
9  with his counsel.
10    (Pause)
11    (Mr. Stern and the witness return to
12  the room)
13    MR. STERN:  I have just conferred with
14  the witness off the record, and I am going
15  to instruct the witness not to answer
16  questions that call for interpretation of
17  the contract, because that does invade the
18  privilege.
19    MR. MAGUIRE:  Just so we are clear,
20  you are directing the witness not to answer
21  the last question?
22    MR. STERN:  Correct.
23    MR. MAGUIRE:  And any other questions
24  asking for Barclays' understanding of
25  provisions of the contract?

Page 123

J. HUGHES

1
2     MR. STERN:  Correct.  Anything calling
3  for interpretation, correct.
4     Q.   Did you understand that Barclays
5  undertook any additional liabilities or assumed
6  any additional liabilities over the weekend of
7  the clarification letter?  By additional, I mean
8  any liabilities that it had not already agreed
9  to under the APA.
10    A.   I don't think so. no.  That I can now
11  recall.
12    Q.   You're familiar with the transfer and
13  assumption agreement?
14    A.   I think so, yes.
15    Q.   Did that in any way change the
16  economics or the fundamentals of the APA?
17    A.   Again, I have been instructed by my
18  counsel not to interpret contracts.  My answer
19  is not an interpretation of the contract.
20    My -- Barclays' understanding of the
21  transfer and assumption agreement in essence is
22  that it was a document designed to achieve a
23  couple of things.  One, to assure the OCC that
24  certain liabilities at Lehman Brothers and
25  certain assets of Lehman Brothers were to be

Page 124

J. HUGHES

1
2  transferred in a particular way.
3     And secondly, it was a more detailed
4  description of what would happen to certain
5  portions of the exchange-traded derivatives
6  business as a result of the sale.
7     My understanding further is that the
8  TAA was the subject of discussions among the
9  OCC, the trustee, Barclays, possibly also
10  including the estate and ultimately the LBHI
11  estate and the creditors committee.  But most
12  notably among -- an understanding among the OCC,
13  the trustee and Barclays with respect to the
14  transfer of OCC margin.
15    And I believe that the agreement, when
16  ultimately signed, was the culmination of quite
17  a lot of communications among those parties.
18  Again, designed primarily to assure the OCC what
19  would happen to margin.  And included in those
20  communications, as I understood them, was some
21  urgency on the part of OCC to have the trustee
22  agree that all forms of margin, whatever their
23  description, should -- needed to be agreed to be
24  delivered -- needed to be delivered to Barclays
25  in order to assure the proper transfer of all of

Page 125

J. HUGHES

1
2  that collateral.
3     I believe there were many, many
4  communications from the OCC and indeed back from
5  the trustee that record that understanding among
6  those parties, that all of that collateral, in
7  whatever form, was to go to Barclays.  I believe
8  that what was ultimately signed -- sorry, the
9  terms ultimately signed and encapsulated in the
10  transfer and assumption agreement not only did
11  establish the agreement for the transfer of all
12  of that margin, but was consistent with the
13  broader agreement that had already been reached
14  among the parties and which everybody at that
15  point plainly was aware of.
16    So the TAA, as you described it, was
17  at a slightly greater level of detail than had
18  been mentioned in the APA, but was entirely
19  consistent with it, and I think was, as it
20  related to the OCC, the effective document that
21  it needed to properly transfer collateral that
22  was previously with LBI in connection with
23  its -- held by LBI in connection with its
24  business as an FCM to Barclays.
25    Q.   Did the TAA add any assets that

Page 126

J. HUGHES

1  were -- to the sale that Barclays was taking?
2      MR. STERN:  I am going to instruct the
3  witness not to answer this, because again,
4  you're calling for an interpretation of the
5  TAA.  Your 30(b)(6) topic calls for
6  information concerning the negotiation and
7  drafting of the TAA.  I don't believe it
8  calls for interpretation of the TAA.
9      So I'll instruct you not to answer.
10     If you want to ask him questions about
11 the course of the negotiation and drafting
12 of that document, that's fine.
13  Q.   In entering into the TAA, did Barclays
14 intend to obtain any assets that it was not
15 already obtaining under the APA?
16  A.   I think in discussing through its
17 representatives the terms of the APA, Barclays'
18 intention was to insure that there was nothing
19 in that agreement inconsistent with the
20 acquisition of the business that it had already
21 agreed to acquire.  And I think that best
22 describes Barclays' intention at the time.
23  Q.   So I guess I'm still trying to
24 understand, when entering into it, did Barclays

Page 127

J. HUGHES

1  intend that there were any assets that it would
2  get at the OCC that Lehman had at the OCC that
3  Barclays was not already acquiring under the
4  APA?
5      MR. STERN:  I think again this calls
6  for an interpretation of both the APA and
7  the TAA.  So I am going instruct the witness
8  not to answer.
9      If you ask him questions about
10 communications and negotiations concerning
11 the TAA, that I think is consistent with
12 your 30(b)(6) topic number 20.
13  Q.   And I take it you're following your
14 counsel's advice?
15  A.   Yes.
16  Q.   Is Barclays aware of any disclosure
17 that Barclays made to the creditors committee
18 concerning the amount of margin that was being
19 transferred to Barclays as a result of the sale?
20  A.   I'm not aware of actual disclosures by
21 Barclays to the creditors committee to that
22 effect.  It is possible, though I don't know
23 with any certainty, that representatives of the
24 creditors committee were involved in or part of,

Page 128

J. HUGHES

1  participated in or were present at discussions
2  during the closing weekend relating to margin or
3  collateral held in connection with the
4  derivatives business.
5      But I am not aware of any specific
6  communication, as I said, of the type you
7  described.  Nor indeed have I asked that
8  question in preparing for today.
9  Q.   Are you aware of any such disclosure
10 to the trustee?
11  A.   When you say such disclosure, will you
12 do me the favor of repeating how you define
13 disclosure?
14  Q.   Any disclosure by Barclays of the
15 amount of margin that was being conveyed to
16 Barclays under the sale?
17  A.   And to what time period are you
18 referring?
19  Q.   This is anytime prior to the closing.
20  A.   It's possible that there were
21 communications referring to valuations, but I'm
22 not aware that Barclays made any representation
23 to anybody about how much margin there may have
24 been or in what form it may have -- or what form

Page 129

J. HUGHES

1  it may have taken, because I don't think at that
2  point Barclays was able to establish precisely
3  either the total or the form.
4      I should also say, that given what I
5  have already said about what would be
6  surprising, indeed shocking, about the transfer
7  of the business that did not include all of the
8  margin in whatever form, that it wouldn't then I
9  think have appeared as a likely important part
10 of the discussion.
11     But it is possible that there were
12 estimations of related values that had been
13 provided by Lehman during the course of the
14 week.  It's possible that there had been, you
15 know, discussion with respect to those values,
16 possible that the trustee was involved in or
17 had -- had sight of some of those estimations of
18 value.
19     But again, I think in common with all
20 other valuations, not only were they, as I have
21 said I think a number of times, extremely
22 uncertain, they were also, again as I have said
23 many times, provided by Lehman, and they weren't
24 Barclays' numbers and Barclays' estimations.

Page 130

1            J. HUGHES
2       Q.   I'll show you a document previously
3  marked as Exhibit 19.  So you will see on both
4  the assets and the liability side the term
5  "derivatives" appears.
6       A.   Yes.
7       Q.   In each case, the same number applies,
8  which is 4 and a half billion dollars.
9       A.   Yes.
10       Q.   Did that number include, either
11  column, any margin?
12       A.   I don't know.
13       Q.   Have you done anything to check
14  whether that was the case?
15       A.   No.
16       Q.   If you wanted to determine whether
17  this 4 and a half billion dollar number includes
18  margin, who would you turn to?
19       A.   I'm tempted to make a joke, but I
20  won't.
21        I really don't know, because I don't
22  know who -- I don't know who composed this
23  document.  I believe it is a document that was
24  produced, put together and produced at some
25  point by somebody at Lehman Brothers, but I

Page 131

1            J. HUGHES
2  don't know who in fact entered the -- either the
3  words "derivatives" or the numbers 4.5.
4       Q.   And you don't know whether anyone at
5  Barclays has any such information?
6       A.   I think there are people at Barclays
7  who are familiar with this document and -- but I
8  don't know, nor have I asked if we know -- if
9  anybody at Barclays specifically knows its
10  actual -- who the scrivener was of this
11  document.  It may be that it has been asked in
12  the past, but I certainly don't recall it now.
13       Q.   I'm not so much interested in the
14  scrivener as much as the person who can tell us
15  whether the 4 and a half billion dollar number
16  includes margin.
17       A.   It would have to be somebody at Lehman
18  Brothers, I would think, to be sure.  Because as
19  I say, I believe it to be produced by somebody
20  at Lehman Brothers.  So I would have thought
21  that would be the best place to ask.
22       Q.   And you haven't checked with anybody
23  at Barclays today who participated in the
24  transaction either on the Barclays side or then
25  as a legacy Lehman person, with respect to the

Page 132

1            J. HUGHES
2  specific question whether the 4 and a half
3  billion dollars includes margin?
4       A.   I have not asked that specific
5  question.
6        I should perhaps add that the -- my
7  belief is that this document refers to a stage
8  in the transaction negotiation which became a
9  stage in the transaction, and to a form of part
10  of the transaction, which soon, soon hereafter
11  changed.
12       Q.   I'm going to ask you -- maybe it will
13  be easier if I showed you.
14       MR. MAGUIRE:  We will mark as
15  Exhibit 561C document Bates stamped WGM
16  Lehman E00013236 through 46.
17       (Exhibit 561C, document Bates stamped
18  WGM Lehman E00013236 through 46 marked for
19  identification, as of this date.)
20       Q.   Are you familiar with this document,
21  sir?
22       MR. STERN:  I guess the first question
23  is whether he has ever seen it before.
24       A.   I'm not sure that I have seen this
25  document before.

Page 133

1            J. HUGHES
2       Q.   You see that it bears September 20,
3  the Saturday date at the top.  Do you see that,
4  sir?
5       A.   I see where it says "WGM final,
6  September 20, 2008 a.m."
7       Q.   And do you see that there is
8  highlighted text in the middle of "Purchased
9  Assets" on the first page which refers to
10  purchased assets that have a book value of
11  approximately 45.5 billion dollars?  Do you see
12  that?
13       A.   I do see that language there, yes.
14       Q.   And this refers to what had previously
15  in the APA had a book value of approximately
16  70 billion dollars.  Do you see that?
17       MR. STERN:  Objection to the form.
18       A.   The language says, "It being
19  understood that the long positions referred to
20  in Clause D of purchased assets do not have a
21  book value of approximately 70 billion, but
22  rather have a book value of approximately
23  45.5 billion."
24        Am I referring to the right piece?
25       Q.   Yes, we are together, looking at the

Page 134

1          J. HUGHES
2   same thing.
3          MR. STERN:  I think if you are going
4   to ask Mr. Hughes about this paragraph, I
5   think you should have a chance to read the
6   entire paragraph.  I don't know if you have
7   done that yet.
8      A.   I haven't yet because I don't know if
9   I need to.
10     Q.   I don't think you need to.  Do
11  whatever you want to do.  Let me give you the
12  question, and you can decide whether you --
13         MR. STERN:  Fair enough.
14     Q.   Did Barclays understand by Saturday,
15  September 20, that the Lehman book value of the
16  repo assets was approximately 45.5 billion
17  dollars?
18         MR. STERN:  If you know that fact, you
19  can answer.
20         I will object to the form because I
21  think the question is a little bit
22  confusing.
23     A.   Could you repeat the question.
24     Q.   Sure.
25         Did Barclays understand by Saturday,

Page 135

1          J. HUGHES
2   September 20, that the Lehman book value of the
3   repo assets was approximately 45.5 billion
4   dollars?
5          MR. STERN:  Objection to the form.
6      A.   Can I just be clear about which assets
7   you are referring to.
8      Q.   Let me try it differently then.  You
9   understood that under the APA there was
10  70 billion dollars of assets that it was agreed
11  would be transferred to Barclays?
12         MR. STERN:  Objection to the form.
13     A.   I -- that's incorrect.  By --
14  certainly by September, the 20th --
15     Q.   No, no.  I'm just talking --
16     A.   -- that was not part of -- that was
17  not the understanding.
18     Q.   Right, right.  I am simply talking
19  about the original terms of the APA as it was
20  originally executed, it called for the transfer
21  of assets that had -- this is the long
22  positions -- that had a value of approximately
23  70 billion dollars?
24         MR. STERN:  Objection to the form.
25     A.   I think I've answered that question

Page 136

1          J. HUGHES
2   earlier by saying that there was an estimation
3   earlier in the week that the long positions as
4   you have described them were valued at
5   approximately 70 billion dollars.
6      Q.   Right, right.  And did Barclays
7   understand that as events had transpired and the
8   deal had changed, by Saturday, the book value of
9   the long positions that were being transferred
10  on Lehman's books was not 70 billion but in fact
11  was going to be approximately 45.5 billion?
12         MR. STERN:  Objection to the form.
13     A.   No, Barclays did not understand that.
14     Q.   What did Barclays understand the book
15  value, Lehman book value was of the assets that
16  were being transferred that had previously been
17  described as long positions?
18     A.   I don't think Barclays had an
19  understanding at the time you mention of what
20  Lehman's book values were.  I don't think we had
21  knowledge of what Lehman's book values were
22  attributed to those same assets.
23     Q.   Did Barclays have an understanding --
24     A.   Can I just be clear.  You're referring
25  to a particular categorized 70 billion dollars

Page 137

1          J. HUGHES
2   of assets which had previously been described as
3   long positions.  My answer is that on -- at the
4   time you're asking the question, that at that
5   time, Barclays, as far as I'm aware, had no
6   knowledge of the book values that Lehman
7   Brothers associated with that categorized set of
8   assets.
9          MR. STERN:  In other words, as of
10  September 20.
11     A.   As of September 20.
12     Q.   And what about with respect to the
13  clearance box assets?  Did Barclays have an
14  understanding as to what the Lehman book value
15  was of the clearance box assets?
16         MR. STERN:  Objection.  I think, you
17  know, the use of the phrase "book value"
18  here is ambiguous.
19         But if you can answer, go ahead.
20     A.   I'm not aware that Lehman Brothers
21  ever referred to values of clearance box
22  securities in terms of book value.  I believe
23  that that category of assets which became known
24  as the clearance box assets was first
25  identified -- it was identified by Lehman

Page 138

1           J. HUGHES
2   Brothers as being worth in their view
3   approximately, I think 1.9 billion dollars.  I
4   think that was the first -- roughly that number
5   was the first estimation.
6       But there was no use of the term "book
7   value" at that point in time.  Nor am I actually
8   aware of any reference to clearance box assets
9   by the use of the term "book value."
10      Q.   Have you asked, in preparation for
11  this or otherwise, any of the Barclays
12  representatives who were at the sale hearing
13  whether they understood the 47.4 billion dollar
14  number that Ms. Fife represented to the court to
15  include 1.9 billion dollars in book assets -- I
16  am sorry -- in clearance box assets, in the 45
17  and a half billion dollars of other assets?
18      MR. STERN:  Objection, this has been
19  asked and answered multiple times.
20      You can answer again.
21      A.   Without repeating our prior relevant
22  answers to your questions, but if I may be
23  lawyerly for a second, incorporating them into
24  this answer, I don't know how Lori Fife came to
25  that number.  I don't know whether it did or did

Page 139

1           J. HUGHES
2   not include, nor does anybody who was present
3   for Barclays at the time, in my belief, know
4   whether or not the clearance box assets were
5   included in that number.
6       Q.   Did you ask the people who attended
7   specifically whether they considered the 47.4 to
8   have been made up of the clearance box assets,
9   plus an additional 45 and a billion dollars of
10  assets?
11      MR. STERN:  I am going to instruct you
12  not to answer to your conversations with
13  people, but you can testify to the facts
14  that you learned.  But I think you have
15  already answered that, so I am just going to
16  instruct you not to answer.
17      Q.   Sir, I am going to show you a document
18  we have previously marked as Exhibit 49.  Have
19  you reviewed this in preparation?
20      A.   I don't know whether I have seen this
21  document before or not, either in preparation
22  for this deposition or otherwise.  On the face
23  of the cover, it is described as a revised
24  clarification letter.  I have discussed the
25  topic of revised -- of revisions to and the

Page 140

1           J. HUGHES
2   negotiations surrounding the clarification
3   letter, and I am aware that there were several
4   drafts of what ultimately was agreed to as the
5   final clarification letter.
6       I'm also aware that, from my
7   participation in the transaction and the events
8   in question, that there was, at the time these
9   revisions were being made and the negotiations
10  were ongoing, a number of efforts by or -- yes,
11  by the lawyers representing Barclays and the
12  lawyers representing Lehman to, unsurprisingly I
13  guess, put on paper what the negotiations had
14  delivered in terms of an agreement at any point
15  in time.
16      I think it is worth just noting that,
17  as you may have heard from others, this was a
18  particularly frantic period.  There were
19  enormous numbers of lawyers present, trying very
20  hard to keep up with the flow of negotiation and
21  the progression of negotiation, and it's clear
22  to me from discussions I have had about the
23  facts and circumstances associated with this
24  effort to conclude the clarification letter.
25  But there were many points in time at which,

Page 141

1           J. HUGHES
2   unfortunately, lawyers for Lehman, lawyers for
3   Barclays, and others in attendance may or may
4   not have been fully knowledgeable about where
5   the discussions had actually got to.
6       So I have gone through the topic as I
7   mentioned of drafts of clarification letters,
8   revisions to clarification letters, and I think
9   it is important to recognize the conditions in
10  which those revisions and negotiations took
11  place.
12      Q.   If you turn to page 2 of the document,
13  you will see at the bottom of the page, there is
14  a term D that talks about excluded assets, and
15  that excludes cash.  Do you see that?
16      A.   I don't.  I see paragraph D.  Can I
17  read it?
18      MR. STERN:  What page are we on in
19  terms of Bates numbers?
20      MR. MAGUIRE:  The one ending in 65.
21      MR. STERN:  I think we are on a
22  different page than you are.  You are
23  looking at the redline?
24      A.   Mine, page 2 of mine finishes at --
25      MR. STERN:  I think it is easier if we

Page 142

J. HUGHES

1
2   refer to Bates numbers, and you should read
3   as much of this as you need to answer the
4   question.
5       Q.   It is page BCI-CG 00024965.
6       A.   OK, I have that page.  Is this the
7   same document as the one you -- that precedes it
8   in the exhibit?  Or is it not?
9       Q.   I think the document that precedes it
10  looks like the cover e-mail.
11          MR. STERN:  Well, we have a clean
12  version and we have a redline version.  And
13  I think what Mr. Hughes is asking is whether
14  the clean corresponds to the redline.  But
15  you're not testifying.  So I --
16          MR. MAGUIRE:  I'm not the witness.
17          MR. STERN:  Just so you know, Bill, we
18  have a document here that has clean and then
19  it has a redline.  But you're pointing us to
20  the redline.
21          MR. MAGUIRE:  Exactly, yeah.
22      A.   Can I read the paragraph?
23      Q.   Sure.
24      A.   OK, I've read it.
25      Q.   I would like you to focus right after

Page 143

J. HUGHES

1
2   the quote, "Excluded Assets."  You'll see where
3   the excluded assets includes cash, and then
4   there is a carve-out that excluded assets shall
5   not include.  Do you see that?
6       A.   Yes.
7       Q.   One of the things in the carve-out is
8   margin guarantee fund deposit.  Do you see that
9   language?
10      A.   Do you mean in the subclause which has
11  a capital A?
12      Q.   Yes.
13      A.   So you mean, you are referring to the
14  words "whether as margin, guarantee fund deposit
15  or in any other form."  Is that what you are
16  referring to?
17      Q.   Exactly.
18      A.   I see the language there, yeah.
19      Q.   Now, was it Barclays' intentions in
20  inserting this language to add anything to the
21  transaction, or was it Barclays' understanding
22  that the margin and guarantee fund was already
23  part of the transaction?
24          MR. STERN:  I believe that calls for
25  privileged information, and I'll instruct

Page 144

J. HUGHES

1
2   you not to answer.
3       You can ask about communications
4   concerning this clause and if the witness is
5   familiar with them.
6       Q.   Who proposed this addition?
7       A.   I have no idea.
8       Q.   Have you done anything in preparation
9   to determine who proposed this insertion?
10      A.   As I said, I have spoken with
11  representatives of Barclays, and both internal
12  and external, to review the topic of drafts and
13  revisions to the clarification letter.  I have
14  not asked the specific question that you just
15  posed to me.
16      Q.   If you'll turn to the previous page.
17      A.   Can I just add that part of the reason
18  for that is that I didn't think it -- I didn't
19  think it was important.
20      Q.   OK.  Do you understand that the
21  references to margin and guarantee fund deposit
22  were deleted from the clarification letter?
23          MR. STERN:  Objection to the form.
24  Actually I'm going to instruct you not to
25  answer, because again here, we are getting

Page 145

J. HUGHES

1
2   into the area of contract interpretation.
3       If you want to show him a subsequent
4   draft and how the subsequent draft changed
5   and get his testimony on what he knows
6   concerning how that occurred, that's fine.
7       Q.   I take it you are going to follow your
8   counsel's instruction?
9       A.   I will.
10      Q.   Sir, I'll --
11      A.   But let me add the following.  I'm not
12  aware of any point during the negotiation of the
13  clarification letter at which Barclays changed
14  its views about -- or that it heard anything
15  different from Lehman Brothers with respect to
16  margin, guarantee funds or anything that one
17  might describe as collateral or margin relating
18  to the exchange-traded derivatives businesses.
19      So it is possible that there were
20  drafts that referred to some of those issues,
21  and you pointed at least to what appears to be
22  one draft which does.  Why it is there, I can't
23  tell you.
24      Q.   And in preparation I take it you have
25  not gone through the specific drafts to see what

Page 146

J. HUGHES

1
2    happened and see how the clarification letter
3    evolved?
4        A.    I have been shown different drafts and
5    I have had highlighted to me different language
6    used in different drafts.  I think that's --
7    that's about as much as I can say about what I
8    have done with respect to the language in the
9    drafts.
10       Q.    And you also mentioned that you had
11   discussions with people about the drafting
12   process?
13       A.    Yeah, that's with my external lawyers.
14       Q.    And who were those?
15       A.    Representatives of Boies Schiller,
16   Cleary Gottlieb and Sullivan & Cromwell.
17       Q.    What was the purpose of your
18   discussions with those counsel?
19       MR. STERN:  Well, part of the
20   discussions were preparation for deposition,
21   and other parts of the discussion were
22   privileged communications.  Well, they are
23   all privileged, but part of the discussions
24   related to getting information so that
25   Mr. Hughes could testify.

Page 147

J. HUGHES

1
2        So if you want to ask him the facts
3    that he learned concerning the chronology of
4    the drafting process and if he remembers, or
5    the people he spoke to remember, you can
6    cover that.
7        Q.    Who did you talk to about the drafting
8    history?
9        A.    Again, representatives of Boies
10   Schiller, Cleary, and Sullivan & Cromwell.
11       Q.    And who from Cleary?
12       A.    People involved in that discussion
13   included Vic Lewkow, Bob Davis, Lindsee
14   Granfield, Ed Rosen.  There is more.  Boaz
15   Morag, B-O-A-Z, M-O-R-A-G.  I think.  Mike
16   Mazzuchi, and I can't spell Mazzuchi.  Did I say
17   Duane McLaughiln?  Duane McLaughiln.
18       I think there may have been more, but
19   I think that should cover it.
20       Q.    It sounds pretty comprehensive.
21       Was the purpose of your discussing --
22   your discussions with them so at least in part
23   determine what discussions they had had in the
24   course of negotiating the clarification letter?
25       MR. STERN:  I guess I am going to

Page 148

J. HUGHES

1
2    instruct you not to answer.  I don't want to
3    intrude on what was discussed between you
4    and Cleary and Boies Schiller and Sullivan &
5    Cromwell.
6        But if you want to ask what facts he
7    knows concerning the course of those
8    negotiations, that's fine.
9        Q.    Sir, what communications occurred
10   between -- what discussions occurred between
11   Cleary and their counterparts after the
12   reference to margin and guarantee funds deposit
13   was deleted from the draft clarification letter?
14       MR. STERN:  Objection to the form.
15       You can answer if you know.
16       A.    I don't know the answer to the
17   question.  Nor do I actually fully understand
18   the question, given that -- I don't know who
19   specifically conducted negotiations of the type
20   we are referring to or if indeed they actually
21   occurred.  So I can't help you with that.
22       Q.    Can you tell us about any discussions
23   that anyone at Cleary had with any of their
24   opposite numbers concerning margin?
25       A.    I do believe there were discussions,

Page 149

J. HUGHES

1
2    as I mentioned earlier, during the period 19th
3    to 22nd involving representatives of Cleary, the
4    trustee, the OCC, I believe representatives of
5    Lehman and LBHI -- sorry, Lehman, and possibly
6    the creditors committee were party to some of
7    those discussions.
8        And if I may, I would refer you back
9    to the earlier comments I made about the
10   transfer and assumption agreement and the many
11   communications among those people that I just
12   identified relating to margin and associated
13   issues.
14       MR. STERN:  Bill, just so your Cleary
15   list is complete, I may not have heard this,
16   but I don't believe you listed Ed Rosen.
17       MR. MAGUIRE:  I believe he did.  But
18   we have certainly got him now.
19       MR. STERN:  So it's complete.
20       Q.    You referred to discussions concerning
21   the transfer and assumption agreement.  Leaving
22   aside any discussions about the transfer and
23   assumption agreement, are you aware of any
24   discussions that Cleary had concerning the
25   subject of margin?

Page 150

J. HUGHES

1
2    MR. STERN: Objection.
3    A.   I'm hesitating because I'm not sure it
4    is a good representation of the discussions that
5    I have learned about, that if one leaves aside,
6    like you just said, discussions about the
7    transfer and assumption agreement, my belief is
8    that representatives of Barclays and their
9    opposite numbers, as you mentioned or described
10   them, had discussions about collateral related
11   to the exchange-traded derivatives business.
12   Those discussions were relevant to the transfer
13   and assumption agreement, but they were also
14   relevant necessarily to the actual sale of the
15   business of Lehman Brothers.  So it is hard to
16   divorce the two.
17       On the one hand, I think the
18   discussions are primarily about margin and
19   establishing, again as I mentioned earlier, that
20   all of the margin in whatever form had to be
21   transferred to Barclays and had to be done
22   quickly, and the OCC urgently wanted an
23   agreement, wanted to conclude the agreement to
24   that effect.
25       And I think it is just somewhat

Page 151

J. HUGHES

1
2    unrealistic to break up the discussion and then
3    apply it to a particular agreement at any
4    particular point in time, other than of course
5    to the actual final documentation of the terms.
6    Q.   And what are the discussions that
7    Cleary had concerning margin, whether it was
8    with respect to the transfer and assumption
9    agreement or otherwise?
10   A.   In effect, as I described earlier,
11   that the margin in whatever form, any property
12   that was held in connection with the
13   exchange-traded derivatives business, including
14   the OCC margin, however described, was
15   understood to be and should be transferred to
16   Barclays in the sale in accordance with what
17   was, I believe, not only the agreement of the
18   parties but the expectation of all of the
19   participants in the discussion that I had
20   earlier identified.
21   Q.   And who at Cleary said that?
22   A.   I don't know whether there is one
23   person.  The principal negotiator of -- or the
24   principal participant in those discussions from
25   Barclays' perspective was Ed Rosen at Cleary

Page 152

J. HUGHES

1
2    Gottlieb.
3    Q.   And with whom did Ed Rosen have those
4    discussions?
5    A.   Representatives of the OCC, the
6    trustee, representatives of Weil Gotshal, I
7    believe.  I'm less certain about the
8    participation, though I believe they
9    participated.  Representatives of the estate,
10   LBHI estate, and the creditors committee.  I
11   believe that they participated in, or if not
12   participated, were made aware during the course
13   of that time, of the substance of the
14   discussions.
15       Precise names of people acting on
16   behalf of the trustee or the OCC, I couldn't now
17   recall.
18   Q.   And what's the basis for your belief
19   that Weil was party to those discussions with
20   Cleary?
21   A.   I'm not certain, but I believe that
22   those were the recollections of representatives
23   of Cleary who participated.  I believe, though
24   again I wouldn't be certain, that the many
25   communications that I again referred to earlier,

Page 153

J. HUGHES

1
2    a good proportion of which were by e-mail, may
3    also have included representatives of Weil.  I
4    could be wrong about that, but that's my
5    recollection.
6    Q.   When you say that's your recollection,
7    do you recall a specific e-mail that went to
8    Weil?
9    A.   I don't recall a specific one here and
10   now.  I was shown some e-mails that relate to
11   these discussions that we are focusing on right
12   now, and I thought that they included some
13   e-mails which were sent to people at Weil, but
14   again, I could be wrong.
15   Q.   And leaving aside e-mails, do you know
16   one way or another whether Weil was party to the
17   conversations with Mr. Rosen concerning margin?
18   A.   I believe so.  I also believe that
19   Harvey Miller and possibly other representatives
20   of Weil understood each and every meaningful
21   portion of the agreement.  But also, understood
22   at the time that all of the margin was included
23   in the assets that had to be transferred to
24   Barclays pursuant to the agreement.
25   Q.   And what's the basis for that belief?

Page 154

J. HUGHES

1  A.  The --
2      MR. STERN:  Let me just -- wait a
3  second.  I'm not sure -- I'm not sure what
4  belief you're referring to in your question,
5  because the answer referred to two different
6  beliefs.
7  Q.   Well, we will take them one at a time.
8      MR. STERN:  One is a belief that
9  Harvey Miller, et cetera --
10  Q.   Why don't we start with that one.
11  With respect to Mr. Miller, what's the basis for
12  your belief?
13  A.   Can I ask one question of Mr. Stern
14  before I answer that question?
15  Q.   Go ahead.
16      MR. STERN:  Let's step out.
17      MR. MAGUIRE:  The witness is excused
18  for a moment.
19      (Recess)
20  Q.   Sir?
21  A.   Thank you.  The belief that you asked
22  me about comes from discussions that I had in
23  reports of -- by the people I had discussions
24  with, mostly Cleary, relating to negotiations

Page 155

J. HUGHES

1  relating to margin during that week, closing
2  weekend.
3      I have also, in preparation for today,
4  reviewed some of the transcript of Harvey
5  Miller's deposition from which I conclude that
6  Mr. Miller was, among other things,
7  knowledgeable about and fully understood all the
8  meaningful terms of this transaction and I
9  believe that he understood that the
10  @@exchange-traded derivatives business and
11  assets held in connection with it were
12  transferred and should be transferred to
13  Barclays.
14  Q.   When you referred to the Cleary
15  people, who were you referring to?
16  A.   Certainly Ed Rosen, but also the
17  recollections of the other Cleary individuals
18  that I mentioned.
19      I hesitate around that only because it
20  is hard for me to pinpoint exactly who may have
21  said something specific at a particular point in
22  time given that a lot of the discussions I have
23  had recently with Cleary Gottlieb have included
24  a variety of issues and, therefore, there has

Page 156

J. HUGHES

1  been present on a number of occasions many
2  people from Cleary.
3  Q.   What did the Cleary people tell you
4  about their communications concerning margin
5  with Harvey Miller?
6      WITNESS' ATTORNEY: @@Don't testify to
7  what Cleary told you.  You can testify what
8  you learned, what facts you know concerning
9  Cleary's communications with Harvey Miller
10  on this subject.
11      Did I simplify it or complicate it?
12      THE WITNESS:  You simplified it.
13  A.   I don't know any facts that are borne
14  of Ed Rosen telling me that he spoke to Harvey
15  Miller specifically and spoke to Harvey Miller
16  specifically about this topic.  So I'm not
17  seeking to attribute specific words from those
18  discussions either to Harry Miller or Ed Rose.
19  Q.   Let's leave those two individuals
20  aside.  What did Barclays -- what did Cleary
21  communicate to Weil concerning margin?
22  A.   I believe that included in the many
23  communications that I have again referred to a
24  few times were the expectation and belief and

Page 157

J. HUGHES

1  understanding that all of the collateral, any
2  form of collateral held in connection with that
3  exchange-traded derivatives business was to be
4  acquired by Barclays.
5      It is hard in reviewing e-mails to
6  recall exactly which was the first e-mail in a
7  chain, but during the course of those
8  communications and during the course of the
9  discussions in the closing weekend, I believe it
10  was clear, made clear by Cleary, among others,
11  but certainly by Cleary to representatives of
12  Weil that the collateral margin of whatever form
13  was to be conveyed as I have described.
14  Q.   I will leave aside e-mails now and
15  just ask you about specific verbal conversation.
16  Is that OK?
17  A.   Sure.
18  Q.   And can you point me to any specific
19  conversations that occurred between Cleary and
20  Weil concerning margin?
21  A.   I think as I said before, there is
22  clarity of recollection regarding the
23  participation of the trustee or its -- or his
24  representatives and the OCC.

Page 158

J. HUGHES

1
2          There is less clarity about the
3   actual participation of Weil in conversations
4   during that closing weekend.  It is my belief
5   that they were party to such discussions, but as
6   I think I acknowledged earlier, I can't -- I
7   couldn't be certain about that.  That being the
8   case, I don't think I can recall for you today
9   specific discussions between those parties that
10  definitively included Weil.  I think they were,
11  as I said, again included in part or all of the
12  relevant e-mail chain of communications.
13          MR. MAGUIRE:  We will mark as Exhibit
14      562C document Bates stamped WGM-Lehman-E
15      0006263 through 6270.
16          (Exhibit 562C, document Bates stamped
17      WGM-Lehman-E 0006263 through 6270 marked for
18      identification, as of this date.)
19      Q.   Sir, I'm going to invite you please to
20  turn to the page, three pages in, Bates stamped
21  WGM-Lehman-E 00006265.
22      A.   Yup.
23      Q.   Are you with me?
24      A.   Yup.
25      Q.   If you would look, sir, at the bottom

Page 159

J. HUGHES

1
2   of the page, few lines, starts with, "Maintained
3   by or on behalf of LBI," goes down to the
4   bottom, it is highlighted and deleted.  Do you
5   see that?
6          WITNESS' ATTORNEY:  This I have to say
7      is very hard to read.
8      A.   I was about to say.  Your use of the
9   term "highlighted" is perhaps not the best, but
10  I see what you are referring to.
11      Q.   You can could read the text albeit
12  with a little struggle.
13      A.   I can with a struggle.
14      Q.   By all means take as much time as you
15  need to read it.  My question is whether you can
16  point me to any discussions that Cleary had with
17  anyone concerning that deletion?
18          WITNESS' ATTORNEY:  So the question is
19      whether Mr. Hughes recalls whether any of
20      the Cleary people recall a discussion about
21      that deletion?
22      Q.   No, the question is whether Barclays
23  can point me to any discussions that Cleary had
24  with anyone concerning that deletion.
25          WITNESS' ATTORNEY:  I don't know how

Page 160

J. HUGHES

1
2      that's different from what I said, but if
3      you can recall.
4      A.   I don't recall any discussions of the
5   type you just described.
6      Q.   Sir, I will show you a document that
7   previously has been marked as Exhibit 50.  While
8   we are getting that actually, let me just ask
9   you a couple more questions about Cleary
10  conversations.
11          Can you point me to any specific
12  discussions that anyone at Cleary had over the
13  weekend of the clarification letter with anyone
14  concerning guarantee fund?
15      A.   What do you mean by guarantee fund?
16      Q.   Using those words.
17      A.   I wouldn't know with that degree of
18  particularity whether the discussions during
19  that weekend included that phrase.  I wouldn't
20  know.
21      Q.   Would you know whether there were any
22  discussions involving the term "clearing fund"?
23      A.   I wouldn't know whether there was a
24  specific discussion that included that phrase.
25  I -- yeah, I think I can limit it at that

Page 161

J. HUGHES

1
2   because I'm not sure of the specific term or
3   not.
4          WITNESS' ATTORNEY:  Let me state for
5      the record while Mr. Hughes is here as a
6      30(b)(6) witness, there should be no
7      implication from his lack of recollection
8      that such conversations did not occur.  The
9      fact that Mr. Hughes may not recall does not
10     mean necessarily that such conversations did
11     not occur.
12          MR. MAGUIRE:  Well, Barclays can
13     certainly reserve its rights in that regard,
14     Jack.
15          WITNESS' ATTORNEY:  That's what I am
16     doing, I am reserving my rights.  I don't
17     want there to be any implication as we sit
18     here today and Mr. Hughes tries in good
19     faith to answer your questions, that if he
20     doesn't recall something, that that
21     necessarily implies that the conversation
22     didn't occur.  So I am reserving my rights
23     to make it clear on the record.
24          MR. MAGUIRE:  Well, reserving your
25     rights --

Page 162

J. HUGHES

1
2     WITNESS' ATTORNEY:  I am more than
3  reserving my rights, I am making it clear on
4  the record.
5     MR. MAGUIRE:  Well, you understand
6  that certainly there is no agreement to that
7  effect on our side of the table.  Everybody
8  can reserve their rights, that's fine.
9     WITNESS' ATTORNEY:  Well, I don't
10  think it is a matter of agreement.  I think
11  it is just a matter of basic common sense
12  that if a witness is trying in good faith --
13     MR. MAGUIRE:  Sir --
14     WITNESS' ATTORNEY:  Let me finish my
15  statement.
16     If a witness is trying in good faith
17  to answer questions and cannot recall, even
18  if the witness is a 30(b)(6) witness, that
19  that does not imply the complete absence of
20  those events.  And we have had 30(b)(6)
21  witnesses for the moving parties who had no
22  recollection of certain facts.  So I just
23  want to make that clear on the record.
24     MR. MAGUIRE:  That's fine, you can
25  make your statement.  We are not going to

Page 163

J. HUGHES

1
2  argue and we will continue with the
3  deposition.
4     A.   Can I make a comment?
5     Q.   If you really want to.
6     A.   I do.  You asked me a question about
7  the use of specific terms is or specific
8  phrases, I should say, and I answered your
9  question literally in the sense that I have no
10  recollection of the use of those specific terms
11  or phrases.
12     But I offer that without the benefit
13  of what you mean by those terms.
14     Q.   Sir, let me show you what we have
15  marked as Exhibit 25 which is the clarification
16  letter?
17     A.   When you say the clarification letter,
18  do you mean the one that was ultimately agreed
19  between the parties and signed?
20     Q.   I believe so, you're familiar with
21  that, right?
22     A.   Yes.
23     Q.   Sir, if you turn to the top of page 2,
24  you will see that four lines down from the top,
25  there is a parenthetical that says, "And any

Page 164

J. HUGHES

1
2  property that may be held to secure obligations
3  under such derivatives."
4     Do you see that?
5     A.   I do.
6     Q.   And who proposed that language?
7     A.   I'm not sure I know who -- I don't
8  think I know who first proposed that language.
9  It's -- it could have come from a number of
10  sources.
11     Q.   Do you know when that language was
12  proposed?
13     A.   Apart from obviously at some point
14  during the course of that weekend, the closing,
15  I don't know exactly when it was first proposed
16  or by whom.  It could have been proposed by the
17  OCC, could have been proposed by Weil.  It could
18  have been proposed by a number of people.
19     Q.   Can you tell me whether this was
20  originally featured in any red line draft or
21  markup of the clarification letter?
22     A.   I don't know the answer to that
23  question.
24     Q.   Can you point me to any discussions by
25  anyone representing Cleary concerning the

Page 165

J. HUGHES

1
2  addition of this parenthetical?
3     A.   When you say point you to discussions,
4  I'm not sure I understand.
5     Q.   Can you tell me what discussions
6  Barclays or any of its representatives had about
7  the addition of this parenthetical to the
8  clarification letter?
9     A.   I believe that the best recollections
10  of people at Cleary that I have spoken to are
11  that the language was included in the final
12  clarification letter partly as a reflection of
13  the discussions that had happened during the
14  course of the weekend, again, which I referred
15  to on several occasions, relating to assets held
16  in connection with the exchange-traded
17  derivatives business and I believe that it
18  appears here in the final letter, agreed letter,
19  following those discussions.
20     Whether it appeared or was proposed
21  prior to that, whether the language had been
22  discussed prior to that or by whom it may have
23  been initially proposed and when, I can't tell
24  you.
25     Q.   Do you know whether anyone at Cleary

Page 166

J. HUGHES

1  had any discussion with anyone about adding this
2  parenthetical to the clarification letter?
3      A.   I don't know specifically whether
4  there were discussions about adding the
5  parenthetical as you describe.
6          I do know that it was Barclays'
7  understanding at the time that this document was
8  signed, was reviewed and signed, that there was
9  no part of what had been agreed in Barclays'
10 mind that was different from the APA or the
11 negotiated terms with Lehman Brothers regarding
12 exchange-traded derivatives.
13         I believe that Barclays intended for
14 this part of the agreement to accurately
15 describe the arrangements that had also been
16 discussed with the trustee and with the OCC.
17         WITNESS' ATTORNEY:  Shall we take a
18 short break?
19         MR. MAGUIRE:  Yes, that's fine.
20         (Recess)
21     Q.   Before the break, we were talking
22 about a parenthetical on page 2 of the
23 clarification agreement.  You are with me?
24     A.   Yes.

Page 167

J. HUGHES

1      Q.   What cash and securities has Barclays
2  received to date pursuant that parenthetical?
3      A.   I'm not sure of the actual numbers to
4  date.  I think there was -- I believe there is
5  an amount of slightly more than -- I think it is
6  a billion, but I'm not sure that it was cash or
7  Treasuries.  I think it may have been
8  Treasuries, and a smaller amount of securities,
9  I believe in the -- either in the range of
10 20-odd million or 40-odd million.  I can't
11 remember the precise number of securities other
12 than Treasuries.
13         Whether any specific cash in the form
14 of hard currencies had been received, I don't
15 know the answer to that.  I think not yet.  But
16 I'm not certain.
17     Q.   Do you know whether Barclays has
18 received 1.375 billion dollars in cash at the
19 OCC?
20     A.   I'm feeling like I should know the
21 answer to that question but I don't.
22     Q.   Let me ask you, would Mr. Romain be
23 maybe the better person to ask that question?
24     A.   Mr. Romain would know much better than

Page 168

J. HUGHES

1  I specifically the numbers and values to be
2  associated with particular assets, be they cash
3  or securities.  There may also be
4  representatives of Barclays in the operations
5  function that might know.
6      Q.   Can you tell me what cash and
7  securities Barclays believes it remains entitled
8  to receive pursuant to the parenthetical we have
9  been talking about?
10     A.   Again, the exact numbers, I can't give
11 you.  I think there is, however, with that
12 proviso, some north of 900 million.  I think it
13 is roughly 925 million, last time I saw, that's
14 due from I believe assets held at the OCC.  I
15 think strictly they are held by JP Morgan, but
16 they relate to the OCC.
17     Q.   Did -- sorry.
18     A.   There may be additional margin or
19 collateral held at other futures exchanges or
20 other clearing houses.  I don't think we have
21 been able to finally establish, despite many
22 attempts to do so with the trustee, what the
23 exact numbers are.  So -- but I do believe that
24 the single largest portion is that 920-odd

Page 169

J. HUGHES

1  million number that I just gave to you.
2      Q.   And when you say other exchanges, does
3  that include foreign exchanges?
4      A.   Absolutely.  It includes any exchange
5  and includes any transaction or any position or
6  any collateral or any property associated with
7  it that was part of the Lehman Brothers
8  exchange-traded derivatives business.
9      Q.   And does it also include the Chicago
10 Mercantile Exchange?
11         WITNESS' ATTORNEY:  Objection to the
12 form of the question.  "And does it also
13 include the Chicago Mercantile Exchange?"
14 All right, go ahead and answer if you can.
15     A.   By that did you mean does it include
16 assets which are held by the CME?
17     Q.   Yes.
18     A.   I'm not sure whether strictly -- well,
19 first of all, whether strictly that would be the
20 right way to refer to it.  I'm not sure whether
21 the relevant assets would be held by the CME as
22 the exchange or whether it would be the
23 clearing -- the relevant clearing corporation,
24 assuming you're not making any distinction

Page 170

```
1            J. HUGHES
2   between the two.
3           I don't -- I'm not aware of assets
4   that are still outstanding and held there.  I am
5   aware that prior to the 19th, the CME did close
6   out a substantial amount of positions that were
7   then held by Lehman Brothers.
8           So to the extent any assets were held
9   with respect to those positions, I wouldn't
10  expect that we would be awaiting those.  But I
11  couldn't tell you definitively whether either
12  the CME or another particular exchange is not
13  holding assets that may come within the assets
14  to be transferred under the sale agreement.
15     Q.   Did Barclays obtain any assets that
16  Lehman held at the CME?
17         WITNESS' ATTORNEY:  Objection to the
18     form.
19     A.   Not that I am aware of.
20     Q.   Did Barclays undertake any credit
21  analysis prior to entering into the transfer and
22  assumption agreement?
23     A.   What do you mean by credit analysis?
24     Q.   The term is used in the transfer and
25  assumption agreement.  We can show it to you if
```

Page 171

```
1            J. HUGHES
2   that helps.
3      A.   Yeah, please.
4      Q.   I show you what has previously been
5   marked as Exhibit 51.  And if you turn, sir, to
6   page 2, if you look at 2C, section 2C, and
7   within that to (i), "Barclays represents and
8   warrants that it has received such documents and
9   other information as it has deemed appropriate
10  to make its own credit analysis."
11         Do you see that?
12     A.   Yup.
13     Q.   What credit analysis did Barclays
14  perform?
15     A.   I don't know, but I think the
16  representation or warranty is that not that --
17  well, I'm not going to -- I'm not aware of one
18  way or another whether any credit analysis was
19  conducted prior to the signature of this
20  agreement.
21     Q.   Can you tell me what documents and
22  other information --
23     A.   Could I interrupt you briefly.
24     Q.   Of course.
25     A.   I would like to ask one quick
```

Page 172

```
1            J. HUGHES
2   question.  I don't need to go out.
3         MR. MAGUIRE:  Fine.
4         (Discussion held off the record.)
5         MR. MAGUIRE:  The record will reflect
6     the witness is consulting with his counsel.
7      A.   Thanks.
8      Q.   Can you tell me, sir, first, do you
9   want to change any prior answer?
10     A.   No, thanks.
11     Q.   Can you tell me what documents and
12  information Barclays obtained prior to making
13  the decision to enter into the TAA?
14     A.   Do you mean what documents Barclays
15  received with respect to the TAA?  Or do you
16  mean any type of document before entering into
17  the TAA?
18     Q.   I guess I'm looking for whatever
19  documents informed Barclays' decision to enter
20  into that agreement.  Can you tell me what were
21  the universe of documents that Barclays
22  considered in making that decision?
23     A.   I'm not sure I could describe
24  necessarily every document that may have been
25  relevant, but I would say that they included the
```

Page 173

```
1            J. HUGHES
2   APA, they included all of the e-mail
3   communications relating to the TAA that I have
4   described.
5         It's possible that there was a prior
6   agreement or a draft of a prior agreement
7   between the OCC and the trustee and there may
8   have been -- and I believe there were additional
9   communications between the OCC and the trustee
10  that Barclays had sight of or was aware of that
11  also may have informed the decision.
12         That last category of additional
13  documents may not, in fact, have been
14  additional.  It's possible they were included in
15  my early description of the e-mail chain among
16  Barclays, the OCC, the trustee, copy to Weil and
17  so forth.  It's possible there were additional
18  ones.  It's possible there were additional
19  discussions between Ed Rosen with respect to
20  this particular document, between Ed Rosen and
21  the OCC and the trustee.  They may also have
22  been part of what I earlier described as the
23  communications during the course of a weekend.
24  So that if they weren't included in the earlier
25  description of the communication flow during the
```

Page 174

J. HUGHES

1    course of that weekend, then I would include
2    them here.
3            Whether that's the entirety of the
4    documentation flow, I couldn't be certain.  But
5    I would have thought it includes at least those
6    items that I referred to.
7        Q.    Did Barclays, over the weekend with
8    the clarification letter, understand or have
9    information concerning the amount of collateral
10   that Lehman's customers had posted with Lehman
11   to secure their derivatives positions?
12       A.    I've -- I don't think Barclays had any
13   information as to the specifics of customer
14   positions of the type you described.  It's
15   possible that there had been some information
16   passed between respective representatives of
17   Lehman and Barclays who were connected with the
18   futures and options businesses.  But I don't
19   think that they were a portion of the
20   negotiations that I referred to and I'm not
21   aware that there was ever any information
22   available regarding the customer positions and I
23   think probably there was not, but I could be
24   wrong about it.

Page 175

J. HUGHES

1    Q.    I'm not going to ask you any questions
2    about customer positions.  I'm going to ask you
3    about the collateral that Lehman held for
4    customers to secure their positions.  So
5    specifically I'm asking you about the money
6    market funds and the other collateral that
7    customers had posted with Lehman.  Do you
8    understand what I am talking about?
9        A.    Well -- no, I'm not sure I do
10   understand what you are talking about actually.
11       Q.    Let me show you a document that has
12   previously been marked as Exhibit 404A.  You
13   will see that this -- this contains some
14   handwriting from your colleague and Mr. Romain.
15   Basically, this says, lists the money market
16   funds and other assets and you will see there is
17   a little addition, Mr. Romain, on the left-hand
18   side, where he calculates the collateral and the
19   number he has here is 2.192 billion dollars.
20       A.    It actually says 2,192 dollars.
21       Q.    I'll represent to you that he has
22   testified that's thousands of millions, whatever
23   it is to get it to 2.192 billion.
24       A.    OK.

Page 176

J. HUGHES

1    Q.    Did Barclays have this information
2    prior to closing?
3        A.    I have no idea.  I have never seen the
4    document before and I haven't spoken to Gary
5    Romain about it either.
6        Q.    Did Barclays know the total amount of
7    collateral that Lehman's customers had posted in
8    respect of their derivatives positions?
9            WITNESS' ATTORNEY:  Where are we in
10       the 30(b)(6) topics here?
11           MR. MAGUIRE:  I think we are still on
12       20.
13           WITNESS' ATTORNEY:  We are on 20.
14       Q.    Do you know, sir?
15           WITNESS' ATTORNEY:  I don't think that
16       really is covered by 20, but I'll let you
17       answer it to the best of your ability.
18       A.    I couldn't be certain, but I don't
19   think, I don't think so.  But I couldn't be
20   certain.
21       Q.    Have you done any investigation prior
22   to this deposition to determine whether or not
23   Barclays knew the amount of collateral that
24   Lehman held for customers of the derivatives

Page 177

J. HUGHES

1    business?
2            WITNESS' ATTORNEY:  I am going to
3        object.  I don't think that's within the
4        scope of this deposition.
5            You can answer.
6        A.    I have not spoken to anybody at
7    Barclays about customer collateral held by
8    Lehman Brothers in order to answer questions at
9    this deposition.
10       Q.    Are you aware of any information that
11   Barclays had when it made the decision to enter
12   into the transfer and assumption agreement other
13   than what you have told us?
14       A.    I am sorry, repeat that.
15       Q.    We have been talking about information
16   that Barclays had prior to making the decision
17   to enter into the transfer and assumption
18   agreement.  And you have listed a number of
19   documents.  Are you aware of any other documents
20   or other information that you haven't told us?
21       A.    I'm not aware of other documents, but
22   I think there is other information that I've
23   alluded -- that I have referred to earlier in
24   our discussions, meaning earlier in the

Page 178

J. HUGHES

1  J. HUGHES
2  deposition. And I'd summarize that as
3  information that people at Barclays had relating
4  to the conduct of futures and options business.
5  And by options, I mean the exchange-traded
6  options business and the detailed knowledge that
7  Barclays had about the conduct of such business,
8  inclusive of the manner in which collateral is
9  held to support that business and including the
10  different forms of collateral that are used in
11  that business.
12      All of that and indeed additional
13  information with respect to those businesses and
14  how that they are conducted, which would be way
15  too detailed to go into now, although I can if
16  you wish, all of that knowledge clearly informed
17  Barclays' assessments about whether it was a
18  good thing, A, to acquire the exchange-traded
19  businesses that we have described, inclusive of
20  assets and liabilities, and also whether it was
21  appropriate to reach the agreements that we did
22  reach with the OCC and the trustee.
23      So that description doesn't refer to
24  documentation, but I think it is important
25  knowledge that Barclays had. I believe also

Page 179

J. HUGHES

1  J. HUGHES
2  Lehman had it, or representatives of Lehman had
3  it, at the time too. So I think that is all
4  important to understand in assessing the
5  judgments that Barclays has made at the time.
6      Q. When you say the information that
7  Barclays had concerning the businesses and how
8  they were conducted, are you including in that
9  the OCC's requirement that all derivatives
10  positions be covered by collateral?
11      A. Yes. And I should just say that I'm
12  not referring to Lehman's businesses in that
13  description. I'm referring to the futures and
14  options industry so to speak, and the manner in
15  which exchange-traded businesses is conducted
16  inclusive of the use of clearing houses and the
17  OCC.
18      Q. I understand. And specifically with
19  respect to the OCC, did you understand, Barclays
20  understood that it marked to market positions on
21  at least a daily basis?
22      A. It would have been the understanding
23  that the OCC and other clearing corporations
24  would mark margin and would value margin and
25  related positions throughout the business day.

Page 180

J. HUGHES

1  J. HUGHES
2      Q. And where a position, where a member
3  fails to post the required margin, the OCC
4  liquidates the position?
5      A. Sometimes, yes, it has the right to do
6  that.
7      Q. Who made the decision to enter into
8  the transfer and assumption agreement?
9      A. I think ultimately Gerard Larocca was
10  the signatory of it.
11      Q. Was he the decision maker?
12      A. I think the decision was made in a
13  combination or through a combination of myself,
14  Gerard Larocca and Rich Ricci.
15      Q. And who was the ultimate decision
16  maker?
17      A. The ultimate decision maker? I'm not
18  sure I -- I'm not sure what you mean by the
19  ultimate decision maker.
20      I think that tracing the delegation
21  and -- of authorities from a corporate
22  perspective factually, I believe I may have been
23  specifically an authorized signatory. But I
24  think ultimately Gerard Larocca was definitively
25  an authorized signatory of the signing entity.

Page 181

J. HUGHES

1  J. HUGHES
2  So I believe he -- I believe that he -- that
3  Gerard Larocca would be the answer to your
4  question.
5      Ultimately because it was connected
6  with the negotiation of the transactions, I
7  guess ultimately was, by extension, approved by
8  the Barclays board. Though nobody, as I recall,
9  actually picked up the phone to a member of the
10  board to say is it OK if I sign this document
11  right now.
12      Q. When was the decision made to enter
13  into the TAA?
14      A. I think it was in the early hours of
15  Monday morning, but I could be wrong about that.
16      Q. Sir, let's switch gears. I would like
17  to ask you some questions about the clearance
18  box assets.
19      A. Sure.
20      Q. Those are assets specifically at DTC,
21  Deposit Trust Corporation. Can I ask you first
22  why Barclays did not enter into an agreement
23  with the DTC similar to the agreement that it
24  entered into with the OCC?
25      A. Well --

Page 182

J. HUGHES

1
2    WITNESS' ATTORNEY:  Does this call for
3    privileged information?
4    A.   I was going to ask a question first.
5        Are you asking me about the clearance
6    box assets or are you asking me the DTC?
7    Q.   Specifically about the arrangements
8    that Barclays entered into with the OCC compared
9    with the arrangements that it entered into with
10   the DTC.
11       I mean to put it -- all I'm trying to
12   find out is, I understand that Barclays agreed
13   to be responsible for the settlement obligations
14   of Lehman with respect to the OCC.  And that
15   Barclays declined to take on that same
16   obligation with respect to the DTC.
17       WITNESS' ATTORNEY:  So I think this is
18       where the confusion comes in.  You have a
19       topic here, "Barclays decision not to the
20       assume LBI's liabilities at DTC," et cetera,
21       and you ask for discussions with LBI, et
22       cetera.  We think those would be the
23       appropriate questions to ask.  So -- I don't
24       know if there is a pending question, but --
25       is there a pending question?  I don't know

Page 183

J. HUGHES

1
2    if there is, is there a pending question.
3    Q.   Let me put it, why did Barclays not
4    agree to be responsible for the Lehman
5    settlement obligations to DTC?
6        WITNESS' ATTORNEY:  You can answer,
7        but don't reveal any privileged
8        communications, if you can answer it without
9        revealing privileged communications.
10   A.   I think that the determinations with
11   respect to OCC obligations on the one hand and
12   the determination with respect to DTC settlement
13   obligations on another hand were never associated at
14   any point in time.
15       The determination with respect to DTC
16   obligations at the time was that Barclays had
17   never contemplated taking on that category of
18   liabilities of Lehman Brothers.  Lehman Brothers
19   never asked Barclays, as far as I'm aware, to
20   take on those liabilities.  Barclays did have
21   discussions with DTC about them.  But at no
22   point, as far as I'm aware, did Barclays
23   indicate to DTC that it would take on those
24   obligations.
25   Q.   I understand that some transfers were

Page 184

J. HUGHES

1
2    made from the DTC clearance box to Barclays on
3    September 18 and September 19 of 2008.  Can you
4    tell me what was the reason that those transfers
5    occurred?
6    A.   I'm not sure I know exactly what
7    you're referring to there by clearance boxes or
8    which assets you are referring to.
9    Q.   I believe that you wrote to the
10   trustee concerning certain transfers that had
11   occurred on Friday, September 19 from DTC.  Do
12   you recall that?
13   A.   On the 19th?
14   Q.   That's the Friday of the sale hearing.
15   A.   Earlier you mentioned the 18th and the
16   19th.  You are referring just to the 19th.
17   Q.   I am going to start with the 19th and
18   see if we can get there.  Do you know why those
19   assets were transferred?
20   A.   Can I be clear which assets you are
21   referring to, either by reading the list you are
22   referring to or perhaps by you describing what
23   exactly you are referring to?
24   Q.   Yeah, I believe in the letter you say
25   Barclays identifies the following transfers of

Page 185

J. HUGHES

1
2    clearance box securities and the first one you
3    mention is 1.035 billion dollars from DTCC on
4    September 19.
5    A.   Um-hm.
6    Q.   Why was that transfer made?
7    A.   I believe it was part of an exercise
8    pursuant to which or "part of" is the wrong
9    word.
10       I believe the securities were
11   transferred by either Jim Hraska, who was then
12   an employee of Lehman Brothers or one of his
13   colleagues, I think Jim Hraska, who I believe at
14   the time thought that he was transferring those
15   securities as part of a repo transaction, but
16   that he was mistaken about that.
17       There had been, at or about the same
18   time if not before that transfer -- I believe it
19   may have been before -- an agreement reached
20   between representatives of Lehman Brothers and
21   Barclays that identified the clearance box
22   assets as being a category of assets
23   transferrable under the -- pursuant to the sale.
24       So I think that's -- I believe that's
25   how it happened.

Page 186

J. HUGHES

1
2    Q.    And I take it that all of the assets
3    that were transferred to Barclays that came from
4    the clearance box, Barclays is claiming them
5    under the clarification letter as clearance box
6    assets and not as a part of the repo?
7        WITNESS' ATTORNEY:  Objection to the
8    form.
9    A.    Well, I think first and foremost, any
10    assets we claim not pursuant to the
11    clarification letter, we claim the assets
12    pursuant to the asset purchase agreement as
13    clarified by the clarification letter, strictly.
14        Do we believe -- did we believe then
15    and do we believe now that some of the assets
16    were identified as clearance box assets and some
17    were identified as repo assets?  Yes.  There
18    were attempts, good faith attempts between both
19    Barclays and Lehmans to identify each of those
20    categories of assets.  I believe the assets that
21    you referred to that I had earlier referred to
22    in my letter were transferred from what were
23    termed the clearance boxes.
24        And so the identified category of
25    clearance box assets represented by Lehman

Page 187

J. HUGHES

1
2    Brothers, I think on the Friday morning as
3    transferrable included the 1.035 billion.
4    Whether any of the -- I can't now recall exactly
5    which accounts the repo assets were transferred
6    from and whether they were, in fact, separate
7    accounts or whether some of the assets under the
8    repo may have also come from the clearance
9    boxes.
10        I can't recall now specifically
11    whether the actual accounts from which the
12    transfers took place were at all times exclusive
13    or different if one looks at one category of
14    assets as compared to the other.
15    Q.    Yeah, my question is simply the
16    billion dollars of assets that were transferred
17    on the Friday the 19th.  I just want to
18    understand, Barclays is claiming that it is
19    entitled to those assets under the sale
20    agreement.
21    A.    Correct.
22    Q.    Does Barclays have any other
23    entitlement to those assets other than under the
24    sale agreement?
25        WITNESS' ATTORNEY:  Objection,

Page 188

J. HUGHES

1
2    objection to the form.
3    A.    Other than under the sale agreement?
4        WITNESS' ATTORNEY:  You can answer if
5    you understand the question.
6    A.    If by your question you mean was
7    Barclays entitled to receive those assets from
8    the clearance boxes pursuant to the terms --
9    pursuant to the asset purchase agreement, yes, I
10    believe Barclays was so entitled.
11        The parties had agreed on the Friday
12    morning that unencumbered assets that were
13    then -- that Lehman Brothers was at that point
14    able to identify and termed the clearance box
15    assets were clearly assets owned in the business
16    and therefore, they were due to Barclays.
17    Q.    The basis for Barclays claim to those
18    assets is the APA?
19    A.    The APA --
20    Q.    As clarified?
21    A.    As clarified, yes.
22    Q.    We have been talking about the DTC
23    clearance box.  Is it Barclays' understanding
24    that it is entitled to securities and other
25    assets from depositories and clearance boxes

Page 189

J. HUGHES

1
2    other than those at DTC?
3    A.    I think if there are other assets that
4    were used in connection with the businesses of
5    Lehman Brothers in North America, that were --
6    that are unencumbered, in the sense used to
7    describe the clearance boxes, whether they are
8    at DTC or anywhere else, they would be due to
9    Barclays.
10    Q.    And that includes EuroClear?
11    A.    If such assets fit the description
12    I've just given, yes.
13    Q.    Do you know whether Barclays has, in
14    fact, obtained securities or other assets from
15    EuroClear?
16    A.    I don't know the answer to that
17    question.
18    Q.    Do you know whether Barclays has
19    obtained securities or other assets from
20    clearance boxes in other -- from other clearance
21    boxes other than EuroClear and DTC?
22    A.    I'm not aware that that's happened,
23    no.  I'm not saying it hasn't, but I'm not aware
24    that it has.  And to be clear, I'm not aware
25    that it has with respect to EuroClear.  It may

Page 190

J. HUGHES

1   have, but I don't know.
2
3       Q.   What did you understand was Lehman's
4   exposure to DTC?
5       A.   When you say exposure, what do you
6   mean?
7       Q.   Risk of loss?
8       A.   To DTC?
9       Q.   Maybe I should -- maybe it is easier
10  the other way around.  What was DTC's exposure
11  to Lehman?
12      A.   I don't know.
13      Q.   Did Barclays make any effort to
14  determine, quantify what was DTC's exposure to
15  Lehman?
16      A.   No.  I think it would be more accurate
17  to say that DT -- that Barclays urged DTC to
18  make a realistic determination of what that
19  exposure would be.  There were initial requests
20  from DTC to Barclays to cover the -- cover
21  Lehman liabilities associated with transactions
22  that are cleared through DTC, and during those
23  discussions, Barclays urged -- well, first of
24  all, rejected those requests.  Secondly,
25  encouraged DTC to make a proper assessment of

Page 191

J. HUGHES

1   the nature and extent of those exposures and
2   instead of pleading or claiming a need for an
3   open-ended guarantee or indemnity, to use its
4   own records to be able to estimate more
5   realistically what that potential exposure could
6   be.
7
8       And ultimately DTC, I believe, did
9   conduct such an exercise.  I wasn't party to
10  such an exercise, nor am I aware that anybody at
11  Barclays specifically was a party to the
12  exercise.  But DTC did ultimately return to the
13  discussion and DTC and Barclays ultimately
14  agreed that Barclays would provide the sum of
15  250 million dollars as a -- I think it was 250
16  million dollars as a limited recourse indemnity,
17  so to speak, for potential losses that DTC might
18  face if -- or after the markets open for
19  business on the morning of the 22nd of
20  September.
21      Q.   Did Barclays assess the impact on the
22  business it was acquiring if DTC were to issue a
23  cease to act notice with respect to Lehman?
24      A.   I'm not sure that Barclays made an
25  assessment of the type as you describe it.  I do

Page 192

J. HUGHES

1   believe that Barclays was very concerned that if
2   transactions that are clearable through -- that
3   were clearable through DTC were not able to
4   clear on -- when markets opened after the
5   closing, that that would be hugely problematic
6   for the -- for not just Lehman but also for
7   Barclays.
8       Q.   Did --
9       A.   And therefore, it was potentially --
10  it was potentially -- it would potentially stand
11  in the way of Barclays being able to conclude
12  the transaction.
13      Q.   Did Barclays consider whether it could
14  conclude the transaction if DTC refused to act
15  for Lehman?
16      A.   I don't know whether there was that
17  specific consideration.  I do know that there
18  were discussions relating to the -- to the risks
19  associated with DTC blocking transactions that
20  needed to clear.  That discussion was not just a
21  DTC discussion, but it also related to other
22  custodians and other organizations or
23  institutions that cleared Lehman-related
24  business.  It was important for the flow of

Page 193

J. HUGHES

1   those settlements to be allowed to happen in
2   order that securities transactions could
3   properly clear and assets and liabilities flow
4   accordingly.
5       Q.   Was there any discussion among the
6   principals at Barclays as to whether it could
7   close the deal without DTC support?
8       A.   When you say DTC support, I don't
9   think there was any discussion about DTC
10  support.
11      Q.   But that I simply mean without DTC
12  continuing to act for Lehman?
13      WITNESS' ATTORNEY:  You can answer if
14  you can answer without revealing privileged
15  communications.
16      A.   I don't think -- I'm not aware of
17  discussions that would be -- discussions other
18  than privileged discussions on that topic.
19      Q.   Did Barclays have any discussions with
20  any regulators concerning the need for DTC to
21  continue to act for Lehman?
22      A.   I think there may have been
23  discussions between external legal advisors of
24  Barclays and certain regulators on that topic,

Page 194

J. HUGHES

1
2  but I don't know the content of those
3  discussions.
4      Q.   Who was involved in those discussions?
5      A.   I can only answer that by saying that
6  I am aware that Ed Rosen from Cleary Gottlieb
7  had some discussions with some regulators and I
8  believe that Roger Cohen and Jay Clayton at
9  Sullivan & Cromwell had discussions with some
10 regulators. Whether those discussions included
11 reference to this topic, I don't know.
12     I should add there were other
13 discussions with regulators involving other
14 people, but again, I'm not aware that they
15 involved this topic.
16     Can I be clear, I assume you do not
17 include the DTC in the definition of a
18 regulator.
19     Q.   That's right. All I am looking for is
20 what communications were made by Barclays to
21 regulators concerning the need for the DTC to
22 continue to act for Lehman. Are there any
23 communications that you are aware of?
24     WITNESS' ATTORNEY:  Other than what
25     you already answered?

Page 195

J. HUGHES

1
2      A.   I don't think I can say anything more
3  than what I have already said on the topic. But
4  I would repeat that DTC was not acting for
5  Lehman Brothers.
6      Q.   By acting for Lehman Brothers, I
7  simply mean clearing, continue to clear Lehman
8  trades?
9      A.   Yes.
10     Q.   You understood that --
11     A.   That I understand, yeah.
12     Q.   I show you a document previously
13 marked Exhibit 156B.
14     WITNESS' ATTORNEY:  This is a lending
15     letter before --
16     Q.   To make it easier to you, sir --
17     WITNESS' ATTORNEY:  You are going to
18     point --
19     Q.   Just going to point to the second
20 page, first full paragraph, "It should be quite
21 clear in context, however"?
22     A.   Yup.
23     WITNESS' ATTORNEY:  Why don't you read
24     that paragraph and read whatever else you
25     think you need to to put it in context.

Page 196

J. HUGHES

1
2      Q.   Just let me know, sir, when you have
3  done that.
4      A.   OK, I've read it.
5      Q.   I want to invite your attention, sir,
6  specifically with respect to the distinction
7  that is being drawn here between certain
8  accounts maintained at DTCC and the securities
9  contained in those accounts. Do you see that?
10     A.   I do.
11     Q.   Can you tell me what is the basis for
12 that distinction?
13     WITNESS' ATTORNEY:  If you can answer
14     that without revealing privileged
15     information, you can answer. If you are
16     concerned you would reveal privileged
17     information, let me know.
18     A.   I believe the basis is that the
19 agreement between Lehman Brothers and Barclays
20 referred to, in this context, particular
21 securities that had been identified by Lehman
22 Brothers initially in a -- it had been a large
23 list or lengthy list of securities. And that
24 was the agreement between the parties with
25 respect to that identified class of securities

Page 197

J. HUGHES

1
2  which were assets held in connection with
3  Lehman's businesses which I said, as I have
4  said, was the core of the transaction.
5      I believe the basis also is that at no
6  point did Barclays ever agree in this context
7  with Lehman Brothers to acquire liabilities in
8  any accounts of Lehman Brothers at DTC, and
9  further, I think the basis is that this
10 paragraph is in part at least a reference to the
11 nature of the agreement between Barclays and DTC
12 as distinct from the nature of the agreement
13 between Barclays and Lehman Brothers.
14     Q.   Was this distinction ever discussed
15 with anyone at DTC?
16     A.   Which distinction?
17     Q.   The distinction between the accounts
18 maintained at the DTC and the securities
19 contained in those accounts?
20     A.   At which point in time are you
21 referring to?
22     Q.   At any point in time.
23     A.   At any point in time. I believe
24 Barclays made it clear to DTC that it was not
25 acquiring any liabilities of Lehman relating to

Page 198

J. HUGHES

1    DTC, that Barclays was not acquiring the Lehman
2    accounts at DTC, and I believe made it clear
3    that there were securities of Lehman Brothers
4    that typically clear through DTC which were to
5    be acquired by Barclays.
6        I believe all of those points were
7    made clear prior to the closing and prior to the
8    signing of the DTC agreement and I can't be
9    certain about what I am about to say, but I
10   believe that representatives of Barclays at
11   Cleary have on more than one occasion reiterated
12   some or all of those points to DTC.
13   Q.    Who at Cleary had those discussions
14   with DTC?
15   A.    I don't know whether those discussions
16   included more -- people in addition to Ed Rosen,
17   but I do believe it did include Ed Rosen.
18   Q.    When did Mr. Rosen have those
19   discussions?
20   A.    I'm not certain as to the exact
21   timing. I do think there were -- I do recall
22   that there were discussions during the closing
23   weekend. Precisely when, I'm not absolutely
24   sure, and I believe there were discussions that

Page 199

J. HUGHES

1    post-dated the closing and the signing of the
2    DTC agreement. Though again, I'm less certain
3    about the fact of those additional discussions
4    and, therefore, necessarily the content of them.
5    Q.    When did the post-closing discussions
6    between Mr. Rosen and DTC occur?
7    A.    I'm really not sure.
8    Q.    Can you give me a month?
9    A.    No.
10   Q.    Can you give me a year?
11   A.    I believe there may have been
12   discussions in the fourth quarter of 2008 and I
13   believe there may have been been discussions in
14   2009. Again, I wouldn't be able to say with
15   certainty, and while I have had discussions with
16   Ed Rosen about a whole variety of different
17   issues, I don't recall -- I certainly can't
18   recall now whether we identified when those
19   discussions might have occurred.
20   Q.    With respect to the 2009 discussions,
21   can you give me a quarter in 2009 that those
22   discussions occurred?
23   A.    Really wouldn't be sure at this point.
24   It's possible there were discussions in each

Page 200

J. HUGHES

1    quarter, but I really, I really couldn't say.
2    Q.    With whom at DTC did Mr. Rosen have
3    these discussions?
4    A.    I think one or more of Don Thompson --
5    sorry, Larry Thompson, I think, and one other
6    individual who I believe is the chief executive
7    of DTC whose name is eluding me. If anybody can
8    help me with that, I would be able to tell you
9    whether it is right or wrong.
10   Q.    When you saw one or more --
11   A.    I think he had discussions with Larry
12   and also with chief executive of DTC, but I'm
13   not absolutely sure about that.
14   Q.    And specifically, can you tell me what
15   was said in those discussions about the
16   distinction between the accounts at DTC and the
17   securities contained in those accounts?
18   A.    Yeah, I can't tell you specifically.
19   As I said earlier, the serial distinctions or
20   the serial comments that I made in answer to
21   your question earlier, I believe were covered or
22   some of them may have been covered, but I
23   couldn't say with any degree of certainty.
24   Q.    Let me ask you with respect to the

Page 201

J. HUGHES

1    discussions prior to the closing. Did anyone
2    other than Mr. Rosen have discussions concerning
3    this distinction with the DTC?
4    A.    As I have earlier defined this
5    distinction, yes.
6    Q.    Who other than Mr. Rosen?
7    A.    There were discussions involving, at
8    one point, I believe Larry Thompson, if I am
9    getting his name correct. But I have a greater
10   recollection of representatives of DTC, I think
11   in the form of their lawyers, who I believe were
12   Proskauer at the time. I can't remember the
13   specific names of individuals, but I do recall
14   specific discussions between representatives of
15   Barclays and such representatives prior to the
16   signing of the DTC letter and prior -- and
17   therefore, by definition, prior to the closing.
18   Q.    And you have mentioned Mr. Thompson
19   and Proskauer. Anyone else?
20   A.    On the other side? I wouldn't be able
21   to say. My sense was there were other people on
22   the phone, but they were telephone
23   conversations, so I couldn't say with certainty
24   who else was present on the other side of the

Page 202

1          J. HUGHES
2   phone.
3       Q.    Other than -- did you participate in
4   these conversations?
5       A.    I did.  Well, I participated in some
6   or part of those conversations.  But not
7   necessarily -- I didn't participate in all of
8   them.
9       Q.    And other than you and Mr. Rosen who
10  on the Barclays side, who else participated in
11  these discussions?
12      A.    The only other person I can recall
13  specifically being there when I was there was
14  Alan Kaplan who is, as I have said, a member of
15  my department.
16      Q.    When did these conversations happen,
17  the preclosing discussions?
18      A.    Again, it is hard to say with
19  certainty given how much was happening at that
20  time, how frenetic the whole thing was and how
21  little sleep everybody had had.
22          My best recollection of the discussion
23  that I was involved with or the discussions that
24  I was involved with, they were probably on the
25  Thursday night, but it's possible they were on

Page 203

1          J. HUGHES
2   Friday night.  I don't think they were after the
3   Friday night.
4          And the reason I say that is that I
5   recall the discussions taking place at whatever
6   time in Alan Kaplan's office at 200 Park Avenue
7   and the reason that that's relevant is that as
8   of Saturday morning, I was constantly at the
9   offices of Weil Gotshal right up until and
10  through the closing.  Exactly what time I
11  arrived at the offices of Weil Gotshal on
12  Saturday morning, I couldn't now remember, but I
13  am pretty certain that the discussions did not
14  take place after 6 or 7 o'clock in the morning
15  on Saturday of what I guess would be the 20th.
16          And again, I do have a recollection of
17  a quite lengthy discussion involving the DTC.
18  It also was a discussion relating to DTC's
19  concern with respect to its own potential loss
20  and included the points I made several moments
21  ago now with respect to our urging DTC to come
22  up with what we thought was a realistic
23  proposition around its potential loss because
24  the urging was done by me.
25      Q.    What did DTC say about its concerns

Page 204

1          J. HUGHES
2   about its exposures to Lehman?
3       A.    I don't recall particular words.  It
4   was clear at the beginning of the discussion
5   that they contended a much broader potential --
6   or much greater potential loss than I thought
7   was rational and I conveyed my thoughts about
8   their irrationality at the time and, as I have
9   said, urged them to come to what I thought was a
10  realistic view which again, as I have said, they
11  ultimately did.
12      Q.    Can you tell me whether anyone from
13  Barclays or representing Barclays had any
14  discussions with anyone at DTC after the Friday
15  night?
16      A.    Anyone at Barclays after the Friday
17  night?  I don't know the answer to that
18  question.  It's possible that -- it's possible
19  that Alan Kaplan had additional conversations
20  with DTC.  It's possible that Gerard Larocca had
21  discussions with DTC.  It's possible that other
22  members of the operations function at Barclays
23  had discussions with DTC.  I couldn't tell you.
24      Q.    You are not aware of any discussions
25  after the Friday night?

Page 205

1          J. HUGHES
2       A.    Well, I'm not aware of any discussions
3   on this particular topic.  I think there is a
4   decent chance, although I wouldn't know with any
5   certainty, that there were other discussions
6   with DTC.
7       Q.    I'm just asking if your from your
8   knowledge --
9       A.    I'm not aware of others.
10      Q.    Who at the Cleary was responsible for
11  negotiating the clarification letter?
12      A.    I think it was a combination of Cleary
13  lawyers that I have previously referred to.  The
14  responsibility I would say was shared among Vic
15  Lewkow, Bob Davis, Ed Rosen, Duane McLaughlin,
16  Lindsee Granfield and others.  There were a lot
17  of people.  No specific individual was delegated
18  with the actual comprehensive responsibility.
19          Many of those lawyers were having
20  discussions throughout the period of the 17th
21  through the 22nd with many different people.
22  From time to time, naturally, they would have
23  communicated either with me or other member of
24  my department about aspects of that negotiation
25  about aspects of the discussions they had with

Page 206

J. HUGHES

1
2  those many other people at Weil or representing
3  the trustee or the creditors committee or indeed
4  anybody else.  So I think there were lots of
5  people that were responsible for it.
6      Q.    You have that Exhibit 156B still in
7  front of you?
8      A.    Yup.
9      Q.    If you would turn to the third page,
10  page 3 of Ms. Granfield's letter.  If you look
11  at the top and you will see the second full
12  sentence reads, "Nothing in this letter or in
13  Exhibit B should be construed to suggest that a
14  portion of the securities in the LBI clearance
15  boxes at the time of closing equal to the
16  quantity of long customer positions in such
17  securities were not sold to Barclays pursuant to
18  the asset purchase agreement as clarified by the
19  clarification letter."
20      Do you see that, sir?
21      A.    I do.
22      Q.    Now, Ms. Granfield here is referring
23  to a portion of security.  Do you see that?
24      A.    Can I read the whole sentence?
25      Q.    Absolutely.

Page 207

J. HUGHES

1
2      A.    OK, I see it.
3      Q.    Do you understand that she is
4  referring to a particular portion of securities
5  there?
6      A.    She certainly uses the --
7      Q.    Maybe I will try it a different
8  question.  Do you understand what she is saying
9  there?
10      A.    No.
11      WITNESS' ATTORNEY:  Would this be a
12  good time to take a little break, just two
13  minutes.
14      MR. MAGUIRE:  Sure, sure.  That's OK,
15  we can take a break.
16      (Recess)
17      (Exhibit 563C, letter dated May 13,
18  2009 marked for identification, as of this
19  date.)
20      Q.    Sir, I have shown you a document we
21  have marked as Exhibit 563C.  It is a letter
22  dated May 13 at 2009 from you to Mr. Giddens, is
23  that correct?
24      A.    Yes.
25      Q.    If you turn it, sir, to page 4 of your

Page 208

J. HUGHES

1
2  letter and see the first full paragraph begins,
3  "By Sunday night, September 21," and it
4  continues.
5      A.    Yup.
6      Q.    Can you tell me, sir, what's the basis
7  for that sentence?
8      WITNESS' ATTORNEY:  Why don't you
9  review the sentence in context.
10      Q.    Take as much time as you need, sir.
11      A.    I believe the basis for the statement
12  is that by that point in time, it had become
13  clear from DTC that the 250 million dollar
14  limited recourse guarantee that's also referred
15  to in this paragraph would be sufficient to
16  cover DTC's exposure.
17      As I said earlier, there had been a
18  discussion with DTC on the topic and I assume
19  that in this -- in the beginning of this
20  paragraph, I'm making a reference to the final
21  agreement from which it was fair to conclude
22  that DTC had concluded that its exposure was, in
23  fact, less than it originally feared and that
24  was my understanding at the time.
25      Q.    And that DTC did not need any

Page 209

J. HUGHES

1
2  protection beyond the 250 million dollars that
3  Barclays had agreed to deposit?
4      A.    Whether, in fact, they needed to or
5  not, I believe that that was what we had agreed
6  by that point in time.
7      Q.    Any other basis for that sentence by
8  Sunday night?
9      A.    I think the tenor of the discussion
10  that I had, that I had -- that I have earlier
11  referred to suggested to me that DTC would
12  reassess its concerns associated with that --
13  with those exposures.  I didn't know at the
14  conclusion of that discussion that they would,
15  in fact, agree that they really didn't need the
16  kind of indemnity that they had first proposed
17  and that they needed something considerably
18  less.
19      But because I felt at the time that it
20  was an objectively sustainable notion, I
21  certainly hoped that they would, as I then
22  viewed it, see reason.  The point being that DTC
23  was in possession of all the necessary
24  information to understand the long and short
25  positions that were relevant to LBI in the DTC

Page 210

J. HUGHES

1
2  system and ought to have been able, therefore,
3  to determine not exactly by any means, but with
4  a reasonable degree of accuracy what that net
5  exposure might actually look like.
6      Q.   Let me ask you about the --
7      A.   But I should just say, Barclays was
8  clearly not in such a position to make that
9  estimation.
10     Q.   Let me ask you about the assets that
11  were in the DTC clearance box.  What due
12  diligence did Barclays perform on those assets?
13     A.   What do you mean by "due diligence"?
14     Q.   What investigation did Barclays do
15  concerning those assets?
16     A.   Can you be a bit more specific about
17  what you mean by investigation?
18     Q.   Anybody go to DTC?
19     A.   Not that I'm aware of.
20     Q.   Did anybody get a schedule of those
21  assets?
22     A.   I believe a schedule of assets was
23  provided or whether it was described as a
24  schedule or not initially, I don't think it was.
25  But a listing, as I mentioned earlier, of what

Page 211

J. HUGHES

1
2  were represented as the clearance box assets was
3  provided on the morning of Friday the 19th by
4  Lehman Brothers to Barclays.
5      I believe that listing changed over
6  time, on more than one occasion, but that there
7  was an attempt to identify the actual
8  securities, CUSIP-by-CUSIP.  I believe it was
9  ultimately referred to as schedule B, but I
10  could be wrong, I've often confused schedules,
11  A, B, Exhibits A and B and other such
12  appendages.
13     Q.   Did Barclays send any of its
14  operations people to DTC's offices at any time
15  prior to the closing?
16     A.   At any time prior to the closing, I
17  don't know the answer to that question.  It's
18  possible that Gerard Larocca asked members of
19  the operations function to do that, but I don't
20  recall.
21     Q.   Did Barclays ask any of its employees
22  to determine whether there were any liabilities
23  associated with any of the assets in the DTC
24  boxes?
25         WITNESS' ATTORNEY:  Objection to the

Page 212

J. HUGHES

1
2  form.
3      Do you understand the question?
4      A.   I'm not sure.  Could you just repeat
5  the question.
6      Q.   Let me try a different way.  Did
7  anyone at Barclays use the term "cats and dogs"
8  with respect to the assets in the clearance box?
9      A.   I don't know whether anybody used that
10  particular term, but I believe that when the
11  assets were first shown or -- to Barclays or
12  soon thereafter, Mike Keegan and/or Stephen King
13  on behalf of Barclays reviewed that listing of
14  assets and I believe concluded two things: One,
15  it was impossible in the time available to
16  assess whether or not those assets had the
17  values that the Lehman Brothers representatives
18  had ascribed to them, and, two, I believe Mike
19  Keegan felt that there was a good possibility
20  that there was a substantial difference between
21  the represented values and the likely actual
22  realizable values.
23     Q.   Did anyone at Barclays use the term
24  "nails and hammers" with respect to the
25  clearance box assets?

Page 213

J. HUGHES

1
2      A.   Again, I've heard both that term and
3  the earlier term you used.  But I don't recall
4  ever being present when such a description was
5  given.
6      If those two terms mean to you
7  anything of the type that I have just described,
8  then maybe they were said.  I don't know.
9      Q.   Was there a discussion among the
10  Barclays operations people in which it was
11  advised that Barclays should not take the assets
12  without the ability to cherry-pick and to leave
13  behind and not take certain assets in the DTC
14  clearance box?
15     A.   I'm not aware of any such discussion
16  involving Barclays' operations people.
17     Q.   Now, what about with -- involving Mike
18  Keegan or Stephen King?
19     A.   I'm not aware of discussions involving
20  either Mike Keegan or Stephen King that relate
21  to cherry-picking of assets as you describe it.
22     Q.   Was it Barclays' intention in taking
23  on the clearance boxes to --
24     A.   Can I just -- Barclays did not take on
25  the clearance boxes.  Barclays agreed that it

Page 214

J. HUGHES

1
2  would acquire a, as part of the purchase,
3  unencumbered securities which by definition, I
4  believe, and certainly Barclays understood to be
5  assets free and clear to be delivered.  They
6  were defined or referred to as, at the time, as
7  unencumbered assets in Lehman's clearance boxes.
8      Q.   Right.  In the -- in entering into the
9  clarification letter, did Barclays intend to
10 retain the discretion and the right to be able
11 to return any clearance box assets to Lehman?
12     A.   I don't believe there was a discussion
13 of the type you describe.  I believe at the
14 time, Barclays had received a representation
15 from Lehman that this was one identified
16 category of assets that could be transferred.
17 And because they were unencumbered, naturally,
18 Barclays would have the right, all of the rights
19 with respect to an unencumbered asset that you
20 would expect them to have with respect to an
21 unencumbered asset.
22     Q.   If you could turn to the clarification
23 letter that's Exhibit 25, I believe, before you.
24 And I would invite to you look at the very
25 bottom of the first page and all see a

Page 215

J. HUGHES

1
2  parenthetical that begins "provided however."
3      A.   Is this the actual signed
4  clarification letter again?
5      Q.   Exhibit 25, yes.
6      A.   I see the beginning of the
7  parenthetical.
8      Q.   If you could read that full
9  parenthetical and anything else that you need to
10 in that sentence just so you understand the
11 context.
12     A.   Yup.
13     Q.   What was Barclays' intention in
14 retaining this right to give certain assets from
15 the box back to Lehman within 60 days?
16     WITNESS' ATTORNEY:  You can answer
17 that provided you can do so without
18 revealing privileged information.
19     I guess to some extent, this is asking
20 for an interpretation of the agreement.
21     MR. MAGUIRE:  No, I'm asking why
22 Barclays wanted this provision?
23     WITNESS' ATTORNEY:  Why this was
24 inserted?
25     MR. MAGUIRE:  Yes.

Page 216

J. HUGHES

1
2      WITNESS' ATTORNEY:  Can you answer
3  that without disclosing privileged
4  information or do you --
5      MR. MAGUIRE:  I'm not looking for
6  legal advice.  I want to know why Barclays
7  wanted the right to give assets back.
8      WITNESS' ATTORNEY:  You can answer
9  that if you know why Barclays wanted the
10 right to give assets back.
11     A.   I don't know the answer.  I don't know
12 the answer.
13     Q.   Did Barclays have a concern that
14 certain of these assets may be more in the
15 nature of liabilities or may have associated
16 liabilities which would make them more trouble
17 than they were worth?
18     A.   I don't know whether at the time such
19 a determination was reached.  I do know that
20 Barclays was concerned at the time, A, with
21 respect to the value of the securities in
22 question and, B, that it had no opportunity to
23 conduct any real analysis with respect to those
24 securities to make judgments of the type you
25 have questioned me about.

Page 217

J. HUGHES

1
2      So I do know there was concern about
3  identity of assets.  There was concern about
4  value of those assets, all compounded by the
5  lack of time in which to conduct any real
6  inquiry.
7      I should add that the Lehman
8  representations did describe the assets as
9  unencumbered.  But as I say, we had no ability
10 really to ascertain fully what it was that we
11 were going to be delivered.
12     Q.   So you did not know at the time and
13 prior to closing whether any of the assets
14 within the DTC box, clearance box, were, in
15 fact, net liabilities?
16     WITNESS' ATTORNEY:  Objection to the
17 form.
18     A.   I don't know that.  I think the right
19 people to ask that -- to ask that question of
20 would be Mike Keegan or Stephen King and I have
21 not spoken to either of the two of them
22 specifically to prepare for this deposition.  I
23 have spoken to each of them over the course of
24 time, but not on this particular point.
25     But I would expect that if anybody at

Page 218

J. HUGHES

1  Barclays knows the answer to your question with
2  respect to specific securities, it would be
3  either one of those two.  And possibly one or
4  two other people on Stephen King's team as it
5  then was.  Jasen Yang I believe is someone you
6  have also had an opportunity to speak with.  It
7  is conceivable that Jasen may have had some
8  appreciation of the type that you're referring
9  to.
10        Those are the guys we relied upon to
11  identify the assets and to try at least to form
12  any conclusions about them.
13     Q.   Mr. Keegan and Mr. King, what were
14  their respective roles?
15     A.    When you say respective roles, you
16  mean as employees of Barclays or with respect to
17  the transaction?
18     Q.   Specifically with respect to the
19  transaction.
20     A.   Well, I think they had a -- I think
21  they had a number of roles associated with --
22     Q.   Let me make it even narrower, let me
23  just make it respect to the clearance boxes.
24     A.   I would say they had roles, but

Page 219

J. HUGHES

1  certainly Barclays turned to both of Mike Keegan
2  and Stephen King to consider the nature and
3  value of a number of different assets, but
4  included in those would be the nature and value
5  of the assets that had been listed as included
6  in the clearance boxes.
7        As I said, they had a very limited
8  opportunity in which to do that, but those are
9  the people whom Barclays relied to make such
10  determinations or judgments about them as we
11  could.
12     Q.   Let me switch gears on you and ask you
13  about the C3 asset.  You remember that the
14  clarification letter which is in front of you
15  refers to a number of 769 million dollars in
16  that regard.
17     A.   I think it should.
18        WITNESS' ATTORNEY:  I don't know if it
19  is 8.
20     A.   It is 8, right?
21     Yes.
22     Q.   How was that number negotiated?
23     A.   Overnight.  Overnight on Thursday, the
24  18th of September, rolling into the morning of

Page 220

J. HUGHES

1  the 19th of September, Lehman Brothers conducted
2  an exercise to try to identify particular assets
3  and their values that could be conveyed as part
4  of the sale transaction.
5        And one of the assets that on the
6  morning of the 19th, there was described or
7  represented by Lehman as being capable of being
8  transferred was what they described as the
9  excess in the 15c33 reserve account.
10        I believe that at that time, the
11  Lehman Brothers representatives thought and
12  indeed mentioned to Barclays that there was
13  roughly, I think, one-half or 1.7 billion
14  dollars of such excess.  And that that would
15  be capable of being identified and transferred
16  as part of the transaction.
17        Subsequently, during the course of the
18  closing weekend, that number of 1.7 billion,
19  roughly, was reduced to 769 million dollars of
20  securities and that was ultimately the agreed
21  identified value within this category that
22  Lehman agreed to convey.
23        Partly, I believe, if not wholly,
24  Barclays' understanding at the time, partly

Page 221

J. HUGHES

1  because of what I believe to have been a
2  mistaken impression on the part of Harvey Miller
3  at Weil Gotshal that there might need to be some
4  regulatory approval to transfer those
5  securities, it was agreed that Lehman Brothers
6  would transfer those securities or other
7  securities that were equivalent.  In other
8  words, either those securities actually
9  identified or another 769 million dollars of
10  securities.
11     Q.   How was the number 769 chosen?
12     A.   I believe it came from a combination
13  of discussions and initially a reference to an
14  e-mail which I believe was later seen by some,
15  though by whom I'm not sure, and the discussions
16  in the e-mail I believe referred to
17  representatives of Lehman Brothers having had
18  discussions with the SEC in which the SEC had
19  agreed that a certain amount of that excess was
20  available to be transferred and I think in that
21  set of communications, I think including the
22  e-mail, there was a specific reference to 769
23  million dollars of securities.  At least I think
24  that's where the 769 came from originally.

Page 222

J. HUGHES

Q.   Did the 769 result from -- did that represent the total amount of noncash assets in the C3 account?

A.   I did not know what was in the C3 account, I did not know nor do I know what was in the C3 account.

I believe that 769 was represented as the total amount of securities in the excess in the C3 account.

Q.   Was there any discussion about any cash excess?

A.   I believe that there was cash included in the excess and I believe there was cash referred to in those communications and the e-mail that I had referred to.  But I don't recall any discussion -- there certainly was not any discussion on the Friday morning when the topic first was raised about the constituent parts of the C3 account or the reserve.

Q.   Was there any discussion by anyone at Barclays about whether it could get cash from the C3 account?

A.   Whether it could get cash from the C3 account.  Again, I didn't think there was any

Page 223

J. HUGHES

discussion about anything relating to the C3 account other than the excess in the C3 account.

Q.   Right, was there any discussion by Barclays about getting any cash excess from the C3 account?

A.   I don't know whether there was any discussions involving anybody from Barclays or its representatives relating to cash specifically.  I believe there was a discussion on, at some point during Sunday afternoon, of the closing weekend in which, as I mentioned earlier, Harvey Miller, I believe, raised his mistaken belief that there was a need to have some kind of SEC approval.

And it's possible that in that discussion, there was a reference -- there was reference to cash.  I believe that at some point, Michael Klein was involved in that discussion, though I did speak with him about that and his recollection about it was not very strong or clear.  So I couldn't say with certainty that there were any discussions involving Barclays or its representatives relating to cash in this context.

Page 224

J. HUGHES

Q.   Right.  Now, you said Mr. Miller had a mistaken belief that regulatory approval was required for any part of the C3 asset to be conveyed to Barclays, is that correct?

A.   I think I did say that.  Yes.  That, I should say, is my belief, that his was a mistaken belief.

Q.   Have you discussed that issue with anyone at the SEC?

A.   No.

Q.   Is it your understanding that Barclays' entitlement to, anything from the C3 account is subject or is not subject to SEC approval?

A.   It's my understanding that both now and at the time that any excess in the C3 account was the property of Lehman Brothers, that that property was part of the Lehman Brothers North American business and it was therefore capable of being transferred as part of the purchase without SEC approval or indeed anybody else's approval.

Because a question had been raised on the Sunday afternoon, albeit I believe that

Page 225

J. HUGHES

Barclays drew no conclusion at that point in time about that concern or question, that Barclays nevertheless felt it was appropriate at that point to cover that question by agreeing with Lehman Brothers that the delivery would be of the 769 within the excess or another 769 million dollars worth of securities and I believe that that's -- that also would not have required any SEC or anybody else's approval.

Q.   So if I understand this, the sequence right, Mr. Miller expressed a belief that you think was mistaken and that's about getting the need to get SEC approval?

A.   That I believe -- I was not a party to that discussion.  I believe -- that discussion was reported to me subsequently, I can't recall precisely when it was first reported to me.  I now believe that to be a mistaken belief.  But I think that was the provenance of the additional part of the agreement; that in any event, Lehman committed to delivering 769 million dollars of securities.

Q.   And so when did this discussion with Mr. Miller happen about -- that concerned his

Page 226

J. HUGHES

1  
2  belief that SEC approval was required?
3     A.   I believe it was sometime on the
4  Sunday afternoon.
5     Q.   With whom did that discussion -- who
6  were the participants pants in that discussion?
7     A.   The person who recalls it best is Vic
8  Lewkow at Cleary Gottlieb.  As I mentioned
9  earlier, he, Vic, recalled that Harvey Miller
10  was there, that at some -- for some portion of
11  the discussion, Michael Klein was there.  I
12  don't recall whether anybody else was present, I
13  couldn't say.
14     Q.   And while Barclays felt that belief
15  was mistaken, it nonetheless agreed that any
16  transfer of the excess would be subject to SEC
17  approval, is that correct?
18     A.   I don't know whether at the time
19  either Vic Lewkow or Michael Klein knew whether
20  that belief was mistaken or not.  But I do
21  believe that it was agreed at that point -- it's
22  possible it was agreed both before and after,
23  but that in any event, 769 million dollars of
24  securities would be transferred.
25     Q.   And based on this belief of Mr. Miller

Page 227

J. HUGHES

1  
2  which Lehman decided to agree with --
3     A.   Sorry to interrupt you, can I just
4  add, I think I mentioned -- and if I didn't, I
5  would like to mention that it had by that stage,
6  I believe, been mentioned that the SEC had
7  agreed that the excess could be transferred.
8  Now, I could be wrong about the actual
9  chronology of events then, it is hard to recall
10  precisely, but as I mentioned earlier, there
11  were communications and there was, I believe, an
12  e-mail referring to, among other things, the 769
13  and the apparent approval of the SEC.
14         Now, I don't know whether that came up
15  before the discussion on the Sunday afternoon or
16  after it, but I just mention it it is possible
17  it came up before as well, I don't know.
18     Q.   If we leave a space in the transcript,
19  you can refer us to the e-mail that you are
20  referring to.
21     A.   Yeah, I think I can.
22         WITNESS' ATTORNEY:  Yes, we can do
23  that.
24  (Insert:_____)
25     Q.   If you look at Exhibit 25, if you have

Page 228

J. HUGHES

1  
2  it in front of you, section 8, this is part ii,
3  why did Barclays agree to the language "to the
4  extent permitted by applicable law"?
5     A.   I don't think I have a nonprivileged
6  answer to that question.
7     Q.   Did anyone ever -- did anyone ever
8  agree with Barclays that the transfer of this
9  769 million dollars would be unconditional?
10         WITNESS' ATTORNEY:  Are you asking for
11  him to interpret the words in the
12  clarification letter?
13     Q.   No.  Did at any time over the
14  weekend --
15         WITNESS' ATTORNEY:  Are you talking
16  about oral?
17     Q.   Was there any discussion in which
18  anyone said to Barclays, 769 million, you will
19  get, unconditionally.  Did that discussion ever
20  happen?
21     A.   I believe that the understanding
22  between Lehman Brothers and Barclays was clear
23  that the excess in the C3 reserve account was
24  both available and could be transferred.  I
25  believe that there was an agreement

Page 229

J. HUGHES

1  
2  unconditionally to transfer 769 million dollars
3  worth of securities.  I believe that was
4  Barclays' understanding of the agreement between
5  Barclays and Lehman Brothers.  I also believe it
6  was Lehman Brothers' understanding of the
7  agreement with Barclays.
8     Q.   Did anyone at Lehman say that Barclays
9  would get 769 million pursuant to this term
10  unconditionally?
11     A.   I'm not aware of the use of the word
12  "unconditionally."  But I believe that Lehman
13  Brothers and Barclays both understood at the
14  time that 769 million dollars of securities
15  would be included in the assets to be
16  transferred to Barclays no later than a point
17  promptly after the closing of the transaction.
18     Q.   Did anyone tell --
19     A.   And I don't believe that Lehman
20  Brothers ever felt then or subsequently that
21  they had any right to withhold 769 million
22  dollars of securities.
23     Q.   Did anyone from Lehman tell anyone at
24  Barclays that Barclays would get 769 million
25  dollars without SEC approval?

Page 230

J. HUGHES

1
2     WITNESS' ATTORNEY:  Objection to the
3  form.
4     A.   I am -- I am not aware of any such
5  expression, but I believe that such an
6  expression was unnecessary given the
7  representations previously made and the
8  agreement that was ultimately reached as it is
9  described in part in paragraph 8.
10     Q.   You see towards the end of the
11  sentence we have been talking about, there is
12  the words, "are securities of substantially the
13  same nature and value."  Do you see that?
14     A.   I do see that.
15     Q.   Who proposed that language?
16     A.   I don't know.
17     Q.   Why was it proposed?
18     WITNESS' ATTORNEY:  Can you answer
19  that without disclosing privileged
20  communications?
21     A.   I don't think I can answer that in any
22  nonprivileged way.
23     Q.   What discussions were there between
24  Barclays and anyone else concerning those words?
25     A.   Again, I don't think I can answer that

Page 231

J. HUGHES

1
2  question without implicating privileged
3  discussions.
4     Q.   I'm not asking for internal Barclays
5  discussions.  I am only asking for discussion
6  between Barclays and anyone representing
7  Barclays and Lehman or anyone else outside of
8  the Barclays family?
9     A.   But you're asking me with respect to
10  this specific language.
11     Q.   Yeah, what discussions did anyone at
12  Barclays or anyone representing Barclays have
13  with the trustee, with Weil, with the creditors
14  committee, anyone else concerning the words, "or
15  securities of substantially the same nature and
16  value"?
17     WITNESS' ATTORNEY:  Let's discuss this
18  because you have a privilege concern.
19     MR. MAGUIRE:  I think actually --
20     WITNESS' ATTORNEY:  No, we are
21  entitled to confer on privileged concerns.
22  I'm not sure what his concern is.  So let me
23  discuss it.
24     MR. MAGUIRE:  Let me -- before you
25  take the break --

Page 232

J. HUGHES

1
2     WITNESS' ATTORNEY:  No, no, no.  We
3  are going to just talk for two seconds out
4  here.
5     MR. MAGUIRE:  Very well.  The record
6  will reflect the witness has again left the
7  room.
8     (Recess)
9     WITNESS' ATTORNEY:  I think the
10  witness can answer this question because it
11  calls for communications between Barclays
12  and Lehman, I believe.
13     Q.   Do you remember the question, sir?
14     A.   I do.  I do remember the question
15  though I am -- I cannot recall any conversations
16  of the type you referred to as hard as I might
17  try.
18     Q.   And that includes whatever you have
19  learned in preparation for this deposition?
20     A.   Yes.
21     (Pause)
22     Q.   Sir, I show you what we will mark as
23  564C, your notice of deposition.
24     (Exhibit 564C, Notice of Deposition
25  marked for identification, as of this date.)

Page 233

J. HUGHES

1
2     Q.   If you will turn, sir, to page 13, you
3  will see a topic number 23.
4     A.   Page 13, topic --
5     Q.   The very stop, I am sorry, topic 13,
6  whatever page it is on, 23.  It is on page 7, I
7  am sorry, I misspoke.
8     A.   Page 7.  Topic --
9     Q.   23?
10     A.   Topic 23.
11     Q.   Can you tell me what did you do to
12  prepare yourself to address that topic?
13     A.   I spoke with people internally at
14  Barclays and at Barclays and with external
15  lawyers who had acted on behalf of Barclays
16  about OCC margin and some of those discussions
17  were discussions had quite recently.  But I also
18  carried with me coming into today the
19  recollections of some discussions that I have
20  had over the course of many months relating to
21  the OCC margin.
22     Q.   Are you in a position as you sit here,
23  sir, to give me a complete list of all of the
24  documents that Barclays created or prepared
25  prior to September 22 of documents prepared or

Page 234

J. HUGHES

1  concerning or reflecting its proposed purchase
2  of the OCC margin?
3      WITNESS' ATTORNEY:  I am going object
4  because the topic itself is ambiguous, but
5  you can try to answer it.  In other words,
6  as you know, we objected to many of these
7  topics as being unclear and this is a
8  perfect example.
9      But go ahead.
10     Q.   The reason I ask, sir, is I don't want
11 to waste your time here, if you have a specific
12 list that you can give me, that's helpful.  If
13 it would be easier to get it from your counsel,
14 I'm perfectly happy to do it that way as well.
15     A.   I don't have a list of the type you
16 describe.  And I'm not aware of Barclays'
17 creation of, preparation of documents of the
18 type described in question 23.
19     Q.   If you were to ask -- if you needed to
20 pull together a complete list of all the
21 documents that Barclays created or prepared that
22 in any way reflected its acquisition of the OCC
23 margin, who would be the person who would pull
24 that together for you?

Page 235

J. HUGHES

1      WITNESS' ATTORNEY:  I am going to
2  object.  It is an ambiguous request.  It is
3  not at all clear what you are talking about.
4      You can try to answer.
5      A.   I think my answer is the same as the
6  one I just gave you; namely, I'm not aware of
7  any documents that fit this description.  There
8  may be some, I'm not aware of any.
9      MR. MAGUIRE:  OK.  I have no further
10 questions for you at this time, sir.  Can we
11 go off the record.
12     (Discussion held off the record)
13     MR. STERN:  Back on the record.  We
14 have had a long day and I understand that
15 the debtors' counsel has questions that may
16 take hours and that creditors committee may
17 have questions.
18     So given the hour of the day, we have
19 agreed to continue this deposition.  The
20 date we have agreed on is February 1 and we
21     (Continued on next page for jurat.)

Page 236

J. HUGHES

1  will talk about location and starting time.
2  But we will continue that.
3      Thanks, everybody.
4
5
6  _____
   JONATHAN HUGHES
7
8  Subscribed and sworn to
9  before me this      day
10 of January, 2010.
11
12 _____

Page 237

J. HUGHES
INDEX:

1
2
3  WITNESS        EXAM BY:          PAGE:
4  J. Hughes      Mr. Maguire        6
5
6              EXHIBITS
7  Exhibit No.              Marked
8  Exhibit 561C Document Bates stamped WGM       132
9      Lehman E00013236 through 46
10 Exhibit 562C Document Bates stamped          158
11     WGM-Lehman-E 0006263 through
12     6270
13 Exhibit 563C Letter dated May 13, 2009     207
14 Exhibit 564C Notice of Deposition          232

Page 238

J. HUGHES

CERTIFICATE

STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK)

I, MARY F. BOWMAN, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

That JONATHAN HUGHES, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 15th day of January, 2010.

_____
MARY F. BOWMAN, RPR, CRR

---

Page 239

J. HUGHES
* * *ERRATA SHEET* * *
NAME OF CASE:  In Re:  Lehman Brothers
DATE OF DEPOSITION:  1/15/10
NAME OF WITNESS:  Jonathan Hughes
Reason codes:
   1. To clarify the record.
   2. To conform to the facts.
   3. To correct transcription errors.
Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

_____
JONATHAN HUGHES

**A**

**ability (10)**
45:17 48:5 100:3
101:24 102:2
106:20 107:2
176:18 213:12
217:9
**able (36)**
13:8,22 14:3 16:5
19:20 55:20,24
56:10 57:17,19
59:12 60:2,3 64:24
65:2 68:11 72:9
76:9 79:20 80:16
96:19 106:18
108:22 113:9
120:17 129:3
168:22 188:14
191:5 192:4,12
199:15 200:9
201:21 210:2
214:10
**absence (1)**
162:19
**absolute (4)**
51:22 56:3 65:22
98:11
**absolutely (10)**
7:14 26:8 29:11 54:18
65:16 121:7 169:5
198:24 200:14
206:25
**abundantly (2)**
12:21 72:24
**account (15)**
93:11 220:10 222:4,6
222:7,10,20,23,25
223:3,3,6 224:14,18
228:23
**accounting (4)**
40:12 68:3,12,14
**accounts (11)**
187:5,7,11 196:8,9
197:8,17,19 198:3
200:17,18
**accretive (2)**
68:20 69:8
**accuracy (2)**
24:25 210:4
**accurate (17)**
23:4 28:18 29:2 30:15
30:16,21 31:4,11,12
32:16 45:20 66:19
90:10 101:21
105:19 106:19
190:16

**accurately (6)**
28:16 69:7 79:21
102:3,10 166:15
**achieve (1)**
123:22
**acknowledged (1)**
158:6
**acquire (23)**
21:11 34:11,15 46:18
49:4,9 60:4 61:10
61:12,24 62:10,23
63:18 65:4 66:25
67:13 102:18
117:22 118:19
126:22 178:18
197:7 214:2
**acquired (10)**
31:13 41:10 60:7,12
60:18 67:5 78:19
109:18 157:5 198:6
**acquiring (29)**
20:10 31:2 32:9 55:17
57:3 60:24 61:6
84:24 86:8,15,20
95:10,24 96:12,24
97:12 99:3 100:6
101:5 102:24
103:18 104:21
112:22 113:24
114:11 127:4
191:22 197:25
198:2
**acquisition (9)**
20:25 21:2 22:8 28:21
34:20 42:11 121:8
126:21 234:23
**act (6)**
93:23 191:23 192:15
193:13,22 194:22
**acted (1)**
233:15
**acting (3)**
152:15 195:4,6
**action (1)**
238:18
**actual (16)**
10:23 43:11 64:20
89:14 127:21
131:10 150:14
151:5 158:3 167:4
187:11 205:18
211:7 212:21 215:3
227:8
**add (14)**
88:10 89:6 90:15
97:10 114:6 120:15

125:25 132:6
143:20 144:17
145:11 194:12
217:7 227:4
**adding (2)**
166:2,5
**addition (14)**
9:19 10:5 12:15 25:14
27:4 32:2,19,21
33:22 144:6 165:2,7
175:18 198:17
**additional (30)**
9:10 24:15 34:4 35:2
35:19 37:21 93:18
102:4 109:10 110:9
112:9 113:11,19,25
114:6 121:4 123:5,6
123:7 139:9 168:19
173:8,12,14,17,18
178:12 199:4
204:19 225:20
**address (5)**
6:7 100:22,23 116:7
233:12
**addressed (1)**
63:24
**adds (1)**
121:3
**administer (1)**
5:18
**Administered (1)**
1:8
**advice (9)**
15:11 50:22 51:8
63:12 103:4,7,13
127:15 216:6
**advise (1)**
82:19
**advised (3)**
21:23 29:4 213:11
**advisor (3)**
6:5 8:6 10:16
**advisors (5)**
8:4,13,19 11:3 193:24
**afternoon (5)**
14:19 223:11 224:25
226:4 227:15
**ago (6)**
13:19 18:21 32:15
35:5 105:10 203:21
**agree (12)**
49:4 60:4 61:11,13
103:5 124:22 183:4
197:6 209:15 227:2
228:3,8
**agreed (39)**

5:5,9,15 29:2 46:17
61:9 72:22 75:23
90:21 98:5,6 109:5
115:11,14,15 123:8
124:23 126:22
135:10 140:4
163:18 165:18
166:10 182:12
188:11 191:14
209:3,5 213:25
220:21,23 221:6,20
226:15,21,22 227:7
235:20,21
**agreeing (2)**
102:18 225:5
**agreement (89)**
6:16 17:15 21:8,10
29:17 30:18 32:2,25
33:11 34:10,15 35:7
50:4,5 67:13 75:7
82:6,9 86:6 87:17
89:14,17 90:6,16
98:9 118:15,17,17
118:25 119:4,8
120:16 121:5
123:13,21 124:15
125:10,11,13
126:20 140:14
149:10,21,23 150:7
150:13,23,23 151:3
151:9,17 153:21,24
162:6,10 166:15,24
170:14,22,25
171:20 172:20
173:6,6 177:13,19
180:8 181:22,23
185:19 186:12
187:20,24 188:3,9
196:19,24 197:11
197:12 198:9 199:3
206:18 208:21
215:20 225:21
228:25 229:4,7
230:8
**agreements (3)**
16:12 84:9 178:21
**ahead (6)**
37:13 59:8 137:19
154:16 169:15
234:10
**aim (1)**
109:2
**aimed (1)**
11:24
**al (1)**
1:8

**Alan (4)**
8:9 202:14 203:6
204:19
**Alastair (1)**
80:14
**albeit (5)**
64:18 68:23 107:21
159:11 224:25
**allow (4)**
15:4,18 51:4 58:25
**allowed (3)**
41:17 89:15 193:2
**allows (1)**
65:13
**alluded (1)**
177:24
**ambiguous (3)**
137:18 234:5 235:3
**America (5)**
33:20 60:13 83:11
94:22 189:5
**American (5)**
21:11 28:21 42:12
98:6 224:20
**Americas (1)**
33:10
**amount (19)**
33:5 64:24 81:7 84:23
86:14 98:3,11
102:13 127:19
128:16 167:6,9
170:6 174:10 176:7
176:24 221:20
222:3,9
**amounts (3)**
25:12 29:21 102:3
**analyses (1)**
76:19
**analysis (8)**
56:13 76:9 170:21,23
171:10,13,18
216:23
**analyst (3)**
40:16,18 41:2
**and/or (4)**
66:19 70:25 71:20
212:12
**announcement (3)**
40:11,15,16
**answer (96)**
7:12 15:18 21:23
25:16 26:10 30:6
32:22 33:13 41:20
45:4 58:4,8,25 59:8
61:15 67:22 78:2
80:12 85:18 89:7

93:5 99:5 101:8,9
101:12 103:10,20
103:22 105:6
108:12,14 112:24
114:19,21 115:18
116:6,17 121:21
122:15,20 123:18
126:4,10 127:9
134:19 137:3,19
138:20,24 139:12
139:16 142:3 144:2
144:25 148:2,15,16
154:6,15 161:19
162:17 164:22
167:16,22 169:15
172:9 176:18 177:6
177:9 181:3 183:6,8
188:4 189:16
193:14,15 194:5
196:13,15 200:21
204:17 211:17
215:16 216:2,8,11
216:12 218:2 228:6
230:18,21,25
232:10 234:6 235:5
235:6
**answered (14)**
37:13 47:25 59:7 65:7
96:6 108:13 110:2
110:17,25 135:25
138:19 139:15
163:8 194:25
**answering (1)**
99:7
**answers (7)**
11:15 14:2 26:14 78:4
100:20 105:12
138:22
**anticipated (1)**
38:17
**anticipation (1)**
9:23
**anybody (38)**
12:17 14:9 38:23,24
46:2,2 52:6 59:17
62:5 65:11 91:10,16
92:15,17 106:10
107:11,23 108:23
112:2,5 115:17
117:19 128:24
131:9,22 139:2
177:7 191:10 200:8
206:4 210:18,20
212:9 217:25 223:8
224:23 225:10
226:12

**anytime (2)**
44:23 128:20
**APA (31)**
34:10 36:10,15 78:11
78:13 91:23 97:15
113:3,5 115:10,12
115:13 118:18
120:7,8,12,18 123:9
123:16 125:18
126:16,18 127:5,7
133:15 135:9,19
166:11 173:2
188:18,19
**Apart (1)**
164:13
**apologize (1)**
69:18
**apparent (2)**
23:20 227:13
**appear (1)**
42:4
**APPEARANCES (2)**
3:2 4:2
**appeared (2)**
129:10 165:20
**appears (4)**
90:19 130:5 145:21
165:18
**appendages (1)**
211:12
**applicable (1)**
228:4
**applied (1)**
76:18
**applies (2)**
103:25 130:7
**apply (1)**
151:3
**appreciable (1)**
46:23
**appreciate (1)**
70:3
**appreciated (1)**
91:24
**appreciation (1)**
218:9
**approached (1)**
34:18
**appropriate (10)**
62:22 89:22 91:3 95:2
106:2 114:9 171:9
178:21 182:23
225:4
**appropriately (1)**
75:6
**approval (12)**

221:5 223:15 224:3
224:15,22,23
225:10,14 226:2,17
227:13 229:25
**approve (7)**
92:21 93:9 96:19
100:18 101:18
102:21 114:8
**approved (3)**
98:24 114:12 181:7
**approving (2)**
39:16 99:18
**approximately (10)**
133:11,15,21,22
134:16 135:3,22
136:5,11 138:3
**Archie (2)**
8:7 115:21
**area (1)**
145:2
**argue (1)**
163:2
**arrangements (4)**
73:22 166:16 182:7,9
**arrived (4)**
22:20 36:24 107:16
203:11
**ascertain (1)**
217:10
**ascertained (1)**
12:16
**ascribed (1)**
212:18
**aside (9)**
19:13 29:9 58:22
77:20 149:22 150:5
153:15 156:21
157:15
**asked (24)**
32:14 47:24 59:7 65:6
89:8 96:2,4 108:13
110:2,17,25 114:14
115:16 128:8 131:8
131:11 132:4
138:10,19 144:14
154:22 163:6
183:19 211:18
**asking (33)**
7:9,19 11:10 23:14
26:12 31:7 37:9
38:6 51:8 54:20
58:19,21 63:7 70:4
95:21,22 96:3
121:16,24 122:2,24
137:4 142:13 175:6
182:5,6 205:7

215:19,21 228:10
231:4,5,9
**aspect (4)**
26:20 27:3 60:15
83:20
**aspects (15)**
12:5 13:5 14:15 28:24
33:9 49:20 74:19
82:9 83:21 84:5
94:24 120:3,22
205:24,25
**assembled (2)**
11:24,25
**assess (3)**
51:15 191:21 212:16
**assessed (2)**
44:3 75:6
**assessing (2)**
120:19 179:4
**assessment (11)**
49:2 50:2,7 56:7 57:8
61:23 62:10 63:14
102:7 190:25
191:25
**assessments (4)**
59:13,15 64:15
178:17
**asset (30)**
21:8 30:10 32:24
33:11,15 34:2 35:7
43:19 57:4 75:7
77:21 78:7 86:19,21
86:25 87:16 95:17
98:9 110:15,19
113:23,25 120:15
186:12 188:9
206:18 214:19,21
219:14 224:4
**assets (278)**
16:15,17 17:15,18,19
17:19 18:13,22
20:10,16 21:12,16
21:21,24 22:6 24:7
25:12,14 31:2,13,17
31:20,25 32:9,11,18
32:20 33:2,4,16,17
33:18,22 34:4,5,8
34:12,20,23 35:6,8
35:11,14,14,15,19
35:19,25 36:8,12,20
41:7 42:18 43:8
44:8,8 45:8 47:2,5
47:14 49:9,17,23
51:24 52:13 54:9
55:13 56:20 57:10
57:18 59:23 60:23

61:18 64:9,17,21,24
69:11 70:9,13,23
71:4,9,15 72:15,23
72:25 75:14,22 76:5
76:20,23 77:4 78:18
79:2,3,4,4,18 87:12
87:13,14,15,16 88:9
92:7 95:10,13,24
96:11,24 97:11,20
97:20 98:3,11,17
99:2,17 100:6,10,17
100:25 101:5,15,21
101:25 102:15,19
102:23 103:24
104:2,20 105:5,8,12
105:21 106:16
107:25 109:4
110:13,23 111:4,5
111:20,24,25 112:9
112:21 113:2,3,7,11
113:14,18,19 114:4
114:5,11 115:24
119:8,9 123:25
125:25 126:15
127:2 130:4 133:9
133:10,20 134:16
135:3,6,10,21
136:15,22 137:2,8
137:13,15,23,24
138:8,15,16,17
139:4,8,10 141:14
143:2,3,4 153:23
155:12 165:15
168:3,15 169:17,22
170:3,8,13,13,15
175:17 178:20
181:18,20 182:6
184:8,19,20 185:22
185:22 186:2,6,10
186:11,15,16,17,20
186:20,25 187:5,7
187:14,16,19,23
188:7,12,15,15,18
188:25 189:3,11,14
189:19 193:4 197:2
210:10,12,15,21,22
211:2,23 212:8,11
212:14,16,25
213:11,13,21 214:5
214:7,11,16 215:14
216:7,10,14 217:3,4
217:8,13 218:12
219:4,6 220:3,6
222:3 229:15
**associated (18)**
56:2 64:9 66:11 84:3

93:19 120:19 137:7
140:23 149:12
168:3 169:7 183:13
190:21 192:20
209:12 211:23
216:15 218:22
**assume (7)**
7:12 29:9 42:2 80:4
182:20 194:16
208:18
**assumed (1)**
123:5
**assuming (12)**
20:11 23:3,19 26:14
44:19 53:8,18,25
54:25 104:12,17
169:25
**assumption (15)**
21:4 123:13,21
125:10 149:10,21
149:23 150:7,13
151:8 170:22,25
177:13,18 180:8
**assure (3)**
123:23 124:18,25
**attempt (1)**
211:7
**attempting (1)**
112:3
**attempts (4)**
76:6 168:23 186:18
186:18
**attend (1)**
7:22
**attendance (2)**
12:10 141:3
**attendant (1)**
103:23
**attended (4)**
7:25 27:24 112:2
139:6
**attending (1)**
10:12
**attention (2)**
73:7 196:5
**ATTORNEY (48)**
156:7 159:6,18,25
161:4,15 162:2,9,14
166:18 169:12
170:17 176:10,14
176:16 177:3 182:2
182:17 183:6 186:7
187:25 188:4
193:14 194:24
195:14,17,23
196:13 207:11

208:8 211:25
215:16,23 216:2,8
217:16 219:19
227:22 228:10,15
230:2,18 231:17,20
232:2,9 234:4 235:2
**attorneys (2)**
3:5,13,20 4:5 5:6 10:5
**attorney/client (3)**
6:15 85:6 103:3
**attribute (1)**
156:18
**attributed (4)**
76:14,16 77:11
136:22
**authorities (1)**
180:21
**authority (6)**
48:8,23 67:19,23,25
68:3
**authorized (5)**
5:17 48:20 49:4
180:23,25
**available (7)**
25:13 35:16 54:15
174:23 212:15
221:21 228:24
**Avenue (3)**
3:14,21 203:6
**awaiting (1)**
170:10
**aware (73)**
12:24 13:11 27:20
28:3,10 30:7 38:15
38:22,24 51:13,16
53:5,9 54:23 55:8
68:6 76:6,8 81:15
86:19 97:23 99:12
100:10 117:2,13,21
118:3 119:20,24
125:15 127:17,21
128:6,10,23 137:5
137:20 138:8 140:3
140:6 145:12
149:23 152:12
170:3,5,19 171:17
173:10 174:22
177:11,20,22
183:19,22 189:22
189:23,24 191:10
193:17 194:6,14,23
204:24 205:2,9
210:19 213:15,19
229:11 230:4
234:17 235:7,9
**a.m (2)**

2:6 133:6

_____
**B**
_____

**B (5)**
206:13 211:9,11,11
216:22
**back (19)**
20:19,23 22:5 56:12
58:10 64:13 84:13
84:17,22 85:17 86:4
87:20 98:15 125:4
149:8 215:15 216:7
216:10 235:14
**balance (2)**
34:19 98:21
**bank (3)**
52:21,23 55:19
**bankruptcy (2)**
1:2 7:21
**bank's (1)**
69:4
**Barclays (448)**
3:13 6:6 8:2,4,6,8,11
8:13,18 9:6,21
10:17,19 11:3,19
12:23,24 16:13
17:17,22 20:10 21:2
21:9,10 22:20 23:3
23:19,21 26:17
27:12,22,23 28:8,21
29:5 30:4,13,22,25
31:3,16,21,24 32:8
34:11 35:20,24
36:13 37:3,10,23,25
38:6,15,17 39:2,5
39:10 40:4,22 41:11
42:16,25 43:23,25
44:16,24 45:5 46:4
46:14 47:3,6,20
48:5,7,20,25 49:3
50:3,8,10 51:9 52:4
52:10,12,18 53:6,16
54:7,15,17,24 55:12
56:10,25 57:7,12
59:10 60:2,18,23
61:5,9,24 62:10,22
63:18 64:2,7,16
65:2 67:4,5,12,18
67:21 68:5,10,16
69:10,21 70:8,15,23
71:6,8,15,19 72:21
72:24 73:24 74:3,14
74:23 75:15,23,25
76:9,13,24 77:6,11
78:19,24,25 80:15
82:3,13,22 83:7,22

84:17,22 85:2,10
86:8,14,20 87:11
88:9,12 89:15 90:6
90:25 91:8,11,14
92:15,17,23 94:14
94:21 95:8,10,22,24
96:9,12,22,24 97:11
98:5 99:2 100:6
101:3,5,10 102:9,10
102:12,17,20,23
103:15,18 104:12
104:17,20 105:25
106:5,9,23 107:14
107:22 108:8
109:22 110:14
111:15 112:3,7,17
112:19,21 113:10
114:11 115:15,19
116:11 117:3,7,22
118:3,19 119:13,21
120:2,12 121:11,22
121:23 122:24
123:4,20 124:9,13
124:24 125:7,24
126:2,14,18,23,25
127:4,17,18,20,22
128:15,17,23 129:3
129:25,25 131:5,6,9
131:23,24 134:14
134:25 135:11
136:6,13,14,18,23
137:5,13 138:11
139:3 140:11 141:3
143:19,21 144:11
145:13 150:8,21
151:16,25 153:24
155:14 156:21
157:5 159:22
161:12 165:6 166:7
166:10,14 167:2,18
168:5,8 170:15,20
171:7,13 172:12,14
172:19,21 173:10
173:16 174:8,13,18
176:2,7,24 177:8,12
177:17 178:3,7,17
178:25 179:5,7,19
181:8,22 182:8,12
182:15,19 183:3,16
183:19,20,22 184:2
184:25 185:21
186:3,4,19 187:18
187:22 188:7,10,16
188:17,23 189:9,13
189:18 190:13,17
190:20,23 191:11

191:13,14,21,24
192:2,8,12,14 193:7
193:20,25 194:20
196:19 197:6,11,13
197:24 198:2,6,11
201:16 202:10
204:13,13,16,22
206:17 209:3 210:7
210:12,14 211:4,13
211:21 212:7,11,13
212:23 213:10,11
213:16,22,24,25
214:4,9,14,18
215:13,22 216:6,9
216:13,20 218:2,17
219:2,10 220:13,25
222:22 223:5,8,24
224:5,13 225:2,4
226:14 228:3,8,18
228:22 229:4,5,7,8
229:13,16,24,24
230:24 231:4,6,7,8
231:12,12 232:11
233:14,14,15,24
234:17,22
**based (7)**
21:14 25:16,19 39:5
68:15 100:3 226:25
**basic (1)**
162:11
**basically (2)**
57:18 175:16
**basis (15)**
23:10 102:22 107:15
152:18 153:25
154:12 179:21
188:17 196:11,18
197:5,9 208:6,11
209:7
**Bates (9)**
132:15,17 141:19
142:2 158:14,16,20
237:8,10
**Battery (2)**
2:10 4:6
**BCI-CG (1)**
142:5
**bearing (1)**
107:21
**bears (1)**
133:2
**beginning (6)**
9:22 46:20 115:9
204:4 208:19 215:6
**begins (2)**
208:2 215:2

**behalf (8)**
8:2 39:9 89:24 115:18
152:16 159:3
212:13 233:15
**belief (29)**
31:15,16 59:18 61:16
65:11 72:12 78:5
84:16 132:7 139:3
150:7 152:18
153:25 154:5,9,13
154:22 156:25
158:4 223:14 224:3
224:7,8 225:12,19
226:2,14,20,25
**beliefs (1)**
154:7
**believe (210)**
10:9 12:3,12,14 20:14
21:19 22:9,16,20,21
23:7 24:10,15 25:7
27:16 28:17,18,23
29:13,21 30:16,20
31:24 32:6,6,12,15
39:9,12,19 40:9,10
41:21 43:11 49:3,22
51:17 52:5,11 53:10
53:13 54:6,13 59:15
64:15 67:23,25 68:3
68:21,22 70:25
72:17 73:10 74:8,10
74:18 75:21 76:3,10
78:25 79:20 80:17
80:22 82:4,5,8,22
82:24 83:3,16,22
84:10,20,21 86:16
86:22,24 87:8,22
90:9,19,25 91:23
93:12 94:14,19,22
95:6,8,12 96:14
97:2 98:18 99:15
101:15 102:20
104:22 105:25
106:11 108:14,15
108:16 117:6
124:15 125:3,7
126:8 130:23
131:19 137:22
143:24 148:25
149:4,16,17 151:17
152:7,8,11,21,23
153:18,18 155:10
156:23 157:10
163:20 165:9,17
166:14 167:5,10
168:15,24 173:8
178:25 180:22

181:2,2 184:9,24
185:7,10,13,18,24
186:14,14,15,20
188:10 191:8 192:2
194:8 196:18 197:5
197:23 198:3,7,11
198:18,25 199:12
199:14 200:7,22
201:9,12 208:11
209:5 210:22 211:5
211:8 212:10,14,18
214:4,12,13,23
218:6 220:11,24
221:2,13,15,17
222:8,13,14 223:10
223:13,18 224:25
225:9,15,16,19
226:3,21 227:6,11
228:21,25 229:3,5
229:12,19 230:5
232:12
**believed (3)**
37:4 95:22 96:22
**believes (2)**
72:22 168:8
**benefit (7)**
39:17,25 74:20,21
93:17,20 163:12
**best (19)**
13:21 14:11 15:5,20
19:20 34:24 49:8
52:15 54:9 105:17
108:18 110:4
126:22 131:21
159:9 165:9 176:18
202:22 226:7
**better (5)**
39:8 113:6,7 167:24
167:25
**beyond (2)**
90:12 209:2
**bid (1)**
33:20
**Bill (5)**
7:8 41:15 58:18
142:17 149:14
**billion (51)**
21:3 22:15,17 23:7
29:22 31:2 32:20
33:23 36:21 37:5
47:23,23,23 108:3,9
109:15,20 110:15
110:23 112:8,19
130:8,17 131:15
132:3 133:11,16,21
133:23 134:16

135:3,10,23 136:5
136:10,11,25 138:3
138:13,15,17 139:9
167:7,19 175:20,24
185:3 187:3,16
220:14,19
**bit (3)**
54:22 134:21 210:16
**bizarre (1)**
52:2
**Blackwell (1)**
80:14
**blocking (1)**
192:20
**blood (1)**
238:19
**blow (1)**
44:25
**board (25)**
50:8 51:9,14,19 52:4
52:5 53:5,10,13,15
53:16,23 54:2,6,6
54:14,21 55:4,4,6
67:19 68:19 69:7
181:8,10
**Boaz (1)**
147:14
**Bob (2)**
147:13 205:15
**Boies (4)**
3:12 146:15 147:9
148:4
**book (26)**
21:4,24 22:6,13,14
23:2,18 24:6 133:10
133:15,21,22
134:15 135:2 136:8
136:14,15,20,21
137:6,14,17,22
138:6,9,15
**books (1)**
136:10
**borne (1)**
156:14
**bottom (4)**
141:13 158:25 159:4
214:25
**Bowman (4)**
1:17 2:11 238:8,24
**box (40)**
16:15 17:15 18:13
33:17 34:2 35:13,25
69:12 70:9 71:16
110:23 111:3
137:13,15,21,24
138:8,16 139:4,8

181:18 182:6 184:2
185:2,21 186:4,5,16
186:25 188:14,23
210:11 211:2 212:8
212:25 213:14
214:11 215:15
217:14,14
**boxes (24)**
17:13,18 70:14,23
71:4 79:6,19 87:12
87:13 184:7 186:23
187:9 188:8,25
189:7,20,21 206:15
211:24 213:23,25
214:7 218:24 219:7
**break (20)**
7:15 36:18 38:9,12
88:19,20,21,25
111:10,13 112:3,3
114:16,25 151:2
166:19,22 207:12
207:15 231:25
**BRIDGET (1)**
3:9
**briefly (1)**
171:23
**bring (1)**
8:17
**broad (1)**
32:16
**broaden (1)**
54:21
**broader (3)**
53:3 125:13 204:5
**broadly (1)**
21:14
**Brothers (98)**
1:7 3:5 16:13 17:16
17:20 21:8,12 24:18
24:24 28:22 31:24
32:4,10 33:19,20
34:12,16 35:15 36:5
42:12,20 45:19
46:18,25 49:6 50:4
50:5 52:2,6 56:9
60:13 70:14,15 75:9
76:12,18 79:4 82:6
83:2,3,11,23 86:12
87:15 89:24 93:19
94:22 98:7 105:16
106:5,12,25 118:21
118:22 123:24,25
130:25 131:18,20
137:7,20 138:2
145:15 150:15
166:12 169:8 170:7

177:9 183:18,18
185:12,20 187:2
188:13 189:5 195:5
195:6 196:19,22
197:7,8,13 198:4
211:4 212:17 220:2
220:12 221:6,18
224:18,20 225:6
228:22 229:5,6,13
229:20 239:3
**buildings (3)**
33:2,24 45:13
**business (118)**
21:11,13 28:22 32:3
33:4,8,9,10,25 34:5
34:13,15,23 35:4,15
36:3,5,15 41:10
42:20 43:4 45:10
46:11,16,19 47:9,18
47:22 48:11,16 49:6
49:10,21 50:11
51:12 55:23 56:22
56:23 57:2,5,9,11
59:12,13,20,24,25
60:5,7,11,14,16
61:11,12,15,16,22
61:25 62:11,24
63:18 64:4 65:5,12
65:14 66:8 67:2,14
75:8 83:11,12 85:7
86:3,12 87:14 88:7
88:14 93:17,24
94:21 113:24
117:23 118:6,20,22
118:24 119:10,12
120:14,20,24,25
121:9,10 124:6
125:24 126:21
128:5 129:8 150:11
150:15 151:13
155:11 157:4
165:17 169:9 177:2
178:4,6,7,9,11
179:25 188:15
191:19,22 192:25
224:20
**businesses (18)**
32:10,11 42:11,12
49:13 60:13 67:6,14
98:6 145:18 174:19
178:13,19 179:7,12
179:15 189:4 197:3
**buy (1)**
98:6
**B-O-A-Z (1)**
147:15

**C**

**calculate (2)**
77:3 101:24
**calculates (1)**
175:19
**call (9)**
18:15 40:16,18 41:3,6
50:14 63:2 122:16
182:2
**called (2)**
7:3 135:20
**calling (4)**
85:5 121:15 123:2
126:5
**calls (5)**
126:6,9 127:6 143:24
232:11
**capable (5)**
17:21 102:10 220:8
220:16 224:21
**capital (10)**
8:8,11,13 33:8 52:22
68:5,13,19 69:8
143:11
**carried (1)**
233:18
**carve-out (2)**
143:4,7
**case (6)**
1:7 47:7 130:7,14
158:8 239:3
**cash (29)**
29:4,8,14,18,19,23,24
30:3,3,9,14,19
141:15 143:3 167:2
167:7,14,19 168:3,7
222:12,13,14,22,24
223:5,9,18,25
**categories (13)**
32:25 33:24 46:6
75:22 76:20,22 77:4
79:17 100:9,12,21
100:23 186:20
**categorizations (1)**
97:20
**categorized (2)**
136:25 137:7
**category (11)**
78:6,11 100:16
137:23 173:12
183:17 185:22
186:24 187:13
214:16 220:22
**cats (1)**
212:7
**cause (1)**

82:14
**caution (1)**
67:7
**cease (1)**
191:23
**certain (47)**
6:7 12:5 13:4 14:3,15
17:6 18:7 20:4,16
20:16 21:16,17,20
21:21,24,25 22:19
76:18 86:23 96:14
102:18 107:25
108:2 115:24
123:24,25 124:4
152:7,21,24 158:7
162:22 167:17
174:5 176:19,21
184:10 193:25
196:7 198:10,21
199:3 203:13
213:13 215:14
216:14 221:20
**certainly (32)**
9:14 17:3,5 24:14
33:13,16 34:13
35:22 44:6,6 52:17
63:11 72:12 81:7
94:3,5 106:14
118:18 120:23
131:12 135:14
149:18 155:17
157:12 161:13
162:6 199:18 207:6
209:21 214:4 219:2
222:17
**certainty (20)**
12:17 16:11,21 38:4
43:14 51:22 52:7
53:14 55:12 68:25
78:21 95:20 100:5
127:24 199:16
200:24 201:24
202:19 205:5
223:23
**CERTIFICATE (1)**
238:4
**Certified (2)**
2:12 238:9
**certify (2)**
238:11,17
**cetera (3)**
154:10 182:20,22
**chain (3)**
157:8 158:12 173:15
**chance (2)**
134:5 205:4

**change (11)**
23:2,17 29:16,18
74:16,24 82:15
90:12 109:3 123:15
172:9
**changed (9)**
22:13 30:23 109:14
109:20 132:11
136:8 145:4,13
211:5
**changes (12)**
14:15 16:8 18:19 20:4
30:17 37:15 81:6,21
81:23 82:2,11
108:18
**changing (1)**
45:22
**Chapter (1)**
1:6
**character (1)**
109:16
**Chase (1)**
79:10
**check (2)**
88:25 130:13
**checked (2)**
115:25 131:22
**cherry-pick (1)**
213:12
**cherry-picking (1)**
213:21
**Chicago (4)**
118:5 119:14 169:10
169:14
**chief (2)**
200:7,13
**chooses (1)**
66:21
**chosen (1)**
221:12
**chronology (2)**
147:3 227:9
**circumstances (5)**
52:3 54:16 93:13
105:19 140:23
**claim (5)**
121:24,25 186:10,11
188:17
**claiming (4)**
85:10 186:4 187:18
191:3
**clarification (48)**
73:7 74:8,15,24 75:12
75:19 81:16,18 82:8
82:14,21 84:5,14,18
84:20 95:3 123:7

139:24 140:2,5,24
141:7,8 144:13,22
145:13 146:2
147:24 148:13
160:13 163:15,17
164:21 165:8,12
166:3,24 174:9
186:5,11,13 205:11
206:19 214:9,22
215:4 219:15
228:12
**clarified (4)**
186:13 188:20,21
206:18
**clarify (5)**
58:19 74:19 78:2 82:8
239:7
**clarifying (2)**
74:7,15
**clarity (2)**
157:23 158:2
**class (2)**
78:22 196:25
**classes (1)**
77:21
**clause (2)**
133:20 144:4
**Clayton (2)**
10:7 194:8
**clean (3)**
142:11,14,18
**clear (69)**
7:11 12:21 13:20,24
18:4,5 26:11 31:23
31:23 47:13 52:4
54:13 55:10 56:19
67:4 72:19,24 80:20
85:4,22 86:6,7,10
87:10,19 88:4 89:9
90:3,4 93:9 94:23
95:7,9 98:9 99:15
113:5 116:5 119:2,5
119:6,7 120:4
122:19 135:6
136:24 140:21
157:11,11 161:23
162:3,23 184:20
189:24 192:5,21
193:4 194:16 195:7
195:21 197:24
198:3,5,8 204:4
208:13 214:5
223:22 228:22
235:4
**clearable (2)**
192:3,4

**clearance (61)**
16:15 17:13,15,18
18:13 33:17 34:2
35:13,25 69:12 70:9
70:13,23 71:4,16
79:6,19 87:12,13
110:23 111:3
137:13,15,21,24
138:8,16 139:4,8
181:17 182:5 184:2
184:7 185:2,21
186:4,5,16,23,25
187:8 188:8,14,23
188:25 189:7,20,20
206:14 210:11
211:2 212:8,25
213:14,23,25 214:7
214:11 217:14
218:24 219:7
**cleared (1)**
190:22 192:24
**clearing (16)**
19:6 66:11,19,22
84:23 85:9,15,19,22
160:22 168:21
169:24,24 179:16
179:23 195:7
**clearly (10)**
43:16 44:14 50:18
87:25 108:25 111:4
111:25 178:16
188:15 210:8
**Cleary (41)**
8:12 10:2 146:16
147:10,11 148:4,11
148:23 149:3,14,24
151:7,21,25 152:20
152:23 154:25
155:15,18,24 156:3
156:4,8,21 157:11
157:12,20 159:16
159:20,23 160:9,12
164:25 165:10,25
194:6 198:12,14
205:10,12 226:8
**Cleary's (1)**
156:10
**close (6)**
48:8 67:19 71:12 74:4
170:5 193:8
**closed (1)**
117:24
**closing (40)**
9:25 40:4 42:24 44:22
44:23 46:24 48:3,5
56:16,19 70:21

71:12 72:14 73:22
73:25 74:13 83:5
120:4,5 128:3,20
155:2 157:10 158:4
164:14 176:3 192:6
198:8,23 199:2
201:2,18 203:10
206:15 211:15,16
217:13 220:19
223:12 229:17
**CME (7)**
119:17,22 169:17,22
170:5,12,16
**codes (1)**
239:6
**Cohen (1)**
194:8
**collateral (31)**
66:13,15,16 85:11
88:6,13 116:22
117:4 119:11 121:9
125:2,6,21 128:4
145:17 150:10
157:2,3,13 168:20
169:7 174:10 175:4
175:7,19 176:8,24
177:8 178:8,10
179:10
**colleague (1)**
175:15
**colleagues (2)**
10:25 185:13
**column (1)**
130:11
**combination (4)**
180:13,13 205:12
221:13
**come (13)**
43:3,5 57:12,17 98:15
102:14 105:19
106:13 164:9
170:13 187:8
203:21 204:9
**comes (4)**
93:25 120:13 154:23
182:18
**comfort (1)**
52:19
**comfortable (1)**
62:22
**coming (2)**
77:7 233:18
**commenced (1)**
74:11
**comment (1)**
163:4

**commentary (2)**
89:11 103:25
**comments (6)**
42:4 51:13,18 91:15
149:9 200:21
**commission (4)**
118:22 120:20 121:2
121:8
**committed (1)**
225:22
**committee (13)**
3:20 12:8 84:2 117:10
124:11 127:18,22
127:25 149:6
152:10 206:3
231:14 235:17
**common (3)**
77:14 129:20 162:11
**communicate (1)**
156:22
**communicated (1)**
205:23
**communication (5)**
53:9 63:3 71:10 128:7
173:25
**communications (35)**
6:9 50:15 67:9 69:21
70:5,6 85:6 124:17
124:20 125:4
127:11 128:22
144:3 146:22 148:9
149:11 152:25
156:5,10,24 157:9
158:12 173:3,9,23
183:8,9 193:16
194:20,23 221:22
222:15 227:11
230:20 232:11
**company (3)**
48:15 53:7,23
**compared (3)**
44:5 182:8 187:14
**complaints (2)**
39:8,13
**complete (6)**
10:9 149:15,19
162:19 233:23
234:21
**completed (1)**
74:10
**complicate (1)**
156:12
**components (2)**
78:22 96:7
**composed (1)**
130:22

**composition (1)**
31:22
**compounded (1)**
217:4
**comprehensive (2)**
147:20 205:18
**comprised (2)**
37:2,5
**conceivable (1)**
218:8
**concern (10)**
45:16 121:14,18
203:19 216:13
217:2,3 225:3
231:18,22
**concerned (9)**
45:6 46:5 50:14 62:25
103:2 192:2 196:16
216:20 225:25
**concerning (38)**
6:13 30:14 63:5 91:3
116:12 117:3 118:5
120:7 126:7 127:11
127:19 144:4 145:6
147:3 148:7,24
149:20,24 151:7
153:17 156:5,9,22
157:21 159:17,24
160:14 164:25
174:10 179:7
184:10 193:21
194:21 201:3
210:15 230:24
231:14 234:2
**concerns (4)**
45:11 203:25 209:12
231:21
**conclude (17)**
48:5,21 55:12,17
65:13 67:24 68:2,4
68:11 82:22 106:18
140:24 150:23
155:6 192:12,15
208:21
**concluded (7)**
67:24 74:12 75:20
81:19 83:5 208:22
212:14
**concluding (1)**
55:18
**conclusion (10)**
55:21 56:25 57:15,17
75:12 76:8 77:13
114:9 209:14 225:2
**conclusions (2)**
56:12 218:13

**conditions (1)**
141:9
**conduct (9)**
59:11 65:12 66:8 76:9
178:4,7 191:9
216:23 217:5
**conducted (8)**
57:9 59:20 148:19
171:19 178:14
179:8,15 220:2
**confer (3)**
122:4,6 231:21
**conferred (1)**
122:13
**confident (3)**
68:18 69:3,8
**conform (1)**
239:7
**confused (1)**
211:10
**confusing (1)**
134:22
**confusion (2)**
107:20 182:18
**connected (2)**
174:18 181:5
**connection (22)**
21:13 32:11 33:19
34:12 49:17 57:5,11
59:23 64:18,21
66:14 119:11
121:10 125:22,23
128:4 151:12
155:12 157:3
165:16 189:4 197:2
**conscious (1)**
77:15
**consent (3)**
92:3,9,11
**consider (8)**
84:17,22 85:5,17
103:15 119:21
192:14 219:3
**considerable (1)**
84:11
**considerably (1)**
209:17
**consideration (2)**
119:25 192:18
**considered (3)**
83:4 139:7 172:22
**considering (1)**
111:20
**consistent (6)**
24:8 37:25 83:6
125:12,19 127:12

**consistently (1)**
72:13
**constantly (1)**
203:8
**constituent (2)**
111:2 222:19
**constitute (1)**
6:14
**constrained (1)**
91:2
**construed (1)**
206:13
**consult (1)**
77:23
**consulting (1)**
172:6
**contained (3)**
196:9 197:19 200:18
**contains (1)**
175:14
**contemplated (2)**
98:19 183:17
**contended (1)**
204:5
**content (3)**
17:4 194:2 199:5
**context (9)**
65:18 75:7 195:21,25
196:20 197:6 208:9
215:11 223:25
**contingency (1)**
50:20
**continue (6)**
163:2 193:22 194:22
195:7 235:20 236:3
**Continued (1)**
235:22
**continues (1)**
208:4
**continuing (2)**
81:17 193:13
**contract (8)**
121:17,19,25 122:3
122:17,25 123:19
145:2
**contracts (1)**
123:18
**contrast (1)**
61:11
**convenient (3)**
7:17 16:15,16
**conversation (3)**
63:21 157:16 161:21
**conversations (16)**
14:23 15:6 63:7
139:12 153:17

157:20 158:3
160:10 161:8,10
201:24 202:4,6,16
204:19 232:15
**convey (2)**
120:12 220:23
**conveyed (7)**
29:5 30:4 128:16
157:14 204:7 220:4
224:5
**copy (2)**
120:8 173:16
**core (1)**
197:4
**corporate (1)**
180:21
**corporation (2)**
169:24 181:21
**corporations (1)**
179:23
**correct (20)**
9:19 11:5,17 20:12
36:11 41:12 66:18
69:9 70:10 82:17
94:10 122:22 123:2
123:3 187:21
201:10 207:23
224:5 226:17 239:8
**correctly (1)**
11:15
**correlation (1)**
23:24
**corresponds (1)**
142:14
**counsel (10)**
6:12,14 9:16 103:13
122:9 123:18
146:18 172:6
234:14 235:16
**counsel's (2)**
127:15 145:8
**counterparts (1)**
148:11
**COUNTY (1)**
238:7
**couple (4)**
21:15 97:8 123:23
160:9
**course (28)**
10:15 16:18 24:24
29:3 30:24 34:21
35:10 40:18 43:17
43:21 44:9 106:15
126:12 129:14
147:24 148:7 151:4
152:12 157:8,9

164:14 165:14
171:24 173:23
174:2 217:23
220:18 233:20
**court (139)**
1:2 5:20 7:21 14:18
16:25 18:17 19:15
21:5,23 22:5,14
24:9,19 25:8 26:22
27:10,13,14,21 28:5
28:13,15 29:4,7,8
29:17 30:14,20 32:7
32:17 37:6,15 38:16
38:23,25 39:10,19
43:13 74:17,20 75:2
81:4,25 82:16,19,19
82:23,24 83:8,12,16
84:13,14,18,21,23
85:17 86:5,6,8,10
86:14,20,22,24 87:4
87:6,11,18,19 88:5
89:9,12,16,20,22
90:4,22 91:3,5,15
92:20,24 93:6 94:8
94:12,15,19 95:2,6
95:8,12,15,23 96:10
96:14,18,23 97:2,9
97:17,19,25 98:8,16
98:24,25 99:9,10,13
99:16,25 100:2,8,15
101:3,10,15,20,23
102:6,20 103:16,17
104:5,8,11,16,20
105:4,13,25 108:10
109:23 113:13
114:2,10 118:19
138:14
**cover (9)**
57:18 139:23 142:10
147:6,19 190:20,20
208:16 225:5
**covered (5)**
36:10 176:17 179:10
200:22,23
**Cox (3)**
8:7 10:21 115:21
**Cox's (1)**
10:20
**CRAWFORD (1)**
3:9
**created (2)**
233:24 234:22
**creation (1)**
234:18
**credit (5)**
170:20,23 171:10,13

171:18
**creditors (17)**
3:20 12:8 39:9,17
40:2 83:25 93:18
117:10 124:11
127:18,22,25 149:6
152:10 206:3
231:13 235:17
**crew (1)**
28:2
**Cromwell (5)**
10:6 146:16 147:10
148:5 194:9
**CRR (2)**
1:17 238:24
**culmination (1)**
124:16
**currencies (1)**
167:15
**CUSIP-by-CUSIP (1)**
211:8
**custodians (1)**
192:23
**customer (5)**
174:14,23 175:3
177:8 206:16
**customers (7)**
39:18 61:17 174:11
175:5,8 176:8,25
**C3 (15)**
219:14 222:4,5,7,10
222:20,23,24 223:2
223:3,6 224:4,13,17
228:23

_____

**D**

**D (3)**
133:20 141:14,16
**daily (1)**
179:21
**date (9)**
132:19 133:3 158:18
167:3,5 207:19
232:25 235:21
239:4
**dated (3)**
207:17,22 237:13
**Davis (2)**
147:13 205:15
**day (11)**
3:4 16:19 17:20 43:5
43:5 58:10 179:25
235:15,19 236:9
238:22
**days (1)**
215:15

**deal (19)**
28:16 29:20,25 34:19
35:3 36:2 40:19
48:8 53:18 57:12
82:20 83:21 98:4,5
98:23 113:15
114:12 136:8 193:8
**dealt (1)**
109:10
**debtors (2)**
1:9 235:16
**December (2)**
69:23 80:2
**decent (1)**
205:4
**decide (1)**
134:12
**decided (1)**
227:2
**decision (17)**
65:2,3 117:21 172:13
172:19,22 173:11
177:12,17 180:7,11
180:12,15,17,19
181:12 182:19
**declined (1)**
182:15
**deemed (1)**
171:9
**define (3)**
48:12 61:8 128:13
**defined (6)**
33:3 80:21 87:15,16
201:5 214:6
**definition (16)**
17:4 36:4,8 42:21
59:19 65:15 66:3
111:4 112:25
113:22 120:14,24
121:12 194:17
201:18 214:3
**definitively (3)**
158:10 170:11 180:24
**degree (5)**
45:23 95:19 160:17
200:24 210:4
**delegated (2)**
48:24 205:17
**delegation (1)**
180:20
**deleted (3)**
144:22 148:13 159:4
**deletion (3)**
159:17,21,24
**deliberately (1)**
34:17

**deliver (1)**
83:10
**delivered (10)**
17:21 78:24 79:25
81:2 100:10 124:24
124:24 140:14
214:5 217:11
**delivering (1)**
225:22
**delivery (1)**
225:6
**demand (5)**
69:11 70:8 71:20
72:14,25
**demanded (1)**
71:15
**department (5)**
8:8,10 44:7 202:15
205:24
**dependent (1)**
102:3
**depends (1)**
61:8
**depleted (1)**
25:15
**deposit (6)**
143:8,14 144:21
148:12 181:21
209:3
**deposited (1)**
117:4
**deposition (28)**
1:12 2:8 5:16 8:22
9:20 14:24 15:7
37:21 41:25 58:21
62:3 139:22 146:20
155:6 163:3 176:23
177:5,10 178:2
217:22 232:19,23
232:24 235:20
237:14 238:13,15
239:4
**depositories (1)**
188:25
**derisk (1)**
42:16
**derisked (6)**
40:20,23,25 41:8 42:8
42:13
**derivative (1)**
61:9
**derivatives (65)**
33:8,25 45:10 46:11
46:16,19 47:9,19
48:11 49:5,10,15
50:11 51:11 52:14

53:2 55:23 56:15,22
59:12,20 60:11,14
60:18,21,21,25 61:5
61:6,7,10,12,25
62:11,23 63:16 64:8
65:4,14 85:12 88:7
116:4,6,9,14 117:5
117:18 118:23
124:5 128:5 130:5
131:3 145:18
150:11 151:13
155:11 157:4 164:3
165:17 166:13
169:9 174:12 176:9
176:25 179:9
**describe (22)**
18:7 46:9 55:9 63:24
79:2,21 82:24 85:8
87:2 102:5 108:17
109:2 145:17 166:6
166:16 172:23
189:7 191:25
213:21 214:13
217:8 234:17
**described (62)**
14:17 16:25 20:25
21:5 22:14 23:17,25
24:3 26:24,25 28:16
28:19 29:13 30:25
31:18 32:13,19
33:22 34:18 35:7
37:17 40:19 52:3
72:16 78:6 79:13
80:17 82:16 83:14
89:22 90:21 97:21
106:6,7 108:2,20
109:12 110:21
113:3 117:12 119:3
125:16 128:8 136:4
136:17 137:2
139:23 150:9
151:10,14 157:14
160:5 173:4,22
174:15 178:19
210:23 213:7 220:7
220:9 230:9 234:19
**describes (1)**
126:23
**describing (5)**
23:16 37:15 63:21
78:23 184:22
**description (38)**
11:23 17:2,4 18:11
20:9,13,15 21:6,7
22:12,24,25 27:20
28:11 29:2 30:21

31:12 32:16 37:18
39:11 47:16 49:23
86:2 89:11 105:17
109:8,9 113:6,7
124:4,23 173:15,25
178:23 179:13
189:11 213:4 235:8
**descriptions (12)**
11:12 19:22,23 20:5,7
28:17 51:19 90:12
101:21 103:23
114:3,4
**designated (1)**
12:23
**designating (1)**
6:6
**designed (3)**
49:12 123:22 124:18
**desire (1)**
71:9
**despite (1)**
168:22
**destroy (2)**
99:21,21
**detail (2)**
32:15 125:17
**detailed (6)**
76:19 81:18 94:24
124:3 178:6,15
**determination (5)**
93:2 183:12,15
190:18 216:19
**determinations (4)**
89:21 90:7 183:10
219:11
**determine (12)**
49:8 92:21 93:8
101:17 114:7
130:16 144:9
147:23 176:23
190:14 210:3
211:22
**determined (1)**
94:25
**Diamond (2)**
68:17 69:6
**Diamond's (1)**
68:21
**difference (4)**
34:6,7 75:11 212:20
**different (35)**
13:7 22:21,22 23:8
35:18 51:16 56:3
63:6 73:4 75:4,22
76:19,22 77:3 79:17
79:23 98:20,22 99:7

103:11 141:22
145:15 146:4,5,6
154:6 160:2 166:11
178:10 187:13
199:17 205:21
207:7 212:6 219:4
**differently (3)**
100:2 112:15 135:8
**difficult (5)**
55:11 58:18,24 77:22
105:18
**difficulties (1)**
102:16
**difficulty (2)**
24:23 25:4
**diligence (3)**
68:16 210:12,13
**diminution (1)**
75:14
**direct (6)**
23:24,24 58:7,15 73:6
121:20
**directing (1)**
122:20
**directly (1)**
71:21
**disagree (1)**
107:3
**disagreements (1)**
106:14
**disclose (3)**
27:14 67:8 84:23
**disclosed (6)**
27:13 74:17 75:2
87:17 104:4,8
**disclosing (4)**
50:19 103:15 216:3
230:19
**disclosure (18)**
38:16 50:17 51:9 55:8
86:13,19 104:10,16
104:19,24 105:3,4,7
127:17 128:10,12
128:14,15
**disclosures (4)**
22:5 54:20,23 127:21
**discretion (1)**
214:10
**discuss (3)**
81:25 231:17,23
**discussed (16)**
6:4 13:4 29:22 34:18
36:6 56:18 67:3,12
71:5 76:4 139:24
148:3 165:22
166:17 197:14

224:9
**discussing (5)**
36:13 67:17 115:24
126:17 147:21
**discussion (67)**
9:15 13:13 15:22
17:14 22:11 24:5,13
25:20 34:22 35:12
46:21 58:3 63:25
64:6,13 65:10 66:24
68:6,8 82:9 116:2
116:11 129:11,16
146:21 147:12
151:2,19 159:20
160:24 166:2 172:4
191:13 192:21,22
193:6,10 202:22
203:17,18 204:4
208:18 209:9,14
213:9,15 214:12
222:11,17,18,21
223:2,4,10,17,20
225:16,16,24 226:5
226:6,11 227:15
228:17,19 231:5
235:13
**discussions (131)**
15:23 16:18 25:21
30:8,9,17 31:21
35:22 52:12 63:23
70:22 73:2 75:16,18
81:17 84:3,8 117:2
117:6 118:4 124:8
128:2 140:22 141:5
146:11,18,20,23
147:22,23 148:10
148:22,25 149:7,20
149:22,24 150:4,6
150:10,12,18 151:6
151:24 152:4,14,19
153:11 154:23,24
155:23 156:19
157:10 158:5,9
159:16,23 160:4,12
160:18,22 164:24
165:3,5,13,19 166:5
173:19 177:25
182:21 183:21
190:23 192:19
193:18,18,19,20,24
194:3,4,7,9,10,13
198:14,16,20,23,25
199:4,6,13,14,16,20
199:21,23,25 200:4
200:12,16 201:2,3,8
201:15 202:11,17

202:23 203:5,13
204:14,21,23,24
205:2,5,20,25
213:19 221:14,16
221:19 223:8,23
230:23 231:3,5,11
233:16,17,19
**dismissed (1)**
39:13
**display (1)**
95:2
**distinct (2)**
78:8 197:12
**distinction (9)**
169:25 196:6,12
197:14,16,17
200:17 201:4,6
**distinctions (1)**
200:20
**DISTRICT (1)**
1:3
**divorce (1)**
150:16
**document (33)**
123:22 125:20 126:13
130:2,23,23 131:7
131:11 132:7,15,17
132:20,25 139:17
139:21 141:12
142:7,9,18 158:14
158:16 160:6 166:8
172:16,24 173:20
175:12 176:5
181:10 195:12
207:20 237:8,10
**documentation (3)**
151:5 174:5 178:24
**documents (16)**
90:20 171:8,21
172:11,14,19,21
173:13 177:20,20
177:22 233:24,25
234:18,22 235:8
**dogs (1)**
212:7
**doing (2)**
49:7 161:16
**dollar (5)**
112:19 130:17 131:15
138:13 208:13
**dollars (43)**
21:3 22:15,17 31:2
37:5 81:8 108:4,9
130:8 132:3 133:11
133:16 134:17
135:4,10,23 136:5

136:25 138:3,15,17
139:9 167:19
175:20,21 185:3
187:16 191:15,16
209:2 219:16
220:15,20 221:10
221:24 225:8,22
226:23 228:9 229:2
229:14,22,25
**Don (1)**
200:5
**door (1)**
7:21
**doubt (1)**
95:17
**draft (6)**
145:4,4,22 148:13
164:20 173:6
**drafting (6)**
74:10 126:8,12
146:11 147:4,7
**drafts (8)**
140:4 141:7 144:12
145:20,25 146:4,6,9
**drawn (1)**
196:7
**drew (1)**
225:2
**driving (1)**
93:22
**DT (1)**
190:17
**DTC (83)**
69:12 70:9 71:16
181:20,23 182:6,10
182:16,20 183:5,12
183:15,21,23 184:2
184:11 188:22
189:2,8,21 190:4,8
190:17,20,22,25
191:8,12,13,17,22
192:4,15,20,22
193:8,9,10,12,21
194:17,21 195:4
197:8,11,15,18,24
198:2,3,5,9,13,15
199:3,7 200:3,8,13
200:17 201:4,11,17
203:17,21,25
204:14,20,21,23
205:6 208:13,18,22
208:25 209:11,22
209:25 210:11,18
211:23 213:13
217:14
**DTCC (2)**

185:3 196:8
**DTC's (5)**
190:10,14 203:18
208:16 211:14
**Duane (3)**
147:17,17 205:15
**due (6)**
68:16 168:15 188:16
189:8 210:11,13
**duly (2)**
7:4 238:14

_____
**E**

**earlier (55)**
11:14 14:16 16:12
17:20 18:6 19:21
20:5,8,24 22:5
23:17 30:11,18
32:13 36:23 60:11
64:14 73:10 75:18
80:17,20 87:21
88:19 108:2,15
111:3 112:16
113:17 114:3
116:21 136:2,3
149:2,9 150:19
151:10,20 152:25
158:6 173:22,24
177:24,25 184:15
186:21 200:20,22
201:5 208:17
209:10 210:25
213:3 223:13 226:9
227:10
**early (9)**
9:23 14:19 46:21
73:11,16,20 115:23
173:15 181:14
**easier (5)**
132:13 141:25 190:9
195:16 234:14
**East (1)**
3:6
**economic (3)**
75:11 82:20 100:24
**economics (11)**
74:16,25 75:3,5 92:25
94:4,9,15,19 113:15
123:16
**economy (1)**
93:20
**Ed (14)**
147:14 149:16 151:25
152:3 155:17
156:15,19 173:19
173:20 194:6

198:17,18 199:17
205:15
**effect (6)**
5:19 90:24 127:23
150:24 151:10
162:7
**effective (1)**
125:20
**effort (6)**
52:15 95:15 102:13
106:12 140:24
190:13
**efforts (2)**
12:22 140:10
**either (29)**
23:21 43:5 48:24
49:19 64:20 71:22
72:11 84:12 91:9
97:25 107:20
109:16 129:4
130:10 131:2,24
139:21 156:19
167:10 170:11
176:6 184:21
185:11 205:23
213:20 217:21
218:4 221:9 226:19
**elements (1)**
101:17
**Elizabeth (1)**
10:7
**else's (2)**
224:23 225:10
**eluding (1)**
200:8
**EMANUEL (1)**
3:19
**emerged (1)**
73:4
**employee (1)**
185:12
**employees (8)**
8:4,18 9:6 45:12
54:15 59:10 211:21
218:17
**enable (1)**
114:5
**encapsulated (1)**
125:9
**encouraged (1)**
190:25
**enormous (6)**
33:5 42:22,25 43:2
102:13 140:19
**enter (8)**
48:8 172:13,19

177:12,18 180:7
181:12,22
**entered (4)**
131:2 181:24 182:8,9
**entering (5)**
126:14,25 170:21
172:16 214:8
**entire (1)**
134:6
**entirely (1)**
125:18
**entirety (2)**
11:25 174:4
**entitled (8)**
15:2,12 168:8 187:19
188:7,10,24 231:21
**entitlement (2)**
187:23 224:13
**entity (1)**
180:25
**equal (1)**
206:15
**equally (1)**
21:17
**equivalent (1)**
221:8
**ERIC (1)**
3:23
**ERRATA (1)**
239:2
**errors (1)**
239:8
**ESQ (6)**
3:8,9,16,23 4:8,9
**essence (2)**
28:20 123:21
**essentially (3)**
28:25 45:22 89:23
**establish (16)**
9:6 13:8 19:20 23:13
43:18 44:8 45:18
47:4,11 64:19 78:4
80:16 113:9 125:11
129:3 168:22
**establishing (2)**
24:25 150:19
**estate (10)**
39:17 40:2 83:25
93:16,17,25 124:10
124:11 152:9,10
**estimate (5)**
52:15 54:9,17 64:17
191:5
**estimated (6)**
51:22 53:11 101:22
102:22 105:8,25

**estimates (3)**
83:14 96:16 106:2
**estimating (1)**
55:25
**estimation (7)**
54:12 57:14 97:3,4
136:2 138:5 210:9
**estimations (19)**
52:8,9,17 56:2 76:11
77:16 96:15 97:18
99:10,11 105:13,14
105:22 106:4
110:10 114:6
129:13,18,25
**et (4)**
1:8 154:10 182:20,21
**EuroClear (4)**
189:10,15,21,25
**evening (1)**
14:19
**event (6)**
50:6 75:21 90:14
109:21 225:21
226:23
**events (6)**
14:13 25:11 136:7
140:7 162:20 227:9
**everybody (7)**
27:13 84:6 105:23
125:14 162:7
202:21 236:4
**everybody's (1)**
84:15
**evolved (1)**
146:3
**exact (6)**
59:17 95:16 98:3
168:11,24 198:21
**exactitude (1)**
95:20
**exactly (17)**
14:3 72:5,7 85:23
90:18 94:18 108:23
142:21 143:17
155:21 157:7
164:15 184:6,23
187:4 203:10 210:3
**EXAM (1)**
237:3
**EXAMINATION (1)**
7:5
**example (8)**
35:13 43:3 49:14
75:15,17 102:8
120:21 234:9
**excess (13)**

220:10,15 221:20
222:9,12,14 223:3,5
224:17 225:7
226:16 227:7
228:23
**exchange (15)**
49:16 60:8,10,20
61:19 66:16,19,22
118:5 119:14 169:5
169:11,14,23
170:12
**exchanges (9)**
61:17 66:9,10 116:22
117:5 121:13
168:20 169:3,4
**exchange-traded (63)**
33:7,25 45:10 46:11
46:15,19 47:8,18
48:11 49:5,10,15
50:11 52:14,25
55:22 56:14,22
59:11,19 60:5,10,14
60:24 61:5,7,10,25
62:11,23 63:15 64:5
64:8 65:4,14,21
66:4,5,5,14 85:11
86:3,12 88:7,14
116:3,6,8,14 117:18
118:23 124:5
145:18 150:11
151:13 155:11
157:4 165:16
166:13 169:9 178:5
178:18 179:15
**exchange-trading (1)**
59:21
**excluded (8)**
21:17,18 35:6 60:21
141:14 143:2,3,4
**excludes (1)**
141:15
**excluding (2)**
55:4,6
**exclusive (1)**
187:12
**exclusively (3)**
25:19 60:8,24
**Excuse (1)**
62:25
**excused (1)**
154:18
**executed (1)**
135:20
**executive (2)**
200:7,13
**exercise (5)**

185:7 191:9,10,12
220:3
**exhaustive (1)**
33:12
**exhibit (25)**
130:3 132:15,17
139:18 142:8
158:13,16 160:7
163:15 171:5
175:13 195:13
206:6,13 207:17,21
214:23 215:5
227:25 232:24
237:7,8,10,13,14
**Exhibits (2)**
211:11 237:6
**exist (2)**
39:21 91:7
**existed (1)**
69:6
**expect (5)**
40:4 63:25 170:10
214:20 217:25
**expectation (2)**
151:18 156:25
**expected (3)**
40:12 74:9 97:25
**expert (1)**
57:7
**explain (2)**
96:22 119:6
**explained (1)**
39:22
**explaining (1)**
37:15
**explanation (3)**
28:4,5 43:13
**explanations (1)**
11:7
**exposure (26)**
44:17 46:15 47:8,12
47:19,21 48:10,15
49:19 50:10 51:11
52:10 53:7,17,24
54:25 65:23 190:4,5
190:10,14,19 191:6
208:16,22 210:5
**exposures (12)**
49:12 51:15 52:16
59:25 64:10,15,18
64:20 65:15 191:2
204:2 209:13
**expressed (2)**
81:5 225:12
**expression (2)**
230:5,6

**expressly (1)**
48:24
**extension (1)**
181:7
**extent (12)**
16:4 28:23 47:2,4,11
51:25 75:10 91:15
170:8 191:2 215:19
228:4
**external (6)**
8:6 70:24 144:12
146:13 193:24
233:14
**extract (2)**
42:2,3
**extreme (2)**
45:24 93:12
**extremely (2)**
45:5 129:22
**e-mail (13)**
142:10 153:2,7 157:7
158:12 173:2,15
221:15,17,23
222:16 227:12,19
**e-mails (5)**
153:10,13,15 157:6
157:15
**E00013236 (3)**
132:16,18 237:9

_____

**F**

**F (4)**
1:17 2:11 238:8,24
**face (2)**
139:22 191:18
**facets (2)**
18:11 121:4
**facing (1)**
47:7
**fact (23)**
9:7 15:9 40:10 51:9
54:3 66:15 82:10
84:10,13 90:9 91:17
131:2 134:18
136:10 161:9
173:13 187:6
189:14 199:4
208:23 209:4,15
217:15
**factors (3)**
94:2 102:4 114:7
**facts (20)**
6:10,13,13 14:25 15:4
50:17 63:5,8,11,19
63:20,24 139:13
140:23 147:2 148:6

156:9,14 162:22
239:7
**factual (3)**
15:10 50:21 90:2
**factually (1)**
180:22
**failed (1)**
27:14
**fails (1)**
180:3
**fair (13)**
13:17 28:25 30:20
32:16 45:14 65:25
80:22 90:10 101:20
105:16,17 134:13
208:21
**fairly (1)**
59:9
**fairness (1)**
41:15
**faith (6)**
95:14 106:11 161:19
162:12,16 186:18
**familiar (5)**
123:12 131:7 132:20
144:5 163:20
**family (1)**
231:8
**far (4)**
78:22 137:5 183:19
183:22
**FARA (1)**
4:9
**favor (1)**
128:13
**FCM (2)**
118:20 125:24
**feared (1)**
208:23
**feasible (2)**
65:23,25
**featured (1)**
164:20
**February (1)**
235:21
**fed (2)**
79:9,25
**feeling (1)**
167:21
**Feldstein (1)**
10:7
**felt (13)**
39:19 44:18 91:3,6,8
91:10 92:11 95:16
209:19 212:19
225:4 226:14

229:20
**Fife (39)**
12:12,15,25 13:9
19:19,21 20:19,24
21:19 22:3 23:10,11
24:6,12 25:6 27:7,9
27:12,16 30:25
31:17,22,25 32:19
33:22 36:24 37:14
37:18 38:3 90:6
97:16 108:10,17,24
109:23 110:3
112:18 138:14,24
**Fife's (3)**
19:13 31:10 110:22
**figure (5)**
47:22 50:23 86:16
100:4 107:23
**file (2)**
84:20 92:4
**filed (2)**
95:4 118:19
**filing (2)**
5:7 92:12
**final (7)**
120:8 133:5 140:5
151:5 165:11,18
208:20
**finalized (1)**
81:16
**finally (1)**
168:22
**finance (1)**
44:7
**financial (1)**
93:13
**find (6)**
7:16 27:8 91:19,22
108:23 182:12
**fine (11)**
6:20 38:11,12 58:8
126:13 145:6 148:8
162:8,24 166:20
172:3
**finish (2)**
38:10 162:14
**finishes (1)**
141:24
**firmly (1)**
94:2
**first (40)**
18:10 21:7 24:16 28:4
41:8 45:16 46:19
67:25 69:10 70:11
70:14 71:4,10,17
72:3 113:17,19

120:13 132:22
133:9 137:24 138:4
138:5 157:7 164:8
164:15 169:20
172:8 181:21 182:4
185:2 186:9 190:23
195:20 208:2
209:16 212:11
214:25 222:19
225:18
**firstly (2)**
29:22 72:21
**fit (2)**
189:11 235:8
**fits (1)**
57:25
**five (3)**
38:9 89:2 111:12
**five-minute (1)**
88:21
**FLEXNER (1)**
3:12
**Floor (1)**
3:21
**flow (5)**
140:20 173:25 174:5
192:25 193:4
**focus (5)**
20:22 21:22 46:8,12
142:25
**focusing (1)**
153:11
**follow (3)**
73:25 103:12 145:7
**following (10)**
10:16 42:24 43:22
46:24 58:3 78:3
127:14 145:11
165:19 184:25
**follows (1)**
7:4
**force (1)**
5:18
**forces (1)**
93:22
**foreign (1)**
169:4
**foremost (4)**
21:7 45:16 113:20
186:9
**form (74)**
5:10 15:21 24:18 26:4
30:5 31:5 37:7 42:9
44:2 45:3 53:12,19
54:4 57:4 60:4 61:3
66:13 81:9 85:4

93:3 94:11,17 95:11
95:25 96:13,25
97:13 99:4 100:7
101:8 104:6,13
105:2,9 106:3 108:5
109:25 110:16,24
111:17 112:10,23
113:16 116:16
118:7 125:7 128:25
128:25 129:4,9
132:9 133:17
134:20 135:5,12,24
136:12 143:15
144:23 148:14
150:20 151:11
157:3,13 167:14
169:13 170:18
186:8 188:2 201:12
212:2 217:17
218:12 230:3
**formed (3)**
78:7 109:15 110:6
**forms (2)**
124:22 178:10
**formulate (1)**
103:10
**forth (3)**
58:10 173:17 238:13
**four (2)**
114:14 163:24
**fourth (1)**
199:13
**frankly (2)**
26:8 27:9
**frantic (1)**
140:18
**free (1)**
214:5
**frenetic (1)**
202:20
**Friday (19)**
16:13 35:17 36:7
70:15,17 78:14
117:10 184:11,14
187:2,17 188:11
203:2,3 204:14,16
204:25 211:3
222:18
**front (3)**
206:7 219:15 228:2
**full (12)**
76:10 104:10,16,19
104:24 105:3,7
109:9 195:20
206:11 208:2 215:8
**fully (4)**

141:4 148:17 155:8
217:10
**function (5)**
11:2 80:15 168:6
204:22 211:19
**fund (13)**
19:6 84:24 85:9,15,20
85:22 143:8,14,22
144:21 160:14,15
160:22
**fundamental (1)**
52:18
**fundamentally (2)**
56:8 89:19
**fundamentals (1)**
123:16
**funds (4)**
145:16 148:12 175:7
175:17
**further (7)**
5:9,15 87:21 124:7
197:9 235:10
238:17
**furthermore (1)**
88:10
**futures (19)**
49:16 57:9 64:3 65:21
65:24 66:4,5,6 86:3
117:23 118:6,21
120:20 121:2,8
168:20 174:19
178:4 179:13

_____

**G**
**GAFFEY (2)**
3:8 6:20
**gain (13)**
38:16,23 39:3 40:4,12
50:18,19 52:19
67:21 68:3,7,9,14
**gained (1)**
94:23
**gander (1)**
93:6
**Gary (1)**
176:5
**gather (1)**
8:23
**gathered (1)**
17:6
**gears (5)**
69:25 70:3 73:6
181:16 219:13
**general (1)**
116:13
**generally (1)**

62:3
**Gerard (7)**
9:21 180:9,14,24
181:3 204:20
211:18
**getting (9)**
48:9,21 114:22
144:25 146:24
160:8 201:10 223:5
225:13
**Giddens (1)**
207:22
**give (13)**
9:17 24:6 98:11
134:11 168:11
199:9,11,22 215:14
216:7,10 233:23
234:13
**given (30)**
24:2,3 53:10 55:16
56:16 78:5 83:14
86:17 90:13 97:2,7
97:9,17,24 99:9
100:12 105:15,17
108:17,20 120:2
129:5 148:18
155:23 189:12
202:19 213:5 230:6
235:19 238:16
**go (15)**
9:12 37:13 59:8 84:13
86:4 111:11 125:7
137:19 154:16
169:15 172:2
178:15 210:18
234:10 235:12
**goes (1)**
159:3
**going (53)**
7:8 9:16 21:22 26:15
41:13,16 51:4,5
53:2 57:11 58:9
64:13 84:17,22 85:3
85:17 88:20,22,23
109:17 111:9
114:20 116:7,15,19
120:5,6 122:14
126:3 127:8 132:12
134:3 136:11
139:11,15,17
144:24 145:7
147:25 158:19
162:25 171:17
175:2,3 177:3 182:4
184:17 195:17,19
217:11 232:3 234:4

235:2
**good (13)**
7:7 95:14 106:11
115:3 150:4 153:2
161:18 162:12,16
178:18 186:18
207:12 212:19
**Gotshal (15)**
12:8,13,19 24:18
28:19 84:19 89:13
89:24 90:22 91:18
94:25 152:6 203:9
203:11 221:4
**Gotshal's (2)**
12:4 20:3
**Gottlieb (6)**
8:12 146:16 152:2
155:24 194:6 226:8
**Granfield (8)**
8:14 10:3 15:21 18:2
18:3 147:14 205:16
206:22
**Granfield's (1)**
206:10
**greater (6)**
39:23 42:5 85:25
125:17 201:10
204:6
**greatest (2)**
43:25 44:18
**groupings (1)**
13:6
**guarantee (14)**
119:13,17,22 120:2
143:8,14,22 144:21
145:16 148:12
160:14,15 191:4
208:14
**guess (10)**
50:6 66:18 126:24
132:22 140:13
147:25 172:18
181:7 203:15
215:19
**guys (1)**
218:11

_____

**H**
**half (5)**
130:8,17 131:15
132:2 138:17
**hammers (1)**
212:24
**hand (4)**
24:2 150:17 183:11
238:22

**handle (4)**
47:20 48:9,13,22
**handwriting (1)**
175:15
**happen (7)**
7:10 124:4,19 193:2
202:16 225:25
228:20
**happened (9)**
14:16 27:21 28:5
71:11 92:14 146:2
165:13 185:25
189:22
**happening (1)**
202:19
**happens (1)**
109:6
**happy (1)**
234:15
**hard (13)**
13:24,24 65:19 102:5
140:20 150:15
155:21 157:6 159:7
167:15 202:18
227:9 232:16
**Harry (1)**
156:19
**Harvey (18)**
89:12,23 90:5,9 91:17
94:24 97:16 107:23
153:19 154:10
155:5 156:6,10,15
156:16 221:3
223:13 226:9
**hear (3)**
57:21 100:15 112:12
**heard (14)**
30:20 39:13 83:8
98:16 101:20
102:12 105:13
107:17 114:3,4
140:17 145:14
149:15 213:2
**hearing (57)**
7:20,20,23 8:2,25
9:23 10:12,14,16
11:8,13,20 19:10,23
19:24 20:6,8,19,23
25:17 27:24 28:3,14
29:4,10,12 30:13,15
30:25 31:19 37:6,11
39:5 40:3,8,9 73:11
74:2,5,11 81:5,11
82:6 92:20 97:25
98:2 100:4,13 107:7
107:8,9 109:13,14

109:18 112:18
138:12 184:14
**heart (2)**
21:9 32:5
**HEDGES (1)**
3:19
**held (41)**
2:8 7:21 9:15 33:18
47:17 49:17 57:5,10
59:23 64:10,17,21
66:13 85:11 88:6,13
119:11 121:9
125:23 128:4
151:12 155:12
157:3 164:2 165:15
168:15,16,20
169:17,22 170:4,7,8
170:16 172:4 175:4
176:25 177:8 178:9
197:2 235:13
**help (2)**
148:21 200:9
**helpful (2)**
89:25 234:13
**helps (1)**
171:2
**hereinbefore (1)**
238:13
**hereunto (1)**
238:21
**hesitate (1)**
155:20
**hesitating (1)**
150:3
**highlighted (4)**
133:8 146:5 159:4,9
**highly (3)**
68:18 69:3,8
**history (1)**
147:8
**Hold (1)**
14:21
**holding (1)**
170:13
**HOLDINGS (1)**
1:8
**hope (1)**
68:11
**hoped (3)**
43:3 81:19 209:21
**hour (1)**
235:19
**hours (2)**
181:14 235:17
**house (2)**
66:20,22

**houses (3)**
66:11 168:21 179:16
**Hraska (3)**
80:13 185:11,13
**Hubbard (2)**
2:9 4:4
**hugely (1)**
192:6
**Hughes (261)**
1:12 2:8,9 4:4 6:1,4,6
6:8 7:1,2,7 8:1 9:1
9:18 10:1 11:1 12:1
13:1 14:1,23 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1,19
59:1 60:1 61:1 62:1
63:1,9 64:1 65:1
66:1 67:1,8 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1,17 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1,4
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1,13
143:1 144:1 145:1
146:1,25 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1

159:19 160:1 161:1
161:5,9,18 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1,6 237:1
237:4 238:1,12
239:1,5,24
**hurt (1)**
91:8
**Hydee (1)**
10:7

───────────
**I**
───────────
**idea (2)**
144:7 176:4
**identification (4)**
132:19 158:18 207:18
232:25
**identified (33)**
17:21 34:4,8,24,25
35:12,14,21 36:7
39:9 45:15 49:24
60:15 78:7,11,13
108:3 113:23
137:25,25 149:12
151:20 185:21
186:16,17,24
196:21,25 199:19
214:15 220:16,22
221:10
**identifies (1)**
184:25
**identify (6)**
44:16 186:19 188:14

211:7 218:12 220:3
**identifying (2)**
38:23 44:12
**identity (1)**
217:3
**ii (1)**
228:2
**immediacy (1)**
68:9
**immediate (2)**
67:20 68:7
**impact (2)**
46:5 191:21
**implicating (1)**
231:2
**implication (2)**
161:7,17
**implicit (1)**
64:6
**impliedly (1)**
48:24
**implies (1)**
161:21
**imply (1)**
162:19
**importance (2)**
39:14,15
**important (12)**
35:3 52:21 60:3 92:24
94:3 114:7 129:10
141:9 144:19
178:24 179:4
192:25
**importantly (6)**
17:16 25:2 28:18
68:10 96:15,17
**impossible (2)**
113:22 212:15
**impression (3)**
18:8,9 221:3
**impressions (1)**
20:4
**inability (1)**
51:14
**inaccuracies (1)**
107:21
**inaccuracy (1)**
35:20
**inaccurate (3)**
41:22 91:9 107:11
**inappropriate (1)**
58:13
**include (24)**
8:5 12:3 22:12 49:11
62:16 85:19 105:7
110:5,15 112:8

113:2 119:10 129:8
130:10 138:15
139:2 143:5 169:4
169:10,14,16 174:2
194:17 198:18
**included (76)**
8:3 12:7 18:12,22,23
20:9,15 31:20 32:10
33:2,7,13,16,17
45:7 47:15 59:16,18
59:22 76:17,21
78:18 79:6,11,14
80:9,22 88:8,8,14
88:16 89:17 95:13
97:21 101:2 108:9
109:24 110:4,8,9,23
111:15,22 113:11
113:12 115:13,20
117:17 118:23
119:4 120:21
124:19 139:5
147:13 153:3,12,22
155:24 156:23
158:10,11 160:19
160:24 165:11
172:25 173:2,14,24
187:3 194:10
198:17 203:20
219:5,6 222:13
229:15
**includes (12)**
120:25 121:3,9
130:17 131:16
132:3 143:3 169:5,6
174:6 189:10
232:18
**including (13)**
6:11 8:14 9:5,5 21:2
34:2 66:8 85:12
124:10 151:13
178:9 179:8 221:22
**inclusive (3)**
178:8,19 179:16
**inconsistent (1)**
126:20
**incorporating (1)**
138:23
**incorrect (1)**
135:13
**incredible (1)**
43:7
**incredibly (1)**
42:20
**indemnity (3)**
191:4,16 209:16
**independently (1)**

117:23
**INDEX (1)**
237:2
**indicate (1)**
183:23
**indirectly (1)**
71:21
**individual (2)**
200:7 205:17
**individuals (4)**
10:2 155:18 156:20
201:14
**industry (1)**
179:14
**information (36)**
8:24 11:18 16:5 26:6
26:17 68:23,24
106:21,22,25
121:16 126:7 131:5
143:25 146:24
171:9,22 172:12
174:10,14,16,22
176:2 177:11,16,21
177:23 178:3,13
179:6 182:3 196:15
196:17 209:24
215:18 216:4
**informed (5)**
26:16 32:7 172:19
173:11 178:16
**inherently (1)**
77:17
**initial (1)**
190:19
**initially (4)**
165:23 196:22 210:24
221:14
**inputs (1)**
55:16
**inquiry (1)**
217:6
**Insert (1)**
227:24
**inserted (1)**
215:24
**inserting (1)**
143:20
**insertion (1)**
144:9
**insignificant (1)**
39:14
**instances (1)**
6:12
**institutions (1)**
192:24
**instruct (11)**

103:9 114:21 122:15
126:3,10 127:8
139:11,16 143:25
144:24 148:2
**instructed (1)**
123:17
**instruction (1)**
145:8
**insure (4)**
52:18,21 81:20
126:19
**intend (4)**
6:8 126:15 127:2
214:9
**intended (9)**
67:5 74:15,18 79:14
80:21 83:10 108:24
110:5 166:14
**intention (6)**
67:13 68:10 126:19
126:23 213:22
215:13
**intentions (2)**
105:17 143:19
**interactions (1)**
72:18
**interest (3)**
10:23 56:25 84:6
**interested (12)**
51:7 74:21 81:25
83:17,24 84:12
101:4,11,14,16
131:13 238:20
**internal (3)**
70:24 144:11 231:4
**internally (1)**
233:13
**interpret (3)**
121:17 123:18 228:11
**interpretation (10)**
121:18 122:3,16
123:3,19 126:5,9
127:7 145:2 215:20
**interrupt (3)**
80:19 171:23 227:3
**interrupting (1)**
67:10
**intervening (2)**
25:11 29:14
**intervention (1)**
109:19
**intrude (2)**
14:22 148:3
**intrudes (1)**
103:3
**invade (1)**

122:17
**investigation (3)**
176:22 210:14,17
**invite (3)**
158:19 196:5 214:24
**involved (13)**
51:11 52:6,12,25 70:7
127:25 129:17
147:12 194:4,15
202:23,24 223:19
**involvement (1)**
41:24
**involving (11)**
117:8 149:3 160:22
194:13 201:8
203:17 213:16,17
213:19 223:8,24
**irrationality (1)**
204:8
**issue (5)**
50:20 70:12 94:6
191:22 224:9
**issues (7)**
60:3 93:7,11 145:20
149:13 155:25
199:18
**items (4)**
16:24 33:14 45:16
174:7

_____
**J**
_____

**J (235)**
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1

102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1,4 238:1 239:1
**Jack (3)**
3:16 58:8 161:14
**January (4)**
1:14 2:5 236:10
238:22
**Jasen (2)**
218:6,8
**Jason (4)**
8:7 15:21 18:2,3
**Jay (2)**

10:6 194:8
**Jersey (1)**
2:14
**Jim (3)**
80:13 185:11,13
**JOB (1)**
1:18
**Joel (1)**
10:4
**join (1)**
92:4
**Jointly (1)**
1:8
**joke (1)**
130:19
**Jonathan (7)**
1:12 2:8 7:2 236:6
238:12 239:5,24
**JONES (1)**
3:4
**JP (5)**
79:15,18 80:5,7
168:16
**JPMorgan (1)**
79:10
**judge (6)**
25:18 39:12,22 81:14
81:20 101:13
**judgment (5)**
60:6 62:7 100:17
101:23 106:17
**judgments (8)**
55:25 56:11 67:16
89:21 90:8 179:5
216:24 219:11
**jurat (1)**
235:22

**K**

**Kaplan (4)**
8:9 11:4 202:14
204:19
**Kaplan's (1)**
203:6
**KAY (2)**
3:23 6:21
**Keegan (7)**
212:12,19 213:18,20
217:20 218:14
219:2
**keep (3)**
61:18 88:23 140:20
**Ken (1)**
10:8
**key (1)**
46:6

**kind (2)**
209:16 223:15
**King (12)**
62:16,20 63:13,23
66:23 80:11 212:12
213:18,20 217:20
218:14 219:3
**King's (1)**
218:5
**Klein (25)**
8:5 13:4,10,12,14,23
14:2,12,17 16:9,25
17:8,23 18:12,15,18
19:3,6,9,16 27:4
115:21 223:19
226:11,19
**Kleinman (1)**
10:4
**Klein's (1)**
10:11
**knew (2)**
176:24 226:19
**know (128)**
7:8,11,16 8:6 12:2
15:2,12 25:3 30:24
35:16 36:24 37:19
39:2 58:9 63:19
67:23 69:25 76:13
76:15 78:21 79:10
80:2,9,11 89:25
91:5 94:18 97:5
98:25 101:13 103:6
105:4 108:22,23
110:3,20 111:2
113:14 114:10
116:10 127:23
129:16 130:12,21
130:22,22 131:2,4,8
131:8 134:6,8,18
137:17 138:24,25
139:3,20 142:17
148:15,16,18
151:22 153:15
156:9,14 159:25
160:17,20,21,23
164:7,8,11,15,22
165:25 166:4,7
167:16,18,21,25
168:6 171:15 176:7
176:15 182:24,25
184:6,18 189:13,16
189:18 190:2,12
192:17,18 194:2,11
196:2,17 198:16
204:17 205:4
209:13 211:17

212:9 213:8 216:6,9
216:11,11,18,19
217:2,12,18 219:19
222:5,6,6 223:7
226:18 227:14,17
230:16 234:7
**knowing (5)**
64:23 101:4,11,14
102:21
**knowledge (9)**
26:16 58:22 65:12
136:21 137:6 178:6
178:16,25 205:8
**knowledgeable (4)**
62:13 64:3 141:4
155:8
**known (2)**
74:9 137:23
**knows (4)**
131:9 145:5 148:7
228:2

**L**

**label (2)**
16:16,17
**lack (2)**
161:7 217:5
**Lacy (1)**
10:6
**language (15)**
133:13,18 143:9,18
143:20 146:5,8
164:6,8,11 165:11
165:21 228:3
230:15 231:10
**large (4)**
75:3 91:6 196:22
**largely (2)**
90:5 109:7
**larger (1)**
42:6
**largest (1)**
168:25
**LaRocca (8)**
9:21 73:11 180:9,14
180:24 181:3
204:20 211:18
**Larry (3)**
200:6,12 201:9
**late (1)**
14:19
**law (1)**
228:4
**lawyerly (1)**
138:23
**lawyers (10)**

140:11,12,19 141:2,2
146:13 201:12
205:13,19 233:15
**LBHI (3)**
124:10 149:5 152:10
**LBI (6)**
125:22,23 159:3
182:21 206:14
209:25
**LBI's (1)**
182:20
**learned (16)**
6:11,14 9:9,20 11:6
11:11 14:25 15:5
26:6 63:5,9 139:14
147:3 150:5 156:9
232:19
**leave (5)**
58:12 156:20 157:15
213:12 227:18
**leaves (1)**
150:5
**leaving (4)**
19:13 77:20 149:21
153:15
**led (1)**
92:15
**left (5)**
9:23 73:11,16,19
232:6
**left-hand (1)**
175:18
**legacy (1)**
131:25
**legal (12)**
6:5 8:8,10,13 11:2,2
15:11 50:22 51:7
63:11 193:24 216:6
**Lehman (162)**
1:7 3:5 12:8 16:13
17:16,19 21:8,12
24:17,24 25:13
28:22 30:22 31:24
32:3,9 33:9,19,20
34:12,15 35:15 36:5
42:12,20 45:18
46:18,25 49:6 50:4
50:5 52:2,5 56:9
60:13 70:14,15 75:9
76:12,18 77:15 79:4
82:6,25 83:3,11,22
86:12 87:14 89:13
89:24 93:19 94:22
98:5,7 105:15 106:5
106:12,25 116:11
116:22 117:3,4,8

118:4,20,22 121:12
123:24,25 127:3
129:14,24 130:25
131:17,20,25
132:16,18 134:15
135:2 136:15 137:6
137:14,20,25
140:12 141:2
145:15 149:5,5
150:15 166:12
169:8 170:7,16
174:11,18 175:4,8
176:25 177:9 179:2
179:2 182:14 183:4
183:18,18 185:12
185:20 186:25
188:13 189:5
190:11,15,21
191:23 192:7,16
193:13,22 194:22
195:5,6,7 196:19,21
197:7,8,13,25 198:2
198:4 204:2 211:4
212:17 214:11,15
215:15 217:7 220:2
220:8,12,23 221:6
221:18 224:18,19
225:6,21 227:2
228:22 229:5,6,8,12
229:19,23 231:7
232:12 237:9 239:3
**Lehmans (1)**
186:19
**Lehman's (12)**
117:22 118:6 119:15
136:10,20,21
174:11 176:8
179:12 190:3 197:3
214:7
**Lehman-related (1)**
192:24
**lending (1)**
195:14
**lengthy (3)**
105:11 196:23 203:17
**letter (58)**
73:7 74:7,8,15,24
75:12,19 81:16,19
82:8,14,21 84:5,15
84:18,20 95:4 123:7
139:24 140:3,5,24
144:13,22 145:13
146:2 147:24
148:13 160:13
163:16,17 164:21
165:8,12,18,18

166:3 174:9 184:24
186:5,11,13,22
195:15 201:17
205:11 206:10,12
206:19 207:17,21
208:2 214:9,23
215:4 219:15
228:12 237:13
**letters (3)**
87:25 141:7,8
**let's (6)**
20:22 122:5 154:17
156:20 181:16
231:17
**level (1)**
125:17
**Lewkow (6)**
8:15 10:3 147:13
205:15 226:8,19
**Lexington (1)**
3:14
**liabilities (86)**
20:11,17 21:4,17,21
21:25 22:7 23:3,5,6
23:18,25 24:3,7
41:8 42:18 43:24
44:4,12,14,19 45:7
45:9,11,15,20 46:3
46:6,10 47:2,5,15
52:20,25 53:4,8,12
53:18,25 54:10 55:2
55:13 56:21 57:19
57:20 61:18 63:15
64:25 76:20 77:4
95:14 98:4,12,17
99:18 103:18,25
104:4,11,17,23,25
105:5,14,20,24
106:4 107:5 114:15
119:9 123:5,6,8,24
178:20 182:20
183:18,20 190:21
193:4 197:7,25
211:22 216:15,16
217:15
**liability (6)**
43:19 44:8,24 95:17
104:7 130:4
**light (3)**
37:21 39:14,23
**likelihood (1)**
39:10
**limit (5)**
48:14 49:12 59:24
64:10 160:25
**limitations (1)**

35:5
**limited (6)**
37:18 65:15 66:7
191:16 208:14
219:8
**limiting (1)**
30:12
**Lindsee (7)**
8:14 10:3 15:20 18:2
18:3 147:13 205:16
**line (9)**
38:10 164:20 239:9
239:11,13,15,17,19
239:21
**lines (2)**
159:2 163:24
**liquidate (1)**
66:17
**liquidates (1)**
180:4
**Lisa (1)**
10:3
**list (10)**
9:17 10:10 149:15
184:21 196:23,23
233:23 234:13,16
234:21
**listed (3)**
149:16 177:19 219:6
**listing (3)**
210:25 211:5 212:13
**lists (1)**
175:16
**literally (1)**
163:9
**little (6)**
54:22 134:21 159:12
175:18 202:21
207:12
**LLP (5)**
2:9 3:4,12,19 4:4
**location (1)**
236:2
**long (20)**
21:3 22:17 25:7 31:18
32:13 37:16 70:7
108:2,20 109:11,15
133:19 135:21
136:3,9,17 137:3
206:16 209:24
235:15
**longer (4)**
25:13 29:19,24
109:16
**look (9)**
44:13 107:24 121:6

158:25 171:6
206:10 210:5
214:24 227:25
**looked (1)**
76:23
**looking (10)**
50:16,22 63:10,13
121:22 133:25
141:23 172:18
194:19 216:5
**looks (2)**
142:10 187:13
**Lori (10)**
12:12 19:13,19 27:7
90:5 97:16 108:17
108:23 110:3
138:24
**loss (4)**
190:7 203:19,23
204:6
**losses (1)**
191:17
**lot (4)**
34:22 124:17 155:23
205:16
**lots (2)**
99:22 206:4
**lunch (4)**
88:19,25 111:9
114:16
**Luncheon (1)**
115:4
**L-E-W-K-O-W (1)**
8:15

_____

## M

**Madison (1)**
3:21
**Maguire (59)**
4:8 6:18 7:6,8 9:14,16
15:8 26:8 37:9
38:11,14,21 50:16
50:25 58:2,6 63:10
69:24 73:13,23
88:24 89:3,5 91:24
96:4 111:11 112:14
114:18,24 115:5
121:20 122:7,19,23
132:14 141:20
142:16,21 149:17
154:18 158:13
161:12,24 162:5,13
162:24 166:20
172:3,5 176:12
207:14 215:21,25
216:5 231:19,24

232:5 235:10 237:4
**maintained (3)**
159:2 196:8 197:18
**major (1)**
25:9
**maker (4)**
180:11,16,17,19
**makers (1)**
65:2
**makeup (2)**
79:16,22
**making (8)**
55:25 92:25 162:3
169:25 172:12,22
177:17 208:20
**management (11)**
54:22,24 55:3,5,11,15
55:20 56:6,24 57:17
59:9
**managing (1)**
47:18
**manner (3)**
92:5 178:8 179:14
**margin (73)**
19:3 84:24 85:12 86:9
86:11,14 87:22,23
88:3,5,13 111:14,24
115:6,8 116:8,12,13
116:20,25 117:11
117:14,17 119:2,11
120:7,12,19 121:9
121:12 124:14,19
124:22 125:12
127:19 128:3,16,24
129:9 130:11,18
131:16 132:3 143:8
143:14,22 144:21
145:16,17 148:12
148:24 149:12,25
150:18,20 151:7,11
151:14 153:17,22
155:2 156:5,22
157:13,21 168:19
179:24,24 180:3
233:16,21 234:3,24
**mark (4)**
132:14 158:13 179:24
232:22
**marked (14)**
130:3 132:18 139:18
158:17 160:7
163:15 171:5
175:13 179:20
195:13 207:18,21
232:25 237:7
**market (5)**

25:11 52:2 175:7,16
179:20
**markets (6)**
25:5 33:8 39:24 93:14
191:18 192:5
**markup (1)**
164:21
**marriage (1)**
238:19
**Mary (4)**
1:17 2:11 238:8,24
**mass (2)**
11:24,25
**match (1)**
23:24
**material (7)**
59:14 81:8,21,23 82:2
82:10,14
**materially (1)**
25:15
**matter (7)**
63:6 66:21 90:2 111:6
162:10,11 238:20
**maximum (9)**
47:21 48:10,15 50:10
51:10 53:7,17,24
54:25
**Mazzuchi (2)**
147:16,16
**McLaughiln (2)**
147:17,17
**McLaughlin (1)**
205:15
**mean (50)**
16:22,23 19:23 24:17
25:12 34:9,10 40:25
42:11,13,15 46:21
48:12 61:9 62:2
63:3 64:5 70:21
71:3 75:8 85:8,23
94:19 105:3 107:14
109:11 116:20
118:11 123:7
143:10,13 160:15
161:10 163:13,18
169:16 170:23
172:14,16 178:5
180:18 182:11
188:6 190:6 193:12
195:7 210:13,17
213:6 218:17
**meaning (5)**
56:5 109:20 113:21
116:25 177:25
**meaningful (7)**
12:5 39:7 40:12 104:7

**Miller's (1)**
155:6
**million (25)**
29:24 81:7 167:11,11
168:13,14 169:2
191:15,16 208:13
209:2 219:16
220:20 221:10,24
225:8,22 226:23
228:9,18 229:2,9,14
229:21,24
**millions (1)**
175:23
**mind (7)**
8:17 22:19,20 38:5
107:21 120:16
166:11
**mine (2)**
141:24,24
**minutes (5)**
38:9 67:17 89:2
111:12 207:13
**misleading (1)**
107:11
**missing (2)**
57:16,23
**misspoke (1)**
233:7
**mistaken (9)**
185:16 221:3 223:14
224:3,8 225:13,19
226:15,20
**moment (6)**
13:19 18:21 72:10
77:24 105:10
154:19
**moments (2)**
32:14 203:20
**Monday (1)**
181:15
**money (2)**
175:6,16
**month (2)**
72:8 199:9
**months (1)**
233:20
**Morag (1)**
147:15
**Morgan (5)**
79:15,18 80:5,7
168:16
**morning (17)**
7:7 70:16,19 71:13
74:13 95:4 181:15
187:2 188:12
191:19 203:8,12,14

107:20 153:20
155:9
**meaningfully (1)**
75:4
**meaningless (2)**
109:7,8
**means (5)**
58:14 94:7 112:21
159:14 210:3
**meant (1)**
69:16
**member (7)**
8:7,10 116:23 180:2
181:9 202:14
205:23
**members (3)**
54:23 204:22 211:18
**mention (4)**
136:19 185:3 227:5
227:16
**mentioned (32)**
9:5 13:19 17:25 18:21
23:8 25:8 30:11
33:14 35:5 39:25
45:21 54:17 56:14
73:10 112:18
115:20 125:18
141:7 146:10 149:2
150:9,19 155:19
184:15 201:19
210:25 220:13
223:12 226:8 227:4
227:6,10
**Mercantile (4)**
118:5 119:14 169:11
169:14
**merchant (4)**
118:22 120:20 121:2
121:8
**Michael (6)**
8:5 13:4 115:20
223:19 226:11,19
**middle (1)**
133:8
**Mike (7)**
147:15 212:12,18
213:17,20 217:20
219:2
**Miller (25)**
38:3 89:12,23 90:5,10
91:17 94:25 97:16
107:23 153:19
154:10,12 155:7
156:6,10,16,16,19
221:3 223:13 224:2
225:12,25 226:9,25

211:3 219:25 220:7
222:18
**mortgage (1)**
79:3
**mortgages (5)**
75:17,20 77:20 78:9
80:25
**mortgage-backed (1)**
78:12
**Moss (1)**
10:4
**motion (1)**
92:5
**move (1)**
121:21
**moving (1)**
162:21
**multiple (1)**
138:19
**Myers (1)**
10:8
**M-O-R-A-G (1)**
147:15

---
**N**
---

**N (1)**
88:2
**nails (1)**
212:24
**name (4)**
200:8 201:10 239:3,5
**names (4)**
9:11 115:20 152:15
201:14
**narrower (1)**
218:23
**naturally (2)**
205:22 214:17
**nature (9)**
59:11 191:2 197:11
197:12 216:15
219:3,5 230:13
231:15
**necessarily (12)**
23:23 49:17 71:11
86:11 106:22
119:10 150:14
161:10,21 172:24
199:5 202:7
**necessary (6)**
83:4,6 98:18 100:15
112:5 209:23
**need (33)**
7:15 39:23 41:9 66:15
82:18,23 86:4 91:11
91:13 92:9,10,11,16

93:14,23 113:4,13
134:9,10 142:3
159:15 172:2 191:3
193:21 194:21
195:25 208:10,25
209:15 215:9 221:4
223:14 225:14
**needed (11)**
94:8 96:19 98:2 105:4
124:23,24 125:21
192:21 209:4,17
234:20
**needing (1)**
9:24
**negative (1)**
52:22
**negotiated (2)**
166:12 219:23
**negotiating (4)**
54:8 115:18 147:24
205:11
**negotiation (12)**
30:22 42:23 78:8
109:13 126:7,12
132:8 140:20,21
145:12 181:6
205:24
**negotiations (13)**
14:16 35:13 43:21
75:13 127:11 140:2
140:9,13 141:10
148:8,19 154:25
174:21
**negotiator (1)**
151:23
**negotiators (4)**
10:18,22 48:7 67:18
**neither (1)**
107:22
**net (2)**
210:4 217:15
**never (4)**
176:4 183:13,17,19
**nevertheless (1)**
225:4
**New (18)**
1:3,13,13 2:10,10,13
2:13 3:7,7,15,15,22
3:22 4:7,7 238:5,7
238:11
**night (8)**
202:25 203:2,3
204:15,17,25 208:3
209:8
**noncash (1)**
222:3

**nonprivileged (2)**
228:5 230:22
**north (11)**
21:11 28:21 33:20
42:12 60:13 83:11
94:22 98:6 168:13
189:5 224:20
**notable (1)**
93:11
**notably (1)**
124:12
**Notary (2)**
2:13 238:10
**note (1)**
81:11
**notice (5)**
58:11 191:23 232:23
232:24 237:14
**noting (2)**
89:10 140:16
**notion (2)**
39:5 209:20
**number (60)**
8:3 9:4 22:19,21,22
23:6,8,8,15,16,25
24:3 31:11,23 36:24
37:2 38:5 45:6
48:17 51:2,16 70:5
97:5,6,23 98:2,3,16
99:12,13 102:8
108:16,17,24
110:15 111:22
112:4,8,19 113:8
115:22 127:13
129:22 130:7,10,17
131:15 138:4,14,25
139:5 140:10 156:2
164:9,18 167:12
169:2 175:20
177:19 218:22
219:4,16,23 220:19
221:12 233:3
**numbers (30)**
21:20 24:21,25 25:6
43:10,11,15 56:18
57:7 77:14 87:25
97:9,10,17 105:20
107:4,16,24 108:19
129:25 131:3
140:19 141:19
142:2 148:24 150:9
167:4 168:2,11,24

---
**O**
---

**oath (1)**
5:18

**object (11)**
26:3 41:13 59:6 85:3
101:8 108:11
116:15 134:20
177:4 234:4 235:3
**objected (1)**
234:7
**objection (58)**
26:9 30:5 31:5 37:7
42:9 44:2 45:2,2
47:24 53:19 54:4
58:7 61:3 65:6 81:9
93:3 94:11,17 95:11
95:25 96:13,25
97:13 99:4 100:7
101:7 104:6,13
105:2,9 106:3 108:5
109:25 110:16,24
111:17 112:10,23
113:16 118:7
133:17 135:5,12,24
136:12 137:16
138:18 144:23
148:14 150:2
169:12 170:17
186:7 187:25 188:2
211:25 217:16
230:2
**objections (2)**
5:10 39:4
**objectively (1)**
209:20
**obligation (1)**
182:16
**obligations (8)**
119:15 164:2 182:13
183:5,11,13,16,24
**observe (1)**
16:2
**obtain (2)**
126:15 170:15
**obtained (3)**
172:12 189:14,19
**obtaining (2)**
87:11 126:16
**obviously (3)**
6:5 120:21 164:13
**OCC (38)**
123:23 124:9,12,14
124:18,21 125:4,20
127:3,3 149:4
150:22 151:14
152:5,16 157:25
164:17 166:17
167:20 168:15,17
173:7,9,16,21

178:22 179:17,19
179:23 180:3
181:24 182:8,14
183:11 233:16,21
234:3,23
**occasion (2)**
198:12 211:6
**occasions (5)**
55:10 71:19,21 156:2
165:15
**occur (4)**
161:8,11,22 199:7
**occurred (10)**
69:22 145:6 148:9,10
148:21 157:20
184:5,11 199:20,23
**OCC's (1)**
179:9
**offer (1)**
163:12
**office (1)**
203:6
**officer (1)**
5:17
**offices (4)**
2:9 203:9,11 211:14
**offset (1)**
61:18
**off-exchange (1)**
60:17
**off-the-record (11)**
11:11,23 13:2,13 22:4
22:11,23,25 24:5,13
25:19
**OK (17)**
21:25 51:6 67:18 73:9
73:23 89:2 108:8
142:6,24 144:20
157:17 175:25
181:10 196:4 207:2
207:14 235:10
**OLIVER (1)**
3:19
**once (1)**
107:13
**ones (1)**
173:18
**one-half (1)**
220:14
**ongoing (2)**
41:9 140:10
**onlookers (1)**
88:12
**onwards (1)**
34:14
**on-the-record (2)**

22:23 87:7
**open (5)**
24:8 49:14,18 66:4
191:18
**opened (1)**
192:5
**open-ended (1)**
191:4
**operations (7)**
80:15 168:5 204:22
211:14,19 213:10
213:16
**opinion (1)**
15:12
**opportunity (9)**
38:3 81:24 84:7 90:7
99:19 100:8 216:22
218:7 219:9
**opposed (2)**
116:8,13
**opposite (2)**
148:24 150:9
**options (14)**
49:16 57:9 64:3,4,5
65:21,24 66:6 86:3
174:19 178:4,5,6
179:14
**oral (1)**
228:16
**orally (2)**
115:11,14
**order (10)**
41:24 87:23 88:2 93:8
100:17 101:17
113:14 124:25
177:9 193:3
**organization (2)**
27:23 57:8
**organizations (1)**
192:23
**original (4)**
36:10,15 115:10
135:19
**originally (5)**
73:19 135:20 164:20
208:23 221:25
**OTC (3)**
60:20,21 61:12
**ought (1)**
210:2
**outcome (1)**
238:20
**outline (1)**
114:17
**outset (1)**
83:9

**outside (2)**
65:18 231:7
**outstanding (2)**
72:25 170:4
**overall (2)**
100:24 105:8
**overly (1)**
51:5
**Overnight (2)**
219:24,24
**owned (1)**
188:15
**o'clock (3)**
88:19 111:9 203:14

**P**

**page (35)**
26:12 120:25 133:9
141:12,13,18,22,24
142:5,6 144:16
158:20 159:2
163:23 166:23
171:6 195:20 206:9
206:10 207:25
214:25 233:2,4,6,6
233:8 235:22 237:3
239:9,11,13,15,17
239:19,21
**pages (1)**
158:20
**pants (1)**
226:6
**paper (1)**
140:13
**paragraph (13)**
87:24 88:2 134:4,6
141:16 142:22
195:20,24 197:10
208:2,15,20 230:9
**parenthetical (11)**
163:25 165:2,7 166:3
166:6,23 167:3
168:9 215:2,7,9
**Park (3)**
2:10 4:6 203:6
**part (81)**
13:6 16:24 20:21,22
21:22 25:17 30:21
32:2,3 36:2,2,4,14
36:15,20,22 43:12
49:12,24 50:2,4
57:12 64:9 66:18
67:14 75:3,22 79:25
86:11 87:11 91:11
91:14,16 94:4 95:18
98:19 109:2,12

110:7 112:9 113:4
113:23 115:6,8,23
117:22,22 118:6
119:4 120:18
124:21 127:25
129:10 132:9
135:16 143:23
144:17 146:19,23
147:22 158:11
166:10,15 169:8
173:22 185:7,8,15
186:6 197:10 202:6
214:2 220:4,17
221:3 224:4,19,21
225:21 228:2 230:9
**participant (2)**
84:12 151:24
**participants (2)**
151:19 226:6
**participate (4)**
41:2 84:8 202:3,7
**participated (11)**
12:20 71:2 84:2 128:2
131:23 152:9,11,12
152:23 202:5,10
**participating (2)**
71:24 72:4
**participation (4)**
140:7 152:8 157:24
158:3
**particular (35)**
34:22 35:11 39:25
44:17,24 47:22 49:2
49:19 51:24 52:13
65:11 76:7,21 77:21
78:6 81:12 88:3
98:10 102:15 113:8
124:2 136:25 151:3
151:4 155:22 168:3
170:12 173:20
196:20 204:3 205:3
207:4 212:10
217:24 220:3
**particularities (1)**
35:22
**particularity (1)**
160:18
**particularly (5)**
77:18 79:8 84:4 121:3
140:18
**parties (17)**
5:7 7:3 74:21 83:17
83:24 93:25 119:2
124:17 125:6,14
151:18 158:9
162:21 163:19

188:11 196:24
238:18
**partly (4)**
47:12 165:12 220:24
220:25
**partner (2)**
12:13,13
**partners (2)**
12:19 24:18
**parts (9)**
23:11 36:19 41:10
42:5 81:2 95:22
111:2 146:21
222:20
**party (7)**
149:6 152:19 153:16
158:5 191:9,11
225:15
**passed (1)**
174:17
**Pause (3)**
77:25 122:10 232:21
**pausing (1)**
99:6
**Peck (1)**
101:13
**pedantic (1)**
113:21
**pending (3)**
182:24,25 183:2
**people (63)**
9:4 14:18 16:25 17:7
17:12,25 23:22
27:22 33:3 37:22,24
43:3 50:9 57:7 60:2
61:15,16,23 62:9,12
72:11 80:14 91:5
93:19 95:14 105:18
107:10,14 111:19
115:18,22 116:3
131:6 139:6,13
146:11 147:5,12
149:11 152:15
153:13 154:24
155:16 156:3,4
159:20 164:18
165:10 178:3
194:14 198:17
201:22 205:17,21
206:2,5 211:14
213:10,16 217:19
218:5 219:10
233:13
**perfect (1)**
234:9
**perfectly (1)**

234:15
**perform (3)**
75:25 171:14 210:12
**period (17)**
10:16 25:11 29:15
43:22 45:21,24
46:24 70:20 71:7
72:20 84:11 93:13
118:13 128:18
140:18 149:2
205:20
**permitted (1)**
228:4
**persistently (1)**
72:13
**person (10)**
15:17 65:13 80:8
131:14,25 151:23
167:24 202:12
226:7 234:24
**personal (4)**
26:16 58:22 72:6,17
**personally (1)**
11:15
**personnel (1)**
33:24
**perspective (5)**
10:19 68:5 69:4
151:25 180:22
**phone (3)**
181:9 201:23 202:2
**phrase (3)**
137:17 160:19,24
**phrases (2)**
163:8,11
**pick (1)**
120:17
**picked (1)**
181:9
**picks (1)**
121:12
**piece (2)**
57:16 133:24
**pieces (1)**
83:12
**pin (1)**
72:8
**pinpoint (2)**
72:9 155:21
**place (9)**
18:17 25:3 72:10
75:18 131:21
141:11 187:12
203:5,14
**plain (3)**
72:11,14 91:14

**plainly (1)**
125:15
**planning (1)**
88:18
**Plaza (2)**
2:10 4:6
**pleading (2)**
92:6 191:3
**please (3)**
19:18 158:19 171:3
**plus (1)**
139:9
**point (70)**
6:3 7:17 11:22 27:11
39:24 40:7 44:12
46:2,23 47:10 48:2
48:6,25 51:21 59:18
64:19 65:16 70:16
71:7,12 73:2 91:12
92:13 98:10 100:11
102:5,11 110:19
111:21 114:13,15
114:22,25 120:11
125:15 129:3
130:25 138:7
140:14 145:12
151:4 155:22
157:19 159:16,23
160:11 164:13,24
165:3 183:14,22
188:13 195:18,19
197:6,20,22,23
199:24 201:9
208:12 209:6,22
217:24 223:11,19
225:2,5 226:21
229:16
**pointed (1)**
145:21
**pointing (1)**
142:19
**points (8)**
24:15 31:10 70:18
109:10 140:25
198:7,13 203:20
**pools (1)**
79:23
**population (1)**
12:2
**portfolio (1)**
41:7
**portion (13)**
41:24 62:14 76:4
81:13 85:24 86:5
153:21 168:25
174:20 206:14,23

207:4 226:10
**portions (2)**
42:19 124:5
**pose (1)**
62:7
**posed (1)**
144:15
**position (20)**
36:25 37:3 38:25 47:3
47:11 53:15 58:14
64:8,16 65:21 66:6
66:17 68:18 69:2
109:16 169:6 180:22
180:4 210:8 233:22
**positions (35)**
21:3 22:17 25:7,10
31:18 32:14 37:16
49:15,18,20 64:11
65:24 66:14 108:3
108:21 109:11
133:19 135:22
136:3,9,17 137:3
170:6,9 174:12,15
174:23 175:3,5
176:9 179:10,20,25
206:16 209:25
**positive (4)**
55:19 68:5,12 69:3
**possession (2)**
106:24 209:23
**possibility (4)**
9:24 43:18 73:21
212:19
**possible (34)**
12:18 18:24 31:19
56:17 62:17 68:7
75:11 76:4 79:6
80:13,13 93:16
98:10 127:23
128:21 129:12,15
129:17 145:19
173:5,14,17,18
174:16 199:25
202:25 204:18,18
204:20,21 211:18
223:16 226:22
227:16
**possibly (7)**
12:9 24:16 117:9
124:9 149:5 153:19
218:4
**post (1)**
180:3
**posted (3)**
174:11 175:8 176:8
**post-closing (1)**

199:6
**post-dated (1)**
199:2
**potential (6)**
191:6,17 203:19,23
204:5,6
**potentially (3)**
192:10,11,11
**preceded (1)**
19:24
**precedes (2)**
142:7,9
**preceding (2)**
118:11,12
**precise (6)**
13:18 90:23 99:13
105:20 152:15
167:12
**precisely (7)**
15:3 64:20 100:4
129:3 198:24
225:18 227:10
**preclosing (1)**
202:17
**precluded (1)**
69:6
**premise (1)**
6:17
**preparation (17)**
8:22 15:7 37:20 58:23
62:2,4,6,8 138:10
139:19,21 144:8
145:24 146:20
155:4 232:19
234:18
**prepare (4)**
9:24 41:25 217:22
233:12
**prepared (6)**
27:21 58:20 74:7
233:24,25 234:22
**preparing (3)**
9:20 14:24 128:9
**present (24)**
8:24 9:9,22 10:6
11:16 18:14 22:22
26:7,13 28:2,7
84:18 91:10 92:16
107:10,15 111:19
128:2 139:2 140:19
156:2 201:25 213:4
226:12
**presentation (14)**
12:4,6,7,11 13:2,7
18:15 19:13 22:4
23:12 25:2 26:21

27:3 109:3
**presentations (1)**
27:6
**presented (8)**
38:5 76:12,25 77:16
89:12 99:12 100:3
107:4
**preserve (3)**
93:15,24 99:20
**pressing (1)**
93:14
**pretty (2)**
147:20 203:13
**previous (3)**
61:14 89:7 144:16
**previously (22)**
29:22 31:18 37:17
79:13 108:19,20
109:5,12,15 119:3
125:22 130:2
133:14 136:16
137:2 139:18 160:7
171:4 175:13
195:12 205:13
230:7
**prices (1)**
45:22
**primarily (5)**
52:20 57:3 66:12
124:18 150:18
**primary (1)**
109:2
**principal (5)**
8:12 10:17,21 151:23
151:24
**principally (3)**
16:11 24:22 44:7
**principals (1)**
193:7
**prior (41)**
30:9 48:3,4 56:15
74:11 78:13 82:5
83:5 89:16 92:3
117:14 118:9,10
119:16,17,18,22
128:20 138:21
165:21,22 170:5,21
171:19 172:9,12
173:5,6 176:3,22
177:17 198:8,8
201:2,16,17,18
211:15,16 217:13
233:25
**privilege (4)**
6:15 103:4 122:18
231:18

**privileged (22)**
6:9 50:14 63:2 67:8
103:8 121:16,19
143:25 146:22,23
182:3 183:7,9
193:15,19 196:14
196:16 215:18
216:3 230:19 231:2
231:21
**privy (1)**
107:15
**probable (1)**
115:25
**probably (6)**
8:14 35:17 76:21
101:25 174:24
202:24
**problem (1)**
6:18
**problematic (1)**
192:6
**proceed (1)**
6:17
**proceeding (1)**
25:17
**proceedings (2)**
11:22 84:13
**process (2)**
146:12 147:4
**produce (1)**
67:20
**produced (3)**
130:24,24 131:19
**Professional (2)**
2:11 238:9
**profit (4)**
38:16 39:6,12,21
**progression (1)**
140:21
**promptly (2)**
81:19 229:17
**proper (4)**
54:11 58:15 124:25
190:25
**properly (3)**
68:17 125:21 193:4
**property (9)**
47:15 49:11 85:18,25
151:11 164:2 169:7
224:18,19
**proportion (1)**
153:2
**proposed (16)**
94:20 144:6,9 164:6,8
164:12,15,16,17,18
165:20,23 209:16

230:15,17 234:2
**proposition (1)**
203:23
**Proskauer (2)**
201:13,20
**protection (1)**
209:2
**provenance (1)**
225:20
**provide (3)**
37:4 119:13 191:14
**provided (7)**
11:23 129:14,24
210:23 211:3 215:2
215:17
**providing (1)**
119:21
**provision (4)**
90:19 91:7,20 215:22
**provisions (3)**
82:20 120:10 122:25
**proviso (5)**
16:10,20 89:18
107:21 168:13
**public (4)**
2:13 40:11,14 238:10
**pull (2)**
234:21,24
**purchase (14)**
21:8 32:24 33:11 35:7
75:7 87:17 98:9
120:15 186:12
188:9 206:18 214:2
224:22 234:2
**purchased (10)**
35:7 36:8 87:15,16
92:7 111:5,25 133:8
133:10,20
**Purchaser (1)**
92:2
**purpose (6)**
81:12 85:15 92:20
121:5 146:17
147:21
**pursuant (12)**
21:10 153:24 167:3
168:9 185:8,23
186:10,12 188:8,9
206:17 229:9
**put (8)**
31:6 99:25 112:14
130:24 140:13
182:11 183:3
195:25

_____

**Q**

**qualified (2)**
21:15 68:24
**quantification (4)**
56:3,20 65:22 87:3
**quantified (1)**
65:17
**quantify (9)**
50:9 51:10 53:6,17,24
54:25 57:19 64:25
190:14
**quantifying (2)**
55:21 63:17
**quantity (1)**
206:16
**quarter (3)**
199:13,22 200:2
**question (94)**
5:11 7:10,13 11:18
15:14,15 31:6,9
48:19 50:21 52:24
53:3,20,21 59:4
61:20 62:6 64:14
69:19 70:11 71:3,8
85:16 88:17 89:9
96:2,5 98:15 99:8
103:3,11 104:15
108:14 112:12
114:14,23 115:16
118:2 120:16
122:21 128:9 132:2
132:5,22 134:12,21
134:23 135:25
137:4 140:8 142:4
144:14 148:17,18
154:5,14,15 159:15
159:18,22 163:6,9
164:23 167:22,24
169:13 172:2 181:4
182:4,24,25 183:2
187:15 188:5,6
189:17 200:22
204:18 207:8
211:17 212:3,5
216:22 217:19
218:2 224:24 225:3
225:5 228:6 231:2
232:10,13,14
234:19
**questioned (1)**
216:25
**questions (25)**
7:9 26:14 38:10 41:14
46:12 73:8 78:4
87:21 100:22 116:7
122:16,23 126:11
127:10 138:22

160:9 161:19
162:17 175:2 177:9
181:17 182:23
235:11,16,18
**quick (1)**
171:25
**quickly (3)**
93:24 120:17 150:22
**QUINN (1)**
3:19
**quite (6)**
28:2 94:2 124:16
195:20 203:17
233:17
**quote (3)**
41:6,16 143:2

_____

**R**

**R (1)**
4:8
**raise (3)**
69:10 70:12 91:12
**raised (4)**
70:14 222:19 223:13
224:24
**raises (1)**
31:9
**range (1)**
167:10
**rational (1)**
204:7
**reach (6)**
50:3 56:12 57:14 84:8
178:21,22
**reached (7)**
77:13 82:5 118:16
125:13 185:19
216:19 230:8
**read (17)**
42:3 57:22 59:5 81:13
134:5 141:17 142:2
142:22,24 159:7,11
159:15 195:23,24
196:4 206:24 215:8
**reading (2)**
110:4 184:21
**reads (1)**
206:12
**real (3)**
105:19 216:23 217:5
**realistic (3)**
190:18 203:22 204:10
**realistically (1)**
191:6
**realizable (1)**
212:22

**really (15)**
32:4 77:8,10 90:6
105:11 114:15
130:21 163:5
176:17 199:8,24
200:2,2 209:15
217:10
**Realtime (2)**
2:12 238:9
**reason (20)**
41:21 43:12 47:12
106:9 107:3 111:23
144:17 184:4 203:4
203:7 209:22
234:11 239:6,9,11
239:13,15,17,19,21
**reasonable (13)**
49:7 50:2 55:16 56:24
57:13,14 60:5 61:24
63:17 65:3,13 66:25
210:4
**reasons (4)**
24:22 25:9 43:9
110:20
**reassess (1)**
209:12
**recall (62)**
8:5 9:10 11:10 15:5
16:8 17:9,12 18:22
18:24 19:11 25:24
26:20,23 27:2 40:20
40:21 62:18 64:12
67:15 71:17,18,24
72:4,5,6 76:10 77:6
79:8 106:10 108:4
112:2 123:11
131:12 152:17
153:7,9 157:7 158:8
159:20 160:3,4
161:9,20 162:17
181:8 184:12 187:4
187:10 198:22
199:18,19 201:14
202:12 203:5 204:3
211:20 213:3
222:17 225:17
226:12 227:9
232:15
**recalled (8)**
15:21 17:23 18:10
19:2,5,9 106:10
226:9
**recalls (2)**
159:19 226:7
**receive (2)**
168:9 188:7

**received (17)**
51:25 75:15,23,24
76:17,25 77:2 78:25
79:5 102:9 106:5
167:3,15,19 171:8
172:15 214:14
**receiving (1)**
106:24
**recess (7)**
38:13 89:4 115:4
154:20 166:21
207:16 232:8
**recognition (1)**
59:19
**recognize (3)**
21:16 60:3 141:9
**recognizing (2)**
52:17 102:7
**recollected (2)**
17:3,5
**recollection (28)**
9:19 13:18,22 14:13
14:14,20 15:9,13,16
15:17,20 16:21 18:4
18:5 23:21 26:5
72:6 81:14 153:5,6
157:23 161:7
162:22 163:10
201:11 202:22
203:16 223:21
**recollections (12)**
12:20 13:3,20 15:25
16:3 18:7,8 37:25
152:22 155:18
165:9 233:19
**record (47)**
6:3,4 9:12,15 11:8,19
19:15,19 20:2,2
22:10,10 24:9,19
25:18,23,23,25 26:2
26:11,21,22,24,25
27:9,10,13,15,17,18
57:22 59:5 122:7,14
125:5 161:5,23
162:4,23 172:4,5
232:5 235:12,13,14
238:15 239:7
**recorded (1)**
118:17
**records (1)**
191:5
**recount (1)**
32:23
**recourse (2)**
191:16 208:14
**red (1)**

164:20
**redline (5)**
141:23 142:12,14,19
142:20
**reduced (3)**
29:23 115:12 220:20
**reduction (2)**
22:18 25:9
**Reed (2)**
2:9 4:4
**refer (12)**
21:19 35:18 49:2 76:2
80:5 87:20 113:4
142:2 149:8 169:21
178:23 227:19
**reference (29)**
18:13 20:16 22:16,18
25:21,22 28:24
29:13 30:8,17 31:16
31:17 32:13 35:11
60:9 87:23 88:2,5
116:13 117:14
120:13 138:8
148:12 194:11
197:10 208:20
221:14,23 223:17
223:18
**referenced (1)**
30:9
**references (4)**
16:11,12 20:3 144:21
**referred (46)**
14:14 16:9 18:19
19:21 20:19 22:4
23:2,5 24:21 25:6
30:19 32:21 51:15
68:7 90:16 98:21
100:21 110:10,12
112:20 116:5,21
133:19 137:21
145:20 149:20
152:25 154:6
155:15 156:24
165:14 174:7,21
177:24 186:21,21
196:20 205:13
208:14 209:11
211:9 214:6 221:17
222:15,16 232:16
**referring (36)**
20:23 27:6 34:19
40:15 58:10 66:12
78:5 80:2 108:16
110:18 113:19
128:19,22 133:24
135:7 136:24

143:13,16 148:20
154:5 155:16
159:10 179:12,13
184:7,8,16,21,22,23
197:21 206:22
207:4 218:9 227:12
227:20
**refers (5)**
71:8 132:7 133:9,14
219:16
**reflect (3)**
122:7 172:5 232:6
**reflected (2)**
82:20 234:23
**reflecting (1)**
234:2
**reflection (1)**
165:12
**refresh (1)**
8:23
**refused (1)**
192:15
**regard (4)**
16:6 81:6 161:13
219:17
**regarding (3)**
157:23 166:12 174:23
**Registered (2)**
2:11 238:8
**regulator (1)**
194:18
**regulators (6)**
193:21,25 194:7,10
194:13,21
**regulatory (2)**
221:5 224:3
**reiterated (1)**
198:12
**rejected (1)**
190:24
**relate (3)**
153:10 168:17 213:20
**related (10)**
64:15 109:12 117:11
125:20 129:13
146:24 150:10
179:25 192:22
238:18
**relates (1)**
50:13
**relating (19)**
20:4 30:18 70:22 92:6
128:3 145:17
149:12 154:25
155:2 165:15 173:3
178:3 192:19

197:25 203:18
223:2,9,25 233:20
**relayed (2)**
26:21 27:22
**relevant (15)**
39:20 84:3 86:2 89:11
120:18 121:5
138:21 150:12,14
158:12 169:22,24
172:25 203:7
209:25
**relied (3)**
59:9 218:11 219:10
**remains (1)**
168:8
**remarkable (1)**
25:4
**remember (15)**
8:20 15:19,23 87:2,24
90:18,23 103:21
147:5 167:12
201:13 203:12
219:14 232:13,14
**remembers (2)**
14:9 147:4
**remind (1)**
24:19
**rendition (1)**
90:11
**renditions (1)**
76:21
**repeat (13)**
25:25 27:25 40:6
53:20 59:4 61:20
69:18 103:23
105:11 134:23
177:15 195:4 212:4
**repeated (1)**
71:20
**repeating (3)**
13:25 128:13 138:21
**repo (15)**
45:8 79:5,18 109:19
109:24 110:7,11,11
134:16 135:3
185:15 186:6,17
187:5,8
**reported (3)**
1:16 225:17,18
**Reporter (4)**
2:12,12 238:9,10
**reports (1)**
154:24
**represent (5)**
14:3 41:5 46:25
175:22 222:3

representation (6)
31:4 92:12 128:23
150:4 171:16
214:14
representations (13)
12:18 28:13,15 38:25
45:18 54:14 56:9
83:19 89:16,20
97:16 217:8 230:7
representative (5)
6:7 12:23 28:8 64:2,7
representatives (60)
8:11,19 12:7 24:17
28:19 48:20,25 49:3
49:7 50:3 52:11
54:7 70:24 71:2,6
71:23 72:19 73:3
83:2,3,23 89:13
91:18 105:15
106:13 107:22
117:7,8,9 126:18
127:24 138:12
144:11 146:15
147:9 149:3,4 150:8
152:5,6,9,22 153:3
153:19 157:12,25
165:6 168:5 174:17
179:2 185:20
198:11 201:11,15
201:16 212:17
220:12 221:18
223:9,24
represented (13)
17:17 37:6 43:10
98:13 107:6 108:10
109:23 138:14
186:25 211:2
212:21 220:8 222:8
representing (8)
69:7 140:11,12
164:25 204:13
206:2 231:6,12
represents (1)
171:7
request (2)
71:20 235:3
requesting (1)
71:10
requests (2)
190:19,24
require (1)
61:17
required (6)
95:19 102:14 180:3
224:4 225:10 226:2
requirement (1)

179:9
requirements (1)
59:22
reserve (6)
114:25 161:13 162:8
220:10 222:20
228:23
reserved (1)
5:11
reserving (4)
161:16,22,24 162:3
residential (7)
75:17,20 77:20 78:8
78:12 79:3 80:25
residual (1)
50:7
RESIs (14)
76:2,4,14,17 77:8,12
77:18,19 78:6,23
79:11,13 80:9,21
respect (120)
10:14 16:14 19:22
20:7,8,14 21:20
23:6 25:5,7,10 29:8
29:16,16,18 30:10
30:18 35:6 42:5
43:14,24 45:9,12,12
45:19 49:13,20
51:14,17,24 52:7,9
52:13 53:11,14
55:13 56:21,23
59:13,25 62:7,21
64:10 65:14,20,23
66:2 68:8,24 73:4
75:16 79:24 81:17
82:7 84:4 85:17
86:17,18 88:6,13
92:13 93:7 96:6
100:16 101:25
102:15 103:24
104:10,11,23,24
105:5,12,14 106:15
106:16,18 107:5,12
108:19 116:3 120:3
124:13 129:16
131:25 137:12
145:15 146:8 151:8
154:12 170:9
172:15 173:19
176:9 178:13
179:19 182:14,16
183:11,12,15
189:25 191:23
196:6,25 199:21
200:25 203:19,21
212:8,24 214:19,20

216:21,23 218:3,17
218:19,24 231:9
respective (5)
5:6 83:23 174:17
218:15,16
respects (1)
21:15
responsibility (2)
205:14,18
responsible (5)
54:8 182:13 183:4
205:10 206:5
result (4)
100:24 124:6 127:20
222:2
retain (1)
214:10
retained (4)
29:14,19 30:3,19
retaining (1)
215:14
return (6)
81:25 82:18,23
122:11 191:12
214:11
reveal (2)
183:7 196:16
revealing (4)
183:9 193:15 196:14
215:18
review (9)
23:22 41:17 81:10
84:7,7,14 114:17
14:12 208:9
reviewed (5)
120:15 139:19 155:5
166:9 212:13
reviewing (2)
107:18 157:6
revised (2)
139:23,25
revisions (5)
139:25 140:9 141:8
141:10 144:13
Ricci (7)
62:17 66:24 67:3,9,12
67:15 180:14
Rich (2)
62:16 180:14
right (48)
11:21 19:13 36:3,16
36:17 46:20 51:2
55:7 60:8,25 62:18
66:20 70:9 73:13,25
92:18 96:5 100:18
101:18 114:19,24

133:24 135:18,18
136:6,6 142:25
153:11 163:21
169:15,21 180:5
181:11 194:19
200:10 203:9 214:8
214:10,18 215:14
216:7,10 217:18
219:21 223:4 224:2
225:12 229:21
rights (8)
115:2 161:13,16,22
161:25 162:3,8
214:18
risk (14)
42:14,22,25 43:18,22
43:25 50:7 55:22,25
57:13,14 66:3,7
190:7
risks (3)
43:2 102:17 192:19
Rob (1)
10:6
ROBERT (1)
3:8
Roger (1)
194:8
role (3)
10:11,13,20
roles (4)
218:15,16,22,25
rolling (1)
219:25
Romain (5)
167:23,25 175:15,18
176:6
room (3)
122:8,12 232:7
Rose (1)
156:19
Rosen (20)
147:14 149:16 151:25
152:3 153:17
155:17 156:15
173:19,20 194:6
198:17,18,19 199:7
199:17 200:3 201:3
201:7 202:9 205:15
roughly (7)
32:25 100:4,5 138:4
168:14 220:14,20
RPR (2)
1:17 238:24
rules (4)
59:21,22 66:9,10

S

sale (73)
7:20 8:25 10:12 11:8
11:12,20 19:10,24
20:18 25:17 28:3,14
30:13,15 37:6,10
38:18 40:3,8,9,22
73:11,25 74:5,11
75:8 81:5,11 82:5
87:12,22 88:2 92:6
92:13,20,21 97:25
98:2,25 100:3,12
101:2,19 102:21
107:7,8,9 109:5,13
109:14,18 112:9,17
115:7,9 117:24
118:9,11 120:3
124:6 126:2 127:20
128:17 138:12
150:14 151:16
170:14 184:14
185:23 187:19,24
188:3 220:5
salient (1)
101:17
sat (1)
107:22
Saturday (7)
133:3 134:14,25
136:8 203:8,12,15
Save (1)
18:16
saw (2)
168:14 200:11
saying (18)
14:9 17:12,23 19:3,6
19:9 25:25 27:3
67:11 87:6 97:8,12
97:14,14 136:2
189:23 194:5 207:8
says (5)
133:5,18 163:25
175:16,21
schedule (4)
210:20,22,24 211:9
schedules (2)
120:9 211:10
Schiller (4)
3:12 146:15 147:10
148:4
Schweitzer (1)
10:4
scope (1)
177:5
scrivener (2)
131:10,14

**sealing (1)**
5:7
**SEC (13)**
221:19,19 223:15
224:10,14,22
225:10,14 226:2,16
227:6,13 229:25
**second (8)**
9:13 14:21 50:12
122:5 138:23 154:4
195:19 206:11
**secondly (3)**
41:9 124:3 190:24
**seconds (1)**
232:3
**section (3)**
91:23 171:6 228:2
**secure (6)**
47:17 49:18 85:11
164:2 174:12 175:5
**securities (55)**
70:8 78:12 79:24
102:8 109:14,17,24
110:6,9,11,12
137:22 167:2,9,12
168:4,8 185:2,10,15
188:24 189:14,19
193:3 196:8,21,23
196:25 197:18
198:4 200:18
206:14,17 207:4
211:8 214:3 216:21
216:24 218:3
220:21 221:6,7,8,9
221:11,24 222:9
225:8,23 226:24
229:3,14,22 230:12
231:15
**security (1)**
206:23
**see (39)**
120:25 130:3 133:2,3
133:5,7,11,13,16
141:13,15,16 143:2
143:5,8,18 145:25
146:2 159:5,10
163:24 164:4
171:11 175:14,17
184:18 196:9
206:11,20,23 207:2
208:2 209:22
214:25 215:6
230:10,13,14 233:3
**seek (1)**
74:4
**seeking (1)**

156:18
**seen (5)**
132:23,24 139:20
176:4 221:15
**sell (1)**
98:5
**seller (1)**
92:4
**send (1)**
211:13
**senior (6)**
6:5 54:22,24 55:3,10
55:15
**sense (9)**
42:16 44:4 64:4 80:7
100:18 162:11
163:9 189:6 201:22
**sent (1)**
153:13
**sentence (7)**
206:12,24 208:7,9
209:7 215:10
230:11
**separate (1)**
187:6
**September (32)**
7:22 19:25 20:6,23
34:14 38:20,22
46:22 69:23 72:12
72:20 82:12 119:16
119:18,18,23 133:2
133:6 134:15 135:2
135:14 137:10,11
184:3,3,11 185:4
191:20 208:3
219:25 220:2
233:25
**sequence (1)**
225:11
**serial (2)**
200:20,21
**series (3)**
42:4 73:8 100:22
**session (1)**
87:7
**set (5)**
33:10 137:7 221:22
238:13,22
**Seth (1)**
10:4
**settlement (10)**
79:9,15,18,25 80:6,8
119:15 182:13
183:5,12
**settlements (1)**
193:2

**shared (1)**
205:14
**shareholders (1)**
52:23
**shed (1)**
37:21
**sheet (3)**
34:19 98:21 239:2
**shift (1)**
73:6
**shifting (2)**
69:25 70:3
**shocking (3)**
88:15 117:19 129:7
**short (4)**
38:8 67:22 166:19
209:24
**show (11)**
120:8 130:2 139:17
145:3 160:6 163:14
170:25 171:4
175:12 195:12
232:22
**showed (1)**
132:13
**shown (4)**
146:4 153:10 207:20
212:11
**side (7)**
130:4 131:24 162:7
175:19 201:21,25
202:10
**sight (2)**
129:18 173:10
**sign (1)**
181:10
**signatory (3)**
180:10,23,25
**signature (1)**
171:19
**signed (9)**
5:17,19 124:16 125:8
125:9 163:19 166:9
166:9 215:3
**significance (1)**
111:6
**significant (6)**
31:25 32:18,20 33:21
43:22 104:4
**signing (4)**
180:25 198:9 199:2
201:17
**similar (2)**
13:5 181:23
**simplified (1)**
156:13

**simplify (1)**
156:12
**simply (7)**
50:21 58:3 121:24
135:18 187:15
193:12 195:7
**single (4)**
44:17 94:5 100:11
168:25
**SIPA (4)**
4:5 69:11,13,16
**sir (33)**
10:11 38:15 120:11
132:21 133:4
139:17 145:10
148:9 154:21
158:19,25 160:6
162:13 163:14,23
171:5 172:8 176:15
181:16 195:16
196:2,5 206:20
207:20,25 208:6,10
232:13,22 233:2,23
234:11 235:11
**sit (2)**
161:17 233:22
**SIVA (1)**
69:15
**size (3)**
45:9 46:5,10
**sleep (1)**
202:21
**slightly (4)**
53:2 112:15 125:17
167:6
**smaller (1)**
167:9
**sold (1)**
206:17
**somebody (6)**
15:16 53:21 65:20
130:25 131:17,19
**somewhat (1)**
150:25
**soon (3)**
74:4 132:10,10
212:12
**sorry (16)**
18:9 27:25 40:6 67:9
69:15 76:7 80:19
125:8 138:16 149:5
168:18 177:15
200:6 227:3 233:5,7
**sort (1)**
47:16
**sorts (1)**

85:18
**sounds (1)**
147:20
**source (1)**
121:25
**sources (2)**
6:11 164:10
**SOUTHERN (1)**
1:3
**space (1)**
227:18
**speak (7)**
12:4 13:12 38:3
179:14 191:17
218:7 223:20
**speaking (1)**
67:15
**specific (61)**
10:13 26:4 34:20
35:10 40:21 43:9
44:17 51:13 52:24
53:3 54:3 55:9 60:9
63:23 64:12,23
71:17 78:10 83:12
95:21 96:6 98:16
100:15,21,23
102:14 111:20,20
111:24 115:16,17
117:14 120:16
128:6 132:2,4
144:14 145:25
153:7,9 155:22
156:18 157:16,19
158:9 160:11,24
161:2 163:7,7,10
167:14 192:18
201:14,15 205:17
210:16 218:3
221:23 231:10
234:12
**specifically (38)**
30:8 36:7 44:5 53:22
53:23 59:17 62:19
62:21 66:24 67:15
76:15 87:5 100:24
102:11 106:17
116:7,12 131:9
139:7 148:19
156:16,17 166:4
168:2 175:6 179:18
180:23 181:20
182:7 187:10
191:11 196:6
200:15,19 202:13
217:22 218:19
223:10

**specifics (1)**
174:14
**speculation (1)**
37:8
**spell (1)**
147:16
**spend (1)**
58:10
**spoke (6)**
9:4 12:25 147:5
156:15,16 233:13
**spoken (19)**
13:14 17:8,9 37:22,24
41:23 59:16 61:22
62:5,9,12,17,20
144:10 165:10
176:5 177:7 217:21
217:23
**ss (1)**
238:6
**stage (3)**
132:7,9 227:5
**stamped (7)**
132:15,17 158:14,16
158:20 237:8,10
**stand (1)**
192:11
**start (6)**
7:19 31:8 65:9 76:7
154:11 184:17
**starting (3)**
33:24 70:18 236:2
**starts (2)**
120:23 159:2
**state (6)**
2:13 6:3 23:5 161:4
238:5,11
**statement (4)**
41:12 162:15,25
208:11
**states (2)**
1:2 92:2
**stayed (1)**
43:5
**step (2)**
122:5 154:17
**Stephen (9)**
62:16,20 80:11
212:12 213:18,20
217:20 218:5 219:3
**stepped (1)**
122:8
**steps (1)**
8:23
**Stern (122)**
3:16 6:2 9:12,18

14:21 15:14,18 26:3
26:9 30:5 31:5 37:7
37:12 38:8,19 41:13
42:9 44:2,21 45:2
47:24 50:12,23 51:4
53:19 54:4 57:21,23
58:5,17 59:6 61:3
62:2,25 63:19 65:6
67:7 69:20 73:12,14
73:18 77:23 81:9
85:3 88:17 89:2
91:22 92:2 93:3
94:11,17 95:11,25
96:13,25 97:13 99:4
100:7 101:7 102:25
103:6,20 104:6,13
105:2,9 106:3 108:5
108:11 109:25
110:16,24 111:8,17
112:10,12,23
113:16 114:13,20
115:3 116:15 118:7
121:14 122:2,11,13
122:22 123:2 126:3
127:6 132:22
133:17 134:3,13,18
135:5,12,24 136:12
137:9,16 138:18
139:11 141:18,21
141:25 142:11,17
143:24 144:23
146:19 147:25
148:14 149:14,19
150:2 154:3,9,14,17
235:14
**stick (1)**
63:8
**STIPULATED (3)**
5:5,9,15
**stop (2)**
88:22 233:5
**stopping (1)**
7:17
**Street (1)**
3:6
**strict (1)**
51:5
**strictly (4)**
168:16 169:19,20
186:13
**strike (2)**
61:21 103:16
**strong (3)**
14:12 39:10 223:22
**struggle (2)**
159:12,13

**struggling (1)**
8:20
**subclause (1)**
143:10
**subject (11)**
22:7 41:19 63:6 70:13
103:7 124:8 149:25
156:11 224:14,14
226:16
**subjects (2)**
17:7,10
**Subscribed (1)**
236:8
**subsequent (2)**
145:3,4
**subsequently (8)**
16:14 20:2 29:23 74:9
115:13 220:18
225:17 229:20
**substance (1)**
152:13
**substantial (6)**
24:20 25:12 42:19
44:14 170:6 212:20
**substantially (2)**
230:12 231:15
**sufficient (6)**
52:19 57:6 68:23
101:23 114:4
208:15
**sufficiently (2)**
14:2 99:17
**suggest (2)**
91:12 206:13
**suggested (1)**
209:11
**suggests (2)**
84:15 107:19
**Sullivan (5)**
10:6 146:16 147:10
148:4 194:9
**sum (1)**
191:14
**summarize (1)**
178:2
**summary (3)**
16:16,16 28:5
**Summers (1)**
10:7
**Sunday (6)**
208:3 209:8 223:11
224:25 226:4
227:15
**support (8)**
41:9 47:17 49:19 92:5
178:9 193:8,9,11

**supported (1)**
68:22
**sure (47)**
10:13 32:23 33:12
40:24 46:2 50:13
54:5,19 57:24 59:2
80:20 94:18 99:23
117:25 118:2 121:7
131:18 132:24
134:24 142:23
150:3 154:4,4
157:18 161:2 164:7
165:4 167:4,7
169:19,21 172:23
175:10 180:18,18
181:19 184:6
191:24 198:25
199:8,24 200:14
207:14,14 212:4
221:16 231:22
**surprise (2)**
117:15,16
**surprising (3)**
45:25 88:11 129:7
**surrounded (1)**
75:13
**surrounding (1)**
140:2
**sustainable (1)**
209:20
**switch (2)**
181:16 219:13
**sworn (5)**
5:16,19 7:4 236:8
238:14
**system (1)**
210:2

---

**T**

**TAA (14)**
124:8 125:16,25
126:6,8,9,14 127:8
127:12 172:13,15
172:17 173:3
181:13
**TABATABAI (1)**
4:9
**table (1)**
162:7
**take (42)**
7:15 8:23 28:4 38:8
38:11 47:13 50:3
57:2 58:14 69:20
88:21,24 93:6 102:7
103:12 111:9,13
112:16 114:5,16,24

116:25 120:21
127:14 145:7,24
154:8 159:14
166:18 182:15
183:20,23 186:2
203:14 207:12,15
208:10 213:11,13
213:24 231:25
235:17
**taken (5)**
41:7 46:3 75:18 93:11
129:2
**talk (5)**
33:21 85:4 147:7
232:3 236:2
**talked (1)**
66:23
**talking (17)**
29:10 37:8 38:19
44:21 50:18 78:10
135:15,18 166:22
168:10 175:9,11
177:16 188:22
228:15 230:11
235:4
**talks (1)**
141:14
**team (1)**
218:5
**teams (1)**
68:17
**telephone (1)**
201:23
**tell (48)**
7:25 11:6 13:16,21
14:5,7 18:14,18
19:2,5,18 24:12
36:25 50:8 65:20
79:16 86:7 87:10
91:20 104:3,9
108:18,24 115:17
131:14 145:23
148:22 156:4
164:19 165:5,23
168:7 170:11
171:21 172:8,11,20
184:4 196:11 200:9
200:15,19 204:12
204:23 208:6
229:18,23 233:11
**telling (2)**
68:18 156:15
**tempted (1)**
130:19
**ten (2)**
44:12 111:12

**tenor (1)**
209:9
**term (23)**
34:25 40:21 42:13
60:19,20 80:21
85:14,21 116:18
130:4 138:6,9
141:14 159:9
160:22 161:2
170:24 212:7,10,23
213:2,3 229:9
**termed (4)**
16:14 17:18 186:23
188:14
**terms (30)**
11:7 32:16 42:21 47:7
52:22 53:10 55:9
68:13 81:18 82:7
84:7 88:18 90:4,23
93:15 120:5 125:9
126:18 135:19
137:22 140:14
141:19 151:5 155:9
163:7,10,13 166:12
188:8 213:6
**test (1)**
107:2
**testified (3)**
7:4 15:15 175:23
**testify (9)**
6:9,10 15:4 58:20
63:20 139:13
146:25 156:7,8
**testifying (2)**
26:5 142:15
**testimony (5)**
6:13 112:16 120:7
145:5 238:15
**text (2)**
133:8 159:11
**Thank (3)**
7:18 27:19 154:22
**thanks (4)**
91:25 172:7,10 236:4
**thing (10)**
15:11 63:3 77:22 94:7
94:8 100:18 101:18
134:2 178:18
202:20
**things (11)**
39:16 59:24 77:3
109:6 118:20 119:3
123:23 143:7 155:7
212:14 227:12
**think (263)**
8:3,5,7,9,17 12:16

13:17 15:2,8,10,12
17:16 18:2,21 23:4
23:20 24:14,16 25:3
25:13 31:15 32:24
33:10 34:5 35:2,19
35:20 36:4,7,17,23
39:4,22 41:14,15
42:22 43:20 44:3,11
45:5,14,21,25 46:4
46:17,22 48:4,19,23
51:2 55:15,24 56:15
56:18 57:6 58:2,12
59:6,9 63:22 65:8
65:19,25 67:11 68:9
69:2,9 70:19 71:11
71:18 72:10 73:18
74:3 75:3 76:16,24
77:13,19 79:7,14
80:4,11,12 85:16
87:18,21,24,25 88:3
88:4,11,15 89:10,14
89:23 90:2 91:6,7
91:10,19 92:10,14
92:16 93:6,9,22
94:12 95:18 97:6,24
98:16 99:7,9,10
100:8,14 101:20
102:6,12,25 103:5,9
103:22 104:7
105:10,16 106:19
108:6,7 110:4,18
111:6,8,18,23 112:4
112:25 114:2,13,15
114:21 119:25
120:13 121:4,7
123:10,14 125:19
126:17,22 127:6,12
129:2,10,20,22
131:6,18 134:3,5,10
134:21 135:25
136:18,20 137:16
138:3,4 139:14
140:16 141:8,21,25
142:9,13 144:18,19
146:6 147:15,18,19
150:17,25 157:22
158:6,8,10 160:25
162:10,10 164:8
167:5,6,8,16 168:12
168:13,16,21
171:15 174:13,20
174:24 176:12,16
176:20,20 177:4,23
178:24 179:3 180:9
180:12,20,24
181:14 182:17,22

183:10 185:13,24
186:9 187:2 189:3
190:16 191:15
193:10,17,23 195:2
195:25 197:9
198:22 200:5,6,12
201:11 203:2 205:3
205:12 206:4 209:9
210:24 217:18
218:21,21 219:18
220:14 221:21,22
221:24 222:25
224:6 225:13,20
227:4,21 228:5
230:21,25 231:19
232:9 235:6
**thinking (1)**
91:20
**third (1)**
206:9
**Thompson (4)**
200:5,6 201:9,19
**thought (17)**
16:24 17:7 18:16
37:12 69:15 73:20
90:14 112:5 117:20
131:20 153:12
174:6 185:14
203:22 204:6,9
220:12
**thoughts (2)**
12:5 204:7
**thousands (1)**
175:23
**three (2)**
114:14 158:20
**Thursday (2)**
202:25 219:24
**time (120)**
5:12 7:16 8:13 14:18
25:3 35:9,9 39:24
40:3,7 43:13 45:23
46:17,23 47:10 48:2
49:4 52:15 54:14,15
56:19 59:14 60:6
62:13,18 64:19
65:16 70:7,7,8
71:12,15,18 72:10
75:19 77:21 83:2
84:11,16 91:6 93:14
98:10,24 102:5,11
105:24 106:20
107:17 110:19
111:7,19,21 112:4
112:17 114:12
115:19 119:15,22

126:23 128:18
136:19 137:4,5
138:7 139:3 140:8
140:15,25 151:4
152:13 153:22
154:8 155:23
159:14 166:8
168:14 179:3,5
183:14,16 185:14
185:18 197:20,22
197:23 201:13
202:20 203:6,10
204:8 205:22,22
206:15 207:12
208:10,12,24 209:6
209:19 211:6,14,16
212:15 214:6,14
216:18,20 217:5,12
217:24 220:11,25
224:17 225:3
226:18 228:13
229:14 234:12
235:11 236:2
**times (9)**
46:4 72:21 75:5
114:15 129:22,24
138:19 156:25
187:12
**timing (3)**
88:18 93:15 198:22
**today (10)**
7:9 26:15 62:6,8
128:9 131:23 155:4
158:8 161:18
233:18
**told (21)**
14:6,8,9 15:2 19:9,16
26:23 29:17 53:6,13
53:23 54:3,7 86:22
86:24 87:6 96:23
103:17 156:8
177:14,21
**top (5)**
44:12 133:3 163:23
163:24 206:11
**topic (30)**
15:24 16:18 50:13,24
59:2 64:13 69:21
87:22 126:6 127:13
139:25 141:6
144:12 156:17
182:19 193:19,25
194:11,15 195:3
205:3 208:18
222:19 233:3,4,5,8
233:10,12 234:5

**topics (7)**
6:8 51:2,17 57:24
58:11 176:11 234:8
**total (38)**
46:15 47:8,21 48:10
81:2 95:9,23 96:7
96:11,23 97:3,5,6
97:11,20,23 98:2,3
98:11,14,17,25
99:12,13,14 100:5
100:25 101:4,14,24
102:3,22 103:17
114:10 129:4 176:7
222:3,9
**totality (1)**
91:17
**tracing (1)**
180:20
**traded (3)**
60:8,10 117:5
**trades (1)**
195:8
**trading (1)**
41:7
**trans (1)**
42:10
**transaction (128)**
10:18,22 11:3,9,12
12:6 13:5 17:22
18:11,20 19:22
20:14,25 21:14
28:20,25 31:14 32:5
32:17 35:23 38:18
39:7,15,16 40:5,13
42:6,8,10,14,17,19
42:23,24 43:11
44:20 45:8 46:7
48:9,21 49:25 51:18
51:21 52:6,23 53:8
54:8,10 55:2,14,18
60:22 62:14 65:19
67:20,24 68:2,4,12
68:19 74:16,19,22
74:25 75:6 79:5
81:6,21,23 82:7,11
82:15 83:9 84:4,25
88:8 90:11,20,21
91:4 92:25 93:8,23
94:10,13,16,20,24
95:7,13,18 96:18,20
97:22 98:19,20,22
99:19 100:19
101:16 102:9,19
103:19 109:19
113:6 114:8 115:7,9
117:24 120:3

131:24 132:8,9,10
140:7 143:21,23
155:9 169:6 185:15
192:13,15 197:4
218:18,20 220:5,17
229:17
**transactions (5)**
181:6 190:21 192:3
192:20 193:3
**transcript (12)**
23:23 81:10,13,14
93:10 99:16 107:19
108:18,25 110:5
155:5 227:18
**transcription (1)**
239:8
**transfer (37)**
71:9,11 72:22 76:5
79:12 81:3 86:25
94:21 117:18 119:8
123:12,21 124:14
124:25 125:10,11
125:21 129:7
135:20 149:10,21
149:22 150:7,12
151:8 170:21,24
177:13,18 180:8
185:6,18 221:5,7
226:16 228:8 229:2
**transferrable (2)**
185:23 187:3
**transferred (30)**
35:16 49:25 88:9
109:5 124:2 127:20
135:11 136:9,16
150:21 151:15
153:23 155:13,13
170:14 184:19
185:11 186:3,22
187:5,16 214:16
220:9,16 221:21
224:21 226:24
227:7 228:24
229:16
**transferring (1)**
185:14
**transfers (7)**
79:3,10 183:25 184:4
184:10,25 187:12
**transmitted (1)**
28:6
**transpired (1)**
136:7
**Treasuries (3)**
167:8,9,13
**tremendous (1)**

25:10
**trial (1)**
5:12
**tried (2)**
54:17 105:18
**tries (1)**
161:18
**trouble (1)**
216:16
**true (5)**
11:4 41:12 77:17,18
238:15
**Trust (1)**
181:21
**trustee (39)**
4:5 12:9 69:11,13,17
69:22 70:6,12,25
71:5,9,16,22 72:15
72:18,22,24 83:25
117:9 124:9,13,21
125:5 128:11
129:17 149:4 152:6
152:16 157:24
166:17 168:23
173:7,9,16,21
178:22 184:10
206:3 231:13
**trustee's (4)**
70:25 71:22 72:18
73:3
**try (11)**
7:11 9:6 101:9 135:8
207:7 212:6 218:12
220:3 232:17 234:6
235:5
**trying (12)**
50:23 58:17,18,23
77:3 99:6 105:11
126:24 140:19
162:12,16 182:11
**turmoil (1)**
39:23
**turn (10)**
130:18 141:12 144:16
158:20 163:23
171:5 206:9 207:25
214:22 233:2
**turned (2)**
109:6 219:2
**two (20)**
17:7 24:15,22 31:10
31:11 36:19 43:6
62:12 150:16 154:6
156:20 170:2
207:12 212:14,18
213:6 217:21 218:4

218:5 232:3
**two-week (1)**
118:13
**type (20)**
49:23 57:4 65:11
67:16 98:20 106:22
109:17 128:7
148:19 160:5
172:16 174:15
191:25 213:7
214:13 216:24
218:9 232:16
234:16,19
**types (3)**
44:15 102:18 115:24
**typically (2)**
80:5 198:5

─────────

**U**

**ultimate (4)**
75:10 180:15,17,19
**ultimately (25)**
52:20 55:18 74:12
75:23 77:5 78:23
79:16 80:25 124:10
124:16 125:8,9
140:4 163:18 180:9
180:24 181:5,7
191:8,12,13 204:11
211:9 220:21 230:8
**Um-hm (2)**
22:2 185:5
**unable (6)**
46:25 50:9 51:10 53:6
54:24 91:2
**unavailable (1)**
75:21
**uncertain (7)**
16:2,3 42:21 51:20
77:17 83:18 129:23
**uncertainties (2)**
14:7 69:5
**uncertainty (4)**
24:20 25:4 33:5 43:7
**unclear (2)**
7:10 234:8
**unconditional (1)**
228:9
**unconditionally (4)**
228:19 229:2,10,12
**understand (87)**
7:13 14:6 16:7 19:14
19:19 20:18,24 21:6
22:3 27:4,12 28:14
29:3 30:6 31:7 35:3
36:9,13,20,21 40:22

40:24 42:7,15 46:14
50:19 61:14 64:7
65:2 74:6,14 77:11
81:4 82:4 92:8,19
92:23,24 94:12
96:17 100:9 101:3
101:10,12 108:8
109:22 110:14,22
111:14,15 112:7
113:10,15 116:17
117:17,25 118:2
123:4 126:25
134:14,25 136:7,13
136:14 144:20
148:17 162:5 165:4
174:9 175:9,11
179:4,18,19 182:12
183:25 187:18
188:5 190:3 195:11
207:3,8 209:24
212:3 215:10
225:11 235:15
**understanding (57)**
11:21 26:18 29:6,7
30:2,13 31:3 35:24
36:14 37:4,10,14
38:7 41:11 48:14
54:2 68:15 73:5,15
73:24 74:3,23 78:17
78:20 82:25 83:7
94:9,15,23 95:7,9
95:19 96:10 101:16
121:11,23 122:24
123:20 124:7,12
125:5 135:17
136:19,23 137:14
143:21 157:2 166:8
179:22 188:23
208:24 220:25
224:12,16 228:21
229:4,6
**understands (1)**
27:12
**understood (42)**
11:14 43:25 53:16
54:2,6,5 59:10 61:17
64:14 82:3 83:13,16
83:17,24 88:5 94:20
95:12,23 96:10,14
96:16,18 97:18,19
98:8 99:11,16,18
105:23 112:19
124:20 133:19
135:9 138:13
151:15 153:20,21
155:8,10 179:20

195:10 214:4
229:13
**undertake (1)**
170:20
**undertook (2)**
120:12 123:5
**unencumbered (10)**
17:19 87:14 188:12
189:6 214:3,7,17,19
214:21 217:9
**unending (1)**
43:17
**unfair (1)**
91:9
**unfortunately (1)**
141:2
**unidentified (2)**
45:9 46:10
**UNITED (1)**
1:2
**universe (1)**
172:21
**unknown (2)**
45:8 46:10
**unnecessary (1)**
230:6
**unrealistic (1)**
151:2
**unsurprisingly (1)**
140:12
**urged (3)**
190:17,23 204:9
**urgency (1)**
124:21
**urgently (1)**
150:22
**urging (2)**
203:21,24
**URQUHART (1)**
3:19
**use (18)**
31:10 34:25 60:19,20
85:14,21 90:4
137:17 138:6,9
159:8 163:7,10
179:16 191:4 212:7
212:23 229:11
**useful (1)**
90:15
**uses (1)**
207:6

─────────

**V**

**Vague (1)**
93:4
**valuation (9)**

21:20 43:8,19 76:2
77:19 83:20 95:16
100:12 109:4
**valuations (18)**
37:16 44:9 45:22
51:20,24 52:8 53:14
56:11 76:23 83:13
83:18 96:16 102:14
106:14,15 111:20
128:22 129:21
**value (67)**
21:4,24 22:13,15 23:2
23:18 24:6 42:22
52:19 56:9 64:21
76:6,10,14,16 77:12
83:15 93:16,24 95:9
95:15,23 96:7,11,15
96:23 97:3,11 98:17
99:2,17,22 100:5,25
101:5,14 102:3,23
104:25 105:8,13
113:14 114:10
129:19 133:10,15
133:21,22 134:15
135:2,22 136:8,15
136:15 137:14,17
137:22 138:7,9
179:24 216:21
217:4 219:4,5
220:22 230:13
231:16
**valued (3)**
33:3 102:10 136:4
**values (40)**
22:6,12 24:6,21 25:2
25:9,14 33:6 51:12
53:11 54:11,18
55:12 68:25 76:11
76:17,25 77:2 98:14
99:10,14,20,21
100:9,15 101:22,24
103:16 107:12
129:13,16 136:20
136:21 137:6,21
168:2 212:17,21,22
220:4
**valuing (1)**
44:4
**variety (5)**
93:7,18 102:4 155:25
199:17
**various (8)**
6:11 15:23 36:20
44:18 69:5 70:18
97:15,19
**Varley (4)**

40:19 41:6,22,23
**varying (1)**
44:14
**verbal (1)**
157:16
**version (2)**
142:12,12
**Vic (6)**
8:14 147:13 205:14
267:7,9,19
**Victor (1)**
10:3
**view (15)**
34:3,4,6 43:2 60:4
68:21 77:7 81:5
82:13 109:7 112:17
113:18 121:2 138:2
204:10
**viewed (3)**
35:21 109:4 209:22
**views (1)**
145:14
**volatility (1)**
45:24

_____
**W**
**W (1)**
3:8
**wait (1)**
154:3
**waiting (1)**
96:21
**waived (1)**
5:8
**waiver (1)**
6:15
**want (30)**
14:22 38:9 39:8 41:15
58:6,7,14 63:11
67:7 78:2 96:8,9
100:22,23 113:13
121:20 126:11
134:11 145:3 147:2
148:2,6 161:17
162:23 163:5 172:9
187:17 196:5 216:6
234:11
**wanted (10)**
16:4 27:8 77:10 81:20
130:16 150:22,23
215:22 216:7,9
**warranted (2)**
43:10 98:13
**warranties (1)**
83:20
**warrants (1)**

171:8
**warranty (1)**
171:16
**wasn't (4)**
26:6 98:4 106:11
191:9
**waste (1)**
234:12
**way (25)**
35:8,23 39:2 57:8
58:15 74:24 78:3
85:11 90:2 99:7,24
107:11 123:15
124:2 153:16
169:21 171:18
178:14 190:10
192:12 212:6
230:22 234:15,23
238:19
**week (22)**
10:15 14:17 24:24
34:21 35:10 43:17
43:21 44:9 46:22
75:19 102:17 106:6
106:16 115:23
118:9,10,11,12,16
129:15 136:3 155:2
**weekend (16)**
123:6 128:3 155:3
157:10 158:4
160:13,19 164:14
165:14 173:23
174:2,8 198:24
220:19 223:12
228:14
**Weil (35)**
12:4,8,13,19 20:3
24:18 28:19 84:19
89:13,24 90:22
91:18 94:25 107:4,6
107:9 152:6,19
153:3,8,13,16,20
156:22 157:13,21
158:3,10 164:17
173:16 203:9,11
206:2 221:4 231:13
**went (1)**
153:7
**weren't (6)**
11:15 14:2 26:13
57:19 129:24
173:24
**WGM (4)**
132:15,18 133:5
237:8
**WGM-Lehman-E (4)**

158:14,17,21 237:11
**whatsoever (1)**
92:5
**whereof (1)**
238:21
**White (6)**
8:7 10:24,25 15:21
18:2,4
**wholly (1)**
220:24
**wildly (1)**
107:10
**WILLIAM (1)**
4:8
**windfall (3)**
39:6,12,21
**wish (1)**
178:16
**wishes (1)**
89:6
**withhold (1)**
229:21
**witness (84)**
3:13 7:3 15:10 41:16
58:4,7,16 63:4,4
77:24 89:6 96:5
122:8,11,14,15,20
126:4 127:8 142:16
144:4 154:18 156:7
156:13 159:6,18,25
161:4,6,15 162:2,9
162:12,14,16,18,18
166:18 169:12
170:17 172:6
176:10,14,16 177:3
182:2,17 183:6
186:7 187:25 188:4
193:14 194:24
195:14,17,23
196:13 207:11
208:8 211:25
215:16,23 216:2,8
217:16 219:19
227:22 228:10,15
230:2,18 231:17,20
232:2,6,9,10 234:4
235:2 237:3 238:12
238:16,21 239:5
**witnesses (2)**
102:13 162:21
**word (5)**
39:8 109:8 116:12
185:9 229:11
**words (14)**
118:21 120:25 131:3
137:9 143:14

156:18 160:16
204:3 221:9 228:11
230:12,24 231:14
234:6
**work (3)**
44:6 48:6 68:16
**working (2)**
72:11 80:14
**worse (1)**
48:17
**worst (2)**
47:6,7
**worth (9)**
54:10 77:5,8 89:10
138:2 140:16
216:17 225:8 229:3
**worthwhile (1)**
112:5
**wouldn't (15)**
18:6 60:19 85:14,19
85:21 129:9 152:24
160:17,19,23 170:9
199:15,24 201:21
205:4
**writing (1)**
115:12
**written (2)**
28:4 92:3
**wrong (11)**
56:16 87:8 109:8
153:4,14 174:25
181:15 185:8
200:10 211:10
227:8
**wrote (1)**
184:9

_____
**X**
**x (2)**
1:4,10

_____
**Y**
**Yang (1)**
218:6
**yeah (23)**
11:14 27:8 28:9 34:3
44:23 53:21 55:6
78:15 89:3,8 111:11
116:24 142:21
143:18 146:13
160:25 171:3
184:24 187:15
195:11 200:19
227:21 231:11
**year (1)**
199:11

**yielded (2)**
68:2,13
**York (17)**
1:3,13,13 2:10,10,13
3:7,7,15,15,22,22
4:7,7 238:5,7,11
**Yup (8)**
46:13 158:22,24
171:12 195:22
206:8 208:5 215:12

**0**

**00006265 (1)**
158:21
**00024965 (1)**
142:5
**0006263 (3)**
158:15,17 237:11
**08-13555(JMP) (1)**
1:7

**1**

**1 (5)**
47:22 88:19 111:9
235:21 239:7
**1.035 (2)**
185:3 187:3
**1.3 (1)**
29:22
**1.375 (1)**
167:19
**1.7 (2)**
220:14,19
**1.9 (2)**
138:3,15
**1/15/10 (1)**
239:4
**1:00 (1)**
88:20
**10 (2)**
47:23 69:21
**10:15 (1)**
2:6
**100 (1)**
47:23
**10004-1482 (1)**
4:7
**10010 (1)**
3:22
**10017-6702 (1)**
3:7
**10022 (1)**
3:15
**11 (1)**
1:6
**12:30 (1)**

88:22
**13 (6)**
207:17,22 233:2,4,5
237:13
**132 (1)**
237:8
**15 (2)**
1:14 2:5
**15c3 (13)**
16:17 18:22 30:10
33:15,16 34:2 35:14
35:25 86:18,20,25
110:15,19
**15c33 (1)**
220:10
**15th (8)**
34:13,14,21 46:22
115:23 118:12,16
238:22
**156B (2)**
195:13 206:6
**158 (1)**
237:10
**17 (2)**
20:6,23
**17th (17)**
19:25 20:8,13 21:5,24
22:14 23:9 24:4
29:12,15 31:19 32:8
40:16 95:3 106:7
118:18 205:20
**18 (3)**
32:25 33:23 184:3
**18th (2)**
184:15 219:25
**19 (8)**
7:22 32:25 33:23
38:20 130:3 184:3
184:11 185:4
**19th (33)**
20:19 22:4,15 24:2
29:10,15 32:8 35:17
38:22 70:16,17,19
70:20 72:20 78:14
82:11 87:7 95:3
106:8 117:11,14
118:12,14 149:2
170:5 184:13,16,16
184:17 187:17
211:3 220:2,7

**2**

**2 (7)**
120:25 141:12,24
163:23 166:23
171:6 239:7

**2C (2)**
171:6,6
**2,192 (1)**
175:21
**2.192 (2)**
175:20,24
**20 (10)**
127:13 133:2,6
134:15 135:2
137:10,11 176:13
176:14,17
**20th (2)**
135:14 203:15
**20-odd (1)**
167:11
**200 (1)**
203:6
**2008 (5)**
7:22 80:2 133:6 184:3
199:13
**2009 (6)**
199:15,21,22 207:18
207:22 237:13
**2010 (4)**
1:14 2:5 236:10
238:22
**207 (1)**
237:13
**21 (1)**
208:3
**22 (5)**
69:23 119:16,18,23
233:25
**22nd (16)**
3:21 34:22 70:20,21
70:22 71:13,14
72:20 74:13 82:12
84:21 95:5 117:11
149:3 191:19
205:21
**222 (1)**
3:6
**23 (6)**
69:23 233:3,6,9,10
234:19
**232 (1)**
237:14
**25 (4)**
163:15 214:23 215:5
227:25
**250 (4)**
191:15,15 208:13
209:2
**27056 (1)**
1:18

**3**

**3 (2)**
206:10 239:8
**30(b)(6) (10)**
6:7 12:23 59:2 63:4
126:6 127:13 161:6
162:18,20 176:11

**4**

**4 (5)**
130:8,17 131:15
132:2 207:25
**4.5 (1)**
131:3
**40-odd (1)**
167:11
**404A (1)**
175:13
**41st (1)**
3:6
**45 (2)**
138:16 139:9
**45.5 (6)**
23:7 133:11,23
134:16 135:3
136:11
**46 (3)**
132:16,18 237:9
**47.4 (25)**
22:15 31:2,11,16,22
32:12,19 33:23
36:21,22,24 37:5
108:3,9 109:23
110:15,23 111:3,15
112:4,8,19 113:13
138:13 139:7
**49 (1)**
139:18

**5**

**50 (1)**
160:7
**500 (1)**
81:7
**51 (2)**
3:21 171:5
**561C (3)**
132:15,17 237:8
**562C (3)**
158:14,16 237:10
**563C (3)**
207:17,21 237:13
**564C (3)**
232:23,24 237:14
**575 (1)**
3:14

**6**

**6 (2)**
203:14 237:4
**60 (1)**
215:15
**6270 (3)**
158:15,17 237:12
**65 (1)**
141:20

**7**

**7 (3)**
203:14 233:6,8
**7.2 (1)**
91:23
**70 (11)**
21:3 22:17 109:15,20
133:16,21 135:10
135:23 136:5,10,25
**700 (1)**
29:24
**769 (20)**
219:16 220:20 221:10
221:12,23,25 222:2
222:8 225:7,7,22
226:23 227:12
228:9,18 229:2,9,14
229:21,24

**8**

**8 (4)**
219:20,21 228:2
230:9

**9**

**900 (1)**
168:13
**920-odd (1)**
168:25
**925 (1)**
168:14

# EXHIBIT L

Page 1

1      IN THE UNITED STATES BANKRUPTCY COURT

2      FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

  In re:              )

5                    ) Chapter 11

  LEHMAN BROTHERS      ) Case No. 08-13555(JMP)

6  HOLDINGS, INC., et al, ) (Jointly Administered)

                     )

7          Debtors.  )

  -----------------------)

8

9

10

11

12        30(b)(6) DEPOSITION OF

13   CLEARY GOTTLIEB STEEN & HAMILTON LLP

14             by

15         VICTOR I. LEWKOW

16       New York, New York

17     Wednesday, February 10, 2010

18

19

20

21

22

23  Reported by:

24  MAYLEEN CINTRON, RMR, CRR

25  JOB NO. 28226

Page 2

```
 1
 2
 3                    February 10, 2010
 4                    10:02 a.m.
 5
 6
 7          30(b)(6) DEPOSITION OF CLEARY
 8    GOTTLIEB STEEN & HAMILTON LLP, by VICTOR I.
 9    LEWKOW, held at the offices of Cleary
10    Gottlieb Steen & Hamilton LLP, 450 Park
11    Avenue, New York, New York, pursuant to
12    Notice, before MayLeen Cintron, a Registered
13    Merit Reporter, Certified Realtime Reporter,
14    and Notary Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1    A P P E A R A N C E S:
 2
 3    JONES DAY LLP
 4    Attorneys for Debtors - Lehman Brothers, Inc.
 5       222 East 41st Street
 6       New York, New York 10017-6702
 7    BY: ROBERT W. GAFFEY, ESQ.
 8       BRIDGET CRAWFORD, ESQ.
 9
10    BOIES, SCHILLER & FLEXNER LLP
11    Attorneys for Barclays
12       5301 Wisconsin Ave., N.W.
13       Washington D.C. 20015
14    BY: HAMISH HUME, ESQ.
15
16
17    QUINN, EMANUEL, URQUHART,
18    OLIVER & HEDGES LLP
19    Attorneys for the Creditors Committee
20       51 Madison Avenue - 22nd Floor
21       New York, New York 10010
22    BY: JAMES TECCE, ESQ.
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1    A P P E A R A N C E S: (Cont'd)
 2
 3    HUGHES, HUBBARD & REED LLP
 4    Attorneys for the SIPA Trustee
 5       One Battery Park Plaza
 6       New York, New York 10004-1482
 7    BY: WILLIAM R. MAGUIRE, ESQ.
 8       AMINA HASSAN, ESQ.
 9
10
11    CLEARY GOTTLIEB STEEN & HAMILTON LLP
12    Attorneys for the Witness: Victor Lewkow
13       One Liberty Plaza
14       New York, New York 10006
15    BY: BOAZ S. MORAG, ESQ.
16       ROBERT P. DAVIS, ESQ.
17
18
19
20              - - -
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1              -Lewkow-
 2    V I C T O R   I.   L E W K O W,
 3       called as a witness, having been duly
 4       sworn by a Notary Public, was examined
 5       and testified as follows:
 6          THE REPORTER:  Please state your
 7    full name for the record.
 8          THE WITNESS:  Victor -- do you need
 9    a middle name?  Ira Lewkow, L-E-W-K-O-W.
10          MR. GAFFEY:  That's all we needed.
11    We just wanted to know your middle
12    name.
13    EXAMINATION BY
14    MR. GAFFEY:
15       Q.  Good morning, Mr. Lewkow.  My name
16    is Bob Gaffey, I'm from Jones Day and we are
17    special counsel to the Debtors in this
18    proceeding.
19          Have you had your deposition taken
20    before?
21       A.  Once.
22       Q.  In the interest of efficiency, I
23    will give you the short version of the usual
24    instructions.  If at any point you don't
25    understand a question, please say so and I
```

TSG Reporting - Worldwide    877-702-9580

Page 6

1           -Lewkow-
2  will try to rephrase it so we understand each
3  other.  If you need a break at any time, say
4  so and we can do that.
5           (Telephone interruption.)
6       Q.  If you need a break at any time,
7  just say so.  If there is a question pending,
8  I prefer we get an answer on the record before
9  we take a break?
10          MR. GAFFEY:  Let me ask the
11      reporter to mark, what's the next
12      exhibit, 613A, a copy of a declaration
13      submitted by Barclays in this matter.
14          (Deposition Exhibit 613A,
15      Declaration of Victor Lewkow, marked
16      for identification, as of this date.)
17      Q.  Is that your Declaration, sir?
18      A.  It is.
19      Q.  Let me ask you to turn your
20  attention, please, to Paragraph 4 of your
21  Declaration.
22          By way of background, my questions
23  today will be about the sale transaction
24  that's at issue in this matter, that is the
25  transaction between Lehman and Barclays, to

Page 7

1           -Lewkow-
2  which I understand your Declaration is
3  addressed.
4           In Paragraph 4 of your Declaration,
5  you say, "The transaction was never discussed
6  or documented as what might be called a
7  'balance sheet' transaction, which would have
8  included pre-closing and/or post-closing
9  purchase price adjustment provisions relating
10  to a valuation of the transferred assets and
11  liabilities".
12          Is the term "balance sheet
13  transaction" a term of art of some kind?
14          MR. MORAG:  Object to the form.
15      You can answer.
16      A.  In many private acquisitions as
17  opposed to public company acquisitions, there
18  are price adjustments tied to an audited
19  balance sheet that is prepared as of the
20  closing date.
21          And I'm not sure if it is a broadly
22  used term, but it certainly is what I was
23  talking about.  So...
24      Q.  I'm sorry.  Are you done with your
25  answer?

Page 8

1           -Lewkow-
2      A.  Yes.
3      Q.  So, there are not, I take it,
4  particular -- there is not a defined list of
5  things you expect to find, that you need to
6  see in a transaction in order to qualify as a
7  so-called "balance sheet transaction"; is that
8  right?
9          MR. MORAG:  Objection to form.
10      A.  I would say that in my experience,
11  in the context of buying a business where
12  there were a lot of financial assets valued
13  and liabilities, the value of which changed
14  over -- could change or would change or did
15  change over time between signing and closing
16  or between if there weren't represented -- a
17  representation by the seller as to the value
18  as of signing, starting date could be actually
19  earlier than the signing of the asset purchase
20  agreement.
21          If between whatever date a balance
22  sheet was represented as of and the closing
23  date, the value of the assets and liabilities
24  had changed and I would expect as part of a
25  balance sheet transaction, for there to be pre

Page 9

1           -Lewkow-
2  or post-closing price -- pre or post- closing
3  price adjustments.
4      Q.  Now in the transaction that was
5  agreed between Lehman and Barclays initially
6  on September 16th, that is embodied in the
7  Asset Purchase Agreement, was there any such
8  purchase price adjustment provision?
9      A.  There was no balance sheet audited
10  financial statement valuation type balance
11  sheet adjustment, no.
12      Q.  Was there a purchase price
13  adjustment provision?
14          MR. MORAG:  Object to form.
15      A.  There was a -- I'm going to say --
16  my answer would be no in the usual sense.  I
17  would comment, and I think that is what you're
18  getting at, we can call it -- if you want to
19  call it "purchase price adjustment", you
20  could, it is simply a matter of semantics.
21          But there was a provision in the
22  original deal -- there were two provisions
23  that had aspects of -- no.  There was one
24  provision that had aspects of additional
25  consideration potentially flowing to the

Page 10

1         -Lewkow-
2   seller. There was a -- there was a provision
3   that said that on a certain pool of positions,
4   that we would be -- that Barclays would be
5   acquiring at the closing, that if, as I
6   recall -- and you know, without having the
7   Agreement in front of me to look at the words,
8   I always defer to what's in the contract.
9         But my recollection is that the --
10  there was a provision that if within some
11  period, I think it was a year, to the extent
12  that Barclays actually sold positions -- not
13  what their value was on a given date or the
14  like, not as audit, not if they held
15  positions, even if those positions increased
16  enormously in value or if they went down in
17  value.
18        But if with respect to some pool --
19  and I don't remember the details of how it
20  worked because that provision was later
21  dropped, as you know.  There was a provision
22  that if -- with respect to some of those
23  assets, if we -- if Barclays sold them during,
24  I think, the first year, there would be some
25  sharing of the -- of the profit compared to
        TSG Reporting - Worldwide    877-702-9580

Page 11

1         -Lewkow-
2   what -- I forget what the base was exactly, as
3   to what date the assumed valuation was.
4         So there was a provision for
5   additional consideration potentially to flow
6   to the seller.
7       **Q.  I'll show you the Asset Purchase
8   Agreement in a minute and we'll spend some
9   time with it today.**
10        **But is the provision that you
11  described, is that fairly described as a
12  post-closing purchase price adjustment
13  provision?**
14        MR. MORAG:  Objection.  Asked and
15  answered.
16      A.  Yeah, I have nothing more to say
17  other than what I said on that subject.
18      **Q.  I'm not sure I have an answer to
19  the question as to whether it is -- the
20  provision you described is what you would
21  describe, and I'm referring to Paragraph 4 of
22  your affidavit, as a "post-closing purchase
23  price adjustment provision"?**
24      A.  Well, with due respect, if you read
25  my declaration, it says, "...a pre-closing
        TSG Reporting - Worldwide    877-702-9580

Page 12

1         -Lewkow-
2   and/or post-closing purchase price adjustment
3   provision relating to the valuation of the
4   transferred assets and liabilities".  This was
5   not such a provision.
6       **Q.  So to qualify as a balance sheet
7   transaction, in your view, the pre or post
8   closing purchase price adjustment provision
9   would have to relate to a valuation of the
10  assets and liabilities?  It's that last piece,
11  "valuation of the assets and liabilities" that
12  defines it as a purchase price adjustment
13  provision as you meant it in your Declaration?**
14        MR. MORAG:  Object to form.
15      A.  As I said earlier, to me a balance
16  sheet transaction is when you later prepare --
17  I'm not sure that the word -- I would say do a
18  valuation from an accounting standpoint.  As a
19  balance sheet, normally you would prepare a
20  balance sheet based on generally accepted
21  accounting principles, have it audited and
22  adjust the purchase price based on that.
23      **Q.  Is there a reason such a mechanism
24  was not included in the transaction at issue
25  here?**
        TSG Reporting - Worldwide    877-702-9580

Page 13

1         -Lewkow-
2       A.  You know, I would -- I don't recall
3   whether at any point in time, whether Lehman
4   or its advisors requested such a provision.  I
5   just don't recall.  Certainly if they did, it
6   came and went very quickly in the discussions
7   of the concept of the Asset Purchase
8   Agreement.  But I don't recall there ever
9   being such a provision.
10        I would note that we were -- as
11  everybody knew then and knows now, it was an
12  incredibly volatile couple of days.  The Asset
13  Purchase Agreement was being negotiated on
14  that Monday and Tuesday after Lehman had filed
15  for Chapter 11 late Sunday night, early Monday
16  morning.
17        And I think the idea that anyone
18  had a wonderfully exact knowledge as to what
19  the value of portfolio assets in particular
20  were at that point in time, it would be
21  amazing because there was a very uncertain
22  value at that point in time.
23      **Q.  Did Cleary Gottlieb play any role
24  in the negotiation of the transaction with
25  regard to arriving at a valuation of the**
        TSG Reporting - Worldwide    877-702-9580

Page 14

```
1              -Lewkow-
2    assets to be transferred?
3         MR. MORAG:  Object to the form.
4    Vague.
5    A.  No.
6    Q.  Were there negotiations between the
7    parties concerning the value of the assets to
8    be transferred?
9    A.  As described in my declaration,
10   there were discussions, I would not -- I don't
11   believe there was a negotiation, as I heard it
12   described.  And I want to stay away from
13   privileged communications, although I'm not
14   sure I have any in particular in mind now.
15   But obviously, I assume none of -- you're not
16   asking me at any point -- if you are, I assume
17   I'll be telling you not, that I won't, or one
18   of the lawyers here will tell me not to.
19        But it was my understanding that
20   Lehman -- that Barclays -- let me step back a
21   second.
22        Even before the bankruptcy, even
23   before that Friday morning when -- the Friday
24   before the 15th, the 12th I guess when
25   Barclays had first retained us certainly, they
```
TSG Reporting - Worldwide    877-702-9580

Page 15

```
1              -Lewkow-
2    may have gotten involved a little bit the day
3    before or something.  But even before Barclays
4    had started thinking about, as far as I know,
5    Lehman, there had been stories in the press
6    about suggesting that Lehman had been slow to
7    revalue assets, and that they had inflated
8    values in their portfolio.
9         But beyond that in the very limited
10   time, as I understood it, that Barclays had
11   been provided with some information about the
12   portfolio that we were -- that Barclays was
13   being asked to -- that it be acquiring as part
14   of its acquisition of basically the entire
15   business with certain exceptions and the
16   assumption of very substantial certain
17   specified liabilities, when their people,
18   financial people, trading people, whoever it
19   was -- and I'm not sure I knew all the people
20   involved.  It was a new client in the
21   United -- I don't know the name of all the
22   people who were going -- who were around and
23   in the different rooms that we were -- that
24   meetings were taking place on that Monday and
25   Tuesday up at Lehman Brothers on the -- on the
```
TSG Reporting - Worldwide    877-702-9580

Page 16

```
1              -Lewkow-
2    big conference and dining floor.
3         But it was my understanding that
4    Barclays people had reviewed certain
5    information about the assets and liabilities
6    and had thought that the -- there were
7    large -- certain category types of assets and
8    the like that had, as last marked by Lehman,
9    were substantially overstated.  Whether they
10   had been overstated as of the date they
11   originally been marked or were overstated
12   because of the passage of a couple of days, I
13   believe they would not have been marked for a
14   couple of days.  It's my recollection.  I
15   could be wrong on that.
16        But one way or another, or a
17   combination of the two, that the Barclays
18   people had concluded that the Lehman marks
19   were substantially overstated.
20   Q.  When was Cleary first retained in
21   connection with this transaction?
22   A.  We were retained on Friday.  Not on
23   this transaction, we were retained on the
24   Friday before the bankruptcy on the 12th,
25   early that morning, to assist Barclays in
```
TSG Reporting - Worldwide    877-702-9580

Page 17

```
1              -Lewkow-
2    looking at a potential much larger transaction
3    to buy not just a substantial part of the U.S.
4    and Canadian broker-dealer investment banking
5    business, but a much larger portion of Lehman
6    Brothers.
7         I don't know whether initially -- I
8    can't recall whether initially it might have
9    been all of Lehman.  I think very early it
10   became clear it was not quite everything but
11   it was a larger universe than what we ended up
12   trying to do in doing, starting with the
13   Monday filing the Chapter 11.
14   Q.  In the interest of everyone's time,
15   we've taken a lot of depositions in this case.
16   Some time over the weekend, the concept of
17   that larger transaction came to an end, those
18   negotiations?
19   A.  Correct.  Sunday around midday.
20   Q.  And around some point, negotiations
21   resumed with respect of the smaller
22   transaction that was ultimately concluded,
23   correct?
24   A.  I don't know if it matters.  But I
25   would use the word "resume."
```
TSG Reporting - Worldwide    877-702-9580

Page 18

1          -Lewkow-
2     **Q.  Okay.**
3          A.  As far as I can tell, they stopped
4    on Sunday, people went home and saw their
5    families.  And I got a call Monday morning,
6    "Well, can you come up to Lehman Brothers?
7    We're going to see if we can do a deal.  If
8    they did file as they said they would" -- we
9    thought they would -- "they filed in
10   Chapter 11 and now want to see whether or not
11   there's something we can do to purchase" --
12   you know, I don't remember how it was
13   described to me in that initial call.
14         But, "Can you come up to Lehman
15   Brothers?"
16         MR. MORAG:  Mr. Lewkow, let me
17         caution you on privilege.  I think you
18         just said the gist to the conversation,
19         which is sufficient for these purposes.
20    **Q.  You came back?**
21         A.  I went up to Lehman Brothers.
22    **Q.  Let's just talk about the period**
23   **when you came back.  In the negotiations that**
24   **began then, what steps, if any, were taken to**
25   **accommodate Barclays' view that the Lehman**

TSG Reporting - Worldwide    877-702-9580

Page 19

1          -Lewkow-
2    **marks were substantially overstated, to use**
3    **your term?**
4         MR. MORAG:  Objection.  Vague.
5         A.  Yeah.  I guess -- I don't know what
6    you mean by "accommodate."  And the word --
7    you also used the word "the view."  I think
8    that view -- I did mention the newspaper.
9         MR. MORAG:  I think we need a
10        break.
11         (Whereupon, a recess was taken
12        from 10:22 a.m. to 10:25 a.m.)
13   BY MR. GAFFEY:
14    **Q.  In the negotiations that took place**
15   **in connection with the transaction that's**
16   **brought us here today, Mr. Lewkow, were there**
17   **discussions, to your knowledge, between the**
18   **folks at Barclays and the folks at Lehman**
19   **about Barclays' view that the assets of Lehman**
20   **were overstated on its books?**
21         MR. MORAG:  Object to the form.
22         A.  Yes.  As to certain assets.
23    **Q.  Can you tell me what you know with**
24   **regard to those discussions?**
25         A.  As I stated in my declaration,

TSG Reporting - Worldwide    877-702-9580

Page 20

1          -Lewkow-
2    Barclays, was my understanding, that Barclays'
3    trading and/or financial folks had been
4    provided certain information about the trading
5    positions; that it was contemplated that
6    Barclays would assume as part of an
7    acquisition of the business of substantially
8    all of the business.
9         And in the course of that, Barclays
10   had -- Barclays people had reached the view
11   that there were very significant -- that the
12   aggregate carrying value that they had been
13   furnished by Lehman was substantially higher
14   than Barclays believed was appropriate that
15   Monday or Tuesday.
16    **Q.  And by "aggregate carrying value",**
17   **do you mean Lehman's book value?**
18         A.  It's my -- I'm not an accountant,
19   as you know.  I'm a lawyer.  It is my
20   understanding that for an entity such as
21   Lehman, they are supposed to -- under
22   regulatory accounting principles, maybe
23   generally accepted accounting principles, I
24   don't know.  But as a general matter,
25   broker-dealers mark their portfolio to market

TSG Reporting - Worldwide    877-702-9580

Page 21

1          -Lewkow-
2    on a daily basis.  And I believe that means
3    their book value is effectively adjusted each
4    day.  To the extent that a balance sheet is
5    prepared, the balance sheet is prepared based
6    on those marks.
7     **Q.  So when you use the phrase**
8    **"aggregate carrying value," were you referring**
9    **to Lehman's books marked to market in that**
10   **manner?**
11         MR. MORAG:  Object to the form.
12         MR. HUME:  Objection, asked and
13        answered.
14         A.  I think I've got nothing more to
15   say on that.
16    **Q.  What did you mean to say when you**
17   **said "aggregate carrying value"?**
18         A.  The value -- what I hear people
19   refer to as "the marks."  What they were being
20   marked at on the books of Lehman by Lehman.
21    **Q.  And in the negotiations of the**
22   **transaction, were any steps taken to address**
23   **Barclays' concern that the aggregate carrying**
24   **value was substantially higher than it should**
25   **have been?**

TSG Reporting - Worldwide    877-702-9580

Page 22

-Lewkow-

1
2      MR. HUME:  Objection.  Vague.
3      MR. MORAG:  Objection.  Asked and
4  answered.
5      A.  I have -- I've told you -- I have
6  nothing to add to my answer.
7      **Q.  Well, I'm afraid that's not going**
8  **to work, so I do need an answer to the**
9  **question.**
10      A.  Your question asked in the
11  negotiations.  I don't -- I don't -- if you
12  mean in the negotiations of the transaction, I
13  think my answer would be no, as I have said in
14  my declaration and in my statement.
15      Barclays was furnished information
16  which led it to believe that Lehman's marks
17  were not correct and overstated the value of
18  assets, and was -- Barclays was not prepared
19  to do a deal with -- where they were
20  overstated marks on the Lehman books of large
21  amounts.
22      **Q.  So if Barclays was not prepared to**
23  **do a deal where there were overstatements on**
24  **Lehman's books of large amounts, what did**
25  **Barclays do to address that concern in order**

TSG Reporting - Worldwide     877-702-9580

Page 23

-Lewkow-

1
2  to conclude a transaction?
3      A.  Barclays made -- made its
4  position -- made its view of the marks, that
5  they were overstated substantially, clear to
6  Lehman people and urged -- my understanding,
7  they urged Lehman to take a fresh look at the
8  values that they were carrying them on on
9  their books because it was at a crazy world,
10  and it was something that Lehman should take a
11  fresh look at to -- to both deal with the
12  passage of time and information.
13      I don't know what -- you know, in
14  my declaration, I mention an example that was
15  mentioned in a broad public -- "public" is the
16  wrong statement.  With both sides present,
17  including lawyers, including me -- of the
18  example of a particular position where
19  Barclays had a junior position of -- junior
20  tranche position from the same issuer, same
21  type of security, and was carrying it --
22      I'm sorry.  Barclays had a senior
23  position and was carrying it at a bigger
24  discount to par than Lehman was carrying the
25  junior position.  And those are -- you know,

TSG Reporting - Worldwide     877-702-9580

Page 24

-Lewkow-

1
2  I'm sure there were other examples.  That was
3  the one that was easy to explain to us lawyers
4  as evidencing why Barclays believed Lehman
5  needed to take a fresh look at what it -- how
6  it was carrying certain portions of the
7  portfolio on its books and whether or not they
8  needed to revise their marks.
9      **Q.  Did the level at which Lehman was**
10  **carrying its assets on the books affect the**
11  **price which Barclays was willing to pay on the**
12  **transaction?**
13      MR. MORAG:  Object to form.
14      A.  I think it affected their
15  willingness to do the deal.  The price was
16  what was in the Agreement where we acquired
17  certain assets, acquired certain liabilities,
18  agreed to make certain payments, assumed a
19  certain level of obligations.
20      We were buying a business as a
21  whole; the purchase price was the whole
22  transaction.  We were not -- no one from
23  Barclays went into this to buy a portfolio; it
24  was to buy substantially all the assets of a
25  business.

TSG Reporting - Worldwide     877-702-9580

Page 25

-Lewkow-

1
2      **Q.  Describe for me, if you would, the**
3  **price that Barclays paid in that purchase.**
4      A.  At what time, sir?
5      **Q.  Good point.  Describe for me the**
6  **price that Barclays agreed to pay for that**
7  **business on September 16, 2008?**
8      MR. HUME:  I'm going to just object
9      to the extent that it calls for
10      interpretation of the contract which he
11      hasn't been shown.
12      (Discussion off the record.)
13      **Q.  I think the question on the table,**
14  **Mr. Lewkow, is:  Will you describe for me the**
15  **price that Barclays agreed to pay for that**
16  **business on September 16, 2008?**
17      MR. MORAG:  Objection.  To the
18      extent it calls for a legal
19      interpretation of the contract.  If you
20      recall generally the terms.
21      A.  Look, I think the contract is the
22  contract.  Without having it in front of me, I
23  may omit certain things.  But in general
24  terms, my recollection is that under the Asset
25  Purchase Agreement as signed late on the 16th

TSG Reporting - Worldwide     877-702-9580

Page 26

1          -Lewkow-
2   or early on the 17th, I think it is dated the
3   16th, Barclays agreed to make payments.  Some
4   were going to be based on appraised value of
5   certain specified real estate assets.
6          There was a -- they were also going
7   to pay another $250 million.  They were going
8   to, under the Asset Purchase Agreement, they
9   would pay, as I testified earlier, under
10  certain circumstances if they sold certain
11  portfolio assets within one year and netted a
12  profit as described in the Asset Purchase
13  Agreement, they would share some of that
14  profit with Lehman Brothers.
15         They were also taking on various
16  liabilities, including liabilities related to
17  the portfolio, part of the portfolio positions
18  that they were taking.  They were agreeing to
19  pay certain cure costs, the amount of which --
20  whatever they turned out to be.  And they also
21  were agreeing to pay  certain compensation
22  amounts under the Asset Purchase Agreement.
23         I may be forgetting some things.
24  If I had the the Agreement in front of me, I'd
25  be happy to go through it and take another
        TSG Reporting - Worldwide    877-702-9580

Page 27

1          -Lewkow-
2   look.
3       Q.  I understand, sir, it is your
4   general recollection.
5          The deal, as it finally closed, did
6   it change the structure you just described?
7          MR. MORAG:  With respect to the
8   purchase price?
9          MR. GAFFEY:  Yes.
10      A.  Yes.
11      Q.  How did it change?
12      A.  It changed -- first of all, the
13  provision that required Barclays, under some
14  scenarios, to share some of the potential
15  profit on the -- if they sold within a year.
16  I think it was a year, it might have been six
17  months.  If they sold within a fixed period
18  certain of the positions that they assumed
19  they made a profit, some portion of that would
20  go to Lehman Brothers.
21         That provision was dropped.  So
22  that was a change in one of the price related
23  provisions.  And -- I remember the other.
24         The other thing -- I don't know if
25  I would call it a price provision or not, but
        TSG Reporting - Worldwide    877-702-9580

Page 28

1          -Lewkow-
2   it involved money; cash.
3          And the original agreement, the
4   Asset Purchase Agreement, had a concept of
5   retained cash, if I remember the defined term,
6   which provided that that amount of cash would
7   be among the assets that Barclays would be
8   receiving as part of the acquisition.  And
9   that was -- that was dropped subsequently from
10  the -- from the transaction.
11      Q.  Anything else that you remember in
12  terms of changes between the transaction, the
13  pricing provisions of the transaction on
14  September 16th, and the provisions as the deal
15  ultimately closed?
16         MR. HUME:  Objection to the extent
17  it calls for an interpretation of the
18  contract.
19         MR. MORAG:  At this point, I'm
20  going to ask you to show it to him.
21      A.  It would be helpful to see the
22  Clarification Letter to know that.  Let me
23  just for one second.
24         Let me just... none that occurs to
25  me without looking at the contract.
        TSG Reporting - Worldwide    877-702-9580

Page 29

1          -Lewkow-
2       Q.  Let me show you what's previously
3   been marked as Deposition Exhibit 1, a copy of
4   the Asset Purchase Agreement.
5          Have you had a chance to review
6   this prior to your deposition today, reviewed
7   it recently?
8       A.  Yes.
9       Q.  Would you take a look at page 14 of
10  that exhibit, sir, Section 3.3 of the
11  Agreement.
12      A.  Yes.
13      Q.  That provision, "Adjustment to cash
14  amount," is that the provision you've been
15  talking about when you talked about potential
16  payments to Lehman depending on the values of
17  certain assets after a year?
18      A.  Let me just reread it.
19      Q.  Sure.
20         MR. MORAG:  Objection.
21      Q.  Don't take my explanation.  But I
22  just want to know if that's the agreement,
23  that's the provision you've been talking
24  about?
25         MR. MORAG:  Object to the
        TSG Reporting - Worldwide    877-702-9580

Page 30

1           -Lewkow-
2    characterization of it, but you can
3    answer if that's the provision you were
4    referring to earlier.
5           (Witness reviewing document.)
6    A.  Yes.
7    Q.  Now, having taken a look at
8    Section 3.3 of the Asset Purchase Agreement,
9    and directing your attention again to
10   Paragraph 4 of your Declaration, could you
11   tell me, sir, whether Section 3.3 is a
12   post-closing purchase price adjustment
13   provision relating to valuation of transferred
14   assets and liabilities, as you described it in
15   Paragraph 4?
16          MR. HUME:  Objection.  Asked and
17   answered.
18          MR. MORAG:  You can answer.
19   A.  No, I don't think so.
20   Q.  Why not?
21   A.  Because if you were going to do it
22   based on a valuation, you would have valued
23   all of the -- those -- at least all of the
24   portfolio assets, and it would turn not on whether or
25   positions, and it would turn not on whether or

TSG Reporting - Worldwide    877-702-9580

Page 31

1           -Lewkow-
2    not Barclays in its complete discretion had or
3    had not sold some, if not others, of those
4    assets.
5    Q.  Do you know if a balance sheet of
6    any kind was prepared in connection with the
7    Asset Purchase Agreement?
8           MR. MORAG:  Object to the form.
9    A.  I don't know whether I would
10   characterize it as a balance sheet.  There was
11   a one-page piece of paper that somebody from
12   Lehman Brothers went into the room late in the
13   game, late in the -- you know, late that
14   Tuesday.  I don't remember what time, that had
15   certain categories of assets other than
16   liabilities on the -- on the -- on it, that
17   was talked about previously and is referred to
18   in one place in the Asset Purchase Agreement.
19   Q.  Mr. Lewkow, I'm showing you what's
20   previously been marked as Exhibit 19.
21          Is that the one-page piece of paper
22   you just referred to?
23   A.  I recall that there was at least
24   two versions of this that came in.  And I
25   think both were initialled by Berkenfeld, that

TSG Reporting - Worldwide    877-702-9580

Page 32

1           -Lewkow-
2    came and went.  So I'm not sure if this was --
3    I don't remember the dating and the time of
4    it.
5           So whether this was the first or
6    the second or some other version, I can't
7    tell.  But it looked generally like this, yes.
8    Q.  Whether this is the particular one
9    you are referring to, it is a version of
10   Exhibit 19 that you were referring to; is that
11   correct?
12          MR. MORAG:  Object to the form.
13   A.  It is what I just said.  It looks,
14   in general terms, like what I am referring to.
15   Q.  Have you seen this document before?
16   A.  I believe so.  Again, I don't
17   remember all the numbers on the page, and so I
18   don't know whether -- which version this was.
19          But certainly I have -- I believe I
20   have seen this document at least recently.
21   Whether I saw this version that night, I have
22   less certainty.
23   Q.  Do you know why Mr. Berkenfeld
24   signed the one-page piece of paper that you
25   mentioned?

TSG Reporting - Worldwide    877-702-9580

Page 33

1           -Lewkow-
2           MR. MORAG:  Objection.  He's --
3           MR. HUME:  Objection.  Calls for
4    speculation.
5    A.  I can tell you what I recall him
6    saying.
7    Q.  Okay.
8    A.  I think he said something like --
9    the Asset Purchase Agreement had been
10   substantially finalized, and he had come into
11   the room with this piece of paper or a version
12   of this piece of paper, and there was some
13   talk about -- that I don't remember very well,
14   about the categories of assets and liabilities
15   on this piece of paper.
16          And he said, "Well, this is what
17   we're talking about here.  I'm going to
18   initial it," or something like that.
19   Q.  Did you ask him why he did that?
20   Why he said "This is what we're talking about,
21   I'm going to initial it"?
22   A.  No.
23   Q.  Did the one-page piece of paper
24   that Mr. Berkenfeld initialled play any role
25   in the transaction?

TSG Reporting - Worldwide    877-702-9580

## Page 34

-Lewkow-

1
2      MR. MORAG:  Objection to form.
3      MR. HUME:  Objection.  Vague.
4      A.  As I mentioned, there is a
5  provision in the compensation section that
6  refers to this piece of paper or some version
7  of it, yes.
8      **Q.  Was it your understanding that the**
9  **one-page piece of paper Mr. Berkenfeld signed**
10 **also guided the transaction to the extent the**
11 **value of portfolio of assets was concerned?**
12     MR. MORAG:  Mr. Gaffey, I'm going
13 to object.  You keep using the word
14 "signed," he keeps using the word
15 "initialled."
16     MR. GAFFEY:  We are big boys.  We
17 both know it means he wrote on the
18 document.  Do you want me to say
19 "initialled"?
20     MR. MORAG:  If you could.
21     MR. GAFFEY:  Sure.  Can you read
22 the question back?
23     (Record read as follows:
24 "Question:  Was it your understanding
25 that the one-page piece of paper

TSG Reporting - Worldwide    877-702-9580

## Page 35

-Lewkow-

1
2  Mr. Berkenfeld signed also guided the
3  transaction to the extent the value of
4  portfolio of assets was concerned?"
5      **Q.  Can you answer that question as if**
6  **I said "initialled"?**
7      A.  I need to hear it again.  I'm
8  sorry.
9      **Q.  Let me rephrase it.**
10     **The one-page piece of paper that**
11 **Mr. Berkenfeld initialled, what role, if any,**
12 **did that play in the transaction?  Withdrawn.**
13     **Did the one-page piece of paper**
14 **that Mr. Berkenfeld initialled guide the**
15 **transaction with regard to the value of the**
16 **portfolio of assets transferred?**
17     MR. MORAG:  Object to the form.
18     A.  I would not -- I don't know what
19 you mean by "guide."
20     **Q.  Was it meant to instruct the drafts**
21 **people of the Asset Purchase Agreement as to**
22 **the value of the long position that was**
23 **transferred?**
24     A.  The drafts people had already
25 drafted the Agreement.  I don't remember

TSG Reporting - Worldwide    877-702-9580

## Page 36

-Lewkow-

1
2  exactly what the status was at the precise
3  time.  This was brought in.  I don't think it
4  influenced the drafting.  If by the draftsmen
5  you mean the lawyers from both sides who were
6  involved in preparation of the document, the
7  Asset Purchase Agreement, I don't believe this
8  guided the drafting of the Agreement, no.
9      **Q.  Did anyone from Cleary Gottlieb**
10 **play any role in the preparation of this**
11 **document?**
12     A.  No.  To the best of my knowledge,
13 no.
14     **Q.  Did anyone from Cleary Gottlieb**
15 **play any role in determining the values that**
16 **are shown on this document?**
17     A.  No.
18     **Q.  Did anyone from Barclays**
19 **participate in the preparation of this**
20 **document?**
21     A.  I don't believe, not to my
22 knowledge.
23     **Q.  Did anyone from Barclays play any**
24 **role in determining the values shown on this**
25 **document?**

TSG Reporting - Worldwide    877-702-9580

## Page 37

-Lewkow-

1
2      A.  I don't -- I don't know what that
3  means.  Other than as I testified previously
4  and is set forth in my declaration, you can
5  characterize that in any way you want.  But
6  other than that, I don't know of anything
7  relative to the question.
8      **Q.  Would you take a look at**
9  **Paragraph 9 of your Declaration?**
10     A.  Sure.
11     **Q.  Take the time you need to review**
12 **the paragraph to refresh yourself of its**
13 **contents.**
14     **But my question is going to go to**
15 **the portion that begins -- seven lines down --**
16 **"While I was not present for the actual**
17 **discussions between Barclays and Lehman**
18 **Brothers traders..."**
19     A.  Let me just reread it.
20     **Q.  Sure.**
21     (Witness reviewing document.)
22     A.  Yes?
23     **Q.  Now, to your knowledge, was the**
24 **document I have before you marked as**
25 **Exhibit 19, a product of the discussions**

TSG Reporting - Worldwide    877-702-9580

Page 38

1          -Lewkow-
2  between Barclays and Lehman traders that
3  you're referring to in Paragraph 9 of your
4  Declaration?
5          MR. MORAG:  Object to the form.
6          A.  No.  I -- I wouldn't -- I mean,
7  I -- this was a Lehman Brothers document.  I
8  assume that as --
9          To the extent that Lehman Brothers,
10  having listened to Barclays' views as to
11  valuation may have changed their marks, as I
12  believe they did, it may have reflected those
13  judgments by Lehman as to the proper marking
14  of assets or liabilities.  But that's all.
15          Q.  Did you come to an understanding
16  that Lehman changed its marks in response to
17  Barclays' expression of concern that they were
18  too high?
19          A.  It was my understanding that they
20  had determined that they would change their
21  marks.
22          MR. MORAG:  By that, who are you
23  referring to?
24          THE WITNESS:  Lehman.  The only one
25  that was making marks was Lehman.  It

TSG Reporting - Worldwide    877-702-9580

Page 39

1          -Lewkow-
2  was their balance sheet.
3          Q.  From whom did you obtain that
4  understanding?  Can I just caution you, if it
5  is a Barclays person, just tell me their name?
6  I don't want to know the substance of the
7  conversation.
8          A.  No, I understand that.
9          Q.  Yes.
10          A.  I don't remember the name.  I have
11  a recollection of someone being involved in
12  those discussions coming into the room.  I
13  believe it was -- where lawyers and other
14  folks from the other side were in the room and
15  reported what I had characterized in my
16  testimony a minute or two ago.  But I don't
17  remember the name of the individual from
18  Barclays.
19          Q.  Do you know if Lehman did, in fact,
20  change its marks?
21          A.  I have no way of knowing that.
22          Q.  Did you or anyone else from Cleary
23  ever ask that question in the week
24  beginning -- well, from Tuesday, September
25  16th through the closing of the transaction on

TSG Reporting - Worldwide    877-702-9580

Page 40

1          -Lewkow-
2  the 22nd?
3          A.  No.
4          Q.  Actually, will you turn to, in the
5  Asset Purchase Agreement, which is Exhibit 1.
6  If I can ask you, please, Mr. Lewkow, to turn
7  to page 6, which contains the definition of
8  "Purchased Assets."
9          And in particular, if you would
10  take a look at subsection (d) of that
11  definition.
12          A.  Yup.
13          Q.  Do you see there's a reference
14  there to various categories of securities.
15  Let met read it.  "Government securities,
16  commercial paper, corporate debt, corporate
17  equity, exchange-traded derivatives and
18  collateralized short-term agreements with a
19  book value as of the date hereof of
20  approximately $70 billion (collectively 'long
21  positions')."  Do you see that?
22          A.  I do.
23          Q.  Where did the $70 billion come from
24  that was put into subsection (d) of the
25  definition of "Purchased Assets"?

TSG Reporting - Worldwide    877-702-9580

Page 41

1          -Lewkow-
2          A.  From Lehman.
3          Q.  Was it Barclays' understanding at
4  the time that that was an accurate estimation
5  of the book value of the described assets?
6          MR. MORAG:  Objection to form.
7          A.  To my knowledge, it was Barclays'
8  understanding that it represented what Lehman
9  Brothers -- having considered the discussions
10  I described earlier in terms of what they
11  concluded, after hearing Barclays, was the
12  proper mark to take on its balance sheet.
13  That it reflected Lehman's conclusions.
14          Q.  Was the term "book value" used for
15  a reason in subsection (d) in the definition
16  of "Purchased Assets"?
17          MR. HUME:  Objection.  Vague.
18          A.  Who's -- yeah, whose reason?
19          Q.  Well, was it supposed to say
20  "market value"?
21          A.  Not all assets on the balance sheet
22  have a market value.  There are -- it is my
23  understanding.  Again, I'm not an expert, a
24  broker-dealer expert or a market expert or a
25  valuation expert, but it is my understanding

TSG Reporting - Worldwide    877-702-9580

Page 42

1      -Lewkow-
2  that for some positions where there is no
3  active market, that other -- other things go
4  into how a broker-dealer is supposed to mark
5  their -- their valuation from an accounting
6  standpoint.
7      **Q.  Was it a considered choice of the**
8  **people who drafted the Asset Purchase**
9  **Agreement to use the phrase "book value"**
10 **instead of some other phrase such as "market**
11 **value"?**
12     MR. HUME:  Objection.  Vague and
13 lacks foundation.
14     A.  Can I have the question read back,
15 please?
16     (Record read.)
17     A.  I don't know how to answer that
18 question, final question.
19     Every -- we tried as a group, Weil
20 Gotshal, Simpson Thacher, Sullivan & Cromwell,
21 Cleary Gottlieb, tried to do the best we could
22 in drafting this Agreement under
23 extraordinarily unusual, difficult
24 circumstances.
25     I do recall that, that this was one

TSG Reporting - Worldwide    877-702-9580

Page 43

1      -Lewkow-
2  of those final changes that was added in
3  handwriting, if I had the other version of the
4  Agreement.  And somebody, I believe on
5  Lehman's side of the table said, suggested we
6  add in words such as -- to categorize that
7  what we were talking about were, you know, a
8  disfunction of assets.  And it was for that
9  purpose that it was referenced.
10     And I believe that it was first
11 suggested -- and again, I don't know from
12 whom, it might have been a Lehman person.  It
13 might have been one of their lawyers.  Said,
14 let's say, with a -- you know, with a
15 marking -- with marks of 70 billion, or some
16 words of that sort.
17     And some lawyer -- again, I don't
18 know on which side.  Because this was all
19 being done in group session issue -- said,
20 "Well, should we use the word" -- "from a
21 legal, instead of saying 'marks', should we
22 use the word 'book value'?"
23     And that's the word that went in.
24 But I don't think people were trying to draw a
25 distinction between book value and marks, at

TSG Reporting - Worldwide    877-702-9580

Page 44

1      -Lewkow-
2  least from what this lawyer believed, the
3  lawyer from Weil, understood "book value" to
4  mean in the context of financial assets held
5  by a broker-dealer.
6      **Q.  Did anyone from the Barclays side**
7  **of the table -- by that I'm including Barclays**
8  **personnel or Cleary, ask for or get any**
9  **information to indicate whether the value of**
10 **$70 billion described in subsection (d) was an**
11 **accurate description of Lehman's book value**
12 **for those classes of securities?**
13     MR. MORAG:  Object to the form.
14     A.  As I told you, as I believe I
15 testified, I believe we were in a group told
16 that Lehman was going to remark certain
17 portfolio assets to reduce them.  I assumed
18 that Lehman had done -- it never occurred to
19 me, when they talked about "marks", I assumed
20 that it reflected whatever Lehman had,
21 therefore, done.  And therefore, book value
22 likewise.
23     **Q.  So from what we talked about so**
24 **far, would it be fair to say that the**
25 **understanding was that Lehman negotiated to**

TSG Reporting - Worldwide    877-702-9580

Page 45

1      -Lewkow-
2  **reduce its marks?**
3      MR. MORAG:  Object to the form.
4      A.  I'm not going to characterize.  I
5  have -- you're trying to characterize what I
6  testified to.  I stand by the accuracy of my
7  testimony.  But I would not -- I would not --
8  I would not call that "negotiated."  It is
9  what it is.
10     **Q.  Mr. Lewkow, don't get me wrong.**
11 **I'm not suggesting any lack of credibility of**
12 **your testimony.  What I'm looking for is your**
13 **best memory of what people talked about at the**
14 **time?**
15     A.  I've given you my best.
16     **Q.  Do you remember anything else in**
17 **terms of discussions concerning the use of the**
18 **phrase "book value" in subsection (d)?**
19     A.  No.
20     **Q.  Let me show you what's previously**
21 **been marked as Exhibit 518.  Take a look at**
22 **the document.  My questions will go to the**
23 **notations on page 7.**
24     MR. HUME:  Page which?
25     MR. MORAG:  7.  Of the document

TSG Reporting - Worldwide    877-702-9580

1      -Lewkow-
2    itself, not the Bates number.
3       A.  Yup?
4       Q.  And you referred a few moments ago,
5    Mr. Lewkow, to the addition of the phrase
6    "book value" in a handwritten note, in a
7    handwritten annotation.  Is this the document
8    that you were remembering?
9       A.  It appears to be, yes.
10      Q.  At least I wasn't clear as to
11   whether you have a memory as to which side of
12   the negotiations added that phrase.  Do you
13   recall whether it was Lehman or Barclays, or
14   do you not recall either side?
15      A.  As I testified, it was a suggestion
16   of someone on the Lehman side that words of
17   that nature be added, yes.
18      Q.  Do you recall who on the Lehman
19   side?
20      A.  No.  I believe it was not one of
21   their outside lawyers.  I believe it was
22   somebody from Lehman itself, but I have no
23   recollection who.
24      Q.  If you can turn back.  Actually, I
25   created kind of a document mess in front of

1      -Lewkow-
2    you.
3       A.  It is all right.
4       Q.  Why don't you fold those up?  And
5    let go back to your Declaration for a minute.
6       A.  Sure.
7       (Witness complying.)
8       Q.  Actually, just before we go back to
9    your Declaration?
10      MR. GAFFEY:  Bridgett, can I have
11   25, please?
12      Q.  Mr. Lewkow, I put before you a copy
13   of what previously has been marked as
14   Exhibit 25.
15      You referred a few moments ago to a
16   Clarification Letter.  Is that the
17   Clarification Letter to which you were
18   referring?
19      A.  Yes.  It appears to be.
20      Q.  What was the purpose of the
21   Clarification Letter?
22      A.  The Clarification Letter was, as
23   set forth in the opening paragraph, "To
24   clarify the intent of the parties with respect
25   to certain provisions of the Asset Purchase

1      -Lewkow-
2    Agreement, supplement in certain respects the
3    agreements of the parties stated therein, and
4    amend the Asset Purchase Agreement in certain
5    respects."
6       Q.  Now, are there particular portions
7    of the Agreement that were amended or are
8    there particular portions that were
9    supplemented or are there particular portions
10   that were clarified?
11      MR. MORAG:  Objection to the form.
12      MR. HUME:  Objection to the form
13   and that it calls for an intersection
14   of the agreement.  And generally
15   Barclays will object to the extent you
16   ask the witness to give legal
17   interpretations of the contract as
18   revealing privilege.
19      A.  The answer is -- the document is
20   the document.  No one ever tried to say, all
21   right, this clause is a supplement; this
22   clause is an amendment; this clause is -- they
23   are what they are.  Certain -- certain things
24   did clarify; certain things amended.  No
25   one -- there was no reason -- there was no

1      -Lewkow-
2    effort to allocate into buckets in this
3    document.
4       Q.  Do you recall if the use of the
5    word "amend" was a deliberate drafting choice?
6       MR. MORAG:  Objection.
7       MR. GAFFEY:  That's a bad question.
8    Let me withdraw that question.
9       Q.  Do you recall if the word "amend"
10   was added at some point during exchanging
11   drafts of the Clarification Letter?
12      A.  I would need to see all the drafts
13   to be sure.  But my recollection is yes.
14      Q.  Okay.  I'm going to show you the
15   draft, so I'm not going to ask you to
16   speculate and pinpoint.
17      Do you recall any discussions
18   between the party, that is between Lehman and
19   Barclays or their representatives, about
20   adding the word "amend" to the Clarification
21   Letter?
22      A.  I have a vague recollection that
23   with the very first draft of the Clarification
24   Letter, which was prepared very quickly by
25   someone -- and I don't know which side --

Page 50

1            -Lewkow-
2    after the Asset Purchase Agreement had been
3    signed and filed with the Court on Wednesday
4    morning, that the original first draft was a
5    page or two and it clearly was truly nothing
6    other than clarification.  And so that the
7    first draft did not use the word "amendment."
8            At some later point, as things got
9    more complicated and things were happening, it
10   became -- there was discussion that we should
11   add the word "amend."  That is my
12   understanding.
13       Q.  Do you recall who was involved in
14   those discussions?
15       A.  People from Cleary Gottlieb and
16   people from Weil Gotshal, and probably Simpson
17   Thacher.
18       Q.  Do you have a more specific memory
19   of which people?  I know it was a pretty
20   tumultuous week.  But do you recall who in
21   particular was involved in those discussions?
22       A.  It was more in the direct
23   conversations between -- I think most of the
24   conversations on the Clarification Letter were
25   on Barclays side between some combination,
         TSG Reporting - Worldwide    877-702-9580

Page 51

1            -Lewkow-
2    Duane McLaughlin, David Leinwand; Robert
3    Davis; some cases me, but not primarily me;
4    and various people from Weil Gotshal which I
5    believe included Robert Messineo, I may be
6    mispronouncing his name, David Murgio, maybe
7    Tom Roberts and I'm not sure who else.
8        Q.  Do you know if Harvey Miller was
9    involved in those discussions?
10       A.  Which discussions?  You started --
11   I probably went too far in answering your
12   question.
13       Q.  I don't know who led who astray
14   there.
15           The question, the issue is what you
16   talked about a minute ago --
17       A.  The word "amendment"?
18       Q.  Yes.  That it became more complex
19   and I decided to add the word "amendment,"
20   whether Mr. Harvey Miller was involved in
21   those discussions.
22       A.  I don't think -- I don't know what
23   Mr. Miller was doing talking internally with
24   his colleagues or with his clients.  Did he
25   participate in the exact wording of that?  I
         TSG Reporting - Worldwide    877-702-9580

Page 52

1            -Lewkow-
2    don't know.  I do have a distinct recollection
3    of him describing to the Court at the sale
4    hearing that Friday evening that there were
5    major changes in the deal.
6            So I can't imagine -- I don't want
7    to speculate.  I do not recall specifically
8    whether he was involved in adding the word
9    "amend" in that clause.
10       Q.  Was the Clarification Letter meant
11   to memorialize those major changes in the
12   deal?
13           MR. MORAG:  Object to form.
14       A.  I'm picking up the Clarification
15   Letter.  It was made to both supplement,
16   clarify and amend the Asset Purchase
17   Agreement.  And it was intended to be
18   consistent with what the Court had been told
19   this Friday evening.
20       Q.  Were you yourself present in court
21   on the sale hearing on the 19th?
22       A.  I was.
23           MR. MORAG:  Yes.
24           MR. GAFFEY:  Yes.  Okay.
25       Q.  The Clarification Letter,
         TSG Reporting - Worldwide    877-702-9580

Page 53

1            -Lewkow-
2    Exhibit 25, sets forth certain changes in the
3    definition of "Purchased Assets" from the
4    original Asset Purchase Agreement; is that
5    correct?
6            MR. HUME:  Object to the form.
7        A.  Can I look at --
8        Q.  Sure.
9        A.  -- both at the Clarification Letter
10   and the Asset Purchase Agreement?
11       Q.  Look at whatever you need to look
12   at.
13       A.  Thank you.
14           (Witness reviewing document.)
15       A.  Yes.
16       Q.  While you were present in court,
17   was Judge Peck told about the changes in the
18   definition of "Purchased Assets"?
19           MR. MORAG:  Object to the form.
20       A.  You can read the transcript as well
21   as I can, and I think it speaks for itself.
22           I think that what the judge was
23   told was about the substantive changes in the
24   deal, major changes in the deal that had been
25   orally agreed to, is my understanding, by
         TSG Reporting - Worldwide    877-702-9580

Page 54

```
 1              -Lewkow-
 2    representatives of Lehman and Barclays in a
 3    couple of hours preceding the beginning of the
 4    court hearing.
 5         So it does not mean that -- as the
 6    Court was well aware and as the Court noted,
 7    that he did not have the document.  The
 8    document did not yet exist but, you know,
 9    major changes were described by Mr. Miller and
10    Ms. Fife to the Court.
11         Q.  And in Cleary Gottlieb's view at
12    the time, were the changes as described by
13    Mr. Miller and Ms. Fife to the Court at the
14    hearing, accurate and complete?
15              MR. MORAG:  Object to the form.
16         A.  Yes.
17         Q.  Were any changes to the transaction
18    discussed or agreed upon after the sale had
19    been concluded, that were incorporated in the
20    Clarification Letter?
21              MR. MORAG:  Object to the form.
22         A.  Well, one -- one thing that was
23    changed that I recall related to the
24    residential mortgages, the so-called RESIs.
25         The original Asset Purchase
           TSG Reporting - Worldwide    877-702-9580
```

Page 55

```
 1              -Lewkow-
 2    Agreement had -- contained a provision that
 3    treated the residential mortgages differently
 4    than any other category of assets and
 5    provided -- can I look at the Agreement?
 6         Q.  Sure.  I think you might be looking
 7    for 1(e) in the definition of "Purchased
 8    Assets"?
 9         A.  He knows where all the clauses are
10    here.
11         Q.  Page 6.
12         (Witness reviewing document.)
13         A.  Right.  So the original Asset
14    Purchase Agreement provided that the Purchased
15    Assets that Barclays would be acquiring
16    included a 50 percent interest in the
17    positions in the residential mortgage
18    securities.
19         At some point on Thursday, late
20    Thursday or early Friday -- I have no
21    recollection of when it was precisely -- an
22    amendment No. 1 to the Asset Purchase
23    Agreement was executed by the parties that was
24    addressed -- was done to address a problem.
25         There was real uncertainty as to
           TSG Reporting - Worldwide    877-702-9580
```

Page 56

```
 1              -Lewkow-
 2    whether the deal could be completed because of
 3    issues that DTC wanted assurances that it was
 4    being -- it would be protected in certain
 5    respects, the details of which I have -- was
 6    not involved in, and that I don't recall great
 7    detail.
 8         But the amendment instead provided
 9    that the 50 percent interest that Lehman was
10    going to keep, as I recall, was instead going
11    to be delivered -- and I don't remember the --
12    I have to look at amendment No. 1, but it was
13    going to be delivered instead to DTC.  And if
14    at the end of some period and the like it
15    turned out that to secure up to, I believe,
16    250 million.  But again, I would need to look
17    at amendment No. 1.
18         But that to the extent that there
19    was some excess available, it would go back to
20    Lehman.  So that Lehman still might end up
21    having some interest in the RESIs to the
22    extent that DTC did not need them to protect
23    it in connection with the Lehman positions.
24         The Court was, as I recall in the
25    court hearing, Mr. Miller and Ms. Fife made
           TSG Reporting - Worldwide    877-702-9580
```

Page 57

```
 1              -Lewkow-
 2    reference to this provision.
 3         It turned out that the parties
 4    learned at some point, Friday or Saturday, I
 5    believe, that, in fact, the so-called
 6    residential real estate mortgage securities or
 7    RESIs, that Lehman didn't have such positions
 8    available to transfer to Barclays in the first
 9    place.  So there were no such -- and the
10    reasons were -- and I really don't recall.  I
11    don't know if I ever knew in detail.
12         Some of those positions had already
13    been traded; they no longer owned them; some,
14    they may have been pledged to third parties;
15    some would have involved, to the extent there
16    were separate double counting with other
17    securities that were getting outside this
18    provision.  And accordingly, there were no
19    RESIs of the sort that the Court had been told
20    about by Mr. Miller or Ms. Fife in the sale
21    hearing.  So that provision was eliminated in
22    the Clarification Letter which basically
23    amended the agreement to unwind amendment No.
24    1.
25         Q.  Just so I'm clear we don't have a
           TSG Reporting - Worldwide    877-702-9580
```

Page 58

1          -Lewkow-
2  disconnect between my question and your
3  answer.  My question went to changes that were
4  made after the sale hearing ended.
5          Was that a change that was made
6  after the sale hearing ended?
7      A.  I believe so.  Because as I said,
8  as I testified, Ms. Fife or Mr. Miller had
9  said, had described the state of the Asset
10  Purchase Agreement as amended by amendment No.
11  1 in the sale hearing.  And this Clarification
12  Letter had the provisions that I just
13  described and for the reasons I described.
14          MR. MORAG:  I need a bathroom break
15      if that's --
16          MR. GAFFEY:  I can't hear you.
17          MR. MORAG:  Bathroom break.
18          MR. GAFFEY:  Perfect time.
19          (Whereupon, a short recess was
20      taken from 11:22 a.m. to 11:35 a.m.)
21  BY MR. GAFFEY:
22      Q.  Mr. Lewkow, I put in the top of the
23  other pile of documents you have in front of
24  you what we previously marked as Exhibit 24,
25  First Amendment to the Asset Purchase
        TSG Reporting - Worldwide    877-702-9580

Page 59

1          -Lewkow-
2  Agreement.
3          Is that the first amendment you
4  were referring to before the break?
5      A.  Yes, it is.
6      Q.  And that was superceded by the
7  Clarification Letter?
8      A.  Yes.
9      Q.  Were there any other changes to the
10  transaction made after the conclusion of the
11  sale hearing that are reflected in the
12  Clarification Letter?
13          MR. MORAG:  Object to the form.
14      A.  The Clarification Letter was not --
15  I can't deal with words like "after".
16          The Clarification Letter didn't
17  exist at the time of the court hearing.  The
18  Clarification Letter did what it did; trying
19  to implement what the Court had been told as
20  well as the clarifications that needed to be
21  made.
22          And the example I gave you before
23  was different from what the Court had been
24  told to the disadvantage, I might add, to
25  Barclays because we had at the time of the
        TSG Reporting - Worldwide    877-702-9580

Page 60

1          -Lewkow-
2  Asset Purchase Agreement and at the time of
3  amendment No. 1 and at the time Weil Gotshal
4  described the transaction, changes to the
5  transaction that had been made.  And when they
6  described them to the Court, they had believed
7  and Barclays had believed that there was a
8  separate pool available of residential
9  mortgages that over and above other assets
10  Barclays was getting would -- 50 percent of
11  the value of which would be something Barclays
12  was getting.
13          That was what the Court was told.
14  It turned out there weren't any separately
15  identifiable residential assets, residential
16  mortgage asset, RESIs.  And so that -- that
17  was a change to reflect the fact that Barclays
18  was not getting something that it had
19  bargained for.  But I don't know what you mean
20  by changes after the sale hearing.
21      Q.  Were there any other changes made
22  to reflect facets of the deal that were
23  different from what the Court had been told,
24  apart from this issue you told me about the
25  RESIs?
        TSG Reporting - Worldwide    877-702-9580

Page 61

1          -Lewkow-
2          MR. MORAG:  Objection to form.  The
3  feed is not coming through.
4          (Discussion off the record.)
5          (Record read as follows:
6  "Question:  Were there any other
7      changes made to reflect facets of the
8      deal that were different from what the
9      Court had been told, apart from this
10      issue you told me about the RESIs?")
11          MR. MORAG:  Object to the form.
12      A.  I'm struggling.  I'm not sure I can
13  answer it.  Can I hear it one more time?
14          (Record read as follows:
15  "Question:  Were there any other
16      changes made to reflect facets of the
17      deal that were different from what the
18      Court had been told, apart from this
19      issue you told me about the RESIs.")
20      A.  Do I recall any changes to the deal
21  as they -- other than as I testified, any
22  changes to the deal that were -- from what the
23  Court, the totality of what the Court had been
24  told about the deal as a result of both the
25  Asset Purchase Agreement, the presentations,
        TSG Reporting - Worldwide    877-702-9580

Page 62

1          -Lewkow-
2    the Wednesday hearing and the Friday hearing,
3    I don't recall any changes to the deal after
4    that, you know, at this -- at this -- at this
5    time.
6          Q.   Take a look, if you would,
7    Mr. Lewkow at Paragraph 1, and tell me if
8    there are changes to the definition of
9    "Purchased Assets" affected by the
10   Clarification Letter, changes to the
11   definition from the Asset Purchase Agreement?
12         MR. MORAG:  You're asking him --
13         A.   Yes.
14         MR. MORAG:  -- the Clarification
15   Letter?
16         A.   Yes.
17         MR. MORAG:  The last thing --
18         A.   The answer is yes.  There was a
19   change in the definition, that's correct.
20         Q.   Do you know if the change in the
21   definition of "Purchased Assets" was brought
22   to the Court's attention?
23         A.   There was --
24         MR. MORAG:  Object to the form.
25         A.   The Court was told about the
     TSG Reporting - Worldwide     877-702-9580

Page 63

1          -Lewkow-
2    substance of the deal.  The Court was not told
3    about clause, actual clause Y or clause Z and
4    the like.  So I can't answer that question
5    other than to say, you know, you can read the
6    transcript and I do not believe the words
7    anyone said, and so such and such a clause or
8    such and such a definition will be
9    appropriately changed.  That's not the way the
10   hearing went.
11         Q.   So, for example, no one, to your
12   knowledge, told the Court that the definition
13   of "Purchased Assets" would be changed to now
14   include securities owned by LBI and
15   transferred to Purchaser or its affiliates
16   under the Barclays Repurchase Agreement?  I'm
17   referring to Paragraph 1A, subsection (ii).
18         MR. MORAG:  Objection to form.
19         A.   To the extent that -- a couple of
20   things.  First of all, that was not -- I do
21   not believe that was a change in the deal.
22   Barclays had agreed, with certain specified
23   exception, to acquire all of the assets used
24   in the business.  Who financed those assets at
25   a given point in time I don't think is
     TSG Reporting - Worldwide     877-702-9580

Page 64

1          -Lewkow-
2    relevant to that question.
3          At the time the Asset Purchase
4    Agreement was signed, it's my understanding
5    that, you know, a lot of the assets were in
6    the form -- were being financed overnight by
7    the Federal Reserve pursuant to a repo.
8          At some point, Thursday or the
9    like, Barclays had taken the fed out of the
10   repo and provided the financing.  But it was
11   the same -- or it should have been, if the
12   assets had been there as had been thought.
13   But those assets, the fact that we added a
14   reference to "repo" doesn't change whether the
15   substance of the transaction changed.
16         Q.   Was there a reason that that
17   particular phrase was added to the
18   Clarification Letter then?
19         MR. MORAG:  Objection.  What
20   particular phrase?
21         A.   I think you're going to have to be
22   more specific.
23         Q.   Well, was there discussion back and
24   forth between the parties about putting that
25   language in the Clarification Letter,
     TSG Reporting - Worldwide     877-702-9580

Page 65

1          -Lewkow-
2    referring to the repo assets?
3          A.   Can you point me to the exact
4    language, please?
5          Q.   Paragraph 1(a)(ii)(A), "The
6    securities owned by LBI and transferred to
7    Purchaser or its affiliates under the Barclays
8    Repurchase Agreement, as defined below, as
9    specified on Schedule A previously delivered
10   by Seller and accepted by Purchaser."  That
11   language.
12         A.   There were, as you know, a number
13   of drafts that were circulated of the
14   Clarification Letter.  And my recollection is
15   that at some point, as lawyers working on the
16   Clarification Letter first learned and then
17   focused on the fact that a lot, most but not
18   all of the assets had been in the -- referred
19   to in the definition of, I believe, "Long
20   positions" in the Asset Purchase Agreement,
21   were now -- had been financed by Barclays at
22   the Feds' request and were in the repo, some
23   lawyer -- and I don't remember whether it was
24   initially from Weil Gotshal or Cleary
25   Gottlieb, but there was agreement that it made
     TSG Reporting - Worldwide     877-702-9580

Page 66

1          -Lewkow-
2   sense to refer to the repo in this context.
3          Q.  Do you recall when it was that the
4   lawyers first learned that assets that had
5   been originally described in the long
6   positions were, in fact, in the repo?  When
7   did that happen?
8          MR. MORAG:  Object to the form.
9          A.  Yeah, I think -- first of all, I
10  can't answer for all lawyers.  That would
11  include the Weil Gotshal lawyers and other
12  lawyers on behalf of...
13         As to Cleary Gottlieb, at some
14  point I believe, at least one of my colleagues
15  that Thursday had heard that there had been --
16  that Barclays had extend -- provided repo
17  financing to Barclays.  I'm not sure.  It is
18  my understanding none of the details, we had
19  not been involved in that at all.  But it was
20  mentioned, and we learned more about it on
21  Friday and over the weekend.
22         But even as -- even as of the Court
23  hearing we knew very little about it.
24         Q.  Did there come a time when you
25  learned that the Repurchase Agreement had been

TSG Reporting - Worldwide    877-702-9580

Page 67

1          -Lewkow-
2   terminated by Barclays?
3          MR. MORAG:  Object to the form.
4          A.  There came a time when I learned --
5   when I -- when I learned that -- I'm not sure
6   how I can answer, whether I can answer this
7   without talking about a privileged
8   conversation.  Can I have...
9          Q.  Absolutely.  Just before you talk
10  to your lawyers, I'm focusing on the timing
11  here.  When did you learn it?  We will tread
12  carefully so that --
13         A.  When did I learn it requires -- I
14  have to deal with your characterization.  Can
15  I hear the question again?
16         Q.  Let me put a question, and then if
17  you need to consult, you can do that.
18         A.  Sure.
19         Q.  The question is:  Did there come a
20  time when you learned that the Repurchase
21  Agreement had been terminated by Barclays?
22         A.  There came --
23         MR. MORAG:  Objection to form.
24         MR. HUME:  I will object and
25  instruct you not to answer to the

TSG Reporting - Worldwide    877-702-9580

Page 68

1          -Lewkow-
2   extent it would reveal a privilege from
3   Barclays.
4          MR. GAFFEY:  As to when?
5          MR. HUME:  Well, you assumed
6   when --
7          MR. GAFFEY:  It is attorney --
8          MR. HUME:  It was terminated.  What
9   does terminated mean?
10         MR. GAFFEY:  It means ended.
11         A.  It's a legal... If you want to ask
12  the question -- can I talk to counsel for
13  Barclays and my counsel?
14         Q.  Sure.  Absolutely.
15         (Whereupon, a recess was taken
16  from 11:49 a.m. to 11:52 a.m.)
17         A.  Before the break you asked me a
18  question about did there come a time of
19  learning about the termination of the repo.
20         Of course, the repo did terminate,
21  as I understand it, when we closed on Monday,
22  but I assume that's not what you're asking.
23         Q.  It is not.
24         A.  There did come a time over the
25  weekend, I don't recall whether it was

TSG Reporting - Worldwide    877-702-9580

Page 69

1          -Lewkow-
2   Saturday or Sunday, where we did learn -- I
3   think I was reminded in preparing for the
4   deposition, that it was -- we initially
5   learned it when we were copied, or not copied
6   and then forwarded on an e-mail from Sullivan
7   & Cromwell who was co-counsel with us for
8   Barclays, and/or to -- to Weil, that there had
9   been an inadvertent notice given to Barclays
10  by folks in the -- I don't know who, but
11  someone at Barclays had sent a notice of
12  termination of the repo at some point, I
13  believe late Friday, and that that was done in
14  error and should be undone.
15         So if that's what you're asking
16  about, you've heard what my recollection is.
17         Q.  It is.  Let me show you what's
18  previously been marked as Exhibit 27.
19         Have you seen that document before,
20  sir?
21         (Witness reviewing document.)
22         A.  No, I don't believe I have.
23         Q.  You learned about the inadvertent
24  termination of the repo over the weekend; is
25  that right?

TSG Reporting - Worldwide    877-702-9580

Page 70

1       -Lewkow-
2       A.  Yes.
3       Q.  Was it the Saturday or the Sunday?
4       A.  I don't know.
5       Q.  Were you involved in any
6  discussion, you or anyone else from Cleary or
7  Barclays, involved in any discussions from the
8  Lehman folks or Weil Gotshal about the
9  inadvertent termination of the repo?
10      A.  It is my -- I don't think I
11  personally was, but here as a
12  30(b)(6) witness --
13      Q.  You are Cleary Gottlieb, sir.
14      A.  -- internally.  I was perfectly
15  happy not knowing in my life.
16          It is my understanding that
17  following up on the e-mail from Sullivan &
18  Cromwell and the like, that the -- that there
19  may have been some discussions about, you
20  know, implementing this and getting it right
21  to -- to -- because it was, as I -- as I was
22  told at the time and we were told at the time,
23  and as I testified to, it was sent in error.
24  But I don't recall any other discussion.
25          I'm not aware of any other

TSG Reporting - Worldwide    877-702-9580

Page 71

1       -Lewkow-
2  discussion that Cleary Gottlieb was aware of
3  with the other side on, on this subject.
4       Q.  That's sort of where I'm leading.
5  Let me rephrase the question so you'll know
6  what it is I'm looking for here.
7          What knowledge does Cleary Gottlieb
8  have that Weil Gotshal or Lehman knew about
9  the termination of the repo, that it had been
10  terminated?
11      A.  I believe, as I testified a minute
12  ago, that there was an e-mail that Sullivan &
13  Cromwell on behalf of Barclays sent to Weil
14  Gotshal.  And I believe there were some
15  follow-up conversations referencing the fact
16  that there had been an inadvertent notice that
17  had been sent on this subject.  Can I look at
18  the Clarification Letter?
19      Q.  Sure.  Paragraph 13 is probably
20  where you want to go.
21      A.  Fine.
22      Q.  The language in Paragraph 13 was
23  supplied by Sullivan & Cromwell, correct?
24      A.  I would have to look at this and
25  compare it to the words in the e-mail.  I

TSG Reporting - Worldwide    877-702-9580

Page 72

1       -Lewkow-
2  don't know the answer to that.
3       Q.  There is a reference in Paragraph
4  13 to the Notice of Termination, do you see
5  that?
6       A.  Yes.
7       Q.  Is the notice of termination that
8  is referred to in Paragraph 13 of the
9  Clarification Letter, the notice that we've
10  marked as Exhibit 27?
11      A.  Well, it says it is a notice of
12  termination in Paragraph 13 dated
13  September 19.  Exhibit 27 that you've shown
14  me, that as I testified I do not believe I've
15  ever seen, it is dated September 19th.  It is
16  from Barclays, it is to Lehman, and it says it
17  is a notice of termination.  So it appears to
18  be it is, but that's all I can tell you.
19      Q.  Was there any discussion between
20  the folks on the Barclays side of the table,
21  including Cleary, and the folks on the Lehman
22  side of the table including Weil Gotshal,
23  about whether there were implications under
24  the Bankruptcy Code to the fact that the repo
25  had been terminated?

TSG Reporting - Worldwide    877-702-9580

Page 73

1       -Lewkow-
2       A.  It is my understanding that to the
3  best of Cleary Gottlieb's knowledge, no.
4       Q.  Did Cleary Gottlieb have
5  communications with any other person or entity
6  outside of your client, outside of Barclays
7  and Cleary, about Section 559 of the
8  Bankruptcy Code in connection with the
9  termination of the repo?
10          MR. HUME:  Outside of any
11  privilege.
12          MR. GAFFEY:  Outside of any
13  privilege, yes.
14      A.  To the best of my knowledge, no,
15  subject to this caveat.  You will be taking my
16  partner's Ed Rosen's deposition.  He was
17  involved in the discussions with DTC and other
18  clearance -- clearing entities.  And since he
19  was going to be the 30(b)(6) witness on those
20  discussions, I have not consulted him.  So as
21  to whether or not there was anything on that
22  point, I do not know the answer on behalf of
23  Cleary Gottlieb.  Subject to that, the answer
24  is no.
25      Q.  Were there discussions about 559

TSG Reporting - Worldwide    877-702-9580

1          -Lewkow-
2    with any other self-regulating organizations
3    or governmental agency concerning Section 559
4    of the Bankruptcy Code.
5          A.  Not to my knowledge.
6          Q.  Mr. Lewkow, I'm going to show
7    you --
8          A.  This is starting to look like my
9    desk at the office.
10         Q.  I'm trying to make you feel at
11   home.  Let me add this to the pile there and
12   show you what previously was marked as Exhibit
13   579B, a Declaration of Alan Kaplan, deputy
14   general counsel of Barclays, that's been
15   submitted in Barclays's opposition papers on
16   Rule 60.  Have you seen this before?
17         A.  I can't remember if someone showed
18   me this in the last few days or not.
19         Q.  Take a minute if you would --
20         A.  I wouldn't swear that I haven't.
21   But if so, I didn't read it very careful.
22         Q.  There's a statement that Mr. Kaplan
23   makes that I want to see if you had any
24   knowledge about.  And it's in Paragraph 4 of
25   his declaration.  He is referring to the
         TSG Reporting - Worldwide    877-702-9580

1          -Lewkow-
2    notice going out erroneously, I'm
3    paraphrasing.  Then he says, "The parties
4    corrected that error in Paragraph 13 of the
5    Clarification Letter."  Do you see that?
6          A.  Yes, let me read all of
7    Paragraph 4, if I may?
8          Q.  Sure.
9             (Witness reviewing document.)
10         A.  Remind me of the question?
11         Q.  I think the question was:  Do you
12   see that?  But --
13         A.  I do.
14         Q.  Okay.  When Mr. Kaplan says "the
15   parties", plural, "The parties corrected the
16   problem with Paragraph 13", I show you that to
17   see if it refreshes your recollection in any
18   way whether there were any discussions between
19   the parties, that is between Barclays and its
20   representatives and Lehman and its
21   representative, about the problem created by
22   the termination of the repo?
23         MR. MORAG:  Objection to the form.
24         A.  I don't know what you mean by the
25   "problem created."  But I believe it was
         TSG Reporting - Worldwide    877-702-9580

1          -Lewkow-
2    discussed between the fact that this change
3    needed to be made, that it was sent in error.
4    It was discussed at least briefly between the
5    Barclays side, including Cleary and Sullivan &
6    Cromwell, and the Lehman side including Weil,
7    yes.
8          Q.  Again, does it refresh your
9    recollection, where you read Mr. Kaplan
10   talking about "correcting an error," does it
11   refresh your recollection about whether there
12   were any discussions between the Barclays side
13   of the table including Cleary, and the Lehman
14   side of the table including Weil, about
15   implications into the Bankruptcy Code from the
16   termination?
17         A.  I answered that question.  To the
18   best of my knowledge, there were no such
19   discussions.
20         Q.  If I could ask you to restrict your
21   answer, sir, to yes or no to the question I'm
22   about to ask you.
23         Were there any discussions between
24   Barclays and Cleary concerning implications
25   under the Bankruptcy Code of the termination
         TSG Reporting - Worldwide    877-702-9580

1          -Lewkow-
2    of the repo?  Yes or no?
3          MR. HUME:  Objection to the extent
4    it calls for privileged communications.
5          MR. GAFFEY:  I'm not sure yes or no
6    does.  And I think I'm entitled to that
7    information under local Rule 26.
8          MR. HUME:  Well, what's your basis
9    for saying --
10         MR. GAFFEY:  Local Rule 26 provides
11   that if privilege is asserted at a
12   deposition, I'm entitled to the same
13   information that would be included on a
14   privilege log, which would be the
15   author, recipient, subject matter of
16   the communication, of the otherwise
17   privileged communication.
18         That's why I'm restricting it to a
19   yes or no.
20         MR. MORAG:  The issue here though
21   is you did not just ask about the
22   subject matter of the termination
23   notice being the subject of the
24   conversation, you asked for yes or no
25   as to the specific advice, whether it
         TSG Reporting - Worldwide    877-702-9580

Page 78

```
1          -Lewkow-
2  was discussed.
3          MR. GAFFEY:  Actually, no.  I --
4          MR. MORAG:  You asked for the
5  specific advice.
6          MR. GAFFEY:  It is phrased quite
7  carefully not to.  That's the point.
8  That's the topic that would be on the
9  privilege log.
10          MR. MORAG:  No, I believe it would
11  be the Notice of Termination.
12          MR. GAFFEY:  Let me get a yes or no
13  to that.  Because I want to see where
14  the instruction not to answer is
15  framed.
16  BY MR. GAFFEY:
17      Q.  Were there discussions between
18  Cleary and Barclays concerning the termination
19  of the repo?  Yes or no.
20      A.  Yes.
21      Q.  When did those discussions take
22  place?
23      A.  Some point over Saturday or Sunday.
24      Q.  Were there discussions between
25  Barclays and Cleary Gottlieb about
```

TSG Reporting - Worldwide    877-702-9580

Page 79

```
1          -Lewkow-
2  implications under the Bankruptcy Code in
3  connection with the termination of the repo?
4  Again, yes or no, please.
5  DI      MR. HUME:  Again, objection.  I
6      instruct the witness not to answer.
7          I don't believe the privilege log
8      subject matter would have to reveal the
9      specific nature of the communication,
10      request for advice under Section Y, Y,
11      Z.  I mean --
12          MR. GAFFEY:  I understand you are
13      going to assert it.  I don't want to
14      take time with the colloquy.
15          MR. MORAG:  Hold on one second.
16          THE WITNESS:  Can we talk outside?
17      Is that all right?
18          (Whereupon, a recess was taken
19      from 12:07 p.m. to 12:09 p.m.)
20          MR. MORAG:  Subject to your
21      agreement that whatever Mr. Lewkow
22      responds will not constitute any waiver
23      of the attorney/client privilege, which
24      you said it wouldn't, but if you
25      confirm that, Mr. Lewkow is prepared to
```

TSG Reporting - Worldwide    877-702-9580

Page 80

```
1          -Lewkow-
2  answer the question.
3          MR. GAFFEY:  Okay.
4          THE WITNESS:  Can I hear the
5  question?
6          MR. MORAG:  The one that you were
7  prepared to answer.
8          MR. GAFFEY:  I rephrased it.  But
9  let's read it back.
10          THE WITNESS:  Let's hear the last
11  question.
12          (Record read as follows:
13  "Question: Were there discussions
14  between Barclays and Cleary Gottlieb
15  about implications under the Bankruptcy
16  Code in connection with the termination
17  of the repo?  Again, yes or no,
18  please.")
19      A.  To the best of my knowledge, no.
20      Q.  What needed to be corrected, then,
21  in connection with the termination of the
22  repo?  Do you know?
23      A.  That it was in error.  It wasn't
24  supposed to be terminated.  I think I was told
25  that it would create a monstrous obligation to
```

TSG Reporting - Worldwide    877-702-9580

Page 81

```
1          -Lewkow-
2  give notices and so forth and so forth to
3  everyone who was on -- to various party,
4  etcetera.  That's all I remember.
5      Q.  Did you or anyone else at Cleary
6  Gottlieb have an understanding that upon
7  termination of the repo in financing haircut
8  over and above the amount advanced would need
9  to be repaid into the estate of LBI?
10          MR. MORAG:  Objection.  I think you
11      are asking for a legal opinion from
12      this witness.
13          MR. GAFFEY:  You are right.  Let me
14      withdraw that.
15      Q.  Was there any discussion with
16  anyone outside of the circle of Cleary and
17  Barclays to the effect that the Bankruptcy
18  Code would require the financing haircut in
19  the repo to be paid back into the estate over
20  and above the amount that Barclays had
21  advanced in the Repurchase Agreement?
22      A.  Not to my knowledge.
23          MR. MORAG:  Objection to
24      characterization.
25      Q.  Do you know if anyone at Cleary had
```

TSG Reporting - Worldwide    877-702-9580

Page 82

-Lewkow-

1  communications with anyone outside of
2  privilege, that is anyone outside of
3  privilege, that is anyone outside of
4  communications with your client concerning
5  whether anyone would seek to stay the
6  application of 559 of the Bankruptcy Code in
7  connection with the termination of the repo?
8       A.  Not to my knowledge.
9       Q.  In your capacity as a 30(b)(6)
10  witness, have you inquired about that topic?
11      A.  Yes.
12      Q.  Is there a reason, Mr. Lewkow, that
13  Sullivan & Cromwell was given the
14  responsibility for drafting the language in
15  Paragraph 13 as opposed to Cleary?
16      MR. MORAG:  Objection.
17      MR. HUME:  Objection.  Calls for
18  privilege.
19      MR. MORAG:  Yes, I mean --
20      THE WITNESS:  I think I can give
21  some factual information, if you want
22  me to.
23      MR. GAFFEY:  I do.
24      THE WITNESS:  Let him ask the
25  question.

TSG Reporting - Worldwide    877-702-9580

Page 83

-Lewkow-

1
2       MR. MORAG:  I would ask you to
3  first pose the foundational question of
4  whether he knows there is a reason.
5       Q.  Do you know whether there's a
6  reason Sullivan & Cromwell drafted the
7  language in Paragraph 13?
8       MR. HUME:  I instructed the witness
9  not to answer that.  To the extent it
10  reveals privilege, I don't know how you
11  can answer it otherwise.
12      THE WITNESS:  I actually think I
13  can.
14      MR. HUME:  If you can, go ahead.
15      A.  We had, as I testified earlier,
16  basically nothing to do with the creation, the
17  documentation, the implementation of the repo.
18  I don't know whether Sullivan & Cromwell did
19  or not, but we had not.  And so I'm not
20  surprised that we had nothing to do with
21  follow-ups with regard to that.
22      Q.  Let's clean up the pile again and
23  go back to the Lewkow declaration, which is
24  the first thing I showed you.  I forget the
25  exhibit number.

TSG Reporting - Worldwide    877-702-9580

Page 84

-Lewkow-

1
2       In Paragraph 4, again, Mr. Lewkow,
3  you say, this is the last sentence, "Further,
4  I do not recall anyone involved in the
5  transaction ever suggesting that the deal was
6  supposed to be a 'wash' with the value of
7  assets acquired equal to the value of
8  liabilities assumed."
9       Did you or anyone else from Cleary
10  Gottlieb ever have conversations with Bart
11  McDade about his understanding of the
12  transaction?
13      A.  Bart McDade was -- about his
14  understanding of the transaction, he was in
15  the room at the time the Asset Purchase
16  Agreement -- at times when the Asset Purchase
17  Agreement was being negotiated.  So in that
18  context, I had -- we sort of had conversations
19  with him.  I don't recall any other
20  conversations with him.
21      Q.  Were any of the conversations with
22  him addressed to the topic of whether or not
23  it was a transaction in which the assets and
24  liabilities were supposed to roughly match?
25      MR. MORAG:  Object to the form.

TSG Reporting - Worldwide    877-702-9580

Page 85

-Lewkow-

1
2       A.  I have included in my declaration
3  that I do not recall anyone involved in a
4  transaction ever suggesting that.  And so that
5  is my recollection.  And Bart McDade comes
6  within the term of "anyone."
7       Q.  I'm asking for a slightly different
8  question.
9       Was the topic ever discussed with
10  Mr. McDade?
11      A.  Not to my knowledge.
12      Q.  Was the topic ever discussed with
13  anyone --
14      MR. HUME:  Objection.  Go ahead.
15      A.  I don't know what the topic is.
16      Q.  -- whether --
17      A.  The deal was the deal, okay.  The
18  agreement is reflected in the Asset Purchase
19  Agreement as originally entered into and then
20  as supplemented, clarified and amended by the
21  Clarification Letter.
22      Q.  I'm assuming, sir -- and correct me
23  if I'm wrong -- that there must have been some
24  discussions between the parties beyond the
25  level of well, the deal is the deal and it is

TSG Reporting - Worldwide    877-702-9580

Page 86

1          -Lewkow-
2    there in that piece of paper.
3          So in those discussions, were there
4    any discussions with Mr. McDade about whether
5    or not the deal was one where assets and
6    liabilities were supposed to roughly match?
7          A.  I do not recall any discussion of
8    that topic with Mr. McDade.
9          Q.  Were there any discussions with
10   anyone from Lehman as to whether or not the
11   deal was one where assets and liabilities were
12   supposed to roughly match?
13         A.  The reason I am struggling with
14   your question is every time you have a
15   discussion about what the deal is and someone
16   doesn't say it is or it isn't a "wash"
17   transaction, is it about whether it is a
18   "wash" transaction?  And insofar as that is
19   your question, well, then every conversation
20   was about whether it was or wasn't because it
21   was a discussion of what it was.  But there
22   was no discussion of "wash" sales.
23         Q.  It is a fair point.  Let me just
24   clear the record up a little bit on it and
25   I'll move on to another topic.

TSG Reporting - Worldwide    877-702-9580

Page 87

1          -Lewkow-
2          So I take it from your answer that
3    there was no discussion about that topic as
4    opposed to discussions that didn't mention it
5    and therefore, excluded it?
6          A.  I do not --
7          Q.  There were no discussions about
8    that topic?
9          MR. MORAG:  Let him finish the
10   question so the record is clear.
11         Q.  There were no discussions expressly
12   about that topic?
13         A.  To the best of my recollection,
14   there were none.
15         Q.  Now, in Paragraph 5 of your
16   Declaration, generally the top Paragraph 5 and
17   6, you talk about generally the topic of
18   employment offers made by Barclays to certain
19   Lehman executives, and I'd like to ask you
20   some questions about that.
21         Was Cleary Gottlieb involved in any
22   way in the negotiations between Barclays and
23   Lehman executives to whom job offers were
24   made?
25         A.  I cannot recall -- "involved" in

TSG Reporting - Worldwide    877-702-9580

Page 88

1          -Lewkow-
2    negotiations, if you mean had meetings with
3    any of those executives or their
4    representative, I do not -- I believe the
5    answer is no.
6          Q.  You seemed concern.  We may have a
7    disconnect on the phrase "involved" here.
8          Was there any indirect role for
9    Cleary in connection with the offering of
10   employment to Lehman executives by Barclays?
11         A.  The only -- the reason I phrased it
12   the way I did is because what I do not recall
13   is whether anyone at Cleary Gottlieb drafted
14   or saw a form of -- form of potential
15   employment agreement at some point that may or
16   may not have ever been, you know, traded with
17   any of the potential senior people, the eight
18   senior officials that were originally covered
19   by the Asset Purchase Agreement.
20         Q.  Do you know if there were
21   employment negotiations between Barclays and
22   Lehman executives other than the eight to whom
23   you just referred?
24         A.  At what time period are we talking
25   about?

TSG Reporting - Worldwide    877-702-9580

Page 89

1          -Lewkow-
2          Q.  Prior to the closing of September
3    22nd.
4          A.  I don't know about negotiations.
5    As I said in my declaration, it was clear that
6    it was very important to Barclays, everyone,
7    it was discussed that -- when you buy -- many
8    people have bought investment banking firms or
9    the businesses from such firms and spent a lot
10   of money, and then spent a lot more money
11   trying to keep people and then had those deals
12   blow up in their faces.
13         So everyone was aware that Barclays
14   wanted to retain not just eight people but a
15   lot of other key people, and that was
16   well-known.  I do not know -- we were not
17   involved in any specific conversations, but it
18   would not -- consistent with my declaration,
19   it wouldn't surprise me if some of those
20   people particularly said, "Gee, we really look
21   forward..." I just don't know.
22         Q.  Look for a minute at Paragraph 9 of
23   your Declaration where you referred, and I
24   asked you about this sentence a while ago.
25   You say, "While I was not present for the

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1  -Lewkow-
2  actual discussions between Barclays and Lehman
3  traders..." are you with me?
4      A. That's correct.
5      Q. Do you know if any of the Lehman
6  traders described in Paragraph 9 were among
7  the Lehman employees to whom Barclays offered
8  employment prior to September 22nd?
9      MR. MORAG: Object to the form.
10     A. I have no idea.
11     Q. Were there any discussions between
12 Cleary and Barclays on the one hand and Lehman
13 and Weil on the other hand about the degree to
14 which the extent and nature of employment
15 should be disclosed?
16     A. No.
17     Q. Do you know --
18     A. Not to the best of my recollection.
19     Q. Do you know if the nature and
20 extent of the negotiations was disclosed to
21 the Lehman Board?
22     A. I have no idea what was disclosed
23 to the Lehman Board.
24     Q. At any point in the negotiations of
25 the transaction or the discussions between the

1  -Lewkow-
2  parties prior to the closing on
3  September 22nd, did Cleary ask to see the
4  minutes of any Lehman Board meeting concerning
5  the transaction?
6      A. No.
7      Q. Is that something that as an M&A
8  lawyer you normally would ask for in a deal
9  where you have a little more time than you had
10 here?
11     MR. MORAG: Objection to form.
12     A. Probably not. In fact, I think it
13 would be highly unusual.
14     Q. Do you know if Barclays made an
15 offer of employment to Mr. McDade prior to
16 September 22, 2008?
17     A. I have a very vague recollection,
18 and I -- from the time. But I've heard it
19 since, so I'm not 100 percent certain I heard
20 it at the time.
21     But I believe I heard at the time,
22 whether they had offered it or not, but it had
23 been determined that he had made a
24 determination early on that he would not --
25 would not go with the business. And the

1  -Lewkow-
2  assumption was that he would not be joining
3  the business.
4      Q. I want to make sure your record and
5  my record are clear here.
6      Can you tell me if you learned that
7  before or after September 22nd?
8      A. What I just testified is, I'm not
9  sure. I believe I had learned it before, but
10 I'm not certain of that.
11     Q. Mr. Lewkow, I'm putting before you
12 what was previously marked as Exhibit 581B,
13 minutes of the meeting of Barclays Board of
14 September 16, 2008. Have you seen those
15 minutes before?
16     A. No.
17     Q. On page 3 of that exhibit, sir, is
18 Paragraph 5 entitled "Retention of Lehman
19 Staff, which says, "An in principle agreement
20 had been reached with Lehman's U.S. senior
21 leadership team on the bonus arrangements
22 subject to approval of the proposals by the
23 Board HR and Remuneration Committee."
24     I know you haven't seen the
25 document before. Did Cleary know one way or

1  -Lewkow-
2  the other that there were in principle
3  agreements between Barclays and Lehman's U.S.
4  senior leadership team on or about
5  September 16, 2008?
6      MR. HUME: Objection. Vague.
7      MR. MORAG: Objection to the form.
8      MR. GAFFEY: Let me make it clear.
9  You are right.
10     Q. Did you know that on
11 September 16th?
12     MR. HUME: Same objection.
13     A. September 16th? I don't know what
14 "U.S. senior leadership team" means. I'm not
15 sure if they are talking about there is a
16 provision in the Asset Purchase Agreement
17 about certain bonuses. But other than that, I
18 have no idea what this is talking about.
19     MR. GAFFEY: That just saved me a
20 whole page of my notes.
21     Q. Mr. Lewkow, I'm handing you a
22 series of documents which previously had been
23 marked Exhibit 28, 29, 30, 31, 32, 33, 34, 35,
24 36 and 37. And you will see, sir, that they
25 consist of various iterations of the

Page 94

1          -Lewkow-
2    Clarification Letter.  I want to go through
3    some of them.
4          And you will need handy, from
5    amidst the other documents, we will refer from
6    time to time to Exhibit 25, the final.
7       A.  Oh, the final?  The Asset Purchase
8    Agreement, too.
9       Q.  We may get to that, too.  But maybe
10   not.
11      A.  As long as there is no quiz on it.
12   I guess it is --
13      Q.  The quiz will come after I take the
14   exhibits away from you.  It is sort of an open
15   book test.
16         You testified a little while ago or
17   we talked a little while ago concerning a
18   point at which the language of the first
19   paragraph of the final Clarification Letter
20   came to include the phrase "supplement" and
21   the phrase "amend."  I just pinpoint that
22   generally for the topic.  All right?
23      A.  I testified a little bit about the
24   word "amends," yes.
25      Q.  Will you take a look in the stack I
     TSG Reporting - Worldwide    877-702-9580

Page 95

1          -Lewkow-
2    have in front of you at Exhibit 34.
3       Q.  MR. GAFFEY:  Let's go off the
4    record for a minute.
5         (Witness reviewing document.)
6       A.  I'm looking in Exhibit 34.
7       Q.  Within Exhibit 34, it is both a
8    clean and a blackline draft.  The blackline
9    begins on page 10279851 in the lower
10   right-hand corner.  If you could go there,
11   that will be helpful.
12         MR. MORAG:  Is there a reason that
13   all the pages are numbered 10279851?
14         MR. GAFFEY:  Yes.  It has to do
15   with how they were numbered at the
16   outset.  They weren't Bates.
17      A.  Okay.  I'm looking.
18      Q.  Do you see there that in that
19   blackline which is in a draft bearing a date
20   of September 19th, "WGM comments,
21   September 19th noon," the blackline indicates
22   that the phrase "supplements in certain
23   respects the agreements of the parties stated
24   therein, and shall amend the Agreement to the
25   extent necessary so as to be consistent with
     TSG Reporting - Worldwide    877-702-9580

Page 96

1          -Lewkow-
2    this letter and" has been added in the
3    blackline?
4       A.  I see that.
5         Can I just state, on the page you
6    are pointing to, it does say, "September 19th
7    at noon."  But my recollection is consistent
8    with, if you go to the first page of this
9    exhibit, I never saw the version that's at the
10   top that shows an e-mail from Andy Keller to
11   Steve Berkenfeld, not surprisingly.
12         The next -- but that then forwards
13   a prior e-mail from Robert Messineo of Weil to
14   a number of people, including me.
15      Q.  Right.
16      A.  And you will see that is --
17      Q.  September 19th, nine minutes after
18   noon, right?
19      A.  Well...
20         (Witness reviewing document.)
21      Q.  So does that cover e-mail indicate
22   to you that you had at least transmitted to
23   you this draft at or about the time it was
24   prepared?
25      A.  Yeah, I don't remember when I saw
     TSG Reporting - Worldwide    877-702-9580

Page 97

1          -Lewkow-
2    it.  Uh-huh.
3       Q.  Okay.
4         I'm going to ask you two questions.
5    I will tell you why I'm asking the first one.
6    I'm going to ask you if it pinpoints your
7    memory of when the decision to include the
8    phrase "supplement and amends" was included
9    and whether it refreshes your recollection as
10   to whether there were any events as to why it
11   was determined to include it at that point?
12         MR. MORAG:  Objection.  Compound.
13      Q.  But you can answer.
14      A.  It clearly came first.  This was
15   presented to us by Weil Gotshal.  They added
16   those words.  I do not recall whether there
17   was any conversation before then as to the
18   fact that they were going to add those words
19   when they prepared this draft.  And since I
20   don't recall any discussion on the front, I
21   can only speculate, which I will not do, as to
22   why Weil added those words.
23      Q.  I most certainly don't want you to
24   speculate.  I just want to know -- I take it
25   the answer is no -- whether this refreshes
     TSG Reporting - Worldwide    877-702-9580

Page 98

1           -Lewkow-
2    your recollection as to whether any
3    development or event in the negotiations gave
4    rise to a decision to add the words
5    "supplement and amend"?
6          MR. MORAG:  That was communicated
7    to you.
8          MR. GAFFEY:  That Cleary knew
9    about.  This is a 30(b)(6) witness.
10         A.  I would need to -- let me just
11   think for a minute.
12         I don't recall.
13         Q.  Okay.  Within the pile that I gave
14   you a moment ago, will you turn to Exhibit 31,
15   that's a September 18th -- it is under an
16   e-mail.
17         A.  I'm sorry.  Which document?
18         Q.  31.  That's under an e-mail from
19   Dave Messineo to you dated September 18, 2008,
20   11:40 p.m. GMT.  Do you see that?
21         A.  Thursday night, yes.
22         MR. MORAG:  Can I just make a
23   statement for the record?  And I'm not
24   suggesting this is the case.  But with
25   respect to Exhibit 34, I just did

TSG Reporting - Worldwide    877-702-9580

Page 99

1           -Lewkow-
2    notice that as an e-mail emanating from
3    Weil Gotshal, it does not indicate at
4    the bottom that there, in fact, was an
5    attachment.  I've often meant to send
6    attachments that I didn't actually
7    attach.  And I'm not saying we didn't
8    get it.  But Exhibit 31, which also
9    emanates from Weil Gotshal, does
10   indicate below the subject line an
11   attachment.
12         THE WITNESS:  We did get this.
13         MR. MORAG:  Okay.
14         THE WITNESS:  We did get this.
15         MR. GAFFEY:  So we don't have to be
16   troubled by that.  I get the concern.
17   Do you notice it says "attached
18   Clarification Letter"?
19         MR. MORAG:  It says it on the
20   forward.
21         THE WITNESS:  It doesn't say it on
22   the lower one, but that may be a
23   difference between the Simpson system
24   and how we attached it and the like.
25   We did receive it.

TSG Reporting - Worldwide    877-702-9580

Page 100

1           -Lewkow-
2          MR. MORAG:  There are a number of
3    drafts in this case that weren't sent
4    to us.
5          THE WITNESS:  But this one, we did
6    receive this one.
7          MR. GAFFEY:  My questions have
8    nothing to do with when you got it.  If
9    I'm going to get there, I'll try to be
10   very clear about it.  So if that's a
11   concern, you raise it.
12   BY MR. GAFFEY:
13         Q.  My question, Mr. Lewkow, goes to
14   Paragraph 10 of the draft that is within this
15   document.
16         A.  Of 31?  Of Exhibit 31?
17         Q.  Of Exhibit 31, yes.
18         A.  Which was late --
19         Q.  The draft is entitled "WGM
20   Comments, September 18, 7:30 p.m."
21         A.  Right.  Although it was sent to us
22   at 11:40 p.m. on Thursday, September 18th.
23         Q.  GMT, which would put you at 7:40
24   p.m.  We spent a lot of time on this
25   documents, sir.

TSG Reporting - Worldwide    877-702-9580

Page 101

1           -Lewkow-
2          A.  Oh, you did?  You're right, I
3    guess.
4          Q.  So if would you take a look at
5    Paragraph 10, which has no translation.  It is
6    Paragraph 10.
7          A.  Yes.
8          Q.  There is a reference to the
9    "9/16/08 balance sheet."  Do you see that?
10         A.  Yes.
11         Q.  Do you know if that balance sheet
12   that's referred to there is the one that was
13   marked as Exhibit 19 that I showed you before?
14         A.  Is and was at the time my
15   understanding that what they were referring to
16   here was either the exhibit you mentioned or,
17   as I testified earlier, some variant of that.
18   I do not know it was precisely the one, but
19   something like that exhibit that you just
20   mentioned.
21         Q.  To push that point a bit further,
22   if you can take a look at Exhibit 19 and look
23   at the lower right-hand corner and see that
24   it's got a time stamp on it of 11:18 a.m.
25         (Witness reviewing document.)

TSG Reporting - Worldwide    877-702-9580

Page 102

1          -Lewkow-
2      A.  So it does.
3      Q.  And the reference to Paragraph 10
4  is to a balance sheet printed at 11:18 a.m. on
5  9/16/08?
6      A.  Yes, it is.
7      Q.  Does that refresh your recollection
8  in any way?
9      A.  It seems to be.
10     Q.  Does any of this refresh your
11 recollection as to whether there were
12 discussions during the course of the week
13 after the APA had been signed about that
14 balance sheet marked as Exhibit 19?
15     A.  My recollection, and I don't recall
16 whether we knew this was going to be in the
17 draft or not, but my recollection is that this
18 showed up and we didn't think it was
19 appropriate to start dealing with that
20 document, which we had not intended to and had
21 not included as an exhibit to the Asset
22 Purchase Agreement.  And so this did not stay
23 in the Clarification Letter.
24     Q.  Were there any discussions between
25 Barclays and Cleary Gottlieb on the one hand
            TSG Reporting - Worldwide    877-702-9580

Page 103

1          -Lewkow-
2  and Lehman and Weil Gotshal on the other about
3  whether or not to include that sheet as an
4  exhibit to the Asset Purchase Agreement?
5      A.  I believe that during the -- at
6  some point at the very end of the finalization
7  of the Asset Purchase Agreement, and it may
8  have been -- you know, it was a final meeting
9  at which people tried to finalize the Asset
10 Purchase Agreement, and that is the meeting at
11 which a Simpson Thacher associate sat between
12 me and John Findley of Simpson Thacher and
13 tried to act as scribner as the combined group
14 of people around a very large rectangular
15 table, square table reached agreement on final
16 changes.  And then she entered in handwritten
17 form, which we have looked at previously or I
18 testified about earlier today.
19         I believe, I'm not sure, but I
20 believe it was in that context that someone on
21 the Lehman side would have raised the idea,
22 would it make sense to attach this document,
23 Exhibit 19, or some variant thereof to the
24 Asset Purchase Agreement.  And a decision was
25 made collectively not to do so.
            TSG Reporting - Worldwide    877-702-9580

Page 104

1          -Lewkow-
2      Q.  What was the basis for the decision
3  made collectively not to do so?
4      A.  The agreement --
5      Q.  I withdraw "basis."
6          What was the reason it was decided
7  not to do that?
8      A.  My recollection is that the piece
9  of paper had been prepared by Lehman and shown
10 to us and the like, and that there was one
11 reference to it that was going into the Asset
12 Purchase Agreement, but that it did not -- the
13 agreement in the deal was to be embodied in
14 the Asset Purchase Agreement, and we had not
15 spent any specific time looking at Exhibit 19
16 or any variant of it with a view towards
17 having legal significance and what it might
18 mean and how it might modify the Asset
19 Purchase Agreement.
20         The Asset Purchase Agreement was
21 intended to stand on its own two feet.
22     Q.  Let me ask you to put before you
23 Exhibit 35.  It is included in the packet of
24 documents that I gave you.
25     A.  Sure.  Yes.
            TSG Reporting - Worldwide    877-702-9580

Page 105

1          -Lewkow-
2      Q.  And Exhibit 35, the first page, has
3  an e-mail from David Murgio at 9:15 p.m. GMT,
4  September 19, 2008 to among others you.  And
5  it attaches this, another draft of the
6  Clarification Letter?
7      A.  Correct.
8      Q.  If you would, again, sir, please
9  turn within the document to the blackline
10 section which begins at page 10279864.
11     A.  Yup.
12     Q.  And within the definition of
13 "Purchased Assets," "Excluded Assets" on the
14 first page of that blackline --
15     A.  On the first page?  First what?
16     Q.  On the first page of the blackline.
17 Okay?  Paragraph 1 of the blackline.
18     A.  Okay.  You referred -- I didn't
19 realize 64 was on all the pages.
20     Q.  It is.  It is the first page marked
21 64.
22     A.  Okay.
23     Q.  And it is Paragraph 1, "Purchased
24 Assets."
25         The underscored language in that
            TSG Reporting - Worldwide    877-702-9580

Page 106

1          -Lewkow-
2   draft includes the following, "Plus with
3   respect to securities of LBI shall also
4   include municipal securities, residential
5   mortgage securities and other securities of
6   which a summary description by category is
7   reflected in Exhibit A hereto. It being
8   understood that the long positions referred to
9   in clause (d) of Purchased Assets do not have
10  a book value of approximately 70 million." We
11  will take the "million" as a typo. I don't
12  think anybody used that number anywhere in
13  this deal.
14          My question to you, sir, is: Do
15  you recall a point in the negotiations of the
16  terms of the Clarification Letter where
17  language like this was proposed for the
18  definition of "Purchased Assets"?
19      A. Let me respond with a number of
20  comments.
21      One, when we look at the first
22  page of this exhibit, this was sent at 9:15
23  GMT, which you pointed out in the other one,
24  which makes it 5:15 New York time. At 5:15
25  New York time, I was sitting in Judge Peck's

TSG Reporting - Worldwide    877-702-9580

Page 107

1          -Lewkow-
2   room and the like. So none of us in the
3   courtroom -- if I snuck a look at my
4   BlackBerry, I might have known that this
5   document had arrived, but I certainly had not
6   looked at it at that stage.
7       By the time -- I believe some of my
8   colleagues did look at it. By time the Court
9   had approved the sale around midnight, I
10  believe -- and I then went back to the office.
11  I think either late that night, I think we
12  were told by Weil basically that this draft
13  did not reflect the discussions that had taken
14  place in the hour or two or three before the
15  Court hearing had begun, were written by
16  lawyers who had not been involved in those
17  discussions and that a new draft would be
18  prepared and we really should not spend a lot
19  of time worrying about this.
20      And in fact, a new draft was
21  furnished to us some time early afternoon, I
22  believe, on Saturday.
23      Q. In what respect did Weil lawyers
24  tell you in that conversation the draft did
25  not reflect the discussions that had taken

TSG Reporting - Worldwide    877-702-9580

Page 108

1          -Lewkow-
2   place in the hour or two or three before the
3   Court hearing?
4       A. That it didn't.
5       Q. Other than the statement that it
6   did not, did they provide any more detail as
7   to the manner --
8       A. The lawyers --
9       Q. -- in which it did not?
10      A. I believe that the lawyers who said
11  that were the ones who had not been in on the
12  discussions and they knew the discussions had
13  taken place that had not been -- they had not
14  been aware of when they did this. And I
15  believe that's all they've done, to the best
16  of my knowledge.
17      Q. In your Declaration, you refer at
18  some point to the fact that a draft of the
19  Clarification Letter had been sent by
20  BlackBerry during the sale hearing. I have to
21  confess I'm panting a little bit because I
22  can't find exactly where you say that.
23      A. It's not in my declaration?
24      Q. I don't think so.
25      MR. MORAG: It's Paragraph 11.

TSG Reporting - Worldwide    877-702-9580

Page 109

1          -Lewkow-
2       THE WITNESS: Yes, it is.
3       (Witness reviewing document.)
4       Q. Here we go. Second sentence of
5   Paragraph 11, "Weil had circulated a revised
6   draft of the Clarification Letter by e-mail
7   during the sale hearing". Do you recall that?
8       A. Yes. That's the one that I
9   mentioned. It's this draft that arrived while
10  I was in court, correct.
11      Q. That's this draft marked as
12  Exhibit 35?
13      A. Correct.
14      Q. Did anyone in the court have any
15  discussions about the draft that was
16  circulated by e-mail?
17      A. No.
18      Q. So other than this statement in
19  your Declaration that was circulated by
20  e-mail, do you have anything you can add as to
21  what anybody did about that fact? Anybody
22  read it? Talk about it?
23      A. No one -- no one had more than a
24  BlackBerry, no copies were ever delivered, to
25  my knowledge, certainly not to Cleary Gottlieb

TSG Reporting - Worldwide    877-702-9580

Page 110

1          -Lewkow-
2    or Barclays in the courtroom.  Whether
3    somebody from Weil had them handed a draft or
4    not?  I don't know.  But certainly no one on
5    our side saw them in the courtroom.
6          Q.  Now, there's a reference in the
7    blacklined portion of Paragraph 1 of
8    Exhibit 35 to a Schedule A, in that sentence I
9    read you about the long position?  Do you see
10   that?
11         A.  Yes.
12         MR. HUME:  "Exhibit A."
13         MR. GAFFEY:  No.  Schedule A.
14         THE WITNESS:  No.  It actually says
15   "Exhibit A."
16         Q.  You're actually right.
17         A.  I see that.
18         Q.  Was there any discussion that the
19   "Exhibit A" referred to there was the sheet
20   marked as Exhibit 19?
21         A.  Well, there was no discussion of
22   this letter that I was aware of.  I believe if
23   you look at subsequent drafts, the concept of
24   Exhibit A that dealt with -- it did survive,
25   but it was a very different -- it was not

TSG Reporting - Worldwide    877-702-9580

Page 111

1          -Lewkow-
2    anything approaching Exhibit 19.
3          Q.  Now --
4          A.  But I don't know what -- I do not
5    know what Weil Gotshal had in mind, whether
6    they had in mind something like Exhibit 19,
7    but it certainly didn't stay in the
8    agreement -- in the draft of the Clarification
9    Letter.
10         Q.  Now, at this point in the
11   chronology, let me be clear about this point,
12   the hearing is over, you're back at your
13   office, you were told by these Weil lawyers,
14   look, this draft doesn't reflect what happened
15   in the two or three days before the hearing,
16   at that point in time --
17         A.  Can I interrupt you?
18         Q.  Absolutely.
19         A.  I don't think you got my testimony
20   correctly.  But it may be that I didn't state
21   it clearly.
22         I'm not sure that when I got back I
23   had a conversation with Weil.  I believe I got
24   back and I was told by one of my colleagues
25   that they had been told that by Weil.

TSG Reporting - Worldwide    877-702-9580

Page 112

1          -Lewkow-
2          Q.  Okay.  You get back to your office,
3    you learned that Weil has said, this draft
4    won't work because it doesn't reflect the
5    changes made in the two or three hours?
6          A.  I might also have been told that, I
7    don't recall, but Tom Roberts or others who
8    were in the courtroom from Weil Gotshal, that
9    they might have said, ignore the stuff that my
10   colleague sent you.  I just don't recall.
11         Q.  Do you recall Ms. Fife saying to
12   the judge at the sale hearing, we are working
13   on a Clarification Letter and we hope to have
14   it down here?
15         A.  I believe she did say something
16   along that line, yes.
17         Q.  At that point, during the sale, by
18   the time you're certainly in the middle of the
19   sale hearing, before that, had there been any
20   discussions between Barclays and its
21   representatives on the one hand and Lehman and
22   its representatives on the other, about
23   whether the Clarification Letter would need to
24   be submitted to the Court for approval?
25         MR. MORAG:  Objection to the form.

TSG Reporting - Worldwide    877-702-9580

Page 113

1          -Lewkow-
2          A.  My recollection is that on
3    Wednesday and Thursday the goal had been to
4    have a Clarification Letter that we could
5    submit to the Court.  The process was taking a
6    longer time than anyone would have hoped,
7    through no one's fault since everybody
8    operated in good faith to try to get it done.
9          But then on -- so it was already
10   moving slowly.  And by Friday, it was my
11   understanding that Lehman and Barclays
12   officials both learned that there were
13   substantial assets that Barclays -- that the
14   agreement contemplated -- the Asset Purchase
15   Agreement contemplated that Barclays was going
16   to receive as part of its acquisition of
17   basically -- issue with only specified
18   exceptions, basically all of the assets of the
19   business.  And there were a lot less -- in
20   terms of financial assets that it turned out
21   there were going to be a lot fewer than that
22   Lehman was going to be able to deliver.
23         And that had led to discussions
24   that took place during the day Friday -- I
25   don't know exactly when they started and when

TSG Reporting - Worldwide    877-702-9580

Page 114

-Lewkow-

1  they ended.  I don't know if they were in
2  person or over the phone -- between not the
3  lawyers, between representatives of Barclays
4  and representatives of Lehman.  And that was
5  going on until very shortly before the Court
6  hearing began.
7        So while it had been contemplated
8  the day before that we would try to have a
9  proposed form of, or maybe an actual form, I
10  don't recall which, of Clarification Letter to
11  provide to the Court, that events made that
12  impossible.
13       **Q.  Now, I take it that between the
14  time of this draft marked as Exhibit 35 and
15  the finalizing of the Clarification Letter on
16  Monday, the signing of the Clarification
17  Letter on Monday, other changes are made.  We
18  will get to those, but I just want to
19  establish the fact that changes were made over
20  the weekend, correct?**
21       MR. HUME:  Objection, vague.
22  Changes to what?
23       MR. GAFFEY:  To the Clarification
24  Letter.

TSG Reporting - Worldwide    877-702-9580

Page 115

-Lewkow-

1        A.  Changes to the draft Clarification
2  Letter were made that are reflected in the
3  final Clarification Letter that was signed,
4  yes.
5       **Q.  And some of those changes were made
6  over the weekend, Saturday the 20th and Sunday
7  the 21st, correct?**
8        A.  New drafts were being prepared and
9  changes to the prior draft were therefore
10  made, correct.
11       **Q.  Now, the discussions that you
12  learned had taken place on Friday morning
13  between non-lawyers for Lehman and Barclays
14  that you referred to a moment ago --**
15       A.  Morning or early afternoon, I'm
16  not sure which.
17       **Q.  Was it your understanding that
18  those discussions were to include assets in
19  the deal, to make up for assets that Lehman
20  had not been able to deliver?**
21       MR. MORAG:  Objection to form.
22       A.  Let me -- I think, I was told --
23  and now I want to carefully describe how I was
24  told it.  But I was told it twice about the

TSG Reporting - Worldwide    877-702-9580

Page 116

-Lewkow-

1  conversation.  I'm doing this and I'm looking
2  at my counsel and Barclays counsel, so they'll
3  caution me, I think.
4        But I was told substantially the
5  same.  And to the extent there's differences,
6  I don't remember which is which and what was
7  the difference.  I was told twice about the
8  results of the conversations that I just
9  alluded to that took place between Barclays
10  representatives and Lehman representatives
11  during the day Friday before the Court
12  hearing.
13       I arrived at the courthouse shortly
14  before the Court was supposed to convene for
15  this case.  And while I was still outside the
16  courtroom, having arrived -- while I was still
17  outside -- not outside the courtroom, outside
18  the courthouse.  While I was still outside the
19  Customs House, another car arrived, or taxi
20  and out came several Barclays representatives,
21  including Michael Klein.
22       Michael Klein, I may have said,
23  what's going on or what happened or something
24  like that --

TSG Reporting - Worldwide    877-702-9580

Page 117

-Lewkow-

1        MR. HUME:  Why don't I interject.
2        THE WITNESS:  Okay.  I don't have
3  to stay with that.
4        MR. HUME:  To the extent --
5        THE WITNESS:  Let me jump ahead.
6  Let me just jump ahead.  Go ahead.
7        MR. HUME:  Just so the record is
8  clear, to the extent Barclays
9  representatives communicated to you in
10  a privileged setting facts that they
11  later communicated in a way that is not
12  privileged, you should disclose --
13       THE WITNESS:  The latter.
14       MR. HUME:  Be careful, but disclose
15  only what was not privileged.
16  BY MR. GAFFEY:
17       **Q.  On that point, I want you to go
18  back to what was next in a minute.  But Klein
19  is there.  Who else was there?  Anybody non
20  Barclays was there?**
21       A.  Not downstairs, no.
22       **Q.  So it was Barclays people and you?**
23       A.  I had a conversation, and he
24  summarized the results of the conversation.

TSG Reporting - Worldwide    877-702-9580

Page 118

-Lewkow-

1    We then all went to the courtroom,
2 which was a zoo, if I can use that technical
3 term.  And I was near the front of the
4 courtroom near the well.
5    I was sitting on -- I managed to
6 get a seat which not many of us did -- on the
7 side.  I can't remember if there was a jury
8 box in that courtroom or not.  If so, I was
9 just in the chairs just inside what would have
10 been a jury box and next to the table at which
11 Weil Gotshal as debtor's counsel was sitting.
12    And there was a conversation that
13 took place that -- of, you know, somewhere
14 between four and eight people, I can't -- I
15 think it was at least five people, six people,
16 including Michael Klein, myself, Lori Fife,
17 and a few other people.  And it may -- among
18 those other people may have been -- I don't
19 think Harvey Miller was one of them.  I'm not
20 100 percent certain.  I believe that one of
21 them may have included, one or more of them
22 may have been Lehman Brothers business folks
23 or representatives, or Lazard representatives.
24 I'm not sure.  I don't remember.

Page 119

-Lewkow-

1    The only three people I am sure of
2 were present were Michael Klein, Lori Fife and
3 me.  There may have been somebody else from
4 Barclays there as well, like Archie Cox.  I
5 just don't remember.
6    And Michael repeated it enough --
7 as I said in the beginning, I don't recall
8 which conversation is which.  And they were in
9 all, to the extent I can recall, they covered
10 the same topic and were consistent with each
11 other and I'm sure he used different words and
12 the like.  But he repeated what he had told me
13 outside 30 or 40 or 50 minutes earlier, or 15
14 or 10 or whatever.
15    Q.  What did he say?
16    A.  I thought you'd ask that.
17    He reported -- and I had -- he
18 reported that it turned out that Lehman and
19 Barclays had both -- officials had both
20 learned in the prior 24 hours that a number of
21 categories of assets that Lehman had told
22 Barclays and agreed before the Asset Purchase
23 Agreement had been signed and were covered by
24 the Asset Purchase Agreement, as to categories

Page 120

-Lewkow-

1 -- specifically specified categories.
2    And of course, as you know,
3 Barclays was to get under the Asset Purchase
4 Agreement, except for specified excluded
5 assets, we were supposed to get all assets
6 used in the business.  But there were certain
7 assets, including financial assets that were
8 included within that universe but were also --
9 and so that Barclays had been led to believe
10 were going to be delivered.  That would be
11 true whether or not they were also articulated
12 as within the including language that follows
13 in the definition of "Purchased Assets."
14    But -- so it's the same universe
15 either way.  But certain of those assets,
16 which we have been told were among the assets
17 that Barclays would be getting would not --
18 were not available to be transferred to us.
19 That they either did not own or they had
20 double counted or they were subject to liens
21 in favor of third parties and they could not
22 be delivered.  And so he reported that.
23    And he said that this was -- and
24 again, I believe there may have been a Lehman

Page 121

-Lewkow-

1 person standing there, but I can't tell you
2 who, or a Lazard person, and that he had
3 created real issues as to whether the deal
4 could be due -- doable.
5    He went on to describe a number of
6 things that had come out as further
7 investigation as to facts as well as further
8 discussions and negotiations as to what to do,
9 as to whether this deal could be saved and
10 whether there would be no deal and there would
11 be no one to purchase the assets and to
12 purchase the business and leave the creditors
13 to a liquidation scenario.
14    But he reported on a number of
15 things.  First of all, that two category of
16 assets should have been identified that could
17 have been included in assets that Lehman used
18 in the business and, therefore, should be
19 coming to Barclays pursuant to the Asset
20 Purchase Agreement, which had not been
21 specifically ever mentioned or focused on by
22 Barclays.  And that those helped to some
23 extent mitigate the shortfall that I just
24 described based on what we had known.

Page 122

-Lewkow-

1    So, we had learned things that
2 reduced the pool of assets that were worth --
3 substantially all the assets that we were
4 getting. But that there were two categories
5 of assets that were within what we were
6 getting that we had not focused on and that
7 Lehman had not told us about were within the
8 pool of assets that Lehman had available for
9 transfer, that they could transfer and would
10 transfer pursuant to the deal.
11    And those, those two categories
12 were the 15c3-3 reserve account or something
13 like that. I'm not sure "reserve" is the
14 right account. And where I was told -- I
15 remember often this one being told the precise
16 number, but I don't remember what number it
17 is. But it was slightly over a billion-seven
18 in -- and I believe he said in security, but
19 he may -- he may not have been that specific.
20    And the second was assets in what I
21 was told was something called the clearance
22 box about -- again, I may have been given a
23 more specific number but this one is less
24 vivid in my mind, of approximately two billion

TSG Reporting - Worldwide    877-702-9580

Page 123

-Lewkow-

1 of assets, and that these assets were
2 available and would be transferred by Lehman
3 as part of the transfer of essentially all the
4 assets that they were going to be giving us.
5    I was also told of some discussions
6 of changes that needed to be made to the deal
7 because that didn't -- the identification of
8 those assets, of additional -- those assets
9 that would be transferred as part of the deal
10 didn't solve by any means the entirety of the
11 problem that had been learned by both sides as
12 to other assets that could not be transferred.
13    And that certain changes to the
14 deal were going to be made.
15    One was -- and that first, another
16 negative change in the deal from Barclays's
17 perspective in that there was a -- there was
18 in the Asset Purchase Agreement a concept
19 of -- I forget what the word was. "Retained
20 cash." It was a very strangely drafted
21 clause. Because retained cash was Lehman's
22 cash that Barclays would get and in a sense it
23 was retained because it would be retained for
24 use in the business that we were effectively

TSG Reporting - Worldwide    877-702-9580

Page 124

-Lewkow-

1 purchasing all the assets of, and certain --
2 and assuming certain specified liabilities.
3    And so I was told that the fact
4 that Lehman would receive the -- Lehman would
5 transfer the so-called retained cash was
6 dropping away and that Barclays would not get
7 that cash. I believe -- I believe I was told
8 that they just didn't have free cash sitting
9 around, but I don't remember precisely what
10 words were used. I don't remember precisely
11 what the words were on any, any of these.
12 This is my recollection and paraphrase of what
13 he told the group in the well in the courtroom
14 before the hearing started with a half a dozen
15 or so people.
16    He also talked about a favorite
17 topic, the RESIs, and that it turned out --
18 wait a second. Hold on a second. -- no. I
19 don't think -- I withdraw that. I don't think
20 there is anything about the RESIs.
21    He reported that another change
22 that needed to be made that the parties had
23 agreed to orally was to eliminate the
24 provision that I testified about earlier in

TSG Reporting - Worldwide    877-702-9580

Page 125

-Lewkow-

1 response to some -- some of your questions
2 that provided that if Barclays sold certain of
3 the financial positions within one year and
4 made a profit, that certain amounts of
5 additional consideration or compensation would
6 be paid to -- to Lehman, that that provision
7 had also -- would be deleted.
8    That -- let me just think if there
9 was anything else that I can recall. That's
10 my recollection.
11    MR. GAFFEY: Do you want to take a
12 lunch break?
13    MR. MORAG: Yes. I believe it's
14 available.
15
16    (Luncheon recess taken at 1:10 p.m.)
17
18    ---
19

TSG Reporting - Worldwide    877-702-9580

Page 126

1      -Lewkow-
2      A F T E R N O O N   S E S S I O N
3         (Time noted: 1:53 p.m.)
4   V I C T O R  I.  L E W K E W, resumed as a
5   witness and testified as follows:
6   CONTINUED EXAMINATION BY
7   MR. GAFFEY:
8      Q.  Mr. Lewkow, before the break you
9   were telling us about a conversation between
10   Michael Klein, Lori Fife, yourself and some
11   others, about discussions that had taken place
12   in the morning before the sale hearing.
13         Was there any discussion between
14   Barclays and its representatives on the one
15   hand, and Lehman and its representatives on
16   the other about what, if anything, of those
17   facts should be told to the judge in the sale
18   hearing?
19      A.  First of all, when you say -- you
20   said "morning," I was very careful.  I believe
21   it continued until shortly before the hearing
22   started at one o'clock, so I was not limited
23   to the morning.  The answer to your question
24   is, no.
25      Q.  As you sat through the sale hearing
         TSG Reporting - Worldwide    877-702-9580

Page 127

1      -Lewkow-
2   and heard the presentations to the Court from
3   the various lawyers who spoke to the judge,
4   was Cleary and Barclays's comfortable that the
5   aspect of the deal that had been discussed in
6   that session prior to the sale hearing were
7   accurately disclosed to the judge?
8         MR. MORAG:  Object to the form.
9      Certainly you speak to Cleary.  As to
10      Barclays, I'm not sure if that calls
11      for a privilege conversation.
12         MR. GAFFEY:  Let me just ask as to
13      Cleary.  That's a good point.
14      A.  As was my understanding was,
15   typical the debtor's counsel on a sale would
16   normally be the ones who take the -- make the
17   presentation to the Court.
18         THE REPORTER:  Can I ask you to
19      please speak up?  Thank you.
20         THE WITNESS:  I'll try.
21      A.  As typical, Weil as counsel for the
22   debtor was making the presentation.  Maybe in
23   other context people would have seen a draft
24   of what Lori Fife was going to say or the
25   like.  But certainly, since it was such a
         TSG Reporting - Worldwide    877-702-9580

Page 128

1      -Lewkow-
2   moving target we had, as I told you in your
3   last question, really hadn't had any
4   consultation as to what exactly she and
5   Mr. Miller were going to tell the Court.
6         That having been said, as I sat
7   there, I am, as a member of the Bar, I am -- I
8   do have obligations and certainly if I had
9   thought that I heard something that was
10   inconsistent with my understanding of the deal
11   or omitted information that was obvious that
12   should have been -- would make the description
13   of what the judge heard -- and by "description
14   of what the judge heard," I include everything
15   that he heard Wednesday and everything that
16   was in the Asset Purchase Agreement that he
17   had heard before.
18         If I thought he was being misled, I
19   obviously would have, as was Mr. Granfield who
20   was my partner who I was sitting next to, we
21   would have either, you know, addressed the
22   Court directly or would have talked to Weil
23   Gotshal and asked them to make appropriate
24   other statements to the Court.
25      Q.  As I understand the events and
         TSG Reporting - Worldwide    877-702-9580

Page 129

1      -Lewkow-
2   discussions that Mr. Klein described to you,
3   essentially because Lehman was unable to
4   deliver certain assets within the
5   contemplation of the Asset Purchase Agreement,
6   other assets were substituted for them?
7         MR. MORAG:  Objection to form.
8      A.  No.  I totally -- that is not a
9   correct characterization.
10      Q.  What is the correct
11   characterization?
12      A.  What I testified.
13      Q.  Is it your testimony that the two
14   categories of assets you discussed, 15c3 and
15   the contents of the box, were covered by the
16   original language of the Asset Purchase
17   Agreement?
18      A.  I don't want to give you legal
19   advice.  But I will point you to the words of
20   the Asset Purchase Agreement that basically
21   says all assets used in the business, other
22   than Excluded Assets, which is a defined term.
23      Q.  At the time that you had the
24   conversation with Mr. Klein and Ms. Fife, was
25   it at that point still within the
         TSG Reporting - Worldwide    877-702-9580

Page 130

-Lewkow-

1  contemplation of the parties that the
2  **Clarification Letter would be submitted to the**
3  **Court?**
4  A.  Well, we -- I don't -- the -- it
5  had been the contemplation on Wednesday and
6  Thursday, and the goal had been to, as I
7  testified earlier, to give the Court, to
8  give -- to have that ready to give the judge.
9  It was also the intention at that stage to try
10 to close Friday evening.
11     And on that sort of scenario, if,
12 in fact, you were there, it would have been
13 probably possible, one would have hoped to
14 have had a Clarification Letter that one could
15 have given to the Court.
16     It was clear to me, but I don't
17 recall that given what had changed and given
18 that there was a draft that had been served up
19 while we were in court, that -- given that it
20 showed up when it did, I was dubious even
21 before I saw it and before I talked to my
22 colleagues as to whether it did or didn't
23 reflect those discussions given the timing of
24 it.

TSG Reporting - Worldwide    877-702-9580

Page 131

-Lewkow-

1  So to me, it was, it would have
2  been shocking if before the Court could have
3  approved it, whether we would have had a final
4  Clarification Letter that we could have
5  provided the Court.
6  **Q.  By the end of the sale hearing, no**
7  **Clarification Letter had been finalized and**
8  **everybody let to continue their work over the**
9  **weekend.  Was there a point during the weekend**
10 **when there were conversations between Barclays**
11 **on the one hand and Lehman on the other**
12 **including their representatives, about**
13 **bringing the Clarification Letter to the**
14 **judge?**
15     MR. MORAG:  Objection to the form.
16     You can answer.
17     A.  What I recall, and to me the
18 Clarification Letter was -- it was getting
19 close to being signed.  I have a vague
20 recollection, I do have a recollection of
21 sitting in the room -- I did a lot of sitting
22 in the rooms -- with a number of Weil Gotshal
23 lawyers, including Harvey Miller, including
24 one or more of his corporate colleagues in

TSG Reporting - Worldwide    877-702-9580

Page 132

-Lewkow-

1  which -- and this would have been late Sunday
2  night, early hours of Monday morning.  I don't
3  know.  But it was very late, very late in the
4  game.  It might have even been Monday.
5     In fact, it might have been Monday
6  morning, you know, 5:00, 6:00, 7:00, just
7  shortly before we closed as I think about it.
8  I don't know when it was.  But it was late.
9  It wasn't Saturday.  It wasn't Sunday morning.
10 It wasn't even Sunday afternoon.  And we were
11 very close to, you know, finish.  The big
12 issues that people were dealing with were DTC
13 and J.P. Morgan and those sorts of issues were
14 really the big issues that people were facing.
15     But very late in the process,
16 Harvey Miller saying to a group of -- you
17 know, again, I don't know how many other -- it
18 was a very fluid group of people who would be
19 sitting in what room at what time that
20 weekend.  But there were a number of other
21 Weil people and Harvey Miller and me.  I don't
22 remember whether any of my colleagues were in
23 the room with me.
24     And Harvey looked at the assembled

TSG Reporting - Worldwide    877-702-9580

Page 133

-Lewkow-

1  group and said something like, Does anyone
2  think that we have done anything inconsistent
3  with what we've told the Court and have to
4  bring this -- go back to court?  Or something
5  like that.  I don't remember the words.  I'm
6  totally paraphrasing.
7     My recollection is, I've read
8  Mr. Miller's deposition transcript, and he
9  does not mention who -- he mentions a
10 conversation which is, I think, more or less
11 consistent with my recollection, but he
12 doesn't mention that anyone from Cleary
13 Gottlieb, like me, was there.
14     But -- and he may have had more
15 than one, so I have no way of knowing if it's
16 the same conversation.
17     But I do recall that.  And he
18 looked around the room and nobody said
19 anything.  It was mostly people on his side.
20 So that's the one that -- you know, in
21 connection with the finalization of the
22 Clarification Letter, that conversation took
23 place.
24 **Q.  Were any of your bankruptcy**

TSG Reporting - Worldwide    877-702-9580

Page 134

1           -Lewkow-
2  partners present during this conversation?
3      A.  I do not believe so.
4      Q.  Have you read any other
5  depositions?
6      A.  Yes.  I've read parts or all of
7  Mr. Miller's deposition, Mr. Hughes deposition
8  and Mr. Ridings' deposition.  I believe that's
9  all.
10     Q.  Did you read both days of
11 Mr. Hughes deposition?
12     A.  Yes.  Skimming, yes.
13     Q.  Did you review any briefs or
14 pleadings to prepare for your deposition?
15     A.  No.
16     Q.  Have you read the Rule 60 filed by
17 the debtor or the Trustee or the Creditors
18 Committee?
19     A.  No.
20     Q.  Have you had them summarized for
21 you?
22         MR. HUME:  Objection.  I think that
23     calls for privileged conversations.
24 DI     MR. MORAG:  Same objection.  I
25     instruct you not to answer.
TSG Reporting - Worldwide    877-702-9580

Page 135

1           -Lewkow-
2      Q.  Was there a time, was there not,
3  where it was contemplated that the
4  Clarification Letter would be styled as an
5  amendment to the APA, as a contractual
6  amendment to the APA.  Do you recall that?
7         MR. MORAG:  Objection to form.
8      A.  Contemplated by whom?
9         MR. GAFFEY:  Can I have this marked
10     as 614A?
11         (Deposition Exhibit 614A, Letter
12     from S&C, CGSH 00020701-20714, marked
13     for identification, as of this date.)
14     Q.  You have before you, Mr. Lewkow,
15 what we marked as Exhibit 614A, a document
16 bearing Bates numbers CGSH 00020701 through
17 20714.  Have you seen that document before?
18     A.  Yes.
19     Q.  I'm sorry.  I didn't hear you.
20     A.  Yes.
21     Q.  Did you see it at or around the
22 time that it's dated, September 19, 2009?
23     A.  I think that around that time, I
24 either saw the cover letter, cover e-mail, or
25 saw a cover e-mail from one of my colleagues
TSG Reporting - Worldwide    877-702-9580

Page 136

1           -Lewkow-
2  basically dismissing it.
3      Q.  Why was it dismissed?
4      A.  Because it was not consistent, best
5  I can recall.  This was sent by someone at
6  Sullivan & Cromwell who had not been involved
7  directly in any of the discussions with --
8  regarding the Clarification Letter.  We didn't
9  know where this had come from.  Hold on a
10 second.  Wait a second.
11         (Witness reviewing document.)
12     A.  I think.  I think a couple of
13 things.  Shortly after this -- this came on,
14 what date is this?
15         (Witness reviewing document.)
16     A.  Friday?  May I look at amendment
17 No. 1?
18     Q.  Sure.  Absolutely.
19     A.  That you had given me earlier.
20     Q.  That's Exhibit 27, right, for the
21 record?
22     A.  24.
23     Q.  I beg your pardon.  24.  You're
24 right.
25         MR. HUME:  Can I just interject?
TSG Reporting - Worldwide    877-702-9580

Page 137

1           -Lewkow-
2  To the extent that the question that's
3  pending, I think --
4         THE WITNESS:  I'm not sure.
5         MR. HUME:  -- is why was it
6     dismissed, to the extent to answer that
7     question requires you to divulge any
8     privileged conversations within Cleary
9     or Cleary and Barclays, I instruct you
10    not to answer.  Otherwise you can
11    answer.
12     A.  The answer is I'm not sure -- I've
13 seen the e-mail from one of my colleagues, I
14 think it was Dave Wyman.  But it was also, and
15 I don't know the precise timing.  One of the
16 elements that I see is, and maybe the key
17 element, was this rider that Ms. Summers had
18 sent with this e-mail to deal with what was
19 called -- a new section called a holdback to
20 deal with the DTC problem.
21         In fact, later that day, Sullivan &
22 Cromwell did, in fact, prepare a First
23 Amendment to the Asset Purchase Agreement to
24 try to address based on what -- what people
25 understood at the time were the -- were the
TSG Reporting - Worldwide    877-702-9580

Page 138

1    -Lewkow-
2  facts relating to the residential real estate
3  mortgage securities which were later learned
4  were not the facts.
5        And in fact, amendment No. 1 was
6  signed.
7    **Q.  The Asset Purchase Agreement --**
8    A.  More accurately, first amendment
9  was signed.
10   **Q.  And the Asset Purchase Agreement**
11 **and the first amendment of the Asset Purchase**
12 **Agreement, both were submitted to Judge Peck**
13 **at the sale hearing.  Do you recall that?**
14   A.  They were both described.  I
15 assume -- I know the Asset Purchase Agreement
16 had been submitted in a technical sense,
17 whether the first amendment was or not, I
18 assume it was, but I don't know for a fact.
19   **Q.  I'll go back to a question I asked**
20 **you a few moments ago.**
21      **Given that the Clarification Letter**
22 **recites that it amends the Asset Purchase**
23 **Agreement, was one of the three verbs that we**
24 **talked about, that it "amends" the Asset**
25 **Purchase Agreement.**

TSG Reporting - Worldwide    877-702-9580

Page 139

1    -Lewkow-
2    **When Mr. Miller asked whoever was**
3  **assembled in that room as to whether anyone**
4  **thought it was different than what had been**
5  **described to the Court, was there any part of**
6  **that discussion that noted that this was an**
7  **amendment to the agreement that had been**
8  **submitted to the judge?**
9        MR. MORAG:  Objection to the form
10 and to the characterization of his
11 testimony regarding Mr. Miller's
12 statement.
13   A.  I don't recall.  I would note that
14 Mr. Miller couldn't have been more clear on
15 Friday to the Court that there were major
16 changes in the deal.  And so the fact that in
17 part this was to some extent an amendment of
18 certain aspects of the Asset Purchase
19 Agreement, I think it was entirely consistent
20 with what Weil Gotshal told the Court on
21 Friday.
22      And the Court carefully considered
23 as I recall the comments made by I think a few
24 of the creditors and/or the Committee or
25 somebody, I don't remember who, arguing that

TSG Reporting - Worldwide    877-702-9580

Page 140

1    -Lewkow-
2  he should wait until he had the final document
3  before he approved the sale.  And he discussed
4  that subject in his statements from the bench
5  and concluded that he did not need to wait for
6  a written document.
7    **Q.  Was it Cleary's understanding**
8  **coming out of the sale hearing that there were**
9  **any limitations on what could be included in**
10 **the clarification agreement and still be**
11 **within the terms of the Sale Order?**
12       MR. MORAG:  Objection.  I think
13 that's work product and privilege.
14 Cleary's understanding?  He can't
15 answer it.
16       MR. GAFFEY:  What's the privilege?
17       MR. MORAG:  The mental impressions
18 of a lawyer of what they couldn't --
19       MR. GAFFEY:  I just want you to
20 identify the privilege.
21       MR. MORAG:  I said work product and
22 attorney/client privilege.
23       MR. GAFFEY:  Okay.
24       MR. MORAG:  To the extent they were
25 discussed with attorneys.

TSG Reporting - Worldwide    877-702-9580

Page 141

1    -Lewkow-
2    **Q.  Do you recall any colloquy with the**
3  **Court that you witnessed on Friday concerning**
4  **any limitations placed on the Clarification**
5  **Letter?**
6    A.  No.  None other than what I
7  testified to earlier.
8    **Q.  Do you recall any restrictions in**
9  **the Sale Order itself placing restrictions on**
10 **the Clarification Letter?**
11       MR. HUME:  Same objection, I
12 believe.
13       MR. MORAG:  I think --
14       MR. HUME:  It calls for a legal
15 interpretation of the Sale Order.  That
16 is a matter in the litigation and
17 you're asking a lawyer how to interpret
18 it for you.  So I think it's asking for
19 work product.
20   **Q.  Were there any discussions between**
21 **Barclays on the one hand including its**
22 **representatives, and Lehman on the other**
23 **including its representatives, as to whether**
24 **there were any limitations in the sail order**
25 **as to what could be included in the**

TSG Reporting - Worldwide    877-702-9580

Page 142

1          -Lewkow-
2  Clarification Letter?
3      A.  Yes.  Two conversations.  One I
4  testified to already, the late Sunday night or
5  late Monday morning conversation with
6  Mr. Miller.  Earlier, I believe it was Sunday,
7  it was a crazy weekend, I believe it was
8  Sunday, there was a conversation in the
9  hallway where the subject of whether certain
10  circumstances, if we did certain things, would
11  lead to a change of -- that would require
12  going back to the Court.
13      Q.  Can you --
14      A.  I may have mischaracterized that.
15  Go ahead.  Ask your next question.
16      Q.  Okay.  My obvious question is:  How
17  did you mischaracterize it?
18          But tell me what you remember about
19  that conversation.  Who said what to who?
20      A.  So, as I testified earlier on
21  Friday, one of the things that Lehman Brothers
22  and Barclays had discovered that among the
23  Purchased Assets that Barclays was going to
24  receive in the -- pursuant to its purchase of
25  substantially all of the assets used in the

TSG Reporting - Worldwide    877-702-9580

Page 143

1          -Lewkow-
2  business, other than Excluded Assets, that
3  although there had been very substantial
4  reductions in what Lehman could deliver, they
5  also had realized and ascertained that there
6  were assets that were part of their assets
7  used in the business that had not previously
8  been sort of focused on specifically by the
9  parties, although they were assets of Lehman
10  used in the business.
11          And I mentioned two -- two
12  categories of such assets.  One was the
13  so-called 15c3-3 account.  And I think I
14  testified -- I'm not sure, it's been a long
15  day so far.  Maybe not.  I may not have
16  mentioned this.  But one of things that
17  Michael Klein had reported in describing that
18  was that he had been told by someone on behalf
19  of Lehman that there was some e-mail around in
20  which the -- pursuant to which referencing
21  that someone in the division of market
22  regulation at the SEC had confirmed that the
23  15c3-3, the assets in the 15c3-3 could, in
24  fact, be transferred by Lehman and at some
25  point, I believe Saturday morning or at some

TSG Reporting - Worldwide    877-702-9580

Page 144

1          -Lewkow-
2  point Saturday, we asked Weil to see that
3  agreement.
4          At some later point, I believe on
5  Sunday, but I couldn't swear to it at this
6  stage -- at some point, as I was walking in
7  the hallway of Weil Gotshal, we were in
8  meetings spread out over a large portion of
9  Weil Gotshal that was full of purely -- I
10  believe purely a conference room.  There were
11  lots of meetings going on by different people.
12  There were people working on the Transition
13  Services Agreement, there were people dealing
14  with DTC, there were people just getting ready
15  to do a closing.  Because all of the work had
16  to be done to be prepared to close, even while
17  other work was going on.  Discussions with
18  JPMorgan Chase.
19          Anyway, we were with Weil Gotshal
20  on that floor.  And as I was walking down the
21  floor, there were a number of the Weil
22  partners standing at this big desk which I
23  assume was the reception desk, although it
24  wasn't near the elevators where there was a
25  big reception desk.  But I don't know.  It

TSG Reporting - Worldwide    877-702-9580

Page 145

1          -Lewkow-
2  wasn't clear.  Maybe it was for if you needed
3  secretaries during the conference room.  I
4  don't remember what it was since I had never
5  been there during a working day, only on
6  weekend.
7          But standing around this desk were
8  a number of Weil lawyers.  There may have well
9  been somebody from Lehman or Lazard there as
10  well, I don't recall.  I believe Harvey Miller
11  was one of the people among the group that was
12  there for Weil, and they said we have -- you
13  asked for and we now have, it gave me the
14  impression they had just received it in the,
15  you know, minutes or the last hour or two, and
16  certainly not before then was the impression.
17  I'm not sure whether they said that or not.
18  That we now have the e-mail relating to the
19  15c3-3 account.  And they showed it to me.
20  And I looked at it.
21          And they said that -- first
22  thing -- well, I noticed and commented on, I
23  believe I commented on, that it was not as I
24  had thought from the SEC but merely an
25  internal Lehman e-mail referencing a

TSG Reporting - Worldwide    877-702-9580

Page 146

-Lewkow-

1
2  conversation with the SEC, with someone on
3  staff of the SEC.
4          And somebody from Lehman, somebody,
5  I'm sorry, from Weil said -- and it may have
6  been Mr. Miller but I don't know.  But
7  somebody from Weil said something like, We
8  didn't realize that some -- that the account
9  was not entirely securities but included a
10 bank account that -- with cash.  It was a
11 major bank.  It was one of the things on that
12 e-mail.  So it was -- and as I recall, it was
13 a million dollars in the bank account that
14 Lehman maintained with a third party bank.
15 And 700-plus, 760 odd million of securities
16 were in that account.
17         And in the course of that, one of
18 the Lehman people, again, I believe it was
19 Mr. Miller, but I'm not sure, said, the
20 question is, does anyone remember exactly what
21 Ms. Fife -- I don't think Ms. Fife was there
22 at the time -- told the Court, when she was
23 discussing the fact that you retain the cash
24 provision in the Asset Purchase Agreement was
25 being eliminated, did she say anything that

TSG Reporting - Worldwide    877-702-9580

Page 147

-Lewkow-

1
2  would be inconsistent with us transferring as
3  part of all the assets of the business, the
4  15c3-3 account which we now know includes a
5  bank account.
6          There then followed some further
7  discussions on a number of -- let me just go
8  through them.
9          MR. MORAG:  If you like.
10 A.  Go ahead, ask another question.
11 **Q.  Tell me about the further**
12 **discussions.**
13 A.  So -- and I don't remember in
14 quite -- again, this was a weekend that was
15 very -- at the end of the week that had been a
16 very complex and difficult and weak -- not
17 just from the financial markets but from
18 everyone on both sides of this deal who were
19 trying to see if this deal could get done.  So
20 I don't remember how quickly it got done,
21 whether it was dragged out over two hours or
22 only over half an hour.
23         But there were some follow-up
24 conversations and one of the things -- it may
25 have even dragged on longer than two hours.

TSG Reporting - Worldwide    877-702-9580

Page 148

-Lewkow-

1
2  Because one of things we asked, or someone
3  asked is -- I don't know who asked it.  Is it
4  possible, can we get a transcript, can we find
5  out exactly what Ms. Fife said to the Court to
6  see whether or not she said something that
7  would be or might appear to be inconsistent
8  now that we knew that the 15c3-3 account
9  included a bank account.
10         All of this is paraphrase.  I do
11 not remember precisely.  All of my testimony
12 where I say what people say is paraphrase.  I
13 don't recall specific words.
14         So some time clearly passed while
15 that -- but I don't remember how long, while
16 people investigated that issue.  And we were
17 told at some point -- again, I don't know by
18 whom -- that it would not be possible to get a
19 transcript, that no transcript had been
20 prepared, and that in effect the -- there had
21 not been a court reporter, shockingly, but it
22 had been -- there was a tape of the Court
23 hearing, and that tape, we learned, was locked
24 up in the courtroom.  This was Sunday.  I'm
25 sure it was Sunday.  That tape was locked up

TSG Reporting - Worldwide    877-702-9580

Page 149

-Lewkow-

1
2  in the courtroom, in the courthouse, there was
3  no way to get access to it, and so there would
4  be no way to obtain a transcript.
5          There was some further discussion;
6  at different points different people joined
7  the discussion.  Still in the hallway.  All of
8  this took place in the hallway.  It may have
9  been a return to the hallway, but it again
10 happened in the hallway.
11         And among those who joined the
12 discussion, and there was more -- in fact, the
13 original discussion there may have been four
14 or five or six people, by then there were 10
15 or 12 people.  And included in the further
16 discussions were from the Barclays side, both
17 Michael Klein, I believe Archie Cox, I'm not
18 hundred percent sure and my partner Ed Rosen.
19         By then -- by some -- you know, was
20 it a second conversation or a third
21 conversation?  I cannot recall.  But at some
22 point we had -- "we" being the Barclays side
23 talked about --
24 **Q.  You shouldn't tell me about that**
25 **conversation.**

TSG Reporting - Worldwide    877-702-9580

Page 150

1          -Lewkow-
2     A.  I'm trying to figure out --
3          MR. MORAG:  There was a
4     communication.
5     A.  There was a communication about
6     what we had heard from Harvey Miller and/or
7     others from Weil Gotshal that I described in
8     my testimony, and that was discussed.
9          And putting aside the conversation
10    that I had with the Barclays representatives,
11    when we got back and the discussion that I'm
12    testifying to resumed with the other side, we
13    said, look, if there's no transcript, nobody
14    remembers precisely what he said.
15         And so until we can get a
16    transcript -- because she clearly had talked
17    about cash and there was, you know --  the
18    retained amount was not, was sort of cash that
19    was free and available and not tied up in
20    positions.  It was just cash that we had been
21    led to believe at the time of the Asset
22    Purchase Agreement was totally free cash that
23    they had somewhere, and that they were going
24    to transfer as part of the Purchased Assets.
25         And nobody knew precisely how
          TSG Reporting - Worldwide    877-702-9580

Page 151

1          -Lewkow-
2     Ms. Fife had, in describing the changes from
3     the deal as reflected in the Asset Purchase
4     Agreement, how precisely she had put it in
5     describing those changes.  And she had clearly
6     indicated that that cash wasn't in -- wasn't
7     going to be in the deal but again, nobody knew
8     precisely what it was.
9          And so the alternative, since
10    nobody wanted to -- neither Weil Gotshal nor
11    Lehman nor Barclays nor the lawyers wanted to
12    do anything inconsistent with what the Court
13    had been told, there were two choices
14    available, which was to wait until Monday, get
15    a transcript and see what, in fact, she had
16    been told.  And then, if necessary, go back to
17    the Court.
18         There were three choices.  Just go
19    back to the Court Monday morning or find
20    another solution.  And the other solution was
21    the one that Barclays put on the table of
22    saying, okay, we will take just the securities
23    portion, 760-some-odd million in securities.
24    And in the course of that discussion, Michael
25    Klein said that if -- if for some reason you
          TSG Reporting - Worldwide    877-702-9580

Page 152

1          -Lewkow-
2     can't --
3          And there was some conversation by
4     someone at Weil about do we -- do we need SEC
5     approval.  And Ed Rosen said no.  And they
6     said well -- they wanted to add language that
7     we had no problem with, something saying
8     "subject to applicable law," or something to
9     that nature that ended up in the Clarification
10    Letter.
11         And then Klein said, Look, if we --
12    you know, we're giving up this billion dollars
13    that we thought we were getting as of Friday
14    afternoon and we want to make sure we're
15    getting this 769 million in securities, and so
16    we want to add language that says -- again,
17    I'm paraphrasing, that if we can't get that,
18    you'll get us 769 million of securities of
19    some other securities.  That is my
20    recollection.
21    Q.  By the time of the conversation
22    with Mr. Miller on either Sunday night or
23    Monday morning concerning whether anyone
24    thought there were any aspects of the
25    Clarification Letter that required going back
          TSG Reporting - Worldwide    877-702-9580

Page 153

1          -Lewkow-
2     to the Court, had anybody seen a transcript by
3     then?
4     A.  No.
5     Q.  Had anybody heard the tape by then?
6     A.  No.
7     Q.  Was there any discussion on Monday
8     before the closing concluded of getting the
9     transcript or the tape to make sure the
10    Clarification Letter was consistent with the
11    Court's limitations or instructions?
12         MR. MORAG:  Object to the form.
13    A.  There was no -- to my recollection,
14    there was no discussion of that.  There was a
15    belief by all of the people that's discussed
16    that it was really important to get this deal
17    closed and announced before the market opened
18    Monday morning.  There was -- the market --
19    there had been press announcements that came
20    out after midnight Friday night that had been,
21    I believe, in the Saturday papers or Sunday
22    papers or both, that the Court had approved
23    the sale.
24         And both Lehman and Barclays
25    believed it was really important both from the
          TSG Reporting - Worldwide    877-702-9580

Page 154

1           -Lewkow-
2   financial markets perspective and from the
3   perspective of Barclays of keeping the Lehman
4   employees -- and I want to come back to the
5   Lehman employees in a second -- comfortable,
6   that they should hang around and that there
7   really was a deal.  That there had been a real
8   hope -- you know, there had been -- I think
9   some of the press reports might have picked up
10  the concept from this.
11          I'm not sure of this, but I believe
12  at least some of the press reports from people
13  who had been in the courtroom had indicated
14  that the deal might close over the weekend or
15  would -- was expected to close over the
16  weekend.
17          And so there was great concern that
18  if, in fact, the markets opened Monday morning
19  and we had not announced a sale, that people
20  would have thought the deal was falling apart
21  or had fallen apart, was never going to
22  happen, or what the heck is the problem out
23  there.  And in the markets that we lived in,
24  this was in the course of the days when the
25  papers were full of information talking about

Page 155

1           -Lewkow-
2   whether Morgan Stanley will go under?  Will
3   Goldman Sachs go under?  Will we be in a Great
4   Depression?  That was the context in which
5   this conversation took place.
6           And there was a belief, as I said,
7   that the employees -- that this would be a
8   major problem if we didn't announce the deal
9   that we had closed by Monday morning before
10  the market opened.
11          I mentioned the employees.  The
12  employees were very important to this deal.
13  Barclays was not -- you know, all of this
14  discussion we've had and this testimony has
15  been -- and I understand that, has been about
16  the financial assets.  Barclays was not doing
17  this deal to buy a portfolio of financial
18  assets.  Barclays was doing this deal because
19  it wanted to buy a broker-dealer investment
20  banking business in the United States and was
21  prepared to take very substantial risks in
22  their view in doing that.
23          And I say "very substantial risks"
24  not focusing particularly on the financial
25  assets but because of the fact that when

Page 156

1           -Lewkow-
2   people have bought investment banking firms in
3   the United States, they have often worked out
4   very badly.
5           Because it is not only what you pay
6   day one but it's can you make it work?  Can
7   you get the employees to stay?  Can you get
8   them integrated?  Can you keep them happy so
9   as to create value for your shareholders?  And
10  that's true in the best of days.
11          And I think of General Electric,
12  pretty savvy acquirers as people would think.
13  They had bought Kidder Peabody, spent a great
14  deal of money and then spent a lot more money
15  over the next X years trying to make it work
16  and had lost a zillion bucks.  A zillion is --
17  I don't know.  But they lost a lot of money.
18  And not just the money they invested but the
19  money they later put in to try to make it
20  work.
21          And that's what Barclays was
22  committing itself to do.  So the reaction of
23  the employees and keeping the employees, in
24  particular the key employees comfortable that
25  they assumed -- and I think rightfully so, and

Page 157

1           -Lewkow-
2   they may have known it as a fact, I don't
3   know, but they assumed that really the
4   Barclays -- the best Barclays [sic] people,
5   the ones you most wanted to keep were getting
6   other inquiries from competitors during the
7   the days, during Monday, during the prior week
8   over that weekend, etcetera, and it was
9   important that we keep -- that Barclays be
10  able to keep the people together.
11          All of that went to the point that
12  the parties believed, both parties, that it
13  was really important to try to get this deal
14  announced before the beginning of the market
15  opening on Monday morning.
16      **Q.  Was the concern about announcing
17  the closing of the deal before the opening of
18  the market on Monday morning, a factor in the
19  decision of the group as to whether or not to
20  bring the Clarification Letter back to the
21  judge?**
22      A.  No.
23          MR. MORAG:  Object to the form.
24      A.  The question was, the Court had
25  approved the the Sale Order without the

Page 158

1            -Lewkow-
2  Clarification Letter.  He knew he didn't have
3  the Clarification Letter.
4            So the only question that I
5  believed that Mr. -- the reason Mr. Miller
6  asked the question, I believe as I described,
7  was, Okay, what we're doing -- what we are
8  doing here in the Clarification Letter, is
9  it -- are we being consistent with what the
10 Court had approved?  Which turned on what the
11 Court had heard, and heard again on Wednesday,
12 on Friday in -- in the Asset Purchase
13 Agreement and the other information that the
14 Court had, and were we doing anything that was
15 inconsistent with that.
16           And this was why the question --
17 so, the question was, the Court clearly knew
18 that he didn't have to see the Clarification
19 Letter.  The question is had something
20 happened that was inconsistent with what he
21 had been told that would change that plan.  He
22 expected us to close over the weekend.  That
23 was what was talked about on Friday.
24           So the only reason we would have to
25 go back is if something had changed that made

Page 159

1            -Lewkow-
2  it not be -- made a change that was
3  inconsistent with what he had been told.  It
4  was for that reason in the prior conversation
5  that there was uncertainty because we weren't
6  sure what he had said about that to the extent
7  it might or might not affect the ability to
8  deliver the cash in that bank account that I
9  mentioned that was part of the assets of the
10 15c3-3 account, that since we weren't sure on
11 that issue, that would have raised the problem
12 that I testified about.
13           But that was the only time that
14 there was any discussion of going back.  And
15 even there, the concept was, how do we --
16 Barclays gave up in its mind a billion dollars
17 because it was important to get the deal
18 closed on Monday morning.
19           MR. GAFFEY:  I don't have anything
20 further.
21           Thanks.  Thanks for your time,
22 Mr. Lewkow.
23           THE WITNESS:  Can we take a break?
24           (Whereupon, a recess was taken
25 from 2:41 p.m. to 2:52 p.m. )

Page 160

1            -Lewkow-
2  EXAMINATION BY
3  MR. MAGUIRE:
4      Q.  Mr. Lewkow, as you know, my name is
5  Bill Maguire, I represent the SIPA Trustee.
6  Before we start with questions, your counsel
7  is going to put on the record the topics you
8  have been designated as representative today.
9           MR. MORAG:  As I think we confirmed
10 to you separately, Mr. Lewkow and
11 Mr. Rosen together are responding to
12 the 30(b)(6) deposition notice served
13 on Cleary Gottlieb and they have
14 separately been subpoenaed for their
15 own personal deposition, which you now
16 have agreed to complete Mr. Lewkow's
17 personal deposition along with his
18 share of the 30(b)(6).
19           With respect to 30(b)(6), the
20 easiest way for me to explain it is
21 that Mr. Rosen is addressing issues
22 relating to the DTC, OCC, and the terms
23 of the Clarification Letter relating to
24 exchange-traded derivatives.
25           To the extent there may be overlap

Page 161

1            -Lewkow-
2  with respect to the 15c3-3 issue, then
3  they're both designated.
4           I think you know from the
5  declaration, Mr. Rosen is a market
6  regulation person and Vic is the
7  mergers and acquisition.
8           That may not be the precise answer,
9  but if you have any question, you
10 should certainly ask them of
11 Mr. Lewkow.  If it's Ed, he will tell
12 you.
13           MR. MAGUIRE:  Thank you.
14 BY MR. MAGUIRE:
15     Q.  Sir, you have seen in the course of
16 today a number of drafts of the deal document,
17 many of them with the black lining or red
18 lining convention.
19          What was the practice in terms of
20 the Cleary team dealing with the Weil team and
21 the other parties in the course of negotiating
22 first the APA and then exchanging drafts in
23 connection with the Clarification Letter?
24          MR. MORAG:  Objection to form.
25 Vague as to "practice".

Page 162

1          -Lewkow-
2          A.  This was in a very unusual deal
3   because in the time period in which it was
4   done, and I'm going to answer the question
5   first with regard to the Asset Purchase
6   Agreement and then with regard to the
7   clarification.
8          The Asset Purchase Agreement was --
9   the first draft of the Asset Purchase
10  Agreement was served up when everyone was
11  involved.  I mean, it doesn't mean there
12  weren't phone calls back to clients and
13  others.  But all of the lawyers certainly and
14  parts of the welded teams were sitting in one
15  or the other of the conference rooms at Lehman
16  Brothers and the first draft was served up by
17  Lehman's counsel -- Weil and Simpson Thacher,
18  I forget who -- that Monday night and it was
19  signed about 25 hours later.
20         Between the first draft on Monday
21  night, and Tuesday night when it was signed,
22  there were -- people were working in the same
23  room on the document.  It doesn't mean someone
24  didn't take his or her laptop out of the room
25  for a few minutes and worked on it, but
         TSG Reporting - Worldwide    877-702-9580

Page 163

1          -Lewkow-
2   basically people were working on it together.
3   And I am not sure that every interim draft was
4   ever sent by e-mail from anyone to anyone else
5   because people were together.
6          There may have been copies -- this
7   applies to the Clarification Letter as well --
8   that were printed out and looked at by people
9   onsite that were never sent outside of Lehman
10  or Weil, depending on what we're talking about
11  the Asset Purchase Agreement or the
12  Clarification Letter.  So it was all done very
13  quickly.  People were there together.
14         As to the Clarification Letter, it
15  was largely not negotiations.  It was trying
16  to -- and this is true to a large extent in
17  the Asset Purchase Agreement as well.  It was
18  trying to, you know, get it right.  People in
19  good faith were trying to make sure they
20  weren't -- given the incredible timeframe that
21  was going on here, instead of weeks, it was
22  being done within hours.  People were
23  trying -- on the Clarification Letter, I'm
24  talking about Saturday and Sunday.
25         There were drafts that were traded
         TSG Reporting - Worldwide    877-702-9580

Page 164

1          -Lewkow-
2   back and forth electronically starting some
3   point Wednesday through the Friday afternoon/
4   evening one that I testified about earlier.
5   But starting on Friday when we went to Weil
6   Gotshal it was an effort to get the
7   Clarification Letter finalized, consistent
8   with the intent of the parties, consistent
9   with, you know, the broad -- the Court's
10  approval of the deal, including -- you know,
11  knowing that there was going to be a
12  Clarification Letter that would lay out the
13  details, but certainly to avoid anything.  To
14  get it right and to make sure we had a deal
15  that was -- that reflected the intent and
16  didn't screw it up.
17         So there were drafts.  There may
18  have been drafts on Saturday and Sunday at
19  Weil that were not sent electronically.  I
20  have no way of knowing for sure.
21         **Q.  Specifically with respect to that**
22  **Saturday and Sunday, are you aware of any**
23  **instances where there wasn't an opportunity**
24  **for people to blackline changes for other**
25  **people to see?**
         TSG Reporting - Worldwide    877-702-9580

Page 165

1          **-Lewkow-**
2          A.  I don't -- I don't know.  The
3   work -- the other thing about it was that, you
4   know, to some extent, particularly Sunday,
5   people from various parties who were around
6   were sitting in the same room working together
7   on the documents.  So it is -- it is certainly
8   possible that there was one or more drafts
9   that were not blacklined.  I do not know.
10         **Q.  Did you have an expectation over**
11  **the weekend that if any of the folks changed a**
12  **term, that would either be discussed with the**
13  **other side or would be blacklined, there would**
14  **be something to point out that the change had**
15  **been made?**
16         A.  Well, when you say "the other
17  side," certainly Sunday, is my recollection,
18  Weil Gotshal is certainly keeping the master.
19  So we certainly didn't make any changes that
20  weren't discussed because we didn't have the
21  ability to do that.
22         **Q.  How did you make sure you were**
23  **aware of all the changes that, that somebody**
24  **was keeping up with all of them?**
25         A.  As I said, there were, and it was
         TSG Reporting - Worldwide    877-702-9580

Page 166

1          -Lewkow-
2  mostly not me, but several of my partners were
3  sitting in a room with Weil Gotshal lawyers
4  and, you know, intermittently working on --
5  along with everything else that was going on,
6  intermittently working towards revising the
7  document. And it doesn't necessarily mean
8  that -- so, if something shows up, for
9  example, in a draft at 8:00 p.m. and I have
10  no recollection, I can go through it. We have
11  documented evidence there were particular
12  drafts that were sent by e-mail.
13          But at 8 p.m. it shows up in the
14  draft, the prior draft at 2:00 p.m., it
15  doesn't mean that the change was agreed to by
16  the party at 8:00 p.m. It might have gone
17  into somebody's computer at 3:15 p.m. but no
18  one produced an interim draft.
19      Q.  How many Cleary professionals
20  worked at Weil that weekend?
21      A.  You know, there were Cleary
22  professionals, lawyers, dealing with a lot of
23  different topics. We had a team working on
24  the Transition Services Agreement, which was
25  important to both Lehman, the estate as well

Page 167

1          -Lewkow-
2  as to Barclays. We had people dealing with
3  J.P. Morgan and DTC and OCC. We had people on
4  some administerial stuff, but important
5  administerial stuff talking -- dealing with
6  the SEC staff.
7          So we had a lot of people. All
8  told -- oh, and we had people working on the
9  closing, trying to prepare for the closing --
10  I don't know, somewhere between 10 and 15.
11      Q.  You mentioned that you became aware
12  at some stage that DTC, of which I understand
13  you to mean the Depository Trust Corporation,
14  wanted to be protected. How did you become
15  aware of that?
16      A.  My recollection is that at the
17  Wednesday hearing on the the Sale Order, that
18  somebody from Wachtell on behalf of DTCC had
19  said some things that they had contacted our
20  client and maybe us, and there started to be a
21  whole issue of whether to use a phrase I had
22  not heard before "the pipes would be open."
23          Whether or not -- if we closed
24  Friday night or over the weekend, whether or
25  not customers and others who were doing

Page 168

1          -Lewkow-
2  business would be able to get access to their
3  accounts. And DTC was an important part of
4  that. And without that, the whole -- you
5  know, there would have been an enormous mess
6  on the hands of the financial system. I don't
7  remember precisely when I was told precisely
8  what.
9      Q.  Do you have your Declaration? I
10  believe the copy was marked Exhibit 613A.
11      A.  Hold on. Let me find it.
12          (Witness reviewing documents.)
13      A.  Yes. I have it.
14      Q.  In Paragraph 3 you describe the
15  basis for your Declaration?
16      A.  Yes.
17      Q.  You mention your personal
18  knowledge. You mention your review of
19  transaction documents. Is that review the
20  review that you did at the time or did you do
21  a review of transaction documents for the
22  purpose of preparing this declaration?
23          (Witness reviewing document.)
24      A.  Where are you looking at, counsel?
25      Q.  First line of Paragraph 3 of your

Page 169

1          -Lewkow-
2  Declaration.
3      A.  Right.
4      Q.  "I base this declaration on my
5  personal knowledge, review of transaction
6  documents..."
7      A.  I did, in connection with the
8  preparation of the declaration, review
9  certain -- certain -- yeah, the purchase, the
10  Asset Purchase Agreement and the
11  clarification.
12      Q.  Anything else?
13      A.  I talked to some of my partners, as
14  indicated.
15      Q.  Just talking about transaction --
16      A.  But you're talking about documents.
17  I think to some extent I had looked at some of
18  the drafts. I mean, I was doing this at the
19  same time as I was starting to get ready for
20  this day that I was so much looking forward to
21  for the deposition.
22          So, you know, I had started looking
23  at some materials and so -- so I had looked at
24  some of the drafts, I think, before I signed
25  the declaration.

Page 170

1           -Lewkow-
2       Q.  You mention here the recollection
3   of your partners.  How did you go about
4   collecting the recollection of your partners?
5       MR. MORAG:  Object to the form.
6       A.  Can I answer that?
7       MR. GAFFEY:  Yes.
8       A.  Some of it was over the period of
9   months, most of it was in the context of --
10  you know, in the couple of weeks before I
11  signed this.  There were -- we had a few
12  meetings.  Some of it was, you know,
13  one-on-one with me and a particular partner.
14  Others were sitting in a room with several of
15  my partners who had worked on the deal
16  together with -- in some cases, Mr. Morag, I
17  think once, I think by phone, at least once
18  with Mr. Hume.  So some -- but some of it was
19  just in one-on-one conversations with some of
20  my colleagues.
21      Q.  Can you tell me who of your
22  partners you met with to discuss this
23  one-on-one?
24      A.  In what timeframe, sir?
25      Q.  In the last few weeks.  The period
    TSG Reporting - Worldwide    877-702-9580

Page 171

1           -Lewkow-
2   you referred to in your last answer.
3       A.  In the last few weeks, putting
4   aside Mr. Hume and Mr. Morag, had
5   conversations with Duane McLaughlin, David
6   Leinwand, Lindsee Granfield, to some extent Ed
7   Rosen.  I think that's it.
8       Q.  And these are all --
9       A.  Oh, Bob Davis.  Robert P. Davis.
10      Q.  And these are all people you met
11  one-on-one?
12      A.  No.  No.  I'm not saying that at
13  all.  Some of those folks I only talked about
14  this in larger groups.  Some I had one-on-one,
15  some I did maybe some of each.
16      Q.  What about Mr. Rosen?
17      A.  Any conversation I had with him was
18  in the context of there was some -- the
19  context of us working together to prepare his
20  declaration and my declaration.  So I had no
21  one-on-one conversations with Ed.
22      Q.  Have you seen Mr. Rosen's
23  declaration?
24      A.  I did read it, yes.
25      Q.  Did you see any drafts of his
    TSG Reporting - Worldwide    877-702-9580

Page 172

1           -Lewkow-
2   declaration?
3       A.  Yes.
4       Q.  In any of the meetings that you
5   described with your partner, did Mr. Jonathan
6   Hughes participate?
7       A.  No, I don't believe he did.
8       Q.  Did you have any meeting with
9   Mr. Hughes concerning any of the topics for
10  this deposition?
11      A.  In what timeframe?
12      Q.  In the last few weeks.
13      A.  No.  Last few weeks, I don't know
14  how many weeks is "a few weeks."
15      MR. MORAG:  The question relates to
16  the Deposition Notice to Cleary
17  Gottlieb Steen & Hamilton.
18      A.  No.
19      Q.  Did you have any meetings with
20  Mr. Hughes?
21      A.  Oh, did anyone talk to Mr. Hughes?
22  Is this addressed to me or --
23      Q.  Yes, you.
24      A.  My personal, did I have any
25  conversations in connection with the
    TSG Reporting - Worldwide    877-702-9580

Page 173

1           -Lewkow-
2   declaration?
3       Q.  In connection with any of the
4   topics that are in the Notice for this
5   deposition.
6       A.  Can I speak with counsel?
7       Q.  Why don't we leave this for a
8   break?
9       A.  Sure.
10      Q.  You can ask and then you can answer
11  after that.
12      A.  Sure.
13      Q.  I gather from your earlier
14  testimony that you had almost a front row seat
15  at the sale hearing on the 19th of September?
16      A.  Yes.
17      Q.  And you understood the purpose of
18  that hearing was for the Court to decide
19  whether to approve the sale of the business to
20  Barclays?
21      A.  Yes.
22      Q.  Did you understand that the Court
23  needed to understand the economics of the
24  transaction in order to make that
25  determination?
    TSG Reporting - Worldwide    877-702-9580

## Page 174

-Lewkow-

1      -Lewkow-
2     MR. HUME:  Objection.  Vague.
3  Calls for speculation.
4     MR. MORAG:  Objection to form.
5    A.  I don't know what you mean by "the
6  economics."
7    **Q.  Did you have an understanding that**
8  **the Court needed to know the overall values of**
9  **what were being provided to Barclays and what**
10  **Barclays -- the consideration that Barclays**
11  **was paying?**
12    A.  It was my understanding that the
13  Court needed to know the terms of the deal.
14  The terms were, as set forth in the Asset
15  Purchase Agreement, and as -- with such
16  changes as were described to the Court.  That
17  is what I believe was required and took place.
18    **Q.  And you had no understanding beyond**
19  **that as to whether the Court needed to know**
20  **what the economic value of those terms were?**
21    A.  You know, "economic value" is --
22  there's all sorts of -- there are lots of
23  numbers around and the like.  There was no --
24    We were buying basically a
25  business.  Obviously, everyone knew that

TSG Reporting - Worldwide    877-702-9580

## Page 175

-Lewkow-

1      -Lewkow-
2  Barclays thought that it was buying a business
3  because they thought in the long run they
4  would make money; that it would be a good
5  investment for them and a good acquisition --
6  taking enormous risks in the course of doing
7  that.
8     So, you know, I don't know what --
9  I don't know what you're getting at,
10  Counselor.  But as I said, the Court needed to
11  know, and did know, the terms of the Asset
12  Purchase Agreement and they were told about
13  the material changes that, you know, were
14  going to be made to deal with -- as described
15  to the Court by Weil Gotshal.
16    **Q.  Did you have any understanding as**
17  **to whether the Court, in making its**
18  **determination, needed to know what the value**
19  **was of the terms that you described?**
20     MR. MORAG:  Mr. Lewkow --
21     THE WITNESS:  I think he's asking
22  for my legal --
23     MR. MORAG:  To the extent your
24  understanding is based on legal advice
25  that you developed yourself or someone

TSG Reporting - Worldwide    877-702-9580

## Page 176

-Lewkow-

1      -Lewkow-
2  has provided to you within Cleary
3  Gottlieb, I instruct you not to answer.
4    A.  I have no -- I'm not going to
5  respond.
6    **Q.  Sir, on page 7, Paragraph 11 of**
7  **your Declaration, you refer to the Lehman**
8  **Trustees' representatives were present at**
9  **Weil.  Did you meet with any of those**
10  **representatives?**
11    A.  Not one-on-one.
12    **Q.  Did you have any discussions with**
13  **them?**
14    A.  They were in the room at various
15  times when discussions took place, and I
16  believe that they had other conversations with
17  the Debtors' representatives.
18    **Q.  Do you recall any discussions you**
19  **had with any particular representative of the**
20  **Trustee?**
21    A.  No.
22    **Q.  Sir, if you turn to page 9 of your**
23  **Declaration.  If you take a look at**
24  **Paragraph 17.  If you read that first**
25  **sentence.**

TSG Reporting - Worldwide    877-702-9580

## Page 177

-Lewkow-

1      -Lewkow-
2    **(Witness reviewing document.)**
3    A.  Read the first sentence?
4    **Q.  Yes.  The first sentence of**
5  **Paragraph 17.**
6    A.  Uh-huh.  Yes.
7    **Q.  You refer there to your**
8  **conversations with your partners?**
9    A.  Yes.
10    **Q.  What are you referring to?**
11    A.  Well, all I'm getting at is that I
12  was signing this declaration and it was my
13  knowledge.  But in this sentence, it was
14  not -- as said in one of the introductory
15  paragraphs that you asked me about earlier, I
16  did consult with my -- some of my partners in
17  preparation -- in preparing this declaration.
18  And in particular, I bring attention to the
19  fact that this -- this does -- was not merely
20  in my presence, but I did confirm with my
21  partners that this was -- applied to them as
22  well.
23    **Q.  And how did you do that?**
24    A.  The conversations I've described to
25  you.

TSG Reporting - Worldwide    877-702-9580

Page 178

1    -Lewkow-
2    Q.  With the partners you've named
3    earlier; is that correct?
4    A.  Yes.  Yes.
5    Q.  And what did you ask those
6    partners?
7    MR. HUME:  I'm going to object to
8    that to the extent it calls for any
9    question not necessary to confirm the
10    facts set forth in the first sentence
11    of Paragraph 17 which are facts
12    relating to non-privileged
13    communications and the like thereof
14    between Cleary and Lehman's lawyers, or
15    Lehman.
16    A.  All I --
17    MR. HUME:  You are not entitled to
18    ask him every aspect of the
19    conversations he had with his partners
20    just because they confirmed facts.
21    A.  The answer is I asked --
22    MR. MAGUIRE:  Excuse me.  Let me
23    just make the record clear.
24    Q.  I'm only asking you now about the
25    conversations you had with your partners for
TSG Reporting - Worldwide    877-702-9580

Page 179

1    -Lewkow-
2    the purpose of being prepared to prepare your
3    Declaration and for your testimony today.
4    And specifically what I'm asking
5    you is: How did you elicit from your partner
6    that no such suggestion had been made?  The
7    suggestion being what you referred to in
8    Paragraph 17.
9    A.  I asked the more likely suspects.
10    Q.  And what did you ask them?
11    A.  Whether or not they had ever heard
12    of -- during those -- those day or two, a
13    suggestion by the other side that the property
14    that was securing the exchange- traded
15    derivatives portion of the business that we
16    were buying was not to be transferred as part
17    of the Purchased Assets.
18    Q.  Who was the person on the Cleary
19    team who had principal responsibility for that
20    part of the deal?
21    A.  Well, "that part of the deal"?  So
22    there were conversations including with the
23    OCC that are referenced here, where -- but
24    those weren't conversations with the other
25    side.  Those were conversations with the OCC.
TSG Reporting - Worldwide    877-702-9580

Page 180

1    -Lewkow-
2    On that subject, I defer to Ed Rosen.  He was
3    certainly involved in the OCC conversations
4    and there may have been others who were
5    involved in those conversations.  I was not
6    involved in the OCC conversation.
7    I was involved, as were the people
8    I mentioned earlier, in the Clarification
9    Letter.  And those reflected conversations
10    that took place in connection -- by those
11    people who were present in connection at one
12    point or another with the Clarification
13    Letter.  And they confirmed, as stated in my
14    declaration, that to their knowledge, none of
15    the -- none of those people, in conversations
16    they were party to, had ever suggested what I
17    say here, what I have in this Paragraph 17.
18    Q.  Did anyone tell you about any
19    suggestion or any indication from anyone, that
20    any portion of the property held to secure
21    Lehman's exchange-traded derivatives was not
22    to be transferred to Barclays?
23    A.  No.
24    Q.  Did anyone tell you that any
25    language --
TSG Reporting - Worldwide    877-702-9580

Page 181

1    -Lewkow-
2    MR. HUME:  Excuse me.
3    (Discussion off the record.)
4    BY MR. MAGUIRE:
5    Q.  Did anyone tell you that any
6    language concerning the transfer of margin to
7    Barclays had been deleted from a draft of the
8    Clarification Letter?
9    MR. MORAG:  Object to the form.
10    A.  I have trouble with the way you
11    asked that question.  There were a lot of
12    changes that got changed over the weekend to
13    the Clarification Letter to implement the
14    transaction, to clarify the transaction,
15    etcetera.
16    So changes were made in the
17    Clarification Letter, but they were
18    consistent.  Insofar as they relate to the
19    margin on the exchange-traded derivatives, it
20    was consistent with our understanding with
21    what the Asset Purchase Agreement had always
22    contemplated.
23    And change X by itself might have
24    one impact that you had to fix by, therefore,
25    also changes -- making change Y, but the net
TSG Reporting - Worldwide    877-702-9580

Page 182

1            -Lewkow-
2  result was to maintain exactly the same
3  situation as it had always been, that the
4  entire positions, including the margin
5  associated with those positions was part of
6  the deal.
7      **Q.  I don't want to speak in**
8  **generalities here.  I want to ask you very**
9  **specific questions.  Were you personally made**
10 **aware that language providing for margin,**
11 **transfer of margin to Barclays, was deleted in**
12 **a draft of the Clarification Letter?**
13     MR. MORAG:  Objection.
14     Mischaracterizes the evidence.
15     A.  You're going to have to point me to
16 something if you have something in mind.  I
17 can't -- I'm not sure I know what you're
18 referring to, so I can't answer that question.
19     **Q.  Do you have any recollection from**
20 **the work that you did that any reference to**
21 **"margin," to transferring margin to Barclays**
22 **was deleted from a draft of the Clarification**
23 **Letter?**
24     MR. MORAG:  Object to the form.
25     Mischaracterizes the evidence.
    TSG Reporting - Worldwide    877-702-9580

Page 183

1            -Lewkow-
2      A.  I don't know what you're referring
3  to, if anything.
4      **Q.  Do you have any such recollection,**
5  **sir?**
6      A.  Deleting a reference to margin?  As
7  I said, there were changes that were made, and
8  one change might have an unintended -- might
9  either -- remember, these were drafts.  They
10 weren't signed except for the version that was
11 signed.
12         There may have been changes where
13 something got deleted and then the side effect
14 of it was -- by somebody, rightly or wrongly,
15 and then someone said, Wait a second, the
16 effect of that is to have an impact that
17 wasn't intended.  So if that clause gets out,
18 we have to add another clause somewhere else.
19         That happened in a few context in
20 the Clarification Letter.  I'm not sure if it
21 happened here.  And if so, it may have been
22 fixed.  But if so, it was to maintain the
23 deal.
24     **Q.  I'm not asking you now what might**
25 **have happened.  I'm asking you what you do**
    TSG Reporting - Worldwide    877-702-9580

Page 184

1            -Lewkow-
2  remember; whether you have a recollection or
3  whether you do not have a recollection.
4      A.  The reason -- look, the reason...
5      **Q.  Why don't I rephrase the question**
6  **and you can give me your best recollection?**
7      **Sir, do you have a recollection**
8  **whether in a draft of the Clarification**
9  **Letter, language concerning a proposed**
10 **transfer of margin to Barclays was deleted?**
11     MR. HUME:  I object to the
12     question.  To the extent you're asking
13     about a specific provision that was
14     changed, I think you need to show it to
15     the witness in order for the record to
16     be accurate.  Otherwise, I think the
17     record is inaccurate.
18     A.  We went through a lot of drafts
19 very quickly, and I'll be happy to go through
20 them and answer your question.
21     **Q.  Without going through the draft,**
22 **sir, do you have an independent recollection?**
23     A.  No.
24     **Q.  Did any of the partners to whom you**
25 **spoke, advise you that there had been language**
    TSG Reporting - Worldwide    877-702-9580

Page 185

1            -Lewkow-
2  transferring margin to Barclays that had been
3  deleted from a draft of the Clarification
4  Letter?
5          In any of the conversations that
6  you testified that you had with your partners
7  over the last few weeks?
8      MR. MORAG:  Objection.  That calls
9      for attorney/client communications and
10     work product.  You know that Mr. Rosen
11     is responding to an assertion made in
12     this case and they obviously -- he's
13     already testified they discussed it.
14     MR. MAGUIRE:  If you're directing
15     the witness not to answer, that's one
16     thing.  Otherwise, I'll ask the witness
17     to answer.
18  DI    MR. MORAG:  I'm directing him not
19     to answer.
20  BY MR. MAGUIRE:
21     **Q.  Sir, the next sentence of Paragraph**
22 **17 starts, "to the contrary."  Do you see**
23 **that?**
24     A.  Yes.
25     **Q.  I'd like to ask you to focus on**
    TSG Reporting - Worldwide    877-702-9580

Page 186

1            -Lewkow-
2    your reference to the parties' communications.
3    Do you see that?
4            (Witness reviewing document.)
5        Q.  Is there anything --
6        A.  Yes.
7        Q.  -- that you're referring to there
8    other than the e-mails to and from the OCC and
9    its counsel?
10       A.  I don't recall.  Not to my personal
11   recollection.
12       Q.  You go on to mention the deal
13   documents?
14       A.  I do.
15       Q.  And you say that they "make clear,
16   do you see those words?
17       A.  Yes.
18       Q.  And you have a quote there, "Any
19   property that may be held to secure
20   obligations under such derivatives."
21       A.  Yes.
22       Q.  I take it that's a quote from the
23   deal documents?
24       A.  I believe so, unless we put in a
25   typo or something.  But yes, that's my
         TSG Reporting - Worldwide    877-702-9580

Page 187

1            -Lewkow-
2    understanding.
3        Q.  In making this clear, is it your
4    understanding that those words are to be read
5    in their plain English meaning and not as any
6    term of art?
7            MR. HUME:  Objection.  Vague.
8            MR. MORAG:  Objection to form.
9        You're asking for a legal opinion.  But
10       I think you can answer that question
11       without explaining why your answer is
12       what it is.
13       A.  I don't understand the question.
14       Q.  When you say that this language
15   makes clear that Barclays was to receive, that
16   language, are you telling us it makes it clear
17   in its plain English sense?  Or are you
18   suggesting there is some term of art here that
19   we should know about?
20           MR. HUME:  I object to the question
21       as it calls for a legal interpretation,
22       and I think the terms you are using are
23       vague.
24       A.  I'm -- I find it vague.
25       Q.  If you're unable to answer the
         TSG Reporting - Worldwide    877-702-9580

Page 188

1            -Lewkow-
2    question, sir, you can just say so.
3        A.  I think the deal documents made it
4    clear that they -- that we were to receive --
5    that Barclays was to receive the exchange-
6    traded derivatives, including any property
7    that may be held to secure obligations under
8    such derivatives.
9        Q.  And those words are plain on their
10   face; is that your understanding?
11       A.  I don't think there's a trick in
12   those words.
13       Q.  Are you aware of any discussions
14   that anyone in the Barclays side had
15   concerning -- with anyone, from Lehman or the
16   Trustee or anyone else involved in the
17   transaction, concerning the subject of margin?
18       A.  Yes.
19           MR. MORAG:  With regard to
20       exchange-traded derivatives or
21       otherwise?
22           MR. MAGUIRE:  Yes.  Any margin.
23       A.  I believe that there was -- there
24   is a -- that there is a -- there was
25   discussion when language -- in the context of
         TSG Reporting - Worldwide    877-702-9580

Page 189

1            -Lewkow-
2    finalizing and prior to that the Clarification
3    Letter, that necessarily because some language
4    was added to eliminate any conceivable issue
5    and to reflect the original understanding in
6    the Asset Purchase Agreement, that on the
7    exchange-traded derivatives, that the margin
8    was part of the positions.  So, yes.
9        Q.  Tell me what you know of those
10   discussions?
11       A.  Well, it would be helpful if I can
12   look at the Clarification Letter and the
13   various drafts.
14       Q.  We will certainly do that.  But
15   first, I would like your independent
16   recollection of the discussions you recall
17   concerning the --
18       A.  My understanding -- and some of
19   this is personal recollection and some of it
20   is my capacity as a representative of the firm
21   under the 30(b)(6) -- that in the course of --
22   a couple of things happened.  One was the
23   discussions with the OCC that I was not
24   directly a party to it, that people had
25   focused on the margin, and that meanwhile
         TSG Reporting - Worldwide    877-702-9580

Page 190

```
 1          -Lewkow-
 2  people were playing with the -- people had
 3  made a variety of changes to do other things
 4  in the Clarification Letter.
 5          And at some point, language was
 6  added to confirm that it had -- and it was my
 7  understanding this was not at all
 8  controversial, to confirm the intention of the
 9  parties that in the Asset Purchase Agreement,
10  signed in the Asset Purchase Agreement, that
11  the intention was that the entire -- that the
12  positions relating to exchange-traded
13  derivatives that were being acquired by
14  Barclays included the margin and in some words
15  clarifying and making that specifically that
16  those were within the all assets that were
17  being purchased, other than Excluded Assets,
18  that that was included.
19      Q.  And who was involved in those
20  discussions that you just referred to?
21      A.  I believe one or more -- I may have
22  been a participant to a very minor extent.  I
23  believe it was one or more of Duane
24  McLaughlin, Bob Davis and Dave Leinwand and Ed
25  Rosen.  Ed Rosen I think may have been
         TSG Reporting - Worldwide    877-702-9580
```

Page 191

```
 1          -Lewkow-
 2  involved as well.
 3      Q.  You said you were involved to a
 4  very minor extent.  Can you tell me what you
 5  remember?
 6      A.  What I told you.  What I just
 7  testified to.
 8      Q.  With whom did you have discussions
 9  about including margin, you personally?  Not
10  in your representative capacity.
11      A.  To anyone other than my colleagues
12  or my client?
13      Q.  Yes.
14      A.  Not sure I did.
15      Q.  Can you tell me, please, with whom
16  Duane McLaughlin had discussions about margin?
17      MR. HUME:  Excuse me.  Is
18  Mr. Lewkow designated as 30(b)(6) on
19  this topic?
20      MR. MORAG:  No, he is not actually.
21      A.  Then you'll have to ask Mr. Rosen.
22      Q.  The names you mentioned, Duane
23  McLaughlin, Bob Davis, Dave Weinman --
24      A.  It's David Leinwand,
25  L-e-i-n-w-a-n-d.
         TSG Reporting - Worldwide    877-702-9580
```

Page 192

```
 1          -Lewkow-
 2      Q.  What is your basis for
 3  understanding that they had discussions about
 4  margin?
 5      A.  Because they were involved in the
 6  clarification over that weekend.  They were
 7  sitting with Weil Gotshal.  Weil Gotshal was
 8  keeping, at least on Sunday, was running the
 9  documents and they were sitting there on and
10  off talking to Weil Gotshal.
11          And where everyone else was around
12  in a room that was open to all the folks who
13  were there that weekend and people came in and
14  out.  And that change was made.  So that's my
15  understanding they were involved.
16      Q.  Did any of the gentlemen you
17  mentioned, the four people you mentioned, tell
18  you they had had discussions about margin?
19      A.  They told me that they were -- one
20  or more of them, and I don't remember which
21  ones.  But I think a couple of them did
22  indicate that they were -- that this provision
23  which was added by Weil Gotshal in turning the
24  documents, reflected conversation they had
25  with Weil Gotshal.
         TSG Reporting - Worldwide    877-702-9580
```

Page 193

```
 1          -Lewkow-
 2      Q.  Did they tell you anything more
 3  about that?
 4      MR. HUME:  This is all --
 5      THE WITNESS:  This is all 30(b)(6).
 6      MR. HUME:  It is either privileged
 7  or 30(b)(6), and you're not on the
 8  30(b)(6) topic.  The only reason we're
 9  allowing it to go is based on your
10  initial reference there to Paragraph 17
11  of the declaration, which I assume is
12  what you're asking.
13      MR. MAGUIRE:  Well, I would like to
14  hear what the witness was told about
15  the conversations with Weil.
16      Q.  First of all, can you tell me who
17  of the four told you that they had a
18  conversation with Weil?
19      MR. MORAG:  Objection.  Asked and
20  answered.  He just told you.
21      A.  I said, I don't recall.
22      Q.  Can you tell me, what did they tell
23  you about the conversation other than they had
24  a conversation with Weil about margin?
25      A.  My recollection is that there --
         TSG Reporting - Worldwide    877-702-9580
```

Page 194

1              -Lewkow-
2    their -- either as a result of other changes
3    that had been made -- other things in the
4    Clarification Letter or as a result of the OCC
5    process, that somebody had raised the issue of
6    whether it was still clear, as it had been in
7    the Asset Purchase Agreement that there was
8    any doubt on the subject and that Weil agreed
9    that was the intention and they put it in.
10   But I don't remember specifically.  This was
11   not negotiated is my understanding.  It was
12   agreed it went in because it was reflecting
13   the transaction as it had always been --
14   "always" meaning from the signing of the Asset
15   Purchase Agreement onward, had always been
16   understood.
17        Q.  Do you know any of the details of
18   what the Cleary representatives told Weil in
19   this discussion --
20        MR. MORAG:  Objection.  Asked and
21   answered.
22        Q.  -- about the margin?
23        A.  I told you everything I recollect,
24   sir.
25        Q.  You described earlier a hallway
          TSG Reporting - Worldwide    877-702-9580

Page 195

1              -Lewkow-
2    conversation that you had which started with
3    your reviewing an internal Lehman e-mail.  Do
4    you recall that testimony, sir?
5        A.  An internal Lehman Brothers'
6    e-mail?
7        Q.  Yes.
8        A.  Yes.
9        MR. GAFFEY:  I'll show you a
10   document which we will mark as
11   Exhibit 615A which is an e-mail from
12   Joel Potenciano to a list of people, a
13   long list of people, starting with
14   Joseph Abate dated Thursday,
15   September 18, 2008.
16        (Deposition Exhibit, 615A, 2PP
17   9/18/08 e-mail from J. Potenciano to
18   distribution re: Preliminary 15c3-3
19   reserve lock-up as of 9/17/08, marked
20   for identification, as of this date.)
21        Q.  If you can take whatever time you
22   need, sir, to examine that document and tell
23   me whether you've ever seen it before.
24        (Witness reviewing document.)
25        A.  Well, it may be the printing.  But
          TSG Reporting - Worldwide    877-702-9580

Page 196

1              -Lewkow-
2    I recall seeing a document that -- that didn't
3    have an attachment, the second page -- well,
4    wait a second.  I never saw this document.
5    I've never seen this document.  This is
6    different than what I've seen.
7        Q.  You described in some detail the
8    hallway conversation.  Is there anything that
9    you recall of that conversation that you did
10   not describe in your prior testimony?
11        A.  Give me a minute, please.
12        I gave a long answer.  I don't
13   remember precisely what I said.  Nothing
14   occurs to me at the moment that I did not
15   include in that subject.
16        Q.  Prior to that hallway conversation,
17   did you have an understanding of what a 15c3-3
18   account was?
19        A.  As I testified this morning, until
20   that Friday afternoon -- this hallway
21   conversation was on Sunday.  Until Friday
22   afternoon, I had -- I may have heard of it.
23   But if so, it never registered in my
24   consciousness.  Prior to that, I really did
25   not know anything about 15c3-3 accounts prior
          TSG Reporting - Worldwide    877-702-9580

Page 197

1              -Lewkow-
2    to Friday.
3        Q.  In the course of the hallway
4    conversation, did anyone describe what a 15c3
5    account was?
6        A.  At some point between Friday
7    afternoon and Sunday, I heard a little bit --
8    I don't remember from whom -- about 15c3-3
9    accounts, and that it would -- that they were,
10   you know, accounts maintained by a
11   broker-dealer of their own assets, with their
12   assets, but that for regulatory reasons were
13   segregated in connection with the company's --
14   the broker-dealers to protect the interest of
15   clients of the broker-dealer.
16        Q.  You understood that the assets were
17   restricted to ensure that customer property
18   could be returned to the customers?
19        MR. MORAG:  Object to the form.
20        A.  Yeah, I used the word "segregated."
21   There were applicable -- I knew there were
22   applicable SEC rules.  Because if you could
23   merely -- if tomorrow Goldman Sachs could take
24   its 15c3-3 account and just spend it all on
25   bonuses, if you will, that would eliminate the
          TSG Reporting - Worldwide    877-702-9580

Page 198

1          -Lewkow-
2    protection that the rule is aimed at doing.
3          I don't know if I would use the
4    word you used, but I recognized that there
5    were regulatory implications about the ability
6    to take the money out that were tied to the
7    accounts of the customers who were being
8    directly or indirectly -- I'm not sure the
9    details of how it works -- to provide some
10   level of effort to the customers and clients.
11         **Q.   Was there a discussion of the**
12   **regulatory constraints on Lehman in releasing**
13   **funds from its c3 account?**
14         A.   As I testified this morning, I
15   believe that when the discussion took place,
16   somebody from Weil -- none of the Weil people
17   were experts at all on 15c3-3 accounts as they
18   all said at the time.  One of them made that
19   point.  And on our side, we did have someone
20   who did have real expertise, Ed Rosen, who was
21   participating at least by the latter stages in
22   discussions.  So somebody from Weil had raised
23   the question of, "Gee, as far as we at Weil
24   know, maybe we need approval from the SEC to
25   do this.  And Rosen said, "You don't need

TSG Reporting - Worldwide     877-702-9580

Page 199

1          -Lewkow-
2    approval to do it, there is no approval
3    requirement."
4          And they said, "Well, this is an
5    account that we gather -- you know, we know is
6    required as a regulatory matter.  Let's at
7    least say --" they may have proposed saying,
8    you know, "subject to SEC approval," I don't
9    remember if they used those words.
10         And Ed said, "No, that's wrong
11   because there is no need for SEC approval."
12   And they said, "Can we say something like
13   'subject to applicable law'?"  Or something
14   like that.  And since we tried to comply with
15   the SEC laws and rules, Ed did not object to
16   that, and language to that effect went into
17   the document.
18         **Q.   Did anyone explain that only an**
19   **amount in excess of a c3 calculation is**
20   **permitted to be removed from such a restricted**
21   **account?**
22         MR. MORAG:  Objection to form.
23   Answer with respect to anything you
24   were told from the Lehman side.
25         A.   I believe that 15 -- as I

TSG Reporting - Worldwide     877-702-9580

Page 200

1          -Lewkow-
2    understood 15c3-3 with total non-expertise, it
3    is a requirement that you maintain certain
4    reserves in a segregated account to protect
5    the interest of customers.  And I don't
6    recall -- I was aware certainly that basically
7    Barclays was assuming the accounts.  So I'm
8    not sure whether there was a difference
9    between an excess and a non-excess given that
10   I don't think Lehman, as a broker-dealer, was
11   going to continue to have customer accounts.
12   But that's all I can say on that subject.
13         **Q.   In that hallway conversation,**
14   **Mr. Rosen did not say that only the excess**
15   **could be transferred?**
16         MR. MORAG:  Is that a question?
17         MR. MAGUIRE:  Yes.
18         A.   I don't remember the word "excess."
19   You'll have to ask Mr. Rosen.
20         **Q.   Did Mr. Rosen say anything about a**
21   **deficiency in the c3 account?**
22         A.   There was no discussion of
23   deficiency of the c3 account.  Lehman Brothers
24   on Friday -- I was told that Lehman Brothers
25   on Friday had identified this account as

TSG Reporting - Worldwide     877-702-9580

Page 201

1          -Lewkow-
2    assets that consistent with the Asset Purchase
3    Agreement that required the delivery of all
4    assets used in the business other than
5    specifically excluded assets.  But they
6    identified this account for the first time on
7    Friday as assets that were Lehman, that Lehman
8    could deliver to Barclays as the purchaser.
9    And therefore, certainly no one had a
10   discussion of the deficiency.
11         **Q.   Did anyone have any discussion**
12   **about a shortfall in customer property?**
13         A.   I don't know what you mean by
14   "shortfall" as opposed to "deficiency."  To me
15   it sounds the same.  I don't -- no.
16         **Q.   Did anyone discuss where Lehman**
17   **would get the property to pay Barclays if it**
18   **was unable, could not get approval, to remove**
19   **the funds from the c3 account?**
20         A.   I think --
21         MR. MORAG:  Object to the form of
22   the question, to the word "funds."  I
23   think there has been testimony what was
24   agreed to be transferred was
25   securities.

TSG Reporting - Worldwide     877-702-9580

Page 202

1         -Lewkow-
2         A.  As I testified earlier, in the
3    course of this discussion, Mr. Klein said in
4    words or in substance that, okay, we will take
5    the billion dollars that are sitting in a bank
6    in cash, deposited with the bank but we want
7    to get the 760-odd million.  And if you can't
8    get it there, we want to get it some other
9    way.  And that's my recollection of the
10   discussion.
11        **Q.  In the middle of Paragraph 20 of**
12   **your Declaration, page 10, after you referred**
13   **to Mr. Klein, you say, "This was agreed to by**
14   **representatives of Lehman."  Do you see that?**
15        A.  Yes.
16        **Q.  What do you mean by "this"?**
17        A.  That if the lead -- if there were
18   legal constraints preventing transfer of the
19   rule 15c3-3 account assets, Barclays would
20   receive substitute assets.
21        **Q.  And who were the Lehman**
22   **representatives who agreed to that?**
23        A.  At a minimum, it included the Weil
24   group that was standing there.  I don't know
25   what authority they had.  As I said, this took

TSG Reporting - Worldwide    877-702-9580

Page 203

1         -Lewkow-
2    place over a couple of conversations, I think.
3    At a minimum, it included them.
4         I actually believed that somebody
5    from Lehman may have been with them during
6    this discussion, but I don't have a distinct
7    recollection of that.  As I said, the group
8    had gotten larger during the course of these
9    two or three hallway conversations.  But I --
10   you know, certainly I leave it to Weil
11   Gotshal.
12        You know, I have enormous respect
13   for Mr. Miller and Mr. Roberts and Ms. Fife
14   and the other lawyers, and Mr. Masaneo, and
15   the other lawyers who were there doing their
16   best to represent their clients.  They know
17   what things they need to go back to and not go
18   back to.
19        So if there was no one from Lehman
20   Brothers there -- I just don't recall if
21   someone from Lehman was there at that moment
22   or not.  But Lehman -- Lehman's counsel -- and
23   there may have been somebody from Simpson
24   Thacher there as well.  May well have been.
25        Lehman's counsel agreed to it.  And

TSG Reporting - Worldwide    877-702-9580

Page 204

1         -Lewkow-
2    then it went -- later in the day it got into a
3    draft.  So certainly -- I don't know what
4    kind -- if Lehman people were not present at
5    that moment, I assume Weil either had
6    authority or obtained authority to include
7    that in.  But you'll have to ask them.
8         **Q.  How did Mr. Miller signify his**
9    **agreement to this?**
10        A.  He said -- somebody from Weil said,
11   okay, or yes, or that's not a problem.  I
12   don't know what words he used.
13        **Q.  Who was the person from Weil who**
14   **said one of those variety of comments?**
15        A.  I don't -- I don't remember.
16        **Q.  And did you understand that person**
17   **from Weil to be agreeing that Barclays would**
18   **get $769 million unconditionally as part of**
19   **the sale as opposed to simply agreeing to the**
20   **inclusion of the language proposed "to the**
21   **extent permitted by applicable law"?**
22        A.  No, I think the phrase -- my
23   understanding at the time and I think what we
24   were all talking about was my understanding
25   was the reason "to the extent permitted by

TSG Reporting - Worldwide    877-702-9580

Page 205

1         -Lewkow-
2    applicable law" or words of that nature were
3    going to get added to the language was because
4    of the technical rules governing 15c3-3 that
5    the Weil lawyers had conceded they were not
6    experts on.
7         I had absolutely no expectation,
8    and it was never suggested, to my
9    recollection, that the limitation "to the
10   extent permitted by applicable law" was a
11   limitation on the broader statement: if we
12   can't transfer that, we will transfer
13   something else.  That was not my
14   understanding.
15        **Q.  Did you do anything to confirm your**
16   **understanding that when Weil, somebody at Weil**
17   **said "okay" or "yes," they were agreeing to**
18   **make this obligation unconditional as opposed**
19   **to simply agreeing to the inclusion of the**
20   **language proposed "to the extent permitted by**
21   **applicable law"?**
22        A.  The language was drafted to reflect
23   the conversation that took place in the
24   hallway and was included in the Clarification
25   Letter.  I believe there is nothing else to

TSG Reporting - Worldwide    877-702-9580

Page 206

1      -Lewkow-
2  say.  People agreed to a principle, it got
3  reflected in the Clarification Letter.
4      **Q.  A couple of lines down in your
5  Declaration, you refer to some other language,
6  it's the phrase you referred to "are
7  securities of substantially the same nature
8  and value."  Do you see that?**
9      A.  Yes.
10      **Q.  Who proposed that language?**
11      A.  I described the agreement, the oral
12  agreement that was reached in the hallway.  It
13  was then left to the folks focusing on pushing
14  the paper forward on the Clarification Letter,
15  which included both Cleary folks and Weil
16  folks and there were others involved, or at
17  least in the room at some time during that
18  conversation.
19      And I believe that somebody did a
20  first version of it that referred to -- of the
21  same nature and didn't include "and value."
22  And then someone on the Barclays' team said,
23  "Well, that doesn't work because that
24  wouldn't -- what does that mean?"  So the
25  words "and value" got put in.
    TSG Reporting - Worldwide    877-702-9580

Page 207

1      -Lewkow-
2      **Q.  Did anyone at Barclays go back and
3  ask anyone at Weil what that meant?**
4      A.  What what meant, sorry?
5      **Q.  The words "are securities of
6  substantially the same nature"; what was meant
7  by that language?**
8      A.  With all due respect, when people
9  are trying to write a document and trying to
10  get a deal done under incredibly difficult
11  circumstances and somebody writes a language
12  that on its face does not work to solve the
13  problem that had been discussed and agreed to
14  on all matters by people to solve a problem,
15  and it was obvious that to say "the same
16  nature" could mean one dollar worth of
17  securities, that would have been an idiotic
18  remark.
19      We had no reason to believe that
20  Weil was trying to sabotage the deal that
21  their colleagues had agreed to.  And so to my
22  understanding, someone said, "You got to add
23  the word 'and value'," and they said "Of
24  course," and it happened.
25      **Q.  From whom did you get that**
    TSG Reporting - Worldwide    877-702-9580

Page 208

1      -Lewkow-
2  understanding?
3      A.  From my colleagues, Mr. Davis,
4  Mr. McLaughlin and Mr. Leinwand and one or
5  more of that group.
6      MR. HUME:  Can we take a short
7  break?
8      THE WITNESS:  Yes, I can use a
9  bathroom break.  Thank you.
10      (Whereupon, a recess was taken
11  from 3:58 p.m. to 4:24 p.m.)
12  BY MR. MAGUIRE:
13      **Q.  Sir, over the course of the weekend
14  prior to closing, did you participate in any
15  meetings with the Creditors Committee?**
16      A.  No.  Let me add to that.  That
17  isn't to say that one or more members of the
18  Creditors Committee may have been present when
19  meetings took place.  But I certainly did not
20  have any -- to my knowledge, any particular
21  meetings with the Creditors Committee.
22      **Q.  Let me show you a document that's
23  previously been marked as Exhibit 451.**
24      A.  I got it.
25      **Q.  Do you recognize that document,**
    TSG Reporting - Worldwide    877-702-9580

Page 209

1      -Lewkow-
2  sir?
3      A.  Yes.
4      **Q.  What is it?**
5      A.  This looks like, and this is the
6  document, I'm quite sure, that I was shown and
7  you asked me about before.  This is the
8  letter -- the internal Lehman Brothers' e-mail
9  that I was shown that Sunday by Weil Gotshal
10  with respect to the 15c3-3 reserve account.
11      **Q.  And you mentioned that a bank had a
12  billion dollars of cash.  Are you referring to
13  the cash with Wells Fargo?**
14      A.  Yes.  On deposit with Wells Fargo.
15      **Q.  So you understand this was, taking
16  the billion dollars in cash out of the
17  transaction left $769 million in qualified
18  securities?**
19      A.  Yes.
20      **Q.  And that was in the subject of the
21  provision that was put in the Clarification
22  Letter?**
23      A.  Yes.
24      **Q.  You'll see the reference here to
25  Mike Macchiaroli?**
    TSG Reporting - Worldwide    877-702-9580

Page 210

1          -Lewkow-
2      A.   Yes.
3      Q.   Did anyone from Barclays have any
4  discussions with Mr. Macchiaroli prior to the
5  closing concerning this issue?
6          MR. MORAG:  To your knowledge.
7      A.   Not to my knowledge.
8      Q.   Did anyone from Barclays have any
9  discussion with anyone at the SEC concerning
10  the c3 account?
11      A.   Not to my knowledge.
12      Q.   I'll show you a document we
13  previously marked as Exhibit 49.
14      A.   Yes.
15      Q.   Do you know whether you've seen
16  this before?
17      A.   Yes, I have.
18      Q.   When did you first see it?
19      A.   At or about the time it was sent.
20      Q.   When did you last see it?
21      A.   I think in preparation for this
22  deposition, it's -- I didn't study it closely.
23  But I did quickly look at the various drafts
24  that my counsel had provided me.
25      Q.   And you understand this is a

Page 211

1          -Lewkow-
2  revised Clarification Letter that Mr. Leinwand
3  sent around on Saturday, September 20th?
4      A.   Revised draft Clarification Letter
5  that Mr. Leinwand sent around at --
6  late Saturday night.  It went out at
7  11:13 p.m. Yes.
8      Q.   And he circulated, the attachment
9  is both a clean version and a blackline?
10      A.   That is correct.
11      Q.   The blackline is about halfway
12  through the document and it has at the top
13  "Cleary Gottlieb Comments."  Do you see that?
14      A.   Yes.
15      Q.   If you turn to the second page of
16  that, sir.
17      A.   Of the blacklined version?
18      Q.   Yes.
19      A.   Yes.
20      Q.   You will see there is a blackline
21  in section (d), the second half of the page.
22      A.   Yes.
23      Q.   And if you scroll down about
24  two-thirds of the way down, you'll see a
25  reference to a Section A.  Do you see that?

Page 212

1          -Lewkow-
2      A.   I see it.
3      Q.   And the language reads, "By or on
4  behalf of LBI pursuant to Rule 15c3-3 of the
5  Securities Exchange Act of 1934, or
6  otherwise..."  Do you see that?
7      A.   I do.
8      Q.   And then it goes on to say, "Are by
9  or on behalf of any clearing agency or any
10  clearing organization to collateralize,
11  guarantee, secure, whether as margin,
12  guarantee funds, deposits or in any other
13  form."  Do you see that that language, sir?
14      A.   I do.
15      Q.   Now, were you aware that that
16  language was deleted from the next draft, at
17  least a subsequent draft of the Clarification
18  Letter?
19          MR. MORAG:  Objection to the form
20      of the question; the characterization
21      "delete."
22      A.   I believe so, yes.
23      Q.   I'll show you a document that we'll
24  mark as 616A, which is Bates stamped
25  WGM-LEHMAN-E 00006236 through 6264?

Page 213

1          -Lewkow-
2      (Deposition Exhibit 616A, 9/22/08
3      e-mail from R. Messineo re:
4      Lehman-Barclays, WGM-LEHMAN-E
5      00006236-6264, marked for
6      identification, as of this date.)
7      (Witness reviewing document.)
8      Q.   Take whatever time you need to
9  review the document, sir.  What I want to know
10  is whether you have ever seen it before, this
11  or any part of the document?
12      A.   Well, I certainly never saw the
13  cover e-mail from Mr. Messineo to your
14  colleagues at Hughes Hubbard.  I'm just trying
15  to figure out the timing.
16      (Witness reviewing document.)
17      A.   May I look at the other -- the
18  draft I was furnished this morning in
19  connection with this deposition to see if this
20  looks the same as the one that I've seen with
21  a different transmittal e-mail?
22      Q.   Feel free to look at any of the --
23      A.   Thank you.
24      Q.   -- exhibits there.
25          MR. MORAG:  The 28 and the 37 --

Page 214

1         -Lewkow-
2    don't go through Sunday.
3         THE WITNESS:  Yeah, I'm looking at
4    28.  Well, I don't have it here then.
5    Okay.  Let me look at it and see if it
6    helps me...
7         A.  I don't -- I would need to look at
8    ones that I know I've seen.  This does not --
9    I don't know that I've seen this.
10        Q.  If you look in particular --
11        A.  But, you know, and I realize
12   litigators do things the way they do things
13   for the reasons they do, but I'm sure you have
14   all the ones that have been produced that we
15   know I've received.  So if you show me one
16   that's got -- that I know I received it, then
17   I can tell you if this is the same one or not.
18   But on the face, and looking quickly, I don't
19   recall this one.
20        Q.  If you turn to the second page of
21   the document.
22        A.  Yup.
23        Q.  Do you see that same section I
24   believe we were looking at.  In the prior
25   draft, it was (d); here it is (c).  You will

TSG Reporting - Worldwide    877-702-9580

Page 215

1         -Lewkow-
2    see the language that I asked you to read
3    before --
4         A.  Yup.
5         Q.  -- concerning margin --
6         A.  Yup.
7         Q.  -- is crossed out or deleted?
8         A.  Yup.
9         Q.  Does that refresh your recollection
10   that you were aware that that language had
11   been deleted from a draft of the --
12        MR. MORAG:  Objection to form.
13        A.  By counsel for Lehman Brothers?
14        Q.  By anyone.
15        A.  It appears -- I don't know if this
16   was -- again, it may have been delivered -- I
17   can't tell without seeing this.  It may well
18   have been deleted from language that was --
19   that we -- the version we saw.  I do think
20   that language never ended in, so I know it was
21   deleted at some stage.
22        Whether this draft is the one I saw
23   or not?  I think that language went in there,
24   is my understanding.  It went in there and I
25   think it was wrong.  It was taking away what

TSG Reporting - Worldwide    877-702-9580

Page 216

1         -Lewkow-
2    had been -- it's interesting.  The language
3    which you've shown me that went in, and it
4    went in a draft that my partner Mr. Leinwand
5    sent out.
6         But it went in there and it
7    suggests that we were taking out of the deal
8    somehow what had been agreed to, which is that
9    margins is part of the position.  And I think
10   that may be to deal -- in an effort, a
11   mistaken effort to deal with OCC issues.  But
12   it was not the deal, and it should have never
13   gone in, and it was taken out.
14        Q.  Just so I can catch up with you.
15        You were referring to the version
16   that Mr. Leinwand sent out.  That was
17   Exhibit 49?
18        A.  Yes.  You showed me language that
19   you read from that Exhibit 49.
20        Q.  You're referring to the margin
21   language on page 2 in section (d)?
22        A.  Yes.  That language was added,
23   correct.  And it's in the -- it was added as
24   part of -- hold on a second.
25        It was part of a sentence that said

TSG Reporting - Worldwide    877-702-9580

Page 217

1         -Lewkow-
2    "Excluded Assets" -- I'm now confusing myself.
3    Hold on a second.
4         (Witness reviewing document.)
5         A.  Hold on a second.  I withdraw what
6    I just said.  I shouldn't jump to conclusions.
7    I think this is -- excuse me.
8         (Witness reviewing document.)
9         Q.  I think you withdrew what you said,
10   so maybe I should ask another question.
11        A.  Start over.  Yes.
12        Q.  Please take whatever time you need
13   to answer.
14        A.  I rushed.  I should take my time
15   then and answer it carefully.
16        Q.  Understand that I don't want you to
17   reach conclusions.  I'm really looking for
18   your recollections of what you previously
19   concluded or previously understood.
20        A.  Uh-huh.
21        Q.  Does looking at the exhibits we put
22   in front of you refresh your recollection that
23   there was, in a draft of the clarification
24   language of the Clarification Letter, language
25   concerning margin?

TSG Reporting - Worldwide    877-702-9580

Page 218

1          -Lewkow-
2          A.  I see there is such language.  I
3  very vaguely recall such language now that I
4  see it, but it's very vague.
5          **Q.  Do you have a recollection as to**
6  **whether that language was proposed by Cleary**
7  **Gottlieb?**
8          A.  I don't know who proposed it.  It
9  was sent out in a draft that Dave Leinwand
10  sent out.
11          (Witness reviewing document.)
12          **Q.  Do you have an understanding,**
13  **sir --**
14          A.  I was --
15          **Q.  Sorry.**
16          A.  I was taking another look at it.  I
17  have not finished the answer.
18          **Q.  Sure.  Please take as much time as**
19  **you need.**
20          **(Witness reviewing document.)**
21          A.  I believe.
22          (Witness reviewing document.)
23          A.  I'm not certain.
24          **Q.  Do you know, sir, whether this**
25  **language was put in to reflect the business**

TSG Reporting - Worldwide    877-702-9580

Page 219

1          -Lewkow-
2  **agreement between the parties, that Barclays**
3  **should get Lehman's margin?**
4          MR. MORAG:  Objection to form.
5          A.  It was my understanding that the
6  Asset Purchase Agreement contemplated as part
7  of Barclays' purchase of all of the assets
8  used in the business subject -- other than
9  Excluded Assets.  That among the assets that
10  Barclays was entitled to under the original
11  Asset Purchase Agreement, including margin
12  relating to the account that they were buying
13  as part of the purchase of business.
14          So to suggest that it was put in by
15  someone in a draft was not to say that it
16  wasn't -- again, these are people who were
17  dealing with a lot of different things.  It
18  was not to make a -- to the extent that's what
19  this document does or would have done if it
20  were in the final agreement, it was not, in my
21  view, making a change in what the deal was.
22          **Q.  So you understood that this**
23  **language was effectuating the APA by conveying**
24  **the margin from Lehman to Barclays?**
25          MR. MORAG:  Objection to the form

TSG Reporting - Worldwide    877-702-9580

Page 220

1          -Lewkow-
2          of the question.
3          A.  "Effectuating" is a funny word.
4  But I think it was consistent with the APA in
5  view of the -- again, things were being done
6  to the Clarification Letter on other things
7  that had been done.  And there had been
8  changes made to cause romanette ii on page 1
9  over to the definition of what were Purchased
10  Assets.
11          We had, by this stage, I believe,
12  deleted the reference that had originally been
13  in the Asset Purchase Agreement.  The
14  reference to "long positions" had been
15  deleted, and there were changes that reflected
16  the Repurchase Agreement that we were -- we
17  had already paid for.  Barclays had
18  effectively already paid for the securities.
19  And those were changes.  And I think people
20  were trying to make changes that preserved the
21  -- the provision of what was in the Asset
22  Purchase Agreement.
23          **Q.  Did you have an understanding that**
24  **there was anything wrong in this language,**
25  **that there was anything -- any respect to**

TSG Reporting - Worldwide    877-702-9580

Page 221

1          -Lewkow-
2  **which this reference to "margin" here, this**
3  **language, failed to effectuate the parties'**
4  **business agreement?**
5          MR. HUME:  I'm going to object to
6      the form of the question and the lack
7      of foundation.  Just to make clear --
8      correct me if I'm wrong -- Mr. Lewkow
9      is not the 30(b)(6) witness --
10          THE WITNESS:  No, I'm not.
11          MR. HUME:  -- on this provision?
12          MR. MORAG:  He is not.
13          MR. HUME:  And he's testified he
14  doesn't recall the provision.
15          THE WITNESS:  I don't recall.
16          MR. HUME:  So I think I'm going to
17  object on lack of foundation as well.
18          **Q.  You don't --**
19          A.  I don't personally recall.
20          **Q.  You don't recall.  Okay.**
21          **You referred to "Excluded Assets."**
22  **Can I ask you to take out the Asset Purchase**
23  **Agreement, Exhibit 1, somewhere in that file**
24  **before you?**
25          A.  Yup.  I have it.

TSG Reporting - Worldwide    877-702-9580

Page 222

1          -Lewkow-
2          **Q.   When you described in your**
3   **Declaration that none of your partners had**
4   **indicated any suggestion that any property**
5   **that was collateralizing exchange-traded**
6   **derivatives was going to Barclays?**
7          MR. MORAG:  That was not --
8          THE WITNESS:  I think you got it
9   backwards.
10         MR. MAGUIRE:  I'm sorry.  Did I put
11  a double negative there?
12         MR. MORAG:  You said none was going
13  to Barclays?
14  A.   Why don't you start over?
15  **Q.   Yes.**
16  A.   Do you want to look at my
17  declaration?
18  **Q.   Still looking at your Declaration.**
19  **Yes.  It think it was Paragraph 17 we were**
20  **looking at.**
21  A.   Yes.
22  **Q.   And that was the suggestion there?**
23  A.   That "no one had suggested in my
24  presence or based on my conversations" --
25  **Q.   Yes.**
TSG Reporting - Worldwide    877-702-9580

Page 223

1          -Lewkow-
2   A.   "--in my partners' presence that
3   any portion of the property held to secure
4   Lehman's exchange-traded derivatives was not
5   to be transferred to Barclays as part of the
6   transaction."
7          **Q.   Did any of your partners bring to**
8   **your attention any of the particular**
9   **provisions of the Asset Purchase Agreement in**
10  **connection with the conversations you**
11  **described in Paragraph 17?**
12         MR. HUME:  I think that calls for
13  privileged work product.  You're asking
14  did anyone --
15  **Q.   Yes.  Did anyone say to you in**
16  **words or substance:  Mr. Lewkow, you've asked**
17  **me whether anything here is suggestive that**
18  **this property was not going to Barclays, well,**
19  **you better take a look at this particular**
20  **section of the Asset Purchase Agreement?**
21         MR. HUME:  I think it still does
22  call for a privileged communication or
23  interpretation of the contract.  The
24  declaration says no one --
25         MR. MORAG:  Why don't you ask him
TSG Reporting - Worldwide    877-702-9580

Page 224

1          -Lewkow-
2   if his statement of declaration is
3   consistent with his understanding of
4   the Asset Purchase Agreement?
5          **Q.   I'm asking about the conversations**
6   **that you had with your partners that you**
7   **referred to.**
8          **In any of those conversations, did**
9   **any of those partners say, You better look at**
10  **this?**
11  A.   I'm not an expert on 30(b)(6).  I
12  would refer to M&A litigation counsel who are
13  sitting in the next two seats to my right.
14         But it seems to me if any of them
15  did do it and they were here in their personal
16  capacity being deposed about how they
17  interpreted the contract, they wouldn't be
18  required to tell you the interpretation.
19         Therefore, the fact is that as
20  30(b)(6), I can't imagine, changes the rules
21  on that.  But I would defer to my counsel and
22  counsel for Barclays on that.  I told you, I
23  used to be a lawyer.
24         MR. HUME:  I think you should
25  answer the question and we should take
TSG Reporting - Worldwide    877-702-9580

Page 225

1          -Lewkow-
2   a short break.
3          THE WITNESS:  I should answer the
4   question?
5          MR. HUME:  Answer the question if
6   it doesn't reveal a privilege.
7   A.   Can I hear the question again?
8          **Q.   Did any of the partners to whom you**
9   **refer in Paragraph 17 say to you, in**
10  **connection with whether there was any**
11  **suggestion that any of this property was not**
12  **to be transferred to Barclays, did any of them**
13  **say, You better look at this provision of the**
14  **Asset Purchase Agreement?**
15  A.   No.
16  **Q.   Either in those words or in**
17  **substance.**
18  A.   I am familiar with the Asset
19  Purchase Agreement.  I think the Asset
20  Purchase Agreement always reflected the
21  understanding of the parties that this was
22  coming along that I could point to, they can
23  point to provisions that show that.
24         Did any of them suggest there was
25  language inconsistent with this?  I don't
TSG Reporting - Worldwide    877-702-9580

Page 226

1          -Lewkow-
2  recall anyone suggesting that.
3          MR. HUME:  Do you want to take a
4  short break?
5          MR. MAGUIRE:  Sure.
6          (Whereupon, a recess was taken
7  from 4:50 p.m. to 5:01 p.m.)
8          MR. MAGUIRE:  Sir, I have no
9  further questions, thank you.
10  EXAMINATION BY
11  MR. HUME:
12      Q.  Mr. Lewkow, I'm Hamish Hume and I'm
13  here representing Barclays, as you know.  I
14  just wanted to make sure one thing on the
15  record is clear.
16          On page 197 of the rough transcript
17  we are looking at, you were asked a question
18  by counsel for the Trustee.  This was
19  referring to the conversation you testified to
20  with Weil Gotshal about the $769 million in
21  securities.
22          The question was: "And did you
23  understand that person from Weil to be
24  agreeing that Barclays would get $769 million
25  unconditionally as part of the sale as opposed
TSG Reporting - Worldwide    877-702-9580

Page 227

1          -Lewkow-
2  to simply agreeing to the inclusion of the
3  language proposed 'to the extent permitted by
4  applicable law'?"
5          Your answer was "No," and then you
6  went on with an explanation.
7          Let me just make sure the record is
8  clear in terms of the "yes" and the "no" of
9  that question.
10          Was it your understanding from your
11  conversation with Weil Gotshal that you
12  referenced relating to the $769 million in
13  securities, that Barclays did have an
14  unconditional right to receive those assets?
15      A.  Yes.  The question, with all due
16  respect, was ambiguous, because I was offered
17  a choice, was I agreeing -- was the Lehman
18  person agreeing unconditionally to pay or
19  agreeing -- "simply agreeing," was your term,
20  to the inclusion of language "to the extent
21  permitted by applicable law."  That was a
22  choice.  And I started with "no."  My "no" was
23  addressed to the end of your question, that it
24  was not merely "to the extent permitted by
25  applicable law."
TSG Reporting - Worldwide    877-702-9580

Page 228

1          -Lewkow-
2          It was, as I explained in the rest
3  of my answer, the discussion of "the
4  applicable law," as I understood what the
5  individual was saying on behalf of Lehman, was
6  merely to 15c3-3 and not to the concept that
7  if that were not payable, there would be an
8  unconditional obligation to deliver the
9  securities some other way.
10          MR. HUME:  I have no other
11  questions.
12          MR. MAGUIRE:  Nothing further.
13          (Time noted:  5:05 p.m.)
14
15
16          _____
17          VICTOR I. LEWKOW
18
19
20
21  Subscribed and sworn to before me,
22  this _____ day _____ of 2010.
23
24  _____
25          Notary Public
TSG Reporting - Worldwide    877-702-9580

Page 229

1  ------------------I N D E X------------------
2  WITNESS        EXAMINATION BY        PAGE
3  V. LEWKOW        MR. GAFFEY            5
4          MR. MAGUIRE        160
5          MR. HUME          226
6
7  DIRECTIONS: PAGE  79, 134, 185
8  MOTIONS:   [None]
9  REQUEST:   [None]
10
11  ----------------EXHIBITS--------------------
12  EXHIBIT                FOR I.D.
13  Exhibit 613A              6
14  Declaration of Victor Lewkow
15
16  Exhibit 614A              135
17  Letter from S&C, CGSH
18  00020701-20714
19
20  Exhibit, 615A            195
21  2PP 9/18/08 e-mail from J.
22  Potenciano to distribution re:
23  Preliminary 15c3-3 reserve lock-up
24  as of 9/17/08
25
TSG Reporting - Worldwide    877-702-9580

Page 230

```
1    ----------------EXHIBITS------------------
2         [previously marked]
3    EXHIBIT                FOR I.D.
4    Exhibit 1              29
5    Exhibit 19             31
6    Exhibit 518            45
7    Exhibit 25             47
8    Exhibit 24             58
9    Exhibit 27             69
10   Exhibit 579B           74
11   exhibit 581B           92
12   Exhibit 28             93
13   Exhibit 29             93
14   Exhibit 30             93
15   Exhibit 31             93
16   Exhibit 32             93
17   Exhibit 33             93
18   Exhibit 34             93
19   Exhibit 35             93
20   Exhibit 36             93
21   Exhibit 37             93
22   Exhibit 34             95
23   Exhibit 451            208
24   Exhibit 49             210
25             - - -
```

TSG Reporting - Worldwide    877-702-9580

Page 231

```
1              C E R T I F I C A T E
2
3    STATE OF NEW YORK     )
4                         ) ss.:
5    COUNTY OF KINGS       )
6         I, MAYLEEN CINTRON, a Registered
7    Merit Reporter, Certified Realtime
8    Reporter and Notary Public within and
9    for the State of New York, do hereby
10   certify:
11        That VICTOR I. LEWKOW, the witness
12   whose deposition is hereinbefore set
13   forth, was duly sworn by me and that
14   such deposition is a true record of the
15   testimony given by such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I
19   am in no way interested in the outcome
20   of this matter.
21        IN WITNESS WHEREOF, I have hereunto set
22   my hand this 10th day of February, 2010.
23
24        --------------------------
25        MAYLEEN CINTRON, RMR, CRR
```

TSG Reporting - Worldwide    877-702-9580

Page 232

```
1      ERRATA SHEET FOR THE TRANSCRIPT OF:
2    Case Name: Re: Lehman Brothers Holdings
     Dep. Date: February 10, 2010
3    Deponent: Cleary Gottlieb | Victor I. Lewkow
4    Pg. Ln.  Now Reads     Should Read   Reason

5    ___ ___ _____ _____ ____
6    ___ ___ _____ _____ ____
7    ___ ___ _____ _____ ____
8    ___ ___ _____ _____ ____
9    ___ ___ _____ _____ ____
10   ___ ___ _____ _____ ____
11   ___ ___ _____ _____ ____
12   ___ ___ _____ _____ ____
13   ___ ___ _____ _____ ____
14   ___ ___ _____ _____ ____
15   ___ ___ _____ _____ ____
16   ___ ___ _____ _____ ____
17   ___ ___ _____ _____ ____
18   ___ ___ _____ _____ ____
19
20        _____
21         VICTOR I. LEWKOW
22
     SUBSCRIBED AND SWORN BEFORE ME,
23   This___ day of_____, 2010.
24   _____
           Notary Public
25   My Commission Expires:_____
```

TSG Reporting - Worldwide    877-702-9580

**A**

**Abate (1)**
195:14
**ability (3)**
159:7 165:21 198:5
**able (4)**
113:22 115:21 157:10
168:2
**absolutely (5)**
67:9 68:14 111:18
136:18 205:7
**accepted (3)**
12:20 20:23 65:10
**access (2)**
149:3 168:2
**accommodate (2)**
18:25 19:6
**account (30)**
122:13,15 143:13
145:19 146:8,10,13
146:16 147:4,5
148:8,9 159:8,10
196:18 197:5,24
198:13 199:5,21
200:4,21,23,25
201:6,19 202:19
209:10 210:10
219:12
**accountant (1)**
20:18
**accounting (5)**
12:18,21 20:22,23
42:5
**accounts (8)**
168:3 196:25 197:9
197:10 198:7,17
200:7,11
**accuracy (1)**
45:6
**accurate (4)**
41:4 44:11 54:14
184:16
**accurately (2)**
127:7 138:8
**acquire (1)**
63:23
**acquired (4)**
24:16,17 84:7 190:13
**acquirers (1)**
156:12
**acquiring (3)**
10:5 15:13 55:15
**acquisition (6)**
15:14 20:7 28:8
113:16 161:7 175:5
**acquisitions (2)**
7:16,17
**act (2)**

103:13 212:5
**action (1)**
231:18
**active (1)**
42:3
**actual (4)**
37:16 63:3 90:2
114:10
**add (14)**
22:6 43:6 50:11 51:19
59:24 74:11 97:18
98:4 109:20 152:6
152:16 183:18
207:22 208:16
**added (15)**
43:2 46:12,17 49:10
64:13,17 96:2 97:15
97:22 189:4 190:6
192:23 205:3
216:22,23
**adding (2)**
49:20 52:8
**addition (1)**
46:5
**additional (4)**
9:24 11:5 123:9 125:6
**address (4)**
21:22 22:25 55:24
137:24
**addressed (6)**
7:3 55:24 84:22
128:21 172:22
227:23
**addressing (1)**
160:21
**adjust (1)**
12:22
**adjusted (1)**
21:3
**adjustment (12)**
7:9 9:8,11,13,19
11:12,23 12:2,8,12
29:13 30:12
**adjustments (2)**
7:18 9:3
**Administered (1)**
1:6
**administerial (2)**
167:4,5
**advanced (2)**
81:8,21
**advice (5)**
77:25 78:5 79:10
129:19 175:24
**advise (1)**
184:25
**advisors (1)**
13:4

**affect (2)**
24:10 159:7
**affidavit (1)**
11:22
**affiliates (2)**
63:15 65:7
**afraid (1)**
22:7
**afternoon (8)**
107:21 115:16 132:11
152:14 164:3
196:20,22 197:7
**agency (2)**
74:3 212:9
**aggregate (5)**
20:12,16 21:8,17,23
**ago (11)**
39:16 46:4 47:15
51:16 71:12 89:24
94:16,17 98:14
115:15 138:20
**agreed (22)**
9:5 24:18 25:6,15
26:3 53:25 54:18
63:22 119:23
124:24 160:16
166:15 194:8,12
201:24 202:13,22
203:25 206:2
207:13,21 216:8
**agreeing (12)**
26:18,21 204:17,19
205:17,19 226:24
227:2,17,18,19,19
**agreement (140)**
8:20 9:7 10:7 11:8
13:8,13 24:16 25:25
26:8,13,22,24 28:3
28:4 29:4,11,22
30:8 31:7,18 33:9
35:21,25 36:7,8
40:5 42:9,22 43:4
48:2,4,7,14 50:2
52:17 53:4,10 55:2
55:5,14,23 57:23
58:10 59:2 60:2
61:25 62:11 63:16
64:4 65:8,20,25
66:25 67:21 79:21
81:21 84:16,17
85:18,19 88:15,19
92:19 93:16 94:8
95:24 102:22 103:4
103:7,10,15,24
104:4,12,13,14,19
104:20 111:8
113:14,15 119:24
119:25 120:5
121:21 123:19

128:16 129:5,17,20
137:23 138:7,10,12
138:15,23,25 139:7
139:19 140:10
144:3,13 146:24
150:22 151:4
158:13 162:6,8,10
163:11,17 166:24
169:10 174:15
175:12 181:21
189:6 190:9,10
194:7,15 201:3
204:9 206:11,12
219:2,6,11,20
220:13,16,22 221:4
221:23 223:9,20
224:4 225:14,19,20
**agreements (4)**
40:18 48:3 93:3 95:23
**ahead (7)**
83:14 85:14 117:6,7,7
142:15 147:10
**aimed (1)**
198:2
**al (1)**
1:6
**Alan (1)**
74:13
**allocate (1)**
49:2
**allowing (1)**
193:9
**alluded (1)**
116:10
**alternative (1)**
151:9
**amazing (1)**
13:21
**ambiguous (1)**
227:16
**amend (10)**
48:4 49:5,9,20 50:11
52:9,16 94:21 95:24
98:5
**amended (5)**
48:7,24 57:23 58:10
85:20
**amendment (23)**
48:22 50:7 51:17,19
55:22 56:8,12,17
57:23 58:10,25 59:3
60:3 135:5,6 136:16
137:23 138:5,8,11
138:17 139:7,17
**amends (4)**
94:24 97:8 138:22,24
**amidst (1)**
94:5
**AMINA (1)**

4:8
**amount (7)**
26:19 28:6 29:14 81:8
81:20 150:18
199:19
**amounts (4)**
22:21,24 26:22 125:5
**Andy (1)**
96:10
**and/or (6)**
7:8 12:2 20:3 69:8
139:24 150:6
**annotation (1)**
46:7
**announce (1)**
155:8
**announced (3)**
153:17 154:19 157:14
**announcements (1)**
153:19
**announcing (1)**
157:16
**answer (68)**
6:8 7:15,25 9:16
11:18 22:6,8,13
30:3,18 35:5 42:17
48:19 58:3 61:13
62:18 63:4 66:10
67:6,6,25 72:2
73:22,23 76:21
78:14 79:6 80:2,7
83:9,11 87:2 88:5
97:13,25 126:23
131:17 134:25
137:6,10,11,12
140:15 161:8 162:4
170:6 171:2 173:10
176:3 178:21
185:15,17,19
187:10,11,25
196:12 199:23
217:13,15 218:17
224:25 225:3,5
227:5 228:3
**answered (7)**
11:15 21:13 22:4
30:17 76:17 193:20
194:21
**answering (1)**
51:11
**anybody (6)**
106:12 109:21,21
117:20 153:2,5
**Anyway (1)**
144:19
**APA (6)**
102:13 135:5,6
161:22 219:23

220:4
**apart (5)**
60:24 61:9,18 154:20
154:21
**appear (1)**
148:7
**appears (4)**
46:9 47:19 72:17
215:15
**applicable (12)**
152:8 197:21,22
199:13 204:21
205:2,10,21 227:4
227:21,25 228:4
**application (1)**
82:6
**applied (1)**
177:21
**applies (1)**
163:7
**appraised (1)**
26:4
**approaching (1)**
111:2
**appropriate (3)**
20:14 102:19 128:23
**appropriately (1)**
63:9
**approval (10)**
92:22 112:24 152:5
164:10 198:24
199:2,2,8,11 201:18
**approve (1)**
173:19
**approved (6)**
107:9 131:4 140:3
153:22 157:25
158:10
**approximately (3)**
40:20 106:10 122:25
**Archie (2)**
119:5 149:17
**arguing (1)**
139:25
**arrangements (1)**
92:21
**arrived (5)**
107:5 109:9 116:14
116:17,20
**arriving (1)**
13:25
**art (3)**
7:13 187:6,18
**articulated (1)**
120:12
**ascertained (1)**
143:5
**aside (2)**

150:9 171:4
**asked (29)**
11:14 15:13 21:12
22:3,10 30:16 68:17
77:24 78:4 89:24
128:23 138:19
139:2 144:2 145:13
148:2,3,3 158:6
177:15 178:21
179:9 181:11
193:19 194:20
209:7 215:2 223:16
226:17
**asking (19)**
14:16 62:12 68:22
69:15 81:11 85:7
97:5 141:17,18
175:21 178:24
179:4 183:24,25
184:12 187:9
193:12 223:13
224:5
**aspect (2)**
127:5 178:18
**aspects (4)**
9:23,24 139:18
152:24
**assembled (2)**
132:25 139:3
**assert (1)**
79:13
**asserted (1)**
77:11
**assertion (1)**
185:11
**asset (99)**
8:19 9:7 11:7 13:7,12
25:24 26:8,12,22
28:4 29:4 30:8 31:7
31:18 33:9 35:21
36:7 40:5 42:8
47:25 48:4 50:2
52:16 53:4,10 54:25
55:13,22 58:9,25
60:2,16 61:25 62:11
64:3 65:20 84:15,16
85:18 88:19 93:16
94:7 102:21 103:4,7
103:9,24 104:11,14
104:18,20 113:14
119:23,25 120:4
121:20 123:19
128:16 129:5,16,20
137:23 138:7,10,11
138:15,22,24
139:18 146:24
150:21 151:3
158:12 162:5,8,9
163:11,17 169:10

174:14 175:11
181:21 189:6 190:9
190:10 194:7,14
201:2 219:6,11
220:13,21 221:22
223:9,20 224:4
225:14,18,19
**assets (133)**
7:10 8:12,23 10:23
12:4,10,11 13:19
14:2,7 15:7 16:5,7
19:19,22 22:18
24:10,17,24 26:5,11
28:7 29:17 30:14,24
31:4,15 33:14 34:11
35:4,16 38:14 40:8
40:25 41:5,16,21
43:8 44:4,17 53:3
53:18 55:4,8,15
60:9,15 62:9,21
63:13,23,24 64:5,12
64:13 65:2,18 66:4
84:7,23 86:5,11
105:13,13,24 106:19
106:18 113:13,18
113:20 115:19,20
119:22 120:6,6,8,8
120:14,16,17
121:12,17,18 122:3
122:4,6,9,21 123:2
123:2,5,9,9,13
124:2 129:4,6,14,21
129:22 142:23,25
143:2,6,6,9,12,23
147:3 150:24
155:16,18,25 159:9
179:17 190:16,17
197:11,12,16 201:2
201:4,5,7 202:19,20
217:2 219:7,9,9
220:10 221:21
227:14
**assist (1)**
16:25
**associate (1)**
103:11
**associated (1)**
182:5
**assume (10)**
14:15,16 20:6 38:8
68:22 138:15,18
144:23 193:11
204:5
**assumed (9)**
11:3 24:18 27:18
44:17,19 68:5 84:8
156:25 157:3
**assuming (3)**
85:22 124:3 200:7

**assumption (2)**
15:16 92:2
**assurances (1)**
56:3
**astray (1)**
51:13
**attach (2)**
99:7 103:22
**attached (2)**
99:17,24
**attaches (1)**
105:5
**attachment (4)**
99:5,11 196:3 211:8
**attachments (1)**
99:6
**attention (5)**
6:20 30:9 62:22
177:18 223:8
**attorney (1)**
68:7
**attorneys (6)**
3:4,11,19 4:4,12
140:25
**attorney/client (3)**
79:23 140:22 185:9
**audit (1)**
10:14
**audited (3)**
7:18 9:9 12:21
**author (1)**
77:15
**authority (3)**
202:25 204:6,6
**available (9)**
56:19 57:8 60:8
120:19 122:9 123:3
125:15 150:19
151:14
**Ave (1)**
3:12
**Avenue (2)**
2:12 3:20
**avoid (1)**
164:13
**aware (15)**
54:6 70:25 71:2 89:13
108:14 110:22
164:22 165:23
167:11,15 182:10
188:13 200:6
212:15 215:10
**a.m (9)**
2:5 19:12,12 58:20,20
68:16,16 101:24
102:4

---

B

---

**back (35)**
14:20 18:20,23 34:22
42:14 46:24 47:5,8
56:19 64:23 80:9
81:19 83:23 107:10
111:12,22,24 112:2
117:19 133:5
138:19 142:12
150:11 151:16,19
152:25 154:4
157:20 158:25
159:14 162:12
164:2 203:17,18
207:2
**background (1)**
6:22
**backwards (1)**
222:9
**bad (1)**
49:7
**badly (1)**
156:4
**balance (23)**
7:7,12,19 8:7,21,25
9:9,10 12:6,15,19
12:20 21:4,5 31:5
31:10 39:2 41:12,21
101:9,11 102:4,14
**bank (10)**
146:10,11,13,14
147:5 148:9 159:8
202:5,6 209:11
**banking (4)**
17:4 89:8 155:20
156:2
**bankruptcy (13)**
1:1 14:22 16:24 72:24
73:8 74:4 76:15,25
79:2 80:15 81:17
82:6 133:25
**Bar (1)**
128:7
**Barclays (194)**
3:11 6:13,25 9:5 10:4
10:12,23 14:20,25
15:3,10,12 16:4,17
16:25 18:25 19:18
19:19 20:2,2,6,9,10
20:14 21:23 22:15
22:18,22,25 23:3,19
23:22 24:4,11,23
25:3,6,15 26:3
27:13 28:7 31:2
36:18,23 37:17 38:2
38:10,17 39:5,18
41:3,7,11 44:6,7
46:13 48:15 49:19
50:25 54:2 55:15
57:8 59:25 60:7,10

60:11,17 63:16,22
64:9 65:7,21 66:16
66:17 67:2,21 68:3
68:13 69:8,9,11
70:7 71:13 72:16,20
73:6 74:14 75:19
76:5,12,24 78:18,25
80:14 81:17,20
87:18,22 88:10,21
89:6,13 90:2,7,12
91:14 92:13 93:3
102:25 110:2
112:20 113:11,13
113:15 114:4
115:14 116:3,10,21
117:9,21,23 119:5
119:20,23 120:4,10
120:18 121:20,23
123:23 124:7 125:3
126:14 127:10
131:11 137:9
141:21 142:22,23
149:16,22 150:10
151:11,21 153:24
154:3 155:13,16,18
156:21 157:4,4,9
159:16 167:2
173:20 174:9,10,10
175:2 180:22 181:7
182:11,21 184:10
185:2 187:15 188:5
188:14 190:14
200:7 201:8,17
202:19 204:17
206:22 207:2 210:3
210:8 219:2,7,10,24
220:17 222:6,13
223:5,18 224:22
225:12 226:13,24
227:13
**Barclays's (3)**
74:15 123:17 127:4
**bargained (1)**
60:19
**Bart (3)**
84:10,13 85:5
**base (2)**
11:2 169:4
**based (10)**
12:20,22 21:5 26:4
30:22 121:25
137:24 175:24
193:9 222:24
**basically (11)**
15:14 57:22 83:16
107:12 113:17,18
129:20 136:2 163:2
174:24 200:6
**basis (6)**

21:2 77:8 104:2,5
168:15 192:2
**Bates (4)**
46:2 95:16 135:16
212:24
**bathroom (3)**
58:14,17 208:9
**Battery (1)**
4:5
**bearing (2)**
95:19 135:16
**beg (1)**
136:23
**began (2)**
18:24 114:7
**beginning (4)**
39:24 54:3 119:8
157:14
**begins (3)**
37:15 95:9 105:10
**begun (1)**
107:15
**behalf (8)**
66:12 71:13 73:22
143:18 167:18
212:4,9 228:5
**belief (2)**
153:15 155:6
**believe (87)**
14:11 16:13 21:2
22:16 32:16,19 36:7
36:21 38:12 39:13
43:4,10 44:14,15
46:20,21 51:5 56:15
57:5 58:7 63:6,21
65:19 66:14 69:13
69:22 71:11,14
72:14 75:25 78:10
79:7 88:4 91:21
92:9 103:5,19,20
107:7,10,22 108:10
108:15 110:22
111:23 112:15
122:19 124:8,8
125:14 126:20
134:3,8 141:12
142:6,7 143:25
144:4,10 145:10,23
146:18 149:17
150:21 153:21
154:11 158:6
168:10 172:7
174:17 176:16
186:24 188:23
190:21,23 198:15
199:25 205:25
206:19 207:19
212:22 214:24

218:21 220:11
**believed (9)**
20:14 24:4 44:2 60:6
60:7 153:25 157:12
158:5 203:4
**bench (1)**
140:4
**Berkenfeld (8)**
31:25 32:23 33:24
34:9 35:2,11,14
96:11
**best (16)**
36:12 42:21 45:13,15
73:3,14 76:18 80:19
87:13 90:18 108:15
136:4 156:10 157:4
184:6 203:16
**better (3)**
223:19 224:9 225:13
**beyond (3)**
15:9 85:24 174:18
**big (6)**
16:2 34:16 132:12,15
144:22,25
**bigger (1)**
23:23
**Bill (1)**
160:5
**billion (10)**
40:20,23 43:15 44:10
122:25 152:12
159:16 202:5
209:12,16
**billion-seven (1)**
122:18
**bit (6)**
15:2 86:24 94:23
101:21 108:21
197:7
**black (1)**
161:17
**BlackBerry (3)**
107:4 108:20 109:24
**blackline (12)**
95:8,19,21 96:3 105:9
105:14,16,17
164:24 211:9,11,20
**blacklined (5)**
95:8 110:7 165:9,13
211:17
**blood (1)**
231:18
**blow (1)**
89:12
**Board (5)**
90:21,23 91:4 92:13
92:23
**BOAZ (1)**
4:15

**Bob (4)**
5:16 171:9 190:24
191:23
**BOIES (1)**
3:10
**bonus (1)**
92:21
**bonuses (2)**
93:17 197:25
**book (15)**
20:17 21:3 40:19 41:5
41:14 42:9 43:22,25
44:3,11,21 45:18
46:6 94:15 106:10
**books (8)**
19:20 21:9,20 22:20
22:24 23:9 24:7,10
**bottom (1)**
99:4
**bought (3)**
89:8 156:2,13
**box (4)**
118:9,11 122:23
129:15
**boys (1)**
34:16
**break (16)**
6:3,6,9 19:10 58:14
58:17 59:4 68:17
125:13 126:8
159:23 173:8 208:7
208:9 225:2 226:4
**BRIDGET (1)**
3:8
**Bridgett (1)**
47:10
**briefly (1)**
76:4
**briefs (1)**
134:13
**bring (4)**
133:5 157:20 177:18
223:7
**bringing (1)**
131:14
**broad (2)**
23:15 164:9
**broader (1)**
205:11
**broadly (1)**
7:21
**broker-dealer (8)**
17:4 41:24 42:44:45
155:19 197:11,15
200:10
**broker-dealers (2)**
20:25 197:14
**Brothers (24)**

1:5 3:4 15:25 17:6
18:6,15,21 26:14
27:20 31:12 37:18
38:7,9 41:9 118:23
142:21 162:16
195:5 200:23,24
203:20 209:8
215:13 232:2
**brought (3)**
19:16 36:3 62:21
**buckets (1)**
49:2
**bucks (1)**
156:16
**business (34)**
8:11 15:15 17:5 20:7
20:8 24:20,25 25:7
25:16 63:24 91:25
92:3 113:19 118:23
120:7 121:13,19
123:25 129:21
143:2,7,10 147:3
155:20 168:2
173:19 174:25
175:2 179:15 201:4
218:25 219:8,13
221:4
**businesses (1)**
8:9
**buy (6)**
17:3 24:23,24 89:7
155:17,19
**buying (6)**
8:11 24:20 174:24
175:2 179:16
219:12

_____
C

**c (7)**
3:1 4:1 5:2 126:4
214:25 231:1,1
**calculation (1)**
199:19
**call (7)**
9:18,19 18:5,13 27:25
45:8 223:22
**called (5)**
5:3 7:6 122:22 137:19
137:19
**calls (16)**
25:9,18 28:17 33:3
48:13 77:4 82:17
127:10 134:23
141:14 162:12
174:3 178:8 185:8
187:21 223:12
**Canadian (1)**
17:4
**capacity (4)**

82:9 189:20 191:10
224:16
**car (1)**
116:20
**careful (3)**
74:21 117:15 126:20
**carefully (5)**
67:12 78:7 115:24
139:22 217:15
**carrying (11)**
20:12,16 21:8,17,23
23:8,21,23,24 24:6
24:10
**case (7)**
1:5 17:15 98:24 100:3
116:16 185:12
232:2
**cases (2)**
51:3 170:16
**cash (22)**
28:2,5,6 29:13 123:21
123:22,23 124:6,8,9
146:10,23 150:17
150:18,20,22 151:6
159:8 202:6 209:12
209:13,16
**catch (1)**
216:14
**categories (10)**
31:15 33:14 40:14
119:22,25 120:2
122:5,12 129:14
143:12
**categorize (1)**
43:6
**category (4)**
16:7 55:4 106:6
121:16
**cause (1)**
220:8
**caution (3)**
18:17 39:4 116:4
**caveat (1)**
73:15
**certain (52)**
10:3 15:15,16 16:4,7
19:22 20:4 24:6,17
24:17,18,19 25:23
26:5,10,10,19,21
27:18 29:17 31:15
44:16 47:25 48:2,4
48:23,23,24 53:2
56:4 63:22 87:18
91:19 92:10 93:17
95:22 118:21 120:7
120:16 123:14
124:2,3 125:3,5
129:4 139:18 142:9
142:10 169:9,9

**certainly (29)**
7:22 13:5 14:25 32:19
97:23 107:5 109:25
110:4 111:7 112:18
127:9,25 128:8
145:16 161:10
162:13 164:13
165:7,17,18,19
180:3 189:14 200:6
201:9 203:10 204:3
208:19 213:12
**certainty (1)**
32:22
**Certified (2)**
2:14 231:7
**certify (2)**
231:10,16
**CGSH (3)**
135:12,16 229:17
**chairs (1)**
118:10
**chance (1)**
29:5
**change (27)**
8:14,14,15 27:6,11,22
38:20 39:20 58:5
60:17 62:19,20
63:21 64:14 76:2
123:17 124:22
142:11 158:21
159:2 165:14
166:15 181:23,25
183:8 192:14
219:21
**changed (14)**
8:13,24 27:12 38:11
38:16 54:23 63:9,13
64:15 130:18
158:25 165:11
181:12 184:14
**changes (53)**
28:12 43:2 52:5,11
53:2,17,23,24 54:9
54:12,17 58:3 59:9
60:4,20,21 61:7,16
61:20,22 62:3,8,10
103:16 112:5
114:18,20,23 115:2
115:6,10 123:7,14
139:16 151:2,5
164:24 165:19,23
174:16 175:13
181:12,16,25 183:7
183:12 190:3 194:2
220:8,15,19,20
224:20
**Chapter (4)**
1:5 13:15 17:13 18:10

**characterization (7)**
30:2 67:14 81:24
129:9,11 139:10
212:20
**characterize (4)**
31:10 37:5 45:4,5
**characterized (1)**
39:15
**Chase (1)**
144:18
**choice (4)**
42:7 49:5 227:17,22
**choices (2)**
151:13,18
**chronology (1)**
111:11
**Cintron (4)**
1:24 2:13 231:6,25
**circle (1)**
81:16
**circulated (5)**
65:13 109:5,16,19
211:8
**circumstances (4)**
26:10 42:24 142:10
207:11
**clarification (107)**
28:22 47:16,17,21,22
49:11,20,23 50:6,24
52:10,14,25 53:9
54:20 57:22 58:11
59:7,12,14,16,18
62:10,14 64:18,25
65:14,16 71:18 72:9
75:5 85:21 94:2,19
99:18 102:23 105:6
106:16 108:19
109:6 111:8 112:13
112:23 113:4
114:11,16,17,24
115:2,4 130:3,15
133:23 135:4 136:8
138:21 140:10
141:4,10 142:2
152:9,25 153:10
157:20 158:2,3,8,18
160:23 161:23
162:7 163:7,12,14
163:23 164:7,12
169:11 180:8,12
181:8,13,17 182:12
182:22 183:20
184:8 185:3 189:2
189:12 190:4 192:6
194:4 205:24 206:3
206:14 209:21
211:2,4 212:17
217:23,24 220:6

**clarifications (1)**
59:20
**clarified (2)**
48:10 85:20
**clarify (4)**
47:24 48:24 52:16
181:14
**clarifying (1)**
190:15
**classes (1)**
44:12
**clause (12)**
48:21,22,22 52:9 63:3
63:3,3,7 106:9
123:22 183:17,18
**clauses (1)**
55:9
**clean (3)**
83:22 95:8 211:9
**clear (25)**
17:10 23:5 46:10
57:25 86:24 87:10
89:5 92:5 93:8
100:10 111:11
117:9 130:17
139:14 145:2
178:23 186:15
187:3,15,16 188:4
194:6 221:7 226:15
227:8
**clearance (2)**
73:18 122:22
**clearing (3)**
73:18 212:9,10
**clearly (7)**
50:5 97:14 111:21
148:14 150:16
151:5 158:17
**Cleary (63)**
1:13 2:8,10 4:11
13:23 16:20 36:9,14
39:22 42:21 44:8
50:15 54:11 65:24
66:13 70:6,13 71:2
71:7 72:21 73:3,4,7
73:23 76:5,13,24
78:18,25 80:14 81:5
81:16,25 82:15 84:9
87:21 88:9,13 90:12
91:3 92:25 98:8
102:25 109:25
127:4,9,13 133:13
137:8,9 160:13
161:20 166:19,21
172:16 176:2
178:14 179:18
194:18 206:15
211:13 218:6 232:3
**Cleary's (2)**

140:7,14
**client (5)**
15:20 73:6 82:4
167:20 191:12
**clients (5)**
51:24 162:12 197:15
198:10 203:16
**close (9)**
130:11 131:20 132:12
144:16 154:14,15
158:22
**closed (8)**
27:5 28:15 68:21
132:8 153:17 155:9
159:18 167:23
**closely (1)**
210:22
**closing (16)**
7:20 8:15,22 9:2 10:5
12:8 39:25 89:2
91:2 144:15 153:8
157:17 167:9,9
208:14 210:5
**Code (9)**
72:24 73:8 74:4 76:15
76:25 79:2 80:16
81:18 82:6
**collateralize (1)**
212:10
**collateralized (1)**
40:18
**collateralizing (1)**
222:5
**colleague (1)**
112:10
**colleagues (14)**
51:24 66:14 107:8
111:24 130:23
131:25 132:23
135:25 137:13
170:20 191:11
207:21 208:3
213:14
**collecting (1)**
170:4
**collectively (3)**
40:20 103:25 104:3
**colloquy (2)**
79:14 141:2
**combination (2)**
16:17 50:25
**combined (1)**
103:13
**come (13)**
18:6,14 33:10 38:15
40:23 66:24 67:19
68:18,24 94:13
121:7 136:9 154:4
**comes (1)**

85:5
**comfortable (3)**
127:4 154:5 156:24
**coming (5)**
39:12 61:3 121:20
140:8 225:22
**comment (1)**
9:17
**commented (2)**
145:22,23
**comments (6)**
95:20 100:20 106:20
139:23 204:14
211:13
**commercial (1)**
40:16
**Commission (1)**
232:25
**Committee (7)**
3:19 92:23 134:18
139:24 208:15,18
208:21
**committing (1)**
156:22
**communicated (3)**
98:6 117:10,12
**communication (6)**
77:16,17 79:9 150:4,5
223:22
**communications (8)**
14:13 73:5 77:4 82:2
82:4 178:13 185:9
186:2
**company (1)**
7:17
**company's (1)**
197:13
**compare (1)**
71:25
**compared (1)**
10:25
**compensation (3)**
26:21 34:5 125:6
**competitors (1)**
157:6
**complete (3)**
31:2 54:14 160:16
**completed (1)**
56:2
**complex (2)**
51:18 147:16
**complicated (1)**
50:9
**comply (1)**
199:14
**complying (1)**
47:7
**Compound (1)**

97:12
**computer (1)**
166:17
**conceded (1)**
205:5
**conceivable (1)**
189:4
**concept (8)**
13:7 17:16 28:4
110:23 123:19
154:10 159:15
228:6
**concern (8)**
21:23 22:25 38:17
88:6 99:16 100:11
154:17 157:16
**concerned (1)**
34:11 35:4
**concerning (20)**
14:7 45:17 74:3 76:24
78:18 82:4 91:4
94:17 141:3 152:23
172:9 181:6 184:9
188:15,17 189:17
210:5,9 215:5
217:25
**conclude (1)**
23:2
**concluded (7)**
16:18 17:22 41:11
54:19 140:5 153:8
217:19
**conclusion (1)**
59:10
**conclusions (3)**
41:13 217:6,17
**conference (4)**
16:2 144:10 145:3
162:15
**confess (1)**
108:21
**confirm (6)**
79:25 177:20 178:9
190:6,8 205:15
**confirmed (4)**
143:22 160:9 178:20
180:13
**confusing (1)**
217:2
**connection (21)**
16:21 19:15 31:6
56:23 73:8 79:3
80:16,21 82:7 88:9
133:22 161:23
169:7 172:25 173:3
180:10,11 197:13
213:19 223:10
225:10
**consciousness (1)**

196:24
**consideration (4)**
9:25 11:5 125:6
174:10
**considered (3)**
41:9 42:7 139:22
**consist (1)**
93:25
**consistent (17)**
52:18 89:18 95:25
96:7 119:11 133:12
136:4 139:19
153:10 158:9 164:7
164:8 181:18,20
201:2 220:4 224:3
**constitute (1)**
79:22
**constraints (2)**
198:12 202:18
**consult (2)**
67:17 177:16
**consultation (1)**
128:4
**consulted (1)**
73:20
**contacted (1)**
167:19
**contained (1)**
55:2
**contains (1)**
40:7
**contemplated (8)**
20:5 113:14,15 114:8
135:3,8 181:22
219:6
**contemplation (3)**
129:5 130:2,6
**contents (2)**
37:13 129:15
**context (12)**
8:11 44:4 66:2 84:18
103:20 127:23
155:4 170:9 171:18
171:19 183:19
188:25
**continue (2)**
131:9 200:11
**continued (2)**
126:6,21
**contract (10)**
10:8 25:10,19,21,22
28:18,25 48:17
223:23 224:17
**contractual (1)**
135:5
**contrary (1)**
185:22
**controversial (1)**

190:8
**Cont'd (1)**
4:1
**convene (1)**
116:15
**convention (1)**
161:18
**conversation (49)**
18:18 39:7 67:8 77:24
86:19 97:17 107:24
111:23 116:2
117:24,25 118:13
119:9 126:9 127:11
129:24 133:11,17
133:23 134:2 142:5
142:8,19 146:2
149:20,21,25 150:9
152:3,21 155:5
159:4 171:17 180:6
192:24 193:18,23
193:24 195:2 196:8
196:9,16,21 197:4
200:13 205:23
206:18 226:19
227:11
**conversations (38)**
50:23,24 71:15 84:10
84:18,20,21 89:17
116:9 131:11
134:23 137:8 142:3
147:24 170:19
171:5,21 172:25
176:16 177:8,24
178:19,25 179:22
179:24,25 180:3,5,9
180:15 185:5
193:15 203:2,9
222:24 223:10
224:5,8
**conveying (1)**
219:23
**copied (2)**
69:5,5
**copies (2)**
109:24 163:6
**copy (4)**
6:12 29:3 47:12
168:10
**corner (2)**
95:10 101:23
**corporate (3)**
40:16,16 131:25
**Corporation (1)**
167:13
**correct (21)**
17:19,23 22:17 32:11
53:5 62:19 71:23
85:22 90:4 105:7
109:10,13 114:21

115:8,11 129:9,10
178:3 211:10
216:23 221:8
**corrected (3)**
75:4,15 80:20
**correcting (1)**
76:10
**correctly (1)**
111:20
**costs (1)**
26:19
**counsel (22)**
5:17 68:11,13 74:14
116:3,3 118:12
127:15,21 160:6
162:17 168:24
173:6 186:9 203:22
203:25 210:24
215:13 224:12,21
224:22 226:18
**Counselor (1)**
175:10
**counted (1)**
120:21
**counting (1)**
57:16
**COUNTY (1)**
231:5
**couple (11)**
13:12 16:12,14 54:3
63:19 136:12
170:10 189:22
192:21 203:2 206:4
**course (16)**
20:9 68:20 102:12
120:3 146:17
151:24 154:24
161:15,21 175:6
189:21 197:3 202:3
203:8 207:24
208:13
**court (81)**
1:1 50:3 52:3,18,20
53:16 54:4,6,6,10
54:13 56:24,25
57:19 59:17,19,23
60:6,13,23 61:9,18
61:23,23 62:25 63:2
63:12 66:22 107:8
107:15 108:3
109:10,14 112:24
113:5 114:6,12
116:12,15 127:2,17
128:5,22,24 130:4,8
130:16,20 131:3,6
133:4,5 139:5,15,20
139:22 141:3
142:12 146:22
148:5,21,22 151:12

151:17,19 153:2,22
157:24 158:10,11
158:14,17 173:18
173:22 174:8,13,16
174:19 175:10,15
175:17
**courthouse (3)**
116:14,19 149:2
**courtroom (13)**
107:3 110:2,5 112:8
116:17,18 118:2,5,9
124:14 148:24
149:2 154:13
**Court's (3)**
62:22 153:11 164:9
**cover (5)**
96:21 135:24,24,25
213:13
**covered (4)**
88:18 119:10,24
129:15
**Cox (2)**
119:5 149:17
**co-counsel (1)**
69:7
**CRAWFORD (1)**
3:8
**crazy (2)**
23:9 142:7
**create (2)**
80:25 156:9
**created (4)**
46:25 75:21,25 121:4
**creation (1)**
83:16
**credibility (1)**
45:11
**creditors (7)**
3:19 121:13 134:17
139:24 208:15,18
208:21
**Cromwell (11)**
42:20 69:7 70:18
71:13,23 76:6 82:13
83:6,18 136:6
137:22
**crossed (1)**
215:7
**CRR (2)**
1:24 231:25
**cure (1)**
26:19
**customer (3)**
197:17 200:11 201:12
**customers (5)**
167:25 197:18 198:7
198:10 200:5
**Customs (1)**
116:20

**c3 (6)**
198:13 199:19 200:21
200:23 201:19
210:10

_____ **D** _____

**d (10)**
40:10,24 41:15 44:10
45:18 106:9 211:21
214:25 216:21
229:1
**daily (1)**
21:2
**date (15)**
6:16 7:20 8:18,21,23
10:13 11:3 16:10
40:19 95:19 135:13
136:14 195:20
213:6 232:2
**dated (6)**
26:2 72:12,15 98:19
135:22 195:14
**dating (1)**
32:3
**Dave (5)**
98:19 137:14 190:24
191:23 218:9
**David (5)**
51:2,6 105:3 171:5
191:24
**Davis (7)**
4:16 51:3 171:9,9
190:24 191:23
208:3
**day (17)**
3:3 5:16 15:2 21:4
113:24 114:9
116:12 137:21
143:15 145:5 156:6
169:20 179:12
204:2 228:22
231:22 232:23
**days (9)**
13:12 16:12,14 74:18
111:15 134:10
154:24 156:10
157:7
**deal (86)**
9:22 18:7 22:19,23
23:11 24:15 27:5
28:14 52:5,12 53:24
53:24 56:2 59:15
60:22 61:8,17,20,22
61:24 62:3 63:2,21
67:14 84:5 85:17,17
85:25,25 86:5,11,15
91:8 104:13 106:13
115:20 121:4,10,11
122:11 123:7,10,15

123:17 127:5
128:10 137:18,20
139:16 147:18,19
151:3,7 153:16
154:7,14,20 155:8
155:12,17,18
156:14 157:13,17
159:17 161:16
162:2 164:10,14
170:15 174:13
175:14 179:20,21
182:6 183:23
186:12,23 188:3
207:10,20 216:7,10
216:11,12 219:21
**dealing (8)**
102:19 132:13 144:13
161:20 166:22
167:2,5 219:17
**deals (1)**
89:11
**dealt (1)**
110:24
**debt (1)**
40:16
**debtor (2)**
127:22 134:17
**Debtors (4)**
1:7 3:4 5:17 176:17
**debtor's (2)**
118:12 127:15
**decide (1)**
173:18
**decided (2)**
51:19 104:6
**decision (5)**
97:7 98:4 103:24
104:2 157:19
**declaration (57)**
6:12,15,17,21 7:2,4
11:25 12:13 14:9
19:25 22:14 23:14
30:10 37:4,9 38:4
47:5,9 74:13,25
83:23 85:2 87:16
89:5,18,23 108:17
108:23 109:19
161:5 168:9,15,22
169:2,4,8,25 171:20
171:20,23 172:2
173:2 176:7,23
177:12,17 179:3
180:14 193:11
202:12 206:5 222:3
222:17,18 223:24
224:2 229:14
**defer (3)**
10:8 180:2 224:21
**deficiency (4)**

200:21,23 201:10,14
**defined (4)**
8:4 28:5 65:8 129:22
**defines (1)**
12:12
**definition (18)**
40:7,11,25 41:15 53:3
53:18 55:7 62:8,11
62:19,21 63:8,12
65:19 105:12
106:18 120:14
220:9
**degree (1)**
90:13
**delete (1)**
212:21
**deleted (14)**
125:8 181:7 182:11
182:22 183:13
184:10 185:3
212:16 215:7,11,18
215:21 220:12,15
**Deleting (1)**
183:6
**deliberate (1)**
49:5
**deliver (7)**
113:22 115:21 129:4
143:4 159:8 201:8
228:8
**delivered (7)**
56:11,13 65:9 109:24
120:11,23 215:16
**delivery (1)**
201:3
**Dep (1)**
232:2
**depending (2)**
29:16 163:10
**Deponent (1)**
232:3
**deposed (1)**
224:16
**deposit (1)**
209:14
**deposited (1)**
202:6
**deposition (29)**
1:12 2:8 5:19 6:14
29:3,6 69:4 73:16
77:12 133:9 134:7,7
134:8,11,14 135:11
160:12,15,17
169:21 172:10,16
173:5 195:16
210:22 213:2,19
231:12,14
**depositions (2)**
17:15 134:5

**Depository (1)**
167:13
**deposits (1)**
212:12
**Depression (1)**
155:4
**deputy (1)**
74:13
**derivatives (13)**
40:17 160:24 179:15
180:21 181:19
186:20 188:6,8,20
189:7 190:13 222:6
223:4
**describe (9)**
11:21 25:2,5,14
115:24 121:6
168:14 196:10
197:4
**described (37)**
11:11,11,20 14:9,12
18:13 26:12 27:6
30:14 41:5,10 44:10
54:9,12 58:9,13,13
60:4,6 66:5 90:6
121:25 129:2
138:14 139:5 150:7
158:6 172:5 174:16
175:14,19 177:24
194:25 196:7
206:11 222:2
223:11
**describing (4)**
52:3 143:17 151:2,5
**description (4)**
44:11 106:6 128:12
128:13
**designated (3)**
160:8 161:3 191:18
**desk (5)**
74:9 144:22,23,25
145:7
**detail (4)**
56:7 57:11 108:6
196:7
**details (6)**
10:19 56:5 66:18
164:13 194:17
198:9
**determination (3)**
91:24 173:25 175:18
**determined (3)**
38:20 91:23 97:11
**determining (2)**
36:15,24
**developed (1)**
175:25
**development (1)**
98:3

**DI (3)**
79:5 134:24 185:18
**difference (3)**
99:23 116:8 200:8
**differences (1)**
116:6
**different (16)**
15:23 59:23 60:23
61:8,17 85:7 110:25
119:12 139:4
144:11 149:6,6
166:23 196:6
213:21 219:17
**differently (1)**
55:3
**difficult (3)**
42:23 147:16 207:10
**dining (1)**
16:2
**direct (1)**
50:22
**directing (3)**
30:9 185:14,18
**DIRECTIONS (1)**
229:7
**directly (4)**
128:22 136:7 189:24
198:8
**disadvantage (1)**
59:24
**disclose (2)**
117:13,15
**disclosed (4)**
90:15,20,22 127:7
**disconnect (2)**
58:2 88:7
**discount (1)**
23:24
**discovered (1)**
142:22
**discretion (1)**
31:2
**discuss (2)**
170:22 201:16
**discussed (18)**
7:5 54:18 76:2,4 78:2
85:9,12 89:7 127:5
129:14 140:3,25
150:8 153:15
165:12,20 185:13
207:13
**discussing (1)**
146:23
**discussion (42)**
25:12 50:10 61:4
64:23 70:6,24 71:2
72:19 81:15 86:7,15
86:21,22 87:3 97:20

110:18,21 126:13
139:6 149:5,7,12,13
150:11 151:24
153:7,14 155:14
159:14 181:3
188:25 194:19
198:11,15 200:22
201:10,11 202:3,10
203:6 210:9 228:3
**discussions (75)**
13:6 14:10 19:17,24
37:17,25 39:12 41:9
45:17 49:17 50:14
50:21 51:9,10,21
70:7,19 73:17,20,25
75:18 76:12,19,23
78:17,21,24 80:13
85:24 86:3,4,9 87:4
87:7,11 90:2,11,25
102:12,24 107:13
107:17,25 108:12
108:12 109:15
112:20 113:23
115:12,19 121:9
123:6 126:11 129:2
130:24 136:7
141:20 144:17
147:7,12 149:16
176:12,15,18
188:13 189:10,16
189:23 190:20
191:8,16 192:3,18
198:22 210:4
**disfunction (1)**
43:8
**dismissed (2)**
136:3 137:6
**dismissing (1)**
136:2
**distinct (2)**
52:2 203:6
**distinction (1)**
43:25
**distribution (2)**
195:18 229:22
**DISTRICT (1)**
1:2
**division (1)**
143:21
**divulge (1)**
137:7
**doable (1)**
121:5
**document (74)**
30:5 32:15,20 34:18
36:6,11,16,20,25
37:21,24 38:7 45:22
45:25 46:7,25 48:19
48:20 49:3 53:14

54:7,8 55:12 69:19
69:21 75:9 92:25
95:5 96:20 98:17
100:15 101:25
102:20 103:22
105:9 107:5 109:3
135:15,17 136:11
136:15 140:2,6
161:16 162:23
166:7 168:23 177:2
186:4 195:10,22,24
196:2,4,5 199:17
207:9 208:22,25
209:6 210:12
211:12 212:23
213:7,9,11,16
214:21 217:4,8
218:11,20,22
219:19
**documentation (1)**
83:17
**documented (2)**
7:6 166:11
**documents (16)**
58:23 93:22 94:5
100:25 104:24
165:7 168:12,19,21
169:6,16 186:13,23
188:3 192:9,24
**doing (14)**
17:12 51:23 116:2
155:16,18,22 158:7
158:8,14 167:25
169:18 175:6 198:2
203:15
**dollar (1)**
207:16
**dollars (6)**
146:13 152:12 159:16
202:5 209:12,16
**double (3)**
57:16 120:21 222:11
**doubt (1)**
194:8
**downstairs (1)**
117:22
**dozen (1)**
124:15
**draft (57)**
49:15,23 50:4,7 95:8
95:19 96:23 97:19
100:14,19 102:17
105:5 106:2 107:12
107:17,20,24
108:18 109:6,9,11
109:15 110:3 111:8
111:14 112:3
114:15 115:2,10
127:23 130:19

162:9,16,20 163:3
166:9,14,14,18
181:7 182:12,22
184:8,21 185:3
204:3 211:4 212:16
212:17 213:18
214:25 215:11,22
216:4 217:23 218:9
219:15
**drafted (6)**
35:25 42:8 83:6 88:13
123:21 205:22
**drafting (5)**
36:4,8 42:22 49:5
82:14
**drafts (22)**
35:20,24 49:11,12
65:13 100:3 110:23
115:9 161:16,22
163:25 164:17,18
165:8 166:12
169:18,24 171:25
183:9 184:18
189:13 210:23
**draftsmen (1)**
36:4
**dragged (2)**
147:21,25
**draw (1)**
43:24
**dropped (3)**
10:21 27:21 28:9
**dropping (1)**
124:7
**DTC (11)**
56:3,13,22 73:17
132:13 137:20
144:14 160:22
167:3,12 168:3
**DTCC (1)**
167:18
**Duane (5)**
51:2 171:5 190:23
191:16,22
**dubious (1)**
130:21
**due (4)**
11:24 121:5 207:8
227:15
**duly (2)**
5:3 231:13
**D.C (1)**
3:13

───────────
E
───────────

**E (12)**
3:1,1 4:1,1 5:2 126:2
126:2,4,4 229:1
231:1,1

**earlier (22)**
8:19 12:15 26:9 30:4
41:10 83:15 101:17
103:18 119:14
124:25 130:8
136:19 141:7 142:6
142:20 164:4
173:13 177:15
178:3 180:8 194:25
202:2
**early (9)**
13:15 16:25 17:9 26:2
55:20 91:24 107:21
115:16 132:3
**easiest (1)**
160:20
**East (1)**
3:5
**easy (1)**
24:3
**economic (2)**
174:20,21
**economics (2)**
173:23 174:6
**Ed (12)**
73:16 149:18 152:5
161:11 171:6,21
180:2 190:24,25
198:20 199:10,15
**effect (5)**
81:17 148:20 183:13
183:16 199:16
**effectively (3)**
21:3 123:25 220:18
**effectuate (1)**
221:3
**effectuating (2)**
219:23 220:3
**efficiency (1)**
5:22
**effort (5)**
49:2 164:6 198:10
216:10,11
**eight (4)**
88:17,22 89:14
118:15
**either (14)**
46:14 101:16 107:11
120:16,20 128:21
135:24 152:22
165:12 183:9 193:6
194:2 204:5 225:16
**Electric (1)**
156:11
**electronically (2)**
164:2,19
**element (1)**
137:17
**elements (1)**

137:16
**elevators (1)**
144:24
**elicit (1)**
179:5
**eliminate (3)**
124:24 189:4 197:25
**eliminated (2)**
57:21 146:25
**emanates (1)**
99:9
**emanating (1)**
99:2
**EMANUEL (1)**
3:17
**embodied (2)**
9:6 104:13
**employees (10)**
90:7 154:4,5 155:7,11
155:12 156:7,23,23
156:24
**employment (7)**
87:18 88:10,15,21
90:8,14 91:15
**ended (7)**
17:11 58:4,6 68:10
114:2 152:9 215:20
**English (2)**
187:5,17
**enormous (3)**
168:5 175:6 203:12
**enormously (1)**
10:16
**ensure (1)**
197:17
**entered (2)**
85:19 103:16
**entire (3)**
15:14 182:4 190:11
**entirely (2)**
139:19 146:9
**entirety (1)**
123:11
**entities (1)**
73:18
**entitled (6)**
77:6,12 92:18 100:19
178:17 219:10
**entity (2)**
20:20 73:5
**equal (1)**
84:7
**equity (1)**
40:17
**ERRATA (1)**
232:1
**erroneously (1)**
75:2

**error (6)**
69:14 70:23 75:4 76:3
76:10 80:23
**ESQ (8)**
3:7,8,14,22 4:7,8,15
4:16
**essentially (2)**
123:4 129:3
**establish (1)**
114:20
**estate (6)**
26:5 57:6 81:9,19
138:2 166:25
**estimation (1)**
41:4
**et (1)**
1:6
**etcetera (3)**
81:4 157:8 181:15
**evening (4)**
52:4,19 130:11 164:4
**event (1)**
98:3
**events (3)**
97:10 114:12 128:25
**everybody (3)**
13:11 113:7 131:9
**everyone's (1)**
17:14
**evidence (3)**
166:11 182:14,25
**evidencing (1)**
24:4
**exact (3)**
13:18 51:25 65:3
**exactly (8)**
11:2 36:2 108:22
113:25 128:4
146:20 148:5 182:2
**EXAMINATION (5)**
5:13 126:6 160:2
226:10 229:2
**examine (1)**
195:22
**examined (1)**
5:4
**example (5)**
23:14,18 59:22 63:11
166:9
**examples (1)**
24:2
**exception (1)**
63:23
**exceptions (2)**
15:15 113:18
**excess (5)**
56:19 199:19 200:9
200:14,18

**exchange (3)**
179:14 188:5 212:5
**exchange-traded (9)**
40:17 160:24 180:21
181:19 188:20
189:7 190:12 222:5
223:4
**exchanging (2)**
49:10 161:22
**excluded (10)**
87:5 105:13 120:5
129:22 143:2
190:17 201:5 217:2
219:9 221:21
**excuse (4)**
178:22 181:2 191:17
217:7
**executed (1)**
55:23
**executives (5)**
87:19,23 88:3,10,22
**exhibit (91)**
6:12,14 29:3,10 31:20
32:10 37:25 40:5
45:21 47:14 53:2
58:24 69:18 72:10
72:13 74:12 83:25
92:12,17 93:23 94:6
95:2,6,7 96:9 98:14
98:25 99:8 100:16
100:17 101:13,16
101:19,22 102:14
102:21 103:4,23
104:15,23 105:2
106:7,22 109:12
110:8,12,15,19,20
110:24 111:2,6
114:15 135:11,15
136:20 168:10
195:11,16 208:23
210:13 213:2
216:17,19 221:23
229:12,13,16,20
230:3,4,5,6,7,8,9,10
230:11,12,13,14,15
230:16,17,18,19,20
230:21,22,23,24
**exhibits (5)**
94:14 213:24 217:21
229:11 230:1
**exist (2)**
54:8 59:17
**expect (2)**
8:5,24
**expectation (2)**
165:10 205:7
**expected (2)**
154:15 158:22
**experience (1)**

8:10
**expert (5)**
41:23,24,24,25
224:11
**expertise (1)**
198:20
**experts (2)**
198:17 205:6
**Expires (1)**
232:25
**explain (3)**
24:3 160:20 199:18
**explained (1)**
228:2
**explaining (1)**
187:11
**explanation (2)**
29:21 227:6
**expression (1)**
38:17
**expressly (1)**
87:11
**extend (1)**
66:16
**extent (47)**
10:11 21:4 25:9,18
28:16 34:10 35:3
38:9 48:15 56:18,22
57:15 63:19 68:2
77:3 83:9 90:14,20
95:25 116:6 117:5,9
119:10 121:24
137:2,6 139:17
140:24 159:6
160:25 163:16
165:4 169:17 171:6
175:23 178:8
184:12 190:22
191:4 204:21,25
205:10,20 219:18
227:3,20,24
**extraordinarily (1)**
42:23
**e-mail (33)**
69:6 70:17 71:12,25
96:10,13,21 98:16
98:18 99:2 105:3
109:6,16,20 135:24
135:25 137:13,18
143:19 145:18,25
146:12 163:4
166:12 195:3,6,11
195:17 209:8 213:3
213:13,21 229:21
**e-mails (1)**
186:8

_____
        **F**
_____
**F (2)**

126:2 231:1
**face (2)**
188:10 207:12 214:18
**faces (1)**
89:12
**facets (3)**
60:22 61:7,16
**facing (1)**
132:15
**fact (33)**
39:19 57:5 60:17
64:13 65:17 66:6
71:15 72:24 76:2
91:12 97:18 99:4
107:20 108:18
109:21 114:20
124:4 130:13 132:6
137:21,22 138:5,18
139:16 143:24
146:23 149:12
151:15 154:18
155:25 157:2
177:19 224:19
**factor (1)**
157:18
**facts (8)**
117:11 121:8 126:17
138:2,4 178:10,11
178:20
**factual (1)**
82:21
**failed (1)**
221:3
**fair (2)**
44:24 86:23
**fairly (1)**
11:11
**faith (2)**
113:8 163:19
**fallen (1)**
154:21
**falling (1)**
154:20
**familiar (1)**
225:18
**families (1)**
18:5
**far (6)**
15:4 18:3 44:24 51:11
143:15 198:23
**Fargo (2)**
209:13,14
**fault (1)**
113:7
**favor (1)**
120:22
**favorite (1)**
124:17

**February (4)**
1:17 2:4 231:22 232:2
**fed (1)**
64:9
**Federal (1)**
64:7
**Feds (1)**
65:22
**feed (1)**
61:3
**feel (2)**
74:10 213:22
**feet (1)**
104:21
**fewer (1)**
113:21
**Fife (16)**
54:10,13 56:25 57:20
58:8 112:11 118:17
119:3 126:10
127:24 129:24
146:21,21 148:5
151:2 203:13
**figure (2)**
150:2 213:15
**file (2)**
18:8 221:23
**filed (4)**
13:14 18:9 50:3
134:16
**filing (1)**
17:13
**final (11)**
42:18 43:2 94:6,7,19
103:8,15 115:4
131:4 140:2 219:20
**finalization (2)**
103:6 133:22
**finalize (1)**
103:9
**finalized (3)**
33:10 131:8 164:7
**finalizing (2)**
114:16 189:2
**finally (1)**
27:5
**financed (3)**
63:24 64:6 65:21
**financial (14)**
8:12 9:10 15:18 20:3
44:4 113:20 120:8
125:4 147:17 154:2
155:16,17,24 168:6
**financing (4)**
64:10 66:17 81:7,18
**find (6)**
8:5 108:22 148:4
151:19 168:11

187:24
**Findley (1)**
103:12
**Fine (1)**
71:21
**finish (2)**
87:9 132:12
**finished (1)**
218:17
**firm (1)**
189:20
**firms (3)**
89:8,9 156:2
**first (52)**
10:24 14:25 16:20
27:12 32:5 43:10
49:23 50:4,7 57:8
58:25 59:3 63:20
65:16 66:4,9 83:3
83:24 94:18 96:8
97:5,14 105:2,14,15
105:15,16,20
106:21 121:16
123:16 126:19
137:22 138:8,11,17
145:21 161:22
162:5,9,16,20
168:25 176:24
177:3,4 178:10
189:15 193:16
201:6 206:20
210:18
**five (2)**
18:16 149:14
**fix (1)**
181:24
**fixed (2)**
27:17 183:22
**FLEXNER (1)**
3:10
**floor (4)**
3:20 16:2 144:20,21
**flow (1)**
11:5
**flowing (1)**
9:25
**fluid (1)**
132:19
**focus (1)**
185:25
**focused (5)**
65:17 121:22 122:7
143:8 189:25
**focusing (3)**
67:10 155:24 206:13
**fold (1)**
47:4
**folks (15)**
19:18,18 20:3 39:14

69:10 70:8 72:20,21
118:23 165:11
171:13 192:12
206:13,15,16
**followed (1)**
147:6
**following (2)**
70:17 106:2
**follows (7)**
5:5 34:23 61:5,14
80:12 120:13 126:5
**follow-up (2)**
71:15 147:23
**follow-ups (1)**
83:21
**forget (4)**
11:2 83:24 123:20
162:18
**forgetting (1)**
26:23
**form (66)**
7:14 8:9 9:14 12:14
14:3 19:21 21:11
24:13 31:8 32:12
34:2 35:17 38:5
41:6 44:13 45:3
48:11,12 52:13 53:6
53:19 54:15,21
59:13 61:2,11 62:24
63:18 64:6 66:8
67:3,23 75:23 84:25
88:14,14 90:9 91:11
93:7 103:17 112:25
114:10,10 115:22
127:8 129:7 131:16
135:7 139:9 153:12
157:23 161:24
170:5 174:4 181:9
182:24 187:8
197:19 199:22
201:21 212:13,19
215:12 219:4,25
221:6
**forth (10)**
37:4 47:23 53:2 64:24
81:2,2 164:2 174:14
178:10 231:13
**forward (4)**
89:21 99:20 169:20
206:14
**forwarded (1)**
69:6
**forwards (1)**
96:12
**foundation (3)**
42:13 221:7,17
**foundational (1)**
83:3
**four (4)**

118:15 149:13 192:17
193:17
**framed (1)**
78:15
**free (4)**
124:9 150:19,22
213:22
**fresh (3)**
23:7,11 24:5
**Friday (35)**
14:23,23 16:22,24
52:4,19 55:20 57:4
62:2 66:21 69:13
113:10,24 115:13
116:12 130:11
136:16 139:15,21
141:3 142:21
152:13 153:20
158:12,23 164:3,5
167:24 196:20,21
197:2,6 200:24,25
201:7
**front (10)**
10:7 25:22 26:24
46:25 58:23 95:2
97:20 118:4 173:14
217:22
**full (3)**
5:7 144:9 154:25
**funds (4)**
198:13 201:19,22
212:12
**funny (1)**
220:3
**furnished (4)**
20:13 22:15 107:21
213:18
**further (12)**
84:3 101:21 121:7,8
147:6,11 149:5,15
159:20 226:9
228:12 231:16

---

**G**

**Gaffey (53)**
3:7 5:10,14,16 6:10
19:13 27:9 34:12,16
34:21 47:10 49:7
52:24 58:16,18,21
68:4,7,10 73:12
77:5,10 78:3,6,12
78:16 79:12 80:3,8
81:13 82:23 93:8,19
95:3,14 98:8 99:15
100:7,12 110:13
114:24 117:17
125:12 126:7
127:12 135:9
140:16,19,23

159:19 170:7 195:9
229:3
**game (2)**
31:13 132:5
**gather (2)**
173:13 199:5
**Gee (2)**
89:20 198:23
**general (6)**
20:24 25:23 27:4
32:14 74:14 156:11
**generalities (1)**
182:8
**generally (8)**
12:20 20:23 25:20
32:7 48:14 87:16,17
94:22
**gentlemen (1)**
192:16
**getting (17)**
9:18 57:17 60:10,12
60:18 70:20 120:18
122:5,7 131:19
144:14 152:13,15
153:8 157:5 175:9
177:11
**gist (1)**
18:18
**give (10)**
5:23 48:16 81:2 82:20
129:18 130:8,9,9
184:6 196:11
**given (16)**
10:13 45:15 63:25
69:9 82:13 122:23
130:16,18,18,20,24
136:19 138:21
163:20 200:9
231:15
**giving (2)**
123:5 152:12
**GMT (4)**
98:20 100:23 105:3
106:23
**go (39)**
26:25 27:20 37:14
42:3 45:22 47:5,8
56:19 71:20 83:14
83:23 85:14 91:25
94:2 95:3,10 96:8
109:4 117:7,18
133:5 138:19
142:15 147:7,10
151:16,18 155:2,3
158:25 166:10
170:3 184:19
186:12 193:9
203:17,17 207:2
214:2

**goal (2)**
113:3 130:7
**goes (2)**
100:13 212:8
**going (68)**
9:15 15:22 18:7 22:7
25:8 26:4,6,7 28:20
30:21 33:17,21
34:12 37:14 44:16
45:4 49:14,15 56:10
56:10,13 64:21
73:19 74:6 75:2
79:13 97:4,6,18
100:9 102:16
104:11 113:15,21
113:22 114:6
116:24 120:11
123:5,15 127:24
128:5 142:12,23
144:11,17 150:23
151:7 152:25
154:21 159:14
160:7 162:4 163:21
164:11 166:5
175:14 176:4 178:7
182:15 184:21
200:11 205:3 221:5
221:16 222:6,12
223:18
**Goldman (2)**
155:3 197:23
**good (7)**
5:15 25:5 113:8
127:13 163:19
175:4,5
**Gotshal (38)**
42:20 50:16 51:4 60:3
65:24 66:11 70:8
71:8,14 72:22 97:15
99:3,9 103:2 111:5
112:8 118:12
128:23 131:23
139:20 144:7,9,19
150:7 151:10 164:6
165:18 166:3
175:15 192:7,7,10
192:23,25 203:11
209:9 226:20
227:11
**gotten (2)**
15:2 203:8
**Gottlieb (31)**
1:13 2:9,11 4:11
13:23 36:9,14 42:21
50:15 65:25 66:13
70:13 71:2,7 73:4
73:23 78:25 80:14
81:6 84:10 87:21
88:13 102:25

109:25 133:14
160:13 172:17
176:3 211:13 218:7
232:3
**Gottlieb's (2)**
54:11 73:3
**governing (1)**
205:4
**Government (1)**
40:15
**governmental (1)**
74:3
**Granfield (2)**
128:19 171:6
**great (4)**
56:6 154:17 155:3
156:13
**group (13)**
42:19 43:19 44:15
103:13 124:14
132:17,19 133:2
145:11 157:19
202:24 203:7 208:5
**groups (1)**
171:14
**guarantee (2)**
212:11,12
**guess (4)**
14:24 19:5 94:12
101:3
**guide (2)**
35:14,19
**guided (3)**
34:10 35:2 36:8

_____

**H**

**haircut (2)**
81:7,18
**half (3)**
124:15 147:22 211:21
**halfway (1)**
211:11
**hallway (15)**
142:9 144:7 149:7,8,9
149:10 194:25
196:8,16,20 197:3
200:13 203:9
205:24 206:12
**Hamilton (5)**
1:13 2:9,11 4:11
172:17
**Hamish (2)**
3:14 226:12
**hand (8)**
90:12,13 102:25
112:21 126:15
131:12 141:21
231:22

**handed (1)**
110:3
**handing (1)**
93:21
**hands (1)**
168:6
**handwriting (1)**
43:3
**handwritten (3)**
46:6,7 103:16
**handy (1)**
94:4
**hang (1)**
154:6
**happen (2)**
66:7 154:22
**happened (9)**
111:14 116:24 149:10
158:20 183:19,21
183:25 189:22
207:24
**happening (1)**
50:9
**happy (4)**
26:25 70:15 156:8
184:19
**Harvey (9)**
51:8,20 118:20
131:24 132:17,22
132:25 145:10
150:6
**HASSAN (1)**
4:8
**hear (10)**
21:18 35:7 58:16
61:13 67:15 80:4,10
135:19 193:14
225:7
**heard (20)**
14:11 66:15 69:16
91:18,19,21 127:2
128:9,13,14,15,17
150:6 153:5 158:11
158:11 167:22
179:11 196:22
197:7
**hearing (40)**
41:11 52:4,21 54:4,14
56:25 57:21 58:4,6
58:11 59:11,17
60:20 62:2,2 63:10
66:23 107:15 108:3
108:20 109:7
111:12,15 112:12
112:19 114:7
116:13 124:15
126:12,18,21,25
127:6 131:7 138:13
140:8 148:23

167:17 173:15,18
**heck (1)**
154:22
**HEDGES (1)**
3:18
**held (7)**
2:10 10:14 44:4
180:20 186:19
188:7 223:3
**helped (1)**
121:23
**helpful (3)**
28:21 95:11 189:11
**helps (1)**
214:6
**hereinbefore (1)**
231:12
**hereof (1)**
40:19
**hereto (1)**
106:7
**hereunto (1)**
231:21
**high (1)**
38:18
**higher (2)**
20:13 21:24
**highly (1)**
91:13
**hold (7)**
79:15 124:19 136:9
168:11 216:24
217:3,5
**holdback (1)**
137:19
**Holdings (2)**
1:6 232:2
**home (2)**
18:4 74:11
**hope (2)**
112:13 154:8
**hoped (2)**
113:6 130:14
**hour (4)**
107:14 108:2 145:15
147:22
**hours (8)**
54:3 112:5 119:21
132:3 147:21,25
162:19 163:22
**House (1)**
116:20
**HR (1)**
92:23
**Hubbard (2)**
4:3 213:14
**Hughes (8)**
4:3 134:7,11 172:6,9

172:20,21 213:14
**Hume (63)**
3:14 21:12 22:2 25:8
28:16 30:16 33:3
34:3 41:17 42:12
45:24 48:12 53:6
67:24 68:5,8 73:10
77:3,8 79:5 82:17
83:8,14 85:14 93:6
93:12 110:12
114:22 117:2,5,8,15
134:22 136:25
137:5 141:11,14
170:18 171:4 174:2
178:7,17 181:2
184:11 187:7,20
191:17 193:4,6
208:6 221:5,11,13
221:16 223:12,21
224:24 225:5 226:3
226:11,12 228:10
229:5
**hundred (1)**
149:18

_____

**I**

**idea (5)**
13:17 90:10,22 93:18
103:21
**identifiable (1)**
60:15
**identification (5)**
6:16 123:8 135:13
195:20 213:6
**identified (3)**
121:17 200:25 201:6
**identify (1)**
140:20
**idiotic (1)**
207:17
**ignore (1)**
112:9
**ii (2)**
63:17 220:8
**imagine (2)**
52:6 224:20
**impact (2)**
181:24 183:16
**implement (2)**
59:19 181:13
**implementation (1)**
83:17
**implementing (1)**
70:20
**implications (6)**
72:23 76:15,24 79:2
80:15 198:5
**important (10)**
89:6 153:16,25

155:12 157:9,13
159:17 166:25
167:4 168:3
**impossible (1)**
114:13
**impression (2)**
145:14,16
**impressions (1)**
140:17
**inaccurate (1)**
184:17
**inadvertent (4)**
69:9,23 70:9 71:16
**include (12)**
63:14 66:11 94:20
97:7,11 103:3 106:4
115:19 128:14
196:15 204:6
206:21
**included (23)**
7:8 12:24 51:5 55:16
77:13 85:2 97:8
102:21 104:23
118:22 120:9
121:18 140:9
141:25 146:9 148:9
149:15 190:14,18
202:23 203:3
205:24 206:15
**includes (2)**
106:2 147:4
**including (26)**
23:17,17 26:16 44:7
72:21,22 76:5,6,13
76:14 96:14 116:22
118:17 120:8,13
131:13,24,24
141:21,23 164:10
179:22 182:4 188:6
191:9 219:11
**inclusion (4)**
204:20 205:19 227:2
227:20
**inconsistent (9)**
128:10 133:3 147:2
148:7 151:12
158:15,20 159:3
225:25
**incorporated (1)**
54:19
**increased (1)**
10:15
**incredible (1)**
163:20
**incredibly (2)**
13:12 207:10
**independent (2)**
184:22 189:15
**indicate (5)**

44:9 96:21 99:3,10
192:22
**indicated (4)**
151:6 154:13 169:14
222:4
**indicates (1)**
95:21
**indication (1)**
180:19
**indirect (1)**
88:8
**indirectly (1)**
198:8
**individual (2)**
39:17 228:5
**inflated (1)**
15:7
**influenced (1)**
36:4
**information (12)**
15:11 16:5 20:4 22:15
23:12 44:9 77:7,13
82:21 128:11
154:25 158:13
**initial (4)**
18:13 33:18,21
193:10
**initialled (7)**
31:25 33:24 34:15,19
35:6,11,14
**initially (5)**
9:5 17:7,8 65:24 69:4
**inquired (1)**
82:10
**inquiries (1)**
157:6
**inside (1)**
118:10
**insofar (2)**
86:18 181:18
**instances (1)**
164:23
**instruct (6)**
35:20 67:25 79:6
134:25 137:9 176:3
**instructed (1)**
83:8
**instruction (1)**
78:14
**instructions (2)**
5:24 153:11
**integrated (1)**
156:8
**intended (4)**
52:17 102:20 104:21
183:17
**intent (3)**
47:24 164:8,15

**intention (4)**
130:10 190:8,11
194:9
**interest (7)**
5:22 17:14 55:16 56:9
56:21 197:14 200:5
**interested (1)**
231:19
**interesting (1)**
216:2
**interim (2)**
163:3 166:18
**interject (2)**
117:2 136:25
**intermittently (2)**
166:4,6
**internal (3)**
145:25 195:3,5 209:8
**internally (2)**
51:23 70:14
**interpret (1)**
141:17
**interpretation (7)**
25:10,19 28:17
141:15 187:21
223:23 224:18
**interpretations (1)**
48:17
**interpreted (1)**
224:17
**interrupt (1)**
111:17
**interruption (1)**
6:5
**intersection (1)**
48:13
**introductory (1)**
177:14
**invested (1)**
156:18
**investigated (1)**
148:16
**investigation (1)**
121:8
**investment (5)**
17:4 89:8 155:19
156:2 175:5
**involved (36)**
15:2,20 28:2 36:6
39:11 50:13,21 51:9
51:20 52:8 56:6
57:15 66:19 70:5,7
73:17 84:4 85:3
87:21,25 88:7 89:17
107:16 136:6
162:11 180:3,5,6,7
188:16 190:19
191:2,3 192:5,15

206:16
**Ira (1)**
5:9
**issue (16)**
6:24 12:24 43:19
51:15 60:24 61:10
61:19 77:20 113:17
148:16 159:11
161:2 167:21 189:4
194:5 210:5
**issuer (1)**
23:20
**issues (7)**
56:3 121:4 132:13,14
132:15 160:21
216:11
**iterations (1)**
93:25
**I.D (2)**
229:12 230:3

_____

**J**

**J (2)**
195:17 229:21
**JAMES (1)**
3:22
**job (2)**
1:25 87:23
**Joel (1)**
195:12
**John (1)**
103:12
**joined (2)**
149:6,11
**joining (1)**
92:2
**Jointly (1)**
1:6
**Jonathan (1)**
172:5
**Jones (2)**
3:3 5:16
**Joseph (1)**
195:14
**JPMorgan (1)**
144:18
**judge (14)**
53:17,22 106:25
112:12 126:17
127:3,7 128:13,14
130:9 131:15
138:12 139:8
157:21
**judgments (1)**
38:13
**jump (3)**
117:6,7 217:6
**junior (3)**

23:19,19,25
**jury (2)**
118:8,11
**J.P (2)**
132:14 167:3

_____

**K**

**K (2)**
5:2 126:4
**Kaplan (3)**
74:13,22 75:14 76:9
**keep (7)**
34:13 56:10 89:11
156:8 157:5,9,10
**keeping (5)**
154:3 156:23 165:18
165:24 192:8
**keeps (1)**
34:14
**Keller (1)**
96:10
**key (3)**
89:15 137:16 156:24
**Kidder (1)**
156:13
**kind (5)**
7:13 31:6 46:25 204:4
**KINGS (1)**
231:5
**Klein (14)**
116:22,23 117:19
118:17 119:3
126:10 129:2,24
143:17 149:17
151:25 152:11
202:3,13
**knew (15)**
13:11 15:19 57:11
66:23 71:8 98:8
102:16 108:12
148:8 150:25 151:7
158:2,17 174:25
197:21
**know (171)**
5:11 10:6,21 13:2
15:4,21 17:7,24
18:12 19:5,23 20:19
20:24 23:13,13,25
27:24 28:22 29:22
31:5,9,13 32:18,23
34:17 35:18 37:2,6
39:6,19 42:17 43:7
43:11,14,18 49:25
50:19 51:8,13,22
52:2 54:8 57:11
60:19 62:4,20 63:5
64:5 65:12 69:10
70:4,20 71:5 72:2
73:22 75:24 80:22

81:25 83:5,10,18
85:15 88:16,20 89:4
89:16,21 90:5,17,19
91:14 92:24,25
93:10,13 97:24
101:11,18 103:8
110:4 111:4,5
113:25 114:2
118:14 120:3
128:21 132:4,7,9,12
132:18,18 133:21
136:9 137:15
138:15,18 144:25
145:15 146:6 147:4
148:3,17 149:19
150:17 152:12
154:8 155:13
156:17 157:3 160:4
161:4 163:18 164:9
164:10 165:2,4,9
166:4,21 167:10
168:5 169:22
170:10,12 172:13
174:5,8,13,19,21
175:8,8,9,11,11,13
175:18 182:17
183:2 185:10
187:19 189:9
194:17 196:25
197:10 198:3,24
199:5,5,8 201:13
202:24 203:10,12
203:16 204:3,12
210:15 213:9 214:8
214:9,11,15,16
215:15,20 218:8,24
226:13
**knowing (5)**
39:21 70:15 133:16
164:11,20
**knowledge (27)**
13:18 19:17 36:12,22
37:23 41:7 63:12
71:7 73:3,14 74:5
74:24 76:18 80:19
81:22 82:8 85:11
108:16 109:25
168:18 169:5
177:13 180:14
208:20 210:6,7,11
**known (3)**
107:4 121:25 157:2
**knows (3)**
13:11 55:9 83:4

───────────

**L**

**L (2)**
5:2 126:4
**lack (3)**

45:11 221:6,17
**lacks (1)**
42:13
**language (56)**
64:25 65:4,11 71:22
82:14 83:7 94:18
105:25 106:17
120:13 129:16
152:6,16 180:25
181:6 182:10 184:9
184:25 187:14,16
188:25 189:3 190:5
199:16 204:20
205:3,20,22 206:5
206:10 207:7,11
212:3,13,16 215:2
215:10,18,20,23
216:2,18,21,22
217:24,24 218:2,3,6
218:25 219:23
220:24 221:3
225:25 227:3,20
**laptop (1)**
162:24
**large (6)**
16:7 22:20,24 103:14
144:8 163:16
**largely (1)**
163:15
**larger (6)**
17:2,5,11,17 171:14
203:8
**late (17)**
13:15 15:25 31:12,13
31:13 55:19 69:13
100:18 107:11
132:2,4,4,9,16
142:4,5 211:6
**law (10)**
152:8 199:13 204:21
205:2,10,21 227:4
227:21,25 228:4
**laws (1)**
199:15
**lawyer (9)**
20:19 43:17 44:2,3
65:23 91:8 140:18
141:17 224:23
**lawyers (30)**
14:18 23:17 24:3 36:5
39:13 43:13 46:21
65:15 66:4,10,11,12
67:10 107:16,23
108:8,10 111:13
114:4 127:3 131:24
145:8 151:11
162:13 166:3,22
178:14 203:14,15
205:5

**lay (1)**
164:12
**Lazard (3)**
118:24 121:3 145:9
**LBI (5)**
63:14 65:6 81:9 106:3
212:4
**lead (2)**
142:11 202:17
**leadership (3)**
92:21 93:4,14
**leading (1)**
71:4
**learn (3)**
67:11,13 69:2
**learned (20)**
57:4 65:16 66:4,20,25
67:4,5,20 69:5,23
92:6,9 112:3 113:12
115:13 119:21
122:2 123:12 138:3
148:23
**learning (1)**
68:19
**leave (3)**
12:13 173:7 203:10
**led (5)**
22:16 51:13 113:23
120:10 150:21
**left (2)**
206:13 209:17
**legal (13)**
25:18 43:21 48:16
68:11 81:11 104:17
129:18 141:14
175:22,24 187:9,21
202:18
**Lehman (150)**
1:5 3:4 6:25 9:5 13:3
13:14 14:20 15:5,6
15:25 16:8,18 17:5
17:9 18:6,14,21,25
19:18,19 20:13,21
21:20,20 22:20 23:6
23:7,10,24 24:4,9
26:14 27:20 29:16
31:12 37:17 38:2,7
38:9,13,16,24,25
39:19 41:2,8 43:12
44:16,18,20,25
46:13,16,18,22
49:18 54:2 56:9,20
56:20,23 57:7 70:8
71:8 72:16,21 75:20
76:6,13 86:10 87:19
87:23 88:10,22 90:2
90:5,7,12,21,23
91:4 92:18 103:2,21
104:9 112:21

113:11,22 114:5
115:14,20 116:11
118:23 119:19,22
120:25 121:18
122:8,9 123:3 124:5
124:5 125:7 126:15
129:3 131:12
141:22 142:21
143:4,9,19,24 145:9
145:25 146:4,14,18
151:11 153:24
154:3,5 162:15
163:9 166:25 176:7
178:15 188:15
195:3,5 198:12
199:24 200:10,23
200:24 201:7,7,16
202:14,21 203:5,19
203:21,22 204:4
209:8 215:13
219:24 227:17
228:5 232:2
**Lehman's (17)**
20:17 21:9 22:16,24
41:13 43:5 44:11
92:20 93:3 123:22
162:17 178:14
180:21 203:22,25
219:3 223:4
**Lehman-Barclays (1)**
213:4
**Leinwand (10)**
51:2 171:6 190:24
191:24 208:4 211:2
211:5 216:4,16
218:9
**letter (107)**
28:22 47:16,17,21,22
49:11,21,24 50:24
52:10,15,25 53:9
54:20 57:22 58:12
59:7,12,14,16,18
62:10,15 64:18,25
65:14,16 71:18 72:9
75:5 85:21 94:2,19
96:2 99:18 102:23
105:6 106:16
108:19 109:6
110:22 111:9
112:13,23 113:4
114:11,16,18,25
115:3,4 130:3,15
131:5,8,14,19
133:23 135:4,11,24
136:8 138:21 141:5
141:10 142:2
152:10,25 153:10
157:20 158:2,3,8,19
160:23 161:23

163:7,12,14,23
164:7,12 180:9,13
181:8,13,17 182:12
182:23 183:20
184:9 185:4 189:3
189:12 190:4 194:4
205:25 206:3,14
209:8,22 211:2,4
212:18 217:24
220:6 229:17
**let's (7)**
18:22 43:14 80:9,10
83:22 95:3 199:6
**level (4)**
24:9,19 85:25 198:10
**Lewkow (266)**
1:15 2:10 4:12 5:1,9
5:15 6:1,15 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1,16 19:1
19:16 20:1 21:1
22:1 23:1 24:1 25:1
25:14 26:1 27:1
28:1 29:1 30:1 31:1
31:19 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1,6
41:1 42:1 43:1 44:1
45:1,10 46:1,5 47:1
47:12 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1,22 59:1 60:1
61:1 62:1,7 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1,6
75:1 76:1 77:1 78:1
79:1,21,25 80:1
81:1 82:1,12 83:1
83:23 84:1,2 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1,11
93:1,21 94:1 95:1
96:1 97:1 98:1 99:1
100:1,13 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1,8 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1,14 136:1

137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1,22
160:1,4,10 161:1,11
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1,20
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1,18 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1,8 222:1
223:1,16 224:1
225:1 226:1,12
227:1 228:1,17
229:3,14 231:11
232:3,21
**Lewkow's (1)**
160:16
**liabilities (20)**
7:11 8:13,23 12:4,10
12:11 15:17 16:5
24:17 26:16,16
30:14 31:16 33:14
38:14 84:8,24 86:6
86:11 124:3
**Liberty (1)**
4:13
**liens (1)**
120:21
**life (1)**
70:15
**likewise (1)**
44:22
**limitation (2)**
205:9,11
**limitations (4)**
140:9 141:4,24
153:11
**limited (2)**
15:9 126:22

**Lindsee (1)**
171:6
**line (3)**
99:10 112:16 168:25
**lines (2)**
37:15 206:4
**lining (2)**
161:17,18
**liquidation (1)**
121:14
**list (3)**
8:4 195:12,13
**listened (1)**
38:10
**litigation (2)**
141:16 224:12
**litigators (1)**
214:12
**little (9)**
15:2 66:23 86:24 91:9
94:16,17,23 108:21
197:7
**lived (1)**
154:23
**LLP (8)**
1:13 2:9,11 3:3,10,18
4:3,11
**Ln (1)**
232:4
**local (2)**
77:7,10
**locked (2)**
148:23,25
**lock-up (2)**
195:19 229:23
**log (3)**
77:14 78:9 79:7
**long (13)**
35:22 40:20 65:19
66:5 94:11 106:8
110:9 143:14
148:15 175:3
195:13 196:12
220:14
**longer (3)**
57:13 113:6 147:25
**look (49)**
10:7 23:7,11 24:5
25:21 27:2 29:9
30:7 37:8 40:10
45:21 53:7,11,11
55:5 56:12,16 62:6
71:17,24 74:8 89:20
89:22 94:25 101:4
101:22,22 106:21
107:3,8 110:23
111:14 136:16
150:13 152:11
176:23 184:4

189:12 210:23
213:17,22 214:5,7
214:10 218:16
222:16 223:19
224:9 225:13
**looked (9)**
32:7 103:17 107:6
132:25 133:19
145:20 163:8
169:17,23
**looking (20)**
17:2 28:25 45:12 55:6
71:6 95:6,17 104:15
116:2 168:24
169:20,22 214:3,18
214:24 217:17,21
222:18,20 226:17
**looks (3)**
32:13 209:5 213:20
**Lori (4)**
118:17 119:3 126:10
127:24
**lost (2)**
156:16,17
**lot (19)**
8:12 17:15 64:5 65:17
89:9,10,15 100:24
107:18 113:19,21
131:22 156:14,17
166:22 167:7
181:11 184:18
219:17
**lots (2)**
144:11 174:22
**lower (3)**
95:9 99:22 101:23
**lunch (1)**
125:13
**Luncheon (1)**
125:17
**L-e-i-n-w-a-n-d (1)**
191:25
**L-E-W-K-O-W (1)**
5:9

**M**

**Macchiaroli (2)**
209:25 210:4
**Madison (1)**
3:20
**Maguire (18)**
4:7 160:3,5 161:13,14
178:22 181:4
185:14,20 188:22
193:13 200:17
208:12 222:10
226:5,8 228:12
229:4
**maintain (3)**

182:2 183:22 200:3
**maintained (2)**
146:14 197:10
**major (7)**
52:5,11 53:24 54:9
139:15 146:11
155:8
**making (7)**
38:25 127:22 175:17
181:25 187:3
190:15 219:21
**managed (1)**
118:6
**manner (2)**
21:10 108:7
**margin (29)**
181:6,19 182:4,10,11
182:21,21 183:6
184:10 185:2
188:17,22 189:7,25
190:14 191:9,16
192:4,18 193:24
194:22 212:11
215:5 216:20
217:25 219:3,11,24
221:2
**margins (1)**
216:9
**mark (6)**
6:11 20:25 41:12 42:4
195:10 212:24
**marked (32)**
6:15 16:8,11,13 21:9
21:20 29:3 31:20
37:24 45:21 47:13
58:24 69:18 72:10
74:12 92:12 93:23
101:13 102:14
105:20 109:11
110:20 114:15
135:9,12,15 168:10
195:19 208:23
210:13 213:5 230:2
**market (14)**
20:25 21:9 41:20,22
41:24 42:3,10
143:21 153:17,18
155:10 157:14,18
161:5
**markets (4)**
147:17 154:2,18,23
**marking (2)**
38:13 43:15
**marks (18)**
16:18 19:2 21:6,19
22:16,20 23:4 24:8
38:11,16,21,25
39:20 43:15,21,25
44:19 45:2

**marriage (1)**
231:18
**Masaneo (1)**
203:14
**master (1)**
165:18
**match (3)**
84:24 86:6,12
**material (1)**
175:13
**materials (1)**
169:23
**matter (10)**
6:13,24 9:20 20:24
77:15,22 79:8
141:16 199:6
231:20
**matters (2)**
17:24 207:14
**MayLeen (4)**
1:24 2:13 231:6,25
**McDade (7)**
84:11,13 85:5,10 86:4
86:8 91:15
**McLaughlin (6)**
51:2 171:5 190:24
191:16,23 208:4
**mean (28)**
19:6 20:17 21:16
22:12 35:19 36:5
38:6 44:4 54:5
60:19 68:9 75:24
79:11 82:19 88:2
104:18 162:11,11
162:23 166:7,15
167:13 169:18
174:5 201:13
202:16 206:24
207:16
**meaning (2)**
187:5 194:14
**means (6)**
21:2 34:17 37:3 68:10
93:14 123:11
**meant (7)**
12:13 35:20 52:10
99:5 207:3,4,6
**mechanism (1)**
12:23
**meet (1)**
176:9
**meeting (5)**
91:4 92:13 103:8,10
172:8
**meetings (10)**
15:24 88:2 144:8,11
170:12 172:4,19
208:15,19,21
**member (1)**

128:7
**members (1)**
208:17
**memorialize (1)**
52:11
**memory (4)**
45:13 46:11 50:18
97:7
**mental (1)**
140:17
**mention (9)**
19:8 23:14 87:4
133:10,13 168:17
168:18 170:2
186:12
**mentioned (18)**
23:15 32:25 34:4
66:20 101:16,20
109:9 121:22
143:11,16 155:11
159:9 167:11 180:8
191:22 192:17,17
209:11
**mentions (1)**
133:10
**merely (5)**
145:24 177:19 197:23
227:24 228:6
**mergers (1)**
161:7
**Merit (2)**
2:14 231:7
**mess (2)**
46:25 168:5
**Messineo (5)**
51:5 96:13 98:19
213:3,13
**met (3)**
40:15 170:22 171:10
**Michael (9)**
116:22,23 118:17
119:3,7 126:10
143:17 149:17
151:24
**midday (1)**
17:19
**middle (4)**
5:9,11 112:18 202:11
**midnight (2)**
107:9 153:20
**Mike (1)**
209:25
**Miller (24)**
51:8,20,23 54:9,13
56:25 57:20 58:8
118:20 128:5
131:24 132:17,22
139:2,14 142:6
145:10 146:6,19

150:6 152:22 158:5
203:13 204:8
**Miller's (3)**
133:9 134:7 139:11
**million (15)**
26:7 56:16 106:10,11
146:13,15 151:23
152:15,18 202:7
204:18 209:17
226:20,24 227:12
**mind (6)**
14:14 111:5,6 122:25
159:16 182:16
**minimum (2)**
202:23 203:3
**minor (2)**
190:22 191:4
**minute (11)**
11:8 39:16 47:5 51:16
71:11 74:19 89:22
95:4 98:11 117:19
196:11
**minutes (7)**
91:4 92:13,15 96:17
119:14 145:15
162:25
**mischaracterize (1)**
142:17
**mischaracterized (1)**
142:14
**Mischaracterizes (2)**
182:14,25
**misled (1)**
128:18
**mispronouncing (1)**
51:6
**mistaken (1)**
216:11
**mitigate (1)**
121:24
**modify (1)**
104:18
**moment (5)**
98:14 115:15 196:14
203:21 204:5
**moments (3)**
46:4 47:15 138:20
**Monday (26)**
13:14,15 15:24 17:13
18:5 20:15 68:21
114:17,18 132:3,5,6
142:5 151:14,19
152:23 153:7,18
154:18 155:9 157:7
157:15,18 159:18
162:18,20
**money (10)**
28:2 89:10,10 156:14
156:14,17,18,19

175:4 198:6
**monstrous (1)**
80:25
**months (2)**
27:17 170:9
**Morag (130)**
4:15 7:14 8:9 9:14
11:14 12:14 14:3
18:16 19:4,9,21
21:11 22:3 24:13
25:17 27:7 28:19
29:20,25 30:18 31:8
32:12 33:2 34:2,12
34:20 35:17 38:5,22
41:6 44:13 45:3,25
48:11 49:6 52:13,23
53:19 54:15,21
58:14,17 59:13 61:2
61:11 62:12,14,17
62:24 63:18 64:19
66:8 67:3,23 75:23
77:20 78:4,10 79:15
79:20 80:6 81:10,23
82:16,19 83:2 84:25
87:9 90:9 91:11
93:7 95:12 97:12
98:6,22 99:13,19
100:2 108:25
112:25 115:22
125:14 127:8 129:7
131:16 134:24
135:7 139:9 140:12
140:17,21,24
141:13 147:9 150:3
153:12 157:23
160:9 161:24 170:5
170:16 171:4
172:15 174:4
175:20,23 181:9
182:13,24 185:8,18
187:8 188:19
191:20 193:19
194:20 197:19
199:22 200:16
201:21 210:6
212:19 213:25
215:12 219:4,25
221:12 222:7,12
223:25
**Morgan (3)**
132:14 155:2 167:3
**morning (27)**
5:15 13:16 14:23
16:25 18:5 50:4
115:13,16 126:12
126:20,23 132:3,7
132:10 142:5
143:25 151:19
152:23 153:18

154:18 155:9
157:15,18 159:18
196:19 198:14
213:18
**mortgage (2)**
55:17 57:6 60:16
106:5 138:3
**mortgages (3)**
54:24 55:3 60:9
**MOTIONS (1)**
229:8
**move (1)**
86:25
**moving (2)**
113:10 128:2
**municipal (1)**
106:4
**Murgio (2)**
51:6 105:3
**M&A (2)**
91:7 224:12

**N**

**N (6)**
3:1 4:1 126:2,2,2
229:1
**name (11)**
5:7,9,12,15 15:21
39:5,10,17 51:6
160:4 232:2
**named (1)**
178:2
**names (1)**
191:22
**nature (10)**
46:17 79:9 90:14,19
152:9 205:2 206:7
206:21 207:6,16
**near (3)**
118:4,5 144:24
**necessarily (2)**
166:7 189:3
**necessary (3)**
95:25 151:16 178:9
**need (30)**
5:8 6:3,6 8:5 19:9
22:8 35:7 37:11
49:12 53:11 56:16
56:22 58:14 67:17
81:8 94:4 98:10
112:23 140:5 152:4
184:14 195:22
198:24,25 199:11
203:17 213:8 214:7
217:12 218:19
**needed (15)**
5:10 24:5,8 59:20
76:3 80:20 123:7
124:23 145:2

154:18 155:9
157:15,18 159:18
196:19 198:14
213:18
**mortgage (2)**

173:23 174:8,13,19
175:10,18
**negative (2)**
123:17 222:11
**negotiated (5)**
13:13 44:25 45:8
84:17 194:11
**negotiating (1)**
161:21
**negotiation (2)**
13:24 14:11
**negotiations (19)**
14:6 17:18,20 18:23
19:14 21:21 22:11
22:12 46:12 87:22
88:2,21 89:4 90:20
90:24 98:3 106:15
121:9 163:15
**neither (1)**
151:10
**net (1)**
181:25
**netted (1)**
26:11
**never (13)**
7:5 44:18 96:9 145:4
154:21 163:9 196:4
196:5,23 205:8
213:12 215:20
216:12
**new (23)**
1:2,16,16 2:12,12,15
3:6,6,21,21 4:6,6,14
4:14 15:20 106:24
106:25 107:17,20
115:9 137:19 231:3
231:9
**newspaper (1)**
19:8
**night (13)**
13:15 32:21 98:21
107:11 132:3 142:4
152:22 153:20
162:18,21,21
167:24 211:6
**nine (1)**
96:17
**non (1)**
117:20
**non-excess (1)**
200:9
**non-expertise (1)**
200:2
**non-lawyers (1)**
115:14
**non-privileged (1)**
178:12
**noon (3)**
95:21 96:7,18

**normally (3)**
12:19 91:8 127:16
**Notary (5)**
2:15 5:4 228:25 231:8
232:24
**notations (1)**
45:23
**note (3)**
13:10 46:6 139:13
**noted (4)**
54:6 126:3 139:6
228:13
**notes (1)**
93:20
**notice (17)**
2:13 69:9,11 71:16
72:4,7,9,11,17 75:2
77:23 78:11 99:2,17
160:12 172:16
173:4
**noticed (1)**
145:22
**notices (1)**
81:2
**number (19)**
46:2 65:12 83:25
96:14 100:2 106:12
106:19 119:21
121:6,15 122:17,17
122:24 131:23
132:21 144:21
145:8 147:7 161:16
**numbered (2)**
95:13,15
**numbers (3)**
32:17 135:16 174:23
**N.W (1)**
3:12

**O**

**O (6)**
5:2,2 126:2,2,2,4
**object (44)**
7:14 9:14 12:14 14:3
19:21 21:11 24:13
25:8 29:25 31:8
32:12 34:13 35:17
38:5 44:13 45:3
48:15 52:13 53:6,19
54:15,21 59:13
61:11 62:24 66:8
67:3,24 84:25 90:9
127:8 153:12
157:23 170:5 178:7
181:9 182:24
184:11 187:20
197:19 199:15
201:21 221:5,17
**objection (62)**

8:9 11:14 19:4 21:12
22:2,3 25:17 28:16
29:20 30:16 33:2,3
34:2,3 41:6,17
42:12 48:11,12 49:6
61:2 63:18 64:19
67:23 75:23 77:3
79:5 81:10,23 82:16
82:17 85:14 91:11
93:6,7,12 97:12
112:25 114:22
115:22 129:7
131:16 134:22,24
135:7 139:9 140:12
141:11 161:24
174:2,4 182:13
185:8 187:7,8
193:19 194:20
199:22 212:19
215:12 219:4,25
**obligation (3)**
80:25 205:18 228:8
**obligations (4)**
24:19 128:8 186:20
188:7
**obtain (2)**
39:3 149:4
**obtained (1)**
204:6
**obvious (3)**
128:11 142:16 207:15
**obviously (4)**
14:15 128:19 174:25
185:12
**OCC (10)**
160:22 167:3 179:23
179:25 180:3,6
186:8 189:23 194:4
216:11
**occurred (1)**
44:18
**occurs (2)**
28:24 196:14
**odd (1)**
146:15
**offer (1)**
91:15
**offered (3)**
90:7 91:22 227:16
**offering (1)**
88:9
**offers (2)**
87:18,23
**office (4)**
74:9 107:10 111:13
112:2
**offices (1)**
2:10
**officials (3)**

88:18 113:12 119:20
**oh (5)**
94:7 101:2 167:8
171:9 172:21
**okay (25)**
18:2 33:7 49:14 52:24
75:14 80:3 85:17
95:17 97:3 98:13
99:13 105:17,18,22
112:2 117:3 140:23
142:16 151:22
158:7 202:4 204:11
205:17 214:5
221:20
**OLIVER (1)**
3:18
**omit (1)**
25:23
**omitted (1)**
128:11
**once (3)**
5:21 170:17,17
**ones (6)**
108:11 127:16 157:5
192:21 214:8,14
**one's (1)**
113:7
**one-on-one (7)**
170:13,19,23 171:11
171:14,21 176:11
**one-page (8)**
31:11,21 32:24 33:23
34:9,25 35:10,13
**onsite (1)**
163:9
**onward (1)**
194:15
**open (3)**
94:14 167:22 192:12
**opened (3)**
153:17 154:18 155:10
**opening (3)**
47:23 157:15,17
**operated (1)**
113:8
**opinion (2)**
81:11 187:9
**opportunity (1)**
164:23
**opposed (7)**
7:17 82:15 87:4
201:14 204:19
205:18 226:25
**opposition (1)**
74:15
**oral (1)**
206:11
**orally (2)**

53:25 124:24
**order (10)**
8:6 22:25 140:11
141:9,15,24 157:25
167:17 173:24
184:15
**organization (1)**
212:10
**organizations (1)**
74:2
**original (10)**
9:22 28:3 50:4 53:4
54:25 55:13 129:16
149:13 189:5
219:10
**originally (5)**
16:11 66:5 85:19
88:18 220:12
**outcome (1)**
231:19
**outset (1)**
95:16
**outside (17)**
46:21 57:17 73:6,6,10
73:12 79:16 81:16
82:2,3 116:16,18,18
116:18,19 119:14
163:9
**overall (1)**
174:8
**overlap (1)**
160:25
**overnight (1)**
64:6
**overstated (9)**
16:9,10,11,19 19:2,20
22:17,20 23:5
**overstatements (1)**
22:23
**owned (3)**
57:13 63:14 65:6
**o'clock (1)**
126:22

**P**

**P (6)**
3:1,1 4:1,1,16 171:9
**packet (1)**
104:23
**page (31)**
29:9 32:17 40:7 45:23
45:24 50:5 55:11
92:17 93:20 95:9
96:5,8 105:2,10,14
105:15,16,20
106:22 176:6,22
196:3 202:12
211:15,21 214:20
216:21 220:8

226:16 229:2,7
**pages (2)**
95:13 105:19
**paid (5)**
25:3 81:19 125:7
220:17,18
**panting (1)**
108:21
**paper (16)**
31:11,21 32:24 33:11
33:12,15,23 34:6,9
34:25 35:10,13
40:16 86:2 104:9
206:14
**papers (4)**
74:15 153:21,22
154:25
**par (1)**
23:24
**paragraph (53)**
6:20 7:4 11:21 30:10
30:15 37:9,12 38:3
47:23 62:7 63:17
65:5 71:19,22 72:3
72:8,12 74:24 75:4
75:7,16 82:15 83:7
84:2 87:15,16 89:22
90:6 92:18 94:19
100:14 101:5,6
102:3 105:17,23
108:25 109:5 110:7
168:14,25 176:6,24
177:5 178:11 179:8
180:17 185:21
193:10 202:11
222:19 223:11
225:9
**paragraphs (1)**
177:15
**paraphrase (3)**
124:13 148:10,12
**paraphrasing (1)**
75:3 133:7 152:17
**pardon (1)**
136:23
**Park (2)**
2:11 4:5
**part (30)**
8:24 15:13 17:3 20:6
26:17 28:8 113:16
123:4,10 139:5,17
143:6 147:3 150:24
159:9 168:3 179:16
179:20,21 182:5
189:8 204:18
213:11 216:9,24,25
219:6,13 223:5
226:25
**participant (1)**

190:22
**participate (4)**
36:19 51:25 172:6
208:14
**participating (1)**
198:21
**particular (21)**
8:4 13:19 14:14 23:18
32:8 40:9 48:6,8,9
50:21 64:17,20
156:24 166:11
170:13 176:19
177:18 208:20
214:10 223:8,19
**particularly (3)**
89:20 155:24 165:4
**parties (29)**
14:7 47:24 48:3 55:23
57:3,14 64:24 75:3
75:15,15,19 85:24
91:2 95:23 120:22
124:23 130:2 143:9
157:12,12 161:21
164:8 165:5 186:2
190:9 219:2 221:3
225:21 231:17
**partner (6)**
128:20 149:18 170:13
172:5 179:5 216:4
**partners (23)**
134:2 144:22 166:2
169:13 170:3,4,15
170:22 177:8,16,21
178:2,6,19,25
184:24 185:6 222:3
223:2,7 224:6,9
225:8
**partner's (1)**
73:16
**parts (2)**
134:6 162:14
**party (6)**
49:18 81:3 146:14
166:16 180:16
189:24
**passage (2)**
16:12 23:12
**passed (1)**
148:14
**pay (10)**
24:11 25:6,15 26:7,9
26:19,21 156:5
201:17 227:18
**payable (1)**
228:7
**paying (1)**
174:11
**payments (3)**
24:18 26:3 29:16

**Peabody (1)**
156:13
**Peck (2)**
53:17 138:12
**Peck's (1)**
106:25
**pending (2)**
6:7 137:3
**people (94)**
15:17,18,18,19,22
16:4,18 18:4 20:10
21:18 23:6 35:21,24
42:8 43:24 45:13
50:15,16,19 51:4
88:17 89:8,11,14,15
89:20 96:14 103:9
103:14 117:23
118:15,16,16,18,19
119:2 124:16
127:23 132:13,15
132:19,22 133:20
137:24 144:11,12
144:13,14 145:11
146:18 148:12,16
149:6,14,15 153:15
154:12,19 156:2,12
157:4,10 162:22
163:2,5,8,13,18,22
164:24,25 165:5
167:2,3,7,8 171:10
180:7,11,15 189:24
190:2,2 192:13,17
195:12,13 198:16
204:4 206:2 207:8
207:14 219:16
220:19
**percent (6)**
55:16 56:9 60:10
91:19 118:21
149:18
**Perfect (1)**
58:18
**perfectly (1)**
70:14
**period (8)**
10:11 18:22 27:17
56:14 88:24 162:3
170:8,25
**permitted (8)**
199:20 204:21,25
205:10,20 227:3,21
227:24
**person (12)**
39:5 43:12 73:5 114:3
121:2,3 161:6
179:18 204:13,16
226:23 227:18
**personal (8)**
160:15,17 168:17

169:5 172:24
186:10 189:19
224:15
**personally (4)**
70:11 182:9 191:9
221:19
**personnel (1)**
44:8
**perspective (3)**
123:18 154:2,3
**Pg (1)**
232:4
**phone (3)**
114:3 162:12 170:17
**phrase (16)**
21:7 42:9,10 45:18
46:5,12 64:17,20
88:7 94:20,21 95:22
97:8 167:21 204:22
206:6
**phrased (2)**
78:6 88:11
**picked (1)**
154:9
**picking (1)**
52:14
**piece (15)**
12:10 31:11,21 32:24
33:11,12,15,23 34:6
34:9,25 35:10,13
86:2 104:8
**pile (4)**
58:23 74:11 83:22
98:13
**pinpoint (2)**
49:16 94:21
**pinpoints (1)**
97:6
**pipes (1)**
167:22
**place (23)**
15:24 19:14 31:18
57:9 78:22 107:14
108:2,13 113:24
115:13 116:10
118:14 126:11
133:24 149:8 155:5
174:17 176:15
180:10 198:15
203:2 205:23
208:19
**placed (1)**
141:4
**placing (1)**
141:9
**plain (3)**
187:5,17 188:9
**plan (1)**
158:21

**play (6)**
13:23 33:24 35:12
36:10,15,23
**playing (1)**
190:2
**Plaza (2)**
4:5,13
**pleadings (1)**
134:14
**please (15)**
5:6,25 6:20 40:6
42:15 47:11 65:4
79:4 80:18 105:8
127:19 191:15
196:11 217:12
218:18
**pledged (1)**
57:14
**plural (1)**
75:15
**Plus (1)**
106:2
**point (55)**
5:24 13:3,20,22 14:16
17:20 25:5 28:19
49:10 50:8 55:19
57:4 63:25 64:8
65:3,15 66:14 69:12
73:22 78:7,23 86:23
88:15 90:24 94:18
97:11 101:21 103:6
106:15 108:18
111:10,11,16
112:17 117:18
127:13 129:19,25
131:10 143:25
144:2,4,6 148:17
149:22 157:11
164:3 165:14
180:12 182:15
190:5 197:6 198:19
225:22,23
**pointed (1)**
106:23
**pointing (1)**
96:6
**points (6)**
149:6
**pool (5)**
10:3,18 60:8 122:3,9
**portfolio (15)**
13:19 15:8,12 20:25
24:7,23 26:11,17,17
30:24 34:11 35:4,16
44:17 155:17
**portion (7)**
17:5 27:19 37:15
110:7 144:8 151:23
179:15 180:20

223:3
**portions (4)**
24:6 48:6,8,9
**pose (1)**
83:3
**position (9)**
23:4,18,19,20,23,25
35:22 110:9 216:9
**positions (24)**
10:3,12,15,15 20:5
26:17 27:18 30:25
40:21 42:2 55:17
56:23 57:7,12 65:20
66:6 106:8 125:4
150:20 182:4,5
189:8 190:12
220:14
**possible (4)**
130:14 148:4,18
165:8
**post (2)**
9:2 12:7
**post-closing (6)**
7:8 9:2 11:12,22 12:2
30:12
**Potenciano (3)**
195:12,17 229:22
**potential (5)**
17:2 27:14 29:15
88:14,17
**potentially (2)**
9:25 11:5
**practice (2)**
161:19,25
**pre (3)**
8:25 9:2 12:7
**preceding (1)**
54:3
**precise (4)**
36:2 122:16 137:15
161:8
**precisely (12)**
55:21 101:18 124:10
124:11 148:11
150:14,25 151:4,8
168:7,7 196:13
**prefer (1)**
6:8
**Preliminary (2)**
195:18 229:23
**preparation (6)**
36:6,10,19 169:8
177:17 210:21
**prepare (7)**
12:16,19 134:14
137:22 167:9
171:19 179:2
**prepared (18)**
7:19 21:5,5 22:18,22

31:6 49:24 79:25
80:7 96:24 97:19
104:9 107:18 115:9
144:16 148:20
155:21 179:2
**preparing (3)**
69:3 168:22 177:17
**presence (3)**
177:20 222:24 223:2
**present (11)**
23:16 37:16 52:20
53:16 89:25 119:3
134:2 176:8 180:11
204:4 208:18
**presentation (2)**
127:17,22
**presentations (2)**
61:25 127:2
**presented (1)**
97:15
**preserved (1)**
220:20
**press (4)**
15:5 153:19 154:9,12
**pretty (2)**
50:19 156:12
**preventing (1)**
202:18
**previously (19)**
29:2 31:17,20 37:3
45:20 47:13 58:24
65:9 69:18 74:12
92:12 93:22 103:17
143:7 208:23
210:13 217:18,19
230:2
**pre-closing (2)**
7:8 11:25
**price (23)**
7:9,18 9:2,3,8,12,19
11:12,23 12:2,8,12
12:22 24:11,15,21
25:3,6,15 27:8,22
27:25 30:12
**pricing (1)**
28:13
**primarily (1)**
51:3
**principal (1)**
179:19
**principle (3)**
92:19 93:2 206:2
**principles (3)**
12:21 20:22,23
**printed (2)**
102:4 163:8
**printing (1)**
195:25
**prior (20)**

29:6 89:2 90:8 91:2
91:15 96:13 115:10
119:21 127:6 157:7
159:4 166:14 189:2
196:10,16,24,25
208:14 210:4
214:24
**private (1)**
7:16
**privilege (19)**
18:17 48:18 68:2
73:11,13 77:11,14
78:9 79:7,23 82:3
82:18 83:10 127:11
140:13,16,20,22
225:6
**privileged (12)**
14:13 67:7 77:4,17
117:11,13,16
134:23 137:8 193:6
223:13,22
**probably (5)**
50:16 51:11 71:19
91:12 130:14
**problem (13)**
55:24 75:16,21,25
123:12 137:20
152:7 154:22 155:8
159:11 204:11
207:13,14
**proceeding (1)**
5:18
**process (3)**
113:5 132:16 194:5
**produced (2)**
166:18 214:14
**product (6)**
37:25 140:13,21
141:19 185:10
223:13
**professionals (2)**
166:19,22
**profit (6)**
10:25 26:12,14 27:15
27:19 125:5
**proper (2)**
38:13 41:12
**property (11)**
179:13 180:20 186:19
188:6 197:17
201:12,17 222:4
223:3,18 225:11
**proposals (1)**
92:22
**proposed (10)**
106:17 114:10 184:9
199:7 204:20
205:20 206:10
218:6,8 227:3

**protect (3)**
56:22 197:14 200:4
**protected (2)**
56:4 167:14
**protection (1)**
198:2
**provide (3)**
108:6 114:12 198:9
**provided (13)**
15:11 20:4 28:6 55:5
55:14 56:8 64:10
66:16 125:3 131:6
174:9 176:2 210:24
**provides (1)**
77:10
**providing (1)**
182:10
**provision (43)**
9:8,13,21,24 10:2,10
10:20,21 11:4,10,13
11:20,23 12:3,5,8
12:13 13:4,9 27:13
27:21,25 29:13,14
29:23 30:3,13 34:5
55:2 57:2,18,21
93:16 124:25 125:7
146:24 184:13
192:22 209:21
220:21 221:11,14
225:13
**provisions (9)**
7:9 9:22 27:23 28:13
28:14 47:25 58:12
223:9 225:23
**public (8)**
2:15 5:4 7:17 23:15
23:15 228:25 231:8
232:24
**purchase (119)**
7:9 8:19 9:7,8,12,19
11:7,12,22 12:2,8
12:12,22 13:7,13
18:11 24:21 25:3,25
26:8,12,22 27:8
28:4 29:4 30:8,12
31:7,18 33:9 35:21
36:7 40:5 42:8
47:25 48:4 50:2
52:16 53:4,10 54:25
55:14,22 58:10,25
60:2 61:25 62:11
64:3 65:20 84:15,16
85:18 88:19 93:16
94:7 102:22 103:4,7
103:10,24 104:12
104:14,19,20
113:14 119:23,25
120:4 121:12,13,21
123:19 128:16

129:5,16,20 137:23
138:7,10,11,15,22
138:25 139:18
142:24 146:24
150:22 151:3
158:12 162:5,8,9
163:11,17 169:9,10
174:15 175:12
181:21 189:6 190:9
190:10 194:7,15
201:2 219:6,7,11,13
220:13,22 221:22
223:9,20 224:4
225:14,19,20
**purchased (20)**
40:8,25 41:16 53:3,18
55:7,14 62:9,21
63:13 105:13,23
106:9,18 120:14
142:23 150:24
179:17 190:17
220:9
**purchaser (4)**
63:15 65:7,10 201:8
**purchasing (1)**
124:2
**purely (2)**
144:9,10
**purpose (5)**
43:9 47:20 168:22
173:17 179:2
**purposes (1)**
18:19
**pursuant (7)**
2:12 64:7 121:20
122:11 142:24
143:20 212:4
**push (1)**
101:21
**pushing (1)**
206:13
**put (18)**
40:24 47:12 58:22
67:16 100:23
104:22 151:4,21
156:19 160:7
186:24 194:9
206:25 209:21
217:21 218:25
219:14 222:10
**putting (4)**
64:24 92:11 150:9
171:3
**p.m (22)**
79:19,19 98:20
100:20,22,24 105:3
125:17 126:3
159:25,25 166:9,13
166:14,16,17

208:11,11 211:7
226:7,7 228:13

**Q**

**qualified (1)**
209:17
**qualify (2)**
8:6 12:6
**question (91)**
5:25 6:7 11:19 22:9
22:10 25:13 34:22
34:24 35:5 37:7,14
39:23 42:14,18,18
49:7,8 51:12,15
58:2,3 61:6,15 63:4
64:2 67:15,16,19
68:12,18 71:5 75:10
75:11 76:17,21 80:2
80:5,11,13 82:25
83:3 85:8 86:14,19
87:10 100:13
106:14 126:23
128:3 137:2,7
138:19 142:15,16
146:20 147:10
157:24 158:4,6,16
158:17,19 161:9
162:4 172:15 178:9
181:11 182:18
184:5,12,20 187:10
187:13,20 188:2
198:23 200:16
201:22 212:20
217:10 220:2 221:6
224:25 225:4,5,7
227:23
**questions (10)**
6:22 45:22 87:20 97:4
100:7 125:2 160:6
182:9 226:9 228:11
**quickly (7)**
13:6 49:24 147:20
163:13 184:19
210:23 214:18
**QUINN (1)**
3:17
**quite (4)**
17:10 78:6 147:14
209:6
**quiz (2)**
94:11,13
**quote (2)**
186:18,22

**R**

**R (8)**
3:1 4:1,7 5:2 126:2,4
213:3 231:1

**raise (1)**
100:11
**raised (4)**
103:21 159:11 194:5
198:22
**reach (1)**
217:17
**reached (4)**
20:10 92:20 103:15
206:12
**reaction (1)**
156:22
**read (29)**
11:24 34:21,23 40:15
42:14,16 53:20 61:5
61:14 63:5 74:21
75:6 76:9 80:9,12
109:22 110:9 133:8
134:4,6,10,16
171:24 176:24
177:3 187:4 215:2
216:19 232:4
**reads (2)**
212:3 232:4
**ready (3)**
130:9 144:14 169:19
**real (7)**
26:5 55:25 57:6 121:4
138:2 154:7 198:20
**realize (3)**
105:19 146:8 214:11
**realized (1)**
143:5
**really (12)**
57:10 89:20 107:18
128:3 132:15
153:16,25 154:7
157:3,13 196:24
217:17
**Realtime (2)**
2:14 231:7
**reason (22)**
12:23 41:15,18 48:25
64:16 82:12 83:4,6
86:13 88:11 95:12
104:6 151:25 158:5
158:24 159:4 184:4
184:4 193:8 204:25
207:19 232:4
**reasons (4)**
57:10 58:13 197:12
214:13
**recall (77)**
10:6 13:2,5,8 17:8
25:20 31:23 33:5
42:25 46:13,14,18
49:4,9,17 50:13,20
52:7 54:23 56:6,10
56:24 57:10 61:20

62:3 66:3 68:25
70:24 84:4,19 85:3
86:7 87:25 88:12
97:16,20 98:12
102:15 106:15
109:7 112:7,10,11
114:11 119:8,10
125:10 130:18
131:18 133:18
135:6 136:5 138:13
139:13,23 141:2,8
145:10 146:12
148:13 149:21
176:18 186:10
189:16 193:21
195:4 196:2,9 200:6
203:20 214:19
218:3 221:14,15,19
221:20 226:2
**receive (10)**
99:25 100:6 113:16
124:5 142:24
187:15 188:4,5
202:20 227:14
**received (3)**
145:14 214:15,16
**receiving (1)**
28:8
**reception (2)**
144:23,25
**recess (8)**
19:11 58:19 68:15
79:18 125:17
159:24 208:10
226:6
**recipient (1)**
77:15
**recites (1)**
138:22
**recognize (1)**
208:25
**recognized (1)**
198:4
**recollect (1)**
194:23
**recollection (58)**
10:9 16:14 25:24 27:4
39:11 46:23 49:13
49:22 52:2 55:21
65:14 69:16 75:17
76:9,11 85:5 87:13
90:18 91:17 96:7
97:9 98:2 102:7,11
102:15,17 104:8
113:2 124:13
125:11 131:21,21
133:8,12 152:20
153:13 165:17
166:10 167:16

170:2,4 182:19
183:4 184:2,3,6,7
184:22 186:11
189:16,19 193:25
202:9 203:7 205:9
215:9 217:22 218:5
**recollections (1)**
217:18
**record (25)**
5:7 6:8 25:12 34:23
42:16 61:4,5,14
80:12 86:24 87:10
92:4,5 95:4 98:23
117:8 136:21 160:7
178:23 181:3
184:15,17 226:15
227:7 231:14
**rectangular (1)**
103:14
**red (1)**
161:17
**reduce (2)**
44:17 45:2
**reduced (1)**
122:3
**reductions (1)**
143:4
**REED (1)**
4:3
**refer (9)**
21:19 66:2 94:5
108:17 176:7 177:7
206:5 224:12 225:9
**reference (17)**
40:13 57:2 64:14 72:3
101:8 102:3 104:11
110:6 182:20 183:6
186:2 193:10
209:24 211:25
220:12,14 221:2
**referenced (3)**
43:9 179:23 227:12
**referencing (3)**
71:15 143:20 145:25
**referred (21)**
31:17,22 46:4 47:15
65:18 72:8 88:23
89:23 101:12
105:18 106:8
110:19 115:15
171:2 179:7 190:20
202:12 206:6,20
221:21 224:7
**referring (22)**
11:21 21:8 30:4 32:9
32:10,14 38:3,23
47:18 59:4 63:17
65:2 74:25 101:15
177:10 182:18

183:2 186:7 209:12
216:15,20 226:19
**refers (1)**
34:6
**reflect (12)**
60:17,22 61:7,16
107:13,25 111:14
112:4 130:24 189:5
205:22 218:25
**reflected (14)**
38:12 41:13 44:20
59:11 85:18 106:7
115:3 151:3 164:15
180:9 192:24 206:3
220:15 225:20
**reflecting (1)**
194:12
**refresh (7)**
37:12 76:8,11 102:7
102:10 215:9
217:22
**refreshes (3)**
75:17 97:9,25
**regard (7)**
13:25 19:24 35:15
83:21 162:5,6
188:19
**regarding (2)**
136:8 139:11
**registered (3)**
2:13 196:23 231:6
**regulation (2)**
143:22 161:6
**regulatory (5)**
20:22 197:12 198:5
198:12 199:6
**relate (2)**
12:9 181:18
**related (4)**
26:16 27:22 54:23
231:17
**relates (1)**
172:15
**relating (11)**
7:9 12:3 30:13 138:2
145:18 160:22,23
178:12 190:12
219:12 227:12
**relative (1)**
37:7
**releasing (1)**
198:12
**relevant (1)**
64:2
**remark (2)**
44:16 207:18
**remember (47)**
10:19 18:12 27:23
28:5,11 31:14 32:3

32:17 33:13 35:25
39:10,17 45:16
56:11 65:23 74:17
81:4 96:25 116:7
118:8,25 119:6
122:16,17 124:10
124:11 132:23
133:6 139:25
142:18 145:4
146:20 147:13,20
148:11,15 168:7
183:9 184:2 191:5
192:20 194:10
196:13 197:8 199:9
200:18 204:15
**remembering (1)**
46:8
**remembers (1)**
150:14
**Remind (1)**
75:10
**reminded (1)**
69:3
**remove (1)**
201:18
**removed (1)**
199:20
**Remuneration (1)**
92:23
**repaid (1)**
81:9
**repeated (2)**
119:7,13
**rephrase (4)**
6:2 35:9 71:5 184:5
**rephrased (1)**
80:8
**repo (26)**
64:7,10,14 65:2,22
66:2,6,16 68:19,20
69:12,24 70:9 71:9
72:24 73:9 75:22
77:2 78:19 79:3
80:17,22 81:7,19
82:7 83:17
**reported (8)**
1:23 39:15 119:18,19
120:23 121:15
124:22 143:17
**reporter (8)**
2:14,14 5:6 6:11
127:18 148:21
231:7,8
**reports (2)**
154:9,12
**represent (2)**
160:5 203:16
**representation (1)**
8:17

**representative (6)**
75:21 88:4 160:8
176:19 189:20
191:10
**representatives (25)**
49:19 54:2 75:20
112:21,22 114:4,5
116:11,11,21
117:10 118:24,24
126:14,15 131:13
141:22,23 150:10
176:8,10,17 194:18
202:14,22
**represented (3)**
8:16,22 41:8
**representing (1)**
226:13
**Repurchase (6)**
63:16 65:8 66:25
67:20 81:21 220:16
**request (3)**
65:22 79:10 229:9
**requested (1)**
13:4
**require (2)**
81:18 142:11
**required (6)**
27:13 152:25 174:17
199:6 201:3 224:18
**requirement (2)**
199:3 200:3
**requires (2)**
67:13 137:7
**reread (2)**
29:18 37:19
**reserve (6)**
64:7 122:13,14
195:19 209:10
229:23
**reserves (1)**
200:4
**residential (9)**
54:24 55:3,17 57:6
60:8,15,15 106:4
138:2
**RESIs (10)**
54:24 56:21 57:7,19
60:16,25 61:10,19
124:18,21
**respect (18)**
10:18,22 11:24 17:21
27:7 47:24 98:25
106:3 107:23
160:19 161:2
164:21 199:23
203:12 207:8
209:10 220:25
227:16
**respects (4)**

48:2,5 56:5 95:23
**respond (2)**
106:19 176:5
**responding (2)**
160:11 185:11
**responds (1)**
79:22
**response (2)**
38:16 125:2
**responsibility (2)**
82:14 179:19
**rest (1)**
228:2
**restrict (1)**
76:20
**restricted (2)**
197:17 199:20
**restricting (1)**
77:18
**restrictions (2)**
141:8,9
**result (4)**
61:24 182:2 194:2,4
**results (2)**
116:9 117:25
**resume (1)**
17:25
**resumed (3)**
17:21 126:4 150:12
**retain (2)**
89:14 146:23
**retained (11)**
14:25 16:20,22,23
28:5 123:20,22,24
123:24 124:6
150:18
**Retention (1)**
92:18
**return (1)**
149:9
**returned (1)**
197:18
**revalue (1)**
15:7
**reveal (3)**
68:2 79:8 225:6
**revealing (1)**
48:18
**reveals (1)**
83:10
**review (10)**
29:5 37:11 134:13
168:18,19,20,21
169:5,8 213:9
**reviewed (2)**
16:4 29:6
**reviewing (25)**
30:5 37:21 53:14

55:12 69:21 75:9
95:5 96:20 101:25
109:3 136:11,15
168:12,23 177:2
186:4 195:3,24
213:7,16 217:4,8
218:11,20,22
**revise (1)**
24:8
**revised (3)**
109:5 211:2,4
**revising (1)**
166:6
**rider (1)**
137:17
**Ridings (1)**
134:8
**right (23)**
8:8 47:3 48:21 55:13
69:25 70:20 79:17
81:13 93:9 94:22
96:15,18 100:21
101:2 110:16
122:15 136:20,24
163:18 164:14
169:3 224:13
227:14
**rightfully (1)**
156:25
**rightly (1)**
183:14
**right-hand (2)**
95:10 101:23
**rise (1)**
98:4
**risks (3)**
155:21,23 175:6
**RMR (2)**
1:24 231:25
**Robert (6)**
3:7 4:16 51:2,5 96:13
171:9
**Roberts (3)**
51:7 112:7 203:13
**role (7)**
13:23 33:24 35:11
36:10,15,24 88:8
**romanette (1)**
220:8
**room (20)**
31:12 33:11 39:12,14
84:15 107:2 131:22
132:20,24 133:19
139:3 145:3 162:23
162:24 165:6 166:3
170:14 176:14
192:12 206:17
**rooms (3)**
15:23 131:23 162:15

**Rosen (17)**
149:18 152:5 160:11
160:21 161:5 171:7
171:16 180:2
185:10 190:25,25
191:21 198:20,25
200:14,19,20
**Rosen's (2)**
73:16 171:22
**rough (1)**
226:16
**roughly (3)**
84:24 86:6,12
**row (1)**
173:14
**rule (7)**
74:16 77:7,10 134:16
198:2 202:19 212:4
**rules (4)**
197:22 199:15 205:4
224:20
**run (1)**
175:3
**running (1)**
192:8
**rushed (1)**
217:14

---

**S**

**S (6)**
3:1 4:1,15 126:2,2,2
**sabotage (1)**
207:20
**Sachs (2)**
155:3 197:23
**sail (1)**
141:24
**sale (36)**
6:23 52:3,21 54:18
57:20 58:4,6,11
59:11 60:20 107:9
108:20 109:7
112:12,17,19
126:12,17,25 127:6
127:15 131:7
138:13 140:3,8,11
141:9,15 153:23
154:19 157:25
167:17 173:15,19
204:19 226:25
**sales (1)**
86:22
**sat (3)**
103:11 126:25 128:6
**Saturday (15)**
57:4 69:2 70:3 78:23
107:22 115:7
132:10 143:25
144:2 153:21

163:24 164:18,22
211:3,6
**saved (2)**
93:19 121:10
**savvy (1)**
156:12
**saw (13)**
18:4 32:21 88:14 96:9
96:25 110:5 130:22
135:24,25 196:4
213:12 215:19,22
**saying (11)**
33:6 43:21 77:9 99:7
112:11 132:17
151:22 152:7
171:12 199:7 228:5
**says (12)**
11:25 72:11,16 75:3
75:14 92:19 99:17
99:19 110:14
129:21 152:16
223:24
**scenario (2)**
121:14 130:12
**scenarios (1)**
27:14
**Schedule (3)**
65:9 110:8,13
**SCHILLER (1)**
3:10
**screw (1)**
164:16
**scribner (1)**
103:13
**scroll (1)**
211:23
**seat (2)**
118:7 173:14
**seats (1)**
224:13
**SEC (12)**
143:22 145:24 146:2
146:3 152:4 167:6
197:22 198:24
199:8,11,15 210:9
**second (21)**
14:21 28:23 32:6
79:15 109:4 122:21
124:19,19 136:10
136:10 149:20
154:5 183:15 196:3
196:4 211:15,21
214:20 216:24
217:3,5
**secretaries (1)**
145:3
**section (14)**
29:10 30:8,11 34:5
73:7 74:3 79:10

105:10 137:19
211:21,25 214:23
216:21 223:20
**secure (6)**
56:15 180:20 186:19
188:7 212:11 223:3
**securing (1)**
179:14
**securities (30)**
40:14,15 44:12 55:18
57:6,17 63:14 65:6
106:3,4,5,5 138:3
146:9,15 151:22,23
152:15,18,19
201:25 206:7 207:5
207:17 209:18
212:5 220:18
226:21 227:13
228:9
**security (2)**
23:21 122:19
**see (53)**
8:6 18:7,10 28:21
40:13,21 49:12 72:4
74:23 75:5,12,17
78:13 91:3 93:24
95:18 96:4,16 98:20
101:9,23 110:9,17
135:21 137:16
144:2 147:19 148:6
151:15 158:18
164:25 171:25
185:22 186:3,16
202:14 206:8
209:24 210:18,20
211:13,20,24,25
212:2,6,13 213:19
214:5,23 215:2
218:2,4
**seeing (2)**
196:2 215:17
**seek (1)**
82:5
**seen (21)**
32:15,20 69:19 72:15
74:16 92:14,24
127:23 135:17
137:13 153:2
161:15 171:22
195:23 196:5,6
210:15 213:10,20
214:8,9
**segregated (3)**
197:13,20 200:4
**self-regulating (1)**
74:2
**seller (4)**
8:17 10:2 11:6 65:10
**semantics (1)**

9:20
**send (1)**
99:5
**senior (6)**
23:22 88:17,18 92:20
93:4,14
**sense (6)**
9:16 66:2 103:22
123:23 138:16
187:17
**sent (23)**
69:11 70:23 71:13,17
76:3 100:3,21
106:22 108:19
112:10 136:5
137:18 163:4,9
164:19 166:12
210:19 211:3,5
216:5,16 218:9,10
**sentence (11)**
84:3 89:24 109:4
110:8 176:25 177:3
177:4,13 178:10
185:21 216:25
**separate (2)**
57:16 60:8
**separately (3)**
60:14 160:10,14
**September (29)**
9:6 25:7,16 28:14
39:24 72:13,15 89:2
90:8 91:3,16 92:7
92:14 93:5,11,13
95:20,21 96:6,17
98:15,19 100:20,22
105:4 135:22
173:15 195:15
211:3
**series (1)**
93:22
**served (4)**
130:19 160:12 162:10
162:16
**Services (2)**
144:13 166:24
**session (2)**
43:19 127:6
**set (6)**
37:4 47:23 174:14
178:10 231:12,21
**sets (1)**
53:2
**setting (1)**
117:11
**seven (1)**
37:15
**share (3)**
26:13 27:14 160:18
**shareholders (1)**

156:9
**sharing (1)**
10:25
**sheet (26)**
7:7,12,19 8:7,22,25
9:9,11 12:6,16,19
12:20 21:4,5 31:5
31:10 39:2 41:12,21
101:9,11 102:4,14
103:3 110:19 232:1
**shocking (1)**
131:3
**shockingly (1)**
148:21
**short (5)**
5:23 58:19 208:6
225:2 226:4
**shortfall (3)**
121:24 201:12,14
**shortly (5)**
114:6 116:14 126:21
132:8 136:13
**short-term (1)**
40:18
**show (16)**
11:7 28:20 29:2 45:20
49:14 69:17 74:6,12
75:16 184:14 195:9
208:22 210:12
212:23 214:15
225:23
**showed (7)**
74:17 83:24 101:13
102:18 130:21
145:19 216:18
**showing (1)**
31:19
**shown (8)**
25:11 36:16,24 72:13
104:9 209:6,9 216:3
**shows (3)**
96:10 166:8,13
**sic (1)**
157:4
**side (32)**
39:14 43:5,18 44:6
46:11,14,16,19
49:25 50:25 71:3
72:20,22 76:5,6,12
76:14 103:21 110:5
118:8 133:20
149:16,22 150:12
165:13,17 179:13
179:25 183:13
188:14 198:19
199:24
**sides (4)**
23:16 36:5 123:12
147:18

**signed (20)**
25:25 32:24 34:9,14
35:2 50:3 64:4
102:13 115:4
119:24 131:20
138:6,9 162:19,21
169:24 170:11
183:10,11 190:10
**significance (1)**
104:17
**significant (1)**
20:11
**signify (1)**
204:8
**signing (6)**
8:15,18,19 114:17
177:12 194:14
**simply (5)**
9:20 204:19 205:19
227:2,19
**Simpson (7)**
42:20 50:16 99:23
103:11,12 162:17
203:23
**SIPA (2)**
4:4 160:5
**sir (34)**
6:17 25:4 27:3 29:10
30:11 69:20 70:13
76:21 85:22 92:17
93:24 100:25 105:8
106:14 161:15
170:24 176:6,22
183:5 184:7,22
185:21 188:2
194:24 195:4,22
208:13 209:2
211:16 212:13
213:9 218:13,24
226:8
**sitting (16)**
106:25 118:6,12
124:9 128:20
131:22,22 132:20
162:14 165:6 166:3
170:14 192:7,9
202:5 224:13
**situation (1)**
182:3
**six (3)**
27:16 118:16 149:14
**Skimming (1)**
134:12
**slightly (2)**
85:7 122:18
**slow (1)**
15:6
**slowly (1)**
113:10

**smaller (1)**
17:21
**snuck (1)**
107:3
**sold (7)**
10:12,23 26:10 27:15
27:17 31:3 125:3
**solution (1)**
151:20,20
**solve (3)**
123:11 207:12,14
**somebody (22)**
31:11 43:4 46:22
110:3 119:4 139:25
145:9 146:4,4,7
165:23 167:18
183:14 194:5
198:16,22 203:4,23
204:10 205:16
206:19 207:11
**somebody's (1)**
166:17
**sorry (9)**
7:24 23:22 35:8 98:17
135:19 146:5 207:4
218:15 222:10
**sort (8)**
43:16 57:19 71:4
84:18 94:14 130:12
143:8 150:18
**sorts (2)**
132:14 174:22
**sounds (1)**
201:15
**SOUTHERN (1)**
1:2
**so-called (5)**
8:7 54:24 57:5 124:6
143:13
**space (1)**
144:10
**speak (4)**
127:9,19 173:6 182:7
**speaks (1)**
53:21
**special (1)**
5:17
**specific (12)**
50:18 64:22 77:25
78:5 79:9 89:17
104:15 122:20,24
148:13 182:9
184:13
**specifically (9)**
52:7 120:2 121:22
143:8 164:21 179:4
190:15 194:10
201:5
**specified (8)**

15:17 26:5 63:22
65:9 113:17 120:2,5
124:3
**speculate (4)**
49:16 52:7 97:21,24
**speculation (2)**
33:4 174:3
**spend (3)**
11:8 107:18 197:24
**spent (6)**
89:9,10 100:24
104:15 156:13,14
**spoke (2)**
127:3 184:25
**spread (1)**
144:8
**square (1)**
103:15
**ss (1)**
231:4
**stack (1)**
94:25
**staff (3)**
92:19 146:3 167:6
**stage (6)**
107:6 130:10 144:6
167:12 215:21
220:11
**stages (1)**
198:21
**stamp (1)**
101:24
**stamped (1)**
212:24
**stand (2)**
45:6 104:21
**standing (4)**
121:2 144:22 145:7
202:24
**standpoint (2)**
12:18 42:6
**Stanley (1)**
155:2
**start (4)**
102:19 160:6 217:11
222:14
**started (9)**
15:4 51:10 113:25
124:15 126:22
167:20 169:22
195:2 227:22
**starting (7)**
8:18 17:12 74:8 164:2
164:5 169:19
195:13
**starts (1)**
185:22
**state (7)**

2:15 5:6 58:9 96:5
111:20 231:3,9
**stated (4)**
19:25 48:3 95:23
180:13
**statement (10)**
9:10 22:14 23:16
74:22 98:23 108:5
109:18 139:12
205:11 224:2
**statements (2)**
128:24 140:4
**States (3)**
1:1 155:20 156:3
**status (1)**
36:2
**stay (6)**
14:12 82:5 102:22
111:7 117:4 156:7
**Steen (5)**
1:13 2:9,11 4:11
172:17
**step (1)**
14:20
**steps (2)**
18:24 21:22
**Steve (1)**
96:11
**stopped (1)**
18:3
**stories (1)**
15:5
**strangely (1)**
123:21
**Street (1)**
3:5
**structure (1)**
27:6
**struggling (2)**
61:12 86:13
**study (1)**
210:22
**stuff (3)**
112:9 167:4,5
**styled (1)**
135:4
**subject (25)**
11:17 71:3,17 73:15
73:23 77:15,22,23
79:8,20 92:22 99:10
120:21 140:4 142:9
152:8 180:2 188:17
194:8 196:15 199:8
199:13 200:12
209:20 219:8
**submit (1)**
113:5
**submitted (7)**

6:13 74:15 112:24
130:3 138:12,16
139:8
**subpoenaed (1)**
160:14
**Subscribed (2)**
228:21 232:22
**subsection (6)**
40:10,24 41:15 44:10
45:18 63:17
**subsequent (2)**
110:23 212:17
**subsequently (1)**
28:9
**substance (6)**
39:6 63:2 64:15 202:4
223:16 225:17
**substantial (6)**
15:16 17:3 113:13
143:3 155:21,23
**substantially (14)**
16:9,19 19:2 20:7,13
21:24 23:5 24:24
33:10 116:5 122:4
142:25 206:7 207:6
**substantive (1)**
53:23
**substitute (1)**
202:20
**substituted (1)**
129:6
**sufficient (1)**
18:19
**suggest (2)**
219:14 225:24
**suggested (5)**
43:5,11 180:16 205:8
222:23
**suggesting (7)**
15:6 45:11 84:5 85:4
98:24 187:18 226:2
**suggestion (8)**
46:15 179:6,7,13
180:19 222:4,22
225:11
**suggestive (1)**
223:17
**suggests (1)**
216:7
**Sullivan (11)**
42:20 69:6 70:17
71:12,23 76:5 82:13
83:6,18 136:6
137:21
**summarized (2)**
117:25 134:20
**summary (1)**
106:6

**Summers (1)**
137:17
**Sunday (28)**
13:15 17:19 18:4 69:2
70:3 78:23 115:7
132:2,10,11 142:4,6
142:8 144:5 148:24
148:25 152:22
153:21 163:24
164:18,22 165:4,17
192:8 196:21 197:7
209:9 214:2
**superceded (1)**
59:6
**supplement (6)**
48:2,21 52:15 94:20
97:8 98:5
**supplemented (2)**
48:9 85:20
**supplements (1)**
95:22
**supplied (1)**
71:23
**supposed (10)**
20:21 41:19 42:4
80:24 84:6,24 86:6
86:12 116:15 120:6
**sure (67)**
7:21 11:18 12:17
14:14 15:19 24:2
29:19 32:2 34:21
37:10,20 47:6 49:13
51:7 53:8 55:6
61:12 66:17 67:5,18
68:14 71:19 75:8
77:5 92:4,9 93:15
103:19 104:25
111:22 115:17
118:25 119:2,12
122:14 127:10
136:18 137:4,12
143:14 145:17
146:19 148:25
149:18 152:14
153:9 154:11 159:6
159:10 163:3,19
164:14,20 165:22
173:9,12 182:17
183:20 191:14
198:8 200:8 209:6
214:13 218:18
226:5,14 227:7
**surprise (1)**
89:19
**surprised (1)**
83:20
**surprisingly (1)**
96:11
**survive (1)**

110:24
**suspects (1)**
179:9
**swear (2)**
74:20 144:5
**sworn (4)**
5:4 228:21 231:13
232:22
**system (2)**
99:23 168:6
**S&C (2)**
135:12 229:17

---

**T**

**T (5)**
5:2 126:2,4 231:1,1
**table (11)**
25:13 43:5 44:7 72:20
72:22 76:13,14
103:15,15 118:11
151:21
**take (46)**
6:9 8:3 23:7,10 24:5
26:25 29:9,21 37:8
37:11 40:10 41:12
45:21 62:6 74:19
78:21 79:14 87:2
94:13,25 97:24
101:4,22 106:11
114:14 125:12
127:16 151:22
155:21 159:23
162:24 176:23
186:22 195:21
197:23 198:6 202:4
208:6 213:8 217:12
217:14 218:18
221:22 223:19
224:25 226:3
**taken (20)**
5:19 17:15 18:24
19:11 21:22 30:7
58:20 64:9 68:15
79:18 107:13,25
108:13 115:13
125:17 126:11
159:24 208:10
216:13 226:6
**talk (8)**
18:22 33:13 67:9
68:12 79:16 87:17
109:22 172:21
**talked (16)**
29:15 31:17 44:19,23
45:13 51:16 94:17
124:17 128:22
130:22 138:24
149:23 150:16
158:23 169:13

171:13
**talking (20)**
7:23 29:15,23 33:17
33:20 43:7 51:23
67:7 76:10 88:24
93:15,18 154:25
163:10,24 167:5
169:15,16 192:10
204:24
**tape (5)**
148:22,23,25 153:5,9
**target (1)**
128:2
**taxi (1)**
116:20
**team (8)**
92:21 93:4,14 161:20
161:20 166:23
179:19 206:22
**teams (1)**
162:14
**TECCE (1)**
3:22
**technical (3)**
118:3 138:16 205:4
**Telephone (1)**
6:5
**tell (34)**
14:18 18:3 19:23
30:11 32:7 33:5
39:5 62:7 72:18
92:6 97:5 107:24
121:2 128:5 142:18
147:11 149:24
161:11 170:21
180:18,24 181:5
189:9 191:4,15
192:17 193:2,16,22
193:22 195:22
214:17 215:17
224:18
**telling (3)**
14:17 126:9 187:16
**term (13)**
7:12,13,22 19:3 28:5
41:14 85:6 118:4
129:22 165:12
187:6,18 227:19
**terminate (1)**
68:20
**terminated (7)**
67:2,21 68:8,9 71:10
72:25 80:24
**termination (21)**
68:19 69:12,24 70:9
71:9 72:4,7,12,17
73:9 75:22 76:16,25
77:22 78:11,18 79:3
80:16,21 81:7 82:7

**terms (18)**
25:20,24 28:12 32:14
41:10 45:17 106:16
113:20 140:11
160:22 161:19
174:13,14,20
175:11,19 187:22
227:8
**test (1)**
94:15
**testified (35)**
5:5 26:9 37:3 44:15
45:6 46:15 58:8
61:21 70:23 71:11
72:14 83:15 92:8
94:16,23 101:17
103:18 124:25
126:5 129:12 130:8
141:7 142:4,20
143:14 159:12
164:4 185:6,13
191:7 196:19
198:14 202:2
221:13 226:19
**testifying (1)**
150:12
**testimony (15)**
39:16 45:7,12 111:19
129:13 139:11
148:11 150:8
155:14 173:14
179:3 195:4 196:10
201:23 231:15
**Thacher (6)**
42:20 50:17 103:11
103:12 162:17
203:24
**thank (6)**
53:13 127:19 161:13
208:9 213:23 226:9
**Thanks (2)**
159:21,21
**thereof (2)**
103:23 178:13
**thing (8)**
27:24 54:22 62:17
83:24 145:22 165:3
185:16 226:14
**things (29)**
8:5 25:23 26:23 42:3
48:23,24 50:8,9
63:20 121:7,16
122:2 136:13
142:10,21 143:16
146:11 147:24
148:2 167:19
189:22 190:3 194:3
203:17 214:12,12
219:17 220:5,6

**think (109)**
9:17 10:11,24 13:17
17:9 18:17 19:7,9
21:14 22:13 24:14
25:13,21 26:2 27:16
30:19 31:25 33:8
36:3 43:24 50:23
51:22 53:21,22 55:6
63:25 64:21 66:9
69:3 70:10 75:11
77:6 80:24 81:10
82:20 83:12 91:12
98:11 102:18
106:12 107:11,11
108:24 111:19
115:23 116:4
118:16,20 124:20
124:20 125:9 132:8
133:3,11 134:22
135:23 136:12,12
137:3,14 139:19,23
140:12 141:13,18
143:13 146:21
154:8 156:11,12,25
160:9 161:4 169:17
169:24 170:17,17
171:7 175:21
184:14,16 187:10
187:22 188:3,11
190:25 192:21
200:10 201:20,23
203:2 204:22,23
210:21 215:19,23
215:25 216:9 217:7
217:9 220:4,19
221:16 222:8,19
223:12,21 224:24
225:19
**thinking (1)**
15:4
**third (4)**
57:14 120:22 146:14
149:20
**thought (13)**
16:6 18:9 64:12
119:17 128:9,18
139:4 145:24
152:13,24 154:20
175:2,3
**three (8)**
107:14 108:2 111:15
112:5 119:2 138:23
151:18 203:9
**Thursday (9)**
55:19,20 64:8 66:15
98:21 100:22 113:3
130:7 195:14
**tied (3)**
7:18 150:19 198:6

**time (87)**
6:3,6 8:15 11:9 13:3
13:20,22 15:10
17:14,16 23:12 25:4
31:14 32:3 36:3
37:11 41:4 45:14
54:12 58:18 59:17
59:25 60:2,3 61:13
62:5 63:25 64:3
66:24 67:4,20 68:18
68:24 70:22,22
79:14 84:15 86:14
88:24 91:9,18,20,21
94:6,6 96:23 100:24
101:14,24 104:15
106:24,25 107:7,8
107:19,21 111:16
112:18 113:6
114:15 126:3
129:23 132:20
135:2,22,23 137:25
146:22 148:14
150:21 152:21
159:13,21 162:3
168:20 169:19
195:21 198:18
201:6 204:23
206:17 210:19
213:8 217:12,14
218:18 228:13
**timeframe (3)**
163:20 170:24 172:11
**times (2)**
84:16 176:15
**timing (4)**
67:10 130:24 137:15
213:15
**today (8)**
6:23 11:9 19:16 29:6
103:18 160:8
161:16 179:3
**told (68)**
22:5 44:14,15 52:18
53:17,23 57:19
59:19,24 60:13,23
60:24 61:9,10,18,19
61:24 62:25 63:2,12
70:22,22 80:24
107:12 111:13,24
111:25 112:6
115:23,25,25 116:5
116:8 119:13,22
120:17 122:8,15,16
122:22 123:6 124:4
124:8,14 126:17
128:2 133:4 139:20
143:18 146:22
148:17 151:13,16
158:21 159:3 167:8

168:7 175:12 191:6
192:19 193:14,17
193:20 194:18,23
199:24 200:24
224:22
**Tom (2)**
51:7 112:7
**tomorrow (1)**
197:23
**top (4)**
58:22 87:16 96:10
211:12
**topic (17)**
78:8 82:10 84:22 85:9
85:12,15 86:8,25
87:3,8,12,17 94:22
119:11 124:18
191:19 193:8
**topics (4)**
160:7 166:23 172:9
173:4
**total (1)**
200:2
**totality (1)**
61:23
**totally (3)**
129:8 133:7 150:22
**traded (5)**
57:13 88:16 163:25
179:14 188:6
**traders (4)**
37:18 38:2 90:3,6
**trading (3)**
15:18 20:3,4
**tranche (1)**
23:20
**transaction (58)**
6:23,25 7:5,7,13 8:6,7
8:25 9:4 12:7,16,24
13:24 16:21,23 17:2
17:17,22 19:15
21:22 22:12 23:2
24:12,22 28:10,12
28:13 33:25 34:10
35:3,12,15 39:25
54:17 59:10 60:4,5
64:15 84:5,12,14,23
85:4 86:17,18 90:25
91:5 168:19,21
169:5,15 173:24
181:14,14 188:17
194:13 209:17
223:6
**transcript (14)**
53:20 63:6 133:9
148:4,19,19 149:4
150:13,16 151:15
153:2,9 226:16
232:1

**transfer (13)**
57:8 122:10,10,11
123:4 124:6 150:24
181:6 182:11
184:10 202:18
205:12,12
**transferred (20)**
7:10 12:4 14:2,8
30:13 35:16,23
63:15 65:6 120:19
123:3,10,13 143:24
179:16 180:22
200:15 201:24
223:5 225:12
**transferring (3)**
147:2 182:21 185:2
**Transition (2)**
144:12 166:24
**translation (1)**
101:5
**transmittal (1)**
213:21
**transmitted (1)**
96:22
**tread (1)**
67:11
**treated (1)**
55:3
**trick (1)**
188:11
**tried (6)**
42:19,21 48:20 103:9
103:13 199:14
**trouble (1)**
181:10
**troubled (1)**
99:16
**true (4)**
120:12 156:10 163:16
231:14
**truly (1)**
50:5
**Trust (1)**
167:13
**Trustee (6)**
4:4 134:17 160:5
176:20 188:16
226:18
**Trustees (1)**
176:8
**try (9)**
6:2 100:9 113:8 114:9
127:20 130:10
137:24 156:19
157:13
**trying (19)**
17:12 43:24 45:5
59:18 74:10 89:11
147:19 150:2

156:15 163:15,18
163:19,23 167:9
207:9,9,20 213:14
220:20
**Tuesday (6)**
13:14 15:25 20:15
31:14 39:24 162:21
**tumultuous (1)**
50:20
**turn (10)**
6:19 30:25 40:4,6
46:24 98:14 105:9
176:22 211:15
214:20
**turned (8)**
26:20 56:15 57:3
60:14 113:20
119:19 124:18
158:10
**turning (1)**
192:23
**twice (2)**
115:25 116:8
**two (26)**
9:22 16:17 31:24
39:16 50:5 97:4
104:21 107:14
108:2 111:15 112:5
121:16 122:5,12,25
129:13 142:3
143:11,11 145:15
147:21,25 151:13
179:12 203:9
224:13
**two-thirds (1)**
211:24
**type (2)**
9:10 23:21
**types (1)**
16:7
**typical (2)**
127:15,21
**typo (2)**
106:11 186:25

---

**U**

**Uh-huh (3)**
97:2 177:6 217:20
**ultimately (2)**
17:22 28:15
**unable (3)**
129:3 187:25 201:18
**uncertain (1)**
13:21
**uncertainty (2)**
55:25 159:5
**unconditional (3)**
205:18 227:14 228:8
**unconditionally (3)**

204:18 226:25 227:18
**underscored (1)**
105:25
**understand (18)**
5:25 6:2 7:2 27:3 39:8
68:21 79:12 128:25
155:15 167:12
173:22,23 187:13
204:16 209:15
210:25 217:16
226:23
**understanding (60)**
14:19 16:3 20:2,20
23:6 34:8,24 38:15
38:19 39:4 41:3,8
41:23,25 44:25
50:12 53:25 64:4
66:18 70:16 73:2
81:6 84:11,14
101:15 113:11
115:18 127:14
128:10 140:7,14
174:7,12,18 175:16
175:24 181:20
187:2,4 188:10
189:5,18 190:7
192:3,15 194:11
196:17 204:23,24
205:14,16 207:22
208:2 215:24
218:12 219:5
220:23 224:3
225:21 227:10
**understood (11)**
15:10 44:3 106:8
137:25 173:17
194:16 197:16
200:2 217:19
219:22 228:4
**undone (1)**
69:14
**unintended (1)**
183:8
**United (4)**
1:1 15:21 155:20
156:3
**universe (3)**
17:11 120:9,15
**unusual (3)**
42:23 91:13 162:2
**unwind (1)**
57:23
**urged (2)**
23:6,7
**URQUHART (1)**
3:17
**use (14)**
17:25 19:2 21:7 42:9
43:20,22 45:17 49:4

50:7 118:3 123:25
167:21 198:3 208:8
**usual (2)**
5:23 9:16
**U.S (4)**
17:3 92:20 93:3,14

---

**V**

**V (3)**
5:2 126:4 229:3
**vague (17)**
14:4 19:4 22:2 34:3
41:17 42:12 49:22
91:17 93:6 114:22
131:20 161:25
174:2 187:7,23,24
218:4
**vaguely (1)**
218:3
**valuation (13)**
7:10 9:10 11:3 12:3,9
12:11,18 13:25
30:13,22 38:11
41:25 42:5
**value (50)**
8:13,17,23 10:13,16
10:17 13:19,22 14:7
20:12,16,17 21:3,8
21:17,18,24 22:17
26:4 34:11 35:3,15
35:22 40:19 41:5,14
41:20,22 42:9,11
43:22,25 44:3,9,11
44:21 45:18 46:6
60:11 84:6,7 106:10
156:9 174:20,21
175:18 206:8,21,25
207:23
**valued (2)**
8:12 30:22
**values (6)**
15:8 23:8 29:16 36:15
36:24 174:8
**variant (3)**
101:17 103:23 104:16
**variety (2)**
190:3 204:14
**various (10)**
26:15 40:14 51:4 81:3
93:25 127:3 165:5
176:14 189:13
210:23
**verbs (1)**
138:23
**version (5)**
5:23 32:6,9,18,21
33:11 34:6 43:3
96:9 183:10 206:20
211:9,17 215:19

216:15
**versions (1)**
31:24
**Vic (1)**
161:6
**Victor (10)**
1:15 2:9 4:12 5:8 6:15
228:17 229:14
231:11 232:3,21
**view (12)**
12:7 18:25 19:7,8,19
20:10 23:4 54:11
104:16 155:22
219:21 220:5
**views (1)**
38:10
**vivid (1)**
122:25
**volatile (1)**
13:12

---

**W**

**W (5)**
3:7 5:2,2 126:4,4
**Wachtell (1)**
167:18
**wait (7)**
124:19 136:10 140:2
140:5 151:14
183:15 196:4
**waiver (1)**
79:22
**walking (2)**
144:6,20
**want (35)**
9:18 14:12 18:10
29:22 34:18 37:5
39:6 52:6 68:11
71:20 74:23 78:13
79:13 82:21 92:4
94:2 97:23,24
114:19 115:24
117:18 125:12
129:18 140:19
152:14,16 154:4
182:7,8 202:6,8
213:9 217:16
222:16 226:3
**wanted (10)**
5:11 56:3 89:14
151:10,11 152:6
155:19 157:5
167:14 226:14
**wash (4)**
84:6 86:16,18,22
**Washington (1)**
3:13
**wasn't (13)**
46:10 80:23 86:20

132:10,10,11
144:24 145:2 151:6
151:6 164:23
183:17 219:16
**way (23)**
6:22 16:16 37:5 39:21
63:9 75:18 87:22
88:12 92:25 102:8
117:12 120:16
133:16 149:3,4
160:20 164:20
181:10 202:9
211:24 214:12
228:9 231:19
**weak (1)**
147:16
**Wednesday (9)**
1:17 50:3 62:2 113:3
128:15 130:6
158:11 164:3
167:17
**week (5)**
39:23 50:20 102:12
147:15 157:7
**weekend (23)**
17:16 66:21 68:25
69:24 114:21 115:7
131:10,10 132:21
142:7 145:6 147:14
154:14,16 157:8
158:22 165:11
166:20 167:24
181:12 192:6,13
208:13
**weeks (9)**
163:21 170:10,25
171:3 172:12,13,14
172:14 185:7
**Weil (89)**
42:19 44:3 50:16 51:4
60:3 65:24 66:11
69:8 70:8 71:8,13
72:22 76:6,14 90:13
96:13 97:15,22 99:3
99:9 103:2 107:12
107:23 109:5 110:3
111:5,13,23,25
112:3,8 118:12
127:21 128:22
131:23 132:22
139:20 144:2,7,9,19
144:21 145:8,12
146:5,7 150:7
151:10 152:4
161:20 162:17
163:10 164:5,19
165:18 166:3,20
175:15 176:9 192:7
192:7,10,23,25

193:15,18,24 194:8
194:18 198:16,16
198:22,23 202:23
203:10 204:5,10,13
204:17 205:5,16,16
206:15 207:3,20
209:9 226:20,23
227:11
**Weinman (1)**
191:23
**welded (1)**
162:14
**Wells (2)**
209:13,14
**well-known (1)**
89:16
**went (27)**
10:16 13:6 18:4,21
24:23 31:12 32:2
43:23 51:11 58:3
63:10 107:10 118:2
121:6 157:11 164:5
184:18 194:12
199:16 204:2 211:6
215:23,24 216:3,4,6
227:6
**weren't (11)**
8:16 60:14 95:16
100:3 159:5,10
162:12 163:20
165:20 179:24
183:10
**we'll (2)**
11:8 212:23
**we're (8)**
18:7 33:17,20 152:12
152:14 158:7
163:10 193:8
**we've (4)**
17:15 72:9 133:4
155:14
**WGM (2)**
95:20 100:19
**WGM-LEHMAN-...**
212:25 213:4
**WHEREOF (1)**
231:21
**WILLIAM (1)**
4:7
**willing (1)**
24:11
**willingness (1)**
24:15
**Wisconsin (1)**
3:12
**withdraw (5)**
49:8 81:14 104:5
124:20 217:5
**Withdrawn (1)**

35:12
**withdrew (1)**
217:9
**witness (73)**
4:12 5:3,8 30:5 37:21
38:24 47:7 48:16
53:14 55:12 69:21
70:12 73:19 75:9
79:6,16 80:4,10
81:12 82:10,20,24
83:8,12 95:5 96:20
98:9 99:12,14,21
100:5 101:25 109:2
109:3 110:14 117:3
117:6,14 126:5
127:20 136:11,15
137:4 159:23
168:12,23 175:21
177:2 184:15
185:15,16 186:4
193:5,14 195:24
208:8 213:7,16
214:3 217:4,8
218:11,20,22 221:9
221:10,15 222:8
225:3 229:2 231:11
231:15,21
**witnessed (1)**
141:3
**wonderfully (1)**
13:18
**word (25)**
12:17 17:25 19:6,7
34:13,14 43:20,22
43:23 49:5,9,20
50:7,11 51:17,19
52:8 94:24 123:20
197:20 198:4
200:18 201:22
207:23 220:3
**wording (1)**
51:25
**words (30)**
10:7 43:6,16 46:16
59:15 63:6 71:25
97:16,18,22 98:4
119:12 124:11,12
129:19 133:6
148:13 186:16
187:4 188:9,12
190:14 199:9 202:4
204:12 205:2
206:25 207:5
223:16 225:16
**work (17)**
22:8 112:4 131:9
140:13,21 141:19
144:15,17 156:6,15
156:20 165:3

182:20 185:10
206:23 207:12
223:13
**worked (5)**
10:20 156:3 162:25
166:20 170:15
**working (12)**
65:15 112:12 144:12
145:5 162:22 163:2
165:6 166:4,6,23
167:8 171:19
**works (1)**
198:9
**world (1)**
23:9
**worrying (1)**
107:19
**worth (2)**
122:3 207:16
**wouldn't (6)**
38:6 74:20 79:24
89:19 206:24
224:17
**write (1)**
207:9
**writes (1)**
207:11
**written (2)**
107:15 140:6
**wrong (8)**
16:15 23:16 45:10
85:23 199:10
215:25 220:24
221:8
**wrongly (1)**
183:14
**wrote (1)**
34:17
**Wyman (1)**
137:14

**X**

**X (3)**
156:15 181:23 229:1

**Y**

**Y (4)**
63:3 79:10,10 181:25
**yeah (8)**
11:16 19:5 41:18 66:9
96:25 169:9 197:20
214:3
**year (7)**
10:11,24 26:11 27:15
27:16 29:17 125:4
**years (1)**
156:15
**York (18)**

1:2,16,16 2:12,12,15
3:6,6,21,21 4:6,6,14
4:14 106:24,25
231:3,9
**Yup (8)**
40:12 46:3 105:11
214:22 215:4,6,8
221:25

**Z**

**Z (2)**
63:3 79:11
**zillion (2)**
156:16,16
**zoo (1)**
118:3

**$**

**$250 (1)**
26:7
**$70 (3)**
40:20,23 44:10
**$769 (5)**
204:18 209:17 226:20
226:24 227:12

**0**

**00006236 (1)**
212:25
**00006236-6264 (1)**
213:5
**00020701 (1)**
135:16
**00020701-20714 (2)**
135:12 229:18
**08-13555(JMP) (1)**
1:5

**1**

**1 (17)**
29:3 40:5 55:22 56:12
56:17 57:24 58:11
60:3 62:7 105:17,23
110:7 136:17 138:5
220:8 221:23 230:4
**1A (1)**
63:17
**1(a)(ii)(A) (1)**
65:5
**1(e) (1)**
55:7
**1:10 (1)**
125:17
**1:53 (1)**
126:3
**10 (11)**
1:17 2:4 100:14 101:5
101:6 102:3 119:15

149:14 167:10
202:12 232:2
**10th (1)**
231:22
**10:02 (1)**
2:5
**10:22 (1)**
19:12
**10:25 (1)**
19:12
**100 (2)**
91:19 118:21
**10004-1482 (1)**
4:6
**10006 (1)**
4:14
**10010 (1)**
3:21
**10017-6702 (1)**
3:6
**10279851 (2)**
95:9,13
**10279864 (1)**
105:10
**11 (7)**
1:5 13:15 17:13 18:10
108:25 109:5 176:6
**11:13 (1)**
211:7
**11:18 (2)**
101:24 102:4
**11:22 (1)**
58:20
**11:35 (1)**
58:20
**11:40 (2)**
98:20 100:22
**11:49 (1)**
68:16
**11:52 (1)**
68:16
**12 (1)**
149:15
**12th (2)**
14:24 16:24
**12:07 (1)**
79:19
**12:09 (1)**
79:19
**13 (9)**
71:19,22 72:4,8,12
75:4,16 82:15 83:7
**134 (1)**
229:7
**135 (1)**
229:16
**14 (1)**
29:9

**15 (3)**
119:14 167:10 199:25
**15c3 (2)**
129:14 197:4
**15c3-3 (22)**
122:13 143:13,23,23
145:19 147:4 148:8
159:10 161:2
195:18 196:17,25
197:8,24 198:17
200:2 202:19 205:4
209:10 212:4 228:6
229:23
**15th (1)**
14:24
**16 (4)**
25:7,16 92:14 93:5
**16th (7)**
9:6 25:25 26:3 28:14
39:25 93:11,13
**160 (1)**
229:4
**17 (10)**
176:24 177:5 178:11
179:8 180:17
185:22 193:10
222:19 223:11
225:9
**17th (1)**
26:2
**18 (3)**
98:19 100:20 195:15
**18th (2)**
98:15 100:22
**185 (1)**
229:7
**19 (15)**
31:20 32:10 37:25
72:13 101:13,22
102:14 103:23
104:15 105:4
110:20 111:2,6
135:22 230:5
**19th (7)**
52:21 72:15 95:20,21
96:6,17 173:15
**1934 (1)**
212:5
**195 (1)**
229:20
**197 (1)**
226:16

**2**

**2 (1)**
216:21
**2PP (2)**
195:16 229:21

**2:00 (1)**
166:14
**2:41 (1)**
159:25
**2:52 (1)**
159:25
**20 (1)**
202:11
**20th (2)**
115:7 211:3
**20015 (1)**
3:13
**2008 (8)**
25:7,16 91:16 92:14
93:5 98:19 105:4
195:15
**2009 (1)**
135:22
**2010 (6)**
1:17 2:4 228:22
231:22 232:2,23
**20714 (1)**
135:17
**208 (1)**
230:23
**21st (1)**
115:8
**210 (1)**
230:24
**22 (1)**
91:16
**22nd (6)**
3:20 40:2 89:3 90:8
91:3 92:7
**222 (1)**
3:5
**226 (1)**
229:5
**24 (5)**
58:24 119:21 136:22
136:23 230:8
**25 (6)**
47:11,14 53:2 94:6
162:19 230:7
**250 (1)**
56:16
**26 (2)**
77:7,10
**27 (5)**
69:18 72:10,13
136:20 230:9
**28 (4)**
93:23 213:25 214:4
230:12
**28226 (1)**
1:25
**29 (3)**
93:23 230:4,13

**3**

**3 (3)**
92:17 168:14,25
**3.3 (3)**
29:10 30:8,11
**3:15 (1)**
166:17
**3:58 (1)**
208:11
**30 (3)**
93:23 119:14 230:14
**30(b)(6) (17)**
1:12 2:8 70:12 73:19
82:9 98:9 160:12,18
160:19 189:21
191:18 193:5,7,8
221:9 224:11,20
**31 (9)**
93:23 98:14,18 99:8
100:16,16,17 230:5
230:15
**32 (2)**
93:23 230:16
**33 (2)**
93:23 230:17
**34 (7)**
93:23 95:2,6,7 98:25
230:18,22
**35 (7)**
93:23 104:23 105:2
109:12 110:8
114:15 230:19
**36 (2)**
93:24 230:20
**37 (3)**
93:24 213:25 230:21

**4**

**4 (8)**
6:20 7:4 11:21 30:10
30:15 74:24 75:7
84:2
**4:24 (1)**
208:11
**4:50 (1)**
226:7
**40 (1)**
119:14
**41st (1)**
3:5
**45 (1)**
230:6
**450 (1)**
2:11
**451 (2)**
208:23 230:23
**47 (1)**
230:7

**49 (4)**
210:13 216:17,19
230:24

**5**

**5 (4)**
87:15,16 92:18 229:3
**5:00 (1)**
132:7
**5:01 (1)**
226:7
**5:05 (1)**
228:13
**5:15 (2)**
106:24,24
**50 (4)**
55:16 56:9 60:10
119:14
**51 (1)**
3:20
**518 (2)**
45:21 230:6
**5301 (1)**
3:12
**559 (4)**
73:7,25 74:3 82:6
**579B (2)**
74:13 230:10
**58 (1)**
230:8
**581B (2)**
92:12 230:11

**6**

**6 (4)**
40:7 55:11 87:17
229:13
**6:00 (1)**
132:7
**60 (2)**
74:16 134:16
**613A (4)**
6:12,14 168:10
229:13
**614A (4)**
135:10,11,15 229:16
**615A (3)**
195:11,16 229:20
**616A (2)**
212:24 213:2
**6264 (1)**
212:25
**64 (2)**
105:19,21
**69 (1)**
230:9

**7**

**7 (3)**
45:23,25 176:6
**7:00 (1)**
132:7
**7:30 (1)**
100:20
**7:40 (1)**
100:23
**70 (2)**
43:15 106:10
**700-plus (1)**
146:15
**74 (1)**
230:10
**760 (1)**
146:15
**760-odd (1)**
202:7
**760-some-odd (1)**
151:23
**769 (2)**
152:15,18
**79 (1)**
229:7

---
**8**
---

**8 (1)**
166:13
**8:00 (2)**
166:9,16

---
**9**
---

**9 (5)**
37:9 38:3 89:22 90:6
176:22
**9/16/08 (2)**
101:9 102:5
**9/17/08 (2)**
195:19 229:24
**9/18/08 (2)**
195:17 229:21
**9/22/08 (1)**
213:2
**9:15 (2)**
105:3 106:22
**92 (1)**
230:11
**93 (10)**
230:12,13,14,15,16
230:17,18,19,20,21
**95 (1)**
230:22