**EXHIBITS M-P OF DECLARATION OF NEIL J. OXFORD
IN SUPPORT OF THE MEMORANDUM OF
MOVANTS IN OPPOSITION TO THE MOTION IN LIMINE OF BARCLAYS
CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF
DANIEL MCISAAC REGARDING LBI'S OBLIGATIONS UNDER SEC RULES 15c3-1,
15c3-3 AND/OR THE SECURITIES INVESTOR PROTECTION ACT**

# EXHIBIT M

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4       ------------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,   (Jointly Administered)

9                 Debtors.

10      ------------------------x

11

12             * * *HIGHLY CONFIDENTIAL* * *

13             DEPOSITION OF IAN LOWITT

14               New York, New York

15                August 20, 2009

16

17     Reported by:

18     MARY F. BOWMAN, RPR, CRR

19     JOB NO. 24043

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                August 20, 2009
 5                   9:31 a.m.
 6
 7
 8
 9        Deposition of IAN LOWITT, held at
10   the offices of Jones Day, LLP, 222 East 41st
11   Street, New York, New York, before Mary F.
12   Bowman, a Registered Professional Reporter,
13   Certified Realtime Reporter, and Notary Public
14   of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2            APPEARANCES:
 3   JONES DAY, LLP
 4   Attorneys for Lehman Brothers, Inc.
 5      222 East 41st Street
 6      New York, New York  10017-6702
 7   BY:  ROBERT GAFFEY, ESQ.
 8      BRIDGET CRAWFORD, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays and The Witness
12      5301 Wisconsin Avenue, NW - Suite 800
13      Washington, DC 20015
14   BY:  HAMISH HUME, ESQ.
15
16   WILLKIE FARR & GALLAGHER, LLP
17   Attorneys for the Witness
18      1875 K Street NW
19      Washington DC   20006-1238
20   BY:  RICHARD D. BERNSTEIN, ESQ.
21      KELLY M. HNATT, ESQ.
22
23
24
25
```

Page 4

```
 1
 2            APPEARANCES:
 3   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
 4   Attorneys for the Creditors Committee
 5      865 Figueroa Street, 10th Floor
 6      Los Angeles, CA  90017
 7   BY:  ERICA P. TAGGART, ESQ.
 8
 9   JENNER & BLOCK, LLC
10   Attorneys for the Examiner
11      330 N. Wabash Avenue
12      Chicago, Illinois  60611-7603
13   BY:  ROBERT L. BYMAN, ESQ.
14
15   HUGHES, HUBBARD & REED, LLP
16   Attorneys for the SIPA Trustee
17      One Battery Park Plaza
18      New York, New York  10004-1482
19   BY:  NEIL J. OXFORD, ESQ.
20      JOHN F. WOOD, ESQ.
21
22   Also Present:
23      THOMAS E. HOMMEL, ESQ.
24        Lehman Brothers Holdings
25      PHILIP E. KRUSE, Alvarez & Marsal
```

Page 5

```
 1
 2
 3
 4
 5        IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15        IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

Page 6

1    LOWITT - HIGHLY CONFIDENTIAL
2    IAN LOWITT,
3        called as a witness by the parties,
4        having been duly sworn, testified as
5        follows:
6    EXAMINATION BY
7    MR. GAFFEY:
8        Q.    Good morning, Mr. Lowitt.  My name is
9    Bob Gaffey.  We met briefly before.  I am with
10    Jones Day.  We're special counsel to the estate of
11    Lehman Brothers Holdings, Inc., and as you
12    probably know, we are looking into issues arising
13    from the transaction in September of 2008 wherein
14    Barclays purchased certain assets of Lehman.
15        I should say to start, I have had a
16    request from my friends at the bottom of the table
17    who have been with us the last couple of days to
18    keep my voice up so they can hear, and I am going
19    to ask you to do the same thing.
20        Have you had your deposition taken
21    before?
22        A.    I have not.
23        Q.    Just a couple of ground rules.  One,
24    try and keep your voice up for everybody.  Two,
25    please give me audible answers.  The court

Page 7

1    LOWITT - HIGHLY CONFIDENTIAL
2    reporter can't take down a nod or a shake of the
3    head.  So for the sake of a clear record, please
4    try to do that.
5        If you need a break at any time, say
6    so.  If there is a question pending and there is
7    not an issue about whether there's a privilege
8    applying to the question, what I would ask is for
9    an answer to that, and then if you need to, you
10    can step out into the hall and we will take a
11    short break.
12        A.    Okay.  Thank you.
13        Q.    Can you give me a description,
14    Mr. Lowitt, of your education after secondary
15    school?
16        A.    I attended the University of
17    Witwatersrand in South Africa, in Johannesburg.
18        MR. BYMAN:  I cannot hear you at all.
19    Can you speak up.
20        A.    I attended the University of
21    Witwatersrand in Johannesburg, South Africa, did
22    an undergraduate degree in electrical engineering,
23    and then I did a Master's degree in electrical
24    engineering.
25        And then I went to Oxford in England

Page 8

1    LOWITT - HIGHLY CONFIDENTIAL
2    and did a PPE, philosophy, politics and economics,
3    and then I did a graduate degree in economics at
4    Oxford.
5        Q.    What college at Oxford?
6        A.    I was at Merton College.
7        Q.    After you took your second degree at
8    Oxford, is that the end of your education?
9        A.    That is the end of my education.
10        Q.    Do you keep any professional licenses?
11        A.    I do not.
12        Q.    Have you ever?  Series 7, series 23,
13    anything like that?
14        A.    No.
15        Q.    Now, you currently are employed as the
16    chief operating officer of Barclays Wealth
17    Americas; is that correct?
18        A.    That is correct.
19        Q.    How long have you held that position?
20        A.    Since April of this year.
21        Q.    And when did you first start work for
22    Barclays?
23        A.    I joined Barclays I guess the Monday
24    that the deal closed.
25        Q.    That would be September 22nd?

Page 9

1    LOWITT - HIGHLY CONFIDENTIAL
2        A.    I believe that's correct.
3        MR. GAFFEY:  Off the record for a
4    second.
5        (Off-the-record discussion)
6        Q.    What was your position when you first
7    joined Barclays on September 22nd?
8        A.    I didn't have a position on the day
9    that I joined Barclays on September 22nd, but
10    within a few days, I was appointed as the director
11    of integration for the Lehman businesses.
12        Q.    And what were your duties as director
13    of integration?
14        A.    To work with Barclays on integrating
15    the Lehman businesses into the Barclays
16    infrastructure.
17        Q.    Is that the position you held until
18    April when you took your current position as head
19    of Barclays Wealth?
20        A.    That's correct.
21        Q.    And prior to taking up employment with
22    Barclays, you were employed by Lehman, correct?
23        A.    That is correct.
24        Q.    Do you know which entity within the
25    Lehman family you were employed by?

Page 10

LOWITT - HIGHLY CONFIDENTIAL

A.   I don't know with certainty.  I believe it was LBI, but I don't know with certainty.

Q.   As I understand it, you began work at Lehman in about 1994 as head of corporate development?

A.   That is correct.

Q.   Was that head of corporate development at Lehman Brothers Holdings, Inc.?  Do you recall that?

A.   I know that my position was head of corporate development.  I can't be clear on whether it was the holding company that employed me or LBI.  It is not a distinction that I would have noted at that time.

Q.   And you served as treasurer and global head of tax from 2000 to 2005, correct?

A.   That is correct.

Q.   And from July of 2005 until October of 2006, you acted as chief administrative officer of LBHI Europe; is that correct?

A.   I was the chief administrative officer for the European business.  I don't know whether that was holdings or LBIE, but that was my

Page 11

LOWITT - HIGHLY CONFIDENTIAL

position.

Q.   And after you -- did you take on a position after you acted as chief administrative officer?

A.   Yes, I did.

Q.   What position was that?

A.   I was the co-global CAO for Lehman.

Q.   How long were you the co-global CAO for Lehman?

A.   From when I returned from London, which I recall as being January 2007, through my employment with Barclays.

Q.   And then in or around June of 2008 -- did you leave Lehman at any time?

A.   I did not.

Q.   In or around June of 2008, you became chief financial officer, correct?

A.   That is correct.

Q.   And what were your duties as chief financial officer?

A.   I needed to run the finance department, the product control, the financial control, tax and treasury.

Q.   And within those responsibilities were

Page 12

LOWITT - HIGHLY CONFIDENTIAL

you responsible to insure that the books and records of the corporation were kept accurately?

A.   Maintaining the accuracy of the books and records was the responsibility of the -- a lot of people in the finance department, and it included myself.

Q.   Well, it included yourself but ultimately reported up to yourself, correct?

A.   Correct.

Q.   You were the man in charge of that operation?

A.   I was in charge of that.

Q.   Now, there came a time in September of 2008, Mr. Lowitt, did there not, when Lehman engaged in discussions with Barclays about a potential acquisition of Lehman by Barclays?  Is that correct?

A.   That is correct.

Q.   And to your knowledge, when did those discussions first take place?

A.   I believe there were discussions that began on the Friday before the bankruptcy filing on the Sunday.  I wasn't party to those discussions, but I believe that there was contact

Page 13

LOWITT - HIGHLY CONFIDENTIAL

between people at Lehman and people at Barclays from that point.

Q.   And although you were not involved in the discussions in those -- that period before the bankruptcy, did you play any role or have any involvement in activities related to those discussions?

A.   There was some due diligence work that was done on the Friday.  I didn't participate in those meetings but I was aware that it had taken place.

Q.   Was any of the due diligence work being done under your supervision or were you responsible for any part of it?

A.   There were -- the people who were meeting with the folks at Barclays were people who reported to me.

Q.   Who were those people who were meeting with Barclays?  Again I am still in the period before the bankruptcy filing.

A.   My recollection is Martin Kelly met with some of his counterparties at Barclays.

Q.   As CFO of Lehman, to whom did you report?

LOWITT - HIGHLY CONFIDENTIAL

1
2     A.   I reported to Bart McDade, who was the
3     president of Lehman Brothers.
4         Q.   Did you have one or more persons who
5     were direct reports to you?
6     A.   I did.
7         Q.   Who were your direct reports?
8     A.   Well, I had direct reports within the
9     finance organization, which included Jerry Reilly,
10    who was the product controller; Martin Kelly, who
11    was the financial controller; Paolo Tonucci, who
12    was the treasurer of the firm; John DeRosa, who
13    was the head of tax, in addition to others.
14        And then I had reports which I
15    maintained through my CAO role which included the
16    other head of IT, which was Bridget O'Connor, and
17    the head of operations, which was Alastair
18    Blackwell.  It also included Bob Lieberberg, who
19    ran expense management for us, and others.
20        MR. BYMAN:  I hate to be a pest, but
21        your voice does drop.  It is difficult to
22        hear you.  I don't want to ask the reporter
23        to repeat things which will make double your
24        agony, so --
25        THE WITNESS:  I will try.  I

LOWITT - HIGHLY CONFIDENTIAL

1
2     apologize.
3     BY MR. GAFFEY:
4         Q.   I won't think you're yelling at me if
5     you keep your voice up.
6         Now, the discussions between Lehman
7     and Barclays that were taking place prior to the
8     filing of the bankruptcy, as I understand it, sir,
9     did not result in an agreement between the two
10    entities.  Is that your understanding as well?
11    A.   That is my understanding.
12        Q.   And to your knowledge, did discussions
13    at some point resume between Barclays and Lehman?
14    A.   Yes, they did.
15        Q.   And when did that occur?
16    A.   I believe that Bart McDade was in
17    contact with folks at Barclays on the Monday
18    morning after the filing for bankruptcy.
19        Q.   That would be September 15?
20    A.   I -- if that was --
21        Q.   OK.
22    A.   If that was the Monday, September 15.
23        Q.   And tell me what you know about the
24    contact Mr. McDade had with folks at Barclays
25    beginning on Monday the 15th.

LOWITT - HIGHLY CONFIDENTIAL

1
2     A.   I understood from Bart that Barclays
3     were interested in potentially transacting an
4     acquisition of some of the assets of LBI and
5     buying the businesses that were in LBI or some
6     subset of those businesses, and that the details
7     would be worked out over the course of the next
8     day.
9         Q.   And how did you gain that
10    understanding?  Did you speak to Bart McDade?
11    A.   I did speak with Bart.
12        Q.   Did he tell you anything else that you
13    can remember now about that initial contact with
14    Barclays and Lehman?
15    A.   He also shared with me that there were
16    eight individuals that Barclays deemed as critical
17    to the transaction, and that I was one of those
18    eight individuals.
19        Q.   Who were the other seven?
20    A.   The other seven, to the best of my
21    recollection, was Mike Gelband, Eric Felder, Ajay
22    Nagpal, Tom Humphrey, Hyung Lee, myself.
23        Q.   Is Skip McGee the last one?
24    A.   Skip McGee.  And I -- Bart indicated
25    to me that he was not going to be part of that

LOWITT - HIGHLY CONFIDENTIAL

1
2     group of eight.
3         Q.   What did Mr. McDade tell you about not
4     being part of the group of eight, best you recall?
5     A.   Nothing beyond that.
6         Q.   Did you understand him to be saying he
7     wasn't going to work at Barclays after the
8     transaction or he wasn't one of the eight that
9     Barclays considered to be critical to the deal?
10    A.   He just indicated that he wasn't part
11    of the eight.
12        Q.   Now, did there come a time when you
13    began to negotiate or -- withdrawn.
14        Did there come a time when you began
15    to discuss with Barclays the terms and conditions
16    upon which you would be employed at Barclays after
17    the transaction?
18    A.   I met with Rich Richie at some point
19    on early Tuesday morning.
20        Q.   And tell me about your meeting with
21    Mr. Richie.  What did you say?  What did he say?
22    A.   To the best of my recollection, he
23    indicated that they wanted me to be part of the
24    transaction, that having me be part of their
25    organization was important.  And he shared with me

Page 18

LOWITT - HIGHLY CONFIDENTIAL

1  the terms that they would be extending to me.
2
3    Q.   What terms did he share with you that
4  they would be extending to you?
5    A.   The terms were that a payment in
6  February, 2009, which was equal to 80 percent of
7  my 2007 compensation, and two additional special
8  payments to be paid at one-year anniversaries of
9  the deal closing, which were each equal to
10 25 percent of my 2007 compensation.
11   Q.   How much was that in dollar amount,
12 the 80 percent of your 2000 comp?
13   A.   $6 million.
14       MR. BERNSTEIN:  Again, we as
15 Mr. Lowitt's counsel will want to be part of
16 the process, and I understand from last time
17 we had a right to be part of the process in
18 terms of maintaining the highly confidential
19 designation for this deposition and
20 particularly for any discussion about his
21 compensation.
22       MR. GAFFEY:  Richard, if you mean by
23 maintaining the highly confidential
24 designation it is bound by the
25 confidentiality order and our agreement that

Page 19

LOWITT - HIGHLY CONFIDENTIAL

1  everything in the depositions is highly
2  confidential until designations come and
3  some period after that, then I agree.
4
5    I am not waiving any rights we have
6  under the confidentiality order to go back
7  and say we don't think it is highly
8  confidential and to take it to the Court if
9  we need to.
10       MR. BERNSTEIN:  I didn't think you
11 were.
12       MR. GAFFEY:  I just wanted to make it
13 clear.
14   Q.   And the two special -- I don't know if
15 you called it -- the two payments you described,
16 one on your first anniversary and one on your
17 second, what are the amounts of those, sir?
18   A.   It is 25 percent of the 7.5.  I think
19 it is 1.875. but I may have those numbers slightly
20 wrong.
21   Q.   Did you at some point enter into a
22 written agreement with Barclays concerning the
23 terms and conditions of your employment by
24 Barclays?
25   A.   I did.

Page 20

LOWITT - HIGHLY CONFIDENTIAL

1
2    Q.   About when did you do that?
3    A.   I think I did that on the Thursday
4  evening.
5    Q.   By the Thursday evening, you are
6  talking about the Thursday after the bankruptcy
7  filing on the 15th?
8    A.   Correct.
9    Q.   That would be September 18th?
10   A.   If that's the Thursday.
11   Q.   While we are looking for an exhibit
12 that I want to mark, Mr. Lowitt, was there any
13 back and forth between you and Barclays about the
14 financial terms of your employment?
15   A.   No.
16   Q.   And when did you -- did they send a
17 draft contract at some point?
18   A.   They did.
19   Q.   How was that delivered to you?
20   A.   I believe it was delivered to me by
21 Anthony Collerton.
22   Q.   And Anthony Collerton was I think head
23 of HR at Lehman or in HR at Lehman?
24   A.   He was in HR in Lehman.
25   Q.   It was delivered to you by hard copy,

Page 21

LOWITT - HIGHLY CONFIDENTIAL

1
2  not by e-mail, not by electronic means?
3    A.   Correct.  To the best of my
4  recollection.  It may have been sent to me in
5  addition in soft copy, but I did have a hard copy.
6    Q.   Do you know when any of the other
7  seven people that you named signed their contracts
8  with Barclays?
9    A.   I don't know when anybody else signed.
10 My understanding was that a condition of the
11 transaction proceeding was that the seven sign
12 their contract.
13   Q.   It was your understanding that the
14 seven had to sign their contracts before the
15 transaction closed?
16   A.   That it was a condition of closing,
17 was at least my understanding.
18   Q.   And from whom did you obtain that
19 understanding?
20   A.   I don't have a specific recollection
21 of where I heard that.
22   Q.   Do you have any general recollection
23 about that?
24   A.   No, I -- I don't know specific -- I
25 have no recollection of how I got that.

Page 22

1        LOWITT - HIGHLY CONFIDENTIAL
2        Q.    Were you -- in the week between the
3    filing of the bankruptcy on the 15th and the
4    closing of the transaction on the 22nd, did you
5    have any involvement in either negotiating or
6    implementing the terms of the agreement?
7        A.    I didn't have a role in negotiating
8    the transaction.  And I guess I'm not sure what
9    you mean by implementing the transaction.  I
10   certainly played a role in providing information
11   to those folks who were doing the negotiation.
12       Q.    Were you kept apprised by Mr. McDade
13   of the state of negotiations through the week?
14   And by the week, I mean between the 15th and the
15   22nd.
16       A.    Not in any formal way.  There may have
17   been elements that he shared with me, but I
18   don't -- I was -- it wasn't part of -- he wasn't
19   keeping me regularly updated on that.
20       Q.    Was one of your responsibilities
21   during that week to identify assets that would be
22   transferred from Lehman to Barclays?
23       A.    That is an exercise that I was
24   involved with towards the end of that week.
25       Q.    When towards the end of the week?

Page 23

1        LOWITT - HIGHLY CONFIDENTIAL
2    Tell me on what day that began.
3        A.    I can't be more precise.  I believe it
4    was on the Friday, the 19th, after the repo
5    transaction had taken place.
6        Q.    And prior to Friday, the 19th, did you
7    have any involvement in the activities surrounding
8    the transaction?
9            MR. BERNSTEIN:  Objection, vague and
10   ambiguous.
11           But you can answer.
12       A.    Yeah, I'm -- I'm not sure what you are
13   getting at.
14       Q.    Let me try and rephrase it.
15           As a general matter, and I'll
16   obviously follow up on this, I am trying to get an
17   idea, Mr. Lowitt, of what you were doing during
18   that week.  Could you sort of take me through the
19   week and give me a general idea of what your
20   activities were?
21       A.    The focus for me during that week was
22   a combination of dealing with funding issues,
23   which were quite extreme; dealing with personnel
24   issues with a number of people in the
25   organization, very disconcerted with what had

Page 24

1        LOWITT - HIGHLY CONFIDENTIAL
2    happened to Lehman and worried about their
3    futures; and then supporting, you know, specific
4    requests, you know, from Bart and others.
5        Q.    Who were the others in addition to
6    Bart that you just referred to?
7        A.    Well, the other people who were
8    involved with the negotiation were Mark Shapiro,
9    Mark Schaefer.  Skip McGee I think was involved in
10   some of the questions and issues, and I think
11   Steve Berkenfeld was providing, you know, legal
12   advice.  There may have been others.
13       Q.    What were the nature of the funding
14   issues that you said were a focus of your
15   activities during that week?
16       A.    Well, clearly there was very
17   substantial market disruption following the Lehman
18   bankruptcy filing.  Clearly, there was, you know,
19   a great deal of fear in the marketplace with
20   secured funders, and there was concern about, you
21   know, LBI, and so we had people not rolling their
22   secured funding and we needed to find other ways
23   to fund the firm.
24           Initially, we were utilizing the Fed,
25   but on Wednesday became involved, together with

Page 25

1        LOWITT - HIGHLY CONFIDENTIAL
2    folks at Barclays, in arranging for the Fed to be
3    taken out of their repo position with LBI and to
4    have that repo replaced with one with Barclays.
5        Q.    And was what you were doing in
6    connection with -- actually, let me just follow up
7    on a phrasing.  When you say rolling the funding,
8    in layman's terms, does that mean not continuing
9    the next day?
10       A.    Correct.  People were canceling their
11   repo trades and returning the collateral for cash.
12       Q.    When you were dealing with Barclays
13   with respect to the repurchase transaction, and
14   again that is something we will talk about in more
15   detail today, were you --
16       A.    When you say repurchase transaction --
17       Q.    That's the transaction that I think
18   you were just referring to where Barclays supplied
19   funding for the firm.
20       A.    Right.  Where Barclays took the Fed
21   out of their repo position.
22       Q.    OK.  And give me a little more detail,
23   if you would, on your activities in connection
24   with the repo transaction.  What did you do in
25   connection with the repo transaction?

Page 26

LOWITT - HIGHLY CONFIDENTIAL

1  A.  Well, I was asked to join people from
2  Barclays in a meeting with the Fed to talk through
3  the logistics and details of how that transaction
4  would take place.  And then on the -- that was on
5  the Wednesday.
6         And then on the Thursday was, you
7  know, involved in -- together with other folks at
8  Lehman, in insuring that the -- you know, the
9  collateral movements and cash movements were
10  taking place as, you know, expected by the
11  transaction.
12     **Q.   Is it fair to characterize what you
13  were engaged in during those couple of days as
14  negotiations with Barclays over the terms of the
15  repo?**
16     A.   There was no negotiation with regard
17  to the terms of the repo.  The repo was -- the
18  repo with the Fed was governed by the haircuts
19  that the Fed applied to various term -- parts of
20  collateral, and then when the collateral went over
21  to Barclays, it was again being driven by the
22  Schedule A that Barclays had in place.
23         So there was no negotiation or pricing
24  elements involved in that at all.  It was just the

Page 27

LOWITT - HIGHLY CONFIDENTIAL

1  mechanics of moving collateral out of the Fed and
2  getting cash back for that, playing cash to the
3  Fed, and then the reverse on the Barclays side,
4  getting the collateral to Barclays and receiving
5  cash in from Barclays.
6         MR. BERNSTEIN:  The record says
7     "playing cash to the Fed."  Did you say
8     "playing" or "paying"?
9         THE WITNESS:  "Paying."
10         MR. BERNSTEIN:  Thank you.  Go ahead.
11  BY MR. GAFFEY:
12     **Q.   Were there any discussions with
13  Barclays about what implied interest rate would be
14  applied in the reverse repo?**
15     A.   Not that I was aware of.
16     **Q.   When you referred to the Schedule A a
17  moment ago, is that -- could you describe for me
18  what you meant by Schedule A?**
19     A.   In financing transactions, any
20  counterparty that's extending cash against
21  collateral would specify what are the haircuts
22  that apply to any piece of collateral that they
23  would be willing to lend against to protect them
24  in the event that that collateral needed to be

Page 28

LOWITT - HIGHLY CONFIDENTIAL

1  sold out and they would realize their cash as a
2  result of that sale.
3         So there is standard haircuts that
4  operate across the marketplace, and in certain
5  cases individual institutions would adjust their
6  haircuts relative to the standards that prevailed
7  in the marketplace, and that tends to get
8  characterized on a schedule that is just called
9  the Schedule A.  So I am using shorthand for that.
10     **Q.   When you refer to a haircut, just to
11  try to put this in layman's terms, the haircut is
12  the difference between the value of the security
13  used as collateral and the amount at which the
14  purchaser will pay for it on the first leg of the
15  repo, yes?**
16     A.   It is the difference between the
17  amount of cash that somebody is willing to extend
18  to a given collateral value.  So if there is, you
19  know, $100 worth of government bonds, they would
20  be willing to, just to make the point, extend $99
21  of cash, because in the event that they -- the
22  repo had to get canceled, they would take the
23  government bonds and they would have to sell those
24  government bonds to recover the 99 of cash that

Page 29

LOWITT - HIGHLY CONFIDENTIAL

1  they extended, and there is always uncertainty in
2  what you can sell collateral for in the
3  marketplace, even if it is very liquid collateral,
4  and the haircuts would tend to be larger for less
5  liquid security.
6     **Q.   What was the mechanism by which the
7  collateral underlying the fed repo was valued?**
8     A.   Well, within triparty, the triparty
9  agent, so in the case of the fed repo, JP Morgan
10  Chase maintains as part of their triparty service
11  a pricing mechanism for the collateral that's
12  being funded on behalf of, in our case, Lehman
13  with the various funding counterparties, so that
14  pricing is part of the triparty service, so that
15  that pricing would have been provided by JP Morgan
16  Chase in the example of the Fed repo.
17     **Q.   Do you know if there was any
18  comparison made between the pricing that JP Morgan
19  Chase applied in the triparty and the values
20  ascribed to the particular securities as
21  collateral on Lehman's books?**
22     A.   Well, these would be, you know, liquid
23  securities, so the pricing, one would expect the
24  pricing to be the same or very similar.  I

Page 30

1    LOWITT - HIGHLY CONFIDENTIAL
2  wouldn't imagine that there would be sources of
3  difference.
4        Q.    Thanks.
5             Was there a comparison made, do you
6  know?
7        A.   I'm not aware of a specific
8  comparison.
9        Q.    Was there anything else that you did
10  in connection with arranging the repurchase -- for
11  Barclays to take over the Fed repo?
12        A.   Nothing that I recall specifically
13  that we haven't talked about already.
14        Q.    Did you consider it part of your
15  duties in the course of doing that work to protect
16  the interest of Lehman?
17             MR. BERNSTEIN:  Objection, vague and
18  ambiguous.
19        A.   I saw myself as having to support
20  Lehman Brothers and do the -- and I was an
21  employee of Lehman Brothers at that point, so yes.
22             (Exhibit 216, document Bates stamped
23        BCI-EX77335 through 37 marked for
24        identification, as of this date.)
25        Q.    Mr. Lowitt, I have put before you what

Page 31

1    LOWITT - HIGHLY CONFIDENTIAL
2  we have marked as Exhibit 216.  Do you recognize
3  the document?
4        A.   I do.
5        Q.    Is that your employment agreement with
6  Barclays?
7        A.   I don't know if it is an employment
8  agreement.  It is certainly the offer that I got
9  from Barclays that I signed on the 18th that we
10  talked about.  I guess I'm just not sure what
11  employment contract means, but yes, it is the
12  agreement that I signed with Barclays.
13        Q.    Well, in this document, you agree to
14  work with Barclays and they agree to pay you a
15  certain amount of money, correct?
16        A.   Yeah, I did sign the document.
17        Q.    And you understood it to be an
18  agreement by you to work for Barclays, and an
19  agreement by Barclays to pay you a certain amount
20  of money for that, correct?
21             MR. BERNSTEIN:  Objection,
22  misrepresents the document.
23        A.   It is an offer to join Barclays
24  Capital.  It is subject to the transaction
25  closing.  It specifies duties and responsibilities

Page 32

1    LOWITT - HIGHLY CONFIDENTIAL
2  that are consistent with my present duties with
3  Lehman Brothers.  That was what I understood that
4  I was signing.
5        Q.    OK.  And the date on your signature on
6  the third page, 18 September, is that the date on
7  which you signed this offer?
8        A.   I believe it is.
9        Q.    Did you think there was any conflict
10  between your obligations to protect the interests
11  of Lehman through the rest of the week and the
12  fact that you were under -- you had accepted an
13  offer from Barclays for employment for which you
14  would be paid in excess of $10 million?
15        A.   Well, I -- I don't -- the $10 million,
16  I'm not sure how you are getting to that.  There
17  were a lot of things that needed to happen for me
18  to receive payment, including remaining with
19  Barclays through sort of the time when bonuses
20  were paid, to get initial payment of, what I see
21  here is $4.560 million, and then I would need to
22  remain employed with Barclays through the
23  anniversary dates to get the special cash awards.
24             So those were the numbers of what I
25  was expecting to get paid.  I knew that this was

Page 33

1    LOWITT - HIGHLY CONFIDENTIAL
2  conditional on the transaction closing.  And until
3  that point, I remained an employee of Lehman
4  Brothers.
5        Q.    My question is -- let me rephrase the
6  question a bit.
7             Did you see any conflict between your
8  obligations during the week between the 15th and
9  the 22nd to protect the interests of Lehman in the
10  fact on the 18th of September you had an agreement
11  signed with Barclays where you stood to be paid up
12  to $10 million over the next two years?
13        A.   I recognize that in that week, I was
14  an employee of Lehman Brothers, I was working
15  to -- in the interests of -- I was working in the
16  interests of Lehman Brothers.  If a transaction
17  did occur, then I had an opportunity to join
18  Barclays and contribute to Barclays and get paid
19  by Barclays.
20        Q.    And if the transaction with Barclays
21  had not closed, what were Lehman's prospects?
22        A.   Oh, I think that Lehman -- I don't
23  know -- it is pure speculation on my part, but it
24  would have been difficult to see how Lehman would
25  have, you know, continued to operate.  I mean post

Page 34

LOWITT - HIGHLY CONFIDENTIAL

1  the bankruptcy, the objective was to wind down LBI
2  in an orderly fashion.  Whether one could in fact
3  have wound it down in an orderly fashion given how
4  much turmoil there was in the market the week
5  after the bankruptcy filing in the absence of the
6  transaction I think has to be seen as quite
7  unlikely.
8      Q.    And you would have lost your job?
9      A.    I would not have been employed by
10  Lehman.  I mean possibly, as others, would have,
11  you know, joined the estate in assisting with the
12  wind-down of the remaining positions as other
13  folks did.  But --
14     Q.    Was it your view you could make that
15  amount of money working for the estate?
16     A.    I really wasn't focused on how much
17  money I was potentially going to make if I stayed
18  at Barclays (sic) through the course of that week.
19  I was working to see if we could -- we could get a
20  transaction with Barclays which we all believed
21  were in the interests of our employees and all the
22  participants, including the creditors.
23     Q.    Did you discuss with anyone whether
24  the fact that you had a signed offer letter with

Page 35

LOWITT - HIGHLY CONFIDENTIAL

1  Barclays on September 18 presented a conflict in
2  your duties?
3      A.    There were people within Lehman who
4  obviously knew that I was one of the eight, and
5  given that I wasn't involved in the negotiation, I
6  didn't feel a specific conflict.
7      Q.    Thank you.
8          Let's go back to the negotiations, all
9  right.  I want to, just to frame this for a time
10  period point, I want to go back to the Monday,
11  which is when I think you told me you first spoke
12  to Mr. McDade about the fact that there were renewed
13  negotiations with Barclays.  That was the Monday,
14  correct?
15     A.    That is correct.
16     Q.    What is your understanding of what
17  happened next between the Monday and the Tuesday?
18     A.    Well, in the Monday evening, you know,
19  a number of Barclays folks came to meet with their
20  counterparts at Lehman to understand, you know,
21  what was the inventory and the assets in the firm.
22  And then there were, you know, groups of folks who
23  were also involved that evening in crafting a
24  deal.

Page 36

LOWITT - HIGHLY CONFIDENTIAL

1      Q.    And can you tell me who were the
2  Barclays folks who came to meet with your
3  counterparts at Lehman to understand what was the
4  inventory and assets in the firm?
5      A.    I don't know the names of all of them.
6  But the -- you know, the head of interest rates
7  would have met with the head of interest rates at
8  Lehman, and the head of credit would have, you
9  know, met with Eric Felder, for example.
10     Q.    Can you give me a roster of who was
11  involved in the Lehman side on this activity?
12     A.    I think the people -- not a complete
13  list, but it would have included Mike Gelband, who
14  was the head of capital markets.  It would have
15  included Alex Kirk, and it would have included
16  Eric Felder.
17          There may well have been others, but
18  those three I'm sure were involved.
19     Q.    Did any of them meet with you, any of
20  the Barclays people meet with you at that point?
21  I'm on the Monday into the Tuesday.
22     A.    I mean I met with Rich Richie.  I --
23  there were some meetings -- I wouldn't say a
24  meeting, but sort of contact where we were --

Page 37

LOWITT - HIGHLY CONFIDENTIAL

1  where I was introducing some of the Barclays
2  people to some of the Lehman people.
3          I mean I recall one situation where
4  there was one asset that the Barclays folks
5  weren't sure what it was, and the person who was
6  in a position to explain it was Jim Seery, so I
7  put the Barclays person, whose name I can't
8  recall, in contact with Jim to understand the
9  particular asset.
10     Q.    And did any of the people who worked
11  directly for you, who were your direct reports or
12  people who reported to them, were they involved in
13  these meetings with the Barclays folks to
14  understand the inventory and assets of the firm?
15     A.    I don't know.  You know, Jerry Reilly,
16  who was the head of product control, may well have
17  been involved in some of those meetings, given
18  that he was knowledgeable about some of the
19  assets, but I'm not aware specifically of any of
20  my reports meeting specifically with people
21  specifically at Barclays, but they may well have.
22     Q.    When you met with Mr. Richie, you
23  talked about the fact that you were one of the
24  eight and that he wanted you at Barclays.  Did you

LOWITT - HIGHLY CONFIDENTIAL

talk about anything else?

A.   I don't recall talking about other things.

Q.   Did there come a time when you learned that an agreement of terms had been reached between Lehman and Barclays?

A.   Well, there were, you know, a number of us waiting in the morning of Tuesday to hear that terms had been reached between the two firms, and at some point on the Tuesday morning, I was aware that a deal between the two firms had, in fact, been reached.

Q.   How did you become aware of the fact that a deal between the two firms had been reached?

A.   I can't recall precisely.  I imagine somebody who was in the room negotiating would have come out and shared with, you know, the senior Lehman folks who were waiting on the 32nd floor that that had taken place, but I can't be more specific in my recollection.

Q.   Who were the senior Lehman folks who were waiting on the 32nd floor to learn whether an agreement had been reached?

LOWITT - HIGHLY CONFIDENTIAL

A.   Well, it included -- my recollection is Skip McGee was there, Paul Parker.  It would have involved, included some of the finance folks that had been working that evening.  So Jerry Reilly, Martin Kelly.

Q.   A tumultuous week for everybody.  Are you there on the premises all night?

A.   Yeah, I was.

Q.   What were you doing, other than waiting?

A.   I was involved in collecting the input that was being generated by different parties, vis-a-vis the assets that were, you know, going to be part of the transaction.

Q.   Tell me what you did in terms of collecting input that was generated by different parties vis-a-vis the assets that were going to be part of the transaction.

A.   There were a number of people that were, you know, involved in that.  There was obviously input from the various business teams with regard to which assets the Barclays folks were interested in purchasing and which ones they weren't.  There was, you know, an effort to match

LOWITT - HIGHLY CONFIDENTIAL

up assets and liabilities, and again a number of folks in Lehman were involved in that effort.

Q.   And what were you doing?  What were your activities?  You described that there were teams looking at assets and teams looking at liabilities.  I want to get a sense of what you were doing over the night from Monday to Tuesday, from the 15th to the 16th.

A.   Well, part of what I was doing was meeting with some of the -- as I indicated, you know, introducing some of the Barclays folks to Lehman folks, and some part of what I was doing was, let's say maintaining a sense of where those discussions were coming out.  And that's mostly what we were doing.

Q.   And were those discussions that you refer to, when you say, talk about the discussions and how they were coming out, are those the discussions -- did they include what the value of the assets are that Barclays will purchase from Lehman?

A.   Yeah.  It included both -- you know, there were certain assets that as the Barclays folks understood them, they decided they would not

LOWITT - HIGHLY CONFIDENTIAL

want to purchase them, and then there were also, as one would expect, if you were buying big blocks of assets, that you would -- that the price that you would offer to purchase those big blocks of assets would be less than what those assets were trading in the marketplace at that point in time.

Q.   Did Lehman's books at that time fairly reflect the value of the assets according to how they were trading at the time?

A.   Yes, I believe they did.

Q.   So it was your understanding on the 15th and the 16th of September of 2008, that Lehman's books carried accurate marks for securities that were recorded therein; is that correct?

A.   Yeah.  The assets that were on Lehman's books were, particularly LBI, were securities, and securities are priced based on, you know, market sources, and our books and records were accurate.

Q.   And as CFO, you were comfortable with the fact that Lehman's books and records were accurate; is that right?

A.   There is obviously an enormous process

Page 42

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    that finance goes through and business goes
3    through to validate those prices, and I had
4    confidence in that process to establish the
5    pricing.
6    **Q.   Do you know if -- when you learned on**
7    **the Tuesday morning that there was a deal, what is**
8    **your memory of the terms that you learned?**
9        A.   I didn't know all of the -- I wasn't
10    party to all of the terms.  You know, I was aware
11    that the -- that Barclays was going to purchase a
12    substantial block of assets for less than the
13    amount that we had on our books to reflect a sort
14    of bid offer that reflected both the size of the
15    purchase, as well as the inherent volatility in
16    the market, which was significant that week.
17    **Q.   So was Barclays agreeing to buy the**
18    **assets at a fixed discount?**
19        MR. HUME:  Objection, vague and
20    ambiguous.
21        A.   Barclays were going to purchase the
22    assets at a price they were willing to pay to
23    purchase a substantial block of assets at a time
24    that was tumultuous in the marketplace.  That
25    amount was less than the amount that those assets

Page 43

1    were on our books for.
2        Q.   Was it a discount from the amount
3    **shown on Lehman's books?**
4    **shown on Lehman's books?**
5        MR. HUME:  Same objection.
6        A.   You keep asking whether it was a
7    discount.  It was an amount that was less than the
8    amount that we had on our books for, which
9    reflected a bid offer that was consistent with the
10    size of the purchase, as well as the volatility in
11    the marketplace.
12    **Q.   Is there a reason you are not**
13    **agreeable to the term "discount" to describe that?**
14        A.   I think my explanation of it is more
15    accurate.  The shorthand for it could be discount.
16    I think that it is important to reflect that the
17    marks that we had on our books were accurate,
18    which I believe was the case, as well as the fact
19    that if you are going to sell a very substantial
20    block of assets, you sell it for an amount, or
21    somebody is going to pay you less than the amount
22    that you actually have it on your books for.
23    **Q.   If someone is going to pay you less**
24    **than the amount that you have it on your books**
25    **for, you would expect that to be recorded in the**

Page 44

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **agreement for that transaction; is that correct?**
3        MR. HUME:  Objection, lacks
4    foundation.
5        A.   The -- my understanding of the
6    transaction was that it included that feature, and
7    how it was reflected in any agreement is not
8    something that I know about.
9    **Q.   Tell me what you know about the**
10    **process by which this difference between the**
11    **amount shown on Lehman's books and the amount**
12    **Barclays would pay was determined.**
13        A.   I think it was a combination of what I
14    term sort of bottom up, as the Barclays folks met
15    with the Lehman folks and looked at the assets
16    specifically, as well as, you know, a top-down
17    view that, you know, emerged from the negotiation
18    between Lehman and Barclays.
19    **Q.   This may be an inartful question, but**
20    **what ultimately governed the decision as to the**
21    **amount of the difference between the amount shown**
22    **on Lehman's books and the price paid?  The**
23    **bottom-up process or the top-down view?**
24        MR. HUME:  Objection, lacks
25    foundation.

Page 45

1    LOWITT - HIGHLY CONFIDENTIAL
2        A.   I mean it is hard for me to say.  I
3    wasn't part of the discussion.  But I would say
4    that the bottoms-up view would have informed what
5    was going on inside the negotiating room, but that
6    in the end, it must have been what was agreed to
7    between the parties in their negotiating sessions.
8    **Q.   Do you know if what was agreed to**
9    **between the parties in their negotiating session**
10    **with regard to this difference between the amount**
11    **shown on the books and the price paid was an**
12    **agreement in terms of a percentage of what was**
13    **shown in the amount of the books or a raw number?**
14        A.   My recollection is that it was a
15    number, not a percentage.
16    **Q.   What was the number?**
17        A.   My recollection is it was $5 billion.
18    **Q.   And do you know how that $5 billion**
19    **number was calculated?  How it was generated?**
20        MR. BERNSTEIN:  Objection, asked and
21    answered.
22        But you can answer it again.
23        A.   I don't know how it was derived, but I
24    understand that if you were buying a big block of
25    assets in one go in a very volatile market, you

Page 46

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    would expect to have a fairly substantial bid
3    offer spread associated with that purchase.
4         Q.    Again, it is something I will ask you
5    in more detail as we go through the day, but to
6    your understanding, sir, the deal changed in form
7    over the week?
8         A.    Well, the deal that was consummated
9    and approved by the judge was a completely
10   different deal than the deal that was worked
11   through on the Monday night/Tuesday morning.
12        Q.    I want to get up to the point -- when
13   the deal is approved by the judge, it is at the
14   hearing that takes place on Friday, the 19th?  Can
15   we agree on that?  I am trying to put the date on
16   that.
17        A.    We can agree on that.
18        Q.    That is all I want you to agree on, is
19   the date.
20             In addition to the Tuesday morning
21   when you learn there is a deal and the hearing on
22   the 19th, the repo arises, right?  Barclays steps
23   into the shoes of the Fed on the repo?
24        A.    The Fed insists on Barclays taking
25   them out of the repo.

Page 47

1    LOWITT - HIGHLY CONFIDENTIAL
2         Q.    For whatever reason, Barclays takes
3    them out of the repo?
4         A.    Correct.
5         Q.    The repo ultimately plays a role in
6    the transaction, correct?
7             MR. HUME:  Objection, vague and
8    ambiguous.
9         Q.    The deal ultimately becomes giving to
10   Barclays the collateral that's in the repo, yes?
11            MR. BERNSTEIN:  Objection, vague and
12   ambiguous.
13        A.    The deal was that Barclays would keep
14   the collateral that was in the repo, and those
15   were the assets that Barclays was going to take as
16   part of the transaction.
17        Q.    And the $5 billion number we talked
18   about before, did that number stay in the deal
19   through its various iterations?
20        A.    Well, the repo transaction was just a
21   different thing.  As we discussed earlier, you
22   know, the standard repo construct is one where a
23   lender extends less cash than the amount of
24   collateral they receive to protect them in the
25   event that they have to cancel that repo and sell

Page 48

1    LOWITT - HIGHLY CONFIDENTIAL
2    off the collateral in order to get the cash back
3    that they have extended.
4             And so in a -- the repo that we did
5    with Barclays was done in a way that was
6    completely sort of market standard, and it did
7    include the financing haircut that was typical,
8    and so it is accurate that the transaction as it
9    took place did include that Barclays received
10   collateral for cash through the repo transaction.
11        Q.    And that --
12        A.    And there was a difference between the
13   amount of repo and the cash proceeds, but they
14   were different and not really related to the
15   original transaction.
16        Q.    And the difference between the amount
17   of the repo and the cash proceeds was
18   approximately $5 billion, correct?
19            MR. HUME:  Objection, lacks
20   foundation.
21        A.    It, it -- I mean it was in that
22   region.
23        Q.    Now, let's go back to the Tuesday
24   morning when you learn about the deal.  I may be
25   treading on a few things you already told me.

Page 49

1    LOWITT - HIGHLY CONFIDENTIAL
2    You learn about it from -- I just
3    forget if I asked you this.  From whom did you
4    learn about the terms of the deal?
5         A.    As I said earlier, I didn't recall
6    specifically.  It was part of a group of us
7    waiting to hear and we heard simultaneously.
8         Q.    And where were you when you heard
9    about the terms of the deal simultaneously?
10        A.    We were on the 32nd floor of 745.
11        Q.    And this was very early in the morning
12   of Tuesday?
13        A.    I don't think it was very early in the
14   morning.  Again, I don't have a precise
15   recollection, but I think that this continued
16   through the morning.
17        Q.    Did there come a time when you
18   attended a meeting of the boards of Lehman
19   Brothers Holdings, Inc. and Lehman Brothers, Inc.
20   on the morning of Tuesday, September 16?
21        A.    I don't recall attending a board
22   meeting on the Tuesday.
23        Q.    No recollection of that at all?
24        A.    I don't.  I was very tired, so I --
25   it's possible, but I have no recollection of it.

Page 50

LOWITT - HIGHLY CONFIDENTIAL

1  LOWITT - HIGHLY CONFIDENTIAL
2      Q.  Do you have any recollection of the
3  deal being described to the board by anybody?
4      A.  I don't have a recollection of being
5  at a meeting of the board, so, no.
6      Q.  Do you ever learn one way or another,
7  whether you attended or not, whether the deal had
8  been described to the board?
9      A.  I mean I would have assumed it would
10 have been presented to the board and approved.
11 But I wasn't aware of anything specific to it, or
12 I don't recall being aware of anything specific to
13 it, but I would have expected that it would have
14 been presented to the board.
15     Q.  Did there come a time when the
16 agreement between Lehman and Barclays was reduced
17 to a written contract?
18     A.  Well, I know there was a contract that
19 was worked on on the Tuesday, and I know that
20 there was, you know, various clarifications that
21 were made to that, but I wasn't involved in the
22 drafting or commenting, you know, of that.
23     Q.  At any point during the week?
24     A.  At any point during the week.
25     Q.  Did you ever see the contract that was

Page 51

1  LOWITT - HIGHLY CONFIDENTIAL
2  first agreed?
3      A.  I don't recall I did.
4      Q.  I am sorry?
5      A.  I don't recall that I did.
6      Q.  I just need to press that a little
7  bit.  You don't recall seeing it or you don't
8  recall whether or not you saw it?
9      A.  I don't recall seeing the contract.
10     Q.  This might be quite an event for you.
11 I am about to show it to you.
12     A.  Can I take a quick break?  Is that OK?
13     Q.  Sure.
14     A.  Thank you.  Very quick.
15        (Recess)
16 BY MR. GAFFEY:
17     Q.  Mr. Lowitt, I have put before you what
18 we have marked as Exhibit 1 at a prior deposition,
19 a document entitled Asset Purchase Agreement among
20 Lehman Brothers Holdings, Inc., Lehman Brothers,
21 Inc., LB745 LLC, and Barclays Capital, Inc., dated
22 as of September 16, 2008.
23        Would you look through the document,
24 sir, sufficiently to tell me whether you have ever
25 seen it before.

Page 52

1  LOWITT - HIGHLY CONFIDENTIAL
2      A.  I have seen it as part of my meetings
3  with my counsel.
4      Q.  Apart from meetings you may have had
5  to prepare for your deposition, have you ever seen
6  the document before?
7      A.  I didn't read it ahead of this, no.
8      Q.  I am asking a different question.
9  Putting aside what documents you may have reviewed
10 with counsel --
11     A.  Right.
12     Q.  -- to prepare for your deposition,
13 independently of that activity, have you ever seen
14 the document marked as Exhibit 1 before?
15     A.  I don't recall having seen the
16 document before that.
17     Q.  You learned that there was a written
18 agreement between Lehman and Barclays, yes?
19     A.  Yes.
20     Q.  Did you ever ask to see it at the
21 time?
22     A.  I was -- I don't recall asking to see
23 it at the time.
24     Q.  Did any of your activities in the
25 ensuing week require you to understand the terms

Page 53

1  LOWITT - HIGHLY CONFIDENTIAL
2  of the agreement?
3      A.  I don't believe they did.
4      Q.  When you learned the terms of the
5  agreement, sir, without regard to the exhibit I
6  gave you, when you learned the terms of the
7  agreement, did you also learn that Barclays would,
8  as part of the deal, assume certain liabilities?
9      A.  I mean my understanding of the
10 transaction was that Barclays was going to assume
11 additional liabilities in addition to the sort of
12 asset liability -- the work around the individual
13 assets and the liabilities associated with those.
14     Q.  Did you come to understand that in the
15 deal there would be an extra $1 billion of
16 compensation beyond Lehman's accrual?
17     A.  I mean I was aware that the
18 compensation liability that Barclays was taking on
19 was $2 billion.
20     Q.  Did you understand that to be
21 $1 billion beyond Lehman's accrual?
22     A.  Well, I understood it to be the total
23 compensation, which as we would have thought about
24 it at Lehman would have included both a cash
25 component and a stock component.

Page 54

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2        Q.    Was it $1 billion above the accrual
3    that Lehman had for those components?
4        A.    We would not have accrued for the
5    stock component of compensation that was granted
6    in -- at the end of that year.  We would have been
7    accruing for that over the five years, three or
8    five years that that stock was vesting.
9        So the accrual would have been for the
10   bonus, and then in addition to that, away from the
11   bonus accrual, we had expensed the cost of the
12   prior equity awards that were continuing to vest
13   through 2008.  So compensation that was included
14   in the 2 billion would have been more than just
15   the bonus piece, it would also have, in my mind,
16   included a component that would have been stock.
17       Q.    Now, putting before you, Mr. Lowitt,
18   what has previously been marked as Exhibit 24 and
19   what has previously been marked as Exhibit 25.
20   And with respect to those two documents, sir, I'll
21   ask you the same question.  Take a look through
22   them sufficiently to tell me whether you have seen
23   them before.
24       A.    I don't believe I've seen either of
25   these documents before.

Page 55

1    LOWITT - HIGHLY CONFIDENTIAL
2        Q.    Now, Exhibit 24 is a First Amendment
3    to the asset purchase agreement, and Exhibit 25 is
4    a letter dated as of September 20, which has come
5    to be called the clarification letter.  Have you
6    heard that term before?
7        A.    I have.
8        Q.    And when did you hear the term
9    "clarification letter" in connection with the
10   transaction between Lehman and Barclays?
11       A.    I would have heard of the
12   clarification letter actually subsequent to the
13   transaction closing, is my recollection.
14       Q.    How long after the transaction closed
15   did you first hear about the clarification letter?
16       A.    My recollection around that is hazy,
17   but it would have been a few weeks, probably
18   within a few weeks of the transaction closing that
19   there was a clarification letter.
20       Q.    Do you remember anything about the
21   circumstances under which you learned a few weeks
22   after the closing about a clarification letter?
23       A.    No.
24       Q.    Did you -- until I have shown it to
25   you today, did you ever know there was a First

Page 56

1        LOWITT - HIGHLY CONFIDENTIAL
2    Amendment to the asset purchase agreement?
3        A.    No.
4        Q.    You knew generally at the time -- and
5    by the time, I mean the week between the 15th and
6    22nd, that there were changes in the deal that
7    were memorialized in some way, correct?
8        A.    Yes.
9        Q.    Did you ever ask to see the writings
10   that memorialized those changes in the deal?
11       A.    I don't recall ever asking to see
12   those.
13       Q.    To conduct the activities you were
14   conducting in connection with the deal, did you
15   think you needed to understand or see the written
16   terms of the deal?
17       MR. BERNSTEIN:  Objection.  Compound.
18       A    I -- I don't believe I -- I didn't ask
19   to see it, so I felt -- I believe I would have
20   felt competent to fulfill my duties without having
21   read it.
22       Q.    Did you attend any of the hearings
23   before the bankruptcy court concerning the
24   transaction?
25       A.    I did not.

Page 57

1    LOWITT - HIGHLY CONFIDENTIAL
2        Q.    Did you have reports from anyone who
3    did attend the hearings before the bankruptcy
4    court about the transaction, about what was going
5    on at the hearings?
6        A.    I recall having conversations with
7    Steve Berkenfeld on the weekend after the 7th --
8    the Friday evening, about it, but don't have
9    recollection of specific details of that
10   conversation.
11       Q.    Do you have a general recollection of
12   what Mr. Berkenfeld was recounting to you in those
13   conversations about the hearing?
14       MR. BERNSTEIN:  Is Lehman --
15   Mr. Berkenfeld, as I understand it, was a
16   Lehman lawyer.  Is everyone comfortable
17   waiving the privilege?
18       MR. GAFFEY:  Mr. Berkenfeld was not
19   acting as a lawyer at that time, so it is
20   not a waiver of privilege.
21       MR. BERNSTEIN:  No one is going to
22   assert that this witness is violating the
23   privilege by answering this question.  There
24   are lots of constituents around the table.
25       MR. GAFFEY:  I'm not.  I'm not going

Page 58

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    to --
3         MR. BERNSTEIN:  If anyone is going to
4    assert that, they need to assert that now.
5         MR. GAFFEY:  I am not going to assert
6    that.
7         MR. HUME:  Barclays may assert that
8    Berkenfeld was acting as a lawyer and this
9    is waiving the privilege.  At least we
10   reserve the right to reserve that.
11        MR. GAFFEY:  I would disagree with
12   that.
13   Q.   Could you answer the question, please.
14   A.   Could you --
15   Q.   Do you recall generally what
16   Berkenfeld told you about the hearing when he
17   spoke to you after the -- over the weekend after
18   the hearing had taken place?
19   A.   I think he was recounting the broad
20   narrative of how it had proceeded without giving
21   very specific details of what had actually
22   transpired.  But again my recollection of it is
23   low on sort of detail.  I just recall having that
24   conversation with him.
25   Q.   Before our break in one of your

Page 59

1    LOWITT - HIGHLY CONFIDENTIAL
2    answers you mentioned that the deal that was
3    approved by the court at the hearing was a
4    different deal than the one that had been reached
5    on the Tuesday.  Do you recall that?
6    A.   I do.
7    Q.   How did you learn that the deal that
8    was approved by the court was a different deal
9    than the one that had been reached on Tuesday?
10   A.   Well, there were -- as specific
11   examples, you know, the work that we had done on
12   the Friday to identify additional sources of value
13   for the transaction were clearly elements that
14   were included in the final transaction which were
15   not part of the transaction that was discussed on
16   the Monday and Tuesday.
17   Q.   What were the different sources of
18   value that were identified on the Friday?
19   A.   There was a 15c3 lock-up excess and
20   unencumbered collateral in LBI.
21   Q.   Anything else?
22   A.   I wasn't party to all the elements of
23   what went into the transaction, but I was aware of
24   the work that we did on, you know, those elements.
25   So there may have been others, but certainly I was

Page 60

1    LOWITT - HIGHLY CONFIDENTIAL
2    aware of those.
3    Q.   And what, as best you recall, is the
4    value of those additional elements, dollar value?
5    A.   The dollar value of the unencumbered
6    collateral was in and around $2 billion, and, you
7    know, the 15c3 excess, my understanding of the
8    deal that was reached vis-a-vis the 15c3 excess
9    was around 750 to 800 million dollars.
10   Q.   And why, why was -- why were different
11   sources of values being identified on the Friday
12   to be transferred to Barclays?
13   A.   I mean I was asked to identify
14   potential sources of value by Bart and by Rich.  I
15   wasn't part of the discussions of why that was
16   necessary.
17   Q.   By Rich, do you mean Mr. Richie?
18   A.   Rich Richie.  I am sorry.  Mr. Richie.
19   Q.   What did Mr. Richie say to you about
20   identifying different sources of value?
21   A.   Just that we needed to identify those,
22   we, Lehman, needed to go and identify where there
23   were different sources of value and what those
24   would be.
25   Q.   And do you remember anything else

Page 61

1    LOWITT - HIGHLY CONFIDENTIAL
2    about what Mr. Richie said about identifying
3    additional sources of value?
4    A.   I don't recall additional details of
5    that conversation, no.
6    Q.   Describe the setting in which
7    Mr. Richie told you that Lehman needed to identify
8    additional sources of value.  Meeting, phone call?
9    A.   It was a meeting.  I had an office on
10   the 31st floor, Rich had an office that he was
11   operating out of on the 31st floor, so we would
12   have -- I can't recall precisely where we met, but
13   we met probably somewhere on the 31st floor.
14   Q.   Was anyone else present when you had
15   this conversation with Mr. Richie?
16   A.   I don't believe anybody else was
17   present.
18   Q.   Did you have the conversation with
19   Mr. Richie before or after you had a conversation
20   with Bart McDade about identifying additional
21   sources of value?
22   A.   I can't be certain, but I believe it
23   was after I spoke with Bart.
24   Q.   So was Bart McDade the first person
25   who discussed with you identifying additional

Page 62

LOWITT - HIGHLY CONFIDENTIAL

1  sources of value?

3  A.  I believe that to be the case.

4  Q.  Was anyone else present when you had

5  this conversation with Bart McDade?

6  A.  I don't recall anybody else being

7  present.

8  Q.  As best you remember, what did

9  Mr. McDade say to you about finding additional

10  sources of value?

11  A.  I don't have a specific recollection

12  of the conversation, but I would -- I would expect

13  that he would have asked me where, if anywhere,

14  were there additional sources of value we could

15  include in a new transaction.

16  Q.  Did Mr. McDade give you a target

17  number for additional sources of value?  How much

18  he needed to find?

19  A.  My recollection is between 3 and 4

20  billion dollars.

21  Q.  Did you ask him why you needed to find

22  3 to 4 billion dollars in additional value on that

23  Friday?

24  A.  I don't recall the details of that

25  conversation, so I can't be clear on whether I did

Page 63

LOWITT - HIGHLY CONFIDENTIAL

1  ask him about that or not.

3  Q.  Without regard to the specific

4  conversation, Mr. Lowitt, after you had these

5  conversations, you spent a considerable amount of

6  time that day looking for 3 to 4 billion dollars

7  in additional value, correct?

8  A.  That is correct.

9  Q.  Who worked with you in that endeavor

10  to find 3 to 4 billion dollars in additional

11  value?

12  A.  The main person I worked with on that

13  was Paolo Tonucci, and we would have also included

14  Jerry Reilly and probably Alastair Blackwell.

15  Q.  Did you have an understanding as to

16  whether finding an additional 3 to 4 billion

17  dollars in additional value was important to the

18  transaction?

19  A.  I mean at some level, it needed to be

20  important to the transaction or we wouldn't have

21  been asked to find it.

22  Q.  I agree with the inference, but it is

23  a different question.

24  My question is, is -- did you have an

25  understanding at the time as to whether it was

Page 64

LOWITT - HIGHLY CONFIDENTIAL

1  important to the transaction?

3  MR. HUME:  Objection, vague and

4  ambiguous.

5  A.  I don't recall how I was thinking

6  about it.  I know that I worked hard on it, you

7  know, on the Friday and into the weekend.  So I

8  would have thought it was important.

9  Q.  Did you express to anyone you were

10  working with in this endeavor to find 3 to 4

11  billion dollars in additional value that it was

12  critical to the deal?

13  A.  I don't recall expressing that to

14  people, but it was obviously, you know, an

15  important exercise, an important element of, you

16  know, the new transaction post the repo.

17  Q.  What was your understanding of why it

18  was an important element of the new transaction

19  post the repo?

20  A.  I don't have specific recollection.  I

21  do know that there was -- it was a pretty

22  tumultuous marketplace, and obviously the

23  discussions between, you know, Barclays and

24  Lehman, Barclays communicated to Lehman that it

25  was important that this additional source of value

Page 65

LOWITT - HIGHLY CONFIDENTIAL

1  was located.

3  Q.  Do you know that as a matter of fact

4  or as a matter of inference that Barclays

5  communicated that to Lehman?

6  A.  I know that as a matter of inference.

7  I wasn't party to those discussions.  Thank you

8  for clarifying.

9  Q.  Did anyone tell you that Barclays had

10  communicated that it was important?

11  A.  I don't recall anybody saying that

12  specifically, but as I say, the fact that I was

13  working on it, it was clear to me it was

14  important.

15  Q.  It can fairly be said that the work

16  that you did on Friday into the weekend to find

17  the additional value was a fairly intense

18  activity, correct?  There was a lot of effort

19  being put into this, correct?

20  MR. BERNSTEIN:  Objection, asked and

21  answered.

22  A.  Yeah, we worked hard on Thursday into

23  the weekend.

24  Q.  Were you curious why you needed to

25  find 3 to 4 billion dollars of additional value

**LOWITT - HIGHLY CONFIDENTIAL**

1
2  **for the transaction post the repo?**
3      A.   I mean the transaction had changed.
4  The circumstances in the marketplace were
5  tumultuous.  It wasn't a great surprise to me that
6  Barclays was, given the risk they were taking on,
7  looking for additional value.
8      **Q.   Now, while you and these other**
9  **folks -- and Mr. Tonucchi and Mr. Reilly and**
10 **perhaps Mr. Blackwell and perhaps other folks,**
11 **were searching for 3 to 4 billion dollars in**
12 **additional value on that Friday, there was a**
13 **hearing in the afternoon going on down at the**
14 **bankruptcy court, correct?**
15     A.   That's correct.
16     **Q.   And you had no reports from the**
17 **hearing about what was going on?  That's what you**
18 **told me, correct?**
19     A.   Yeah, I don't believe I was -- I
20 certainly wasn't getting updates of how things
21 were going in the meeting.
22     **Q.   Did you ever ask anyone if the judge**
23 **had addressed and approved the 15c3 issue?**
24     A.   I do know as a result of an e-mail
25 that I saw as part of my preparation for this

LOWITT - HIGHLY CONFIDENTIAL

1
2  deposition that I had asked that of Bart.
3      **Q.   Did you get an answer from Bart?**
4      A.   I don't recall the specific
5  conversation that I had with Bart, but I'm sure I
6  did.
7      **Q.   Why were you asking Bart whether the**
8  **court had approved the 15c3 lock-up point?**
9      A.   We needed to sort of operationalize
10 the movement of collateral, if that was part of
11 the approved transaction, and so my interest was
12 in determining what we needed to do to get
13 ourselves ready to close on the transaction.
14     **Q.   My question is a bit more specific.**
15     A.   It is less than -- 15c3 lock-up would
16 have been something that would have resolved over
17 a period of time as the customer claims were being
18 addressed.  It was really around the unencumbered
19 collateral that we would have needed to
20 operationalize ourselves.
21     **Q.   The 15c3 lock-up piece, let me be sure**
22 **I understand what you just said.  As I understand**
23 **it, the reason it takes place over a period of**
24 **time is as trades settle and customer activity**
25 **takes place, you are able to realize how much is**

**LOWITT - HIGHLY CONFIDENTIAL**

1
2  **surplus in 15c3, correct?**
3      A.   I don't know if it's so much trade
4  settling, but 15c3 lock-up is sort of a regulatory
5  requirement which establishes a set of rules
6  which, based on customer assets and how they are
7  custodied, determines an amount of excess that you
8  need to hold against that.
9          And it is only in sort of the unwind
10 of all of those customer positions that you can
11 determine whether there is excess as calculated
12 per the formula or whether the actual excess is a
13 different number.
14     **Q.   When you asked Bart whether the court**
15 **had approved this 15c3 component, did you think**
16 **the court needed to approve it before you could**
17 **operationalize transferring that to Barclays?**
18     A.   If -- if those elements were not part
19 of a deal, then obviously there was no requirement
20 to operationalize those.
21     **Q.   Was it your understanding that the**
22 **court needed to approve it for it to be part of**
23 **the deal?**
24     MR. HUME:  Objection, lacks
25     foundation.  Calls for a legal conclusion.

LOWITT - HIGHLY CONFIDENTIAL

1
2      A.   All I wanted to know was whether we
3  needed to get ourselves set up on the Monday to
4  begin moving assets.
5      **Q.   So I guess my question is, why didn't**
6  **you ask Mr. McDade, should I send it, should I**
7  **operationalize it, as opposed to did the court**
8  **approve it?**
9      A.   I did understand that the court needed
10 to approve the transaction, and if the court had,
11 you know, not approved the transaction, then -- or
12 not approved elements of the transaction, then
13 there would have been no requirement to
14 operationalize it.
15     **Q.   And you were asking Mr. McDade in that**
16 **e-mail about whether the court had approved the**
17 **15c3 component specifically, correct?**
18     MR. HUME:  Objection, lacks
19     foundation.
20     MR. BERNSTEIN:  Why don't we show him
21     the e-mail.
22     MR. GAFFEY:  I want to get his
23     independent recollection first before it is
24     refreshed.
25     MR. BERNSTEIN:  If you want to ask him

Page 70

1    LOWITT - HIGHLY CONFIDENTIAL
2  specifically what he did in the e-mail, show
3  him the e-mail.
4      **Q.  I think you can answer my question.**
5      A.  Which is your question?
6      MR. BERNSTEIN:  You have the right if
7  you're being asked about what a specific
8  document says to see the document.
9      THE WITNESS:  OK.
10     MR. GAFFEY:  I'm not sure that's so.
11  But let's not have that fight.
12     **Q.  Let me ask you this.  Did you review**
13  **documents to prepare for your testimony today?**
14     A.  I did.
15     MR. BERNSTEIN:  You can answer yes or
16  no.
17     A.  Yes.
18     **Q.  And can you tell me whether any of the**
19  **documents that you reviewed had the effect of**
20  **refreshing your recollection about the events I am**
21  **asking you about?**
22     MR. BERNSTEIN:  You can answer that
23  yes or no.
24     A.  I am struggling with it because I'm
25  not quite sure what -- of my ability to sort of

Page 71

1    LOWITT - HIGHLY CONFIDENTIAL
2  separate out if something refreshed it or not.  In
3  some cases it probably did.
4      **Q.  Can you tell me which documents had**
5  **that effect of refreshing your recollection of**
6  **events?**
7      A.  I can't.
8      **Q.  Do you know when the agreement was**
9  **made -- do you know, sir, if the agreement with**
10  **Barclays was changed or amended to include the**
11  **unencumbered collateral -- unencumbered collateral**
12  **and the 15c3 lock-up?**
13     MR. HUME:  Objection, vague and
14  ambiguous and calls for a legal conclusion.
15     MR. BERNSTEIN:  I would add no
16  foundation.
17     A.  I wasn't party to the negotiation of
18  the deal, the writing of the contracts or what was
19  presented to the court, so I'm not in a position
20  to respond to that.
21     **Q.  Did you know at the time -- well,**
22  **withdrawn.**
23     **Do you know now whether the court was**
24  **told about the 15c3 lock-up and the unencumbered**
25  **collateral?**

Page 72

1    LOWITT - HIGHLY CONFIDENTIAL
2      MR. BERNSTEIN:  You are asking him
3  whether he knows from sources other than
4  discussions with counsel what the court was
5  told?
6      **Q.  Other than discussions with the**
7  **counsel representing you here today.**
8      A.  I do not.
9      **Q.  Do you know if the $5 billion**
10  **difference between the amount at which assets were**
11  **carried on Lehman's books and the amount Barclays**
12  **agreed to pay, back on Tuesday, was disclosed to**
13  **the court?**
14     MR. BERNSTEIN:  Again you are asking
15  for his knowledge other than his discussions
16  with counsel?
17     MR. GAFFEY:  Counsel representing him
18  here today.
19     MR. BERNSTEIN:  Counsel representing
20  him, period.
21     MR. GAFFEY:  No, counsel representing
22  him here today.
23     MR. BERNSTEIN:  My instruction is
24  counsel representing him, period.  We all
25  have associates, et cetera.

Page 73

1    LOWITT - HIGHLY CONFIDENTIAL
2      MR. GAFFEY:  OK, Willkie Farr or Boies
3  Schiller, I will take all of them.
4      MR. BERNSTEIN:  Whoever his counsel
5  is.
6      MR. HUME:  Or representing Barclays.
7      MR. GAFFEY:  Fine.
8      A.  Can you repeat the question.
9      **Q.  Apart from talking to your own lawyers**
10  **or lawyers from Barclays, do you know if the**
11  **$5 billion difference between the amount at which**
12  **assets were carried on Lehman's books and the**
13  **amount Barclays agreed to pay, back on Tuesday,**
14  **was disclosed to the court?**
15     A.  I don't know what was disclosed to the
16  court, but I also would say that the transaction
17  that was presented to the court was not the
18  transaction that was the one that was agreed to on
19  the Tuesday.  It mutated, it was different as a
20  result of sort of the repo and other factors.
21     **Q.  Did the deal mutate over the weekend**
22  **of the 21st -- of the 20th and 21st?**
23     A.  Again, I'm not really in a position to
24  say what happened because I'm not -- I don't know
25  what was really agreed to on the Friday and what

Page 74

1          LOWITT - HIGHLY CONFIDENTIAL
2    was presented to the court.
3          Q.   Do you know -- whether you know the
4    specific means in which it did, do you know
5    whether the deal mutated over the weekend of the
6    20th and 21st?
7          MR. BERNSTEIN:  Objection, asked and
8    answered.
9          MR. HUME:  Same objection, lacks
10   foundation.
11         A.   Again, I just repeat the previous
12   answer, which was I didn't know what exactly went
13   into the deal on the Friday that was presented to
14   the court, so I'm not in a position to say whether
15   things changed.  I wasn't party to the discussions
16   even over the weekend around what would have or
17   might have changed.
18         Q.   Did you ever get an understanding of
19   the components of the deal as it actually closed
20   on the 22nd?
21         A.   The 22nd is the --
22         Q.   Is the Monday.
23         A.   Is the Monday?
24         MR. HUME:  Excluding conversations
25   with counsel.

Page 75

1          LOWITT - HIGHLY CONFIDENTIAL
2          A.   Well, I knew that there was a fairly
3    detailed schedule which identified unencumbered
4    collateral that was, you know, reviewed by the
5    creditors' committee and was -- again I assumed,
6    not that I knew, included what -- the deal that
7    was agreed to with Barclays.
8          Q.   When you refer there to unencumbered
9    collateral, are you talking about the unencumbered
10   collateral you were looking for on Friday?
11         A.   Correct.
12         Q.   My question is a little broader.  Did
13   you ever have an understanding of the overall
14   terms of the deal that closed on Monday?  What did
15   Barclays get, what did Barclays pay?
16         MR. HUME:  Again objection to the
17   extent it calls for anything you learned
18   from Barclays' lawyers or your own lawyers,
19   I am instructing you on behalf of the
20   company not to answer.  Preserve the
21   attorney/client privilege.
22         MR. GAFFEY:  I -- hold that thought.
23   Let's see if we can save everybody some
24   speechifying.  That will be a standing
25   instruction to the witness.

Page 76

1          LOWITT - HIGHLY CONFIDENTIAL
2          I never want you to disclose to me,
3    unless I specifically ask you for it,
4    anything that was disclosed to you by your
5    counsel from Willkie Farr or counsel
6    representing Barclays.
7          Would that solve the problem so we
8    don't have to solve it every time?
9          MR. BERNSTEIN:  It doesn't solve his
10   problem.  It has to be counsel, period.
11         MR. HUME:  First of all, what about
12   in-house Barclays counsel?  We are entitled
13   to object and to instruct the witness.
14         MR. GAFFEY:  It will take longer.
15   That's fine.  I have all day.
16         Q.   Do you have the question in mind?
17         A.   Can you repeat it for me, please.
18         (Record read)
19         MR. BERNSTEIN:  Again, you can answer
20   the question except with reference to
21   information you have obtained from either
22   Barclays' counsel or your counsel.
23         THE WITNESS:  No, I understand.
24         A.   I had a sense of many but probably not
25   all of the elements of the transaction.

Page 77

1          LOWITT - HIGHLY CONFIDENTIAL
2          Q.   Describe for me what your sense was,
3    what your understanding was.
4          A.   So my sense was that it included the
5    unencumbered collateral, it included the 15c3
6    lock-up excess or a component of 15c3 lock-up
7    excess, that it involved the cancellation of the
8    repo, it involved making offers to -- of
9    employment to legacy Lehman employees of LBI.  It
10   included the exchange -- the exchange derivative
11   business and all the business -- the majority of
12   the businesses of LBI.
13         But again, the details of what was in
14   and what was out, there were details there that I
15   would not have been aware of.
16         Q.   Do you know if in connection with the
17   inclusion of the exchange derivative business any
18   cash was transferred to Barclays?
19         A.   Not aware.
20         Q.   So the unencumbered collateral, if I
21   have your testimony correctly, was approximately
22   2 billion?
23         A.   That's my recollection.
24         Q.   And the 15c3 was approximately
25   1 billion, correct?

Page 78

LOWITT - HIGHLY CONFIDENTIAL

1       LOWITT - HIGHLY CONFIDENTIAL
2     A.  I think my recollection was between
3  750 and 800 million dollars.
4     Q.  And the collateral on the repo was
5  approximately 50 billion, correct?
6     MR. HUME:  Objection, lacks
7  foundation, vague and ambiguous.
8     A.  I believe it was in and around
9  $50 billion of collateral.
10     Q.  So at least by my amateur math, my
11  understanding, as I am adding it up, sir, tell me
12  if I'm correct, your understanding is that
13  Barclays got about $52.8 billion in value?
14     MR. BERNSTEIN:  Objection,
15  mischaracterizes his testimony.
16     A.  There was individual components of the
17  deal. I don't think you could adequately -- you
18  can correctly stand them up as you have just done
19  that.  And you are just mixing different concepts
20  together.
21     Q.  Why don't you tell me what you think
22  Barclays -- let me ask you this.  In your
23  understanding, was the deal structured in a way
24  that Barclays would have an immediate gain on
25  acquisition?

Page 79

1       LOWITT - HIGHLY CONFIDENTIAL
2     A.  I didn't know how Barclays was going
3  to account for the transaction, but it wouldn't
4  have surprised me that Barclays was going to get
5  some equity out of the transaction, given the
6  risks that they were taking on.
7     Q.  Describe what you mean by that, given
8  the risks that they were taking on?  Why would it
9  not surprise you given the risks that they were
10  taking on?
11     A.  I think they were taking on at least
12  two risks.  One was that as they looked to sell
13  off the collateral on the repo trade, that they
14  couldn't sell it out for -- you know, within the
15  amount of the financing haircut.
16     And then the second risk is obviously,
17  you know, any integration has a fair amount of
18  risk, and they were going to employ, you know, a
19  large number of Lehman people, and it was possible
20  that they wouldn't have been successful in
21  integrating all of those people and that the costs
22  of those folks would have been more than they were
23  generating in revenue.
24     Q.  And at the time that the deal closed,
25  again around the Monday, September 22nd, did you

Page 80

1       LOWITT - HIGHLY CONFIDENTIAL
2  have an understanding or a view as to whether
3  Barclays would enjoy immediate gain on the
4  acquisition?
5     A.  I had no sense of it.
6     Q.  Mr. Lowitt, showing you what was
7  marked at a prior deposition as Exhibit 19.  Have
8  you seen that document before?
9     A.  I have.
10     Q.  What do you recognize the document to
11  be?
12     A.  Monday night, Tuesday morning, we were
13  tracking elements of the transaction and in
14  particular the sort of net assets, the specific
15  liabilities that we from a Lehman perspective
16  understood that Barclays would be assuming in the
17  transaction as it was conceived on the Monday and
18  Tuesday period.
19     Q.  Did you play any role in the drafting
20  of the document we have marked as Exhibit 19?
21     A.  I mean I can't recall precisely my
22  role in this particular version, but I was
23  certainly involved in the iterative work product
24  that led up to this particular piece of paper.
25     Q.  By iterative work product, are you

Page 81

1       LOWITT - HIGHLY CONFIDENTIAL
2  talking about prior drafts of this -- withdrawn.
3     What do you mean by iterative work
4  product?
5     A.  I believe there were earlier drafts of
6  this as our understanding of what was going to
7  constitute the transaction as we were getting a
8  better sense of it through the morning of Tuesday.
9     Q.  Now, on the asset side of this --
10  withdrawn.
11     On the asset side of this financial
12  schedule, sir, there are descriptions of various
13  asset classes.  Do you see that?  Government
14  agency, commercial paper, et cetera?
15     A.  I do see that.
16     Q.  Are the amounts attributed to each of
17  those asset classes -- withdrawn.
18     Were the amounts attributed to each of
19  those asset classes the values shown on Lehman's
20  books for each of those asset classes?
21     A.  My understanding of what was reflected
22  in these asset values would be the amount that
23  Barclays would be paying for assets in those asset
24  categories.
25     Q.  So that roughly $5 billion number that

Page 82

LOWITT - HIGHLY CONFIDENTIAL

1  we talked about before is recognized in this
2  document, Exhibit 19, correct?
3      MR. BERNSTEIN:  Objection, vague and
4      ambiguous.
5      A.   It is not recognized in this, in the
6  sense that these -- these asset numbers are post
7  that -- reflect what Barclays were willing to pay
8  for $72 billion worth, $72.65 billion worth of
9  assets, which are less for reasons that we talked
10 about earlier than the amount they were on
11 Lehman's books for, and the amount less is
12 probably the 5 billion that you referenced.
13     Q.   Now, you told me a moment ago, sir,
14 there were various drafts of iterative work
15 product that led to this final.  Do you recall how
16 many different drafts of it there were before this
17 document was a result?
18     A.   I don't recall how many, but there
19 were many, and that's -- just for clarification,
20 you know, I'm not aware of why this is marked
21 final, but there were a number of, you know, sort
22 of iterations that led to whatever the final
23 version of this thing was.
24     Q.   And when were these iterations being

Page 83

LOWITT - HIGHLY CONFIDENTIAL

1  generated?  Is this during Tuesday, the 16th?
2      A.   It would have started -- I can't say
3  when it would have started, but it certainly would
4  have continued through the morning of Tuesday.
5      Q.   May have started as early as --
6      A.   Monday evening.
7      Q.   Monday evening.  OK.
8          And who, if you know, was actually
9  generating the document?
10     A.   Again, my recollection is that it was
11 one of the Weil lawyers who had the spreadsheets
12 on his computer, but I don't know the name of that
13 person.
14     Q.   Do you -- can you describe that
15 person?
16     A.   A reasonably young man, but I'm afraid
17 I can't be more specific than that.
18     Q.   That would qualify every man in the
19 room, sir.  Can you give a more detailed
20 description?
21     MR. BERNSTEIN:  I just want to correct
22     that.  It wouldn't describe everyone in the
23     courtroom.
24     Q.   With the possible exception of Neil

Page 84

LOWITT - HIGHLY CONFIDENTIAL

1  Oxford, it would be everyone in the room.
2          Do you have a more detailed
3  description that you can give me, sir, than
4  fungible young associate at Weil Gotshal?
5      A.   I'm afraid I can't.
6      Q.   Did he have it on a laptop?  Did he
7  have it on a computer, a PC?
8      A.   I believe it was on a laptop that he
9  had rather than a standing PC, just because he was
10 in one of the dining rooms on the 32nd floor, so
11 there aren't standing computers there.  But that's
12 based on my assumption rather than a specific
13 recollection of whether it was a laptop or a
14 computer.
15     Q.   How do you know he worked for Weil
16 Gotshal?
17     A.   I can't be specific about how I knew.
18 He wasn't somebody who was, you know, at Lehman,
19 and he wasn't somebody at Barclays, but -- and my
20 recollection is he was at Weil, but I
21 unfortunately can't be more clear about how I knew
22 he was at Weil.
23     Q.   Is it anything other than process of
24 elimination that makes you think that he worked

Page 85

LOWITT - HIGHLY CONFIDENTIAL

1  for Weil?
2      A.   I have a recollection that he worked
3  for Weil.  I can't be more specific as to why I
4  have that recollection.
5      Q.   Is it possible he was a Lehman intern?
6      A.   It's possible.
7      Q.   Were there Lehman interns in and
8  around the premises when this work was being done?
9      MR. BERNSTEIN:  Were you finished with
10     your answer, your prior answer?
11     Q.   I am sorry.  If I interrupted, I
12 apologize.  Is there any --
13     A.   Again, it is not because of
14 recollection, but I would have been very surprised
15 if we would have been using a Lehman intern for
16 this.  Again, given that I can't be more precise
17 about who it was, things are possible, but it
18 would surprise me if that was the case.
19     Q.   Were there any junior-level Lehman
20 personnel in and around the premises when this
21 work was being done?
22     A.   Again, I couldn't say with complete
23 certainty, but I would be surprised if there were.
24     Q.   Did you know everybody who was in and

Page 86

LOWITT - HIGHLY CONFIDENTIAL

1   around the premises when this work was being done?
2   A.   I obviously didn't know everybody who
3   was involved.
4   Q.   And had you met this young man at any
5   time prior to seeing him when this work was being
6   done?
7   A.   I don't recall meeting him prior to
8   that.
9   Q.   I am going to put before you what has
10  been marked at a previous deposition as
11  Exhibit 200.  Mr. Lowitt, I will ask you what I
12  asked you with respect to other documents.  Would
13  you take a look through that document sufficiently
14  to tell me whether you have seen it before.
15  A.   I certainly saw it as part of my -- I
16  have seen it before.
17  Q.   Let me ask you this.  Have you seen it
18  before, apart from your preparation for the
19  deposition?
20  A.   I don't recall seeing it before that.
21  It is just an interim work product, and when I
22  recall seeing it is as part of my preparation for
23  this deposition.
24  Q.   Is that your handwriting on the

Page 87

LOWITT - HIGHLY CONFIDENTIAL

1   document?
2   A.   Part of this looks like my
3   handwriting.
4   Q.   Does that include the part that says
5   "mark down," down below the asset line?
6   A.   I can't be certain of that, but it may
7   well be.
8   Q.   Why do you say it may well be?
9   Because it looks like your handwriting to you?
10  A.   It looks like it could be my
11  handwriting.
12  Q.   And there are other annotations on the
13  document by hand.  Do you recognize any of them as
14  your handwriting, the various numbers written on
15  the page?
16  A.   The numbers on the right side of the
17  adjust column look like my handwriting.  The ones
18  to the left actually don't.
19  Q.   When you say the adjust column, you
20  are talking about the adjustment column both for
21  assets and liabilities?  There are two adjustment
22  columns.
23  A.   To the right of both of those columns.
24  Q.   Under the word "asset," where it says

Page 88

LOWITT - HIGHLY CONFIDENTIAL

1   40.31 and 8.4, that may not be your handwriting;
2   is that right?
3   A.   That is correct.
4   Q.   Do you have any idea whose handwriting
5   that is?
6   A.   I do not.
7   Q.   Do you recall making handwritten
8   notations on the financial schedule as part of
9   this iterative work?
10  A.   I do.
11  Q.   Why are you doing that?
12  A.   We are really trying to keep track of
13  what are the assets that Barclays is willing to
14  purchase and at what price they would be willing
15  to purchase it at that reflects a difference
16  between our book value and what they would be
17  willing to purchase at to reflect the size of the
18  purchase and the market conditions.
19  Q.   Take a look, if you would, sir, at the
20  handwritten entries along the line for government
21  and agencies on the asset side.  Do you see that?
22  A.   Yes.
23  Q.   Is that a 42 or a 41 in your
24  handwriting next to the adjustment column?

Page 89

LOWITT - HIGHLY CONFIDENTIAL

1   A.   It looks like 41 to me.
2   Q.   Do you recall a point where Barclays
3   offered 41 for government and agencies? I'm
4   wondering why that number is higher than the
5   number shown on the schedule.
6   A.   I can't say.  We may have found that
7   the amount of governments and agencies was
8   actually more than was on the schedule rather than
9   a markup of any position.
10  Q.   I asked you earlier before about --
11  that sort of vague question I put about the
12  difference between the bottoms-up review and the
13  top-down look.  This sort of -- the question I am
14  about to ask you relates to that.
15  Are the calculations being done on
16  this schedule and whatever other calculations were
17  done like that that day, are they meant to achieve
18  the raw total number or are they meant to develop
19  the components, add them up and see what the raw
20  number will be?
21  A.   I think it is supposed to cover both,
22  which is supposed to say bottoms up, what does it
23  look like, and then top down, what would we need
24  to do to achieve the overall goal.

Page 90

LOWITT - HIGHLY CONFIDENTIAL

2  Q.   And the overall goal is the price that
3  Barclays will pay and the difference between that
4  and the value shown on Lehman's books, yes?
5  A.   The difference between what Barclays
6  are willing to pay versus the amount that's on
7  Lehman's books which reflects, you know, the
8  market price of those securities.
9  Q.   When that agreement ultimately was
10  made, whatever that difference was between the
11  amount shown on the books and the amount Barclays
12  would pay, was it expressed as a percentage of the
13  amount shown on the books?
14  A.   My recollection is that it was a
15  dollar amount, not a percentage.
16  MR. GAFFEY:  I need to take about ten
17  minutes.  Can we do that now?  Is that
18  convenient?
19  MR. BERNSTEIN:  Sure.
20  (Recess)
21  BY MR. GAFFEY:
22  Q.   Exhibit 200, sir, is before you.  We
23  were talking before the break about some of your
24  annotations down the right-hand side of each of
25  the adjustment columns.

Page 91

LOWITT - HIGHLY CONFIDENTIAL

2  I direct your attention now to the
3  words "mark down" at the bottom.  Do you have any
4  information, sir, as to why you wrote the words
5  "mark down" on this document?  Why you would have
6  written the words "mark down" on this document?
7  A.   I really don't have any recollection
8  of why that would be the case.  We were in this
9  exercise both identifying which assets Barclays
10  would be purchasing and the price they were
11  comfortable paying, and that represented a -- you
12  know, obviously a lower price than they were on
13  the books for.
14  So it is possible that it has to do
15  with that, but I don't recall writing this down
16  specifically.  So that would just be an
17  interpretation of what I am seeing on the page.
18  Q.   Without regard to that particular
19  document, sir, in this process where the
20  determination is being made as to the amount that
21  this schedule finally will reflect when it is
22  done, do you know if there is any back and forth
23  between Lehman and Barclays as to the price?
24  A.   I mean I know there is back and forth
25  between Lehman and Barclays vis-a-vis what assets

Page 92

LOWITT - HIGHLY CONFIDENTIAL

2  are going to be included.  So I recall, for
3  example, that a set of the mortgage assets were
4  ones that Barclays said they weren't in a position
5  to determine value so they would -- they would not
6  include those.
7  And I know that there was ---if you
8  are asking me do I know precisely the nature of
9  that back and forth, I don't.
10  Q.   I'll follow up on the -- the inclusion
11  of assets point that you just told me about.  My
12  question goes more toward the number, the number
13  that's finally agreed.
14  Is there a negotiation of that number,
15  Barclays wants it to be a zillion dollars and
16  Lehman wants it to be one, and they negotiate it?
17  Do you know anything about the process that led to
18  it being that number as opposed to any other
19  number?
20  A.   Again, I wasn't in the room where the
21  negotiations were taking place, but what -- you
22  know, what I was seeing was, you know, information
23  that was coming in from the various businesses
24  that indicated how much less Barclays would pay
25  for certain assets than it was on the books of

Page 93

LOWITT - HIGHLY CONFIDENTIAL

2  Lehman for, and that the combination of those
3  things I think were being tracked and became part
4  of the back and forth of the negotiation.
5  But I again wasn't party to those
6  discussions, so I don't know how that was
7  proceeding.  But my sense was it was an iterative
8  process between the parties.
9  Q.   Do you have any -- not with respect to
10  the particular document we have marked as
11  Exhibit 200, but if you can use that to refresh
12  your recollection, fine.
13  Do you have any recollection of where
14  you sit in the process?  You're writing down
15  numbers on a financial statement.  What are you
16  keeping track of here?
17  A.   I don't have a specific recollection,
18  but I would imagine that what I was keeping track
19  of was a combination of which assets Barclays
20  would have or would not be purchasing because they
21  were in a position to say what price they would be
22  willing to purchase it for, so that was part of
23  the screening exercise that we talked about
24  earlier that Barclays was engaging with their
25  counterparts at Lehman about.

LOWITT - HIGHLY CONFIDENTIAL

1          LOWITT - HIGHLY CONFIDENTIAL
2          And then the difference between what
3   the assets were on Lehman's books for and as a
4   result of the bulk purchase and the volatility of
5   the marketplace, what Barclays would be willing to
6   pay for it.
7      **Q.   Was it your understanding of the**
8   **transaction -- did you have an understanding that**
9   **after the transaction, Barclays planned to sell**
10  **these assets off in bulk?**
11         MR. HUME:  Objection, lacks
12     foundation.
13     A.   I had no idea what Barclays were
14  planning to do.
15     **Q.   You knew you were going to go work at**
16  **Barclays.  You knew they were taking what**
17  **businesses they were taking.  Did you have an**
18  **understanding that what Barclays was planning to**
19  **do was operate the business as Lehman had?**
20         MR. BERNSTEIN:  Objection, compound,
21     mischaracterizes his testimony.
22         You may answer.
23     A.   Well, it seems like there were a
24  couple of things you were saying.  I didn't know I
25  was going to work at Barclays because I didn't

1          LOWITT - HIGHLY CONFIDENTIAL
2   know that the deal was going to be completed.  I
3   would -- I had had no discussions with Barclays
4   vis-a-vis how they were going to operate these
5   various businesses.  So I am not in a position to
6   say whether they were anticipating selling off
7   these assets or not.
8          You know, what I would have known was
9   that if Barclays were going to maintain these on
10  their balance sheet, then they needed sort of
11  equity to support those assets and they needed
12  room within their leverage ratios, and I wouldn't
13  have known if they had an ability to absorb that
14  or not.
15     **Q.   Can you go back to Exhibit 19.  That's**
16  **the one without the handwritten notes.**
17     **Now, Exhibit 19 shows on the liability**
18  **side entries for cure payment and comp on the**
19  **lower right-hand side.  Do you see that?**
20     A.   I do.
21     **Q.   And cure payment is put at**
22  **2.25 billion, and comp is put at 2 billion.  Do**
23  **you see that?**
24     A.   Yes.  There isn't the dot on my copy,
25  but yes, 2.25 and 2 billion.

1          LOWITT - HIGHLY CONFIDENTIAL
2      **Q.   Do you know the basis upon which those**
3   **numbers were calculated?**
4          MR. BERNSTEIN:  Objection, compound.
5      A.   When you say the basis under which
6   they were calculated, I mean those were numbers
7   that -- the $2 billion of comp I think was a
8   negotiated number between the parties.
9          The cure payment number was one that I
10  recall Martin Kelly was working on and that, you
11  know, it represented the best estimate that we had
12  of the -- those payables that would be assumed by
13  Barclays.
14     **Q.   And was it, to your understanding, a**
15  **component of the transaction that the difference**
16  **between the amount Barclays would pay for the**
17  **assets and the amount for which -- and the**
18  **amount -- the value of those assets shown on**
19  **Lehman's books needed to exceed the amount of**
20  **liabilities assumed for cure and comp?**
21         MR. HUME:  Objection, lacks
22     foundation.
23     A.   I wasn't party to the discussions that
24  were occurring between sort of Lehman and Barclays
25  with regard to that.  Again, you know, we spent a

1          LOWITT - HIGHLY CONFIDENTIAL
2   lot of time on this, the difference between the
3   amount that things were on Lehman's books for and
4   the amount that Barclays were going to pay for,
5   for those assets.  How they viewed their ability
6   to capture that difference, I just have no basis
7   to assess.
8      **Q.   My question goes to something slightly**
9   **different, not Barclays' state of mind.  It is**
10  **more toward did you hear any conversation, see any**
11  **documents, learn any facts at the time this**
12  **schedule was being prepared about that issue,**
13  **about whether the 5 billion was to cover the cost**
14  **of the assumed liabilities?**
15     A.   I don't recall knowing anything
16  specific to that, and again, that would have been
17  something that would have been discussed between
18  Lehman and Barclays.
19     **Q.   Did you ever have a discussion with**
20  **Mr. Kelly concerning whether the 5 billion was**
21  **needed to cover Barclays' expenses?**
22     A.   I don't recall a conversation with
23  Martin about that.
24     (Exhibit 217, document Bates stamped
25  BCI-EX00115595 through 654 marked for

Page 98

1      LOWITT - HIGHLY CONFIDENTIAL
2      identification, as of this date.)
3          Q.   Mr. Lowitt, I have put before you what
4      we have marked as Exhibit 217, a document,
5      multipage document bearing Bates number
6      BCI-EX00115595 through 115654.
7          I will ask you if you have any
8      recollection of seeing this document before.
9          A.   I don't recall this document.
10         Q.   I will represent to you, sir, that
11     this exhibit is put together in the manner in
12     which it was produced to us by Barclays.  In other
13     words, the metadata put all of these pages
14     together.
15         Can you see any reason why the
16     schedule that is the first page of the document
17     would have been combined with the triparty
18     collateral analysis that's attached to it?
19         MR. BERNSTEIN:  Objection, no
20     foundation.
21         MR. HUME:  When you say, when you say
22     the metadata -- you said the metadata put
23     the pages together.  I don't know what you
24     mean.
25         MR. GAFFEY:  It appears from Barclays'

Page 99

1      LOWITT - HIGHLY CONFIDENTIAL
2      production that this is produced as a
3      singular document.
4          MR. HUME:  Was it attached to an
5      e-mail?  This whole production came from an
6      e-mail?
7          MR. GAFFEY:  No.
8          MR. HUME:  It was not attached to an
9      e-mail?
10         MR. GAFFEY:  Not the way it was
11     produced.  It could well be a clerical
12     issue, but I need to ask him about it.
13         MR. BERNSTEIN:  Can I ask a question?
14     Who put the Bates numbers on this?
15         MR. GAFFEY:  Barclays.
16         A.   But I think I know what at least
17     elements of this are.  These are materials that as
18     I was preparing for the deposition, as I looked
19     through --
20         MR. HUME:  Can anyone give me a copy?
21     I don't have a copy.
22         Q.   Go ahead.
23         A.   I was asked the question whether I had
24     any materials that were associated with the period
25     post the bankruptcy, and the first and second

Page 100

1      LOWITT - HIGHLY CONFIDENTIAL
2      schedules I believe were materials that I made
3      available through my lawyers to Barclays.  The
4      subsequent materials, I'm not aware of what those
5      would be.
6          Q.   Let me see if I can get a slightly
7      clearer record on it.  The first page is what you
8      are referring to as the first schedule?
9          A.   Yes.
10         Q.   The second page entitled "Triparty
11     Collateral Analysis" is the second.
12         A.   Yes.
13         Q.   But after that, you haven't seen the
14     document before?
15         A.   I don't have a specific recollection
16     of that, but it is possible that this -- I mean I
17     would just be speculating what the long document
18     is.
19         Q.   I don't want you to do that.
20         You have seen the first page marked
21     115595, yes?
22         A.   Yes.
23         Q.   You have seen that before?
24         A.   This page.
25         Q.   Right.

Page 101

1      LOWITT - HIGHLY CONFIDENTIAL
2          A.   Yes.
3          Q.   And you have seen the second page
4      bearing the number in the lower right-hand corner
5      115596?
6          A.   Correct.
7          Q.   And you don't know if you have seen
8      the pages 115597 through the end of the document?
9          A.   Correct.
10         Q.   What's the second page, marked 115596?
11         A.   I believe that this is the collateral
12     that was with the Fed that was part -- that was --
13     as there was the necessity to unwind the Fed repo,
14     this was the collateral that was returned to
15     Lehman from the Fed.
16         Q.   Can you tell me what it means when it
17     describes collateral value after margin reduction?
18         A.   This is a schedule from the Fed.  It
19     says, "Customer Lehman Brothers," top left.
20         Q.   Well, in the column where it says
21     "effective margin," do you understand that to be
22     describing the haircut in some fashion?
23         MR. BERNSTEIN:  No foundation.
24     Objection, no foundation.
25         A.   It is not my schedule, so I don't

Page 102

LOWITT - HIGHLY CONFIDENTIAL

know.

Q.   OK.  All right, that's fine.  Let's put the document aside.

I want to go back to the conversation you told me about a while ago that you had with Mr. Richie on the morning of Friday, September 19, about looking for additional sources of value.

A.   Right.

Q.   Did Mr. Richie say to you in sum or substance that it was critical to the deal closing to find those additional sources of value?

A.   I don't recall Rich saying it was critical to the deal closing.  But clearly it was important as an input into the discussions that were taking place between Barclays and Lehman.

Q.   The conversation that you had with Mr. McDade, the first conversation that you had about -- as between the one with Mr. Richie, that you had about finding additional sources of collateral, was that in the early morning of Friday?

A.   My recollection is somewhat hazy, but I believe it was early on Friday morning.

Q.   Was there a meeting with Mr. McDade

Page 103

LOWITT - HIGHLY CONFIDENTIAL

early on Friday morning that you attended along with others?

A.   I have no recollection of that meeting, but I believe it is possible that it took place.  I think Thursday night was also an all-nighter.

Q.   It sounds like most of the week was all-nighters.

Was there a sense of urgency in finding the additional sources of value?

MR. BERNSTEIN:  Objection, asked and answered.

A.   It was obviously important for us to do that.

Q.   When you spoke to Mr. Richie after you spoke to Mr. McDade, did Mr. Richie relay to you any conversations he had had with McDade about this issue?

A.   No.  I don't believe he did.

Q.   Did you refer to your earlier conversation with Mr. McDade about the issue when you spoke to Mr. Richie?

A.   I don't have a recollection of the details of, you know, my conversation with

Page 104

LOWITT - HIGHLY CONFIDENTIAL

Mr. Richie other than that it was -- other than we needed to look to identify sources of additional value.

Q.   Did you speak or otherwise communicate with Mr. McDade about the issue after you spoke to Richie?

A.   I can't recall any additional conversations with Bart, but the progress that we were making in identifying sources of value is something that I would have been communicating to Bart through the course of the day.

Q.   Now, there came a point during the course of the day where Bart went down to the bankruptcy court, correct?

A.   On the Friday, yes.

Q.   And approximately when during the day was that, morning or afternoon?

A.   I don't know exactly when Bart went down, but I would assume it was in the afternoon.

Q.   And the hearing went on until the wee hours of the morning on the 20th.  It went past midnight, correct?

A.   Don't know with certainty, but if you say that was what happened, I'm sure that's right.

Page 105

LOWITT - HIGHLY CONFIDENTIAL

Q.   Do you know if Mr. McDade was down there for the entire hearing?

A.   Again, I wasn't there so I don't know if Bart was there for the whole time.

Q.   Do you know if as part of this project to identify additional sources of collateral, do you know if during the work related to that project anyone sent assets over to Barclays on the Friday?

MR. BERNSTEIN:  Objection, vague and ambiguous.

A.   I don't have a recollection.

Q.   Did it ever come to your attention that happened, that additional sources of value that were found during the Friday project were sent over to Barclays on the Friday?

MR. BERNSTEIN:  Same objection.

A.   I don't have a recollection.

Q.   Was part of your -- was one of the goals of that work on the Friday to send assets to Barclays on the Friday, Friday, the 19th?

MR. BERNSTEIN:  Same objections.

A.   I don't have a recollection of that.

Q.   Putting before you what was marked at

Page 106

**LOWITT - HIGHLY CONFIDENTIAL**

1  **LOWITT - HIGHLY CONFIDENTIAL**
2  a prior deposition as Exhibit 20.  Can you take a
3  look through the document and tell me whether you
4  have seen it before?
5       MR. BERNSTEIN:  Just so the record is
6  clear, when you are showing him documents
7  like this, you mean the part after "unknown"
8  and the 2009 date?
9       MR. GAFFEY:  Yes.
10      **Q.   Do you understand what he is referring**
11  **to?  Up at the top it says "unknown" and then a**
12  **date.  Ignore that.  That's imprinted on the**
13  **document by our vendor.  Below that is a copy of**
14  **the document I want to ask you about.**
15      A.   Again, only in the preparation for the
16  deposition.
17      **Q.   You note that the document is an**
18  **e-mail addressed to you and Paolo Tonucci from**
19  **Martin Kelly.  That's the only e-mail on the**
20  **chain.**
21      A.   I can see that, yes.
22      **Q.   Do you have a recollection of seeing**
23  **this e-mail from Mr. Kelly at or about the time it**
24  **is dated, September 16, 5:10 a.m.?**
25      A.   I don't have a recollection of it

Page 107

1   LOWITT - HIGHLY CONFIDENTIAL
2  specifically.
3      **Q.   Do you have any recollection of**
4  **communicating in any way with Mr. Kelly in the**
5  **early morning hours of September 16 about the deal**
6  **terms?**
7      A.   I don't have a recollection of
8  speaking with Mr. Kelly about anything
9  specifically, but speculatively, I would imagine
10  that I would have spoken with him about what was
11  our understanding of what was emerging.
12      **Q.   And looking at the document in**
13  **preparation for your testimony today, did that**
14  **have any -- did that refresh your recollection in**
15  **any way about communications with Mr. Kelly on the**
16  **early -- in the early morning of September 16?**
17      A.   It did not.
18      **Q.   Does looking at that now refresh your**
19  **recollection?**
20      A.   No, it doesn't refresh the
21  recollection.
22      **Q.   Take a look, if you would, at the next**
23  **e-mail up in the chain, which appears to be from**
24  **you to Martin Kelly, copying Mr. Tonucci.  Do you**
25  **see that?**

Page 108

1       **LOWITT - HIGHLY CONFIDENTIAL**
2      A.   Yes.
3      **Q.   And in it, it says, "You are a hero.**
4  **Well done."  Do you see that?**
5      A.   Yes.
6      **Q.   Do you have any recollection as to why**
7  **you would respond to Mr. Kelly and describe him as**
8  **a hero?**
9      A.   I think the reason I would imagine
10  that I was doing that, he had worked all night
11  after an extremely tumultuous week around this
12  deal, and that he had -- and it was part of just
13  showing appreciation for that.
14      **Q.   Do you have -- he was one of your**
15  **direct reports, is that right, Martin Kelly?**
16      A.   That is correct.
17      **Q.   Do you have an understanding of -- can**
18  **you describe to me what it was that Martin Kelly**
19  **was doing overnight from Monday to Tuesday?  What**
20  **were his tasks?**
21       MR. BERNSTEIN:  Objection, no
22  foundation and compound.
23      A.   I know some of the things that Martin
24  was doing.  Martin was helping to sort of estimate
25  some of the numbers that were going into the

Page 109

1       LOWITT - HIGHLY CONFIDENTIAL
2  transaction, like the cure payment, and as the
3  financial controller, he was a key participant in
4  determining what some of the items in the
5  transaction were, and as is clear from the e-mail,
6  he had a good sense of what many of the key
7  elements of the transaction included.
8      **Q.   Is that the extent of your**
9  **recollection about that?**
10      A.   That's my recollection of that morning
11  and my interactions with Martin and his role.
12      **Q.   You referred before to some**
13  **mortgage -- some mortgage securities that Barclays**
14  **did not want.**
15      A.   Correct.
16      **Q.   Can you describe them in any more**
17  **detail?**
18      A.   Only that they were sort of
19  residential mortgages.  But no, I can't be more
20  specific.  But as you see in the e-mail, you know,
21  it talks about $3.6 billion of Resi assets left
22  behind.  I believe that's the -- those are the
23  same assets I was referring to before.
24      **Q.   Did you have an understanding in the**
25  **early part of the week, the Monday, Tuesday, that**

Page 110

**LOWITT - HIGHLY CONFIDENTIAL**
1
2 the agreement that was reached 50 percent of
3 the Resis going to Barclays and 50 percent going
4 to Lehman, remaining with Lehman?
5      A.   I don't recall what the percentages
6 were, but there were clearly assets that were
7 staying and assets that were going.
8      Q.   I put before you, Mr. Lowitt, what has
9 been marked at a prior deposition as Exhibit 10.
10 I would ask you to take a look through the
11 document and tell me whether you have a
12 recollection of seeing it before.
13      A.   No, I don't recall seeing this before.
14      Q.   Some of the e-mails reflect on this --
15 well, the e-mail at the top appears to be an
16 e-mail from you to Jerry Reilly and Eric Felder.
17 Do you see that?
18      A.   Yes, I do.
19      Q.   And in that piece of the e-mail chain,
20 it says "that's my understanding, but check with
21 whoever drafted the purchase agreement, Ian," and
22 that's responding to a question about whether
23 certain Resis and auction securities are going to
24 be included, right?
25      A.   That seems to be the sense of the

Page 111

**LOWITT - HIGHLY CONFIDENTIAL**
1
2 chain of e-mails.
3      Q.   I want you to get the sense of it
4 because my question goes to your apparent
5 direction to Reilly and Felder to check with
6 whoever drafted the purchase agreement.  Do you
7 know who drafted the purchase agreement?
8      A.   It would be -- I don't know.  I would
9 assume it was lawyers from Weil working together
10 with maybe some lawyers from Lehman.
11      Q.   You are assuming it because that's
12 what -- do you have any factual basis for the
13 assumption or it is an assumption?
14      A.   It's an assumption.
15      Q.   And do you have any knowledge, sir, of
16 what facts were given to whoever drafted the
17 purchase agreement about the business terms that
18 had been agreed?
19      Let me make that question simpler.  Do
20 you know what the drafters were told about the
21 terms of the deal?
22      A.   I do not.
23      Q.   And this e-mail appears to indicate
24 that at least on September 17 at 12:34 p.m., which
25 is the time of the e-mail from you to Reilly and

Page 112

**LOWITT - HIGHLY CONFIDENTIAL**
1
2 Felder, you had not seen the purchase agreement;
3 is that correct?
4      MR. BERNSTEIN:  You are asking him if
5 that's what the e-mail indicates or --
6      MR. GAFFEY:  Actually let me ask if it
7 refreshes his recollection as to the first
8 time he saw the asset purchase agreement.
9      A.   I don't believe I had seen the
10 purchase agreement.
11      Q.   Further down in that e-mail chain,
12 there is an e-mail from Eric Felder to a number of
13 people and a cc to a number of people including
14 you.  And Mr. Felder wrote, "I think the Barclays
15 folks picked the assets.  I recall them saying
16 they didn't want the auction securities, but I
17 wasn't in all the meetings."
18      Do you see that?
19      A.   I do.
20      Q.   Was it your understanding that the
21 Barclays folks picked the assets?
22      A.   The Barclays folks determined which
23 assets they were willing to purchase and which
24 assets they didn't want to purchase.  So in that
25 sense, the Barclays folks picked the assets.

Page 113

**LOWITT - HIGHLY CONFIDENTIAL**
1
2      Q.   Was it your understanding that
3 Barclays picked the assets it was willing to
4 purchase based on the quality of those assets they
5 were --
6      MR. HUME:  Objection, lacks
7 foundation.
8      A.   I couldn't say why they chose to
9 purchase certain assets and not others.
10      Q.   Let me go back to what may have been
11 expressed to you at the time by others.  That's
12 really what I am asking.  Did anybody express to
13 you that Barclays was picking assets based on the
14 quality of the assets?
15      A.   I have no recollection that that was
16 the basis.  It would have been what they -- how
17 they decided which assets they wanted to purchase
18 would have been driven by their own positions and
19 not wanting to get overconcentrated, as well as,
20 you know, their view of how easy it was to assess
21 what was an appropriate mark on those.
22      Q.   Take a look, if you would, sir, at the
23 second page of the exhibit.  The earliest e-mail
24 in this e-mail chain is from -- I'll probably
25 murder this -- Gilles Aublin to Jerry Reilly, cc

Page 114

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **Clement Bernard, dated September 17, 11:53 a.m.**
3        **And it is asking in the last line**
4    **whether there are "guidelines to exclude some**
5    **assets that are deemed to be more toxic (for**
6    **example, we have 2.8 billion of ARS, in high grade**
7    **and muni combined)."**
8        **Do you see that?**
9        A.   I do.
10       Q.   **Does that refresh your recollection as**
11   **to whether there were standards or guidelines**
12   **governing assets Barclays had said it would**
13   **purchase as opposed to those it said it would not?**
14       A.   I wasn't aware of any guidelines. I
15   know there were meetings that took place between
16   managers at Barclays and managers at Lehman so
17   that Barclays could make an assessment about
18   whether they were willing to purchase certain
19   assets, with an understanding that there were some
20   assets in the portfolio that for reasons that made
21   sense to them they chose not to want to purchase.
22       Q.   **Mr. Lowitt, we talked earlier today in**
23   **somewhat broad terms about the repo, and I would**
24   **like to return to that topic and that segment of**
25   **the week, as it were.**

Page 115

1    **LOWITT - HIGHLY CONFIDENTIAL**
2        A.   Sure.
3        Q.   **Give me as best you can a description**
4    **of how it came to be that the repo with Barclays**
5    **was necessary and agreed.  What caused the repo to**
6    **come into being?**
7        A.   I think the context for it was the
8    extreme markets disruption that was being
9    experienced that week, where, as you recall, AIG
10   was -- received assistance on the Tuesday.  There
11   was big increases in credit default swaps of many
12   other firms.
13       The Fed, for reasons of its own,
14   decided that it didn't want to have ongoing
15   exposure to LBI, and although I wasn't party to
16   any of the discussions, you know, communicated to
17   Barclays that they wanted Barclays to take them
18   out of their repo with Lehman Brothers.
19       I was asked to attend the meeting with
20   the Fed, together with people at Barclays, to talk
21   through how that was going to get effected, but it
22   was clear that the Fed was very keen on being
23   taken out of that risk so that they would
24   either -- for reasons that made sense to them.  I
25   can speculate on what those were.

Page 116

1    LOWITT - HIGHLY CONFIDENTIAL
2        As a consequence, on the Thursday,
3    there was a huge effort under way to move the
4    collateral back from -- move -- to move the
5    collateral from JP Morgan, who was the triparty
6    agent for Lehman, to BONY, that was the triparty
7    agent for Barclays, with Chase obviously concerned
8    through this whole process about their own
9    exposures to Lehman Brothers.
10       The effect of this was that through
11   the Thursday, this repo was now effected with
12   Barclays rather than with the Fed, so Barclays
13   needed to come up with, in round numbers, the
14   $45 billion of cash to buy the Fed out of their
15   repo position so the Fed no longer had a claim on
16   that collateral and received the cash for that
17   collateral.
18       That then became a new and very
19   different element, because there was no way that
20   LBI could get out of that repo position.  It
21   couldn't generate $45 billion to give to Barclays
22   to get back its collateral.  The repo was now an
23   imposed element on whatever deal was going to get
24   consummated between LBI and Barclays.
25       Q.   **Now, when the repo was put into**

Page 117

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **place -- was it put into place on the Thursday,**
3    **the 18th?**
4        A.   That's my recollection, that we met
5    with the Fed on the Wednesday and Thursday, and
6    the Thursday evening was when the repo was unwound
7    with the Fed and a new repo was put in place with
8    Barclays.
9        Q.   **Is it your understanding, sir, as the**
10   **deal ultimately came to be implemented, one**
11   **element of it was that Lehman -- that the repo was**
12   **extinguished, it was terminated?**
13       MR. HUME:  Objection, vague and
14   ambiguous, calls for a legal conclusion.
15       Q.   **Can you answer my question.**
16       A.   Can you repeat the question.
17       (Record read)
18       A.   I mean what was clear to me was that
19   Barclays kept the collateral and LBI kept the
20   cash.  If that's the equivalent of extinguishing
21   the repo, yes, it extinguished the repo.
22       What really was happening, Barclays
23   accepted the collateral that was in the repo trade
24   and they kept that collateral and LBI kept the
25   cash.

Page 118

LOWITT - HIGHLY CONFIDENTIAL

1
2     Q.    The collateral included the haircut
3 over and above the cash amount?
4     A.    It included the collateral -- the
5 amount of cash was less than the collateral
6 reflecting the standard financing haircuts on
7 those collateral terms, but yes.
8     Q.    Yes, it kept the difference?
9     A.    It got the collateral that was part of
10 the repo.  They retained that.  And they didn't
11 get the cash back from LBI.  That cash obviously
12 had gone to the Fed to take the Fed out of its
13 repo position.
14     Q.    Do you know when during the week it
15 was determined that that's how the repo would be
16 resolved, that Barclays would keep the collateral
17 and Lehman would keep the cash?
18     A.    It was definitely part of -- I wasn't
19 party to the negotiating sessions, but it was
20 definitely part of the discussions that were
21 occurring on the Friday.
22     Q.    The discussions between whom and whom
23 on the Friday?
24     A.    Well, we were looking to see how the
25 deal -- within finance, there was an effort to

Page 119

LOWITT - HIGHLY CONFIDENTIAL

1
2 determine what would be delivered to Barclays
3 under the deal, whatever the deal was, and the
4 repo as a new fact in the situation allowed or it
5 enabled or became a basis for the new transaction.
6     Q.    I think we might be at cross purposes
7 here.  My question to you, sir, when you referred
8 to some discussions that were occurring on the
9 Friday, I asked you between whom and whom.  What
10 people were involved in these discussions?
11     A.    I don't have specific recollections of
12 the discussions.  I do know that the people in
13 finance, so that would have included Jerry Reilly,
14 myself, would have been discussing what collateral
15 was going to be delivered to Barclays and how that
16 was going to be effected.
17         Actually, could I take a break,
18 please?
19     Q.    Sure.
20         (Luncheon recess)
21         (Continued on next page)
22
23
24
25

Page 120

LOWITT - HIGHLY CONFIDENTIAL

1
2         AFTERNOON SESSION
3              1:10 p.m.
4 BY MR. GAFFEY:
5     Q.    Mr. Lowitt, I have put before you what
6 we have previously marked as Deposition Exhibit 5.
7 Take a look at the document and tell me whether
8 you recognize it.
9     A.    I don't recognize the e-mail, but I am
10 obviously aware of the people who are referenced
11 in it.
12     Q.    There is a reference in the e-mail,
13 which is from you to Chris O'Meara, to -- you say
14 as follows:  "We worked all night to find what
15 inventory we have available to sell.  Meet me in
16 Martin's office.  Jerry has the details.  Ian."
17         Do you see that?
18     A.    I do.
19     Q.    Do you recall working all night from
20 Thursday to Friday to find inventory to sell?
21     A.    I do.
22     Q.    Is that part of this project we were
23 talking about before the lunch break of looking
24 for additional value for Barclays?
25     A.    No.  This was in the construct of the

Page 121

LOWITT - HIGHLY CONFIDENTIAL

1
2 earlier transaction which was around our ability
3 to insure that the collateral that we were selling
4 to Barclays was collateral that was unencumbered
5 and available.
6     Q.    When you're referring to the
7 collateral that was going to Barclays, is that the
8 collateral in the repo?
9     A.    It was the collateral that was
10 conceptually referenced on the earlier schedules,
11 the assets that would have been described in that
12 schedule.  So we were -- it wasn't thinking about
13 the repo specifically.  It was, you know, what
14 assets did we have where we knew we had possession
15 of those so that we could make sure that they went
16 to Barclays, some portion of which was the repo,
17 but it could have been in other inventory as well.
18     Q.    And is that because during the week,
19 starting on Tuesday and now we are at Friday, the
20 body of available collateral had shrunk because of
21 issues of possession or title?
22     A.    Yes.  And the fact that, you know,
23 some of it was being financed and that the various
24 counterparties wouldn't have returned it, and
25 there was that series of issues, operationalizing

Page 122

LOWITT - HIGHLY CONFIDENTIAL
1 the delivery of collateral.
2 
3     Q.    And do you have a sense of how much
4 that body of collateral had shrunk from Tuesday to
5 Friday?
6     A.    I don't have a recollection of how
7 much.
8     Q.    Do you remember if on Friday, whether
9 you remember the number today or not, do you
10 remember if on Friday you had a determination of
11 what the value was of what was available to give
12 to Barclays?
13     A.    I know we worked Thursday to develop a
14 point of view of what collateral we did have that
15 we could deliver as part of the transaction.  I
16 can't be more specific about the amount, and I
17 would simply be speculating as to how much it was
18 less than the amount that was available on Monday.
19     Q.    But again without regard to the
20 particular number, and it is a while ago, you do
21 remember that there was a number of some kind, if
22 you can't remember it today?  It was quantified in
23 some way?
24     A.    There were a series of schedules that
25 identified specific pieces of collateral that

Page 123

LOWITT - HIGHLY CONFIDENTIAL
1 
2 based on the information that we had, which was
3 hazy because of data issues with Chase and others,
4 that we were confident was collateral we could
5 have delivered into the deal.
6     Q.    And there is a reference in the lower
7 e-mail, that is the earlier e-mail from Chris
8 O'Meara to you at 6:24 in the morning on
9 September 19, "Ian, Bart asked some LEH folks to
10 meet with Alex Kirk about the Barclays deal at
11 7 a.m. today.  We will get him up to speed on
12 where we stand, especially on the matter of
13 inventory being sold.  We will then coordinate
14 with the LEH business heads to ensure they are in
15 agreement, FYIC."
16         Focusing your attention on that
17 language, sir, was there a meeting with Alex Kirk
18 in the early morning of September 19?
19     A.    I don't recall.
20     Q.    Do you know if there was a meeting --
21 well, this suggests that you had a conversation or
22 a communication of some kind with Bart McDade
23 prior to 6:24 on September 19.  Does it refresh
24 your recollection as to --
25     A.    No, I actually don't see that in -- it

Page 124

LOWITT - HIGHLY CONFIDENTIAL
1 says Bart asked some Lehman folks to meet with
2 Alex.
3     Q.    I beg your pardon, that's absolutely
4 right, that's absolutely right.
5 
6         Do you know why Bart wanted LEH folks
7 to meet with Alex Kirk about the Barclays deal
8 that morning?
9     A.    I don't know.  Again, the sense of the
10 e-mail is that it is associated with the inventory
11 that was being sold as part of the transaction,
12 and the work that we had done the previous evening
13 was around determining what it was that we had
14 that was available to sell.
15         So it is -- they seem linked to me.
16     Q.    Is that determination with respect to
17 inventory separate from the other issue we were
18 talking about before, the 15c3 and unencumbered
19 collateral?
20     A.    It is separate in the sense that --
21 they are different issues to my mind.  So there
22 was one which was what was the inventory that we
23 had that was available to us that we could include
24 in a transaction.  So that was one thing.
25         And then separately there is a

Page 125

LOWITT - HIGHLY CONFIDENTIAL
1 
2 question of sort of unencumbered collateral, which
3 would have overlapped with this but was different
4 from it, and I think the exercise that we
5 undertook on the Thursday evening was to determine
6 what was the inventory that was unencumbered that
7 we would be able to sell to Barclays.
8     Q.    I think -- I always get these two
9 numbers backwards.  We talked before about a
10 $1.9 billion number, an approximately $2 billion
11 number as between the 15c3 and the unencumbered
12 collateral?
13     A.    No, I think we said unencumbered
14 collateral was around $2 billion and the 15c3 was
15 between 700 and 800 million.
16     Q.    Those are the two I mixed up.  Was
17 the -- did the unencumbered collateral overlap the
18 inventory that is being discussed in Exhibit 5?
19         MR. HUME:  Objection, lacks
20 foundation.
21     A.    Really they were just different
22 things.  To the extent that we discovered
23 inventory that was unencumbered and could be
24 delivered into the deal and wasn't part of the
25 repo, then it would be available as unencumbered

Page 126

LOWITT - HIGHLY CONFIDENTIAL

1  collateral to deliver into the transaction.

2  **Q.   And was property of that character**

3  **added to the body of assets that were going to be**

4  **traded to Barclays?  Not in the repo but available**

5  **for transfer?**

6

7  A.   Again, this exercise was associated

8  with trying to satisfy the structure that was

9  existing prior to the repo, even though it was

10 done on the Thursday evening.  I think what

11 emerged through Friday was that the repo itself

12 was going to be the basis of the transaction.

13 **Q.   That brings me back to the search for**

14 **additional value, if the repo itself was going to**

15 **be the basis for the transaction.  The 15c3 and**

16 **the unencumbered collateral were not within the**

17 **repo, correct?**

18 MR. BERNSTEIN:  Objection, form,

19 compound.

20 Go ahead.

21 A.   The transaction clearly included more

22 than just the repo.  It included other elements as

23 well.  It included the repo, it included 15c3 and

24 unencumbered collateral.  It included the

25 exchanged traded derivatives.  It included a

Page 127

LOWITT - HIGHLY CONFIDENTIAL

1  variety of other things.

2

3  So the repo was an element of the

4  transaction, obviously a big part of the

5  transaction, but it wasn't the sole part of the

6  transaction.

7  **Q.   Was there a time, Mr. Lowitt, during**

8  **the week when Barclays' personnel were involved in**

9  **marking Lehman positions?**

10 A.   Marking Lehman positions for the

11 purpose of --

12 **Q.   You would have to tell me.**

13 A.   I mean I think there were Barclays

14 personnel involved in looking at our assets and

15 determining what they would be willing to purchase

16 it for, but they were not marking our positions

17 for the purposes of our books and records.

18 **Q.   I show you what was marked at a prior**

19 **deposition as Exhibit 23.  I ask you to take a**

20 **look at that.**

21 **Do you recall seeing this e-mail chain**

22 **before?**

23 A.   Not before preparing for the

24 deposition.

25 **Q.   Take a look, please, at the earliest**

Page 128

LOWITT - HIGHLY CONFIDENTIAL

1  **of the e-mails, from Ian Lowitt to Gerard Reilly,**

2  **September 17, 9:29 p.m.  In it you write, the**

3  **subject is, "Are we set up to do the marking of**

4  **the positions?  Ian."**

5  A.   Yup.

6  **Q.   And then above that is an e-mail from**

7  **you to Gerard Reilly forwarding that e-mail and**

8  **adding, "What I meant was for BarCap to mark the**

9  **positions further?  Ian."  Do you see that?**

10 A.   I do.

11 **Q.   What did you mean when you wrote that**

12 **to Mr. Reilly, asking if we were set up to do the**

13 **marking of positions and with the explanatory note**

14 **about BarCap?**

15

16 A.   Either -- what I understand as I read

17 it now is that we were determining what was the

18 price that BarCap were willing to pay for the

19 assets of the -- that reflected the discount for

20 the -- to use your word discount -- the delta

21 between what they were on our books for and what

22 they would buy it for, given the size of the

23 purchase, as well as for the volatility of the

24 underlying positions.

25 **Q.   So can you tell me why negotiations**

Page 129

LOWITT - HIGHLY CONFIDENTIAL

1  **were continuing on September 17 about that topic?**

2

3  A.   I don't know whether they were

4  negotiations.  We were trying to determine what

5  was the way in which we would effect the

6  transaction, which was to deliver a series of

7  assets to Barclays at prices that they were

8  comfortable purchasing them at.

9  **Q.   Had the prices not been determined in**

10 **the exercise on Tuesday with the development of**

11 **the financial schedule we looked at before?**

12 A.   They weren't developed at the level

13 of -- I don't know the extent to which they were

14 developed, but we weren't aware of information

15 that was at an asset-by-asset level which would

16 have been necessary to effect the transaction.

17 **Q.   And was that process being conducted**

18 **on an asset-by-asset level on the 17th?  Is that**

19 **what you are referring to here?**

20 A.   On the 17th we were believing what we

21 needed to do was to mark the positions to a level

22 that was consistent with what Barclays were

23 willing to purchase them at.

24 **Q.   Did that happen?**

25 A.   I don't believe that it did.

Page 130

LOWITT - HIGHLY CONFIDENTIAL

1
2    Q.   Why not?
3    A.   I think the transaction changed when
4 the repo was effected, and because the repo was
5 effected, the transaction itself changed.
6    Q.   Was the process of marking the
7 positions to a level that was consistent with what
8 Barclays were willing to purchase them at referred
9 to as the conversion?
10    A.   I don't believe so.  The conversion --
11 can you be more precise about the conversion.
12    Q.   I will show you a document in a little
13 while about that.
14    A.   I would imagine the conversion is
15 about converting the assets from the Fed to
16 Barclays, would be my surmise about what that
17 means.
18         This was not an exercise that we
19 actually undertook.
20    Q.   And --
21    MR. BERNSTEIN:  Can we be clear for
22    the record, when you said this was not an
23    exercise, I don't want to suggest an answer
24    to you, but you might want to explain
25    "this," because I'm not sure if you are

Page 131

LOWITT - HIGHLY CONFIDENTIAL

1
2 talking about the conversion or piece of
3 paper that you are holding in your hand.
4    Q.   My question exactly.
5    A.   I am referring to what is described in
6 this e-mail as having Barclays' traders come to
7 Lehman and engage in a marking process.
8    MR. BERNSTEIN:  Just for the record,
9    this e-mail is Exhibit 23, correct?
10    THE WITNESS:  That is correct.
11    Q.   Further up in that e-mail chain, there
12 is an e-mail from Mr. Reilly to you, also
13 September 17, at 9:35 p.m., responding to yours,
14 saying "Ian, I told business guys they must get
15 counterparts at BarCap comfortable tomorrow night
16 by our front-end systems.  We will not have time
17 to do Friday.  We are going to send last night's
18 assets and marks over so they can see mix and
19 marks."
20         What did you understand Mr. Reilly to
21 be conveying to you with that e-mail?
22    A.   That we needed to have the Barclays'
23 traders comfortable with the assets that they were
24 purchasing and marks that they were going to buy
25 them at that reflected a price that they were

Page 132

LOWITT - HIGHLY CONFIDENTIAL

1
2 willing to pay for those assets.
3    Q.   Now, further up, the next one up,
4 September 17, 9:41 p.m., Mr. Reilly writes to you,
5 "I went through all docs and did not see reference
6 to the price haircut.  If we want conservative
7 marks to reflect block nature, we need to know how
8 much and then can allocate to most logical
9 assets."
10         Could you explain that to me?
11    A.   I think what Jerry is describing here
12 is the need to reflect in the assets that we
13 are -- we would be sending to Barclays a mark that
14 reflected what they were willing to pay for the
15 assets and that there needed to be a process of
16 reflecting that not at the level of the gross
17 asset category but at the level of individual
18 assets.
19    Q.   Now, do I understand that to mean that
20 the price haircut would be determined and then the
21 assets would be identified to which it would be
22 applied?
23    MR. BERNSTEIN:  Objection to the form.
24    A.   Yeah, I didn't see it in that way.  I
25 think it was trying to insure what we were doing

Page 133

LOWITT - HIGHLY CONFIDENTIAL

1
2 at an asset-by-asset level was consistent with
3 what was in the agreement.
4    Q.   And is that -- when you say in the
5 agreement, is that what you understood Mr. Reilly
6 to be referring to when he referred to the docs?
7    A.   Yeah, the documents describing what
8 the contract was.
9    Q.   You respond to Mr. Reilly by saying,
10 "Since not in contract, hard to see what to" -- it
11 says D-P but I will read that as "do.  Ian."  Do
12 you see that?
13    A.   I do.
14    Q.   Had you, by September 18, referred
15 the -- now reviewed the contract?
16    A.   I had not.
17    Q.   Well, how would you know, Mr. Lowitt,
18 what was and what was not in the contract?
19    A.   I didn't know what was in and what
20 wasn't in the contract.  I had a sense of what the
21 terms were, but I hadn't reviewed it in the
22 contract.
23    Q.   I note that you don't say in your
24 e-mail to Mr. Reilly I don't know what the
25 contract says.  You say it's not in the contract.

Page 134

**LOWITT - HIGHLY CONFIDENTIAL**
1    
2    **Do you see that?**
3        A.    I do.
4        **Q.    Does that suggest to you that you had**
5    **read the contract and seen no reference to the**
6    **price haircut?**
7        MR. BERNSTEIN:  Objection.  Asked and
8    answered.
9        A.    I don't read it as such.  I said if --
10    it doesn't -- when I say "since not in contract,"
11    it doesn't mean that I knew that independently.
12    It is referencing what Jerry has said about that
13    the documents didn't include it.
14        **Q.    So when you were saying to Mr. Reilly**
15    **that it was hard to see what to do, what were you**
16    **communicating?**
17        A.    It was hard to see how we were going
18    to identify those assets that Barclays were going
19    to purchase and what the pricing on each of those
20    individual assets were going to be.
21        **Q.    And it was hard to see because, at**
22    **least if Mr. Reilly's right that there is no**
23    **reference to the price haircut, it doesn't give**
24    **any guidance?**
25        MR. BERNSTEIN:  Objection to form.

Page 135

LOWITT - HIGHLY CONFIDENTIAL
1    
2        **Q.    Is that right?**
3        A.    It is hard because, as Jerry says,
4    "went through the docs and do not see reference to
5    price haircut."
6        **Q.    So absent a reference in the**
7    **documents, you don't know how to apply the price**
8    **haircut?  Is that what you are saying?**
9        A.    It is hard to determine how we are
10    going to identify the series of assets that are
11    part of the transaction and at what price those
12    are going to be marked at and that Barclays is
13    going to purchase them at.
14        **Q.    Now, did there come a time,**
15    **Mr. Lowitt, where you understood that --**
16    **withdrawn.**
17        **Did there come a time when it was**
18    **suggested to you that the best means of delivering**
19    **the discount to Barclays was by defaulting on the**
20    **repo?**
21        A.    Again, I don't -- I don't agree with
22    the characterization of the best way to deliver
23    the discount.  I think what was clear on the
24    Friday, in part because of the difficulties that
25    we have talked about, but also because the repo

Page 136

LOWITT - HIGHLY CONFIDENTIAL
1    
2    was now in place, that the repo represented -- was
3    part of what any new transaction was going to be
4    and that what you had in the repo addressed many
5    of the operational questions that we were not sure
6    how to address, which was which of the assets
7    Barclays was going to acquire, because clearly the
8    ones in the repo became the basis of what they
9    were going to acquire, as well as what was the
10    financing haircut associated with that.
11        **Q.    Mr. Lowitt, I am putting before you**
12    **what has previously been marked as Deposition**
13    **Exhibit 127.  Have you seen that document before?**
14        A.    Again, I don't recall seeing this
15    before the preparation for the deposition.
16        **Q.    Take a scan through it sufficient to**
17    **familiarize yourself with it and let me know when**
18    **you have done that.**
19        A.    OK.
20        **Q.    I would -- directing your attention to**
21    **the earliest message on the page, the one at the**
22    **bottom, from Gerard Reilly to you, Michael**
23    **Gelband, copy Paolo Tonucci and Martin Kelly,**
24    **September 18th, 2008 at 6:04 a.m.**
25        **And in that e-mail entitled "Open**

Page 137

**LOWITT - HIGHLY CONFIDENTIAL**
1    
2    **Issues on Deal," Mr. Reilly writes -- I'm down at**
3    **paragraph 3 -- "Not clear on the amount of block**
4    **discount or how we make it happen.  Defaulting on**
5    **repo could be the best, as discount could be taken**
6    **from haircut.  If not that, then we need to give**
7    **business an allocation of block discount so they**
8    **can mark down the books tonight.  Does that create**
9    **a problem, as it could tip the broker early?**
10    **Would we rather have that be in the sale price**
11    **tomorrow?"**
12        **Do you see that portion?**
13        A.    I do.
14        **Q.    What did you understand Mr. Reilly to**
15    **be suggesting in this e-mail when he said,**
16    **defaulting on repo could be the best as the**
17    **discount could be taken from the haircut?**
18        A.    Again, I don't have a recollection of
19    this on the Thursday, but in reading the e-mail
20    here, you know, what Jerry is suggesting is that
21    the repo transaction is a way in which we could
22    deliver collateral to Barclays and that as a basic
23    concept, the financing haircut is a similar
24    concept to the item that we were talking about
25    earlier, which is Barclays' buying collateral for

Page 138

LOWITT - HIGHLY CONFIDENTIAL
1
2  less than the marks to reflect the size of their
3  purchase and the volatility of the underlying
4  assets.
5  **Q.   So to put that at least in my layman's**
6  **terms, that would be using the haircut on the repo**
7  **as a replacement for the markdown of the value**
8  **shown on the books?**
9       MR. BERNSTEIN:  Objection,
10      mischaracterizes his testimony.
11      A.   What I would say is not how I would
12  think of it as a replacement.  They were -- they
13  are comparable concepts, but the repo transaction
14  was, again, a way in which we could deliver
15  specific assets to Barclays at a specific price,
16  which is what the original deal intended, but it
17  was a different thing.
18      **Q.   Well, if the repo is used to deliver**
19  **assets to Barclays at a specific price and**
20  **Barclays gave $45 billion and received 50 billion**
21  **in collateral, does that mean Barclays bought**
22  **50 billion in collateral for $45 billion?**
23      A.   If the -- if they received all their
24  collateral and that was the cash that came to the
25  firm, then, yes, they received $49 billion of

Page 139

LOWITT - HIGHLY CONFIDENTIAL
1
2  collateral -- $50 billion of collateral for the
3  cash.
4       **Q.   Further up in the e-mail, you write to**
5  **Mr. Reilly, Gelband, with copies to Kelly, Felder**
6  **and Lee, "Jerry, please set up a meeting first**
7  **thing this morning to work through these issues**
8  **with Mike, Eric and Hyung."**
9       A.   That's Hyung Lee.
10      **Q.   "Probably want Martin as well, and how**
11  **to approach.  Must be a huge priority for today.**
12  **Ian."**
13           **Why was this a huge priority for that**
14  **day?**
15      A.   Well, we needed to determine how we
16  would be able to deliver collateral that was
17  specified and what Barclays would be paying for
18  that collateral.
19      **Q.   And the Martin that you are referring**
20  **to is Martin Kelly?**
21      A.   I believe it would be Martin Kelly
22  from the context.
23      **Q.   Do you still work with Martin Kelly on**
24  **a day-to-day basis?**
25      A.   I do not.  We speak occasionally,

Page 140

LOWITT - HIGHLY CONFIDENTIAL
1
2  but --
3       **Q.   Apart from meeting with your lawyers,**
4  **did you talk to anyone about the fact that your**
5  **deposition was being taken today?**
6       A.   There are some people in the wealth
7  division that are aware that I am being deposed.
8       **Q.   Did you talk to them for any reason**
9  **other than to explain your absence?  Did you talk**
10 **to them about the substance of what you would be**
11 **testifying about?**
12      A.   No, no.
13      **Q.   Have you spoken to anyone else who has**
14 **had their deposition taken in this matter?**
15      MR. BERNSTEIN:  I presume you mean
16      about the deposition?
17      MR. GAFFEY:  Yeah, sure.
18      MR. BERNSTEIN:  As opposed to at some
19      point in his life about something else.
20      MR. GAFFEY:  Yes.  But "no" would
21      cover both.
22      A.   But I meant about the deposition.
23      **Q.   OK.  Now, up at the top of this,**
24 **Mr. Felder writes to Reilly, Lowitt, Gelband, copy**
25 **Kelly and Lee, "The Barclays guys chose the**

Page 141

LOWITT - HIGHLY CONFIDENTIAL
1
2  **assets.  We did not have anything to do with it."**
3           **In the context of the e-mails below,**
4  **do you have an understanding of what Mr. Felder is**
5  **communicating here?**
6       A.   He is saying that Barclays' folks, my
7  understanding would be that what the -- that the
8  Barclays folks were the ones who decided which
9  assets they wanted to purchase and which ones they
10 didn't, so the selection of which assets would be
11 included was not something driven by the Lehman
12 folks but by the Barclays folks.
13      **Q.   I am trying to put it in context of**
14 **the e-mail.  Let me suggest it might be a response**
15 **to paragraph 1 in the bottom e-mail, about whether**
16 **or not auction rates are included.  I don't want**
17 **you to speculate, but I am wondering if you have**
18 **any knowledge of what it is Mr. Felder meant when**
19 **he wrote this.**
20      A.   I don't know what Mr. Felder meant
21 when he wrote this.
22      **Q.   Mr. Lowitt, you have before you what**
23 **has previously been marked as Deposition**
24 **Exhibit 14.  And with the exclusion we talked**
25 **about before, the top two lines that say "unknown**

Page 142

LOWITT - HIGHLY CONFIDENTIAL
1
2 and sent," have you seen the text of this e-mail
3 before?
4     A.    Yeah, I don't have a recollection of
5 it besides in the preparation for the deposition.
6     Q.    In the bottom e-mail, from you to
7 Gelband, Kirk and Beldner, copies to Tonucci,
8 Reilly and Kelly, you say, "Today was very bad
9 with very large number of surprises, increased
10 requirement of 7 or so billion.  Cannot get
11 through tomorrow if not tighter.  Not sure what to
12 suggest other than someone makes ensuring great
13 discipline the number one priority.  Let's huddle
14 in the morning to see the best way forward.  Also
15 need to shrink matchbook, which as of yesterday
16 was much larger than expected.  Jerry and Martin
17 have details.  Ian."
18         What were you referring to when you
19 said increased requirement of 7 or so billion?
20     A.    You see here the subject says funding
21 tomorrow?
22     Q.    Yes.
23     A.    This was referring to the funding
24 position of the firm on the Wednesday evening
25 where per the e-mail, there was a number of

Page 143

LOWITT - HIGHLY CONFIDENTIAL
1
2 surprises vis-a-vis the funding, which I think
3 would have referred to the fact that people we
4 thought were going to roll secured funding didn't,
5 or some of the term repo that we expected to stay
6 on as term had -- wasn't available to us, which
7 increased the funding requirement that we had to 7
8 or so billion dollars.  So this was referring to
9 the funding position of the firm.
10         When it says, "cannot get through
11 tomorrow if not tighter," it is saying that our
12 ability to fund the firm on Thursday requires us
13 to be extremely disciplined around financing and
14 funding in one or two, ensuring that the senior
15 people in fixed income were aware of just how
16 important this was and how our funding position
17 was deteriorating.
18     Q.    And what are you referring to when you
19 talk about the need to shrink the matchbook?
20     A.    Well, the matchbook, there is a book
21 which has -- you know, assets and liabilities
22 should be matched.  It was consuming some amount
23 of cash.  So shrinking the matchbook was one of
24 the ways we wanted to improve the liquidity
25 position of the firm.

Page 144

LOWITT - HIGHLY CONFIDENTIAL
1
2     Q.    When you say shrink the matchbook,
3 what does that mean?  I guess you need to explain
4 the matchbook term.
5     A.    It means you could be longer Treasury
6 and shorter Treasury, and shrink it means -- you
7 know, one is a repo, one is a reverse repo, so
8 when you repo the collateral out, so shrinking the
9 matchbook's essentially relating to reducing the
10 number of repos of collateral where you hold the
11 collateral and reducing the number of reverse
12 repos where you reverse the collateral in.
13 Normally -- that's what it would be.
14     Q.    Could you -- in front of you there
15 ought to be Exhibit 127 that we just looked at a
16 moment ago.  It is the e-mail, not clear about the
17 amount of block discount.
18     A.    Yes, I see that.
19     Q.    A few more questions about that.  Down
20 in paragraph 3, when Mr. Reilly writes, "Does that
21 create a problem, as it could tip the broker
22 early," what did you understand him to mean?
23     A.    Again, I don't have a recollection of
24 what that means.  Again, as I sort of speculate
25 from the context, it is you need broker -- the

Page 145

LOWITT - HIGHLY CONFIDENTIAL
1
2 broker-dealer needs to remain in compliance from a
3 regulatory perspective and regulatory capital
4 perspective, so he may have been talking about the
5 implications of dealer marking the books down
6 would create a problem from a regulatory capital
7 perspective, but again this is pure speculation.
8     Q.    Is an alternative speculation that
9 defaulting on the repo could drive the
10 broker-dealer into a bankruptcy earlier than
11 planned?
12     A.    Defaulting on the repo?  I don't see
13 why -- I don't read it in that way at all.
14     Q.    And when Mr. Reilly writes, "Would we
15 rather have that be in the sale price tomorrow,"
16 do you have an understanding of what he is
17 communicating to you there?
18     A.    I don't have a recollection of it, but
19 I think it is a question of do you mark the books
20 down before the bankruptcy filing or essentially
21 as part of the bankruptcy filing.
22     Q.    This is written on the 18th and the
23 sale hearing is going to be conducted before the
24 bankruptcy court on the 19th, LBI, correct?
25     A.    That is correct.

Page 146

LOWITT - HIGHLY CONFIDENTIAL

1  LOWITT - HIGHLY CONFIDENTIAL
2  Q.  Do you understand this to mean a
3  reference to the sale price that will be
4  referenced at the bankruptcy hearing the next day?
5  MR. BERNSTEIN:  Objection, no
6  foundation.
7  A.  I can't say what that would be
8  referring to, but -- I can't say what it would be
9  referring to.
10  (Exhibit 218, document Bates stamped
11  42628 marked for identification, as of this
12  date.)
13  Q.  Mr. Lowitt, you have before you what
14  we have marked as Deposition Exhibit 218.  Do you
15  recognize the document?
16  A.  I don't recall it specifically.
17  Q.  Have you seen it before?
18  A.  I don't recall seeing it before.  But
19  I see that it was sent from me to Paolo.
20  Q.  In the e-mail sent from you to Paolo,
21  the subject is "As matter of urgency need to get
22  going on showing THAT the DTCC money is there."
23  What did you mean by the DTCC money?
24  A.  I can't recall what I would have meant
25  by that.

Page 147

1  LOWITT - HIGHLY CONFIDENTIAL
2  Q.  The text of the e-mail refers to
3  the -- well, IT says, "Need proof that lock-up is
4  2 billion.  Also other unencumbered collateral in
5  DTCC we can pledge.  Ian."
6  Does that e-mail relate to the project
7  we were talking about before of identifying
8  additional value?
9  A.  From the context, it suggests that it
10  does.
11  Q.  And having looked at that now, do you
12  have -- can you tell me why finding additional
13  value would require looking for unencumbered
14  collateral in DTCC?
15  A.  I can't say why it would be in DTCC
16  rather than unencumbered collateral in aggregate.
17  Our exercise was around unencumbered collateral
18  whether it was in DTCC or any other depository or
19  location.
20  Q.  Why were you describing this as a
21  matter of urgency on Friday, September 19, at
22  1:36 p.m. eastern time?  Note that the time there
23  is GMT.
24  A.  Well, again, to the discussion we had
25  earlier, finding sources of value was an important

Page 148

1  LOWITT - HIGHLY CONFIDENTIAL
2  exercise for us on the Friday.  You can see here
3  that the estimate of the 15c3 lock-up at that
4  point was 2 billion.  It turned out as a result of
5  the work that was done that the amount of the
6  lock-up was less than that.  But it was obviously
7  an early estimate of it as high as $2 billion.
8  Q.  Were you describing this as a matter
9  of urgency based in any part on your conversation
10  that morning with Mr. Ricci?
11  A.  The whole exercise of identifying
12  additional collateral, which as we talked about
13  was a result of a conversation with Bart as well
14  as with Rich Ricci, was a very important exercise
15  for us on the Friday, which is why I think I would
16  have talked about it in this way.
17  Q.  Did you think you were at some degree
18  of professional risk if that project was
19  unsuccessful?
20  A.  No, I don't recall feeling that.
21  (Exhibit 219, document Bates stamped
22  138140 marked for identification, as of this
23  date.)
24  Q.  You have before you, Mr. Lowitt, what
25  we have marked as Deposition Exhibit 219.  Do you

Page 149

1  LOWITT - HIGHLY CONFIDENTIAL
2  recognize the document?
3  A.  I don't recall the e-mail
4  specifically.
5  Q.  It appears to be an e-mail from you to
6  Mr. McDade.
7  A.  Yes, it does.
8  Q.  And the subject says "CLS money all
9  snarfed up by city.  The 15c3 lock-up looks OK at
10  1.3 billion.  Good faith not.  So we are short
11  1.7 billion.  The TBA and FX settlement don't
12  work.  We did find 5 billion of exchange listed
13  options which we are investigating.  Ian."
14  Can you explain to me what it is you
15  are reporting to Mr. McDade here?
16  A.  Yeah.  There are a series of issues
17  obviously.  Not issues, items.  CLS refers to
18  money that we had pledged to Citi to insure that
19  they would continue to operate as our CLS bank, so
20  that's the bank that performs the FX settlements
21  on behalf of -- that was performing FX settlements
22  on behalf of Lehman Brothers.  So we posted cash
23  to them probably on the Thursday, and this
24  suggests that they had not released it, they had
25  taken it all themselves.

Page 150

LOWITT - HIGHLY CONFIDENTIAL

1          The 15c3 lock-up, so this is now
2  saying what we think the value of the 15c3 lock-up
3  was. So what's the excess in 15c3? Looks like at
4  that point the estimate was 1.3 billion.
5          Good faith was another item of --
6  there was an item called the good faith lock-up,
7  which again as part of the investigation to
8  determine sources of value, it was determined that
9  there was no value that could be included in the
10  transaction from the line that was called good
11  faith lock-up. So that is suggesting that if, you
12  know, your target is 4 billion, that we need
13  $1.7 billion of additional value beyond what's in
14  the 15c3 lock-up.
15          And TBA and FX settlements don't work,
16  I think what that was meaning was there was no
17  additional sources of value in the items of TBA or
18  FX settlement.
19          And then it says we did find 5 billion
20  of exchange listed options which we are
21  investigating.
22          So it was a status update for Bart on
23  a series of things that were going on vis-a-vis
24  our efforts to determine the extra value.

Page 151

LOWITT - HIGHLY CONFIDENTIAL

1    Q.   So you're basically looking in every
2  corner for this extra value, right?
3    A.   We were looking in a number of places
4  to determine -- to find extra value.
5    Q.   And the target was $4 billion?
6    A.   Yeah. My recollection is between 3
7  and 4, and the math here suggests that what we
8  were targeting was $4 billion.
9    Q.   Let me push that a little further.
10  Rather than suggesting it, does it refresh your
11  recollection that the target was $4 billion?
12    A.   My recollection is it was between 3
13  and 4.
14    Q.   Did there come a point where the
15  target was reached? Whether it was 3 or 4 billion
16  dollars or something in between, did there come a
17  point where the target was reached?
18    A.   I think we identified -- we determined
19  that the exchange listed options were already
20  included as part of the business transaction, so
21  there was no additional value there, and the
22  additional place where we found the value was in
23  the unencumbered collateral in the various depots.
24    Q.   As of the writing of Exhibit 219,

Page 152

LOWITT - HIGHLY CONFIDENTIAL

1  where you say, "So we are 1.7 billion short,"
2  that's one time point. My question goes to what
3  follows. Did there come a time when the target
4  was met?
5    A.   I mean there was a time when we had
6  identified unencumbered collateral and 15c3
7  lock-up that we had some degree of confidence
8  represented 3 to 4 billion dollars of value.
9  Didn't know with certainty, but we believed that
10  it did represent value of the amount we were
11  searching for.
12    Q.   Did there come a point where Barclays
13  indicated that enough extra value had been found
14  that it was willing to close?
15    A.   I'm not aware of that, but the
16  transaction went forward, so that seems to
17  indicate it.
18    Q.   When did you stop looking for
19  additional assets?
20    A.   I don't recall specifically when we
21  stopped looking for additional assets.
22    Q.   Do you generally recall that the
23  search continued into the weekend?
24    A.   I do recall that we were continuing to

Page 153

LOWITT - HIGHLY CONFIDENTIAL

1  work through the weekend, and I do recall that we
2  shared a schedule of unencumbered collateral with
3  the creditors' committee on the Sunday.
4    Q.   And who is the "we" who shared the
5  schedule of unencumbered collateral with the
6  creditors' committee on Sunday? Is that a
7  meeting? And if so, who is at it?
8    A.   I think -- my recollection is a
9  schedule was delivered, so there were big thick
10  piles of paper which included all the collateral
11  that was included on that schedule, and that
12  schedule was delivered to a group of people
13  representing the creditors' committee in another
14  room at Weil.
15    Q.   Why was it delivered to the creditors'
16  committee?
17    A.   I can't say specifically. I assume
18  because they wanted to review it.
19    Q.   Did you deliver it to the creditors'
20  committee?
21    A.   I don't recall being the person
22  delivering it.
23    Q.   Did you cause it to be delivered to --
24  did somebody under your supervision deliver it?

Page 154

**LOWITT - HIGHLY CONFIDENTIAL**

1
2    A.   My recollection is that either -- I
3  would expect that either Paolo or Robert Azerad
4  would have delivered it, but I can't be precise.
5    **Q.   Other than thinking they had a reason**
6  **they wanted to see it, do you have any**
7  **recollection of the reason this schedule was given**
8  **to the creditors' committee?**
9    MR. BERNSTEIN:  Objection, asked and
10  answered.
11    A.   I don't have anything additional to
12  say.
13    **Q.   Before you, Mr. Lowitt, is what we**
14  **have marked as Deposition Exhibit 220, a two-page**
15  **document.  Have you seen the document before?**
16    MS. HNATT:  Did you say two-page
17  document?
18    MR. GAFFEY:  I did.
19    MR. BERNSTEIN:  Mine is one.
20    MR. GAFFEY:  You know what?  Let's
21  just -- I'll sort that out during a break
22  and we will come back to the document.
23    MR. BERNSTEIN:  OK.
24    (Exhibit 220 withdrawn)
25    (Exhibit 221, document Bates stamped

Page 155

LOWITT - HIGHLY CONFIDENTIAL

1
2  137537 marked for identification, as of this
3  date.)
4    **Q.   Before you, Mr. Lowitt, is what we**
5  **have marked as Deposition Exhibit 221, an e-mail**
6  **from Bart McDade to you at the top.  Have you seen**
7  **the document before?**
8    A.   I don't recall the document
9  specifically, but I have seen it as part of my
10  preparation.
11    **Q.   The earliest e-mail in the chain is**
12  **from you to McDade, September 19 at 7:12 p.m.**
13  **Subject, "Please send word when you are done.**
14  **Ian."**
15    **What were you referring to there?**
16    A.   Again, I don't have a specific
17  recollection, but given from the timing of it and
18  the context, it suggests that I would -- I am
19  asking Bart to say when he is completed with the
20  bankruptcy hearing with the judge.
21    **Q.   And Mr. McDade responds, "The conclave**
22  **is over.  We are part of BarCap," exclamation**
23  **point, "subject to documenting."**
24    **Do you see that?**
25    A.   I do.

Page 156

LOWITT - HIGHLY CONFIDENTIAL

1
2    **Q.   Do you have any knowledge of any**
3  **documenting going on after this point?**
4    A.   I mean, I was aware that there was
5  documentation of the transaction that was
6  occurring over the weekend following the agreement
7  with the bankruptcy court, but I don't have any
8  knowledge specifically of what documentation
9  needed to be completed.
10    **Q.   And did you -- I may have asked you**
11  **this before, but just so it is in this section,**
12  **were you involved in that documenting over the**
13  **weekend?**
14    A.   I was not.
15    **Q.   Did you ever see it?**
16    A.   I did not.  I don't remember seeing
17  it.
18    **Q.   Further up is a response from you to**
19  **McDade, Berkenfeld, with a copy to Tonucci, at**
20  **5:52 a.m. on Saturday, September 20, and it reads,**
21  **"Did the court accept the 15c3 lock-up and**
22  **unencumbered box make it through to BarCap?  If**
23  **so, need to make sure documentation is very tight**
24  **so we can deliver on it.  Should have Weil lawyers**
25  **work closely with Paolo on it.  Obviously critical**

Page 157

**LOWITT - HIGHLY CONFIDENTIAL**

1
2  we get this right.  Congrats again.  Ian."
3    **When you refer to the documentation**
4  **needing to be "very tight," are you referring to**
5  **documentation about 15c3 lock-up and unencumbered**
6  **box?**
7    A.   The sense of it suggests that.
8    **Q.   Did you ever see any documentation**
9  **concerning the 15c3 lock-up and unencumbered box?**
10    A.   I didn't read through the contract,
11  no.
12    **Q.   Do you know if Paolo worked with**
13  **lawyers on putting that documentation together?**
14    A.   I don't know with certainty.
15    **Q.   Do you have any general recollection**
16  **of that?**
17    A.   My recollection is Paolo talking with
18  some of the folks at Barclays about this, but I
19  don't have a specific recollection about him
20  talking to lawyers.
21    **Q.   Do you have any recollection about him**
22  **being involved in any documentation concerning the**
23  **15c3 lock-up and the unencumbered box?**
24    A.   I mean he was the person who knew a
25  great deal about both of those two items, so I

Page 158

1    LOWITT - HIGHLY CONFIDENTIAL
2  would have expected him to be involved, but I
3  don't have a specific knowledge of whether he was
4  or he wasn't.
5      Q.   Now, apart from the search for
6  additional value that we have been talking about,
7  give me a general idea of what your activities are
8  on the Friday and through the weekend before the
9  deal was closed.
10      MR. BERNSTEIN:  Can I just clarify,
11   when you say on the Friday, he has already
12   talked a lot about on the Friday.
13      MR. GAFFEY:  That's a good point.
14      Q.   Let's go to the evening of the
15  Friday -- actually after you wrote this e-mail to
16  Mr. McDade, at 1 in the morning on Saturday.  What
17  did you do during the weekend?
18      A.   Again, I have a hazy recollection.
19  But I -- again, I was very tired, but I do have
20  remembrances of spending time waiting at the Weil
21  offices to answer specific questions about
22  settlement and other issues which were a subject
23  of discussion in the -- on the Sunday.
24      Q.   What are you referring to when you
25  refer to settlement?

Page 159

1    LOWITT - HIGHLY CONFIDENTIAL
2      A.   Well, there was a series of questions
3  about whether Barclays would step into Lehman's
4  shoes vis-a-vis settlement obligations that
5  existed in the coming week, and there were
6  representatives from a number of different
7  organizations, including DTCC and Chase, that were
8  discussing these items with folks from Barclays,
9  and on occasion people would ask questions about
10  elements of that.
11      Q.   And what was the area of knowledge or
12  expertise that you lent to that discussion?
13      A.   You know, it was familiarity with
14  elements of Lehman's operational processes or at
15  least knowing who within Lehman would be better
16  equipped to address those questions.
17      Q.   Now, in the e-mail that we have marked
18  as -- series of e-mails that we have marked as
19  Exhibit 221, the one at the top, Mr. McDade to
20  you, says, "Can you call me at home," and that's
21  at 10:51 p.m. -- 10:51 a.m. on Saturday,
22  September 20, when we convert to GMT time.
23      Did you speak to Mr. McDade at home on
24  Saturday morning.
25      A.   I don't have a specific recollection

Page 160

1    LOWITT - HIGHLY CONFIDENTIAL
2  of speaking with Bart, but in all likelihood I
3  would have called him.  I wasn't going to not call
4  the president of the firm.
5      Q.   Do you have a general recollection of
6  speaking to him in person or over the phone over
7  the weekend?
8      A.   Well, I believe I would have spoken to
9  him over the phone on Saturday morning, and then I
10  think we were both at the Weil offices on --
11  certainly on the Sunday.
12      Q.   As you sit here today, looking at
13  Exhibit 221, do you have any knowledge as to
14  whether there was any particular topic Mr. McDade
15  wanted to talk to you about when he wrote this
16  e-mail?
17      A.   Well, I think that again it is -- I
18  don't have a specific recollection, but from the
19  sense of the e-mail, it was to answer the
20  questions that I asked of him.
21      Q.   Did you get an answer to the question
22  you asked of him as to whether the court accepted
23  the 15c3 lock-up and unencumbered box make it
24  through to BarCap?
25      A.   I don't have a recollection of that,

Page 161

1    LOWITT - HIGHLY CONFIDENTIAL
2  but we did begin working, once the transaction
3  closed, on both of these items, so I feel
4  confident, but I don't have a specific
5  recollection that Bart would have communicated to
6  me that these were both part of the transaction.
7      Q.   Just sort of focus where you are and I
8  will give you the two-page version of that
9  version.
10      MR. GAFFEY:  Can we just substitute --
11   do you mind if we unmark that and mark that
12   as 220?
13      MR. BERNSTEIN:  Fine.
14   Would now be a good time for a break?
15      THE WITNESS:  Yes.
16      (Exhibit 220, document Bates stamped
17   10298186 marked for identification as of
18   this date.)
19      (Recess)
20  BY MR. GAFFEY:
21      Q.   Mr. Lowitt, could you go back to in
22  the pile in front of you Exhibit 23, please.
23      A.   Yes.
24      Q.   We talked a bit about this a moment
25  ago where I asked you about the language in these

LOWITT - HIGHLY CONFIDENTIAL

**e-mails that referred to marking of the positions, and what you meant was for BarCap to mark the positions further, and I think you said this was the asset-by-asset assessment that was being done; is that right?**

A. Yes, I think that's what we talked about before.

**Q. Now, the financial schedule we looked at earlier, one-page financial schedule, reflected the difference between the price Barclays agreed to pay and the amount shown on Lehman's books as of September 16, correct?**

MR. HUME: Objection, lacks foundation. Which schedule?

**Q. Exhibit 19 that's in front of you there.**

A. I think that --

**Q. Do you have 19 there?**

A. I have 19.

**Q. That's the schedule I am referring to. That schedule reflects the values for the assets that reflect the difference between the amounts shown on Lehman's books and the amount Barclays was willing to pay, correct?**

LOWITT - HIGHLY CONFIDENTIAL

MR. BERNSTEIN: Objection, asked and answered.

A. What this reflects is for the different -- at the broad level of the asset categories, an amount that Barclays was going to pay to Lehman for assets in those asset categories which reflected the combination of those assets they wanted to purchase as well as the price that they were willing to pay, as we discussed, for the large purchases as well as the volatility of the assets.

**Q. Taking a look at Exhibit 23, which refers to Barclays and the positions, is there further marking down going on here when it is done on an asset-by-asset basis?**

A. It is not additional. I wouldn't read it that way. It is an asset-by-asset buildup that gets us to the purchase. But what you see on Exhibit 19 is the amount after the -- that Barclays is willing to pay. It doesn't reflect what was the amount that was the amount that was on -- that those particular assets were on Lehman's books at.

So the combination of things that you

LOWITT - HIGHLY CONFIDENTIAL

have to do in the exercise that I think Jerry is referring to on Exhibit 23 is come up with a set of assets which on a -- which reflects the amount that Barclays is going to pay within that asset category that is consistent with Exhibit 19.

MR. BERNSTEIN: Can I just -- can I -- this is the problem with having a live transcript. The second sentence on the live transcript begins, "I want read it that way," and what I heard was, "I wouldn't read it that way."

**Q. So I asked you a little earlier whether in the exercise that led to the completion of Exhibit 19, the top-down view was to arrive at the broad price then. And to put another question, so the exercise that led to Exhibit 19 was the top-down process to determine broadly the difference between the amount on Lehman's books and the amount that Barclays would pay?**

A. I don't think that's completely right. I think that's the -- what led to Exhibit 19 was a view on the Lehman side of the combination of what was emerging from the sort of bottoms up with what was happening top down. It wasn't just the

LOWITT - HIGHLY CONFIDENTIAL

top-down view. It was a combination, and it was iterative through the course of the evening.

**Q. And now looking again at Exhibit 23, which is written on the 17th of September, this is the security-by-security review you talked about, yes?**

A. It is the effort to say, just pick a number. There are $2.7 billion of mortgages on Exhibit 19. What are the specific positions that are going to get transferred over to Barclays that they will be paying 2.7 billion for, that represents the price they are willing to pay which is less than the amount that would have been the book value.

**Q. So the question that's being answered on the 17th is which particular securities within the category of mortgages will be priced in a way to add up to the total for mortgages in Exhibit 19?**

A. You mean the September 18, but yes.

**Q. Yes. But yes is the answer?**

A. I believe, if I am understanding you correctly, that it is the asset-by-asset view that's going to -- because in the end, what was

Page 166

LOWITT - HIGHLY CONFIDENTIAL

1  necessary to complete the transaction was a
2  specific set of assets were going to be delivered
3  at a specific set of prices.  In aggregate by
4  category, we are going to be consistent with 19,
5  if it didn't shift in some way, rather than just
6  something that you saw on 19, on Exhibit 19.
7      **Q.   Well, what do you mean if it didn't**
8  **shift in some way?**
9      A.   Again, the values that -- the values
10 of assets may have changed, some assets that --
11 that valuations of those may have changed.  I
12 didn't mean anything more than that.
13     **Q.   As a result of the asset-by-asset**
14 **review that was going on, that you are writing**
15 **about on the 17th, did the delta between the**
16 **amount shown on Lehman's books and the price**
17 **Barclays was willing to pay grow larger?**
18     A.   I think as we said, we didn't actually
19 do the exercise that we talked about on Exhibit
20 23.  It was -- this was a series of correspondence
21 about what we would need to have done, but we
22 didn't sit down with Barclays, we didn't sit down
23 and actually re-mark any of the positions.  It
24 was -- it was a reference to what we would have

Page 167

LOWITT - HIGHLY CONFIDENTIAL

1  needed to have done if the transaction had
2  proceeded in the earlier form rather than the repo
3  form.
4      **Q.   Were the individual positions being**
5  **marked for the purpose of putting them into the**
6  **repo?**
7      A.   No.
8      **Q.   Would you need to do --**
9      A.   I don't believe so.
10     **Q.   Would you need to -- to put them into**
11 **repo, would you need a schedule of individual**
12 **positions?**
13     A.   The repo, the advantage of the repo
14 was that there was collateral that was at the Fed,
15 that collateral was delivered to Chase, Chase was
16 supposed to deliver that collateral to Barclays at
17 BoNY, Bank of New York, and as a result, there was
18 no requirement to go into separate schedules and
19 identify specific assets or to mark them in any
20 particular way.
21     **Q.   Because they are marked by BoNY when**
22 **they're received, BoNY in the triparty; is that**
23 **correct?**
24     A.   And by Chase when they return from the

Page 168

LOWITT - HIGHLY CONFIDENTIAL

1  Fed.
2      **Q.   OK.  I am going to show you a new and**
3  **improved Exhibit 220.  I have marked the correct**
4  **document this time.  And just so we don't have a**
5  **gap in numbering, I have re-marked Exhibit 66B**
6  **also as Exhibit 220.**
7      MR. BERNSTEIN:  So this is both 66B
8  and 220.
9      MR. GAFFEY:  Yeah.  We will call it
10 220 for the purpose of this deposition.  I
11 just didn't want a numbering gap.
12     MR. BERNSTEIN:  Sure.
13 BY MR. GAFFEY:
14     **Q.   Let me know when you have had a chance**
15 **to look at what we have marked as Exhibit 220,**
16 **Mr. Lowitt, and tell me whether you recall seeing**
17 **it before.**
18     A.   I don't have a specific recollection
19 of this chain of e-mails.
20     **Q.   Do you know who David Aronow is?**
21 **A-R-O-N-O-W.**
22     A.   David was one of the people in
23 operations who worked for Alastair Blackwell.
24     **Q.   Would David Aronow have been involved**

Page 169

LOWITT - HIGHLY CONFIDENTIAL

1  **in this security-by-security marking we were**
2  **talking about before with respect to Exhibit 23?**
3      A.   There was no security-by-security
4  marking for Exhibit 23.  There was no effort
5  that -- in other words, there was a project that
6  was being identified as a piece of work.  It
7  wasn't a piece of work that actually took place.
8      **Q.   OK.  In his e-mail to Mr. Tonucci,**
9  **copy to you, Mr. Aronow says, "Paolo, apologies if**
10 **you already know this.  Barclays' operations team**
11 **has recalculated the value of the collateral that**
12 **they received from us last night and they are more**
13 **than fully collateralized, including the haircut**
14 **applied.  Senior management at Barclays I am told**
15 **are very satisfied with the results of the effort.**
16 **They are not interested in moving forward with any**
17 **more collateral movements from us to them today**
18 **through the process we built and applied**
19 **yesterday.  They have said that we can now stand**
20 **down with the process we had in place to move**
21 **collateral."**
22     **Do you know what Mr. Aronow was**
23 **referring to when he communicated that the**
24 **Barclays operation team had recalculated the value**

Page 170

LOWITT - HIGHLY CONFIDENTIAL

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    of the collateral they received from Lehman?
3         A.   I mean I can't know precisely what
4    Dave meant by this, but I would assume what
5    Barclays' operations was doing was looking at the
6    collateral that was in their BoNY accounts and
7    assessing the value of that collateral, probably
8    utilizing the BoNY triparty system to assess what
9    they had received and what the value of that was.
10        **Q.   When Mr. Aronow writes that Barclays**
11   **was now "more than fully collateralized, including**
12   **the haircuts applied," what do you understand that**
13   **to mean?**
14        A.   Again, I don't know what Dave was
15   referring to.
16        **Q.   All right.  Well, if you had received**
17   **this in realtime on the 19th of September, give me**
18   **your best estimate of what you would have**
19   **understood it to mean or whether you would have**
20   **had to write back to David to say what do you mean**
21   **by this.**
22        MR. HUME:  Objection, calls for
23   speculation.
24        A.   I don't know what David was referring
25   to specifically with that.  I could speculate if

Page 171

1    LOWITT - HIGHLY CONFIDENTIAL
2    you would like.
3         **Q.   No, thank you.**
4         **Did it ever come to your attention**
5    **that Barclays was more than fully collateralized?**
6         A.   Again, I wasn't aware of Barclays
7    being fully collateralized or not.  I know that
8    there were a lot of difficulties associated with
9    the collateral movement from Chase to BoNY and
10   that that didn't proceed smoothly.
11        **Q.   Do you know what Mr. Aronow was**
12   **referring to when he refers to "the process we had**
13   **in place to move collateral"?**
14        A.   Again, from the context, I would
15   suggest that it is, or I would understand it to be
16   the collateral that was going to move from Chase
17   to BoNY because, you know, the Fed repo was taken
18   down, and rather than transact through JP Morgan,
19   the new repo was going to get booked through BoNY.
20   That process of moving the collateral was not a
21   standard one, and so a process needed to be
22   developed and then applied.
23        **Q.   And at some point apparently Lehman**
24   **was told it could stand down with the process,**
25   **yes?**

Page 172

1    **LOWITT - HIGHLY CONFIDENTIAL**
2         A.   That's what David is saying.
3         **Q.   Do you have any independent knowledge**
4    **of a process -- of Lehman standing down on that**
5    **process?**
6         A.   I mean at some point, we weren't
7    moving additional collateral, but I'm not aware
8    specifically of, you know, a time or a place where
9    people were told no additional work needed to get
10   done.
11        **Q.   Do you have -- without regard to the**
12   **documents, sir, do you have any knowledge of a**
13   **point during this week where Barclays said we have**
14   **enough collateral?**
15        A.   I am not aware of that, no.  I don't
16   recall being aware of that.
17        **Q.   Now, did this, the project we have**
18   **been talking about of looking for additional**
19   **assets, did that project ultimately succeed?  Did**
20   **you find enough additional assets?**
21        A.   I think we identified unencumbered
22   collateral and we understood the excess collateral
23   in the 15c3 lock-up were in the range that we were
24   looking for.
25        MR. GAFFEY:  Can we mark that, please.

Page 173

1    LOWITT - HIGHLY CONFIDENTIAL
2         (Exhibit 222, e-mail dated 9/20/2008
3    at 1:42:32 marked for identification, as of
4    this date.)
5         **Q.   We have marked as Exhibit 222,**
6    **Mr. Lowitt, a one-page chain of e-mails.  Take a**
7    **look through it and tell me whether you have seen**
8    **it before.**
9         A.   I don't recall the e-mail trail
10   specifically.
11        **Q.   On the lower e-mail from you to Paolo**
12   **Tonucci, copy to Steven Berkenfeld, the subject is**
13   **"Thanks for all your help getting us over the goal**
14   **line.  We did it," with exclamation points.**
15        **Is "we did it" a reference to we found**
16   **enough additional value to transfer to Barclays?**
17        A.   I think it's -- that the transaction
18   was approved by the court would have been what I
19   think we would have referred to as getting over
20   the goal line.  And we participated in that.
21        **Q.   And what was Mr. Tonucci's**
22   **participation in getting you over the goal line --**
23   **withdrawn.  I will get to that in a minute.**
24        **That being so, there is no reference**
25   **in here to the bankruptcy court or hearing or**

Page 174

**LOWITT - HIGHLY CONFIDENTIAL**

1  **decision. It is speaking in terms of 15c3 lock-up**
2  **money and the unencumbered box. By that, were you**
3  **referring to the result in the hearing of the**
4  **bankruptcy court where the sale was approved?**
5  MR. BERNSTEIN: Objection,
6  mischaracterizes the document.
7  MR. HUME: I object to vague and
8  ambiguous, the question.
9  A.   Again, my -- you know, we had just
10 gone through an extremely trying period in
11 aggregate. You know, dealing with the bankruptcy
12 initially and then all the work to get a deal done
13 with Barclays. And this is on the Saturday saying
14 we got the approval or the transaction was
15 approved, but we have to do more work. We have to
16 ensure that the 15c3 lock-up money and the -- you
17 know, we could free that up and transfer it, and
18 we can also transfer the collateral in the
19 unencumbered box to Barclays.
20       Saying that everything that we have
21 had to deal with has proven to be complicated and
22 difficult, we wanted to make sure that we had a
23 team on it to ensure that we are organized to
24 effect that.

Page 175

**LOWITT - HIGHLY CONFIDENTIAL**

1  Q.   And how was it that Mr. Tonucci's
2  activities helped get over the goal line?
3  A.   Well, it was a combination of things.
4  One was the work that he had done in identifying
5  the excess collateral, as well as the 15c3 excess.
6  It was also all the work that was done in
7  effecting the movement of collateral from Chase to
8  BoNY, as well as helping to keep the firm sort of
9  funded over that period.
10 Q.   And Mr. Tonucci responds in response
11 to your direction to coordinate with Berkenfeld
12 and the additional work that needs to be done,
13 "Agreed. We will use Robert for this. Have
14 confidence he knows how to get done."
15       Is that a reference to Robert Azerad?
16 A.   I believe it is.
17 Q.   Now, I asked you before if in the
18 course of the project to find additional assets
19 you felt that you were at some degree of
20 professional risk if that goal was not achieved.
21 Do you recall that?
22 A.   I do recall you asking that.
23 Q.   And you told me no?
24 MR. BERNSTEIN: Mischaracterizes his

Page 176

**LOWITT - HIGHLY CONFIDENTIAL**

1  testimony.
2  Q.   Well, did you feel some degree of
3  professional risk if the goal was not achieved
4  with respect to finding additional assets?
5  MR. BERNSTEIN: Objection, asked and
6  answered.
7       You can answer it again.
8  A.   I think I said I didn't recall
9  specifically.
10 Q.   Well, you write to Mr. Tonucci on the
11 20th of September at 9:33 a.m., "You need to be
12 close to it. If we don't succeed, you and I are
13 toast despite all our heroics."
14       Does that refresh your recollection?
15 A.   I think that -- what I think was
16 described here is we both worked fantastically
17 hard to get the transaction to a point where we
18 could fund the firm through the Friday where we
19 could meet the requirements of the -- we could
20 support the transaction as it was negotiated, and
21 that we didn't want to sort of fail at the last
22 minute vis-a-vis our ability to move the
23 collateral and to resolve the 15c3 lock-up.
24 Q.   Is that what you meant when you said

Page 177

**LOWITT - HIGHLY CONFIDENTIAL**

1  to Mr. Tonucci, "if we don't succeed, you and I
2  are toast despite all our heroics"?
3  A.   That's what I think I could have meant
4  by that.
5  Q.   Could you also have meant by that if
6  the deal didn't close, the offer you accepted for
7  approximately $10 million in compensation from
8  Barclays would not go into effect?
9  A.   I don't think that's what I was
10 referring to. I think we were anxious to have a
11 trade succeed because of what it meant for the
12 whole franchise and all the employees of Lehman
13 Brothers, as well as to see the franchise continue
14 in some form, given the amount of work we had put
15 into building it up over the years, as well as
16 having a sort of functioning entity to continue to
17 support the various estates.
18       So I think we were anxious for it to
19 succeed for a range of reasons.
20 Q.   And when you refer to the benefits of
21 this to the whole franchise and the employees and
22 functioning entity, is that what you meant when
23 you wrote to Mr. Tonucci referring to "you and I
24 being toast"?

Page 178

LOWITT - HIGHLY CONFIDENTIAL

1        **LOWITT - HIGHLY CONFIDENTIAL**
2        MR. BERNSTEIN:  Objection, asked and
3  answered, and argumentative.
4        You can answer it one more time and
5  then we will move on.
6     A.  I think it means -- I don't see it as
7  referring only to Paolo and myself.  I think of it
8  as if we are not successful with this despite all
9  the hard work that everybody has put into this,
10  that it will be -- that it would have been in
11  vain.
12     **Q.  Had you and Mr. Tonucci ever had**
13  **discussions, the two of you, about the effect on**
14  **your own personal careers if the transaction**
15  **didn't close?**
16     A.  I don't recall us having that
17  conversation, and we were so busy with so many
18  things, I don't believe we would have had that
19  conversation.
20     **Q.  Well, do you know if Mr. Tonucci had**
21  **an offer in hand from Barclays during the week**
22  **before the closing?**
23     A.  He didn't have an offer in the week
24  before the closing.  The deal would have included,
25  you know, all the employees of LBI having an offer

Page 179

LOWITT - HIGHLY CONFIDENTIAL

1  as part of the transaction.
2     **Q.  Had you had any conversations with**
3  **Mr. Tonucci in the week prior to the transaction**
4  **about whether he, Paolo Tonucci, was likely to**
5  **find employment with Barclays after the**
6  **transaction?**
7     A.  I don't recall having that
8  conversation with Paolo.
9     **Q.  Did he ever raise that topic with you,**
10  **is there going to be a job for me at Barclays?**
11     A.  I don't recall him ever raising it
12  with me.
13     **Q.  Did there ever come a point when you**
14  **spoke to Mr. Tonucci who reported directly to you**
15  **about whether there would be a job for him at**
16  **Barclays?**
17     A.  I did speak with Barclays the week
18  after the transaction closed together with a
19  number of other folks who were on a list of --
20  people that Barclays wanted to retain.  But that
21  was only the week after the transaction closed.
22     **Q.  When did Barclays make it known to you**
23  **that it wanted to retain Mr. Tonucci?**
24     A.  Well, there wasn't a communication

Page 180

LOWITT - HIGHLY CONFIDENTIAL

1        LOWITT - HIGHLY CONFIDENTIAL
2  around Mr. Tonucci specifically.  There were --
3  there was a list that had been generated for a
4  number of people in the corporate area that
5  Barclays was interested in retaining.
6     **Q.  Did this list include Mr. Tonucci?**
7     A.  It did.
8     **Q.  Did it include Mr. Kelly?**
9     A.  It did.
10     **Q.  Did it include Mr. Reilly?**
11     A.  It did.
12     **Q.  Did it include -- I didn't get the**
13  **name -- the person who was in charge of tax who**
14  **was a direct report to you?**
15     A.  Yes, it did.
16     **Q.  Did it include Alastair Blackwell?**
17     A.  It did.
18     **Q.  Did it exclude any of your direct**
19  **reports?**
20     A.  I can't say with certainty.  It was a
21  list that was -- that had actually been generated
22  by Lehman prior to the bankruptcy as the list of
23  people that would receive -- that potentially
24  would have received various stock awards that
25  Lehman was contemplating.

Page 181

LOWITT - HIGHLY CONFIDENTIAL

1        LOWITT - HIGHLY CONFIDENTIAL
2     So it was a lift of a list that had
3  been developed previously.
4     **Q.  On the Friday, the 19th, when the**
5  **project was going on to search for additional**
6  **assets, during that day, was it matter of any**
7  **concern to you that you might not have a position**
8  **at Barclays if that project was not successful?**
9       MR. BERNSTEIN:  Objection, asked and
10  answered.
11     A.  I did not -- that was not my focus on
12  that day, and it was not a concern of mine, I
13  don't believe.
14     **Q.  Was it a focus of yours or matter of**
15  **concern to you that if the project of finding**
16  **additional value was not successful, your several**
17  **direct reports would not have jobs or the**
18  **possibility of jobs at Barclays?**
19     A.  Again, I was -- we were all working
20  very hard to ensure a transaction took place
21  without regard to individual circumstances.
22     (Exhibit 223, document Bates stamped
23  10293506 marked for identification, as of
24  this date.)
25     **Q.  Mr. Lowitt, I put before you what we**

Page 182

LOWITT - HIGHLY CONFIDENTIAL
1  **LOWITT - HIGHLY CONFIDENTIAL**
2  **have marked as Deposition Exhibit 223. Have you**
3  **seen this document before?**
4       A.   I have not.  Or I don't recall seeing
5  it before.
6       Q.   **The document is a chain of e-mails,**
7  **the earliest of which is 20th September, 2008, at**
8  **1:04 p.m. from you to Alastair Blackwell with a**
9  **copy to Paolo Tonucci.  Subject, "Confirming our**
10 **unencumbered box is now the top priority."**
11      **And in it you say to Mr. Blackwell,**
12 **"Please coordinate with Paolo to do everything**
13 **possible to ensure we have the 1.95 billion of**
14 **collateral identified and ready to move and**
15 **address claims from Chase that they have a claim.**
16 **Ian."**
17      **What are you referring to when you**
18 **refer to claims from Chase there?**
19      A.   I am -- again, I don't have a
20 recollection of this specifically, but Chase were
21 seizing collateral, and so what we needed to do
22 was make sure that the collateral that we had
23 identified that was unencumbered was -- in fact,
24 we were in -- we had the ability to deliver to
25 Barclays.

Page 183

LOWITT - HIGHLY CONFIDENTIAL
1  LOWITT - HIGHLY CONFIDENTIAL
2       So I think that this is again about
3  operationalizing what had been agreed to, which
4  was our ability to deliver the collateral to
5  Barclays to satisfy the terms of the transaction.
6       Q.   **OK.  So on the Saturday, as far as**
7  **this e-mail reflects anyway, on the Saturday, you**
8  **are looking at whether the -- having found the**
9  **additional value, whether it can actually be --**
10 **you are assuring yourself it can be transferred to**
11 **Barclays, correct?**
12      A.   That's the essence of the e-mail, yes.
13      Q.   **Over the course of the weekend, apart**
14 **from that type of activity, what was found on**
15 **Friday can be transferred to Barclays, were there**
16 **efforts to find still more value?**
17      A.   Again, I can't recall whether there
18 were things specifically to add additional value.
19 I think that if there were additional efforts, it
20 was to sort of understand, in the event some of
21 this collateral couldn't be delivered, whether
22 there was other collateral that could have been
23 delivered to satisfy the requirement under
24 whatever the deal was that was agreed.
25      Can I have a quick break, please.

Page 184

LOWITT - HIGHLY CONFIDENTIAL
1  LOWITT - HIGHLY CONFIDENTIAL
2       Q.   Sure.
3       A.   Thank you very much.
4           (Recess)
5           (Exhibit 224, four-page e-mail dated
6  9/20/2008 at 6:12 p.m. marked for
7  identification as of this date.)
8  BY MR. GAFFEY:
9       Q.   **Mr. Lowitt, I am putting before you a**
10 **document we have marked as 224.  Take a look at**
11 **that, please, and let me know whether you have**
12 **seen it before.**
13      A.   I don't have a specific recollection
14 of seeing this trail of e-mails.
15      Q.   **OK.  I should -- I am going to ask you**
16 **a couple of questions about it anyway, but I just**
17 **want to note that as far as I can see on my read,**
18 **you are not within the very top one that seems to be sent to you as a whole.**
19 **top one that seems to be sent to you as a whole.**
20 **I only see your name at the top.**
21      **But you will see that the e-mail chain**
22 **is a series of communications that start with**
23 **Martin Kelly writing to Robert Azerad, Alastair**
24 **Blackwell and Brett Beldner with some ccs about an**
25 **opening balance sheet that has been requested by**

Page 185

LOWITT - HIGHLY CONFIDENTIAL
1  **LOWITT - HIGHLY CONFIDENTIAL**
2  **Barclays.  Do you see that?**
3       A.   I do see that on the last page.
4       Q.   **Do you have any independent**
5  **recollection of work being done to prepare an**
6  **opening balance sheet for Barclays?**
7       A.   I don't have an independent
8  recollection of that, no, not that I recall.
9       Q.   **And in the e-mail that follows, and**
10 **I'm moving up the page here, 20 September 2008 at**
11 **10:27 a.m. from Azerad to Kelly, Blackwell and**
12 **Felder.  Do you see that?**
13      A.   I do see that.
14      Q.   **Azerad refers to a "classification of**
15 **the assets by asset class that should be done by**
16 **end of day today, assuming that what was**
17 **transferred was," and then he has got two items.**
18 **One is, "Repo with Barclays as of Thursday night**
19 **(49 billion-42 billion of securities and 7 billion**
20 **of cash)."  Do you see that?**
21      A.   I do see that.
22      Q.   **And then two, "Non-actionable box as**
23 **shown to Barclays on Friday afternoon (1.9 billion**
24 **of collateral).  Actual box is slightly bigger**
25 **because it also contains Lehman debt."**

Page 186

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **Do you see that?**
3    A.   I do.
4    **Q.   And do you recognize this to be two of**
5    **the components of the value that was ultimately**
6    **transferred to Barclays in the transaction?**
7    A.   I see this as two of the elements of
8    the transaction, the repo transaction and the
9    non-actionable box, which I think is shorthand for
10   or just a different term for the unencumbered
11   collateral.
12   **Q.   The description of the values there is**
13   **correct, is it not?  49 billion for the repo and**
14   **1.9 billion for the unencumbered collateral?**
15   MR. HUME:  Objection, lacks
16   foundation, vague and ambiguous.
17   A.   Yeah.  As I said before, unencumbered
18   collateral was about a billion nine, and the total
19   repo was, you know, my recollection, about --
20   between 49 and 50 billion dollars of collateral
21   was what was papered, and the cash movement was
22   about $45 billion, again from my recollection.
23   What I will say, I don't think the
24   7 billion in cash was actually included in the 49.
25   **Q.   Well, there was a point where -- there**

Page 187

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **was 7 billion in cash that was supposed to be**
3    **included, correct?**
4    A.   Again, I believe that that was how the
5    49 was -- or 49, 50 was going to get established,
6    but it didn't move -- I don't believe it all
7    moved.
8    **Q.   Do you know why the 7 billion did not**
9    **move?**
10   A.   I don't know why.  I know Chase didn't
11   move it.
12   **Q.   And ultimately Chase's failure to move**
13   **it was resolved in a settlement that came in**
14   **December, correct?**
15   A.   I don't know when it happened.  I know
16   there was an ongoing settlement discussion that
17   Mr. Ricci was involved in.
18   **Q.   Were you involved in any of the**
19   **discussions that led to that settlement in**
20   **December?**
21   A.   I was not.
22   **Q.   Do you have any knowledge as to on**
23   **what terms Chase's failure to move the 7 billion**
24   **were resolved?**
25   A.   I don't know and I wasn't part of the

Page 188

1    LOWITT - HIGHLY CONFIDENTIAL
2    negotiating team.
3    **Q.   The plan was 42 billion plus 7 billion**
4    **in cash, correct?**
5    A.   Again, I can't confirm that for you.
6    That's what it says down on the e-mail.
7    **Q.   Apart from the fact that it says that**
8    **on the e-mail, sir, do you have any knowledge as**
9    **to whether the amount of the repo, the collateral**
10   **in the repo was roughly $49 billion?**
11   A.   Yeah, my recollection is between 49
12   and 50 billion dollars.
13   **Q.   Further up the e-mail, there is an**
14   **e-mail from Paolo Tonucci to Azerad, Kelly,**
15   **Blackwell and Beldner.**
16   A.   This is the 10:31?
17   **Q.   That's right.**
18   **And in it Mr. Tonucci writes, "We also**
19   **need to add the 15c3 cash as a receivable."  Do**
20   **you see that?**
21   A.   I do see that.
22   **Q.   And if you read further up the e-mail,**
23   **you will see that's calculated -- well, that a**
24   **series of cash sources are calculated, and I am**
25   **going to ask you to read through it and then take**

Page 189

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **a look at the e-mail from Dan Flemming to Paolo**
3    **Tonucci, 20 September at 5:01.  Read that through.**
4    A.   I have read the E mail.
5    **Q.   Do you see the reference in the 20**
6    **September 5 -- 17:01 e-mail to a summary of**
7    **securities in lock-up at JPM for 15c3 EBOC, all**
8    **caps, and PAIB, all caps?**
9    A.   I do.
10   **Q.   I want to see what your reading is of**
11   **this, but as I understand the calculations being**
12   **done here, there is a total of 1.763 billion --**
13   A.   Yeah, my --
14   **Q.   -- identified here; is that right?**
15   **Are you seeing it that way?**
16   A.   Yeah.  My recollection was that the
17   15c3 excess was about $1.75 billion, so this would
18   be consistent with that recollection.
19   **Q.   And at the end of the day, in the**
20   **event only the security portion of the 15c3 was --**
21   **well, what was the ultimate amount of 15c3 that**
22   **went over?**
23   A.   Again, I know that in the final
24   contract, the amount was about $560 million.
25   (Exhibit 225, two-page document Bates

Page 190

1         LOWITT - HIGHLY CONFIDENTIAL
2     stamped 77882 marked for identification, as
3     of this date.)
4         Q.   I put before you Exhibit 225,
5     Mr. Lowitt.  Tell me, please, if you recall seeing
6     this document before.
7         A.   I don't recall seeing this document
8     before.
9         Q.   The chain of e-mails here begins on
10    the second page with an e-mail -- well, on the
11    first page it runs over.  An e-mail from Paolo
12    Tonucci sent September 18, 4:07 p.m., to you, copy
13    to Alastair Blackwell, subject, "First 5 billion
14    gone."
15         What is that a reference to?  Do you
16    know?
17         A.   Again, I would assume this is moving
18    the collateral from Chase to BoNY.
19         Q.   And that's collateral in respect of
20    the September 18 Lehman-Barclays-BoNY triparty
21    repo?
22         A.   Right.  The unwind of the Fed and the
23    movement of collateral from JP Morgan to BoNY, so
24    the repo could be booked through BoNY's triparty
25    rather than Chase's triparty.

Page 191

1         LOWITT - HIGHLY CONFIDENTIAL
2         Q.   The next e-mail up, from you to
3     Blackwell, September 18, 16:35, you write, "Are we
4     still papering the 18 billion repo from Barclays
5     or is that all part of the same transfer?  Afraid
6     that is getting lost in the numbers.  Ian."
7         Do you see that?
8         A.   I do.
9         Q.   Mr. Blackwell responds in the next
10    e-mail up, "We are not unwinding.  It was
11    15.8 billion last night.  We will increase it at
12    the end of the process."
13         A.   I see that.
14         Q.   This was just kind of a cry for help
15    for me.  What is the $18 billion Barclays repo you
16    are referring to here?
17         A.   So you will recall one of those
18    earlier e-mails that we talked about that the
19    funding position of the firm was deteriorating
20    quite rapidly.  So on the Wednesday we talked
21    about the position having deteriorated by
22    $7 billion.  Barclays was assisting us in our
23    funding, so Barclays was doing repos with Lehman
24    and helping to make up the lost funding capacity
25    that we were experiencing as people were pulling

Page 192

1         LOWITT - HIGHLY CONFIDENTIAL
2     away from funding the street and funding Lehman.
3         So in addition to taking on the Fed
4     repo, Barclays were additionally funding Lehman.
5         Q.   In a repo transaction separate and
6     apart from stepping into the Fed repo?
7         A.   Separate and apart.
8         Q.   OK.  And that --
9         A.   And that was built up over, I think --
10    again, I can't say with certainty, but I think it
11    was probably being built up on the Tuesday and the
12    Wednesday.
13         Q.   Now, on the Thursday in your e-mail
14    from -- in your e-mail to Blackwell and Tonucci,
15    you seem to be asking whether we are still
16    papering the $18 billion repo with Barclays or is
17    that all part of the same transfer.  Is the
18    question you are asking whether they are to be
19    combined, that is the Fed repo and the 18 billion?
20         A.   It is saying -- I don't recall it
21    specifically, but the question would have been,
22    was Barclays going to continue to fund the
23    $18 billion of collateral or cash -- I can't be
24    sure if it was collateral or cash -- in addition
25    to what they were doing with the Fed, or was -- or

Page 193

1         LOWITT - HIGHLY CONFIDENTIAL
2     were they in effect going to cancel this
3     $18 billion repo that they had outstanding.
4         Q.   And that perhaps explains for me
5     anyway the e-mail you're sending further up,
6     Lowitt to Blackwell, September 18, 16:44.  What --
7     "Do you mean increase it at the end of the
8     process?  Do you mean that the total repo with
9     BarCap becomes 15.8 plus 48 or so?  What is the
10    exact number to take out the Fed so it goes up to
11    63.8?"
12         That's not what happened, right?
13         A.   That's not what happened.  One way
14    this could have happened was that Barclays
15    maintained their $18 billion repo, which they were
16    doing through Chase, and in addition to that, they
17    were going to take on the $50 billion or so off
18    the Fed.
19         Q.   Now, did Barclays roll a $15.8 billion
20    repo --
21         MR. BERNSTEIN:  In your last answer
22    did you say 15 billion or so off the Fed or
23    50?
24         THE WITNESS:  50.  5-0.
25         Q.   Did Barclays roll the $15.8 billion

Page 194

1    LOWITT - HIGHLY CONFIDENTIAL
2    repo, the one that is referred to here?
3        A.   They did not.
4        Q.   Had it been your expectation that they
5    would?
6        A.   I mean expectation is -- I'm not sure
7    if that's the right word.  I certainly wasn't
8    aware that they were not going to, but that was
9    why I was asking the question.
10       Q.   Were you surprised at the time to
11   learn that they weren't rolling the $15.8 billion
12   repo?
13       A.   Again, I don't have a complete
14   recollection, but I do believe that I -- it was
15   not expected that they were not going to roll the
16   15.8 that they had been funding up to that point.
17       Q.   So did that create -- we have enough
18   to deal with there.  Does that create another
19   problem that has to be addressed to replace that
20   funding?
21       A.   That's the heart of the issue with
22   Chase, because Chase then had to fund that as a
23   box position.  So Chase effectively stood in to
24   fund that position on the Thursday evening.
25       Q.   Did Chase do that, stand in on that

Page 195

1    LOWITT - HIGHLY CONFIDENTIAL
2    funding?
3        A.   They did.
4        Q.   Would you explain to me how they do
5    that?  I'm a little, as you put it in your
6    e-mails, lost in the numbers.  How does Chase
7    stand in to replace the Barclays repo funding?
8        A.   The collateral is sitting in the Chase
9    accounts, so they have the collateral, and they
10   extend a box loan against that collateral.
11            So the way the triparty would work
12   normally is, if there is any collateral left in
13   the box, because of inefficiencies in funding
14   through the course of the day that weren't
15   anticipated, in certain cases if there is extra
16   collateral in the box, Chase would extend a loan
17   against that collateral.
18            So the collateral here that had been
19   funded by Barclays in the 15.8 remained in the box
20   as collateral, and Chase needed to fund it that
21   night with a very substantial box loan.
22       Q.   And they made the loan?
23       A.   They did make the loan.
24       Q.   And does that roll the next day?
25       A.   Well, it remains in place and the

Page 196

1        LOWITT - HIGHLY CONFIDENTIAL
2    meeting with the bankruptcy judge occurs on the
3    Friday afternoon.
4        Q.   Mr. Lowitt, I put before you what was
5    previously marked as Deposition Exhibit 77B.  Have
6    you seen those e-mails before, that chain of
7    e-mails?
8        A.   Yeah, I don't have a specific
9    recollection of this e-mail chain.
10       Q.   The e-mail -- again, I am now starting
11   at the top of the page rather than working
12   chronologically.  The e-mail from you to Monty
13   Forrest, Alastair Blackwell, Neal Ullman, Jim
14   Hrasca, copies Tonucci, Azerad and Flemming,
15   entitled "1.9 billion, 9:15 p.m. update."
16            And you say, and it's as follows,
17   "Need a CUSIP level detail of the collateral and
18   where it is for a 7 a.m. meeting with Bart.
19   Monty, you or Alastair need to be at that 7 a.m.
20   meeting to prepare for a final Weil meeting to
21   finalize the agreement.  Thanks.  Good luck
22   getting additional collateral.  But good accurate
23   presentation of the collateral is also critical,
24   as we will append to the agreement.  Thanks again
25   for all the hard work.  Ian."

Page 197

1        LOWITT - HIGHLY CONFIDENTIAL
2            Now, do you recall -- if you don't --
3    even if you don't recall a particular e-mail, do
4    you recall putting this project on the plate of
5    people that night for a 7 a.m. meeting with Bart
6    McDade?
7        A.   I don't have a recollection of that.
8        Q.   Do you recall meeting with Bart McDade
9    on the Monday morning at 7 a.m.?
10       A.   Is it on the --
11           MR. BERNSTEIN:  Yeah.
12       Q.   Let me back up.  The e-mail you send
13   is --
14       A.   This is Saturday night for Sunday
15   morning.
16       Q.   You're right.  I have screwed up my
17   GMTs here.
18           So the e-mail is late Saturday night
19   at about 10:23 p.m. Saturday night, and refers to
20   a 7 a.m. meeting for Sunday, yeah?
21       A.   I believe that to be the case based on
22   the timing.
23       Q.   OK.  All right.  And the reference in
24   here to a final Weil meeting to finalize the
25   agreement, what agreement are you referring to in

Page 198

LOWITT - HIGHLY CONFIDENTIAL

1 there?
2    A.    Again, I know that the -- that there
3 were meetings on Saturday and Sunday at Weil which
4 were finalizing the agreement with Barclays, and
5 that there were some set of issues or items that,
6 you know, still needed to get resolved, and that's
7 why, you know, we were meeting at the Weil offices
8 on Sunday.
9    Q.    Did you go to any of those meetings?
10    A.    I mean I was at Weil.  A lot of time
11 was spent sitting around.  There was some meetings
12 that I was a part of, but the majority of meetings
13 were happening with other people involved in
14 those.
15    Q.    And you were not at any of the
16 meetings where the agreements were finalized; is
17 that right?
18    A.    That's -- I don't remember being at
19 any meetings where things were finalized.
20    Q.    And in this e-mail, you express to the
21 men to whom you are sending it, "Good luck getting
22 additional collateral."  What is that a reference
23 to?  Are you still looking for collateral as late
24 as Saturday night?

Page 199

LOWITT - HIGHLY CONFIDENTIAL

1    A.    I think we were trying to understand
2 what was the collateral that was unencumbered.
3 The information that was available was
4 extremely -- it was extremely difficult to get
5 clarity on what collateral we had that was really
6 unencumbered, given that we didn't have access to
7 many of our accounts at Chase and we didn't know
8 what collateral Chase had actually taken.
9        So I think that was what this was
10 probably referring to.  But I don't have a precise
11 recollection of it.  Based on what I know was
12 going on at the time.
13    Q.    Did that get straightened out, what
14 collateral they had actually taken?
15    A.    I think it was -- it wasn't
16 straightened out completely that weekend.  I think
17 it remained work that was ongoing, and we didn't
18 have access to many of the -- much of the
19 information systems that we needed to resolve that
20 completely.
21        (Exhibit 226, e-mail dated September
22 21, 2008 at 2:15 p.m. marked for
23 identification, as of this date.)
24    Q.    I put before you, Mr. Lowitt, what we

Page 200

LOWITT - HIGHLY CONFIDENTIAL

1 have marked as Deposition Exhibit 226.  Have you
2 seen that before?
3    A.    I have no recollection of seeing this
4 before.
5    Q.    Do you know Gerard Larocca?
6    A.    Gerard is the CAO for BarCap in the
7 Americas.
8    Q.    And this e-mail is dated September 21,
9 2:15 p.m.
10    A.    So that's the Saturday?
11    Q.    Yes.  No, that's the Sunday.
12    A.    That's the Sunday.
13    Q.    That's the Sunday.
14        Entitled "Please give me a call to
15 review the schedules on collateral."  And the text
16 of the e-mail says, "To emphasize the key point,
17 there is no overlap between the unencumbered
18 collateral and the purchased assets of
19 49.9 billion.  Ian."
20        Do you see that?
21    A.    I do.
22    Q.    Do you have a recollection of there
23 being some issue that you needed to resolve or
24 clarify with Mr. Larocca as to whether the

Page 201

LOWITT - HIGHLY CONFIDENTIAL

1 unencumbered collateral overlapped with the repo
2 amount?
3    A.    I don't have a specific recollection,
4 but I'm sure that BarCap would have wanted to make
5 sure that the schedule that was the unencumbered
6 collateral schedule didn't include any assets that
7 were already in the repo transaction and that they
8 were -- given the sort of uncertainty around
9 information, that we were sure that the collateral
10 that was in the unencumbered collateral schedule
11 was not included in the repo transaction that we
12 talked about before.
13    Q.    And apparently you determined that the
14 unencumbered collateral was not included in the
15 repo; is that correct?
16    A.    That was what a lot of the work that
17 Alastair and the others who are referenced in that
18 earlier e-mail were working to insure.  Not only
19 that it wasn't in the repo, but also that it was
20 genuinely unencumbered and that if there was --
21 you know, additional work over that period may
22 have identified some collateral that we had
23 previously thought was unencumbered that may have
24 been encumbered as they got better or new

Page 202

1           LOWITT - HIGHLY CONFIDENTIAL
2    information.
3        Q.    When you write to Mr. Larocca on
4    Sunday, the 21st, the conclusion that has been
5    reached is it wasn't in the repo and it was
6    unencumbered, correct?
7        A.    That was what the exercise was
8    designed to ensure, and every effort was made to
9    ensure that was the case.  Whether it was correct
10   in every case, can't say, but that was the best
11   effort that a lot of people were putting in to
12   determine that was the case, because that was our
13   understanding of what the transaction called for.
14       Q.    I'm not trying to be argumentative
15   here.  I think we may be at cross purposes.  I
16   think what I am asking you is, this project people
17   were working so hard on, did it conclude that the
18   unencumbered -- that the unencumbered collateral
19   was not included in the repo and it was available
20   for transfer?
21            MR. BERNSTEIN:  Objection, asked and
22       answered.
23       A.    The exercise was to identify
24   collateral that was unencumbered and not part of
25   the repo transaction.  The people working on it

Page 203

1           LOWITT - HIGHLY CONFIDENTIAL
2    were confident that was the case.
3            What I can't say with certainty is
4    that that was correct in every single
5    circumstance, but that was the purpose of the
6    exercise that people were undergoing.
7        Q.    OK, thank you.
8            (Exhibit 227, two-page document Bates
9        numbed 70327 marked for identification, as
10       of this date.)
11       Q.    I put before you, Mr. Lowitt, what we
12   have marked as Deposition Exhibit 227.  Have you
13   seen this set of e-mails before?
14       A.    Again, I don't recall the specific
15   flow of e-mails.
16       Q.    Looking at the earliest e-mail in the
17   chain, from Tonucci to you September 22,
18   5:24 a.m., re: 15c3 -- you know, I think it's part
19   of --
20       A.    Mine says 4:02 a.m.
21       Q.    I was in the wrong place.  Let me
22   start again.
23            The earliest is 4:02 a.m. entitled
24   "15c3."  Tonucci writes to O'Meara, Lowitt, Kelly,
25   Azerad and Blackwell, "Final agreement was limited

Page 204

1           LOWITT - HIGHLY CONFIDENTIAL
2    to the 769 million of Treasuries so should be more
3    comfortable to accomplish."
4            Does that reflect an adjustment in the
5    15c3 that no cash would move over?
6        A.    I don't know if it would be that no
7    cash would move over.  What I understood this to
8    mean was the amount of excess under the 15c3 that
9    was in the contract was 769 rather than that
10   billion seven that had been talked about earlier.
11       Q.    What contract are you referring to?
12       A.    The final agreement that was signed by
13   BarCap.
14       Q.    And you have never seen that contract?
15       A.    Which I didn't read.
16       Q.    Well, were you -- did you ever have it
17   in your hand?  Were you ever in possession of it?
18       A.    I did not have it in my hand that I
19   recall.
20       Q.    And in your e-mail to Mr. Tonucci, at
21   5:22 on the morning of September 22, you ask, "Is
22   it all signed?  Ian."  Do you see that?
23       A.    Yes, I do.
24       Q.    What is the "it" that you are
25   referring to?

Page 205

1           LOWITT - HIGHLY CONFIDENTIAL
2        A.    I think I would have been referring to
3    the agreement between Barclays and Lehman being
4    finally signed and completed.
5        Q.    Again, just so we -- this series of
6    questions is complete, that's the agreement you
7    hadn't seen?
8        A.    It was the agreement that was being
9    worked on by a large number of people between
10   Barclays and Lehman.  I wasn't involved with that.
11   I wasn't present at the time that those agreements
12   were being worked on.
13       Q.    Now, further up in the e-mail chain,
14   you're told by Mr. Tonucci that there is an issue
15   with RACERS which JPM had on their list of assets
16   to transfer.  That is the only open item.  Do you
17   see that?
18       A.    I do.
19       Q.    Do you have any recollection of what
20   the issue was concerning RACERS?
21       A.    I don't have a specific recollection,
22   but I can infer from this that JP Morgan wanted
23   the RACERS to be included in the repo trade with
24   Barclays and that Barclays was resisting that, and
25   that was something that I was aware was an issue.

Page 206

LOWITT - HIGHLY CONFIDENTIAL

1
2     Q.    Can you give me a bit more detail
3  about the issues?  Why was it Barclays was
4  resisting that?  Did you have an understanding of
5  that?
6     A.    Well, it was one of those assets that
7  Barclays didn't want to take, and when they
8  thought about the Fed repo that they stepped into,
9  the Fed repo didn't include the RACERS, and so
10  they didn't feel that they should have to take the
11  RACERS position as part of the repo.
12     Q.    Did they wind up taking the RACERS
13  position, as far as you know?
14     A.    I don't know.  That was, I'm sure,
15  part of the discussion between JP Morgan and
16  BarCap that you referenced that was completed in
17  December.
18     Q.    Further up in the e-mail Mr. Tonucci
19  says, "We are not involved, have tried to stay out
20  of it completely."  Do you see that?
21     A.    I do.
22     Q.    What is your understanding of why
23  Tonucci or Lehman would try to stay out of it
24  completely?
25     A.    Look, I -- I don't know what Paolo

Page 207

LOWITT - HIGHLY CONFIDENTIAL

1
2  means by this specifically, but this would -- I
3  think we would have seen this as an issue between
4  JP Morgan and BarCap to resolve, not something
5  that Lehman could contribute to.
6          Could I take a quick break, please.
7     Q.    Sure.  If it helps, I am almost done.
8  If you want to take a break --
9     A.    Just a short one.  I just need a few
10  minutes.
11          (Recess)
12  BY MR. GAFFEY:
13     Q.    There was some part of your testimony
14  that you wanted to clarify, sir?
15     A.    Yes.
16          MR. BERNSTEIN:  Let me refer you to
17  the end of 176.  You were asked, "What was
18  the ultimate amount of 15c3 that went over?"
19  And your answer:  "Again, I know that in the
20  final contract, the amount was about
21  $560 million."
22          Do you want to make a clarification?
23     A.    The correct number would be
24  $760 million, around $760 million.
25     Q.    Thanks.

Page 208

LOWITT - HIGHLY CONFIDENTIAL

1
2          Mr. Lowitt, when the -- you will --
3  can you pull out -- I think you have it there --
4  Exhibit 19.
5     A.    Yes.
6     Q.    Everybody spends time with Exhibit 19.
7  Exhibit 19.  When the -- when that schedule was
8  put together and the asset classes -- when that
9  schedule was put together and it was going to
10  reflect the price that Barclays would pay versus
11  the amount shown on Lehman's books for those asset
12  classes, were the RACERS included within the asset
13  classes that are listed?
14     A.    I actually don't know.  I don't know.
15     Q.    We talked a bit just before the last
16  break about an issue that arose over the weekend
17  where Barclays didn't want the RACERS and they
18  were -- I think they were taken out of the
19  collateral supporting the repo.  Is that right?
20     A.    Again, I don't know what ended up
21  being concluded between JP Morgan and Barclays,
22  but I know that it was a point of contention
23  between the two parties.
24     Q.    And whatever discussions they had to
25  solve that point of contention, do you know if the

Page 209

LOWITT - HIGHLY CONFIDENTIAL

1
2  end result was the RACERS were not transferred
3  over to Barclays?
4     A.    Again, I don't know the details of
5  what the settlement was between JP Morgan and
6  BarCap, so I don't know whether the RACERS went
7  over to Barclays or remained with JP Morgan.
8     Q.    Do you know if the basis of Barclays'
9  concern about the RACERS was the quality of that
10  collateral?
11     A.    I don't know the basis of their
12  concern.  It may well have been their ability to
13  feel comfortable with what they were willing to
14  pay for it, but I don't know why, what the basis
15  of their concern was.
16     Q.    We have talked from time to time today
17  about the delta between the amount Barclays was
18  willing to pay against the amount -- against the
19  value that Lehman ascribed to the collateral.  Was
20  there any discussion over the weekend about
21  adjusting that delta if the RACERS were taken out?
22     A.    Again, I'm not aware of any
23  discussions around that.  I think that the repo
24  that Barclays believed that they were entering
25  into was the one that they were standing in the

Page 210

LOWITT - HIGHLY CONFIDENTIAL
1  LOWITT - HIGHLY CONFIDENTIAL
2  shoes of the Fed. The RACERS were not part of the
3  repo with the Fed, so they were not expecting the
4  RACERS to be part of the transaction.
5      Q.   The constituent parts of the
6  collateral that was in the repo at the Fed, the
7  body of collateral that was with the Fed, was that
8  body of collateral amongst the securities that
9  were valued that led to the -- valued and priced,
10  that led to the drafting of Exhibit 19?
11      MR. HUME:  Objection, vague and
12  ambiguous.
13      A.   I think the --
14      Q.   You know, I think my friend Hamish
15  might be right.  Let me rephrase that.
16      Did the component parts of Lehman's
17  inventory change from the time the exercise that
18  led to Exhibit 19 took place to the time
19  collateral was put into the repo when Barclays
20  stepped in for the Fed?
21      A.   I think there was some small amount of
22  trading activity, but given the state of LBI, it
23  would have been, you know, securities that were
24  maturing or settling but there was very little
25  trading activity.  So it wouldn't be identical,

Page 211

1  LOWITT - HIGHLY CONFIDENTIAL
2  but it would be largely similar but not
3  necessarily identical.
4      Q.   Now, with respect to this, on
5  Exhibit 19, the annotations for assumed
6  liabilities for comp and cure, did you ever have a
7  discussion with Mr. Kelly about the amount that
8  was accrued for cure in that schedule?
9      A.   You said the amount that was accrued
10  for cure?
11      Q.   You see the amount next to "cure"
12  there is 2 and a quarter billion?
13      A.   I do.
14      Q.   Did there come a time after that
15  schedule was prepared where you had a discussion
16  with Martin Kelly about whether that number was
17  too high?
18      A.   Yeah, I have no recollection of
19  discussions with Martin about a cure payment.
20      Q.   Do you have any recollections of any
21  discussions with Mr. McDade where he was informed
22  that that number was too high?
23      A.   I have -- I don't recall a
24  conversation with Bart about that.
25      Q.   Do you generally recall any point

Page 212

1  LOWITT - HIGHLY CONFIDENTIAL
2  where Mr. McDade allowed as how if that number was
3  too high, Lehman had just left a billion dollars
4  on the table?
5      A.   I don't recall any conversations
6  around the cure payment after the Monday night,
7  Tuesday morning.
8      Q.   Do you recall any conversations at
9  all, without, you know, with regard to Mr. McDade,
10  Mr. Kelly, any conversations at all about whether
11  that accrual for 2 and a quarter billion for cure
12  was a good estimate, whether it was close to what
13  the real liability would be?
14      A.   Again, my focus through the course of
15  that week was around funding, around other
16  aspects, and I don't recall any discussions around
17  the cure payment.
18      Q.   Were you involved in any discussions
19  surrounding the comp accrual shown on that
20  schedule?
21      A.   I don't recall being a part of any
22  discussions around the comp.
23      Q.   Did you ever develop an understanding
24  as to whether the accrual for comp on that
25  schedule bore any relation to the actual accruals

Page 213

1  LOWITT - HIGHLY CONFIDENTIAL
2  for comp at Lehman?
3      MR. BERNSTEIN:  Objection,
4  mischaracterizes the document.
5      Q.   I am sorry, I am getting tired too.
6  Let me rephrase the question.
7      Did you ever develop an understanding
8  as to whether a $2 billion accrual for comp was a
9  good estimate?
10      A.   My understanding of the 2 billion was
11  that it was a negotiated number between Barclays
12  and Lehman, that it included the cash bonus, as
13  well as sort of stock and other forms of
14  compensation.
15      So the fact that it was a $2 billion
16  number which was larger than the sort of accrual
17  for cash bonus didn't surprise me.
18      Q.   Is the effect of that enlargement of
19  the number over the accrual for -- accrual for a
20  cash bonus, to increase the consideration Barclays
21  is shown to pay by assuming liabilities?
22      A.   I don't see it in that way.  I see it
23  as an agreement that $2 billion of compensation in
24  the form of cash bonus and stock would be
25  available for Lehman employees.

Page 214

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2        Q.    Was it agreed to that amount,
3    $2 billion, simply so assets and liabilities would
4    balance on Exhibit 19?
5        A.    The comp number at 2 billion was
6    consistent through earlier iterations of this that
7    we have been through, so it wasn't a number that
8    made these balance.  It was one of the inputs that
9    had been consistent based on the discussions
10    through the evening and morning.
11        Q.    Were the -- were the numbers for comp
12    and accrual on that balance -- on that, on Exhibit
13    19, just plug numbers?
14        A.    No.  The comp number was the number
15    that was the number that was agreed between the
16    parties, and 2 and a quarter was the estimate that
17    Martin generated that evening for what the cure
18    payment items were going to be.
19        Q.    It was Martin who generated that
20    number?
21        A.    That's my recollection.
22        Q.    Tell me what you remember about Martin
23    generating that number.  Martin is Martin Kelly?
24        A.    Martin Kelly.
25            My own specific recollection was

Page 215

1    LOWITT - HIGHLY CONFIDENTIAL
2    talking with Martin on that -- either the Monday
3    night or Tuesday morning about the need to
4    estimate that and the difficulties associated with
5    it, given that we didn't have sort of daily
6    balance sheets associated with LBI, and there was
7    a need to estimate it, and Martin went through
8    some process to estimate it, which I don't recall
9    him taking me through.  He would just have
10    provided the estimate.
11        Q.    I am showing you, sir, what has
12    previously been marked as Exhibit 45.  Have you
13    seen this document before?
14        A.    I have not.
15        Q.    Do you recall writing to
16    Mr. Berkenfeld, Mr. McDade, Mr. Kirk, Mr. Tonucci
17    and Mr. Seery in the early morning hours of
18    Monday, September 22, and commenting on the fact
19    that the closing had started?
20        A.    I don't recall it specifically.
21        Q.    Do you recall sending e-mails back and
22    forth inquiring as to where things stood on the
23    closing?
24        A.    I mean we have been through
25    Exhibit 227, where I was asking Paolo how the

Page 216

1    LOWITT - HIGHLY CONFIDENTIAL
2    negotiations were proceeding.  I obviously was
3    interested in how it was going.
4        Q.    And in the e-mail below yours saying
5    hooray, from Berkenfeld to McDade, Berkenfeld
6    writes, "JP Morgan blinked.  They agreed to cancel
7    the 7.4 billion collateral purchase."
8            Do you understand what that is a
9    reference to?
10        A.    I don't know.
11        Q.    Do you know if at the time you did
12    have an understanding, even if you don't remember
13    it today?
14        A.    I don't have any recollection other
15    than I am sure that my hooray with three
16    exclamation points was about we are starting the
17    closing.  That was a huge relief, that after all
18    this, the transaction was going to close.
19        Q.    I am going to ask you not to say
20    hooray, but I don't have any further questions.
21    Let's just change some seats so the court reporter
22    can hear.
23            - - - -
24
25

Page 217

1    LOWITT - HIGHLY CONFIDENTIAL
2    EXAMINATION BY
3    MS. TAGGART:
4        Q.    Mr. Lowitt, I am Erica Taggart and I
5    represent the committee.
6        A.    The committee?
7        Q.    The official committee of unsecured
8    creditors.  We are special counsel for the
9    committee and we're the law firm of Quinn Emanuel.
10        A.    So the creditors' committee?
11        Q.    Yes.
12            Before the closing did you have any
13    other outstanding offers of employment if you did
14    not move to Barclays?
15        A.    I didn't have outstanding offers, but
16    I had been in conversations with various other
17    institutions.
18        Q.    Do you remember now what those
19    institutions were?
20        A.    I had some conversations with Citadel.
21        Q.    And any others?
22        A.    That was -- that's one that I had
23    probably the most conversations with.
24        Q.    Did you get to the point of discussing
25    any terms of employment with Citadel prior to the

Page 218

LOWITT - HIGHLY CONFIDENTIAL

1    closing?
2        A.   I did not.
3        Q.   Do you know one way or the other
4    whether Citadel was prepared to offer you any
5    terms that were commensurate with what Barclays
6    was offering you?
7        MR. BERNSTEIN:  Objection, vague and
8    ambiguous.
9        A.   The role that I was in discussions
10   with Citadel was a very senior role at a major
11   hedge fund, but we did not discuss terms
12   specifically.  It didn't get to that point.
13       Q.   Now, I want to switch gears for a
14   minute and talk about the repo transaction, and I
15   understand that the general idea was that Barclays
16   was going to step into the shoes of the Fed and
17   take the collateral that had been pledged to the
18   Fed as part of a repurchase agreement.
19       Do you generally recall that subject?
20       A.   I do.
21       Q.   Was all of the collateral that was
22   pledged to the Fed as part of the repurchase
23   agreement ultimately given to Barclays?
24       A.   Again, I don't know whether some of

Page 219

LOWITT - HIGHLY CONFIDENTIAL

1    that collateral was held by Chase or whether all
2    of that collateral was moved to Barclays.  That
3    was subject to that settlement that we referred to
4    earlier as occurring in the December time frame
5    between JP Morgan and Barclays.
6        Q.   Is it your understanding that some of
7    the collateral that was pledged to the Fed did not
8    make it over to Barclays?
9        A.   Again, I don't know with certainty
10   whether all the collateral that was in the Fed
11   repo made it over to Barclays.  I believe the
12   majority did.  I can't say whether all did because
13   I don't have the details of the settlement between
14   JP Morgan and Barclays.
15       Q.   Do you know if there was collateral
16   that went to Barclays as part of the triparty repo
17   with Bank of New York, Barclays and Lehman that
18   was not part of what was pledged to the Fed?
19       A.   Again, I don't know all the collateral
20   that made it into BoNY because of the operational
21   difficulties with Chase and Chase's activity
22   moving collateral from Chase to BoNY.
23       Q.   Do you know who would know that?
24       A.   Well, the people who would have the

Page 220

LOWITT - HIGHLY CONFIDENTIAL

1    best view of that would probably be Paolo Tonucci
2    and Mr. Blackwell.
3        Q.   Do you know whether it was someone at
4    JPMC or someone at Lehman who made the decision
5    about what of the securities that were pledged to
6    the Fed were going to be transferred to Barclays?
7        A.   I don't know with certainty.  I would
8    imagine that it was -- there were communications
9    going on between Lehman operations and people at
10   Chase to effect the movement of collateral from
11   Chase to BoNY.
12       Q.   Were you involved at all in
13   discussions of whether residential mortgage-backed
14   securities would be part of the transaction
15   between Lehman and Barclays?
16       A.   I wasn't part of the negotiations or
17   the determination of which assets would be
18   included.  I am assuming you are referring to now
19   the sort of earlier transaction that was discussed
20   on the Monday and Tuesday.
21       Q.   Well, do you know one way or another
22   whether -- have you heard the term "Resi's" in
23   connection with this transaction?
24       A.   There may well have been Resi's that

Page 221

LOWITT - HIGHLY CONFIDENTIAL

1    were part of the transaction, I can't say for
2    certainty whether they were or they weren't.
3        Q.   So just to be clear, do you know one
4    way or the other whether any residential
5    mortgage-backed securities were transferred to
6    Barclays as part of the transaction with Lehman?
7        A.   I don't know with certainty.
8        Q.   You also discussed earlier that there
9    was a presentation to the creditors committee the
10   weekend prior to the closing that showed a
11   schedule of unencumbered collateral.  Do you
12   recall that?
13       A.   I don't think it was a presentation,
14   but I do recall that a schedule of unencumbered
15   collateral that was going to be included as a
16   component of the deal was shared with the
17   creditors committee.
18       Q.   How do you know that?
19       A.   I was at the Weil offices and the
20   creditors were in a -- the creditors committee
21   were in one of the rooms at the Weil offices.
22       Q.   Were you present during that
23   presentation to the committee?
24       A.   Again, it wasn't a presentation.  I

Page 222

1      LOWITT - HIGHLY CONFIDENTIAL
2   think it was a delivery of a schedule.
3      Q.   Were you present when there was a
4   delivery of a schedule?
5      A.   I don't have a precise recollection of
6   that.
7      Q.   Do you know who did the delivery?
8      A.   I don't know precisely.  I would --
9   again, I'm speculating, but I think it would have
10  been either Paolo Tonucci or Robert Azerad.
11     Q.   Do you know if any other documents
12  were transmitted to the committee along with that
13  schedule identifying unencumbered collateral?
14     A.   I don't know whether they received
15  additional information.  They may well have, I
16  don't know.
17     Q.   Do you know one way or the other
18  whether there was any discussion of the value of
19  that unencumbered collateral in the delivery of
20  that schedule to the committee?
21     A.   Again, I think that the schedule was
22  delivered to the committee.  I'm not aware of
23  specific discussions in relation to the valuation.
24     Q.   You also testified this morning about
25  your understanding of the deal as it closed and

Page 223

1      LOWITT - HIGHLY CONFIDENTIAL
2   you described your sense of many of the elements
3   of the transaction.  Do you recall that part of
4   your testimony?
5      A.   I do recall that.
6      Q.   And I think you listed some different
7   pieces of the transaction of value that was
8   ultimately received by Barclays generally?
9      A.   My recollection is that I talked about
10  different elements of the transaction.
11     Q.   Do you have a sense of what Barclays
12  gave in the deal to Lehman?
13     A.   I am sorry, can you be more specific
14  about what you mean by what Barclays gave to
15  Lehman.
16     Q.   Sure.  So if I understand your
17  testimony from earlier, you listed some different
18  things that Lehman ended up transferring to
19  Barclays in the transaction, including
20  unencumbered collateral and the 15c3 and some
21  securities that were related to the repo.  Do you
22  recall that?
23     A.   I do.
24     Q.   What did Lehman receive from the
25  transaction?

Page 224

1      LOWITT - HIGHLY CONFIDENTIAL
2      A.   Again, what Lehman received was
3   negotiated by other parties and I don't know the
4   details of all of those items.  I know they got
5   consideration for the building.  I know they
6   received some amount of cash and I know there was
7   a TSA agreement that was signed which required
8   Barclays to provide a number of services to
9   support the various estates.  And there may be
10  others, I'm not familiar with all of them, all
11  other items.
12     Q.   And in connection with the repurchase
13  agreement, they received 45 billion dollars in
14  cash?
15     A.   Essentially, they received, you know,
16  45 billion dollars of cash which then had to be
17  paid to the Fed to replace the repo that was done
18  by the Fed.
19     Q.   For the securities that Barclays
20  received as part of this repurchase agreement, did
21  it assume any liabilities related to those
22  securities?
23     MR. BERNSTEIN:  Objection, calls for a
24  legal conclusion.
25     A.   I'm afraid I don't understand what you

Page 225

1      LOWITT - HIGHLY CONFIDENTIAL
2   mean by accepted liabilities.
3      Q.   Well, maybe we could take a look at
4   Exhibit 19 and that's the schedule -- this is the
5   version that was marked final.
6      A.   Everyone's favorite schedule.
7      Q.   It is everyone's favorite schedule.
8      So putting aside the questions I just
9   asked, focusing on this schedule, did you have
10  an understanding of what was listed under the
11  liability section?
12     A.   Yeah, but the repo that we have just
13  been talking about was what was transacted on the
14  Thursday and it replaced this transaction.
15     Q.   I understand and it is my fault that I
16  switched two gears, but I just for a minute want
17  to now focus on this schedule and the way it
18  reflected the deal that was in place as of
19  September 16 at 11:18 a.m.  Did you have an
20  understanding of what these numbers listed under
21  liabilities were meant to reflect?
22     A.   I think these were liabilities that
23  Barclays would take on, whether those were the
24  short positions that LBI held or they would have
25  to step in for -- they would have to assume the

Page 226

1        LOWITT - HIGHLY CONFIDENTIAL
2    liability of some of the short term funding.
3        Q.   Was there a relationship between the
4    categories of assets that were listed, such as
5    government and agriculture, with assets and the
6    liabilities that were listed under that same
7    category in the other column?
8        A.   Those are agencies, so it is
9    government and agencies.
10       Q.   Excuse me?
11       A.   That's OK.  Those would have been
12   short positions in governments and agencies is 21
13   billion, and the 40 would have been the long
14   positions in governments and agencies.
15       Q.   Do you know how the numbers were
16   arrived at that were listed in the liabilities on
17   this schedule?
18       A.   Again, they were the collection of a
19   number of people in finance identifying what were
20   the short positions that were associated with
21   those assets that were going to be acquired by
22   Barclays.
23       Q.   Were the numbers listed in the
24   liabilities on Exhibit 19 subject to negotiation
25   between Barclays and Lehman?

Page 227

1        LOWITT - HIGHLY CONFIDENTIAL
2        A.   Again, I wasn't party to those
3    discussions so I can't answer that question for
4    you.  I am sorry.
5        Q.   Do you know one way or another whether
6    they reflected Lehman's view of what the
7    liabilities would be or an opinion based on what
8    Barclays thought the liabilities would be?
9        A.   I can't say with certainty.  I think
10   these were probably the liabilities as Lehman
11   assessed them with input from folks at BarCap to
12   the extent that they were uncomfortable accepting
13   some of the short positions.
14       Q.   Do you know if in the ultimate
15   agreement, setting this aside, Barclays assumed
16   any liabilities related to short positions?
17       A.   Again, I don't know.  As discussed,
18   you know, I wasn't party to the negotiations.
19       Q.   I think you also testified earlier
20   that you were involved in a -- there was some
21   effort made to match assets and liabilities I
22   think in conjunction with setting up the initial
23   deal on Tuesday the 16th.
24            MR. HUME:  Objection, mischaracterizes
25       prior testimony.

Page 228

1        LOWITT - HIGHLY CONFIDENTIAL
2        A.   No, I don't think I said that.
3        Q.   Was there any -- was there any effort
4    made to match assets and liabilities?
5            MR. BERNSTEIN:  Objection, vague and
6        ambiguous, but you may answer.
7        A.   I mean the, you know, adjusted total
8    assets and the total of liabilities do match, so
9    one would assume from that that there was some
10   effort to match assets and liabilities in this
11   schedule.  Whether this schedule represents the
12   agreement that was agreed to by Barclays again is
13   subject to the negotiators and what the
14   negotiators agreed to.
15       Q.   First let me find out if I can
16   understand what I think you testified to before.
17   I think it was in just -- according to my notes,
18   when you were talking about what you were doing
19   that night, you collected input from parties about
20   the asset part of the transaction, you got input
21   from the business about which assets Barclays
22   would be interested in, and I believe you made
23   some sort of testimony about there was an effort
24   to match assets and liabilities.  I understand
25   that is paraphrasing and not exactly what you

Page 229

1        LOWITT - HIGHLY CONFIDENTIAL
2    said, but do you recall any involvement that you
3    personally did in an effort to match assets and
4    liabilities?
5            MR. BERNSTEIN:  I am going to object
6        to the form of the question.
7            You can answer the last sentence which
8        was the question part.
9        A.   Again, I think that the adjusted total
10   assets equals the total liabilities on this, so
11   some effort was undertaken to match assets and
12   liabilities per the schedule.
13       Q.   Were you personally involved in some
14   activity relating to matching assets and
15   liabilities?
16       A.   Again, I have no precise recollection,
17   but I may well have been involved in that.
18       Q.   But like you testified, you did notice
19   that the final exhibit does have a matching in
20   that the adjusted total assets is the same number
21   as the total liabilities?  You see that?
22       A.   I do see that.
23       Q.   And do you know if that was
24   coincidence or that was something that was
25   purposeful?

Page 230

LOWITT - HIGHLY CONFIDENTIAL

1
2      MR. HUME:  Objection, vague and
3  ambiguous.
4      A.    Yeah, I can't say -- I can't say
5  anything to you other than the totals do equal one
6  another.
7      Q.    If I look, Exhibit 200, which is I
8  believe the earlier -- an earlier version of the
9  schedule that has some annotations by yourself,
10  and here you see there are some -- the numbers
11  that are listed under adjusted total assets is not
12  the same as total liabilities.  You see that?
13      A.    I do see that.
14      Q.    Do you know when -- did there come a
15  time that you noticed that the schedule had those
16  matching of assets and liabilities?
17      A.    Again, I don't have a specific --
18  this -- I don't have a specific recollection of
19  that.  I do know that through the course of the
20  evening and the morning, these were updated with
21  additional information, and as you point out, the
22  Exhibit 19 does have assets and liabilities equal
23  to one another.
24      Q.    Switching topics again, I also want to
25  take you to the conversation that you had with

Page 231

LOWITT - HIGHLY CONFIDENTIAL

1
2  Mr. McDade and Mr. Ricci on Friday the 19th about
3  the process of finding additional value.  Do you
4  remember that event?
5      A.    I do.
6      Q.    Was there any time given where you
7  needed to find that amount of collateral by a
8  certain time?
9      A.    I don't recall a specific deadline for
10  that.
11      Q.    Did you have a sense for when that
12  would be needed by?
13      A.    I think my sense was the sooner, the
14  better.
15      Q.    You also testified a number of times
16  about -- that the numbers -- let's start with, for
17  example, listed on the assets in Exhibit 19
18  reflected a price that Barclays was willing to pay
19  given the size of their purchase and the
20  volatility of the market.  Do you recall that?
21      A.    I do.
22      Q.    What is your basis of your testimony
23  that that price was determined based on the
24  factors of the size of their purchase and the
25  volatility of the market?

Page 232

LOWITT - HIGHLY CONFIDENTIAL

1
2      A.    I mean, it is not based on specific
3  knowledge of what they were thinking about.  It is
4  based on my sense of what would happen in a -- in
5  any circumstance where a securities firm was
6  selling a very large block of assets.
7          They would expect that whoever was
8  purchasing that large block of assets,
9  particularly at a time of great market
10  uncertainty -- which certainly the week after
11  the Lehman bankruptcy was a time of great
12  market uncertainty -- that they would pay less
13  for those assets because they were making such
14  a large purchase and how much less they would
15  pay would also be determined by the amount of
16  volatility in the marketplace and how given
17  that volatility, the asset prices could reduce
18  before they were able to sell out their
19  positions.
20      Q.    Did you communicate with anyone at
21  Barclays about whether the reason for their
22  selection of price had to do with either the size
23  of their purchase or the volatility of the market?
24      A.    I don't recall specific conversation
25  with people at Barclays about their approach to

Page 233

LOWITT - HIGHLY CONFIDENTIAL

1
2  the valuation of the assets.
3      Q.    What about anyone at Lehman?  Did
4  anybody at Lehman say that the price that Barclays
5  was going to pay was based on the size of their
6  purchase and the volatility of the market?
7      A.    Again, I don't have a precise
8  recollection of that.  But again, I don't feel
9  that that would have been an unusual view for
10  anyone to have had.  If I had spoken with Bart or
11  Alex Kirk about that, I'm sure, I believe they
12  would have agreed that that made sense.  But I
13  don't recall a specific conversation.
14      Q.    Putting aside conversations with your
15  lawyers and this discussion today, have you ever
16  spoken to anybody about whether or not the price
17  that Barclays paid was reflective of the size of
18  their purchase and the volatility of the market?
19      MR. BERNSTEIN:  Hold on.  When you
20  said putting aside conversations with your
21  lawyers, you are including Barclays counsel?
22      MS. TAGGART:  Yes.
23      MR. BERNSTEIN:  OK, go ahead.
24      A.    The transaction that actually took
25  place was not this transaction.  It was the repo

Page 234

1    LOWITT - HIGHLY CONFIDENTIAL
2  transaction and the repo transaction, the
3  difference between the collateral delivered and
4  the cash received was driven by the standard
5  financing haircuts and so the actual transaction
6  that took place was different and there was no
7  requirement to hence operationalize this version
8  of adjusted assets being sold to Barclays.
9      Q.   I understand there is something that
10 happens after about the repo transaction, but I do
11 just want to focus on your testimony today, a
12 number of times, that the pricing that was, at
13 least in the original transaction from the 16th,
14 was based on the size of the purchase and the
15 volatility of the market.  Putting aside your
16 conversations with counsel, have you ever
17 discussed that with anybody?
18     A.   I don't have a recollection of
19 discussing that specifically with anybody, but
20 again, I would just reiterate that the notion of
21 one firm buying a large block of assets from
22 another would involve a substantial bid offer
23 spread is one that would be broadly understood by
24 market participants.
25     Q.   What exactly were you told about the

Page 235

1    LOWITT - HIGHLY CONFIDENTIAL
2  reason that these prices were less than what was
3  marked on Lehman's books referring to the prices
4  reflected on Exhibit 19?
5      A.   Again, I don't have a recollection of
6  a specific instruction with regard to that.  I was
7  aware that Barclays were willing to purchase a
8  substantial quantity of assets from the Lehman
9  estate and that what they were willing to pay for
10 those assets was less than what those were marked
11 at based on the prevailing market prices.
12     Q.   Is there anything else that you
13 actually learned from somebody, either from
14 Barclays or Lehman, prior to September 22, about
15 the basis for the pricing that Barclays used in
16 the assets that it was willing to pay for these
17 assets?
18     A.   Again, I don't have anything specific
19 with regard to why Barclays were willing to pay
20 those prices for these specific assets.  That was
21 their judgment of what they were willing to pay to
22 acquire this large quantity of assets.
23     Q.   You did testify just a bit ago that
24 you believed that some sort of discount based on
25 the size of the purchase or volatility of the

Page 236

1    LOWITT - HIGHLY CONFIDENTIAL
2  market is something that happens when securities
3  firms are selling a large block of assets.  Do you
4  recall that?
5      A.   I do.
6      Q.   Have you been in any transactions
7  where securities firms are selling large blocks of
8  asset?
9      A.   Well, in the, you know, in the prior
10 quarter, Lehman had sold substantial quantities of
11 assets in our efforts to manage down our legacy
12 positions.  But I wasn't party to those specific
13 negotiations, but I was aware that when
14 counterparties were looking to purchase blocks of
15 assets, they were looking for a big bid/offer
16 spread associated with that.
17     MR. BERNSTEIN:  Again, this may just
18 be the transcript, but what's written down
19 "big bid/offer spread."
20     THE WITNESS:  A big bid/offer spread.
21     MR. BERNSTEIN:  Good, my apologies.
22     Q.   Are you referring to specific
23 transactions?
24     A.   The transaction that I have in mind is
25 a sale of European residential securities to

Page 237

1    LOWITT - HIGHLY CONFIDENTIAL
2  BlackRock.
3      Q.   Were you involved in those
4  negotiations?
5      A.   I was not.
6      Q.   How do you know that BlackRock wanted
7  a bid off the spread in association with the
8  transaction?
9      A.   That would have been reported to me by
10 Tom Humphrey who was engaged in discussions with
11 BlackRock.
12     Q.   Do you know what BlackRock was
13 intending to do with the assets that it purchased?
14     A.   No, I don't.
15     Q.   And do you know what the amount of
16 spread it negotiated for, BlackRock negotiated in
17 this other transaction?
18     A.   I don't recall precisely what the
19 spread was.  It actually wasn't a consummated
20 transaction.  It was one that was in negotiations
21 over the quarter end and didn't end up being
22 completed.
23     Q.   Is there any other transaction that is
24 informing your testimony that you believe that
25 generally when securities firms are selling large

Page 238

LOWITT - HIGHLY CONFIDENTIAL

1      **LOWITT - HIGHLY CONFIDENTIAL**
2   **blocks of assets, they require some sort of**
3   **discount?**
4         A.  Again, I can't point to specific
5   transactions, but it was my understanding that --
6   it is my understanding that that's how the market
7   operates.  And it does seem logical to me.
8         **Q.  Do you have any other factual basis**
9   **besides your belief that that is logical?**
10        A.  I can't point to a specific
11  transaction which effects that.  I could --
12        **Q.  Anything else?**
13        A.  No.
14        **Q.  But your general belief based on logic**
15  **that securities firms selling a large block of**
16  **assets include this sort of discount -- how is**
17  **your sense of how much that discount is compared**
18  **to the haircut that financers (sic) often require**
19  **when they are giving cash for collateral?**
20        MR. BERNSTEIN:  Objection, vague and
21  ambiguous.
22        A.  I think those are just different
23  things.  One is negotiated by two parties, one of
24  whom wants to sell assets in size quickly when
25  the buyer has negotiating power and can extract a

Page 239

1      LOWITT - HIGHLY CONFIDENTIAL
2   large bid/offer spread to transact.  You know,
3   financing haircuts are set based on sort of a
4   market standard which establishes what the market
5   believes they have to take possession of the
6   collateral and sell off the collateral to generate
7   cash, they will have to sell the collateral out at
8   in order to realize the cash value that they have
9   extended.
10        Can I take a short break?
11        **Q.  Sure.**
12        (Recess)
13        **Q.  So I also want to ask you some**
14  **questions about the search for unencumbered**
15  **assets.  As I understand that, there was a long**
16  **process of trying to find what unencumbered assets**
17  **Lehman had that could be transferred to Barclays,**
18  **do you recall that?**
19        A.  I do.
20        **Q.  Of all the unencumbered assets that**
21  **Lehman located, did it give all of those to**
22  **Barclays?**
23        A.  I don't know the details of the
24  transaction that was agreed between the parties.
25        **Q.  Are you aware of any unencumbered**

Page 240

1      **LOWITT - HIGHLY CONFIDENTIAL**
2   **assets that were held back from Barclays?**
3         A.  Again, I think there was a schedule
4   that was created that represented our best
5   estimate of what the unencumbered collateral was
6   and that was the schedule that was provided to the
7   Lehman management and they then negotiated a deal
8   with Barclays.
9         **Q.  But as far as you know, there was no**
10  **unencumbered assets that you found in your search**
11  **that were held back from the transfer to Barclays,**
12  **is that correct?**
13        MR. BERNSTEIN:  Objection, no
14  foundation.  But go ahead.
15        A.  Again, we came up with what we thought
16  was the unencumbered collateral.  We realize that
17  had we had imperfect information and it may have
18  been that there was additional collateral.  It may
19  have been that some of the collateral on the
20  schedule was, in fact, encumbered and we were
21  unaware of that.  So it was a best efforts to come
22  up with a schedule that reflected collateral that
23  was not a part of the repo, as well as was
24  unencumbered and available to be transferred to
25  Barclays if that was what was agreed between the

Page 241

1      LOWITT - HIGHLY CONFIDENTIAL
2   parties.
3         **Q.  I just want to focus on what you know.**
4   **You were part of a search where you searched for**
5   **any collateral that was unencumbered that could be**
6   **transferred to Barclays.  You were part of that**
7   **search effort, right?**
8         A.  That's correct.
9         **Q.  And all of the unencumbered assets**
10  **that you were able to locate that could be**
11  **transferred, you communicated that to people at**
12  **Lehman as assets that could be transferred to**
13  **Barclays, right?**
14        A.  Yeah, that schedule was made available
15  to people, that schedule was made available.
16        **Q.  And do you personally know of any of**
17  **those assets that you found that were held back**
18  **from the transfer?**
19        A.  Again, we had a schedule of assets
20  that we believed was, were unencumbered and those
21  assets were identified and included on a schedule
22  it summed around a billion, nine of value.
23        **Q.  You personally don't know of any**
24  **assets that were determined to be unencumbered**
25  **that were held back from the agreement with**

Page 242

LOWITT - HIGHLY CONFIDENTIAL

1    **Barclays, correct?**
2    A.   I'm not aware at this point of any
3    collateral that was not included in that schedule
4    that we have talked about.
5    **Q.   And that schedule refers to the**
6    **schedule of unencumbered assets that -- well,**
7    **maybe I should ask, what schedule are you**
8    **referring to when you say that all of the**
9    **unencumbered assets were included on the schedule?**
10   A.   That we were aware of at that time
11   were included in the schedule of unencumbered
12   assets, I don't know if it is schedule B that I
13   think we have been referring to.
14   **Q.   So is it your understanding that all**
15   **of the assets that you determined were**
16   **unencumbered and could be transferred were**
17   **included on a schedule that became schedule B to a**
18   **contract with Barclays?**
19   A.   Again, I don't know that it became
20   part of the contract, but yes, all the assets that
21   we identified -- but again, I'll come back to make
22   sure there was no confusion, there may well have
23   been unencumbered collateral that we had not
24   identified and determined that it specifically was

Page 243

LOWITT - HIGHLY CONFIDENTIAL

1    unencumbered and we knew that there may well have
2    been additional collateral that we were not able
3    to determine at that point was unencumbered but
4    there may have been.  But what we had identified
5    to the point that you have been pressing on was
6    included in that schedule.
7    **Q.   When you were searching for**
8    **unencumbered collateral, did you search everywhere**
9    **you thought that unencumbered collateral might be?**
10   A.   Well, I think the search was broad,
11   but I mean in particular, there was -- there is
12   collateral in physical form that we were unsure
13   whether it was unencumbered or whether it had been
14   seized by one of the entities, so that in
15   particular was collateral that we just did not
16   know if it was unencumbered or not.
17   **Q.   But in your search that you did prior**
18   **to the closing, you searched for everywhere that**
19   **there might be collateral that was**
20   **unencumbered that could be transferred to**
21   **Barclays, right?**
22   A.   Again, I keep saying the same thing
23   which is we looked to determine what collateral we
24   could determine was unencumbered.  There may have

Page 244

LOWITT - HIGHLY CONFIDENTIAL

1    been collateral that actually was unencumbered but
2    we were unable to determine it, and as a result,
3    we would not have included it in that schedule.
4    The "we" I am talking about here is
5    very loose.  I wasn't actually involved in
6    searching for pieces of collateral.  I am
7    merely referring to the broad effort that was
8    going on involving operations and finance.
9    **Q.   The broad effort that involved**
10   **operations and finance looked everywhere that it**
11   **thought there might be unencumbered collateral and**
12   **every collateral that it could determine really**
13   **was unencumbered, you put on schedule B, right?**
14   MR. BERNSTEIN:  Two objections; no
15   foundation, asked and answered.  This really
16   ought to be the last time.
17   A.   Again, I -- I have just got to
18   reiterate what I think I have said in the previous
19   answers which is we looked broadly for all sources
20   of unencumbered collateral.  When we -- when
21   people in operations and finance were able to
22   determine to the best of their judgment that it
23   was unencumbered, then it made it on to the
24   schedule.  There was an understanding that there

Page 245

LOWITT - HIGHLY CONFIDENTIAL

1    was some collateral which, upon additional work,
2    might have been determined to be unencumbered and
3    people knew and recognized that.
4    **Q.   While you have been at Barclays, have**
5    **you been involved at all in valuing the gain that**
6    **Barclays had upon acquisition, the gain of what it**
7    **received from Lehman?**
8    A.   I've not been involved in that.
9    **Q.   You also testified earlier today that**
10   **you were not yourself involved in documenting any**
11   **of the changes to the contract that followed the**
12   **court hearing, correct?**
13   A.   I am sorry, can you be more specific
14   what you mean by changing the contract?
15   **Q.   Sure.  I think it was your**
16   **understanding that following the agreement that**
17   **was presented to the court, there was some sort of**
18   **documenting of that agreement?**
19   A.   Yeah, there was a -- and we went
20   through it as one of the e-mails, there was a
21   documentation process that needed to take place to
22   reflect the agreement that was discussed.
23   **Q.   Do you know who was involved in that**
24   **process?**

Page 246

**LOWITT - HIGHLY CONFIDENTIAL**

1
2      A.   Who was involved in the process of
3   documenting?
4      **Q.   Yes.**
5      A.   I think the main law firm was Weil.
6   Again, I don't know the specific people that were
7   involved.  I could speculate on who I think was
8   involved.
9      **Q.   First, do you know anyone at Lehman**
10  **who was involved in documenting the deal following**
11  **the court hearing?**
12     A.   Yeah, I believe Steve Berkenfeld was
13  involved, but I don't know with certainty because
14  I didn't see him actually documenting things
15  myself, but it would -- I would have expected
16  Steve to have been involved in that effort.
17     **Q.   Anybody else?**
18     A.   I can't -- there are no specific names
19  that I could give you.  Again, I could speculate
20  who I think was involved.
21     **Q.   Why don't you go ahead and speculate,**
22  **but I understand you don't know for sure.  But who**
23  **are the people you personally might ask if you**
24  **were trying to find out who documented the deal as**
25  **it changed or documenting anything following the**

Page 247

**LOWITT - HIGHLY CONFIDENTIAL**

1
2   court hearing.
3      A.   Well, again, I think the people who
4   negotiated the deal would have been involved.  I
5   think Steve, Steve Berkenfeld would have been
6   involved.  I think the senior lawyers from Weil
7   would have been involved.  I would guess that Alex
8   Kirk may have been involved.  But again, I'm
9   basing that not on any specific knowledge, I'm
10  basing that on my understanding of sort of the
11  roles that different people played at Lehman.
12     **Q.   On Sunday -- where were you Sunday, at**
13  **Weil's office, on the Sunday, September 21st, the**
14  **day before the closing?**
15     A.   Yeah, I spent a lot of the day at
16  Weil.
17     **Q.   Who else from Lehman was there at the**
18  **office with you?**
19     A.   Paolo Tonucci was there, Robert Azerad
20  was there, Bart McDade was there.  I think Alex
21  Kirk was there, that's my recollection, and Steve
22  Berkenfeld was there.  I'm sure there were others.
23  Those are the -- the listing includes those.
24     MS. TAGGART:  OK, that is all the
25  questions I have.

Page 248

**LOWITT - HIGHLY CONFIDENTIAL**

1
2   EXAMINATION BY
3   MR. OXFORD:
4      **Q.   Good afternoon, Mr. Lowitt.  My name**
5   **is Neil Oxford.  I am with the law firm of Hughes,**
6   **Hubbard & Reed.  We represent the SIPA trustee.**
7         **Could you have in front of you Exhibit**
8   **219.  If you could direct your attention to the**
9   **part of the subject line in the last sentence**
10  **where it says, "We did find 5 billion of**
11  **exchange listed options which we are**
12  **investigating."**
13        **I believe you testified that you, when**
14  **you investigated, you found what that was already**
15  **included as part of the business transaction.**
16     A.   Yes.
17     **Q.   Is that correct?**
18     A.   That is correct.
19     **Q.   Can you explain that a little further,**
20  **which part of the business transaction was this 5**
21  **billion dollars a part of?**
22     A.   Well, again, I don't have a
23  recollection of the 5 billion specifically, so
24  again, I have no recollection of where that came
25  from.  I do know that the exchange-listed sort of

Page 249

**LOWITT - HIGHLY CONFIDENTIAL**

1
2   options business was one that we came to
3   understand was included in the deal, that that
4   business was being taken over by Barclays in its
5   entirety and that was part of what had been agreed
6   to on the, I guess, on the Tuesday.
7      **Q.   Did that business deal, to your**
8   **understanding, sir, change at any point?**
9      A.   Again, I wasn't part of the final -- I
10  wasn't aware of how the whole thing was coming
11  together in the final version.  But given that it
12  was included -- the business itself was included
13  as part of the earlier transaction, the assumption
14  that we were working with was it would be included
15  in the remaining transaction and so we didn't
16  continue to do any additional work on looking for
17  value in the exchange-listed options.
18     **Q.   Just so I am clear, the**
19  **exchange-listed options you are e-mailing**
20  **Mr. McDade about in Exhibit 219 don't form any**
21  **part of the repo that we have been discussing**
22  **today, correct?**
23     A.   That's correct.  That would have --
24  the repo would have been the repo and then we were
25  looking for value in items away from that.  There

Page 250

LOWITT - HIGHLY CONFIDENTIAL
1
2  was a long list that was generated, including
3  15c3, the good faith lock-up, the TBA settlement,
4  FX settlement, and there was obviously an item
5  that somebody had identified as a potential source
6  of value which was exchange-listed options and
7  that was dropped from our investigation because
8  our understanding was that it was already included
9  in the transaction as a stand-alone business.
10     Q.   And from whom did you gain that
11  understanding, sir?
12     A.   I don't have a precise recollection of
13  who I would have got that from.  I think that -- I
14  mean to the best of my recollection, that was
15  something that Paolo Tonucci had looked into and
16  communicated, but I do know -- I do recall that we
17  didn't continue to investigate exchange-listed
18  options.  Our focus was on the 15c3 and
19  unencumbered collateral.
20     Q.   Was it your understanding, sir, that
21  Barclays was to step into the shoes of Lehman
22  insofar as Lehman owned exchange-listed options?
23     A.   Again, I didn't have a sense of what
24  was agreed to between the parties with regard to
25  this.  What I do recall was that this was a

Page 251

LOWITT - HIGHLY CONFIDENTIAL
1
2  business that was included in the transaction and
3  didn't represent a place where we should
4  investigate to determine additional sources of
5  value.  How precisely Barclays was going to engage
6  with regard to this business, I wasn't aware of.
7     Q.   Can you give me your definition of
8  what you meant by exchange-listed options in
9  Exhibit 219, please?
10     A.   Again, I --
11     Q.   What kind of assets were covered in
12  exchange-listed options as you used it in this
13  document?
14     A.   Again, I don't recall precisely --
15  there was sort of a list that identified potential
16  sources of value and exchange-listed options had
17  made it to the list and then was removed from the
18  list because it was already included in the deal.
19  So that's what I would say around that.
20        If you are asking me the more general
21  question away from this about what are
22  exchange-listed options, they are, you know,
23  derivative contracts that are listed on an
24  exchange and sort of collateralized with that
25  exchange.

Page 252

LOWITT - HIGHLY CONFIDENTIAL
1
2     Q.   In the context of the use of that
3  phrase "exchange-listed options" in this document,
4  sir, would that include short options as well as
5  long options?
6     A.   Again, in -- for the purposes of this,
7  we were engaged in an exercise to identify
8  additional sources of value and that, the
9  investigation suggested that we would not look for
10  value in exchange-listed options.  So that was --
11  we didn't do any work on exchange-listed options.
12  So what actually made it into the transaction was
13  what was agreed to between the parties and really
14  we were just, we didn't pursue as a source of
15  value which could be included in the transaction
16  potentially.
17     Q.   Again, I think I have got this, but
18  just so I am clear, to the best of your knowledge,
19  the exchange-listed options were never removed
20  from the deal between Barclays and Lehman?
21     A.   I'm not aware but -- I'm not aware
22  that -- I'm not aware either way.
23     Q.   OK.  Do you have any knowledge as to
24  whether the 5 billion dollars that's estimated
25  here for exchange-listed options includes margin

Page 253

LOWITT - HIGHLY CONFIDENTIAL
1
2  and deposits at various exchanges?
3     A.   Again, I -- I have no recollection of
4  where the 5 billion came from or what it reflects.
5  It was something that we looked at to determine if
6  it was a potential source of value, as were
7  others, and determined that it wasn't a place we
8  needed to look because it was already included in
9  the deal, was my recollection of why we didn't.
10  We found, for example, in the TBA and FX
11  settlements that there was no value in those
12  items.  So that was the investigation that we were
13  doing on the Friday.
14     Q.   Do you recall having any conversations
15  at any time, sir, in the week from 15th of
16  September until the closing on the 22nd with
17  anybody other than Mr. Tonucci about the inclusion
18  or otherwise of exchange-listed options in the
19  transaction between Lehman and Barclays?
20     A.   Again, I have no recollection of any
21  conversations besides the one with Paolo.
22     Q.   Are you able to testify any further
23  about the details of your conversation with
24  Mr. Tonucci?
25     A.   Again, the only thing that I recall

Page 254

LOWITT - HIGHLY CONFIDENTIAL

1 was that this was not an item that we needed to
2 continue to investigate because it was already
3 included in the deal.
4     Q.   OK.  I am handing what you has
5 **previously been marked in these depositions as**
6 **Exhibit 95B.  If you could take a moment to review**
7 **that document, I am going to focus primarily on**
8 **the e-mail, and let me know when you have had a**
9 **chance to do that.**
10     A.   I've read through the e-mail trail.
11     Q.   **Do you recognize this document, sir?**
12     A.   I don't have a recollection of this.
13     Q.   **You see that it is an e-mail that was**
14 **sent to you by Francis Pearn on Sunday the 21st of**
15 **September.  Do you see that?**
16     A.   I do see that, yes.
17     Q.   **And the time here is reflected, and**
18 **GMT, so it was sent to you at 4:03 p.m. eastern?**
19 **Do you have any understanding of why Mr. Pearn**
20 **would send this document to you?**
21     A.   I mean, I don't know specifically why
22 he would have.  I was the CFO of the firm and
23 Frank was in the finance department, so that might
24 be a reason why he would have included me in it.

Page 255

LOWITT - HIGHLY CONFIDENTIAL

1     Q.   **Are you familiar with the type of**
2 **report that is attached to this e-mail, sir?**
3     A.   I mean, I can't recall ever looking
4 through this report or one like it.
5     Q.   **Reading the e-mail that Mr. Pearn**
6 **sends to you and others, it says "Craig Jones**
7 **provided the OCC statements as of September 22 for**
8 **the LBI 074 account.  The first statement shows**
9 **collateral value of 522 million (cash and**
10 **government securities) in LBI.  The second file**
11 **details approximately 2 billion of collateral,**
12 **(letters of credit, cash and security).  Craig and**
13 **Dan confirmed these balances with the OCC and can**
14 **answer questions you may have."**
15     **Do you see that?**
16     A.   I do.
17     Q.   **Would you agree with me that this**
18 **e-mail Mr. Pearn -- withdrawn.**
19     **Would you agree with me that the**
20 **e-mail that Mr. Pearn sends to you reflects that**
21 **there is substantial collateral value held by LBI**
22 **at the OCC?**
23     A.   Well, it suggests there is a lot of
24 collateral at the OCC.  My recollection was at

Page 256

LOWITT - HIGHLY CONFIDENTIAL

1 some point during the week that because Lehman was
2 no longer posting margin, that the OCC sold out
3 the Lehman position and would have -- would have
4 been satisfied with whatever the obligations it
5 had were and I don't know how that -- how much
6 collateral was left after that.
7     Q.   **If you look at the first attachment,**
8 **sir.  Do you see in the middle of the page at the**
9 **top it says "activity date"?**
10     A.   I do.
11     Q.   **And that date is 9/22/08, correct?**
12     A.   Yes.
13     Q.   **And below, there is a system date and**
14 **that date is 9/20/08?**
15     A.   Yes.
16     Q.   **Does that refresh your recollection as**
17 **to the collateral that LBI owned that was posted**
18 **at OCC as of the date of this e-mail?**
19     A.   Again, I -- I don't recall spending
20 any time around the collateral at OCC on the
21 Sunday or on any of the other days.  To say we
22 were engaged in, you know, efforts to fund the
23 firm, to effect the repo, and to identify sources
24 of value and really, I didn't focus any attention

Page 257

LOWITT - HIGHLY CONFIDENTIAL

1 on this over that time period.
2     MR. OXFORD:  OK, that is all I have on
3 that document.
4     (Exhibit 228, e-mail dated 9/21/2008
5 at 8:09:34 p.m. marked for identification,
6 as of this date.)
7     A.   Do you mind if we take a short break?
8     Q.   **Sure.**
9     (Recess)
10     Q.   **Mr. Lowitt, I would like to hand you**
11 **what I have marked as Exhibit 228.**
12     A.   Yes.
13     Q.   **Which is an e-mail from Jerry Reilly**
14 **to you, Mr. Kelly and Mr. O'Meara entitled, "VIX,**
15 **V-I-X Statements," and on Sunday, the 21st, 4:08**
16 **eastern in the afternoon.  Why don't you take a**
17 **moment to read through that document.  Again, I am**
18 **going to ask you mostly about the e-mail rather**
19 **than the attachments.  Let me know when you have**
20 **had a chance to do that?**
21     A.   I have.
22     Q.   **Do you recognize this document, sir?**
23     A.   I don't.
24     Q.   **In the chain below where it is**

Page 258

**LOWITT - HIGHLY CONFIDENTIAL**

1 **LOWITT - HIGHLY CONFIDENTIAL**
2 **forwarded to you, Mr. Michael Neilson writes to**
3 **Mr. Francis Pearn and others:  Here are the**
4 **clearing house runs.  Do you know what the**
5 **clearing house runs are?**
6     A.   No, I don't.
7     **Q.   Do you know what the reference to VIX**
8 **is in the subject line?**
9     A.   I mean, I don't know.  The VIX is an
10 instrument that is associated with the volatility
11 of the equity markets.
12     **Q.   Mr. Reilly writes to you, "This has**
13 **been confirmed as a good balance.  We are going to**
14 **send to BarCap who is looking for our positions**
15 **and balances, 507 M" -- which I take it to be 507**
16 **million?  Do you see that?**
17     A.   I see that.  I don't know if that is
18 millions or thousands.  But I can see it is 507 M.
19 I'm sure you could show me that it is millions.
20     **Q.   I'm sure I could, but I'm not so sure**
21 **it matters if you don't remember the document.  Do**
22 **you remember having -- withdrawn.**
23         **Do you have any understanding of why**
24 **Mr. Reilly sent you this e-mail?**
25     A.   I don't know why he did.  I imagine he

Page 259

1 **LOWITT - HIGHLY CONFIDENTIAL**
2 was keeping -- he felt he should include me in a
3 mail because I was the CFO and he was reporting to
4 me and it would be something that he felt I would
5 want to see.
6     **Q.   From your review of this e-mail, do**
7 **you have an understanding of what he was keeping**
8 **you in the loop on?**
9     A.   I mean, that Barclays was looking for
10 information and that this was part of the
11 information and what they were looking for.
12     **Q.   Does this refresh your recollection**
13 **about the inclusion or otherwise in the business**
14 **deal between Lehman and Barclays of**
15 **exchange-traded derivatives?**
16     A.   Again, exchange-traded derivatives, I
17 was -- I spent no time on it.  It wasn't -- it
18 just wasn't a focus either for me during that
19 period.
20     **Q.   You don't recall any conversations**
21 **with Mr. Kelly about that subject?**
22     A.   I don't recall any conversations with
23 Martin about exchange-traded derivatives or about
24 this.
25     **Q.   What about Mr.  Reilly, same question,**

Page 260

1 **LOWITT - HIGHLY CONFIDENTIAL**
2 **did you have any conversations with him about the**
3 **inclusion or otherwise in the assets going to**
4 **Barclays of exchange-traded derivatives or any**
5 **assets to secure those derivatives?**
6     A.   I have no recollection of discussions
7 with either Jerry or Martin or Chris or any of the
8 folks on this e-mail about that.
9         MR. OXFORD:  That is all I have on
10     this document.
11         (Exhibit 229, e-mail dated 9/21/2008
12     at 6:20:35 p.m. marked for identification,
13     as of this date.)
14         MR. BERNSTEIN:  By the way, I
15     actually -- I should do this -- I'm assuming
16     with this and the prior document, which are
17     not Bates stamped, that Counsel has a -- it
18     is Counsel's understanding that these are,
19     in fact, attached documents in the real
20     world?
21         MR. OXFORD:  Yes, that is my
22     information.
23     **Q.   Mr. Lowitt, take your time and**
24 **whenever you're ready, let me know when you have**
25 **had a chance to review Exhibit 229.**

Page 261

1 **LOWITT - HIGHLY CONFIDENTIAL**
2     A.   Yeah, I have looked at it.
3     **Q.   It looks to me to be an e-mail from**
4 **Robert Azerad to Gary Romain at Barclays, James**
5 **Walker at Barclays, T.J. Gavenda, also at**
6 **Barclays, and you and others at Lehman are copied,**
7 **is that correct?**
8     A.   That's what it suggests on the first
9 page.
10     **Q.   It was sent on the Sunday, 21st of**
11 **September at 2:20 eastern.  The subject is**
12 **"updated opening balance sheet."  Do you see that?**
13     A.   I do.
14     **Q.   Do you recognize this document?**
15     A.   I don't recognize it.
16     **Q.   Did you have any responsibility,**
17 **direct or otherwise, for the creation of an**
18 **opening balance sheet for Barclays?**
19     A.   I am sorry, could you just repeat, did
20 you have any responsibility --
21     **Q.   Did you have any responsibility,**
22 **direct or otherwise, for the creation of an**
23 **opening balance sheet for Barclays?**
24         MR. BERNSTEIN:  Objection, vague and
25     ambiguous.

Page 262

LOWITT - HIGHLY CONFIDENTIAL

1          LOWITT - HIGHLY CONFIDENTIAL
2          You may answer.
3          Q.   Let me ask it this way:  Did you have
4     any responsibility for creating an open balance
5     sheet for Barclays?
6          A.   I don't believe I had responsibility
7     for creating an opening balance sheet for
8     Barclays.  I think we were -- we needed to provide
9     information to Barclays so that they could go
10    through their process and there was pieces of
11    information that they would have looked to from us
12    to provide, but that, you know, establishing an
13    opening balance sheet was going to be their
14    responsibility.
15         Q.   OK, did Mr. Azerad work for you?
16         A.   Robert reported in to Paolo and Paolo
17    reported to me, so Robert was in my chain.
18         Q.   Do you have any understanding that
19    Mr. Azerad created the opening balance sheet that
20    is attached to this e-mail?
21         A.   Again, I'm not in a position to say
22    who created this.  I just have no knowledge of who
23    would have done this.
24         Q.   Safe to say then you did not have any
25    involvement in creating this opening balance

Page 263

1          LOWITT - HIGHLY CONFIDENTIAL
2     sheet?
3          A.   I can't recall having any involvement
4     in creating this.
5          Q.   You see that it was sent at 2:20 p.m.
6     on Sunday the 21st?
7          A.   I do see that.
8          Q.   If you take a moment to review the
9     balance sheet and then tell me if, to the best of
10    your recollection, it accurately reflects the
11    business deal between Barclays and Lehman as you
12    understood it at the time the e-mail was sent?
13         A.   Again, I -- I didn't know all the
14    items of what went into the business deals, so
15    what I would have been aware of was that there was
16    a repo transaction, that there was the assumption
17    of liabilities for sort of bonuses or cure
18    payment, although again, I didn't know that with
19    any certainty because I didn't know that that made
20    it into the final transaction.  And I know that we
21    had been looking for, you know, additional sources
22    of value but I can't say more than that or how
23    that would have been reflected in a balance sheet
24    or what Barclays would have wanted to show in
25    their opening balance sheet.

Page 264

1          LOWITT - HIGHLY CONFIDENTIAL
2          Q.   One of those additional sources of
3     value that you have testified about at length is
4     the 15c3 lock-up release, correct?
5          A.   Yes.
6          Q.   And that's shown is there as 1 billion
7     dollars.
8          A.   That's what it is shown here.
9          Q.   You have already testified about a
10    search for other unencumbered assets that you
11    believe were valued at approximately 2 billion
12    dollars, correct?
13         A.   At 1.9 to 2 billion.
14         Q.   1.9 to 2 billion.  Do you see anywhere
15    on this spreadsheet where those unencumbered
16    assets balance at 1.9 to 2 billion dollars are
17    reflected?
18         A.   I don't see it on this schedule.  But
19    again, I don't think that the schedule would
20    necessarily have represented the transaction that
21    was agreed to.  Also -- another example, the 15c3
22    lock-up release we talked about earlier was agreed
23    to at around 760 million dollars.
24         Q.   The 5 billion dollars of
25    exchange-listed options that you included in the

Page 265

1          LOWITT - HIGHLY CONFIDENTIAL
2     subject line of Exhibit 219, do you see those
3     exchange-listed options listed anywhere in the
4     opening balance sheet marked as Exhibit 229?
5          A.   I don't see it listed.
6          Q.   Do you have any understanding of why
7     it would not be listed?
8          A.   Again, I don't know who pulled this
9     schedule together and I don't know the amount of
10    knowledge they would have had about all the
11    elements of the deal.  And even if they had known
12    about that item, I don't know if they would have
13    had any knowledge of what that was actually worth,
14    again, it wasn't something that I was aware of any
15    work that went on to determine if there was or how
16    much value there was in that and so just wouldn't
17    have known how -- I don't know how anybody would
18    have reflected it on the balance sheet.
19         Q.   Well, they could have used the 5
20    billion dollar figure that you told Mr. McDade
21    that you had found in Exhibit 219, right?
22         A.   We didn't say we had found it.  We
23    said in that exhibit that there was
24    exchange-listed options.  I don't know where the 5
25    billion came from, and I don't know if 5 billion

Page 266

LOWITT - HIGHLY CONFIDENTIAL

1  was right. But you're right, somebody could have
2  put that there. But again, I don't know who put
3  this together and I don't know what they were
4  aware of and I, again, don't know what the real
5  valuation of exchange-listed options business was.
6  And I wasn't aware of any work that was done to
7  determine that.
8      Q.    Could you just briefly have Exhibit 19
9  in front of you, please?
10     A.    Sure, 19. Do see anywhere on Exhibit
11 19 a description or a figure that includes the
12 exchange-listed options that you referenced in
13 your e-mail marked as Exhibit 219?
14         MR. HUME: Objection, vague and
15     ambiguous.
16     A.    Again, I don't know how
17 exchange-listed options turn up on balance sheets.
18 So I wouldn't know this. There is derivative
19 lines here, it's possible that it is in those
20 lines, but again, I'm just speculating. I don't
21 know where it would have turned up here.
22     Q.    OK. You testified earlier about a
23 conversion, sir. Do you remember that testimony?
24     A.    The conversion.

Page 267

LOWITT - HIGHLY CONFIDENTIAL

1
2      Q.    You used the word "conversion"?
3      A.    Actually somebody else used the word
4  "conversion," but I did say that I understood it
5  to be the movement of collateral from JP Morgan
6  Chase to BoNY to reflect the replacement of the
7  Fed repo with the Barclays repo.
8      Q.    And the way in which you used that
9  phrase "conversion" has nothing to do with the OCC
10 or exchange-traded derivatives, correct?
11     A.    That is correct.
12     Q.    You mentioned, sir, that the subject
13 of discussion on Sunday the 21st of September was
14 a series of questions about what would happen if
15 Barclays steps into the shoes of Lehman in the
16 coming weeks. Do you remember that testimony?
17     A.    I do, yes.
18     Q.    Focusing on the DTCC for the present,
19 did you tell me what your recollection is of any
20 discussions about Barclays stepping into the shoes
21 of Lehman at DTCC?
22     A.    I was aware that on the Sunday, there
23 were ongoing discussions between the Barclays
24 representatives and representatives from DTCC
25 around how that would be covered, but I was not

Page 268

LOWITT - HIGHLY CONFIDENTIAL

1
2  party to the resolution of those -- of that.
3      Q.    With whom did you discuss that issue,
4  sir?
5      A.    I don't recall discussing it with
6  anybody. There was a large forum that included
7  participants from a number of different --
8  representing Barclays and JP Morgan and DTCC and
9  creditors and others and my recollection is that
10 at a certain point, the people from Barclays and
11 people from DTCC left that group and went through
12 and talked through that issue themselves.
13     Q.    Did you have any understanding, sir,
14 that Barclays was conducting due diligence into
15 Lehman's positions at DTC during the day on Sunday
16 the 21st?
17     A.    I'm not sure I understand what the
18 word "due diligence" means, but I do know that
19 Barclays were trying to understand what the Lehman
20 obligations were vis-a-vis DTCC and what, if any,
21 were the risks that they would take on if they
22 stepped into LBI's shoes and that those were
23 discussions that they had in my recollection with
24 people in operations like Alastair Blackwell.
25     Q.    Did you ever come to have an

Page 269

LOWITT - HIGHLY CONFIDENTIAL

1
2  understanding of what Barclays concluded about the
3  risks they would take on if they stepped into
4  Lehman's shoes at DTCC?
5      A.    I was not part of that discussion and
6  I did not know where Barclays came out or what
7  their assessment of those risks were.
8      Q.    You didn't talk to Mr. Blackwell about
9  that?
10     A.    I don't recall having a conversation
11 with Mr. Blackwell about that. I do -- but I
12 don't believe that Mr. Blackwell would have been
13 aware of what Barclays' assessment of those risks
14 would have been. He would have explained the
15 risks as he understood them and it was up to
16 Barclays to make an assessment of those risks
17 themselves.
18     Q.    Do you know who at Barclays was
19 involved in assessing the risks of stepping into
20 Lehman's positions in DTC?
21     A.    Again, I wasn't party to those
22 discussions, but of the people at Barclays that
23 were involved, my recollection is that it included
24 Rich Ricci, Gerard Larocca, probably Jonathan
25 Hughes. There may be others at Barclays that were

Page 270

1          LOWITT - HIGHLY CONFIDENTIAL
2    involved in those discussions.
3        Q.   Did you ever hear, sir, that Barclays
4    had decided not to take Lehman's positions at DTC
5    because there were concerns about the liabilities
6    associated with those positions?
7        MR. HUME:  Objection, lacks
8    foundation.
9        A.   Yeah, I have no recollection of how
10   that got resolved.
11       Q.   Just a couple of questions on C3, sir.
12   Did you understand that the transfer of any assets
13   from Lehman's 15c3 reserve was conditional upon an
14   approval of the SEC?
15       MR. HUME:  Objection, calls for legal
16   speculation -- legal conclusion.
17       A.   Again, I -- what I was aware of was
18   that the resolution of the 15c3 excess was
19   uncertain because it was a formula and nobody
20   would know precisely how much excess there was
21   when the customer positions were fully unwound.
22   So there was uncertainty about what that was going
23   to -- what that number was going to eventually
24   become.
25       Q.   Was it your understanding, sir, that

Page 271

1          LOWITT - HIGHLY CONFIDENTIAL
2    the resolution of the 15c3 excess was that any
3    transfer of 15c3 excess would be conditional upon
4    the existence of an excess?
5        MR. HUME:  Objection, lacks
6    foundation, calls for a legal conclusion.
7        A.   I don't know what actually made it
8    into the contract with regard to 15c3.  What I was
9    involved with, as I have spoken about today, is
10   the efforts to identify what our best estimate of
11   what that excess was and to make that available to
12   those who are involved in negotiating to determine
13   how they were going to treat that and I don't know
14   how it was treated specifically in the final
15   resolution between Barclays and Lehman.
16       Q.   Did you understand, sir, that there
17   were certain difficulties negotiated with
18   calculating the 15c3 requirement over the weekend
19   of the 21st and 22nd of September?
20       A.   I was aware that the data that the
21   people needed to -- the data were -- there were a
22   lot of data issues associated with running the 15C
23   lock-up that weekend.
24       Q.   Did you or anybody who reported to you
25   come to the conclusion as to the existence or

Page 272

1          LOWITT - HIGHLY CONFIDENTIAL
2    otherwise of an excess in the 15c3 reserve over
3    the weekend of the 21st and the 20th of September?
4        A.   Well, again, I -- we didn't -- my
5    recollection was that the estimates of the 15c3
6    excess that had been generated earlier in the week
7    were believed to be accurate reflections and that
8    those were computed without all the dirty data
9    that was associated with all the collateral
10   movements and other issues in LBI, and so the
11   excess that had been estimated earlier was a good
12   reflection of what the excess was likely to be.
13   Because there wasn't a lot of customer activity
14   that had taken place subsequent to when those
15   earlier calculations were made.
16       Q.   What do you mean by "dirty data"?
17       A.   Well, there was a fair amount of chaos
18   in the marketplace towards the end of that week.
19   There was a lot of fails.  There was items that
20   weren't being posted accurately and those were all
21   elements that made the computation of 15c3
22   difficult that weekend.
23       Q.   Did you ever come to have an
24   understanding, Mr. Lowitt, that there was a change
25   in the deal between Lehman and Barclays and that

Page 273

1          LOWITT - HIGHLY CONFIDENTIAL
2    change was that no cash was to be transferred from
3    Lehman to Barclays?
4        A.   Again, I was not part of the
5    negotiating teams and I wasn't aware of what was
6    agreed to between the two parties.  So I would
7    have no view on whether that was agreed to or not
8    agreed to.
9        Q.   Nobody ever told you that?
10       A.   No, I don't recall.
11       Q.   Even subsequent to the transaction,
12   did anyone ever discuss the inclusion or otherwise
13   of cash in the deal between Lehman and Barclays?
14       MR. HUME:  Obviously excluding any
15   conversations with counsel for Barclays or
16   your own counsel.
17       Q.   I offer the same caveat as Mr. Gaffey,
18   I am not looking for --
19       A.   I have no recollection of anybody
20   indicating that the transfer of cash was not --
21   was excluded from the deal in any way.  It was
22   just no discussion one way or the other with me
23   that I recall.
24       MR. OXFORD:  Can I mark this as my
25   last one.

Page 274

1          LOWITT - HIGHLY CONFIDENTIAL
2          (Exhibit 230, e-mail dated 9/22/2008
3      at 11:53:18 a.m. marked for identification,
4      as of this date.)
5          Q.    This, I promise, Mr. Lowitt is my last
6      exhibit which I have marked as Exhibit 230.  It is
7      an e-mail from you to Mr. Tonucci at 11:53 a.m.
8      Greenwich Mean Time so 7:53 Eastern on the 22nd.
9      And below, Mr. Tonucci writes to you and
10     Mr. McDade on the subject of closing call saying,
11     "Cash should go in the next five minutes.
12     Congratulations!  Paolo."  And you reply, "What a
13     relief!!  Ian."  Do you see that?
14         A.    I do.
15         Q.    Do you have any understanding of what
16     Mr. Tonucci meant by his reference to cash going
17     in the next five minutes?
18         A.    I don't have a specific recollection.
19     Again, if I was speculating, it would be the cash
20     from Barclays to Lehman to effect the transaction
21     would move and that that was establishing that the
22     transaction was actually closing.  And my response
23     is it is actually done.  Because I think we knew
24     that it needed to happen before 8 o'clock when the
25     markets opened.

Page 275

1          LOWITT - HIGHLY CONFIDENTIAL
2          Q.    You made it by 7 minutes.
3          A.    It was a stressful time.
4          Q.    I'm sure it was.
5              MR. OXFORD:  I have no further
6      questions for you at this time.  Thank you,
7      sir.
8              THE WITNESS:  Thank you very much.
9              MR. GAFFEY:  Just one or two to follow
10     up, I promise.
11     EXAMINATION BY
12     BY MR. GAFFEY:
13         Q.    Mr. Lowitt, in response to --
14     Ms. Taggart asked you a series of questions about
15     the logic behind the discount behind the idea of a
16     discount applying to a large transaction by a
17     firm.  You said, and I think I have the words
18     here, I am if I am a little off forgive me, if
19     anyone had spoke to Bart or Kirk, they would agree
20     it made sense, but I don't recall a specific
21     conversation.  And that was in the context of
22     talking about these bulk prices.
23         Do you know who on the Lehman side of
24     the table decided that the point was negotiable
25     at all?  Who decided that it was negotiable

Page 276

1          LOWITT - HIGHLY CONFIDENTIAL
2      whether Lehman would take less than the marks
3      shown on its books for its securities?
4          A.    I don't.  It is a question for you to
5      ask those people who were involved in the
6      negotiations.
7          Q.    The reason I ask you, you made a
8      reference to Bart or Kirk.  I assume Bart is Bart
9      McDade and Kirk is Alex Kirk?
10         A.    Yes.
11         Q.    Is there a reason Alex Kirk is a
12     person who might have some information on that?
13         A.    Well, Alex was running our principal
14     business and was involved in the -- was close to
15     Bart and was engaged in the negotiation as best I
16     understood it.  So that was the reason I included
17     those two names and they would both be very
18     knowledgeable about capital markets and how one
19     disposes of big blocks of assets.
20         Q.    And my question as to who made the
21     decision as to whether it was appropriate to
22     negotiate at all was a very broad one.  It doesn't
23     go to the process that you spoke about before of
24     determining what it was.  Who made the
25     determination, all right, we will talk to Barclays

Page 277

1          LOWITT - HIGHLY CONFIDENTIAL
2      about selling assets for less than we carry them
3      on our books and you don't know who it was who
4      made that decision?
5          A.    I'm not aware of who would have made
6      that decision.
7          Q.    OK, and Mr. Oxford asked you a
8      question about the conversion which is a topic
9      that I had raised with you earlier and
10     unfortunately for you, it reminded me of a
11     document that I promise you I won't be very long
12     with it.
13         (Exhibit 231, document Bates stamped
14     10254271 (two pages) marked for
15     identification, as of this date.)
16         Q.    Take a look at the document,
17     Mr. Lowitt, sufficiently to determine if you
18     remember seeing it today.
19         A.    Yeah, I have read it.
20         Q.    Have you seen the document before
21     today?
22         A.    I don't recall seeing it before.
23         Q.    I would direct your attention to
24     the -- again, the top two lines which we are
25     disregarding, "administrator" and "sent," below

Page 278

LOWITT - HIGHLY CONFIDENTIAL

1  that, the latest e-mail in the chain is from you
2  to Alastair Blackwell, Robert Azerad entitled,
3  "The Conversion," where you say, "Need people to
4  work all night on it.  Need to know we can get
5  BarCap their money by Sunday night.  We had a list
6  we showed them.  Can we not give them that
7  collateral.  Robert produced it.  Ian."  Would you
8  take a look there?
9     A.  Yeah.
10    Q.  And then if you go to the very bottom,
11 the very last e-mail, and that is from a Nancy
12 Reyda to the ITD war room on the previous evening,
13 Friday, September 19, at about 8:08 p.m.
14    A.  I do see that.
15    Q.  And she writes to the war room, "As
16 you all probably know by now, the asset move was
17 orchestrated in such a way that the conversion
18 move was not needed this weekend.  We will regroup
19 on Monday to discuss these next steps."  Do you
20 see that?
21    A.  I do.
22    Q.  Having seen the two ends of this
23 e-mail conversation where Nancy Reyda is telling
24 the war room that the asset transfer was

Page 279

LOWITT - HIGHLY CONFIDENTIAL

1  orchestrated in such a way that we can go home,
2  and you say no, everybody needs to work all night,
3  does that refresh your recollection as to what the
4  conversion was?
5     A.  I think the conversion here is
6  different than the conversion that I have been
7  talking about.  So the conversion that I was
8  referring to, without the benefit of this was just
9  the movement of assets from the JP Morgan to BoNY
10 to effect the repo.
11       Again, I don't have a recollection of
12 this, but what I think Nancy is sharing with
13 people is that there is no requirement to move
14 the assets in the way that was envisaged in the
15 original transaction, which was moving large
16 amount of specific assets and at specific
17 prices to Barclays in one way or another.  And
18 then the -- my mail at the top, again, I am
19 doing this by just reading through this -- is
20 saying that the reserve formula requires recs.
21 R-E-C-S to be run and processed,
22 reconciliations, and that what I am saying in
23 this is that we actually need to, we need to
24 work on those reconciliations so we can update

Page 280

LOWITT - HIGHLY CONFIDENTIAL

1  the reserve formula.  The reserve formula would
2  be referring to the 15c3 lock-up and then my
3  mail is really referring to that income
4  collateral.  So it seems to be a combination of
5  a number of different things in this chain.
6     Q.  And in the middle of that sequence is
7  an e-mail from Alastair Blackwell to you and
8  Gerard Larocca, September 27, 10 p.m., asking,
9  "FYI, what do you want us to do here, use Thursday
10 night or can it wait until tomorrow?"
11       Do you understand what is meant by use
12 Thursday night?
13    A.  Again, I'm basing that on what goes
14 below that.  But usually 15c3 lock-up calculation
15 that was calculated on the Thursday night.
16    Q.  OK.
17    A.  Rather than having to rerun it and
18 then to the questions that we had a little while
19 ago about the need to rerun the 15c3 over the
20 weekend, that was -- that was work that needed to
21 get done in order to run that 15c3.
22    MR. GAFFEY:  Thanks, I have nothing
23    else.
24    MR. HUME:  I have I am sorry, to do

Page 281

LOWITT - HIGHLY CONFIDENTIAL

1  this.  I have two things to quickly clean
2  up.
3  EXAMINATION BY
4  MR. HUME:
5     Q.  Mr. Lowitt, if you look at Exhibit 229
6  that Mr. Oxford showed you.  Do you have Exhibit
7  229 in front of you?
8     A.  I do.
9     Q.  If you look at the spreadsheet
10 attached or schedule attached, Mr. Oxford asks you
11 first whether you saw the unencumbered collateral
12 that has been talked about today of approximately
13 1.9 billion or 2 billion on this schedule.  Do you
14 remember him asking you that?
15    A.  I do.
16    Q.  I think you may have said that you did
17 not see it in there.  And I just wanted to ask
18 you, you see that there is a cash number of 7
19 billion represented.  Do you see that?
20    A.  I do.
21    Q.  And then you see there is an inventory
22 of a variety of classes of securities.  Do you see
23 that?
24    A.  I do.

Page 282

LOWITT - HIGHLY CONFIDENTIAL

1
2      Q.    And that inventory totaled 44.8
3 billion. Do you see that?
4      A.    I do.
5      Q.    Which if you add the inventory and the
6 cash, you get to 51.8 billion.  Do you see that?
7      A.    I do.
8      Q.    And do you recall saying earlier that
9 your general recollection was that the repo
10 collateral had a value at least from Chase of
11 about 49.7, I think, or 49.9 billion, something
12 like that.  Do you recall that?
13      A.    I do.
14      Q.    Is it possible -- first let me ask
15 you, do you know -- did you prepare this schedule?
16      A.    I did not prepare this schedule.
17      Q.    Do you know that the unencumbered
18 assets, the approximately 1.9 billion or 2 billion
19 is not included within the inventory?
20      A.    I don't know that and as you show what
21 the sum of the numbers are, at close to 52 billion
22 dollars, it is quite plausible that the 1.9
23 billion dollars of unencumbered collateral is
24 included in inventory for the purpose of this, but
25 again, I didn't prepare it and I don't know with

Page 283

LOWITT - HIGHLY CONFIDENTIAL

1
2 certainty if it is.
3      Q.    Mr. Oxford also asked you if you
4 saw -- and here I just don't know whether the
5 question was clear.  He asked you if you saw the 5
6 billion of exchange-listed options which he took
7 as a phrase from another exhibit, Exhibit 219.  Do
8 you remember him asking you that?
9      A.    I do remember him asking me that.
10      Q.    And you said you did not see that on
11 this schedule, Exhibit 229.  Do you recall giving
12 that answer?
13      A.    I do recall giving that answer.
14      Q.    Now, do you see a listing of 5 billion
15 on the schedule?  Let me ask the question this
16 way:  Was your answer that you did not see the 5
17 billion for exchange-listed options or that you do
18 not believe it is possible that exchange-traded
19 derivatives of any kind are listed on this
20 schedule?
21      MS. TAGGART:  Object to form.
22      A.    I mean, I see under inventory a number
23 that says "derivatives and other contracts."
24      Again, I didn't create this schedule
25 and I probably didn't spend enough time

Page 284

LOWITT - HIGHLY CONFIDENTIAL

1
2 reviewing it.  I was saying I didn't see a line
3 that referred explicitly to exchange-traded
4 options and I didn't see a 5 billion dollar
5 number.
6      Again, I don't know how the schedule
7 was created and it is possible that it includes
8 an estimate for what the exchange-traded
9 options are.  I can't say one way or the other.
10      MR. HUME:  I have no further
11 questions.
12      I do want it state for the record that
13 Exhibit 217, I have been informed -- and we
14 can address this off line -- I just want to
15 state it on line, from our production
16 people, it is not an integrated document.
17 All these sheets marked together as Exhibit
18 217 are not a single document but multiple
19 documents.  We will have to address it off
20 the record.
21      MR. GAFFEY:  Sounds like a vendor
22 issue.
23                - - - -
24
25

Page 285

LOWITT - HIGHLY CONFIDENTIAL

1
2 EXAMINATION BY
3 MR. OXFORD:
4      Q.    I have one question based on Mr.
5 Hume's question.  You just said with respect to
6 Exhibit 229 that it was possible that the
7 spreadsheet attached to the e-mail included a line
8 item for derivatives, is that correct?
9      A.    Again, I see under "inventory
10 derivatives and other contracts."
11      Q.    What's the value of that entry, sir?
12      A.    It looks like 80.
13      Q.    And when you say 80, do you mean 80
14 million dollars, sir?
15      A.    It doesn't say what the unit is, but
16 given the other numbers, it seems that it would be
17 80 million.
18      Q.    Well, you managed to answer my
19 question about a thousand for C3 lock-up release
20 meant 1 billion dollars, right?
21      A.    Right.
22      Q.    And you managed to answer Mr. Hume's
23 question that figure of 7000 for cash is 7
24 billion?
25      A.    Yes.

Page 286

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.    So it is fair to assume that the
3    figure of 80 against the line items of derivatives
4    and other contracts is 80 million dollars,
5    correct?
6        MR. BERNSTEIN:  Asked and answered.
7    A.    Yes, I did say it was 80 million
8    dollars.
9    Q.    Do you see anywhere on Exhibit 229 an
10    entry that reflects, separate and apart from the
11    "derivatives and other contracts" line any entry
12    for margin or deposits at the UCC or any other
13    exchange?
14        MR. HUME:  Objection, the document
15        speaks for itself.
16    A.    Again, I didn't develop the schedule.
17    I don't know precisely what makes it into the
18    different lines.  The words "margin" or -- and
19    "OCC," I don't see on the schedule.
20    Q.    And do you see any other entry under
21    the subheading of inventory in which margin or
22    deposits at OCC or elsewhere would naturally fit?
23    A.    I didn't generate the schedule so I
24    don't know where somebody might have done that,
25    but the inventory categories of governments and

Page 287

1    LOWITT - HIGHLY CONFIDENTIAL
2    equities and mortgages and corporate debt,
3    commercial paper and derivatives and other, you
4    would imagine it would be in the derivatives line
5        (Continued on next page for jurat)

Page 288

1    LOWITT - HIGHLY CONFIDENTIAL
2    if it was anywhere.
3        MR. OXFORD:  OK.  Thank you, no
4    further questions.
5        MR. BERNSTEIN:  Both Mr. Lowitt and
6    Mr. Kelly reserve the right to read the
7    deposition and provide errata.  Depositions,
8    and provide errata.
9        (Time noted:  5:51 p.m.)
10
11    _____
12        IAN LOWITT
13
14    Subscribed and sworn to
15    before me this     day
16    of August, 2009.
17
18    _____
19
20
21
22
23
24
25

Page 289

1    LOWITT - HIGHLY CONFIDENTIAL
2        INDEX:
3    WITNESS        EXAM BY:        PAGE:
4    I. Lowitt    Mr. Gaffey    6, 276
5                Ms. Taggart    216
6                Mr. Oxford    248, 285
7                Mr. Hume    281
8
9        EXHIBITS
10    Exhibit No.            Marked
11    Exhibit 216 document Bates stamped        30
        BCI-EX77335 through 37
12    Exhibit 217 document Bates stamped        97
        BCI-EX00115595 through 654
13    Exhibit 218 document Bates stamped 42628    146
    Exhibit 219 document Bates stamped 138017    148
14    Exhibit 221 document Bates stamped 137537    154
    Exhibit 220 document Bates stamped    161
15        10298186
    Exhibit 222 e-mail dated 9/20/2008 at    173
16        1:42:32
    Exhibit 223 document Bates stamped    181
17        10293506
    Exhibit 224 four-page e-mail dated    184
18        9/20/2008 at 6:12 p.m.
    Exhibit 225 two-page document Bates    189
19        stamped 77882
    Exhibit 226 e-mail dated September 21,    199
20        2008 at 2:15 p.m.
    Exhibit 227 two-page document Bates numbed    203
21        70327
    Exhibit 228 e-mail dated 9/21/2008 at    257
22        8:09:34 p.m.
    Exhibit 229 e-mail dated 9/21/2008 at    260
23        6:20:35 p.m.
    Exhibit 230 e-mail dated 9/22/2008 at    274
24        11:53:18 a.m.
    Exhibit 231 document Bates stamped    277
25        10254271 (two pages)

Page 290

```
1        LOWITT - HIGHLY CONFIDENTIAL
2
3              CERTIFICATE
4    STATE OF NEW YORK )
5                      )ss:
6    COUNTY OF NEW YORK)
7        I, MARY F. BOWMAN, a Registered
8    Professional Reporter, Certified Realtime
9    Reporter, and Notary Public within and for
10   the State of New York, do hereby certify:
11       That IAN LOWITT, the witness whose
12   deposition is hereinbefore set forth, was
13   duly sworn by me and that such deposition is
14   a true record of the testimony given by such
15   witness.
16       I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage and that I am in no way
19   interested in the outcome of this matter.
20       In witness whereof, I have hereunto
21   set my hand this 20th day of August, 2009.
22
23       _____
24       MARY F. BOWMAN, RPR, CRR
25
```

Page 291

```
1         LOWITT - HIGHLY CONFIDENTIAL
2           * * *ERRATA SHEET* * *
3    NAME OF CASE:  In Re:  Lehman Brothers, Inc.
4    DATE OF DEPOSITION:  8/20/09
5    NAME OF WITNESS:  Ian Lowitt
6    Reason codes:
7       1. To clarify the record.
        2. To conform to the facts.
8       3. To correct transcription errors.
9
10   Page ____ Line ____ Reason____
     From _____ to_____
11
12   Page ____ Line ____ Reason____
     From _____ to_____
13
14   Page ____ Line ____ Reason____
     From _____ to_____
15
16   Page ____ Line ____ Reason____
     From _____ to_____
17
18   Page ____ Line ____ Reason____
     From _____ to_____
19
20   Page ____ Line ____ Reason____
     From _____ to_____
21
22   Page ____ Line ____ Reason____
     From _____ to_____
23
24       _____
             IAN LOWITT
25
```

**A**

**ability (9)**
70:25 95:13 97:5
121:2 143:12
176:23 182:24
183:4 209:12
**able (8)**
67:25 125:7 139:16
232:18 241:10
243:3 244:22
253:22
**absence (2)**
34:6 140:9
**absent (1)**
135:6
**absolutely (2)**
124:4,5
**absorb (1)**
95:13
**accept (1)**
156:21
**accepted (5)**
32:12 117:23 160:22
177:7 225:2
**accepting (1)**
227:12
**access (2)**
199:7,19
**accomplish (1)**
204:3
**account (2)**
79:3 255:9
**accounts (3)**
170:6 195:9 199:8
**accrual (3)**
53:16,21 54:2,9,11
212:11,19,24 213:8
213:16,19,19
214:12
**accruals (1)**
212:25
**accrued (3)**
54:4 211:8,9
**accruing (1)**
54:7
**accuracy (1)**
12:4
**accurate (8)**
41:14,21,24 43:15,17
48:8 196:22 272:7
**accurately (3)**
12:3 263:10 272:20
**achieve (2)**
89:18,25
**achieved (2)**
175:21 176:4
**acquire (3)**
136:7,9 235:22
**acquired (1)**
226:21

**acquisition (5)**
12:17 16:4 78:25 80:4
245:7
**acted (2)**
10:21 11:4
**acting (2)**
57:19 58:8
**action (1)**
290:17
**activities (10)**
13:7 23:7,20 24:15
25:23 40:5 52:24
56:13 158:7 175:3
**activity (11)**
36:12 52:13 65:18
67:24 183:14
210:22,25 219:22
229:14 256:10
272:13
**actual (4)**
68:12 185:24 212:25
234:5
**add (6)**
71:15 89:20 165:19
183:18 188:19
282:5
**added (1)**
126:4
**adding (2)**
78:11 128:9
**addition (9)**
14:13 21:5 24:5 46:20
53:11 54:10 192:3
192:24 193:16
**additional (72)**
18:7 53:11 59:12 60:4
61:3,4,8,20,25 62:9
62:14,17,22 63:7,10
63:16,17 64:11,25
65:17,25 66:7,12
102:8,12,20 103:11
104:3,8 105:7,15
120:24 126:14
147:8,12 148:12
150:14,18 151:22
151:23 152:20,22
154:11 158:6
163:17 172:7,9,18
172:20 173:16
175:13,19 176:5
181:5,16 183:9,18
183:19 196:22
198:23 201:22
222:15 230:21
231:3 240:18 243:3
245:2 249:16 251:4
252:8 263:21 264:2
**additionally (1)**
192:4
**address (5)**

136:6 159:16 182:15
284:14,19
**addressed (5)**
66:23 67:18 106:18
136:4 194:19
**adequately (1)**
78:17
**adjust (3)**
28:6 87:18,20
**adjusted (5)**
228:7 229:9,20
230:11 234:8
**adjusting (1)**
209:21
**adjustment (5)**
87:21,22 88:25 90:25
204:4
**administer (1)**
5:18
**Administered (1)**
1:8
**administrative (3)**
10:21,23 11:4
**administrator (1)**
277:25
**advantage (1)**
167:14
**advice (1)**
24:12
**afraid (4)**
83:17 84:6 191:5
224:25
**Africa (2)**
7:17,21
**afternoon (8)**
66:13 104:18,20
120:2 185:23 196:3
248:4 257:17
**agencies (7)**
88:22 89:4,8 226:8,9
226:12,14
**agency (1)**
81:14
**agent (3)**
29:10 116:6,7
**aggregate (3)**
147:16 166:4 174:12
**ago (8)**
27:18 82:14 102:6
122:20 144:16
161:25 235:23
280:20
**agony (1)**
14:24
**agree (11)**
19:4 31:13,14 46:15
46:17,18 63:22
135:21 255:18,20
275:19
**agreeable (1)**

43:13
**agreed (34)**
5:5,9,15 45:6,8 51:2
72:12 73:13,18,25
75:7 92:13 111:18
115:5 162:11
175:14 183:3,24
214:2,15 216:6
228:12,14 233:12
239:24 240:25
249:5 250:24
252:13 264:21,22
273:6,7,8
**agreeing (1)**
42:17
**agreement (60)**
15:9 18:25 19:22 22:6
31:5,8,12,18,19
33:10 38:6,25 44:2
44:7 45:12 50:16
51:19 52:18 53:2,5
53:7 55:3 56:2 71:8
71:9 90:9 110:2,21
111:6,7,17 112:2,8
112:10 123:15
133:3,5 156:6
196:21,24 197:25
197:25 198:5
203:25 204:12
205:3,6,8 213:23
218:19,24 224:7,13
224:20 227:15
228:12 241:25
245:17,19,23
**agreements (2)**
198:17 205:11
**agriculture (1)**
226:5
**ahead (7)**
27:11 52:7 99:22
126:20 233:23
240:14 246:21
**AIG (1)**
115:9
**Ajay (1)**
16:21
**al (1)**
1:8
**Alastair (13)**
14:17 63:14 168:24
180:16 182:8
184:23 190:13
196:13,19 201:18
268:24 278:3 280:8
**Alex (11)**
36:16 123:10,17
124:3,7 233:11
247:7,20 276:9,11
276:13
**allocate (1)**

132:8
**allocation (1)**
137:7
**allowed (2)**
119:4 212:2
**all-nighter (1)**
103:7
**all-nighters (1)**
103:9
**alternative (1)**
145:8
**Alvarez (1)**
4:25
**amateur (1)**
78:10
**ambiguous (20)**
23:10 30:18 42:20
47:8,12 64:4 71:14
78:7 82:5 105:12
117:14 174:9
186:16 210:12
218:9 228:6 230:3
238:21 261:25
266:16
**amended (1)**
71:10
**Amendment (2)**
55:2 56:2
**Americas (2)**
8:17 200:8
**amount (91)**
18:11 28:14,18 31:15
31:19 34:16 42:13
42:25,25 43:3,7,8
43:20,21,24 44:11
44:11,21,21 45:10
45:13 47:23 48:13
48:16 63:5 68:7
72:10,11 73:11,13
79:15,17 81:22
82:11,12 89:8 90:6
90:11,11,13,15
91:20 96:16,17,18
96:19 97:3,4 118:3
118:5 122:16,18
137:3 143:22
144:17 148:5
152:11 162:12,24
163:6,20,22,22
164:4,19,20 165:14
166:17 177:15
188:9 189:21,24
201:3 204:8 207:18
207:20 208:11
209:17,18 210:21
211:7,9,11 214:2
224:6 231:7 232:15
237:15 265:9
272:17 279:17
**amounts (4)**

19:17 81:16,18
162:23
**analysis (2)**
98:18 100:11
**Angeles (1)**
4:6
**anniversaries (1)**
18:8
**anniversary (2)**
19:16 32:23
**annotations (4)**
87:13 90:24 211:5
230:9
**answer (34)**
7:9 23:11 45:22 58:13
67:3 70:4,15,22
74:12 75:20 76:19
85:11,11 94:22
117:15 130:23
158:21 160:19,21
165:22 176:8 178:4
193:21 207:19
227:3 228:6 229:7
255:15 262:2
283:12,13,16
285:18,22
**answered (14)**
45:21 65:21 74:8
103:13 134:8
154:10 163:3
165:16 176:7 178:3
181:10 202:22
244:16 286:6
**answering (1)**
57:23
**answers (3)**
6:25 59:2 244:20
**Anthony (2)**
20:21,22
**anticipated (1)**
195:15
**anticipating (1)**
95:6
**anxious (2)**
177:11,19
**anybody (16)**
21:9 50:3 61:16 62:6
65:11 113:12 233:4
233:16 234:17,19
246:17 253:17
265:17 268:6
271:24 273:19
**anyway (3)**
183:7 184:16 193:5
**apart (10)**
52:4 73:9 86:19 140:3
158:5 183:13 188:7
192:6,7 286:10
**apologies (2)**
169:10 236:21

**apologize (2)**
15:2 85:13
**apparent (1)**
111:4
**apparently (2)**
171:23 201:14
**APPEARANCES (2)**
3:2 4:2
**appears (5)**
98:25 107:23 110:15
111:23 149:5
**append (1)**
196:24
**applied (8)**
26:20 27:15 29:20
132:22 169:15,19
170:12 171:22
**apply (2)**
27:23 135:7
**applying (2)**
7:8 275:16
**appointed (1)**
9:10
**appreciation (1)**
108:13
**apprised (1)**
22:12
**approach (2)**
139:11 232:25
**appropriate (2)**
113:21 276:21
**approval (2)**
174:15 270:14
**approve (4)**
68:16,22 69:8,10
**approved (15)**
46:9,13 50:10 59:3,8
66:23 67:8,11 68:15
69:11,12,16 173:18
174:5,16
**approximately (11)**
48:18 77:21,24 78:5
104:17 125:10
177:8 255:12
264:11 281:13
282:18
**April (2)**
8:20 9:18
**area (2)**
159:11 180:4
**argumentative (2)**
178:3 202:14
**arises (1)**
46:22
**arising (1)**
6:12
**Aronow (6)**
168:21,25 169:10,23
170:10 171:11
**arose (1)**

208:16
**arranging (2)**
25:2 30:10
**arrive (1)**
164:15
**arrived (1)**
226:16
**ARS (1)**
114:6
**ascribed (2)**
29:21 209:19
**aside (7)**
52:9 102:4 225:8
227:15 233:14,20
234:15
**asked (40)**
26:2 45:20 49:3 60:13
62:13 63:21 65:20
67:2 68:14 70:7
74:7 86:13 89:11
99:23 103:12
115:19 119:9 123:9
124:2 134:7 154:9
156:10 160:20,22
161:25 163:2
164:13 175:18
176:6 178:2 181:9
202:21 207:17
225:9 244:16
275:14 277:7 283:3
283:5 286:6
**asking (26)**
43:6 52:8,22 56:11
67:7 69:15 70:21
72:2,14 92:8 112:4
113:12 114:3
128:13 155:19
175:23 192:15,18
194:9 202:16
215:25 251:20
280:9 281:15 283:8
283:9
**asks (1)**
281:11
**aspects (1)**
212:16
**assert (5)**
57:22 58:4,4,5,7
**assess (3)**
97:7 113:20 170:8
**assessed (1)**
227:11
**assessing (2)**
170:7 269:19
**assessment (5)**
114:17 162:5 269:7
269:13,16
**asset (32)**
37:5,10 51:19 53:12
55:3 56:2 81:9,11

81:13,17,19,20,22
81:23 82:7 87:6,25
88:22 112:8 132:17
163:5,7 164:5
185:15 208:8,11,12
228:20 232:17
236:8 278:17,25
**assets (187)**
6:14 16:4 22:21 35:22
36:5 37:15,20 39:14
39:18,23 40:2,6,21
40:24 41:4,6,6,9,17
42:12,18,22,23,25
43:20 44:15 45:25
47:15 53:13 68:6
69:4 72:10 73:12
80:14 81:23 82:10
87:22 88:14 91:9,25
92:3,11,25 93:19
94:3,10 95:7,11
96:17,18 97:5 105:9
105:21 109:21,23
110:6,7 112:15,21
112:23,24,25 113:3
113:4,9,13,14,17
114:5,12,19,20
121:11,14 126:4
127:14 128:19
129:7 130:15
131:18,23 132:2,9
132:12,15,18,21
134:18,20 135:10
136:6 138:4,15,19
141:2,9,10 143:21
152:20,22 162:22
163:7,8,12,23 164:4
166:3,11,11 167:20
172:19,20 175:19
176:5 181:6 185:15
200:19 201:7
205:15 206:6 214:3
220:18 226:4,5,21
227:21 228:4,8,10
228:21,24 229:3,10
229:11,14,20
230:11,16,22
231:17 232:6,8,13
233:2 234:8,21
235:8,10,16,17,20
235:22 236:3,11,15
237:13 238:2,16,24
239:15,16,20 240:2
240:10 241:9,12,17
241:19,21,24 242:7
242:10,13,16,21
251:11 260:3,5
264:10,16 270:12
276:19 277:2
279:10,15,17
282:18

**asset-by-asset (8)**
129:15,18 133:2
162:5 163:16,18
165:24 166:14
**assistance (1)**
115:10
**assisting (2)**
34:12 191:22
**associate (1)**
84:5
**associated (15)**
46:3 53:13 99:24
124:10 126:7
136:10 171:8 215:4
215:6 226:20
236:16 258:10
270:6 271:22 272:9
**associates (1)**
72:25
**association (1)**
237:7
**assume (12)**
53:8,10 104:20 111:9
153:18 170:4
190:17 224:21
225:25 228:9 276:8
286:2
**assumed (7)**
50:9 75:5 96:12,20
97:14 211:5 227:15
**assuming (6)**
80:16 111:11 185:16
213:21 220:19
260:15
**assumption (6)**
84:13 111:13,13,14
249:13 263:16
**assuring (1)**
183:10
**attached (9)**
98:18 99:4,8 255:3
260:19 262:20
281:11,11 285:7
**attachment (1)**
256:8
**attachments (1)**
257:20
**attend (3)**
56:22 57:3 115:19
**attended (5)**
7:16,20 49:18 50:7
103:2
**attending (1)**
49:21
**attention (8)**
91:2 105:14 123:16
136:20 171:4 248:8
256:25 277:23
**attorneys (7)**
3:4,11,17 4:4,10,16

5:6
**attorney/client (1)**
75:21
**attributed (2)**
81:16,18
**Aublin (1)**
113:25
**auction (3)**
110:23 112:16 141:16
**audible (1)**
6:25
**August (4)**
1:15 2:5 288:16
290:21
**authorized (1)**
5:17
**available (18)**
100:3 120:15 121:5
121:20 122:11,18
124:14,23 125:25
126:5 143:6 199:4
202:19 213:25
240:24 241:14,15
271:11
**Avenue (2)**
3:12 4:11
**awards (3)**
32:23 54:12 180:24
**aware (51)**
13:11 27:16 30:7
37:20 38:12,14
42:10 50:11,12
53:17 59:23 60:2
77:15,19 82:21
100:4 114:14
120:10 129:14
140:7 143:15
152:16 156:4 171:6
172:7,15,16 194:8
205:25 209:22
222:22 235:7
236:13 239:25
242:3,11 249:10
251:6 252:21,21,22
263:15 265:14
266:5,7 267:22
269:13 270:17
271:20 273:5 277:5
**Azerad (14)**
154:3 175:16 184:23
185:11,14 188:14
196:14 203:25
222:10 247:19
261:4 262:15,19
278:3
**A-R-O-N-O-W (1)**
168:22
**a.m (21)**
2:6 106:24 114:2
123:11 136:24

156:20 159:21
176:12 185:11
196:18,19 197:5,9
197:20 203:18,20
203:23 225:19
274:3,7 289:24

——————————
**B**

**B (3)**
242:13,18 244:14
**back (30)**
19:6 20:13 27:3 35:9
35:11 48:2,23 72:12
73:13 91:22,24 92:9
93:4 95:15 102:5
113:10 116:4,22
118:11 126:13
154:22 161:21
170:20 197:12
215:21 240:2,11
241:17,25 242:22
**backwards (1)**
125:9
**bad (1)**
142:8
**balance (23)**
95:10 184:25 185:6
214:4,8,12 215:6
258:13 261:12,18
261:23 262:4,7,13
262:19,25 263:9,23
263:25 264:16
265:4,18 266:18
**balances (2)**
255:14 258:15
**bank (4)**
149:19,20 167:18
219:18
**bankruptcy (29)**
1:2 12:23 13:6,21
15:8,18 20:6 22:3
24:18 34:2,6 56:23
57:3 66:14 99:25
104:15 145:10,20
145:21,24 146:4
155:20 156:7
173:25 174:5,12
180:22 196:2
232:11
**BarCap (18)**
128:9,15,18 131:15
155:22 156:22
160:24 162:3 193:9
200:7 201:5 204:13
206:16 207:4 209:6
227:11 258:14
278:6
**Barclays (397)**
3:11 6:14 8:16,22,23
9:7,9,14,15,19,22

11:13 12:16,17 13:2
13:17,20,23 15:7,13
15:17,24 16:2,14,16
17:7,9,15,16 19:22
19:24 20:13 21:8
22:22 25:2,4,12,18
25:20 26:3,15,22,23
27:4,5,6,14 30:11
31:6,9,12,14,18,19
31:23 32:13,19,22
33:11,18,18,19,20
34:19,21 35:2,14,20
36:3,21 37:2,5,8,14
37:22,25 38:7 39:23
40:12,21,24 42:11
42:17,21 44:12,14
44:18 46:22,24 47:2
47:10,13,15 48:5,9
50:16 51:21 52:18
53:7,10,18 55:10
58:7 60:12 64:23,24
65:4,9 66:6 68:17
71:10 72:11 73:6,10
73:13 75:7,15,15,18
76:6,12,22 77:18
78:13,22,24 79:2,4
80:3,16 81:23 82:8
84:20 88:14 89:3
90:3,5,11 91:9,23
91:25 92:4,15,24
93:19,24 94:5,9,13
94:16,18,25 95:3,9
96:13,16,24 97:4,9
97:18,21 98:12,25
99:15 100:3 102:16
105:9,17,22 109:13
110:3 112:14,21,22
112:25 113:3,13
114:12,16,17 115:4
115:17,17,20 116:7
116:12,12,21,24
117:8,19,22 118:16
119:2,15 120:24
121:4,7,16 122:12
123:10 124:7 125:7
126:5 127:8,13
129:7,22 130:8,16
131:6,22 132:13
134:18 135:12,19
136:7 137:22,25
138:15,19,20,21
139:17 140:25
141:6,8,12 152:13
157:18 159:3,8
162:11,24 163:6,14
163:21 164:5,20
165:11 166:18,23
167:17 169:11,15
169:25 170:5,10
171:5,6 172:13

173:16 174:14,20
177:9 178:21 179:6
179:11,17,18,21,23
180:5 181:8,18
182:25 183:5,11,15
185:2,6,18,23 186:6
191:4,15,22,23
192:4,16,22 193:14
193:19,25 195:7,19
198:5 205:3,10,24
205:24 206:3,7
208:10,17,21 209:3
209:7,8,17,24
210:19 213:11,20
217:14 218:6,16,24
219:3,6,9,12,15,17
219:18 220:7,16
221:7 223:8,11,14
223:19 224:8,19
225:23 226:22,25
227:8,15 228:12,21
231:18 232:21,25
233:4,17,21 234:8
235:7,14,15,19
239:17,22 240:2,8
240:11,25 241:6,13
242:2,19 243:22
245:5,7 249:4
250:21 251:5
252:20 253:19
259:9,14 260:4
261:4,5,6,18,23
262:5,8,9 263:11,24
267:7,15,20,23
268:8,10,14,19
269:2,6,13,16,18,22
269:25 270:3
271:15 272:25
273:3,13,15 274:20
276:25 279:18
**Bart (44)**
14:2 15:16 16:2,10,11
16:24 24:4,6 60:14
61:20,23,24 62:5
67:2,3,5,7 68:14
104:9,12,14,19
105:5 123:9,22
124:2,6 148:13
150:23 155:6,19
160:2 161:5 196:18
197:5,8 211:24
233:10 247:20
275:19 276:8,8,8,15
**based (21)**
41:19 68:6 84:13
113:4,13 123:2
148:9 197:21
199:12 214:9 227:7
231:23 232:2,4
233:5 234:14

235:11,24 238:14
239:3 285:4
**basic (1)**
137:22
**basically (1)**
151:2
**basing (3)**
247:9,10 280:14
**basis (17)**
96:2,5 97:6 111:12
113:16 119:5
126:12,15 136:8
139:24 163:16
209:8,11,14 231:22
235:15 238:8
**Bates (23)**
30:22 97:24 98:5
99:14 146:10
148:21 154:25
161:16 181:22
189:25 203:8
260:17 277:13
289:11,12,13,13,14
289:14,16,18,20,24
**Battery (1)**
4:17
**BCI-EX00115595 (3)**
97:25 98:6 289:12
**BCI-EX77335 (2)**
30:23 289:11
**bearing (2)**
98:5 101:4
**beg (1)**
124:4
**began (5)**
10:5 12:23 17:13,14
23:2
**beginning (1)**
15:25
**begins (2)**
164:10 190:9
**behalf (4)**
29:13 75:19 149:21
149:22
**Beldner (3)**
142:7 184:24 188:15
**belief (2)**
238:9,14
**believe (52)**
9:2 10:3 12:22,25
15:16 20:20 23:3
32:8 41:11 43:18
53:3 54:24 56:18,19
61:16,22 62:3 66:19
78:8 81:5 84:9
100:2 101:11
102:24 103:5,20
109:22 112:9
129:25 130:10
139:21 160:8

165:23 167:10
175:17 178:18
181:13 187:4,6
194:14 197:21
219:12 228:22
230:8 233:11
237:24 246:12
248:13 262:6
264:11 269:12
283:18
**believed (6)**
34:21 152:10 209:24
235:24 241:20
272:7
**believes (1)**
239:5
**believing (1)**
129:20
**benefit (1)**
279:9
**benefits (1)**
177:21
**Berkenfeld (16)**
24:11 57:7,12,15,18
58:8,16 156:19
173:12 175:12
215:16 216:5,5
246:12 247:5,22
**Bernard (1)**
114:2
**BERNSTEIN (90)**
3:20 18:14 19:10 23:9
27:7,11 30:17 31:21
45:20 47:11 56:17
57:14,21 58:3 65:20
69:20,25 70:6,15,22
71:15 72:2,14,19,23
73:4 74:7 76:9,19
78:14 82:4 83:22
85:10 90:19 94:20
96:4 98:19 99:13
101:23 103:12
105:11,18,23 106:5
108:21 112:4
126:18 130:21
131:8 132:23 134:7
134:25 138:9
140:15,18 146:5
154:9,19,23 158:10
161:13 163:2 164:7
168:8,13 174:6
175:25 176:6 178:2
181:9 193:21
197:11 202:21
207:16 213:3 218:8
224:23 228:5 229:5
233:19,23 236:17
236:21 238:20
240:13 244:15
260:14 261:24

286:6 288:5
**best (24)**
16:20 17:4,22 21:3
60:3 62:8 96:11
115:3 135:18,22
137:5,16 142:14
170:18 202:10
220:2 240:4,21
244:23 250:14
252:18 263:9
271:10 276:15
**better (4)**
81:8 159:15 201:25
231:14
**beyond (4)**
17:5 53:16,21 150:14
**bid (5)**
42:14 43:9 46:2
234:22 237:7
**bid/offer (4)**
236:15,19,20 239:2
**big (10)**
41:3,5 45:24 115:11
127:4 153:10
236:15,19,20
276:19
**bigger (1)**
185:24
**billion (151)**
45:17,18 47:17 48:18
53:15,19,21 54:2,14
60:6 62:20,22 63:6
63:10,16 64:11
65:25 66:11 72:9
73:11 77:22,25 78:5
78:9,13 81:25 82:9
82:9,13 95:22,22,25
96:7 97:13,20
109:21 114:6
116:14,21 125:10
125:10,14 138:20
138:20,22,22,25
139:2 142:10,19
143:8 147:4 148:4,7
149:10,11,12 150:5
150:13,14,20 151:6
151:9,12,16 152:2,9
165:9,12 182:13
185:19,19,23
186:13,14,18,20,22
186:24 187:2,8,23
188:3,3,10,12
189:12,17 190:13
191:4,11,15,22
192:16,19,23 193:3
193:15,17,19,22,25
194:11 196:15
200:20 204:10
211:12 212:3,11
213:8,10,15,23

214:3,5 216:7
224:13,16 226:13
241:22 248:10,21
248:23 252:24
253:4 255:12 264:6
264:11,13,14,16,24
265:20,25,25
281:14,14,20 282:3
282:6,11,18,18,21
282:23 283:6,14,17
284:4 285:20,24
**billion-42 (1)**
185:19
**bit (7)**
33:6 51:7 67:14
161:24 206:2
208:15 235:23
**BlackRock (5)**
237:2,6,11,12,16
**Blackwell (24)**
14:18 63:14 66:10
168:24 180:16
182:8,11 184:24
185:11 188:15
190:13 191:3,9
192:14 193:6
196:13 203:25
220:3 268:24 269:8
269:11,12 278:3
280:8
**blinked (1)**
216:6
**block (14)**
4:9 42:12,23 43:20
45:24 132:7 137:3,7
144:17 232:6,8
234:21 236:3
238:15
**blocks (6)**
41:3,5 236:7,14 238:2
276:19
**blood (1)**
290:18
**board (6)**
49:21 50:3,5,8,10,14
**boards (1)**
49:18
**Bob (2)**
6:9 14:18
**body (5)**
121:20 122:4 126:4
210:7,8
**Boies (2)**
3:10 73:2
**bonds (3)**
28:20,24,25
**bonus (7)**
54:10,11,15 213:12
213:17,20,24
**bonuses (2)**

32:19 263:17
**BoNY (17)**
116:6 167:18,22,23
170:6,8 171:9,17,19
175:9 190:18,23
219:21,23 220:12
267:6 279:10
**BoNY's (1)**
190:24
**book (3)**
88:17 143:20 165:15
**booked (2)**
171:19 190:24
**books (47)**
12:2,4 29:22 41:8,14
41:18,20,23 42:13
43:2,4,8,17,22,24
44:11,22 45:11,13
72:11 73:12 81:20
82:12 90:4,7,11,13
91:13 92:25 94:3
96:19 97:3 127:17
128:21 137:8 138:8
145:5,19 162:12,24
163:24 164:19
166:17 208:11
235:3 276:3 277:3
**bore (1)**
212:25
**bottom (7)**
6:16 44:14 91:3
136:22 141:15
142:6 278:11
**bottoms (2)**
89:23 164:24
**bottoms-up (2)**
45:4 89:13
**bottom-up (1)**
44:23
**bought (1)**
138:21
**bound (1)**
18:24
**Bowman (4)**
1:18 2:12 290:7,23
**box (17)**
156:22 157:6,9,23
160:23 174:3,20
182:10 185:22,24
186:9 194:23
195:10,13,16,19,21
**break (15)**
7:5,11 51:12 58:25
90:23 119:17
120:23 154:21
161:14 183:25
207:6,8 208:16
239:10 257:8
**Brett (1)**
184:24

**Bridget (2)**
3:8 14:16
**briefly (2)**
6:9 266:9
**brings (1)**
126:13
**broad (8)**
58:19 114:23 163:5
164:16 243:11
244:8,10 276:22
**broader (1)**
75:12
**broadly (3)**
164:18 234:23 244:20
**broker (3)**
137:9 144:21,25
**broker-dealer (2)**
145:2,10
**Brothers (22)**
1:7 3:4 4:24 6:11
10:10 14:3 30:20,21
32:3 33:4,14,16
49:19,19 51:20,20
101:19 115:18
116:9 149:22
177:14 291:3
**building (2)**
177:16 224:5
**buildup (1)**
163:18
**built (3)**
169:19 192:9,11
**bulk (3)**
94:4,10 275:22
**business (27)**
10:24 39:22 42:2
77:11,11,17 94:19
111:17 123:14
131:14 137:7
151:21 228:21
248:15,20 249:2,4,7
249:12 250:9 251:2
251:6 259:13
263:11,14 266:6
276:14
**businesses (8)**
9:11,15 16:5,6 77:12
92:23 94:17 95:5
**busy (1)**
178:17
**buy (4)**
42:17 116:14 128:22
131:24
**buyer (1)**
238:25
**buying (5)**
16:5 41:3 45:24
137:25 234:21
**BYMAN (3)**
4:13 7:18 14:20

---

**C**

---

**CA (1)**
  4:6
**calculated (7)**
  45:19 68:11 96:3,6
  188:23,24 280:16
**calculating (1)**
  271:18
**calculation (1)**
  280:15
**calculations (4)**
  89:16,17 189:11
  272:15
**call (6)**
  61:8 159:20 160:3
  168:10 200:15
  274:10
**called (8)**
  6:3 19:15 28:9 55:5
  150:7,11 160:3
  202:13
**calls (8)**
  68:25 71:14 75:17
  117:14 170:22
  224:23 270:15
  271:6
**cancel (3)**
  47:25 193:2 216:6
**canceled (1)**
  28:23
**canceling (1)**
  25:10
**cancellation (1)**
  77:7
**CAO (4)**
  11:8,9 14:15 200:7
**capacity (1)**
  191:24
**capital (6)**
  31:24 36:15 51:21
  145:3,6 276:18
**caps (2)**
  189:8,8
**capture (1)**
  97:6
**careers (1)**
  178:14
**carried (3)**
  41:14 72:11 73:12
**carry (1)**
  277:2
**case (13)**
  1:7 29:10,13 43:18
  62:3 85:19 91:8
  197:21 202:9,10,12
  203:2 291:3
**cases (3)**
  28:6 71:3 195:15
**cash (65)**
  25:11 26:10 27:3,3,6

27:8,21 28:2,18,22
28:25 32:23 47:23
48:2,10,13,17 53:24
77:18 116:14,16
117:20,25 118:3,5
118:11,11,17
138:24 139:3
143:23 149:22
185:20 186:21,24
187:2 188:4,19,24
192:23,24 204:5,7
213:12,17,20,24
224:6,14,16 234:4
238:19 239:7,8
255:10,13 273:2,13
273:20 274:11,16
274:19 281:19
282:6 285:23
**categories (5)**
  81:24 163:6,7 226:4
  286:25
**category (5)**
  132:17 164:6 165:18
  166:5 226:7
**cause (1)**
  153:24
**caused (1)**
  115:5
**caveat (1)**
  273:17
**cc (2)**
  112:13 113:25
**ccs (1)**
  184:24
**certain (16)**
  6:14 28:5 31:15,19
  40:24 53:8 61:22
  87:7 92:25 110:23
  113:9 114:18
  195:15 231:8
  268:10 271:17
**certainly (10)**
  22:10 31:8 59:25
  66:20 80:23 83:4
  86:16 160:11 194:7
  232:10
**certainty (17)**
  10:2,4 85:24 104:24
  152:10 157:14
  180:20 192:10
  203:3 219:10 220:8
  221:3,8 227:9
  246:13 263:19
  283:2
**CERTIFICATE (1)**
  290:3
**Certified (2)**
  2:13 290:8
**certify (2)**
  290:10,16

cetera (2)
  72:25 81:14
**CFO (4)**
  13:24 41:22 254:23
  259:3
**chain (23)**
  106:20 107:23 110:19
  111:2 112:11
  113:24 127:21
  131:11 155:11
  168:20 173:6 182:6
  184:18,21 190:9
  196:6,9 203:17
  205:13 257:25
  262:17 278:2 280:6
**chance (4)**
  168:15 254:10 257:21
  260:25
**change (5)**
  210:17 216:21 249:8
  272:24 273:2
**changed (10)**
  46:6 66:3 71:10 74:15
  74:17 130:3,5
  166:11,12 246:25
**changes (3)**
  56:6,10 245:12
**changing (1)**
  245:15
**chaos (1)**
  272:17
**Chapter (1)**
  1:6
**character (1)**
  126:3
**characterization (1)**
  135:22
**characterize (1)**
  26:13
**characterized (1)**
  28:9
**charge (3)**
  12:11,13 180:13
**Chase (35)**
  29:11,17,20 116:7
  123:3 159:7 167:16
  167:16,25 171:9,16
  175:8 182:15,18,20
  187:10 190:18
  193:16 194:22,22
  194:23,25 195:6,8
  195:16,20 199:8,9
  219:2,22,23 220:11
  220:12 267:6
  282:10
**Chase's (4)**
  187:12,23 190:25
  219:22
**check (2)**
  110:20 111:5

Chicago (1)
  4:12
**chief (6)**
  8:16 10:21,23 11:4,18
  11:20
**chose (3)**
  113:8 114:21 140:25
**Chris (3)**
  120:13 123:7 260:7
**chronologically (1)**
  196:12
**circumstance (2)**
  203:5 232:5
**circumstances (3)**
  55:21 66:4 181:21
**Citadel (1)**
  217:20,25 218:5,11
**Citi (1)**
  149:18
**city (1)**
  149:9
**claim (2)**
  116:15 182:15
**claims (3)**
  67:17 182:15,18
**clarification (8)**
  55:5,9,12,15,19,22
  82:20 207:22
**clarifications (1)**
  50:20
**clarify (4)**
  158:10 200:25 207:14
  291:7
**clarifying (1)**
  65:8
**clarity (1)**
  199:6
**class (1)**
  185:15
**classes (8)**
  81:13,17,19,20 208:8
  208:12,13 281:23
**classification (1)**
  185:14
**clean (1)**
  281:2
**clear (18)**
  7:3 10:13 19:13 62:25
  65:13 84:22 106:6
  109:5 115:22
  117:18 130:21
  135:23 137:3
  144:16 221:4
  249:18 252:18
  283:5
**clearer (1)**
  100:7
**clearing (2)**
  258:4,5
**clearly (7)**

24:16,18 59:13
  102:14 110:6
  126:21 136:7
**Clement (1)**
  114:2
**clerical (1)**
  99:11
**close (9)**
  67:13 152:15 176:13
  177:7 178:15
  212:12 216:18
  276:14 282:21
**closed (12)**
  8:24 21:15 33:21
  55:14 74:19 75:14
  79:24 158:9 161:3
  179:19,22 222:25
**closely (1)**
  156:25
**closing (23)**
  18:9 21:16 22:4 31:25
  33:2 55:13,18,22
  102:11,14 178:22
  178:24 215:19,23
  216:17 217:12
  218:2 221:11
  243:19 247:14
  253:16 274:10,22
**CLS (1)**
  149:8,17,19
**codes (1)**
  291:6
**coincidence (1)**
  229:24
**collateral (230)**
  25:11 26:10,21,21
  27:2,5,22,23,25
  28:14,19 29:3,4,8
  29:12,22 47:10,14
  47:24 48:2,10 59:20
  60:6 67:10,19 71:11
  71:11,25 75:4,9,10
  77:5,20 78:4,9
  79:13 98:18 100:11
  101:11,14,17
  102:21 105:7 116:4
  116:5,16,17,22
  117:19,23,24 118:2
  118:4,5,7,9,16
  119:14 121:3,4,7,8
  121:9,20 122:2,4,14
  122:25 123:4
  124:19 125:2,12,14
  125:17 126:2,16,24
  137:22,25 138:21
  138:22,24 139:2,2
  139:16,18 144:8,10
  144:11,12 147:4,14
  147:16,17 148:12
  151:24 152:7 153:3

153:6,11 167:15,16
167:17 169:12,18
169:22 170:2,6,7
171:9,13,16,20
172:7,14,22,22
174:19 175:6,8
176:24 182:14,21
182:22 183:4,21,22
185:24 186:11,14
186:18,20 188:9
190:18,19,23
192:23,24 195:8,9
195:10,12,16,17,18
195:20 196:17,22
196:23 198:23,24
199:3,6,9,15 200:16
200:19 201:2,7,10
201:11,15,23
202:18,24 208:19
209:10,19 210:6,7,8
210:19 216:7
218:18,22 219:2,3,8
219:11,16,20,23
220:11 221:12,16
222:13,19 223:20
231:7 234:3 238:19
239:6,6,7 240:5,16
240:18,19,22 241:5
242:4,24 243:3,9,10
243:13,16,20,24
244:2,7,12,13,21
245:2 250:19
255:10,12,22,25
256:7,18,21 267:5
272:9 278:8 280:5
281:12 282:10,23

**collateralized (5)**
169:14 170:11 171:5
171:7 251:24

**collected (1)**
228:19

**collecting (2)**
39:12,17

**collection (1)**
226:18

**college (2)**
8:5,6

**Collerton (2)**
20:21,22

**column (6)**
87:18,20,21 88:25
101:20 226:7

**columns (3)**
87:23,24 90:25

**combination (10)**
23:22 44:13 93:2,19
163:8,25 164:23
165:2 175:4 280:5

**combined (3)**
98:17 114:7 192:19

**come (30)**
17:12,14 19:3 38:5,19
49:17 50:15 53:14
55:4 105:14 115:6
116:13 131:6
135:14,17 151:15
151:17 152:4,13
154:22 164:3 171:4
179:14 211:14
230:14 240:21
242:22 268:25
271:25 272:23

**comfortable (8)**
41:22 57:16 91:11
129:8 131:15,23
204:3 209:13

**coming (6)**
40:15,19 92:23 159:5
249:10 267:16

**commensurate (1)**
218:6

**commenting (2)**
50:22 215:18

**commercial (2)**
81:14 287:3

**committee (20)**
4:4 75:5 153:4,7,14
153:17,21 154:8
217:5,6,7,9,10
221:10,18,21,24
222:12,20,22

**communicate (2)**
104:5 232:20

**communicated (8)**
64:24 65:5,10 115:16
161:5 169:24
241:11 250:16

**communicating (5)**
104:11 107:4 134:16
141:5 145:17

**communication (2)**
123:22 179:25

**communications (3)**
107:15 184:22 220:9

**comp (14)**
18:12 95:18,22 96:7
96:20 211:6 212:19
212:22,24 213:2,8
214:5,11,14

**company (2)**
10:14 75:20

**comparable (1)**
138:13

**compared (1)**
238:17

**comparison (3)**
29:19 30:5,8

**compensation (11)**
18:7,10,21 53:16,18
53:23 54:5,13 177:8

213:14,23

**competent (1)**
56:20

**complete (5)**
36:13 85:23 166:2
194:13 205:6

**completed (6)**
95:2 155:19 156:9
205:4 206:16
237:22

**completely (7)**
46:9 48:6 164:21
199:17,21 206:20
206:24

**completion (1)**
164:14

**compliance (1)**
145:2

**complicated (1)**
174:22

**component (10)**
53:25,25 54:5,16
68:15 69:17 77:6
96:15 210:16
221:17

**components (5)**
54:3 74:19 78:16
89:20 186:5

**compound (5)**
56:17 94:20 96:4
108:22 126:19

**computation (1)**
272:21

**computed (1)**
272:8

**computer (3)**
83:13 84:8,15

**computers (1)**
84:12

**conceived (1)**
80:17

**concept (2)**
137:23,24

**concepts (2)**
78:19 138:13

**conceptually (1)**
121:10

**concern (7)**
24:20 181:7,12,15
209:9,12,15

**concerned (1)**
116:7

**concerning (6)**
19:22 56:23 97:20
157:9,22 205:20

**concerns (1)**
270:5

**conclave (1)**
155:21

**conclude (1)**

202:17

**concluded (2)**
208:21 269:2

**conclusion (8)**
68:25 71:14 117:14
202:4 224:24
270:16 271:6,25

**condition (2)**
21:10,16

**conditional (3)**
33:2 270:13 271:3

**conditions (3)**
17:15 19:23 88:19

**conduct (1)**
56:13

**conducted (2)**
129:17 145:23

**conducting (2)**
56:14 268:14

**confidence (3)**
42:4 152:8 175:15

**confident (3)**
123:4 161:4 203:2

**confidential (291)**
1:12 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1,18,23 19:1,3,8
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1

136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1

**confidentiality (2)**
18:25 19:6

**confirm (1)**
188:5

**confirmed (2)**
255:14 258:13

**Confirming (1)**
182:9

**conflict (4)**
32:9 33:7 35:2,7
**conform (1)**
291:7
**confusion (1)**
242:23
**Congrats (1)**
157:2
**Congratulations (1)**
274:12
**conjunction (1)**
227:22
**connection (9)**
25:6,23,25 30:10 55:9
56:14 77:16 220:24
224:12
**consequence (1)**
116:2
**conservative (1)**
132:6
**consider (1)**
30:14
**considerable (1)**
63:5
**consideration (2)**
213:20 224:5
**considered (1)**
17:9
**consistent (10)**
32:2 43:9 129:22
130:7 133:2 164:6
166:5 189:18 214:6
214:9
**constituent (1)**
210:5
**constituents (1)**
57:24
**constitute (1)**
81:7
**construct (2)**
47:22 120:25
**consuming (1)**
143:22
**consummated (3)**
46:8 116:24 237:19
**contact (6)**
12:25 15:17,24 16:13
36:25 37:9
**contains (1)**
185:25
**contemplating (1)**
180:25
**contention (2)**
208:22,25
**context (10)**
115:7 139:22 141:3
141:13 144:25
147:9 155:18
171:14 252:2
275:21

**continue (7)**
149:19 177:14,17
192:22 249:16
250:17 254:3
**continued (6)**
33:25 49:15 83:5
119:21 152:24
287:5
**continuing (4)**
25:8 54:12 129:2
152:25
**contract (28)**
20:17 21:12 31:11
50:17,18,25 51:9
133:8,10,15,18,20
133:22,25,25 134:5
134:10 157:10
189:24 204:9,11,14
207:20 242:19,21
245:12,15 271:8
**contracts (8)**
21:7,14 71:18 251:23
283:23 285:10
286:4,11
**contribute (2)**
33:18 207:5
**control (3)**
11:23,24 37:17
**controller (3)**
14:10,11 109:3
**convenient (1)**
90:18
**conversation (32)**
57:10 58:24 61:5,15
61:18,19 62:5,12,25
63:4 67:5 97:10,22
102:5,17,18 103:22
103:25 123:21
148:9,13 178:17,19
179:9 211:24
230:25 232:24
233:13 253:23
269:10 275:21
278:24
**conversations (22)**
57:6,13 63:5 74:24
103:18 104:9 179:3
212:5,8,10 217:16
217:20,23 233:14
233:20 234:16
253:14,21 259:20
259:22 260:2
273:15
**conversion (17)**
130:9,10,11,14 131:2
266:24,25 267:2,4,9
277:8 278:4,18
279:5,6,7,8
**convert (1)**
159:22

**converting (1)**
130:15
**conveying (1)**
131:21
**coordinate (3)**
123:13 175:12 182:12
**copied (1)**
261:6
**copies (3)**
139:5 142:7 196:14
**copy (14)**
20:25 21:5,5 95:24
99:20,21 106:13
136:23 140:24
156:19 169:10
173:12 182:9
190:12
**copying (1)**
107:24
**corner (2)**
101:4 151:3
**corporate (5)**
10:6,9,13 180:4 287:2
**corporation (1)**
12:3
**correct (88)**
8:17,18 9:2,20,22,23
10:8,18,19,22 11:18
11:19 12:9,10,18,19
20:8 21:3 25:10
31:15,20 35:15,16
41:16 44:2 47:4,6
48:18 56:7 63:7,8
65:18,19 66:14,15
66:18 68:2 69:17
75:11 77:25 78:5,12
82:3 83:22 88:4
101:6,9 104:15,23
108:16 109:15
112:3 126:17 131:9
131:10 145:24,25
162:13,25 167:24
168:4 183:11
186:13 187:3,14
188:4 201:16 202:6
202:9 203:4 207:23
240:12 241:8 242:2
245:13 248:17,18
249:22,23 256:12
261:7 264:4,12
267:10,11 285:8
286:5 291:8
**correctly (3)**
77:21 78:18 165:24
**correspondence (1)**
166:21
**cost (2)**
54:11 97:13
**costs (1)**
79:21

**counsel (25)**
6:10 18:15 52:3,10
72:4,7,16,17,19,21
72:24 73:4 74:25
76:5,5,10,12,22,22
217:8 233:21
234:16 260:17
273:15,16
**Counsel's (1)**
260:18
**counterparties (4)**
13:23 29:14 121:24
236:14
**counterparts (4)**
35:21 36:4 93:25
131:15
**counterparty (1)**
27:21
**COUNTY (1)**
290:6
**couple (6)**
6:17,23 26:14 94:24
184:16 270:11
**course (11)**
16:7 30:15 34:19
104:12,14 165:3
175:19 183:13
195:14 212:14
230:19
**court (39)**
1:2 5:20 6:25 19:8
56:23 57:4 59:3,8
66:14 67:8 68:14,16
68:22 69:7,9,10,16
71:19,23 72:4,13
73:14,16,17 74:2,14
104:15 145:24
156:7,21 160:22
173:18,25 174:5
216:21 245:13,18
246:11 247:2
**courtroom (1)**
83:24
**cover (4)**
89:22 97:13,21
140:21
**covered (2)**
251:11 267:25
**co-global (2)**
11:8,9
**crafting (1)**
35:24
**Craig (2)**
255:7,13
**CRAWFORD (1)**
3:8
**create (6)**
137:8 144:21 145:6
194:17,18 283:24
**created (4)**

**counsel (25)** [right column continuation]
240:4 262:19,22
284:7
**creating (4)**
262:4,7,25 263:4
**creation (2)**
261:17,22
**credit (3)**
36:9 115:11 255:13
**creditors (16)**
4:4 34:23 75:5 153:4
153:7,14,16,20
154:8 217:8,10
221:10,18,21,21
268:9
**critical (7)**
16:16 17:9 64:12
102:11,14 156:25
196:23
**cross (2)**
119:6 202:15
**CRR (2)**
1:18 290:23
**cry (1)**
191:14
**cure (15)**
95:18,21 96:9,20
109:2 211:6,8,10,11
211:19 212:6,11,17
214:17 263:17
**curious (1)**
65:24
**current (1)**
9:18
**currently (1)**
8:15
**CUSIP (1)**
196:17
**custodied (1)**
68:7
**customer (7)**
67:17,24 68:6,10
101:19 270:21
272:13
**C3 (2)**
270:11 285:19

---

**D**

**D (1)**
3:20
**daily (1)**
215:5
**Dan (2)**
189:2 255:14
**data (6)**
123:3 271:20,21,22
272:8,16
**date (28)**
30:24 32:5,6 46:15,19
98:2 106:8,12
146:12 148:23

155:3 161:18 173:4
181:24 184:7 190:3
199:24 203:10
256:10,12,14,15,19
257:7 260:13 274:4
277:15 291:4

**dated (17)**
51:21 55:4 106:24
114:2 173:2 184:5
199:22 200:9 257:5
260:11 274:2
289:15,17,19,21,22
289:23

**dates (1)**
32:23

**Dave (2)**
170:4,14

**David (6)**
168:21,23,25 170:20
170:24 172:2

**day (27)**
2:10 3:3 6:10 9:8 16:8
23:2 25:9 46:5 63:6
76:15 89:18 104:12
104:14,17 139:14
146:4 181:6,12
185:16 189:19
195:14,24 247:14
247:15 268:15
288:15 290:21

**days (4)**
6:17 9:10 26:14
256:22

**day-to-day (1)**
139:24

**DC (2)**
3:13,19

**deadline (1)**
231:9

**deal (92)**
8:24 17:9 18:9 24:19
35:25 38:12,15 42:7
46:6,8,10,10,13,21
47:9,13,18 48:24
49:4,9 50:3,7 53:8
53:15 56:6,10,14,16
59:2,4,7,8 60:8
64:12 68:19,23
71:18 73:21 74:5,13
74:19 75:6,14 78:17
78:23 79:24 95:2
102:11,14 107:5
108:12 111:21
116:23 117:10
118:25 119:3,3
123:5,10 124:7
125:24 137:2
138:16 157:25
158:9 174:13,22
177:7 178:24

183:24 194:18
221:17 222:25
223:12 225:18
227:23 240:7
246:10,24 247:4
249:3,7 251:18
252:20 253:9 254:4
259:14 263:11
265:11 272:25
273:13,21

**dealer (1)**
145:5

**dealing (4)**
23:22,23 25:12
174:12

**deals (1)**
263:14

**debt (2)**
185:25 287:2

**Debtors (1)**
1:9

**December (4)**
187:14,20 206:17
219:5

**decided (7)**
40:25 113:17 115:14
141:8 270:4 275:24
275:25

**decision (6)**
44:20 174:2 220:5
276:21 277:4,6

**deemed (2)**
16:16 114:5

**default (1)**
115:11

**defaulting (5)**
135:19 137:4,16
145:9,12

**definitely (2)**
118:18,20

**definition (1)**
251:7

**degree (8)**
7:22,23 8:3,7 148:17
152:8 175:20 176:3

**deliver (14)**
122:15 126:2 129:6
135:22 137:22
138:14,18 139:16
153:20,25 156:24
167:17 182:24
183:4

**delivered (18)**
20:19,20,25 119:2,15
123:5 125:24
153:10,13,16,24
154:4 166:3 167:16
183:21,23 222:22
234:3

**delivering (2)**

135:18 153:23

**delivery (5)**
122:2 222:2,4,7,19

**delta (4)**
128:20 166:16 209:17
209:21

**department (3)**
11:23 12:6 254:24

**deposed (1)**
140:7

**deposition (41)**
1:13 2:9 5:16 6:20
18:19 51:18 52:5,12
67:2 80:7 86:11,20
86:24 99:18 106:2
106:16 110:9 120:6
127:19,24 136:12
136:15 140:5,14,16
140:22 141:23
142:5 146:14
148:25 154:14
155:5 168:11 182:2
196:5 200:2 203:12
288:7 290:12,13
291:4

**depositions (3)**
19:2 254:6 288:7

**depository (1)**
147:18

**deposits (3)**
253:2 286:12,22

**depots (1)**
151:24

**derivative (4)**
77:10,17 251:23
266:19

**derivatives (15)**
126:25 259:15,16,23
260:4,5 267:10
283:19,23 285:8,10
286:3,11 287:3,4

**derived (1)**
45:23

**DeRosa (1)**
14:12

**describe (10)**
27:18 43:13 61:6 77:2
79:7 83:15,23 108:7
108:18 109:16

**described (8)**
19:15 40:5 50:3,8
121:11 131:5
176:17 223:2

**describes (1)**
101:17

**describing (5)**
101:22 132:11 133:7
147:20 148:8

**description (6)**
7:13 83:21 84:4 115:3

186:12 266:12

**descriptions (1)**
81:12

**designation (2)**
18:19,24

**designations (1)**
19:3

**designed (1)**
202:8

**despite (3)**
176:14 177:3 178:8

**detail (7)**
25:15,22 46:5 58:23
109:17 196:17
206:2

**detailed (3)**
75:3 83:20 84:3

**details (17)**
16:6 26:4 57:9 58:21
61:4 62:24 77:13,14
103:25 120:16
142:17 209:4
219:14 224:4
239:23 253:23
255:12

**deteriorated (1)**
191:21

**deteriorating (2)**
143:17 191:19

**determination (5)**
91:20 122:10 124:16
220:18 276:25

**determine (24)**
68:11 92:5 119:2
125:5 129:4 135:9
139:15 150:9,25
151:5 164:18
202:12 243:4,24,25
244:3,13,23 251:4
253:5 265:15 266:8
271:12 277:17

**determined (15)**
44:12 112:22 118:15
129:9 132:20 150:9
151:19 201:14
231:23 232:15
241:24 242:16,25
245:3 253:7

**determines (1)**
68:7

**determining (6)**
67:12 109:4 124:13
127:15 128:17
276:24

**develop (5)**
89:19 122:13 212:23
213:7 286:16

**developed (4)**
129:12,14 171:22
181:3

**development (4)**
10:7,9,13 129:10

**difference (24)**
28:13,17 30:3 44:10
44:21 45:10 48:12
48:16 72:10 73:11
88:16 89:13 90:3,5
90:10 94:2 96:15
97:2,6 118:8 162:11
162:23 164:19
234:3

**different (36)**
39:13,17 46:10 47:21
48:14 52:8 59:4,8
59:17 60:10,20,23
63:23 68:13 73:19
78:19 82:17 97:9
116:19 124:21
125:3,21 138:17
159:6 163:5 186:10
223:6,10,17 234:6
238:22 247:11
268:7 279:7 280:6
286:18

**difficult (5)**
14:21 33:24 174:23
199:5 272:22

**difficulties (5)**
135:24 171:8 215:4
219:22 271:17

**diligence (4)**
13:9,13 268:14,18

**dining (1)**
84:11

**direct (13)**
14:5,7,8 37:12 91:2
108:15 180:14,18
181:17 248:8
261:17,22 277:23

**directing (1)**
136:20

**direction (2)**
111:5 175:12

**directly (2)**
37:12 179:15

**director (2)**
9:10,12

**dirty (2)**
272:8,16

**disagree (1)**
58:11

**discipline (1)**
142:13

**disciplined (1)**
143:13

**disclose (1)**
76:2

**disclosed (4)**
72:12 73:14,15 76:4

**disconcerted (1)**

23:25

**discount (20)**
42:18 43:3,7,13,15
128:19,20 135:19
135:23 137:4,5,7,17
144:17 235:24
238:3,16,17 275:15
275:16

**discovered (1)**
125:22

**discuss (6)**
17:15 34:24 218:12
268:3 273:12
278:20

**discussed (11)**
47:21 59:15 61:25
97:17 125:18
163:10 220:20
221:9 227:17
234:17 245:23

**discussing (6)**
119:14 159:8 217:24
234:19 249:21
268:5

**discussion (17)**
9:5 18:20 45:3 97:19
147:24 158:23
159:12 187:16
206:15 209:20
211:7,15 222:18
233:15 267:13
269:5 273:22

**discussions (51)**
12:16,21,22,25 13:5,8
15:6,12 27:13 40:15
40:17,18,20 60:15
64:23 65:7 72:4,6
72:15 74:15 93:6
95:3 96:23 102:15
115:16 118:20,22
119:8,10,12 178:13
187:19 208:24
209:23 211:19,21
212:16,18,22 214:9
218:10 220:14
222:23 227:3
237:10 260:6
267:20,23 268:23
269:22 270:2

**disposes (1)**
276:19

**disregarding (1)**
277:25

**disruption (2)**
24:17 115:8

**distinction (1)**
10:15

**DISTRICT (1)**
1:3

**division (1)**

140:7

**docs (3)**
132:5 133:6 135:4

**document (98)**
30:22 31:3,13,16,22
51:19,23 52:6,14,16
70:8,8 80:8,10,20
82:3,18 83:10 86:14
87:2,14 91:5,6,19
93:10 97:24 98:4,5
98:8,9,16 99:3
100:14,17 101:8
102:4 106:3,13,14
106:17 107:12
110:11 120:7
130:12 136:13
146:10,15 148:21
149:2 154:15,15,17
154:22,25 155:7,8
161:16 168:5 174:7
181:22 182:3,6
184:10 189:25
190:6,7 203:8 213:4
215:13 251:13
252:3 254:8,12,21
257:4,18,23 258:21
260:10,16 261:14
277:11,13,16,20
284:16,18 286:14
289:11,12,13,13,14
289:14,16,18,20,24

**documentation (9)**
156:5,8,23 157:3,5,8
157:13,22 245:22

**documented (1)**
246:24

**documenting (9)**
155:23 156:3,12
245:11,19 246:3,10
246:14,25

**documents (16)**
52:9 54:20,25 70:13
70:19 71:4 86:13
97:11 106:6 133:7
134:13 135:7
172:12 222:11
260:19 284:19

**doing (22)**
22:11 23:17 25:5
30:15 39:10 40:4,8
40:10,13,16 88:12
108:10,19,24
132:25 170:5
191:23 192:25
193:16 228:18
253:13 279:20

**dollar (6)**
18:11 60:4,5 90:15
265:20 284:4

**dollars (32)**

60:9 62:20,22 63:6,10
63:17 64:11 65:25
66:11 78:3 92:15
143:8 151:17 152:9
186:20 188:12
212:3 224:13,16
248:21 252:24
264:7,12,16,23,24
282:22,23 285:14
285:20 286:4,8

**dot (1)**
95:24

**double (1)**
14:23

**draft (1)**
20:17

**drafted (4)**
110:21 111:6,7,16

**drafters (1)**
111:20

**drafting (3)**
50:22 80:19 210:10

**drafts (4)**
81:2,5 82:15,17

**drive (1)**
145:9

**driven (4)**
26:22 113:18 141:11
234:4

**drop (1)**
14:21

**dropped (1)**
250:7

**DTC (3)**
268:15 269:20 270:4

**DTCC (14)**
146:22,23 147:5,14
147:15,18 159:7
267:18,21,24 268:8
268:11,20 269:4

**due (4)**
13:9,13 268:14,18

**duly (2)**
6:4 290:13

**duties (7)**
9:12 11:20 30:15
31:25 32:2 35:3
56:20

**D-P (1)**
133:11

_____

**E**
_____

**E (3)**
4:23,25 189:4

**earlier (37)**
47:21 49:5 81:5 82:11
89:11 93:24 103:21
114:22 121:2,10
123:7 137:25
145:10 147:25

162:10 164:13
167:3 191:18
201:19 204:10
214:6 219:5 220:20
221:9 223:17
227:19 230:8,8
245:10 249:13
264:22 266:23
272:6,11,15 277:9
282:8

**earliest (7)**
113:23 127:25 136:21
155:11 182:7
203:16,23

**early (16)**
17:19 49:11,13 83:6
102:21,24 103:2
107:5,16,16 109:25
123:18 137:9
144:22 148:7
215:17

**East (2)**
2:10 3:5

**eastern (5)**
147:22 254:19 257:17
261:11 274:8

**easy (1)**
113:20

**EBOC (1)**
189:7

**economics (2)**
8:2,3

**education (3)**
7:14 8:8,9

**effect (15)**
5:19 70:19 71:5
116:10 129:5,16
174:25 177:9
178:13 193:2
213:18 220:11
256:24 274:20
279:11

**effected (5)**
115:21 116:11 119:16
130:4,5

**effecting (1)**
175:8

**effective (1)**
101:21

**effectively (1)**
194:23

**effects (1)**
238:11

**effort (20)**
39:25 40:3 65:18
116:3 118:25 165:8
169:5,16 202:8,11
227:21 228:3,10,23
229:3,11 241:7
244:8,10 246:16

**efforts (7)**
150:25 183:16,19
236:11 240:21
256:23 271:10

**eight (8)**
16:16,18 17:2,4,8,11
35:5 37:25

**either (14)**
22:5 54:24 76:21
115:24 128:16
154:2,3 215:2
222:10 232:22
235:13 252:22
259:18 260:7

**electrical (2)**
7:22,23

**electronic (1)**
21:2

**element (6)**
64:15,18 116:19,23
117:11 127:3

**elements (20)**
22:17 26:25 59:13,22
59:24 60:4 68:18
69:12 76:25 80:13
99:17 109:7 126:22
159:10,14 186:7
223:2,10 265:11
272:21

**elimination (1)**
84:25

**Emanuel (2)**
4:3 217:9

**emerged (2)**
44:17 126:11

**emerging (2)**
107:11 164:24

**emphasize (1)**
200:17

**employ (1)**
79:18

**employed (7)**
8:15 9:22,25 10:14
17:16 32:22 34:10

**employee (3)**
30:21 33:3,14

**employees (6)**
34:22 77:9 177:13,22
178:25 213:25

**employment (12)**
9:21 11:13 19:23
20:14 31:5,7,11
32:13 77:9 179:6
217:13,25

**enabled (1)**
119:5

**encumbered (2)**
201:25 240:20

**endeavor (1)**
63:9 64:10

**ended (2)**
208:20 223:18
**ends (1)**
278:23
**engage (2)**
131:7 251:5
**engaged (6)**
12:16 26:14 237:10
252:7 256:23
276:15
**engaging (1)**
93:24
**engineering (2)**
7:22,24
**England (1)**
7:25
**enjoy (1)**
80:3
**enlargement (1)**
213:18
**enormous (1)**
41:25
**ensuing (1)**
52:25
**ensure (7)**
123:14 174:17,24
181:20 182:13
202:8,9
**ensuring (2)**
142:12 143:14
**enter (1)**
19:21
**entering (1)**
209:24
**entire (1)**
105:3
**entirety (1)**
249:5
**entities (2)**
15:10 243:15
**entitled (9)**
51:19 76:12 100:10
136:25 196:15
200:15 203:23
257:15 278:3
**entity (3)**
9:24 177:17,23
**entries (2)**
88:21 95:18
**entry (4)**
285:11 286:10,11,20
**envisaged (1)**
279:15
**equal (4)**
18:6,9 230:5,22
**equals (1)**
229:10
**equipped (1)**
159:16
**equities (1)**

287:2
**equity (4)**
54:12 79:5 95:11
258:11
**equivalent (1)**
117:20
**Eric (6)**
16:21 36:10,17
110:16 112:12
139:8
**Erica (2)**
4:7 217:4
**errata (1)**
288:7,8 291:2
**errors (1)**
291:8
**especially (1)**
123:12
**ESQ (10)**
3:7,8,14,20,21 4:7,13
4:19,20,23
**essence (1)**
183:12
**essentially (3)**
144:9 145:20 224:15
**establish (1)**
42:4
**established (1)**
187:5
**establishes (2)**
68:5 239:4
**establishing (2)**
262:12 274:21
**estate (4)**
6:10 34:12,16 235:9
**estates (2)**
177:18 224:9
**estimate (16)**
96:11 108:24 148:3,7
150:5 170:18
212:12 213:9
214:16 215:4,7,8,10
240:5 271:10 284:8
**estimated (2)**
252:24 272:11
**estimates (1)**
272:5
**et (3)**
1:8 72:25 81:14
**Europe (1)**
10:22
**European (2)**
10:24 236:25
**evening (20)**
20:4,5 35:19,24 39:5
57:8 83:7,8 117:6
124:12 125:5
126:10 142:24
158:14 165:3
194:24 214:10,17

230:20 278:13
**event (7)**
27:25 28:22 47:25
51:10 183:20
189:20 231:4
**events (2)**
70:20 71:6
**eventually (1)**
270:23
**everybody (8)**
6:24 39:7 75:23 85:25
86:3 178:9 208:6
279:3
**everyone's (2)**
225:6,7
**exact (1)**
193:10
**exactly (5)**
74:12 104:19 131:4
228:25 234:25
**EXAM (1)**
289:3
**EXAMINATION (6)**
6:6 217:2 248:2
275:11 281:4 285:2
**Examiner (1)**
4:10
**example (7)**
29:17 36:10 92:3
114:6 231:17
253:10 264:21
**examples (1)**
59:11
**exceed (1)**
96:19
**exception (1)**
83:25
**excess (25)**
32:14 59:19 60:7,8
68:7,11,12 77:6,7
150:4 172:22 175:6
175:6 189:17 204:8
270:18,20 271:2,3,4
271:11 272:2,6,11
272:12
**exchange (10)**
77:10,10,17 149:12
150:21 151:20
248:11 251:24,25
286:13
**exchanged (1)**
126:25
**exchanges (1)**
253:2
**exchange-listed (24)**
248:25 249:17,19
250:6,17,22 251:8
251:12,16,22 252:3
252:10,11,19,25
253:18 264:25

265:3,24 266:6,13
266:18 283:6,17
**exchange-traded (8)**
259:15,16,23 260:4
267:10 283:18
284:3,8
**exclamation (3)**
155:22 173:14 216:16
**exclude (2)**
114:4 180:18
**excluded (1)**
273:21
**excluding (2)**
74:24 273:14
**exclusion (1)**
141:24
**Excuse (1)**
226:10
**exercise (22)**
22:23 64:15 91:9
93:23 125:4 126:7
129:10 130:18,23
147:17 148:2,11,14
164:2,14,17 166:20
202:7,23 203:6
210:17 252:7
**exhibit (137)**
20:11 30:22 31:2
51:18 52:14 53:5
54:18,19 55:2,3
80:7,20 82:3 86:12
90:22 93:11 95:15
95:17 97:24 98:4,11
106:2 110:9 113:23
120:6 125:18
127:19 131:9
136:13 141:24
144:15 146:10,14
148:21,25 151:25
154:14,24,25 155:5
159:19 160:13
161:16,22 162:16
163:13,20 164:3,6
164:15,17,22 165:4
165:10,20 166:7,20
168:4,6,7,16 169:3
169:5 173:2,5
181:22 182:2 184:5
189:25 190:4 196:5
199:22 200:2 203:8
203:12 208:4,6,7
210:10,18 211:5
214:4,12 215:12,25
225:4 226:24
229:19 230:7,22
231:17 235:4 248:7
249:20 251:9 254:7
257:5,12 260:11,25
265:2,4,21,23 266:9
266:11,14 274:2,6,6

277:13 281:6,7
283:7,7,11 284:13
284:17 285:6 286:9
289:10,11,12,13,13
289:14,14,15,16,17
289:18,19,20,21,22
289:23,24
**EXHIBITS (1)**
289:9
**existed (1)**
159:5
**existence (2)**
271:4,25
**existing (1)**
126:9
**expect (7)**
29:24 41:3 43:25 46:2
62:12 154:3 232:7
**expectation (2)**
194:4,6
**expected (7)**
26:11 50:13 142:16
143:5 158:2 194:15
246:15
**expecting (2)**
32:25 210:3
**expense (1)**
14:19
**expensed (1)**
54:11
**expenses (1)**
97:21
**experienced (1)**
115:9
**experiencing (1)**
191:25
**expertise (1)**
159:12
**explain (8)**
37:7 130:24 132:10
140:9 144:3 149:14
195:4 248:19
**explained (1)**
269:14
**explains (1)**
193:4
**explanation (1)**
43:14
**explanatory (1)**
128:14
**explicitly (1)**
284:3
**exposure (1)**
115:15
**exposures (1)**
116:9
**express (3)**
64:9 113:12 198:21
**expressed (2)**
90:12 113:11

**expressing (1)**
64:13
**extend (4)**
28:18,21 195:10,16
**extended (4)**
29:2 48:3 239:9
**extending (3)**
18:2,4 27:21
**extends (1)**
47:23
**extent (5)**
75:17 109:8 125:22
129:13 227:12
**extinguished (2)**
117:12,21
**extinguishing (1)**
117:20
**extra (6)**
53:15 150:25 151:3,5
152:14 195:15
**extract (1)**
238:25
**extreme (2)**
23:23 115:8
**extremely (5)**
108:11 143:13 174:11
199:5,5
**e-mail (132)**
21:2 66:24 69:16,21
70:2,3 99:5,6,9
106:18,19,23
107:23 109:5,20
110:15,16,19
111:23,25 112:5,11
112:13 113:23,24
120:9,12 123:7,7
124:10 127:21
128:7,8 131:6,9,11
131:12,21 133:24
136:25 137:15,19
139:4 141:14,15
142:2,6,25 144:16
146:20 147:2,6
149:3,5 155:5,11
158:15 159:17
160:16,19 169:9
173:2,9,11 183:7,12
184:5,18,21 185:9
188:6,8,13,14,22
189:2,6 190:10,11
191:2,10 192:13,14
193:5 196:9,10,12
197:3,12,18 198:21
199:22 200:9,17
201:19 203:16
204:20 205:13
206:18 216:4 254:9
254:11,14 255:3,6
255:19,21 256:19
257:5,14,19 258:24

259:6 260:8,11
261:3 262:20
263:12 266:14
274:2,7 278:2,12,24
280:8 285:7 289:15
289:17,19,21,22,23
**e-mailing (1)**
249:19
**e-mails (19)**
110:14 111:2 128:2
141:3 159:18 162:2
168:20 173:6 182:6
184:14 190:9
191:18 195:6 196:6
196:7 203:13,15
215:21 245:21

————————
F

**F (5)**
1:18 2:11 4:20 290:7
290:23
**fact (22)**
32:12 33:10 34:3,25
35:13 37:24 38:13
38:14 41:23 43:18
65:3,12 119:4
121:22 140:4 143:3
182:23 188:7
213:15 215:18
240:20 260:19
**factors (2)**
73:20 231:24
**facts (3)**
97:11 111:16 291:7
**factual (2)**
111:12 238:8
**fail (1)**
176:22
**fails (1)**
272:19
**failure (2)**
187:12,23
**fair (4)**
26:13 79:17 272:17
286:2
**fairly (5)**
41:8 46:2 65:15,17
75:2
**faith (5)**
149:10 150:6,7,12
250:3
**familiar (2)**
224:10 255:2
**familiarity (1)**
159:13
**familiarize (1)**
136:17
**family (1)**
9:25
**fantastically (1)**

176:17
**far (4)**
183:6 184:17 206:13
240:9
**Farr (3)**
3:16 73:2 76:5
**fashion (3)**
34:3,4 101:22
**fault (1)**
225:15
**favorite (2)**
225:6,7
**fear (1)**
24:19
**feature (1)**
44:6
**February (1)**
18:6
**fed (58)**
24:24 25:2,20 26:3,19
26:20 27:2,4,8 29:8
29:10,17 30:11
46:23,24 101:12,13
101:15,18 115:13
115:20,22 116:12
116:14,15 117:5,7
118:12,12 130:15
167:15 168:2
171:17 190:22
192:3,6,19,25
193:10,18,22 206:8
206:9 210:2,3,6,7
210:20 218:17,19
218:23 219:8,11,19
220:7 224:17,18
267:7
**feel (6)**
35:7 161:3 176:3
206:10 209:13
233:8
**feeling (1)**
148:20
**Felder (14)**
16:21 36:10,17
110:16 111:5 112:2
112:12,14 139:5
140:24 141:4,18,20
185:12
**felt (5)**
56:19,20 175:20
259:2,4
**fight (1)**
70:11
**Figueroa (1)**
4:5
**figure (4)**
265:20 266:12 285:23
286:3
**file (1)**
255:11

**filing (11)**
5:7 12:23 13:21 15:8
15:18 20:7 22:3
24:18 34:6 145:20
145:21
**final (16)**
59:14 82:16,22,23
189:23 196:20
197:24 203:25
204:12 207:20
225:5 229:19 249:9
249:11 263:20
271:14
**finalize (2)**
196:21 197:24
**finalized (2)**
198:17,20
**finalizing (1)**
198:5
**finally (3)**
91:21 92:13 205:4
**finance (12)**
11:22 12:6 14:9 39:4
42:2 118:25 119:13
226:19 244:9,11,22
254:24
**financed (1)**
121:23
**financers (1)**
238:18
**financial (12)**
11:18,21,23 14:11
20:14 81:11 88:9
93:15 109:3 129:11
162:9,10
**financing (9)**
27:20 48:7 79:15
118:6 136:10
137:23 143:13
234:5 239:3
**find (23)**
24:22 62:18,21 63:10
63:21 64:10 65:16
65:25 102:12
120:14,20 149:12
150:20 151:5
172:20 175:19
179:6 183:16
228:15 231:7
239:16 246:24
248:10
**finding (9)**
62:9 63:16 102:20
103:11 147:12,25
176:5 181:15 231:3
**fine (5)**
73:7 76:15 93:12
102:3 161:13
**finished (1)**
85:10

**firm (23)**
14:12 24:23 25:19
35:22 36:5 37:15
138:25 142:24
143:9,12,25 160:4
175:9 176:19
191:19 217:9 232:5
234:21 246:5 248:5
254:23 256:24
275:17
**firms (8)**
38:10,12,15 115:12
236:3,7 237:25
238:15
**first (30)**
8:21 9:6 12:21 19:16
28:15 35:12 51:2
55:2,15,25 61:24
69:23 76:11 98:16
99:25 100:7,8,20
102:18 112:7 139:6
190:11,13 228:15
246:9 255:9 256:8
261:8 281:12
282:14
**fit (1)**
286:22
**five (4)**
54:7,8 274:11,17
**fixed (2)**
42:18 143:15
**Flemming (2)**
189:2 196:14
**FLEXNER (1)**
3:10
**floor (8)**
4:5 38:21,24 49:10
61:10,11,13 84:11
**flow (1)**
203:15
**focus (13)**
23:21 24:14 161:7
181:11,14 212:14
225:17 234:11
241:3 250:18 254:8
256:25 259:18
**focused (1)**
34:17
**focusing (3)**
123:16 225:9 267:18
**folks (41)**
13:17 15:17,24 22:11
25:2 26:8 34:14
35:20,23 36:3 37:5
37:14 38:20,23 39:4
39:23 40:3,12,13,25
44:14,15 66:9,10
79:22 112:15,21,22
112:25 123:9 124:2
124:6 141:6,8,12,12

157:18 159:8
179:20 227:11
260:8
**follow (4)**
23:16 25:6 92:10
275:9
**followed (1)**
245:12
**following (5)**
24:17 156:6 245:17
246:10,25
**follows (5)**
6:5 120:14 152:4
185:9 196:16
**force (1)**
5:18
**forget (1)**
49:3
**forgive (1)**
275:18
**form (13)**
5:10 46:6 126:18
132:23 134:25
167:3,4 177:15
213:24 229:6
243:13 249:20
283:21
**formal (1)**
22:16
**forms (1)**
213:13
**formula (5)**
68:12 270:19 279:21
280:2,2
**Forrest (1)**
196:13
**forth (7)**
20:13 91:22,24 92:9
93:4 215:22 290:12
**forum (1)**
268:6
**forward (3)**
142:14 152:17 169:17
**forwarded (1)**
258:2
**forwarding (1)**
128:8
**found (13)**
89:7 105:16 151:23
152:14 173:15
183:8,14 240:10
241:17 248:14
253:10 265:21,22
**foundation (23)**
44:4,25 48:20 68:25
69:19 71:16 74:10
78:7 94:12 96:22
98:20 101:23,24
108:22 113:7
125:20 146:6

162:15 186:16
240:14 244:16
270:8 271:6
**four-page (2)**
184:5 289:17
**frame (2)**
35:10 219:5
**franchise (3)**
177:13,14,22
**Francis (2)**
254:15 258:3
**Frank (1)**
254:24
**free (1)**
174:18
**Friday (53)**
12:23 13:10 23:4,6
46:14 57:8 59:12,18
60:11 62:23 64:7
65:16 66:12 73:25
74:13 75:10 102:7
102:22,24 103:2
104:16 105:10,16
105:17,21,22,22
118:21,23 119:9
120:20 121:19
122:5,8,10 126:11
131:17 135:24
147:21 148:2,15
158:8,11,12,15
176:19 181:4
183:15 185:23
196:3 231:2 253:13
278:14
**friend (1)**
210:14
**friends (1)**
6:16
**front (6)**
144:14 161:22 162:16
248:7 266:10 281:8
**front-end (1)**
131:16
**fulfill (1)**
56:20
**fully (5)**
169:14 170:11 171:5
171:7 270:21
**functioning (2)**
177:17,23
**fund (9)**
24:23 143:12 176:19
192:22 194:22,24
195:20 218:12
256:23
**funded (3)**
29:13 175:10 195:19
**funders (1)**
24:20
**funding (27)**

23:22 24:13,22 25:7
25:19 29:14 142:20
142:23 143:2,4,7,9
143:14,16 191:19
191:23,24 192:2,2,4
194:16,20 195:2,7
195:13 212:15
226:2
**fungible (1)**
84:5
**further (23)**
5:9,15 112:11 128:10
131:11 132:3 139:4
151:10 156:18
162:4 163:15
188:13,22 193:5
205:13 206:18
216:20 248:19
253:22 275:5
284:10 288:4
290:16
**futures (1)**
24:3
**FX (7)**
149:11,20,21 150:16
150:19 250:4
253:10
**FYI (1)**
280:10
**FYIC (1)**
123:15

_____

**G**
**Gaffey (48)**
3:7 6:7,9 9:3 15:3
18:22 19:12 27:12
51:16 57:18,25 58:5
58:11 69:22 70:10
72:17,21 73:2,7
75:22 76:14 90:16
90:21 98:25 99:7,10
99:15 106:9 112:6
120:4 140:17,20
154:18,20 158:13
161:10,20 168:10
168:14 172:25
184:8 207:12
273:17 275:9,12
280:23 284:21
289:4
**gain (6)**
16:9 78:24 80:3 245:6
245:7 250:10
**GALLAGHER (1)**
3:16
**gap (2)**
168:6,12
**Gary (1)**
261:4
**Gavenda (1)**

261:5
**gears (2)**
218:14 225:16
**Gelband (6)**
16:21 36:14 136:23
139:5 140:24 142:7
**general (11)**
21:22 23:15,19 57:11
157:15 158:7 160:5
218:16 238:14
251:20 282:9
**generally (7)**
56:4 58:15 152:23
211:25 218:20
223:8 237:25
**generate (3)**
116:21 239:6 286:23
**generated (10)**
39:13,17 45:19 83:2
180:3,21 214:17,19
250:2 272:6
**generating (3)**
79:23 83:10 214:23
**genuinely (1)**
201:21
**Gerard (7)**
128:2,8 136:22 200:6
200:7 269:24 280:9
**getting (13)**
23:13 27:3,5 32:16
66:20 81:7 173:13
173:19,22 191:6
196:22 198:22
213:5
**Gilles (1)**
113:25
**give (23)**
6:25 7:13 23:19 25:22
36:11 62:16 83:20
84:4 99:20 115:3
116:21 122:11
134:23 137:6 158:7
161:8 170:17
200:15 206:2
239:21 246:19
251:7 278:7
**given (25)**
28:19 34:4 35:6 37:18
66:6 79:5,7,9 85:17
111:16 128:22
154:7 155:17
177:15 199:7 201:9
210:22 215:5
218:24 231:6,19
232:16 249:11
285:16 290:14
**giving (5)**
47:9 58:20 238:19
283:11,13
**global (1)**

10:17
**GMT (3)**
147:23 159:22 254:19
**GMTs (1)**
197:17
**go (27)**
19:6 27:11 35:9,11
45:25 46:5 48:23
60:22 94:15 95:15
99:22 102:5 113:10
126:20 158:14
161:21 167:19
177:9 198:10
233:23 240:14
246:21 262:9
274:11 276:23
278:11 279:2
**goal (8)**
89:25 90:2 173:13,20
173:22 175:3,21
176:4
**goals (1)**
105:21
**goes (8)**
42:2,2 92:12 97:8
111:4 152:3 193:10
280:14
**going (109)**
6:18 16:25 17:7 34:18
39:14,18 42:11,21
43:19,21,23 45:5
47:15 53:10 57:4,21
57:25 58:3,5 66:13
66:17,21 79:2,4,18
81:6 86:10 92:2
94:15,25 95:2,4,9
97:4 108:25 110:3,3
110:7,23 115:21
116:23 119:15,16
121:7 126:4,12,14
131:17,24 134:17
134:18,20 135:10
135:12,13 136:3,7,9
143:4 145:23
146:22 150:24
156:3 160:3 163:6
163:15 164:5
165:11,25 166:3,5
166:15 168:3
171:16,19 179:11
181:5 184:15 187:5
188:25 192:22
193:2,17 194:8,15
199:13 208:9
214:18 216:3,18,19
218:17 220:7,10
221:16 226:21
229:5 233:5 244:9
251:5 254:8 257:19
258:13 260:3

262:13 270:22,23
271:13 274:16
**good (18)**
6:8 109:6 149:10
150:6,7,11 158:13
161:14 196:21,22
198:22 212:12
213:9 236:21 248:4
250:3 258:13
272:11
**Gotshal (2)**
84:5,17
**governed (2)**
26:19 44:20
**governing (1)**
114:12
**government (9)**
28:20,24,25 81:13
88:21 89:4 226:5,9
255:11
**governments (4)**
89:8 226:12,14
286:25
**grade (1)**
114:6
**graduate (1)**
8:3
**granted (1)**
54:5
**great (6)**
24:19 66:5 142:12
157:25 232:9,11
**Greenwich (1)**
274:8
**gross (1)**
132:16
**ground (1)**
6:23
**group (5)**
17:2,4 49:6 153:13
268:11
**groups (1)**
35:23
**grow (1)**
166:18
**guess (7)**
8:23 22:8 31:10 69:5
144:3 247:7 249:6
**guidance (1)**
134:24
**guidelines (3)**
114:4,11,14
**guys (2)**
131:14 140:25

**H**

**haircut (19)**
28:11,12 48:7 79:15
101:22 118:2 132:6
132:20 134:6,23

135:5,8 136:10
137:6,17,23 138:6
169:14 238:18
**haircuts (9)**
26:19 27:22 28:4,7
29:5 118:6 170:12
234:5 239:3
**hall (1)**
7:10
**Hamish (2)**
3:14 210:14
**hand (7)**
87:14 131:3 178:21
204:17,18 257:11
290:21
**handing (1)**
254:5
**handwriting (9)**
86:25 87:4,10,12,15
87:18 88:2,5,25
**handwritten (2)**
88:8,21 95:16
**happen (6)**
32:17 129:24 137:4
232:4 267:14
274:24
**happened (9)**
24:2 35:18 73:24
104:25 105:15
187:15 193:12,13
193:14
**happening (3)**
117:22 164:25 198:14
**happens (2)**
234:10 236:2
**hard (16)**
20:25 21:5 45:2 64:6
65:22 133:10
134:15,17,21 135:3
135:9 176:18 178:9
181:20 196:25
202:17
**hate (1)**
14:20
**hazy (4)**
55:16 102:23 123:3
158:18
**head (15)**
7:3 9:18 10:6,9,12,18
14:13,16,17 20:22
36:7,8,9,15 37:17
**heads (1)**
123:14
**hear (10)**
6:18 7:18 14:22 38:9
49:7 55:8,15 97:10
216:22 270:3
**heard (7)**
21:21 49:7,8 55:6,11
164:11 220:23

**hearing (18)**
46:14,21 57:13 58:16
58:18 59:3 66:13,17
104:21 105:3
145:23 146:4
155:20 173:25
174:4 245:13
246:11 247:2
**hearings (3)**
56:22 57:3,5
**heart (1)**
194:21
**hedge (1)**
218:12
**HEDGES (1)**
4:3
**held (10)**
2:9 8:19 9:17 219:2
225:24 240:2,11
241:17,25 255:22
**help (2)**
173:13 191:14
**helped (1)**
175:3
**helping (3)**
108:24 175:9 191:24
**helps (1)**
207:7
**hereinbefore (1)**
290:12
**hereunto (1)**
290:20
**hero (2)**
108:3,8
**heroics (2)**
176:14 177:3
**high (5)**
114:6 148:7 211:17
211:22 212:3
**higher (1)**
89:5
**highly (291)**
1:12 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1,18,23 19:1,2,7
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1

76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1

262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
**HNATT (2)**
3:21 154:16
**hold (4)**
68:8 75:22 144:10
233:19
**holding (2)**
10:14 131:3
**holdings (7)**
1:8 4:24 6:11 10:10
10:25 49:19 51:20
**home (3)**
159:20,23 279:2
**HOMMEL (1)**
4:23
**hooray (3)**
216:5,15,20
**hours (3)**
104:22 107:5 215:17
**house (2)**
258:4,5
**HR (3)**
20:23,23,24
**Hrasca (1)**
196:14
**Hubbard (2)**
4:15 248:6
**huddle (1)**
142:13
**huge (4)**
116:3 139:11,13
216:17
**Hughes (3)**
4:15 248:5 269:25
**Hume (44)**
3:14 42:19 43:5 44:3
44:24 47:7 48:19
58:7 64:3 68:24
69:18 71:13 73:6
74:9,24 75:16 76:11
78:6 94:11 96:21
98:21 99:4,8,20
113:6 117:13
125:19 162:14
170:22 174:8
186:15 210:11
227:24 230:2
266:15 270:7,15
271:5 273:14
280:25 281:5
284:10 286:14

289:7
**Hume's (2)**
285:5,22
**Humphrey (2)**
16:22 237:10
**Hyung (3)**
16:22 139:8,9

_____

**I**

**Ian (28)**
1:13 2:9 6:2 110:21
120:16 123:9 128:2
128:5,10 131:14
133:11 139:12
142:17 147:5
149:13 155:14
157:2 182:16 191:6
196:25 200:20
204:22 274:13
278:8 288:12
290:11 291:5,24
**idea (7)**
23:17,19 88:5 94:13
158:7 218:16
275:15
**identical (2)**
210:25 211:3
**identification (16)**
30:24 98:2 146:11
148:22 155:2
161:17 173:3
181:23 184:7 190:2
199:24 203:9 257:6
260:12 274:3
277:15
**identified (19)**
59:18 60:11 75:3
122:25 132:21
151:19 152:7 169:7
172:21 182:14,23
189:14 201:23
241:21 242:22,25
243:5 250:5 251:15
**identify (15)**
22:21 59:12 60:13,21
60:22 61:7 104:3
105:7 134:18
135:10 167:20
202:23 252:7
256:24 271:10
**identifying (11)**
60:20 61:2,20,25 91:9
104:10 147:7
148:11 175:5
222:13 226:19
**Ignore (1)**
106:12
**Illinois (1)**
4:12
**imagine (9)**

30:2 38:17 93:18
107:9 108:9 130:14
220:9 258:25 287:4
**immediate (2)**
78:24 80:3
**imperfect (1)**
240:17
**implemented (1)**
117:10
**implementing (2)**
22:6,9
**implications (1)**
145:5
**implied (1)**
27:14
**important (17)**
17:25 43:16 63:17,20
64:2,8,15,15,18,25
65:10,14 102:15
103:14 143:16
147:25 148:14
**imposed (1)**
116:23
**imprinted (1)**
106:12
**improve (1)**
143:24
**improved (1)**
168:4
**inartful (1)**
44:19
**include (19)**
40:20 48:7,9 62:15
71:10 87:5 92:6
124:23 134:13
180:6,8,10,12,16
201:7 206:9 238:16
252:4 259:2
**included (76)**
12:7,8 14:9,15,18
36:14,16,16 39:2,4
40:23 44:6 53:24
54:13,16 59:14
63:13 75:6 77:4,5
77:10 92:2 109:7
110:24 118:2,4
119:13 126:21,22
126:23,23,24,25
141:11,16 150:10
151:21 153:11,12
178:24 186:24
187:3 201:12,15
202:19 205:23
208:12 213:12
220:19 221:16
241:21 242:4,10,12
242:18 243:7 244:4
248:15 249:3,12,12
249:14 250:8 251:2
251:18 252:15

253:8 254:4,25
264:25 268:6
269:23 276:16
282:19,24 285:7
**includes (4)**
247:23 252:25 266:12
284:7
**including (9)**
32:18 34:23 112:13
159:7 169:14
170:11 223:19
233:21 250:2
**inclusion (6)**
77:17 92:10 253:17
259:13 260:3
273:12
**income (2)**
143:15 280:4
**increase (3)**
191:11 193:7 213:20
**increased (3)**
142:9,19 143:7
**increases (1)**
115:11
**independent (4)**
69:23 172:3 185:4,7
**independently (2)**
52:13 134:11
**INDEX (1)**
289:2
**indicate (2)**
111:23 152:18
**indicated (6)**
16:24 17:10,23 40:11
92:24 152:14
**indicates (1)**
112:5
**indicating (1)**
273:20
**individual (8)**
28:6 53:12 78:16
132:17 134:20
167:5,12 181:21
**individuals (2)**
16:16,18
**inefficiencies (1)**
195:13
**infer (1)**
205:22
**inference (3)**
63:22 65:4,6
**information (19)**
22:10 76:21 91:4
92:22 123:2 129:14
199:4,20 201:10
202:2 222:15
230:21 240:17
259:10,11 260:22
262:9,11 276:12
**informed (3)**

45:4 211:21 284:13
**informing (1)**
237:24
**infrastructure (1)**
9:16
**inherent (1)**
42:15
**initial (3)**
16:13 32:20 227:22
**initially (2)**
24:24 174:13
**input (7)**
39:12,17,22 102:15
227:11 228:19,20
**inputs (1)**
214:8
**inquiring (1)**
215:22
**inside (1)**
45:5
**insists (1)**
46:24
**insofar (1)**
250:22
**institutions (3)**
28:6 217:17,19
**instruct (1)**
76:13
**instructing (1)**
75:19
**instruction (3)**
72:23 75:25 235:6
**instrument (1)**
258:10
**insure (5)**
12:2 121:3 132:25
149:18 201:19
**insuring (1)**
26:9
**integrated (1)**
284:16
**integrating (2)**
9:14 79:21
**integration (3)**
9:11,13 79:17
**intended (1)**
138:16
**intending (1)**
237:13
**intense (1)**
65:17
**interactions (1)**
109:11
**interest (5)**
27:14 30:16 36:7,8
67:11
**interested (7)**
16:3 39:24 169:17
180:5 216:3 228:22
290:19

**interests (5)**
32:10 33:9,15,16
34:22
**interim (1)**
86:22
**intern (2)**
85:6,16
**interns (1)**
85:8
**interpretation (1)**
91:17
**interrupted (1)**
85:12
**introducing (2)**
37:2 40:12
**inventory (23)**
35:22 36:5 37:15
120:15,20 121:17
123:13 124:10,17
124:22 125:6,18,23
210:17 281:22
282:2,5,19,24
283:22 285:9
286:21,25
**investigate (3)**
250:17 251:4 254:3
**investigated (1)**
248:14
**investigating (3)**
149:13 150:22 248:12
**investigation (4)**
150:8 250:7 252:9
253:12
**involve (1)**
234:22
**involved (64)**
13:4 22:24 24:8,9,25
26:8,25 35:6,24
36:12,19 37:13,18
39:4,12,21 40:3
50:21 77:7,8 80:23
86:4 119:10 127:8
127:14 156:12
157:22 158:2
168:25 187:17,18
198:14 205:10
206:19 212:18
220:13 227:20
229:13,17 237:3
244:6,10 245:6,9,11
245:24 246:2,7,8,10
247:6,7,8 269:19,23
270:2 271:9,12
276:5,14
**involvement (6)**
13:7 22:5 23:7 229:2
262:25 263:3
**involving (1)**
244:9

**in-house (1)**
76:12
**issue (18)**
7:7 66:23 97:12 99:12
103:19,22 104:6
124:17 194:21
200:24 205:14,20
205:25 207:3
208:16 268:3,12
284:22
**issues (18)**
6:12 23:22,24 24:10
24:14 121:21,25
123:3 124:21 137:2
139:7 149:16,17
158:22 198:6 206:3
271:22 272:10
**ITD (1)**
278:13
**item (8)**
137:24 150:6,7
205:16 250:4 254:2
265:12 285:8
**items (16)**
109:4 149:17 150:18
157:25 159:8 161:3
185:17 198:6
214:18 224:4,11
249:25 253:12
263:14 272:19
286:3
**iterations (4)**
47:19 82:23,25 214:6
**iterative (7)**
80:23,25 81:3 82:15
88:10 93:7 165:3

---

**J**

**J (1)**
4:19
**James (1)**
261:4
**January (1)**
11:12
**JENNER (1)**
4:9
**Jerry (17)**
14:9 37:16 39:5 63:14
110:16 113:25
119:13 120:16
132:11 134:12
135:3 137:20 139:6
142:16 164:2
257:14 260:7
**Jim (2)**
37:7,9 196:13
**job (4)**
1:19 34:9 179:11,16
**jobs (2)**
181:17,18

**Johannesburg (2)**
7:17,21
**John (2)**
4:20 14:12
**join (3)**
26:2 31:23 33:17
**joined (4)**
8:23 9:7,9 34:12
**Jointly (1)**
1:8
**Jonathan (1)**
269:24
**Jones (4)**
2:10 3:3 6:10 255:7
**JP (18)**
29:10,16,19 116:5
171:18 190:23
205:22 206:15
207:4 208:21 209:5
209:7 216:6 219:6
219:15 267:5 268:8
279:10
**JPM (2)**
189:7 205:15
**JPMC (1)**
220:5
**judge (5)**
46:9,13 66:22 155:20
196:2
**judgment (2)**
235:21 244:23
**July (1)**
10:20
**June (2)**
11:14,17
**junior-level (1)**
85:20
**jurat (1)**
287:5

---

**K**

**K (1)**
3:18
**keen (1)**
115:22
**keep (11)**
6:18,24 8:10 15:5
43:6 47:13 88:13
118:16,17 175:9
243:23
**keeping (5)**
22:19 93:16,18 259:2
259:7
**Kelly (35)**
3:21 13:22 14:10 39:6
96:10 97:20 106:19
106:23 107:4,8,15
107:24 108:7,15,18
136:23 139:5,20,21
139:23 140:25

142:8 180:8 184:23
185:11 188:14
203:24 211:7,16
212:10 214:23,24
257:15 259:21
288:6
**kept (7)**
12:3 22:12 117:19,19
117:24,24 118:8
**key (3)**
109:3,6 200:17
**kind (5)**
122:21 123:22 191:14
251:11 283:19
**Kirk (14)**
36:16 123:10,17
124:7 142:7 215:16
233:11 247:8,21
275:19 276:8,9,9,11
**knew (15)**
32:25 35:5 56:4 75:2
75:6 84:18,22 94:15
94:16 121:14
134:11 157:24
243:2 245:4 274:23
**know (316)**
6:12 9:24 10:2,3,12
10:24 15:23 19:14
21:6,9,24 24:3,4,11
24:18,21 26:8,9,11
28:20 29:18,23 30:6
31:7 33:23,25 34:12
35:19,21,23 36:6,7
36:10 37:16,16 38:8
38:19 39:14,21,25
40:12,23 41:20 42:6
42:9,10 44:8,9,16
44:17 45:8,18,23
47:22 50:18,19,20
50:22 55:25 59:11
59:24 60:7 64:6,7
64:14,16,21,23 65:3
65:6 66:24 68:3
69:2,11 71:8,9,21
71:23 72:9 73:10,15
73:24 74:3,3,4,12
75:4 77:16 79:2,14
79:17,18 82:21,22
83:9,13 84:16,19
85:25 86:3 90:7
91:12,22,24 92:7,8
92:17,22,22 93:6
94:24 95:2,8 96:2
96:11,25 98:23
99:16 101:7 102:2
103:25 104:19,24
105:2,4,6,8 108:23
109:20 111:7,8,20
113:20 114:15
115:16 118:14

119:12 121:13,22
122:13 123:20
124:6,9 129:3,13
132:7 133:17,19,24
135:7 136:17
137:20 141:20
143:21 144:7
150:13 152:10
154:20 157:12,14
159:13 168:15,21
169:11,23 170:3,14
170:24 171:7,11,17
172:8 174:10,12,18
178:20,25 184:11
186:19 187:8,10,10
187:15,15,25
189:23 190:16
198:3,7,8 199:8,12
200:6 201:22
203:18 204:6
206:13,14,25
207:19 208:14,14
208:20,22,25 209:4
209:6,8,11,14
210:14,23 212:9
216:10,11 218:4,25
219:10,16,20,24,24
220:4,8,22 221:4,8
221:19 222:7,8,11
222:14,16,17 224:3
224:4,5,6,15 226:15
227:5,14,17,18
228:7 229:23
230:14,19 236:9
237:6,12,15 239:2
239:23 240:9 241:3
241:16,23 242:13
242:20 243:17
245:24 246:6,9,13
246:22 248:25
250:16 251:22
254:9,22 256:6,23
257:20 258:4,7,9,17
258:25 260:24
262:12 263:13,18
263:19,20,21 265:8
265:9,12,17,24,25
266:3,4,5,17,19,22
268:18 269:6,18
270:20 271:7,13
275:23 277:3 278:5
278:17 282:15,17
282:20,25 283:4
284:6 286:17,24
**knowing (2)**
97:15 159:15
**knowledge (21)**
12:20 15:12 72:15
111:15 141:18
156:2,8 158:3

159:11 160:13
172:3,12 187:22
188:8 232:3 247:9
252:18,23 262:22
265:10,13
**knowledgeable (2)**
37:19 276:18
**known (2)**
95:8,13 179:23
265:11,17
**knows (2)**
72:3 175:15
**KRUSE (1)**
4:25

---

**L**

**L (1)**
4:13
**lacks (15)**
44:3,24 48:19 68:24
69:18 74:9 78:6
94:11 96:21 113:6
125:19 162:14
186:15 270:7 271:5
**language (2)**
123:17 161:25
**laptop (3)**
84:7,9,14
**large (17)**
79:19 142:9 163:11
205:9 232:6,8,14
234:21 235:22
236:3,7 237:25
238:15 239:2 268:6
275:16 279:16
**largely (1)**
211:2
**larger (4)**
29:5 142:16 166:18
213:16
**Larocca (5)**
200:6,25 202:3
269:24 280:9
**late (2)**
197:18 198:24
**latest (1)**
278:2
**law (3)**
217:9 246:5 248:5
**lawyer (3)**
57:16,19 58:8
**lawyers (15)**
73:9,10 75:18,18
83:12 100:3 111:9
111:10 140:3
156:24 157:13,20
233:15,21 247:6
**layman's (3)**
25:8 28:12 138:5
**LBHI (1)**

10:22
**LBI (27)**
10:3,15 16:4,5 24:21
25:3 34:2 41:18
59:20 77:9,12
115:15 116:20,24
117:19,24 118:11
145:24 178:25
210:22 215:6
225:24 255:9,11,22
256:18 272:10
**LBIE (1)**
10:25
**LBI's (1)**
268:22
**LB745 (1)**
51:21
**learn (10)**
38:24 46:21 48:24
49:2,4 50:6 53:7
59:7 97:11 194:11
**learned (9)**
38:5 42:6,8 52:17
53:4,6 55:21 75:17
235:13
**leave (1)**
11:15
**led (11)**
80:24 82:16,23 92:17
164:14,17,22
187:19 210:9,10,18
**Lee (4)**
16:22 139:6,9 140:25
**left (7)**
87:19 101:19 109:21
195:12 212:3 256:7
268:11
**leg (1)**
28:15
**legacy (2)**
77:9 236:11
**legal (8)**
24:11 68:25 71:14
117:14 224:24
270:15,16 271:6
**LEH (3)**
123:9,14 124:6
**Lehman (174)**
1:7 3:4 4:24 6:11,14
9:11,15,22,25 10:6
10:10 11:8,10,15
12:15,17 13:2,24
14:3 15:6,13 16:14
20:23,23,24 22:22
24:2,17 26:9 29:13
30:16,20,21 32:3,11
33:3,9,14,16,22,24
34:11 35:4,21 36:4
36:9,12 37:3 38:7
38:20,23 40:3,13,22

44:15,18 49:18,19
50:16 51:20,20
52:18 53:24 54:3
55:10 57:14,16
60:22 61:7 64:24,24
65:5 77:9 79:19
80:15 84:19 85:6,8
85:16,20 91:23,25
92:16 93:2,25 94:19
96:24 97:18 101:15
101:19 102:16
110:4,4 111:10
114:16 115:18
116:6,9 117:11
118:17 124:2 127:9
127:10 131:7
141:11 149:22
159:15 163:7
164:23 170:2
171:23 172:4
177:13 180:22,25
185:25 191:23
192:2,4 205:3,10
206:23 207:5
209:19 212:3 213:2
213:12,25 219:18
220:5,10,16 221:7
223:12,15,18,24
224:2 226:25
227:10 232:11
233:3,4 235:8,14
236:10 239:17,21
240:7 241:12 245:8
246:9 247:11,17
250:21,22 252:20
253:19 256:2,4
259:14 261:6
263:11 267:15,21
268:19 271:15
272:25 273:3,13
274:20 275:23
276:2 291:3
**Lehman's (36)**
29:22 33:21 41:8,14
41:18,23 43:4 44:11
44:22 53:16,21
72:11 73:12 81:19
82:12 90:4,7 94:3
96:19 97:3 159:3,14
162:12,24 163:24
164:19 166:17
208:11 210:16
227:6 235:3 268:15
269:4,20 270:4,13
**Lehman-Barclays-...**
190:20
**lend (1)**
27:24
**lender (1)**
47:23

**length (1)**
264:3
**lent (1)**
159:12
**letter (8)**
34:25 55:4,5,9,12,15
55:19,22
**letters (1)**
255:13
**let's (11)**
35:9 40:14 48:23
70:11 75:23 102:3
142:13 154:20
158:14 216:21
231:16
**level (11)**
63:19 129:12,15,18
129:21 130:7
132:16,17 133:2
163:5 196:17
**leverage (1)**
95:12
**liabilities (39)**
40:2,7 53:8,11,13
80:15 87:22 96:20
97:14 143:21 211:6
213:21 214:3
224:21 225:2,21,22
226:6,16,24 227:7,8
227:10,16,21 228:4
228:8,10,24 229:4
229:10,12,15,21
230:12,16,22
263:17 270:5
**liability (6)**
53:12,18 95:17
212:13 225:11
226:2
**licenses (1)**
8:10
**Lieberberg (1)**
14:18
**life (1)**
140:19
**lift (1)**
181:2
**likelihood (1)**
160:2
**limited (1)**
203:25
**line (25)**
87:6 88:21 114:3
150:11 173:14,20
173:22 175:3 248:9
258:8 265:2 284:2
284:14,15 285:7
286:3,11 287:4
291:10,12,14,16,18
291:20,22
**lines (5)**

141:25 266:20,21
277:24 286:18
**linked (1)**
124:15
**liquid (3)**
29:4,6,23
**liquidity (1)**
143:24
**list (13)**
36:14 179:20 180:3,6
180:21,22 181:2
205:15 250:2
251:15,17,18 278:6
**listed (20)**
149:12 150:21 151:20
208:13 223:6,17
225:10,20 226:4,6
226:16,23 230:11
231:17 248:11
251:23 265:3,5,7
283:19
**listing (2)**
247:23 283:14
**little (11)**
25:22 51:6 75:12
130:12 151:10
164:13 195:5
210:24 248:19
275:18 280:19
**live (2)**
164:8,9
**LLC (2)**
4:9 51:21
**LLP (6)**
2:10 3:3,10,16 4:3,15
**loan (5)**
195:10,16,21,22,23
**locate (1)**
241:10
**located (2)**
65:2 239:21
**location (1)**
147:19
**lock-up (36)**
59:19 67:8,15,21 68:4
71:12,24 77:6,6
147:3 148:3,6 149:9
150:2,3,7,12,15
152:8 156:21 157:5
157:9,23 160:23
172:23 174:2,17
176:24 189:7 250:3
264:4,22 271:23
280:3,15 285:19
**logic (2)**
238:14 275:15
**logical (3)**
132:8 238:7,9
**logistics (1)**
26:4

**London (1)**
11:11
**long (9)**
8:19 11:9 55:14
100:17 226:13
239:15 250:2 252:5
277:11
**longer (2)**
76:14 116:15 144:5
256:3
**look (30)**
51:23 54:21 86:14
87:18 88:20 89:14
89:24 104:3 106:3
107:22 110:10
113:22 120:7
127:20,25 163:13
168:16 173:7
184:10 189:2
206:25 225:3 230:7
252:9 253:8 256:8
277:16 278:9 281:6
281:10
**looked (14)**
44:15 79:12 99:18
129:11 144:15
147:11 162:9
243:24 244:11,20
250:15 253:5 261:2
262:11
**looking (36)**
6:12 20:11 40:6,6
63:6 66:7 75:10
102:8 107:12,18
118:24 120:23
127:14 147:13
151:2,4 152:19,22
160:12 165:4 170:5
172:18,24 183:8
198:24 203:16
236:14,15 249:16
249:25 255:4
258:14 259:9,11
263:21 273:18
**looks (8)**
87:3,10,11 89:2 149:9
150:4 261:3 285:12
**loop (1)**
259:8
**loose (1)**
244:6
**Los (1)**
4:6
**lost (4)**
34:9 191:6,24 195:6
**lot (14)**
12:5 32:17 65:18 97:2
158:12 171:8
198:11 201:17
202:11 247:15

255:24 271:22
272:13,19
**lots (1)**
57:24
**low (1)**
58:23
**lower (5)**
91:12 95:19 101:4
123:6 173:11
**Lowitt (342)**
1:13 2:9 6:1,2,8 7:1
7:14 8:1 9:1 10:1
11:1 12:1,15 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1,12
21:1 22:1 23:1,17
24:1 25:1 26:1 27:1
28:1 29:1 30:1,25
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1,17 52:1 53:1
54:1,17 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1,4
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1,6 81:1 82:1
83:1 84:1 85:1 86:1
86:12 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1,3 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1,8 111:1
112:1 113:1 114:1
114:22 115:1 116:1
117:1 118:1 119:1
120:1,5 121:1 122:1
123:1 124:1 125:1
126:1 127:1,7 128:1
128:2 129:1 130:1
131:1 132:1 133:1
133:17 134:1 135:1
135:15 136:1,11
137:1 138:1 139:1
140:1,24 141:1,22
142:1 143:1 144:1
145:1 146:1,13
147:1 148:1,24
149:1 150:1 151:1
152:1 153:1 154:1
154:13 155:1,4
156:1 157:1 158:1

159:1 160:1 161:1
161:21 162:1 163:1
164:1 165:1 166:1
167:1 168:1,17
169:1 170:1 171:1
172:1 173:1,6 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1,25 182:1
183:1 184:1,9 185:1
186:1 187:1 188:1
189:1 190:1,5 191:1
192:1 193:1,6 194:1
195:1 196:1,4 197:1
198:1 199:1,25
200:1 201:1 202:1
203:1,11,24 204:1
205:1 206:1 207:1
208:1,2 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1,4 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1,4 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1,11
258:1 259:1 260:1
260:23 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1,24 273:1
274:1,5 275:1,13
276:1 277:1,17
278:1 279:1 280:1
281:1,6 282:1 283:1
284:1 285:1 286:1
287:1 288:1,5,12
289:1,4 290:1,11
291:1,5,24
**Lowitt's (1)**
18:15
**luck (2)**
196:21 198:22
**lunch (1)**
120:23
**Luncheon (1)**
119:20

— M —

**M (3)**

3:21 258:15,18
**mail (4)**
189:4 259:3 279:19
280:4
**main (2)**
63:12 246:5
**maintain (1)**
95:9
**maintained (2)**
14:15 193:15
**maintaining (4)**
12:4 18:18,23 40:14
**maintains (1)**
29:11
**major (1)**
218:11
**majority (3)**
77:11 198:13 219:13
**making (4)**
77:8 88:8 104:10
232:13
**man (4)**
12:11 83:17,19 86:5
**manage (1)**
236:11
**managed (2)**
285:18,22
**management (3)**
14:19 169:15 240:7
**managers (2)**
114:16,16
**manner (1)**
98:11
**margin (2)**
101:17,21 252:25
256:3 286:12,18,21
**mark (18)**
20:12 24:8,9 87:6
91:3,5,6 113:21
128:9 129:21
132:13 137:8
145:19 161:11
162:3 167:20
172:25 273:24
**markdown (1)**
138:7
**marked (63)**
30:23 31:2 51:18
52:14 54:18,19 80:7
80:20 82:21 86:11
93:10 97:25 98:4
100:20 101:10
105:25 110:9 120:6
127:18 135:12
136:12 141:23
146:11,14 148:22
148:25 154:14
155:2,5 159:17,18
161:17 167:6,22
168:4,16 173:3,5

181:23 182:2 184:6
184:10 190:2 196:5
199:23 200:2 203:9
203:12 215:12
225:5 235:3,10
254:6 257:6,12
260:12 265:4
266:14 274:3,6
277:14 284:17
289:10
**market (22)**
24:17 34:5 41:20
42:16 45:25 48:6
88:19 90:8 231:20
231:25 232:9,12,23
233:6,18 234:15,24
235:11 236:2 238:6
239:4,4
**marketplace (12)**
24:19 28:5,8 29:4
41:7 42:24 43:11
64:22 66:4 94:5
232:16 272:18
**markets (5)**
36:15 115:8 258:11
274:25 276:18
**marking (12)**
127:9,10,16 128:4,14
130:6 131:7 145:5
162:2 163:15 169:2
169:5
**marks (8)**
41:14 43:17 131:18
131:19,24 132:7
138:2 276:2
**markup (1)**
89:10
**marriage (1)**
290:18
**Marsal (1)**
4:25
**Martin (32)**
13:22 14:10 39:6
96:10 97:23 106:19
107:24 108:15,18
108:23,24 109:11
136:23 139:10,19
139:20,21,23
142:16 184:23
211:16,19 214:17
214:19,22,23,23,24
215:2,7 259:23
260:7
**Martin's (1)**
120:16
**Mary (4)**
1:18 2:11 290:7,23
**Master's (1)**
7:23
**match (8)**

39:25 227:21 228:4,8
228:10,24 229:3,11
**matchbook (6)**
142:15 143:19,20,23
144:2,4
**matchbook's (1)**
144:9
**matched (1)**
143:22
**matching (3)**
229:14,19 230:16
**materials (4)**
99:17,24 100:2,4
**math (2)**
78:10 151:8
**matter (12)**
23:15 65:3,4,6 123:12
140:14 146:21
147:21 148:8 181:6
181:14 290:19
**matters (1)**
258:21
**maturing (1)**
210:24
**McDade (45)**
14:2 15:16,24 16:10
17:3 22:12 35:13
61:20,24 62:5,9,16
69:6,15 102:18,25
103:17,18,22 104:6
105:2 123:22 149:6
149:15 155:6,12,21
156:19 158:16
159:19,23 160:14
197:6,8 211:21
212:2,9 215:16
216:5 231:2 247:20
249:20 265:20
274:10 276:9
**McGee (4)**
16:23,24 24:9 39:3
**mean (69)**
18:22 22:9,14 25:8
33:25 34:11 36:23
37:4 45:2 48:21
50:9 53:9,17 56:5
60:13,17 63:19 66:3
79:7 80:21 81:3
91:24 96:6 98:24
100:16 106:7
117:18 127:13
128:12 132:19
134:11 138:21
140:15 144:3,22
146:2,23 152:6
156:4 157:24
165:21 166:8,13
170:3,13,19,20
172:6 193:7,8 194:6
198:11 204:8

215:24 223:14
225:2 228:7 232:2
243:12 245:15
250:14 254:22
255:4 258:9 259:9
272:16 274:8
283:22 285:13
**meaning (1)**
150:17
**means (12)**
21:2 31:11 74:4
101:16 130:17
135:18 144:5,6,24
178:6 207:2 268:18
**meant (20)**
27:19 89:18,19 128:9
140:22 141:18,20
146:24 162:3 170:4
176:25 177:4,6,12
177:23 225:21
251:8 274:16
280:12 285:20
**mechanics (1)**
27:2
**mechanism (2)**
29:7,12
**meet (9)**
35:20 36:3,20,21
120:15 123:10
124:2,7 176:20
**meeting (31)**
13:17,19 17:20 26:3
36:25 37:21 40:11
49:18,22 50:5 61:8
61:9 66:21 86:8
102:25 103:5
115:19 123:17,20
139:6 140:3 153:8
196:2,18,20,20
197:5,8,20,24 198:8
**meetings (14)**
13:11 36:24 37:14,18
52:2,4 112:17
114:15 198:4,10,12
198:13,17,20
**memorialized (2)**
56:7,10
**memory (1)**
42:8
**men (1)**
198:22
**mentioned (2)**
59:2 267:12
**merely (1)**
244:8
**Merton (1)**
8:6
**message (1)**
136:21
**met (13)**

6:9 13:22 17:18 36:8
36:10,23 37:23
44:14 61:12,13 86:5
117:4 152:5
**metadata (3)**
98:13,22,22
**Michael (2)**
136:22 258:2
**middle (2)**
256:9 280:7
**midnight (1)**
104:23
**Mike (3)**
16:21 36:14 139:8
**million (21)**
18:13 32:14,15,21
33:12 60:9 78:3
125:15 177:8
189:24 204:2
207:21,24,24
255:10 258:16
264:23 285:14,17
286:4,7
**millions (2)**
258:18,19
**mind (7)**
54:15 76:16 97:9
124:21 161:11
236:24 257:8
**mine (3)**
154:19 181:12 203:20
**minute (4)**
173:23 176:23 218:15
225:16
**minutes (5)**
90:17 207:10 274:11
274:17 275:2
**mischaracterizes (7)**
78:15 94:21 138:10
174:7 175:25 213:4
227:24
**misrepresents (1)**
31:22
**mix (1)**
131:18
**mixed (1)**
125:16
**mixing (1)**
78:19
**moment (7)**
27:18 82:14 144:16
161:24 254:7
257:18 263:8
**Monday (30)**
8:23 15:17,22,25
35:11,14,18,19
36:22 40:8 46:11
59:16 69:3 74:22,23
75:14 79:25 80:12
80:17 83:7,8 108:19

109:25 122:18
197:9 212:6 215:2
215:18 220:21
278:20
**money (11)**
31:15,20 34:16,18
146:22,23 149:8,18
174:3,17 278:6
**Monty (2)**
196:12,19
**Morgan (18)**
29:10,16,19 116:5
171:18 190:23
205:22 206:15
207:4 208:21 209:5
209:7 216:6 219:6
219:15 267:5 268:8
279:10
**morning (43)**
6:8 15:18 17:19 38:9
38:11 42:7 46:11,20
48:24 49:11,14,16
49:20 80:12 81:8
83:5 102:7,21,24
103:2 104:18,22
107:5,16 109:10
123:8,18 124:8
139:7 142:14
148:10 158:16
159:24 160:9 197:9
197:15 204:21
212:7 214:10 215:3
215:17 222:24
230:20
**mortgage (3)**
92:3 109:13,13
**mortgages (5)**
109:19 165:9,18,19
287:2
**mortgage-backed (2)**
220:14 221:6
**move (21)**
116:3,4,4 169:21
171:13,16 176:23
178:5 182:14 187:6
187:9,11,12,23
204:5,7 217:14
274:21 278:17,19
279:14
**moved (2)**
187:7 219:3
**movement (8)**
67:10 171:9 175:8
186:21 190:23
220:11 267:5
279:10
**movements (4)**
26:10,10 169:18
272:10
**moving (9)**

27:2 69:4 169:17
171:20 172:7
185:10 190:17
219:23 279:16
**multipage (1)**
98:5
**multiple (1)**
284:18
**muni (1)**
114:7
**murder (1)**
113:25
**mutate (1)**
73:21
**mutated (2)**
73:19 74:5

_____
**N**
_____

**N (1)**
4:11
**Nagpal (1)**
16:22
**name (8)**
6:8 37:8 83:13 180:13
184:20 248:4 291:3
291:5
**named (1)**
21:7
**names (3)**
36:6 246:18 276:17
**Nancy (3)**
278:12,24 279:13
**narrative (1)**
58:20
**naturally (1)**
286:22
**nature (3)**
24:13 92:8 132:7
**Neal (1)**
196:13
**necessarily (2)**
211:3 264:20
**necessary (4)**
60:16 115:5 129:16
166:2
**necessity (1)**
101:13
**need (37)**
7:5,9 19:9 32:21 51:6
58:4 68:8 89:24
90:16 99:12 132:7
132:12 137:6
142:15 143:19
144:3,25 146:21
147:3 150:13
156:23 166:22
167:9,11,12 176:12
188:19 196:17,19
207:9 215:3,7 278:4
278:5 279:24,24

280:20
**needed (48)**
11:22 24:22 27:25
32:17 56:15 60:21
60:22 61:7 62:18,21
63:19 65:24 67:9,12
67:19 68:16,22 69:3
69:9 95:10,11 96:19
97:21 104:3 116:13
129:21 131:22
132:15 139:15
156:9 167:2 171:21
172:9 182:21
195:20 198:7
199:20 200:24
231:7,12 245:22
253:8 254:2 262:8
271:21 274:24
278:19 280:21
**needing (1)**
157:4
**needs (3)**
145:2 175:13 279:3
**negotiable (2)**
275:24,25
**negotiate (3)**
17:13 92:16 276:22
**negotiated (10)**
96:8 176:21 213:11
224:3 237:16,16
238:23 240:7 247:4
271:17
**negotiating (11)**
22:5,7 38:18 45:5,7,9
118:19 188:2
238:25 271:12
273:5
**negotiation (11)**
22:11 24:8 26:17,24
35:6 44:17 71:17
92:14 93:4 226:24
276:15
**negotiations (14)**
22:13 26:15 35:9,14
92:21 128:25 129:4
216:2 220:17
227:18 236:13
237:4,20 276:6
**negotiators (2)**
228:13,14
**Neil (3)**
4:19 83:25 248:5
**Neilson (1)**
258:2
**net (1)**
80:14
**never (3)**
76:2 204:14 252:19
**new (26)**
1:3,14,14 2:11,11,14

3:6,6 4:18,18 62:15
64:16,18 116:18
117:7 119:4,5 136:3
167:18 168:3
171:19 201:25
219:18 290:4,6,10
**night (26)**
39:8 40:8 80:12 103:6
108:10 120:14,19
131:15 169:13
185:18 191:11
195:21 197:5,14,18
197:19 198:25
212:6 215:3 228:19
278:5,6 279:3
280:11,13,16
**night's (1)**
131:17
**night/Tuesday (1)**
46:11
**nine (2)**
186:18 241:22
**nod (1)**
7:2
**non-actionable (2)**
185:22 186:9
**normally (2)**
144:13 195:12
**Notary (2)**
2:13 290:9
**notations (1)**
88:9
**note (5)**
106:17 128:14 133:23
147:22 184:17
**noted (2)**
10:16 288:9
**notes (2)**
95:16 228:17
**notice (1)**
229:18
**noticed (1)**
230:15
**notion (1)**
234:20
**numbed (2)**
203:9 289:20
**number (73)**
23:24 35:20 38:8
39:20 40:2 45:13,15
45:16,19 47:17,18
62:17 68:13 79:19
81:25 82:22 89:5,6
89:19,21 92:12,12
92:14,18,19 96:8,9
98:5 101:4 112:12
112:13 122:9,20,21
125:10,11 142:9,13
142:25 144:10,11
151:4 159:6 165:9

179:20 180:4
193:10 205:9
207:23 211:16,22
212:2 213:11,16,19
214:5,7,14,14,15,20
214:23 224:8
226:19 229:20
231:15 234:12
268:7 270:23 280:6
281:19 283:22
284:5
**numbering (2)**
168:6,12
**numbers (23)**
19:19 32:24 82:7
87:15,17 93:15 96:3
96:6 99:14 108:25
116:13 125:19 191:6
195:6 214:11,13
225:20 226:15,23
230:10 231:16
282:21 285:16
**NW (2)**
3:12,18

**O**

**oath (1)**
5:18
**object (4)**
76:13 174:8 229:5
283:21
**objection (67)**
23:9 30:17 31:21
42:19 43:5 44:3,24
45:20 47:7,11 48:19
56:17 64:3 65:20
68:24 69:18 71:13
74:7,9 75:16 78:6
78:14 82:4 94:11,20
96:4,21 98:19
101:24 103:12
105:11,18 108:21
113:6 117:13
125:19 126:18
132:23 134:7,25
138:9 146:5 154:9
162:14 163:2
170:22 174:6 176:6
178:2 181:9 186:15
202:21 210:11
213:3 218:8 224:23
227:24 228:5 230:2
238:20 240:13
261:24 266:15
270:7,15 271:5
286:14
**objections (3)**
5:10 105:23 244:15
**objective (1)**
34:2

**obligations (5)**
32:10 33:8 159:4
256:5 268:20
**obtain (1)**
21:18
**obtained (1)**
76:21
**obviously (21)**
23:16 35:5 39:22
41:25 64:14,22
68:19 79:16 86:3
91:12 103:14 116:7
118:11 120:10
127:4 148:6 149:17
156:25 216:2 250:4
273:14
**OCC (10)**
255:8,14,23,25 256:3
256:19,21 267:9
286:19,22
**occasion (1)**
159:9
**occasionally (1)**
139:25
**occur (2)**
15:15 33:17
**occurring (5)**
96:24 118:21 119:8
156:6 219:5
**occurs (1)**
196:2
**October (1)**
10:20
**offer (16)**
31:8,23 32:7,13 34:25
41:5 42:14 43:9
46:3 177:7 178:21
178:23,25 218:5
234:22 273:17
**offered (1)**
89:4
**offering (1)**
218:7
**offers (3)**
77:8 217:13,15
**office (5)**
61:9,10 120:16
247:13,18
**officer (7)**
5:17 8:16 10:21,23
11:5,18,21
**offices (6)**
2:10 158:21 160:10
198:8 221:20,22
**official (1)**
217:7
**Off-the-record (1)**
9:5
**Oh (1)**
33:22

**OK (30)**
15:21 25:22 32:5
51:12 70:9 73:2
83:8 102:3 136:19
140:23 149:9
154:23 168:3 169:9
183:6 184:15 192:8
197:23 203:7
226:11 233:23
247:24 252:23
254:5 257:3 262:15
266:23 277:7
280:17 288:3
**Okay (1)**
7:12
**OLIVER (1)**
4:3
**once (1)**
161:2
**ones (6)**
39:24 87:18 92:4
136:8 141:8,9
**one-page (2)**
162:10 173:6
**one-year (1)**
18:8
**ongoing (4)**
115:14 187:16 199:18
267:23
**open (3)**
136:25 205:16 262:4
**opened (1)**
274:25
**opening (11)**
184:25 185:6 261:12
261:18,23 262:7,13
262:19,25 263:25
265:4
**operate (5)**
28:5 33:25 94:19 95:4
149:19
**operates (1)**
238:7
**operating (2)**
8:16 61:11
**operation (2)**
12:12 169:25
**operational (3)**
136:5 159:14 219:21
**operationalize (7)**
67:9,20 68:17,20 69:7
69:14 234:7
**operationalizing (2)**
121:25 183:3
**operations (9)**
14:17 168:24 169:11
170:5 220:10 244:9
244:11,22 268:24
**opinion (1)**
227:7

**opportunity (1)**
33:17
**opposed (4)**
69:7 92:18 114:13
140:18
**options (32)**
149:13 150:21 151:20
248:11 249:2,17,19
250:6,18,22 251:8
251:12,16,22 252:3
252:4,5,10,11,19,25
253:18 264:25
265:3,24 266:6,13
266:18 283:6,17
284:4,9
**orchestrated (2)**
278:18 279:2
**order (5)**
18:25 19:6 48:2 239:8
280:22
**orderly (2)**
34:3,4
**organization (3)**
14:9 17:25 23:25
**organizations (1)**
159:7
**organized (1)**
174:24
**original (4)**
48:15 138:16 234:13
279:16
**ought (2)**
144:15 244:17
**outcome (1)**
290:19
**outstanding (3)**
193:3 217:13,15
**overall (3)**
75:13 89:25 90:2
**overconcentrated (1)**
113:19
**overlap (2)**
125:17 200:18
**overlapped (2)**
125:3 201:2
**overnight (1)**
108:19
**owned (2)**
250:22 256:18
**Oxford (20)**
4:19 7:25 8:4,5,8 84:2
248:3,5 257:3 260:9
260:21 273:24
275:5 277:7 281:7
281:11 283:3 285:3
288:3 289:6
**o'clock (1)**
274:24
**O'Connor (1)**
14:16

**O'Meara (4)**
120:13 123:8 203:24
257:15

**P**

**P (1)**
4:7
**page (29)**
32:6 87:16 91:17
98:16 100:7,10,20
100:24 101:3,10
113:23 119:21
136:21 185:3,10
190:10,11 196:11
256:9 261:9 287:5
289:3 291:10,12,14
291:16,18,20,22
**pages (5)**
98:13,23 101:8
277:14 289:25
**PAIB (1)**
189:8
**paid (10)**
18:8 32:14,20,25
33:11,18 44:22
45:11 224:17
233:17
**Paolo (30)**
14:11 63:13 106:18
136:23 146:19,20
154:3 156:25
157:12,17 169:10
173:11 178:7 179:5
179:9 182:9,12
188:14 189:2
190:11 206:25
215:25 220:2
222:10 247:19
250:15 253:21
262:16,16 274:12
**paper (5)**
80:24 81:14 131:3
153:11 287:3
**papered (1)**
186:21
**papering (2)**
191:4 192:16
**paragraph (3)**
137:3 141:15 144:20
**paraphrasing (1)**
228:25
**pardon (1)**
124:4
**Park (1)**
4:17
**Parker (1)**
39:3
**part (100)**
13:15 16:25 17:4,10
17:23,24 18:15,17

22:18 29:11,15
30:14 33:23 39:15
39:19 40:10,13 45:3
47:16 49:6 52:2
53:8 59:15 60:15
66:25 67:10 68:18
68:22 86:16,23 87:3
87:5 88:9 93:3,22
101:12 105:6,20
106:7 108:12
109:25 118:9,18,20
120:22 122:15
124:11 125:24
127:4,5 135:11,24
136:3 145:21 148:9
150:8 151:21 155:9
155:22 161:6 179:2
187:25 191:5
192:17 198:13
202:24 203:18
206:11,15 207:13
210:2,4 212:21
218:19,23 219:17
219:19 220:15,17
221:2,7 223:3
224:20 228:20
229:8 240:23 241:4
248:15,20,21 249:5
249:9,13,21 259:10
269:5 273:4
**participant (1)**
109:3
**participants (3)**
34:23 234:24 268:7
**participate (1)**
13:10
**participated (1)**
173:20
**participation (1)**
173:22
**particular (15)**
29:21 37:10 80:14,22
80:24 91:18 93:10
122:20 160:14
163:23 165:17
167:21 197:3
243:12,16
**particularly (3)**
18:20 41:18 232:9
**parties (19)**
5:7 6:3 39:13,18 45:7
45:9 93:8 96:8
208:23 214:16
224:3 228:19
238:23 239:24
241:2 250:24
252:13 273:6
290:17
**parts (3)**

26:20 210:5,16
**party (15)**
12:24 42:10 59:22
65:7 71:17 74:15
93:5 96:23 115:15
118:19 227:2,18
236:12 268:2
269:21
**Paul (1)**
39:3
**pay (42)**
28:15 31:14,19 42:22
43:21,23 44:12
72:12 73:13 75:15
82:8 90:3,6,12
92:24 94:6 96:16
97:4 128:18 132:2
132:14 162:12,25
163:7,10,21 164:5
164:20 165:13
166:18 208:10
209:14,18 213:21
231:18 232:12,15
233:5 235:9,16,19
235:21
**payables (1)**
96:12
**paying (6)**
27:9,10 81:23 91:11
139:17 165:12
**payment (12)**
18:5 32:18,20 95:18
95:21 96:9 109:2
211:19 212:6,17
214:18 263:18
**payments (2)**
18:8 19:15
**PC (2)**
84:8,10
**Pearn (6)**
254:15,20 255:6,19
255:21 258:3
**pending (1)**
7:6
**people (69)**
12:6 13:2,2,16,17,19
21:7 23:24 24:7,21
25:10 26:2 35:4
36:13,21 37:3,3,11
37:13,21 39:20
64:14 79:19,21
112:13,13 115:20
119:10,12 120:10
140:6 143:3,15
153:13 159:9
168:23 172:9
179:21 180:4,23
191:25 197:5
198:14 202:11,16
202:25 203:6 205:9

219:25 220:10
226:19 232:25
241:11,15 244:22
245:4 246:6,23
247:3,11 268:10,11
268:24 269:22
271:21 276:5 278:4
279:14 284:16
**percent (6)**
18:6,10,12 19:18
110:2,3
**percentage (4)**
45:12,15 90:12,15
**percentages (1)**
110:5
**performing (1)**
149:21
**performs (1)**
149:20
**period (16)**
13:5,20 19:4 35:11
67:17,23 72:20,24
76:10 80:18 99:24
174:11 175:10
201:22 257:2
259:19
**person (11)**
37:6,8 61:24 63:12
83:14,16 153:22
157:24 160:6
180:13 276:12
**personal (1)**
178:14
**personally (5)**
229:3,13 241:16,23
246:23
**personnel (4)**
23:23 85:21 127:8,14
**persons (1)**
14:4
**perspective (4)**
80:15 145:3,4,7
**pest (1)**
14:20
**PHILIP (1)**
4:25
**philosophy (1)**
8:2
**phone (3)**
61:8 160:6,9
**phrase (3)**
252:3 267:9 283:7
**phrasing (1)**
25:7
**physical (1)**
243:13
**pick (1)**
165:8
**picked (4)**
112:15,21,25 113:3

**picking (1)**
113:13
**piece (8)**
27:23 54:15 67:21
80:24 110:19 131:2
169:7,8
**pieces (4)**
122:25 223:7 244:7
262:10
**pile (1)**
161:22
**piles (1)**
153:11
**place (37)**
12:21 13:12 15:7 23:5
26:5,11,23 38:21
46:14 48:9 58:18
67:23,25 92:21
102:16 103:6
114:15 117:2,2,7
136:2 151:23 169:8
169:21 171:13
172:8 181:20
195:25 203:21
210:18 225:18
233:25 234:6
245:22 251:3 253:7
272:14
**places (1)**
151:4
**plan (1)**
188:3
**planned (2)**
94:9 145:11
**planning (2)**
94:14,18
**plate (1)**
197:4
**plausible (1)**
282:22
**play (2)**
13:6 80:19
**played (2)**
22:10 247:11
**playing (3)**
27:3,8,9
**plays (1)**
47:5
**Plaza (1)**
4:17
**please (18)**
6:25 7:3 58:13 76:17
119:18 127:25
139:6 155:13
161:22 172:25
182:12 183:25
184:11 190:5
200:15 207:6 251:9
266:10
**pledge (1)**

147:5
**pledged (6)**
149:18 218:18,23
219:8,19 220:6
**plug (1)**
214:13
**plus (2)**
188:3 193:9
**point (53)**
13:3 15:13 17:18
19:21 20:17 28:21
30:21 33:3 35:11
36:21 38:11 41:7
46:12 50:23,24 67:8
89:3 92:11 104:13
122:14 140:19
148:4 150:5 151:15
151:18 152:3,13
155:23 156:3
158:13 171:23
172:6,13 176:18
179:14 186:25
194:16 200:17
208:22,25 211:25
217:24 218:13
230:21 238:4,10
242:3 243:4,6 249:8
256:2 268:10
275:24
**points (2)**
173:14 216:16
**politics (1)**
8:2
**portfolio (1)**
114:20
**portion (3)**
121:16 137:12 189:20
**position (35)**
8:19 9:6,8,17,18
10:12 11:2,4,7 25:3
25:21 37:7 71:19
73:23 74:14 89:10
92:4 93:21 95:5
116:15,20 118:13
142:24 143:9,16,25
181:7 191:19,21
194:23,24 206:11
206:13 256:4
262:21
**positions (33)**
34:13 68:10 113:18
127:9,10,16 128:5
128:10,14,24
129:21 130:7 162:2
162:4 163:14
165:10 166:24
167:5,13 225:24
226:12,14,20
227:13,16 232:19
236:12 258:14

268:15 269:20
270:4,6,21
**possession (4)**
121:14,21 204:17
239:5
**possibility (1)**
181:18
**possible (15)**
49:25 79:19 83:25
85:6,7,18 91:14
100:16 103:5
182:13 266:20
282:14 283:18
284:7 285:6
**possibly (1)**
34:11
**post (6)**
33:25 64:16,19 66:2
82:7 99:25
**posted (3)**
149:22 256:18 272:20
**posting (1)**
256:3
**potential (5)**
12:17 60:14 250:5
251:15 253:6
**potentially (4)**
16:3 34:18 180:23
252:16
**power (1)**
238:25
**PPE (1)**
8:2
**precise (10)**
23:3 49:14 85:17
130:11 154:4
199:11 222:5
229:16 233:7
250:12
**precisely (11)**
38:17 61:12 80:21
92:8 170:3 222:8
237:18 251:5,14
270:20 286:17
**premises (4)**
39:8 85:9,21 86:2
**preparation (8)**
66:25 86:19,23
106:15 107:13
136:15 142:5
155:10
**prepare (8)**
52:5,12 70:13 185:5
196:20 282:15,16
282:25
**prepared (3)**
97:12 211:15 218:5
**preparing (1)**
99:18 127:23
**present (10)**

4:22 32:2 61:14,17
62:4,7 205:11
221:23 222:3
267:18
**presentation (5)**
196:23 221:10,14,24
221:25
**presented (8)**
35:2 50:10,14 71:19
73:17 74:2,13
245:18
**Preserve (1)**
75:20
**president (2)**
14:3 160:4
**press (1)**
51:6
**pressing (1)**
243:6
**presume (1)**
140:15
**pretty (1)**
64:21
**prevailed (1)**
28:7
**prevailing (1)**
235:11
**previous (5)**
74:11 86:11 124:12
244:19 278:13
**previously (10)**
54:18,19 120:6
136:12 141:23
181:3 196:5 201:24
215:12 254:6
**price (36)**
41:4 42:22 44:22
45:11 88:15 90:2,8
91:10,12,23 93:21
128:18 131:25
132:6,20 134:6,23
135:5,7,11 137:10
138:15,19 145:15
146:3 162:11 163:9
164:16 165:13
166:17 208:10
231:18,23 232:22
233:4,16
**priced (3)**
41:19 165:18 210:9
**prices (11)**
42:3 129:7,9 166:4
232:17 235:2,3,11
235:20 275:22
279:18
**pricing (11)**
26:24 29:12,15,16,19
29:24,25 42:5
134:19 234:12
235:15

**primarily (1)**
254:8
**principal (1)**
276:13
**prior (24)**
9:21 15:7 23:6 51:18
54:12 80:7 81:2
85:11 86:6,8 106:2
110:9 123:23 126:9
127:18 179:4
180:22 217:25
221:11 227:25
235:14 236:9
243:18 260:16
**priority (4)**
139:11,13 142:13
182:10
**privilege (6)**
7:7 57:17,20,23 58:9
75:21
**probably (19)**
6:12 55:17 61:13
63:14 71:3 76:24
82:13 113:24
139:10 149:23
170:7 192:11
199:11 217:23
220:2 227:10
269:24 278:17
283:25
**problem (7)**
76:7,10 137:9 144:21
145:6 164:8 194:19
**proceed (1)**
171:10
**proceeded (2)**
58:20 167:3
**proceeding (3)**
21:11 93:7 216:2
**proceeds (2)**
48:13,17
**process (35)**
18:16,17 41:25 42:4
44:10,23 84:24
91:19 92:17 93:8,14
116:8 129:17 130:6
131:7 132:15
164:18 169:19,21
171:12,20,21,24
172:4,5 191:12
193:8 215:8 231:3
239:16 245:22,25
246:2 262:10
276:23
**processed (1)**
279:22
**processes (1)**
159:14
**produced (4)**
98:12 99:2,11 278:8

**product (8)**
11:23 14:10 37:17
80:23,25 81:4 82:16
86:22
**production (3)**
99:2,5 284:15
**professional (6)**
2:12 8:10 148:18
175:21 176:4 290:8
**progress (1)**
104:9
**project (15)**
105:6,9,16 120:22
147:6 148:18 169:6
172:17,19 175:19
181:5,8,15 197:4
202:16
**promise (3)**
274:5 275:10 277:11
**proof (1)**
147:3
**property (1)**
126:3
**prospects (1)**
33:21
**protect (5)**
27:24 30:15 32:10
33:9 47:24
**proven (1)**
174:22
**provide (5)**
224:8 262:8,12 288:7
288:8
**provided (4)**
29:16 215:10 240:6
255:8
**providing (2)**
22:10 24:11
**Public (2)**
2:13 290:9
**pull (1)**
208:3
**pulled (1)**
265:8
**pulling (1)**
191:25
**purchase (54)**
40:21 41:2,5 42:11,15
42:21,23 43:10 46:3
51:19 55:3 56:2
88:15,16,18,19
93:22 94:4 110:21
111:6,7,17 112:2,8
112:10,23,24 113:4
113:9,17 114:13,18
114:21 127:15
128:23 129:23
130:8 134:19
135:13 138:3 141:9
163:9,19 216:7

231:19,24 232:14
232:23 233:6,18
234:14 235:7,25
236:14
**purchased (3)**
6:14 200:19 237:13
**purchaser (1)**
28:15
**purchases (1)**
163:11
**purchasing (6)**
39:24 91:10 93:20
129:8 131:24 232:8
**pure (2)**
33:23 145:7
**purpose (5)**
127:11 167:6 168:11
203:5 282:24
**purposeful (1)**
229:25
**purposes (4)**
119:6 127:17 202:15
252:6
**pursue (1)**
252:14
**push (1)**
151:10
**put (39)**
28:12 30:25 37:8
46:15 51:17 65:19
86:10 89:12 95:21
95:22 98:3,11,13,22
99:14 102:4 110:8
116:25 117:2,7
120:5 138:5 141:13
164:16 167:11
177:15 178:9
181:25 190:4 195:5
196:4 199:25
203:11 208:8,9
210:19 244:14
266:3,3
**putting (13)**
52:9 54:17 105:25
136:11 157:13
167:6 184:9 197:4
202:11 225:8
233:14,20 234:15
**p.m (26)**
111:24 120:3 128:3
131:13 132:4
147:22 155:12
159:21 182:8 184:6
190:12 196:15
197:19 199:23
200:10 254:19
257:6 260:12 263:5
278:14 280:9 288:9
289:18,20,22,23

## Q

**qualify (1)**
83:19
**quality (3)**
113:4,14 209:9
**quantified (1)**
122:22
**quantities (1)**
236:10
**quantity (2)**
235:8,22
**quarter (5)**
211:12 212:11 214:16
236:10 237:21
**question (58)**
5:11 7:6,8 33:5,6
44:19 52:8 54:21
57:23 58:13 63:23
63:24 67:14 69:5
70:4,5 73:8 75:12
76:16,20 89:12,14
92:12 97:8 99:13,23
110:22 111:4,19
117:15,16 119:7
125:2 131:4 145:19
152:3 160:21
164:17 165:16
174:9 192:18,21
194:9 213:6 227:3
229:6,8 251:21
259:25 276:4,20
277:8 283:5,15
285:4,5,19,23
**questions (22)**
24:10 136:5 144:19
158:21 159:2,9,16
160:20 184:16
205:6 216:20 225:8
239:14 247:25
255:15 267:14
270:11 275:6,14
280:19 284:11
288:4
**quick (4)**
51:12,14 183:25
207:6
**quickly (2)**
238:24 281:2
**Quinn (2)**
4:3 217:9
**quite (6)**
23:23 34:7 51:10
70:25 191:20
282:22

## R

**RACERS (14)**
205:15,20,23 206:9
206:11,12 208:12
208:17 209:2,6,9,21

210:2,4
**raise (1)**
179:10
**raised (1)**
277:9
**raising (1)**
179:12
**ran (1)**
14:19
**range (2)**
172:23 177:20
**rapidly (1)**
191:20
**rate (1)**
27:14
**rates (3)**
36:7,8 141:16
**ratios (1)**
95:12
**raw (3)**
45:13 89:19,20
**reached (12)**
38:6,10,13,16,25 59:4
59:9 60:8 110:2
151:16,18 202:5
**read (23)**
52:7 56:21 76:18
117:17 128:16
133:11 134:5,9
145:13 157:10
163:17 164:10,11
184:17 188:22,25
189:3,4 204:15
254:11 257:18
277:19 288:6
**reading (4)**
137:19 189:10 255:6
279:20
**reads (1)**
156:20
**ready (3)**
67:13 182:14 260:24
**real (3)**
212:13 260:19 266:5
**realize (4)**
28:2 67:25 239:8
240:16
**really (16)**
34:17 48:14 67:18
73:23,25 88:13 91:7
113:12 117:22
125:21 199:6
244:13,16 252:13
256:25 280:4
**realtime (3)**
2:13 170:17 290:8
**reason (22)**
43:12 47:2 67:23
98:15 108:9 140:8
154:5,7 232:21

235:2 254:25 276:7
276:11,16 291:6,10
291:12,14,16,18,20
291:22
**reasonably (1)**
83:17
**reasons (5)**
82:10 114:20 115:13
115:24 177:20
**recalculated (2)**
169:12,25
**recall (133)**
10:10 11:12 17:4
30:12 37:4,9 38:3
38:17 49:5,21 50:12
51:3,5,7,8,9 52:15
52:22 56:11 57:6
58:15,23 59:5 60:3
61:4,12 62:6,24
64:5,13 65:11 67:4
80:21 82:16,19 86:8
86:21,23 88:8 89:3
91:15 92:2 96:10
97:15,22 98:9
102:13 104:8 110:5
110:13 112:15
115:9 120:19
123:19 127:21
136:14 146:16,18
146:24 148:20
149:3 152:21,23,25
153:2,22 155:8
168:17 172:16
173:9 175:22,23
176:9 178:16 179:8
179:12 182:4
183:17 185:8 190:5
190:7 191:17
192:20 197:2,3,4,8
203:14 204:19
211:23,25 212:5,8
212:16,21 215:8,15
215:20,21 218:20
221:13,15 223:3,5
223:22 229:2 231:9
231:20 232:24
233:13 236:4
237:18 239:18
250:16,25 251:14
253:14,25 255:4
256:20 259:20,22
263:3 268:5 269:10
273:10,23 275:20
277:22 282:8,12
283:11,13
**receivable (1)**
188:19
**receive (4)**
32:18 47:24 180:23
223:24

**received (21)**
48:9 115:10 116:16
138:20,23,25
167:23 169:13
170:2,9,16 180:24
222:14 223:8 224:2
224:6,13,15,20
234:4 245:8
**receiving (1)**
27:5
**recess (8)**
51:15 90:20 119:20
161:19 184:4
207:11 239:12
257:10
**recognize (13)**
31:2 33:13 80:10
87:14 120:8,9
146:15 149:2 186:4
254:12 257:23
261:14,15
**recognized (3)**
82:2,6 245:4
**recollection (142)**
13:22 16:21 17:22
21:4,20,22,25 38:22
39:2 45:14,17 49:15
49:23,25 50:2,4
55:13,16 57:9,11
58:22 62:11,19
64:20 69:23 70:20
71:5 77:23 78:2
83:11 84:14,21 85:3
85:5,15 90:14 91:7
93:12,13,17 98:8
100:15 102:23
103:4,24 105:13,19
105:24 106:22,25
107:3,7,14,19,21
108:6 109:9,10
110:12 112:7
113:15 114:10
117:4 122:6 123:24
137:18 142:4
144:23 145:18
151:7,12,13 153:9
154:2,7 155:17
157:15,17,19,21
158:18 159:25
160:5,18,25 161:5
168:19 176:15
182:20 184:13
185:5,8 186:19,22
188:11 189:16,18
194:14 196:9 197:7
199:12 200:4,23
201:4 205:19,21
211:18 214:21,25
216:14 222:5 223:9
229:16 230:18

233:8 234:18 235:5
247:21 248:23,24
250:12,14 253:3,9
253:20 254:13
255:25 256:17
259:12 260:6
263:10 267:19
268:9,23 269:23
270:9 272:5 273:19
274:18 279:4,12
282:9
**recollections (2)**
119:11 211:20
**reconciliations (2)**
279:23,25
**record (13)**
7:3 9:3 27:7 76:18
100:7 106:5 117:17
130:22 131:8
284:12,20 290:14
291:7
**recorded (2)**
41:15 43:25
**records (5)**
12:3,5 41:21,23
127:17
**recounting (2)**
57:12 58:19
**recover (1)**
28:25
**recs (1)**
279:21
**reduce (1)**
232:17
**reduced (1)**
50:16
**reducing (2)**
144:9,11
**reduction (1)**
101:17
**Reed (2)**
4:15 248:6
**refer (9)**
28:11 40:18 75:8
103:21 157:3
158:25 177:21
182:18 207:16
**reference (21)**
76:20 120:12 123:6
132:5 134:5,23
135:4,6 146:3
166:25 173:15,24
175:16 189:5
190:15 197:23
198:23 216:9 258:7
274:16 276:8
**referenced (7)**
82:13 120:10 121:10
146:4 201:18
206:16 266:13

**referencing (1)**
134:12
**referred (13)**
24:6 27:17 109:12
119:7 130:8 133:6
133:14 143:3 162:2
173:19 194:2 219:4
284:3
**referring (44)**
25:18 100:8 106:10
109:23 121:6
129:19 131:5 133:6
139:19 142:18,23
143:8,18 146:8,9
155:15 157:4
158:24 162:21
164:3 169:24
170:15,24 171:12
174:4 177:11,24
178:7 182:17
191:16 197:25
199:11 204:11,25
205:2 220:19 235:3
236:22 242:9,14
244:8 279:9 280:3,4
**refers (7)**
147:2 149:17 163:14
171:12 185:14
197:19 242:6
**reflect (17)**
41:9 42:13 43:16 82:8
88:18 91:21 110:14
132:7,12 138:2
162:23 163:21
204:4 208:10
225:21 245:23
267:6
**reflected (18)**
42:14 43:9 44:7 81:21
128:19 131:25
132:14 162:10
163:8 225:18 227:6
231:18 235:4
240:22 254:18
263:23 264:17
265:18
**reflecting (2)**
118:6 132:16
**reflection (1)**
272:12
**reflections (1)**
272:7
**reflective (1)**
233:17
**reflects (10)**
88:16 90:7 162:22
163:4 164:4 183:7
253:4 255:21
263:10 286:10
**refresh (11)**

93:11 107:14,18,20
114:10 123:23
151:11 176:15
256:17 259:12
279:4
**refreshed (2)**
69:24 71:2
**refreshes (1)**
112:7
**refreshing (2)**
70:20 71:5
**regard (16)**
26:17 39:23 45:10
53:5 63:3 91:18
96:25 122:19
172:11 181:21
212:9 235:6,19
250:24 251:6 271:8
**region (1)**
48:22
**Registered (2)**
2:12 290:7
**regroup (1)**
278:19
**regularly (1)**
22:19
**regulatory (4)**
68:4 145:3,3,6
**Reilly (33)**
14:9 37:16 39:6 63:14
66:9 110:16 111:5
111:25 113:25
119:13 128:2,8,13
131:12,20 132:4
133:5,9,24 134:14
136:22 137:2,14
139:5 140:24 142:8
144:20 145:14
180:10 257:14
258:12,24 259:25
**Reilly's (1)**
134:22
**reiterate (2)**
234:20 244:19
**relate (1)**
147:6
**related (7)**
13:7 48:14 105:8
223:21 224:21
227:16 290:17
**relates (1)**
89:15
**relating (2)**
144:9 229:14
**relation (2)**
212:25 222:23
**relationship (1)**
226:3
**relative (1)**
28:7

**relay (1)**
103:17
**release (3)**
264:4,22 285:19
**released (1)**
149:24
**relief (2)**
216:17 274:13
**remain (2)**
32:22 145:2
**remained (4)**
33:3 195:19 199:18
209:7
**remaining (4)**
32:18 34:13 110:4
249:15
**remains (1)**
195:25
**remember (23)**
16:13 55:20 60:25
62:8 122:8,9,10,21
122:22 156:16
198:19 214:22
216:12 217:18
231:4 258:21,22
266:24 267:16
277:18 281:15
283:8,9
**remembrances (1)**
158:20
**reminded (1)**
277:10
**removed (2)**
251:17 252:19
**renewed (1)**
35:13
**repeat (6)**
14:23 73:8 74:11
76:17 117:16
261:19
**rephrase (4)**
23:14 33:5 210:15
213:6
**replace (3)**
194:19 195:7 224:17
**replaced (2)**
25:4 225:14
**replacement (3)**
138:7,12 267:6
**reply (1)**
274:12
**repo (155)**
23:4 25:3,4,11,21,24
25:25 26:16,18,18
26:19 27:15 28:16
28:23 29:8,10,17
30:11 46:22,23,25
47:3,5,10,14,20,22
47:25 48:4,10,13,17
64:16,19 66:2 73:20

77:8 78:4 79:13
101:13 114:23
115:4,5,18 116:11
116:15,20,22,25
117:6,7,11,21,21,23
118:10,13,15 119:4
121:8,13,16 125:25
126:5,9,11,14,17,22
126:23 127:3 130:4
130:4 135:20,25
136:2,4,8 137:5,16
137:21 138:6,13,18
143:5 144:7,7,8
145:9,12 167:3,7,12
167:14,14 171:17
171:19 185:18
186:8,13,19 188:9
188:10 190:21,24
191:4,15 192:4,5,6
192:16,19 193:3,8
193:15,20 194:2,12
195:7 201:2,8,12,16
201:20 202:5,19,25
205:23 206:8,9,11
208:19 209:23
210:3,6,19 218:15
219:12,17 223:21
224:17 225:12
233:25 234:2,10
240:23 249:21,24
249:24 256:24
263:16 267:7,7
279:11 282:9
**report (4)**
13:25 180:14 255:3,5
**reported (10)**
1:17 12:9 13:18 14:2
37:13 179:15 237:9
262:16,17 271:24
**reporter (7)**
2:12,13 7:2 14:22
216:21 290:8,9
**reporting (2)**
149:15 259:3
**reports (11)**
14:5,7,8,14 37:12,21
57:2 66:16 108:15
180:19 181:17
**repos (3)**
144:10,12 191:23
**represent (5)**
98:10 152:11 217:5
248:6 251:3
**representatives (3)**
159:6 267:24,24
**represented (7)**
91:11 96:11 136:2
152:9 240:4 264:20
281:20
**representing (9)**

72:7,17,19,21,24
73:6 76:6 153:14
268:8
**represents (2)**
165:13 228:11
**repurchase (7)**
25:13,16 30:10
218:19,23 224:12
224:20
**request (1)**
6:16
**requested (1)**
184:25
**requests (1)**
24:4
**require (4)**
52:25 147:13 238:2
238:18
**required (1)**
224:7
**requirement (11)**
68:5,19 69:13 142:10
142:19 143:7
167:19 183:23
234:7 271:18
279:14
**requirements (1)**
176:20
**requires (2)**
143:12 279:21
**rerun (2)**
280:18,20
**reserve (8)**
58:10,10 270:13
272:2 279:21 280:2
280:2 288:6
**reserved (1)**
5:11
**Resi (1)**
109:21
**residential (4)**
109:19 220:14 221:5
236:25
**Resis (2)**
110:3,23
**resisting (2)**
205:24 206:4
**Resi's (2)**
220:23,25
**resolution (4)**
268:2 270:18 271:2
271:15
**resolve (4)**
176:24 199:20 200:24
207:4
**resolved (6)**
67:16 118:16 187:13
187:24 198:7
270:10
**respect (10)**

25:13 54:20 86:13
93:9 124:16 169:3
176:5 190:19 211:4
285:5
**respective (1)**
5:6
**respond (3)**
71:20 108:7 133:9
**responding (2)**
110:22 131:13
**responds (3)**
155:21 175:11 191:9
**response (7)**
141:14 156:18 175:11
274:22 275:13
**responsibilities (3)**
11:25 22:20 31:25
**responsibility (7)**
12:5 261:16,20,21
262:4,6,14
**responsible (2)**
12:2 13:15
**rest (1)**
32:11
**result (13)**
15:9 28:3 66:24 73:20
82:18 94:4 148:4,13
166:14 167:18
174:4 209:2 244:3
**results (1)**
169:16
**resume (1)**
15:13
**retain (2)**
179:21,24
**retained (1)**
118:10
**retaining (1)**
180:5
**return (2)**
114:24 167:25
**returned (3)**
11:11 101:14 121:24
**returning (1)**
25:11
**revenue (1)**
79:23
**reverse (5)**
27:4,15 144:7,11,12
**review (10)**
70:12 89:13 153:19
165:6 166:15
200:16 254:7 259:6
260:25 263:8
**reviewed (5)**
52:9 70:19 75:4
133:15,21
**reviewing (1)**
284:2
**Reyda (2)**

278:13,24
**re-mark (1)**
166:24
**re-marked (1)**
168:6
**Ricci (5)**
148:10,14 187:17
231:2 269:24
**Rich (9)**
17:18 36:23 60:14,17
60:18 61:10 102:13
148:14 269:24
**Richard (2)**
3:20 18:22
**Richie (20)**
17:18,21 36:23 37:23
60:17,18,19 61:2
61:7,15,19 102:7,10
102:19 103:16,17
103:23 104:2,7
**right (47)**
18:17 25:20 35:10
41:24 46:22 52:11
58:10 70:6 87:17,24
88:3 100:25 102:3,9
104:25 108:15
110:24 124:5,5
134:22 135:2 151:3
157:2 162:6 164:21
170:16 188:17
189:14 190:22
193:12 194:7
197:16,23 198:18
208:19 210:15
241:7,13 243:22
244:14 265:21
266:2,2 276:25
285:20,21 288:6
**rights (1)**
19:5
**right-hand (3)**
90:24 95:19 101:4
**risk (7)**
66:6 79:16,18 115:23
148:18 175:21
176:4
**risks (11)**
79:6,8,9,12 268:21
269:3,7,13,15,16,19
**Robert (13)**
3:7 4:13 154:3 175:14
175:16 184:23
222:10 247:19
261:4 262:16,17
278:3,8
**role (10)**
13:6 14:15 22:7,10
47:5 80:19,22
109:11 218:10,11
**roles (1)**

247:11
**roll (5)**
143:4 193:19,25
194:15 195:24
**rolling (3)**
24:21 25:7 194:11
**Romain (1)**
261:4
**room (10)**
38:18 45:5 83:20 84:2
92:20 95:12 153:15
278:13,16,25
**rooms (2)**
84:11 221:22
**roster (1)**
36:11
**roughly (2)**
81:25 188:10
**round (1)**
116:13
**RPR (2)**
1:18 290:23
**rules (2)**
6:23 68:5
**run (3)**
11:22 279:22 280:22
**running (2)**
271:22 276:13
**runs (3)**
190:11 258:4,5
**R-E-C-S (1)**
279:22

―――――――――

**S**

**Safe (1)**
262:24
**sake (1)**
7:3
**sale (7)**
28:3 137:10 145:15
145:23 146:3 174:5
236:25
**satisfied (2)**
169:16 256:5
**satisfy (3)**
126:8 183:5,23
**Saturday (14)**
156:20 158:16 159:21
159:24 160:9
174:14 183:6,7
197:14,18,19 198:4
198:25 200:11
**save (1)**
75:23
**saw (9)**
30:19 51:8 66:25
86:16 112:8 166:7
281:12 283:4,5
**saying (23)**
17:6 65:11 94:24

102:13 112:15
131:14 133:9
134:14 135:8 141:6
143:11 150:3 172:2
174:14,21 192:20
216:4 243:23
274:10 279:21,23
282:8 284:2
**says (29)**
27:7 70:8 87:5,25
101:19,20 106:11
108:3 110:20 124:2
133:11,25 135:3
142:20 143:10
147:3 149:8 150:20
159:20 169:10
188:6,7 200:17
203:20 206:19
248:10 255:7
256:10 283:23
**scan (1)**
136:16
**Schaefer (1)**
24:9
**schedule (94)**
26:23 27:17,19 28:9
28:10 75:3 81:12
88:9 89:6,9,17
91:21 97:12 98:16
100:8 101:18,25
121:12 129:11
153:3,6,10,12,13
154:7 162:9,10,15
162:21,22 167:12
201:6,7,11 208:7,9
211:8,15 212:20,25
221:12,15 222:2,4
222:13,20,21 225:4
225:6,7,9,17 226:17
228:11,11 229:12
230:9,15 240:3,6,20
240:22 241:14,15
241:19,21 242:4,6,7
242:8,10,12,13,18
242:18 243:7 244:4
244:14,25 264:18
264:19 265:9
281:11,14 282:15
282:16 283:11,15
283:20,24 284:6
286:16,19,23
**schedules (5)**
100:2 121:10 122:24
167:19 200:16
**Schiller (1)**
3:10 73:3
**school (1)**
7:15
**screening (1)**
93:23

197:16
**sealing (1)**
5:7
**search (12)**
126:13 152:24 158:5
181:5 239:14
240:10 241:4,7
243:9,11,18 264:10
**searched (2)**
241:4 243:19
**searching (4)**
66:11 152:12 243:8
244:7
**seats (1)**
216:21
**SEC (1)**
270:14
**second (13)**
8:7 9:4 19:17 79:16
99:25 100:10,11
101:3,10 113:23
164:9 190:10
255:11
**secondary (1)**
7:14
**section (2)**
156:11 225:11
**secure (1)**
260:5
**secured (3)**
24:20,22 143:4
**securities (29)**
29:21,24 41:15,19,19
90:8 109:13 110:23
112:16 165:17
185:19 189:7 210:8
210:23 220:6,15
221:6 223:21
224:19,22 232:5
236:2,7,25 237:25
238:15 255:11
276:3 281:23
**security (4)**
28:13 29:6 189:20
255:13
**security-by-securit...**
165:6 169:2,4
**see (125)**
32:20 33:7,24 34:20
50:25 52:20,22 56:9
56:11,15,19 70:8
75:23 81:13,15
88:22 89:20 95:19
95:23 97:10 98:15
100:6 106:21
107:25 108:4
109:20 110:17
112:18 114:8
118:24 120:17
123:25 128:10

131:18 132:5,24
133:10,12 134:2,15
134:17,21 135:4
137:12 142:14,20
144:18 145:12
146:19 148:2 154:6
155:24 156:15
157:8 163:19
177:14 178:6
184:17,20,21 185:2
185:3,12,13,20,21
186:2,7 188:20,21
188:23 189:5,10
191:7,13 200:21
204:22 205:17
206:20 211:11
213:22,22 229:21
229:22 230:10,12
230:13 246:14
254:14,16,17
255:16 256:9
258:16,17,18 259:5
261:12 263:5,7
264:14,18 265:2,5
266:11 274:13
278:15,21 281:18
281:19,20,22,23
282:3,6 283:10,14
283:16,22 284:2,4
285:9 286:9,19,20
**seeing (24)**
51:7,9 86:6,21,23
91:17 92:22 98:8
106:22 110:12,13
127:21 136:14
146:18 156:16
168:17 182:4
184:14 189:15
190:5,7 200:4
277:18,22
**seen (39)**
34:7 51:25 52:2,5,13
52:15 54:22,24 80:8
86:15,17,18 100:13
100:20,23 101:3,7
106:4 112:2,9 134:5
136:13 142:2
146:17 154:15
155:6,9 173:7 182:3
184:12 196:6 200:3
203:13 204:14
205:7 207:3 215:13
277:20 278:23
**Seery (2)**
37:7 215:17
**segment (1)**
114:24
**seized (1)**
243:15
**seizing (1)**

182:21
**selection (2)**
141:10 232:22
**sell (16)**
28:24 29:3 43:19,20
47:25 79:12,14 94:9
120:15,20 124:14
125:7 232:18
238:24 239:6,7
**selling (8)**
95:6 121:3 232:6
236:3,7 237:25
238:15 277:2
**send (8)**
20:16 69:6 105:21
131:17 155:13
197:12 254:21
258:14
**sending (4)**
132:13 193:5 198:22
215:21
**sends (2)**
255:7,21
**senior (6)**
38:20,23 143:14
169:15 218:11
247:6
**sense (31)**
40:7,14 76:24 77:2,4
80:5 81:8 82:7 93:7
103:10 109:6
110:25 111:3
112:25 114:21
115:24 122:3 124:9
124:20 133:20
157:7 160:19 223:2
223:11 231:11,13
232:4 233:12
238:17 250:23
275:20
**sent (15)**
21:4 105:9,17 142:2
146:19,20 184:19
190:12 254:15,19
258:24 261:10
263:5,12 277:25
**sentence (3)**
164:9 229:7 248:9
**separate (7)**
71:2 124:17,20
167:19 192:5,7
286:10
**separately (1)**
124:25
**September (66)**
6:13 8:25 9:7,9 12:14
15:19,22 20:9 32:6
33:10 35:2 41:13
49:20 51:22 55:4
79:25 102:7 106:24

107:5,16 111:24
114:2 123:9,18,23
128:3 129:2 131:13
132:4 133:14
136:24 147:21
155:12 156:20
159:22 162:13
165:5,21 170:17
176:12 182:7
185:10 189:3,6
190:12,20 191:3
193:6 199:22 200:9
203:17 204:21
215:18 225:19
235:14 247:13
253:16 254:16
255:8 261:11
267:13 271:19
272:3 278:14 280:9
289:19
**sequence (1)**
280:7
**series (16)**
8:12,12 121:25
122:24 129:6
135:10 149:16
150:24 159:2,18
166:21 184:22
188:24 205:5
267:14 275:14
**served (1)**
10:17
**service (2)**
29:11,15
**services (1)**
224:8
**session (2)**
45:9 120:2
**sessions (2)**
45:7 118:19
**set (14)**
68:5 69:3 92:3 128:4
128:13 139:6 164:3
166:3,4 198:6
203:13 239:3
290:12,21
**setting (3)**
61:6 227:15,22
**settle (1)**
67:24
**settlement (13)**
149:11 150:19 158:22
158:25 159:4
187:13,16,19 209:5
219:4,14 250:3,4
**settlements (4)**
149:20,21 150:16
253:11
**settling (2)**
68:4 210:24

**seven (6)**
16:19,20 21:7,11,14
204:10
**shake (1)**
7:2
**Shapiro (1)**
24:8
**share (1)**
18:3
**shared (7)**
16:15 17:25 22:17
38:19 153:3,5
221:17
**sharing (1)**
279:13
**sheet (17)**
95:10 184:25 185:6
261:12,18,23 262:5
262:7,13,19 263:2,9
263:23,25 265:4,18
291:2
**sheets (3)**
215:6 266:18 284:17
**shift (2)**
166:6,9
**shoes (5)**
46:23 159:4 210:2
218:17 250:21
267:15,20 268:22
269:4
**short (13)**
7:11 149:10 152:2
207:9 225:24 226:2
226:12,20 227:13
227:16 239:10
252:4 257:8
**shorter (1)**
144:6
**shorthand (3)**
28:10 43:15 186:9
**show (9)**
51:11 69:20 70:2
127:18 130:12
168:3 258:19
263:24 282:20
**showed (3)**
221:11 278:7 281:7
**showing (5)**
80:6 106:6 108:13
146:22 215:11
**shown (23)**
43:4 44:11,21 45:11
45:13 55:24 81:19
89:6 90:4,11,13
96:18 138:8 162:12
162:24 166:17
185:23 208:11
212:19 213:21
264:6,8 276:3
**shows (2)**

95:17 255:9
**shrink (4)**
142:15 143:19 144:2
144:6
**shrinking (2)**
143:23 144:8
**shrunk (2)**
121:20 122:4
**sic (2)**
34:19 238:18
**side (11)**
27:4 36:12 81:9,11
87:17 88:22 90:24
95:18,19 164:23
275:23
**sign (3)**
21:11,14 31:16
**signature (1)**
32:5
**signed (13)**
5:17,19 21:7,9 31:9
31:12 32:7 33:11
34:25 204:12,22
205:4 224:7
**significant (1)**
42:16
**signing (1)**
32:4
**similar (3)**
29:25 137:23 211:2
**simpler (1)**
111:19
**simply (2)**
122:17 214:3
**simultaneously (2)**
49:7,9
**single (2)**
203:4 284:18
**singular (1)**
99:3
**SIPA (2)**
4:16 248:6
**sir (46)**
15:8 19:17 46:6 51:24
53:5 54:20 71:9
78:11 81:12 82:14
83:20 84:4 88:20
90:22 91:4,19 98:10
111:15 113:22
117:9 119:7 123:17
172:12 188:8
207:14 215:11
249:8 250:11,20
252:4 253:15
254:12 255:3 256:9
257:23 266:24
267:12 268:4,13
270:3,11,25 271:16
275:7 285:11,14
**sit (4)**

93:14 160:12 166:23
166:23
**sitting (2)**
195:8 198:12
**situation (2)**
37:4 119:4
**size (13)**
42:14 43:10 88:18
128:22 138:2
231:19,24 232:22
233:5,17 234:14
235:25 238:24
**Skip (4)**
16:23,24 24:9 39:3
**slightly (4)**
19:19 97:8 100:6
185:24
**small (1)**
210:21
**smoothly (1)**
171:10
**snarfed (1)**
149:9
**soft (1)**
21:5
**sold (6)**
28:2 123:13 124:11
234:8 236:10 256:3
**sole (1)**
127:5
**solve (4)**
76:7,8,9 208:25
**somebody (11)**
28:18 38:18 43:21
84:19,20 153:25
235:13 250:5 266:2
267:3 286:24
**somewhat (2)**
102:23 114:23
**sooner (1)**
231:13
**sorry (9)**
51:4 60:18 85:12
213:5 223:13 227:4
245:14 261:19
280:25
**sort (46)**
23:18 32:19 36:25
42:13 44:14 48:6
53:11 58:23 67:9
68:4,9 70:25 73:20
80:14 82:22 89:12
89:14 95:10 96:24
108:24 109:18
125:2 144:24
154:21 161:7
164:24 175:9
176:22 177:17
183:20 201:9
213:13,16 215:5

220:20 228:23
235:24 238:2,16
239:3 245:18
247:10 248:25
251:15,24 263:17
**sounds (2)**
103:8 284:21
**source (4)**
64:25 250:5 252:14
253:6
**sources (35)**
30:2 41:20 59:12,17
60:11,14,20,23 61:3
61:8,21 62:2,10,14
62:17 72:3 102:8,12
102:20 103:11
104:3,10 105:7,15
147:25 150:9,18
188:24 244:20
251:4,16 252:8
256:24 263:21
264:2
**South (2)**
7:17,21
**SOUTHERN (1)**
1:3
**speak (7)**
7:19 16:10,11 104:5
139:25 159:23
179:18
**speaking (4)**
107:8 160:2,6 174:2
**speaks (1)**
286:15
**special (5)**
6:10 18:7 19:14 32:23
217:8
**specific (74)**
21:20,24 24:3 30:7
35:7 38:22 50:11,12
57:9 58:21 59:10
62:11 63:3 64:20
67:4,14 70:7 74:4
80:14 83:18 84:13
84:18 85:4 93:17
97:16 100:15
109:20 119:11
122:16,25 138:15
138:15,19 155:16
157:19 158:3,21
159:25 160:18
161:4 165:10 166:3
166:4 167:20
168:19 184:13
196:8 201:4 203:14
205:21 214:25
222:23 223:13
230:17,18 231:9
232:2,24 233:13
235:6,18,20 236:12

236:22 238:4,10
245:14 246:6,18
247:9 274:18
275:20 279:17,17
**specifically (36)**
30:12 37:20,21,22
44:16 49:6 65:12
69:17 70:2 76:3
91:16 107:2,9
121:13 146:16
149:4 152:21
153:18 155:9 156:8
170:25 172:8
173:10 176:10
180:2 182:20
183:18 192:21
207:2 215:20
218:13 234:19
242:25 248:23
254:22 271:14
**specified (1)**
139:17
**specifies (1)**
31:25
**specify (1)**
27:22
**speculate (7)**
115:25 141:17 144:24
170:25 246:7,19,21
**speculating (5)**
100:17 122:17 222:9
266:21 274:19
**speculation (5)**
33:23 145:7,8 170:23
270:16
**speculatively (1)**
107:9
**speechifying (1)**
75:24
**speed (1)**
123:11
**spend (1)**
283:25
**spending (2)**
158:20 256:20
**spends (1)**
208:6
**spent (5)**
63:5 96:25 198:12
247:15 259:17
**spoke (10)**
35:12 58:17 61:23
103:16,17,23 104:6
179:15 275:19
276:23
**spoken (6)**
107:10 140:13 160:8
233:10,16 271:9
**spread (9)**
46:3 234:23 236:16

236:19,20 237:7,16
237:19 239:2
**spreadsheet (3)**
264:15 281:10 285:7
**spreadsheets (1)**
83:12
**ss (1)**
290:5
**stamped (19)**
30:22 97:24 146:10
148:21 154:25
161:16 181:22
190:2 260:17
277:13 289:11,12
289:13,13,14,14,16
289:19,24
**stand (6)**
78:18 123:12 169:20
171:24 194:25
195:7
**standard (7)**
28:4 47:22 48:6 118:6
171:21 234:4 239:4
**standards (2)**
28:7 114:11
**standing (5)**
75:24 84:10,12 172:4
209:25
**stand-alone (1)**
250:9
**start (5)**
6:15 8:21 184:22
203:22 231:16
**started (4)**
83:3,4,6 215:19
**starting (3)**
121:19 196:10 216:16
**state (8)**
2:14 22:13 97:9
210:22 284:12,15
290:4,10
**statement (2)**
93:15 255:9
**statements (2)**
255:8 257:16
**STATES (1)**
1:2
**status (1)**
150:23
**stay (4)**
47:18 143:5 206:19
206:23
**stayed (1)**
34:18
**staying (1)**
110:7
**step (5)**
7:10 159:3 218:17
225:25 250:21
**stepped (4)**

206:8 210:20
268:22 269:3
**stepping (3)**
192:6 267:20 269:19
**steps (3)**
46:22 267:15 278:20
**Steve (7)**
24:11 57:7 246:12,16
247:5,5,21
**Steven (1)**
173:12
**STIPULATED (3)**
5:5,9,15
**stock (7)**
53:25 54:5,8,16
180:24 213:13,24
**stood (3)**
33:11 194:23 215:22
**stop (1)**
152:19
**stopped (1)**
152:22
**straightened (2)**
199:14,17
**street (5)**
2:11 3:5,18 4:5 192:2
**stressful (1)**
275:3
**structure (1)**
126:8
**structured (1)**
78:23
**struggling (1)**
70:24
**subheading (1)**
286:21
**subject (22)**
31:24 128:4 142:20
146:21 149:8
155:13,23 158:22
173:12 182:9
190:13 218:20
219:4 226:24
228:13 248:9 258:8
259:21 261:11
265:2 267:12
274:10
**Subscribed (1)**
288:14
**subsequent (4)**
55:12 100:4 272:14
273:11
**subset (1)**
16:6
**substance (2)**
102:11 140:10
**substantial (10)**
24:17 42:12,23 43:19
46:2 195:21 234:22
235:8 236:10

255:22
**substitute (1)**
161:10
**succeed (5)**
172:19 176:13 177:2
177:12,20
**successful (4)**
79:20 178:8 181:8,16
**sufficient (1)**
136:16
**sufficiently (4)**
51:24 54:22 86:14
277:17
**suggest (5)**
130:23 134:4 141:14
142:12 171:15
**suggested (2)**
135:18 252:9
**suggesting (4)**
137:15,20 150:12
151:11
**suggests (8)**
123:21 147:9 149:24
151:8 155:18 157:7
255:24 261:8
**Suite (1)**
3:12
**sum (2)**
102:10 282:21
**summary (1)**
189:6
**summed (1)**
241:22
**Sunday (25)**
12:24 153:4,7 158:23
160:11 197:14,20
198:4,9 200:12,13
200:14 202:4
247:12,12,13
254:15 256:22
257:16 261:10
263:6 267:13,22
268:15 278:6
**supervision (2)**
13:14 153:25
**supplied (1)**
25:18
**support (5)**
30:19 95:11 176:21
177:18 224:9
**supporting (2)**
24:3 208:19
**supposed (4)**
89:22,23 167:17
187:2
**sure (47)**
22:8 23:12 31:10
32:16 36:19 37:6
51:13 67:5,21 70:10
70:25 90:19 104:25

115:2 119:19
121:15 130:25
136:5 140:17
142:11 156:23
168:13 174:23
182:22 184:2
192:24 194:6 201:5
201:6,10 206:14
207:7 216:15
223:16 233:11
239:11 242:23
245:16 246:22
247:22 257:9
258:19,20,20
266:11 268:17
275:4
**surmise (1)**
130:16
**surplus (1)**
68:2
**surprise (4)**
66:5 79:9 85:19
213:17
**surprised (4)**
79:4 85:15,24 194:10
**surprises (2)**
142:9 143:2
**surrounding (2)**
23:7 212:19
**swaps (1)**
115:11
**switch (1)**
218:14
**switched (1)**
225:16
**Switching (1)**
230:24
**sworn (5)**
5:16,19 6:4 288:14
290:13
**system (2)**
170:8 256:14
**systems (2)**
131:16 199:20

—————————

**T**

**table (4)**
6:16 57:24 212:4
275:24
**Taggart (8)**
4:7 217:3,4 233:22
247:24 275:14
283:21 289:5
**take (56)**
7:2,10 11:3 12:21
19:8 23:18 26:5
28:23 30:11 47:15
51:12 54:21 73:3
76:14 86:14 88:20
90:16 106:2 107:22

110:10 113:22
115:17 118:12
119:17 120:7
127:19,25 136:16
173:6 184:10
188:25 193:10,17
206:7,10 207:6,8
218:18 225:3,23
230:25 239:5,10
245:22 254:7 257:8
257:17 258:15
260:23 263:8
268:21 269:3 270:4
276:2 277:16 278:9
**taken (19)**
6:20 13:11 23:5 25:3
38:21 58:18 115:23
137:5,17 140:5,14
149:25 171:17
199:9,15 208:18
209:21 249:4
272:14
**takes (4)**
46:14 47:2 67:23,25
**talk (13)**
25:14 26:3 38:2 40:18
115:20 140:4,8,9
143:19 160:15
218:15 269:8
276:25
**talked (29)**
30:13 31:10 37:24
47:17 82:2,10 93:23
114:22 125:9
135:25 141:24
148:12,16 158:12
161:24 162:7 165:6
166:20 191:18,20
201:13 204:10
208:15 209:16
223:9 242:5 264:22
268:12 281:13
**talking (24)**
20:6 38:3 73:9 75:9
81:2 87:21 90:23
120:23 124:18
131:2 137:24 145:4
147:7 157:17,20
158:6 169:3 172:18
215:2 225:13
228:18 244:5
275:22 279:8
**talks (1)**
109:21
**target (7)**
62:16 150:13 151:6
151:12,16,18 152:4
**targeting (1)**
151:9
**tasks (1)**

108:20
**tax (4)**
10:18 11:24 14:13
180:13
**TBA (5)**
149:11 150:16,18
250:3 253:10
**team (4)**
169:11,25 174:24
188:2
**teams (4)**
39:22 40:6,6 273:5
**tell (29)**
15:23 16:12 17:3,20
23:2 36:2 39:16
44:9 51:24 54:22
65:9 70:18 71:4
78:11,21 86:15
101:16 106:3
110:11 120:7
127:12 128:25
147:12 168:17
173:7 190:5 214:22
263:9 267:19
**telling (1)**
278:24
**ten (1)**
90:16
**tend (1)**
29:5
**tends (1)**
28:8
**term (11)**
26:20 43:13 44:14
55:6,8 143:5,6
144:4 186:10
220:23 226:2
**terminated (1)**
117:12
**terms (38)**
17:15 18:2,3,5,18
19:23 20:14 22:6
25:8 26:15,18 28:12
38:6,10 39:16 42:8
42:10 45:12 49:4,9
52:25 53:4,6 56:16
75:14 107:6 111:17
111:21 114:23
118:7 133:21 138:6
174:2 183:5 187:23
217:25 218:6,12
**testified (11)**
6:4 222:24 227:19
228:16 229:18
231:15 245:10
248:13 264:3,9
266:23
**testify (2)**
235:23 253:22
**testifying (1)**

testifying (1)
140:11
testimony (18)
70:13 77:21 78:15
94:21 107:13
138:10 176:2
207:13 223:4,17
227:25 228:23
231:22 234:11
237:24 266:24
267:16 290:14
text (3)
142:2 147:2 200:16
thank (11)
7:12 27:11 35:8 51:14
65:7 171:3 184:3
203:7 275:6,8 288:3
Thanks (6)
30:4 173:13 196:21
196:24 207:25
280:23
thick (1)
153:10
thing (9)
6:19 47:21 82:24
124:24 138:17
139:7 243:23
249:10 253:25
things (25)
14:23 32:17 38:4
48:25 66:20 74:15
85:18 93:3 94:24
97:3 108:23 125:22
127:2 150:24
163:25 175:4
178:18 183:18
198:20 215:22
223:18 238:23
246:14 280:6 281:2
think (134)
15:4 19:7,10,18 20:3
20:22 24:9,10 25:17
32:9 33:22 34:7
35:12 36:13 43:14
43:16 44:13 49:13
49:15 56:15 58:19
68:15 70:4 78:2,17
78:21 79:11 84:25
89:22 93:3 96:7
99:16 103:6 108:9
112:14 115:7 119:6
125:4,8,13 126:10
127:13 130:3
132:11,25 135:23
138:12 143:2
145:19 148:15,17
150:3,17 151:19
153:9 160:10,17
162:4,7,18 164:2,21
164:22 166:19

172:21 173:17,19
176:9,16,16 177:4
177:10,11,19 178:6
178:7 183:2,19
186:9,23 192:9,10
199:2,10,16,17
202:15,16 203:18
205:2 207:3 208:3
208:18 209:23
210:13,14,21
221:14 222:2,9,21
223:6 225:22 227:9
227:19,22 228:2,16
228:17 229:9
231:13 238:22
240:3 242:14
243:11 244:19
245:16 246:5,7,20
247:3,5,6,20 250:13
252:17 262:8
264:19 274:23
275:17 279:6,13
281:17 282:11
thinking (4)
64:5 121:12 154:5
232:3
third (1)
32:6
THOMAS (1)
4:23
thought (10)
53:23 64:8 75:22
143:4 201:24 206:8
227:8 240:15
243:10 244:12
thousand (1)
285:19
thousands (1)
258:18
three (3)
36:19 54:7 216:15
Thursday (26)
20:3,5,6,10 26:7
65:22 103:6 116:2
116:11 117:2,5,6
120:20 122:13
125:5 126:10
137:19 143:12
149:23 185:18
192:13 194:24
225:14 280:10,13
280:16
tight (2)
156:23 157:4
tighter (2)
142:11 143:11
time (83)
5:12 7:5 10:16 11:15
12:14 17:12,14
18:16 32:19 35:10

38:5 41:7,8,10
42:23 49:17 50:15
52:21,23 56:4,5
57:19 63:6,25 67:17
67:24 71:21 76:8
79:24 86:6 97:2,11
105:5 106:23
111:25 112:8
113:11 127:7
131:16 135:14,17
147:22,22 152:3,4,6
158:20 159:22
161:14 168:5 172:8
178:4 194:10
198:11 199:13
205:11 208:6
209:16,16 210:17
210:18 211:14
216:11 219:5
230:15 231:6,8
232:9,11 242:11
244:17 253:15
254:18 256:21
257:2 259:17
260:23 263:12
274:8 275:3,6
283:25 288:9
times (2)
231:15 234:12
timing (2)
155:17 197:22
tip (2)
137:9 144:21
tired (3)
49:24 158:19 213:5
title (1)
121:21
toast (3)
176:14 177:3,25
today (26)
25:15 55:25 70:13
72:7,18,22 107:13
114:22 122:9,22
123:11 139:11
140:5 142:8 160:12
169:18 185:16
209:16 216:13
233:15 234:11
245:10 249:22
271:9 277:21
281:13
told (20)
35:12 48:25 58:16
61:7 66:18 71:24
72:5 82:14 92:11
102:6 111:20
131:14 169:15
171:24 172:9
175:24 205:14
234:25 265:20

273:9
Tom (2)
16:22 237:10
tomorrow (7)
131:15 137:11 142:11
142:21 143:11
145:15 280:11
tonight (1)
137:8
Tonucchi (1)
66:9
Tonucci (44)
14:11 63:13 106:18
107:24 136:23
142:7 156:19 169:9
173:12 175:11
176:11 177:2,24
178:12,20 179:4,5
179:15,24 180:2,6
182:9 188:14,18
189:3 190:12
192:14 196:14
203:17,24 204:20
205:14 206:18,23
215:16 220:2
222:10 247:19
250:15 253:17,24
274:7,9,16
Tonucci's (2)
173:21 175:2
top (16)
89:24 101:19 106:11
110:15 140:23
141:25 155:6
159:19 164:25
182:10 184:19,20
196:11 256:10
277:24 279:19
topic (5)
114:24 129:2 160:14
179:10 277:8
topics (1)
230:24
top-down (6)
44:16,23 89:14
164:15,18 165:2
total (14)
53:22 89:19 165:19
186:18 189:12
193:8 228:7,8 229:9
229:10,20,21
230:11,12
totaled (1)
282:2
totals (1)
230:5
toxic (1)
114:5
track (3)
88:13 93:16,18

tracked (1)
93:3
tracking (1)
80:13
trade (5)
68:3 79:13 117:23
177:12 205:23
traded (2)
126:5,25
traders (2)
131:6,23
trades (2)
25:11 67:24
trading (4)
41:7,10 210:22,25
trail (5)
173:9 184:14 254:11
transact (2)
171:18 239:2
transacted (1)
225:13
transacting (1)
16:3
transaction (167)
6:13 16:17 17:8,17,24
21:11,15 22:4,8,9
23:5,8 25:13,16,17
25:24,25 26:4,12
31:24 33:2,16,20
34:7,21 39:15,19
44:2,6 47:6,16,20
48:8,10,15 53:10
55:10,13,14,18
56:24 57:4 59:13,14
59:15,23 62:15
63:18,20 64:2,16,18
66:2,3 67:11,13
69:10,11,12 73:16
73:18 76:25 79:3,5
80:13,17 81:7 94:8
94:9 96:15 109:2,5
109:7 119:5 121:2
122:15 124:11,24
126:2,12,15,21
127:4,5,6 129:6,16
130:3,5 135:11
136:3 137:21
138:13 150:11
151:21 152:17
156:5 161:2,6 166:2
167:2 173:17
174:15 176:18,21
178:14 179:2,4,7,19
179:22 181:20
183:5 186:6,8,8
192:5 201:8,12
202:13,25 210:4
216:18 218:15
220:15,20,24 221:2
221:7 223:3,7,10,19

223:25 225:14
228:20 233:24,25
234:2,2,5,10,13
236:24 237:8,17,20
237:23 238:11
239:24 248:15,20
249:13,15 250:9
251:2 252:12,15
253:19 263:16,20
264:20 273:11
274:20,22 275:16
279:16
**transactions (4)**
27:20 236:6,23 238:5
**transcript (3)**
164:9,10 236:18
**transcription (1)**
291:8
**transfer (14)**
126:6 173:16 174:18
174:19 191:5
192:17 202:20
205:16 240:11
241:18 270:12
271:3 273:20
278:25
**transferred (19)**
22:22 60:12 77:18
165:11 183:10,15
185:17 186:6 209:2
220:7 221:6 239:17
240:24 241:6,11,12
242:17 243:21
273:2
**transferring (2)**
68:17 223:18
**transmitted (1)**
222:12
**transpired (1)**
58:22
**treading (1)**
48:25
**treasurer (2)**
10:17 14:12
**Treasuries (1)**
204:2
**treasury (3)**
11:24 144:5,6
**treat (1)**
271:13
**treated (1)**
271:14
**trial (1)**
5:12
**tried (1)**
206:19
**triparty (16)**
29:9,9,11,15,20 98:17
100:10 116:5,6
167:23 170:8

190:20,24,25
195:11 219:17
**true (1)**
290:14
**trustee (2)**
4:16 248:6
**try (6)**
6:24 7:4 14:25 23:14
28:12 206:23
**trying (13)**
23:16 46:15 88:13
126:8 129:4 132:25
141:13 174:11
199:2 202:14
239:16 246:24
268:19
**TSA (1)**
224:7
**Tuesday (36)**
17:19 35:18 36:22
38:9,11 40:8 42:7
46:20 48:23 49:12
49:20,22 50:19 59:5
59:9,16 72:12 73:13
73:19 80:12,18 81:8
83:2,5 108:19
109:25 115:10
121:19 122:4
129:10 192:11
212:7 215:3 220:21
227:23 249:6
**tumultuous (5)**
39:7 42:24 64:22 66:5
108:11
**turmoil (1)**
34:5
**turn (1)**
266:18
**turned (2)**
148:4 266:22
**two (34)**
6:24 15:9 18:7 19:14
19:15 33:12 38:10
38:12,15 54:20
79:12 87:22 125:8
125:16 141:25
143:14 157:25
178:13 185:17,22
186:4,7 208:23
225:16 238:23
244:15 273:6 275:9
276:17 277:14,24
278:23 281:2
289:25
**two-page (7)**
154:14,16 161:8
189:25 203:8
289:18,20
**type (2)**
183:14 255:2

**typical (1)**
48:7
**T.J (1)**
261:5

_____
**U**
**UCC (1)**
286:12
**Ullman (1)**
196:13
**ultimate (3)**
189:21 207:18 227:14
**ultimately (11)**
12:9 44:20 47:5,9
90:9 117:10 172:19
186:5 187:12
218:24 223:8
**unable (1)**
244:3
**unaware (1)**
240:21
**uncertain (1)**
270:19
**uncertainty (5)**
29:2 201:9 232:10,12
270:22
**uncomfortable (1)**
227:12
**undergoing (1)**
203:6
**undergraduate (1)**
7:22
**underlying (3)**
29:8 128:24 138:3
**understand (47)**
10:5 15:8 17:6 18:16
35:21 36:4 37:9,15
45:24 52:25 53:14
53:20 56:15 57:15
67:22,22 69:9 76:23
101:21 106:10
128:16 131:20
132:19 137:14
144:22 146:2
170:12 171:15
183:20 189:11
199:2 216:8 218:16
223:16 224:25
225:15 228:16,24
234:9 239:15
246:22 249:3
268:17,19 270:12
271:16 280:12
**understanding (74)**
15:10,11 16:10 21:10
21:13,17,19 35:17
41:12 44:5 46:6
53:9 60:7 63:15,25
64:17 68:21 74:18
75:13 77:3 78:11,12

78:23 80:2 81:6,21
94:7,8,18 96:14
107:11 108:17
109:24 110:20
112:20 113:2
114:19 117:9 141:4
141:7 145:16
165:23 202:13
206:4,22 212:23
213:7,10 216:12
219:7 222:25
225:10,20 238:5,6
242:15 244:25
245:17 247:10
249:8 250:8,11,20
254:20 258:23
259:7 260:18
262:18 265:6
268:13 269:2
270:25 272:24
274:15
**understood (16)**
16:2 31:17 32:3 40:25
53:22 80:16 133:5
135:15 170:19
172:22 204:7
234:23 263:12
267:4 269:15
276:16
**undertaken (1)**
229:11
**undertook (2)**
125:5 130:19
**unencumbered (98)**
59:20 60:5 67:18
71:11,11,24 75:3,8
75:9 77:5,20 121:4
124:18 125:2,6,11
125:13,17,23,25
126:16,24 147:4,13
147:16,17 151:24
152:7 153:3,6
156:22 157:5,9,23
160:23 172:21
174:3,20 182:10,23
186:10,14,17 199:3
199:7 200:18 201:2
201:6,11,15,21,24
202:6,18,18,24
221:12,15 222:13
222:19 223:20
239:14,16,20,25
240:5,10,16,24
241:5,9,20,24 242:7
243:2,4,9,10,14,17
243:21,25 244:2,12
244:14,21,24 245:3
250:19 264:10,15
281:12 282:17,23

**unfortunately (2)**
84:22 277:10
**unit (1)**
285:15
**UNITED (1)**
1:2
**University (2)**
7:16,20
**unknown (3)**
106:7,11 141:25
**unmark (1)**
161:11
**unsecured (1)**
217:7
**unsuccessful (1)**
148:19
**unsure (1)**
243:13
**unusual (1)**
233:9
**unwind (3)**
68:9 101:13 190:22
**unwinding (1)**
191:10
**unwound (2)**
117:6 270:21
**update (2)**
150:23 196:15 279:25
**updated (3)**
22:19 230:20 261:12
**updates (1)**
66:20
**urgency (4)**
103:10 146:21 147:21
148:9
**URQUHART (1)**
4:3
**use (6)**
93:11 128:20 175:14
252:2 280:10,12
**usually (1)**
280:15
**utilizing (2)**
24:24 170:8

_____
**V**
**vague (21)**
23:9 30:17 42:19 47:7
47:11 64:3 71:13
78:7 82:4 89:12
105:11 117:13
174:8 186:16
210:11 218:8 228:5
230:2 238:20
261:24 266:15
**vain (1)**
178:11
**validate (1)**
42:3
**valuation (3)**

222:23 233:2 266:6
**valuations (1)**
166:12
**value (97)**
28:13,19 40:20 41:9
59:12,18 60:4,4,5
60:14,20,23 61:3,8
61:21 62:2,10,14,17
62:22 63:7,11,17
64:11,25 65:17,25
66:7,12 78:13 88:17
90:4 92:5 96:18
101:17 102:8,12
103:11 104:4,10
105:16 120:24
122:11 126:14
138:7 147:8,13,25
150:3,9,10,14,18,25
151:3,5,22,23 152:9
152:11,14 158:6
165:15 169:12,25
170:7,9 173:16
181:16 183:9,16,18
186:5 209:19
222:18 223:7 231:3
239:8 241:22
249:17,25 250:6
251:5,16 252:8,10
252:15 253:6,11
255:10,22 256:25
263:22 264:3
265:16 282:10
285:11
**valued (4)**
29:8 210:9,9 264:11
**values (8)**
29:20 60:11 81:19,22
162:22 166:10,10
186:12
**valuing (1)**
245:6
**variety (2)**
127:2 281:23
**various (17)**
26:20 29:14 39:22
47:19 50:20 81:12
82:15 87:15 92:23
95:5 121:23 151:24
177:18 180:24
217:16 224:9 253:2
**vendor (2)**
106:13 284:21
**version (8)**
80:22 82:24 161:8,9
225:5 230:8 234:7
249:11
**versus (2)**
90:6 208:10
**vest (1)**
54:12

**vesting (1)**
54:8
**view (15)**
34:15 44:17,23 45:4
80:2 113:20 122:14
164:15,23 165:2,24
220:2 227:6 233:9
273:7
**viewed (1)**
97:5
**violating (1)**
57:22
**vis-a-vis (10)**
39:14,18 60:8 91:25
95:4 143:2 150:24
159:4 176:23
268:20
**VIX (3)**
257:15 258:7,9
**voice (4)**
6:18,24 14:21 15:5
**volatile (1)**
45:25
**volatility (16)**
42:15 43:10 94:4
128:23 138:3
163:11 231:20,25
232:16,17,23 233:6
233:18 234:15
235:25 258:10
**V-I-X (1)**
257:16

_____

**W**

**Wabash (1)**
4:11
**wait (1)**
280:11
**waiting (6)**
38:9,20,24 39:11 49:7
158:20
**waived (1)**
5:8
**waiver (1)**
57:20
**waiving (3)**
19:5 57:17 58:9
**Walker (1)**
261:5
**want (46)**
14:22 18:15 20:12
35:10,11 40:7 41:2
46:12,18 69:22,25
76:2 83:22 100:19
102:5 106:14
109:14 111:3
112:16,24 114:21
115:14 130:23,24
132:6 139:10
141:16 164:10

168:12 176:22
184:17 189:10
206:7 207:8,22
208:17 218:14
225:16 230:24
234:11 239:13
241:3 259:5 280:10
284:12,14
**wanted (22)**
17:23 19:12 37:25
69:2 113:17 115:17
124:6 141:9 143:24
153:19 154:6
160:15 163:9
174:23 179:21,24
201:5 205:22
207:14 237:6
263:24 281:18
**wanting (1)**
113:19
**wants (3)**
92:15,16 238:24
**war (3)**
278:13,16,25
**Washington (2)**
3:13,19
**wasn't (66)**
12:24 17:7,8,10 22:18
22:18 34:17 35:6
42:9 45:3 50:11,21
59:22 60:15 65:7
66:5,20 71:17 74:15
84:19,20 92:20 93:5
96:23 105:4 112:17
114:14 115:15
118:18 121:12
125:24 127:5
133:20 143:6 158:4
160:3 164:25 169:8
171:6 179:25
187:25 194:7
199:16 201:20
202:5 205:10,11
214:7 220:17
221:25 227:2,18
236:12 237:19
244:6 249:9,10
251:6 253:7 259:17
259:18 265:14
266:7 269:21
272:13 273:5
**way (49)**
22:16 48:5 50:6 56:7
78:23 99:10 107:4
107:15 116:3,19
122:23 129:5
132:24 135:22
137:21 138:14
142:14 145:13
148:16 163:18

164:11,12 165:18
166:6,9 167:21
189:15 193:13
195:11 213:22
218:4 220:22 221:5
222:17 225:17
227:5 252:22
260:14 262:3 267:8
273:21,22 278:18
279:2,15,18 283:16
284:9 290:18
**ways (2)**
24:22 143:24
**wealth (3)**
8:16 9:19 140:6
**Wednesday (6)**
24:25 26:6 117:5
142:24 191:20
192:12
**wee (1)**
104:21
**week (43)**
22:2,13,14,21,24,25
23:18,19,21 24:15
32:11 33:8,13 34:5
34:19 39:7 42:16
46:7 50:23,24 52:25
56:5 103:8 108:11
109:25 114:25
115:9 118:14
121:18 127:8 159:5
172:13 178:21,23
179:4,18,22 212:15
232:10 253:15
256:2 272:6,18
**weekend (26)**
57:7 58:17 64:7 65:16
65:23 73:21 74:5,16
152:24 153:2 156:6
156:13 158:8,17
160:7 183:13
199:17 208:16
209:20 221:11
271:18,23 272:3,22
278:19 280:21
**weeks (4)**
55:17,18,21 267:16
**Weil (22)**
83:12 84:5,16,21,23
85:2,4 111:9 153:15
156:24 158:20
160:10 196:20
197:24 198:4,8,11
221:20,22 246:5
247:6,16
**Weil's (1)**
247:13
**went (21)**
7:25 26:21 59:23
74:12 104:14,19,21

104:22 121:15
132:5 135:4 152:17
189:22 207:18
209:6 215:7 219:17
245:20 263:14
265:15 268:11
**weren't (10)**
37:6 39:25 92:4
129:12,14 172:6
194:11 195:14
221:3 272:20
**we're (2)**
6:10 217:9
**whereof (1)**
290:20
**willing (34)**
27:24 28:18,21 42:22
82:8 88:14,15,18
90:6 93:22 94:5
112:23 113:3
114:18 127:15
128:18 129:23
130:8 132:2,14
152:15 162:25
163:10,21 165:13
166:18 209:13,18
231:18 235:7,9,16
235:19,21
**Willkie (3)**
3:16 73:2 76:5
**wind (2)**
34:2 206:12
**wind-down (1)**
34:13
**Wisconsin (1)**
3:12
**withdrawn (10)**
17:13 71:22 81:2,10
81:17 135:16
154:24 173:23
255:19 258:22
**witness (20)**
3:11,17 6:3 14:25
27:10 57:22 70:9
75:25 76:13,23
131:10 161:15
193:24 236:20
275:8 289:3 290:11
290:15,20 291:5
**Witwatersrand (2)**
7:17,21
**wondering (2)**
89:5 141:17
**WOOD (1)**
4:20
**word (7)**
87:25 128:20 155:13
194:7 267:2,3
268:18
**words (7)**

91:3,4,6 98:13
169:6 275:17
286:18
**work (61)**
8:21 9:14 10:5 13:9
13:13 17:7 30:15
31:14,18 53:12
59:11,24 65:15
80:23,25 81:3 82:15
85:9,22 86:2,6,22
88:10 94:15,25
105:8,21 124:12
139:7,23 148:5
149:12 150:16
153:2 156:25 169:7
169:8 172:9 174:13
174:16 175:5,7,13
177:15 178:9 185:5
195:11 196:25
199:18 201:17,22
245:2 249:16
252:11 262:16
265:15 266:7 278:5
279:3,25 280:21
**worked (19)**
16:7 37:11 46:10
50:19 63:9,12 64:6
65:22 84:16,25 85:3
108:10 120:14
122:13 157:12
168:24 176:17
205:9,12
**working (17)**
33:14,15 34:16,20
39:5 64:10 65:13
96:10 111:9 120:19
161:2 181:19
196:11 201:19
202:17,25 249:14
**world (1)**
260:20
**worried (1)**
24:2
**worth (4)**
28:20 82:9,9 265:13
**wouldn't (13)**
30:2 36:24 63:20 79:3
79:20 83:23 95:12
121:24 163:17
164:11 210:25
265:16 266:19
**wound (1)**
34:4
**write (6)**
128:3 139:4 170:20
176:11 191:3 202:3
**writes (13)**
132:4 137:2 140:24
144:20 145:14
170:10 188:18

203:24 216:6 258:2
258:12 274:9
278:16
**writing (7)**
71:18 91:15 93:14
151:25 166:15
184:23 215:15
**writings (1)**
56:9
**written (9)**
19:22 50:17 52:17
56:15 87:15 91:6
145:22 165:5
236:18
**wrong (2)**
19:20 203:21
**wrote (8)**
91:4 112:14 128:12
141:19,21 158:15
160:15 177:24

_____
**X**
_____
**x (2)**
1:4,10

_____
**Y**
_____
**yeah (32)**
23:12 31:16 39:9
40:23 41:17 65:22
66:19 132:24 133:7
140:17 142:4
149:16 151:7
168:10 186:17
188:11 189:13,16
196:8 197:11,20
211:18 225:12
230:4 241:14
245:20 246:12
247:15 261:2 270:9
277:19 278:10
**year (2)**
8:20 54:6
**years (4)**
33:12 54:7,8 177:16
**yelling (1)**
15:4
**yesterday (2)**
142:15 169:20
**York (15)**
1:3,14,14 2:11,11,14
3:6,6,6 4:18,18
167:18 219:18
290:4,6,10
**young (3)**
83:17 84:5 86:5
**Yup (1)**
128:6

_____
**Z**
_____
**zillion (1)**

92:15

_____
**$**
_____
**$1 (3)**
53:15,21 54:2
**$1.7 (1)**
150:14
**$1.75 (1)**
189:17
**$1.9 (1)**
125:10
**$10 (4)**
32:14,15 33:12 177:8
**$100 (1)**
28:20
**$15.8 (3)**
193:19,25 194:11
**$18 (5)**
191:15 192:16,23
193:3,15
**$2 (10)**
53:19 60:6 96:7
125:10,14 148:7
213:8,15,23 214:3
**$2.7 (1)**
165:9
**$3.6 (1)**
109:21
**$4 (3)**
151:6,9,12
**$4.560 (1)**
32:21
**$45 (5)**
116:14,21 138:20,22
186:22
**$49 (2)**
138:25 188:10
**$5 (7)**
45:17,18 47:17 48:18
72:9 73:11 81:25
**$50 (3)**
78:9 139:2 193:17
**$52.8 (1)**
78:13
**$560 (2)**
189:24 207:21
**$6 (1)**
18:13
**$7 (1)**
191:22
**$72 (1)**
82:9
**$72.65 (1)**
82:9
**$760 (2)**
207:24,24
**$99 (1)**
28:21

_____
**0**
_____

**074 (1)**
255:9
**08-13555(JMP) (1)**
1:7

_____
**1**
_____
**1 (8)**
51:18 52:14 77:25
141:15 158:16
264:6 285:20 291:7
**1.3 (2)**
149:10 150:5
**1.7 (2)**
149:11 152:2
**1.763 (1)**
189:12
**1.875 (1)**
19:19
**1.9 (9)**
185:23 186:14 196:15
264:13,14,16
281:14 282:18,22
**1.95 (1)**
182:13
**1:04 (1)**
182:8
**1:10 (1)**
120:3
**1:36 (1)**
147:22
**1:42:32 (2)**
173:3 289:16
**10 (2)**
110:9 280:9
**10th (1)**
4:5
**10:23 (1)**
197:19
**10:27 (1)**
185:11
**10:31 (1)**
188:16
**10:51 (2)**
159:21,21
**10004-1482 (1)**
4:18
**10017-6702 (1)**
3:6
**10254271 (2)**
277:14 289:25
**10293506 (2)**
181:23 289:17
**10298186 (2)**
161:17 289:15
**11 (1)**
1:6
**11:18 (1)**
225:19
**11:53 (2)**
114:2 274:7

**11:53:18 (2)**
274:3 289:24
**115595 (1)**
100:21
**115596 (2)**
101:5,10
**115597 (1)**
101:8
**115654 (1)**
98:6
**12:34 (1)**
111:24
**127 (2)**
136:13 144:15
**137537 (2)**
155:2 289:14
**138017 (2)**
148:22 289:13
**14 (1)**
141:24
**146 (1)**
289:13
**148 (1)**
289:13
**15 (3)**
15:19,22 193:22
**15C (1)**
271:22
**15c3 (66)**
59:19 60:7,8 66:23
67:8,15,21 68:2,4
68:15 69:17 71:12
71:24 77:5,6,24
124:18 125:11,14
126:15,23 148:3
149:9 150:2,3,4,15
152:7 156:21 157:5
157:9,23 160:23
172:23 174:2,17
175:6 176:24
188:19 189:7,17,20
189:21 203:18,24
204:5,8 207:18
223:20 250:3,18
264:4,21 270:13,18
271:2,3,8,18 272:2
272:5,21 280:3,15
280:20,22
**15th (9)**
15:25 20:7 22:3,14
33:8 40:9 41:13
56:5 253:15
**15.8 (4)**
191:11 193:9 194:16
195:19
**154 (1)**
289:14
**16 (7)**
49:20 51:22 106:24
107:5,16 162:13

40:9 41:13 83:2
227:23 234:13
**16:35 (1)**
191:3
**16:44 (1)**
193:6
**161 (1)**
289:14
**17 (6)**
111:24 114:2 128:3
129:2 131:13 132:4
**17th (5)**
129:18,20 165:5,17
166:16
**17:01 (1)**
189:6
**173 (1)**
289:15
**176 (1)**
207:17
**18 (10)**
32:6 35:2 133:14
165:21 190:12,20
191:3,4 192:19
193:6
**18th (6)**
20:9 31:9 33:10 117:3
136:24 145:22
**181 (1)**
289:16
**184 (1)**
289:17
**1875 (1)**
3:18
**189 (1)**
289:18
**19 (41)**
80:7,20 82:3 95:15,17
102:7 123:9,18,23
147:21 155:12
162:16,19,20
163:20 164:6,15,17
164:22 165:10,20
166:5,7,7 208:4,6,7
210:10,18 211:5
214:4,13 225:4
226:24 230:22
231:17 235:4 266:9
266:11,12 278:14
**19th (9)**
23:4,6 46:14,22
105:22 145:24
170:17 181:4 231:2
**199 (1)**
289:19
**1994 (1)**
10:6

---
**2**

**2 (19)**

54:14 77:22 95:22,25
147:4 148:4 211:12
212:11 213:10
214:5,16 255:12
264:11,13,14,16
281:14 282:18
291:7
**2.25 (2)**
95:22,25
**2.7 (1)**
165:12
**2.8 (1)**
114:6
**2:15 (3)**
199:23 200:10 289:20
**2:20 (2)**
261:11 263:5
**20 (9)**
1:15 2:5 55:4 106:2
156:20 159:22
185:10 189:3,5
**20th (7)**
73:22 74:6 104:22
176:12 182:7 272:3
290:21
**200 (4)**
86:12 90:22 93:11
230:7
**2000 (2)**
10:18 18:12
**20006-1238 (1)**
3:19
**20015 (1)**
3:13
**2005 (2)**
10:18,20
**2006 (1)**
10:21
**2007 (3)**
11:12 18:7,10
**2008 (12)**
6:13 11:14,17 12:15
41:13 51:22 54:13
136:24 182:7
185:10 199:23
289:20
**2009 (6)**
1:15 2:5 18:6 106:8
288:16 290:21
**203 (1)**
289:20
**21 (4)**
199:23 200:9 226:12
289:19
**21st (3)**
73:22,22 74:6 202:4
247:13 254:15
257:16 261:10
263:6 267:13
268:16 271:19

272:3
**216 (4)**
30:22 31:2 289:5,11
**217 (5)**
97:24 98:4 284:13,18
289:12
**218 (3)**
146:10,14 289:13
**219 (11)**
148:21,25 151:25
248:8 249:20 251:9
265:2,21 266:14
283:7 289:13
**22 (5)**
203:17 204:21 215:18
235:14 255:8
**22nd (13)**
8:25 9:7,9 22:4,15
33:9 56:6 74:20,21
79:25 253:16
271:19 274:8
**220 (10)**
154:14,24 161:12,16
168:4,7,9,11,16
289:14
**221 (5)**
154:25 155:5 159:19
160:13 289:14
**222 (5)**
2:10 3:5 173:2,5
289:15
**223 (3)**
181:22 182:2 289:16
**224 (3)**
184:5,10 289:17
**225 (3)**
189:25 190:4 289:18
**226 (3)**
199:22 200:2 289:19
**227 (4)**
203:8,12 215:25
289:20
**228 (3)**
257:5,12 289:21
**229 (9)**
260:11,25 265:4
281:6,8 283:11
285:6 286:9 289:22
**23 (10)**
8:12 127:19 131:9
161:22 163:13
164:3 165:4 166:21
169:3,5
**230 (3)**
274:2,6 289:23
**231 (2)**
277:13 289:24
**24 (2)**
54:18 55:2
**24043 (1)**

1:19
**248 (1)**
289:6
**25 (4)**
18:10 19:18 54:19
55:3
**257 (1)**
289:21
**260 (1)**
289:22
**27 (1)**
280:9
**274 (1)**
289:23
**276 (1)**
289:4
**277 (1)**
289:24
**281 (1)**
289:7
**285 (1)**
289:6

---
**3**

**3 (15)**
62:19,22 63:6,10,16
64:10 65:25 66:11
137:3 144:20 151:7
151:13,16 152:9
291:8
**30 (1)**
289:11
**31st (3)**
61:10,11,13
**32nd (4)**
38:20,24 49:10 84:11
**330 (1)**
4:11
**37 (2)**
30:23 289:11

---
**4**

**4 (13)**
62:19,22 63:6,10,16
64:10 65:25 66:11
150:13 151:8,14,16
152:9
**4:02 (2)**
203:20,23
**4:03 (1)**
254:19
**4:07 (1)**
190:12
**4:08 (1)**
257:16
**40 (1)**
226:13
**40.31 (1)**
88:2
**41 (3)**

88:24 89:2,4
**41st (2)**
2:10 3:5
**42 (2)**
88:24 188:3
**42628 (2)**
146:11 289:13
**44.8 (1)**
282:2
**45 (3)**
215:12 224:13,16
**48 (1)**
193:9
**49 (7)**
185:19 186:13,20,24
187:5,5 188:11
**49.7 (1)**
282:11
**49.9 (2)**
200:20 282:11

---
**5**

**5 (22)**
82:13 97:13,20 120:6
125:18 149:12
150:20 189:6
190:13 248:10,20
248:23 252:24
253:4 264:24
265:19,24,25 283:5
283:14,16 284:4
**5-0 (1)**
193:24
**5:01 (1)**
189:3
**5:10 (1)**
106:24
**5:22 (1)**
204:21
**5:24 (1)**
203:18
**5:51 (1)**
288:9
**5:52 (1)**
156:20
**50 (10)**
78:5 110:2,3 138:20
138:22 186:20
187:5 188:12
193:23,24
**507 (1)**
258:15,15,18
**51.8 (1)**
282:6
**52 (1)**
282:21
**522 (1)**
255:10
**5301 (1)**
3:12

---

**6**

**6 (1)**
289:4
**6:04 (1)**
136:24
**6:12 (2)**
184:6 289:18
**6:20:35 (2)**
260:12 289:23
**6:24 (2)**
123:8,23
**60611-7603 (1)**
4:12
**63.8 (1)**
193:11
**654 (2)**
97:25 289:12
**66B (2)**
168:6,8

---

**7**

**7 (19)**
8:12 123:11 142:10
142:19 143:7
185:19 186:24
187:2,8,23 188:3
196:18,19 197:5,9
197:20 275:2
281:19 285:23
**7th (1)**
57:7
**7.4 (1)**
216:7
**7.5 (1)**
19:18
**7:12 (1)**
155:12
**7:53 (1)**
274:8
**700 (1)**
125:15
**7000 (1)**
285:23
**70327 (2)**
203:9 289:21
**745 (1)**
49:10
**750 (2)**
60:9 78:3
**760 (1)**
264:23
**769 (2)**
204:2,9
**77B (1)**
196:5
**77882 (2)**
190:2 289:19

---

**8**

**8 (1)**

274:24
**8.4 (1)**
88:2
**8/20/09 (1)**
291:4
**8:08 (1)**
278:14
**8:09:34 (2)**
257:6 289:22
**80 (9)**
18:6,12 285:12,13,13
285:17 286:3,4,7
**800 (4)**
3:12 60:9 78:3 125:15
**865 (1)**
4:5

---

**9**

**9/20/08 (1)**
256:15
**9/20/2008 (4)**
173:2 184:6 289:15
289:18
**9/21/2008 (4)**
257:5 260:11 289:21
289:22
**9/22/08 (1)**
256:12
**9/22/2008 (2)**
274:2 289:23
**9:15 (1)**
196:15
**9:29 (1)**
128:3
**9:31 (1)**
2:6
**9:33 (1)**
176:12
**9:35 (1)**
131:13
**9:41 (1)**
132:4
**90017 (1)**
4:6
**95B (1)**
254:7
**97 (1)**
289:12
**99 (1)**
28:25

# EXHIBIT N

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                 Chapter 11

7        LEHMAN BROTHERS          Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,   (Jointly Administered)

9                    Debtors.

10       ------------------------x

11

12            DEPOSITION OF EDWARD J. ROSEN

13                 New York, New York

14                 February 19, 2010

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 28461

19

20

21

22

23

24

25

| | |
|---|---|
| Page 2 | Page 3 |

**Page 2**

1
2
3
4          February 19, 2010
5          9:35 a.m.
6
7
8          Deposition of EDWARD J. ROSEN, held at
9    the offices of Cleary, Gottlieb, Steen &
10   Hamilton, LLP, One Liberty Plaza, New York, New
11   York, before Mary F. Bowman, a Registered
12   Professional Reporter, Certified Realtime
13   Reporter, and Notary Public of the State of New
14   York and New Jersey.
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

**Page 3**

1
2              APPEARANCES:
3
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6        222 East 41st Street
7        New York, New York   10017-6702
8    BY:  ROBERT W. GAFFEY, ESQ.
9
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays and The Witness
13       5301 Wisconsin Avenue, NW - Suite 800
14       Washington DC   20015
15   BY:  HAMISH HUME, ESQ.
16
17
18   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19   Attorneys for the Creditors Committee
20       51 Madison Avenue - 22nd Floor
21       New York, New York   10010
22   BY:  ROBERT DAKIS, ESQ.
23
24
25

TSG Reporting - Worldwide    877-702-9580

| | |
|---|---|
| Page 4 | Page 5 |

**Page 4**

1
2              APPEARANCES:
3
4    HUGHES, HUBBARD & REED, LLP
5    Attorneys for the SIPA Trustee
6        One Battery Park Plaza
7        New York, New York   10004-1482
8    BY:  WILLIAM R. MAGUIRE, ESQ.
9        AMINA HASSAN, ESQ.
10
11   CLEARY, GOTTLIEB, STERN & HAMILTON, LLP
12   Attorneys for the witness
13       One Liberty Plaza
14       New York, New York   10006
15   BY:  BOAZ S. MORAG, ESQ.
16       ROBERT P. DAVIS, ESQ.
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

**Page 5**

1
2
3
4
5          IT IS HEREBY STIPULATED AND AGREED, by
6    and between the attorneys for the respective
7    parties herein, that filing and sealing be
8    and the same are hereby waived.
9          IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15          IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 6

ROSEN

1
2        (Exhibit 622, declaration of Edward J.
3    Rosen marked for identification, as of this
4    date.)
5  EDWARD J. ROSEN,
6        called as a witness by the parties,
7        having been duly sworn, testified as follows:
8  EXAMINATION BY
9  MR. MAGUIRE:
10       Q.    As you know, my name is Bill Maguire
11   with Hughes, Hubbard & Reed.  I am here with my
12   colleague Amina Hassan.  We represent James
13   Giddens, the SIPA trustee.
14            We are going to ask you some
15   questions.  If any questions are unclear, let me
16   know.  If you need to take a break at any time,
17   just let me know.
18            I will show you a document we have
19   marked as Exhibit 622.  If you can tell me what
20   that document is, sir.
21       A.    It looks like my declaration, pursuant
22   to Rule 30(b)(6).
23       Q.    You have mentioned in the second
24   paragraph that you specialize in derivatives.
25   Do you see that?

TSG Reporting - Worldwide    877-702-9580

Page 7

ROSEN

1
2       A.    Yes.
3       Q.    Can you tell me what -- the
4   derivatives that Barclays acquired in the
5   transaction that's the subject of this, did that
6   include any futures contracts?
7            MR. MORAG:  Object to the form.
8       A.    It did, it did include the acquisition
9   of the futures business.
10       Q.    And did that futures business include
11   any positions?
12       A.    I don't know.  I don't know what
13   positions were actually on.  We didn't handle
14   the futures side of the arrangements.  Those
15   were handled by S&C, by and large.
16       Q.    Did you have an understanding whether
17   any futures contracts were included in the
18   acquisition by Barclays?
19            MR. MORAG:  Object to the form.
20       A.    Yes.  I believe, my understanding was
21   that there were futures positions and listed
22   options positions.
23       Q.    And what kinds of futures and options
24   contracts did you understand Barclays to be
25   acquiring in this transaction?

TSG Reporting - Worldwide    877-702-9580

Page 8

ROSEN

1
2       A.    I'm not sure I understand the
3   question, what type of futures options.
4       Q.    Were they exchange-traded or over the
5   counter?
6       A.    Yes, yes, listed.  Not over the
7   counter.  My understanding was the
8   over-the-counter business was excluded.
9       Q.    Did you have an understanding how
10   Lehman organized its derivatives business?
11       A.    No.
12       Q.    When did you become involved in the
13   transaction?
14       A.    My recollection was sometime around
15   the 15th of September, maybe the 14th of
16   September.
17       Q.    And what was your role?
18            MR. MORAG:  Time frame?  At the start?
19       Q.    Starting on the 15th.
20       A.    On the 15th, going forward, I was both
21   dealing with certain of the deal issues relating
22   to the regulated character of the transaction,
23   and also dealing with certain regulators on
24   issues that needed to be addressed if the deal
25   was going to be closed.

TSG Reporting - Worldwide    877-702-9580

Page 9

ROSEN

1
2            That's primarily what I was doing, but
3   also the clearinghouse issues that arose and the
4   JP Morgan issues that arose, I had some
5   involvement in, as events unfolded between then
6   and the 22nd.
7       Q.    When you say the clearinghouse, are
8   you referring to DTCC?
9       A.    And OCC.
10       Q.    What regulators did you deal with?
11       A.    I spoke with the SEC.  I did have one
12   or two conversations with staff at FINRA, and I
13   had a couple of conversations with folks at the
14   Federal Reserve.
15       Q.    With whom did you deal at the SEC?
16       A.    I had conversations with Mike
17   Macchiaroli, Randall Roy, and Dan Gallagher.
18       Q.    What were the subject of your
19   conversations with Mike Macchiaroli?
20       A.    There were a couple of issues.  The
21   principal issue related to the fact that Lehman
22   operated under a different -- was registered
23   under a different broker dealer regulatory
24   regime with different capital requirements than
25   Barclays, and there were questions about how

TSG Reporting - Worldwide    877-702-9580

3  (Pages 6 to 9)

Page 10

ROSEN

1
2  capital would be computed in the face of the
3  combination of those two entities.
4      Q.   What was the outcome of those
5  discussions?
6      A.   The outcome of those discussions was
7  that the SEC confirmed that following the
8  combination -- it is a little bit complicated,
9  but in essence, that the surviving entity could
10 take advantage of the regulatory status that the
11 LBI broker dealer enjoyed with potential
12 accommodations being made for systems
13 integration, things like that.  Because you have
14 systems to compute capital and they were
15 disparate systems.
16     Q.   Notwithstanding Barclays' acquisition
17 of the North American business, the acquired
18 business would remain subject to the previous
19 regulatory capital regime?
20     A.   It would actually be sort of a
21 combination of the two, but would ultimately, to
22 the extent that the systems were able to
23 consolidate, it could be operated under the same
24 regime, yes.
25     Q.   Did you have any discussions with

TSG Reporting - Worldwide    877-702-9580

Page 11

ROSEN

1
2  Mr. Macchiaroli specifically about the amount of
3  capital that would be required to operate the
4  acquired business?
5      A.   The amount of capital?  There was a
6  conversation about whether or not there would be
7  combined tentative net capital, I believe, of
8  5 billion dollars, and I believe the view was
9  that there would be adequate tentative net
10 capital.
11     Q.   What was your understanding as to what
12 tentative net capital meant?
13     A.   It's a calculation before certain
14 deductions for various positions and associated
15 risks of a market credit nature.  I should add I
16 am not an expert on capital computations.
17     Q.   Is what you are describing an
18 understanding that was reached between Barclays
19 and the SEC, that there would be a tentative net
20 capital of 5 billion dollars following the
21 acquisition to support the acquired business?
22     A.   I don't recall it being an express
23 condition or agreement.  And I think, I think
24 people possibly operated under the assumption
25 that there would be adequate tentative net

TSG Reporting - Worldwide    877-702-9580

Page 12

ROSEN

1
2  capital as a result of the combination.
3      Q.   Do you know whether any such
4  understanding was documented?
5      A.   There was language -- there was an
6  undertaking, which I don't recall the terms of,
7  there was an undertaking that was provided by
8  Barclays to the SEC, because there hadn't
9  been -- usually you go through a formal process
10 in order to become part of this regime, and
11 there was a document.  I don't recall its
12 contents sitting here now.
13     Q.   Who prepared that undertaking?
14     A.   That was I believe prepared at
15 Barclays.
16     Q.   Who is the person on the Barclays side
17 who was responsible for the net capital
18 discussions with the SEC?
19     A.   That, I mean, I don't know.  I, I
20 believe, corresponded with Jonathan Hughes and
21 Alan Kaplan on those issues.  I don't know who
22 they may have coordinated with internally.
23     Q.   Was there any discussion with Mike
24 Macchiaroli about where Barclays would get the
25 5 billion tentative net capital?

TSG Reporting - Worldwide    877-702-9580

Page 13

ROSEN

1
2      MR. MORAG:  Object to the form.
3      A.   No.  Not that I recall, I should say.
4      Q.   Was there any discussion with Mike
5  Macchiaroli as to whether the acquired business
6  itself would be a source of the capital needed
7  to support its future operations?
8      A.   Could you ask the question again.
9      Q.   Yes.  Was there any discussion with
10 Mike Macchiaroli about whether Barclays would
11 obtain the capital to support the business from
12 the business itself?
13     A.   I don't recall discussing with him
14 what the source of the tentative net capital
15 would be.
16     Q.   Was there any discussion with Mike
17 Macchiaroli about day one gain, profit that
18 Barclays expected to make on the acquisition?
19     MR. MORAG:  Objection, foundation,
20 lack of foundation.
21     A.   I don't recall having a conversation
22 with Mike Macchiaroli about that.
23     Q.   Do you recall any such conversation
24 with anyone at the SEC, including Randall Roy or
25 Dan Gallagher?

TSG Reporting - Worldwide    877-702-9580

Page 14

ROSEN

2   A.   Remind me again, any conversation
3 regarding --
4   **Q.   About Barclays anticipating making a**
5 **day one gain or profit on the acquisition of the**
6 **business.**
7   A.   I don't recall participating in or
8 being aware.  It doesn't mean that there weren't
9 conversations.  I was not a party to them.
10   **Q.   Were you aware at any point that**
11 **Barclays did anticipate a day one gain or profit**
12 **on the acquisition of the Lehman business?**
13   MR. MORAG:  Objection to form and
14   foundation.
15   A.   I don't recall having conversations
16 about the accounting treatment for the
17 transaction.  So I couldn't say.
18   **Q.   And leaving aside accounting**
19 **treatment, in terms of economic gain, were you**
20 **ever aware that Barclays was anticipating an**
21 **economic gain from the transaction?**
22   MR. MORAG:  Objection to the form.
23   Time frame.
24   A.   I'm not sure what you mean by an
25 economic gain.  I do know that they wouldn't

TSG Reporting - Worldwide    877-702-9580

Page 15

ROSEN

2 have done this transaction if they didn't think
3 that it would have been profitable for them to
4 do over the long term.  I think they were making
5 a major bet on their North American investment
6 banking activities and taking a significant risk
7 at the same time.
8   **Q.   But you have no further knowledge**
9 **beyond that general understanding?  And to help**
10 **you, I am specifically talking not about a**
11 **long-term gain or the expected performance of**
12 **the business after the closing, I'm talking**
13 **about whether Barclays anticipated that the**
14 **total economic value of what it was getting in**
15 **the deal would exceed what it was paying, such**
16 **that it would record an immediate economic value**
17 **in favor of Barclays at the closing?**
18   A.   No, but I don't think my involvement
19 in the transaction would have necessarily
20 positioned me to be part to those discussions.
21 If they were to be had, they probably would have
22 been with other people.
23   **Q.   Certainly that was not a subject that**
24 **was discussed in any of your discussions with**
25 **the regulators?**

TSG Reporting - Worldwide    877-702-9580

Page 16

ROSEN

2   A.   I don't recall having a conversation
3 with the regulators regarding the details of
4 the -- you know, how the transaction would be
5 reflected on Barclays' books and records.  It
6 was not part of my role in the transaction, I
7 guess.
8   **Q.   Can you tell me any other subjects**
9 **that you discussed with Mike Macchiaroli?**
10   MR. MORAG:  Please try to keep your
11   voice up for the court reporter.
12   A.   Conversations with Mike Macchiaroli.
13 I'm sorry.  I'm trying to remember certain
14 subjects and who I would have spoken with about
15 them.
16   I did have conversations with Mike
17 Macchiaroli about sort of generally how things
18 were going, because he was, from what I
19 understood, the -- at Lehman presiding over sort
20 of developments there.  And we might have had --
21 we had conversations from time to time, and we
22 may have spoken about how things looked from his
23 perspective, and while I don't remember the
24 specifics of the exchange that we had, I do
25 remember coming away from the conversation with

TSG Reporting - Worldwide    877-702-9580

Page 17

ROSEN

2 Mike, was, you know, not committal, and I think
3 he was struggling to stay on top of all the
4 information that he needed to figure out sort of
5 where the books and records were, but I do
6 remember coming away with the impression that he
7 was optimistic that the assets there were going
8 to be adequate for covering the customer claims,
9 which was good, because everybody was hoping
10 that there weren't going to be any obstacles.
11   I may have had other conversations,
12 but I can't recall other conversations that I
13 necessarily had with Mike.
14   **Q.   Any other conversations you recall**
15 **with anyone else at the SEC?**
16   A.   Yes.  I did have a conversation with
17 Dan Gallagher at one point which related to an
18 issue that I was not directly negotiating about
19 the PIM accounts and what was coming across and
20 what was not, and I had a conversation with
21 Randall Roy about some additional relief that
22 Barclays -- that Barclays identified relating to
23 the Fed's request that Barclays step into its
24 shoes in the repos that were outstanding with
25 the Fed, and I can't remember, I can't remember

TSG Reporting - Worldwide    877-702-9580

ROSEN

1    for sure all the people at the SEC who I might
2    have spoke with, but we did request that the SEC
3    agree to waive certain rights that they might
4    otherwise have been entitled to exercise that
5    might have prevented Barclays from exercising
6    its rights under the repo should the deal not go
7    through. But I honestly can't remember the
8    details of that. We did ultimately get that
9    assurance.
10        And I had a conversation with Bob
11   Colby, who contacted me because there was a
12   miscommunication among the representatives of
13   the clearing organization, OCC, and the SEC, and
14   there was some suggestion that the SEC was
15   imposing a requirement on Lehman that would have
16   prevented Lehman from taking the accounts at
17   OCC -- I am sorry, I mean Barclays, take the
18   accounts under the TAA, and I spoke to him
19   regarding that, and it took a little bit of
20   time, but it was identified as a
21   misunderstanding on the part of outside counsel
22   to OCC. So that issue disappeared.
23       **Q.   Besides that misunderstanding and**
24   **besides the PIM accounts and the repo and**

ROSEN

1    **capital requirements, any other subjects you**
2    **recall discussing with the SEC?**
3        A.   I may have had a number of others. I
4    honestly just don't remember them, sitting here
5    now.
6        You know, I can't remember how far my
7    conversations went with this, but one of the
8    questions presented by the transaction was how
9    the Lehman business would be acquired and what
10   entity, and there are different regulatory
11   consequences if it is acquired by a going broker
12   dealer that is already registered than if it was
13   acquired by a new entity that doesn't enjoy a
14   registration.
15       And there was thinking going on as to
16   the various pros and cons to how the transaction
17   was to be booked -- what entity might take it,
18   and I recall spending some time trying to get
19   the approval to be able to close the deal if we
20   needed to with the Lehman business being
21   acquired by an affiliate or subsidiary of the
22   registered broker dealer, rather than the
23   registered brother teller itself.
24       That ultimately was not necessary, but

ROSEN

1    I believe I spent some time dealing with that
2    issue.
3        **Q.   Do you know which entity acquired the**
4    **PIM business?**
5        A.   Do I know which entity acquired the
6    PIM business. I had thought -- I thought or
7    assumed that it was Barclays Capital, Inc.
8        **Q.   Can you tell me what is or was the PIM**
9    **business?**
10       MR. HUME: Object to the form.
11       A.   I believe it is a business in which
12   investment management services are provided by
13   Lehman brokers to customers. I don't know more
14   than that. I don't know the business plan, I
15   don't know the scope of it.
16       **Q.   Did you understand that it was part of**
17   **the investment management business, the**
18   **investment management division?**
19       A.   I don't know structurally how it fit
20   into Lehman's organization.
21       **Q.   Do you know whether the customers of**
22   **the PIM business did any trading in derivatives?**
23       A.   I don't -- I didn't have specific
24   knowledge as to whether they did or didn't. I

ROSEN

1    assume it would be possible that they did.
2        **Q.   In paragraph 3 of your declaration,**
3    **you note the basis for your declaration in the**
4    **first sentence.**
5        A.   Yes.
6        **Q.   And you refer to the recollection of**
7    **your partners. Can you tell me to whom you are**
8    **referring there?**
9        A.   It would have included Mr. Davis, and
10   Lindsee Granfield, Duane McLaughlin, David
11   Leinwand, L-E-I-N-W-A-N-D.
12       Dana Fleischman, Vic Lewkow, Boaz
13   Morag. I feel like I am forgetting somebody.
14       MR. MORAG: Washington?
15       A.   I am sorry, and Mike Mazzuchi, a
16   partner in the Washington office. Thank you.
17   He participated by phone, so I didn't remember
18   him.
19       **Q.   Everyone else participated in person?**
20       A.   Not necessarily. In some cases -- for
21   example, I think Duane McLaughlin was out of
22   town and may have called in.
23       **Q.   How did you go about collecting the**
24   **recollection of these partners?**

Page 22

ROSEN

1
2    A.    Talking about the 30(b)(6) issues and
3    discussing our recollection of them.
4        Q.    Can you tell me when that happened?
5            MR. HUME:  I am just going to object,
6    because I think the record is unclear
7    whether your question is about recollections
8    reflected in the affidavit versus 30(b)(6)
9    prep.
10       Q.    Did you distinguish between preparing,
11   getting your recollections for your declaration
12   and your recollections for your deposition, or
13   was that all part of the same process where you
14   were preparing to testify either by way of
15   declaration or by way of deposition?
16       A.    Well, obviously the discussions were
17   held earlier with respect to the declaration,
18   sometime during the week leading up to the
19   completion of the declaration.  I don't recall
20   whether Duane McLaughlin or Dana Fleischman
21   participated in those earlier discussions.
22       Q.    They did, however, participate in
23   another round of similar discussions --
24       A.    After the declaration.
25       Q.    -- after the declaration.

TSG Reporting - Worldwide    877-702-9580

Page 23

ROSEN

1
2        And when was that?  Was that just in
3    the last week?
4        A.    The week before, primarily.  And
5    yesterday, but only a small subset.
6        Q.    And how did you actually get the
7    recollection from the partners?  How did you
8    find out what they remembered?
9        A.    I'm not quite sure I understand the
10   question.  We talked amongst ourselves about the
11   events and our recollections of them covered by
12   the 30(b)(6).
13       Q.    Did any of your partners remember
14   things that you did not remember?
15       A.    I would say yes, we all had different
16   recollections.
17       Q.    Now, you note in your declaration,
18   paragraph 3, you say, "Where indicated, the
19   recollection of my partners."  Do you see that?
20   It's on the second line of paragraph 3.
21       A.    Um-hm.  I do see that.
22       Q.    Is there any recollection that any of
23   your partners gave you that you did not set
24   forth in this declaration?
25           MR. MORAG:  Objection to form and

TSG Reporting - Worldwide    877-702-9580

Page 24

ROSEN

1
2    objection on the attorney/client privilege
3    and work product.
4            MR. MAGUIRE:  Are you objecting or
5    directing the witness not to answer?
6            MR. MORAG:  If I understand your
7    question correctly, I'm directing him not to
8    answer.
9        Q.    In paragraph 4, sir, you refer to the
10   removal of certain language.  Do you see that?
11       A.    Yes.
12       Q.    And you note specifically the draft
13   that it was removed from.
14       A.    I am sorry.
15       Q.    You refer to language -- you refer to
16   a draft that contained that language?
17       A.    Yes.
18       Q.    And the draft language that you are
19   referring to, you set that forth in paragraph 5;
20   is that correct?
21       A.    I am sorry, in paragraph 4, I don't
22   see a reference to paragraph 5.
23       Q.    That's correct.  In paragraph 4, you
24   refer to the removal of certain language.
25       A.    Yes.  I am sorry.  You are referring

TSG Reporting - Worldwide    877-702-9580

Page 25

ROSEN

1
2    to paragraph 5 of the declaration, not
3    paragraph -- OK, could you repeat the question.
4        Q.    I just want to make sure we are on the
5    same page here.  You're -- when you talk about
6    the certain language in paragraph 4, you are
7    referring to the language that you set forth in
8    quotes in paragraph 5 of your declaration?
9        A.    Yes.  This is a reference to the
10   language in 1D.
11           MR. MORAG:  Let me note for the record
12   that the quoted language in paragraph 5 does
13   have ellipses and was not intended to be a
14   full quote.
15       Q.    As a matter of reference, we are
16   talking about the same language?
17       A.    Yes.
18       Q.    At the end of paragraph 4, you say
19   that the trustee's position is incorrect, and
20   you say, "There was to my or my partners'
21   knowledge never any such agreement or
22   discussion."  Do you see that?
23       A.    Yes.
24       Q.    Sir, was there any discussion, to your
25   knowledge, or to the knowledge of your partners,

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1
2    **with anyone, about the removal of the language**
3    **that you discuss in paragraphs 4 and 5 of your**
4    **declaration?**
5        MR. MORAG:  Object to the form, and to
6    the extent -- you can answer to the extent
7    you're going to talk about discussion with
8    anyone in the Lehman side.
9        THE WITNESS:  Yeah, I know, it's fine.
10        A.    The only -- I -- the answer is, I
11    don't recall the specific content of the
12    discussion.  But in response to that language,
13    there was -- there was additional language that
14    we drafted that was provided and identified to
15    Lehman's attorneys explaining that this language
16    was needed in light of the changes that had been
17    made to 1D.
18        Q.    And is that, sir, your recollection or
19    **the recollection of one of your partners?**
20        A.    Well, we gave -- it is our collective
21    recollection that we drafted the additional
22    language, and it was our recollection that we
23    provided that in the form of a handwritten
24    markup, and I don't recall, and I'm not sure any
25    of my partners specifically recall, who actually

ROSEN

1
2    handed the markup over to the Lehman side, but
3    it was provided to the Lehman side in the form
4    of handwritten comments.
5        Q.    **And the handwritten comments, are**
6    **those the ones that included the parenthetical**
7    **"property held to secure"?**
8        A.    Yes, yes.
9        Q.    **Have you seen those handwritten**
10    **comments?**
11        MR. MORAG:  Time frame?
12        Q.    **At any time?**
13        A.    You mean including at the time that
14    they were drafted?
15        Q.    **Yes.**
16        A.    The recollection of the group was that
17    I drafted them.
18        Q.    **Do you recall actually what you did**
19    **with those handwritten notes?**
20        A.    I would have given them to one of my
21    partners.
22        Q.    **Have you seen them since the weekend**
23    **when those notes were prepared?**
24        A.    No, no, I have not.
25        Q.    **Do you know whether they exist today?**

**ROSEN**

1
2        A.    I don't know.
3        Q.    **Do you know whether, in fact, you did**
4    **give them to somebody or what you did with those**
5    **handwritten notes?**
6        A.    My recollection is that I handed them
7    to one of my partners.
8        Q.    **Do you know which partner you handed**
9    **them to?**
10        A.    I don't recall specifically.
11        Q.    **Do you have a general recollection?**
12        A.    I have a general recollection, it
13    would have been Bob Davis or Duane McLaughlin or
14    David Leinwand.  It would have been one of those
15    three.
16        Q.    **Have you asked your partners for that**
17    **draft?**
18        A.    No, I haven't.
19        Q.    **Do you know whether anyone has**
20    **attempted to locate that draft?**
21        A.    I don't know.
22        Q.    **Did you talk to anyone on the Lehman**
23    **side concerning the insertion of the**
24    **parenthetical that you were proposing in that**
25    **draft?**

**ROSEN**

1
2        A.    Did I personally speak to anyone on
3    the Lehman side?  Well, it depends upon -- I am
4    sorry, I personally did not speak to anyone on
5    the Lehman side.
6        Q.    **Do you know whether any of your**
7    **partners spoke to anyone on the Lehman side**
8    **about including that parenthetical in the**
9    **clarification letter?**
10        A.    Our understanding, our recollection,
11    Cleary's recollection, is that it would have
12    been -- it would have been identified as a
13    change to be made to the agreement, to the --
14    whoever the lawyer was on the -- representing
15    Lehman that was handling the document.
16        Q.    **And do you know who the lawyer on the**
17    **Lehman side was to whom it was handed?**
18        A.    I don't know.  I don't know.
19        Q.    **And the draft that was handed to that**
20    **Lehman lawyer, did it have any other handwritten**
21    **changes?**
22        A.    I'm trying to remember.  There were
23    two other changes that I recall, and you will
24    have to forgive me for being a little bit
25    unclear about the timing or the sequencing, but

Page 30

ROSEN

1  I believe there were two other changes.
2      One, there was language -- let me back
3  up and ask you this question and get
4  clarification.  Are you asking me just about the
5  language that's described in 1D, or are you
6  asking about other changes to the clarification
7  letter?
8      Q.   Let's get our time frame and context
9  together first.  I'm talking to you specifically
10  about the draft that I understand from your
11  testimony in which you, in handwriting, inserted
12  the parenthetical that includes the words "and
13  property held to secure."
14      A.   Yes.
15      Q.   And the question is whether that draft
16  included any other proposed changes.
17      A.   I'd have to go back and look at the
18  sequence of the drafts.  There were two other
19  changes that may or may not have been
20  simultaneous.  I don't know.  They may have been
21  given sequentially but have been processed by
22  the other side as part of one turn.  I don't, I
23  don't recall.
24      But there was a change in the
25

TSG Reporting - Worldwide    877-702-9580

Page 31

ROSEN

1  clarification of language concerning 15c3-3,
2  provision to add the word "or value" at the end
3  of a sentence, and there was a sentence to
4  clarify what had been agreed as part of the
5  resolution of issues with DTC, that the
6  liabilities to DTC associated with Lehman were
7  excluded liabilities under the APA.
8      Q.   I am going to ask you again
9  specifically about the draft in which you
10  inserted that parenthetical "property held to
11  secure."
12      With respect to that draft, can you
13  tell me what, if anything, was said about anyone
14  on the Barclays side or the Cleary side to the
15  person on the Lehman side who received that
16  draft?
17      A.   No, I can't give you verbatim what
18  would have been said, but what would ordinarily
19  happen in that circumstance is that the changes
20  would be identified to the other side so they
21  could understand what was being provided to
22  them.
23      Q.   And when you say the changes would be
24  identified, the other side would be shown what
25

TSG Reporting - Worldwide    877-702-9580

Page 32

ROSEN

1  the proposed language was?
2      A.   Yes.  We did not control the
3  documents, so Cleary did not input those
4  changes.  Those changes were put into whatever
5  revised draft emerged in whatever time it
6  emerged by the Lehman's counsel.
7      Q.   Other than pointing out the changed
8  language, do you know what, if anything, was
9  said to Lehman about the addition of that
10  parenthetical?
11      A.   No.  Not at that time.
12      Q.   When you say not at that time, is
13  there some other time that there was a
14  discussion --
15      A.   Not about that specific parenthetical
16  but about the subject, there were a lot of --
17  there were exchanges of a number of
18  communications and documents that I think were
19  addressed to the same issue that were exchanged.
20      Q.   I would like to go through some of
21  them, and the first one I'd like to take is the
22  one that you refer to in paragraph 4.  And
23  that's the draft language that you have put
24  forth in quotes in paragraph 5.
25

TSG Reporting - Worldwide    877-702-9580

Page 33

ROSEN

1      And if we get our sequence right,
2  there was a draft that included this language
3  which has an express reference to margin, and
4  that's the language you have set forth in
5  paragraph 5, right?
6      A.   I am sorry, could you repeat the
7  question about this language.
8      Q.   Yes.  Let's get our context right
9  first.
10      I invite you to look at paragraph 5
11  and look at the draft language that you have,
12  starting with the quotes, "any and all
13  property."
14      A.   I am sorry, where are you in
15  paragraph 5?
16      Q.   About midway down, the second full
17  sentence:  "The draft language accomplished this
18  by making clear that the definition of excluded
19  assets did not include 'any and all property,'"
20  and it continues.
21      A.   Correct.
22      Q.   So for my next couple of questions, I
23  am going to be asking you specifically about
24  that language and the draft in which that
25

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2    language was deleted or crossed out.  Are you
3    with me?
4        A.   Yes.
5        Q.   Did you see the draft in which that
6    language was crossed out?
7            MR. MORAG:  Object to the form.  I
8        also object to the representation that all
9        of the language was crossed out.  If you
10       want to show him the actual draft, it may be
11       more appropriate.
12       A.   I saw a draft which included a number
13   of changes in which language was moved to other
14   sections and modifications were made, and those
15   modifications included modifications to this
16   language.  Yes, I did.
17       Q.   And you refer to this as the removal
18   of certain language in paragraph 4?
19       A.   Well, I would -- without mincing
20   words, I would say that there was a draft
21   prepared that dealt with some of these issues in
22   other ways, in other provisions of the
23   agreement.
24       Q.   Did you see the draft in which the
25   language you quote in paragraph 5 was removed?

ROSEN

1
2        A.   Yes.  Well, subject to the caveat as
3    to what you mean by remove.
4        Q.   What I mean by removed is the language
5    that you quote was deleted, it was marked as
6    deleted?
7            MR. MORAG:  Object to the form.
8        Q.   Did you see such a draft?
9        A.   I saw a draft in which this language
10   did not appear in this form.
11       Q.   Did this language appear in any other
12   form in that draft?
13       A.   Some of it did and obviously some of
14   it didn't.
15       Q.   And what part of it did not?
16       A.   I'd have to -- I would have to look at
17   the particular draft of the agreement to answer
18   that question.  I can't recall with accuracy --
19   with accuracy what the other changes were that
20   were made at the same time as this change was
21   made.
22       Q.   Once you saw that draft, did you
23   personally have any discussions with anyone on
24   the Lehman side concerning the removal of any of
25   this language?

ROSEN

1
2        A.   As I said earlier, we prepared
3    language, I prepared language, and that language
4    was provided to Lehman, and they would have
5    identified to Lehman that this language was now
6    necessary.
7        Q.   Yes.  And I understand that testimony.
8    I was just asking whether there was any other
9    conversation that you recalled.
10       A.   No, not that I was -- not that I am
11   aware of.
12       Q.   Are you aware of any discussion
13   involving any of your partners and anyone on the
14   Lehman side --
15       A.   Actually, hang on just a second.  Hang
16   on just a second.
17           I need to see the clarification
18   agreement in which this language appears,
19   because this language deals with a number of
20   issues that were in flux at the time, some of
21   which were the subject of discussions.
22           There was language that addresses
23   15c3-3, as I said earlier, that also addressed
24   the DTC situation which had changed.  And so --
25   and there were conversations obviously among the

ROSEN

1
2    parties about a number of issues that are
3    addressed in this language.
4            But as I said, with respect
5    specifically to the language that was added in
6    response in section 1(a)(ii)(C), the
7    conversation would have been in connection with
8    the transmittal of that language to the Lehman
9    side.
10       Q.   And you don't recall any other
11   communication with the Lehman side concerning
12   the removal of this language beyond what you
13   have told us?
14           MR. HUME:  Object to the form.
15           MR. MORAG:  Same objection.
16       A.   I think the -- other than the language
17   itself, other than the changes that were
18   proffered by Cleary having received a revised
19   draft and discussions that I suspect we are
20   going to cover relating to 15c3-3, and the
21   discussions relating to DTCC, there were no
22   specific conversations that we had and none that
23   we thought were necessary, because this was part
24   of the deal.
25       Q.   Did you have any discussions with

ROSEN

1
2    anyone on the Lehman side concerning margin?
3         MR. MORAG:  Time frame?
4    Q.    Over the weekend prior to the closing?
5         MR. MORAG:  Objection to the form.
6    Objection to the term "margin."
7    A.    Well, there were conversations --
8    there were e-mail communications in which I was
9    copied and Lehman's people were copied about
10   what was going to happen to the margin at OCC.
11   Not just the margin but the property associated
12   with those accounts, yes, in which OCC said,
13   consistent with the order in their -- what was
14   then the draft TAA that they had prepared, was
15   going to be transferred to Barclays.
16   Q.    Any discussions about margin with
17   anyone on the Lehman side other than in
18   connection with the OCC?
19        MR. MORAG:  Objection to the form.
20   A.    There was an e-mail to me copying
21   Lehman, I believe, about the transfer of a
22   certain amount of margin -- I can't remember
23   exactly what it was -- in which Lehman was
24   copied.  I think that e-mail was from Jim
25   McDaniel.  I think the trustee's representatives

ROSEN

1
2    were also copied on that.
3    Q.    And that's in connection --
4    Mr. McDaniel represented the OCC?
5    A.    The OCC.
6    Q.    Yes.
7         Other than with respect to the OCC,
8    any discussions that you had concerning margin?
9    A.    Well, verbal discussions?
10   Q.    Yes.
11   A.    I believe that there were conference
12   calls about the clearinghouses.  I think they
13   may have been scheduled for Saturday or Sunday,
14   and the arrangements that were going to be made
15   and the transfers, and I believe that
16   representatives from Lehman were on those calls.
17   I cannot recall specifically, either the
18   specific discussions or exactly when they
19   occurred.
20        And it would have -- I think it
21   probably included discussions about how things
22   were going to be done in the transfer of margin
23   and the like.
24   Q.    What clearinghouses are you referring
25   to?

ROSEN

1
2    A.    DTC and OCC.
3    Q.    Do you recall any discussion
4    concerning margin at DTCC?
5    A.    Discussing margin at DTCC?  Well,
6    there were discussions about the DTC accounts
7    and how they were going to be handled, and those
8    accounts would have included both proprietary
9    positions, customers' positions, positions that
10   may have been margined, and so indirectly, all
11   of those discussions with DTC potentially
12   included discussions about margin, to the extent
13   that that was relevant.
14   Q.    Any express reference to margin?
15   Margin coming up in any express way in any
16   conversation with DTC that you remember?
17   A.    Well, in the sense that to the extent
18   that anything constituted margin that was in
19   there and the discussions covered those
20   accounts, yes.  But I don't remember us
21   specifically singling out margin as a topic.
22   Q.    Do you recall any discussions about
23   margin at any foreign exchanges or
24   clearinghouses?
25   A.    Again, I don't recall conversations

ROSEN

1
2    with foreign clearinghouses, but to the extent
3    that we discussed the accounts that were going
4    over and the credit support for them, to the
5    extent that as part of the business that was
6    being transferred, there were positions in those
7    accounts, they would have been covered by the
8    conversations.
9    Q.    And do you recall any specific such
10   conversations?
11   A.    Well, there were negotiations between
12   the parties about the business, so if you're
13   saying that I'm taking the FCM business and if
14   that business includes positions that are traded
15   on foreign markets, then by definition you're
16   talking about them as part of the same thing.
17   If you are taking that business and customer and
18   other deposits associated with them and assets
19   associated with that business, then yes, you are
20   talking about the margin indirectly, although
21   you may not be specifically singling it out.
22   Q.    That's what I want to do.  I want to
23   single it out.
24        Do you recall a specific singling out,
25   a specific mention of either margin or guarantee

Page 42

ROSEN

1
2  fund deposit in any conversations other than in
3  connection with the OCC?
4          MR. HUME: Objection, asked and
5  answered.
6      A.   I think I would say that the
7  discussions about the assets that were being
8  transferred in connection with the business and
9  any deposits is a discussion about guarantee
10 fund deposits and margin at those clearing
11 organizations.
12     Q.   I understand that testimony.  The
13 question is, do you have a recollection or have
14 you heard from any of your partners their
15 hearing that somebody specifically referred,
16 specifically to margin or guarantee fund deposit
17 in any of those discussions?
18     A.   I think that the answer to your
19 question is that in the documents, that is
20 covered.  And I'm confident that there may have
21 been -- I shouldn't say that.
22          I don't recall the specific
23 conversations that we had with the clearing
24 organizations and other lawyers who may have
25 been involved.  We may have or may not have

TSG Reporting - Worldwide    877-702-9580

Page 43

ROSEN

1
2  specifically referred to the word "margin" on
3  those calls.
4          But we did repeatedly exchange
5  communications regarding the various forms of
6  assets that would be coming over, for example,
7  under the TAA.
8      Q.   We have been talking now about the
9  time period over the weekend prior to the
10 closing.  I would like to just ask you if I have
11 missed anything, if we go back to the work that
12 you were doing from the 15th on, anytime up to
13 that weekend.  During that period, do you recall
14 any discussions specifically in which margin or
15 guarantee fund deposit were mentioned?
16     A.   Again, I would say in the deal
17 documentation relating to the transfer of assets
18 associated with those businesses that were being
19 transferred and the agreements as to the
20 inclusion of deposits, including customer
21 deposits, yes, they were the subject of
22 communications in that form.
23     Q.   And what discussion do you remember in
24 which anyone specifically referred to margin?
25     A.   As I say, I don't recall specifically

TSG Reporting - Worldwide    877-702-9580

Page 44

ROSEN

1
2  the content of specific conversations that I may
3  have had at that time.
4      Q.   Is there any conversation that you're
5  aware of where anyone on the Barclays or Cleary
6  side had specifically discussed guarantee funds
7  deposit?
8          MR. MORAG:  You can answer to the
9  extent it involves someone on the Lehman or
10 OCC or DTC side as well.
11     A.   It was never raised as an issue for
12 discussion, because it was assumed by all
13 parties, I think, that it was part of the
14 business.  And certainly nobody on the Lehman
15 side ever suggested or raised the question as to
16 its needing to be singled out from the language
17 that otherwise covered it.
18     Q.   Now, when you saw that the draft
19 language referring to margin and guarantee fund
20 deposit had been removed from the draft, did
21 that suggest to you that there needed to be a
22 discussion about this or that someone on the
23 Lehman side was suggesting that they had
24 different assumptions or different
25 understandings from what you had?

TSG Reporting - Worldwide    877-702-9580

Page 45

ROSEN

1
2          MR. MORAG:  Objection to form.
3  Compound.
4      A.   As I mentioned, the language that came
5  out was actually not specific to OTC -- to
6  listed derivatives or listed derivatives
7  customers.  It was language that sort of
8  addressed a variety of issues.
9          And so I would not have drawn any
10 necessary inference as to what specifically the
11 concerns were that, from the Lehman side, were
12 being addressed.  There were changes to the deal
13 that needed to be addressed in that language.
14 There were changes in the agreements that
15 related to the handling of -- I'm sorry.  There
16 were changes in the language that was
17 documenting, for lack of a better reference, the
18 15c3-3 treatment, and indeed the fact that the
19 DTC arrangement had essentially changed.
20         So it was clear that the language that
21 was modified needed to be modified.  As to
22 whether or not that modification signaled a
23 specific view about the treatment of credit
24 support for exchange-traded derivatives, you
25 would never know until you clarified it with

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2    your own language, and to my knowledge, nobody
3    on the Lehman side, when presented with that
4    language, expressed any surprise or objection.
5        So I think the clear inference is that
6    it was not a surprise to them, and therefore, we
7    inferred that there was no intent to communicate
8    to us that they didn't think it was part of the
9    deal, or anybody else who had the opportunity to
10   see those changes, which would have been all the
11   signatories.
12       Q.   So you didn't feel there was any need
13   to go up and have a specific discussion with the
14   folks on the Lehman side about the removal of
15   the language?
16       A.   I didn't think that there was anything
17   more that needed to be done than to provide to
18   them the language that we thought was
19   appropriate in order to clarify what the deal's
20   agreement was with respect to the treatment of
21   that credit support, that property.  That is the
22   way we ordinarily communicate in a transaction
23   of this type.
24       Q.   In the beginning of the, of your
25   paragraph 5, you note that the draft language at

ROSEN

1
2    issue was an attempt to accurately document the
3    business deal.  Do you see that?
4        A.   Yes.
5        Q.   What is the business deal that you are
6    referring to there?
7        A.   Here, that Barclays was acquiring the
8    exchange-traded businesses, exchange-traded
9    derivatives businesses of Lehman and the assets
10   and customer deposits and other deposits that
11   were part of that business.
12       Q.   Are you aware of whether there was any
13   business discussion between the Barclays and
14   Lehman folks concerning specifically the
15   acquisition of either margin or clearing fund,
16   guarantee fund deposit?
17       MR. HUME:  Objection, asked and
18   answered.
19       MR. MORAG:  Objection, form.
20       A.   I don't know whether there were or
21   weren't.  I assume as part of the negotiation of
22   the deal leading up to the description, the
23   documentation of it, that it was implicit in
24   those discussions.
25       Q.   You go on to say that the draft

ROSEN

1
2    language accomplished this, the beginning of the
3    next sentence.  Do you see that, sir?
4        A.   Um-hm.
5        Q.   Can you tell me, what did the draft
6    language accomplish?
7        A.   What did the -- in relation to the
8    exchange-traded derivatives, that it -- what
9    it -- what this -- I am sorry, let me see.
10       It included language that, as I said,
11   covered a wide variety of things, but also would
12   have provided -- I am sorry, included language
13   that clarified that the property of any kind
14   that was basically held by any of these or in
15   any of these forms, was not an excluded asset
16   under the terms of the deal documentation.
17       Q.   And in the quotes, you have "any and
18   all property," and then you have square
19   parenthesis, "including cash."  Do you see that?
20       A.   Um-hm.
21       Q.   Why did you include those square
22   brackets around the words "including cash"?
23       A.   Just as a clarification.  It's not
24   necessary, but just for the sake of -- for the
25   avoidance of any lack of clarity.

ROSEN

1
2        Q.   Why did you not include those words in
3    the handwritten parenthetical that you provided?
4        A.   The answer to that question -- I'm
5    going to try to answer this without going into
6    attorney/client privileges, but the answer to
7    that question is because we also came to believe
8    that this was not the best location for
9    clarifying this, because this got caught up in
10   provisions dealing with, you know, what the
11   parties understood to be an exception to the
12   excluded assets, and excluded assets included
13   cash.  So we wanted to make sure in this
14   provision that it was relevant.
15       But on the other hand, we realized
16   that providing this clarification in an
17   exclusion to the -- to an exclusion was not the
18   clearest way to do it and, therefore, we decided
19   in response, rather than go back into this
20   provision and start wordsmithing, which we
21   didn't have the time to do, we would just make
22   it abundantly clear, in as concise words as we
23   could, what the purchased assets included in
24   relation to that business.
25       Q.   And you made it abundantly clear by

Page 50

                    ROSEN
1
2    putting the parenthetical that made clear it
3    included property held to secure?
4        A.   Yes.
5        Q.   And my question is, why did you not
6    include, beside "property," the words "including
7    cash"?
8        A.   Didn't think it was necessary.  At
9    this point in time, it was 5 or 6 o'clock in the
10   morning.  We were extremely concerned about
11   whether we were going to run out of time in
12   terms of the objective of having this deal
13   signed in time to be announced early in the
14   morning, so as to avoid any negative sort of
15   market reaction to the deal not being announced.
16       And we were trying in as concise a
17   form as possible and as clear a form as possible
18   to get it down and not to get embroiled in
19   parsing words.
20       So, I, I mean did I have -- would I
21   have preferred to have had hours to have sat
22   down and drafted it and perfected it?  I
23   certainly would.  But I thought it was
24   absolutely clear that if we said "any property,"
25   that it would include cash, noncash, securities,

TSG Reporting - Worldwide    877-702-9580

Page 51

1                    ROSEN
2    nonsecurities, whether or not it was held by
3    Lehman, by a clearing organization, wherever it
4    was, and whoever was holding it and whatever its
5    character might be.
6        I think for the purpose of clarifying
7    what might have been a subject of dispute in
8    light of the deletion of that language, we
9    didn't think it was actually necessary to
10   include the language, but we were concerned
11   about the sort of negative inferences that could
12   arise, and so we thought because it was an
13   important point for the deal that we would make
14   it as clear as we could, as concisely as we
15   could.
16       Q.   You had had a discussion, and we will
17   get to this a little bit later, on the subject
18   of whether cash in the 15c3 account could be
19   transferred to Barclays.  You recall that?
20       A.   Yes.
21       Q.   And in connection with that, some of
22   the Lehman people at least took the position
23   that cash could not be properly transferred?
24       A.   I wouldn't describe what they said as
25   that.  I would say, this was part of the purpose

TSG Reporting - Worldwide    877-702-9580

Page 52

1                    ROSEN
2    of the clarification letter.  There were
3    provisions about deposits, customer deposits.
4    There were provisions in the excluded assets
5    provisions of the APA regarding bank accounts.
6    And I think it was clear to us that the 15c3-3
7    assets were assets of the business that we were
8    buying.
9        I would describe what I heard at least
10   as being an expression of concern as to whether
11   in light of what had been said to the court
12   about bank deposits, whether or not if we were
13   going to include cash in bank deposits -- that
14   would be in bank deposits, whether some
15   additional steps might need to be taken, which
16   would have been inconsistent with completing the
17   deal and being able to announce it.
18       But I don't recall anybody saying that
19   it couldn't be done or that it wasn't part of
20   the deal or that it wouldn't be permitted or
21   that it wasn't part of the sale order.  There
22   was, I would have said, a decision taken to
23   avoid the issue by limiting the account assets.
24       MR. HUME:  We have been going for
25       about an hour.  Can we have a break?

TSG Reporting - Worldwide    877-702-9580

Page 53

1                    ROSEN
2        MR. MAGUIRE:  Sure.  If we can just
3        wrap up this.  It might take a couple of
4        minutes.
5        Q.   Were you at the sale hearing?
6        A.   Only during the, for lack of a better
7    word, the intermission.  It went into recess and
8    I was there.  I was not actually there at the
9    time that it was --
10       Q.   Do you know whether the court was told
11   anything about bank deposits as opposed to cash?
12       A.   No, I don't know.  I just know that
13   the issue about it was raised, and under the
14   circumstances, people were willing to eliminate
15   the issue, rather than -- because I think the
16   feeling was that if we didn't close before the
17   Monday open, there may have been greater
18   jeopardy to the deal.
19       Q.   In order to avoid the issue, Barclays
20   agreed that it would not take any of the cash in
21   the Wells Fargo account that was part of the
22   15c3 account?
23       MR. MORAG:  Objection to the form.
24       A.   I would say Barclays agreed to include
25   language in the clarification letter that only

TSG Reporting - Worldwide    877-702-9580

Page 54

ROSEN

1   called out the transfer of a certain amount of
2   securities associated with the 15c3 account, or
3   if those weren't available, other securities of
4   similar value.
5       Q.   And did not call out the 1 billion
6   dollars in cash that was at Wells Fargo?
7       A.   Not in the clarification provision,
8   correct.
9       Q.   Now, given those discussions, and the
10  decision by everyone to avoid the cash issue,
11  did it occur to you that the words "including
12  cash" should be included in the parenthetical
13  when you described property held to secure?
14      A.   No.  No, because I thought there was a
15  clear distinction between deposits and customer
16  deposits and LBI cash in its bank accounts.
17      MR. MAGUIRE:  This is a good time for
18  a break.
19      (Recess)
20      MR. MORAG:  I should just put on the
21  record, to the extent, Mr. Maguire, you're
22  curious, Cleary did search for all
23  documents, including any handwritten notes,
24  and our production does not include them

Page 55

ROSEN

1   because we were not able to find the markup
2   that you asked about in your examination.
3       MR. MAGUIRE:  I appreciate that.
4       MR. HUME:  I should also state we have
5   looked for it in the Weil production, have
6   not found it.  I'm double checking.
7       THE WITNESS:  Which would have been
8   consistent with our handing it to Weil to
9   deal with the document.
10  BY MR. MAGUIRE:
11      Q.   Sir, before the break, we were in
12  paragraph 5 of your declaration and we were
13  talking about the -- what you referred to as the
14  business deal in the first and second lines of
15  that declaration.
16      Was it your understanding that the
17  business deal was documented in the asset
18  purchase agreement?
19      A.   It was my understanding that the deal
20  was documented in the asset purchase agreement,
21  the first amendment in the clarification letter.
22      Q.   The language that we have been talking
23  about in the quotes at the bottom of page 2 of
24  your declaration, starting with "any and all

Page 56

ROSEN

1   property," did you draft that language?
2       A.   I'm sorry, could you --
3       MR. MORAG:  Starting here.
4       Q.   Paragraph 5 on page 2 and starting
5   with the language we have been talking about
6   that starts with the quotation "any and all
7   property."
8       A.   I was involved in its drafting, but I
9   think it was, like many things, a bit of a group
10  process.
11      Q.   So who were the members of this group?
12      A.   The members of the group on the Cleary
13  side would have been me, Dana Fleischman, Bob
14  Davis, Duane McLaughlin, possibly David
15  Leinwand.  Whether -- the extent to which any of
16  one of them was specifically involved in
17  particular language, I don't recall.
18      Q.   So this was a collective, this
19  language was a collective drafting effort of a
20  number of Cleary lawyers?
21      A.   Yes, although I would say probably
22  principally me.
23      Q.   When it was proposed to the Lehman
24  side, your understanding was that this language

Page 57

ROSEN

1   accurately reflected the business deal?
2       A.   Yes.
3       Q.   Did you ever ask anyone to identify
4   who had negotiated this specific part of the
5   business deal?
6       MR. MORAG:  Object to the form.
7       I will let you answer if it is -- as
8   to the yes or no, but if it involves a
9   privileged communication, do not go into the
10  substance of the communication.
11      A.   I assume it was negotiated by the
12  principals who negotiated the deal that was
13  ultimately documented in the APA and these
14  documents.  I was not privy to those specific
15  negotiations.
16      Q.   Do you know the names of the
17  individuals who negotiated the deal specifically
18  on this point?
19      A.   I don't know who participated in each
20  discussion.  I know that Archibald Cox and
21  Michael Klein and Jonathan Hughes and Rich Ricci
22  were involved in the negotiations, but I did
23  not -- I don't have personal knowledge of those
24  exchanges.

Page 58

ROSEN

1
2    Q.   Do you know who was involved on the
3    Lehman side specifically with respect to the
4    business deal that's -- that you describe in --
5    A.   Whoever was in those conversations,
6    and I wasn't present, so I couldn't identify
7    them.
8    Q.   Did the business deal ever change?
9    I'm talking now specifically about that part of
10   the business deal that's the subject of the
11   language you and your group drafted and that you
12   put forth in paragraph 5 of your declaration.
13   Did that part of the business deal change
14   anytime after the discussion of the asset
15   purchase agreement?
16   MR. MORAG:  Object to the form.
17   You can answer.
18   A.   I would say that the only respect in
19   which it changed was reflected in the 3-3
20   provisions in which Barclays agreed in essence
21   to relinquish the claims specifically in the
22   clarification letter to the -- the non-769
23   million or whatever it was of securities in the
24   15c3-3 account.
25   There were aspects in which the deal

TSG Reporting - Worldwide    877-702-9580

Page 59

ROSEN

1
2    was evolving as it contemplated it would at the
3    sale hearing in relation to the DTC
4    arrangements.  That is all that comes to mind.
5    Q.   And specifically with respect to
6    assets that were related to derivatives, margin
7    or clearing funds deposit, did the deal change
8    anytime after -- the business deal change at any
9    time after the execution of the asset purchase
10   agreement?
11   A.   I'm not aware that it ever changed.
12   only that it was clarified.
13   Q.   You refer, at the bottom of page 2 and
14   top of page 3 of your declaration, to the
15   obligations of LBI or any other person.  To whom
16   are you referring with the words "any other
17   person"?
18   A.   It could be -- well, without
19   limitation on what it might include, the two
20   obvious inclusions would have been the
21   obligations of LBI or any affiliate or any
22   customer who was involved as part of these
23   transactions or part of the business that was
24   being transferred.
25   Q.   Then you say, "in an account

TSG Reporting - Worldwide    877-702-9580

Page 60

ROSEN

1
2    maintained by or on behalf of."  Can you tell me
3    what is the distinction here between an account
4    maintained by as opposed to an account
5    maintained on behalf of LBI?
6    A.   Well, Lehman, when Lehman conducts --
7    when a broker dealer conducts business with a
8    customer or on behalf of an affiliate or for its
9    own proprietary account, it will reflect, it
10   will be required to reflect on its own books and
11   records accounts which are its accounts.  Those
12   assets may be held by custodian banks, other
13   banks, clearing agencies, clearing
14   organizations.
15   So this is meant to not be limited to
16   those specific alternatives to the account as it
17   is described on the books of the carrying
18   broker, to carry anything, wherever it may be,
19   if it was to secure obligations in essence for
20   which BCI was going to become responsible.
21   Q.   And you go on to say, "for which
22   Barclays shall become responsible as of the
23   closing."  What were you referring to there?
24   A.   At this point, I believe it was
25   unclear how the DTCC accounts were going to be

TSG Reporting - Worldwide    877-702-9580

Page 61

ROSEN

1
2    handled, but it was clear that, for example, to
3    the extent that Barclays was a clearing, either
4    a clearing member of a clearing organization
5    which carried accounts, or was a clearing broker
6    carrying positions with other clearing brokers
7    who were clearing members of other exchanges on
8    which positions may have been carried in or out
9    of the United States, whatever the form, that
10   would have been covered.
11   The point was that if there was credit
12   support available and Barclays was on the hook
13   and potentially subject to liabilities
14   associated with that, that all of those assets
15   would be available.
16   Q.   And were Barclays -- in the case of a
17   foreign account, where Barclays was not
18   taking -- stepping into the shoes of Lehman and
19   taking over from Lehman, the obligations to a
20   foreign exchange or clearing corporation, it
21   would get the exchange-traded derivatives but
22   not the associated assets?
23   MR. MORAG:  Object to form.
24   A.   Not at all.  Not at all.  That's not
25   what I am saying at all.

TSG Reporting - Worldwide    877-702-9580

Page 62

ROSEN

1  In fact, if BCI was going to be in the
2  chain of financial responsibility for those
3  positions, whether it was because they were
4  taking the account or they were carrying the
5  account or they were carrying the account with a
6  foreign clearinghouse or another broker who was
7  in the clearinghouse, that that would be
8  included.
9  **Q.   And that's what I am trying to**
10 **understand.  Where the flip side of that**
11 **happens, where Barclays was not taking the**
12 **account, did you consider what happens when**
13 **Barclays does not take the account at a foreign**
14 **exchange?**
15 A.   I think that language is dealt with
16 elsewhere.  And I need the clarification letter
17 to --
18 **Q.   So you believe there is a separate**
19 **provision that deals with when Barclays takes**
20 **exchange-traded derivatives --**
21 A.   I don't recall the specific language.
22 I would prefer to --
23 MR. MORAG:  You have to --
24 A.   I am sorry, I prefer to look at the

TSG Reporting - Worldwide    877-702-9580

Page 63

ROSEN

1  clarification letter.
2  **Q.   Well, we will certainly get to the**
3  **clarification letter, but your understanding is**
4  **that that's not covered by this language; is**
5  **that correct?**
6  A.   Well, there are ellipses in here.
7  This is a very long provision, and I'm not
8  prepared to summarize all the things that it
9  does or does not cover in this abbreviated form.
10 So if you want me to tell you what it covers,
11 you are going to have to give me the provisions
12 so that I can look at them.
13 **Q.   Sounds fair.  I think it is Exhibit**
14 **25.**
15 MR. MORAG:  Mr. Maguire, if I recall
16 correctly, Exhibit 25 is the executed
17 clarification letter.  You have been asking
18 him questions about language which was not
19 included in the executed clarification
20 letter.  So I'm not sure that's going to be
21 responsive to his request.
22 **Q.   That may be fair.  Maybe we should go**
23 **through the drafts.**
24 A.   I think we should look at the draft

TSG Reporting - Worldwide    877-702-9580

Page 64

ROSEN

1  that has this --
2  MR. MORAG:  Only if you have questions
3  about the draft.  If you have questions
4  about the final, show him the final.
5  **Q.   Why don't we do that.  We will go**
6  **through the drafts and then we will take a look**
7  **at the final.**
8  **Before we do that, let me ask you to**
9  **scroll down to the end of that paragraph, the**
10 **bottom of paragraph 5.  You refer there to,**
11 **"which is consistent with the discussions of the**
12 **lawyers from both sides."**
13 **Do you see that reference to those**
14 **discussions?**
15 A.   Um-hm.
16 **Q.   Can you tell me what discussions you**
17 **are referring to there?**
18 A.   The discussions negotiating the terms
19 of the deal, which were that Lehman sold the
20 exchange-traded derivatives business and all
21 assets associated with it and all deposits and
22 customer deposits.  But basically it is
23 consistent with the treatment in the
24 documentation and therefore the negotiation of

TSG Reporting - Worldwide    877-702-9580

Page 65

ROSEN

1  the documentation relating to what it was that
2  Barclays was getting.
3  **Q.   Is there any specific conversation**
4  **among any two or more lawyers that you were**
5  **intending to refer to in that last sentence of**
6  **paragraph 5?**
7  A.   I was not present in the negotiations
8  of the original provisions in the APA that this
9  clarifies.
10 **Q.   And you're not aware of any**
11 **conversations that your partners have told you**
12 **they remember from the negotiation of the**
13 **original deal?**
14 **What I am trying to clarify is just,**
15 **did you have in mind when you wrote this**
16 **reference to discussions something either that**
17 **you remembered or something that one of your**
18 **partners told you about?**
19 A.   No.  I'm referring to what would have
20 had to have been discussed if the parties were
21 to come to the terms on which they signed the
22 APA.
23 **Q.   I am going to show you a document that**
24 **has previously been marked as Exhibit 30.  Do**

TSG Reporting - Worldwide    877-702-9580

Page 66

```
1              ROSEN
2  you recognize this document?
3       A.   Looking at the first page, no.  I
4  don't believe I was copied -- yes, I am.  OK.
5       I don't recall looking at this
6  document, but it is possible that I saw it at
7  some point.
8       Q.   If you look, sir, at paragraph 11, you
9  will see that the language there includes a
10 paragraph on derivatives.  Do you see that?
11      A.   Yes.
12      Q.   And there is a reference to Exhibit A.
13 Did you ever see an Exhibit A?
14      A.   I don't recall whether I saw
15 Exhibit A.
16      MR. MAGUIRE:  I would ask your counsel
17 to maybe let us know if you were able to
18 find an Exhibit A in the Cleary production.
19      MR. MORAG:  If we did, we would have
20 produced it.  I certainly have never seen
21 it.  It would not be the first time in this
22 deal that someone anticipated an Exhibit A
23 that was never completed.
24      Q.   Mr. Rosen, I will show you a document
25 previously marked as Exhibit 36.  Have you ever
```

TSG Reporting - Worldwide     877-702-9580

Page 67

```
1              ROSEN
2  seen this draft, sir?
3       A.   I can't be sure.  I would have to look
4  at it against other drafts to know.
5       Q.   If you look at the markup version.
6       A.   Is that in here?
7       MR. MORAG:  At the end.
8       Q.   About halfway through.
9       A.   OK.
10      Q.   On the first page of the markup, if
11 you look down at the bottom, you will see there
12 is a provision that refers to a clearance box.
13 Do you see that?
14      A.   Let me just look at it.
15      Q.   Sure.
16      A.   Yes, I see the provision, clause B.
17      Q.   Did you understand that Barclays was
18 acquiring assets at the DTC clearance box?
19      MR. MORAG:  Object to the form.
20      A.   I understood that they were acquiring
21 all the assets of the business, including
22 clearance box assets, some of which were at DTC
23 and some of which were not at DTC.  That was my
24 understanding at the time.  All of the assets of
25 the business that was being acquired other than
```

TSG Reporting - Worldwide     877-702-9580

Page 68

```
1              ROSEN
2  the defined excluded assets.
3       Q.   If you turn to page 4, you will see a
4  section 8.  It refers to DTC arrangements.
5       MR. MORAG:  There is two section 8s.
6  I guess you mean the second one.
7       Q.   The second one.  Yes.
8       A.   Um-hm, I do see it.
9       Q.   Did you have an understanding at any
10 time that Barclays was contemplating assuming
11 all of Lehman's obligations to the Depository
12 Trust and Clearing Corporation?
13      A.   I'm not exactly sure what you mean by
14 contemplating, but the question as to how the
15 DTCC situation would be handled and documented
16 was the subject of negotiations.  There were a
17 range of potential outcomes, one of which could
18 have included assuming those rights and
19 obligations, but there were concerns associated
20 with the liabilities to which they had not
21 contemplated they would be subject based on the
22 liabilities that were intended to be excluded
23 but which they would become responsible for if
24 they just simply assumed the liabilities in the
25 accounts.
```

TSG Reporting - Worldwide     877-702-9580

Page 69

```
1              ROSEN
2       So at this point in time, I don't
3  think there was -- it was -- I don't think
4  people were proceeding on the Barclays side
5  necessarily on the assumption they were going to
6  be doing this, but this was an open issue.
7       Q.   I am going to show you a document that
8  has previously been marked as Exhibit 49.
9       A.   Is this blacklined --
10      Q.   Why don't we follow the blacklined.
11      Do you recall seeing this document
12 before?
13      A.   It looks like a draft I may have seen.
14 Again, without, you know, comparing them, I
15 can't be sure.
16      Q.   Was that a protocol that Cleary
17 followed at the top of the blackline, where it
18 says "CGSH comments" and the date and time?
19      MR. HUME:  Object to the form.
20      MR. MORAG:  Same objection.
21      A.   I don't know that it is a practice
22 that's uniformly followed, but when there is
23 enough time and the comments are transmitted in
24 this way, you might do it just because there
25 could otherwise be confusion about the timing of
```

TSG Reporting - Worldwide     877-702-9580

Page 70

ROSEN

1  drafts and what followed what.
2  But it would not have been the
3  protocol, for example, in circumstances where,
4  as happened frequently in this deal, comments
5  were just scribbled on a piece of paper and sort
6  of shared and then ultimately inputted.
7  **Q.   Do you see at the bottom of the first**
8  **page, there is a reference to certain assets and**
9  **the clearance box language has been removed?  Do**
10  **you see that?**
11  MR. HUME:  Object to the
12  characterization of the document.
13  MR. MORAG:  There is no question
14  pending other than to refer your attention
15  to the first page.
16  A.   I'm just trying to understand the
17  entire document.  OK.  Yes.
18  **Q.   At the bottom where the clearance box**
19  **language was on the bottom of page 1, do you see**
20  **that?**
21  A.   Yes, I do.
22  **Q.   You will see that Cleary has added the**
23  **language, "or any portion of such securities."**
24  **See that, the last two lines on the page?**

TSG Reporting - Worldwide     877-702-9580

Page 71

ROSEN

1  A.   Um-hm, yes, I do.
2  **Q.   Just from your previous testimony, I**
3  **understood your understanding was that Barclays**
4  **was acquiring all of the assets at DTC.  So can**
5  **you explain to me why Barclays wanted to**
6  **negotiate the right to acquire only a portion**
7  **instead of all of the assets?**
8  MR. MORAG:  Object to the form, and
9  objection, mischaracterizes his testimony.
10  A.   I didn't say that they were buying all
11  the assets at DTCC.  I said they were acquiring
12  the assets of the business.
13  And in terms of this, it looks to me
14  as though the portion of this, the change that
15  was made here, was that to the extent there was
16  any discretion not to take them, that discretion
17  enabled them to decide when they were going to
18  take all or just a portion of them.  It wasn't
19  an all or nothing decision.
20  I think there was not -- it was not
21  entirely clear -- I'll just leave it at that.
22  **Q.   And can you tell me why it was**
23  **important to have the ability to take a portion**
24  **of the assets, instead of all of the assets?**

TSG Reporting - Worldwide     877-702-9580

Page 72

ROSEN

1  MR. HUME:  I am going to object to the
2  lack of foundation and to the extent it
3  calls for speculation.
4  MR. MORAG:  Same objection.
5  A.   I wasn't directly involved in this,
6  but my recollection is that this provision
7  relating to the ability not to take some
8  clearance box assets, I'm not sure that we were
9  the source of that, but I think this provision
10  merely provided more flexibility that to the
11  extent that there was discretion to take or not,
12  that was a discretion to take or not in whole or
13  in part.
14  **Q.   And were you privy to any of the**
15  **discussions about why it was important to have**
16  **that flexibility?**
17  A.   I was not privy to those discussions,
18  and I don't know whether there were discussions
19  or whether it was a provision that was suggested
20  by the other side, or whether we really cared
21  about it, given that it provided a flexibility
22  that we didn't have any obligation to, that
23  Barclays didn't have any obligation to exercise
24  or not.

TSG Reporting - Worldwide     877-702-9580

Page 73

ROSEN

1  **Q.   If you turn to the top of the next**
2  **page, you will see item C on the second line**
3  **refers to exchange-traded futures.  Do you know**
4  **why the reference here is to exchange-traded**
5  **futures?**
6  A.   This was, I think -- this was a
7  placeholder.  I think the purpose of putting
8  this in brackets was that people wanted to put a
9  marker down that they needed to consider whether
10  anything needed to be addressed to those issues,
11  and if so, what, and people didn't know exactly
12  what it would have been appropriate to have
13  included here or whether it was necessary to
14  include anything, but so as not to drop the
15  issue, I think the bracketed language was
16  included, and I don't think there was any
17  particular attention paid to exactly how those
18  issues were put on the table.
19  **Q.   And then if you look down at item D,**
20  **you will see the exception, exclusion from the**
21  **exclusion.**
22  A.   Right.  I see that.
23  **Q.   And this includes the language that**
24  **you referred to in your declaration?**

TSG Reporting - Worldwide     877-702-9580

Page 74

ROSEN

1
2    A.   It seems to.  Again, I can't be sure
3    that all of these words are exactly the same
4    without verifying, but it looks like the
5    provision that was just described.
6        Q.   If you turn to the next page, page 4,
7    and the section 8, do you see the same language
8    appearing in that section?
9        MR. MORAG:  As what?
10       MR. MAGUIRE:  As well.
11       MR. MORAG:  No.  As what?  Same as
12   what?
13       Q.   Same as the language that you quote in
14   paragraph 5 of your declaration.
15       A.   I see some similar wording.  I don't
16   think it is exactly the same.
17       Q.   If we turn back to page 2, to that
18   section D, as in David.
19       MR. HUME:  Section 2?  Page 2.
20       Q.   At the beginning of D, it specifically
21   says that "excluded assets shall not include any
22   and all property of any customer."  Do you see
23   that?
24       A.   I see that it says "except as
25   otherwise specified in the definition of

TSG Reporting - Worldwide   877-702-9580

Page 75

ROSEN

1
2    purchased assets, excluded assets shall not..."
3        Q.   And what was the point of this
4    reference to customer property?
5        A.   The purpose of this language was to
6    insure that to the extent that -- what do you
7    call it -- to insure that to the extent that, in
8    connection with any account that was
9    transferred, there were liabilities associated
10   with them at the property that secured those
11   obligations and protected those liabilities,
12   were included in the deal, not excluded by any
13   other provision.
14       Q.   And you're talking about all the
15   customer accounts that were transferred from
16   Lehman to Barclays?
17       A.   Yes, this refers to customers whose
18   accounts were being transferred.
19       Q.   You see a little further down, there
20   is a reference to 15c3-3?
21       A.   By the way, it says "or."
22       Q.   Right.
23       A.   "Maintained by or on behalf of," "for
24   which they become responsible," parsing down.
25       So whether or not the account was

TSG Reporting - Worldwide   877-702-9580

Page 76

ROSEN

1
2    being transferred, if somehow Lehman -- Barclays
3    was to assume responsibility for that, that
4    would also be included.  It didn't have to
5    necessarily be a transferred account.
6        Q.   So you're saying it either had to be a
7    transferred account or an account for which
8    Barclays became responsible?
9        A.   You know, I hate to say this, but this
10   sentence is incomplete.  I see that it says
11   maintained, A, and then I don't see a clause B.
12   So it is not impossible that there was other
13   language that should have been included here
14   that wasn't.
15       But in terms of the language that's in
16   here, I think the concept was, if we were taking
17   accounts or would otherwise become responsible
18   for them, that they would be ours, and if they
19   were otherwise purchased assets, they would be
20   ours.  Any of those three categories would have
21   been encompassed.
22       Q.   And the 15c3 account is mentioned here
23   too, right?
24       A.   Yes.
25       Q.   And you understood that the entire

TSG Reporting - Worldwide   877-702-9580

Page 77

ROSEN

1
2    15c3 account was being transferred to Barclays;
3    is that correct?
4        MR. MORAG:  Objection, time frame.
5        Q.   The time frame was as of this draft.
6        A.   That is what this draft seems to
7    provide.
8        Q.   Now, we discussed earlier about how
9    Barclays was getting the assets associated with
10   the accounts when it was becoming responsible
11   for the accounts, and I had asked you about
12   foreign exchanges where Barclays was not taking
13   over the accounts, it was not stepping into the
14   shoes of Lehman, and the question I asked you
15   then, and I would like to re-pose to you now --
16       A.   I would like to just stop you and say,
17   I'm not aware of Lehman not -- of there being a
18   distinction in the context of the
19   exchange-traded derivatives between, you know,
20   U.S. listed derivatives and non-U.S. listed
21   derivatives.  So you can postulate that, but I'm
22   not necessarily agreeing that that's the right
23   characterization.
24       Q.   I'm not characterizing derivatives
25   differently.  I'm talking about where -- I'm

TSG Reporting - Worldwide   877-702-9580

Page 78

1              ROSEN
2    asking you to focus on the distinction between
3    the accounts that Barclays was assuming and
4    becoming responsible for and the accounts that
5    Barclays was not assuming and not becoming
6    responsible for.  And you told me about the
7    first.  Now I want to ask you about the second.
8          With respect to those accounts, and
9    the example I will give you is the foreign
10   accounts, when Barclays was acquiring
11   exchange-traded derivatives in foreign
12   organizations around the world and was not
13   stepping into the shoes of the foreign -- of
14   Lehman in those foreign clearing organizations,
15   what was your understanding as to how margin
16   clearing fund deposit was being treated under
17   the business deal?
18         MR. HUME:  I object to the question as
19   lacking foundation, particularly in light of
20   the witness' testimony that he is not aware
21   of any such accounts.  Therefore, I object
22   that it calls for speculation and a
23   hypothetical, and he is not here as an
24   expert.
25         A.   Well, if there was a guarantee fund
     TSG Reporting - Worldwide    877-702-9580

Page 79

1              ROSEN
2    deposit, and it was a Lehman guarantee fund
3    deposit, you would have to parse that under the
4    agreement.  But there are -- the fact that
5    Lehman may not have been a clearing member of
6    the foreign clearinghouse directly and had
7    contributed to the guarantee fund deposit does
8    not mean that was not an account for which
9    Barclays would have become responsible, as I
10   said, if Barclays was in any part of the chain
11   between customer and the clearinghouse.
12         So, it may not have been Barclays -- a
13   transfer of an account, but if Lehman maintained
14   the account and carried the account with
15   Barclays who carried it with somebody else, that
16   would have been a different matter.  And if it
17   was part of the assets that were purchased, if
18   it were part of the assets that were purchased,
19   then whether or not the account was transferred
20   or whether or not it was an account for which
21   Barclays became responsible, if it was something
22   that they acquired as part of Lehman's business,
23   exchange listed derivatives business, then it
24   would be included.
25         I guess I am not here to advise you as
     TSG Reporting - Worldwide    877-702-9580

Page 80

1              ROSEN
2    to whether the language provided for that or
3    not.
4          Q.  I don't want any advice, sir.  What I
5    am looking for is to follow up on your earlier
6    testimony where you said you needed to see the
7    draft, and specifically what I had asked you
8    to see where Barclays was not taking the
9    account, Barclays did not take the account at a
10   foreign exchange.  And I believe you answered
11   that that language is dealt with elsewhere and
12   you needed the clarification letter to point
13   that out.
14         Can you point out in this draft of the
15   clarification letter anything that you
16   understood at the time covered the situation
17   where Barclays was not acquiring the account?
18         MR. HUME:  Objection, lacks
19   foundation.  I don't think you have
20   established when Barclays didn't acquire the
21   account or what that means.
22         MR. MAGUIRE:  I'm just asking the
23   witness to identify what he was referring to
24   in his prior testimony.
25         A.   You are asking -- I am sorry, can you
     TSG Reporting - Worldwide    877-702-9580

Page 81

1              ROSEN
2    ask specifically the question --
3          Q.  Sure.
4          A.   -- that you are asking me to respond
5    to.
6          Q.  What I am focusing on is the limiting
7    words -- I won't give it a characterization,
8    I'll say the words, that are in the language
9    drafted here by you and your Cleary colleagues,
10   where you -- where the language we have been
11   discussing is specific to accounts for which
12   purchaser shall become responsible as of the
13   closing.
14         I'm asking you what -- where in this
15   document did it deal with those accounts for
16   which Barclays did not become responsible at the
17   closing?
18         MR. MORAG:  Object to the form, and I
19   think you have mischaracterized his
20   testimony.  I'm not sure he said it was
21   reflected in this draft.
22         A.   Well, as I said, this exception is
23   itself limited to the extent that it was a
24   purchased asset of a business.  This language
25   does not call out and specifically address --
     TSG Reporting - Worldwide    877-702-9580

Page 82

ROSEN

1    this particular provision doesn't specifically
2    address it, and how it would be treated would be
3    a function of how you evaluate the scope of the
4    purchased assets which were all the assets
5    associated with the business.
6         So you would still have to evaluate
7    it, not under this language but under the
8    purchased asset provisions. Obviously I can't
9    go further into how you would evaluate those
10   provisions.
11        Q.   I'm not asking you to form an opinion
12   here, just so we are clear. I am only asking
13   you for your understanding at the time. And --
14        A.   As I said, I'm not -- there seems to
15   be a clause B that's not here, and so I'm not
16   entirely comfortable sitting here reflecting on
17   all of the things that I was thinking about at
18   the time that I drafted.
19        But I will -- but I agree that the
20   language here as it relates to customer
21   accounts, are accounts that are transferred or
22   accounts for which BCI is becoming responsible
23   in some way.
24        Q.   And you had referred earlier in your

Page 83

ROSEN

1    testimony to where that situation was covered by
2    language elsewhere. Was there some other
3    language --
4         A.   I am sorry, I am sorry. Or if it was
5    a cash item maintained by LBI pursuant to
6    15c3-3.
7         So if there was -- so it wouldn't have
8    been customer property, it would have been
9    property, technically property of Lehman
10   Brothers, Inc. But to the extent that it
11   relates, the reserve relates to a customer
12   account, that does not seem to be so limited
13   here.
14        But I don't think you need me to parse
15   the language in this provision.
16        Q.   No. What I am looking for, sir, is,
17   when you referred to language elsewhere covering
18   this specific point where Barclays was not
19   acquiring the accounts, what language did you
20   have in mind?
21        A.   Purchased assets.
22        Q.   Section 1 --
23        A.   Purchased assets provisions.
24        Q.   Section 1 of the clarification letter?

Page 84

ROSEN

1         A.   The answer to your question is, all of
2    the other provisions of the documentation that
3    establish the rights and obligations of the
4    parties.
5         Q.   Is there anything specific you can
6    point me to?
7         A.   The provisions that relate to
8    purchased assets.
9         Q.   Is that generally section 1 of the
10   clarification letter, or is there anything --
11        A.   It is in the APA, and it's in the
12   clarification letter.
13        Q.   Is there any more specificity you can
14   provide me?
15        A.   I think I am going to leave that
16   parsing to you.
17        Q.   If you turn to page 4, section 8, the
18   new section 8 that starts with DTC arrangements
19   and some language, that language and other
20   language removed. Do you see that?
21        A.   Yes.
22        Q.   Can you tell me what prompted the
23   removal of the language concerning the DTC
24   arrangements?

Page 85

ROSEN

1         A.   I don't think it was removal of that
2    language so much as a belief by the drafters
3    that these provisions needed to cover a broader
4    set of -- category of arrangements than just
5    DTCC. Because, for example, there was the OCC
6    arrangement and possibly other clearinghouses of
7    which Lehman might have been a member that might
8    have been coming over.
9         Q.   This section continues in the next
10   sentence, "Assumption of accounts: Purchaser
11   shall assume all customer accounts of the
12   business." Do you see that?
13        A.   I do.
14        Q.   And do you understand that the text
15   that follows all describes transfers of property
16   to Barclays in connection with the transfer of
17   customer accounts?
18        MR. HUME:  Objection to the form.
19        A.   First let me just clarify that it says
20   all accounts of the business, not necessarily
21   all accounts.
22        MR. MORAG:  I am going to object --
23        A.   I think to answer your question, I am
24   going to have to evaluate how you interpret the

Page 86

```
1              ROSEN
2   interplay of various provisions here.  I'm not
3   sure I can answer that without effectively
4   analyzing the contract and interpreting it.
5       Q.   Did you understand that Barclays was
6   assuming all of the customer accounts of the
7   business?
8          MR. HUME:  Objection to the form.
9          MR. MORAG:  Again, the time frame?
10      Q.   At the time of this draft.
11      A.   I -- it was very fluid.  I can't
12  recall when I understood what precisely was in
13  and what was out.  I knew that there were some
14  things that were in and some things that were
15  out, but I'm not sure at this time what my state
16  of knowledge was.
17         I was also not the draftsperson of
18  this or the draftsperson to use language that
19  was common to the provision.
20      Q.   Did you come to understand at some
21  point that certain of the customer accounts of
22  the business were not being assumed by Barclays?
23      A.   Yes.  Yes, I understood that there was
24  the sale of something called PAM that was being
25  sold to Neuberger Berman.  I can't remember when
       TSG Reporting - Worldwide    877-702-9580
```

Page 87

```
1              ROSEN
2   I became aware of that.
3          And I believe that there was -- there
4   were certain exceptions to the PIM accounts, or
5   maybe it was some other business, but I
6   didn't -- as I say, I am not -- I was not and am
7   not familiar with how the business was
8   organized, but there were some that were in and
9   there were some that were not.
10      Q.   I will show you a document previously
11  marked as Exhibit 616A.  Obviously I'm not going
12  to ask you about the first page, which is an
13  e-mail that you weren't copied on, but I will
14  ask you, sir, if the rest of the document is a
15  draft that you were aware of at the time.
16      A.   I'm not sure that I can -- I can't
17  read this.  I can't read out the provisions, and
18  I don't know what time this document was
19  generated or when it was shared with anyone on
20  our side sitting here.  I don't know.  This may
21  have been an internal draft.  I'm not sure I
22  recall seeing it contemporaneously.
23      Q.   The only reason I wanted to show it to
24  you is really on page 2 at the bottom, if you
25  can make out through the highlighting, you will
       TSG Reporting - Worldwide    877-702-9580
```

Page 88

```
1              ROSEN
2   see language concerning margin and guarantee
3   funds deposit, the language that you address in
4   your declaration.
5       A.   I cannot actually see it on this copy
6   unfortunately.
7       Q.   OK. I'll represent to you that this
8   draft removes that language.  I think in your
9   declaration, you refer to a draft --
10         MR. HUME:  Are you representing it is
11  removed or removed and replaced with
12  something else?
13         MR. MAGUIRE:  I can read it on my
14  copy.
15         MR. HUME:  I understand.  But you are
16  representing that it is removed.  Are you
17  representing that anything was added?
18         MR. MAGUIRE:  I am certainly not
19  representing that.
20         MR. HUME:  There is language added
21  right after the removal.
22         MR. MORAG:  If I may state for the
23  record, in terms of the declaration, the
24  fact of the non-inclusion of the language of
25  paragraph 5 was established by a draft, a
       TSG Reporting - Worldwide    877-702-9580
```

Page 89

```
1              ROSEN
2   subsequent draft, but not necessarily this
3   one.
4          MR. MAGUIRE:  You're right, actually,
5   and we will show that to the witness next.
6   It is Exhibit 50.
7       Q.   In broad terms, you were aware that
8   the language we have been discussing from
9   your -- that you quote in your declaration was
10  removed, but do you have a recollection of
11  actually seeing the draft that had that removal
12  in it, that showed the actual deletion of that
13  language?
14      A.   I would have seen a draft which
15  modified the language that we had included, as I
16  described earlier.  Whether I saw it in a
17  blackline or a clean copy, I can't remember.
18      Q.   Did you ask any of your partners about
19  that question, whether they saw it with the
20  language actually deleted --
21      A.   I didn't ask my partners or I don't
22  recall asking my partners that question.
23      Q.   Let me show you a document previously
24  marked as Exhibit 50.  Take whatever time you
25  need to review the draft, sir, and just let me
       TSG Reporting - Worldwide    877-702-9580
```

Page 90

ROSEN

1  know when you're ready.
2         And my first question is going to be,
3  have you seen this draft before?
4      A.  I've seen before an e-mail transmittal
5  from Michael Mazzuchi passing on a draft of the
6  clarification letter to DTCC and its counsel at
7  their request, and there being a draft of the
8  clarification letter attached to it that was
9  provided to us by Weil.
10        But as to whether this is exactly the
11  same draft, I can't say.  I would have to
12  verify.
13     Q.  You will see at the bottom of page 1
14  of the draft is a reference to LBI's clearance
15  boxes.
16     A.  I see that.
17     Q.  Do you know why the word DTC was not
18  included there?
19     A.  My understanding is that it was not
20  included because there were clearance box assets
21  held at locations other than DTCC.  So DTCC was
22  not the exclusive depository of clearance boxes,
23  is my recollection.
24     Q.  And what were the other depositories?

TSG Reporting - Worldwide    877-702-9580

Page 91

ROSEN

1      A.  I don't remember knowing the details.
2      Q.  Did anyone consider saying DTC and
3  other clearance boxes?
4          MR. MORAG:  Object to the form.
5      A.  I wouldn't speculate as to whether
6  somebody did or didn't.  They may have.
7      Q.  In a prior draft, there had been a
8  reference to the box 074, which I understand was
9  the DTC box.  Do you have any knowledge as to
10  why that reference was dropped?
11     A.  I am not certain, but I have a
12  recollection that it was because 074 may not
13  have included all of the clearance box assets,
14  that they may not have been confined to the
15  account 074.  But I'm not 100 percent certain.
16  I have a recollection of something along those
17  lines.
18     Q.  If you look at the bottom of page 1,
19  you will see there is a parenthetical that says,
20  "provided, however, that purchaser in its
21  discretion may elect within 60 days after the
22  closing to return any such securities to LBI."
23        Do you see that?
24     A.  Yeah.

TSG Reporting - Worldwide    877-702-9580

Page 92

ROSEN

1      Q.  And can you tell me what was the
2  purpose of that?
3      A.  I'm not sure that we were the source
4  of that language.  I think that on its face, it
5  seemed to have contemplated that there may be
6  things that, in the clearance box, that Barclays
7  might not have wanted.
8      Q.  And do you have any understanding as
9  to what kinds of assets Barclays would not want
10  from the clearance box?
11         MR. HUME:  Objection, calls for
12  speculation.
13     A.  As I say, I'm not sure that this was
14  motivated by Barclays, and I'm not sure that
15  this wasn't an option that was being provided to
16  Barclays that Barclays didn't see any reason to
17  negotiate, since it gave them the ability to do
18  something but not an obligation to do it.
19     Q.  But you don't have knowledge as to
20  what prompted this?
21     A.  No, I don't.  Or I should say I don't
22  recall.
23     Q.  If you turn to page 4, and see the
24  paragraph 8, transfer of customer accounts.  And

TSG Reporting - Worldwide    877-702-9580

Page 93

ROSEN

1  towards the end of that, you will see a
2  reference to 15c3.
3      A.  Yes.
4      Q.  And at the end of that sentence, it
5  refers to the phrase, "or securities of
6  substantially the same nature and value."
7      A.  Yes.
8      Q.  Can you tell me how did those words
9  get to be inserted in the clarification letter?
10         MR. MORAG:  Which words?  All of them?
11     Q.  The words "or securities of
12  substantially the same nature and value."
13     A.  My recollection of the events for
14  that, following on the discussion which led to
15  the limiting of this provision to 769 million of
16  securities, that Harvey Miller raised the
17  question whether or not it was clear that we
18  could agree to this.
19        And I told him that I was not aware of
20  a limitation, particularly to the extent as had
21  been represented, that the 769 million dollars
22  was excess to the level that Lehman was required
23  to reserve under 3-3 as of that date, and in
24  response to the question can we do it, I

TSG Reporting - Worldwide    877-702-9580

Page 94

1          ROSEN
2    suggested that if there was a concern along
3    those lines, which we didn't share -- and I'll
4    say only, my recollection is there was a
5    question raised about it -- that we say to the
6    extent permitted by applicable law and as soon
7    as practicable after the closing.
8          And because the provision by its terms
9    then raised a question about whether or not this
10   value was going to be conveyed, because the
11   reason this was in here and was the subject of
12   discussion was that there was a significant
13   erosion or concern about the erosion of value
14   and assets that were contemplated to be
15   delivered initially but were not available to be
16   delivered, and that Lehman identified this as a
17   source of value, and so we wanted to make sure
18   that that value was conveyed.
19          And so as a result of this language,
20   it made us think, well, fine, if you can't give
21   us these 769 million of securities, give us
22   those other securities of a similar nature and
23   value.
24          That's my recollection of the origins
25   of this provision.
          TSG Reporting - Worldwide    877-702-9580

Page 95

1          ROSEN
2    Q.  I'll show you a document we have
3    previously marked as Exhibit 451.  Have you seen
4    that before, sir?
5    A.  I don't recall that I necessarily saw
6    precisely this.  I do recall that there was a
7    representation made that the SEC had approved as
8    excess a certain level of value and that there
9    was an e-mail.  We thought that we were going to
10   see an e-mail saying that.  Instead, there was
11   an e-mail, I recall, but which didn't involve --
12   didn't come from the SEC, but reported that it
13   was approved.
14          I don't think I have seen this
15   particular document, and I can't say that I
16   recall with precision the numbers for the
17   allocations between cash and securities.
18   Q.  Did you ever discuss Lehman's 15c3
19   account with Mike Macchiaroli?
20   A.  I don't recall being able -- at the
21   time that I sort of first saw this, which I
22   believe was on a -- or not this -- I was made
23   aware of the e-mail and shown something, I do
24   not believe that I spoke to Mike Macchiaroli,
25   but as I mentioned at the outset of this, I had
          TSG Reporting - Worldwide    877-702-9580

Page 96

1          ROSEN
2    earlier had a conversations with Mike which,
3    while we didn't discuss specifically the 3-3
4    reserve account or the amount that was excess, I
5    came away with the impression that he was
6    optimistic that there was going to be sufficient
7    assets.
8          So I did not have a -- I did not have
9    a -- I did not have a confirmation from him.  I
10   didn't have a concern that there would be a
11   deficiency, but I did not have an opportunity to
12   actually go over this with him.
13   Q.  So in your earlier conversation with
14   Mr. Macchiaroli, he was optimistic that there
15   would be sufficient assets available to pay all
16   customer claims; is that correct?
17   A.  Yeah.  That -- well, I don't think he
18   would have -- I don't think he would have -- I
19   don't mean to put words in his mouth that he
20   would have made a representation to those
21   effects, but I came away with an impression that
22   he was optimistic that there wouldn't be a
23   shortfall.
24   Q.  And you took from that conversation
25   that there wouldn't be a shortfall in customer
          TSG Reporting - Worldwide    877-702-9580

Page 97

1          ROSEN
2    property?
3    A.  Yes.
4    Q.  And you, therefore, expected --
5    A.  Well, I took away that at that point,
6    knowing what he knew, that it looked as though
7    there wouldn't be.  I wouldn't say -- I wouldn't
8    characterize it beyond that.
9    Q.  And he didn't tell you to what extent
10   there would be any excess?
11   A.  We didn't discuss any quantification.
12   Q.  Did you have any discussions with
13   anyone at the SEC concerning the reserve account
14   or any excess in the reserve account?
15          MR. MORAG:  Objection, asked and
16   answered.
17   A.  I don't recall.
18   Q.  Now, you were responding to a Weil
19   question.  Was it Harvey Miller who said can we
20   do it?
21   A.  I believe it was Harvey Miller, yes.
22   Q.  What he was referring to is the
23   transfer from the 3-3 account?
24   A.  Yes.  He was, he was raising the
25   question as to whether there might be a
          TSG Reporting - Worldwide    877-702-9580

Page 98

ROSEN

1 limitation on this transfer.
2
3    Q.    And did you understand that there was
4 1.7 billion in the reserve account?
5    A.    I don't think I recall at that time
6 specifically what the number was.  I knew that
7 there was a reserve account, and I knew it was
8 funded.  I can't recall at what level it was
9 funded.
10    Q.    And there was -- one issue was this
11 cash issue that you testified about earlier,
12 right?  And that was resolved by people avoiding
13 the issue and simply not transferring the cash
14 to Barclays, correct?
15    A.    Correct.
16    Q.    And that left the 700 or 769 million
17 which was government securities?
18    A.    They were securities, yes.
19    Q.    And with respect to that, Mr. Miller
20 raised the question can we do it, meaning can we
21 transfer this 769 million from the reserve
22 account to Barclays?
23    A.    Correct.
24    Q.    And you said that there was no limit
25 to the extent to which that could be transferred

TSG Reporting - Worldwide    877-702-9580

Page 99

ROSEN

1
2 where there was an excess in the account?
3    MR. MORAG:  Objection to
4 mischaracterizing.  I think he said
5 limitation.
6    A.    What I said was I wasn't aware of a
7 limitation that would prevent them as part of
8 this transaction from effecting that transfer,
9 and I said particularly if it is an excess.  I
10 didn't limit it to it being an excess.
11    Q.    Where there was no excess, where there
12 was in fact a deficiency or shortfall in
13 customer property, were you aware of any
14 limitation on the ability of Lehman to transfer
15 from the reserve account to Barclays?
16    A.    There is not a limitation identified
17 to me that couldn't necessarily be addressed as
18 part of the transaction.  They could -- there is
19 no -- the sale of a business where the customer
20 accounts or some portion of them are going over,
21 I'm not aware of a reason why the SEC and the
22 court couldn't assent to the transfer of those
23 assets if it wanted to.
24    And one would have inferred from the
25 documents that as part of the assets of the

TSG Reporting - Worldwide    877-702-9580

Page 100

ROSEN

1
2 business that was being sold, that that had in
3 fact been approved in a transaction approved by
4 the court and to which the SEC gave no
5 objection.
6    Q.    And that would have involved then
7 transferring -- where there was a shortfall or
8 deficiency, the transfer of 769 million would
9 have to come from customer property; isn't that
10 correct?
11    MR. MORAG:  Object to the form.
12    A.    Not necessarily.
13    Q.    Well, the transfer of that amount to
14 Barclays would mean that 769 million would not
15 be available to satisfy customer claims?
16    A.    That's not -- whether or not Lehman
17 would have been under-reserved going forward,
18 when it was in liquidation mode, is an entirely
19 different question that would not necessarily --
20 if these assets were in the account but this
21 account was required to have more, those assets
22 would still be assets of Lehman, that as part of
23 this transaction could have been approved to be
24 transferred to Barclays as part of the business
25 that it was acquiring.

TSG Reporting - Worldwide    877-702-9580

Page 101

ROSEN

1
2    Q.    And it was your view that could have
3 been done regardless of whether that left
4 customers, remaining customers short by the
5 amount of 769 million?
6    A.    That's not what I said.  I said that
7 could be done even if as a result Lehman had a
8 deficit in its reserve account.
9    Q.    I know that's what you said.  But my
10 question is, where there is such a deficit and
11 the transfer of these assets means that the
12 customers do not have access to that
13 769 million, and that means that --
14    A.    You know, those assets may have had --
15 as the deal was approved, it was represented
16 that there were other assets that Lehman had.
17 The assets that can be made -- as I'm sure you
18 are aware, the assets that can be made available
19 to customers in satisfaction of their claims are
20 not limited to what is in the 15c3-3 account.
21 That is a regulatory construct that does not
22 limit the recourse of customers.
23    So I reject the premise that the
24 transfer of that would necessarily have resulted
25 in a shortfall.

TSG Reporting - Worldwide    877-702-9580

Page 102

ROSEN

1
2    Q.   And leaving aside the whole construct
3  and whole premise, my only question is, you were
4  not aware of any limitation, even in the
5  event --
6    A.   I wasn't, I wasn't thinking about all
7  of the -- parsing all of the scenarios.  There
8  was nothing on the face of this agreement that
9  to my mind couldn't be accomplished, and from my
10  perspective, caveating it with the language "the
11  extent permitted by applicable law," even though
12  you could argue that that's implicit, was a
13  concession that we could readily make in order
14  to complete the deal.
15    Q.   So given that concession, you didn't
16  think through what would happen if the transfer
17  left unavailable property for customers?
18    MR. MORAG:  Object to the form.
19    A.   No, I reject that characterization.
20  It was not necessarily the case that there would
21  have been any deficit for customers as a result.
22  And as a result, because I didn't have the
23  information available to evaluate it, I did not
24  engage in a hypothetical conjecture as to
25  whether -- under what circumstances or set of

TSG Reporting - Worldwide    877-702-9580

Page 103

ROSEN

1
2  facts there would be a problem.
3    But from my perspective, but for the
4  concern, which was really a procedural concern
5  as a matter of caution, as I understood it from
6  Harvey Miller, I believed that these assets
7  arguably were intended to be transferred, were
8  intended to be transferred as part of the assets
9  of the business.
10    Q.   In any event, you and the Barclays
11  side of the house agreed to set aside the cash
12  issue by taking the billion dollars in cash out
13  of the deal, correct?
14    A.   By taking the billion dollars out of
15  the deal?
16    Q.   Yeah.  The 1 billion dollars in the
17  bank account was not being transferred as part
18  of the reserve account?
19    A.   Let me say this.  This provision, this
20  provision doesn't call for the transfer of that.
21  I will leave it to the lawyers to argue what the
22  implications of that might be.
23    Q.   And as to the remaining issue as
24  raised by Mr. Miller about can we do it with
25  respect to the government securities, somebody

TSG Reporting - Worldwide    877-702-9580

Page 104

ROSEN

1
2  proposed that that issue would be resolved by
3  inserting the words "to the extent permissible
4  by law"?
5    A.   My recollection is that that was me.
6    Q.   Now, did all this happen in a hallway
7  conversation?
8    A.   Yes.
9    Q.   Who was present?
10    A.   I don't have a clear recollection
11  other than Harvey Miller was there, Vic Lewkow
12  was there.  I think Dana Fleischman may have
13  been there at least for some portion of it.  And
14  there were others huddling around, but I don't
15  have a clear recollection, and to be perfectly
16  candid, because I wasn't involved in the
17  negotiation of this transaction from the very
18  beginning, I was not as -- and I was mostly
19  troubleshooting specific issues, particularly
20  those relating to the clearing arrangements, I
21  was not as familiar with the lawyers from the
22  other side, so I could not have readily, as
23  readily identified them.
24    Q.   How long did the, did this hallway
25  huddling session last?

TSG Reporting - Worldwide    877-702-9580

Page 105

ROSEN

1
2    A.   I honestly don't know.  More than a
3  couple of minutes, less than a couple of hours.
4    Q.   And can you tell me what you recall
5  being said in the course of this hallway
6  conversation?
7    A.   Pretty much what I have just described
8  to you, that there was a group already there
9  when I arrived.  I guess some predecessor
10  language to this was being reviewed, and Harvey
11  Miller, as I said, raised the question whether
12  there might be limits under applicable law, and
13  I said that I wasn't aware of any, but to the
14  extent that they exist, and it would address
15  your concern, we can provide that the transfer
16  be to the extent permitted by applicable law.
17  But if there was such a constraint, that that
18  basically 769 million dollars in securities
19  would come from somewhere else.
20    And can I remember exactly what was
21  said, whether it was a grunt or a nod or a
22  smile, I don't remember, but I remember coming
23  away from the conversation feeling that we had
24  sort of resolved the point.
25    Q.   Who was the person who gave the --

TSG Reporting - Worldwide    877-702-9580

Page 106

ROSEN

1
2 manifested assent with the grunt or nod or
3 smile?
4     A.   I could be wrong, my recollection was
5 that it was Harvey Miller, but I could be wrong.
6     Q.   Did Mr. Miller agree to your proposal
7 that "to the extent permitted by applicable law"
8 would be inserted into the --
9     A.   That was my understanding, yes.
10    Q.   Did he also agree to avoid the cash
11 issue by having this provision not call for the
12 transfer of a billion dollars in cash?
13    A.   I believe he did.
14    Q.   And did that also happen in this
15 hallway conversation?
16    A.   It may have been two different
17 conversations or it may have been a continuing
18 conversation.  Again, I was called out to deal
19 with other issues constantly, issues that were
20 being dealt with in different rooms and on
21 different floors, so I don't have a clear
22 recollection of precisely what the progress, the
23 progression of discussions were.
24        The cash conversation clearly preceded
25 this.  And there may have been a break before

TSG Reporting - Worldwide    877-702-9580

Page 107

ROSEN

1
2 this issue, it may have been that drafts were
3 prepared and exchanged to reflect the first
4 issue, and then the second issue was raised.  I
5 just don't have a clear recollection of it.
6     Q.   We seem to have the cash issue, you
7 say maybe came up first, and then we have a
8 second issue, is can we do it, as in
9 transferring the 769, and that gets resolved
10 with your proposed language "to the extent
11 permissible by applicable law," right?
12        MR. HUME:  Objection, mischaracterizes
13 his testimony.
14    A.   Do you want to repeat the question?
15    Q.   If the first issue is the cash issue,
16 the second issue is the can we do it question
17 that Mr. Miller raised?
18    A.   Transfer, there was a discussion about
19 the transfer of securities.
20    Q.   Which gets resolved with your proposed
21 language?
22    A.   Yes.  And the documentation of it gets
23 resolved.
24    Q.   Do I understand you to be saying there
25 was also a third issue in that somebody said if

TSG Reporting - Worldwide    877-702-9580

Page 108

ROSEN

1
2 for any reason it is not permissible to transfer
3 the government securities from the reserve
4 account, Lehman has to make that up to Barclays
5 with securities of some other value?
6     A.   I'm not sure I would describe it as a
7 third issue, but as an adjunct to the second
8 issue, that if the securities, these 769 million
9 were not available, some other 769 million
10 dollars of securities would be made available.
11    Q.   How did that, whatever you want to
12 call it, an adjunct to the second issue or a
13 third issue, how did that issue get raised?
14    A.   How did it get raised?
15        MR. HUME:  Objection, asked and
16 answered.
17    A.   Someone on our side, maybe me, maybe
18 somebody else who was there, I don't have a
19 clear recollection on the second point, but
20 said, well, if there is any contingency to the
21 769 from the 3-3, we get them from somewhere.
22        The whole purpose of this, again, was
23 to say -- we were identifying a source of value
24 that was in the deal in the light of other
25 evaporating value, and so it was important to

TSG Reporting - Worldwide    877-702-9580

Page 109

ROSEN

1
2 the Lehman side -- I am sorry, it was important
3 to the Barclays side that if this wasn't
4 available, some other asset would be available.
5     Q.   Was there any discussion about the
6 implications for customer property claims --
7     A.   No, there was no discussion about
8 customer property claims.
9     Q.   And there was no discussion of the
10 implications on customers of transferring 769
11 million --
12    A.   None of us, none of us on the Barclays
13 side had anything like the information that
14 would have been necessary to evaluate that, to
15 even raise questions about it.  That information
16 was not available, and there was no way for it
17 to become available and to be discussed and
18 analyzed in a time frame that would have enabled
19 the deal to close.
20        MR. MORAG:  Let him finish the
21 questions.
22    Q.   Can you tell me -- you came away from
23 this meeting with an understanding that Harvey
24 Miller or someone on the Weil side had
25 manifested assent to the proposition that if the

TSG Reporting - Worldwide    877-702-9580

Page 110

ROSEN

1
2    government securities in the reserve account
3    weren't available, some alternative similar
4    securities would be provided.
5        Can you tell me, how are you -- how do
6    you know that Mr. Miller or his colleague was
7    agreeing to that unconditional transfer as
8    opposed to his nod, his grunt, his smile,
9    whatever you recall, meaning nothing more than
10   this conversation is at an end or that we agree
11   to your proposed language "to the extent
12   permitted by applicable law"?
13       MR. MORAG:  Object to the form.
14       A.   I don't think I have more to add, more
15   than what I have already said, except to say
16   that a draft was provided to us by Weil that
17   reflected that agreement.
18       Q.   You got a draft from Weil which
19   provided that Barclays -- that Lehman would
20   transfer to Barclays 769 million from the
21   reserve account or securities of a substantially
22   similar nature.  Are you aware of that?
23       A.   I recall that.
24       Q.   What was the reaction on the Barclays'
25   side when you got that draft?

TSG Reporting - Worldwide    877-702-9580

Page 111

ROSEN

1
2        A.   We didn't know what "or nature" meant
3    and whether it was clear that it meant that they
4    would be of equivalent value.  So we added the
5    words "or value."  I believe I may have made
6    that change.
7        Q.   Did you have any discussion with
8    anyone at Weil to find out what they meant by
9    adding the words "substantially similar,"
10   without the words "in value"?
11       MR. MORAG:  Objection, foundation.
12   You have not established that Weil added
13   these words as opposed to mistyped or didn't
14   type the Cleary proposal.
15       Q.   Well, let me back up.  I thought you
16   said you were provided with a draft from Weil
17   that included the words "substantially similar
18   nature"?
19       A.   I believe I was shown a draft that
20   included that language, an interim draft that
21   included that language.
22       Q.   Do you know who provided you that
23   draft?
24       A.   I don't have a clear recollection, but
25   my assumption is it was Weil.  That's my

TSG Reporting - Worldwide    877-702-9580

Page 112

ROSEN

1
2    assumption.
3        Q.   Did you have any discussion with Weil
4    about that draft and specifically about those
5    words in that draft?
6        A.   Yes, in the sense that we provided a
7    markup of it with the words "or value," and that
8    seems to have been accepted as an appropriate
9    clarification of the agreement that we had
10   reached earlier and reflected in the next
11   turnover of documents.
12       Q.   Any communication between the Cleary
13   and the Weil folk, other than --
14       A.   Yes.  The language "or value," which I
15   think speaks for itself.
16       Q.   I'm just saying, anything beyond that?
17       A.   I don't think there needed to be
18   anything beyond that.
19       Q.   And have you heard from your partners
20   whether they are aware of anything beyond that?
21       A.   I don't have a recollection of
22   discussing it.
23       MR. HUME:  Are you going to finish
24   before lunch or should we take a break for
25   lunch or take another break?  Either way I

TSG Reporting - Worldwide    877-702-9580

Page 113

ROSEN

1
2    think we can use another break.  We have
3    been going for an hour and a half.
4        MR. MAGUIRE:  Why don't we take a
5    break, and if lunch is ready, this is a fine
6    time for lunch.  I certainly will continue
7    after lunch.
8        MR. HUME:  You will.
9        MR. MAGUIRE:  Yes.  I still have quite
10   a bit to go.
11       (Recess)
12   BY MR. MAGUIRE:
13       Q.   Sir, before the break, you were
14   describing the hallway conversation at Weil
15   Gotshal's offices concerning the 3-3 account,
16   and I note that is a subject of paragraph 7 of
17   your declaration; is that correct?
18       A.   Yes.
19       Q.   In paragraph 7, and you don't refer to
20   the contingency that you described in your
21   testimony earlier today concerning what would
22   happen if Barclays did not get or Lehman could
23   not transfer government securities from the 3-3
24   account.  Do you see that?
25       A.   Um-hm.

TSG Reporting - Worldwide    877-702-9580

Page 114

ROSEN

1
2    Q.   Can you tell me why you did not refer
3    to that contingency in your declaration?
4    A.   No.
5    Q.   Earlier in your declaration, in
6    paragraph 5, you refer both to the removed
7    language that we have discussed earlier, the
8    language that starts, "any and all property" --
9    you remember that? -- and also to the
10   parenthetical that ultimately ends up being
11   inserted in the clarification letter, that's a
12   parenthetical that reads, "and any property that
13   may be held to secure obligations under such
14   derivatives."
15   A.   Correct.
16   Q.   Can you tell me why when you posed the
17   parenthetical, you didn't simply put the earlier
18   language in the parenthetical?
19   A.   The only reason is that it was -- the
20   original language had been obviously subject to
21   modification, and I didn't want to get
22   embroiled -- we didn't have time to get
23   embroiled in sending back language and having
24   extensive negotiations.
25   So the purpose of doing it this way

TSG Reporting - Worldwide    877-702-9580

Page 115

ROSEN

1
2    was to do it as simply and clearly as possible
3    and not resurrect language that might have
4    been -- for other reasons raised issues in
5    people's minds for reasons unrelated to the
6    point that was intended to be conveyed here,
7    clarified here.
8    Q.   By inserting the parenthetical, did
9    you mean anything different from what you say in
10   your declaration, paragraph 5 was documenting
11   the business deal?
12   MR. MORAG:  Object to the form.
13   Q.   In other words, did you mean anything
14   different in the language in the parenthetical
15   from the earlier language that had been removed?
16   MR. HUME:  Objection, I think you are
17   really calling for him to interpret the
18   contract now.
19   MR. MAGUIRE:  No, no, I am asking what
20   he meant at the time.
21   A.   What I will say is that I meant to
22   express the thought reflected in the markup, but
23   I didn't parse, because I didn't have time to
24   parse the differences in the wording.  And this
25   was intended to pick up everything in a shorter

TSG Reporting - Worldwide    877-702-9580

Page 116

ROSEN

1
2    and more concise formulation.
3    Q.   Do you know how much in value terms
4    this parenthetical picked up?
5    MR. MORAG:  Objection to the form.
6    Q.   In other words, do you know how much
7    property there actually was that was held to
8    secure obligations under such derivatives?
9    MR. HUME:  The question is whether he
10   knows today?
11   Q.   Did you know at the time what the
12   dollar amount of that was?
13   MR. MORAG:  And I object, lack of
14   foundation.
15   Go ahead.
16   A.   I did not know the precise number, no.
17   Q.   Did you have a general understanding?
18   A.   I would have assumed it was a
19   significant amount of, significant amount of
20   money.  Lehman was a very significant, one of
21   the largest investment banks.  They had a very
22   significant business, and I would have assumed
23   that with a significant business would come
24   significant customer property to margin the
25   proprietary and customer activities that were

TSG Reporting - Worldwide    877-702-9580

Page 117

ROSEN

1
2    going on.
3    So the bigger it was, the more
4    concerned I was about it.
5    Q.   Did you understand that the customer
6    margin was in the billions of dollars?
7    A.   I didn't have specific knowledge of
8    it, but it wouldn't surprise me to hear that.  I
9    expected it to be a large number.
10   Q.   Did you understand what the
11   proprietary margin was that was in the billions
12   of dollars?
13   A.   I would have expected it to be of that
14   kind of magnitude, but I didn't know exactly
15   what it was.
16   Q.   Do you know whether the folks at Weil
17   had an understanding as to how much property was
18   picked up by the parenthetical?
19   MR. MORAG:  Object to the form and
20   foundation.
21   A.   All I'll say about that is that they
22   had more ready access to that information
23   through their client than we had.
24   Q.   What about the trustee, do you know
25   whether the trustee had any knowledge about the

TSG Reporting - Worldwide    877-702-9580

Page 118

**ROSEN**

1
2  amount of the property that was the subject of
3  that parenthetical?
4      A.   I can't speak to the state of mind of
5  the trustee, but I assume that as part of this,
6  the trustee was looking at what was there.
7      Q.   Is your answer the same with respect
8  to the creditors committee?
9      A.   I've had no direct interaction with
10 them, the creditors committee, such that I can
11 recall.
12         MR. MAGUIRE:  We will mark as
13     Exhibit 623 a document dated September 19,
14     2008, Bates stamped GCGSH0002699 through
15     700.
16         (Exhibit 623, document Bates stamped
17     CGSH0002699 through 700 marked for
18     identification, as of this date.)
19     A.   Can I back up a second to your
20 previous question?  In terms of what the trustee
21 and Weil knew about the amount of the margin,
22 they would have known -- they were copied on
23 e-mails which -- from OCC just in the context of
24 OCC that suggested that just the pays and
25 collects from -- for the Monday would have been

TSG Reporting - Worldwide    877-702-9580

Page 119

ROSEN

1
2  on the order of several hundreds of millions of
3  dollars, which would have suggested an
4  extraordinarily large amount of positions and
5  therefore margin associated with them.
6         So they could have inferred that it
7  would be an extremely significant amount of
8  margin.
9      Q.   When you refer to the pays and
10 collects, what are you referring to?
11     A.   The accounts are marked on a periodic
12 basis by the clearinghouse, and it was sort of
13 what additional flows are coming in or going out
14 between the clearinghouse and the clearing
15 member as a result of the changes in the marks
16 or the exercises of contracts or whatever other
17 activity is being conducted in the account.
18     Q.   And what's a pay?
19     A.   Well, it depends on what your
20 perspective is, but some amounts are paid by the
21 clearinghouse to the clearing member, and there
22 are amounts that are paid, so if you are
23 receiving the funds, you are the collect, and if
24 you are paying the funds, you're the pay.
25     Q.   Do you know whether the trustee or

TSG Reporting - Worldwide    877-702-9580

Page 120

**ROSEN**

1
2  Weil actually received any information
3  concerning pays or collects at the OCC prior to
4  the closing?
5      A.   I believe they were copied on e-mail
6  correspondence from the OCC, but that may be a
7  misrecollection, but I believe there was a lot
8  of correspondence including another e-mail that
9  referred to a billion dollars and that confirmed
10 that OCC was going to transfer all of that to
11 Barclays, as we would have all expected.
12     Q.   And did you receive any response to
13 Exhibit 623?
14     A.   I don't have a clear recollection of a
15 specific response to this except that the SEC,
16 after this interim exchange of communications
17 regarding DTCC, stepped up to support the
18 transaction, so presumably if they had had a
19 problem, they would have raised it in connection
20 with their support of the transaction.
21     Q.   We will mark as Exhibit 624 a document
22 Bates stamped DTCC 00126 through 00198.
23         (Exhibit 624, document Bates stamped
24     DTCC 00126 through 00198 marked for
25     identification, as of this date.)

TSG Reporting - Worldwide    877-702-9580

Page 121

ROSEN

1
2      Q.   Is this an e-mail you received from
3  DTCC on or about September 20, 2008?
4      A.   Appears so.
5      Q.   It is a lengthy document.  I am really
6  going to ask you only about one of the
7  attachments, the contents.
8         MR. MORAG:  Just for the record, there
9     do appear to be other e-mails starting at
10    page 180 that may or may not be part of
11    this.  Since they are dated later, I don't
12    know that they could have been part of the
13    original e-mail.
14     Q.   I'm not going to ask you about
15 anything after 178.  But if you could take a
16 look at the pages that begin 175.
17     A.   Um-hm.
18     Q.   You will see on page 176, the first
19 paragraph concerns assumption of accounts.
20     A.   Right.
21     Q.   Was there at one point in time a
22 discussion whereby Barclays was assuming the
23 DTC -- the Lehman accounts at DTCC?
24         MR. MORAG:  Object to the form.
25         MR. HUME:  Object to the form.

TSG Reporting - Worldwide    877-702-9580

Page 122

ROSEN

1
2    A.   I am sorry, can you repeat the
3  question.
4    **Q.   Yes.  With respect to paragraph 1 at**
5  **the top of page 176, you see that's entitled**
6  **"Assumption of Accounts."  Do you recall that**
7  **drafts were exchanged which provided that**
8  **Barclays would assume the Lehman accounts at**
9  **DTC?**
10    A.   I believe in this form, I don't
11  believe that Barclays had at this point agreed
12  to do that.  I know I got these documents.  I
13  know Michael Mazzuchi was looking at them.  I
14  don't recall focusing on them, because at the
15  time that we got these, our client had not
16  decided that it was going to assume the
17  accounts.  I said it was a potential outcome,
18  but it was not one that had been agreed.
19    **Q.   You will see paragraph 2 is entitled**
20  **"Excluded Assets and Liabilities."  Did you have**
21  **any discussions with DTCC concerning excluding**
22  **certain assets?**
23        MR. MORAG:  Object to the form.
24    A.   There were discussions with DTCC about
25  what was in the accounts.  There were

TSG Reporting - Worldwide     877-702-9580

Page 123

ROSEN

1
2  discussions about whether or not or the extent
3  to which Barclays was going to assume
4  responsibilities for liabilities in the
5  accounts, and there were discussions about, in
6  recognition that there were assets that Barclays
7  was getting as part of the transaction and
8  assets that Barclays was not getting as part of
9  the transaction, and all of those factors played
10  into sort of the crucible of considerations as
11  to how this would be -- how this situation with
12  DTCC was going to be resolved.
13        But I think it was not until Sunday
14  night that there was a meeting of the minds as
15  to how this was going to be handled.  There was
16  a first amendment which reflected an arrangement
17  which ultimately was -- couldn't be performed
18  because of the unavailability of certain
19  securities to be used as part of the -- what do
20  you call it? -- as part of the credit support
21  for DTCC.
22    **Q.   You referred to discussions with DTCC**
23  **concerning assets that Barclays was getting and**
24  **assets that Barclays was not taking.  Can you**
25  **tell me what you know of those discussions?**

TSG Reporting - Worldwide     877-702-9580

Page 124

ROSEN

1
2    A.   What I said was there were assets that
3  Barclays was taking and there were assets --
4  there were assets that Barclays was not taking,
5  and there were discussions with DTCC about
6  should -- what the position at the DTCC
7  subsidiary clearing organizations were, but I
8  think in the end, they didn't proceed to a point
9  where Barclays was comfortable assuming
10  greater -- assuming responsibility for the
11  financial obligations that were associated with
12  the accounts.
13    **Q.   I'm not going to ask you now about the**
14  **assumption of liabilities or anything about**
15  **assuming liabilities.  I just want to ask you**
16  **what you recall of your involvement in any**
17  **discussions with DTCC concerning what assets**
18  **Barclays was taking and what assets Barclays was**
19  **not taking from the Lehman accounts at DTCC.**
20    A.   Those discussions were held by an
21  operations team, and I don't believe that there
22  was a focus with DTCC on that.  The focus on
23  what assets were being sold and what were not
24  and what liabilities was the deal documentation.
25  DTCC was not a part of the negotiations about

TSG Reporting - Worldwide     877-702-9580

Page 125

ROSEN

1
2  what Barclays was and wasn't taking, but there
3  were extensive meetings about what the
4  liabilities might be and what kind of recourse
5  was going to be -- you know, what additional
6  credit support DTCC might look for.
7    **Q.   Were you aware that a Barclays due**
8  **diligence team visited DTCC's offices?**
9    A.   Yes.
10    **Q.   To review the assets that were there?**
11        MR. MORAG:  Object to the form.
12    A.   I would say that there was a due
13  diligence team that was trying to learn as much
14  as it could about the accounts.  But I'm not
15  sure that there weren't potentially multiple
16  objectives from their perspective.
17    **Q.   Who, to your knowledge, was part of**
18  **that operations team?**
19    A.   Gerard Larocca is the individual that
20  I corresponded with, but I believe he had an
21  extensive team.
22    **Q.   Anyone else you can remember?**
23    A.   I don't remember the names in here,
24  no.  Maybe John Rodefeld.
25    **Q.   Did any of the Barclays operations**

TSG Reporting - Worldwide     877-702-9580

Page 126

ROSEN

1
2  team members report to you?
3      A.   Well, we communicated.  I wouldn't
4  have described what they did as reporting to me.
5      Q.   Did any of them fill you in on any of
6  their specific findings from their due
7  diligence?
8      A.   I think they reported to --
9          MR. MORAG:  It is a yes or no question
10     on that.  The substance may be privileged,
11     so I think the answer is -- calls for a yes
12     or a no.
13     A.   That team did not report findings to
14  me.
15     Q.   When you say "that team," you're
16  referring to the due diligence team?
17     A.   The team, the operations team that was
18  at DTCC.
19     Q.   Did you hear through any other source
20  the findings of the Barclays due diligence team?
21         MR. MORAG:  Yes or no.
22     A.   No.
23     Q.   Did you participate in any of the
24  phone calls between any Barclays operations
25  people on that due diligence team and

TSG Reporting - Worldwide    877-702-9580

Page 127

ROSEN

1
2  representatives of DTCC on Sunday, the Sunday
3  night?
4      A.   I may have participated in one call or
5  sort of been in and out of the call while
6  dealing with other issues, but I'm -- I don't
7  have a clear recollection.
8      Q.   Do you recall anything of that call?
9      A.   I don't recall the specifics of the
10  call.
11     Q.   Do you recall when it happened?
12     A.   At what time on Sunday, no.
13     Q.   Do you recall who participated?
14     A.   I don't have a specific recollection.
15  I could speculate based on who was involved in
16  the conversations, but I don't have a specific
17  recollection beyond, you know, it would have
18  included Archie Cox and Jonathan Hughes, Gerard
19  Larocca.  As to the other participants, I just
20  don't recall.
21     Q.   Do you recall anything that was said
22  in that call?
23     A.   No.  I recall the results of the call,
24  but I don't recall the specific discussion.
25     Q.   Do you know who led the call on the

TSG Reporting - Worldwide    877-702-9580

Page 128

ROSEN

1
2  Barclays side?
3      A.   I'm not sure that there was a leader.
4  There was a group convened to share information
5  and reach conclusions.
6      Q.   Do you recall any Barclays persons
7  speaking on that call?
8      A.   Since it was an internal Barclays
9  call, yes, I mean there was an exchange of --
10         MR. MORAG:  Wait.
11         MR. HUME:  This is --
12     Q.   We may have misunderstood each other.
13  I'm not asking about an internal Barclays call.
14  I'm asking about your -- whether you have any
15  knowledge of a call between Barclays operations
16  people and folks at DTCC on the Sunday night.
17     A.   I am sorry, no.
18     Q.   Did you participate in any telephone
19  call with anyone from DTCC on the Sunday?
20     A.   Yes.
21     Q.   How many calls?
22     A.   I honestly don't remember, but there
23  could have been two or three or maybe three or
24  four, or a long call that I walked in and out
25  of.  But there were continued discussions until

TSG Reporting - Worldwide    877-702-9580

Page 129

ROSEN

1
2  quite late at night with DTCC.
3      Q.   Can you tell me on the Barclays side,
4  who were the Barclays participants?
5      A.   Archie Cox, Jonathan Hughes, myself,
6  Michael Klein.  I -- Gerard Larocca, although
7  I'm not sure that he was on all of the calls or
8  on the calls all of the time.
9      Q.   And taking the wider Barclays group,
10  you would include yourself as participating in
11  those calls?
12     A.   I was in a room for a lot of those
13  calls, not all of them.
14     Q.   Did you say anything on any of those
15  calls?
16     A.   Did I say anything on those calls?  I
17  may very well have, but I don't have specific
18  recollection of what I may have said.
19     Q.   Any general recollection?
20     A.   I really can't recall.
21     Q.   Anyone else from Cleary who
22  participated in any of these calls?
23     A.   On Sunday night, I don't think so.
24     Q.   Do you recall anything that Archie Cox
25  said on any of these calls?

TSG Reporting - Worldwide    877-702-9580

Page 130

ROSEN

1
2    A.    He conveyed Barclays' reluctance to
3    assume the obligation to provide any form of
4    guarantee beyond the 250 million dollars
5    representing the holdback of that payment that
6    would otherwise have been made to Lehman under
7    the APA, and there would have been -- there was
8    a call -- there was a point at which he said, he
9    conveyed to DTCC that because Barclays was not
10    willing to accept more liability than that, they
11    would not be accepting the transfer of those
12    accounts.
13    Q.    Anything else you remember Mr. Cox
14    saying in any of the Sunday night calls?
15    A.    I really don't recall specifics.
16    There was undoubtedly a lot more discussed and a
17    lot more give and take, but candidly, I cannot
18    remember the specifics of the dialogues. There
19    would have been conversations about, gee, does
20    DTCC really need all the credit support that it
21    is asking for, can't it get comfortable, it has
22    better access to the information than Barclays
23    does. It would have been of that nature, but I
24    just, sitting here now, can't recall the
25    conversations.

TSG Reporting - Worldwide    877-702-9580

Page 131

ROSEN

1
2    Q.    Anything you recall Jonathan Hughes
3    saying?
4    A.    Not really. I don't have a specific
5    recollection. I think -- I'm sure that he
6    reiterated or articulated many of the same
7    themes as Archie Cox, because the Barclays view
8    was, at that point, pretty well settled that
9    they were not prepared to assume additional
10    potentially substantial liabilities.
11    Q.    Anything you recall Mr. Hughes saying
12    beyond what you said?
13    A.    Not specific words, no.
14    Q.    Anything you recall Michael Klein
15    saying?
16    A.    No.
17    Q.    Anything you recall Mr. Larocca
18    saying?
19    A.    Well, there were a lot of
20    conversations also about sort of the pipes and
21    the plumbing and sort of the operational aspects
22    of what was going to be the mechanism for DTC to
23    effect the transfers of securities that needed
24    to be effected as part of the transactions, what
25    accountant are they going to go to or through,

TSG Reporting - Worldwide    877-702-9580

Page 132

ROSEN

1
2    or how that was going to be hooked up or
3    handled, but I was not focused on those because
4    I regarded them as essentially operational
5    matters.
6    Q.    Was that an issue that was in
7    Mr. Larocca's purview?
8    A.    Yes, I think so -- yes.
9    Q.    Did he speak to that?
10    A.    He did, and he may have delegated some
11    of the details of it to people who reported to
12    him.
13    Q.    Do you recall Mr. Larocca saying in
14    any call on Sunday night or early Monday morning
15    we are not taking anything?
16    A.    I do not recall Gerard Larocca saying
17    that or anyone else saying that, because it
18    was -- the whole purpose of the DTC endeavor was
19    to resolve their concerns in a manner that would
20    enable them to effect the transfers of assets
21    that were necessary to consummate the deal. So
22    it would have been a ludicrous thing for anyone
23    to have said, because otherwise, why did we need
24    to be dealing with DTCC?
25    Q.    Was anyone from DTCC present for any

TSG Reporting - Worldwide    877-702-9580

Page 133

ROSEN

1
2    of these discussions?
3    A.    These -- they were on the phone.
4    There was nobody from DTCC in the room at Weil's
5    offices.
6    Q.    Who did you understand was
7    participating from DTCC?
8    A.    My understanding was that it was Larry
9    Thompson, the general counsel; his deputy, Isaac
10    Montal, Shelly Hirshon, their outside counsel,
11    and Don Donahue, the chairman of DTCC, at least
12    at some -- at least in some portions of the
13    conversation.
14    Q.    And who was the person who did most of
15    the talking for DTCC?
16    A.    My recollection was that it was Larry
17    Thompson.
18    Q.    Did you understand at some point, DTCC
19    was considering issuing a cease to act with
20    respect to Lehman?
21    MR. MORAG: Object to the form.
22    A.    After Barclays had conveyed to DTCC
23    that Barclays was not going to accept a transfer
24    of the accounts, I believe Larry Thompson
25    indicated -- and I don't recall exactly when

TSG Reporting - Worldwide    877-702-9580

Page 134

ROSEN

1    this was -- that they would issue a cease to
2    act, which meant that once the pipeline and
3    these transactions were transferred, DTCC would
4    be liquidating positions and closing out the
5    account and not accepting any other
6    transactions.
7        And I received a call from Don Donahue
8    to say, you know, if we could avoid doing that,
9    they would prefer to do that, because they
10   hadn't done it before, and which I told him I
11   would convey to the client.
12       **Q.   Do you have an understanding of what
13   the consequences would be for the transaction if
14   the DTC were to issue a cease to act notice?**
15       MR. MORAG:  Objection to form.
16       A.   My understanding is that it wouldn't
17   have affected the transaction.
18       **Q.   Did you have any discussion with
19   anyone as to whether Barclays could or would
20   close the transaction if DTCC issued a cease to
21   act notice?**
22       MR. MORAG:  Again, Mr. Rosen, if your
23   discussions are with anybody outside of
24   Barclays, you can answer.  Not -- if not,

TSG Reporting - Worldwide    877-702-9580

Page 135

ROSEN

1    say you are not able to answer.
2        A.   Would you mind repeating the question.
3        **Q.   Yes.  The question is whether you had
4    any discussion, any conversation with anyone
5    about whether Barclays could or would close the
6    transaction if DTCC were to issue a cease to
7    act.**
8        MR. MORAG:  Do you have a time frame
9    on when the issuance was supposed to be?
10       A.   It really --
11       **Q.   Yes, the Sunday.**
12       A.   Can I just -- let me just say this.
13   It really depends.  Your question presupposes
14   with respect to what point in time the cease to
15   act would take effect.
16       If -- I did have a conversation with
17   Shari Leventhal at the Fed, which the substance
18   of which was that I expressed my concern that we
19   were not making rapid progress in the
20   negotiations with DTCC toward a resolution in
21   which they would accept a much more limited
22   amount of credit support, and I was worried that
23   we were running out of time, and we thought that
24   it might be helpful to let the Fed know, that we

TSG Reporting - Worldwide    877-702-9580

Page 136

ROSEN

1    didn't want the Fed to find out at the last
2    minute that this thing was falling apart for
3    reasons unrelated to, you know, the actual
4    negotiation of the deal, that because of a
5    problem with DTCC.
6        So I spoke to Shari Leventhal and
7    said, if we can't reach a resolution with DTCC
8    and DTCC does not agree to process the
9    transactions, absent other arrangements, we are
10   not going to be able to close this, at least in
11   the manner in which we had contemplated.
12       And I did have that conversation with
13   her.
14       **Q.   Can you help me out and explain,
15   because I thought you had told us that a cease
16   to act from DTCC would not have affected the
17   transaction, but I thought you also told us --**
18       A.   I also told you it depends at what
19   point they are ceasing to act.  And if they
20   cease to act following the processing of the
21   transaction and the transactions that are in
22   their pipeline, we would have been able to close
23   the transaction.  If they said as of Saturday,
24   we are ceasing to act and we are not going to

TSG Reporting - Worldwide    877-702-9580

Page 137

ROSEN

1    accept any other instructions on Monday to
2    transfer customer or proprietary agents, that
3    would have been a very different result than the
4    one which ultimately obtained.
5        **Q.   And when you told us earlier that
6    after Barclays had made clear it was not
7    accepting the transfer of accounts and Larry
8    Thompson responded that DTCC would issue a cease
9    to act, what did you understand the timing of
10   that notice that he was talking about to be?**
11       A.   My understanding was that DTCC was
12   going to issue a cease to act after processing
13   trades in the pipeline, including the transfers
14   that were necessary to implement the deal, and
15   that there had been operational calls, my
16   understanding was to sort of discuss the
17   plumbing and how you accomplish that.
18       **Q.   So Mr. Thompson was simply telling you
19   that they would issue a cease to act after
20   clearing all the pipelines, all the uncleared
21   trades after the closing?**
22       A.   Yeah, I didn't think -- I did not
23   understand him to be saying -- well, I'm going
24   to add some clarification to this.  There was a

TSG Reporting - Worldwide    877-702-9580

Page 138

ROSEN

1
2    point at which we were not, we did not have a
3    meeting of the minds with DTC about what, in
4    addition to 250, Barclays might make available,
5    and DTC, DTC was not, had not yet agreed to
6    accept only the 250 million, so you had two
7    parties who were -- who lacked a meeting of the
8    minds.
9        In that context, Larry Thompson may
10   well have said basically, you know, if we don't
11   get what we want, we are just going to cease to
12   act and you are going to have to figure things
13   out for yourself.  That was some of the need to
14   deal with that issue, so we could close
15   expeditiously and not have to create some kind
16   of a work-around, was precisely why we continued
17   the negotiations until DTCC would be willing to
18   process the transactions that were in the
19   pipeline and transactions that are associated
20   with this deal.
21   **Q.   Was that comment by Mr. Thompson about**
22   **what they would do if they didn't get what they**
23   **wanted, was that in response to hearing from**
24   **Barclays that Barclays was not accepting**
25   **transfer of the accounts?**

Page 139

ROSEN

1
2        A.   Again, you have got to focus on the
3    time.  I think at some point it was made clear
4    that not having the credit support meant that
5    after the cease to act, when a meeting of the --
6    when DTCC agreed that on the understanding that
7    it was going to get the 250 million in credit
8    support but no more, the fact that they would
9    have to cease to act was never presented by him
10   as, you know, something that would have
11   precluded the very reason that we were having
12   the negotiations, in order to enable the
13   transaction to close by processing and making
14   the transfers.
15   **Q.   Let me try --**
16       A.   You couldn't accept a transfer of
17   customer accounts and get that business if the
18   accounts couldn't be -- and the assets in them
19   couldn't be transferred by DTCC.  Everybody
20   realized that they had to agree to do that and
21   not shut the pipes down.
22   **Q.   Yeah, I'm not interested in what would**
23   **or could have happened.  I want to get the**
24   **sequence of your recollection down right.**
25       **I understand that on Sunday night at**

Page 140

ROSEN

1
2    **some point, Archie Cox described to DTCC**
3    **Barclays' reluctance to assume the accounts and**
4    **made plain that Barclays was not accepting the**
5    **transfer of the accounts of DTCC?**
6        A.   Yes.
7    **Q.   That's correct?**
8        **Now, what was -- in response to that,**
9    **did Mr. Thompson say in words or substance if**
10   **DTCC can't get happy, it will issue a cease to**
11   **act?**
12       A.   I don't recall it being specifically
13   in response to the -- you know, the articulation
14   of the final position or whether it occurred in
15   the course of earlier assertions of the
16   position.  But it was clear in their minds that
17   if they didn't have a -- if they did not have
18   adequate credit support or a viable creditworthy
19   clearing member, that they were not going to
20   take the risk of just carrying the accounts open
21   and continuing to accept positions.  They would
22   have to go through the process that they
23   described as ceasing to act.
24   **Q.   And they made that clear to Barclays?**
25       A.   Yes.

Page 141

ROSEN

1
2    **Q.   Can you tell me, what happened or what**
3    **was the event that triggered the decision by**
4    **Barclays that it would not accept a transfer of**
5    **accounts at DTCC?**
6        MR. MORAG:  I caution you from
7    disclosing any privileged communications.
8        A.   Can I consult on the privilege
9    question?
10   **Q.   Sure.**
11       **(Recess)**
12   **Q.   Would you like the question, sir?  Can**
13   **you tell me what happened or what was the event**
14   **that triggered the decision by Barclays that it**
15   **would not accept a transfer of accounts at DTCC?**
16       A.   After the report from the operations
17   team, of the operations team to their principal,
18   their principals, Archie Cox, the decision was
19   made that they would not -- they would not
20   accept the possibility of liabilities in excess
21   of 250 million dollars, and they confirmed to
22   DTCC that they were firm on their position they
23   weren't going to accept the accounts.
24   **Q.   When was the report of the operations**
25   **team received?**

Page 142

ROSEN

1
2  A.    Other than that it was earlier in the
3  evening on Sunday, but possibly late, I don't
4  have a specific recollection.
5  **Q.    Do you have any sense of the timing as**
6  **to when a decision was made by Barclays that it**
7  **would not accept any liabilities beyond the 250**
8  **million?**
9  A.    Well, I think internally they had
10 reached that position -- we were trying in good
11 faith to see whether they could get enough
12 information to make them comfortable, but it was
13 finally communicated that they were firm on the
14 250 and not accepting the accounts, maybe like
15 11 o'clock, something like -- it was quite late
16 on Sunday night.
17 **Q.    And was that Mr. Cox who conveyed that**
18 **to DTCC?**
19 A.    I believe so, I believe so.
20 **Q.    Was Larry Thompson on the call in**
21 **which --**
22 A.    I believe so.
23 **Q.    He was?**
24 A.    I believe so.
25 **Q.    Did Mr. Thompson make a reference to**

TSG Reporting - Worldwide    877-702-9580

Page 143

ROSEN

1
2  **issuing a cease to act on that call?**
3  A.    I don't recall him specifically making
4  a reference at that time in response to it.  But
5  to be clear, the understanding was that the
6  cease to act was not in respect of the
7  processing of any of the transactions that --
8  any of the -- processing any of the transfers
9  that were part of the transaction.
10 **Q.    Now, when did you have the call with**
11 **Shari Leventhal?**
12 A.    Earlier in the evening.  Whether it
13 was at 5 o'clock or 8 o'clock or 9 o'clock, I
14 don't honestly recall.
15 **Q.    Did you have any follow-up call with**
16 **her?**
17 A.    I don't recall that I had a follow-on,
18 one-on-one call with Shari.  It's possible that
19 I did, but they were on the open line which was
20 established for the purpose of reporting to all
21 people who needed to know simultaneously,
22 because we were under a very tight time frame,
23 sort of what was open and what was being agreed.
24      There was an open line with the Fed
25 and the SEC and other interested parties, and I

TSG Reporting - Worldwide    877-702-9580

Page 144

ROSEN

1
2  believe that at least at some point, she was on
3  to hear the results of the negotiations.  She
4  may have gotten information from DTCC, I just
5  don't recall specifically.
6  **Q.    Can you tell me what else you recall**
7  **Larry Thompson saying in the various**
8  **conversations on Sunday night?**
9  A.    For the most part, I recall him
10 justifying their need for collateral in excess
11 of the 250 million dollars.  That was the point
12 at which they were willing to go forward on that
13 basis.
14 **Q.    How did he justify that?**
15 A.    That they were -- his team, you know,
16 were concerned about the risks.
17 **Q.    Do you recall anything specifically**
18 **said about the risks?**
19 A.    Mostly my recollection is, you know,
20 there is uncertainty, there is a lot in there to
21 do, it would take time, we can't know exactly
22 what the results of the liquidations will be.  I
23 mean they are a clearinghouse, they are a
24 conservative organization, and they viewed the
25 risk conservatively.

TSG Reporting - Worldwide    877-702-9580

Page 145

ROSEN

1
2  **Q.    Do you recall him saying anything**
3  **further about a cease to act other than what you**
4  **have told us?**
5  A.    Nothing beyond what I told you.
6  **Q.    Do you recall saying, addressing**
7  **specifically the subject of whether the -- of**
8  **when the cease to act would take effect and the**
9  **impact that it would have on the transaction or**
10 **on the unsettled trades that were at DTCC?**
11      MR. MORAG:  Objection, asked and
12      answered.
13 A.    He never suggested that there would be
14 any impact as the transaction was resolved.  The
15 purpose of the resolution was that there would
16 be no impact.
17 **Q.    Did he ever address whether the cease**
18 **to act would have an impact on outstanding**
19 **unsettled trades?**
20 A.    Mostly what I recall him focusing on
21 was they don't like to cease to act because it
22 means that other participants in the marketplace
23 aren't going to receive the benefit of the
24 processing that they would otherwise do when
25 those transactions came in, and hadn't had to do

TSG Reporting - Worldwide    877-702-9580

Page 146

ROSEN

1
2  it in the past.
3      My impression was that they were more
4  concerned about the public relations
5  implications of a clearing corporation doing
6  that than they were focused on any impact on us,
7  because it was a mutual premise that the purpose
8  of this was to enable us to close and process
9  the transactions.
10     Q.  Did he ever say anything to indicate
11 that his references to cease to act related
12 exclusively to a notice that would come into
13 effect after the closing and after all of the
14 unprocessed, unsettled trades of Lehman had been
15 cleared by DTCC?
16     MR. MORAG:  Object to the form.
17     A.  I think in going over the terms of the
18 arrangements it was clear that the transactions
19 that were the subject of the acquisition, those
20 transfers were going to be made, and I don't
21 think there was any implication of any kind, it
22 would have been absurd for there to have been an
23 implication that we reached an agreement with
24 DTC and by the way, they were going to not
25 process the transactions.

TSG Reporting - Worldwide    877-702-9580

Page 147

ROSEN

1
2      Q.  Let me ask you about the time period
3  prior to reaching a meeting of the minds with
4  DTCC.  At any time before that, did he give any
5  representation or assurance to Barclays that
6  while DTCC might issue a cease to act, it would
7  not affect the transaction, and that they would
8  honor and process all unsettled trades?  Did he
9  say that in words or substance?
10     A.  I am sorry, can you repeat that.
11     Q.  Yes.  At any time prior to the meeting
12 of the minds between Barclays and DTCC, did
13 Larry Thompson in words or substance say, we may
14 have to issue a cease to act, but it will not
15 affect the transaction, and notwithstanding our
16 cease to act, we will make sure that it takes
17 effect only after all unsettled trades have been
18 cleared?
19     A.  No.  I think that if the -- if we
20 hadn't reached an agreement with DTCC, then we
21 had, we had the prospect of having to figure out
22 another way of consummating the transaction if
23 they were not going to process trades, and
24 basically what DTCC was saying was that if they
25 were going to continue to process trades and act

TSG Reporting - Worldwide    877-702-9580

Page 148

ROSEN

1
2  for these accounts, then they wanted more credit
3  support than they would have if they were left
4  to look only to the assets of LBI.
5      Q.  Is there anything further you recall
6  Larry Thompson saying on the Sunday night other
7  than what you have told us?
8      A.  I'm sure there is a lot more that
9  could be said.  I just don't have a specific
10 recollection of that.
11     Q.  And all my questions are just to your
12 recollection.
13     What about Mr. Montal?  Do you recall
14 anything that Mr. Montal said in any of the
15 conversations on Sunday night or early Monday
16 morning?
17     A.  He was not a prominent speaker, at
18 least while I was in the room.
19     Q.  Anything that you recall?
20     A.  I don't have a specific recollection
21 of what he might have said.
22     Q.  What about Shelly Hirshon?
23     A.  I don't remember Shelly Hirshon
24 speaking of it.
25     Q.  You did tell us about Don Donahue

TSG Reporting - Worldwide    877-702-9580

Page 149

ROSEN

1
2  making a call to you.  Anything else that you
3  recall hearing from Dan Donahue on the Sunday
4  night?
5      A.  No.  No more than that conversation.
6      Q.  I have been asking you now about the
7  conversations with DTC for some time limited to
8  the Sunday night, and I know that there were
9  conversations that may have spilled over into
10 the wee hours of early morning.  So if we
11 include Monday morning, are there any
12 conversations by any of the participants that
13 you recall that you haven't told us about?
14     A.  I have a vague recollection that there
15 may have been continuing discussions on the
16 operations side in anticipation of the closing
17 of the transaction, and the balance of the
18 exchanges were between the lawyers trying to
19 reflect what had been agreed in I think what's
20 become or been referred to as the DTCC letter.
21     Q.  And anything else, if you recall?
22     A.  Not that I specifically recall,
23 sitting here.
24     Q.  We will mark as Exhibit 625 a document
25 Bates stamped DTCC 00359 through 361.

TSG Reporting - Worldwide    877-702-9580

Page 150

ROSEN

1
2      **(Exhibit 625, document Bates stamped**
3      **DTCC 00359 through 361 marked for**
4      **identification, as of this date.)**
5      A.   I recall this.
6      **Q.   If you look at the e-mail at the top,**
7      **the first page, sir.  Can you tell me what you**
8      **meant when you said, "The obligations and**
9      **entitlements in relation to the funds run**
10     **between DTC and the LBI estate, not between**
11     **Barclays and DTC"?**
12     A.   Because the credit support was going
13     to be limited to the 250 million dollar cash
14     payment, we thought that since we could direct
15     that payment, I thought that since it was
16     possible to direct that payment on Lehman's
17     behalf, so that the DTC got hold of it, it
18     was -- as far as the transaction was concerned,
19     that was an asset of -- that would otherwise
20     have been an asset of the estate that was being
21     made available to provide credit support, and
22     since it would otherwise have been an asset,
23     that the arrangements relating to that were
24     between Lehman and DTC and didn't need to be
25     between Barclays.

TSG Reporting - Worldwide    877-702-9580

Page 151

ROSEN

1
2      So my feeling was that to keep things
3      simple, we didn't really need to have a separate
4      agreement.
5      **Q.   Let me show you a document that's**
6      **previously been marked as Exhibit 606.**
7      **While we are waiting for that, sir,**
8      **how did the impasse between Barclays and DTC get**
9      **resolved?  How did the parties reach a meeting**
10     **of the minds?**
11     A.   There were conversations staking out
12     positions.  The parties would go off.  There was
13     due diligence being done on both sides, because
14     both sides wanted to know what the risks were,
15     and they would get back on the telephone, and at
16     some point, DTC decided that the position that
17     had been articulated by Barclays was acceptable
18     to it.
19     **Q.   So DTC had previously refused to**
20     **accept Barclays' position of limiting the**
21     **recourse to 250 million, but it changed its mind**
22     **at some point on the Sunday or early Monday?**
23     A.   Until late on Sunday night, DTC had
24     not signaled its agreement to go forward based
25     on the 250 million dollars.

TSG Reporting - Worldwide    877-702-9580

Page 152

ROSEN

1
2      **Q.   How did DTCC signal its agreement?**
3      A.   On a conference call, it -- Larry
4      Thompson said, we are willing to go forward on
5      this basis.
6      **Q.   And what was the specific thing he**
7      **said with respect to the basis?**
8      A.   That Barclays would not be assuming
9      the accounts and that the credit support that
10     would be made available would be limited to the
11     250 million dollar holdback on the purchase, on
12     the 250 million dollars.
13     **Q.   Is that something that you recall**
14     **Larry Thompson specifically saying?**
15     A.   I could be wrong, but that's my
16     recollection.  My recollection is that Larry was
17     largely the spokesperson for DTC.
18     **Q.   And did Larry explain what prompted**
19     **DTCC to change its position?**
20     A.   No.  I don't recall -- I don't recall
21     having an explanation from him.
22     **Q.   Did you have any understanding as to**
23     **what prompted DTCC to change its position?**
24     A.   I assume that -- all I can say is that
25     I assumed with more time, they got a better

TSG Reporting - Worldwide    877-702-9580

Page 153

ROSEN

1
2      understanding of what the assets and the risks
3      were, and assumed that they decided that would
4      be acceptable for them, to take the liquidation
5      risk with the assets that they had in the
6      250 million.
7      But he didn't give us a
8      quantitative -- he didn't share his quantitative
9      analysis of their evaluation of that risk, nor
10     did we expect them to.
11     **Q.   When did this meeting of the minds**
12     **conversation happen?**
13     A.   It was very late on Sunday night.
14     Sometime before midnight, I think.
15     **Q.   Do you know whether it was before**
16     **midnight or after midnight?**
17     A.   I would have to refresh my
18     recollection.
19     **Q.   How would you do that?**
20     A.   I would look at the e-mail traffic.
21     **Q.   Anything else?**
22     A.   I think that is all that I would have
23     available to me today to help.
24     **Q.   I show you a document previously**
25     **marked as Exhibit 606.  Sir, you received this**

TSG Reporting - Worldwide    877-702-9580

Page 154

ROSEN

1
2 e-mail?
3    A.   Yes.
4    Q.   Does it -- do you see the reference to
5 "earlier this evening," the first line?  Does
6 that refresh your recollection as to -- the
7 first line of the e-mail, cover e-mail, does
8 that refresh your recollection as to when the
9 agreement was reached?
10    A.   Well, I know it was before 3:43 a.m.
11 How much before -- I remember we felt that we
12 tended to wait a long time to get drafts back
13 from the other side, but I don't recall.
14    Q.   Who prepared this draft?
15    A.   This was -- it appears to have been
16 prepared by DTC or its counsel, but I don't know
17 specifically.
18    Q.   Did you have any discussions with DTCC
19 or its counsel anytime after receiving this
20 e-mail?
21    A.   Most of the direct negotiations
22 regarding this were conducted by my partner Mike
23 Mazzuchi.  I did exchange e-mails including, I
24 guess it was slightly earlier in the evening,
25 with Sheldon Hirshon.  There may have been later

TSG Reporting - Worldwide    877-702-9580

Page 155

ROSEN

1
2 e-mails exchanges, I don't recall.
3    Q.   Leaving aside e-mails, do you know
4 whether Mike Mazzuchi had discussions with
5 anyone at DTCC after circulating or the
6 circulation of this draft that has been marked
7 as Exhibit 606?
8    A.   Well, with their counsel, certainly.
9 I don't recall whether or not he was, he had
10 conversations that included individuals from
11 DTCC.
12    Q.   Do you know what conversations he had
13 with their counsel?
14    A.   Other than to discuss changes to this
15 document prior to its finalization, I don't.
16    Q.   And do you know whether there were in
17 fact discussions as opposed to e-mail exchanges?
18    A.   I don't -- I think it was principally
19 exchanges of drafts.  It was very late and
20 people were very tired.
21    Q.   If you turn to paragraph 1, sir, the
22 winding down of accounts.  Did you review this
23 at the time?
24    A.   I don't recall specifically whether I
25 looked at this draft or a subsequent draft.

TSG Reporting - Worldwide    877-702-9580

Page 156

ROSEN

1
2    Q.   Did you understand that, at the time
3 this draft was received, that there was an
4 agreement, a meeting of the minds between
5 Barclays and DTC whereby all of the assets in
6 the Lehman accounts at DTC were going to go to
7 Barclays and the accounts themselves were going
8 to stay at DTCC?
9        MR. MORAG:  Object to the form.
10    A.   Could you repeat the question.
11    Q.   Did you have an understanding at the
12 time you received this e-mail that there had --
13 there was an agreement, a meeting of the minds
14 between Barclays and DTCC?
15        MR. MORAG:  That's the only question?
16        MR. MAGUIRE:  Yes.
17    A.   Yes.
18    Q.   And did you understand that that
19 agreement involved the accounts, the Lehman
20 accounts staying at Lehman and at DTC?
21    A.   Yes.
22    Q.   Did you understand what was happening
23 to the assets in those accounts?
24    A.   Insofar as Barclays was concerned, our
25 understanding was that the assets, whether they

TSG Reporting - Worldwide    877-702-9580

Page 157

ROSEN

1
2 were proprietary assets or customer assets that
3 under the deal terms were to be transferred,
4 would be processed.
5    Q.   And once those transactions were all
6 processed, who owned the assets in the Lehman
7 accounts at DTCC?
8    A.   The residual assets that were not to
9 be -- whatever we didn't -- whatever Barclays
10 didn't buy or acquire was part of the Lehman
11 estate.
12    Q.   Did you have an understanding as to
13 whether Barclays was acquiring any of the assets
14 at the -- in the DTCC clearance boxes?
15    A.   Yes.  Yes, my understanding is that
16 they were acquiring those assets.
17    Q.   And so that at the closing, those
18 assets would then belong to Barclays?
19    A.   Contractually, yes, at the closing
20 there would have been an agreement to transfer
21 them to Barclays, an understanding that those
22 transactions would be processed by DTCC and not
23 be subject to a cease to act.
24    Q.   And was that explained to the DTCC,
25 that the assets in the Lehman accounts would

TSG Reporting - Worldwide    877-702-9580

Page 158

ROSEN

1
2  contractually belong to Barclays at closing?
3      A.   The DTCC was provided at their request
4  a draft of the agreement that reflected the --
5  what do you call it? -- that reflected the
6  agreements to transfer the clearance box assets
7  as part of the deal.
8      Q.   A draft of the clarification letter?
9      A.   A draft of the letter, right.
10     Q.   Other than providing the DTCC with a
11 draft of the clarification letter, did anyone on
12 the Barclays side explain to DTCC that the
13 assets --
14     A.   I believe that that was the subject of
15 discussions on an operational level, because
16 they wanted to impose a cease to act at some
17 point, and they had to figure out a way to
18 effect the transfers and do whatever else that
19 they wanted to do under their rules.
20     Q.   Did you participate in any of the
21 operations conversations in which anyone from
22 the Barclays side explained to anyone on the
23 DTCC side that all of the assets at, in the
24 Lehman accounts at DTCC were being acquired by
25 Barclays?

TSG Reporting - Worldwide    877-702-9580

Page 159

ROSEN

1
2      A.   No, I don't think that I said that all
3  of the assets in those accounts were being
4  acquired.  There are some assets that were being
5  acquired, some assets that were not being
6  acquired.  There were customer accounts that
7  were being transferred and presumably other
8  customer accounts that were not part of the
9  deal.  I mean customer securities.
10          That was dealt with in the
11 clarification letter.  What Lehman was and was
12 not selling to Barclays was not the subject of
13 the DTCC letter.  The DTCC letter from the
14 beginning was about financial responsibilities
15 to DTCC for the liabilities associated with
16 those accounts.
17     Q.   And did anyone explain to DTCC that
18 Barclays understood there to be a distinction
19 between the accounts and the assets in the
20 accounts?
21     A.   It would have been an absurd
22 conversation to have with a clearing
23 corporation, because a clearing corporation is
24 basically structured fundamentally on the
25 premise that there is a difference between legal

TSG Reporting - Worldwide    877-702-9580

Page 160

ROSEN

1
2  ownership and responsibility for accounts and
3  beneficial ownership and entitlement to the
4  assets in the accounts.
5          Without that distinction, every person
6  who owns a security in the United States in
7  order to own it would have to be a clearing
8  member of a clearing corporation, which is not
9  how we would realize our financial markets.
10     Q.   You are not aware of any conversation
11 between anyone at Barclays, working for
12 Barclays, and anyone at DTCC concerning any
13 distinction between the Lehman accounts and the
14 assets in the Lehman accounts at DTCC?
15         MR. HUME:  Objection, asked and
16 answered.
17     A.   I don't have anything to add.
18     Q.   Did it come to your attention that
19 DTCC was of the understanding that the assets in
20 the Lehman account were remaining with the
21 estate?
22     A.   It is impossible for me to understand
23 how they could have formed that view or that
24 they -- and I am unaware that they did form that
25 view.

TSG Reporting - Worldwide    877-702-9580

Page 161

ROSEN

1
2      Q.   If you look, sir, at paragraph 1 of
3  the draft before you marked as Exhibit 606, you
4  will see the second part of that section 1, same
5  paragraph really of that section 1, says, "As
6  part of this closeout process, the trustee
7  hereby authorizes DTC to accept and act upon
8  instructions from NSCC to deliver securities
9  from the DTC LBI account to NSCC's account," and
10 it goes on.  Do you see that sentence?
11     A.   I do.
12     Q.   Can you explain why the parties were
13 providing for the trustee to exercise authority
14 over assets in the Lehman account if those
15 assets contractually were understood all along
16 to belong to Barclays?
17         MR. MORAG:  Objection,
18 mischaracterizes his testimony.  For the
19 third time.
20     A.   And I think you're asking me to
21 interpret what the import of this is, because I
22 don't accept your characterization of what this
23 does or -- what this provision does or says.
24     Q.   So you would --
25     A.   I think I would decline to answer on

TSG Reporting - Worldwide    877-702-9580

Page 162

```
            ROSEN
1
2    the grounds that I think my interpretation of
3    this provision would be privileged.
4        Q.   At the time that this draft was
5    received, did you understand that Barclays was
6    taking -- was cherry picking or at least taking
7    certain assets from the clearance box and not
8    other assets, or at least that it had that
9    option?
10       MR. MORAG:  Objection, compound.
11       A.   Why don't you ask the first question.
12       Q.   Sure.  What I am trying to understand
13   is, at the time that this draft is circulated,
14   what is your understanding of the business deal
15   between Barclays and the estate?
16       A.   I was not -- I was not aware -- I
17   don't know it to be the case, sitting here
18   today, that there were clearance box assets that
19   Barclays had decided they didn't want.
20       Q.   Did you understand that Barclays had
21   the ability to either return or not take certain
22   clearance box assets?
23       A.   I'm not sure at that time that I had
24   focused on the language that you showed me
25   earlier today.
```

TSG Reporting - Worldwide     877-702-9580

Page 163

```
            ROSEN
1
2        Q.   Did you raise any question with DTCC
3    or anyone else as to why there was not any
4    mechanism here for separating out the assets
5    that were being taken by Barclays and the assets
6    that Barclays did not choose to take from the
7    DTC clearance boxes?
8        A.   No, because at that point, I was under
9    the impression that Barclays was taking all of
10   the clearance box assets, which it was their
11   ability to do or not do, as they decided at any
12   time.  I think there was a lack of -- I don't
13   know how clearly it was understood what all of
14   those assets were.
15       Q.   I'll show you next a document that has
16   been marked as Exhibit 607.
17       MR. HUME:  How much more do you have?
18   And would it make sense to take a break at
19   some point afternoon then finish?
20       MR. MAGUIRE:  I can finish this in
21   five minutes and that might be a better time
22   to take a break.
23       Q.   This is an e-mail that your colleague,
24   Mr. Mazzuchi circulated?
25       A.   Um-hm.
```

TSG Reporting - Worldwide     877-702-9580

Page 164

```
            ROSEN
1
2        Q.   I note in this draft and the prior
3    draft, there is a signature line for James B.
4    Giddens as trustee for the liquidation of Lehman
5    Brothers.  And the signature line is for James
6    B. Kobak, Jr.  Do you see that?
7        A.   Um-hm.
8        Q.   Did you have any discussions with
9    Mr. Kobak concerning this agreement?
10       A.   I did not have a verbal conversation
11   with James Kobak about this agreement, but he
12   was provided the various drafts that were
13   exchanged.
14       Q.   And made comments?
15       A.   As far as I'm aware, yes.
16       Q.   You see Mr. Mazzuchi's cover e-mail
17   says, "Further to Ed Rosen's discussion with
18   Sheldon, attached is a revised draft of the
19   recourse arrangement for the 250 million dollar
20   purchase price.  This also reflects comments
21   from Lehman."
22       Did you understand that to be a
23   reference to comments from the trustee's
24   representatives?
25       A.   I don't know.
```

TSG Reporting - Worldwide     877-702-9580

Page 165

```
            ROSEN
1
2        Q.   Do you know whether this agreement was
3    discussed with anyone from Weil Gotshal?
4        WITNESS' ATTORNEY:  Are you referring
5    to the DTC letter in general or this draft
6    in particular?
7        Q.   The DTC letter in general.
8        A.   I do not recall.
9        Q.   Do you know whether Weil was provided
10   with any draft of the DTC letter agreement?
11       A.   Yes, it would have been on the closing
12   table and it may have been provided separately
13   by Shelly Hirshorn.
14       Q.   Other than it being on the closing
15   table and whether Mr. Hirshorn did or did not
16   provide it, do you though whether anyone
17   otherwise provided either the final agreement or
18   a draft of the DTC later agreement to anyone at
19   Weil?
20       A.   I don't have a recollection.  They may
21   well have been in the room.  The rooms weren't
22   closed off.  They may have participated in
23   reviewing the exchanges of draft.  I just don't
24   have a specific recollection.  Again, at this
25   time, I was in and out of the documentation,
```

TSG Reporting - Worldwide     877-702-9580

Page 166

ROSEN

1  also working on other problems.
2  **Q.  In which room was the DTC letter
3  agreement put together -- speaking now to Cleary
4  and the Barclays representatives -- which room
5  at Weil were you working in?**
6      WITNESS' ATTORNEY:  Objection,
7  compound.  It is two different questions.
8      A.    Yeah, I don't know how to describe,
9  there was a room on a floor and I was not
10  located in a particular room.  I jockeyed
11  between several rooms.
12      **Q.    Where was the, speaking specifically
13  now to the DTCC negotiations, telephone calls
14  and the drafting, in which room did that happen?**
15      A.    That happened in a room on a different
16  floor.
17      **Q.    Do you know what floor?**
18      A.    I believe it was the floor below the
19  floor where the other meetings were taking
20  place.
21      **Q.    Were there any other Lehman-related
22  conference rooms in use on that lower floor?**
23      A.    I don't, I don't recall.
24      **Q.    Did anyone from Cleary instruct anyone**

TSG Reporting - Worldwide    877-702-9580

Page 167

ROSEN

1  **from Weil that they were not permitted into that
2  room?**
3      A.    No, not that I am aware.
4      **Q.    Have you -- at the beginning of
5  Mr. Mazzuchi's e-mail, he says, "Further to Ed
6  Rosen's discussion with Sheldon," do you know
7  what that discussion refers to?**
8      A.    I think it refers to the same issue
9  that's reflected in the earlier exchange of
10  e-mail in which we were taking the view that
11  this was a limited recourse form of credit
12  support and not a guarantee of Barclays.  This
13  was an asset that would otherwise have been paid
14  to the estate as part of the transaction that
15  was being made available to secure additional
16  credit support to DTCC and its related
17  affiliates, and I thought that describing it as
18  a guarantee by Barclays was not entirely
19  accurate.
20      **Q.    OK.**
21      MR. MAGUIRE:  This is probably a good
22  time to take a break.
23      (Recess)
24      **Q.    I will show you a document we have**

TSG Reporting - Worldwide    877-702-9580

Page 168

ROSEN

1  **previously marked as Exhibit 563C.  Have you
2  ever seen that letter before?**
3      A.    Again, yes, without verifying how
4  closely it tracks the actual agreement.
5      **Q.    If you turn, sir, to page 4, there is
6  a sentence beginning at the first full paragraph
7  that starts, "By Sunday night, September 21."
8  Do you see that sentence?**
9      A.    Um-hm, yes.
10      **Q.    I give that to you as background.  My
11  question is whether on any of the Sunday night
12  or Monday morning conversations anyone from DTCC
13  said in words, substance that they believed that
14  DTCC's exposure to Lehman from processing the
15  remaining transactions was substantially less
16  than it originally feared?**
17      A.    I think implicitly by them saying they
18  had become comfortable with the internal review
19  that they were doing, they would be willing to
20  close the transaction with 250 million.
21      **Q.    So the fact that there was a meeting
22  of the minds suggests that DTCC had become more
23  comfortable with its exposure?**
24      A.    They may have said that we have

TSG Reporting - Worldwide    877-702-9580

Page 169

ROSEN

1  continued to review this and we have gotten to
2  that point based on the review.  I don't recall
3  specifically.
4      **Q.    Do you have any recollection of that?**
5      MR. HUME:  Objection, asked and
6  answered.
7      **Q.    The reason I ask is because you say
8  specifically?**
9      A.    I have an impression that that was
10  what was conveyed, that they had gotten
11  comfortable with the risk.  But I don't have a
12  specific recollection of a specific articulation
13  from the calls.
14      **Q.    I'll show you a document that has
15  previously been marked as Exhibit 156B.  It is
16  actually not entirely clear, but it is a letter
17  from Cleary Gottlieb dated March 6, 2009.  Do
18  you know whether you have ever seen that letter
19  before, sir?**
20      A.    I may have seen a draft of this
21  letter.  I don't have a specific recollection.
22      **Q.    My only questions, sir, are with
23  respect to page 3 of this letter, the second
24  full sentence on page 3, starts, "Nothing in**

TSG Reporting - Worldwide    877-702-9580

Page 170

ROSEN

1    **ROSEN**
2    this letter or in Exhibit B should be construed
3    to suggest."
4         **Do you see that?**
5    A.   Yes.
6    Q.   **Do you have an understanding, sir, as**
7    **to what that sentence means, of Mr. Kobak's**
8    **letter?**
9    A.   To be honest with you, I would have to
10   look at -- I would have to read the entire
11   letter in order to put that sentence in context.
12        WITNESS' ATTORNEY:  Maybe we could
13   discuss this off the record and I could
14   explain it to you.
15   Q.   **Sure, that would be helpful.  Let me**
16   **just ask you then if you have an understanding**
17   **that the securities in the Lehman -- that**
18   **Barclays acquired the securities in the Lehman**
19   **clearance boxes at the time of closing**
20   **regardless of whether any customers had long**
21   **positions in those securities?**
22        MR. HUME:  I think you're asking the
23   witness to interpret the contract when you
24   ask that question.  If you want to ask him a
25   factual question about a discussion, that's

TSG Reporting - Worldwide    877-702-9580

Page 171

1    ROSEN
2    fine, but to interpret precisely which
3    securities are covered by the clearance box
4    provision of the clarification letter just
5    seems like you're asking him a legal
6    interpretation question.
7    Q.   **You can answer.**
8         MR. HUME:  Well, you can't answer to
9    the extent it would reveal attorney work
10   product analysis that we have done and I
11   think beyond that --
12   A.   I think answering the question would
13   call for me to interpret the contractual
14   documents.
15   Q.   **Let me leave aside the contractual**
16   **documents.  Just as a matter of the business**
17   **deal that was negotiated, did you understand the**
18   **business agreement between the parties was that**
19   **Barclays was getting the assets in the clearance**
20   **boxes that were not owned by customers or did**
21   **you understand that Barclays was getting the**
22   **assets in the clearance boxes notwithstanding**
23   **whether any customer had had a long position?**
24   A.   My understanding was that they were
25   getting what was in the clearance boxes.

TSG Reporting - Worldwide    877-702-9580

Page 172

1    **ROSEN**
2    Q.   **And that's regardless of what**
3    **customers had long positions in those**
4    **securities?**
5    A.   It is based on there being lien-free
6    securities.
7    Q.   **So the fact that customers had long**
8    **positions did not affect Barclays' rights?**
9    A.   I think you're asking me to interpret
10   the implications of those provisions in the
11   clearance box, relating to the clearance box.
12   Q.   **I'm just asking you to tell me what**
13   **you just told me?**
14   A.   You're asking me to interpret whether
15   the reference to the clearance box, the extent
16   to which it covered certain kinds of assets and
17   that's asking me to interpret a term of the
18   agreement.
19   Q.   **Leaving aside the agreement, just the**
20   **business deal, just the business deal between**
21   **the parties, did you understand --**
22   A.   The business deal, as far as I was
23   aware, did not include a limitation on the
24   clearance box assets that Barclays was getting
25   as far as I recall.

TSG Reporting - Worldwide    877-702-9580

Page 173

1    ROSEN
2         MR. MAGUIRE:  We will mark as Exhibit
3    626 a document Bates stamped BCI-CG 0024097
4    through 99.
5         (Exhibit 626, document Bates stamped
6    BCI-CG 00024097 through 99 marked for
7    identification, as of this date.)
8    Q.   **Had you received this e-mail chain**
9    **from Mr. McDaniel, sir?**
10   A.   I did.
11   Q.   **And you had learned at some point that**
12   **there was 1 billion dollars in cash margin at**
13   **the OCC?**
14   A.   Could you repeat your question.
15   Q.   **Yes, you learned at some point there**
16   **was 1 billion dollars in cash that the OCC was**
17   **holding for the accounts of LBI?**
18   A.   That is in here, yes.
19   Q.   **And that was in addition to government**
20   **securities that were being held at JP Morgan**
21   **Chase?**
22   A.   It presumably is additional to any
23   other collateral that would have been noncash.
24   Q.   **And you asked Jim for more information**
25   **about the 1 billion dollars?**

TSG Reporting - Worldwide    877-702-9580

Page 174

ROSEN

1
2     WITNESS' ATTORNEY:  Object to the
3     characterization.
4     Q.    Specifically, you asked him whether it
5     was excess margin?
6     A.    Yeah.
7     Q.    Tell me why you asked that question.
8     A.    Yes.  Barclays was -- by agreeing to
9     step into Lehman's shoes under the TAA, it was
10    stepping into the responsibility to perform all
11    of the obligations for all positions that were
12    in the account up until the day at some point in
13    the future when the positions in the account
14    were ultimately liquidated and there was no
15    further exposure.
16    One of the things that I was trying to
17    ascertain was whether or not, if Barclays
18    stepped into the -- into Lehman's shoes, whether
19    in addition to the ongoing liabilities that it
20    was going to assume while the positions in those
21    accounts were outstanding, it was stepping into
22    a day one liability, and in addition, the extent
23    to which there was what would have been from
24    OCC's perspective an excess requirement which is
25    not necessarily obviously the same as whether

TSG Reporting - Worldwide    877-702-9580

Page 175

ROSEN

1
2     there is an excess from the clearing brokers'
3     requirement.
4     There are very few, if any, clearing
5     brokers who limit the amount of margin that they
6     collect across their customer base to the amount
7     that's required at the clearing house,
8     particularly in the case of less creditworthy
9     customers.  So this was part of an endeavor to
10    get our arms around how much potential liability
11    Barclays might be stepping into in taking on
12    these accounts.
13    Q.    And what did you learn?
14    A.    Not a lot.  Not as much as we would
15    have liked to have learned.  What we learned was
16    that over the weekend, I received an e-mail that
17    suggested that there was -- it was an e-mail
18    forwarded to me by Bill Navin, I'm sure it is in
19    the record, that it looked like there were net
20    in-flows to the clearing accounts expected on
21    Monday at the open of business.
22    So that suggested to me that if we
23    closed on Monday morning, at least on Monday
24    morning -- obviously you can't speak to Monday
25    night or Tuesday morning -- as far as Monday

TSG Reporting - Worldwide    877-702-9580

Page 176

ROSEN

1
2     morning when they closed, Barclays would not
3     have to have coughed up a significant amount of
4     additional margin to be held at OCC.
5     I also learned though one of the
6     things that we wanted to find out about, as I
7     say, there are two dimensions to the risk that
8     you assume when you do this.  One dimension to
9     the risk is the liability you assume as of the
10    pre-existing mark to market by the clearing
11    corporation and the other is the risk that you
12    assume with respect to positions that are in
13    there, particularly if they are positions of
14    someone who is not creditworthy and may not be
15    good for the payment.
16    And so I asked the question whether or
17    not there looked to be positions that could
18    entail that kind of risk and was told yes and
19    one position in particular that was identified
20    was a position of an affiliate, I don't remember
21    which affiliate of Lehman that was, a very
22    substantial position in what was called a VIX
23    future contract that the OCC cleared that was
24    regarded as being so large that it would have
25    taken a very significant amount of time to

TSG Reporting - Worldwide    877-702-9580

Page 177

ROSEN

1
2     liquidate it and because it was on market
3     volatility at that point in time, it was a -- it
4     was basically opposite the most volatile market
5     reference and there was significant concern, for
6     example, that it may take many million, tens of
7     millions of dollars before that position could
8     be liquidated.
9     There was separately some effort that
10    I saw in an e-mail to provide better information
11    about sort of what the collateral was, what the
12    positions were.  But those positions were not
13    made available in a way that would have enabled
14    Barclays to fully sort of model and understand
15    the respective risks.
16    So they were not ultimately aware how
17    much risk they were assuming by assuming
18    financial responsibility for those.  But it did
19    appear that at least at the moment that the
20    transaction was concluded, there wouldn't have
21    been a shortfall that they would necessarily
22    have to make up.
23    But it was equally true that the
24    hundreds of millions or billions that were going
25    in on Monday morning could have gone out on

TSG Reporting - Worldwide    877-702-9580

Page 178

ROSEN

1  Tuesday morning because that was the volatility
2  from just one mark to another.  So there was
3  obviously a substantial amount of risk in a
4  market with very substantial volatility.
5       So we tried to find out what we could,
6  but it was a very mixed picture with a potential
7  significant downside.
8    **Q.   And the risk, as you understood it,**
9  **was concentrated in what would happen after**
10 **closing as opposed to inherent in any of the**
11 **positions as of closing?**
12   A.   It was that -- yes, let me put it
13 differently, I would say that the amount of
14 immediate payment obligations seemed to be
15 known, unless the market or the facts changed in
16 a way between the time we got that e-mail and
17 what happened when it opened.  It could
18 conceivably have been some event in an early
19 open in Asia that caused the markets to tank so
20 significantly that OCC would have said, sorry,
21 we need another mark.  But it didn't -- there
22 wasn't -- there wasn't a clear obligation to pay
23 out money on Monday morning to the OCC.
24   **Q.   Did Barclays do anything to protect**

TSG Reporting - Worldwide    877-702-9580

Page 179

ROSEN

1  **itself against the uncreditworthy affiliate and**
2  **its VIX futures position?**
3    A.   I think it just decided to take the
4  risk of that with the balance of the
5  arrangements.  There was nothing it could have
6  done in terms of Monday.  The markets weren't
7  open to close out the positions and the reason
8  there was a significant risk was because the
9  position couldn't have been closed out that
10 quickly because it was apparently so large in
11 relation to the liquidity of the market for
12 contract.
13      MR. MAGUIRE:  We will mark as Exhibit
14 627 a document Bates stamped CGSH 00034491
15 through 92.
16      (Exhibit 627, document Bates stamped
17 CGSH 0034491 through 92 marked for
18 identification, as of this date.)
19   **Q.   Is this an e-mail you received from**
20 **Bill Navin on the Sunday?**
21   A.   Yes, yes, it is.  It was on Sunday
22 morning.
23   **Q.   And he provides in this the**
24 **information concerning the collects, that is the**

TSG Reporting - Worldwide    877-702-9580

Page 180

ROSEN

1  **amount that the OCC would pay to the clearing**
2  **member, in this case to Lehman or its successor,**
3  **Barclays, on Monday morning, right?**
4    A.   The witness is nodding, the deponent
5  is nodding.  Yes.
6    **Q.   And you understand in each case, the**
7  **collect was a positive, meaning that payment**
8  **from the OCC to Lehman or, following closing, to**
9  **Barclays?**
10   A.   Well, let me just say that I forwarded
11 this on to Barclays to interpret, but my lay
12 reading of this would be that these were net
13 collects to the clearing member.
14   **Q.   So you understood this at the time you**
15 **received it?**
16   A.   I understood it the way I described to
17 you, yes.
18   **Q.   And you understood the payments to**
19 **Barclays would be in the hundreds of millions of**
20 **dollars?**
21   A.   Yes.
22      MR. MAGUIRE:  We will mark as Exhibit
23 628 a document Bates stamped OCC 0036408
24 through 409.

TSG Reporting - Worldwide    877-702-9580

Page 181

ROSEN

1      (Exhibit 628, document Bates stamped
2  OCC36408 through 409 marked for
3  identification, as of this date.)
4    **Q.   Is this an e-mail you received from**
5  **Jim McDaniel on the previous day, Saturday,**
6  **September 20?**
7    A.   Yes.
8    **Q.   You will see the first question that**
9  **Jim McDaniel raises is how much of the billion**
10 **dollars in cash will be transferred to Barclays**
11 **at the closing.  Do you know what happened to**
12 **that?**
13   A.   I believe it was transferred.
14   **Q.   The entire 1 billion?**
15   A.   Yeah, it would have been the deal that
16 all of that margin was transferred.
17   **Q.   The second question he asks is how**
18 **would Barclays replace the 252 million in**
19 **letters of credit.  Do you know what happened**
20 **about that?**
21   A.   I'm not sure, but I think they may
22 have called down those letters of credit because
23 they were going to lapse and they wanted to make
24 sure they had enough -- I'm not certain -- I

TSG Reporting - Worldwide    877-702-9580

Page 182

ROSEN

1 know that they did call down some. I'm not sure
2 whether it is these particular letters of
3 credit.
4 Q. Do you know what happened with respect
5 to the 927 million in government securities at
6 JPM?
7 A. I don't, I'm not certain, but they may
8 have been part of a body of securities that are
9 in dispute as to how they are going to be
10 allocated that we -- I think the documents make
11 pretty clear were supposed to be transferred to
12 Barclays.
13 Q. Mr. McDaniel ends the e-mail talking
14 about excess margin and he talks about how
15 preliminary numbers actually showed a 5.1
16 million margin deficit, do you see that? Did
17 you get any update on the margin situation?
18 A. I didn't, but I was under the
19 impression at this time that -- and I can't
20 remember the timing, that Barclays was going to
21 do what it could to focus on this. I wanted to
22 get the process started, but I was certainly not
23 doing the credit analysis and deciding what was
24 and wasn't acceptable to Barclays.

TSG Reporting - Worldwide 877-702-9580

Page 183

ROSEN

1 Q. So you understood somebody at Barclays
2 was following up and doing the credit analysis?
3 A. Doing what they could. I believe they
4 were limited in their ability to do a fully
5 satisfactory credit analysis because they didn't
6 have in a form that was electronic that they
7 could have manipulated the transaction data that
8 would have enabled them to evaluate the risk.
9 So I think to a certain extent, they
10 were assuming a significant risk in going
11 forward because they really didn't know
12 themselves what the likely statistical outcomes
13 were for the portfolio.
14 Q. Did Barclays obtain a statement from
15 the OCC on Lehman's accounts?
16 A. I believe that I saw an e-mail that
17 indicated that OCC had provided some data on
18 collateral and positions to Barclays personnel.
19 I did not see the data and I don't know
20 firsthand that it was received or what it was,
21 but I believe so.
22 Q. Did anyone tell you what the statement
23 showed in terms of the excess margin, the amount
24 of excess margin at the OCC?

TSG Reporting - Worldwide 877-702-9580

Page 184

ROSEN

1 WITNESS' ATTORNEY: Objection to the
2 form. Time frame.
3 Q. Any time before the closing?
4 WITNESS' ATTORNEY: What's the date of
5 the statement?
6 Q. The statement meaning statement of
7 Lehman's positions as of the close of business
8 on Friday?
9 A. I don't know what those positions were
10 and I never saw that statement.
11 Q. Nobody told you what the amount of the
12 excess margin was?
13 A. No, not -- I did not have information
14 other than -- I don't recall having information
15 other than the information transmitted by e-mail
16 that I was copied on. If it came through my
17 e-mail box, I may have just not have focused on
18 it.
19 MR. MAGUIRE: We will mark as Exhibit
20 629 a document Bates stamped OCC 0036472
21 through 36473.
22 (Exhibit 629, document Bates stamped
23 OCC 0036472 through 36473 marked for
24 identification, as of this date.)

TSG Reporting - Worldwide 877-702-9580

Page 185

ROSEN

1 Q. You sent this e-mail to Mr. McDaniel
2 on Sunday, September 21?
3 A. Yes.
4 Q. He had raised a question with you in
5 his prior e-mail to which you were responding.
6 Do you see that?
7 A. Um-hm, yes, I do.
8 Q. And he is referring to the letter
9 draft raising a specific issue about assumed
10 liabilities. Do you see that?
11 A. Yes.
12 Q. And he notes that the current draft
13 would appear to say that Barclays is not
14 assuming liabilities represented by the short
15 option positions in the accounts of Lehman at
16 OCC. Did you have any discussion with him about
17 that?
18 A. He responds at the top of the page.
19 Q. Did you have any verbal discussion
20 with him about that?
21 A. No, just what I communicated to him
22 and I assume that he accepted my explanation.
23 Which is -- sorry.
24 Q. Did you at the time agree with his

TSG Reporting - Worldwide 877-702-9580

Page 186

1          **ROSEN**
2  observation that the draft --
3      A.  I didn't analyze it because I didn't
4  think that it was relevant.  If Barclays signed
5  on to the asset transfer agreement and had
6  separately reached some other agreement about
7  was going to happen with respect to assets in
8  the account that would not have limited
9  Barclays' obligations having stepped into the
10  transferred assumption agreement.
11          So I didn't regard the clarification
12  letter as a limiting Barclays' obligation to
13  OCC, whatever the net result of the entitlements
14  and obligations between Lehman and Barclays.
15      Q.   **You are getting a little ahead of me.**
16  **Let me ask you first, he is asking you about the**
17  **intention.  Do you see that, the intention of**
18  **the clarification letter?**
19      A.  Yes.
20      Q.   **So my first question is, was it the**
21  **intention in t,he clarification letter to say**
22  **that Barclays was not assuming liabilities**
23  **represented by short option positions?**
24      A.  I didn't evaluate that because I did
25  not think it was relevant to DTCC and so my

TSG Reporting - Worldwide    877-702-9580

Page 187

1          ROSEN
2  responsibility -- I am sorry, to OCC, and my
3  response was basically to say that the TAA
4  speaks for itself on what our liabilities are to
5  the OCC.
6      Q.   **I think I understand your answer and I**
7  **don't want to follow up on any evaluation that**
8  **you did or did not do.  I am really asking about**
9  **the intention, not the evaluation of any**
10  **contractual language.**
11          **Was the intention of the parties as**
12  **you understood it that Barclays was not assuming**
13  **liabilities represented by short option**
14  **positions in the accounts of Lehman at the OCC?**
15      A.  As between Barclays and Lehman, I
16  would have to refresh my recollection of the
17  definition of excluded liabilities to answer
18  that question and it probably would have to call
19  for me to interpret it.
20      Q.   **Why don't we give you the final**
21  **clarification letter and see, it is Exhibit 25,**
22  **which should be in front of you.**
23          WITNESS' ATTORNEY:  I don't think you
24  ever showed him 25.
25      Q.   Here you are, sir.

TSG Reporting - Worldwide    877-702-9580

Page 188

1          **ROSEN**
2      A.  I think I need the APA as well.
3      Q.   **That's Exhibit 1.**
4          **WITNESS' ATTORNEY:  Do you know which**
5  **draft of the clarification letter is being**
6  **referred to in Daniel's e-mail of**
7  **September 20, 2008, a.m.**
8          MR. MAGUIRE:  I don't.
9      A.  I would have to -- it would take me
10  some time to focus on this, but I don't think
11  this provision is focused on options positions.
12  But I'm not that familiar with this portion of
13  the agreement.  It will take me some time and
14  I'm concerned that evaluating whether his
15  concern is justified would require me to
16  interpret these provisions.
17      Q.   **Yes, my question is directed not so**
18  **much to interpretation of provisions, more to**
19  **your understanding of what the intention of the**
20  **parties was.  Did you have an understanding of**
21  **what the intent of the parties was?**
22          MR. HUME:  I am going to object.  That
23  is a very subtle distinction.  Why don't you
24  ask whether there was a discussion about
25  those provisions with the other side.

TSG Reporting - Worldwide    877-702-9580

Page 189

1          ROSEN
2  That's a factual question.
3          MR. MAGUIRE:  The factual question I
4  have asked is with respect to Jim McDaniel's
5  e-mail where he refers to the intention.
6      Q.   **And the question is at the time, did**
7  **you agree with him?**
8          MR. HUME:  He has already answered
9  that.
10      A.  I did not agree with him because I did
11  not think it mattered what was in the agreement
12  vis-a-vis any concerns he might have -- I should
13  say in the APA vis-a-vis any concerns that he
14  might have regarding the scope of the
15  responsibility that Barclays was undertaking to
16  OCC.
17      Q.   **That's where I said you were moving**
18  **ahead of me.  I wanted to understand the**
19  **precursor to that.  He says --**
20      A.  I know, but I have never -- I didn't
21  analyze it at the time or form a view.  I formed
22  a view that the subject matter was something
23  that we didn't have to go into.
24          So whether or not he was right, I
25  could probably form a view, but it would take me

TSG Reporting - Worldwide    877-702-9580

Page 190

ROSEN

1
2    time that I haven't spent evaluating the concern
3    that he is raising here and the various
4    interconnected provisions of the agreement.
5        Q.    You did not --
6        A.    I did not address this.  I basically
7    said it doesn't seem to be relevant, what the
8    agreement provides in terms of our obligations
9    to OCC.
10        Q.    Now, he offered a proposed
11    clarification.  Do you see he offers some
12    language here?
13        A.    He did.
14        Q.    What did you do with that?
15        A.    I don't recall having done anything
16    with it.
17        Q.    Why not?
18        A.    Because I didn't believe that the
19    provisions in the asset purchase agreement
20    affected the undertakings that we were making to
21    OCC.
22        Q.    You said in your note to him, "What we
23    agree with Lehman regarding assumed liabilities
24    and what we agree with OCC are two different
25    things with potentially different economic

TSG Reporting - Worldwide    877-702-9580

Page 191

ROSEN

1
2    consequences."
3        A.    Right.
4        Q.    Can you explain what you meant by
5    that?
6        A.    I can.  If the position of a customer
7    was in an account that Barclays had assumed and
8    executed the TAA and was carrying at the
9    clearing house, they had economic liability to
10    the clearing house.
11        If it were the case that as part of
12    the deal, the liability that Barclays was
13    assuming to the clearing corporation was a
14    liability that, in fact, Lehman remained
15    responsible for, then it was between Barclays
16    and Lehman for Barclays to be made whole for
17    whatever its obligation under the TAA was.
18        So for that reason, I didn't think it
19    was relevant.  So it performed an obligation of
20    a liability that it wasn't assuming, it could
21    have had a claim over and against Lehman.  But
22    it couldn't have used that claim against Lehman
23    that it wasn't assuming that liability for
24    refusing to pay OCC what it owed OCC.
25        Q.    So are you saying that the transfer

TSG Reporting - Worldwide    877-702-9580

Page 192

ROSEN

1
2    and assumption agreement set forth Barclays'
3    obligations to the OCC, but did not in any way
4    affect Barclays' rights under the clarification
5    letter?
6        WITNESS' ATTORNEY:  Object to the
7    form.
8        A.    I wouldn't say that they were utterly
9    unrelated, but I would have said that the
10    liabilities that it did or didn't assume under
11    the clarification -- under the deal documents as
12    reflected in the various agreements overrode the
13    contractual obligation that it was separately
14    making to OCC.
15        OCC wanted to know that Barclays was
16    going to be responsible for every liability that
17    arose in those accounts and that was the risk
18    and liability that Barclays was assuming, even
19    if that meant they were not liabilities that
20    Barclays was contemplating acquiring from or
21    assuming from Lehman as part of the deal.
22        Q.    Did you have any discussions with
23    Mr. McDaniel about that?
24        A.    Just -- my recollection is that -- I
25    don't recall him coming back to me.  There may

TSG Reporting - Worldwide    877-702-9580

Page 193

ROSEN

1
2    be e-mail traffic that you could refresh my
3    recollection, but I think this was the last of
4    the discussion of this issue, but I could be
5    forgetting something.
6        MR. MAGUIRE:  We will mark as Exhibit
7    630 a document Bates stamped OCC 0036482
8    through 483.
9        (Exhibit 630, document Bates stamped
10    OCC 0036482 through 483 marked for
11    identification, as of this date.)
12        Q.    You sent this e-mail to Mr. McDaniel
13    on Sunday morning?
14        WITNESS' ATTORNEY:  No.
15        A.    It looks will like I sent it to him
16    sometime in the afternoon on Sunday.
17        Q.    3:31 p.m.?
18        A.    Yes.
19        Q.    And you were responding to his e-mail
20    of just about half an hour earlier?  And he is
21    communicating, the purpose of his e-mail is to
22    communicate OCC's position to you?
23        A.    Yes.
24        Q.    And he explains that they need the
25    transaction, the transfer and assumption

TSG Reporting - Worldwide    877-702-9580

Page 194

ROSEN

1
2  agreement signed, right, and he says over
3  towards the end of his e-mail on the next page
4  in the paragraph numbered 3, "If the transaction
5  does not close tonight, OCC would need to
6  immediately liquidate and close out the Lehman
7  accounts and is preparing to do so."
8      Do you see that?
9      A.  I do see that.
10     Q.  You got back to him in your response
11  and you say, "Very sorry to keep you hanging."
12     Can you tell me why did Barclays keep
13  the OCC hanging on the Sunday afternoon?
14     A.  Because we didn't think that this was
15  the most difficult issue to solve and we had
16  much bigger fish to fry and so I was not able to
17  turn my attention to this, although what I did
18  do is forward it on, my recollection, is to a
19  number of people, including the president of
20  SIPC because I thought other people would have
21  more leverage with OCC to get them to calm down
22  and wait because it was looking less like we
23  were going to be able to sign up the entire deal
24  by that night.
25     So I thought it would probably be more

TSG Reporting - Worldwide    877-702-9580

Page 195

ROSEN

1
2  effective for me to spend my time dealing with
3  the fires we were feeling with and let somebody
4  else calm them down.
5      Q.  When did the Barclays'
6  representatives, the businessmen make the
7  decision to authorize the TAA, transfer and
8  assumption agreement, to the execution of that
9  agreement?
10     A.  I would have to look and see -- I
11  would have to refresh my recollection of the
12  e-mails transmitting the drafts to remember
13  exactly when that was.  But I mean, I think it
14  might have been quite late when I asked Jonathan
15  Hughes, once we had reached agreement on the
16  language, whether or not they had sign off from
17  the business people.
18     Q.  And when you say quite late, do you
19  mean on the near side of midnight or far side of
20  midnight on Sunday?
21     A.  I'm not sure, but it could have been
22  on the far side of midnight.  I may be
23  misremembering, but my recollection is that the
24  handling of the documentation of the sort of the
25  clearing house agreements followed the sort of

TSG Reporting - Worldwide    877-702-9580

Page 196

ROSEN

1
2  the dealing with the various issues that needed
3  to be solved, particularly with the DTCC.
4      I was not that concerned because I
5  think subject to sort of the due diligence and
6  whatever, we did not have the same problems in
7  the OCC arrangement that we had with the DTC
8  arrangement.  So I was relatively saying that we
9  would get there.
10     Q.  Who was the decision maker at Barclays
11  who gave the sign-off authority if you know?
12     A.  I don't know who Jonathan Hughes
13  corresponded with.
14     MR. MAGUIRE:  Why don't we take a
15  break and I may actually be done.
16     (Recess)
17     Q.  Sir, you have talked some today about
18  the margin Lehman maintained at the OCC.  Did
19  you consider that to be an asset that was
20  related to Lehman's exchange-traded derivatives?
21     A.  Yes.
22     Q.  What about the margin at other
23  derivatives exchanges?  Did you consider the
24  margin that Lehman maintained at other
25  derivatives exchanges to be an asset that was

TSG Reporting - Worldwide    877-702-9580

Page 197

ROSEN

1
2  related to its exchange-traded derivatives?
3      A.  If it was part of the FCM business
4  that they were acquiring or the equity brokering
5  dealing, trading business, yes.
6      Q.  When you say FCM business, you are
7  referring to futures commission merchant?
8      A.  Yes, or the options being an outgrowth
9  of the equity trading and brokerage business.
10     Q.  Now, you mentioned a number of
11  meetings that you had with various of your
12  partners to obtain recollection and to prepare
13  yourself for a number of things; one was your
14  declaration and another was for this deposition.
15  Did you also have meetings with your partners in
16  connection with Jonathan Hughes' preparation for
17  his deposition?
18     A.  I'm trying to remember.  I'm not sure
19  I was involved in Jonathan Hughes' preparation.
20     Q.  Did you not meet with Jonathan Hughes
21  in connection with his deposition?
22     MR. HUME:  I am going to object to the
23  question to the extent there may be
24  privileged meetings that Mr. Hughes and
25  Mr. Rosen had that may also have somehow

TSG Reporting - Worldwide    877-702-9580

Page 198

ROSEN

1
2  informed the deposition, it may be hard to
3  parse that.
4      Q.   I am asking you about whether you met
5  with him where the purpose of the meeting was to
6  help him prepare and get recollections from
7  Cleary partners so he could testify as a
8  representative of Barclays.
9      A.   I don't recall participating in the
10  meeting.
11      Q.   In any of the meetings that you had
12  with your partners in connection with preparing
13  your declaration, or in connection with
14  preparing for this deposition, in searching
15  people's recollections, did any of your partners
16  suggest that anyone on the Lehman side had ever
17  indicated that margin was not included in the
18  deal?
19      A.   No, I don't recall any such statement.
20      Q.   You have, I think, the asset purchase
21  agreement in front of you as Exhibit 1.  If you
22  could turn to section 1.1, to the definition of
23  excluded assets on page 2 and the one I would
24  like to ask you about is subparagraph N.  It is
25  at the top of page 4.

TSG Reporting - Worldwide    877-702-9580

Page 199

ROSEN

1
2          Did any of your partners invite you to
3  address that section of the APA?
4          WITNESS' ATTORNEY:  That is a yes or
5  no question.
6      A.   No.
7      Q.   Did you have any discussion with any
8  of your partners concerning whether margin was
9  an excluded asset under the APA?
10          WITNESS' ATTORNEY:  I am going to
11  object on privilege grounds.  If you want to
12  ask him for his understanding or discussions
13  with Lehman, that's fine, but his
14  declaration says what it says and --
15          MR. MAGUIRE:  Are you directing him
16  not to answer.
17          WITNESS' ATTORNEY:  Phrased that way,
18  yes.
19      Q.   Let me ask you, sir, did any of your
20  partners describe to you any discussions that
21  they had had with anyone at Lehman concerning
22  the excluded asset in the APA?
23      A.   I don't think in our conversations we
24  discussed the definition of excluded assets.
25      Q.   Did you have any -- did anyone discuss

TSG Reporting - Worldwide    877-702-9580

Page 200

ROSEN

1
2  any conversation that they had had with anyone
3  at Lehman on that subject?
4      A.   That was not the subject of the
5  discussions between us.
6      Q.   Let me --
7      A.   But it doesn't surprise me that we
8  didn't discuss that because derivatives
9  contracts in that context would have been
10  regarded as relating to the OTC derivatives
11  contracts.
12      Q.   Can you explain what you mean by that
13  answer?
14      A.   I believe that this reference is
15  intended to be a reference to OTC derivatives
16  contracts.
17      Q.   What's the basis for that belief?
18      A.   Because it would have been
19  fundamentally inconsistent with the agreement
20  for it to have any other meaning because the
21  derivatives business that was OTC was not part
22  of the deal and the derivatives business that
23  was the listed derivatives and the assets
24  associated with it were.
25          So I think that the natural reading

TSG Reporting - Worldwide    877-702-9580

Page 201

ROSEN

1
2  that provision is that it was intended to refer
3  to the derivatives business that was not coming
4  over, the derivatives contracts rather than not
5  coming over.
6      Q.   When were OTC derivatives excluded?
7      A.   I believe they were excluded as part
8  of the original deal as reflected in the APA.
9      Q.   Are you referring again to this
10  provision N?
11          WITNESS' ATTORNEY:  I am going to
12  instruct him not to answer.
13          MR. HUME:  You are asking him to
14  interpret the contract.
15          WITNESS' ATTORNEY:  You asked him
16  about business understanding or business
17  deal, he has answered that, and now you are
18  asking him to prove it by asking him where
19  in the contract.
20      Q.   When did you learn that the OTC
21  derivatives were not part of the deal?
22      A.   I don't remember when I first learned
23  that.
24      Q.   How did you learn that?
25      A.   I don't remember precisely how I first

TSG Reporting - Worldwide    877-702-9580

Page 202

```
 1              ROSEN
 2  learned it.
 3      Q.   Do you know from whom you learned
 4  that?
 5      A.   No.  It might have been from reading
 6  the document.  It may have been from Jonathan
 7  Hughes.  It may have been from one of my
 8  partners.
 9          MR. MAGUIRE:  Sir, I have no further
10  questions for you at this time.
11          MR. GAFFEY:  I have just a couple.  If
12  it is OK, rather than have a break, we
13  should be pretty quick.  I am Bob Gaffey,
14  Jones Day, special counsel to the debtor.
15  EXAMINATION BY
16  MR. GAFFEY:
17      Q.   Earlier today, in response to one of
18  Mr. Maguire's questions, you spoke a bit about
19  conversations you had with Dan Gallagher at the
20  SEC regarding Barclays stepping into the shoes
21  of the Fed in respect to a certain repo.  Do you
22  recall that topic generally?
23      A.   No, I don't recall having a
24  conversation with Dan.  He may have been one of
25  the people at the SEC -- I couldn't remember
```

TSG Reporting - Worldwide    877-702-9580

Page 203

```
 1              ROSEN
 2  specifically who I had followed up with at the
 3  SEC.
 4      Q.   Let me give you a more general
 5  question.  Whether you remember the particular
 6  person you spoke to or people you spoke to at
 7  the moment, did you have conversations with
 8  people at the SEC about the topic of the repo?
 9      A.   I had discussions with the SEC about
10  the need for a waiver by the SEC of certain
11  rights that it might be construed to have.  That
12  would have affected the ability of Barclays, if
13  the transaction hadn't closed, to exercise
14  contractual rights embodied in the documentation
15  of the repo that they were contemplating
16  entering into with Lehman, and in the
17  eventuality that the deal didn't close, I didn't
18  want Barclays to be in the position where it
19  wasn't going to be able to exercise all of its
20  rights under the repo agreement.
21      Q.   The repo that you are talking about,
22  was that what has been referred to, you might
23  have heard the term "replacement transaction,"
24  where Barclays stepped into the shoes of the
25  Fed?
```

TSG Reporting - Worldwide    877-702-9580

Page 204

```
 1              ROSEN
 2      A.   This is the transaction where the Fed
 3  unwound its repo, repurchase transaction with
 4  Lehman, and Barclays entered into the repo with
 5  Lehman on purportedly the same assets.
 6      Q.   What assurances were needed from the
 7  SEC with regard to Barclays' rights under that
 8  repo?
 9      A.   It was, because of the possibility
10  that LBI would have become -- I'm not a SIPC
11  expert, but I can tell you that my understanding
12  was that in the event of a SIPC liquidation of
13  the broker/dealer, that if the broker/dealer had
14  entered into a repurchase transaction, that
15  there was some risk -- not saying that it was my
16  understanding that this outcome was clear, but
17  there was some potential risk that the ability
18  to exercise rights of termination, liquidation,
19  set-off, whatever it is, might have been
20  something that the SEC would have had an ability
21  under applicable provisions to have sought a
22  stay on and we wanted the SEC to agree that in
23  consideration for Barclays doing this, which it
24  would probably not otherwise have undertaken to
25  do in the face of an insolvent counterparty, in
```

TSG Reporting - Worldwide    877-702-9580

Page 205

```
 1              ROSEN
 2  the event that the deal was not going to be
 3  consummated.
 4      Q.   And when you say applicable
 5  provisions, applicable provisions of what, of
 6  the Bankruptcy Code?
 7      A.   I think there are maybe 34 SIPC
 8  provisions.  As I said, I'm not an expert.
 9      Q.   Do you recall, as we talk about this,
10  do you recall who at the SEC you communicated
11  with about this topic?
12      A.   That's what I -- I don't remember
13  who -- I'm sure it is in the -- I'm sure it is
14  in the e-mails.  Well, I suppose -- no, it would
15  have to be in the e-mails because something came
16  back from them saying that they would agree to
17  waive.
18      Q.   And the nature of the rights that you
19  were talking about, again as a general matter --
20  I take your point you're not an expert in the
21  area -- but what type of rights were you asking
22  for assurances about in terms of Barclays'
23  exercising its rights under the repo?
24      A.   I think they are rights to terminate
25  the transactions; for example, in the event of a
```

TSG Reporting - Worldwide    877-702-9580

Page 206

ROSEN

1  default or insolvency set-off claims against
2  collateral.  It would be whatever rights are in
3  the relevant master repurchase documentation.
4    Q.   Did you review the relevant master
5  repurchase documentation when you had these
6  discussions?
7    A.  I did not.
8    Q.   Who did?
9    A.  I did not.
10     Let me just say something, I received
11  copies of them.  I didn't actually open the
12  e-mails with those until recently.  But in terms
13  of the risk to Barclays, when the Fed asked them
14  to do this, one of my colleagues, Sandra Rocks
15  provided advice to Barclays.
16    Q.   And I am sorry, Sandra --
17    A.  Sandra Rocks.
18    Q.   What is Sandra Rocks' area of
19  specialty?
20    A.  Creditors' rights.
21    Q.   And did Sandra Rocks propose some
22  language, either directly or through you,
23  propose particular language --
24    A.   Yeah, I drafted the language and I

TSG Reporting - Worldwide    877-702-9580

Page 207

ROSEN

1  provided it to the SEC and also I believe to
2  SIPC.
3    Q.   And the rights that were at the center
4  of this discussion had to do with Barclays, as a
5  general matter, Barclays' rights to recover the
6  amounts that it advanced under the repo?
7    A.   I think it would have been whatever
8  the contractual rights under the terms of the
9  agreement were.
10    Q.   Did you or anyone on the Barclays'
11  side of the table have any discussions with
12  anyone on the Lehman side of the table or the
13  business people or lawyers about this issue?
14    A.  About the reservation of rights?
15    Q.   Yeah, about, this for lack -- it is my
16  term, not yours -- but about this contingency
17  plan about what would happen if the
18  broker/dealer were liquidated?
19    A.   I don't recall who all the
20  participants were on the phone.  It may very
21  well have been Lehman and Fed representatives
22  and Barclays' representatives, but I can't -- I
23  don't recall for sure.
24    Q.   When you say you don't recall, is it

TSG Reporting - Worldwide    877-702-9580

Page 208

ROSEN

1  because you have a vague recollection someone
2  were there and you're not sure, or because there
3  were a lot of phone calls and you can't tell one
4  way or the other?
5    A.  Both.
6    Q.   Were you part of any discussions with
7  Lehman or its representatives at Weil Gotshal
8  about what Barclays' rights would be in the
9  event of the termination of the repo?
10    A.   No.  We would have assumed that
11  they -- that the documents spoke for itself.
12  They would know from the standard form
13  documentation.
14    Q.   Are you aware of any discussions
15  where, with Lehman or its representatives at
16  Weil Gotshal, about what, if anything, the
17  documents said that addressed that possibility
18  of a termination of the repo?
19    A.   No, the agreement I think spoke for
20  itself and they executed it and I don't know who
21  was involved in the process of approving and
22  executing the repo.
23    Q.   So we have a clear record, the
24  document you are talking about is the master

TSG Reporting - Worldwide    877-702-9580

Page 209

ROSEN

1  repurchase agreement or the transaction
2  documents relating to the sale transaction or
3  both?
4    A.   Well, I believe your question was
5  directed to the master repurchase agreement.
6    Q.   Did, at any point, were you involved
7  in any discussions or to your knowledge was
8  anybody at Cleary -- withdrawn.
9     To your knowledge, was anybody on the
10  Barclays' side of the table, Barclays or its
11  representatives involved in discussion with
12  Lehman or its representatives about provisions
13  in the clarification letter that need -- that
14  addressed the issue of the termination of the
15  repo?
16    A.  I'm not sure, am I the designated
17  spokesperson -- what I spoke to you about, what
18  I responded to on the repo was something I
19  responded to because I was actually directly
20  involved.
21    Q.   I should have said this up front, I am
22  sorry --
23    A.  I'm not aware --
24    Q.   We have collapsed your deposition into

TSG Reporting - Worldwide    877-702-9580

Page 210

ROSEN

1  both 30(b)(6) and your individual deposition.
2  My questions go to your personal knowledge. I
3  have sort of reversed the rules a little bit.
4      A.  I am sorry, could you repeat the
5  question.
6      Q.  Do you have any knowledge of whether
7  anyone on the Barclays' side of the table,
8  Barclays or its representatives, spoke to anyone
9  on the Lehman side of the table, Lehman or its
10  representatives, about provisions that needed to
11  be included in the clarification letter
12  regarding the termination of the repo?
13          MR. HUME:  Object to the form.
14      A.  I am sorry?
15          MR. HUME:  I object to the form.
16      Q.  I think you can answer.
17      A.  I believe that there may have been
18  conversations between the lawyers, maybe Alan
19  Kaplan at Barclays, but I don't have personal
20  knowledge because I was not involved in the
21  events leading up to the notice and the
22  clarification that was made in the clarification
23  letter.
24          But I assume that -- it is obvious

TSG Reporting - Worldwide    877-702-9580

Page 211

ROSEN

1  that since the provisions were ultimately
2  included in the clarification letter, that it
3  was conveyed in the form of the amendments to
4  the clarification letter that reflected those
5  provisions.
6      Q.  OK.  I would like to show you -- let's
7  mark this as our next exhibit.
8          (Exhibit 631, document Bates stamped
9  BCI-EX(S) 201894 through 95 marked for
10  identification, as of this date.)
11      Q.  The document I have put before you
12  Mr. Rosen marked as Exhibit 631 bears Bates
13  number BCI-EX(S) 00201894 through 895.
14          Have you seen the document before?
15      A.  Again, not parsing every word, but it
16  looks like an e-mail that I sent.
17      Q.  And you'll see it is an e-mail from
18  you to Josephine Wang?
19      A.  Yes.
20      Q.  I can't --
21      A.  This is what I was referring to --
22      Q.  It is?
23      A.  -- earlier in terms of the sort of the
24  clarification of the language included in the

TSG Reporting - Worldwide    877-702-9580

Page 212

ROSEN

1  order, and then we asked SIPC and, I guess it
2  was Mike Macchiaroli now that I see this, to
3  confirm that they wouldn't seek such a stay.
4      Q.  I can't tell from the e-mail address
5  with whom or what is Josephine Wang affiliated.
6      A.  You can't tell that.  I think she is
7  in the legal department at SIPC.
8      Q.  And you say in this e-mail to
9  Josephine Wang and Steven Sharbeck, Mike
10  Macchiaroli, "Below is the language we believe
11  to be necessary to ensure that the order is
12  sufficiently broad to cover the relevant
13  Barclays Capital transactions."
14          Do you see that?
15      A.  Yes.
16      Q.  And below that is some proposed
17  language and below that is a note that says,
18  "Mike, I am trying to place us in the document,
19  are you with me?"
20          Where did the particular language set
21  off in italics come from, beginning, "Exercise
22  of any rights," and ending "September 24, 2008"?
23      A.  Probably from my colleague, Sandra
24  Rocks.

TSG Reporting - Worldwide    877-702-9580

Page 213

ROSEN

1      Q.  And was this particular language shown
2  to or discussed with, to your knowledge, anybody
3  on the Lehman side of the table, including its
4  business people or representatives?
5      A.  I think that certainly they would have
6  seen the order in the proposed sale -- the sale
7  order.
8      Q.  Well, you are a bit ahead of me.  I
9  guess I should have asked that.  The order that
10  you refer to, is that the sale order?
11      A.  Yes.
12      Q.  Do you know if this language wound up
13  in the sale order?
14      A.  I would have to check.  I believe so,
15  but I would have to check to confirm.
16      Q.  And in the language that you proposed
17  in this e-mail, there is a reference to section
18  559 of the Bankruptcy Code.  Do you see that?
19      A.  Yes.
20      Q.  Were you familiar with the terms of
21  Section 559 of the Bankruptcy Code when you
22  proposed this language to the Section and SIPC?
23      A.  No, I was the transmitter.
24      Q.  Do you know if anyone at -- on the

TSG Reporting - Worldwide    877-702-9580

54  (Pages 210 to 213)

Page 214

1           **ROSEN**
2    **Barclays side of the table, including its**
3    **representatives, spoke to anyone on the Lehman**
4    **side of the table, including its representatives**
5    **about Section 559 of the Bankruptcy Code?**
6         A.   I don't have a specific recollection
7    of that.
8         WITNESS' ATTORNEY:  Mr. Gaffey, let me
9    state for the record, for what it's worth,
10    the language, the italicized language says,
11    "The order that the stays set forth above
12    shall not apply to," and I just am not sure
13    whether or not that really is referring to
14    the sale order as opposed to some other
15    order.
16         MR. GAFFEY:  Neither am I.  That's why
17    I asked the question.
18    **Q.   Does what your counsel has to say**
19    **refresh your recollection?**
20         MR. HUME:  I think it is the SIPC
21    order.
22         A.   Hang on a second.  You know what, I
23    think you're right.  This predated the sale
24    order.  This is Wednesday -- this is the 17th of
25    September, so there was a stay put into place
      TSG Reporting - Worldwide     877-702-9580

Page 215

1                ROSEN
2    and I guess this was to seek clarification of
3    that.
4    **Q.   This refers to the SIPC order, the**
5    **SIPA order?**
6         THE WITNESS:  Is that the only order?
7         MR. GAFFEY:  Let's go off the record
8    for a minute.
9         (Recess)
10         MR. GAFFEY:  Back on the record.
11    **Q.   Mr. Rosen, do you know one way or the**
12    **other what order is being referred to?  I mean**
13    **from memory, do you know one way or the other**
14    **what order is being referred to in the document**
15    **we have marked as 631, your e-mail?**
16         A.   I believe it was in anticipation of
17    the sale order, but I'm not 100 percent
18    confident.
19    **Q.   And how much time -- I know it was a**
20    **busy week -- but how much time did you devote to**
21    **conversations with the SEC about this assurance**
22    **language that's set out in Exhibit 631, this**
23    **issue?**
24         A.   I really don't have a clear
25    recollection.  We sent it down to them and I had
      TSG Reporting - Worldwide     877-702-9580

Page 216

1                ROSEN
2    a conversation and asked them to focus on it and
3    then come back.  I think there was -- they
4    understood what the import of it was.  And then
5    they came back and confirmed that they
6    wouldn't -- you know, that they agreed they
7    wouldn't exercise that right to seek a stay.
8    But it didn't take a lot of to'ing and fro'ing
9    on the telephone to get there.  Their people are
10    I think quite familiar with their rights.
11    **Q.   Did there come a point that it came to**
12    **your attention that the repurchase agreement**
13    **was, in fact, terminated?**
14         A.   Well, it came to my attention that the
15    clarification letter provided for a collapse
16    instead of unwinding the repurchase agreement
17    and then separately transferring to basically
18    collapse that into one step.  And it was part
19    of -- the collateral that had been under that
20    agreement was part of the securities that were
21    being sold.
22    **Q.   My question is a little different.  It**
23    **goes to the timing point more than anything**
24    **else, but did there come a time when you learned**
25    **that the prepurchase agreement had been**
      TSG Reporting - Worldwide     877-702-9580

Page 217

1                **ROSEN**
2    **terminated?  And if so, when did you find that**
3    **out?**
4         A.   Well, with a consummation of the
5    transaction, it was terminated.
6    **Q.   Do you know when the repurchase**
7    **agreement was terminated?**
8         MR. HUME:  Objection, asked and
9    answered.
10         A.   My recollection is that the agreement
11    was terminated as part of the consummation of
12    the sale transaction.
13    **Q.   That would be at the closing on the**
14    **22nd?**
15         A.   Which would be at the closing.
16    **Q.   Did it come to your attention at any**
17    **point prior to the closing that Barclays issued**
18    **a notice of termination to Lehman?**
19         A.   At some point, I did see e-mail
20    traffic indicating that a notice had been sent
21    in error and then my recollection is that there
22    was an effort to document that in the
23    clarification letter.
24    **Q.   When did the fact of the notice come**
25    **to your attention?**
      TSG Reporting - Worldwide     877-702-9580

Page 218

ROSEN

1    A.  I honestly don't recall.
2    Q.  Was it after the sale hearing?
3    A.  I honestly don't recall when I became
4    aware of it to be honest with you.  There is
5    probably an e-mail somewhere about it.  I don't
6    have a date on it.
7    MR. GAFFEY:  OK.  Let's mark this
8    document as Exhibit 632.
9    (Exhibit 632, document Bates stamped
10   CGSH 163813 through 815 marked for
11   identification, as of this date.)
12   Q.  I have put before you, Mr. Rosen, what
13   has been marked as Exhibit 632 document bearing
14   Bates number CGSH 00163813 through 815.  Take a
15   look at the document, please, sufficient to tell
16   me whether you have seen it before.
17   A.  Yes, it looks like the e-mail
18   correspondence to which I was a party.
19   Q.  Does this e-mail constitute the
20   assurance that had been requested from the SEC?
21   A.  Yeah, I believe this is.
22   Q.  And had you spoken with Alastaire
23   Bambach about the topic?
24   A.  I don't recall.  It is possible that
25

TSG Reporting - Worldwide    877-702-9580

Page 219

ROSEN

1    he -- that I did or that he was on the phone
2    when I spoke to someone regarding it.  I
3    honestly don't have a clear recollection.  There
4    was so many conversations with the SEC.
5    Q.  And you asked Alastaire in the e-mail
6    at the top of the chain, an e-mail dated
7    September 18, 2008 at the time of 4:01 p.m. -- I
8    beg your pardon, the time of 3:59 p.m.
9    Alastaire, "Is this comfort something that we
10   may share with others who may have an interest."
11   Do you see that?
12   A.  Yes.
13   Q.  Who were the others you are referring
14   to?
15   A.  I'm looking at that and I don't recall
16   specifically whether this was sort of just a
17   general, abstract question or whether I had
18   somebody in mind.  I honestly don't recall
19   sitting here today.
20   Q.  And did you share this comfort with
21   others?
22   A.  I think I probably shared it with the
23   client certainly.
24   Q.  Did you share it with anybody at Weil

TSG Reporting - Worldwide    877-702-9580

Page 220

ROSEN

1    Gotshal?
2    A.  I don't recall providing it directly
3    to Weil Gotshal.
4    Q.  Do you know if it was provided
5    indirectly to Weil Gotshal?
6    A.  I don't have a recollection about
7    that.  It may have been.  I do not.  It may have
8    been that I did this because the client at
9    Barclays wanted to forward it on and they asked
10   me whether they could.  But I just -- but
11   honestly, this is not a keen recollection.
12   Q.  Do you have any knowledge, direct or
13   indirect, as to whether this comfort language
14   was shared with Lehman or Weil Gotshal?
15   A.  I really don't recall.
16   Q.  You referred a few times today in
17   various contexts to -- you can put the document
18   aside.  To various circumstances where -- and
19   this is, again, not a quote, but you talked
20   about jeopardy to the deal closing by Monday the
21   22nd, that's a prospect that you have talked
22   about a few times today.  Was there a drop-dead
23   date for closing?
24   A.  No, there was just a perception that

TSG Reporting - Worldwide    877-702-9580

Page 221

ROSEN

1    if it didn't close by Monday, there could be
2    developments in the marketplace which might have
3    complicated or prevented the deal from getting
4    done.  I don't think it was an ultimatum.
5    I think people wanted to get the deal
6    done, but I think there was a concern about
7    letting another business cycle go by was just --
8    because we didn't know what was going to happen.
9    I think this was the weekend where we had
10   learned very late Sunday night that, you know,
11   Morgan Stanley and Goldman Sachs had quite
12   expeditiously become banks and people were
13   worried and the hurry to do that was no doubt in
14   part due to concerns.
15   So I wouldn't say that it was a drop
16   dead or an ultimatum or anything like that.  It
17   was that people realized it became more
18   complicated and there was more noise that could
19   interfere with the transaction the more time
20   that elapsed.  So we all, I think internally at
21   Cleary regarded it as, put it this way, if the
22   deal wasn't ready to close on Monday, we didn't
23   want to be the ones responsible for it not being
24   ready to close on Monday morning, so we took it

TSG Reporting - Worldwide    877-702-9580

Page 222

1              ROSEN
2    seriously.
3        Q.   That issue aside, the deal could have
4    closed on Tuesday?
5        A.   Theoretically, it could have closed on
6    Tuesday if things hadn't intervened.  It was
7    more the risks that were associated with not
8    closing expeditiously that were the concerns.
9    You had to remember, the markets were very
10   volatile and there were assets whose valuation
11   was the source of considerable uncertainty and
12   concern.
13       MR. GAFFEY:  I don't have anything
14   further.  Thank you for your time.
15       MR. DAKIS:  The committee has no
16   questions.
17       THE WITNESS:  Thank you.
18       (Time Noted:  4:35 p.m.)
19
20   _____
        EDWARD J. ROSEN
21
22   Subscribed and sworn to
     before me this EDWARD J. ROSEN  day
23   of February, 2010.
24
25   _____

TSG Reporting - Worldwide    877-702-9580

Page 223

1                ROSEN
2              INDEX:
3    WITNESS     EXAM BY:         PAGE:
4    E. Rosen     Mr. Maguire        6
5                 Mr. Gaffey      202
6              EXHIBITS
7    Exhibit No.              Marked
8    Exhibit 622 declaration of Edward J. Rosen    8
9    Exhibit 623 document Bates stamped      120
10       CGSH0002699 through 700
11   Exhibit 624 document Bates stamped DTCC      122
12       00126 through 00198
13   Exhibit 625 document Bates stamped DTCC      152
14       00359 through 361
15   Exhibit 626 document Bates stamped BCI-CG    175
16       00024097 through 99
17   Exhibit 627 document Bates stamped CGSH      181
18       0034491 through 92
19   Exhibit 628 document Bates stamped      183
20       OCC36408 through 409
21   Exhibit 629 document Bates stamped OCC      186
22       0036472 through 36473
23   Exhibit 630 document Bates stamped OCC      195
24       0036482 through 483
25

TSG Reporting - Worldwide    877-702-9580

Page 224

1              ROSEN
2            EXHIBITS
3    Exhibit No.              Marked
4    Exhibit 631 document Bates stamped      213
5        BCI-EX(S) 201894 through 95
6    Exhibit 632 document Bates stamped CGSH      220
7        163813 through 815
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 225

1              ROSEN
2           CERTIFICATE
3    STATE OF NEW YORK )
4              )ss:
5    COUNTY OF NEW YORK)
6        I, MARY F. BOWMAN, a Registered
7    Professional Reporter, Certified Realtime
8    Reporter, and Notary Public within and for
9    the State of New York, do hereby certify:
10       That EDWARD J. ROSEN, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such
13   deposition is a true record of the testimony
14   given by such witness.
15       I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage and that I am in no way
18   interested in the outcome of this matter.
19       In witness whereof, I have hereunto
20   set my hand this 19th day of February, 2010.
21
22   _____
23       MARY F. BOWMAN, RPR, CRR
24
25

TSG Reporting - Worldwide    877-702-9580

Page 226

```
 1              ROSEN
 2         * * *ERRATA SHEET* * *
 3   NAME OF CASE:  In Re:  Lehman Brothers
 4   DATE OF DEPOSITION:  February 19, 2010
 5   NAME OF WITNESS:  EDWARD J. ROSEN
 6   Reason codes:
 7      1. To clarify the record.
        2. To conform to the facts.
 8      3. To correct transcription errors.
 9   Page _____ Line _____ Reason_____
     From _____ to_____
10
11   Page _____ Line _____ Reason_____
     From _____ to_____
12
13   Page _____ Line _____ Reason_____
     From _____ to_____
14
15   Page _____ Line _____ Reason_____
     From _____ to_____
16
17   Page _____ Line _____ Reason_____
     From _____ to_____
18
19   Page _____ Line _____ Reason_____
     From _____ to_____
20
21   Page _____ Line _____ Reason_____
     From _____ to_____
22
23
24         _____
           EDWARD J. ROSEN
25
```

TSG Reporting - Worldwide     877-702-9580

**A**

**abbreviated (1)**
63:10
**ability (10)**
71:24 72:8 92:18
99:14 162:21
163:11 183:5
203:12 204:17,20
**able (12)**
10:22 19:20 52:17
55:2 66:17 95:20
135:2 136:11,23
194:16,23 203:19
**absent (1)**
136:10
**absolutely (1)**
50:24
**abstract (1)**
219:18
**absurd (2)**
146:22 159:21
**abundantly (2)**
49:22,25
**accept (15)**
130:10 133:23 135:22
137:2 138:6 139:16
140:21 141:4,15,20
141:23 142:7
151:20 161:7,22
**acceptable (3)**
151:17 153:4 182:25
**accepted (2)**
112:8 185:23
**accepting (6)**
130:11 134:6 137:8
138:24 140:4
142:14
**access (3)**
101:12 117:22 130:22
**accommodations (1)**
10:12
**accomplish (2)**
48:6 137:18
**accomplished (3)**
33:18 48:2 102:9
**account (67)**
51:18 52:23 53:21,22
54:3 58:24 59:25
60:3,4,9,16 61:17
62:5,6,6,13,14 75:8
75:25 76:5,7,7,22
77:2 79:8,13,14,14
79:19,20 80:9,9,17
80:21 83:13 91:16
95:19 96:4 97:13,14
97:23 98:4,7,22
99:2,15 100:20,21
101:8,20 103:17,18

108:4 110:2,21
113:15,24 119:17
134:6 160:20 161:9
161:9,14 174:12,13
186:8 191:7
**accountant (1)**
131:25
**accounting (2)**
14:16,18
**accounts (98)**
17:19 18:17,19,25
38:12 40:6,8,20
41:3,7 52:5 54:17
60:11,11,25 61:5
68:25 75:15,18
76:17 77:10,11,13
78:3,4,8,10,21
81:11,15 82:22,22
82:23 83:20 85:11
85:12,18,21,22 86:6
86:21 87:4 92:25
99:20 119:11
121:19,23 122:6,8
122:17,25 123:5
124:12,19 125:14
130:12 133:24
137:8 138:25
139:17,18 140:3,5
140:20 141:5,15,23
142:14 148:2 152:9
155:22 156:6,7,19
156:20,23 157:7,25
158:24 159:3,6,8,16
159:19,20 160:2,4
160:13,14 173:17
174:21 175:12,20
183:16 185:16
187:14 192:17
194:7
**accuracy (1)**
35:19
**accurate (2)**
35:18 167:20
**accurately (2)**
47:2 57:2
**acquire (3)**
71:7 80:20 157:10
**acquired (18)**
7:4 10:17 11:4,21
13:5 19:10,12,14,22
20:4,6 67:25 79:22
158:24 159:4,5,6
170:18
**acquiring (14)**
7:25 47:7 67:18,20
71:5,12 78:10 80:17
83:20 100:25
157:13,16 192:20
197:4

**acquisition (9)**
7:8,18 10:16 11:21
13:18 14:5,12 47:15
146:19
**act (32)**
133:19 134:3,15,22
135:8,16 136:17,20
136:21,25 137:10
137:13,20 138:12
139:5,9 140:11,23
143:2,6 145:3,8,18
145:21 146:11
147:6,14,16,25
157:23 158:16
161:7
**action (1)**
225:16
**activities (2)**
15:6 116:25
**activity (1)**
119:17
**actual (4)**
34:10 89:12 136:4
168:5
**add (5)**
11:15 31:3 110:14
137:25 160:17
**added (6)**
37:5 70:23 88:17,20
111:4,12
**adding (1)**
111:9
**addition (5)**
32:10 138:4 173:19
174:19,22
**additional (10)**
17:21 26:13,21 52:15
119:13 125:5 131:9
167:16 173:22
176:4
**address (8)**
81:25 82:3 88:3
105:14 145:17
190:6 199:3 212:5
**addressed (11)**
8:24 32:20 36:23 37:3
45:8,12,13 73:11
99:17 208:18
209:15
**addresses (1)**
36:22
**addressing (1)**
145:6
**adequate (4)**
11:9,25 17:8 140:18
**adjunct (2)**
108:7,12
**administer (1)**
5:18

**Administered (1)**
1:8
**advanced (1)**
207:7
**advantage (1)**
10:10
**advice (2)**
80:4 206:16
**advise (1)**
79:25
**affect (4)**
147:7,15 172:8 192:4
**affidavit (1)**
22:8
**affiliate (6)**
19:22 59:21 60:8
176:20,21 179:2
**affiliated (1)**
212:6
**affiliates (1)**
167:18
**afternoon (3)**
163:19 193:16 194:13
**agencies (1)**
60:13
**agents (1)**
137:3
**agree (15)**
18:4 82:20 93:19
106:6,10 110:10
136:9 139:20
185:25 189:7,10
190:23,24 204:22
205:16
**agreed (15)**
5:5,9,15 31:5 53:20
53:24 58:20 103:11
122:11,18 138:5
139:6 143:23
149:19 216:6
**agreeing (3)**
77:22 110:7 174:8
**agreement (63)**
11:23 25:21 29:13
34:23 35:17 36:18
46:20 55:19,21
58:15 59:10 79:4
102:8 110:17 112:9
146:23 147:20
151:4,24 152:2
154:9 156:4,13,19
157:20 158:4 164:9
164:11 165:2,10,17
165:18 166:4 168:5
171:18 172:18,19
186:5,6,10 188:13
189:11 190:4,8,19
192:2 194:2 195:8,9
195:15 198:21

200:19 203:20
207:10 208:20
209:2,6 216:12,16
216:20,25 217:7,10
**agreements (5)**
43:19 45:14 158:6
192:12 195:25
**ahead (4)**
116:15 186:15 189:18
213:9
**al (1)**
1:8
**Alan (2)**
12:21 210:19
**Alastaire (3)**
218:23 219:6,10
**allocated (1)**
182:11
**allocations (1)**
95:17
**alternative (1)**
110:3
**alternatives (1)**
60:16
**amendment (2)**
55:22 123:16
**amendments (1)**
211:4
**American (2)**
10:17 15:5
**Amina (2)**
4:9 6:12
**amount (24)**
11:2,5 38:22 54:2
96:4 100:13 101:5
116:12,19,19 118:2
118:21 119:4,7
135:23 175:5,6
176:3,25 178:4,14
180:2 183:24
184:12
**amounts (3)**
119:20,22 207:7
**analysis (5)**
153:9 171:10 182:24
183:3,6
**analyze (2)**
186:3 189:21
**analyzed (1)**
109:18
**analyzing (1)**
86:4
**announce (1)**
52:17
**announced (2)**
50:13,15
**answer (28)**
24:5,8 26:6,10 35:17

42:18 44:8 49:4,5,6
57:8 58:17 84:2
85:24 86:3 118:7
126:11 134:25
135:2 161:25 171:7
171:8 187:6,17
199:16 200:13
201:12 210:17
**answered (11)**
42:5 47:18 80:10
97:16 108:16
145:12 160:16
169:7 189:8 201:17
217:9
**answering (1)**
171:12
**anticipate (1)**
14:11
**anticipated (2)**
15:13 66:22
**anticipating (2)**
14:4,20
**anticipation (2)**
149:16 215:16
**anybody (7)**
46:9 52:18 134:24
209:9,10 213:3
219:25
**anytime (4)**
43:12 58:14 59:8
154:19
**APA (13)**
31:8 52:5 57:14 65:9
65:23 84:12 130:7
188:2 189:13 199:3
199:9,22 201:8
**apart (1)**
136:3
**apparently (1)**
179:11
**appear (5)**
35:10,11 121:9
177:19 185:14
**APPEARANCES (2)**
3:2 4:2
**appearing (1)**
74:8
**appears (3)**
36:18 121:4 154:15
**applicable (10)**
94:6 102:11 105:12
105:16 106:7
107:11 110:12
204:21 205:4,5
**apply (1)**
214:12
**appreciate (1)**
55:4
**appropriate (4)**

34:11 46:19 73:13
112:8
**approval (1)**
19:20
**approved (6)**
95:7,13 100:3,3,23
101:15
**approving (1)**
208:22
**Archibald (1)**
57:21
**Archie (6)**
127:18 129:5,24
131:7 140:2 141:18
**area (2)**
205:21 206:19
**arguably (1)**
103:7
**argue (2)**
102:12 103:21
**arms (1)**
175:10
**arose (3)**
9:3,4 192:17
**arrangement (6)**
45:19 85:7 123:16
164:19 196:7,8
**arrangements (12)**
7:14 39:14 59:4 68:4
84:19,25 85:5
104:20 136:10
146:18 150:23
179:6
**arrived (1)**
105:9
**articulated (2)**
131:6 151:17
**articulation (2)**
140:13 169:13
**ascertain (1)**
174:17
**Asia (1)**
178:20
**aside (8)**
14:18 102:2 103:11
155:3 171:15
172:19 220:19
222:3
**asked (27)**
28:16 42:4 47:17 55:3
77:11,14 80:7 97:15
108:15 145:11
160:15 169:6
173:24 174:4,7
176:16 189:4
195:14 201:15
206:14 212:2
213:10 214:17
216:2 217:8 219:6

220:10
**asking (32)**
30:5,7 33:24 36:8
63:18 78:2 80:22,25
81:4,14 82:12,13
89:22 115:19
128:13,14 130:21
149:6 161:20
170:22 171:5 172:9
172:12,14,17
186:16 187:8 198:4
201:13,18,18
205:21
**asks (1)**
181:18
**aspects (2)**
58:25 131:21
**assent (3)**
99:22 106:2 109:25
**assertions (1)**
140:15
**asset (19)**
48:15 55:18,21 58:14
59:9 81:24 82:9
109:4 150:19,20,22
167:14 186:5
190:19 196:19,25
198:20 199:9,22
**assets (121)**
17:7 33:20 41:18 42:7
43:6,17 47:9 49:12
49:12,23 52:4,7,7
52:23 59:6 60:12
61:14,22 64:22
67:18,21,22,24 68:2
70:9 71:5,8,12,13
71:25,25 72:9 74:21
75:2,2 76:19 77:9
79:17,18 82:5,5
83:22,24 84:9 90:21
91:14 92:10 94:14
96:7,15 99:23,25
100:20,21,22
101:11,14,16,17,18
103:6,8 122:20,22
123:6,8,23,24 124:2
124:3,4,17,18,23
125:10 132:20
139:18 148:4 153:2
153:5 156:5,23,25
157:2,2,6,8,13,16
157:18,25 158:6,13
158:23 159:3,4,5,19
160:4,14,19 161:14
161:15 162:7,8,18
162:22 163:4,5,10
163:14 171:19,22
172:16,24 186:7
198:23 199:24

200:23 204:5
222:10
**associated (20)**
11:14 31:7 38:11
41:18,19 43:18 54:3
61:14,22 64:22
68:19 75:9 77:9
82:6 119:5 124:11
138:19 159:15
200:24 222:7
**assume (20)**
21:2 47:21 57:12 76:3
85:12 118:5 122:8
122:16 123:3 130:3
131:9 140:3 152:24
174:20 176:8,9,12
185:23 192:10
210:25
**assumed (12)**
20:8 44:12 68:24
86:22 116:18,22
152:25 153:3
185:10 190:23
191:7 208:11
**assuming (21)**
68:10,18 78:3,5 86:6
121:22 124:9,10,15
152:8 177:17,17
183:11 185:15
186:22 187:12
191:13,20,23
192:18,21
**assumption (12)**
11:24 69:5 85:11
111:25 112:2
121:19 122:6
124:14 186:10
192:2 193:25 195:8
**assumptions (1)**
44:24
**assurance (4)**
18:10 147:5 215:21
218:21
**assurances (2)**
204:6 205:22
**attached (2)**
90:9 164:18
**attachments (1)**
121:7
**attempt (1)**
47:2
**attempted (1)**
28:20
**attention (8)**
70:15 73:18 160:18
194:17 216:12,14
217:16,25
**attorney (17)**
165:4 166:7 170:12

171:9 174:2 184:2,5
187:23 188:4 192:6
193:14 199:4,10,17
201:11,15 214:8
**attorneys (7)**
3:5,12,19 4:5,12 5:6
26:15
**attorney/client (2)**
24:2 49:6
**authority (2)**
161:13 196:11
**authorize (1)**
195:7
**authorized (1)**
5:17
**authorizes (1)**
161:7
**available (21)**
54:4 61:12,15 94:15
96:15 100:15
101:18 102:23
108:9,10 109:4,4,16
109:17 110:3 138:4
150:21 152:10
153:23 167:16
177:13
**Avenue (2)**
3:13,20
**avoid (6)**
50:14 52:23 53:19
54:11 106:10 134:9
**avoidance (1)**
48:25
**avoiding (1)**
98:12
**aware (34)**
14:8,10,20 36:11,12
44:5 47:12 59:11
65:11 77:17 78:20
87:2,15 89:7 93:20
95:23 99:6,13,21
101:18 102:4
105:13 110:22
112:20 125:7
160:10 162:16
164:15 167:4
172:23 177:16
208:15 209:24
218:5
**a.m (3)**
2:6 154:10 188:7

_____
**B**

**B (6)**
67:16 76:11 82:16
164:3,6 170:2
**back (16)**
30:3,18 43:11 49:19
74:17 111:15

114:23 118:19
151:15 154:12
192:25 194:10
205:16 215:10
216:3,5
**background (1)**
168:11
**balance (2)**
149:17 179:5
**Bambach (1)**
218:24
**bank (7)**
52:5,12,13,14 53:11
54:17 103:17
**banking (1)**
15:6
**Bankruptcy (5)**
1:2 205:6 213:19,22
214:5
**banks (4)**
60:12,13 116:21
221:13
**Barclays (240)**
3:12 7:4,18,24 9:25
10:16 11:18 12:8,15
12:16,24 13:10,18
14:4,11,20 15:13,17
16:5 17:22,22,23
18:6,18 20:8 31:15
38:15 44:5 47:7,13
51:19 53:19,24
58:20 60:22 61:3,12
61:16,17 62:12,14
62:20 65:3 67:17
68:10 69:4 71:4,6
72:24 75:16 76:2,8
77:2,9,12 78:3,5,10
79:9,10,12,15,21
80:8,9,17,20 81:16
83:19 85:17 86:5,22
92:7,10,15,17,17
98:14,22 99:15
100:14,24 103:10
108:4 109:3,12
110:19,20,24
113:22 120:11
121:22 122:8,11
123:3,6,8,23,24
124:3,4,9,18,18
125:2,7,25 126:20
126:24 128:2,6,8,13
128:15 129:3,4,9
130:2,9,22 131:7
133:22,23 134:20
134:25 135:6 137:7
138:4,24,24 140:3,4
140:24 141:4,14
142:6 147:5,12
150:11,25 151:8,17

151:20 152:8 156:5
156:7,14,24 157:9
157:13,18,21 158:2
158:12,22,25
159:12,18 160:11
160:12 161:16
162:5,15,19,20
163:5,6,9 166:5
167:13,19 170:18
171:19,21 172:8,24
174:8,17 175:11
176:2 177:14
178:25 180:4,10,12
180:20 181:11,19
182:13,21,25 183:2
183:15,19 185:14
186:4,9,12,14,22
187:12,15 189:15
191:7,12,15,16
192:2,4,15,18,20
194:12 195:5
196:10 198:8
202:20 203:12,18
203:24 204:4,7,23
205:22 206:14,16
207:5,6,11,23 208:9
209:11,11 210:8,9
210:20 212:14
214:2 217:17
220:10
**base (1)**
175:6
**based (5)**
68:21 127:15 151:24
169:3 172:5
**basically (10)**
48:14 64:23 105:18
138:10 147:24
159:24 177:4 187:3
190:6 216:17
**basis (6)**
21:4 119:12 144:13
152:5,7 200:17
**Bates (30)**
118:14,16 120:22,23
149:25 150:2 173:3
173:5 179:15,17
180:24 181:2
184:21,23 193:7,9
211:9,13 218:10,15
223:9,11,13,15,17
223:19,21,23 224:4
224:6
**Battery (1)**
4:6
**BCI (3)**
60:20 62:2 82:23
**BCI-CG (3)**
173:3,6 223:15

**BCI-EX(S) (3)**
211:10,14 224:5
**bearing (1)**
218:14
**bears (1)**
211:13
**becoming (4)**
77:10 78:4,5 82:23
**beg (1)**
219:9
**beginning (8)**
46:24 48:2 74:20
104:18 159:14
167:5 168:7 212:22
**behalf (5)**
60:2,5,8 75:23 150:17
**belief (2)**
85:3 200:17
**believe (51)**
7:20 11:7,8 12:14,20
20:2,12 30:2 38:21
39:11,15 49:7 60:24
62:19 66:4 80:10
87:3 95:22,24 97:21
106:13 111:5,19
120:5,7 122:10,11
124:21 125:20
133:24 142:19,19
142:22,24 144:2
158:14 166:19
181:14 183:4,17,22
190:18 200:14
201:7 207:2 209:5
210:18 212:11
213:15 215:16
218:22
**believed (2)**
103:6 168:14
**belong (3)**
157:18 158:2 161:16
**beneficial (1)**
160:3
**benefit (1)**
145:23
**Berman (1)**
86:25
**best (1)**
49:8
**bet (1)**
15:5
**better (6)**
45:17 53:6 130:22
152:25 163:21
177:10
**beyond (12)**
15:9 37:12 97:8
112:16,18,20
127:17 130:4
131:12 142:7 145:5

171:11
**bigger (2)**
117:3 194:16
**Bill (3)**
6:10 175:18 179:21
**billion (15)**
11:8,20 12:25 54:6
98:4 103:12,14,16
106:12 120:9
173:12,16,25
181:10,15
**billions (3)**
117:6,11 177:24
**bit (9)**
10:8 18:20 29:24
51:17 56:10 113:10
202:18 210:4 213:9
**blackline (2)**
69:17 89:17
**blacklined (2)**
69:9,10
**blood (1)**
225:17
**Boaz (2)**
4:15 21:13
**Bob (2)**
18:11 28:13 56:14
202:13
**body (1)**
182:9
**BOIES (1)**
3:11
**booked (1)**
19:18
**books (4)**
16:5 17:5 60:10,17
**bottom (10)**
55:24 59:13 64:11
67:11 70:8,19,20
87:24 90:14 91:19
**Bowman (4)**
1:17 2:11 225:6,22
**box (23)**
67:12,18,22 70:10,19
72:9 90:21 91:9,10
91:14 92:7,11 158:6
162:7,18,22 163:10
171:3 172:11,11,15
172:24 184:18
**boxes (9)**
90:16,23 91:4 157:14
163:7 170:19
171:20,22,25
**bracketed (1)**
73:16
**brackets (2)**
48:22 73:9
**break (15)**
6:16 52:25 54:19

55:12 106:25
112:24,25 113:2,5
113:13 163:18,22
167:23 196:15
202:12
**broad (2)**
89:7 212:13
**broader (1)**
85:4
**broker (8)**
9:23 10:11 19:12,23
60:7,18 61:5 62:7
**brokerage (1)**
197:9
**brokering (1)**
197:4
**brokers (4)**
20:14 61:6 175:2,5
**broker/dealer (3)**
204:13,13 207:19
**brother (1)**
19:24
**Brothers (5)**
1:7 3:5 83:11 164:5
226:3
**business (92)**
7:9,10 8:8,10 10:17
10:18 11:4,21 13:5
13:11,12 14:6,12
15:12 19:10,21 20:5
20:7,10,12,15,18,23
41:5,12,13,14,17,19
42:8 44:14 47:3,5
47:11,13 49:24 52:7
55:15,18 57:2,6
59:23 60:7 64:21
67:21,25 71:13
78:17 79:22,23
81:24 82:6 85:13,21
86:7,22 87:5,7
99:19 100:2,24
103:9 115:11
116:22,23 139:17
162:14 171:16,18
172:20,20,22
175:21 184:8
195:17 197:3,5,6,9
200:21,22 201:3,16
201:16 207:14
213:5 221:8
**businesses (3)**
43:18 47:8,9
**businessmen (1)**
195:6
**busy (1)**
215:20
**buy (1)**
157:10

**buying (2)**
52:8 71:11

---

**C**

**C (1)**
73:3
**calculation (1)**
11:13
**call (34)**
54:6 75:7 81:25
103:20 106:11
108:12 123:20
127:4,5,8,10,22,23
127:25 128:7,9,13
128:15,19,24 130:8
132:14 134:8
142:20 143:2,10,15
143:18 149:2 152:3
158:5 171:13 182:2
187:18
**called (7)**
6:6 21:23 54:2 86:24
106:18 176:22
181:23
**calling (1)**
115:17
**calls (22)**
39:12,16 43:3 72:4
78:22 92:12 126:11
126:24 128:21
129:7,8,11,13,15,16
129:22,25 130:14
137:16 166:14
169:14 208:4
**calm (2)**
194:21 195:4
**candid (1)**
104:16
**candidly (1)**
130:17
**capital (20)**
9:24 10:2,14,19 11:3
11:5,7,10,12,16,20
12:2,17,25 13:6,11
13:14 19:2 20:8
212:14
**cared (1)**
72:21
**carried (4)**
61:5,8 79:14,15
**carry (1)**
60:18
**carrying (6)**
60:17 61:6 62:5,6
140:20 191:8
**case (9)**
1:7 61:16 102:20
162:17 175:8 180:3
180:7 191:11 226:3

**cases (1)**
21:21
**cash (29)**
48:19,22 49:13 50:7
50:25 51:18,23
52:13 53:11,20 54:7
54:11,13,17 83:6
95:17 98:11,13
103:11,12 106:10
106:12,24 107:6,15
150:13 173:12,16
181:11
**categories (1)**
76:20
**category (1)**
85:5
**caught (1)**
49:9
**caused (1)**
178:20
**caution (2)**
103:5 141:6
**caveat (1)**
35:2
**caveating (1)**
102:10
**cease (27)**
133:19 134:2,15,21
135:7,15 136:16,21
137:9,13,20 138:11
139:5,9 140:10
143:2,6 145:3,8,17
145:21 146:11
147:6,14,16 157:23
158:16
**ceasing (3)**
136:20,25 140:23
**center (1)**
207:4
**certain (27)**
8:21,23 11:13 16:13
18:4 24:10,24 25:6
34:18 38:22 54:2
70:9 86:21 87:4
91:12,16 95:8
122:22 123:18
162:7,21 172:16
181:25 182:8
183:10 202:21
203:10
**certainly (11)**
15:23 44:14 50:23
63:3 66:20 88:18
113:6 155:8 182:23
213:6 219:24
**CERTIFICATE (1)**
225:2
**Certified (2)**
2:12 225:7

**certify (2)**
225:9,15
**CGSH (7)**
69:18 179:15,18
218:11,15 223:17
224:6
**CGSH0002699 (2)**
118:17 223:10
**chain (4)**
62:3 79:10 173:8
219:7
**chairman (1)**
133:11
**change (11)**
29:13 30:25 35:20
58:8,13 59:7,8
71:15 111:6 152:19
152:23
**changed (7)**
32:8 36:24 45:19
58:19 59:11 151:21
178:16
**changes (20)**
26:16 29:21,23 30:2,7
30:17,20 31:20,24
32:5,5 34:13 35:19
37:17 45:12,14,16
46:10 119:15
155:14
**Chapter (1)**
1:6
**character (2)**
8:22 51:5
**characterization (6)**
70:13 77:23 81:7
102:19 161:22
174:3
**characterize (1)**
97:8
**characterizing (1)**
77:24
**Chase (1)**
173:21
**check (2)**
213:15,16
**checking (1)**
55:7
**cherry (1)**
162:6
**choose (1)**
163:6
**circulated (2)**
162:13 163:24
**circulating (1)**
155:5
**circulation (1)**
155:6
**circumstance (1)**

31:20
**circumstances (4)**
53:14 70:4 102:25
220:19
**claim (2)**
191:21,22
**claims (8)**
17:8 58:21 96:16
100:15 101:19
109:6,8 206:2
**clarification (50)**
29:9 30:5,7 31:2
36:17 48:23 49:16
52:2 53:25 54:8
55:22 58:22 62:17
63:2,4,18,20 80:12
80:15 83:25 84:11
84:13 90:7,9 93:10
112:9 114:11
137:25 158:8,11
159:11 171:4
186:11,18,21
187:21 188:5
190:11 192:4,11
209:14 210:12,23
210:23 211:3,5,25
215:2 216:15
217:23
**clarified (4)**
45:25 48:13 59:12
115:7
**clarifies (1)**
65:10
**clarify (5)**
31:5 46:19 65:15
85:20 226:7
**clarifying (2)**
49:9 51:6
**clarity (1)**
48:25
**clause (3)**
67:16 76:11 82:16
**clean (1)**
89:17
**clear (37)**
33:19 45:20 46:5
49:22,25 50:2,17,24
51:14 52:6 54:16
61:2 71:22 82:13
93:18 104:10,15
106:21 107:5
108:19 111:3,24
120:14 127:7 137:7
139:3 140:16,24
143:5 146:18
169:17 178:23
182:12 204:16
208:24 215:24
219:4

**clearance (29)**
67:12,18,22 70:10,19
72:9 90:15,21,23
91:4,14 92:7,11
157:14 158:6 162:7
162:18,22 163:7,10
170:19 171:3,19,22
171:25 172:11,11
172:15,24
**cleared (3)**
146:15 147:18 176:23
**clearest (1)**
49:18
**clearing (41)**
18:14 42:10,23 47:15
51:3 59:7 60:13,13
61:3,4,4,5,6,7,20
68:12 78:14,16 79:5
104:20 119:14,21
124:7 137:21
140:19 146:5
159:22,23 160:7,8
175:2,4,7,20 176:10
180:2,14 191:9,10
191:13 195:25
**clearinghouse (10)**
9:3,7 62:7,8 79:6,11
119:12,14,21
144:23
**clearinghouses (5)**
39:12,24 40:24 41:2
85:7
**clearly (3)**
106:24 115:2 163:13
**Cleary (22)**
2:9 4:11 31:15 32:4
37:18 44:5 54:23
56:13,21 66:18
69:16 70:23 81:9
111:14 112:12
129:21 166:4,25
169:18 198:7 209:9
221:22
**Cleary's (1)**
29:11
**client (5)**
117:23 122:15 134:12
219:24 220:9
**close (19)**
19:20 53:16 109:19
134:21 135:6
136:11,23 138:14
139:13 146:8
168:21 179:8 184:8
194:5,6 203:17
221:2,23,25
**closed (8)**
8:25 165:22 175:23
176:2 179:10

203:13 222:4,5
**closely (1)**
168:5
**closeout (1)**
161:6
**closing (31)**
15:12,17 38:4 43:10
60:23 81:13,17
91:23 94:7 120:4
134:5 137:22
146:13 149:16
157:17,19 158:2
165:11,14 170:19
178:11,12 180:9
181:12 184:4
217:13,15,17
220:21,24 222:8
**Code (4)**
205:6 213:19,22
214:5
**codes (1)**
226:6
**Colby (1)**
18:12
**collapse (2)**
216:15,18
**collapsed (1)**
209:25
**collateral (6)**
144:10 173:23 177:11
183:19 206:3
216:19
**colleague (4)**
6:12 110:6 163:23
212:24
**colleagues (2)**
81:9 206:15
**collect (3)**
119:23 175:6 180:8
**collecting (1)**
21:24
**collective (3)**
26:20 56:19,20
**collects (5)**
118:25 119:10 120:3
179:25 180:14
**combination (4)**
10:3,8,21 12:2
**combined (1)**
11:7
**come (14)**
65:22 86:20 95:12
100:9 105:19
116:23 146:12
160:18 212:22
216:3,11,24 217:16
217:24
**comes (1)**
59:4

**comfort (3)**
219:10,21 220:14
**comfortable (7)**
82:17 124:9 130:21
142:12 168:19,24
169:12
**coming (11)**
16:25 17:6,19 40:15
43:6 85:9 105:22
119:13 192:25
201:3,5
**comment (1)**
138:21
**comments (9)**
27:4,5,10 69:18,23
70:5 164:14,20,23
**commission (1)**
197:7
**committal (1)**
17:2
**committee (4)**
3:19 118:8,10 222:15
**common (1)**
86:19
**communicate (3)**
46:7,22 193:22
**communicated (4)**
126:3 142:13 185:22
205:10
**communicating (1)**
193:21
**communication (4)**
37:11 57:10,11
112:12
**communications (6)**
32:19 38:8 43:5,22
120:16 141:7
**comparing (1)**
69:14
**complete (1)**
102:14
**completed (1)**
66:23
**completing (1)**
52:16
**completion (1)**
22:19
**complicated (3)**
10:8 221:4,19
**compound (3)**
45:3 162:10 166:8
**computations (1)**
11:16
**compute (1)**
10:14
**computed (1)**
10:2
**conceivably (1)**

178:19
**concentrated (1)**
178:10
**concept (1)**
76:16
**concern (13)**
52:10 94:2,13 96:10
103:4,4 105:15
135:19 177:5
188:15 190:2 221:7
222:12
**concerned (9)**
50:10 51:10 117:4
144:16 146:4
150:18 156:24
188:14 196:4
**concerning (22)**
28:23 31:2 35:24
37:11 38:2 39:8
40:4 47:14 84:24
88:2 97:13 113:15
113:21 120:3
122:21 123:23
124:17 160:12
164:9 179:25 199:8
199:21
**concerns (8)**
45:11 68:19 121:19
132:19 189:12,13
221:15 222:8
**concession (2)**
102:13,15
**concise (3)**
49:22 50:16 116:2
**concisely (1)**
51:14
**concluded (1)**
177:20
**conclusions (1)**
128:5
**condition (1)**
11:23
**conducted (2)**
119:17 154:22
**conducts (2)**
60:6,7
**conference (3)**
39:11 152:3 166:23
**confident (2)**
42:20 215:18
**confined (1)**
91:15
**confirm (2)**
212:4 213:16
**confirmation (1)**
96:9
**confirmed (4)**
10:7 120:9 141:21
216:5

**conform (1)**
226:7
**confusion (1)**
69:25
**conjecture (1)**
102:24
**connection (13)**
37:7 38:18 39:3 42:3
42:8 51:21 75:8
85:17 120:19
197:16,21 198:12
198:13
**cons (1)**
19:17
**consequences (3)**
19:12 134:14 191:2
**conservative (1)**
144:24
**conservatively (1)**
144:25
**consider (5)**
62:13 73:10 91:3
196:19,23
**considerable (1)**
222:11
**consideration (1)**
204:23
**considerations (1)**
123:10
**considering (1)**
133:19
**consistent (4)**
38:13 55:9 64:12,24
**consolidate (1)**
10:23
**constantly (1)**
106:19
**constitute (1)**
218:20
**constituted (1)**
40:18
**constraint (1)**
105:17
**construct (2)**
101:21 102:2
**construed (2)**
170:2 203:11
**consult (1)**
141:8
**consummate (1)**
132:21
**consummated (1)**
205:3
**consummating (1)**
147:22
**consummation (2)**
217:4,11
**contacted (1)**

18:12
**contained (1)**
24:16
**contemplated (5)**
59:2 68:21 92:6 94:14
136:12
**contemplating (4)**
68:10,14 192:20
203:15
**contemporaneously...**
87:22
**content (2)**
26:11 44:2
**contents (2)**
12:12 121:7
**context (7)**
30:9 33:9 77:18
118:23 138:9
170:11 200:9
**contexts (1)**
220:18
**contingency (4)**
108:20 113:20 114:3
207:17
**continue (2)**
113:6 147:25
**continued (3)**
128:25 138:16 169:2
**continues (2)**
33:21 85:10
**continuing (3)**
106:17 140:21 149:15
**contract (7)**
86:4 115:18 170:23
176:23 179:13
201:14,19
**contracts (8)**
7:6,17,24 119:16
200:9,11,16 201:4
**contractual (6)**
171:13,15 187:10
192:13 203:14
207:9
**contractually (3)**
157:19 158:2 161:15
**contributed (1)**
79:7
**control (1)**
32:3
**convened (1)**
128:4
**conversation (36)**
11:6 13:21,23 14:2
16:2,25 17:16,20
18:11 36:9 37:7
40:16 44:4 65:4
96:13,24 104:7
105:6,23 106:15,18
106:24 110:10

113:14 133:13
135:5,17 136:13
149:5 153:12
159:22 160:10
164:10 200:2
202:24 216:2
**conversations (46)**
9:12,13,16,19 14:9,15
16:12,16,21 17:11
17:12,14 19:8 36:25
37:22 38:7 40:25
41:8,10 42:2,23
44:2 58:5 65:12
96:2 106:17 127:16
130:19,25 131:20
144:8 148:15 149:7
149:9,12 151:11
155:10,12 158:21
168:13 199:23
202:19 203:7
210:19 215:21
219:5
**convey (1)**
134:12
**conveyed (9)**
94:10,18 115:6 130:2
130:9 133:22
142:17 169:11
211:4
**coordinated (1)**
12:22
**copied (9)**
38:9,9,24 39:2 66:4
87:13 118:22 120:5
184:17
**copies (1)**
206:12
**copy (3)**
88:5,14 89:17
**copying (1)**
38:20
**corporation (8)**
61:20 68:12 146:5
159:23,23 160:8
176:11 191:13
**correct (16)**
24:20,23 33:22 54:9
63:6 77:3 96:16
98:14,15,23 100:10
103:13 113:17
114:15 140:7 226:8
**correctly (2)**
24:7 63:17
**corresponded (3)**
12:20 125:20 196:13
**correspondence (3)**
120:6,8 218:19
**coughed (1)**
176:3

**counsel (12)**
18:22 32:7 66:16 90:7
133:9,10 154:16,19
155:8,13 202:14
214:18
**counter (2)**
8:5,7
**counterparty (1)**
204:25
**COUNTY (1)**
225:5
**couple (7)**
9:13,20 33:23 53:3
105:3,3 202:11
**course (2)**
105:5 140:15
**court (7)**
1:2 5:20 16:11 52:11
53:10 99:22 100:4
**cover (6)**
37:20 63:10 85:4
154:7 164:16
212:13
**covered (12)**
23:11 40:19 41:7
42:20 44:17 48:11
61:10 63:5 80:16
83:2 171:3 172:16
**covering (2)**
17:8 83:18
**covers (1)**
63:11
**Cox (9)**
57:21 127:18 129:5
129:24 130:13
131:7 140:2 141:18
142:17
**create (1)**
138:15
**credit (24)**
11:15 41:4 45:23
46:21 61:11 123:20
125:6 130:20
135:23 139:4,7
140:18 148:2
150:12,21 152:9
167:12,17 181:20
181:23 182:4,24
183:3,6
**creditors (4)**
3:19 118:8,10 206:21
**creditworthy (3)**
140:18 175:8 176:14
**crossed (3)**
34:2,6,9
**CRR (2)**
1:17 225:22
**crucible (1)**
123:10

**curious (1)**
54:23
**current (1)**
185:13
**custodian (1)**
60:12
**customer (41)**
17:8 41:17 43:20
47:10 52:3 54:16
59:22 60:8 64:23
74:22 75:4,15 79:11
82:21 83:9,12 85:12
85:18 86:6,21 92:25
96:16,25 99:13,19
100:9,15 109:6,8
116:24,25 117:5
137:3 139:17 157:2
159:6,8,9 171:23
175:6 191:6
**customers (18)**
20:14,22 40:9 45:7
75:17 101:4,4,12,19
101:22 102:17,21
109:10 170:20
171:20 172:3,7
175:9
**cycle (1)**
221:8

---

**D**

**D (3)**
73:20 74:18,20
**DAKIS (2)**
3:22 222:15
**Dan (6)**
9:17 13:25 17:17
149:3 202:19,24
**Dana (4)**
21:13 22:20 56:14
104:12
**Daniel's (1)**
188:6
**data (3)**
183:8,18,20
**date (17)**
6:4 69:18 93:24
118:18 120:25
150:4 173:7 179:19
181:4 184:5,25
193:11 211:11
218:7,12 220:24
226:4
**dated (4)**
118:13 121:11 169:18
219:7
**David (4)**
21:11 28:14 56:15
74:18
**Davis (4)**

4:16 21:10 28:13
56:15
**day (10)**
3:4 13:17 14:5,11
174:12,22 181:6
202:14 222:22
225:20
**days (1)**
91:22
**DC (1)**
3:14
**dead (1)**
221:17
**deal (82)**
8:21,24 9:10,15 15:15
18:7 19:20 37:24
43:16 45:12 46:9
47:3,5,22 48:16
50:12,15 51:13
52:17,20 53:18
55:10,15,18,20 57:2
57:6,13,18 58:4,8
58:10,13,25 59:7,8
64:20 65:14 66:22
70:5 75:12 78:17
81:15 101:15
102:14 103:13,15
106:18 108:24
109:19 115:11
124:24 132:21
136:5 137:15
138:14,20 157:3
158:7 159:9 162:14
171:17 172:20,20
172:22 181:16
191:12 192:11,21
194:23 198:18
200:22 201:8,17,21
203:17 205:2
220:21 221:4,6,23
222:3
**dealer (5)**
9:23 10:11 19:13,23
60:7
**dealing (9)**
8:21,23 20:2 49:10
127:6 132:24 195:2
196:2 197:5
**deals (2)**
36:19 62:20
**dealt (5)**
34:21 62:16 80:11
106:20 159:10
**deal's (1)**
46:19
**debtor (1)**
202:14
**Debtors (1)**
1:9

**decide (1)**
71:18
**decided (7)**
49:18 122:16 151:16
153:3 162:19
163:11 179:4
**deciding (1)**
182:24
**decision (9)**
52:22 54:11 71:20
141:3,14,18 142:6
195:7 196:10
**declaration (34)**
6:2,21 21:3,4 22:11
22:15,17,19,24,25
23:17,24 25:2,8
26:4 55:13,16,25
58:12 59:14 73:25
74:14 88:4,9,23
89:9 113:17 114:3,5
115:10 197:14
198:13 199:14
223:8
**decline (1)**
161:25
**deductions (1)**
11:14
**default (1)**
206:2
**deficiency (3)**
96:11 99:12 100:8
**deficit (4)**
101:8,10 102:21
182:17
**defined (1)**
68:2
**definition (6)**
33:19 41:15 74:25
187:17 198:22
199:24
**delegated (1)**
132:10
**deleted (4)**
34:2 35:5,6 89:20
**deletion (2)**
51:8 89:12
**deliver (1)**
161:8
**delivered (2)**
94:15,16
**department (1)**
212:8
**depends (4)**
29:3 119:19 135:14
136:19
**deponent (1)**
180:5
**deposit (12)**
42:2,16 43:15 44:7,20

47:16 59:7 78:16
79:2,3,7 88:3
**deposition (15)**
1:12 2:8 5:16 22:12
22:15 197:14,17,21
198:2,14 209:25
210:2 225:11,13
226:4
**depositories (1)**
90:25
**depository (2)**
68:11 90:23
**deposits (17)**
41:18 42:9,10 43:20
43:21 47:10,10 52:3
52:3,12,13,14 53:11
54:16,17 64:22,23
**deputy (1)**
133:9
**derivatives (36)**
6:24 7:4 8:10 20:23
45:6,6,24 47:9 48:8
59:6 61:21 62:21
64:21 66:10 77:19
77:20,21,24 78:11
79:23 114:14 116:8
196:20,23,25 197:2
200:8,10,15,21,22
200:23 201:3,4,6,21
**describe (6)**
51:24 52:9 58:4 108:6
166:9 199:20
**described (11)**
30:6 54:14 60:17 74:5
89:16 105:7 113:20
126:4 140:2,23
180:17
**describes (1)**
85:16
**describing (3)**
11:17 113:14 167:18
**description (1)**
47:22
**designated (1)**
209:17
**details (4)**
16:3 18:9 91:2 132:11
**developments (2)**
16:20 221:3
**devote (1)**
215:20
**dialogues (1)**
130:18
**difference (1)**
159:25
**differences (1)**
115:24
**different (20)**
9:22,23,24 19:11

23:15 44:24,24
79:16 100:19
106:16,20,21 115:9
115:14 137:4 166:8
166:16 190:24,25
216:22
**differently (2)**
77:25 178:14
**difficult (1)**
194:15
**diligence (8)**
125:8,13 126:7,16,20
126:25 151:13
196:5
**dimension (1)**
176:8
**dimensions (1)**
176:7
**direct (5)**
118:9 150:14,16
154:21 220:13
**directed (2)**
188:17 209:6
**directing (3)**
24:5,7 199:15
**directly (6)**
17:18 72:6 79:6
206:23 209:20
220:3
**disappeared (1)**
18:23
**disclosing (1)**
141:7
**discretion (5)**
71:17,17 72:12,13
91:22
**discuss (9)**
26:3 95:18 96:3 97:11
137:17 155:14
170:13 199:25
200:8
**discussed (12)**
15:24 16:9 41:3 44:6
65:21 77:8 109:17
114:7 130:16 165:3
199:24 213:3
**discussing (7)**
13:13 19:3 22:3 40:5
81:11 89:8 112:22
**discussion (43)**
12:23 13:4,9,16 25:22
25:24 26:7,12 32:15
36:12 40:3 42:9
43:23 44:12,22
46:13 47:13 51:16
57:21 58:14 93:15
94:12 107:18 109:5
109:7,9 111:7 112:3
121:22 127:24

134:19 135:5
164:17 167:7,8
170:25 185:17,20
188:24 193:4 199:7
207:5 209:12
**discussions (67)**
10:5,6,25 12:18 15:20
15:24 22:16,21,23
35:23 36:21 37:19
37:21,25 38:16 39:8
39:9,18,21 40:6,11
40:12,19,22 42:7,17
43:14 47:24 54:10
64:12,15,17,19
65:17 72:16,18,19
97:12 106:23
122:21,24 123:2,5
123:22,25 124:5,17
124:20 128:25
133:2 134:24
149:15 154:18
155:4,17 158:15
164:8 192:22
199:12,20 200:5
203:9 206:7 207:12
208:7,15 209:8
**disparate (1)**
10:15
**dispute (2)**
51:7 182:10
**distinction (8)**
54:16 60:3 77:18 78:2
159:18 160:5,13
188:23
**distinguish (1)**
22:10
**DISTRICT (1)**
1:3
**division (1)**
20:19
**document (67)**
6:18,20 12:11 29:15
47:2 55:10 65:24
66:2,6,24 69:7,11
70:13,18 81:15
87:10,14,18 89:23
95:2,15 118:13,16
120:21,23 121:5
149:24 150:2 151:5
153:24 155:15
163:15 167:25
169:15 173:3,5
179:15,17 180:24
181:2 184:21,23
193:7,9 202:6
208:25 211:9,12,15
212:19 215:14
217:22 218:9,10,14
218:16 220:18

223:9,11,13,15,17
223:19,21,23 224:4
224:6
**documentation (14)**
43:17 47:23 48:16
64:25 65:2 84:3
107:22 124:24
165:25 195:24
203:14 206:4,6
208:14
**documented (5)**
12:4 55:18,21 57:14
68:15
**documenting (2)**
45:17 115:10
**documents (15)**
32:4,19 42:19 54:24
57:15 99:25 112:11
122:12 171:14,16
182:11 192:11
208:12,18 209:3
**doing (11)**
9:2 43:12 69:6 114:25
134:9 146:5 168:20
182:24 183:3,4
204:23
**dollar (4)**
116:12 150:13 152:11
164:19
**dollars (25)**
11:8,20 54:7 93:22
103:12,14,16
105:18 106:12
108:10 117:6,12
119:3 120:9 130:4
141:21 144:11
151:25 152:12
173:12,16,25 177:7
180:21 181:11
**Don (3)**
133:11 134:8 148:25
**Donahue (4)**
133:11 134:8 148:25
149:3
**double (1)**
55:7
**doubt (1)**
221:14
**downside (1)**
178:8
**draft (94)**
24:12,16,18 28:17,20
28:25 29:19 30:11
30:16 31:10,13,17
32:6,24 33:3,12,18
33:25 34:5,10,12,20
34:24 35:8,9,12,17
35:22 37:19 38:14
44:18,20 46:25

47:25 48:5 56:2
63:25 64:4 67:2
69:13 77:5,6 80:7
80:14 81:21 86:10
87:15,21 88:8,9,25
89:2,11,14,25 90:4
90:6,8,12,15 91:8
110:16,18,25
111:16,19,20,23
112:4,5 154:14
155:6,25,25 156:3
158:4,8,9,11 161:3
162:4,13 164:2,3,18
165:5,10,18,23
169:21 185:10,13
186:2 188:5
**drafted (9)**
26:14,21 27:14,17
50:22 58:11 81:9
82:19 206:25
**drafters (1)**
85:3
**drafting (3)**
56:9,20 166:15
**drafts (11)**
30:19 63:24 64:7 67:4
70:2 107:2 122:7
154:12 155:19
164:12 195:12
**draftsperson (2)**
86:17,18
**drawn (1)**
45:9
**drop (2)**
73:15 221:16
**dropped (1)**
91:11
**drop-dead (1)**
220:23
**DTC (51)**
31:6,7 36:24 40:2,6
40:11,16 44:10
45:19 59:3 67:18,22
67:23 68:4 71:5
84:19,24 90:18 91:3
91:10 121:23 122:9
131:22 132:18
134:15 138:3,5
146:24 149:7
150:10,11,17,24
151:8,16,19,23
152:17 154:16
156:5,6,20 161:7,9
163:7 165:5,7,10,18
166:3 196:7
**DTCC (108)**
9:8 37:21 40:4,5
60:25 68:15 71:12
85:6 90:7,22,22

120:17,22,24 121:3
121:23 122:21,24
123:12,21,22 124:5
124:6,17,19,22,25
125:6 126:18 127:2
128:16,19 129:2
130:9,20 132:24,25
133:4,7,11,15,18,22
134:4,21 135:7,21
136:6,8,9,17 137:9
137:12 138:5,17
139:6,19 140:2,5,10
141:5,15,22 142:18
144:4 145:10
146:15 147:4,6,12
147:20,24 149:20
149:25 150:3 152:2
152:19,23 154:18
155:5,11 156:8,14
157:7,14,22,24
158:3,10,12,23,24
159:13,13,15,17
160:12,14,19 163:2
166:14 167:17
168:13,23 186:25
196:3 223:11,13
**DTCC's (2)**
125:8 168:15
**Duane (5)**
21:11,22 22:20 28:13
56:15
**due (9)**
125:7,12 126:6,16,20
126:25 151:13
196:5 221:15
**duly (2)**
6:7 225:12

**E**

**E (1)**
223:4
**earlier (28)**
22:17,21 36:2,23 77:8
80:5 82:25 89:16
96:2,13 98:11
112:10 113:21
114:5,7,17 115:15
137:6 140:15 142:2
143:12 154:5,24
162:25 167:10
193:20 202:17
211:24
**early (6)**
50:13 132:14 148:15
149:10 151:22
178:19
**East (1)**
3:6
**economic (7)**

14:19,21,25 15:14,16
190:25 191:9
**Ed (2)**
164:17 167:6
**Edward (1)**
1:12 2:8 6:2,5 222:20
222:22 223:8
225:10 226:5,24
**effect (8)**
5:19 131:23 132:20
135:16 145:8
146:13 147:17
158:18
**effected (1)**
131:24
**effecting (1)**
99:8
**effective (1)**
195:2
**effectively (1)**
86:3
**effects (1)**
96:21
**effort (3)**
56:20 177:9 217:22
**either (11)**
22:14 39:17 41:25
47:15 61:3 65:17
76:6 112:25 162:21
165:17 206:23
**elapsed (1)**
221:21
**elect (1)**
91:22
**electronic (1)**
183:7
**eliminate (1)**
53:14
**ellipses (2)**
25:13 63:7
**EMANUEL (1)**
3:18
**embodied (1)**
203:14
**embroiled (3)**
50:18 114:22,23
**emerged (2)**
32:6,7
**enable (3)**
132:20 139:12 146:8
**enabled (4)**
71:18 109:18 177:13
183:9
**encompassed (1)**
76:21
**endeavor (2)**
132:18 175:9
**ends (2)**

114:10 182:14
**engage (1)**
102:24
**enjoy (1)**
19:14
**enjoyed (1)**
10:11
**ensure (1)**
212:12
**entail (1)**
176:18
**entered (2)**
204:4,14
**entering (1)**
203:16
**entire (5)**
70:18 76:25 170:10
181:15 194:23
**entirely (5)**
71:22 82:17 100:18
167:19 169:17
**entities (1)**
10:3
**entitled (3)**
18:5 122:5,19
**entitlement (1)**
160:3
**entitlements (2)**
150:9 186:13
**entity (6)**
10:9 19:11,14,18 20:4
20:6
**equally (1)**
177:23
**equity (2)**
197:4,9
**equivalent (1)**
111:4
**erosion (2)**
94:13,13
**ERRATA (1)**
226:2
**error (1)**
217:21
**errors (1)**
226:8
**ESQ (7)**
3:8,15,22 4:8,9,15,16
**essence (3)**
10:9 58:20 60:19
**essentially (2)**
45:19 132:4
**establish (1)**
84:4
**established (4)**
80:20 88:25 111:12
143:20
**estate (6)**

150:10,20 157:11
160:21 162:15
167:15
**et (1)**
1:8
**evaluate (8)**
82:4,7,10 85:25
102:23 109:14
183:9 186:24
**evaluating (2)**
188:14 190:2
**evaluation (3)**
153:9 187:7,9
**evaporating (1)**
108:25
**evening (4)**
142:3 143:12 154:5
154:24
**event (9)**
102:5 103:10 141:3
141:13 178:19
204:12 205:2,25
208:10
**events (4)**
9:5 23:11 93:14
210:22
**eventuality (1)**
203:17
**everybody (2)**
17:9 139:19
**evolving (1)**
59:2
**exactly (13)**
38:23 39:18 68:13
73:12,18 74:3,16
90:11 105:20
117:14 133:25
144:21 195:13
**EXAM (1)**
223:3
**examination (3)**
6:8 55:3 202:15
**example (8)**
21:22 43:6 61:2 70:4
78:9 85:6 177:6
205:25
**exceed (1)**
15:15
**exception (3)**
49:11 73:21 81:22
**exceptions (1)**
87:4
**excess (18)**
93:23 95:8 96:4 97:10
97:14 99:2,9,10,11
141:20 144:10
174:5,24 175:2
182:15 183:24,25
184:13

**exchange (10)**
16:24 43:4 61:20
62:15 79:23 80:10
120:16 128:9
154:23 167:10
**exchanged (1)**
32:20 107:3 122:7
164:13
**exchanges (12)**
32:18 40:23 57:25
61:7 71:12 149:18
155:2,17,19 165:23
196:23,25
**exchange-traded (14)**
8:4 45:24 47:8,8 48:8
61:21 62:21 64:21
73:4,5 77:19 78:11
196:20 197:2
**excluded (20)**
8:8 31:8 33:19 48:15
49:12,12 52:4 68:2
68:22 74:21 75:2,12
122:20 187:17
198:23 199:9,22,24
201:6,7
**excluding (1)**
122:21
**exclusion (4)**
49:17,17 73:21,22
**exclusive (1)**
90:23
**exclusively (1)**
146:12
**executed (4)**
63:17,20 191:8
208:21
**executing (1)**
208:23
**execution (2)**
59:9 195:8
**exercise (8)**
18:5 72:24 161:13
203:13,19 204:18
212:22 216:7
**exercises (1)**
119:16
**exercising (2)**
18:6 205:23
**exhibit (64)**
6:2,19 63:14,17 65:25
66:12,13,15,18,22
66:25 69:8 87:11
89:6,24 95:3 118:13
118:16 120:13,21
120:23 149:24
150:2 151:6 153:25
155:7 161:3 163:16
168:2 169:16 170:2
173:2,5 179:14,17

180:23 181:2
184:20,23 187:21
188:3 193:6,9
198:21 211:8,9,13
215:22 218:9,10,14
223:7,8,9,11,13,15
223:17,19,21,23
224:3,4,6
**EXHIBITS (2)**
223:6 224:2
**exist (2)**
27:25 105:14
**expect (1)**
153:10
**expected (7)**
13:18 15:11 97:4
117:9,13 120:11
175:20
**expeditiously (3)**
138:15 221:13 222:8
**expert (5)**
11:16 78:24 204:11
205:8,20
**explain (9)**
71:6 136:15 152:18
158:12 159:17
161:12 170:14
191:4 200:12
**explained (2)**
157:24 158:22
**explaining (1)**
26:15
**explains (1)**
193:24
**explanation (2)**
152:21 185:23
**exposure (3)**
168:15,24 174:15
**express (5)**
11:22 33:4 40:14,15
115:22
**expressed (2)**
46:4 135:19
**expression (1)**
52:10
**extensive (3)**
114:24 125:3,21
**extent (35)**
10:22 26:6,6 40:12,17
41:2,5 44:9 54:22
56:16 61:3 71:16
72:3,12 75:6,7
81:23 83:11 93:21
94:6 97:9 98:25
102:11 104:3
105:14,16 106:7
107:10 110:11
123:2 171:9 172:15
174:22 183:10

197:23
**extraordinarily (1)**
119:4
**extremely (2)**
50:10 119:7
**e-mail (57)**
38:8,20,24 87:13 90:5
95:9,10,11,23 120:5
120:8 121:2,13
150:6 153:20 154:2
154:7,7,20 155:17
156:12 163:23
164:16 167:6,11
173:8 175:16,17
177:10 178:17
179:20 181:5
182:14 183:17
184:16,18 185:2,6
188:6 189:5 193:2
193:12,19,21 194:3
211:17,18 212:5,9
213:18 215:15
217:19 218:6,18,20
219:6,7
**e-mails (9)**
118:23 121:9 154:23
155:2,3 195:12
205:14,15 206:13

---

**F**

**F (4)**
1:17 2:11 225:6,22
**face (4)**
10:2 92:5 102:8
204:25
**fact (15)**
9:21 28:3 45:18 62:2
79:4 88:24 99:12
100:3 139:8 155:17
168:22 172:7
191:14 216:13
217:24
**factors (1)**
123:9
**facts (3)**
103:2 178:16 226:7
**factual (3)**
170:25 189:2,3
**fair (2)**
63:14,23
**faith (1)**
142:11
**falling (1)**
136:3
**familiar (5)**
87:1 104:21 188:12
213:21 216:10
**far (8)**
19:7 150:18 164:15

172:22,25 175:25
195:19,22
**Fargo (2)**
53:21 54:7
**favor (1)**
15:17
**FCM (3)**
41:13 197:3,6
**feared (1)**
168:17
**February (5)**
1:14 2:5 222:23
225:20 226:4
**Fed (10)**
17:25 135:18,25
136:2 143:24
202:21 203:25
204:2 206:14
207:22
**Federal (1)**
9:14
**Fed's (1)**
17:23
**feel (2)**
21:14 46:12
**feeling (4)**
53:16 105:23 151:2
195:3
**felt (1)**
154:11
**figure (4)**
17:4 138:12 147:21
158:17
**filing (1)**
5:7
**fill (1)**
126:5
**final (6)**
64:5,5,8 140:14
165:17 187:20
**finalization (1)**
155:15
**finally (1)**
142:13
**financial (5)**
62:3 124:11 159:14
160:9 177:18
**find (8)**
23:8 55:2 66:18 111:8
136:2 176:6 178:6
217:2
**findings (3)**
126:6,13,20
**fine (5)**
26:9 94:20 113:5
171:2 199:13
**finish (4)**
109:20 112:23 163:19

163:20
**FINRA (1)**
9:12
**fires (1)**
195:3
**firm (2)**
141:22 142:13
**first (31)**
21:5 30:10 32:22
33:10 55:15,22 66:3
66:21 67:10 70:8,16
78:7 85:20 87:12
90:3 95:21 107:3,7
107:15 121:18
123:16 150:7 154:5
154:7 162:11 168:7
181:9 186:16,20
201:22,25
**firsthand (1)**
183:21
**fish (1)**
194:16
**fit (1)**
20:20
**five (1)**
163:21
**Fleischman (4)**
21:13 22:20 56:14
104:12
**flexibility (3)**
72:11,17,22
**FLEXNER (1)**
3:11
**flip (1)**
62:11
**floor (7)**
3:20 166:10,17,18,19
166:20,23
**floors (1)**
106:21
**flows (1)**
119:13
**fluid (1)**
86:11
**flux (1)**
36:20
**focus (7)**
78:2 124:22,22 139:2
182:22 188:10
216:2
**focused (5)**
132:3 146:6 162:24
184:18 188:11
**focusing (3)**
81:6 122:14 145:20
**folk (1)**
112:13
**folks (5)**

9:13 46:14 47:14
117:16 128:16
**follow (3)**
69:10 80:5 187:7
**followed (5)**
69:17,22 70:2 195:25
203:2
**following (6)**
10:7 11:20 93:15
136:21 180:9 183:3
**follows (2)**
6:7 85:16
**follow-on (1)**
143:17
**follow-up (1)**
143:15
**force (1)**
5:18
**foreign (14)**
40:23 41:2,15 61:17
61:20 62:7,14 77:12
78:9,11,13,14 79:6
80:10
**forgetting (2)**
21:14 193:5
**forgive (1)**
29:24
**form (64)**
5:10 7:7,19 13:2
14:13,22 20:11
23:25 26:5,23 27:3
34:7 35:7,10,12
37:14 38:5,19 43:22
45:2 47:19 50:17,17
53:23 57:7 58:16
61:9,23 63:10 67:19
69:19 71:9 81:18
82:12 85:19 86:8
91:5 100:11 102:18
110:13 115:12
116:5 117:19
121:24,25 122:10
122:23 125:11
130:3 133:21
134:16 146:16
156:9 160:24
167:12 183:7 184:3
189:21,25 192:7
208:13 210:14,16
211:4
**formal (1)**
12:9
**formed (2)**
160:23 189:21
**forms (2)**
43:5 48:15
**formulation (1)**
116:2
**forth (9)**

23:24 24:19 25:7
32:25 33:5 58:12
192:2 214:11
225:11
**forward (8)**
8:20 100:17 144:12
151:24 152:4
183:12 194:18
220:10
**forwarded (2)**
175:18 180:11
**found (1)**
55:7
**foundation (9)**
13:19,20 14:14 72:3
78:19 80:19 111:11
116:14 117:20
**four (1)**
128:24
**frame (12)**
8:18 14:23 27:11 30:9
38:3 77:4,5 86:9
109:18 135:9
143:22 184:3
**frequently (1)**
70:5
**Friday (1)**
184:9
**front (3)**
187:22 198:21 209:22
**fro'ing (1)**
216:8
**fry (1)**
194:16
**full (4)**
25:14 33:17 168:7
169:25
**fully (2)**
177:14 183:5
**function (1)**
82:4
**fund (11)**
42:2,10,16 43:15
44:19 47:15,16
78:16,25 79:2,7
**fundamentally (2)**
159:24 200:19
**funded (2)**
98:8,9
**funds (6)**
44:6 59:7 88:3 119:23
119:24 150:9
**further (13)**
5:9,15 15:8 75:19
82:10 145:3 148:5
164:17 167:6
174:15 202:9
222:14 225:15
**future (3)**

13:7 174:13 176:23
**futures (12)**
7:6,9,10,14,17,21,23
8:3 73:4,6 179:3
197:7

_____
**G**
_____
**Gaffey (11)**
3:8 202:11,13,16
214:8,16 215:7,10
218:8 222:13 223:5
**gain (7)**
13:17 14:5,11,19,21
14:25 15:11
**Gallagher (4)**
9:17 13:25 17:17
202:19
**GCGSH0002699 (1)**
118:14
**gee (1)**
130:19
**general (12)**
15:9 28:11,12 116:17
129:19 133:9 165:5
165:7 203:4 205:19
207:6 219:18
**generally (3)**
16:17 84:10 202:22
**generated (1)**
87:19
**Gerard (4)**
125:19 127:18 129:6
132:16
**getting (15)**
15:14 22:11 65:3 77:9
123:7,8,23 171:19
171:21,25 172:24
186:15 221:4
**Giddens (2)**
6:13 164:4
**give (13)**
28:4 31:18 63:12 78:9
81:7 94:20,21
130:17 147:4 153:7
168:11 187:20
203:4
**given (6)**
27:20 30:22 54:10
72:22 102:15
225:14
**go (28)**
12:9 18:7 21:24 30:18
32:21 43:11 46:13
47:25 49:19 57:10
60:21 63:23 64:6
82:10 96:12 113:10
116:15 131:25
140:22 144:12
151:12,24 152:4

156:6 189:23 210:3
215:7 221:8
**goes (2)**
161:10 216:23
**going (95)**
6:14 8:20,25 16:18
17:7,10 19:12,16
22:5 26:7 31:9
33:24 37:20 38:10
38:15 39:14,22 40:7
41:3 49:5,5 50:11
52:13,24 60:20,25
62:2 63:12,21 65:24
69:5,7 71:18 72:2
84:16 85:23,25
87:11 90:3 94:10
95:9 96:6 99:20
100:17 112:23
113:3 117:2 119:13
120:10 121:6,14
122:16 123:3,12,15
124:13 125:5
131:22,25 132:2
133:23 136:11,25
137:13,24 138:11
138:12 139:7
140:19 141:23
145:23 146:17,20
146:24 147:23,25
150:12 156:6,7
174:20 177:24
181:24 182:10,21
183:11 186:7
188:22 192:16
194:23 197:22
199:10 201:11
203:19 205:2 221:9
**Goldman (1)**
221:12
**good (5)**
17:9 54:18 142:10
167:22 176:15
**Gotshal (7)**
165:3 208:8,17 220:2
220:4,6,15
**Gotshal's (1)**
113:15
**gotten (3)**
144:4 169:2,11
**Gottlieb (3)**
2:9 4:11 169:18
**government (7)**
98:17 103:25 108:3
110:2 113:23
173:19 182:6
**Granfield (1)**
21:11
**greater (2)**
53:17 124:10

**grounds (2)**
162:2 199:11
**group (8)**
27:16 56:10,12,13
58:11 105:8 128:4
129:9
**grunt (3)**
105:21 106:2 110:8
**guarantee (14)**
41:25 42:9,16 43:15
44:6,19 47:16 78:25
79:2,7 88:2 130:4
167:13,19
**guess (8)**
16:7 68:6 79:25 105:9
154:24 212:2
213:10 215:2

_____
**H**
_____
**half (2)**
113:3 193:20
**halfway (1)**
67:8
**hallway (5)**
104:6,24 105:5
106:15 113:14
**Hamilton (2)**
2:10 4:11
**HAMISH (1)**
3:15
**hand (2)**
49:15 225:20
**handed (5)**
27:2 28:6,8 29:17,19
**handing (1)**
55:9
**handle (1)**
7:13
**handled (6)**
7:15 40:7 61:2 68:15
123:15 132:3
**handling (3)**
29:15 45:15 195:24
**handwriting (1)**
30:12
**handwritten (9)**
26:23 27:4,5,9,19
28:5 29:20 49:3
54:24
**hang (3)**
36:15,15 214:22
**hanging (2)**
194:11,13
**happen (12)**
31:20 38:10 102:16
104:6 106:14
113:22 153:12
166:15 178:10

186:7 207:18 221:9
**happened (11)**
22:4 70:5 127:11
139:23 141:2,13
166:16 178:18
181:12,20 182:5
**happening (1)**
156:22
**happens (2)**
62:12,13
**happy (1)**
140:10
**hard (1)**
198:2
**Harvey (8)**
93:17 97:19,21 103:6
104:11 105:10
106:5 109:23
**Hassan (2)**
4:9 6:12
**hate (1)**
76:9
**hear (3)**
117:8 126:19 144:3
**heard (4)**
42:14 52:9 112:19
203:23
**hearing (6)**
42:15 53:5 59:3
138:23 149:3 218:3
**HEDGES (1)**
3:18
**held (16)**
2:8 22:17 27:7 30:14
31:11 48:14 50:3
51:2 54:14 60:12
90:22 114:13 116:7
124:20 173:20
176:4
**help (4)**
15:9 136:15 153:23
198:6
**helpful (2)**
135:25 170:15
**hereinbefore (1)**
225:11
**hereunto (1)**
225:19
**highlighting (1)**
87:25
**Hirshon (4)**
133:10 148:22,23
154:25
**Hirshorn (2)**
165:13,15
**hold (1)**
150:17
**holdback (2)**

130:5 152:11
**holding (2)**
51:4 173:17
**HOLDINGS (1)**
1:8
**honest (2)**
170:9 218:5
**honestly (10)**
18:8 19:5 105:2
128:22 143:14
218:2,4 219:4,19
220:12
**honor (1)**
147:8
**hook (1)**
61:12
**hooked (1)**
132:2
**hoping (1)**
17:9
**hour (3)**
52:25 113:3 193:20
**hours (3)**
50:21 105:3 149:10
**house (5)**
103:11 175:7 191:9
191:10 195:25
**Hubbard (2)**
4:4 6:11
**huddling (2)**
104:14,25
**Hughes (15)**
4:4 6:11 12:20 57:22
127:18 129:5 131:2
131:11 195:15
196:12 197:16,19
197:20,24 202:7
**HUME (41)**
3:15 20:11 22:5 37:14
42:4 47:17 52:24
55:5 69:19 70:12
72:2 74:19 78:18
80:18 85:19 86:8
88:10,15,20 92:12
107:12 108:15
112:23 113:8
115:16 116:9
121:25 128:11
160:15 163:17
169:6 170:22 171:8
188:22 189:8
197:22 201:13
210:14,16 214:20
217:8
**hundreds (3)**
119:2 177:24 180:20
**hurry (1)**
221:14
**hypothetical (2)**

78:23 102:24

────────── **I** ──────────

**identification (11)**
6:3 118:18 120:25
150:4 173:7 179:19
181:4 184:25
193:11 211:11
218:12
**identified (11)**
17:22 18:21 26:14
29:12 31:21,25 36:5
94:16 99:16 104:23
176:19
**identify (3)**
57:4 58:6 80:23
**identifying (1)**
108:23
**immediate (2)**
15:16 178:15
**immediately (1)**
194:6
**impact (5)**
145:9,14,16,18 146:6
**impasse (1)**
151:8
**implement (1)**
137:15
**implication (2)**
146:21,23
**implications (5)**
103:22 109:6,10
146:5 172:10
**implicit (2)**
47:23 102:12
**implicitly (1)**
168:18
**import (2)**
161:21 216:4
**important (5)**
51:13 71:24 72:16
108:25 109:2
**impose (1)**
158:16
**imposing (1)**
18:16
**impossible (2)**
76:12 160:22
**impression (7)**
17:6 96:5,21 146:3
163:9 169:10
182:20
**include (18)**
7:6,8,10 33:20 48:21
49:2 50:6,25 51:10
52:13 53:24 54:25
59:19 73:15 74:21
129:10 149:11

172:23
**included (38)**
7:17 21:10 27:6 30:17
33:3 34:12,15 39:21
40:8,12 48:10,12
49:12,23 50:3 54:13
62:9 63:20 68:18
73:14,17 75:12 76:4
76:13 79:24 89:15
90:19,21 91:14
111:17,20,21
127:18 155:10
198:17 210:12
211:3,25
**includes (4)**
30:13 41:14 66:9
73:24
**including (17)**
13:24 27:13 29:8
43:20 48:19,22 50:6
54:12,24 67:21
120:8 137:14
154:23 194:19
213:4 214:2,4
**inclusion (1)**
43:20
**inclusions (1)**
59:20
**incomplete (1)**
76:10
**inconsistent (2)**
52:16 200:19
**incorrect (1)**
25:19
**INDEX (1)**
223:2
**indicate (1)**
146:10
**indicated (4)**
23:18 133:25 183:18
198:17
**indicating (1)**
217:20
**indirect (1)**
220:14
**indirectly (3)**
40:10 41:20 220:6
**individual (2)**
125:19 210:2
**individuals (2)**
57:18 155:10
**inference (2)**
45:10 46:5
**inferences (1)**
51:11
**inferred (3)**
46:7 99:24 119:6
**information (16)**
17:4 102:23 109:13

109:15 117:22
120:2 128:4 130:22
142:12 144:4
173:24 177:10
179:25 184:14,15
184:16
**informed (1)**
198:2
**inherent (1)**
178:11
**initially (1)**
94:15
**input (1)**
32:4
**inputted (1)**
70:7
**inserted (5)**
30:12 31:11 93:10
106:8 114:11
**inserting (2)**
104:3 115:8
**insertion (1)**
28:23
**Insofar (1)**
156:24
**insolvency (1)**
206:2
**insolvent (1)**
204:25
**instruct (2)**
166:25 201:12
**instructions (2)**
137:2 161:8
**insure (2)**
75:6,7
**integration (1)**
10:13
**intended (8)**
25:13 68:22 103:7,8
115:6,25 200:15
201:2
**intending (1)**
65:6
**intent (2)**
46:7 188:21
**intention (7)**
186:17,17,21 187:9
187:11 188:19
189:5
**interaction (1)**
118:9
**interconnected (1)**
190:4
**interest (1)**
219:11
**interested (3)**
139:22 143:25 225:18
**interfere (1)**

221:20
**interim (2)**
111:20 120:16
**intermission (1)**
53:7
**internal (4)**
87:21 128:8,13
168:19
**internally (3)**
12:22 142:9 221:21
**interplay (1)**
86:2
**interpret (13)**
85:25 115:17 161:21
170:23 171:2,13
172:9,14,17 180:12
187:19 188:16
201:14
**interpretation (3)**
162:2 171:6 188:18
**interpreting (1)**
86:4
**intervened (1)**
222:6
**investment (5)**
15:5 20:13,18,19
116:21
**invite (2)**
33:11 199:2
**involve (1)**
95:11
**involved (18)**
8:12 42:25 56:9,17
57:23 58:2 59:22
72:6 100:6 104:16
127:15 156:19
197:19 208:22
209:7,12,21 210:21
**involvement (3)**
9:5 15:18 124:16
**involves (1)**
44:9 57:9
**involving (1)**
36:13
**in-flows (1)**
175:20
**Isaac (1)**
133:9
**issuance (1)**
135:10
**issue (54)**
9:21 17:18 18:23 20:3
32:20 44:11 47:2
52:23 53:13,15,19
54:11 69:6 73:16
98:10,11,13 103:12
103:23 104:2
106:11 107:2,4,4,6
107:8,15,15,16,25

108:7,8,12,13,13
132:6 134:2,15
135:7 137:9,13,20
138:14 140:10
147:6,14 167:9
185:10 193:4
194:15 207:14
209:15 215:23
222:3
**issued (2)**
134:21 217:17
**issues (20)**
8:21,24 9:3,4,20
12:21 22:2 31:6
34:21 36:20 37:2
45:8 73:11,19
104:19 106:19,19
115:4 127:6 196:2
**issuing (2)**
133:19 143:2
**italicized (1)**
214:10
**italics (1)**
212:22
**item (3)**
73:3,20 83:6

**J**

**J (10)**
1:12 2:8 6:2,5 222:20
222:22 223:8
225:10 226:5,24
**James (4)**
6:12 164:3,5,11
**jeopardy (2)**
53:18 220:21
**Jersey (1)**
2:14
**Jim (5)**
38:24 173:24 181:6
181:10 189:4
**JOB (1)**
1:18
**jockeyed (1)**
166:11
**John (1)**
125:24
**Jointly (1)**
1:8
**Jonathan (11)**
12:20 57:22 127:18
129:5 131:2 195:14
196:12 197:16,19
197:20 202:6
**Jones (2)**
3:4 202:14
**Josephine (3)**
211:19 212:6,10
**JP (2)**

9:4 173:20
**JPM (1)**
182:7
**Jr (1)**
164:6
**justified (1)**
188:15
**justify (1)**
144:14
**justifying (1)**
144:10

**K**

**Kaplan (2)**
12:21 210:20
**keen (1)**
220:12
**keep (4)**
16:10 151:2 194:11
194:12
**kind (6)**
48:13 117:14 125:4
138:15 146:21
176:18
**kinds (3)**
7:23 92:10 172:16
**Klein (3)**
57:22 129:6 131:14
**knew (5)**
86:13 97:6 98:6,7
118:21
**know (129)**
6:10,16,17 7:12,12
12:3,19,21 14:25
16:4 17:2 19:7 20:4
20:6,14,15,16,20,22
26:9 27:25 28:2,3,8
28:19,21 29:6,16,18
29:18 30:21 32:9
45:25 47:20 49:10
53:10,12,12 57:17
57:20,21 58:2 66:17
67:4 69:14,21 72:19
73:4,12 76:9 77:19
87:18,20 90:2,18
101:9,14 105:2
110:6 111:2,22
116:3,6,11,16
117:14,16,24
119:25 121:12
122:12,13 123:25
125:5 127:17,25
134:9 135:25 136:4
138:10 139:10
140:13 143:21
144:15,19,21 149:8
151:14 153:15
154:10,16 155:3,12
155:16 162:17

163:13 164:25
165:2,9 166:9,18
167:7 169:19
181:12,20 182:2,5
183:12,20 184:10
188:4 189:20
192:15 196:11,12
202:3 208:13,21
213:13,25 214:22
215:11,13,19 216:6
217:6 220:5 221:9
221:11
**knowing (2)**
91:2 97:6
**knowledge (21)**
15:8 20:25 25:21,25
25:25 46:2 57:24
86:16 91:10 92:20
117:7,25 125:17
128:15 209:8,10
210:3,7,21 213:3
220:13
**known (2)**
118:22 178:16
**knows (1)**
116:10
**Kobak (3)**
164:6,9,11
**Kobak's (1)**
170:7

**L**

**lack (8)**
13:20 45:17 48:25
53:6 72:3 116:13
163:12 207:16
**lacked (1)**
138:7
**lacking (1)**
78:19
**lacks (1)**
80:18
**language (156)**
12:5 24:10,15,16,18
24:24 25:6,7,10,12
25:16 26:2,12,13,15
26:22 30:3,6 31:2
32:2,9,24 33:3,5,8
33:12,18,25 34:2,6
34:9,13,16,18,25
35:4,9,11,25 36:3,3
36:3,5,18,19,22
37:3,5,8,12,16
44:16,19 45:4,7,13
45:16,20 46:2,4,15
46:18,25 48:2,6,10
48:12 51:8,10 53:25
55:23 56:2,6,18,20
56:25 58:11 62:16

62:22 63:5,19 66:9
70:10,20,24 73:16
73:24 74:7,13 75:5
76:13,15 80:2,11
81:8,10,24 82:8,21
83:3,4,16,18,20
84:20,20,21,24 85:3
86:18 88:2,3,8,20
88:24 89:8,13,15,20
92:5 94:19 102:10
105:10 107:10,21
110:11 111:20,21
112:14 114:7,8,18
114:20,23 115:3,14
115:15 162:24
187:10 190:12
195:16 206:23,24
206:25 211:25
212:11,18,21 213:2
213:13,17,23
214:10,10 215:22
220:14
**lapse (1)**
181:24
**large (5)**
7:15 117:9 119:4
176:24 179:11
**largely (1)**
152:17
**largest (1)**
116:21
**Larocca (6)**
125:19 127:19 129:6
131:17 132:13,16
**Larocca's (1)**
132:7
**Larry (13)**
133:8,16,24 137:8
138:9 142:20 144:7
147:13 148:6 152:3
152:14,16,18
**late (9)**
129:2 142:3,15
151:23 153:13
155:19 195:14,18
221:11
**law (8)**
94:6 102:11 104:4
105:12,16 106:7
107:11 110:12
**lawyer (3)**
29:14,16,20
**lawyers (9)**
42:24 56:21 64:13
65:5 103:21 104:21
149:18 207:14
210:19
**lay (1)**
180:12

**LBI (12)**
10:11 54:17 59:15,21
60:5 83:6 91:23
148:4 150:10 161:9
173:17 204:10
**LBI's (1)**
90:15
**leader (1)**
128:3
**leading (3)**
22:18 47:22 210:22
**learn (4)**
125:13 175:13 201:20
201:24
**learned (10)**
173:11,15 175:15,15
176:5 201:22 202:2
202:3 216:24
221:11
**leave (4)**
71:22 84:16 103:21
171:15
**leaving (4)**
14:18 102:2 155:3
172:19
**led (2)**
93:15 127:25
**left (4)**
98:16 101:3 102:17
148:3
**legal (3)**
159:25 171:5 212:8
**Lehman (133)**
1:7 3:5 8:10 9:21
14:12 16:19 18:16
18:17 19:10,21
20:14 26:8 27:2,3
28:22 29:3,5,7,15
29:17,20 31:7,16
32:10 35:24 36:4,5
36:14 37:8,11 38:2
38:17,21,23 39:16
44:9,14,23 45:11
46:3,14 47:9,14
51:3,22 56:24 58:3
60:6,6 61:18,19
64:20 75:16 76:2
77:14,17 78:14 79:2
79:5,13 83:10 85:8
93:23 94:16 99:14
100:16,22 101:7,16
108:4 109:2 110:19
113:22 116:20
121:23 122:8
124:19 130:6
133:20 146:14
150:24 156:6,19,20
157:6,10,25 158:24
159:11 160:13,14

160:20 161:14
164:4,21 168:15
170:17,18 176:21
180:3,9 185:16
186:14 187:14,15
190:23 191:14,16
191:21,22 192:21
194:6 196:18,24
198:16 199:13,21
200:3 203:16 204:4
204:5 207:13,22
208:8,16 209:13
210:10,10 213:4
214:3 217:18
220:15 226:3
**Lehman's (13)**
20:21 26:15 32:7 38:9
68:11 79:22 95:18
150:16 174:9,18
183:16 184:8
196:20
**Lehman-related (1)**
166:22
**Leinwand (3)**
21:12 28:14 56:16
**lengthy (1)**
121:5
**letter (54)**
29:9 30:8 52:2 53:25
55:22 58:22 62:17
63:2,4,18,21 80:12
80:15 83:25 84:11
84:13 90:7,9 93:10
114:11 149:20
158:8,9,11 159:11
159:13,13 165:5,7
165:10 166:3 168:3
169:17,19,22,24
170:2,8,11 171:4
185:9 186:12,18,21
187:21 188:5 192:5
209:14 210:12,24
211:3,5 216:15
217:23
**letters (3)**
181:20,23 182:3
**letting (1)**
221:8
**let's (5)**
30:9 33:9 211:7 215:7
218:8
**level (4)**
93:23 95:8 98:8
158:15
**Leventhal (3)**
135:18 136:7 143:11
**leverage (1)**
194:21
**Lewkow (2)**

21:13 104:11
**liabilities (28)**
31:7,8 61:13 68:20,22
68:24 75:9,11
122:20 123:4
124:14,15,24 125:4
131:10 141:20
142:7 159:15
174:19 185:11,15
186:22 187:4,13,17
190:23 192:10,19
**liability (11)**
130:10 174:22 175:10
176:9 191:9,12,14
191:20,23 192:16
192:18
**Liberty (2)**
2:10 4:13
**lien-free (1)**
172:5
**light (5)**
26:16 51:8 52:11
78:19 108:24
**liked (1)**
175:15
**limit (4)**
98:24 99:10 101:22
175:5
**limitation (9)**
59:19 93:21 98:2 99:5
99:7,14,16 102:4
172:23
**limited (11)**
60:15 81:23 83:13
101:20 135:22
149:7 150:13
152:10 167:12
183:5 186:8
**limiting (5)**
52:23 81:6 93:16
151:20 186:12
**limits (1)**
105:12
**Lindsee (1)**
21:11
**line (15)**
23:20 73:3 143:19,24
154:5,7 164:3,5
226:9,11,13,15,17
226:19,21
**lines (4)**
55:15 70:25 91:18
94:3
**liquidate (2)**
177:2 194:6
**liquidated (3)**
174:14 177:8 207:19
**liquidating (1)**
134:5

**liquidation (5)**
100:18 153:4 164:4
204:12,18
**liquidations (1)**
144:22
**liquidity (1)**
179:12
**listed (8)**
7:21 8:6 45:6,6 77:20
77:20 79:23 200:23
**little (8)**
10:8 18:20 29:24
51:17 75:19 186:15
210:4 216:22
**LLP (6)**
2:10 3:4,11,18 4:4,11
**locate (1)**
28:20
**located (1)**
166:11
**location (1)**
49:8
**locations (1)**
90:22
**long (9)**
15:4 63:8 104:24
128:24 154:12
170:20 171:23
172:3,7
**long-term (1)**
15:11
**look (24)**
30:18 33:11,12 35:16
62:25 63:13,25 64:7
66:8 67:3,5,11,14
73:20 91:19 121:16
125:6 148:4 150:6
153:20 161:2
170:10 195:10
218:16
**looked (6)**
16:22 55:6 97:6
155:25 175:19
176:17
**looking (8)**
66:3,5 80:5 83:17
118:6 122:13
194:22 219:16
**looks (7)**
6:21 69:13 71:14 74:4
193:15 211:17
218:18
**lot (11)**
32:17 120:7 129:12
130:16,17 131:19
144:20 148:8
175:14 208:4 216:8
**lower (1)**
166:23

**ludicrous (1)**
132:22
**lunch (5)**
112:24,25 113:5,6,7
**L-E-I-N-W-A-N-D ...**
21:12

_____

**M**

**Macchiaroli (16)**
9:17,19 11:2 12:24
13:5,10,17,22 16:9
16:12,17 95:19,24
96:14 212:3,11
**Madison (1)**
3:20
**magnitude (1)**
117:14
**Maguire (35)**
4:8 6:9,10 24:4 53:2
54:18,22 55:4,11
63:16 66:16 74:10
80:22 88:13,18 89:4
113:4,9,12 115:19
118:12 156:16
163:20 167:22
173:2 179:14
180:23 184:20
188:8 189:3 193:6
196:14 199:15
202:9 223:4
**Maguire's (1)**
202:18
**maintained (9)**
60:2,4,5 75:23 76:11
79:13 83:6 196:18
196:24
**major (1)**
15:5
**maker (1)**
196:10
**making (9)**
14:4 15:4 33:19
135:20 139:13
143:3 149:2 190:20
192:14
**management (3)**
20:13,18,19
**manifested (2)**
106:2 109:25
**manipulated (1)**
183:8
**manner (2)**
132:19 136:12
**March (1)**
169:18
**margin (51)**
33:4 38:2,6,10,11,16
38:22 39:8,22 40:4
40:5,12,14,15,18,21

40:23 41:20,25
42:10,16 43:2,14,24
44:19 47:15 59:6
78:15 88:2 116:24
117:6,11 118:21
119:5,8 173:12
174:5 175:5 176:4
181:17 182:15,17
182:18 183:24,25
184:13 196:18,22
196:24 198:17
199:8
**margined (1)**
40:10
**mark (13)**
118:12 120:21 149:24
173:2 176:10 178:3
178:22 179:14
180:23 184:20
193:6 211:8 218:8
**marked (32)**
6:3,19 35:5 65:25
66:25 69:8 87:11
89:24 95:3 118:17
119:11 120:24
150:3 151:6 153:25
155:6 161:3 163:16
168:2 169:16 173:6
179:18 181:3
184:24 193:10
211:10,13 215:15
218:11,14 223:7
224:3
**marker (1)**
73:10
**market (8)**
11:15 50:15 176:10
177:2,4 178:5,16
179:12
**marketplace (2)**
145:22 221:3
**markets (5)**
41:15 160:9 178:20
179:7 222:9
**marks (1)**
119:15
**markup (7)**
26:24 27:2 55:2 67:5
67:10 112:7 115:22
**marriage (1)**
225:17
**Mary (4)**
1:17 2:11 225:6,22
**master (4)**
206:4,5 208:25 209:6
**matter (6)**
25:15 79:16 103:5
171:16 189:22
205:19 207:6

225:18
**mattered (1)**
189:11
**matters (1)**
132:5
**Mazzuchi (6)**
21:16 90:6 122:13
154:23 155:4
163:24
**Mazzuchi's (2)**
164:16 167:6
**McDaniel (9)**
38:25 39:4 173:9
181:6,10 182:14
185:2 192:23
193:12
**McDaniel's (1)**
189:4
**McLaughlin (5)**
21:11,22 22:20 28:13
56:15
**mean (22)**
12:19 14:8,24 18:18
27:13 35:3,4 50:20
68:6,13 79:8 96:19
100:14 115:9,13
128:9 144:23 159:9
195:13,19 200:12
215:12
**meaning (5)**
98:20 110:9 180:8
184:7 200:20
**means (5)**
80:21 101:11,13
145:22 170:7
**meant (12)**
11:12 60:15 111:2,3,8
115:20,21 134:3
139:4 150:8 191:4
192:19
**mechanism (2)**
131:22 163:4
**meet (1)**
197:20
**meeting (14)**
109:23 123:14 138:3
138:7 139:5 147:3
147:11 151:9
153:11 156:4,13
168:22 198:5,10
**meetings (6)**
125:3 166:20 197:11
197:15,24 198:11
**member (9)**
61:4 79:5 85:8 119:15
119:21 140:19
160:8 180:3,14
**members (4)**
56:12,13 61:7 126:2

**memory (1)**
215:13
**mention (1)**
41:25
**mentioned (6)**
6:23 43:15 45:4 76:22
95:25 197:10
**merchant (1)**
197:7
**merely (1)**
72:11
**met (1)**
198:4
**Michael (5)**
57:22 90:6 122:13
129:6 131:14
**midnight (6)**
153:14,16,16 195:19
195:20,22
**midway (1)**
33:17
**Mike (21)**
9:16,19 12:23 13:4,10
13:16,22 16:9,12,16
17:2,13 21:16 95:19
95:24 96:2 154:22
155:4 212:3,10,19
**Miller (13)**
93:17 97:19,21 98:19
103:6,24 104:11
105:11 106:5,6
107:17 109:24
110:6
**million (33)**
58:23 93:16,22 94:21
98:16,21 100:8,14
101:5,13 105:18
108:8,9 109:11
110:20 130:4 138:6
139:7 141:21 142:8
144:11 150:13
151:21,25 152:11
152:12 153:6
164:19 168:21
177:6 181:19 182:6
182:17
**millions (4)**
119:2 177:7,24
180:20
**mincing (1)**
34:19
**mind (8)**
59:4 65:16 83:21
102:9 118:4 135:3
151:21 219:19
**minds (12)**
115:5 123:14 138:3,8
140:16 147:3,12
151:10 153:11

156:4,13 168:23
**minute (2)**
136:3 215:8
**minutes (3)**
53:4 105:3 163:21
**mischaracterized (1)**
81:19
**mischaracterizes (3)**
71:10 107:12 161:18
**mischaracterizing (1)**
99:4
**miscommunication ...**
18:13
**misrecollection (1)**
120:7
**misremembering (1)**
195:23
**missed (1)**
43:11
**mistyped (1)**
111:13
**misunderstanding (2)**
18:22,24
**misunderstood (1)**
128:12
**mixed (1)**
178:7
**mode (1)**
100:18
**model (1)**
177:14
**modification (2)**
45:22 114:21
**modifications (3)**
34:14,15,15
**modified (3)**
45:21,21 89:15
**moment (2)**
177:19 203:7
**Monday (21)**
53:17 118:25 132:14
137:2 148:15
149:11 151:22
168:13 175:21,23
175:23,24,25
177:25 178:24
179:7 180:4 220:21
221:2,23,25
**money (2)**
116:20 178:24
**Montal (3)**
133:10 148:13,14
**Morag (80)**
4:15 7:7,19 8:18 13:2
13:19 14:13,22
16:10 21:14,15
23:25 24:6 25:11
26:5 27:11 34:7

35:7 37:15 38:3,5
38:19 44:8 45:2
47:19 53:23 54:21
56:4 57:7 58:16
61:23 62:24 63:16
64:3 66:19 67:7,19
68:5 69:20 70:14
71:9 72:5 74:9,11
77:4 81:18 85:23
86:9 88:22 91:5
93:11 97:15 99:3
100:11 102:18
109:20 110:13
111:11 115:12
116:5,13 117:19
121:8,24 122:23
125:11 126:9,21
128:10 133:21
134:16,23 135:9
141:6 145:11
146:16 156:9,15
161:17 162:10
**Morgan (3)**
9:4 173:20 221:12
**morning (18)**
50:10,14 132:14
148:16 149:10,11
168:13 175:23,24
175:25 176:2
177:25 178:2,4
179:23 180:4
193:13 221:25
**motivated (1)**
92:15
**mouth (1)**
96:19
**moved (1)**
34:13
**moving (1)**
189:17
**multiple (1)**
125:15
**mutual (1)**
146:7

_____ N _____

**N (1)**
198:24 201:10
**name (3)**
6:10 226:3,5
**names (2)**
57:17 125:23
**natural (1)**
200:25
**nature (9)**
11:15 93:7,13 94:22
110:22 111:2,18
130:23 205:18
**Navin (2)**

175:18 179:21
**near (1)**
195:19
**necessarily (16)**
15:19 17:13 21:21
69:5 76:5 77:22
85:21 89:2 95:5
99:17 100:12,19
101:24 102:20
174:25 177:21
**necessary (12)**
19:25 36:6 37:23
45:10 48:24 50:8
51:9 73:14 109:14
132:21 137:15
212:12
**need (19)**
6:16 36:17 46:12
52:15 62:17 83:15
89:25 130:20
132:23 138:13
144:10 150:24
151:3 178:22 188:2
193:24 194:5
203:10 209:14
**needed (20)**
8:24 13:6 17:4 19:21
26:16 44:21 45:13
45:21 46:17 73:10
73:11 80:6,12 85:4
112:17 131:23
143:21 196:2 204:6
210:11
**needing (1)**
44:16
**negative (2)**
50:14 51:11
**negotiate (2)**
71:7 92:18
**negotiated (5)**
57:5,12,13,18 171:17
**negotiating (2)**
17:18 64:19
**negotiation (5)**
47:21 64:25 65:13
104:17 136:5
**negotiations (13)**
41:11 57:16,23 65:8
68:16 114:24
124:25 135:21
138:17 139:12
144:3 154:21
166:14
**Neither (1)**
214:16
**net (11)**
11:7,9,12,19,25 12:17
12:25 13:14 175:19
180:13 186:13

Neuberger (1)
86:25
never (9)
25:21 44:11 45:25
66:20,23 139:9
145:13 184:11
189:20
new (20)
1:3,13,13 2:10,10,13
2:14 3:7,7,21,21 4:7
4:7,14,14 19:14
84:19 225:3,5,9
night (21)
123:14 127:3 128:16
129:2,23 130:14
132:14 139:25
142:16 144:8 148:6
148:15 149:4,8
151:23 153:13
168:8,12 175:25
194:24 221:11
nod (3)
105:21 106:2 110:8
nodding (2)
180:5,6
noise (1)
221:19
noncash (2)
50:25 173:23
nonsecurities (1)
51:2
non-inclusion (1)
88:24
non-U.S (1)
77:20
non-769 (1)
58:22
North (2)
10:17 15:5
Notary (2)
2:13 225:8
note (9)
21:4 23:17 24:12
25:11 46:25 113:16
164:2 190:22
212:18
Noted (1)
222:18
notes (5)
27:19,23 28:5 54:24
185:13
notice (8)
134:15,22 137:11
146:12 210:22
217:18,20,24
notwithstanding (3)
10:16 147:15 171:22
NSCC (1)
161:8

NSCC's (1)
161:9
number (14)
19:4 32:18 34:12
36:19 37:2 56:21
98:6 116:16 117:9
194:19 197:10,13
211:14 218:15
numbered (1)
194:4
numbers (2)
95:16 182:16
NW (1)
3:13

_____

O

oath (1)
5:18
object (43)
7:7,19 13:2 20:11
22:5 26:5 34:7,8
35:7 37:14 57:7
58:16 61:23 67:19
69:19 70:12 71:9
72:2 78:18,21 81:18
85:23 91:5 100:11
102:18 110:13
115:12 116:13
117:19 121:24,25
122:23 125:11
133:21 146:16
156:9 174:2 188:22
192:6 197:22
199:11 210:14,16
objecting (1)
24:4
objection (40)
13:19 14:13,22 23:25
24:2 37:15 38:5,6
38:19 42:4 45:2
46:4 47:17,19 53:23
69:20 71:10 72:5
77:4 80:18 85:19
86:8 92:12 97:15
99:3 100:5 107:12
108:15 111:11
115:16 116:5
134:16 145:11
160:15 161:17
162:10 166:7 169:6
184:2 217:8
objections (1)
5:10
objective (1)
50:12
objectives (1)
125:16
obligation (9)
72:23,24 92:19 130:3

178:23 186:12
191:17,19 192:13
obligations (18)
59:15,21 60:19 61:19
68:11,19 75:11 84:4
114:13 116:8
124:11 150:8
174:11 178:15
186:9,14 190:8
192:3
observation (1)
186:2
obstacles (1)
17:10
obtain (3)
13:11 183:15 197:12
obtained (1)
137:5
obvious (2)
59:20 210:25
obviously (9)
22:16 35:13 36:25
82:9 87:11 114:20
174:25 175:24
178:4
OCC (56)
9:9 18:14,18,23 38:10
38:12,18 39:4,5,7
40:2 42:3 44:10
85:6 118:23,24
120:3,6,10 173:13
173:16 176:4,23
178:21,24 180:2,9
180:24 183:16,18
183:25 184:21,24
185:17 186:13
187:2,5,14 189:16
190:9,21,24 191:24
191:24 192:3,14,15
193:7,10 194:5,13
194:21 196:7,18
223:21,23
occur (1)
54:12
occurred (2)
39:19 140:14
OCC's (2)
174:24 193:22
OCC36408 (2)
181:3 223:20
offered (1)
190:10
offers (1)
190:11
office (1)
21:17
officer (1)
5:17
offices (4)

2:9 113:15 125:8
133:5
OK (9)
25:3 66:4 67:9 70:18
88:7 167:21 202:12
211:7 218:8
OLIVER (1)
3:18
once (4)
35:22 134:3 157:5
195:15
ones (2)
27:6 221:24
one-on-one (1)
143:18
ongoing (1)
174:19
open (10)
53:17 69:6 140:20
143:19,23,24
175:21 178:20
179:8 206:12
opened (1)
178:18
operate (1)
11:3
operated (3)
9:22 10:23 11:24
operational (4)
131:21 132:4 137:16
158:15
operations (12)
13:7 124:21 125:18
125:25 126:17,24
128:15 141:16,17
141:24 149:16
158:21
opinion (1)
82:12
opportunity (2)
46:9 96:11
opposed (7)
53:11 60:4 110:8
111:13 155:17
178:11 214:14
opposite (1)
177:4
optimistic (4)
17:7 96:6,14,22
option (5)
92:16 162:9 185:16
186:23 187:13
options (5)
7:22,23 8:3 188:11
197:8
order (28)
12:10 38:13 46:19
52:21 53:19 102:13
119:2 139:12 160:7

170:11 212:2,12
213:7,8,10,11,14
214:11,14,15,21,24
215:4,5,6,12,14,17
ordinarily (2)
31:19 46:22
organization (5)
18:14 20:21 51:3 61:4
144:24
organizations (6)
42:11,24 60:14 78:12
78:14 124:7
organized (2)
8:10 87:8
original (5)
65:9,14 114:20
121:13 201:8
originally (1)
168:17
origins (1)
94:24
OTC (6)
45:5 200:10,15,21
201:6,20
outcome (5)
10:4,6 122:17 204:16
225:18
outcomes (2)
68:17 183:13
outgrowth (1)
197:8
outset (1)
95:25
outside (3)
18:22 133:10 134:24
outstanding (3)
17:24 145:18 174:21
overrode (1)
192:12
over-the-counter (1)
8:8
owed (1)
191:24
owned (2)
157:6 171:20
ownership (2)
160:2,3
owns (1)
160:6
o'clock (5)
50:9 142:15 143:13
143:13,13

_____

P

P (1)
4:16
page (42)
25:5 55:24 56:5 59:13

59:14 66:3 67:10
68:3 70:9,16,20,25
73:3 74:6,6,17,19
84:18 87:12,24
90:14 91:19 92:24
121:10,18 122:5
150:7 168:6 169:24
169:25 185:19
194:3 198:23,25
223:3 226:9,11,13
226:15,17,19,21
**pages (1)**
121:16
**paid (4)**
73:18 119:20,22
167:14
**PAM (1)**
86:24
**paper (1)**
70:6
**paragraph (46)**
6:24 21:3 23:18,20
24:9,19,21,22,23
25:2,3,6,8,12,18
32:23,25 33:6,11,16
34:18,25 46:25
55:13 56:5 58:12
64:10,11 65:7 66:8
66:10 74:14 88:25
92:25 113:16,19
114:6 115:10
121:19 122:4,19
155:21 161:2,5
168:7 194:4
**paragraphs (1)**
26:3
**pardon (1)**
219:9
**parenthesis (1)**
48:19
**parenthetical (20)**
27:6 28:24 29:8 30:13
31:11 32:11,16 49:3
50:2 54:13 91:20
114:10,12,17,18
115:8,14 116:4
117:18 118:3
**Park (1)**
4:6
**parse (5)**
79:3 83:15 115:23,24
198:3
**parsing (5)**
50:19 75:24 84:17
102:7 211:16
**part (68)**
12:10 15:20 16:6
18:22 20:17 22:13
30:23 31:5 35:15

37:23 41:5,16 44:13
46:8 47:11,21 51:25
52:19,21 53:21 57:5
58:9,13 59:22,23
72:14 79:10,17,18
79:22 99:7,18,25
100:22,24 103:8,17
118:5 121:10,12
123:7,8,19,20
124:25 125:17
131:24 143:9 144:9
157:10 158:7 159:8
161:4,6 167:15
175:9 182:9 191:11
192:21 197:3
200:21 201:7,21
208:7 216:18,20
217:11 221:15
**participants (5)**
127:19 129:4 145:22
149:12 207:21
**participate (4)**
22:22 126:23 128:18
158:20
**participated (8)**
21:18,20 22:21 57:20
127:4,13 129:22
165:22
**participating (4)**
14:7 129:10 133:7
198:9
**particular (13)**
35:17 56:18 73:18
82:2 95:15 165:6
166:11 176:19
182:3 203:5 206:24
212:21 213:2
**particularly (7)**
78:19 93:21 99:9
104:19 175:8
176:13 196:3
**parties (19)**
5:7 6:6 37:2 41:12
44:13 49:11 65:21
84:5 138:7 143:25
151:9,12 161:12
171:18 172:21
187:11 188:20,21
225:16
**partner (3)**
21:17 28:8 154:22
**partners (31)**
21:8,25 23:7,13,19,23
25:20,25 26:19,25
27:21 28:7,16 29:7
36:13 42:14 65:12
65:19 89:18,21,22
112:19 197:12,15
198:7,12,15 199:2,8

199:20 202:8
**party (2)**
14:9 218:19
**passing (1)**
90:6
**pay (6)**
96:15 119:18,24
178:23 180:2
191:24
**paying (2)**
15:15 119:24
**payment (7)**
130:5 150:14,15,16
176:15 178:15
180:8
**payments (1)**
180:19
**pays (3)**
118:24 119:9 120:3
**pending (1)**
70:15
**people (27)**
11:24 15:22 18:2 38:9
51:22 53:14 69:4
73:9,12 98:12
126:25 128:16
132:11 143:21
155:20 194:19,20
195:17 202:25
203:6,8 207:14
213:5 216:9 221:6
221:13,18
**people's (2)**
115:5 198:15
**percent (2)**
91:16 215:17
**perception (1)**
220:25
**perfected (1)**
50:22
**perfectly (1)**
104:15
**perform (1)**
174:10
**performance (1)**
15:11
**performed (2)**
123:17 191:19
**period (3)**
43:9,13 147:2
**periodic (1)**
119:11
**permissible (3)**
104:3 107:11 108:2
**permitted (7)**
52:20 94:6 102:11
105:16 106:7
110:12 167:2

**person (9)**
12:16 21:20 31:16
59:15,17 105:25
133:14 160:5 203:6
**personal (3)**
57:24 210:3,20
**personally (3)**
29:2,4 35:23
**personnel (1)**
183:19
**persons (1)**
128:6
**perspective (6)**
16:23 102:10 103:3
119:20 125:16
174:24
**phone (6)**
21:18 126:24 133:3
207:21 208:4 219:2
**phrase (1)**
93:6
**Phrased (1)**
199:17
**pick (1)**
115:25
**picked (2)**
116:4 117:18
**picking (1)**
162:6
**picture (1)**
178:7
**piece (1)**
70:6
**PIM (7)**
17:19 18:25 20:5,7,9
20:23 87:4
**pipeline (4)**
134:3 136:23 137:14
138:19
**pipelines (1)**
137:21
**pipes (2)**
131:20 139:21
**place (3)**
166:21 212:19 214:25
**placeholder (1)**
73:8
**plain (1)**
140:4
**plan (2)**
20:15 207:18
**played (1)**
123:9
**Plaza (3)**
2:10 4:6,13
**please (2)**
16:10 218:16
**plumbing (2)**

131:21 137:18
**point (48)**
14:10 17:17 50:9
51:13 57:19 60:24
61:11 66:7 69:2
75:3 80:12,14 83:19
84:7 86:21 97:5
105:24 108:19
115:6 121:21
122:11 124:8 130:8
131:8 133:18
135:15 136:20
138:2 139:3 140:2
144:2,11 151:16,22
158:17 163:8,19
169:3 173:11,15
174:12 177:3
205:20 209:7
216:11,23 217:17
217:19
**pointing (1)**
32:8
**portfolio (1)**
183:14
**portion (8)**
70:24 71:7,15,19,24
99:20 104:13
188:12
**portions (1)**
133:12
**posed (1)**
114:16
**position (21)**
25:19 51:22 124:6
140:14,16 141:22
142:10 151:16,20
152:19,23 171:23
176:19,20,22 177:7
179:3,10 191:6
193:22 203:18
**positioned (1)**
15:20
**positions (37)**
7:11,13,21,22 11:14
40:9,9,9 41:6,14
61:6,8 62:4 119:4
134:5 140:21
151:12 170:21
172:3,8 174:11,13
174:20 176:12,13
176:17 177:12,12
178:12 179:8
183:19 184:8,10
185:16 186:23
187:14 188:11
**positive (1)**
180:8
**possibility (3)**
141:20 204:9 208:18

**possible (8)**
21:2 50:17,17 66:6
115:2 143:18
150:16 218:25
**possibly (4)**
11:24 56:15 85:7
142:3
**postulate (1)**
77:21
**potential (6)**
10:11 68:17 122:17
175:10 178:7
204:17
**potentially (5)**
40:11 61:13 125:15
131:10 190:25
**practicable (1)**
94:7
**practice (1)**
69:21
**preceded (1)**
106:24
**precise (1)**
116:16
**precisely (6)**
86:12 95:6 106:22
138:16 171:2
201:25
**precision (1)**
95:16
**precluded (1)**
139:11
**precursor (1)**
189:19
**predated (1)**
214:23
**predecessor (1)**
105:9
**prefer (3)**
62:23,25 134:10
**preferred (1)**
50:21
**preliminary (1)**
182:16
**premise (4)**
101:23 102:3 146:7
159:25
**prep (1)**
22:9
**preparation (2)**
197:16,19
**prepare (2)**
197:12 198:6
**prepared (12)**
12:13,14 27:23 34:21
36:2,3 38:14 63:9
107:3 131:9 154:14
154:16

**preparing (5)**
22:10,14 194:7
198:12,14
**prepurchase (1)**
216:25
**present (4)**
58:6 65:8 104:9
132:25
**presented (3)**
19:9 46:3 139:9
**president (1)**
194:19
**presiding (1)**
16:19
**presumably (3)**
120:18 159:7 173:22
**presupposes (1)**
135:14
**pretty (4)**
105:7 131:8 182:12
202:13
**prevent (1)**
99:7
**prevented (3)**
18:6,17 221:4
**previous (4)**
10:18 71:3 118:20
181:6
**previously (11)**
65:25 66:25 69:8
87:10 89:23 95:3
151:6,19 153:24
168:2 169:16
**pre-existing (1)**
176:10
**price (1)**
164:20
**primarily (2)**
9:2 23:4
**principal (2)**
9:21 141:17
**principally (2)**
56:23 155:18
**principals (2)**
57:13 141:18
**prior (11)**
38:4 43:9 80:24 91:8
120:3 147:3,11
155:15 164:2 185:6
217:17
**privilege (3)**
24:2 141:8 199:11
**privileged (5)**
57:10 126:10 141:7
162:3 197:24
**privileges (1)**
49:6
**privy (3)**

57:15 72:15,18
**probably (11)**
15:21 39:21 56:22
167:22 187:18
189:25 194:25
204:24 212:24
218:6 219:23
**problem (3)**
103:2 120:19 136:6
**problems (2)**
166:2 196:6
**procedural (1)**
103:4
**proceed (1)**
124:8
**proceeding (1)**
69:4
**process (14)**
12:9 22:13 56:11
136:9 138:18
140:22 146:8,25
147:8,23,25 161:6
182:23 208:22
**processed (4)**
30:22 157:4,6,22
**processing (7)**
136:21 137:13 139:13
143:7,8 145:24
168:15
**produced (1)**
66:20
**product (2)**
24:3 171:10
**production (3)**
54:25 55:6 66:18
**Professional (2)**
2:12 225:7
**proffered (1)**
37:18
**profit (3)**
13:17 14:5,11
**profitable (1)**
15:3
**progress (2)**
106:22 135:20
**progression (1)**
106:23
**prominent (1)**
148:17
**prompted (4)**
84:23 92:21 152:18
152:23
**properly (1)**
51:23
**property (34)**
27:7 30:14 31:11
33:14,20 38:11
46:21 48:13,18 50:3

50:6,24 54:14 56:2
56:8 74:22 75:4,10
83:9,10,10 85:16
97:2 99:13 100:9
102:17 109:6,8
114:8,12 116:7,24
117:17 118:2
**proposal (2)**
106:6 111:14
**propose (1)**
206:22,24
**proposed (12)**
30:17 32:2 56:24
104:2 107:10,20
110:11 190:10
212:17 213:7,17,23
**proposing (1)**
28:24
**proposition (1)**
109:25
**proprietary (6)**
40:8 60:9 116:25
117:11 137:3 157:2
**pros (1)**
19:17
**prospect (2)**
147:21 220:22
**protect (1)**
178:25
**protected (1)**
75:11
**protocol (2)**
69:16 70:4
**prove (1)**
201:18
**provide (8)**
46:17 77:7 84:15
105:15 130:3
150:21 165:16
177:10
**provided (32)**
12:7 20:13 26:14,23
27:3 31:22 36:4
48:12 49:3 72:11,22
80:2 90:10 91:21
92:16 110:4,16,19
111:16,22 112:6
122:7 158:3 164:12
165:9,12,17 183:18
206:16 207:2
216:15 220:5
**provides (2)**
179:24 190:8
**providing (4)**
49:16 158:10 161:13
220:3
**provision (28)**
31:3 49:14,20 54:8
62:20 63:8 67:12,16

72:7,10,20 74:5
75:13 82:2 83:16
86:19 93:16 94:8,25
103:19,20 106:11
161:23 162:3 171:4
188:11 201:2,10
**provisions (30)**
34:22 49:10 52:3,4,5
58:20 63:12 65:9
82:9,11 83:24 84:3
84:8 85:4 86:2
87:17 172:10
188:16,18,25 190:4
190:19 204:21
205:5,5,8 209:13
210:11 211:2,6
**public (3)**
2:13 146:4 225:8
**purchase (8)**
55:19,21 58:15 59:9
152:11 164:20
190:19 198:20
**purchased (11)**
49:23 75:2 76:19
79:17,18 81:24 82:5
82:9 83:22,24 84:9
**purchaser (1)**
81:12 85:11 91:21
**purportedly (1)**
204:5
**purpose (13)**
51:6,25 73:8 75:5
92:3 108:22 114:25
132:18 143:20
145:15 146:7
193:21 198:5
**pursuant (2)**
6:21 83:6
**purview (1)**
132:7
**put (16)**
32:5,24 54:21 58:12
73:9,19 96:19
114:17 166:4
170:11 178:13
211:12 214:25
218:13 220:18
221:22
**putting (2)**
50:2 73:8
**p.m (4)**
193:17 219:8,9
222:18

---

**Q**
**quantification (1)**
97:11
**quantitative (2)**
153:8,8

**question (78)**
5:11 8:3 13:8 22:7
23:10 24:7 25:3
30:4,16 33:8 35:18
42:13,19 44:15 49:4
49:7 50:5 68:14
70:14 77:14 78:18
81:2 84:2 85:24
89:19,22 90:3 93:18
93:25 94:5,9 97:19
97:25 98:20 100:19
101:10 102:3
105:11 107:14,16
116:9 118:20 122:3
126:9 135:3,4,14
141:9,12 156:10,15
162:11 163:2
168:12 170:24,25
171:6,12 173:14
174:7 176:16 181:9
181:18 185:5
186:20 187:18
188:17 189:2,3,6
197:23 199:5 203:5
209:5 210:6 214:17
216:22 219:18
**questions (17)**
6:15,15 9:25 19:9
33:23 63:19 64:3,4
109:15,21 148:11
166:8 169:23
202:10,18 210:3
222:16
**quick (1)**
202:13
**quickly (1)**
179:11
**QUINN (1)**
3:18
**quite (8)**
23:9 113:9 129:2
142:15 195:14,18
216:10 221:12
**quotation (1)**
56:7
**quote (6)**
25:14 34:25 35:5
74:13 89:9 220:20
**quoted (1)**
25:12
**quotes (5)**
25:8 32:25 33:13
48:17 55:24

---

**R**

**R (1)**
4:8
**raise (2)**
109:15 163:2

**raised (16)**
44:11,15 53:13 93:17
94:5,9 98:20 103:24
105:11 107:4,17
108:13,14 115:4
120:19 185:5
**raises (1)**
181:10
**raising (3)**
97:24 185:10 190:3
**Randall (3)**
9:17 13:24 17:21
**range (1)**
68:17
**rapid (1)**
135:20
**reach (3)**
128:5 136:8 151:9
**reached (8)**
11:18 112:10 142:10
146:23 147:20
154:9 186:6 195:15
**reaching (1)**
147:3
**reaction (2)**
50:15 110:24
**read (4)**
87:17,17 88:13
170:10
**readily (3)**
102:13 104:22,23
**reading (3)**
180:13 200:25 202:5
**reads (1)**
114:12
**ready (5)**
90:2 113:5 117:22
221:23,25
**realize (1)**
160:9
**realized (3)**
49:15 139:20 221:18
**really (18)**
72:21 87:24 103:4
115:17 121:5
129:20 130:15,20
131:4 135:11,14
151:3 161:5 183:12
187:8 214:13
215:24 220:16
**Realtime (2)**
2:12 225:7
**reason (18)**
87:23 92:17 94:11
99:21 108:2 114:19
139:11 169:8 179:8
191:18 226:6,9,11
226:13,15,17,19,21
**reasons (3)**

115:4,5 136:4
**recall (129)**
11:22 12:6,11 13:3,13
13:21,23 14:7,15
16:2 17:12,14 19:3
19:19 22:19 26:11
26:24,25 27:18
28:10 29:23 30:24
35:18 37:10 39:17
40:3,22,25 41:9,24
42:22 43:13,25
51:19 52:18 56:18
62:22 63:16 66:5,14
69:11 86:12 87:22
89:22 92:23 95:5,6
95:11,16,20 97:17
98:5,8 105:4 110:9
110:23 118:11
122:6,14 124:16
127:8,9,11,13,20,21
127:23,24 128:6
129:20,24 130:15
130:24 131:2,11,14
131:17 132:13,16
133:25 140:12
143:3,14,17 144:5,6
144:9,17 145:2,6,20
148:5,13,19 149:3
149:13,21,22 150:5
152:13,20,20
154:13 155:2,9,24
165:8 166:24 169:3
172:25 184:15
190:15 192:25
198:9,19 202:22,23
205:9,10 207:20,24
207:25 218:2,4,25
219:16,19 220:3,16
**recalled (1)**
36:9
**receive (2)**
120:12 145:23
**received (17)**
31:16 37:18 120:2
121:2 134:8 141:25
153:25 156:3,12
162:5 173:8 175:16
179:20 180:16
181:5 183:21
206:11
**receiving (2)**
119:23 154:19
**recess (7)**
53:7 54:20 113:11
141:11 167:24
196:16 215:9
**recognition (1)**
123:6
**recognize (1)**

66:2
**recollection (76)**
8:14 21:7,25 22:3
23:7,19,22 26:18,19
26:21,22 27:16 28:6
28:11,12 29:10,11
42:13 72:7 89:10
90:24 91:13,17
93:14 94:4,24 104:5
104:10,15 106:4,22
107:5 108:19
111:24 112:21
120:14 127:7,14,17
129:18,19 131:5
133:16 139:24
142:4 144:19
148:10,12,20
149:14 152:16,16
153:18 154:6,8
165:20,24 169:5,13
169:22 187:16
192:24 193:3
194:18 195:11,23
197:12 208:2 214:6
214:19 215:25
217:10,21 219:4
220:7,12
**recollections (7)**
22:7,11,12 23:11,16
198:6,15
**record (14)**
15:16 22:6 25:11
54:22 88:23 121:8
170:13 175:19
208:24 214:9 215:7
215:10 225:13
226:7
**records (3)**
16:5 17:5 60:11
**recourse (5)**
101:22 125:4 151:21
164:19 167:12
**recover (1)**
207:6
**Reed (2)**
4:4 6:11
**refer (18)**
21:7 24:9,15,15,24
32:23 34:17 59:13
64:11 65:6 70:15
88:9 113:19 114:2,6
119:9 201:2 213:11
**reference (26)**
24:22 25:9,15 33:4
40:14 45:17 64:14
65:17 66:12 70:9
73:5 75:4,20 90:15
91:9,11 93:3 142:25
143:4 154:4 164:23

172:15 177:5
200:14,15 213:18
**references (1)**
146:11
**referred (15)**
42:15 43:2,24 55:14
73:25 82:25 83:18
120:9 123:22
149:20 188:6
203:22 215:12,14
220:17
**referring (23)**
9:8 21:9 24:19,25
25:7 39:24 44:19
47:6 59:16 60:23
64:18 65:20 80:23
97:22 119:10
126:16 165:4 185:9
197:7 201:9 211:22
214:13 219:14
**refers (9)**
67:12 68:4 73:4 75:17
93:6 167:8,9 189:5
215:4
**reflect (4)**
60:9,10 107:3 149:19
**reflected (15)**
16:5 22:8 57:2 58:19
81:21 110:17
112:10 115:22
123:16 158:4,5
167:10 192:12
201:8 211:5
**reflecting (1)**
82:17
**reflects (1)**
164:20
**refresh (7)**
153:17 154:6,8
187:16 193:2
195:11 214:19
**refused (1)**
151:19
**refusing (1)**
191:24
**regard (2)**
186:11 204:7
**regarded (4)**
132:4 176:24 200:10
221:22
**regarding (12)**
14:3 16:3 18:20 43:5
52:5 120:17 154:22
189:14 190:23
202:20 210:13
219:3
**regardless (3)**
101:3 170:20 172:2
**regime (4)**

9:24 10:19,24 12:10
**registered (6)**
2:11 9:22 19:13,23,24
225:6
**registration (1)**
19:15
**regulated (1)**
8:22
**regulators (4)**
8:23 9:10 15:25 16:3
**regulatory (5)**
9:23 10:10,19 19:11
101:21
**reiterated (1)**
131:6
**reject (2)**
101:23 102:19
**relate (1)**
84:8
**related (9)**
9:21 17:17 45:15 59:6
146:11 167:17
196:20 197:2
225:16
**relates (3)**
82:21 83:12,12
**relating (12)**
8:21 17:22 37:20,21
43:17 65:2 72:8
104:20 150:23
172:11 200:10
209:3
**relation (5)**
48:7 49:24 59:3 150:9
179:12
**relations (1)**
146:4
**relatively (1)**
196:8
**relevant (9)**
40:13 49:14 186:4,25
190:7 191:19 206:4
206:5 212:13
**relief (1)**
17:21
**relinquish (1)**
58:21
**reluctance (2)**
130:2 140:3
**remain (1)**
10:18
**remained (1)**
191:14
**remaining (4)**
101:4 103:23 160:20
168:16
**remember (42)**
16:13,23,25 17:6,25

17:25 18:8 19:5,7
21:18 23:13,14
29:22 38:22 40:16
40:20 43:23 65:13
86:25 89:17 91:2
105:20,22,22 114:9
125:22,23 128:22
130:13,18 148:23
154:11 176:20
182:21 195:12
197:18 201:22,25
202:25 203:5
205:12 222:9
**remembered (2)**
23:8 65:18
**Remind (1)**
14:2
**removal (11)**
24:10,24 26:2 34:17
35:24 37:12 46:14
84:24 85:2 88:21
89:11
**remove (1)**
35:3
**removed (12)**
24:13 34:25 35:4
44:20 70:10 84:21
88:11,11,16 89:10
114:6 115:15
**removes (1)**
88:8
**repeat (8)**
25:3 33:7 107:14
122:2 147:10
156:10 173:14
210:5
**repeatedly (1)**
43:4
**repeating (1)**
135:3
**replace (1)**
181:19
**replaced (1)**
88:11
**replacement (1)**
203:23
**repo (18)**
18:7,25 202:21 203:8
203:15,20,21 204:3
204:4,8 205:23
207:7 208:10,19,23
209:16,19 210:13
**report (4)**
126:2,13 141:16,24
**reported (4)**
1:16 95:12 126:8
132:11
**reporter (5)**
2:12,13 16:11 225:7,8

**reporting (2)**
126:4 143:20
**repos (1)**
17:24
**represent (2)**
6:12 88:7
**representation (4)**
34:8 95:7 96:20 147:5
**representative (1)**
198:8
**representatives (18)**
18:13 38:25 39:16
127:2 164:24 166:5
195:6 207:22,23
208:8,16 209:12,13
210:9,11 213:5
214:3,4
**represented (6)**
39:4 93:22 101:15
185:15 186:23
187:13
**representing (6)**
29:14 88:10,16,17,19
130:5
**repurchase (9)**
204:3,14 206:4,6
209:2,6 216:12,16
217:6
**request (5)**
17:23 18:3 63:22 90:8
158:3
**requested (1)**
218:21
**require (1)**
188:15
**required (5)**
11:3 60:10 93:23
100:21 175:7
**requirement (3)**
18:16 174:24 175:3
**requirements (2)**
9:24 19:2
**reservation (1)**
207:15
**reserve (15)**
9:14 83:12 93:24 96:4
97:13,14 98:4,7,21
99:15 101:8 103:18
108:3 110:2,21
**reserved (1)**
5:11
**residual (1)**
157:8
**resolution (4)**
31:6 135:21 136:8
145:15
**resolve (1)**
132:19

**resolved (9)**
98:12 104:2 105:24
107:9,20,23 123:12
145:14 151:9
**respect (23)**
22:17 31:13 37:4 39:7
46:20 58:3,18 59:5
78:8 98:19 103:25
118:7 122:4 133:20
135:15 143:6 152:7
169:24 176:12
182:5 186:7 189:4
202:21
**respective (2)**
5:6 177:15
**respond (1)**
81:4
**responded (3)**
137:9 209:19,20
**responding (3)**
97:18 185:6 193:19
**responds (1)**
185:19
**response (13)**
26:12 37:6 49:19
93:25 120:12,15
138:23 140:8,13
143:4 187:3 194:10
202:17
**responsibilities (2)**
123:4 159:14
**responsibility (8)**
62:3 76:3 124:10
160:2 174:10
177:18 187:2
189:15
**responsible (18)**
12:17 60:20,22 68:23
75:24 76:8,17 77:10
78:4,6 79:9,21
81:12,16 82:23
191:15 192:16
221:24
**responsive (1)**
63:22
**rest (1)**
87:14
**result (8)**
12:2 94:19 101:7
102:21,22 119:15
137:4 186:13
**resulted (1)**
101:24
**results (3)**
127:23 144:3,22
**resurrect (1)**
115:3
**return (2)**
91:23 162:21

**reveal (1)**
171:9
**reversed (1)**
210:4
**review (7)**
89:25 125:10 155:22
168:19 169:2,3
206:5
**reviewed (1)**
105:10
**reviewing (1)**
165:23
**revised (3)**
32:6 37:18 164:18
**re-pose (1)**
77:15
**Ricci (1)**
57:22
**Rich (1)**
57:22
**right (21)**
33:2,6,9 71:7 73:23
75:22 76:23 77:22
88:21 89:4 98:12
107:11 121:20
139:24 158:9 180:4
189:24 191:3 194:2
214:23 216:7
**rights (24)**
18:4,7 68:18 84:4
172:8 192:4 203:11
203:14,20 204:7,18
205:18,21,23,24
206:3,21 207:4,6,9
207:15 208:9
212:23 216:10
**risk (21)**
15:6 140:20 144:25
153:5,9 169:12
176:7,9,11,18
177:17 178:4,9
179:5,9 183:9,11
192:17 204:15,17
206:14
**risks (7)**
11:15 144:16,18
151:14 153:2
177:15 222:7
**ROBERT (3)**
3:8,22 4:16
**Rocks (5)**
206:15,18,19,22
212:25
**Rodefeld (1)**
125:24
**role (2)**
8:17 16:6
**room (11)**
129:12 133:4 148:18

165:21 166:3,5,10
166:11,15,16 167:3
**rooms (4)**
106:20 165:21 166:12
166:23
**Rosen (238)**
1:12 2:8 6:1,3,5 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1,24
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
134:23 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1

185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1,25 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1,13 212:1
213:1 214:1 215:1
215:11 216:1 217:1
218:1,13 219:1
220:1 221:1 222:1
222:20,22 223:1,4,8
224:1 225:1,10
226:1,5,24
**Rosen's (2)**
164:17 167:7
**round (1)**
22:23
**Roy (3)**
9:17 13:24 17:21
**RPR (2)**
1:17 225:22
**Rule (1)**
6:22
**rules (2)**
158:19 210:4
**run (2)**
50:11 150:9
**running (1)**
135:24

————— S —————

**S (1)**
4:15
**Sachs (1)**
221:12
**sake (1)**
48:24
**sale (15)**
52:21 53:5 59:3 86:24
99:19 209:3 213:7,7
213:11,14 214:14
214:23 215:17
217:12 218:3
**Sandra (6)**
206:15,17,18,19,22
212:24
**sat (1)**
50:21
**satisfaction (1)**
101:19
**satisfactory (1)**
183:6
**satisfy (1)**
100:15
**Saturday (3)**

39:13 136:24 181:6
**saw (13)**
34:12 35:9,22 44:18
66:6,14 89:16,19
95:5,21 177:10
183:17 184:11
**saying (28)**
41:13 52:18 61:25
76:6 91:3 95:10
107:24 112:16
130:14 131:3,11,15
131:18 132:13,16
132:17 137:24
144:7 145:2,6
147:24 148:6
152:14 168:18
191:25 196:8
204:15 205:16
**says (17)**
69:18 74:21,24 75:21
76:10 85:20 91:20
161:5,23 164:17
167:6 189:19 194:2
199:14,14 212:18
214:10
**scenarios (1)**
102:7
**scheduled (1)**
39:13
**SCHILLER (1)**
3:11
**scope (3)**
20:16 82:4 189:14
**scribbled (1)**
70:6
**scroll (1)**
64:10
**sealing (1)**
5:7
**search (1)**
54:23
**searching (1)**
198:14
**SEC (34)**
9:11,15 10:7 11:19
12:8,18 13:24 17:15
18:2,3,14,15 19:3
95:7,12 97:13 99:21
100:4 120:15
143:25 202:10,25
203:3,8,9,10 204:7
204:20,22 205:10
207:2 215:21
218:21 219:5
**second (21)**
6:23 23:20 33:17
36:15,16 55:15 68:6
68:7 73:3 78:7
107:4,8,16 108:7,12

108:19 118:19
161:4 169:24
181:18 214:22
**section (21)**
37:6 68:4,5 74:7,8,18
74:19 83:23,25
84:10,18,19 85:10
161:4,5 198:22
199:3 213:18,22,23
214:5
**sections (1)**
34:14
**secure (9)**
27:7 30:14 31:12 50:3
54:14 60:19 114:13
116:8 167:16
**secured (1)**
75:10
**securities (39)**
50:25 54:3,4 58:23
70:24 91:23 93:6,12
93:17 94:21,22
95:17 98:17,18
103:25 105:18
107:19 108:3,5,8,10
110:2,4,21 113:23
123:19 131:23
159:9 161:8 170:17
170:18,21 171:3
172:4,6 173:20
182:6,9 216:20
**security (1)**
160:6
**see (82)**
6:25 23:19,21 24:10
24:22 25:22 34:5,24
35:8 36:17 46:10
47:3 48:3,9,19
64:14 66:9,10,13
67:11,13,16 68:3,8
70:8,11,20,23,25
73:3,21,23 74:7,15
74:22,24 75:19
76:10,11 80:6,8
84:21 85:13 88:2,5
90:14,17 91:20,24
92:17,24 93:2 95:10
113:24 121:18
122:5,19 142:11
154:4 161:4,10
164:6,16 168:9
170:4 181:9 182:17
183:20 185:7,11
186:17 187:21
190:11 194:8,9
195:10 211:18
212:3,15 213:19
217:19 219:12
**seeing (3)**

69:11 87:22 89:11
**seek (3)**
212:4 215:2 216:7
**seen (16)**
27:9,22 66:20 67:2
69:13 89:14 90:4,5
95:3,14 168:3
169:19,21 211:15
213:7 218:17
**selling (1)**
159:12
**sending (1)**
114:23
**sense (4)**
40:17 112:6 142:5
163:18
**sent (6)**
185:2 193:12,15
211:17 215:5
217:20
**sentence (15)**
21:5 31:4,4 33:18
48:3 65:6 76:10
85:11 93:5 161:10
168:7,9 169:25
170:7,11
**separate (2)**
62:19 151:3
**separately (5)**
165:12 177:9 186:6
192:13 216:17
**separating (1)**
163:4
**September (11)**
8:15,16 118:13 121:3
168:8 181:7 185:3
188:7 212:23
214:25 219:8
**sequence (3)**
30:19 33:2 139:24
**sequencing (1)**
29:25
**sequentially (1)**
30:22
**seriously (1)**
222:2
**services (1)**
20:13
**session (1)**
104:25
**set (13)**
23:23 24:19 25:7 33:5
85:5 102:25 103:11
192:2 212:21
214:11 215:22
225:11,20
**settled (1)**
131:8
**set-off (2)**

204:19 206:2
**Sharbeck (1)**
212:10
**share (6)**
94:3 128:4 153:8
219:11,21,25
**shared (4)**
70:7 87:19 219:23
220:15
**Shari (1)**
135:18 136:7 143:11
143:18
**SHEET (1)**
226:2
**Sheldon (3)**
154:25 164:18 167:7
**Shelly (4)**
133:10 148:22,23
165:13
**shoes (4)**
17:24 61:18 77:14
78:13 174:9,18
202:20 203:24
**short (4)**
101:4 185:15 186:23
187:13
**shorter (1)**
115:25
**shortfall (6)**
96:23,25 99:12 100:7
101:25 177:21
**show (17)**
6:18 34:10 64:5 65:24
66:24 69:7 87:10,23
89:5,23 95:2 151:5
153:24 163:15
167:25 169:15
211:7
**showed (5)**
89:12 162:24 182:16
183:24 187:24
**shown (4)**
31:25 95:23 111:19
213:2
**shut (1)**
139:21
**side (64)**
7:14 12:16 26:8 27:2
27:3 28:23 29:3,5,7
29:17 30:23 31:15
31:15,16,21,25
35:24 36:14 37:9,11
38:2,17 44:6,10,15
44:23 45:11 46:3,14
56:14,25 58:3 62:11
69:4 72:21 87:20
103:11 104:22
108:17 109:2,3,13
109:24 110:25

128:2 129:3 149:16
154:13 158:12,22
158:23 188:25
195:19,19,22
198:16 207:12,13
209:11 210:8,10
213:4 214:2,4
**sides (3)**
64:13 151:13,14
**sign (2)**
194:23 195:16
**signal (1)**
152:2
**signaled (2)**
45:22 151:24
**signatories (1)**
46:11
**signature (2)**
164:3,5
**signed (6)**
5:17,19 50:13 65:22
186:4 194:2
**significant (15)**
15:6 94:12 116:19,19
116:20,22,23,24
119:7 176:3,25
177:5 178:8 179:9
183:11
**significantly (1)**
178:21
**sign-off (1)**
196:11
**similar (8)**
22:23 54:5 74:15
94:22 110:3,22
111:9,17
**simple (1)**
151:3
**simply (5)**
68:24 98:13 114:17
115:2 137:19
**simultaneous (1)**
30:21
**simultaneously (1)**
143:21
**single (1)**
41:23
**singled (1)**
44:16
**singling (3)**
40:21 41:21,24
**SIPA (3)**
4:5 6:13 215:5
**SIPC (10)**
194:20 204:10,12
205:7 207:3 212:2,8
213:23 214:20
215:4
**sir (29)**

6:20 24:9 25:24 26:18
48:3 55:12 66:8
67:2 80:4 83:17
87:14 89:25 95:4
113:13 141:12
150:7 151:7 153:25
155:21 161:2 168:6
169:20,23 170:6
173:9 187:25
196:17 199:19
202:9
**sitting (8)**
12:12 19:5 82:17
87:20 130:24
149:23 162:17
219:20
**situation (6)**
36:24 68:15 80:16
83:2 123:11 182:18
**slightly (1)**
154:24
**small (1)**
23:5
**smile (3)**
105:22 106:3 110:8
**sold (5)**
64:20 86:25 100:2
124:23 216:21
**solve (1)**
194:15
**solved (1)**
196:3
**somebody (11)**
21:14 28:4 42:15
79:15 91:7 103:25
107:25 108:18
183:2 195:3 219:19
**soon (1)**
94:6
**sorry (29)**
16:13 18:18 21:16
24:14,21,25 29:4
33:7,15 45:15 48:9
48:12 56:3 62:25
80:25 83:5,5 109:2
122:2 128:17
147:10 178:21
185:24 187:2
194:11 206:17
209:23 210:5,15
**sort (25)**
10:20 16:17,19 17:4
45:7 50:14 51:11
70:6 95:21 105:24
119:12 123:10
127:5 131:20,21
137:17 143:23
177:11,14 195:24
195:25 196:5 210:4

211:24 219:17
**sought (1)**
204:21
**Sounds (1)**
63:14
**source (8)**
13:6,14 72:10 92:4
94:17 108:23
126:19 222:11
**SOUTHERN (1)**
1:3
**speak (5)**
29:2,4 118:4 132:9
175:24
**speaker (1)**
148:17
**speaking (4)**
128:7 148:24 166:4
166:13
**speaks (2)**
112:15 187:4
**special (1)**
202:14
**specialize (1)**
6:24
**specialty (1)**
206:20
**specific (41)**
20:24 26:11 32:16
37:22 39:18 41:9,24
41:25 42:22 44:2
45:5,23 46:13 57:5
57:15 60:16 62:22
65:4 81:11 83:19
84:6 104:19 117:7
120:15 126:6
127:14,16,24
129:17 131:4,13
142:4 148:9,20
152:6 165:24
169:13,13,22
185:10 214:6
**specifically (50)**
11:2 15:10 24:12
26:25 28:10 30:10
31:10 33:24 37:5
39:17 40:21 41:21
42:15,16 43:2,14,24
43:25 44:6 45:10
47:14 56:17 57:18
58:3,9,21 59:5
74:20 80:7 81:2,25
82:2 96:3 98:6
112:4 140:12 143:3
144:5,17 145:7
149:22 152:14
154:17 155:24
166:13 169:4,9
174:4 203:2 219:17

**specificity (1)**
84:14
**specifics (4)**
16:24 127:9 130:15
130:18
**specified (1)**
74:25
**speculate (2)**
91:6 127:15
**speculation (3)**
72:4 78:22 92:13
**spend (1)**
195:2
**spending (1)**
19:19
**spent (2)**
20:2 190:2
**spilled (1)**
149:9
**spoke (15)**
9:11 18:3,19 29:7
95:24 136:7 202:18
203:6,6 208:12,20
209:18 210:9 214:3
219:3
**spoken (3)**
16:14,22 218:23
**spokesperson (2)**
152:17 209:18
**square (2)**
48:18,21
**ss (1)**
225:4
**staff (1)**
9:12
**staking (1)**
151:11
**stamped (28)**
118:14,16 120:22,23
149:25 150:2 173:3
173:5 179:15,17
180:24 181:2
184:21,23 193:7,9
211:9 218:10 223:9
223:11,13,15,17,19
223:21,23 224:4,6
**standard (1)**
208:13
**Stanley (1)**
221:12
**start (2)**
8:18 49:20
**started (1)**
182:23
**starting (6)**
8:19 33:13 55:25 56:4
56:5 121:9
**starts (5)**

56:7 84:19 114:8
168:8 169:25
**state (8)**
2:13 55:5 86:15 88:22
118:4 214:9 225:3,9
**statement (7)**
183:15,23 184:6,7,7
184:11 198:19
**States (3)**
1:2 61:9 160:6
**statistical (1)**
183:13
**status (1)**
10:10
**stay (6)**
17:3 156:8 204:22
212:4 214:25 216:7
**staying (1)**
156:20
**stays (1)**
214:11
**Steen (1)**
2:9
**step (3)**
17:23 174:9 216:18
**stepped (4)**
120:17 174:18 186:9
203:24
**stepping (7)**
61:18 77:13 78:13
174:10,21 175:11
202:20
**steps (1)**
52:15
**STERN (1)**
4:11
**Steven (1)**
212:10
**STIPULATED (3)**
5:5,9,15
**stop (1)**
77:16
**Street (1)**
3:6
**structurally (1)**
20:20
**structured (1)**
159:24
**struggling (1)**
17:3
**subject (27)**
7:5 9:18 10:18 15:23
32:17 35:2 36:21
43:21 51:7,17 58:10
61:13 68:16,21
94:11 113:16
114:20 118:2 145:7
146:19 157:23

158:14 159:12
189:22 196:5 200:3
200:4
**subjects (3)**
16:8,14 19:2
**subparagraph (1)**
198:24
**Subscribed (1)**
222:22
**subsequent (2)**
89:2 155:25
**subset (1)**
23:5
**subsidiary (2)**
19:22 124:7
**substance (7)**
57:11 126:10 135:18
140:9 147:9,13
168:14
**substantial (4)**
131:10 176:22 178:4
178:5
**substantially (6)**
93:7,13 110:21 111:9
111:17 168:16
**subtle (1)**
188:23
**successor (1)**
180:3
**sufficient (3)**
96:6,15 218:16
**sufficiently (1)**
212:13
**suggest (3)**
44:21 170:3 198:16
**suggested (8)**
44:15 72:20 94:2
118:24 119:3
145:13 175:17,22
**suggesting (1)**
44:23
**suggestion (1)**
18:15
**suggests (1)**
168:23
**Suite (1)**
3:13
**summarize (1)**
63:9
**Sunday (32)**
39:13 123:13 127:2,2
127:12 128:16,19
129:23 130:14
132:14 135:12
139:25 142:3,16
144:8 148:6,15
149:3,8 151:22,23
153:13 168:8,12
179:21,22 185:3

193:13,16 194:13
195:20 221:11
**support (22)**
11:21 13:7,11 41:4
45:24 46:21 61:12
120:17,20 123:20
125:6 130:20
135:23 139:4,8
140:18 148:3
150:12,21 152:9
167:13,17
**suppose (1)**
205:14
**supposed (2)**
135:10 182:12
**sure (49)**
8:2 14:24 18:2 23:9
25:4 26:24 49:13
53:2 63:21 67:3,15
68:13 69:15 72:9
74:2 81:3,20 86:3
86:15 87:16,21 92:4
92:14,15 94:17
101:17 108:6
125:15 128:3 129:7
131:5 141:10
147:16 148:8
162:12,23 170:15
175:18 181:22,25
182:2 195:21
197:18 205:13,13
207:24 208:3
209:17 214:12
**surprise (4)**
46:4,6 117:8 200:7
**surviving (1)**
10:9
**suspect (1)**
37:19
**sworn (5)**
5:16,19 6:7 222:22
225:12
**systems (4)**
10:12,14,15,22
**S&C (1)**
7:15

———————————

**T**

**TAA (8)**
18:19 38:14 43:7
174:9 187:3 191:8
191:17 195:7
**table (11)**
73:19 165:12,15
207:12,13 209:11
210:8,10 213:4
214:2,4
**take (41)**
6:16 10:10 18:18

19:18 32:22 53:3,20
62:14 64:7 71:17,19
71:24 72:8,12,13
80:9 89:24 112:24
112:25 113:4
121:15 130:17
135:16 140:20
144:21 145:8 153:4
162:21 163:6,18,22
167:23 177:6 179:4
188:9,13 189:25
196:14 205:20
216:8 218:15
**taken (4)**
52:15,22 163:5
176:25
**takes (2)**
62:20 147:16
**talk (4)**
25:5 26:7 28:22 205:9
**talked (4)**
23:10 196:17 220:20
220:22
**talking (20)**
15:10,12 22:2 25:16
30:10 41:16,20 43:8
55:14,23 56:6 58:9
75:14 77:25 133:15
137:11 182:14
203:21 205:19
208:25
**talks (1)**
182:15
**tank (1)**
178:20
**team (17)**
124:21 125:8,13,18
125:21 126:2,13,15
126:16,17,17,20,25
141:17,17,25
144:15
**technically (1)**
83:10
**telephone (4)**
128:18 151:15 166:14
216:9
**tell (37)**
6:19 7:3 16:8 20:9
21:8 22:4 31:14
48:5 60:2 63:11
64:17 71:23 84:23
92:2 93:9 97:9
105:4 109:22 110:5
114:2,16 123:25
129:3 141:2,13
144:6 148:25 150:7
172:12 174:7
183:23 194:12
204:11 208:4 212:5

212:7 218:16
**teller (1)**
19:24
**telling (1)**
137:19
**tended (1)**
154:12
**tens (1)**
177:6
**tentative (7)**
11:7,9,12,19,25 12:25
13:14
**term (5)**
15:4 38:6 172:17
203:23 207:17
**terminate (1)**
205:24
**terminated (5)**
216:13 217:2,5,7,11
**termination (6)**
204:18 208:10,19
209:15 210:13
217:18
**terms (23)**
12:6 14:19 48:16
50:12 64:19 65:22
71:14 76:15 88:23
89:7 94:8 116:3
118:20 146:17
157:3 179:7 183:24
190:8 205:22
206:13 207:9
211:24 213:21
**testified (2)**
6:7 98:11
**testify (2)**
22:14 198:7
**testimony (14)**
30:12 36:7 42:12 71:3
71:10 78:20 80:6,24
81:20 83:2 107:13
113:21 161:18
225:13
**text (1)**
85:15
**Thank (3)**
21:17 222:14,17
**themes (1)**
131:7
**Theoretically (1)**
222:5
**thing (4)**
41:16 132:22 136:3
152:6
**things (8)**
10:13 16:17,22 23:14
39:21 48:11 56:10
63:9 82:18 86:14,14
92:7 138:12 151:2

92:7 138:12 151:2
174:16 176:6
190:25 197:13
222:6
**think (124)**
11:23,23 15:2,4,18
17:2 21:22 22:6
32:19 37:16 38:24
38:25 39:12,20 42:6
42:18 44:13 46:5,8
46:16 50:8 51:6,9
52:6 53:15 56:10
62:16 63:14,25 69:3
69:3 71:21 72:10
73:7,8,16,17 74:16
76:16 80:19 81:19
83:15 84:16 85:2,24
88:8 92:5 94:20
95:14 96:17,18 98:5
99:4 102:16 104:12
110:14 112:15,17
113:2 115:16
123:13 124:8 126:8
126:11 129:23
131:5 132:8 137:23
139:3 142:9 146:17
146:21 147:19
149:19 153:14,22
155:18 159:2
161:20,25 162:2
163:12 167:9
168:18 170:22
171:11,12 172:9
179:4 181:22
182:11 183:10
186:4,25 187:6,23
188:2,10 189:11
191:18 193:3
194:14 195:13
196:5 198:20
199:23 200:25
205:7,24 207:8
208:20 210:17
212:7 213:6 214:20
214:23 216:3,10
219:23 221:5,6,7,10
221:21
**thinking (3)**
19:16 82:18 102:6
**third (4)**
107:25 108:7,13
161:19
**Thompson (15)**
133:9,17,24 137:9,19
138:9,21 140:9
142:20,25 144:7
147:13 148:6 152:4
152:14
**thought (18)**

20:7,7 37:23 46:18
50:23 51:12 54:15
95:9 111:15 115:22
135:24 136:16,18
150:14,15 167:18
194:20,25
**three (4)**
28:15 76:20 128:23
128:23
**tight (1)**
143:22
**time (107)**
5:12 6:16 8:18 14:23
15:7 16:21,21 18:21
19:19 20:2 27:11,12
27:13 30:9 32:6,12
32:13,14 35:20
36:20 38:3 43:9
44:3 49:21 50:9,11
50:13 53:9 54:18
59:9 66:21 67:24
68:10 69:2,18,23
77:4,5 80:16 82:14
82:19 86:9,10,15
87:15,18 89:24
95:21 98:5 109:18
113:6 114:22
115:20,23 116:11
121:21 122:15
127:12 129:8 135:9
135:15,24 139:3
143:4,22 144:21
147:2,4,11 149:7
152:25 154:12
155:23 156:2,12
161:19 162:4,13,23
163:12,21 165:25
167:23 170:19
176:25 177:3
178:17 180:15
182:20 184:3,4
185:25 188:10,13
189:6,21 190:2
195:2 202:10
215:19,20 216:24
219:8,9 221:20
222:14,18
**times (2)**
220:17,23
**timing (6)**
29:25 69:25 137:10
142:5 182:21
216:23
**tired (1)**
155:20
**today (11)**
27:25 113:21 116:10
153:23 162:18,25
196:17 202:17

219:20 220:17,23
**told (18)**
37:13 53:10 65:12,19
78:6 93:20 134:11
136:16,18,19 137:6
145:4,5 148:7
149:13 172:13
176:18 184:12
**tonight (1)**
194:5
**top (9)**
17:3 59:14 69:17 73:2
122:5 150:6 185:19
198:25 219:7
**topic (5)**
40:21 202:22 203:8
205:11 218:24
**total (1)**
15:14
**town (1)**
21:23
**to'ing (1)**
216:8
**tracks (1)**
168:5
**traded (1)**
41:14
**trades (9)**
137:14,22 145:10,19
146:14 147:8,17,23
147:25
**trading (3)**
20:23 197:5,9
**traffic (3)**
153:20 193:2 217:20
**transaction (54)**
7:5,25 8:13,22 14:17
14:21 15:2,19 16:4
16:6 19:9,17 46:22
99:8,18 100:3,23
104:17 120:18,20
123:7,9 134:14,18
134:21 135:7
136:18,22,24
139:13 143:9 145:9
145:14 147:7,15,22
149:17 150:18
167:15 168:21
177:20 183:8
193:25 194:4
203:13,23 204:2,3
204:14 209:2,3
217:5,12 221:20
**transactions (18)**
59:23 131:24 134:4,7
136:10,22 138:18
138:19 143:7
145:25 146:9,18,25
157:5,22 168:16

205:25 212:14
**transcription (1)**
226:8
**transfer (43)**
38:21 39:22 43:17
54:2 79:13 85:17
92:25 97:23 98:2,21
99:8,14,22 100:8,13
101:11,24 102:16
103:20 105:15
106:12 107:18,19
108:2 110:7,20
113:23 120:10
130:11 133:23
137:3,8 138:25
139:16 140:15 141:4
141:15 157:20
158:6 186:5 191:25
193:25 195:7
**transferred (30)**
38:15 41:6 42:8 43:19
51:19,23 59:24 75:9
75:15,18 76:2,5,7
77:2 79:19 82:22
98:25 100:24 103:7
103:8,17 134:4
139:19 157:3 159:7
181:11,14,17
182:12 186:10
**transferring (5)**
98:13 100:7 107:9
109:10 216:17
**transfers (9)**
39:15 85:16 131:23
132:20 137:14
139:14 143:8
146:20 158:18
**transmittal (2)**
37:8 90:5
**transmitted (2)**
69:23 184:16
**transmitter (1)**
213:24
**transmitting (1)**
195:12
**treated (2)**
78:16 82:3
**treatment (6)**
14:16,19 45:18,23
46:20 64:24
**trial (1)**
5:12
**tried (1)**
178:6
**triggered (2)**
141:3,14
**troubleshooting (1)**
104:19
**true (2)**

177:23 225:13
**Trust (1)**
68:12
**trustee (11)**
4:5 6:13 117:24,25
118:5,6,20 119:25
161:6,13 164:4
**trustee's (3)**
25:19 38:25 164:23
**try (3)**
16:10 49:5 139:15
**trying (14)**
16:13 19:19 29:22
50:16 62:10 65:15
70:17 125:13
142:10 149:18
162:12 174:16
197:18 212:19
**Tuesday (4)**
175:25 178:2 222:4,6
**turn (11)**
30:23 68:3 73:2 74:6
74:17 84:18 92:24
155:21 168:6
194:17 198:22
**turnover (1)**
112:11
**two (16)**
9:12 10:3,21 29:23
30:2,19 59:19 65:5
68:5 70:25 106:16
128:23 138:6 166:8
176:7 190:24
**type (4)**
8:3 46:23 111:14
205:21
**t,he (1)**
186:21

**U**

**ultimately (11)**
10:21 18:9 19:25
57:14 70:7 114:10
123:17 137:5
174:14 177:16
211:2
**ultimatum (2)**
221:5,17
**Um-hm (12)**
23:21 48:4,20 64:16
68:8 71:2 113:25
121:17 163:25
164:7 168:10 185:8
**unavailability (1)**
123:18
**unavailable (1)**
102:17
**unaware (1)**
160:24

**uncertainty (2)**
144:20 222:11
**unclear (4)**
6:15 22:6 29:25 60:25
**uncleared (1)**
137:21
**unconditional (1)**
110:7
**uncreditworthy (1)**
179:2
**understand (41)**
7:24 8:2 20:17 23:9
24:6 30:11 31:22
36:7 42:12 62:11
67:17 70:17 85:15
86:5,20 88:15 91:9
98:3 107:24 117:5
117:10 133:6,18
137:10,24 139:25
156:2,18,22 160:22
162:5,12,20 164:22
171:17,21 172:21
177:14 180:7 187:6
189:18
**understanding (49)**
7:16,20 8:7,9 11:11
11:18 12:4 15:9
29:10 55:17,20
56:25 63:4 67:24
68:9 71:4 78:15
82:14 90:20 92:9
106:9 109:23
116:17 117:17
133:8 134:13,17
137:12,17 139:6
143:5 152:22 153:2
156:11,25 157:12
157:15,21 160:19
162:14 170:6,16
171:24 188:19,20
199:12 201:16
204:11,16
**understandings (1)**
44:25
**understood (19)**
16:19 49:11 67:20
71:4 76:25 80:16
86:12,23 103:5
159:18 161:15
163:13 178:9
180:15,17,19 183:2
187:12 216:4
**undertaken (1)**
204:24
**undertaking (4)**
12:6,7,13 189:15
**undertakings (1)**
190:20
**under-reserved (1)**

100:17
**undoubtedly (1)**
130:16
**unfolded (1)**
9:5
**unfortunately (1)**
88:6
**uniformly (1)**
69:22
**United (3)**
1:2 61:9 160:6
**unprocessed (1)**
146:14
**unrelated (3)**
115:5 136:4 192:9
**unsettled (5)**
145:10,19 146:14
147:8,17
**unwinding (1)**
216:16
**unwound (1)**
204:3
**update (1)**
182:18
**URQUHART (1)**
3:18
**use (3)**
86:18 113:2 166:23
**usually (1)**
12:9
**utterly (1)**
192:8
**U.S (1)**
77:20

---

**V**

**vague (2)**
149:14 208:2
**valuation (1)**
222:10
**value (21)**
15:14,16 31:3 54:5
93:7,13 94:10,13,17
94:18,23 95:8 108:5
108:23,25 111:4,5
111:10 112:7,14
116:3
**variety (2)**
45:8 48:11
**various (12)**
11:14 19:17 43:5 86:2
144:7 164:12 190:3
192:12 196:2
197:11 220:18,19
**verbal (3)**
39:9 164:10 185:20
**verbatim (1)**
31:18

**verify (1)**
90:13
**verifying (2)**
74:4 168:4
**version (1)**
67:5
**versus (1)**
22:8
**viable (1)**
140:18
**Vic (2)**
21:13 104:11
**view (10)**
11:8 45:23 101:2
131:7 160:23,25
167:11 189:21,22
189:25
**viewed (1)**
144:24
**visited (1)**
125:8
**vis-a-vis (2)**
189:12,13
**VIX (2)**
176:22 179:3
**voice (1)**
16:11
**volatile (2)**
177:4 222:10
**volatility (3)**
177:3 178:2,5

---

**W**

**W (1)**
3:8
**wait (3)**
128:10 154:12 194:22
**waiting (1)**
151:7
**waive (2)**
18:4 205:17
**waived (1)**
5:8
**waiver (1)**
203:10
**walked (1)**
128:24
**Wang (3)**
211:19 212:6,10
**want (21)**
25:4 34:10 41:22,22
63:11 78:7 80:4
92:10 107:14
108:11 114:21
124:15 136:2
138:11 139:23
162:19 170:24
187:7 199:11

203:18 221:24
**wanted (20)**
49:13 71:6 73:9 87:23
92:8 94:17 99:23
138:23 148:2
151:14 158:16,19
176:6 181:24
182:22 189:18
192:15 204:22
220:10 221:6
**Washington (3)**
3:14 21:15,17
**wasn't (21)**
52:19,21 58:6 71:19
72:6 76:14 92:16
99:6 102:6,6 104:16
105:13 109:3 125:2
178:23,23 182:25
191:20,23 203:19
221:23
**way (24)**
22:14,15 40:15 46:22
49:18 69:24 75:21
82:24 109:16
112:25 114:25
146:24 147:22
158:17 177:13
178:17 180:17
192:3 199:17 208:5
215:11,13 221:22
225:17
**ways (1)**
34:22
**Wednesday (1)**
214:24
**wee (1)**
149:10
**week (4)**
22:18 23:3,4 215:20
**weekend (6)**
27:22 38:4 43:9,13
175:16 221:10
**Weil (28)**
55:6,9 90:10 97:18
109:24 110:16,18
111:8,12,16,25
112:3,13 113:14
117:16 118:21
120:2 165:3,9,19
166:6 167:2 208:8
208:17 219:25
220:4,6,15
**Weil's (1)**
133:4
**Wells (2)**
53:21 54:7
**went (2)**
19:8 53:7
**weren't (10)**

14:8 17:10 47:21 54:4
87:13 110:3 125:15
141:23 165:21
179:7
**whereof (1)**
225:19
**wide (1)**
48:11
**wider (1)**
129:9
**WILLIAM (1)**
4:8
**willing (6)**
53:14 130:10 138:17
144:12 152:4
168:20
**winding (1)**
155:22
**Wisconsin (1)**
3:13
**withdrawn (1)**
209:9
**witness (34)**
3:12 4:12 6:6 24:5
26:9 55:8 78:20
80:23 89:5 165:4
166:7 170:12,23
174:2 180:5 184:2,5
187:23 188:4 192:6
193:14 199:4,10,17
201:11,15 214:8
215:6 222:17 223:3
225:10,14,19 226:5
**word (5)**
31:3 43:2 53:7 90:18
211:16
**wording (2)**
74:15 115:24
**words (31)**
30:13 34:20 48:22
49:2,22 50:6,19
54:12 59:16 74:3
81:7,8 93:9,11,12
96:19 104:3 111:5,9
111:10,13,17 112:5
112:7 115:13 116:6
131:13 140:9 147:9
147:13 168:14
**wordsmithing (1)**
49:20
**work (3)**
24:3 43:11 171:9
**working (3)**
160:11 166:2,6
**work-around (1)**
138:16
**world (1)**
78:12
**worried (2)**

135:23 221:14
**worth (1)**
214:9
**wouldn't (19)**
14:25 51:24 52:20
  83:8 91:6 96:22,25
  97:7,7,7 117:8
  126:3 134:17
  177:20 192:8 212:4
  216:6,7 221:16
**wound (1)**
213:13
**wrap (1)**
53:3
**wrong (3)**
106:4,5 152:15
**wrote (1)**
65:16

**X**

**x (2)**
1:4,10

**Y**

**Yeah (12)**
26:9 91:25 96:17
  103:16 137:23
  139:22 166:9 174:6
  181:16 206:25
  207:16 218:22
**yesterday (1)**
23:5
**York (17)**
1:3,13,13 2:10,11,14
  3:7,7,21,21 4:7,7,14
  4:14 225:3,5,9

**0**

**00024097 (2)**
173:6 223:16
**00034491 (1)**
179:15
**00126 (3)**
120:22,24 223:12
**00163813 (1)**
218:15
**00198 (3)**
120:22,24 223:12
**00201894 (1)**
211:14
**0024097 (1)**
173:3
**0034491 (2)**
179:18 223:18
**00359 (3)**
149:25 150:3 223:14
**0036408 (1)**
180:24

**0036472 (3)**
184:21,24 223:22
**0036482 (3)**
193:7,10 223:24
**074 (3)**
91:9,13,16
**08-13555(JMP) (1)**
1:7

**1**

**1 (20)**
54:6 70:20 83:23,25
  84:10 90:14 91:19
  103:16 122:4
  155:21 161:2,4,5
  173:12,16,25
  181:15 188:3
  198:21 226:7
**1D (3)**
25:10 26:17 30:6
**1(a)(ii)(C) (1)**
37:6
**1.1 (1)**
198:22
**1.7 (1)**
98:4
**100 (2)**
91:16 215:17
**10004-1482 (1)**
4:7
**10006 (1)**
4:14
**10010 (1)**
3:21
**10017-6702 (1)**
3:7
**11 (3)**
1:6 66:8 142:15
**120 (1)**
223:9
**122 (1)**
223:11
**14th (1)**
8:15
**15c3 (7)**
51:18 53:22 54:3
  76:22 77:2 93:3
  95:18
**15c3-3 (9)**
31:2 36:23 37:20
  45:18 52:6 58:24
  75:20 83:7 101:20
**15th (4)**
8:15,19,20 43:12
**152 (1)**
223:13
**156B (1)**
169:16

**163813 (2)**
218:11 224:7
**17th (1)**
214:24
**175 (2)**
121:16 223:15
**176 (2)**
121:18 122:5
**178 (1)**
121:15
**18 (1)**
219:8
**180 (1)**
121:10
**181 (1)**
223:17
**183 (1)**
223:19
**186 (1)**
223:21
**19 (4)**
1:14 2:5 118:13 226:4
**19th (1)**
225:20
**195 (1)**
223:23

**2**

**2 (10)**
55:24 56:5 59:13
  74:17,19,19 87:24
  122:19 198:23
  226:7
**20 (3)**
121:3 181:7 188:7
**20015 (1)**
3:14
**2008 (5)**
118:14 121:3 188:7
  212:23 219:8
**2009 (1)**
169:18
**2010 (5)**
1:14 2:5 222:23
  225:20 226:4
**201894 (2)**
211:10 224:5
**202 (1)**
223:5
**21 (2)**
168:8 185:3
**213 (1)**
224:4
**22nd (4)**
3:20 9:6 217:14
  220:22
**220 (1)**
224:6

**222 (1)**
3:6
**24 (1)**
212:23
**25 (4)**
63:15,17 187:21,24
**250 (16)**
130:4 138:4,6 139:7
  141:21 142:7,14
  144:11 150:13
  151:21,25 152:11
  152:12 153:6
  164:19 168:21
**252 (1)**
181:19
**28461 (1)**
1:18

**3**

**3 (8)**
21:3 23:18,20 59:14
  169:24,25 194:4
  226:8
**3-3 (7)**
58:19 93:24 96:3
  97:23 108:21
  113:15,23
**3:31 (1)**
193:17
**3:43 (1)**
154:10
**3:59 (1)**
219:9
**30 (1)**
65:25
**30(b)(6) (5)**
6:22 22:2,8 23:12
  210:2
**34 (1)**
205:7
**36 (1)**
66:25
**361 (3)**
149:25 150:3 223:14
**36473 (3)**
184:22,24 223:22

**4**

**4 (14)**
24:9,21,23 25:6,18
  26:3 32:23 34:18
  68:3 74:6 84:18
  92:24 168:6 198:25
**4:01 (1)**
219:8
**4:35 (1)**
222:18
**409 (3)**

**180:25 181:3 223:20
**41st (1)**
3:6
**451 (1)**
95:3
**483 (3)**
193:8,10 223:24
**49 (1)**
69:8

**5**

**5 (26)**
11:8,20 12:25 24:19
  24:22 25:2,8,12
  26:3 32:25 33:6,11
  33:16 34:25 46:25
  50:9 55:13 56:5
  58:12 64:11 65:7
  74:14 88:25 114:6
  115:10 143:13
**5.1 (1)**
182:16
**50 (2)**
89:6,24
**51 (1)**
3:20
**5301 (1)**
3:13
**559 (3)**
213:19,22 214:5
**563C (1)**
168:2

**6**

**6 (3)**
50:9 169:18 223:4
**60 (1)**
91:22
**606 (4)**
151:6 153:25 155:7
  161:3
**607 (1)**
163:16
**616A (1)**
87:11
**622 (3)**
6:2,19 223:8
**623 (4)**
118:13,16 120:13
  223:9
**624 (3)**
120:21,23 223:11
**625 (3)**
149:24 150:2 223:13
**626 (3)**
173:3,5 223:15
**627 (3)**
179:15,17 223:17

**628 (3)**
180:24 181:2 223:19
**629 (3)**
184:21,23 223:21
**630 (3)**
193:7,9 223:23
**631 (5)**
211:9,13 215:15,22
224:4
**632 (4)**
218:9,10,14 224:6

---
**7**
---

**7 (2)**
113:16,19
**700 (4)**
98:16 118:15,17
223:10
**769 (16)**
93:16,22 94:21 98:16
98:21 100:8,14
101:5,13 105:18
107:9 108:8,9,21
109:10 110:20

---
**8**
---

**8 (7)**
68:4 74:7 84:18,19
92:25 143:13 223:8
**8s (1)**
68:5
**800 (1)**
3:13
**815 (3)**
218:11,15 224:7
**895 (1)**
211:14

---
**9**
---

**9 (1)**
143:13
**9:35 (1)**
2:6
**92 (3)**
179:16,18 223:18
**927 (1)**
182:6
**95 (2)**
211:10 224:5
**99 (3)**
173:4,6 223:16

# EXHIBIT O

**To:**      Anthony.savoca@finra.org[Anthony.savoca@finra.org]; yolanda.trottman@finra.org[yolanda.trottman@finra.org]
**Cc:**      Burke, William T[wburke@lehman.com]; Stucchio, Anthony[astucchi@lehman.com]
**From:**    Potenciano, Joel
**Sent:**    Tue 9/16/2008 12:06:41 PM
**Subject:** FW: Reserve Formula as of 09/12/2008
**Categories:** urn:content-classes:message

<u>FINRA.Consolidated 15c3-3.091208.pdf</u>

Hi Yolanda and Tony,

Attached is the final Reserve Formula as of 09/12/2008.  Please let us know if you have questions.  Thanks!

With kind regards,
Joel K. Potenciano
LEHMAN BROTHERS
Telephone  +1 (212) 320-6786
Fax  +1 (646) 885-9383
Email  joel.potenciano@lehman.com


> _____
> From:          Potenciano, Joel
> Sent: Tuesday, September 16, 2008 12:02 PM
> To:    Stanton, Brian
> Subject:       Reserve Formula as of 09/12/2008
>
>  <<FINRA.Consolidated 15c3-3.091208.pdf>>
>
> Brian,
>
> Per our request, attached is the final 9/12 calc.  Please let me know
> if you have questions.  Thanks!
>
> With kind regards,
> Joel K. Potenciano
> LEHMAN BROTHERS
> Telephone  +1 (212) 320-6786
> Fax  +1 (646) 885-9383
> Email  joel.potenciano@lehman.com
>

LEHMAN BROTHERS INC.
CONSOLIDATED 15c3-3 RESERVE FORMULA
AS OF SEPTEMBER 12, 2008
(in 000's)

| | BD UNIT | GOVT UNIT | TOTAL |
|---|---|---|---|
| CREDITS: | | | |
| CUSTOMER CREDITS | 6,520,841 | 1,057,744 | 7,578,585 |
| CUSTOMER BANK LOAN | 660,564 | - | 660,564 |
| CUSTOMER STOCK LOAN | 857,412 | 218,912 | 1,076,324 |
| CUSTOMER FAIL TO RECEIVE | 1,062,994 | 201,900 | 1,264,894 |
| FIRM SHORT VS CUSTOMER LONG | 1,287,667 | 559,028 | 1,846,695 |
| CUSTOMER DIVIDENDS AND INTEREST | 5,034 | - | 5,034 |
| SECURITY COUNT DIFFERENCE | - | - | - |
| SUSPENSE ACCOUNT CREDITS AND SMV | 106,369 | 197,137 | 303,506 |
| AGED TRANSFER AND REORGANIZATION | - | - | - |
| OTHER | - | - | - |
| TOTAL CREDITS | 10,500,880 | 2,234,721 | 12,735,601 |
| DEBITS: | | | |
| CUSTOMER DEBITS | 3,710,783 | 1,006,026 | 4,716,809 |
| CUSTOMER STOCK BORROW | 1,325,861 | 341,498 | 1,667,359 |
| CUSTOMER FAIL TO DELIVER | 406,793 | 178,626 | 585,419 |
| CUSTOMER MARGIN WITH OCC | 657,782 | - | 657,782 |
| OTHER | - | - | - |
| AGGREGATE DEBITS | 6,101,219 | 1,526,150 | 7,627,369 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | (183,037) | (45,785) | (228,822) |
| TOTAL DEBITS | 5,918,182 | 1,480,366 | 7,398,547 |
| EXCESS OF CREDITS OVER DEBITS | 4,582,698 | 754,356 | 5,337,053 |
| EXCESS OF DEBITS OVER CREDITS | - | - | - |
| ADJUSTED REGULATORY LOCK-UP | | | 5,691,000 |
| Less: Accounts Funded By Treasury 9/15 | | | (447,000) |
| NET AMOUNT SEGREGATED | | | 5,244,000 |

## LEHMAN BROTHERS INC.
## CONSOLIDATED 15c3-3 PAIB RESERVE FORMULA
## AS OF SEPTEMBER 12, 2008
### (in 000's)

|  | TOTAL |
|---|---:|
| **CREDITS:** | |
| PAIB CREDITS | 1,928,151 |
| PAIB BANK LOAN | 3,934 |
| PAIB STOCK LOAN | 388,700 |
| PAIB FAIL TO RECEIVE | 8,500 |
| FIRM SHORT VS PAIB LONG | 194,659 |
| PAIB DIVIDENDS AND INTEREST | - |
| SECURITY COUNT DIFFERENCE | - |
| SUSPENSE ACCOUNT CREDITS AND SMV | - |
| AGED TRANSFER AND REORGANIZATION | - |
| OTHER | - |
| **TOTAL CREDITS** | 2,523,944 |
| **DEBITS:** | |
| PAIB DEBITS | 1,420,683 |
| PAIB STOCK BORROW | 681,137 |
| PAIB FAIL TO DELIVER | 1,717 |
| PAIB MARGIN WITH OCC | - |
| OTHER | - |
| **AGGREGATE DEBITS** | 2,103,537 |
| **TOTAL DEBITS** | 2,103,537 |
| **EXCESS OF CREDITS OVER DEBITS** | 420,407 |
| **AMOUNT SEGREGATED** | 531,000 |

*LEHMAN BROTHERS INC.*
*CUSTOMER RESERVE FORMULA*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 12, 2008*
*(in 000's)*
*(ITS ONLY)*

|  | 09/12/08 | 09/05/08 | VARIANCE |
|---|---|---|---|
| **CUSTOMER CREDITS:** | | | |
| Customer Accts (ITS, | 1,643,317 | 1,497,870 | 145,447 |
| Customer Accts | 0 | 0 | 0 |
| Securities Related Intercompany Payable. | 189,086 | 181,077 | 8,009 |
| Phlx Options Payables | 0 | 0 | 0 |
| NonReg Commodity Credits | 433,709 | 0 | 433,709 |
| Bank Overdrafts | 0 | 0 | 0 |
| Bank Overdrafts(Commodity) | 13,779 | 28,144 | (14,365) |
| Other | 0 | 0 | 0 |
| Total | 2,279,890 | 1,707,091 | 572,800 |
|  | | | 0 |
| **CUSTOMER BANK LOAN** | 0 | 0 | 0 |
| **CUSTOMER STOCK LOAN** | 0 | 0 | 0 |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 203,076 | 140,336 | 62,739 |
| **CUSTOMER FAIL TO RECEIVE** | 0 | 0 | 0 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 | 0 | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 293,844 | 21,838 | 272,006 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 6,186 | 5,818 | 367 |
| **FIRM SHORT VS. CUSTOMER LONG** | 0 | 0 | 0 |
| **SUSPENSE CREDITS** | 0 | 0 | 0 |
| **TOTAL CREDITS** | 2,782,995 | 1,875,084 | 907,912 |
| **CUSTOMER DEBITS:** | | | |
| Customer Accts (ITS, | 1,259,787 | 508,324 | 751,463 |
| Customer Accts | 0 | 0 | 0 |
| Philadelphia Options Cust. Receivables | 0 | 0 | 0 |
| Total | 1,259,787 | 508,324 | 751,463 |
| **CUSTOMER MARGIN WITH OCC** | 0 | 0 | 0 |
| **CUSTOMER STOCK BORROW (ITS)** | 54,435 | 3,130 | 51,306 |
| **CUSTOMER STOCK BORROW** | 0 | 0 | 0 |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 182,886 | 84,283 | 98,603 |
| **CUSTOMER FAIL TO DELIVER** | 0 | 0 | 0 |
| **AGGREGATE DEBITS** | 1,497,108 | 595,737 | 901,371 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 44,913 | 17,872 | 27,041 |
| **TOTAL DEBITS** | 1,452,195 | 577,865 | 874,330 |
| **EXCESS OF CREDITS OVER DEBITS** | 1,330,800 | 1,297,219 | 33,582 |

*LEHMAN BROTHERS INC.*
*CUSTOMER RESERVE FORMULA*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 12, 2008*
*(in 000's)*
*(ADP ONLY)*

| | 09/12/08 | 09/05/08 | VARIANCE |
|---|---:|---:|---:|
| **CUSTOMER CREDITS:** | | | |
| Customer Accts (ITS) | 0 | 0 | 0 |
| Customer Accts | 4,170,706 | 3,970,526 | 200,180 |
| OMNI Conv payable Acct. | 0 | 0 | 0 |
| Phlx Options Payables | 0 | 0 | 0 |
| NonReg Commodity Credits | 0 | 0 | 0 |
| Bank Overdrafts | 70,244 | 52,177 | 18,067 |
| Other | 0 | 0 | 0 |
| Total | 4,240,951 | 4,022,704 | 218,247 |
| | | | |
| **CUSTOMER BANK LOAN** | 366,720 | 0 | 366,720 |
| **CUSTOMER STOCK LOAN** | 857,412 | 225,563 | 631,849 |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 0 | 0 | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 859,918 | 166,254 | 693,664 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 | 0 | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 0 | 0 | 0 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 0 | 0 | 0 |
| **FIRM SHORT VS. CUSTOMER LONG** | 1,281,481 | 448,890 | 832,591 |
| **CUSTOMER DIVIDEND & INTEREST** | 5,034 | 15,944 | (10,911) |
| **SUSPENSE CREDITS** | 106,369 | 97,453 | 8,916 |
| **OTHER** | 0 | 0 | 0 |
| | | | |
| **TOTAL CREDITS** | 7,717,884 | 4,976,807 | 2,741,077 |
| | | | |
| | | | |
| **CUSTOMER DEBITS:** | | | |
| Customer Accts (ITS) | 0 | 0 | 0 |
| Customer Accts | 2,450,996 | 2,092,314 | 358,682 |
| Philadelphia Options Cust. Receivables | 0 | 0 | 0 |
| Total | 2,450,996 | 2,092,314 | 358,682 |
| | | | |
| **CUSTOMER MARGIN WITH OCC** | 657,782 | 621,700 | 36,082 |
| **CUSTOMER STOCK BORROW (ITS)** | 0 | 0 | 0 |
| **CUSTOMER STOCK BORROW** | 1,271,426 | 581,598 | 689,828 |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 0 | 0 | 0 |
| **CUSTOMER FAIL TO DELIVER** | 223,907 | 96,702 | 127,205 |
| | | | |
| **AGGREGATE DEBITS** | 4,604,111 | 3,392,313 | 1,211,798 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 138,123 | 101,769 | 36,354 |
| | | | |
| **TOTAL DEBITS** | 4,465,988 | 3,290,544 | 1,175,444 |
| | | | |
| **EXCESS OF DEBITS OVER CREDITS** | 0 | 0 | 0 |
| | | | |
| **EXCESS OF CREDITS OVER DEBITS** | 3,251,896 | 1,686,263 | 1,565,634 |

## LEHMAN BROTHERS INC.
## CUSTOMER RESERVE FORMULA
## BROKER DEALER UNIT
### AS OF SEPTEMBER 12, 2008
*(in 000's)*

*(COMBINED)*

|  | 09/12/08 | 09/05/08 | VARIANCE |
|---|---|---|---|
| **CUSTOMER CREDITS:** | | | |
| Customer Accts (ITS) | 1,643,317 | 1,497,870 | 145,447 |
| Customer Accts | 4,170,706 | 3,970,526 | 200,180 |
| Securities Related Intercompany Payable | 189,086 | 181,077 | 8,009 |
| Phlx Options Payables | 0 | 0 | 0 |
| NonReg Commodity Credits | 433,709 | 0 | 433,709 |
| Bank Overdrafts | 70,244 | 52,177 | 18,067 |
| Bank Overdrafts (Commodity) | 13,779 | 28,144 | (14,365) |
| Other | 0 | 0 | 0 |
| *Total* | 6,520,841 | 5,729,794 | 791,047 |
| | | | |
| **CUSTOMER BANK LOAN** | 366,720 | 0 | 366,720 |
| **CUSTOMER STOCK LOAN** | 857,412 | 225,563 | 631,849 |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 203,076 | 140,336 | 62,739 |
| **CUSTOMER FAIL TO RECEIVE** | 859,918 | 166,254 | 693,664 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 | 0 | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 293,844 | 21,838 | 272,006 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 6,186 | 5,818 | 367 |
| **FIRM SHORT VS. CUSTOMER LONG** | 1,281,481 | 448,890 | 832,591 |
| **CUSTOMER DIVIDEND & INTEREST** | 5,034 | 15,944 | (10,911) |
| **SUSPENSE CREDITS** | 106,369 | 97,453 | 8,916 |
| **OTHER** | 0 | 0 | 0 |
| | | | |
| **TOTAL CREDITS** | 10,500,880 | 6,851,891 | 3,648,989 |
| | | | |
| **CUSTOMER DEBITS:** | | | |
| Customer Accts (ITS) | 1,259,787 | 508,324 | 751,463 |
| Customer Accts | 2,450,996 | 2,092,314 | 358,682 |
| Philadelphia Options Cust. Receivables | 0 | 0 | 0 |
| *Total* | 3,710,783 | 2,600,638 | 1,110,145 |
| | | | |
| **CUSTOMER MARGIN WITH OCC** | 657,782 | 621,700 | 36,082 |
| **CUSTOMER STOCK BORROW (ITS)** | 54,435 | 3,130 | 51,306 |
| **CUSTOMER STOCK BORROW** | 1,271,426 | 581,598 | 689,828 |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 182,886 | 84,283 | 98,603 |
| **CUSTOMER FAIL TO DELIVER** | 223,907 | 96,702 | 127,205 |
| | | | |
| **AGGREGATE DEBITS** | 6,101,219 | 3,988,050 | 2,113,169 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 183,037 | 119,642 | 63,395 |
| | | | |
| **TOTAL DEBITS** | 5,918,182 | 3,868,408 | 2,049,774 |
| | | | |
| **EXCESS OF CREDITS OVER DEBITS** | 4,582,698 | 2,983,482 | 1,599,215 |
| | | | |
| **EXCESS OF DEBITS OVER CREDITS** | 0 | 0 | 0 |

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

AS OF SEPTEMBER 12, 2008

|  | 09/12/08 |
|---|---|
| *CUSTOMER CREDITS:* | |
| Customer Accounts | 1,581,447 |
| Securities Related Intercompany Payables | 189,086 |
| ITS Unsecured Shorts | 61,870 |
| *Non Commodity Reg* | 433,709 |
| Commodity Overdrafts | 13,779 |
| Bank Overdrafts | 0 |
| Tefra Withholdings | 0 |
| Aged Checks | 0 |
| Subtotal | 2,279,890 |
| | |
| *CUSTOMER STOCK LOAN* | 0 |
| *CUSTOMER FAIL TO RECEIVE* | 203,076 |
| *CUSTOMER BANK LOAN (OCC MARGIN)* | 0 |
| *CUSTOMER BANK LOAN (ITS-REPO)* | 293,844 |
| *FIRM SHORT VS. CUSTOMER LONG* | 6,186 |
| *SUSPENSE CREDITS* | 0 |
| | |
| *TOTAL CREDITS* | 2,782,995 |
| | |
| *CUSTOMER DEBITS:* | |
| Customer Accounts | 1,259,787 |
| *OMNI Rec Formula* | 0 |
| Philadelphia Options Cust. Receivables | 0 |
| Subtotal | 1,259,787 |
| | |
| *CUSTOMER MARGIN WITH OCC* | 0 |
| | |
| *CUSTOMER STOCK BORROW* | 54,435 |
| *CUSTOMER FAIL TO DELIVER* | 182,886 |
| *AGGREGATE DEBITS* | 1,497,108 |
| Less 3% | 44,913 |
| *TOTAL DEBITS* | 1,452,195 |
| | |
| *EXCESS CREDITS OVER DEBITS* | 1,330,801 |

### 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 12, 2008
(in OOO'S)

| | 09/12/08 |
|---|---|
| **1.  CUSTOMER CREDITS:** | |
| CUSTOMER SECURITY ACCOUNTS | 8,426,751 |
| CUSTOMER ADJUSTMENTS | (2,763,246) |
| UNMAPPED CUSTOMER PAYABLE | 3,707 |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (767,443) |
| CUSTOMER NETTING NB | (87,776) |
| MONEY CONTROL ADJUSTMENTS | - |
| NON-BROKER DEALER AFFILIATES TYPE 5 | 291 |
| BOOKKEEPING ADJUSTMENTS | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - |
| BANK OVERDRAFTS | 70,244 |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 183,000 |
| HOUSE ACCOUNTS | 512 |
| TEFRA WITHHOLDING PAYABLE | 187 |
| LEGAL LEDGER CONTRA ACCOUNTS | 115 |
| BREAK VS. CUSTOMER LONG | 115 |
| FIRM LONG VS. CUSTOMER SHORT | (130,037) |
| NONCUST LONG VS. CUSTOMER SHORT | (716,611) |
| REVERSE REPO VS. CUSTOMER SHORT | - |
| PAIB LONG VS. CUSTOMER SHORT | (1,670) |
| SHORT & CREDIT INTEREST | 20,788 |
| MONEY FUND SETTLEMENTS 098-00003  & 098-70001 | - |
| UNALLOCATED CUSTOMER SHORT | 2,023 |
| | |
| TOTAL CUSTOMER CREDITS | **4,240,951** |
| | |
| **2.  CUSTOMER BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFICIT | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
| STOCK BORROW VS. CUST BANK LOAN | 35,113 |
| STOCK BORROW VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
| STOCK BORROW L/C VS FIRM BANK LOAN | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 331,607 |
| CUST BANK LOAN - CUST NOT LONG | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
| FIRM BANK LOAN - FIRM NOT LONG | - |
| | |
| TOTAL CUSTOMER BANK LOAN | **366,720** |
| | |
| **3.  CUSTOMER STOCK LOAN:** | |
| STOCK LOAN | 38,381,735 |
| STOCK LOAN MTM | (2,540,921) |
| STOCK LOAN WITH CLEARING ORG | - |
| STOCK LOAN FREE OF MONEY | 6,651,469 |
| STOCK LOAN MTM DEFICIT | 468 |
| STOCK LOAN BOB ADJUSTMENT | - |
| UNALLOCATED STOCK LOAN ADJ | - |
| STOCK LOAN VS. STOCK BORROW L/C | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L/C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | (2,834) |
| STOCK LOAN PLEDGE VS. PAIB LONG | (385,866) |
| STOCK LOAN VS. STOCK BORROW | (29,303,462) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q. | (250,604) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (1,884,943) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (1,822,715) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q. | (45,546) |

*15c-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 12, 2008*
(in OOO'S)

| | 09/12/08 |
|---|---|
| *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ* | **(168,201)** |
| *STOCK LOAN VS. NONCUSTOMER LONG* | **(1,751,845)** |
| *STOCK LOAN PLEDGE VS. NONCUSTOMER LONG* | **(1,997,870)** |
| *STOCK LOAN VS. FIRM LONG* | **(2,759,139)** |
| *STOCK LOAN PLEDGE VS. FIRM LONG* | **(1,262,314)** |
| *TOTAL CUSTOMER STOCK LOAN* | **857,412** |

15c-3 CUSTOMER RESERVE COMPUTATION
BROKER DEALER UNIT
AS OF SEPTEMBER 12, 2008
*(in OOO'S)*

| | 09/12/08 |
|---|---|
| **4.    CUSTOMER FAIL TO RECEIVE:** | |
| FAIL TO RECEIVE | 2,124,866 |
| CNS FAIL TO RECEIVE | 174,581 |
| MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| FAIL TO RECEIVE MTM ADJUSTMENT | - |
| FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 319,376 |
| FAIL TO RECEIVE VS. FAIL TO DELIVER | (164,495) |
| FAIL TO RECEIVE VS. REVERSE REPO | - |
| FAIL TO RECEIVE VS. MTM DEFICIT | - |
| FAIL TO RECEIVE VS. STOCK BORROW | (616,514) |
| FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q. | (3,098) |
| FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (10,219) |
| FAIL TO RECEIVE VS. FIRM LONG | (257,236) |
| FAIL TO RECEIVE VS. NONCUSTOMER LONG | (547,505) |
| FAIL TO RECEIVE VS. PAIB LONG | (7,596) |
| FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| CNS FAIL TO RECEIVE VS. FIRM LONG | (57,078) |
| CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (45,119) |
| CNS FAIL TO RECEIVE VS. PAIB LONG | (904) |
| CNS FAIL TO RECEIVE ADJUSTMENT | - |
| CNS FAIL TO RECEIVE VS. STOCK BORROW | (37,672) |
| CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q. | (1,248) |
| CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (10,221) |
| | |
| TOTAL CUSTOMER FAIL TO RECEIVE | **859,918** |
| | |
| | |
| **5.    FIRM SHORT VS CUSTOMER LONG:** | |
| TOTAL FIRM SHORT | - |
| FIRM OMNI SHORT | - |
| FIRM SHORT VS. CUSTOMER LONG | 158,591 |
| NONCUSTOMER SHORT VS. CUSTOMER LONG | 457,358 |
| REPO VS. CUSTOMER LONG | 549,501 |
| PAIB SHORT VS. CUSTOMER LONG | 113,511 |
| REPO VS. UNALLOCATED | 142 |
| FIRM SHORT VS. UNALLOCATED | 515 |
| NONCUSTOMER SHORT VS. UNALLOCATED | 1,863 |
| | |
| TOTAL FIRM SHORT VS. CUSTOMER LONG | **1,281,481** |
| | |
| | |
| **6.    CUSTOMER DIVIDEND & INTEREST:** | |
| DIVIDEND & INT PAYABLES | 8,242 |
| ADJUSTMENTS FROM DIVIDEND DEPT. | (3,208) |
| | |
| TOTAL CUSTOMER DIVIDENDS & INTEREST | **5,034** |
| | |
| | |
| **7.    SECURITY COUNT DIFFERENCE > 7 DAYS:** | |
| | |
| **8.    SUSPENSE ACCOUNTS** | |
| SUSPENSE CREDITS & SMV: | 8,093 |
| CUSTOMER UNAPPLIED 090-01234 | 13,064 |
| ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBAT | 85,212 |
| | |
| TOTAL SUSPENSE ACCOUNTS | **106,369** |
| | |
| | |
| **9.    AGED TRANSFERS & REORGANIZATION:** | |
| TRANSFER SHORTS OVER 40 DAYS | - |
| REORG/REDEMPTION SMV OVER 7 DAYS | - |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 12, 2008*
*(in OOO'S)*

|  | 09/12/08 |
|---|---|
| TOTAL AGED TRANSFERS & REORGANIZATION | - |
| **10.** **OTHER:** | |
| OTHER CREDITS | - |
| TOTAL OTHER | - |
| TOTAL CREDITS | 7,717,884 |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 12, 2008*
*(in OOO'S)*

| | | 09/12/08 |
|---|---|---:|
| **12.** | **CUSTOMER DEBITS:** | |
| | *CUSTOMER SECURITY ACCOUNTS* | 4,039,364 |
| | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (767,443) |
| | *CUSTOMER NETTING NB* | (87,776) |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits)* | - |
| | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
| | *BOOKKEEPING ADJUSTMENTS* | - |
| | *INV ADVISORY FEES RELATED TO NB MARGIN DEBITS* | - |
| | *MONEY FUND RECEIVABLE* | (550,169) |
| | *MARGIN INTEREST* | 30,096 |
| | *UNSECURED DEBITS* | (1,210) |
| | *PARTLY SECURED DEBITS* | (12) |
| | *NON-PURPOSE LOANS* | (211,854) |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | *TOTAL CUSTOMER DEBITS* | 2,450,996 |
| | | |
| **13.** | **CUSTOMER STOCK BORROW** | |
| | *STOCK BORROW* | 43,660,760 |
| | *STOCK BORROW MTM* | (1,309,085) |
| | *STOCK BORROW L.O.C.* | 114 |
| | *STOCK BORROW VS. CUST SHORT ADJ.* | - |
| | *STOCK BORROW FREE OF MONEY* | 8,524,833 |
| | *STOCK BORROW LC VS SECURED BK LOAN* | - |
| | *STOCK BORROW L/C VS. CUSTOMER SHORT* | - |
| | *STOCK BORROW NQ VS. CUSTOMER SHORT* | (5,871) |
| | *STOCK BORROW L/C VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW NQ VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW VS STOCK LOAN* | (29,303,462) |
| | *STOCK BORROW VS. STOCK LOAN PLEDGE* | (1,822,715) |
| | *STOCK BORROW PLEDGE Q VS. STOCK LOAN* | (250,604) |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN* | (1,884,943) |
| | *STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE* | (45,546) |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE* | (168,201) |
| | *STOCK BORROW L/C VS. STOCK LOAN* | - |
| | *STOCK BORROW L/C VS. STOCK LOAN PLEDGE* | - |
| | *STOCK BORROW L/C VS. FIRM SHORT* | - |
| | *STOCK BORROW L/C VS. NONCUSTOMER SHORT* | - |
| | *STOCK BORROW VS. FIRM SHORT* | (5,471,070) |
| | *STOCK BORROW VS. NONCUSTOMER SHORT* | (2,145,942) |
| | *STOCK BORROW PLEDGE Q. VS FIRM SHORT* | (270,618) |
| | *STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT* | (158,018) |
| | *STOCK BORROW PLEDGE NQ VS. FIRM SHORT* | (324,010) |
| | *STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT* | (95,927) |
| | *STOCK BORROW VS. THE BOX* | (1,645,436) |
| | *STOCK BORROW PLEDGE Q. VS. THE BOX* | (99,360) |
| | *STOCK BORROW PLEDGE NQ VS. THE BOX* | (29,705) |
| | *STOCK BORROW L/C VS. THE BOX* | - |
| | *STOCK BORROW VS. FAIL REC CNS* | (37,672) |
| | *STOCK BORROW PLEDGE Q. VS. F/R CNS* | (1,248) |
| | *STOCK BORROW PLEDGE NQ VS. F/R CNS* | - |
| | *STOCK BORROW L/C VS. F/R CNS* | - |
| | *STOCK BORROW L/C VS. REPO* | - |
| | *STOCK BORROW VS. REPO* | (4,306,900) |
| | *STOCK BORROW PLEDGE Q. VS. REPO* | (55,120) |
| | *STOCK BORROW PLEDGE NQ VS. REPO* | (157,954) |
| | *STOCK BORROW VS. UNALLOCATED* | - |
| | *STOCK BORROW PLEDGE Q. VS. UNALLOCATED* | (49) |
| | *STOCK BORROW PLEDGE NQ VS. UNALLOCATED* | - |
| | *STOCK BORROW L/C VS. UNALLOCATED* | - |
| | *STOCK BORROW VS. PAIB SHORT* | (676,933) |
| | *STOCK BORROW PLEDGE Q. VS. PAIB SHORT* | (4,204) |
| | *STOCK BORROW PLEDGE NQ VS. PAIB SHORT* | (15,863) |

*15c-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 12, 2008*
*(in OOO'S)*

|  | 09/12/08 |
|---|---|
| *STOCK BORROW L/C VS. PAIB SHORT* | - |
| *STOCK BORROW L/C VS. FAIL TO RECEIVE* | - |
| *STOCK BORROW VS. FAIL TO RECEIVE* | **(616,514)** |
| *STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE* | **(3,098)** |
| *STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE* | **(8,213)** |
| *TOTAL CUSTOMER STOCK BORROW* | **1,271,426** |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 12, 2008*
*(in 000'S)*

| | | 09/12/08 |
|---|---|---:|
| **14.** | **CUSTOMER FAIL TO DELIVER:** | |
| | FAIL TO DELIVER | 856,445 |
| | CNS FAIL TO DELIVER | 243,203 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | (11,225) |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (164,495) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (10,221) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (52,597) |
| | FAIL TO DELIVER VS. PAIB SHORT | (1,702) |
| | FAIL TO DELIVER VS. REPO | (38,000) |
| | FAIL TO DELIVER VS. THE BOX | (316,248) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (70,352) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (3,770) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (63,175) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (5,215) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (15) |
| | CNS FAIL TO DELIVER VS. THE BOX | (127,307) |
| | CNS FAIL TO DELIVER VS. REPO | (345) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (28) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (10,219) |
| | TOTAL CUSTOMER FAIL TO DELIVER | **223,907** |
| **15.** | **CUSTOMER MARGIN WITH OCC** | |
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 657,782 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | TOTAL CUSTOMER MARGIN WITH OCC | **657,782** |
| **16.** | **OTHER** | |
| | OTHER CUSTOMER DEBITS | - |
| | TOTAL OTHER | - |
| **17.** | **AGGREGATE DEBIT ITEMS** | 4,604,111 |
| **18.** | **LESS 3%** | (138,123) |
| **19.** | **TOTAL 15C3-3 DEBITS** | 4,465,988 |
| **20.** | **EXCESS - DEBITS OVER CREDITS** | - |
| **21.** | **DEFICIT - CREDITS OVER DEBITS** | (3,251,896) |

*LEHMAN BROTHERS INC.*
*CUSTOMER RESERVE FORMULA*
*GOVERNMENT DEALER UNIT (MTS)*
*AS OF SEPTEMBER 12, 2008*
*(in 000's)*

|  | **09/12/08** |
|---|---|
| *CREDITS :* | |
| *CUSTOMER CREDITS* | 1,057,744 |
| *CUSTOMER BANK LOAN* | 0 |
| *CUSTOMER STOCK LOAN* | 218,912 |
| *CUSTOMER FAIL TO RECEIVE* | 201,900 |
| *FIRM SHORT VS CUSTOMER LONG* | 559,028 |
| *CUSTOMER DIVIDENDS AND INTEREST* | 0 |
| *SECURITY COUNT DIFFERENCE* | 0 |
| *SUSPENSE ACCOUNT CREDITS AND SMV* | 197,137 |
| *AGED TRANSFER AND REORGANIZATION* | 0 |
| *OTHER* | 0 |
| *TOTAL CREDITS* | 2,234,721 |
| *DEBITS:* | |
| *CUSTOMER DEBITS* | 1,006,026 |
| *CUSTOMER STOCK BORROW* | 341,498 |

| | |
|---|---:|
| *CUSTOMER FAIL TO DELIVER* | **178,626** |
| *CUSTOMER MARGIN WITH OCC* | **0** |
| *OTHER* | **0** |
| | |
| *AGGREGATE DEBITS* | **1,526,150** |
| *LESS 3% OF AGGREGATE DEBIT ITEMS* | **45,785** |
| *TOTAL DEBITS* | **1,480,365** |
| *EXCESS OF CREDITS OVER DEBITS* | **754,356** |

### 15c3-3 P.A.I.B COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 12, 2008
*(in OOO'S)*

|  | 09/12/08 |
|---|---|
| **1.    P.A.I.B. CREDITS:** | |
| PAIB CREDITS | 2,359,791 |
| BREAK VS. PAIB LONG | - |
| PAIB CREDIT ADJ | (47,500) |
| PAIB DEFERRED COMMISSIONS AND IA FEES | 12,638 |
| PAIB LONG VS CUSTOMER SHORT | 1,670 |
| FIRM LONG vs PAIB SHORT | (7,891) |
| NONCUST LONG VS. PAIB SHORT | (277,047) |
| UNALLOCATED PAIB SHORT | - |
| PAIB SHORT VS CUSTOMER LONG | (113,511) |
| | |
| P.A.I.B. CREDITS: | 1,928,151 |
| | |
| **2.    PAIB BANK LOAN:** | |
| | |
| OCC MARGIN | - |
| OCC MARGIN DEFECIT | - |
| PAIB LONG VS. FIRM BANK LOAN | - |
| PAIB LONG VS. CUST BANK LOAN | 3,934 |
| PAIB LONG VS. PAIB BANK LOAN | - |
| PAIB BANK LOAN - PAIB NOT LONG | - |
| CUST BANK LOAN- CUSTOMER NOT LONG | - |
| FIRM BANK LOAN- CUSTOMER NOT LONG | - |
| | |
| TOTAL P.A.I.B. BANK LOAN | 3,934 |
| | |
| **3.    PAIB STOCK LOAN:** | |
| | |
| STOCK LOAN VS PAIB LONG | 2,834 |
| STOCK LN PLDG VS. PAIB LONG | 385,866 |
| | |
| TOTAL CUSTOMER STOCK LOAN | 388,700 |

## 15c3-3 P.A.I.B COMPUTATION
## BROKER DEALER UNIT
## AS OF SEPTEMBER 12, 2008
### (in OOO'S)

|  |  | 09/12/08 |
|---|---|---:|
| 4. | **PAIB FAIL TO RECEIVE:** | |
| | | |
| | FAIL TO RECEIVE VS PAIB LONG | 7,596 |
| | CNS FAIL TO RECEIVE VS PAIB LONG | 904 |
| | | |
| | TOTAL P.A.I.B. FAIL TO RECEIVE | 8,500 |
| | | |
| 5. | **FIRM SHORT VS PAIB LONG:** | |
| | | |
| | REPO VS PAIB LONG | 98,741 |
| | NONCUST SHORT VS. PAIB LONG | 90,215 |
| | FIRM SHORT VS PAIB LONG | 5,703 |
| | | |
| | TOTAL FIRM SHORT VS P.A.I.B. LONG | 194,659 |
| | | |
| 6. | **PAIB DIVIDEND & INTEREST:** | |
| | | |
| | STOCK DIVIDENDS > 30 DAYS | - |
| | MONEY CONTROL ADJUSTMENT | - |
| | DIVIDEND & INT PAYABLES > 7 DAYS | - |
| | | |
| | TOTAL P.A.I.B. DIVIDENDS & INTEREST | - |
| 7. | **SECURITY COUNT DIFFERENCE > 7 DAYS.** | - |
| | | |
| 8. | **SUSPENSE CREDITS & SMV >7 DAYS:** | - |
| 9. | **AGED TRANSFERS & REORGANIZATION:** | |
| | | |
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG/REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |
| | | |
| 10. | **OTHER:** | |
| | | |
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL PAIB CREDITS | 2,523,944 |

## 15c3-3 P.A.I.B COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 12, 2008
*(in OOO'S)*

|  |  | 09/12/08 |
|---|---|---:|
| **12.** | **P.A.I.B. DEBITS:** | |
|  | CUSTOMER SECURITY ACCOUNTS | 1,647,478 |
|  | VARIOUS PAIB DEBIT ADJ | (226,796) |
|  | UNSECURED DEBITS | - |
|  | PARTLY SECURED DEBITS | - |
|  | RULE 144 UNSECURED DEBITS | - |
|  | SECURITY CONCENTRATION | - |
|  | BREAK VS CUSTOMER LONG | - |
|  | P.A.I.B. DEBITS: | 1,420,683 |
| **13.** | **PAIB STOCK BORROW:** | |
|  | STOCK BORROW VS PAIB SHORT | 676,933 |
|  | STOCK BORROW O. VS. PAIB SHORT | 4,204 |
|  | STOCK BORROW NQ VS. PAIB SHORT | - |
|  | STOCK BORROW L/C VS PAIB SHORT | - |
|  | TOTAL P.A.I.B. STOCK BORROW | 681,137 |
| **14.** | **PAIB FAIL TO DELIVER:** | |
|  | FAIL TO DELIVER OVER 30 DAYS | - |
|  | FAIL TO DELIVER VS PAIB SHORT | 1,702 |
|  | CNS FAIL TO DELIVER VS PAIB SHORT | 15 |
|  | CNS FAIL TO DELIVER VS THE BOX | - |
|  | CNS FAIL TO DELIVER VS REPO | - |
|  | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
|  | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
|  | TOTAL P.A.I.B. FAIL TO DELIVER | 1,717 |

## 15c3-3 P.A.I.B COMPUTATION
## BROKER DEALER UNIT
## AS OF SEPTEMBER 12, 2008
### (in OOO'S)

|  |  | 09/12/08 |
|---|---|---:|
| **15.** | **PAIB MARGIN WITH OCC** | |
|  | OCC MARGIN | - |
|  | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
|  | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
|  | TOTAL P.A.I.B. MARGIN WITH OCC | - |
| **16.** | **OTHER** | |
|  | OTHER PAIB DEBITS | - |
|  | TOTAL OTHER | - |
| **17.** | **TOTAL PAIB DEBITS** | 2,103,537 |
| **20.** | **EXCESS - DEBITS OVER CREDITS** | - |
| **21.** | **DEFICIT - CREDITS OVER DEBITS** | 420,407 |

# EXHIBIT P

**From:**     Kaplan, Alan: Legal (NYK)
**Sent:**     Tue, 21 Oct 2008 16:21:58 GMT
**To:**       Robert W COOK; dfleischman@cgsh.com
**Subject:**  FW: LBI Customer Reserve Formula 10-17

---

FYI

**From:**  Blackwell, Alastair
**Sent:**  Tuesday, October 21, 2008 12:21 PM
**To:**    Berkenfeld, Steven; Kaplan, Alan: Legal (NYK)
**Subject:**   FW: LBI Customer Reserve Formula 10-17

**From:**  Burke, William T
**Sent:**  Tuesday, October 21, 2008 11:15 AM
**To:**    'McGowant@sec.gov'; 'MacchiaroliM@sec.gov'; 'DohertyR@sec.gov'; Blackwell, Alastair; Crepeau, Alex F; Stucchio,
Anthony; 'mkarp@deloitte.com'

**Subject:**   LBI Customer  Reserve Formula 10-17

Please see attached files for LBI 15c3-3 as of 10/17/08.  Thanks!

<<...>> <<...>>

With kind regards,
**Joel K. Potenciano**
**BARCLAYS CAPITAL**
Telephone  +1 (212) 320-6786
Fax  +1 (646) 885-9383
Email  joel.potenciano@barclayscapital.com

MOVANTS' TRIAL
EXHIBIT
673

### LEHMAN BROTHERS INC.
### CONSOLIDATED 15c3-3 RESERVE FORMULA
### AS OF OCTOBER 17, 2008
(in 000's)

| | 10/17/08 BD UNIT | 10/17/08 GOVT UNIT | 10/17/08 TOTAL | 09/17/2008 TOTAL | VARIANCE |
|---|---|---|---|---|---|
| **CREDITS:** | | | | | |
| CUSTOMER CREDITS | 11,676,887 | 32,319,162 | 43,996,049 | 9,320,386 | 34,675,663 |
| CUSTOMER BANK LOAN | 1,655,529 | - | 1,655,529 | 1,343,769 | 311,760 |
| CUSTOMER STOCK LOAN | 46,837 | 0 | 46,837 | 3,263,868 | (3,217,030) |
| CUSTOMER FAIL TO RECEIVE | 5,274,379 | 21,811,227 | 27,085,606 | 5,796,629 | 21,288,977 |
| FIRM SHORT VS CUSTOMER LONG | 2,431,212 | 8,681,532 | 11,112,744 | 4,835,108 | 6,277,636 |
| CUSTOMER DIVIDENDS AND INTEREST | 103,268 | - | 103,268 | 5,322 | 97,946 |
| SECURITY COUNT DIFFERENCE | - | - | - | - | - |
| SUSPENSE ACCOUNT CREDITS AND SMV | 92,683 | 414,146 | 506,829 | 189,765 | 317,064 |
| AGED TRANSFER AND REORGANIZATION | - | - | - | - | - |
| OTHER | - | - | - | - | - |
| **TOTAL CREDITS** | 21,280,795 | 63,226,067 | 84,506,862 | 24,754,847 | 59,752,015 |
| **DEBITS:** | | | | | |
| CUSTOMER DEBITS | 12,953,933 | 55,824,409 | 68,778,342 | 16,636,342 | 52,142,000 |
| CUSTOMER STOCK BORROW | 1,321,615 | 2,417 | 1,324,032 | 2,026,218 | (702,186) |
| CUSTOMER FAIL TO DELIVER | 6,586,939 | 5,254,702 | 11,841,641 | 4,916,919 | 6,924,722 |
| CUSTOMER MARGIN WITH OCC | 518,516 | - | 518,516 | 349,858 | 168,658 |
| OTHER | - | - | - | - | - |
| AGGREGATE DEBITS | 21,381,003 | 61,081,528 | 82,462,531 | 23,929,337 | 58,533,194 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | (641,430) | (1,832,446) | (2,473,876) | (717,880) | (1,755,996) |
| **TOTAL DEBITS** | 20,739,573 | 59,249,082 | 79,988,655 | 23,211,457 | 56,777,198 |
| EXCESS OF CREDITS OVER DEBITS | 541,222 | 3,976,985 | 4,518,207 | 1,543,390 | 2,974,817 |
| EXCESS OF DEBITS OVER CREDITS | - | - | - | - | - |
| CUSHION | | | - | 225,609 | (225,609) |
| **TOTAL REQUIREMENT** | | | 4,518,207 | 1,768,999 | 2,749,208 |

### LEHMAN BROTHERS INC.
### CONSOLIDATED 15c3-3 PAIB RESERVE FORMULA
### AS OF OCTOBER 17, 2008
(in 000's)

| | 10/17/08 TOTAL | 09/17/2008 TOTAL | VARIANCE |
|---|---|---|---|
| CREDITS: | | | |
| PAIB CREDITS | 1,805,113 | 1,926,229 | (121,116) |
| PAIB BANK LOAN | - | 3,560 | (3,560) |
| PAIB STOCK LOAN | - | 312,247 | (312,247) |
| PAIB FAIL TO RECEIVE | 32,202 | 31,031 | 1,171 |
| FIRM SHORT VS PAIB LONG | 521,104 | 394,506 | 126,598 |
| PAIB DIVIDENDS AND INTEREST | - | - | - |
| SECURITY COUNT DIFFERENCE | - | - | - |
| SUSPENSE ACCOUNT CREDITS AND SMV | - | - | - |
| AGED TRANSFER AND REORGANIZATION | - | - | - |
| OTHER | - | - | - |
| TOTAL CREDITS | 2,358,419 | 2,667,573 | (309,154) |
| DEBITS: | | | |
| PAIB DEBITS | 1,837,702 | 1,600,943 | 236,760 |
| PAIB STOCK BORROW | - | 560,229 | (560,229) |
| PAIB FAIL TO DELIVER | 310,573 | 40,281 | 270,292 |
| PAIB MARGIN WITH OCC | - | - | - |
| OTHER | - | - | - |
| AGGREGATE DEBITS | 2,148,275 | 2,201,453 | (53,177) |
| TOTAL DEBITS | 2,148,275 | 2,201,453 | (53,177) |
| EXCESS OF CREDITS OVER DEBITS | 210,144 | 466,120 | (255,976) |
| EXCESS OF DEBITS OVER CREDITS | - | - | - |
| CUSHION | - | 25,880 | (25,880) |
| TOTAL REQUIREMENT | 210,144 | 492,000 | (281,856) |

*LEHMAN BROTHERS INC.*
*CUSTOMER RESERVE FORMULA*
*BROKER DEALER UNIT*
*AS OF OCTOBER 17, 2008*
*(in 000's)*

*(ITS ONLY)*

|  | 10/17/08 | 09/17/08 | VARIANCE |
|---|---:|---:|---:|
| **CUSTOMER CREDITS:** | | | |
| Customer Accts (ITS) | 11,804,041 | 3,358,915 | 8,445,127 |
| Customer Accts | 0 | 0 | 0 |
| Securities Related Intercompany Payables | 188,875 | 189,086 | (211) |
| Phlx Options Payables | 0 | 0 | 0 |
| NonReg Commodity Credits | 0 | 52,000 | (52,000) |
| Bank Overdrafts | 0 | 0 | 0 |
| Bank Overdrafts(Commodity) | 0 | 176,487 | (176,487) |
| Other | 0 | 0 | 0 |
| Total | 11,992,916 | 3,776,488 | 8,216,428 |
| | | | 0 |
| **CUSTOMER BANK LOAN** | 0 | 0 | 0 |
| **CUSTOMER STOCK LOAN** | 0 | 0 | 0 |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 4,333,585 | 2,202,479 | 2,131,106 |
| **CUSTOMER FAIL TO RECEIVE** | 0 | 0 | 0 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 | 0 | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 1,641,261 | 613,236 | 1,028,025 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 20,834 | 20,633 | 201 |
| **FIRM SHORT VS. CUSTOMER LONG** | 0 | 0 | 0 |
| **SUSPENSE CREDITS** | 0 | 0 | 0 |
| **TOTAL CREDITS** | 17,988,596 | 6,612,836 | 11,375,760 |
| | | | |
| **CUSTOMER DEBITS:** | | | |
| Customer Accts (ITS) | 10,357,279 | 4,258,469 | 6,098,810 |
| Customer Accts | 0 | 0 | 0 |
| Philadelphia Options Cust. Receivables | 0 | 0 | 0 |
| Total | 10,357,279 | 4,258,469 | 6,098,810 |
| **CUSTOMER MARGIN WITH OCC** | 0 | 0 | 0 |
| **CUSTOMER STOCK BORROW (ITS)** | 1,193,138 | 497,654 | 695,484 |
| **CUSTOMER STOCK BORROW** | 0 | 0 | 0 |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 5,917,103 | 1,200,926 | 4,716,177 |
| **CUSTOMER FAIL TO DELIVER** | 0 | 0 | 0 |
| **AGGREGATE DEBITS** | 17,467,520 | 5,957,049 | 11,510,471 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 524,026 | 178,711 | 345,315 |
| **TOTAL DEBITS** | 16,943,494 | 5,778,338 | 11,165,156 |
| **EXCESS OF CREDITS OVER DEBITS** | 1,045,102 | 834,498 | 210,604 |

**LEHMAN BROTHERS INC.**
**CUSTOMER RESERVE FORMULA**
**BROKER DEALER UNIT**
**AS OF OCTOBER 17, 2008**
*(in 000's)*
*(ADP ONLY)*

| | 10/17/08 | 09/17/08 | VARIANCE |
|---|---|---|---|
| **CUSTOMER CREDITS:** | | | |
| Customer Accts (ITS) | 0 | 0 | 0 |
| Customer Accts | (359,147) | 3,622,505 | (3,981,652) |
| OMNI Conv payable Accts | 0 | 0 | 0 |
| Phlx Options Payables | 0 | 0 | 0 |
| NonReg Commodity Credits | 0 | 0 | 0 |
| Bank Overdrafts | 43,118 | 62,604 | (19,486) |
| Other | 0 | 0 | 0 |
| Total | (316,029) | 3,685,109 | (4,001,138) |
| | | | |
| **CUSTOMER BANK LOAN** | 14,268 | 730,533 | (716,265) |
| **CUSTOMER STOCK LOAN** | 46,837 | 1,050,110 | (1,003,272) |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 0 | 0 | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 940,794 | 2,210,873 | (1,270,080) |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 | 0 | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 0 | 0 | 0 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 0 | 0 | 0 |
| **FIRM SHORT VS. CUSTOMER LONG** | 2,410,378 | 2,820,568 | (410,190) |
| **CUSTOMER DIVIDEND & INTEREST** | 103,268 | 5,322 | 97,946 |
| **SUSPENSE CREDITS** | 92,683 | 135,230 | (42,547) |
| **OTHER** | 0 | 0 | 0 |
| | | | |
| **TOTAL CREDITS** | 3,292,199 | 10,637,746 | (7,345,547) |
| | | | |
| **CUSTOMER DEBITS:** | | | |
| Customer Accts (ITS) | 0 | 0 | 0 |
| Customer Accts | 2,596,654 | 7,642,271 | (5,045,617) |
| Philadelphia Options Cust. Receivables | 0 | 0 | 0 |
| Total | 2,596,654 | 7,642,271 | (5,045,617) |
| | | | |
| **CUSTOMER MARGIN WITH OCC** | 518,516 | 349,858 | 168,658 |
| **CUSTOMER STOCK BORROW (ITS)** | 0 | 0 | 0 |
| **CUSTOMER STOCK BORROW** | 128,477 | 1,201,991 | (1,073,514) |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 0 | 0 | 0 |
| **CUSTOMER FAIL TO DELIVER** | 669,836 | 1,562,267 | (892,431) |
| | | | |
| **AGGREGATE DEBITS** | 3,913,483 | 10,756,386 | (6,842,903) |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 117,404 | 322,692 | (205,288) |
| | | | |
| **TOTAL DEBITS** | 3,796,079 | 10,433,694 | (6,637,615) |
| | | | |
| **EXCESS OF DEBITS OVER CREDITS** | 503,880 | 0 | 503,880 |
| | | | |
| **EXCESS OF CREDITS OVER DEBITS** | 0 | 204,052 | (204,052) |

*LEHMAN BROTHERS INC.*
*CUSTOMER RESERVE FORMULA*
*BROKER DEALER UNIT*
*AS OF OCTOBER 17, 2008*
*(in 000's)*
(COMBINED)

|  | 10/17/08 | 09/17/08 | VARIANCE |
|---|---|---|---|
| **CUSTOMER CREDITS:** |  |  |  |
| Customer Accts (ITS) | 11,804,041 | 3,358,915 | 8,445,127 |
| Customer Accts | (359,147) | 3,622,505 | (3,981,652) |
| Securities Related Intercompany Payables | 188,875 | 189,086 | (211) |
| Phlx Options Payables | 0 | 0 | 0 |
| NonReg Commodity Credits | 0 | 52,000 | (52,000) |
| Bank Overdrafts | 43,118 | 62,604 | (19,486) |
| Bank Overdrafts (Commodity) | 0 | 176,487 | (176,487) |
| Other | 0 | 0 | 0 |
| **Total** | 11,676,887 | 7,461,597 | 4,215,290 |
| **CUSTOMER BANK LOAN** | 14,268 | 730,533 | (716,265) |
| **CUSTOMER STOCK LOAN** | 46,837 | 1,050,110 | (1,003,272) |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 4,333,585 | 2,202,479 | 2,131,106 |
| **CUSTOMER FAIL TO RECEIVE** | 940,794 | 2,210,873 | (1,270,080) |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 | 0 | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 1,641,261 | 613,236 | 1,028,025 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 20,834 | 20,633 | 201 |
| **FIRM SHORT VS. CUSTOMER LONG** | 2,410,378 | 2,820,568 | (410,190) |
| **CUSTOMER DIVIDEND & INTEREST** | 103,268 | 5,322 | 97,946 |
| **SUSPENSE CREDITS** | 92,683 | 135,230 | (42,547) |
| **OTHER** | 0 | 0 | 0 |
| **TOTAL CREDITS** | 21,280,795 | 17,250,582 | 4,030,213 |
| **CUSTOMER DEBITS:** |  |  |  |
| Customer Accts (ITS) | 10,357,279 | 4,258,469 | 6,098,810 |
| Customer Accts | 2,596,654 | 7,642,271 | (5,045,617) |
| Philadelphia Options Cust. Receivables | 0 | 0 | 0 |
| Total | 12,953,933 | 11,900,739 | 1,053,194 |
| **CUSTOMER MARGIN WITH OCC** | 518,516 | 349,858 | 168,658 |
| **CUSTOMER STOCK BORROW (ITS)** | 1,193,138 | 497,654 | 695,484 |
| **CUSTOMER STOCK BORROW** | 128,477 | 1,201,991 | (1,073,514) |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 5,917,103 | 1,200,926 | 4,716,177 |
| **CUSTOMER FAIL TO DELIVER** | 669,836 | 1,562,267 | (892,431) |
| **AGGREGATE DEBITS** | 21,381,003 | 16,713,435 | 4,667,568 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 641,430 | 501,403 | 140,027 |
| **TOTAL DEBITS** | 20,739,573 | 16,212,032 | 4,527,541 |
| **EXCESS OF CREDITS OVER DEBITS** | 541,222 | 1,038,550 | (497,327) |
| **EXCESS OF DEBITS OVER CREDITS** | 0 | 0 | 0 |

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

**AS OF OCTOBER 17, 2008**

|  | **10/17/08** |
|---|---:|
| *CUSTOMER CREDITS:* | |
| *Customer Accounts* | 11,740,089 |
| *Securities Related Intercompany Payables* | 188,875 |
| *ITS Unsecured Shorts* | 63,952 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 0 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 11,992,916 |
| | |
| *CUSTOMER STOCK LOAN* | 0 |
| *CUSTOMER FAIL TO RECEIVE* | 4,333,585 |
| *CUSTOMER BANK LOAN (OCC MARGIN)* | 0 |
| *CUSTOMER BANK LOAN (ITS-REPO)* | 1,641,261 |
| *FIRM SHORT VS. CUSTOMER LONG* | 20,834 |
| *SUSPENSE CREDITS* | 0 |
| | |
| *TOTAL CREDITS* | 17,988,596 |
| | |
| *CUSTOMER DEBITS:* | |
| *Customer Accounts* | 10,357,279 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 10,357,279 |
| | |
| *CUSTOMER MARGIN WITH OCC* | 0 |
| | |
| *CUSTOMER STOCK BORROW* | 1,193,138 |
| *CUSTOMER FAIL TO DELIVER* | 5,917,103 |
| *AGGREGATE DEBITS* | 17,467,520 |
| *Less 3%* | 524,026 |
| *TOTAL DEBITS* | 16,943,494 |
| | |
| *EXCESS CREDITS OVER DEBITS* | 1,045,102 |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF OCTOBER 17, 2008*
*(in OOO'S)*

|  |  | 10/17/08 |
|---|---|---:|
| **1.** | **CUSTOMER CREDITS:** |  |
|  | CUSTOMER SECURITY ACCOUNTS | 8,432,106 |
|  | CUSTOMER ADJUSTMENTS | (2,322,077) |
|  | UNMAPPED CUSTOMER PAYABLE | 15 |
|  | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (59,829) |
|  | CUSTOMER NETTING NB | - |
|  | MONEY CONTROL ADJUSTMENTS | 37,527 |
|  | NON-BROKER DEALER AFFILIATES TYPE  5 | - |
|  | BOOKKEEPING ADJUSTMENTS | - |
|  | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
|  | NON-NETWORK OFFSHR MUTUAL FUNDS | - |
|  | BANK OVERDRAFTS | 43,118 |
|  | NON-BROKER DEALER AFFILIATES - OTHER TYPES | 224,115 |
|  | HOUSE ACCOUNTS | 12 |
|  | TEFRA WITHHOLDING PAYABLE | 95 |
|  | LEGAL LEDGER CONTRA ACCOUNTS | 116 |
|  | BREAK VS. CUSTOMER LONG | 633 |
|  | FIRM LONG VS. CUSTOMER SHORT | (380,256) |
|  | NONCUST LONG VS. CUSTOMER SHORT | (6,286,273) |
|  | REVERSE REPO VS. CUSTOMER SHORT | - |
|  | PAIB LONG VS. CUSTOMER SHORT | (5,330) |
|  | SHORT & CREDIT INTEREST | - |
|  | MONEY FUND SETTLEMENTS 098-00003  & 098-70001 | - |
|  | UNALLOCATED CUSTOMER SHORT | - |
|  |  |  |
|  | **TOTAL CUSTOMER CREDITS** | (316,029) |
|  |  |  |
| **2.** | **CUSTOMER BANK LOAN:** |  |
|  | OCC MARGIN | - |
|  | OCC MARGIN DEFICIT | - |
|  | OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
|  | STOCK BORROW VS. CUST BANK LOAN | - |
|  | STOCK BORROW VS. FIRM BANK LOAN | - |
|  | STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
|  | STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
|  | STOCK BORROW L/C VS FIRM BANK LOAN | - |
|  | FAIL TO DELIVER VS. FIRM BANK LOAN | - |
|  | CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
|  | CUSTOMER LONG VS. CUSTOMER BANK LOAN | 14,268 |
|  | CUST BANK LOAN - CUST NOT LONG | - |
|  | NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
|  | FIRM BANK LOAN - FIRM NOT LONG | - |
|  |  |  |
|  | **TOTAL CUSTOMER BANK LOAN** | 14,268 |
|  |  |  |
| **3.** | **CUSTOMER STOCK LOAN:** |  |
|  | STOCK LOAN | 135,461 |
|  | STOCK LOAN MTM | - |
|  | STOCK LOAN WITH CLEARING ORG | - |
|  | STOCK LOAN FREE OF MONEY | - |
|  | STOCK LOAN MTM DEFICIT | - |
|  | STOCK LOAN BOB ADJUSTMENT | - |
|  | UNALLOCATED STOCK LOAN ADJ | - |
|  | STOCK LOAN VS. STOCK BORROW L/C | - |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF OCTOBER 17, 2008*
*(in OOO'S)*

| | 10/17/08 |
|---|---|
| *STOCK LOAN PLEDGE VS. STOCK BORROW L/C* | - |
| *STOCK LOAN VS. REVERSE REPO* | - |
| *STOCK LOAN PLEDGE VS. REVERSE REPO* | - |
| *STOCK LOAN VS. PAIB LONG* | - |
| *STOCK LOAN PLEDGE VS. PAIB LONG* | - |
| *STOCK LOAN VS. STOCK BORROW* | (86,631) |
| *STOCK LOAN VS. STOCK BORROW PLEDGE Q.* | - |
| *STOCK LOAN VS. STOCK BORROW PLEDGE NQ* | - |
| *STOCK LOAN PLEDGE VS. STOCK BORROW* | - |
| *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q.* | - |
| *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ* | - |
| *STOCK LOAN VS. NONCUSTOMER LONG* | (1,423) |
| *STOCK LOAN PLEDGE VS. NONCUSTOMER LONG* | - |
| *STOCK LOAN VS. FIRM LONG* | (570) |
| *STOCK LOAN PLEDGE VS. FIRM LONG* | - |
| | |
| *TOTAL CUSTOMER STOCK LOAN* | 46,837 |

| | | |
|---|---|---|
| **4.** | **CUSTOMER FAIL TO RECEIVE:** | |
| | *FAIL TO RECEIVE* | 11,002,946 |
| | *CNS FAIL TO RECEIVE* | 622,134 |
| | *MISC FAIL TO RECEIVE ADJUSTMENTS* | (598,880) |
| | *OMNI FAIL TO RECEIVE ADJUSTMENTS* | - |
| | *FAIL TO RECEIVE MTM ADJUSTMENT* | - |
| | *FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND* | - |
| | *FAIL TO RECEIVE VS. FAIL TO DELIVER* | (142,663) |
| | *FAIL TO RECEIVE VS. REVERSE REPO* | - |
| | *FAIL TO RECEIVE VS. MTM DEFICIT* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q.* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW L/C* | - |
| | *FAIL TO RECEIVE VS. FAIL TO DELIVER CNS* | (63,345) |
| | *FAIL TO RECEIVE VS. FIRM LONG* | (5,445,396) |
| | *FAIL TO RECEIVE VS. NONCUSTOMER LONG* | (3,908,328) |
| | *FAIL TO RECEIVE VS. PAIB LONG* | (32,202) |
| | *FAIL TO RECEIVE VS. UNALLOCATED / BREAK* | - |
| | *CNS FAIL TO RECEIVE VS. FIRM LONG* | (188,651) |
| | *CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG* | (261,631) |
| | *CNS FAIL TO RECEIVE VS. PAIB LONG* | - |
| | *CNS FAIL TO RECEIVE ADJUSTMENT* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q.* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW L/C* | - |
| | *CNS FAIL TO RECEIVE VS. REVERSE REPO* | - |
| | *CNS FAIL TO RECEIVE VS. FAIL TO DELIVER* | (43,190) |
| | | |
| | *TOTAL CUSTOMER FAIL TO RECEIVE* | 940,794 |

| | | |
|---|---|---|
| **5.** | **FIRM SHORT VS CUSTOMER LONG:** | |
| | *TOTAL FIRM SHORT* | - |
| | *FIRM OMNI SHORT* | - |
| | *FIRM SHORT VS. CUSTOMER LONG* | 1,107,602 |
| | *NONCUSTOMER SHORT VS. CUSTOMER LONG* | 1,138,722 |
| | *REPO VS. CUSTOMER LONG* | 42,557 |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF OCTOBER 17, 2008*
*(in OOO'S)*

|  |  | 10/17/08 |
|---|---|---:|
| | *PAIB SHORT VS. CUSTOMER LONG* | 121,497 |
| | *REPO VS. UNALLOCATED* | - |
| | *FIRM SHORT VS. UNALLOCATED* | - |
| | *NONCUSTOMER SHORT VS. UNALLOCATED* | - |
| | *TOTAL FIRM SHORT VS. CUSTOMER LONG* | 2,410,378 |
| 6. | *CUSTOMER DIVIDEND & INTEREST:* | |
| | *DIVIDEND & INT PAYABLES* | 106,733 |
| | *ADJUSTMENTS FROM DIVIDEND DEPT.* | (3,465) |
| | *TOTAL CUSTOMER DIVIDENDS & INTEREST* | 103,268 |
| 7. | *SECURITY COUNT DIFFERENCE > 7 DAYS:* | |
| 8. | *SUSPENSE ACCOUNTS* | |
| | *SUSPENSE CREDITS & SMV:* | - |
| | *CUSTOMER UNAPPLIED 090-01234* | 7,364 |
| | *ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBAT* | 85,319 |
| | *TOTAL SUSPENSE ACCOUNTS* | 92,683 |
| 9. | *AGED TRANSFERS & REORGANIZATION:* | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| 10. | *OTHER:* | |
| | *OTHER CREDITS* | - |
| | *TOTAL OTHER* | - |
| | *TOTAL CREDITS* | 3,292,199 |
| 12. | *CUSTOMER DEBITS:* | |
| | *CUSTOMER SECURITY ACCOUNTS* | 5,175,050 |
| | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (59,829) |
| | *CUSTOMER NETTING NB* | - |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits)* | (2,470,958) |
| | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
| | *BOOKKEEPING ADJUSTMENTS* | - |
| | *INV ADVISORY FEES RELATED TO NB MARGIN DEBITS* | - |
| | *MONEY FUND RECEIVABLE* | - |
| | *MARGIN INTEREST* | - |
| | *UNSECURED DEBITS* | (40,984) |
| | *PARTLY SECURED DEBITS* | (6,625) |
| | *NON-PURPOSE LOANS* | - |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | *TOTAL CUSTOMER DEBITS* | 2,596,654 |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF OCTOBER 17, 2008*
*(in 000'S)*

|  |  | 10/17/08 |
|---|---|---:|
| **13.** | **CUSTOMER STOCK BORROW:** | |
| | *STOCK BORROW* | 215,175 |
| | *STOCK BORROW MTM* | - |
| | *STOCK BORROW L.O.C.* | - |
| | *STOCK BORROW VS. CUST SHORT ADJ.* | - |
| | *STOCK BORROW FREE OF MONEY* | - |
| | *STOCK BORROW LC VS SECURED BK LOAN* | - |
| | *STOCK BORROW L/C VS. CUSTOMER SHORT* | - |
| | *STOCK BORROW NQ VS. CUSTOMER SHORT* | - |
| | *STOCK BORROW L/C VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW NQ VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW VS STOCK LOAN* | (86,631) |
| | *STOCK BORROW VS. STOCK LOAN PLEDGE* | - |
| | *STOCK BORROW PLEDGE Q VS. STOCK LOAN* | - |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN* | - |
| | *STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE* | - |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE* | - |
| | *STOCK BORROW L/C VS. STOCK LOAN* | - |
| | *STOCK BORROW L/C VS. STOCK LOAN PLEDGE* | - |
| | *STOCK BORROW L/C VS. FIRM SHORT* | - |
| | *STOCK BORROW L/C VS. NONCUSTOMER SHORT* | - |
| | *STOCK BORROW VS. FIRM SHORT* | - |
| | *STOCK BORROW VS. NONCUSTOMER SHORT* | (67) |
| | *STOCK BORROW PLEDGE Q. VS FIRM SHORT* | - |
| | *STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT* | - |
| | *STOCK BORROW PLEDGE NQ VS. FIRM SHORT* | - |
| | *STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT* | - |
| | *STOCK BORROW VS. THE BOX* | - |
| | *STOCK BORROW PLEDGE Q. VS. THE BOX* | - |
| | *STOCK BORROW PLEDGE NQ VS. THE BOX* | - |
| | *STOCK BORROW L/C VS. THE BOX* | - |
| | *STOCK BORROW VS. FAIL REC CNS* | - |
| | *STOCK BORROW PLEDGE Q. VS. F/R CNS* | - |
| | *STOCK BORROW PLEDGE NQ VS. F/R CNS* | - |
| | *STOCK BORROW L/C VS. F/R CNS* | - |
| | *STOCK BORROW L/C VS. REPO* | - |
| | *STOCK BORROW VS. REPO* | - |
| | *STOCK BORROW PLEDGE Q. VS. REPO* | - |
| | *STOCK BORROW PLEDGE NQ VS. REPO* | - |
| | *STOCK BORROW VS. UNALLOCATED* | - |
| | *STOCK BORROW PLEDGE Q. VS. UNALLOCATED* | - |
| | *STOCK BORROW PLEDGE NQ VS. UNALLOCATED* | - |
| | *STOCK BORROW L/C VS. UNALLOCATED* | - |
| | *STOCK BORROW VS. PAIB SHORT* | - |
| | *STOCK BORROW PLEDGE Q. VS. PAIB SHORT* | - |
| | *STOCK BORROW PLEDGE NQ VS. PAIB SHORT* | - |
| | *STOCK BORROW L/C VS. PAIB SHORT* | - |
| | *STOCK BORROW L/C VS. FAIL TO RECEIVE* | - |
| | *STOCK BORROW VS. FAIL TO RECEIVE* | - |
| | *STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE* | - |
| | *STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE* | - |
| | | |
| | *TOTAL CUSTOMER STOCK BORROW* | 128,477 |

| **14.** | **CUSTOMER FAIL TO DELIVER:** | |
|---|---|---|

### 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF OCTOBER 17, 2008
*(in OOO'S)*

|  | 10/17/08 |
|---|---:|
| FAIL TO DELIVER | 9,035,807 |
| CNS FAIL TO DELIVER | 1,235,456 |
| MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| FAIL TO DELIVER MTM ADJUSTMENT | - |
| FAIL TO DELIVER ADJUSTMENT | - |
| FAIL TO DELIVER VS. FAIL TO RECEIVE | (142,663) |
| FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (43,190) |
| FAIL TO DELIVER OVER 30 DAYS | (826) |
| FAIL TO DELIVER VS. FIRM SHORT | (2,782,459) |
| FAIL TO DELIVER VS. PAIB SHORT | (305,516) |
| FAIL TO DELIVER VS. REPO | - |
| FAIL TO DELIVER VS. THE BOX | (876,298) |
| FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (4,236,780) |
| FAIL TO DELIVER VS. UNALLOCATED/ BREAK | - |
| CNS FAIL TO DELIVER VS. FIRM SHORT | (685,534) |
| CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (398,515) |
| CNS FAIL TO DELIVER VS. PAIB SHORT | (5,057) |
| CNS FAIL TO DELIVER VS. THE BOX | (61,244) |
| CNS FAIL TO DELIVER VS. REPO | - |
| CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| CNS FAIL TO DELIVER VS. UNALLOC/BREAK | - |
| CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (63,345) |
|  |  |
| TOTAL CUSTOMER FAIL TO DELIVER | 669,836 |
|  |  |
| **15.  CUSTOMER MARGIN WITH OCC** |  |
| OCC MARGIN | - |
| OCC PROPRIETARY QUALIFIED COLLATERAL | 518,516 |
| OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
|  |  |
| TOTAL CUSTOMER MARGIN WITH OCC | 518,516 |
|  |  |
| **16.  OTHER** |  |
| OTHER CUSTOMER DEBITS | - |
|  |  |
| TOTAL OTHER | - |
|  |  |
| **17.  AGGREGATE DEBIT ITEMS** | 3,913,483 |
| **18.  LESS 3%** | (117,404) |
| **19.  TOTAL 15C3-3 DEBITS** | 3,796,079 |
|  |  |
| **20.  EXCESS - DEBITS OVER CREDITS** | 503,880 |
| **21.  DEFICIT - CREDITS OVER DEBITS** |  |

**LEHMAN BROTHERS INC.**
**CUSTOMER RESERVE FORMULA**
**GOVERNMENT DEALER UNIT (MTS)**
**AS OF OCTOBER 17, 2008**
*(in 000's)*

| | 10/17/08 |
|---|---|
| **CREDITS :** | |
| **CUSTOMER CREDITS** | 32,319,162 |
| **CUSTOMER BANK LOAN** | 0 |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 21,811,227 |
| **FIRM SHORT VS CUSTOMER LONG** | 8,681,532 |
| **CUSTOMER DIVIDENDS AND INTEREST** | 0 |
| **SECURITY COUNT DIFFERENCE** | 0 |
| **SUSPENSE ACCOUNT CREDITS AND SMV** | 414,146 |
| **AGED TRANSFER AND REORGANIZATION** | 0 |
| **OTHER** | 0 |
| **TOTAL CREDITS** | 63,226,067 |
| **DEBITS:** | |
| **CUSTOMER DEBITS** | 55,824,409 |
| **CUSTOMER STOCK BORROW** | 2,417 |
| **CUSTOMER FAIL TO DELIVER** | 5,254,702 |
| **CUSTOMER MARGIN WITH OCC** | 0 |
| **OTHER** | 0 |
| **AGGREGATE DEBITS** | 61,081,528 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 1,832,446 |
| **TOTAL DEBITS** | 59,249,082 |
| **EXCESS OF CREDITS OVER DEBITS** | 3,976,985 |

*15c3-3 P.A.I.B. COMPUTATION*
**BROKER DEALER UNIT**
*AS OF OCTOBER 17, 2008*
*(in OOO'S)*

|  |  | **10/17/08** |
|---|---|---|
| **1.** | **P.A.I.B. CREDITS:** | |
|  | *PAIB CREDITS* | 2,285,408 |
|  | *BREAK VS. PAIB LONG* | - |
|  | *PAIB CREDIT ADJ* | (8,000) |
|  | *PAIB DEFERRED COMMISSIONS AND IA FEES* | 20,004 |
|  | *PAIB LONG VS CUSTOMER SHORT* | 5,330 |
|  | *FIRM LONG vs PAIB SHORT* | (220,498) |
|  | *NONCUST LONG VS. PAIB SHORT* | (155,633) |
|  | *UNALLOCATED PAIB SHORT* | - |
|  | *PAIB SHORT VS CUSTOMER LONG* | (121,497) |
|  | | |
|  | *P.A.I.B. CREDITS:* | 1,805,113 |
|  | | |
| **2.** | **PAIB BANK LOAN:** | |
|  | | |
|  | *OCC MARGIN* | - |
|  | *OCC MARGIN DEFECIT* | - |
|  | *PAIB LONG VS. FIRM BANK LOAN* | - |
|  | *PAIB LONG VS. CUST BANK LOAN* | - |
|  | *PAIB LONG VS. PAIB BANK LOAN* | - |
|  | *PAIB BANK LOAN - PAIB NOT LONG* | - |
|  | *CUST BANK LOAN- CUSTOMER NOT LONG* | - |
|  | *FIRM BANK LOAN- CUSTOMER NOT LONG* | - |
|  | | |
|  | *TOTAL P.A.I.B. BANK LOAN* | - |
|  | | |
| **3.** | **PAIB STOCK LOAN:** | |
|  | | |
|  | *STOCK LOAN VS PAIB LONG* | - |
|  | *STOCK LN PLDG VS. PAIB LONG* | - |
|  | | |
|  | *TOTAL CUSTOMER STOCK LOAN* | - |
| **4.** | **PAIB FAIL TO RECEIVE:** | |
|  | | |
|  | *FAIL TO RECEIVE VS PAIB LONG* | 32,202 |
|  | *CNS FAIL TO RECEIVE VS PAIB LONG* | - |
|  | | |
|  | *TOTAL P.A.I.B. FAIL TO RECEIVE* | 32,202 |
|  | | |
| **5.** | **FIRM SHORT VS PAIB LONG:** | |
|  | | |
|  | *REPO VS PAIB LONG* | - |
|  | *NONCUST SHORT VS. PAIB LONG* | 346,571 |
|  | *FIRM SHORT VS PAIB LONG* | 174,533 |

## 15c3-3 P.A.I.B. COMPUTATION
## BROKER DEALER UNIT
## AS OF OCTOBER 17, 2008
### (in OOO'S)

|  |  | 10/17/08 |
|---|---|---|
| | *TOTAL FIRM SHORT VS P.A.I.B. LONG* | 521,104 |
| **6.** | **PAIB DIVIDEND & INTEREST:** | |
| | *STOCK DIVIDENDS > 30 DAYS* | - |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *DIVIDEND & INT PAYABLES > 7 DAYS* | - |
| | *TOTAL P.A.I.B. DIVIDENDS & INTEREST* | - |
| **7.** | **SECURITY COUNT DIFFERENCE > 7 DAYS:** | - |
| **8.** | **SUSPENSE CREDITS & SMV >7 DAYS:** | - |
| **9.** | **AGED TRANSFERS & REORGANIZATION:** | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| **10.** | **OTHER:** | |
| | *OTHER CREDITS* | - |
| | *TOTAL OTHER* | - |
| | *TOTAL PAIB CREDITS* | 2,358,419 |
| **12.** | **P.A.I.B. DEBITS:** | |
| | *CUSTOMER SECURITY ACCOUNTS* | 2,014,272 |
| | *VARIOUS PAIB DEBIT ADJ* | (176,570) |
| | *UNSECURED DEBITS* | - |
| | *PARTLY SECURED DEBITS* | - |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | *BREAK VS CUSTOMER LONG* | - |
| | *P.A.I.B. DEBITS:* | 1,837,702 |
| **13.** | **PAIB STOCK BORROW:** | |

*15c3-3 P.A.I.B. COMPUTATION*
***BROKER DEALER UNIT***
***AS OF OCTOBER 17, 2008***
*(in OOO'S)*

|                                              | 10/17/08  |
|----------------------------------------------|----------:|
| *STOCK BORROW VS PAIB SHORT*                 | -         |
| *STOCK BORROW Q. VS. PAIB SHORT*             | -         |
| *STOCK BORROW NQ VS. PAIB SHORT*             | -         |
| *STOCK BORROW L/C VS PAIB SHORT*             | -         |
| *TOTAL P.A.I.B. STOCK BORROW*                | -         |

| 14. | *PAIB FAIL TO DELIVER:*                  |           |
|-----|------------------------------------------|----------:|
|     | *FAIL TO DELIVER OVER 30 DAYS*           | -         |
|     | *FAIL TO DELIVER VS PAIB SHORT*          | 305,516   |
|     | *CNS FAIL TO DELIVER VS PAIB SHORT*      | 5,057     |
|     | *CNS FAIL TO DELIVER VS THE BOX*         | -         |
|     | *CNS FAIL TO DELIVER VS REPO*            | -         |
|     | *CNS FAIL TO DELIVER VS UNALLOC./BREAK*  | -         |
|     | *CNS FAIL TO DELIVER VS FAIL TO RECEIVE* | -         |
|     | *TOTAL P.A.I.B. FAIL TO DELIVER*         | 310,573   |

| 15. | *PAIB MARGIN WITH OCC*                        |         |
|-----|-----------------------------------------------|--------:|
|     | *OCC MARGIN*                                  | -       |
|     | *CUSTOMER LONG SEG VS. CUST. BANK LOAN*       | -       |
|     | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)*     | -       |
|     | *TOTAL P.A.I.B. MARGIN WITH OCC*              | -       |

| 16. | *OTHER*             |     |
|-----|---------------------|----:|
|     | *OTHER PAIB DEBITS* | -   |
|     | *TOTAL OTHER*       | -   |

| 17. | *TOTAL PAIB DEBITS* | 2,148,275 |
|-----|---------------------|----------:|

| 20. | *EXCESS - DEBITS OVER CREDITS* | -       |
|-----|--------------------------------|--------:|

| 21. | *DEFICIT - CREDITS OVER DEBITS* | 210,144 |
|-----|---------------------------------|--------:|

Lehman Brother Lehman Brothers Inc.
Customer/PAIB i Customer/PAIB Reserve Analysis

| Customer: | 10/17/08 | 10/10/08 | 09/30/08 | 09/26/08 | 09/19/08 | 09/17/08 | 10/17 v.09/17 Variance | Comments |
|---|---|---|---|---|---|---|---|---|
| **MTS** | | | | | | | | |
| Free Credits | 1,196,920 | 528,373 | 456,905 | 456,438 | 214,410 | 77,216 | 1,029,704 | Increase due to frozen Chase records |
| SCS Cash | 206 | 206 | 918 | 38,211 | 38,194 | 46,452 | (46,256) | |
| Option Margin | 13,210 | 13,210 | 13,205 | 13,203 | 7,130 | 15,824 | (2,614) | |
| P & I | 376,662 | 345,872 | 339,982 | 451,277 | 22,187 | 22,858 | 353,805 | Increase due to no cash receipts from Chase and DTC related to principal and interest |
| Aged Fails and Partly Secured Debits | 275,934 | 34,881 | 26,571 | 31,539 | 4,595 | 7,518 | 268,416 | |
| Customer Receivable Versus Box | | | | | | | | |
| Stock Record/FtoC items | 334,123 | 258,239 | 25,229 | 27,359 | 76,152 | 86,809 | 247,314 | |
| Overdrafts | | | | 3,231 | 3,231 | | | |
| Unapplied Cash / Suspense | 37,484 | 36,984 | 16,856 | 30,386 | 61,014 | 31,677 | 5,807 | |
| 3% ADV | 1,832,445 | 1,170,216 | 766,752 | 622,487 | 394,926 | 216,477 | 1,615,969 | Increased customer fails over the period with no streetside settlements |
| Sub-total | 3,976,996 | 2,387,982 | 1,683,714 | 1,674,130 | 821,840 | 504,841 | 3,472,145 | |
| **ADP** | | | | | | | | |
| Free Credits / Margin | (1,382,431) | (3,443,710) | (3,476,374) | (2,944,607) | (2,724,737) | 481,456 | (1,863,888) | Decrease in customer credits related to accounts migrating to BCI for $563 mil |
| Net Customer Financing | 815,623 | 1,115,713 | 2,341,571 | 2,050,094 | 1,509,788 | (831,906) | 1,647,529 | |
| GMNI Conversion Payable | | | | | | | | |
| O/Drafts | 43,118 | 43,026 | 46,439 | 46,145 | 222,207 | 62,604 | (19,486) | |
| Dividends | 103,268 | 87,724 | 17,184 | 16,688 | 5,322 | 5,322 | 97,946 | |
| S/B L O C vs. Customer Short | | | | | | | | |
| S/B NQ vs. Customer Short | | 6,559 | 1,249 | 14,563 | 10,976 | 5,287 | (5,287) | |
| Non-Broker Dealer Affil | 224,115 | 224,115 | 224,119 | 224,115 | 210,769 | 290,539 | (66,424) | |
| OCC Proprietary Qualified Collateral | (518,516) | (513,787) | (472,428) | (479,781) | (507,418) | (349,858) | (168,658) | Increase in cash collateral pledged to OCC in lieu of LOCs |
| Firm Bank Loan - Firm Net Long | | | 4,455 | | | | | |
| Suspense | | 41,729 | 41,620 | 56,118 | 35,290 | 39,897 | (39,897) | |
| Unapplied Cash | 7,364 | 7,388 | 7,779 | 7,779 | 11,553 | 10,121 | (2,757) | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | 85,319 | 85,319 | 85,319 | 85,319 | 85,212 | 107 | |
| Other | 856 | 8,602 | 28,884 | 85,271 | 115,894 | 82,685 | (81,829) | |
| 3% ADV | 117,404 | 163,381 | 175,971 | 213,518 | 401,980 | 322,692 | (205,288) | Decreased netting of fails or other ADI items |
| Sub-total | (503,880) | (2,173,941) | (974,113) | (624,778) | (623,057) | 204,052 | (707,932) | |
| **ITS** | | | | | | | | |
| Free Credits (primarily SCS cash) | 268,249 | 381,146 | 430,062 | 17,579 | (124,665) | 160,575 | 107,675 | Decrease in ITS SCS free credits |
| Unsecured Shorts | 63,952 | 63,952 | 80,145 | 77,049 | 77,049 | 77,639 | (13,688) | |
| Securities Related IC Payable (Mostly ITS) | 188,875 | 188,875 | 188,875 | 188,875 | 189,227 | 189,086 | (211) | |
| Other | | | | | | | | |
| 3% ADI | 524,026 | 510,696 | 462,295 | 421,462 | 228,496 | 178,711 | 345,314 | Increase in customer CODs with no streetside settlement |
| Sub-total | 1,045,102 | 1,144,668 | 1,161,377 | 704,965 | 370,097 | 606,011 | 439,090 | |
| **Commodities** | | | | | | | | |
| O/Drafts | - | - | - | - | - | 176,487 | (176,487) | No foreign exchange related credits in lock-up per SEC |
| Non-Reg Commodity Credits | - | - | - | - | - | 52,000 | (52,000) | |
| Sub-total | - | - | - | - | - | 228,487 | (228,487) | |
| Requirement | 4,518,208 | 1,358,709 | 1,870,977 | 1,754,317 | 568,879 | 1,543,392 | 2,974,816 | |
| Amount Segregated for Customer | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | | |
| (Excess) Deficit over Requirement | 2,749,208 | (410,291) | 101,977 | (14,683) | (1,200,121) | (225,608) | | |
| **PAIB:** | | | | | | | | |
| Net Payable Debits/Credits | (32,589) | 235,405 | 156,405 | 143,706 | 253,918 | 325,286 | (357,875) | Decrease in LOTC payables due to reduced inventory |
| Bank Loan | - | - | 813 | 6,374 | 114 | 3,560 | (3,560) | |
| Stock Loan | - | 64,500 | 95,259 | 80,291 | 80,009 | 312,247 | (312,247) | |
| F/R Vs PAIB Long | 32,202 | 27,443 | 44,199 | 173,945 | 4,073 | 31,031 | 1,171 | |
| Firm Short vs. PAIB Long | 521,104 | 445,267 | 555,562 | 505,041 | 403,853 | 394,506 | 126,598 | |
| Stock Borrow | | (204,577) | (252,725) | (260,224) | (442,644) | (560,229) | 560,229 | |
| Fail to Deliver | (310,573) | (325,708) | (390,009) | (376,568) | (105,904) | (40,281) | (270,292) | |
| Requirement | 210,144 | 242,330 | 209,414 | 272,565 | 193,419 | 466,120 | (255,976) | |
| Amount Segregated for PAIB | 492,000 | 492,000 | 492,000 | 492,000 | 492,000 | 492,000 | | |
| (Excess) over Requirement | (281,856) | (249,670) | (282,586) | (219,435) | (298,581) | (25,880) | | |

Notes:
* Denotes account net debit balances.

| | 10/17/08 | 10/10/08 | 09/30/08 | 09/26/08 | 09/19/08 | 09/17/08 |
|---|---|---|---|---|---|---|
| Total Customer & PAIB Requirement | 4,728,351 | 1,601,040 | 2,080,391 | 2,026,882 | 762,298 | 2,009,512 |
| Cushion | (2,467,351) | 659,960 | 180,609 | 234,118 | 1,498,702 | 251,488 |
| Total 15c3-3 Segregated | 2,261,000 | 2,261,000 | 2,261,000 | 2,261,000 | 2,261,000 | 2,261,000 |
| **Aggregate Debits:** | | | | | | |
| MTS Aggregate Debits | 61,061,528 | 39,007,213 | 25,558,394 | 20,749,580 | 13,164,196 | 7,215,902 |
| ITS Aggregate Debits | 17,467,520 | 17,023,193 | 15,408,832 | 14,048,731 | 7,816,195 | 5,967,049 |
| ADP Aggregate Debits | 3,913,483 | 5,446,022 | 5,868,365 | 7,117,264 | 13,399,326 | 10,756,386 |
| Total Aggregate Debits | 82,462,531 | 61,476,428 | 46,836,591 | 41,915,575 | 34,179,719 | 23,929,337 |
| Total 3% of Aggregate Debits | 2,473,875 | 1,844,293 | 1,405,018 | 1,257,467 | 1,025,392 | 717,881 |
| **Breakdown of 15c3-3 Segregation:** | | | | | | |
| Qualified Securities with JP Morgan Chase Customers | 769,000 | 769,000 | 769,000 | 769,000 | 769,000 | 769,000 |
| Qualified Securities with JP Morgan Chase PAIB | 492,000 | 492,000 | 492,000 | 492,000 | 492,000 | 492,000 |
| Cash Deposit with Wells Fargo | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| Total Lock-up | 2,261,000 | 2,261,000 | 2,261,000 | 2,261,000 | 2,261,000 | 2,261,000 |

Notes:
** Includes both the 15c3-3 Customer and PAIB requirement that is lock-up as of 09/17/2008. See Breakdown of 15c3-3 Segregation.

MOVANTS' TRIAL EXHIBIT
674

|  | 10/17/08 |  | 09/30/08 |  | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** |  | 6,087,741 |  | 6,030,490 | 57,251 |
| Firm Long vs Cust Short | (380,256) |  | (64,983) |  | (315,273) |
| Non Cust Long vs. Cust Short | (6,286,273) |  | (6,726,451) |  | 440,178 |
| PAIB Long vs Cust Short | (5,330) |  | (3,326) |  | (2,004) |
| Reverse Repo vs Cust Short | - |  | - |  | - |
| Cust Long vs Cust Short |  |  |  |  | - |
| Stock Borrow vs Cust Short | (128,477) |  | (409,381) |  | 280,904 |
| Fail to Deliver vs Cust Short | (669,836) |  | (2,302,723) |  | 1,632,887 |
| sub-total | (7,470,172) | (7,470,172) | (9,506,864) | (9,506,864) | 2,036,692 |
| **Total** |  | **(1,382,431)** |  | **(3,476,374)** | **2,093,943** |
| **Customer Debits** |  | 2,644,263 |  | 2,673,031 | (28,768) |
| Money Fund Receivable | - |  | - |  |  |
| Unsecured/Partly Secured Receivables/Non-Purpose Loans | (47,609) |  | 9,399 |  | (57,008) |
| Security Concentrations | - |  | - |  | - |
| Cust. Long vs.Customer Bank Loan | (14,268) |  | (26,625) |  | 12,357 |
| Stock Loan vs Cust Long | (46,837) |  | (851,548) |  | 804,711 |
| Cust Long vs Cust Short | - |  | - |  | - |
| Fail to Receive vs Cust Long | (940,794) |  | (2,477,575) |  | 1,536,782 |
| Firm Short vs Customer Long | (2,410,378) |  | (1,668,253) |  | (742,125) |
| sub-total | (3,459,886) | (3,459,886) | (5,014,602) | (5,014,602) | 1,554,716 |
| **Total** |  | **(815,623)** |  | **(2,341,571)** | **1,525,948** |
| Plus: |  |  |  |  |  |
| Stock Borrow / SB Q vs. Firm Bank Loan |  | - |  | - | - |
| Stock Borrow vs. Cust Bank Loan |  | - |  | - | - |
| **Net Cust Dr./Cr.** |  | **(566,808)** |  | **(1,134,803)** | **567,995** |

COPY PASTE FROM RESERVE FILE

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*10/17/08*
*(in 000'S)*

|  |  | 10/17/08 |
|---|---|---:|
| **1.** | ***CUSTOMER CREDITS:*** | |
|  | *CUSTOMER SECURITY ACCOUNTS* | 8,432,106 |
|  | *CUSTOMER ADJUSTMENTS* | (2,322,077) |
|  | *UNMAPPED CUSTOMER PAYABLE* | 15 |
|  | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (59,829) |
|  | *CUSTOMER NETTING NB* | - |
|  | *MONEY CONTROL ADJUSTMENTS* | 37,527 |
|  | *NON-BROKER DEALER AFFILIATES TYPE 5* | - |
|  | *BOOKKEEPING ADJUSTMENTS* | - |
|  | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
|  | *NON-NETWORK OFFSHR MUTUAL FUNDS* | - |
|  | *BANK OVERDRAFTS* | 43,118 |
|  | *NON-BROKER DEALER AFFILIATES - OTHER TYPES* | 224,115 |
|  | *HOUSE ACCOUNTS* | 12 |
|  | *TEFRA WITHHOLDING PAYABLE* | 95 |
|  | *LEGAL LEDGER CONTRA ACCOUNTS* | 116 |
|  | *BREAK VS. CUSTOMER LONG* | 633 |
|  | *FIRM LONG VS. CUSTOMER SHORT* | (380,256) |
|  | *NONCUST LONG VS. CUSTOMER SHORT* | (6,286,273) |
|  | *REVERSE REPO VS. CUSTOMER SHORT* | - |
|  | *PAIB LONG VS. CUSTOMER SHORT* | (5,330) |
|  | *SHORT & CREDIT INTEREST* | - |
|  | *MONEY FUND SETTLEMENTS 098-00003 & 098-70001* | - |
|  | *UNALLOCATED CUSTOMER SHORT* | - |
|  |  | |
|  | *TOTAL CUSTOMER CREDITS* | (316,029) |
|  |  | |
| **2.** | ***CUSTOMER BANK LOAN:*** | |
|  | *OCC MARGIN* | - |
|  | *OCC MARGIN DEFICIT* | - |
|  | *OCC COMMINGLED MARGIN (NONCUST BANK LOAN)* | - |
|  | *STOCK BORROW VS. CUST BANK LOAN* | - |
|  | *STOCK BORROW VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW L/C VS FIRM BANK LOAN* | - |
|  | *FAIL TO DELIVER VS. FIRM BANK LOAN* | - |
|  | *CUSTOMER BANK LOAN VS. NON-CUST LONG* | - |
|  | *CUSTOMER LONG VS. CUSTOMER BANK LOAN* | 14,268 |
|  | *CUST BANK LOAN - CUST NOT LONG* | - |
|  | *NONCUST BANK LOAN - NONCUSTOMER NOT LONG* | - |
|  | *FIRM BANK LOAN - FIRM NOT LONG* | - |
|  |  | |
|  | *TOTAL CUSTOMER BANK LOAN* | 14,268 |
|  |  | |
| **3.** | ***CUSTOMER STOCK LOAN:*** | |
|  | *STOCK LOAN* | 135,461 |
|  | *STOCK LOAN MTM* | - |
|  | *STOCK LOAN WITH CLEARING ORG* | - |
|  | *STOCK LOAN FREE OF MONEY* | - |
|  | *STOCK LOAN MTM DEFICIT* | - |
|  | *STOCK LOAN BOB ADJUSTMENT* | - |
|  | *UNALLOCATED STOCK LOAN ADJ* | - |
|  | *STOCK LOAN VS. STOCK BORROW L/C* | - |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW L/C* | - |
|  | *STOCK LOAN VS. REVERSE REPO* | - |
|  | *STOCK LOAN PLEDGE VS. REVERSE REPO* | - |
|  | *STOCK LOAN VS. PAIB LONG* | - |
|  | *STOCK LOAN PLEDGE VS. PAIB LONG* | - |
|  | *STOCK LOAN VS. STOCK BORROW* | (86,631) |
|  | *STOCK LOAN VS. STOCK BORROW PLEDGE Q.* | - |
|  | *STOCK LOAN VS. STOCK BORROW PLEDGE NQ* | - |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW* | - |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q.* | - |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ* | - |
|  | *STOCK LOAN VS. NONCUSTOMER LONG* | (1,423) |
|  | *STOCK LOAN PLEDGE VS. NONCUSTOMER LONG* | - |
|  | *STOCK LOAN VS. FIRM LONG* | (570) |
|  | *STOCK LOAN PLEDGE VS. FIRM LONG* | - |
|  |  | |
|  | *TOTAL CUSTOMER STOCK LOAN* | 46,837 |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
***BROKER DEALER UNIT***
*10/17/08*
*(in 000'S)*

|  | | **10/17/08** |
|---|---|---|
| **4.** | **CUSTOMER FAIL TO RECEIVE:** | |
| | *FAIL TO RECEIVE* | **11,002,946** |
| | *CNS FAIL TO RECEIVE* | 622,134 |
| | *MISC FAIL TO RECEIVE ADJUSTMENTS* | (598,880) |
| | *OMNI FAIL TO RECEIVE ADJUSTMENTS* | - |
| | *FAIL TO RECEIVE MTM ADJUSTMENT* | - |
| | *FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND* | - |
| | *FAIL TO RECEIVE VS. FAIL TO DELIVER* | (142,663) |
| | *FAIL TO RECEIVE VS. REVERSE REPO* | - |
| | *FAIL TO RECEIVE VS. MTM DEFICIT* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q.* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW L/C* | - |
| | *FAIL TO RECEIVE VS. FAIL TO DELIVER CNS* | (63,345) |
| | *FAIL TO RECEIVE VS. FIRM LONG* | (5,445,396) |
| | *FAIL TO RECEIVE VS. NONCUSTOMER LONG* | (3,908,328) |
| | *FAIL TO RECEIVE VS. PAIB LONG* | (32,202) |
| | *FAIL TO RECEIVE VS. UNALLOCATED / BREAK* | - |
| | *CNS FAIL TO RECEIVE VS. FIRM LONG* | (188,651) |
| | *CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG* | (261,631) |
| | *CNS FAIL TO RECEIVE VS. PAIB LONG* | - |
| | *CNS FAIL TO RECEIVE ADJUSTMENT* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q.* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW L/C* | - |
| | *CNS FAIL TO RECEIVE VS. REVERSE REPO* | - |
| | *CNS FAIL TO RECEIVE VS. FAIL TO DELIVER* | (43,190) |
| | | |
| | *TOTAL CUSTOMER FAIL TO RECEIVE* | **940,794** |
| | | |
| **5.** | **FIRM SHORT VS CUSTOMER LONG:** | |
| | *TOTAL FIRM SHORT* | - |
| | *FIRM OMNI SHORT* | - |
| | *FIRM SHORT VS. CUSTOMER LONG* | 1,107,602 |
| | *NONCUSTOMER SHORT VS. CUSTOMER LONG* | 1,138,722 |
| | *REPO VS. CUSTOMER LONG* | 42,557 |
| | *PAIB SHORT VS. CUSTOMER LONG* | 121,497 |
| | *REPO VS. UNALLOCATED* | - |
| | *FIRM SHORT VS. UNALLOCATED* | - |
| | *NONCUSTOMER SHORT VS. UNALLOCATED* | - |
| | | |
| | *TOTAL FIRM SHORT VS. CUSTOMER LONG* | **2,410,378** |
| | | |
| **6.** | **CUSTOMER DIVIDEND & INTEREST:** | |
| | *DIVIDEND & INT PAYABLES* | 106,733 |
| | *ADJUSTMENTS FROM DIVIDEND DEPT.* | (3,465) |
| | | |
| | *TOTAL CUSTOMER DIVIDENDS & INTEREST* | **103,268** |
| | | |
| **7.** | **SECURITY COUNT DIFFERENCE > 7 DAYS:** | |
| | | |
| **8.** | **SUSPENSE ACCOUNTS** | |
| | *SUSPENSE CREDITS & SMV:* | - |
| | *CUSTOMER UNAPPLIED 090-01234* | 7,364 |
| | *ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES* | 85,319 |
| | | |
| | *TOTAL SUSPENSE ACCOUNTS* | **92,683** |
| | | |
| **9.** | **AGED TRANSFERS & REORGANIZATION:** | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | | |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| | | |
| **10.** | **OTHER:** | |
| | *OTHER CREDITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| | *TOTAL CREDITS* | 3,292,199 |

*15c3-3 CUSTOMER RESERVE COMPUTATION*

*BROKER DEALER UNIT*

*10/17/08*

*(in OOO'S)*

| | | 10/17/08 |
|---|---|---|
| **12.** | **CUSTOMER DEBITS:** | |
| | CUSTOMER SECURITY ACCOUNTS | 5,175,050 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (59,829) |
| | CUSTOMER NETTING NB | - |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | (2,470,958) |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | - |
| | MONEY FUND RECEIVABLE | - |
| | MARGIN INTEREST | - |
| | UNSECURED DEBITS | (40,984) |
| | PARTLY SECURED DEBITS | (6,625) |
| | NON-PURPOSE LOANS | - |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | **TOTAL CUSTOMER DEBITS** | **2,596,654** |
| | | |
| **13.** | **CUSTOMER STOCK BORROW:** | |
| | STOCK BORROW | 215,175 |
| | STOCK BORROW MTM | - |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | - |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L/C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | - |
| | STOCK BORROW L/C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (86,631) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | - |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | - |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L/C VS. STOCK LOAN | - |
| | STOCK BORROW L/C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L/C VS. FIRM SHORT | - |
| | STOCK BORROW L/C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | - |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (67) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | - |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | - |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. THE BOX | - |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | - |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | - |
| | STOCK BORROW L/C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | - |
| | STOCK BORROW PLEDGE Q. VS. F/R CNS | - |
| | STOCK BORROW PLEDGE NQ VS. F/R CNS | - |
| | STOCK BORROW L/C VS. F/R CNS | - |
| | STOCK BORROW L/C VS. REPO | - |
| | STOCK BORROW VS. REPO | - |
| | STOCK BORROW PLEDGE Q. VS. REPO | - |
| | STOCK BORROW PLEDGE NQ VS. REPO | - |
| | STOCK BORROW VS. UNALLOCATED | - |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | - |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | - |
| | STOCK BORROW L/C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | - |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | - |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | - |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | - |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | - |
| | | |
| | **TOTAL CUSTOMER STOCK BORROW** | **128,477** |

*15c3-3 CUSTOMER RESERVE COMPUTATION*

**BROKER DEALER UNIT**

*10/17/08*

*(in OOO'S)*

| | | 10/17/08 |
|---|---|---|
| **14.** | ***CUSTOMER FAIL TO DELIVER:*** | |
| | *FAIL TO DELIVER* | 9,035,807 |
| | *CNS FAIL TO DELIVER* | 1,235,456 |
| | *MISC FAIL TO DELIVER ADJUSTMENTS* | - |
| | *OMNI FAIL TO DELIVER ADJUSTMENTS* | - |
| | *FAIL TO DELIVER MTM ADJUSTMENT* | - |
| | *FAIL TO DELIVER ADJUSTMENT* | - |
| | *FAIL TO DELIVER VS. FAIL TO RECEIVE* | (142,663) |
| | *FAIL TO DELIVER VS. FAIL TO RECEIVE CNS* | (43,190) |
| | *FAIL TO DELIVER OVER 30 DAYS* | (826) |
| | *FAIL TO DELIVER VS. FIRM SHORT* | (2,782,459) |
| | *FAIL TO DELIVER VS. PAIB SHORT* | (305,516) |
| | *FAIL TO DELIVER VS. REPO* | - |
| | *FAIL TO DELIVER VS. THE BOX* | (876,298) |
| | *FAIL TO DELIVER VS. NON-CUSTOMER SHORT* | (4,236,780) |
| | *FAIL TO DELIVER VS. UNALLOCATED/ BREAK* | - |
| | *CNS FAIL TO DELIVER VS. FIRM SHORT* | (685,534) |
| | *CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT* | (398,515) |
| | *CNS FAIL TO DELIVER VS. PAIB SHORT* | (5,057) |
| | *CNS FAIL TO DELIVER VS. THE BOX* | (61,244) |
| | *CNS FAIL TO DELIVER VS. REPO* | - |
| | *CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN* | - |
| | *CNS FAIL TO DELIVER VS. UNALLOC/BREAK* | - |
| | *CNS FAIL TO DELIVER VS. FAIL TO RECEIVE* | (63,345) |
| | | |
| | *TOTAL CUSTOMER FAIL TO DELIVER* | **669,836** |
| | | |
| **15.** | ***CUSTOMER MARGIN WITH OCC*** | |
| | *OCC MARGIN* | - |
| | *OCC PROPRIETARY QUALIFIED COLLATERAL* | 518,516 |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | | |
| | *TOTAL CUSTOMER MARGIN WITH OCC* | **518,516** |
| | | |
| **16.** | ***OTHER*** | |
| | *OTHER CUSTOMER DEBITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| **17.** | ***AGGREGATE DEBIT ITEMS*** | 3,913,483 |
| **18.** | ***LESS 3%*** | (117,404) |
| **19.** | ***TOTAL 15C3-3 DEBITS*** | 3,796,079 |
| | | |
| **20.** | ***EXCESS - DEBITS OVER CREDITS*** | 503,880 |
| **21.** | ***DEFICIT - CREDITS OVER DEBITS*** | |

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|  | 10/17/08 |
|---|---|
| *CUSTOMER CREDITS:* | |
| *Customer Accounts* | 11,740,089 |
| *Securities Related Intercompany Payables* | 188,875 |
| *ITS Unsecured Shorts* | 63,952 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 0 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 11,992,916 |
| | |
| *CUSTOMER STOCK LOAN* | 0 |
| *CUSTOMER FAIL TO RECEIVE* | 4,333,585 |
| *CUSTOMER BANK LOAN (OCC MARGIN)* | 0 |
| *CUSTOMER BANK LOAN (ITS-REPO)* | 1,641,261 |
| *FIRM SHORT VS. CUSTOMER LONG* | 20,834 |
| *SUSPENSE CREDITS* | 0 |
| | |
| *TOTAL CREDITS* | 17,988,596 |
| | |
| | |
| *CUSTOMER DEBITS:* | |
| *Customer Accounts* | 10,357,279 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 10,357,279 |
| | |
| *CUSTOMER MARGIN WITH OCC* | 0 |
| | |
| *CUSTOMER STOCK BORROW* | 1,193,138 |
| *CUSTOMER FAIL TO DELIVER* | 5,917,103 |
| *AGGREGATE DEBITS* | 17,467,520 |
| *Less 3%* | 524,026 |
| *TOTAL DEBITS* | 16,943,494 |
| | |
| *EXCESS CREDITS OVER DEBITS* | 1,045,102 |

*SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS*    10/17/08

**CREDITS**

| Acct | Description | | |
|---|---|---|---|
| #47 | (17) CUST F/D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #48 | (19) B/D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F/D (6) REPO | 0 | 0 |
| #63 | (19) BR/Dealer Long Free vs (6) Repos | 0 | 0 |
| | | 0 | |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F/D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (8) HIC REPO | 0 | 0 |
| #80 | (23)INACT. LONG VS (8) HIC REPO | 0 | 0 |
| #92 | (17) CUST LONG F/D  VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY R. | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F/D VS TRI PARTY REPO | 0 | 0 |
| #98 | (29) AFFILIATE LONG  VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST/D>30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (17) CUST Long Free VS (16) PLEDGE Vbor | 0 | |
| #139 | (21) OPERATIONAL VS (16)PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | (11) NON CUST F/D > 30 DAYS VS (18) NON CUST F/R | 63,975,543 | 63,976 |
| #150 | (17) CUST LONG F  VS (18) NON CUST (F/R) | 0 | 0 |
| #151 | (19) B/R DEALER LONG FREE VS (18) NON CUST (F/R) | 0 | |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F/R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F/R | 0 | 0 |
| #163 | (17) CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #166 | (23) Inact Long VS (20) NET CLEARING | 0 | 0 |
| #176 | (11) NON CUST/D>30 VS (22) CUST SHRT(F/R) | 210,909,229 | 210,909 |
| #194 | (15) CUST LONG  (24)  OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22)CUST SHORT(F/R) | 22,833,440 | 22,833 |
| #180 | (19) BR/DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22)CUST SHORT(F/R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22)CUST SHORT(F/R) | 0 | 0 |
| #192 | (11)NONCUST FD V S (24)OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LNG VS (24) OPER SHRT | 0 | 0 |
| #198 | (23) INACT. LONG  VS (24) OPER SHRT | 2,786,170 | 2,788 |
| #208 | (9) NON CST F/D>30 VS (26) AFFILIATE SHRT | 0 | 0 |
| #191 | (15) NON-CUST F/D VS (24) OPER SHORT | 0 | 0 |
| #211 | (17) CUST. LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #218 | (31) AFFILIATE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26)AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 96,766,940 | 96,767 |
| #285 | (33) BOX BREAKS VS (22)CUST SHRT(F/R) | 154,518 | 155 |
| #285C | (33) BOX BREAKS VS (20)CUST NET CL | 0 | 0 |
| #286 | (33) BOX BREAKS VS (20)CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (18) F/R | 85,318,494 | 85,318 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 492,203 | 492 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 67,975,310 | 67,975 |
| #294C | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #339 | (13) NET LONG  CLE(38) INACTIVE SHORT | 0 | 0 |
| #341 | (17) CUST LONG FREE VS (38)INACTIVE SHRT | 742,530 | 743 |
| #342 | (19) BR/DEALER LONG FREE VS (38)INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (38)INACTIVE SHRT | 1,683,335 | 1,683 |
| #344 | (23) INACTIVE LONG (19) VS (38)INACTIVE SHRT | 25,631,684 | 25,632 |
| #346 | (27) NON-BROKER DEALER (19) VS (38)INACTIVE SHRT | 0 | 0 |
| #347 | (27) AFFIL LGFREE(19) VS (38)INACTIVE SHRT | 0 | 0 |
| #348 | (31) OPER.LONG F (38) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (38)INACTIVE SHRT | 25,619,610 | 25,620 |
| #337 | (9) NON CUST F/D (38) INACTIVE SHORT | 0 | 0 |
| #386 | (5) BVP VS (46) SPECIAL FINANCE | 0 | 0 |
| #392 | (17)CUST LONG FREE VS (46)SPECIAL FINANCE | 512,909 | 513 |
| #393 | (19)BR/DEALER LONG FREE VS (46)SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 1,674,846 | 1,675 |
| #398 | (29) CUST. LONG F VS (01)SPECIAL FIN.. | 0 | 0 |
| #400 | (33) BOX BREAK L0NG (46) SPECIAL FIN. | 0 | 0 |
| #419 | (33)BOX BREAKS LAW (48) FIN LDGR TRF. | 0 | 0 |
| #433 | (35) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #438 | (35)SPEC FIN CUST SHT VS (38) INACTIVE SHORT | 1,930,788 | 1,931 |
| #443 | (37) FIN. LDGR TR VS (8) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 1,049,177 A | 1,049 |
| | STOCK RECORD BREAK | 0 B | B |
| | ACCOUNTS PAYABLE | 1,106,920,412 R-2 | 1,106,920 |
| | SCS CASH | 206,409 R-2 | 206 |
| | OPTION MARGIN | 13,210,277 R-2 | 13,210 |
| MONEY | BANK OVERDRAFTS | 0 R-3 | 0 |
| ONLY | SUSPENSE / BANK REC. DIFFERENCES | 20,378,322 R-4 | 20,378 |
| | OPERATIONAL / UNAPPLIED CASH | 17,105,648 R-5 | 17,106 |
| | P&I PAYABLES CANADA | 0 R-5 | 0 |
| | P&I PAYABLES | 376,662,430 R-5 | 376,662 |
| | | 1,534,483,498 | |
| LESS 3% OF AGGREGATE DEBIT ITEMS | #REF! | 1,832,445,830 | 1,832,446 |

**DEBIT**

| Acct | Description | | |
|---|---|---|---|
| #223 | (9) NON CUST F/D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F/D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F/D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F/D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F/D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE VS (34) BOX | 0 | 0 |
| #270C | (15) CUST F/D VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F/D VS (36) BOX - LBSI | 0 | 0 |

| EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS | 3,976,986,052 | 3,976,986 |
|---|---|---|

##

##
##
##

0

*15c3-3 P.A.I.B COMPUTATION*
**BROKER DEALER UNIT**
*10/17/08*
*(in OOO'S)*

| | | 10/17/08 |
|---|---|---:|
| **1.** | **P.A.I.B. CREDITS:** | |
| | *PAIB CREDITS* | **2,285,408** |
| | *BREAK VS. PAIB LONG* | **-** |
| | *PAIB CREDIT ADJ* | **(8,000)** |
| | *PAIB DEFERRED COMMISSIONS AND IA FEES* | **20,004** |
| | *PAIB LONG VS CUSTOMER SHORT* | **5,330** |
| | *FIRM LONG vs PAIB SHORT* | **(220,498)** |
| | *NONCUST LONG VS. PAIB SHORT* | **(155,633)** |
| | *UNALLOCATED PAIB SHORT* | **-** |
| | *PAIB SHORT VS CUSTOMER LONG* | **(121,497)** |
| | | |
| | *P.A.I.B. CREDITS:* | **1,805,113** |
| | | |
| **2.** | **PAIB BANK LOAN:** | |
| | | |
| | *OCC MARGIN* | **-** |
| | *OCC MARGIN DEFECIT* | **-** |
| | *PAIB LONG VS. FIRM BANK LOAN* | **-** |
| | *PAIB LONG VS. CUST BANK LOAN* | **-** |
| | *PAIB LONG VS. PAIB BANK LOAN* | **-** |
| | *PAIB BANK LOAN - PAIB NOT LONG* | **-** |
| | *CUST BANK LOAN- CUSTOMER NOT LONG* | **-** |
| | *FIRM BANK LOAN- CUSTOMER NOT LONG* | **-** |
| | | |
| | *TOTAL P.A.I.B. BANK LOAN* | **-** |
| | | |
| **3.** | **PAIB STOCK LOAN:** | |
| | | |
| | *STOCK LOAN VS PAIB LONG* | **-** |
| | *STOCK LN PLDG VS. PAIB LONG* | **-** |
| | | |
| | *TOTAL CUSTOMER STOCK LOAN* | **-** |
| **4.** | **PAIB FAIL TO RECEIVE:** | |
| | | |
| | *FAIL TO RECEIVE VS PAIB LONG* | **32,202** |
| | *CNS FAIL TO RECEIVE VS PAIB LONG* | **-** |
| | | |
| | *TOTAL P.A.I.B. FAIL TO RECEIVE* | **32,202** |
| | | |
| **5.** | **FIRM SHORT VS PAIB LONG:** | |
| | | |
| | *REPO VS PAIB LONG* | **-** |
| | *NONCUST SHORT VS. PAIB LONG* | **346,571** |
| | *FIRM SHORT VS PAIB LONG* | **174,533** |
| | | |
| | *TOTAL FIRM SHORT VS P.A.I.B. LONG* | **521,104** |
| | | |
| **6.** | **PAIB DIVIDEND & INTEREST:** | |
| | | |
| | *STOCK DIVIDENDS > 30 DAYS* | **-** |
| | *MONEY CONTROL ADJUSTMENT* | **-** |
| | *DIVIDEND & INT PAYABLES > 7 DAYS* | **-** |

***TOTAL P.A.I.B. DIVIDENDS & INTEREST*** -

**7.** ***SECURITY COUNT DIFFERENCE > 7 DAYS:***

**8.** ***SUSPENSE CREDITS & SMV >7 DAYS:*** -

**9.** ***AGED TRANSFERS & REORGANIZATION:***

  ***TRANSFER SHORTS OVER 40 DAYS*** -
  ***REORG/REDEMPTION SMV OVER 7 DAYS*** -

  ***TOTAL AGED TRANSFERS & REORGANIZATION*** -

**10.** ***OTHER:***

  ***OTHER CREDITS*** -

  ***TOTAL OTHER*** -

  ***TOTAL PAIB CREDITS*** 2,358,419

| | | |
|---|---|---:|
| 12. | *P.A.I.B. DEBITS:* | |
| | *CUSTOMER SECURITY ACCOUNTS* | 2,014,272 |
| | *VARIOUS PAIB DEBIT ADJ* | (176,570) |
| | *UNSECURED DEBITS* | - |
| | *PARTLY SECURED DEBITS* | - |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | *BREAK VS CUSTOMER LONG* | - |
| | | |
| | *P.A.I.B. DEBITS:* | 1,837,702 |
| | | |
| 13. | *PAIB STOCK BORROW:* | |
| | | |
| | *STOCK BORROW VS PAIB SHORT* | - |
| | *STOCK BORROW Q. VS. PAIB SHORT* | - |
| | *STOCK BORROW NQ VS. PAIB SHORT* | - |
| | *STOCK BORROW L/C VS PAIB SHORT* | - |
| | | |
| | *TOTAL P.A.I.B. STOCK BORROW* | - |
| | | |
| 14. | *PAIB FAIL TO DELIVER:* | |
| | | |
| | *FAIL TO DELIVER OVER 30 DAYS* | - |
| | *FAIL TO DELIVER VS PAIB SHORT* | 305,516 |
| | *CNS FAIL TO DELIVER VS PAIB SHORT* | 5,057 |
| | *CNS FAIL TO DELIVER VS THE BOX* | - |
| | *CNS FAIL TO DELIVER VS REPO* | - |
| | *CNS FAIL TO DELIVER VS UNALLOC./BREAK* | - |
| | *CNS FAIL TO DELIVER VS FAIL TO RECEIVE* | - |
| | | |
| | *TOTAL P.A.I.B. FAIL TO DELIVER* | 310,573 |
| | | |
| 15. | *PAIB MARGIN WITH OCC* | |
| | *OCC MARGIN* | - |
| | *CUSTOMER LONG SEG VS. CUST. BANK LOAN* | - |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | | |
| | *TOTAL P.A.I.B. MARGIN WITH OCC* | - |
| | | |
| 16. | *OTHER* | |
| | *OTHER PAIB DEBITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| 17. | *TOTAL PAIB DEBITS* | 2,148,275 |
| | | |
| 20. | *EXCESS - DEBITS OVER CREDITS* | - |
| 21. | *DEFICIT - CREDITS OVER DEBITS* | 210,144 |

| | 09/12/08 | 09/05/08 | 08/29/08 | 08/22/08 | 08/15/08 | 08/08/08 | 07/31/08 | 07/25/08 | 07/18/08 | 07/11/08 | 07/03/08 | 06/27/08 | 06/20/08 | 06/13/08 | 06/06/08 | 5/30/2008 | 5/23/2008 | 5/16/2008 | 3 Month Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MTS** | | | | | | | | | | | | | | | | | | | |
| Accounts Payable | 20,440 | 20,440 | 14,966 | 21,456 | 47,357 | 19,049 | | 13,189 | | | 18,475 | 22,937 | 127,725 | 38,746 | 41,237 | 34,268 | 25,993 | | 31,115 |
| SCS Cash | 149,163 | 243,640 | 157,911 | 168,658 | 529,301 | 528,553 | 579,997 | 521,464 | 426,060 | 457,567 | 466,527 | 402,880 | 362,170 | 322,362 | 310,236 | 288,845 | 356,923 | 488,695 | 717,160 | 393,585 |
| Options Margin | 39,800 | 56,002 | 59,461 | 59,978 | 72,454 | 84,520 | 73,758 | 75,134 | 79,534 | 44,640 | 65,807 | 80,169 | 81,035 | 81,546 | 96,128 | 60,844 | 26,542 | 16,396 | 49,951 | 63,353 |
| P & I | 9,004 | 9,004 | 8,800 | 11,901 | 95,582 | 13,411 | 16,762 | 39,598 | 15,397 | 20,086 | 33,194 | 17,816 | 47,023 | 9,969 | 10,377 | 18,006 | 13,398 | 13,530 | 30,521 | 22,809 |
| S/R Breaks | 1,340 | 3,988 | 4,121 | 3,850 | 3,791 | 2,452 | 2,610 | 10,011 | 44,479 | 44,458 | 1,979 | 24,387 | 2,155 | 2,759 | 3,446 | 6,652 | 5,970 | 6,578 | 6,199 | 9,538 |
| | | | | (1,234) | | | | | | | | | | | | | | | | (65) |
| Overdrafts | 156,260 | 6,106 | 170,082 | 18,584 | 0 | 1 | 5,753 | 26 | 2,816 | 195,896 | 45,113 | 106 | 6,639 | 7,936 | 17,075 | 644 | 1,811 | 3,662 | 1,937 | 33,719 |
| Unapplied Cash / Suspense | 22,565 | 5,500 | 481 | 2,036 | 28,189 | 23,717 | 503,703 | 1,263 | 2,109 | 10,431 | 36,254 | 13,364 | 12,897 | 17,204 | 30,116 | 10,750 | 121,717 | 28,402 | 2,065 | 45,935 |
| 3% ADI | 13,090 | 13,940 | 41,563 | 24,194 | 64,673 | 50,388 | 34,136 | 131,489 | 77,861 | 63,330 | 30,258 | 117,875 | 69,577 | 43,622 | 89,012 | 24,189 | 70,880 | 38,884 | 54,930 | 55,468 |
| 3% ADI | 45,785 | 15,599 | 108,534 | 22,976 | 25,040 | 10,258 | 15,787 | 17,852 | 21,609 | 24,814 | 14,718 | 133,560 | 39,406 | 19,255 | 25,338 | 14,243 | 25,338 | 38,189 | 64,847 | 35,950 |
| *Sub-total* | 457,447 | 374,219 | 565,919 | 332,399 | 866,386 | 732,339 | 1,245,661 | 815,385 | 693,655 | 884,411 | 722,344 | 821,113 | 639,575 | 527,589 | 709,452 | 462,919 | 663,715 | 668,604 | 953,603 | 691,407 |
| **ADP** | | | | | | | | | | | | | | | | | | | |
| Free Credits / Margin | 2,140,440 | 2,937,601 | 2,619,903 | 2,865,742 | 3,106,303 | 3,133,182 | 3,222,251 | 2,543,047 | 2,661,771 | 3,122,151 | 3,112,121 | 4,217,985 | 3,809,015 | 2,547,585 | 5,202,633 | 2,334,570 | 1,739,727 | 1,719,277 | 1,270,152 | 2,858,182 |
| Net Customer Financing | 1,201,745 | (1,204,038) | (141,281) | (1,248,725) | (985,271) | (1,010,434) | (1,085,527) | (1,175,416) | (929,743) | (507,346) | (1,383,862) | (1,383,327) | (928,204) | (1,363,736) | (1,326,850) | (1,336,779) | (1,416,599) | (1,236,340) | (1,014,510) | (972,434) |
| OMNI Conversion Payable | | | | | | | | | | | | | | | | | | | - |
| O/Drafts | 70,244 | 52,177 | 41,114 | 24,809 | 35,540 | 22,744 | 44,223 | 36,824 | 36,824 | 51,609 | 56,361 | 54,577 | 47,145 | 40,337 | 87,613 | 78,943 | 66,879 | 53,947 | 52,338 | 50,330 |
| Dividends | 5,034 | 15,944 | 16,910 | 16,536 | 14,552 | 15,243 | 15,172 | 16,628 | 19,340 | 20,592 | 19,118 | 18,088 | 18,117 | 19,178 | 21,102 | 10,882 | 11,599 | 14,250 | 9,929 | 15,695 |
| S/B L.O.C. | | | | | | | | | | | | | | | | | | | - |
| S/B NQ | 5,871 | 4,230 | 4,965 | 4,281 | 7,866 | 3,035 | 7,247 | 4,883 | 11,242 | | | 91 | 38 | 42,842 | 35,419 | 46,932 | 29,142 | 60,799 | | 14,152 |
| Non-Broker Dealer Affil. | 183,000 | 284,964 | 203,674 | 207,715 | 244,457 | 212,728 | 188,950 | 157,428 | 149,220 | 141,218 | 161,083 | 93,327 | 91,138 | 58,654 | 92,679 | 87,331 | 95,928 | 93,186 | 98,002 | 149,720 |
| OCC Commingled Margin/Deficit | (657,782) | (621,700) | (369,709) | (606,125) | (698,598) | (694,808) | (209,780) | (719,534) | (726,972) | (874,848) | (876,238) | (936,432) | (937,785) | (1,384,252) | (1,404,383) | (1,042,676) | (910,359) | (1,091,056) | (1,040,435) | (831,762) |
| Firm Bank Loan - Firm Not Long | | | | | | | | | | | | | | | | | | | - |
| Suspense | 8,093 | 5,442 | 2,926 | 12,501 | 8,273 | 4,461 | 31,927 | 43,235 | 36,014 | 36,894 | 13,288 | 23,003 | 9,425 | 6,121 | 6,304 | 2,028 | 3,265 | 14,302 | 2,364 | 14,203 |
| Unapplied Cash | 13,064 | 6,799 | 12,371 | 7,121 | 6,035 | 10,722 | 4,678 | 8,177 | 4,888 | 9,731 | 5,312 | 6,037 | 4,348 | 5,168 | 4,767 | 45,140 | 8,642 | 9,137 | 11,065 | 9,642 |
| Abandoned Property / Soft Dollars | 85,212 | 85,212 | 85,212 | 85,212 | 85,212 | 81,304 | 81,304 | 81,304 | 81,304 | 81,304 | 81,304 | 80,649 | 80,649 | 76,104 | 76,104 | 76,104 | 76,104 | 76,104 | | 81,066 |
| Other | 58,853 | 17,666 | 12,930 | 8,362 | 26,217 | 20,389 | (4,118) | 9,549 | 28,210 | 32,991 | 15,623 | 10,881 | 10,684 | 38,485 | 20,000 | 25,367 | 36,208 | 8,960 | 38,017 | 22,382 |
| 3% ADI | 138,123 | 101,775 | 95,467 | 106,570 | 110,190 | 117,908 | 103,250 | 130,953 | 127,682 | 129,052 | 128,649 | 127,990 | 135,892 | 147,072 | 169,688 | 158,683 | 153,357 | 164,958 | 179,066 | 132,964 |
| *Sub-total* | 3,251,896 | 1,686,073 | 2,564,801 | 1,483,999 | 1,960,776 | 1,920,383 | 2,399,578 | 1,139,097 | 1,499,770 | 2,243,349 | 1,332,760 | 2,312,777 | 2,340,514 | 195,299 | 3,002,498 | 475,011 | (88,317) | (144,133) | (257,109) | 1,544,142 |
| **ITS** | | | | | | | | | | | | | | | | | | | |
| Free Credits (primarily SCS cash) | 587,444 | 1,008,942 | 1,067,193 | 957,419 | 1,219,824 | 1,062,229 | 910,429 | 1,026,967 | 888,261 | 1,053,263 | 1,282,741 | 1,266,344 | 1,398,987 | 1,212,444 | 1,168,096 | 1,353,271 | 2,610,267 | 1,654,514 | 1,729,414 | 1,234,634 |
| Unsecured Shorts | 61,870 | 61,183 | 58,943 | 59,509 | 59,509 | 58,996 | 58,996 | 58,996 | 58,996 | 58,996 | 61,505 | 59,285 | 59,329 | 59,329 | 59,329 | 67,559 | 65,791 | 58,974 | 60,338 | 60,336 |
| Poss & Control | 189,086 | 181,077 | 190,060 | 83,868 | 81,348 | 170,220 | 191,183 | 118,709 | 130,872 | 147,618 | 133,300 | 85,668 | 110,902 | 100,809 | 102,554 | 99,353 | 90,833 | 146,461 | 182,018 | 133,470 |
| Other | | | | | | | | | | | | | | | | | | | - |
| 3% ADI | 44,913 | 17,872 | 16,341 | 20,000 | 21,109 | 25,208 | 21,265 | 11,135 | 24,671 | 26,046 | 23,375 | 29,794 | 25,141 | 24,672 | 29,557 | 29,386 | 25,676 | 19,291 | 26,523 | 24,315 |
| *Sub-total* | 883,313 | 1,269,074 | 1,332,537 | 1,120,796 | 1,381,790 | 1,316,653 | 1,181,872 | 1,215,807 | 1,102,801 | 1,285,893 | 1,500,921 | 1,441,090 | 1,594,358 | 1,397,254 | 1,359,535 | 1,541,339 | 2,794,335 | 1,886,058 | 1,996,929 | 1,452,756 |
| **Commodities** | | | | | | | | | | | | | | | | | | | |
| O/Drafts | 13,779 | 28,144 | 136,100 | 92,598 | 87,729 | 73,040 | 28,669 | 23,019 | 94,522 | 34,544 | 25,845 | 19,479 | 45,291 | 73,086 | 112,491 | 31,423 | 35,861 | 71,279 | 12,935 | 54,728 |
| Other | 1,317,364 | | | | | | | | | | | | | | | 176,986 | 532,347 | | | 106,668 |
| *Sub-total* | 1,331,143 | 28,144 | 136,100 | 92,598 | 87,729 | 73,040 | 28,669 | 23,019 | 94,522 | 34,544 | 25,845 | 19,479 | 45,291 | 73,086 | 112,491 | 31,423 | 212,847 | 603,626 | 12,935 | 161,396 |
| | | | | | | | | | | | | | | | | | | | |
| Requirement | 5,923,799 | 3,357,511 | 4,619,038 | 3,029,791 | 4,296,681 | 4,042,415 | 4,855,780 | 3,193,308 | 3,390,747 | 4,448,197 | 3,581,870 | 4,594,459 | 4,619,738 | 2,193,226 | 5,183,976 | 2,510,692 | 3,582,580 | 3,014,156 | 2,706,359 | 3,849,701 |
| Cushion (plus 2% deduction) | 369,449 | 313,489 | 338,962 | 307,209 | 332,317 | 327,585 | 343,220 | 310,692 | 314,253 | 335,803 | 318,130 | 358,541 | 358,262 | 310,772 | 370,024 | 316,308 | 338,420 | 326,844 | 320,641 | 332,154 |
| **Amount Segregated** | 6,293,248 | 3,671,000 | 4,958,000 | 3,337,000 | 4,628,998 | 4,370,000 | 5,199,000 | 3,504,000 | 3,705,000 | 4,784,000 | 3,900,000 | 4,953,000 | 4,978,000 | 2,504,000 | 5,554,000 | 2,827,000 | 3,921,000 | 3,341,000 | 3,027,000 | 4,181,855 |