Hearing Date and Time: August 18, 2010 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date: August 11, 2010 at 4:00 p.m. (Prevailing Eastern Time)

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | ) | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | ) | Chapter 11 Case No. |
| | ) | 08-13555 (JMP) |
| Debtor | ) | |
| | ) | |

### NOTICE OF MOTION AND MOTION FOR ORDER APPROVING LAWRENCE FOGARAZZO, ET AL.'S MOTION PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE FOR RELIEF FROM AUTOMATIC STAY TO ALLOW ADVANCEMENT UNDER INSURANCE POLICY BY LLOYD'S OF LONDON (LLOYD'S)

TO ALL INTERESTED PARTIES:

PLEASE TAKE NOTICE that a hearing will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York , New York, 10004 (the "Bankruptcy Court"), on August 18, 2010 at 10 a.m., on the annexed Motion of Lawrence and Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel, individually and on behalf of all other persons similarly situated ("Plaintiffs"), by their undersigned attorneys, for relief from the automatic stay, to the extent applicable, to permit Plaintiffs to seek recovery in and from applicable insurance coverage.  The relief from the automatic stay will allow Plaintiffs to pursue an action with respect to insurance coverage while imposing no burden or prejudice on the bankruptcy estate or other creditors of the Debtor.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

1

and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set

forth the name of the objecting party, the basis for the objection and the specific grounds thereof,

shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242

(which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's

case filing system, and by all other parties in interest, on a 3.5 inch disk, preferably in Portable

Document Format (PDF), WordPerfect, or any other Windows-based word processing format

(with two hard copies delivered directly to Chambers), and shall be served upon: (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Law Offices of Curtis V. Trinko LLP, 16 W 46th Street, 7th Fl., New York,

NY 10036, attorneys for Movant; (iii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New

York, New York 10153, Attn: Richard P. Krasnow, Esq. Lori R. Fife, Esq., Shai Y. Waisman,

Esq., and Jacqueline Marcus, Esq., attorneys for the Debtors; (iv) the Office of the United States

Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st

Floor, New York, New York 10004, Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq.,

Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (v) Milbank, Tweed,

Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F.

Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee

of unsecured creditors appointed in these cases; (vi) Hughes Hubbard LLP, One Battery Park

Plaza, New York, New York 10004, Attn: Sarah Loomis Cave, Esq., attorneys for the Debtors;

(vii) Lloyd's of London, c/o New York Secretary of State, 99 Washington Ave., 6th Floor,

Albany, NY 12231; (viii) the U.S. Securities and Exchange Commission, 450 5th Street N.E.,

Washington, D.C. 20549-1001, Attn: Bonnie L. Gaugh; and (ix) any person or entity with a

particularized interest in the Motion pursuant to Bankruptcy ECF system, so as to be so filed and

received by no later than **August 11, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the

"Objection Deadline").

      PLEASE TAKE FURTHER NOTICE that if an Objection to the Motion is not received

by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy

Court may enter an order granting the relief sought without a hearing.

      PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the

Hearing, and failure to appear may result in relief being granted or denied upon default.

           Respectfully submitted,

           LAW OFFICES OF CURTIS V. TRINKO, LLP

DATED: July 19, 2010

           By: _____

             Curtis V. Trinko
             Wynter V. Galindez
             Jennifer E. Traystman

             Law Offices of Curtis V. Trinko, LLP
             16 West 46th Street
             7th Floor
             New York, New York 10036
             Tel: (212) 490-9550
             Fax: (212) 986-0158
             Email: ctrinko@trinko.com

             **Attorneys For Movants**

Hearing Date and Time: August 18, 2010 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date: August 11, 2010 at 4:00 p.m. (Prevailing Eastern Time)

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | ) |
| | ) |
| | ) Chapter 11 Case No. |
| | ) 08-13555 (JMP) |
| Debtor | ) |
| | ) |

## MOTION OF LAWRENCE FOGARAZZO, ET AL. PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE FOR RELIEF FROM AUTOMATIC STAY TO ALLOW ADVANCEMENT UNDER INSURANCE POLICY BY LLOYD'S OF LONDON (LLOYD'S)

TO THE HONORABLE JUDGE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lawrence Fogarazzo, Carolyn Fogarazzo, Steven L. Hopkins and Don Engel, Court-appointed Lead Plaintiffs in a securities fraud class action law suit[1] pending in the United States District Court, Southern District of New York , Movants, file this Motion and respectfully present:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court under 28 U.S.C. § 1408. This is a core proceeding as defined in 28 U.S.C. § 157.

