# EXHIBIT A

COPY

 # Lloyd's Policy

**We, Underwriting Members** of the Syndicates whose definitive numbers and proportions are shown in the Table attached hereto (hereinafter referred to as 'the Underwriters'), hereby agree, in consideration of the payment to Us by or on behalf of the Assured of the Premium specified in the Schedule, to insure against loss, including but not limited to associated expenses specified herein, if any, to the extent and in the manner provided in this Policy.

**The Underwriters** hereby bind themselves severally and not jointly, each for his own part and not one for another, and therefore each of the Underwriters (and his Executors and Administrators) shall be liable only for his own share of his Syndicate's proportion of any such Loss and of any such Expenses. The identity of each of the Underwriters and the amount of his share may be ascertained by the Assured or the Assured's representative on application to Lloyd's Policy Signing Office, quoting the Lloyd's Policy Signing Office number and date or reference shown in the Table.

If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

**In Witness** whereof the General Manager of Lloyd's Policy Signing Office has signed this Policy on behalf of each of Us.

FOR EMBOSSMENT BY
LLOYD'S
POLICY SIGNING
OFFICE
EMBOSSMENT
APPEARS HERE
ON ORIGINAL
DOCUMENT
LLOYD'S POLICY SIGNING OFFICE

LLOYD'S POLICY SIGNING OFFICE
General Manager

CONFIDENTIAL

# LLOYD'S

THE ASSURED IS REQUESTED TO READ THIS POLICY. IF IT IS INCORRECT, PLEASE RETURN IT
IMMEDIATELY TO YOUR BROKER OR AGENT FOR ALTERATION.

IN ALL COMMUNICATIONS THE POLICY NUMBER APPEARING OVERLEAF SHOULD BE QUOTED

CONFIDENTIAL

## Schedule

Policy or Certificate No. 509/QA529399    Contract No. (if any)

**The name and address of the Assured**

Lehman Brothers Holding Inc
Three World Financial Centre
24th Floor
New York
New York 10285
USA

**The risk, interest, location and sum insured hereunder**

Primary Combined Financial Institutions Comprehensive Crime and Professional
Indemnity

To indemnify the Assured in accordance with the wording attached, which is hereby
incorporated in and forms part of this Policy.

**The Premium**      USD2,741,557.50, part of USD5,483,115.00, three years prepaid
split as follows:-

Section 1 USD  959,545.12 being 35%
Section 2 USD1,782,012.38 being 65%

**The period of Insurance** from 31st January 1999 to 31st January 2002 both days
12.01am Local Standard Time and for such further period or periods as may be mutually
agreed upon

**Dated in London**      21 December, 1999
**J or J(A) (Schedule)**
NMA 2422 for attachment to NMA 2420, NMA 2421, NMA 2461 or NMA 2462

CONFIDENTIAL

## LINES CLAUSE

This Insurance, being signed for 83.3332% of 60.0000% insures only that proportion of any loss, whether total or partial, including but not limited to that proportion of associated expenses, if any, to the extent and in the manner provided in this Insurance.

The percentages signed in the Table are percentages of 60.0000% of the amount(s) of Insurance stated herein.

NMA 2419.

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

LSW1001 (Insurance) 08/94



CONFIDENTIAL

## BOND NO. QA529399 – SECTION I (a) – FINANCIAL INSTITUTIONS

**ITEM 1. NAME OF ASSURED:**   LEHMAN BROTHERS HOLDINGS INC.,
and its majority owned subsidiaries as now existing or hereinafter constituted including any Employee Benefit, Welfare or Pension Plans created by the Assured for the benefits of its Employees (herein called Assured). NEW YORK, NY

**ITEM 2. BOND PERIOD:**    from 12:01 a.m. Local Standard Time on    January 31, 1999
to 12:01 a.m. Local Standard Time on    January 31, 2002

**ITEM 3.**    The Aggregate Limit of the Underwriter during the Bond Period shall be: $100,000,000.

**ITEM 4.**    Subject to Section 4 and 11 hereof, the Single Loss Limit of Liability is $100,000,000. and the Single Loss Deductible is $2,500,000.

Provided, however, that if any amounts are inserted below opposite specified Insuring Agreement or Coverage, those amounts shall be controlling. Any amount set forth below shall be part of and not in addition to amounts set forth above.

| Amount applicable to: | | Single Loss Limit of Liability | Single Loss Deductible |
|---|---|---|---|
| Insuring Agreement (A1)- | EMPLOYEE FIDELITY | $100,000,000. | $2,500,000. |
| Insuring Agreement (A2)- | DISCLOSED AGENTS FIDELITY | $100,000,000. | $2,500,000. |
| Insuring Agreement (A3)- | SERVICING CONTRACTORS | $100,000,000. | $2,500,000. |
| Insuring Agreement (A4)- | MALICIOUS DESTRUCTION OF ELECTRONIC MEDIA | $100,000,000. | $2,500,000. |
| Insuring Agreement (B) – | ON PREMISES | $100,000,000. | $2,500,000. |
| Insuring Agreement (C) – | IN TRANSIT | $100,000,000. | $2,500,000. |
| Insuring Agreement (D) – | FORGERY OR ALTERATION | $100,000,000. | $2,500,000. |
| Insuring Agreement (E) – | SECURITIES | $100,000,000 | $2,500,000. |
| Insuring Agreement (F) – | COUNTERFEIT CURRENCY | $100,000,000. | $2,500,000. |
| Insuring Agreement (G) – | FACSIMILE SIGNATURES | $100,000,000. | $2,500,000. |
| Insuring Agreement (H) – | FRAUDULENT REAL PROPERTY MORTGAGES | $100,000,000. | $2,500,000. |
| Insuring Agreement (I) – | MORTGAGE FRAUD | $100,000,000. | $2,500,000. |
| Insuring Agreement (J) - | CLAIMS EXPENSE | $    500,000* | $Nil |

*in the aggregate, part of and not in addition the aggregate limit of liability hereunder.

