## SECTION I (b) – ELECTRONIC COMPUTER CRIME POLICY

This Electronic and Computer Crime Policy is designed to be a companion policy to the Assured's Financial Institution Bond and is intended to provide coverage for computer related crime as defined in the Insuring Agreements which is not covered under the Assured's Financial Institution Bond. Since certain Underwriters who are underwriting this Electronic and Computer Crime Policy may also be underwriting the Assured's Financial Institution Bond by either primary insurance, excess insurance or other contributing insurance or reinsurance and since it is their intention not to increase or double up their coverage to the Assured it is agreed that this Policy will not be deemed to be excess or co-insuring coverage

### INSURING AGREEMENT 1. COMPUTER SYSTEMS

By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of the fraudulent input of Electronic Data directly into:

    1)  the Assured's Computer Systems; or

    2)  a Service Bureau's Computer System; or

    3)  an Electronic Funds Transfer System; or

    4)  a Customer Communication System;

or the fraudulent modification, or the fraudulent destruction, of Electronic Data stored within, or being run within, or transferred by systems or during electronic transmission through data communication lines, including satellite links, to the Assured's Computer Systems or a Service Bureau's Computer System.

### INSURING AGREEMENT 2. ELECTRONIC COMPUTER INSTRUCTIONS

By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of the fraudulent preparation or the fraudulent modification or alteration of Electronic Computer Instructions.

Costs and expenses incurred and paid by the Assured, all with the prior approval of Underwriters, for the verification and reconstruction of Electronic Computer Instructions, which Electronic Computer Instructions were fraudulently prepared or fraudulently modified and which fraudulent acts give rise to a loss paid under this Insuring Agreement.

### INSURING AGREEMENT 3. ELECTRONIC COMMUNICATIONS

By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communications directed to the Assured which were transmitted or appear to have been transmitted through:

    (1)  an Electronic Communication System; or

    (2)  an Automated Clearing House; or

    (3)  by telex, TWX or similar means of communication;



46

CONFIDENTIAL

directly into the Assured's Computer Systems or to the Assured's Communications Terminal and fraudulently purport to have been sent by a customer, Automated Clearing House, financial institution or any other entity involved in the normal course of daily computer transactions with the Assured but which communications were either not sent by said customer, Automated Clearing House, financial institution or any other entity, or were fraudulently modified or altered prior to or during physical transit of Electronic Data Processing Media to the Assured or during electronic transmission through data communication lines to and from, including satellite links, to the Assured's Computer Systems or to the Assured's Communications Terminal.

## INSURING AGREEMENT 4. ELECTRONIC TRANSMISSIONS

By reason of a customer of the Assured, an Automated Clearing House or a financial institution or any other entity having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communications purporting to have been directed by the Assured to its customer, an Automated Clearing House, financial institution or any other entity authorizing, or acknowledging the transfer, payment, delivery or receipt of funds or property, which communications were transmitted or appear to have been transmitted through:

    (1)   an Electronic Communication System; or

    (2)   an Automated Clearing House; or

    (3)   by telex, TWX or similar means of communications;

~~directly into a Computer System or a Communications Terminal of said customer, Automated Clearing House, financial institution or any other entity, and fraudulently purport to have been sent by the Assured but which communications were either not sent by the Assured or were fraudulently modified during physical transit of Electronic Data Processing Media from the Assured or during electronic transmission through data communication lines, including satellite links, from the Assured's Computer Systems or the Assured's Communications Terminal and for which loss the Assured is held to be legally liable.~~

## INSURING AGREEMENT 5. CUSTOMER VOICE INITIATED TRANSFERS

A)    By reason of the Assured having transferred any funds on the faith of any voice initiated funds transfer instructions directed to the Assured authorizing the transfer of funds in a customer's account to other Financial Institutions for credit to persons designated by the customer and which instructions were made over the telephone to those employees of the Assured specifically authorized to receive said instructions at the Assured's offices and fraudulently purport to have been made by a person authorized and appointed by a customer to request by telephone the transfer of such funds but which instructions were not made by said customer or by any officer, director, partner or employee of said customer or were fraudulently made by an officer, director, partner or employee of said customer whose duty, responsibility or authority did not permit the individual to make, initiate, authorize, validate or authenticate customer voice initiated funds transfer instructions.



CONFIDENTIAL

B)     The Assured having transferred any funds on the faith of any voice initiated funds transfer instructions purportedly communicated between the Assured's offices authorizing the transfer of funds in a Customer's account to another financial institution for the credit to persons allegedly designated by the Customer and which instructions were purportedly made over the telephone between the Assured's offices by those employees of the Assured specifically authorized to send and receive said inter-office instructions by telephone.

Special Definition

Customer as used in this Insuring Agreement means any individual, corporation, partnership, trust customer or similar business entity which has a written customer agreement with the Assured.

Special Condition

All voice initiated requests received for the transfer of funds are subject to the Assured's standard operating procedures or any amendments thereof. If through an inadvertent error or omission, the transfer of funds is not in compliance with the Assured's procedures, such transfers shall nevertheless be covered hereunder.

INSURING AGREEMENT 6, ASSURED'S SERVICE BUREAU OPERATIONS

By reason of a customer of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of the fraudulent input, the fraudulent modification or the fraudulent destruction of Electronic Data stored within, or being run within, the Assured's Computer Systems, or during electronic transmission through data communication lines from the Assured's Computer Systems into the customer's Computer System, while the Assured is acting as a Service Bureau for said customers and for which loss the Assured is held to be legally liable.

