# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAWRENCE FOGARAZZO and CAROLYN FOGARAZZO, Joint Tenants With Rights of Survivorship, STEPHEN L. HOPKINS, AND DON ENGEL on behalf of themselves, and all others similarly situated, | Civ Action No. 03 Civ. 5194 (SAS) |
| Plaintiffs, | AMENDED FEDERAL SECURITIES CLASS ACTION COMPLAINT |
| -against - | |
| LEHMAN BROTHERS, INC., GOLDMAN SACHS & CO., and MORGAN STANLEY & CO., INC. | JURY TRIAL DEMANDED |
| Defendants, | |

Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint, allege upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, based upon the investigation made by and through their attorneys, which investigation included a review of analyst reports published and disseminated to the investing public by Defendants Lehman Brothers Inc. ("Lehman"), Goldman, Sachs& Co. ("Goldman Sachs"), and Morgan Stanley & Co., Inc. ("Morgan Stanley") on RSL Communications, Inc. ("RSL" or the "Company"), and recent public filings and related documents from the United States Securities and Exchange Commission ("SEC") and the States of New York, Alabama, and Utah, attacking the independence and accuracy of research reports issued by Defendants, as well as additional publicly available information:

## NATURE OF ACTION

1.      This is a securities class action brought on behalf of public investors who
purchased the common stock of RSL during the period from April 30, 1999 through and
including December 29, 2000 (the "Class Period").  Defendants are each charged with violations
of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5
promulgated thereunder.

2.      During the Class Period, Defendants issued to the investing public false and
misleading analyst reports on RSL as part of their bids to win or maintain lucrative banking and
financial advisory work from the Company.

3.      As a result of Defendants' false and misleading statements, the market price of
RSL common stock was artificially inflated throughout the Class Period, to the injury of
Plaintiffs and the other Class members who purchased RSL stock at that time, relying upon the
integrity of the market price of the stock.

4.      On or about April 28, 2003, in connection with the settlement of charges filed
against Defendants, the SEC and the Attorneys General of various states, including New York,
Alabama, and Utah (who were litigation task force leaders), found that Defendants each had
failed, during the Class Period, to adopt sufficient procedures and processes to ensure that the
interaction between their research analysts and investment bankers and/or covered companies
did not expose analysts to economic pressures or influences from the affected investment
banking personnel or covered companies, and had violated several rules of the NASD and NYSE
by issuing false and misleading analyst reports on numerous companies, including RSL, as a
result of analysts having had conflicts of interest.  The SEC complaints charged Defendants with
violating numerous rules of conduct of the NASD and NYSE, by issuing false and misleading

-2-

analyst reports on numerous companies, including RSL. The complaint describes the influence
and control exerted by Defendants' investment bankers on its supposedly independent research
analysts in order to obtain lucrative investment banking opportunities from covered companies,
including RSL, details how positive ratings and research reports on RSL and numerous other
companies issued by Defendants to the public were contrary to the Defendants' more negative
assessments of the true value and prospects of such companies, and asserts that such ratings and
reports contributed to the inflation of the stock prices of such companies, including RSL, during
the Class Period.

## JURISDICTION AND VENUE

5.      The claims asserted below arise under §§10(b) and 20(a) of the Exchange Act,
15U.S.C. §§78j(b), and Rule 10b-5 promulgated thereunder by the United States Securities and
Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

6.      Jurisdiction is conferred upon this Court by §27 of the Exchange Act, 15 U.S.C.
§78aa, and 28 U.S.C. §§1331 and 1337.

7.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28
U.S.C. § 1391(b) since Defendants have their principal place of business located in this District,
and many of the acts alleged herein, including the dissemination of the misleading statements to
the investing public, occurred in substantial part in this District.

8.      In connection with the acts, conduct and other wrongs alleged herein, Defendants,
directly and indirectly, used the means and instrumentalities of interstate commerce, including
the United States mails, interstate telephonic communications and the facilities of the national
securities exchanges.

A - 138

## THE PARTIES

### Plaintiffs

9.      Plaintiffs, Lawrence and Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel

all purchased shares of RSL common stock during the Class Period as set forth in the

accompanying certifications, and have been damaged as a result of Defendants' misconduct as

described herein.

### Defendants

10.      Defendant Lehman is, and was during the class period, a global investment bank

serving institutional, corporate, government and individual clients.  Lehman is also a broker-

dealer registered with the SEC and is a member of all principal securities and commodities

exchanges, including the NYSE and NASD.  Lehman's businesses include securities

underwriting, sales and trading, investment banking, private equity, financial advisory services,

investment research, venture capital, correspondent brokerage services, and asset management.

Lehman maintains its corporate headquarters at 745 Seventh Avenue, New York, New York.

11.      Goldman Sachs is, and was during the Class Period, an international financial

services firm that provides investment banking and broker dealer services to business, engaged

in retail and institutional sales to its customers, and publishes research reports and ratings on

stocks.  Goldman Sachs is also a broker-dealer registered with the SEC and is a member of all

principal securities and commodities exchanges, including the NYSE and NASD.  Goldman

Sachs maintains its corporate headquarters at 85 Broad Street, New York, New York

12.      Morgan Stanley is, and was during the Class Period, an international financial

services firm that provides investment banking services to business, engaged in retail and

institutional sales to its customers, and publishes research reports and ratings on stocks.  Morgan

-4-

A - 139

Stanley is also a broker-dealer registered with the SEC and is a member of all principal securities

and commodities exchanges, including the NYSE and NASD. Morgan Stanley's principal place

of business is located at 1585 Broadway, New York, New York.

## CLASS ACTION ALLEGATIONS

13.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired shares

of RSL equities during the period from April 30, 1999 through December 29, 2000, both dates

inclusive (the "Class"). Excluded from the Class are Defendants, members of Defendants'

employees' immediate family, as well as their officers, directors, subsidiaries or affiliates, and

any entity in which any excluded person has a controlling interest, and legal representatives,

heirs, successors or assigns of any of the foregoing.

14.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiffs at this time

and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a

minimum, thousands of members of the Class who purchased RSL common stock during the

Class Period.

15.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class are:

- whether Defendants engaged in acts or conduct in violation of the federal
  securities laws as alleged herein;

- whether Defendants participated in and pursued the common course of
  conduct complained of herein;

A - 140

- whether Defendants issued false and misleading statements during the Class Period;

- whether the market prices of the Company's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

16.     Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and the other members of the Class sustained damages arising out of Defendants's wrongful conduct in violation of federal law as complained herein.

17.     Plaintiffs will fairly and adequately protect the interests of members of the Class, and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

18.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

19.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

-6-

- the omissions and misrepresentations were material;

- the common stock of the Company traded on the NASDAQ National
  Market System, an efficient market;

- the market reacted to public information disseminated by Defendants;

- the misrepresentations and omissions alleged would tend to induce a
  reasonable investor to misjudge the value of the Company's securities; and,

- Plaintiffs and the other members of the Class purchased their Company
  stock between the time the Defendants failed to disclose or misrepresented
  material facts and the time the true facts were disclosed, without
  knowledge of the omitted or misrepresented facts.

20.    Based upon the foregoing, Plaintiffs and the other members of the Class are
entitled to a presumption of reliance upon the integrity of the market.

