Because Goldman Sachs was providing advisory services to the company, Governali asserted
that he "had to talk to our bankers and l[a]wyers before it went out."

144.   Additionally, an analyst wrote to Governali that she had changed the content of
her report in order to satisfy a company/issuer, as follows: "included [the issuer's]
extensive comments . . . I also said we had slightly smoothed the negative edge (emphasis
section up front and text) from when they saw the report." Moreover, the analyst said she
"promised them I'd re-email the final report tonight so they could see our changes." Despite the
analyst's efforts, the issuer's officers complained to Governali that the research report was not
sufficiently favorable.  In response, Governali promised the company that "such an important
industry report which is going to have profound implications will be to their liking."

### Other Comments Made by Frank Governali

145.   In an email, dated January 19, 2000, Governali wrote that he was not available to
discuss stock valuations on a certain stock because he was fearful such discussions would "taint
our ability to do the IPO," and that, in any event, he was involved "in a banking pitch right
now."

146.   In an email, dated sometime in January 2000, Governali e-mailed a friend at
another investment bank that: "It's been a good first month, and its [sic] been very busy.  There
has not been a day when we're not involved with some deal..."

147.   In an email, dated February 29, 2000, Governali revealed to a Goldman Sachs
research associate that he was "inundated with deals" and, thus, could not return her calls.

148.   In an email, dated March 23, 2000, Governali revealed the extent of his
preoccupation with deal making.  Since he had "four deals in the market simultaneously," he had
in fact spent the entirety of his vacation time on the phone "dialing for dollars."

149.   In an email, dated June 26, 2000, Governali revealed that slides used in an

emerging telecom companies conference had been manipulated by "banking."

150.   In an email, dated, July 20, 2000, Governali requested the attendance of his

analyst colleagues at a meeting with Goldman Sachs bankers in order to discuss "gameplans and

priorities."

151.   In an email, dated July 20, 2000, Governali discussed RSL management's

complaints concerning a research note drafted by another Goldman Sachs analyst, Robert

Pomeroy, who had worked closely with and was supervised by Governali, with respect to RSL

coverage, in Goldman Sachs's Portland, Maine office.  In an email sent to Pomeroy that same

day, Governali asked:  "what happened with RSL - I thought the company...knew in advance

everything you were doing with the notes?"

152.   In an earlier email to a Goldman Sachs investment Banker and Governali, dated

October 2, 1999, Pomeroy had complained that RSL "think[s] the investment rating is purchased

and are shocked when the analyst wants to do some work."

153.   Sometime in August 2000, Pomeroy "resigned" from Goldman Sachs.

**Goldman Sachs's Banking Business with RSL**

154.   Goldman Sachs had substantial Investment Banking relationships with RSL.

Goldman Sachs was lead or joint-lead underwriter/placement agent in various of the Company's

public offerings (which yielded in excess of $64 million in total investment banking fees),

including, but not limited to: (a) the RSL IPO in late 1997; (b) RSL's Delta 3 spin-off IPO, for

which Goldman Sachs received substantial fees, commissions, and other compensation; (c) the

February 2000 issuance of $200 million in 12 7/8% Senior Notes due 2010 (aggregate

commissions amounting to approximately $5.0 million to three placement agents, including

-46-

Goldman Sachs); (d) RSL's issuance of $115 million aggregate liquidation preference of 7 ½%

Series A preferred shares (aggregate commissions amounting to approximately $4.0 million to

three placement agents, including Goldman Sachs), and for which, in March 2000, Goldman

Sachs exercised its over-allotment option with respect to an additional $15 million aggregate

liquidation preference of Series A preferred shares; (e) the May 1999 offering of 9 7/8% Senior

notes due 2009, for which Goldman Sachs was appointed lead placement agent and received

commissions of approximately $1.1 million.

### Goldman Sachs's False and Misleading Ratings and Reports on RSL

155.    After having issued numerous reports on RSL since 1998, on or about September

21, 1999, Goldman Sachs analysts issued new research reports on RSL that added RSL to its

Recommended List (RL), Goldman Sachs's highest stock rating, and issued a price target of $42

per share, notwithstanding the Company's serious earnings problems and devastating

restructuring charges.  On September 3, 1999, RSL had filed a registration statement for the

Delta 3 spin-off IPO.  In May 1999, RSL issued 9 7/8% Senior notes due 2009, for which

Goldman Sachs was appointed lead placement agent and received commissions of approximately

$1.1 million.

156.    On or about February 1, 2000, Goldman Sachs conducted a road show for RSL.

The road show featured Goldman Sachs's analysts' upbeat, bullish research reports concerning

RSL.  Such bullish reports had continued unabated, since, at least, September 1999.

157.    The road show showcased the Company's $115 million in Series A preferred

shares and $200 million in high yield Senior Note offerings, for which Goldman Sachs had won

the lucrative positions of co-lead placement agent.

158.    In March 2000, Goldman Sachs maintained its bullish reports on RSL stock, which had shot up to $32 per share, despite increasing concerns about RSL's prospective earnings which were significantly lowered.    In March 2000, as well, Goldman Sachs exercised its over-allotment option with respect to an additional $15 million aggregate liquidation preference of Series A preferred shares and, consequently, earned millions of dollars in fees, commissions, and other revenue.

159.    On July 18, 2000, pursuant to a prospectus, Form S-3/A, filed with the SEC, Goldman Sachs had gained the rights to sell 282,998 RSL converted Series A preferred shares to the public.    Despite a massive $48 million write-down to RSL's 2Q00 earnings which resulted in a huge loss of equity value, on or about this same date, Goldman Sachs published a report stating that RSL shares would outperform the overall market (from RL to MO rating).    Also on that day, the CNBC financial news network reported that RSL's share price had fallen due to "comments by Goldman Sachs," relating to the MO rating that Goldman Sachs had issued.    RSL shares would have fallen further, but for Goldman Sachs's policy of changing RL ratings to MO, in order to retain "honour" and to keep the many companies with which it conducted investment banking business, such as RSL, placated.

160.    The analyst ratings, reports, and price targets referred to in paragraphs 155, 156, 158, and 159 herein were false and/or misleading because Goldman Sachs knew or recklessly disregarded and failed to disclose, that Goldman Sachs:

1.    regularly used analyst research to obtain and maintain lucrative investment banking business from companies it covered, including RSL;

2.    caused the analysts covering RSL to assign and maintain bullish ratings for RSL stock, in order to pursue and win and/or maintain investment

-48-

banking business from RSL, including but not limited to: (a) appointment as underwriter for RSL's lucrative Delta 3 spin-off IPO; (b) the lucrative lead placement agent positions for RSL's May 1999 and February 2000 issuance of its Senior Notes, as well as Series A preferred shares, including rights to exercise over-allotment options and sell RSL's converted Series A shares to the public;

3.  analysts were subject to financial conflicts of interest that adversely impacted the independence of its research product, including analyst ratings, reports, and price targets, concerning RSL;

4.  failed to adequately manage and supervise its analysts or impose adequate controls in order to protect the objectivity of its published research, including allowing companies, including RSL, to review and approve analyst reports prior to being published;

5.  as a result of the foregoing, its analysts issued more positive reports and ratings, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated, throughout the Class Period.

161.  On December 29, 2000, RSL was trading at $0.20 per share and was de-listed from the NASDAQ stock exchange.

## MORGAN STANLEY'S FRAUDULENT SCHEME

### Background

### The Investment Banking Function at Morgan Stanley

162.   Morgan Stanley frequently served as the lead underwriter in IPOs as well as follow-on offerings of securities, including those of RSL.

163.   Investment banking was an important source of revenues and profits for Morgan Stanley.  In 2000, investment banking revenues exceeded $4.8 billion, or approximately twenty-four percent of Morgan Stanley's total new revenues.

