# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
LAWRENCE FOGARAZZO and                  :
CAROLYN FOGARAZZO, Joint Tenants        :    **OPINION AND ORDER**
With Rights of Survivorship, STEPHEN L. :
HOPKINS, and DON ENGEL on behalf of     :    03 Civ. 5194 (SAS)
themselves, and all others similarly situated,
                                        :
                    Plaintiffs,         :
                                        :
        - against -                     :
                                        :
LEHMAN BROTHERS, INC.,                  :
GOLDMAN SACHS & CO., and                :
MORGAN STANLEY & CO., INC.,             :
                                        :
                    Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Plaintiffs, investors in RSL Communications, Inc., allege that

Lehman Brothers, Inc., Goldman Sachs & Co., and Morgan Stanley & Co., Inc.

(the "Banks") issued false and misleading research reports pertaining to RSL.

Specifically, plaintiffs allege that the reports were fraudulently optimistic due to

conflicts of interest between the research and investment banking departments of

the defendant Banks. The Banks, having entered into a settlement with state and

federal regulators, do not contest (at this point) the existence of the conflicts or

that the reports were false.  Rather, they argue that because plaintiffs have not

alleged a causal connection between the alleged fraud and the subsequent decline

of RSL stock, the complaint must be dismissed.  In addition, the Banks contend

that because analyst conflicts of interest have been well-publicized for almost a

decade, plaintiffs' claims are time-barred.

## II.    THE COMPLAINT

The following allegations, drawn from plaintiffs' complaint, are

presumed to be true for purposes of this motion.

### A.    Parties

Plaintiffs Lawrence and Carolyn Fogarazzo, Stephen L. Hopkins, and

Don Engel filed this suit on behalf of all investors who purchased shares of RSL

common stock between April 30, 1999, and December 29, 2000.[1]  By Order dated

September 24, 2003, I appointed the RSL Communications Shareholders Group —

comprising the Fogarazzos, Hopkins, and Engel — as lead plaintiffs under the

Private Securities Litigation Reform Act of 1995.[2]

---

[1]    *See* Amended Federal Securities Class Action Complaint ("Compl.")
¶ 13.  "Excluded from the Class are Defendants, members of Defendants'
employees' immediate family, as well as their officers, directors, subsidiaries or
affiliates, and any entity in which any excluded person has a controlling interest,
and legal representatives, heirs, successors or assigns of any of the foregoing."  *Id.*

[2]    15 U.S.C. § 78u-4(a)(3).

Defendants Lehman Brothers, Inc., Goldman Sachs & Co., and

Morgan Stanley & Co., Inc. are international financial services firms and

investment banks.  Lehman, Goldman, and Morgan Stanley are all broker-dealers

registered with the United States Securities and Exchange Commission, and are

members of all major securities and commodities exchanges, including the New

York Stock Exchange and National Association of Securities Dealers.[3]

### B.    The Interplay Between Investment Banking and Research Divisions at the Banks

Each of the Banks provide both investment banking and financial

advising services to clients.  As investment banks, the Banks engaged in securities

offerings — including initial public offerings (IPOs), secondary offerings and debt

financing — and provided merger and acquisition services.[4]  The Banks actively

competed for investment banking business, and in particular for positions as lead

manager, underwriter, or placement agent for securities offerings.[5]  In 2001, for

example, Lehman earned approximately $1.3 billion from such underwriting

services.[6]  Investment banking business was lucrative not only in its own right, but

---

[3]    *See id.* ¶¶ 10-12.

[4]    *See id.* ¶¶ 21 (Lehman); 91 (Goldman); 162-163 (Morgan Stanley).

[5]    *See id.* ¶ 22 (Lehman); 91 (Goldman); 168 (Morgan Stanley).

[6]    *See id.* ¶ 22.

3

also because it provided the basis for a working relationship that often brought the Banks additional transactional and advisory work.[7]

In addition to investment banking, the Banks provided market research and analysis for their clients. Analysts collect information about a particular industry and the companies that comprise it, and develop recommendations to investors based on that information.[8]

Analysts' reports compile a variety of predictions about a particular company, including anticipated earnings, revenue and cash flow, and dividend potential. They also assess a company's operating and financial strengths and weaknesses, and predict its long-term profitability.[9] All of the information in a research report is distilled into a single recommendation, or "rank." For example, Lehman's analyst reports ranked companies from one through five: 1-Buy (meaning that the company was expected to outperform the market by more than 15 percent); 2-Outperform (expected to outperform the market by 5-15 percent); 3-Neutral (expected to perform within five percent of the market, either way); 4-Underperform (expected to underperform the market by 15 or more percent); 5-

---

[7]   *See id.* ¶¶ 22 (Lehman); 96 (Goldman); 169-170 (Morgan Stanley).

[8]   *See id.* ¶ 24.

[9]   *See id.*

Sell.[10]  Plaintiffs allege, however, that the Banks had a secret policy to never (or

very rarely) use the lowest ratings, turning a five-point scale into a *de facto* four-

point scale.[11]  Research reports also carried another critical value:  a stock price

target, designed to reflect the anticipated market price of the company's stock at

some time in the future.[12]

Lehman, for instance, provided analyst coverage for approximately

80 different "sectors" for a total of approximately 900 individual companies.[13]

These reports were widely distributed, both directly to the Banks' clients and to

---

[10]    *See id.* ¶ 26.  Goldman and Morgan Stanley's research reports used a
similar ranking methodology, although with only four ranks.  *See id.* ¶¶ 92
(alleging that Goldman ranked securities as "Recommended," "Market
Outperformer," "Market Performer," and "Market Underperformer"); 164
(alleging that Morgan Stanley ranked securities as "Strong Buy," Outperform,"
"Neutral," or "Underperform").

[11]    *See id.* ¶¶ 27 ([D]uring the Class Period, Lehman analysts never
assigned a 5-Sell rating to a domestic company and almost never assigned a 4-
Underperform rating to a stock."); 137 ("The percentage of companies that
received Goldman Sachs's worst rating, Market Underperformer, never rose above
1.1% during this time."); 201 ("No more than three of the 1,033 stocks covered by
Morgan Stanley over the course of the year 1999 were given an Underperform
rating; no more than five of the 1,058 stocks covered by Morgan Stanley over the
course of year 2000 received that rating; and no more than six of the 1030 stocks
covered by Morgan Stan [*sic*] over the course of year 2001 were rated
Underperform.").

[12]    *See id.* ¶ 28.

[13]    *See id.* ¶ 23.

5

large institutional investors, as well as indirectly to the public, through the media and various public services.[14]  Critical to the value of these reports was that the Banks held them out to be based on accurate information and to contain independent and unbiased recommendations on which the investing public could rely.[15]

According to plaintiffs, however, the Banks' analysts were tainted by conflicts of interest that caused them to make fraudulent recommendations in their reports, suggesting that the securities of investment banking clients were more valuable than they actually were.  Those conflicts of interest arose for a number of reasons.

*First*, analysts were called on to help win important investment banking business.[16]  This required an extraordinary level of coordination between investment bankers and research analysts.[17]  Indeed, a 1999 memorandum from Lehman's Managing Director of Global Equity Research circulated to key personnel in the research department underscored the importance of research

---

[14]    *See id.* ¶¶ 25 (Lehman); 94-95 (Goldman); 164 (Morgan Stanley).

[15]    *See id.* ¶ 29.

[16]    *See id.* ¶¶ 31 (Lehman); 96 (Goldman); 170 (Morgan Stanley).

[17]    *See id.* ¶¶ 31-37 (Lehman); 97-101 (Goldman); 180 (Morgan Stanley).

6

analysts to the acquisition of investment banking business.  Towards that end, the

memorandum explained that "to ensure we have a proper recognition of analysts'

impact on banking, we have to closely track every dollar of IBD [Investment

Banking Department] revenue (equity, M&A, debt) by analyst."[18]

*Second*, the Banks instituted "360 degree" review policies for

analysts, whereby analysts' job performances were reviewed not only by their

superiors within the research department, but also by investment bankers who

dealt with the clients that the analysts' research covered.[19]  Among the explicit

criteria for reviewing analysts were to what extent they were prioritizing the

acquisition of banking business and their effectiveness in recruiting banking

clients.[20]  Indeed, analysts at Goldman were required to fill out "business plan"

forms that included details about how the analyst intended to help win investment

banking business.[21]  To underscore the importance of banking fees, one analyst

responded to the question, "what are the three most important goals for you in

2000?" with the answer, "1.  Get more investment banking revenue.  2.  Get more

---

[18]     *Id.* ¶ 35.

[19]     *See id.* ¶¶ 38 (Lehman); 102, 104 (Goldman); 191 (Morgan Stanley).

[20]     *See id.* ¶¶ 38 (Lehman); 105-107 (Goldman); 181, 191-193 (Morgan
Stanley).

[21]     *See id.* ¶ 106.

