# EXHIBIT G

ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUREAU OF INVESTMENT PROTECTION

-------------------------------------------------------------------X

In the Matter of                                          :

MORGAN STANLEY & CO. INCORPORATED          :

-------------------------------------------------------------------X

**ASSURANCE OF DISCONTINUANCE**
**PURSUANT TO EXECUTIVE LAW § 63 (15)**

ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUREAU OF INVESTMENT PROTECTION

---------------------------------------------------------------X

In the Matter of                                            :

MORGAN STANLEY & CO. INCORPORATED          :

---------------------------------------------------------------X

## ASSURANCE OF DISCONTINUANCE
### PURSUANT TO EXECUTIVE LAW § 63 (15)

**FINDINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**I.    BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    **A.    The Investment Banking Function at Morgan Stanley** . . . . . . . . . . . . . . . . . 4

    **B.    The Role of Research Analysts at Morgan Stanley** . . . . . . . . . . . . . . . . . . . . 4

**II.   THE RELATIONSHIP BETWEEN INVESTMENT BANKING
AND RESEARCH CREATED CONFLICTS OF INTEREST
FOR MORGAN STANLEY RESEARCH ANALYSTS** . . . . . . . . . . . . . . . . . . . . 5

    **A.    Morgan Stanley Marketed Research Coverage, Including,
at Times, Implicitly Favorable Coverage, in Competing
for Investment Banking Business** . . . . . . . . . . . . . . . . . . . . 6

    **B.    Investment Banking Concerns Influenced Morgan Stanley's
Decisions Whether to Initiate or Continue Research Coverage** . . . . . . . . . 11

    **C.    Morgan Stanley Research Analysts Performed
Investment Banking Functions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    **D.    Investment Banking Was an Important Factor in Determining
Research Analysts' Compensation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        **1.    Analysts Rated Their Contributions to Investment Banking** . . . . . . 16

        **2.    Investment Bankers Evaluated Analysts' Performance** . . . . . . . . . 17

3.  Investment Banking Was the Factor Accorded the Greatest Weight by Management in Reviewing Management's Initial Determination of Proposed Analysts' Compensation .................................... 18

III.  MORGAN STANLEY DID NOT DISCLOSE THAT IT PAID $2.7 MILLION OF UNDERWRITING FEES AT ISSUERS' DIRECTION TO OTHER INVESTMENT BANKS TO PROVIDE RESEARCH COVERAGE .................................... 20

IV.  MORGAN STANLEY FAILED REASONABLY TO SUPERVISE ITS SENIOR RESEARCH ANALYSTS .................................... 21

A.  Morgan Stanley Had No System for Reviewing the Ratings Issued by Its Senior Analysts .................................... 21

B.  Morgan Stanley's Analysts Virtually Never Used the Lowest Rating in the Firm's Stock Rating System .................................... 22

AGREEMENT .................................... 23

Affirmative Relief .................................... 23

The Investigation and This Assurance .................................... 27

No Disqualifications .................................... 28

Other Provisions .................................... 29

ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUREAU OF INVESTMENT PROTECTION

-----------------------------------------------------------------X

In the Matter of                                    :

MORGAN STANLEY & CO. INCORPORATED                   :

-----------------------------------------------------------------X

## ASSURANCE OF DISCONTINUANCE
### PURSUANT TO EXECUTIVE LAW § 63 (15)

WHEREAS, pursuant to the provisions of the Martin Act (Article 23-A of the General Business Law), Eliot Spitzer, Attorney General of the State of New York, commenced in March 2002 an investigation into the practices, procedures and conduct of Morgan Stanley & Co. Incorporated ("Morgan Stanley") respecting the preparation and issuance by Morgan Stanley's U.S. equity research analysts ("research analysts" or "analysts") of research, analysis, ratings, recommendations and communications concerning common stocks of publicly traded companies covered by such analysts ("research coverage"), during the period 1999 through 2001, including without limitation, commencement and discontinuance of research coverage, actual or potential conflicts of interests affecting research coverage, research analysts or termination of research analysts, and statements, opinions, representations and non-disclosure of material facts in research coverage (the "Investigation");

WHEREAS, the Investigation was conducted in connection with a multi-state task force and a joint task force of the U.S. Securities and Exchange Commission, the New York Stock Exchange, Inc. and NASD, Inc.;

WHEREAS, in the course of the Investigation, numerous witnesses were interviewed and/or deposed and extensive documentary evidence was reviewed;

WHEREAS, Morgan Stanley has cooperated in the Investigation by producing documentary evidence and witnesses;

WHEREAS, the Investigation finds that certain practices by Morgan Stanley have violated the Martin Act;

WHEREAS, Morgan Stanley has advised regulators of its agreement to resolve the Investigation;

WHEREAS, Morgan Stanley agrees to implement certain changes with respect to research and stock allocation practices, and to make certain payments; and

WHEREAS, the Attorney General and Morgan Stanley now desire to settle and resolve the Investigation, and Morgan Stanley agrees to the sanctions provided herein;

NOW THEREFORE, the Attorney General, based upon the Investigation, makes the following findings:

## FINDINGS

1. Morgan Stanley is, and was at all relevant times, a Delaware corporation and a registered broker-dealer with its principal place of business located at 1585 Broadway, New York, New York 10036. Morgan Stanley is, and has been at all relevant times, an international financial services firm that provides investment banking services to businesses, engages in retail and institutional sales to its customers, and publishes research reports and ratings on stocks. In mid-2002, Morgan Stanley had about 58,000 employees with 700 offices in twenty-eight countries. It had approximately $450 billion in assets under management as of May 31, 2002.

2. The Attorney General has jurisdiction over this matter pursuant to the Martin Act.

3. From at least July 1999 through 2001, Morgan Stanley engaged in acts and practices that created conflicts of interest for its research analysts with respect to investment banking activities and considerations. Morgan Stanley failed to manage those conflicts in an adequate or appropriate manner. Some conflicts resulted from the fact that Morgan Stanley compensated its research analysts, in part, based on the degree to which they helped generate investment banking business for Morgan Stanley. Morgan Stanley also offered research coverage by its analysts as a marketing tool to gain investment banking business. As a result, Morgan Stanley research analysts were faced with a conflict of interest between helping generate investment banking business for Morgan Stanley and their responsibilities to publish objective research reports that, if unfavorable to actual or potential banking clients, could prevent Morgan Stanley from winning that banking business.

4. As lead underwriter in various stock offerings, Morgan Stanley also complied with the issuers' directives to pay portions of the underwriting fees to other broker-dealers that served as underwriters or syndicate members to publish research reports on the issuer. Morgan Stanley did not take steps to ensure that these broker-dealers disclosed these payments in their research reports. Further, Morgan Stanley did not cause the payments to be disclosed in the offering documents or elsewhere as being for research.

5. Morgan Stanley also failed to reasonably supervise its analysts regarding the content of their research reports.

## I. BACKGROUND

### A. The Investment Banking Function at Morgan Stanley

6. The investment banking division at Morgan Stanley advised corporate clients and helped them execute various financial transactions, including the issuance of stock and other securities. Morgan Stanley frequently served as the lead underwriter in initial public offerings ("IPOs") -- the first public issuance of stock of a company that has not previously been publicly traded -- and follow-on offerings of securities.

7. During the relevant period, investment banking was an important source of revenues and profits for Morgan Stanley. In 2000, investment banking generated more than $4.8 billion in revenues, or approximately twenty-four percent of Morgan Stanley's total net revenues.

### B. The Role of Research Analysts at Morgan Stanley

8. Research analysts at Morgan Stanley covered a broad range of industry sectors and published periodic reports on certain companies within those sectors. Analysts typically reviewed the performance of their covered companies, evaluated their business prospects, and provided analysis and projections concerning whether they presented good investment opportunities. Through 2001, Morgan Stanley's equity research department had a system calling for rating covered companies, from most to least positive, as "Strong Buy," "Outperform," "Neutral," or "Underperform." Analyst reports were disseminated to Morgan Stanley clients by mail and facsimile and by financial advisors. Certain research reports were made available to retail clients who set up accounts on Morgan Stanley's web site and, similarly, institutional clients were able to access Morgan Stanley's research reports via accounts on Morgan Stanley's web site. In addition, certain industry reports were available on Morgan Stanley's public web

site. Certain institutional clients of Morgan Stanley could also access research reports through the First Call subscription service. The financial news media on occasion also reported Morgan Stanley analysts' ratings.

9. Morgan Stanley analysts also played an important role in assessing potential investment banking transactions, in particular IPOs. Morgan Stanley's stated objective was to take public as lead underwriter the leading companies in their respective industry sectors and to have its research analysts serve as gatekeepers to the IPO process by investigating whether companies were appropriate IPO candidates. Research analysts who endorsed an IPO candidate typically participated in the competition to obtain the investment banking business and, if Morgan Stanley was selected as lead underwriter, helped market the IPO to institutional investors, explained the IPO to the firm's institutional and retail sales forces, and then issued research on the company.

10. Senior analysts at Morgan Stanley published individual research reports without pre-publication review by research department supervisors. While reports were reviewed for grammatical errors and for compliance with certain legal requirements, there was no system for reviewing the recommendations or price targets included in the reports of senior analysts prior to their publication.

## II.    THE RELATIONSHIP BETWEEN INVESTMENT BANKING AND RESEARCH CREATED CONFLICTS OF INTEREST FOR MORGAN STANLEY RESEARCH ANALYSTS

11. Certain practices at Morgan Stanley created or maintained conflicts of interest for the firm's research analysts with respect to investment banking considerations. These conflicts arose from the inherent tension between the analysts' involvement in helping to win investment

banking business for Morgan Stanley and their responsibilities to publish objective research that, if negative as to prospective banking clients, could prevent the firm from winning the banking business.

### A.    Morgan Stanley Marketed Research Coverage, Including, at Times, Implicitly Favorable Coverage, in Competing for Investment Banking Business

12.    Morgan Stanley typically competed with other investment banks for selection as the lead underwriter, or "bookrunner," for securities offerings, including IPOs and follow-on offerings. Significant financial rewards were at stake in these competitions. Sole or joint bookrunners generally received the largest portion of underwriting fees, which were typically divided among the participating investment banks. The bookrunner also established the allocation of shares in an offering and typically retained the greatest number of shares for itself. The typical IPO generated millions of dollars in investment banking fees for the bookrunner.

13.    The process of selecting the lead underwriter typically culminated in a series of presentations by competing investment banks called a "bakeoff," in which investment banks competing for the business in a particular offering met with the issuer to present their qualifications and offer investment banking and other services. As part of these presentations, investment banks often provided issuers with a "pitchbook," which typically described the investment bank's credentials and services. In selecting the lead underwriters, issuers assessed a host of factors, including the strength and quality of the bankers' research coverage. Issuers sought research coverage of their stocks, believing such coverage would enhance the credibility of their businesses, potentially lead to higher stock prices, and increase their exposure to the investing public.

