# EXHIBIT H

STATE OF ALABAMA
ALABAMA SECURITIES COMMISSION

IN THE MATTER OF:          )
                          )
LEHMAN BROTHERS INC. )          ADMINISTRATIVE ORDER
                          )          NO. CO-2003- 0010
    RESPONDENT         )

## CONSENT ORDER

WHEREAS, the Alabama Securities Commission ("Commission") and RESPONDENT are desirous of settling this matter as hereafter set forth and agree to the entry of this Order for the purpose of settling this matter,

WHEREAS, RESPONDENT has voluntarily waived all rights to a hearing upon entry of this Order, and has consented to the entry of this Order, and

WHEREAS, the Commission finds this Order necessary and appropriate in the public interest for the protection of investors, and consistent with the purposes fairly intended by the policy and provisions of the Alabama Securities Act ("Act").

The Commission, having the power to administer and provide for the enforcement of all provisions of Title 8, Chapter 6, Code of Alabama 1975, of the Act, and upon due consideration of the subject matter hereof, has determined as follows:

## RESPONDENT

1.      LEHMAN BROTHERS INC. (RESPONDENT) has been a broker-dealer registered with the Commission since October 24, 1981 and an investment adviser since April 3, 1991. RESPONDENT is a wholly owned subsidiary of Lehman Brothers Holdings Inc., a Delaware corporation. The firm is a member of all principal securities and commodity exchanges to include the NYSE, as well as the NASD. Lehman's principal offices are located at 745 Seventh Avenue, New York, New York. Lehman provides the full range of

services offered by a multi-purpose investment bank, including equity and fixed income sales, trading and research, investment banking, private equity and private client sales

## STATEMENT OF FACTS

I.    BACKGROUND

A.    The Investment Banking Function at Lehman

2.    Lehman is a global investment bank providing financial advisory, capital markets and underwriting services, among other services, to its clients. From at least July 1999 through at least June 2001, Lehman's investment banking department ("Investment Banking"), among other activities, engaged in securities offerings, including initial public offerings ("IPOs"), secondary offerings and debt financings, and provided merger and acquisition and other advisory services for its clients.

3.    From at least July 1999 through at least June 2001, Lehman competed vigorously with other investment banks to be selected as the lead manager for securities offerings, in part because of the financial rewards associated with that role.    In addition, Lehman hoped to gain ongoing transactional and advisory work from existing and potential clients, including secondary offerings and financial advisory arrangements.    In 2001, Lehman served as lead manager for sixty-six equity deals, and earned approximately $1.3 billion from underwriting services.

B.    Lehman's Global Equity Research Department

4.    During 1999 and 2000, Lehman's Equity Research Department ("Research") employed approximately 400 people and expanded to 600 employees in 2001, including approximately 100 senior research analysts and 200 junior research analysts. During 2001, Research covered approximately 80 industries and approximately 900 U.S. companies. Senior research analysts in

the United States reported to the Director of U.S. Equity Research, who reported to the Managing Director of Global Equity Research.

5.      Research analysts collect financial and other information about a company and its industry, analyze that information, and develop recommendations and ratings regarding a company's securities. In addition, research analysts also examine the financial condition of selected publicly traded companies that are believed to be of potential investment value. Lehman analysts also make evaluations of companies' expected earnings, revenue and cash flow, operating and financial strengths and weaknesses, and long term viability and dividend potential. Lehman analysts produced written research materials including research reports and First Call notes regarding companies and industry sectors.

6.      Lehman's research was distributed to both institutional clients and retail investors. Lehman distributed its research product directly to its own client base, comprised of institutional investors and high net worth individual retail investors. In June 1999, Lehman entered into a "strategic alliance" with Fidelity Investments. Among other things, the "strategic alliance" provided Fidelity's retail customers with access to Lehman's research, along with other independent research. Lehman also sold its research product to other broker-dealers that in turn provided the research to their retail customers. Lehman also made its research available to the public through services such as Thomson Financial/First Call and Multex.com, Inc. Ratings of Lehman's analysts were freely and publicly available to retail clients through a number of media outlets.

7.      At the top of its research reports that were devoted to specific stocks, Lehman assigned to the stock a "rank" according to a 5-point scale reflecting how the analyst believed the stock would perform relative to the market generally. During the period June 1999 through December 2000, Research used the following ratings: 1-Buy (expected to outperform the market by 15 or more percentage points), 2 – Outperform (expected to outperform the market by 5 –15 percentage points), 3 – Neutral (expected to perform in line with the market, plus or minus 5 percentage points), 4 – Underperform (expected to underperform the

market by 5 –15 percentage points), 5 – Sell (expected to underperform the market by 15 or more percentage points).  In January 2001, Lehman changed the names of these ratings to 1-Strong Buy, 2- Buy, 3-Market Perform, 4-Market Underperform and 5-Sell.  The definitions remained the same.  The definitions for the ratings were provided to Lehman clients on a monthly basis. Commencing in March 2001, the definitions appeared on all of Lehman's research reports.

8.      Although Lehman purported to rank stocks according to a 5-point scale, in fact, during the relevant period Lehman analysts never assigned a 5-Sell rating to a domestic company and almost never assigned a 4-Underperform to a stock.

9.      Lehman's research reports also assigned to the stock a price target designed to reflect the price at which the analyst believed the stock would trade within a time period that was identified in some reports and unidentified in others. Commencing in March 2001, the relevant time period for the price target appeared in Lehman's research reports.

II.    **LEHMAN'S RESEARCH ANALYSTS WERE SUBJECTED TO CONFLICTS OF INTEREST ARISING FROM LEHMAN'S USE OF RESEARCH TO OBTAIN INVESTMENT BANKING BUSINESS**

10.     Lehman held out its research analysts as providing independent recommendations and analysis of companies and stocks upon which investors could rely in reaching investment decisions.  Lehman promoted its research for the "quality and timeliness of its investment recommendations."

11.     In fact, Lehman's research analysts were, at times, subjected to conflicts of interest arising from the close relationship between Research and Investment Banking.  Such conflicts of interest, at times, adversely impacted the independence of Lehman's public stock recommendations.

A.     **Lehman Used Research To Obtain Investment Banking Business**

12.     Analysts worked closely with members of Investment Banking and other departments to generate business for Lehman.  Analysts often worked with

Investment Banking to identify corporate finance opportunities and to win corporate finance business for Lehman, including identifying private companies appropriate for an IPO, as well as, identifying possible transactions, such as secondary offerings or debt financings, once a company had completed an IPO. To this end, analysts were expected to have yearly target and alignment meetings with their Investment Banking counterparts.

13.    Lehman aligned its analysts with an Investment Banking team. Analysts' responsibilities included providing research to their Investment Banking counterparts so that the bankers could leverage the research product into a full service relationship with a company.

14.    Recognizing the strategic importance of this alignment, on August 5, 1999, Lehman's Managing Director of Global Equity Research circulated a memorandum to Global Research Directors (the "August 5 Memorandum"), which detailed key areas of "strategic importance." The memorandum concluded that in order for Lehman to be more profitable, Investment Banking and Research should work together to increase Lehman's number of equity originations stating:

> Investment Banking Partnership – This is a key challenge for not only research but the entire global equities business. Increasing our equity origination will be one of the most important accomplishments of the firm. One of the most significant ways we will increase the equity division's total revenue to more than $2 billion is by substantially increasing origination.

15.    The August 5 Memorandum also set forth a "new paradigm" for Lehman's investment banking relationships stating:

> the analyst is THE key driver of the firm relationship with its corporate client base. Analysts need to accept responsibility and use it to expand the franchise and DRIVE PROFITABILITY EVERY DAY BUT IN A WAY THAT IS CONSISTENT WITH BUILDING A LONG TERM FRANCHISE.(Emphasis in original.)

16.    The August 5 Memorandum emphasized the research analyst's role in identifying potential banking business for Lehman stating: "global research must drive the banking targeting efforts, consistent with the 'new

paradigm.'"  The August 5 memorandum stated further:  "to ensure we have proper recognition of analysts' impact on banking, we have to closely track every dollar of IBD revenue (equity, M&A, and debt) by analyst."

17.    On September 14, 1999, the Managing Director of Global Equity Research again emphasized the importance of the Investment Banking/Research partnership in a memo directed to "Coverage Analysts." "Coverage Analysts" were provided with an attachment dated September 13, 1999 entitled "1 + 1 = $" (the "September 13 Attachment") that advised them that the successful partnership of Research and Investment Banking was a key to Lehman's growth as a firm. The first page of the September 13 Attachment contained a chart reflecting that an "enhanced Banking/Research partnership" would strengthen brand perception, increase origination fee share and ultimately lead to a higher Lehman stock price.

18.    The September 13 Attachment explained numerous ways in which Lehman Research and Investment Banking could be beneficial to each other and stated that "seamless Banking/Research coverage" was critical to all Investment Banking products.  The attachment also contained a chart captioned "Secret to Success -- Lehman Wins Business When Banking And Research Are Aligned." The September 13 Attachment explained that the Research/Investment Banking partnership at Lehman would be institutionalized through executive committee support, targeting and alignment, full partnership accountability between bankers and research analysts, and reinforced through compensation.

19.    The September 13 Attachment also instructed that bankers and research analysts would be required to complete performance reviews of their counterparts.  Research analysts would be evaluated on, among other things, "the extent to which the analyst places origination as [a] priority," and "adds value in building banking business," and the analyst's "effectiveness in [the] pitching process."

20.    Finally, the September 13 Attachment explained that Lehman would reinforce the partnership of Research and Banking through compensation. Analyst compensation would be "impacted by contribution to banking" and

"reviewed with appropriate banking group heads." ⋅    ⋅ ⋅ ⋅ e primary criterion in
evaluating analyst compensation would be Investment B⋅    ⋅king Revenue.

21.    As part of the relationship between Ir⋅    ⋅stment Banking and
Research, analysts often communicated with thei    Investment Banking
counterparts several times a week, or even daily.    hese communications
included identifying banking opportunities for Lehman.    or example, on July 7,
2000, one senior analyst wrote the following email to    iembers of Investment
Banking:

> FYI, I have recently come across several great c    npanies in the wireless
> data services industry, an incredibly hot sec⋅    ⋅ for most technology
> investors. ... In my view, we as a firm (tech & tele    om) should get all over
> this sector . . . I think we should be very coor    nated in attacking this
> banking windfall.

