# EXHIBIT I

Division of Securities
Utah Department of Commerce
160 East 300 South, 2nd Floor
PO Box 146760
Salt Lake City, UT 84114-6760
Telephone:      (801) 530-6600
Facsimile:      (801) 530-6980

---

## BEFORE THE DIVISION OF SECURITIES

## OF THE DEPARTMENT OF COMMERCE

## OF THE STATE OF UTAH

---

| | |
|---|---|
| **IN THE MATTER OF:** ) | |
| ) | |
| ) | **CONSENT ORDER** |
| **GOLDMAN, SACHS & CO.** ) | |
| 85 Broad Street ) | |
| New York, NY 10004 ) | |
| ) | |
| CRD # 361 ) | Docket No. SD-02-0166 |
| ) | |
| Respondent ) | |
| ) | |

---

WHEREAS, Goldman, Sachs & Co. ("Goldman Sachs") is a broker-dealer registered in

the State of Utah; and

WHEREAS, coordinated investigations into Goldman Sachs's activities in connection

with its potential conflicts of interest by research analysts, the issuance of research that might have

lacked objectivity, and potentially improper sharing of research information with public companies

and the investment banking division of the firm during the period of approximately 1999 through

2001 ("Relevant Period") have been conducted by a multi-state task force and a joint task force of

the U.S. Securities and Exchange Commission, the New York Stock Exchange, and the National

Association of Securities Dealers (collectively, the "regulators"); and

WHEREAS, Goldman Sachs has cooperated with regulators conducting the investigations by responding to inquiries, providing documentary evidence and other materials, and providing regulators with access to facts relating to the investigations; and

WHEREAS, Goldman Sachs has advised regulators of its agreement to resolve the investigations relating to its research practices; and

WHEREAS, Goldman Sachs agrees to implement certain changes with respect to its research practices, and to make certain payments; and

WHEREAS, Goldman Sachs elects permanently to waive any right to a hearing and appeal under the Utah Administrative Procedures Act, Title 63, chapter 46b of the Utah Code, with respect to this Administrative Consent Order (the "Order");

NOW THEREFORE, the Division of Securities, as administrator of the Utah Uniform Securities Act, hereby enters this Order:

## I.

## JURISDICTION/CONSENT

Goldman Sachs admits the jurisdiction of the Division of Securities, neither admits nor denies the findings of fact and conclusions of law contained in this Order, and consents to the entry of this Order by the Division of Securities.

## II.

## FINDINGS OF FACT

1.    As set forth in greater detail herein, in general, during the Relevant Period, certain of the procedures and processes in place to insulate Goldman Sachs's equity research analysts

2

(hereafter "analysts" or "research analysts") from pressures and influences from covered companies or investment banking were not sufficient. Also, in general, during the Relevant Period, in some respects Goldman Sachs failed to exercise reasonable supervision so as to ensure that, in the context of the procedures and processes in place, its research analysts were sufficiently insulated from pressures and influences from covered companies or investment banking.

2.      Goldman Sachs is a leading global investment banking and securities firm that, among other things, offers underwriting services to companies seeking to sell their securities to the public. In addition to its prominent investment banking operations, Goldman Sachs also offers extensive services to its institutional investor clients and its private wealth management clients (principally high net worth individuals), has an active securities sales and trading business, and maintains a separate division to perform research on equity securities.

3.      For the companies for which Goldman Sachs provides equity research coverage, Goldman Sachs analysts issue periodic reports and make investment recommendations. During the Relevant Period, Goldman Sachs's equity research ratings included four investment ratings:

**Recommended List** - expected to provide price gains of at least 10 percentage points greater than the market over the next 6-18 months;

**Market Outperformer** - expected to provide price gains of at least 5-10 percentage points greater than the market over the next 6-18 months;

**Market Performer** - expected to provide price gains similar to the market over the next

3

6-18 months; and

**Market Underperformer** - expected to provide price gains of at least 5 percentage points less than the market over the next 6-18 months.

In addition, Goldman Sachs had one shorter-term rating:

**Trading Buy** - expected to provide price gains of at least 20 percentage points sometime in the next 6-9 months.

4.    In addition to ratings, the research reports generally contained Goldman Sachs's analysis of the covered company's financial prospects.

A.    **INVESTMENT BANKING DIVISION'S RELATIONSHIP TO AND INFLUENCE ON RESEARCH DIVISION.**

**Portrayal of Research**

5.    Goldman Sachs held itself out as generating and providing research reports that were the product of objective research and the opinions of the firm's research division.  During the Relevant Period, Goldman Sachs disclosed various conflicts of interest-related disclaimers in its research reports, including investment banking relationships with covered companies.

6.    The research reports and ratings of companies covered by Goldman Sachs analysts as well as Goldman Sachs's list of recommended stocks were made available to Goldman Sachs's institutional investor clients and its private wealth management clients, principally high net worth individuals.  On occasion, the substance of Goldman Sachs's research reports, in whole or in part also was reported in the U.S. financial news media.

7.    Goldman Sachs's equity research included formal, so-called "blue-stripe" reports, notes, and comments.

4

8.     Goldman Sachs's research or the content of its research was disseminated by various means, including: by mail, via facsimile, distributions at client meetings, via e-mail, via Goldman Sachs's research Website for clients, telephone conversations by analysts and salespersons, and as part of analysts' appearances on television, at seminars, and at industry conferences.

9.     The 2002 mission statement by Goldman Sachs's U.S. research department was: "Regain our pre-eminent status through independent, high-quality, differentiated product and service."

### Research analyst assistance to investment banking.

10.    During the Relevant Period, research coverage by analysts (including at Goldman Sachs) was a factor many issuers took into account in awarding investment banking business. The reputation of Goldman Sachs's analysts was sometimes a factor in winning investment banking business from certain issuers. Goldman Sachs's use of its research analysts for investment banking business went beyond simply relying on the reputation of its analysts; Goldman Sachs's research analysts assisted in evaluating and marketing certain investment banking business.

11.    Frank Governali, co-head of Goldman Sachs's research for the telecommunications sector, joined Goldman Sachs in mid-1999. In January 2000, he e-mailed a former colleague at another investment bank: "It's been a good first 6 months, and its [sic] been very busy. There has not been a day when we're not involved with some deal, so I'm learning a lot more about that side of the business than I experienced at [the other investment bank]."

**"Research alignment" process**

12.     In connection with making coverage decisions in the context of limited resources, *Goldman Sachs implemented a Research Alignment process whereby the Investment Banking Division, the Equities Division, and the Research Division* "work collaboratively to insure a strategic alignment of [Goldman Sachs's] business - that the biggest opportunities for investment banking and equities were being covered, that [Goldman Sachs] had the right Research resources in the right places, and that [Goldman Sachs's] Research reputation for independent and thoughtful analysis was sustained if not enhanced." In the context of Investment Banking, Research Alignment "insur[es] that companies of strategic and/or commercial importance to both IBD and Research are covered by an analyst and a banking team. . . . [I]deal candidates for coverage are those that are franchise defining, and/or those that offer a meaningful opportunity for significant revenue in the relatively near term."

13.     Sector captains were appointed within investment banking to "coordinate *all* banker requests for Research coverage; work with IBD teams and ECM [Equity Capital Markets] to establish priority rankings within the sector and reach consensus with Research counterparts."

14.     A January 2001 research retreat reminded analysts that investment banking sector captains were to "[w]ork directly with Research counterparts to agree on names and timing" of companies to be covered and to "[d]etermine IBD priority ranking of *each* company needing Research, including rationale and timing."

15.     Representatives of investment banking and research met periodically to review companies

6

that were candidates for research coverage. In May 2000, the heads of research reported:

"Of the 63 companies highlighted which offered equity opportunities over the next 12

months or which were SuperLeague targets, 40 are now considered no longer active, 9

have been picked up by Research, and 14 still need coverage, based on recent banker input

. . . ."

16.    The Research Alignment process was designed to ensure that the various interested areas

of the firm (including Investment Banking and Equities) had effective input into which

issuers to cover and when to initiate coverage. Goldman Sachs states that the research

alignment did not dictate the substance of research.

### Goldman Sachs's compensation structure and employee performance review system

17.    As with all professional employees of the firm, analyst compensation consisted of a salary

and a discretionary bonus. Analyst compensation at Goldman Sachs was based on many

factors, including, among other things, the level of compensation that analysts could

command in the market for their particular industry or sector specialty - which might be

impacted by the level of investment banking activity in that sector - whether an analyst

was ranked in broker polls, *Greenwich Survey, Institutional Investor,* and performance

reviews - which, as discussed below, often made reference to contributions to investment

banking. Analysts received no formulaic or other compensation with respect to specific

investment banking projects. Comments in some employee evaluations indicated that

some analysts were involved in many aspects of investment banking-related activities and

reflected certain employees' beliefs that participating or assisting in investment banking

activities was a factor in measuring the analyst's performance.

18.    Goldman Sachs introduced a new program in June 2000 to strengthen "firmwide marketing . . . including how we leverage our brand, advertise, and in particular, cross-sell . . . ." Strengthening cross-selling efforts was defined as a "top strategic priority for 2000." A $50,000 award was created to recognize individuals across all divisions of the firm who "cross-sell or help deliver a significant mandate to another business unit or division."

19.    Goldman Sachs explored and took steps toward the development of a potential "Analyst Scorecard" in 2001, to measure the success of analysts' work, including "client contact and revenue generation," and "the analyst's involvement with IBD transactions, and associated fees [to be earned by Goldman Sachs]." In connection with this process, Goldman Sachs created spreadsheets, for each analyst, listing the number of investment transactions in which the analyst was involved and the total value of investment banking fees involved in those transactions. Goldman Sachs determined not to implement the Analyst Scorecard. Had Goldman Sachs decided to implement the Analyst Scorecard, the investment banking deals with the largest estimated revenues to Goldman Sachs would have resulted in higher scores on the Analyst Scorecard.

20.    In February 2002, Goldman Sachs introduced its Research Pentathlon. There were five areas being measured: polls, stock picking, commercial, reviews, and culture. As part of the commercial measurement: "analysts [were] measured according to their banking and trading activity." Each analyst was required to identify those "announced or closed banking transactions in your sector that took place" during the prior period. For example,

in a February 15, 2002 e-mail, an analyst was told to indicate whether he had "Introduced Senior Management to GS Banking," "Attended Pitch," or "Led Sales Call," and to "rate the scale of your overall involvement" ranging from minimal to critical.

