# EXHIBIT M

## NASD
## LETTER OF ACCEPTANCE, WAIVER AND CONSENT
## NO. CAF030021

TO:    Department of Enforcement
        NASD

RE:    Lehman Brothers Inc., Respondent, CRD No. 7506

Pursuant to Rule 9216 of the NASD Code of Procedure, Respondent Lehman Brothers Inc. ("Respondent" or "Lehman") submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described in Part II below. This AWC is submitted on the condition that, if accepted, NASD will not bring any future actions against Respondent alleging violations based on the same factual findings.

Respondent understands that:

1.    Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by NASD's Department of Enforcement and National Adjudicatory Council ("NAC"), pursuant to NASD Rule 9216;

2.    If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondent; and

3.    If accepted:

    a.    this AWC will become part of Respondent's permanent disciplinary record and may be considered in any future actions brought by NASD or any other regulator against Respondent;

    b.    this AWC will be made available through NASD's public disclosure program in response to public inquiries about Respondent's disciplinary record;

    c.    NASD may make a public announcement concerning this agreement and the subject matter thereof in accordance with NASD Rule 8310 and IM-8310-2; and

    d.    Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any allegation in this AWC or creating the impression that the AWC is without factual basis. Nothing in this provision affects the testimonial obligations or right of

Respondent to take legal or factual positions in litigation or other legal proceedings in which NASD is not a party.

Respondent also understands that its experience in the securities industry and disciplinary history may be factors that will be considered in deciding whether to accept this AWC:

**Lehman Brothers Inc.** is a broker-dealer and has been a member of NASD since 1960. Lehman is a wholly owned subsidiary of Lehman Brothers Holdings Inc., a Delaware corporation. Lehman's principal offices are located at 745 Seventh Avenue, New York, New York. Lehman provides the full range of services offered by a multi-purpose investment bank, including equity and fixed income sales, trading and research, investment banking, private equity and private client sales.

Lehman has no relevant disciplinary history.

I.

## WAIVER OF PROCEDURAL RIGHTS

Respondent specifically and voluntarily waives the following rights granted under NASD's Code of Procedure:

A.     To have a Formal Complaint issued specifying the allegations against it;

B.     To be notified of the Formal Complaint and have the opportunity to answer the allegations in writing;

C.     To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.     To appeal any such decision to the NAC and then to the U.S. Securities and Exchange Commission ("Commission") and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of Rule 9143 or the separation of functions prohibitions of Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

2

II.

## ACCEPTANCE AND CONSENT

Lehman hereby accepts and consents, without admitting or denying the allegations or findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of NASD, or to which NASD is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by NASD:

**A.    Summary**

From at least July 1999 through at least June 2001, Lehman held out its equity research as providing independent stock recommendations and independent analysis of stocks based on the investment merits of the stocks being evaluated. In fact, Lehman's research analysts were, at times, confronted with pressures and conflicts of interest stemming from Lehman's desire to obtain investment banking business from covered companies.

Lehman used research to obtain investment banking business from covered companies. Specifically, Lehman tied the financial compensation of analysts directly and indirectly to the analyst's success in generating investment banking revenue from covered companies. In addition, Lehman also used the promise of future research coverage to obtain valuable IPO underwriting business and marketed to companies the ability of Lehman analysts to move the market for a stock. Lehman analysts were subject to conflicts of interest that, at times, adversely impacted the independence of Lehman's research product.

In certain instances, the financial incentives and pressure on analysts to assist in obtaining investment banking deals and to maintain banking relationships adversely affected the integrity of the analysts' ratings, price targets, and research reports, and caused analysts to issue more positive reports or ratings, and to avoid downgrades or negative reports regarding companies that were investment banking clients.

As a result of the conduct described herein, Lehman violated several NASD Conduct Rules.

**B.    Background**

**1.    The Investment Banking Function at Lehman**

Lehman is a global investment bank providing financial advisory, capital markets and underwriting services, among other services, to its clients. From at least July 1999 through at least June 2001, Lehman's investment banking department ("Investment Banking"), among other activities, engaged in securities offerings, including initial public offerings ("IPOs"), secondary offerings and debt financings, and provided merger and acquisition and other advisory services for its clients.

3

From at least July 1999 through at least June 2001, Lehman competed vigorously with other investment banks to be selected as the lead manager for securities offerings, in part because of the financial rewards associated with that role. In addition, Lehman hoped to gain ongoing transactional and advisory work from existing and potential clients, including secondary offerings and financial advisory arrangements. In 2001, Lehman served as lead manager for sixty-six equity deals, and earned approximately $1.3 billion from underwriting services.

## 2.    Lehman's Global Equity Research Department

During 1999 and 2000, Lehman's Equity Research Department ("Research") employed approximately 400 people and expanded to 600 employees in 2001, including approximately 100 senior research analysts and 200 junior research analysts. During 2001, Research covered approximately 80 industries and approximately 900 U.S. companies. Senior research analysts in the United States reported to the Director of U.S. Equity Research, who reported to the Managing Director of Global Equity Research.

Research analysts collect financial and other information about a company and its industry, analyze that information, and develop recommendations and ratings regarding a company's securities. In addition, research analysts also examine the financial condition of selected publicly traded companies that are believed to be of potential investment value. Lehman analysts also make evaluations of companies' expected earnings, revenue and cash flow, operating and financial strengths and weaknesses, and long term viability and dividend potential. Lehman analysts produced written research materials including research reports and First Call notes regarding companies and industry sectors.

