# EXHIBIT N

# NASD
## LETTER OF ACCEPTANCE, WAIVER AND CONSENT
### NO. CAF 030024

TO:    Department of Enforcement
        NASD

RE:    Goldman, Sachs & Co., Respondent, CRD No. 361

Pursuant to Rule 9216 of the NASD Code of Procedure, Respondent Goldman, Sachs & Co. ("Respondent," "Goldman Sachs," or the "Firm") submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described in Part II below.  This AWC is submitted on the condition that, if accepted, NASD will not bring any future actions against Respondent alleging violations based on the same factual findings.

Respondent understands that:

1.    Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by NASD's Department of Enforcement and National Adjudicatory Council ("NAC"), pursuant to NASD Rule 9216;

2.    If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondent; and

3.    If accepted:

    a.    this AWC will become part of Respondent's permanent disciplinary record and may be considered in any future actions brought by NASD or any other regulator against Respondent;

    b.    this AWC will be made available through NASD's public disclosure program in response to public inquiries about Respondent's disciplinary record;

    c.    NASD may make a public announcement concerning this agreement and the subject matter thereof in accordance with NASD Rule 8310 and IM-8310-2; and

    d.    Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or

otherwise, denying, directly or indirectly, any allegation in this AWC or creating the impression that the AWC is without factual basis. Nothing in this provision affects the testimonial obligations or right of Respondent to take legal or factual positions in litigation or other legal proceedings in which NASD is not a party.

Respondent also understands that its experience in the securities industry and disciplinary history may be factors that will be considered in deciding whether to accept this AWC:

Goldman Sachs is a registered broker-dealer and has been a member of the NASD since 1936. It has its principal place of business in New York, New York and is licensed to conduct securities business on a nationwide basis. Goldman Sachs offers, among other things, underwriting and merger and acquisitions services and services to its institutional investor clients, securities sales and trading, and research on equity securities.

Goldman Sachs has no relevant disciplinary history.

## I.

## WAIVER OF PROCEDURAL RIGHTS

Respondent specifically and voluntarily waives the following rights granted under NASD's Code of Procedure:

A.   To have a Formal Complaint issued specifying the allegations against it;

B.   To be notified of the Formal Complaint and have the opportunity to answer the allegations in writing;

C.   To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.   To appeal any such decision to the NAC and then to the U.S. Securities and Exchange Commission ("Commission") and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

2

Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of Rule 9143 or the separation of functions prohibitions of Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## II.

## ACCEPTANCE AND CONSENT

Goldman Sachs hereby accepts and consents, without admitting or denying the allegations or findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of NASD, or to which NASD is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by NASD:

### A.    Overview

1.    During the period July 1, 1999 to June 30, 2001 (the "relevant period"), Goldman Sachs sought and did investment banking business with many companies covered by its Research Division.  Research analysts were encouraged to participate in investment banking activities, and that was a factor considered in the analysts' compensation.  In addition, the decision to initiate and maintain research coverage of certain companies was in some cases coordinated with the investment banking Department and influenced by investment banking interests.

2.    As a result of the foregoing, certain research analysts at Goldman Sachs were subjected to investment banking influences and conflicts of interest between supporting the investment banking business at Goldman Sachs and publishing objective research.

3.    Goldman Sachs had knowledge of these investment banking influences and conflicts of interest yet failed to establish and maintain adequate policies, systems and procedures that were reasonably designed to detect and prevent those influences and manage the conflicts.

## B.    Research Analyst Participation in Investment Banking Activities

1.    Research analysts were responsible for providing analyses of the financial outlook of particular companies in the context of the business sectors in which those companies operate and the securities market as a whole.

3

2.    Research analysts evaluated companies by, among other things, examining financial information contained in public filings, questioning company management, investigating customer and supplier relationships, evaluating companies' business plans and the products or services offered, building financial models and analyzing competitive trends.

3.    After synthesizing and analyzing this information, the research analysts drafted research reports and more abbreviated "notes" summarizing their opinions. These reports or notes typically contained a summary and analysis of the factors relied upon by the analyst in reaching his conclusions, and some contained a rating and/or a price target.

4.    During the Relevant Period, Goldman Sachs' equity research ratings included four investment ratings:

- RL: Recommended List -- expected to provide price gains of at least 10 percentage points greater than the market over the next 6 – 18 months;

- MO: Market Outperformer -- expected to provide price gains of at least 5 – 10 percentage points greater than the market over the next 6 – 18 months;

- MP: Market Performer -- expected to provide price gains similar to the market over the next 6 – 18 months; and

- MU: Market Underperformer -- expected to provide price gains of at least 5 percentage points less than the market over the next 6 – 18 months.

