# EXHIBIT O

# NASD
# LETTER OF ACCEPTANCE, WAIVER AND CONSENT
# NO. CAF030025

TO:  Department of Enforcement
     NASD

RE:  Morgan Stanley & Co. Incorporated, Respondent, CRD No. 8209

Pursuant to Rule 9216 of the NASD Code of Procedure, Respondent Morgan Stanley & Co Incorporated ("Respondent" or "Morgan Stanley") submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described in Part II below. This AWC is submitted on the condition that, if accepted, NASD will not bring any future actions against Respondent alleging violations based on the same factual findings.

Respondent understands that:

1. Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by NASD's Department of Enforcement and National Adjudicatory Council ("NAC"), pursuant to NASD Rule 9216;

2. If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondent; and

3. If accepted:

   a. this AWC will become part of Respondent's permanent disciplinary record and may be considered in any future actions brought by NASD or any other regulator against Respondent;

   b. this AWC will be made available through NASD's public disclosure program in response to public inquiries about Respondent's disciplinary record;

   c. NASD may make a public announcement concerning this agreement and the subject matter thereof in accordance with NASD Rule 8310 and IM-8310-2; and

   d. Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any allegation in this AWC or creating the impression that the AWC is without factual basis. Nothing in this provision affects the testimonial obligations or right of Respondent to take legal or factual

positions in litigation or other legal proceedings in which NASD is not a party.

Respondent also understands that its experience in the securities industry and disciplinary history may be factors that will be considered in deciding whether to accept this AWC.

Morgan Stanley is a Delaware corporation with its principal place of business in New York, New York. Morgan Stanley is a broker dealer and has been a member of NASD since 1970. Morgan Stanley engages in a nationwide securities business.

Morgan Stanley has no relevant disciplinary history.

## I.

## WAIVER OF PROCEDURAL RIGHTS

Respondent specifically and voluntarily waives the following rights granted under NASD's Code of Procedure:

A. To have a Formal Complaint issued specifying the allegations against it;

B. To be notified of the Formal Complaint and have the opportunity to answer the allegations in writing;

C. To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D. To appeal any such decision to the NAC and then to the U.S. Securities and Exchange Commission ("Commission") and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of Rule 9143 or the separation of functions prohibitions of Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

2

## II.

## ACCEPTANCE AND CONSENT

Morgan Stanley hereby accepts and consents, without admitting or denying the allegations or findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of NASD, or to which NASD is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by NASD:

### A.   Summary

From at least July 1999 through 2001, Morgan Stanley engaged in acts and practices that created conflicts of interest for its research analysts with respect to investment banking activities and considerations. Morgan Stanley failed to manage those conflicts in an adequate or appropriate manner. Some conflicts resulted from the fact that Morgan Stanley compensated its research analysts, in part, based on the degree to which they helped generate investment banking business for Morgan Stanley. Morgan Stanley also offered research coverage by its analysts as a marketing tool to gain investment banking business. As a result, Morgan Stanley research analysts were faced with a conflict of interest between helping generate investment banking business for Morgan Stanley and their responsibilities to publish objective research reports that, if unfavorable to actual or potential banking clients, could prevent Morgan Stanley from winning that banking business.

As lead underwriter in various stock offerings, Morgan Stanley also complied with the issuers' directives to pay portions of the underwriting fees to other broker-dealers that served as underwriters or syndicate members to publish research reports on the issuer. Morgan Stanley did not take steps to ensure that these broker-dealers disclosed these payments in their research reports. Further, Morgan Stanley did not cause the payments to be disclosed in the offering documents or elsewhere as being for research.

Morgan Stanley also failed to reasonably supervise its analysts regarding the content of their research reports.

### B.   Background

#### 1.   The Investment Banking Function at Morgan Stanley

The investment banking division at Morgan Stanley advised corporate clients and helped them execute various financial transactions, including the issuance of stock and other securities. Morgan Stanley frequently served as the lead underwriter in initial public offerings ("IPOs") -- the first public issuance of stock of a company that has not previously been publicly traded -- and follow-on offerings of securities.

3

During the relevant period, investment banking was an important source of revenues and profits for Morgan Stanley. In 2000, investment banking generated more than $4.8 billion in revenues, or approximately twenty-four percent of Morgan Stanley's total net revenues.

