**JONES DAY**  
Robert W. Gaffey  
222 East 41st Street  
New York, New York 10017  

Attorneys for Debtors  
and Debtors in Possession  

**QUINN EMANUEL URQUHART &**  
**SULLIVAN LLP**  
James C. Tecce  
51 Madison Avenue  
22nd Floor  
New York, NY 10010  

Attorneys for Official Committee  
of Unsecured Creditors  

**HUGHES HUBBARD & REED LLP**  
William R. Maguire  
One Battery Park Plaza  
New York, New York 10004  

Attorneys for James W. Giddens, as Trustee for the  
SIPA Liquidation of Lehman Brothers Inc.  

**UNITED STATES BANKRUPTCY COURT**  
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re:                                    :    Chapter 11
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    Case No. 08-13555 (JMP)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
-------------------------------------------------------------x
                                          :
In re:                                    :    SIPA Proceeding
                                          :
LEHMAN BROTHERS INC.,                     :    Case No. 08-01420 (JMP)
                                          :
                    Debtor.               :
                                          :
-------------------------------------------------------------x
```

## MEMORANDUM OF MOVANTS IN OPPOSITION TO THE MOTION *IN LIMINE* OF BARCLAYS CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF JOHN P. GARVEY, MARK E. SLATTERY, JOSEPH SCHWABA, JOHN J. SCHNEIDER, JOHN J. OLVANY, HARRISON J. GOLDIN, AND PROFESSOR MARK E. ZMIJEWSKI

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 4

ARGUMENT ...................................................................................................... 11

    I.    The Proposed Testimony of Movants' Experts Is Relevant ............................... 11

        A.    Barclays' Relevance Argument Effectively Has Been Mooted by
            Proceedings Before This Court .................................................................. 11

        B.    Expert Testimony on the Valuation of the Securities Transferred to
            Barclays Is Highly Relevant to the Issues Before the Court ..................... 12

        C.    The Barclays Acquisition Balance Sheet Systematically and
            Substantially Undervalued the Assets Acquired by Barclays as of
            the Closing Date ...................................................................................... 13

            1.    Barclays' Rejection of Independent, Third-Party Custodial
                Prices ........................................................................................... 14

            2.    Barclays' Use of Post-Closing Date Valuations ......................... 15

            3.    Barclays' Use of Excessive Haircuts and Discounts ................... 16

            4.    Barclays' Use of Internal Transactions to Price Securities .......... 17

            5.    Movants' Valuations Are Consistent with Those of
                Independent Third-Parties ............................................................ 17

            6.    Barclays' Valuation Mirrors the Undisclosed Liquidation
                Value Analysis Conducted on the Morning of September
                19, 2008, and Used to Misinform the Court ............................... 18

    II.    The Proposed Testimony of Movants' Experts Meets the Admissibility
        Standards of Fed. R. Evid. 702 and Daubert ...................................................... 21

        A.    Mark Zmijewski's Proposed Testimony Is Admissible .......................... 22

            1.    Professor Zmijewski Appropriately Relied on Movants'
                Other Experts .............................................................................. 23

            2.    Professor Zmijewski Appropriately Relied on the JPM
                 Values ......................................................................................... 25

            3.    Professor Zmijewski's Calculation of September 19 End-
                 of-Day Prices for the JPM Inventory Was Reliable and
                 Appropriate ................................................................................. 25

            4.    Professor Zmijewski's Selection of the Valuation Date for
                 JPM Inventory Was Appropriate ................................................. 26

            5.    Professor Zmijewski's Selection of a Valuation Date for the
                 Equities Portfolio Was Appropriate ............................................ 27

## TABLE OF CONTENTS
(continued)

**Page**

B.    John P. Garvey's Proposed Testimony Is Admissible ............................ 28

    1.    Mr. Garvey's Testimony Is Logical And Internally Consistent .................................................................... 30

    2.    Mr. Garvey's Testimony Is Consistent with the Undisputed Facts .................................................................... 31

    3.    Mr. Garvey Considered All Relevant Facts and Testimony ........ 32

C.    John Olvany's Proposed Testimony Is Admissible. ................................ 33

D.    Mark Slattery's Proposed Testimony Is Admissible. ............................. 36

E.    Joseph Schwaba's Proposed Testimony Is Admissible .......................... 38

F.    John Schneider's Proposed Testimony Is Admissible. ........................... 42

G.    Harrison J. Goldin's Proposed Testimony Is Admissible. ...................... 44

# TABLE OF AUTHORITIES

**Page**

CASES

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
    222 F. Supp. 2d 423 (S.D.N.Y. 2002),
    *aff'd sub nom. In re Omeprazole Patent Litig.*, 84 Fed. App'x 76 (Fed. Cir. 2003) .........23, 25

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .............................................................................................. passim, 3, 13

*Davidov v. Louisville Ladder Group, LLC*,
    No. 02 Civ. 6652(LLS), 2005 WL 486734 (S.D.N.Y. Mar. 1, 2005),
    *aff'd*, 169 Fed. App'x 661 (2d Cir. Mar. 10, 2006) ................................................................32

*Highland Capital Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008).................................................................13, 29, 30, 43

*In re 1115 Third Ave. Rest. Corp.*,
    No. 03 Civ. 0586, 2004 WL 1542261 (S.D.N.Y. July 8, 2004) ..................................23, 24, 25

*In re Adler, Coleman Clearing Corp.*,
    247 B.R. 51 (Bankr. S.D.N.Y. 1999), *aff'd in part*, 263 B.R. 406 (S.D.N.Y. 2001)..............43

*In re Blech Sec. Litig.*,
    No. 94 Civ. 7696(RWS), 2003 WL 1610775 (S.D.N.Y. March 26, 2003) ............................13

*Lippe v. Bairnco Corp.*,
    99 Fed. App'x 274 (2d Cir. 2004)........................................................................................42

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010)..................................................................................30

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    No. 93 Civ. 4001(NRB), 2004 U.S. Dist. LEXIS 2676 (S.D.N.Y. Feb. 20, 2004) .................33

OTHER AUTHORITIES

FED. R. EVID. 702 ................................................................................................................ passim

Lehman Brothers Holdings Inc. ("LBHI"), James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc., and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. and its affiliated debtors and debtors-in-possession (the "Committee," and collectively, the "Movants"), submit this memorandum in opposition to Barclays' Motion *in Limine* for an Order Excluding the Expert Testimony of John P. Garvey, Mark E. Slattery, Joseph Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and Professor Mark E. Zmijewski ("Movants' Experts") filed on April 20, 2010 (the "Barclays Motion"), by Barclays Capital, Inc. ("Barclays").[1]  Movants respectfully request that the Court deny the Barclays Motion.

## INTRODUCTION

1.      In this action, Movants contend, among other things, that (a) the value of the approximately 12,000 distinct securities Barclays acquired through the Sale Transaction exceeded the consideration Barclays paid by billions of dollars, and (b) in disclosures made to the Court to obtain approval for the Sale Transaction, the value of the acquired securities was understated by billions of dollars while the value of the consideration, including assumed liabilities, was overstated by billions of dollars.  Indeed, when those assets and liabilities are properly valued, the evidence reveals that Barclays received approximately $13 billion in value in excess of what was disclosed to this Court.  Barclays now seeks to exclude independent expert valuations that demonstrate this massive, undisclosed, asset-liability mismatch in Barclays' favor that was never disclosed to the Court.

---

[1] Barclays has filed two separate motions to exclude the testimony of Movants' Expert Daniel MacIsaac. (LBHI Docket Nos. 8481 and 8482.)  Movants are submitting separate objections to those motions.

2.      In a single, perfunctory brief, Barclays seeks to exclude the testimony of seven of Movants' Experts ostensibly on the basis that, *first*, the testimony of the Movants' Experts is irrelevant (Barclays Motion ¶¶ 2-5, 10), and *second*, that Movants' Experts have offered opinions that purportedly "contradict the record, fail to consider the actual securities at issue, are based on unreliable methodology, and are internally inconsistent." (Barclays Motion ¶¶ 6-7, 11-65.) Neither of Barclays' arguments provides any basis to exclude the testimony of any of Movants' Experts under the Federal Rules of Evidence and *Daubert*.

3.      The first argument – concerning the legal relevancy of the proposed testimony – is premised entirely on Barclays' assumption that it will prevail on certain of the *legal* arguments it has presented in opposition to the Rule 60 Motions. (Barclays Motion ¶¶ 1 n.2, 10.) That argument is not only presumptuous, it is moot. The Court already has declined to grant Barclays' requests to deny the Rule 60 Motions and to dismiss the Adversary Complaints as a matter of law. (4/9/10 Hr'g Tr. [LBHI Docket No. 8488] 10:19-24, 210:19-211:3.) Instead, the Court ordered this matter to proceed to an evidentiary trial on all issues presented (*id.* at 210:19-211:3), including the issues of valuation presented by Movants' Rule 60 Motions and Adversary Complaints.

4.      The proposed testimony of Movants' Experts is directly relevant to those valuation issues and will be helpful to the Court in deciding the issues presented. In addition, Movants' Experts rebut the testimony of Barclays' expert Professor Pfleiderer who Barclays proffers to vouch for Barclays' internal valuations (even though Professor Pfleiderer conceded that he had not independently valued a single security at issue, and he could not state unequivocally that he actually agreed with Barclays' accounting valuation for any particular security).

5.      The second argument – concerning foundation and methodology challenges to the reliability of Movants' Experts – fares no better.  Barclays mischaracterizes the scope of the experts' testimony and the bases for their opinions and ignores or misapplies controlling law concerning the admissibility of expert testimony.  Indeed, Barclays' attack is so broad-based and generic it seeks to exclude completely each and every one of Movants' Experts even though the Motion itself does not identify any deficiencies as to certain of the opinions expressed by these experts.

6.      As summarized below, and demonstrated in the Expert Reports and the supplemental declarations submitted herewith, each of Movants' Experts is a qualified and experienced professional with specialized knowledge.  Each of these experts will assist the Court to understand the evidence and to determine the relevant facts in issue, including the valuation of approximately 12,000 unique securities, applicable accounting principles and industry customs and practices concerning securities valuation and repo lending.[2]  These experts formed their opinions by using reliable methods, applied in a reliable manner to the facts and data in this case. While Barclays can disagree with these Experts' conclusions, it is not entitled to deny this Court the benefit of their expertise and opinions.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

---

[2] The reports and deposition transcripts of Movants' Experts are attached as Exhibits to the Barclays Motion, with the exception of the deposition transcript of Movants' Expert John Olvany, who was deposed after the Barclays Motion was filed:  Ex. P (Zmijewski Report), Ex. Q (Zmijewski Tr.), Ex. A (Garvey Report), Ex. B (Garvey Tr.), Ex. M (Olvany Report), Ex. C (Slattery Report), Ex. E (Slattery Tr.), Ex. J (Schwaba Report), Ex. I (Schwaba Tr.), Ex. L (Schneider Report), Ex. K (Schneider Tr.), Ex. N (Goldin Report), Ex. O (Goldin Tr.).  Mr. Olvany's deposition transcript is appended to the Declaration of Jayant W. Tambe, dated July 16, 2010 ("Tambe Declaration") as Ex. 6 (Deposition Transcript of John Olvany, dated April 21, 2010 ("Olvany Tr.")).  Supplemental declarations from Movants' Experts are appended to the Tambe Declaration as Ex. 1 (Declaration of Mark E. Zmijewski, dated July 15, 2010 ("Zmijewski Decl.")), Ex. 2 (Declaration of John P. Garvey, dated July 15, 2010 ("Garvey Decl.")), Ex. 3 (Declaration of John J. Olvany, dated July 15, 2010 ("Olvany Decl.")), Ex. 4 (Declaration of Mark E. Slattery, dated July 15, 2010 ("Slattery Decl.")), and Ex. 5 (Declaration of Joseph Schwaba, dated July 15, 2010 ("Schwaba Decl.")).

579, 595 (1993) (the focus "must be solely on principles and methodology, not on the conclusions that they generate").

## BACKGROUND

7.        At issue in Movants' pending Rule 60 Motions is whether Barclays received value materially in excess of what was disclosed to the Court, and thus, benefited from the Sale Transaction beyond what was approved by the Court (the "Barclays Windfall").[3]  All parties have submitted expert reports addressing, among other things, the valuation of the securities transferred from Lehman to Barclays.

8.        In connection with the Rule 60 Motions, each of the seven experts that are the subject of this Motion reviewed the report of Barclays' expert Professor Paul Pfleiderer dated January 8, 2010 (the "Pfleiderer Report") and responded to the issues that are related to each expert's respective expertise.  (*See generally* Pfleiderer Report (Ex. 11 to Tambe Decl.).)