### RELIEF REQUESTED

2. The Movant seeks the entry of an order granting relief from the automatic stay provided for in Section 362(a) of the U.S. Bankruptcy Code, to the extent that it applies, to allow

---

[1] *Fogarazzo, et al. v. Lehman Brothers, et al.*, 03 Civ. 5194 (SAS)

4

Movant to proceed against any and all insurance policies that may provide coverage to Lehman Brothers Holding Inc. and/or its subsidiary, Lehman Brothers, Inc., hereafter both referred to together as "Lehman", including Lehman's *Primary Combined Financial Institutions Comprehensive Crime and Professional Indemnity Policy, No. 509/QA529399*, issued by Lloyd's of London, included in Plaintiffs' Appendix as Exhibit A,  for damages arising from the wrongdoing by Lehman, as alleged in Movants' class action complaint pending in the U.S.D.C., Southern District of New York.  See Amended Class Action Complaint in Civ. Action No. 03 Civ. 5194(SAS), included in Plaintiffs' Appendix as Exhibit B.

3.        Section 524(e) of the US. Bankruptcy Code permits a creditor to seek recovery from "any other entity" which may be liable on behalf of the debtor.  Therefore, a creditor may pursue an insurance company post-bankruptcy to the extent that this entity is liable for pre-petition claims brought against the debtor.


## INTRODUCTION

4.        Movants ("Plaintiffs") are duly authorized Class Representatives in a certified class action pending in the U.S.D.C., S.D.N.Y., who allege that the named Defendants therein: Lehman Brothers, Inc. ("Lehman")[2], Goldman Sachs & Co. ("Goldman"), and Morgan Stanley & Co., Inc. ("Morgan") misrepresented their true investment opinions regarding RSL Communications, Inc. ("RSL"), and failed to disclose their *quid pro quo* schemes whereby they prepared their investment analyst reports (which contained numerous misrepresentations of

---

[2] During the pendency of the action, on September 19, 2008, Lehman Brothers Inc., commenced liquidation proceedings in the United States Bankruptcy Court for the Southern District of New York.  On or about June 1, 2009, Plaintiffs filed timely proofs of claim in the Lehman Bankruptcy proceeding.

material fact and material omissions) to obtain investment banking business from companies being analyzed by the equity research division in order to receive tens of millions of dollars of investment banking proceeds from various offerings and transactions conducted on behalf of RSL. As a result, Defendants are subject to potentially sizeable damages for their violations of the federal securities laws, as alleged in the Amended Complaint. Plaintiffs' assessment of the settlement value of their claims and the underlying rationales for same are explained herein.

## BACKGROUND AND PROCEDURAL HISTORY

5.      As of 2002, Defendants' Analysts' practices came under investigation by a group of regulatory entities working together. That year amid widespread suspicion of corruption in the equity research divisions of ten (10) major investment firms, the U.S. SEC, NYSE, NASD and various state attorneys general and state regulatory authorities became involved in a multi-state task force that investigated Wall Street research analysts' conflicts of interest. As part of this investigation, the coordinated regulatory entities reviewed research practices at various Wall Street firms, including Goldman Sachs & Co., Morgan Stanley & Co. and Lehman Brothers, Inc. In particular, on April 23, 2003[3], the SEC filed a complaint ("SEC Complaint") against Lehman Brothers, Inc., alleging that "From at least July 1999 through at least June 2001 … Lehman's research analysts were, at times, confronted with pressures and conflicts of interest stemming from Lehman's desire to obtain investment banking business from covered companies." (See *SEC v. Lehman Brothers, Inc.*, ¶ 1, http://www.sec.gov/litigation/complaints/comp18116.htm). The SEC complaint alleged that (i) Lehman used its equity research professionals to obtain

_____

[3] Less than two months later, on July 15, 2003, Plaintiffs/Movants filed their original Complaint against Lehman Brothers, Inc. in the U.S. District Court for the Southern District of New York discussed below.