**ITEM 5.**    The liability of the Underwriter is subject to the terms of the following Riders attached hereto:

Riders 1 to 10
Special Letters 1 to 12



1

CONFIDENTIAL

The Underwriter, in consideration of an agreed premium, and in reliance upon all statements made and information furnished to the Underwriter by the Assured, in applying for this bond, and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Assured for:

## SECTION I (a) – FINANCIAL INSTITUTION BOND

### INSURING AGREEMENTS

#### (A1) EMPLOYEE FIDELITY

Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent:

    (a)   to cause the Assured to sustain such loss, or

    (b)   to obtain financial benefit for the Employee or another person or entity.

Notwithstanding the foregoing, however, it is agreed that with regard to Loans this bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to make and which:

    i)   results in a financial benefit for the Employee, or

    ii)   results in a financial benefit for another person or entity with whom the Employee committing the dishonest or fraudulent act was in collusion, provided that the Assured establishes that the Employee intended to participate in the financial benefit, or

    iii)   results in the intentional transfer of funds or Property to the benefit of an innocent third party, committed by the Employee in the knowledge that such third party was not entitled to such funds or Property, and which Property is not recoverable by the Assured.

Financial benefit shall not include salary, salary increases, commissions, fees, bonuses, promotions, awards, profit sharing, incentive plans, pension or other emoluments earned in the normal course of employment.

#### (A2) DISCLOSED AGENT FIDELITY

Loss resulting directly from one or more dishonest or fraudulent acts committed by a Disclosed Agent, whether committed alone or in collusion with others, which acts are committed by the Disclosed Agent with the intent:

    (a)   to cause the Assured to sustain a loss; and

    (b)   to thereby obtain an improper financial benefit for the Disclosed Agent or for any other person or organization intended by the Disclosed Agent to receive such financial benefit or acting in collusion with the Disclosed Agent.

Financial benefit shall not include salary, salary increases, commission, fees, bonuses, promotions, awards, profit sharing, incentive plans, pension or other emoluments.

2

CONFIDENTIAL

Schedule

All current Disclosed Agents under written Agreement with Lehman Brothers or established during the term of this Bond with annually reporting required for additions.

(A3) SERVICING CONTRACTORS

Loss resulting directly from one or more dishonest or fraudulent acts by a Servicing Contractor whether committed alone or in collusion with others, which acts are committed by the Servicing Contractor with the intent:

(a)   to cause the Assured to sustain a loss; and

(b)   to thereby obtain an improper personal financial benefit for the Servicing Contractor, or another person or entity.

Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or any other benefits of a type which may be earned in the normal course of employment or performance of a servicing contract shall not constitute improper personal financial benefit.

(A4) MALICIOUS DESTRUCTION OF ELECTRONIC MEDIA/DATA BY EMPLOYEE

Loss resulting directly from the malicious destruction of or the malicious damage of Property, Electronic Data, or Electronic Data Processing Media committed by an Employee whether committed alone or in collusion with others, which acts are committed with the intent to cause such loss.

As used herein: Electronic Data means facts or information converted to a form usable in a computer system and which is stored on Electronic Data Processing Media for use by computer programs.

Electronic Data Processing Media means the punched cards, magnetic tapes, punched tapes, or magnetic discs or other bulk media on which data are recorded.

Computer System includes computer and all input/output facilities which are connected to such a device. Off-line media libraries are deemed to be part of said Computer System.

(B) ON PREMISES

(1) Loss of Property resulting directly from:

(a)   robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, or

(b)   theft, common-law or statutory larceny or false pretenses committed by a person while present within any office or premises of the Assured,

while Property is lodged or deposited within offices or premises located anywhere.



3

CONFIDENTIAL

For the purposes of this Insuring Agreement, false pretenses means the delivery and transfer of tangible Property on the premises of the Assured, or on the premises in which the Property is lodged or deposited, to a person on said premises as the direct result of a fraudulent misrepresentation made by said person to the Assured at the time of delivery and transfer of said Property.

(2)    Loss of or damage to

    (a)    furnishings, fixtures, supplies or equipment within an office of the Assured covered under this bond resulting directly from larceny or theft in, or by burglary or robbery of, such office, or attempt thereat, or by vandalism or malicious mischief or

    (b)    such office resulting from larceny or theft in, or by burglary or robbery of such office or attempt thereat, or to the interior of such office by vandalism or malicious mischief, provided that

        (i)    the Assured is the owner of such furnishings, fixtures, supplies, equipment, or office or is liable for such damage, and

        (ii)    the loss is not caused by fire.