INSURING AGREEMENT 7. FORGED TELEFACSIMILE

By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any authenticated instructions directed to the Assured authorizing, or acknowledging, the transfer, payment, delivery or receipt of funds or property which authenticated instructions were transmitted by Telefacsimile directly to the Assured and fraudulently purport to have been set by a customer, but which authenticated instructions were sent without the knowledge or consent of said person and bear a Forgery.

Special Condition

All Telefacsimile requests received for the transfer of funds are subject to the Assured's standard operating procedures or any amendments thereof. If through an inadvertent error or omission, the transfer of funds is not in compliance with the Assured's procedures, such transfers shall nevertheless be covered hereunder.

INSURING AGREEMENT 8 - FRAUDULENT TELEPHONE SYSTEM ACCESS

By reason of the Assured sustaining Direct Financial Loss caused by the unauthorized access and the use of the Assured's telephone system(s) located on the premises of the Assured whether access initiated on or off the premises.

48

CONFIDENTIAL

Special Definitions

1.   Direct Financial Loss means toll and line charges the Assured is responsible for as a result of unauthorized use of their Telephone System.

2.   Telephone System(s) means PBX, remote access, voice mail or similar systems owned or leased by the Assured for the purposes of telecommunications.

INSURING AGREEMENT 9 - COMPUTER VIRUS

Loss resulting directly from the malicious destruction of, or damage to, Electronic Data or Computer Programs owned by the Assured or for which the Assured is legally liable while stored within a Computer System covered under the terms of Insuring Agreement 1 if such destruction or damage was caused by a computer program or similar instruction which was written or altered to incorporate a hidden instruction designed to destroy or damage Electronic Data or Computer Programs in the Computer System in which the computer program or instruction so written or so altered is used.

The liability of the Underwriter shall be limited to the cost of duplication of such Electronic Data or Computer Programs from other Electronic Data or Computer Programs which shall have been furnished by the Assured.

In the event, however, that destroyed or damaged Computer Programs cannot be duplicated from other Computer Programs, the Underwriter will pay the cost incurred for computer time, computer programmers, consultants or other technical specialists as is reasonable necessary to restore the Computer Programs to substantially the previous level of operational capability.

Special Condition

Under this Insuring Agreement, Single Loss means all covered costs incurred by the Assured between the time destruction or damage is discovered and the time the Computer System is restored to substantially the previous level of operational capability.  Recurrence of destruction or damage after the Computer System is restored shall constitute a separate Single Loss.

INSURING AGREEMENT 10 - ELECTRONIC SECURITIES

By reason of a Central Depository authorizing the transfer, payment or delivery of said funds or property or the debiting of the Assured's account in connection with the purchase, sale, transfer or pledge of an Electronic Security which communications were transmitted or appear to have been transmitted through:

1)   an Electronic Communication System; or

2)   an Automated Clearing House; or

3)   by telex, TWX or similar means of communication



49

CONFIDENTIAL

directly into a Computer System or a Communications Terminal of said Central Depository and fraudulently purport to have been sent by the Assured to the Central Depository but which communications were either not sent by the Assured to the Central Depository or were fraudulently modified during physical transit of Electronic Data Processing Media from the Assured or during electronic transmission through data communication lines including Satellite links from the Assured's Computer System or the Assured's Communications Terminal to the Central Depository and for which loss the Assured is held to be legally liable to the Central Depository.

Electronic Security means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer which:

1)   is a type similarly dealt in upon securities, exchanges or markets;

2)   is either one of a class or series or by its terms is divisible into a class or series of shares, participations, interests or obligations; and

3)   a)   is not represented by an instrument, or

b)   is part of a master or global certificate, or

c)   represents a paper certificate that has been surrendered by a financial institution and which paper certificate has been combined into a master depository note and the paper certificates are immobilized

and such securities as shown as an electronic entry on the account of the transferor, pledgor or pledgee on the books of a Central Depository.

## INSURING AGREEMENT II. MALICIOUS DESTRUCTION

A.   By reason of the malicious destruction or attempt thereat of the Assured's Electronic Data by any person while the Electronic Data are stored within the Assured's Computer System or a Service Bureau's Computer System or while recorded upon Electronic Data Processing Media within offices or premises of the Assured or in the custody of a person designated by the Assured to act as its messenger (or a person acting as messenger or custodian during an emergency arising from the incapacity of such designated messenger) while the Electronic Data Processing Media upon which such Electronic Data are recorded is in transit anywhere, such transit to begin immediately upon receipt of such Electronic Data Processing Media by said messenger and to end immediately upon delivery to the designated by the Assured to act as its messenger (or a person acting as a messenger or custodian during an emergency arising from the incapacity of such designated messenger) while the Electronic Data Processing Media is in transit anywhere, such transit to begin immediately upon receipt of such Electronic Data Processing Media by said messenger and to end immediately upon delivery to the designated recipient or its agent, provided that the Assured is the owner of such Electronic Data Processing Media or is legally liable for such loss or damage.



50

CONFIDENTIAL

B.   Electronic Data Processing Media and/or Electronic Computer Instructions being lost, damaged or destroyed as the direct result of malicious destruction or attempt thereat, robbery, burglary, larceny, theft, misplacement or mysterious unexplainable disappearance while electronic Data Processing Media and/or Electronic Data and/or Electronic Computer Instructions is lodged or deposited within offices or premises located anywhere, or in the custody of a person designated by the Assured to act as its messenger (or a person acting as messenger or custodian during an emergency arising from the incapacity of such designated messenger) while the Electronic Data Processing Media and/or Electronic Data and/or Electronic Computer Instructions is in transit anywhere, such transit to begin immediately upon receipt of such Electronic Data Processing Media and/or Electronic Data and/or Electronic Computer Instructions by said messenger and to end immediately upon delivery to the designated recipient or its agent, provided that the Assured is the owner of such Electronic Data Processing Media and/or Electronic Data and/or Electronic Computer Instructions or is legally liable for such loss or damage.