## SUBSTANTIVE ALLEGATIONS

### LEHMAN'S FRAUDULENT SCHEME

#### Background

21.    Lehman is a global investment bank providing financial advisory, capital markets
and underwriting services, among other services, to its clients.  During the Class Period, Lehman's
investment banking department ("Investment Banking"), among other activities, engaged in
securities offerings, including initial public offerings ("IPOs"), secondary offerings and debt
financings, and provided merger and acquisition and other advisory services for its clients.

#### The Investment Banking Function at Lehman

22.    During the Class Period, Lehman competed vigorously with other investment
banks to be selected as the lead manager, underwriter and/or placement agent for securities

-7-

A - 142

offerings, because of the financial rewards associated with those roles. In addition, Lehman

hoped to gain ongoing transactional and advisory work from existing and potential clients,

including secondary offerings and financial advisory arrangements. In 2001, Lehman served as

lead manager, underwriter, and/or placement agent for sixty-six equity deals, and earned

approximately $ 1.3 billion from underwriting services.

### Lehman's Global Equity Research and Public Dissemination of Reports

23.    During the Class Period, Lehman's Equity Research Department ("Research")

employed up to 600 employees, including approximately 100 senior research analysts and 200

junior research analysts. Additionally, during 2001, Research covered approximately 80

industries and approximately 900 U.S. companies. Senior research analysts in the United States

reported to the Director of U.S. Equity Research, who reported to the Managing Director of

Global Equity Research.

24.    Research analysts collect financial and other information about a company and its

industry, analyze that information, and develop recommendations and ratings regarding a

company's securities. In addition, research analysts also examine the financial condition of

selected publicly traded companies that are believed to be of potential investment value.

Lehman claims that its analysts make evaluations of companies' anticipated earnings, revenue

and cash flow, operating and financial strengths and weaknesses, and long term viability and

dividend potential. During the Class Period, Lehman analysts produced and compiled written

research materials including research reports and First Call notes regarding companies and

industry sectors.

25.    Lehman's research was distributed to both institutional clients and retail

investors. Lehman distributed its research product directly to its own client base, consisting of

institutional investors and high net worth individual retail investors.  In June 1999, Lehman

entered into a "strategic alliance" with Fidelity Investments.  Among other things, the "strategic

alliance" provided Fidelity's retail customers with access to Lehman research.  Lehman also sold

its research products to other broker-dealers that in turn provided the research to their retail

costumers.  Lehman also made its research available to the public through services such as

Thomson Financial/First Call and Multex.com, Inc.  Ratings of Lehman's analysts were freely

and publicly available through a number of print and electronic media outlets.  Lehman analysts

appeared regularly in the financial press, and the substance of their reports were widely reported

in the media.

26.     Appearing at the top of its research reports that were devoted to specific stocks,

Lehman assigned a "rank" according to a 5-point scale reflecting how the analyst believed the

stock would perform relative to the market generally.  During the Class Period, Research used

the following ratings: 1- Buy (expected to outperforms the market by 15 or more percentage

points), 2 - Outperform (expected to outperform the market by 5-15 percentage points), 3 -

Neutral (expected to perform in line with the market, plus or minus 5 percentage points), 4 -

Underperform (expected to underperform the market by 15 or more percentages points), and 5 -

Sell.  The definitions for the ratings were provided to Lehman clients on a monthly basis.

27.     Although Lehman purported to rank stocks according to a 5-point scale, in fact,

during the Class Period, Lehman analysts never assigned a 5- Sell rating to a domestic company

and almost never assigned a 4-Underperform rating to a stock.

28.     Lehman's research reports also assigned to the stock a price target designed to

reflect the price at which the analyst believed the stock would trade within a time period that was

identified in some reports and unidentified in others.

-9-

29.     Lehman held out its research analysts as providing independent recommendations and analyses of companies and stocks upon which investors could rely to reach investment decisions.  Lehman promoted its research for the "quality and timeliness of its investment recommendations."

30.     In fact, Lehman's research analysts were subjected to conflicts of interest arising from the close relationship between Research and Investment Banking.  Such conflicts of interest adversely impacted the independence of Lehman's public stock recommendations.

31.     Analysts worked closely with members of Investment Banking and other departments to generate business for Lehman.  Analysts often worked with Investment Banking to identify and win corporate finance business for Lehman, including secondary offerings or debt finances.  To this end, analysts were expected to have target and alignment meetings with their Investment Banking counterparts on a periodic basis.

32.     Lehman aligned its analysts with an Investment Banking team.  Analysts' responsibilities included providing research to their Investment Banking counterparts so that the bankers could leverage the research product order to create and/or maintain investment banking business relationships with a company.

33.     Recognizing the strategic importance of this alignment, on August 5, 1999, Lehman's Managing Director of Global Equity Research circulated a memorandum to Global Research Directors (the "August 5 Memorandum"), which detailed key areas of "strategic importance."  The memorandum concluded that in order for Lehman to be more profitable, Investment Banking and Research should work together to increase Lehman's number of equity originations, stating:

-10-

> Investment Banking Partnership- This is a key challenge for not
> only research but the entire global equities businesses.  Increasing
> our equity origination will be one of the most important
> accomplishments of the firm.  One of the most significant ways we
> will increase the equity division's total revenue to more than $ 2
> billion is by substantially increasing origination.

34.    The August 5 Memorandum also set forth the "paradigm" for Lehman's

investment banking relationships:

> the analyst is THE key driver of the firm relationship with its
> corporate client base.  Analysts need to accept responsibility and
> use it to expand the franchise and DRIVE PROFITABILITY
> EVERY DAY BUT IN A WAY THAT IS CONSISTENT WITH
> BUILDING A LONG TERM FRANCHISE (Emphases in
> original.)

35.    The August 5 Memorandum emphasized the research analyst's role in identifying

potential banking business for Lehman, stating: "global research must drive the banking

targeting efforts, consistent with the new paradigm."  The August 5 memorandum stated further:

"to ensure we have proper recognition of analysts' impact on banking, we have to closely track

every dollar of IBD revenue (equity, M&A, debt ) by analyst."

36.    On September 14, 1999, the Managing Director of Global Equity Research again

emphasized the importance of the Investment Banking/Research partnership in a memo directed

to Coverage Analysts.  Coverage Analysts were provided with an attachment, dated September

13, 1999, entitled "1 + 1= $" (the September 13 Attachment), that emphasized that the successful

partnership of Research and Investment Banking was key to Lehman's growth as a firm.

37.    The September 13 Attachment explained numerous ways in which Lehman's

Research and Investment Banking divisions could benefit each other, and stated that "seamless

Banking/Research coverage" was critical to all Investment Banking products.  The attachment

also contained a chart, entitled "Secret to Success– Lehman Wins Business When Banking And

Research are Aligned." The September 13 Attachment explained that the Research /Investment

Banking partnership at Lehman would be institutionalized through executive committee support,

targeting and alignment, full partnership accountability between bankers and research analysts,

and reinforced through compensation.

38.    The September 13 Attachment also revealed that Lehman's investment bankers

and research analysts would be required to complete performance reviews of each other.

Bankers would evaluate research analysts on, among other things "the extent to which the

analysts places origination as [a] priority," and "adds value in building banking business," and

the analyst's "effectiveness in the pitching process."

39.    Finally, the September 13 Attachment revealed that Lehman reinforced the

partnership of Research and Banking through compensation. Analyst compensation would be

"impacted by contribution to banking" and "reviewed with appropriate banking group heads."