### The Role of Research Analysts at Morgan Stanley

164.   Research analysts at Morgan Stanley covered a broad range of industry sectors and published periodic reports on companies within those sectors.  Through 2001, Morgan Stanley's equity research department had a system for rating covered companies, from most to least positive, as "Strong Buy," "Outperform", "Neutral", or "Underperform." Analyst reports were disseminated to Morgan Stanley clients by mail and facsimile and by financial advisors. Research reports were also made available to retail clients on Morgan Stanley's web site.  In addition, certain industry reports were also available on Morgan Stanley's publicly-accessed web site.  Certain institutional clients of Morgan Stanley could also access research reports through the First Call/Multex subscription service.  The financial news media often reported Morgan Stanley analysts' ratings, and analysts often appeared in print and electronic media.

165.   Morgan Stanley analysts also played an important role in assessing potential investment banking transactions, particularly IPOs.  Morgan Stanley's stated objective was, as lead underwriter, to take companies public and to have its research analysts serve as gatekeepers to the IPO process.  Research analysts who endorsed an IPO candidate participated in the

competition to obtain the investment banking business and, if Morgan Stanley was selected as
lead underwriter, helped market the IPO to institutional investors and explain the IPO to the
firm's institutional and retail sales forces, and then issued research on the company.

166.    During the Class period, senior analysts at Morgan Stanley published individual
research reports without pre-publication review by research department supervisors.  While
reports were minimally reviewed for grammatical errors and compliance with certain legal
requirements, there was no system in place for reviewing the recommendations for price targets
included in the reports of senior analysts prior to their publication.

### The Relationship Between Investment Banking and Research
### Created Conflicts of Interest for Morgan Stanley Research Analysts

167.    Morgan Stanley created and maintained conflicts of interest for the firm's
research analysts with respect to investment banking considerations.  These conflicts arose due
to the analysts' involvement in helping to win investment banking business for Morgan Stanley.
Reports from analysts, if negative, could prevent the firm from winning the banking business
from both prospective and actual clients.

168.    Morgan Stanley typically competed with other investment banks for selection as
the lead underwriter, or "bookrunner," for securities offerings, including IPO and follow-on
offerings.  Significant rewards were at stake in these competitions.  Sole or joint bookrunners
generally received the largest portion of underwriting fees, which were typically divided among
participating investment banks.  The bookrunner also established the allocation of shares in an
offering, and typically retained the greatest number of shares for itself.  The typical IPO,
including the RSL IPO, generated millions of dollars in investment banking fees for Morgan
Stanley.

A - 186

169.   As part of the package of services it offered to issuers to win investment banking business, Morgan Stanley would offer the initiation or continuance of research coverage. If Morgan Stanley won the banking competition, research coverage would, in fact, be initiated or continued. Thus, Morgan Stanley used its analysts as a marketing tool to help secure banking business. The promise of future research coverage was often a critical selling point that enabled Morgan Stanley to obtain millions of dollars in investment banking fees. Research coverage was a critical part of a package of services for which Morgan Stanley was compensated in those investment banking deals.

170.   Analysts also played an important role in Morgan Stanley's pitches for banking business. Along with the investment bankers, analysts were typically presented as part of the Morgan Stanley "team that would consummate the transaction." The pitchbooks typically dedicated several pages to analysts' experience, credentials, and specific roles in the completed transaction. Analysts drafted portions of the pitchbooks and almost always attended the presentations for IPO business. The pitchbooks favorably compared Morgan Stanley analysts to their counterparts at competing firms, citing their rankings in analyst polls and other measures. Morgan Stanley typically identified its analysts as a critical factor that issuers should consider in selecting Morgan Stanley for their investment banking business needs.

171.   In its pitches to obtain investment banking business, Morgan Stanley typically promised future research coverage. For example, in pitchbooks provided to iBean Broadcasting Corp., Morgan Stanley promised to "provide ongoing research coverage and aftermarket trading" and, in another instance, committed that "coverage would be initiated immediately after the quiet period. Additional research reports will follow on a regular basis thereafter." Morgan Stanley won the iBeam IPO business and received investment banking fees of approximately

-52-

$3.8 million. Morgan Stanley made comparable commitments to other prospective banking clients, including RSL. Additionally, Morgan Stanley pitchbooks often identified the specific number of reports its analyst published on other companies, giving implicit guidance on how many reports issuers could expect to receive if they selected Morgan Stanley as their lead banker.

172.    In other instances, Morgan Stanley pitchbooks identified a particular analyst's history of issuing Strong Buy and Outperform ratings on other companies. Moreover, some pitchbooks identified instances in which other stocks covered by a Morgan Stanley analyst increased in price following their IPOs. For example, Morgan Stanley provided pitchbooks to Transmeta Corp. in July 2000, emphasizing how one analyst's "support" of IPOs since 1997 had "resulted in unparalleled performance in the public market," and included a line graph showing a dramatic increase in the stock's price from 1998 through March 2000.

173.    In addition to pitchbooks, Morgan Stanley occasionally provided draft or "mock" research reports to issuers to provide examples of how analysts might describe the issuer to investors. The draft or mock reports always described the issuers in favorable terms.

174.    Morgan Stanley's commitments to provide research coverage were not limited to pitches for IPO business. Morgan Stanley frequently obtained investment banking business for follow-on offerings of companies that its analysts did not cover, by promising to initiate future coverage.

175.    Morgan Stanley consistently honored its commitments to provide, initiate, or maintain coverage after it won investment banking business.

176.    In Morgan Stanley's annual performance evaluation process, some analysts and bankers noted their success in obtaining banking fees by promising future research coverage.

A - 188

For example, in a November 3, 1999 e-mail, an investment banker specified several banking transactions that Morgan Stanley had won because it committed a highly-rated analyst to initiate research coverage.  Specifically, the banker wrote that Morgan Stanley had won two transactions totaling $13.4 million in fees "just for promising that [the senior analyst] would pick up coverage after the deals."  The banker observed that "enraged" competing firms complained that it was "unprecedented" to give an underwriter with no previous research coverage such a high share of the fees, and added: "The response from the CEO to those firms - 'you don't have [the senior analyst].'"  Analyst evaluations, as well as internal Morgan Stanley documents, identified additional instances whereby Morgan Stanley won investment banking business simply by making commitments to initiate coverage.

### Investment Banking Concerns Influenced Morgan Stanley's Decisions on Whether to Initiate or Continue Research Coverage

177.    Morgan Stanley's decisions on whether to initiate or continue research coverage was determined by the companies' decisions to award Morgan Stanley investment banking business.

178.    Morgan Stanley analysts declined to cover some companies that refused to award investment banking business to Morgan Stanley.  One senior analyst wrote in a year 2000 self-evaluation that he had declined one company's request for research coverage for four years, and added that he had "insisted that we first be mandated on a large investment banking transaction." When the company provided Morgan Stanley with banking business in connection with a spin-off, the analyst initiated coverage with a bullish Outperform rating.

179.    In a senior analyst's self-evaluation for year 2000, the analyst stated that "when we miss a winning IPO, we should work like crazy (with tons of ideas) to secure a spot as M&A advisor (USWeb/CKS) or book running manager on follow-on offerings (eBay)."

### Morgan Stanley Research Analysts Performed Investment Banking Functions

180.    Morgan Stanley research analysts performed a number of investment banking-related functions, including identifying potential IPO and merger and acquisition transaction candidates for the investment banking department, participating in soliciting investment banking business for the firm, and participating in road shows and other efforts to sell Morgan Stanley-underwritten IPOs and secondary offerings to institutional investors.  Analysts also discussed business strategy with investment banking clients; one senior analyst was described as a "relationship manager" with investment banking clients.

181.    Morgan Stanley kept records of each analyst's contribution to investment banking revenues.  Each year, a "Revenue Share Analysis" was prepared, specifying every investment banking transaction in which each analyst had participated, the revenues secured from each transaction, ratings on a scale of 1 to 5 (5 being "critical" to the deal) of the analyst's contribution to the transaction, and a calculation of the analyst's "share" of the credit for the revenues secured from the transaction.  The Revenue Share Analysis also recorded investment gains on Morgan Stanley investments in companies covered by the analyst.