7

investment banking revenue.  3.  Get more investment banking revenue."[22]

*Third*, analyst compensation was directly tied to investment banking. At Lehman, for instance, investment bankers were explicitly consulted about analyst compensation.[23]  This was particularly important given analysts' salary structure.  Analysts typically received small base salaries accompanied by much larger bonuses; the bonuses, in turn, were computed based on the analysts' ability to bring in banking business.[24]  One analyst at Lehman, for example, received a base salary of $200,000 per year and a bonus that could range from $4.8 to $8.8 million, depending entirely (and explicitly) on the aggregate investment banking fees that he generated.[25]  Even analysts whose bonuses were not explicitly tied to banking business never doubted that their bonuses depended on banking fees.[26] Analysts often cited the investment banking fees that they generated as evidence that they deserved certain compensation or promotions.[27]

---

[22]     *See id.* ¶ 107(a).

[23]     *See id.* ¶ 39.

[24]     *See id.* ¶ 44 (Lehman); 185 (Morgan Stanley).

[25]     *See id.* ¶ 46.

[26]     *See id.* ¶¶ 48-60 (Lehman); 102-105 (Goldman); 184-186 (Morgan Stanley).

[27]     *See id.* ¶¶ 52-53 (Lehman); 176, 183 (Morgan Stanley).

Not surprisingly, the close relationship between investment banks and analysts created pressure on analysts to refer business to banking (*e.g.*, by identifying sectors of the economy that bankers should target), and to tailor research reports to the needs of bankers. Investment bankers understood that if their analysts covered a particular company, it would help the bankers get business from that company.[28] And if the analysts issued positive recommendations regarding the company — regardless of the company's actual market outlook — this would be good for the investment bankers.[29] Towards that end, bankers routinely reviewed analyst reports before the reports were released.[30] And analysts consulted bankers — and sometimes even the companies themselves — before changing recommendations or altering their research coverage.[31]

Bankers thus used analysts and research reports to recruit new business. Analysts would accompany bankers to "pitch meetings" for the purpose of guaranteeing analyst coverage to the company; the company was also shown the

---

[28]    *See id.* ¶ 41 (Lehman).

[29]    *See id.* ¶ 61 (Lehman).

[30]    *See id.* ¶¶ 43 (Lehman); 119 (Goldman).

[31]    *See id.* ¶¶ 129-130, 140-144 (Goldman).

9

effect of positive analyst reports on the price of its stock.[32]  In some cases, explicit

promises were allegedly made: one Lehman pitch promised that the analyst "will

lead a powerful marketing campaign" for the company, presumably through

positive reports.[33]  The inevitable result of the close relationship between banking

and research, coupled with the tremendous pressure on analysts to help investment

bankers acquire business, was the issuance of research reports that were

exaggerated or outright fabricated.[34]

## C.    The Banks' Business With RSL

It was in this market environment that the Banks formed a working

relationship — both investment banking and research — with RSL.  Lehman

generated over $64 million in investment banking fees as lead or co-lead

underwriter for: (a) the RSL IPO in 1997; (b) a high yield note placement in

December 1998; (c) RSL's spin-off IPO of deltathree.com on September 3, 1999;

(d) RSL's Consent Solicitation Statement, on September 13, 1999; (e) the issuance

of $200 million in 12 7/8 percent Senior Notes in February 2000; and (f) the

issuance of $114 million aggregate liquidation preference of 7 ½ percent Series A

---

[32]    *See id.* ¶¶ 63 (Lehman); 113-117 (Goldman).

[33]    *Id.* ¶ 64.

[34]    *See id.* ¶ 69 (Lehman).

10

preferred shares in February 2000.[35]  With respect to its placement of Series A preferred shares, Lehman exercised its own over-allotment option to acquire an additional $15 million in preferred stock, which it then sold as part of the placement.[36]

Goldman also generated over $64 million in investment banking fees as lead or co-lead underwriter for: (a) the RSL IPO in 1997; (b) the offering of 9 7/8 percent Senior notes in May 1999; (c) RSL's spin-off IPO of deltathree.com on September 3, 1999; (d) the issuance of $200 million in 12 7/8 percent Senior Notes in February 2000; and (e) the issuance of $114 million aggregate liquidation preference of 7 ½ percent Series A preferred shares in February 2000.[37]  With respect to its placement of Series A preferred shares, Goldman exercised its own over-allotment option to acquire an additional $15 million in preferred stock, which it then sold as part of the placement.[38]

Finally, Morgan Stanley *also* generated over $64 million in investment banking fees as lead or co-lead underwriter for: (a) the RSL IPO in

---

[35]    *See id.* ¶ 71.

[36]    *See id.*

[37]    *See id.* ¶ 154.

[38]    *See id.*

11

1997; (b) the issuance of $200 million in 12 7/8 percent Senior Notes in February 2000; and (c) the issuance of $114 million aggregate liquidation preference of 7 ½ percent Series A preferred shares in February 2000.[39]  With respect to its placement of Series A preferred shares, Morgan Stanley exercised its own over-allotment option to acquire an additional $15 million in preferred stock, which it then sold as part of the placement.[40]

### D.    The Banks' False and Misleading Research Coverage of RSL

During the period of time that the Banks were doing investment banking work for RSL, they were also providing analyst coverage of RSL's common stock.

### 1.    Lehman's Research Coverage

Between April 30, 1999, and July 9, 1999, Lehman issued three reports characterizing RSL's stock as "real cheap," touting the importance of the deltathree.com IPO, and giving RSL its highest buy recommendation.[41]  In response to these reports, the price of RSL's common stock rose by approximately $1, $3, and $2 per share, respectively.  Lehman was subsequently appointed lead

---

[39]    *See id.* ¶ 203.

[40]    *See id.*

[41]    *See id.* ¶¶ 73-75.

12

underwriter of the deltathree.com spin-off, for which it received approximately $5 million in fees.[42] On September 7, 1999, shortly after the deltathree.com IPO, Lehman resumed its "1-Buy" recommendation, although in fact Lehman's analysts "thought little about Delta 3's long-term prospects after the IPO had been successfully sold to its investors."[43] On November 1, 1999, Lehman again rated RSL "1-Buy" with a price target of $40 per share (it was then trading at $20 3/16 per share); as a result, RSL common stock rose by approximately $3 per share.[44]

By February 2000, RSL was trading at $17 per share and some analysts at Lehman wanted to downgrade the stock. One analyst even prepared a draft report that, while lowering the price target for RSL, maintained a "bullish" price target of $35 per share.[45] The draft report began, "We are revising our Revenue and EBITDA estimates for RSL to reflect declining revenue from U.S. prepaid and wholesale and more moderate ramp in European retail revenue."[46] The investment banker handling the RSL account, however, prevailed on the

---

[42]    *See id.* ¶ 76.

[43]    *See id.* ¶ 78.

[44]    *See id.*

[45]    *See id.* ¶ 80.

[46]    *See id.*

analyst to maintain the $40 per share price target; the actual report that was issued on March 2, 2000, began: "RSL's European unit posted strong sequential revenue growth in Q4. . . ."[47]  And on March 9 and 10, Lehman issued additional reports that raised the RSL price target to $50 per share.[48]  By then, RSL was trading at $32.

Lehman maintained the $50 price target and "1-Buy" rating in a report issued May 5, 2000, notwithstanding that RSL had by then dropped to $15.50 per share.[49]  By August 14, 2000, RSL's stock had declined to $4 per share and the Lehman analyst covering RSL was fed up.  In an e-mail to his supervisor, he wrote:

> Enough is enough.  It's hard enough to be right about stocks, it's even harder to build customer relationships when all your companies blow up, you knew they were going to, and you couldn't say anything.
>                    *        *        *
> [F]or the record, I have attempted to downgrade RSLC THREE times over the last year, but have been held off for banking reasons each time.[50]

As a result, Lehman did not downgrade its rating of RSL; rather, it simply dropped

---

[47]    *See id.* ¶ 81.

[48]    *See id.*

[49]    *See id.* ¶ 84.

[50]    *See id.* ¶¶ 86-87 (emphasis in original).

14

research coverage altogether in September 2000.[51]

## 2.    Goldman's Research Coverage

In September 1999 — after having covered RSL since 1998 — Goldman moved RSL to its "Recommended List," Goldman's highest rating for covered securities, and issued a price target of $42 per share.[52]  On July 18, 2000 — notwithstanding a $48 million downward restatement of RSL's earnings for the second quarter of fiscal year 2000 — Goldman issued a report recommending RSL as a "Market Outperformer," which was followed by a drop in RSL share prices.[53] Had Goldman rated RSL lower, RSL shares would have fallen further; Goldman, however, had opted to rate RSL as "Market Outperform" to preserve RSL's "honour,"[54] notwithstanding that the downgrade merely "lower[ed] the [price] target from stupid heights to the merely absurd."[55]

---

[51]    *See id.* ¶ 88.

[52]    *See id.* ¶ 155.

[53]    *See id.* ¶ 159.

[54]    *Id.*

[55]    *Id.* ¶ 134.