-6-

14. Between 1999 and 2001, as part of the package of services it offered to issuers to win investment banking business from certain issuers, Morgan Stanley typically committed that its analysts would initiate (or continue) research coverage of the issuer if Morgan Stanley won the banking competition. In so doing, Morgan Stanley used its analysts as a marketing tool to help secure banking business. The promise of future research coverage was often a critical selling point that enabled Morgan Stanley to obtain millions of dollars in investment banking fees. Research coverage was part of a package of services for which Morgan Stanley was compensated in those investment banking deals.

15. Analysts played an important role in Morgan Stanley's pitches for banking business. Along with investment bankers and others, analysts were typically presented as part of the Morgan Stanley "team" that would consummate the transaction. The pitchbooks typically identified the analysts on the team and dedicated several pages to the analysts' experience, credentials, and specific role in the contemplated transaction. Analysts drafted portions of the pitchbook and almost always attended the presentations for IPO business. The pitchbooks typically compared Morgan Stanley analysts favorably to their counterparts at competing firms, citing their rankings in analyst polls and other measures. (Exhibit 1 at pp. 15-17; Exhibit 2 at 044379 and 81; Exhibit 3 at 254772-73.)

16. Morgan Stanley typically identified its analysts as a favorable factor that issuers should consider in selecting Morgan Stanley for investment banking business. For example, in describing one reason Loudcloud, Inc., should name Morgan Stanley as bookrunner for its 1999 IPO, the pitchbook referred to two senior analysts as a "dream team" who would "articulate Loudcloud's story to investors in a way that no other investment bank can match." (Exhibit 1 at

-7-

p. 4.) Another pitchbook described two senior analysts as "the most powerful combination in the extended enterprise space . . . ever." (Exhibit 4 at p. 4.)

17. In its pitches to obtain investment banking business, Morgan Stanley typically promised future research coverage as among the package of services it would provide. For example, in a pitchbook provided to iBeam Broadcasting Corp. to obtain its IPO business, Morgan Stanley said it would "provide ongoing research coverage and aftermarket trading" and, in another instance, said "coverage would be initiated immediately after the quiet period. Additional research reports will follow on a regular basis thereafter." (Exhibit 5 at 255981 and 6005, note 2.) Morgan Stanley won the iBeam IPO business and received investment banking fees of approximately $3.8 million. Another pitchbook, in a chronology of how the IPO would unfold, stated: "Research coverage initiated on day 26" (Exhibit 6 at 283222), which was the day research coverage could be initiated by an underwriter following an IPO. Morgan Stanley made comparable commitments to other prospective banking clients. Another Morgan Stanley pitchbook, provided to Transmeta Corp. in July 2000 in connection with its IPO, said "we view research as an ongoing commitment," and offered to "continue regular publication of research reports." (Exhibit 7 at 284727 and 751.) Morgan Stanley won the Transmeta IPO business and received investment banking fees of approximately $9.5 million. In other pitchbooks, Morgan Stanley emphasized its "aftermarket support" services, which it expressly described as including future research coverage. (Exhibit 8 at 312446.) For example, a pitchbook presented to AT&T Latin America said Morgan Stanley "is committed to bolstering an IPO's performance in the aftermarket through extensive equity research and active market-making." (Exhibit 9 at 282952, emphasis added.) Morgan Stanley pitchbooks often identified the specific number of reports its

-8-

analysts published on other companies, giving implicit guidance on how many reports issuers could expect to receive if they selected Morgan Stanley as lead banker. (Exhibit 6 at 283220; Exhibit 10 at 257397; Exhibit 11 at 282901.)

18. Further, Morgan Stanley at times implicitly suggested that analysts would provide favorable research coverage, pending completion of due diligence, by noting analysts' past favorable coverage and/or emphasizing its enthusiastic support for the issuer. For example, when Morgan Stanley sought investment banking business from Convergys Corp., the company already had been covered for two years by a senior Morgan Stanley analyst who, as the pitchbook mentioned four times, considered Convergys to have been the analyst's "#1 stock pick" over those years. (Exhibit 2 at 044376, 378, 381 and 404.) (During that time period, the stock price had appreciated 98%.) The May 2001 pitchbook then described the analyst as the "voice of the issuing company," who would work "in tandem" with Convergys management to position its story to investors. (Exhibit 2 at 044382 and 404.) In the following month, June 2001, the senior analyst downgraded Convergys from Strong Buy to Outperform, still a favorable rating (Exhibit 12), then later upgraded Convergys back to Strong Buy in December 2001 (Exhibit 13).

19. In other instances, Morgan Stanley pitchbooks identified a particular analyst's history of issuing Strong Buy or Outperform ratings on other companies. (Exhibit 3 at 254772; Exhibit 5 at 255983 and 84.) Some pitchbooks also identified instances in which other stocks covered by Morgan Stanley analysts increased in price following their IPOs. For example, the Morgan Stanley pitchbook provided to Transmeta Corp. in July 2000 emphasized how one analyst's "support" of eight semiconductor IPOs since 1997 had "resulted in unparalleled performance in

-9-

the public market," and included a line graph showing a dramatic increase in the stocks' price from 1998 through March 2000. (Exhibit 7 at 284725.)

20. In another instance, after Loudcloud management informed Morgan Stanley in 1999 that research coverage was a key factor in its selection of the bookrunner for its IPO, Morgan Stanley's head of worldwide investment banking informed the issuer in an e-mail that the firm had "developed a successful model which combines the best of technology and telecom research at Morgan Stanley to properly position Loudcloud in the capital markets; specifically, enthusiastic sponsorship" by two research analysts who covered Loudcloud's sector. He added: "I commit to putting the entire franchise behind Loudcloud to achieve the best valuation and after market performance, as well as unmatched strategic advice post-IPO." (Exhibit 14.) Morgan Stanley won the Loudcloud IPO business and received investment banking fees of approximately $4.7 million.

21. In addition to pitchbooks, Morgan Stanley occasionally provided draft or "mock" research reports to issuers to provide an example of how analysts might describe the issuer to investors. The draft or mock reports described the issuers in favorable terms without including ratings or price targets. (Exhibit 15 at p. 1; Exhibit 16 at 283753.)

22. Morgan Stanley's commitments to provide research coverage were not limited to pitches for IPO business. Morgan Stanley obtained investment banking business for follow-on offerings of companies that its analysts did not cover in part by promising to initiate future coverage. (Exhibit 17.)

23. Morgan Stanley consistently honored its commitments to provide research coverage, initiating or maintaining coverage when it won the investment banking business.

-10-

24. In Morgan Stanley's annual performance evaluation process, some analysts and bankers noted their success in obtaining banking fees by promising future research coverage. For example, in a November 3, 1999 e-mail, an investment banker listed several banking transactions that he said Morgan Stanley had won because it committed that a particular highly-rated analyst would initiate research coverage. Specifically, the banker wrote that Morgan Stanley had won two transactions totaling $13.4 million in fees from Veritas Software Corp. "just for promising that [the senior analyst] would pick up coverage after the deals." The banker observed that this had "enraged" competing firms, which said it was "unprecedented" to give an underwriter with no previous research coverage such a high share of the fees. The banker added: "The response from the CEO to those firms -- 'you don't have [the senior analyst].'" (Exhibit 17.) Other analyst evaluations as well as other internal Morgan Stanley documents identified additional instances in which it was stated that Morgan Stanley won investment banking business in large part because its analysts committed to initiate coverage. (Exhibit 18 at 283322; Exhibit 19.)

**B.    Investment Banking Concerns Influenced Morgan Stanley's Decisions Whether to Initiate or Continue Research Coverage**

25. The decision to initiate or continue research coverage of certain companies was influenced, at least in part, by whether those companies were actual or prospective investment banking clients of Morgan Stanley.

26. In one instance, in May 2001, the liaison between the research and investment banking divisions was advised that a poultry company, Pilgrim's Pride, was seeking equity research coverage in connection with a prospective high-yield offering. The liaison made clear

-11-

that Morgan Stanley should not commit to providing coverage until it received a certain amount of investment banking fees from the company:

> Be careful with this one. Under no circumstances should we commit unless we get the books and at least $3-5mm in fees, with the money in the bank before we pick up coverage. We can tell them it will go in the queue and we cannot promise them a rating. It costs about $1 mm to pick up coverage of a stock and there are also meaningful ongoing expenses to maintain. (Exhibit 20.)

27. Morgan Stanley analysts on occasion also declined to cover some companies that refused to award investment banking business to Morgan Stanley. One senior analyst wrote in a 2000 self-evaluation that the analyst had declined Sabre Group's requests for research coverage for four years and that the analyst had "insisted that we first be mandated on a large investment banking transaction." (Exhibit 21 at 0087533.) Generally, analysts select which of the many companies in a sector they will cover. This senior analyst did not consider Sabre to be one the analyst needed to cover, unless Morgan Stanley were to be mandated on an investment banking transaction. When Sabre provided Morgan Stanley with banking business in connection with its spin-off from AMR Corp., the analyst initiated coverage of Sabre with an Outperform rating in March 2000.

28. Morgan Stanley also declined to initiate coverage of Concord/EFS, Inc. Concord initially retained Morgan Stanley as bookrunner for a 1999 secondary offering, but then hired a different bank as bookrunner after Morgan Stanley declined Concord's request that it commit to initiating coverage with a "Strong Buy" rating. Though Concord continued to offer part of that investment banking business to Morgan Stanley, Morgan Stanley withdrew, and it did not initiate research coverage of Concord at that time. In the fall of 2000, Morgan Stanley sought

-12-

investment banking business from Concord in connection with another secondary offering. Concord's management told Morgan Stanley's senior analyst that it wanted an advance view of the analyst's initial rating. After completing two to three months of preliminary due diligence, the analyst told Concord that, if coverage were to be initiated at that time, the analyst tentatively would issue a "Strong Buy" up to a certain valuation level. Morgan Stanley also provided Concord with a draft research report (Exhibit 22), which, according to an e-mail written by an investment banker, was part of Morgan Stanley's "marketing efforts." (Exhibit 23.) When Morgan Stanley was not awarded the 2000 investment banking business, its analyst did not initiate coverage at that time, despite the analyst's initial view that Concord had emerged as a leader in its industry that preliminarily merited a "Strong Buy." (Exhibit 24.)

29.    Morgan Stanley also initiated coverage of eBay, Inc., in part with the hope of obtaining investment banking business. After Morgan Stanley initially lost the IPO business for eBay in 1998, a senior Morgan Stanley analyst met with eBay's chief executive officer and provided a draft research report on the company. After Morgan Stanley nevertheless lost the IPO business, the analyst initiated coverage on eBay on its first day of trading with an Outperform rating. The analyst was the only one covering eBay, since firms in the underwriting syndicate were prohibited from initiating coverage until after the 25-day "quiet period" had expired. It is the only time that the senior analyst initiated coverage of a company on its first day of trading. Later, in 1999 and again in 2001, eBay awarded two banking transactions to Morgan Stanley, with total fees of approximately $13.8 million. (Exhibit 25.) In the senior analyst's self-evaluation for 2000, the analyst stated, as part of the analyst's "philosophy" for Morgan Stanley's "Internet banking efforts," that "when we miss a winning IPO, we should work like crazy (with

tons of ideas) to secure a spot as M&A advisor (USWeb/CKS) or book running manager on follow-on offerings (eBay)."  (Exhibit 27 at MS0083293.)