22.    In another instance, on September 21,    .000 that same analyst
wrote an email to a company to offer research coverage    n exchange for naming
Lehman as a co-manager on a deal stating:

> since the announcement of the Chase/JPM merg    ⋅, I'm sure you've
> come to the same realization that the merger v    ⋅uld result in just
> one firm covering your stock . . . If . . . the loss ⋅    one analyst is of
> concern, was wondering if the opportunity is av⋅    able to add a jnr
> (sic) co-manager to ensure same number of cove    age analysts.

23.    Investment bankers at times suggested th    t analysts issue positive
research coverage on a company to help the bankers    ⋅in business. Investment
bankers would sometimes recommend potential ban    ng clients to Lehman's
research analysts. Lehman's investment bankers ur⋅    ⋅rstood that if Lehman's
research department would cover a potential banking c    ⋅nt, this could strengthen
Lehman's chances to obtain banking business from th    ⋅client. For example, on
October 4, 2000 a banker sent the following email to ar    analyst:

> Spoke with [ a Worlstor employee] over at W    lstor. Here's the
> scoop and what we need to do. They are    eeting with other
> bankers over the next 4 days . . . They like [S⋅    omon] because of
> their research report. Action plan for us incluc    ⋅ : . . . We need to
> say [Lehman's analyst] is publishing a big sto    ⋅e ssp report and
> we would like to make Worlstor the feature of    e report like Solly
> did MSI and Storagenetworks. . . .

> [Analyst] you need to call (the CEO) and the CFO at least 3 times
> between now and the Board meeting . . . The message is we luv
> you and have been waiting for you.    [Analyst] your call and
> enthusiasm is key.

24.    Another banker wrote the following email to investment bankers and analysts on June 29, 2000:

> Our competition on the CPQ debt deal is likely the following . . .
> Given their stock price action after today's downgrade by [SSB], we
> are the highest equity recommendation.  The bottom line is that
> they need a very strong story around their credit and we, with
> [analyst] are in the best position to deliver."

25.    Investment bankers also routinely reviewed drafts of analysts' research reports before publication for several purposes including to insure that the reports were consistent with generating investment banking revenue from the covered company.

**B.    Lehman Gave Its Analysts Financial Incentives To <u>Use Research To Generate Investment Banking Revenue</u>**

26.    Lehman tied the compensation of senior research analysts to the amount of Investment Banking revenue the analyst helped to generate.  Lehman analysts typically received relatively small base salaries and considerably larger bonuses.  Bonuses were determined by, among other factors, the amount of Investment Banking revenue generated by companies the analysts covered.  The bonuses Lehman paid to analysts dwarfed their base salaries and gave the analysts a strong personal financial incentive to obtain Investment Banking business.  This compensation structure, which in part linked analyst compensation to investment banking business, created conflicts of interest.

**1. Certain Analyst Employment Contracts Tied Bonuses Directly To Investment Banking Revenue**

27.    Six of Lehman's approximately 100 senior research analysts had employment contracts that linked their bonuses directly to Investment Banking revenue generated by companies they covered.  Depending on the contract, the

analyst's entire bonus or an additional Investment Banking Department ("IBD")
bonus was paid based on the aggregate IBD net revenues and fees generated
by companies covered by the analyst or by companies where the analyst
significantly contributed to the Investment Banking business.

28.    For example, one analyst's contract provided for an annual salary
of $200,000, and a minimum bonus of $4.8 million. The minimum bonus could
increase in $1 million increments, based on the Aggregate IBD Net Revenues
and Fees for the performance year as follows:

| Minimum Bonus | Aggregate IBD Net Revenues and Fees |
|---|---|
| $4.8 million | Less than $50 million |
| $5.8 million | At least $50 million but less than $75 million |
| $6.8 million | At least $75 million but less than $100 million |
| $7.8 million | At least $100 million but less than $125 million |
| $8.8 million | $125 million or more |

Aggregate IBD Net Revenues and Fees were defined as revenues and fees
booked or received by Lehman from companies covered by the analyst or from
companies whose award of business to Lehman was attributable to the analyst's
"significant contribution."

29.    Another analyst's contract provided for the payment of a yearly
salary of $200,000, a minimum bonus of $3.3 million and an additional bonus
equal to 5% of Investment Banking revenues and fees generated by companies
covered by the analyst or companies where the analyst substantially contributed
to the award of Investment Banking business.

### 2. Lehman Compensated Other Analysts Based In Part On Their Contribution To Investment Banking Revenue

30.    Analysts who did not have specific clauses in their contracts related to Investment Banking revenue were nevertheless compensated financially if companies they covered generated Investment Banking revenue.

31.    The Director of U.S. Equity Research applauded analysts for generating Investment Banking business. In an email dated January 21, 2001, an analyst described that he had arranged a meeting between Lehman analysts and investment bankers and a large blue chip company. The analyst explained that his relationship with the company resulted in Investment Banking receiving ten potential projects for the company. The Director of U.S. Equity Research congratulated the analyst in an email dated January 22, 2001 stating "well done, we need senior bankers to see who (the analysts) have the real relationships with the big companies. This is how we justify big comp. packages."

32.    Lehman also monitored the Investment Banking revenue that analysts generated. For example, Lehman maintained a document titled "Performance Review" that, among other information, kept track of the Investment Banking and trading revenue attributable to each senior analyst. Senior analysts were shown the Performance Review during their reviews.

33.    For each analyst, Investment Banking also generated a spreadsheet known as a "Project Review" that identified Investment Banking projects with revenue booked for the year and projects expected to generate revenue in the next year. The Director of U.S. Equity Research used the Project Reviews in conducting both mid-year and year-end evaluations for senior analysts.

34.    Senior analysts also frequently provided lists of the Investment Banking deals they had worked on during the year to the Director of U.S. Equity Research in connection with consideration of their year-end bonuses. For example, in December 1999 one senior analyst (who did not have an Investment

Banking revenue clause in his contract) wrote in an email to the Director of U.S. Equity Research that his research accomplishments and banking revenue were relevant to his compensation. In describing his research accomplishments, the analyst noted that he had written frequently on a company and the company had raised $430 million in equity and high yield financing through Lehman. The analyst also noted that he had written frequently about another company and, as a result, Lehman was going to appear "out of order" on the cover of a convertible deal and had a "good shot" at leading an upcoming equity deal. With respect to banking revenue, the analyst wrote:

> I believe the revenues generated by my universe generated at least as much as other research universes, excluding the Delta Three IPO (which RSL's CEO will tell I (sic) was a key part of why LB won the books [Delta Three was covered by another analyst] and for which I believe I should get credit.

35.    One Senior analyst sent an email on February 9, 2000 to Lehman's Managing Director of Global Research and the Director of U.S. Equity Research requesting a promotion to vice president. In support of this request, the analyst wrote, among other things, that the analyst's estimated Investment Banking revenue for the year 2000 was greater than $5 million and added "1999 Banking Revenue $1.2M solely due to research relationship."

36.    In addition, senior analysts were required to complete business plans each year. The business plan included an entire section devoted to banking and asked analysts to identify the transactions they are working on or foresee for the coming year. The business plans asked senior analysts to report:

- their plan to add stocks to coverage for either sales and trading and/or banking;
- whether Research/Banking target and alignment discussions were reflected in the business plan; and
- whether analysts had completed the selection of "franchise and super league clients" with their bankers.

37.    Investment bankers participated in analyst evaluations by providing written comments on a form titled "Year End Performance Review for Analysts

(to be completed by Bankers)" to the heads of Research. Bankers were asked to evaluate:

- Whether the analyst places origination as a priority
- The analyst's contribution toward building relationships with clients in the sector
- The analyst's effectiveness in the pitching process
- The quality of the analyst's reputation with banking clients; and
- The analyst's level of initiative in providing the banker with value-added ideas for banking clients.

38.    The bankers' comments were relayed to analysts during their reviews. For example, one senior analyst's review stated the analyst "cares a great deal about competing for business and winning." Another senior analyst's review stated "strong originator/rainmaker," "strong pitchman" and "very supportive of banking effort; coordinate with banking team on targeting major clients."

39.    Analysts were also criticized, at times, if they failed to work closely with Investment Banking. For example, in one instance, a senior analyst was encouraged to have more frequent contact with her Investment Banking counterpart.

40.    One analyst sent a memorandum dated December 22, 1999 to the Managing Director of Global Equity Research and the Director of U.S. Equity Research stating that he was "'surprised'" by the review he received from an investment banker (the "December 22 Memorandum"). As a result, the analyst met with the investment banker in order to receive feedback and "improve the relationship between research and investment banking."

41.    The analyst described his meeting with the banker in the December 22 Memorandum stating:

> [banker] has concluded, after seeing me for 2-3 months (based on two pitches and other feedback) that I may not have the capabilities to be a "banking analyst"; i.e., telling companies what they want to hear and not what I think!" . . .
> Both parties acknowledge that the Ansell pitch was ineffectual. I should not have been there to start with – despite the potential fee! I was told that the bankers working on the pitch were "upset" that I

would not present their material . . . Ansell had an inherent growth rate of 0-2% as compared to Merrill's forecast of 10% per annum. A major fee was "lost."

42.    The analyst also commented that the bankers told him "that the analysts need to be available at extremely short notice to assist in pitch meetings." The analyst defended himself, in part, by commenting that he spent an "inordinate" amount of time on other banking prospects.

43.    Finally, the analyst listed several steps for the future to improve his relationship with Investment Banking and stated:

> during my one year tenure at [another bank], we tripled our M&A business. I created a fundamental research 'halo effect' for 'banking-oriented' analysts. I believe banking could further leverage our sector research into the VC community (and elsewhere).

## C.    Lehman Used The Promise Of Future Research Coverage To Obtain Investment Banking Business

44.    Lehman used the promise of future research coverage to obtain Investment Banking business. Implicit in Lehman's marketing efforts was the assurance that Lehman's research would be favorable and that Lehman research would raise the price of the issuer's stock.

45.    Lehman competed with other investment banks for selection as lead underwriter for securities offerings, including IPOs, secondary offerings and debt offerings. As part of this competition, Lehman met with companies to present its qualifications. Research analysts sometimes attended these meetings, often referred to as "pitch" meetings, with members of Investment Banking in an effort to win Investment Banking business for Lehman. Lehman research analysts typically advised companies how best to position and market the company's story to investors.

46.    At such meetings, Lehman often presented companies with marketing materials known as pitchbooks that touted Lehman's underwriting qualifications. The pitchbooks typically featured the Lehman analyst who would be covering the company after a banking transaction and stated that the analyst

would issue research on the company as soon as the "quiet period"(a period of time after an offering during which the underwriting firms cannot publish research) ended.   The pitchbooks on occasion provided examples of how coverage by the analyst had been viewed favorably by the market and had a positive impact on a company's stock price.