21.     All Goldman Sachs employees, including analysts, were evaluated as part of the firmwide "360 degree" review process. During the Relevant Period, analysts, like all other employees at the firm, were evaluated not only by supervisors, peers, and subordinates in the research division, but also by employees in other divisions and departments of the firm with whom the analyst had worked, including to varying extents investment banking and equity sales and trading. The evaluations that employees submitted during the 360 degree review process generally were anonymous. In most cases, even the analyst's supervisor who orally delivered the year-end review to the analyst did not know the identities of the employees who made comments about the analyst. The specific comments in the 360 degree reviews were not shown to analysts but certain comments may have been discussed or described in some cases. Rather, after reading all of the 360 degree reviews, reviewing other indicators of performance and taking into account his or her own assessment of the analyst's performance, the analyst's supervisor would provide an overall assessment of the analyst's performance.

*Comments about analysts in the 360 degree review*

22.     Some employee evaluations referred to investment banking revenues on transactions in which the analyst had a role and to the fact that analysts might be involved in many aspects of investment banking.

a.      For example, one employee commented that an analyst was: "Very hard working,

9

focused and eager to do a good job and win business." He said the analyst was

"Becoming much more proactive about sharing info with banking. A good team

player and very cooperative. Well focused on banking issues and GS [Goldman

Sachs] business overall." Another evaluation of the same analyst commented that:

"He is a great help to the Banking franchise. Always willing to impart his expertise

and seems happy to take the time to explain complex strategic and positioning

issues." A different evaluation of this analyst stated: "[Analyst] takes a high level

of pride in his analysis and work, and has put out a number of carefully researched

and well-written pieces which are definitely value-added to clients."

b.     An evaluation of another analyst stated: "She did a super job with the IB client as

well as investors on the Coinstar CSO. . . . She became more comfortable over

time that IB fee-paying potential should be a consideration in her list [of companies

to cover]. Though [analyst] worked closely with IB putting her initial list

together, [analyst] is fairly (sometimes fiercely) independent. I strongly suggest

that she use the resources that IB offers as she works evaluating companies (e.g.

when changing her [financial] model, please inform/consult the IB team)."

c.     A comment about one analyst stated: "Hard to say how much of poor investment

decisions have been because banking drove the outcome." Another comment

about the same analyst said: "[Analyst] has a very high integrity in her work."

d.     An evaluation of Frank Governali stated: "Frank is swamped and needs help. The

demands placed upon him by his banking duties threatens the very franchise that

has allowed him to become such a powerful banking asset. Frank is a very good

analyst who is thoughtful, user friendly, creative and totally inaccessible." Another

evaluation of Governali stated "his overall integrity is a strong feature."

e.     An evaluation of another analyst stated: "There are still times when [analyst] does

not think commercially about a client.  There have been times when [analyst] is

going to see an important CEO target and no one from banking is even aware that

he has the meeting."  Another comment about the same analyst said: "His analysis

is considered very objective and is widely used by clients."

*Performance evaluations influenced compensation.*

23.    Training for new analysts taught that their performance evaluation criteria included

"Revenue production . . . [and] 360° feedback from IBD bankers."

*Analyst business plans.*

24.    During the Relevant Period, analysts were required to develop business plans that

discussed a broad range of areas such as what the analyst's plans were for Global

Research with respect to both products and services, what major investment themes the

analyst would develop relating to his or her coverage universe, and what investor

conferences the analyst had planned.  One of the many such categories covered by the

business plans was how the analyst planned to assist the investment banking efforts of the

firm.  As noted below, the business plans included questions that implied that the research

analysts' contribution to the firm's investment banking business plan was part of their job.

Business plan forms asked analysts to explain, among other things:

a.     "How much of your time will be devoted to IBD?"

b.     "Are you using/managing IBD effectively?  How can you work more effectively

11

with IBD to exploit the opportunities available to the firm?  What specific

opportunities do you see?  Do you have alignment - do you have counterparts in

IBD you work with to approach business in an integrated fashion?  How can IBD

help you in conferences, client meetings, etc?"

    c.    "What stocks do you plan to add at current team size? . . . Have you discussed this

coverage with relevant IBD, Equities and other users?"

    d.    "With which corporates do you have a better relationship with senior management

than IBD does?  How will you use that to enhance GS business opportunities?"

25.    Analyst responses included:

    a.    In response to the question: "What are the three most important goals for you in

2000?" one analyst replied: "1. Get more investment banking revenue.  2.  Get

more investment banking revenue.  3.  Get more investment banking revenue."

    b.    Another analyst commented: "My two most important company specific research

reports in 2000 will likely be the initiation of coverage reports of the two Latin

American e-Finance companies that we may IPO this year." [An IPO is an initial

public offering.]

    c.    An analyst expressed the view that "flexible/opportunistic research can be a *big*

business driver for GS."  In discussing "Lessons Learned," the analyst also stated

that: "Reputational issues surrounding this business demand that we properly

manage it" including "Independence of Research."

    d.    In response to the question of which firms present the toughest competition to an

analyst and what the competition does better, one analyst remarked about the firm

Sanford Bernstein:  "Bernstein also gives us a run because they have equivalent manpower to what we have, but they cover only about half as many stocks and don[']t have any banking business.  We just have an incredibly difficult time beating the thought leadership these guys are able to put back on the table as a result of that focus."

***Analysts' assistance to investment banking.***

26.    An August 2001 presentation to managers of the research division on Research Alignment states: "The individual company coverage provided by Global Investment Research helps drive the majority of the firm's largest businesses, from winning financing deals and advisory business to obtaining orders in the secondary market." The presentation also states: "the Research Alignment process was developed with the goal of quantifying, at the individual company, industry and sector levels, the available revenue opportunities to Goldman Sachs on both the Equities (trading) and IBD (equity issuance, high yield issuance and M&A) sides of the business." On the investment banking side, this assistance included, among other things, identifying potential investment banking opportunities, assisting in pitching investment banking business, and assisting in selling securities being underwritten by Goldman Sachs.

27.    Analysts assisted investment banking at the firm by using their knowledge of particular industry sectors and companies within those sectors to identify potential investment banking opportunities.

28.    An analyst wrote to an investment banker, wanting to "harmonize with you strategically" to pursue an investment banking opportunity with one of the companies in the technology

13

sector that the Research Division wanted to cover. The analyst suggested offering research coverage of the issuer to be in a position to obtain investment banking business.

29.    A widely distributed 2001 e-mail discussed "an *Internal Use Only* report for Investment Banking in the Americas highlighting Research views on potential investment banking activity in each sector." The "report will provide our bankers with a record of our ideas, and credit when our prescience leads to a transaction."

30.    In October 1999, an analyst sent an e-mail thanking equity salespeople and private wealth management representatives at Goldman Sachs for arranging investors for a non-deal roadshow for company management to present a potential share repurchase to potential investors. The day after the roadshow was completed, the company awarded Goldman Sachs a mandate to repurchase 5% of the company's outstanding stock. The analyst told the salespeople and private wealth management representatives: "your efforts have already borne positive fruit" because "Goldman Sachs received the mandate for [this share repurchase] as a direct reward for the work you all did."

### *Assistance in making pitches.*

31.    In an April 20, 2000 e-mail, an investment banker told two analysts at the firm that in preparation for an investment banking pitch to a potential issuer [Loudcloud], that the company suggested that the analysts "come prepared to SELL." The banker proposed that part of the pitch include a draft research report on the potential issuer so that Goldman Sachs could say "we are so excited about the story that we have already begun writing the report." The analyst predicted to the investment bankers: "WE WILL WIN THIS MANDATE!!!"

32.    Frank Governali was credited by a Goldman Sachs banker as the determining factor in

winning an early 2000 IPO for a foreign issuer: "Frank was fully involved in pitching this

and thanks to him, we received a sole-book mandate with Joint lead of [another

investment bank]." Moreover, the banker told other analysts "your input will be critical to

the success of this IPO."

### *Assistance in explaining and marketing IPOs to institutional investor clients.*

33.    Analysts often assisted in marketing the securities to be sold in an IPO. One issuer's

"Lead Banker Selection Criteria" stated: "Need to understand commitment of senior

analysts that they will be the 'lead' research analyst on the deal and in the aftermarket."

This "commitment" was understood to include the following with respect to analysts:

a.    "Spending time personally with the CFO to refine the financial model and define

appropriate IPO and ongoing business metrics."

b.    Assisting with the roadshow presentation.

c.    "They personally will pro-actively market [the issuer] to the institutional

community and be available on a regular basis to respond to institutional investor

questions."

34.    A March 2001 pitchbook stated: "Leverage the role of research in marketing the [issuer's]

story."

35.    An analyst commented about an issuer: "I have been out aggressively telling the story, and

the volume has picked up noticeably." The issuer's stock had moved from $50 on August

2, 2000 to over $60 on August 25, 2000, the day of this e-mail.

15

36.     Responding to complaints by a potential issuer about a downgrade of the sector, an analyst told the potential issuer: "Both [analyst] and I continue to view the [potential issuer] offering in these difficult markets [as] our highest priority, and remain committed to doing everything we can to get us to a successful outcome over the coming days and beyond. . . . We continue to use every opportunity including client discussions of the macro environment to highlight [potential issuer's] short and long-term differentiation against a lot of the public models." The analyst closed by saying: "Again, I want to stress that both [analyst] and I remain committed to the short and long-term success of [potential issuer]."

***The time and effort expended by analysts to assist investment banking efforts varied.***

37.     In self-reported time estimates for 2000, one analyst estimated he spent 40% of his time on investment banking-related activities while another analyst estimated his investment banking-related activities consumed 55% of his time.

38.     Business plans prepared by analysts included an estimate of how much of the analyst's time not devoted to Research would be devoted to each of four divisions of the firm, including Investment Banking and Equities. In 1999, different analysts estimated they would spend between 5% and 75% of their non-Research time on Investment Banking, which included all merger and acquisition and financing activities (dividing 100% of their non-Research time among the four divisions listed in the question).

**Research alignment effectiveness.**

39.     Goldman Sachs's "Global Investment Research IBD Alignment Process" was summarized

16

as follows in 2000: "US Investment Research appears to be on the right track with our IBD alignment initiative."

a.    "[R]esearch analysts, on 429 different occasions, solicited 328 transactions in the first 5 ½ months of this fiscal year."

b.    "Research was involved in 82% of all 'won business' solicitations."

c.    "Research was involved in 49% of 'lost business' solicitations."

d.    "Only 4.3% of all IBD 'lost business' was attributed to lack of research coverage."

e.    "IR [Investment Research] was involved in 31 mergers amounting to $56 billion."

f.    "IR was involved in 209 financing transactions not reported in MarketView amounting to $83 billion."

g.    "In addition to financings, US IR was involved in a significant number of merger advisories, solicitations, and other transactions which have either not yet closed or were not captured [in the] database."

**Influences of investment banking personnel on research and the timing of research coverage.**

40.    In at least some instances, analysts sent drafts of research reports to investment banking before publicizing them. An advance copy of changes to a research report was sent to two employees in the investment banking division for their comments "to speed up the approval process."