Lehman's research was distributed to both institutional clients and retail investors. Lehman distributed its research product directly to its own client base, comprised of institutional investors and high net worth individual retail investors. In June 1999, Lehman entered into a "strategic alliance" with Fidelity Investments. Among other things, the "strategic alliance" provided Fidelity's retail customers with access to Lehman's research, along with other independent research. Lehman also sold its research product to other broker-dealers that in turn provided the research to their retail customers. Lehman also made its research available to the public through services such as Thomson Financial/First Call and Multex.com, Inc. Ratings of Lehman's analysts were freely and publicly available to retail clients through a number of media outlets.

At the top of its research reports that were devoted to specific stocks, Lehman assigned to the stock a "rank" according to a 5-point scale reflecting how the analyst believed the stock would perform relative to the market generally. During the period June 1999 through December 2000, Research used the following ratings: 1-Buy (expected to outperform the market by 15 or more percentage points), 2 – Outperform (expected to outperform the market by 5 –15 percentage points), 3 – Neutral (expected to perform in line with the market, plus or minus 5 percentage points), 4 – Underperform

(expected to underperform the market by 5 –15 percentage points), 5 – Sell (expected to underperform the market by 15 or more percentage points).  In January 2001, Lehman changed the names of these ratings to 1-Strong Buy, 2-Buy, 3-Market Perform, 4-Market Underperform and 5-Sell.  The definitions remained the same.  The definitions for the ratings were provided to Lehman clients on a monthly basis.  Commencing in March 2001, the definitions appeared on all of Lehman's research reports.

Although Lehman purported to rank stocks according to a 5-point scale, in fact, during the relevant period Lehman analysts never assigned a 5-Sell rating to a domestic company and almost never assigned a 4-Underperform to a stock.

Lehman's research reports also assigned to the stock a price target designed to reflect the price at which the analyst believed the stock would trade within a time period that was identified in some reports and unidentified in others.  Commencing in March 2001, the relevant time period for the price target appeared in Lehman's research reports.

## C.   Lehman's Research Analysts Were Subjected To Conflicts Of Interest Arising From Lehman's Use Of Research To Obtain Investment Banking Business

Lehman held out its research analysts as providing independent recommendations and analysis of companies and stocks upon which investors could rely in reaching investment decisions.  Lehman promoted its research for the "quality and timeliness of its investment recommendations."

In fact, Lehman's research analysts were, at times, subjected to conflicts of interest arising from the close relationship between Research and Investment Banking.  Such conflicts of interest, at times, adversely impacted the independence of Lehman's public stock recommendations.

### 1.   Lehman Used Research To Obtain Investment Banking Business

Analysts worked closely with members of Investment Banking and other departments to generate business for Lehman.  Analysts often worked with Investment Banking to identify corporate finance opportunities and to win corporate finance business for Lehman, including identifying private companies appropriate for an IPO as well as identifying possible transactions, such as secondary offerings or debt financings, once a company had completed an IPO.  To this end, analysts were expected to have yearly target and alignment meetings with their Investment Banking counterparts.

Lehman aligned its analysts with an Investment Banking team.  Analysts' responsibilities included providing research to their Investment Banking counterparts so that the bankers could leverage the research product into a full service relationship with a company.

Recognizing the strategic importance of this alignment, on August 5, 1999, Lehman's Managing Director of Global Equity Research circulated a memorandum to Global Research Directors (the "August 5 Memorandum"), which detailed key areas of "strategic importance." The memorandum concluded that in order for Lehman to be more profitable, Investment Banking and Research should work together to increase Lehman's number of equity originations, stating:

> Investment Banking Partnership – This is a key challenge for not only research but the entire global equities business. Increasing our equity origination will be one of the most important accomplishments of the firm. One of the most significant ways we will increase the equity division's total revenue to more than $2 billion is by substantially increasing origination.

The August 5 Memorandum also set forth a "new paradigm" for Lehman's investment banking relationships, stating:

> the analyst is THE key driver of the firm relationship with its corporate client base. Analysts need to accept responsibility and use it to expand the franchise and **DRIVE PROFITABILITY EVERY DAY BUT IN A WAY THAT IS CONSISTENT WITH BUILDING A LONG TERM FRANCHISE.** (Emphasis in original.)

The August 5 Memorandum emphasized the research analyst's role in identifying potential banking business for Lehman stating: "global research must drive the banking targeting efforts, consistent with the 'new paradigm.'" The August 5 Memorandum stated further: "to ensure we have proper recognition of analysts' impact on banking, we have to closely track every dollar of IBD revenue (equity, M&A, and debt) by analyst."

On September 14, 1999, the Managing Director of Global Equity Research again emphasized the importance of the Investment Banking/Research partnership in a memo directed to "Coverage Analysts." "Coverage Analysts" were provided with an attachment dated September 13, 1999 entitled "1 + 1 = $" (the "September 13 Attachment") that advised them that the successful partnership of Research and Investment Banking was a key to Lehman's growth as a firm. The first page of the September 13 Attachment contained a chart reflecting that an "enhanced Banking/Research partnership" would strengthen brand perception, increase origination fee share and ultimately lead to a higher Lehman stock price.

The September 13 Attachment explained numerous ways in which Lehman Research and Investment Banking could be beneficial to each other and stated that "seamless Banking/Research coverage" was critical to all Investment Banking products. The attachment also contained a chart captioned "Secret to Success -- Lehman Wins Business When Banking And Research Are Aligned." The September 13 Attachment explained that the Research/Investment Banking partnership at Lehman would be institutionalized through executive committee support, targeting and alignment, full

partnership accountability between bankers and research analysts, and reinforced through compensation.