In addition, Goldman Sachs had one shorter-term rating:

- Trading Buy – expected to provide price gains of at least 20 percentage points sometime in the next 6 – 9 months.

5.    The percentage of issuers being assigned one of the top two investment ratings (Recommended List or Market Outperformer) ranged from 72% in the first quarter of 1999 to 50% in the last quarter of 2001. The percentage of companies assigned a Market Underperformer rating did not rise above 1.1% during the relevant period.

4

6.      The Firm published research on publicly traded companies, and this research was made available to the Firm's institutional and private wealth management clients, principally high net worth individuals.  Published research or the content of the research was disseminated by various means, including: by mail, via facsimile, distributions at client meetings, via electronic mail ("e-mail"), via Goldman Sachs' research website for clients, telephone conversations by analysts or salespersons, as part of analysts' appearances on television, seminars, and industry conferences, and through subscription services provided by Bloomberg and First Call.  On occasion, the substance of Goldman Sachs' research reports, in whole or in part, was also reported in the U.S. financial news media.   In addition, beginning in December 2000, certain of Goldman Sachs' research was made available to another broker-dealer, who made it available to its retail customers.

7.      During the relevant period, analysts made themselves available, via telephone, e-mail and in person, to the Firm's institutional sales force to answer questions about industry sectors and covered companies.  Analysts also conducted "teach-ins" for the Firm's institutional sales force to educate the sales force about companies for which the Firm initiated research coverage.  In addition, analysts provided periodic research updates to the institutional sales force through "morning calls" or "morning notes," which are daily pre-market opening discussions of the sector and/or specific covered companies.  Analysts also provided research updates to the institutional sales force through "blast" e-mails and voice-mail messages, which typically provided a more abbreviated analysis than what is contained in a research report and may have contained a rating on a company or sector.

8.      In addition to performing research functions, certain research analysts from time to time participated or assisted in connection with investment banking-related activities.  These investment banking-related activities included assisting the Investment Banking Division by identifying and/or vetting companies as prospects for investment banking services, participating in "pitches" of investment banking services to companies, participating in "roadshows" [1] associated with underwriting transactions, speaking to investors to educate them about underwriting transactions, and participating in due diligence activities in connection with underwriting transactions. [2]  In the context of the capital raising process, research analysts contributed by evaluating businesses that appeared potentially appropriate for public markets and screening out unsuitable candidates.

---

[1] A roadshow is a series of presentations made by the management of a company in conjunction with the marketing of an upcoming underwriting to potential investors.

[2] Underwriting services included sales of the company's securities to the public through initial or secondary public offerings.

9.     The Investment Banking Division at Goldman Sachs advised corporate clients and helped them execute various financial transactions, including the issuance of stock and other securities.  Goldman Sachs frequently served as the lead underwriter in initial public offerings ("IPOs")—the first public issuance of stock of a company that has not previously been publicly traded—and follow-on offerings of securities.

10.     During the relevant period, investment banking activities were an important source of revenues and profits for Goldman Sachs.  In fiscal year 2000, investment banking generated more than $5.37 billion in revenues, or approximately 32 percent of Goldman Sachs' total net revenues.

11.     The Firm encouraged research analysts to support the investment banking and other businesses of the Firm, and in some cases, research analysts were expected to participate or assist in the foregoing investment banking-related activities.  The level of analyst participation or assistance in the foregoing investment banking-related activities varied widely but was sometimes significant.  During 2000, one research analyst self-reported that he spent an estimated 40% of his time on investment banking-related activities, and another analyst self-reported that he spent an estimated 55% of his time on investment banking-related activities.

**12.**     During the relevant period, Goldman Sachs held itself out as generating and providing research reports that were the product of objective research and opinions of the Firm's Research Division.

## C.    Participation in Investment Banking Activities was a Factor in Evaluating and Compensating Research Analysts

1.     The compensation system at Goldman Sachs provided an incentive for research analysts to contribute to all areas of Goldman Sachs's business, including participation in investment banking activities and assisting in the generation of investment banking business for Goldman Sachs.  Analyst compensation was based on many factors, including the level of compensation the analyst could command in the market for their sector (which might be impacted by the level of investment banking activity in that sector), the analysts' participation in investment banking-related activities, whether an analyst was ranked in the broker polls, *Greenwich Survey, Institutional Investor*, and performance reviews.  Analyst compensation consisted of a salary and a discretionary bonus.