### 2. The Role of Research Analysts at Morgan Stanley

Research analysts at Morgan Stanley covered a broad range of industry sectors and published periodic reports on certain companies within those sectors. Analysts typically reviewed the performance of their covered companies, evaluated their business prospects, and provided analysis and projections concerning whether they presented good investment opportunities. Through 2001, Morgan Stanley's equity research department had a system calling for rating covered companies, from most to least positive, as "Strong Buy," "Outperform," "Neutral," or "Underperform." Analyst reports were disseminated to Morgan Stanley clients by mail and facsimile and by financial advisors. Certain research reports were made available to retail clients who set up accounts on Morgan Stanley's web site, and similarly, institutional clients were able to access Morgan Stanley's research reports via accounts on Morgan Stanley's web site. In addition, certain industry reports were available on Morgan Stanley's public web site. Certain institutional clients of Morgan Stanley could also access research reports through the First Call subscription service. The financial news media on occasion also reported Morgan Stanley analysts' ratings.

Morgan Stanley analysts also played an important role in assessing potential investment banking transactions, in particular IPOs. Morgan Stanley's stated objective was to "take public" as lead underwriter the leading companies in their respective industry sectors and to have its research analysts serve as gatekeepers to the IPO process by investigating whether companies were appropriate IPO candidates. Research analysts who endorsed an IPO candidate typically participated in the competition to obtain the investment banking business and, if Morgan Stanley was selected as lead underwriter, helped market the IPO to institutional investors, explained the IPO to the firm's institutional and retail sales forces, and then issued research on the company.

Senior analysts at Morgan Stanley published individual research reports without pre-publication review by research department supervisors. While reports were reviewed for grammatical errors and for compliance with certain legal requirements, there was no system for reviewing the recommendations or price targets included in the reports of senior analysts prior to their publication.

### C. The Relationship Between Investment Banking And Research Created Conflicts Of Interest For Morgan Stanley Research Analysts

Certain practices at Morgan Stanley created or maintained conflicts of interest for the firm's research analysts with respect to investment banking considerations. These

4

conflicts arose from the inherent tension between the analysts' involvement in helping to win investment banking business for Morgan Stanley and their responsibilities to publish objective research that, if negative as to prospective banking clients, could prevent the firm from winning the banking business.

1. **Morgan Stanley Marketed Research Coverage, Including, at Times, Implicitly Favorable Coverage, in Competing for Investment Banking Business**

Morgan Stanley typically competed with other investment banks for selection as the lead underwriter, or "bookrunner," for securities offerings, including IPOs and follow-on offerings. Significant financial rewards were at stake in these competitions. Sole or joint bookrunners generally received the largest portion of underwriting fees, which were typically divided among the participating investment banks. The bookrunner also established the allocation of shares in an offering and typically retained the greatest number of shares for itself. The typical IPO generated millions of dollars in investment banking fees for the bookrunner.

The process of selecting the lead underwriter typically culminated in a series of presentations by competing investment banks called a "bakeoff," in which investment banks competing for the business in a particular offering met with the issuer to present their qualifications and offer investment banking and other services. As part of these presentations, investment banks often provided issuers with a "pitchbook," which typically described the investment bank's credentials and services. In selecting the lead underwriters, issuers assessed a host of factors, including the strength and quality of the bankers' research coverage. Issuers sought research coverage of their stocks, believing such coverage would enhance the credibility of their businesses, potentially lead to higher stock prices, and increase their exposure to the investing public.

Between 1999 and 2001, as part of the package of services it offered to issuers to win investment banking business from certain issuers, Morgan Stanley typically committed that its analysts would initiate (or continue) research coverage of the issuer if Morgan Stanley won the banking competition. In so doing, Morgan Stanley used its analysts as a marketing tool to help secure banking business. The promise of future research coverage was often a critical selling point that enabled Morgan Stanley to obtain millions of dollars in investment banking fees. Research coverage was part of the package of services for which Morgan Stanley was compensated in those investment banking deals.

Analysts played an important role in Morgan Stanley's pitches for banking business. Along with investment bankers and others, analysts were typically presented as part of the Morgan Stanley "team" that would consummate the transaction. The pitchbooks typically identified the analysts on the team and dedicated several pages to the analysts' experience, credentials, and specific role in the contemplated transaction. Analysts drafted portions of the pitchbook and almost always attended the presentations

5

for IPO business. The pitchbooks typically compared Morgan Stanley analysts favorably to their counterparts at competing firms, citing their rankings in analyst polls and other measures.