9.        In his report, Professor Pfleiderer opined that Barclays did not receive a $5 billion discount on the portfolio of securities Barclays acquired in the Sale Transaction.  (*Id.* ¶¶ 5(a), 7-91.)  To reach this conclusion, Professor Pfleiderer did not actually perform any kind of valuation.  Instead, he lifted his valuation, essentially on blind faith, from Barclays' self-prepared, post-Sale Transaction Acquisition Balance Sheet.  Professor Pfleiderer did not undertake any independent analysis of his own.  (*Id.* ¶¶ 23-25, 49-50, 60; Paul Pfleiderer Deposition Transcript, dated February 23, 2010 ("Pfleiderer Tr.") 40:3-43:24, 46:4-15, 81:10-21, 82:16-83:14, 107:6-110:16, 260:11-262:22, 318:20-323:14 (Ex. 7 to the Tambe Decl.).)  Instead, Professor Pfleiderer apparently satisfied himself that he could bless Barclays' internal valuation,

---

[3] *See* Movants' Rule 60 Motions and Adversary Complaints (LBHI Proc. No. 08-13555, Docket Nos. 5148, 5169, 7641, 7667; LBI Proc. No. 08-01420, Docket Nos. 1690, 2847; LBHI Adv. Proc. No. 09-01731, Docket No. 1; LBI Adv. Proc. No. 09-01732, Docket No. 1; Committee Adv. Proc. No. 09-01733, Docket No. 1).

rather than perform one of his own because, in his view, he had adequately consulted with the individuals at Barclays who purportedly conducted the valuation upon which he relies. (*See* Pfleiderer Report ¶¶ 49-50, 60.) However, discovery conducted since Professor Pfleiderer testified at his deposition indicates that those employees had little, if any, recollection of ever having spoken with him. (Richard Landreman Deposition Transcript, dated June 16, 2010 ("Landreman Tr.") 187:19-189:12; Mark Washtell Deposition Transcript, dated June 17, 2010 ("Washtell Tr.") 188:7-194:7; Sean Teague Deposition Transcript, dated June 30, 2010 ("Teague Tr.") 103:21-105:6.)[4]

10.    Nonetheless, having obtained Professor Pfleiderer's imprimatur, Barclays contends the Repo Collateral can be worth no more than the $45.5 billion Barclays' internally ascribed to the securities for purposes of its acquisition accounting after the Sale Transaction. (Barclays Motion ¶¶ 1, 4.)[5] Movants' Experts, based upon their independent and in-depth valuation analysis of the securities transferred to Barclays, put the lie to Barclays' contention.[6]

11.    Six of Movants' Experts are with Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc. ("Navigant").[7] Four of these experts offer valuation

---

[4] The Landreman, Washtell and Teague deposition transcripts are attached to the Tambe Declaration as Exs. 8, 9 and 10 respectively.

[5] The Pfleiderer Report defines "Repo Collateral" as the "inventory of trading portfolio securities [Barclays] acquired when it replaced the Federal Reserve Bank of New York, as LBI's primary source of financing on Thursday, September 18, 2008." (Pfleiderer Report ¶ 5(a).) Table 2 of the Pfleiderer Report sets forth what is included within the term. The Pfleiderer Report uses the term "Schedule B breakout analysis" to describe certain assets removed from its analysis of the Repo Collateral. (Pfleiderer Report 64 n.77.)

[6] Given Professor Pfleiderer's lack of independent analysis of Barclays' valuations and his attempt, in other parts of his report, to usurp the role of the Court, Movants have sought to exclude his opinions pursuant to *Daubert*. *See* Motion *In Limine* for an Order Excluding the Expert Testimony of Professor Paul Pfleiderer (Bankr. S.D.N.Y. April 2, 2010) (LBHI Docket No. 8015).

[7] Expert Report of Mark E. Zmijewski, dated March 15, 2010 (the "Zmijewski Report"); Expert Report of John P. Garvey, dated March 15, 2010 (the "Garvey Report"); Expert Report of John J. Olvany, dated March 15, 2010 (the "Olvany Report"); Expert Report of Mark E. Slattery, dated March 15, 2010 (the "Slattery Report");

opinions, i.e., Professor Mark Zmijewski, Mark Slattery, John Olvany and Joseph Schwaba.

Each of these experts provided a valuation opinion on the type of securities within his particular

expertise.[8]

| Summary of Barclays' Undervaluation of Initial and JPM Inventory[9] (amounts in billions of dollars) | | |
|---|---|---|
| **Expert** | **Asset Class** | **Barclays' Undervaluation** |
| Zmijewski | Equities | $0.541 |
| | JPM Inventory | $1.657 |
| Slattery | Rates, Credits, and Securitized Products | $2.380 |
| Olvany | Corporate Bonds | $0.381 |
| Schwaba | Municipal Securities | $0.150 |
| **Total Barclays' Undervaluation** | | **$5.109** |

12.     The other two experts, also with Navigant, are John Garvey and John Schneider.

Messrs. Garvey and Schneider do not offer valuation opinions.  They are industry custom and

practice experts who offer opinions about accounting and tri-party repo custodial issues,

respectively.  The seventh expert, Harrison J. Goldin, is another industry custom and practice

expert with an expertise in complex distressed transactions.  The Movants' Experts and opinions

that are the subject of this Motion are outlined below:

**Professor Mark Zmijewski**

13.     Professor Mark E. Zmijewski is the Leon Carroll Marshall Professor of

Accounting and Deputy Dean at The University of Chicago Booth Graduate School of Business.

---

(continued…)

Expert Report of  Joseph Schwaba, dated March 15, 2010 (the "Schwaba Report"); Expert Report of John J. Schneider, dated March 15, 2010 (the "Schneider Report").

[8] Professor Zmijewski also provides testimony in rebuttal to a number of additional opinions offered in the Pfleiderer Report.  (Zmijewski Report ¶ 11 (Opinions 4, 7-12).)

[9] The terms Initial Inventory and JPM Inventory are used herein as defined in the Zmijewski Report.  (*See* Zmijewski Report ¶ 11 n.5.)

(Zmijewski Report ¶ 1.)  He is a founder and principal of Navigant Economics (Chicago Partners).  (*Id.*)

14.     Professor Zmijewski independently valued two distinct portfolios of securities Barclays received in the Sale Transaction:  (a) the portfolio of Equity securities, which Professor Zmijewski opines Barclays undervalued by $541 million as of the Closing Date (*id.* ¶¶ 11 (Opinion 1), 19); and (b) the JPM Inventory, which Professor Zmijewski opines Barclays undervalued by $1.657 billion as of the Closing Date (*id.* ¶¶ 11 (Opinion 3), 31).

15.     In addition to these specific valuations of particular portfolios of securities, Professor Zmijewski also summarized in his report the findings of the other valuation experts so to calculate Barclays' total undervaluation of the Initial Inventory and JPM Inventory at $5.112 billion.  (*Id.* ¶¶ 11 (Opinions 1-2), 12, 14, 20, 24, Ex. A-2.)

16.     Similarly, citing Mr. Goldin's calculation of the transaction described to the Court, as well as making certain adjustments to Barclays' Acquisition Balance Sheet to reflect the fair value of the transaction as of the Closing Date, Professor Zmijewski calculates the amount of Barclays Windfall at up to $13.051 billion.  (*Id.* ¶¶ 11 (Opinion 2), 27, Exs. B-1, B-2.) That is the amount by which Barclays' gain at Closing exceeded the values described to and approved by the Court.

**<u>Mark E. Slattery</u>**

17.     Mark E. Slattery is an independent consultant with Navigant Economics (Chicago Partners) and a Chartered Financial Analyst with expertise spanning over 20 years in fixed income, including agency and non-agency residential mortgage back securities ("RMBS") and other securitized products, financial modeling, and risk management.  (Slattery Report ¶¶ 1, 9, 10, App. I.)

18.     Mr. Slattery valued 6,667 out of the total 11,938 CUSIPS in the Initial Inventory

and JPM Inventory. (*Id.* ¶ 5.) These securities were U.S. Treasury and Agency debt securities, Agency and Non-Agency RMBS, Collateralized Loan Obligations ("CLOs"), including the Pine CLO, Collateralized Debt Obligations ("CDOs"), and Commercial Mortgage-Backed Securities ("CMBS"). (*Id.* ¶¶ 15-16.)

19.     Mr. Slattery opined that Barclays undervalued these securities by at least $2.38 billion as of the Closing Date. (*Id.*)

**John J. Olvany**

20.     John J. Olvany is a Senior Advisor with Navigant Economics (Chicago Partners). (Olvany Report ¶ 1.) He has over 20 years of industry experience and was formerly a Managing Director at Morgan Stanley, where he ran the Fixed Income Institutional Sales and Trading Group in Chicago. (*Id.* ¶¶ 5-6, App. I.)

21.     Mr. Olvany valued 22 bonds, including 4 Giants Stadium Bonds, corporate bonds, and covered bonds. (*Id.* ¶ 8.) Mr. Olvany opines that Barclays undervalued the corporate and covered bonds, including the Giants Stadium Bonds, by at least $381 million as of the Closing Date. (*Id.* ¶ 7.)

**Joseph Schwaba**

22.     Joseph Schwaba is an independent consultant with Navigant Economics (Chicago Partners). (Schwaba Report ¶ 1.) He has over 20 years of industry experience in the fixed income and derivative markets, and managed profitable businesses at AG Becker, Prudential-Bache Securities, and Continental Bank. (*Id.* ¶¶ 3-5, App. 1.) Most recently, he was a Director of Corporate Risk Management at the Federal Home Loan Bank, Pittsburgh. (*Id.* ¶ 5.)

23.     Mr. Schwaba valued 26 municipal securities and opined that Barclays undervalued those municipal securities by at least $150 million as of the Closing Date. (*Id.* ¶¶ 14-15; Schwaba Decl. ¶ 28.)

**John P. Garvey**

24.     John P. Garvey is a Managing Director at Navigant Economics (Chicago Partners).  (Garvey Report ¶ 1.)  He has over thirty years of accounting experience, including as Market Team Leader for Business Fraud and Investigation Services at Arthur Andersen, Vice President with Fort Dearborn Partners, Inc., and a Partner in the audit group at Deloitte & Touche.  (*Id.* ¶¶ 5-6, App. I.)

25.     Mr. Garvey reviewed the decisions and judgments Barclays incorporated in its Acquisition Balance Sheet and determined that it is not representative of the value of the securities at the Closing Date.  (*Id.* ¶¶ 7 (Opinion 2), 16-32.)  Specifically, Mr. Garvey opined that Barclays' inconsistent and subjective use of different methods and adjustments to mark securities from mid-to-bid as well as the decision to value securities as of the close of business on September 22, or as late as September 30 or December 31 in the case of certain securities, resulted in valuations that understate the value of the securities as of the Closing Date.  (*Id.* ¶¶ 7 (Opinion 2, 2(a)-2(c)), 16-70.)

**John J. Schneider**

26.     John J. Schneider is a Managing Director at Navigant Consulting Inc. and a CPA. (Schneider Report ¶ 5.)  He has over 20 years of experience working with financial services companies, including Brown Brothers Harriman & Co., Citibank, and as a consultant, designing and evaluating governance and control environments, including the custodial valuation process. (*Id.* ¶¶ 5-7, App. II.)

27.     Mr. Schneider concluded that BoNY and JPMorgan Chase ("JPM"), the custodians and tri-party agents in the repo between Barclays and Lehman (the "September 18 Repo") and the repo between the Federal Reserve Bank of New York (the "Fed") and Lehman (the "Fed Repo"), respectively, were well qualified to value the collateral at issue.  (*Id.* ¶¶ 9-11.)

Also, BoNY and JPM were obligated contractually, under applicable law and regulation, and as a matter of custom and practice in the industry, to maintain adequate processes and safeguards to be able to value the collateral under the short time constraints that were common in the repo market.  (*Id.* ¶ 10.)  Mr. Schneider offers his opinion, based on his knowledge and expertise in the area of custodial services, to rebut Professor Pfleiderer's generic opinion that the BoNY and JPM marks were unreliable.  (*Id.* ¶¶ 13-28.)[10]

### Harrison J. Goldin

28.    Harrison J. Goldin, a senior managing director of Goldin Associates, has over 40 years of experience in large and complicated financial transactions and has acted as an advisor, as a fiduciary, and as a principal.  (Goldin Report at 4-5, Ex. I.)  For the last twenty years, he has been involved in large and complicated distressed transactions, including many section 363 sales, as a CEO, financial advisor, trustee, and examiner.  (*Id.*)

29.    Using his expertise in complicated distressed transactions, Mr. Goldin calculated what, in his opinion, was the value of the Sale Transaction as approved by the Court.  He valued the transaction described to the Court as one that would result in a $1.85 billion net benefit to Lehman.  (*Id.* at 6-11, 17.)  In so concluding, Mr. Goldin rebuts Professor Pfleiderer's opinion that the gain reported by Barclays in its Acquisition Balance Sheet is "not unusual, unexpected, or unreasonable."  (*Id.*)

30.    Mr. Goldin opined that, even using Barclays' own calculations, which back out the $2.08 billion in intangible assets noted on Barclays' Acquisition Balance Sheet, Barclays' reported gain exceeded the value of the transaction disclosed to the Court by approximately

---

[10] As far as we can tell, Professor Pfleiderer has no special knowledge or any expertise regarding custodial services and valuations.  He does not claim in his report to have any such expertise.