6

investment banking business; (ii) Lehman offered financial incentives to its financial analysts with regard to the investment banking revenue generated from their research; (iii) Lehman promised companies favorable future research coverage to obtain their investment banking business; and (iv) Lehman's anyalysts' conflicts of interest, at times, resulted in the publication of exaggerated or unwarranted research conclusions and/or recommendations. Concerning RSL Communications, Inc., the SEC complaint alleged that "On at least three occasions during 1999-2000, the Lehman analyst covering RSL was 'held off' from downgrading his analysis of RSL for 'banking reasons'." (SEC Complaint ¶ 68)

6.    The SEC complaint further describes the pressure felt by Lehman's RSL analyst as he sought to down grade RSL's investment rating in early 2000. The SEC Complaint stated, in ¶ 69:

> On November 1, 1999, with RSL trading at $21 5/16, the Lehman analyst covering RSL had rated RSL a 1-Buy with a price target of $40. In February 2000, with RSL trading at $17, the analyst drafted a new report which lowered his revenue projections for RSL and lowered the price target to $35. The first sentence of the text of the draft report read "we are revising our Revenue and EBITDA estimates for RSL to reflect declining revenue from U.S. prepaid and wholesale and a more moderate ramp in European retail revenue." Based on his prior experience, the analyst knew that his attempt to express his more negative view of RSL would be resisted by Investment Banking within Lehman. On February 24, 2000, the analyst sent an email to his supervisor captioned "RSL Note - Bankers are going to resist" in which he enclosed his draft report and stated:
>
>> Below is a draft of a note lowering our numbers on RSL (maintaining our 1 rating) Recall we were a co. in their recent convert deal. I've wanted to lower numbers for several months now, but have held back as 1) we led the DeltaThree IPO (was owned by RSL) and more recently were on the cover of the convert. . . . I've given our coverage banker the courtesy of seeing this and preparing the company. **I know they are going to resist.** I've been

quiet on this too long, and I plan on going ahead anyway. [emphasis in original]

The SEC Complaint continues in ¶73:

> By August 14, 2000 RSL's stock price had declined to approximately $4. In an August 14, 2000 email, the analyst candidly complained to his supervisor about the influence Investment Banking had exerted over his research during the preceding year:

Enough is enough. It's hard enough to be right about stocks, it's even harder to build customer relationships when all your companies blow up, you knew they were going to, and you couldn't say anything. Every single one of my companies has blown up in some fashion (or will - GBLX) and with the exception of PGEX, I haven't been able to speak my mind. I think I've been a team player, and I believe it is now imperative for the franchise that I be able to take action on bad situations.

7.    On Oct. 31, 2003, the Honorable William H. Pauley III, United States District Judge for the Southern District of New York, approved a $1.4 billion global settlement of enforcement actions against ten of the nation's top investment firms.  As part of the global settlement, Lehman was ordered by the SEC to pay a total amount of $80,000,000 ($25M as penalty; $25M as disgorgement of commissions and other monies;  $25M to be used for procurement of Independent Research; and $5M to be used for investment education).

8.    On July 15, 2003, Plaintiffs filed their original Complaint in the U.S. District Court for the Southern District of New York, which named Lehman Brothers, Inc. as the sole Defendant.  On November 14, 2003, Plaintiffs filed the operative Amended Complaint ("Amended Complaint").  A copy of the Amended Complaint is included in Plaintiffs' Appendix as Exhibit B.  Among other revisions, the Amended Complaint named Goldman Sachs & Co. and Morgan Stanley & Co., Inc., as Defendants, in addition to Lehman Brothers, Inc.

9.    On May 21, 2004, the district court denied Defendants' motions to dismiss Plaintiffs' claims against Defendants arising under § 10 (b) of the Securities Exchange Act of

1934 (the "Exchange Act"). *Fogarazzo v. Lehman Bros., Inc.*, 341 F.Supp.2d 274 (S.D.N.Y. 2004). A copy of this Opinion and Order is included in Plaintiffs' Appendix as Exhibit C. On July 9, 2004, the district court denied Defendant Morgan's application to certify that interlocutory order for immediate appeal, pursuant to 28 U.S.C. § 1292(b). *Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194 (SAS), 2004 WL 1555136 (S.D.N.Y. July 9, 2004).