**(C) IN TRANSIT**

Loss of Property resulting directly from robbery, common-law or statutory larceny, theft, misplacement, mysterious unexplainable disappearance, being lost or made away with, and damage to or destruction thereof, while the Property is in transit anywhere in the custody of:

    (a)    a natural person acting as a messenger of the Assured (or another natural person acting as messenger or custodian during an emergency arising from the incapacity of the original messenger), or

    (b)    a Transportation Underwriter and being transported in any conveyance.

Coverage under this Insuring Agreement begins immediately upon the receipt of such Property by the natural person or Transportation Company and ends immediately upon delivery to the designated recipient or its agent. For the purpose of this Insuring Agreement, the word delivery is interpreted in the following manner: If the transporting messenger who is to make delivery of Property, releases possession of the Property, merely for inspection and verification, such release does not constitute a delivery within the meaning of the word as used. Transit coverage in such circumstances will only be continuous for a period of not more than fifteen (15) days and there has been a definite acceptance of Property by the person, firm or corporation to whom such property is to be delivered as evidenced by delivery to the transporting messenger of cash, check or permanent receipt in exchange for the Property as delivered. The paragraph is not to be interpreted as including the guarantee or validity of any check, the genuineness of any cash, or any credit. Notwithstanding the foregoing, coverage hereunder shall include loss of Property in transit providing such transit is in compliance with Lehman Brothers procedures (or any amendments thereof). If, through an inadvertent error or omission, Property in transit is not in compliance with Lehman Brothers procedures (or any amendments thereof), such transit shall nevertheless be covered hereunder.

4

CONFIDENTIAL

(D) FORGERY OR ALTERATION

Loss resulting directly from:

(1)     Forgery or alteration of, on, in any Negotiable Instrument (except an Evidence of Debt), Acceptance, Withdrawal Order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit, or

(2)     transferring, paying, or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Assured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer or Employee or by any financial institution or other entity and which instructions or advices either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer, Employee or financial institution, or other entity,

A mechanically reproduced facsimile signature or computer generated signature is treated the same as a handwritten signature.

(E) SECURITIES

Loss resulting directly from the Assured having in good faith, for its own account or for the account of others (including loss sustained by reason of liability imposed upon the Assured by law or by the constitution, rules or regulations of any Stock Exchange of which the Assured is a member or which would have been imposed upon the Assured by the constitution, rules or regulations of any Stock Exchange if the Assured had been a member thereof):

(1)     acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any original

(a)     Certificated Security or Similar Written Instrument,

(b)     Instruction,

(c)     Statement of Uncertificated Security, or

(d)     Initial Transaction Statement, which

(i)     bears a Forged signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity, upon which the Assured relied, or

(ii)     bears an alteration upon which the Assured relied, or

(iii)    is lost or stolen;



5

CONFIDENTIAL

(2)   guaranteed in writing or witnessed any signatures, whether for valuable consideration or not and whether or not such guaranteeing or witnessing is ultra vires the Assured, upon any transfers, assignments, bills of sale, power of attorney, Guarantees, endorsements or other obligations upon or in connection with any of the items listed in (a) through (d) above; excluding, in any event, loss through Forgery or alteration of, on, or in any bills of exchange, checks, drafts, acceptances, certificates of deposit, promissory notes, or other written promises, orders or directions to pay sums certain in money, due bills, money orders, warrants, orders upon public treasuries, Letters of Credit, written instructions or advices directed to the Assured, authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any person or entity but which instructions or advices either bear the forged signature or endorsement or have been altered without the knowledge and consent of such person or entity, withdrawal orders or receipts for the withdrawal of funds or Property or receipts or Certificates of Deposit for Property and bearing the name of the Assured as issuer;

(3)   acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (d) above which is a Counterfeit of the authentic original item.

A mechanically reproduced facsimile signature or computer generated signature is treated the same as a handwritten signature.

Special Definition

Similar Written instruments shall be deemed to mean:  Original negotiable or non-negotiable agreements in writing, having value which value is, in the ordinary course of business, transferable by delivery of such agreements with any necessary endorsement or assignment.

(F) COUNTERFEIT CURRENCY

Loss resulting directly from the receipt by the Assured, in good faith, or any Counterfeit Money of any country.

(G) FACSIMILE SIGNATURES

Loss due to any issuer of securities, transfer agent, bank, banker, or trust Underwriter having received from the Assured or its customers (the New York Stock Exchange or any other entity) specimen copies of the Assured's mechanically reproduced facsimile signature and having acted in reliance upon any false, fraudulent, or unauthorized reproduction of such facsimile signature, whether such facsimile signature is the facsimile signature duly adopted by the Assured or is one resembling or purporting to be such facsimile signature, regardless of by whom or by what means the same may have been imprinted, and whether or not such loss is sustained by reason of the Assured having entered into an agreement to be legally liable when such facsimile signature or one resembling or purporting to be such facsimile signature is used, provided, however, that:

(a) such facsimile signature is used

(1)   as the signature to an assignment or other instrument authorizing or effecting the transfer of shares of stock, or other registered securities, which may now or at any time hereafter be registered in the name of the Assured on the books of the association, Underwriter, or corporation issuing the same; or

6

CONFIDENTIAL

(2)    as the signature to a power of substitution, designating a substitute or substitutes to make the actual transfer on the books of the issuer of shares of stock, or other registered securities, in respect of which the Assured may now or at any time hereafter be named as attorney to effect said transfer, whether said power of substitution is embodied in an endorsement on the certificate for said shares of stock or other registered security or in a separate instrument; and

(b)    the New York Stock Exchange has not interposed any objections to the use by the Assured of such facsimile signature and such agreement, if any, was required by the said Exchange is a condition to its failing to interpose any such objection; and

(c)    this Insuring Agreement shall not apply to any Counterfeited certificates for shares of stock or to other Counterfeited securities.