GENERAL AGREEMENTS

Companion Section

(A)   The Electronic and Computer Crime Policy is designed to be a companion policy to the Assured's Financial Institution Bond and is intended to provide coverage for computer related crime as defined in the Insuring Agreements, which is not covered under the Assured's Financial Institution Bond. It is agreed that:

(a) any loss which is covered under the Assured's Financial Institution Bond is excluded from coverage under this Policy; and

(b) this Policy will not be deemed to be excess or coinsuring coverage.

Notice of Legal Proceedings Against Assured—Election to Defend

(B)   The Assured shall notify the Underwriter at the earliest practicable moment, not to exceed ninety (90) days after notice thereof is received by the Risk and Insurance Management Department, of any legal proceeding brought to determine the Assured's liability for any loss, claim, or damage, which, if established, would constitute a collectible loss under this bond. Concurrently, the Assured shall furnish copies of all pleading and pertinent papers to the Underwriter.

If the Underwriter elects to defend the Assured, in whole or in part, any judgement against the Assured on those counts or causes of action which the Underwriter defended on behalf of the Assured or any settlement in which the Underwriter participates and all attorneys' fees, costs, and expenses incurred by the Underwriter in the defense of the litigation shall be a loss covered by this bond.

If the Assured does not give the notices required in subsection (a) of Section 5 of this bond and in the first paragraph of the General Agreement, or if the Underwriter elects not to defend any causes of action, neither a judgement against the Assured, nor a settlement of any legal proceeding by the Assured's liability for any loss, claim, or damage, which if established, would constitute a collectible loss under this bond. Concurrently, the Assured shall furnish copies of all pleading and pertinent papers to the Underwriter.

51

CONFIDENTIAL

The Underwriter, with the Assured's agreement, may elect to conduct the defense of such legal proceeding, in whole or in part. The defense by the Underwriter shall be in the Assured name through attorneys to be mutually agreed upon by the Assured and the Underwriter. The Assured shall provide all reasonable information and assistance required by the Underwriter for such defense.

With respect to this General Agreement, subsections (b) and (d) of Section 5 of this bond apply upon the entry of such judgement or the occurrence of such settlement instead of upon discovery of loss. In addition, the Assured must notify the Underwriter within thirty (30) days after such judgement is entered against it or after the Assured settles such legal proceedings, and, subject to subsection (e) of Section 5, the Assured may not bring legal proceedings for the recovery of such loss after the expiration of twenty-four (24) months from the date of such final judgement or settlement.

Nominees

(C)    Loss sustained by any nominee organized by the Assured for the purpose of handling certain of its business transactions and composed exclusively of its Employees or those performing the usual duties of Employees shall, for all the purposes of this bond and whether or not any partner of such nominee is implicated in such loss, be deemed to be loss sustained by the Assured.

Additional Offices and Computer Systems - Consolidation. Merger or Purchase of Assets - Notice

(D)    If the Assured shall, while this policy is in force, establish any additional offices, or add any computer systems, other than by consolidation or merger with or purchase or acquisition of assets or liabilities of another institution, such offices or computer systems shall be automatically covered hereunder from the date of such establishment without the requirement of notice to the Underwriter or the payment of additional premium for the remainder of the premium period.

If the Assured shall, while this policy is in force, consolidate or merge with, or purchase assets or liabilities of another institution, the Assured shall not have such coverage as is afforded under this bond for loss which:

(a)    has occurred or will occur in offices or premises; or

(b)    has been caused or will be caused by an employee or employees of such institution, or

(c)    has arisen or will arise out of the assets or liabilities acquired by the Assured as a result of such consolidation, merger or purchase or acquisition of assets or liabilities unless the Assured shall:

   (i)    give the Underwriter written notice of the proposed consolidation, merger or purchase or acquisition of assets or liabilities prior the proposed effective date of such action, and

   (ii)    obtain the written consent of the Underwriter to extend the coverage provided by this bond to such additional offices or premises, Employees, and other exposures, and

   (iii)    pay to the Underwriter an additional premium computed pro-rata from the date of such consolidation, merger, or purchase of assets to the end of the current premium period,

CONFIDENTIAL

unless the acquisition or merger occurs with an entity having one thousand (1,000) or less employees; and having assets totaling under $750,000,000.; and having a clean fidelity bond record excess of $2,500,000. for the prior three (3) years.

<u>Change of Control – Notice to Underwriter</u>

(E)    When the Risk and Insurance Management Department of the Assured learns of a change in control, it shall give written notice to the Underwriter.

As used in this General Agreement, control means the power to determine the management or policy of a controlling holding Underwriter or the Assured by virtue of voting stock ownership. A change in ownership of voting stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of such stock shall be presumed to result in a change of control for the purpose of the required notice.

Failure to give the required notice shall result in termination of coverage for any loss involving a transferee, to be effective upon the date of the stock transfer.