The primary criterion in evaluating analyst compensation was the analysts' contribution to

Lehman's investment banking revenue.

40.    As part of the relationship between Investment Banking and Research, analysts

met or communicated with their Investment Banking counterparts several times a week , or even

daily. These communications included analysts identifying banking opportunities for Lehman.

For example, on July 7, 2000, one senior analyst sent the following email to Investment Bankers:

> FYI, I have recently come across several great companies in the
> wireless data services industry, an incredible sector for most
> technology inventors.... In my view, we as a firm (tech & telecom)
> should get all over this sector ... I think we should be very
> coordinated in attacking this banking windfall.

41.    Investment bankers pressured analysts to issue positive research coverage on a

company to help Lehman win banking business. Lehman's investment bankers understood that

-12-

if Lehman's research department would cover a potential banking client, Lehman's chances to

obtain banking business from that client would be greatly strengthened.  For example, on

October 4, 2000, a banker sent the following email to an analyst :

> Spoke with [a Worlstor employee] over at Worlstor.  Here's the
> scoop and what we need to do.  They are meeting with other
> bankers over the next 4 days...  They like [Salomon] because of
> their research report.  Action plan for us includes ...  We need to
> say [Lehman's analyst] is publishing a big storage ssp report and
> we would like to make Worlstor the feature of the report like Solly
> did MSI and Storagenetworks...
>
> [Analyst] you need to call (the CEO) and the CFO at least 3 times
> between now and the Board meeting ...  The message is we luv you
> and have been waiting for you.  [Analyst] your call and enthusiasm
> is key.  (Emphasis added).

42.    Another banker wrote the following email to investment bankers and analysts on

June 29, 2000:

> Our competition on the CPQ debt deal is likely the following...
> Given their stock price action after today's downgrade by [SSB],
> we are the highest equity recommendation.  The bottom line is that
> they need a very strong story around their credit and we, with
> [analyst] are in the best position to deliver."

43.    Investment bankers also routinely reviewed drafts of analysts' research reports

before publication in order to insure that the reports were aimed at generating investment

banking revenue from the company.

### Lehman Gave Its Analysts Financial Incentives To
### Use Research To Generate Investment Banking Revenue

44.    Lehman tied the compensation of senior research analysts to the amount of

Investment Banking revenue the analyst helped to generate.  Typically, Lehman analysts

received relatively small base salaries and considerably larger bonuses.  Bonuses were

determined by, in large part, the amount of investment banking revenue generated by companies

the analysts covered.  The bonuses Lehman paid to analysts dwarfed their base salaries and gave

the analysts a strong personal financial incentive to obtain investment banking business, which

created conflicts of interest for the analysts.

### Analyst Employment Contracts Tied
### Bonuses Directly To Investment Banking Revenue

45.     Some of Lehman's approximately 100 senior research analysts had employment

contracts that linked their bonuses directly to the amount of investment banking revenue they

generated.  Depending on the contract, the analyst's entire bonus or an additional Investment

Banking Department ("IBD") bonus was paid based on the aggregate IBD net revenues and fees

generated by companies covered by the analyst, or by companies where the analyst significantly

contributed to the investment banking business.

46.     For example, one analyst contract provided for an annual salary of $200,000, and

a minimum bonus of $ 4.8 million.  The minimum bonus could increase in $1 million

increments, based on the Aggregate IBD Net Revenues and Fees for the performance year, as

follows:

| Minimum Bonus | Aggregate IBD Net Revenues and Fees |
|---|---|
| $ 4.8 Million | Less than $50 million |
| $ 5.8 million | At least $ 50 million but less than $75 million |
| $ 6.8 million | At least $75 million but less than $100 million |
| $ 7.8 million | At least $ 100 million but less than $125 million |
| $ 8.8 million | $125 million or more |

A -149

Aggregate IBD Net Revenues and Fees were defined as revenues and fees booked or received by Lehman from companies covered by the analyst or from companies whose award of business to Lehman was attributed to the analyst's "significant contribution."

47.    Another analyst's contract provided for the payment of a yearly salary of $200,000, a minimum bonus of $3.3 million, and an additional bonus equal to 5% of Investment Banking revenues and fees generated by companies covered by the analyst or companies where the analyst substantially contributed to the award of investment banking business.

### Lehman Compensated Other Analysts Based On Their Contribution To Investment Banking Revenue

48.    Analysts who did not have specific clauses in their contracts related to investment banking revenue were nevertheless compensated financially if companies they covered generated Investment Banking revenue.

49.    As an example of these interrelationships, a Lehman analyst had described that he had arranged a meeting between Lehman analysts, Lehman investment bankers, and a large blue chip company.  The analyst explained that his relationship with the company resulted in Investment Banking receiving ten potential projects for the company.  The Director of U.S. Equity Research congratulated the analyst, stating: "well done, we need senior bankers to see who (the analysts) have the real relationships with the big companies. This is how we justify big comp. packages." (emphasis added).

50.    Also, Lehman monitored the investment banking revenue that analysts generated. For example, Lehman's "Performance Reviews" kept track of the investment banking and trading revenue attributable to each senior analyst.  Senior analysts were shown Performance Reviews during their compensation evaluations.

A - 150

51.    For each analyst, Investment Banking also generated a spreadsheet known as a "Project Review" that identified Investment Banking projects with revenue booked for the year and projects expected to generate revenue in the next year.  The Director of U.S. Equity Research used the Project Reviews in conducting both mid-year and year-end evaluations for senior analysts.

52.    Senior analysts also frequently provided lists of the Investment Banking deals they had worked on during the year to the Director of U.S. Equity Research, in connection with the consideration of their year-end bonuses.  For example, in December 1999, one senior analyst (who did not have an Investment Banking revenue clause in his contract) wrote in an email to the Director of U.S. Equity Research that his research accomplishments and banking revenue were relevant to his compensation.  In describing his research accomplishments, the analyst noted that he had written frequently on a company, and that the company had raised $430 million in equity and high yield financing through Lehman.  The analyst noted that he had written frequently about another company and, as a result, Lehman had a "good shot" at leading an upcoming equity deal.  With respect to banking revenue from RSL, the analyst wrote:

> I believe the revenues generated by my universe generated at least
> as much as other research universes, excluding the Delta Three
> IPO (which RSL's CEO will tell I (sic) was a key part of why LB
> won the books [Delta Three was covered by another analyst] and
> for which I believe I should get credit.

53.    One Senior analyst sent an email, on February 9, 2000, to Lehman's Managing Director of Global Research and the Director of U.S. Equity Research, requesting a promotion to vice president.  In support of his request, the analyst emphasized that his estimated investment banking revenue for the year 2000 was greater than $5 million, and added that "1999 Banking Revenue [of] $1.2M solely [was]due to research relationship."

-16-

54.    In addition, senior analysts were required to complete "business plans" each year. The business plans included an entire section devoted to banking and required analysts to identify their banking initiatives for the coming year.  The business plans required senior analysts to report:

- their plan to add stocks to coverage for either sales and trading and/or banking;

- whether Research/Banking targets and alignment discussions were reflected in the business plan; and

- whether analysts had completed the selection of "franchise and super league clients" with their bankers.

55.    Investment Bankers participated in analyst evaluations by providing written comments on a form titled "Year End Performance Review for Analysts (to be completed by Bankers)" to the heads of Research.  Bankers were asked to evaluate:

- Whether the analyst places origination as a priority;

- The analyst's contribution toward building relationships with clients in the sector;

- The analyst's effectiveness in the pitching process;

- The quality of the analyst's reputation with banking clients; and

- The analyst's level of initiative in providing the banker with value-added ideas for banking clients.