182.    One senior analyst's involvement in investment banking activities was so pervasive that investment bankers at the firm considered the analyst to be an investment banker.  One banker wrote that the analyst was the most committed and focused banker with whom he had ever worked.  Another banker wrote that the analyst was a "commercial animal."  The analyst's supervisor wrote, in 1999, that the analyst's focus was primarily on banking and that,

-55-

A - 190

notwithstanding the growing demand for the analyst's time on investment banking matters, the
analyst needed to devote more attention to institutional investors and the firm's institutional sales
force.

183.    The same analyst's self-evaluation prominently highlighted his assistance to
investment banking in selecting and generating investment banking business and large fees,
stating: "Bottom line, my highest and best use is to help MSDW win the best Internet IPO
mandates (and to ensure that we have the appropriate analysts and bankers to serve the
companies well). . ." The analyst also prominently listed the deals and revenues from her
investment banking-connected efforts, as follows:

> **Internet Investment Banking, a Record Year with $205MM+
> YTD Revenue, [20+] Pending Financings, Co-Coverage
> (Leverage) in 85% of Cases, 6 of 6 Tech IBD Revenue
> Generating Clients, Internet Category was #1 Revenue
> Generator in Tech IBD ($505MM YTD Tech Revenue) . . .**
> (Emphasis in original.)
>
> Ok, the numbers (see Attachment A): Forty investment banking
> transactions ($143MM in fees) . . .
> It's notable that 96% of the $205MM in revenue was derived from
> clients new to the firm since 1995! Exceptions were America
> Online, Compaq, Hearst and Sotheby's. **And, I have been very
> involved in this business**. (Emphasis added.)

### Research Analyst's Compensation

184.    Participation in investment banking activities was the determining factor in
awarding compensation to Morgan Stanley research analysts.  Thus, analysts faced conflicts of
interest between helping win investment banking business for Morgan Stanley and publishing
honest and accurate research that, if negative, could prevent Morgan Stanley from winning
banking business.

-56-

185.    The annual salaries paid to senior Morgan Stanley analysts typically were comparatively small components of their total annual compensation.  The majority of their total annual compensation was paid in the form of a bonus.  In 2000, one senior analyst received a year-end bonus that was 90 times greater than her base salary.

186.    The total compensation paid to analysts was based on the investment banking fees that Morgan Stanley received.  Thus, the success or failure of the investment banking division determined the amount of funds available for analyst compensation.

### Analysts Rated Their Contributions to Investment Banking

187.    The level of analysts' contribution to investment banking was an important factor in the annual evaluations of Morgan Stanley's analysts and, consequently, their compensation.

188.    As part of the annual performance evaluation process, analysts were required to submit self-evaluations that, among other things, discussed their contributions to Morgan Stanley's investment banking business.  Analysts' self-evaluations often included discussions of analysts' involvement in investment banking, including descriptions of specific transactions, the fees generated, and roles the analysts played in deals.  For example, the 1999 self-evaluation of one analyst identified forty transactions in which he was involved that year which generated a total of $143 million in fees for Morgan Stanley.

189.    As part of the evaluation process, analysts rated their contributions to specific banking transactions.  Analysts were instructed to complete a Transaction Summary Worksheet ("TSW") in which they graded their roles in specific deals on a scale of 1-5.  Instructions provided to each analyst described the rating system as follows:

> 5 = critical to deal
>
> 4 = important to development and execution

3 = solid contribution

2 = limited contribution

1 = contribution limed to provided research coverage

190.    Analysts were instructed to reveal whether the "promise of coverage was critical to winning" a given investment banking mandate. Analysts were also instructed that supplying this information was an "important part" of the evaluation process.

**Investment Bankers Evaluated Analysts' Performance**

191.    Moreover, Morgan Stanley also solicited and received investment bankers' assessments of analysts' performance. Morgan Stanley's liaison between the research and investment banking divisions compiled and summarized the bankers' evaluations of the analysts' role in each deal, and then prepared a final TSW listing for each transaction that provided a joint evaluation of the analysts' contributions to each deal.

192.    Finally, as part of Morgan Stanley's "360 degree" review process, in which employees confidentially reviewed one another, investment bankers submitted written opinions of analysts with whom they worked.

193.    Investment bankers thus played a major role in the annual evaluation of research analysts by providing substantive information that was considered in the year-end evaluation process and in the determination of the analysts' compensation for that year. The investment bankers' role in the evaluation process created a conflict of interest for the analysts, who wanted positive evaluations from investment bankers. By issuing honest and objective research reports, if negative, analysts would jeopardize Morgan Stanley's ability to win future investment banking business from the covered companies and, consequently, would jeopardize their compensation level.

A - 193

**Investment Banking Was the Factor Accorded the Greatest
Weight by Management in Reviewing Analysts' Compensation**

194.    In 1999 and 2000, analyst compensation was set primarily by a managing director

in the equity research division.  The managing director made an initial determination of proposed

compensation for all analysts and ranked the analysts based on that determination.  The

managing director then ranked the analysts based on their composite scores in nine separate

categories.  The managing director then compared the two rankings before forwarding the final

compensation recommendations to his/her superiors at Morgan Stanley.

195.    The nine categories used to rank the analysts included the amount of investment

banking revenues attributed to each analyst based on their involvement in transactions (relative

weight of 33%) and eight other categories related to core research activities, including: (1) poll

rankings from the *Institutional Investor* and other sources (19%); (2) poll ranking from

institutional equity division sales (12%); (3) firm activities and ability to be a team player (11%);

(4) the "hit ratio" in vote gathering from institutional clients (7%); (5) rank in vote gathering

from institutional clients (7%); (6) stock picking (active portfolio vs. passive portfolio) (6%); (7)

stock picking (active portfolio vs. index portfolio) (3%); and (8) poll ranking from retail sales

(2%).  Thus, the managing director assigned a one-third weight to the amount of investment

banking revenues - the highest weight given to any single category.

196.    The impact that analysts' contributions to investment banking revenues could

have on the determination of their compensation is demonstrated by the compensation of one

Morgan Stanley senior analyst.  In 1999, this analyst ranked only 11th overall, but ranked first in

investment banking revenues and, thereafter, received the highest compensation of all Morgan

Stanley research analysts.

A - 194

197.    In 2000, the same analyst continued to rank first in investment banking revenues: the total investment banking revenues that this analyst helped Morgan Stanley to obtain more than doubled from 1999. In most other categories, however, the analyst's performance declined after 1999, and the analyst's composite score dropped to 19th overall. In 2000, the analyst ranked only 70th out of 111 analysts in stock picking and the analyst's self-evaluation conceded that 2000 had been the analyst's worst stock-picking year in fifteen years. Nevertheless, this analyst's total salary bonus for 2000 increased by approximately $8.7 million compared to 1999, again ranking first among all Morgan Stanley analysts.

**Morgan Stanley Had No System in Place for
Reviewing the Ratings Issued By Its Senior Analysts**

198.    Morgan Stanley required only non-officer-level analysts to submit their initial ratings and proposed changes in ratings for review by the Stock Selection Committee. Senior analysts, principals, and managing directors were not subject to this requirement. During the Class Period, Morgan Stanley had no effective system in place for reviewing the ratings of its senior analysts.

199.    Not until late 2001, after numerous complaints from Institutional Sales personnel, did management tell analysts: "Don't let your ratings get stale; change them ahead of expected price action."

**Morgan Stanley's Analysts Virtually Never Used
the Lowest Rating in the Firm's Stock Rating System**

200.    From 1995 to March 2002, Morgan Stanley publicly stated that it had a four-category rating system: Strong Buy, Outperform; Neutral; and Underperform. "Underperform" was defined, as follows: "Given the current price, these securities are not expected to perform as well as other stocks in the universe covered by the analyst."

A - 195

201.    Although Morgan Stanley stated that it had a four-category system, its analysts virtually never used the "Underperform" rating and, in effect, used a three-category system. During the Class Period, Morgan Stanley published research on approximately 1,000 North American company stocks.  No more than three of the 1,033 stocks covered by Morgan Stanley over the course of year1999 were given an Underperform rating; no more than five of the 1,058 stocks covered by Morgan Stanley over the course of year 2000 received that rating; and no more than six of the 1030 stocks covered by Morgan Stan over the course of year 2001 were rated Underperform.