15

### 3.    Morgan Stanley's Research Coverage

On April 30, 1999, Morgan Stanley issued a research report that rated RSL a "Strong Buy," its highest rating.[56]  RSL shares went up by $1 that same day.[57]  On May 21, 1999, Morgan Stanley reiterated its "Strong Buy" recommendation, and RSL shares again rose by approximately $3.[58]

On August 10, 1999 — even as RSL's price had fallen to $14 1/4 per share — Morgan Stanley again listed RSL as a "Strong Buy," causing RSL's stock price to rise by approximately $2.[59]  And on October 15, 1999, with RSL trading at $20.63 per share, Morgan Stanley rated it "Strong Buy" and listed a price target of $38 per share.[60]  Morgan Stanley gave this rating despite the fact that three days earlier RSL announced that it had to pay a $32 million restructuring charge. Morgan Stanley characterized this charge as a "positive for RSL."[61]  Morgan Stanley maintained its price target and recommendation in a report issued

---

[56]    *See id.* ¶ 205.

[57]    *See id.*

[58]    *See id.* ¶ 206.

[59]    *See id.* ¶ 207.

[60]    *See id.* ¶ 208.

[61]    *Id.*

16

November 4, 1999, even though RSL's quarterly earning were well below estimates.[62] Shortly thereafter, Morgan Stanley suspended its coverage of RSL when it lost out on its bid to be RSL's underwriter for the deltathree.com spin-off IPO.[63]

On February 18, 2000, however, Morgan Stanley resumed coverage when it was vying for placement of RSL's $115 million in preferred shares and $200 million in high yield notes.[64] At that time — when RSL common stock had dropped to $15 per share — Morgan Stanley maintained its "Strong Buy" recommendation and $38 per share price target.[65] Morgan Stanley issued a report on March 3, 2000, that contained these same ratings.[66]

By March 28, 2000, RSL stock had rebounded to trade at $27 per share, and Morgan Stanley issued a report maintaining its "Strong Buy" rating but revising its price target to $50 per share.[67] It repeated that price target in reports

---

[62]    *See id.* ¶ 209.

[63]    *See id.*

[64]    *See id.* ¶ 211.

[65]    *See id.*

[66]    *See id.* ¶ 212.

[67]    *See id.* ¶ 214.

17

dated April 4, 2000,[68] and May 26, 2000, although by that last report RSL's stock had fallen to $10 per share.[69]  Within two days of Morgan Stanley's report, however, RSL's stock rose twenty percent.[70]

None of this was enough to stop RSL's stock from spiraling downward.  On July 18, 2000, RSL dropped to $7.30 per share when it revealed the $48 million write-down of its earnings for the second quarter of fiscal year 2000.[71]  At this time — when Lehman and Goldman had slightly downgraded their rating of RSL — Morgan Stanley rated RSL a "Strong Buy" and insisted that its valuation was "compelling."[72]  By the beginning of August, RSL's bond rating had been dropped by Moody's Investment Service and RSL common stock was selling at approximately $1 per share; a Morgan Stanley analyst, however, remarked that "This company is selling dirt cheap, I don't think it could be trading at these levels."[73]

---

[68]    *See id.* ¶ 216.

[69]    *See id.* ¶ 218.

[70]    *See id.*

[71]    *See id.* ¶ 220.

[72]    *Id.*

[73]    *See id.* ¶ 222.

\*       \*       \*

On December 29, 2000, RSL common stock was trading at $0.20 per share and was de-listed from the NASDAQ exchange.[74]

### E.    The Instant Suit

On April 28, 2003, the Banks settled charges relating to analyst conflicts of interest with the SEC and the Attorneys General of various states, including task force leaders Alabama, New York, and Utah.[75]  Those authorities had charged the Banks with "violat[ing] several rules of the NASD and NYSE by issuing false and misleading analyst reports on numerous companies which served to artificially inflate the prices of numerous companies, including RSL."[76]  In addition to accepting other "remedial obligations," Lehman settled the charges for $50 million, Goldman for $110 million, and Morgan Stanley for $125 million.[77]

Plaintiffs allege that the Banks' settlement with regulators first informed them of the fraud; this lawsuit followed less than three months later, on July 15, 2003.  Plaintiffs assert three claims under Section 10(b) of the Exchange

---

[74]    *See id.* ¶ 90.

[75]    *See id.* ¶ 225.

[76]    *Id.*

[77]    *See id.* ¶¶ 228-230.

19

Act and Rule 10b-5 promulgated thereunder, one against each Bank. Plaintiffs
allege, in sum, that the Banks made untrue statements of material fact and omitted
to disclose material facts in four ways.[78] *First*, because the analysts' ratings did
not reflect their true opinions of RSL. *Second*, because the Banks maintained an
undisclosed policy never (or rarely) to issue their lowest recommendations, such
as "Market Underperform" or "Sell." *Third*, because the analyst reports failed to
disclose that the Banks' ratings and recommendations were "tarnished by an
undisclosed conflict of interest in that the research analysts were acting as quasi-
investment bankers for RSL and the companies at issue, often initiating,
continuing, and/or manipulating research coverage for the purpose of attracting
and keeping investment banking business with RSL and other covered clients,
thereby producing misleading reports that were neither objective nor
independent."[79] And *fourth*, because the Banks failed to comply with the
regulations of the SEC and NASD regarding communications to the investing
public.

   Plaintiffs further allege that these undisclosed conflicts of interest
caused their damages:

---

[78]   *See id.* ¶ 240.

[79]   *Id.*

Throughout the Class Period, Defendant[s'] material misrepresentations and omissions induced a disparity between the market price and the true "investment quality" of RSL securities. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts . . . the market price of RSL securities were artificially inflated during the Class Period, and Plaintiffs and the Class were deceived as to the true investment quality of RSL securities. In ignorance of the fact that the market price of RSL securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant[s], or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendant[s] but not disclosed in public statements by Defendant[s] during the Class Period, Plaintiffs and other members of the Class acquired RSL securities during the Class [P]eriod at artificially inflated prices and were damaged thereby.[80]

## III.    LEGAL STANDARD

"Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations.'"[81]  The task of the court in ruling on a Rule 12(b)(6) motion is "'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might

---

[80]     *Id.* ¶ 244 (Lehman); *see id.* ¶¶ 255 (Goldman); 266 (Morgan Stanley).

[81]     *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (emphasis added) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

be offered in support thereof.'"[82]  When deciding a motion to dismiss pursuant to

Rule 12(b)(6), courts must accept all factual allegations in the complaint as true

and draw all reasonable inferences in plaintiff's favor.[83]

At the motion to dismiss stage, the issue "'is not whether a plaintiff is

likely to prevail ultimately, but whether the claimant is entitled to offer evidence

to support the claims.  Indeed it may appear on the face of the pleading that a

recovery is very remote and unlikely but that is not the test.'"[84]

## IV.    DISCUSSION

The Banks assert two independent bases for dismissal of the

Complaint.  *First*, they argue that plaintiffs have failed to plead loss causation, an

element of securities fraud, as that term is understood in the Second Circuit.

*Second*, they argue that the claims are time-barred, as plaintiffs were on notice of

analyst conflicts of interest as early as April 2000.  Goldman and Morgan Stanley

additionally argue that the Complaint does not plead certain elements of securities

---

[82]      *Pierce v. Marano*, No. 01 Civ. 3410, 2002 WL 1858772, at *3
(S.D.N.Y. Aug. 13, 2002) (quoting *Saunders v. Coughlin*, No. 92 Civ. 4289, 1994
WL 98108, at *2 (S.D.N.Y. Mar. 15, 1994)).

[83]      *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.
2002).

[84]      *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002) (per curiam)
(quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)).

fraud with the particularity mandated by the PSLRA; Lehman does not join in this

argument.

### A.    Loss Causation

### 1.    Applicable Law

To maintain a claim for securities fraud, a plaintiff must plead, among

other things, both (1) that it relied upon defendant's allegedly fraudulent conduct

in purchasing or selling securities, and (ii) that defendant's conduct caused, at

least in part, plaintiff's loss.[85]  These two elements are known, respectively, as

"transaction causation" and "loss causation."

"Transaction causation is generally understood as reliance."[86]  Under

settled Supreme Court precedent, a rebuttable presumption of transaction

causation may be established under the "fraud on the market" theory, even where a

plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale.

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

---

[85]    *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001).

[86]    *Id.* at 186.

23

> . . . The causal connection between the defendants' fraud and the
> plaintiffs' purchase of stock in such a case is no less significant
> than in a case of direct reliance on misrepresentations.[87]

Pleading that defendants perpetrated a fraud on the market, therefore, fulfills a

plaintiff's transaction causation pleading requirement.

Loss causation, on the other hand, refers to the requirement that a

plaintiff demonstrate that the fraudulent scheme caused her loss.[88]  In the case of

10b-5 actions for material misstatements or omissions, loss causation generally

requires a plaintiff to show that her investments would not have lost value if the

---

[87]    *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (alterations in
original) (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).