### C.    Morgan Stanley Research Analysts Performed Investment Banking Functions

30.  Morgan Stanley research analysts performed a number of investment banking-related functions.  They identified potential IPO and merger and acquisition transaction candidates for the investment banking department, participated in soliciting investment banking business for the firm, and participated in road shows and other efforts to sell Morgan Stanley-underwritten IPOs and secondary offerings to institutional investors.  At times, analysts also had discussions about business strategy with investment banking clients directly, and one senior analyst was described as a relationship manager with certain investment banking clients.  (Exhibit 30 at MS0083109.)

31.  Morgan Stanley kept a record of each analyst's contribution to investment banking revenues.  Each year, a "Revenue Share Analysis" was prepared that listed every investment banking transaction in which each analyst had participated, the revenues from each transaction, a rating on a scale of 1 to 5 (5 being "critical" to the deal) of the analyst's contribution to the transaction, and a calculation of the analyst's "share" of the credit for the revenues secured from the transaction.  The Revenue Share Analysis also recorded investment gains on Morgan Stanley investments in companies covered by the analyst.  (Exhibit 31.)

32.  One senior analyst's involvement in investment banking activities was such that several investment bankers at the firm regarded the analyst as tantamount to an investment banker.  One banker wrote that the analyst was the most committed and focused banker with whom he had ever worked.  (Exhibit 32.)  Another wrote that the analyst was a "commercial

-14-

animal" who would do anything appropriate to win underwriting mandates. (Exhibit 32.) The analyst's supervisor wrote in 1999 that the analyst's focus was primarily on banking and that, notwithstanding the growing demand for the analyst's time on investment banking matters, the analyst needed to devote more attention to institutional investors and the firm's institutional sales force. (Exhibit 29 at MS0083192.)

33. The analyst's own self-evaluation prominently mentioned the analyst's assistance to investment banking in selecting and generating investment banking business and large fees, stating:   "Bottom line, my highest and best use is to help MSDW win the best Internet IPO mandates (and to ensure that we have the appropriate analysts and bankers to serve the companies well) . . .." (Exhibit 33 at MS0083161, emphasis in original.)  It also prominently listed the deals and revenues from the analyst's investment-banking connected efforts:

> **Internet Investment Banking, a Record Year with $205MM+ YTD Revenue, [20+] Pending Financings, Co-Coverage (Leverage) in 85% of Cases, 6 of 6 Tech IBD Revenue Generating Clients, Internet Category was #1 Revenue Generator in Tech IBD ($505MM YTD Tech Revenue)** . . . . (Emphasis in original.)
>
> OK, the numbers (see Attachment A): Forty investment banking transactions ($143MM in fees) . . . .
>
> It's notable that 96% of the $205MM in revenue was derived from clients new to the firm since 1995! Exceptions were America Online, Compaq, Hearst and Sotheby's.  And, I have been very involved in this business.  (Emphasis added.)
> (Exhibit 33 at MS0083162-63.)

-15-

### D.    Investment Banking Was an Important Factor in Determining Research Analysts' Compensation

34.  From 1999 through 2001, participation in investment banking activities was a factor in determining the total compensation awarded to some Morgan Stanley research analysts.  These analysts thus faced a conflict of interest between helping win investment banking business for Morgan Stanley and publishing negative research that could prevent Morgan Stanley from winning that banking business.

35.  The annual salaries paid to senior Morgan Stanley analysts and other senior Morgan Stanley personnel typically were comparatively small components of their total annual compensation.  The majority of their total annual compensation was paid in the form of a bonus.  In 2000, one senior analyst received a year-end bonus that was 90 times greater than the analyst's base salary.

36.  The total compensation paid to analysts was based in part on Morgan Stanley's total revenues for a particular year, including the investment banking fees that Morgan Stanley received.  Thus, the success or failure of the investment banking division determined, in part, the total amount of funds available to pay employee compensation in any given year, including analyst compensation.

### 1.    Analysts Rated Their Contributions to Investment Banking

37.  The level of contribution to investment banking transactions was an important factor in the annual evaluations of Morgan Stanley's analysts and compensation decisions.

38.  As part of the annual performance evaluation process, analysts were asked to submit self-evaluations that, among other things, discussed their contributions to Morgan Stanley.

-16-

Analysts often included in their self-evaluations a discussion of their involvement in investment banking, including a description of specific transactions, the fees generated, and the role the analyst played in each deal. For example, one-quarter of the 1999 self-evaluation of one analyst was dedicated to the analyst's role in investment banking activities, and identified forty transactions that year that had generated a total of $143 million in fees. (Exhibit 33 at MS0083162.)

39. As part of the evaluation process, the analysts also provided a rating of their contributions to specific banking transactions. Analysts were instructed to complete a Transaction Summary Worksheet ("TSW") in which they graded their roles in specific deals on a scale of 1-5. Instructions provided to each analyst described the rating system as follows:

    5 = critical to deal
    4 = important to development and execution
    3 = solid contribution
    2 = limited contribution
    1 = contribution limited to providing research coverage
    (Exhibit 34.)

40. Analysts were also instructed to comment on important aspects of any transaction, including, for example, whether the "promise of coverage was critical to winning" the mandate. The instructions informed analysts that supplying the information called for in the TSWs was an "important part" of their annual evaluation process. (Exhibit 34.)

## 2.    Investment Bankers Evaluated Analysts' Performance

41. Morgan Stanley also solicited and received the investment bankers' assessment of the analysts' performance on the same transactions. Morgan Stanley's liaison between the research and investment banking divisions compiled and summarized the bankers' evaluations of the

-17-

analysts' role in each deal and then prepared a final TSW listing for each transaction that provided a joint evaluation of the analysts' contributions to each deal. (Exhibits 34, 26, and 31.)

42. Finally, as part of Morgan Stanley's "360 degree" review process, in which employees confidentially reviewed one another, investment bankers submitted written opinions of analysts with whom they worked. (Exhibits 30 and 32.)

43. Investment bankers thus played a role in the annual evaluation of research analysts by providing substantive information that was considered in the year-end evaluation process and input into the determination of the analysts' compensation for that year. The investment bankers' role in the evaluation process created a conflict of interest for analysts, who hoped for positive evaluations from investment bankers at the same time that they were charged with issuing objective research reports that, if negative, could have impeded Morgan Stanley's ability to win future investment banking business from the covered companies.

3.    **Investment Banking Was the Factor Accorded the Greatest Weight by Management in Reviewing Management's Initial Determination of Proposed Analysts' Compensation**

44. In 1999 and 2000, analyst compensation was set primarily by a managing director in the equity research division. The managing director made an initial determination of proposed compensation for all analysts and ranked the analysts based on that determination. The managing director then ranked the analysts based on their composite scores in nine categories. The managing director then compared the two rankings before forwarding the compensation recommendations to superiors. (Exhibits 35 and 36.)

45. The nine categories used to rank the analysts included the amount of investment banking revenues attributed to analysts based on their involvement in transactions (relative

-18-

weight of 33%) and eight other categories related to core research activities, including: (1) poll rankings from the *Institutional Investor* and other sources (19%); (2) poll ranking from institutional equity division sales (12%); (3) firm activities and ability to be a team player (11%); (4) the "hit ratio" in vote gathering from institutional clients (7%); (5) rank in vote gathering from institutional clients (7%); (6) stock picking (active portfolio vs. passive portfolio) (6%); (7) stock picking (active portfolio vs. index portfolio) (3%); and (8) poll ranking from retail sales (2%). Thus, the managing director assigned a one-third weight to investment banking revenues -- the highest weight given to any single category. (Exhibits 35 and 36.)

46. The impact that an analyst's contribution to investment banking revenues could have on the determination of the analyst's compensation is shown by the compensation of one Morgan Stanley senior analyst in 1999 and 2000. In 1999, the analyst who received the highest compensation among Morgan Stanley research analysts had a composite score that ranked only 11th overall, but ranked first in investment banking revenues. (Exhibit 35 at MS0083729, Exhibit 26, and Exhibit 33 at MS0083162.)

47. In 2000, the same analyst continued to rank first in investment banking revenues: the total investment banking revenues that the analyst helped Morgan Stanley obtain more than doubled. (Exhibit 36 at MS0083858, Exhibit 31, Exhibit 27 at MS0083292, and Exhibit 28 at MS0083322.) In most other categories, however, the analyst's performance declined from 1999, and the analyst's composite score dropped to 19th overall. (Exhibit 36 at MS0083858.) In 2000, the analyst ranked only 70th out of 111 analysts in stock picking (Exhibit 36 at MS0083858), and the analyst's self-evaluation conceded that 2000 had been the analyst's worst stock-picking year in fifteen years. (Exhibit 27 at MS0083297.) Nevertheless, this analyst's total salary and bonus

-19-

for 2000 increased by approximately $8.7 million as compared to 1999, again ranking first among all Morgan Stanley analysts.

### III. MORGAN STANLEY DID NOT DISCLOSE THAT IT PAID $2.7 MILLION OF UNDERWRITING FEES AT ISSUERS' DIRECTION TO OTHER INVESTMENT BANKS TO PROVIDE RESEARCH COVERAGE

48. In at least twelve stock offerings in which it was selected as lead underwriter from 1999 through 2001, Morgan Stanley paid $2.7 million of the underwriting fees to approximately twenty-five investment banks. Internal Morgan Stanley documents described these payments as "research guarantees" or "guaranteed economics for research." (Exhibit 37.) Other internal Morgan Stanley documents noted instances in which the bank receiving the payment "will write." (Exhibit 38.) Morgan Stanley made these payments from the offering proceeds at the direction of the issuers.

49. These "research guarantee" payments included more than $670,000 paid to three investment banks in connection with an offering by Veritas Software Corp. in December 1999; more than $816,000 paid to seven banks in connection with an Agile Software Corp. offering in December 1999; and more than $440,000 paid to five banks in connection with an offering by Atmel Corp. in February 2000. The individual disbursements ranged from two payments of just over $6,000 each to three payments of more than $225,000 each. (Exhibit 37.)

50. The issuers' registration statements and other offering documents identified the other banks as part of the underwriting syndicates and as receiving payments, but did not specifically disclose the payments as being for research. Morgan Stanley did not take steps to ensure that these banks disclosed these payments in their research reports. Morgan Stanley also did not

cause the payments to be disclosed in offering documents or elsewhere as having been for research.