47.     For example, a pitchbook for the Zymogenetics potential IPO promised that the analyst would issue a comprehensive report on the company twenty-five days after pricing (at the end of the quiet period), would regularly educate investors on the company's story and would publish reports and notes on the company on a timely basis.   The pitchbook also promised that Lehman would provide "pricing, trading and aftermarket support" by, among other things, providing on-going research coverage.   Under the heading "Preliminary Terms and Marketing Conditions," the pitchbook stated that the analyst would provide "high quality research support critical to a strong aftermarket."

48.     A pitchbook for a Dyax PIPE offering described Lehman's prior research support of the company following its IPO, noting that Lehman had issued "8 notes and one extremely comprehensive report on [company], as compared to 5 notes and 1 report by [co-manager], and 2 notes and 1 report by [co-manager]."   The pitchbook also noted that "Lehman's Equity Analysts . . . have been strong supporters of the stock," adding that since the analysts published their research report the stock had increased twenty percent.

49.     The pitchbooks often noted the analyst's role in marketing the offering.   Some pitchbooks listed research as a term of the underwriting and stated that the "[analyst] will lead a powerful marketing campaign."   The Zymogenetics pitchbook described the analyst as the "preeminent force" in the biotechnology sector and stated that the analyst has "outsold other analysts in previous equity offerings," and   "outsold the other co-managers."   Other pitchbooks described the analyst as the "axe" in the industry and provided numerous examples of how the analyst's positive coverage had positively impacted a company's stock price.

50.    For example, a pitchbook for Yadayada dated November 10, 2000 contained a section entitled "[Analyst] Moves Markets" and contained graphs for two companies, Triton and Alamosa, covered by the analyst. The graph subtitled "[Analyst] Moves Triton" demonstrated a decrease in stock price following the analyst's downgrade of Triton and an increase in the stock price following an upgrade by the analyst. Similarly, the graph subtitled "[Analyst] Upgrades Alamosa" shows an increase in Alamosa's stock price following a voicemail blast by the analyst to clients reiterating the analyst's buy recommendation.

51.    Similarly, a pitchbook for Texas Instruments dated June 2000 included a graph of Micron Technology's stock price demonstrating that the stock price increased after the analyst re-initiated coverage and rose again when the analyst raised earnings per share ("EPS") targets. The pitchbook also contained a graph of Intel's stock reflecting price increases after the analyst re-initiated coverage and again when the analyst raised the EPS target. Other pitchbooks contained similar statements about the manner in which the market received Lehman's research.

52.    The decision whether Lehman would initiate research coverage of a company was often tied to the opportunity for Lehman to earn Investment Banking fees from the covered company. For example, in February 2000, Lehman bankers questioned a delay in Lehman initiating research on Curagen Corporation following Lehman's participation in a convertible bond offering by Curagen. The analyst had explained he needed more time and more meetings with the company before issuing a report. The bankers then questioned the delay in an email to the Director of U.S. Equity Research who responded that the analyst was doing a great job given his many responsibilities, and asked the bankers:

> [W]hen did we decide to promise equity research for a small convertible bond deal. What were the economics & how much did we make.

One of the bankers responded to the question stating:

> We made $1.5m in banking and Lehman made $12m as of last
> Thursday. The real question is could we just put a note out that
> would satisfy the company and get us in the next deal.

53.    On another occasion, the Director of U.S. Equity Research received inquiries from Lehman employees on behalf of officers of public companies seeking to have Lehman initiate research coverage of their company. The Director of U.S. Equity Research responded by directing such inquiries to Investment Banking. For example, in February 2000, the Director of U.S. Equity Research advised a Lehman employee in an email:

> the proper process is to introduce the principals to someone in
> investment banking. If we have the resources and there appears to
> be significant revenue potential, banking will request research.

54.    Similarly, in October 1999 the Director of U.S. Equity Research advised another Lehman employee in an email:

> doing business is not enough, we need to do a lot of business to
> commit resources. Finally, you should find a contact in banking to
> channel these requests as well.

55.    In another email in March 2000, an analyst explained to his product manager his reason for initiating coverage on a stock listed only in Mexico that will be of "little interest to our US institutional salesforce." The analyst wrote:

> The reason for coverage is there is a potential banking deal (big
> $$$) we're trying to get later this year. The bankers just want the
> report out. They don't care about promoting the stock and realize it
> is of little interest to my client base.

III.    **CONFLICTS OF INTEREST, AT TIMES, RESULTED IN THE
PUBLICATION OF EXAGGERATED OR UNWARRANTED RESEARCH.**

56.    The relationship between Investment Banking and Research as alleged herein at times created conflicts of interest for Lehman's research analysts. At times, the financial incentives and pressure on analysts to assist in

obtaining investment banking deals and to maintain banking relationships adversely affected the integrity of the analysts' ratings, price targets, and research reports. As the following examples demonstrate, these conflicts of interest caused analysts, at times, to issue more positive research reports or ratings, and to avoid downgrades or negative reports regarding companies that were investment banking clients.

A.    Razorfish, Inc.

57.    Lehman co-managed the IPO for Razorfish, Inc. ("Razorfish") in April 1999. The Razorfish IPO was priced on April 26, 1999 at $16 per share and opened for trading on April 27, 1999 at $56 per share but ended the day at $35 per share. On May 3, 1999, with Razorfish trading at $37 per share, the Lehman analyst confided to an institutional investor in emails that he was not sure of the rating and price to assign to the company when he initiated coverage. The institutional investor replied:

> unless you anticipate Lehman getting I-business from them, I would rate them neutral with a price target of $20 (especially if you read the last half of the WSJ article on them last week, which pointed out that their business lacks any real depth)

The analyst responded:

> Well, I they are a banking client so I expect a 2 rating with a price target just a shade above the trading price

58.    The institutional investor and the analyst discussed the effect of the conflict of interest on the analyst's research in the following exchange:

> Institutional Investor: I understand – business is business. But I feel bad for those naïve investors who assume that sell-side analysts are objective! I wish some buy-side institutions would get together to establish an independent equity research consortium with analysts paid for on a subscription basis or something …

> Analyst: well, ratings and price targets are fairly meaningless anyway, buy-side generally ignores, commentary is what matters and I'll be a 3-Neutral in my comments . . . but, yes, the "little guy" who isn't smart about the nuances may get misled, such is the nature of my business.

59.    On May 24, 1999, with Razorfish trading at $36, Lehman initiated coverage of Razorfish with a 2-Buy rating and a price target of $48.

### B.    RSL Communications, Inc.

60.    Lehman had a substantial Investment Banking relationship with RSL Communications, Inc. ("RSL"). Lehman was a joint lead underwriter in a high yield note placement by RSL in December 1998, provided advisory services in October 1999, was the lead underwriter when RSL spun off Delta Three Communications, Inc. in an IPO in November 1999 and co-managed two debt offerings for RSL in February 2000. On at least three occasions during 1999-2000, the Lehman analyst covering RSL was "held off" from downgrading his analysis of RSL for "banking reasons." One of these instances occurred in February 2000.

61.    On November 1, 1999, with RSL trading at $21 5/16, the Lehman analyst covering RSL had rated RSL a 1-Buy with a price target of $40. In February 2000, with RSL trading at $17, the analyst drafted a new report in which lowered his revenue projections for RSL and lowered the price target to $35. The first sentence of the text of the draft report read "we are revising our Revenue and EBITDA estimates for RSL to reflect declining revenue from U.S. prepaid and wholesale and a more moderate ramp in European retail revenue." Based on his prior experience, the analyst knew that his attempt to express his more negative view of RSL would be resisted by Investment Banking within Lehman. On February 24, 2000, the analyst sent an email to his supervisor captioned "RSL Note – Bankers are going to resist" in which he enclosed his draft report and stated:

> Below is a draft of a note lowering our numbers on RSL (maintaining our 1 rating) Recall we were a co. in their recent convert deal. I've wanted to lower numbers for several months now, but have held back as 1) we led the DeltaThree IPO(was owned by RSL) and more recently were on the cover of the convert. . . . I've given our coverage banker the courtesy of seeing this and preparing the company. **I know they are going to resist.** I've

been quiet on this too long, and I plan on going ahead anyway.
[emphasis in original]

62.    The Lehman investment banker for RSL prevailed on the analyst
not to issue the report and instead to meet with RSL management and to
reconsider his analysis.   As a result, on March 2, 2000, the analyst issued a
report that maintained the $40 price target.   The first sentence of the text of the
report touted that "RSL's European unit posted strong sequential revenue growth
in Q4 . . . ." The analyst issued additional reports on RSL on March 9 and March
10, 2000, in which he raised the price target to $50.

63.    On March 16, 2000, the investment banker for RSL sent an email to
the analyst's supervisor praising the analyst's "open-mindedness" and crediting
the analyst with raising RSL's stock price stating:

> I just wanted to drop you a note to let you know of [analyst's] recent
> helpfulness in a touchy situation with RSL Communications.  RSL is
> a telecom company . . . and is the parent company of Delta 3 for
> which we recently led an IPO.  Following RSL's recent convertible
> notes issue (for which we were a co), [analyst] was inclined
> negatively toward the Company's prospects; however, he agreed to
> hold off on a downgrade (which would have harmed an important
> banking relationship) at the request of banking until he could hear
> out management. [Analyst] met with the Company's CEO and was
> convinced positively, he issued a positive report and was the axe
> behind significant positive momentum to the stock.   The CEO
> praised [analyst's] open-mindedness and has indicated we will be
> included in the underwritings of their coming spin-offs.   Thus,
> [analyst] has helped our banking relationship with the client
> significantly.

The supervisor forwarded the email to the analyst and wrote "good job &
congratulations."

64.    In May 2000, the analyst issued another report reiterating the 1-
Buy rating on the stock and retaining the $50 price target despite the fact that the
stock price had declined to $15.50 per share and the company had missed its
revenue estimates.