41.    One analyst stated in a business plan: "Since our banking ties are so close to each one of the companies mentioned above along with the fact that these companies are direct competitors with each other, it is incredibly difficult to voice strong opinions in these

sectors."

42.     In early 2000, Goldman Sachs investment banking client "Ask Jeeves" expressed concern

that Goldman Sachs had yet to initiate research coverage on the issuer. The issuer e-

mailed Goldman Sachs's investment banker saying its stock was "dropping like a rock,"

and stating: "Our hopes were that a buy coverage from our lead banker might help

stabilize the stock." Goldman Sachs's investment bankers complained to analysts who

stated that "[w]ith research commitment committee approval and an improvement in the

market, research coverage is imminent."

### Discussion of research capabilities in Goldman Sachs pitchbooks.

43.     Some Goldman Sachs investment banking pitches included a discussion of the benefits the

issuers would receive from Goldman Sachs research. In some cases, this included

reference to Goldman Sachs research ratings for other companies covered by Goldman

Sachs analysts.

### Examples of pitches featuring the roles of analysts

44.     An October 2000 pitchbook for GeneProt explained the "[r]ole of investment research

analyst," as "creating the story . . . marketing the story . . . [and] following the story." A

pitchbook for MFS Investment Management included a list of the various ratings provided

by the analyst on the companies he covered, stated a "[g]lobal sales effort led by analysts,"

and contained a diagram of the role of analysts in an initial public offering.

45.     A July 2000 pitchbook to Crown Castle said "Goldman Sachs has been a constant bull on

the tower sector" and stated the fact that "Goldman Sachs has placed Crown Castle on

our Recommended List, our Firm's highest investment rating."

18

46.    Another pitchbook said: "[Goldman Sachs analyst] has sold more stock than any research analyst in the sector." The pitchbook provided a list of other companies covered by the analyst - none had a "Market Underperformer" rating, eight had Market Performer ratings, four were listed as Market Outperformers, and five were on the firm's Recommended List.

### Goldman Sachs's investment bankers had input into research coverage decisions.

47.    Investment banking and equities personnel had input into decisions regarding the initiation and termination of research coverage for certain issuers.

48.    On July 12, 2000, Goldman Sachs assigned a Market Outperformer rating for RSL Communications. By October 11, 2000, the stock had dropped below $1.50 so the analyst sent an e-mail to Frank Governali asking when Goldman Sachs could drop coverage of RSLC. Governali responded: "Good que[s]tion. I'll Call the bankers soon and ask their view."

49.    An investment banker informed an analyst in 2000 that the head of research had approved "dropping coverage of Olympic Steel (ZEUS) and Birmingham Steel (BIR)."

50.    In September 1999, an investment banker sent an e-mail to an analyst stating: "Our list for you to publish on from the IBD front is (in order): . . . ." Five issuers were then listed (four of which were investment banking prospects).

51.    A 360 degree review of one analyst stated: "Initiated coverage of . . . [two examples cited] promptly after being co-manager on the initial public offering. NOT picking up coverage of [another company] as the company stiff-armed IBD when selecting underwriters."

52.    In another 360 degree review of an analyst, an investment banker stated: "we have probably pushed her into research on companies where maybe she shouldn't have been or we did not have the client firmly commit[ed] enough on business before she covered them."

53.    In 2001 an investment banker attempted "to squeeze [an analyst] about accelerating the time frame for picking up [coverage on Time Warner Telecom]."

**Analyst discussions about research.**

54.    In March 2001, an analyst told her supervisor [Governali]: "I don't feel comfortable going on the call and pounding the table when I just can't come up with a way to justify the fact that [MFNX is] trading at 13 times 2001 revenue and I can't think of any catalysts except that it's fundamentally one of the best positioned companies out there and it's reaffirmed [its earnings] guidance." Governali responded to the analyst: "If you can't recommend it now, when it is trading at nearly all time lows[, t]hen it should be pulled from the recommended list." The supervisor then listed multiple things the analyst could use to say good things about the issuer, concluding "while this stock may not soar in the next couple of months, it will probably bounce back a little, and over the next 12 months, significantly outperform. I'll call you in a bit." In the end, MFNX remained on Goldman Sachs's Recommended List until July - when the stock had dropped to $1.60 a share.

55.    On July 21, 2000, Goldman Sachs was preparing to begin research coverage on Storage Networks. The analyst preparing the report said: "The [Discounted Cash Flow] tab of [the financial model] shows these revenues applied, and I cannot by any stretch of a variable come up with a stock price much if at all above the current levels." He asked his

supervisor: "What do we want to do? assign a share scarcity premium? . . . Or do we just

pick it up without a price target and an M[arket] O[utperformer]?" Four days later,

Goldman Sachs initiated coverage with a Market Outperformer rating.

56.    In August 2000, James Golob, the co-head of global telecommunications services, wrote

Frank Governali, the other co-head, about the "anomalous situation where our sector has

been tanking for 3-4 months and we globally still have a majority of stocks as

R[ecommended] L[ist]s as that is all the salesmen and clients care about". Golob suggested

that Governali at least consider the approach he had taken: "In Europe, we have found

that honour is preserved if we have a stock as an M[arket] O[utperformer] and the

companies can't complain because [it's] better than an M[arket] P[erformer]." Governali

agreed, saying he planned "to re-rate most of the CLECs, which is where the problem is

most egregious. The ratings were a residual from [a departed analyst], and I never

changed them, not wanting to disrupt things too much. But, its ridiculous. I've already

met with the bankers, and plan to move most of the companies down to M[arket]

O[utperformer], from R[ecommended] L[ist] before [another analyst] takes over

completely in September. . . . I don't think I would end up leaving only 7.5% as

R[ecommended] L[ist], but the present 68% is ridiculous."

57.    An analyst asked Governali in April 2001 whether she should adjust the "rating and price

target" for 360 Networks since "it is clear that TSIX is worth 0." Governali suggested

that rather than change the rating, they might "eliminate the price target." He expressed

concern that: "Changing the ratings now is probably not a good idea, because from an

outsiders perspective, who doesn't know anything, it may look like a belated ratings

change . . . ." Governali was concerned that CNBC might "[make] fun of [the analyst] on the air."

58.     In August 2000, the issuer Mpower was included in Goldman Sachs's Recommended List. At that time, Mpower's stock price was dropping rapidly. The analysts described the stock drop as "a death spiral." One analyst questioned whether the drop was due to investor concern over management at the company. The analyst covering Mpower, responded that the price drop was "just the stench of reality wafting through the air." The other analyst felt some vindication over the price drop, commenting that Goldman Sachs's investment bankers had maligned him "for lowering the [price] target from stupid heights to the merely absurd."

59.     In May 2001, WorldCom had Goldman Sachs's highest rating. Governali told his counterpart in Europe that he "would have loved to have cut ratings long ago. Unfortunately, we can't cut [AT&T], because we're essentially restricted there. And without cutting [AT&T], there is no consistency in cutting WCOM."

60.     Also in May 2001, Governali told his counterpart in Europe: "2001 estimates among sell side analysts, and company guidance, are still to[o] high for most companies, and long term growth rate assumptions are too high." He said: "As analyst and company expectations fall, we can get more positive again."

61.     In May 2001, Governali apprised an investment banker that an analyst at another firm had just downgraded LVLT [Level 3 Communications]. Governali said he "share[s] many of the same concerns that this analyst has." At this time, and for another six weeks afterwards, Goldman Sachs maintained LVLT at its highest rating - Recommended List.

62.  In a March 26, 2000 e-mail with the heading "GBLX [Global Crossing] - I think they are bullshitting us," an analyst stated that the company's revenue guidance "does not make any sense. . . . I think the answer is they wanted to obscure something sucking cash flow out of the company. . . . They are hiding behind the complexity of their accounting." The issuer remained on Goldman Sachs's Recommended List.

63.  One analyst's self-evaluation in a the 360 degree review stated: "Has subordinated personal preferences on recommendations [citing two examples] for 'commercial' reasons."

### Research ratings.

64.  The percentage of issuers being assigned one of the top two investment ratings (Recommended List or Market Outperformer) ranged from 72% in the first quarter of 1999 to 50% in the last quarter of 2001. The percentage of companies assigned a Market Underperformer rating never rose above 1.1% during this time.

### In some instances Goldman Sachs terminated research coverage on issuers without first having reduced its research ratings.

65.  The number of companies for which Goldman Sachs ceased providing research coverage increased from one in early 1999 to 280 at the end of 2001. Some of these companies may have declared bankruptcy or ceased to exist during this period, while others were dropped because the covering analyst left Goldman Sachs. In some cases, Goldman Sachs ceased covering the company without first having downgraded its rating. A Goldman Sachs analyst asked whether this was the "proper protocol with respect to a bankrupt company."

*Comments to institutional investors, internal observations.*

66.  Between July 1999 and July 2001, WorldCom had Goldman Sachs's highest investment

rating - inclusion on the firm's "Recommended List." As noted above, the Recommended

List rating means "expected to provide price gains of at least 10 percentage points greater

than the market over the next 6-18 months." In April 2001 a hedge fund customer that

had a short-term investment horizon asked Governali: "wcom . . . buy sell or hold here at

[$]20"? Governali responded saying: "sell." Three months later, Goldman Sachs

downgraded the stock one-step to a Market Outperformer rating.

67.  In February 2002, a Goldman Sachs analyst rated Time Warner Telecom as a Market

Performer at a price of $11.75. Again, this rating relates to a time outlook of 6-18

months. On February 21, 2002, the analyst was asked by another hedge fund that had a

short-term investment horizon at what price he would then buy Time Warner Telecom, the

analyst responded: "$0.25," prompting a "wow" from the investor.

68.  On June 21, 2001, the covering analyst downgraded the stock Exodus from a

Recommended List rating to Market Outperformer. Both ratings have a time horizon of

the next 6-18 months. Shortly before the downgrade, the analyst met with at least two

institutional investors who e-mailed the analyst after their meetings:

a.  An institutional investor wrote the analyst on June 21, 2001: "I wanted to write a

quick email to you to THANK you for your candor when you came into our

offices and gave me your teach-in on the company. You gave me the unbiased

view, told me the negatives I needed to know - - and basically gave me the ammo I

needed to prevent my PM from buying the stock [Exodus]."

b.    Another institutional investor wrote the analyst the same day: "I really appreciate your straight forward comments on EXDS during our conversation last week. Looks like our worst concerns were realized yesterday.  Fortunately, we were able to get out of our last piece at around $5 and avoid the recent carnage in the shares. Still painful, but it could have been a lot worse. . . thanks"

69.    A comment about one analyst in a sales force survey said: "His investment recommendations have been abysmal and while I understand he communicates what he really thinks to a sele[c]t few, his public ratings have been an embarrassment to the firm."