The September 13 Attachment also instructed that bankers and research analysts would be required to complete performance reviews of their counterparts. Research analysts would be evaluated on, among other things, "the extent to which the analyst places origination as [a] priority" and "adds value in building banking business," and the analyst's "effectiveness in [the] pitching process."

Finally, the September 13 Attachment explained that Lehman would reinforce the partnership of Research and Banking through compensation. Analyst compensation would be "impacted by contribution to banking" and "reviewed with appropriate banking group heads." The primary criterion in evaluating analyst compensation would be Investment Banking Revenue.

As part of the relationship between Investment Banking and Research, analysts often communicated with their Investment Banking counterparts several times a week, or even daily. These communications included identifying banking opportunities for Lehman. For example, on July 7, 2000 one senior analyst wrote the following email to members of Investment Banking:

> FYI, I have recently come across several great companies in the wireless data services industry, an incredibly hot sector for most technology investors. ... In my view, we as a firm (tech & telecom) should get all over this sector . . . I think we should be very coordinated in attacking this banking windfall.

In another instance, on September 21, 2000 that same analyst wrote an email to a company to offer research coverage in exchange for naming Lehman as a co-manager on a deal stating:

> since the announcement of the Chase/JPM merger, I'm sure you've come to the same realization that the merger would result in just one firm covering your stock . . . If . . . the loss of one analyst is of concern, was wondering if the opportunity is available to add a jnr [sic] co-manager to ensure same number of coverage analysts.

Investment bankers at times suggested that analysts issue positive research coverage on a company to help the bankers win business. Investment bankers would sometimes recommend potential banking clients to Lehman's research analysts. Lehman's investment bankers understood that if Lehman's research department would cover a potential banking client, this could strengthen Lehman's chances to obtain banking business from that client. For example, on October 4, 2000 a banker sent the following email to an analyst:

> Spoke with [a Worlstor employee]. Here's the scoop and what we need to do. They are meeting with other bankers over the next 4 days . . . They like [Salomon] because of their research report. Action plan for us includes: . . .We need to say [Lehman's analyst] is publishing a big storage ssp report and we

would like to make Worlstor the feature of the report like Solly did MSI and Storagenetworks. . . .

[Analyst] you need to call (the CEO) and the CFO at least 3 times between now and the Board meeting . . .The message is we luv you and have been waiting for you.  [Analyst] your call and enthusiasm is key.

Another banker wrote the following email to investment bankers and analysts on June 29, 2000:

Our competition on the CPQ debt deal is likely the following . . . Given their stock price action after today's downgrade by [SSB], we are the highest equity recommendation.  The bottom line is that they need a very strong story around their credit and we, with [analyst] are in the best position to deliver.

Investment bankers also routinely reviewed drafts of analysts' research reports before publication for several purposes including to insure that the reports were consistent with generating investment banking revenue from the covered company.

## 2.    Lehman Gave Its Analysts Financial Incentives To Use Research To Generate Investment Banking Revenue

Lehman tied the compensation of senior research analysts to the amount of Investment Banking revenue the analyst helped to generate.  Lehman analysts typically received relatively small base salaries and considerably larger bonuses.  Bonuses were determined by, among other factors, the amount of Investment Banking revenue generated by companies the analysts covered.  The bonuses Lehman paid to analysts dwarfed their base salaries and gave the analysts a strong personal financial incentive to obtain Investment Banking business.  This compensation structure, which in part linked analyst compensation to investment banking business, created conflicts of interest.

### a.    Certain Analyst Employment Contracts Tied Bonuses Directly To Investment Banking Revenue

Six of Lehman's approximately 100 senior research analysts had employment contracts that linked their bonuses directly to Investment Banking revenue generated by companies they covered.  Depending on the contract, the analyst's entire bonus or an additional Investment Banking Department ("IBD") bonus was paid based on the aggregate IBD net revenues and fees generated by companies covered by the analyst or by companies where the analyst significantly contributed to the Investment Banking business.

For example, one analyst's contract provided for an annual salary of $200,000, and a minimum bonus of $4.8 million.  The minimum bonus could increase in $1 million increments, based on the Aggregate IBD Net Revenues and Fees for the performance year as follows:

8

| Minimum Bonus | Aggregate IBD Net Revenues and Fees |
|---|---|
| $4.8 million | Less than $50 million |
| $5.8 million | At least $50 million but less than $75 million |
| $6.8 million | At least $75 million but less than $100 million |
| $7.8 million | At least $100 million but less than $125 million |
| $8.8 million | $125 million or more |

Aggregate IBD Net Revenues and Fees were defined as revenues and fees booked or received by Lehman from companies covered by the analyst or from companies whose award of business to Lehman was attributable to the analyst's "significant contribution."

Another analyst's contract provided for the payment of a yearly salary of $200,000, a minimum bonus of $3.3 million and an additional bonus equal to 5% of Investment Banking revenues and fees generated by companies covered by the analyst or companies where the analyst substantially contributed to the award of Investment Banking business.

### b.    Lehman Compensated Other Analysts Based In Part On Their Contribution To Investment Banking Revenue

Analysts who did not have specific clauses in their contracts related to Investment Banking revenue were nevertheless compensated financially if companies they covered generated Investment Banking revenue.