2.     During the relevant period, Goldman Sachs gathered information about the analyst's job performance through self-evaluations, business plans completed by the analysts, sales force surveys, and anonymous "360 degree review," evaluation

6

forms completed by supervisors, peers and subordinates in the Research Division, as well as members of other divisions of Goldman Sachs, including to varying extents the Investment Banking and Equities Divisions. The Head of Research and/or other senior Research Division employees would then evaluate the performance of research analysts as described below.

3.    After reviewing all the performance evaluations, analysts rankings, and other indicators of performance such as the analyst's research production, and taking into account his or her own assessment of the analyst's performance, the analyst's supervisor would provide an overall assessment of the analyst's performance. The specific comments in the 360 degree reviews were not shown to the analysts, but certain comments may have been discussed or described in some cases.

4.    Some comments in the 360 degree reviews of analysts indicated that some analysts were involved in many aspects of investment banking-related activities and reflected certain employees' beliefs that participating or assisting in investment banking activities was a factor in measuring the analyst's performance.   The following comments were submitted through 360 degree reviews about different research analysts:

--    "One of my favorite analysts.  A real trader's analyst[].  Solid grasp of the industry; well liked by investors ie [sic] well informed as to their intentions, which translates to a ton of business.  Aside from a few 'tell it like it is' lapses in judgment to the press, [analyst] leaves very little room for improvement.  I'm sincere when I emphasize that many GS analysts can learn from his model insofar as a trading relationship goes. I realize bringing in the banking bucks is primary to an analysts [sic] success and actually being able to pick a stock takes second, but I wouldn't trade him for anyone.  He brings too much business to my table and keeps me from getting hurt P&L wise when he's first with important insight."

--    "[needs to] make more of an effort to separate research views from banking views.  Like many analysts, he has been known to be swayed by banking to support certain names"

--    "he has been in the incredibly awkward position of having the investment bankers have a stronghold over his written work – STOR [StorageNetworks], LDCL [Loudcloud] to name a few embarrassments" Another review of the same analyst said: "One gets the sense that he's been held captive to the agenda of others within the Firm and that, were he allowed to exercise independent investment thesis, he would have had a decidedly different take of this group's prospects."  Another

review of the same analysts said: "he works closely with bankers to help their franchise while maintaining research independence."

5.    Some analysts' self-evaluations reflected their perception that they were expected to participate or assist in the Firm's investment banking business. For example, one analyst wrote: "Need to get closure on some key wins. To monetize relationships for the firm, both at the corporate and buyside level." Another analyst wrote "has subordinated personal preferences on recommendations [citing two examples] for 'commercial' reasons.

6.    Furthermore, a presentation to research analysts in 2000 stated that the performance review process included "Formal IBD recognition of Research contribution to business we win and relationships we improve."

### *Research Analysts' Business Plans*

7.    During the relevant period, analysts were required to develop business plans that discussed a broad range of areas such as what the analyst's plans were for Global Research with respect to both products and services, what major investment themes the analyst would develop relating to his or her coverage universe, and what investor conference the analyst had planned. One of the many such categories covered by the business plans was how the analyst planned to assist the investment banking efforts of the Firm. As noted below, the business plans included questions that implied that the research analysts' contribution to the Firm's investment banking business was part of their job.

8.    Business plan questions included:

•    How much of your time will be devoted to IBD [Investment Banking Division]? ...Are you using/managing IBD effectively? How can you work more effectively with IBD to exploit the opportunities available to the firm? What specific opportunities do you see? Do you have alignment—do you have counterparts in IBD you work with to approach business in an integrated fashion? How can IBD help you in conferences, client meetings, etc.?

•    What will be the three most important IBD transactions in your space not yet mandated (that can be identified now, of course)? How well placed are your IBD relationships with respect to winning this business?...With which corporates can you use IBD's relationship to enhance your own? For which corporates do you have a better

relationship with senior management than IBD does?  How will you use that to enhance GS business opportunities?

9.      In response to these questions, research analysts presented their investment banking goals, activities, accomplishments, participation in lead- and co-managed underwritings, and sometimes fees associated with the investment banking transactions on which the analyst worked.

10.     Business plans asked analysts to estimate how much of their time not devoted to Research would be devoted to each of four divisions of the Firm, including Investment Banking and Equities.  In 1999, analysts estimated that they would spend between 5% and 75% of their time not devoted to Research on Investment Banking, which includes all merger and acquisition and financing activities.