Morgan Stanley typically identified its analysts as a favorable factor that issuers should consider in selecting Morgan Stanley for investment banking business. For example, in describing one reason Loudcloud, Inc., should name Morgan Stanley as bookrunner for its 1999 IPO, the pitchbook referred to two senior analysts as a "dream team" who would "articulate Loudcloud's story to investors in a way that no other investment bank can match." Another pitchbook described another two senior analysts as "the most powerful combination in the extended enterprise space . . . ever."

In its pitches to obtain investment banking business, Morgan Stanley typically promised future research coverage as among the package of services it would provide. For example, in a pitchbook provided to iBeam Broadcasting Corp. to obtain its IPO business, Morgan Stanley said it would "provide ongoing research coverage and aftermarket trading" and, in another instance, said "coverage would be initiated immediately after the quiet period. Additional research reports will follow on a regular basis thereafter." Morgan Stanley won the iBeam IPO business and received investment banking fees of approximately $3.8 million. Another pitchbook, in a chronology of how the IPO would unfold, stated: "Research coverage initiated on day 26," which was the day research coverage could be initiated by an underwriter following an IPO. Morgan Stanley made comparable commitments to other prospective banking clients. Another Morgan Stanley pitchbook, provided to Transmeta Corp. in July 2000 in connection with its IPO, said "we view research as an ongoing commitment," and offered to "continue regular publication of research reports." Morgan Stanley won the Transmeta IPO business and received investment banking fees of approximately $9.5 million. In other pitchbooks, Morgan Stanley emphasized its "aftermarket support" services, which it expressly described as including future research coverage. For example, a pitchbook presented to AT&T Latin America said Morgan Stanley "is committed to bolstering an IPO's performance in the aftermarket through extensive equity research and active market making." (Emphasis added). Morgan Stanley pitchbooks often identified the specific number of reports its analysts published on other companies, giving implicit guidance on how many reports issuers could expect to receive if they selected Morgan Stanley as lead banker.

Further, Morgan Stanley at times implicitly suggested that analysts would provide favorable research coverage, pending completion of due diligence, by noting analysts' past favorable coverage and/or emphasizing its enthusiastic support for the issuer. For example, when Morgan Stanley sought investment banking business from Convergys Corp., the company already had been covered for two years by a senior Morgan Stanley analyst who, as the pitchbook mentioned four times, considered Convergys to have been the analyst's "#1 stock pick" over those years. (During that time period, the stock price had appreciated 98%.) The May 2001 pitchbook then described the analyst as the "voice of the issuing company," who would work "in tandem" with Convergys

6

management to position its story to investors. In the following month, June 2001, the senior analyst downgraded Convergys from Strong Buy to Outperform, still a favorable rating, then later upgraded Convergys back to Strong Buy in December 2001.

In other instances, Morgan Stanley pitchbooks identified a particular analyst's history of issuing Strong Buy or Outperform ratings on other companies. Some pitchbooks also identified instances in which other stocks covered by Morgan Stanley analysts increased in price following their IPOs. For example, the Morgan Stanley pitchbook provided to Transmeta Corp. in July 2000 emphasized how one analyst's "support" of eight semiconductor IPOs since 1997 had "resulted in unparalleled performance in the public market," and included a line graph showing a dramatic increase in the stocks' prices from 1998 through March 2000.

In another instance, after Loudcloud management informed Morgan Stanley in 1999 that research coverage was a key factor in its selection of the bookrunner for its IPO, Morgan Stanley's head of worldwide investment banking informed the issuer in an e-mail that the firm had "developed a successful model which combines the best of technology and telecom research at Morgan Stanley to properly position Loudcloud in the capital markets; specifically, enthusiastic sponsorship" by two research analysts who covered Loudcloud's sector. He added: "I commit to putting the entire franchise behind Loudcloud to achieve the best valuation and after market performance, as well as unmatched strategic advice post-IPO." Morgan Stanley won the Loudcloud IPO business and received investment banking fees of approximately $4.7 million.

In addition to pitchbooks, Morgan Stanley occasionally provided draft or "mock" research reports to issuers to provide an example of how analysts might describe the issuer to investors. The draft or mock reports described the issuers in favorable terms without including ratings or price targets.