$4.85 billion.  (*Id.* at 8-9, 37.)  Mr. Goldin further opined that given these facts, the consideration

paid by Barclays did not constitute reasonably equivalent value.  (*Id.* at 9.)

## ARGUMENT

**I.    The Proposed Testimony of Movants' Experts Is Relevant**

### A.    Barclays' Relevance Argument Effectively Has Been Mooted by Proceedings Before This Court

31.    The proposed testimony of Movants' Experts is clearly relevant to the central

issue before the Court on the Rule 60 Motions – whether Barclays received more assets than

were disclosed to the Court and paid less for those assets than was represented to the Court.[11]  In

seeking to exclude Movants' Experts on the basis of legal relevancy, Barclays relies entirely on

contractual arguments it raised in its opposition to the Rule 60 Motions, apparently assuming that

they are dispositive.  (Barclays Motion ¶¶ 1 n.2, 10.)  This is not a proper basis for excluding

expert testimony under *Daubert*.  The fact that the Court ultimately could rule in favor of

Barclays on its contractual arguments, does not render it irrelevant or inadmissible at this stage

of the proceedings.  Moreover, Barclays' optimism about the strength of its contractual

arguments as dispositive is misplaced.  Less than two weeks before Barclays filed this motion,

the Court already had declined to resolve this matter on the legal arguments Barclays presented,

denied Barclays' request that the motion be denied on the strength of Barclays' legal arguments

and ordered the parties to proceed with the full evidentiary hearing that is now underway.

(4/9/10 Hr'g Tr. 10:19-24, 210:19-211:3.)  That evidentiary hearing will culminate with the

---

[11] Notwithstanding the representations to the Court at the September 19 Sale Hearing that the value of the trading assets being acquired was $47.4 billion (M.261 [LBHI Docket No. 318], 9/19/08 Hr'g Tr. 47:1-4), Barclays months later, for purposes of its acquisition accounting, accounted for the financial assets it received in the Sale Transaction at $50.16, including $45.5 billion for the Repo Collateral (M.105 [Dep. Ex. 377A]), a value Prof. Pfleiderer later rubber stamped.  (Pfleiderer Report ¶ 5(a).)  Even using Barclays' valuation of the financial assets it received, this value is more than the $47.4 billion represented to the Court.

presentation of expert testimony by Movants and Barclays. Given that the Court has already

determined that it will only decide the pending Rule 60 Motions and Adversary Proceedings on

the basis of a full evidentiary record, Barclays' first basis for evidentiary exclusion is moot.

**B.      Expert Testimony on the Valuation of the Securities Transferred to Barclays Is Highly Relevant to the Issues Before the Court**

32.      Other than by reference to its legal arguments, and its implicit confidence that it

will prevail on them, Barclays does not seriously contend that the matters addressed by Movants'

Experts are not relevant. Nor could Barclays do so. To resolve critical issues on the Rule 60

Motions, it is essential for this Court to determine the fair market value of the Repo Collateral

transferred to Barclays, as well as the total value of all the other assets transferred to Barclays.[12]

Barclays tacitly concedes the relevance of such valuation issues when it argues that this Court

should simply accept Barclays' word that the Repo Collateral was worth at most the $45.5 billion

that Barclays "ascribed to those assets on its public financial statements, which were audited by

PricewaterhouseCoopers ("PwC"), and filed with the Securities Exchange Commission ("SEC")"

(Barclays Motion ¶ 1; *see also id.* ¶ 4; BCI Opp. ¶¶ 29 n.25, 137, 208, 312, 594, 640, 651,

661),[13] and that it hired Professor Pfleiderer to bless.

33.      Movants disagree that the post-Sale Transaction valuation conducted by Barclays,

for purposes of its financial accounting and public reporting requirements, accurately values the

---

[12] In addition to writing down the Repo Collateral by $5 billion, Barclays also claims it is entitled to approximately $7 billion in cash, cash equivalents and additional collateral, which was not disclosed to the Court. This additional amount consists of the clearance box assets, 15c3-3 customer reserve securities and margin assets that are in dispute. (M.105 [Dep. Ex. 377A]; 4/30/2010 Hr'g Tr [Hughes] 222:5-11.)

[13] Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets ("BCI Opp.") (Bankr. S.D.N.Y. Jan. 29, 2010) (LBHI Docket No. 6815).

securities as of the Closing Date.[14]  And the testimony of Movants' Experts will undoubtedly be

helpful to the resolution of this factual dispute; it more than satisfies the so-called "fit"

requirement because it "will assist the trier of fact to understand the evidence or to determine a

fact in issue."  FED. R. EVID. 702; *see Daubert*, 509 U.S. at 591 ("Rule 702 further requires that

the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a

fact in issue.'  This condition goes primarily to relevance.  'Expert testimony which does not

relate to any issue in the case is not relevant and, ergo, non-helpful'  . . . . The consideration has

been aptly described . . . as one of 'fit.'") (citations omitted); *In re Blech Sec. Litig.*, No. 94 Civ.

7696(RWS), 2003 WL 1610775, at *24 (S.D.N.Y. March 26, 2003) ("The Rules' basic standard

of relevance … is a liberal one") (citations omitted); *Highland Capital Mgmt., L.P. v. Schneider*,

551 F. Supp. 2d 173, 185 (S.D.N.Y. 2008) (finding "[Defendant] is free to attack [Plaintiffs'

expert] opinion at trial; however, it is relevant").

## C.    The Barclays Acquisition Balance Sheet Systematically and Substantially Undervalued the Assets Acquired by Barclays as of the Closing Date.

34.    As described in the expert reports and supplemental declarations, and as will be

further demonstrated through the evidentiary hearing, Barclays employed a biased valuation

methodology to systematically – and substantially – undervalue the transferred securities.  As

such, the values Barclays ascribed to these securities for purposes of Barclays' Acquisition

Balance Sheet bear no resemblance to the fair value of these securities as of the Closing Date.

35.    Examples of Barclays' systematic undervaluation of the relevant securities

include the following:

---

[14] The Asset Purchase Agreement provides, in relevant part:  "Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date. (M.1 [Dep. Ex. 1] (APA) § 4.1.)

1.    Barclays' Rejection of Independent, Third-Party Custodial Prices

36.    Movants' Experts will show how Barclays summarily rejects the independent

valuations provided by the two premier tri-party repo custodians in the world, BoNY and JPM,

which settle over $1 trillion in repos every day (Schneider Report ¶¶ 27-28), and whose

independent, real time, valuations of the securities at issue in this case were close to 1% of each

other.  (Zmijewski Decl. ¶ 74, Ex. X-1.)  In addition:

- Barclays' valuation is the outlier among the available valuations.  BoNY and JPM's valuations, comparing CUSIPs they both valued, are only 1.28% apart. (*Id.*)  The valuations independently derived by Movants' Expert are only 1.99% lower than BoNY's and 3.83% lower than JPM's.  (*See id.*)  Barclays' calculations, by contrast, are almost 13% lower than BoNY's and JPM's valuations and over 10% lower than Movants' Experts.  (*See id.*)  On a portfolio of approximately $50 billion of securities, Barclays' undervaluation exceeds $5 billion.

- In certain cases, Barclays' valuations were significantly lower than the values calculated by BoNY, Barclays' own custodial agent in the repo transaction. Barclays valued a complex CLO security – the Pine CLO – at only $428,610,484. On the other hand, BoNY, Barclays' collateral agent, valued it at $914,983,902. (Pfleiderer Report, App. 4, at 116-17.)  Movants' Expert, Mr. Slattery, independently valued this security at $817,297,291 as of the Closing Date. (Slattery Report ¶ 54.)  All but acknowledging that it had improperly undervalued the Pine CLO, Barclays later, internally marked-up the value of this security by $353,000,000 by December 31, 2008 (M.242 [Dep. Ex. 533A].)[15]  However, Barclays never made any corresponding adjustment to its Acquisition Balance Sheet accounting to reflect this mark-up.

- Even as Barclays purported to reject the custodian's prices as unreliable, it selectively used those very prices for purposes of its accounting when it suited Barclays' clear objective to drive down the acquisition value of the securities.  For example, Barclays adopted low BoNY prices to value the Giants Stadium Bonds (Olvany Report ¶¶ 28-29) and certain municipal bonds (Schwaba Report ¶ 21). Barclays has claimed it used the BoNY prices only as a last resort when Barclays felt it did not have enough other information to value the securities.  (Teague Tr. 50:10-17, 65:4-66:23.)  However, the Barclays employee responsible for valuing both the Giants Stadium Bonds and the municipal bonds has admitted he did only

---

[15] Movants' trial exhibits are cited to as M.___ with the corresponding deposition exhibit number in brackets.  Barclays' trial exhibits are cited to as BCI. Ex.___.

a cursory review for information before electing to use the BoNY mark for the Giants Stadium Bonds (Teague Tr. 65:4-66:23), a position Barclays later marked up by $349 million (Olvany Report ¶ 9), and he described the pricing of certain municipal securities as essentially worthless (priced at $0.0001) as "an oversight on our part" (Teague Tr. 166:11-167:23).  Barclays has not made any adjustments to its Acquisition Balance Sheet to correct either the massive post-closing mark-ups on the values it ascribed to certain assets as of the Closing Date or its admitted "oversight[s]."

> 2.      Barclays' Use of Post-Closing Date Valuations

37.    Barclays decided for its own accounting purposes to use prices as of the close of business on September 22, or, in some cases, prices from weeks and even months later.  It did this notwithstanding that (i) the Sale Transaction closed *before* the open of business on September 22 (*see, e.g.*, Dep. Ex. 813B (Ex. 12 to the Tambe Decl.); Dep. Ex. 873 (Ex. 15 to the Tambe Decl.)), and (ii) the Asset Purchase Agreement expressly defined the Closing Date to be as of 12:01 a.m., September 22.  (M.1 [Dep. Ex. 1] (APA) § 4.1.)  Barclays' election to price the securities at later points in time, resulted in the systemic undervaluation of relevant securities when they were transferred to Barclays.  In particular:

- With respect to the portfolio of Equity securities, this strategic decision by Barclays, standing alone, resulted in undervaluing those securities by approximately $300,000,000 as of the Closing Date.  (Zmijewski Decl. ¶ 22; Garvey Report ¶¶ 60-62; Washtell Tr. 97:7-23; Dep. Ex. 820 (Ex. 13 to the Tambe Decl.).)

- Barclays' use of close of business prices from September 22 and later dates improperly sought to shift to Lehman the risk of any downward price movements following the effective Closing Date of 12:01 a.m. on September 22.

- Barclays' use of a December 22, 2008 valuation date for the JPM Inventory it received through its December Settlement with JPM further undervalued the assets Barclays received under the Sale Transaction.  (Zmijewski Report ¶¶ 28-31.)  Barclays claimed it was entitled to $7 billion in cash that JPM had withheld as of the Closing Date.  In December 2008, Barclays compromised with JPM and settled its claim for the $7 billion in cash, agreeing with JPM to take cash and securities that Barclays valued in total at far less than $7 billion.  Applying simple arithmetic, Barclays undervalued its $7 billion claim by approximately $1.75 billion in accounting for it at the compromise amount it agreed to accept from

JPM to settle the dispute, i.e., about $5.25 billion in cash and securities.  (M.105 [Dep. Ex. 377A]; M.119 [Dep. Ex. 205].)  Based on a security valuation analysis conducted by Professor Zmijewski, if the JPM Inventory were appropriately valued as of the Closing Date (the date of the Sale Transaction) rather than December 22 (the date of Barclays' compromise of its claim against JPM), Barclays undervalued the JPM Inventory value by at least $1.657 billion. (Zmijewski Report ¶ 28; *see also* Zmijewski Decl. ¶ 25 n.54.)

     3.    <u>Barclays' Use of Excessive Haircuts and Discounts</u>

38.    Barclays' undervaluation also resulted from Barclays' use of steep liquidity haircuts (or discounts) for certain types of securities that Barclays ordinarily either did not discount at all or did not discount as steeply.  (Landreman Tr. 61:8-17, 154:3-158:8.)  Barclays applied deep haircuts and discounts for certain so-called illiquid securities, as discussed below:

- Barclays applied a 20% liquidity discount to certain adjustable rate municipal securities, which accounts for $38 million of the $150 million undervaluation Mr. Schwaba calculated.  (Schwaba Report ¶ 11; Schwaba Decl. ¶¶ 10-11.)