10.    On July 27, 2005, the district court granted Plaintiffs' original motion for class certification, which was brought on behalf of "all persons who purchased or otherwise acquired shares of RSL equities during the period from April 30, 1999 through December 29, 2000, both dates inclusive". Thereafter, Defendants filed a Rule 23(f) petition for leave to pursue an interlocutory appeal of the district court's class certification decision. On December 22, 2005, the Second Circuit ordered that the district court's class certification decision in this action be held in abeyance pending the Second Circuit's upcoming decision in *Miles v. Merrill Lynch & Co.*, 04-8026, but specifically denied defendants' Rule 23(f) petition to appeal the district court's application of the *Affiliated Ute* presumption. A copy of this Summary Order is included in Plaintiffs' Appendix as Exhibit D. On January 26, 2007, after the Second Circuit articulated new standards of proof for class certification motions in *In re Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006), the Second Circuit vacated the district court's original class certification order in this matter, and remanded the action for reconsideration in light of the new standards of proof. On April 30, 2009, Plaintiffs filed a renewed motion for class certification. On August 4, 2009, the district court, in a 46-page Opinion and Order discussing the Second Circuit's newly established requirements for class certification under Fed. R. Civ. P. 23, granted plaintiffs' renewed motion for class certification pursuant to the Appellate Courts's directives set forth in its decision in *In re Initial Public Offering Sec. Litig.* (*"In re IPO"*), *supra*, and its

9

progeny.

11.    On August 18, 2009, Defendants again petitioned the Second Circuit for leave to appeal the district court's decision pursuant to Fed. R. Civ. P. 23(f). On January 25, 2010, their petition was denied in a one page decision and order. A copy of the Summary Order is included in Plaintiffs' Appendix as Exhibit E.

12.    In addition to undertaking a successful motion practice, Plaintiffs have assiduously conducted a substantial discovery program. To date, Plaintiffs have reviewed and analyzed approximately 600,000 pages of documents produced by Goldman, Morgan and Lehman.    Specifically, Plaintiffs have served two document requests on Lehman. The document requests, were entitled  "Plaintiffs' First Request for the Production of Documents and the Interrogatories Directed to Defendant Lehman Brothers, Inc." and "Plaintiffs' Second Request for the Production of Documents Directed to Defendant Lehman Brothers, Inc.", dated August 5, 2004, and December 13, 2005, respectively, which yielded the production of over 30,000 documents. Copies of the aforesaid document requests are included in Plaintiffs' Appendix as Exhibits F-1 and F-2.

13.    As part of Plaintiffs' efforts to link the analyst reports regarding RSL to the investment banking business of the Defendants, Plaintiffs conducted an intensive deposition schedule. From December 2009 through March 2010, Plaintiffs deposed 15 current or former Goldman and Morgan employees who were employed by the Defendants during the class period. Ten of the employees worked in the telecommunications investment banking department of Goldman (six) and Morgan (four). Five of the employees were telecommunications equity analysts (three at Goldman and two at Morgan). In addition, Plaintiffs undertook extensive expert discovery regarding the analyst reports' impact on stock prices, the determination of loss

causation, and the assessment of recoverable damages. Plaintiffs' expert has produced five detailed reports on the aforementioned subjects and was twice deposed by the Defendants.

14.    Plaintiffs' diligent pursuit of the facts and staunch advocacy of the renewed motion for class certification is certainly evidence of the diligence and determination of Plaintiffs' counsel in pursuing these claims against the Defendants. The parties also embarked on an expert discovery program regarding Defendants' prospective Motions for Summary Judgment. Plaintiffs deposed two expert witnesses proffered by the Defendants, and Defendants deposed Plaintiffs' expert witness. Plaintiffs' persistent efforts in pursuing the merits of the case, the discovery of the facts, and the taking of merits and expert testimony have clarified the level of culpability of Lehman's employees in the market-wide fraudulent representation of the value of RSL Communications, Inc.'s securities during the class period.