## (H) FRAUDULENT REAL PROPERTY MORTGAGES

Loss through the Assured's having, in good faith and in the course of business in connection with any loan, accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instruments pertaining to the realty or assignments of such mortgages, deeds of trust or instruments which prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud or false pretenses.

## (I) MORTGAGE FRAUD

Loss or claim arising out of or in connection with the purchase and/or resale of any real property mortgage(s) by the Assured shall be considered solely under the terms and conditions of this Insuring Agreement, unless otherwise covered under Insuring Agreement (A).

### Forged and Fraudulent Mortgages

Loss resulting directly from the Assured having in good faith and in the ordinary course of business purchased, sold, delivered, given value, extended credit or Assured liability or otherwise acquired on the faith of any original Mortgage Loan which proves to:

i.    be based upon an original Mortgage, deed of trust or other instrument creating or discharging a lien upon real property, which bears a Forged signature of any person signing in a material capacity or which has been fraudulently altered in the material sense, or which is lost or stolen, or which is a Counterfeit, or

ii.    be fraudulently made upon real property which does not in fact exist, or

iii.    be fraudulently made in the name of a person who is in fact fictitious, or

iv.    be fraudulently made in the name of a person who does not have title to the real property securing such Mortgage Loans, or

CONFIDENTIAL

v.   be fraudulently made in an amount which is in excess of the Fair Market Value reasonably attributable to the real property securing such Mortgage Loan (provided that the Mortgage Loan file contains a written appraisal which has been fraudulently made to show a value in excess of such Fair Market Value or which has been fraudulently altered).

Actual physical possession of the Mortgage and Mortgage Loan File pertaining to a particular mortgage loan by the Assured or its designated Document Custodian prior to having acted thereupon is a condition precedent to any claim being made hereunder.

Warranties: The following warranties apply in respect of this Insuring Agreement (I)

i.   The Assured shall not release any funds prior to having received each Mortgage Loan or having received a certification of receipt from its designated Document Custodian, or attorney bailment letter.

ii.   The Assured will conduct a review of a sample of each newly originated Mortgage and a sample of seasoned Mortgages purchased prior to the closing of purchase. (The scope of the review will be based upon the prudent business judgement of the Assured).

iii.   The Mortgage originators with whom the Assured conducts business will have been examined under the then applicable guidelines established by the Credit Review Department.

iv.   The Assured shall obtain from each mortgage originator such representations and warranties that, based on the Assured's business judgement would allow for the perfection of the Assured's legal interest and assurance of the collateral underlying the Mortgage Loan. From time to time, depending on the transaction in question and the Assured's business judgement, other representations and warranties may be obtained.

v.   Prior to any claim hereunder, the Assured will pursue its rights as against any mortgage originator, servicing contractor or other person who may be liable to the Assured for such loss.

(J)    CLAIM EXPENSE

Fees and expenses incurred and paid by the Assured, with the prior approval of the Underwriters, in preparing any valid and collectible claim hereunder.

GENERAL AGREEMENTS

NOMINEES

A.    Loss sustained by any nominee organized by the Assured for the purpose of handling certain of its business transactions and composed exclusively of its Employees or those performing the usual duties of Employees shall, for all the purposes of this bond and whether or not any partner of such nominee is implicated in such loss, be deemed to be loss sustained by the Assured.



8

CONFIDENTIAL

ADDITIONAL OFFICES OR EMPLOYEES CONSOLIDATION, MERGER OR PURCHASE OF ASSETS NOTICE

B.   If the Assured shall, while this bond is in force, establish any additional offices, other than by consolidation or merger with or purchase or acquisition of assets or liabilities of, another institution, such offices shall be automatically covered hereunder from the date of such establishment without the requirement of notice to the Underwriter or the payment of additional premium for the remainder of the premium period.

If the Assured shall, while this bond is in force, consolidate or merge with, or purchase or acquire assets or liabilities of another institution, the Assured shall not have such coverage as is afforded under this bond for loss which:

   (a)   has occurred or will occur in offices or premises, or

   (b)   has been caused or will be caused by an employee or employees of such institution, or

   (c)   has arisen or will arise out of the assets or liabilities acquired by the Assured as a result of such consolidation, merger, or purchase or acquisition of assets or liabilities unless the Assured shall

      (i)   give the Underwriter written notice of the proposed consolidation, merger, or purchase or acquisition of assets or liabilities prior to the proposed effective date of such action and

      (ii)   obtain the written consent of the Underwriter to extend the coverage provided by this bond to such additional offices or premises, Employees, and other exposures, and

      (iii)   pay to the Underwriter an additional premium computed pro-rata from the date of such consolidation, merger, or purchase of assets to the end of the current premium period;

unless the acquisition or merger occurs with an entity having one thousand (1,000) or less employees; and having assets totaling under $750,000,000; and having a clean fidelity bond record excess of $2,500,000 for the prior three (3) years.

CHANGE OF CONTROL -- NOTICE

C.   When the Risk and Insurance Management Department of the Assured learns of a change in control, it shall give written notice to the Underwriter.