<u>Joint Assured</u>

(F)    If two or more Assureds are covered under this bond, the first Named Assured shall act for all Assureds. Payment by the Underwriter to the first Named Assured of loss sustained by any Assured shall fully release the Underwriter on account of such loss. If the first Named Assured ceases to be covered under this bond, the Assured next named shall thereafter be considered as the first Named Assured. Knowledge possessed or discovery made by any Assured shall constitute knowledge or discovery by all Assureds for all purposes of this bond. The liability of the Underwriter for loss or losses sustained by all Assureds shall not exceed the amount for which the Underwriter would have been liable had all such loss or losses been sustained by one Assureds.

<u>Representation of Assured</u>

(G)    No statement made by or on behalf of the Assured, whether contained in the application or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.



53

CONFIDENTIAL

CONDITIONS AND LIMITATIONS

Section 1. Definitions

(a)     Assured's Computer Systems means those Computer Systems owned, leased or operated by the Assured.

(b)     Automated Clearing House means any corporation or association which operates an electronic clearing and transfer mechanism for the transfer of pre-authorized recurring debits and credits between financial institutions on behalf of the financial institutions' customers.

(c)     Communications Terminal means teletype, teleprinter or video display terminal, or personal computer when used as a device for receiving or transmitting Electronic Data.

(d)     Computer System includes a computer and all input, output, processing, storage, and communication facilities which are connected to such a device and are controlled by a single copy of the operating system which is resident within that device. Off-line media libraries are deemed to be part of said Computer System.

(e)     Computer Program means a set of related electronic instructions which direct the operations and functions of a computer or devices connected to it which enable the computer or devices to receive, process, store or send Electronic Data.

(f)     Computer Virus means a set of unauthorized instructions, programmatic or otherwise, that propagate themselves through the Assured's Computer system and/or networks, which instructions were maliciously introduced by a person other than by an identifiable employee.

(g)     Customer Communications System means those communications systems which provide customers of the Assured with direct access to the Assured's Computer System.

(h)     Electronic Communication Systems means electronic communication operations by FedWire, Clearing House Interbank Payment System (CHIPS), Society for Worldwide International Financial Telecommunication (SWIFT), CHAPS, CEDEL, Euroclear, and similar automated Interbank Communication Systems, depositories, custodians, exchanges, or any other similar entity with whom the Assured conducts business, the internet, or similar systems.

(i)     Electronic Computer Instructions means computer programs, (i.e. facts or statements) converted to a form usable in the Computer Systems to act upon Electronic Data.

(j)     Electronic Data means facts or information converted to a form usable in Computer Systems and which is stored on Electronic Data Processing Media for use by computer programs.

(k)     Electronic Data Processing Media means the punched cards, magnetic tapes, electronic core systems, punched tapes or magnetic discs or other media on which data is recorded, optical storage, hard disks, or soft disks.

(l)     Electronic Funds Transfer Systems means those systems which are leased by the Assured to interface with other financial institutions and used by the Assured to initiate funds transfer instructions into automated interbank communication systems.

54

(m)   Forgery means the signing of the name of another person or organization and with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(n)   Service Bureau means a natural person, partnership or corporation authorized by written agreement to perform data processing services using Computer Systems

(o)   Service Bureau's Computer Systems means those Computer Systems owned, leased or operated by a Service Bureau.

(p)   Central Depository means any Federal Reserve Bank of the United States or any other depository utilized by the Assured.

(q)   Telefacsimile means a system of transmitting written documents by means of electronic signals over telephone lines, private lines, communication lines or telecommunication systems to equipment maintained by the Assured room for the purpose of reproducing a copy of said document. It does not mean electronic communications sent by telex, TWX or similar means of communication or through an Electronic Communication System.

## Section 2. Exclusions

This policy does not cover:

(a)   loss resulting from any of the named perils in the Assured's Financial Institution Bond;

(b)   Loss caused by a dishonest or fraudulent act of an identifiable employee of the Assured or by a person or persons in collusion with any employee that a fraudulent act by a person, or persons, not in the employ of the Assured, has been, or will be, perpetrated shall, for the intent and purpose of this Policy, be deemed to be collusion should said employee willfully or deliberately withhold this knowledge from the Assured. The withholding of knowledge from the Assured by an employee because of a threat to do bodily harm to any person, or to do damage to the premises or property of the Assured, shall not be deemed to be or to constitute collusion;

(c)   loss of potential income including, but not limited to, interest and dividends, not realized by the Assured or by any customer of the Assured;

(d)   indirect or consequential loss of any nature;

(e)   damages of any type for which the Assured may be held legally liable, except direct compensatory damages arising from a loss covered under this policy;

(f)   liability assumed by the Assured by agreement under any contract unless such liability would have attached to the Assured even in the absence of such agreement;

(g)   all fees, costs, and expenses by the Assured

    (1)   in establishing the existence of or amount of loss covered under this bond; or

    (2)   as a party to any legal proceeding whether or not such legal proceeding exposes the Assured to loss covered under this bond;

55

CONFIDENTIAL

(h)    loss due to riot or civil commotion outside of any country where the Assured has an office, or loss due to military, naval or usurped power, war or insurrection;

(i)    (1)    any loss or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss; or

(2)    any legal liability of whatsoever nature;

directly or indirectly caused by or contributed to or arising from:

(i)    ionizing radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel;

(ii)   the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

(j)    loss as a result of a threat

(1)    to do bodily harm to any person; or

(2)    to do damage to the premises or property of the Assured;

(k)    loss of Electronic Data Processing Media or Electronic Data while in the mail;

(l)    loss of Electronic Data or Electronic Data Processing Media except as provided for under Section 7 of the Conditions and Limitations of this insurance.