56.    One senior analyst's review stated that the analyst "cares a great deal about competing for business and winning."  Another senior analyst's review stated "strong originator/rainmaker," "strong pitchman" and "very supportive of banking effort; coordinate with banking team on targeting major clients."

-17-

57.    Analysts were criticized if they failed to work closely with Investment Banking. For example, in one instance, a senior analyst was criticized for not having had more frequent contact with her Investment Banking counterpart.

58.    One analyst sent a memorandum, dated December 22, 1999, to the Managing Director of Global Equity Research and the Director of U.S. Equity Research, stating that he was "surprised" by the review he received from an investment banker (the "December 22 Memorandum"). As a result, Lehman required the analyst to meet with the investment banker in order to receive "feedback" and "improve the relationship between research and investment banking".

59.    The analyst described this meeting with the banker, in the December 22 Memorandum, stating:

> [banker] has concluded, after seeing me for 2-3 months (based on two pitches and other feedback) that I may not have the capabilities to be a "banking analyst", i.e., telling companies what they want to hear and not what I think!"...

60.    The analyst also commented that the bankers told him "that the analysts need to be available at extremely short notice to assist in pitch meetings." The analyst defended himself, in part, by commenting that he spent an "inordinate" amount of time on banking prospects.

**Lehman Used The Promise Of Future Research Coverage
To Obtain Investment Banking Business From Companies**

61.    Lehman's marketing efforts aimed at companies included assurances that its research would be favorable and, thus, raise the price of the company's stock.

62.    Lehman competed with other investment banks for selection as lead underwriter for securities offerings, including IPOs, as well as secondary and debt offerings. As part of this competition, Lehman met with companies to present its qualifications. Research analysts

-18-

attended these meetings, referred to as "pitch" meetings, with members of Investment Banking in an effort to win investment banking business for Lehman. At these meetings, Lehman research analysts typically advised companies how best to position and market the company's "story" to investors.

63.     At such meetings, Lehman often presented companies with marketing materials known as pitchbooks that touted Lehman's underwriting qualifications. The pitchbooks typically featured the Lehman analyst who would be covering the company after a banking transaction, and stated that the analyst would issue research on the company as soon as the "quiet period" (a period of time after an offering during which the underwriting firms cannot publish research) ended. The pitchbooks often provided examples of favorable research reports by an analyst, and how such favorable reports resulted in a company's stock price being raised.

64.     The pitchbooks often featured the role that the analyst would play in marketing the offering. Some pitchbooks listed research as a key part of Lehman's underwriting services and, in one case, stated that the "[analyst] will lead a powerful marketing campaign." Other pitchbooks described the analyst as the "axe" in the industry, and provided numerous examples of how the analyst's positive coverage had positively impacted a company's stock price.

65.     Lehman's initiation of research coverage of a company was often tied to Investment Banking fees from the covered company. For example, in February 2000, Lehman bankers questioned a delay in initiating Lehman's coverage of Curagen Corporation, following Lehman's participation in a convertible bond offering by Curagen. The analyst had explained he needed more time and more meetings with the company before issuing a report. The bankers then questioned the delay in an email to the Director of U.S. Equity Research, who responded that the analyst was doing a great job given his many responsibilities, and asked the bankers:

> [W]hen did we decide to promise equity research for a small
> convertible bond deal. What were the economics & how much did
> we make.

One of the bankers responded to the question, stating:

> We made $1.5m in banking and Lehman made $12m as of last
> Thursday. The real question is could we just put a note out that
> would satisfy the company and get us in the next deal.

66.     On another occasion, the Director of U.S. Equity Research received inquiries

from Lehman employees on behalf of officers of public companies seeking to have Lehman

initiate research coverage of their company. The Director of U.S. Equity Research responded by

directing such inquiries to Investment Banking. For example, in February 2000, the Director of

U.S. Equity Research advised a Lehman employee in an email:

> The proper process is to introduce the principals to someone in
> investment banking. If we have the resources and there appears to
> be significant revenue potential, banking will request research.

67.     Similarly, in October 1999, the Director of U.S. Equity Research advised another

Lehman employee in an email:

> doing business is not enough, we need to do a lot of business to
> commit resources. Finally, you should find a contact in banking to
> channel these requests as well.

68.     In another email in March 2000, an analyst explained to his product manager his

reason for initiating coverage on a stock listed only in Mexico that will be of "little interest to

our US institutional salesforce." The analyst wrote:

> The reason for coverage is there is a potential banking deal (big
> $$$) we're trying to get later this year. The bankers just want the
> report out. They don't care about promoting the stock and realize
> it is of little interest to my client base.

**Conflicts of Interest Resulted in the Publication
of Exaggerated or Unwarranted Research.**

69.    The relationship between Investment Banking and Research as alleged herein

created conflicts of interest for Lehman's research analysts.  The financial incentives and

pressure exerted on analysts to assist in obtaining investment banking deals and to maintain

banking relationships adversely affected the integrity of the analysts' ratings, price targets, and

research reports.  These conflicts of interest caused Lehman analysts to issue more positive

research reports or ratings than were warranted by the financial data, and to avoid downgrades or

negative reports regarding companies that were Lehman investment banking clients, such as

RSL.

70.    In doing so, Lehman analysts were driven not by their assessment of the inherent

value of companies, including RSL, but rather the opportunity for Lehman to earn lucrative

investment banking fees.  As noted in a recently filed complaint by the SEC:

> Lehman used research to obtain investment banking business from
> covered companies.  Specifically, Lehman tied the financial
> compensation of analysts directly and indirectly to the analyst's
> success in generating investment banking revenue from covered
> companies.  In addition, Lehman also used the promise of future
> research coverage to obtain valuable underwriting business and
> marketed to companies the ability of Lehman analysts to move the
> market for a stock.  Lehman analysts were subject to conflicts of
> interest that, at times, adversely impacted the independence of
> Lehman's research product.
>
> In certain instances, the financial incentives and pressure on
> analysts to assist in obtaining investment banking deals and to
> maintain banking relationships adversely affected the integrity of
> the analysts' ratings, price targets, and research reports, and caused
> analysts to issue more positive reports or ratings, and to avoid
> downgrades or negative reports regarding companies that were
> investment banking clients.

A - 156

## Lehman's Banking Business with RSL

71.     Lehman had substantial Investment Banking relationships with RSL.  Lehman
was lead or joint-lead underwriter or placement agent in the Company's various public offerings
from 1997 through 2000 (which yielded in excess of $64 million in total investment banking
fees), including but not limited to: (a) the RSL IPO, in late 1997; (b) a high yield note placement
by RSL, in December 1998; (c) RSL's deltathree.com, Inc. ("Delta 3") spin-off IPO, dated
September 3, 1999, for which Lehman was lead underwriter and received approximately $5
million in fees, commissions, and other compensation; (d) the February 2000 issuance of $200
million in 12 7/8% Senior Notes due 2010 (aggregate commissions amounting to approximately
$5.0 million shared by three placement agents, including Lehman), for which Lehman was lead
or co-lead placement agent; (e) the February 2000 issuance of $115 million aggregate liquidation
preference of 7 ½% Series A preferred shares (aggregate commissions amounting to
approximately $4.0 million shared by three placement agents), for which Lehman was lead or
co-lead placement agent and Lehman exercised its over-allotment option with respect to an
additional $15 million aggregate liquidation preference of Series A preferred shares; and (f)
RSL's Consent Solicitation Statement, dated on or about September 13, 1999, to certain of
RSL's note holders, for which Lehman served as Solicitation Agent and received $750,000 in
compensation.  On at least three occasions during 1999-2000, the Lehman analysts covering RSL
upgraded or were "held off" from downgrading analyses of RSL for "banking reasons, "
including the investment banking business mentioned above.