202.    Morgan Stanley management was aware that analysts were not using the "Underperform" ratings, but did not correct the problem until March 2002, when a new rating system was instituted.

### Morgan Stanley's Banking Business with RSL

203.    Morgan Stanley had substantial Investment Banking relationships with RSL. Morgan Stanley was lead or joint-lead underwriter/placement agent in the Company's various public offerings (which yielded in excess of $64 million in total investment banking fees), from 1997 through 2000), including, but not limited to: the RSL IPO, in late 1997; and the February 2000 issuance of $200 million in 12 7/8% Senior Notes due 2010 (total aggregate commissions amounting to approximately $5.0 million shared by three firms), as well as RSL's issuance of $115 million aggregate liquidation preference of 7 ½% Series A preferred shares (total aggregate commissions amounting to approximately $4.0 million shared by three firms) -- in both cases, Morgan Stanley was appointed lead or co-lead placement agent and earned millions of dollars of fees, commissions, and other substantial compensation.  Moreover, in March 2000, Morgan

Stanley exercised its over-allotment options with respect to an additional $15 million aggregate liquidation preference of Series A preferred shares.

### Morgan Stanley's False and Misleading Statements

204.   On May 3, 1999, RSL announced its plans to spin-off its Delta 3 subsidiary and offer Delta 3 common stock to the public in an IPO.

205.   On April 30, 1999, Morgan Stanley analysts had issued a Strong Buy rating (its then highest rating) for RSL shares. On the same day, RSL stock rose approximately $1 per share.

206.   On May 21, 1999, Morgan Stanley analysts reiterated the Strong Buy rating for RSL, emphasizing that, notwithstanding price declines, RSL shares constituted a "buying opportunity." On the same day, the price of RSL's shares rose approximately $3 per share.

207.   On or about August 10, 1999, the price of RSL shares had fallen to $14 1/4 per share, a then 52-week low. On or about that same date, Morgan Stanley issued a report which included a "strong buy" recommendation for the RSL. Within one week of the issuance of this report, the share price of RSL shares had risen approximately $2.

208.   By October 15, 1999, RSL stock price had increased to $20.63 per share. On the same day, Morgan Stanley had issued an Equity Research and Briefing Note in which it reiterated its Strong Buy rating and a $38.00 per share price target for RSL, even though, on October 12, 1999, RSL announced that it had taken a massive $32 million restructuring charge. Incredibly, in the same October 15 report, Morgan Stanley characterized the $32 million charge to earnings as "a positive for RSL."

A - 197

209.    A few weeks later, on November 4, 1999, RSL stock price had increased to
$21.63 per share.  On the same date, Morgan Stanley had issued an Equity Research and Briefing
Note in which it maintained its Strong Buy rating and target price of $38 per share for RSL,
notwithstanding the fact that RSL's quarterly earnings per share came in considerably below
estimates, due to, among other things, RSL's higher than expected non-cash compensation
expenses.  After the November 4, 1999 report had been published, Morgan Stanley temporarily
dropped coverage of RSL.  Morgan Stanley had not been chosen to underwrite the Delta 3 spin-
off IPO, which yielded millions of dollars of fees, commissions, and other substantial
compensation to its competitors.

210.    The analyst ratings and price targets contained in the research reports on RSL
referred to in the five (5) preceding paragraphs herein were false and/or misleading because
Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.    it regularly used analyst research to obtain lucrative investment banking
business from companies it covered, including RSL;

2.    it caused the analysts covering RSL to upgrade or otherwise not
downgrade their analysis of RSL due to investment banking reasons,
including, but not limited to, the prospect of underwriting and/or
managing RSL's public offerings, including, but not limited to, the Delta 3
spin-off IPO;

3.    its analysts were subject to financial conflicts of interest that adversely
impacted the independence and accuracy of its research product, including
analyst ratings, reports, and price targets concerning RSL;

-63-

A - 198

4.      it failed to adequately manage and supervise its analysts or impose adequate controls in order to protect the objectivity of its published research;

5.      as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated during the Class Period.

211.    By February 18, 2000, RSL stock had dropped to $15.00 per share. On the same date, Morgan Stanley issued a Equity Research report in which it resumed coverage for RSL and reaffirmed its Strong Buy rating and $38 per share price target for the stock. In this same time period, RSL was involved in road shows that touted RSL's offerings of $115 million in preferred shares and $200 million in high yield notes, which presented highly lucrative investment banking opportunities for Morgan Stanley. RSL chose Morgan Stanley to be co-lead placement agent for both offerings, for which Morgan Stanley earned millions of dollars in commissions, fees, and other substantial compensation.

212.    By March 3, 2000, RSL stock shot up to more than $26.00 per share. On the same date, Morgan Stanley had issued a Sales/Earnings Analysis report in which it maintained its Strong Buy rating and $38 per share price target for RSL, despite the perceived weakness of its convertible preferred stock offerings. A few days later, RSL stock had skyrocketing to $32.00 per share. Sometime in March, 2000, Morgan Stanley exercised its over-allotment option with respect to the RSL Series A preferred shares.

A - 199

213.    The analyst ratings and price targets contained in the research report of RSL referred to in the preceding two (2) paragraphs, herein, were false and/or misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.    it regularly used analyst research to obtain lucrative investment banking business from companies it covered, including RSL;

2.    it caused the analysts covering RSL to upgrade or otherwise not downgrade their analysis of RSL due to investment banking business with RSL, including but not limited to RSL's Senior Notes and Series A preferred shares offerings, including rights to exercise over-allotment options, for which Morgan Stanley was chosen lead or co-lead placement agent and earned millions of dollars in fees, commissions, and other substantial compensation;

3.    its analysts were subject to financial conflicts of interest that adversely impacted the independence and accuracy of its research product, including analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately manage and supervise its analysts or impose adequate controls in order to protect the objectivity of its published research;

5.    as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated during the class period.

A - 200

214.    On March 28, 2000, RSL stock was trading in the $27.00 per share range.  On the same day, Morgan Stanley had issued an Equity Research report which it maintained a Strong Buy rating and increased its price target to $50 per share for RSL stock.  The bullish report emphasized that RSL shares are "extremely attractive," even though RSL had a need for additional capital and was increasingly viewed as having an obsolete Internet/data business strategy.

215.    The analyst ratings and price targets contained in the research reports of RSL referred to in the preceding paragraph herein were false and/or misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.    it regularly used analyst research to obtain lucrative investment banking business from companies it covered, including RSL;

2.    it caused the analysts covering RSL to upgrade or otherwise not downgrade their analysis of RSL due to investment banking business with RSL, including but not limited to RSL's Senior Notes and Series A preferred shares offerings, including rights to exercise over-allotment options, for which Morgan Stanley was chosen lead or co-lead placement agent and earned millions of dollars in fees, commissions and other substantial compensation;

3.    its analysts were subject to financial conflicts of interest that adversely impacted the independence of its research product, including analyst ratings, reports, and price targets concerning RSL;

A - 201

4.      it failed to adequately manage and supervise its analysts or impose

adequate controls in order to protect the objectivity of its published

research;

5.      as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated during the class period.

216.    On April 4, 2000, RSL stock traded as high $22 5/16 per share.  On the same date,

Morgan Stanley issued an Equity Research report in which it affirmed its Strong Buy rating and

$50 per share price target for RSL stock, despite a sharp reduction in RSL's revenue estimates.

217.    The analyst ratings and price targets contained in the research reports on RSL

referred to in the preceding paragraph herein were false and/or misleading because Morgan

Stanley knew or recklessly disregarded and failed to disclose, that:

1.      it regularly used analyst research to obtain lucrative investment banking

business from companies it covered, including RSL;

2.      it caused the analysts covering RSL to upgrade or otherwise not

downgrade their analysis of RSL due to investment banking business with

RSL, including, but not limited to, RSL's Senior Notes and Series A

preferred shares offerings, including rights to exercise over-allotment

options, for which Morgan Stanley was chosen lead or co-lead placement

agent and received millions of dollars in fees, commissions, and/or other

substantial compensation;

-67-

3.      its analysts were subject to financial conflicts of interest that adversely

impacted the independence and accuracy of its research product, including

analyst ratings, reports, and price targets concerning RSL;

4.      it failed to adequately manage and supervise its analysts or impose

adequate controls in order to protect the objectivity of its published

research;

5.      as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated during the class period.