[88]    *See Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716-17 (2d Cir.
1980) (Meskill, J., dissenting) (noting that "a fundamental principle of causation
which has long prevailed under the common law of fraud and which has been
applied to comparable claims brought under the federal securities acts . . . is, quite
simply, that the injury averred must proceed directly from the wrong alleged and
must not be attributable to some supervening cause.").  In 1995, Congress codified
the loss causation requirement in the PSLRA:

> In any private action arising under this chapter, the plaintiff shall
> have the burden of proving that the act or omission of the
> defendant alleged to violate this chapter caused the loss for which
> the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

facts that defendant misrepresented or omitted had been known.[89]

In *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, the Second

Circuit held that plaintiffs could plead causation in securities fraud cases by

alleging:

> both that [Plaintiffs] would not have entered the transaction but
> for the misrepresentations [*i.e.*, transaction causation] *and* that the
> defendants' misrepresentations induced a disparity between the
> transaction price and the true "investment quality" of the
> securities at the time of transaction [*i.e.*, loss causation].[90]

Thus, as recently as 2001, this circuit *appeared* to hold that allegations of artificial

inflation, alone, are sufficient to plead transaction causation.

More recently, however, the Second Circuit decided *Emergent*

*Capital Investment Management, LLC v. Stonepath Group, Inc.*,[91] which purported

to "clarify" the rule of *Suez Equity*.[92]  The *Emergent Capital* court explained:

> We did not mean to suggest in *Suez Equity* that a purchase-time
> loss allegation *alone* could satisfy the loss causation pleading
> requirement.  To the contrary, we emphasized that the plaintiffs
> had "also adequately alleged a second, related loss. . . ."
> [T]herefore, we do not think *Suez Equity* undermined our

---

[89]    *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250
F.3d 87, 96 (2d Cir. 2001).

[90]    *Id.* at 97-99.

[91]    343 F.3d 189 (2d Cir. 2003).

[92]    *Id.* at 198.

established requirement that securities fraud plaintiffs demonstrate a causal connection between the content of the alleged misstatements or omissions and "the harm actually suffered."[93]

Thus, "[i]t is *now* clear that allegations of artificial inflation, without more, do not suffice to plead loss causation in securities fraud cases involving material misstatements and omissions."[94]

### 2.   Understanding *Emergent Capital* in Misrepresentation Cases

The central teaching of *Emergent Capital*, then, is that in misrepresentation cases,[95] a plaintiff must allege something more than merely artificial inflation. What remains murky, however, is what that "something more" must be. Obviously, a plaintiff need not allege a totally independent basis for her loss *in addition to* artificial inflation; if that were the case, then allegations of artificial inflation would be superfluous. *Emergent Capital* implicitly rejected that notion when it held that allegations of a purchase-time price disparity "*alone* could [not] satisfy the loss causation pleading requirement." The inference to be drawn

---

[93]   *Id.* at 198-99 (emphasis in original) (quoting *Suez Equity*).

[94]   *In re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d 668, 672 (S.D.N.Y. 2003).

[95]   The rule of *Emergent Capital* has been applied differently in market manipulation cases than in material misrepresentation cases. *See, e.g., id.*

is that allegations of artificial inflation *plus* something else (described only as a "second, related loss") suffice.

In *Emergent Capital*, plaintiff sued for misrepresentations allegedly made in connection with its investment into the preferred stock of a company called Net Value Holdings, Inc. (NETV). In particular, plaintiff alleged that NETV misstated the size of its largest asset and failed to disclose the prior working relationship between one of NETV's principals, Andrew Panzo, and a man by the name of Howard Appel. According to the complaint, Panzo and Appel (who had been barred from the securities industry by the NASD) had a history of engaging in "pump and dump" schemes, whereby "persons holding certain securities fraudulently inflate their price (the 'pump') in order to sell at an artificial profit (the 'dump')."[96]

According to the *Emergent Capital* court, these allegations were sufficient to allege loss causation. The court, reading the complaint in the light most favorable to the plaintiff, concluded that Panzo and Appel might be operating a pump and dump scheme through NETV. The court then held that pump and

---

[96]    *United States v. Salmonese*, 352 F.3d 608, 612 (2d Cir. 2003) (defining pump and dump schemes).

27

dump allegations are sufficient to plead loss causation.[97]  Thus, in *Emergent Capital*, the "something more" was the selling of "substantial quantities" of NETV stock.[98]

The *Emergent Capital* court also clarified what the "something more" was in *Suez Equity*.  In that case, plaintiffs sued the defendant bank because of alleged misstatements by the bank when soliciting plaintiffs' investment into a health-care financing venture called SAM Group.  Defendant provided plaintiffs with a report from a private investigator who had conducted a background check into SAM's principal, J. Christopher Mallick.  Plaintiffs alleged that defendant redacted material adverse information about Mallick, including his bankruptcy, a number of civil suits pending against him, three tax liens, several lawsuits that had been decided against Mallick, Mallick's bad credit, and some second-hand critical comments about him.  By withholding this information, plaintiffs alleged that defendant concealed Mallick's lack of "sound business, financial management and organization skills, sound judgment, character, honesty, commitment and

---

[97]    *See* 343 F.3d at 198 ("Because the second amended complaint may be read as alleging that NETV was a 'pump and dump' scheme, appellant has adequately alleged loss causation for the purposes of its federal securities fraud claims.").

[98]    *Id.* at 197.

diligence."[99]

The district court dismissed the case, holding that plaintiffs had failed to adequately plead loss causation. The Court of Appeals reversed the district court's dismissal, holding that a "liberal reading of the complaint" included adequate allegations of loss causation.[100] Plaintiff had pleaded loss causation, the court reasoned, by alleging a misrepresentation that was "directly related to the stock's intrinsic investment characteristics,"[101] in the sense that "[t]he alleged deliberate concealment of the financial and business problems of the leader of SAM Group . . . gave plaintiffs an inaccurate perspective from which to value the Group securities."[102] For the *Suez Equity* court, the critical factor in determining whether plaintiff alleged loss causation was whether the misrepresentations related to the value of the security. Indeed, the court distinguished its prior precedent on this basis:

> A comparison of *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980), and *Bennett v. United States Trust Co.*, 770 F.2d 308 (2d Cir. 1985), elucidates why the plaintiffs' allegations of loss causation are sufficiently particular.

---

[99]     250 F.3d at 94 (quoting the complaint).

[100]    *Id.* at 96.

[101]    *Id.* at 97.

[102]    *Id.*

29

\*    \*    \*

> [B]ecause the misrepresentation in *Marbury Management* induced the purchase (transaction loss) and related to the stock's value (loss causation), it was causally related to the loss. In *Bennett* since the margin rules [which were the subject of the defendant's alleged misrepresentation] were extrinsic to the stock, the complaint failed to allege loss causation.[103]

The *Suez Equity* court found that, under this test, plaintiffs had sufficiently alleged loss causation because the misrepresentations pertained to the "investment quality" of the securities.[104]   The court also acknowledged a "second, related loss" — "that Mallick's concealed lack of managerial ability induced SAM Group's failure."[105]   This allegation was the "something more" in *Suez Equity*.[106]

Taken together, the facts of *Emergent Capital* and *Suez Equity* (as understood after the gloss of *Emergent Capital*) give some context to the requirements for pleading loss causation.   In both cases, it was critical that defendants had made misrepresentations that went to the value of the security — by concealing material adverse information about the principals of the issuing

---

[103]   *Id.*

[104]   *Id.* at 98.

[105]   *Id.*

[106]   In *Suez Equity*, the "second, related loss" was an *independent* basis supporting plaintiffs' adequate pleading of loss causation.   When seen through the lens of *Emergent Capital*, however, this "second, related loss" becomes the "something more."

companies. And in both cases, the ultimate decline in the companies' stock price was attributable to the very thing that the defendants allegedly lied about.

In *Suez Equity*, defendant allegedly lied about the business acumen of Mallick (which went to the "investment quality" of SAM Group securities), and it was Mallick's lack of business acumen that caused the failure of SAM Group. In *Emergent Capital*, defendant allegedly concealed Panzo's prior business relationship with Appel involving pump and dumps (which suggested that the "investment quality" of NETV was misstated), and it was the pump and dump that caused the decline of NETV stock. In neither case was the plaintiff required to show a causal link between the misrepresentation itself and the loss. It was enough that (1) the misrepresentation artificially inflated the value of the security, or otherwise misrepresented its investment quality, and (2) the *subject* of the misrepresentation *caused* the decline in the value of the security.[107] In those circumstances, loss was foreseeable because the misrepresentations induced plaintiffs to purchase securities at artificially inflated prices, and then those securities lost value as a result of the very information concealed by the

---

[107]     *See Emergent Capital*, 343 F.3d at 199 (reaffirming the "requirement that securities fraud plaintiffs demonstrate a causal connection between the *content* of the alleged misstatements or omissions and the harm actually suffered") (emphasis added) (quotation marks and citation omitted).

31

misrepresentations.  The misrepresentations therefore caused the plaintiffs' losses and "were the reason the transaction turned out to be a losing one,"[108] even if they did not cause the decline in the value of the securities.