## IV.    MORGAN STANLEY FAILED REASONABLY TO SUPERVISE ITS SENIOR RESEARCH ANALYSTS

### A.    Morgan Stanley Had No System for Reviewing the Ratings Issued by Its Senior Analysts

51.  Morgan Stanley failed reasonably to supervise its senior research analysts.  The firm required only non-officer-level analysts to submit their initial ratings and proposed changes in ratings for review by the Stock Selection Committee.  Senior analysts -- principals and managing directors -- were not subject to this requirement.  (Exhibit 39 at MS0000155.)  In addition, Morgan Stanley had no effective system in place for reviewing the ratings of its senior analysts against changed conditions.

52.  Morgan Stanley's lack of an effective review system allowed some principal and managing director analysts to maintain Outperform ratings unchanged on declining stocks without any review by management.  For example, in 2000 and 2001, four senior analysts maintained Outperform ratings unchanged on 13 stocks as the prices of the stocks declined by over 74 percent.  The names of the stocks, their percentage declines, and the number of months without a change in the Outperform rating are shown on the following chart:

-21-

| Company | Percent Price Drop While Rated Outperform | Months Without Change in Outperform Rating |
|---|---|---|
| Chemdex (Ventro) | 96.2 | 8.5 |
| Drugstore.com | 95.4 | 30 |
| Priceline.com | 92.0 | 30 |
| Ask Jeeves | 90.9 | 16 |
| Marimba | 88.9 | 8.5 |
| Homestore.com | 88.7 | 10 |
| Vignette | 87.1 | 7.5 |
| VeriSign | 83.3 | 19.5 |
| Akamai | 82.8 | 10 |
| Women.com | 80.3 | 8.5 |
| CNET | 77.7 | 16.5 |
| Inktomi | 76.9 | 15 |
| FreeMarkets | 74.3 | 23 |

(Exhibit 40.)

53.  Not until late 2001, after complaints from Institutional Sales persons made as part of the year-end evaluation process, did management state to one of the analysts: "Don't let your ratings get stale; change them ahead of expected price action." (Exhibit 41 at MS0083402.)

**B.    Morgan Stanley's Analysts Virtually Never Used the Lowest Rating in the Firm's Stock Rating System**

54.  From 1995 to March 2002, Morgan Stanley publicly stated that it had a four-category rating system:  Strong Buy; Outperform; Neutral; and Underperform. "Underperform" was defined as follows: "Given the current price, these securities are not expected to perform as well as other stocks in the universe covered by the analyst." (Exhibit 42.)

55.  Although Morgan Stanley stated that it had a four-category system, its analysts virtually never used the "Underperform" rating and, in effect, used a three-category system. From 1999 through 2001, the firm published research on approximately 1,000 North American company stocks.  No more than three of the 1033 stocks covered over the course of 1999 were

-22-

given an Underperform rating; no more than five of the 1058 stocks covered over the course of 2000 received that rating; and no more than six of the 1030 stocks covered over the course of 2001 were rated Underperform.

56. Morgan Stanley management was aware that analysts were not using the "Underperform" rating, but did not correct the problem until March 2002, when a new rating system was instituted. (Exhibit 43.)

57. The Attorney General finds the following sanctions appropriate and in the public interest.

## AGREEMENT

IT NOW APPEARING THAT Morgan Stanley desires to settle and resolve the Investigation prior to a hearing or trial and without an adjudication after a hearing or trial of law and fact, and without admitting or denying the Attorney General's Findings, the Attorney General and Morgan Stanley hereby enter into this Assurance of Discontinuance, pursuant to Executive Law § 63 (15), and agree as follows:

**Affirmative Relief**

A.    Morgan Stanley admits the jurisdiction of the New York State Attorney General, and will cease and desist from engaging in any acts in violation of the Martin Act and will comply with the Martin Act.

B.    Evidence of a violation of this Assurance of Discontinuance by Morgan Stanley shall constitute prima facie proof of violation of the Martin Act in any civil action or proceeding hereafter commenced by the Attorney General.

-23-

C.    Morgan Stanley shall pay a total amount of $125,000,000 (which includes $25,000,000 as a penalty) as follows:

(1)    a $1,462,158 penalty shall be paid to the New York State Department of Law (the "New York Payment") by wire transfer within 10 days of the parties' execution of this Assurance of Discontinuance. By making this payment, Morgan Stanley relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Morgan Stanley. If such payment is not made by Morgan Stanley or if Morgan Stanley defaults in any of its obligations under this Assurance of Discontinuance, the Attorney General may terminate this Assurance of Discontinuance, at his sole discretion, upon 10 days' written notice to Morgan Stanley and Morgan Stanley agrees that any statute of limitations applicable to the subject of the Investigation and any claims arising from or relating thereto are tolled from and after the date of this Assurance of Discontinuance.

(2)    $23,537,842 that Morgan Stanley has offered to pay in connection with the resolution of related proceedings by other state securities regulators (which, for these purposes, shall include the District of Columbia and Puerto Rico) (Morgan Stanley's offer to the state securities regulators hereinafter shall be called the "State Settlement Offer").

(3)    $25,000,000 shall be paid by Morgan Stanley pursuant to the final judgment in the related action brought by the Securities and Exchange Commission ("SEC") against Morgan Stanley ("Final Judgment") and in connection with Morgan Stanley's resolution of related proceedings instituted by the NASD, Inc. ("NASD") and the New York Stock Exchange, Inc. ("NYSE").

-24-

(4)    $75,000,000 to be used for the procurement of Independent Research, as described in Paragraph D below and Addendum A hereto and paid pursuant to the Final Judgment. This amount is not contingent or dependent in any way or part upon acceptance by any state securities regulator(s) of the State Settlement Offer. Any money that is not spent after the five-year period set forth in Section III.1 of Addendum A hereto will not be retained by Morgan Stanley and will be paid one-half to NASD and one-half to NYSE for use in their regulation and enforcement programs.

(5)    Morgan Stanley's obligation to make the New York Payment is not contingent or dependent in any way or part on Morgan Stanley's payments: (a) to state securities regulators pursuant to the State Settlement Offer; or (b) to the SEC, NASD, or NYSE as described in Paragraph C.3. The total amount to be paid by Morgan Stanley to state securities regulators pursuant to the State Settlement Offer (and the total amount of the penalty) may be reduced due to the decision of any state securities regulator(s) not to accept the State Settlement Offer. In the event a state securities regulator determines not to accept Morgan Stanley's State Settlement Offer, or the Final Judgment is not approved, signed and so ordered by the Court or final resolutions for the related proceedings instituted by the NASD or NYSE are not duly signed and approved by such organizations, the total amount of the New York Payment shall not be affected, and shall remain at $1,462,158.

(6)    Morgan Stanley agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification, including but not limited to payment made pursuant to any insurance policy, with regard to any penalty amounts that Morgan Stanley shall pay pursuant to this Assurance of Discontinuance or the Final Judgment, regardless of whether

-25-

such penalty amounts or any part thereof are added to the Distribution Fund Account provided for in the Final Judgment or otherwise used for the benefit of investors. Morgan Stanley further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Morgan Stanley shall pay pursuant to this Assurance of Discontinuance or Section II of the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to the foregoing Distribution Fund Account or otherwise used for the benefit of investors. Morgan Stanley understands and acknowledges that these provisions are not intended to imply that the Attorney General would agree that any other amounts Morgan Stanley shall pay pursuant to this Assurance of Discontinuance or the Final Judgment may be reimbursed or indemnified (whether pursuant to an insurance policy or otherwise) under applicable law or may be the basis for any tax deduction or tax credit with regard to any federal, state or local tax.

No portion of the payments for Independent Research shall be considered disgorgement or restitution, and/or used for compensatory purposes.

D.    Morgan Stanley agrees to the terms and shall comply with the undertakings, of Addendum A, hereto, incorporated by reference herein, which, inter alia, provides for: (1) separation of research and investment banking; (2) procurement of independent, third-party research by the Independent Consultant (as defined in Addendum A) and provision of such independent research to Morgan Stanley's customers at no cost to such customers; (3) information and disclosures to enhance investors' abilities to evaluate the quality and accuracy of research reports; and (4) certification to the Attorney General respecting Morgan Stanley's compliance with the requirements and prohibitions set forth in Addendum A hereto.

-26-

Morgan Stanley shall also escrow $1,250,000 within thirty (30) days after entry of, and pursuant to, the Final Judgment to cover the fees and costs of the Independent Consultant. This obligation is not contingent or dependent in any way or part upon acceptance by any state securities regulator(s) of the State Settlement Offer. In the event that such escrowed amount exceeds the fees and costs of the Independent Consultant, the excess, pursuant to the Final Judgment, will be returned to Morgan Stanley at the conclusion of the five-year period set forth in Section III.1 of Addendum A hereto.

E.    Morgan Stanley agrees to the terms of Addendum B, attached hereto, incorporated by reference herein, which provides, inter alia, that Morgan Stanley will not allocate securities of "hot" initial public offerings to an account of an executive officer or director of a public company.

**The Investigation and This Assurance**

F.    This Assurance of Discontinuance concludes the Investigation by the Attorney General and any other action the Attorney General could commence against Morgan Stanley or its affiliates relating to the subject of the Investigation, provided however, that excluded from and not covered by this Paragraph F are any claims by the Attorney General arising from or relating to the "Agreement" provisions contained in this Assurance of Discontinuance.

G.    Nothing herein shall preclude New York State, its departments, agencies, boards, commissions, authorities, political subdivisions and corporations, other than the New York State Attorney General and only to the extent set forth in paragraph F above (collectively, "State Entities") and the officers, agents or employees of State Entities from asserting any claims, causes of action, or applications for compensatory, nominal and/or punitive damages,

-27-

administrative, civil or criminal, or injunctive relief against Morgan Stanley or its affiliates, or the current or former directors, officers or employees of Morgan Stanley or its affiliates arising from or relating to the subject of the Investigation.

H.    For any person or entity not a party hereto, this Assurance of Discontinuance does not prohibit, limit or create: (1) any private rights or remedies against Morgan Stanley; (2) liability of Morgan Stanley; or (3) defenses of Morgan Stanley to any claims. Nothing herein shall be construed to prohibit the use of any e-mails or other documents of Morgan Stanley or of others.

**No Disqualifications**

I.    This Assurance of Discontinuance is not intended by the Attorney General to subject any Covered Person to any disqualifications under the laws of any state, the District of Columbia or Puerto Rico (collectively, "State"), including, without limitation, any disqualifications from relying upon the State registration exemptions or State safe harbor provisions. "Covered Person" means Morgan Stanley, or any of its officers, directors, affiliates, current or former employees, or other persons that would otherwise be disqualified as a result of the Orders (as defined below).