65.    By August 14, 2000 RSL's stock price had declined to
approximately $4.   In an August 14, 2000 email, the analyst candidly complained

to his supervisor about the influence Investment Banking had exerted over his research during the preceding year:

> Enough is enough. It's hard enough to be right about stocks, it's even harder to build customer relationships when all your companies blow up, you knew they were going to, and you couldn't say anything. Every single one of my companies has blown up in some fashion (or will – GBLX) and with the exception of PGEX, I haven't been able to speak my mind. I think I've been a team player, and I believe it is now imperative for the franchise that I be able to take action on bad situations

66.     The analyst voiced particular concerns about RSL stating "for the record, I have attempted to downgrade RSLC THREE times over the last year, but have been held off for banking reasons each time." (Emphasis in original)

67.     Even after this complaint, the analyst did not downgrade RSL but rather simply was permitted to drop coverage in September 2000, devoting a few short sentences to the company in a sector report.

### C.     DDi Corporation

68.     A pitchbook for the DDi Corporation ("DDi") IPO offering described Lehman's highly regarded research team, listed the analysts' combined years of experience and strong research qualifications and promised research coverage for DDi after the IPO.

69.     The pitchbook contained an example of the mock research report that the two Lehman analysts who covered DDi's industry sector would write for DDi, including a graphic of the research report's cover page with a 1-Buy rating.

70.     DDi opened for trading on April 10, 2000. On June 28, 2000, the analyst whose name appeared on the mock research report sent an email to the Director of U.S. Equity Research stating that Lehman was a "co" on the DDi IPO and that the analyst should have initiated coverage when the company went public in April but did not due to other demands on his time including the need to cover two banking deals where Lehman was the lead. The analyst complained that both DDi and Lehman bankers were pushing the analyst to initiate coverage with a 1-Buy rating. The analyst wrote:

Now company DDi and parent (Bain Capital), and bankers are obviously pushing for coverage and unhappy. Problem is that the shares IPOed at $14 are at $28 today. Bankers want a 1-Buy and are pushing hard. I am concerned that given the current expectations, the shares could sell off after the quarter is reported in July and could easily drop to $20. I am ready with initiation a FC [First Call] note and could go out this week, but am not sure how best to deal with this situation. Bankers are not really satisfied with a 2."

71.    Despite his misgivings, the analyst initiated coverage of DDi on June 30, 2000 with a 1-Buy rating and a price target of $36. DDi closed on June 30, 2000 at $28 1/2. On July 31, 2000 DDi closed at $22.

### D.    RealNetworks, Inc.

72.    In June 1999, Lehman served as a co-managing underwriter for a secondary offering of common stock by RealNetworks, Inc. Lehman maintained a 1-Strong Buy rating on the stock from July 1999 through June 2001 despite the fact that the stock lost approximately 90% of its value falling from a high of $78.59 per share in February 2000 to a low of $7.06 in April 2001.

73.    In the first few days of July 2000, RealNetworks' stock price dropped from $52 per share on July 3, 2000 to $38 per share on July 11, 2000. Lehman issued a research report on July 11, 2000 responding to what the report described as a weakness in the stock price caused by investor concern over RealNetworks' exposure to online advertising revenue. The report sought to calm investors' fears by stating that online advertising figures would have "minimal" impact on RealNetworks overall revenue. The report reiterated the 1-Buy rating assigned to the stock and maintained the $150 price target. The report further advised investors that the price weakness presented a buying opportunity and that Lehman remained "bullish" on the stock.

74.    By July 18, 2000, the stock price had climbed to $56 per share. The analyst issued another research report that again advised investors to ignore concerns about RealNetworks' exposure to online advertising revenue stating "we believe recent articles about reductions in online spending is (sic) completely

over-hyped – in terms of its overall impact on RealNetworks." The report also reiterated the 1-Buy rating assigned to the stock and maintained the $150 price target for the stock.

75.    On July 19, 2000 the analyst issued a third report commenting on RealNetworks' second quarter earnings release. The report described the second quarter results as "stellar" and reiterated the 1-Buy rating assigned to the stock and maintained the $150 price target for the stock.

76.    Despite the analyst's support for RealNetworks, on July 18, 2000, the analyst advised an institutional investor to short the stock stating "RNWK has to be a short big time." The next morning the institutional investor emailed the analyst "nice call on rnwk . . . I mean all the upside from crappy ad business . . . why aren't people jumping up and down and saying this sucked??? . . . nice call on your part anyhow."

77.    The analyst replied: "we bank these guys so I always have to cut the benefit of the doubt."

78.    RealNetworks' stock price continued to fall throughout July 2000 and its price continued to drop through the end of 2000. By December 2000, RealNetworks had fallen to approximately $12 per share having fallen from its February 2000 high of $78 per share.

79.    In January 2001, that same analyst wrote to an institutional investor "if it's in my group it's a short" despite the fact that the analyst maintained 1-Strong Buy ratings on all of his stocks.

### E.    Broadwing, Inc.

80.    In January 2001, an analyst was about to initiate coverage of Broadwing, Inc. ("Broadwing"). On January 24, 2001, an investment banker sent an email to the analyst asking him if Broadwing's numbers were good. The analyst responded that the numbers were "very much in line." The banker asked the analyst to raise the price target. When the analyst questioned the rationale, the banker explained that the increase was necessary to help Lehman win investment banking business.

Banker: any chance of nudging up that price target?

Analyst: isn't it better for your cause to start conservative, and move up targets, rather than start high and use up dry powder?

Banker: if they are doing a financing and a few points on a price target puts us in line with our competition and, hopefully, helps us get into a financing, it may be worth considering

Analyst: I'm already at $40, I can add a buck or two.

Banker: that would be great – MSDW is at 44, CSFB at 46, Mer at 50.

Analyst: Done.

The next day the analyst issued a research report initiating coverage of Broadwing with a $42 price target.

## IV. LEHMAN FAILED TO ADEQUATELY SUPERVISE RESEARCH ANALYSTS OR ESTABLISH POLICIES AND PROCEDURES <u>TO ENSURE THEIR PROPER CONDUCT</u>

81.     Lehman failed to supervise sufficiently research analysts or establish adequate policies and procedures to ensure their proper conduct at all times. Lehman had insufficient written procedures to protect the independence of its research analysts and failed to fully enforce the written procedures it did have.

82.     Research did not review the propriety of the ratings issued by analysts. For example, Lehman purportedly vetted most of the written research produced by analysts through the Investment Policy Committee ("IPC") comprised of six people including the Director of U.S. Equity Research. Written procedures required that an IPC meeting be held to review initiation of coverage or change of a rating. In fact, at times reports were reviewed by a single IPC member, who received reports shortly before a meeting.

83.     Lehman also had inadequate procedures to protect analysts from the pressures and conflicts of interest resulting from the interaction between research analysts and investment bankers. As alleged above, Lehman permitted

pre-publication review of draft research reports by Investment Banking and by the companies covered in the reports. The Chairman of the IPC and other senior managers in Research also encouraged analysts to check with banking before changing ratings, downgrading or dropping coverage of a stock.

## V.    CONCLUSIONS OF LAW

84.    RESPONDENT, during the period from July 1999 through June 2001, failed to exercise diligent supervision over all the securities activities of its associated persons and failed to establish, maintain or enforce written procedures, a copy of which should be kept in each business office, which set forth the procedures adopted by the dealer, issuer or investment adviser to comply with the listed duties imposed in violation of rule 830-X-3-.13(1), (3) Alabama Securities Act.

85.    Respondent, during the period from July 1999 through June 2001, engaged in acts or practices that created or maintained inappropriate influences by Investment Banking over Research Analysts, imposed conflicts of interest on its Research Analysts, and failed to manage these conflicts in an adequate or appropriate manner in violation of just and equitable principles of trade.

The NASD and NYSE have both established rules governing ethical practices and conduct. The standards established by the NASD and the NYSE are recognized by the Alabama Securities Commission as minimum standards of ethical conduct for the purposes of § 8-6-3(j)7, relating generally to dishonest or unethical practices in the securities business. During the relevant period, Lehman engaged in acts and practices violative of:

(a)    NASD Conduct Rule 2110 requiring members to observe high standards of commercial honor and just and equitable principles of trade;

(b)    NYSE Rule 401 requiring that broker dealers shall at all times adhere to the principles of good business practice and the conduct of his or its business affairs;

(c) NYSE Rule 476(a)6 prohibiting the engagement in practices of conduct inconsistent with just and equitable principles of trade;

(d) NASD Conduct Rule 2210(d)1 and 2210(d)2 prohibiting exaggerated or unwarranted claims in public communications and requiring a reasonable basis for all recommendations made in advertisements and sales literature; and

(e) NYSE Rule 472 prohibiting the issuance of communications that contain exaggerated or unwarranted claims or opinions that lack a reasonable basis.

By engaging in the acts and practices described above that created and/or maintained inappropriate influence by Investment Banking over Research Analysts and therefore imposed conflicts of interest on its Research Analysts, Lehman failed to manage these conflicts in an adequate or appropriate manner, in violation of § 8-6-3(j)7.

86.    RESPONDENT, during the period from July 1999 through June 2001, issued research reports, including those for Razorfish, Inc., RSL Communications, Inc., DDI Corp., RealNetworks, Inc., and Broadwing, Inc., that were not based on principles of fair dealing and good faith, did not provide sound basis for evaluating facts, were not properly balanced, and/or contained exaggerated or unwarranted claims and opinions of which there was no reasonable basis, in violation of rule 830-X-2-.06(2).

On the basis of the Findings of Fact and Conclusions of Law, Lehman Brothers Inc.'s consent to the entry of this Order, for the sole purpose of settling this matter, prior to a hearing and without admitting or denying any of the Findings of Fact or Conclusions of Law.

## ACCORDINGLY, IT IS HEREBY ORDERED:

1. This Order concludes the investigation by the Alabama Securities Commission and any other action that the Alabama Securities Commission could commence under applicable state law on behalf of the State of Alabama as it relates to Lehman Brothers Inc., relating to certain research or banking practices at Lehman Brothers Inc.

2.  Lehman Brothers Inc. will CEASE AND DESIST from violating rule 830-X-3-
    .13(1), (3); § 8-6-3(j)7 of the Alabama Securities Act, and rule 830-X-2-
    .06(2) and will comply with rule 830-X-3-.13(1), (3); § 8-6-3(j)7 of the
    Alabama Securities Act, and rule 830-X-2-.06(2) in connection with the
    research practices referenced in this Order and will comply with the
    undertakings of Addendum A, incorporated herein by reference.

3.  If payment is not made by Lehman Brothers Inc. or if Lehman Brothers Inc.
    defaults in any of its obligations set forth in this Order, the Alabama
    Securities Commission may vacate this Order, at its sole discretion, upon
    10 days notice to Lehman Brothers Inc. and without opportunity for
    administrative hearing.