70.    In the 2002 analyst review process, an investment banking vice president gave this evaluation of an analyst: "He also understands how to shade his comments to minimize the impact of negative comments."  Another commenter said about this analyst: "highly commercial yet maintains research integrity."

**Draft research reports and expected research ratings were shared by analysts with issuers and Goldman Sachs's investment bankers.**

71.    Goldman Sachs's policy permitted management of covered companies to review draft research reports "as long as any response is limited to correction of factual inaccuracies or general indications as to the accuracy of projections." Analysts were instructed that "the analyst's recommendation paragraph, investment summary, as well as any references to other companies included in the report must be deleted prior to distribution to company management."

72.    Goldman Sachs's policy further permitted analysts to give investment bankers and covered companies a "heads up" on the rating to be assigned to a company after the market closed

25

the day before a report was to issue. "You may convey the conclusions of [pending research] to IBD/Companies outside trading hours. For example, you can alert bankers and companies just before the Morning Call that you are about to make a meaningful change."

73.    In February 2000, an issuer whose securities were being underwritten by Goldman Sachs [Net 2000] was engaged in roadshow presentations to potential investors. During the roadshow period, an analyst sent Net2000 a draft financial model for the company. The issuer then complained to Goldman Sachs's investment bankers that the analyst "did not build a separate model for GS in support of our roadshow . . . [and n]ow our concern is that while GS's current estimates fit within our forecast, there is very little room for error. Specifically, I am requesting that GS estimate a $60M negative EBITDA instead of the current $57M. Our proposed estimate results in only a 10% cushion. I think this will ensure that everyone's interest and credibility is protected." The analyst changed the model to increase the negative EBITDA, but not as much as requested by the issuer.

74.    In March 2001, one of Goldman Sachs's Hong Kong-based research analysts was preparing to issue a sector report on the global underwater communications lines industry - predicting price erosion for companies in that business. An investment banker suggested that the Research Division get input from certain issuers "BEFORE this piece is published." Governali responded: "we wouldn't think of publishing this without direct input from the company and their review of the report."

75.    In September 2000, following news of a possible merger between two large telecommunications providers, Governali wrote a research report on one of the

companies. Because that company was on a list of companies for which Goldman Sachs was then providing advisory services (which could raise regulatory and other issues), he first "had to talk to our bankers and l[a]wyers before it went out."

76. Goldman Sachs initiated research coverage of Amazon.com on November 11, 1999. The previous day, an analyst sent to Amazon a "nearly final draft" of the initial research report. The draft did not include the rating to be assigned by Goldman Sachs, but did include the analyst's evaluative comments and his financial models about the company. Amazon responded with requests that the analyst change some phrases. Most of these comments were incorporated by the analyst before submitting the research report to the firm's compliance department.

77. Goldman Sachs initiated research coverage of Internet equipment provider Equinix on August 17, 2000. A draft of the research call note that omitted the price target and omitted the Market Outperformer rating in all places except one was sent to the company by the analyst on August 16 for comments before it was publicly released.

78. In an August 22, 2000 e-mail, copied to an analyst, an investment banker writes: "[analysts] had a meeting with [WebEx] yesterday (which I attended part of). We discussed initiation strategy and decided that likely to initiate (probably MO, no price target) shortly with a note to be followed with a report by end of next week (given additional info from yesterday's meeting and desire to iterate a bit with the company). [WebEx] was more than happy with that approach as felt be beneficial to stock price to stagger good news.

79. On January 19, 2001, WebEx management wrote to the analyst: "As discussed, I want NO

27

mention of any funding issues in this written report. I told you if people called and asked why your plan shows a need for modest funding, you can verbally tell them that management believes they have adequate funding and it is probably because manageme[nt] has a less conservative plan than you do." The analyst responded, with an attached revised report: "The webx [sic] funding issues is a key area of investor concern, as such will remove any mention from the top section of the note, but will address it in a manner this [sic] is consistent with your recommendation for verbal responses to client inquiries in a later section. To exclude it completely detracts from the intention of the note, which is to address key investor concerns upfront and then give them a reason to buy the stock." WebEx management responded: "Thank you. This is much better. The other note said the company has a funding problem, but we think it isn't very big. This says that the company believes it has enough funds, but there could be a problem; and if there is it will be minor. Thanks again for the change." The research report was issued on January 22, 2001.

80.    In April 2001, an analyst sent a draft research report to Global Crossing Ltd. in advance of public release of the report. She received "extensive comments" from company officials. The analyst wrote Governali that she had "included [the issuer's] extensive comments. . . I also said we had slightly smoothed the negative edge (emphasis section up front and text) from when they saw the report." Moreover, the analyst said she "promised them I'd re-email the final report tonight so they could see our changes." Despite all this, the issuer's officers were still concerned and wanted to talk to Governali "so that 'such an important industry report which is going to have profound implications' will be to their liking."

28

**Goldman Sachs's investment banking division had input into the hiring of
Goldman Sachs's analysts.**

81.    Recruitment of analysts involved input from investment banking among others.

82.    In January 2000, an analyst and an investment banker stated that because Goldman
Sachs's research resources were inadequate in a particular sector, they needed to "[h]elp
prevent Goldman, Sachs & Co. from turning away substantial revenue business." They
proposed that a European analyst be reassigned temporarily to cover the U.S. sector until
a permanent analyst in the U.S. was hired.

83.    In March 2000, Goldman Sachs was considering hiring an analyst from a competing firm.
The day the candidate came to Goldman Sachs to interview, his first interview of the day
was with an investment banker.

84.    An undated Goldman Sachs chart listed analyst openings in each of the firm's research
sectors.  For each vacancy, the chart lists a corresponding "IBD Action Step."  For the PC
Hardware sector, research was ready to hire a candidate, but had to "[c]heck with IBD
team . . . comfort level with proposed analyst experience."  In the CommTech sector,
there was "[c]oncern whether IBD will be comfortable with 'development time period'
(i.e., bringing up to speed an internal hire and resulting suspension of coverage)."  In
Wireless Services, one offer had been extended but, because the offeree also wanted to
bring with him to Goldman Sachs two associates and one assistant, "IBD approval [was]
required for the junior team hire.  Equities is OK."  In the publishing sector, a targeted
replacement had been identified, but "IBD approval required/confirm with [investment
banker.]"  For Taipei Head and CommTech, a written offer required "IBD approval."

29

B.     **GOLDMAN SACHS SUPERVISORY PROCEDURES.**

**Some supervisory procedures were in place, but contacts between investment banking and research were not adequately monitored.**

85.    Goldman Sachs's policy permitted analysts to "respond to generic requests for company or industry information from members of the Investment Banking Division.  For all other requests, the analyst should ask the banker whether the request has been cleared by Research Management.  If the request has not been cleared by Research Management, the analyst must wait until the banker has the appropriate clearance before responding to the request."

86.    In general, during the Relevant Period, Goldman Sachs failed to adopt sufficient procedures and processes to ensure that the interaction between research analysts and investment bankers or covered companies did not expose analysts to pressures or influences from investment banking or covered companies.

87.    While one role of research analysts was to produce objective research, Goldman Sachs also encouraged some analysts to participate in investment banking-related activities.  As a result of their participation in investment banking-related activities, those analysts were subject to pressures or influences from investment banking and covered companies.  Goldman Sachs had knowledge of these pressures or influences yet failed adequately to manage them to protect the objectivity of the firm's published research.

88.    Goldman Sachs's policies during the Relevant Period prohibited "convey[ing] the conclusion of pending research to anyone who does not need to know" (including bankers and covered companies), required that analysts only "disseminate material research . . . via

30

a written product through the regular channels," and proscribed discussing "'material' pending research" which "could include initiations of coverage and changes in ratings, estimates, or price targets" with anyone outside the firm or investment bankers. On certain occasions, these policies were not consistently followed by analysts at the firm.

**Some supervisory procedures were not adequate.**

89.     The procedures or mechanisms in place to monitor or supervise communications (including e-mails) between investment bankers and research analysts were not adequate. Similarly, the procedures or mechanisms to monitor or supervise communications between analysts and covered companies were not adequate. Additionally, there were inadequate procedures or mechanisms to restrict, monitor, or supervise e-mail communications sent by analysts from their home e-mail addresses.

**C.     SUMMARY.**

90.     Goldman Sachs portrayed its research as objective.

91.     At the same time, the reputation and involvement of its analysts in investment banking activities was, at times, a factor used to solicit investment banking business. Analysts assisted in evaluating and marketing certain investment banking business. Goldman Sachs implemented a variety of programs that resulted in close cooperation between research analysts and investment bankers in certain aspects of their work. These included the research alignment initiative, consideration of investment banking comments in performance evaluations of analysts, development of business plans, a firmwide award for cross-selling, and analyst-created lists of investment banking transactions in their sectors. At times, analysts assisted investment banking by identifying potential investment banking

31

opportunities, assisted in pitching investment banking business, and assisted in marketing securities being underwritten by Goldman Sachs.

92.    Goldman Sachs research was subject to pressures or influences by investment bankers. At times, bankers were allowed to review and comment on research reports and pressured analysts about the timing to initiate coverage on specific issuers. At least one analyst felt it was sometimes difficult to voice strong opinions. Some pitchbooks to issuers described how analysts assisted investment banking efforts of the firm in preparing for an underwriting and assisting in marketing IPO securities. Issuers sometimes were told which analysts would be assigned to cover their companies and a list of that analyst's ratings for other companies.

93.    Investment bankers had input into decisions regarding the initiation and termination of research coverage on particular issuers. At times, Research sought approval from investment bankers before dropping coverage and investment bankers suggested certain issuers that Research should be covering. In some instances, analysts dropped coverage of issuers without first having downgraded the rating.

94.    Draft research reports and expected ratings sometimes were shared by analysts with investment bankers and issuers. In some cases, analysts made changes to draft research reports after getting feedback from issuers. Investment bankers also had input into the hiring of Goldman Sachs analysts.

95.    Goldman Sachs did not adequately monitor contacts between research and investment banking. In some cases, the supervisory procedures were not adequate. The procedures in place to monitor communications between analysts and investment bankers or covered

32

companies were not adequate.

## III.

## CONCLUSIONS OF LAW

1.   The Division of Securities has jurisdiction over this matter pursuant to Utah Code Ann.
§§61-1-6 and 61-1-24.

2.   The Utah Uniform Securities Act proscribes the use of dishonest or unethical practices in
the securities business.  Utah Code Ann. §61-1-6(1)(g).  Broker-dealers also are required
to supervise adequately the conduct of its employees and agents.  Utah Code Ann. §61-1-
6(1)(j).