The Director of U.S. Equity Research applauded analysts for generating Investment Banking business. In an email dated January 21, 2001 an analyst described that he had arranged a meeting between Lehman analysts and investment bankers and a large blue chip company. The analyst explained that his relationship with the company resulted in Investment Banking receiving ten potential projects for the company. The Director of U.S. Equity Research congratulated the analyst in an email dated January 22, 2001 stating "well done, we need senior bankers to see who (the analysts) have the real relationships with the big companies. This is how we justify big comp. packages."

Lehman also monitored the Investment Banking revenue that analysts generated. For example, Lehman maintained a document titled "Performance Review"

that, among other information, kept track of the Investment Banking and trading revenue attributable to each senior analyst.  Senior analysts were shown the Performance Review during their reviews.

For each analyst, Investment Banking also generated a spreadsheet known as a "Project Review" that identified Investment Banking projects with revenue booked for the year and projects expected to generate revenue in the next year.  The Director of U.S. Equity Research used the Project Reviews in conducting both mid-year and year-end evaluations for senior analysts.

Senior analysts also frequently provided lists of the Investment Banking deals they had worked on during the year to the Director of U.S. Equity Research in connection with consideration of their year-end bonuses.  For example, in December 1999 one senior analyst (who did not have an Investment Banking revenue clause in his contract) wrote in an email to the Director of U.S. Equity Research that his research accomplishments and banking revenue were relevant to his compensation.  In describing his research accomplishments, the analyst noted that he had written frequently on a company and the company had raised $430 million in equity and high yield financing through Lehman.  The analyst also noted that he had written frequently about another company and, as a result, Lehman was going to appear "out of order" on the cover of a convertible deal and had a "good shot" at leading an upcoming equity deal.  With respect to banking revenue, the analyst wrote:

> I believe the revenues generated by my universe generated at least as much as other research universes, excluding the Delta Three IPO (which RSL's CEO will tell I (sic) was a key part of why LB won the books [Delta Three was covered by another analyst] and for which I believe I should get credit.

One senior analyst sent an email on February 9, 2000 to Lehman's Managing Director of Global Research and the Director of U.S. Equity Research requesting a promotion to vice president.  In support of this request, the analyst wrote, among other things, that the analyst's estimated Investment Banking revenue for the year 2000 was greater than $5 million and added "1999 Banking Revenue $1.2M solely due to research relationship."

In addition, senior analysts were required to complete business plans each year.  The business plan included an entire section devoted to banking and asked analysts to identify the transactions they are working on or foresee for the coming year.  The business plans asked senior analysts to report:

- their plan to add stocks to coverage for either sales and trading and/or banking;

- whether Research/Banking target and alignment discussions were reflected in the business plan; and

- whether analysts had completed the selection of "franchise and super league clients" with their bankers.

Investment bankers participated in analyst evaluations by providing written comments on a form titled "Year End Performance Review for Analysts (to be completed by Bankers)" to the heads of Research. Bankers were asked to evaluate:

- Whether the analyst places origination as a priority;

- The analyst's contribution toward building relationships with clients in the sector;

- The analyst's effectiveness in the pitching process;

- The quality of the analyst's reputation with banking clients; and

- The analyst's level of initiative in providing the banker with value-added ideas for banking clients.

The bankers' comments were relayed to analysts during their reviews. For example, one senior analyst's review stated the analyst "cares a great deal about competing for business and winning." Another senior analyst's review stated "strong originator/rainmaker," "strong pitchman" and "very supportive of banking effort; coordinate with banking team on targeting major clients."

Analysts were also criticized at times if they failed to work closely with Investment Banking. For example, in one instance, a senior analyst was encouraged to have more frequent contact with her Investment Banking counterpart.

One analyst sent a memorandum dated December 22, 1999 to the Managing Director of Global Equity Research and the Director of U.S. Equity Research stating that he was "'surprised'" by the review he received from an investment banker (the "December 22 Memorandum"). As a result, the analyst met with the investment banker in order to receive feedback and "improve the relationship between research and investment banking."

The analyst described his meeting with the banker in the December 22 Memorandum stating:

[Banker] has concluded, after seeing me for 2-3 months (based on two pitches and other feedback) that I may not have the capabilities to be a "banking analyst"; i.e., telling companies what they want to hear and not what I think!" . . .

Both parties acknowledge that the Ansell pitch was ineffectual. I should not have been there to start with – despite the potential fee! I was told that the bankers working on the pitch were "upset" that I would not present their material . . . Ansell had an inherent growth rate of 0-2% as compared to Merrill's forecast of 10% per annum. A major fee was "lost."

11

The analyst also commented that the bankers told him "that the analysts need to be available at extremely short notice to assist in pitch meetings." The analyst defended himself, in part, by commenting that he spent an "inordinate" amount of time on other banking prospects.

Finally, the analyst listed several steps for the future to improve his relationship with Investment Banking and stated:

> during my one year tenure at [another bank], we tripled our M&A business. I created a fundamental research 'halo effect' for 'banking-oriented' analysts. I believe banking could further leverage our sector research into the VC community (and elsewhere).

## D.    Lehman Used The Promise Of Future Research Coverage To Obtain Investment Banking Business

Lehman used the promise of future research coverage to obtain Investment Banking business. Implicit in Lehman's marketing efforts was the assurance that Lehman's research would be favorable and that Lehman's research would raise the price of the issuer's stock.