11.     In response to the question: "What are the three most important goals for you in 2000?" one analyst replied: "1. Get more investment banking revenue. 2. Get more investment banking revenue.  3. Get more investment banking revenue."

D.    **Investment Banking Interests Influenced Goldman Sachs' Decisions to Initiate and Maintain Research Coverage**

1.      In general, the Research Division determined whether to initiate and/or maintain research coverage based upon institutional investors' interest in the company, the company's importance to the sector, and/or the company's importance to the Investment Banking Division or Equities Division.

2.      One analyst commented in a business plan: "Since our banking ties are so close to each one of the companies mentioned above along with the fact that these companies are direct competitors with each other, it is incredibly difficult to voice strong opinions in these sectors."

3.      In a March 16, 2000 e-mail communication from an analyst to an investment banker, the analyst writes:  "I wanted to harmonize with you strategically. [Chief Executive Officer at Ventro] suggested that there might be a banking opportunity for us, can we use a carrot and stick approach to win some economics here.  I've been successful in the past using my research efforts to cement relationships where we previously had none"

4.      A 2000 presentation to research analysts stated that investment banking and Research Divisions had a "shared mission" that included:

9

- "Highest ranked Research and Investment Banking teams in our industry";
- "Provide thought leadership; anticipation of trends";
- "Effective coverage and servicing of franchise enhancing or defining companies in each sector";
- "Effective identification of commercial opportunities";
- "Foster superb relationships with senior management of companies";
- "Research-driven success, not simply research-resourced."

### *"Research Alignment" Process*

5.    In 1998-1999, "in order to fully leverage [its] limited Research resources," Goldman Sachs implemented a formalized process called "Research Alignment" whereby the Investment Banking, Equities and Research Divisions "work collaboratively to insure a strategic alignment of [Goldman Sachs'] business – that the biggest opportunities for investment banking and equities were being covered, that [Goldman Sachs] had the right Research resources in the right places, and that [Goldman **Sachs'**] Research reputation for independent and thoughtful analysts was sustained if not enhanced." The process recognized that "[t]he individual company coverage provided by Global Investment Research helps drive the majority of the Firm's largest businesses, from winning financing deals and advisory business to obtaining orders in the secondary markets."

6.    "Research Alignment" was "developed with the goal of quantifying, at the individual company, industry and sector levels, what the available revenue opportunities are to Goldman Sachs on both the Equities (trading) and IBD (equity issuance, high yield issuance and M&A) sides of the business."

7.    In 2000, Goldman Sachs' "Global Investment Research IBD Alignment Process" was summarized in part as follows: "US Investment Research appears to be on the right track with our IBD alignment initiative"

   a.  "[R]esearch analysts, on 429 different occasions, solicited 328 transactions in the first 5 ½ months of this fiscal year."

   b.  "Research was involved in 82% of all 'won business' solicitations."

   c.  "Research was involved in 49% of 'lost business' solicitations."

      d.   "Only 4.3% of all IBD 'lost business' was attributed to lack of research coverage."

      e.   "IR [Investment Research] was involved in 31 mergers amounting to $56 billion.   IR was involved in 209 financing transactions amounting to $83 billion."

      f.   "In addition to financings, US IR was involved in a significant number of merger advisories, solicitations, and other transactions which have either not yet closed or were not captured [in the] database."

8.     In connection with Research Alignment, members of the Investment Banking Division called "Sector Captains" were responsible for coordinating research coverage requests from investment banking, prioritizing research coverage, determining candidates for termination of coverage, and conveying that information to the Research Division.  Sector Captains, as representatives of the Investment Banking Division, worked directly with the Research Division on issues relating to candidates for coverage and timing of coverage.

**E.**    **Goldman Sachs' Pitch Materials Contained Discussions of Research Coverage**

1.     During the relevant period, research coverage was an important factor many companies considered in selecting a firm for investment banking transactions. In some instances, the reputation of Goldman Sachs' analysts was a factor in winning investment banking business from certain issuers.

2.     In competing for investment banking business, the Firm typically sent representatives to meet with prospective issuers to discuss why the issuer should select the Firm as one of the investment bankers to participate in an offering.  This meeting was commonly referred to in the securities industry as a "pitch."  During the pitch, Firm investment banking personnel would present their level of expertise in the company's sector and discuss the Firm's previous experience with similar companies, as well as their view of the company's merits and likelihood of success.