Morgan Stanley's commitments to provide research coverage were not limited to pitches for IPO business. Morgan Stanley obtained investment banking business for follow-on offerings of companies that its analysts did not cover in part by promising to initiate future coverage.

Morgan Stanley consistently honored its commitments to provide research coverage, initiating or maintaining coverage when it won the investment banking business.

In Morgan Stanley's annual performance evaluation process, some analysts and bankers noted their success in obtaining banking fees by promising future research coverage. For example, in a November 3, 1999 e-mail, an investment banker listed several banking transactions that he said Morgan Stanley had won because it committed that a particular highly-rated analyst would initiate research coverage. Specifically, the banker wrote that Morgan Stanley had won two transactions totaling $13.4 million in fees from Veritas Software Corp. "just for promising that [the senior

7

analyst] would pick up coverage after the deals." The banker observed that this had "enraged" competing firms, which said it was "unprecedented" to give an underwriter with no previous research coverage such a high share of the fees. The banker added: "The response from the CEO to those firms -- 'you don't have [the senior analyst].'" Other analyst evaluations as well as other internal Morgan Stanley documents identified additional instances in which it was stated that Morgan Stanley won investment banking business in large part because its analysts committed to initiate coverage.

### 2. Investment Banking Concerns Influenced Morgan Stanley's Decisions Whether to Initiate or Continue Research Coverage

The decision to initiate or continue research coverage of certain companies was influenced, at least in part, by whether those companies were actual or prospective investment banking clients of Morgan Stanley.

In one instance, in May 2001, the liaison between the research and investment banking divisions was advised that a poultry company, Pilgrim's Pride, was seeking equity research coverage in connection with a prospective high-yield offering. The liaison made clear that Morgan Stanley should not commit to providing coverage until it received a certain amount of investment banking fees from the company:

> Be careful with this one. Under no circumstances should we commit unless we get the books and at least $3-5mm in fees, with the money in the bank before we pick up coverage. We can tell them it will go in the queue and we cannot promise them a rating. It costs about $1 mm to pick up coverage of a stock and there are also meaningful ongoing expenses to maintain.

Morgan Stanley analysts on occasion also declined to cover some companies that refused to award investment banking business to Morgan Stanley. One senior analyst wrote in a 2000 self-evaluation that the analyst had declined Sabre Group's requests for research coverage for four years and that the analyst had "insisted that we first be mandated on a large investment banking transaction." Generally, analysts select which of the many companies in a sector they will cover. This senior analyst did not consider Sabre to be one the analyst needed to cover, unless Morgan Stanley were to be mandated on an investment banking transaction. When Sabre provided Morgan Stanley with banking business in connection with its spin-off from AMR Corp., the analyst initiated coverage of Sabre with an Outperform rating in March 2000.

Morgan Stanley also declined to initiate coverage of Concord/EFS, Inc. Concord initially retained Morgan Stanley as bookrunner for a 1999 secondary offering, but then hired a different bank as bookrunner after Morgan Stanley declined Concord's request that it commit to initiating coverage with a "Strong Buy" rating. Though Concord continued to offer part of that investment banking business to Morgan Stanley, Morgan Stanley withdrew, and it did not initiate research coverage of Concord at that time. In the fall of 2000, Morgan Stanley sought investment banking business from Concord in

8

connection with another secondary offering. Concord's management told Morgan Stanley's senior analyst that it wanted an advance view of the analyst's initial rating. After completing two to three months of preliminary due diligence, the analyst told Concord that, if coverage were to be initiated at that time, the analyst tentatively would issue a "Strong Buy" up to a certain valuation level. Morgan Stanley also provided Concord with a draft research report, which, according to an e-mail written by an investment banker, was part of Morgan Stanley's "marketing efforts." When Morgan Stanley was not awarded the 2000 investment banking business, its analyst did not initiate coverage at that time, despite the analyst's initial view that Concord had emerged as a leader in its industry that preliminarily merited a "Strong Buy."