- Barclays applied a 5% liquidity discount to both U.S. Agency debt securities and covered bonds (foreign bank debt instruments secured by mortgage loans), which accounts for $377 of the $424 million within the $2.83 billion undervaluation Mr. Slattery calculated.  (Slattery Report ¶¶ 18-24; Slattery Decl. ¶6.)

- Barclays applied a 10% liquidity discount to Agency CMOs, which accounts for $181 of the $728 million within the $2.83 billion undervaluation Mr. Slattery calculated.  (Slattery Report ¶¶ 31-32; Slattery Decl. ¶6.)

- Barclays understated the value of cash equities by approximately $251 million by using inflated implied bid-ask spread calculations.  (Zmijewski Report ¶¶ 16-19, Ex. A-1; Zmijewski Decl. ¶ 38, Ex. III-1; Garvey Report ¶¶ 41-42, 48-49; *see also* Dep. Ex. 820.)  The convoluted methodology that Barclays used to derive these deep discounts was unprecedented.  In fact, it substantially departed from Barclays' *own* practices and procedures. (Washtell Tr. 127:15-129:10; *see also* Zmijewski Decl. ¶¶ 27-32.)

- Barclays did not bother even to check if its valuation of the securities obtained from Lehman was consistent with its valuation of similar securities already on Barclays' books.  (Washtell Tr. 32:9-33:8, 38:4-39:17; Teague Tr. 89:21-94:14.)

4.      Barclays' Use of Internal Transactions to Price Securities

39.      Instead of real sales, Barclays used its "sales" of certain acquired securities **to internal desks at Barclays** in late-September to value certain so-called illiquid securities held by its PMTG group for purposes of its acquisition accounting.  (*See, e.g.*, Dep. Ex. 813B; Teague Tr. 150:21-151:23; Slattery Report ¶ 48.)  In effect, Barclays' own traders, in transactions that were not on the open market and not arms-length, artificially set low prices for some of the most complex securities at issue.  Not surprisingly, those traders – whose compensation would be derived from future gains – elected to place unduly low initial values on those securities.  Thus, by setting lower prices at the outset in these internal transactions within Barclays, the traders ensured for themselves the ability to generate a healthy trading profit – and handsome bonuses – when they subsequently sold those same securities at higher prices on the open market.  For example:

- 828 of the 1,110 so-called PMTG and PMTG II securities in the Initial Inventory were marked at sales prices (mostly internal "sales" prices) for sales between September 22 and September 30.  (Slattery Decl. ¶¶ 26-27.)

- Self-interested Barclays traders determined the values at which their respective desks would be willing to "purchase" the securities internally.  (Landreman Tr. 49:23-50:12.)

- $389 million of the $2.38 billion undervaluation Mr. Slattery calculated is directly attributable to Barclays using post-Closing Date sales prices (again, at mostly internal "sales" prices).  (*See* Slattery Decl. ¶¶ 26-27.)

5.      Movants' Valuations Are Consistent with Those of Independent Third-Parties

40.      In contrast to the result-oriented valuations Barclays used to undervalue the securities, the independent valuations conducted by Movants' Experts are consistent with valuations conducted at the time of the Sale Transaction by a number of other independent parties.  Much of the evidence concerning these other valuations is already before the Court.  For

example, in (i) the letter from Jamie Dimon (CEO of JPM, the collateral agent on the Fed Repo) dated October 11, 2008, to Mr. Varley (M.98), (ii) the declaration of Shari Leventhal of the Federal Reserve in support of the December Settlement (M.119 [Dep. Ex. 205]), and (iii) the CUSIP-by-CUSIP schedules in circulation between the parties at the time of the Sale Transaction (*see, e.g.*, M.381 [Dep. Ex. 461B]), the value of the Repo Collateral was valued at approximately $49.9 billion, against $45 billion in cash advanced.  These valuations of the collateral are also consistent with the valuation of Movants' Experts.  (Zmijewski Report ¶ 11 (Opinion 1).)   Using the values ascribed by Barclays' custodial agent, BoNY, and adding in the $7 billion of cash that Barclays expected to receive at closing, the value of the Repo Collateral was as high as $52 billion.  (M.47 [Dep. Ex. 144A]; M.73 [Dep. Ex. 83B]; M.84 [Dep. Ex. 84B]; M.64 [Dep. Ex. 275].)  JPM placed the value of the Fed Repo at $50.6 billion.  (M.119 [Dep. Ex. 205]), Leventhal Declaration, ¶ 9; M.45 [Dep. Ex. 133]; M.147 [Dep. Ex. 666].)[16]

6.    Barclays' Valuation Mirrors the Undisclosed Liquidation Value Analysis Conducted on the Morning of September 19, 2008, and Used to Misinform the Court.

41.    Barclays has submitted no evidence that the market value of the Repo Collateral actually declined by approximately $5 billion overnight from Thursday, September 18 to Friday, September 19, or that there was any such precipitous decline over the weekend from the close of business on Friday, September 19 to the Closing Date, 12:01 a.m. Monday, September 22.  To the contrary, the value of the equity portfolio actually increased as much as $400 million on September 19.  (Dep. Ex. 822 (Ex. 14 to the Tambe Decl.); M.230 [Dep. Ex. 367A] (email from Clackson stating that "we made a load"); 4/30/10 Hr'g Tr. [Clackson] 27:3-29:11.)  With respect

---

[16] Evidence adduced at the evidentiary hearing also shows that Barclays itself was using this $52 billion number around the time of the Sale Transaction.  (5/7/10 Hr'g Tr. [Ricci] 190:20-193:14; M. 200 [Dep. Ex. 204]; M. 362 [Dep. Ex. 382].)

to securitized products, which accounted for the majority of the securities that Barclays deems illiquid, Barclays' senior valuation professional, Richard Landreman, testified that he did not expect the value for such securities to have changed much between Friday, September 19 and Monday, September 22.  (Landreman Dep. Tr. 205:25-206:13.)  In addition, an analysis of the foreign equity indexes over the weekend of September 20 and 21, to cross check the issue, does not support any such decline either.  (Zmijewski Tr. 50:20-52:22.)

42.      Only one "valuation" as of the Closing Date is consistent with the $45.5 billion valuation offered by Barclays through Professor Pfleiderer.  That is the undisclosed *liquidation* valuation, with deep haircuts by asset class, that was conducted by Barclays and Lehman on the morning of September 19, 2008, as a prelude to, and excuse for, the "Friday asset grab."  At the evidentiary hearing, former Lehman employee James Seery, Lehman's then-Managing Director for Fixed Income Loans, admitted that, on the morning of September 19, shortly before the Sale Hearing before this Court, he instructed Lehman traders to assign liquidation values – not market values – broadly by asset class, to the Repo Collateral in order to arrive at a "negotiated price" (not a market price) for the securities.  (5/3/10 Hr'g Tr. [Seery] 142:12-23, 144:4-11, 146:13-24, 178:1-10; M.147 [Dep. Ex. 666] at JS-LB-BANKR 000070.)  A similar process was undertaken at Barclays, resulting in a "haircut summary" spreadsheet that was then forwarded to Lehman. (M.45 [Dep. Ex. 133]; M.45N (native Excel file of M.45); M.45M (metadata to M.45N); 4/29/10 Hr'g Tr. [Clackson] 267:14-25.)  The liquidation values on that spreadsheet were subsequently mis-described to the Court, by a lawyer unaware of the liquidation value exercise, as market values.  The testimony of Barclays' highest executive, John Varley, among others, supports the conclusion that the value of the assets was deliberately undervalued in this way to ensure that Barclays would have a "buffer" and the deal would be "capital accretive" to Barclays.  (6/22/10

Hr'g Tr. [Varley] 102:16-103:17, 106:22-107:10, 110:24-111:1; M.12 [Dep. Ex. 412B] at BCI-EX-00166340.)

43.    The "haircut summary" document authored by Barclays in the early hours of September 19 (M.45 [Dep. Ex. 133]; M.45N; M.45M), and the undisclosed liquidation analysis conducted by the Lehman traders on the morning of September 19 (5/3/10 Hr'g Tr. [Seery] 142:12-23, 144:4-11, 146:13-24, 178:1-10; M.147 [Dep. Ex. 666] at JS-LB-BANKR 000070), are the *only* valuations that are consistent with the valuations that Barclays ascribes to these securities in its Acquisition Balance Sheet and asks Professor Pfleiderer to adopt.  (M.105 [Dep. Ex. 377A]; M.102 [Dep. Ex. 86B]; M.103 [Dep. Ex. 87B]; M.143 [Dep. Ex. 641].)  It is hardly a coincidence that in its post-Sale Transaction Acquisition Balance Sheet Barclays valued the Repo Collateral for accounting purposes at approximately $45.5 billion; that was precisely the value that Barclays' management and traders had, without disclosing it to the Court, negotiated with certain Lehman executives as the maximum price that Barclays was willing to pay for those securities.  (*See*, *e.g.*, 5/3/10 Hr'g Tr. [Seery] 142:12-23, 144:4-11, 146:13-24, 178:1-10; M.147 [Dep. Ex. 666] at JS-LB-BANKR 000070.)  And that agreement was made long before Barclays purportedly undertook a CUSIP-by-CUSIP valuation as part of its financial accounting and reporting process.[17]

44.    Barclays apparently contends that the Court should simply accept Barclays' word that the "fair value" of the Repo Collateral was no more than this reverse-engineered $45.5 billion "valuation" solely because that is the number Barclays submitted to the SEC and it was

---

[17] Of course, this $5 billion reduction is also consistent with the $5 billion "loss" to Lehman's marks negotiated in the "all night" session on Monday, September 15.  (M.7 [Dep. Ex. 20]; *see also* 6/22/10 Hr'g Tr. [Varley] 104:20-105:11, 106:2-14 (admitting that undisclosed "mark-to-market" adjustment to Lehman's book value "was designed to protect [Barclays] against the risk of downside loss").)

audited by PwC.[18]  However, the testimony of Movants' Experts – Professor Zmijewski, Mr.

Garvey, Mr. Schneider, Mr. Olvany, Mr. Slattery, Mr. Schwaba, and Mr. Goldin – refutes this.

Each addresses either the value of assets or the relevant industry customs and practices within his

respective areas of expertise.  Their testimony will assist the Court to analyze and understand the

record evidence, to determine the key facts in issue, to evaluate Professor Pfleiderer's opinions,

and to decide for itself the appropriate valuation, as of the Closing Date, for the securities

transferred to Barclays.

## II.    The Proposed Testimony of Movants' Experts Meets the Admissibility Standards of Fed. R. Evid. 702 and *Daubert*.

45.    The prospective testimony of Movants' Experts satisfy the "fit" requirement of

Rule 702 and the Barclays Motion fails to articulate any other basis for exclusion under Rule 702

or *Daubert*.  None of Barclays' arguments supports a conclusion that Movants' Experts do not

have the "knowledge, skill, experience, training or education" in the relevant subject to qualify

as an expert.  FED. R. EVID. 702.  Moreover, other than conclusory statements, Barclays offers

nothing to support its sweeping contention that the proposed testimony of Movants' Experts' is

not "(1) . . . based upon sufficient facts or data, (2) . . .  the product of reliable principles and

methods, and (3) the witness has [not] applied the principles and methods reliably to the facts of

the case."  *Id.*  Indeed, while Barclays seeks to exclude the prospective testimony of each of

---

[18] In an effort to explain the $5 billion delta between its valuation and that of the custodial agents and Movants' Experts, Barclays argues that "the actual Repo Collateral transferred to Barclays was worth substantially less and included many securities that differed from those pledged to the Fed."  (Barclays Motion ¶ 2.)  This is simply untrue.  The repo custodians (BoNY in the case of the Initial Inventory and JPM in the case of the JPM inventory) valued the Repo Collateral that **overlaps** with that in the Fed Repo at approximately $41.20 billion. (Zmijewski Decl. ¶ 70.)  Movants' Experts have valued these same securities, which overlap with those in the Fed Repo, at $40.09 billion.  (*Id.*)  Barclays have valued those at only $35.97 billion.  (*Id.*)  Thus, Barclays' valuation of the overlapping securities accounts for over $4 billion of the undervaluation.  Moreover, contrary to Barclays' contention, even accepting Barclays' definition of illiquids, the ratio of liquids to illiquids was roughly the same between the collateral in the Fed Repo and the Repo Collateral Barclays actually received.  (*Id.* ¶¶ 71-73, Ex. X-1.) This puts the lie to Barclays' contention that the Repo Collateral is worth $5 billion less because Barclays received "substantially less" and "securities that differed" from what was in the Fed Repo.

Movants' Experts in its entirety, it does not even address all of the opinions of each expert.   Set forth below is a summary of the substantial grounds that support the admissibility of the opinions of each of the Movants' Experts.