## CAUSE EXISTS TO GRANT THE RELIEF REQUESTED

15.    Section 362(a)(3) of the U.S. Bankruptcy Code provides for an automatic stay of any action seeking to obtain possession or exercise control over property of the bankruptcy estate. It is well settled that insurance policies covering the debtor are property of the estate and are covered by the automatic stay provisions of the U.S. Bankruptcy Code. *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir 1988). However, courts have distinguished between the ownership of a *policy* and the ownership of the *proceeds* of a policy. While courts have not been uniform in their analysis, where a policy provides for payment only to a third party – such as payments to officers and directors under an executive insurance policy – or where the debtor has a right of coverage or indemnification, but such right is hypothetical or speculative, courts have held that the proceeds of such policy are not the property of the bankruptcy estate. *See, e.g.,*

*In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 53 (S.D.N.Y. 2003) (holding that insurance proceeds were not property of the estate where it had not been suggested that debtors had made any payment for which they may be entitled to indemnification under that policy or that any such payments were then contemplated); *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 510 (Bankr. D. Del. 2004) (holding that proceeds of D&O insurance policy were not property of the estate where debtor's indemnification right under the policy was speculative and direct coverage of debtor under policy was hypothetical); *In re La. World Exposition, Inc.*, 832 F.2d 1391, 1401 (5th Cir. 1987) (holding that proceeds of a D&O policy belonged only to the officers and directors and, therefore, were not the property of the estate); *In re World Health Alternatives, Inc.*, 369 B.R. 805, 809 (Bankr. D. Del. 2007) (when proceeds of a policy are payable to the directors and officers and not the estate, the proceeds are not property of the estate); *See In re First Cent. Fin. Corp.*, 238 B.R. 9, 18 (Bankr. E.D.N.Y. 1999) (holding that circumstances that may give rise to entity coverage were highly remote and therefore proceeds were not property of the estate).

16.    In determining whether the proceeds are property of the estate, courts review "the language and scope of the policy at issue." *In re Allied Digital Tech., Corp.*, 306 B.R. 505, 509. See also *In re CyberMedia, Inc.*, 280 B.R. 12, 16 (Bankr. D Mass. 2002); *In re Jones*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) (respective rights of debtors and non-debtors to insurance proceeds must be ascertained by reference to the parties' contractual rights pursuant to the interpretation of the pertinent contractual provisions under the applicable state law").

17.    Here, Defendant Lehman purchased the *Primary Combined Financial Institutions Comprehensive Crime and Professional Indemnity Policy, No. 509/QA529399* ("the Policy"). See Exhibit A.

12

18.    Item 1 of the Policy names Lehman Brothers Holding Inc. ("LBHI") and its majority owned subsidiaries as the Assured.  Defendant Lehman Brothers, Inc. is a majority-owned subsidiary of LBHI.

19.    Item 2 of the Policy states that the coverage period for the instrument is January 31, 1999 to January 31, 2002.  The endorsement dated 6th June 2001 extends the period of insurance up to and including January 31, 2003.  The causes of action in the underlying class action suit arose during the Class Period from April 30, 1999 through December 29, 2000.

20.    Items 3 and 4 of the Policy state the aggregate and single limits of liability of the policy for the coverage period is One Hundred Million Dollars ($100,000,000).

21.    Section II(1)(a) of the Policy states that "Underwriters will pay on behalf of the Assured that loss incurred by the Assured as a result of any claim made against the Assured for a Wrongful Act by the Assured or any person or entity for whom the Assured is legally liable in the Assured's performance of Professional Services (including failure to render Professional Services), provided that such Claim is first made against the Assured during the Policy period, or in the event of non-renewal or cancellation of this policy, during a period of 90 days after the effective date of such non-renewal or cancellation, or within the Optional Extension Period if purchased."

22.    It is Plaintiffs' belief that Defendant Lehman and/or persons or entities for whom Lehman Brothers, Inc. is legally liable, committed wrongful acts as defined above in the Policy. Paragraph 240 of the Plaintiffs' Amended Complaint summarizes Plaintiffs' claims against Lehman Brothers, Inc. and/or persons or entities for whom Lehman Brothers, Inc. is legally liable:

The Defendant made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, all in violation of section 10(b) of the Exchange Act and Rule 10b-5. Defendant's material misrepresentations and omissions concerned, inter alia: (i) the fact their ratings did not reflect the analysts' true opinions of RSL; (ii) that Lehman had an undisclosed internal policy to never issue "underperform" or "sell" recommendations on Internet companies, including RSL, thereby converting a published five-point rating scale into a de-facto three-point system; (iii) that the challenged ratings and reports on RSL failed to disclose that Lehman's ratings were tarnished by an undisclosed conflict of interest in that the research analysts were acting as quasi-investment bankers for RSL and the companies at issue, often initiating, continuing, and/or manipulating research coverage for the purpose of attracting and keeping investing banking business with RSL and other covered clients, thereby producing misleading ratings that were neither objective nor independent, as they purported to be; and (iv) Defendant's failure to comply with the rules and regulations of the SEC, NASD and other regulatory authorities regarding communications to the investing public.