As used in this General Agreement, control means the power to determine the management or policy of a controlling holding Underwriter or the Assured by virtue of voting stock ownership. A change in ownership of voting stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of such stock shall be presumed to result in a change of control for the purpose of the required notice.

Failure to give the required notice shall result in termination of coverage for any loss involving a transferee, to be effective upon the date of the stock transfer.

9

CONFIDENTIAL

## STATEMENTS NOT WARRANTIES

No statement made by or on behalf of the Assured, whether contained in the application or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

## JOINT ASSURED

E.    If two or more Assureds are covered under this bond, the first Named of Assured shall act for all Assureds. Payment by the Underwriter to the first Named of Assured of loss sustained by any Assured shall fully release the Underwriter on account of such loss. If the first Named of Assured ceases to be covered under this bond, the Assured next named shall thereafter be considered as the first Named Assured Knowledge possessed or discovery made by any Assured shall constitute knowledge or discovery by all Assureds for all purposes of this bond. The liability of the Underwriter for loss or losses sustained by all Assureds shall not exceed the amount for which the Underwriter would have been liable had all such loss or losses been sustained by one Assured.

## NOTICE OF LEGAL PROCEEDINGS AGAINST ASSURED—ELECTION TO DEFEND

F.    The Assured shall notify the Underwriter at the earliest practicable moment, not to exceed ninety (90) days after notice thereof is received by the Risk and Insurance Management Department, of any legal proceeding brought to determine the Assured's liability for any loss, claim, or damage, which, if established, would constitute a collectible loss under this bond. Concurrently, the Assured shall furnish copies of all pleading and pertinent papers to the Underwriter.

If the Underwriter elects to defend the Assured, in whole or in part, any judgment against the Assured on those counts or causes of action which the Underwriter defended on behalf of the Assured or any settlement in which the Underwriter participates and all attorneys' fees, costs, and expenses incurred by the Underwriter in the defense of the litigation shall be a loss covered by this bond.

If the Assured does not give the notices required in subsection (a) of Section 5 of this bond and in the first paragraph of this General Agreement, or if the Underwriter elects not to defend any causes of action, neither a judgment against the Assured, nor a settlement of any legal proceeding by the Assured's liability for any loss, claim, or damage, which if established, would constitute a collectible loss under this bond. Concurrently, the Assured shall furnish copies of all pleading and pertinent papers to the Underwriter.

The Underwriter, with the Assured's agreement, may elect to conduct the defense of such legal proceeding, in whole or in part. The defense by the Underwriter shall be in the Assured's name through attorneys to be mutually agreed upon by the Assured and the Underwriter. The Assured shall provide all reasonable information and assistance required by the Underwriter for such defense.

With respect to this General Agreement, subsection (b) and (d) of Section 5 of this bond apply upon the entry of such judgment or the occurrence of such settlement instead of upon discovery of loss. In addition, the Assured must notify the Underwriter within thirty (30) days after such judgment is entered against it or after the Assured settles such legal proceeding, and, subject to subsection (e) of Section 5, the Assured may not bring legal proceedings for the recovery of such loss after the expiration of twenty-four (24) months from the date of such final judgment or settlement.



CONFIDENTIAL

CONDITIONS AND LIMITATIONS

DEFINITIONS

Section 1. As used in this bond:

    (a)    Acceptance means a draft which the drawee has, by signature written thereon, engaged to honor as presented.

    (b)    Certificate of Deposit means an acknowledgement in writing by a financial institution of receipt of Money with engagement to repay it.

    (c)    Certificated Security means a share, participation, or other interest in property of or any enterprise of the issuer or an obligation of the issuer, which is:

        (1)    represented by an instrument issued in bearer or registered form;

        (2)    of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

        (3)    either one of a class or series or by its terms divisible into a class or series of shares, participations, interest, or obligations.

    (d)    Counterfeit means an imitation of an actual valid original, which is intended to deceive and to be taken as the original.

    (e)    Disclosed Agent means any natural person, partnership, or corporation, doing business and entered into a signed agreement with the Assured on a Disclosed Account basis whereby the Assured executes orders for (a) the purchase and sale of Certificated Securities or Uncertificated Securities (b) contracts for the future delivery of commodities, and (c) spot transactions in such commodities in customers' accounts carried on the Assured's books, which orders are transmitted to the Assured by said Disclosed Agent on behalf of the respective customers. The term Disclosed Agent shall include the partners, offices, and employees of such Disclosed Agent and each such Disclosed Agent, and its partners, officers, and employees, shall collectively be deemed to be one person for all purposes of subsection (c) of the last paragraph of Section 4.

    (f)    Document Custodian shall mean an independent third party, designated by the Assured to act as custodian of the original Mortgage Loan file pursuant to a written custodian agreement.