(m)   loss resulting directly or indirectly from:

(1)    telegraphic or cable instructions or advices, unless covered under Insuring Agreements 3, 4 or 10; or

(2)    instructions or advices by voice over the telephone, unless covered under Insuring Agreement 5; or

(3)    Telefacsimile instructions or advices unless said Telefacsimile instructions or advices are covered under Insuring Agreement 7;

(n)    loss resulting directly or indirectly from the accessing of any confidential information including but not limited to, trade secret information, computer programs or customer information;

(o)    loss or damage caused by fire;

(p)    loss resulting from mechanical failure, faulty construction, error in design, latent defect, wear or tear, gradual deterioration, electrical disturbance, Electronic Data Processing Media failure or breakdown or any malfunction or error in programming or errors or omissions in processing;

(q)    loss resulting directly or indirectly from the fraudulent preparation or fraudulent modification of Electronic Computer Instructions unless covered under Insuring Agreements 2, 8 or 10;

L P S C
K.L.

CONFIDENTIAL

(r)    loss by reason of the input of Electronic Data at an authorized electronic terminal of an Electronic Funds Transfer System or a Customer Communication System by a customer or other person who had authorized access to the customer's authentication mechanism unless covered under Insuring Agreements 3,4,5 and 6;

(s)    loss resulting from fraudulent features contained in Electronic Computer Instructions at the time of their acquisition from a vendor or consultant, where those Electronic Computer Instructions were developed for sale to or that are sold to multiple customers, provided however, that this Exclusion shall not apply where:

(1)    no other purchaser of the said Electronic Computer Instructions has discovered an insurable loss resulting from such fraudulent features during a period of 60 days from the date of discovery of the loss by the Assured, or

(2)    at the time of the loss such fraudulent features are contained solely on the Electronic Computer Instructions of the Assured and are not present on Electronic Computer Instructions sold to other customers or which fraudulent features were inserted subsequent to the date of acquisition;

(t)    loss resulting from payments (or withdrawals) made from the Assured's or any customer(s) account in reliance upon instruction(s) or advice(s) received via telefacsimile, except when covered under Insuring Agreement 7;

(u)    Loss resulting directly or indirectly from any Computer Virus unless covered under Insuring Agreement 9.

Section 3: Limit of Liability/Non-Accumulation of Liability

Aggregate Limit of Liability

The Underwriter's total liability for all losses discovered during the Policy Period showing in Item 2 of the Declarations shall not exceed the Aggregate Limit of Liability shown in Item 3 of the Declarations. The Aggregate Limit of Liability shall be reduced by the amount of any payment made under the terms of this bond.

Upon exhaustion of the Aggregate Limit of Liability by such payments:

(a)    The Underwriter shall have not further liability for loss or losses regardless of when discovered and whether or not previously reported to the Underwriter, and

(b)    The Underwriter shall have no obligation under General Agreement B to continue the defense of the Assured upon notice to the Assured that the Aggregate Limit of Liability has been exhausted; the Assured shall assume responsibility for its defense at its own cost.

The Aggregate Limit of Liability shall not be increased or reinstated by any recovery made and applied in accordance with subsection (a), (b) and (c) of Section 8. In the event that a loss of Property is settled by the Underwriter through the use of a lost instrument bond, such loss shall not reduce the Aggregate Limit of Liability.

57

CONFIDENTIAL

Single Loss Limit of Liability

Subject to the Aggregate Limit of Liability, the Underwriter's liability for each Single Loss shall not exceed the applicable Single Loss Limit of Liability shown in Item 4 of the Declarations. If a Single Loss is covered under more than one Insuring Agreement or coverage, the maximum payable shall not exceed the largest applicable Single Loss Limit of Liability.

Single Loss Defined

Single Loss means all covered loss, including court costs and attorneys' fees incurred by the Underwriter under General Agreement (B), resulting from:

(a)    any one act or series of related acts of burglary, robbery, or attempt thereat in which no Employee is implicated, or

(b)    any one act or series of related unintentional or negligent acts or omission on the part of any person (whether an Employee or not) resulting in damage to or destruction or misplacement of Property, or

(c)    all acts or omissions other than those specified in (a) or (b) preceding, caused by any person (whether an Employee or not) or in which such person is implicated, or

(d)    any one casualty or event not specified in (a), (b) or (c) preceding.

Section 4. Discovery

This bond applies to loss discovered by the Assured during the Policy Period. 'Discovery by the Assured', as used in this bond, shall be deemed to mean discovery by any individual assigned to the Risk and Insurance Management Department of Vice President level or above.

Section 5. Notice/Proof-Legal Proceeding

(a)    At the earliest practicable moment, not to exceed ninety (90) days, after discovery of loss by any individual assigned to the Risk and Insurance Management Department of Vice President level or above, the Assured shall give the Underwriter notice thereof.

(b)    Within six (6) months after such discovery, the Assured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

(c)    Lost Certificated Securities listed in a proof of loss shall be identified by certificate or bond numbers if such securities were issued therewith.

(d)    Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of ninety (90) days after the original proof of loss is field with the Underwriter or after the expiration of twenty-four (24) months from the discovery of such loss.

(e)    If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

CONFIDENTIAL

(f)    This bond affords coverage only in favor of the Assured.  No suit, action, or legal proceedings shall be brought hereunder by any one other than the named Assured.

Section 7. Valuation

Any loss of Money, or loss payable in Money, shall be paid, at the option of the Assured, in the money of the country in which the loss was sustained or in the United States of America dollar equivalent thereof, determined by the rate of exchange on the day preceding the discovery of such loss.