A - 157

**Lehman's False and Misleading Statements During the Class Period**

72.     On May 3, 1999, RSL announced its plans to spin-off its Delta 3 subsidiary and offer Delta 3 common stock to the public in an IPO.  On September 3, 1999, RSL filed its registration statement for the Delta 3 IPO.

73.     On April 30, 1999, Lehman analysts had issued a Strong Buy rating (its then highest rating) for RSL shares, citing the importance of the Delta 3 IPO to the valuation of RSL shares.  In response to this report, RSL stock rose approximately $1 per share.

74.     On May 21, 1999, Lehman analysts reiterated the Strong Buy rating for RSL, emphasizing that RSL shares were "real cheap." In response to this report, the price of RSL's shares rose approximately $3 per share.

75.     After having met with RSL's management, Lehman analysts, on July 9, 1999, issued yet another bullish report on RSL containing a 1-Buy rating (its then highest rating) for RSL shares.  In response to this report, the price of RSL's shares rose approximately $2 per share.

76.     On September 3, 1999, RSL filed a registration statement with the SEC for the Delta 3 IPO, for which Lehman was appointed lead underwriter and received approximately $5 million in fees, commissions, and other compensation.

77.     The analyst ratings and reports concerning RSL referred to in paragraphs 73, 74, and 75 herein were false and misleading because Lehman knew or recklessly disregarded and failed to disclose that:

> 1.     it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

-23-

A - 158

2.    it caused the analyst covering RSL to upgrade or not downgrade his

research reports and/or ratings of RSL for "banking reasons, " including

but not limited to the fact that Lehman: (a) sought and won the lead

underwriter position for RSL's IPOs, including the lucrative Delta 3 IPO

spin-off; (b) sought and won the lucrative lead placement agent position for

RSL's issuance of Senior Notes and Series A preferred shares and

exercised its over-allotment options for the preferred shares; and (c) sought

and won the lucrative solicitation agent position, in connection with RSL's

Consent Solicitation Statement;

3.    its analysts were subject to financial conflicts of interest that adversely

impacted the independence of Lehman's research product, including

analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately supervise its analysts and protect the objectivity of

its published research;

5.    as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated throughout the Class Period.

78.    On September 7, 1999, with RSL trading at $20 3/16 per share, Lehman analysts

resumed its 1-Buy rating (its then highest stock rating) for RSL shares and evaluated RSL's

break-up value as exceeding $40 per share. Additionally, the analyst cited RSL's Delta 3 IPO as

"pure upside to our valuation" of RSL. Documents reveal that RSL, based on conversations with

analysts, in fact, thought little about Delta 3's long-term prospects after the IPO had been

-24-

successfully sold to investors. On November 1, 1999, Lehman analysts reiterated their 1-Buy rating with a price target of $40 per share for RSL shares and, as a result, RSL shares rose approximately $3 per share.

79.    The analyst ratings and reports concerning RSL referred to in the preceding paragraph herein were false and misleading because Lehman knew or recklessly disregarded and failed to disclose that:

1.    it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

2.    it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons, " including but not limited to the fact that Lehman: (a) sought and won the lead underwriter position for RSL's IPOs, including the lucrative Delta 3 IPO spin-off; (b) sought and won the lucrative lead placement agent position for RSL's issuance of Senior Notes and Series A preferred shares and exercised its over-allotment options for the preferred shares; and (c) sought and won the lucrative solicitation agent position, in connection with RSL's Consent Solicitation Statement;

3.    its analysts were subject to financial conflicts of interest that adversely impacted the independence of Lehman's research product, including analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately supervise its analysts and protect the objectivity of its published research;

5.       as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated throughout the Class Period.

80.     In February 2000, with RSL trading at $17 per share, the Lehman analyst drafted

but did not a issue a new report on RSL in which he lowered his revenue projections for RSL but,

nonetheless, maintained a bullish price target of $35 per share.  The first sentence of the text of

the draft report read: "we are revising our Revenue and EBITDA estimates for RSL to reflect

declining revenue from U.S. prepaid and wholesale and more moderate ramp in European retail

revenue."  Based on his prior experience, the analyst knew that his attempt to express his more

negative view of RSL would be resisted by Lehman's Investment Banking division.  On February

24, 2000, the analyst sent an email to his supervisor, captioned "RSL Note - Bankers are going to

resist," in which he enclosed his draft report, and stated:

> Below is a draft of a note lowering our numbers on RSL
> (maintaining our 1 rating) Recall we were a co. in their recent
> convert deal.  I've wanted to lower numbers for several months
> now, but have held back as 1) we led the DeltaThree IPO (was
> owned by RSL) and more recently were on the cover of the
> convert ....  I've given our coverage banker the courtesy of seeing
> this and preparing the company.  I know they are going to resist.
> I've been quiet on this too long, and I plan on going ahead anyway.
> [emphasis in original].

81.     The Lehman investment banker dealing with RSL prevailed on the analyst not to

issue the report and instead to meet with RSL management, and to reconsider his analysis.  As a

result, on March 2, 2000, the analyst issued a report that maintained the 1-Buy rating and $40

price target for RSL shares.  The first sentence of the text of the report touted that "RSL's

European unit posted strong sequential revenue growth in Q4..." On March 9 and 10, 2002, the

-26-

analyst issued additional reports on RSL in which he raised the price target to $50 per share.
Despite negative news about the Company, including lowered earnings expectations, on March
10, 2000, RSL stock had shot up to $32 per share.

82.    The analyst ratings and reports concerning RSL referred to in the preceding
paragraph herein were false and misleading because Lehman knew or recklessly disregarded and
failed to disclose that:

1.    it regularly used analyst research to obtain and/or maintain lucrative
investment banking business from companies it covered, including RSL;

2.    it caused the analyst covering RSL to upgrade or not downgrade his
research reports and/or ratings of RSL for "banking reasons, " including
but not limited to the fact that Lehman: (a) sought and won the lead
underwriter position for RSL's IPOs, including the lucrative Delta 3 spin-
off IPO; (b) sought and won the lucrative lead placement agent position
for RSL's issuance of Senior Notes and Series A preferred shares, and
exercised its over-allotment options for the preferred shares; and (c)
sought and won the lucrative solicitation agent position, in connection
with RSL's Consent Solicitation Statement;

3.    its analysts were subject to financial conflicts of interest that adversely
impacted the independence of Lehman's research product, including
analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately supervise its analysts or impose adequate controls in
order to protect the objectivity of its published research; and,

A - 162

5.     as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused

RSL's stock price to be artificially inflated throughout the Class Period.