218.    By May 26, 2000, RSL's stock price had dropped to approximately $10 per share.
On the same date, despite the significant stock price drop and a radical reduction in RSL's
revenue estimates, Morgan Stanley issued an Equity Research report in which it affirmed its
Strong Buy rating and $50 per share price target for RSL shares.  Within two days of the
issuance of this report, RSL's stock price rose approximately $2 per share, or 20%.

219.    The analyst ratings and price targets contained in the research reports of RSL
referred to in the preceding paragraph were false and/or misleading because Morgan Stanley
knew or recklessly disregarded and failed to disclose, that:

1.      it regularly used analyst research to obtain lucrative investment banking

business from companies it covered, including RSL;

2.      it caused the analysts covering RSL to upgrade or otherwise not

downgrade their analysis of RSL in order to pursue and maintain

investment banking business with RSL, including, but not limited to,

-68-

RSL's Senior Notes and Series A preferred shares offerings, including
rights to exercise over-allotment options, for which Morgan Stanley was
chosen lead or co-lead placement agent and received millions of dollars in
fees, commissions, and/or other substantial compensation;

3.    its analysts were subject to financial conflicts of interest that adversely
impacted the independence and accuracy of its research product, including
analyst ratings, reports, and price targets, concerning RSL;

4.    it failed to adequately manage and supervise its analysts or impose
adequate controls in order to protect the objectivity of its published
research;

5.    as a result of the foregoing, its analysts issued more positive reports and
ratings than were justified, and avoided downgrades or negative reports
regarding investment banking clients, including RSL, and thus caused the
stock price of RSL to be artificially inflated during the class period.

220.    By July 18, 2000, RSL's stock price had dropped to $7.30 per share. Despite a
massive $48 million write-down applicable to RSL's 2Q00 earnings, which resulted in a huge
loss of equity value, on the same date, Morgan Stanley issued an Equity Research report in
which it reiterated its Strong Buy rating for RSL's shares and, further stated that RSL's valuation
was "compelling." On or about this same date, other brokerage firms, including Lehman and
Goldman Sachs had marginally downgraded RSL shares to the still bullish ratings of
"outperform."

221. The analyst ratings contained in the research reports of RSL referred to in the preceding paragraph herein were false and misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.  it regularly used analyst research to obtain and maintain lucrative investment banking business from companies it covered, including RSL;

2.  it caused the analysts covering RSL to not meaningfully downgrade their analysis of RSL due to investment banking business with RSL, including, but not limited to, RSL's Senior Notes and Series A preferred shares offerings, including rights to exercise over-allotment options, for which Morgan Stanley was chosen lead or co-lead placement agent and earned millions of dollars in fees, commissions and/or other substantial compensation;

3.  its analysts were subject to financial conflicts of interest that adversely impacted the independence and accuracy of its research product, including analyst ratings, reports, and price targets, concerning RSL;

4.  it failed to adequately manage and supervise its analysts or impose adequate controls in order to protect the objectivity of its published research;

5.  as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated or stabilized during the Class Period.

A - 205

222.    On August 7, 2000, the High Yield Report announced that Moody's Investment
Service had downgraded RSL's bond rating from B2 to B3, citing RSL's inability to achieve
cash flow growth. At this time, RSL's stock had dropped to approximately $1 per share. In
response to this news, a Morgan Stanley analyst stated: "This company is selling dirt cheap, I
don't think it should be trading at these levels."

223.    The analyst comments referred to in the preceding paragraph herein were false and /
or misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.    it regularly used analyst research reports to obtain and maintain lucrative
investment banking business from companies it covered, including RSL;

2.    it caused the analysts covering RSL to upgrade or otherwise not downgrade
their analysis of RSL due to investment banking business with RSL,
including, but not limited to, RSL's Senior Notes and Series A preferred
shares offerings, including rights to exercise over-allotment options, for
which Morgan Stanley was chosen lead or co-lead placement agent and
earned millions of dollars in fees, commissions and/or other substantial
compensation;

3.    its analysts were subject to financial conflicts of interest that adversely
impacted the independence and accuracy of its research product, including
analyst ratings, reports, and price targets, concerning RSL;

4.    it failed to adequately manage and supervise its analysts or impose adequate
controls in order to protect the objectivity of its published research;

5.    as a result of the foregoing, its analysts issued more positive reports and
ratings than were justified, and avoided downgrades or negative reports

A - 206

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated and/or stabilized during the

Class Period.

224.    On December 29, 2000, RSL was trading at $0.20 per share and was de-listed

from the NASDAQ stock exchange.

### Defendants' Misconduct Revealed

225.    On or about April 28, 2003, a settlement was reached in connection with charges

filed against Defendants by the SEC and the Attorneys General of various states, including New

York, Alabama, and Utah (who were task force leaders).  Pursuant to settlement memoranda,

which includes numerous findings of fact that relate to Plaintiffs' complaint, the substance of

which is particularized herein, the SEC and the aforementioned state Attorneys General found

that Defendants each had systematically failed to adopt sufficient procedures and processes to

ensure that the interaction between its research analysts and investment bankers or covered

companies did not expose its analysts to undue pressures or influences from investment banking

personnel and/or covered companies.  Moreover, the afore-stated charges allege that Defendants

had violated several rules of the NASD and NYSE by issuing false and misleading analyst

reports on numerous companies which served to artificially inflate the prices of numerous

companies, including RSL.

226.    Additionally, the SEC and various states' settlement memoranda sets forth

specific e-mails and internal communications described above, which establish that Defendants

each had violated federal securities laws in connection with their published research and ratings

on many companies its analysts had covered, including RSL.

227.    Moreover, the findings of fact in the aforesaid settlement memoranda reveal that while the purported role of Defendants' research analysts was to produce objective research, Defendants systematically encouraged their analysts to participate in investment banking-related activities. Additionally, analysts' compensation was directly tied to investment banking revenue. As a result of their participation in investment banking-related activities and the financial pressures arising from linkage of their compensation to investment banking revenue, analysts issued numerous misleading and false research reports which served to bolster the Defendants' investment banking revenues and, consequently, artificially inflated the stock prices of numerous companies, including RSL. Defendants each knew or should have known of these undue pressures or influences, and yet failed to adequately manage them and, thus, failed to protect the objectivity and accuracy of their published research concerning many companies they covered, including RSL.

228.    Lehman settled these charges for the payment of $50 million, in addition to accepting other remedial obligations.

229.    Goldman Sachs settled these charges for the payment of $110 million, in addition to accepting other remedial obligations.

230.    Morgan Stanley settled these charges for the payment of $125 million, in addition to accepting other remedial obligations.

**The Market for RSL Shares**

231.    The market for RSL common stock was open, well-developed and efficient at all relevant times herein. As a result of the materially false and misleading statements and failures to disclose outlined herein, RSL's common stock price had been artificially inflated or otherwise stabilized during the Class Period. The suppression of the truth concerning such artificial

-73-

A - 208

inflation and/or stabilization of RSL's stock price continued until the time Defendants each

admitted to the SEC and/or relevant state authorities that their reports and ratings concerning

RSL were, in fact, false and misleading and caused injury to investors, including the members of

the Class.

232.    Defendants each had communicated false and misleading statements to the

investment community, and such communications had been absorbed by the securities markets,

leading to the artificial inflation of the stock price of RSL shares.  Plaintiffs and the other

members of the Class purchased or otherwise acquired RSL common stock in reliance upon the

integrity of the market concerning RSL, and have been damaged thereby.

233.    During the Class Period, Defendants each materially misled the investing public,

thereby inflating the price of RSL common stock, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make its statements, as set forth

herein, not false and misleading.  Said statements and omissions were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the

truth about Defendants' analysts' conflicts of interests.