### 3.    The Complaint Sufficiently Alleges Loss Causation

Applying the standard of *Emergent Capital*, there is no doubt that plaintiffs here have adequately alleged that the Banks' misrepresentations caused their loss.  In short, the Banks are alleged to have lied about the financial health and future prospects of RSL — namely, the investment quality of RSL securities.[109]  Moreover, RSL ultimately failed because of the very facts that the Banks misrepresented: that RSL was in financial trouble and that the entire "internet telephony sector" was collapsing.

It is true that the Banks did not *conceal* any facts regarding RSL — they did not withhold information about RSL's debts or assets or about any important financial events in the life of RSL, including the October 1999 $3 million restructuring charge or the July 2000 $48 million write-down.  Nor did

---

[108]    *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994).

[109]    *See* Compl. ¶ 244 (alleging that Lehman's "material misrepresentations and omissions induced a disparity between the market price and the true 'investment quality' of RSL securities."); *see id.* ¶¶ 255 (Goldman); 266 (Morgan Stanley).

they conceal it when RSL earnings came in below estimates. What the Banks did do, however, was manipulate these objective facts by misstating the Banks' true opinions of the impact of these events on the investment quality of RSL securities. Rather than identify these events for what they really were — the first warnings signs of the demise of RSL — the Banks instead injected bullish reports into the market suggesting that RSL was being drastically underpriced, that events such as the restructuring charge were aberrations, and that this was the perfect time to buy RSL stock because it was far cheaper than it ought to have been. The Banks' purportedly expert opinions thus concealed the actual financial state of RSL. In other words, even though the true facts were available for the world to see, by affirmatively opining on the meaning of those facts the Banks obscured the logical conclusion that RSL was failing.[110]

The Banks' research reports are thus much like the redacted report on Mallick that was the subject of the *Suez Equity* lawsuit:

> The alleged deliberate concealment of the financial and business problems of the leader of SAM Group, the complaint goes on to allege, gave plaintiffs an inaccurate perspective from which to

---

[110]    The effects of the Banks' misstatements were exacerbated by the breadth of the scheme alleged. This case differs from a classic misrepresentation case because it involves a scheme that includes multiple misrepresentations by a number of defendants over a significant period of time. The complaint alleges that three banks made a total of 22 misrepresentations over a sixteen month period.

value the Group securities. If defendants had not provided the Modified Report, plaintiffs assert, they would have conducted their own due diligence investigation of Mallick, would have uncovered the various negative facts about his background, and would not have invested in SAM Group. Under this chain of factual allegations, it would have been foreseeable to defendants that facts concealed in the Modified Report would have indicated Mallick's inability to run the Group, and would have forecast its (eventually fatal) liquidity problems. These allegations in our view are sufficient to survive a motion to dismiss on the ground of failure to sufficiently plead loss causation.[111]

The allegations are nearly identical here. By hyping RSL stock, the Banks "gave plaintiffs an inaccurate perspective from which to value [RSL] securities." Had the Banks not issued the reports, plaintiffs would have uncovered the various warning signs about RSL and, more importantly, would have likely seen them for what they were. It was foreseeable, in other words, that had the Banks not released the tainted analyst reports, the information already available to the market would have "forecast [RSL's] (eventually fatal) liquidity problems." Such allegations are explicitly sufficient under *Suez Equity*, and are the "something more" required by *Emergent Capital*.

Indeed, Judge Gerard Lynch recently had occasion to consider loss causation in a case similar to this one. In *DeMarco v. Robertson Stephens, Inc.*, plaintiffs alleged that the defendant investment bank artificially inflated the price

---

[111]    *Id.* at 97.

34

of Corvis Corp. securities by "disseminating research analyst reports advising

investors to purchase the stock at a time when defendants actually believed the

stock to be greatly overvalued."[112]  Defendant then sold its own holdings of Corvis

shares, although plaintiffs did not allege that those sales drove the price of Corvis

downward.[113]

Rather, the court articulated the following theory of loss causation:

> [P]laintiffs' theory of the case is that these defendants deliberately
> participated in inflating the bubble in the first place by
> disseminating the very misrepresentations at issue.  Thus, the

---

[112]    No. 03 Civ. 590, 2004 WL 51232, at *1 (S.D.N.Y. Jan. 9, 2004).

[113]    Judge Lynch rejected the notion that plaintiffs had pleaded a pump and dump scheme that would suffice to allege loss causation.  The same logic applies here.  Plaintiffs argue that their allegations that the Banks exercised over-allotments of preferred stock amount to a "dumping" of RSL securities, and that the whole scheme is thus a pump and dump.  *See* Pl. Mem. at 25-26 ("In addition to the Complaint's detailed 'scheme to defraud' allegations, Plaintiffs were also able to specifically allege Defendants' misuse of the more classic examples of market manipulation in the form of 'pump and dump' misconduct by each of the Defendants.").  But "'pump and dump' is not a talisman, and merely citing those words is not sufficient to allege loss causation."  2003 WL 51232, at *10.  *First*, the stock pumped (RSL common stock) and the stock dumped (RSL Series A preferred shares) are different; the Complaint does not allege any connection between the prices of the two.  *Second*, the alleged pump and dump covers only a small fraction of the conduct complained of.  The Banks were allegedly pumping RSL stock well before, and well after, the Banks exercised their over-allotments.  *Third*, plaintiffs have not alleged any connection between the alleged dump and their loss, nor have they alleged circumstantial facts that could give rise to an inference of causation, such as that the Banks' combined market power allowed them to easily manipulate the price.

publication of the intentionally false opinions that allegedly distorted the market price of Corvis stock contained the seeds of loss causation. Unless an intervening event were to occur first, the author of the false opinion will be appropriately held responsible when the market eventually corrects the artificially inflated price by bursting the bubble. . . . [D]efendants here are alleged to have induced the purchase of Corvis stock by doing their best to pump up the very bubble that then predictably collapsed. Indeed, they are alleged to have known that the bubble was already, as to Corvis, in the process of deflating, even as they flogged the stock to less knowledgeable investors by blowing as much hot air as they could.

Defendants' argument that loss causation is not alleged because plaintiffs assert that the misrepresentations increased the Corvis stock price misses the point that the origins of loss causation reside precisely in that artificial price inflation.[114]

For precisely these reasons, plaintiffs here have alleged loss causation. The Banks attempt to distinguish *DeMarco* by noting that it preceded my post-*Emergent Capital* decision in *In re Initial Public Offering Securities Litigation*.[115] This distinction is meaningless. In fact, *Demarco* was decided after *Emergent Capital* and is in perfect harmony with both that decision and with my later decision in

---

[114]    No. 03 Civ. 590, 2004 WL 51232, at *10 (S.D.N.Y. Jan. 9, 2004) (emphasis added).

[115]    *See* Reply Memorandum of Law in Further Support of Defendant Lehman Brothers Inc.'s Motion to Dismiss at 4 ("Plaintiffs' reliance on Judge Lynch's opinion in *DeMarco* is entirely inappropriate" because "Judge Lynch's opinion relied on this Court's pre-*Emergent Capital* decision in *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) and not this Court's more recent decision in *In re IPO 2*, [297 F. Supp. 2d 668 (S.D.N.Y. 2003)]").

*IPO*.  Judge Lynch held that the securities in *DeMarco* declined when "the market

eventually correct[ed] the artificially inflated price by bursting the bubble."  This

is consistent with my decision in *IPO*:

> [I]nflated stock prices can lead to a loss in one of two ways.
> *First*, there can be an external correction to the market, such as a
> corrective disclosure.  Once the fraud is revealed, it no longer
> taints the stock price and the artificial inflation disappears.  The
> result is a sale at true value, causing a loss based on the inflated
> price at the time of purchase.  *Second*, there can be a market
> correction, where ordinary market forces affect the rate of
> artificial inflation.  If, for example, the normal functioning of the
> securities market causes the inflationary effect to dissipate over
> time, a customer who buys and sells at inflated prices will still
> suffer a loss based on the inflated price at the time of purchase so
> long as the price was *less* inflated at the time of sale.[116]

Plaintiffs here have alleged a number of events that operated, essentially, as

disclosures or market corrections.  They have alleged that RSL's earnings fell

short of its estimates, that it had to pay a $3 million restructuring charge, and that

it had to write-down its earnings by $48 million.  Taking these allegations in the

light most favorable to plaintiffs, all of these could be seen as disclosures or

corrective events.  And after each of these events, the Banks issued new reports to

counteract the effect and to further prop up the price of RSL stock.  Ultimately,

however, the true "investment quality" of RSL was so poor that the Banks could

---

[116]    *In re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d at 673.

not plausibly continue to issue bullish reports and they eventually dropped coverage. This was the ultimate disclosure — when the Banks dropped coverage, they essentially conceded (in the eyes of the investing public) that their previous recommendations were mistaken. Dropping coverage altogether was just as surely a disclosure as a restated analyst report with a "Sell" recommendation would have been.

In sum, the Banks, knowing that RSL was actually in decline, inflated the price of RSL shares and then worked doubly hard to conceal or obfuscate the meaning of every fact that would have revealed that decline to the investing public. How could the Banks *not* have foreseen the loss to investors?