J.    The SEC Final Judgment, the NYSE Stipulation and Consent, the NASD Letter of Acceptance, Waiver and Consent, this Assurance of Discontinuance and the order of any other State in related proceedings against Morgan Stanley (collectively, the "Orders") shall not disqualify any Covered Person from any business that they otherwise are qualified, licensed or permitted to perform under applicable law of the State of New York and any disqualifications

-28-

from relying upon the State of New York's registration exemptions or safe harbor provisions that arise from the Orders are hereby waived.

**Other Provisions**

K.    This Assurance of Discontinuance and any dispute related thereto shall be governed by the laws of the State of New York without regard to any choice of law principles.

L.    No failure or delay by the Attorney General in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein shall be cumulative.

M.    For a period of five years from the date of this Assurance of Discontinuance, Morgan Stanley, its officers, directors, agents, affiliates, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, shall not destroy, mutilate, conceal, alter, or dispose of (a) any research distributed by Morgan Stanley during the relevant period identified in paragraph 3 of this Assurance of Discontinuance ("Relevant Period"); (b) documents sufficient to identify all customers who bought or sold equity securities of the issuers as to which Morgan Stanley issued research during the Relevant Period (the "Transactions"), including but not limited to documents sufficient to identify the dates, amounts, and prices of the Transactions;

(c) documents sufficient to identify which customers received which research distributed by Morgan Stanley during the Relevant Period; (d) order entry information sufficient to identify whether the Transactions were solicited by Morgan Stanley; (e) documents sufficient to identify the publicly-traded companies for which Morgan Stanley sought to provide, was engaged to

-29-

provide, or did provide investment banking services during the Relevant Period; and (f) any and all written (including electronic) communication, including communications to and from customers and intra-firm communications, relating to Morgan Stanley's investment banking and equity research operations during the Relevant Period; provided, however, that Morgan Stanley need not retain duplicate identical copies of public documents filed with the Securities and Exchange Commission or any other regulatory authority.

N.    Morgan Stanley enters into this Assurance of Discontinuance voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Attorney General or any member, officer, employee, agent, or representative of the Attorney General to induce Morgan Stanley to enter into this Assurance of Discontinuance.

O.    Morgan Stanley agrees not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in this Assurance of Discontinuance or creating the impression that this Assurance of Discontinuance is without factual basis. Nothing in this Paragraph affects Morgan Stanley's testimonial obligations or right to take legal or factual positions in defense of litigation or in defense of other legal proceedings in which the Attorney General is not a party.

P.    This Agreement shall be binding upon Morgan Stanley and its successors and assigns. Further, with respect to all matters referred to in Paragraphs A and B on page 23 hereof and all future obligations, responsibilities, undertakings, commitments, limitations, restrictions, events, and conditions, the terms "Morgan Stanley" and "Morgan Stanley's" as used herein shall include Morgan Stanley's successors and assigns (which, for these purposes, shall include a successor or assign to Morgan Stanley's investment banking and research operations, and in the

case of an affiliate of Morgan Stanley, a successor or assign to Morgan Stanley's investment

banking or research operations).

WHEREFORE, the following signatures are affixed hereto on the dates set forth below.

Dated: April 21, 2003

MORGAN STANLEY & CO. INCORPORATED


By: /s/ Donald G. Kempf, Jr.
DONALD G. KEMPF, JR., ESQ.
Authorized Signatory

Dated: April 21, 2003
Reviewed by:


/s/ Alexander Dimitrief
ALEXANDER DIMITRIEF, ESQ.
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022
Counsel for Morgan Stanley & Co. Incorporated

Dated:        4/24 , 2003

ELIOT SPITZER, ESQ.


/s/ Eliot Spitzer
Attorney General of the State of New York

-31-

## CORPORATE ACKNOWLEDGMENT

STATE OF NEW YORK    )
                     : SS.
COUNTY OF NEW YORK )

On the 21st day of April, 2003, before me personally came Donald G. Kempf, Jr., known to me, who, being sworn by me, did depose and say that he resides at 1965 Broadway, New York, New York; that he is the authorized signatory for Morgan Stanley & Co. Incorporated, the corporation described in and which executed the foregoing Assurance of Discontinuance; that he knows the seal of the corporation; that the seal affixed to the foregoing Assurance of Discontinuance is such corporate seal; that it was so affixed by order of the corporation's board of directors, and that he signed his name thereto by like order.

/s/ Theresa A. Pilosi
Notary Public
My commission expires:

-32-

**ADDENDUM  A**

## Addendum A

## Undertakings

The firm shall comply with the following undertakings:

## I.  Separation of Research and Investment Banking

1. <u>Reporting Lines</u>.  Research and Investment Banking will be separate units with entirely separate reporting lines within the firm – i.e., Research will not report directly or indirectly to or through Investment Banking.  For these purposes, the head of Research may report to or through a person or persons to whom the head of Investment Banking also reports, provided that such person or persons have no direct responsibility for Investment Banking or investment banking activities.

   a. As used throughout this Addendum, the term "firm" means Morgan Stanley & Co. Incorporated ("Morgan Stanley"), Morgan Stanley's successors and assigns (which, for these purposes, shall include a successor or assign to Morgan Stanley's investment banking and research operations), and their affiliates, other than "exempt investment adviser affiliates."

   b. As used throughout this Addendum, the term "exempt investment adviser affiliate" means an investment adviser affiliate (including for these purposes, a separately identifiable department or division that is principally engaged in the provision of investment advice to managed accounts as governed by the Investment Advisers Act of 1940 or investment companies under the Investment Company Act of 1940) having no officers (or persons performing similar functions) or employees in common with the firm (which, for purposes of this Section I.1.b, shall not include the investment adviser affiliate) who can influence the activities of the firm's Research personnel or the content of the firm's research reports; provided that the firm (i) maintains and enforces written policies and procedures reasonably designed to prevent the firm, any controlling persons, officers (or persons performing similar functions), or employees of the firm from influencing or seeking to influence the activities of Research personnel of, or the content of research reports prepared by, the investment adviser affiliate; (ii) obtains an annual independent assessment of the operation of such policies and procedures; and (iii) does not furnish to its customers research reports prepared by the investment adviser affiliate or otherwise use such investment adviser affiliate to do indirectly what the firm may not do directly under this

1

Addendum.

c. As used throughout this Addendum, the term "Investment Banking" means all firm personnel engaged principally in investment banking activities, including the solicitation of issuers and structuring of public offering and other investment banking transactions. It also includes all firm personnel who are directly or indirectly supervised by such persons and all personnel who directly or indirectly supervise such persons, up to and including Investment Banking management.

d. As used throughout this Addendum, the term "Research" means all firm personnel engaged principally in the preparation and/or publication of research reports, including firm personnel who are directly or indirectly supervised by such persons and those who directly or indirectly supervise such persons, up to and including Research management.

e. As used throughout this Addendum, the term "research report" means any written (including electronic) communication that is furnished by the firm to investors in the U.S. and that includes an analysis of the common stock, any security convertible into common stock, or any derivative thereof, including American Depository Receipts (collectively, "Securities"), of an issuer or issuers and provides information reasonably sufficient upon which to base an investment decision; provided, however, that a "research report" shall not include:

   i. the following communications, if they do not include (except as specified below) an analysis, recommendation or rating (e.g., buy/sell/hold, under perform/market perform/outperform, underweight/market weight/overweight, etc.) of individual securities or issuers:

      1. reports discussing broad-based indices, such as the Russell 2000 or S&P 500 index;

      2. reports commenting on economic, political or market (including trading) conditions;

      3. technical or quantitative analysis concerning the demand and supply for a sector, index or industry based on trading volume and price;

      4. reports that recommend increasing or decreasing holdings in particular industries or sectors or types of securities; and

2

5.    statistical summaries of multiple companies' financial data and broad-based summaries or listings of recommendations or ratings contained in previously-issued research reports, provided that such summaries or listings do not include any analysis of individual companies; and

ii.    the following communications, even if they include information reasonably sufficient upon which to base an investment decision or a recommendation or rating of individual securities or companies:

1.    an analysis prepared for a current or prospective investing customer or group of current or prospective investing customers by a registered salesperson or trader who is (or group of registered salespersons or traders who are) not principally engaged in the preparation or publication of research reports; and

2.    periodic reports, solicitations or other communications prepared for current or prospective investment company shareholders (or similar beneficial owners of trusts and limited partnerships) or discretionary investment account clients, provided that such communications discuss past performance or the basis for previously made discretionary investment decisions.

2.  <u>Legal/Compliance</u>.  Research will have its own dedicated legal and compliance staff, who may be a part of the firm's overall compliance/legal infrastructure.

3.  <u>Budget</u>.  For the firm's first fiscal year following the entry of the final judgment in the action by the Securities and Exchange Commission ("SEC") against Morgan Stanley in a related proceeding ("final judgment") and thereafter, Research budget and allocation of Research expenses will be determined by the firm's senior management (e.g., CEO/Chairman/management committee, other than Investment Banking personnel) without input from Investment Banking and without regard to specific revenues or results derived from Investment Banking, though revenues and results of the firm as a whole may be considered in determining Research budget and allocation of Research expenses. On an annual basis thereafter, the Audit Committee of the firm's holding/parent company (or comparable independent persons/group without management responsibilities) will review the budgeting and expense allocation process with respect to Research to ensure compliance with this requirement.

4. <u>Physical Separation</u>. Research and Investment Banking will be physically separated. Such physical separation will be reasonably designed to prevent the intentional and unintentional flow of information between Research and Investment Banking.

5. <u>Compensation</u>. Compensation of professional Research personnel will be determined exclusively by Research management and the firm's senior management (but not including Investment Banking personnel) using the following principles:

    a. Investment Banking will have no input into compensation decisions.

    b. Compensation may not be based directly or indirectly on Investment Banking revenues or results; provided, however, that compensation may relate to the revenues or results of the firm as a whole.

    c. A significant portion of the compensation of anyone principally engaged in the preparation of research reports (as defined in this Addendum) that he or she is required to certify pursuant to the SEC's Regulation Analyst Certification ("Regulation AC") (such person hereinafter a "lead analyst") must be based on quantifiable measures of the quality and accuracy of the lead analyst's research and analysis, including his or her ratings and price targets, if any. In assessing quality, the firm may rely on, among other things, evaluations by the firm's investing customers, evaluations by the firm's sales personnel and rankings in independent surveys. In assessing accuracy, the firm may use the actual performance of a company or its equity securities to rank its own lead analysts' ratings and price targets, if any, and forecasts, if any, against those of other firms, as well as against benchmarks such as market or sector indices.

    d. Other factors that may be taken into consideration in determining lead analyst compensation include: (i) market capitalization of, and the potential interest of the firm's investing clients in research with respect to, the industry covered by the analyst; (ii) Research management's assessment of the analyst's overall performance of job duties, abilities and leadership; (iii) the analyst's seniority and experience; (iv) the analyst's productivity; and (v) the market for the hiring and retention of analysts.

    e. The criteria to be used for compensation decisions will be determined by Research management and the firm's senior management (not including Investment Banking) and set forth in writing in advance.

    f. Research management will document the basis for each compensation decision made with respect to (i) anyone who, in the last 12 months, has been required to certify a research report (as defined in this

Addendum) pursuant to Regulation AC; and (ii) anyone who is a member of Research management (except in the case of senior-most Research management, in which case the basis for each compensation decision will be documented by the firm's senior management).