4.  This Order is not intended by the Alabama Securities Commission to
    subject any Covered Person to any disqualifications under the laws of any
    state, District of Columbia, or Puerto Rico (collectively, "State") including
    without limitation, any disqualifications from relying upon the registration
    exemptions or safe harbor provisions. "Covered Person" means Lehman
    Brothers Inc., or any of its officers, directors, affiliates, current or former
    employees, or other persons that would other wise be disqualified as a
    result of the Orders (as defined below).

5.  The SEC Final Judgment, the NYSE Stipulation and Consent, the NASD
    Letter of Acceptance, Waiver and Consent, this Order and the order of any
    other State in related proceedings against Lehman Brothers Inc.
    (collectively, the "Orders) shall not disqualify any Covered Person from
    any business that they otherwise are qualified, licensed or permitted to
    perform under applicable law of Alabama and any disqualifications from
    relying upon this state's registration exemptions or safe harbor provisions
    that arise from the Orders are hereby waived.

6.  For any person or entity not a party to this Order, this Order does not limit or
    create any private rights or remedies against Lehman Brothers Inc.
    including, without limitation, the use of any e-mails or other documents of
    Lehman Brothers Inc. or of others regarding research practices, or limit or
    create liability of Lehman Brothers Inc. or limit or create defenses of Lehman
    Brothers Inc. to any claims.

7.  Nothing herein shall preclude Alabama, its departments, agencies, boards,
    commissions, authorities, political subdivisions and corporations, other than
    the Alabama Securities Commission and only to the extent set forth in
    paragraph 1 above, (collectively, "State Entities") and the officers, agents or
    employees of State Entities from asserting any claims, causes of action, or
    applications for compensatory, nominal and/or punitive damages,
    administrative, civil, criminal, or injunctive relief against Lehman Brothers

Inc. in connection with certain research and/or banking practices at Lehman Brothers Inc.

As a result of the Findings of Fact and Conclusions of Law contained in this Order, Lehman Brothers Inc. shall pay a total amount of $80,000,000 as follows:

$25,000,000 to the states (50 states, plus the District of Columbia and Puerto Rico) (Lehman Brothers Inc.'s offer to the state securities regulators hereinafter shall be called the "state settlement offer").  Upon execution of this Order, Lehman Brothers Inc. shall pay the sum of $342,654 as follows:

a)    That in accordance with Section 8-6-19(j)(1), Code of Alabama 1975, Lehman Brothers Inc. shall pay to the State of Alabama an administrative penalty in the total sum $275,000 said funds to be tendered in certified funds contemporaneously with the entry of this Order;

b)    That in accordance with Section 8-6-19(k)(1), Code of Alabama 1975, Lehman Brothers Inc. shall pay to the Alabama Securities Commission, as partial reimbursement for the Commission's cost for investigating this matter, the sum of $27,654, said funds to be tendered in certified funds contemporaneously with the entry of this Order;

c)    Lehman Brothers Inc. shall pay the sum of $30,000 payable to the Office of the Attorney General, State of Alabama for reimbursement of its cost in this investigation and past and future investigations and for the use of that office as it sees fit in its efforts to continue to safeguard the citizens of the State of Alabama;

d)    Lehman Brothers Inc. shall pay the sum of $10,000 to the Investor Protection Trust, a non-profit corporation and such funds are designated specifically for investor education and investor protection in the State of Alabama as directed by the Alabama Securities Commission in its sole discretion.

The total amount to be paid by Lehman Brothers Inc. to state securities regulators pursuant to the state settlement offer may be reduced due to the decision of any state securities regulator not to accept the state settlement offer. In the event another state securities regulator determines not to accept Lehman Brothers Inc.'s state settlement offer, the total amount of the Alabama payment shall not be affected, and shall remain at $342,654.

$25,000,000 as disgorgement of commissions, fees and other monies as specified in the order in the related action filed by the SEC;

$25,000,000, to be used for the procurement of independent research, as described in Addendum A, incorporated by reference herein;

$5,000,000, to be used for investor education, as described in Addendum A, incorporated by reference herein.

Lehman Brothers Inc. agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to payment made pursuant to any insurance policy, with regard to all penalty amounts that Lehman Brothers Inc. shall pay pursuant to this Order or Section II of the SEC Final Judgment, regardless of whether such penalty amounts or any part thereof are added to the Distribution Fund Account referred to in the SEC Final Judgment or otherwise used for the benefit of investors. Lehman Brothers Inc. further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any state, federal or local tax for any penalty amounts that Lehman Brothers Inc. shall pay pursuant to this Order or Section II of the SEC Final Judgment, regardless of whether such penalty amounts or any part thereof are added to the Distribution Fund Account referred to in the SEC Final Judgment or otherwise used for the benefit of investors. Lehman Brothers Inc. understands and acknowledges that these provisions are not intended to imply that Alabama would agree that any other amounts Lehman Brothers Inc. shall pay pursuant to the SEC Final Judgment may be reimbursed or indemnified (whether pursuant to an insurance policy or otherwise) under applicable law or may be the basis for any tax deduction or tax credit with regard to any state, federal or local tax.

WHEREFORE, the following signatures are affixed hereto this __25th__ day of __April 25__, 2003.

Lehman Brothers, Inc.                                    Alabama Securities Commission

By: _____                           By: _____
Joseph Polizzotto                                            Joseph P. Borg, Director
Managing Director and
General Counsel

The Attorney General of the State of Alabama

Approved By: _____
Bill Pryor, Attorney General

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *



CONSENT TO ENTRY OF ADMINISTRATIVE ORDER BY LEHMAN BROTHERS INC.

Lehman Brothers Inc. hereby acknowledges that it has been served with a copy of this Administrative Order, has read the foregoing Order, is aware of its right to a hearing and appeal in this matter, and has waived the same.

Lehman Brothers Inc. admits the jurisdiction of the Alabama Securities Commission, but neither admits nor denies the Findings of Fact and Conclusions of Law contained in this Order; and consents to entry of this Order by the Alabama Securities Commission as settlement of the issues contained in this Order.

Lehman Brothers Inc. states that no promise of any kind or nature whatsoever was made to it to induce it to enter into this Order and that it has entered into this Order voluntarily.

Joseph Polizzotto represents that he is Managing Director and General Counsel of Lehman Brothers Inc. and that, as such, has been authorized by Lehman Brothers Inc. to enter into this Order for and on behalf of Lehman Brothers.

Dated this 24th day of April, 2003.

Lehman Brothers Inc.

By: _Joseph Polizzotto_

Joseph Polizzotto

Managing Director and General Counsel

SUBSCRIBED  AND  SWORN  TO  before  me  this  24th  day of _April_, 2003.

_____

Notary Public

My Commission expires: 8/13/2005

JOSHUA J. MIKA
Notary Public, State Of New York
No. 01MI6062566
Qualified In New York County
Commission Expires August 13, 2005

<u>Addendum A</u>

<u>Undertakings</u>

The firm shall comply with the following undertakings:

I.    Separation of Research and Investment Banking

1. <u>Reporting Lines</u>.  Research and Investment Banking will be separate units with entirely separate reporting lines within the firm – i.e., Research will not report directly or indirectly to or through Investment Banking. For these purposes, the head of Research may report to or through a person or persons to whom the head of Investment Banking also reports, provided that such person or persons have no direct responsibility for Investment Banking or investment banking activities.

   a. As used throughout this Addendum, the term "firm" means the Respondent, Respondent's successors and assigns (which, for these purposes, shall include a successor or assign to Respondent's investment banking and research operations), and their affiliates, other than "exempt investment adviser affiliates."

   b. As used throughout this Addendum, the term "exempt investment adviser affiliate" means an investment adviser affiliate (including for these purposes, a separately identifiable department or division that is principally engaged in the provision of investment advice to managed accounts as governed by the Investment Advisers Act of 1940 or investment companies under the Investment Company Act of 1940) having no officers (or persons performing similar functions) or employees in common with the firm (which, for purposes of this Section I.1.b, shall not include the investment adviser affiliate) who can influence the activities of the firm's Research personnel or the content of the firm's research reports; provided that the firm (i) maintains and enforces written policies and procedures reasonably designed to prevent the firm, any controlling persons, officers (or persons performing similar functions), or employees of the firm from influencing or seeking to influence the activities of Research personnel of, or the content of research reports prepared by the investment adviser affiliate; (ii) obtains an annual independent assessment of the operation of such

policies and procedures; and (iii) does not furnish to its customers research reports prepared by the investment adviser affiliate or otherwise use such investment adviser affiliate to do indirectly what the firm may not do directly under this Addendum.

c. As used throughout this Addendum, the term "Investment Banking" means all firm personnel engaged principally in investment banking activities, including the solicitation of issuers and structuring of public offering and other investment banking transactions. It also includes all firm personnel who are directly or indirectly supervised by such persons and all personnel who directly or indirectly supervise such persons, up to and including Investment Banking management.

d. As used throughout this Addendum, the term "Research" means all firm personnel engaged principally in the preparation and/or publication of research reports, including firm personnel who are directly or indirectly supervised by such persons and those who directly or indirectly supervise such persons, up to and including Research management.

e. As used throughout this Addendum, the term "research report" means any written (including electronic) communication that is furnished by the firm to investors in the U.S. and that includes an analysis of the common stock, any security convertible into common stock, or any derivative thereof, including American Depositary Receipts (collectively, "Securities"), of an issuer or issuers and provides information reasonably sufficient upon which to base an investment decision; provided, however, that a "research report" shall not include:

    i. the following communications, if they do not include (except as specified below) an analysis, recommendation or rating (e.g., buy/sell/hold, under perform/market perform/outperform, underweight/market weight/overweight, etc.) of individual securities or issuers:

        1. reports discussing broad-based indices, such as the Russell 2000 or S&P 500 index;

2. reports commenting on economic, political or market (including trading) conditions;

3. technical or quantitative analysis concerning the demand and supply for a sector, index or industry based on trading volume and price;

4. reports that recommend increasing or decreasing holdings in particular industries or sectors or types of securities; and

5. statistical summaries of multiple companies' financial data and broad-based summaries or listings of recommendations or ratings contained in previously-issued research reports, provided that such summaries or listings do not include any analysis of individual companies; and

ii. the following communications, even if they include information reasonably sufficient upon which to base an investment decision or a recommendation or rating of individual securities or companies:

1. an analysis prepared for a current or prospective investing customer or group of current or prospective investing customers by a registered salesperson or trader who is (or group of registered salespersons or traders who are) not principally engaged in the preparation or publication of research reports; and

2. periodic reports, solicitations or other communications prepared for current or prospective investment company shareholders (or similar beneficial owners of trusts and limited partnerships) or discretionary investment account clients, provided that such communications discuss past performance or the basis for previously made discretionary investment decisions.