3.   Goldman Sachs failed to ensure that analysts who issued research were adequately
insulated from pressures and influences from covered companies and investment banking.
This conduct was a dishonest or unethical practice under Utah Code Ann. §61-1-6(1)(g).

4.   Goldman Sachs failed reasonably to supervise its employees to ensure that its analysts who
issued research were adequately insulated from pressures and influences from covered
companies and investment banking as required by Utah Code Ann. §61-1-6(1)(j).

5.   Nothing in this Order shall be construed as a finding or admission of fraud.

## IV.

## ORDER

The Division of Securities finds the following relief appropriate and in the public interest. On the basis of the Findings of Fact, Conclusions of Law, and Goldman Sachs's consent to the entry of this Order, for the sole purpose of settling this matter, prior to a hearing and without admitting or denying any of the Findings of Fact or Conclusions of Law,

IT IS HEREBY ORDERED:

1.  This Order concludes the investigation by the Division of Securities and any other action that the Division of Securities could commence under the Utah Uniform Securities Act on behalf of Utah as it relates to Goldman Sachs, relating to certain research or banking practices at Goldman Sachs.

2.  Goldman Sachs will CEASE AND DESIST from violating the Utah Uniform Securities Act and will comply with the Utah Uniform Securities Act in connection with the research practices referenced in this Order.

3.  Goldman Sachs shall pay the sum of $250,000 to the Utah Division of Securities as a civil monetary penalty. This amount shall be paid into the Securities Investor Education and Training Fund as provided by Utah Code Ann. § 61-1-18.7.

4.  Goldman Sachs shall comply with the undertakings of Sections I, II, and IV of Addendum A, which is attached and incorporated herein by reference.

5.  If payment is not made by Goldman Sachs or if Goldman Sachs defaults in any of its obligations set forth in this Order, the Division of Securities may vacate this Order, at its sole discretion, upon 10 days notice to Goldman Sachs and without opportunity for

administrative hearing.

6.     This Order is not intended by the Division of Securities to subject any Covered Person to

any disqualifications under the laws of any state, the District of Columbia or Puerto Rico

(collectively, "State"), including, without limitation, any disqualifications from relying

upon the State registration exemptions or State safe-harbor provisions.  "Covered Person"

means Goldman Sachs, or any of its officers, directors, affiliates, current or former

employees, or other persons that would otherwise be disqualified as a result of the Orders

(as defined below).

7.     The SEC Final Judgment, the NYSE Stipulation and Consent, the NASD Letter of

Acceptance, Waiver and Consent, this Order and the order of any other state in related

proceedings against Goldman Sachs (collectively, the "Orders") shall not disqualify any

Covered Person from any business that they otherwise are qualified, licensed or permitted

to perform under the applicable law of Utah and any disqualifications from relying upon

this state's registration exemptions or safe-harbor provisions that arise from the Orders are

hereby waived.

8.     For any person or entity not a party to this Order, this Order does not limit or create any

private rights or remedies against Goldman Sachs including, without limitation, the use of

any e-mails or other documents of Goldman Sachs or of others regarding research

practices, limit or create liability of Goldman Sachs or limit or create defenses of Goldman

Sachs to any claims.

9.     Nothing herein shall preclude the state of Utah, its departments, agencies, boards,

commissions, authorities, political subdivisions and corporations, other than the Division

of Securities and only to the extent set forth in paragraph 1 above, (collectively, "State Entities") and the officers, agents or employees of State Entities from asserting any claims, causes of action, or applications for compensatory, nominal and/or punitive damages, administrative, civil, criminal, or injunctive relief against Goldman Sachs in connection with certain research and/or banking practices at Goldman Sachs.

10.    Goldman Sachs agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to payment made pursuant to any insurance policy, with regard to all penalty amounts that Goldman Sachs shall pay pursuant to this Order or Section II of the SEC Final Judgment, regardless of whether such penalty amounts or any part thereof are added to the Distribution Fund Account referred to in the SEC Final Judgment or otherwise used for the benefit of investors. Goldman Sachs further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any state, federal or local tax for any penalty amounts that Goldman Sachs shall pay pursuant to this Order or Section II of the SEC Final Judgment, regardless of whether such penalty amounts or any part thereof are added to the Distribution Fund Account referred to in the SEC Final Judgment or otherwise used for the benefit of investors. Goldman Sachs understands and acknowledges that these provisions are not intended to imply that Utah would agree that any other amounts Goldman Sachs shall pay pursuant to the SEC Final Judgment may be reimbursed or indemnified (whether pursuant to an insurance policy or otherwise) under applicable law or may be the basis for any tax deduction or tax credit with regard to any state, federal or local tax.

36

Dated this _____ day of April, 2003.

BY ORDER OF THE DIVISION OF SECURITIES

_____
S. ANTHONY TAGGART, Director
Division of Securities

37

**BY THE SECURITIES ADVISORY BOARD:**

The foregoing Order is hereby accepted, confirmed, and approved by the Utah Securities

Advisory Board.

DATED This 22nd day of April, 2003.

_____
Henry Autry

_____
John R. Jackson

_____
Richard M. Smiley

_____
W. Rex Thornton

_____
A. Robert Thorup

## CONSENT TO ENTRY OF ADMINISTRATIVE ORDER BY
## GOLDMAN, SACHS & CO.

Goldman, Sachs & Co. hereby acknowledges that it has been served with a copy of this

Administrative Order, has read the foregoing Order, is aware of its right to a hearing and appeal in

this matter, and has waived the same.

Goldman, Sachs & Co. admits the jurisdiction of the Division of Securities, neither admits

nor denies the Findings of Fact and Conclusions of Law contained in this Order; and consents to

entry of this Order by the Division of Securities as settlement of the issues contained in this Order.

Goldman, Sachs & Co. states that no promise of any kind or nature whatsoever was made

to it to induce it to enter into this Order and that it has entered into this Order voluntarily.

Gregory K. Palm represents that he is a Managing Director and General Counsel of

Goldman, Sachs & Co. and that, as such, has been authorized by Goldman, Sachs & Co. to enter

into this Order for and on behalf of Goldman, Sachs & Co.

Dated this __21ˢᵗ__ day of April, 2003.

Goldman, Sachs & Co.

By:    Gregory K. Palm
Title:    Managing Director and General Counsel

SUBSCRIBED AND SWORN TO before me this 21ˢᵗ day of April, 2003.

Notary Public

My Commission expires:
STEPHANIE G. WHEELER
Notary Public, State of New York
No. 02WH6004899
Qualified in New York County
Commission Expires March 3, 2006

39

## Addendum A

## Undertakings

The firm shall comply with the following undertakings:

**I.    Separation of Research and Investment Banking**

1.  <u>Reporting Lines</u>.  Research and Investment Banking will be separate units with entirely separate reporting lines within the firm – i.e., Research will not report directly or indirectly to or through Investment Banking.  For these purposes, the head of Research may report to or through a person or persons to whom the head of Investment Banking also reports, provided that such person or persons have no direct responsibility for Investment Banking or investment banking activities.

   a.  As used throughout this Addendum, the term "firm" means the Respondent, Respondent's successors and assigns (which, for these purposes, shall include a successor or assign to Respondent's investment banking and research operations), and their affiliates, other than "exempt investment adviser affiliates."

   b.  As used throughout this Addendum, the term "exempt investment adviser affiliate" means an investment adviser affiliate (including for these purposes, a separately identifiable department or division that is principally engaged in the provision of investment advice to managed accounts as governed by the Investment Advisers Act of 1940 or investment companies under the Investment Company Act of 1940) having no officers (or persons performing similar functions) or employees in common with the firm (which, for purposes of this Section I.1.b, shall not include the investment adviser affiliate) who can influence the activities of the firm's Research personnel or the content of the firm's research reports; provided that the firm (i) maintains and enforces written policies and procedures reasonably designed to prevent the firm, any controlling persons, officers (or persons performing similar functions), or employees of the firm from influencing or seeking to influence the activities of Research personnel of, or the content of research reports prepared by the investment adviser affiliate; (ii) obtains an annual independent assessment of the operation of such policies and procedures; and (iii) does not furnish to its customers research reports prepared by the investment adviser affiliate or otherwise use such investment adviser affiliate to do indirectly what the firm may not do directly under this Addendum.

   c.  As used throughout this Addendum, the term "Investment Banking" means all firm personnel engaged principally in investment banking activities, including the solicitation of issuers and structuring of public offering and other investment banking transactions.  It also includes all firm personnel who are directly or indirectly supervised by such persons and all personnel who

directly or indirectly supervise such persons, up to and including Investment Banking management.

d.  As used throughout this Addendum, the term "Research" means all firm personnel engaged principally in the preparation and/or publication of research reports, including firm personnel who are directly or indirectly supervised by such persons and those who directly or indirectly supervise such persons, up to and including Research management.

e.  As used throughout this Addendum, the term "research report" means any written (including electronic) communication that is furnished by the firm to investors in the U.S. and that includes an analysis of the common stock, any security convertible into common stock, or any derivative thereof, including American Depositary Receipts (collectively, "Securities"), of an issuer or issuers and provides information reasonably sufficient upon which to base an investment decision; provided, however, that a "research report" shall not include:

   i.  the following communications, if they do not include (except as specified below) an analysis, recommendation or rating (e.g., buy/sell/hold, under perform/market perform/outperform, underweight/market weight/overweight, etc.) of individual securities or issuers:

      1.  reports discussing broad-based indices, such as the Russell 2000 or S&P 500 index;

      2.  reports commenting on economic, political or market (including trading) conditions;

      3.  technical or quantitative analysis concerning the demand and supply for a sector, index or industry based on trading volume and price;

      4.  reports that recommend increasing or decreasing holdings in particular industries or sectors or types of securities; and

      5.  statistical summaries of multiple companies' financial data and broad-based summaries or listings of recommendations or ratings contained in previously-issued research reports, provided that such summaries or listings do not include any analysis of individual companies; and

   ii. the following communications, even if they include information reasonably sufficient upon which to base an investment decision or a recommendation or rating of individual securities or companies:

2

1. an analysis prepared for a current or prospective investing customer or group of current or prospective investing customers by a registered salesperson or trader who is (or group of registered salespersons or traders who are) not principally engaged in the preparation or publication of research reports; and

2. periodic reports, solicitations or other communications prepared for current or prospective investment company shareholders (or similar beneficial owners of trusts and limited partnerships) or discretionary investment account clients, provided that such communications discuss past performance or the basis for previously made discretionary investment decisions.

2. <u>Legal/Compliance</u>.  Research will have its own dedicated legal and compliance staff, who may be a part of the firm's overall compliance/legal infrastructure.