Lehman competed with other investment banks for selection as lead underwriter for securities offerings, including IPOs, secondary offerings and debt offerings. As part of this competition, Lehman met with companies to present its qualifications. Research analysts sometimes attended these meetings, often referred to as "pitch" meetings, with members of Investment Banking in an effort to win Investment Banking business for Lehman. Lehman research analysts typically advised companies how best to position and market the company's story to investors.

At such meetings, Lehman often presented companies with marketing materials known as pitchbooks that touted Lehman's underwriting qualifications. The pitchbooks typically featured the Lehman analyst who would be covering the company after a banking transaction and stated that the analyst would issue research on the company as soon as the "quiet period" (a period of time after an offering during which the underwriting firms cannot publish research) ended. The pitchbooks on occasion provided examples of how coverage by the analyst had been viewed favorably by the market and had a positive impact on a company's stock price.

For example, a pitchbook for the Zymogenetics potential IPO promised that the analyst would issue a comprehensive report on the company twenty-five days after pricing (at the end of the quiet period), would regularly educate investors on the company's story and would publish reports and notes on the company on a timely basis. The pitchbook also promised that Lehman would provide "pricing, trading and aftermarket support" by, among other things, providing on-going research coverage. Under the heading "Preliminary Terms and Marketing Conditions," the pitchbook stated that the analyst would provide "high quality research support critical to a strong aftermarket."

A pitchbook for a Dyax PIPE offering described Lehman's prior research support of the company following its IPO, noting that Lehman had issued "8 notes and one extremely comprehensive report on [company], as compared to 5 notes and 1 report by [co-manager], and 2 notes and 1 report by [co-manager]." The pitchbook also noted that "Lehman's Equity Analysts . . . have been strong supporters of the stock," adding that since the analysts published their research report the stock had increased twenty percent.

The pitchbooks often noted the analyst's role in marketing the offering. Some pitchbooks listed research as a term of the underwriting and stated that the "[analyst] will lead a powerful marketing campaign." The Zymogenetics pitchbook described the analyst as the "preeminent force" in the biotechnology sector and stated that the analyst has "outsold other analysts in previous equity offerings," and "outsold the other co-managers." Other pitchbooks described the analyst as the "axe" in the industry and provided numerous examples of how the analyst's positive coverage had positively impacted a company's stock price.

For example, a pitchbook for Yadayada dated November 10, 2000 contained a section entitled "[Analyst] Moves Markets" and contained graphs for two companies, Triton and Alamosa, covered by the analyst. The graph subtitled "[Analyst] Moves Triton" demonstrated a decrease in stock price following the analyst's downgrade of Triton and an increase in the stock price following an upgrade by the analyst. Similarly, the graph subtitled "[Analyst] Upgrades Alamosa" shows an increase in Alamosa's stock price following a voicemail blast by the analyst to clients reiterating the analyst's buy recommendation.

Similarly, a pitchbook for Texas Instruments dated June 2000 included a graph of Micron Technology's stock price demonstrating that the stock price increased after the analyst re-initiated coverage and rose again when the analyst raised earnings per share ("EPS") targets. The pitchbook also contained a graph of Intel's stock reflecting price increases after the analyst re-initiated coverage and again when the analyst raised the EPS target. Other pitchbooks contained similar statements about the manner in which the market received Lehman's research.

The decision whether Lehman would initiate research coverage of a company was often tied to the opportunity for Lehman to earn Investment Banking fees from the covered company. For example, in February 2000, Lehman bankers questioned a delay in Lehman initiating research on Curagen Corporation following Lehman's participation in a convertible bond offering by Curagen. The analyst had explained he needed more time and more meetings with the company before issuing a report. The bankers then questioned the delay in an email to the Director of U.S. Equity Research who responded that the analyst was doing a great job given his many responsibilities, and asked the bankers:

> [W]hen did we decide to promise equity research for a small convertible bond deal. What were the economics & how much did we make.

One of the bankers responded to the question, stating:

> We made $1.5m in banking and Lehman made $12m as of last Thursday. The real question is could we just put a note out that would satisfy the company and get us in the next deal.

On other occasions, the Director of U.S. Equity Research received inquiries from Lehman employees on behalf of officers of public companies seeking to have Lehman initiate research coverage of their company. The Director of U.S. Equity Research responded by directing such inquiries to Investment Banking. For example, in February 2000, the Director of U.S. Equity Research advised a Lehman employee in an email:

> the proper process is to introduce the principals to someone in investment banking. If we have the resources and there appears to be significant revenue potential, banking will request research.

Similarly, in October 1999 the Director of U.S. Equity Research advised another Lehman employee in an email:

> doing business is not enough, we need to do a lot of business to commit resources. Finally, you should find a contact in banking to channel these requests as well.

In another email in March 2000, an analyst explained to his product manager his reason for initiating coverage on a stock listed only in Mexico that will be of "little interest to our US institutional salesforce." The analyst wrote:

> The reason for coverage is there is a potential banking deal (big $$$) we're trying to get later this year. The bankers just want the report out. They don't care about promoting the stock and realize it is of little interest to my client base.

**E.    Conflicts Of Interest, At Times, Resulted In The Publication Of Exaggerated Or Unwarranted Research**

The relationship between Investment Banking and Research as described herein at times created conflicts of interest for Lehman's research analysts. At times, the financial incentives and pressure on analysts to assist in obtaining investment banking deals and to maintain banking relationships adversely affected the integrity of the analysts' ratings, price targets, and research reports. As the following examples demonstrate, these conflicts of interest caused analysts, at times, to issue more positive research reports or ratings, and to avoid downgrades or negative reports regarding companies that were investment banking clients.