3.     Some investment banking pitches included, among other things, discussion of the benefits the company would receive from Goldman Sachs' research coverage if the company selected Goldman Sachs as its banker.  In preparation for each presentation, investment bankers, sometimes with research analyst input, prepared pitch materials including a "pitch book" which was distributed at the meeting.  Some Firm pitch materials implicitly suggested that the Firm would provide favorable research coverage after the investment banking transaction.

4.    In an April 2000 e-mail, an investment banker wrote:  "For next Wednesday's meeting, we have a challenge before us.  We have been guided today by Loudcloud that we must show total focus and commitment from a RESEARCH perspective.  [Loudcloud representative] strongly suggested that you guys come prepared to SELL.... HERE IS THE SUGGESTION: CAN YOU GUYS PREPARE A BRIEF (3-4 PG) RESEARCH REPORT ON LOUDCLOUD FOR THE MEETING.  This is effectively our pitch.... This way we can say we are so excited about the story that we have already begun writing the report..." [emphasis in original].   In response, the analyst wrote:  "I want to make this thing the best.  WE WILL WIN THIS MANDATE." [Emphasis in original].

5.    Pitch books typically contained reference to Goldman Sachs' research ratings for other companies covered by Goldman Sachs' analysts, and suggested that the Firm would continue to provide research coverage to the issuer after the investment banking transaction.  The pitch books identified the analyst who would likely provide coverage by name, and provided information about that research analyst's background and reputation.  In addition, some pitch books set forth information juxtaposing an analyst's positive comments about other companies in the same sector with the positive performance of the stock prices of those companies.

6.    Some pitch books distributed by the Firm to potential clients included such factors as the number of lead-managed IPOs currently under research coverage, the average length of research reports, the number of days from the date of the transaction in which research was published, and the frequency that reports were issued.

7.    For example, a pitch book included a list of the various ratings provided by the analyst on the companies he covered, and described the benefits the company would receive if it chose Goldman Sachs, including, "a [g]lobal sales effort led by analysts," and contained a diagram of the role of analysts in an initial public offering.

8.    The research analyst(s) who would likely provide coverage of the company after it went public sometimes worked with investment bankers to prepare the Firm's pitch presentation and, in some cases, attended the pitch meeting.  The research analyst would on occasion make a presentation at the pitch in which the analyst typically discussed his/her view of the company and his/her understanding of the market's need for the company's product.

9.    In July 2000, a pitch book for Crown Castle said "Goldman Sachs has been a constant bull on the tower sector" and stated the fact that "Goldman Sachs

12

has placed Crown Castle on our Recommended List, our Firm's highest investment rating."

10.    A pitch book for the Willis Group stated: "[the analyst] has sold more stock than any research analyst in the sector."

11.    The Business Unit Head of U.S. Telecommunications research was credited by a Goldman Sachs banker as the determining factor in winning an early 2000 IPO for Crosswave Communications: "[the analyst] was fully involved in pitching this and thanks to him, we received a sole-book mandate with Joint lead of MS." Moreover, the banker told other analysts: "your input will be critical to the success of this IPO."

12.    An October 2000 pitch book for GeneProt explained the "[r]ole of investment research analyst," as "creating the story . . . marketing the story . . . [and] following the story."

**F.    Research Analysts Were Subject to Pressures from Covered Companies and Investment Banking Considerations**

1.      Certain research analysts communicated regularly with employees of the companies that they covered, including executive and senior management of those companies.  These communications occurred through telephone and e-mail exchanges, company-sponsored events, and analyst calls.  As a result, research analysts were sometimes subject to pressure from companies they covered and investment banking considerations regarding their research.  This conflict, between investment banking considerations and the publication of objective research, may have resulted in pressures on certain analysts, at times, to use language more favorable to the company or to avoid language which companies construed as negative in their research reports.

2.      In an August 22, 2000 e-mail, copied to a research analyst, an investment banker writes:  "[analysts] had a meeting with [WebEx] yesterday (which I attended part of).  We discussed initiation strategy and decided that likely to initiate (probably MO, no price target) shortly with a note to be followed with a report by end of next week (given additional info from yesterday's meeting and desire to iterate a bit with the company).  [WebEx] was more than happy with that approach as felt be beneficial to stock price to stagger good news."

3.      Research analysts sometimes allowed covered companies to review drafts of research reports and comment on them.  When a research analyst would downgrade or issue a negative comment on a company or sector, the analyst from time to time would receive direct and negative feedback from company management.