Morgan Stanley also initiated coverage of eBay, Inc., in part with the hope of obtaining investment banking business. After Morgan Stanley initially lost the IPO business for eBay in 1998, a senior Morgan Stanley analyst met with eBay's chief executive officer and provided a draft research report on the company. After Morgan Stanley nevertheless lost the IPO business, the analyst initiated coverage on eBay on its first day of trading with an Outperform rating. The analyst was the only one covering eBay, since firms in the underwriting syndicate were prohibited from initiating coverage until after the 25-day "quiet period" had expired. It is the only time that the senior analyst initiated coverage of a company on its first day of trading. Later, in 1999 and again in 2001, eBay awarded two banking transactions to Morgan Stanley, with total fees of approximately $13.8 million. In the senior analyst's self-evaluation for 2000, the analyst stated, as part of the analyst's "philosophy" for Morgan Stanley's "Internet banking efforts," that "when we miss a winning IPO, we should work like crazy (with tons of ideas) to secure a spot as M&A advisor (USWeb/CKS) or book running manager on follow-on offerings (eBay)."

### 3. Morgan Stanley Research Analysts Performed Investment Banking Functions

Morgan Stanley research analysts performed a number of investment banking-related functions. They identified potential IPO and merger and acquisition transaction candidates for the investment banking department, participated in soliciting investment banking business for the firm, and participated in road shows and other efforts to sell Morgan Stanley-underwritten IPOs and secondary offerings to institutional investors. At times, analysts also had discussions about business strategy with investment banking clients directly, and one senior analyst was described as a relationship manager with certain investment banking clients.

Morgan Stanley kept a record of each analyst's contribution to investment banking revenues. Each year, a "Revenue Share Analysis" was prepared that listed every investment banking transaction in which each analyst had participated, the revenues from each transaction, a rating on a scale of 1 to 5 (5 being "critical" to the deal) of the analyst's contribution to the transaction, and a calculation of the analyst's "share" of the credit for the revenues secured from the transaction. The Revenue Share

Analysis also recorded investment gains on Morgan Stanley investments in companies covered by the analyst.

One senior analyst's involvement in investment banking activities was such that several investment bankers at the firm regarded the analyst as tantamount to an investment banker. One banker wrote that the analyst was the most committed and focused banker with whom he had ever worked. Another wrote that the analyst was a "commercial animal" who would do anything appropriate to win underwriting mandates. The analyst's supervisor wrote in 1999 that the analyst's focus was primarily on banking and that, notwithstanding the growing demand for the analyst's time on investment banking matters, the analyst needed to devote more attention to institutional investors and the firm's institutional sales force.

The analyst's own self-evaluation prominently mentioned the analyst's assistance to investment banking in selecting and generating investment banking business and large fees, stating: "Bottom line, <u>my highest and best use is to help MSDW win the best Internet IPO mandates</u> (and to ensure that we have the appropriate analysts and bankers to serve the companies well). . . " (emphasis in original). It also prominently listed the deals and revenues from the analyst's investment-banking connected efforts:

> **Internet Investment Banking, a Record Year with $205MM+ YTD Revenue, [20+] Pending Financings, Co-Coverage (Leverage) in 85% of Cases, 6 of 6 Tech IBD Revenue Generating Clients, Internet Category was #1 Revenue Generator in Tech IBD ($505MM YTD Tech Revenue). . .** (Emphasis in original.)
>
> OK, the numbers (see Attachment A): Forty investment banking transactions ($143MM in fees) . . .
>
> It's notable that 96% of the $205MM in revenue was derived from clients new to the firm since 1995! Exceptions were America Online, Compaq, Hearst and Sotheby's. <u>And I have been very involved in this business</u>. (Emphasis added).

### 4. Investment Banking Was an Important Factor in Determining Research Analysts' Compensation

From 1999 through 2001, participation in investment banking activities was a factor in determining the total compensation awarded to some Morgan Stanley research analysts. These analysts thus faced a conflict of interest between helping win investment banking business for Morgan Stanley and publishing negative research that could prevent Morgan Stanley from winning that banking business.

The annual salaries paid to senior Morgan Stanley analysts and other senior Morgan Stanley personnel typically were comparatively small components of their total annual compensation. The majority of their total annual compensation was paid in the

10

form of a bonus. In 2000, one senior analyst received a year-end bonus that was 90 times greater than the analyst's base salary.