### A.    Mark Zmijewski's Proposed Testimony Is Admissible.

46.    Professor Zmijewski, Movants' lead expert, will testify about how, based on the independent valuations of Movants' valuation experts, Barclays' Acquisition Balance Sheet undervalues the securities it received by $5 billion when the "fair value" of the securities is calculated as of the Closing Date, how Barclays' Windfall was up to $13 billion, how Barclays undervalued the Equities portfolio by at least $541 million, and how Barclays undervalued the JPM Inventory by at least $1.657 billion; he will also testify in rebuttal to a number of opinions expressed in the Pfleiderer Report.  (*See generally* Zmijewski Report.)

47.    Barclays does not dispute Professor Zmijewski's qualifications to offer these opinions.  Nor does Barclays present any particular challenges to most of Professor Zmijewski's opinions offered in rebuttal to the Pfleiderer Report.   Barclays contends instead that Professor Zmijewski's entire testimony should be excluded because:  (1) in calculating Barclays' undervaluation and Barclays' Windfall he relied on work done by Movants' three other valuation experts – his colleagues at Navigant, Mr. Slattery, Mr. Olvany, and Mr. Schwaba – as well as the work done by Mr. Goldin, in calculating Barclays' undervaluation and Barclays' Windfall (Barclays Motion ¶¶ 55-57); (2) in valuing the JPM Inventory, he relied on JPM marks, purportedly without testing them, and in turn, relied on the opinion of Mr. Schneider, another one of Movants' Experts, and the BoNY marks (*id.* ¶ 60) (3) his methodology for adjusting the September 17 JPM marks to September 19 in calculating the JPM Inventory, and reliance on GFS data to do so, is purportedly unreliable (*id.* ¶ 62); (4) he used an end-of-day September 19 valuation date to value the JPM Inventory when, Barclays contends, Lehman had an obligation

under the September 18 Repo to deliver securities to Barclays and did not do so until December

(*id.* ¶ 63); and (5) he used an end-of-day September 19 valuation date to value the equities

portfolio, which Barclays contends is not an accurate estimate of September 22 value, even if the

operative time to value the equities is 12:01 a.m. on the next business day, September 22 (*id.*

¶ 64).[19]  None of these arguments is a ground to exclude the testimony of Professor Zmijewski.

While it may want to disagree with his opinions, Barclays has offered nothing to support that

Professor Zmijewski's opinions are not ". . . based upon sufficient facts or data, . . . the product

of reliable principles and methods," or that Professor Zmijewski has done anything but "appl[y]

the principles and methods reliably to the facts of the case."  FED. R. EVID. 702.

    1.    <u>Professor Zmijewski Appropriately Relied on Movants' Other Experts</u>

    48.    Barclays' contention, that reliance by one testifying expert on the opinions of

another testifying expert is a ground for exclusion, simply misstates the law.  *See, e.g.*, *In re*

*1115 Third Ave. Rest. Corp.*, No. 03 Civ. 0586, 2004 WL 1542261, at *2-3 (S.D.N.Y. July 8,

2004) (appeal from Bankruptcy Court) ("Mr. Marchitelli, who was qualified as an expert by the

Bankruptcy Court, was permitted to rely on Mr. Zagor's relevant expert testimony in forming his

own opinion."); *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 491 (S.D.N.Y.

2002) ("The court has admitted the testimony and test results by [the expert witness] Dr. Davies

upon which [the expert witness] Dr. Langer relied, and the court finds that Dr. Langer's reliance

---

[19] Also, in spite of the fact that neither Barclays nor its experts quantify or even discuss a margin of error or confidence interval for any of the valuations they conducted, Barclays criticizes Professor Zmijewski's analyses because he does not quantify the margin of error or confidence interval around his valuation.  (Barclays Motion ¶ 65.)  Barclays' criticism is misguided.  For Professor Zmijewski's valuation of Equity securities, he used actual third party prices and Barclays' value for the Equity securities.  (Zmijewski Decl. ¶ 48, Ex. IV-1.)  Professor Zmijewski's testimony is, therefore, both appropriate and admissible.  Moreover, with respect to the JPM Inventory, like Barclays, Professor Zmijewski provided point estimates for the securities in the JPM Inventory, which is the relevant valuation to measure the Barclays Windfall.  (*Id.* ¶ 59.)  Barclays and Professor Pfleiderer also use point estimates when valuing the JPM Inventory and, like them, Professor Zmijewski did not provide analysis of the margin of error or confidence interval around those values.  (*Id.*)

on that information was reasonable."), *aff'd sub nom. In re Omeprazole Patent Litig.*, 84 Fed.

App'x 76 (Fed. Cir. 2003).

49.     Insofar as Professor Zmijewski relies on the work of his colleagues at Navigant

(Chicago Partners), he does so based on sufficient data and testing.  Professor Zmijewski need

not have reviewed the calculations of Mr. Olvany, Mr. Slattery or Mr. Schwaba or the execution

of their chosen methodologies to use them as an input to calculate the total of Barclays'

undervaluation; it is enough that Professor Zmijewski reviewed the methodologies and inputs of

Movants' other valuation experts to determine that they would be a reliable indicator of value.

(Zmijewski Decl. ¶¶ 60-61; Zmijewski Tr. 31:18-32:24; *see also id*. 34:25-38:4.)  Moreover,

each of these experts has submitted a separate expert report and provided testimony.  Barclays

has had the opportunity to examine every one of these experts at depositions and can do so at

trial as well.  *See, e.g.*, *In re 1115 Third Ave. Rest. Corp.*, 2004 WL 1542261, at *3 (admitting

expert who relied upon other expert who "had been deposed, and, at trial, . . . was cross-

examined at some length").

50.     Similarly, in calculating Barclays' Windfall of up to $13 billion, to the extent

Professor Zmijewski relies on Mr. Slattery, Mr. Olvany, and Mr. Schwaba, he did so with

sufficient foundation and thus meets the standard of Rule 702.  The same is true insofar as he

relies on Mr. Goldin's calculation of $1.85 billion for the amount of the Court-approved

transaction in calculating the Barclays Windfall.  (Barclays Motion ¶¶ 55-57.)  As Professor

Zmijewski explained at his deposition, Mr. Goldin's opinion ultimately will be replaced with the

amount the Court determines was disclosed and approved:  "any difference between Mr.

Goldin's opinion and what the judge, the Court finally determines as what was the approved

transaction would flow into an adjustment to my minus 1.85.  Everything else remains the same."

(Zmijewski Tr. 210:4-9.)  Moreover, the record reflects what the Court was told, so there is nothing "unreliable" here.

       2.      <u>Professor Zmijewski Appropriately Relied on the JPM Values</u>

51.     Contrary to Barclays' contention, Professor Zmijewski did not simply accept the JPM prices on September 17 as an accurate measure of market value to calculate the value of the JPM Inventory as of the Closing Date.  (Barclays Motion ¶ 60).  He relied on Mr. Schneider, who opined on the role of a tri-party repo agent and the skills required to perform such a function, including the valuation of non-traditional and so-called "illiquid" collateral commonly acceptable in tri-party repo arrangements both in private and central bank markets, and which had in fact become a substantial part of the market since at least 2005.  (Zmijewski Decl. ¶¶ 52-53.)  Barclays' additional contention that the September 17 JPM marks were not "reliable indicators of realizable value" based on two emails dated on or after October 31, 2008 (Barclays Motion ¶ 61), mischaracterizes the emails and ignores that estimates of market value as of November 3, 2008 were not known or knowable at 12:01 a.m. on September 22, 2008.  They are not a basis to deem the September 17 JPM marks as unreliable. (Zmijewski Decl. ¶ 54.)

52.     Professor Zmijewski was permitted to rely on the Schneider Report.  *See, e.g.*, *In re 1115 Third Ave. Rest. Corp.*, 2004 WL 1542261, at *2-3; *Astra Aktiebolag*, 222 F. Supp. 2d at 491.

       3.      <u>Professor Zmijewski's Calculation of September 19 End-of-Day Prices for the JPM Inventory Was Reliable and Appropriate</u>

53.     Similarly unpersuasive is Barclays' attempt to exclude Professor Zmijewski's testimony on the ground that his reliance on the GFS system, to show changes in the JPM inventory securities between September 17 and 19, renders his methodology unreliable.  (Barclays Motion ¶ 62.)

54.  Neither Barclays' motion papers nor Professor Pfleiderer provide any data or analysis to support the contention that the GFS data was unreliable for the limited and narrow purposes for which Professor Zmijewski used it.  Instead, Barclays makes only unsubstantiated claims that the GFS system failed to capture the full extent of the decline in the market during the week of September 15.  (*Id.* ¶¶ 62-63.)  Moreover, Professor Zmijewski tested his methodology, using independent third-party prices to cross check the GFS data, and the differences between the two methods are immaterial – less than 1%.  (Zmijewski Decl. ¶ 56, Ex. V-1.)

### 4.  Professor Zmijewski's Selection of the Valuation Date for JPM Inventory Was Appropriate

55.  Barclays contends that Professor Zmijewski has no basis for ignoring the date of receipt of the JPM Inventory on December 22, and using September 19 close of business as a proxy for the close of the transaction at 12:01 a.m. on September 22.  (Barclays Motion ¶ 63.)  Here, Barclays ignores Professor Zmijewski's testimony, in which he articulated the basis for this position at several points:

> But the issue isn't about what they received in December and what the value of what they received in December was, in some other date, the 19th of September.  What is at issue here is what is the claim as of 12:01 a.m., on September 22nd, what is the claim, what is the value of the claim.  Because that is the value of what they received at the closing date.  And that is what I am attempting to value.

(Zmijewski Tr. 187:7-15.)

> [T]here was some dispute with JPMorgan, and JPMorgan didn't give all those assets to Barclays, for reasons I don't know, but that was an issue between – as I understand, an issue between JPMorgan and Barclays…

(*Id.* 97:23-98:3.)

> Receipt of the assets isn't relevant.  Ownership, transfer of – I am
> not characterizing this as legal talk.  Transfer of the ownership of
> the assets and the risk of ownership, risk and rewards of ownership
> of those assets at that point in time, that's when you would
> measure the value.

(*Id*. 100:2-7.)

56.    Barclays may well have a difference of opinion with Professor Zmijewski as to the appropriate date for valuation of the JPM inventory.   But, as is evident from the above testimony, it is entirely incorrect and improper for Barclays to contend that Professor Zmijewski has *no basis* for his opinion.

5.    Professor Zmijewski's Selection of a Valuation Date for the Equities Portfolio Was Appropriate

57.    Barclays also takes issue with the use of values as of the close of business on September 19, 2008 as a proxy for values at 12:01 a.m. on the next business day, September 22, 2008.  (Barclays Motion ¶ 63.)  However, the Equities portfolio that Professor Zmijewski valued is the best example of how Barclays' strategic decision to value the transaction at end-of-day September 22 or later is not reflective of the value of the transaction at the Closing Date.   On the Equities portfolio alone, this decision resulted in a $290 million understatement of the assets valued by Barclays at Closing.  (Zmijewski Decl. ¶ 22; *see also* Washtell Tr. 97:7-23; Dep. Ex. 820.)

58.    Simply because Barclays disagrees with Professor Zmijewski and uses September 22, 2008 close of day to value the Equities, December 22, 2008 close of day values for the JPM Inventory, and values between September 22 close and September 30 for everything else (*see*, *e.g.*, Dep. Ex. 813B), does not mean the use of a September 19 close of day price is not grounded in sufficient facts or data or that Professor Zmijewski did not use reliable principles and methods such that exclusion is warranted.  In fact, Barclays itself originally used a September 19

valuation date for purposes of its Acquisition Balance Sheet and switched to a close of business

on September 22 as late as December 2008, months after the transaction.  (Dep. Ex. 873.)

59.    As Professor Zmijewski explained at his deposition, the change in value from

close of business on Friday, September 19 through 12:01 a.m. on Monday, September 22 cannot

be measured with precision because it is unobservable:

> We don't have an observed market value as of 12:01 a.m. on the
> 22nd.  It doesn't exist.  Therefore, you have measure it using
> something else.  And as long as that measurement is reasonable
> and unbiased, then it's appropriated to use for 12:01 a.m.  We will
> never know what is equal on that date.  Equal doesn't exist because
> the actual doesn't exist.  So you don't know.  There is never a time
> to judge.  So it has to be a reasonable and unbiased measure for
> that price.

(Zmijewski Tr. 124: 3-17.)  However, putting to rest Barclays' unsupported speculation on this

topic, Professor Zmijewski also reviewed the movement in foreign exchanges over the weekend

and concluded that there were no material changes in those markets over the weekend that would

provide a basis for any valuation adjustments from the close of business on September 19 to

12:01 a.m. on September 22nd.  (*Id*. 50:20-52:22.)