## PLAINTIFFS' CLAIMS AND THE SUPPORTING FACTS

23.    The U.S. District Court found that the Plaintiffs' Amended Complaint sufficiently alleged that Defendants Lehman, Goldman, and Morgan had perpetrated a fraudulent scheme whereby Defendants distorted, falsified, and otherwise misrepresented the nature of their equity analyst reports on RSL Communications, Inc. ("RSL") during the class period from April 30, 1999 through December 29, 2000. In addition, the District Court also found that plaintiffs have sufficiently alleged claims that Defendants failed to disclose improper *quid pro quo* arrangements between the Defendants' investment banking division, their equity research analysts, and the clients utilizing their underwriting services. *See* Ex. C, at 34-35. Defendants perpetrated this scheme in exchange for lucrative investment banking business, fees, and other improperly-attained profits. The Amended Complaint, as well as certain documents produced by Defendants during document discovery, demonstrate that the Defendants made material

14

misrepresentations in their analyst reports and participated in fraudulent *quid pro quo* schemes

with RSL in order to obtain, among other things, preferred share allocations, and over-allotment

options for RSL's Series A preferred shares, which misrepresentations resulted *in toto* in

approximately $64 million in banking revenues being realized, per named Defendant in

investment banking revenue from various offerings concerning RSL over a brief, three and one-

half-year time period from late 1997 through 2000.

      24.      Defendants' fraud was fully revealed on or about April 28, 2003, when the

Defendants publicly disclosed the settlement of similar claims concerning RSL and other

companies filed by the U.S. Securities and Exchange Commission (the "SEC"), and the State

Attorneys General and the State Securities Commissions of the States of New York, Alabama,

and Utah.[4]  The settlement memoranda executed in connection with these charges outline

numerous findings which reflect, among other things, that Defendants publicly disseminated

misleading equity research reports regarding RSL and other companies, and systematically

adopted procedures and practices to improperly influence their investment analysts, and thus

subvert the objectivity of their evaluations, in order to satisfy the goals of their firms' investment

banking personnel and their corporate clients.  Defendants Lehman, Goldman Sachs, and

Morgan Stanley settled these charges in 2003 by paying the sizeable sums of $80 million, $110

million, and $125 million to the regulatory authorities, respectively, in addition to agreeing to

implement certain remedial "Undertakings."[5]  In addition, each Defendant executed Letters of

---

[4] The settlement memoranda of each Defendant with the respective state attorney generals are  included in Plaintiffs' Appendix as Exhibits G, H, and I, for New York (Morgan), Alabama (Lehman) and Utah (Goldman), respectively.

[5] The consent orders of each Defendant with the SEC are included in Plaintiffs' Appendix as Exhibits J, K and L, for Lehman, Goldman Sachs and Morgan Stanley, respectively.

Acceptance, Waiver and Consent agreements with the NASD for alleged rule violations for their
wrongdoing as described herein.[6]

25.    By means of Plaintiffs' investigation into the underlying facts concerning the
allegations in the Amended Complaint, and through extensive document discovery and
depositions conducted herein, Plaintiffs have uncovered substantial evidentiary support for the
allegations contained in their Amended Complaint.  For the sake of brevity, movants offer the
following facts supporting Plaintiffs' allegations against Defendant Lehman Bros.:

**Lehman Brothers**

26.    Defendant Lehman Brothers Inc., like Goldman Sachs and Morgan Stanley,
issued numerous false and misleading analyst reports concerning RSL throughout the Class
Period.  *See* Exhibit P included in Plaintiffs' Appendix (Said Exhibit is comprised of two charts
excerpted from the Reply Expert Report of Dr. Paul J. Irvine, dated July 9, 2009, that
demonstrate that Lehman Brothers issued numerous analyst reports throughout the Class Period).
Although Lehman held itself out as an honest generator and provider of objective and forthright
equity research assessments, documents obtained through discovery in this litigation indicate that
the investment reports issued by Lehman throughout the Class Period were false and misleading,
and failed to disclose the *quid pro quo* relationship the firm had with RSL.  The facts show that
Lehman, by and through its investment bankers, coerced its research analysts covering RSL to
issue false and misleading reports on RSL (which reports did not reflect their true opinions on

---

[6] The Letters of Acceptance, Waiver and Consent forms from each Defendant with the
NASD are included in Plaintiffs' Appendix as Exhibits M, N and O, for Lehman, Goldman
Sachs and Morgan Stanley, respectively.