    (g)    Employee means

        (1)    a natural person in the service of the Assured whom the Assured compensates directly by salary or commissions and who the Assured has the right to direct and control while performing services for the Assured;

        (2)    an attorney retained by the Assured or an employee of such attorney while either is performing legal services for the Assured;

CONFIDENTIAL

(3) a person provided by an employment contractor to perform employee duties for the Assured under the Assured's supervision at any of the Assured's offices or premises covered hereunder; and a guest student pursuing studies or duties in any of said offices or premises;

(4) an employee of an institution merged or consolidated with the Assured prior to the effective date of this bond;

(5) each natural person, partnership, or corporation authorized by the Assured to perform services as data processor of checks or other accounting records related to such checks of the Assured (not including preparation or modification of computer software or programs), herein called Processor. Each such Processor shall collectively be deemed to be one Employee for all the purposes of this bond. A Federal Reserve Bank or clearing house shall not be construed to be a processor;

(6) any person on military leave or other leave of absence or other alternative working arrangements;

(7) any person hired for summer employment by, and paid by, employees of Lehman Brothers and who the Assured has the right to direct and control while performing services for the Assured;

(8) any person hired as a data processing, computer, or other consultant, or retirees serving as consultants whilst performing services for the Assured;

(9) any person or firms hired by the Assured to perform services normally performed internally, and who the Assured has the right to direct and control while performing such services for the Assured;

(10) James Anthony Wheatley retained by the Assured while performing services for the Assured acting as Power of Attorney in Brazil;

(11) any such person who resigns, retires or is terminated from the service of the Assured during the Bond Period. However, this subsection (g)(11) applies only:

    i. for a period of sixty (60) days subsequent to such resignation, retirement or termination (but not beyond the date of expiration or termination of the bond), and

    ii. if such resignation, retirement or termination has not arisen from or in connection with the discovery of the Assured of any actual or alleged, dishonest, fraudulent or criminal acts of such person.

For the purposes of this subsection (g)(11), termination occurs when an Employee is no longer on the Assured's payroll.

(12) all trustees of the Assured's employee benefit plans;

(h) Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Assured and held by the Assured which in the regular course of business is treated as evidencing the customer's debt to the Assured.

12

CONFIDENTIAL

(i)    Fair Market Value shall mean the reasonable appraisal value of property at the date of the original appraisal referred to in Sub-section (v) of Insuring Agreement (I), which is the true worth of the property for the purpose of making the Mortgage Loan. It is agreed, however, that the Underwriter's liability shall be limited to that part of the amount of each Mortgage Loan purchased which, at the time of such purchase is in excess of the Fair Market Value or, if it be greater, the Market Value at the time of discovery of loss.

(j)    Forgery means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(k)    Guarantee means a written undertaking obligating the signer to pay the debt of another to the Assured or its assignee or to a financial institution from which the Assured has purchased participation in the debt, if the debt is not paid in accordance with its terms.

(l)    Instruction means a written order to the issuer of an Uncertificated Security requesting that the transfer, pledge, or release from pledge of the Uncertificated Security specified be registered.

(m)    Initial Transaction Statement means the first written statement signed by or on behalf of the issuer of an Uncertificated Security sent to the registered owner or registered pledgee containing:

    (1)    a description of the issue of which the Uncertificated Security is a part; and

    (2)    the number of shares or units which are transferred to the registered owner, pledged by the registered owner to the registered pledgee or released from pledge by the registered pledgee; and subject to pledge on the date of the statement;

    (3)    the name, address, and taxpayer identification number, if any, of the registered owner or registered pledgee; and

    (4)    the date the transfer pledge or release was registered.

(n)    Letter of Credit means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honor drafts or other demands for payment upon compliance with the conditions specified in the Letter of Credit.

(o)    Loan means all extensions of credit by the Assured and all transactions creating a creditor or lessor relationship in favor of the Assured, including all purchase and repurchase agreements, and all transactions by which the Assured assumes an existing creditor or lessor relationship.

(p)    Money means a medium of exchange in current use authorized or adopted by a domestic or foreign government as part of its currency.

(q)    Mortgage shall mean the mortgage, deed of trust or other instrument creating a first lien on an unsubordinated estate in fee simple in real property securing a mortgage note.

(r)    Mortgage Loan shall mean an individual mortgage loan purchased by the Assured and shall be deemed to include the original mortgage note and the original Mortgage or deed of trust in a recordable form together with all other documents included in the Mortgage Loan file delivered

13

CONFIDENTIAL

to the Assured or its designated Document Custodian upon purchase.

(s)    Negotiable Instrument means any writing

(1)    signed by the maker or drawer; and

(2)    containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation, or power given by the maker or drawer; and

(3)    is payable on demand or at a definite time; and

(4)    is payable to order or bearer.

(t)    Property means money (including currency, coin, bank notes, Federal reserve notes), postage and revenue stamps, U.S. Saving Stamps, bullion, base metals and precious metals of all kinds and in any form and articles made therefrom, jewelry, watches, necklaces, bracelets, gems, precious and semiprecious stones, bonds, securities, Certificated Securities, Initial Transaction Statements, Statements of Uncertificated Security, Evidences of Debts, debentures, scrip, certificates, interim receipts, warrants, rights, puts, calls, straddles, spreads, transfers, coupons, drafts, bills of exchange, Acceptances, notes, checks, Withdrawal Orders, money orders, warehouse receipts, bills of lading, conditional sales contracts, abstracts of title, insurance policies, deeds, Mortgages upon real estate and/or chattels and upon interest therein, and assignments of such policies, Mortgages and instruments, and other valuable papers, including books of account and other records used by the Assured in the conduct of its business, and all other instruments similar to or in the nature of the foregoing, in which the Assured has an interest or in which the Assured acquired or should have acquired an interest by reason of a predecessor's declared financial condition at the time of the Assureds consolidation or merger with or purchase of the principal assets of, such predecessor or which are held by the Assured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Assured is liable therefor.