<u>Securities</u>

The Underwriter shall settle, in kind, its liability under this Policy on account of a loss of any securities or, at the option of the Assured, shall pay to the Assured the cost of replacing such securities including electronic securities, determined by the market value of such securities on the day preceding the discovery of such loss. In case of a loss of subscription, conversion or redemption privileges through the loss of securities, the amount of such loss shall be the value of such privileges immediately preceding the expiration thereof. If such securities cannot be replaced, or have no quoted market value, or if such privileges have no quoted market value, their value shall be determined by agreement or arbitration.

If the applicable Coverage of this Policy is subject to a Deductible Amount, and/or is not sufficient in amount to indemnify the Assured in full for the loss of securities for which claim is made hereunder, the liability of the Underwriter under this Policy is limited to the payment for, or the duplication of, so much of such securities as has a value equal to the amount of such applicable coverage.

<u>Electronic Data Processing Media</u>

In case of loss of, or damage to, Electronic Data Processing Media used by the Assured in its business, the Underwriter shall be liable under this policy only if such items are actually reproduced by other Electronic Data Processing Media which is of the same kind or quality and then for not more than the cost of the blank media plus the cost of labor for the actual transcription or copying of data which shall have been furnished by the Assured in order to reproduce such Electronic Data Processing Media subject, of course, to the applicable Limit of Indemnity.

<u>Other Property</u>

In case of loss of, or damage to, any property other than money, securities or Electronic Data Processing Media, the Underwriter shall not be liable for more than the actual cash value of such property. The Underwriter may, at their election, pay the actual cash value of, or replace or repair such property. Disagreement between the Underwriter and the Assured as to the cash value or as to the adequacy of repair or replacement shall be resolved by arbitration.



59

CONFIDENTIAL

Electronic Data

In case of loss of Electronic Data, the Underwriter shall be liable under this policy only if such data is actually reproduced by other Electronic Data of the same kind or quality and then for not more than the cost of labor for the actual transcription or copying of data which shall have been furnished by the Assured in order to reproduce such Electronic Data subject, of course, to the applicable Limit of Indemnity.

However, if such Electronic Data cannot be reproduced and said Electronic Data represents securities or financial instruments having a value, then the loss will be valued as indicated in the Securities and Other Property paragraphs of this Section.

Section 8. Assignment-Subrogation-Recovery-Cooperation

(a) In the event of payment under this policy, the Assured shall deliver, if so requested by the Underwriter, an assignment of such of the Assured's rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(b) In the event of payment under this policy, the Underwriter shall be subrogated to the Assured's rights of recovery therefor against any person or entity to the extent of such payment.

(c) Recoveries, whether effected by the Underwriter or by the Assured, shall be applied, net of the expense of such recovery, first to the satisfaction of the Assured's loss which would have otherwise have been paid but for the fact that it is in excess of either the Single or Aggregate Limit of Liability, secondly, to the underwriter as reimbursement of amounts paid in settlement of the Assured's claim, and thirdly, to the Assured in satisfaction of any Deductible Amount. Recovery on account of loss of securities as set forth in the second paragraph of Section 6, or recovery from reinsurance and/or indemnity of the Underwriter shall not be deemed a recovery as used herein.

(d) Upon the Underwriter's request and at reasonable times and places designated by the Underwriter the Assured shall:

(1) submit to examination by the Underwriter and subscribe to the same under oath; and

(2) produce for the Underwriter's examination all pertinent records; and

(3) cooperate with the Underwriter in all matters pertaining to the loss.

(e) The Assured shall execute all papers and render assistance to secure to the Underwriter the rights and causes of action provided for herein. The Assured shall do nothing after discovery of loss to prejudice such rights or causes of action.

LPSC K.L.

CONFIDENTIAL

Section 9. Limit of Liability Under This Policy and Prior Insurance

With respect to any loss set forth in subsection (c) of Section 4 of this bond which is recoverable or recovered in whole or in part under any bonds or policies issued by the Underwriter to the Assured or to any predecessor in the interest of the Assured and terminated or cancelled or allowed to expire and in which the period of discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Underwriter under this bond and under such other bonds or policies shall not exceed, in the aggregate, the amount carried hereunder on such loss or the amount available to the Assured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss if the latter amount be the larger.

If the coverage of this bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an Insurer other than the Underwriter and terminated, cancelled or allowed to expire, the Underwriter, with respect to any loss sustained prior to such termination, cancellation or expiration and discovered within the period permitted under such other bond or policy for the discovery of loss thereunder, shall be liable under this bond only for that part of such loss covered by this bond as is in excess of the amount recoverable or recovered on account of such loss under such other bond or policy, anything to the contrary in such other bond or policy notwithstanding.

Section 10. Other Insurance or Indemnity

Except as provided in General Agreement A, coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Assured, or by another entity which employed the person causing the loss or the messenger conveying the Property involved or on whole premises the loss occurred, or by Transportation Underwriter.

Section 11. Ownership

This policy shall apply to loss of property and loss of Electronic Data Processing Media and Electronic Data owned by the Assured, held by the Assured in any capacity, or for which the Assured is legally liable. This policy shall be for the sole use and benefit of the Assured named in the Declarations.

Section 12. Deductible Amount

The Underwriter shall be liable hereunder only for the amount by which any Single Loss, as defined in Section 4, exceeds the Single Loss Deductible Amount for the Insuring Agreement or coverage applicable to such loss, subject to the Aggregate Limit of Liability and the applicable Single Loss Limit of Liability.