83.    On March 16, 2000, the investment banker for RSL sent an email to the analyst's

supervisor praising the analyst's "open-mindedness" and crediting the analyst with raising RSL's

stock price:

> I just wanted to drop you a note to let you know of [analyst's]
> recent helpfulness in a touchy situation with RSL
> Communications.  RSL is a telecom company... and is the parent
> company of Delta 3 for which we recently led an IPO.  Following
> RSL's recent convertible notes issue (for which we were a co),
> [analyst] was inclined negatively toward the Company's prospects;
> however, he agreed to hold off on a downgrade (which would have
> harmed an important banking relationship) at the request of
> banking until he could hear out management.  [Analyst] met with
> the Company's CEO and was convinced positively, **he issued a
> positive report and was the axe behind significant positive
> momentum to the stock**.  The CEO praised [analyst's] open-
> mindedness and has indicated we will be included in the
> underwritings of their coming spinoffs.  Thus, [analyst] has helped
> our banking relationship with the client significantly. (emphasis
> added).

The supervisor forwarded the email to the analyst and wrote "good job & congratulations."

84.    On or about May 5, 2000, the Lehman analyst issued another report, reiterating

the 1-Buy rating on the stock and the $50 price target, despite the fact that the stock price had

declined to $15.50 per share and the Company had missed its revenue estimates by a substantial

amount.

A - 163

85.     The analyst rating and report concerning RSL referred to in the preceding paragraph was false and/or misleading because Lehman knew, or recklessly disregarded and/or failed to disclose that:

1.      it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

2.      it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons, " including but not limited to the fact that Lehman: (a) sought and won the lead underwriter position for RSL's IPOs, including the lucrative Delta 3spin-off IPO; (b) sought and won the lucrative lead placement agent position for RSL's issuance of Senior Notes and Series A preferred shares, and exercised its over-allotment options for the preferred shares; and (c) sought and won the lucrative solicitation agent position, in connection with RSL's Consent Solicitation Statement;

3.      its analysts were subject to financial conflicts of interest that adversely impacted the independence of Lehman's research product, including analyst ratings, reports, and price targets concerning RSL;

4.      it failed to adequately manage its analyst and protect the objectivity of its published research;

5.      as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated throughout the Class Period.

86.    By August 14, 2000 RSL's stock price had declined to approximately $4 per share. In an August 14, 2000 email, the analyst candidly complained to his supervisor about the influence Investment Banking had continued to exert over his research:

> Enough is enough. It's hard enough to be right about stocks, it's even harder to build customer relationships when all your companies blow up, you knew they were going to, and you couldn't say anything. Every single one of my companies has blown up in some fashion (or will - GBLX) and with the exception of PGEX, I haven't been able to speak my mind. I think I've been a team player, and I believe it is now imperative for the franchise that I be able to take action on bad situations.

87.    The analyst voiced particular concerns about RSL, stating "for the record, I have attempted to downgrade RSLC THREE times over the last year, but have been held off for banking reasons each time." (Emphasis in original.)

88.    Even after his complaint, the analyst did not downgrade RSL but rather simply was permitted to drop coverage of RSL in September 2000, devoting a few short sentences to the Company in a "Sector Report."

89.    The Sector report concerning RSL, referred to in the preceding paragraph herein, was false and/or misleading because Lehman knew, or recklessly disregarded and/or failed to disclose that:

1.    it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

2.    it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons, " including but not limited to the fact that Lehman: (a) had sought and won the lead underwriter position for RSL's lucrative Delta 3 spin-off IPO; (b) had

-30-

sought and won the lucrative lead placement agent position for RSL's issuance of Senior Notes and Preferred shares and exercised its over-allotment options for the Preferred shares; and (c) sought and won the lucrative solicitation agent position, in connection with RSL's Consent Solicitation Statement;

3.    its analysts were subject to financial conflicts of interest that adversely impacted the independence of Lehman's research product, including analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately manage its analyst and protect the objectivity of its published research;

5.    as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated throughout the Class Period.

90.    On December 29, 2000, RSL was trading at $0.20 per share and was de-listed from the NASDAQ stock exchange.

## GOLDMAN SACHS'S FRAUDULENT SCHEME

### Background

91.    Goldman Sachs is a leading global investment banking and securities firm that, offers underwriting services to companies seeking to sell their securities to the public. In addition to its prominent investment banking operations, Goldman Sachs also offers extensive services to its institutional investor clients and its private wealth management clients (principally

high net worth individuals), has an active securities sales and trading business, and maintains a

separate division to perform research on equity securities.

92.    For the companies for which Goldman Sachs provided equity research coverage,

including RSL, Goldman Sachs analysts issued periodic reports and made investment

recommendations.  During the Class Period, Goldman Sachs' equity research ratings included

four investment ratings:

>           **Recommended List** - expected to provide price gains of at least 10
>
> percentage points greater than the market over the next 6-18 months;
>
>           **Market Outperformer**- expected to provide price gains of at least 5-10
>
> percentage points greater than the market over the next 6-18 months;
>
>           **Market Performer**- expected to provide price gains similar to the market
>
> over the next 6-18 months;
>
>           **Market Underperformer**- expected to provide price gains of at least 5
>
> percentage points less than the market over the next 6-18 months;

93.    In addition to ratings, the research reports generally contained Goldman Sachs's

analysis of the covered company's financial prospects.

**Investment Banking Division's Relationship
to and Influence on Research Division**

94.    Goldman Sachs held itself out as generating and providing research reports that

were the product of objective research and the honest and independent opinions of the firm's

research analysts.  The research reports and ratings of companies covered by Goldman Sachs

analysts as well as Goldman Sachs's list of recommended stocks were made available to

Goldman Sachs's institutional investor clients and its private wealth management clients,

principally high net worth individuals.  Additionally, the substance of Goldman Sachs's research reports was often reported in the U.S. and world financial press.

95.    Goldman Sachs's research, or the content of its research, was disseminated by various means, including: mail, facsimile, distributions at client meetings, e-mail, Goldman Sachs's research website, telephone conversations involving analysts and salespersons, and as part of analysts' appearances in the financial news media, as well as seminars and industry conferences.

96.    Research coverage by Goldman Sachs analysts was a critical factor many issuers took into account in awarding its investment banking business.  Goldman Sachs's research analysts' reputations for working in tandem with investment bankers and evaluating and marketing investment banking business was a big incentive for issuers.

97.    In connection with its marketing and coverage decisions, Goldman Sachs implemented a Research Alignment process whereby the Investment Banking , Equities, and Research Divisions would "work collaboratively to insure a strategic alignment of [Goldman Sachs's] business - that the biggest opportunities for investment banking and equities were being covered , that [Goldman Sachs] had the right Research resources in the right places, and that [Goldman Sachs's] Research reputation for independent and thoughtful analysis was sustained if not enhanced." The alliance of Goldman Sachs's Investment Banking and Research Divisions "insur[ed] that companies of strategic and/or commercial importance to both IBD and Research are covered by an analyst and a banking team... [I]deal candidates for coverage are those that are franchise defining, and/or those that offer a meaningful opportunity for significant revenue in the relatively near term."

-33-

98.    Sector captains were appointed within Investment Banking to "coordinate all banker requests for Research coverage; work with IBD teams and ECM [Equity Capital Markets] to establish priority rankings within the sector and reach consensus with Research counterparts."

99.    At Goldman Sachs research retreats, analysts were instructed that Investment Banking sector captains were to "[w]ork directly with Research counterparts to agree on names and timing" of companies to be covered to "[d]etermine IBD priority ranking of each company needing Research, including rationale and timing."