234.    At all relevant times, the material misrepresentations and omissions particularized

in this complaint directly or proximately caused, or were a substantial contributing cause of, the

damages sustained by Plaintiffs and the other members of the Class.  As described herein, during

the Class Period, each Defendant made or caused to be made a series of materially false or

misleading statements about RSL.  These material misstatements and omissions had the cause

and effect of creating in the market an unrealistically positive assessment of RSL, thus causing

the price of the Company's common stock to be overvalued at all relevant times herein.  As the

following chart shows, Defendants' false and misleading reports, ratings and/or statements were

-74-

repeatedly issued while RSL's stock price was plummeting and had the effect of temporarily halting the downward trend and driving the price back up. These specific points can be viewed graphically in the following chart where the arrows indicate the timing of Defendants statements:



## RSL Communications
### stock price history for April 1, 1999 - Sept. 29, 2000

Class Period: April 30, 1999 - Dec. 29, 2000
May 1999: RSL issued **$175 million** of unregistered Senior Notes. GS was the placement agent.
Sept - Nov 1999: SEC filings for IPO of deltathree.com wherein RSL sold 6.9 million shares at $15 per share for **$103.5 million**. LB was lead underwriter and GS a participating underwriter.
Feb 2000: RSL issued **$115 million** of Series A Covertible Preferred Shares (2.3 million); **$100 million** of Senior Notes; and **100 million Euros** of Senior Notes. GS, LB and MS were co-lead placement agents.

Each Defendant's materially false and misleading statements during the Class Period resulted in Plaintiffs and the other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

A - 210

235.   Defendants each regularly issued analyst research reports which were reported in the financial press, made readily available through Defendants' web sites and public activities, including road shows, and made available through third-party investment report subscriber services, among other outlets.   Consequently, the Defendants' reports were publicly available and entered and influenced the public marketplace concerning the price of RSL shares.

236.   As a result, the markets digested all information with respect to RSL from all publicly-available sources and reflected such information in RSL's stock price.   Under these circumstances, all purchasers of RSL's common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

## STATUTORY SAFE HARBOR

237.   The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made.   Nor was it stated that actual results "could differ materially from those projected."   Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants each are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and/or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Defendants who knew that those statements were false when made.

A - 211

## CLAIMS FOR RELIEF

### COUNT I

**(Against Lehman For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder)**

238.    Plaintiffs repeat and reallege each and every allegation set forth above.

239.    During the Class Period, Defendant Lehman made untrue statements of material fact and omitted to disclose material facts, that were intended to and did: (i) deceive the investing public, including Plaintiffs and the other members of the Class, as alleged herein; (ii) artificially inflated and maintained the market price of RSL common stock; and (iii) caused Plaintiffs and the other members of the Class to purchase or otherwise acquire RSL stock at artificially inflated prices.

240.    The Defendant made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, all in violation of section 10(b) of the Exchange Act and Rule 10b-5. Defendant's material misrepresentations and omissions concerned, inter alia: (i) the fact their ratings did not reflect the analysts' true opinions of RSL; (ii) that Lehman had an undisclosed internal policy to never issue "underperform" or "sell" recommendations on Internet companies, including RSL, thereby converting a published five-point rating scale into a de-facto three-point system; (iii) that the challenged ratings and reports on RSL failed to disclose that Lehman's ratings were tarnished by an undisclosed conflict of interest in that the research analysts were acting as quasi-investment bankers for RSL and the companies at issue, often initiating , continuing, and/or manipulating research coverage for the purpose of attracting and keeping investing banking business with RSL and other covered clients, thereby producing

-77-

A - 212

misleading ratings that were neither objective nor independent, as they purported to be; and (iv)
Defendant's failure to comply with the rules and regulations of the SEC, NASD and other
regulatory authorities regarding communications to the investing public.

241.    Defendant's material misrepresentations and/or omissions were done knowingly
or recklessly and for the purpose and effect of obtaining lucrative investment banking business
from RSL.  Specifically, the analysts' reports were represented to be both positive and objective,
while internal Lehman e-mails have shown that the ratings and recommendations in the reports
were both artificially inflated and given merely in the hopes of obtaining future banking
business.

242.    Defendant Lehman, however, knew or recklessly disregarded that their statements
concerning the integrity and objectivity of their securities research and ratings system were false
at the time they made these statements, because those statements were flatly contradicted by the
Defendant's unlawful plan, scheme and course of conduct alleged herein.

243.    Defendant was required to comply with all relevant SEC and NASD regulations.
In addition, said Defendant had a duty to fully disclose the truth concerning their business
practices alleged herein by virtue of their issuance of research reports to investors, as a result of
Defendant Lehman's status as a registered U.S. broker/dealer and its wrongful activities in such
capacity alleged herein, and as a result of the integrated disclosure provisions of the SEC as
embodied in SEC Regulations S-X, [17 C.F.R.; § 210.0, et seq.], S-K [ 17 C.F.R.; § 299.10, et
seq.], and other SEC regulations.

244.    Throughout the Class Period, Defendant's material misrepresentations and
omissions induced a disparity between the market  price and the true "investment quality" of
RSL securities.  As a result of the dissemination of the materially false and misleading

A - 213

information and failure to disclose material facts, as set forth above, the market price of RSL

securities were artificially inflated during the Class Period, and Plaintiffs and the Class were

deceived as to the true investment quality of RSL securities. In ignorance of the fact that the

market price of RSL securities was artificially inflated, and relying directly or indirectly on the

false and misleading statements made by Defendant Lehman, or upon the integrity of the market

in which the securities trade, and/or on the absence of material adverse information that was

known to or recklessly disregarded by Defendant but not disclosed in public statements by

Defendant during the Class Period, Plaintiffs and the other members of the Class acquired RSL

securities during the Class period at artificially inflated prices and were damaged thereby.

245.    At the time of said misrepresentations and omissions, Plaintiffs and the other

members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs

and the other members of the Class known of the omitted material facts, Plaintiffs and the other

members of the Class would not have purchased or otherwise acquired RSL securities, or if they

had acquired RSL securities, they would not have done so at the artificially inflated prices.

246.    Plaintiffs and the other members of the Class were injured because the risks that

materialized were risks of which they were unaware as a result of Defendant's material

misrepresentations and omissions. Absent Defendant's wrongful conduct, Plaintiffs and the

other members of the Class would not have been injured.

247.    By virtue of the foregoing, Defendant Lehman violated section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

248.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and

the other members of the Class suffered damages in connection with their purchases or

acquisitions of RSL securities in an amount to be proved at trial.

A - 214

## COUNT II

### (Against Goldman Sachs For Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Promulgated Thereunder

249.   Plaintiffs repeat and reallege paragraphs 1 through 237, set forth above.

250.   During the Class Period, Defendant Goldman Sachs made untrue statements of
material fact and omitted to disclose material facts, that were intended to and did:  (i) deceive the
investing public, including Plaintiffs and the other Class members, as alleged herein; (ii)
artificially inflated and maintained the market price of RSL common stock; and (iii) caused
Plaintiffs and the other members of the Class to purchase or otherwise acquire RSL stock at
artificially inflated prices.

251.   The Defendant made untrue statements of material fact and/or omitted to state
material facts necessary to make the statements made, in light of the circumstances under which
they were made, not misleading, all in violation of section 10(b) of the Exchange Act and Rule
10b-5.  Defendant's material misrepresentations and omissions concerned, inter alia: (i) the fact
that the ratings did not reflect the analysts' true opinions of RSL; (ii) that Goldman Sachs
maintained an undisclosed internal policy to never issue "sell" recommendations on Internet
companies, including RSL; (iii) that the challenged ratings and reports on RSL failed to disclose
that Goldman Sachs's ratings were tarnished by an undisclosed conflict of interest in that the
research analysts were acting as quasi-investment bankers for RSL and the companies at issue,
often initiating , continuing, and/or manipulating research coverage for the purpose of attracting
and keeping investing banking business with RSL and the other covered clients, thereby
producing misleading ratings that were neither objective nor independent, as they purported to

A - 215

be; and (iv) Goldman Sachs's failure to comply with the rules and regulations of the SEC, NASD
and other regulatory authorities regarding communications to the investing public.