## B.   Misrepresentations and Scienter

Under the securities law, a valid claim of securities fraud based on misrepresentations and/or omissions must contain allegations that (1) the defendant made a statement that was *objectively* misleading, (2) that the defendant knew that her statement was misleading and *intended* to mislead, and (3) that the plaintiff was actually misled by and *relied on* the statement.[117]   In other words, for

---

[117]    These are, of course, not the only elements of securities fraud.  In order to plead a Rule 10b-5 claim based on material misrepresentations or omissions, "[a] plaintiff must allege" the following elements:

that in connection with the purchase or sale of securities, the

38

a statement to be actionable, it must be both objectively misleading, as well as

subjectively misleading from the defendant's point of view (*i.e.,* scienter) as well

as from the plaintiff's (*i.e.,* reliance).  The requirement that a statement be

objectively misleading — and that the plaintiff explain why the statement was

misleading — is contained in paragraph (b)(1) of the PSLRA.[118]  The requirement

that the defendant intended to mislead (*i.e.,* the scienter requirement) is contained

in paragraph (b)(2) of the PSLRA.[119]

In addition to objecting to the complaint's allegations of loss

causation, Goldman and Morgan Stanley (but not Lehman) also argue that the

complaint fails to plead, with the requisite particularity, either the alleged

misstatements under paragraph (b)(1) or the defendants' states of mind under

paragraph (b)(2).  Neither contention has merit.

---

defendant, acting with scienter, made a false material
misrepresentation or omitted to disclose material information and
that plaintiff's reliance on defendant's conduct caused [plaintiff]
injury.

*Caiola v. Citibank, N.A.*, 295 F.3d 312, 312 (2d Cir. 2002) (quotation marks and
citations omitted).

[118]    *See* 15 U.S.C. § 78u-4(b)(1).

[119]    *See* 15 U.S.C. § 78u-4(b)(2).

## 1.    Misrepresentations and Omissions

In any case "in which the plaintiff alleges that the defendant" either

"made an untrue statement of a material fact" or "omitted to state a material fact,"

the complaint must specify:

> [1] each statement alleged to have been misleading, [2] the reason
> or reasons why the statement is misleading, and [3], if an
> allegation regarding the statement or omission is made on
> information and belief, the complaint shall state with particularity
> all facts on which that belief is formed.[120]

There is no question that plaintiffs have identified the allegedly misleading

statements: they are the buy recommendations and price targets contained in the

Banks' research reports.  Nor is there any question about the basis for plaintiffs'

information and belief: those few allegations that are based on information and

belief are based on material derived from the Banks' settlements with regulators.

Rather, Goldman and Morgan Stanley argue that the complaint fails

to allege the second requirement: why the misstatements are misleading.  On this

point, they rely on recent decisions dismissing analyst conflict cases holding that

plaintiffs must allege more than the mere falsity of the analysts' recommendations.

For example, in *Pfeiffer v. Goldman, Sachs & Co.* the court explained:

> The fatal flaw of the pleadings is that nowhere does the Amended

---

[120]    15 U.S.C. § 78u-4(b)(1).

40

> Complaint adequately state why the recommendations were fraudulent or misleading. . . . [P]laintiffs provide no facts to show that the Defendants' research analysts actually had a less-optimistic view of Covad and that the Defendants' bankers pressured them to issue false ratings on Covad. . . . [T]he fact that Covad was in tenuous financial condition at the time and eventually went bankrupt does not mean that there was no rational basis for each's positive recommendations; plaintiffs' conclusion to the contrary is grounded more in hindsight than fact. Lacking is any specific allegation that the ratings were false, as opposed to overly optimistic or unwise — *i.e.*, that the Defendants' analysts actually regarded Covad as a very poor investment.[121]

This argument misses the mark. As a matter of law, *Pfeiffer* conflates the requirement that plaintiffs plead that misstatements are made with fraudulent intent — *i.e.,* the scienter element — with the requirement that they explain why the statement is misleading.[122]

---

[121] No. 02 Civ. 6912, 2003 WL 21505876, at *5 (S.D.N.Y. July 1, 2003) (citation omitted). *See also Merrill Lynch*, 273 F. Supp. 2d at 370.

[122] That *Pfeiffer* impermissibly combined two distinct elements of securities fraud is underscored by its citation to cases discussing "fraud in hindsight," where a plaintiff sues for, *e.g.*, accountings or earning statements that turn out to be false. It is true, as *Pfeiffer* notes, that cases of "fraud in hindsight" do not give rise to claims for securities fraud, but the reason why such claims are not actionable is because of an absence of scienter. *See, e.g., In re Carter-Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 42 (2d Cir. 2000) (dismissing claim of "fraud in hindsight" for lack of scienter); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (explaining that allegations of "fraud by hindsight" fail this circuit's scienter test); *Stevelman v. Alias Res. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (allegations of "fraud by hindsight" do not suffice to allege conscious misbehavior or recklessness) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)).

41

A statement is objectively misleading — and thus satisfies the requirement of paragraph (b)(1) — simply by virtue of being false. For example, if someone says on Wednesday, "today is Monday," that statement is misleading.[123] A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact.

But a statement does not become fraudulent simply by virtue of being false (or otherwise misleading) — the other elements of fraud, such as scienter and reliance, must also be present. In the earlier example, the statement "today is Monday" is fraudulent only if the speaker's statement was intentionally misleading because she knew what day it was (*i.e.,*the speaker acted with scienter) and if the listener, not knowing what day it was, relied on the statement. The point

---

[123]    *See, e.g., In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 329 ("Plaintiffs' burden with respect to the first two requirements of paragraph (b)(1) is self-evident. In order to plead a claim, a plaintiff cannot generically aver that the defendant made a material misstatement or omission, nor may she merely copy the language of the statute. Rather, plaintiff must specifically plead the statements or omissions that give rise to her cause of action and then *explain why they were false or* misleading.") (emphasis added).

Because the misrepresentations in this case involve statements of opinion rather than fact, this discussion is somewhat complicated. Nonetheless, the Supreme Court has confirmed that misstatements of opinion are actionable, so long as the speaker deliberately misrepresented her actual opinion. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991). Whether a misrepresentation is *deliberate* is, of course, a question of scienter, not of whether the plaintiffs have identified the alleged misstatements and explained why they are misleading.

42

is that each of these are distinct elements of securities fraud and ought not be confused or combined. Paragraph (b)(1) of the PSLRA requires only that a statement be *objectively* false or otherwise misleading.

Here, the Banks issued price targets that were allegedly misleading because RSL stock never approached, let alone reached, those targets. The Banks also made buy recommendations that were allegedly misleading because the Banks predicted that RSL would vastly outperform the market when they believed it would not. The complaint specifically alleges why the Banks' reports were misleading. According to the complaint:

1. [The Banks] regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

2. [The Banks] caused the analysts covering RSL to assign and maintain bullish ratings for RSL stock, in order to pursue and win and/or maintain investment banking business from RSL, including but not limited to: (a) appointment as underwriter for RSL's lucrative Delta 3 spin-off IPO; (b) the lucrative lead placement agent positions for RSL's May 1999 and February 2000 issuance of Senior Notes, as well as Series A preferred shares, including rights to exercise over-allotment options and sell RSL's converted Series A shares to the public;

3. [A]nalysts were subject to financial conflicts of interest that adversely impacted the independence of [their] research product, including analyst ratings, reports, and price targets, concerning RSL;

43

4.      [The Banks] failed to adequately manage and supervise [their] analysts or impose adequate controls in order to protect the objectivity of its published research, including allowing companies, including RSL, to review and approve analyst reports prior to being published;

5.      [A]s a result of the foregoing, [the Banks'] analysts issued more positive reports and ratings, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated, throughout the Class Period.[124]

These allegations are more than sufficient to apprise the Banks of why their statements were misleading.

## 2.      Scienter

Under the PSLRA, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[125]  The Second Circuit has explained that facts giving rise to a strong inference of scienter can be alleged in either of two ways: the plaintiffs may plead "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness."[126]  In general, a strong

---

[124]      *See* Compl. ¶ 160.  Plaintiffs have similarly identified, separately, why *each* of the Banks' reports were misleading.  *See id.* ¶¶ 77, 79, 82, 85, 89 (Lehman), 160 (Goldman), 210, 213, 215, 217, 219, 221, 223 (Morgan Stanley).

[125]      15 U.S.C. §78u-4(b)(2).

[126]      *Novak*, 216 F.3d at 310-11.

44

inference of scienter "may arise where the complaint sufficiently alleges that the

defendants: (1) benefitted in a concrete and personal way from the purported

fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to

information suggesting that their public statements were not accurate; or (4) failed

to check information they had a duty to monitor."[127]    Plaintiffs have arguably

alleged facts supporting all four of these categories.    Indeed, they have made

allegations suggesting that analysts at each Bank were issuing recommendations

that were contrary to their true evaluations of the relevant securities or were

otherwise tainted by conflicts of interest — strong circumstantial evidence of

conscious misbehavior.[128]

      At the very least, however, plaintiffs have certainly alleged scienter

by showing that the Banks had both the motive and the opportunity to commit

fraud.    Plaintiffs have indisputably alleged that the Banks had the opportunity to

---

[127]    *Id.* at 311 (citations omitted).