On an annual basis, the Compensation Committee of the firm's holding/parent company (or comparable independent persons/group without management responsibilities) will review the compensation process for Research personnel. Such review will be reasonably designed to ensure that compensation decisions have been made in a manner that is consistent with these requirements.

6. <u>Evaluations</u>. Evaluations of Research personnel will not be done by, nor will there be input from, Investment Banking personnel.

7. <u>Coverage</u>. Investment Banking will have no input into company-specific coverage decisions (i.e., whether or not to initiate or terminate coverage of a particular company in research reports furnished by the firm), and investment banking revenues or potential revenues will not be taken into account in making company-specific coverage decisions; provided, however, that this requirement does not apply to category-by-category coverage decisions (e.g., a given industry sector, all issuers underwritten by the firm, companies meeting a certain market cap threshold).

8. <u>Termination of Coverage</u>. When a decision is made to terminate coverage of a particular company in the firm's research reports (whether as a result of a company-specific or category-by-category decision), the firm will make available a final research report on the company using the means of dissemination equivalent to those it ordinarily uses; provided, however, that no final report is required for any company as to which the firm's prior coverage has been limited to purely quantitative analysis. Such report will be comparable to prior reports, unless it is impracticable for the firm to produce a comparable report (e.g., if the analyst covering the company and/or sector has left the firm). In any event, the final research report must disclose: the firm's termination of coverage; and the rationale for the decision to terminate coverage.

9. <u>Prohibition on Soliciting Investment Banking Business</u>. Research is prohibited from participating in efforts to solicit investment banking business. Accordingly, Research may not, among other things, participate in any "pitches" for investment banking business to prospective investment banking clients, or have other communications with companies for the purpose of soliciting investment banking business.

10. <u>Firewalls Between Research and Investment Banking</u>. So as to reduce further the potential for conflicts of interest or the appearance of

conflicts of interest, the firm must create and enforce firewalls between Research and Investment Banking reasonably designed to prohibit all communications between the two except as expressly described below:

a. Investment Banking personnel may seek, through Research management (or an appropriate designee with comparable management or control responsibilities ("Designee")) or in the presence of internal legal or compliance staff, the views of Research personnel about the merits of a proposed transaction, a potential candidate for a transaction, or market or industry trends, conditions or developments. Research personnel may respond to such inquiries on these subjects through Research management or its Designee or in the presence of internal legal or compliance staff. In addition, Research personnel, through Research management or its Designee or in the presence of internal legal or compliance staff, may initiate communications with Investment Banking personnel relating to market or industry trends, conditions or developments, provided that such communications are consistent in nature with the types of communications that an analyst might have with investing customers. Any communications between Research and Investment Banking personnel must not be made for the purpose of having Research personnel identify specific potential investment banking transactions.

b. In response to a request by a commitment or similar committee or subgroup thereof, Research personnel may communicate their views about a proposed transaction or potential candidate for a transaction to the committee or subgroup thereof in connection with the review of such transaction or candidate by the committee. Investment Banking personnel working on the proposed transaction may participate with the Research personnel in these discussions with such committee or subgroup. However, the Research personnel also must have an opportunity to express their views to the committee or subgroup outside the presence of such Investment Banking personnel.

c. Research personnel may assist the firm in confirming the adequacy of disclosure in offering or other disclosure documents for a transaction based on the analysts' communications with the company and other vetting conducted outside the presence of Investment Banking personnel, but to the extent communicated to Investment Banking personnel, such communication shall only be made in the presence of underwriters' or other counsel on the transaction or internal legal or compliance staff.

d. After the firm receives an investment banking mandate, or in connection with a block bid or similar transaction, Research personnel may (i) communicate their views on the structuring and pricing of the transaction to personnel in the firm's equity capital

markets group, which group's principal job responsibility is the pricing and structuring of transactions (including by participating with the firm's equity capital markets group in the preparation of internal-use memoranda and other efforts to educate the sales force), and (ii) provide to such personnel other information obtained from investing customers relevant to the pricing and structuring of the transaction. .

e.  Research personnel may attend or participate in a widely-attended conference attended by Investment Banking personnel or in which Investment Banking personnel participate, provided that the Research personnel do not participate in activities otherwise prohibited herein.

f.  Research and Investment Banking personnel may attend or participate in widely-attended firm or regional meetings at which matters of general firm interest are discussed. Research management and Investment Banking management may attend meetings or sit on firm management, risk or similar committees at which general business and plans (including those of Investment Banking and Research) and other matters of general firm interest are discussed. Research and Investment Banking personnel may communicate with each other with respect to legal or compliance issues, provided that internal legal or compliance staff is present.

g.  Communications between Research and Investment Banking personnel that are not related to investment banking or research activities may take place without restriction.

11. Additional Restrictions on Activities By Research and Investment Banking Personnel.

a.  Research personnel are prohibited from participating in company or Investment Banking-sponsored road shows related to a public offering or other investment banking transaction.

b.  Investment Banking personnel are prohibited from directing Research personnel to engage in marketing or selling efforts to investors with respect to an investment banking transaction.

12. Oversight. An oversight/monitoring committee or committees, which will be comprised of representatives of Research management and may include others (but not personnel from Investment Banking), will be created to:

a.  review (beforehand, where practicable) all changes in ratings, if any, and material changes in price targets, if any, contained in the firm's research reports;

7

    b.  conduct periodic reviews of research reports to determine whether changes in ratings or price targets, if any, should be considered; and

    c.  monitor the overall quality and accuracy of the firm's research reports;

provided, however, that Sections I.12a and I.12b of this Addendum shall not be required with respect to research reports limited to purely quantitative analysis.

## II.  Disclosure/Transparency and Other Issues

1.  <u>Disclosures</u>. In addition to other disclosures required by rule, the firm must disclose prominently on the first page of any research report and any summary or listing of recommendations or ratings contained in previously-issued research reports, in type no smaller than the type used for the text of the report or summary or listing, that:

    a.  "Morgan Stanley does and seeks to do business with companies covered in their research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report."

    b.  With respect to Covered Companies as to which the firm is required to make available Independent Research (as set forth in Section III below): "Customers of Morgan Stanley can receive independent, third-party research on the company covered in this report, at no cost to them, where such research is available. Customers can access this independent research at [website address/hyperlink] or can call [toll-free number] to request a copy of this research."

    c.  "Investors should consider this report as only a single factor in making their investment decision."

2.  <u>Transparency of Analysts' Performance</u>. The firm will make publicly available (via its website, in a downloadable format), no later than 90 days after the conclusion of each quarter (beginning with the first full calendar quarter that commences at least 120 days following the entry of the final judgment), the following information, if such information is included in any research report (other than any research report limited to purely quantitative analysis) prepared and furnished by the firm during the prior quarter: subject company, name(s) of analyst(s) responsible for certification of the report pursuant to Regulation AC, date of report, rating, price target, period within which the price target is to be achieved, earnings per share forecast(s), period(s) for which such forecast(s) are applicable (e.g., 3Q03, FY04, etc.), and definition/explanation of ratings

used by the firm.

3. <u>Applicability</u>. Except as specified in the second and third sentences of this Section II.3, the restrictions and requirements set forth in Sections I [Separation of Research and Investment Banking] and Section II [Disclosure/Transparency and Other Issues] of this Addendum will only apply in respect of a research report that is both (i) prepared by the firm, and (ii) that relates to either (A) a U.S. company, or (B) a non-U.S. company for which a U.S. market is the principal equity trading market; provided, however, that such restrictions and requirements do not apply to Research activities relating to a non-U.S. company until the second calendar quarter following the calendar quarter in which the U.S. market became the principal equity trading market for such company. Notwithstanding the foregoing, Section I.7 [Coverage] of this Addendum will also apply to any research report (other than the Independent Research made available by the firm pursuant to Section III [Independent, Third-Party Research] of this Addendum) that has been *furnished* by the firm to investors in the U.S., but not prepared by the firm, but only to the extent that the report relates to either (A) a U.S. company, or (B) a non-U.S. company for which a U.S. market is the principal equity trading market. Also notwithstanding the foregoing, Section II.1 [Disclosures] of this Addendum will also apply to any research report (other than the Independent Research made available by the firm pursuant to Section III of this Addendum) that has been *furnished* by the firm to investors in the U.S., but not prepared by the firm, including a report that relates to a non-U.S. company for which a U.S. market is not the principal equity trading market, but only to the extent that the report has been furnished under the firm's name, has been prepared for the exclusive or sole use of the firm or its customers, or has been customized in any material respect for the firm or its customers.

a. For purposes of this Section II.3, the firm will be deemed to have furnished a research report to investors in the U.S. if the firm has made the research report available to investors in the U.S. or has arranged for someone else to make it available to investors in the U.S.

b. For purposes of this Section II.3, a "U.S. company" means any company incorporated in the U.S. or whose principal place of business or headquarters is in the U.S.

c. For purposes of this Section II.3, the calendar quarter in which a non-U.S. company's "principal equity trading market" becomes the U.S. market is a quarter when more than 50% of worldwide trading in the company's common stock and equivalents (such as ordinary shares or common stock or ordinary shares represented by American Depositary Receipts) takes place in the U.S. Trading volume shall be measured by publicly reported share volume.

9

4. <u>General</u>.

   a. The firm may not knowingly do indirectly that which it cannot do directly under this Addendum.

   b. The firm will adopt and implement policies and procedures reasonably designed to ensure that its associated persons (including but not limited to the firm's Investment Banking personnel) cannot and do not seek to influence the contents of a research report or the activities of Research personnel for purposes of obtaining or retaining investment banking business. The firm will adopt and implement procedures instructing firm personnel to report immediately to a member of the firm's legal or compliance staff any attempt to influence the contents of a research report or the activities of Research personnel for such a purpose.

5. <u>Timing</u>. Unless otherwise specified, the restrictions and requirements of this Addendum will be effective within 120 days of the entry of the final judgment, except that Sections I.5 [Compensation], I.6 [Evaluations], I.7[Coverage], I.8[Termination of Coverage], I.9 [Prohibition on Soliciting Investment Banking Business], I.11 [Additional Restrictions on Activities by Research and Investment Banking Personnel], and II.4(a) [General (subpart a)] and II.7 [Superseding Rules and Amendments] of this Addendum will be effective within 60 days of the entry of the final judgment, and Sections II.1.b [Disclosures (subpart b)] and III [Independent, Third-Party Research] of this Addendum will be effective within 270 days of the entry of the final judgment.