2. <u>Legal/Compliance</u>. Research will have its own dedicated legal and

compliance staff, who may be a part of the firm's overall
compliance/legal infrastructure.

3. <u>Budget</u>. For the firm's first fiscal year following the entry of the Final
Judgment in the SEC's action against Respondent in a related
proceeding ("Final Judgment") and thereafter, Research budget and
allocation of Research expenses will be determined by the firm's senior
management (e.g., CEO/Chairman/management committee, other than
Investment Banking personnel) without input from Investment Banking
and without regard to specific revenues or results derived from
Investment Banking, though revenues and results of the firm as a whole
may be considered in determining Research budget and allocation of
Research expenses. On an annual basis thereafter, the Audit Committee
of the firm's holding/parent company (or comparable independent
persons/group without management responsibilities) will review the
budgeting and expense allocation process with respect to Research to
ensure compliance with this requirement.

4. <u>Physical Separation</u>. Research and Investment Banking will be
physically separated. Such physical separation will be reasonably
designed to prevent the intentional and unintentional flow of information
between Research and Investment Banking.

5. <u>Compensation</u>. Compensation of professional Research personnel will
be determined exclusively by Research management and the firm's
senior management (but not including Investment Banking personnel)
using the following principles:

   a. Investment Banking will have no input into compensation
      decisions.

   b. Compensation may not be based directly or indirectly on
      Investment Banking revenues or results; provided, however, that
      compensation may relate to the revenues or results of the firm as a
      whole.

   c. A significant portion of the compensation of anyone principally
      engaged in the preparation of research reports (as defined in this
      Addendum) that he or she is required to certify pursuant to the U.S.
      Securities and Exchange's Regulation Analyst Certification

("Regulation AC") (such person hereinafter a "lead analyst") must be based on quantifiable measures of the quality and accuracy of the lead analyst's research and analysis, including his or her ratings and price targets, if any.  In assessing quality, the firm may rely on, among other things, evaluations by the firm's investing customers, evaluations by the firm's sales personnel and rankings in independent surveys.  In assessing accuracy, the firm may use the actual performance of a company or its equity securities to rank its own lead analysts' ratings and price targets, if any, and forecasts, if any, against those of other firms, as well as against benchmarks such as market or sector indices.

    d.  Other factors that may be taken into consideration in determining lead analyst compensation include:  (i) market capitalization of, and the potential interest of the firm's investing clients in research with respect to, the industry covered by the analyst; (ii) Research management's assessment of the analyst's overall performance of job duties, abilities and leadership; (iii) the analyst's seniority and experience; (iv) the analyst's productivity; and (v) the market for the hiring and retention of analysts.

    e.  The criteria to be used for compensation decisions will be determined by Research management and the firm's senior management (not including Investment Banking) and set forth in writing in advance.

    f.  Research management will document the basis for each compensation decision made with respect to (i) anyone who, in the last 12 months, has been required to certify a research report (as defined in this Addendum) pursuant to Regulation AC; and (ii) anyone who is a member of Research management (except in the case of senior-most Research management, in which case the basis for each compensation decision will be documented by the firm's senior management).

On an annual basis, the Compensation Committee of the firm's holding/parent company (or comparable independent persons/group without management responsibilities) will review the compensation process for Research personnel.  Such review will be reasonably

designed to ensure that compensation decisions have been made in a manner that is consistent with these requirements.

6. <u>Evaluations</u>.  Evaluations of Research personnel will not be done by, nor will there be input from, Investment Banking personnel.

7. <u>Coverage</u>.  Investment Banking will have no input into company-specific coverage decisions (i.e., whether or not to initiate or terminate coverage of a particular company in research reports furnished by the firm), and investment banking revenues or potential revenues will not be taken into account in making company-specific coverage decisions; provided, however, that this requirement does not apply to category-by-category coverage decisions (e.g., a given industry sector, all issuers underwritten by the firm, companies meeting a certain market cap threshold).

8. <u>Termination of Coverage</u>.  When a decision is made to terminate coverage of a particular company in the firm's research reports (whether as a result of a company-specific or category-by-category decision), the firm will make available a final research report on the company using the means of dissemination equivalent to those it ordinarily uses; provided, however, that no final report is required for any company as to which the firm's prior coverage has been limited to purely quantitative analysis. Such report will be comparable to prior reports, unless it is impracticable for the firm to produce a comparable report (e.g., if the analyst covering the company and/or sector has left the firm).  In any event, the final research report must disclose:  the firm's termination of coverage; and the rationale for the decision to terminate coverage.

9. <u>Prohibition on Soliciting Investment Banking Business</u>.  Research is prohibited from participating in efforts to solicit investment banking business.  Accordingly, Research may not, among other things, participate in any "pitches" for investment banking business to prospective investment banking clients, or have other communications with companies for the purpose of soliciting investment banking business.

10. <u>Firewalls Between Research and Investment Banking</u>.  So as to reduce further the potential for conflicts of interest or the appearance of conflicts of interest, the firm must create and enforce firewalls between Research

and Investment Banking reasonably designed to prohibit all communications between the two except as expressly described below:

a.  Investment Banking personnel may seek, through Research management (or an appropriate designee with comparable management or control responsibilities ("Designee")) or in the presence of internal legal or compliance staff, the views of Research personnel about the merits of a proposed transaction, a potential candidate for a transaction, or market or industry trends, conditions or developments. Research personnel may respond to such inquiries on these subjects through Research management or its Designee or in the presence of internal legal or compliance staff. In addition, Research personnel, through Research management or its Designee or in the presence of internal legal or compliance staff, may initiate communications with Investment Banking personnel relating to market or industry trends, conditions or developments, provided that such communications are consistent in nature with the types of communications that an analyst might have with investing customers. Any communications between Research and Investment Banking personnel must not be made for the purpose of having Research personnel identify specific potential investment banking transactions.

b.  In response to a request by a commitment or similar committee or subgroup thereof, Research personnel may communicate their views about a proposed transaction or potential candidate for a transaction to the committee or subgroup thereof in connection with the review of such transaction or candidate by the committee. Investment Banking personnel working on the proposed transaction may participate with the Research personnel in these discussions with such committee or subgroup. However, the Research personnel also must have an opportunity to express their views to the committee or subgroup outside the presence of such Investment Banking personnel.

c.  Research personnel may assist the firm in confirming the adequacy of disclosure in offering or other disclosure documents for a transaction based on the analysts' communications with the company and other vetting conducted outside the presence of Investment Banking personnel, but to the extent communicated to Investment Banking personnel, such communication shall only be made in the presence of

underwriters' or other counsel on the transaction or internal legal or compliance staff.

d. After the firm receives an investment banking mandate, or in connection with a block bid or similar transaction, Research personnel may (i) communicate their views on the structuring and pricing of the transaction to personnel in the firm's equity capital markets group, which group's principal job responsibility is the pricing and structuring of transactions (including by participating with the firm's equity capital markets group in the preparation of internal-use memoranda and other efforts to educate the sales force), and (ii) provide to such personnel other information obtained from investing customers relevant to the pricing and structuring of the transaction.

e. Research personnel may attend or participate in a widely-attended conference attended by Investment Banking personnel or in which Investment Banking personnel participate, provided that the Research personnel do not participate in activities otherwise prohibited herein.

f. Research and Investment Banking personnel may attend or participate in widely-attended firm or regional meetings at which matters of general firm interest are discussed. Research management and Investment Banking management may attend meetings or sit on firm management, risk or similar committees at which general business and plans (including those of Investment Banking and Research) and other matters of general firm interest are discussed. Research and Investment Banking personnel may communicate with each other with respect to legal or compliance issues, provided that internal legal or compliance staff is present.

g. Communications between Research and Investment Banking personnel that are not related to investment banking or research activities may take place without restriction.

11. <u>Additional Restrictions on Activities By Research and Investment Banking Personnel</u>.

a. Research personnel are prohibited from participating in company or Investment Banking-sponsored road shows related to a public offering or other investment banking transaction.

    b. Investment Banking personnel are prohibited from directing Research personnel to engage in marketing or selling efforts to investors with respect to an investment banking transaction.

12. Oversight. An oversight/monitoring committee or committees, which will be comprised of representatives of Research management and may include others (but not personnel from Investment Banking), will be created to:

    a. review (beforehand, where practicable) all changes in ratings, if any, and material changes in price targets, if any, contained in the firm's research reports;

    b. conduct periodic reviews of research reports to determine whether changes in ratings or price targets, if any, should be considered; and

    c. monitor the overall quality and accuracy of the firm's research reports;

provided, however, that Sections I.12.a and I.12.b of this Addendum shall not be required with respect to research reports limited to purely quantitative analysis.

## II. Disclosure/Transparency and Other Issues

1. Disclosures. In addition to other disclosures required by rule, the firm must disclose prominently on the first page of any research report and any summary or listing of recommendations or ratings contained in previously-issued research reports, in type no smaller than the type used for the text of the report or summary or listing, that:

    a. "Lehman Brothers Inc. does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report."

    b. With respect to Covered Companies as to which the firm is required to make available Independent Research (as set forth in Section III below): "Customers of Lehman Brothers Inc. can

receive independent, third-party research on the company covered in this report, at no cost to them, where such research is available. Customers can access this independent research at [website address/hyperlink] or can call [toll-free number] to request a copy of this research."

c. "Investors should consider this report as only a single factor in making their investment decision."

2. <u>Transparency of Analysts' Performance</u>. The firm will make publicly available (via its website, in a downloadable format), no later than 90 days after the conclusion of each quarter (beginning with the first full calendar quarter that commences at least 120 days following the entry of the Final Judgment), the following information, if such information is included in any research report (other than any research report limited to purely quantitative analysis) prepared and furnished by the firm during the prior quarter: subject company, name(s) of analyst(s) responsible for certification of the report pursuant to Regulation AC, date of report, rating, price target, period within which the price target is to be achieved, earnings per share forecast(s), period(s) for which such forecast(s) are applicable (e.g., 3Q03, FY04, etc.), and definition/explanation of ratings used by the firm.