3. <u>Budget</u>.  For the firm's first fiscal year following the entry of the Final Judgment in the SEC's action against Respondent in a related proceeding ("Final Judgment") and thereafter, Research budget and allocation of Research expenses will be determined by the firm's senior management (e.g., CEO/Chairman/management committee, other than Investment Banking personnel) without input from Investment Banking and without regard to specific revenues or results derived from Investment Banking, though revenues and results of the firm as a whole may be considered in determining Research budget and allocation of Research expenses. On an annual basis thereafter, the Audit Committee of the firm's holding/parent company (or comparable independent persons/group without management responsibilities) will review the budgeting and expense allocation process with respect to Research to ensure compliance with this requirement.

4. <u>Physical Separation</u>.  Research and Investment Banking will be physically separated. Such physical separation will be reasonably designed to prevent the intentional and unintentional flow of information between Research and Investment Banking.

5. <u>Compensation</u>.  Compensation of professional Research personnel will be determined exclusively by Research management and the firm's senior management (but not including Investment Banking personnel) using the following principles:

a. Investment Banking will have no input into compensation decisions.

b. Compensation may not be based directly or indirectly on Investment Banking revenues or results; provided, however, that compensation may relate to the revenues or results of the firm as a whole.

3

c.  A significant portion of the compensation of anyone principally engaged in the preparation of research reports (as defined in this Addendum) that he or she is required to certify pursuant to the U.S. Securities and Exchange's Regulation Analyst Certification ("Regulation AC") (such person hereinafter a "lead analyst") must be based on quantifiable measures of the quality and accuracy of the lead analyst's research and analysis, including his or her ratings and price targets, if any.  In assessing quality, the firm may rely on, among other things, evaluations by the firm's investing customers, evaluations by the firm's sales personnel and rankings in independent surveys.  In assessing accuracy, the firm may use the actual performance of a company or its equity securities to rank its own lead analysts' ratings and price targets, if any, and forecasts, if any, against those of other firms, as well as against benchmarks such as market or sector indices.

d.  Other factors that may be taken into consideration in determining lead analyst compensation include:  (i) market capitalization of, and the potential interest of the firm's investing clients in research with respect to, the industry covered by the analyst; (ii) Research management's assessment of the analyst's overall performance of job duties, abilities and leadership; (iii) the analyst's seniority and experience; (iv) the analyst's productivity; and (v) the market for the hiring and retention of analysts.

e.  The criteria to be used for compensation decisions will be determined by Research management and the firm's senior management (not including Investment Banking) and set forth in writing in advance.

f.  Research management will document the basis for each compensation decision made with respect to (i) anyone who, in the last 12 months, has been required to certify a research report (as defined in this Addendum) pursuant to Regulation AC; and (ii) anyone who is a member of Research management (except in the case of senior-most Research management, in which case the basis for each compensation decision will be documented by the firm's senior management).

On an annual basis, the Compensation Committee of the firm's holding/parent company (or comparable independent persons/group without management responsibilities) will review the compensation process for Research personnel.  Such review will be reasonably designed to ensure that compensation decisions have been made in a manner that is consistent with these requirements.

6.  Evaluations.  Evaluations of Research personnel will not be done by, nor will there be input from, Investment Banking personnel.

7.  Coverage.  Investment Banking will have no input into company-specific coverage decisions (i.e., whether or not to initiate or terminate coverage of a particular

company in research reports furnished by the firm), and investment banking revenues or potential revenues will not be taken into account in making company-specific coverage decisions; provided, however, that this requirement does not apply to category-by-category coverage decisions (e.g., a given industry sector, all issuers underwritten by the firm, companies meeting a certain market cap threshold).

8.  <u>Termination of Coverage</u>.  When a decision is made to terminate coverage of a particular company in the firm's research reports (whether as a result of a company-specific or category-by-category decision), the firm will make available a final research report on the company using the means of dissemination equivalent to those it ordinarily uses; provided, however, that no final report is required for any company as to which the firm's prior coverage has been limited to purely quantitative analysis. Such report will be comparable to prior reports, unless it is impracticable for the firm to produce a comparable report (e.g., if the analyst covering the company and/or sector has left the firm). In any event, the final research report must disclose: the firm's termination of coverage; and the rationale for the decision to terminate coverage.

9.  <u>Prohibition on Soliciting Investment Banking Business</u>.  Research is prohibited from participating in efforts to solicit investment banking business. Accordingly, Research may not, among other things, participate in any "pitches" for investment banking business to prospective investment banking clients, or have other communications with companies for the purpose of soliciting investment banking business.

10. <u>Firewalls Between Research and Investment Banking</u>.  So as to reduce further the potential for conflicts of interest or the appearance of conflicts of interest, the firm must create and enforce firewalls between Research and Investment Banking reasonably designed to prohibit all communications between the two except as expressly described below:

    a.  Investment Banking personnel may seek, through Research management (or an appropriate designee with comparable management or control responsibilities ("Designee")) or in the presence of internal legal or compliance staff, the views of Research personnel about the merits of a proposed transaction, a potential candidate for a transaction, or market or industry trends, conditions or developments. Research personnel may respond to such inquiries on these subjects through Research management or its Designee or in the presence of internal legal or compliance staff. In addition, Research personnel, through Research management or its Designee or in the presence of internal legal or compliance staff, may initiate communications with Investment Banking personnel relating to market or industry trends, conditions or developments, provided that such communications are consistent in nature with the types of communications that an analyst might have with investing customers. Any communications between Research and Investment Banking personnel must not be made for the purpose of having Research personnel identify specific potential investment banking transactions.

5

b. In response to a request by a commitment or similar committee or subgroup thereof, Research personnel may communicate their views about a proposed transaction or potential candidate for a transaction to the committee or subgroup thereof in connection with the review of such transaction or candidate by the committee. Investment Banking personnel working on the proposed transaction may participate with the Research personnel in these discussions with such committee or subgroup. However, the Research personnel also must have an opportunity to express their views to the committee or subgroup outside the presence of such Investment Banking personnel.

c. Research personnel may assist the firm in confirming the adequacy of disclosure in offering or other disclosure documents for a transaction based on the analysts' communications with the company and other vetting conducted outside the presence of Investment Banking personnel, but to the extent communicated to Investment Banking personnel, such communication shall only be made in the presence of underwriters' or other counsel on the transaction or internal legal or compliance staff.

d. After the firm receives an investment banking mandate, or in connection with a block bid or similar transaction, Research personnel may (i) communicate their views on the structuring and pricing of the transaction to personnel in the firm's equity capital markets group, which group's principal job responsibility is the pricing and structuring of transactions (including by participating with the firm's equity capital markets group in the preparation of internal-use memoranda and other efforts to educate the sales force), and (ii) provide to such personnel other information obtained from investing customers relevant to the pricing and structuring of the transaction.

e. Research personnel may attend or participate in a widely-attended conference attended by Investment Banking personnel or in which Investment Banking personnel participate, provided that the Research personnel do not participate in activities otherwise prohibited herein.

f. Research and Investment Banking personnel may attend or participate in widely-attended firm or regional meetings at which matters of general firm interest are discussed. Research management and Investment Banking management may attend meetings or sit on firm management, risk or similar committees at which general business and plans (including those of Investment Banking and Research) and other matters of general firm interest are discussed. Research and Investment Banking personnel may communicate with each other with respect to legal or compliance issues, provided that internal legal or compliance staff is present.

g. Communications between Research and Investment Banking personnel that are not related to investment banking or research activities may take place without restriction.

6

11. Additional Restrictions on Activities By Research and Investment Banking Personnel.

    a.  Research personnel are prohibited from participating in company or Investment Banking-sponsored road shows related to a public offering or other investment banking transaction.

    b.  Investment Banking personnel are prohibited from directing Research personnel to engage in marketing or selling efforts to investors with respect to an investment banking transaction.

12. Oversight. An oversight/monitoring committee or committees, which will be comprised of representatives of Research management and may include others (but not personnel from Investment Banking), will be created to:

    a.  review (beforehand, where practicable) all changes in ratings, if any, and material changes in price targets, if any, contained in the firm's research reports;

    b.  conduct periodic reviews of research reports to determine whether changes in ratings or price targets, if any, should be considered; and

    c.  monitor the overall quality and accuracy of the firm's research reports;

provided, however, that Sections I.12.a and I.12.b of this Addendum shall not be required with respect to research reports limited to purely quantitative analysis.

## II.    Disclosure/Transparency and Other Issues

1. Disclosures. In addition to other disclosures required by rule, the firm must disclose prominently on the first page of any research report and any summary or listing of recommendations or ratings contained in previously-issued research reports, in type no smaller than the type used for the text of the report or summary or listing, that:

    a.  "[Firm] does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report."

    b.  With respect to Covered Companies as to which the firm is required to make available Independent Research (as set forth in Section III below): "Customers of [firm] can receive independent, third-party research on the company covered in this report, at no cost to them, where such research is available. Customers can access this independent research at [website address/hyperlink] or can call [toll-free number] to request a copy of this research."

    c. "Investors should consider this report as only a single factor in making their investment decision."

2. <u>Transparency of Analysts' Performance</u>. The firm will make publicly available (via its website, in a downloadable format), no later than 90 days after the conclusion of each quarter (beginning with the first full calendar quarter that commences at least 120 days following the entry of the Final Judgment), the following information, if such information is included in any research report (other than any research report limited to purely quantitative analysis) prepared and furnished by the firm during the prior quarter: subject company, name(s) of analyst(s) responsible for certification of the report pursuant to Regulation AC, date of report, rating, price target, period within which the price target is to be achieved, earnings per share forecast(s), period(s) for which such forecast(s) are applicable (e.g., 3Q03, FY04, etc.), and definition/explanation of ratings used by the firm.

3. <u>Applicability</u>. Except as specified in the second and third sentences of this Section II.3, the restrictions and requirements set forth in Sections I [Separation of Research and Investment Banking] and Section II [Disclosure/Transparency and Other Issues] of this Addendum will only apply in respect of a research report that is both (i) prepared by the firm, and (ii) that relates to either (A) a U.S. company, or (B) a non-U.S. company for which a U.S. market is the principal equity trading market; provided, however, that such restrictions and requirements do not apply to Research activities relating to a non-U.S. company until the second calendar quarter following the calendar quarter in which the U.S. market became the principal equity trading market for such company. Notwithstanding the foregoing, Section I.7 [Coverage] of this Addendum will also apply to any research report (other than the Independent Research made available by the firm pursuant to Section III [Independent, Third-Party Research]of this Addendum) that has been furnished by the firm to investors in the U.S., but not prepared by the firm, but only to the extent that the report relates to either (A) a U.S. company, or (B) a non-U.S. company for which a U.S. market is the principal equity trading market. Also notwithstanding the foregoing, Section II.1 [Disclosures] of this Addendum will also apply to any research report (other than the Independent Research made available by the firm pursuant to Section III of this Addendum) that has been furnished by the firm to investors in the U.S., but not prepared by the firm, including a report that relates to a non-U.S. company for which a U.S. market is not the principal equity trading market, but only to the extent that the report has been furnished under the firm's name, has been prepared for the exclusive or sole use of the firm or its customers, or has been customized in any material respect for the firm or its customers.

    a. For purposes of this Section II.3, the firm will be deemed to have furnished a research report to U.S. investors in the U.S. if the firm has made the research report available to investors in the U.S. or has arranged for someone else to make it available to investors in the U.S.

b. For purposes of this Section II.3, a "U.S. company" means any company incorporated in the U.S. or whose principal place of business or headquarters is in the U.S.

c. For purposes of this Section II.3, the calendar quarter in which a non-U.S. company's "principal equity trading market" becomes the U.S. market is a quarter when more than 50% of worldwide trading in the company's common stock and equivalents (such as ordinary shares or common stock or ordinary shares represented by American Depositary Receipts) takes place in the U.S. Trading volume shall be measured by publicly reported share volume.