**1.    Razorfish, Inc.**

Lehman co-managed the IPO for Razorfish, Inc. ("Razorfish") in April 1999. The Razorfish IPO was priced on April 26, 1999 at $16 per share and opened for trading on April 27, 1999 at $56 per share but ended the day at $35 per share. On May 3, 1999,

with Razorfish trading at $37 per share, the Lehman analyst confided to an institutional investor in emails that he was not sure of the rating and price to assign to the company when he initiated coverage.  The institutional investor replied:

> unless you anticipate Lehman getting I-banking business from them, I would rate them neutral with a price target of $20 (especially if you read the last half of the WSJ article on them last week, which pointed out that their business lacks any real depth).

The analyst responded:

> Well, they are a banking client, so I expect a 2 rating with a price target just a shade above the trading price.

The institutional investor and the analyst discussed the effect of the conflict of interest on the analyst's research in the following exchange:

> Institutional Investor:  I understand – business is business.  But I feel bad for those naïve investors who assume that sell-side analysts are objective!  I wish some buy-side institutions would get together to establish an independent equity research consortium with analysts paid for on a subscription basis or something …

> Analyst:  well, ratings and price targets are fairly meaningless anyway, buy-side generally ignores, commentary is what matters and I'll be a 3-Neutral in my comments . . . but, yes, the "little guy" who isn't smart about the nuances may get misled, such is the nature of my business.

On May 24, 1999, with Razorfish trading at $36, Lehman initiated coverage of Razorfish with a 2-Buy rating and a price target of $48.

## 2.    RSL Communications, Inc.

Lehman had a substantial Investment Banking relationship with RSL Communications, Inc. ("RSL").  Lehman was a joint lead underwriter in a high yield note placement by RSL in December 1998, provided advisory services in October 1999, was the lead underwriter when RSL spun off Delta Three Communications, Inc. in an IPO in November 1999 and co-managed two debt offerings for RSL in February 2000.  On at least three occasions during 1999-2000, the Lehman analyst covering RSL was "held off" from downgrading his analysis of RSL for "banking reasons."  One of these instances occurred in February 2000.

On November 1, 1999, with RSL trading at $21 5/16, the Lehman analyst covering RSL had rated RSL a 1-Buy with a price target of $40.  In February 2000, with RSL trading at $17, the analyst drafted a new report in which lowered his revenue projections for RSL and lowered the price target to $35.  The first sentence of the text of the draft report read "we are revising our Revenue and EBITDA estimates for RSL to reflect declining revenue from U.S. prepaid and wholesale and a more moderate ramp

in European retail revenue." Based on his prior experience, the analyst knew that his attempt to express his more negative view of RSL would be resisted by Investment Banking within Lehman. On February 24, 2000, the analyst sent an email to his supervisor captioned "RSL Note – Bankers are going to resist" in which he enclosed his draft report and stated:

> Below is a draft of a note lowering our numbers on RSL (maintaining our 1 rating) Recall we were a co. in their recent convert deal. I've wanted to lower numbers for several months now, but have held back as 1) we led the DeltaThree IPO (was owned by RSL) and more recently were on the cover of the convert. . . . I've given our coverage banker the courtesy of seeing this and preparing the company. **I know they are going to resist.** I've been quiet on this too long, and I plan on going ahead anyway. [emphasis in original]

The Lehman investment banker for RSL prevailed on the analyst not to issue the report and instead to meet with RSL management and to reconsider his analysis. As a result, on March 2, 2000, the analyst issued a report that maintained the $40 price target. The first sentence of the text of the report touted that "RSL's European unit posted strong sequential revenue growth in Q4 . . .." The analyst issued additional reports on RSL on March 9 and March 10, 2000, in which he raised the price target to $50.

On March 16, 2000, the investment banker for RSL sent an email to the analyst's supervisor praising the analyst's "open-mindedness" and crediting the analyst with raising RSL's stock price stating:

> I just wanted to drop you a note to let you know of [analyst's] recent helpfulness in a touchy situation with RSL Communications. RSL is a telecom company . . . and is the parent company of Delta 3 for which we recently led an IPO. Following RSL's recent convertible notes issue (for which we were a co), [analyst] was inclined negatively toward the Company's prospects; however, he agreed to hold off on a downgrade (which would have harmed an important banking relationship) at the request of banking until he could hear out management. [Analyst] met with the Company's CEO and was convinced positively, he issued a positive report and was the axe behind significant positive momentum to the stock. The CEO praised [analyst's] open-mindedness and has indicated we will be included in the underwritings of their coming spin-offs. Thus, [analyst] has helped our banking relationship with the client significantly.

The supervisor forwarded the email to the analyst and wrote "good job & congratulations."

In May 2000 the analyst issued another report reiterating the 1-Buy rating on the stock and retaining the $50 price target despite the fact that the stock price had declined to $15.50 per share and the company had missed its revenue estimates.

16

By August 14, 2000 RSL's stock price had declined to approximately $4. In an August 14, 2000 email, the analyst candidly complained to his supervisor about the influence Investment Banking had exerted over his research during the preceding year:

> Enough is enough. It's hard enough to be right about stocks, it's even harder to build customer relationships when all your companies blow up, you knew they were going to, and you couldn't say anything. Every single one of my companies has blown up in some fashion (or will – GBLX) and with the exception of PGEX, I haven't been able to speak my mind. I think I've been a team player, and I believe it is now imperative for the franchise that I be able to take action on bad situations.