4.      On February 23, 2001, a research analyst sent a draft of an Internet sector report to investment banking for review.  In the e-mail, the analyst states: "I have drafted a note that highlights our concerns yet does not translate into the lowering of numbers for specific companies.  Considerations include: 1) we believe that most of our cost back-end loaded 2001 numbers have to come down, 2)exds [Exodus] is a major offender of back-end loading, but to lower numbers right after selling equity @ $18.50 could be a problem.  It would also be a problem to cut other company's numbers for aforementioned reasons and not exds  3) we have a deal in the market and negative commentary could be a problem or used against us by morgan stanley.  Based on these considerations this note is as far as I think we can go and even this might be too aggressive from a perception standpoint."

5.      After the report downgrading the sector was issued, one of the Firm's investment banking clients in the sector, Loudcloud, contacted the Firm via e-mail: "Are you trying to kill our offering?  Or just issuing these reports blindly with no regard

14

to consequences?" The analyst did not change the downgrade. However, the Goldman Sachs bankers and analysts involved apologized to Loudcloud management for not giving them a heads up about the sector downgrade and said that the analysts had been marketing the offering aggressively. The senior analyst also responded directly to Loudcloud management: "I echo [banker's] apology on not giving you a heads up on these calls. Wanted to reassure you on two fronts: 1) Both [the other analyst] and I continue to view the LDCL offering in these difficult markets our highest priority, and remain committed to doing everything we can to get us to a successful outcome over the coming days and beyond. 2) We continue to use every opportunity, including client discussions of the macro environment to highlight LDCL's short and long-term differentiation against a lot of the public models. ...Again, I want to stress that both [the other analyst] and I remain committed to the short and long-term success of Loudcloud."

6.      The following communications between WebEx management and an analyst occurred in January 2001:

a.      WebEx management wrote to an analyst: "As discussed, I want NO mention of any funding issues in this written report. I told you if people called and asked you why your plan shows a need for modest funding, you can verbally tell them that management believes they have adequate funding and it is probably because management has a less conservative plan than you do." [Emphasis in original.]

b.      The analyst responded, with an attached revised report: "the webx [sic] funding issues is a key area of investor concern, as such will remove any mention from the top section of the note, but will address it in a manner this [sic] is consistent with your recommendation for verbal responses to client inquiries in a later section. To exclude it completely detracts from the intention of the note, which is to address key investor concerns upfront and then give them a reason to buy the stock."

c.      WebEx management responded: "Thank you. This is much better. The other note said the company has a funding problem, but we think it isn't very big. This says that the company believes it has enough funds, but there could be a problem; and if there is it will be minor. Thanks again for the change." The research report was issued on January 22, 2001.

7.      In April 2001, an analyst sent a draft research report to Global Crossing Ltd. in advance of public release of the report. She received "extensive comments" from Global Crossing officials. The analyst wrote her supervising analyst that she had included Global Crossing's extensive comments and "...I also said we had slightly smoothed the negative edge (emphasis section up front and text) from when

15

they saw the report. I said we included throughout the piece technological cost benefit comments and in [sic] up front conclusion section. I also said we still think supply/demand balance is THE near term critical price determinant. I promised them I'd re-email the final report tonight so they could see our changes. Nonetheless, [Global Crossing official] still wants to talk to YOU life [sic] today if possible so that he knows his time was used well and so that 'such an important industry report which is going to have profound implications will be to their liking---ALL YOURS [emphasis in original]."

## G.    In Certain Instances, Goldman Sachs Published Exaggerated or Unwarranted Research or Ratings

1.    On several occasions, the conflicts of interest discussed above resulted in analysts publishing recommendations and/or ratings that violated the NASD Advertising Rule (Conduct Rule 2110). The following are examples of how these conflicts affected the research.

2.    In August 2000, the Business Unit Leader for European Telecommunications research e-mailed his U.S. counterpart about the "anomalous situation where our sector has been tanking for 3-4 months and we globally still have a majority of stocks as R[ecommended] L[ist] as that is all the salesmen and clients care about." He suggested that his U.S. counterpart consider the approach taken by him: "In Europe, we have found that honour is preserved if we have a stock as an M[arket] O[utperformer] and the companies can't complain because its [sic] better than an M[arket] P[erformer]." In his response, the Business Unit Leader for U.S. Telecommunications research agreed, saying: "The plan we have in place now is that in early September we are going to re-rate most of the CLECs [competitive local exchange carriers], which is where the problem is the most egregious. The ratings were a residual from [a former research analyst], and I never changed them, not wanting to disrupt things too much. But it's ridiculous. I've already met with the bankers, and plan to move most of the companies down to M[arket] O[utperformer], from R[ecommended] L[ist] before [another analyst] takes over completely in September. For the other segments the situation is not as bad, and where there is a problem, investment banking considerations have prevented me from making a change (i.e. AT&T, WCOM [Worldcom]). I don't think I would end up leaving only 7.5% as R[ecommended] L[ist], but the present 68% is ridiculous...."