The total compensation paid to analysts was based in part on Morgan Stanley's total revenues for a particular year, including the investment banking fees that Morgan Stanley received. Thus, the success or failure of the investment banking division determined, in part, the total amount of funds available to pay employee compensation in any given year, including analyst compensation.

    a.    <u>Analysts Rated Their Contributions to Investment Banking</u>

The level of contribution to investment banking transactions was an important factor in the annual evaluations of Morgan Stanley's analysts and compensation decisions.

As part of the annual performance evaluation process, analysts were asked to submit self-evaluations that, among other things, discussed their contributions to Morgan Stanley. Analysts often included in their self-evaluations a discussion of their involvement in investment banking, including a description of specific transactions, the fees generated, and the role the analyst played in each deal. For example, one-quarter of the 1999 self-evaluation of one analyst was dedicated to the analyst's role in investment banking activities, and identified forty transactions that year that had generated a total of $143 million in fees.

As part of the evaluation process, the analysts also provided a rating of their contributions to specific banking transactions. Analysts were instructed to complete a Transaction Summary Worksheet ("TSW") in which they graded their roles in specific deals on a scale of 1-5. Instructions provided to each analyst described the rating system as follows:

    5 = critical to deal

    4 = important to development and execution

    3 = solid contribution

    2 = limited contribution

    1 = contribution limited to providing research coverage

Analysts were also instructed to comment on important aspects of any transaction, including, for example, whether the "promise of coverage was critical to winning" the mandate. The instructions informed analysts that supplying the information called for in the TSWs was an "important part" of their annual evaluation process.

11

b.   Investment Bankers Evaluated Analysts' Performance

Morgan Stanley also solicited and received the investment bankers' assessment of the analysts' performance on the same transactions. Morgan Stanley's liaison between the research and investment banking divisions compiled and summarized the bankers' evaluations of the analysts' role in each deal and then prepared a final TSW listing for each transaction that provided a joint evaluation of the analysts' contributions to each deal.

Finally, as part of Morgan Stanley's "360 degree" review process, in which employees confidentially reviewed one another, investment bankers submitted written opinions of analysts with whom they worked.

Investment bankers thus played a role in the annual evaluation of research analysts by providing substantive information that was considered in the year-end evaluation process and input into the determination of the analysts' compensation for that year. The investment bankers' role in the evaluation process created a conflict of interest for analysts, who hoped for positive evaluations from investment bankers at the same time that they were charged with issuing objective research reports that, if negative, could have impeded Morgan Stanley's ability to win future investment banking business from the covered companies.

c.   Investment Banking Was the Factor Accorded the Greatest Weight by Management in Reviewing Management's Initial Determination of Proposed Analysts' Compensation

In 1999 and 2000, analyst compensation was set primarily by a managing director in the equity research division. The managing director made an initial determination of proposed compensation for all analysts and ranked the analysts based on that determination. The managing director then ranked the analysts based on their composite scores in nine categories. The managing director then compared the two rankings before forwarding the compensation recommendations to superiors.

The nine categories used to rank the analysts included the amount of investment banking revenues attributed to analysts based on their involvement in transactions (relative weight of 33.3%) and eight other categories related to core research activities, including: (1) poll rankings from the *Institutional Investor* and other sources (19%); (2) poll ranking from institutional equity division sales (12%); (3) firm activities and ability to be a team player (11%); (4) the "hit ratio" in vote gathering from institutional clients (7%); (5) rank in vote gathering from institutional clients (7%); (6) stock picking (active portfolio vs. passive portfolio) (6%); (7) stock picking (active portfolio vs. index portfolio) (3%); and (8) poll ranking from retail sales (2%). Thus, the managing director assigned a one-third weight to investment banking revenues -- the highest weight given to any single category.

12

The impact that an analyst's contribution to investment banking revenues could have on the determination of the analyst's compensation is shown by the compensation of one Morgan Stanley senior analyst in 1999 and 2000. In 1999, the analyst who received the highest compensation among Morgan Stanley research analysts had a composite score that ranked only 11th overall, but ranked first in investment banking revenues (based on banking revenues of approximately $143 million).

In 2000, the same analyst continued to rank first in investment banking revenues: the total investment banking revenues that the analyst helped Morgan Stanley obtain more than doubled to approximately $425 million. In most other categories, however, the analyst's performance declined from 1999, and the analyst's composite score dropped to 19th overall. In 2000, the analyst ranked only 70th out of 111 analysts in stock picking, and the analyst's self-evaluation conceded that 2000 had been the analyst's worst stock-picking year in fifteen years. Nevertheless, this analyst's total salary and bonus for 2000 increased by approximately $8.7 million as compared to 1999, again ranking first among all Morgan Stanley analysts.