### B.    John P. Garvey's Proposed Testimony Is Admissible.

60.    Barclays complains that Mr. Garvey did not conduct a valuation.  This argument

is a strawman.  Mr. Garvey was not asked to and has not offered any opinions as to (i) the value

of any particular asset, (ii) any errors made by Barclays or PwC in the accounting that underlies

Barclays' Acquisition Balance Sheet, or (iii) whether Barclays' Acquisition Balance Sheet is

"materially" understated.  (Garvey Decl. ¶¶ 7, 12-13.)  Mr. Garvey did not offer such opinions in

his Report, and he did not offer such opinions in his deposition.  Mr. Garvey will testify about

certain accounting decisions and judgments made by Barclays, and apparently accepted by PwC,

that resulted in an Acquisition Balance Sheet that does not represent the fair market value of the securities transferred to Barclays as of the Closing Date.  (*Id.* ¶¶ 9, 15.)

61.    Mr. Garvey's opinions supplement and need to be considered in conjunction with the expert opinions proffered by Movants' valuation experts.  In particular, Mr. Garvey's opinions support the conclusion that Barclays' inconsistent and subjective use of different valuation methods and *ad hoc* valuation adjustments to mark securities from mid prices to "bid" or "exit" prices (as well as Barclays' decision to use various different valuation dates) resulted in valuations that understate the fair market value of the securities transferred to Barclays as of the Closing Date.  (Garvey Report ¶¶ 7 (Opinion 2, 2(a)-2(c)), 16-70.)

62.    Barclays does not challenge, because it cannot, Mr. Garvey's qualifications to render opinions on the accounting methodologies at issue.  Barclays argues instead that it disagrees with Mr. Garvey's testimony, asserting it should be excluded because (i) it is illogical and internally inconsistent (Barclays Motion ¶¶ 11-17), (ii) contradicts undisputed facts (*id.* ¶¶ 18-21), and (iii) fails to consider the facts and circumstances relevant to his testimony (*id.* ¶¶ 22-25).  Once again, this confuses the standards for admissibility with Barclays' right to disagree on the merits.  None of Barclays' arguments – which are nothing more than a difference of opinion about Mr. Garvey's conclusions – warrants the exclusion of Mr. Garvey's expert testimony.

63.    As an accounting expert, Mr. Garvey's testimony will assist the Court in understanding (a) the "industry context" surrounding the valuation of the securities transferred to Barclays, and (b) why Barclays' Acquisition Balance Sheet is not representative of the value of those securities as of the relevant valuation date – 12:01 a.m. on September 22, 2008, the Closing Date.  *See*, *e.g.*, *Highland Capital*, 551 F. Supp. 2d at 185 (noting that "without industry context,

the jury may have no understanding of the importance, or lack of importance, of such documentation"). Mr. Garvey's testimony should be admitted because it will aid the Court by summarizing complex accounting documents, which documents are "studded with complex terminology." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 691 F. Supp. 2d 448, 462 (S.D.N.Y. 2010). In any event, to the extent that the Court lends any credence to any of Barclays' alleged deficiencies in Mr. Garvey's analysis, the Court should consider those issues in determining the relative weight to be afforded his opinion, not its admissibility. *See*, *e.g.*, *Highland Capital*, 551 F. Supp. 2d at 187.

    1. <u>Mr. Garvey's Testimony Is Logical And Internally Consistent</u>

  64. Contrary to Barclays' contention, Mr. Garvey's opinion is neither "illogical" nor "internally inconsistent" simply because he has not also rendered an opinion on the size or "materiality" of Barclays' understatement. (Barclays Motion ¶¶ 12-13.) Barclays pretends that, because Mr. Garvey did not also render an opinion about materiality, it is somehow fatal to the opinions he did offer. (*Id.*) This is absurd. There is no aspect, element or cause of action set forth in the Rule 60 Motions or the Adversary Complaints that requires Movants to demonstrate that Barclays filed materially false and misleading financial statements with its regulators and the SEC. All that is relevant here is whether the values that Barclays has chosen to ascribe to the securities it acquired in the Sale Transaction accurately reflect the fair market value of those securities at the relevant point in time – 12:01 a.m. on September 22, 2008, the Closing Date.

  65. Barclays also quarrels with Mr. Garvey's opinions concerning accounting rules relating to the pricing of securities and whether and to what extent it is appropriate to adjust valuation marks to reflect "exit" prices of securities. (Barclays Motion ¶ 14.) These objections

are hardly the stuff of *Daubert* motions.  They are merely points and counterpoints concerning complex valuation and accounting concepts upon which Mr. Garvey is fully qualified to opine.[20]

2.    Mr. Garvey's Testimony Is Consistent with the Undisputed Facts

66.    To support its argument that Mr. Garvey's testimony should be excluded because it contradicts undisputed facts, Barclays misrepresents Mr. Garvey's opinions and testimony about the valuation date used in Barclays' Acquisition Balance Sheet.  (Barclays Motion ¶¶ 11-25.)  Mr. Garvey's testimony is consistent with the fact that, under the express terms of the APA, the Closing Date of the transaction was 12:01 a.m. on September 22, 2008.  (M. 1 [Dep. Ex. 1] (APA) § 4.1.)  Thus, Mr. Garvey's opinions concerning the relevant date for valuation purposes focus on the Sale Transaction and the effective date for the transfer of all title, rights and ownership in the relevant securities because, by agreement of the parties, that occurred on September 22, 2008 at 12:01 a.m.  The mere fact that Barclays later elected to settle its dispute with JPM by choosing to receive certain securities in December 2008, instead of the $7 billion in cash Barclays believed was in its account at the time of Closing, cannot alter the relevant time for the valuation of the Sale Transaction.[21]

67.    Barclays' argument for exclusion rests not on Mr. Garvey's qualifications, the opinions in his report, or what he cites in his report in support of his opinion.  Barclays ignores these, and instead seizes upon an apparent error in Mr. Garvey's testimony at his deposition,

---

[20] In contrast, Barclays' proffered expert, Professor Pfleiderer is not an accountant and admits he is not an expert on accounting issues.  (Pfleiderer Tr. 89:13-22, 90:18-91:9.)  Indeed, Barclays has not designated a single expert witness who can justify Barclays' accounting on the Acquisition Balance Sheet.

[21] Barclays' President admitted at the evidentiary hearing that Lehman actually *transferred* the cash to Barclays and, unbeknownst to Lehman, JPM removed the cash from Barclays' account.  (6/21/10 Hr'g Tr. [Diamond] 201:4-224:7.)

which he promptly corrected during the course of the same deposition, about whether the

Closing Date was September 19 or September 22.[22]

68.     Based on the accounting rules for business combinations, his experience, and the

record, Mr. Garvey testified that the best proxy for 12:01 a.m. (New York time) on September 22

is to use a "measurement date" of end-of-day September 19 – the closest date prior to 12:01 a.m.

on Monday, September 22, 2008 for which market data is available. (Garvey Tr. 62:9-19, 65:14-

25; Garvey Decl. ¶¶ 35-44.) This is what Movants' valuation experts—Professor Zmijewski,

Mr. Slattery, Mr. Olvany and Mr. Schwaba—have done. (Zmijewski Report ¶ 11 n.11; Slattery

Report ¶¶ 17, 28, 43, 49, 50, 54, 66; Olvany Report ¶¶ 27, 30, 33, 34 n.40, 36; Schwaba Report

at 3 n.2, ¶¶ 8, 13, 15, 16.) Movants' Valuation Experts have used the most recent available

public data (*i.e.*, market close on Friday, September 19, 2008) and evaluated any changes from

end-of-day September 19th to open of market on September 22, 2008. (*See id.*)

69.     Mr. Garvey's testimony is not "in conflict with the factual evidence" and certainly

cannot be characterized as "little more than speculation . . . in conflict with the uncontradicted

evidence in the case," as was the situation in the only case Barclays cites in support of its

argument. *See Davidov v. Louisville Ladder Group, LLC*, No. 02 Civ. 6652(LLS), 2005 WL

486734, at *2 (S.D.N.Y. Mar. 1, 2005), *aff'd*, 169 Fed. App'x 661 (2d Cir. Mar. 10, 2006).

        3.     Mr. Garvey Considered All Relevant Facts and Testimony

70.     Barclays contends Mr. Garvey did not consider all the relevant facts and

testimony. (Barclays Motion ¶¶ 22-25.) There is no colorable argument to exclude Mr.

---

[22] Contrary to Barclays' contention, it was proper for Mr. Garvey to consult with counsel where he believed that the record being created by Barclays' counsel was potentially confusing, misleading and flatly incorrect. Mr. Garvey made clear that his knowledge of the Closing Date was based on the APA. Indeed, he directed Barclays' counsel to footnote 24 of his expert report that cites the relevant provision of the APA. (*See* Garvey Tr. 16:8-17:18.) Barclays selectively omits any mention of that testimony in its motion. (*See id.*)

Garvey's testimony on this basis.  Barclays, again, is trying to convert Mr. Garvey's opinion into a valuation opinion.  It was inappropriate from an accounting perspective for Barclays to use prices obtained in non-arms-length, internal to Barclays, transactions in which Barclays sold certain of the acquired securities to different trading desks within Barclays.  (Garvey Report ¶¶ 23-26, 67-70.)  *Ex post* information cannot be used to value those securities as of the Closing Date and, even if it were otherwise permissible, the fact the prices are not independent, arms-length prices, renders them inappropriate for fair market valuation purposes.  In fact, Barclays' expert Professor Pfleiderer conceded that Barclays' internal sales prices may not be indicative of fair market value (Pfleiderer Tr. 232:17-233:7, 233:17-234:3), although Barclays systematically relied on such prices for purposes of its Acquisition Balance Sheet accounting, and Prof. Pfleiderer did nothing to confirm if those prices were proper (*Id*. 233:8-16).

71.     The case Barclays relies upon, therefore, is clearly distinguishable.  It involves a situation where "instead of factoring into his analysis [] real world facts and events, [the excluded expert] systematically adopt[ed] possibly speculative assumptions and predictions" to project future earnings.  *See, e.g.*, *Point Prods. A.G. v. Sony Music Entm't, Inc*., No. 93 Civ. 4001(NRB), 2004 U.S. Dist. LEXIS 2676, at *23 (S.D.N.Y. Feb. 20, 2004).  That is clearly not the case here and there is no basis to exclude Mr. Garvey's opinions.

### C.    <u>John Olvany's Proposed Testimony Is Admissible.</u>

72.     Mr. Olvany will testify about his valuation of 22 bonds at the Closing Date, including four Giants Stadium Bonds, corporate bonds, and covered bonds, which Mr. Olvany opines Barclays undervalued by at least $381 million.  (Olvany Report ¶¶ 7-8.)

73.     So indiscriminate is Barclays' approach to this motion, that it moved to exclude Mr. Olvany's testimony in its entirety even before it had taken Mr. Olvany's deposition.   In the motion, Barclays argues in conclusory fashion that Mr. Olvany's valuation of the Giants Stadium

Bonds at par (a price of $100) was unreliable.  (Barclays Motion ¶¶ 44-45.)  In support, Barclays argues Mr. Olvany's opinion is based on speculative valuation assumptions and is unsupported by facts or logic because "the markets for such securities were frozen with few if any willing buyers."  (*Id.* ¶ 6.)

74.    Barclays' argument, in essence, is that Mr. Olvany's valuation must be wrong because it does not match BoNY's valuation.  In reality, Barclays makes this assertion to hide a flaw in its own case.  With regard to the Giants Stadium Bonds, Barclays simply adopted the BoNY valuations, notwithstanding Barclays' general rejection of BoNY prices.  Sean Teague, the individual in Barclays' Independent Valuation Group with primary responsibility for valuing the Giants Stadium Bonds, attempted to explain this when he testified that he "had not performed a large amount of auction rate analysis in the past because we as a firm did not have an auction rate desk like Lehman had."  (Teague Tr. 65:21-66:6; Olvany Decl. ¶ 9.)  According to Mr. Teague, it was only because of the absence of any experience or information about the specific market that Barclays selected BoNY's valuation of the Giants Stadium Bonds, even though Barclays did not know "any of the specifics of any of the BoNY valuations."  (Teague Tr. 67:8-20; Olvany Decl. ¶ 9.)  Mr. Teague did not contend that such information was unavailable; he admitted that Barclays performed only a "cursory analysis" before adopting the BoNY valuations in this instance.  (Teague Tr. 65:4-66:23; Olvany Decl. ¶ 9.)