RSL) in order to obtain and/or maintain RSL's investment banking business (i.e., RSL's debt and convertible share offerings undertaken during the class period). One such document, among numerous others, reflects admissions by Lehman management officials that Lehman's analysts "were prevented" from stating the truth about RSL's business condition, and instead published positive but false reports on RSL, so that Lehman could obtain lucrative and substantial investment banking business from RSL.[7] Lehman's equity analysts' false and misleading investment reports on RSL, and Lehman's failure to disclose its *quid pro quo* relationships with RSL, distorted the prices of RSL stock throughout the Class Period, and thereby ensured the successful completion of the various RSL debt and convertible share offerings made to the investing public during the Class Period, which offerings directly and substantially benefitted Lehman.

27.    Lehman's scheme was similar to those employed by Goldman and Morgan, and is demonstrated by an email between Lehman investment bankers, dated March 16, 2000. The Lehman investment bankers acknowledged that although Lehman's RSL analyst (Daniel Fletcher) was "inclined negatively toward the Company's prospects . . . he agreed to hold off on a downgrade (which would have harmed an "important banking relationship")." In the same email, the Bankers further admitted that Lehman's RSL analyst reports influenced the price of RSL stock by stating that their analyst had "issued a positive report and was the axe behind

---

[7] This allegation is evidenced by an email dated August 14, 2000, wherein Lehman's RSL analyst (Daniel Fletcher) admitted: "Enough is Enough ... I haven't been able to speak my mind. I think it is now imperative for the franchise that I be able to take action on bad situations," and, "for the record, I have attempted to downgrade RSLC THREE times over the last year, but have been held off for banking reasons each time" (Emphasis in original). In the same email, Fletcher further admitted: "As I have been right about this name [RSL] for a long time, I'd like to avoid the embarrassment of closing the barn door after all the animals have left. I want to drop this immediately." The August 14, 2000 email is included in Plaintiffs' Appendix as Exhibit Q.

significant positive momentum to the stock." The March 16, 2000 email is included in Plaintiffs' Appendix as Exhibit R.

28.    Also, similar to the other Defendants, the compensation of Lehman's equity research analysts were directly related to the investment banking revenues of the firm. In an email dated on or about December 20, 1999, a Lehman equity analyst who covered RSL boasted to management about the revenues his "universe generated," and assured Lehman's management that "RSL's CEO will tell I (sic) was a key part of why LB won the books." In the same email, Lehman's analyst stated that RSL's "fundamentals weakened, numbers had to come down although we maintained our 1-Buy as we led the Delta Three IPO." The December 20, 1999 email is included in Plaintiffs' Appendix as Exhibit S.

29.    Based on the foregoing, as well as other documents produced by the Defendants, Plaintiffs believe that the Defendants could be held liable at trial for the wrongdoing outlined in the Amended Complaint. As Judge Scheindlin has noted in the District Court litigation:

> knowing that RSL was actually in decline, [the Defendants] inflated the price of RSL shares and then worked doubly hard to conceal or obfuscate the meaning of every fact that would have revealed that decline to the investing public. How could the Banks not have foreseen the loss to investors?

*Fogarazzo v. Lehman Bros., Inc. et al.*, 341 F. Supp. 2d 274, 292 (S.D.N.Y.2004).

30.    For all of the foregoing reasons, Movants believe the court should grant the relief requested.


## NOTICE

31.    No private trustee has been appointed in these cases, instead, the U.S. Trustee is involved. Accordingly, Movants have served notice of this Motion in accordance with the

procedures set forth in the amended order entered by the Court on June 17, 2010 governing case

management and administrative procedures for these cases, mandating service on (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn: Richard P. Krasnow, Esq. Lori R. Fife, Esq., Shai Y. Waisman, Esq., and

Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee

for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New

York, New York 10004, Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian

Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley

& McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne,

Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee of

unsecured creditors appointed in these cases; (v) Hughes Hubbard LLP, One Battery Park Plaza,

New York, New York 10004, Attn: Sarah Loomis Cave, Esq., attorneys for the Debtors; (vi)

Lloyd's of London, c/o New York Secretary of State, 99 Washington Ave., 6th Floor, Albany,

NY 12231; (vii) the U.S. Securities and Exchange Commission, 450 5th Street N.E., Washington,

D.C. 20549-1001, Attn: Bonnie L. Gaugh; and (viii) any person or entity with a particularized

interest in the Motion pursuant to Bankruptcy ECF system. The Movants submit that no other or

further notice need be provided.