(u)    Servicing Contractor means a natural person, partnership or corporation, other than an officer or employee of the Assured, duly authorized by the Assured under written agreement with the Assured to perform any or all of the following:

(a)    collect and record payments on Loans made, held or assigned to the Assured, establish tax and insurance escrow accounts,

(b)    manage real property owned by or under the supervision or control of the Assured,

(c)    perform other acts directly related to the above,

14



CONFIDENTIAL

but only while such natural person, partnership or corporation is actually performing such for the Assured anywhere in the world, not acting in any other capacity, whether on behalf of the Assured or otherwise, including but not limited to the making of any real estate mortgage or home improvement loans; provided that any additional Servicing Contractors duly authorized by the Assured under written agreement with the Assured after the inception date of this bond are automatically covered hereunder.

The term Servicing Contractor shall include the partners, officers and employees of such Servicing Contractors and each such Servicing Contractor and its partners, officers and employees shall collectively be deemed to be one person for all purposes of this bond.

(v)    Statement of Uncertificated Security means a written statement of the issuer of an Uncertificated Security containing:

    (1)    a description of the issue of which the Uncertificated Security is a part or the whole of the issue;

    (2)    the number of shares or units

        (a)    transfer to the registered owner;

        (b)    pledged by the registered owner to the registered pledgee;

        (c)    released from pledge by the registered pledgee;

        (d)    registered in the name of the registered owner on the date of the statement; or

        (e)    subject to pledge on the date of the statement;

    (3)    the name and address of the registered owner and registered pledgee;

    (4)    a notation of any liens and restrictions of the issuer and any adverse claims to which the Uncertificated Security is or may be subject to or a statement that there are none of those liens, restrictions or adverse claims; and

    (5)    the date

        (a)    the transfer of the share of units to the new registered owner of the shares of the units was registered;

        (b)    the pledge of the registered pledgee was registered, or

        (c)    of the statement, if it is a periodic or annual statement.

(w)    Transportation Underwriter means any organization which provides its own or leased vehicles for transportation or provides freight forwarding or air express services.

15

CONFIDENTIAL

(x)    Uncertificated Security means a shared participation or other interest in property or assets, or an enterprise of the issuer, which is:

    (1)    not represented by an instrument and the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer;

    (2)    of a type commonly dealt in on securities exchanges or markets; and

    (3)    either one of a class or series or by its terms divisible into a class or series of shares, participations, interest or obligations.

(y)    Withdrawal Order means a non-negotiable instrument, other than an Instruction, signed by a customer of the Assured authorizing the Assured to debit the customer's account in the amount of funds stated therein.



CONFIDENTIAL

## EXCLUSIONS

Sections 2.1. The following exclusions apply to all Insuring Agreements:

(a)   loss due to riot or civil commotion outside any country where the Assured has an office; or loss due to military, naval, or usurped power, war or insurrection, unless covered under Insuring Agreement C.

(b)   loss resulting directly or indirectly from the effects of nuclear fission or fusion or radioactivity; provided, however, that this paragraph shall not apply to loss resulting from industrial uses of nuclear energy;

(c)   loss resulting from any act or acts of any person who is a member of the Board of Directors of the Assured or a member of any equivalent body by whatsoever name known unless such person is also an Employee or an elected official of the Assured in some other capacity, nor, in any event, loss resulting from the act or acts of any person while acting in the capacity of a member of such Board or equivalent body;

(d)   loss resulting from any violation by the Assured or by any Employee

   (1)   of law regulating

      (i)   the issuance, purchase, or sale of securities

      (ii)   securities transactions upon security exchanges or over the counter market,

      (iii)   investment companies, or

      (iv)   investment advisers, or

   (2)   of any rule or regulation made pursuant to any such law, unless it is established by the Assured that the act or acts which caused the said loss involved fraudulent or dishonest conduct which would have caused a loss to the Assured in a similar amount in the absence of such laws, rules, or regulations;

(e)   potential income, including but not limited to interest and dividends, not realized by the Assured or by any customer of the Assured;

(f)   damages of any type for which the Assured is legally liable, except compensatory damages, but not multiples thereof, arising directly from a loss covered under this bond;

(g)   all fees, costs, and expenses by the Assured

   (1)   in establishing the existence of or amount of loss covered under this bond; or

   (2)   as a party to any legal proceeding whether or not such legal proceeding exposes the Assured to loss covered under this bond,

except when covered under Insuring Agreement (J);



17

CONFIDENTIAL

(h)    indirect or consequential loss of any nature;

(i)    loss due to liability imposed upon the Assured as a result of the unlawful disclosure of non-public material information

(1)    by the Assured or any Employee, or

(2)    as a result of any Employee acting upon such information

(j)    loss arising from any Uncertificated Security, except for loss of an Initial Transaction Statement, or Statement of Uncertificated Security when covered under Insuring Agreement (B) or (C) or, except when covered under Insuring Agreement (A) or (E);

(k)    Loss resulting directly or indirectly from transactions in a customer's or Assured's account, whether authorized or unauthorized, except

(1)    the unlawful withdrawal and conversion of money, securities, precious metals, or other Property, directly from a customer's or Assured's account by an Employee provided such unlawful withdrawal and conversion is covered under Insuring Agreement (A1), (A2), or

(2)    when covered under Insuring Agreement (D) or (E);

(l)    loss resulting from acts committed subsequent to the purchase of Mortgage Loans by the Assured, except when covered by Insuring Agreement (A)(3);

(m)    loss resulting from acts committed prior to the purchase of Mortgage Loans by the Assured, except when covered by Insuring Agreement (I);

(n)    loss resulting from the insolvency, bankruptcy or taking over by a receiver or other liquidator or by State or Federal Officials of any Servicing Contractor covered under this Bond;

(o)    loss through the failure of any Servicing Contractor covered under this Bond to collect or receive Money for the account of the Assured, notwithstanding any agreement between such Servicing Contractor and the Assured to the contrary;

(p)    loss of Money collected or received for the account of the Assured by any Servicing Contractor covered under this Bond except when covered by this Insuring Agreement (A)(3).

Section 2.2 The following exclusions apply to all Insuring Agreements except (A1) & (A2).

(a)    loss caused by an Employee;

(b)    loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification, cash management or other cards;

(1)    in obtaining credit or funds, or

(2)    in gaining access to automated mechanical devices which, on behalf of the Assured, disburse money, accept deposits, cash checks, drafts, or similar written instruments or make credit card loans, or

18

CONFIDENTIAL

(3)    in gaining access to point of sale terminals, customer bank communication terminals, or similar electronic terminals of electronic funds transfer systems; whether such cards were issued, or purport to have been issued, by the Assured or by anyone other than the Assured;

(c)    loss through the surrender of Property away from an office of the Assured as a result of a threat;

(1)    to do bodily harm to any person, or

(2)    to do damage to the premises or property of the Assured,

except when covered under Insuring Agreement (C);

(d)    loss resulting directly or indirectly from payments made or withdrawals from a depositor's or customer's account involving erroneous credits to such account, unless such payments or withdrawals are physically received by such depositor or customer or representative of such depositor or customer who is within the office of the Assured at the time of such payment or withdrawal;

(e)    loss involving items of deposit which are not finally paid for any reason, including but not limited to Forgery or any other fraud; however, this exclusion does not apply to instruments which are returned to the Assured by the United States Government for any reason after the funds for said checks, drafts, or similar instruments have been remitted to the Assured;

(f)    loss of any tangible item of personal property which is not specifically enumerated in the paragraph defining Property if such property is specifically Assured by other insurance of any kind and in any amount obtained by the Assured, and in any event, loss of such Property occurring more than sixty (60) days after the Assured takes possession of such Property;

(g)    loss of Property while in the mail;

(h)    loss resulting from payments (or withdrawals) made from the Assured's or any customer's account in reliance upon instruction(s) or advice(s) received via printed teleprocessed imagery;

(i)    loss arising from any Uncertificated Security, except for loss of an Initial Transaction Statement when covered under Insuring Agreement (E);

(j)    loss resulting directly or indirectly from forgery or alteration except when covered under Insuring Agreement (D) and (E);

(k)    loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any loan or transaction involving the Assured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan, transaction or extension was procured in good faith or through trick, artifice, fraud, or false pretenses, except when covered under Insuring Agreement (D) and (E);

(l)    loss resulting directly or indirectly from counterfeiting except when covered under Insuring Agreement (D) and (F);

19

CONFIDENTIAL

    (m)   loss resulting directly or indirectly from any actual or alleged representation, advice, warranty, or guarantee as to the performance of any investments;

    (n)   loss resulting directly or indirectly from the failure of a financial or depository institution, or its receiver or liquidator, to pay or deliver, on demand of the Assured, funds or Property of the Assured held by it in any capacity, except when covered under Insuring Agreement (B);

    (o)   damages resulting from any civil, criminal or other legal proceeding in which the Assured is adjudicated to have engaged in racketeering activity. For the purposes of this Section 2.2(o), racketeering activity is defined in 18 United State Code 1961 et seq., as amended;

    (p)   loss caused by an agent, broker, factor, commission merchant, independent contractor, intermediary, finder or other representative of the same general character, unless such loss is otherwise covered pursuant to any Insuring Agreement of this bond.

Section 2.3 The following exclusions shall apply in respect of Insuring Agreement L.

    (a)   loss discovered more than twelve (12) months after the sale or delivery of Mortgage Loans by the Assured to another purchaser or acquirer;

    (b)   loss resulting from any negligent act, or error or omission by the Assured or any of its agents, including the failure to satisfy the legal procedures which are required to complete an effective transfer to it or any Mortgage Loan under the Uniform Commercial Code or real property law of the applicable state and/or equivalent Federal requirements and the like.

## DISCOVERY

Section 3. This bond applies to loss discovered by the Assured during the Bond Period. 'Discovery by the Assured', as used in this bond, shall be deemed to mean discovery by any individual assigned to the Risk and Insurance Management Department of Vice President level or above.

## LIMIT OF LIABILITY

Section 4. Aggregate Limit of Liability

The Underwriter's total liability for all losses discovered during the Bond Period showing in Item 2 of the Declarations shall not exceed the Aggregate Limit of Liability shown in Item 3 of the Declarations. The Aggregate Limit of Liability shall be reduced by the amount of any payment made under the terms of this bond.

Upon exhaustion of the Aggregate Limit of Liability by such payments:

    (a)   The Underwriter shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to the Underwriter, and

    (b)   The Underwriter shall have no obligation under General Agreement F to continue the defense of the Assured upon notice to the Assured that the Aggregate Limit of Liability has been exhausted, the Assured shall assume responsibility for its defense at its own cost.

CONFIDENTIAL