The Assured shall, in the time and in the manner prescribed in this bond, give the Underwriter notice of any loss of the kind covered by the terms of this bond, whether or not the Underwriter is liable therefor, and upon the request of the Underwriter, shall file with it a brief statement giving the particulars concerning such loss.

Section 13. Termination or Cancellation

This policy shall be deemed terminated or cancelled as an entirety at the earliest of the following times:

    (a)    immediately upon the taking over of the Assured by a receiver or other liquidator or by State or Federal officials, or

    (b)    immediately upon the taking over of the Assured by another institution.

61

CONFIDENTIAL

The Underwriter shall, on request, refund to the Assured the unearned premium, computed pro-rata, if this policy be terminated or cancelled or reduced by notice from, or at the instance of, the Underwriter or if terminated or cancelled as provided in sub-section (c) or (d) of this paragraph. The Underwriter shall refund to the Assured the unearned premium computed at short rates if this policy be terminated or cancelled or reduced by notice from, or at the instance of, the Assured.

This policy shall be deemed terminated or cancelled as to any Service Bureau:

    (a)    As soon as any Assured, or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by any partner, director, officer or employee of any such Service Bureau at any time against the Assured or any other person or entity, without prejudice to the loss of any property then in transit in the custody of such person; or

    (b)    fifteen (15) days after the receipt by the Assured of a written notice from the Underwriter of their desire to terminate or cancel this policy as to such person.

Termination of this policy as to any Assured terminates liability for any loss sustained by such Assured which is discovered after the effective date of such termination

## Section 14. Action Against Service Bureau or Customer

This policy does not afford coverage in favor of any Service Bureau or customer as aforesaid, and upon payment to the Assured by the Underwriter on account of any loss through fraudulent or dishonest acts committed by any of the partners, directors, officers or employees of such Service Bureau or customer, whether acting alone or in collusion with others, an assignment of such of the Assured's rights and causes of action as they may have against such Service Bureau or customer by reason of such loss so compensated shall, to the extent of such payment, be given by the Assured to the Underwriter and the Assured shall execute all papers necessary to secure to the Underwriter the rights herein provided for.



CONFIDENTIAL

Rider No. I
Bond No. QA529399 Section I (b)

Name of Assured:   LEHMAN BROTHERS HOLDINGS INC.

It is agreed that:

1.  At the written request of the named Assured, any payment in satisfaction of loss covered by said bond involving Money or other Property in which the Government National Mortgage Association and the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation has an interest shall be paid by an instrument issued to that organization and the named Assured as joint loss-payees, subject to the following conditions and limitations:

    a.  The attached bond is for the sole use and benefit of the Named Assured as expressed herein. The organization named above shall not be considered as an Assured under the bond, nor shall it otherwise have any rights or benefits under said bond.

    b.  Notwithstanding any payment made under the terms of this rider or the execution of more than one loss occurrence or otherwise in accordance with the terms of this bond shall not exceed the aggregate limits of liability as set forth in Item 3 of the Declarations Page.

    c.  Nothing herein is intended to alter the terms, conditions and limitations of the bond.

2.  Should this bond be cancelled, reduced, non-renewed, or restrictively modified by the Underwriter, the Underwriter will endeavor to give thirty (30) days advance notice to the organization named above, but failure to do so shall not impair or delay the effectiveness of any such cancellation, reduction, non-renewal or restrictive modification, nor shall the Underwriter be held liable in any way.

3.  Should this bond be cancelled or reduced at the request of the Assured, the Underwriter will endeavor to notify the organization named above of such cancellation or reduction within 10 business days after receipt of such request, but failure to do so shall not impair or delay the effectiveness of such cancellation or reduction, nor shall the Underwriter be held liable in any way.

4.  This Endorsement shall become effective 12:01 a.m. on January 31, 1999.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Freddie Mac, Fannie Mae or Ginnie Mae – SR 6186

LPSO
K.L.

CONFIDENTIAL

Rider No. 2
Bond No. QA529399 Section I (b)

Name of Assured:    LEHMAN BROTHERS HOLDINGS INC.

It is agreed that this bond is amended by adding to Section 12., TERMINATION OR CANCELLATION, the following:

"The Underwriter will mark its records to indicate that the New York Stock Exchange is to be notified promptly concerning termination, cancellation or substantial modification of this bond or as to any Partner or Employee, whether such termination, cancellation or substantial modification is effected by notice from the Assured or by the Underwriter.  The Underwriter will use its best efforts to so notify the New York Stock Exchange, but failure to so notify shall not impair or delay the effectiveness of any such termination, cancellation or modification."

This Endorsement applies to loss discovered after 12:01 a.m. on January 31, 1999.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

64

CONFIDENTIAL

Rider No. 3
Bond No. QA529399 Section I (b)

Name of Assured:    LEHMAN BROTHERS HOLDINGS INC.

It is agreed that

1.   The attached policy is amended in the event of loss covered under the Underwriter's Financial Institution
     Bond, Bond No. QA529399 – Section 1 issued to LEHMAN BROTHERS HOLDINGS INC., the
     Aggregate Limit of Liability under this policy shall be reduced by any payment under Bond No. QA529399 –
     Section 1 and only the remainder, if any, shall be applicable to such loss under this policy.

2.   This Endorsement applies to loss discovered after 12:01 a.m. on January 31, 1999.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

65

CONFIDENTIAL

Rider No. 4
Bond No. QA529399 Section I (b)

Name of Assured:    LEHMAN BROTHERS HOLDINGS INC.

It is agreed that:

1.    The Name of Assured in the Declarations is amended to read as follows:

"LEHMAN BROTHERS HOLDINGS INC., and any subsidiary or management controlled entity now existing or hereinafter created or acquired including all Employee Benefit, Mutual Funds, Welfare or Pension Plans sponsored by the Assured."

2.    Coverage shall be provided for those joint venture companies, limited liability companies, partnerships, or other entities which are not under Lehman's management control and in which they do now own more than 50% up to their interest therein.  This policy will respond excess of any other insurance available or as primary if no other insurance exists.

This Endorsement applies to loss discovered after 12:01 a.m. on January 31, 1999

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

CONFIDENTIAL

Rider No. 5
Bond No. QA529399 Section I (b)

Name of Assured:   LEHMAN BROTHERS HOLDINGS INC.

---

It is agreed that this bond is amended by deleting the last paragraph of GENERAL AGREEMENT B., ADDITIONAL OFFICES OR EMPLOYEES CONSOLIDATION, MERGER OR PURCHASE OF ASSETS NOTICE, in its entirety and substituting the following:

"unless the acquisition or merger occurs with an entity having one thousand (1,000) or less employees; and having assets totaling under 35% of LEHMAN BROTHERS HOLDINGS INC. assets; and having a clean fidelity bond record excess of $2,500,000 for the prior three (3) years."

This Rider applies to loss discovered after 12:01 a.m. on January 31, 1999.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

67

CONFIDENTIAL

**BOND NO. QA529399 – SECTION II – FINANCIAL INSTITUTION PROFESSIONAL INDEMNITY INSURANCE**

| | | |
|---|---|---|
| Item 1. | NAME OF ASSURED | Lehman Brothers Holding Inc |
| | PRINCIPAL ADDRESS | Three World Financial Centre<br>24th Floor<br>New York<br>New York 10285<br>USA |
| Item 2. | POLICY PERIOD | From 31st January 1999 to 31st January 2002 both days at 12.01am Local Standard Time at the principal Address |
| Item 3. | RETROACTIVE DATE | Not Applicable |
| Item 4. | THE PREMIUM | USD 3,564,024.75 three years prepaid |
| Item 5. | PROPOSAL FORM DATED | No Proposal |
| Item 6. | LIMIT OF INDEMNITY | USD 100,000,000 any one claim and in the aggregate |
| Item 7. | DEDUCTIBLE | USD 25,000,000 each and every claim including costs and expenses |
| Item 8. | CLAIMS to be notified to | Marsh Limited<br>FINPRO Division<br>No.1, The Marsh Centre<br>London<br>E1 8DX |

68

CONFIDENTIAL

Item 9.          SERVICE OF SUIT          As detailed in Item 9 of Rider No 1 – All Sections

69

CONFIDENTIAL

## SECTION II - FINANCIAL INSTITUTION PROFESSIONAL INDEMNITY INSURANCE

NOTICE: THIS POLICY SUBJECT TO ITS TERMS, APPLIES ONLY TO ANY CLAIM (AS
DEFINED HEREIN) MADE AGAINST THE ASSURED (AS DEFINED HEREIN) DURING THE
POLICY PERIOD OR OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO
THE UNDERWRITERS WITHIN 90 DAYS AFTER THE EXPIRATION DATE OF THE POLICY
PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE). DEFENSE COSTS AND
EXPENSES SHALL BE APPLIED TO THE DEDUCTIBLE. THE LIMIT OF INDEMNITY
AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE
EXHAUSTED BY AMOUNTS INCURRED BY DEFENSE COSTS AND EXPENSES AND
REIMBURSED UNDER THIS POLICY, TO THE EXTENT THAT SUCH DEFENSE COSTS AND
EXPENSES EXCEED THE DEDUCTIBLE. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY
BY UNDERWRITERS TO DEFEND THOSE INSURED UNDER THE POLICY.

**CONDITIONS:**

1.   *INSURING AGREEMENT*

    a.   The Underwriters will pay on behalf of the Assured that Loss incurred by the Assured as a
result of any **Claim** made against the **Assured** for a **Wrongful Act** by the Assured or any
person or entity for whom the **Assured** is legally liable in the Assured's performance of
**Professional Services** (including failure to render **Professional Services**), provided that
such **Claim** is first made against the Assured during the Policy Period, or in the event of
non-renewal or cancellation of this policy, during a period of 90 days after the effective date
of such non-renewal or cancellation, or within the Optional Extension Period if purchased.

2.   *LIMIT OF INDEMNITY*

    a.   The total liability (inclusive of the Assured's approved Defense Costs and Expenses and
regardless of the total number of **Claims** made against the Assured or amount of Loss) of
the Underwriters shall not exceed the Limit of Indemnity stated in Item 6 of the Schedule, in
the aggregate, for all **Claims** made against the **Assured** during the Policy Period or Optional
Extension Period (if applicable). The Limit of Indemnity stated in Item 6 of the Schedule
shall be in excess of the Deductible stated in Item 7 of the Schedule.

    b.   The Underwriters may at any time pay to the Assured in connection with any **Claim**
notified hereunder the amount of the Limit of Indemnity as stated in Item 6 of Schedule
(after deduction of any sum or sums already paid by the Underwriters whether as **Defense
Costs and Expenses** or indemnity for settlements, awards or judgments) which the claimant
agrees to accept in complete satisfaction of such Claim or Claims. Upon such payment
being made, the Underwriters shall have no further liability or obligation for **Defense Costs
and Expenses** or indemnity for settlements, awards or judgments in connection with such
Claim.

CONFIDENTIAL