100.    Representatives of Investment Banking and Research met periodically to review companies that were candidates for research coverage. In May 2000, the head of Research reported: "Of the 63 companies highlighted which offered equity opportunities over the next 12 months or which were SuperLeague targets, 40 are now considered no longer active, 9 have been picked up by Research, and 14 still need coverage, based on the recent banker input ..."

101.    The Research Alignment process was designed to ensure that the various interested areas of the firm (including Investment Banking and Equities) had effective input into critical decisions concerning the initiation of analyst coverage.

### Goldman Sachs's Compensation Structure and Analyst Performance Review

102.    Analyst compensation at Goldman Sachs was based largely on performance reviews, which often made reference to analysts' contributions to investment banking revenue. Comments in analysts' evaluations indicated that analysts were involved in many aspects of investment banking-related activities and reflected analysts' beliefs that participating or assisting in investment banking activities was a factor in determining analyst performance and compensation.

A - 169

103.    Goldman Sachs introduced a new program, in June 2000, to strengthen "firmwide marketing... including how we leverage our brand, advertise, and in particular, cross sell ...." Strengthening cross-selling efforts was defined as a "top strategic priority for 2000." A $50,000.00 award was created to recognize individuals across all divisions of the firm who "cross-sell or help deliver a significant mandate to another business unit or division."

104.    Analysts were evaluated as part of the firmwide "360 degree" review process. Analysts were evaluated not only by supervisors, peers, and subordinates in the Research division, but also by employees in other divisions and departments of the firm with whom the analyst had worked , including Investment Banking, Equity Sales, and Trading.

105.    Some analyst evaluations referred to investment banking revenues for transactions in which the analyst had a role, as well as to the fact that analysts were involved in many aspects of investment banking.  For example:

a.      In one evaluation, an analyst was referred to as: "Very hard working, focused and eager to do a good job and win business." Moreover, the analyst was: "Becoming much more proactive about sharing info with banking.  Well focused on banking issues and GS [Goldman Sachs] business overall."  Another evaluation of the same analyst commented that: "He is a great help to the Banking franchise."

b.      An evaluation of another analyst stated: "She did a super job with the IB client as well as investors ... She became more comfortable over time that IB- fee paying potential should be a consideration in her list [of companies to cover].  I strongly suggest that she use the resources that IB offers as she works evaluating companies (e.g. when changing her [financial] model, please inform/ consult the IB team).

A - 170

c.      A comment about another analyst stated: "Hard to say how much of poor investment decisions have been because banking drove the outcome."

d.      An evaluation of RSL analyst Frank Governali stated: "Frank is swamped and needs help.  The demands placed upon him by his banking duties threatens the very franchise that has allowed him to become such a powerful banking asset."

e.      An evaluation of another analyst stated "There are still times when [analyst] does not think commercially about a client.  There have been times when [analyst] is going to see an important CEO target and no one from banking is even aware that he has the meeting."

**Analyst Business Plans**

106.    Goldman Sachs analysts were required to develop business plans.  One critical area covered in business plans was how analysts planned to assist the firm's investment banking efforts.  Goldman Sachs created and distributed business plan forms to analysts, in order to find out from analysts:

a.      "How much of your time will be devoted to IBD?"

b.      "Are you using/managing IBD effectively?  How can you work more effectively with IBD to exploit the opportunities available to the firm? What specific opportunities do you see?  Do you have alignment - do you have counterparts in IBD you work with to approach business in an integrated fashion?  How can IBD help you in conferences, client meetings, etc?"

c.      "What stocks do you plan to add at current team size?... Have you discussed this coverage with relevant IBD, Equities and other users?"

-36-

      d.      "With which corporates do you have a better relationship with senior management than IBD does?  How will you use that to enhance GS business opportunities?

107.     Analysts' responses included:

      a.      In response to the question "what are the three most important goals for you in 2000?" -- one analyst replied: "1. Get more investment banking revenue." 2. Get more investment banking revenue. 3. Get more investment banking  revenue."

      b.      Another analyst commented: "My two most important company specific research reports in 2000 will likely be the initiation of coverage reports of the two Latin American e-Finance companies that we may IPO this year."

      c.      An analyst expressed the view : "flexible/opportunities" for  research can be a "big business driver for GS."

      d.      In response to a question that asked analysts to identify the research firms that do a better job than Goldman Sachs, one analyst remarked about the firm Sanford Bernstein: "Bernstein also gives us a run because they have equivalent manpower to what we have, but they cover only about a half as many stocks and don['t] have any banking business.  We just have an incredibly difficult time beating the thought leadership these guys are able to put back on the table as a result of that focus."

108.     Analysts assisted investment banking by using their industry knowledge to identify potential investment banking opportunities.

-37-

109.   An analyst wrote to an investment banker that he wanted to "harmonize with you strategically," in order to pursue an investment banking opportunity.

110.   In October 1999, an analyst sent an e-mail thanking equity salespeople and private wealth management representatives at Goldman Sachs for arranging an investor road show at a certain company.  The day after the road show was completed, the company awarded Goldman Sachs a mandate to repurchase 5% of the company's outstanding stock.  The analyst stated: "your efforts have already borne positive fruit" because "Goldman Sachs received the mandate for [this share repurchase] as a direct reward for the work you all did."

111.   In an April 2000 e-mail, a Goldman Sachs investment banker advised two Goldman Sachs analysts that, for an investment banking pitch to a potential issuer, they "come prepared to SELL." The banker proposed that the "pitch" include a draft research report on the potential issuer so that Goldman Sachs could demonstrate to the issuer that "we are so excited about the story that we have already begun writing the report."  The analyst predicted to the investment bankers: "WE WILL WIN THIS MANDATE!!!!"

112.   RSL analyst Frank Governali received credit from a Goldman Sachs banker for being the determining factor in winning an early 2000 IPO: "Frank was fully involved in pitching this and thanks to him, we received a sole-book mandate with the Joint lead of [another investment bank]." Moreover, the banker reminded analysts that their "input will be critical to the success of this IPO."

### Assistance in Explaining and Marketing IPOs to Institutional Investor Clients

113.   Goldman Sachs analysts often assisted in marketing IPO securities.  One issuer's "Lead Banker Selection Criteria" stated: "Need to understand commitment of senior analysts that

-38-

they will be the 'lead' research analyst on the deal and in the aftermarket." This commitment
was understood to include the following with respect to analysts:

> a.   "Spending time personally with the CFO to refine model and define
>      appropriate IPO and ongoing business metrics."
>
> b.   "They personally will pro-actively market [the issuer] to the institutional
>      community and be available on a regular basis to respond to institutional
>      investor questions."

114.   An analyst commented about an issuer's stock offering: " I have been out
aggressively telling the story, and the volume has picked up noticeably."

115.   Responding to complaints by a potential issuer about a downgrade of the sector,
an analyst told the potential issuer: "Again, I want to stress that both [analyst] and I remain
committed to the short and long-term success of [potential issuer]."

116.   In self-reported time estimates for 2000, one analyst estimated he spent 40% of
his time in investment-banking related activities, while another analyst estimated his investment
banking-related activities consumed 55% of his time.

117.   In 1999, analysts estimated they spent up to 75% of their non-Research time on
Investment Banking matters.

**Research alignment effectiveness.**

118.   Goldman Sachs commented on its year 2000 "Global Investment Research IBD
Alignment Process, " as follows: "US Investment Research appears to be on the right track with
our IBD alignment initiative."  Specific comments included:

> a.   "[R]esearch analysts, on 429 different occasions, solicited 328
>      transactions in the first 5 ½ months of this fiscal year."

A - 174

b.      "Research was involved in 82% of all 'won business' solicitations."

c.      "Research was involved in 49% of 'lost business' solicitations."

d.      Only 4.3% of all IBD 'lost business' was attributed to lack of research
coverage."

e.      "IR [Investment Research] was involved in 31 mergers amounting to $56
billion."

f.      "IR was involved in 209 financing transactions not reported in Market
View amounting to $83 billion."

g.      "In addition to financings, US IR was involved in a significant number of
merger advisories, solicitations, and other transactions which have either
not yet closed or were not captured [in the] database."

**Influence of Investment Banking Personnel on
Research and the Timing of Research Coverage**

119.    Analysts sent drafts of research reports to investment bankers before publicizing
them.  In one case, an advance copy of changes to a research report was sent to investment
bankers for their comments, in order to "to speed up the approval process."

120.    One analyst revealed: "Since our banking ties are so close to each one of the
companies mentioned above along with the fact that these companies are direct competitors with
each other, it is incredibly difficult to voice strong opinions in these sectors."

121.    In early 2000, a Goldman Sachs investment banking client complained that
Goldman Sachs had yet to initiate research coverage on his company.  The client emailed a
Goldman Sachs investment banker, informing her that its stock was "dropping like a rock," and
stated: "Our hopes were that a buy coverage from our lead banker might help stabilize the

-40-

stock." In response, Goldman Sachs investment bankers complained to analysts, who asserted that "[w]ith research commitment committee approval and an improvement in the market, research coverage is imminent."

### Goldman Sachs's Investment Banking Division Had Input into the Hiring of Goldman Sachs's Analysts.

122.    Recruitment and hiring of analysts involved significant input from Goldman Sachs's investment bankers.

123.    In January 2000, an investment banker had complained that Goldman Sachs's research resources were inadequate and, therefore, additional analysts were needed to be hired in order to prevent loss of substantial revenue business.

124.    In March 2000, Goldman Sachs was considering hiring an analyst from a competing firm. The candidate's first interview was with a Goldman Sachs investment banker. The investment banker was later asked to comment on her "comfort level" with the prospective analyst.

### Discussion of Research Capabilities in Goldman Sachs Pitchbooks

125.    Some Goldman Sachs investment banking pitches included discussions of benefits issuers would receive from Goldman Sachs, including obtaining research ratings from Goldman Sachs analysts.

126.    An October 2000 pitchbook explained the "[r]ole of investment research analyst" as "creating the story . . . marketing the story . . . [and] following the story." Another pitchbook included a list of the various ratings provided by the analyst on the companies he covered and cited to "[g]lobal sales effort led by analysts," and contained a diagram highlighting the crucial role Goldman Sachs analysts play in an initial public offering.

-41-

127.    Another pitchbook said: "[Goldman Sachs analyst] has sold more stock than any research analyst in the sector."

**Goldman Sachs's Investment Bankers Had Input into Research Coverage**

128.    Investment Banking and Equities personnel had input into decisions regarding the initiation and termination of research coverage.

129.    For example, after having received numerous bullish reports from Goldman Sachs analysts, RSL stock had finally dropped below $1.50 per share on October 11, 2000.  On the same day, an analyst sent an e-mail to Frank Governali asking when Goldman Sachs could finally drop coverage of RSL.  Governali responded: "Good que[s]tion.  I'll call the bankers soon and ask their view."

130.    An investment banker informed an analyst in 2000 that the head of Research had approved dropping coverage of various companies he covered.

131.    In September 30, 1999, an investment banker sent an e-mail to Goldman Sachs analyst Robert Pomeroy, who, along with Frank Governali, covered RSL, stating:  "Our list for you to publish on from the IBD front is (in order): . . ."  The banker listed five issuers, four of which were described as investment banking prospects.

132.    A 360 degree review of one analyst stated: "Initiated coverage of . . . [two examples cited] promptly after being co-manager on the initial public offering.  NOT picking up coverage of [another company] as the company stiff-armed IBD when selecting underwriters."

133.    In another 360 degree review of an analyst, an investment banker stated: "we have probably pushed her into research on companies where maybe she shouldn't have been or we did not have the client firmly commit[ed] enough on business before she covered them."

A - 177

**Analyst Discussions About Research**

134.    In August 2000, James Golob, the co-head of Goldman Sachs's global

telecommunications services, wrote to RSL analyst Governali, the other co-head, about the

"anomalous situation where our sector has been tanking for 3-4 months and we globally still

have a majority of stocks as R[ecommended] L[ist]s as that is all the salesmen and clients care

about". Golob suggested that Governali at least consider the approach he had taken: "In Europe,

we have found that honour is preserved if we have a stock as an M[arket] O[utperformer] and the

companies can't complain because [it's] better than an M[arket] P[erformer]." Governali

responded that he had planned "to re-state most of the CLECs, which is where the problem is

most egregious. The ratings were a residual from [a departed analyst], and I never changed

them, not wanting to disrupt things too much. But, its ridiculous. I've already met with the

bankers, and plan to move most of the companies down to M[arket] O[utperformer], from

R[ecommended] L[ist] before [another analyst] takes over completely in September . . . I don't

think I would end up leaving only 7.5% as R[ecommended] L[ist], but the present 68% is

ridiculous."

135.    In August 2000, an analyst complained that Goldman Sachs's investment bankers

had maligned him "for lowering the [price] target from stupid heights to the merely absurd."

136.    One analyst's self-evaluation contained the admission that he : "[h]as

subordinated personal preferences on recommendations [citing two examples] for 'commercial'

reasons."

**Research Ratings.**

137.    The percentage of companies that received Goldman Sachs's top two investment

ratings (Recommended List or Market Outperformers) reached 72%, in the first quarter of 1999,

A - 178

and fell to 50% in the last quarter of 2001. The percentage of companies that received Goldman

Sachs's worst rating, Market Underperformer, never rose above 1.1% during this time.

138.    The number of companies for which Goldman Sachs ceased providing research

coverage increased from 1, in early 1999, to 280, at the end of 2001. Some of these companies

may have declared bankruptcy or ceased to exist during this period. In some cases, Goldman

Sachs ceased covering bankrupt companies without first having downgraded their ratings. A

Goldman Sachs analyst questioned whether this was the "proper protocol with respect to a

bankrupt company."

139.    A comment made about one analyst stated: "... he communicates what he really

thinks to a select few, his public ratings have been an embarrassment to the firm."

**Draft Research Reports and Expected Research Ratings Were
Shared with Issuers and Goldman Sachs's Investment Bankers.**

140.    Goldman Sachs permitted covered companies to review its draft research reports.

141.    Goldman Sachs further permitted analysts to give investment bankers and covered

companies a "heads up" on the rating to be assigned to a company after the

market closed, the day before a report was to be issued.

142.    For example, an investment banker had suggested that the Research Division get

input from certain issuers "BEFORE this piece is published." To this suggestion, RSL analyst

Frank Governali responded: "we wouldn't think of publishing this without direct input from the

company and their review of the report."

143.    In September 2000, following news of a possible merger between two large

telecommunications providers, Governali wrote a research report on one of the companies.