252.   Defendant's material misrepresentations and/or omissions were done knowingly
or recklessly and for the purpose and effect of obtaining lucrative investment banking business
from RSL.  Specifically, the analysts' reports were represented to be both positive and objective,
while internal Goldman Sachs e-mails and other documents have shown that the ratings and
recommendations in the reports were both artificially inflated and given merely in the hopes of
obtaining future banking business.

253.   Defendant Goldman Sachs, however, knew or recklessly disregarded that their
statements concerning the integrity and objectivity of their securities research and ratings system
were false at the time they made these statements, because those statements were flatly
contradicted by the Defendant's unlawful plan, scheme and course of conduct alleged herein.

254.   Defendant Goldman Sachs was required to comply with all relevant SEC and
NASD regulations.  In addition, said Defendant had a duty to fully disclose the truth concerning
their business practices alleged herein by virtue of their issuance of research reports to investors,
as a result of Defendant Goldman Sachs's status as a registered U.S. broker/dealer and its
wrongful activities in such capacity alleged herein, and as a result of the integrated disclosure
provisions of the SEC as embodied in SEC Regulations S-X, [17 C.F.R.; § 210.0, et seq.], S-K [
17 C.F.R.; § 299.10, et seq.], and other SEC regulations.

255.   Throughout the Class Period, Defendant's material misrepresentations and
omissions induced a disparity between the market price and the true "investment quality" of RSL
securities.  As a result of the dissemination of the materially false and misleading information
and failure to disclose material facts, as set forth above, the market price of RSL securities were

artificially inflated during the Class Period, and Plaintiffs and the Class were deceived as to the

true investment quality of RSL securities.  In ignorance of the fact that the market price of RSL

securities was artificially inflated, and relying directly or indirectly on the false and misleading

statements made by Defendant , or upon the integrity of the market in which the securities trade,

and/or on the absence of material adverse information that was known to or recklessly

disregarded by Defendant but not disclosed in public statements by Defendant during the Class

Period, Plaintiffs and the other members of the Class acquired RSL securities during the Class

period at artificially inflated prices and were damaged thereby.

256.    At the time of said misrepresentations and omissions, Plaintiffs and the other

members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs

and the other members of the Class known of the omitted material facts, Plaintiffs and the other

members of the Class would not have purchased or otherwise acquired RSL securities, or if they

had acquired RSL securities, they would have not done so at the artificially inflated prices.

257.    Plaintiffs and the other members of the Class were injured because the risks that

materialized were risks of which they were unaware as a result of Defendant's material

misrepresentations and omissions.  Absent Defendant's wrongful conduct, Plaintiffs and the

other members of the Class would not have been injured.

258.    By virtue of the foregoing, Defendant Goldman Sachs violated section 10(b) of

the Exchange Act and Rule 10b-5, promulgated thereunder.

259.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and

the other members of the Class suffered damages in connection with their purchases or

acquisitions of RSL securities in an amount to be proved at trial.

## COUNT III

### (Against Morgan Stanley For Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Promulgated Thereunder

260. Plaintiffs repeat and reallege paragraphs 1 through 237, set forth above.

261. During the Class Period, Defendant Morgan Stanley made untrue statements of material fact and omitted to disclose material facts, that were intended to and did: (i) deceive the investing public, including Plaintiffs and the other members of the Class, as alleged herein; (ii) artificially inflated and maintained the market price of RSL common stock; and (iii) caused Plaintiffs and the other members of the Class to purchase or otherwise acquire RSL stock at artificially inflated prices.

262. The Defendant Morgan Stanley made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, all in violation of section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder. Defendant's material misrepresentations and omissions concerned, inter alia: (i) the fact the ratings did not reflect the analysts' true opinions of RSL; (ii) that Morgan Stanley had an undisclosed internal policy to never issue "sell" recommendations on companies, including RSL; (iii) that the challenged ratings and reports on RSL failed to disclose that Morgan Stanley's ratings were tarnished by an undisclosed conflict of interest in that the research analysts were acting as quasi-investment bankers for RSL and the other companies at issue, often initiating, continuing, and/or manipulating research coverage for the purpose of attracting and keeping investing banking business with RSL and other covered clients, thereby producing misleading ratings that were neither objective nor independent, as they purported to be; and (iv) Defendant's failure to

comply with the rules and regulations of the SEC, NASD and other regulatory authorities

regarding communications to the investing public.

263.    Defendant's material misrepresentations and/or omissions were done knowingly

or recklessly and for the purpose and effect of obtaining lucrative investment banking business

from RSL.  Specifically, the analysts' reports were represented to be both positive and objective,

while internal Morgan Stanley documents have shown that the ratings and recommendations in

the reports were both artificially inflated and given merely in the hopes of obtaining future

banking business.

264.    Defendant Morgan Stanley, however, knew or recklessly disregarded that their

statements concerning the integrity and objectivity of their securities research and ratings system

were false at the time they made these statements, because those statements were flatly

contradicted by the Defendant's unlawful plan, scheme and course of conduct alleged herein.

265.    Defendant Morgan Stanley was required to comply with all relevant SEC and

NASD regulations.  In addition, said Defendant had a duty to fully disclose the truth concerning

their business practices alleged herein by virtue of their issuance of research reports to investors,

as a result of Defendant Morgan Stanley's status as a registered U.S. broker/dealer and its

wrongful activities in such capacity alleged herein, and as a result of the integrated disclosure

provisions of the SEC as embodied in SEC Regulations S-X, [17 C.F.R.; § 210.0, et seq.], S-K

[17 C.F.R.; § 299.10, et seq.], and other SEC regulations.

266.    Throughout the Class Period, Defendant's material misrepresentations and

omissions induced a disparity between the market price and the true "investment quality" of RSL

securities.  As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price of RSL securities were

artificially inflated during the Class Period, and Plaintiffs and the Class were deceived as to the true investment quality of RSL securities. In ignorance of the fact that the market price of RSL securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant Morgan Stanley, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendant but not disclosed in public statements by Defendant during the Class Period, Plaintiffs and the other members of the Class acquired RSL securities during the Class period at artificially inflated prices and were damaged thereby.

267.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class known of the omitted material facts Plaintiffs and the other members of the Class would not have purchased or otherwise acquired RSL securities, or if they had acquired RSL securities, they would not have done so at the artificially inflated prices.

268.    Plaintiffs and the other members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendant's material misrepresentations and omissions. Absent Defendant's wrongful conduct, Plaintiffs and the other members of the Class would not have been injured.

269.    By virtue of the foregoing, Defendant Morgan Stanley violated section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

270.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of RSL securities in an amount to be proved at trial.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

i)      Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and Plaintiffs' counsel as Lead Counsel, and thereafter certifying Plaintiffs as authorized class representatives under Rule 23 of the Federal Rules of Civil Procedure;

ii)      Awarding compensatory damages in favor of Plaintiffs and the other Class members against the Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

iii)      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

iv)      Such other and further relief as the Court may deem just and proper

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: November 14, 2003

LAW OFFICES OF CURTIS V. TRINKO, LLP

By: _Curtis V. Trinko_

     Curtis V. Trinko (CT-1838)
     Jeffrey B. Silverstein (JS-4818)
16 West 46th Street
7th Floor
New York, New York 10036
Tel: (212) 490-9550
Fax: (212) 986-0158

Attorneys for Plaintiffs

## CERTIFICATION OF NAMED PLAINTIFFS
## PURSUANT TO FEDERAL SECURITIES LAWS

**WE, LAWRENCE FOGARAZZO** and **CAROLYN FOGARAZZO,** hereby certify as

follows:

1.      We have reviewed the complaint prepared for us concerning RSL

Communications, Inc., brought under the federal securities laws, and have authorized the filing

of such an action .

2.      Plaintiffs did not purchase, or otherwise acquire, the securities of RSL

Communications, Inc. that are the subject of this action, at the direction of plaintiffs' counsel, or

in order to participate in any action arising under the federal securities laws.

3.      We are willing to serve as representative parties on behalf of the class and will

provide testimony at a deposition and/or at trial, if necessary.

4.      Plaintiffs' transactions in the securities that are the subject of this litigation during

the class period set forth in the complaint are, as follows:

        a.      Plaintiffs purchased 1,000 shares of RSL Communications, Inc. common

            stock on March 6, 2000 at $22.85064 per share;

        b.      Plaintiffs purchased 200 shares of RSL Communications, Inc. common

            stock on May 10, 2000 at $14.38315 per share;

        c.      Plaintiffs purchased 500 shares of RSL Communications, Inc. common

            stock on May 15, 2000 at $13.56616 per share; and

        d.      Plaintiffs still hold 1,700 shares of RSL Communications, Inc. common

            stock.

A - 222

5.      During the three years prior to the date hereof, plaintiffs have not filed an action in which they have sought to serve, or have served, as representative parties for a class in any action filed under the federal securities laws.

6.      Plaintiffs will not accept any payment for serving as representative parties on behalf of the class beyond their pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge and belief. Executed this ___9___ day of July, 2003 at Manchester Center, Vermont.


LAWRENCE FOGARAZZO


CAROLYN FOGARAZZO

2

A - 223

## CERTIFICATION OF NAMED PLAINTIFFS
## PURSUANT TO FEDERAL SECURITIES LAWS

**I, DONALD ENGEL,** hereby certify as follows:

1.      I have reviewed the complaint prepared for Plaintiffs Lawrence and Carolyn Fogarazzo against Lehman Brothers, Inc. concerning RSL Communications, Inc., brought under the federal securities laws, and have authorized the filing of such an action.

2.      I did not purchase, or otherwise acquire, the securities of RSL Communications, Inc. that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any action arising under the federal securities laws.

3.      I am willing to serve, along with the other plaintiffs named in this action, as representative parties on behalf of the class and will provide testimony at a deposition and/or at trial, if necessary.

4.      My transactions in RSL Communications, Inc. common stock, which are the subject of this litigation, made during the class period set forth in the complaint, are as follows:

| Date | Transaction | Volume | Amount Paid |
|---|---|---|---|
| 09/21/1999 | Buy | 2,500 | $42,025.00 |
| 09/21/1999 | Buy | 2,500 | $42,181.25 |
| 09/21/1999 | Buy | 100 | $1,693.50 |
| 09/21/1999 | Buy | 4,900 | $83,293.10 |
| 10/11/1999 | Buy | 4,000 | $82,995.35 |
| 10/11/1999 | Buy | 1,000 | $20,560.00 |
| 03/08/2000 | Buy | 5,000 | $131,550.00 |
| 03/08/2000 | Buy | 2,000 | $52,120.00 |
| 03/08/2000 | Buy | 3,000 | $77,992.50 |
| 03/27/2000 | Buy | 6,000 | $141,735.00 |
| 03/27/2000 | Buy | 14,000 | $329,842.35 |

| | | | |
|---|---|---|---|
| 03/28/2000 | Buy | 10,000 | $258,725.00 |
| 04/04/2000 | Buy | 4,500 | $87,457.50 |
| 04/04/2000 | Buy | 500 | $9,030.00 |
| 04/04/2000 | Buy | 4,000 | $72,240.00 |
| 04/04/2000 | Buy | 2,500 | $49,212.50 |
| 04/04/2000 | Buy | 2,000 | $38,370.00 |
| 04/04/2000 | Buy | 500 | $8,842.50 |
| 04/04/2000 | Buy | 500 | $8,842.50 |
| 04/04/2000 | Buy | 500 | $9,873.75 |
| 05/04/2000 | Sell | 5,000 | $78,872.36 |
| 05/04/2000 | Sell | 2,000 | $31,548.94 |
| 05/04/2000 | Sell | 3,000 | $47,323.42 |
| 05/04/2000 | Sell | 10,000 | $157,744.72 |
| 05/04/2000 | Sell | 4,500 | $70,985.12 |
| 05/04/2000 | Sell | 500 | $7,887.24 |
| 09/20/2000 | Sell | 4,000 | $13,398.34 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 2,00 | $6,699.17 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 100 | $334.96 |
| 09/20/2000 | Sell | 4,000 | $16,412.97 |
| 09/20/2000 | Sell | 4,000 | $13,398.34 |
| 09/20/2000 | Sell | 1,000 | $3,349.59 |
| 09/20/2000 | Sell | 6,000 | $20,087.52 |
| 09/20/2000 | Sell | 14,000 | $46.894.21 |

2

5.    During the three years prior to the date hereof, I have not filed an action
in which I have sought to serve, or have served, as a representative party for a class in any action
filed under the federal securities laws.

6.    I will not accept any payment for serving as a representative party on behalf of
the class beyond a pro rata share of any recovery, or as ordered or approved by the Court,
including the award to a representative of reasonable costs and expenses (including lost wages)
directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge and belief.

Executed this __20__ day of August, 2003, at New York, New York.

DONALD ENGEL

3

A - 226

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, STEPHEN LOUIS HOPKINS, hereby certify as follows:

1.     I have reviewed the complaint prepared for Plaintiffs Lawrence and Carolyn Fogarazzo against Lehman Brothers, Inc. concerning RSL Communications, Inc., brought under the federal securities laws, and have authorized the filing of such an action .

2.     I did not purchase, or otherwise acquire, the securities of RSL Communications, Inc. that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any action arising under the federal securities laws.

3.     I am willing to serve, along with the other plaintiffs named in this action, as representative parties on behalf of the class and will provide testimony at a deposition and/or at trial, if necessary.

4.     My transactions in RSL Communications, Inc. common stock, which are the subject of this litigation, made during the class period set forth in the complaint, are as follows:

    a.     I purchased 200 shares of RSL Communications, Inc. common stock on October 12, 1999 at $19.6875 per share;

    b.     I sold 200 shares of RSL Communications, Inc. common stock on October 18, 1999 at $20.00 per share;

    c.     I purchased 300 shares of RSL Communications, Inc. common stock on December 14, 1999 at $18.50 per share; and

    d.     I purchased 400 shares of RSL Communications, Inc. common stock on December 20, 1999 at $17.00 per share.

    e.     I purchased 200 shares of RSL Communications, Inc. common stock on December 31, 1999 at $15.75 per share;

    f.     I purchased 100 shares of RSL Communications, Inc. common stock on December 31, 1999 at $15.75 per share;

A - 227

g.    I sold 1000 shares of RSL Communications, Inc. common stock on
February 4, 2000 at $22.625 per share;

h.    I purchased 500 shares of RSL Communications, Inc. common stock on
April 19, 2000 at $16.125 per share;

i.    I purchased 500 shares of RSL Communications, Inc. common stock on
April 26, 2000 at $13.875 per share; and

j.    I purchased 300 shares of RSL Communications, Inc. common stock on
June 1, 2000 at $12.1875 per share.

k.    I purchased 400 shares of RSL Communications, Inc. common stock on
June 5, 2000 at $11.75 per share.

l.    I purchased 300 shares of RSL Communications, Inc. common stock on
June 16, 2000 at $11.625 per share.

m.    I purchased 1000 shares of RSL Communications, Inc. common stock on
July 17, 2000 at $7.3125 per share.

n.    I purchased 900 shares of RSL Communications, Inc. common stock on
July 24, 2000 at $5.875 per share.

o.    I purchased 100 shares of RSL Communications, Inc. common stock on
June 24, 2000 at $5.875 per share.

p.    I purchased 300 shares of RSL Communications, Inc. common stock on
August 16, 2000 at $3.1875 per share.

q.    I purchased 700 shares of RSL Communications, Inc. common stock on
August 16, 2000 at $3.1875 per share.

3.    During the three years prior to the date hereof, I have not filed an action

in which I have sought to serve, or have served, as a representative party for a class in any action

filed under the federal securities laws.

4.    I will not accept any payment for serving as a representative party on behalf of

the class beyond a pro rata share of any recovery, or as ordered or approved by the Court,

2

including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this __21__ day of August, 2003 at Highland Haven, Texas.

STEPHEN LOUIS HOPKINS

3

A - 229