[128]    *See, e.g., id.* ¶¶ 80 (e-mail from Lehman analyst asking to downgrade
RSL); 142 (statement of Goldman's RSL analyst explaining that he would not
issue a report "without direct input from the company and their review of the
report"); 144 (statement of Goldman's RSL analyst promising to issue reports "to
the[] liking" of a covered company); 152 (Goldman analyst complaining that RSL
"think[s] the investment rating is purchased"); 178 (Morgan Stanley analyst
refusing to give research coverage to a company until the company "mandated
[Morgan Stanley] on a large investment banking transaction"); 183 (Morgan
Stanley analyst explaining his importance to investment banking business).

commit the fraud — they were the entities that released the allegedly fraudulent analyst reports.[129]  For purposes of this motion, the Banks do not contest that they had the opportunity to make the alleged misstatements.  The only question is whether they also had a motive.

A plaintiff shows motive by alleging "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[130]  Plaintiffs have alleged at least two sufficient motives for the Banks' fraud.

*First*, the motive prong is satisfied when the defendant is "alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit."[131]  Plaintiffs have alleged that the Banks inflated the price of RSL securities and then each exercised their respective over-

---

[129]    *See, e.g., In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 364 ("the Individual Defendants who signed the registration statements were intimately involved in the IPO process with the Underwriters (*e.g.*, marketing the company and attending road shows)" and therefore had the opportunity to commit fraud).

[130]    *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 170 (2d Cir. 2000).

[131]    *Novak*, 216 F.3d at 308.  *See also Stevelman,* 174 F.3d at 85; *Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985).

allotments of RSL's Class A preferred stock and sold those shares on the open market. Those sales are precisely the sort of "concrete benefit" that demonstrate the Banks' motive to make the alleged misrepresentations.

*Second*, the motive prong is also satisfied because the Banks allegedly doctored their analyst reports in order to win investment banking business from RSL. These allegations are not merely generalized statements about the Banks' profit motives; such allegations would be insufficient.[132] Plaintiffs here have essentially alleged a *quid pro quo* — the Banks gave RSL favorable research coverage in exchange for investment banking business. In some cases, this was an explicit bargain.[133] In others, there are no explicit allegations of a deal to trade

---

[132]    *See Shields*, 25 F.3d at 1130-31.

[133]    *See, e.g.,* Compl. ¶¶ 178 ("Morgan Stanley analysts declined to cover some companies that refused to award investment banking business to Morgan Stanley. One senior analyst wrote in a year 2000 self-evaluation that he had declined one company's request for research coverage for four years, and added that he had 'insisted that we first be mandated on a large investment banking transaction.' When the company provided Morgan Stanley with banking business in connection with a spin-off, the analyst initiated coverage with a bullish Outperform rating."); 121 ("In early 2000, a Goldman Sachs investment banking client complained that Goldman Sachs had yet to initiate research coverage on his company. The client emailed a Goldman Sachs investment banker, informing her that its stock was 'dropping like a rock,' and stated: 'Our hopes were that a buy coverage from our lead banker might help stabilize the stock.' In response, Goldman Sachs investment bankers complained to analysts, who asserted that . . . 'research coverage is imminent.'").

research coverage for business, but there are remarkable coincidences that, viewed in the light most favorable to the plaintiffs, suffice to suggest that *quid pro quo*.[134]

It is true that *some* of the most specific allegations of scienter in the complaint do not pertain to RSL, but rather to other companies that the Banks dealt with. The Banks argue that this is a basis for concluding that plaintiffs have not sufficiently alleged scienter.[135] However, even where the heightened pleading standards of the PSLRA and Rule 9(b) are concerned, a court is directed to draw every inference in favor of plaintiffs on a motion to dismiss.[136] Here, plaintiffs have alleged wide-spread conflicts of interest between the analyst and investment banking departments at three major Banks. They have made specific allegations — based on, among other things, e-mails from the Banks' own analysts — suggesting that the Banks received investment banking business in return for

---

[134]    *See, e.g., id.* ¶¶ 209-211 (noting that Morgan Stanley dropped research coverage when it was not selected to underwrite the Delta 3 spin-off IPO, and then resumed coverage when it was appointed co-lead placement agent for RSL's offering of preferred shares and high yield notes). *See also In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 425 (S.D.N.Y. 2003) (finding sufficient plaintiffs' allegations that Salomon Smith Barney "had a motive and opportunity to commit a fraud in connection with the alleged omissions in the analyst reports of any meaningful description of the *quid pro quo* arrangement").

[135]    *See, e.g., Pfeiffer*, 2003 WL 21505876, at *6.

[136]    *See In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 326-28 (explaining that Rules 8(a) and 9(b) must be read in harmony).

48

favorable analyst coverage, as part of a standard industry practice.  Moreover, they have alleged that the Banks' relationship with RSL was the same as with these other companies — the Banks issued positive research reports on the heels of new investment banking business and in the face of overwhelming information calling into question RSL's financial health.  Taken together, I can easily infer that the Banks' relationships with RSL were subject to the same conditions as with other companies.  That being so, plaintiffs have amply pleaded facts giving rise to a strong inference that the Banks made the alleged misstatements with scienter.

## C.    Statute of Limitations

I turn finally to the Banks' argument that this case is time-barred. Claims of securities fraud must be filed within either one[137] or two years[138] "after the discovery of the facts constituting the violation."[139]  Whether the one or two year statute of limitations applies is a question on which the federal courts are divided,[140] and which, fortunately, all parties agree need not be resolved in this

---

[137]    *See Lampf, Pleva, Lipkind, Prupis & Petigrow & Gilbertson*, 501 U.S. 350, 364 (1991).

[138]    *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 804(a), 116 Stat. 745, 801 (2002) (codified at 28 U.S.C. § 1658).

[139]    15 U.S.C. § 78i(e).

[140]    *Compare In re Enterprise Mortgage Acceptance Co.*, 295 F. Supp. 2d 307, 317 (S.D.N.Y. 2003) (holding that the two year statute of limitations

case.  All parties agree that if the Banks' arguments prevail, plaintiffs' claims will be barred under either rule, and likewise, if plaintiffs' arguments prevail, that their claims are timely under either rule.  The only question, then, is whether plaintiffs "discovered the facts constituting" the alleged fraud in April 2000, when media reports had detailed analyst conflicts of interest, or in April 2003, when the Banks' settlement with regulators was announced.

### 1.    Applicable Law

"A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. . . .  Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make

---

contained in Sarbanes-Oxley does not revive claims that were time-barred under the prior one year limitations period); *In re Heritage Bond Litig.*, 289 F. Supp. 2d 1132, 1148 (C.D. Cal. 2003) (same); *Glaser v. Enzo Biochem, Inc.*, No. Civ. A. 02-1242-A, 2003 WL 21960613, at *5 (E.D. Va. July 16, 2003) (same), *with Roberts v. Dean Witter Reynolds, Inc.*, No. 02-2115, 2003 WL 1936116, at *1 (M.D. Fla. Nov. 15, 2003) (holding that Sarbanes-Oxley does revive otherwise time-barred claims).

such an inquiry."[141] Facts triggering a duty to inquire are frequently termed "storm warnings."[142] "Discovery of facts for the purposes of this statute of limitations 'includes constructive or inquiry notice, as well as actual notice.'"[143]

To be placed on inquiry notice, plaintiffs "need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them."[144] A plaintiff in a securities fraud case "is charged with knowledge of publicly available news articles and analysts' reports" to the extent that they constitute storm warnings sufficient to trigger inquiry notice.[145] Accordingly, a Court may properly consider media reports for this purpose, even on a motion to dismiss.[146] "The issue that the

---

[141]    *See Dodds v. Cigna Sec. Litig.*, 12 F.3d 346, 350 (2d Cir. 1993) (citations omitted).  *See also LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (holding that a plaintiff is on inquiry notice when "circumstance would suggest to an investor of ordinary intelligence the probability that she has been defrauded.").

[142]    *Id.*

[143]    ___*Rothman v. Gregor*, 220 F.3d 87, 96 (2d Cir. 2000) (quoting *Menowitz v. Brown*, 991 F.2d 36, 41-42 (2d Cir. 1993)).

[144]    *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997).

[145]    *Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.*, 821 F. Supp. 212, 222 (S.D.N.Y. 1993).

[146]    *See LC Capital Partners*, 318 F.3d at 155.

Court must consider is . . . whether Plaintiffs 'had constructive notice of facts

sufficient to create a duty to inquire further into that matter.  An investor does not

have to have notice of the entire fraud being perpetrated to be on inquiry

notice.'"[147]

Available information must establish "a probability, not a possibility"

of fraud to trigger inquiry notice.[148]  Moreover, in the context of dismissal,

"defendants bear a heavy burden in establishing that the plaintiff was on inquiry

notice as a matter of law.  Inquiry notice exists only when uncontroverted

evidence irrefutably demonstrates when plaintiff discovered or should have

discovered the fraudulent conduct."[149]  "In fact, Southern District courts have

variously described defendants' burden in this regard as 'extraordinary' and

appropriate only in 'extreme circumstances.'"[150]

---

[147]    *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (quoting *Dodds*, 12 F.3d at 351-52).

[148]    *Id.* at 194.

[149]    *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993); *see also Newman*, 335 F.3d at 193-95 (holding that defendants "bear a heavy burden in establishing that plaintiff was on inquiry notice as a matter of law.").

[150]    *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) (quoting *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 76 (S.D.N.Y. 1996)).

Once sufficient storm warnings appear, "plaintiffs must exhibit 'reasonable diligence' in investigating the possibility that they have been defrauded.  If they fail to meet this obligation, plaintiffs will be held to have had 'constructive knowledge' of the fraud against them."[151]

### 2.    Plaintiffs' Claims Are Not Time-Barred

The Banks argue that general media reports that surfaced in early 2000 (and in some cases as early as 1995) regarding analyst conflicts of interest served to put plaintiffs on notice of the alleged fraud.  The Banks point to other potential "storm warnings" as well, including (a) the precipitous drop of RSL's stock price, (b) the Banks' maintenance of strong "Buy" recommendations in the face of the declining stock value; and (c) the Banks' eventual dropping of RSL from its research coverage, notwithstanding the consistently high recommendations.  None of these alleged "storm warnings" were sufficient to put plaintiffs on notice of the alleged fraud.

### a.    Media Reports

The Banks rely principally on *In re Merrill Lynch & Co., Inc., Research Reports Securities Litigation*, in which the court held that "well before . .

---

[151]    *Addeo v. Braver*, 956 F. Supp. 443, 449 (S.D.N.Y. 1997) (quoting *Dodds*, 12 F.3d at 350) (citations omitted).

53

. April 2000, abundant material was in the public domain regarding the existence of widespread investment banking conflicts of interest and allegedly inflated buy ratings in Wall Street stock research."[152]  In fact, none of the Banks have submitted any of those media reports to the Court — rather, they expect this Court to hold plaintiffs' claims time-barred based on the court's descriptions of those reports in *Merrill Lynch.*

The media reports cited in *Merrill Lynch* are "far more pointed and specific than generalized media reports," at least with respect to Merrill Lynch.[153] While some of the media reports — particularly the earliest ones — speak broadly about conflicts of interest created by the research analyst/investment banker relationship, those reports do not disclose the systematic misrepresentations charged in this suit.  Those media reports contain statements like:

> "[A]nalysts have become an important sales tool for the investment banks to land their super-profitable deals.  A top analyst and the credibility he or she brings can be the difference between landing a deal or not — and the pay for the most sought-after analysts can top $5 million a year."[154]

---

[152]    273 F. Supp. 2d at 388.

[153]    *Id.* at 380.

[154]    Steve Bailey & Steven Syre, *Taking Analysts' Tempting Forecasts With a Grain of Salt*, BOSTON GLOBE, Oct. 23, 1996, at C1 (quoted in *Merrill Lynch*, 273 F. Supp. 2d at 383-84).

"[John Adams, chairman and chief executive of Adams, Harkness & Hill, the Boston brokerage firm] claims that 'sells' are scarce for a simple reason: They nearly always bear a negative consequences for the analyst. Clients who hold the stock become livid, and the company's management can retaliate by keeping analysts out of the information loop."[155]

"Analysts routinely play up good news and sugarcoat the bad. Positive corporate news — an unexpectedly strong earnings report or successful product launch — may get a recommendation of "strong buy." Bad news gets a "hold" or "neutral" — often a euphemism for "sell," which has all but vanished from the analysts' vocabulary. . . ."[156]

While such reports indicate a tension created by analysts' placement within firms that derive a large proportion of their revenue from investment banking business, they do not suggest the widespread fraud alleged here — they only provide the background. Absent from these reports are allegations that investment bankers were requiring analysts to issue certain recommendations, that analysts' compensation was derived from the amount of investment banking revenue that they generated, or that the analysts' views of the securities they covered were the exact opposite of what they recommended to the public.

---

[155]    John R. Dorfman, *All-Star Analysts 1997 Survey*, WALL ST. J., June 19, 1997, at R1 (quoted in *Merrill Lynch*, 273 F. Supp. 2d at 385).

[156]    Jeffrey M. Laderman, *Who Can You Trust? Wall Street's Spin Game*, BUSINESS WEEK, Oct. 5, 1998, at 148 (quoted in *Merrill Lynch*, 273 F. Supp. 2d at 385).

In *Merrill Lynch*, the court had media reports that *specifically* identified Merrill Lynch as suffering from wide-spread conflicts of interest,[157] and which detailed *particular* statements by Merrill Lynch analysts indicating a massive scheme to defraud.[158] There are no such reports here. *Merrill Lynch* does not mention Lehman, Goldman or RSL at all, and it contains only a fleeting reference to one Morgan Stanley analyst, without any accusation of fraud on her part.[159] And, as noted, the Banks have not submitted any other media reports that they argue triggered plaintiffs' duty of inquiry. On the other hand, the Complaint specifically alleges that the internal communications, e-mails, and other facts that permitted plaintiffs to file the instant suit were not disclosed until April 28, 2003,

---

[157] *See, e.g.*, Jon Birger, *New Executive Henry Blodget; Merrill Lynch's Top Pick*, CRAIN'S NEW YORK BUSINESS, Mar. 22, 1999, at 11; David Streitfeld, *Analyst With a Knack for Shaking Up Net Stocks; Henry Blodget Is Wall Street's Link Between Online Firms, Investors*, WASH. POST., Apr. 2, 2000, at H1 (both cited in *Merrill Lynch*, 273 F. Supp. 2d at 386, 388).

[158] *See Merrill Lynch*, 273 F. Supp. 2d at 381 (quoting Merrill Lynch analyst Henry Blodget "as describing companies on which he had buy ratings as 'pieces of [expletive]'") (alteration in original) (citation omitted).

[159] *See* Erick Schonfeld, *The High Price of Research*, Fortune, Mar. 20, 2000, at 118 ("Analysts of all stripes — from Morgan Stanley's Mary Meeker on down to lowly researchers at the likes of the Aberdeen Group — increasingly derive a portion of their compensation, directly or indirectly, from the companies they cover.") (quoted in *Merrill Lynch*, 273 F. Supp. 2d at 387).

56

when the Banks' settlement with regulators was announced.[160]  That being so, the

generalized media reports cited in *Merrill Lynch*, without more specific reports

pertaining to the parties in this case or even to industry-wide fraud, were

insufficient to create a duty of inquiry.  At most, those reports should have

instilled in plaintiffs a healthy skepticism towards research reports; they did not

reveal a "probability"of fraud.[161]

### b.    Other "Storm Warnings"

Nor did the other alleged "storm warnings" give rise to a duty to

inquire.  The continued decline of RSL's stock price hardly suggested that the

Banks' recommendations were fraudulent.  To the contrary, it could have been

evidence that, as the Banks' research reports suggested, RSL was consistently

undervalued by the market.  At worst, RSL's ultimate decline and subsequent

delisting was merely evidence that the Banks' reports were *wrong*, not that they

were intentionally false.  According to the evidence now before the Court,

plaintiffs were not on notice of fraud until the April 28, 2003 settlements were

announced.  Only with 20/20 hindsight does RSL's failure as a business — at a

time when many other similar companies were also failing, a point not lost on the

---

[160]    *See* Compl. ¶¶ 225-227.

[161]    *Newman*, 335 F.3d at 193.

57

Banks, *who have argued that the alleged fraud had nothing to do with RSL's decline* — become a "storm warning" of fraud.

## V.    CONCLUSION

For the reasons just given, Defendants' motions are denied.  The Clerk is directed to close these motions [Nos. 14 and 17].  A conference is scheduled for 4:30 p.m. on June 16, 2004, in Courtroom 15C.

SO ORDERED:

_____
Shira A. Scheindlin
United States District Judge

Dated:      New York, New York
            May 21, 2004

58

## - Appearances -

*For Plaintiffs:*

Curtis V. Trinko, Esq.
Neal A. DeYoung, Esq.
Lori E. Colangelo, Esq.
Jeffrey B. Silverstein, Esq.
LAW OFFICES OF CURTIS V.
    TRINKO, LLP
16 West 46th Street, Seventh Floor
New York, New York 10036
(212) 490-9550

*For Defendant Lehman Brothers,*
*Inc.:*

Moses Silverman, Esq.
H. Christopher Boehning, Esq.
Diane G. Knox, Esq.
Anne E. Arreola, Esq.
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*For Defendant Goldman Sachs &*
*Co.:*

David H. Braff, Esq.
Stephanie G. Wheeler, Esq.
David E. Swarts, Esq.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*For Defendant Morgan Stanley &*
*Co., Inc.:*

Alexander Dimitrief, P.C.
Peter D. Doyle, Esq.
Katherine J. Alprin, Esq.
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800