6. <u>Review of implementation</u>.

   a. The firm will retain, at its own expense, an Independent Monitor acceptable to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office to conduct a review to provide reasonable assurance of the implementation and effectiveness of the firm's policies and procedures designed to achieve compliance with the terms of this Addendum. This review will begin 18 months after the date of the entry of the final judgment. The Independent Monitor will produce a written report of its review, its findings as to the implementation and effectiveness of the firm's policies and procedures, and its recommendations of other policies or procedures (or amendments to existing policies or procedures) as are necessary and appropriate to achieve compliance with the requirements and prohibitions of this Addendum. The report will be produced to the firm and the Staff of the SEC, the NYSE and the NASD within 30 days from the completion of the review, but no later than 24 months from the date of entry of the final judgment. (The SEC Staff shall make the report

10

available to the President of NASAA and the New York Attorney General's Office upon request.) The Independent Monitor shall have the option to seek an extension of time by making a written request to the Staff of the SEC.

b. The firm will have a reasonable opportunity to comment on the Independent Monitor's review and proposed report prior to its submission, including a reasonable opportunity to comment on any and all recommendations, and to seek confidential treatment of such information and recommendations set forth therein to the extent that the report concerns proprietary commercial and financial information of the firm. This report will be subject to the protections from disclosure set forth in the rules of the SEC, including the protections from disclosure set forth in 5 U.S.C. § 552(b)(8) and 17 C.F.R. § 200.80(b)(8), and will not constitute a record, report, statement or data compilation of a public office or agency under Rule 803(8) of the Federal Rules of Evidence.

c. The firm will adopt all recommendations contained in the written report of the Independent Monitor; provided, however, that as to any recommendation that the firm believes is unduly burdensome or impractical, the firm may demonstrate why the recommended policy or procedure is, under the circumstances, unreasonable, impractical and/or not designed to yield benefits commensurate with its cost, or the firm may suggest an alternative policy or procedure designed to achieve the same objective, and submit such explanation and/or alternative policy or procedure in writing to the Independent Monitor and to the Staff of the SEC. The firm and the Independent Monitor shall then attempt in good faith to reach agreement as to any policy or procedure as to which there is any dispute and the Independent Monitor shall reasonably evaluate any alternative policy or procedure proposed by the firm. If an agreement on any issue is not reached, the firm will abide by the determinations of the Staff of the SEC (which shall be made after allowing the firm and the Independent Monitor to present arguments in support of their positions), and adopt those recommendations the Staff of the SEC deems appropriate.

d. The firm will cooperate fully with the Independent Monitor in this review, including making such non-privileged information and documents available, as the Independent Monitor may reasonably request, and by permitting and requiring the firm's employees and agents to supply such non-privileged information and documents as the Independent Monitor may reasonably request.

e. To ensure the independence of the Independent Monitor, the firm (i)

11

shall not have the authority to terminate the Independent Monitor without the prior written approval of the SEC staff; and (ii) shall compensate the Independent Monitor, and persons engaged to assist the Independent Monitor, for services rendered pursuant to this Order at their reasonable and customary rates.

f. For the period of engagement and for a period of three years from completion of the engagement, the Independent Monitor shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with the firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any entity with which the Independent Monitor is affiliated or of which he/she is a member, and any person engaged to assist the Independent Monitor in performance of his/her duties under this Order shall not, without prior written consent of the Staff of the SEC, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of three years after the engagement.

g. Five years after the date of the entry of the final judgment, the firm shall certify to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office, that the firm has complied in all material respects with the requirements and prohibitions set forth in this Addendum or, in the event of material non-compliance, will describe such material non-compliance.

7. <u>Superseding Rules and Amendments</u>. In the event that the SEC adopts a rule or approves an SRO rule or interpretation with the stated intent to supersede any of the provisions of this settlement set forth in this Addendum, the SEC or SRO rule or interpretation will govern with respect to that provision of the settlement and such provision will be superseded. In addition, each of the SEC, NYSE, the NASD, the New York Attorney General's Office and any State that incorporates this Addendum into its settlement of related proceedings against Morgan Stanley agrees that the SEC Staff may provide interpretive guidance with respect to the terms of the settlement set forth in this Addendum, as requested by the firm and that, subject to Court approval, the SEC and the firm may agree to amend or modify any term of the settlement set forth in this Addendum, in each case, without any further action or involvement by any other regulator in any related proceeding. With respect to any term in Section I or II of this Addendum that has not been superseded (as set forth above) within five years of the entry of the final judgment, it is the expectation of Morgan Stanley, the SEC, NYSE, NASD, New York Attorney General's Office and the States that the SEC

would agree to an amendment or modification of such term, subject to Court approval, unless the SEC believes such amendment or modification would not be in the public interest.

8.  <u>Other Obligations and Requirements</u>. Except as otherwise specified, the requirements and prohibitions of this Addendum shall not relieve the firm of any other applicable legal obligation or requirement.

## III.  Independent, Third-Party Research

1.  <u>Obligation to Make Available</u>. Each year, for the period ending five years after the effective date of this Section III (as set forth in Section II.5 [Timing] of this Addendum), the firm will be required to contract with no fewer than three independent providers of research ("Independent Research Providers") at a time in order to procure and make available Independent Research (as defined below) to the firm's customers in the U.S. as set forth below. There is, however, no requirement that there be at least three Independent Research Providers for the Common Stock of each Covered Company (as those terms are defined below):

a.  For common stock and equivalents (such as ordinary shares or common stock or ordinary shares represented by American Depositary Receipts) listed on a U.S. national securities exchange or quoted in Nasdaq (such securities hereinafter, collectively, "Common Stock") and covered in the firm's research reports (other than those limited to purely quantitative analysis) (an issuer of such covered Common Stock hereinafter called a "Covered Company"), the firm, through an Independent Consultant (as discussed below) will use its reasonable efforts to procure, and shall make available to its customers in the U.S., Independent Research on such Covered Company's Common Stock. (If the Independent Research Providers drop coverage or do not timely pick up coverage of the Common Stock of a Covered Company, the firm will not be in violation of any of the requirements in this Section III, and may continue to disseminate its own research reports on the Common Stock of the Covered Company without making available any Independent Research on the Common Stock of the Covered Company, if the firm takes reasonable steps to request that the Independent Consultant procure such coverage promptly.)

i.  For purposes of this Section III, the firm's research reports include research reports that have not been prepared by the firm, but only to the extent that such reports have been furnished under the firm's name, have been prepared for the exclusive or sole use of the firm or its customers, or have been customized in any material

13

respect for the firm or its customers.

    ii.    A non-U.S. company for which a U.S. market is not the principal equity trading market shall only be considered a Covered Company if in the calendar quarter ended March 31, 2003, or in any subsequent calendar quarter during the period that the firm's obligations to procure and make available Independent Research under this Section III are effective, the publicly reported, average daily dollar volume of U.S. trading in such company's Common Stock (measured by multiplying the publicly reported, average daily share volume of U.S. trading during the quarter by the closing price per share of the Common Stock on the last day of the quarter), exceeded $2.5 million, and (b) the outstanding total public float of the Common Stock as of the last day of such calendar quarter exceeded $150 million. Further, the firm's obligation to procure and make available Independent Research with respect to such company shall become effective at the later of: (a) 90 days after the end of the calendar quarter in which the company met the foregoing trading and public float tests; or (b) the effective date of this Section III.

b.  For purposes of this Section III, Independent Research means (i) a research report prepared by an unaffiliated person or entity, or (ii) a statistical or other survey or analysis of research reports (including ratings and price targets) issued by a broad range of persons and entities, including persons and entities having no association with investment banking activities, which survey or analysis has been prepared by an unaffiliated person or entity.

c.  The firm will adopt policies and procedures reasonably designed to ensure that, in connection with any solicited order for a customer in the U.S. relating to the Common Stock of a Covered Company, and if Independent Research on the Covered Company's Common Stock is available, the registered representative will have informed the customer, during the solicitation, that the customer can receive Independent Research on the Covered Company's Common Stock at no cost to the customer (the "Notice Requirement").

d.  Notwithstanding the foregoing, the Notice Requirement will not apply to (i) the solicitation of an institutional customer (an entity other than a natural person having at least $10 million invested in securities in the aggregate in its portfolio and/or under management) unless such customer, after due notice and opportunity, has advised the firm that it wishes to have the Notice Requirement apply to it (any

customer who has not so advised the firm is hereinafter referred to as a "Non-Participating Institutional Customer"); (ii) orders as to which discretion was exercised, pursuant to a written discretionary account agreement or written grant of trading authorization; or (iii) a solicitation by an entity affiliated with Morgan Stanley if such entity does not furnish to its customers research reports under the firm's name, prepared by the firm or for the exclusive or sole use of the firm or its customers, or research reports that have been customized in any material respect for the firm or its customers.

e. Each trade confirmation sent by Morgan Stanley to a customer with respect to an order as to which the Notice Requirement applies will set forth (or will be accompanied by a separate statement, which shall be considered part of the confirmation, that will set forth), as of the time the trade confirmation is generated, the ratings, if any, contained in the firm's own research reports and in Independent Research procured for the firm with respect to the Common Stock of the Covered Company that is the subject of the order.

f. Each periodic account statement sent by Morgan Stanley to a customer in the U.S. that reflects a position in the Common Stock of a Covered Company will set forth (or will be accompanied by a separate statement, which shall be considered part of the periodic account statement, that will set forth), as of the end of the period covered by the statement, the ratings, if any, contained in the firm's own research reports and in the Independent Research made available by the firm on the Common Stock of each such Covered Company; provided, however, that this requirement will not apply to Non-Participating Institutional Customers or discretionary accounts.

g. Notice of the availability of Independent Research on Covered Companies' Common Stock will also be included prominently in the periodic account statements of Morgan Stanley's customers in the U.S., in the firm's research reports, and on the firm's website.

h. The firm will make the Independent Research available to its customers in the U.S. using, for each customer, the means of dissemination equivalent to those it uses to provide the customer with the firm's own research reports, unless the firm and customer agree on another means of dissemination; provided, however, that nothing herein shall require or authorize the firm to comply with the Notice Requirement or make available or disseminate Independent Research at a time when doing so would violate Section 5 of the Securities Act of 1933 or the other provisions of the federal securities laws or the rules and regulations thereunder. If and to the extent the firm is able to make available or disseminate its own research reports on the Common Stock of a Covered Company pursuant to Rule 137, Rule

15

138(a) or Rule 139(a) under the Securities Act of 1933 and in reliance on Regulation M under the Securities Exchange Act of 1934, then the firm is also authorized and required to make available or disseminate Independent Research on the Common Stock of such Covered Company (even if the Independent Research does not meet the requirements of such Rule). Notwithstanding this Section III.1.h, if the firm determines, because of legal, compliance or similar concerns, not to furnish or make available its own research reports on the Common Stock of a Covered Company for a limited period of time, it shall not be required to make available the Independent Research on such Covered Company for such period of time.

i. If, during the period that the firm's obligations to procure and make available Independent Research under this Section III are effective, the firm terminates coverage of the Common Stock of a Covered Company, the firm, through its Independent Consultant, will make reasonable efforts to continue to procure and make available Independent Research on the Common Stock of such company for a period of at least 18 months after termination of coverage (subject to expiration of the firm's obligations under this Section III).

j. The firm will not be responsible or liable for (i) the procurement decisions of the Independent Consultant (as discussed in Section III.2 [Appointment of Independent Consultant to Oversee the Procurement of Independent Research] of this Addendum) with respect to the Independent Research, (ii) the Independent Research or its content, (iii) customer transactions, to the extent based on the Independent Research, or (iv) claims arising from or in connection with the inclusion of Independent Research ratings in the firm's confirmations and periodic account statements, to the extent such claims are based on those ratings. The firm will not be required to supervise the production of the Independent Research procured by the Independent Consultant and will have no responsibility to comment on the content of the Independent Research. The firm may advise its customers of the foregoing in its discretion.

k. The Independent Consultant will not be liable for (i) its procurement decisions, (ii) the Independent Research or its content, (iii) customer transactions, to the extent based on the Independent Research, or (iv) claims arising from or in connection with the inclusion of Independent Research ratings in the firm's confirmations and periodic account statements, to the extent such claims are based on those ratings, unless the Independent Consultant has carried out such duties in bad faith or with willful misconduct. The firm will indemnify the Independent Consultant for any liability arising from the Independent Consultant's good-faith performance of its duties as such.

2. <u>Appointment of Independent Consultant to Oversee the Procurement of Independent Research</u>. Within 30 days of the entry of the final judgment, an Independent Consultant acceptable to the SEC Staff, the NYSE, the NASD, the President of NASAA, the New York Attorney General and the firm shall be named to oversee the procurement of Independent Research from Independent Research Providers. The Independent Consultant will have the final authority (following consultation with the firm and in accordance with the criteria set forth in Section III.3 [Selection of Independent Research Providers] of this Addendum) to procure the Independent Research. The Independent Consultant will not have had any significant financial relationship with the firm during the prior three years and may not have any financial relationship with the firm for three years following his or her work as the Independent Consultant. The Independent Consultant's fee arrangement will be subject to the approval of the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office. In the event that an Independent Consultant must be replaced, the replacement shall be acceptable to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, the New York Attorney General's Office and the firm, and shall be subject to these same conditions.

3. <u>Selection of Independent Research Providers</u>. The Independent Consultant will seek to procure research reports on the Common Stock of all Covered Companies from Independent Research Providers. Independent Research Providers may not perform investment banking business of any kind and may not provide brokerage services in direct and significant competition with the firm. In addition, the Independent Consultant will use the following criteria in selecting and contracting with Independent Research Providers to provide Independent Research.

   a. whether and to what extent the Independent Research Provider or any of its affiliates or associated persons is engaged in activities (including, but not limited to, activities involving Covered Companies or their securities), or has a business or other relationship with the firm or any of its affiliates or associated persons, that may conflict or create the appearance of conflict with its preparation and publication of the Independent Research;

   b. the desirability of multiple coverage of certain Covered Companies (e.g., by size of company, industry sector, companies underwritten by the firm, etc.);

   c. the extent to which the Independent Research Provider has a client base and revenue stream broad enough to ensure its independence from the firm;

   d. the utility of the Independent Research Provider's Independent

17

Research to the firm's customers, including the inclusion of ratings and price targets in such research and the extent to which the firm's customers actually use the research; and with respect to surveys or analyses described above in Section III.1.b(ii), the extent to which the Independent Research provides customers with a means of comparing the firm's research reports to those published by other persons and entities, including persons and entities having no association with investment banking activities;

e.  the quality and accuracy of the Independent Research Provider's past research, including during the term of the Independent Consultant's tenure;

f.  the experience, expertise, reputation and qualifications (including, as appropriate, registrations) of the Independent Research Provider and its personnel; and

g.  the cost of the Independent Research, especially in light of the five-year period set forth in Section III.1 above for the firm to make Independent Research available to its investing customers.

4.  <u>Disclosure Language</u>.  Language substantially to the effect set forth below may be used by the firm and its registered representatives to inform the firm's customers of the availability of Independent Research:

a.  Disclosure to customers as required by Section III.1.c [Obligation to Make Available subpart c] of this Addendum.

"There is also independent, third-party research available on this company, which you can get at no cost [from our website/hyperlink] or by calling [toll-free number], or which I can arrange to send to you if you would like."

b.  General website and periodic customer account statement disclosure as required by Section III.1.g. [Obligation to Make Available subpart g] of this Addendum.

"Independent, third-party research on certain companies covered by the firm's research is available to customers of Morgan Stanley at no cost.  Customers can access this research at [our website/hyperlink] or can call [toll-free number] to request that a copy of this research be sent to them."

5.  <u>Annual Reporting</u>.  The Independent Consultant will report annually to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office on its selection of Independent Research Providers, the Independent Research it has

18

procured, the cost of the Independent Research it has procured to date, and the Independent Consultant's fees and expenses to date.

**ADDENDUM  B**

<u>Addendum B</u>

<u>Voluntary Initiative Regarding Allocations of Securities in "Hot" Initial
Public Offerings to Corporate Executives and Directors</u>

Each Participating Firm is committed to restoring investor confidence
in the IPO allocation process. Accordingly, each Participating Firm (which,
for purposes of this Voluntary Initiative, includes the Participating Firm's
U.S. broker-dealer affiliates) represents and promises to the Securities and
Exchange Commission, the NASD, the New York Stock Exchange, the
Office of the New York Attorney General, and the North American
Securities Administrators Association, that it will establish, implement and
maintain policies and procedures reasonably designed to ensure that:

1. The Participating Firm will not allocate securities in a "hot" IPO to
   an account of an executive officer or director of a U.S. public
   company or a public company for which a U.S. market is the
   principal equity trading market.

   a) An "IPO" is the initial public offering of an issuer's equity
      securities, which offering is registered under the Securities Act
      of 1933 and as a result of which the issuer becomes a "public
      company" as defined below.

   b) A "hot" IPO is any IPO that trades at a premium in the
      secondary market when the secondary market begins.

   c) A "public company" is any company that is registered under
      Section 12 of the Securities Exchange Act of 1934 or files
      periodic reports pursuant to Section 15(d) thereof.

   d) A company's "principal equity trading market" is a U.S. market
      if, in the second preceding quarter, more than 50% of
      worldwide trading in the company's common stock and
      equivalents (such as ordinary shares or common stock or
      ordinary shares represented by American Depositary Receipts)
      takes place in the U.S. Trading volume, for these purposes,
      shall be measured by publicly reported share volume.

   e) In determining whether someone is an executive officer or
      director of a particular company, the Participating Firm may use
      any reasonable means or combination of reasonable means,

which may include, among other things, such company's most recent proxy statement filed with the Securities and Exchange Commission (or, for a company that has not filed a proxy statement, such company's most recent annual report filed with the Commission), third-party information or data services that list executive officers and directors of public companies, and/or representations made by account holders.

f) An "account of an executive officer or director" is any brokerage account in the name of the executive officer or director, and any brokerage account beneficially owned in whole or principal part by the executive or director or by his or her "immediate family members."

g) A person's "immediate family members" are the person's spouse or minor child having the same last name or living at the same address as such person.

2. In connection with any IPO transaction in which the Participating Firm is seeking to become the lead or co-lead managing underwriter, the Participating Firm will take reasonable steps, prior to the award of the formal mandate, to notify the company in writing (through the company's chief legal officer or, if there is no chief legal officer, through the chief executive officer, chief financial officer or chief operating officer) that the Participating Firm may have allocated hot IPOs to the company's executive officers and directors and/or their immediate family members, and that the company's board of directors may wish to obtain information from such executive officers or directors concerning such allocations in connection with its consideration of the Participating Firm as an underwriter.

3. The Participating Firm will not allocate securities in an IPO in exchange for or for the purpose of obtaining investment banking business.

4. The Participating Firm will not permit investment banking personnel (which, for these purposes, shall not include members of the Participating Firm's equity capital markets group or any employee of the issuer or its affiliates) to have input into the

2

Participating Firm's allocation of securities in an IPO to a brokerage account in the name of, or beneficially owned in whole or principal part by, a specific individual (i.e., non-institutional) customer or limited number of specific individual (i.e., non-institutional) customers; provided, however, that the foregoing will not prevent investment banking personnel from (i) conveying allocation requests made in writing by the issuer or other sellers, or (ii) participating in discussions with the issuer or its affiliates, other sellers or other Participating Firm personnel regarding the general plan of distribution (e.g., the percentage of an offering that should be given to retail vs. institutional customers, geographical allocation of a global offering, etc.).

5. This Voluntary Initiative does not apply to allocations of securities that are directed, in writing, by the issuer or its affiliates, selling shareholders or a separately organized investment adviser (including, for these purposes, a separately identifiable department or division that is (a) principally engaged in the provision of investment advice as governed by the Investment Advisers Act of 1940, and (b) is not subject to affiliate restrictions pursuant to Rule 100(b)(3) of Regulation M under the Securities Exchange Act of 1934); provided, however, that with respect to this and the other Items of this Voluntary Initiative, the Participating Firm will not knowingly do indirectly what it has agreed not to do directly.

6. This Voluntary Initiative shall be effective six months from the date hereof, and shall expire at the earlier of (i) five years from such effective date; or (ii) the effective date of any rule that would place restrictions on the ability of investment banking firms to allocate securities in "hot" IPOs to executive officers and directors of public companies.

By Participating Firms as of April 18, 2003:


By:        *Bear, Stearns & Co. Inc.*

Name:      _____

Title:     _____


3

By:      *Citigroup Global Markets Incorporated*

Name:    _____

Title:   _____


By:      *Credit Suisse First Boston LLC*

Name:    _____

Title:   _____


By:      *Deutsche Bank Securities Inc.*

Name:    _____

Title:   _____


By:      *Goldman, Sachs & Co.*

Name:    _____

Title:   _____


By:      *JP Morgan Securities Inc.*

Name:    _____

Title:   _____


By:      *Lehman Brothers Inc.*

Name:    _____

Title:   _____


4

By:      *Merrill Lynch, Pierce, Fenner & Smith Incorporated*

Name:    _____

Title:   _____


By:      *Morgan Stanley & Co. Incorporated*

Name:    _____

Title:   _____


By:      *UBS Warburg LLC*

Name:    _____

Title:   _____


By:      *U.S. Bancorp Piper Jaffray Inc.*

Name:    _____

Title:   _____


Acknowledged and Received:

United States Securities and Exchange Commission

Name:    _____

Title:   _____

National Association of Securities Dealers, Inc.

Name:    _____

Title:   _____

5

New York Stock Exchange, Inc.

Name:    _____

Title:    _____

New York Attorney General

Name:    _____

Title:    _____

North American Securities Administrators Association

Name:    _____

Title:    _____

6