3. <u>Applicability</u>. Except as specified in the second and third sentences of this Section II.3, the restrictions and requirements set forth in Sections I [Separation of Research and Investment Banking] and Section II [Disclosure/Transparency and Other Issues] of this Addendum will only apply in respect of a research report that is both (i) prepared by the firm, and (ii) that relates to either (A) a U.S. company, or (B) a non-U.S. company for which a U.S. market is the principal equity trading market; provided, however, that such restrictions and requirements do not apply to Research activities relating to a non-U.S. company until the second calendar quarter following the calendar quarter in which the U.S. market became the principal equity trading market for such company. Notwithstanding the foregoing, Section I.7 [Coverage] of this Addendum will also apply to any research report (other than the Independent Research made available by the firm pursuant to Section III [Independent, Third-Party Research] of this Addendum) that has been *furnished* by the firm to investors in the U.S., but not prepared by the firm, but only to the extent that the report relates to either (A) a U.S.

company, or (B) a non-U.S. company for which a U.S. market is the principal equity trading market. Also notwithstanding the foregoing, Section II.1 [Disclosures] of this Addendum will also apply to any research report (other than the Independent Research made available by the firm pursuant to Section III of this Addendum) that has been *furnished* by the firm to investors in the U.S., but not prepared by the firm, including a report that relates to a non-U.S. company for which a U.S. market is not the principal equity trading market, but only to the extent that the report has been furnished under the firm's name, has been prepared for the exclusive or sole use of the firm or its customers, or has been customized in any material respect for the firm or its customers.

    a. For purposes of this Section II.3, the firm will be deemed to have furnished a research report to U.S. investors in the U.S. if the firm has made the research report available to investors in the U.S. or has arranged for someone else to make it available to investors in the U.S.

    b. For purposes of this Section II.3, a "U.S. company" means any company incorporated in the U.S. or whose principal place of business or headquarters is in the U.S.

    c. For purposes of this Section II.3, the calendar quarter in which a non-U.S. company's "principal equity trading market" becomes the U.S. market is a quarter when more than 50% of worldwide trading in the company's common stock and equivalents (such as ordinary shares or common stock or ordinary shares represented by American Depositary Receipts) takes place in the U.S. Trading volume shall be measured by publicly reported share volume.

4. <u>General</u>.

    a. The firm may not knowingly do indirectly that which it cannot do directly under this Addendum.

    b. The firm will adopt and implement policies and procedures reasonably designed to ensure that its associated persons (including but not limited to the firm's Investment Banking personnel) cannot and do not seek to influence the contents of a research report or the activities of Research personnel for purposes of obtaining or

retaining investment banking business. The firm will adopt and implement procedures instructing firm personnel to report immediately to a member of the firm's legal or compliance staff any attempt to influence the contents of a research report or the activities of Research personnel for such a purpose.

5. <u>Timing</u>. Unless otherwise specified, the restrictions and requirements of this Addendum will be effective within 120 days of the entry of the Final Judgment, except that Sections I.5 [Compensation], I.6 [Evaluations], I.7[Coverage], I.8[Termination of Coverage], I.9 [Prohibition on Soliciting Investment Banking Business], I.11 [Additional Restrictions on Activities by Research and Investment Banking Personnel], and II.4(a) [General subpart a)] and II.7 [Superseding Rules and Amendments] of this Addendum will be effective within 60 days of the entry of the Final Judgment, and Sections II.1.b [Disclosures (subpart b)] and III [Independent, Third-Party Research]of this Addendum will be effective within 270 days of the entry of the Final Judgment.

6. <u>Review of implementation</u>.

a. The firm will retain, at its own expense, an Independent Monitor acceptable to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office to conduct a review to provide reasonable assurance of the implementation and effectiveness of the firm's policies and procedures designed to achieve compliance with the terms of this Addendum. This review will begin 18 months after the date of the entry of the Final Judgment. The Independent Monitor will produce a written report of its review, its findings as to the implementation and effectiveness of the firm's policies and procedures, and its recommendations of other policies or procedures (or amendments to existing policies or procedures) as are necessary and appropriate to achieve compliance with the requirements and prohibitions of this Addendum. The report will be produced to the firm and the Staff of the SEC, the NYSE and the NASD within 30 days from the completion of the review, but no later than 24 months from the date of entry of the Final Judgment. (The SEC Staff shall make the report available to the President of NASAA and the New York Attorney General's Office upon request.) The Independent Monitor shall have

the option to seek an extension of time by making a written request to
the Staff of the SEC.

b.  The firm will have a reasonable opportunity to comment on the
Independent Monitor's review and proposed report prior to its
submission, including a reasonable opportunity to comment on any
and all recommendations, and to seek confidential treatment of such
information and recommendations set forth therein to the extent that
the report concerns proprietary commercial and financial information
of the firm.  This report will be subject to the protections from
disclosure set forth in the rules of the SEC, including the protections
from disclosure set forth in 5 U.S.C. § 552(b) (8) and 17 C.F.R. §
200.80(b) (8), and will not constitute a record, report, statement or
data compilation of a public office or agency under Rule 803(8) of the
Federal Rules of Evidence.

c.  The firm will adopt all recommendations contained in the written
report of the Independent Monitor; provided, however, that as to any
recommendation that the firm believes is unduly burdensome or
impractical, the firm may demonstrate why the recommended policy
or procedure is, under the circumstances, unreasonable, impractical
and/or not designed to yield benefits commensurate with its cost, or
the firm may suggest an alternative policy or procedure designed to
achieve the same objective, and submit such explanation and/or
alternative policy or procedure in writing to the Independent Monitor
and to the Staff of the SEC.  The firm and the Independent Monitor
shall then attempt in good faith to reach agreement as to any policy or
procedure as to which there is any dispute and the Independent
Monitor shall reasonably evaluate any alternative policy or procedure
proposed by the firm.  If an agreement on any issue is not reached, the
firm will abide by the determinations of the Staff of the SEC (which
shall be made after allowing the firm and the Independent Monitor to
present arguments in support of their positions), and adopt those
recommendations the Staff of the SEC deems appropriate.

d.  The firm will cooperate fully with the Independent Monitor in this
review, including making such non-privileged information and
documents available, as the Independent Monitor may reasonably
request, and by permitting and requiring the firm's employees and

agents to supply such non-privileged information and documents as the Independent Monitor may reasonably request.

e. To ensure the independence of the Independent Monitor, the firm (i) shall not have the authority to terminate the Independent Monitor without the prior written approval of the SEC staff; and (ii) shall compensate the Independent Monitor, and persons engaged to assist the Independent Monitor, for services rendered pursuant to this Order at their reasonable and customary rates.

f. For the period of engagement and for a period of three years from completion of the engagement, the Independent Monitor shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with the firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any entity with which the Independent Monitor is affiliated or of which he/she is a member, and any person engaged to assist the Independent Monitor in performance of his/her duties under this Order shall not, without prior written consent of the Staff of the SEC, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of three years after the engagement.

g. Five years after the date of the entry of the Final Judgment, the firm shall certify to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office, that the firm has complied in all material respects with the requirements and prohibitions set forth in this Addendum or, in the event of material non-compliance, will describe such material non-compliance.

7. <u>Superseding Rules and Amendments</u>. In the event that the SEC adopts a rule or approves an SRO rule or interpretation with the stated intent to supersede any of the provisions of this settlement, except Section IV [Investor Education] the SEC or SRO rule or interpretation will govern with respect to that provision of the settlement and such provision will be superseded. In addition, the SEC, NYSE, the NASD, the New York Attorney General's Office and any State that incorporates this Addendum

into its settlement of related proceedings against the Respondent agrees that the SEC Staff may provide interpretive guidance with respect to the terms of the settlement, except for Section IV [Investor Education], as requested by the firm and that, subject to Court approval, the SEC and the firm may agree to amend or modify any term of the settlement, except for Section IV [Investor Education], in each case, without any further action or involvement by any other regulator in any related proceeding. With respect to any term in Section I or II of this Addendum that has not been superseded (as set forth above) within five years of the entry of the Final Judgment, it is the expectation of Respondent, the SEC, NYSE, NASD, New York Attorney General's Office and the States that the SEC would agree to an amendment or modification of such term, subject to Court approval, unless the SEC believes such amendment or modification would not be in the public interest.

8. <u>Other Obligations and Requirements</u>. Except as otherwise specified, the requirements and prohibitions of this Addendum shall not relieve the firm of any other applicable legal obligation or requirement.

III.    Independent, Third-Party Research

1.    <u>Obligation to Make Available</u>. Each year, for the period ending five years after the effective date of this Section III (as set forth in Section II.5 [Timing] of this Addendum), the firm will be required to contract with no fewer than three independent providers of research ("Independent Research Providers") at a time in order to procure and make available Independent Research (as defined below) to the firm's customers in the U.S. as set forth below. There is, however, no requirement that there be at least three Independent Research Providers for the Common Stock of each Covered Company (as those terms are defined below):

a. For common stock and equivalents (such as ordinary shares or common stock or ordinary shares represented by American Depositary Receipts) listed on a U.S. national securities exchange or quoted in Nasdaq (such securities hereinafter, collectively, "Common Stock") and covered in the firm's research reports (other than those limited to purely quantitative analysis) (an issuer of such covered Common Stock hereinafter called a "Covered Company"), the firm, through an

Independent Consultant (as discussed below) will use its reasonable efforts to procure, and shall make available to its customers in the U.S., Independent Research on such Covered Company's Common Stock. (If the Independent Research Providers drop coverage or do not timely pick up coverage of the Common Stock of a Covered Company, the firm will not be in violation of any of the requirements in this Section III, and may continue to disseminate its own research reports on the Common Stock of the Covered Company without making available any Independent Research on the Common Stock of the Covered Company, if the firm takes reasonable steps to request that the Independent Consultant procure such coverage promptly.)

    i.  For purposes of this Section III, the firm's research reports include research reports that have not been prepared by the firm, but only to the extent that such reports have been furnished under the firm's name, have been prepared for the exclusive or sole use of the firm or its customers, or have been customized in any material respect for the firm or its customers.

    ii.  A non-U.S. company for which a U.S. market is not the principal equity trading market shall only be considered a Covered Company if in the calendar quarter ended March 31, 2003, or in any subsequent calendar quarter during the period that the firm's obligations to procure and make available Independent Research under this Section III are effective, the publicly reported, average daily dollar volume of U.S. trading in such company's Common Stock (measured by multiplying the publicly reported, average daily share volume of U.S. trading during the quarter by the closing price per share of the Common Stock on the last day of the quarter), exceeded $2.5 million, and (b) the outstanding total public float of the Common Stock as of the last day of such calendar quarter exceeded $150 million. Further, the firm's obligation to procure and make available Independent Research with respect to such company shall become effective at the later of: (a) 90 days after

the end of the calendar quarter in which the company
met the foregoing trading and public float tests; or (b)
the effective date of this Section III.

b.  For purposes of this Section III, Independent Research means
(i) a research report prepared by an unaffiliated person or entity,
or (ii) a statistical or other survey or analysis of research reports
(including ratings and price targets) issued by a broad range of
persons and entities, including persons and entities having no
association with investment banking activities, which survey or
analysis has been prepared by an unaffiliated person or entity.

c.  The firm will adopt policies and procedures reasonably
designed to ensure that, in connection with any solicited order
for a customer in the U.S. relating to the Common Stock of a
Covered Company, and if Independent Research on the
Covered Company's Common Stock is available, the registered
representative will have informed the customer, during the
solicitation, that the customer can receive Independent Research
on the Covered Company's Common Stock at no cost to the
customer (the "Notice Requirement").

d.  Notwithstanding the foregoing, the Notice Requirement will not
apply to (i) the solicitation of an institutional customer (an
entity other than a natural person having at least $10 million
invested in securities in the aggregate in its portfolio and/or
under management) unless such customer, after due notice and
opportunity, has advised the firm that it wishes to have the
Notice Requirement apply to it (any customer who has not so
advised the firm is hereinafter referred to as a "Non-
Participating Institutional Customer"); (ii) orders as to which
discretion was exercised, pursuant to a written discretionary
account agreement or written grant of trading authorization; or
(iii) a solicitation by an entity affiliated with the Respondent if
such entity does not furnish to its customers research reports
under the firm's name, prepared by the firm for the exclusive or
sole use of the firm or its customers, or research reports that
have been customized in any material respect for the firm or its
customers.

e.  Each trade confirmation sent by the Respondent to a customer
    with respect to an order as to which the Notice Requirement
    applies will set forth (or will be accompanied by a separate
    statement, which shall be considered part of the confirmation,
    that will set forth), as of the time the trade confirmation is
    generated, the ratings, if any, contained in the firm's own
    research reports and in Independent Research procured for the
    firm with respect to the Common Stock of the Covered
    Company that is the subject of the order.

f.  Each periodic account statement sent by the Respondent to a
    customer in the U.S. that reflects a position in the Common
    Stock of a Covered Company will set forth (or will be
    accompanied by a separate statement, which shall be considered
    part of the periodic account statement, that will set forth), as of
    the end of the period covered by the statement, the ratings, if
    any, contained in the firm's own research reports and in the
    Independent Research made available by the firm on the
    Common Stock of each such Covered Company; provided,
    however, that this requirement will not apply to Non-
    Participating Institutional Customers or discretionary accounts.

g.  Notice of the availability of Independent Research on Covered
    Companies' Common Stock will also be included prominently
    in the periodic account statements of the Respondent's
    customers in the U.S., in the firm's research reports, and on the
    firm's website.

h.  The firm will make the Independent Research available to its
    customers in the U.S. using, for each customer, the means of
    dissemination equivalent to those it uses to provide the
    customer with the firm's own research reports, unless the firm
    and customer agree on another means of dissemination;
    provided, however, that nothing herein shall require or
    authorize the firm to comply with the Notice Requirement or
    make available or disseminate Independent Research at a time
    when doing so would violate Section 5 of the Securities Act of
    1933 or the other provisions of the federal securities laws or the
    rules and regulations thereunder.  If and to the extent the firm is
    able to make available or disseminate its own research reports

on the Common Stock of a Covered Company pursuant to Rule 137, Rule 138(a) or Rule 139(a) under the Securities Act of 1933 and in reliance on Regulation M under the Securities Exchange Act of 1934, then the firm is also authorized and required to make available or disseminate Independent Research on the Common Stock of such Covered Company (even if the Independent Research does not meet the requirements of such Rule). Notwithstanding this Section III.1.h, if the firm determines, because of legal, compliance or similar concerns, not to furnish or make available its own research reports on the Common Stock of a Covered Company for a limited period of time, it shall not be required to make available the Independent Research on such Covered Company for such period of time.

i. If, during the period that the firm's obligations to procure and make available Independent Research under this Section III are effective, the firm terminates coverage of the Common Stock of a Covered Company, the firm, through its Independent Consultant, will make reasonable efforts to continue to procure and make available Independent Research on the Common Stock of such company for a period of at least 18 months after termination of coverage (subject to expiration of the firm's obligations under this Section III).

j. The firm will not be responsible or liable for (i) the procurement decisions of the Independent Consultant (as discussed in Section III.2 [Appointment of Independent Consultant to Oversee the Procurement of Independent Research] of this Addendum) with respect to the Independent Research, (ii) the Independent Research or its content, (iii) customer transactions, to the extent based on the Independent Research, or (iv) claims arising from or in connection with the inclusion of Independent Research ratings in the firm's confirmations and periodic account statements, to the extent such claims are based on those ratings. The firm will not be required to supervise the production of the Independent Research procured by the Independent Consultant and will have no responsibility to comment on the content of the Independent

Research. The firm may advise its customers of the foregoing in its discretion.

k. The Independent Consultant will not be liable for (i) its procurement decisions, (ii) the Independent Research or its content, (iii) customer transactions, to the extent based on the Independent Research, or (iv) claims arising from or in connection with the inclusion of Independent Research ratings in the firm's confirmations and periodic account statements, to the extent such claims are based on those ratings, unless the Independent Consultant has carried out such duties in bad faith or with willful misconduct. The firm will indemnify the Independent Consultant for any liability arising from the Independent Consultant's good-faith performance of its duties as such.

2. <u>Appointment of Independent Consultant to Oversee the Procurement of Independent Research</u>. Within 30 days of the entry of the Final Judgment, an Independent Consultant acceptable to the SEC Staff, the NYSE, the NASD, the President of NASAA, the New York Attorney General and the firm shall be named to oversee the procurement of Independent Research from Independent Research Providers. The Independent Consultant will have the final authority (following consultation with the firm and in accordance with the criteria set forth in Section III.3 [Selection of Independent Research Providers] of this Addendum) to procure the Independent Research. The Independent Consultant will not have had any significant financial relationship with the firm during the prior three years and may not have any financial relationship with the firm for three years following his or her work as the Independent Consultant. The Independent Consultant's fee arrangement will be subject to the approval of the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office. In the event that an Independent Consultant must be replaced, the replacement shall be acceptable to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, the New York Attorney General's Office and the firm, and shall be subject to these same conditions.

3. <u>Selection of Independent Research Providers</u>. The Independent Consultant will seek to procure research reports on the Common Stock of all Covered Companies from Independent Research Providers.

Independent Research Providers may not perform investment banking business of any kind and may not provide brokerage services in direct and significant competition with the firm. In addition, the Independent Consultant will use the following criteria in selecting and contracting with Independent Research Providers to provide Independent Research.

a. whether and to what extent the Independent Research Provider or any of its affiliates or associated persons is engaged in activities (including, but not limited to, activities involving Covered Companies or their securities), or has a business or other relationship with the firm or any of its affiliates or associated persons, that may conflict or create the appearance of conflict with its preparation and publication of the Independent Research;

b. the desirability of multiple coverage of certain Covered Companies (e.g., by size of company, industry sector, companies underwritten by the firm, etc.);

c. the extent to which the Independent Research Provider has a client base and revenue stream broad enough to ensure its independence from the firm;

d. the utility of the Independent Research Provider's Independent Research to the firm's customers, including the inclusion of ratings and price targets in such research and the extent to which the firm's customers actually use the research; and with respect to surveys or analyses described above in Section III.1.b(ii), the extent to which the Independent Research provides customers with a means of comparing the firm's research reports to those published by other persons and entities, including persons and entities having no association with investment banking activities;

e. the quality and accuracy of the Independent Research Provider's past research, including during the term of the Independent Consultant's tenure;

    f.  the experience, expertise, reputation and qualifications (including, as appropriate, registrations) of the Independent Research Provider and its personnel; and

    g.  the cost of the Independent Research, especially in light of the five-year period set forth in Section III.1 above for the firm to make Independent Research available to its investing customers.

4.  <u>Disclosure Language</u>.  Language substantially to the effect set forth below may be used by the firm and its registered representatives to inform the firm's customers of the availability of Independent Research:

    a.  {Disclosure to customers as required by Section III.1.c [Obligation to Make Available subpart c] of this Addendum.}

    "There is also independent, third-party research available on this company, which you can get at no cost [from our website/hyperlink] or by calling [toll-free number], or which I can arrange to send to you if you would like."

    b.  {General website and periodic customer account statement disclosure as required by Section III.1.g. [Obligation to Make Available subpart g] of this Addendum].}

    "Independent, third-party research on certain companies covered by the firm's research is available to customers of [firm] at no cost.  Customers can access this research at [our website/hyperlink] or can call [toll-free number] to request that a copy of this research be sent to them."

5.  <u>Annual Reporting</u>.  The Independent Consultant will report annually to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office on its selection of Independent Research Providers, the Independent Research it has procured, the cost of the Independent Research it has procured to date, and the Independent Consultant's fees and expenses to date.

shall be made into the Fund at the Investor Protection Trust as described in Section IV.2(b).

3.    Purpose of and Limitations on the Use of the Fund.

a.  The Fund (including all installment payments) shall be used to support programs designed for the purpose of investor education and research and education with respect to the protection of investors, and to equip investors with the knowledge and skills necessary to make informed investment decisions and to increase personal financial literacy. The Investor Protection Trust, in cooperation with NASAA, shall establish an investor education plan designed to achieve these purposes.

b.  No principal or income from the Fund shall:
(i) inure to the general fund or treasury of any State;
(ii) be utilized to pay the routine operating expenses of NASAA; or
(iii) be utilized to pay the compensation or expenses of state officials or state employees except such expenses as are necessary to fulfill the purposes of the Fund.

c.  Monies in the Fund may also be used to pay any taxes on income earned by such Fund.  Respondent shall provide the Investor Protection Trust with relevant information and otherwise cooperate with the Investor Protection Trust in fulfilling the Fund's obligations under applicable law.

d.  All fees, costs, and expenses incurred by the Investor Protection Trust in connection with and incidental to the performance of its duties under this Addendum, including the fees, costs, and expenses of any persons engaged to assist it and all administrative fees, costs, and expenses related to the investor education plan described below, shall be paid out of the Fund.