4. <u>General</u>.

a. The firm may not knowingly do indirectly that which it cannot do directly under this Addendum.

b. The firm will adopt and implement policies and procedures reasonably designed to ensure that its associated persons (including but not limited to the firm's Investment Banking personnel) cannot and do not seek to influence the contents of a research report or the activities of Research personnel for purposes of obtaining or retaining investment banking business. The firm will adopt and implement procedures instructing firm personnel to report immediately to a member of the firm's legal or compliance staff any attempt to influence the contents of a research report or the activities of Research personnel for such a purpose.

5. <u>Timing</u>. Unless otherwise specified, the restrictions and requirements of this Addendum will be effective within 120 days of the entry of the Final Judgment, except that Sections I.5 [Compensation], I.6 [Evaluations], I.7[Coverage], I.8[Termination of Coverage], I.9 [Prohibition on Soliciting Investment Banking Business], I.11 [Additional Restrictions on Activities by Research and Investment Banking Personnel], and II.4(a) [General subpart a)] and II.7 [Superseding Rules and Amendments] of this Addendum will be effective within 60 days of the entry of the Final Judgment, and Sections II.1.b [Disclosures (subpart b)] and III [Independent, Third-Party Research]of this Addendum will be effective within 270 days of the entry of the Final Judgment.

6. <u>Review of implementation</u>.

a. The firm will retain, at its own expense, an Independent Monitor acceptable to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office to conduct a review to provide reasonable assurance of the implementation and effectiveness of the firm's policies and procedures designed to achieve compliance with the terms of this Addendum. This review will begin 18 months after the date of the entry of the Final Judgment. The Independent Monitor will produce a written report of its review, its findings as to the implementation and effectiveness of the firm's policies and

9

procedures, and its recommendations of other policies or procedures (or amendments to existing policies or procedures) as are necessary and appropriate to achieve compliance with the requirements and prohibitions of this Addendum. The report will be produced to the firm and the Staff of the SEC, the NYSE and the NASD within 30 days from the completion of the review, but no later than 24 months from the date of entry of the Final Judgment. (The SEC Staff shall make the report available to the President of NASAA and the New York Attorney General's Office upon request.) The Independent Monitor shall have the option to seek an extension of time by making a written request to the Staff of the SEC.

b.  The firm will have a reasonable opportunity to comment on the Independent Monitor's review and proposed report prior to its submission, including a reasonable opportunity to comment on any and all recommendations, and to seek confidential treatment of such information and recommendations set forth therein to the extent that the report concerns proprietary commercial and financial information of the firm. This report will be subject to the protections from disclosure set forth in the rules of the SEC, including the protections from disclosure set forth in 5 U.S.C. § 552(b) (8) and 17 C.F.R. § 200.80(b) (8), and will not constitute a record, report, statement or data compilation of a public office or agency under Rule 803(8) of the Federal Rules of Evidence.

c.  The firm will adopt all recommendations contained in the written report of the Independent Monitor; provided, however, that as to any recommendation that the firm believes is unduly burdensome or impractical, the firm may demonstrate why the recommended policy or procedure is, under the circumstances, unreasonable, impractical and/or not designed to yield benefits commensurate with its cost, or the firm may suggest an alternative policy or procedure designed to achieve the same objective, and submit such explanation and/or alternative policy or procedure in writing to the Independent Monitor and to the Staff of the SEC. The firm and the Independent Monitor shall then attempt in good faith to reach agreement as to any policy or procedure as to which there is any dispute and the Independent Monitor shall reasonably evaluate any alternative policy or procedure proposed by the firm. If an agreement on any issue is not reached, the firm will abide by the determinations of the Staff of the SEC (which shall be made after allowing the firm and the Independent Monitor to present arguments in support of their positions), and adopt those recommendations the Staff of the SEC deems appropriate.

d.  The firm will cooperate fully with the Independent Monitor in this review, including making such non-privileged information and documents available, as the Independent Monitor may reasonably request, and by permitting and requiring the firm's employees and agents to supply such non-privileged information and documents as the Independent Monitor may reasonably request.

e. To ensure the independence of the Independent Monitor, the firm (i) shall not have the authority to terminate the Independent Monitor without the prior written approval of the SEC staff; and (ii) shall compensate the Independent Monitor, and persons engaged to assist the Independent Monitor, for services rendered pursuant to this Order at their reasonable and customary rates.

f. For the period of engagement and for a period of three years from completion of the engagement, the Independent Monitor shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with the firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any entity with which the Independent Monitor is affiliated or of which he/she is a member, and any person engaged to assist the Independent Monitor in performance of his/her duties under this Order shall not, without prior written consent of the Staff of the SEC, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of three years after the engagement.

g. Five years after the date of the entry of the Final Judgment, the firm shall certify to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office, that the firm has complied in all material respects with the requirements and prohibitions set forth in this Addendum or, in the event of material non-compliance, will describe such material non-compliance.

7. Superseding Rules and Amendments. In the event that the SEC adopts a rule or approves an SRO rule or interpretation with the stated intent to supersede any of the provisions of this settlement, except Section IV [Investor Education] the SEC or SRO rule or interpretation will govern with respect to that provision of the settlement and such provision will be superseded. In addition, the SEC, NYSE, the NASD, the New York Attorney General's Office and any State that incorporates this Addendum into its settlement of related proceedings against the Respondent agrees that the SEC Staff may provide interpretive guidance with respect to the terms of the settlement, except for Section IV [Investor Education], as requested by the firm and that, subject to Court approval, the SEC and the firm may agree to amend or modify any term of the settlement, except for Section IV [Investor Education], in each case, without any further action or involvement by any other regulator in any related proceeding. With respect to any term in Section I or II of this Addendum that has not been superseded (as set forth above) within five years of the entry of the Final Judgment, it is the expectation of Respondent, the SEC, NYSE, NASD, New York Attorney General's Office and the States that the SEC would agree to an amendment or modification of such term, subject to Court approval, unless the SEC believes such amendment or modification would not be in the public interest.

8. <u>Other Obligations and Requirements</u>. Except as otherwise specified, the requirements and prohibitions of this Addendum shall not relieve the firm of any other applicable legal obligation or requirement.

## III.   Independent, Third-Party Research

1. <u>Obligation to Make Available</u>. Each year, for the period ending five years after the effective date of this Section III (as set forth in Section II.5 [Timing] of this Addendum), the firm will be required to contract with no fewer than three independent providers of research ("Independent Research Providers") at a time in order to procure and make available Independent Research (as defined below) to the firm's customers in the U.S. as set forth below. There is, however, no requirement that there be at least three Independent Research Providers for the Common Stock of each Covered Company (as those terms are defined below):

   a. For common stock and equivalents (such as ordinary shares or common stock or ordinary shares represented by American Depositary Receipts) listed on a U.S. national securities exchange or quoted in Nasdaq (such securities hereinafter, collectively, "Common Stock") and covered in the firm's research reports (other than those limited to purely quantitative analysis) (an issuer of such covered Common Stock hereinafter called a "Covered Company"), the firm, through an Independent Consultant (as discussed below) will use its reasonable efforts to procure, and shall make available to its customers in the U.S., Independent Research on such Covered Company's Common Stock. (If the Independent Research Providers drop coverage or do not timely pick up coverage of the Common Stock of a Covered Company, the firm will not be in violation of any of the requirements in this Section III, and may continue to disseminate its own research reports on the Common Stock of the Covered Company without making available any Independent Research on the Common Stock of the Covered Company, if the firm takes reasonable steps to request that the Independent Consultant procure such coverage promptly.)

      i. For purposes of this Section III, the firm's research reports include research reports that have not been prepared by the firm, but only to the extent that such reports have been furnished under the firm's name, have been prepared for the exclusive or sole use of the firm or its customers, or have been customized in any material respect for the firm or its customers.

      ii. A non-U.S. company for which a U.S. market is not the principal equity trading market shall only be considered a Covered Company if in the calendar quarter ended March 31, 2003, or in any subsequent calendar quarter during the period that the firm's obligations to procure and make available Independent Research

12

under this Section III are effective, the publicly reported, average daily dollar volume of U.S. trading in such company's Common Stock (measured by multiplying the publicly reported, average daily share volume of U.S. trading during the quarter by the closing price per share of the Common Stock on the last day of the quarter), exceeded $2.5 million, and (b) the outstanding total public float of the Common Stock as of the last day of such calendar quarter exceeded $150 million. Further, the firm's obligation to procure and make available Independent Research with respect to such company shall become effective at the later of: (a) 90 days after the end of the calendar quarter in which the company met the foregoing trading and public float tests; or (b) the effective date of this Section III.

b.  For purposes of this Section III, Independent Research means (i) a research report prepared by an unaffiliated person or entity, or (ii) a statistical or other survey or analysis of research reports (including ratings and price targets) issued by a broad range of persons and entities, including persons and entities having no association with investment banking activities, which survey or analysis has been prepared by an unaffiliated person or entity.

c.  The firm will adopt policies and procedures reasonably designed to ensure that, in connection with any solicited order for a customer in the U.S. relating to the Common Stock of a Covered Company, and if Independent Research on the Covered Company's Common Stock is available, the registered representative will have informed the customer, during the solicitation, that the customer can receive Independent Research on the Covered Company's Common Stock at no cost to the customer (the "Notice Requirement").

d.  Notwithstanding the foregoing, the Notice Requirement will not apply to (i) the solicitation of an institutional customer (an entity other than a natural person having at least $10 million invested in securities in the aggregate in its portfolio and/or under management) unless such customer, after due notice and opportunity, has advised the firm that it wishes to have the Notice Requirement apply to it (any customer who has not so advised the firm is hereinafter referred to as a "Non-Participating Institutional Customer"); (ii) orders as to which discretion was exercised, pursuant to a written discretionary account agreement or written grant of trading authorization; or (iii) a solicitation by an entity affiliated with the Respondent if such entity does not furnish to its customers research reports under the firm's name, prepared by the firm for the exclusive or sole use of the firm or its customers, or research reports that have been customized in any material respect for the firm or its customers.

e. Each trade confirmation sent by the Respondent to a customer with respect to an order as to which the Notice Requirement applies will set forth (or will be accompanied by a separate statement, which shall be considered part of the confirmation, that will set forth), as of the time the trade confirmation is generated, the ratings, if any, contained in the firm's own research reports and in Independent Research procured for the firm with respect to the Common Stock of the Covered Company that is the subject of the order.

f. Each periodic account statement sent by the Respondent to a customer in the U.S. that reflects a position in the Common Stock of a Covered Company will set forth (or will be accompanied by a separate statement, which shall be considered part of the periodic account statement, that will set forth), as of the end of the period covered by the statement, the ratings, if any, contained in the firm's own research reports and in the Independent Research made available by the firm on the Common Stock of each such Covered Company; provided, however, that this requirement will not apply to Non-Participating Institutional Customers or discretionary accounts.

g. Notice of the availability of Independent Research on Covered Companies' Common Stock will also be included prominently in the periodic account statements of the Respondent's customers in the U.S., in the firm's research reports, and on the firm's website.

h. The firm will make the Independent Research available to its customers in the U.S. using, for each customer, the means of dissemination equivalent to those it uses to provide the customer with the firm's own research reports, unless the firm and customer agree on another means of dissemination; provided, however, that nothing herein shall require or authorize the firm to comply with the Notice Requirement or make available or disseminate Independent Research at a time when doing so would violate Section 5 of the Securities Act of 1933 or the other provisions of the federal securities laws or the rules and regulations thereunder. If and to the extent the firm is able to make available or disseminate its own research reports on the Common Stock of a Covered Company pursuant to Rule 137, Rule 138(a) or Rule 139(a) under the Securities Act of 1933 and in reliance on Regulation M under the Securities Exchange Act of 1934, then the firm is also authorized and required to make available or disseminate Independent Research on the Common Stock of such Covered Company (even if the Independent Research does not meet the requirements of such Rule). Notwithstanding this Section III.1.h, if the firm determines, because of legal, compliance or similar concerns, not to furnish or make available its own research reports on the Common Stock of a Covered Company for a limited period of time,

it shall not be required to make available the Independent Research on such Covered Company for such period of time.

i. If, during the period that the firm's obligations to procure and make available Independent Research under this Section III are effective, the firm terminates coverage of the Common Stock of a Covered Company, the firm, through its Independent Consultant, will make reasonable efforts to continue to procure and make available Independent Research on the Common Stock of such company for a period of at least 18 months after termination of coverage (subject to expiration of the firm's obligations under this Section III).

j. The firm will not be responsible or liable for (i) the procurement decisions of the Independent Consultant (as discussed in Section III.2 [Appointment of Independent Consultant to Oversee the Procurement of Independent Research] of this Addendum) with respect to the Independent Research, (ii) the Independent Research or its content, (iii) customer transactions, to the extent based on the Independent Research, or (iv) claims arising from or in connection with the inclusion of Independent Research ratings in the firm's confirmations and periodic account statements, to the extent such claims are based on those ratings. The firm will not be required to supervise the production of the Independent Research procured by the Independent Consultant and will have no responsibility to comment on the content of the Independent Research. The firm may advise its customers of the foregoing in its discretion.

k. The Independent Consultant will not be liable for (i) its procurement decisions, (ii) the Independent Research or its content, (iii) customer transactions, to the extent based on the Independent Research, or (iv) claims arising from or in connection with the inclusion of Independent Research ratings in the firm's confirmations and periodic account statements, to the extent such claims are based on those ratings, unless the Independent Consultant has carried out such duties in bad faith or with willful misconduct. The firm will indemnify the Independent Consultant for any liability arising from the Independent Consultant's good-faith performance of its duties as such.

2. <u>Appointment of Independent Consultant to Oversee the Procurement of Independent Research</u>. Within 30 days of the entry of the Final Judgment, an Independent Consultant acceptable to the SEC Staff, the NYSE, the NASD, the President of NASAA, the New York Attorney General and the firm shall be named to oversee the procurement of Independent Research from Independent Research Providers. The Independent Consultant will have the final authority (following consultation with the firm and in accordance with the criteria set forth in Section III.3 [Selection of Independent Research Providers] of this Addendum) to procure the Independent Research. The Independent Consultant will not have had any significant financial

15

relationship with the firm during the prior three years and may not have any financial relationship with the firm for three years following his or her work as the Independent Consultant. The Independent Consultant's fee arrangement will be subject to the approval of the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office. In the event that an Independent Consultant must be replaced, the replacement shall be acceptable to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, the New York Attorney General's Office and the firm, and shall be subject to these same conditions.

3.  <u>Selection of Independent Research Providers</u>. The Independent Consultant will seek to procure research reports on the Common Stock of all Covered Companies from Independent Research Providers. Independent Research Providers may not perform investment banking business of any kind and may not provide brokerage services in direct and significant competition with the firm. In addition, the Independent Consultant will use the following criteria in selecting and contracting with Independent Research Providers to provide Independent Research.

   a.  whether and to what extent the Independent Research Provider or any of its affiliates or associated persons is engaged in activities (including, but not limited to, activities involving Covered Companies or their securities), or has a business or other relationship with the firm or any of its affiliates or associated persons, that may conflict or create the appearance of conflict with its preparation and publication of the Independent Research;

   b.  the desirability of multiple coverage of certain Covered Companies (e.g., by size of company, industry sector, companies underwritten by the firm, etc.);

   c.  the extent to which the Independent Research Provider has a client base and revenue stream broad enough to ensure its independence from the firm;

   d.  the utility of the Independent Research Provider's Independent Research to the firm's customers, including the inclusion of ratings and price targets in such research and the extent to which the firm's customers actually use the research; and with respect to surveys or analyses described above in Section III.1.b(ii), the extent to which the Independent Research provides customers with a means of comparing the firm's research reports to those published by other persons and entities, including persons and entities having no association with investment banking activities;

   e.  the quality and accuracy of the Independent Research Provider's past research, including during the term of the Independent Consultant's tenure;

f. the experience, expertise, reputation and qualifications (including, as appropriate, registrations) of the Independent Research Provider and its personnel; and

g. the cost of the Independent Research, especially in light of the five-year period set forth in Section III.1 above for the firm to make Independent Research available to its investing customers.

4. <u>Disclosure Language</u>. Language substantially to the effect set forth below may be used by the firm and its registered representatives to inform the firm's customers of the availability of Independent Research:

a. {Disclosure to customers as required by Section III.1.c [Obligation to Make Available subpart c] of this Addendum.}

"There is also independent, third-party research available on this company, which you can get at no cost [from our website/hyperlink] or by calling [toll-free number], or which I can arrange to send to you if you would like."

b. {General website and periodic customer account statement disclosure as required by Section III.1.g. [Obligation to Make Available subpart g] of this Addendum.}

"Independent, third-party research on certain companies covered by the firm's research is available to customers of [firm] at no cost. Customers can access this research at [our website/hyperlink] or can call [toll-free number] to request that a copy of this research be sent to them."

5. <u>Annual Reporting</u>. The Independent Consultant will report annually to the Staff of the SEC, the NYSE, the NASD, the President of NASAA, and the New York Attorney General's Office on its selection of Independent Research Providers, the Independent Research it has procured, the cost of the Independent Research it has procured to date, and the Independent Consultant's fees and expenses to date.

## IV. Investor Education

1. <u>General.</u> The firm will pay a total of $10,000,000, payable in five equal installments on an annual basis (with the first payment to be made 90 days after the entry of the Final Judgment), to funds earmarked for investor education. Of this money, a total of $5,000,000 shall be paid pursuant Firm's agreement with the SEC, NYSE and NASD. The remainder of the funds earmarked for investor education, in the amount of $5,000,000, shall be paid to the Investor Education Fund at the Investor Protection Trust, a Wisconsin charitable trust, pursuant to agreement with the Board of Directors

17

of NASAA, to be used for the purpose of investor education as described in Section IV.3.

2.  Payments to the Investor Education Fund.

    a.  As referenced in Section IV.1 above, Firm shall pay the amount of $5,000,000 in five equal annual installment payments as designated by the NASAA Board of Directors to the Investor Education Fund ("the Fund") to be held as a separate fund by the Investor Protection Trust, 411 East Wisconsin Avenue, Milwaukee, WI 53202-4497, c/o Quarles & Brady. The amount for investor education to be paid by Firm to the Fund may be reduced due to the decision of any state(s) not to enter into a settlement with Firm.

    b.  Firm shall make the first such installment payment within ninety (90) days after the entry of the Final Judgment. This payment shall be made by wire transfer to the Investor Protection Trust at US Bank NA, Milwaukee, WI, ABA #075000022 for credit for the Trust Division Account 112-950-027, for further credit to the Investor Protection Trust Account Number 000012891800 together with a cover letter identifying Firm as a respondent in this action and the payment designated for the Investor Education Fund. Firm shall simultaneously transmit photocopies of its payment and letter to the President of NASAA, 10 G Street NE, Washington, DC 20002. By making this payment, and those payments referenced in Section IV.2.c. below, Firm relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Firm. The Fund shall be administered in accordance with the terms of the investor education plan.

    c.  Firm shall make subsequent installment payments annually on or before the month and day of the entry of the Final Judgment. Such payments shall be made into the Fund at the Investor Protection Trust as described in Section IV.2(b).

3.  Purpose of and Limitations on the Use of the Fund.

    a.  The Fund (including all installment payments) shall be used to support programs designed for the purpose of investor education and research and education with respect to the protection of investors, and to equip investors with the knowledge and skills necessary to make informed investment decisions and to increase personal financial literacy. The Investor Protection Trust, in cooperation with NASAA, shall establish an investor education plan designed to achieve these purposes.

18

b. No principal or income from the Fund shall:

    (i)     inure to the general fund or treasury of any State;

    (ii)    be utilized to pay the routine operating expenses of NASAA; or

    (iii)   be utilized to pay the compensation or expenses of state officials or state employees except such expenses as are necessary to fulfill the purposes of the Fund.

c. Monies in the Fund may also be used to pay any taxes on income earned by such Fund. Firm shall provide the Investor Protection Trust with relevant information and otherwise cooperate with the Investor Protection Trust in fulfilling the Fund's obligations under applicable law.

d. All fees, costs, and expenses incurred by the Investor Protection Trust in connection with and incidental to the performance of its duties under this Addendum, including the fees, costs, and expenses of any persons engaged to assist it and all administrative fees, costs, and expenses related to the investor education plan shall be paid out of the Fund.

19