The analyst voiced particular concerns about RSL stating "for the record, I have attempted to downgrade RSLC THREE times over the last year, but have been held off for banking reasons each time." (Emphasis in original.)

Even after this complaint, the analyst did not downgrade RSL but rather simply was permitted to drop coverage in September 2000, devoting a few short sentences to the company in a sector report.

### 3.    DDi Corporation

A pitchbook for the DDi Corporation ("DDi") IPO offering described Lehman's highly regarded research team, listed the analysts' combined years of experience and strong research qualifications and promised research coverage for DDi after the IPO.

The pitchbook contained an example of the mock research report that the two Lehman analysts who covered DDi's industry sector would write for DDi, including a graphic of the research report's cover page with a 1-Buy rating.

DDi opened for trading on April 10, 2000. On June 28, 2000, the analyst whose name appeared on the mock research report sent an email to the Director of U.S. Equity Research stating that Lehman was a "co" on the DDi IPO and that the analyst should have initiated coverage when the company went public in April but did not due to other demands on his time including the need to cover two banking deals where Lehman was the lead. The analyst complained that both DDi and Lehman bankers were pushing the analyst to initiate coverage with a 1-Buy rating. The analyst wrote:

> Now company DDi and parent (Bain Capital), and bankers are obviously pushing for coverage and unhappy. Problem is that the shares IPOed at $14 are at $28 today. Bankers want a 1-Buy and are pushing hard. I am concerned that given the current expectations, the shares could sell off after the quarter is reported in July and could easily drop to $20. I am ready with initiation a FC [First Call] note and could go out this week, but am not sure how best to deal with this situation. Bankers are not really satisfied with a 2.

Despite his misgivings, the analyst initiated coverage of DDi on June 30, 2000 with a 1-Buy rating and a price target of $36.  DDi closed on June 30, 2000 at $28 1/2.  On July 31, 2000 DDi closed at $22.

## 4.    RealNetworks, Inc.

In June 1999, Lehman served as a co-managing underwriter for a secondary offering of common stock by RealNetworks, Inc.  Lehman maintained a 1-Strong Buy rating on the stock from July 1999 through June 2001 despite the fact that the stock lost approximately 90% of its value falling from a high of $78.59 per share in February 2000 to a low of $7.06 in April 2001.

In the first few days of July 2000, RealNetworks' stock price dropped from $52 per share on July 3, 2000 to $38 per share on July 11, 2000.  Lehman issued a research report on July 11, 2000 responding to what the report described as a weakness in the stock price caused by investor concern over RealNetworks' exposure to online advertising revenue.  The report sought to calm investors' fears by stating that online advertising figures would have  "minimal" impact on RealNetworks overall revenue.  The report reiterated the 1-Buy rating assigned to the stock and maintained the $150 price target.  The report further advised investors that the price weakness presented a buying opportunity and that Lehman remained "bullish" on the stock.

By July 18, 2000, the stock price had climbed to $56 per share.  The analyst issued another research report that again advised investors to ignore concerns about RealNetworks' exposure to online advertising revenue stating "we believe recent articles about reductions in online spending is (sic) completely over-hyped − in terms of its overall impact on RealNetworks."  The report also reiterated the 1-Buy rating assigned to the stock and maintained the $150 price target for the stock.

On July 19, 2000 the analyst issued a third report commenting on RealNetworks' second quarter earnings release.  The report described the second quarter results as "stellar" and reiterated the 1-Buy rating assigned to the stock and maintained the $150 price target for the stock.

Despite the analyst's support for RealNetworks, on July 18, 2000, the analyst advised an institutional investor to short the stock stating "RNWK has to be a short big time."  The next morning the institutional investor emailed the analyst "nice call on rnwk . . . I mean all the upside from crappy ad business . . . why aren't people jumping up and down and saying this sucked??? . . .  nice call on your part anyhow."

The analyst replied:  "we bank these guys so I always have to cut the benefit of the doubt."

RealNetworks' stock price continued to fall throughout July 2000, and its price continued to drop through the end of 2000.  By December 2000, RealNetworks had fallen to approximately $12 per share having fallen from its February 2000 high of $78 per share.

In January 2001, that same analyst wrote to an institutional investor, "if it's in my group it's a short" despite the fact that the analyst maintained 1-Strong Buy ratings on all of his stocks.

### 5.    Broadwing, Inc.

In January 2001, an analyst was about to initiate coverage of Broadwing, Inc. ("Broadwing"). On January 24, 2001 an investment banker sent an email to the analyst asking him if Broadwing's numbers were good. The analyst responded that the numbers were "very much in line." The banker asked the analyst to raise the price target. When the analyst questioned the rationale, the banker explained that the increase was necessary to help Lehman win Investment Banking business.

> Banker: any chance of nudging up that price target?

> Analyst:  isn't it better for your cause to start conservative, and move up targets, rather than start high and use up dry powder?

> Banker:  if they are doing a financing and a few points on a price target puts us in line with our competition and, hopefully, helps us get into a financing, it may be worth considering

> Analyst:  I'm already at $40, I can add a buck or two.

> Banker:  that would be great – MSDW is at 44, CSFB at 46, Mer at 50.

> Analyst:  Done.

The next day the analyst issued a research report initiating coverage of Broadwing with a $42 price target.

### F.    Lehman Failed Adequately To Supervise Research Analysts Or Establish Policies And Procedures To Ensure Their Proper Conduct

Lehman failed to supervise sufficiently research analysts or establish adequate policies and procedures to ensure their proper conduct at all times. Lehman had insufficient written procedures to protect the independence of its research analysts and failed to enforce fully the written procedures it did have.

Research did not review the propriety of the ratings issued by analysts. For example, Lehman purportedly vetted most of the written research produced by analysts through the Investment Policy Committee ("IPC") comprised of six people including the Director of U.S. Equity Research. Written procedures required that an IPC meeting be held to review initiation of coverage or change of a rating. In fact, at times, reports were reviewed by a single IPC member, who received reports shortly before a meeting.

Lehman also had inadequate procedures to protect analysts from the pressures and conflicts of interest resulting from the interaction between research analysts and investment bankers.  As described above, Lehman permitted pre-publication review of draft research reports by Investment Banking and by the companies covered in the reports.  The Chairman of the IPC and other senior managers in Research also encouraged analysts to check with banking before changing ratings, downgrading or dropping coverage of a stock.

## G.    Violations

**Violation of NASD Conduct Rules Due to Conflicts of Interest Resulting from Investment Banking Influence over Research Analysts.**  NASD Conduct Rule 2110 requires members to observe high standards of commercial honor and just and equitable principles of trade.  As described above, during the relevant period, Lehman engaged in acts and practices that created and/or maintained inappropriate influence by investment banking over research analysts and therefore imposed conflicts of interest on its research analysts.  Lehman failed to manage these conflicts in an adequate or appropriate manner.  By reason of the foregoing, Lehman violated NASD Conduct Rule 2110.

**Violation of NASD Conduct Rules by Publishing Research That Was Exaggerated or Unwarranted.**   NASD Conduct Rule 2210 (d)(1) and (2) prohibits members from making exaggerated or unwarranted claims in public communications and requires members to have a reasonable basis for all recommendations made in advertisements and sales literature.  As described above, during the relevant period, Lehman issued research reports, including those for Razorfish, Inc., RSL Communications, Inc., DDi Corp., RealNetworks, Inc., and Broadwing, Inc., that were not based on principles of fair dealing and good faith and did not provide a sound basis for evaluating facts, contained exaggerated or unwarranted claims about these companies, and/or contained opinions for which there was no reasonable basis.  As a result, Lehman violated NASD Conduct Rules 2110, 2210(d)(1) and 2210(d)(2).

**Violation of NASD Conduct Rules by Failing to Supervise.**  NASD Conduct Rule 3010(a) requires members, among other things, to "establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with" NASD's own Rules.  As described above, during the relevant time period, Lehman failed to establish and maintain adequate procedures to protect research analysts from conflicts of interest.  Despite knowledge of research analysts' complex responsibilities and conflicts of interest, Lehman failed to implement a system to detect and insulate its research analysts from improper influence and pressure by Investment Banking personnel.  To the contrary, Lehman's business practices motivated research analysts to issue research that would attract and retain Investment Banking business.  By reason of the foregoing, Lehman violated NASD Rule 3010(a).

L.    **Sanctions**

Lehman consents to the imposition, at a maximum, of the following sanctions:

1.    a censure; and

2.    a total payment of $80,000,000.00, as specified in the Final Judgment ordered in a related action filed by the Securities and Exchange Commission ("Final Judgment"), as follows:

    (a)    $25,000,000, as a fine;

    (b)    $25,000,000, as disgorgement of commissions, fees, and other monies;

    (c)    $25,000,000, to be used for the procurement of Independent Research, as described in Addendum A: Undertakings to the Final Judgment ("Addendum A"); and

    (d)    $5,000,000, to be used for investor education, as described in the Final Judgment.

The monetary sanctions imposed by NASD shall be reduced by the amounts paid by Respondent pursuant to the Final Judgment. Addendum A and the payment provisions of the Final Judgment are incorporated herein by reference.

Respondent agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification, including but not limited to payment made pursuant to any insurance policy, with regard to any fine/penalty amounts that Respondent shall pay pursuant to Section II of the Final Judgment, regardless of whether such fine/penalty amounts or any part thereof are added to the Distribution Fund Account or otherwise used for the benefit of investors. Respondent further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any fine/penalty amounts that Respondent shall pay pursuant to Section II of the Final Judgment, regardless of whether such fine/penalty amounts or any part thereof are added to the Distribution Fund Account or otherwise used for the benefit of investors. Respondent understands and acknowledges that these provisions are not intended to imply that NASD would agree that any other amounts Respondent shall pay pursuant to the Final Judgment may be reimbursed or indemnified (whether pursuant to an insurance policy or otherwise) under applicable law or may be the basis for any tax deduction or tax credit with regard to any federal, state, or local tax.

The sanctions imposed herein shall be effective on a date set by NASD staff.

III.

## OTHER MATTERS

Respondent understands that it may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct.   It understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement.  This Statement does not constitute factual or legal findings by NASD, nor does it reflect the views of NASD or its staff.

Respondent certifies that it has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it, and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein, has been made to induce Respondent to submit it.

Lehman Brothers Inc.

Date: April 21, 2003                    By: _____
                                              Joseph Polizzotto
                                              Managing Director and General Counsel

Reviewed by:

_____
Mark F. Pomerantz, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

22

Accepted by NASD:

On behalf of the Director of the Office of
Disciplinary Affairs, through delegated
authority,

4/24/03

Date

Barry R. Goldsmith
Executive Vice President
Department of Enforcement
NASD
1801 K St. NW
Washington, DC 20006