3.    In an April 27, 2001 e-mail, a research analyst wrote to a supervising research analyst: "In light of the fact that it is clear that TSIX [360Networks] is worth 0, do you think we should adjust our rating and price target? How can we go about doing this?" The supervising analyst responded: "Maybe the thing to do is to eliminate the price target. Maybe, put out a note that says, having a price target in this kind of situation is ludicrous...Changing the rating now is probably not a good

idea, because from an outsider's perspective, who doesn't know anything, it may look like a belated ratings change. This happened last week to [an analyst], although he had been appropriately negative on WCII all the way down, he belatedly dropped the rating from a M[arket] P[erformer] to an M[arket] U[nderperformer], and cnbc picked it up and made fun of him on the air."

4.    In a March 26, 2000 e-mail with the heading "GBLX [Global Crossing]-I think they are bullshitting us" an analyst stated that the company's revenue guidance "does not make any sense....I think the answer is they wanted to obscure something sucking cash flow out of the company...They are hiding behind the complexity of their accounting."

5.    In May 2001, WorldCom had Goldman Sachs' highest rating, Recommended List. The Business Unit Leader for U.S. Telecommunications research told his European counterpart that he "would have loved to have cut ratings long ago. Unfortunately, we can't cut [AT&T], because we're essentially restricted there. And without cutting [AT&T], there is no consistency in cutting WCOM."

6.    Between July 1999 and July 2001, WorldCom had Goldman Sachs' highest investment recommendation - inclusion on the firm's "Recommended List." Worldcom was downgraded to Market Outperformer in July 2001. In April 2001, a hedge fund customer that had a very short-term investment horizon asked the Business Unit Leader of U.S. Telecommunications research: "wcom...buy sell or hold here at [$]20"? He responded to the inquiry: "sell."

7.    On June 21, 2001, an analyst downgraded the company Exodus from a Recommended List rating to Market Outperformer. Both ratings have a time horizon of the next 6 – 18 months. In his April 27, 2001 research report on Exodus, the analyst discussed "heavy churn and low visibility given...the current revenue run rate" and further stated that the "EBITDA forecast looks challenging." In addition, that research report also stated the following: "Fully Funded Plan. Despite our more conservative EBITDA estimates for 2001 and 2002, we are confident that EXDS is funded to FCF positive." Shortly before the downgrade, the analyst met with at least two institutional investors who e-mailed the analyst after their meetings:

a.    An institutional investor wrote the analyst on June 21, 2001: "I wanted to write a quick email to you to THANK you for your candor when you came into our offices and gave me your teach-in on the company. You gave me the unbiased view, told me the negatives I needed to know - - and basically gave me the ammo I needed to prevent my PM from buying the stock." [Emphasis in original.]

    b.      Another institutional investor wrote the analyst the same day: "I really appreciate your straight forward comments on EXDS during our conversation last week.  Looks like our worst concerns were realized yesterday.  Fortunately, we were able to get out of our last piece at around $5 and avoid the recent carnage in the shares.  Still painful, but it could have been a lot worse. . . thanks"

    8.      In a sales force survey about this analyst, the writer commented: "His investment   recommendations have been abysmal and while I understand he communicates what he really thinks to a sele[c]t few, his public ratings have been an embarrassment to the firm."

## H.    Goldman Sachs Failed to Adequately Supervise Its Research and Investment Banking Divisions

    1.      As set forth above, while one role of research analysts was to produce objective research, the Firm also encouraged some analysts to participate in investment banking-related activities.  As a result of their participation in investment banking-related activities, those analysts were subject to investment banking influences and conflicts of interest between supporting investment banking business for the Firm and publishing objective research.

    2.      The Firm had knowledge of these investment banking influences and conflicts of interest yet failed to manage them adequately to protect the objectivity of its published research.

    3.      Goldman Sachs failed to establish and maintain adequate policies, systems and procedures reasonably designed to ensure the objectivity of its published research.  Although Goldman Sachs had some policies governing research analyst activities during the relevant period, these policies were inadequate and did not address the conflicts of interest that existed.

## J.    Violations

**Violation of NASD Conduct Rules Due to Conflicts of Interest Resulting from Investment Banking Influence over Research Analysts.**  NASD Conduct Rule 2110 requires members to observe high standards of commercial honor and just and equitable principles of trade.  As described above, during the relevant period, Goldman Sachs engaged in acts and practices that created and/or maintained inappropriate influence by investment banking over research analysts and therefore imposed conflicts of interest on its research analysts.  Goldman Sachs failed to

manage these conflicts in an adequate or appropriate manner.  By reason of the foregoing, Goldman Sachs violated NASD Conduct Rule 2110.

**Violation of NASD Conduct Rules by Publishing Research or Ratings That Were Exaggerated or Unwarranted.** NASD Conduct Rule 2210 prohibits members from making exaggerated or unwarranted claims in public communications and requires members to have a reasonable basis for all recommendations made in advertisements and sales literature. As described above, during the relevant period, Goldman Sachs in several instances issued certain research reports for companies that were not based on principles of fair dealing and good faith and did not provide a sound basis for evaluating facts, contained exaggerated or unwarranted claims about these companies, and/or contained opinions for which there was no reasonable basis. As a result, Goldman Sachs violated NASD Conduct Rules 2110, 2210(d)(1) and 2210(d)(2).

**Violation of NASD Conduct Rules by Failing to Supervise.** NASD Conduct Rule 3010(a) requires members, among other things, to "establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with" NASD's own Rules. As described above, during the relevant time period, Goldman Sachs failed to establish and maintain adequate procedures reasonably designed to protect research analysts from conflicts of interest. Despite knowledge of research analysts' complex responsibilities and conflicts of interest, Goldman Sachs failed to implement a system to detect and insulate its research analysts from improper influence and pressure by Investment Banking personnel. By reason of the foregoing, Goldman Sachs violated NASD Rule 3010.

## K.    Sanctions

Goldman Sachs also consents to the imposition, at a maximum, of the following sanctions:

1.    a censure; and

2.    a total payment of $110,000,000.00, as specified in the Final Judgment ordered in a related action filed by the Securities and Exchange Commission ("Final Judgment"), as follows:

(a)    $25,000,000, as a fine;

(b)    $25,000,000, as disgorgement of commissions, fees, and other monies;

20

(c)    $50,000,000, to be used for the procurement of Independent Research, as described in Addendum A: Undertakings to the Final Judgment ("Addendum A"); and

(d)    $10,000,000, to be used for investor education, as described in the Final Judgment.

The monetary sanctions imposed by NASD shall be reduced by the amounts paid by Respondent pursuant to the Final Judgment. Addendum A and the payment provisions of the Final Judgment are incorporated herein by reference.

Respondent agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification, including but not limited to payment made pursuant to any insurance policy, with regard to all fine/penalty amounts that Respondent shall pay pursuant to Section II of the Final Judgment, regardless of whether such fine/penalty amounts or any part thereof are added to the Distribution Fund Account or otherwise used for the benefit of investors. Respondent further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any fine/penalty amounts that Respondent shall pay pursuant to Section II of the Final Judgment, regardless of whether such fine/penalty amounts or any part thereof are added to the Distribution Fund Account or otherwise used for the benefit of investors. Respondent understands and acknowledges that these provisions are not intended to imply that NASD would agree that any other amounts Respondent shall pay pursuant to the Final Judgment may be reimbursed or indemnified (whether pursuant to an insurance policy or otherwise) under applicable law or may be the basis for any tax deduction or tax credit with regard to any federal, state, or local tax.

The sanctions imposed herein shall be effective on a date set by NASD staff.

### III.

### OTHER MATTERS

Respondent understands that it may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. It understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by NASD, nor does it reflect the views of NASD or its staff.

Respondent certifies that it has read and understands all of the provisions of

21

Goldman, Sachs & Co.

Date: _April 21, 2003_

By: _____
Gregory K. Palm
Managing Director and General Counsel

Reviewed by:

David Braff, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

Accepted by NASD:

On behalf of the Director of the Office of
Disciplinary Affairs, through delegated
authority,

4/24/03
Date

Barry R. Goldsmith
Executive Vice President
Department of Enforcement
NASD
1801 K St. NW
Washington, DC 20006

20