### D. Morgan Stanley Did Not Disclose That It Paid $2.7 Million Of Underwriting Fees At Issuers' Direction To Other Investment Banks To Provide Research Coverage

In at least twelve stock offerings in which it was selected as lead underwriter from 1999 through 2001, Morgan Stanley paid $2.7 million of the underwriting fees to approximately twenty-five investment banks. Internal Morgan Stanley documents described these payments as "research guarantees" or "guaranteed economics for research." Other internal Morgan Stanley documents noted instances in which the bank receiving the payment "will write research." Morgan Stanley made these payments from the offering proceeds at the direction of the issuers.

These "research guarantee" payments included more than $670,000 paid to three investment banks in connection with an offering by Veritas Software Corp. in December 1999; more than $816,000 paid to seven banks in connection with an Agile Software Corp. offering in December 1999; and more than $440,000 paid to five banks in connection with an offering by Atmel Corp. in February 2000. The individual disbursements ranged from two payments of just over $6,000 each to three payments of more than $225,000 each.

The issuers' registration statements and other offering documents identified the other banks as part of the underwriting syndicates and as receiving payments, but did not specifically disclose the payments as being for research. Morgan Stanley did not take steps to ensure that these banks disclosed these payments in their research reports. Morgan Stanley also did not cause the payments to be disclosed in offering documents or elsewhere as having been for research.

13

### E. Morgan Stanley Failed Reasonably To Supervise Its Senior Research Analysts

#### 1. Morgan Stanley Had No System for Reviewing The Ratings Issued by Its Senior Analysts

Morgan Stanley failed reasonably to supervise its senior research analysts. The firm required only non-officer-level analysts to submit their initial ratings and proposed changes in ratings for review by the Stock Selection Committee. Senior analysts -- principals and managing directors -- were not subject to this requirement. In addition, Morgan Stanley had no effective system in place for reviewing the ratings of its senior analysts against changed conditions.

Morgan Stanley's lack of an effective review system allowed some principal and managing director analysts to maintain Outperform ratings unchanged on declining stocks without any review by management. For example, in 2000 and 2001, four senior analysts maintained Outperform ratings unchanged on 13 stocks as the prices of the stocks declined by over 74 percent. The names of the stocks, their percentage declines, and the number of months without a change in the Outperform rating are shown on the following chart:

| Company | Percent Price Drop While Rated Outperform | Months Without Change in Outperform Rating |
|---|---|---|
| Chemdex (Ventro) | 96.2 | 8.5 |
| Drugstore.com | 95.4 | 30 |
| Priceline.com | 92.0 | 30 |
| Ask Jeeves | 90.9 | 16 |
| Marimba | 88.9 | 8.5 |
| Homestore.com | 88.7 | 10 |
| Vignette | 87.1 | 7.5 |
| VeriSign | 83.3 | 19.5 |
| Akamai | 82.8 | 10 |
| Women.com | 80.3 | 8.5 |

14

| CNET | 77.7 | 16.5 |
|---|---|---|
| Inktomi | 76.9 | 15 |
| FreeMarkets | 74.3 | 23 |

Not until late 2001, after complaints from Institutional Sales persons made as part of the year-end evaluation process, did management state to one of the analysts: "Don't let your ratings get stale; change them ahead of expected price action."

### 2. Morgan Stanley's Analysts Virtually Never Used the Lowest Rating in the Firm's Stock Rating System

From 1995 to March 2002, Morgan Stanley publicly stated that it had a four-category rating system: Strong Buy; Outperform; Neutral; and Underperform. "Underperform" was defined as follows: "Given the current price, these securities are not expected to perform as well as other stocks in the universe covered by the analyst."

Although Morgan Stanley stated that it had a four-category system, its analysts virtually never used the "Underperform" rating and, in effect, used a three-category system. From 1999 through 2001, the firm published research on approximately 1,000 North American company stocks. No more than three of the 1033 stocks covered over the course of 1999 were given an Underperform rating; no more than five of the 1058 stocks covered over the course of 2000 received that rating; and no more than six of the 1030 stocks covered over the course of 2001 were rated Underperform.

Morgan Stanley management was aware that analysts were not using the "Underperform" rating, but did not correct the problem until March 2002, when a new rating system was instituted.

### F. Violations

**Violation of NASD Conduct Rules Due to Conflicts of Interest Resulting from Investment Banking Influence over Research Analysts.** NASD Conduct Rule 2110 requires members to observe high standards of commercial honor and just and equitable principles of trade. During the relevant period, Morgan Stanley engaged in the acts and practices described above that created and/or maintained inappropriate influence by investment banking over research analysts and therefore imposed conflicts of interest on its research analysts. Morgan Stanley failed to manage these conflicts in an adequate or appropriate manner. By reason of the foregoing, Morgan Stanley violated NASD Conduct Rule 2110.

15

**Violation of NASD Conduct Rule by Paying Underwriting Fees to Other Broker-Dealers for Research.** NASD Conduct Rule 2210(d)(1)(A) states in part that "All member communications with the public shall be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts in regard to any particular security or securities or type of security, industry discussed, or service offered." As described above, Morgan Stanley, as lead underwriter, made payments to other broker-dealers identified as part of the underwriting syndicate when the Firm knew that these payments were made, at least in part, for research coverage. Morgan Stanley failed to disclose or cause to be disclosed these payments in offering documents or elsewhere. By reason of the foregoing, Morgan Stanley violated NASD Conduct Rules 2110 and 2210(d)(1)(A).

**Violation of NASD Conduct Rule by Failing to Supervise.** NASD Conduct Rule 3010(a) requires members, among other things, to "establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with [NASD's Rules]." As described above, Morgan Stanley did not establish and maintain adequate procedures to protect research analysts from conflicts of interest. Morgan Stanley also did not adequately supervise the work of senior analysts, the content of their reports, and the reasonableness of their ratings. By reason of the foregoing, Morgan Stanley violated NASD Rule 3010(a).

### G.    Sanctions

Morgan Stanley consents to the imposition, at a maximum, of the following sanctions:

1.    a censure; and

2.    a total payment of $125,000,000.00, as specified in the Final Judgment ordered in a related action filed by the Securities and Exchange Commission ("Final Judgment"), as follows:

   (a)    $25,000,000, as a fine;

   (b)    $25,000,000, as disgorgement of commissions, fees, and other monies; and

   (c)    $75,000,000, to be used for the procurement of Independent Research, as described in Addendum A: Undertakings to the Final Judgment ("Addendum A").

The monetary sanctions imposed by NASD shall be reduced by the amounts paid by Respondent pursuant to the Final Judgment. Addendum A and the payment provisions of the Final Judgment are incorporated herein by reference.

Respondent agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification, including but not limited to payment made pursuant to any insurance policy, with regard to any fine/penalty amounts that Respondent shall pay pursuant to Section II of the Final Judgment, regardless of whether such fine/penalty amounts or any part thereof are added to the Distribution Fund Account or otherwise used for the benefit of investors. Respondent further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any fine/penalty amounts that Respondent shall pay pursuant to Section II of the Final Judgment, regardless of whether such fine/penalty amounts or any part thereof are added to the Distribution Fund Account or otherwise used for the benefit of investors. Respondent understands and acknowledges that these provisions are not intended to imply that NASD would agree that any other amounts Respondent shall pay pursuant to the Final Judgment may be reimbursed or indemnified (whether pursuant to an insurance policy or otherwise) under applicable law or may be the basis for any tax deduction or tax credit with regard to any federal, state, or local tax.

The sanctions imposed herein shall be effective on a date set by NASD staff.

### III.

### OTHER MATTERS

Respondent understands that it may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. It understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by NASD, nor does it reflect the views of NASD or its staff.

17

Respondent certifies that it has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it, and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein, has been made to induce Respondent to submit it.

Date: 4/21/03

Morgan Stanley & Co. Incorporated
By: _____
Donald G. Kempf, Jr.
Authorized Signatory

Reviewed by:
_____
James Cusick, Esq.
Managing Director

Accepted by NASD:

4/24/03
Date

On behalf of the Director of the Office of Disciplinary Affairs, through delegated authority,

_____
Barry R. Goldsmith
Executive Vice President
Department of Enforcement
NASD
1801 K St. NW
Washington, DC 20006