75.    Unlike Barclays, Mr. Olvany conducted an in-depth analysis of the Giants Stadium Bonds and, contrary to Barclays' contention, Mr. Olvany provided support for his valuation in Appendix III of his report as well as the supporting work papers.  (Olvany Report, App. III, ¶¶ 1-4; Olvany Decl. ¶¶ 11-12 (*citing* LEH-NAVIGANT 026166 and LEH-NAVIGANT 026167).)  Mr. Olvany's methodology was consistent with market practice

commonly used by investment professionals at the time.  (Olvany Decl. ¶ 12.)  Moreover, unlike

Barclays' approach, Mr. Olvany took into account the likelihood that the Giants would default on

principal and interest payments (which he determined was highly unlikely), the general level of

interest rates (which could entail a coupon payment of up to 22%) and other pricing factors when

reaching a conclusion on the valuation of the Giants Stadium Bonds and the likelihood they

would be redeemed at par.  (*Id*. ¶¶ 12-13.)  All of the pricing inputs Mr. Olvany employed were

consistent with market conditions generally and specifically pertaining to the Giants Stadium

Bonds on September 19, 2008.  (*Id*. ¶ 12.)  Indeed, Barclays' own actions support Mr. Olvany's

work; Barclays *itself* revised its initial valuation of those bonds, and before the end of the

quarter, had written up those bonds to par.  (*Id*. ¶ 17.)  Although it steadfastly refuses to

acknowledge it now, Barclays' revised valuation concedes that the bonds were undervalued at

acquisition and were in fact worth par on the Closing Date.  (*Id*.)

        76.    Finally, contrary to Barclays' contention, Mr. Olvany and Mr. Schwaba do not

contradict each other.  (Barclays Motion ¶ 45.)  Mr. Olvany testified that the valuation of auction

rate securities requires an analysis of the individual characteristics and fail provisions of each

specific security.  (Olvany Tr. 113:4-116:6; Olvany Decl. ¶ 21.)  Consistent with Mr. Olvany's

testimony, Mr. Schwaba testified at his deposition:  "They could trade below par, but not

necessarily."  (Schwaba Tr. 23:15-19.)  To defend its across the board (and later revised)

undervaluation for all auction rate securities at the Closing Date, Barclays relies on the false

proposition that auction rate securities that had been subject to failed auctions might have traded

below par, regardless of the individual characteristics of the particular bonds at issue.  (Barclays

Motion ¶¶ 6, 34-39.)  Auction rate securities that have traded through failed auctions do not

necessarily trade at a discount to par; Barclays' argument neglects to specifically consider the facts and circumstances of these specific bonds.  (Olvany Decl. ¶ 21.)

### D.   Mark Slattery's Proposed Testimony Is Admissible.

77.     Mr. Slattery will testify about Barclays' $2.83 billion undervaluation of U.S. Treasury and Agency debt securities, Agency and Non-Agency RMBS, CLOs, CDOs, and CMBS, including Barclays' application of an across-the-board 5% liquidity discount (also referred to as a haircut or adjustment) for U.S. Agency securities, its application of an across-the-board 10% liquidity adjustments for Agency CMOs, and its $388 million undervaluation of the Pine CLO.  (Slattery Report ¶¶ 3-6, 13, 15, 19, 38, 54.)

78.     Barclays contends Mr. Slattery's opinions are unreliable in their entirety. (Barclays Motion ¶ 26.)  Yet, in the motion, Barclays purports to set forth disputes only with Mr. Slattery's liquidity adjustments for U.S. Treasury and Agency securities and Agency RMBS (*Id.* ¶¶ 26-32), which account for only $558 million, or 23.5% of the overall $2.38 billion undervaluation that Mr. Slattery sets forth in his expert report.  (*See* Slattery Decl. ¶ 6.)  Barclays simply ignores the rest of the calculation, except to contend it should not come into evidence. Significantly, although it seeks to bar Mr. Slattery *in toto*, Barclays does not offer any particular challenge to Mr. Slattery's other opinions, such as his valuation of the Pine CLO, which accounts for approximately $388 million of his $2.83 billion calculation.  (Slattery Report ¶¶ 54-62.)

79.     Barclays also attempts to discredit Mr. Slattery by suggesting he had no significant personal involvement in those markets in September 2008.  (Barclays Motion ¶ 27.) That is irrelevant.  Mr. Slattery has deep experience in the valuation of the types of securities he has independently valued in his expert report and is well qualified to conduct such valuations. (Slattery Decl. ¶¶ 8-11.)

80.     Similarly, Barclays contends that Mr. Slattery's technique to adjust from mid-to-bid prices in distressed conditions is novel, generally untested, has never been peer-reviewed and validated, and has not been "empirically tested" and thus its "error rate" is unknown.  (Barclays Motion ¶¶ 27-28.) This simply has no basis in fact.  Mr. Slattery's application of bid-ask spread data to adjust prices for liquidity risk is not a new or novel concept.  It is, in fact, a well-established and widely-known methodology that is the subject of numerous published peer reviewed research and practitioner white papers.  (Slattery Decl. ¶¶ 15-21.)  Moreover, Mr. Slattery's "stressed" liquidity spreads were conservative relative to actual market conditions in September 2008.  (*Id.* ¶ 23.)  Indeed, according to a report issued by Fannie Mae in August/September 2009, the widest bid-ask spread applied for its debt during the height of the financial crisis in 2008 was only 0.04% whereas Mr. Slattery conservatively applied bid-ask spreads ranging from 0.14% to 1.22%, depending on the maturity date of the bond.  (*Id.* ¶ 23.)

81.     In contrast, there are no academic or practitioner studies that support the use of deep discounts and haircuts of the magnitude applied by Barclays.  (*Id.* ¶ 21.)  Given the "flight to quality" in September 2008, Barclays' 5% liquidity discount on U.S. Agency bonds, which were "highly liquid" during that time period, was excessive.  (*Id.* ¶ 24.)  Moreover, Barclays failed to take into account maturity dates in calculating its bid-offer spreads.  As a consequence, Barclays assigned a generic 5% liquidity discount to all U.S. Agency debt securities, resulting in implied yields for certain securities as high as 643%.  (Slattery Report ¶¶ 18-24; Slattery Decl. ¶ 24.)  Barclays' application of a 10% liquidity discount on Agency CMOs is similarly excessive, and the product of a flawed methodology.  (Slattery Decl. ¶¶ 28-29.)

82.     Barclays' further contention that Mr. Slattery's opinions rely on estimates rather than empirical data also has no merit.  (Barclays Motion ¶ 30.)  Mr. Slattery's framework was

based on empirical data available for September 19, 2008, including prices for Agency RMBS

obtained from Citigroup, Credit Suisse, Lehman Brothers and Goldman Sachs.  (Slattery Decl.

¶ 25.)  Mr. Slattery adapted this data using accepted methodology and a robust modeling

framework that included Polypath, Intex, the ADCo Model, published ABX price data, and

prices obtained from independent third parties.  (*Id.* ¶ 25.)  Barclays itself used many of these

same models.  (Landreman Tr. 145:10-146:22; Slattery Decl. ¶ 5.)

83.    Finally, Barclays contends Mr. Slattery had no factual basis for opining that

Barclays used fire-sale prices.  (Barclays Motion ¶ 33.)  Not only did Mr. Slattery have sufficient

basis to question whether Barclays' use of sale prices post-Closing Date reflected fair value as of

12:01 a.m., September 22, but following submission of the Slattery Report, testimony at the

evidentiary hearing has demonstrated that Barclays internal sales prices appear to bear a strong

resemblance to the liquidity haircut analyses conducted by Barclays and Lehman on the morning

of September 19.  (Slattery Report ¶ 48; Slattery Decl. ¶ 26-27; 5/3/10 Hr'g Tr. [Seery] 170:4-

174:24; Teague Tr. 146:1-25.)  That testimony supports the conclusion that Barclays' internal

sales prices reflect "fire sale" or "liquidation" values, rather than fair market values.  (Slattery

Decl. ¶ 26.)

**E.**    **Joseph Schwaba's Proposed Testimony Is Admissible.**

84.    Mr. Schwaba will testify about Barclays' $150 million undervaluation of twenty-

six municipal securities transferred to Barclays in the Sale Transaction.  (Schwaba Report ¶¶ 2,

9-15; Schwaba Decl. ¶ 10.)[23]  Barclays' effort to exclude Mr. Schwaba's testimony is focused

almost exclusively on auction rate securities (Barclays Motion ¶¶ 34-39), even though auction

---

[23] Mr. Schwaba valued twenty-six municipal bonds.  (Schwaba Report ¶ 9 n. 3)  Nineteen are municipal
bonds that had a dollar value difference greater than $1,000,000 between the absolute value derived by BoNY and
that of Barclays.  (*Id.*)  Seven represent an analogous grouping in municipal bonds that are all priced at one tenth of
a cent.  (*Id.*)

rate securities are only a subset of the municipal securities Mr. Schwaba independently valued.
(Schwaba Decl. ¶ 9.)  Barclays contends that Mr. Schwaba's methodology for valuing the
auction rate securities at par, or close to par, was flawed in that he failed to take into account the
fact that he was valuing auction rate securities that had failed at auction.  (Barclays Motion ¶ 34.)

85.    Mr. Schwaba is qualified and his methodology is reliable.  Indeed, conceding the
validity of Mr. Schwaba's analysis, in recent deposition testimony, the individual who led the
valuation of municipal securities in Barclays' independent valuation group described Barclays'
valuation of certain municipal securities at .0001 as "an oversight on our part."  (Teague Tr.
166:11-167:9.)

86.    As a threshold matter, Barclays' entire argument for excluding Mr. Schwaba is
based on the flawed premise that twenty out of twenty-six of the municipal securities Mr.
Schwaba valued were auction rate securities.  (Barclays Motion ¶ 34.)  In fact, twenty-one out of
the twenty-six securities were adjustable rate securities.  (Schwaba Decl. ¶ 9-10.)  Of those, only
nine were auction rate securities (with 7 unique CUSIPs).  (*Id*. ¶ 10.)[24]  Of the remaining five of
the municipal securities, three were zero coupon bonds and two were fixed rate bonds.
(Schwaba Report ¶ 9; Schwaba Decl. ¶ 9.)

87.    That Barclays persists in its effort to obfuscate the record by equating all
adjustable rate securities with auction rate securities is consistent with the equally invalid
terminology its counsel employed in Mr. Schwaba's deposition, resulting in a distorted and
confused record.  Of course, now Barclays seeks to exploit that confusion it created with

---

[24] Mr. Schwaba priced the nine auction rate securities at or near par (*i.e.*, 100 cents on the dollar) in
accordance with his methodology, as defined in Appendix III of the Schwaba Report.  (Schwaba Decl. ¶ 10.)  He
calculated a mean price from a set of proxy bonds to arrive at an estimated market price for each adjustable bond.
Comparable securities were selected on the basis of credit rating, issuer location and maturity.  (*Id.*)  Barclays
incorrectly priced these same nine securities at 80 cents on the dollar.  (*Id.*)  These nine securities account for
$25,520,000 of the $150 million undervaluation that Mr. Schwaba calculated.  (*Id.*)

misleading questions as an excuse to exclude Mr. Schwaba's opinions in their entirety. Mr.

Schwaba understood Barclay's counsel to equate auction rate securities with adjustable rate

securities, when he asked Mr. Schwaba to adopt a definition for "auction rate securities" that

equated to "adjustable rate securities":

> Q. So can we agree on a definition of "Auction Rate Securities"
> as adjustable rate securities whose adjustable rate is determined
> through an auction process?
>
> A. I would accept that.

(Schwaba Tr. 31:3-7.)

> Q. And when you use the term "ARS," do
> you mean adjustable rate or do you mean auction
> rate?
>
> A. We use adjustable rate, incorporating
> auction rate as well.

(*Id.* 52:25-53:5.)

88.    Moving beyond the obvious miscommunication during the deposition, and

Barclays' tactical use of it here, it is evident that Mr. Schwaba's analysis was thorough, proper

and reliable. In constructing his methodology for valuing adjustable rate securities (including

auction rate securities) and the use of modeling for fixed, floating, and zero coupon securities,

Mr. Schwaba used carefully and appropriately selected comparable market-traded securities.

(Schwaba Decl. ¶¶ 10, 12.) For adjustable rate securities, comparable securities were selected on

the basis of credit rating, issuer location and maturity. (*Id.*) The results of this analysis were

entirely consistent with the Mr. Schwaba's conclusion that the adjustable rate securities at issue

were worth approximately par. There were some comparables selected that traded slightly above

or below par. (*Id.* ¶ 28.)

89.     From the universe of adjustable rate securities that traded on September 19, 2008, and using Bloomberg reported auction history, Mr. Schwaba has identified 93 out of 157 auction rate securities that traded on September 19, 2008 and experienced a failed auction on or before September 19, 2008.  (*Id.* ¶ 19.)  All of these securities that had experienced a failed auction previously traded at par for September 19, 2008.  (*Id.*)  This data is consistent with the opinion expressed in Mr. Schwaba's report and flatly contradicts Barclays' apparent contention that the mere fact of a failed auction should have required the relevant securities to be marked down in value.  Quite simply, this data further rebuts Barclays' *ad hoc* discounting approach to auction rate securities and buttresses Mr. Schwaba's analysis, which is premised not simply on whether or not prior auctions had failed but also on a variety of other factors with careful consideration of each bond's individual characteristics.

90.     Barclays also complains that Mr. Schwaba used models to derive valuations and that Mr. Schwaba allegedly did not personally examine and was not familiar with how the models worked.  (Barclays Motion ¶¶ 34, 40.)  That complaint is readily refuted.  In Mr. Schwaba's thirty plus years of experience in the trading, pricing, valuation, and risk management of fixed income instruments, including senior management positions at Prudential Bache Securities, Continental Bank, Federal Home Loan Bank – Pittsburgh, and as an independent consultant, he has personally developed his own pricing models, used investment bank proprietary models, as well as many other industry standard modeling products including, for example, the models of QRM.  (Schwaba Decl. ¶¶ 4, 23.)  QRM is an industry standard fixed income pricing model service provider that employs models similar to those used here and provides them to many of the world's largest commercial and investment banks.  (*Id.* ¶ 23.)  Mr.

Schwaba also used fixed income pricing models as a professional within the Federal Home Loan

Bank System.  (*Id.*)

91.    Mr. Schwaba is amply familiar with fixed income pricing models and has the

expertise necessary to understand the results of the modeling efforts undertaken by his staff.  (*Id.*

¶ 24.)  He worked with staff at his direction to employ valuation models to supplement his

analysis of the municipal bonds at issue.  (*Id.*)  While he instructed the staff as to particular

inputs, they actually ran the models to produce the pricing output.  (*Id.*)  This is similar to how he

operated with modeling staff within the investment banks and at Federal Home Loan Bank of

Pittsburgh.  (*Id.*)  Most fixed income pricing models have similar characteristics in that they

employ discounted cash flow calculations and incorporate calculations of the probability of

credit default and recovery rates.  (*Id.*)  The models he used share these common characteristics

and are recognized as industry standard models.  (*Id.*)[25]

92.    Barclays has not demonstrated even a "minor flaw" in Mr. Schwaba's opinion, let

alone "considerably more than a 'minor flaw'" in order to warrant exclusion of his testimony as

inadmissible under Rule 702, as was the situation in the case Barclays cites.  *Lippe v. Bairnco

Corp.*, 99 Fed. App'x 274, 278 (2d Cir. 2004) ("[A] minor flaw in an expert's reasoning or a

slight modification of an otherwise reliable method will not render an expert's opinion *per se*

inadmissible . . . .") (citation omitted).

**F.    John Schneider's Proposed Testimony Is Admissible.**

93.    Mr. Schneider will testify about whether it was reasonable for Professor Pfleiderer

to dismiss as unreliable the prices used by BoNY for valuing the positions comprising the Repo

---

[25] Barclays also cites Mr. Schwaba's inability to recognize Dep. Ex. 700 in his deposition to support its
contention that he is not familiar with the models used to derive the valuations in his report.  The fundamental flaw
with Barclays' argument is that Dep. Ex. 700 had nothing whatsoever to do with Mr. Schwaba's analysis.  (Schwaba
Decl. ¶ 25.)  It is hardly surprising then that he was unable to recognize that particular exhibit at his deposition.

Collateral and the prices used by JPM for valuing the Fed Repo collateral that was also included

in the Repo Collateral. (Schneider Report ¶¶ 11-12, 57; *see also* Pfleiderer Report ¶ 46.) In

moving to exclude Mr. Schneider's testimony, Barclays mischaracterizes the scope of Mr.

Schneider's analysis and the specific topics he was asked to analyze. (Barclays Motion ¶¶ 41-

43.) Mr. Schneider's testimony is admissible for purposes of helping the Court understand the

central role played by custodial agents like BoNY and JPM in the fast-moving, high volume

context of short-term and overnight repo lending at issue in this case.

94.     Barclays challenges the admissibility of Mr. Schneider's testimony under Rule

702, arguing Mr. Schneider's opinions are unreliable because he has made no effort to fit his

opinions to the facts of this case. (Barclays Motion ¶¶ 41-43.) Specifically, Barclays maintains

Mr. Schneider cannot validate the BoNY and JPM marks without having examined in any way

the specific valuations at issue. (*Id*. ¶ 43.) As with Mr. Garvey, Barclays attempts first to turn

Mr. Schneider into a valuation expert and then argue he cannot be one. But that Mr. Schneider

does not purport to be a valuation expert in no way diminishes the relevance, reliability, fit and

admissibility of his opinions concerning a different issue: practices in the repo industry and the

role of custodial agents in that industry.

95.     Mr. Schneider is well qualified to offer such opinions; he has substantial

experience in the role of repo collateral agents in tri-party repurchase agreements. (Schneider

Report ¶¶ 5-7, App. II; Schneider Tr. 7:3-13:2.) And expert testimony about the role of repo

collateral agents in tri-party repurchase agreements is both appropriate and admissible. *Highland

Capital*, 551 F. Supp. 2d at 185-86 (expert's opinion regarding broker-dealers' recordkeeping

and record making practices was reliable because it was "grounded in industry rules, practices,

and guidelines, as well as [expert's] experience"); *In re Adler, Coleman Clearing Corp*., 247

B.R. 51, 129 (Bankr. S.D.N.Y. 1999) (expert testified as to duties of clearing agents and as to whether any NASD or NYSE rules required clearing agents to conduct due diligence concerning introducing brokers for which they cleared), *aff'd in part*, 263 B.R. 406 (S.D.N.Y. 2001).

### G.    **Harrison J. Goldin's Proposed Testimony Is Admissible**.

96.    Mr. Goldin's testimony should be allowed.  It is to rebut the report of Barclays' expert, and is helpful to the Court.  In his expert report, Mr. Goldin compares the representations that were made to the Court at the time of the Sale Hearing to Barclays' Acquisition Balance Sheet.  (*See generally* Goldin Report.)  As disclosed to the Court, the transaction would have resulted in a net loss to Barclays of $1.85 billion.  (*Id.* at 7-9.)  In contrast, the transaction that Barclays actually consummated resulted in a first day gain, according to Barclays' own accounting, of $4.17 billion.  (*Id.*)[26]  In examining the more than $6 billion difference between the transaction as described to the Court and as reported in Barclays' acquisition accounting, Mr. Goldin ultimately concludes that Barclays "materially overstated the assets and values it was entitled to receive pursuant to the Sale Order."  (*Id.* at 6-9.)

97.    Barclays does not dispute Mr. Goldin's expertise in "managing, investigating and advising in connection with failed financial services companies and the disposition of their assets," but argues that his testimony should be excluded because it is "not the result of expert analysis."  (Barclays Motion ¶ 46.)  This argument fails to consider, among other things, the fact that Mr. Goldin's testimony is offered specifically to rebut the testimony of Barclays' expert Professor Paul Pfleiderer, who opines on precisely the same subject matter:  Barclays' accounting of its gain on the transaction.  (*See generally* Pfleiderer Report; *see also id.* ¶ 5.)

---

[26] In fact, Barclays' gain is at least $5 billion more when the financial assets are ascribed fair values as of the Closing Date, as demonstrated in the reports of Movants' valuation experts.

Because Mr. Goldin's experience is helpful to the Court in comparing the representations made at the Sale Hearing to Barclays' reported day-one gain, and because Mr. Goldin's opinion rebuts a key opinion offered by Barclays' own expert that Barclays' day one gain was "not unusual, unexpected, or unreasonable," Barclays' motion as to Mr. Goldin should be denied.

98.    Barclays does not and cannot point to any serious flaw in Mr. Goldin's reasoning or methodology that would render his testimony inadmissible.  In arguing that Mr. Goldin's testimony is improper, Barclays focuses exclusively on his analysis of the representations made to the Court, while ignoring Mr. Goldin's analysis of Barclays' Acquisition Balance Sheet.  Mr. Goldin analyzed how each line item on the Acquisition Balance Sheet corresponded to the categories of assets and liabilities disclosed to the Court.  (*See* Goldin Report at 7, 18-35.)  This analysis is inarguably helpful to the Court in answering one of the principal questions before it in this litigation:  how the disclosures to this Court at the Sale Hearing compare to what Barclays actually received in the sale, as reflected in Barclays' own day-one accounting.

99.    Mr. Goldin's testimony will also rebut the conclusion of Barclays' expert, Professor Pfleiderer, that the first-day gain Barclays announced on the sale was "not unusual, unexpected, or unreasonable."  (Goldin Report at 3, 9; Pfleiderer Report ¶¶ 5, 121; *see also id.* ¶ 118 ("Barclays' reported gain is reasonable, unsurprising, and fair to the Sellers").)  Indeed, Mr. Goldin's calculation of Barclays' gain on the transaction is based on Professor Pfleiderer's adjustments to the values contained in Barclays' Acquisition Balance Sheet.[27]  Mr. Goldin's report directly challenges Professor Pfleiderer's assertion that the information disclosed to the Court at the Sale Hearing and the information contained in Barclays' Acquisition Balance Sheet

---

[27] Goldin Report at 9; Goldin Tr. 63:5-64:3 ("[M]y opinion is focused on the delta between what Barclays claims it received and is entitled to and the liabilities it says it assumed, particularly as adjusted by Professor Pfleiderer on the Acquisition Balance Sheet."); *id.* at 211:5-12 ("[I]t was the Acquisition Balance Sheet as adjusted by Mr. Pfleiderer . . . that formed the basis for my opinion.").

are consistent, and that it therefore should have been clear to the Court that, although no one actually said so in any filing or presentation to the Court, Barclays expected to make a first-day gain of $4.2 billion.  (Goldin Report at 3, 5-6, 9; Goldin Tr. 99:19–100:18 ("[My report] utilizes for analytic purposes the approach taken by Professor Pfleiderer and compares his conclusion as to the delta between assets and liabilities at the closing . . . to what the court was told . . . .").)

100.    During the first part of the evidentiary hearing that is now underway, Barclays' former general counsel Jonathan Hughes claimed that it was possible to "deduce" from information available at the Sale Hearing that Barclays expected to make a first day gain on the sale.  In response to a question regarding whether "anyone informed the Court in any way, shape or form that the sales [sic] transaction required a first-day gain for Barclays," Mr. Hughes contended that there were "pieces of information" available to the Court "from which one might have been able to deduce" that Barclays expected to record a first-day gain on the sale.  (4/30/10 Hr'g Tr. [Hughes] 126:8-21.)  Mr. Goldin's report analyzes those "pieces of information" that were before the Court at the time of the Sale Hearing, compares those to Barclays' after the fact accounting of the sale, and offers an opinion rebutting the testimony of Mr. Hughes and Professor Pfleiderer that the expectation of a first-day gain was deducible from the information available to the Court.[28]  As this testimony can only aid the Court in understanding the inconsistencies between the representations made at the Sale Hearing and the accounting of the

---

[28] Barclays incorrectly states that Mr. Goldin focused on "those assets and liabilities specifically mentioned in the transcript of the Sale Hearing held on September 19, 2008, while completely ignoring others in the papers submitted to the Court."  (Barclays Motion ¶ 47.)  Mr. Goldin's report devotes several pages to analyzing the disclosures made in the Asset Purchase Agreement and the First Amendment to the Asset Purchase Agreement.  (Goldin Report at 11-16.)  The list of materials upon which Mr. Goldin relied in writing his report also contains several additional documents, including the parties' pleadings in this litigation and the Expert Report of Professor Paul Pfleiderer.  (*Id.* at Ex. 2.)

sale that Barclays later conducted, and in critically assessing the opinion of Barclays' own

expert, it is permissible expert testimony and should be allowed.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court deny the

Motion in Limine of Barclays Capital Inc. for an Order Excluding John P. Garvey, Mark E.

Slattery, Joseph Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and Professor

Mark E. Zmijewski.

Dated: New York, New York
      July 16, 2010

Respectfully submitted,


\_\_\_\_/s/ Robert W. Gaffey_____
JONES DAY
Robert W. Gaffey
Jayant W. Tambe
Kelly A. Carrero
222 East 41st Street
New York, New York  10017
(212) 326-3939 (telephone)
rwgaffey@jonesday.com

*Attorneys for Debtors*
*and Debtors in Possession*


\_\_/s/ William R. Maguire_____
HUGHES HUBBARD & REED LLP
William R. Maguire
Seth D. Rothman
Neil J. Oxford
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
maguire@hugheshubbard.com

*Attorneys for James W. Giddens,*
* as Trustee for the SIPA Liquidation*
*of Lehman Brothers Inc.*


\_\_\_/s/ James C. Tecce_____
QUINN EMANUEL URQUHART &
SULLIVAN LLP
Susheel Kirpalani
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
212 849-7000 (telephone)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

*Attorneys for Official Committee*
*of Unsecured Creditors*