32.    WHEREFORE, Movants respectfully request that an order be entered (i) lifting

the automatic stay (to the extent necessary) to allow Movants to pursue their causes of action

against the Debtor's professional indemnity insurance policy(ies).

DATED: July 19, 2010

Respectfully submitted,

LAW OFFICES OF CURTIS V. TRINKO, LLP

By: _____

Curtis V. Trinko
Wynter V. Galindez
Jennifer E. Traystman

Law Offices of Curtis V. Trinko, LLP
16 West 46th Street, 7th Floor
New York, New York 10036
Tel: (212) 490-9550
Fax: (212) 986-0158
Email: ctrinko@trinko.com

**Attorneys for Movants**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | ) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | ) |
|  | ) |
|  | ) |
|  | ) |
| Debtor | ) |
|  | ) |

Chapter 11 Case No.
08-13555 (JMP)

[PROPOSED] ORDER GRANTING PETITIONER'S MOTION, PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE, FOR RELIEF FROM AUTOMATIC STAY TO ALLOW ADVANCEMENT UNDER INSURANCE POLICY BY LLOYD'S OF LONDON (LLOYD'S)

Upon the motion, dated July 19, 2010 (the "Motion"), of Lawrence Fogarazzo, et al. in the above-referenced Chapter 11 proceedings, as Petitioners, pursuant to section 362(d) of title 11 to the United States Code (the "Bankruptcy Code") and Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order modifying the automatic stay, to the extent applicable, to compel Lloyd's and all other appropriate Lehman Brothers Holdings Inc. ("Lehman" or "Debtors") insurers ("Insurers") to respond to Petitioners' claims, and, if appropriate, to cover damages caused by Lehman while misrepresenting their true investment opinions regarding RSL Communications, Inc., as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered June 17, 2010 governing case management and administrative procedures [Docket No. 9635] to (i) the

21

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Law Offices of Curtis V. Trinko LLP, 16 W 46th Street, 7th Fl., New York, NY 10036, attorneys for Movant; (iii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq. Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq., attorneys for the Debtors; (iv) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (v) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these cases; (vi) Hughes Hubbard LLP, One Battery Park Plaza, New York, New York 10004, Attn: Sarah Loomis Cave, Esq., attorneys for the Debtors; (vii) Lloyd's of London, c/o New York Secretary of State, 99 Washington Ave., 6th Floor, Albany, NY 12231; (viii) the U.S. Securities and Exchange Commission, 450 5th Street N.E., Washington, D.C. 20549-1001, Attn: Bonnie L. Gaugh; and (ix) any person or entity with a particularized interest in the Motion pursuant to Bankruptcy ECF system, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 362(d) of the Bankruptcy Code, the automatic stay, to the extent applicable, is hereby modified to, and without further order of this Court, compel Lloyd's and the other Insurers pursuant to the terms of the Policy(ies), to respond to the claims presented by Petitioners; and it is further

ORDERED the Petitioners are authorized to execute all documentation necessary to engage the Insurers in the appropriate litigation; and it is further

ORDERED that nothing in this Order shall modify, alter or accelerate the rights and obligations of Lloyd's, the Insurers, the Debtors or the Individual Defendants provided for under the terms and conditions of the Policy; and it is further

ORDERED that all parties to the Policy reserve all rights and defenses that they would otherwise have; and it is further

ORDERED that nothing in this Order shall constitute a determination that the proceeds of the Policy are the property of the Debtors' estates, and the rights of all parties in interest to assert that the proceeds of the Policy are, or are not, property of the Debtors' estates are hereby reserved; and it is further

ORDERED that the ten day stay provided by Bankruptcy Rule 4001(a)(3) is waived; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:                 2010
New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE